**Insert District**
**Address**

**Date**

**Applicant Name**
**Applicant**
**Address City,**
**State, Zip Email**
**Address**

File No.: **XX, XX** County

**Dear Mr./Ms. /Mrs. Last Name**:

On **XX**, we received your request for verification of exemption to perform the following activities:

**XX [perform/construct/remove] (please describe the proposed activities fully include:**
**total square footage, acreage, or other info as appropriate to identify the exempt**
**activity) in XX [waterbody, classification, address, section, township, range, county]**.

**Your project qualifies for exemption from State 404 Program permitting requirements.**
However, this letter does not relieve you from the responsibility of obtaining other federal, state, or local authorizations that may be required for the activity.

If you change the project from what you submitted, the authorization(s) granted may no longer be valid at the time of commencement of the project. Please contact us prior to beginning your project if you wish to make any changes.

If you have any questions regarding this matter, please contact **XX [insert name of processor]** at the letterhead address or at **XX[insert phone number and email address of processor].**

**State 404 Program Review – Verified**

Based on the information submitted, the Department has verified that the **XX** activity as proposed is exempt **XX**, or **XX** the activities as proposed are exempt **XX**. Exemption from 404 permitting requirements is granted by 40 C.F.R. Part 232 via subsection 62-331.020(1), F.A.C. and Part IV of Chapter 373, F.S.

This exemption verification is based on the information you provided the Department and the statutes and rules in effect when the information was submitted. This verification may not be valid if site conditions materially change, the project design is modified, or the statutes or rules governing the exempt activity are amended. In the event you need to re-verify the exempt status for the activity, a new request will be required. Any substantial modifications to the project design should be submitted to the Department for review, as changes may result in a permit being required.

**Best Management Practices(BMPs)**

The Best Management Practices (BMPS) that will be used to satisfy the exemption provisions in 62-331.020(1), F.A.C. for the construction and maintenance of farm roads, forest roads, and temporary roads for moving mining equipment are attached to this verification.

### Additional Information

Please retain this letter. The activities may be inspected by authorized state personnel in the future to ensure compliance with appropriate statutes and administrative codes. If the activities are not in compliance, you may be subject to penalties under Chapter 373, F.S.

## NOTICE OF RIGHTS

This action is final and effective on the date filed with the Clerk of the Department unless a petition for an administrative hearing is timely filed under Sections 120.569 and 120.57, F.S., before the deadline for filing a petition. On the filing of a timely and sufficient petition, this action will not be final and effective until further order of the Department Because the administrative hearing process is designed to formulate final agency action, the subsequent order may modify or take a different position than this action.

Petition for Administrative Hearing
A person whose substantial interests are affected by the Department's action may petition for an administrative proceeding (hearing) under Sections 120.569 and 120.57, F.S. Pursuant to Rules 28-106.201 and 28-106.301, F.A.C., a petition for an administrative hearing must contain the following information:
> (a) The name and address of each agency affected and each agency's file or identification number, if known;
> (b) The name, address, any e-mail address, any facsimile number, and telephone number of the petitioner, if the petitioner is not represented by an attorney or a qualified representative; the name, address, and telephone number of the petitioner's representative, if any, which shall be the address for service purposes during the course of the proceeding; and an explanation of how the petitioner's substantial interests will be affected by the agency determination;
> (c) A statement of when and how the petitioner received notice of the agency decision;
> (d) A statement of all disputed issues of material fact. If there are none, the petition must so indicate;
> (e) A concise statement of the ultimate facts alleged, including the specific facts that the petitioner contends warrant reversal or modification of the agency's proposed action;
> (f) A statement of the specific rules or statutes that the petitioner contends require reversal or modification of the agency's proposed action, including an explanation of how the alleged facts relate to the specific rules or statutes; and
> (g) A statement of the relief sought by the petitioner, stating precisely the action that the petitioner wishes the agency to take with respect to the agency's proposed action.

The petition must be filed (received by the Clerk) in the Office of General Counsel of the Department at 3900 Commonwealth Boulevard, Mail Station 35, Tallahassee, Florida 32399-3000, or via electronic correspondence at Agency_Clerk@dep.state.fl.us. Also, a copy of the petition shall be mailed to the applicant at the address indicated above at the time of filing.

File Name:
FDEP File No.:
Page 3 of 20

Time Period for Filing a Petition
In accordance with Rule 62-110.106(3), F.A.C., petitions for an administrative hearing by the applicant and persons entitled to written notice under Section 120.60(3), F.S., must be filed within 21 days of receipt of this written notice. Petitions filed by any persons other than the applicant, and other than those entitled to written notice under Section 120.60(3), F.S., must be filed within 21 days of publication of the notice or within 21 days of receipt of the written notice, whichever occurs first.  You cannot justifiably rely on the finality of this decision unless notice of this decision and the right of substantially affected persons to challenge this decision has been duly published or otherwise provided to all persons substantially affected by the decision. While you are not required to publish notice of this action, you may elect to do so pursuant Rule 62-110.106(10)(a), F.A.C.

The failure to file a petition within the appropriate time period shall constitute a waiver of that person's right to request an administrative determination (hearing) under Sections 120.569 and 120.57, F.S., or to intervene in this proceeding and participate as a party to it. Any subsequent intervention (in a proceeding initiated by another party) will be only at the discretion of the presiding officer upon the filing of a motion in compliance with Rule 28-106.205, F.A.C. If you do not publish notice of this action, this waiver will not apply to persons who have not received written notice of this action.

Extension of Time
Under Rule 62-110.106(4), F.A.C., a person whose substantial interests are affected by the Department's action may also request an extension of time to file a petition for an administrative hearing. The Department may, for good cause shown, grant the request for an extension of time. Requests for extension of time must be filed with the Office of General Counsel of the Department at 3900 Commonwealth Boulevard, Mail Station 35, Tallahassee, Florida 32399-3000, or via electronic correspondence at Agency_Clerk@dep.state.fl.us, before the deadline for filing a petition for an administrative hearing. A timely request for extension of time shall toll the running of the time period for filing a petition until the request is acted upon.

Mediation
Mediation is not available in this proceeding.

FLAWAC Review
The applicant, or any party within the meaning of Section 373.114(1)(a) or 373.4275, F.S., may also seek appellate review of this order before the Land and Water Adjudicatory Commission under Section 373.114(1) or 373.4275, F.S. Requests for review before the Land and Water Adjudicatory Commission must be filed with the Secretary of the Commission and served on the

Department within 20 days from the date when this order is filed with the Clerk of the Department.

Judicial Review
Once this decision becomes final, any party to this action has the right to seek judicial review pursuant to Section 120.68, F.S., by filing a Notice of Appeal pursuant to Florida Rules of Appellate Procedure 9.110 and 9.190 with the Clerk of the Department in the Office of General Counsel (Station #35, 3900 Commonwealth Boulevard, Tallahassee, Florida 32399-3000) and by filing a copy of the Notice of Appeal accompanied by the applicable filing fees with the appropriate district court of appeal. The notice must be filed within 30 days from the date this action is filed with the Clerk of the Department.

**EXECUTION AND CLERKING**

Executed in **[Insert City],** Florida.

STATE OF FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION

_____

**[Name of Signatory]**
**[Title of Signatory]**

Enclosures:

       **XX [Insert applicable Rules or Statutes]**
       **XX** Project drawings
       **XX** Best Management Practices

**CERTIFICATE OF SERVICE**

The undersigned duly designated deputy clerk hereby certifies that this document and all attachments were sent on the filing date below to the following listed persons:

Name, company, email address
**Agent/Contractor/Consultant**
**(FDEP employees can be listed here OR in the email routing template to mail centralization.)**

**FILING AND ACKNOWLEDGMENT**

FILED, on this date, pursuant to Section 120.52, F. S., with the designated Department Clerk, receipt of which is hereby acknowledged.

_____   _____

**Clerk**        **Date**

**XX If 40 CFR 232.3(c)(1) XX** Normal farming, silviculture and ranching activities such as plowing, seeding, cultivating, minor drainage, and harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices, as defined in General Condition 3 of this verification.

> **(A)** To fall under this exemption, the exempt activities must be part of an established (*i.e.*, ongoing) farming, silviculture, or ranching operation, and must be in accordance with definitions in General Condition 3. Activities on areas lying fallow as part of a conventional rotational cycle are part of an established operation.

> **(B)** Activities which bring an area into farming, silviculture or ranching use are not part of an established operation. An operation ceases to be established when the area in which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operation. If an activity takes place outside the waters of the United States, or if it does not involve a discharge, it does not need a State 404 Program permit whether or not it was part of an established farming, silviculture or ranching operation.

**XX IF 40 CFR 232.3(c)(2) XX** Maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, bridge abutments or approaches, and transportation structures. Maintenance does not include any modification that changes the character, scope, or size of the original fill design. Emergency reconstruction must occur within a reasonable period of time after damage occurs in order to qualify for this exemption.

**XX IF 40CFR232.3(c)(3) XX** Construction or maintenance of farm or stock ponds or irrigation ditches or the maintenance (but not construction) of drainage ditches. Discharge associated with siphons, pumps, headgates, wingwalls, weirs, diversion structures, and such other facilities as are appurtenant and functionally related to irrigation ditches are included in this exemption.

**XX IF 40 CFR232.3(c)(4 )XX** Construction of temporary sedimentation basins on a construction site which does not include placement of fill material into waters of the United States. The term "construction site" refers to any site involving the erection of buildings, roads, and other discrete structures and the installation of support facilities necessary for construction and utilization of such structures. The term also includes any other land areas which involve land-disturbing excavation activities, including quarrying or other mining activities, where an increase in the runoff of sediment is controlled through the use of temporary sedimentation basins.

**XX IF 40 CFR 232.3(c)(5) XX** Any activity with respect to which a State has an approved program under section 208(b)(4) of the Clean Water Act which meets the requirements of section 208(b)(4)(B) and (C).

**XX IF 40 CFR 232.3(c)(6) XX** Construction or maintenance of farm roads, forest roads, or temporary roads for moving mining equipment, where such roads are constructed and maintained in accordance with best management practices (BMPs) to assure that flow and circulation patterns and chemical and biological characteristics of waters of the United States are not impaired, that the reach of the waters of the United States is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized. The BMPs which must be applied to satisfy this provision include the following baseline provisions:

**(i)** Permanent roads (for farming or forestry activities), temporary access roads (for mining, forestry, or farm purposes) and skid trails (for logging) in waters of the United States shall be held to the minimum feasible number, width, and total length consistent with the purpose of specific farming, silvicultural or mining operations, and local topographic and climatic conditions;

**(ii)** All roads, temporary or permanent, shall be located sufficiently far from streams or other water bodies (except for portions of such roads which must cross water bodies) to minimize discharges of dredged or fill material into waters of the United States;

**(iii)** The road fill shall be bridged, culverted, or otherwise designed to prevent the restriction of expected flood flows;

**(iv)** The fill shall be properly stabilized and maintained to prevent erosion during and following construction;

**(v)** Discharges of dredged or fill material into waters of the United States to construct a road fill shall be made in a manner that minimizes the encroachment of trucks, tractors, bulldozers, or other heavy equipment within the waters of the United States (including adjacent wetlands) that lie outside the lateral boundaries of the fill itself;

**(vi)** In designing, constructing, and maintaining roads, vegetative disturbance in the waters of the United States shall be kept to a minimum;

**(vii)** The design, construction and maintenance of the road crossing shall not disrupt the migration or other movement of those species of aquatic life inhabiting the water body;

**(viii)** Borrow material shall be taken from upland sources whenever feasible;

**(ix)** The discharge shall not take, or jeopardize the continued existence of, a threatened or endangered species as defined under the Endangered Species Act, or adversely modify or destroy the critical habitat of such species;

**(x)** Discharges into breeding and nesting areas for migratory waterfowl, spawning areas, and wetlands shall be avoided if practical alternatives exist;

**(xi)** The discharge shall not be located in the proximity of a public water supply intake;

**(xii)** The discharge shall not occur in areas of concentrated shellfish production;

**(xiii)** The discharge shall not occur in a component of the National Wild and Scenic River System;

**(xiv)** The discharge of material shall consist of suitable material free from toxic pollutants in toxic amounts; and

**(xv)** All temporary fills shall be removed in their entirety and the area restored to its original elevation.

File Name:
FDEP File No.:
Page 7 of 20

**XX IF 40 CFR 232.3(e)) XX** Federal projects which qualify under the criteria contained in section 404(r) of the Clean Water Act are exempt from section 404 permit requirements, but may be subject to other State or Federal requirements.

**Insert approved project drawings**

**File
Name:**
**File No:**

## INSERT DISTRICT LETTERHEAD

### DATE

**Name Street**
**City/State/Zip**
**Email address**

File No. **XX, XX** County

Dear **Mr./Ms./Mrs. XX**:

On **XX**, we received your notice of intent to use a General Permit (GP), pursuant to Rule 62-331.**XXX**, Florida Administrative Code (F.A.C.), to perform **XX[insert project description, within XX insert waterbody]**, a Class **XX** Florida waterbody. The project is located at **address**, **city**, Section **XX**, Township **XX** South, Range **XX** East, **XX** County.

Your intent to use a general permit has been reviewed by Department staff for State 404 Program authorization. The authority for review and the outcomes of the reviews are listed below. Please read each section carefully.

**XX [if meets] Your project qualifies for authorization**. However, this letter does not relieve you from the responsibility of obtaining other federal, state, or local authorizations that may be required for the activity.

### State 404 Program Review – Approved

Based on the forms, drawings, and documents **submitted/revised** with your notice, it appears that the project meets the requirements for the General Permit under Rule 62-331.**XXX**, F.A.C. Any activities performed under a general permit are subject to general conditions required in Rule62-331.201, F.A.C. (attached), the conditions of Rule 62-331.**XXX**, F.A.C., (attached), and any specific conditions, below. Any deviations from these conditions may subject the permittee to enforcement action and possible penalties.

Please be advised that the construction phase of the GP must be completed by 202**X**.  State 404 Program permits cannot be extended or renewed.

### Specific Conditions
**(Add specific conditions, numbered sequentially. Specific conditions may include, but are not limited to: mitigation requirements, listed species conditions provided by FWC/USFWS, historical and cultural resources conditions provided by SHPO/THPO/Tribes, and requirements for use of best management practices.)**

Authority for review – Part IV of Chapter 373, Florida Statutes (F.S.), and Title 62, F.A.C.

**File
Name:
File No:
Additional Information**

Please retain this general permit. The activities may be inspected by authorized state personnel in the future to ensure compliance with appropriate statutes and administrative codes. If the activities are not in compliance, you may be subject to penalties under Chapter 373, F.S., and Chapter 18-14, F.A.C.

## NOTICE OF RIGHTS

This action is final and effective on the date filed with the Clerk of the Department unless a petition for an administrative hearing is timely filed under Sections 120.569 and 120.57, F.S., before the deadline for filing a petition. On the filing of a timely and sufficient petition, this action will not be final and effective until further order of the Department. Because the administrative hearing process is designed to formulate final agency action, the subsequent order may modify or take a different position than this action.

<u>Petition for Administrative Hearing</u>
A person whose substantial interests are affected by the Department's action may petition for an administrative proceeding (hearing) under Sections 120.569 and 120.57, F.S. Pursuant to Rules 28-106.201 and 28-106.301, F.A.C., a petition for an administrative hearing must contain the following information:

(a) The name and address of each agency affected and each agency's file or identification number, if known;

(b) The name, address, any e-mail address, any facsimile number, and telephone number of the petitioner, if the petitioner is not represented by an attorney or a qualified representative; the name, address, and telephone number of the petitioner's representative, if any, which shall be the address for service purposes during the course of the proceeding; and an explanation of how the petitioner's substantial interests will be affected by the agency determination;

(c) A statement of when and how the petitioner received notice of the agency decision;

(d) A statement of all disputed issues of material fact. If there are none, the petition must so indicate;

(e) A concise statement of the ultimate facts alleged, including the specific facts that the petitioner contends warrant reversal or modification of the agency's proposed action;

(f) A statement of the specific rules or statutes that the petitioner contends require reversal or modification of the agency's proposed action, including an explanation of how the alleged facts relate to the specific rules or statutes; and

(g) A statement of the relief sought by the petitioner, stating precisely the action that the petitioner wishes the agency to take with respect to the agency's proposed action.

The petition must be filed (received by the Clerk) in the Office of General Counsel of the Department at 3900 Commonwealth Boulevard, Mail Station 35, Tallahassee, Florida 32399-3000, or via electronic correspondence at Agency_Clerk@dep.state.fl.us. Also, a copy of the petition shall be mailed to the applicant at the address indicated above at the time of filing.

**File
Name:**
**File No:**

Time Period for Filing a Petition
In accordance with Rule 62-110.106(3), F.A.C., petitions for an administrative hearing by the applicant and persons entitled to written notice under Section 120.60(3), F.S., must be filed within 21 days of receipt of this written notice. Petitions filed by any persons other than the applicant, and other than those entitled to written notice under Section 120.60(3), F.S., must be filed within 21 days of publication of the notice or within 21 days of receipt of the written notice, whichever occurs first.  You cannot justifiably rely on the finality of this decision unless notice of this decision and the right of substantially affected persons to challenge this decision has been duly published or otherwise provided to all persons substantially affected by the decision. While you are not required to publish notice of this action, you may elect to do so pursuant Rule 62-110.106(10)(a).

The failure to file a petition within the appropriate time period shall constitute a waiver of that person's right to request an administrative determination (hearing) under Sections 120.569 and 120.57, F.S., or to intervene in this proceeding and participate as a party to it. Any subsequent intervention (in a proceeding initiated by another party) will be only at the discretion of the presiding officer upon the filing of a motion in compliance with Rule 28-106.205, F.A.C. If you do not publish notice of this action, this waiver will not apply to persons who have not received written notice of this action.

Extension of Time
Under Rule 62-110.106(4), F.A.C., a person whose substantial interests are affected by the Department's action may also request an extension of time to file a petition for an administrative hearing. The Department may, for good cause shown, grant the request for an extension of time. Requests for extension of time must be filed with the Office of General Counsel of the Department at 3900 Commonwealth Boulevard, Mail Station 35, Tallahassee, Florida 32399-3000, or via electronic correspondence at Agency_Clerk@dep.state.fl.us, before the deadline for filing a petition for an administrative hearing. A timely request for extension of time shall toll the running of the time period for filing a petition until the request is acted upon.

Mediation
Mediation is not available in this proceeding.

FLAWAC Review
The applicant, or any party within the meaning of Section 373.114(1)(a) or 373.4275, F.S., may also seek appellate review of this order before the Land and Water Adjudicatory Commission under Section 373.114(1) or 373.4275, F.S. Requests for review before the Land and Water Adjudicatory Commission must be filed with the Secretary of the Commission and served on the Department within 20 days from the date when this order is filed with the Clerk of the Department.

**File
Name:**
**File No:**

<u>Judicial Review</u>

Once this decision becomes final, any party to this action has the right to seek judicial review pursuant to Section 120.68, F.S., by filing a Notice of Appeal pursuant to Florida Rules of Appellate Procedure 9.110 and 9.190 with the Clerk of the Department in the Office of General Counsel (Station #35, 3900 Commonwealth Boulevard, Tallahassee, Florida 32399-3000) and by filing a copy of the Notice of Appeal accompanied by the applicable filing fees with the appropriate district court of appeal. The notice must be filed within 30 days from the date this action is filed with the Clerk of the Department.

EXECUTION AND CLERKING

Executed in **[Insert City],** Florida.

STATE OF FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION

_____

**[Name of Signatory]**
**[Title of Signatory]**

Enclosures:

62-331.**XXX,**
General Conditions for All General Permits, Ch. 62-331.201, F.A.C.
**XX** Project drawings
Certification of Compliance with State 404 Program General Permit, form 62-331.200(1)

**CERTIFICATE OF SERVICE**
The undersigned duly designated deputy clerk hereby certifies that this document and all attachments were sent on the filing date below to the following listed persons:

Name, company, email address

**XX AGENT**
**(FDEP employees can be listed here OR in the email routing template to mail centralization.)**


**FILING AND ACKNOWLEDGMENT**

FILED, on this date, pursuant to Section 120.52, F. S., with the designated Department Clerk, receipt of which is hereby acknowledged.

_____        _____
   **Clerk**                      **Date**

**File Name:**

**File No:**

**X[Insert applicable 62-331.XXX GP rule language]**

**File Name:**

**File No:**

## Conditions for General Permits

(1) General permits shall be subject to the conditions in subsections (2) and (3), below, and the general conditions for all general permits in Rule 62-330.405, F.A.C., except subsections 62-330.405(7) and (10), F.A.C. The Agency may revise the general conditions in Rule 62-330.405, F.A.C. to include references to applicable rules under this Chapter, as necessary.

(2) When a project requires submittal of a notice of intent to use a general permit, the Agency shall impose specific conditions as necessary to assure that the activities will be conducted in compliance with this Chapter, and in a manner which minimizes adverse impacts upon the physical, chemical, and biological integrity of wetlands or other surface waters, such as mitigation, monitoring, reporting, or recordkeeping requirements and protection measures for listed species or historical resources.

(3) In addition, general permits under this Chapter are subject to the following conditions:

(a) Aquatic Life Movements. No activity may substantially disrupt the necessary life cycle movements of those species of aquatic life indigenous to the waterbody, including those species that normally migrate through the area, unless the activity's primary purpose is to impound water. All permanent and temporary crossings of waterbodies shall be suitably culverted, bridged, or otherwise designed and constructed to maintain low flows to sustain the movement of those aquatic species. If a bottomless culvert cannot be used, then the crossing shall be designed and constructed to minimize adverse effects to aquatic life movements.

(b) Spawning Areas. Activities in spawning areas during spawning seasons must be avoided to the maximum extent practicable. Activities that result in the physical destruction (e.g., through excavation, fill, or downstream smothering by substantial turbidity) of an important spawning area are not authorized.

(c) Migratory Bird Breeding Areas. Activities in state-assumed waters that serve as breeding areas for migratory birds must be avoided to the maximum extent practicable.

(d) Shellfish Beds. No activity may occur in areas of concentrated shellfish populations, unless the activity is directly related to a shellfish harvesting activity authorized by general permits in Rule 62-331.211 or 62-331.244, F.A.C., or is a shellfish seeding or habitat restoration activity authorized by the general permit in Rule 62-331.225, F.A.C.

(e) Suitable Material. No activity may use unsuitable material (e.g., trash, debris, car bodies, asphalt, etc.). Material used for construction or fill must be free from toxic pollutants in toxic amounts as listed in section 307 of the CWA, which is incorporated by reference in subparagraph 62-331.053(3)(a)3., F.A.C., or state law.

(f) Water Supply Intakes. No activity may occur within 1000 feet of a public water supply intake, except where the activity is for the repair or improvement of public water supply intake structures or adjacent bank stabilization.

(g) Fills Within 100-year Floodplains. The activity shall comply with applicable FEMA-approved state or local floodplain management requirements.

(h) Single and Complete Project. The activity must be a single and complete project. The same general permit cannot be used more than once for the same single and complete project unless otherwise stated within the general permit. (See 404 Handbook, section 3.2.1).

(i) Wild and Scenic Rivers. No general permit activity may occur in a component of the National Wild and Scenic Rivers System, or in a river officially designated by Congress as a study river for possible inclusion in the System while the river is in an official study status, unless the appropriate federal agency with direct management responsibility for such river has determined in writing that the proposed activity will not adversely affect the Wild and Scenic River designation or study status.

(j) Tribal Rights. No general permit activity may cause more than minimal adverse effects on tribal rights (including treaty rights, settlement rights, or rights reserved under state or federal law), protected tribal resources (including cultural or burial resources off reservation), tribal waters, or to tribal lands.

**File
Name:
File No:**

(k) Listed species. No activity is authorized under any general permit which is likely to directly or indirectly jeopardize the continued existence of an endangered or threatened species or a species proposed for such designation, or which will directly or indirectly destroy or adversely modify the critical habitat of such species. No activity is authorized under any general permit which may affect a listed species or critical habitat, unless the Agency has consulted with, or been provided technical assistance by the Florida Fish & Wildlife Conservation Commission, the U.S. Fish & Wildlife Service, and the National Marine Fisheries Service under their respective authorities and appropriate measures to address the effects of the proposed activity have been implemented or are required as a specific condition to the general permit.

(l) Migratory Birds and Bald and Golden Eagles. The permittee is responsible for ensuring their action complies with the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 – 712 (2018), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12068), and the Bald and Golden Eagle Protection Act,  16 U.S.C. §§ 668 – 668(d) (2018), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12069). The permittee is responsible for contacting the appropriate local office of the U.S. Fish and Wildlife Service to determine applicable measures to reduce impacts to migratory birds or eagles, including whether incidental take permits are necessary and available under the Migratory Bird Treaty Act or Bald and Golden Eagle Protection Act for a particular activity.

(m) Historic Properties. In cases where the Agency determines, based on information from SHPO, that the activity may have the potential to cause effects to properties listed, or eligible for listing, in the National Register of Historic Places, the activity is not authorized until a determination of "no effect" or "no adverse effect" is provided by SHPO.

(n) Manatees. In waters that are accessible to manatees, the permittee shall follow the "Standard Manatee Conditions for In-Water Work (2011)", incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12070).

(o) Sea turtles, smalltooth sawfish, Gulf sturgeon, or shortnose sturgeon. In waters that are accessible to these species, the permittee shall follow the "Sea Turtle and Smalltooth Sawfish Construction Conditions" (March 23, 2006), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12071).

(p) Use of Multiple General Permits. The use of more than one general permit under this Chapter for a single and complete project is prohibited, except when specified within a specific general permit, or when the acreage loss of state-assumed waters authorized by the general permits does not exceed the acreage limit of the general permit with the highest specified acreage limit.

(q) Transfer of General Permit Verifications. If the permittee sells the property associated with the general permit verification, the permittee shall transfer the general permit verification to the new owner by submitting a completed Form 62-331.100(1) – "Transfer of State 404 Program General Permit Verification" (effective date), incorporated by reference in subsection 62-331.100(2), F.A.C., within 30 days of the sale, to the Agency that processed the original notice.

(r) Compliance Certification. Each permittee who receives a general permit verification letter under this Chapter must submit a completed Form 62-331.200(1) – "Certification of Compliance with a State 404 Program General Permit" (effective date), incorporated by reference in subsection 62-331.200(4), F.A.C., within 30 days of completion of the authorized activity, or the implementation of any required compensatory mitigation, whichever is later.

(s) Activities Affecting Structures or Work Built by the United States. If an activity also requires permission from the Corps pursuant to 33 U.S.C. § 408 because it will alter or temporarily or permanently occupy or use a Corps federally authorized Civil Works project, the prospective permittee is responsible for obtaining such permission separately from the Corps prior to commencing activities authorized by the general permit.

(t) If during the ground disturbing activities and construction work within the permit area, there are archaeological or cultural materials encountered which were not the subject of a previous cultural resources assessment survey or to which such impacts were not anticipated, including but not limited to pottery, modified shell, flora, fauna, human remains, ceramics, stone tools or metal implements, dugout canoes, evidence of structures or any other physical remains that could be associated with Native American cultures or early colonial or American settlement; the Permittee shall immediately stop all work  and ground-disturbing activities within a 100-meter diameter of the discovery and notify the Agency within the same business day. The Agency shall then notify the State Historic Preservation Officer (SHPO) and the appropriate Tribal Historic Preservation Officer(s) (THPO(s)) or tribe when the interested tribe does not have a THPO, to assess the significance of the discovery and devise appropriate actions.

**File Name:**
**File No:**

(u) Additional cultural resources assessments may be required of the permit area in the case of unanticipated discoveries or effects to historic properties as referenced in condition (t), above, and if deemed necessary by the SHPO, or THPO(s), Tribes, or Agency. Based on the circumstances of the discovery, equity to all parties, and considerations of the public interest, the Agency may modify, suspend, or revoke the permit in accordance with Rule 62-331.080, F.A.C. Such activity shall not resume without written authorization from the SHPO and THPO(s), or tribe when the interested tribe does not have a THPO, concerning potential effects to cultural resources or historic properties for finds under their jurisdiction, and from the Agency.

(v) In the event that unmarked human remains are identified, they shall be treated in accordance with Section 872.05, F.S. All work and ground-disturbing activities within a 100-meter diameter of the unmarked human remains shall immediately cease and the Permittee shall immediately notify the medical examiner, Agency, and State Archaeologist within the same business day. The Agency shall then notify the appropriate SHPO and THPO(s) and appropriate tribes and other appropriate consulting parties. Based on the circumstances of the discovery, equity to all parties, and considerations of the public interest, the Agency may modify, suspend, or revoke the permit in accordance with Rule 62-331.080, F.A.C. Such activity shall not resume without written authorization from the medical examiner, State Archaeologist, and from the Agency. Additionally, if the unmarked remains were identified on federal lands, or lands where the Archaeological Resources Protection Act, 16 U.S.C. §§ 470aa – 470mm (2018), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12072), or the Native American Graves Protection Repatriation 25 U.S.C. §§ 3001-3013 (2018), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12073), applies, such activity shall not resume without written authorization from the SHPO, the appropriate THPO(s), and the federal land manager.

(w) Noncompliance. The permittee shall timely notify the Agency of any expected or known actual noncompliance.

(x) Inspection and entry. The permittee shall allow the Agency, upon presentation of proper identification, at reasonable times to:
1. Enter upon the permittee's premises where a regulated activity is located or where records must be kept under the conditions of the permit,
2. Have access to and copy any records that must be kept under the conditions of the permit,
3. Inspect operations regulated or required under the permit, and
4. Sample or monitor, for the purposes of assuring permit compliance or as otherwise authorized by the Act, any substances or parameters at any location.

(y) The permittee shall comply with all conditions of the permit, even if that requires halting or reducing the permitted activity to maintain compliance. Any permit violation constitutes a violation of Part IV of Chapter 373, F.S., and this Chapter, as well as a violation of the CWA.

(z) The permittee shall take all reasonable steps to prevent any unauthorized dredging or filling in violation of this permit.

(aa) Upon Agency request, the permittee shall provide information necessary to determine compliance status, or whether cause exists for permit modification, revocation, or termination.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law*

*Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423,*

*373.429 FS. History – New _____.*

**62-330.405 General Conditions for All General Permits.**
The following general permit conditions are binding upon the permittee and are enforceable under chapter 373, F.S. These conditions do not apply to the general permit for stormwater management systems under section 403.814(12), F.S

(1) The general permit is valid only for the specific activity indicated. Any deviation from the specified activity and the conditions for undertaking that activity shall constitute a violation of the permit and may subject the permittee to enforcement action and revocation of the permit under chapter 373, F.S

**File
Name:
File No:**

(2) The general permit does not eliminate the necessity to obtain any required federal, state, local and special district authorizations prior to the start of any construction, alteration, operation, maintenance, removal or abandonment authorized by this permit; and it does not authorize any violation of any other applicable federal, state, local, or special district laws (including, but not limited to, those governing the "take" of listed species).

(3) The general permit does not convey to the permittee or create in the permittee any property right, or any interest in real property, nor does it authorize any entrance upon or activities on property which is not owned or controlled by the permittee, or convey any rights or privileges other than those specified in the general permit.

(4) The general permit does not relieve the permittee from liability and penalties when the permitted activity causes harm or injury to: human health or welfare; animal, plant or aquatic life; or property. It does not allow the permittee to cause pollution that violates state water quality standards.

(5) Section 253.77, F.S., provides that a person may not commence any excavation, construction, or other activity involving the use of state-owned or other lands of the state, the title to which is vested in the Board of Trustees of the Internal Improvement Trust Fund without obtaining the required consent, lease, easement, or other form of authorization authorizing the proposed use. Therefore, the permittee is responsible for obtaining any necessary authorizations from the Board of Trustees prior to commencing activity on state-owned lands.

(6) The authorization to conduct activities under a general permit may be modified, suspended or revoked in accordance with chapter 120, F.S., and section 373.429, F.S.

(7) Not applicable.

(8) Upon reasonable notice to the permittee, Agency staff with proper identification shall have permission to enter, inspect, sample and test the permitted system to ensure conformity with the plans and specifications approved by the general permit.

(9) The permittee shall maintain any permitted project or activity in accordance with the plans submitted to the Agency and authorized in the general permit.

(10) Not applicable.

(11) Activities shall be conducted in a manner that does not cause or contribute to violations of state water quality standards. Performance-based erosion and sediment control best management practices shall be implemented and maintained immediately prior to, during, and after construction as needed to stabilize all disturbed areas, including other measures specified in the permit to prevent adverse impacts to the water resources and adjacent lands. Erosion and sediment control measures shall be installed and maintained in accordance with the *State of Florida Erosion and Sediment Control Designer and Reviewer Manual (Florida Department of Environmental Protection and Florida Department of Transportation, June 2007)*, available at https://www.flrules.org/Gateway/reference.asp?No=Ref-04227, and the *Florida Stormwater Erosion and Sedimentation Control Inspector's Manual (Florida Department of Environmental Protection, Nonpoint Source Management Section, Tallahassee, Florida, July 2008)*, available at http://publicfiles.dep.state.fl.us/DEAR/Stormwater_Training_Docs/erosion-inspectors-manual.pdf.

**File Name:**

**File No:**

(12) Unless otherwise specified in the general permit, temporary vehicular access within wetlands during construction shall be performed using vehicles generating minimum ground pressure to minimize rutting and other environmental impacts. Within forested wetlands, the permittee shall choose alignments that minimize the destruction of mature wetland trees to the greatest extent practicable. When needed to prevent rutting or soil compaction, access vehicles shall be operated on wooden, composite, metal, or other non-earthen construction mats. In all cases, access in wetlands shall comply with the following:

(a) Access within forested wetlands shall not include the cutting or clearing of any native wetland tree having a diameter four inches or greater at breast height;

(b) The maximum width of the construction access area shall be limited to 15 feet;

(c) All mats shall be removed as soon as practicable after equipment has completed passage through, or work has been completed, at any location along the alignment of the project, but in no case longer than seven days after equipment has completed work or passage through that location; and

(d) Areas disturbed for access shall be restored to natural grades immediately after the maintenance or repair is completed.

(13) Barges or other work vessels used to conduct in-water activities shall be operated in a manner that prevents unauthorized dredging, water quality violations, and damage to submerged aquatic communities.

(14) The construction, alteration, or use of the authorized project shall not adversely impede navigation or create a navigational hazard in the water body.

(15) Except where specifically authorized in the general permit, activities must not:

(a) Impound or obstruct existing water flow, cause adverse impacts to existing surface water storage and conveyance capabilities, or otherwise cause adverse water quantity or flooding impacts to receiving water and adjacent lands; or

(b) Cause an adverse impact to the maintenance of surface or ground water levels or surface water flows established pursuant to section 373.042, F.S., or a Works of the District established pursuant to section 373.086, F.S.

(16) If prehistoric or historic artifacts, such as pottery or ceramics, projectile points, stone tools, dugout canoes, metal implements, historic building materials, or any other physical remains that could be associated with Native American, early European, or American settlement are encountered at any time within the project site area, the permitted project shall cease all activities involving subsurface disturbance in the vicinity of the discovery. The permittee or other designee shall contact the Florida Department of State, Division of Historical Resources, Compliance Review Section (DHR), at (850)245-6333, as well as the appropriate permitting agency office. Project activities shall not resume without verbal or written authorization from the Division of Historical Resources. If unmarked human remains are encountered, all work shall stop immediately and the proper authorities notified in accordance with section 872.05, F.S.

(17) The activity must be capable, based on generally accepted engineering and scientific principles, of being performed and of functioning as proposed, and must comply with any applicable District special basin and geographic area criteria.

(18) The permittee shall comply with the following when performing work within waters accessible to federally- or state-listed aquatic species, such as manatees, marine turtles, smalltooth sawfish, and Gulf sturgeon:

(a) All vessels associated with the project shall operate at "Idle Speed/No Wake" at all times while in the work area and where the draft of the vessels provides less than a four-foot clearance from the bottom. All vessels will follow routes of deep water whenever possible.

(b) All deployed siltation or turbidity barriers shall be properly secured, monitored, and maintained to prevent entanglement or entrapment of listed species.

**File
Name:
File No:**

(c) All in-water activities, including vessel operation, must be shut down if a listed species comes within 50 feet of the work area. Activities shall not resume until the animal(s) has moved beyond a 50-foot radius of the in-water work, or until 30 minutes elapses since the last sighting within 50 feet. Animals must not be herded away or harassed into leaving. All onsite project personnel are responsible for observing water-related activities for the presence of listed species.

(d) Any listed species that is killed or injured by work associated with activities performed shall be reported immediately to the Florida Fish and Wildlife Conservation Commission (FWC) Hotline at 1(888)404-3922 and ImperiledSpecies@myFWC.com.

(e) Whenever there is a spill or frac-out of drilling fluid into waters accessible to the above species during a directional drilling operation, the FWC shall be notified at ImperiledSpecies@myfwc.com with details of the event within 24 hours following detection of the spill or frac-out.

(19) The permittee shall hold and save the Agency harmless from any and all damages, claims, or liabilities which may arise by reason of the construction, alteration, operation, maintenance, removal, abandonment or use of any activity authorized by the general permit.

(20) The permittee shall immediately notify the Agency in writing of any submitted information that is discovered to be inaccurate.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.044, 373.118(1), 373.129, 373.136, 373.406(5), 373.413, 373.4131, 373.414(9), 373.4145, 373.416, 373.422, 373.423, 373.429, 403.814(1) FS. History–New 10-3-95, Amended 10-1-07, Formerly 62-341.215, Amended 10-1-13, 6-1-18.*

**File
Name:**
**File No:**


**[INSERT SHPO LINK]**

**[INSERT APPROVED PROJECT DRAWINGS]**

**[INSERT CERTIFICATE OF COMPLIANCE]**

**[INSERT OTHER ATTACHMENTS]**

File Name:
File No:
Page 1 of 5

**INSERT DISTRICT LETTERHEAD**

**Click here to enter MAILING date.**

**NAME**
**ADDRESS**
**CITY, STATE**
**ZIP EMAIL**
**ADDRESS**

File No.: **XXXXXXXXX, XX**
County

Dear: **XXXXXXXXXXXX**

On **Click here to enter received date.**, we received your notice of intent to use a State 404 Program General Permit (GP), pursuant to Rule 62-331.**XXX**, F.A.C. to perform the following activities:

> **Project description** at **project site (address and legal description)** in **waterbody**, **choose waterbody description**, Section **XX**, Township **XX** South, Range **XX** East, **XX** County.

Your intent to use a general permit has been reviewed by Department staff. The authority for review and the outcome of the review is described below. Please read carefully.

This letter does not relieve you from the responsibility of obtaining other federal, state, or local authorizations that may be required for the activity. Please refer to the information below for advice on how to proceed.

**State 404 Program Review – DOES NOT QUALIFY**

Based on the forms, drawings, and documents submitted with your notice, it appears that the project does not meet the requirements for the General Permit under Rule 62-331.**XXX**, F.A.C., for the following reasons:

> **XXINSERT REASONS FOR DENIAL (Use numbered list if more than one reason)XX**

Section 62-331.200(3), F.A.C., allows you to amend your notice by providing additional information to the Department by **60 days from mailing date,** to demonstrate that the activity qualifies for the general permit under 62-331.**XXX**, F.A.C.

If you are unable to submit an amended notice demonstrating that the activity qualifies for the general permit as described above, you may submit a complete application for a State 404 Program Individual Permit, in accordance with Rule 62-331.051, F.A.C.

Authority for review- Part IV of Chapter 373 of the Florida Statutes and Title 62, Florida Administrative Code.

**File Name:**
**File No:**
**Page 2 of 5**

## NOTICE OF RIGHTS

This action is final and effective on the date filed with the Clerk of the Department unless a petition for an administrative hearing is timely filed under Sections 120.569 and 120.57, F.S., before the deadline for filing a petition. On the filing of a timely and sufficient petition, this action will not be final and effective until further order of the Department. Because the administrative hearing process is designed to formulate final agency action, the hearing process may result in a modification of the agency action or even denial of the application.

<u>Petition for Administrative Hearing</u>
A person whose substantial interests are affected by the Department's action may petition for an administrative proceeding (hearing) under Sections 120.569 and 120.57, F.S. Pursuant to Rule 28-106.201, F.A.C., a petition for an administrative hearing must contain the following information:

(a)    The name and address of each agency affected and each agency's file or identification number, if known;

(b)    The name, address, any email address, any facsimile number, and telephone number of the petitioner; the name, address, and telephone number of the petitioner's representative, if any, which shall be the address for service purposes during the course of the proceeding; and an explanation of how the petitioner's substantial interests are or will be affected by the agency determination;

(c)    A statement of when and how the petitioner received notice of the agency decision;

(d)    A statement of all disputed issues of material fact. If there are none, the petition must so indicate;

(e)    A concise statement of the ultimate facts alleged, including the specific facts that the petitioner contends warrant reversal or modification of the agency's proposed action;

(f)    A statement of the specific rules or statutes that the petitioner contends require reversal or modification of the agency's proposed action, including an explanation of how the alleged facts relate to the specific rules or statutes; and

(g)    A statement of the relief sought by the petitioner, stating precisely the action that the petitioner wishes the agency to take with respect to the agency's proposed action.

The petition must be filed (received by the Clerk) in the Office of General Counsel of the Department at 3900 Commonwealth Boulevard, Mail Station 35, Tallahassee, Florida 32399-3000 or by e-mail at Agency_clerk@dep.state.fl.us. Also, a copy of the petition shall be mailed to the applicant at the address indicated above at the time of filing.

<u>Time Period for Filing a Petition</u>
In accordance with Rule 62-110.106(3), F.A.C., petitions for an administrative hearing by the applicant must be filed within 21 days of receipt of this written notice. Petitions filed by any persons other than the applicant, and other than those entitled to written notice under Section 120.60(3), F.S., must be filed within 21 days of publication of the notice or within 21 days of receipt of the written notice, whichever occurs first. Under Section 120.60(3), F.S., however, any person who has asked the Department for notice of agency action may file a petition within 21 days of receipt of such notice, regardless of the date of publication. The failure to file a petition within the appropriate time period shall constitute a waiver of that person's right to request an

**File Name:**
**File No:**
**Page 3 of 5**

administrative determination (hearing) under Sections 120.569 and 120.57, F.S., or to intervene in this proceeding and participate as a party to it. Any subsequent intervention (in a proceeding initiated by another party) will be only at the discretion of the presiding officer upon the filing of a motion in compliance with Rule 28-106.205, F.A.C.

Extension of Time

Under Rule 62-110.106(4), F.A.C., a person whose substantial interests are affected by the Department's action may also request an extension of time to file a petition for an administrative hearing. The Department may, for good cause shown, grant the request for an extension of time. Requests for extension of time must be filed with the Office of General Counsel of the Department at 3900 Commonwealth Boulevard, Mail Station 35, Tallahassee, Florida 32399-3000, before the applicable deadline for filing a petition for an administrative hearing. A timely request for extension of time shall toll the running of the time period for filing a petition until the request is acted upon.

Mediation

Mediation is not available in this proceeding.

FLAWAC Review

The applicant, or any party within the meaning of Section 373.114(1)(a) or 373.4275, F.S., may also seek appellate review of this order before the Land and Water Adjudicatory Commission under Section 373.114(1) or 373.4275, F.S. Requests for review before the Land and Water Adjudicatory Commission must be filed with the Secretary of the Commission and served on the Department within 20 days from the date when this order is filed with the Clerk of the Department.

**File Name:**
**File No:**
**Page 4 of 5**

Judicial Review
Once this decision becomes final, any party to this action has the right to seek judicial review pursuant to Section 120.68, F.S., by filing a Notice of Appeal pursuant to Rules 9.110 and 9.190, Florida Rules of Appellate Procedure, with the Clerk of the Department in the Office of General Counsel, 3900 Commonwealth Boulevard, M.S. 35, Tallahassee, Florida 32399-3000; and by filing a copy of the Notice of Appeal accompanied by the applicable filing fees with the appropriate District Court of Appeal.

The Notice of Appeal must be filed within 30 days from the date this action is filed with the Clerk of the Department.

Thank you for applying to the Submerged Lands and Environmental Resource Program. If you have any questions, please contact **XX** When referring to this project, please reference the file number listed above.

Executed in **XX** County, Florida.

STATE OF FLORIDA DEPARTMENT
OF ENVIRONMENTAL PROTECTION

Sincerely,

_____
**XX**
Permitting Program Administrator
**XX** District

**Attachments:**
Request for Additional Information (RAI)

**Copies furnished to:**
Agent
Other entities, as applicable

CERTIFICATE OF SERVICE

The undersigned duly designated deputy clerk hereby certifies that this document **and authorization to use sovereignty submerged lands,** including all copies, was mailed before the close of business on_____, 20_, to the above listed person(s).

FILING AND ACKNOWLEDGMENT

FILED, on this date, pursuant to Section 120.52(7), F.S., with the designated Department clerk, receipt of which is hereby acknowledged.

_____          _____
Clerk                                                    Date

**Insert District Letterhead in this header**

# State 404 Program Individual Permit

**Permittee:** _____
**Permit No:** _____

## PROJECT LOCATION
The activities authorized by this permit  are located at **(street address and/or parcel ID number with short description of location) City**, Florida **zip code**, in Section_____, Township_____, Range_____ in_____ County, at **lat_____/long_____ (include locations of all activities as appropriate (i.e., offsite mitigation, restoration, public interest, etc.)**

## PROJECT DESCRIPTION
The permittee is authorized to **(provide detailed description of authorized activities with applicable acreages) X within the landward extent of X (name of waterbody), a Class (I, II, or III), X Outstanding Florida Waterbody, X Florida Waterbody, X Aquatic Preserve**. Those activities include the **(dredging or filling of X square feet/acres of wetlands and other surface waters for the purpose of X.)**. Authorized activities are depicted on the attached exhibits. **(*Be sure drawings only depict authorized activities.)**

To offset unavoidable impacts that will occur from these authorized activities, the permittee shall **(provide general description of all impacts and corresponding mitigation activities including conservation easements with applicable acreages).**

## AUTHORIZATIONS
**[X Project Name or Phase]**
State 404 Program Individual Permit
The Department has determined that the activity qualifies for a State 404 Program Individual Permit. Therefore, the State 404 Program Permit is hereby granted, pursuant to Part IV of Chapter 373, Florida Statutes (F.S.), and Chapter 62-331, Florida Administrative Code (F.A.C.).

Coastal Zone Management
**XX (Activities in coastal counties)** This activity, as authorized, is determined to be in compliance with Florida's Coastal Zone Management Program.

Water Quality Certification
 This activity, as authorized, is determined to be in compliance with applicable state water quality standards.

Other Authorizations
You are advised that authorizations or permits for this activity may be required by other federal, state, regional, or local entities including but not limited to local governments or municipalities. This permit does not relieve you from the requirements to obtain all other required permits or authorizations.

The activity described may be conducted only in accordance with the terms, conditions and attachments contained in this document. Issuance and granting of the permit and authorizations

herein do not infer, nor guarantee, nor imply that future permits, authorizations, or modifications will be granted by the Department.

**PERMIT CONDITIONS**

The activities described must be conducted in accordance with:

- **The Specific Conditions**
- **The General Conditions**
- **The limits, conditions and locations of work shown in the attached drawings**
- **The term limits of this authorization**

You are advised to read and understand these conditions and drawings prior to beginning the authorized activities, and to ensure the work is conducted in conformance with all the terms, conditions, and drawings herein. If you are using a contractor, the contractor also should read and understand these conditions and drawings prior to beginning any activity. Failure to comply with these conditions, including any mitigation requirements, shall be grounds for the Department to revoke the permit and authorization and to take appropriate enforcement action. Operation of the facility is not authorized except when determined to be in conformance with all applicable rules and this permit, as described.

**(Number all conditions sequentially.)**
**SPECIFIC CONDITIONS**


**SPECIFIC CONDITIONS - PRIOR TO ANY CONSTRUCTION**
**(Include conditions for any applicable pre-construction activities such as mitigation bank credit purchases, public interest projects, marking wetlands prior to impact, conferences, etc.)**

**SPECIFIC CONDITIONS – CONSTRUCTION ACTIVITIES**
**(Include conditions for the construction and refer back to page numbers of approved drawings as applicable.)**

**SPECIFIC CONDITIONS – MITIGATION**
**(Include conditions for mitigation construction, monitoring and success criteria)**

**SPECIFIC CONDITIONS - LISTED SPECIES**
**(Include conditions provided by FWC and/or USFWS as appropriate)**

**SPECIFIC CONDITIONS - CONSTRUCTION COMPLETION**
**(Include conditions requiring as-built survey, etc.)**

**SPECIFIC CONDITIONS – OPERATION AND MAINTENANCE ACTIVITIES**
**(Include conditions for operating and maintaining systems, including requirements for Homeowners Association documents, and provisions for such things as maintaining handrails on docks, operating water control structures, and providing for regular inspections and reporting.)**

**SPECIFIC CONDITIONS – MONITORING/REPORTING REQUIREMENTS**
**(Include conditions for reporting such as construction progress, water quality, etc.)**

Case 1:21-cv-00119-RDM     Document 55-1     Filed 06/22/21     Page 26 of 377
Permit Expiration:

# GENERAL CONDITIONS FOR STATE 404 PROGRAM INDIVIDUAL PERMITS

## General Conditions for Individual Permits

(1) General Conditions under section 62-331.054, F.A.C.:

(a) The permittee shall comply with all conditions of the permit, even if that requires halting or reducing the permitted activity to maintain compliance. Any permit violation constitutes a violation of Part IV of Chapter 373, F.S., and this Chapter, as well as a violation of the CWA.

(b) The permittee shall take all reasonable steps to prevent any unauthorized dredging or filling in violation of this permit.

(c) The permittee shall timely notify the Agency of any expected or known actual noncompliance.

(d) Upon Agency request, the permittee shall provide information necessary to determine compliance status, or whether cause exists for permit modification, revocation, or termination.

(e) Inspection and entry. The permittee shall allow the Agency, upon presentation of proper identification, at reasonable times to:

> 1. Enter upon the permittee's premises where a regulated activity is located or where records must be kept under the conditions of the permit,

> 2. Have access to and copy any records that must be kept under the conditions of the permit,

> 3. Inspect operations regulated or required under the permit, and

> 4. Sample or monitor, for the purposes of assuring permit compliance or as otherwise authorized by the CWA, any substances or parameters at any location.

(2) Applicable General Conditions under section 62-330.350(1), F.A.C., modified to contain applicable references under Chapter 62-331, F.A.C. (remove those that are not applicable):

(a) All activities shall be implemented following the plans, specifications and performance criteria approved by this permit. Any deviations must be authorized in a permit modification in accordance with rule 62-331.080, F.A.C. Any deviations that are not so authorized may subject the permittee to enforcement action and revocation of the permit under chapter 373, F.S.

(b) A complete copy of this permit shall be kept at the work site of the permitted activity during the construction phase, and shall be available for review at the work site upon request by the Agency staff. The permittee shall require the contractor to review the complete permit prior to beginning construction.

(c) Activities shall be conducted in a manner that does not cause or contribute to violations of state water quality standards. Performance-based erosion and sediment control best management practices shall be installed immediately prior to, and be maintained during and after construction as needed, to prevent adverse impacts to the water resources and adjacent lands. Such practices shall be in accordance with the *State of Florida Erosion and Sediment Control Designer and Reviewer Manual (Florida Department of Environmental Protection and Florida Department of Transportation, June 2007)*, and the *Florida Stormwater Erosion and Sedimentation Control Inspector's Manual (Florida Department of Environmental Protection, Nonpoint Source Management Section, Tallahassee, Florida, July 2008)*, which are both

incorporated by reference in subparagraph 62-330.050(9)(b)5., F.A.C., unless a project-specific erosion and sediment control plan is approved or other water quality control measures are required as part of the permit.

(d) At least 48 hours prior to beginning the authorized activities, the permittee shall submit to the Agency a fully executed Form 62-330.350(1), "Construction Commencement Notice," (October 1, 2013), (http://www.flrules.org/Gateway/reference.asp?No=Ref-02505), incorporated by reference herein, indicating the expected start and completion dates. A copy of this form may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C., and shall be submitted electronically or by mail to the Agency. However, for activities involving more than one acre of construction that also require a NPDES stormwater construction general permit, submittal of the Notice of Intent to Use Generic Permit for Stormwater Discharge from Large and Small Construction Activities, DEP Form 62-621.300(4)(b), shall also serve as notice of commencement of construction under this chapter and, in such a case, submittal of Form 62-330.350(1) is not required.

(e) Unless the permit is transferred under rule 62-331.100, F.A.C., the permittee is liable to comply with the plans, terms, and conditions of the permit for the life of the project or activity.

(f) Within 30 days after completing construction of the entire project, or any independent portion of the project, the permittee shall provide the following to the Agency, as applicable:
1. For an individual, private single-family residential dwelling unit, duplex, triplex, or quadruplex – "Construction Completion and Inspection Certification for Activities Associated with a Private Single-Family Dwelling Unit" [Form 62-330.310(3)]; or
2. For all other activities – "As-Built Certification and Request for Conversion to Operation Phase" [Form 62-330.310(1)].
3. If available, an Agency website that fulfills this certification requirement may be used in lieu of the form.

(g) If the final operation and maintenance entity is a third party:
1. Prior to sales of any lot or unit served by the activity and within one year of permit issuance, or within 30 days of as-built certification, whichever comes first, the permittee shall submit, as applicable, a copy of the operation and maintenance documents (see sections 12.3 thru 12.3.4 of Volume I) as filed with the Florida Department of State, Division of Corporations, and a copy of any easement, plat, or deed restriction needed to operate or maintain the project, as recorded with the Clerk of the Court in the County in which the activity is located.
2. Within 30 days of submittal of the as-built certification, the permittee shall submit "Request for Transfer of Environmental Resource Permit to the Perpetual Operation and Maintenance Entity" [Form 62-330.310(2)] to transfer the permit to the operation and maintenance entity, along with the documentation requested in the form. If available, an Agency website that fulfills this transfer requirement may be used in lieu of the form.

(h) The permittee shall notify the Agency in writing of changes required by any other regulatory agency that require changes to the permitted activity, and any required modification of this permit must be obtained prior to implementing the changes.

(i) This permit does not:

1. Convey to the permittee any property rights or privileges, or any other rights or privileges other than those specified herein or in chapter 62-330, F.A.C.;

2. Convey to the permittee or create in the permittee any interest in real property;

3. Relieve the permittee from the need to obtain and comply with any other required federal, state, and local authorization, law, rule, or ordinance; or

4. Authorize any entrance upon or work on property that is not owned, held in easement, or controlled by the permittee.

(j) Prior to conducting any activities on state-owned submerged lands or other lands of the state, title to which is vested in the Board of Trustees of the Internal Improvement Trust Fund, the permittee must receive all necessary approvals and authorizations under chapters 253 and 258, F.S. Written authorization that requires formal execution by the Board of Trustees of the Internal Improvement Trust Fund shall not be considered received until it has been fully executed.

(k) The permittee shall hold and save the Agency harmless from any and all damages, claims, or liabilities that may arise by reason of the construction, alteration, operation, maintenance, removal, abandonment or use of any project authorized by the permit.

(l) The permittee shall notify the Agency in writing:

1. Immediately if any previously submitted information is discovered to be inaccurate; and

2. Within 30 days of any conveyance or division of ownership or control of the property or the system, other than conveyance via a long-term lease, and the new owner shall request transfer of the permit in accordance with rule 62-330.340, F.A.C. This does not apply to the sale of lots or units in residential or commercial subdivisions or condominiums where the stormwater management system has been completed and converted to the operation phase.

(m) Upon reasonable notice to the permittee, Agency staff with proper identification shall have permission to enter, inspect, sample and test the project or activities to ensure conformity with the plans and specifications authorized in the permit.

(n) If prehistoric or historic artifacts, such as pottery or ceramics, projectile points, stone tools, dugout canoes, metal implements, historic building materials, or any other physical remains that could be associated with Native American, early European, or American settlement are encountered at any time within the project site area, the permitted project shall cease all activities involving subsurface disturbance in the vicinity of the discovery. The permittee or other designee shall contact the Florida Department of State, Division of Historical Resources, Compliance Review Section (DHR), at (850)245-6333, as well as the appropriate permitting agency office. Project activities shall not resume without verbal or written authorization from the Division of Historical Resources. If unmarked human remains are encountered, all work shall stop immediately and the proper authorities notified in accordance with section 872.05, F.S. For project activities subject to prior consultation with the DHR and as an alternative to the above requirements, the permittee may follow procedures for unanticipated discoveries as set forth within a cultural resources assessment survey determined complete and sufficient by DHR and included as a specific permit condition herein.

(o) Any delineation of the extent of a wetland or other surface water submitted as part of the permit application, including plans or other supporting documentation, shall not be considered binding unless a specific condition of this permit or a formal determination under rule 62-330.201, F.A.C., provides otherwise.

(p) The permittee shall provide routine maintenance of all components of the stormwater management system to remove trapped sediments and debris. Removed materials shall be disposed of in a landfill or other uplands in a manner that does not require a permit under chapter 62-331, F.A.C., or cause violations of state water quality standards.

Permit Expiration.

(q) This permit is issued based on the applicant's submitted information that reasonably demonstrates that adverse water resource-related impacts will not be caused by the completed permit activity. If any adverse impacts result, the Agency will require the permittee to eliminate the cause, obtain any necessary permit modification, and take any necessary corrective actions to resolve the adverse impacts.

## NOTICE OF RIGHTS

This action is final and effective on the date filed with the Clerk of the Department unless a petition for an administrative hearing is timely filed under Sections 120.569 and 120.57, F.S., before the deadline for filing a petition. On the filing of a timely and sufficient petition, this action will not be final and effective until further order of the Department. Because the administrative hearing process is designed to formulate final agency action, the subsequent order may modify or take a different position than this action.

Petition for Administrative Hearing

A person whose substantial interests are affected by the Department's action may petition for an administrative proceeding (hearing) under Sections 120.569 and 120.57, F.S. Pursuant to Rules 28-106.201 and 28-106.301, F.A.C., a petition for an administrative hearing must contain the following information:

(a) The name and address of each agency affected and each agency's file or identification number, if known;

(b) The name, address, any e-mail address, any facsimile number, and telephone number of the petitioner, if the petitioner is not represented by an attorney or a qualified representative; the name, address, and telephone number of the petitioner's representative, if any, which shall be the address for service purposes during the course of the proceeding; and an explanation of how the petitioner's substantial interests will be affected by the agency determination;

(c) A statement of when and how the petitioner received notice of the agency decision;

(d) A statement of all disputed issues of material fact. If there are none, the petition must so indicate;

(e) A concise statement of the ultimate facts alleged, including the specific facts that the petitioner contends warrant reversal or modification of the agency's proposed action;

(f) A statement of the specific rules or statutes that the petitioner contends require reversal or modification of the agency's proposed action, including an explanation of how the alleged facts relate to the specific rules or statutes; and

(g) A statement of the relief sought by the petitioner, stating precisely the action that the petitioner wishes the agency to take with respect to the agency's proposed action.

The petition must be filed (received by the Clerk) in the Office of General Counsel of the Department at 3900 Commonwealth Boulevard, Mail Station 35, Tallahassee, Florida 32399-3000, or via electronic correspondence at Agency_Clerk@dep.state.fl.us. Also, a copy of the petition shall be mailed to the applicant at the address indicated above at the time of filing.


Time Period for Filing a Petition

In accordance with Rule 62-110.106(3), F.A.C., petitions for an administrative hearing by the applicant and persons entitled to written notice under Section 120.60(3), F.S., must be filed within **X 14 (if on SSL) X** 21 **(if not on SSL)** days of receipt of this written notice. Petitions filed by any persons other than the applicant, and other than those entitled to written notice under Section 120.60(3), F.S., must be filed within **X 14 (if on SSL) X** 21 **(if not on SSL)** days of publication of the notice or within **X 14 (if on SSL) X** 21 **(if not on SSL)** days of receipt of the written notice, whichever occurs first. You cannot justifiably rely on the finality of this decision unless notice of this decision and the right of substantially affected persons to challenge this decision has been duly published or otherwise provided to all persons substantially affected by the decision. While you are not required to publish notice of this action, you may elect to do so pursuant Rule 62-110.106(10)(a).


The failure to file a petition within the appropriate time period shall constitute a waiver of that person's right to request an administrative determination (hearing) under Sections 120.569 and 120.57, F.S., or to intervene in this proceeding and participate as a party to it. Any subsequent intervention (in a proceeding initiated by another party) will be only at the discretion of the presiding officer upon the filing of a motion in compliance with Rule 28-106.205, F.A.C. If you do not publish notice of this action, this waiver will not apply to persons who have not received written notice of this action.

Extension of Time

Under Rule 62-110.106(4), F.A.C., a person whose substantial interests are affected by the Department's action may also request an extension of time to file a petition for an administrative hearing. The Department may, for good cause shown, grant the request for an extension of time. Requests for extension of time must be filed with the Office of General Counsel of the Department at 3900 Commonwealth Boulevard, Mail Station 35, Tallahassee, Florida 32399-3000, or via electronic correspondence at Agency_Clerk@dep.state.fl.us, before the deadline for filing a petition for an administrative hearing. A timely request for extension of time shall toll the running of the time period for filing a petition until the request is acted upon.


Mediation

Mediation is not available in this proceeding.


FLAWAC Review

The applicant, or any party within the meaning of Section 373.114(1)(a) or 373.4275, F.S., may also seek appellate review of this order before the Land and Water Adjudicatory Commission under Section 373.114(1) or 373.4275, F.S. Requests for review before the Land and Water Adjudicatory Commission must be filed with the Secretary of the Commission and served on the Department within 20 days from the date when this order is filed with the Clerk of the Department.

<u>Judicial Review</u>

Once this decision becomes final, any party to this action has the right to seek judicial review pursuant to Section 120.68, F.S., by filing a Notice of Appeal pursuant to Florida Rules of Appellate Procedure 9.110 and 9.190 with the Clerk of the Department in the Office of General Counsel (Station #35, 3900 Commonwealth Boulevard, Tallahassee, Florida 32399-3000) and by filing a copy of the Notice of Appeal accompanied by the applicable filing fees with the appropriate district court of appeal. The notice must be filed within 30 days from the date this action is filed with the Clerk of the Department.

Your signature below, as permittee, indicates that you accept and agree to comply with the terms and conditions of this permit.

_____          _____
(Permittee)                                (Date)

_____
(Permittee Name – Printed)

This permit becomes effective when the designated Department official has signed below.

Executed in **(City)**, Florida.          STATE OF FLORIDA DEPARTMENT
                                          OF ENVIRONMENTAL PROTECTION

                                          _____
                                          **X Administrator's Name**
                                          Program Administrator

                                          Submerged Lands & Environmental Resource
                                          Program

**XX:xx**

**Attachments:(add/remove exhibits as applicable)**
Exhibit 1, Project Drawings and Design Specs., **X pages**
**X** Exhibit 2, **X Recorded** Conservation Easement, **X pages**
**X** Exhibit 3, **X** Mitigation Plan, **X pages**
**X** Standard Manatee Construction Conditions 2011
**X** Construction Commencement Notice/Form 62-330.350(1)
**X** Construction Completion and Inspection Certification for Activities Associated With a
Private Single-Family Dwelling Unit/Form 62-330.310(3)
**X** As-built Certification and Request for Conversion to Operational Phase/ Form 62-330.310(1)
**X** Request for Transfer to the Perpetual Operation Entity/Form 62-330.310(2)
**X** Request to Transfer Permit/Form 62-330.340(1)
**X** Operation and Maintenance Inspection Certification/Form 62-330.311(1)

**Permittee:**
**Permit No:**
**Page 10 of**                                    Permit Expiration:

**X** Long-Term Planning Document (for projects that will take longer than 5 years to complete)


**Copies furnished to:**
DEP, Office of General Counsel
U.S. Environmental Protection Agency
U.S. Army Corps of Engineers
FWC, Imperiled Species Management Section (for projects where species comments were received)
**X** County (if you are going to copy the county give a contact name or department)
**X** Department of Economic Opportunity (include for Areas of Critical State Concern, docking facilities in OFWs, Class II Waters, or in areas frequented by manatees)
**X** Consultant/Agent
**X** Other Interested Parties all who have requested being advised of the project, including any listed in SLER 0905, the county mailing list, or direct request to district staff
File

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that this permit, including all copies, were mailed before the close of business on
_____, to the above listed persons.


FILING AND ACKNOWLEDGMENT

FILED, on this date, under 120.52(7) of the
Florida Statutes, with the designated Department Clerk,

receipt of which is hereby acknowledged.


_____
            Clerk                    Date

## STANDARD MANATEE CONDITIONS FOR IN-WATER WORK
2011

The permittee shall comply with the following conditions intended to protect manatees from direct project effects:

a.  All personnel associated with the project shall be instructed about the presence of manatees and manatee speed zones, and the need to avoid collisions with and injury to manatees.  The permittee shall advise all construction personnel that there are civil and criminal penalties for harming, harassing, or killing manatees which are protected under the Marine Mammal Protection Act, the Endangered Species Act, and the Florida Manatee Sanctuary Act.

b.  All vessels associated with the construction project shall operate at "Idle Speed/No Wake" at all times while in the immediate area and while in water where the draft of the vessel provides less than a four-foot clearance from the bottom.  All vessels will follow routes of deep water whenever possible.

c.  Siltation or turbidity barriers shall be made of material in which manatees cannot become entangled, shall be properly secured, and shall be regularly monitored to avoid manatee entanglement or entrapment.  Barriers must not impede manatee movement.

d.  All on-site project personnel are responsible for observing water-related activities for the presence of manatee(s).  All in-water operations, including vessels, must be shutdown if a manatee(s) comes within 50 feet of the operation.  Activities will not resume until the manatee(s) has moved beyond the 50-foot radius of the project operation, or until 30 minutes elapses if the manatee(s) has not reappeared within 50 feet of the operation.  Animals must not be herded away or harassed into leaving.

e.  Any collision with or injury to a manatee shall be reported immediately to the Florida Fish and Wildlife Conservation Commission (FWC) Hotline at 1-888-404-3922.  Collision and/or injury should also be reported to the U.S. Fish and Wildlife Service in Jacksonville (1-904-731-3336) for north Florida or Vero Beach (1-772-562-3909) for south Florida, and to FWC at ImperiledSpecies@myFWC.com

f.  Temporary signs concerning manatees shall be posted prior to and during all in-water project activities.  All signs are to be removed by the permittee upon completion of the project.  Temporary signs that have already been approved for this use by the FWC must be used.  One sign which reads *Caution: Boaters* must be posted.  A second sign measuring at least 8 ½" by 11" explaining the requirements for "Idle Speed/No Wake" and the shut down of in-water operations must be posted in a location prominently visible to all personnel engaged in water-related activities.  These signs can be viewed at MyFWC.com/manatee. Questions concerning these signs can be sent to the email address listed above.

**Permittee:**
**Permit No:**
**Page 12 of**

Permit Expiration:



CAUTION: MANATEE HABITAT

All project vessels
IDLE SPEED / NO WAKE

When a manatee is within 50 feet of work
all in-water activities must

SHUT DOWN

Report any collision with or injury to a manatee:
Wildlife Alert:
1-888-404-FWCC(3922)
cell *FWC or #FWC

**State 404 Program**
**Technical Staff Report**
**Regulatory Basis of Issuance**

**Statement of Compliance with State 404 Program**

I.   **Alternatives Analysis** – 8.3.1 and Appendix C, 404 Handbook
     **Avoidance and Minimization of Impacts** – 10.2.1, A.H. Vol I , 8.2(i) 404 Handbook
     (How has the applicant addressed the alternatives analysis? Please include: scope of the
     analysis, discussion of impacts that are expected to result from the activity, and
     alternatives that were considered (may include consideration of the "no project
     alternative").  If an alternatives analysis was not required how did the applicant
     demonstrate avoidance and minimization of impacts?)

II.  **Aesthetics Review** – 8.3.2 404 Handbook
     (How has the applicant provided reasonable assurance the activity will not significantly
     adversely affect the aesthetics of the aquatic ecosystem as they apply to the quality of life
     enjoyed by the general public and property owners?)

III. **Cumulative Effects** – 8.3.5 404 Handbook
     (How has the applicant provided reasonable assurance that the regulated activity will not
     cause unacceptable cumulative impacts upon the aquatic ecosystem?)

IV.  **Secondary Effects** – 8.3.6 404 Handbook, 10.2.7 A.H. Vol I
     (How has the applicant addressed the secondary impacts from the activity to the aquatic
     ecosystem? The analysis must include consideration of the secondary effects to (a)
     sanctuaries and refuges, and (b) human use characteristics of the aquatic ecosystem.)

V.   **Compensatory Mitigation** -- 8.5 404 Handbook
     (How has the applicant provided compensatory mitigation for authorized impacts to the
     aquatic ecosystem?)

VI.  **Listed Species and their Habitats** – 5.2.3 404 Handbook
     (How has the applicant provided reasonable assurance that the proposed activity will not
     jeopardize the continued existence of endangered or threated species or results in the
     likelihood of the destruction or adverse modification of a critical habitat for an
     endangered or threatened species.  Please describe the result of any consultation with
     FWC or USFWS.)

VII. **Historic Properties Review** – 5.2.2 404 Handbook
     (How has the applicant provided reasonable assurance that the proposed activity will not
     have an adverse effect on historic properties listed or eligible for listing on the National
     Register.?  Please describe the result of any consultation with SHPO or THPO.)

VIII. **Public Interest Determination**

File Name:
File No.:
Page **2** of **4**

IX. **Water Quality**
(How has the applicant addressed the water quality requirements in Rule 62-331.053(3)(a)?)

X. **Public Comments**
(Please include all comments received and the date of a public meeting, if held, on the application. Rule 62-331.060(6)).

XI. **EPA comments, objections or recommendations - 5.2.5 404 Handbook**
(Please include all comments, objections, recommendations, or reservations received from EPA on the application.).

XII. **Additional Conditions for Issuance of State 404 Program Individual Permits** – Section 62-331.053, F.A.C.

   a. Does the application contain sufficient information to make a reasonable judgment as to whether the proposed activity will comply with the State 404 program? Section 8.1 404 Handbook

   b. Has EPA objected to issuance of the permit, and the objection has not been resolved or placed requirement for a permit condition that has not been addressed?

   c. Is the activity in an area which has been prohibited, withdrawn, or denied as a disposal site by EPA under section 404(c) of the CWA, or will the activity fail to comply with a restriction imposed thereunder.

   d. Has the Corps determined, in consultation with the Secretary of the Department, in which the Coast Guard is operating, that anchorage and navigation of any of the navigable waters will be substantially impaired by the activity?

**62-330 Conditions that apply to State 404 Program permits.**

**Conditions for Issuance of Individual and Conceptual Approval Permits** – Section 62-330.301, F.A.C –

XIII. An applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter:
   a. Will not cause adverse water quantity impacts to receiving waters and adjacent lands; (Part III, A.H. Vol. II)
   b. Will not cause adverse flooding to on-site or off-site property; (Part III, A.H. Vol. II)
   c. Will not cause adverse impacts to existing surface water storage and conveyance capabilities; (Part III, A.H. Vol. II)
   d. Will not adversely impact the maintenance of surface or ground water levels or surface water flows established pursuant to Section 373.042, F.S. (Part III, IV, and V, A.H. Vol. II, for SFWMD, SWFWMD, SRWMD; A.H. Vol. II for NWFWMD and SJWMD)
   e. Will not cause adverse impacts to a Work of the District established pursuant to Section 373.086, F.S.; (review based on all of the information above)

     f.   Will be capable, based on generally accepted engineering and scientific principles, of performing and functioning as proposed; (review based on all of the information above)

     g.   Will comply with any applicable special basin or geographic area criteria; (NWFWMD- Sections 13.0- 13. of Vol. II, Including Appendix A; SFWMD- 40E-41, 40E-61, and 40E-63; SWFWMD- N/A; SJWMD – Section 5.9 Vol. II; SRWMD- 40C-41, Sections 13.0-13.8.3 A.H. Vol. II, Part VI, Vol. II.)

## Environmental Conditions for Issuance

XIV.   **Elimination or Reduction of Impacts** – 10.2.1, A.H. Vol. I – (How has the applicant addressed elimination and reduction of impacts? Need to consider the following: the degree of impact to wetlands and other surface water functions caused by the proposed activity, whether the impact to the functions can be mitigated, and the practicability of design modifications,10.2.1.1, A.H. Vol. I)

XV.   **Fish, Wildlife, Listed Species and their Habitat** – 10.2.2, A.H. Vol. I, 10.1.1(a), A.H. Vol. I – (Provide assurance that the activity will not impact values of wetland and other surface water functions so as to cause adverse impacts to: the abundance and diversity of fish, wildlife, listed species, and the bald eagle, or the habitats of fish wildlife and listed species.)

XVI.   **Water quantity, impacts to wetlands and other surface waters** – 10.2.2.4, A.H. Vol. I – (How does the applicant provide reasonable assurance that the regulated activity will not change the hydroperiod of a wetland or other surface water, so as to adversely affect wetland functions or other surface water functions. Summarize analysis or modeling results provided as reasonable assurance and any monitoring requirements for the adjacent wetlands that will be included in the permit)

XVII.   **Public Interest Test** – Chapter 373.414(1)(a), F.S., Paragraph 62-330.302(1)(a), F.A.C., 10.2.3, A.H. Vol. I – (The Agency shall consider and balance, and an applicant must address, the following criteria :)

     a.   Whether the activity will adversely affect public health, safety, or welfare or the property of others; (10.2.3.1 A.H. Vol. I)

     b.   Whether the activity will adversely affect the conservation of fish and wildlife and their habitats; (10.2.3.2, A.H. Vol. I; addressed in section II above)

     c.   Whether the activity will adversely affect Navigation or the flow of water or cause harmful erosion or Shoaling; (10.2.3.3, A.H. Vol. I)

     d.   Whether the activity will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity; (10.2.3.4, A.H. Vol. I)

     e.   Whether the activity is temporary or permanent in nature; (10.2.3.5, A.H. Vol. I)

     f.   Whether the activity will adversely affect or will enhance significant historical and archeological resources; (10.2.3.6, A.H. Vol. I)

     g.   The current condition and relative value of functions being performed by areas affected by the proposed activity. (10.2.3.7, A.H. Vol. I)

XVIII.   **Water Quality** – 10.2.4, A.H. Vol. I – (How was reasonable assurance provided that the activity will not cause or contribute to violations of water quality standards?

File Name:
File No.:
Page **4** of **4**

   a.   Short term water quality considerations – 10.2.4.1, A.H. Vol. I – (water quality during construction activities, BMP's, etc. Consult 11.0, A.H. Vol. I for information regarding erosion and sediment control.)

   b.   Long term water quality considerations – 10.2.4.2, A.H. Vol. I – (depth or configuration doesn't cause WQ problems, long term erosion issues, prevention of discharges or pollutants, etc. Consult 12.0 A.H. Vol. I for information regarding operation and maintenance.)

   c.   Additional Water Quality considerations for docking facilities – 10.2.4.3, A.H. Vol. I – (hydrographic information, flushing, fueling facilities, waste disposal, pump outs etc.)

   d.   Mixing Zones – 10.2.4.4, A.H. Vol. I – (Will they have a temporary mixing zone during construction activities? Use 62-2.242 and 62-4.244(5), F.A.C.)

   e.   Where Ambient Water Quality Does Not Meet Standards – 10.2.4.4, A.H. Vol. I – (How will WQ mitigation be provided if the activity contributes to an existing violation?)

Month Day, 20XX

## STATE 404 PROGRAM
## PUBLIC NOTICE

OGC Case No. XX-XXXX

TO WHOM IT MAY CONCERN: The Department of Environmental Protection is providing notice of a proposed settlement addressing violation(s) of the State 404 Program implemented in Chapter 62-331, Florida Administrative Code, as described below:

RESPONDENT(S):     Business name, if any
                   Contact name
                   Address
                   Telephone number

                   Business name, if any
                   Contact name
                   Address
                   Telephone number


LOCATION: (describe the location(s) of the activity(ies) and include an address; note, the address may be the same as the address listed above).

APPROXIMATE CENTRAL COORDINATES:
Latitude XX.XXXXXX° Longitude XX.XXXXXX°

PROJECT PURPOSE: (describe the purpose of the project, e.g., commercial development in Leon County)

ALLEGED VIOLATIONS: (describe the violation(s), including a description of any structures erected on fills; a description of the type, composition, and quantity (including area and volume) of materials dredged or used as fill; and a description of the condition(s) of the entire site as it existed immediately prior to the violation, including, but not limited to: wetland community type(s) and condition(s), existing structures/features, surrounding or adjacent sites, and other information necessary to evaluate site condition).

PROPOSED SETTLEMENT: (describe settlement type/format and all corrective action requirements as necessary to address all applicable regulatory program requirements, including (but not limited to) avoidance and minimization of impacts, compensatory mitigation, cultural resource considerations, protected species considerations, and any other applicable program criteria).

COMMENTS regarding the proposed settlement and penalty assessment should be submitted in writing to [contact name] at [address], or by electronic mail at [email address], within 30 days from the date of this notice. Written comments will be made part of the record and should reference OGC Case No. XX-XXXX. Any comments received will be considered by the Department in determining whether to proceed with the settlement as proposed.

The Department is soliciting comments from the public; federal, state, and local agencies and officials; Indian Tribes; and other interested parties. Comments are considered in the assessment of impacts to endangered species, historic properties, water quality, general environmental effects, and other public interest factors.

FOR FURTHER INFORMATION regarding this proposed settlement, contact the project manager, [name], in writing at [address]; by electronic mail at [email address]; or by telephone at [telephone number].

*Attachments to be included: (draft settlement document, including all attachments and exhibits, and any other documentation necessary to allow complete evaluation of the project scope and impacts)*

Month Day, 20XX

# STATE 404 PROGRAM
# PUBLIC NOTICE

Permit Application No. XXXXXXXXX

TO WHOM IT MAY CONCERN: The Department of Environmental Protection has received an application for a State 404 Program permit pursuant to 62-331, Florida Administrative Code, as described below:

APPLICANT:          Business name, if any
                             Contact name
                             Address
                             Telephone number

LOCATION: (describe the location of the proposed activity(ies) and include an address; note, the address may be the same as the address listed above).

APPROXIMATE CENTRAL COORDINATES:
Latitude XX.XXXXXX° Longitude XX.XXXXXX°

PROJECT PURPOSE: (describe the purpose of the project, e.g., commercial development in Leon County)

PROPOSED WORK: The applicant seeks authorization to (describe the proposed work to be done, including a description of the type of structures, if any, to be erected on fills, and a description of the type, composition, and quantity of materials to be dredged or used as fill).

EXISTING CONDITIONS: (describe the site as it exists currently, including, but not limited to: wetland area (impact, mitigation, undisturbed); wetland community type; existing structures/features; surrounding sites; depth of water).

AVOIDANCE AND MINIMIZATION INFORMATION: Based on information provided by the applicant, (describe any avoidance and minimization information provided by the applicant, if applicable; if mitigation is proposed, include mention of it here).

COMPENSATORY MITIGATION: (describe the compensatory mitigation plan, if any)

CULTURAL RESOURCES: (describe known historic properties within the permit area, if any) By copy of this public notice, the Department is providing information for review. Our final determination relative to historic resource impacts is subject to review by and coordination with the State Historic Preservation Office and those federally recognized tribes with concerns in Florida and the permit area.

ENDANGERED SPECIES: The Department, in coordination with the US Fish and Wildlife Service and the Florida Fish and Wildlife Conservation Commission, has determined the proposed project [has, does not have] the potential to affect [the following species, any listed species] (if species are affected, list them out here and include details on each species and the impact on them in paragraph form below).

OTHER INFORMATION: Include any other information which would significantly assist interested parties in evaluating the likely impact of the proposed activity.

COMMENTS regarding the potential authorization of the work proposed should be submitted in writing to [contact name] at [address], or by electronic mail at [email address], within [15, 30] days from the date of this notice. Written comments will be made part of the record and should reference the above permit application number. Objections must be factual, specific, and fully describe the reasons upon which any objection is founded. Any comments received will be considered by the Department to determine whether to issue, modify, condition, or deny a permit for this proposal. Unless a written request is filed with the Department within the [15,30]-day public comment period, the Department may decide on the application without a public meeting.

EVALUATION: The determination as to whether a permit will be issued, or a public meeting held, will be based on an evaluation of all relevant factors, including the public comments received and the effect of the proposed work on the public interest, including, but not limited to, fish, wildlife, historical resources, and pollution. The specific permit decision criteria can be found in Chapter 62-331, Florida Administrative Code.

The Department is soliciting comments from the public; federal, state, and local agencies and officials; Indian Tribes; and other interested parties in order to consider and evaluate the impacts of this proposed activity. To make this consideration, comments are used to assess impacts to endangered species, historic properties, water quality, general environmental effects, and other public interest factors. Comments are also used to determine the need for a public meeting and to determine the overall public interest of the proposed activity.

FOR FURTHER INFORMATION regarding this application, contact the project manager, [name], in writing at [address]; by electronic mail at [email address]; or by telephone at [telephone number].

REQUEST FOR PUBLIC MEETING: Any person may request a public meeting. The request must be submitted to [same name as under "Comment" section] within the designated comment period of the notice and must state the specific reasons for requesting the public meeting.

*Attachments to be included: (plan and elevation drawing showing the general and specific site location and character of all proposed activities, including the size relationship of the proposed structures to the size of the impacted waterway and depth of water in the area)*

(g) Description of the State's Compliance Evaluation and
Enforcement Programs
(Required by 40 C.F.R. § 233.11(g))

*Florida Department of Environmental Protection*
*Program Description, Section (g) – Description of the State's Compliance Evaluation and Enforcement Programs*

## Purpose of Section (g)

The purpose of Section (g) is to provide the information required in 40 C.F.R. § 233.11(g), which states: *"The program description as required under § 233.10 shall include: (g) A description of the State's compliance evaluation and enforcement programs, including a description of how the State will coordinate its enforcement strategy with that of the Corps and EPA".*

## I. Compliance & Enforcement Program Overview

Compliance evaluation and enforcement of the State 404 Program will be implemented through the Department's six regulatory district offices, with each district responsible for projects located within its respective administrative boundaries (see sections (a) and (c) of the program description). The districts' day-to-day compliance and enforcement activities for all programs are supervised by the Assistant District Directors, while legal enforcement support is provided by the Office of General Counsel.

Program-specific support for State 404 Program compliance and enforcement will be provided by the Division of Water Resource Management and the Submerged Lands and Environmental Resources Coordination (SLERC) Program. SLERC will be responsible for ensuring statewide consistency in implementation of the State 404 Program. SLERC staff will provide rule interpretation, guidance, and training, and will be responsible for reviewing and auditing district-level activities for consistency with overall program enforcement objectives (see section (c) of the program description).

### Compliance and Enforcement Strategy

When appropriate, the Department attempts to resolve certain minor violations informally through compliance assistance. As described under Section IV, below, an initial compliance assistance approach is generally recommended when the corrective actions required to bring the activity into compliance are not complicated, the responsible party does not have a history of non-compliance, and penalties are not appropriate. For more significant violations, or those that cannot be resolved informally, the State employs a combination of the authorities listed under Section V below to address civil, administrative, and criminal actions.

## II. Permit Compliance

All State 404 Program individual permits and general permit verifications will be forwarded to district compliance staff for review. Compliance evaluation and review responsibilities include reviewing the issued permit; creating compliance tracking database records; scheduling, conducting, and documenting compliance evaluations; tracking required submittals; and managing documentation and maintaining database records for the project.

The districts will take reasonable measures to inspect permitted activities during active construction to ensure compliance with permit terms and conditions. Individual permit recipients will be required (per 62-330.350(1)(d), F.A.C. via 62-331.054(1), F.A.C.) to notify the Department at least 48 hours prior to commencement of construction of a permitted project,

which will allow review to confirm that pre-construction conditions have been met as required and will facilitate compliance monitoring during active construction.

Timing of investigations will be commensurate with agency resources and potential environmental damage. Permit compliance inspections will be prioritized based on project-specific considerations such as compensatory mitigation requirements, regional areas of concern, potential to affect threatened and endangered species, historic properties, or other factors that the district considers important. The districts will also prioritize inspection of projects for which it has received reports of suspected permit violations.

The districts will be responsible for meeting minimum inspection requirements as outlined below.

## Minimum Inspection Responsibilities

The Department will annually inspect a minimum percentage of all State 404 Program permitted activities according to the following sliding scale (subject to adjustments and limiting provisions described below):

- Year 1: Inspection of 100% of individual permits and 25% of general permits
- Year 2: Inspection of 50% of individual permits and 20% of general permits
- Year 3: Inspection of 25% of individual permits and 15% of general permits
- Year 4+: Inspection of 20% of individual permits and 10% of general permits

Upward adjustments of the above minimum annual inspection rates will be implemented as deemed necessary by SLERC or upon request by EPA. Minimum annual inspection rates may not be decreased below 20% of individual permits and 10% of general permits. Any inspection conducted prior to commencement of permitted activities shall not count toward satisfaction of these requirements.

In addition to satisfying the above minimum annual inspection rates, the districts will inspect all State 404 Program projects designated as "High Risk" during active construction. Permit compliance projects may be automatically assigned a High Risk designation based on the type/scope of authorized activity or the size of the project area. Staff may also manually designate any compliance or enforcement project High Risk for one of two reasons:

(1) Proximity, which captures proximity to sensitive resources, potential for environmental harm or water quality violations, and/or heightened public concern; or
(2) History, which captures a history of significant non-compliance.

## Permit Violations

If permit violations are identified, the permittee will be advised to immediately stop all activities in violation until compliance is restored. Permit violations will be documented according to the same standards for documenting unauthorized activity violations, as described under Section III, below.

When appropriate, the district may attempt to resolve permit violations through informal compliance assistance as described under Section IV, below. However, if compliance is not

readily achieved through compliance assistance, or if compliance assistance is not appropriate, the permit may be suspended or revoked per 373.429, F.S., and enforcement is pursued as described under Section V, below.

## III. Unauthorized Activities

The Department responds to reports of potential violations from federal, state and local officials, as well as from the general public.  When a possible violation is reported, district staff will work with the complainant to gather as much relevant information as possible concerning the condition of the site, the status of the activity, and the parties responsible for the alleged violation.  All potential violations of the State 404 Program reported to the Department will be entered into a statewide database and tracked until resolution.

The Department will investigate and provide written responses to all citizen complaints submitted pursuant to State procedures in accordance with 40 C.F.R. § 233.41(e)(2)(i) and as described further under Section V, below.

Prior to onsite inspection, preliminary review of a reported violation is conducted in order to inform and prioritize investigations.  At a minimum, pre-inspection research should include review of permitting and enforcement records for the subject site, the owner of record, and any other alleged responsible parties identified by the complainant.  Preliminary evaluation will also include review of current and historic aerial imagery, soil surveys, and other available physical or environmental data.  Based on the findings of the preliminary research, a field inspection will be scheduled as needed.  Timing of investigations will reflect the nature and location of the suspected violations, the anticipated impacts, and the most effective use of inspection resources available.  Any reported State 404 Program violations determined to be located within retained waters will be referred to the U.S. Army Corps of Engineers.

Field Investigation and Documentation

Field investigation of a potential State 404 Program violation involving an unauthorized regulated activity will include a determination regarding whether the site falls within the jurisdiction of the State's wetland regulatory programs and whether an unauthorized regulated activity has occurred or is occurring.  Generally speaking, a report of a potential State 404 Program violation will also be investigated as a potential violation of the ERP Program, and vice versa.  When the inspection confirms that a violation exists, the field investigation will also identify the extent of the violation and the parties responsible.

All field investigations will include verification of the landward extent of wetlands and other surface waters in accordance with Chapter 62-340, F.A.C., and the Department will also review the wetlands and other surface waters to determine if they are Waters of the United States as needed (see section (a) of the program description).  Jurisdictional determinations will be documented using the Chapter 62-340, F.A.C., Data Form, Form 62-330.201(1), incorporated by reference in subsection 62-330.201(1), F.A.C. and as described in Section 7.1 of the ERP Applicant's Handbook, Volume I (62-331.010(3), F.A.C.).

When jurisdiction has been established, the investigator will document the condition of the site as necessary to demonstrate whether or not violations of the ERP or State 404 Programs have occurred or are occurring.  If a violation exists, the findings of the investigation will be documented in an inspection report containing sufficient evidence to prove the elements of the violation.  The report should, at a minimum: (a) establish jurisdiction; (b) provide a detailed description of the illegal activity, including the location and date of the violation, the persons responsible, and the cause of the violation; and (c) provide a detailed description of the existing environmental conditions at the site.

To the greatest extent practicable, field investigations will be conducted and documented in a manner that is sufficiently thorough to prevent the need for follow-up inspection(s).

## Unauthorized Activity Violations

Upon documenting that an unauthorized regulated activity has occurred, the district will immediately issue written notification to the responsible party or parties advising that the violator(s) immediately cease the unauthorized activities, presenting possible options for resolution, and establishing deadlines for response.

When compliance assistance as described under Section IV, below, is an appropriate initial approach, preliminary notification of a violation may be provided as an informal compliance assistance offer.  For more significant violations, proceeding directly to formal enforcement as described under Section V, below, by issuing a Warning Letter or Notice of Violation may be the appropriate first step.

## IV. Compliance Assistance

When appropriate, the Department will attempt to resolve minor violations of the State 404 Program through informal compliance assistance.  Compliance assistance is generally recommended when the corrective actions required to bring an activity into compliance are not complicated, the responsible party does not have a history of non-compliance, and penalties are not warranted.  For example, if the inspector identifies a small dredge and fill violation in a residential backyard, the owner did not know about the requirement for a permit, and the owner agrees to restore the area quickly, the case can potentially be resolved without the need for more formal enforcement.

If the Department determines that compliance assistance is appropriate, an initial verbal compliance assistance offer may be provided onsite.  The Department will subsequently issue a written notice of non-compliance that presents options for resolution of the violation and establishes deadlines for response or corrective action.  The notice of non-compliance will be issued to all related responsible parties and documented by the Department as necessary to ensure that the State maintains accurate records that facilitate identification of repeat violators.

Although the notice of non-compliance establishes deadlines for action by the violator, the Department maintains open lines of communication in an attempt to expeditiously resolve the violation through voluntary corrective actions.  If communications break down or if it appears that the violator has not taken appropriate steps to resolve the violation, the Department may also

issue a Warning Letter prior to initiating formal enforcement.  Enforcement will be pursued as described under Section V, below, if the violation is not readily resolved through compliance assistance.

## V. Enforcement

Section 373.129(7), F.S., authorizes enforcement of the State 404 Program in the same manner and to the same extent as provided in Sections 373.430, 403.121(1) and (2), 403.131, 403.141, and 403.161, F.S.  Available remedies include:

- Judicial (civil) actions instituted in a court of competent jurisdiction pursuant to 403.121(1), F.S., to:
  - recover damages for injury to air, waters, or property, including plants, animals and aquatic life;
  - impose civil penalties up to $15,000 per offense (for which each day constitutes a separate offense);
- Administrative proceedings initiated per 403.121(2), F.S., to:
  - recover damages;
  - order abatement/control of the violation or other appropriate corrective action; and
  - assess penalties up to $50,000, depending on the type and extent of violation;
- Injunctive relief pursuant to 403.131, F.S.; or
- Criminal provisions (403.161 and 373.430, F.S.) enforced by the Office of the State Attorney.

Resolution of a violation through formal enforcement is pursued with the assistance of the Department's Office of General Counsel.  Most violations are resolved by means of civil or administrative procedures, with criminal actions pursued only in the most serious cases or in cases that cannot be resolved through other available avenues and for which criminal sanctions are provided.  The formal administrative enforcement process is typically initiated by serving a Notice of Violation and is finalized through entry of a Consent Order or Final Order.

### Settlements

When formal enforcement is necessary, the Department will attempt to negotiate a consent order to resolve all issues, including recovery of civil penalties, whenever possible and appropriate, before issuing a Notice of Violation or filing a judicial complaint.  In accordance with 40 C.F.R. § 233.41(e)(2)(iii), the Department will publish notice of and provide at least 30 days for public comment on any proposed settlement of a State 404 Program enforcement action (as addressed under "Public Participation," below).

It is the policy of the Department to avoid permanent environmental harm caused by a violator's activities by requiring remedial actions or ordering removal and restoration.  Typical requirements for restoration of a wetland dredge and fill violation may include: fill removal, restoration of pre-violation elevations and contours (which may require submittal of topographic surveys), and replanting; maintenance work including exotic species control; and monitoring and

reporting to ensure that the restoration trends toward and achieves success as expected. When necessary, a settlement agreement may require the violator to also provide mitigation needed to offset temporal loss of ecological function.

An acceptable State 404 Program settlement will generally include complete physical and ecological restoration of the regulated features on the site, or partial restoration and permit authorization for any unauthorized discharges which will be allowed to remain. The majority of cases will also require the violator to pay a civil penalty.

Corrective Actions
In cases involving unauthorized discharges of dredged or fill material which would not qualify for a State 404 Program permit, the Department should seek complete restoration except in limited circumstances as discussed in this section.

In determining whether to seek complete restoration, the Department will consider whether the unauthorized discharge in question meets the criteria for authorization under the State 404 Program, and whether the restoration is achievable in a practical manner. In cases where the project does not satisfy the requirements of the State 404 Program, complete restoration is almost always preferable to partial restoration and/or compensatory mitigation. This is because complete restoration not only replaces the lost functions and values provided by the impacted water resources, but also maintains a level playing field within the regulated community by ensuring that all discharges are evaluated using the same guidelines.

The Department may consider accepting compensatory mitigation in lieu of seeking on-site restoration in the following circumstances:

(1) where effective or meaningful ecological restoration is not possible or when restoration activities are expected to cause substantial ecological harm (e.g., unacceptable impacts to Critical Habitat for Threatened or Endangered Species),
(2) when restoration is not practicable (e.g., when, due to the nature of the violation, the system is not expected to return to the functional equivalent as the system prior to the discharge), and
(3) where the property is now owned by a good-faith purchaser (who was not aware of the violation and/or did not benefit from the action) and the equities strongly favor allowing the new owner to retain the fill.

These determinations will be made on a case-by-case basis with adequate consideration of all the relevant facts and circumstances of the case and must be documented in the Department's enforcement file.

In those cases where complete restoration is not appropriate and the violator is required to conduct partial restoration and/or provide compensatory mitigation, such restoration and mitigation activities shall be imposed as an enforceable requirement of a binding enforcement or settlement action. Where unauthorized discharges are allowed to remain in place, the Department should assess penalties which prevent violators from gaining a competitive

*Florida Department of Environmental Protection*
*Program Description, Section (g) – Description of the State's Compliance Evaluation and Enforcement Programs*

advantage over entities that do not violate the law and which are sufficient to deter future non-compliance with the State 404 Program permitting procedures.

Post-Enforcement Permitting
In the limited circumstances when unauthorized discharges are allowed by the Department to remain in place, that material will be authorized through a State 404 Program individual permit. No such permit shall be approved until resolution has been reached through an appropriate enforcement response and all administrative, legal and/or corrective action has been completed.

Although this post-enforcement permit will be issued "after-the-fact" in the sense that it will follow an enforcement resolution, the Department will avoid explicitly referring to any State 404 Permit as "after-the-fact." This slight difference in terminology allows the Department to maintain consistency with the closely associated ERP Program and prevent misunderstanding by the regulated public. Specifically, the Department's goal is to counter the common misconception that it is acceptable and appropriate to conduct a regulated activity without first obtaining authorization.

If any corrective actions are necessary to render an unauthorized discharge permissible under the State 404 Program, any formal requirements for such corrective actions will be imposed exclusively through the enforcement process. The final settlement agreement should ensure that adequate mitigation takes place to compensate for the impacts of those existing unauthorized discharges that are to remain.

## Civil Penalty Assessment

The Environmental Litigation Reform Act (ELRA) was amended in 2020 to authorize the Department to impose up to a total of $50,000 in civil penalties in an administrative action instituted pursuant to Section 403.121(2), F.S.

Civil penalty assessments can be calculated using the ELRA administrative penalty schedule or according to the Penalty Matrix, as described below. Guidance for assessing penalties under each of these options is provided by DEP Directive 923 (Attachment (g)-1) as well as program specific guidelines for characterizing certain types of violations and determining appropriate penalties.

ELRA Administrative Penalty Schedule
ELRA establishes an administrative penalty schedule to provide a more predictable and efficient manner for individuals and businesses to resolve relatively minor environmental disputes. For violations of the State 404 Program, including unauthorized dredge and fill violations affecting up to one acre, administrative penalties may be calculated using the ELRA penalties provided in Sections 403.121(3)(c), (4), and (5), F.S., which are transcribed in Table (g)-1, below.

*Florida Department of Environmental Protection*
*Program Description, Section (g) – Description of the State's Compliance Evaluation and Enforcement Programs*

*Table (g)-1: ELRA penalties applicable to the State 404 Program.*

| Violation (Statutory Language) | Base Penalty | Cite (F.S.) |
|---|---|---|
| Unpermitted/unauthorized dredging/filling or unauthorized construction of a stormwater management system | $1,500 | 403.121(3)(c) |
| *Add-0n 1* – If the dredging/filling occurs in an aquatic preserve, OFW, conservation easement, or Class I or II surface water | + $3,000 | |
| *Add-0n 2* – If the area dredged or filled is greater than 0.25 acre but less than or equal to 0.50 acre | + $1,500 | |
| *Add-0n 3* – If the area dredged or filled is greater than 0.50 acre but less than or equal to 1.0 acre (add $1,500 for *Add-On 2* and an additional $1,500 for *Add-On 3*) | + $1,500 | |
| Failure to complete required mitigation, failure to record a required conservation easement, or for a water quality violation resulting from dredging/filling activities, stormwater construction activities or failure of a stormwater treatment facility | $4,500 | 403.121(3)(c) |
| Failure to properly or timely construct a stormwater management system serving less than 5 acres | $3,000 | 403.121(3)(c) |
| Contractors and/or agents that conduct unpermitted or unauthorized dredging or filling shall be assessed a penalty per violation | $7,500 | 403.121(3)(c) |
| Failure to satisfy financial responsibility requirements | $7,500 | 403.121(4)(a) |
| Failure to install, maintain, or use a required pollution control system or device | $6,000 | 403.121(4)(b) |
| Failure to obtain a required permit before construction or modification | $4,500 | 403.121(4)(c) |
| Failure to conduct required monitoring or testing | $3,000 | 403.121(4)(d) |
| Failure to construct in compliance with a permit | $3,000 | 403.121(4)(d) |
| Failure to conduct required training | $1,500 | 403.121(4)(e) |
| Failure to prepare, maintain, or update required contingency plans | $1,500 | 403.121(4)(e) |
| Failure to submit required notification to the Department | $1,500 | 403.121(4)(e) |
| Failure to prepare, submit, maintain, or use required reports or other required documentation | $750 | 403.121(4)(f) |
| Failure to comply with any other Departmental regulatory statute or rule requirement | $1,000 | 403.121(5) |

Penalty Calculation Matrix for ERP and State 404 Program Violations

The Department's Penalty Calculation Matrix for the ERP and State 404 Programs, reproduced as Table (g)-2, below, is used to calculate civil penalties for dredge and fill violations affecting

*Florida Department of Environmental Protection*
*Program Description, Section (g) – Description of the State's Compliance Evaluation and Enforcement Programs*

over one acre or that otherwise exceed the limitations of the ELRA penalty schedule, or when penalties are pursued via a judicial complaint.

*Table (g)-2: Penalty Calculation Matrix for the ERP and State 404 Programs.*

| | | EXTENT OF DEVIATION FROM REQUIREMENT | | |
| :---: | :---: | :---: | :---: | :---: |
| | | MAJOR | MODERATE | MINOR |
| ENVIRONMENTAL HARM | MAJOR | $15,000 to $12,000 | $11,999 to $9,000 | $8,999 to $6,900 |
| | MODERATE | $6,899 to $4,800 | $4,799 to $3,000 | $2,999 to $1,800 |
| | MINOR | $1,799 to $750 | $750[1] | $750[1] |

[1]– Environmental Education may be an acceptable substitute.

The attached document "Guidelines for Characterizing ERP Violations" (Attachment (g)-2) provides program-specific guidance for characterizing violations by Environmental Harm and Extent of Deviation.  (Please note that the attached version of said document is pending revisions to the listed statutory penalty amounts to reflect changes effective July 1, 2020.)  The guidelines for characterizing the Environmental Harm and Extent of Deviation (starting at page 3) of an ERP violation will also be applied to characterize violations of the State 404 Program, as applicable. Note that for the purposes of determining Extent of Deviation, mitigation shall not be considered a "modification."  If the violation requires mitigation to offset impacts, then the Extent of Deviation is Major.

Multi-Day Penalties and Adjustment Factors
When evaluating an enforcement case, the Department carefully considers the circumstances surrounding the case to determine which factors either contributed to or mitigated the violation(s).  Such factors may then be used to adjust the penalty amount upward or downward as appropriate and can be applied under both ELRA and the Penalty Matrix.

DEP Directive 923 discusses when and how to assess multi-day penalties as authorized by Section 403.121(6), F.S., and provides guidance for applying various penalty adjustment factors. These factors include:

- Knowing, deliberate, or chronic violations;
- Good faith efforts to comply (or lack of good faith efforts to comply) either prior to or after discovery of the violation by the Department;
- History of noncompliance;
- Economic benefit of noncompliance;
- Ability to pay; and
- Other unique factors.

*Page 10 of 12*

*Florida Department of Environmental Protection*
*Program Description, Section (g) – Description of the State's Compliance Evaluation and Enforcement Programs*

Specific statutory provisions for penalty adjustments based on history of noncompliance and economic benefit gained from a violation are also described under Sections 403.121(7) and (8), F.S., respectively. Pursuant to Section 403.121(9), F.S., the total administrative penalties assessed for a violation may not exceed $10,000 against any one violator, unless the violator has a history of noncompliance, the economic benefit of the violation exceeds $10,000, or there are multiday violations.

In-Kind Penalties and Pollution Prevention Projects
The Department may approve In-Kind Penalties and Pollution Prevention Projects in lieu of a cash penalty. In-Kind Penalties and Pollution Prevention Projects are assessed at 1.5 times the amount of the penalty if paid in cash and should be considered as provided in DEP Directive 923.

## Appeals & Public Participation
The Department's initial document(s) used to institute an administrative enforcement proceeding state its understanding of the facts, conclusions of law, and proper remedies in a particular case. Under the Administrative Procedures Act (Chapter 120, F.S.), a person who is substantially affected by the Department's decisions in these documents has a right to contest the findings and decisions pursuant to Section 403.121(2)(h), F.S.

Public Participation
The Department will provide for public participation in the State 404 Permit Program enforcement process pursuant to 40 C.F.R. § 233.41(e)(2).

In order to satisfy 40 C.F.R. § 233.41(e)(2)(i), the Department will investigate and provide written responses to all citizen complaints submitted pursuant to State procedures as described under Section III, above. However, many complaints reported to the Department are received by callers wishing to remain anonymous. In order to accommodate these complainants, upon request by the caller the Department will provide the option to "opt out" of receiving a written response to their complaint.

As required by 40 C.F.R. § 233.41(e)(2)(ii), the Department will not oppose intervention by any citizen when permissive intervention may be authorized by statute, rule, or regulation.

The Department will publish notice of and provide at least 30 days for public comment on any proposed settlement of a State 404 Program enforcement action in accordance with 40 C.F.R. § 233.41(e)(2)(iii). The public noticing will be conducted in accordance with the applicable provisions of Rule 62-331.060(1), F.A.C., as described further at section (b) of the program description.

## VI. Coordination and Consistency
Enforcement of the State 404 Program will be coordinated with EPA and the Corps as outlined in each agency's respective memorandum of agreement with the State (see sections 233.13 and 233.14 of this package). The Department will make available without restriction any information obtained or used in the enforcement of the State 404 Program to EPA upon request.

*Florida Department of Environmental Protection*
*Program Description, Section (g) – Description of the State's Compliance Evaluation and Enforcement Programs*

## Consistency Initiatives

In order to promote consistency in enforcement of the State 404 Program, all proposed formal enforcement actions will be subject to peer review by SLERC and the Division of Water Resource Management.  The peer review process provides for an independent assessment conducted by experts at the Division that is intended to ensure statewide consistency of enforcement actions, satisfy federal requirements under the state review framework, and serve as a check point on the draft penalty calculations and rule references.  Division staff will provide comments to the district including any recommendations to improve the quality and consistency of the proposed enforcement actions.

State 404 Program compliance evaluation and enforcement activities conducted at the district level will also be subject to SLERC audit review.  At a minimum, SLERC will conduct audit review of 10% of compliance projects for which a violation is discovered plus a minimum percentage of formal enforcement actions according to the following sliding scale:

- Year 1: Audit of 50% of enforcement actions
- Year 2: Audit of 25% of enforcement actions
- Year 3+: Audit of 20% of enforcement actions

SLERC may conduct additional audits at the discretion of the program, but minimum audit rates may not be decreased below 20% of enforcement actions and 10% of compliance projects for which a violation was discovered.  Potential audit projects may be selected or prioritized based on High Risk designation, identification of a violation classified as "significant noncompliance," acreage of a subject violation, or factors corresponding to project significance.

Annual reports submitted to the EPA will describe any concerns identified through these consistency initiatives and provide recommendations for their resolution, as required by 40 C.F.R. § 233.52(b).

State of Florida
Department of Environmental Protection

DEP 923
Effective:

Administrative Directive

_____
Approved by the Secretary

## SETTLEMENT GUIDELINES FOR CIVIL AND ADMINISTRATIVE PENALTIES

1. **Purpose**

   These guidelines are provided solely for the use of Department staff in determining what position the agency should take in settlement negotiations concerning civil and administrative penalties. They are intended to provide a rational, fair and consistent method for determining whether the Department should seek a civil penalty in an enforcement action and the appropriate amount of civil and administrative penalties the Department should seek from responsible parties in settling enforcement actions when imposition of a civil penalty is appropriate. These guidelines do not represent an unadopted rule (inasmuch as the Department is not obligated to settle cases) and may not be cited as legal authority for any agency action. *Envirochem Envtl. Serv. v. Dep't of Envtl. Prot.,* No. 93-5553RU (Fla. DOAH Feb. 9, 1994) (Final Order). These guidelines are not applicable for assessing damages to natural resources. In an appropriate case, monetary relief for actual damages caused to the State's natural resources can be sought in addition to civil or administrative penalties. These guidelines will be periodically reviewed to determine their effectiveness, and whether refinements are needed.

2. **Authority**

   With the enactment of the Environmental Litigation Reform Act (ELRA), Section 403.121, Florida Statutes (2001), the Department was given administrative penalty authority for most regulatory programs. ELRA was amended in 2020 to give the Department the authority to impose up to a total of $50,000 in administrative penalties in one administrative action for most regulatory violations.

   Independent of ELRA, the Department has statutory authority to assess administrative penalties in Beaches and Coastal Systems cases for up to $15,000 per day, Section 161.054(1), Florida Statutes, and in State Lands cases for up to $10,000 per day, Section 253.04(2), Florida Statutes. ELRA does not modify or add to that existing authority. Penalty guidelines for these programs have been adopted by rule.

The Department also has the authority in a judicial proceeding to ask a court to assess penalties of up to $15,000 per day per violation, Sections 403.141, 377.37, 376.302, and 373.129(5) Florida Statutes; up to $37,500 per day per violation for hazardous substance violations, Section 403.726, Florida Statutes; up to $75,000 per day per violation for hazardous waste violations, Section 403.727, Florida Statutes, for violations of the Pollutant Discharge Prevention and Control Act, Section 376.16, and for gambling vessel violations, Section 376.25, Florida Statutes; up to $5,000 per day per violation for violations of the Safe Drinking Water Act, Section 403.860, Florida Statutes; up to $375,000 for coral reef damage, Section 403.93345, Florida Statutes; and up to $7,500 per day per violation for violations involving phosphate mines in Section 378.211, Florida Statutes.

## 3.   <u>Introduction</u>

This Department is directed by the Legislature to protect and enhance Florida's water, air, and lands, to protect human health, safety and welfare from adverse environmental conditions, and to manage the state's natural resources.   To accomplish these goals, the Legislature has passed laws restricting or prohibiting activities that may cause pollution, harm the resources of the state, or threaten human health or safety.   It has also given the Department the authority to adopt environmental standards, to require that persons engaging in certain activities obtain permits or other authorizations before those activities are undertaken, and to take appropriate actions to ensure that all persons comply with the statutory, rule, and permit requirements.

The Department has multiple ways to encourage compliance with the law, and to address non-compliance.   Effective education of the public and regulated persons may prevent non-compliance from occurring in many instances.   Such education may be in the form of training or outreach efforts.   If a violation occurs, the Department may often obtain a return to compliance by informal means. In such cases, education may still be the appropriate remedy, and the Department may establish an environmental education course for such persons.   Assisting with a prompt return to compliance without formal enforcement is the preferred means to correct a violation committed by a person who did not know that the person's actions were contrary to law, or whose actions were inadvertent , if the violation caused no more than "minor harm" as identified in the Program's Penalty Guidelines.   An inadvertent violation is one that occurs despite the good faith efforts of the responsible party to comply with the applicable requirements.

Once a decision has been made that formal enforcement is appropriate, Department staff must then decide whether an administrative or civil penalty is appropriate.   Even when formal enforcement is necessary, these guidelines do not

require imposition of a penalty in every enforcement action. The Department staff involved in pursuing enforcement, with appropriate supervisory review, should use their sound judgment, along with any program specific guidance that is consistent with this policy, to decide when a penalty should be sought.  In exercising this judgment, the user should remember that the imposition of penalties is an enforcement tool that is intended to insure immediate and continued compliance by the subject of the action and by others who may face a similar situation in the future. Thus, penalties should be considered in those cases in which it is determined that penalties are needed to ensure that the responsible party and others similarly situated will be deterred from future non-compliance.

For example, a person – perhaps a homeowner or a person new to a business venture – may have committed a violation out of sheer ignorance. The person may acknowledge the mistake and be willing to correct any problems created by the violation. For this first-time violator, the staff may reasonably believe that the violation was inadvertent or occurred because the responsible party was not aware of or did not understand the requirement, and that a civil penalty would not provide a deterrent effect under the circumstances.  In general, such cases may be appropriate for education.  However, because of the nature of the corrective actions, the Department staff may decide that a consent order would be most appropriate to ensure that the corrective actions are completed or to provide needed authorization to conduct the corrective actions.  In such cases, the staff should ensure that impacts on the environment are corrected, while also minimizing the impact of the consent order on the responsible party. Under these circumstances, devices such as conservation easements, institutional controls, etc., should only be required if necessary, to achieve the restoration goal.  On the other hand, a penalty may be entirely appropriate for a first time violator who knew or had reason to know that the actions were illegal, who refuses to correct the problem that the person created by those illegal actions, or whose violation resulted in harm to the public health or the environment.  A penalty should normally be sought against a person with a pattern of non-compliance.

Once you have decided that a civil penalty is appropriate, these guidelines should be used in settling both administrative and judicial enforcement actions brought against the persons violating Department statutes, permit conditions or rules. Although ELRA, enacted in the 2001 legislative session and amended in 2020, sets specific penalty amounts for certain violations covered under the Act when those violations are pursued with a Notice of Violation, these guidelines provide: (1) direction about the application of the ELRA penalty schedule to the penalty calculation and negotiation process, (2) direction for programs not covered under ELRA, and (3) direction on cases that involve penalties calculated under ELRA that exceed $50,000.

When formal enforcement is necessary, staff should attempt to negotiate a consent order to resolve all issues, including civil penalties, whenever possible and appropriate, before issuing a Notice of Violation or filing a judicial complaint. No such Notice of Violation or complaint should refer to these guidelines. If a settlement cannot be reached and recovering penalties is appropriate, the Department must issue a Notice of Violation for all violations that are covered under ELRA that involve only penalties (i.e. no corrective actions), and that involve penalties in an amount that is $50,000 or less as calculated under ELRA (see Section 5., below).

In determining whether the Department should settle a case, file a Notice of Violation, or go to court for a judicial assessment of penalties, the Department will not only look at the statutory authorizations and requirements, but also at the following: does formal enforcement result in the elimination of any economic benefit gained by the violator as a result of the violation; and beyond that, does formal enforcement provide enough of a financial disincentive to discourage future violations not only by the violator but by others contemplating similar activities? At the same time, this policy should not be used to try to obtain more without litigation than could be obtained as civil penalties in an administrative or a judicial action. It must also be recognized that in some cases the benefits to the Department and public are not worth the costs and effort necessary to recover a penalty. In carrying out the mission of the agency, the District and Division Directors are authorized to deviate from these guidelines consistent with state law. However, penalties which are increased for the reasons cited below are subject to Secretarial approval.

### 4.    Applicability to Program Areas

This policy is designed to apply to all program areas except those overseen by the Board of Trustees, unless otherwise preempted by an interagency agreement or other obligation of the Department. The Department currently has guidance and interagency agreements with the EPA, which are updated from time-to-time. Although such guidance and agreements represent a basis for establishing consistency, they are to not be used as mandates, but rather guidelines, applied on a case-by-case basis.

Most of the Department's programs have developed program specific guidelines for characterizing violations routinely found in their program areas. The program specific guidelines do not provide guidelines for every possible violation that may be discovered. The program specific guidelines are intended to be used in conjunction with these Settlement Guidelines when calculating the appropriate penalties to be sought in cases that will not be pursued under ELRA via a Notice of Violation if settlement fails (e.g., where the total penalties exceed $50,000 as

calculated by the ELRA penalty schedule, where correction actions are sought that are of the degree and immediacy that a court order is necessary, or where the violations are not covered under ELRA). There may be some cases that involve unusual circumstances that have not been factored into the program specific guidelines. The program area should be consulted in these cases to enhance state-wide consistency.

## 5.   Penalty Calculation

**Step 1:**  The initial step in calculating any penalty is to determine whether the penalties will be pursued via a Notice of Violation (pursuant to ELRA) or a judicial complaint in the event a settlement agreement is not reached.  In making this determination, the following four questions must be considered:

### 1)   Is the violation for which the penalty is being assessed assigned a mandatory penalty amount under the schedule in ELRA?

In other words, is the violation accounted for in subsection (3) or (4) of ELRA?  If so, it is statutorily mandated to proceed administratively, unless the answer to any of the following questions is "yes."  If the violation is not accounted for in subsections (3) and (4), the Department may proceed judicially, but can still opt to proceed administratively under ELRA by using the permissive, $500 "catch all" penalty provision in subsection (5) of the statute.

### 2)   Does the violation for which the penalty is being assessed involve the failure to comply with an asbestos, hazardous waste, or underground injection control regulation?

If so, it is not mandated to proceed administratively by ELRA, but it is also not prohibited.  Thus, if the violation is assigned a penalty under either of the mandatory provisions in the ELRA schedule, the District may or may not proceed administratively.  The District also has the discretion to use the permissive, $500 "catch all" penalty provision, if the violation is not otherwise accounted for in the ELRA schedule, but it still wishes to proceed administratively.

### 3)   Does the violation for which the penalty is being assessed necessitate a corrective action in addition to a penalty?

If so, it is not statutorily mandated to proceed administratively, but it is also not prohibited.  However, in the event a temporary injunction is necessary,

the Department should always proceed judicially.

### 4)    Does the total of the penalties calculated under the ELRA schedule for all violations, including all adjustments exceed $50,000?

If so, the Department is prohibited from proceeding administratively unless the District Director opts to cap the total penalty sought at $50,000.  For example, the District Director may choose to cap the penalty in a case in which the calculated penalty only marginally exceeds $50,000 or in a case that would not warrant a judicial action if not settled.  As a practical matter, those cases should either be settled at $50,000 or pursued administratively for the maximum allowed under the ELRA.

*Even when it is optional whether to proceed judicially or administratively, an initial decision should be made as to how the District plans to proceed for the purpose of calculating a penalty to initiate settlement discussions.  In making this decision, the District Director and District staff should thoughtfully consider the advantages and disadvantages of the administrative and judicial processes outlined in Chapter 5, Section 5.0 of the Department's Enforcement Manual as well as the factors discussed in the Introduction above.*

**Step 2:**  If the penalties will not be pursued via a Notice of Violation in the event a settlement is not reached, the penalty should be calculated using: (a) the program specific guidelines to determine how the violation should be characterized; and (b) the guidance below in Sections 6, 7, and 8 to determine the total penalty amount.

If the penalties will be pursued via a Notice of Violation in the event a settlement is not achieved, the civil penalty calculation should start with the application of the specific penalty assigned to each violation under the penalty schedule in set forth ELRA (i.e., Section 403.121(3)-(6), Florida Statutes).  This is the baseline penalty.

Once the baseline penalty has been established, a decision must be made as to whether there are any mitigating circumstances involved in the particular case that would warrant downward or upward adjustments of the baseline penalty. Downward adjustments could be made for good faith efforts to comply before or after the discovery of the violation, or for violations caused by circumstances beyond the control of the responsible party which could not have been prevented by due diligence.  See Section 403.121(10), Fla. Stat.  Upward adjustments to the baseline penalty could be made based upon a history of non-compliance as provided in ELRA (see Section 403.121(7), Fla. Stat.) or for economic benefit gained from the violation (See Section 403.121(8), Fla. Stat.).  Note, if the upward

adjustments together with the ELRA schedule baseline penalty exceeds a total of $50,000, the penalty must be capped at $50,000, if the Department is going to pursue the penalty under ELRA.

**Step 3:**  In all cases where a proposed penalty is to exceed $25,000, a peer review by the Division should be conducted and the proposed penalty must gain Deputy Secretary approval.  Proposed penalties established at a value of $75,000 or more must gain approval by the Secretary.

## 6.    **Penalty Matrix**

The program specific guidelines created under this directive shall include penalty matrices that have two factors: (a) actual (or in some cases "potential") environmental harm and (b) extent of deviation from a statutory regulatory requirement.

Factor (a), the y axis, addresses the actual or potential harm to human health or the environment that may occur as a result of the violation.   Generally, penalties that are assessed predominantly for potential harm (where little or no actual harm is done, nor willful intent to violate existed) should not exceed $15,000.  There are three levels of harm within this axis of the matrix:

1.    MAJOR:  violations that actually result in pollution in a manner that represents a substantial threat to human health or the environment;

2.    MODERATE:  violations that actually or are reasonably expected to result in a pollution in a manner that represents a significant threat to human health or the environment;

3.    MINOR:  violations that actually or are reasonably expected to result in a minimal threat to human health or the environment.

An example of a major violation is a discharge or emission of a pollutant to the air or a water body in a manner which exceeds air or water quality standards by an order of magnitude amount and over a substantial period of time, or where the environment is measurably and substantially affected by the discharge or emission.

Factor (b), the x axis, addresses the degree to which the violation deviates from Department statutes and rules and thereby upsets the orderly and consistent application of the law.  The three levels are classified as follows:

1.    MAJOR:  the violator deviates from the requirements of the law by a significant extent (e.g. an order of magnitude or more) or the violation was willful and intentional.

2.    MODERATE:  the violator deviates from the legal requirements of the law significantly but for a short period of time and/or most of the requirements are implemented as intended.

3.    MINOR: the violator deviates somewhat from the requirements of the law but most of the requirements are met.

An example matrix is attached hereto as attachment I.  Each box in the penalty matrices contains a range of penalty amounts.  If it is determined that the violations were knowing, deliberate or chronic violations, penalties should be calculated by using the top of the applicable ranges.

## 7.    Multiple and Multi-Day Penalties

Violations usually occur in multiples, over extended periods of time.  While the policy must be designed to encourage a prompt return to compliance, assessing the full matrix penalty amount for each day of a violation for those cases outside the scope of ELRA could result in an astronomical amount being sought.  On the other hand, such a calculation might be useful in setting outside limits if a large economic benefit has been received from the violation.  In order to recognize ongoing and multiple violations without unrealistic results, the following applies:

Multi-day penalties may be pursued where daily advantage is being gained by the violator for an ongoing violation; or, where the violation is causing daily adverse impacts to the environment and  the violator knew or should have known of the violation after the first day it occurred and either failed to take action to mitigate or eliminate the violation or took action that resulted in the violation continuing.  On the other hand, deference should be given to those rare cases involving regulated entities, whereby the sole alternative to a violation would result in the loss of essential services (e.g. water or electricity) to Florida citizens.  Multi-day penalties should be computed by multiplying the appropriate daily penalty calculated or a part thereof by the number of days of noncompliance.  Where the impact of the ongoing violation is not significantly detrimental to the environment, a penalty amount that is lower than the matrix amount should be calculated for the violations that occur after the first day.  For violations that are significantly detrimental to the environment, a penalty amount at the matrix amount should be calculated for the violations that occur after the first day, up to 30 days of non-compliance.  For violations that occur for more than 30 days, judgment should be exercised to determine the appropriate penalty amount to be sought for each

additional day of non-compliance that occurs over 30 days.  For multi-day hazardous waste violations, staff should consider the guidance provided in EPA's most current RCRA Civil Penalty Policy.  Multi-day penalties are also useful when a facility agrees to come into compliance by a specific date.  In that case stipulated daily penalties could be required for missing the agreed upon compliance date.  Or the overall penalty could be lowered based upon the number of days the violator comes into compliance prior to the compliance date.

An alternative to multiplying the total daily penalty by the number of days of noncompliance for non-ELRA cases that are not significantly detrimental to the environment would be to use one or more of the adjustment factor amounts chosen multiplied by the number of days the adjustment factor is appropriate.  For example, assume a total one day penalty of $8,000 was arrived at by adding $6,000 derived from the matrix, $1,000 for lack of good faith before the Department discovered the violation, and $1,000 for lack of good faith after the Department informed the responsible party of the violation, but you feel the penalty is too low considering the nature of the violation.  A multi-day penalty could be calculated, for example, by adding to the total one day penalty ($6,000) a multiple of $1,000 times the number of days the violation occurred prior to being discovered by the Department and the violator acted with lack of good faith, and/or by multiplying $1,000 times the number of days the violation occurred after the Department informed the responsible party of the violation and the violator acted with lack of good faith.

If the above described example involved a violation that took place over a twenty day period with the violator acting with lack of good faith for five days prior to the Department discovering the violation, and the violator acting with lack of good faith for ten days after being informed of the violation by the Department, the total penalty could be calculated as follows:

a.   One day penalty - $6,000 (without adjustments), plus

b.   A multi-day penalty using the adjustment factor amount for lack of good faith prior to the Department discovering the violation times the number of days lack of good faith was demonstrated by the violator - $1,000 x 5 = $5,000, plus

c.   A multi-day penalty using the adjustment factor amount for lack of good faith after the violator was informed of the violation by the Department times the number of days lack of good faith was demonstrated by the violator - $1,000 x 10 - $10,000.

d.   Total penalty proposed for settlement: $6,000 + $5,000 + $10,000 =

$21,000.

It is important in using daily penalties of this type that the amount be sufficient to discourage the violator from continuing a violation by making it more expensive to pay the daily penalty than to come into compliance.  Also, if the case is within the scope of ELRA, multi-day penalties should be pursued consistent with ELRA.

8.    **Adjustment Factors**

The attached Penalty Computation Worksheet sets out the steps you should follow in calculating a penalty based upon the matrix and adjustment factors.  After you have calculated the penalty amount derived from the matrix, you should consider the adjustment factors and determine whether any or all of them should be used. When applying adjustment factors, a penalty can be reduced to zero or increased up to the statutory maximum per day allowed for the particular violation.

**Good Faith Efforts to Comply/Lack of Good Faith Prior to Discovery of the Violation by the Department:** This adjustment factor can be used to increase or decrease the amount of penalties derived from the penalty matrix. This adjustment factor allows you to consider what efforts the responsible party made prior to the Department's discovering a violation to comply with applicable regulations.  Some examples of lack of good faith are:

a.    The responsible party knew it was not complying with the Department's regulations.

b.    The responsible party claims it did not know it was not complying with the Department's regulations, but because of the nature of the responsible party's business and the length of time the business was operating, it is reasonable to assume that the responsible party should have known about the Department's regulations.

c.    The violation was caused by an uninformed employee or agent of the responsible party, and the responsible party knew or should have known about the Department's regulations and made no or little effort to train, educate or inform its employees or agents.

Some examples of good faith efforts to comply are:

a.    The violation was caused by the responsible party's employees or agents despite the responsible party's reasonable efforts to train, educate or inform its employees or agents.

b.    The violation was caused by the responsible party as a result of a legitimate\misinterpretation of the Department's regulations.

c.    The violation occurred after a Department regulation was changed and compliance was required, but the responsible party had been making reasonable efforts to bring its operation into compliance with the new Department regulation.

d.    The responsible party took action on its own to mitigate the violation once it discovered that a violation had occurred.

e.    Once the responsible party discovered the violation, it made changes to its operation on its own to prevent future violations from occurring.

f.    The responsible party has demonstrated that it is implementing an acceptable pollution prevention plan.

g.    The responsible party has demonstrated that it is operating in accordance with a DEP Ecosystem Management Agreement.

**Good Faith Efforts to Comply/Lack of Good Faith after the Department Informed the Responsible Party of the Violation:** This adjustment factor can be used to increase or decrease the amount of penalties derived from the penalty matrix.  Some examples of good faith efforts to comply are:

a.    Once the responsible party was notified of the violation by the Department, it took immediate action to stop the violation and mitigate any effects of the violation.

b.    Once the responsible party was notified of the violation by the Department, it cooperated with the Department in reaching a quick and effective agreement for addressing the violation.

Some examples of lack of good faith efforts to comply are:

a.    The responsible party took affirmative action that was in violation of the Department's regulation after being notified by the Department that such action constituted a violation of the Department's regulation.

b.    The responsible party failed to take action to stop an ongoing violation or to mitigate the effects of a violation after being notified by the Department that it was in violation of a Department regulation.

c.      The responsible party ignores the Department's requests to negotiate a settlement.

**History of Non-Compliance:** This adjustment factor can be used to increase the amount of penalties derived from the penalty matrix or ELRA schedule.  For non-ELRA cases, this adjustment factor may be used if a violation has occurred within a five year period previous to the occurrence of the current violation and a consent order, final order, judgment, judicial complaint or Notice of Violation was issued for the violation; the previous violations involved any of the programs regulated by the Department; and the previous violations involved a penalty obtained or being pursued where  at least one of the violations was deemed as major for either the "environmental harm" or "extent of deviation from requirement" categories and was in the amount of $2,000 or more.  For ELRA cases, this adjustment factor may be used if a violation has occurred within a five-year period previous to the Notice of Violation and resulted in a consent order, final order, or judgment.

**Economic Benefit of Non-Compliance (requires Deputy Secretary approval):**  Economic benefits can be both passive, such as avoided costs gained from inaction, where the benefits come from the money saved from avoiding or delaying costs of compliance; and active, such as increased profits or revenue gained from actions taken in violation of Department statutes or rules where the benefits would not have been gained, if the facility had only been operated in compliance.  In certain situations, a responsible party could both actively and passively gain economic benefit from violating Department statutes or rules.  Other than in ELRA cases, the statutes do not specifically authorize the recovery of economic benefits gained by the violator.  However, the statutes do provide for penalties to be imposed in an amount that ensures immediate and continued compliance, and unless the economic benefit from the violation is taken away by the penalties, the penalties will not ensure immediate and continued compliance. Therefore, economic benefits that are not de minimis may be included in all penalty calculations up to the amount allowed by the applicable statutory per day penalty cap.

Passive economic benefits usually consist of the money that was made or that could have been made by an alternate use of the money that should have been expended to bring the facility into compliance.  Assuming the responsible party will be forced to spend money to come into compliance as a result of the enforcement action, the minimum economic benefit associated with avoiding or delaying costs can be determined by calculating the amount of interest that was or could have been earned on the amount of money that should have been spent to bring the facility into compliance.  The amount of this form of economic benefit will depend upon the amount of money that should have been spent, the period of time the costs were avoided or delayed, and the prevailing interest rate.  A

common example of economic benefits gained from avoiding or delaying costs is the situation in which an owner or operator of a regulated source of pollution fails to purchase a pollution control device needed to operate the facility in compliance with pollution control laws.

Active economic benefits usually consist of any increase in profits, revenue gained or reduction in costs that are directly attributable to the activity conducted in violation of Department statutes or rules.  Increased profits and/or a reduction of costs, for example, can occur when a facility that is required to operate with a pollution control device is operated without the use of the pollution control device in order to increase the production or reduce the costs of production.  Increased profits can also be gained when action is taken such as constructing and operating a facility without obtaining the required permits in order to make money from the operation of the facility sooner than would have been allowed.  A possible example could involve a situation in which the developer of a shopping center conducts dredging and filling activities, constructs a stormwater facility or runs water and sewer lines without waiting to obtain permits so that the construction of the shopping center can meet a deadline for opening.

ELRA penalties can be adjusted upward by considering economic benefit up to the per violation and per assessment caps (see Section 403.121(8)-(9), Fla. Stat.).  In non-ELRA cases, the economic benefit adjustment factor can be used to increase the amount of penalties derived from the penalty matrix up to the maximum penalty authorized by statute. For example, if a violation occurs for 10 days and the statute allows for the imposition of a penalty up to $15,000 per day, and the matrix penalty calculated for the violations is $60,000, the amount of economic benefit gained by the violator maybe added to the matrix penalty up to the statutory maximum penalty of $150,000. Continuing with the example, if the matrix penalty calculated for the violations is $60,000, and the economic benefit to the violator from the violations is $30,000, the penalty sought may be as high as $90,000.  If the matrix penalty calculated for the violations is $80,000 and the economic benefit to the violator from the violations is $750,000, the Department would be limited to pursuing a penalty of $150,000.   Staff should consider capturing the economic benefit gained by one or more violations by using the statutory penalty cap for the total of all violations in all non-ELRA cases.

**Ability to Pay:** This adjustment factor may only be used in (waste and petroleum) clean up cases to decrease or increase the amount of penalties derived from the penalty matrix or ELRA schedule.  The violator has the burden of providing to the Department all of the financial information needed to determine ability to pay. If sufficient information is not provided by the violator, an ability to pay adjustment decreasing the penalty may not be considered.   The District Staff should seek

support from the Division of Waste Management in reviewing ability to pay information.

**Other Unique Factors:** This adjustment factor can be used to increase or decrease the amount of penalties derived from the penalty matrix, or to decrease the amount of penalties to be pursued in an ELRA case, but may not be used to increase the amount of penalties that can be pursued in an ELRA case. This adjustment factor is intended to provide the District with flexibility to make adjustments in a particular case based upon unique circumstances that do not clearly fit within the other adjustment factors. When it is used, the unique circumstances justifying its use must be specifically explained on the penalty worksheet, and a peer review by the Division should be conducted.

9. **In-Kind Penalties**

Once the settlement amount has been established, staff should make the violator aware of the opportunity to propose, and should consider if proposed, an in-kind penalty project by the violator as a way of reducing the total cash amount owed the Department. The in-kind penalty project is not designed to give the violator credit for the cost of corrective actions that he would be required to undertake anyway, but only to offset all or some portion of the cash settlement in a mutually satisfactory manner so long as the financial impact upon the violator is equivalent to that established pursuant to these settlement guidelines, the Department is encouraged to work cooperatively to find alternative ways that the violator may pay the penalty.

In-kind penalties should only be considered in the following circumstances:

a.    If the responsible party is a government entity, such as a federal agency, state agency, county, city, university, or school board, including a port or airport, or

b.    If the responsible party is a private party proposing an environmental restoration or enhancement project, or

c.    If the responsible party is a private party proposing an in-kind project that does not involve environmental restoration or enhancement for a calculated penalty of $50,000 or more.

In-kind penalties are limited to the following specific options:

a.    Material and/or Labor Support for Environmental Enhancement or Restoration Projects.  Preference should be given to proposals that involve

participation in existing or proposed government sponsored environmental enhancement or restoration projects such as SWIM projects.   The responsible party shall be required to place appropriate signs at the project site during the implementation of the project indicating that the responsible party's involvement with the project is the result of a Department enforcement action.  Once the project has been completed as required by the Consent Order, the sign may be taken down.  However, the responsible party should not be allowed to post a sign at the site after the project has been completed indicating that the reason for the project being completed was anything other than a DEP enforcement action.  For most environmental enhancement or restoration projects conducted on private property, the responsible party should provide a conservation easement to the Department for the land on which the restoration project took place. For an environmental enhancement or restoration project on public land, the responsible party may need to provide a conservation easement to the Department for private land adjoining the environmental enhancement or restoration project if it is required to protect the completed restoration project.

b.      Environmental Information/Education Projects.   Any information or education project proposed must demonstrate how the information or education project will directly enhance the Department's pollution control activities.  An example of an acceptable information or education project is one that involves training, workshops, brochures, PSAs, or handbooks on what small quantity generators of hazardous waste need to do to comply with RCRA.   The information or education projects must not include recognition of the development of the projects by the responsible parties.

c.      Capital or Facility Improvements.   Any capital or facility improvement project proposed must demonstrate how the capital or facility improvement project will directly enhance the Department's pollution control activities. An example of an acceptable capital or facility improvement project is one that involves the construction of a sewer line to hook up a failing package plant, owned and operated by an insolvent third party, to a regional sewage treatment plant. An example of an unacceptable capital or facility improvement project is one that involves the planting of upland trees and shrubs.

d.      Property.  A responsible party may propose to donate environmentally sensitive land to the Department as an in-kind penalty. Any proposals concerning the donation of land to the Department as an in-kind penalty must receive prior approval from the Department's Division of State Lands. The DEP may require proposals concerning the donation of land to another

government entity or non-profit organization to include a conservation easement involving the donated property.

If an in-kind penalty is used in lieu of a cash penalty, the value of the in-kind penalty should be 1 and 1/2 times the amount of the penalty if paid in cash. Department staff should not be involved in choosing vendors or agents used by the responsible party in implementing an in-kind project. No in-kind penalty project should include the purchase or lease of any equipment for the Department.

10.    <u>Pollution Prevention Projects</u>

Whenever practicable, enforcement staff should affirmatively consider and discuss with responsible parties the option of offsetting civil penalties with pollution prevention projects.  Responsible parties should be provided materials on the definition of a pollution prevention project, the nature of preferred pollution prevention projects, a description of the information that would need to be submitted by the responsible party to the Department for a pollution prevention project to be approved, and a description and sample of a pollution prevention plan that would be attached as an exhibit to a consent order or settlement agreement.

Pollution Prevention Project in the context of enforcement is defined as a process improvement that can be classified in one of the following three categories:

a.    <u>Source Reduction</u> - Source reduction involves eliminating the source of pollution. It is accomplished when chemicals or processes that produce pollution are eliminated or replaced with chemicals or processes that cause less pollution.  The ideal source reduction project is to produce goods with no pollution.  This has the most benefit for the environment, and usually requires the greatest change in the production process.  Source reduction can be as sweeping as terminating the production of products that cannot be manufactured without pollution, or it can be as mundane as eliminating an unneeded cleaning step.   Other examples of source reduction include:

(1)    Replacing a vapor degreaser with a re-circulating, water-based cleaning process;

(2)    Using darker wood to eliminate solvents in ordinary staining;

(3)    Using UV cure paint to eliminate the solvents in ordinary paint;

      (4)     Using a painted or plastic surface instead of chrome plated surface such as those found on lawnmower handles and the "Euro-look" cars and bumpers;

      (5)     Eliminating the release of CFC by sending electronic parts for sterilization to a plant that can use pure ethylene oxide instead of the more common ethylene oxide/freon mix;

      (6)     Keeping supplies and stock out of the weather to eliminate cleaning between processes;

      (7)     Having a vendor use a no-clean rust inhibitor on incoming parts; and

      (8)     Using propylene carbonate instead of acetone to clean tools used in fiberglass parts manufacturing.

b.    <u>Waste Minimization</u> - Waste minimization involves the conservation of materials that are the source of pollution.  This is accomplished when releases of chemicals to the environment are reduced.  The ideal situation is a no-loss process.  Waste minimization can be as expensive as replacing a regular vapor degreaser with one that has an airlock, or it can be as simple as using large, refillable containers to reduce the amount of material disposed of on the walls of emptied containers.  Other examples include:

      (1)     Using High-Volume Low-Pressure paint guns in place of High-Pressure Low Volume paint guns in a painting line to reduce paint loss.

      (2)     Using electrostatics with painting to reduce paint loss.

      (3)     Keeping containers of liquids covered and cool to minimize evaporation.

      (4)     Using processes less likely to produce spills.

      (5)     Using rollers instead of sprayers to reduce evaporation loss from atomization.

      (6)     Adjusting floating lid tanks to keep fixed volume tanks full, reducing evaporation.

      (7)     Using counter current rinsing to reduce water use.

(8)   Reducing dragout to minimize chemical depletion.

c.   <u>On-Site Recycling</u> - On-site recycling involves the reuse of materials that are the source of pollution. Process - chemicals are reused directly in the process or are revived in some manner and reused in either their original process or in some other operation within the facility.  The ideal is total reuse of materials.  On-site recycling can be as complex as an ion exchange system for the recovery of dissolved metals in a rinse water, or it can be as simple as a batch solvent still for the recycling of a cleaner.  Other examples include:

(1)   Using a cart that rolls up to a vehicle, filters oil or coolant and returns the clean fluid to the vehicle;

(2)    Using a solvent still to clean solvent for reuse;

(3)   Filtering machining fluids for reuse;

(4)   Installing a paint gun cleaner that filters and recirculates the cleaning solvent;

(5)   Using electrowinning to remove dissolved metals from plating rinse water and allowing the water to be reused;

(6)   Capturing solvent vapors from printing operations for their distillation and reuse.

Pollution prevention does NOT include:

a.   Off-site recycling such as sending used process water to be reused at a golf course, sending used motor oil or coolant off-site for reclamation or incineration, off-site solvent recovery, or regeneration of ion exchange columns;

b.   Treatment such as: wastewater treatment to remove contaminants prior to disposal, evaporation of a waste stream to remove water from contaminants, sludge de-watering to reduce volume, air stack scrubbers to remove gaseous contaminants or catalytic incinerators to remove VOCs from air;

c.   Disposal such as: landfilling or incineration.

Before a pollution prevention project should be approved to offset civil penalties, the responsible party must submit a waste audit report to the Department. The responsible party should be given the option of preparing the report on his or her own, by hiring a consultant or by requesting the help of the Department's Pollution Prevention Program staff. The waste audit report must include: 1) a waste audit of the facility or of the process or processes that are relevant to the proposed pollution prevention project; 2) a pollution prevention opportunity penalty calculation; and 3) a conceptual pollution prevention proposal.

The Department retains the option to approve or disapprove the submitted conceptual proposal depending upon the environmental merits of the proposal. The Divisions should provide programmatic guidance to the enforcement staff concerning the nature of preferred pollution prevention projects. Potential or actual economic benefits gained by the responsible party should not be used as a basis for denying an otherwise acceptable proposal for a pollution prevention project.

Once a conceptual pollution prevention project has been approved, the responsible party must prepare a pollution prevention project plan that must, when applicable, include information on the following: design, construction, installation, testing, training, maintenance/operation, capital/equipment costs, monitoring, reporting, and scheduling of activities.

No costs expended by a responsible party on a pollution prevention project that are necessary to bring the facility into compliance with current law should be used to offset civil penalties. The following costs associated with pollution prevention projects can be used to offset up to 100% of civil penalties on a dollar for dollar basis:

a.    Preparation of a pollution prevention plan.

b.    Design of a pollution prevention project.

c.    Installation of a pollution prevention project.

d.    Construction of a pollution prevention project.

e.    Testing of a pollution prevention project.

f.    Training of staff concerning the implementation of a pollution prevention project.

g.    Capital/equipment needed for a pollution prevention project.

The following costs should not be used to offset a civil penalty:

a.      Cost incurred in conducting a waste audit and preparing a waste audit report (includes waste audit, opportunity assessment and conceptual proposal).

b.      Maintenance and operation costs involved in implementing a pollution prevention project.

c.      Monitoring and reporting costs.

A responsible party should not be given the opportunity to bank or transfer pollution prevention credits to offset future civil penalties.

Whenever possible, approval of specific pollution prevention projects should be obtained prior to entering into a consent order or settlement agreement.  District Directors or Division Directors are authorized to approve pollution prevention proposals.  If the specifics of a pollution prevention plan cannot be worked out in time to meet EPA timelines for taking formal enforcement action, the responsible party can be given the option of paying the civil penalty in cash or having a pollution prevention project reviewed and approved by a time certain to be identified in a consent order or settlement agreement.

For all approved pollution prevention projects, the responsible party must maintain/operate the pollution prevention project for a time certain after initial implementation and must be required to submit at least one report discussing the status of implementation and the pollution prevention results of the project.

11.    <u>Review by the Office of General Counsel</u>

In addition to any unique case identified by a Division or District Director, cases which exceed certain threshold penalties should be reviewed for legal defensibility by OGC. These three situations are:

a.      The case involves a proposed penalty of $37,500 or more for non-RCRA cases.

b.      The case involves a proposed penalty of $75,000 or more for RCRA cases.

c.      The case involves a proposed cash penalty of $15,000 or more to be satisfied with an in-kind proposal that does not involve environmental enhancement or restoration.

All above-described penalty proposals should be submitted to the Office of General Counsel using the Department's form penalty authorization memo and routed to the Chief Deputy General Counsel for review to determine whether the penalty proposals are consistent with this policy.

12.   Procedure for Implementation

In order for these guidelines to be implemented properly, adequate record keeping must be followed.  The penalty determination matrices are included in the program specific guidelines.

The program specific penalty computation worksheets listed separately in the Enforcement manual should be used in all cases in which a penalty is calculated and proposed, and (following applicable peer review thresholds) should be sent along with the draft Consent Order that is to be reviewed by OGC for final approval.

If the penalty amount calculated for all violations is reduced after meeting with the responsible party, a revised penalty computation worksheet must be filled out. If the penalty is being reduced based upon new information concerning the facts or law relied upon to determine the number or character of the violations for which penalties are being sought, a revised penalty computation worksheet should be filled out reflecting the changes in the violations for which penalties are being sought or the characterization of the violations. If the penalty is being reduced for other reasons, a revised penalty computation worksheet must be filled out and signed and dated by the Director of District Management.

A narrative explanation or civil penalty authorization memo should also be prepared in all cases that are to be reviewed by the Chief Deputy General Counsel to explain how the penalty proposal was reached, and in all cases in which the program specific guidelines are not being followed.  This should be completed at the time the penalty is calculated and forwarded with the penalty computation worksheet.

Responsible Office:  Office of General Counsel

DEP 923
July 1, 2020
Page **22** of **22**

ATTACHMENT I
Example Penalty Matrix

|  |  | EXTENT OF DEVIATION FROM REQUIREMENT | | |
|---|---|---|---|---|
|  |  | MAJOR | MODERATE | MINOR |
| E N V I R O N M E N T A L  H A R M | MAJOR | $15,000 to $13,000 | $12,999 to $11,000 | $10,999 to $9,600 |
|  | MODERATE | $9,599 to $8,200 | $8,199 to $7,000 | $6,199 to $6,200 |
|  | MINOR | $6,199 to $5500 | $5500[1] | $5500[1] |

1)– Environmental Education may be an acceptable substitute

## Guidelines for Characterizing ERP Violations

## Introduction

Department of Environmental Protection (DEP) Directive 923 is the Department's controlling enforcement guidance document.  These guidelines are intended to complement Directive 923, and to provide a rational, fair, and consistent method for determining the appropriate amount of civil and administrative penalties.  These guidelines should only be used when settling Environmental Resource and Wetland Resource enforcement actions, and should never be cited in a Notice of Violation.

## Administrative Penalties (ELRA)

Under the Environmental Litigation and Reform Act (ELRA), the Department can issue an administrative penalty for certain violations through a Notice of Violation (NOV).  Administrative penalty amounts are set by statute. For additional details, see DEP Directive 923 and Section 403.121 of the Florida Statutes (F.S.)

| Violation (Statutory Language) | Base Penalty | Cite (F.S.) |
|---|---|---|
| Unpermitted/unauthorized dredging/filling or unauthorized construction of a stormwater management system | $1,000 | 403.121(3)(c) |
| *Add-0n 1* – If the dredging/filling occurs in an aquatic preserve, OFW, conservation easement, or Class I or II surface water | + $2,000 | |
| *Add-0n 2* – If the area dredged or filled is greater than 0.25 acre but less than or equal to 0.50 acre | + $1,000 | |
| *Add-0n 3* – If the area dredged or filled is greater than 0.50 acre but less than or equal to 1.0 acre (add $1,000 for *Add-On 2* and an additional $1,000 for *Add-On 3*) | + $1,000 | |
| Failure to complete required mitigation, failure to record a required conservation easement, or for a water quality violation resulting from dredging/filling activities, stormwater construction activities or failure of a stormwater treatment facility | $3,000 | 403.121(3)(c) |
| Failure to properly or timely construct a stormwater management system serving less than 5 acres | $2,000 | 403.121(3)(c) |
| Contractors and/or agents that conduct unpermitted or unauthorized dredging or filling shall be assessed a penalty per violation | $5,000 | 403.121(3)(c) |
| Contractors or agents that conduct mangrove trimming or alteration without a permit shall be assessed a penalty per violation | $5,000 | 403.121(3)(d) |
| Failure to satisfy financial responsibility requirements | $5,000 | 403.121(4)(a) |
| Failure to install, maintain, or use a required pollution control system or device | $4,000 | 403.121(4)(b) |
| Failure to obtain a required permit before construction or modification | $3,000 | 403.121(4)(c) |
| Failure to conduct required monitoring or testing | $2,000 | 403.121(4)(d) |
| Failure to construct in compliance with a permit | $2,000 | 403.121(4)(d) |

## Guidelines for Characterizing ERP Violations

| Violation (Statutory Language) | Base Penalty | Cite (F.S.) |
|---|---|---|
| Failure to conduct required training | $1,000 | 403.121(4)(e) |
| Failure to prepare, maintain, or update required contingency plans | $1,000 | 403.121(4)(e) |
| Failure to submit required notification to the Department | $1,000 | 403.121(4)(e) |
| Failure to prepare, submit, maintain, or use required reports or other required documentation | $500 | 403.121(4)(f) |
| Failure to comply with any other Departmental regulatory statute or rule requirement | $500 | 403.121(5) |

## Multi-Day Penalties and Adjustment Factors

DEP Directive 923 discusses when and how to assess multi-day penalties. The directive also sets out various adjustment factors to be used when calculating a penalty based on the matrix. These factors include:

- Knowing, deliberate, or chronic violations.
- Good faith efforts to comply (or lack of good faith efforts to comply) either prior to or after Department discovery of the violation.
- History of noncompliance.
- Economic benefit of noncompliance.
- Ability to pay.
- Other unique factors.

## In-Kind Penalties and Pollution Prevention Projects

In-Kind Penalties and Pollution Prevention Projects are used in lieu of a cash penalty, are assessed at 1.5 times the amount of the penalty if paid in cash, and should be considered as provided in Directive 923.

## Penalty Calculation Matrix for ERP Violations

### Matrix Factor Considerations

The Department's Penalty Calculation Matrix for ERP (found in Directive 923 and titled: *Penalty Calculation Matrix Extent of Deviation from Requirement, for cases other than PW, HS, or HW*), is reproduced below. Beneath the matrix are tables characterizing specific violations by Environmental Harm and Extent of Deviation. It is important to remember the Major category of Environmental Harm is reserved for violations that actually result in pollution in a manner that represents a substantial threat to human health or the environment. The Moderate category of Environmental Harm is reserved for violations that actually result in, or are reasonably expected to result in, pollution in a manner that represents a significant threat to human health or the environment. The Minor category of

2

## Guidelines for Characterizing ERP Violations

Environmental Harm is reserved for violations that actually result in, or are reasonably expected to result in, a minimal threat to human health or the environment.

| | | EXTENT OF DEVIATION FROM REQUIREMENT | | |
|---|---|---|---|---|
| E N V I R O N M E N T A L  H A R M | | MAJOR | MODERATE | MINOR |
| | MAJOR | $10,000 to $8,000 | $7,999 to $6,000 | $5,999 to $4,600 |
| | MODERATE | $4,599 to $3,200 | $3,199 to $2,000 | $1,199 to $1,200 |
| | MINOR | $1,199 to $500 | $500[1] | $500[1] |

1)– Environmental Education may be an acceptable substitute

### Violation—Dredging or Filling in Wetlands without a Permit

| Matrix Factor | Environmental Harm | Points or Factor | Acreage in Decimal Fraction | Subtotal |
|---|---|---|---|---|
| **Area:** (Decimal Fraction is not multiplied by points) | Less than or equal to a 0.25 acre | 1 | | |
| | Greater than 0.25 acre but less than or equal to 0.5 acre | 2 | | |
| | Greater than 0.5 acre but less than or equal to 1 acre | 3 | | |
| | Greater than 1 acre | Add an additional 3 points/acre or portion of acre | | |
| **Habitat:** (Decimal Fraction is multiplied by points) | Low: Greater than 50% coverage by exotic or nuisance vegetation, and/or moderate to major hydrological or other adverse physical alterations. | 1 | | |
| | Medium: 6% – 50% coverage by exotic or nuisance vegetation, and/or minor hydrological or other adverse physical alterations. | 3 | | |
| | High: 5% or less coverage by exotic or nuisance vegetation, and no hydrological impacts or other adverse physical alterations. | 5 | | |

Revision date August 9, 2013

3

# Guidelines for Characterizing ERP Violations

| | | | | |
|---|---|---|---|---|
| **Permanency:** (Decimal Fraction is multiplied by points) | Impacted area can be restored and recover within 1 growing season. | 1 | | |
| | Impacted area can be restored and recover within 2-5 years | 2 | | |
| | Impacted area can be restored and recover within 5-10 years. | 3 | | |
| | Impacted area will require greater than 10 years to be restored and recover, or the area is permanently impacted. | 4 | | |
| **Waterbody, in or adjacent:** (Decimal Fraction is not multiplied by points) | Class III, IV, V waters | 1 | | |
| | Class II waters, **NOT** approved for shellfish harvesting | 2 | | |
| | Class II waters, approved/conditionally approved | 3 | | |
| | Class I waters | 4 | | |
| | OFW, AP or areas of special protection designation | 5 | | |
| **Total Harm** | Major:  15 or Greater | | | |
| | Moderate:  9-14 | | | |
| | Minor:  1-8 | | | |

| Matrix Factor | Extent of Deviation from Requirement |
|---|---|
| **Major** | Construction is not permittable even with modifications. |
| **Moderate** | Construction is permittable only with modifications other than mitigation. |
| **Minor** | Construction is permittable without modifications. |

## Violation—Construction of Docks without a Permit

| Matrix Factor | Environmental Harm | Extent of Deviation from Requirement |
|---|---|---|
| **Major** | Construction of a dock without a permit that actually results in pollution in a manner that represents a substantial threat to human health or the environment. | Construction is not permittable even with modifications. |
| **Moderate** | Construction of a dock without a permit that actually results in, or is reasonably expected to result in, pollution in a manner that represents a significant threat to human health or the environment. | Construction is permittable only with modifications other than mitigation. |
| **Minor** | Construction of a dock without a permit that actually results in, or is reasonably expected to result in, a minimal threat to human health or the environment. | Construction is permittable without modifications. |

## Violation— Permit Condition Violations or Failure to Do Required Work Other Than Mitigation or Monitoring

| Matrix Factor | Environmental Harm | Extent of Deviation from Requirement |
|---|---|---|
| **Major** | [Not applicable] | Failure to comply with General or Specific Permit Conditions, drawings or other permit attachments that result in PERMANENT loss or impact to wetlands, submerged resources or a water quality violation. |

Revision date August 9, 2013

4

## Guidelines for Characterizing ERP Violations

| Moderate | [Not applicable] | Failure to comply with General or Specific Permit Conditions, drawings or other permit attachments that result in TEMPORARY loss or impact to wetlands, submerged resources or a water quality violation. |
| --- | --- | --- |
| Minor | Failure to comply with General or Specific Permit Conditions, drawings or other permit attachments, including BMPs, construction methods, timeline or administrative requirements that actually results in, or is reasonably expected to result in, a minimal threat to human health or the environment | Failure to comply with General or Specific Permit Conditions, drawings or other permit attachments that result in NO loss or impact to wetlands, submerged resources or a water quality violation. |

### Violation— Permit Violations Involving Failure to Conduct Mitigation, Other Required Work Including Conservation Easement/Binding Agreement

| Matrix Factor | Environmental Harm | Extent of Deviation from Requirement |
| --- | --- | --- |
| Major | 1. Failure to perform or complete required mitigation or other work that actually results in pollution in a manner that represents a substantial threat to human health or the environment.<br><br>2. Failure to satisfy mitigation requirements including the purchase of mitigation credits within the required timeframe that actually results in pollution in a manner that represents a substantial threat to human health or the environment. | 1. Required work was not initiated.<br><br>2. Failure to execute and record a conservation easement or binding agreement as required by an Environmental Resource Permit or WRP. |
| Moderate | Failure to perform or complete required mitigation or other work of one acre or less that results in, or is reasonably expected to result in, pollution that represents a significant threat to human health or the environment. | 1. Required work was not completed.<br><br>2. Recorded conservation easement or binding agreement is not provided to the Department prior to expiration of construction phase of the permit. |
| Minor | 1. Failure to perform maintenance pursuant to mitigation requirements.<br><br>2. Failure to provide a recorded copy of the conservation easement or binding agreement within the required timeframes which create conditions that actually or are reasonably expected to result in a minimal threat to human health or the environment. | |

Revision date August 9, 2013

## Guidelines for Characterizing ERP Violations

### Violation—Water Quality Standard Violations Associated with Dredging and Filling Activities

| Matrix Factor | Environmental Harm | Extent of Deviation from Requirement |
|---|---|---|
| Major | 1. Water quality violations in Class I or Class II waters that **ARE** approved or conditionally approved for shellfish harvesting, OFWs and aquatic preserves.<br><br>2. Water quality violations in Class III waters that impact an area that exceeds ¼ mile (1320 linear feet) in creeks, canals and other confined waterways or ¼ acre (10,890 ft$^2$) in all other waterbodies.<br><br>3. Turbidity violations that actually result in pollution, silting/sedimentation that represents a substantial threat to human health or the environment. | 1. Turbidity violations greater than 15 NTUs above background in an OFW or greater than 290 NTUs above background in any waterbody.<br><br>2. Violations of other water quality parameters exceeding 10 times the standard or the violation was willful and intentional. |
| Moderate | 1. Water quality violations in Class III waters other than aquatic preserves and OFWs, and Class II waters **NOT** approved for shellfish harvesting that impact an area less than ¼ mile in creeks, canals and other confined waterways or between 2,000 and 10,889 ft$^2$ in all other waterbodies.<br><br>2. Turbidity violations that actually or are reasonably expected to result in pollution, silting/sedimentation in a manner that represents a significant threat to human health or the environment. | 1. Turbidity violations less than or equal to 15 NTUs above background in an OFW or between 290 and 50 NTUs above background in any waterbody.<br><br>2. Violations of other water quality parameters exceeding less than 10 times the standard but greater than 5%. |
| Minor | 1. Water quality violation in Class IV or Class V waters.<br><br>2. Water quality violations in Class III waters other than aquatic preserves and OFWs, and Class II waters **NOT** approved for shellfish harvesting that impact an area less 2,000 ft$^2$ in unconfined waters.<br><br>3. Turbidity violations that actually or are reasonably expected to result in a minimal threat to human health or the environment. | 1. Turbidity violations less than 50 NTUs above background in any waterbody other than an OFW.<br><br>2. Violations of other water quality parameters exceeding less than 5%. |

### Violation—Testing, Reporting and Record Keeping Violations

| Matrix Factor | Environmental Harm | Extent of Deviation from Requirement |
|---|---|---|
| Major | 1. Submittal of fraudulent data or information intended to conceal a violation.<br><br>2. Permit violations that actually result in pollution that represents a substantial threat to human health or the environment. | 1. Failure to perform testing, reporting or submittal required by permit or rule.<br><br>2. Notice of abnormal occurrences or system failures not reported when required by permit or rule.<br><br>3. Submittal or fraudulent data or information. |

Revision date August 9, 2013

## Guidelines for Characterizing ERP Violations

| | | |
|---|---|---|
| **Moderate** | 1. All testing requirement violations such as inappropriate frequency, location, parameter, etc. that actually result in, or are reasonably expected to result in, pollution in a manner that represents a significant threat to human health or the environment.<br><br>2. Failure to conduct or report analytical data requirements. | 1. Reporting or record keeping requirements are only completed after being requested by the Department.<br><br>2. Required reports are submitted more than 60 days late. |
| **Minor** | All non-data reporting or record keeping violations that actually, or are reasonably expected to, result in a minimal threat to human health or the environment. | Required reports are submitted less than 60 days late. |

### Violation—Construction of Shoreline Hardening Structures Without a Permit

| Matrix Factor | Environmental Harm | Extent of Deviation from Requirement |
|---|---|---|
| **Major** | 1. Structure extends greater than 24 inches waterward of the uplands or of the previous seawall location and actually results in pollution in a manner that represents a substantial threat to human health or the environment.<br><br>2. Structure consists of greater than 50% deleterious materials that actually result in pollution in a manner that represents a substantial threat to human health or the environment. | Structure deviates from the requirements of the law by a significant extent (i.e. is not permittable), or the violation was willful and intentional. |
| **Moderate** | 1. Structure extends 18-24 inches waterward of the uplands or of the previous seawall location and actually results in, or are reasonably expected to result in, pollution in a manner that represents a significant threat to human health or the environment.<br><br>2. Structures consist of 10 - 50% deleterious materials that actually result in, or are reasonably expected to result in, pollution in a manner that represents a significant threat to human health or the environment. | Structure deviates from the requirements of the law significantly; however, the structure is permissible with structural modifications such as removal of deleterious material, planting at toe, addition of filter fabric, etc. |
| **Minor** | 1. Structure extends less than 18 inches waterward of the uplands or of previous seawall location and actually or are reasonably expected to result in a minimal threat to human health or the environment.<br><br>2. Structures consist of less than 10% deleterious materials that actually or are reasonably expected to result in a minimal threat to human health or the environment. | Structure deviates somewhat from the requirements of the law but most of the requirements are met and the project is permittable as placed without modification. |

7

# Guidelines for Characterizing ERP Violations

### Violation—Stormwater Violations of Permitted or Unpermitted Facilities

| Matrix Factor | Environmental Harm | Extent of Deviation from Requirement |
|---|---|---|
| **Major** | 1. Complete system failure that results in a catastrophic or continuous release of untreated stormwater that actually results in pollution in a manner that represents a substantial threat to human health or the environment.<br><br>2. Failure of a stormwater treatment system or failure to use BMPs resulting in impacts in waters in the state or wetlands, that actually results in pollution in a manner that represents a substantial threat to human health or the environment.<br><br>3. Construction of a new stormwater management system for a site greater than one acre of total area or greater than 0.5 acre of impervious area without a permit. | Construction deviates from the requirements of the law by a significant extent (i.e. is not permittable as constructed), or the violation was willful and intentional. |
| **Moderate** | 1. Partial system failure that results in FREQUENT releases of inadequately treated stormwater that actually results in, or is reasonably expected to result in, pollution in a manner that represents a significant threat to human health or the environment.<br><br>2. Construction of a new stormwater management system for a site less than one acre of total area or less than 0.5 acre of impervious area without a permit. | 1. Structure deviates from the requirements of the law significantly; however, the structure is permissible with further modifications.<br><br>2. Failure to complete a stormwater management system in accordance with a Department approved permit prior to completion of construction of the stormwater pollution source.<br><br>3. Failure to implement erosion/sedimentation controls during construction to retain sediments onsite.<br><br>4. Failure to meet exemption requirements.<br><br>5. Failure to maintain a stormwater management system. |
| **Minor** | Partial system failure that results in **INFREQUENT** releases of inadequately treated stormwater that actually or is reasonably expected to result in pollution in a manner that represents a minimal threat to human health or the environment. | Structure deviates somewhat from the requirements of the law but most of the requirements are met and the project is permittable as constructed without modification. |

8

# Guidelines for Characterizing ERP Violations

## Violation— Mangrove Violations

| Matrix Factor | Environmental Harm | Points | Subtotal |
|---|---|---|---|
| **Percent Violation of Total Trimmed Area** | 5% - 25% of the trimmed area | 1 | |
| | 26% - 50% of the trimmed area | 2 | |
| | 51% - 100% of the trimmed area | 3 | |
| | If mangrove mortality, chemical defoliation, mangrove removal, and/or filling over the trunks. | 2X above factor | |
| **Area of Impacts** | Less than 500 ft$^2$ | 1 | |
| | $500 - 1,000$ ft$^2$ | 2 | |
| | $1,001 - 2,999$ ft$^2$ | 3 | |
| | $3,000 - 5,000$ ft$^2$ | 4 | |
| | Greater than 5,000 ft$^2$ | 5 | |
| **Average Diameter of Impacted Trees** | Less than 1" base trunk diameter | 1 | |
| | $1 - 3"$ base trunk diameter | 2 | |
| | Greater than 3" but less than 5" base trunk diameter | 3 | |
| | Greater than 5" but less than 7" base trunk diameter | 4 | |
| | Greater than 7" base trunk diameter | 5 | |
| **Mangrove Fringe Depth** | Less than 25 ft | 1 | |
| | $26 - 50$ ft | 2 | |
| | $51 - 100$ ft | 3 | |
| | $101 - 250$ ft | 4 | |
| | Greater than 250 ft | 5 | |
| **Total Harm** (Divide total points by the number of categories used) | Major:  $4.1 - 5.0$ | | |
| | Moderate $2.1 - 4.0$ | | |
| | Minor: $1.0 - 2.0$ | | |
| | Minor:  $1.0 - 2.0$ | | |

| Matrix Factor | Extent of Deviation from Requirement |
|---|---|
| **Major** | Activity prohibited in conservation easement, mitigation area, or public lands set aside for conservation pursuant to Section 403.9325(6), F.S. |
| | Activity not permittable even with modifications, or the violation was willful and intentional. |
| **Moderate** | Activity required a Professional Mangrove Trimmer |
| | Activity occurred on lands not owned or controlled by responsible party (excluding conservation easement or mitigation area) |
| **Minor** | Activity complies with General Permit criteria. |

Revision date August 9, 2013

(h) Description of the Waters of the United States within a State over which
the State Assumes Jurisdiction Under the Approved Program
(Required by 40 C.F.R. § 233.11(h))

*Florida Department of Environmental Protection*
*Program Description, Section (h) – Description of Jurisdictional Waters/ Comparison of Delineation Methodology*

## Purpose of Section (h)

The purpose of Section (h) is to provide the information required in 40 C.F.R. § 233.11(h), which states: *"The program description as required under §233.10 shall include: (h) A description of the waters of the United States within a State over which the State assumes jurisdiction under the approved program; a description of the waters of the United States within a State over which the Secretary retains jurisdiction subsequent to program approval; and a comparison of the State and Federal definitions of wetlands."*

## Description of State-Assumed Waters

Section 404 of the Clean Water Act (CWA) provides that the U.S. Army Corps of Engineers (USACE) is the agency authorized to issue CWA section 404 dredge and fill program permits for activities within waters of the United States. However, the CWA includes provisions that allow a state to assume administration of a 404 program in certain waters (state-assumed waters). The CWA does not define state-assumed waters; rather, it describes waters that a state cannot assume and for which jurisdiction remains with the USACE (retained waters). State-assumed waters then are all waters of the United States that are not retained waters. Retained waters are defined below, and in section 2.0 of the State 404 Program Applicant's Handbook and listed in Appendix A of the Handbook. Activities within retained waters will generally still require a state ERP authorization and a separate federal authorization from the USACE. To provide certainty, streamlining, and efficiency, the State will consider that any wetlands or other surface waters delineated in accordance with Chapter 62-340, F.A.C., that are regulated under Part IV of Chapter 373, F.S. could be considered Waters of the United States, and will treat them as if they are, unless the applicant clearly demonstrates otherwise.

## Description of Retained Waters

"Retained Waters" means those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The USACE will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A of the State 404 Program Applicant's Handbook), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only.

## Comparison of Florida's Wetland Delineation Methodology to the Federal Methodology

For regulatory purposes since July 1, 1994, all state and local governments must delineate uplands, wetlands, and other surface waters using Chapter 62-340 F.A.C. pursuant to Florida Statutes 373.019(22) and 373.4211. For regulatory purposes since November 1, 2010, the United States Army Core of Engineers (ACOE) and the United States Environmental Protection Agency (EPA) use the 1987 Wetland Delineation Manual (87 Manual) combined with the Atlantic and Gulf Coastal Plain Region Supplement Version 2.0 to delineate wetlands in the state of Florida. While utilizing different methodologies to delineate areas meeting the wetland definition, both the 87 Manual and Chapter 62-340 F.A.C. use the identical operational sentence and nearly identical diagnostic environmental characteristics in their definitions of wetlands, leading to consistent determinations. Florida statute 373.019(22), Florida Chapter 62-340.200(19) F.A.C., EPA 1980 Federal Registry, and the 87 Manual, define wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." In addition to this core operational sentence are three diagnostic environmental characteristics describing vegetation, soils, and hydrology generally found in wetlands. Both the State and Federal definitions of wetlands share these three diagnostic environmental characteristics. Below are the Federal and State definitions of wetlands, hydric soils, and wetland hydrologic indicators for regulatory purposes in the state of Florida.

## Wetland definition per 1987 ACOE Wetland Delineation Manual:

*a. Definition.* The CE (*Federal Register* 1982) and the EPA (*Federal Register* 1980) jointly define wetlands as: Those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.

*b. Diagnostic environmental characteristics.* Wetlands have the following general diagnostic environmental characteristics:

(1) *Vegetation.* The prevalent vegetation consists of macrophytes that are typically adapted to areas having hydrologic and soil conditions described in *a* above. Hydrophytic species, due to morphological, physiological, and/or reproductive adaptation(s), have the ability to grow, effectively compete, reproduce, and/or persist in anaerobic soil conditions.

(2) *Soil.* Soils are present and have been classified as hydric, or they possess characteristics that are associated with reducing soil conditions.

(3) *Hydrology.* The area is inundated either permanently or periodically at mean water depths: 6.6 ft., or the soil is saturated to the surface at some time during the growing season of the prevalent vegetation.

## Wetland definition per Florida Statute 373.019(22) and Chapter 62-340.200(19) F.A.C.:

"Wetlands", means those areas that are inundated or saturated by surface water or ground water at a frequency and a duration sufficient to support, and under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soils. Soils present in wetlands generally are classified as hydric or alluvial, or possess characteristics that are associated with reducing soil conditions. The prevalent vegetation in wetlands generally consists of facultative or obligate hydrophytic macrophytes that are typically adapted to areas having soil conditions described above. These species, due to morphological, physiological, or reproductive adaptations, have the ability to grow, reproduce or persist in aquatic environments or anaerobic soil conditions. Florida wetlands generally include swamps, marshes, bayheads, bogs, cypress domes and strands, sloughs, wet prairies, riverine swamps and marshes, hydric seepage slopes, tidal marshes, mangrove swamps and other similar areas. Florida wetlands generally do not include longleaf or slash pine flatwoods with an understory dominated by saw palmetto.

## Hydric Soils per 1987 ACOE Wetland Delineation Manual Federal:

"Hydric Soils" means soils that are saturated, flooded, or ponded long enough during the growing season to develop anaerobic conditions in the upper part of the soil profile.

## Hydric soils per Florida Statute 373.4211 and Chapter 62-340.200(8) F.A.C.:

"Hydric Soils" means soils that are saturated, flooded, or ponded long enough during the growing season to develop anaerobic conditions in the upper part of the soil profile.

## Hydrologic indicators per 1987 ACOE Wetland Delineation Manual and Regional Supplement:

Indicator A1: Surface water / Category: Primary / General Description: This indicator consists of the direct, visual observation of surface water (flooding or ponding) during a site visit.

Indicator A2: High water table / Category: Primary / General Description: This indicator consists of the direct, visual observation of the water table 12 in. (30 cm) or less below the surface in a soil pit, auger hole, or shallow monitoring well. This indicator includes water tables derived from perched water, throughflow, and discharging groundwater (e.g., in seeps) that may be moving laterally near the soil surface.

Indicator A3: Saturation / Category: Primary / General Description: Visual observation of saturated soil conditions 12 in. (30 cm) or less from the soil surface as indicated by water glistening on the surfaces and broken interior faces of soil samples removed from the pit or auger hole. This indicator must be associated with an existing water table located immediately below the saturated zone; however, this requirement is waived under episaturated conditions if there is a restrictive soil layer or bedrock within 12 in. (30 cm) of the surface.

Indicator B1: Water marks / Category: Primary / General Description: Water marks are discolorations or stains on the bark of woody vegetation, rocks, bridge supports, buildings, fences, or other fixed objects as a result of inundation.

Indicator B2: Sediment deposits / Category: Primary / General Description: Sediment deposits are thin layers or coatings of fine-grained mineral material (e.g., silt or clay) or organic matter (e.g., pollen), sometimes mixed with other detritus, remaining on tree bark, plant stems or leaves, rocks, and other objects after surface water recedes.

Indicator B3: Drift deposits / Category: Primary / General Description: Drift deposits consist of rafted debris that has been deposited on the ground surface or entangled in vegetation or other fixed objects. Debris consists of remnants of vegetation (e.g., branches, stems, and leaves), man-made litter, or other waterborne materials. Drift material may be deposited at or near the high water line in ponded or flooded areas, piled against the upstream side of trees, rocks, and other fixed objects, or widely distributed within the dewatered area.

Indicator B4: Algal mat or crust / Category: Primary / General Description: This indicator consists of a mat or dried crust of algae, perhaps mixed with other detritus, left on or near the soil surface after dewatering.

Indicator B5: Iron deposits / Category: Primary / General Description: This indicator consists of a thin orange or yellow crust or gel of oxidized iron on the soil surface or on objects near the surface.

Indicator B6: Surface soil cracks / Category: Secondary / General Description: Surface soil cracks consist of shallow cracks that form when fine-grained mineral or organic sediments dry and shrink, often creating a network of cracks or small polygons.

Indicator B7: Inundation visible on aerial imagery / Category: Primary / General Description: One or more recent aerial photographs or satellite images show the site to be inundated.

Indicator B8: Sparsely vegetated concave surface / Category: Secondary / General Description: On concave land surfaces (e.g., depressions and swales), the ground surface is either unvegetated or sparsely vegetated (less than 5 percent ground cover) due to long-duration ponding or flooding during the growing season.

Indicator B9: Water-stained leaves / Category: Primary / General Description: Water-stained leaves are fallen or recumbent dead leaves that have turned grayish or blackish in color due to inundation for long periods.

Indicator B10: Drainage patterns / Category: Secondary / General Description: This indicator consists of flow patterns visible on the soil surface or eroded into the soil, low vegetation bent over in the direction of flow, absence of leaf litter or small woody debris due to flowing water, and similar evidence that water flowed across the ground surface.

Indicator B13: Aquatic fauna / Category: Primary / General Description: Presence of live individuals, diapausing insect eggs or crustacean cysts, or dead remains of aquatic fauna, such as, but not limited to, sponges, bivalves, aquatic snails, aquatic insects, ostracods, shrimp, other

crustaceans, tadpoles, or fish, either on the soil surface or clinging to plants or other emergent objects.

Indicator B15: Marl deposits / Category: Primary / General Description: This indicator consists of the presence of marl on the soil surface.

Indicator B16: Moss trim lines / Category: Secondary / General Description: Presence of moss trim lines on trees or other upright objects in seasonally inundated areas.

Indicator C1: Hydrogen sulfide odor / Category: Primary / General Description: A hydrogen sulfide (rotten egg) odor within 12 in. (30 cm) of the soil surface.

Indicator C2: Dry-season water table / Category: Secondary / General Description: Visual observation of the water table between 12 and 24 in. (30 and 60 cm) below the surface during the normal dry season or during a drier-than-normal year.

Indicator C3: Oxidized rhizospheres along living roots / Category: Primary / General Description: Presence of a layer containing 2 percent or more iron-oxide coatings or plaques on the surfaces of living roots and/or iron-oxide coatings or linings on soil pores immediately surrounding living roots within 12 in. (30 cm) of the soil surface.

Indicator C4: Presence of reduced iron / Category: Primary / General Description: Presence of a layer containing reduced (ferrous) iron in the upper 12 in. (30 cm) of the soil profile, as indicated by a ferrous iron test or by the presence of a soil that changes color upon exposure to the air.

Indicator C6: Recent iron reduction in tilled soils / Category: Primary / General Description: Presence of a layer containing 2 percent or more redox concentrations as pore linings or soft masses in the tilled surface layer of soils cultivated within the last two years. The layer containing redox concentrations must be within the tilled zone or within 12 in. (30 cm) of the soil surface, whichever is shallower.

Indicator C7: Thin muck surface / Category: Primary / General Description: This indicator consists of a layer of muck 1 in. (2.5 cm) or less thick on the soil surface.

Indicator C8: Crayfish burrows / Category: Secondary / General Description: Presence of crayfish burrows, as indicated by openings in soft ground up to 2 in. (5 cm) in diameter, often surrounded by chimney-like mounds of excavated mud.

Indicator C9: Saturation visible on aerial imagery / Category: Secondary / General Description: One or more recent aerial photographs or satellite images indicate soil saturation. Saturated soil signatures must correspond to field-verified hydric soils, depressions or drainage patterns, differential crop management, or other evidence of a seasonal high water table.

Indicator D2: Geomorphic position / Category: Secondary / General Description: This indicator is present if the area in question is located in a depression, drainageway, concave position within a floodplain, at the toe of a slope, on an extensive flat, on the low-elevation fringe of a pond or other water body, or in an area where groundwater discharges.

Indicator D3: Shallow aquitard / Category: Secondary / General Description: This indicator occurs in and around the margins of depressions and in flat landscapes, and consists of the presence of an aquitard within the soil profile that is potentially capable of perching water within 12 in. (30 cm) of the surface.

Indicator D5: FAC-neutral test / Category: Secondary / General Description: The plant community passes the FAC-neutral test.

Indicator D8: Sphagnum moss / Category: Secondary / General Description: Presence of peat mosses (Sphagnum spp.).

## Hydrologic indicators per Florida Statute 373.4211 and Chapter 62-340.500 F.A.C.:

(1)     Algal mats. The presence or remains of nonvascular plant material which develops during periods of inundation and persists after the surface water has receded.

(2)     Aquatic mosses or liverworts on trees or substrates. The presence of those species of mosses or liverworts tolerant of or dependent on surface water inundation.

(3)     Aquatic plants. Defined in subsection 62-340.200(1), F.A.C.

(4)     Aufwuchs. The presence or remains of the assemblage of sessile, attached or free-living, nonvascular plants and invertebrate animals (including protozoans) which develop a community on inundated surfaces.

(5)     Drift lines and rafted debris. Vegetation, litter, and other natural or manmade material deposited in discrete lines or locations on the ground or against fixed objects, or entangled above the ground within or on fixed objects in a form and manner which indicates that the material was waterborne. This indicator should be used with caution to ensure that the drift lines or rafted debris represent usual and recurring events typical of inundation or saturation at a frequency and duration sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C.

(6)     Elevated lichen lines. A distinct line, typically on trees, formed by the water-induced limitation on the growth of lichens.

(7)     Evidence of aquatic fauna. The presence or indications of the presence of animals which spend all or portions of their life cycle in water. Only those life stages which depend on being in or on water for daily survival are included in this indicator.

(8)     Hydrologic data. Reports, measurements, or direct observation of inundation or saturation which support the presence of water to an extent consistent with the provisions of the definition of wetlands and the criteria within this rule, including evidence of a seasonal high water table at or above the surface according to methodologies set forth in Soil and Water Relationships of Florida's Ecological Communities (Florida Soil Conservation Staff 1992).

(9)     Morphological plant adaptations. Specialized structures or tissues produced by certain plants in response to inundation or saturation which normally are not observed when the plant has not been subject to conditions of inundation or saturation.

(10)    Secondary flow channels. Discrete and obvious natural pathways of water flow landward of the primary bank of a stream watercourse and typically parallel to the main channel.

(11)    Sediment deposition. Mineral or organic matter deposited in or shifted to positions indicating water transport.

(12)    Vegetated tussocks or hummocks. Areas where vegetation is elevated above the natural grade on a mound built up of plant debris, roots, and soils so that the growing vegetation is not subject to the prolonged effects of soil anoxia.

(13)    Water marks. A distinct line created on fixed objects, including vegetation, by a sustained water elevation.

Both methodologies utilize the same three field categories of wetland indicators to delineate wetlands: plant species percentages, hydric soils as defined by the Natural Resource and Conservation Service (NRCS), and hydrologic indicators of wetland saturation or inundation. While differences in plant percentage requirements or plant indicator classification exist between the two methodologies, the similarity between hydrologic indicators and hydric soil indicators leads to the same wetland boundary. This is due to a shared definition of wetlands and how the two methodologies evaluate the three categories of field indicators being absent or present under normal circumstances.

 Five delineation methods are authorized to delineate wetlands using Chapter 62-340 F.A.C. under normal circumstances: direct application of the "wetland definition", "A" test, "B" test, "C" test, and "D" test.  None of the Chapter 62-340 F.A.C. methods require all three categories of wetland field indicators to be present at the same location before delineating an area as a wetland but rather two out of three. Unlike Chapter 62-340 F.A.C., the 87 Manual methodology requires all three indicators be present at the same location before delineation as a wetland is possible under normal circumstances. Thus, for any area delineated as a wetland by the 87 Manual, it will automatically qualify as having a hydric soil for Chapter 62-340 F.A.C., and therefore, will require only one additional indicator in plants or hydrology to qualify as a wetland. If the hydrologic indicator the 87 Manual identified within a wetland area also has a Chapter 62-340 F.A.C. hydrologic indicator present, then the wetland boundary is the same regardless of any plant differences. This 2/3 requirement vs. 3/3 requirement is a critical alignment consideration between the two methodologies. Areas identified as wetlands by the 87 Manual which may fail plant criteria per Chapter 62-340 F.A.C. will still qualify as wetlands with the presence of a Chapter 62-340 F.A.C. hydrologic indicator and soil. For example, any hydric pine flatwood identified as a wetland by the 87 Manual, and failing plant percentage ratios for Chapter 62-340 F.A.C., would still be identified as a wetland per the "D" test (i.e. two of three field indicators are meet, hydric soils and hydrologic indicators).

Since the 2010 adoption by the ACOE of the NRCS Hydric Soil Definition and NRCS Hydric Soils Field Indicators, pre-2010 delineation differences between Chapter 62-340 F.A.C. and 87 Manual methodologies no longer exists within the state of Florida. Pragmatically, given normal expression of indicators, the two methodologies now yield the same wetland extent throughout Florida's landscapes despite different plant indicator statuses such as Slash Pine (*Pinus elliottii*)

and Gallberry (*Ilex glabra*) between the two methodologies. Conversely, any sites in "atypical" or "altered" conditions should also be equivalent since both methodologies strive to delineate wetlands in these conditions as they would occur under normal or typical circumstances.

Chapter 62-340 F.A.C. has provided a rapid and specifically tailored delineation methodology for Florida's landscape which accurately delineates Florida's surface water resources with clarity, statewide consistency, and legally defensible certainty for the past 24 years. The USACOE uses a Wetland Data Form within its methodology and Florida Department of Environmental Protection has developed a similar Chapter 62-340 Data Form which is analogous in form and function. Adoption of the 62-340 Data Form into statewide ERP phase III rule revisions will further align the standardization of field procedures and documentation.

## Comparison of State vs. Federal Hydrologic Indicators

Wetland hydrologic indicator comparison for the Atlantic and Gulf Coastal Plain Region and Florida Chapter 62-340.500 F.A.C. Federal hydrologic indicators must meet "typical year hydrology" standards before satisfying wetland hydrology criteria.  Federal rules require one "primary" indicatory or two "secondary" indicators to satisfy wetland hydrology criteria.  State rules do not have typical year restrictions or primary vs. secondary requirements on wetland hydrologic indicators.

### Table Legend

Same: Identical indicator, application, or equivalent result with similar State indicator.

Partial: Similar State indicator but may have more limited applications or results.

No: Same or similar indicator does not exist in State rule as an indicator of wetland hydrology.

+: Positive symbols indicate a greater application or result may be authorized in State rule usually due to typical year restrictions placed upon Federal inundation indicators or the lack of primary indicator requirements in State rules.

-: Negative symbols indicate a lesser application or result may be required in State rule.

### Comparison Table

| Federal Hydrologic Indicator | Category | | Chapter 62-340.500 F.A.C. |
|---|---|---|---|
| | Primary | Secondary | Florida Hydrologic Indicator |
| Group A – Observation of Surface Water or Saturated Soils | | | State indicator comparison: Same/Partial/No/+/- |
| A1 – Surface water | X | | Same + (8) Hydrologic data |
| A2 – High water table | X | | Partial (8) Hydrologic data |
| A3 – Saturation | X | | Partial (8) Hydrologic data |
| Group B – Evidence of Recent Inundation | | | |
| B1 – Water marks | X | | Same + (13) Water marks |
| B2 – Sediment deposits | X | | Same + (11) Sediment deposition |

| | | | |
|---|---|---|---|
| B3 – Drift deposits | X | | Same + (5) Drift lines or rafted debris |
| B4 – Algal mat or crust | X | | Same + (1) Algal mats |
| B5 – Iron deposits | X | | Same + (8) Hydrologic data |
| B7 – Inundation visible on aerial imagery | X | | Same + (8) Hydrologic data |
| B9 – Water-stained leaves | X | | No |
| B13 – Aquatic fauna | X | | Same (7) Evidence of aquatic fauna |
| B15 – Marl deposits | X | | Same (8) Hydrologic data |
| B6 – Surface soil cracks | | X | Same + (8) Hydrologic data |
| B8 – Sparsely vegetated concave surface | | X | No |
| B10 – Drainage patterns | | X | Same + (10) Secondary flow channels |
| B16 – Moss trim lines | | X | Same + (2) Aquatic mosses or liverworts |
| Group C – Evidence of Current or Recent Soil Saturation | | | |
| C1 – Hydrogen sulfide odor | X | | Same (8) Hydrologic data |
| C3 – Oxidized rhizospheres along living | X | | Partial - (8) Hydrologic data |
| C4 – Presence of reduced iron | X | | Partial - (8) Hydrologic data |
| C6 – Recent iron reduction in tilled soils | X | | Partial - (8) Hydrologic data |
| C7 – Thin muck surface | X | | Same (8) Hydrologic data |
| C2 – Dry-season water table | | X | No |
| C8 – Crayfish burrows | | X | Same + (7) Evidence of aquatic fauna |
| C9 – Saturation visible on aerial imagery | | X | No |
| Group D – Evidence from Other Site Conditions or Data | | | |
| D2 – Geomorphic position | | X | No |
| D3 – Shallow aquitard | | X | No |
| D5 – FAC-neutral test | | X | No |
| D8 – Sphagnum moss | | X | Same + (2) Aquatic mosses or liverworts |
| Group E - Florida Chapter 62-340.500 hydrologic indicators not included in Federal hydrologic indicators categories | | | Chapter 62-340.500 F.A.C. Hydrologic Indicators |
| | | | (3) – Aquatic plants |
| | | | (4) - Aufwuchs |
| | | | (6) - Elevated lichen lines |
| | | | (7) - Evidence of aquatic fauna |
| | | | (8) - Hydrologic data |
| | | | (9) - Morphologic plant adaptations |
| | | | (12) - Vegetated tussocks or hummocks |

(i) Description of Specific Best Management Practices for Exemptions
(Required by 40 C.F.R. § 233.11(i))

## Purpose of Section (i)

The purpose of Section (i) is to provide the information required in 40 C.F.R. § 233.11(i), which states: *"A description of the specific best management practices proposed to be used to satisfy the exemption provisions of section 404(f)(1)(E) of the Act for construction or maintenance of farm roads, forest roads, or temporary roads for moving mining equipment."*

## Description of Specific Best Management Practices

The specific Best Management Practices (BMPs) to satisfy the exemption provisions in 404(f)(1)(E) of the CWA and 62-331.020(1), F.A.C. for the construction and maintenance of farm roads, forest roads, and temporary roads for moving mining equipment are located in Appendix B of the State 404 Program Applicant's Handbook. These terms and conditions were adopted directly from 40 C.F.R. § 232.3, and will be implemented in accordance with applicable law.

(j) Additional Information Related to the Program Description

## Purpose of Section (j)

The purpose of Section (j) is to provide additional information that did not fit cleanly into any of the program description sections listed in 40 C.F.R. § 233.11, but are pertinent to a clear description of the State's program.

## Memoranda of Understanding/Operating Agreements with Other Agencies

The Department has entered into an Operating Agreement with the State Historic Preservation Office (Appendix (j)-1), and a Memoranda of Understanding (MOU) with the Florida Fish and Wildlife Conservation Commission (FWC) and the US Fish and Wildlife Service (USFWS) (Appendix (j)-2). These documents outline coordination procedures by which State 404 Program staff will conduct historical/tribal resources reviews and listed species reviews.

## Mapping and GIS Data

The Corps of Engineers (USACE) is currently working on three data layers that they plan to provide to the Department prior to the effective date of assumption. These data layers are intended to provide an efficient means for applicants and the Department to determine if USACE review is needed for a project. The data layers include:

- Retained waters layer – this layer will show the estimated boundary of retained waters. The Department will create a 300 foot buffer layer to accompany this layer that will assist applicants and staff to  assess whether their project falls within state-assumed or retained waters.
- Federal projects layer – this layer will show the location of federal projects to assist the Department and applicant in determining if a Section 408 authorization will be required from USACE.
- Indian Country – this layer will show the boundaries of "Indian Country", which will assist applicants and the Department in determining if a project may have impacts on tribal lands, and whether the USACE will need to process an application (waters within Indian Country are retained by the USACE).

The Department has a publicly-available mapping service called MapDirect. MapDirect contains many pre-loaded maps that help applicants, the public, and Department staff quickly determine many things about a project area. The Department will create a map focus specifically for the State 404 Program that will include the three USACE layers listed above, as well as any other available layers pertinent to review of State 404 Program applications. Pre-loaded layers will include, but are not limited to:

- Critical habitat maps
- Listed species layers

- Permitting and compliance location data
- District and WMD office boundaries

MapDirect may be viewed at the following website: https://ca.dep.state.fl.us/mapdirect/

## State 404 Program Data Collection

The Department will collect data about each permitting and compliance action that will be used in compiling the annual report required in 40 C.F.R. § 233.52. The Department will also use the data to conduct program auditing, track permit information, identify issues, and assess cumulative impacts on State waters. At a minimum, the following data will be collected:

- Total project area
- Project impact acreage
- Project impact functional loss determined using UMAM
- Project compensatory mitigation acreage
- Project mitigation functional gain determined using UMAM
- FLUCCS or FNAI community types impacted or proposed for mitigation
- Mitigation bank credits required/purchased
- Mitigation bank credit type
- Other mitigation type
- Number and nature of general permits issued/withdrawn/denied
- Number and nature of individual permits issued/withdrawn/modified/denied
- Number and nature of exemption verifications issued/withdrawn/modified/denied
- Number of violations identified
- Number and nature of enforcement actions taken
- Number of suspected unauthorized activities reported/nature of action taken
- Species coordination data to include:
  - Type of technical assistance
  - Determination/outcome/action from technical assistance
  - Species name
  - Critical habitat affected
  - Whether conditions were added to the permit
- Historical/Tribal resources coordination data

*Florida Department of Environmental Protection*
*Program Description, Section (j) – Additional Information*

## State 404 Program Training

The Department's Submerged Lands and Environmental Resources Coordination (SLERC) program will conduct in-depth staff training prior to implementing the State 404 Program, and then on a regular basis and as needed. Training will include, but not be limited to, the following subjects:

- Delineation of Wetlands and Other Surface Waters (Chapter 62-340, F.A.C.)
- Certified Wetland Evaluator (CWE) training and testing (internal only)
- Introduction to State 404 Program
- Processing State 404 Program Permits (Focus on Procedures)
- Listed Species Coordination
- Historical and Tribal Resources Coordination
- ERP/USACE/State 404 Program Coordination
- Alternatives Analysis Review
- Mitigation and Mitigation Hierarchy
- WOTUS Jurisdictional Determinations
- Documenting the Decision (Technical Staff Reports)
- Records and Data Collection
- Compliance and Enforcement
- Review of Secondary and Cumulative Effects
- EPA Oversight and Review/Public Notice Procedures
- Listed Species Determinations
- Processing Walk-Through Sessions (Exemption, GP, Individual, Compliance)

## Comparison with Federal Requirements

The Department created a comprehensive cross-walk to document how the state program meets federal requirements. This comparison is in Appendix (j)-3.

**OPERATING AGREEMENT BETWEEN THE FLORIDA DEPARTMENT OF
ENVIRONMENTAL PROTECTION AND THE FLORIDA DIVISION OF HISTORICAL
RESOURCES - STATE HISTORIC PRESERVATION OFFICER REGARDING THE
STATE 404 PROGRAM**

## I.    INTRODUCTION

The Florida Department of Environmental Protection (hereinafter "Department") has the authority to assume the Clean Water Act Section 404 dredge and fill permitting program. In its administration of the program, the State must consider the effects, if any, that a State 404 Program permit could have on historic properties. Pursuant to section 267.061(2)(a), Florida Statutes (F.S.), these historic properties are those included in, or eligible for inclusion in, the National Register of Historic Places. To affect a proper and comprehensive review of permit actions on these sites, the Department has entered into this operating agreement (hereinafter "Agreement") with the Florida Division of Historical Resources, State Historic Preservation Officer (SHPO). SHPO has the expertise necessary to ensure the thorough preservation of these historic properties, as well as proficiency in determining those areas within the state that may be eligible for inclusion in the National Register. This Agreement will provide for the protection of these rich historic resources when the Department administers the State 404 permitting program, which constitutes a State undertaking. The process outlined in this Agreement is referred to as the historic properties review and is designed to work within the already established timeframes for the processing of State 404 Program permit applications set forth in Chapter 62-331, F.A.C.

A.    **Parties.** The following parties may have an interest and/or consultative role in the historic properties review of State undertakings related to the administration of the State 404 permitting program:

1. **Action Agency:**

   **Florida Department of Environmental Protection.** The Department is the state agency responsible for administering the State 404 Program in state-assumed waters, which includes the authority to issue general permits and to grant or deny applications for State 404 Program permits. (§ 373.4146(5)(a), F.S.).

2. **Consulting Parties:**

   a. **State Historic Preservation Officer.** SHPO reflects the interests of Florida and its citizens in the preservation of the state's cultural heritage. SHPO will advise and assist the Department with carrying out its historic preservation responsibilities (§267.038(5)(e), F.S. (Section 5.2.2. State 404 Program Handbook ("Handbook")). SHPO shall be a consulting party.

   b. **Indian tribes.** Indian tribes include any Indian Tribe, band, group, or community which are recognized as eligible for special programs and services provided by the United States to Indians because of their status as Indians. Indian tribes frequently have an interest in State undertakings which may affect cultural resources or historic properties of religious and cultural significance on ancestral, aboriginal, or ceded lands.

i.   The Department shall consult with any Indian tribe that attaches religious and cultural significance to historic properties that may be affected by an application. This consultation applies regardless of the location of the historic property. The passage of time, changing perceptions of significance, or incomplete prior evaluations may require the Department to reevaluate properties previously determined eligible or ineligible. The Department shall acknowledge that Indian tribes possess special expertise in assessing the eligibility of cultural resources or historic properties that may possess religious and cultural significance to the Indian Tribe. Such Indian tribe may choose to participate as a consulting party in the Department's historic properties review and may participate in the determination of the Area of Potential Effects.

ii.   Where an Indian tribe has assumed the responsibilities of Tribal Historic Preservation Office (THPO) for section 106 under section 101(d)(2) of the National Historic Preservation Act (NHPA), the Department shall coordinate consultation with the THPO for purposes of historic properties review. Where an Indian tribe has not assumed the responsibilities of the THPO for section 106 under section 101(d)(2) of the NHPA, the Indian Tribe may notify the Department in writing that it is waiving its rights to provide comments on State 404 program permit applications.

3.   **Other Interested Parties:**

a.   **Applicants.** Applicants may participate in the historic properties review.

b.   **Public.** The views of the public are essential to informed decision making in the historic properties review. The Department shall seek and consider the views of the public in a manner that reflects the nature and complexity of the application and its effects on historic properties, the likely interest of the public in the effects on historic properties, and confidentiality concerns of private individuals and businesses.

c.   **Local Government.** A representative of a local government with jurisdiction over the area in which the effects of an application may occur may participate as a consulting party during the procedures set forth in Sections II.B. or III.B.

B.  **Duties and Responsibilities:**

1.  **The Department.** The Department shall be responsible for leading the historic properties review of State undertakings associated with the State 404 Program. The Department shall, in accordance with the provisions of Sections II and III below, perform the following duties in support of this Agreement:

a.   To SHPO:

i.   Notify SHPO of an application for a State 404 Program permit in accordance with the procedures provided in Section II.A. or an

2

intended compliance action in accordance with the procedures provided in Section II.B.

    ii.    Provide SHPO sufficient information to conduct an assessment of the potential effects the application or compliance action may have on historic properties.

    iii.    Request, on behalf of SHPO, any additional information required to support their findings, recommendations, or determinations. The Department will notify the SHPO when the response to the request is received.

    iv.    Will address any adverse effects on historic properties in accordance with Section III.B.

**b.** To THPO or Indian Tribe when the interested Indian Tribe does not have a THPO:

    i.    Notify THPO/Indian Tribes of an application for a State 404 Program permit in accordance with the procedures provided in Section II.A. or an intended compliance action in accordance with the procedures provided in Section II.B.

    ii.    Provide THPO/Indian Tribes sufficient information to conduct an assessment of the potential effects the application or compliance action may have on cultural resources or historic properties of religious and cultural significance.

    iii.    Request, on behalf of THPO/Indian Tribes, any additional information required to support their findings, recommendations, or determinations. The Department will notify the THPO/Indian Tribes when the response to the request is received.

    iv.    Will address any adverse effects on historic properties or cultural resources of religious and cultural significance in accordance with Section III.B.

    v.    Will seek verification from the THPO/Indian Tribes that any submission pursuant to Section I.B.c.iv may be relied upon in processing the application or notice.

**c.** To the applicant:

    i.    May request additional information, on behalf of a consulting party, to support the findings, recommendations, or determinations.

    ii.    Coordinate the review of historic properties potentially affected by the individual and general permit application.

iii.    Provide a final decision to grant or deny an application.

iv.    If an agency, such as FDOT, is the applicant and has previously coordinated with SHPO and THPO/Indian Tribes on the project, and there have been no changes to the project following coordination, the agency may submit proof of concurrence or a determination by SHPO and THPO/Indian Tribes for the proposed project with the application for a State 404 permit.

**d.**  To the public and local governments:

i.    Notify the public and local governments of an application for a State 404 Program permit or compliance action in accordance with Section II.B.

ii.    Receive comments from the public or local governments during the comment period.

iii.    Request, on behalf of the public or local government, any additional information required to clarify the concerns expressed by the public or local government regarding potential effects to historic properties made during the comment period.

**e.**  Future coordination:

In the event the Department employs a historic resource coordinator, the Department will coordinate with SHPO and the THPO/Indian Tribes to establish procedures to streamline certain categories of projects.

**2.  SHPO.** SHPO will, in accordance with the provisions of Sections II and III, perform the following duties in support of this Agreement:

**a.**  To the Department:

i.    Review general permit and expedited applications against the Florida Master Site File to determine the presence or absence of historic properties or request that the project be evaluated as an individual permit because of potential historical resources concerns.

ii.    Notify the Department of any request for additional information to the applicant to complete the historic properties review of the application.

iii.    Evaluate the area of potential effects for potential historic properties and provide recommendations for National Register eligibility.

iv.    Review individual permit applications for potential effects to historic properties listed or eligible for listing on the National Register.

      v.    Provide a determination of the effect an application may have on historic properties.

     vi.    Provide recommendations for alternatives or modifications to the application that could avoid, minimize, or mitigate adverse effects on historic properties.

  **b.**  To applicant:

      i.    Conduct a historic properties search against the Florida Master File when an applicant provides information required for review of no-notice general permits to determine if the application has the potential to affect any known historic properties.

     ii.    Inform the applicant if SHPO or THPO/Indian Tribes determine area includes a historic property listed or eligible for listing on the National Register.

    iii.    Assist with any pre-coordination, initiated by an applicant, to facilitate the historic properties review for an application.

  **c.**  To THPO/Indian Tribes:

      i.    On the same day received, provide information by an applicant for review of no-notice general permits.

     ii.    On the same day received, provide information related to an unanticipated discovery, effects to historic resources, or the identification of unmarked human remains on issued no-notice general permits, general permits, and individual permits.

**3.**  **THPO/Indian Tribes.** THPO/Indian Tribes may, in accordance with the provisions of Sections II and III, provide the following in support of this Agreement:

  **a.**  To the Department

      i.    Review general permit and expedited applications to determine the presence or absence of cultural resources or historic properties of religious and cultural significance or request that the project be evaluated as an individual permit because of potential historical resources concerns.

     ii.    Notify the Department of any request for additional information to the applicant to complete the historic properties of religious and cultural significance or cultural resource review of the application.

    iii.    Evaluate the area of potential effects for potential historic properties and provide recommendations for National Register eligibility.

    iv.    Review individual permit applications for potential effects to cultural resources or historic properties of religious and cultural significance listed or eligible for listing on the National Register.

    v.    Review and comment on the effect an application may have on cultural resources or historic properties of religious and cultural significance.

    vi.    Provide recommendations for alternatives or modifications to the application, or for special conditions to add to the permit that could avoid, minimize, or mitigate adverse effects on cultural resources or historic properties of religious and cultural significance.

    vii.    Provide determination if no-notice general permit area includes a cultural resource or historic property of religious and cultural significance listed or eligible for listing on the National Register.

  **b.**  To SHPO:

    i.    Conduct a historic properties search of no-notice general permits to determine if the application has the potential to affect any known cultural resources or historic properties of religious and cultural significance.

    ii.    Provide determination if no-notice general permit area includes a cultural resource or historic property of religious and cultural significance listed or eligible for listing on the National Register.

**4.**  **The Applicant.** In accordance with the following regulatory requirements, the Applicant will provide the following duties in support of this Agreement.

  **a.**  Certify that all information contained in the application is true and accurate. (Forms 62-330.060, section A, part 4, and 62-330.402(1), Part 2)

  **b.**  Respond to the Department's request for additional information within the timeframes set forth in Applicant's Handbook, Volume I, sections 5.3.3. and 5.5.3.

  **c.**  Provide a Cultural Resource Assessment Survey when requested by the Department pursuant to the State 404 Program Applicant's Handbook, Section 5.2.2.

  **d.**  Coordinate the historic properties review for general permit (no notice) applications. See Section 62-331.200(3)(i), F.A.C.

  **e.**  Pre-coordinate with consulting parties, when desired, to expedite the historic properties review of an application and provide any documentation resulting from such pre-coordination to the Department in support of the application.

5.  **The Public/Local Government.** The public and local governments may provide the following duties in support of this Agreement.

    a.  Review the Public Notice for information on the application.

    b.  Address any questions or concerns to the Department during the comment period.

    c.  Attend any public hearings, which may be sponsored by the Department to solicit comments on an application.

## II.   PROCEDURES

### A.   Consultation during the Department's initial review of a State 404 Program permit.

1.  Within five days of receipt of an application for a State 404 Program Permit, the Department shall email a notification to SHPO and THPO/Indian Tribes. The email subject line shall state "State 404 Program [& ERP] [select: Individual Permit or General Permit No.] Application, Application/permit number, county." The body of the email/notification shall include:

    a.  Application number;

    b.  Permit number (if applicable);

    c.  Corresponding Environmental Resource Permit (ERP) number;

    d.  Applicant name;

    e.  City, County;

    f.  Location (GPS coordinates, TRS, street address, or parcel ID);

    g.  Brief description of the activity;

    h.  A location map showing the project boundaries;

    i.  Link to the Permit Application for additional information; and

    j.  End date for the Department's initial 30-day review (comment due date).

2.  SHPO shall review the application for potential effects to historic properties. The THPO/Indian Tribes may choose to review the application for potential effects to cultural resources or historic properties of religious and cultural significance.

    a.  If the application provides sufficient information required to make an effects determination, the consulting party shall strive to provide an effects

determination pursuant to Section III.A. and provide initial recommendations for resolution of any adverse effects within the initial review period.

b. If the application does not provide sufficient information required to make an effects determination, the consulting party shall, prior to the expiration of the Department's 30-day review period, ask the Department to request additional information from the applicant.

　　i. The request from the consulting party shall clearly identify the additional information required.

　　ii. The Department shall include the consulting party's questions in a Request for Additional Information. Once the Department receives a response, it will provide the requested information to the consulting party and inform the consulting party of the deadline by which the Department must provide public notice of the application.

　　iii. The consulting party shall review the new information and provide an effects determination pursuant to Section III.A. and provide initial recommendations for resolution of any adverse effects within the time period prescribed by the Department in its notification.

c. If the Department does not receive a response from SHPO or THPO/Indian Tribes within the initial review period, the Department may consider the application administratively complete without said response and put the application out on public notice in accordance with Rule 62-331.060, F.A.C., and Section II.B., below. The consulting parties may have initial or additional comments pertaining to the application during the public notice comment period.

3. Within 15 days of receipt of notice of intent to use a State 404 general permit, SHPO shall provide to the Department the presence or absence of historic properties from review of the Florida State Master File and/or request the Department process the application as an individual permit.

4. If the THPO/Indian Tribes choose to review a notice of intent to use a State 404 general permit, within 15 days of receipt the THPO/Indian Tribes will provide to the Department information on the presence or absence of cultural resources or historic properties of religious and cultural significance. Within this 15 days, THPO/Indian Tribes may also request the Department process the application as an individual permit.

**B.**  **Consultation during the public notice process**.

    1.  Types of Action

        a.  The Department will provide a public notice of all administratively complete State 404 Program individual permit applications pursuant to the provisions of Rule 62-331.060, F.A.C. SHPO, THPO/Indian Tribes shall receive an email notification of the public notice in accordance with paragraph 62-331.060(2)(a), F.A.C.

        b.  The Department will publish notice on its website and provide for public comment on any proposed settlement of a State enforcement action.

    2.  The public notice shall specifically mention and solicit comment on the historic properties review process, including any initial effects determinations and recommendations received by SHPO/THPO/Indian Tribes during the Department's initial review of the application. If the initial determination is that the activity will have no effect on historic properties, a "no potential to cause effect" or "no effect" statement shall be included in the public notice.

    3.  If the undertaking may affect a historic property, the public notice will also be sent to EPA for review and comment in accordance with subsection 62-331.052(3), F.A.C.

    4.  The consulting parties may, within the timeframes established in subsection 62-331.060(3), F.A.C., provide written comments and suggest permit conditions for the Department's consideration.

    5.  Pursuant to paragraph 62-331.052(1)(c), F.A.C., the Department may request additional information, from the applicant, to address any concerns it receives during the comment period.

    6.  SHPO shall develop and evaluate alternatives or modifications to the application that could avoid, minimize, or mitigate adverse effects on historic properties identified through public comment and notify the Department of the recommendations.

    7.  The THPO/Indian Tribes may choose to develop and evaluate alternatives or modifications to the application that could avoid, minimize, or mitigate adverse effects on historic properties identified through public comment and notify the Department of the recommendations.

    8.  The Department shall resolve adverse effects in accordance with sections III.A.3. or III.B., below.

**C.**  **Department decision on a State 404 Permit Application**

    1.  In making the decision on an individual or general State 404 Permit Application, the Department shall consider all criteria set forth in the State 404

Program, including the effects of the permitted activity on historic properties, any comments of the consulting parties, and any views of other interested parties.

2. The Department shall first attempt to resolve adverse effects through permit conditions in accordance with Section III.A.3, below. If the adverse effect can be resolved through conditions, the effect determination shall be "Conditional no adverse effect to historic properties".

3. The Department shall not provide authorization for an application that has an unresolved adverse effect on historic properties. The Department shall resolve any adverse effect on historic properties not resolved in accordance with II.C.2. in accordance with Section III.B.

4. Unanticipated Discoveries

   a. All State 404 individual permits and general permits include a condition requiring permittees to cease work immediately and contact SHPO and/or the Department in the event of an unanticipated discovery of historic resources, effects to historic resources, or the identification of unmarked human remains. *See* §§ 62-330.350(1)(n), 62-331.201(t) – (v), F.A.C.

   b. In the event of an unanticipated discovery, effects to historic resources, or the identification of unmarked human remains, the Department shall notify the SHPO and THPO/Indian Tribes on the same day the Department is notified by the permittee. Activity authorized under the permit shall not resume without written authorization from the Department, SHPO and THPO/Indian Tribes.

**D.    Provisions for State 404 Program General Permits (no notice)**

1. Applicants for no-notice general permits are instructed in paragraph 62-331.200(3)(j), F.A.C. to pre-coordinate with SHPO to determine if there are any properties determined to be eligible or potentially eligible for listing on the National Register of Historic Places.

2. When an applicant submits a sufficient request for pre-review, SHPO shall respond to the request within 15 days of receipt and shall include any responses received from the THPO/Indian Tribes. The applicant shall then follow the procedures in subparagraph 62-331.200(3)(j)1. or 2., F.A.C., as appropriate.

3. If both SHPO and THPO/Indian Tribes do not respond within 15 days of receipt of the request, and the project does not otherwise require notice to the Department to proceed under the 404 general permit, the permittee may proceed with the work, provided all other required authorizations have been obtained. However, if the Department receives information from SHPO/THPO/Indian Tribes that the activity may have the potential to cause effects to historic properties, the project shall no longer qualify for a no-notice general permit

pursuant to paragraph 62-331.201(3)(m), F.A.C., and the Department will inform the applicant whether the project requires a notice to the Department or will require the submission of an individual permit application pursuant to subsection 62-331.200(6), F.A.C.

4. Unanticipated Discoveries

a. All State 404 general permits are subject to consultation and additional Cultural Resource Assessment Surveys in the event of unanticipated discovery of historic resources, effects to historic resources, or the identification of unmarked human remains during construction. *See* 62-331.201(t) – (v), F.A.C.

b. In the event of an unanticipated discovery, effects to historic resources, or the identification of unmarked human remains, the Department shall notify the SHPO and THPO/Indian Tribes on the same day the Department is notified by the permittee. Activity authorized under the permit shall not resume without written authorization from the Department, SHPO and THPO/Indian Tribes.

## III.    EFFECTS DETERMINATIONS AND RESOLUTION OF ADVERSE EFFECTS

### A.    Effects Determinations

1. **No effect to historic properties.** If the consulting party finds that either there are no historic properties present, or there are historic properties present but the permit application will have no effect upon them, the consulting party will notify the Department the application will have no effect on historic properties.

2. **No adverse effect to historic properties.**

a. If the consulting party finds historic properties are present and may be affected by the application, the consulting party will assess adverse effects, if any.  An adverse effect is found when an application may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association. Consideration shall be given to all qualifying characteristics of a historic property, including those that may have been identified subsequent to the original evaluation of the property's eligibility for the National Register. Adverse effects may include reasonably foreseeable effects caused by the application that may occur later in time, be farther removed in distance or be cumulative.

b. Examples of adverse effects on historic properties include, but are not limited to:

    i.    Physical destruction of or damage to all or part of the property, including inundation;

    ii.    Alteration of a property, including restoration, rehabilitation, repair, maintenance, stabilization, hazardous material remediation, and provision of handicapped access, that is not consistent with the Secretary of the Interior's standards for the treatment of historic properties (incorporated by reference in Rule 1A-46, F.A.C.) and applicable guidelines;

    iii.    Removal of the property from its historic location;

    iv.    Change of the character of the property's use or of physical features within the property's setting, or impacts to the landscape that contribute to its historic significance;

    v.    Introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features; and

    vi.    Neglect of a property which causes its deterioration, except where such neglect and deterioration are recognized qualities of a property of religious and cultural significance to an Indian Tribe.

c.  The consulting party will notify the Department the application will have no adverse effect on historic properties when it is determined the application may have an effect on historic properties but will not adversely affect the historic property.

**3.  Conditional no adverse effect to historic properties**.

a.  The consulting parties will develop and evaluate alternatives or modifications to the application that could avoid, minimize, or mitigate adverse effects on historic properties, and notify the Department of their recommendations.

b.  To resolve the application's adverse effects, the Department will require, as specific condition(s) of the authorization, the consulting party's recommendations to avoid, minimize, or mitigate adverse effects on historic properties. With such conditions requiring avoidance, minimization or mitigation of adverse effects on historic properties, the effect determination will be "Conditional no adverse effect to historic properties".

**4.  Adverse effect to historic properties**.

If the consulting party cannot recommend, or cannot agree on, alternatives or modifications to the application or permit conditions that could avoid, minimize, or mitigate adverse effects on historic properties, the consulting party(s) shall notify the Department the application has an adverse effect on historic properties. The Department shall then either deny the permit or

continue working toward resolution of adverse effects in accordance with III.B, below.

5. **For General Permits:** A consulting party may request the Department evaluate a general permit application as an individual permit due to concerns about potential adverse effects on historic properties.

6. **For Disagreements, Conflicts, or Disputes:** If there is a disagreement, conflict, or dispute between consulting parties regarding the effects determinations or recommendations for resolving adverse effects that the Department cannot reconcile, the parties shall continue working toward resolution in accordance with III.B., below.

B.      **Resolution of Adverse Effects**

1. Continued Consultation.

   a. Following a determination of adverse effect by a consulting party pursuant to Section III.A.4, or if there is a conflict that the Department cannot reconcile in accordance with Section III.A.6., the Department shall consult with the SHPO, THPO/Indian Tribes, and other interested parties to develop and evaluate alternatives or modifications to project that could avoid, minimize, or mitigate adverse effects on historic properties.

   b. The Department, the SHPO, and THPO/Indian Tribes, if participating, may agree to invite other individuals or organizations to become consulting parties. The Department shall invite, where appropriate, any individual or organization that will assume a specific role or responsibility in a memorandum of agreement to participate as a consulting party.

   c. The Department shall make information available to the public, subject to any confidentiality requirements. The Department shall provide an opportunity for members of the public to express their views on resolving adverse effects of the undertaking. The Department should use appropriate mechanisms, taking into account the magnitude of the undertaking and the nature of its effects upon historic properties, the likely effects on historic properties, and the relationship of the State involvement to the undertaking to ensure that the public's views are considered in the consultation. The Department should also consider the extent of notice and information concerning historic preservation issues afforded the public at earlier steps in the process to determine the appropriate level of public involvement when resolving adverse effects.

2. Resolve Adverse Effects.

   a. Following public outreach and invitation of any additional consulting parties, the Department shall continue to consult with the SHPO,

THPO/Indian Tribes, and other consulting parties to seek ways to avoid, minimize, or mitigate the adverse effect.

b.  If through further consultation the adverse effect can be avoided, the Department shall complete the review process as may be appropriate in accordance with Section III.A.1., III.A.2., or III.A.3.

c.  If the adverse effect cannot be avoided, the Department shall consult with the SHPO, THPO/Indian Tribes, and other consulting parties regarding appropriate minimization and/or mitigation measures.

    i.  Minimization and/or mitigation measures shall be commensurate with the extent of the adverse effect to historic properties.

    ii.  Minimization and/or mitigation measures may include, but are not limited to: archaeological data recovery, archaeological/historical contextual reports, archeological monitoring, preservation easements, detailed historic structure documentation, architectural salvage, interpretive and educational material, or signage. Other creative and meaningful minimization and/or mitigation alternatives as agreed upon by the Department, the SHPO, THPO/Indian Tribes, and other consulting parties.

d.  If the Department, the SHPO, THPO/Indian Tribes, and other participating interested parties, agree on how the adverse effects will be resolved, the Department and the SHPO shall execute a memorandum of agreement (MOA). The THPO/Indian Tribes shall be invited to concur in the MOA.

    i.  The Department shall include the MOA as part of the issued permit and shall include specific permit conditions as necessary.

    ii.  The Department shall ensure that the permittee carries out the permitted activity in accordance with the MOA and any specific permit conditions.

e.  If agreement cannot be reached, the Department shall attempt to continue consultation to reach an acceptable agreement. However, if agreement is not possible, the Department shall proceed according to Section III.C.

## C.  Federal Review

An application will be elevated for EPA review in the following circumstances:

**1.**  The Department shall send a copy of the public notice described in Section II.B., to EPA in accordance with subsection 62-331.052(2), F.A.C, for those projects that are subject to federal review. Included in list are projects within critical areas established under state or federal law, including sites identified or proposed under the National Historic Preservation Act;

14

    **2.**   The Department agrees to request, in accordance with section 5.2.5 of the State 404 Applicant's Handbook, EPA review of an application where the consulting parties cannot agree on the effect determination of a proposed activity or where the Department does not accept the recommendations of one of the consulting parties for the resolution of adverse effects; and

    **3.**   The Department shall, in accordance with paragraph 62-331.052(3)(b), F.A.C., notify the EPA if the Department does not accept the effect determination of a proposed activity or recommendations for the resolution of adverse effects of the THPO/Indian Tribes, together with the Department's reason for doing so, in which case the EPA can comment upon, object to, or make recommendations.

## IV.   TERMS & DEFINITIONS

A.   "Area of Potential Effects" means the geographic area or areas within which a state undertaking may directly or indirectly effect historic properties or historic resources, if any such properties exist. The area of potential effects is influenced by the scale and nature of a state undertaking and may be different for different kinds of effects caused by a state undertaking

B.   "Consultation" means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the historic properties review.

C.   "Cultural resource" means physical evidence or place of past human activity: site, object, landscape, structure; or a site, structure, landscape, object or natural feature of significance to a group of people traditionally associated with it.

D.   "Effect" means alteration to the characteristics of a historic property or historic resource qualifying it for inclusion in or eligibility for the National Register of Historic Places.

E.   "Eligible for Inclusion in the National Register" includes both properties formally determined as such in accordance with the regulations of the Secretary of the U.S. Department of the Interior and all other properties that meet the National Register criteria published at 36 C.F.R. § 60.4.

F.   "Historic property" or "historic resource" means any prehistoric or historic district, site, building, object, or other real or personal property of historical, architectural, or archaeological value, and folklife resources, in, or eligible for inclusion in, the National Register of Historic Places. These properties or resources may include, but are not limited to, monuments, memorials, Indian habitations, ceremonial sites, abandoned settlements, sunken or abandoned ships, engineering works, treasure trove, artifacts, or other objects with intrinsic historical or archaeological value, or any part thereof, relating to the history, government, and culture of the state.

G.   "Historical Resources Assessment Survey" or "Cultural Resources Assessment Survey" means a survey of the project site which meets the requirements set forth

in Chapter 1A-46, F.A.C., Archaeological and Historical Report Standards and Guidelines.

H.    "National Register of Historic Places" means the list of historic properties significant in American history, architecture, archaeology, engineering, and culture, maintained by the Secretary of the Interior, as established by the National Historic Preservation Act of 1966, as amended.

I.    "State undertaking" means a project, activity or program in which a state agency of the executive branch has direct or indirect jurisdiction; those in which a state agency provides financial assistance to a project or entity; and those in which a state agency is involved through the issuance of state permits or licenses.

J.    "Unmarked human remains" means any human skeletal remains or associated burial artifacts or any location, including any burial mound or earthen or shell monument, where human skeletal remains or associated burial artifacts are discovered or believed to exist on the basis of archaeological or historical evidence, excluding any burial marked or previously marked by a tomb, monument, gravestone, or other structure or thing placed or designed as a memorial of the dead.

## V.    CONFIDENTIALITY

Confidentiality:  The Department shall withhold from public disclosure information about the location, character, or ownership of a historic property when disclosure may cause a significant invasion of privacy; risk harm to the historic property; or impede the use of a traditional religious site by practitioners. Neither the Department, nor SHPO are authorized to disclose any information about the location, character, or ownership of a cultural resource or historic property of religious and cultural significance provided by the THPO/Indian Tribes pursuant to this Agreement without written authorization from the THPO/Indian Tribes.

## VI.    TRAINING REQUIREMENTS

A.    DEP shall provide occasional training for SHPO and other consulting parties regarding the State 404 Program and ERP Program.

B.    SHPO shall provide occasional training for DEP and other consulting parties regarding the historic property review process.

C.    THPO/Indian Tribe may provide occasional training for DEP and other consulting parties regarding cultural resources or historic properties of religious and cultural significance on ancestral, aboriginal, or ceded lands.

## VII.    AMENDMENTS

This agreement may be amended when such an amendment is agreed to in writing by all signatories. The amendment will be effective on the date the amendment is signed by all of the signatories.

## VIII.   TERMINATION

If any signatory to this agreement determines that its terms will not or cannot be carried out, that party shall immediately consult with the other signatories to attempt to develop an amendment per Stipulation VII, above. If within thirty (30) days (or another time period agreed to by all signatories) an amendment cannot be reached, any signatory may terminate the agreement upon written notification to the other signatories.

## IX.   SIGNATURES

**Florida Department of Environmental Protection**

07/31/2020

_____

Noah Valenstein                     (Date)
Secretary

**Florida Department of State, Division of Historical Resources**

8/6/2020

Dr. Timothy Parsons            (Date)
Director and State Historic Preservation Officer

17

# MEMORANDUM OF UNDERSTANDING
## BETWEEN THE
## FLORIDA FISH AND WILDLIFE CONSERVATION COMMISSION,
## THE UNITED STATES FISH AND WILDLIFE SERVICE AND
## THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION
## AUGUST 5, 2020

This Memorandum of Understanding ("Understanding", or "MOU") is entered into by and between the Florida Fish and Wildlife Conservation Commission ("FWC"), the United States Fish and Wildlife Service ("USFWS"), and the Florida Department of Environmental Protection ("FDEP"), to formally memorialize existing coordination and collaborative efforts and to establish future processes and procedures that will ensure that the State of Florida's assumption of the CWA 404 program, as well as other permitting programs executed under FDEP's authority, will 1) fulfill state rule requirements regarding fish and wildlife under Part IV of Chapter 373 Florida Statutes (F.S.), including Chapters 62-330, F.A.C., and 62-331, F.A.C., 2) be compliant with the State of Florida requirements under Article IV, Section 9 of the Florida Constitution, Chapter 253, F.S., Chapter 379, F.S., and Rules Relating to Threatened and Endangered Species under Chapter 68A-27, F.A.C., and 3) comply with the Endangered Species Act (ESA; 16 U.S.C. § 1531 et seq) and the Marine Mammal Protection Act (MMPA; 16 U.S.C. § 1361 et seq.).

## I.  PURPOSE

The purpose of this MOU between the FWC, the USFWS, and FDEP is to formalize the existing coordination between these agencies and establish additional coordination processes to ensure the conservation of Florida's federally and State-listed wildlife and their habitats. This MOU is to ensure that FDEP's permitting and lease programs under Part IV of Chapter 373, F.S., and Chapter 253, F.S., are consistent with all applicable requirements of the ESA, the MMPA, 16 U.S.C. § 1531-43, and are in keeping with the State of Florida requirements under Article IV, Section 9 of the Florida Constitution, Chapter 379, F.S., and Chapter 68A-27, F.A.C..

This MOU is focused on FDEP's implementation of the State of Florida's permitting programs under Part IV of Chapter 373, F.S. These programs include the Environmental Resource Permitting program (ERP Program), 62-330, F.A.C., and the anticipated State 404 Permitting Program (State 404 Program), 62-331, F.A.C., contingent upon the Environmental Protection Agency (EPA) approval of Florida's request for State assumption of Section 404 of the Clean Water Act (CWA) under 40 C.F.R. Part 233.

These permitting programs authorize FDEP to regulate proposed activities in surface waters and wetlands.  Alteration of wetlands and other surface waters may have a detrimental impact on the environment. Wetlands produce the basic food material used by many fish and other aquatic life and some also serve as nursery grounds for fish and rookery areas for birds. Many wildlife species, some of which are threatened or endangered, depend on wetlands to complete all or part of their life cycle. Dredging and filling can degrade water quality during and after construction and can impact aquatic invertebrates, fish, and wildlife in that area. It has been estimated that as much as 80 percent of our recreationally and commercially important fish species are dependent

upon wetlands for at least some portion of their life cycle.

The purpose of this MOU is to:

- Improve the existing framework and develop new processes as needed for meeting responsibilities under the ERP Program, State 404 Program, Chapter 68A-27, F.A.C., Florida's Constitution, MMPA, and the ESA.
- Create a State and Federal Endangered and Threatened Species Technical Team to better assist FDEP's district, regional, and field offices to conserve and protect Florida's aquatic and terrestrial species and their habitats, natural resources and ecosystems through the State permitting processes.
- Develop a coordination process for the State 404 Program that will maximize efficiencies and consistency in order to successfully balance the permitting workload, while minimizing administrative processing for all involved parties. See Attachment 1 for a species coordination process flowchart.
- Develop a coordination plan that will include guidance on how to elevate any conflicts or disagreements between agencies.
- Ensure consistent internal coordination processes between regional offices of the USFWS, FWC, and FDEP Districts.
- Ensure the state permitting processes implemented by FDEP meet the requirements of the rules and statutes governing protection of state imperiled species.

  A. Authorities

  1. Environmental Resource Permitting

The State of Florida's ERP Program regulates activities involving the alteration of surface flows, including new activities in uplands that generate stormwater runoff, as well as dredging and filling in wetlands and other surface waters. Dredging and filling in the surface waters of Florida has been regulated since the early 1970s. Established under Chapter 403, F.S., the "dredge and fill permit" program protected surface waters from degradation caused by the loss of wetlands, and from pollution caused by construction activities.  This program was phased out in 1995, and replaced by the new environmental resource permit program under Part IV of Chapter 373, F.S. The ERP program provides a mechanism for protection for all fish and wildlife and their habitats, particularly federally and State-listed wildlife and plant species, and can provide protection measures in perpetuity.

The FWC is Florida's state wildlife agency established in the State Constitution to exercise the regulatory and executive powers of the state with respect to wild animal life and fresh water aquatic life.  The FWC has permitting authority over species identified in Chapter 68A-27, F.A.C., which include the species identified within FDEP's ERP program.  Permits issued by FDEP cannot authorize impacts, specifically take, of species identified in Chapter 68A-27, F.A.C. As such, the FDEP has historically coordinated protection and conservation of aquatic and terrestrial fish and wildlife species with the FWC.  FWC's permit commenting authority was codified upon the agency's creation in Section 20.331(10), F.S. The FWC provides a list of

potentially affected federally and State-listed species to FDEP during ERP application review. It also evaluates potential impacts to State-listed fish and wildlife for ERP Program project applications that are expected to affect species and habitat, and provides recommendations for permit conditions to the FDEP.

2. State Lands

The state of Florida acquired title to sovereignty submerged lands on March 3, 1845, by virtue of statehood. Sovereignty submerged lands include all submerged lands, title to which is held by the Board of Trustees (Governor and Cabinet) of the Internal Improvement Trust Fund. FDEP is Florida's lead agency for environmental management and stewardship, serving as staff to the Board of Trustees. As such, the FDEP's role includes acquiring lands for protection, and providing oversight for the management of activities on more than 12 million acres of public lands including lakes, rivers and islands. These public lands include sovereignty submerged lands, which include, but are not limited to, tidal lands, islands, sandbars, shallow banks, lands waterward of the ordinary or mean high water line, and those beneath navigable fresh water or beneath tidally influenced waters. These publicly owned lands are managed under Chapter 253, F.S., and the rules promulgated thereunder, to provide for areas of natural resource-based recreation, to ensure the survival of plant and animal species, and the conservation of finite and renewable natural resources. Section 18-21.004(2)(i), F.A.C. states: "Activities on sovereignty lands shall be designed to minimize or eliminate adverse impacts on fish and wildlife habitat, and other natural or cultural resources. Special attention and consideration shall be given to endangered and threatened species habitat.

3. Section 404 of the Clean Water Act

The United States Army Corps of Engineers (USACE) currently regulates proposed activities through a federal permit review process, administering Section 404 of the CWA. The USACE permitting program regulates the discharge of dredged or fill material into waters of the United States, including wetlands. Activities in waters of the United States regulated under this program include fill for development, water resource projects (such as dams and levees), infrastructure development (such as highways and airports), and mining projects. Section 404 requires a permit before dredged or fill material may be discharged into waters of the United States, unless the activity is exempt from Section 404 regulation (e.g., certain farming and forestry activities). An individual permit is required for potentially significant impacts. Individual permit applications under USACE review are evaluated for public interest, as well as the environmental criteria set forth in the CWA Section 404(b)(1).

The USACE consults with the USFWS, the federal agency charged with wildlife protection, to ensure protection of federally listed fish, wildlife and plants. The USFWS evaluates impacts on federally listed fish, wildlife, and plant species for all federal projects and federally permitted projects expected to affect species and their critical habitat, including projects subject to the requirements of Section 404.

The State of Florida, through FDEP, is requesting assumption of this permitting authority.  If approved, this program will be referred to as the State 404 Program.

    4.  Section 6 of the Endangered Species Act

Section 6(a) of the ESA directs the USFWS to "cooperate to the maximum extent practicable with the States" to further the conservation of federally threatened and endangered species. The purpose, processes, and procedures described in this MOU are consistent with this mandate. This MOU does not conflict with or limit the longstanding section 6(c) cooperative agreement between the USFWS and FWC, which has been annually renewed since its establishment in 1976.

    B.  Background

In 2020, FDEP will be submitting its application to the EPA seeking to assume authority to administer Section 404 of the CWA for certain waters of the United States (assumption). If approved, the State 404 Program will be a separate permitting program from the ERP Program, with separate authorizations. Assumption of the permitting program is limited to "state-assumed" waters, which is not defined in the CWA but is described as all waters of the United States that are not under the jurisdiction remaining with the USACE (retained waters, such as those waters subject to section 10 of the Rivers and Harbors Act). Retained waters are defined in the State 404 Program Applicant's Handbook, as:

> "Retained Waters" means those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The Corps will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the Corps is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the Corps will retain jurisdiction to the landward boundary of the project for the purposes of that project only."

Based on a comparison of the last five years of USACE and FDEP reviewed applications, it is anticipated that the majority of future projects will require both a State 404 and an ERP authorization. It is the intent of FDEP to establish a State 404 Program coordination process for protection of federally listed species and designated critical habitat that is similar, and as protective as, the ESA's Section 7 interagency consultation process that currently exists between the USACE and the USFWS for federal Section 404 permits.  As part of the State of Florida's assumption of Section 404, FDEP will continue to utilize FWC's biologists and species

specialists that are already involved in the review of both 404 applications and ERP applications. Currently, FWC already provides a list of federally and State-listed species to FDEP and the USACE as part of their review. FWC also provides comments and recommendations on State-listed species, provides technical assistance on federally listed species, and currently provides comments and recommendations on aquatic species such as manatees and sea turtles under the Florida Manatee Sanctuary Act and Florida's Marine Turtle Protection Act. FWC also regulates intentional and incidental take of State-listed species under Chapter 68A-27, F.A.C. exclusive of the ERP Program and the State 404 Program. Nothing in this MOU, the ERP Program, nor the State 404 Program supersede nor otherwise affect FWC's permitting programs or authorities. For State 404 Program application reviews, FWC proposes to provide preliminary effect assessments for federally listed species and their critical habitat, as well as provide preliminary impact avoidance and minimization measures that will become permit conditions during the FDEP review of project applications. These project-specific preliminary lists of affected federally listed species, assessment determinations, and proposed impact avoidance and minimization measures may be coordinated with the USFWS during technical assistance review and/or as part of the Public Notice process for concurrence. This will be in addition to FWC's role in reviewing the ERP Program applications for state listed species impacts, which will remain unchanged. The benefits of this MOU, and FWC's involvement with Part IV of Chapter 373, F.S. concern the authorizations as outlined in Section V of this MOU.

## II.  COORDINATION FRAMEWORK

### A.  The Permit Application Review Process Framework

The current ERP species coordination process includes FWC's involvement upon initial receipt of the application, allowing FWC's review to begin early in the process and proceed during the ERP Request for Additional Information and Completeness phases. State 404 permit applications are proposed to be processed in a similar manner, where FWC and USFWS will receive applications from FDEP as soon as possible after receipt. Upon assumption of the Section 404 Program, coordination between the USFWS and FDEP related to the proposed action's effects on species will occur through the technical assistance process, which is anticipated to be outlined in the USFWS's biological opinion based on information included in the biological assessment submitted by EPA. FWC and FDEP will jointly decide which agency will be the species coordination lead to coordinate the federally listed species review with the USFWS for each application. The State species coordination lead is responsible for making a preliminary determination for affected federally listed species, affected action area and critical habitats, and assessing whether, and what type of, adverse impacts to federally endangered or threatened species and their critical habitats is expected. The FDEP and FWC reviewers will work as a team. This coordination between reviewers will ensure that the preliminary information and impact/effect determinations for federally listed species that is to be sent to the USFWS represents all needed aspects of the State review. The designated State species lead will always include the other State agency's reviewer on all correspondence with the USFWS. Disagreements between agencies will be handled in accordance with Section IV of this MOU. Upon receipt of a permit application, the State species lead will coordinate with the USFWS and provide to DEP the preliminary assessment and additional information request within 20 days, so that FDEP may comply with its requirement to submit its request for additional information

within 30 days of receipt of a permit application (Rule 62-331.052, F.A.C)

After FDEP/FWC has all the necessary information needed in order to review the permit application, the State species lead for that project can provide preliminary effect determinations and protective measures to USFWS for review and comment. Comments from the USFWS will be incorporated into FDEP's review of the permit application, including the effects discussion and incorporation of draft permit conditions. Or, in the case where no species will be affected, this information will be officially documented, and the species coordination review will be considered completed. This technical assistance with the USFWS will be accomplished prior to the Public Notice, when possible. The Public Notice will include the types of anticipated impacts to endangered and threatened species as well as their critical habitat, and the proposed protection measures to offset those impacts. After the Public Notice, the State species lead will review any additional information and public concerns that were received and coordinate with the USFWS to address them as appropriate. If there are no additional concerns or modifications that would affect the species review, the conclusions and permit conditions by USFWS will be drafted as final correspondence for the file and recommended conditions incorporated into the permit.

During EPA's review of Florida's application for assumption, FDEP's Submerged Lands and Environmental Resources Coordination Program (SLERC) staff, with assistance from FWC and USFWS, if possible, will provide training to FDEP permit review staff on the species coordination process and performing assessments of effects that different types of projects pose to federally listed species. This will include the use of information and approaches found in section 7 consultation keys, Standard Local Operating Procedures for Endangered Species (SLOPES) and other species effects evaluation tools. These tools will be provided to FWC and FDEP in advance of these trainings and any discrepancies in the species information or use of these tools will be resolved. In addition, information and approaches for how to analyze species-specific data and assess potential effects to species that do not have such tools would be discussed. Additional tools will be adopted as they are developed by the USFWS.

The parties anticipate that FWC's species expertise and current engagement in the ERP review will create efficiencies during the transition from a Federal 404 program to the State 404 permit program, while also providing continuous protection to Florida's fish, wildlife, and plant species and their habitats. The FWC and USFWS staff will be providing expertise to FDEP staff regarding species issues, and the species coordination process will be a joint effort for each application. Over time, FDEP, FWC, and USFWS will become more proficient and knowledgeable about effects determinations for federally listed species during the State 404 Program permitting process.

## B. Agency Roles and Responsibilities

This MOU anticipates the following roles and responsibilities for each agency. However, after 404 assumption, a technical team (described in Section III below) should convene and formalize the details of coordination.

FWC
• Attend Technical Team meetings.

• Participate in training efforts with FDEP and USFWS.
• Provide oversight during the permitting review process, when needed.
• Provide a list of potentially affected species and habitat during the review of permit applications, preliminary determinations of the project's potential effect on federally and State-listed species and habitat (particularly critical habitat) and provide preliminary recommendations for impact avoidance and minimization measures.
• Determine if the project meets any specified criteria identified in any pre-existing biological opinions, USFWS-approved species effect determination keys, or USFWS-issued incidental take permits for federally and State-listed species.
• In coordination with USFWS, develop appropriate, site specific habitat conservation or species conservation measures to be incorporated as permit conditions. When appropriate, the USFWS-approved species lists, and recommended impact avoidance and minimization measures may be finalized by FWC as official correspondence to FDEP.
• Participate in project-specific meetings, teleconferences and email conversations regarding wildlife and habitat reviews. This will provide support for the review of wildlife and habitat impacts when needed.
• Take the lead in resolution of issues regarding State-listed species, including State-listed species that are also designated federally as "at-risk", "candidate" or "proposed" species, as appropriate.
• Work directly with the applicant to resolve issues regarding permitting for take of State-listed species in accordance with FWC's Rules Relating to Threatened and Endangered Species.

USFWS
• Attend Technical Team meetings, when appropriate.
• Participate in training efforts with FDEP and FWC.
• Provide technical assistance during the permitting review process, where there may be effects to federally listed species, proposed species, petitioned species, or candidate species.
• Coordinate compliance with FWC to meet ESA requirements for relevant federally threatened and endangered ("T/E") species.
• Provide section 7 consultation keys, Standard Local Operating Procedures for Endangered Species (SLOPES) and other species effects evaluation tools used to evaluate effect determinations
• Provide technical assistance regarding effects on federally threatened or endangered species and measures to avoid or minimize adverse effects.
• In coordination with FWC, develop appropriate, site-specific habitat conservation or species management opportunities.
• Participate in project-specific meetings, teleconferences and email conversations regarding wildlife and habitat reviews upon request as related to ESA-listed species, proposed species, petitioned species, or candidate species. This will provide support for the review of wildlife and habitat impacts when needed.
• Take the lead in resolution of issues related to federally listed species.
• Incidental take for federally listed species will be handled in accordance with the Biological Assessment and Biological Opinion developed for this assumption.

FDEP

• Attend Technical Team meetings when appropriate.
• Participate in training efforts with FWC and USFWS.
• Provide oversight during the permitting review process, when needed.
• Provide State 404 Program and ERP program related permit applications as soon as possible for review upon submittal.
• Provide any additional information that may assist in the review, including activity-specific information to FWC and USFWS. Incorporate any additional information requested by FWC and USFWS into the FDEP requests for additional information or completeness requests to the applicant.
• Participate in project-specific meetings, teleconferences and email conversations regarding wildlife and habitat reviews. This provides support for the review of species and habitat impacts when needed.
• Provide notification to FWC regarding timelines for the submittal of FWC questions and comments during the review of submitted applications.  When FWC is actively reviewing a permit, FDEP will not issu the permit without resolution of FWC's review.

## III. ENDANGERED AND THREATENED SPECIES TECHNICAL TEAM

This MOU's framework, processes, and procedures may be reviewed periodically after initiating an Endangered and Threatened Species Technical Team (Technical Team) comprised of FWC, USFWS and FDEP agency staff members. This Technical Team will meet to review the effectiveness of the coordination processes, procedures, training resources, and other areas related to State of Florida permitting under Part IV of Chapter 373 F.S. to ensure compliance with the ESA and State of Florida Rules Relating to Threatened and Endangered Species. Team members would include staff from FWC's Office of Conservation Planning Services (CPS), USFWS's Florida's Ecological Services Office, and FDEP's SLERC. FDEP SLERC's office will take the lead in setting up Technical Team meetings and training meetings. The Technical Team will also act as technical support to FDEP District offices during the permitting process should any issues arise regarding state or federally listed species or habitat conservation measures. Frequent and informal contact between agencies is encouraged regarding the general process, project-specific issues, or emerging issues.

### A.  Guidance/Training

FDEP, FWC and USFWS will hold cross-training sessions, and joint training sessions with district, regional and field staff of all agencies to facilitate mutual understanding and implementation of the MOU. Initially, the goal is completion of basic training to all relevant permit review personnel prior to the approval of assumption, with additional training resources and sessions to continue periodically as needed. The agencies may issue guidance individually or jointly to assist in carrying out this MOU.

### B.  Oversight Review

The Technical Team provides oversight and coordination for all aspects of this MOU. Its functions include, but are not limited to:

(1) Developing, maintaining, and updating training guidance;
(2) Addressing issues about process implementation to ensure compliance with ESA;
(3) Identifying and addressing workload issues;
(4) Incorporating/identifying improvements and revisions into the process;
(5) Convening interagency scientific/technical reviews, as appropriate;
(6) Reviewing and evaluating, at least on an annual basis, the MOU and its implementation;
(7) Facilitating reaching consensus on particular issues at any level upon requests by personnel at that level.

## IV. INTERAGENCY ELEVATION PROCESS

FDEP, FWC and USFWS intend to work cooperatively to achieve their mutually shared objectives of protecting the quality of waters of the United States and the species that depend on those waters. Collaboration among Technical Team members, agency district, regional, and field staff when resolving any potential conflicts or disagreements should be performed through a structured, time-sensitive process at the lowest possible level. During the review of State 404 permit applications and these elevation procedures, the following regulations will be followed: 40 CFR § 233.20; 40 CFR § 233.50; the 404(b)(1) Guidelines in 40 CFR § 230; 40 CFR § 230.10(b)(3) and 40 CFR § 230.30(c). The agencies will follow the procedures below to elevate any conflict or disagreement.

Any contentious issues, disagreements or conflicts between agencies, or between agencies and applicants, will be discussed with an attempt to resolve them at the lowest levels within the agencies without elevation (reviewers and their supervisors). If issues cannot be resolved at this level, reviewers and their supervisors will reach out to the Technical Team for assistance (Level 1). If there is no consensus resolution at that level, or if it is deemed prudent, the issues will be elevated to Level 2, which would include the USFWS State Supervisor, FDEP State 404 program Supervisor, FWC Conservation Planning Services Director, and EPA Florida State 404 program Supervisor). While anticipated to be very rare, issues can be elevated to Level 3 if needed, which would include the USFWS Regional Director, Atlanta; EPA Regional Administrator, Atlanta; FWC Executive Director and FDEP Secretary. The supervisory level staff may differ for each agency and may differ depending upon the issue in dispute or conflict that needs resolution. All agencies will be included in resolution discussions, even if the issue only involves two of the three partner agencies.

While decisions by all levels, including decisions to elevate, will be made by consensus to the greatest extent practicable, any one agency can initiate the elevation process or elevate to the next supervisor level. Agencies will jointly prepare a summary document that will contain a statement of facts and succinctly state each agency's position and recommendations for resolution. This summary document will be developed and shared when elevated to Level 2 or Level 3.  If needed, the summary documents may be updated when elevated to Level 3. The overall goal is to jointly develop implementable actions to avoid and/or minimize adverse impacts to listed species to ensure the impacts of any given project are not likely to result in take, or likely to jeopardize the continued existence of any species or adversely modify its critical habitat. With regard to conclusions about the potential effects of a project on ESA-listed species

or the effectiveness of proposed protection measures, the final USFWS position is determinative. With regard to conclusions about the potential effects of a project on State listed species or the effectiveness of proposed protection measures, the final FWC position is determinative.

Elevation should be initiated so that all applicable deadlines will be met, considering subsequent levels of review. If FDEP is aware of a dispute, they will resolve the dispute prior to taking final action. This is to ensure consistency with applicable legal deadlines, and to allow the issue to be resolved through the elevation process When determined to be appropriate (e.g., where the results of the elevation would provide useful guidance to agency staff or transparency to the public), the decision on the elevation should be memorialized in writing, placed in the application's official file, and circulated among Agency staff to serve as guidance for future decisions.

## V.  BENEFITS OF THIS MEMORANDUM OF UNDERSTANDING

While there is statutory permit commenting authority for FWC in the ERP Program, no specific, written coordination procedures or agreements have been initiated between FWC and FDEP for the ERP Program. This MOU will improve communication and provide a mechanism to improve ERP processes, resolve emerging issues, and likely increase efficiency and consistency in the ERP Program review for endangered and threatened species.

Once assumed, the implementation of the State 404 Program will result in FWC reviewing potentially affected federally and State-listed species concurrently.  Since similar guilds of species have similar habitat needs or life-history traits, FWC's preliminary determinations of a project's potential adverse effects to species will be more holistic and more efficient than the current process. There are also some limited jurisdictional overlap between FWC and USFWS with some species, such as species that are State-listed and federally designated as "at risk", "candidate", and "proposed".  This MOU provides a mechanism for FWC and USFWS to more closely coordinate the review of potential adverse impacts to these types of species during State permit review.  In addition, on rare occasions there can be conflicting conservation needs of species located within the same action area of a project.  This MOU provides a mechanism for FDEP, FWC and USFWS to better resolve such issues.

This MOU formally memorializes partnerships that are mutually beneficial to all parties:

- Benefit to FDEP: The FWC and USFWS partnerships and involvement in both permitting processes ensures fulfillment of the ERP Program, State 404 Program, Chapter 253 F.S. and all other laws requiring protection of federally and State-listed species and their habitats. The FDEP/FWC partnership will ease the transition of the State 404 Program, providing faster and more accurate project reviews and effect determinations as compared to FDEP staff alone.

- Benefit to FWC: The FDEP partnership provides a mechanism for fulfillment of the requirements of Article IV, Section 9 of the Florida Constitution, and FWC's Chapter

68A-27 of the Florida Administrative Code (F.A.C.).

- Benefit to USFWS: The FWC and FDEP partnerships increase collaboration on development projects that previously may have been reviewed and permitted separately but will now be reviewed by one permitting agency (FDEP) and one wildlife agency (FWC). FDEP and FWC may assist USFWS during the technical assistance process by providing preliminary reviews when possible, in order to ensure the fulfillment of ESA requirements.

## VI. OBLIGATION OF FUNDS, COMMITMENT OF RESOURCES

Nothing in this MOU shall be construed as obligating any of the parties to the expenditure of funds in excess of appropriations already authorized by law, or otherwise commit any of the agencies to actions for which it lacks authority. It is understood that the level of resources to be expended under this MOU will be consistent with the level of resources available to the agencies to support such efforts.

## VII. NATURE OF THE MEMORANDUM OF UNDERSTANDING

This Memorandum is intended only to improve the interagency coordination between FWC, USFWS and FDEP. It is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the State of Florida or the United States, its agencies or instrumentalities, its officers or employees, or any other person. FWC, USFWS, and the FDEP may jointly revise this document. No party to this MOU waives any administrative claims, positions, or interpretations it may have with respect to the applicability or the enforceability of the ESA or the CWA.

(1) Nothing in this MOU shall be construed to restrict in any way EPA's authority to fulfill its oversight and enforcement responsibilities under the CWA, nor shall it restrict the enforcement responsibilities of FDEP and FWC under Florida law or USFWS under Federal law.

(2) This MOU, and procedures established in conformance with it, shall be reviewed periodically by FDEP, FWC, and USFWS. Any party may request in writing an amendment or modification to the MOU.

(3) This MOU, and any amendments and modifications, shall remain in effect until the State 404 Program authorization is modified in a manner that would affect this MOU.

## VIII. EFFECTIVE DATE; TERMINATION

This Memorandum will become effective upon signature by each of the parties. If the State 404 Program is not yet approved, this Memorandum will only become effective for the ERP program and requirements under Chapter 253, F.S.. Once the application for assumption is approved by EPA, this Memorandum will become effective for both the ERP program and the State 404 Program. Any of the parties may withdraw from this MOU upon 60 days written notice to the other parties, provided that any coordination covered by the terms of this MOU that are pending

at the time notice of withdrawal is identified by the parties, and those activities covered by this MOU that begin the process prior to and within the 60-day notice period, will continue to be covered by the terms of this MOU.

IX.  SIGNATURES

**Florida Department of Environmental Protection**

Date: _____    By: _____
                                    Noah Valenstein, Secretary

**Florida Fish and Wildlife Conservation Commission**

Date: _____    By: _____
                                    Eric Sutton, Executive Director

**United States Fish and Wildlife Service**

Date: _____    By: _____

Attachment 1: Species Coordination Process Flowchart



## Comparison with Federal Requirements

Florida's existing environmental resource permitting (ERP) program heavily overlaps with the requirements of Section 404 of the Clean Water Act (CWA). Florida's assumption strategy is a two-program approach, where the ERP and 404 authorizations will be separate authorizations. To reduce duplication, provide streamlining, and utilize DEP staff's current understanding of the ERP program rules, we are proposing creation of Chapter 62-331, Florida Administrative Code (F.A.C.) to "bridge the gap" between existing ERP rules and the requirements of section 404 of the CWA.

### General Authority, Section 373.4146, F.S.:

### 373.4146   State assumption of the federal Clean Water Act, section 404 dredge and fill permitting program. —

1. As used in this section, the term "state assumed waters" means waters of the United States that the state assumes permitting authority over pursuant to s. 404 of the Clean Water Act (CWA), Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq., and rules promulgated thereunder, for the purposes of permitting the discharge of dredge or fill material.

2. The department has the power and authority to assume, in accordance with 40 C.F.R. part 233, the dredge and fill permitting program established in s. 404 of the Clean Water Act, Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq., and rules promulgated thereunder. The department may adopt any federal requirements, criteria, or regulations necessary to obtain assumption, including, but not limited to, the guidelines specified in 40 C.F.R. part 230 and the public interest review criteria in 33 C.F.R. s. 320.4(a). Any rule, standard, or other requirement adopted pursuant to the authority granted in this subsection for purposes of obtaining assumption may not become effective or otherwise enforceable until the United States Environmental Protection Agency has approved the state's assumption application. This legislative authority is intended to be sufficient to enable the department to assume and implement the federal section 404 dredge and fill permitting program in conjunction with the environmental resource permitting program established in this chapter.

3. To the extent that state law applies and does not conflict with the federal requirements identified in subsection (2), the application of such state law to further regulate discharges in state assumed waters is not prohibited. Provisions of state law which conflict with the federal requirements identified in subsection (2) do not apply to state administered section 404 permits.

4. A state administered section 404 permit is not required for activities as specified in 33 U.S.C. s. 1344(f), 40 C.F.R. s. 232.3, or 33 C.F.R. s. 323.4. The exemptions established in ss. 373.406, 373.4145, and 403.813 still apply to environmental resource permits. However, the exemptions identified in ss. 373.406, 373.4145, and 403.813 may not be applied to state administered section 404 permits.

5. Upon state assumption of the section 404 dredge and fill permitting program pursuant to subsection (2):

   a. The department must grant or deny an application for a state administered section 404 permit within the time allowed for permit review under 40 C.F.R. part 233, subparts D and F. The department is specifically exempted from the time limitations provided in ss. 120.60 and 373.4141 for state administered section 404 permits.

   b. All state administered section 404 permits issued under this section must be for a period of no more than 5 years. Upon an applicant's submittal of a timely application for reissuance, a state administered section 404 permit does not expire until the department takes final action upon the application or until the last day for seeking judicial review of the department's decision or, at a later date fixed by order of the reviewing court. If the department fails to render a permitting decision within the time allowed by s. 404 of the Clean Water Act, Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq., 40 C.F.R. part 233, subparts D and F, or a memorandum of agreement executed by the department and the United States Environmental Protection Agency, whichever is shorter, the applicant may apply for an order from the circuit court requiring the department to render a decision within a specified time. The department must adopt by rule an expedited permit review process that is consistent with federal law for the reissuance of a state administered section 404 permits where there have been no material changes in the scope of the project as originally permitted, site and surrounding environmental conditions have not changed, and the applicant does not have a history of noncompliance with the existing permit. The decision by the department to approve the reissuance of any state administered section 404 permit issued pursuant to this section is subject to ss. 120.569 and 120.57 only with respect to any material permit modification or material changes in the scope of the project as originally permitted.

   c. The department may delegate administration of the state administered section 404 permitting program if such delegation is in accordance with federal law. The department must retain the authority to review, modify, revoke, or rescind a state administered section 404 permit issued by any delegated entity to ensure consistency with federal law.

### Applicable Definitions – from 40 CFR Parts 230, 232, and 233, CFR (additional definitions unique to the state program can be found in Volume I, Section 2.0 and the 404 Handbook Section 2.0.

(Citations in parenthesis) Definitions pertaining strictly to the processing of mitigation banking and in-lieu fee instruments are not included. Certain administrative definitions used in 40 CFR Part 233 are also not included because they are unnecessary for inclusion in rule.

| Term | Federal Definition | State Definition | Comments |
|---|---|---|---|
| *Act or CWA* | **Act:** The term Act means the Clean Water Act (also known as the Federal Water Pollution Control Act or FWPCA) Pub. L. 92-500, as amended by Pub. L. 95-217, 33 U.S.C. 1251, et seq. (40 CFR § 230.3) | **"Act" or "CWA"** means the Federal Water Pollution Control Act (also known as the Clean Water Act) Pub. L. 92-500, as amended by Pub. L. 95-217, 33 U.S.C. 1251, et seq. (404 Handbook) | Same. |

| Term | Federal Definition | State Definition | Comments |
|---|---|---|---|
| *Activity* | See: "Discharge of Dredged Material" and/or "Discharge of Fill Material" and/or "discharge" | **"Activity"** for the purposes of the State 404 Program only, means "discharge of dredged material" and/or "discharge of fill material" as those terms are defined in 40 CFR § 232.2 (see Appendix B). The terms "dredge", "fill", "dredging", and "filling", when used within Chapter 62-331, F.A.C., or this Handbook shall be interchangeable with "activity" as defined herein. (404 Handbook) | The state could not use "discharge" because the term already has a unique and specific definition under ERP relating to stormwater. Use of the term "discharge" may have caused significant confusion because the State 404 Program is heavily linked to ERP rules and statutes. |
| *Adaptive Management* | **Adaptive management** means the development of a management strategy that anticipates likely challenges associated with compensatory mitigation projects and provides for the implementation of actions to address those challenges, as well as unforeseen changes to those projects. It requires consideration of the risk, uncertainty, and dynamic nature of compensatory mitigation projects and guides modification of those projects to optimize performance. It includes the selection of appropriate measures that will ensure that the aquatic resource functions are provided and involves analysis of monitoring results to identify potential problems of a compensatory mitigation project and the identification and implementation of measures to rectify those problems. (40 CFR § 230.92) | **"Adaptive Management"** means the development of a management strategy that anticipates likely challenges associated with compensatory mitigation projects and provides for the implementation of actions to address those challenges, as well as unforeseen changes to those projects. It requires consideration of the risk, uncertainty, and dynamic nature of compensatory mitigation projects and guides modification of those projects to optimize performance. It includes the selection of appropriate measures that will ensure that the aquatic resource functions are provided and involves analysis of monitoring results to identify potential problems of a compensatory mitigation project and the identification and implementation of measures to rectify those problems. (404 Handbook) | Same. |
| *Adjacent* | **Adjacent.** The term *adjacent* means wetlands that: (A) Abut, meaning to touch at least at one point or side of, a water identified in paragraph (1)(i), (ii), or (iii) of this definition; (B) Are inundated by flooding from a water identified in paragraph (1)(i), (ii), or (iii) of this definition in a typical year; (C) Are physically separated from a water identified in paragraph (1)(i), (ii), or (iii) of this definition only by a natural berm, bank, dune, or similar natural feature; or (D) Are physically separated from a water identified in paragraph (1)(i), (ii), or (iii) of this definition only by an artificial dike, barrier, or similar artificial structure so long as that structure allows for a direct hydrologic surface connection between the wetlands and the water identified in paragraph (1)(i), (ii), or (iii) of this definition in a typical year, such as through a culvert, flood or tide gate, pump, or similar artificial feature. An adjacent wetland is jurisdictional in its entirety when a road or similar artificial structure divides the wetland, as long as the structure allows for a direct hydrologic surface connection through or over that structure in a typical year. (40 CFR § 120.2 | **"Adjacent"** means bordering, contiguous, or neighboring. Wetlands separated from other state-assumed waters by man-made dikes or barriers, natural river berms, beach dunes, and the like are considered adjacent wetlands. (404 Handbook) | The State 404 Program applies to state-assumed waters of the United States (WOTUS) as defined at 40 CFR Part 120. |
| *Administratively Complete* | | **"Administratively complete"** means an application that contains all the items required under the public noticing requirements of section 62-331.060, F.A.C. (404 Handbook) | No federal definition. |
| *Agency* | | **"Agency"** means the Department of Environmental Protection ("Department"), or the water management districts ("Districts"), where the Districts are delegated authority to implement the State 404 Program by the Department, and such delegation has been approved by EPA in accordance with 40 CFR Part 233. (404 Handbook) | No federal definition. |

| Term | Federal Definition | State Definition | Comments |
|---|---|---|---|
| *Aquatic Environment or Aquatic Ecosystem* | The terms **aquatic environment** and **aquatic ecosystem** mean waters of the United States, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals. (40 CFR § 230.3) | "Aquatic environment" and "aquatic ecosystem" mean state-assumed waters, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals. (Also see "Natural systems" definition in Volume I, section 2.0) (404 Handbook) | |
| *Buffer* | **Buffer** means an upland, wetland, and/or riparian area that protects and/or enhances aquatic resource functions associated with wetlands, rivers, streams, lakes, marine, and estuarine systems from disturbances associated with adjacent land uses. (40 CFR § 230.92) | "Buffer" means an upland, wetland, and/or riparian area that protects and/or enhances aquatic resource functions associated with wetlands, rivers, streams, lakes, marine, and estuarine systems from disturbances associated with adjacent land uses. (404 Handbook) | Same. |
| *Burial Resources* | | "Burial Resources" means human remains, meaning all physical remains of a human body of a person of American Indian ancestry, even if in fragmentary form unless it is determined that the human remain had been freely given or naturally shed by the individual from whose body it was obtained, such as hair made into ropes or nets or individual teeth. For the purposes of determining cultural affiliation, human remains incorporated into a funerary object, sacred object, or object of cultural patrimony, are considered as part of that item and as a cultural resource item. (404 Handbook) | No federal definition. Requested by the Seminole Tribe of Florida. |
| *Carolina Bays And Delmarva Bays* | **Carolina bays and Delmarva bays.** Carolina bays and Delmarva bays are ponded, depressional wetlands that occur along the Atlantic coastal plain. (40 CFR § 230.3) | | N/A for Florida. No state definition |
| *Carrier of Contaminant* | The term **carrier of contaminant** means dredged or fill material that contains contaminants. (40 CFR § 230.3) | | No state definition. |
| *Compensatory Mitigation* | **Compensatory mitigation** means the restoration (re-establishment or rehabilitation), establishment (creation), enhancement, and/or in certain circumstances preservation of aquatic resources for the purposes of offsetting unavoidable adverse impacts which remain after all appropriate and practicable avoidance and minimization has been achieved. (40 CFR § 230.92) | "Compensatory Mitigation" means the restoration (re-establishment or rehabilitation), establishment (creation), enhancement, and/or in certain circumstances preservation of aquatic resources for the purposes of offsetting unavoidable adverse impacts which remain after all appropriate and practicable avoidance and minimization has been achieved. (404 Handbook) | Same. |
| *Compensatory Mitigation Project* | **Compensatory mitigation project** means compensatory mitigation implemented by the permittee as a requirement of a DA permit (i.e., permittee-responsible mitigation), or by a mitigation bank or an in-lieu fee program. (40 CFR § 230.92) | "Compensatory Mitigation Project" means compensatory mitigation implemented by the permittee as a requirement of a permit (i.e., permittee-responsible mitigation), or by a mitigation bank or in-lieu fee program. (404 Handbook) | Same. |
| *Condition* | **Condition** means the relative ability of an aquatic resource to support and maintain a community of organisms having a species composition, diversity, and functional organization comparable to reference aquatic resources in the region. (40 CFR § 203.92) | "Condition" as it is used in the mitigation section of this Handbook, means the relative ability of an aquatic resource to support and maintain a community of organisms having a species composition, diversity, and functional organization comparable to reference aquatic resources in the region. (404 Handbook) | Mostly the same language, with one clarifying statement for the state definition. |
| *Contaminant* | The term **contaminant** means a chemical or biological substance in a form that can be incorporated into, onto or be ingested by and that harms aquatic organisms, consumers of aquatic organisms, or users of the aquatic environment, and includes but is not limited to the substances on the 307(a)(1) list of toxic pollutants promulgated on January 31, 1978 (43 FR 4109). (40 CFR § 230.3) | "Contaminant" means a chemical or biological substance in a form that can be incorporated into, onto or be ingested by and that harms aquatic organisms, consumers of aquatic organisms, or users of the aquatic environment, and includes but is not limited to the substances on the 307(a)(1) list of toxic pollutants. The list of toxic pollutants is incorporated in paragraph 62-620.100(3)(k), F.A.C., and reproduced in Appendix D of this Handbook. | Same, with reference information. |

| Term | Federal Definition | State Definition | Comments |
|---|---|---|---|
| *Creation* (State)<br>*Establishment* (Federal) | **Establishment (creation)** means the manipulation of the physical, chemical, or biological characteristics present to develop an aquatic resource that did not previously exist at an upland site. Establishment results in a gain in aquatic resource area and functions. (40 CFR § 230.92) | **"Creation"** means the establishment of new wetlands or surface waters by conversion of other land forms. (A.H. Vol. 1) | Defining the same concept using two different terms, creation for state and establishment for federal. Also uses different language in definition. |
| *Department* | | **"Department"** means the Florida Department of Environmental Protection (A.H. Vol. 1) | No federal definition |
| *Discharge (ERP version)* | | **"Discharge"** means to allow or cause water to flow. (A.H. Vol. 1) | This ERP definition is added here to demonstrate the different meaning of the term "discharge" between ERP and the CWA. This existing definition is why we could not use the term "discharge of dredged or fill material". |

| *Discharge of Dredged Material* | | |
|---|---|---|
| | **Discharge of dredged material** (1) Except as provided below in paragraph (2), the term discharge of dredged material means any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the waters of the United States. The term includes, but is not limited to, the following: | See "Activity", above. |
| | (i) The addition of dredged material to a specified discharge site located in waters of the United States; | The term "activity", or the interchangeable terms "dredge", "fill", "dredging", or "filling" are used instead of discharge for the State 404 Program. Please see the term "discharge", above, for explanation. |
| | (ii) The runoff or overflow, associated with a dredging operation, from a contained land or water disposal area; and | |
| | (iii) Any addition, including redeposit other than incidental fallback, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation. | |
| | (2) The term discharge of dredged material does not include the following: | |
| | (i) Discharges of pollutants into waters of the United States resulting from the onshore subsequent processing of dredged material that is extracted for any commercial use (other than fill). These discharges are subject to section 402 of the Clean Water Act even though the extraction and deposit of such material may require a permit from the Corps or applicable state. | |
| | (ii) Activities that involve only the cutting or removing of vegetation above the ground (e.g., mowing, rotary cutting, and chainsawing) where the activity neither substantially disturbs the root system nor involves mechanized pushing, dragging, or other similar activities that redeposit excavated soil material. | |
| | (iii) Incidental fallback. | |
| | (3) Section 404 authorization is not required for the following: | |
| | (i) Any incidental addition, including redeposit, of dredged material associated with any activity that does not have or would not have the effect of destroying or degrading an area of waters of the U.S. as defined in paragraphs (4) and (5) of this definition; however, this exception does not apply to any person preparing to undertake mechanized landclearing, ditching, channelization and other excavation activity in a water of the United States, which would result in a redeposit of dredged material, unless the person demonstrates to the satisfaction of the Corps, or EPA as appropriate, prior to commencing the activity involving the discharge, that the | |

| Term | Federal Definition | State Definition | Comments |
|---|---|---|---|
| | activity would not have the effect of destroying or degrading any area of waters of the United States, as defined in paragraphs (4) and (5) of this definition. The person proposing to undertake mechanized landclearing, ditching, channelization or other excavation activity bears the burden of demonstrating that such activity would not destroy or degrade any area of waters of the United States. | | |
| | (ii) Incidental movement of dredged material occurring during normal dredging operations, defined as dredging for navigation in navigable waters of the United States, as that term is defined in 33 CFR part 329, with proper authorization from the Congress or the Corps pursuant to 33 CFR part 322; however, this exception is not applicable to dredging activities in wetlands, as that term is defined at § 232.2(r) of this chapter. | | |
| | (iii) Certain discharges, such as those associated with normal farming, silviculture, and ranching activities, are not prohibited by or otherwise subject to regulation under Section 404. See 40 CFR 232.3 for discharges that do not require permits. | | |
| | (4) For purposes of this section, an activity associated with a discharge of dredged material destroys an area of waters of the United States if it alters the area in such a way that it would no longer be a water of the United States. | | |
| | Note: Unauthorized discharges into waters of the United States do not eliminate Clean Water Act jurisdiction, even where such unauthorized discharges have the effect of destroying waters of the United States. | | |
| | (5) For purposes of this section, an activity associated with a discharge of dredged material degrades an area of waters of the United States if it has more than a de minimis (i.e., inconsequential) effect on the area by causing an identifiable individual or cumulative adverse effect on any aquatic function. | | |

| Term | Federal Definition | State Definition | Comments |
|---|---|---|---|
| *Discharge of Fill Material* | **Discharge of fill material. (1)** The term discharge of fill material means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills; placement of overburden, slurry, or tailings or similar mining-related materials;" after the words "utility lines; and artificial reefs.

(2) In addition, placement of pilings in waters of the United States constitutes a discharge of fill material and requires a Section 404 permit when such placement has or would have the effect of a discharge of fill material. Examples of such activities that have the effect of a discharge of fill material include, but are not limited to, the following: Projects where the pilings are so closely spaced that sedimentation rates would be increased; projects in which the pilings themselves effectively would replace the bottom of a waterbody; projects involving the placement of pilings that would reduce the reach or impair the flow or circulation of waters of the United States; and projects involving the placement of pilings which would result in the adverse alteration or elimination of aquatic functions.

(i) Placement of pilings in waters of the United States that does not have or would not have the effect of a discharge of fill material shall not require a Section 404 permit. Placement of pilings for linear projects, such as bridges, elevated walkways, and powerline structures, generally does not have the effect of a discharge of fill material. Furthermore, placement of pilings in waters of the United States for piers, wharves, and an individual house on stilts generally does not have the effect of a discharge of fill material. All pilings, however, placed in the navigable waters of the United States, as that term is defined in 33 CFR part 329, require authorization under section 10 of the Rivers and Harbors Act of 1899 (see 33 CFR part 322).

(iii) [Reserved] (40 CFR § 232.2). | See "Activity" above. | The term "activity", or the interchangeable terms "dredge", "fill", "dredging", or "filling" are used instead of discharge for the State 404 Program. Please see the term "discharge", above, for explanation. |

| Term | Federal Definition | State Definition | Comments |
|------|--------------------|------------------|----------|
| *Discharge Point* | The term **discharge point** means the point within the disposal site at which the dredged or fill material is released. (40 CFR § 230.3) | See "discharge", above. Also see "Project area" and "Project site". | |
| *Disposal Site* | The term **disposal site** means that portion of the "waters of the United States" where specific disposal activities are permitted and consist of a bottom surface area and any overlying volume of water. In the case of wetlands on which surface water is not present, the disposal site consists of the wetland surface area. (40 CFR § 230.3) | See "Project area" and "Project site". | The state chose not to use the term "Disposal" because it seems to mean something is being disposed of. This may be appropriate for ocean dumping, but fill activities within state-assumed waters are not likely to be for the purpose of disposal of materials, but rather for the purpose of filling to create uplands. The terms spoil site, spoil cell, or dredged material management area are used for sediment disposal sites in ERP. |
| *District* | | **"District"** means a water management district created pursuant to Section 373.069, F.S. (A.H. Vol. 1) | No federal definition |
| *Dredged Material* | **Dredged material** means material that is excavated or dredged from waters of the United States. (40 CFR § 232.2) | See "material", below. | |
| *Ecological Value* | See "functional capacity". | **"Ecological value"** means the value of functions performed by uplands, wetlands, and other surface waters to the abundance, diversity, and habitats of fish, wildlife, and listed species. Included are functions such as providing cover and refuge; breeding, nesting, denning, and nursery areas; corridors for wildlife movement; food chain support; natural water storage, natural flow attenuation, and water quality improvement which enhances fish, wildlife, and listed species utilization. (62-345.300, F.A.C.) | |
| *Endangered or Threatened Species* | | **"Endangered or threatened species"** means those animal species that are identified as endangered or threatened by the US Fish and Wildlife Service, the National Marine Fisheries Service, or the Florida Fish and Wildlife Conservation Commission, as well as those plant species identified as endangered or threatened when such plants are located in a wetland or other surface water. (A.H. Vol. 1) | No federal definition. Demonstrates that the state considers federally and state listed species when evaluating impacts to wetlands and other surface waters. |
| *Enhancement* | **Enhancement** means the manipulation of the physical, chemical, or biological characteristics of an aquatic resource to heighten, intensify, or improve a specific aquatic resource function(s). Enhancement results in the gain of selected aquatic resource function(s), but may also lead to a decline in other aquatic resource function(s). Enhancement does not result in a gain in aquatic resource area. (40 CFR § 230.92) | **"Enhancement"** means improving the ecological value of wetlands, other surface waters, or uplands in comparison to their current condition. (A.H. Vol. 1) | Different definitions with the same outcome. |
| *Extraction Site* | The term **extraction site** means the place from which the dredged or fill material proposed for discharge is to be removed. (40 CFR § 230.3) | See "Project site" or "Project area". | |

| Term | Federal Definition | State Definition | Comments |
|---|---|---|---|
| **Fill Material** (Federal) **Material** (State) | **Fill material.** (1) Except as specified in paragraph (3) of this definition, the term fill material means material placed in waters of the United States where the material has the effect of: <br><br> (i) Replacing any portion of a water of the United States with dry land; or <br><br> (ii) Changing the bottom elevation of any portion of a water of the United States. <br><br> (2) Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in the waters of the United States. <br><br> (3) The term fill material does not include trash or garbage. (40 CFR § 232.2) | "**Material,**" when used in the context of "filling," means matter of any kind, such as, sand, clay, silt, rock, dredged material, construction debris, solid waste, pilings or other structures, ash, and residue from industrial and domestic processes. The term does not include the temporary use and placement of lobster pots, crab traps, or similar devices or the placement of oyster cultch pursuant to Section 597.010, F.S., and Chapter 5L-3, F.A.C. (April 9, 2007). (A.H. Vol. 1) | Different definitions with the same outcome. |
| *Functional Capacity* | **Functional capacity** means the degree to which an area of aquatic resource performs a specific function. (40 CFR § 230.92) | See "ecological value". | |
| *Functions* | **Functions** means the physical, chemical, and biological processes that occur in ecosystems. (40 CFR § 230.92) | "**Functions,**" as used in the mitigation section of this handbook, means the physical, chemical, and biological processes that occur in ecosystems. (404 Handbook) | Same |
| *Historical Resources Assessment Survey or Cultural Resources Assessment Survey* | No federal definition | "**Historical Resources Assessment Survey**" or "**Cultural Resources Assessment Survey**" means a survey of the project site which meets the requirements set forth in Chapter 1A-46, F.A.C., Archaeological and Historical Report Standards and Guidelines. | Used within 404 Handbook when referring to Historical resources reviewed by SHPO or tribes. |
| *Historic Resource or Cultural Resources* | No federal definition | "**Historic Resource**" or "**Cultural Resource**" means any prehistoric or historic district, site, building, object, or other real or personal property of historical, architectural, or archeological value, and folklife resources. These properties or resources may include, but are not limited to, monuments, memorials, Indian habitations, ceremonial sites, abandoned settlements, sunken or abandoned ships, engineering works, treasure trove, artifacts, or other objects with intrinsic historical or archeological value, or any part thereof, relating to the history, government and culture of the state. (Source Section 267.021(3), F.S.) (404 Handbook) | Used within 404 Handbook when referring to historical resources reviewed by SHPO or tribes. |
| *Impact* | **Impact** means adverse effect. (40 CFR § 230.92) | "**Impact**" or "**Adverse Impact**" means adverse effect. (404 Handbook) | Same |
| *Indian Tribe* | **Indian Tribe** means any Indian Tribe, band, group, or community recognized by the Secretary of the Interior and exercising governmental authority over a Federal Indian reservation. (40 CFR § 232.2) | "**Tribe**" means any Indian Tribe, band, group, or community recognized by the Secretary of the Interior and exercising governmental authority over a federal Indian reservation. (404 Handbook) | "Tribe" is used throughout the 404 Handbook, so "Tribe" is used instead of "Indian Tribe". |
| *In-Kind* | **In-kind** means a resource of a similar structural and functional type to the impacted resource. (40 CFR § 230.92) | "**In-kind**" means a resource of a similar structural and functional type to the impacted resource. (404 Handbook) | Same |

| Term | Federal Definition | State Definition | Comments |
|---|---|---|---|
| **In-Lieu Fee Program** | **In-lieu fee program** means a program involving the restoration, establishment, enhancement, and/or preservation of aquatic resources through funds paid to a governmental or non-profit natural resources management entity to satisfy compensatory mitigation requirements for DA permits. Similar to a mitigation bank, an in-lieu fee program sells compensatory mitigation credits to permittees whose obligation to provide compensatory mitigation is then transferred to the in-lieu fee program sponsor. However, the rules governing the operation and use of in-lieu fee programs are somewhat different from the rules governing operation and use of mitigation banks. The operation and use of an in-lieu fee program are governed by an in-lieu fee program instrument. (40 CFR § 230.92) | **In-lieu fee program**" means a program involving the restoration, creation, enhancement, and/or preservation of aquatic resources through funds paid to a governmental or non-profit natural resources management entity to satisfy compensatory mitigation requirements for 404 permits. Similar to a mitigation bank, an in-lieu fee program sells compensatory mitigation credits to permittees whose obligation to provide compensatory mitigation is then transferred to the in-lieu fee program sponsor. The operation and use of an in-lieu fee program are governed by an in-lieu fee program instrument. (404 Handbook) | State definition is nearly the same, but excludes language referring to rules governing the use and operation of in-lieu fee programs (N/A – the Corps will process these). |
| **In-Lieu Fee Program Instrument** | **In-lieu fee program instrument** means the legal document for the establishment, operation, and use of an in-lieu fee program. (40 CFR § 230.92) | N/A for the state program | No state definition |
| **Instrument** | **Instrument** means mitigation banking instrument or in-lieu fee program instrument. (40 CFR § 230.92) | N/A for the state program | No state definition |
| **Interagency Review Team** | **Interagency Review Team** (IRT) means an interagency group of federal, tribal, state, and/or local regulatory and resource agency representatives that reviews documentation for, and advises the district engineer on, the establishment and management of a mitigation bank or an in-lieu fee program. (40 CFR § 230.92) | **"Interagency Review Team"** (IRT) means an interagency group of federal, tribal, state, and/or local regulatory and resource agency representatives that reviews documentation for, and advises the Corps district engineer on, the establishment and management of a mitigation bank or an in-lieu fee program. (404 Handbook) | Same, except clarifies that the district engineer is a Corps' representative. |

| Term | Federal Definition | State Definition | Comments |
|---|---|---|---|
| **_Waters of the United States_** (Federal) | The term **Waters of the United States** means:<br><br>(1) For purposes of the Clean Water Act, 33 U.S.C. 1251 et seq. and its implementing regulations, subject to the exclusions in paragraph (o)(2) of this section, the term "waters of the United States" means:<br><br>(i) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;<br><br>(ii) All interstate waters, including interstate wetlands;<br><br>(iii) The territorial seas;<br><br>(iv) All impoundments of waters otherwise identified as waters of the United States under this section;<br><br>(v) All tributaries, as defined in paragraph (o)(3)(iii) of this section, of waters identified in paragraphs (o)(1)(i) through (iii) of this section;<br><br>(vi) All waters adjacent to a water identified in paragraphs (o)(1)(i) through (v) of this section, including wetlands, ponds, lakes, oxbows, impoundments, and similar waters;<br><br>(vii) All waters in paragraphs (o)(1)(vii)(A) through (E) of this section where they are determined, on a case-specific basis, to have a significant nexus to a water identified in paragraphs (o)(1)(i) through (iii) of this section. The waters identified in each of paragraphs (o)(1)(vii)(A) through (E) of this section are similarly situated and shall be combined, for purposes of a significant nexus analysis, in the watershed that drains to the nearest water identified in paragraphs (o)(1)(i) through (iii) of this section. Waters identified in this paragraph shall not be combined with waters identified in paragraph (o)(1)(vi) of this section when performing a significant nexus analysis. If waters identified in this paragraph are also an adjacent water under paragraph (o)(1)(vi), they are an adjacent water and no case-specific significant nexus analysis is required. (40 CFR § 230.3) | | No state definition |

| Term | Federal Definition | State Definition | Comments |
|---|---|---|---|
| *Mean High Tide Line* | | "**Mean high tide line**", for purposes of identifying retained waters, means the line of intersection of the land with the water's surface at the maximum height reached by a rising tide. The high tide line may be determined, in the absence of actual data, by a line of oil or scum along shore objects, a more or less continuous deposit of fine shell or debris on the foreshore or berm, other physical markings or characteristics, vegetation lines, tidal gages, or other suitable means that delineate the general height reached by a rising tide. The line encompasses spring high tides and other high tides that occur with periodic frequency but does not include storm surges in which there is a departure from the normal or predicted reach of the tide due to the piling up of water against a coast by strong winds such as those accompanying a hurricane or other intense storm. (33 CFR Part 328 – "high tide line") | This term is used in the Corps MOA. |
| *Mitigation Bank* | **Mitigation bank** means a site, or suite of sites, where resources (e.g., wetlands, streams, riparian areas) are restored, established, enhanced, and/or preserved for the purpose of providing compensatory mitigation for impacts authorized by DA permits. In general, a mitigation bank sells compensatory mitigation credits to permittees whose obligation to provide compensatory mitigation is then transferred to the mitigation bank sponsor. The operation and use of a mitigation bank are governed by a mitigation banking instrument. (40 CFR § 230.92) | "**Mitigation Bank**" for the purposes of the State 404 Program only, means a site, or suite of sites, where resources (e.g., wetlands, streams, riparian areas) are restored, established, enhanced, and/or preserved for the purpose of providing compensatory mitigation for impacts authorized by State 404 Program permits. In general, a mitigation bank sells compensatory mitigation credits to permittees whose obligation to provide compensatory mitigation is then transferred to the mitigation bank sponsor. The operation and use of a mitigation bank are governed by a mitigation banking instrument. (404 Handbook) | |
| *Mixing Zone* | The term **mixing zone** means a limited volume of water serving as a zone of initial dilution in the immediate vicinity of a discharge point where receiving water quality may not meet quality standards or other requirements otherwise applicable to the receiving water. The mixing zone should be considered as a place where wastes and water mix and not as a place where effluents are treated. (40 CFR § 230.3) | "**Mixing zone**" means a limited volume of water serving as a zone of initial dilution in the immediate vicinity of a dredge or fill activity where receiving water quality may not meet quality standards or other requirements otherwise applicable to the receiving water. (404 Handbook) | |
| *Natural Systems* | See "aquatic environment" and "aquatic ecosystem" | "**Natural systems**" for the purpose of this rule means an ecological system supporting aquatic and wetland-dependent natural resources, including fish and aquatic and wetland-dependent wildlife habitat. (A.H. Vol. 1) | |

| Term | Federal Definition | State Definition | Comments |
|---|---|---|---|
| *Neighboring* | **Neighboring.** The term neighboring means:<br><br>(A) All waters located within 100 feet of the ordinary high water mark of a water identified in paragraphs (o)(1)(i) through (v) of this section. The entire water is neighboring if a portion is located within 100 feet of the ordinary high water mark;<br><br>(B) All waters located within the 100-year floodplain of a water identified in paragraphs (o)(1)(i) through (v) of this section and not more than 1,500 feet from the ordinary high water mark of such water. The entire water is neighboring if a portion is located within 1,500 feet of the ordinary high water mark and within the 100-year floodplain;<br><br>(C) All waters located within 1,500 feet of the high tide line of a water identified in paragraphs (o)(1)(i) or (iii) of this section, and all waters within 1,500 feet of the ordinary high water mark of the Great Lakes. The entire water is neighboring if a portion is located within 1,500 feet of the high tide line or within 1,500 feet of the ordinary high water mark of the Great Lakes. (40 CFR § 230.3) | | No state definition - this is in the WOTUS rule that is currently being challenged. |
| *Off-site* | **Off-site** means an area that is neither located on the same parcel of land as the impact site, nor on a parcel of land contiguous to the parcel containing the impact site. (40 CFR § 230.92) | "Off-site," for purposes of the mitigation section of this Handbook, means an area that is neither located on the same parcel of land as the impact site, or on a parcel of land contiguous to the parcel containing the impact site. (404 Handbook) | Same |
| *On-site* | **On-site** means an area located on the same parcel of land as the impact site, or on a parcel of land contiguous to the impact site. (40 CFR § 230.92) | "On-site," for purposes of the mitigation section of this Handbook, means an area located on the same parcel of land as the impact site, or on a parcel of land contiguous to the impact site. (404 Handbook) | Same |
| *Ordinary High Water Mark* (Federal)<br>*Ordinary High Water Line* (State) | **Ordinary high water mark.** The term ordinary high water mark means that line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas. (40 CFR § 230.3) | "Ordinary high water mark", for purposes of identifying retained waters, means that line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas. | Same, except "for purposes of identifying retained waters" |
| *Other Surface Waters* | | "Other surface waters" means surface waters as described and delineated pursuant to Rule 62-340.600, F.A.C., as ratified by Section 373.4211, F.S., other than wetlands. (A.H. Vol. 1) | No federal definition |
| *Other Watercourse* | | "Other watercourse" means any canal, ditch, or other artificial watercourse in which water usually flows in a defined bed or channel. It is not essential that the flowing be uniform or uninterrupted. [Section 373.019(14), F.S.] (A.H. Vol. 1) | No federal definition |
| *Out-of-kind* | **Out-of-kind** means a resource of a different structural and functional type from the impacted resource. (40 CFR § 230.92) | "Out-of-kind" means a resource of a different structural and functional type from the impacted resource. (404 Handbook) | Same |

| Term | Federal Definition | State Definition | Comments |
|---|---|---|---|
| *Performance Standards* | **Performance standards** are observable or measurable physical (including hydrological), chemical and/or biological attributes that are used to determine if a compensatory mitigation project meets its objectives. (40 CFR § 230.92) | "**Performance standards**" are observable or measurable physical (including hydrological), chemical and/or biological attributes that are used to determine if a compensatory mitigation project meets its objectives. (404 Handbook) | Same |
| *Permittee- Responsible Mitigation* | **Permittee-responsible mitigation** means an aquatic resource restoration, establishment, enhancement, and/or preservation activity undertaken by the permittee (or an authorized agent or contractor) to provide compensatory mitigation for which the permittee retains full responsibility. (40 CFR § 230.92) | "**Permittee-responsible mitigation**" means an aquatic resource restoration, creation, enhancement, and/or preservation activity undertaken by the permittee (or an authorized agent or contractor) to provide compensatory mitigation for which the permittee retains full responsibility. (404 Handbook) | Same |
| *Pocosins* | **Pocosins** are evergreen shrub and tree dominated wetlands found predominantly along Central Atlantic coastal plain. (40 CFR § 230.3) | N/A for Florida. | No state definition |
| *Pollutant* | The term **pollutant** means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials which are not encompassed in the definition of source, byproduct, or special nuclear materials as defined by the Atomic Energy Act of 1954, as amended, heat, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into water. The legislative history of the Act reflects that "radioactive materials" as included within the definition of "pollutant" in section 502 of the Act means only radioactive materials which are not encompassed in the definition of source, byproduct, or special nuclear materials as defined by the Atomic Energy Act, and therefore, included with-in the term "pollutant" are radium and accelerator produced isotopes. See Train v. Colorado Public Interest Research Group, Inc., 426 U.S. 1 (1976). (40 CFR § 230.3) | "**Pollutant**" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials not covered by discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into water. The legislative history of the Act reflects that "radioactive materials" as included within the definition of "pollutant" in section 502 of the Act means only radioactive materials which are not encompassed in the definition of source, byproduct, or special nuclear materials as defined by the Atomic Energy Act of 1954, as amended, and regulated under the Atomic Energy Act. Examples of radioactive materials not covered by the Atomic Energy Act and, therefore, included with- in the term "pollutant", are radium and accelerator produced isotopes. See Train v. Colorado Public Interest Research Group, Inc., 426 U.S. 1 (1976). (404 Handbook) | |
| *Pollution* | The term **pollution** means the man-made or man-induced alteration of the chemical, physical, biological or radiological integrity of an aquatic ecosystem. (40 CFR § 230.3) | "**Pollution**" is the presence in the outdoor atmosphere or waters of the state of any substances, contaminants, noise, or manmade or human-induced impairment of air or waters or alteration of the chemical, physical, biological, or radiological integrity of air or water in quantities or at levels which are or may be potentially harmful or injurious to human health or welfare, animal or plant life, or property or which unreasonably interfere with the enjoyment of life or property, including outdoor recreation unless authorized by applicable law. [Section 403.031(7), F.S.] (A.H. Vol. 1) | |
| *Practicable* | The term **practicable** means available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. (40 CFR § 230.3) | "**Practicable**" means available and capable of being done after taking into consideration cost, existing technology, and logistics considering overall project purpose. (404 Handbook) | |
| *Practicable Alternative* | | "**Practicable alternative**" means other choices available and capable of being carried out after taking into consideration cost, existing technology, and logistics considering overall project purposes, and may require an area not owned by the applicant which could reasonably have been obtained, utilized, expanded, or managed in order to fulfill the basic purpose of the proposed activity. (404 Handbook) | No federal definition |

| Term | Federal Definition | State Definition | Comments |
|---|---|---|---|
| *Prairie Potholes* | **Prairie Potholes** are a complex of glacially formed wetlands, usually occurring in depressions that lack permanent natural outlets, located in the upper Midwest. (40 CFR § 230.3) | N/A for Florida | No state definition |
| *Preservation* | **Preservation** means the removal of a threat to, or preventing the decline of, aquatic resources by an action in or near those aquatic resources. This term includes activities commonly associated with the protection and maintenance of aquatic resources through the implementation of appropriate legal and physical mechanisms. Preservation does not result in a gain of aquatic resource area or functions. (40 CFR § 230.92) | "**Preservation**" means the protection of wetlands, other surface waters or uplands from adverse impacts by placing a conservation easement or other comparable land use restriction over the property or by donation of fee simple interest in the property. (A.H. Vol. 1) | Meaning is the same but uses different language. |
| *Project Area* | See "point of discharge" and "disposal site" | "**Project area" or "Project site**" means that portion of the state-assumed waters where specific dredging or filling activities are permitted and consist of a bottom surface area, any overlying volume of water, and any mixing zones. In the case of wetlands on which surface water is not present, the project area consists of the wetland surface area. (404 Handbook) | The state uses the terms "Project area or "Project site" instead of point of discharge and disposal site, because of the reasons described in the comments for those terms, above. |
| *Re-establishment* | **Re-establishment** means the manipulation of the physical, chemical, or biological characteristics of a site with the goal of returning natural/historic functions to a former aquatic resource. Re-establishment results in rebuilding a former aquatic resource and results in a gain in aquatic resource area and functions. (40 CFR § 230.92) | "**Re-establishment**" means the manipulation of the physical, chemical, or biological characteristics of a site with the goal of returning natural/historic functions to a former aquatic resource. Re-establishment results in rebuilding a former aquatic resource and results in a gain in aquatic resource area and functions. (see "Restoration") (404 Handbook) | Same |
| *Reference Aquatic Resources* | **Reference aquatic resources** are a set of aquatic resources that represent the full range of variability exhibited by a regional class of aquatic resources as result of natural processes and anthropogenic disturbances. (40 CFR § 230.92) | "**Reference aquatic resources**" or "Reference site" are a set of aquatic resources that represent the full range of variability exhibited by a regional class of aquatic resources as a result of natural processes and anthropogenic disturbances. (404 Handbook) | Same |
| *Rehabilitation* | **Rehabilitation** means the manipulation of the physical, chemical, or biological characteristics of a site with the goal of repairing natural/historic functions to a degraded aquatic resource. Rehabilitation results in a gain in aquatic resource function, but does not result in a gain in aquatic resource area. (40 CFR § 230.92) | "**Rehabilitation**" means the manipulation of the physical, chemical, or biological characteristics of a site with the goal of repairing natural/historic functions to a degraded aquatic resource. Rehabilitation results in a gain in aquatic resource function, but does not result in a gain in aquatic resource area. (see "Restoration") (404 Handbook) | Same |
| *Restoration* | **Restoration** means the manipulation of the physical, chemical, or biological characteristics of a site with the goal of returning natural/historic functions to a former or degraded aquatic resource. For the purpose of tracking net gains in aquatic resource area, restoration is divided into two categories: re-establishment and rehabilitation. (40 CFR § 230.92) | "**Restoration**", for the purposes of the State 404 Program, means the manipulation of the physical, chemical, or biological characteristics of a site with the goal of returning natural/historic functions to a former or degraded aquatic resource. For the purpose of tracking net gains in aquatic resource area, restoration is divided into two categories: re-establishment and rehabilitation. (404 Handbook) | Same |

| Term | Federal Definition | State Definition | Comments |
|---|---|---|---|
| *Retained Waters* | | "**Retained Waters**" means those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The Corps will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the Corps is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the Corps will retain jurisdiction to the landward boundary of the project for the purposes of that project only. | From Corps MOA. |
| *Riparian Areas* | **Riparian areas** are lands adjacent to streams, rivers, lakes, and estuarine-marine shorelines. Riparian areas provide a variety of ecological functions and services and help improve or maintain local water quality. (40 CFR § 230.92) | "**Riparian areas**" are lands adjacent to streams, rivers, lakes, and estuarine-marine shorelines. Riparian areas provide a variety of ecological functions and services and help improve or maintain local water quality. (404 Handbook) | Same |
| *Service Area* | **Service area** means the geographic area within which impacts can be mitigated at a specific mitigation bank or an in-lieu fee program, as designated in its instrument. (40 CFR § 230.92) | "**Service area**" means the geographic area within which impacts can be mitigated at a specific mitigation bank or an in-lieu fee program, as designated in its instrument. (404 Handbook) | Same |
| *Services* | **Services** mean the benefits that human populations receive from functions that occur in ecosystems. (40 CFR § 230.92) | "**Services**" mean the benefits that human populations receive from functions that occur in ecosystems. (404 Handbook) | Same |
| *Special Aquatic Sites* | **Special aquatic sites** means those sites identified in subpart E. They are geographic areas, large or small, possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values. These areas are generally recognized as significantly influencing or positively contributing to the general overall environmental health or vitality of the entire ecosystem of a region. (See §230.10(a)(3)) (40 CFR § 230.3) | "**Special aquatic sites**" means sanctuaries and refuges under state and federal laws or local ordinances, wetlands, mud flats, vegetated shallows, coral reefs, and riffle and pool complexes. They are geographic areas, large or small, possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values. These areas are generally recognized as significantly influencing or positively contributing to the general overall environmental health or vitality of the entire ecosystem of a region. (404 Handbook) | Listed the sites in Subpart E that are applicable to Florida within state definition. |
| *Sponsor* | **Sponsor** means any public or private entity responsible for establishing, and in most circumstances, operating a mitigation bank or in-lieu fee program. (40 CFR § 230.92) | "**Sponsor**" means any public or private entity responsible for establishing, and in most circumstances, operating a mitigation bank or in-lieu fee program. (404 Handbook) | Same |
| *State-assumed Waters or Assumed Waters* | | "**State-assumed Waters**" or "**Assumed Waters**" means those waters as defined in Section 373.4146(1), F.S. | |

| Term | Federal Definition | State Definition | Comments |
|---|---|---|---|
| *Surface Water* | | "Surface water" means water upon the surface of the earth, whether contained in bounds created naturally or artificially or diffused. Water from natural springs shall be classified as surface water when it exits from the spring onto the earth's surface. [Section 373.019(21), F.S.] (A.H. Vol. 1) | |
| *Technically Complete* | | "Technically complete" means an application where each application item is adequate to allow the Agency to determine if the proposed project complies with Chapter 62-331, F.A.C. If a project requires both an ERP and a State 404 Program authorization, the State 404 Program review shall not be considered complete until the ERP review is complete. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met. (404 Handbook) | |
| *Temporal Loss* | **Temporal loss** is the time lag between the loss of aquatic resource functions caused by the permitted impacts and the replacement of aquatic resource functions at the compensatory mitigation site. Higher compensation ratios may be required to compensate for temporal loss. When the compensatory mitigation project is initiated prior to, or concurrent with, the permitted impacts, the district engineer may determine that compensation for temporal loss is not necessary, unless the resource has a long development time. (40 CFR § 230.92) | "Temporal loss" or "time lag" is the time that passes between the loss of aquatic resource functions caused by the permitted impacts and the replacement of aquatic resource functions at the compensatory mitigation site. (404 Handbook) | The Agencies address temporal loss, and the additional mitigation that may be required, in UMAM (Chapter 62-345, F.A.C.). UMAM will be used for both ERP and State 404 permits. That is why the second half of the federal definition was not included. |
| *Texas Coastal Prairie Wetlands* | **Texas coastal prairie wetlands.** Texas coastal prairie wetlands are freshwater wetlands that occur as a mosaic of depressions, ridges, intermound flats, and mima mound wetlands located along the Texas Gulf Coast. (40 CFR § 230.3) | N/A for Florida | No state definition |
| *Water Management District* | | "Water Management District" or "District" means a Water Management District created pursuant to Section 373.069, F.S. (A.H. Vol. 1) | |
| *Water Quality Standard* | | "Water quality standards" or "State water quality standards" means those standards set forth in Chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including the antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), F.A.C., subsections 62-4.242(2) and (3), F.A.C., and Rule 62-302.300, F.A.C. (A.H. Vol. 1) | |
| *Watershed* | | "Watershed" means the land area that contributes to the flow of water into a receiving body of water. (Sections 373.403(12) and 403.031(18), F.S.] (A.H. Vol. 1) | |

| Term | Federal Definition | State Definition | Comments |
|---|---|---|---|
| *Watershed Approach* | | "Watershed approach" means an analytical process for making mitigation decisions that support the sustainability or improvement of aquatic resources in a watershed. It involves consideration of watershed needs, and how locations and types of compensatory mitigation projects address those needs. A landscape perspective is used to identify the types and locations of mitigation projects that will benefit the watershed and offset losses of aquatic resource functions and services caused by activities authorized by Section 404 permits. The watershed approach may involve consideration of landscape scale, historic and potential aquatic resource conditions, past and projected aquatic resource impacts in the watershed, and terrestrial connections between aquatic resources when determining mitigation requirements for Section 404 permits. (404 Handbook) | |
| *Watershed Plan* | | "Watershed plan" means a plan developed by federal, tribal, state, and/or local government agencies or appropriate non-governmental organizations, in consultation with relevant stakeholders, for the specific goal of aquatic resource restoration, creation, enhancement, and preservation. A watershed plan addresses aquatic resource conditions in the watershed, multiple stakeholder interests, and land uses. Watershed plans may also identify priority sites for aquatic resource restoration and protection. Examples of watershed plans include special area management plans, advance identification programs, and wetland management plans. (404 Handbook) | |
| *Wetlands* | **Wetlands.** The term wetlands means those areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas. (40 CFR § 230.3) | "Wetlands," means those areas that are inundated or saturated by surface water or ground water at a frequency and duration sufficient to support, and under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soils. Soils present in wetlands generally are classified as hydric or alluvial, or possess characteristics that are associated with reducing soil conditions. The prevalent vegetation in wetlands generally consists of facultative or obligate hydrophytic macrophytes that are typically adapted to areas having soil conditions described above. These species, due to morphological, physiological, or reproductive adaptations, have the ability to grow, reproduce or persist in aquatic environments or anaerobic soil conditions. Florida wetlands generally include swamps, marshes, bayheads, bogs, cypress domes and strands, sloughs, wet prairies, riverine swamps and marshes, hydric seepage slopes, tidal marshes, mangrove swamps and other similar areas. Florida wetlands generally do not include longleaf or slash pine flatwoods with an understory dominated by saw palmetto. [Section 373.019(27), F.S.] The landward extent of wetlands is delineated pursuant to Rules 62-340.100 through 62-340.550, F.A.C., as ratified by Section 373.4211, F.S. (A.H. Vol. 1) | |

**40 CFR Part 232 -**

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 232.2 | Definitions | Definitions from 40 CFR Parts 232, 235, and 230 are addressed in Rule 62-331.060, F.A.C. and the 404 Handbook, section 2.0. See also the definitions table, above. | See the definitions table, above. | |
| 232.3 | Activities not requiring permits | 62-331.020(1), F.A.C. 404 Handbook, Appendix A 62-331.040(1), F.A.C. | 62-331.020(1), F.A.C. - A permit under this Chapter is not required for the activities described in 40 CFR § 232.3 as of July 1, 2019, incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-XXXX), and in Appendix B of the 404 Handbook, subject to the limitations described therein. 62-331.040(1), F.A.C. – A notice to the Agency is not required to conduct an activity that is exempt under subsection 62-331.020(1), F.A.C., except where the activity requires an authorization or notification under Chapter 62-330. F.A.C. Exemptions under Rule 62-330.051, F.A.C., are not applicable to the State 404 Program. 40 CFR § 323.3 is copied verbatim into Appendix B of the 404 Handbook. | |

**40 CFR Part 233 -**

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | **Subpart C Permit Requirements** | |
| **233.20 Prohibitions** | | | | |
| 233.20(a) | No permit shall be issued by the Director in the following circumstances: (a) When permit does not comply with the requirements of the Act or regulations thereunder, including the section 404(b)(1) Guidelines (part 230 of this chapter). | 62-331.053(3), F.A.C. | 6. Causes or contributes to significant degradation of wetlands or other surface waters. Effects contributing to significant degradation considered individually or collectively include: i. Significant adverse effects on human health or welfare, including but not limited to, effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites; ii. Significant adverse effects on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their by-products outside of the project site through biological, physical, and chemical processes; | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | iii. Significant adverse effects on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy; or | |
| | | | iv. Significant adverse effects on recreational, aesthetic, and economic values. | |
| | | | (b) When appropriate and practicable steps have not been taken to minimize potential adverse impacts of the activity on the aquatic ecosystem; | |
| | | | (c) When there does not exist sufficient information to make a reasonable judgement as to whether the proposed activity will comply with the requirements of this Chapter; | |
| | | | (d) When the EPA has objected to issuance of the permit and the objection has not been resolved, or placed a requirement for a permit condition that has not been addressed, as described in paragraph 62-331.052(3)(b), F.A.C.; | |
| | | | (e) When the proposed dredge or fill activity would be in an area which has been prohibited, withdrawn, or denied as a disposal site by the EPA under section 404(c) of the CWA, or when the activity would fail to comply with a restriction imposed thereunder; | |
| | | | (f) If the Corps determines, after consultation with the Secretary of the Department in which the Coast Guard is operating, that anchorage and navigation of any of the navigable waters would be substantially impaired. | |
| 233.20(b) | No permit shall be issued by the Director in the following circumstances:<br><br>(b) When the Regional Administrator has objected to issuance of the permit under § 233.50 and the objection has not been resolved. | 62-331.052(3)(b)2., F.A.C.<br><br>62-331.053(3)(d), F.A.C. | 62-331.052(3)(b)2., F.A.C. - When the Agency has received an EPA objection or requirement for a permit condition under this section, the Agency shall not issue the permit unless the steps required by the EPA to eliminate the objection or condition the permit have been taken. If the Agency chooses not to perform the required steps, the Agency may still issue an ERP permit under Chapter 62-330, F.A.C., but shall not issue a permit under this Chapter. In such a case, the applicant is responsible for obtaining any necessary authorizations under section 404 of the CWA from the Corps.<br><br>62-331.053(3)(d), F.A.C. - No permit shall be issued for the following: (d) When the EPA has objected to issuance of the permit and the objection has not been resolved, or placed a requirement for a permit condition that has not been addressed, as described in paragraph 62-331.052(3)(b), F.A.C.; | |
| 233.20(c) | No permit shall be issued by the Director in the following circumstances: | 62-331.053(3)(e), F.A.C. | 62-331.053(3), F.A.C. - No permit shall be issued for the following: (e) When the proposed dredge or fill activity would be in an area which has been prohibited, withdrawn, or denied as a disposal site | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | (c) When the proposed discharges would be in an area which has been prohibited, withdrawn, or denied as a disposal site by the Administrator under section 404(c) of the Act, or when the discharge would fail to comply with a restriction imposed thereunder. | | by the EPA under section 404(c) of the CWA, or when the activity would fail to comply with a restriction imposed thereunder | |
| 233.20(d) | No permit shall be issued by the Director in the following circumstances: <br><br> (d) If the Secretary determines, after consultation with the Secretary of the Department in which the Coast Guard is operating, that anchorage and navigation of any of the navigable waters would be substantially impaired. | 62-331.0531(f), F.A.C. | 62-331.0531(f), F.A.C. – No permit shall be issued for the following: (f) If the Corps determines, after consultation with the Secretary of the Department in which the Coast Guard is operating, that anchorage and navigation of any of the navigable waters would be substantially impaired. | |
| **233.21 General Permits** | | | | |
| 233.21(a) | (a) Under section 404(h)(5) of the Act, States may, after program approval, administer and enforce general permits previously issued by the Secretary in State regulated waters. <br><br> Note: <br> If States intend to assume existing general permits, they must be able to ensure compliance with existing permit conditions and any reporting monitoring, or prenotification requirements. | 62-331.210 – 62.331-248, F.A.C. | 62-331.200(1), F.A.C. - The general permits apply to those activities that do not otherwise qualify for an exemption under subsection 62-331.020(1), F.A.C., and that qualify under the general permit requirements in this section and within the specific general permit for which notice of intent to use a general permit is given. | The state general permits in Chapter 62-331 are modeled after the Corp's nationwide permits. They contain the same or similar permit conditions and prenotification requirements as the NWPs. |
| 233.21(b) | (b) The Director may issue a general permit for categories of similar activities if the determines that the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment. Any general permit issued shall be in compliance with the section 404(b)(1) Guidelines. | 62-331.200(2), F.A.C. | 62-330.200(2), F.A.C. - General permits authorize activities that, if conducted consistent with the permit requirements, will cause only minimal individual and cumulative adverse environmental effects. Compensatory mitigation shall be required, when necessary, to offset impacts authorized under a general permit, unless the general permit specifically states otherwise. Any required compensatory mitigation must comply with provisions in Rule 62-331.130, F.A.C., and section 8.5 of the 404 Handbook. | |
| 233.21(c) | (c) In addition to the conditions specified in § 233.23, each general permit shall contain: <br><br> (1) A specific description of the type(s) of activities which are authorized, including limitations for any single operation. The description shall be detailed enough to ensure that the requirements of paragraph (b) of this section are met. (This paragraph supercedes § 233.23(c)(1) for general permits.) <br><br> (2) A precise description of the geographic area to which the general permit applies, including limitations | See below detail of § 233.23 | These requirements are addressed in the "Notice of Intent to Use an Environmental Resource and/or State 404 Program General Permit", form, which is proposed to be adopted in rule under 62-330.402(1), F.A.C. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | on the type(s) of water where operations may be conducted sufficient to ensure that the requirements of paragraph (b) of this section are met. | | | |
| 233.21(d) | (d) Predischarge notification or other reporting requirements may be required by the Director on a permit-by-permit basis as appropriate to ensure that the general permit will comply with the requirement (section 404(e) of the Act) that the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment. | 62-331.200(3), F.A.C. | 62-331.200(3), F.A.C. – If required, notice of intent to use the general permit shall be given pursuant to subsection 62-330.402(1), F.A.C. and section 4.3 of the 404 Handbook, and acted upon in accordance with subsection 62-330.402(4), F.A.C., section 5.0 of the 404 Handbook, and this section. Submittal of a notice of intent to the Agency is required if: <br> (a) Indicated in the general permit; <br> (b) The activity requires a notification or authorization under Chapter 62-330, F.A.C.; <br> (c) The project is in state-assumed waters accessible to any state or federal listed species; <br> (d) The activity is adjacent to the river segments identified in the Nationwide Rivers Inventory: https://www.nps.gov/ncrc/programs/rtca/nri/index.html; <br> (e) The activity is in the Florida Keys; <br> (f) The project is adjacent to a federal project; <br> (g) The project is adjacent to or may impact Tribal lands or Tribal Trust Resources; <br> (h) The project is within six miles of the Seminole Tribe of Florida's Big Cypress or Brighton Reservations; within two miles of the Seminole Tribe of Florida's Immokalee, Lakeland, or Fort Pierce Reservations; within one mile of the Seminole Tribe of Florida's Tampa, Coconut Creek, or Hollywood Reservations; within the Seminole Tribe's reserved rights areas, including but not limited to: within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A; <br> (i) The project is within two miles of the Miccosukee Federal Reservation; Miccosukee Reserve Area; Krome Avenue, Dade Corners, Cherry Ranch, or Sherrod Ranch Reservations; and Coral Way, Lambick, or Sema Trust Properties. Also for any activity within the Miccosukee Tribe's reserved rights areas, including but not limited to: within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A; or | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (i) The State Historic Preservation Office (SHPO) determines that the Florida Master Site File (FMSF) includes a historic property within 50 meters of the project area that is listed on, determined to be eligible for listing on, or potentially eligible for listing on the National Register of Historic Places. To obtain this determination, any person who intends to use a general permit that does not otherwise require notice shall contact an historic properties search. The applicant shall provide the FMSF with the project area and Section/Township/Range information to sitefile@dos.myflorida.com or contact the FMSF office at (850) 245-6440. <br> 1. Where the FMSF Report for the property (or all properties if more than one) shows the SHPO Evaluation ("SHPO Eval" column) to be "Not Eligible" and also shows the property(ies) are not listed or proposed for listing on the National Register of Historic Places ("NR Status" column), and notice is not otherwise required under this section, then submittal of a notice of intent is not required. <br> 2. Notice is required if the applicant has knowledge of a historic property that is listed on, determined to be eligible for listing on, or potentially eligible for listing on the National Register of Historic Places, including previously unidentified properties. | |
| 233.21(e) | (e) The Director may, without revoking the general permit, require any person authorized under a general permit to apply for an individual permit. This discretionary authority will be based on concerns for the aquatic environment including compliance with paragraph (b) of this section and the 404(b)(1) Guidelines (40 CFR part 230). <br> (1) This provision in no way affects the legality of activities undertaken pursuant to the general permit prior to notification by the Director of such requirement. <br> (2) Once the Director notifies the discharger of his decision to exercise discretionary authority to require an individual permit, the discharger's activity is no longer authorized by the general permit. | 62-331.200(6), F.A.C. | 62-331.200(6), F.A.C. – The Agency shall have discretionary authority to require any person authorized under a general permit to apply for an individual permit where sufficient cause exists. Sufficient cause shall include a likelihood that the project will cause more than minimal adverse environmental effects to the aquatic environment; including individual, secondary, and cumulative impacts; and the ability to comply with the conditions in Rule 62-331.201, F.A.C. below. | |
| **233.22 Emergency Permits** | | | | |
| 233.22(a) | Notwithstanding any other provision of this part, the Director may issue a temporary emergency permit for a discharge of dredged or fill material if unacceptable harm to life or severe loss of physical property is likely | 62-331.110(1), F.A.C. | 62-331.110(1), F.A.C. – The Agency shall issue an emergency field authorization for dredge or fill activities to abate an emergency condition before a permit could be issued or modified under this Chapter. "Emergency conditions" are defined as those that pose an | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | to occur before a permit could be issued or modified under procedures normally required. | | imminent or existing serious threat or danger and require immediate action to protect the public health, safety, or welfare, or the water resources of the Agency, including the health of aquatic and wetland-dependent species; a public water supply; or recreational, commercial, industrial, agricultural or other reasonable uses. Carelessness or the lack of planning on the part of an applicant shall not be sufficient grounds to warrant the granting of an emergency field authorization. | |
| 233.22(b) | (b) Emergency permits shall incorporate, to the extent possible and not inconsistent with the emergency situation, all applicable requirements of § 233.23. | Form 62-331.110(1) | See form 62-331.110(1). | |
| 233.22(b)(1) | (1) Any emergency permit shall be limited to the duration of time (typically no more than 90 days) required to complete the authorized emergency action. | 62-331.110(3), F.A.C. | 62-331.110(3), F.A.C. – Any emergency field authorization shall be limited to the duration of time (typically no more than 90 days) required to complete the authorized emergency action. | |
| 233.22(b)(2) | (2) The emergency permit shall have a condition requiring appropriate restoration of the site. | Form 62-331.110(1) | See form 62-331.110(1). | |
| 233.22(c) | (c) The emergency permit may be terminated at any time without process (§ 233.36) if the Director determines that termination is necessary to protect human health or the environment. | 62-331.110(4), F.A.C. | 62-331.110(4), F.A.C. – The emergency field authorization may be terminated at any time, effective immediately upon the Agency notifying the permittee of the termination either orally or in writing, if the Agency determines that termination is necessary to protect human health or the environment. If oral termination is given, the Agency shall follow up with a written termination within five business days. | |
| 233.22(d) | (d) The Director shall consult in an expeditious manner, such as by telephone, with the Regional Administrator, the Corps, FWS, and NMFS about issuance of an emergency permit. | 62-331.110(7), F.A.C. | 62-331.110(7), F.A.C. – The Agency shall consult with EPA, the Corps, the tribes, FWC, FWS, and NMFS, as applicable, about issuance of an emergency permit as soon as possible after the emergency permit is requested, but no later than the day of issuance of the emergency permit. | |
| 233.22(e) | (e) The emergency permit may be oral or written. If oral, it must be followed within 5 days by a written emergency permit. A copy of the written permit shall be sent to the Regional Administrator. | 62-331.110(2), F.A.C. | 62-331.110(2), F.A.C. – The entity requesting an emergency field authorization shall complete an "State 404 Program Emergency Field Authorization" Form 62-331.110(1) (effective date), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12066). A copy of this form may be obtained from the Agency, as described in subsection 62-331.010(8), F.A.C. The activity authorized by the emergency field authorization may commence upon written approval by the Agency's field representative. The recipient of an emergency field authorization is responsible for compliance with all the terms and conditions of the authorization. | State will issue only written emergency permits |
| 233.22(f) | (f) Notice of the emergency permit shall be published and public comments solicited in accordance with § | 62-331.110(5), F.A.C. | 62-331.110(5), F.A.C. – Notice of the emergency field authorization shall be published and public comments solicited in accordance with | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | 233.32 as soon as possible but no later than 10 days after the issuance date. | | Rule 62-331.060, F.A.C. as soon as possible, but no later than 10 days after the issuance date. | |
| **233.23 Permit Conditions** | | | | |
| 233.23(a) | For each permit the Director shall establish conditions which assure compliance with all applicable statutory and regulatory requirements, including the 404(b)(1) Guidelines, applicable section 303 water quality standards, and applicable section 307 effluent standards and prohibitions. | 62-331.054, F.A.C.  62-331.201, F.A.C. | See referenced rule text. | The referenced rules are long, so we did not copy/paste here. |
| 233.23(b) | Section 404 permits shall be effective for a fixed term not to exceed 5 years. | 62-331.090, F.A.C. | 62-331.090, F.A.C. – Unless revoked or otherwise modified, the duration of a permit under this Chapter is: (1) General permits shall be effective for a fixed term not to exceed five years as provided in subsection 62-331.200(5), F.A.C. (2) The duration of individual permits shall be specified in each permit and shall not exceed the maximum timeframe allowable under federal law and reasonably necessary to complete the project. | |
| 233.23(c)(1) | Each 404 permit shall include conditions meeting or implementing the following requirements:  A specific identification and complete description of the authorized activity including name and address of permittee, location and purpose of discharge, type and quantity of material to be discharged. (This subsection is not applicable to general permits). | | | This information is located in our permit templates, usually on the first page. It is not in rule. Permit templates will be included as part of the assumption package submitted to EPA along with the finalized rules. |
| 233.23(c)(2) | Each 404 permit shall include conditions meeting or implementing the following requirements:  Only the activities specifically described in the permit are authorized. | 62-331.054(1), F.A.C.  62-330.350(1)(a), F.A.C.  62-331.201(1), F.A.C.  62-330.405(1), F.A.C. | 62-331.054(1), F.A.C. – (1) Individual permits shall contain the general conditions for individual permits in subsection 62-330.350(1), F.A.C., as applicable, and any specific conditions necessary to assure that the activities will be conducted in compliance with this Chapter, and in a manner which minimizes adverse impacts upon the physical, chemical, and biological integrity of wetlands or other surface waters, such as mitigation requirements and protection measures for listed species or historical resources.  62-330.350(1)(a), F.A.C. – All activities shall be implemented following the plans, specifications and performance criteria approved by this permit. Any deviations must be authorized in a permit modification in accordance with rule 62-330.315, F.A.C. Any deviations that are not so authorized may subject the permittee to enforcement action and revocation of the permit under chapter 373, F.S.  62-331.201(1), F.A.C. – General permits shall be subject to the conditions in subsections (2) and (3) below, and the general conditions for all general permits in Rule 62-330.405, F.A.C., except subsections 62-330.405(7) and (10), F.A.C. The Agency may revise the | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | general conditions in Rule 62-330.405, F.A.C. to include references to applicable rules under this Chapter, as necessary. | |
| | | | 62-330.405(1), F.A.C. – (1) The general permit is valid only for the specific activity indicated. Any deviation from the specified activity and the conditions for undertaking that activity shall constitute a violation of the permit and may subject the permittee to enforcement action and revocation of the permit under chapter 373, F.S. | |
| 233.23(c)(3) | Each 404 permit shall include conditions meeting or implementing the following requirements: | 62-331.054(2)(a), F.A.C. | 62-331.054(2), F.A.C. – Individual permits shall contain the following conditions in addition to those described in (1), above: | |
| | The permittee shall comply with all conditions of the permit even if that requires halting or reducing the permitted activity to maintain compliance. Any permit violation constitutes a violation of the Act as well as of State statute and/or regulation. | | (a) The permittee shall comply with all conditions of the permit, even if that requires halting or reducing the permitted activity to maintain compliance. Any permit violation constitutes a violation of Part IV of Chapter 373, F.S., and this Chapter, as well as a violation of the CWA. | |
| 233.23(c)(4) | Each 404 permit shall include conditions meeting or implementing the following requirements: | 62-331.054(2)(b), F.A.C. | 62-331.054(2), F.A.C. Individual permits shall contain the following conditions in addition to those described in (1), above: | |
| | The permittee shall take all reasonable steps to minimize or prevent any discharge in violation of this permit. | | (b) The permittee shall take all reasonable steps to prevent any unauthorized dredging or filling in violation of this permit. | |
| 233.23(c)(5) | Each 404 permit shall include conditions meeting or implementing the following requirements: | 62-331.054(2)(c), F.A.C. | 62-331.054(2), F.A.C. – Individual permits shall contain the following conditions in addition to those described in (1), above: | |
| | | 62-331.201(3)(t), F.A.C. | (c) The permittee shall timely notify the Agency of any expected or known actual noncompliance. | |
| | The permittee shall inform the Director of any expected or known actual noncompliance. | | 62-331.201(3), F.A.C. – In addition, general permits under this Chapter are subject to the following conditions: | |
| | | | (t) Noncompliance. The permittee shall timely notify the Agency of any expected or known actual noncompliance. | |
| 233.23(c)(6) | Each 404 permit shall include conditions meeting or implementing the following requirements: | 62-331.054(2)(d), F.A.C. | 62-331.054(2)(d), F.A.C. – Upon Agency request, the permittee shall provide information necessary to determine compliance status, or whether cause exists for permit modification, revocation, or termination. | |
| | | 62-331.201(3)(aa), F.A.C. | | |
| | The permittee shall provide such information to the Director, as the Director requests, to determine compliance status, or whether cause exists for permit modification, revocation or termination. | | 62-331.201(3)(aa), F.A.C. – Upon Agency request, the permittee shall provide information necessary to determine compliance status, or whether cause exists for permit modification, revocation, or termination. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 233.23(c)(7) | Each 404 permit shall include conditions meeting or implementing the following requirements:<br><br>Monitoring, reporting and recordkeeping requirements as needed to safeguard the aquatic environment. (Such requirements will be determined on a case-by-case basis, but at a minimum shall include monitoring and reporting of any expected leachates, reporting of noncompliance, planned changes or transfer of the permit.) | 62-331.054(1), F.A.C.<br><br>62-331.201(2), F.A.C. | 62-331.054(1), F.A.C. – Individual permits shall contain the general conditions for individual permits in subsection 62-330.350(1), F.A.C., as applicable, and any specific conditions necessary to assure that the activities will be conducted in compliance with this Chapter, and in a manner which minimizes adverse impacts upon the physical, chemical and biological integrity of wetlands or other surface waters, such as mitigation requirements and protection measures for listed species or historical resources.<br><br>62-331.201(2), F.A.C. – When a project requires submittal of a notice of intent to use a general permit, the Agency shall impose specific conditions as necessary for protection of the resource. Specific conditions include, but are not limited to, mitigation requirements, and protection measures for listed species or historical resources. Where a specific condition or a condition within the rule language of a general permit is more stringent than the general conditions, the more stringent condition shall apply. | |
| 233.23(c)(8) | Inspection and entry.<br><br>The permittee shall allow the Director, or his authorized representative, upon presentation of proper identification, at reasonable times to:<br><br>(i) Enter upon the permittee's premises where a regulated activity is located or where records must be kept under the conditions of the permit,<br><br>(ii) Have access to and copy any records that must be kept under the conditions of the permit,<br><br>(iii) Inspect operations regulated or required under the permit, and<br><br>(iv) Sample or monitor, for the purposes of assuring permit compliance or as otherwise authorized by the Act, any substances or parameters at any location. | 62-331.054(2)(e), F.A.C.<br><br>62-331.201(3)(x), F.A.C. | 62-331.054(2)(e), F.A.C. – Inspection and entry. The permittee shall allow the Agency, upon presentation of proper identification, at reasonable times to:<br>1. Enter upon the permittee's premises where a regulated activity is located or where records must be kept under the conditions of the permit,<br>2. Have access to and copy any records that must be kept under the conditions of the permit,<br>3. Inspect operations regulated or required under the permit, and<br>4. Sample or monitor, for the purposes of assuring permit compliance or as otherwise authorized by the CWA, any substances or parameters at any location.<br><br>62-331.201(3)(x), F.A.C. – Inspection and entry. The permittee shall allow the Agency, upon presentation of proper identification, at reasonable times to:<br>1. Enter upon the permittee's premises where a regulated activity is located or where records must be kept under the conditions of the permit,<br>2. Have access to and copy any records that must be kept under the conditions of the permit,<br>3. Inspect operations regulated or required under the permit, and | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | 4. Sample or monitor, for the purposes of assuring permit compliance or as otherwise authorized by the Act, any substances or parameters at any location. | |
| 233.23(c)(9) | Each 404 permit shall include conditions meeting or implementing the following requirements:<br><br>Conditions assuring that the discharge will be conducted in a manner which minimizes adverse impacts upon the physical, chemical and biological integrity of the waters of the United States, such as requirements for restoration or mitigation. | 62-331.054(1), F.A.C.<br><br>62-331.201(2), F.A.C. | 62-331.054(1), F.A.C. – Individual permits shall contain the general conditions for individual permits in subsection 62-330.350(1), F.A.C., as applicable, and any specific conditions necessary to assure that the activities will be conducted in compliance with this Chapter, and in a manner which minimizes adverse impacts upon the physical, chemical, and biological integrity of wetlands or other surface waters, such as mitigation requirements and protection measures for listed species or historical resources.<br><br>62-331.201(2), F.A.C. – When a project requires submittal of a notice of intent to use a general permit, the Agency shall impose specific conditions as necessary for protection of the resource. Specific conditions include, but are not limited to, mitigation requirements, and protection measures for listed species or historical resources. Where a specific condition or a condition within the rule language of a general permit is more stringent than the general conditions, the more stringent condition shall apply. | |
| | **Subpart D Program Operation** | | | |
| **233.30 Application for a permit** | | | | |
| 233.30(a) | Except when an activity is authorized by a general permit issued pursuant to § 233.21 or is exempt from the requirements to obtain a permit under § 232.3, any person who proposes to discharge dredged or fill material into State regulated waters shall complete, sign and submit a permit application to the Director. Persons proposing to discharge dredged or fill material under the authorization of a general permit must comply with any reporting requirements of the general permit. | 62-331.050(1), F.A.C. | 62-331.050(1), F.A.C. – An individual permit is required for activities within state-assumed waters if they do not qualify for an exemption under subsection 62-331.020(1), F.A.C., or a general permit under Rules 62-331.200 through 62-331.248, F.A.C. | |
| 233.30(b) | A complete application shall include:<br><br>(1) Name, address, telephone number of the applicant and name(s) and address(es) of adjoining property owners.<br><br>(2) A complete description of the proposed activity including necessary drawings, sketches or plans sufficient for public notice (the applicant is not | 62-331.060(1), F.A.C.<br><br>62-331.051(1), F.A.C.<br><br>See also Form 62-330.060(1) | 62-331.060(1), F.A.C. – The Agency shall provide public notice, as described in subsection (2), below, within 10 days of the following: agency determination that an application for an individual permit or major modification is administratively complete; Agency notification to a permittee of revocation or suspension of a permit; and issuance of an emergency field authorization. The Agency shall provide public notice 30 days prior to any scheduled public meeting for such projects. An administratively complete application, as defined and | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | generally expected to submit detailed engineering plans and specifications); the location, purpose and intended use of the proposed activity; scheduling of the activity; the location and dimensions of adjacent structures; and a list of authorizations required by other Federal, interstate, State or local agencies for the work, including all approvals received or denials already made.

(3) The application must include a description of the type, composition, source and quantity of the material to be discharged, the method of discharge, and the site and plans for disposal of the dredged or fill material.

(4) A certification that all information contained in the application is true and accurate and acknowledging awareness of penalties for submitting false information.

(5) All activities which the applicant plans to undertake which are reasonably related to the same project should be included in the same permit application. | | described in sections 2.0 and 8.1, respectively, of the 404 Handbook, shall include the following information:
(a) Name, address, and telephone number of the applicant;
(b) Name(s) and address(es) of owners of property adjoining the property where the activity is proposed to occur;
(c) Self-addressed, stamped envelopes and/or email addresses for each adjoining property owner. These will be used by the Agency to send the public notice. Do not include a return address; it will be added by the Agency;
(d) A complete description of the activity including necessary drawings, sketches, or plans sufficient for public notice; the location, purpose, and intended use of the proposed activity; the long-term conceptual plan described in 404 Handbook, section 5.3.2, if applicable; scheduling of the activity; the location and dimensions of adjacent structures; and a list of authorizations required by other agencies including federal, interstate, state, or local agencies for the work, including all approvals received or denials already made;
(e) A description of the type, composition, source, and quantity of the material to be dredged or used as fill; construction methods; and the site and plans for disposal of any dredged material including a description of spoil cells, dredged material management areas (DMMAs), and final disposal plans if the dredged material is not proposed to remain onsite;
(f) A summary of proposed wetland and other surface water impacts and compensatory mitigation including acres, habitat type, and Uniform Mitigation Assessment Method (UMAM) score developed pursuant to Chapter 62-345, F.A.C. for each assessment area;
(g) The alternatives analysis required by subsection 62-331.053(1), F.A.C.; and
(h) A certification that all information contained in the application is true and accurate and acknowledging awareness of penalties for submitting false information.
(i) Any other information relevant to the project that would significantly assist the public and commenting agencies in reviewing, understanding, and commenting on the proposed project, including any information needed for review of impacts to state or federal listed species.

62-331.051, F.A.C. - Materials to include in an application for an individual permit are described below. Applicants are encouraged to have a pre-application meeting or discussion with Agency staff prior to submitting the application.
(1) The application shall be made on Form 62-330.060(1), "Application for Individual and Conceptual Approval Environmental | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | In addition to the information indicated in § 233.30(b), the applicant will be required to furnish such additional information as the Director deems appropriate to assist in the evaluation of the application. Such additional information may include environmental data and information on alternate methods and sites as may be necessary for the preparation of the required environmental documentation. | | Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands" (effective date), including the information required in the applicable Sections A, B, C, D, G, H, and I, incorporated by reference in subsection 62-330.060(1), F.A.C. (https://www.flrules.org/Gateway/reference.asp?No=Ref-12036), or by use of the applicable Agency's equivalent e-application form. (2) All activities which the applicant plans to undertake which are reasonably related to the same project shall be included in the same permit application. Projects that will take longer than five years to complete shall follow the long-term conceptual planning process in 404 Handbook section 5.3.2. (3) In addition to the information described in subsection (1), above, the applicant will be required to provide additional information as necessary to assist in the evaluation of the application. Such additional information may include environmental data and information on alternate methods and sites as necessary for the preparation of the required environmental documentation. Further, such additional information shall include data and information necessary for purposes of reviewing impacts to state and federal listed species, including compliance with any applicable requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission, the U.S. Fish & Wildlife Service, and the National Marine Fisheries Service for purposes of the State 404 Program. | |
| 233.30(c) | In addition to the information described in subsection (1), above, the applicant will be required to complete a project that a permittee is unable to complete within the original duration of the permit shall undergo an expedited review process pursuant to subsections 62-331.052(1) and 62-331.060(8), F.A.C., provided there are no material changes in the scope of the project as originally proposed, site and surrounding environmental conditions have not changed, and the applicant does not have a history of noncompliance with the existing permit. | 62-331.051(3), F.A.C. | 62-331.051(3), F.A.C. - An application for a permit to complete a project that a permittee is unable to complete within the original duration of the permit shall undergo an expedited review process pursuant to subsections 62-331.052(1) and 62-331.060(8), F.A.C., provided there are no material changes in the scope of the project as originally proposed, site and surrounding environmental conditions have not changed, and the applicant does not have a history of noncompliance with the existing permit. (4) In addition to the information described in subsection (1), above, the applicant will be required to provide additional information as necessary to assist in the evaluation of the application. Such additional information may include environmental data and information on alternate methods and sites as necessary for the preparation of the required environmental documentation. Further, such additional information shall include data and information necessary for purposes of reviewing impacts to state and federal listed species, including compliance with any applicable | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission, the U.S. Fish & Wildlife Service, and the National Marine Fisheries Service for purposes of the State 404 Program. | | | |
| 233.30(d) | The level of detail shall be reasonably commensurate with the type and size of discharge, proximity to critical areas, likelihood of long-lived toxic chemical substances, and potential level of environmental degradation. | | | We did not add this to the rule. Applicants must submit reasonable assurance that the project meets the rules -- smaller projects, by their nature, usually do not require the level of detail that larger projects require. Therefore, this statement does not seem necessary and could encourage applicants to submit inadequate information. |
| **233.31 Coordination Requirements** | | | | |
| 233.31(a) | If a proposed discharge may affect the biological, chemical, or physical integrity of the waters of any State(s) other than the State in which the discharge occurs, the Director shall provide an opportunity for such State(s) to submit written comments within the public comment period and to suggest permit conditions. If these recommendations are not accepted by the Director, he shall notify the affected State and the Regional Administrator prior to permit issuance in writing of his failure to accept these recommendations, together with his reasons for so doing. The Regional Administrator shall then have the time provided for in § 233.50(d) to comment upon, object to, or make recommendations. | 62-331.060(5), F.A.C. | 62-331.060(5), F.A.C. - Any state whose waters may be affected by the proposed activity, or any tribe whose waters or resources, including historical resources, may be affected by the proposed activity, may submit written comments and suggest permit conditions within the public notice comment period provided in subsection (3), above. If the Agency does not accept the recommendations of the state or tribe, the Agency shall notify the state or tribe and EPA in writing, prior to permit issuance, of the Agency's failure to accept the recommendations, with the reasons for so doing. The application shall then be subject to the review process in paragraph 62-331.052(3), F.A.C. | |
| 233.31(b) | State section 404 permits shall be coordinated with Federal and Federal-State water related planning and review processes. | | | The state plans to engage in this kind of coordination whenever possible. |
| **233.32** | **Public Notice** | | | |
| 233.32(a) | (a) Applicability. | 62-331.060(1), F.A.C. | 62-331.060(1), F.A.C. - The Agency shall provide public notice, as described in subsection (2), below, within 10 days of the following: agency determination that an application for an individual permit or major modification is administratively complete; Agency notification to a permittee of revocation or suspension of a permit; and issuance of an emergency field authorization. The Agency shall provide public notice 30 days prior to any scheduled public meeting for such projects. | Draft general permits go through the rulemaking process in chapter 120, F.S., and are subject to public notice and comment periods as set forth therein. |
| | (1) The Director shall give public notice of the following actions: | 62-331.060(4)(b), F.A.C. | 62-331.060(4)(b), F.A.C. - The Agency shall provide notice of a public meeting at least 30 days prior to the scheduled public meeting date. | |
| | (i) Receipt of a permit application. | | | |
| | (ii) Preparation of a draft general permit. | | | |
| | (iii) Consideration of a major modification to an issued permit. | | | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | (iv) Scheduling of a public hearing.<br><br>(v) Issuance of an emergency permit.<br><br>(2) Public notices may describe more than one permit or action. | | | |
| 233.32(b) | (b) Timing.<br><br>(1) The public notice shall provide a reasonable period of time, normally at least 30 days, within which interested parties may express their views concerning the permit application.<br><br>(2) Public notice of a public hearing shall be given at least 30 days before the hearing.<br><br>(3) The Regional Administrator may approve a program with shorter public notice timing if the Regional Administrator determines that sufficient public notice is provided for. | 62-331.060(3) & (4), F.A.C. | 62-331.060(3) & (4), F.A.C. – (3) From the date of publication, interested parties may express their views concerning the permit application, modification, revocation, or suspension for a period of:<br>(a) 30 days; or<br>(b) 15 days for the following projects:<br>1. Mosquito control activities including rotary ditching;<br>2. Erosion control activities not to exceed 0.2 acre of fill;<br>3. Restoration efforts required by the Agency that do not exceed 0.5 acre of dredge or fill activities into state-assumed waters;<br>4. The placement of fill material in freshwater wetlands for residential development, not to exceed 0.2 acre, except within the following areas:<br>a. Wetlands in or adjacent to Outstanding Florida Waters (OFWs);<br>b. Wetlands in or adjacent to National Parks, National Wildlife Sanctuaries, National Preserves, and National Marine Sanctuaries;<br>c. Wetlands in Areas of Critical State Concern;<br>d. Timicuan Ecological and Historical Preserve in Duval County;<br>e. Golden Gate Estates, Collier County, south of Alligator Alley;<br>f. The Florida Keys.<br>(c) The public notice comment period shall automatically be extended to the close of any public meeting, if one is held. The presiding officer may also extend the comment period at the public meeting.<br>(4) The Agency may hold a public meeting for a proposed project, modification, revocation, or suspension if it is determined that there is a significant degree of public interest in the application. A public meeting may also be held at the discretion of the Agency, when the Agency determines a public meeting may be useful to a decision on the permit application. Interested parties may request a public meeting during the comment period in subsection (3), above.<br>(a) Any request for a public meeting shall be in writing and shall state the nature of the issues proposed to be raised at the public meeting.<br>(b) The Agency shall provide notice of a public meeting at least 30 days prior to the scheduled public meeting date.<br>(c) Any person may submit oral or written statements or data concerning the permit application at the public meeting. Public meetings shall be reported verbatim. Copies of the record of | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | proceedings may be obtained from the Agency or the reporter of such meeting. A copy of the transcript (or, if none is prepared, a recording of the proceedings) shall be made available for public inspection at the local Agency office. | |
| 233.32(c) | (c) The Director shall give public notice by each of the following methods:<br><br>(1) By mailing a copy of the notice to the following persons (any person otherwise entitled to receive notice under this paragraph may waive his rights to receive notice for any classes or categories of permits):<br><br>(i) The applicant.<br><br>(ii) Any agency with jurisdiction over the activity or the disposal site, whether or not the agency issues a permit.<br><br>(iii) Owners of property adjoining the property where the regulated activity will occur.<br><br>(iv) All persons who have specifically requested copies of public notices. (The Director may update the mailing list from time to time by requesting written indication of continued interest from those listed. The Director may delete from the list the name of any person who fails to respond to such a request.)<br><br>(v) Any State whose waters may be affected by the proposed discharge.<br><br>(2) In addition, by providing notice in at least one other way (such as advertisement in a newspaper of sufficient circulation) reasonably calculated to cover the area affected by the activity. | 62-331.060(2), F.A.C. | 62-331.060(2), F.A.C. - Public notice shall be prepared in accordance with section 5.3.1 of the 404 Handbook and provided as follows:<br>(a) The Agency shall mail and/or email the notice to the following parties:<br>1. The applicant;<br>2. Any other agency with jurisdiction over the activity or the project site, whether or not the agency issues a permit;<br>3. Owners of property adjoining the property where the regulated activity is proposed or is permitted to occur;<br>4. Any State or tribe whose waters may be affected by the proposed or permitted activity; and<br>5. All persons, other than those listed above, who have specifically requested copies of public notices. The Agency may require the use of an existing online notification system to request and receive such notices, except where the requestor asks to be notified by an alternative method because of a technical or financial hardship.<br>6. The Seminole Tribe of Florida Environmental Resource Management Department (ERMD) for any activity that is within six miles of the Seminole Tribe of Florida's Big Cypress or Brighton Reservations, within two miles of the Seminole Tribe of Florida's Immokalee, Lakeland, or Fort Pierce Reservations, within one mile of the Seminole Tribe of Florida's Tampa, Coconut Creek, or Hollywood Reservations; within the Seminole Tribe's reserved rights areas, including but not limited to: within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A.<br>7. The Seminole Tribe of Florida's Tribal Historic Preservation Office (THPO) for activities in the State of Florida.<br>8. The Miccosukee Tribe of Indians of Florida for any activity that is within two miles of the Miccosukee Federal Reservation; Miccosukee Reserve Area; Krome Avenue, Dade Corners, Cherry Ranch, or Sherrod Ranch Reservations; and Coral Way, Lambik, or Serna Trust Properties. Also for any activity within the Miccosukee Tribe's reserved rights areas, including but not limited to: within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A.<br>(b) Notice shall be published on the Agency website. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (c) The notice provided in (a) or (b), above, may be combined with notice required for ERP permits or certain activities on sovereign submerged lands pursuant to Volume I, section 5.5.2.3, provided the provisions of this section are met. | |
| 233.32(d) | (d) All public notices shall contain at least the following information: | 404 Handbook Section 5.3.1(a) | 404 Handbook Section 5.3.1(a) - Public notices shall be prepared by the Agency and shall contain: | |
| | (1) The name and address of the applicant and, if different, the address or location of the activity(ies) regulated by the permit. | | 1. The name and address of the applicant and, if different, the address or location of the activity(ies) regulated by the permit. | |
| | (2) The name, address, and telephone number of a person to contact for further information. | | 2. The name, address, and telephone number of a person to contact for further information. | |
| | (3) A brief description of the comment procedures and procedures to request a public hearing, including deadlines. | | 3. A brief description of the comment procedures and procedures to request a public meeting, including deadlines. | |
| | (4) A brief description of the proposed activity, its purpose and intended use, so as to provide sufficient information concerning the nature of the activity to generate meaningful comments, including a description of the type of structures, if any, to be erected on fills, and a description of the type, composition and quantity of materials to be discharged. | | 4. A brief description of the proposed activity, its purpose and intended use, so as to provide sufficient information concerning the nature of the activity to generate meaningful comments, including a description of the type of structures, if any, to be erected on fills, and a description of the type, composition and quantity of materials to be used as fill. | |
| | (5) A plan and elevation drawing showing the general and specific site location and character of all proposed activities, including the size relationship of the proposed structures to the size of the impacted waterway and depth of water in the area. | | 5. A plan and elevation drawing showing the general and specific site location and character of all proposed activities, including the size relationship of the proposed structures to the size of the impacted waterway and depth of water in the area. | |
| | (6) A paragraph describing the various evaluation factors, including the 404(b)(1) Guidelines or State-equivalent criteria, on which decisions are based. | | 6. A paragraph describing the various evaluation factors on which decisions are based. | |
| | (7) Any other information which would significantly assist interested parties in evaluating the likely impact of the proposed activity. | | 7. Any other information which would significantly assist interested parties in evaluating the likely impact of the proposed activity. | |
| 233.32(e) | (e) Notice of public hearing shall also contain the following information: | 404 Handbook Section 5.3.1(b) | 404 Handbook Section 5.3.1(b) - Notice of public meeting shall also contain the information in (a)1. through 7., above, and the following information: | |
| | (1) Time, date, and place of hearing. | | 1. Time, date, and place of meeting. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | (2) Reference to the date of any previous public notices relating to the permit. (3) Brief description of the nature and purpose of the hearing. | | 2. Reference to the date of any previous public notices relating to the permit. 3. Brief description of the nature and purpose of the meeting. | |
| **233.33 Public Hearing** | | | | |
| 233.33(a) | Any interested person may request a public hearing during the public comment period as specified in § 233.32. Requests shall be in writing and shall state the nature of the issues proposed to be raised at the hearing. | 62-331.060(4), F.A.C. | 62-331.060(4), F.A.C. – The Agency may hold a public meeting for a proposed project, modification, revocation, or suspension if it is determined that there is a significant degree of public interest in the application. A public meeting may also be held at the discretion of the Agency, when the Agency determines a public meeting may be useful to a decision on the permit application. Interested parties may request a public meeting during the comment period in subsection (3), above. (a) Any request for a public meeting shall be in writing and shall state the nature of the issues proposed to be raised at the public meeting. | |
| 233.33(b) | The Director shall hold a public hearing whenever he determines there is a significant degree of public interest in a permit application or a draft general permit. He may also hold a hearing, at his discretion, whenever he determines a hearing may be useful to a decision on the permit application. | 62-331.060(4), F.A.C. | 62-331.060(4), F.A.C. – The Agency may hold a public meeting for a proposed project, modification, revocation, or suspension if it is determined that there is a significant degree of public interest in the application. A public meeting may also be held at the discretion of the Agency, when the Agency determines a public meeting may be useful to a decision on the permit application. Interested parties may request a public meeting during the comment period in subsection (3), above. | |
| 233.33(c) | At a hearing, any person may submit oral or written statements or data concerning the permit application or draft general permit. The public comment period shall automatically be extended to the close of any public hearing under this section. The presiding officer may also extend the comment period at the hearing. | 62-331.060(4)(c), F.A.C. 62-331.060(3)(c), F.A.C. | 62-331.060(4)(c), F.A.C. – Any person may submit oral or written statements or data concerning the permit application at the public meeting. Public meetings shall be reported verbatim. Copies of the record of proceedings may be obtained from the Agency or the reporter of such meeting. A copy of the transcript (or, if none is prepared, a recording of the proceedings) shall be made available for public inspection at the local Agency office. 62-331.060(3)(c), F.A.C. – The public notice comment period shall automatically be extended to the close of any public meeting, if one is held. The presiding officer may also extend the comment period at the public meeting. | |
| 233.33(d) | All public hearings shall be reported verbatim. Copies of the record of proceedings may be purchased by any person from the Director or the reporter of such hearing. A copy of the transcript (or if none is prepared, a tape of the proceedings) shall be made available for public inspection at an appropriate State office. | 62-331.060(4)(c), F.A.C. | 62-331.060(4)(c), F.A.C. – Any person may submit oral or written statements or data concerning the permit application at the public meeting. Public meetings shall be reported verbatim. Copies of the record of proceedings may be obtained from the Agency or the reporter of such meeting. A copy of the transcript (or, if none is | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | prepared, a recording of the proceedings) shall be made available for public inspection at the local Agency office. | |
| 233.34 | Making a decision on a permit application | | | |
| 233.34(a) | The Director will review all applications for compliance with the 404(b)(1) Guidelines and/or equivalent State environmental criteria as well as any other applicable State laws or regulations. | 62-331.052(1), F.A.C. | 62-331.052(1), F.A.C. - Within 30 days of receipt of an application for a permit in accordance with Rule 62-331.051, F.A.C., or receipt of any additional information provided by the applicant in response to the Agency's request for additional information, or within 15 days of receipt of an application for a subsequent phase of a project where the first phase was previously permitted in accordance with section 5.3.2 of the 404 Handbook or where a new permit is needed to complete a project that was unable to be completed during the duration of the original permit, the Agency shall review the application for administrative and technical completeness and shall request any additional information required by the Agency to publish public notice pursuant to Rule 62-331.060, F.A.C., and to determine if the proposed activity meets the conditions for issuance in Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. The applicant may voluntarily submit a written waiver of the above timeclock requirement to allow the Agency additional time to determine if additional information is required; the Agency is not obligated to accept the waiver or to delay sending the request for additional information. | |
| 233.34(b) | The Director shall consider all comments received in response to the public notice, and public hearing if a hearing is held. All comments, as well as the record of any public hearing, shall be made part of the official record on the application. | 62-331.060(6), F.A.C. | 62-331.060(6), F.A.C. The Agency shall consider all comments received in response to the public notice, and public meeting if a meeting is held. All comments, as well as the record of any public meeting, shall be made part of the official record on the application. | |
| 233.34(c) | After the Director has completed his review of the application and consideration of comments, the Director will determine, in accordance with the record and all applicable regulations, whether or not the permit should be issued. No permit shall be issued by the Director under the circumstances described in § 233.20. The Director shall prepare a written determination on each application outlining his decision and rationale for his decision. The determination shall be dated, signed and included in the official record prior to final action on the application. The official record shall be open to the public. | 404 Handbook section 8.2
62-331.053(3), F.A.C. | No permit shall be issued for the following:
(a) When the project is inconsistent with the requirements of this Chapter and the 404 Handbook, including when the project:
1. Causes or contributes to violations of any applicable State water quality standard, except when temporarily within a mixing zone proposed by the applicant and approved by the Agency;
2. Causes or contributes to violations of any applicable water quality standard within other states or Tribal lands;
3. Violates any applicable toxic effluent standard or prohibition under section 307 of the CWA, 33 U.S.C. § 1317 (2018), incorporated herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-120651, or state law;
4. Jeopardizes the continued existence of endangered or threatened species, or results in the likelihood of the destruction or adverse modification of a habitat which is determined by the Secretary of Interior or Commerce, as appropriate, to be a critical habitat for endangered or threatened species. Compliance with any | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission, the U.S. Fish & Wildlife Service, and the National Marine Fisheries Service for purposes of the State 404 Program, and review, as it pertains to endangered or threatened species, by the U.S. Environmental Protection Agency as described in subsection 62-331.052(2), F.A.C., shall be determinative for purposes of evaluating violations of this subparagraph. If an exemption has been granted by the Endangered Species Committee, the terms of such exemption shall apply in lieu of this subparagraph; 5. Violates any requirement imposed by the Secretary of Commerce to protect any area designated as a marine sanctuary. 6. Causes or contributes to significant degradation of wetlands or other surface waters. Effects contributing to significant degradation considered individually or collectively include: i. Significant adverse effects on human health or welfare, including but not limited to, effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites; ii. Significant adverse effects on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their by-products outside of the project site through biological, physical, and chemical processes; iii. Significant adverse effects on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland ecosystem to assimilate nutrients, purify water, or reduce wave energy; or iv. Significant adverse effects on recreational, aesthetic, and economic values. (b) When appropriate and practicable steps have not been taken to minimize potential adverse impacts of the activity on the aquatic ecosystem; (c) When there does not exist sufficient information to make a reasonable judgement as to whether the proposed activity will comply with the requirements of this Chapter; (d) When the EPA has objected to issuance of the permit and the objection has not been resolved, or placed a requirement for a permit condition that has not been addressed, as described in paragraph 62-331.052(3)(b), F.A.C.; (e) When the proposed dredge or fill activity would be in an area which has been prohibited, withdrawn, or denied as a disposal site by the EPA under section 404(c) of the CWA, or when the activity would fail to comply with a restriction imposed thereunder; | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (f) If the Corps determines, after consultation with the Secretary of the Department in which the Coast Guard is operating, that anchorage and navigation of any of the navigable waters would be substantially impaired. | |
| **233.35 Issuance and effective date of permit** | | | | |
| 233.35(a) | If the Regional Administrator comments on a permit application or draft general permit under § 233.50, the Director shall follow the procedures specified in that section in issuing the permit. | 62-331.052(3)(b), F.A.C. | 62-331.052(3)(b), F.A.C. - If the EPA intends to comment on, object to, or make recommendations with respect to a permit application, or if EPA does not wish to comment but wishes to reserve the right to object based on any new information brought out by the public during the comment period or at a public meeting, EPA shall notify the Agency of its intent within 30 days of receipt of the public notice or the Agency's notice to EPA of failure to accept the recommendations of an affected state or tribe. Once the Agency is notified by EPA, or if the Agency fails to accept the recommendations of an affected state or tribe and EPA must review the reasons for failing to accept the recommendations, the following procedures shall apply:

1. Subject to subparagraphs 2. through 5. below, the permit shall not be issued until after the receipt of such comments, objections, or recommendations, or within 90 days of EPA's receipt of the notice, whichever occurs first.

2. When the Agency has received an EPA objection or requirement for a permit condition under this section, the Agency shall not issue the permit unless the steps required by the EPA to eliminate the objection or condition the permit have been taken. If the Agency chooses not to perform the required steps, the Agency may still issue an ERP permit under Chapter 62-330, F.A.C. but shall not issue a permit under this Chapter. In such a case, the applicant is responsible for obtaining any necessary authorizations under section 404 of the CWA from the Corps.

3. Within 90 days after Agency receipt of an objection or a requirement for a permit condition from the EPA, the Agency or any interested party may request that the EPA hold a public meeting on the objection or requirement. EPA shall conduct a public meeting if requested by the Agency, or if warranted by significant public interest based on requests received.

4. If EPA does not hold a public meeting under subparagraph 3. above, the Agency shall, within 90 days of receipt of the objection or requirement for a permit condition, either issue the permit revised to satisfy EPA's objections or notify EPA of its intent to deny the permit.

5. If EPA holds a public meeting under subparagraph 3. above, EPA shall reaffirm, modify, or withdraw the objection or requirement for a permit condition, and notify the Agency of that decision. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | 6. If EPA holds a public meeting, the Agency shall have 30 days after EPA gives the Agency notice of its decision under subparagraph 4., above, to take one of the following actions: a. If EPA has withdrawn the objection or requirement for a permit condition, and the application is technically complete, the Agency may issue the permit; or b. If EPA has not withdrawn the objection or requirement for a permit condition, the Agency shall do one of the following: (I) Issue a permit that includes the required permit condition and/or otherwise satisfies EPA's objection; (II) Notify EPA of its intent to deny the permit; or (III) Notify EPA and the applicant that the Agency intends to take no action, in which case, the Corps shall process the section 404 authorization. | |
| 233.35(b) | If the Regional Administrator does not comment on a permit application or draft general permit, the Director shall make a final permit decision after the close of the public comment period and shall notify the applicant.<br><br>(1) If the decision is to issue a permit, the permit becomes effective when it is signed by the Director and the applicant.<br><br>(2) If the decision is to deny the permit, the Director will notify the applicant in writing of the reason(s) for denial. | 62-331.052(3)(a), F.A.C. | 62-331.052(3)(a), F.A.C. - If the EPA does not comment on, provide notice to the Agency of its intent to comment on, object to, make recommendations with respect to, or notify the Agency that it is reserving its right to object to, a permit application within 30 days of the date EPA receives the notice, the Agency shall make a final permit decision within 60 days after either the close of the public comment period described in subsection 62-331.060(3), F.A.C. or the project is declared technically complete, whichever occurs later. 1. If the decision is to issue a permit, the permit becomes effective when it is signed by the Agency and the applicant. 2. If the decision is to deny the permit, the Agency will notify the applicant in writing of the reason(s) for denial. | |
| **233.36 Modification, suspension or revocation of permits** | | | | |
| 233.36(a) | General. The Director may reevaluate the circumstances and conditions of a permit either on his own motion or at the request of the permittee or of a third party and initiate action to modify, suspend, or revoke a permit if he determines that sufficient cause exists. Among the factors to be considered are:<br><br>(1) Permittee's noncompliance with any of the terms or conditions of the permit;<br><br>(2) Permittee's failure in the application or during the permit issuance process to disclose fully all relevant | 62-331.080(2), F.A.C. | The Agency shall reevaluate the circumstances and conditions of a permit at any time, either on its own motion or at the request of the permittee or a third party and determine whether to initiate action to modify, suspend, and revoke a permit if sufficient cause exists. Sufficient cause exists when any one of the following factors are present: (a) Permittee's noncompliance with any of the terms or conditions of the permit; (b) Permittee's failure in the application or during the permit issuance process to fully disclose all relevant facts for the permittee's misrepresentation of any relevant facts at the time; (c) Information that activities authorized by a general permit are having more than minimal individual or cumulative adverse effect on | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | facts or the permittee's misrepresentation of any relevant facts at the time;<br><br>(3) Information that activities authorized by a general permit are having more than minimal individual or cumulative adverse effect on the environment, or that the permitted activities are more appropriately regulated by individual permits;<br><br>(4) Circumstances relating to the authorized activity have changed since the permit was issued and justify changed permit conditions or temporary or permanent cessation of any discharge controlled by the permit;<br><br>(5) Any significant information relating to the activity authorized by the permit if such information was not available at the time the permit was issued and would have justified the imposition of different permit conditions or denial at the time of issuance;<br><br>(6) Revisions to applicable statutory or regulatory authority, including toxic effluent standards or prohibitions or water quality standards. | | the environment, or that the permitted activities are more appropriately regulated by individual permits;<br>(d) Circumstances relating to the authorized activity have changed since the permit was issued and changed permit conditions or temporary or permanent cessation of any dredge or fill activity controlled by the permit are justified;<br>(e) Any significant information relating to the activity authorized by the permit if such information was not available at the time the permit was issued and would have justified the imposition of different permit conditions or denial at the time of issuance;<br>(f) Revisions to applicable statutory or regulatory authority, including toxic effluent standards or prohibitions or water quality standards. | |
| 233.36(b) | Limitations. Permit modifications shall be in compliance with § 233.20. | 62-331.080(1), F.A.C. | 62-331.080(1), F.A.C. – The following shall be processed as minor modifications. Any activity not covered below shall be processed as a major modification:<br>(a) Correction of typographical errors;<br>(b) Requiring more frequent monitoring or reporting by permittee;<br>(c) Changing ownership or operational control of a project or activity where the Agency determines that no other change in the permit is necessary, provided that a written agreement containing a specific date for transfer of permit responsibility, coverage, and liability between the current and new permittees has been submitted to the Agency;<br>(d) Minor modifications of project plans that do not significantly change the character, scope, and/or purpose of the project or result in significant change in environmental impact. The Agency shall use the factors in section 6.2.1(d) of Volume I, as applicable, to determine whether the modification will be considered minor;<br>(e) Extending the term of an individual permit to the amount of time reasonably needed to complete the project, but not to exceed the maximum duration allowed under federal law and so long as the modification does not result in any increase in the amount of material to be dredged or used as fill. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 233.36(c) | Procedures.<br><br>(1) The Director shall develop procedures to modify, suspend or revoke permits if he determines cause exists for such action (§ 233.36(a)). Such procedures shall provide opportunity for public comment (§ 233.32), coordination with the Federal review agencies (§ 233.50), and opportunity for public hearing (§ 233.33) following notification of the permittee. When permit modification is proposed, only the conditions subject to modification need be reopened.<br><br>(2) Minor modification of permits. The Director may, upon the consent of the permittee, use abbreviated procedures to modify a permit to make the following corrections or allowance for changes in the permitted activity:<br><br>(i) Correct typographical errors;<br><br>(ii) Require more frequent monitoring or reporting by permittee;<br><br>(iii) Allow for a change in ownership or operational control of a project or activity where the Director determines that no other change in the permit is necessary, provided that a written agreement containing a specific date for transfer of permit responsibility, coverage, and liability between the current and new permittees has been submitted to the Director;<br><br>(iv) Provide for minor modification of project plans that do not significantly change the character, scope, and/or purpose of the project or result in significant change in environmental impact;<br><br>(v) Extend the term of a permit, so long as the modification does not extend the term of the permit beyond 5 years from its original effective date and does not result in any increase in the amount of dredged or fill material allowed to be discharged. | 62-331.080(4), F.A.C.<br><br>62-331.080(1), F.A.C.<br><br>62-331.080(3), F.A.C. | 62-331.080(4), F.A.C. – Public notice.<br>(a) Minor modifications shall not be subject to the public notice requirements in Rule 62-331.060, F.A.C.<br>(b) Major modifications shall be subject to the public notice requirements in Rule 62-331.060, F.A.C. However, only the conditions subject to modification shall be re-opened.<br>(c) Revocation and suspension of permits shall be effective upon the permittee's receipt of notification from the Agency of such revocation or suspension. Public notice of the revocation or suspension shall be made in accordance with Rule 62-331.060, F.A.C.<br><br>62-331.080(1), F.A.C. – The following shall be processed as minor modifications. Any activity not covered below shall be processed as a major modification:<br>(a) Correction of typographical errors;<br>(b) Requiring more frequent monitoring or reporting by permittee;<br>(c) Changing ownership or operational control of a project or activity where the Agency determines that no other change in the permit is necessary, provided that a written agreement containing a specific date for transfer of permit responsibility, coverage, and liability between the current and new permittees has been submitted to the Agency;<br>(d) Minor modifications of project plans that do not significantly change the character, scope, and/or purpose of the project or result in significant change in environmental impact. The Agency shall use the factors in section 6.2.1(d) of Volume I, as applicable, to determine whether the modification will be considered minor;<br>(e) Extending the term of an individual permit to the amount of time reasonably needed to complete the project, but not to exceed the maximum duration allowed under federal law and so long as the modification does not result in any increase in the amount of material to be dredged or used as fill.<br><br>62-331.080(3), F.A.C. – Extensions of permits.<br>(a) Individual permits shall not be extended beyond the maximum duration allowed under federal law.<br>(b) General permits shall not be extended. | |
| 233.37 | **Signatures on permit applications and reports.** | Form 62-330.060(1)<br><br>Form 62-330.402(1) | See Form Language | Rule 62-331.051(1), F.A.C., implements the requirements of 40 C.F.R. § 233.37 by requiring an applicant use Form 62-330.060(1) |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | The application and any required reports must be signed by the person who desires to undertake the proposed activity or by that person's duly authorized agent if accompanied by a statement by that person designating the agent. In either case, the signature of the applicant or the agent will be understood to be an affirmation that he possesses or represents the person who possesses the requisite property interest to undertake the activity proposed in the application. | | | – "'Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands." Part 4, Section A of this Form requires the signature of the applicant or the applicant's agent; Section B requires the certification of real property interest; and Section C requires the Designation of Authorized Agent (if applicable). Noticed general permits require the use of Form 62-330.402(1), which requires substantially the same information and certification. |
| 233.38 | **Continuation of expiring permits.**<br><br>A Corps 404 permit does not continue in force beyond its expiration date under Federal law if, at that time, a State is the permitting authority. States authorized to administer the 404 Program may continue Corps or State-issued permits until the effective date of the new permits, if State law allows. Otherwise, the discharge is being conducted without a permit from the time of expiration of the old permit to the effective date of a new State-issued permit, if any. | 62-331.090, F.A.C.<br><br>404 Handbook, Section 6<br><br>Draft MOA with Corps, Section IV. 1)<br><br>Draft MOA with Corps, Section IV.B. | 62-331.090, F.A.C. - Unless revoked or otherwise modified, the duration of a permit under this Chapter is:<br><br>(1) General permits shall be effective for a fixed term not to exceed five years as provided in subsection 62-331.200(5), F.A.C.<br><br>(2) The duration of individual permits shall be specified in each permit and shall not exceed the maximum timeframe allowable under federal law and reasonably necessary to complete the project.<br><br>404 Handbook, section 6.0 – Duration, Modification, and Transfer of Permits<br><br>(a) Duration of permits shall be in accordance with Rule 62-331.090, F.A.C.<br><br>(b) Individual permits become effective when they are signed by the Agency and the applicant. Each State 404 Individual permit, when issued, shall contain a signature page with signature blocks for the person who has authority to sign permits for the district where the permit is issued and for the applicant. The applicant shall sign the page and send it back to the Agency for Agency signature.<br><br>(c) Individual permits cannot be extended beyond the duration allowed under federal law but may be administratively continued while an application for a new permit is under review in accordance with section 5.3.3 of this handbook when unexpected project delays cause a project to require more time to complete.<br><br>Corps MOA IV.A.(1)    The time limit for completing work authorized under a Department of the Army (DA) individual permit issued prior to the date of assumption for the discharge of dredged or fill material in State assumed waters will remain the expiration date stated in the permit instrument. After the date of assumption, an | The Corps MOA will not be adopted by rule but will be a binding part of the state program after EPA's approval of the program. |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | applicant must apply for a new permit from DEP for any work that remains incomplete by the expiration date. The Corps will not review requests for extension of time and will refer the applicant to DEP to apply for a new permit under the State 404 Program. DEP may administratively continue an expiring Corps permit until the effective date of a new permit, if any, consistent with 40 C.F.R. § 233.38, or a decision is made not to issue a new permit.<br><br>Corps MOA IV.B. The time limit for completing the work under a DA general permit verified prior to the date of assumption for the discharge of dredged or fill material in State assumed waters will remain the expiration date stated in the verification letter or as stated in the DA general permit, whichever is earliest. After the date of assumption, any work that remains incomplete by the expiration date must receive a new permit from DEP under the State 404 Program. Requests for modifications of verifications under a DA general permit within State assumed waters shall be made to DEP. Verifications of DA general permits shall continue to be effective for the original duration established by the Corps' verification letter, to include 12 months after expiration if work has commenced or is under contract to commence. After the date of assumption, no new verifications under general permits will be issued by the Corps within State assumed waters. | |
| 233.39 | Electronic Reporting<br><br>States that choose to receive electronic documents must satisfy the requirements of 40 CFR Part 3 - (Electronic reporting) in their state program. | 373.026(10), F.S. | 373.026(10), F.S. - In addition to its other powers and duties, the department shall, to the greatest extent possible:<br><br>(10) Expand the use of Internet-based self-certification services for appropriate exemptions and general permits if such expansion is economically feasible. In addition to expanding the use of Internet-based self-certification services for appropriate exemptions and general permits, the department and water management districts shall identify and develop general permits for appropriate activities currently requiring individual review which could be expedited through the use of applicable professional certification. | The Department receives electronic documents through its ESSA (Electronic Self-Service Application Portal and EzDMR (Electronic Discharge Monitoring Report) applications, which have been compliant with CROMERR (EPAs Cross Media Electronic Reporting Rule) since January 2012. |
| **Subpart E Compliance Evaluation and Enforcement** | | | | |
| **233.40 Requirements for compliance evaluation programs** | | | | |
| 233.40(a) | In order to abate violations of the permit program, the State shall maintain a program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with permit conditions. | 373.129(1) and (7), F.S.<br>373.430(1), F.S.<br>(via 373.129(7), F.S.) | 373.129(1) and (7), F.S. – The department, the governing board of any water management district, any local board, or a local government to which authority has been delegated pursuant to s. 373.103(8), is authorized to commence and maintain proper and | The State has authority to enforce rules and regulations promulgated under Part IV of Chapter 373, F.S., including the Environmental Resource Permit (ERP) program and the State 404 Program, if |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | 403.161(1), F.S. (via 373.129(7), F.S.) | necessary actions and proceedings in any court of competent jurisdiction for any of the following purposes: (1) To enforce rules, regulations, and orders adopted or issued pursuant to this law. (7) Enforce the provisions of part IV of this chapter in the same manner and to the same extent as provided in ss. 373.430, 403.121(1) and (2), 403.131, 403.141, and 403.161. 373.430(1), F.S. (via 373.129(7), F.S.) - (1) It shall be a violation of this part, and it shall be prohibited for any person: (a) To cause pollution, as defined in s. 403.031(7), except as otherwise provided in this part, so as to harm or injure human health or welfare, animal, plant, or aquatic life or property. (b) To fail to obtain any permit required by this part or by rule or regulation adopted pursuant thereto, or to violate or fail to comply with any rule, regulation, order, or permit adopted or issued by a water management district, the department, or local government pursuant to their lawful authority under this part. (c) To knowingly make any false statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained under this part, or to falsify, tamper with, or knowingly render inaccurate any monitoring device or method required to be maintained under this part or by any permit, rule, regulation, or order issued under this part. 403.161(1), F.S. (via 373.129(7), F.S.) - (1) It shall be a violation of this chapter, and it shall be prohibited for any person: (a) To cause pollution, except as otherwise provided in this chapter, so as to harm or injure human health or welfare, animal, plant, or aquatic life or property. (b) To fail to obtain any permit required by this chapter or by rule or regulation, or to violate or fail to comply with any rule, regulation, order, permit, or certification adopted or issued by the department pursuant to its lawful authority. (c) To knowingly make any false statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained under this chapter, or to falsify, tamper with, or knowingly render inaccurate any monitoring device or method required to be maintained under this chapter or by any permit, rule, regulation, or order issued under this chapter. (d) For any person who owns or operates a facility to fail to report to the representative of the department, as established by department rule, within one working day of discovery of a release of hazardous substances from the facility if the owner or operator is required to | assumed. Such regulatory violations include failure to obtain a required permit or failure to comply with permit conditions.<br><br>Compliance monitoring and enforcement procedures are implemented statewide via the Department's Compliance Assurance Program (CAP). CAP staff are responsible for tracking and maintaining records related to permit compliance monitoring and unpermitted violations using the program-specific Environmental Resource Permit Compliance & Enforcement (ERPce) database. The ERPce database also enables staff to identify parties responsible for multiple or repeat violations, and to record publicly-submitted reports about potential violations (as discussed in the comments for § 233.40(d), below). |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | report the release to the United States Environmental Protection Agency in accordance with 42 U.S.C. s. 9603. | |
| | | | (e) To fail to provide required notice pursuant to s. 403.077. | |
| 233.40(b) | The Director and State officers engaged in compliance evaluation, upon presentation of proper identification, shall have authority to enter any site or premises subject to regulation or in which records relevant to program operation are kept in order to copy any records, inspect, monitor or otherwise investigate compliance with the State program. | 373.423, F.S.<br><br>403.091, F.S.<br><br>62-331.054(1), F.A.C. and 62-330.350(1)(m), F.A.C.<br><br>62-331.201(1), F.A.C. and 62-330.405(8), F.A.C.<br><br>Applicant's Handbook Vol. I, Section 1.7 | 373.423, F.S.  Inspection. —<br>(1) During the construction or alteration of any stormwater management system, dam, impoundment, reservoir, appurtenant work, or works, the governing board or department pursuant to s. 403.091 shall make at its expense such periodic inspections as it deems necessary to ensure conformity with the approved plans and specifications included in the permit.<br>(2) If during construction or alteration the governing board or department finds that the work is not being done in accordance with the approved plans and specifications as indicated in the permit, it shall give the permittee written notice stating with which particulars of the approved plans and specifications the construction is not in compliance and shall order immediate compliance with such plans and specifications. The failure to act in accordance with the orders of the governing board or department after receipt of written notice shall result in the initiation of revocation proceedings in accordance with s. 373.429.<br>(3) Upon completion of the work, the executive director of the district or the Department of Environmental Protection or its successor agency shall have periodic inspections made of permitted stormwater management systems, dams, reservoirs, impoundments, appurtenant work, or works to protect the public health and safety and the natural resources of the state. No person shall refuse immediate entry or access to any authorized representative of the governing board or the department who requests entry for purposes of such inspection and presents appropriate credentials.<br><br>403.091, F.S.  Inspections. —<br>(1)(a) Any duly authorized representative of the department may at any reasonable time enter and inspect, for the purpose of ascertaining the state of compliance with the law or rules and regulations of the department, any property, premises, or place, except a building which is used exclusively for a private residence, on or at which:<br>1. A hazardous waste generator, transporter, or facility or other air or water contaminant source;<br>2. A discharger, including any nondomestic discharger which introduces any pollutant into a publicly owned treatment works;<br>3. Any facility, as defined in s. 376.301; or<br>4. A resource recovery and management facilityis located or is being constructed or installed or where records which are required under this chapter, ss. 376.30-376.317, or department rule are kept. | Several statutes grant the Department authority to access sites for inspections. Additional sources of site access authority include permits, consent orders, other administrative orders, permission forms, easements and licenses, inspection warrants, and court orders.<br><br>Pursuant to Section 1.7 of Applicant's Handbook Vol. I ("Permission to Inspect, Monitor and Sample"), ERP program applications must include authorization for Department staff to enter and inspect the subject site; after an individual or general permit is issued, Department staff are authorized to access and inspect the subject site pursuant to s. 373.423, F.S. and the permit general conditions of Rule 62-330.350 or Rule 62-330.405, F.A.C., as applicable. |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (b) Any duly authorized representative may at reasonable times have access to and copy any records required under this chapter or ss. 376.30-376.317; inspect any monitoring equipment or method; sample for any pollutants as defined in s. 376.301, effluents, or wastes which the owner or operator of such source may be discharging or which may otherwise be located on or underlying the owner's or operator's property; and obtain any other information necessary to determine compliance with permit conditions or other requirements of this chapter, ss. 376.30-376.317, or department rules.<br><br>(c) No person shall refuse reasonable entry or access to any authorized representative of the department who requests entry for purposes of inspection and who presents appropriate credentials; nor shall any person obstruct, hamper, or interfere with any such inspection. The owner or operator of the premises shall receive a report, if requested, setting forth all facts found which relate to compliance status.<br><br>(2) An inspection pursuant to subsection (1) may be conducted only after: (a) Consent for the inspection is received from the owner, operator, or person in charge; or (b) The appropriate inspection warrant as provided in this section is obtained.<br><br>(3)(a) An inspection warrant as authorized by this chapter may be issued by a judge of any county court or circuit court of this state which has jurisdiction of the place or thing to be searched.<br><br>(b) Upon proper affidavit being made, an inspection warrant may be issued under the provisions of this chapter or ss. 376.30-376.317. 1. When it appears that the properties to be inspected may be connected with or contain evidence of the violation of any of the provisions of this chapter or ss. 376.30-376.317 or any rule properly promulgated thereunder; or 2. When the inspection sought is an integral part of a larger scheme of systematic routine inspections which are necessary to, and consistent with, the continuing efforts of the department to ensure compliance with the provisions of this chapter or ss. 376.30-376.317 and any rules adopted thereunder.<br><br>(c) The judge shall, before issuing the warrant, have the application for the warrant duly sworn to and subscribed by a representative of the department; and may receive further testimony from witnesses, supporting affidavits, or depositions in writing to support the application. The affidavit and further proof, if had or required, shall set forth the facts tending to establish the grounds specified in paragraph (b) or the reasons for believing that such grounds exist.<br><br>(d) Upon examination of the application and proofs submitted and if satisfied that cause exists for the issuing of the inspection warrant, the judge shall thereupon issue a warrant, signed by him or her with the name of his or her office, to any department representative, | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | which warrant will authorize the representative forthwith to inspect the property described in the warrant. | |
| | | | 62-331.054(1), F.A.C. - Individual permits shall contain the general conditions for individual permits in subsection 62-330.350(1), F.A.C, as applicable, and any specific conditions necessary to assure that the activities will be conducted in compliance with this Chapter, and in a manner which minimizes adverse impacts upon the physical, chemical, and biological integrity of wetlands or other surface waters, such as mitigation requirements and protection measures for listed species or historical resources. | |
| | | | 62-330.350(1), F.A.C. - The following general conditions are binding on all individual permits issued under this chapter, except where the conditions are not applicable to the authorized activity, or where the conditions must be modified to accommodate project-specific conditions. | |
| | | | (m) Upon reasonable notice to the permittee, Agency staff with proper identification shall have permission to enter, inspect, sample and test the project or activities to ensure conformity with the plans and specifications authorized in the permit. | |
| | | | 62-331.201(1), F.A.C. - General permits shall be subject to the conditions in subsections (2) and (3) below, and the general conditions for all general permits in Rule 62-330.405, F.A.C., except subsections 62-330.405(7) and (10), F.A.C. The Agency may revise the general conditions in Rule 62-330.405, F.A.C. to include references to applicable rules under this Chapter, as necessary. | |
| | | | 62-330.405, F.A.C. - The following general permit conditions are binding upon the permittee and are enforceable under chapter 373, F.S. These conditions do not apply to the general permit for stormwater management systems under section 403.814(12), F.S. | |
| | | | (8) Upon reasonable notice to the permittee, Agency staff with proper identification shall have permission to enter, inspect, sample and test the permitted system to ensure conformity with the plans and specifications approved by the permit. | |
| | | | Volume I, section 1.7 - Each application must include permission signed by the landowner, easement or lessee holder, or their legal designee that Agency staff may access the property where the proposed activity is located for purposes of inspecting, sampling, and monitoring the land subject to the application to determine whether the activity can meet (and if a permit is issued, is meeting) permitting | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | criteria and permit conditions. If this is not possible, the applicant must supply the Agency with written authorization through other means (such as obtaining permission from leases and easement holders) for staff to enter onto, inspect, and conduct sampling of the site. This is necessary to prevent claims of trespass, and to ensure the applicant, and potential permittee, has approval from the entity that has sufficient real property interest over the land subject to the application to construct, alter, operate, and maintain, or remove, the project.<br><br>In the case of an easement, the easement must specifically provide for the right of governmental entities to be on the lands subject to the easement for such purposes as compliance, or such right must flow through necessity from the explicit grant of the easement. Each permit is subject to the condition that Agency authorized staff, upon proper identification, will have permission to enter, inspect and observe, and collect samples of the activity to ensure compliance with the approved plans and specifications included in the permit. See Part 4 of form 62-330.060(1) for additional information. | |
| 233.40(c) | The State program shall provide for inspections to be conducted, samples to be taken and other information to be gathered in a manner that will produce evidence admissible in an enforcement proceeding. | OGC Enforcement Manual, Chapter 4 | Refer to full text: Chapter 4 – Inspections and Investigations | Chapter 4 of the Department's OGC Enforcement Manual, "Inspections and Investigations," provides guidance for staff related to conducting and documenting inspections. Instruction specifically related to gathering and recording information in a manner that will produce evidence admissible in an enforcement proceeding is primarily found in ss. 4.5-4.10, which address: general documentation of the inspection and investigation (4.5); location and ownership information (4.6-4.7); responsible parties, including corporations or partnerships (4.8-4.9); and procedures for sampling and analysis (4.10). Specific procedures and standards for criminal investigations are outlined in s. 4.11. |
| 233.40(d) | The State shall maintain a program for receiving and ensuring proper consideration of information submitted by the public about violations. | Refer to § 233.40(a), above | Refer to § 233.40(a), above | As discussed in the comments provided for § 233.40(a), above, the State utilizes the program-specific ERPce database to maintain records related to permit compliance and unpermitted violations. The ERPce database is also used to record publicly-submitted reports of potential |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | | violations (categorized as "complaints") and to track any related investigations. |
| **233.41 Requirements for enforcement authority** | | | | |
| 233.41(a)(1) and (2) | (a) Any State agency administering a program shall have authority: (1) To restrain immediately and effectively any person from engaging in any unauthorized activity; (2) To sue to enjoin any threatened or continuing violation of any program requirement; | 373.129(1), (2) and (7), F.S. 403.121(2)(b), F.S. (via 373.129(7), F.S.) 403.131, F.S. (via 373.129(7), F.S.) | 373.129(1), (2) and (7), F.S. - The department, the governing board of any water management district, any local board, or a local government to which authority has been delegated pursuant to s. 373.103(8), is authorized to commence and maintain proper and necessary actions and proceedings in any court of competent jurisdiction for any of the following purposes: (1) To enforce rules, regulations, and orders adopted or issued pursuant to this law. (2) To enjoin or abate violations of the provisions of this law or rules, regulations, and orders adopted pursuant hereto. (7) To Enforce part IV of this chapter in the same manner and to the same extent as provided in ss. 373.430, 403.121(1) and (2), 403.131, 403.141 and 403.161.

403.121(2)(b), F.S. (via 373.129(7), F.S.) - (2)(b) If the department has reason to believe a violation has occurred, it may institute an administrative proceeding to order the prevention, abatement, or control of the conditions creating the violation or other appropriate corrective action. Except for violations involving hazardous wastes, asbestos, or underground injection, the department shall proceed administratively in all cases in which the department seeks administrative penalties that do not exceed $50,000 per assessment as calculated in accordance with subsections (3), (4), (5), (6), and (7). Pursuant to 42 U.S.C. s. 300g-2, the administrative penalty assessed pursuant to subsection (3), subsection (4), or subsection (5) against a public water system serving a population of more than 10,000 shall be not less than $1,000 per day per violation. The department may not impose administrative penalties in excess of $50,000 in a notice of violation. The department may not have more than one notice of violation seeking administrative penalties pending against the same party at the same time unless the violations occurred at a different site or the violations were discovered by the department subsequent to the filing of a previous notice of violation.

403.131, F.S. (via 373.129(7), F.S.) - (1) The department may institute a civil action in a court of competent jurisdiction to seek injunctive relief to enforce compliance with this chapter or any rule, regulation, permit certification, or order; to enjoin any violation specified in s. 403.161(1); and to seek injunctive relief to prevent irreparable injury to the air, waters, and property, including animal, | The State has statutory authority to restrain violators and to sue to enjoin threatened or continuing violations. |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | plant, and aquatic life, of the state and to protect human health, safety, and welfare caused or threatened by any violation. | |
| 233.41(a)(3) | (a) Any State agency administering a program shall have authority: (3) To assess or sue to recover civil penalties and to seek criminal remedies, as follows: | | | The State has the authority to assess or sue to recover civil penalties and criminal fines in amounts that meet or exceed federal requirements (see below). The State also has authority to: • Seek administrative remedies and recover costs and attorney's fees [403.121(2), F.S.]; • Recover damages [373.430(2), 403.121, and 403.161(2), F.S.]; and Recover investigative costs, court costs, and reasonable attorney's fees [373.129(6), F.S.]. |
| 233.41(a)(3)(i) | (a) Any State agency administering a program shall have authority: (3) To assess or sue to recover civil penalties and to seek criminal remedies, as follows: (i) The agency shall have the authority to assess or recover civil penalties for discharges of dredged or fill material without a required permit or in violation of any section 404 permit condition in an amount of at least $5,000 per day of such violation. | 373.129(5), F.S. 403.121(1)(b), F.S. (via 373.129(7), F.S.) 403.141(1), F.S. (via 373.129(7) and 403.161(2), F.S.) | 373.129(5), F.S. - The department, the governing board of any water management district, any local board, or a local government to which authority has been delegated pursuant to s. 373.103(8), is authorized to commence and maintain proper and necessary actions and proceedings in any court of competent jurisdiction for any of the following purposes: (5) To recover a civil penalty for each offense in an amount not to exceed $15,000 per offense. Each date during which such violation occurs constitutes a separate offense. 403.121(1)(b), F.S. (via 373.129(7), F.S.) - (1)(b) The department may institute a civil action in a court of competent jurisdiction to impose and to recover a civil penalty for each violation in an amount of not more than $15,000 per offense. However, the court may receive evidence in mitigation. Each day during any portion of which such violation occurs constitutes a separate offense. 403.141(1), F.S. (via 373.129(7) and 403.161(2), F.S.) - (1) A person who commits a violation specified in s. 403.161(1) is liable to the state for any damage caused to the air, waters, or property, including animal, plant, or aquatic life, of the state and for reasonable costs and expenses of the state in tracing the source of the discharge, in controlling and abating the source and the pollutants, and in restoring the air, waters, and property, including animal, plant, and aquatic life, of the state to their former condition, and furthermore is subject to the judicial imposition of a civil penalty for each offense in an amount of not more than $15,000 per offense. However, the court may receive evidence in mitigation. Each day during any portion of which such violation occurs constitutes a separate offense. | The State has the authority to assess or sue to recover civil penalties of up to $10,000 per day of violation. *Note: The state also has statutory authority to seek administrative remedies, including penalties, as provided by s. 403.121(2), F.S.* |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | If a violation is an unauthorized discharge of domestic wastewater, each day the cause of the violation is not addressed constitutes a separate offense until the violation is resolved by order or judgment. This section does not give the department the right to bring an action on behalf of any private person. | |
| 233.41(a)(3)(ii) | (a) Any State agency administering a program shall have authority: (3) To assess or sue to recover civil penalties and to seek criminal remedies, as follows: (ii) The agency shall have the authority to seek criminal fines against any person who willfully or with criminal negligence discharges dredged or fill material without a required permit or violates any permit condition issued under section 404 in the amount of at least $10,000 per day of such violation. | 373.430(3) and (5), F.S. (via 373.129(7), F.S.) 403.161(3) and (5), F.S. (via 373.129(7), F.S.) | 373.430(3) and (5), F.S. (via 373.129(7), F.S.) - (3)  A person who willfully commits a violation specified in paragraph (1)(a) is guilty of a felony of the third degree, punishable as provided in ss. 775.082(3)(e) and 775.083(1)(g), by a fine of not more than $50,000 or by imprisonment for 5 years, or by both, for each offense. Each day during any portion of which such violation constitutes a separate offense. (5)  A person who willfully commits a violation specified in paragraph (1)(b) or who commits a violation specified in paragraph (1)(c) commits a misdemeanor of the first degree, punishable as provided in ss. 775.082(4)(a) and 775.083(1)(g), by a fine of not more than $10,000 or by 6 months in jail, or by both, for each offense.

403.161(3) and (5), F.S. (via 373.129(7), F.S.) - (3)  A person who willfully commits a violation specified in paragraph (1)(a) commits a felony of the third degree, punishable as provided in ss. 775.082(3)(e) and 775.083(1)(g) by a fine of not more than $50,000 or by imprisonment for 5 years, or by both, for each offense. Each day during any portion of which such violation occurs constitutes a separate offense. (5)  A person who willfully commits a violation specified in paragraph (1)(b) or who commits a violation specified in paragraph (1)(c) is guilty of a misdemeanor of the first degree punishable as provided in ss. 775.082(4)(a) and 775.083(1)(g) by a fine of not more than $10,000 or by 6 months in jail, or by both for each offense. | The State has the authority to assess or sue to recover criminal fines of up to $50,000 for willful violations described by (a)(3)(ii). Such violations are also punishable by incarceration, or by both a criminal fine and incarceration. |
| 233.41(a)(3)(iii) | (a) Any State agency administering a program shall have authority: (3) To assess or sue to recover civil penalties and to seek criminal remedies, as follows: (iii) The agency shall have the authority to seek criminal fines against any person who knowingly makes false statements, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained under the Act, these regulations or the approved State program, or who falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required to be maintained under the permit, in an amount of at least $5,000 for each instance of violation. | 373.430(5), F.S. (via 373.129(7), F.S.) 403.161(5), F.S. (via 373.129(7), F.S.) | 373.430(5), F.S. (via 373.129(7), F.S.) - (5)  A person who willfully commits a violation specified in paragraph (1)(b) or who commits a violation specified in paragraph (1)(c) is guilty of a misdemeanor of the first degree, punishable as provided in ss. 775.082(4)(a) and 775.083(1)(g), by a fine of not more than $10,000 or by 6 months in jail, or by both, for each offense.

403.161(5), F.S. (via 373.129(7), F.S.) - (5)  A person who willfully commits a violation specified in paragraph (1)(b) or who commits a violation specified in paragraph (1)(c) is guilty of a misdemeanor of the first degree punishable as provided in ss. 775.082(4)(a) and 775.083(1)(g) by a fine of not more than $10,000 or by 6 months in jail, or by both for each offense. | The State has the authority to assess or sue to recover criminal fines of up to $10,000 per day for the violations described under (a)(3)(iii). Such violations are also punishable by 6 months in jail or by both a fine and incarceration. |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 233.41(b)(1) | (b)(1) The approved maximum civil penalty or criminal fine shall be assessable for each violation and, if the violation is continuous, shall be assessable in that maximum amount for each day of violation. | *Civil penalties:* 373.129(5), F.S. <br><br> 403.141(1), F.S. (via 373.129(7), F.S.) <br><br> *Criminal fines:* 373.430(3), F.S. (via 373.129(7), F.S.) <br><br> 403.161(3), F.S. (via 373.129(7), F.S.) | Civil penalties: 373.129(5), F.S. - The department, the governing board of any water management district, any local board, or a local government to which authority has been delegated pursuant to s. 373.103(8), is authorized to commence and maintain proper and necessary actions and proceedings in any court of competent jurisdiction for any of the following purposes: <br> (5) To recover a civil penalty for each offense in an amount not to exceed $15,000 per offense. Each date during which such violation occurs constitutes a separate offense. <br><br> 403.141(1), F.S. (via 373.129(7), F.S.) - (1) Whoever commits a violation specified in s. 403.161(1) is liable to the state for any damage caused to the air, waters, or property, including animal, plant, or aquatic life, of the state and for reasonable costs and expenses of the state in tracing the source of the discharge, in controlling and abating the source and the pollutants, and in restoring the air, waters, and property, including animal, plant, and aquatic life, of the state to their former condition, and furthermore is subject to the judicial imposition of a civil penalty for each offense in an amount of not more than $15,000 per offense. However, the court may receive evidence in mitigation. Each day during any portion of which such violation occurs constitutes a separate offense. If a violation is an unauthorized discharge of domestic wastewater, each day the cause of the violation is not addressed constitutes a separate offense until the violation is resolved by order or judgment. This section does not give the department the right to bring an action on behalf of any private person. <br><br> Criminal fines: 373.430(3), F.S. (via 373.129(7), F.S.) - (3) Any person who willfully commits a violation specified in paragraph (1)(a) commits a felony of the third degree, punishable as provided in ss. 775.082(3)(e) and 775.083(1)(g), by a fine of not more than $50,000 or by imprisonment for 5 years, or by both, for each offense. Each day during any portion of which such violation occurs constitutes a separate offense. <br><br> 403.161(3), F.S. (via 373.129(7), F.S.) - (3) A person who willfully commits a violation specified in paragraph (1)(a) commits a felony of the third degree punishable as provided in ss. 775.082(3)(e) and 775.083(1)(g) by a fine of not more than $50,000 or by imprisonment for 5 years, or by both, for each offense. Each day during any portion of which such violation occurs constitutes a separate offense. | The State has authority to assess maximum civil penalties or criminal fines for each violation and for each day of violation, should the violation be continuous. <br><br> *Note: While the maximum daily criminal fines authorized under ss. 373.430(3) and 403.161(5), F.S. (which are cited for § 233.41(a)(3)(ii) and (iii), above) are assessable for each violation, neither section allows the fine to be assessed in the maximum amount for each day of violation. However, these statutes provide that criminal violations are also punishable by 6 months in jail or by both a criminal fine and incarceration; therefore, state authority establishes a method of ensuring compliance with equivalent or more significant punitive and deterrent effects than those required by this section.* |
| 233.41(b)(2) | (2) The burden of proof and degree of knowledge or intent required under State law for establishing | | | State statutes and regulations do not require a greater burden of proof to |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | violations under paragraph (a)(3) of this section, shall be no greater than the burden of proof or degree of knowledge or intent EPA must bear when it brings an action under the Act. | | | establish a violation than that borne by EPA when it brings an action under the CWA. |
| 233.41(c) | (c) The civil penalty assessed, sought, or agreed upon by the Director under paragraph (a)(3) of this section shall be appropriate to the violation.<br><br>Note: To the extent that State judgments or settlements provide penalties in amounts which EPA believes to be substantially inadequate in comparison to the amounts which EPA would require under similar facts, EPA may, when authorized by section 309 of the Act, commence separate action for penalties. | 373.430(6), F.S. (via 373.129(7), F.S.)<br><br>403.161(6), F.S. (via 373.129(7), F.S.)<br><br>403.121, F.S. (via 373.129(7), F.S.) and 403.121(2)(b), F.S.) | 373.430(6), F.S. (via 373.129(7), F.S.) - (6)  It is the intent of the Legislature that the civil penalties imposed by the court be of such amount as to ensure immediate and continued compliance with this section.<br><br>403.161(6), F.S. (via 373.129(7), F.S.) - (6)  It is the legislative intent that the civil penalties and criminal fines imposed by the court be of such amount as to ensure immediate and continued compliance with this section.<br><br>403.121, F.S. (via 373.129(7), F.S. and 403.121(2)(b), F.S.) - *Refer to full text for administrative remedies and penalty assessment.* | The same statutes that provide State authority to assess penalties explicitly state the legislative intent that civil penalties and criminal fines "be of such amount as to ensure immediate and continued compliance with this section." DEP policies also ensure that penalties are assessed or recovered in an amount that is appropriate to the specific violation.<br><br>Administrative remedies and penalties are described in 403.121, F.S. and DEP Directive 923. Penalty amounts for dredge and fill violations are outlined in 403.121(3)(c). Pursuant to subsections (6)-(8), respectively, administrative penalties are assessable daily for continuous or multi-day violations; may include adjustments for history of non-compliance; and should include economic benefit considerations. |
| 233.41(d) | (d)(1)  The Regional Administrator may approve a State program where the State lacks authority to recover penalties of the levels required under paragraphs (a)(3)(i)-(iii) of this section only if the Regional Administrator determines, after evaluating a record of at least one year for an alternative enforcement program, that the State has an alternate, demonstrably effective method of ensuring compliance which has both punitive and deterrence effects.<br>(2)  States whose programs were approved via waiver of monetary penalties shall keep the Regional Administrator informed of all enforcement actions taken under any alternative method approved pursuant to paragraph (d)(1) of this section. The manner of reporting will be established in the Memorandum of Agreement with the Regional Administrator (§233.13). | *Not applicable* | *Not applicable* | |
| 233.41(e) | (e)  Any State administering a program shall provide for public participation in the State enforcement process by providing either: | Memorandum of Agreement Between the Florida Department of Environmental | EPA MOA, section III.I. –DEP shall provide for public participation in the State 404 Permit Program enforcement process pursuant to 40 C.F.R. § 233.41(e)(2). | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | (1) Authority which allows intervention of right in any civil or administrative action to obtain remedies specified in paragraph (a)(3) of this section by any citizen having an interest which is or may be adversely affected, or<br><br>(2) Assurance that the State agency or enforcement authority will:<br>(i) Investigate and provide written responses to all citizen complaints submitted pursuant to State procedures;<br>(ii) Not oppose intervention by any citizen when permissive intervention may be authorized by statute, rule, or regulation; and<br>(iii) Publish notice of and provide at least 30 days for public comment on any proposed settlement of a State enforcement action. | Protection and The United States Environmental Protection Agency ("EPA MOA"), Section III.I. | | |
| 233.41(f) | (f) *Provision for Tribal criminal enforcement authority.* To the extent that an Indian Tribe does not assert or is precluded from asserting criminal enforcement authority (§233.41(a)(3) (ii) and (iii)), the Federal government will continue to exercise primary criminal enforcement responsibility. The Tribe, with the EPA Region and Corps District(s) with jurisdiction, shall develop a system where the Tribal agency will refer such a violation to the Regional Administrator or the District Engineer(s), as agreed to by the parties, in an appropriate and timely manner. This agreement shall be incorporated into joint or separate Memorandum of Agreement with the EPA Region and the Corps District(s), as appropriate. | Not applicable | Not applicable | *See EPA MOA Sections III.A. and III.K.* |

## 40 CFR Part 230 – 404(b)(1) Guidelines

The 404(b)(1) Guidelines and existing ERP rules are laid out differently, but generally accomplish the same purpose. The guidelines lay out certain environmental concerns and habitat types and then discuss the possible loss of environmental characteristics and values, which are often the same for several concern types/habitats. ERP rules describe general scientific and environmental principals that are to be applied to all types of concerns and habitat types. Any reviewer of this crosswalk will probably note the repetition of state rules for the concerns/habitats listed in the guidelines. The ERP rules containing the environmental principles which will also apply to the State 404 Program are Rules 62-330.301, F.A.C. and 62-330.302, F.A.C. The reviewer may save time by reading and/or printing those two sections of the ERP rule for reference before proceeding. The ERP Applicant's Handbook Volume I provides further explanations and guidance for each of the rule requirements. In most cases, the text of Applicant's Handbook Volume I is not reproduced in this table, for brevity.

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| **Subpart A** | **General** | | | |
| 230.1 | Purpose and Policy | NA | | Not necessary to include in state law |
| 230.2 | Applicability | NA | | Not necessary to include in state law |
| 230.3 | Definitions | See Definitions table, above | | |
| 230.4 | Organization | | | State law is organized differently than the Guidelines but accomplishes the same purpose. (See introductory paragraph above this table) |
| 230.5 | General Procedures to be Followed (aka "sequence of review") | 62-331.050, F.A.C.<br><br>404 Handbook, section 8.2 | 62-331.050, F.A.C. – (1) An individual permit is required for activities within state-assumed waters if they do not qualify for an exemption under subsection 62-331.020(1), F.A.C., or a general permit under Rules 62-331.200 through 62-331.248, F.A.C.<br>(2) An application for an individual permit shall be:<br>(a) Prepared in accordance with Rule 62-331.051, F.A.C.;<br>(b) Submitted in accordance with section 4.3 of the 404 Handbook and section 4.4 of Volume I; and<br>(c) Reviewed and acted on in accordance with Rule 62-331.052, F.A.C., Rule 62-331.053, F.A.C., and sections 5.0 through 8.5 of the 404 Handbook.<br><br>404 Handbook, section 8.2 – Sequence of Review<br>Upon receipt of a technically complete application, the Agency will follow the sequence of review for processing applications summarized below. The sequence is simplified for purposes of illustration. The actual process followed may be iterative, with the results of one step leading to a re-examination of the previous steps. The Agency must address all the applicable State 404 Program permitting conditions in reaching a permitting decision for a project.<br>a) Determine whether the activity qualifies for a State 404 Program exemption or general permit. If it is not covered by an exemption or general permit, then;<br>b) Review practicable alternatives to the proposed activity. Alternatives may include not dredging or filling in state-assumed waters (avoidance) or dredging or filling in an alternative aquatic site with potentially less damaging environmental consequences. The applicant shall submit an alternatives analysis as required by Rule 62-331.053, F.A.C. Guidance for completing the alternatives analysis can be found in Appendix C.<br>c) Review the proposed project area boundaries. For the purposes of the State 404 Program only, the project area includes all areas of dredging or filling in state-assumed waters, and any proposed mixing zones, where applicable. Mixing zones shall be | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | reviewed in accordance with Chapter 62-331, F.A.C, and as provided in Rule 62-4.242, and subsection 62-4.244(5), F.A.C. | |
| | | | d) Evaluate the various physical and chemical components which characterize the non-living environment of the proposed site, the substrate and the water including its dynamic characteristics consistent with Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. | |
| | | | e) Identify and evaluate any special or critical characteristics of the proposed project site and surrounding areas which might be affected by use of such site, related to their living communities or human uses consistent with Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. | |
| | | | f) Review the information submitted with the application to determine whether the information provided by the applicant is sufficient to provide reasonable assurance that the applicable provisions of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. will be met. | |
| | | | g) Evaluate the material to be dredged or used as fill to determine the possibility of the presence of contaminants, including chemical contamination, that may violate state water quality standards listed in paragraph 62-330.301(1)(e), F.A.C., or any toxic effluent standard or prohibition under section 307 of the CWA. Check for physical incompatibility of the material to be used as fill (examples – 1) muck should not be used as structural fill but may be appropriate for use in a wetland restoration project; 2) if a certain ecological community type is expected to colonize the fill, the fill should be appropriate for the desired species). | |
| | | | h) If there is a reasonable probability that contaminants are present, including chemical contamination, the Agency shall require the applicant to conduct appropriate sediment, elutriate, and/or water quality tests, as applicable. | |
| | | | i) Identify appropriate and practicable changes to the project plan to avoid or minimize the environmental impact of the activity, as described in Volume I, section 10.2.1, except 10.2.1.2, which is not applicable to the State 404 Program. Avoidance should be considered first, and then minimization only if avoidance is not practicable. | |
| | | | j) Complete a Technical Staff Report to document how the project addresses the requirements of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. | |
| | | | k) Make and document a finding of either compliance or noncompliance with the requirements of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. This is a determination of | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | whether the project, including any mitigation, is permittable under the State 404 Program. <br> j) Prepare a written determination on each application outlining the permitting decision and the rationale for the decision. The determination shall be dated, signed, and included in the official record prior to final action on the application. The Technical Staff Report from step 10 (subsection (j)), above, shall be included in or attached to the determination. | |
| 230.6 | Adaptability | NA | | Not necessary to include in state law. State law allows for use of "reasonable assurances" and "best scientific judgement". These two principles lend adaptability to the state review. |
| 230.7 | General Permits | These will be outlined in the program description submitted to EPA for review. | | Not necessary to include in state law. The state must follow the requirements of Chapter 331, F.A.C. and 40 CFR Part 233 when creating a new general permit, but this information is not presented in rule. |
| **Subpart B** | | | | |
| 230.10(a) | Compliance with the guidelines <br><br> (a) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences. | 62-331.053(1), F.A.C. | 62-331.053(1), F.A.C. – No dredge or fill activity shall be permitted if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences. The Agency shall require the applicant to submit an alternatives analysis completed in accordance with the provisions below. Guidance for completing an alternatives analysis is in Appendix C of the 404 Handbook. | |
| 230.10(a)(1)(i) and (ii) | (1) For the purpose of this requirement, practicable alternatives include, but are not limited to: <br> (i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters; <br> (ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters; | 62-331.053(1)(a)1. and 2., F.A.C. | 62-331.053(1)(a), F.A.C. – For the purpose of this condition, practicable alternatives shall include, but shall not be limited to: <br> 1. Activities which do not involve dredging or filling in state-assumed waters; <br> 2. Locations where dredge or fill activities would have less adverse impact than the proposed project location, so long as the alternative does not have other significant adverse environmental consequences. | |
| 230.10(a)(2) | (2) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable | 62-331.053(1)(b), F.A.C. | 62-331.053(1)(b), F.A.C. – An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics considering overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered. | | applicant which could reasonably be obtained, utilized, expanded, or managed to fulfill the basic purpose of the proposed activity may be considered. | |
| 230.10(a)(3) | (3) Where the activity associated with a discharge which is proposed for a special aquatic site (as defined in subpart E) does not require access or proximity to or siting within the special aquatic site to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise. | 62-331.053(1)(c), F.A.C. | 62-331.053(1)(c), F.A.C. – Where the dredge or fill activity proposed within a special aquatic site does not require access or proximity to or siting within the special aquatic site to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a dredge or fill activity is proposed within a special aquatic site, all practicable alternatives to the proposed activity which do not involve dredging or filling within a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise. | |
| 230.10(a)(4) | Actions subject to NEPA - N/A to state program | N/A | | |
| 230.10(a)(5) | (5) To the extent that practicable alternatives have been identified and evaluated under a Coastal Zone Management program, a section 208 program, or other planning process, such evaluation shall be considered by the permitting authority as part of the consideration of alternatives under the Guidelines. Where such evaluation is less complete than that contemplated under this subsection, it must be supplemented accordingly. | 62-331.053(1)(d), F.A.C. | 62-331.053(1)(d), F.A.C. – To the extent that practicable alternatives have been identified and evaluated under the Coastal Zone Management Program, a CWA section 208 program, or other planning process, such evaluation shall be considered by the Agency as part of the consideration of alternatives under this section. Where such evaluation does not contain all information required under this section, the additional information shall be provided to the Agency for review. | |
| 230.10(b) | (b) No discharge of dredged or fill material shall be permitted if it: | 62-331.053(3), F.A.C. | 62-331.053(3), F.A.C. – No permit shall be issued for the following: (a) When the project is inconsistent with the requirements of this Chapter and the 404 Handbook, including when the project: | |
| 230.10(b)(1) | (1) Causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable state water quality standard; | 62-331.053(3)(a)1. and 2., F.A.C.; | 62-331.053(3)(a)1., F.A.C. – Causes or contributes to violations of any applicable State water quality standard, except when temporarily within a mixing zone proposed by the applicant and approved by the Agency; 2. Causes or contributes to violations of any applicable water quality standard within other states or Tribal lands; | |
| 230.10(b)(2) | (2) Violates any applicable toxic effluent standard or prohibition under section 307 of the Act; | 62-331.053(3)(a)3., F.A.C. | 62-331.053(3)(a)3., F.A.C. – Violates any applicable toxic effluent standard or prohibition under section 307 of the CWA, 33 U.S.C. § 1317 (2018), incorporated herein | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (https://www.flrules.org/Gateway/reference.asp?No=Ref-12065), or state law; | |
| 230.10(b)(3) | (3) Jeopardizes the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of a habitat which is determined by the Secretary of Interior or Commerce, as appropriate, to be a critical habitat under the Endangered Species Act of 1973, as amended. If an exemption has been granted by the Endangered Species Committee, the terms of such exemption shall apply in lieu of this subparagraph; | 62-331.053(3)(a)4., F.A.C. | 62-331.053(3)(a)4., F.A.C. – Jeopardizes the continued existence of endangered or threatened species, or results in the likelihood of the destruction or adverse modification of a habitat which is determined by the Secretary of Interior or Commerce, as appropriate, to be a critical habitat for endangered or threatened species. Compliance with any requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission, the U.S. Fish & Wildlife Service, and the National Marine Fisheries Service for purposes of the State 404 Program, and review, as it pertains to endangered or threatened species, by the U.S. Environmental Protection Agency as described in subsection 62-331.052(2), F.A.C. shall be determinative for purposes of evaluating violations of this subparagraph. If an exemption has been granted by the Endangered Species Committee, the terms of such exemption shall apply in lieu of this subparagraph; | |
| 230.10(b)(4) | (4) Violates any requirement imposed by the Secretary of Commerce to protect any marine sanctuary designated under title III of the Marine Protection, Research, and Sanctuaries Act of 1972. | 62-331.053(3)(a)5., F.A.C. | 62-331.053(3)(a)5., F.A.C. – Violates any requirement imposed by the Secretary of Commerce to protect any area designated as a marine sanctuary. | |
| 230.10(c) | (c) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States. Findings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations, and tests required by subparts B and G, after consideration of subparts C through F, with special emphasis on the persistence and permanence of the effects outlined in those subparts. Under these Guidelines, effects contributing to significant degradation considered individually or collectively, include: | 62-331.053(3)(a)6., F.A.C. | 62-331.053(3)(a)6., F.A.C. – Causes or contributes to significant degradation of wetlands or other surface waters. Effects contributing to significant degradation considered individually or collectively, include: | |
| 230.10(c)(1) | (1) Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites. | 62-331.053(3)(a)6.i., F.A.C. | 62-331.053(3)(a)6.i., F.A.C. – Significant adverse effects on human health or welfare, including but not limited to, effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites; | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 230.10(c)(2) | (2) Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical, and chemical processes; | 62-331.053(3)(a)6.ii., F.A.C. | 62-331.053(3)(a)6.ii., F.A.C. – Significant adverse effects on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their by-products outside of the project site through biological, physical, and chemical processes; | |
| 230.10(c)(3) | (3) Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy; or | 62-331.053(3)(a)6.iii., F.A.C. | 62-331.053(3)(a)6.iii., F.A.C. – Significant adverse effects on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy; or | |
| 230.10(c)(4) | (4) Significantly adverse effects of discharge of pollutants on recreational, aesthetic, and economic values. | 62-331.053(3)(a)6.iv., F.A.C. | 62-331.053(3)(a)6.iv., F.A.C. – Significant adverse effects on recreational, aesthetic, and economic values. | |
| 230.10(d) | Except as provided under section 404(b)(2), no permit unless steps taken to avoid and minimize impacts on aquatic ecosystem | 62-331.053(3)(b), F.A.C. | 62-331.053(3)(b), F.A.C. – When appropriate and practicable steps have not been taken to minimize potential adverse impacts of the activity on the aquatic ecosystem; | |
| 230.11 | Factual Determinations - The permitting authority shall determine in writing the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment in light of subparts C through F. Such factual determinations shall be used in §230.12 in making findings of compliance or non-compliance with the restrictions on discharge in §230.10. The evaluation and testing procedures described in §230.60 and §230.61 of subpart G shall be used as necessary to make, and shall be described in, such determinations. The determinations of effects of each proposed discharge shall include the following: | Subsection 120.60(3), F.S. 404 Handbook Section 8.2 | 120.60(3), F.S. - Each applicant shall be given written notice, personally or by mail, that the agency intends to grant or deny, or has granted or denied, the application for license. The notice must state with particularity the grounds or basis for the issuance or denial of the license, except when issuance is a ministerial act. Unless waived, a copy of the notice shall be delivered or mailed to each party's attorney of record and to each person who has made a written request for notice of agency action. Each notice must inform the recipient of the basis for the agency decision, inform the recipient of any administrative hearing pursuant to ss. 120.569 and 120.57 or judicial review pursuant to s.120.68 which may be available, indicate the procedure that must be followed, and state the applicable time limits. The issuing agency shall certify the date the notice was mailed or delivered, and the notice and the certification must be filed with the agency clerk.

404 Handbook, section 8.2 – Sequence of Review
Upon receipt of a technically complete application, the Agency will follow the sequence of review for processing applications summarized below. The sequence is simplified for purposes of illustration. The actual process followed may be iterative, with the results of one step leading to a re-examination of the previous steps. The Agency must address all the applicable State 404 Program permitting conditions in reaching a permitting decision for a project. | Florida's ERP rules, conditions and additional conditions for issuance (62-330.301 and 62-330.302, F.A.C.) and the explanations in Applicant's Handbook Volume I broadly cover the same effects as listed in 40 CFR § 230.11. The state rules used to evaluate the concerns in each section are listed below, with a brief explanation, where helpful. |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | a) Determine whether the activity qualifies for a State 404 Program exemption or general permit. If it is not covered by an exemption or general permit, then:<br>b) Review practicable alternatives to the proposed activity. Alternatives may include not dredging or filling in state-assumed waters (avoidance) or dredging or filling in an alternative aquatic site with potentially less damaging environmental consequences. The applicant shall submit an alternatives analysis as required by Rule 62-331.053, F.A.C. Guidance for completing the alternatives analysis can be found in Appendix C.<br>c) Review the proposed project area boundaries. For the purposes of the State 404 Program only, the project area includes all areas of dredging or filling in state-assumed waters, and any proposed mixing zones, where applicable. Mixing zones shall be reviewed in accordance with Chapter 62-331, F.A.C, and as provided in Rule 62-4.242, and subsection 62-4.244(5), F.A.C.<br>d) Evaluate the various physical and chemical components which characterize the non-living environment of the proposed site, the substrate and the water including its dynamic characteristics consistent with Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C.<br>e) Identify and evaluate any special or critical characteristics of the proposed project site and surrounding areas which might be affected by use of such site, related to their living communities or human uses consistent with Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C.<br>f) Review the information submitted with the application to determine whether the information provided by the applicant is sufficient to provide reasonable assurance that the the applicable provisions of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. will be met.<br>g) Evaluate the material to be dredged or used as fill to determine the possibility of the presence of contaminants, including chemical contamination, that may violate state water quality standards listed in paragraph 62-330.301(1)(e), F.A.C., or any toxic effluent standard or prohibition under section 307 of the CWA. Check for physical incompatibility of the material to be used as fill (examples — 1) muck should not be used as structural fill but may be appropriate for use in a wetland restoration project; 2) If a certain ecological community type is expected to colonize the fill, the fill should be appropriate for the desired species). | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | h) If there is a reasonable probability that contaminants are present, including chemical contamination, the Agency shall require the applicant to conduct appropriate sediment, elutriate, and/or water quality tests, as applicable.<br><br>i) Identify appropriate and practicable changes to the project plan to avoid or minimize the environmental impact of the activity, as described in Volume I, section 10.2.1, except 10.2.1.2, which is not applicable to the State 404 Program. Avoidance shall be considered first, and then minimization only if avoidance is not practicable.<br><br>j) Complete a Technical Staff Report to document how the project addresses the requirements of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C.<br><br>k) Make and document a finding of either compliance or noncompliance with the requirements of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. This is a determination of whether the project, including any mitigation, is permittable under the State 404 Program.<br><br>l) Prepare a written determination on each application outlining the permitting decision and the rationale for the decision. The determination shall be dated, signed, and included in the official record prior to final action on the application. The Technical Staff Report from step 10 (subsection (j)), above, shall be included in or attached to the determination. | |
| 230.11(a) | (a) *Physical substrate determinations.* Determine the nature and degree of effect that the proposed discharge will have, individually and cumulatively, on the characteristics of the substrate at the proposed disposal site. Consideration shall be given to the similarity in particle size, shape, and degree of compaction of the material proposed for discharge and the material constituting the substrate at the disposal site, and any potential changes in substrate elevation and bottom contours, including changes outside of the disposal site which may occur as a result of erosion, slumpage, or other movement of the discharged material. The duration and physical extent of substrate changes shall also be considered. The possible loss of environmental values (§230.20) and actions to minimize impact (subpart H) shall also be considered in making these determinations. Potential changes in substrate elevation and bottom contours shall be predicted on the basis of the proposed method, volume, location, | 62-330.301(1)(a), (b), (c), (d), (e), and (f), F.A.C.<br><br>62-330.302(1)(a)3., F.A.C.<br><br>62-330.302(1)(b), F.A.C.<br><br>62-331.053, F.A.C. (see rule text) | 62-330.301(1), F.A.C. - To obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter:<br>(a) Will not cause adverse water quantity impacts to receiving waters and adjacent lands;<br>(b) Will not cause adverse flooding to on-site or off-site property;<br>(c) Will not cause adverse impacts to existing surface water storage and conveyance capabilities;<br>(d) Will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters;<br>(e) Will not adversely affect the quality of receiving waters such that the state water quality standards set forth in Chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including the antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), F.A.C., subsections 62-4.242(2) and (3), F.A.C., and Rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C., will be violated; | 62-331.053, F.A.C. is not copied here, or anywhere it is referenced below due to length. |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | and rate of discharge, as well as on the individual and combined effects of current patterns, water circulation, wind and wave action, and other physical factors that may affect the movement of the discharged material. | | (f) Will not cause adverse secondary impacts to the water resources. In addition to the criteria in this subsection and in subsection 62-330.301(2), F.A.C., in accordance with Section 373.4132, F.S., an applicant proposing the construction, alteration, operation, maintenance, abandonment, or removal of a dry storage facility for 10 or more vessels that is functionally associated with a boat launching area must also provide reasonable assurance that the facility, taking into consideration any secondary impacts, will meet the provisions of paragraph 62-330.302(1)(a), F.A.C., including the potential adverse impacts to manatees;<br><br>62-330.302(1), F.A.C. - In addition to the conditions in Rule 62-330.301, F.A.C., to obtain an individual or conceptual approval permit under this chapter, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, repair, removal, and abandonment of a project:<br><br>(a) Located in, on, or over wetlands or other surface waters will not be contrary to the public interest, or if such activities significantly degrade or are within an Outstanding Florida Water, are clearly in the public interest, as determined by balancing the following criteria as set forth in sections 10.2.3 through 10.2.3.7 of Volume I:<br>...<br>3. Whether the activities will adversely affect navigation or the flow of water or cause harmful erosion or shoaling;<br>...<br>(b) Will not cause unacceptable cumulative impacts upon wetlands and other surface waters as set forth in sections 10.2.8 through 10.2.8.2 of Volume I. | |
| 230.11(b) | (b) *Water circulation, fluctuation, and salinity determinations.* Determine the nature and degree of effect that the proposed discharge will have individually and cumulatively on water, current patterns, circulation including downstream flows, and normal water fluctuation. Consideration shall be given to water chemistry, salinity, clarity, color, odor, taste, dissolved gas levels, temperature, nutrients, and eutrophication plus other appropriate characteristics. Consideration shall also be given to the potential diversion or obstruction of flow, alterations of bottom contours, or other significant changes in the hydrologic regime. Additional consideration of the possible loss of environmental values (§§230.23 through 230.25) and actions to minimize impacts (subpart H), shall be used | 62-330.301(1)(a), (b), (c), (d), (e), (f), F.A.C.<br><br>62-330.301(2), F.A.C.<br><br>62-330.302(1)(a)3., F.A.C.<br><br>62-330.302(1)(b), F.A.C.<br><br>62-4.246(1)-(3), F.A.C<br><br>62-331.053, F.A.C. (see rule text) | 62-330.301(1), F.A.C. - To obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter:<br><br>(a) Will not cause adverse water quantity impacts to receiving waters and adjacent lands;<br>(b) Will not cause adverse flooding to on-site or off-site property;<br>(c) Will not cause adverse impacts to existing surface water storage and conveyance capabilities;<br>(d) Will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters;<br>(e) Will not adversely affect the quality of receiving waters such that the state water quality standards set forth in Chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including the antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), F.A.C., subsections 62-4.242(2) and | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | in making these determinations. Potential significant effects on the current patterns, water circulation, normal water fluctuation and salinity shall be evaluated on the basis of the proposed method, volume, location, and rate of discharge. | | (3), F.A.C., and Rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C., will be violated; (f) Will not cause adverse secondary impacts to the water resources. In addition to the criteria in this subsection and in subsection 62-330.301(2), F.A.C., in accordance with Section 373.4132, F.S., an applicant proposing the construction, alteration, operation, maintenance, abandonment, or removal of a dry storage facility for 10 or more vessels that is functionally associated with a boat launching area must also provide reasonable assurance that the facility, taking into consideration any secondary impacts, will meet the provisions of paragraph 62-330.302(1)(a), F.A.C., including the potential adverse impacts to manatees; (2) In instances where an applicant is unable to meet state water quality standards because existing ambient water quality does not meet standards and the system will contribute to this existing condition, the applicant must implement mitigation measures that are proposed by or acceptable to the applicant that will cause net improvement of the water quality in the receiving waters for those parameters that do not meet standards. <br><br> 62-330.302(1), F.A.C. - In addition to the conditions in Rule 62-330.301, F.A.C., to obtain an individual or conceptual approval permit under this chapter, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, repair, removal, and abandonment of a project: (a) Located in, on, or over wetlands or other surface waters will not be contrary to the public interest, or if such activities significantly degrade or are within an Outstanding Florida Water, are clearly in the public interest, as determined by balancing the following criteria as set forth in sections 10.2.3 through 10.2.3.7 of Volume I: ... 3. Whether the activities will adversely affect navigation or the flow of water or cause harmful erosion or shoaling. ... (b) Will not cause unacceptable cumulative impacts upon wetlands and other surface waters as set forth in sections 10.2.8 through 10.2.8.2 of Volume I. <br><br> 62-4.246(1)-(3), F.A.C. - (1) The Department shall require monitoring and sampling for pollutants reasonably expected to be contained in the discharge and to violate the water quality criteria in Chapter 62-302, F.A.C. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (In addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (2) Field testing, sample collection and preservation, laboratory testing, including quality control procedures, and all record keeping shall comply with Chapter 62-160, F.A.C.<br><br>(3) Subsections (4)-(11) of this rule apply only to permit applications, permits, monitoring reports, and other sources of data relating to discharges to surface waters. | |
| 230.11(c) | (c) Suspended particulate/turbidity determinations. Determine the nature and degree of effect that the proposed discharge will have, individually and cumulatively, in terms of potential changes in the kinds and concentrations of suspended particulate/turbidity in the vicinity of the disposal site. Consideration shall be given to the grain size of the material proposed for discharge, the shape and size of the plume of suspended particulates, the duration of the discharge and resulting plume and whether or not the potential changes will cause violations of applicable water quality standards. Consideration should also be given to the possible loss of environmental values (§230.21) and to actions for minimizing impacts (subpart H). Consideration shall include the proposed method, volume, location, and rate of discharge, as well as the individual and combined effects of current patterns, water circulation and fluctuations, wind and wave action, and other physical factors on the movement of suspended particulates. | 62-330.301(1)(d)-(f), F.A.C.<br><br>62-330.301(4), F.A.C.<br><br>62-330.302(1)(b), F.A.C.<br><br>62-4.244(5)(a)-(c), F.A.C.<br><br>62-4.244(7), F.A.C.<br><br>62-331.053, F.A.C. (see rule text)<br><br>Volume I, section 11.0 | 62-330.301(1), F.A.C. - To obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter:<br><br>(d) Will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters;<br>(e) Will not adversely affect the quality of receiving waters such that the state water quality standards set forth in Chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including the antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), F.A.C., subsections 62-4.242(2) and (3), F.A.C., and Rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C., will be violated;<br>(f) Will not cause adverse secondary impacts to the water resources. In addition to the criteria in this subsection and in subsection 62-330.301(2), F.A.C., in accordance with Section 373.4132, F.S., an applicant proposing the construction, alteration, operation, maintenance, abandonment, or removal of a dry storage facility for 10 or more vessels that is functionally associated with a boat launching area must also provide reasonable assurance that the facility, taking into consideration any secondary impacts, will meet the provisions of paragraph 62-330.302(1)(a), F.A.C., including the potential adverse impacts to manatees;<br><br>62-330.301(4), F.A.C. - The standards and criteria used to determine whether the reasonable assurances required in this section and Rule 62-330.302, F.A.C., have been provided, including the provisions for elimination or reduction of impacts and mitigation to offset adverse impacts, are contained in Volume I, incorporated by reference in subsection 62-330.010(4), F.A.C., and Volume II, incorporated by reference in subsection 62-330.010(4), F.A.C., for the applicable District.<br><br>62-330.302(1), F.A.C. - In addition to the conditions in Rule 62-330.301, F.A.C., to obtain an individual or conceptual approval permit under this chapter, an applicant must provide reasonable assurance that the | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | construction, alteration, operation, maintenance, repair, removal, and abandonment of a project: (b) Will not cause unacceptable cumulative impacts upon wetlands and other surface waters as set forth in sections 10.2.8 through 10.2.8.2 of Volume I. | |
| | | | 62-4.244(5), F.A.C. - Mixing zones for dredge and fill permits shall not be subject to the provisions in paragraphs (1)(c) through (j), subsection (2), (3), or (4) of this rule, provided that applicable water quality standards are met at the boundary and outside the mixing zone. (a) The dimensions of dredge and fill mixing zones shall be proposed by the applicant and approved, modified or denied by the Department. (b) Criteria for departmental evaluation of a proposed mixing zone shall include site-specific biological and hydrographic or hydrological considerations. (c) In no case shall the boundary of a Joint Coastal Permit mixing zone be more than 1000 meters from the point of discharge into the waterbody or the boundary of a dredge and fill mixing zone be more than 150 meters downstream in flowing streams or 150 meters in radius in other bodies of water, where these distances are measured from the cutterhead, return flow, discharge, or other points of generation of turbidity or other pollutants. | |
| | | | 62-4.244(7), F.A.C. - Additional relief from mixing zone restrictions necessary to prevent significant impairment of a designated use is through: (a) Reclassification of the water body pursuant to Rule 62-302.400, F.A.C.; (b) Variance granted pursuant to Section 403.201, F.S., and Rule 62-103.100, F.A.C. (c) Modification of the requirements of this section for specific criteria by the Secretary upon compliance with the notice and hearing requirements for mixing zones set forth in paragraph (1)(c), above, and upon affirmative demonstration by an applicant that the applicant's discharge from a source existing on the effective date of this rule complies with best technology economically achievable, best management practices, or other requirements set forth in Chapter 62-600, F.A.C., and the economic, environmental and social costs of compliance with the existing criteria outweigh the social, environmental, and economic benefits of compliance with more stringent discharge limitations necessary to comply with mixing zone requirements of subsection 62-4.244(1), F.A.C., and the provisions relating to dissolved oxygen in Rule 62-4.244, F.A.C. | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | 1. No discharger may be issued more than one permit or permit modification or renewal which allows a modification pursuant to this subsection unless the applicant affirmatively demonstrates that it has undertaken a continuing program, approved by the Department, designed to consider water quality conditions and review or develop any reasonable means of achieving compliance with the water quality criteria from which relief has been granted pursuant to this subsection. 2. With respect to paragraphs 62-4.244(1)(c) and 62-4.244(7)(c), F.A.C., the applicant must affirmatively demonstrate the minimum area of the water body necessary to achieve compliance with either subsection. Within a minimum area determined by the Secretary to be necessary to achieve compliance, the discharger shall be exempt from the criterion for which a demonstration has been made. (d) Whenever site specific alternative criteria are established pursuant to Rule 62-302.800 or paragraph 62-302.510(2)(g), F.A.C., a mixing zone may be issued for dissolved oxygen if all provisions of Rule 62-4.244, F.A.C., are met with the exception of subparagraph 62-4.244(1)(j)1., F.A.C. | |
| 230.11(d) | (d) Contaminant determinations. Determine the degree to which the material proposed for discharge will introduce, relocate, or increase contaminants. This determination shall consider the material to be discharged, the aquatic environment at the proposed disposal site, and the availability of contaminants. | 62-330.301(1), F.A.C.<br><br>62-330.301(2), F.A.C.<br><br>62-330.302(1)(a)1., and 2., F.A.C.<br><br>62-4.246, F.A.C.<br><br>62-331.053, F.A.C. (see rule text) | 62-330.301(1), F.A.C. - To obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter: (d) Will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters; (e) Will not adversely affect the quality of receiving waters such that the state water quality standards set forth in Chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including the antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), F.A.C., subsections 62-4.242(2) and (3), F.A.C., and Rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C., will be violated;<br><br>62-330.301(2), F.A.C. - In instances where an applicant is unable to meet state water quality standards because existing ambient water quality does not meet standards and the system will contribute to this existing condition, the applicant must implement mitigation measures that are proposed by or acceptable to the applicant that will cause net improvement of the water quality in the receiving waters for those parameters that do not meet standards.<br><br>62-330.302(1), F.A.C. - In addition to the conditions in rule 62-330.301, F.A.C., to obtain an individual or conceptual approval permit under this chapter, an applicant must provide reasonable assurance that the | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | construction, alteration, operation, maintenance, repair, removal, and abandonment of a project: | |
| | | | (a) Located in, on, or over wetlands or other surface waters will not be contrary to the public interest, or if such activities significantly degrade or are within an Outstanding Florida Water, are clearly in the public interest, as determined by balancing the following criteria as set forth in sections 10.2.3 through 10.2.3.7 of Volume I: | |
| | | | 1. Whether the activities will adversely affect the public health, safety, or welfare or the property of others; | |
| | | | 2. Whether the activities will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats; | |
| | | | 62-4.246, F.A.C. – (1) The Department shall require monitoring and sampling for pollutants reasonably expected to be contained in the discharge and to violate the water quality criteria in Chapter 62-302, F.A.C. | |
| | | | (2) Field testing, sample collection and preservation, laboratory testing, including quality control procedures, and all record keeping shall comply with Chapter 62-160, F.A.C. | |
| | | | (3) Subsections (4)-(11) of this rule apply only to permit applications, permits, monitoring reports, and other sources of data relating to discharges to surface waters. | |
| | | | (4) Using generally accepted scientific procedures, the Department shall establish and publish a method detection limit (MDL) and practical quantification limit (PQL) for each approved analytical method for a parameter (including any pollutant). On request, the Department shall make available a list of all current established MDLs and PQLs. The permittee may request and the Department shall consider approval for alternative methods or for alternative MDLs and PQLs for any approved analytical method, in accordance with the criteria of Rules 62-160.520 (New Methods, Validation Requirements) and 62-160.530 (Approval of Alternate Test Procedures), F.A.C. Permit applications, permits, and monitoring reports shall specify the applicable MDL and PQL established by the Department for each pertinent parameter. | |
| | | | (5) When establishing effluent limits in accordance with Rule 62-650, F.A.C., for pollutants for which MDLs are higher than the established water quality criteria, the Department shall base the limits on concentrations in the receiving waters computed in accordance with generally accepted scientific procedures and with subsections (8), (10) and (11), of this rule. Permit applications and monitoring reports shall identify results below the MDL. Except as specified in subsections (8) and (10), below, such results shall demonstrate compliance for that pollutant. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | granted by Section 373.4146, F.S.) | (6) All results submitted to the Department for permit applications and monitoring shall be reported as follows. (a) The approved analytical method and corresponding Department-established MDL and PQL levels shall be reported for each pollutant. The MDLs and PQLs incorporated in the permit shall constitute the minimum reporting levels for each parameter for the life of the permit. The Department shall not accept results for which the laboratory's MDLs or PQLs are greater than those incorporated in the permit. All results with laboratory MDLs and PQLs lower than those established in the permit shall be reported to the Department. Unless otherwise specified, all subsequent references to MDL and PQL pertain to the MDLs and PQLs incorporated in the permit. (b) Results greater than or equal to the PQL shall be reported as the measured quantity. (c) Results less than the PQL and greater than or equal to the MDL shall be reported as less than the PQL and deemed to be equal to the MDL. (d) Results less than the MDL shall be reported as less than the MDL. (e) The following table is intended as a guide in the use of paragraphs (6)(b)-(d), for determining compliance with permit limits. Common abbreviations used in this table are as follows: PQL means practical quantification limit MDL means method detection limit > means greater than < means less than = means equal to. Table 1 COMPLIANCE DETERMINATION PERMIT LIMIT DATA  COMPLIANCE  NONCOMPLIANCE *[table removed for this crosswalk – can be found in rule]* (7) When all the results or projected concentrations for the effluent and the receiving water are below the MDL for a particular parameter, the Department shall deem the permittee to be in compliance with the applicable criterion or permit limit, subject to the provisions of subsections (8) and (10), below, when applicable. (8) The presence of toxicity (as established through biomonitoring), data from analysis of plant or animal tissue, contamination of sediment in the vicinity of the installation, intermittent violations of effluent limits or water quality standards, or other similar kinds of evidence reasonably related to the installation may indicate that a pollutant in the effluent may cause or contribute to violations of water quality criteria. If there is such evidence of possible water quality violations, then (unless the permittee has complied with subsection (9), below) in reviewing reports and applications to establish permit conditions and determine compliance with permits and water quality criteria, the Department shall treat any result less than the MDL of the method | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | required in the permit or the method as required under subsection (10), below, or any lower MDL reported by the permittee's laboratory as being one half the MDL (if the criterion equals or exceeds the MDL) or one half the criterion (if the criterion is less than the MDL), for any pollutant. Without the permission of the applicant, the Department shall not use any values determined under this subsection or subsection (9) below for results obtained under a MDL superseded later by a lower MDL. (9) As an alternative to the procedure described in subsection (8), above, for determining the value of any result, the permittee may select and follow any procedure if set forth in any of the sources listed in this subsection below or shown by the permittee to provide equivalent reasonable assurance of accuracy and reliability, and if applicable to the particular discharge. Such equivalency of reasonable assurance and the applicability of each such procedure shall be determined in accordance with generally accepted methods of statistical analysis for that procedure. The following sources are incorporated here by reference. (a) Gilbert, O.R., 1987. Statistical Methods For Environmental Pollution Monitoring. Van Nostrand Reinhold Company. (b) Hollander, M., and D.A. Wolfe, 1973. Nonparametric Statistical Methods. Wiley, New York. (c) USEPA. 1989. Draft Technical Guidance Manual for Performing Wasteload Allocations. Book III: Estuaries. Part 1: Estuaries and WLA Models. Center for Exposure Assessment Modeling. Athens, Ga. (d) USEPA. 1991. Technical Support Document for Water Quality-Based Toxics Control. Office of Water Regulations and Standards. Washington, DC. EPA/505/2-90-001. (e) USEPA. 1983. Technical Guidance Manual for Performing Wasteload Allocations. Book II: Streams and Rivers. Chapter 1: Biochemical Oxygen Demand/Dissolved Oxygen. Office of Water Regulations and Standards. Washington, DC. EPA/440/4-84/020. (f) USEPA. 1983. Technical Guidance Manual for Performing Wasteload Allocations. Book II: Streams and Rivers. Chapter 2: Nutrient/Eutrophication Impact. Office of Water Regulations and Standards. Washington, DC. EPA/440/4-84/021. (g) USEPA. 1984. Technical Guidance Manual for Performing Wasteload Allocations. Book II: Streams and Rivers. Chapter 3: Toxic Substances. Office of Water Regulations and Standards. Washington, DC. EPA/440/4-84/022. (h) USEPA. 1983. Technical Guidance Manual for Performing Wasteload Allocations. Book IV: Lakes and Impoundments. Chapter 2: Nutrient/Eutrophication Impacts. Office of Water Regulations and Standards. Washington, DC. EPA/440/4-84/019. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (i) USEPA. 1986. Technical Guidance Manual for Performing Wasteload Allocations. Book IV: Lakes and Impoundments. Chapter 3: Toxic Substances. Office of Water Regulations and Standards. Washington, DC. EPA/440/4-87/002.<br><br>(j) USEPA. 1986. Technical Guidance Manual for Performing Wasteload Allocations. Book VI: Stream Design Flow for Steady-State Modeling. Office of Water Regulations and Standards. Washington, DC. EPA/440/4-87/004.<br><br>(k) USEPA. 1985. Water Quality Assessment: A Screening Procedure for Toxic and Conventional Pollutants. Office of Research and Development. Athens, Ga. EPA/600/6-85/002 a and b.<br><br>(10) If there is evidence of possible water quality violations as set forth in subsection (8), above, and if the water quality criterion for the pollutant is lower than the MDL, the Department shall require the permittee to use the approved analytical method with the lowest MDL from those published by the Department or established by the permittee's laboratory for each such pollutant, for all reports and applications, to establish permit conditions and determine compliance. The Department shall not require the permittee to use an MDL lower than necessary to demonstrate compliance.<br><br>(11) If there is evidence that a pollutant in the effluent is reasonably expected to cause or contribute to water quality violations but there is no evidence of the presence of that pollutant in the ambient background receiving water, the Department shall treat the ambient background value of that pollutant in the receiving water as zero in establishing the pertinent effluent limit. | |
| 230.11(e) | (e) Aquatic ecosystem and organism determinations. Determine the nature and degree of effect that the proposed discharge will have, both individually and cumulatively, on the structure and function of the aquatic ecosystem and organisms. Consideration shall be given to the effect at the proposed disposal site of potential changes in substrate characteristics and elevation, water or substrate chemistry, nutrients, currents, circulation, fluctuation, and salinity, on the recolonization and existence of indigenous aquatic organisms or communities. Possible loss of environmental values (§230.31), and actions to minimize impacts (subpart H) shall be examined. Tests as described in §230.61 (Evaluation and Testing), may be required to provide information on the effect of the discharge material on communities or populations of organisms expected to be exposed to it. | 62-330.301(1), and (f), F.A.C.<br><br>62-330.301(4), F.A.C.<br><br>62-330.302(1)(a)2., and 7., F.A.C.<br><br>62-330.302(1)(b), and (c), F.A.C. | 62-330.301(1), F.A.C. — To obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter:<br><br>(d) Will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters;<br><br>(f) Will not cause adverse secondary impacts to the water resources. In addition to the criteria in this subsection and in subsection 62-330.301(2), F.A.C., in accordance with section 373.4132, F.S., an applicant proposing the construction, alteration, operation, maintenance, abandonment, or removal of a dry storage facility for 10 or more vessels that is functionally associated with a boat launching area must also provide reasonable assurance that the facility, taking into consideration any secondary impacts that the facility, will meet the provisions of paragraph 62-330.302(1)(a), F.A.C., including the potential adverse impacts to manatees; | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | 62-330.301(4), F.A.C. – (4) The standards and criteria used to determine whether the reasonable assurances required in this section and rule 62-330.302, F.A.C., have been provided, including the provisions for elimination or reduction of impacts and mitigation to offset adverse impacts, are contained in Volume I, incorporated by reference in subsection 62-330.010(4), F.A.C., and Volume II, incorporated by reference in subsection 62-330.010(4), F.A.C., for the applicable District. 62-330.302(1)(a)2, and 7., F.A.C. – (1) In addition to the conditions in rule 62-330.301, F.A.C, to obtain an individual or conceptual approval permit under this chapter, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, repair, removal, and abandonment of a project: (a) Located in, on, or over wetlands or other surface waters will not be contrary to the public interest, or if such activities significantly degrade or are within an Outstanding Florida Water, are clearly in the public interest, as determined by balancing the following criteria as set forth in sections 10.2.3 through 10.2.3.7 of Volume I: 1. Whether the activities will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats; ... 7. The current condition and relative value of functions being performed by areas affected by the proposed activities. 62-330.302(1)(b), F.A.C. – Will not cause unacceptable cumulative impacts upon wetlands and other surface waters as set forth in sections 10.2.8 through 10.2.8.2 of Volume I. (c), F.A.C. – Located in, adjacent to or in close proximity to Class II waters or located in Class II waters or Class III waters classified by the Department of Agriculture and Consumer Services as approved, restricted, conditionally approved, or conditionally restricted for shellfish harvesting will comply with the additional criteria in section 10.2.5 of Volume I. | |
| 230.11(f) | (f) Proposed disposal site determinations. (1) Each disposal site shall be specified through the application of these Guidelines. The mixing zone shall be confined to the smallest practicable zone within each specified disposal site that is consistent with the type of dispersion determined to be appropriate by the application of these Guidelines. In a few special cases under unique environmental conditions, where there is adequate justification to show that widespread | 62-4.244(5)(a)-(c), F.A.C. 62-4.244(7), F.A.C. | 62-4.244(5), F.A.C. - Mixing zones for dredge and fill permits shall not be subject to the provisions in paragraphs (1)(c) through (j), subsection (2), (3), or (4) of this rule, provided that applicable water quality standards are met at the boundary and outside the mixing zone. (a) The dimensions of dredge and fill mixing zones shall be proposed by the applicant and approved, modified or denied by the Department. (b) Criteria for departmental evaluation of a proposed mixing zone shall include site-specific biological and hydrographic or hydrological considerations. | 230.11(f) seems to be very specific to ocean dumping activities, and of limited applicability to state-assumed waters. However, the state does have methods for determining the appropriate size of a mixing zone, in Rule 62-4.244, F.A.C. |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | dispersion by natural means will result in no significantly adverse environmental effects, the discharged material may be intended to be spread naturally in a very thin layer over a large area of the substrate rather than be contained within the disposal site. <br><br> (2) The permitting authority and the Regional Administrator shall consider the following factors in determining the acceptability of a proposed mixing zone: <br><br> (i) Depth of water at the disposal site; <br> (ii) Current velocity, direction, and variability at the disposal site; <br> (iii) Degree of turbulence; <br> (iv) Stratification attributable to causes such as obstructions, salinity or density profiles at the disposal site; <br> (v) Discharge vessel speed and direction, if appropriate; <br> (vi) Rate of discharge; <br> (vii) Ambient concentration of constituents of interest; <br> (viii) Dredged material characteristics, particularly concentrations of constituents, amount of material, type of material (sand, silt, clay, etc.) and settling velocities; <br> (ix) Number of discharge actions per unit of time; <br> (x) Other factors of the disposal site that affect the rates and patterns of mixing. | | (c) In no case shall the boundary of a Joint Coastal Permit mixing zone be more than 1000 meters from the point of discharge into the waterbody or the boundary of a dredge and fill mixing zone be more than 150 meters downstream in flowing streams or 150 meters in radius in other bodies of water, where these distances are measured from the cutterhead, return flow, discharge, or other points of generation of turbidity or other pollutants. <br><br> 62-4.244(7), F.A.C. – Additional relief from mixing zone restrictions necessary to prevent significant impairment of a designated use is through: <br><br> (a) Reclassification of the water body pursuant to Rule 62-302.400, F.A.C.; <br> (b) Variance granted pursuant to Section 403.201, F.S., and Rule 62-103.100, F.A.C. <br> (c) Modification of the requirements of this section for specific criteria by the Secretary upon compliance with the notice and hearing requirements for mixing zones set forth in paragraph (1)(c), above, and upon affirmative demonstration by an applicant that the applicant's discharge from a source existing on the effective date of this rule complies with best technology economically achievable, best management practices, or other requirements set forth in Chapter 62-600, F.A.C., and the economic, environmental and social costs of compliance with the existing criteria outweigh the social, environmental, and economic benefits of compliance with more stringent discharge limitations necessary to comply with mixing zone requirements of subsection 62-4.244(1), F.A.C., and the provisions relating to dissolved oxygen in Rule 62-4.244, F.A.C. <br><br> 1. No discharge may be issued more than one permit or permit modification or renewal which allows a modification pursuant to this subsection unless the applicant affirmatively demonstrates that it has undertaken a continuing program, approved by the Department, designed to consider water quality conditions and review or develop any reasonable means of achieving compliance with the water quality criteria from which relief has been granted pursuant to this subsection. <br><br> 2. With respect to paragraphs 62-4.244(1)(c) and 62-4.244(7)(c), F.A.C., the applicant must affirmatively demonstrate the minimum area of the water body necessary to achieve compliance with either subsection. Within a minimum area determined by the Secretary to be necessary to achieve compliance, the discharger shall be exempt from the criterion for which a demonstration has been made. <br><br> (d) Whenever site specific alternative criteria are established pursuant to Rule 62-302.800 or paragraph 62-302.510(2)(g), F.A.C., a mixing zone may be issued for dissolved oxygen if all provisions of Rule 62- | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (In addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | 4.244, F.A.C., are met with the exception of subparagraph 62-4.244(1)(j)1., F.A.C. | |
| 230.11(g)(1) and (2) | (g) Determination of cumulative effects on the aquatic ecosystem. (1) Cumulative impacts are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material. Although the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems. (2) Cumulative effects attributable to the discharge of dredged or fill material in waters of the United States should be predicted to the extent reasonable and practical. The permitting authority shall collect information and solicit information from other sources about the cumulative impacts on the aquatic ecosystem. This information shall be documented and considered during the decision-making process concerning the evaluation of individual permit applications, the issuance of a General permit, and monitoring and enforcement of existing permits. | 62-330.302(1)(b), F.A.C. Applicant's Handbook Volume I, section 10.2.8 (see Handbook text) State 404 Program Applicant's Handbook section 8.3.5 | 62-330.302(1)(b), F.A.C. – (1) In addition to the conditions in rule 62-330.301, F.A.C., to obtain an individual or conceptual approval permit under this chapter, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, repair, removal, and abandonment of a project: … (b) Will not cause unacceptable cumulative impacts upon wetlands and other surface waters as set forth in sections 10.2.8 through 10.2.8.2 of Volume I. 8.3.5    Cumulative Effects Unlike ERP reviews, the CWA does not limit analysis of cumulative effects to the resources within the impacted drainage basin. However, the drainage basin is a good starting point for review and will often be found to be the appropriate scale. Some projects will require cumulative effects reviewed on a larger or smaller scale depending on the size, project purpose, and resources proposed for impact. When reviewing cumulative effects, the Agency shall identify resources of concern and determine the potentially effected resource area(s). Compensatory mitigation for cumulative impacts shall comply with Volume I, section 10.2.8. Cumulative impacts are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual dredge or fill activities. Although the impact of a particular activity may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems. Cumulative effects attributable to dredge or fill activities in wetlands and other surface waters should be predicted to the extent reasonable and practical. The Agency shall collect information and solicit information from other sources, such as other permitting agencies, governmental agencies, or the public, about the cumulative impacts on the aquatic ecosystem. This information shall be documented and considered during the decision-making process concerning the evaluation of individual permit applications and monitoring and enforcement of existing permits. | |
| 230.11(h)(1) and (2) | (h) Determination of secondary effects on the aquatic ecosystem. (1) Secondary effects are effects on an aquatic ecosystem that are associated with a discharge of | 62-330.301(1)(f), F.A.C. | 62-330.301(1)(f), F.A.C. – (1) To obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter: | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | dredged or fill materials, but do not result from the actual placement of the dredged or fill material. Information about secondary effects on aquatic ecosystems shall be considered prior to the time final section 404 action is taken by permitting authorities. (2) Some examples of secondary effects on an aquatic ecosystem are fluctuating water levels in an impoundment and downstream associated with the operation of a dam, septic tank leaching and surface runoff from residential or commercial developments on fill, and leachate and runoff from a sanitary landfill located in waters of the U.S. Activities to be conducted on fast land created by the discharge of dredged or fill material in waters of the United States may have secondary impacts within those waters which should be considered in evaluating the impact of creating those fast lands. | Applicant's Handbook Volume I, section 10.2.7 (see Handbook text)<br><br>State 404 Program Applicant's Handbook, section 8.3.6 | ...<br>(f) Will not cause adverse secondary impacts to the water resources. In addition to the criteria in this subsection and in subsection 62-330.301(2), F.A.C., in accordance with section 373.4132, F.S., an applicant proposing the construction, alteration, operation, maintenance, abandonment, or removal of a dry storage facility for 10 or more vessels that is functionally associated with a boat launching area must also provide reasonable assurance that the facility, taking into consideration any secondary impacts, will meet the provisions of paragraph 62-330.302(1)(a), F.A.C., including the potential adverse impacts to manatees;<br><br>8.3.6    Secondary Effects<br>Secondary effects are effects on an aquatic ecosystem that are associated with a dredge or fill activity, but do not result from the actual placement of the dredged or fill material. Information about secondary effects on aquatic ecosystems shall be considered and documented during the decision-making process concerning the evaluation of individual permit applications.<br>Some examples of secondary effects on an aquatic ecosystem are fluctuating water levels in an impoundment and downstream associated with the operation of a dam, septic tank leaching and surface runoff from residential or commercial developments on fill, and growth induced by improved access. Activities to be conducted on uplands created by fill activities in wetlands or other surface waters may have secondary impacts within those waters which should be considered in evaluating the impact of creating those uplands.<br>In addition to the secondary impact analysis categories identified in Volume I, section 10.2.7, the CWA requires secondary impact analysis on the following categories:<br>(a)    Sanctuaries and refuges<br>Sanctuaries and refuges consist of areas designated under state and federal laws or local ordinances to be managed principally for the preservation and use of fish and wildlife resources. Sanctuaries and refuges may be affected by dredge or fill activities which will:<br>Disrupt the breeding, spawning, migratory movements or other critical life requirements of resident or transient fish and wildlife resources;<br>1.    Create unplanned, easy and incompatible human access to remote aquatic areas;<br>2.    Create the need for frequent maintenance activity;<br>3.    Result in the establishment of undesirable competitive species of plants and animals; or | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | 4.    Change the balance of water and land areas needed to provide cover, food, and other fish and wildlife habitat requirements in a way that modifies sanctuary or refuge management practices; (b)    Human use characteristics Categories include: 1.    Municipal and private water supplies. Activities can affect the quality of water supplies with respect to color, taste, odor, chemical content and suspended particulate concentration, in such a way as to reduce the fitness of the water for consumption. Water can be rendered unpalatable or unhealthy by the addition of suspended particulates, viruses and pathogenic organisms, and dissolved materials. The expense of removing such substances before the water is delivered for consumption can be high. Activities may also affect the quantity of water available for municipal and private water supplies. In addition, certain commonly used water treatment chemicals have the potential for combining with some suspended or dissolved substances from dredged or fill material to form other products that can have a toxic effect on consumers. 2.    Recreational and commercial fisheries. Activities can affect the suitability of recreational and commercial fishing grounds as habitat for populations of consumable aquatic organisms. Activities can result in the chemical contamination of recreational or commercial fisheries. They may also interfere with the reproductive success of recreational and commercially important aquatic species through disruption of migration and spawning areas. The introduction of pollutants at critical times in their life cycle may directly reduce populations of commercially important aquatic organisms or indirectly reduce them by reducing organisms upon which they depend for food. Any of these impacts can be of short duration or prolonged, depending upon the physical and chemical impacts of the discharge and the biological availability of contaminants to aquatic organisms. 3.    Water-related recreation. Water-related recreation encompasses activities undertaken for amusement and relaxation. Recreational activities encompass two broad categories of use: consumptive, such as harvesting resources by hunting and fishing; and non-consumptive, such as canoeing and sight-seeing. Activities may adversely modify or destroy water use for recreation by changing turbidity, suspended particulates, temperature, dissolved oxygen, dissolved materials, toxic materials, pathogenic organisms, quality of habitat, and the aesthetic qualities of sight, taste, odor, and color. 4.    Aesthetics. Aesthetics associated with the aquatic ecosystem consist of the perception of beauty by one or a combination of the senses of sight, hearing, touch, and smell. Aesthetics of aquatic | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | ecosystems apply to the quality of life enjoyed by the general public and property owners. Dredge or fill activities can mar the beauty of natural aquatic ecosystems by degrading water quality, creating distracting disposal sites, inducing inappropriate development, encouraging unplanned and incompatible human access, and by destroying vital elements that contribute to the compositional harmony or unity, visual distinctiveness, or diversity of an area. Dredge or fill activities can adversely affect the particular features, traits, or characteristics of an aquatic area which make it valuable to property owners. Activities which degrade water quality, disrupt natural substrate and vegetational characteristics, deny access to or visibility of the resource, or result in changes in odor, air quality, or noise levels may reduce the value of an aquatic area to private property owners.\n5.    Parks, national and historical monuments, national seashores, wilderness areas, research sites, and similar preserves. These preserves consist of areas designated under federal and state laws or local ordinances to be managed for their aesthetic, educational, historical, recreational, or scientific value. Dredge or fill activities in such areas may modify the aesthetic, educational, historical, recreational and/or scientific qualities thereby reducing or eliminating the uses for which such sites are set aside and managed. | Equivalent state terms = issued/granted (complying), issued/granted with conditions (complying with conditions), or denied (failing to comply). |
| 230.12 | Findings on the compliance or non-compliance with the restrictions on discharge.\n(a) On the basis of these Guidelines (subparts C through G) the proposed disposal sites for the discharge of dredged or fill material must be:\n(1) Specified as complying with the requirements of these Guidelines; or\n(2) Specified as complying with the requirements of these Guidelines with the inclusion of appropriate and practicable discharge conditions (see subparts H and J) to minimize pollution or adverse effects to the affected aquatic ecosystems; or\n(3) Specified as failing to comply with the requirements of these Guidelines where:\n(i) There is a practicable alternative to the proposed discharge that would have less adverse effect on the aquatic ecosystem, so long as such alternative does not have other significant adverse environmental consequences; or\n(ii) The proposed discharge will result in significant degradation of the aquatic ecosystem under §230.10(b) or (c); or | 62-331.054, F.A.C.\n\nApplicant's Handbook Volume I, section 5.5.4 (see Handbook text)\n\n120.60(3), F.S.\n\n404 Handbook, Section 8.2, (j), (k), and (l) | 62-331.054, F.A.C. - (1) Individual permits shall contain the general conditions for individual permits in subsection 62-330.3501(1), F.A.C. as applicable, and any specific conditions necessary to assure that the activities will be conducted in compliance with this Chapter, and in a manner which minimizes adverse impacts upon the physical, chemical, and biological integrity of wetlands or other surface waters, such as mitigation requirements and protection measures for listed species or historical resources.\n\n120.60(3), F.S. - Each applicant shall be given written notice, personally or by mail, that the agency intends to grant or deny, or has granted or denied, the application for license. The notice must state with particularity the grounds or basis for the issuance or denial of the license, except when issuance is a ministerial act. Unless waived, a copy of the notice shall be delivered or mailed to each party's attorney of record and to each person who has made a written request for notice of agency action. Each notice must inform the recipient of the basis for the agency decision, inform the recipient of any administrative hearing pursuant to ss. 120.569 and 120.57 or judicial review pursuant to s. 120.68 which may be available, indicate the procedure that must be followed, and state the applicable time limits. The issuing agency shall certify the date the notice was mailed or delivered, and the notice and the certification must be filed with the agency clerk. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | (iii) The proposed discharge does not include all appropriate and practicable measures to minimize potential harm to the aquatic ecosystem; or <br><br> (iv) There does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with these Guidelines. <br><br> (b) Findings under this section shall be set forth in writing by the permitting authority for each proposed discharge and made available to the permit applicant. These findings shall include the factual determinations required by §230.11, and a brief explanation of any adaptation of these Guidelines to the activity under consideration. In the case of a General permit, such findings shall be prepared at the time of issuance of that permit rather than for each subsequent discharge under the authority of that permit. | | 404 Handbook, section 8.2, (j), (k), and (l) – <br><br> Upon receipt of a technically complete application, the Agency will follow the sequence of review for processing applications summarized below. The sequence is simplified for purposes of illustration. The actual process followed may be iterative, with the results of one step leading to a re-examination of the previous steps. The Agency must address all of the applicable State 404 Program permitting conditions in reaching a permitting decision for a project. <br><br> ... <br><br> (j)    Complete a Technical Staff Report to document how the project addresses the requirements of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. <br><br> (k)    Make and document a finding of either compliance or noncompliance with the requirements of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. This is a determination of whether the project, including any mitigation, is permittable under the State 404 Program. <br><br> (l)    Prepare a written determination on each application outlining the permitting decision and the rationale for the decision. The determination shall be dated, signed, and included in the official record prior to final action on the application. The Technical Staff Report from step 10 (subsection (j)), above, shall be included in or attached to the determination. | |
| **Subpart C** | **Potential impacts on physical and chemical characteristics of the aquatic ecosystem** | | | |
| 230.20(a) and (b) | (a) The substrate of the aquatic ecosystem underlies open waters of the United States and constitutes the surface of wetlands. It consists of organic and inorganic solid materials and includes water and other liquids or gases that fill the spaces between solid particles. <br><br> (b) Possible loss of environmental characteristics and values: The discharge of dredged of fill material can result in varying degrees of change in the complex physical, chemical, and biological characteristics of the substrate. Discharges which alter substrate elevation or contours can result in changes in water circulation, depth, current pattern, water fluctuation and water temperature. Discharges may adversely affect bottom-dwelling organisms at the site by smothering immobile forms or forcing mobile forms to migrate. Benthic forms present prior to a discharge are unlikely to recolonize | See §230.11(a), above, for F.A.C. rule references. <br><br> Applicant's Handbook Volume I, section 10.2.2.4 | Volume I, section 10.2.2.4 - Water Quantity Impacts to Wetlands and Other Surface Waters <br><br> Pursuant to section 10.1.1(a), above, an applicant must provide reasonable assurance that the regulated activity will not change the hydroperiod of a wetland or other surface water, so as to adversely affect wetland functions or other surface water functions as follows: <br><br> (a) Whenever portions of a system, such as constructed basins, structures, stormwater ponds, canals, and ditches, could have the effect of reducing the depth, duration or frequency of inundation or saturation in a wetland or other surface water, the applicant must perform an analysis of the drawdown in water levels or diversion of water flows resulting from such activities and provide reasonable assurance that these drawdowns or diversions will not adversely impact the functions that wetlands and other surface waters provide to fish and wildlife and listed species; <br><br> (b) Increasing the depth, duration, or frequency of inundation through changing the rate or method of discharge of water to wetlands or other | The State evaluates projects to determine if they will adversely impact habitat, including substrate considerations outlined in 40 CFR § 230.20. |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | on the discharged material if it is very dissimilar from that of the discharge site. Erosion, slumping, or lateral displacement of surrounding bottom of such deposits can adversely affect areas of the substrate outside the perimeters of the disposal site by changing or destroying habitat. The bulk and composition of the discharged material and the location, method, and timing of discharges may all influence the degree of impact on the substrate. | | surface waters or by impounding water in wetlands or other surface waters must also be addressed to prevent adverse effects to functions that wetlands and other surface waters provide to fish and wildlife and listed species. Different types of wetlands respond differently to increased depth, duration, or frequency of inundation. Therefore, the applicant must provide reasonable assurance that activities that have the potential to increase discharge or water levels will not adversely affect the functioning of the specific wetland or other surface water subject to the increased discharge or water level; and (c) Whenever portions of an activity could have the effect of altering water levels in wetlands or other surface waters, applicants shall be required to either: monitor the wetland or other surface waters to demonstrate that such alteration has not resulted in adverse impacts; or modify the activity to prevent adverse impacts. Monitoring parameters, methods, schedules, and reporting requirements shall be specified in permit conditions. | |
| 230.21(a) and (b) | (a) Suspended particulates in the aquatic ecosystem consist of fine-grained mineral particles, usually smaller than silt, and organic particles. Suspended particulates may enter water bodies as a result of land runoff, flooding, vegetative and planktonic breakdown, resuspension of bottom sediments, and man's activities including dredging and filling. Particulates may remain suspended in the water column for variable periods of time as a result of such factors as agitation of the water mass, particulate specific gravity, particle shape, and physical and chemical properties of particle surfaces. (b) Possible loss of environmental characteristics and values: The discharge of dredged or fill material can result in greatly elevated levels of suspended particulates in the water column for varying lengths of time. These new levels may reduce light penetration and lower the rate of photosynthesis and the primary productivity of an aquatic area if they last long enough. Sight-dependent species may suffer reduced feeding ability leading to limited growth and lowered resistance to disease if high levels of suspended particulates persist. The biological and the chemical content of the suspended material may react with the dissolved oxygen in the water, which can result in oxygen depletion. Toxic metals and organics, pathogens, and viruses absorbed or adsorbed to fine-grained particulates in the material may become biologically | See §230.11(c), above, for F.A.C. rule references Applicant's Handbook Volume I, section 10.2.4.1 | Volume I, section 10.2.4.1 – Short Term Water Quality Considerations The applicant must address the short term water quality impacts of a proposed activity, including: (a) Providing and maintaining turbidity barriers or similar devices for the duration of dewatering and other construction activities in or adjacent to wetlands or other surface waters; (b) Stabilizing newly created slopes or surfaces in or adjacent to wetlands and other surface waters to prevent erosion and turbidity; (c) Providing proper construction access for barges, boats and equipment to ensure that propeller dredging and rutting from vehicular traffic does not occur; (d) Maintaining construction equipment to ensure that oils, greases, gasoline, or other pollutants are not released into wetlands or other surface waters; (e) Controlling the discharge from spoil disposal sites; and (f) Preventing any other discharge or release of pollutants during construction or alteration that will cause or contribute to water quality standards being violated. | Limits for turbidity (suspended particulates) are provided in Rule 62-302.530(70), F.A.C. depending on the classification of the waterbody. We evaluate projects for the likelihood that turbidity or suspended particulate will occur. A General Condition of all individual permits requires use of turbidity and sedimentation control BMPs. Larger, in-water projects are required to perform turbidity monitoring during construction. |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (In addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | available to organisms either in the water column or on the substrate. Significant increases in suspended particulate levels create turbid plumes which are highly visible and aesthetically displeasing. The extent and persistence of these adverse impacts caused by discharges depend upon the relative increase in suspended particulates above the amount occurring naturally, the duration of the higher levels, the current patterns, water level, and fluctuations present when such discharges occur, the volume, rate, and duration of the discharge, particulate deposition, and the seasonal timing of the discharge. | | | |
| 230.22(a) and (b) | (a) Water is the part of the aquatic ecosystem in which organic and inorganic constituents are dissolved and suspended. It constitutes part of the liquid phase and is contained by the substrate. Water forms part of a dynamic aquatic life-supporting system. Water clarity, nutrients and chemical content, physical and biological content, dissolved gas levels, pH, and temperature contribute to its life-sustaining capabilities.

(b) Possible loss of environmental characteristics and values: The discharge of dredged or fill material can change the chemistry and the physical characteristics of the receiving water at a disposal site through the introduction of chemical constituents in suspended or dissolved form. Changes in the clarity, color, odor, and taste of water and the addition of contaminants can reduce or eliminate the suitability of water bodies for populations of aquatic organisms, and for human consumption, recreation, and aesthetics. The introduction of nutrients or organic material to the water column as a result of the discharge can lead to a high biochemical oxygen demand (BOD), which in turn can lead to reduced dissolved oxygen, thereby potentially affecting the survival of many aquatic organisms. Increases in nutrients can favor one group of organisms such as algae to the detriment of other more desirable types such as submerged aquatic vegetation, potentially causing adverse health effects, objectionable tastes and odors, and other problems. | See §230.11(d), above, for F.A.C. rule references

Applicant's Handbook Volume I, sections 8.3.1 and 10.2.4 | Volume I, section 8.3.1 Surface Water Quality Standards - State surface water quality standards are set forth in Chapters 62-4 and 62-302, F.A.C., including the antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), 62-4.242(2) and (3), F.A.C., and Rule 62-302.300, F.A.C., and the special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C.

Volume I, section 10.2.4 Water Quality -
Pursuant to section 10.1.1(c), above, an applicant must provide reasonable assurance that the regulated activity will not cause or contribute to violations of water quality standards in areas where water quality standards apply.
Reasonable assurances regarding water quality must be provided both for the short term and the long term, addressing the proposed construction, alteration, operation, maintenance, removal and abandonment of the project. The following requirements are in addition to the water quality requirements found in sections 8.2.3 and 8.3 through 8.3.3, above.

Volume I, section 10.2.4.1 Short Term Water Quality Considerations
The applicant must address the short term water quality impacts of a proposed activity, including:
(a) Providing and maintaining turbidity barriers or similar devices for the duration of dewatering and other construction activities in or adjacent to wetlands or other surface waters;
(b) Stabilizing newly created slopes or surfaces in or adjacent to wetlands and other surface waters to prevent erosion and turbidity;
(c) Providing proper construction access for barges, boats and equipment to ensure that propeller dredging and rutting from vehicular traffic does not occur; | We evaluate projects for likelihood to violate state water quality standards. Evaluation can include water quality, sediment, and effluent testing, if needed. Pollution prevention requirements are added as permit conditions, as needed. |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (d) Maintaining construction equipment to ensure that oils, greases, gasoline, or other pollutants are not released into wetlands or other surface waters; (e) Controlling the discharge from spoil disposal sites; and (f) Preventing any other discharge or release of pollutants during construction or alteration that will cause or contribute to water quality standards being violated. | |
| | | | Volume I, section 10.2.4.2 Long Term Water Quality Considerations The applicant must address the long term water quality impacts of a proposed activity, including: (a) The potential of a constructed or altered water body to cause or contribute to violations of water quality standards due to its depth or configuration. For example, the depth of water bodies must be designed to ensure proper mixing so that the water quality standard for dissolved oxygen will not be violated in the lower levels of the water body, but the depth should not be so shallow that the bottom sediments are frequently resuspended by boat activity. Water bodies must be configured to prevent the creation of debris traps or stagnant areas that could result in violations of water quality standards. (b) Long term erosion, siltation or propeller dredging that will cause turbidity violations. (c) Prevention of any discharge or release of pollutants from the activity that will cause water quality standards to be violated. | |
| | | | Volume I, section 10.2.4.3 Additional Water Quality Considerations for Docking Facilities Docking facilities, due to their nature, provide potential sources of pollutants to wetlands and other surface waters. If the proposed work has the potential to adversely affect water quality, an applicant proposing the construction, expansion or alteration of a docking facility must address the following factors to provide the required reasonable assurance that water quality standards will not be violated: (a) Hydrographic information or studies shall be required for docking facilities of greater than ten boat slips, unless hydrographic information or studies previously conducted in the vicinity of the facility provide reasonable assurance that the conditions of the water body and the nature of the proposed activity do not warrant the need for new information or studies. Hydrographic information or studies also may be required for docking facilities of fewer than ten slips, dependent upon the site specific features described in section 10.2.4.3(b), below. In all cases, the design of the hydrographic study, and its complexity, will be dependent upon the specific project design and the specific features of the project site. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (b) The purpose of the hydrographic information or studies is to document the flushing time (the time required to reduce the concentration of a conservative pollutant to ten percent of its original concentration) of the water at the docking facility. This information is used to determine the likelihood that the facility will accumulate pollutants to the extent that water quality violations will occur. Generally, a flushing time of less than or equal to four days is the maximum that is desirable for docking facilities. However, the evaluation of the maximum desirable flushing time also takes into consideration the size (number of slips) and configuration of the proposed docking facility, the amplitude and periodicity of the tide; the geometry of the subject water body; the circulation and flushing of the water body; the quality of the waters at the project site; the type and nature of the docking facility; the services provided at the docking facility; and the number and type of other sources of water pollution in the area. <br> (c) The level and type of hydrographic information or studies that will be required for the proposed docking facility will be determined based upon an analysis of site specific characteristics. As compared to sites that flush in less than four days, sites where the flushing time is greater than four days generally will require additional, more complex levels of hydrographic studies or information to determine whether water quality standards can be expected to be violated by the facility. The degree and complexity of the hydrographic study will be dependent upon the types of considerations listed in section 10.2.4.3(b), above, including the potential for the facility, based on its design and location, to add pollutants to the receiving waters. Types of information that can be required include site-specific measurements of: waterway geometry, tidal amplitude, the periodicity of forces that drive water movement at the site, and water tracer studies that document specific circulation patterns. <br> (d) The applicant shall document, through hydrographic information or studies, that pollutants leaving the site of the docking facility will be adequately dispersed in the receiving water body so as to not cause or contribute to violations of water quality standards based on circulation patterns and flushing characteristics of the receiving water body. <br> (e) In all cases, the hydrographic studies shall be designed to document the hydrographic characteristics of the project site and surrounding waters. All hydrographic studies must be based on the factors described in sections (a) through (d), above. An applicant should consult with the Agency prior to conducting such a study. <br> (f) In accordance with Chapters 62-761 and 62-762, F.A.C., applicants are advised that fueling facilities must have secondary containment | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | equipment and shall be located and operated so that the potential for spills or discharges to surface waters and wetlands is minimized. (g) The disposal of domestic wastes from boat heads, particularly from liveaboard vessels, must be addressed to prevent improper disposal into wetlands or other surface waters. A liveaboard vessel shall be defined as a vessel docked at the facility that is inhabited by a person or persons for any five consecutive days or a total of ten days within a 30-day period. (h) The disposal of solid waste, such as garbage and fish cleaning debris, must be addressed to prevent disposal into wetlands or other surface waters. (i) Pollutant leaching characteristics of materials such as treated pilings and anti-fouling paints used on the hulls of vessels must be addressed to ensure that any pollutants that leach from the structures and vessels will not cause violations of water quality standards given the flushing at the site and the type, number and concentration of the likely sources of pollutants. | |
| | | | Volume I, section 10.2.4.4 Mixing Zones A temporary mixing zone for water quality during construction or alteration may be requested by the applicant. The Agency shall review such requests pursuant to Rule 62-4.242 and subsection 62-4.244(5), F.A.C. | |
| | | | Volume I, section 10.2.4.5 Where Ambient Water Quality Does Not Meet Standards If the site of the proposed activity currently does not meet water quality standards, the applicant must demonstrate compliance with the water quality standards by meeting the provisions in sections 10.2.4.1, 10.2.4.2, and 10.2.4.3, above, as applicable, and for the parameters that do not meet water quality standards, the applicant must demonstrate that the proposed activity will not contribute to the existing violation. If the proposed activity will contribute to the existing violation, mitigation may be proposed as described in section 10.3.1.4, below. | |
| 230.23(a) and (b) | (a) Current patterns and water circulation are the physical movements of water in the aquatic ecosystem. Currents and circulation respond to natural forces as modified by basin shape and cover, physical and chemical characteristics of water strata and masses, and energy dissipating factors. | See §230.11(b), above, for F.A.C. rule citations Applicant's Handbook Volume I, section 10.2.3.3 | Volume I, section 10.2.3.3 Navigation, Water Flow, Erosion and Shoaling In reviewing and balancing the criterion on navigation, erosion and shoaling in section 10.2.3(c), above, the Agency will evaluate whether the regulated activity located in, on or over wetlands or other surface waters will: (a) Significantly impede navigability or enhance navigability. The Agency will consider the current navigational uses of the surface | We review projects for impacts to current patterns, circulation and water fluctuations. The state does this in many ways and may require testing as needed. Certain project types, such as groins, jetties, large docking facilities, or any other project that is likely to significantly |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | (b) Possible loss of environmental characteristics and values: The discharge of dredged or fill material can modify current patterns and water circulation by obstructing flow, changing the direction or velocity of water flow, changing the direction or velocity of water flow and circulation, or otherwise changing the dimensions of a water body. As a result, adverse changes can occur in: location, structure, and dynamics of aquatic communities; shoreline and substrate erosion and deposition rates; the deposition of suspended particulates; the rate and extent of mixing of dissolved and suspended components of the water body; and water stratification. | | waters and will not speculate on uses that may occur in the future. Applicants proposing to construct bridges or other traversing works must address adequate horizontal and vertical clearance for the type of watercraft currently navigating the surface waters. Applicants proposing to construct docks, piers and other works that extend into surface waters must address the continued navigability of these waters. An encroachment into a marked or customarily used navigation channel is an example of a significant impediment to navigability. Applicants proposing temporary activities in navigable surface waters, such as the mooring of construction barges, must address measures for clearly marking the work as a hazard to navigation, including nighttime lighting. The addition of navigational aids may be beneficial to navigation. If an applicant has a U.S. Coast Guard permit issued pursuant to 14 U.S.C. Section 81 or 33 C.F.R. Part 62 for a regulated activity in, on or over wetlands or other surface waters, submittal of this permit with the application may assist the applicant in addressing this criterion.<br><br>(b) Cause or alleviate harmful erosion or shoaling. Applicants proposing activities such as channel relocation, artificial reefs, construction of jetties, breakwaters, groins, bulkheads and beach nourishment must address existing and expected erosion or shoaling in the proposed design. Compliance with erosion control best management practices referenced in Part IV of this Volume, will be an important consideration in addressing this criterion. Each permit will have a general condition that requires applicants to utilize appropriate erosion control practices and to correct any adverse erosion or shoaling resulting from the regulated activities.<br><br>(c) Significantly impact or enhance water flow. Applicants must address significant obstructions to sheet flow by assessing the need for structures that minimize the obstruction such as culverts or spreader swales in fill areas. Compliance with the water quantity criteria found in section 10.2.2.4, above, shall be an important consideration in addressing this criterion. | impact the flow of water trigger hydrographic testing requirements. |
| 230.24(a) and (b) | (a) Normal water fluctuations in a natural aquatic system consist of daily, seasonal, and annual tidal and flood fluctuations in water level. Biological and physical components of such a system are either attuned to or characterized by these periodic water fluctuations.<br><br>(b) Possible loss of environmental characteristics and values: The discharge of dredged or fill material can alter the normal water-level fluctuation pattern of an area, resulting in prolonged periods of inundation, exaggerated extremes of high and low water, or a | See § 230.11(b), above, for F.A.C. rule citations.<br><br>Applicant's Handbook Volume I, section 10.2.2.4 | Volume I, section 10.2.2.4 - Water Quantity Impacts to Wetlands and Other Surface Waters<br><br>Pursuant to section 10.1.1(a), above, an applicant must provide reasonable assurance that the regulated activity will not change the hydroperiod of a wetland or other surface water, so as to adversely affect wetland functions or other surface water functions as follows:<br><br>(a) Whenever portions of a system, such as constructed basins, structures, stormwater ponds, canals, and ditches, could have the effect of reducing the depth, duration or frequency of inundation or saturation in a wetland or other surface water, the applicant must perform an analysis of the drawdown in water levels or diversion of | We review projects for impacts to current patterns, circulation and water fluctuations. The state does this in many ways and may require testing as needed. Certain project types, such as groins, jetties, large docking facilities, or any other project that is likely to significantly impact the flow of water trigger hydrographic testing requirements. |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | static, nonfluctuating water level. Such water level modifications may change salinity patterns, alter erosion or sedimentation rates, aggravate water temperature extremes, and upset the nutrient and dissolved oxygen balance of the aquatic ecosystem. In addition, these modifications can alter or destroy communities and populations of aquatic animals and vegetation, induce populations of nuisance organisms, modify habitat, reduce food supplies, restrict movement of aquatic fauna, destroy spawning areas, and change adjacent, upstream, and downstream areas. | | water flows resulting from such activities and provide reasonable assurance that these drawdowns or diversions will not adversely impact the functions that wetlands and other surface waters provide to fish and wildlife and listed species; (b) Increasing the depth, duration, or frequency of inundation through changing the rate or method of discharge of water to wetlands or other surface waters or by impounding water in wetlands or other surface waters must also be addressed to prevent adverse effects to functions that wetlands and other surface waters provide to fish and wildlife and listed species. Different types of wetlands respond differently to increased depth, duration, or frequency of inundation. Therefore, the applicant must provide reasonable assurance that activities that have the potential to increase discharge or water levels will not adversely affect the functioning of the specific wetland or other surface water subject to the increased discharge or water level; and (c) Whenever portions of an activity could have the effect of altering water levels in wetlands or other surface waters, applicants shall be required to either: monitor the wetland or other surface waters to demonstrate that such alteration has not resulted in adverse impacts; or modify the activity to prevent adverse impacts. Monitoring parameters, methods, schedules, and reporting requirements shall be specified in permit conditions. | |
| 230.25(a) and (b) | (a) Salinity gradients form where salt water from the ocean meets and mixes with fresh water from land.<br><br>(b) Possible loss of environmental characteristics and values: Obstructions which divert or restrict flow of either fresh or salt water may change existing salinity gradients. For example, partial blocking of the entrance to an estuary or river mouth that significantly restricts the movement of the salt water into and out of that area can effectively lower the volume of salt water available for mixing within that estuary. The downstream migration of the salinity gradient can occur, displacing the maximum sedimentation zone and requiring salinity-dependent aquatic biota to adjust to the new conditions, move to new locations if possible, or perish. In the freshwater zone, discharge operations in the upstream regions can have equally adverse impacts. A significant reduction in the volume of fresh water moving into an estuary below that which is considered normal can affect the location and type of mixing thereby changing the characteristic salinity patterns. The resulting changed circulation pattern can | See § 230.11(b), above, for rule citations.<br><br>Applicant's Handbook Volume I, section 10.2.3.4<br><br>Applicant's Handbook Volume I, section 10.2.4 | Volume I, section 10.2.3.4 - Fisheries, Recreation, Marine Productivity In reviewing and balancing the criterion regarding fishing or recreational values and marine productivity in section 10.2.3(d), above, the Agency will evaluate whether the regulated activity in, on, or over wetlands or other surface waters will cause:<br>(a) Adverse effects to sport or commercial fisheries or marine productivity. Examples of activities that may adversely affect fisheries or marine productivity are the elimination or degradation of fish nursery habitat, change in ambient water temperature, change in normal salinity regime, reduction in detrital export, change in nutrient levels, or other adverse effects on populations of native aquatic organisms.<br>(b) Adverse effects or improvements to existing recreational uses of a wetland or other surface water. Wetlands and other surface waters may provide recreational uses such as boating, fishing, swimming, waterskiing, hunting, and birdwatching. An example of potential adverse effects to recreational uses is the construction of a traversing work, such as a road crossing a waterway, which could impact the current use of the waterway for boating.<br><br>Volume I, section 10.2.4 Water Quality - | Potential impacts to salinity gradients are determined through water quality and hydrographic testing/modelling. |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | cause the upstream migration of the salinity gradient displacing the maximum sedimentation zone. This migration may affect those organisms that are adapted to freshwater environments. It may also affect municipal water supplies. | | Pursuant to section 10.1.1(c), above, an applicant must provide reasonable assurance that the regulated activity will not cause or contribute to violations of water quality standards in areas where water quality standards apply.<br><br>Reasonable assurances regarding water quality must be provided both for the short term and the long term, addressing the proposed construction, alteration, operation, maintenance, removal and abandonment of the project. The following requirements are in addition to the water quality requirements found in sections 8.2.3 and 8.3 through 8.3.3, above. | |
| **Subpart D** | **Potential impacts on biological characteristics of the aquatic ecosystem** | | | |
| 230.30(a), (b), and (c) | (a) An endangered species is a plant or animal in danger of extinction throughout all or a significant portion of its range. A threatened species is one in danger of becoming an endangered species in the foreseeable future throughout all or a significant portion of its range. Listings of threatened and endangered species as well as critical habitats are maintained by some individual States and by the U.S. Fish and Wildlife Service of the Department of the Interior (codified annually at 50 CFR § 17.11). The Department of Commerce has authority over some threatened and endangered marine mammals, fish and reptiles.<br><br>(b) Possible loss of values: The major potential impacts on threatened or endangered species from the discharge of dredged or fill material include:<br><br>(1) Covering or otherwise directly killing species;<br><br>(2) The impairment or destruction of habitat to which these species are particularly crucial to the continued survival of some threatened or endangered species include adequate good quality water, spawning and maturation areas, nesting areas, protective cover, adequate and reliable food supply, and resting areas for migratory species. Each of these elements can be adversely affected by changes in either the normal water conditions for clarity, chemical content, nutrient balance, dissolved oxygen, pH, temperature, salinity, | 62-330.301(1)(d), and (f), F.A.C.<br><br>62-330.302(1)(a)2, F.A.C.<br><br>62-331.053(3)(a)4, F.A.C.<br><br>Applicant's Handbook Volume I, sections 10.2.2 (see Handbook text), 10.2.3.2, and 10.2.7 (see Handbook text) | 62-330.301(1), F.A.C. - To obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter:<br><br>(d) Will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters<br><br>(f) Will not cause adverse secondary impacts to the water resources. In addition to the criteria in this subsection and in subsection 62-330.301(2), F.A.C., in accordance with section 373.4132, F.S., an applicant proposing the construction, alteration, operation, maintenance, abandonment, or removal of a dry storage facility for 10 or more vessels that is functionally associated with a boat launching area must also provide reasonable assurance that the facility, taking into consideration any secondary impacts, will meet the provisions of paragraph 62-330.302(1)(a), F.A.C., including the potential adverse impacts to manatees;<br><br>62-330.302(1), F.A.C. - In addition to the conditions in Rule 62-330.301, F.A.C., to obtain an individual or conceptual approval permit under this chapter, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, repair, removal, and abandonment of a project:<br><br>(a) Located in, on, or over wetlands or other surface waters will not be contrary to the public interest, or if such activities significantly degrade or are within an Outstanding Florida Water, are clearly in the public interest, as determined by balancing the following criteria as set forth in sections 10.2.3 through 10.2.3.7 of Volume I:<br><br>1. Whether the activities will adversely affect the public health, safety, or welfare or the property of others;<br><br>2. Whether the activities will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats | DEP, WMDs and delegated local governments send projects with wetland or surface water impacts to FWC for review. If FWC determines that listed species may be impacted, they provide suggestions for project revision to minimize or eliminate impact and may provide conditions to be added to a permit. If FWC determines that a project will threaten the continued existence of a listed species, they can file a CZM objection to the project, in which case the permit would be denied.<br><br>The agencies also send projects to the Department of Agriculture and Consumer Services (DACS) for review and comment if a project is in Class II (shellfish harvesting) waters. DACS may also provide comments, suggestions, or object to the project.<br><br>All projects are reviewed to make sure they will meet state water quality standards, which are designed to maintain the integrity of the waterbodies for certain categories of use. These categories can be found in 62-302.400, F.A.C.<br><br>Most waters in Florida are Class II or III:<br>CLASS II: Shellfish Propagation or Harvesting<br>CLASS III: Fish Consumption; Recreation, Propagation and Maintenance of a |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | current patterns, circulation and fluctuation, or the physical removal of habitat; and<br><br>(3) Facilitating incompatible activities.<br><br>(c) Where consultation with the Secretary of the Interior occurs under section 7 of the Endangered Species Act, the conclusions of the Secretary concerning the impact(s) of the discharge on threatened and endangered species and their habitat shall be considered final. | | 62-331.053(3)(a)4., F.A.C. - (3) No permit shall be issued for the following:<br><br>(a) When the project is inconsistent with the requirements of this Chapter and the 404 Handbook, including when the project:<br><br>4. Jeopardizes the continued existence of endangered or threatened species, or results in the likelihood of the destruction or adverse modification of a habitat which is determined by the Secretary of Interior or Commerce, as appropriate, to be a critical habitat for endangered or threatened species. Compliance with any requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission, the U.S. Fish & Wildlife Service, and the National Marine Fisheries Service for purposes of the State 404 Program, and review, as it pertains to endangered or threatened species, by the U.S. Environmental Protection Agency as described in subsection 62-331.052(2), F.A.C. shall be determinative for purposes of evaluating violations of this subparagraph. If an exemption has been granted by the Endangered Species Committee, the terms of such exemption shall apply in lieu of this subparagraph;<br><br>Volume I, section 10.2.3.2 - The Agency's public interest review of that portion of a proposed activity in, on, or over wetlands and other surface waters for impacts to "the conservation of fish and wildlife, including endangered or threatened species, or their habitats" is encompassed within the required review of the entire activity under section 10.2.2, above. An applicant must always provide the reasonable assurances required under section 10.2.2, above.<br><br>Volume I, section10.2.7 – Secondary Impacts – (see Handbook text) (prevention of incompatible activities) | Healthy, Well-Balanced Population of Fish and Wildlife |
| 230.31(a) and (b) | (a) Aquatic organisms in the food web include, but are not limited to, finfish, crustaceans, mollusks, insects, annelids, planktonic organisms, and the plants and animals on which they feed and depend upon for their needs. All forms and life stages of an organism, throughout its geographic range, are included in this category.<br><br>(b) Possible loss of values: The discharge of dredged or fill material can variously affect populations of fish, crustaceans, mollusks and other food web organisms through the release of contaminants which adversely affect adults, juveniles, larvae, or eggs, or result in the | 62-330.301(1)(d) and (e), F.A.C.<br><br>62-330.302(1)(a)1., 2. and 4., F.A.C.<br><br>Applicant's Handbook Volume I, sections 10.2.3.1(a) and (b), 10.2.3.4 (a) and (b), and 10.2.5 (see Handbook text) | 62-330.301(1), F.A.C. - To obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter:<br><br>(d) Will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters;<br>(e) Will not adversely affect the quality of receiving waters such that the state water quality standards set forth in Chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including the antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), F.A.C., subsections 62-4.242(2) and (3), F.A.C., and Rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C., will be violated | (Same as §230.30, above) DEP, WMDs and delegated local governments send projects with wetland or surface water impacts to FWC for review. If FWC determines that listed species may be impacted, they provide suggestions for project revision to minimize or eliminate impact and may provide conditions to be added to a permit. If FWC determines that a project will threaten the continued existence of a listed species, they can file a CZM objection to the project, in which case the permit would be denied. |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | establishment or proliferation of an undesirable competitive species of plant or animal at the expense of the desired resident species. Suspended particulates settling on attached or buried eggs can smother the eggs by limiting or sealing off their exposure to oxygenated water. Discharge of dredged and fill material may result in the debilitation or death of sedentary organisms by smothering, exposure to chemical contaminants in dissolved or suspended form, exposure to high levels of suspended particulates, reduction in food supply, or alteration of the substrate upon which they are dependent. Mollusks are particularly sensitive to the discharge of material during periods of reproduction and growth and development due primarily to their limited mobility. They can be rendered unfit for human consumption by tainting, by production and accumulation of toxins, or by ingestion and retention of pathogenic organisms, viruses, heavy metals or persistent synthetic organic chemicals. The discharge of dredged or fill material can redirect, delay, or stop the reproductive and feeding movements of some species of fish and crustacea, thus preventing their aggregation in accustomed places such as spawning or nursery grounds and detrital feeding species or other representatives of lower trophic levels can impair the flow of energy from primary consumers to higher trophic levels. The reduction or potential elimination of food chain organism populations decreases the overall productivity and nutrient export capability of the ecosystem. | | 62-330.302(1), F.A.C. - In addition to the conditions in Rule 62-330.301, F.A.C., to obtain an individual or conceptual approval permit under this chapter, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, repair, removal, and abandonment of a project: (a) Located in, on, or over wetlands or other surface waters will not be contrary to the public interest, or if such activities significantly degrade or are within an Outstanding Florida Water, are clearly in the public interest, as determined by balancing the following criteria as set forth in sections 10.2.3 through 10.2.3.7 of Volume I: 1. Whether the activities will adversely affect the public health, safety, or welfare or the property of others; 2. Whether the activities will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats; 4. Whether the activities will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity

Volume I, section 10.2.3.1 - In reviewing and balancing the criterion regarding public health, safety, welfare and the property of others in section 10.2.3(a), above, the Agency will evaluate whether the regulated activity located in, on, or over wetlands or other surface waters will cause: (a) An environmental hazard to public health or safety or improvement to public health or safety with respect to environmental issues. Each applicant must identify potential environmental public health or safety issues resulting from their project. Examples of these issues include: mosquito control; proper disposal of solid, hazardous, domestic or industrial waste; aids to navigation; hurricane preparedness or cleanup; environmental remediation, enhancement or restoration; and similar environmentally related issues. For example, the installation of navigational aids may improve public safety and may reduce impacts to public resources; (b) Impacts to areas classified by the Department of Agriculture and Consumer Services as approved, conditionally approved, restricted or conditionally restricted for shellfish harvesting. Activities that would cause closure or a more restrictive classification or management plan for a shellfish harvesting area would result in a negative factor in the public interest balance with respect to this criterion;

Volume I, section 10.2.3.4 - In reviewing and balancing the criterion regarding fishing or recreational values and marine productivity in section 10.2.3(d), above, the Agency will evaluate whether the | The agencies also send projects to the Department of Agriculture and Consumer Services (DACS) for review and comment if a project is in Class II (shellfish harvesting) waters. DACS may also provide comments, suggestions, or object to the project. All projects are reviewed to make sure they will meet state water quality standards, which are designed to maintain the integrity of the waterbodies for certain categories of use. These categories can be found in 62-302.400, F.A.C. Most waters in Florida are Class II or III: CLASS II: Shellfish Propagation or Harvesting CLASS III: Fish Consumption; Recreation, Propagation and Maintenance of a Healthy, Well-Balanced Population of Fish and Wildlife |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (In addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | regulated activity in, on, or over wetlands or other surface waters will cause: (a) Adverse effects to sport or commercial fisheries or marine productivity. Examples of activities that may adversely affect fisheries or marine productivity are the elimination or degradation of fish nursery habitat, change in ambient water temperature, change in normal salinity regime, reduction in detrital export, change in nutrient levels, or other adverse effects on populations of native aquatic organisms. (b) Adverse effects or improvements to existing recreational uses of a wetland or other surface water. Wetlands and other surface waters may provide recreational uses such as boating, fishing, swimming, waterskiing, hunting, and birdwatching. An example of potential adverse effects to recreational uses is the construction of a traversing work, such as a road crossing a waterway, which could impact the current use of the waterway for boating. Volume I, section 10.2.5 – Class II Waters, Waters Approved for Shellfish Harvesting (See Handbook text) | |
| 230.32(a) and (b) | (a) Wildlife associated with aquatic ecosystems are resident and transient mammals, birds, reptiles, and amphibians. (b) Possible loss of values: The discharge of dredged or fill material can result in the loss or change of breeding and nesting areas, escape cover, travel corridors, and preferred food sources for resident and transient wildlife species associated with the aquatic ecosystem. These adverse impacts upon wildlife habitat may result from changes in water levels, water flow and circulation, salinity, chemical content, and substrate characteristics and elevation. Increased water turbidity can adversely affect wildlife species which rely upon sight to feed, and disrupt the respiration and feeding of certain aquatic wildlife and food chain organisms. The availability of contaminants from the discharge of dredged or fill material may lead to the bioaccumulation of such contaminants in wildlife. Changes in such physical and chemical factors of the environment may favor the introduction of undesirable plant and animal species at the expense of resident species and communities. In some aquatic environments lowering plant and animal species diversity may disrupt the normal functions of the | 62-330.301(1)(d), (e), and (f), F.A.C. 62-331.302(1)(a)2., 3., 4., 7., F.A.C. Applicant's Handbook Volume I, Sections 10.2.2 (see Handbook text) and 10.2.3.2 | 62-330.301(1), F.A.C. - To obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter: (d) Will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters (e) Will not adversely affect the quality of receiving waters such that the state water quality standards set forth in chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including the antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), F.A.C., subsections 62-4.242(2) and (3), F.A.C., and rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C., will be violated; (f) Will not cause adverse secondary impacts to the water resources. In addition to the criteria in this subsection and in subsection 62-330.301(2), F.A.C., in accordance with section 373.4132, F.S., an applicant proposing the construction, alteration, operation, maintenance, abandonment, or removal of a dry storage facility for 10 or more vessels that is functionally associated with a boat launching area must also provide reasonable assurance that the facility, taking into consideration any secondary impacts, will meet the provisions of paragraph 62-330.301(1)(a), F.A.C., including the potential adverse impacts to manatees; | The state must review a project for impacts to all wildlife, not just listed species. The review is done using available scientific literature, and appropriate wildlife protection guidance documents, if available. |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | ecosystem and lead to reductions in overall biological productivity. | | 62-330.302(1), F.A.C. - In addition to the conditions in Rule 62-330.301, F.A.C., to obtain an individual or conceptual approval permit under this chapter, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, repair, removal, and abandonment of a project: (a) Located in, on, or over wetlands or other surface waters will not be contrary to the public interest, or if such activities significantly degrade or are within an Outstanding Florida Water, are clearly in the public interest, as determined by balancing the following criteria as set forth in sections 10.2.3 through 10.2.3.7 of Volume I: 1. Whether the activities will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats 2. Whether the activities will adversely affect the flow of water or cause harmful erosion or shoaling; 3. Whether the activities will adversely affect navigation or the flow of water or cause harmful erosion or shoaling; 4. Whether the activities will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity; 7. The current condition and relative value of functions being performed by areas affected by the proposed activities.<br><br>Volume I, section 10.2.3.2 - The Agency's public interest review of that portion of a proposed activity in, on, or over wetlands and other surface waters for impacts to "the conservation of fish and wildlife, including endangered or threatened species, or their habitats" is encompassed within the required review of the entire activity under section 10.2.2, above. An applicant must always provide the reasonable assurances required under section 10.2.2, above. | |
| **Subpart E** | **Potential impacts in special aquatic sites** | See definition in 404 Handbook section 2.0 | | |
| 230.40-45 (combined because they are similarly addressed) | • Sanctuaries and refuges<br>• Wetlands<br>• Mud flats<br>• Vegetated shallows<br>• Coral reefs<br>• Riffle and pool complexes | 62-330.301(1)(a)-(f), F.A.C.<br><br>62-330.302(1)(a)2., 3., 4., and 7, F.A.C.<br><br>404 Handbook, section 2.0<br><br>62-331.053(1)(c), F.A.C.<br><br>62-302.700, F.A.C. (Special Protection, Outstanding Florida Waters, Outstanding National Resource Waters) (see rule for full text) | 62-330.301(1)(a)-(f), F.A.C. – (1) To obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter: (a) Will not cause adverse water quantity impacts to receiving waters and adjacent lands; (b) Will not cause adverse flooding to on-site or off-site property; (c) Will not cause adverse impacts to existing surface water storage and conveyance capabilities; (d) Will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters; (e) Will not adversely affect the quality of receiving waters such that the state water quality standards set forth in chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including the antidegradation provisions of | **Sanctuaries and refuges** The state has many ways to protect sanctuaries and refuges. In addition to rules to protect Aquatic Preserves and Outstanding Florida waters, special criteria for review of sensitive areas can be found in our Sovereignty Submerged Lands Management rules and ERP rules. Any project within an Aquatic Preserve or special managed area must be consistent with any existing management plan. Our Coastal Zone Management commenting agencies and Aquatic Preserve staff also assist with these protections by providing |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | Chapter 258, F.S. (Aquatic Preserves) (see chapter text) Chapter 18-20, F.A.C. (Aquatic Preserves) (see chapter text) Chapter 18-18, F.A.C. (Biscayne Bay Aquatic Preserve) (see chapter text) Chapter 62-312, F.A.C. (Dredge and fill activities within Monroe County Outstanding Florida Waters) (see rule text) | paragraphs 62-4.242(1)(a) and (b), F.A.C., subsections 62-4.242(2) and (3), F.A.C., and rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C., will be violated; (f) Will not cause adverse secondary impacts to the water resources. In addition to the criteria in this subsection in subsection 62-330.301(2), F.A.C., in accordance with section 373.4132, F.S., an applicant proposing the construction, alteration, operation, maintenance, abandonment, or removal of a dry storage facility for 10 or more vessels that is functionally associated with a boat launching area must also provide reasonable assurance that the facility, taking into consideration any secondary impacts, will meet the provisions of paragraph 62-330.302(1)(a), F.A.C., including the potential adverse impacts to manatees; 62-330.302(1)(a)2., 3., 4., and 7., F.A.C. – (1) In addition to the conditions in rule 62-330.301, F.A.C., to obtain an individual or conceptual approval permit under this chapter, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, repair, removal, and abandonment of a project: (a) Located in, on, or over wetlands or other surface waters will not be contrary to the public interest, or if such activities significantly degrade or are within an Outstanding Florida Water, are clearly in the public interest, as determined by balancing the following criteria as set forth in sections 10.2.3 through 10.2.3.7 of Volume I: … 2. Whether the activities will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats; 3. Whether the activities will adversely affect navigation or the flow of water or cause harmful erosion or shoaling; 4. Whether the activities will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity; … 7. The current condition and relative value of functions being performed by areas affected by the proposed activities. 404 Handbook, section 2.0 – 43.   "Special aquatic sites" means sanctuaries and refuges under state and federal laws of local ordinances, wetlands, mud flats, vegetated shallows, coral reefs, and riffle and pool complexes. They are geographic areas, large or small, possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological | comments and conditions to add to ERP permits. To receive a permit, an applicant has to have sufficient real property interest. This means that any activities within a park or preserve are applied for by park or preserve staff in accordance with any management plans or objectives or are endorsed by the park through the park being a co-applicant on a permit application. Staff also evaluate each project for potential impact to the property of others. This includes any adverse environmental impact or flooding. **Other Special Aquatic Sites** Wetlands, mud flats, coral reefs, vegetated shallows, and riffle and pool complexes are delineated as wetlands or other surface waters under 62-340, F.A.C, and are regulated. Special consideration is given to sites that are rare, or that have exceptional wetland functional value. Many General Permits are excluded from use or contain special protections for areas that contain submerged or emergent aquatic vegetation, corals, or hard-bottom habitat. For individual permits, these types of habitats are considered to provide highly valuable functions and are regulated accordingly. The state has a special statute for assessing civil penalties for destruction of coral – 403.93345, F.S. |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | values. These areas are generally recognized as significantly influencing or positively contributing to the general overall environmental health or vitality of the entire ecosystem of a region. | |
| | | | 62-331.053(1)(c), F.A.C. - In addition to the conditions in Rules 62-330.301 and 62-330.302, F.A.C., individual permits under this Chapter are subject to the following conditions: | |
| | | | (1) No dredge or fill activity shall be permitted if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences. The Agency shall require the applicant to submit an alternatives analysis completed in accordance with the provisions below. Guidance for completing an alternatives analysis is in Appendix C of the 404 Handbook. | |
| | | | (c) Where the dredge or fill activity proposed within a special aquatic site does not require access or proximity to or siting within the special aquatic site to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a dredge or fill activity is proposed within a special aquatic site, all practicable alternatives to the proposed activity which do not involve dredging or filling within a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise. | |
| | | | 62-302.700, F.A.C. - Special Protection, Outstanding Florida Waters, Outstanding National Resource Waters. | |
| | | | (1) It shall be the Department policy to afford the highest protection to Outstanding Florida Waters and Outstanding National Resource Waters. No degradation of water quality, other than that allowed in subsections 62-4.242(2) and (3), F.A.C., is to be permitted in Outstanding Florida Waters and Outstanding National Resource Waters, respectively, notwithstanding any other Department rules that allow water quality lowering. | |
| | | | (2) A complete listing of Outstanding Florida Waters and Outstanding National Resource Waters is provided in subsections (9) and (10). Outstanding Florida Waters generally include the following surface waters (unless named as Outstanding National Resource Waters): | |
| | | | (a) Waters in National Parks, Preserves, Memorials, Wildlife Refuges and Wilderness Areas; | |
| | | | (b) Waters in the State Park System and Wilderness Areas; | |
| | | | (c) Waters within areas acquired through donation, trade, or purchased under the Environmentally Endangered Lands Bond Program, | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | Conservation and Recreation Lands Program, Land Acquisition Trust Fund Program, and Save Our Coast Program; (d) Rivers designated under the Florida Scenic and Wild Rivers Program, federal Wild and Scenic Rivers Act of 1968 as amended, and Myakka River Wild and Scenic Designation and Preservation Act; (e) Waters within National Seashores, National Marine Sanctuaries, National Estuarine Research Reserves, and certain National Monuments; (f) Waters in Aquatic Preserves created under the provisions of Chapter 258, F.S.; (g) Waters within the Big Cypress National Preserve; (h) Special Waters as listed in paragraph 62-302.700(9)(l), F.A.C.; and, (i) Certain Waters within the Boundaries of the National Forests. | |
| **Subpart F** | **Potential effects on human use characteristics** | | | |
| 230.50(a) and (b) | (a) Municipal and private water supplies consist of surface water or ground water which is directed to the intake of a municipal or private water supply system. (b) Possible loss of values: Discharges can affect the quality of water supplies with respect to color, taste, odor, chemical content and suspended particulate concentration, in such a way as to reduce the fitness of the water for consumption. Water can be rendered unpalatable or unhealthy by the addition of suspended particulates, viruses and pathogenic organisms, and dissolved materials. The expense of removing such substances before the water is delivered for consumption can be high. Discharges may also affect the quantity of water available for municipal and private water supplies. In addition, certain commonly used water treatment chemicals have the potential for combining with some suspended or dissolved substances from dredged or fill material to form other products that can have a toxic effect on consumers. | 62-330.301(1)(e), F.A.C. 62-330.302(1)(a)1., F.A.C. 62-331.201(3)(f), F.A.C. | 62-330.301(1)(e), F.A.C. - (1) To obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter: (e) Will not adversely affect the quality of receiving waters such that the state water quality standards set forth in chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including the antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), F.A.C., subsections 62-4.242(2) and (3), F.A.C., and rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C., will be violated; 62-330.302(1)(a)1., F.A.C. - (1) In addition to the conditions in rule 62-330.301, F.A.C., to obtain an individual or conceptual approval permit under this chapter, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, repair, removal, and abandonment of a project: (a) Located in, on, or over wetlands or other surface waters will not be contrary to the public interest, or if such activities significantly degrade or are within an Outstanding Florida Water, are clearly in the public interest, as determined by balancing the following criteria as set forth in sections 10.2.3 through 10.2.3.7 of Volume I: 1. Whether the activities will adversely affect the public health, safety, or welfare or the property of others; 62-331.201(3)(f), F.A.C. - (3) In addition, general permits under this Chapter are subject to the following conditions: | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (f) Water Supply Intakes. No activity may occur within 1000 feet of a public water supply intake, except where the activity is for the repair or improvement of public water supply intake structures or adjacent bank stabilization. | |
| 230.51(a) and (b) | (a) Recreational and commercial fisheries consist of harvestable fish, crustaceans, shellfish, and other aquatic organisms used by man.<br><br>(b) Possible loss of values: The discharge of dredged or fill materials can affect the suitability of recreational and commercial fishing grounds as habitat for populations of consumable aquatic organisms. Discharges can result in the chemical contamination of recreational or commercial fisheries. They may also interfere with the reproductive success of recreational and commercially important aquatic species through disruption of migration and spawning areas. The introduction of pollutants at critical times in their life cycle may directly reduce populations of commercially important aquatic organisms or indirectly reduce them by reducing organisms upon which they depend for food. Any of these impacts can be of short duration or prolonged, depending upon the physical and chemical impacts of the discharge and the biological availability of contaminants to aquatic organisms. | 62-330.301(1)(e), F.A.C.<br><br>62-330.302(1)(a)1., 2., 4., 7., and (c), F.A.C. | 62-330.301(1)(e), F.A.C. - (1) To obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter:<br>(e) Will not adversely affect the quality of receiving waters such that the state water quality standards set forth in chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including the antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), F.A.C., subsections 62-4.242(2) and (3), F.A.C., and rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C., will be violated;<br><br>62-330.302(1)(a)1., 2., 4., 7., and (c), F.A.C. - (1) In addition to the conditions in rule 62-330.301, F.A.C, to obtain an individual or conceptual approval permit under this chapter, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, repair, removal, and abandonment of a project:<br>(a) Located in, on, or over wetlands or other surface waters will not be contrary to the public interest, or if such activities significantly degrade or are within an Outstanding Florida Water, are clearly in the public interest, as determined by balancing the following criteria as set forth in sections 10.2.3 through 10.2.3.7 of Volume I:<br>1. Whether the activities will adversely affect the public health, safety, or welfare or the property of others;<br>2. Whether the activities will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;<br>4. Whether the activities will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity;<br>7. The current condition and relative value of functions being performed by areas affected by the proposed activities.<br>(c) Located in, adjacent to or in close proximity to Class II waters or located in Class II waters or Class III waters classified by the Department of Agriculture and Consumer Services as approved, restricted, conditionally approved, or conditionally restricted for shellfish harvesting will comply with the additional criteria in section 10.2.5 of Volume I. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 230.52(a) and (b) | (a) Water-related recreation activities undertaken for amusement and relaxation. Activities encompass two broad categories of use: consumptive, e.g., harvesting resources by hunting and fishing; and non-consumptive, e.g. canoeing and sight-seeing.<br><br>(b) Possible loss of values: One of the more important direct impacts of dredged or fill disposal is to impair or destroy the resources which support recreation activities. The disposal of dredged or fill material may adversely modify or destroy water use for recreation by changing turbidity, suspended particulates, temperature, dissolved oxygen, dissolved materials, toxic materials, pathogenic organisms, quality of habitat, and the aesthetic qualities of sight, taste, odor, and color. | 62-330.302(1)(a)4., F.A.C. | 62-330.302(1)(a)4., F.A.C. – (1) In addition to the conditions in rule 62-330.301, F.A.C., to obtain an individual or conceptual approval permit under this chapter, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, repair, removal, and abandonment of a project:<br>(a) Located in, on, or over wetlands or other surface waters will not be contrary to the public interest, or if such activities significantly degrade or are within an Outstanding Florida Water, are clearly in the public interest, as determined by balancing the following criteria as set forth in sections 10.2.3 through 10.2.3.7 of Volume I:<br>1. Whether the activities will adversely affect the public health, safety, or welfare or the property of others;<br>4. Whether the activities will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity; | |
| 230.53(a) and (b) | (a) Aesthetics associated with the aquatic ecosystem consist of the perception of beauty by one or a combination of the senses of sight, hearing, touch, and smell. Aesthetics of aquatic ecosystems apply to the quality of life enjoyed by the general public and property owners.<br><br>(b) Possible loss of values: The discharge of dredged or fill material can adversely affect the beauty of natural aquatic ecosystems by degrading water quality, creating distracting disposal sites, inducing inappropriate development, encouraging unplanned and incompatible human access, and by destroying vital elements that contribute to the compositional harmony or unity, visual distinctiveness, or diversity of an area. The discharge of dredged or fill material can adversely affect the particular features, traits, or characteristics of an aquatic area which make it valuable to property owners. Activities which degrade water quality, disrupt natural substrate and vegetational characteristics, deny access to or visibility of the resource, or result in changes in odor, air quality, or noise levels may reduce the value of an aquatic area to private property owners. | 62-331.053(2), F.A.C.<br><br>404 Handbook, section 8.3.2 | 62-331.053(2), F.A.C. – (2) The activity shall not significantly adversely affect the aesthetics of the aquatic ecosystem as they apply to the quality of life enjoyed by the general public and property owners as described in section 8.3.2 of the 404 Handbook.<br><br>404 Handbook, section 8.3.2 – Aesthetics Review<br>Aesthetics shall be considered as part of the evaluation of potential adverse effects on human-use characteristics that may occur as a result of the proposed activities.<br>Aesthetics associated with the aquatic ecosystem consist of the perception of beauty by one or a combination of the senses of sight, hearing, touch, and smell. Aesthetics of aquatic ecosystems apply to the quality of life enjoyed by the general public and property owners.<br>Possible loss of values (adverse effects) include: The dredge or fill projects can mar the beauty of natural aquatic ecosystems by degrading water quality, creating distracting project areas, inducing inappropriate development, encouraging unplanned and incompatible human access, and by destroying vital elements that contribute to the compositional harmony or unity, visual distinctiveness, or diversity of an area. Dredging or filling can adversely affect the particular features, traits, or characteristics of an aquatic area which make it valuable to property owners. Activities which degrade water quality, disrupt natural substrate and vegetational characteristics, deny access to or visibility of the resource, or result in changes in odor, air quality, or noise levels may reduce the value of an aquatic area to private property owners. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | The Agency shall also consider any comments received during the public comment period that apply to aesthetics. | |
| 230.54(a) and (b) | Parks, national and historical monuments, national seashores, wilderness areas, research sites, and similar preserves

(a) These preserves consist of areas designated under Federal and State laws or local ordinances to be managed for their aesthetic, educational, historical, recreational, or scientific value.

(b) Possible loss of values: The discharge of dredged or fill material into such areas may modify the aesthetic, educational, historical, recreational and/or scientific qualities thereby reducing or eliminating the uses for which such sites are set aside and managed. | 62-330.301(1)(e), and (j), F.A.C.

62-330.302(1)(a)4., 6., F.A.C.

62-330.350(1)(n), F.A.C.

62-330.405(16), F.A.C. | 62-330.301(1), F.A.C. - To obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter:

(e) Will not adversely affect the quality of receiving waters such that the state water quality standards set forth in chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including the antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), F.A.C., subsections 62-4.242(2) and (3), F.A.C., and rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C., will be violated;

(j) Will be conducted by a person with the financial, legal and administrative capability of ensuring that the activity will be undertaken in accordance with the terms and conditions of the permit, if issued;

62-330.302(1), F.A.C. - In addition to the conditions in rule 62-330.301, F.A.C., to obtain an individual or conceptual approval permit under this chapter, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, repair, removal, and abandonment of a project:

(a) Located in, on, or over wetlands or other surface waters will not be contrary to the public interest, or if such activities significantly degrade or are within an Outstanding Florida Water, are clearly in the public interest, as determined by balancing the following criteria as set forth in sections 10.2.3 through 10.2.3.7 of Volume I:

4. Whether the activities will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity;

6. Whether the activities will adversely affect or will enhance significant historical and archaeological resources under the provisions of section 267.061, F.S.; and

62-330.350(1)(n), F.A.C. – General Conditions for Individual Permits - If prehistoric or historic artifacts, such as pottery or ceramics, projectile points, stone tools, dugout canoes, metal implements, historic building materials, or any other physical remains that could be associated with Native American, early European, or American settlement are encountered at any time within the project site area, the permitted project shall cease all activities involving subsurface disturbance in the vicinity of the discovery. The permittee or other designee shall contact the Florida | Such preserves typically have management plans. The applicant must have sufficient ownership and/or control of the property to conduct the activity.

This means that the park, preserve, etc. is typically the applicant, and aware of their management plans.

Other preserve areas that might be under private ownership are protected under state rules for Outstanding Florida Waters and Aquatic Preserves.

The rules governing review of aesthetics and recreation also apply.

Historical resources are also protected. |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | Department of State, Division of Historical Resources, Compliance Review Section (DHR), at (850)245-6333, as well as the appropriate permitting agency office. Project activities shall not resume without verbal or written authorization from the Division of Historical Resources. If unmarked human remains are encountered, all work shall stop immediately and the proper authorities notified in accordance with section 872.05, F.S. For project activities subject to prior consultation with the DHR and as an alternative to the above requirements, the permittee may follow procedures for unanticipated discoveries as set forth within a cultural resources assessment survey determined complete and sufficient by DHR and included as a specific permit condition herein.<br><br>62-330.405(16), F.A.C. – General Conditions for General Permits - If prehistoric or historic artifacts, such as pottery or ceramics, projectile points, stone tools, dugout canoes, metal implements, historic building materials, or any other physical remains that could be associated with Native American, early European, or American settlement are encountered at any time within the project site area, the permitted project shall cease all activities involving subsurface disturbance in the vicinity of the discovery. The permittee or other designee shall contact the Florida Department of State, Division of Historical Resources, Compliance Review Section (DHR), at (850)245-6333, as well as the appropriate permitting agency office. Project activities shall not resume without verbal or written authorization from the Division of Historical Resources. If unmarked human remains are encountered, all work shall stop immediately and the proper authorities notified in accordance with section 872.05, F.S.<br><br>404 Handbook, section 5.2.2<br><br>Florida Division of Historical Resources/State Historic Preservation Office<br>The State Historic Preservation Office (SHPO) shall review proposed projects to determine whether the project is likely to have an adverse effect on properties listed, or eligible for listing on the National Register of Historic Places. If the Agency or SHPO determine that the project as proposed may have adverse effects to properties listed or eligible to be listed in the National Register of Historic Places, the Agency, applicant, and SHPO shall consult to resolve the adverse effects prior to the final determination by SHPO. SHPO may provide any of the following determinations for the project:<br>• Request for additional information, and/or a request for a Cultural Resources Assessment Survey (CRAS); | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | • No effect to historic properties; <br> • No adverse effect to historic properties; <br> • Conditional no adverse effect to historic properties (recommended project modifications and/or special conditions for the permit); <br> • Adverse effect to historic properties; or <br> • (For general permit applications) Request that the project be evaluated as an individual permit because of potential historical resources concerns. <br><br> If SHPO sends a request for additional information or a CRAS, or recommends project modifications, the information shall be included in an Agency request for additional information. Once the additional information is received by the Agency, the additional information shall be immediately forwarded to SHPO for review and additional determination. <br> (a) General Permits – Pre-coordination with SHPO is required for those activities that may qualify for a general permit without notice to the Agency (no-notice general permit). Pre-coordination shall be the responsibility of the prospective permittee, and shall be conducted in accordance with paragraph 62-331.200(3)(i), F.A.C. If use of a general permit requires notice to the Agency, the Agency shall forward a copy of the notice to SHPO for review. A prospective permittee may choose to pre-coordinate with SHPO, in which case the prospective permittee shall submit a copy of the outcome of such review with the notice. <br> (b) Individual permits that also require an ERP individual permit – The Agency shall send a copy of the application to SHPO upon receipt, and shall include a notice to SHPO that the project also requires a State 404 Program permit. At such time that the Agency publishes the public notice for the project in accordance with Rule 62-331.060, F.A.C., a copy of the public notice shall be sent to SHPO. The notice shall contain the ERP application and/or permit number. SHPO may have additional comments pertaining to the State 404 authorization, or may state that any information sent to the Agency during the ERP review period shall also apply to the State 404 Program review. <br><br> (c) Individual permits that do not require an ERP individual permit – The agency shall send SHPO a copy of the public notice in accordance with Rule 62-331.060, F.A.C. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | If an agency, such as FDOT, is the applicant and has previously coordinated with SHPO on the project, and there have been no changes to the project following coordination, the agency may submit proof of concurrence or a determination by SHPO for the proposed project with the application for a State 404 permit. | |
| **Subpart G** | **Evaluation and testing** | | | |
| 230.60 and 230.61 | General Evaluation of dredged or fill material; and Chemical, biological, and physical evaluation and testing. | 62-4.246(1)-(3), F.A.C. – Sampling, Testing Methods, and Method Detection Limits for Water Pollution Sources

62-330.301(1)(d), (e), and (f), and (2), F.A.C. – Conditions for Issuance of Individual and Conceptual Approval Permits

62-330.302(1)(a)1, 2, 4, and (c), F.A.C. – Additional Conditions for Issuance of Individual and Conceptual Approval Permits | 62-4.246(1)-(3), F.A.C. – (1) The Department shall require monitoring and sampling for pollutants reasonably expected to be contained in the discharge and to violate the water quality criteria in Chapter 62-302, F.A.C.
(2) Field testing, sample collection and preservation, laboratory testing, including quality control procedures, and all record keeping shall comply with Chapter 62-160, F.A.C.
(3) Subsections (4)-(11) of this rule apply only to permit applications, permits, monitoring reports, and other sources of data relating to discharges to surface waters.

62-330.301(1)(d), (e), and (f), and (2), F.A.C. – (1) To obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter:
(d) Will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters;
(e) Will not adversely affect the quality of receiving waters such that the state water quality standards set forth in Chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including the antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), F.A.C., subsections 62-4.242(2) and (3), F.A.C., and Rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C., will be violated;
(f) Will not cause adverse secondary impacts to the water resources. In addition to the criteria in this subsection and in subsection 62-330.301(2), F.A.C., in accordance with Section 373.4132, F.S., an applicant proposing the construction, alteration, operation, maintenance, abandonment, or removal of a dry storage facility for 10 or more vessels that is functionally associated with a boat launching area must also provide reasonable assurance that the facility, taking into consideration any secondary impacts, will meet the provisions of paragraph 62-330.302(1)(a), F.A.C., including the potential adverse impacts to manatees | The authority to require water quality and sediment testing is in the rules listed. The state implements a review process very similar to the process described in the guidelines. Contamination thresholds are addressed in our state water quality standards. When testing is required, applicants must test for specific parameters determined by the agency to be appropriate for the project and location, and labs are required to follow certain approved testing procedures, and to report the data in a specified, useable format. Processors then compare the data to the applicable standards as listed in 62-330.301(1)(e), F.A.C. for water quality, sediments, or groundwater. If testing testing results indicate, eluriate testing will also be required. The testing requirements are tailored to the project and the final disposal site, similar to the guidance in 40 CFR § 230.60 and .61. |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (2) In instances where an applicant is unable to meet state water quality standards because existing ambient water quality does not meet standards and the system will contribute to this existing condition, the applicant must implement mitigation measures that are proposed by or acceptable to the applicant that will cause net improvement of the water quality in the receiving waters for those parameters that do not meet standards.<br><br>62-330.302(1)(a)1, 2, 4, and (c), F.A.C. - (1) In addition to the conditions in rule 62-330.301, F.A.C., to obtain an individual or conceptual approval permit under this chapter, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, repair, removal, and abandonment of a project: (a) Located in, on, or over wetlands or other surface waters will not be contrary to the public interest, or if such activities significantly degrade or are within an Outstanding Florida Water, are clearly in the public interest, as determined by balancing the following criteria as set forth in sections 10.2.3 through 10.2.3.7 of Volume I: 1. Whether the activities will adversely affect the public health, safety, or welfare or the property of others, 2. Whether the activities will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats, 4. Whether the activities will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity (c) Located in, adjacent to or in close proximity to Class II waters or located in Class II waters or Class III waters classified by the Department of Agriculture and Consumer Services as approved, restricted, conditionally approved, or conditionally restricted for shellfish harvesting will comply with the additional criteria in section 10.2.5 of Volume I, as described in subsection 62-330.010(5), F.A.C. | |
| **Subpart H** | **Actions to Minimize Adverse Effects** | | | |
| 230.70-77 | These sections give examples of ways to minimize adverse effects of a project. | Applicant's Handbook Volume I, section 10.2.1 except section 10.2.1.2 and the 1st sentence of the second paragraph of 10.2.1.1, which are not applicable to the State 404 Program. | Volume I, section 10.2.1 Elimination or Reduction of Impacts - Protection of wetlands and other surface waters is preferred to destruction and mitigation due to the temporal loss of ecological value and uncertainty regarding the ability to recreate certain functions associated with these features. The following factors are considered in determining whether an application will be approved by the Agency; the degree of impact to wetland and other surface water functions caused by a proposed activity; whether the impact to these functions can be mitigated; and the practicability of design modifications for the site that could eliminate or reduce impacts to these functions, including alignment alternatives for a proposed linear system. Design modifications to reduce or eliminate adverse impacts must be | ERP Applicant's Handbook Volume I gives instructions for avoiding and minimizing (aka eliminating and reducing) impacts but is not as specific as the Guidelines. The regulatory outcome is the same.<br><br>The highlighted portions are not applicable to the State 404 Program. |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | explored, as described in section 10.2.1.1, below. Adverse impacts remaining after practicable design modifications have been made may be offset by mitigation as described in sections 10.3 through 10.3.8, below. An applicant may propose mitigation, or the Agency may suggest mitigation, to offset the adverse impacts caused by regulated activities as identified in sections 10.2 through 10.2.8.2, below. To receive Agency approval, an activity cannot cause a net adverse impact on wetland functions and other surface water functions that is not offset by mitigation. | |
| | | | 10.2.1.1 Except as provided in section 10.2.1.2, below, if the proposed activity will result in adverse impacts to wetland functions and other surface water functions such that it does not meet the requirements of sections 10.2.2 through 10.2.3.7, below, then the Agency in determining whether to grant or deny a permit shall consider whether the applicant has implemented practicable design modifications to reduce or eliminate such adverse impacts. | |
| | | | The term "modification" shall not be construed as including the alternative of not implementing the activity in some form), nor shall it be construed as requiring a project that is significantly different in type or function. A proposed modification that is not technically capable of being completed, is not economically viable, or that adversely affects public safety through the endangerment of lives or property is not considered "practicable." A proposed modification need not remove all economic value of the property in order to be considered not "practicable." Conversely, a modification need not provide the highest and best use of the property to be "practicable." In determining whether a proposed modification is practicable, consideration shall also be given to the cost of the modification compared to the environmental benefit it achieves. | |
| | | | Volume I, section 10.2.1.2 - The Agency will not require the applicant to implement practicable design modifications to reduce or eliminate impacts when: | |
| | | | a. The ecological value of the functions provided by the area of wetland or other surface water to be adversely affected is low, based on a site specific analysis using the factors in section 10.2.2.3, below, and the proposed mitigation will provide greater long term ecological value than the area of wetland or other surface water to be adversely affected; or | |
| | | | b. The applicant proposes mitigation that implements all or part of a plan that provides regional ecological value and that provides greater long term ecological value than the area of wetland or other surface water to be adversely affected. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | Volume I, section 10.2.1.3 - Should such mutual consideration of modification and mitigation not result in a permittable activity, the Agency must deny the application. Nothing herein shall imply that the Agency may not deny an application for a permit as submitted or modified, if it fails to meet the conditions for issuance, or that mitigation must be accepted by the Agency. | |
| **Subpart I** | **Planning to shorten permit processing time** | | | |
| 230.80 | Advanced identification of disposal areas<br><br>(a) Consistent with these Guidelines, EPA and the permitting authority, on their own initiative or at the request of any other party and after consultation with any affected State that is not the permitting authority, may identify sites which will be considered as:<br><br>(1) Possible future disposal sites, including existing disposal sites and non-sensitive areas; or<br><br>(2) Areas generally unsuitable for disposal site specification;<br><br>(b) The identification of any area as a possible future disposal site should not be deemed to constitute a permit for the discharge of dredged or fill material within such area or a specification of a disposal site. The identification of areas that generally will not be available for disposal site specification should not be deemed as prohibiting applications for permits to discharge dredged or fill material in such areas. Either type of identification constitutes information to facilitate individual or General permit application and processing.<br><br>(c) An appropriate public notice of the proposed identification of such areas shall be issued;<br><br>(d) To provide the basis for advanced identification of disposal areas, and areas unsuitable for disposal, EPA and the permitting authority shall consider the likelihood that use of the area in question for dredged or fill material disposal will comply with these Guidelines. To facilitate this analysis, EPA and the | 373.4144, F.S. | 373.4144, F.S. - It is the intent of the Legislature to: (a) Facilitate coordination and a more efficient process of implementing regulatory duties and functions between the Department of Environmental Protection, the water management districts, the United States Army Corps of Engineers, the United States Fish and Wildlife Service, the National Marine Fisheries Service, the United States Environmental Protection Agency, the Fish and Wildlife Conservation Commission, and other relevant federal and state agencies. (b) Authorize the Department of Environmental Protection to obtain issuance by the United States Army Corps of Engineers, pursuant to state and federal law and as set forth in this section, of an expanded state programmatic general permit, or a series of regional general permits, for categories of activities in waters of the United States governed by the Clean Water Act and in navigable waters under the Rivers and Harbors Act of 1899 which are similar in nature, which will cause only minimal adverse environmental effects when performed separately, and which will have only minimal cumulative adverse effects on the environment. (c) Use the mechanism of such a state general permit or such regional general permits to eliminate overlapping federal regulations and state rules that seek to protect the same resource and to avoid duplication of permitting between the United States Army Corps of Engineers and the department for minor work located in waters of the United States, including navigable waters, thus eliminating, in appropriate cases, the need for a separate individual approval from the United States Army Corps of Engineers while ensuring the most stringent protection of wetland resources. (d) Direct the department not to seek issuance of or take any action pursuant to any such permit or permits unless such conditions are at least as protective of the environment and natural resources as existing state law under this part and federal law under the Clean Water Act and the Rivers and Harbors Act of 1899.<br>(2)(a) In order to effectuate efficient wetland permitting and avoid duplication, the department and water management districts are authorized to implement a voluntary state programmatic general permit for all dredge and fill activities impacting 10 acres or less of wetlands or other surface waters, including navigable waters, subject | The state has the ability to do this, and may at some point in the future. |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | permitting authority should review available water resources management data including data available from the public, other Federal and State agencies, and information from approved Coastal Zone Management programs and River Basin Plans; | | to agreement with the United States Army Corps of Engineers, if the general permit is at least as protective of the environment and natural resources as existing state law under this part and federal law under the Clean Water Act and the Rivers and Harbors Act of 1899. (b) By seeking to use a statewide programmatic general permit, an applicant consents to applicable federal wetland jurisdiction criteria, which are not included pursuant to this part, but which are authorized by the regulations implementing s. 404 of the Clean Water Act, Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq., and s. 10 of the Rivers and Harbors Act of 1899 as required by the United States Army Corps of Engineers, notwithstanding s. 373.4145 and for the limited purpose of implementing the state programmatic general permit authorized by this subsection. | |
| | (e) The permitting authority should maintain a public record of the identified areas and a written statement of the basis for identification. | | (3) The department may pursue a series of regional general permits for construction activities in wetlands or surface waters or delegation or assumption of federal permitting programs regulating the discharge of dredged or fill material pursuant to s. 404 of the Clean Water Act, Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq., and s. 10 of the Rivers and Harbors Act of 1899. | |
| **Subpart J** | **Compensatory mitigation for losses of aquatic resources** | | | |
| 230.91 | Purpose and general considerations | NA | | Not necessary to include in state law |
| 230.91(a) and (b) | Purpose and applicability | NA | | Not necessary to include in state law |
| 230.91(c) | Sequencing | | | |
| 230.91(c)(1) | (1) Nothing in this section affects the requirement that all DA permits subject to section 404 of the Clean Water Act comply with applicable provisions of this part. | Applicant's Handbook Volume I, section 10.3, paragraph 1 | Volume I, section 10.3 - Mitigation will be approved only after the applicant has complied with the requirements of sections 10.2.1 through 10.2.1.3, above, regarding practicable modifications to reduce or eliminate adverse impacts. However, any mitigation proposal submitted for review shall be reviewed concurrently with the analysis of any modification pursuant to section 10.2, above. This section establishes criteria to be followed in evaluating mitigation proposals in light of the programmatic and project permitting goal of no net loss of wetland and other surface waters functions. | |
| 230.91(c)(2) | (2) Pursuant to these requirements, the district engineer will issue an individual section 404 permit only upon a determination that the proposed discharge complies with applicable provisions of 40 CFR part 230, including those which require the permit applicant to take all appropriate and practicable steps to avoid and minimize adverse impacts to waters of the United States. Practicable means available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project | Applicant's Handbook Volume I, section 10.3 | Volume I, section 10.3 - Mitigation will be approved only after the applicant has complied with the requirements of sections 10.2.1 through 10.2.1.3, above, regarding practicable modifications to reduce or eliminate adverse impacts. However, any mitigation proposal submitted for review shall be reviewed concurrently with the analysis of any modification pursuant to section 10.2, above. This section establishes criteria to be followed in evaluating mitigation proposals in light of the programmatic and project permitting goal of no net loss of wetland and other surface waters functions. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | purposes. Compensatory mitigation for unavoidable impacts may be required to ensure that an activity requiring a section 404 permit complies with the Section 404(b)(1) Guidelines. | | Mitigation as described in sections 10.3 through 10.3.8, below, is required only to offset the adverse impacts to the functions identified in sections 10.2 through 10.2.8.2, above, caused by regulated activities. In certain cases, mitigation cannot offset impacts sufficiently to yield a permittable project. Such cases include activities that significantly degrade Outstanding Florida Waters, adversely impact those wetlands or other surface waters that are not likely to be successfully recreated.

Applicants are encouraged to consult with Agency staff in pre-application conferences or during the application process to identify appropriate mitigation options. | |
| 230.91(c)(3) | (3) Compensatory mitigation for unavoidable impacts may be required to ensure that an activity requiring a section 404 permit complies with the Section 404(b)(1) Guidelines compliance analysis, the district engineer may determine that a DA permit for the proposed activity cannot be issued because of the lack of appropriate and practicable compensatory mitigation options. | Applicant's Handbook Volume I, section 10.3 | Volume I, section 10.3 - Mitigation will be approved only after the applicant has complied with the requirements of sections 10.2.1 through 10.2.1.3, above, regarding practicable modifications to reduce or eliminate adverse impacts. However, any mitigation proposal submitted for review shall be reviewed concurrently with the analysis of any modification pursuant to section 10.2, above. This section establishes criteria to be followed in evaluating mitigation proposals in light of the programmatic and project permitting goal of no net loss of wetland and other surface waters functions.

Mitigation as described in sections 10.3 through 10.3.8, below, is required only to offset the adverse impacts to the functions identified in sections 10.2 through 10.2.8.2, above, caused by regulated activities. In certain cases, mitigation cannot offset impacts sufficiently to yield a permittable project. Such cases include activities that significantly degrade Outstanding Florida Waters, adversely impact those wetlands or other surface waters that are not likely to be successfully recreated.

Applicants are encouraged to consult with Agency staff in pre-application conferences or during the application process to identify appropriate mitigation options. | |
| 230.91(d) | Accounting for regional variations | See comment | | State uses the concept of "conceptual reference site". This means considering literature, local examples, and site specific details to determine the appropriate functions for a specific community in a specific location. |
| 230.91(e) | Relationship to other guidance documents | NA for state program | | |
| 230.92 | Definitions | See definition table (first table) | | See definitions section (next table) |
| 230.93 | General compensatory mitigation requirements | | | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 230.93(a)(1) | Fundamental objective is to offset environmental losses… | Applicant's Handbook Volume I, section 10.3.1 | Volume I, section 10.3 - Mitigation usually consists of restoration, enhancement, creation, or preservation of wetlands, other surface waters, or uplands. Uplands that function as a hydrologic contributing area to wetlands, and are necessary to maintain the ecological value of those wetlands, may be appropriate for mitigation of impacts to wetlands, as well as impacts to uplands that are used by bald eagles, and listed aquatic and wetland dependent species for nesting or denning. The evaluation of the appropriateness of incorporating uplands as part of a mitigation plan shall include consideration of the proximity of uplands to wetlands and the degree to which uplands support the functions of the associated wetlands. In some cases, a combination of mitigation types is the best approach to offset adverse impacts resulting from the regulated activity.  Restoration is usually preferred over creation as it often has a greater chance of success due to soil characteristics, hydrologic regime, landscape position, or other factors that favor re-establishment of wetland or other surface water communities. Preservation of important ecosystems can provide an improved level of protection over current regulatory programs when it ensures that the values of the preserved area are protected and maintained in the long term. Areas proposed to be preserved to prevent secondary or cumulative impacts (sections 10.2.7 and 10.2.8, above) may also be considered part of a mitigation plan if those areas also serve to offset adverse impacts. | |
| 230.93(a)(2) | (2) Compensatory mitigation may be performed using the methods of restoration, enhancement, establishment, and in certain circumstances preservation. Restoration should generally be the first option… | Applicant's Handbook Volume I, section 10.3.1 | Volume I, section 10.3.1Mitigation usually consists of restoration, enhancement, creation, or preservation of wetlands, other surface waters, or uplands. Uplands that function as a hydrologic contributing area to wetlands, and are necessary to maintain the ecological value of those wetlands, may be appropriate for mitigation of impacts to wetlands, as well as impacts to uplands that are used by bald eagles, and listed aquatic and wetland dependent species for nesting or denning. The evaluation of the appropriateness of incorporating uplands as part of a mitigation plan shall include consideration of the proximity of uplands to wetlands and the degree to which uplands support the functions of the associated wetlands. In some cases, a combination of mitigation types is the best approach to offset adverse impacts resulting from the regulated activity.  Restoration is usually preferred over creation as it often has a greater chance of success due to soil characteristics, hydrologic regime, landscape position, or other factors that favor re-establishment of wetland or other surface water communities. Preservation of important ecosystems can provide an improved level of protection | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | over current regulatory programs when it ensures that the values of the preserved area are protected and maintained in the long term. Areas proposed to be preserved to prevent secondary or cumulative impacts (sections 10.2.7 and 10.2.8, above) may also be considered part of a mitigation plan if those areas also serve to offset adverse impacts. | |
| 230.93(a)(3) | (3) Compensatory mitigation projects may be sited on public or private lands. Credits for compensatory mitigation projects on public land must be based solely on aquatic resource functions provided by the compensatory mitigation project, over and above those provided by public programs already planned or in place. All compensatory mitigation projects must comply with the standards in this part, if they are to be used to provide compensatory mitigation for activities authorized by DA permits, regardless of whether they are sited on public or private lands and whether the sponsor is a governmental or private entity. | Section 373.4135, F.S. | 373.4135, F.S. - Mitigation banks and offsite regional mitigation. — (1)  The Legislature finds that the adverse impacts of activities regulated under this part may be offset by the creation, maintenance, and use of mitigation banks and offsite regional mitigation. Mitigation banks and offsite regional mitigation can enhance the certainty of mitigation and provide ecological value due to the improved likelihood of environmental success associated with their proper construction, maintenance, and management. Therefore, the department and the water management districts are directed to participate in and encourage the establishment of private and public mitigation banks and offsite regional mitigation. Mitigation banks and offsite regional mitigation should emphasize the restoration and enhancement of degraded ecosystems and the preservation of uplands and wetlands as intact ecosystems rather than alteration of landscapes to create wetlands. This is best accomplished through restoration of ecological communities that were historically present.<br>(a)  The Legislature intends that the provisions for establishing mitigation banks apply equally to both public and private entities, except that the rules of the department and water management districts may set forth different measures governing financial responsibility, and different measures governing legal interest, needed to ensure the construction and perpetual protection of a mitigation bank.<br>(b)  Notwithstanding the provisions of this section, a governmental entity may not create or provide mitigation for a project other than its own unless the governmental entity uses land that was not previously purchased for conservation and unless the governmental entity provides the same financial assurances as required for mitigation banks permitted under s. 373.4136. This paragraph does not apply to:<br>1.  Mitigation banks permitted before December 31, 2011, under s. 373.4136;<br>2.  Offsite regional mitigation areas established before December 31, 2011, under subsection (6);<br>3.  Mitigation for transportation projects under ss. 373.4137 and 373.4139;<br>4.  Mitigation for impacts from mining activities under s. 373.41492;<br>5.  Mitigation provided for single-family lots or homeowners under subsection (7); | Section 373.4135, F.S. limits mitigation on public lands except under certain circumstances. |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | 6. Entities authorized in chapter 98-492, Laws of Florida; | |
| | | | 7. Mitigation provided for electric utility impacts certified under part II of chapter 403; or | |
| | | | 8. Mitigation provided on sovereign submerged lands under subsection (6). | |
| | | | (c) It is the further intent of the Legislature that mitigation banks and offsite regional mitigation be considered appropriate and a permittable mitigation option under the conditions specified by the rules of the department and water management districts. | |
| | | | (d) Offsite mitigation, including offsite regional mitigation, may be located outside the regional watershed in which the adverse impacts of an activity regulated under this part are located, if such adverse impacts are offset by the offsite mitigation. | |
| | | | (e) The department or water management district may allow the use of a mitigation bank or offsite regional mitigation alone or in combination with other forms of mitigation to offset adverse impacts of activities regulated under this part. | |
| | | | (f) When an applicant for a permit under the provisions of this part other than this section and s. 373.4136 submits more than one mitigation proposal to the department or a water management district, the department or water management district shall, in evaluating each proposal, ensure that such proposal adequately offsets the adverse impacts. | |
| | | | (2) Local governments shall not deny the use of a mitigation bank or offsite regional mitigation due to its location outside of the jurisdiction of the local government. | |
| | | | (3) Nothing in this section or s. 373.4136 shall be construed to eliminate or diminish any of the regulatory requirements applicable to applicants seeking permits pursuant to other provisions of this part. | |
| | | | (4) Except as otherwise provided herein, nothing in this section or s. 373.4136 shall be construed to diminish or limit the existing authority of the department, water management districts, or local governments. | |
| | | | (5) Nothing in this section or s. 373.4136 shall be construed to limit the consideration of forms of mitigation other than mitigation banks and offsite regional mitigation. | |
| | | | (6) An environmental creation, preservation, enhancement, or restoration project, including regional offsite mitigation areas, for which money is donated or paid as mitigation, that is sponsored by the department, a water management district, or a local government and provides mitigation for five or more applicants for permits under this part, or for 35 or more acres of adverse impacts, shall be established and operated under a memorandum of agreement. The memorandum of agreement shall be between the governmental entity proposing the mitigation project and the department or water management district, | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | as appropriate. Such memorandum of agreement need not be adopted by rule. For the purposes of this subsection, one creation, preservation, enhancement, or restoration project shall mean one or more parcels of land with similar ecological communities that are intended to be created, preserved, enhanced, or restored under a common scheme. (a)   For any ongoing creation, preservation, enhancement, or restoration project and regional offsite mitigation area sponsored by the department, a water management district, or a local government, for which money was or is paid as mitigation, that was begun prior to the effective date of this subsection and has operated as of the effective date of this subsection, or is anticipated to operate, in excess of the mitigation thresholds provided in this subsection, the governmental entity sponsoring such project shall submit a draft memorandum of agreement to the water management district or department by October 1, 2000. The governmental entity sponsoring such project shall make reasonable efforts to obtain the final signed memorandum of agreement within 1 year after such submittal. The governmental entity sponsoring such project may continue to receive moneys donated or paid toward the project as mitigation, provided the requirements of this paragraph are met. (b)   The memorandum of agreement shall establish criteria that each environmental creation, preservation, enhancement, or restoration project must meet. These criteria must address the elements listed in paragraph (c). The entity sponsoring such project, or category of projects, shall submit documentation or other evidence to the water management district or department that the project meets, or individual projects within a category meet, the specified criteria. (c)   At a minimum, the memorandum of agreement must address the following for each project authorized: 1.   A description of the work that will be conducted on the site and a timeline for completion of such work. 2.   A timeline for obtaining any required environmental resource permit. 3.   The environmental success criteria that the project must achieve. 4.   The monitoring and long-term management requirements that must be undertaken for the project. 5.   An assessment of the project in accordance with s. 373.4136(4)(a)-(i), until the adoption of the uniform wetland mitigation assessment method pursuant to s. 373.414(18). 6.   A designation of the entity responsible for the successful completion of the mitigation work. 7.   A definition of the geographic area where the project may be used as mitigation established using the criteria of s. 373.4136(6). | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | 8.  Full cost accounting of the project, including annual review and adjustment.<br>9.  Provision and a timetable for the acquisition of any lands necessary for the project.<br>10.  Provision for preservation of the site.<br>11.  Provision for application of all moneys received solely to the project for which they were collected.<br>12.  Provision for termination of the agreement and cessation of use of the project as mitigation if any material contingency of the agreement has failed to occur.<br>(d)  A single memorandum of understanding may authorize more than one environmental creation, preservation, enhancement, or restoration project, or category of projects, as long as the elements listed in paragraph (c) are addressed for each project.<br>(e)  Projects governed by this subsection, except for projects established pursuant to subsection (7), shall be subject to the provisions of s. 373.414(1)(b)1.<br>(f)  The provisions of this subsection shall not apply to mitigation areas established to implement the provisions of s. 373.4137.<br>(g)  The provisions of this subsection shall not apply when the department, water management district, or local government establishes, or contracts with a private entity to establish, a mitigation bank permitted under s. 373.4136. The provisions of this subsection shall not apply to other entities that establish offsite regional mitigation as defined in this section and s. 373.403.<br>(7)  The department, water management districts, and local governments may elect to establish and manage mitigation sites, including regional offsite mitigation areas, or contract with permitted mitigation banks, to provide mitigation options for private single-family lots or homeowners. The department, water management districts, and local governments shall provide a written notice of their election under this subsection by United States mail to those individuals who have requested, in writing, to receive such notice. The use of mitigation options established under this subsection are not subject to the full-cost-accounting provision of s. 373.414(1)(b)1. To use a mitigation option established under this subsection, the applicant for a permit under this part must be a private, single-family lot or homeowner, and the land upon which the adverse impact is located must be intended for use as a single-family residence by the current owner. The applicant must not be a corporation, partnership, or other business entity. However, the provisions of this subsection shall not apply to other entities that establish offsite regional mitigation as defined in this section and s. 373.403 | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 230.93(b)(1) | (1) When considering options for successfully providing the required compensatory mitigation, the district engineer shall consider the type and location options in the order presented in paragraphs (b)(2) through (b)(6) of this section. ... (Mitigation hierarchy) | 62-331.130(1), F.A.C. 404 Handbook, sections 8.5 and 8.5.1 | 62-331.130, F.A.C. – Compensatory mitigation shall be considered only after the requirements of Rule 62-331.053(1), F.A.C., have been met. Compensatory mitigation required for authorizations or compliance actions under this Chapter shall be conducted in accordance with section 10.3 of Volume I, section 8.5 of the 404 Handbook, and this section: (1) Mitigation Hierarchy. The preferential hierarchy in the 404 Handbook section 8.5.1 shall be followed when compensatory mitigation is required for authorizations and compliance actions. 404 Handbook, section 8.5 – Compensatory Mitigation Compensatory mitigation for State 404 Program permits shall be conducted in accordance with Rule 62-331.130, F.A.C., and this section. 404 Handbook, section 8.5.1 – Compensatory Mitigation Hierarchy When considering options for successfully providing the required compensatory mitigation, the Agency shall consider the type and location options in the order presented in paragraphs (a) through (e) of this section. It is recognized that flexibility may be needed to address watershed needs and allow for the consideration of mitigation projects that are environmentally preferable based on a watershed approach. If such projects are consistent with this section. Subject to the provisions in paragraphs (a) through (e), below, and section 8.5.2 of this Handbook, the required compensatory mitigation should be located within the same watershed as the impact site, and should be located where it is most likely to successfully replace lost functions and services, taking into account such watershed scale features as aquatic habitat diversity, habitat connectivity, relationships to hydrologic sources (including the availability of water rights), trends in land use, ecological benefits, and compatibility with adjacent land uses. When compensating for impacts to marine resources, the location of the compensatory mitigation site should be chosen to replace lost functions and services within the same marine ecological system (e.g., reef complex, littoral drift cell). Compensation for impacts to aquatic resources in coastal watersheds (watersheds that include a tidal water body) should also be located in a coastal watershed where practicable. Compensatory mitigation projects should not be located where they will increase risks to aviation by attracting wildlife to areas where aircraft-wildlife strikes may occur (e.g., near airports). (a) Mitigation bank credits. When permitted impacts are located within the service area of an approved mitigation bank, and the bank has the appropriate number and resource type of credits available, the |  |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | permittee's compensatory mitigation requirements may be met by the purchase of mitigation bank credits; | |
| | | | Since an approved instrument (including an approved mitigation plan and appropriate real estate and financial assurances) for a mitigation bank is required to be in place before its credits can begin to be used to compensate for authorized impacts, use of a mitigation bank can help reduce risk and uncertainty, as well as temporal loss of resource functions and services. Mitigation bank credits are not released for debiting until specific milestones associated with the mitigation bank site's protection and development are achieved, thus use of mitigation bank credits can also help reduce risk that mitigation will not be fully successful. | |
| | | | Mitigation banks typically involve larger, more ecologically valuable parcels, and more rigorous scientific and technical analysis, planning and implementation than permittee-responsible mitigation. Also, development of a mitigation bank requires site identification in advance, project-specific planning, and significant investment of financial resources that is often not practicable for many in-lieu fee programs. For these reasons, the Agency shall give preference to the use of mitigation bank credits when these considerations are applicable. However, these same considerations may also be used to override this preference, where appropriate, as, for example, where an in-lieu fee program has released credits available from a specific approved in-lieu fee project, or a permittee-responsible project will restore an outstanding resource based on rigorous scientific and technical analysis. | |
| | | | (b) Corps authorized in-lieu fee program credits. Where permitted impacts are located within the service area of a Corps authorized in-lieu fee program, and the in-lieu fee program has the appropriate number and resource type of credits available, the permittee's compensatory mitigation requirements may be met by securing those credits from the in-lieu fee program. | |
| | | | In-lieu fee projects typically involve larger, more ecologically valuable parcels, and more rigorous scientific and technical analysis, planning and implementation than permittee-responsible mitigation. They also devote significant resources to identifying and addressing high-priority resource needs on a watershed scale, as reflected in their compensation planning framework. For these reasons, the Agency shall give preference to in-lieu fee program credits over permittee-responsible mitigation, where these considerations are applicable. However, as with the preference for mitigation bank credits, these same considerations may be used to override this preference where | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | appropriate. Additionally, in cases where permittee-responsible mitigation is likely to successfully meet performance standards before advance credits secured from an in-lieu fee program are fulfilled, the Agency shall also consider this factor in deciding between an in-lieu fee mitigation and permittee-responsible mitigation. <br><br>(c) Permittee-responsible mitigation under a watershed approach. Where permitted impacts are not in the service area of an approved mitigation bank or in-lieu fee program that has the appropriate number and resource type of credits available, permittee-responsible mitigation is the only option. Where practicable and likely to be successful and sustainable, the resource type and location for the required permittee-responsible compensatory mitigation shall be determined using the principles of a watershed approach as outlined in section 8.5 of the 404 Handbook. <br><br>(d) Permittee-responsible mitigation through on-site and in-kind mitigation. In cases where a watershed approach is not practicable, the Agency shall consider opportunities to offset anticipated aquatic resource impacts by requiring on-site and in-kind compensatory mitigation. The Agency shall also consider the practicability of on-site compensatory mitigation and its compatibility with the proposed project. <br><br>(e) Permittee-responsible mitigation through off-site and/or out-of-kind mitigation. If, after considering opportunities for on-site, in-kind compensatory mitigation as provided in paragraph (d), above, the Agency determines that these compensatory mitigation opportunities are not practicable, are unlikely to compensate for the permitted impacts, or will be incompatible with the proposed project, and an alternative, practicable off-site and/or out-of-kind mitigation opportunity is identified that has a greater likelihood of offsetting the permitted impacts or is environmentally preferable to on-site or in-kind mitigation, the Agency shall require that this alternative compensatory mitigation be provided. | |
| 230.93(c)(1) – (4) | (1) The district engineer must use a watershed approach to establish compensatory mitigation requirements in DA permits to the extent appropriate and practicable. ... | 62-331.130, F.A.C. <br><br>Volume I, section 102.8 <br><br>404 Handbook, section 8.5.2 | 62-331.130, F.A.C.– Compensatory mitigation shall be considered only after the requirements of Rule 62-331.0531), F.A.C., have been met. Compensatory mitigation required for authorizations or compliance actions under this Chapter shall be conducted in accordance with section 10.3 of Volume I, section 8.5 of the 404 Handbook, and this section: | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | Volume I, section 10.2.8: Pursuant to section 10.1.1(g), above, an applicant must provide reasonable assurance that a regulated activity will not cause unacceptable cumulative impacts upon wetlands and other surface waters within the same drainage basin as the regulated activity for which a permit is sought. The impact on wetlands and other surface waters shall be reviewed by evaluating the impacts to water quality as set forth in section 10.1.1(c), above, and by evaluating the impacts to functions identified in section 10.2.2, above. | |
| | | | (a)    If an applicant proposes to mitigate these adverse impacts within the same drainage basin as the impacts, and if the mitigation fully offsets these impacts, then the Agency will consider the regulated activity to have no unacceptable cumulative impacts upon wetlands and other surface waters, and consequently, the condition for issuance in section 10.1.1(g) will be satisfied. The drainage basins within each District are reproduced below in Figures 10.2.8-1 through 10.2.8-5. | |
| | | | (b)    If an applicant proposes to mitigate adverse impacts through mitigation physically located outside of the drainage basin where the impacts are proposed, an applicant may demonstrate that such mitigation fully offsets the adverse impacts within the impacted drainage basin (as measured from the impacted drainage basin), based on factors such as connectivity of waters, hydrology, habitat range of affected species, and water quality. If the mitigation fully offsets the impacts (as measured from the impacted drainage basin), then the Agency will consider the regulated activity to have no unacceptable cumulative impacts upon wetlands and other surface waters, and consequently, the condition for issuance in section 10.1.1(g), above, will be satisfied. In other words, if the functions provided by the proposed out-of-basin-mitigation will "spill over" into the impacted basin, and are sufficient to offset the impacts within the impacted basin, then the condition for issuance in section 10.1.1(g) will be satisfied. | |
| | | | (c)    When adverse impacts to water quality or adverse impacts to the functions of wetlands and other surface waters, as referenced in paragraphs (a) and (b) above, are not fully offset within the same drainage basin as the impacts, then an applicant must provide reasonable assurance that the proposed activity, when considered with the following activities, will not result in unacceptable cumulative impacts to water quality or the functions of wetlands and other surface waters, within the same drainage basin: | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | 1.    Projects that are existing or activities regulated under Part IV, Chapter 373, F.S., that are under construction or projects for which permits or determinations pursuant to Section 373.421, F.S., or Section 403.914, F.S. (1991), have been sought. | |
| | | | 2.    Activities that are under review, approved, or vested pursuant to Section 380.06, F.S., or other activities regulated under Part IV of Chapter 373, F.S., which may reasonably be expected to be located within wetlands or other surface waters, in the same drainage basin, based upon the comprehensive plans, adopted pursuant to Chapter 163, F.S., of the local governments having jurisdiction over the activities, or applicable land use restrictions and regulations. | |
| | | | Only those activities listed in sections (c)1. and 2., above, that have similar types of impacts (adverse effects) to those that will be caused by the proposed activity and for which those impacts are not fully offset within the drainage basin, as described in section (a) or (b), above, will be considered. Activities are considered to have similar impacts if they affect similar types of water resources and functions, regardless of whether the activities themselves are similar to one another. | |
| | | | The cumulative impact evaluation is conducted using an assumption that reasonably expected future applications with like impacts will be sought, thus necessitating equitable distribution of acceptable impacts among future applications. | |
| | | | 404 Handbook, section 8.5.2: Watershed approach | |
| | | | The Agency shall use a watershed approach to establish compensatory mitigation requirements in State 404 Program permits to the extent appropriate and practicable. Where a watershed plan is available, the Agency will determine whether the plan is appropriate for use in the watershed approach for mitigation. In cases where the Agency determines that an appropriate watershed plan is available, the watershed approach shall be based on that plan. Where no such plan is available, the watershed approach shall be based on information provided by the applicant or available from other sources. The ultimate goal of a watershed approach is to maintain and improve the quality and quantity of aquatic resources within watersheds through strategic selection of mitigation sites. | |
| | | | (a)    Considerations | |
| | | | 1.    A watershed approach to mitigation considers the importance of landscape position and resource type of mitigation projects for the sustainability of aquatic resource functions within the watershed. Such an approach considers how the types and locations of mitigation projects will provide the desired aquatic resource functions and will continue to function | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | over time in a changing landscape. It also considers the habitat requirements of important species, habitat loss or conversion trends, sources of watershed impairment, and current development trends, as well as the requirements of other regulatory and non-regulatory programs that affect the watershed, such as storm water management or habitat conservation programs. It includes the protection and maintenance of terrestrial resources, such as non-wetland riparian areas and uplands, when those resources contribute to or improve the overall ecological functioning of aquatic resources in the watershed. Mitigation requirements determined through the watershed approach shall not focus exclusively on specific functions (e.g., water quality or habitat for certain species), but shall provide, where practicable, the suite of functions typically provided by the affected aquatic resource.<br>2.    Locational factors (e.g., hydrology, surrounding land use) are important to the success of mitigation for impacted habitat functions and may lead to siting of such mitigation away from the project area. However, consideration shall also be given to functions and services (e.g., water quality, flood control, shoreline protection) that will likely need to be addressed at or near the impacted areas.<br>3.    A watershed approach may include on-site mitigation, off-site mitigation (including mitigation banks or in-lieu fee programs), or a combination of on-site and off-site mitigation.<br>4.    A watershed approach to mitigation shall include, to the extent practicable, inventories of historical and existing aquatic resources, including identification of degraded aquatic resources, and identification of immediate and long-term aquatic resource needs within watersheds that can be met through permittee-responsible mitigation projects, mitigation banks, or in-lieu fee programs. Planning efforts shall identify and prioritize aquatic resource restoration, creation, and enhancement activities, and preservation of existing aquatic resources that are important for maintaining or improving ecological functions of the watershed. The identification and prioritization of resource needs shall be as specific as possible, to enhance the usefulness of the approach in determining mitigation requirements.<br>(b)    Information Needs<br>1.    In the absence of a watershed plan determined by the Agency to be appropriate for use in the watershed approach, the Agency shall use a watershed approach based on analysis of information regarding watershed conditions and needs, including potential sites for aquatic resource restoration activities and priorities for aquatic resource restoration and preservation. Such information includes: Current trends in habitat loss or conversion; cumulative impacts of past development activities, current development trends, the presence and needs of sensitive species; site conditions that favor or hinder the success of mitigation projects; and chronic environmental problems such as flooding or poor water quality.<br>2.    This information may be available from sources such as wetland maps; soil surveys; U.S. Geological Survey topographic and hydrologic maps; aerial photographs; information on rare, endangered and threatened species and critical habitat; local ecological reports or studies; and other information | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | sources that could be used to identify locations for suitable mitigation projects in the watershed. (c) Watershed Scale. The cumulative impact basins described in Volume I, section 10.2.8 shall be used when considering watershed scale in mitigation for State 404 Program permits. | |
| 230.93(d)(1) – (3) | Site selection | Applicant's Handbook Volume I, sections 10.3.3.1, 10.3.3.2 (b)-(e), and 10.2.8.1 | Volume I, section 10.3.3.1 - Applicants shall provide reasonable assurance that proposed mitigation will: <br><br>(a) Offset adverse impacts due to regulated activities; and <br><br>(b) Achieve mitigation success by providing viable and sustainable ecological and hydrological functions. <br><br>The use of credits from a mitigation bank permitted under Part IV of Chapter 373, F.S., or a Regional Offsite Mitigation Area under Section 373.4135, F.S., is not subject to sections 10.3.3.2 through 10.3.8, below. <br><br>Volume I, section 10.3.3.2 (b)-(e) - <br>(b) A topographic map of the mitigation area and adjacent hydrologic contributing and receiving areas; <br><br>(c) A hydrologic features map of the mitigation area and adjacent hydrologic contributing and receiving areas; <br><br>(d) A description of current hydrologic conditions affecting the mitigation area; <br><br>(e) A map of vegetation communities in and around the mitigation area; <br><br>Volume I, section 10.2.8.1 - Cumulative impacts are considered unacceptable when the proposed activity, considered in conjunction with the past, present, and future activities as described in section 10.2.8, above, would then result in a violation of state water quality standards as set forth in section 10.1.1(c)above, or significant adverse impacts to functions of wetlands or other surface waters identified in section 10.2.2, above, within the same drainage basin when considering the basin as a whole. This analysis asks the question whether the proposed system, considered in conjunction with past, present, and future activities, would be the proverbial "straw that breaks the camel's back" regarding the | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | above referenced water quality or wetland and other surface water functions in the basin. | |
| 230.93(e) | Mitigation type | Applicant's Handbook Volume I, section 10.3.1.1 | Volume I, section 10.3.1.1 - In general, mitigation is best accomplished through creation, restoration, enhancement, or preservation of ecological communities similar to those being impacted. However, when the area proposed to be impacted is degraded, compared to its historic ecological community and hydrologic condition, mitigation is best accomplished through creation, restoration, enhancement or preservation of the ecological community that was historically present. When impacts are proposed to wholly artificial systems, such as borrow pits, ditches, and canals, mitigation is best accomplished through creation, restoration, enhancement or preservation of the native ecological community to which it is most analogous in function. For wetlands or other surface waters that have been altered from their native community type, the historic community type at that location shall be used as a reference, unless the alteration has been of such a degree and extent that a different native community type is now present and self sustaining. Mitigation involving other ecological communities is acceptable if impacts are offset and the applicant demonstrates that greater improvement in ecological value will result. | |
| 230.93(f) | Amount of compensatory mitigation | Applicant's Handbook Volume I, section 10.3.2 | Volume I, section 10.3.2 - Guidelines for the Amount of Mitigation

Chapter 62-345, F.A.C., Uniform Mitigation Assessment Method (UMAM), establishes a standardized procedure for assessing functions provided by wetlands and other surface waters, the amount those functions are reduced by proposed impact, and the amount of mitigation needed to offset that impact. The Agency will be responsible for verifying the information provided and applying this assessment method to determine the amount of mitigation necessary to offset the proposed impacts.

Chapter 62-345, F.A.C., also establishes the criteria to award and deduct mitigation bank or regional offsite mitigation area credits. The Agency will be responsible for verifying that information and applying this assessment method to determine the potential amount of mitigation to be provided by the bank or regional offsite mitigation area. | |
| 230.93(g) | Use of mitigation banks and in-lieu fee programs | Applicant's Handbook Volume I, section 10.3.1.3 | Volume I, section 10.3.1.3 - Mitigation through participation in a mitigation bank shall be in accordance with Section 373.4136, F.S., and Chapter 62-342, F.A.C. (Mitigation Banks), except that, for purposes of the maps applicable to regional watersheds, the | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | SJRWMD, SWFWMD, and SFWMDs shall use the maps incorporated by reference in the applicable Volume II. | |
| 230.93(h) | Preservation | Applicant's Handbook Volume I, section 10.3.1

404 Handbook, section 8.5.5 | Volume I, section 10.3.1 - Types of Mitigation

Mitigation usually consists of restoration, enhancement, creation, or preservation of wetlands, other surface waters, or uplands. Uplands that function as a hydrologic contributing area to wetlands, and are necessary to maintain the ecological value of those wetlands, may be appropriate for mitigation of impacts to wetlands, as well as impacts to uplands that are used by bald eagles, and listed aquatic and wetland dependent species for nesting or denning. The evaluation of the appropriateness of incorporating uplands as part of a mitigation plan shall include consideration of the proximity of uplands to wetlands and the degree to which uplands support the functions of the associated wetlands. In some cases, a combination of mitigation types is the best approach to offset adverse impacts resulting from the regulated activity.

Restoration is usually preferred over creation as it often has a greater chance of success due to soil characteristics, hydrologic regime, landscape position, or other factors that favor re-establishment of wetland or other surface water communities. Preservation of important ecosystems can provide an improved level of protection over current regulatory programs when it ensures that the values of the preserved area are protected and maintained in the long term. Areas proposed to be preserved to prevent secondary or cumulative impacts (sections 10.2.7 and 10.2.8, above) may also be considered part of a mitigation plan if those areas also serve to offset adverse impacts.

404 Handbook, section 8.5.5 - 8.5.5    Use    of    Preservation    as Compensatory Mitigation
(a)    Preservation may be used to provide compensatory mitigation when all the following criteria are met:
1.    The resources to be preserved provide important physical, chemical, or biological functions for the watershed;
2.    The resources to be preserved contribute significantly to the ecological sustainability of the watershed. In determining the contribution of those resources to the ecological sustainability of the watershed, the Agency shall use appropriate quantitative assessment tools, where available; | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | 3. Preservation is determined by the Agency to be appropriate and practicable;<br>4. The resources are under threat of destruction or adverse modifications; and<br>5. The preserved site will be permanently protected through an appropriate real estate or other legal instrument as described in Volume I, section 10.3.8.<br>(b) Where preservation is used to provide compensatory mitigation, to the extent appropriate and practicable the preservation shall be done in conjunction with aquatic resource restoration, establishment, and/or enhancement activities. This requirement may be waived by the Agency where preservation has been identified as a high priority using a watershed approach described in section 8.5.2 of this Handbook, but compensation ratios shall be higher. | |
| 230.93(i) | (i) Buffers. District engineers may require the restoration, establishment, enhancement, and preservation, as well as the maintenance, of riparian areas and/or buffers around aquatic resources where necessary to ensure the long-term viability of those resources. Buffers may also provide habitat or corridors necessary for the ecological functioning of aquatic resources. If buffers are required by the district engineer as part of the compensatory mitigation project, compensatory mitigation credit will be provided for those buffers. | Applicant's Handbook Volume I, section 10.3.1 | Volume I, section 10.3.1 Types of Mitigation -<br><br>Mitigation usually consists of restoration, enhancement, creation, or preservation of wetlands, other surface waters, or uplands. Uplands that function as a hydrologic contributing area to wetlands, and are necessary to maintain the ecological value of those wetlands, may be appropriate for mitigation of impacts to wetlands, as well as impacts to uplands that are used by bald eagles, and listed aquatic and wetland dependent species for nesting or denning. The evaluation of the appropriateness of incorporating uplands as part of a mitigation plan shall include consideration of the proximity of uplands to wetlands and the degree to which uplands support the functions of the associated wetlands. In some cases, a combination of mitigation types is the best approach to offset adverse impacts resulting from the regulated activity.<br><br>Restoration is usually preferred over creation as it often has a greater chance of success due to soil characteristics, hydrologic regime, landscape position, or other factors that favor re-establishment of wetland or other surface water communities. Preservation of important ecosystems can provide an improved level of protection over current regulatory programs when it ensures that the values of the preserved area are protected and maintained in the long term. Areas proposed to be preserved to prevent secondary or cumulative impacts (sections 10.2.7 and 10.2.8, above) may also be considered part of a mitigation plan if those areas also serve to offset adverse impacts. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 230.93(j) | Relationship to other federal, tribal, state, and local programs | Applicant's Handbook Volume I, section 10.3.1.7 | Volume I, section 10.3.1.7 - Except as provided in Section 373.414(6), F.S., mitigation or reclamation required or approved by other agencies for a specific project will be acceptable to the Agency to the extent that such mitigation or reclamation fulfills the requirements of sections 10.3 through 10.3.8, and offsets adverse impacts of the same project in accordance with the criteria in sections 10.2 through 10.2.8.2, above. | |
| 230.93(j)(1) | (1) Compensatory mitigation projects for DA permits may also be used to satisfy the environmental requirements of other programs, such as tribal, state, or local wetlands regulatory programs, other federal programs such as the Surface Mining Control and Reclamation Act, Corps civil works projects, and Department of Defense military construction projects, consistent with the terms and requirements of these programs and subject to the following considerations: ... | 62-331.130(3), F.A.C. | 62-331.130(3), F.A.C. – Federal credits from mitigation banks or in-lieu fee programs approved by the Corps shall be accepted by the Agencies to offset impacts for permits when the number and resource type of credits available are appropriate to offset impacts. | |
| 230.93(j)(2) | (2) Except for projects undertaken by federal agencies, or where federal funding is specifically authorized to provide compensatory mitigation, federally-funded aquatic resource restoration or conservation projects undertaken for purposes other than compensatory mitigation, such as the Wetlands Reserve Program, Conservation Reserve Program, and Partners for Wildlife Program activities, cannot be used for the purpose of generating compensatory mitigation credits for activities authorized by DA permits. However, compensatory mitigation credits may be generated by activities undertaken in conjunction with, but supplemental to, such programs in order to maximize the overall ecological benefits of the restoration or conservation project. | NA to state programs | | |
| 230.93(j)(3) | (3) Compensatory mitigation projects may also be used to provide compensatory mitigation under the Endangered Species Act or for Habitat Conservation Plans, as long as they comply with the requirements of paragraph (j)(1) of this section. | Applicant's Handbook Volume I, section 10.3.1.7 | Volume I, section 10.3.1.7 - Except as provided in Section 373.414(6), F.S., mitigation or reclamation required or approved by other agencies for a specific project will be acceptable to the Agency to the extent that such mitigation or reclamation fulfills the requirements of sections 10.3 through 10.3.8, and offsets adverse impacts of the same project in accordance with the criteria in sections 10.2 through 10.2.8.2, above. | |
| 230.93(k) | Permit conditions | | | |
| 230.93(k)(1) | (1) The compensatory mitigation requirements for a DA permit, including the amount and type of compensatory mitigation, must be clearly stated in the special conditions of the individual permit or general permit verification (see 33 CFR 325.4 and 330.6(a)). The special conditions must be enforceable. | 62-331.054(1), F.A.C.  62-331.201(2), F.A.C.  Volume I, section 10.3.7.5  404 Handbook, section 8.5.3(a) | 62-331.054(1), F.A.C. – (1) Individual permits shall contain the general conditions for individual permits in subsection 62-330.350(1), F.A.C. as applicable, and any specific conditions necessary to assure that the activities will be conducted in compliance with this Chapter, and in a manner which minimizes adverse impacts upon the physical, chemical, and biological integrity of wetlands or other surface waters, such as | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | mitigation requirements and protection measures for listed species or historical resources. | |
| | | | 62-331.201(2), F.A.C -(2) When a project requires submittal of a notice of intent to use a general permit, the Agency shall impose specific conditions as necessary to assure that the activities will be conducted in compliance with this chapter, and in a manner which minimizes adverse impacts upon the physical, chemical, and biological integrity of wetlands or other surface waters, such as mitigation, monitoring, reporting, or recordkeeping requirements and protection measures for listed species or historical resources. | |
| | | | Volume I, section 10.3.7.5 - If the permittee fails to comply with the terms and conditions of the permit, including any mitigation requirement, such failure shall be deemed a violation of Chapter 62-330, F.A.C. and the permit issued thereunder. In addition to any other remedies for such violation available to it, the Agency may make demand upon the financial mechanism. Notice of intent to make demand shall be as provided in the mechanism or, if none, upon reasonable notice. | |
| | | | 404 Handbook, section 8.5.3(a) – The compensatory mitigation requirements for a permit, including the amount and type of compensatory mitigation, shall be clearly stated in the specific conditions of the individual or general permit verification. The specific conditions must be enforceable. | |
| 230.93(k)(2) | (2) For an individual permit that requires permittee-responsible mitigation, the special conditions must: (i) Identify the party responsible for providing the compensatory mitigation; (ii) Incorporate, by reference, the final mitigation plan approved by the district engineer; (iii) State the objectives, performance standards, and monitoring required for the compensatory mitigation project, unless they are provided in the approved final mitigation plan; and (iv) Describe any required financial assurances or long-term management provisions for the compensatory mitigation project, unless they are specified in the approved final mitigation plan. | 404 Handbook, section 8.5.3(b) | 404 Handbook, section 8.5.3(b) - For an individual permit that requires permittee-responsible mitigation, the specific conditions shall: 1. Identify the party responsible for providing the compensatory mitigation; 2. Incorporate the final mitigation plan approved by the Agency; 3. State the objectives, performance standards, and monitoring required for the compensatory mitigation project, unless they are provided in the approved final mitigation plan; and 4. Describe any required financial assurances or long-term management provisions for the compensatory mitigation project, unless they are specified in the approved final mitigation plan. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 230.93(k)(3) | (3) For a general permit activity that requires permittee-responsible compensatory mitigation, the special conditions must describe the compensatory mitigation proposal, which may be either conceptual or detailed. The general permit verification must also include a special condition that states that the permittee cannot commence work in waters of the United States until the district engineer approves the final mitigation plan, unless the district engineer determines that such a special condition is not practicable and not necessary to ensure timely completion of the required compensatory mitigation. To the extent appropriate and practicable, special conditions of the general permit verification should also address the requirements of paragraph (k)(2) of this section. | 404 Handbook, section 8.5.3(c) | 404 Handbook, section 8.5.3(c) – For a general permit activity that requires permittee-responsible mitigation, the specific conditions shall describe the compensatory mitigation proposal, which may be either conceptual or detailed. The general permit verification shall also include a specific condition that states that the permittee cannot commence work until the Agency approves the final mitigation plan, unless the Agency determines that such a specific condition is not practicable and not necessary to ensure timely completion of the required compensatory mitigation. To the extent appropriate and practicable, specific conditions of the general permit verification shall also address the requirements of paragraph (b), above. | |
| 230.93(k)(4) | (4) If a mitigation bank or in-lieu fee program is used to provide the required compensatory mitigation, the special conditions must indicate whether a mitigation bank or in-lieu fee program will be used, and specify the number and resource type of credits the permittee is required to secure. In the case of an individual permit, the special condition must also identify the specific mitigation bank or in-lieu fee program that will be used. For general permit verifications, the special conditions may either identify the specific mitigation bank or in-lieu fee program, or state that the specific mitigation bank or in-lieu fee program used to provide the required compensatory mitigation must be approved by the district engineer before the credits are secured. | 404 Handbook, section 8.5.3(d) | 404 Handbook, section 8.5.3(d) - If a mitigation bank or in-lieu fee program is used to provide the required compensatory mitigation, the specific conditions shall indicate whether a mitigation bank or in-lieu fee program will be used, and specify the number and resource type of credits the permittee is required to purchase. In the case of an individual permit, the specific condition shall also identify the specific mitigation bank or in-lieu fee program that will be used. For general permit verifications, the specific conditions shall either identify the specific mitigation bank or in-lieu fee program, or state that the specific mitigation bank or in-lieu fee program used to provide the required credits shall be approved by the Agency prior to purchasing credits. | |
| 230.93(l) | Party responsible for compensatory mitigation | | | |
| 230.93(l)(1) | (1) For permittee-responsible mitigation, the special conditions of the DA permit must clearly indicate the party or parties responsible for the implementation, performance, and long-term management of the compensatory mitigation project. | 404 Handbook, section 8.5.3(b)1. | 404 Handbook, section 8.5.3(b)1. – (b) For an individual permit that requires permittee-responsible mitigation, the specific conditions shall:<br>1. Identify the party responsible for providing the compensatory mitigation; | |
| 230.93(l)(2) | (2) For mitigation banks and in-lieu fee programs, the instrument must clearly indicate the party or parties responsible for the implementation, performance, and long-term management of the compensatory mitigation project(s). The instrument must also contain a provision expressing the sponsor's agreement to assume responsibility for a permittee's compensatory | NA to state program | | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | mitigation requirements, once that permittee has secured the appropriate number and resource type of credits from the sponsor and the district engineer has received the documentation described in paragraph (l)(3) of this section. | | | |
| 230.93(l)(3) | (3) If use of a mitigation bank or in-lieu fee program is approved by the district engineer to provide part or all of the required compensatory mitigation for a DA permit, the permittee retains responsibility for providing the compensatory mitigation until the appropriate number and resource type of credits have been secured from a sponsor and the district engineer has received documentation that confirms that the sponsor has accepted the responsibility for providing the required compensatory mitigation. This documentation may consist of a letter or form signed by the sponsor, with the permit number and a statement indicating the number and resource type of credits that have been secured from the sponsor. Copies of this documentation will be retained in the administrative records for both the permit and the instrument. If the sponsor fails to provide the required compensatory mitigation, the district engineer may pursue measures against the sponsor to ensure compliance. | | | The state requires the applicant to provide proof of purchase of mitigation bank credits before beginning the permitted activity. |
| 230.93(m) | (m) Timing. Implementation of the compensatory mitigation project shall be, to the maximum extent practicable, in advance of or concurrent with the activity causing the authorized impacts. The district engineer shall require, to the extent appropriate and practicable, additional compensatory mitigation to offset temporal losses of aquatic functions that will result from the permitted activity. | 404 Handbook, section 8.5.4 | 404 Handbook, section 8.5.4 Timing of Compensatory Mitigation Implementation of the compensatory mitigation project shall be, to the maximum extent practicable, in advance of or concurrent with the authorized impacts. Temporal loss shall be compensated for in accordance with appropriate calculations for time lag in accordance with Rule 62-345.600, F.A.C., except paragraph 62-345.600(1)(b), F.A.C., which is not applicable to the State 404 Program. | |
| 230.93(n) | Financial assurances | 62-330.301(1)(j), F.A.C. | 62-330.301(1), F.A.C. – To obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter: (j) Will be conducted by a person with the financial, legal and administrative capability of ensuring that the activity will be undertaken in accordance with the terms and conditions of the permit, if issued | |
| 230.93(n)(1) | (1) The district engineer shall require sufficient financial assurances to ensure a high level of confidence that the | Applicant's Handbook Volume I, sections 10.3.7 and 10.3.7.1 | Volume I, section 10.3.7 - Financial Responsibility for Mitigation. | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | compensatory mitigation project will be successfully completed, in accordance with applicable performance standards. In cases where an alternate mechanism is available to ensure a high level of confidence that the compensatory mitigation will be provided and maintained (e.g., a formal, documented commitment from a government agency or public authority) the district engineer may determine that financial assurances are not necessary for that compensatory mitigation project. | | As part of compliance with paragraph 62-330.301(1)(j), F.A.C., where an applicant proposes mitigation, the applicant shall provide proof of financial responsibility to:

(a)   Conduct the mitigation activities;

(b)   Conduct any necessary management of the mitigation site;

(c)   Conduct monitoring of the mitigation;

(d)   Prepare and submit monitoring reports to the Agency; and

      (e) Conduct any necessary corrective action indicated by the monitoring

Volume I, section 10.3.7.1 -
Applicants not subject to financial responsibility requirements.

The following applicants shall not be subject to the financial responsibility requirements in sections 10.3.7 through 10.3.7.9:

(a)   Applicants whose mitigation is deemed successful pursuant to section 10.3.6, above, prior to undertaking the construction activities authorized under the permit issued pursuant to Part IV, Chapter 373, F.S.

(b)   Applicants whose mitigation is estimated to cost less than $25,000.

(c)   Federal, state, county and municipal governments; state political subdivisions; investor-owned utilities regulated by the Florida Public Service Commission; and rural electric cooperative.

(d)   Mitigation banks that comply with the financial responsibility provisions of Rule 62-342.700, F.A.C. | |
| 230.93(n)(2) | (2) The amount of the required financial assurances must be determined by the district engineer, in consultation with the project sponsor, and must be based on the size and complexity of the compensatory mitigation project, the degree of completion of the project at the time of project approval, the likelihood of | Applicant's Handbook Volume I, sections 10.3.7.2, 10.3.7.3, and10.3.7.7 | Volume I, section 10.3.7.2 -
Amount of financial responsibility.

The amount of financial responsibility provided by the applicant shall be in an amount equal to 110 percent of the cost estimate determined pursuant to section 10.3.7.7, below, for each phase of the mitigation plan submitted | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | success, the past performance of the project sponsor, and any other factors the district engineer deems appropriate. Financial assurances may be in the form of performance bonds, escrow accounts, casualty insurance, letters of credit, legislative appropriations for government sponsored projects, or other appropriate instruments, subject to the approval of the district engineer. The rationale for determining the amount of the required financial assurances must be documented in the administrative record for either the DA permit or the instrument. In determining the assurance amount, the district engineer shall consider the cost of providing replacement mitigation, including costs for land acquisition, planning and engineering, legal fees, mobilization, construction, and monitoring. | | under the requirements of sections 10.3 through 10.3.8, and under the requirements of Section 373.414(19)(a), F.S., when mitigation is required for the extraction of limestone and phosphate.

Volume I, section 10.3.7.3 – Documentation.

The permit applicant shall provide draft documentation of the required financial responsibility mechanism described below with the permit application, and shall submit to the Agency the executed or finalized documentation within the time frames specified in the permit.

Volume I, section 10.3.7.7 – Cost estimates.

For the purposes of determining the amount of financial responsibility that is required by this subsection, the applicant shall submit a detailed written estimate, in current dollars, of the total cost of conducting the mitigation, including any maintenance and monitoring activities, and the applicant shall comply with the following:

(a)    The cost estimate for conducting the mitigation and monitoring shall include all associated costs for each phase thereof, including earthmoving, planting, structure installation, maintaining and operating any structures, controlling nuisance or exotic species, fire management, consultant fees, monitoring activities, and reports.

(b)    The applicant shall submit the estimates, together with verifiable documentation, to the Agency along with the draft of the financial responsibility mechanism.

(c)    The costs shall be estimated based on a third party performing the work and supplying materials at the fair market value of the services and materials. The source of any cost estimates shall be indicated. | |
| 230.93(n)(3) | (3) If financial assurances are required, the DA permit must include a special condition requiring the financial assurances to be in place prior to commencing the permitted activity. | Applicant's Handbook Volume I, section 10.3.7.4(d) | Volume I, section 10.3.7.4(d) – The financial responsibility mechanisms shall be effective on or prior to the date the activity authorized by the permit commences and shall continue to be effective through the date of notification of final release by the Agency in accordance with section 10.3.7.7.2 below. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 230.93(n)(4) | (4) Financial assurances shall be phased out once the compensatory mitigation project has been determined by the district engineer to be successful in accordance with its performance standards. The DA permit or instrument must clearly specify the conditions under which the financial assurances are to be released to the permittee, sponsor, and/or other financial assurance provider, including, as appropriate, linkage to achievement of performance standards, adaptive management, or compliance with special conditions. | Applicant's Handbook Volume I, sections 10.3.7.7.1, and 10.3.7.7.2 | Volume I, section 10.3.7.7.1 - Partial Releases.<br><br>The permittee may request the Agency to release portions of the financial responsibility mechanism as parts of the mitigation plan, such as earth moving, construction, or other activities for which cost estimates were submitted in accordance with section 10.3.7.7, are successfully completed. The request shall be in writing and include documentation that the activities have been completed and have been paid for or will be paid for upon release of the applicable portion of the financial responsibility mechanism and a revised cost estimate for the completion of the mitigation activities. The Agency shall authorize the release, or shall request the applicable financial institution release, of the portion requested upon verification that the activities have been completed in accordance with the mitigation plans.<br><br>Volume I, section 10.3.7.7.2<br>Final Release.<br><br>Within thirty (30) days of the Agency determining that the mitigation is successful in accordance with section 10.3.6, above, the Agency shall so notify the permittee and shall authorize the return and release of all funds held or give written authorization to the appropriate third party for the cancellation or termination of the financial responsibility mechanism. | |
| 230.93(n)(5) | (5) A financial assurance must be in a form that ensures that the district engineer will receive notification at least 120 days in advance of any termination or revocation. For third-party assurance providers, this may take the form of a contractual requirement for the assurance provider to notify the district engineer at least 120 days before the assurance is revoked or terminated. | Applicant's Handbook Volume I, section 10.3.7.4(e) | Volume I, section 10.3.7.4(e) - The financial responsibility mechanisms shall provide that they cannot be revoked, terminated, or cancelled without first providing an alternative financial responsibility mechanism that meets the requirements of sections 10.3.7 through 10.3.7.9. Financial mechanisms shall provide that they cannot be revoked, terminated, or cancelled without a 120-day notice to the Agency. Within 90 days of receipt by the permittee of actual or constructive notice of revocation, termination, or cancellation of a financial responsibility mechanism or other actual or constructive notice of cancellation, the permittee shall provide such an alternate financial responsibility mechanism. | |
| 230.93(n)(6) | (6) Financial assurances shall be payable at the direction of the district engineer to his designee or to a standby trust agreement. When a standby trust is used (e.g., with performance bonds or letters of credit) all amounts paid by the financial assurance provider shall be deposited directly into the standby trust fund for distribution by the trustee in accordance with the district engineer's instructions. | Applicant's Handbook Volume I, sections 10.3.7.4(b), and 10.3.7.6 | Volume I, section 10.3.7.4(b) - The financial mechanisms shall name the Agency as sole beneficiary or shall be payable solely to the Agency. If the financial mechanism is of a type that is retained by the beneficiary according to industry standards, the original financial responsibility mechanism shall be retained by the Agency.<br><br>Volume I, section 10.3.7.6 - | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | Financial Responsibility Mechanisms. | |
| | | | Financial responsibility for the mitigation, monitoring, and corrective action for each phase of the project may be established by any of the following methods, at the discretion of the applicant: | |
| | | | (a) Performance bond; when issued in favor of DEP, the applicant shall also establish a standby trust fund agreement; | |
| | | | (b) Irrevocable letter of credit; when issued in favor of DEP, the applicant shall also establish a standby trust fund agreement; | |
| | | | (c) Trust fund agreement; | |
| | | | (d) Deposit of cash or cash equivalent into an escrow account at a regulated financial institution or at the Florida Department of Financial Services; and | |
| | | | (e) Guarantee bond. | |
| 230.93(o) | The compensatory mitigation project must comply with all applicable federal, state, and local laws. The DA permit, mitigation banking instrument, or in-lieu fee program instrument must not require participation by the Corps or any other federal agency in project management, including receipt or management of financial assurances or long-term financing mechanisms, except as determined by the Corps or other agency to be consistent with its statutory authority, mission, and priorities. | NA | | |
| 230.94 | Planning and documentation | | | |
| 230.94(a) | (a) *Pre-application consultations*. Potential applicants for standard permits are encouraged to participate in pre-application meetings with the Corps and appropriate agencies to discuss potential mitigation requirements and information needs. | Applicant's Handbook Volume I, section 10.3 paragraph 3<br><br>404 Handbook, section 4.2 | Volume I, section 10.3 - Applicants are encouraged to consult with Agency staff in pre-application conferences or during the application process to identify appropriate mitigation options.<br><br>404 Handbook, section 4.2 – Pre-application Conferences<br>Applicants are encouraged to have a pre-application phone call, meeting (on-site or in the office), or other conference with the applicable Agency staff, prior to submitting an application or notice. Pre-application conferences may help streamline processing steps and | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | Section 373.4146, F.S.) | potential time delays by assisting the applicant to understand such things as:<br>(a)    The need for a permit or potential qualification for an exemption or general permit, including a determination of what combination of ERP/State 404 Program authorizations will be required;<br>(b)    Which Agency or Agencies will be responsible for the review of the application or notice;<br>(c)    How to prepare the application or notice, including availability of on-line tools that may assist in completing it, and how to use the long-term conceptual planning process in section 5.3.2 of this Handbook;<br>(d)    Information required by the Agency to evaluate an application or notice, including such things as wetland delineations, resources that may be affected, alternatives analysis, surface water data, and other hydrologic, environmental, or water quality data;<br>(e)    Application processing, public notice, and evaluation procedures;<br>(f)    The need for a pre-application on-site meeting;<br>(g)    Avoiding adverse impacts that may prevent the proposed activity from meeting applicable permitting or review standards or criteria;<br>(h)    The existence of available project alternatives;<br>(i)    Measures that can be taken to reduce or eliminate adverse impacts, and the appropriateness of compensatory mitigation to offset any remaining adverse impacts; and<br>(j)    The potential for the project to impact tribal waters or tribal cultural resources (see section 5.2.6 for more information about tribal resources and coordination). | |
| 230.94(b) | Public review and comment | | | |
| 230.94(b)(1) | (b) *Public review and comment.* (1) For an activity that requires a standard DA permit pursuant to section 404 of the Clean Water Act, the public notice for the proposed activity must contain a statement explaining how impacts associated with the proposed activity are to be avoided, minimized, and compensated for. This explanation shall address, to the extent that such information is provided in the mitigation statement required by 33 CFR 325.1(d)(7), the proposed avoidance and minimization and the amount, type, and location of any proposed compensatory mitigation, including any out-of-kind compensation, or indicate an intention to use an approved mitigation bank or in-lieu fee program. The level of detail provided in the public notice must be commensurate with the scope and scale of the impacts. | 62-331.060(1)(f), F.A.C. | 62-331.060(1)(f), F.A.C. – A summary of proposed wetland and other surface water impacts and compensatory mitigation including acres, habitat type, and Uniform Mitigation Assessment Method (UMAM) score developed pursuant to chapter 62-345, F.A.C., for each assessment area; | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | The notice shall not include information that the district engineer and the permittee believe should be kept confidential for business purposes, such as the exact location of a proposed mitigation site that has not yet been secured. The permittee must clearly identify any information being claimed as confidential in the mitigation statement when submitted. In such cases, the notice must still provide enough information to enable the public to provide meaningful comment on the proposed mitigation. | | | |
| 230.94(b)(2) | (2) For individual permits, district engineers must consider any timely comments and recommendations from other federal agencies; tribal, state, or local governments; and the public. | 62-331.052, F.A.C. 62-331.060, F.A.C. | 62-331.052 Processing of Individual Permit Applications (1) Within 30 days of receipt of an application for a permit in accordance with Rule 62-331.051, F.A.C., or receipt of any additional information provided by the applicant in response to the Agency's request for additional information, or within 15 days of receipt of an application for a subsequent phase of a project where the first phase was previously permitted in accordance with section 5.3.2 of the 404 Handbook or where a new permit is needed to complete a project that was unable to be completed during the duration of the original permit, the Agency shall review the application for administrative and technical completeness and shall request any additional information required by the Agency to publish public notice pursuant to Rule 62-331.060, F.A.C., and to determine if the proposed activity meets the conditions for issuance in Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. The applicant may voluntarily submit a written waiver of the above timeclock requirement to allow the Agency additional time to determine if additional information is required; the Agency is not obligated to accept the waiver or to delay sending the request for additional information. (a) An application will be considered administratively incomplete if it does not include the information required in subsection 62-331.060(1), F.A.C., and will be considered technically incomplete if additional information is needed to determine if the proposed activity meets the conditions for issuance in Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. Permit applications shall not be considered technically complete until the ERP review, if required, is complete. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met. (See Rule 62-331.070, F.A.C., and section 5.0 of the 404 Handbook) (b) The timeframes and other provisions described in Volume I, sections 5.3.3 through 5.3.7 shall also apply to applications for permits under this Chapter. | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (c) The Agency may request additional information as necessary during its review of any information that the Agency receives during the public comment period, at a public meeting, or during federal review. (2) Within 10 days of the Agency determining that an application is administratively complete pursuant to subsection 62-331.060(1), F.A.C., the Agency shall provide public notice as described in subsection 62-331.060(2), F.A.C. In addition, the Agency shall send a copy of the public notice to EPA for those projects that EPA reviews, in accordance with section 5.2.5 of the 404 Handbook. (3) For those projects that are subject to federal review in accordance with section 5.2.5 of the 404 Handbook: (a) If the EPA does not comment on, provide notice to the Agency of its intent to comment on, object to, make recommendations with respect to, or notify the Agency that it is reserving its right to object to, a permit application within 30 days of the date EPA receives the notice, the Agency shall make a final permit decision within 60 days after either the close of the public comment period described in subsection 62-331.060(3), F.A.C., or the project is declared technically complete, whichever occurs later. 1. If the decision is to issue a permit, the permit becomes effective when it is signed by the Agency and the applicant. 2. If the decision is to deny the permit, the Agency will notify the applicant in writing of the reason(s) for denial. (b) If the EPA intends to comment on, object to, or make recommendations with respect to a permit application, or if EPA does not wish to comment but wishes to reserve the right to object based on any new information brought out by the public during the comment period or at a public meeting, EPA shall notify the Agency of its intent within 30 days of receipt of the public notice or the Agency's notice to EPA of failure to accept the recommendations of an affected state or tribe. Once the Agency is notified by EPA, or if the Agency fails to accept the recommendations of an affected state or tribe and EPA must review the reasons for failing to accept the recommendations, the following procedures shall apply: 1. Subject to subparagraphs 2. through 5., below, the permit shall not be issued until after the receipt of such comments, objections, or recommendations, or within 90 days of EPA's receipt of the notice, whichever occurs first. 2. When the Agency has received an EPA objection or requirement for a permit condition under this section, the Agency shall not issue the permit unless the steps required by the EPA to eliminate the objection or condition on the permit have been taken. If the Agency chooses not to perform the required steps, the Agency may still issue an ERP permit under Chapter 62-330, F.A.C., but shall not issue a permit under this | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | granted by Section 373.4146, F.S. | Chapter. In such a case, the applicant is responsible for obtaining any necessary authorizations under section 404 of the CWA from the Corps. 3. Within 90 days after Agency receipt of an objection or a requirement for a permit condition from the EPA, the Agency or any interested party may request that the EPA hold a public meeting on the objection or requirement. EPA shall conduct a public meeting if requested by the Agency, or if warranted by significant public interest based on requests received. 4. If EPA does not hold a public meeting under subparagraph 3., above, the Agency shall, within 90 days of receipt of the objection or requirement for a permit condition, either issue the permit revised to satisfy EPA's objections or notify EPA of its intent to deny the permit. 5. If EPA holds a public meeting under subparagraph 3., above, EPA shall reaffirm, modify, or withdraw the objection or requirement for a permit condition, and notify the Agency of that decision. 6. If EPA holds a public meeting, the Agency shall have 30 days after EPA gives the Agency notice of its decision under subparagraph 4., above, to take one of the following actions: a. If EPA has withdrawn the objection or requirement for a permit condition, and the application is technically complete, the Agency may issue the permit; or b. If EPA has not withdrawn the objection or requirement for a permit condition, the Agency shall do one of the following: (I) Issue a permit that includes the required permit condition and/or otherwise satisfies EPA's objection; (II) Notify EPA of its intent to deny the permit; or (III) Notify EPA and the applicant that the Agency intends to take no action, in which case, the Corps shall process the section 404 authorization. 62-331.060 Public Notice (1) The Agency shall provide public notice, as described in subsection (2), below, within 10 days of the following: agency determination that an application for an individual permit or major modification is administratively complete; Agency notification to a permittee of revocation or suspension of a permit; and issuance of an emergency field authorization. The Agency shall provide public notice 30 days prior to any scheduled public meeting for such projects. An administratively complete application, as defined and described in sections 2.0 and 8.1, respectively, of the 404 Handbook, shall include the following information: (a) Name, address, and telephone number of the applicant; (b) Name(s) and address(es) of owners of property adjoining the property where the activity is proposed to occur; | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (c) Self-addressed, stamped envelopes and/or email addresses for each adjoining property owner. These will be used by the Agency to send the public notice. Do not include a return address, it will be added by the Agency; | |
| | | | (d) A complete description of the activity including necessary drawings, sketches, or plans sufficient for public notice; the location, purpose, and intended use of the proposed activity; the long-term conceptual plan described in 404 Handbook, section 5.3.2, if applicable; scheduling of the activity; the location and dimensions of adjacent structures; and a list of authorizations required by other agencies including federal, interstate, state, or local agencies for the work, including all approvals received or denials already made; | |
| | | | (e) A description of the type, composition, source, and quantity of the material to be dredged or used as fill; construction methods; and the site and plans for disposal of any dredged material including a description of spoil cells, dredged material management areas (DMMAs), and final disposal plans if the dredged material is not proposed to remain onsite; | |
| | | | (f) A summary of proposed wetland and other surface water impacts and compensatory mitigation including acres, habitat type, and Uniform Mitigation Assessment Method (UMAM) score developed pursuant to Chapter 62-345, F.A.C., for each assessment area; | |
| | | | (g) The alternatives analysis required by subsection 62-331.053(1), F.A.C.; and | |
| | | | (h) A certification that all information contained in the application is true and accurate and acknowledging awareness of penalties for submitting false information. | |
| | | | (i) Any other information relevant to the project that would significantly assist the public and commenting agencies in reviewing, understanding, and commenting on the proposed project, including information needed for review of impacts to state or federal listed species. | |
| | | | (2) Public notice shall be prepared in accordance with section 5.3.1 of the 404 Handbook and provided as follows: | |
| | | | (a) The Agency shall mail and/or email notice to the following parties: | |
| | | | 1. The applicant; | |
| | | | 2. Any other agency with jurisdiction over the activity or the project site, whether or not the agency issues a permit; | |
| | | | 3. Owners of property adjoining the property where the regulated activity is proposed or is permitted to occur; | |
| | | | 4. Any State or tribe whose waters may be affected by the proposed or permitted activity; and | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | 5. All persons, other than those listed above, who have specifically requested copies of public notices. The Agency may require the use of an existing online notification system to request and receive such notices, except where the requestor asks to be notified by an alternative method because of a technical or financial hardship. | |
| | | | 6. The Seminole Tribe of Florida Environmental Resource Management Department (ERMD) for any activity that is within six miles of the Seminole Tribe of Florida's Big Cypress or Brighton Reservations; within two miles of the Seminole Tribe of Florida's Immokalee, Lakeland, or Fort Pierce Reservations; within one mile of the Seminole Tribe of Florida's Tampa, Coconut Creek, or Hollywood Reservations; within the Seminole Tribe's reserved rights areas, including but not limited to: within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A. | |
| | | | 7. The Seminole Tribe of Florida's Tribal Historic Preservation Office (THPO) for activities in the State of Florida. | |
| | | | 8. The Miccosukee Tribe of Indians of Florida for any activity that is within two miles of the Miccosukee Federal Reservation; Miccosukee Reserve Area; Krome Avenue, Dade Corners, Cherry Ranch, or Sherrod Ranch Reservations; and Coral Way, Lambkik, or Sema Trust Properties. Also for any activity within the Miccosukee Tribe's reserved rights areas, including but not limited to within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A. | |
| | | | (b) Notice shall be published on the Agency website. | |
| | | | (c) The notice provided in subsection (a) or (b), above, may be combined with notice required for ERP permits or certain activities on sovereign submerged lands pursuant to Volume I, section 5.5.2.3, provided the provisions of this section are met. | |
| | | | (3) From the date of publication, interested parties may express their views concerning the permit application, modification, revocation, or suspension for a period of: | |
| | | | (a) 30 days; or | |
| | | | (b) 15 days for the following projects: | |
| | | | 1. Mosquito control activities including rotary ditching; | |
| | | | 2. Erosion control activities not to exceed 0.2 acre of fill; | |
| | | | 3. Restoration efforts required by the Agency that do not exceed 0.5 acre of dredge or fill activities into state-assumed waters; | |
| | | | 4. The placement of fill material in freshwater wetlands for residential development, not to exceed 0.2 acre, except within the following areas: | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | a. Wetlands in or adjacent to Outstanding Florida Waters (OFWs); b. Wetlands in or adjacent to National Parks, National Wildlife Sanctuaries, National Preserves, and National Marine Sanctuaries; c. Wetlands in Areas of Critical State Concern; d. Timnican Ecological and Historical Preserve in Duval County; e. Golden Gate Estates, Collier County, south of Alligator Alley; f. The Florida Keys. (c) The public notice comment period shall automatically be extended to the close of any public meeting, if one is held. The presiding officer may also extend the comment period at the public meeting. (4) The Agency may hold a public meeting for a proposed project, modification, revocation, or suspension if it is determined that there is a significant degree of public interest in the application. A public meeting may also be held at the discretion of the Agency, when the Agency determines a public meeting may be useful to a decision on the permit application. Interested parties may request a public meeting during the comment period in subsection (3), above. (a) Any request for a public meeting shall be in writing and shall state the nature of the issues proposed to be raised at the public meeting. (b) The Agency shall provide notice of a public meeting at least 30 days prior to the scheduled public meeting date. (c) Any person may submit oral or written statements or data concerning the permit application at the public meeting. Public meetings shall be reported verbatim. Copies of the record of proceedings may be obtained from the Agency or the reporter of such meeting. A copy of the transcript (or, if none is prepared, a recording of the proceedings) shall be made available for public inspection at the local Agency office. (5) Any state whose waters may be affected by the proposed activity, or any tribe whose waters or resources, including historical resources, may be affected by the proposed activity, may submit written comments and suggest permit conditions within the public notice comment period provided in subsection (3), above. If the Agency does not accept the recommendations of the state or tribe, the Agency shall notify the state or tribe and EPA in writing, prior to permit issuance, of the Agency's failure to accept the recommendations, with the reasons for so doing. The application shall then be subject to the review process in paragraph 62-331.052(3)(b), F.A.C. (6) The Agency shall consider all comments received in response to the public notice, and public meeting if a meeting is held. All comments, as well as the record of any public meeting, shall be made part of the official record on the application. (7) Revocation or suspension of permits shall be subject to the review process in subsection 62-331.052(3), F.A.C. | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (8) Notice for subsequent phases of a long-term project permitted in accordance with section 5.3.2 of the 404 Handbook, or for permits to complete a project that was unable to be completed during the duration of the original permit, shall include only those changes not considered during permitting of a previous phase. Where there are no changes to the project, the notice shall provide the public an opportunity to submit comments, materials, or evidence pertaining to identification of material site changes or potential noncompliance. | |
| 230.94(b)(3) | (3) For activities authorized by letters of permission or general permits, the review and approval process for compensatory mitigation proposals and plans must be conducted in accordance with the terms and conditions of those permits and applicable regulations including the applicable provisions of this part. | Not repeated in rule, but is upheld by other requirements that are in rule. (applicants must comply with terms and conditions of general permits) | | |
| 230.94(c) | Mitigation plan | | | |
| 230.94(c)(1)1 | Preparation and approval | | | |
| 230.94(c)(1)(i) | (i) For individual permits, the permittee must prepare a draft mitigation plan and submit it to the district engineer for review. After addressing any comments provided by the district engineer, the permittee must prepare a final mitigation plan, which must be approved by the district engineer prior to issuing the individual permit. The approved final mitigation plan must be incorporated into the individual permit by reference. The final mitigation plan must include the items described in paragraphs (c)(2) through (c)(14) of this section, but the level of detail of the mitigation plan should be commensurate with the scale and scope of the impacts. As an alternative, the district engineer may determine that it would be more appropriate to address any of the items described in paragraphs (c)(2) through (c)(14) of this section as permit conditions, instead of components of a compensatory mitigation plan. For permittees who intend to fulfill their compensatory mitigation obligations by securing credits from approved mitigation banks or in-lieu fee programs, their mitigation plans need include only the items described in paragraphs (c)(5) and (c)(6) of this section, and the name of the specific mitigation bank or in-lieu fee program to be used. | Applicant's Handbook Volume I, sections 10.3.3 and 10.3.3.1 (last sentence) | Volume I, section 10.3.3<br><br>Mitigation Proposals (see handbook)<br><br>Volume I, section 10.3.3.1 (last sentence)<br>The use of credits from a mitigation bank permitted under Part IV of Chapter 373, F.S., or a Regional Offsite Mitigation Area under Section 373.4135, F.S., is not subject to sections 10.3.3.2 through 10.3.8, below. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 230.94(c)(1)(ii) | (ii) For general permits, if compensatory mitigation is required, the district engineer may approve a conceptual or detailed compensatory mitigation plan to meet required time frames for general permit verifications, but a final mitigation plan incorporating the elements in paragraphs (c)(2) through (c)(14) of this section, at a level of detail commensurate with the scale and scope of the impacts, must be approved by the district engineer before the permittee commences work in waters of the United States. As an alternative, the district engineer may determine that it would be more appropriate to address any of the items described in paragraphs (c)(2) through (c)(14) of this section as permit conditions, instead of components of a compensatory mitigation plan. For permittees who intend to fulfill their compensatory mitigation obligations by securing credits from approved mitigation banks or in-lieu fee programs, their mitigation plans need include only the items described in paragraphs (c)(5) and (c)(6) of this section, and either the name of the specific mitigation bank or in-lieu fee program to be used or a statement indicating that a mitigation bank or in-lieu fee program will be used (contingent upon approval by the district engineer). | | | State program is more stringent – we will require the mitigation plan before issuance for reasonable assurance. |
| 230.94(c)(1)(iii) | (iii) Mitigation banks and in-lieu fee programs must prepare a mitigation plan including the items in paragraphs (c)(2) through (c)(14) of this section for each separate compensatory mitigation project site. For mitigation banks and in-lieu fee programs, the preparation and approval process for mitigation plans is described in §230.98. | | | NA for state program |
| 230.94(c)(2) | (2) Objectives. A description of the resource type(s) and amount(s) that will be provided, the method of compensation (i.e., restoration, establishment, enhancement, and/or preservation), and the manner in which the resource functions of the compensatory mitigation project will address the needs of the watershed, ecoregion, physiographic province, or other geographic area of interest. | Applicant's Handbook Volume I, sections 10.3.3.2(n)-(o), and 10.3.6 | Volume I, section 10.3.3.2(n)-(o)<br>(n)  A description of anticipated site conditions in and around the mitigation area after the mitigation plan is successfully implemented;<br><br>(o)  A comparison of current fish and wildlife habitat to expected habitat after the mitigation plan is successfully implemented;<br><br>Volume I, section 10.3.6 - Mitigation Success | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | Mitigation success will be measured in terms of whether the objectives of the mitigation are expected to be realized. The success criteria to be included in permit conditions will specify the minimum requirements necessary to attain a determination of success. The mitigation shall be deemed successful by the Agency when all applicable water quality standards are met, the mitigation area has achieved viable and sustainable ecological and hydrological functions and the specific success criteria contained in the permit are met. If success is not achieved within the time frame specified within the permit, remedial measures shall be required. Monitoring requirements shall remain in effect until success is achieved as specified in the permit. Maintenance requirements shall remain in effect as specified in the permit. | |
| 230.94(c)(3) | (3) *Site selection.* A description of the factors considered during the site selection process. This should include consideration of watershed needs, on-site alternatives where applicable, and the practicability of accomplishing ecologically self-sustaining aquatic resource restoration, establishment, enhancement, and/or preservation at the compensatory mitigation project site. (See §230.93(d).) | Applicant's Handbook Volume I, sections 10.3.3.1, 10.3.3.2, and 10.3.5 | Volume I, section 10.3.3.1 - Applicants shall provide reasonable assurance that proposed mitigation will: <br><br>(a)  Offset adverse impacts due to regulated activities; and <br><br>(b)  Achieve mitigation success by providing viable and sustainable ecological and hydrological functions. <br><br>The use of credits from a mitigation bank permitted under Part IV of Chapter 373, F.S., or a Regional Offsite Mitigation Area under Section 373.4135, F.S., is not subject to sections 10.3.3.2 through 10.3.8, below. <br><br>Volume I, section 10.3.3.2 - Applicants shall submit detailed plans describing proposed construction, establishment, and management of mitigation areas. These plans shall include the following information, as appropriate for the type of mitigation proposed: <br><br>(a)  A soils map of the mitigation area and other soils information pertinent to the specific mitigation actions proposed; <br><br>(b)  A topographic map of the mitigation area and adjacent hydrologic-contributing and receiving areas; <br><br>(c)  A hydrologic features map of the mitigation area and adjacent hydrologic-contributing and receiving areas; | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (d) A description of current hydrologic conditions affecting the mitigation area; | |
| | | | (e) A map of vegetation communities in and around the mitigation area; | |
| | | | (f) Construction drawings detailing proposed topographic alterations and all structural components associated with proposed activities; | |
| | | | (g) Proposed construction activities, including a detailed schedule for implementation; | |
| | | | (h) A vegetation-planting scheme if planting is proposed, and schedule for implementation; | |
| | | | (i) Sources of plants and soils used in wetland creation or restoration; | |
| | | | (j) Measures to be implemented during and after construction to avoid adverse impacts related to proposed activities; | |
| | | | (k) A management plan comprising all aspects of operation and maintenance, including water management practices, vegetation establishment, exotic and nuisance species control, fire management, and control of access; | |
| | | | (l) A proposed monitoring plan to demonstrate mitigation success; | |
| | | | (m) A description of the activities proposed to control exotic and nuisance species should these become established in the mitigation area. The mitigation proposal must include reasonable measures to assure that these species do not invade the mitigation area in such numbers as to affect the likelihood of success of the project; | |
| | | | (n) A description of anticipated site conditions in and around the mitigation area after the mitigation plan is successfully implemented; | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (o) A comparison of current fish and wildlife habitat to expected habitat after the mitigation plan is successfully implemented; <br><br> (p) For mitigation plans with projected implementation costs in excess of $25,000, an itemized estimate of the cost of implementing mitigation as set forth in **section 10.3.7.7, below**; <br><br> (q) Evidence that the applicant has legal access to the mitigation area and authority to perform the mitigation, and documentation granting the Agency a reasonable right of legal access to the mitigation area and the authority to conduct the mitigation should the applicant fail to do so; and <br><br> (r) Any additional necessary supporting information required by Chapter 62-345, F.A.C. <br><br> Volume I, section 10.3.5 - Protection of Mitigation Areas <br><br> Applicants shall propose and be responsible for implementing methods that assure that mitigation areas will not be adversely impacted by incidental encroachment or secondary activities that might compromise mitigation success or long-term viability. | |
| 230.94(c)(4) | (4) *Site protection instrument*: A description of the legal arrangements and instrument, including site ownership, that will be used to ensure the long-term protection of the compensatory mitigation project site (see §230.97(a)). | Applicant's Handbook Volume I, sections 10.3.5 and 10.3.8 | Volume I, section 10.3.5 - Protection of Mitigation Areas <br><br> Applicants shall propose and be responsible for implementing methods that assure that mitigation areas will not be adversely impacted by incidental encroachment or secondary activities that might compromise mitigation success or long-term viability. <br><br> Volume I, section 10.3.8 - Real property conveyances. <br><br> (a) All conservation easements, deed restrictions, and restrictive covenants accepted for mitigation purposes shall be granted in perpetuity without encumbrances, unless such encumbrances do not adversely affect the ecological viability of the mitigation. All liens and mortgages shall be released or subordinated to the conservation easement. All conservation easements shall be consistent with Section 704.06, F.S., and shall | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | contain restrictions that ensure the ecological viability of the site. | |
| | | | (b) All real property conveyances shall be in fee simple and by statutory warranty deed, special warranty deed, or other deed, without encumbrances that adversely affect the integrity of the preservation. The Agency shall also accept a quit claim deed if necessary to aid in clearing minor title defects or otherwise resolving boundary questions. | |
| | | | (c) The use of the applicable Form 62-330.301(8) through 62-330.301(17) shall constitute consistency with Section 704.06, F.S. Where the applicant demonstrates that project specific conditions necessitate deviation from language of the accepted forms, alternative language shall be accepted provided that it meets the provisions of Section 704.06, F.S. and section 10. 3. 8 of this Volume. Each of these forms are in Appendix C of this Volume, and a copy of the form may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C. | |
| 230.94(c)(5) | (5) Baseline information. A description of the ecological characteristics of the proposed compensatory mitigation project site and, in the case of an application for a DA permit, the impact site. This may include descriptions of historic and existing plant communities, historic and existing hydrology, soil conditions, a map showing the locations of the impact and mitigation site(s) or the geographic coordinates for those site(s), and other site characteristics appropriate to the type of resource proposed as compensation. The baseline information should also include a delineation of waters of the United States on the proposed compensatory mitigation project site. A prospective permittee planning to secure credits from an approved mitigation bank or in-lieu fee program only needs to provide baseline information about the impact site, not the mitigation bank or in-lieu fee project site. | Applicant's Handbook Volume I, sections 10.3.3.1(b) and 10.3.3.2 | Volume I, section 10.3.3.1(b) –<br><br>(b) Achieve mitigation success by providing viable and sustainable ecological and hydrological functions.<br><br>Volume I, section 10.3.3.2 –<br><br>Applicants shall submit detailed plans describing proposed construction, establishment, and management of mitigation areas. These plans shall include the following information, as appropriate for the type of mitigation proposed:<br><br>(a) A soils map of the mitigation area and other soils information pertinent to the specific mitigation actions proposed;<br><br>(b) A topographic map of the mitigation area and adjacent hydrologic contributing and receiving areas;<br><br>(c) A hydrologic features map of the mitigation area and adjacent hydrologic contributing and receiving areas;<br><br>(d) A description of current hydrologic conditions affecting the mitigation area; | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (e) A map of vegetation communities in and around the mitigation area; | |
| | | | (f) Construction drawings detailing proposed topographic alterations and all structural components associated with proposed activities; | |
| | | | (g) Proposed construction activities, including a detailed schedule for implementation; | |
| | | | (h) A vegetation-planting scheme If planting is proposed, and schedule for implementation; | |
| | | | (i) Sources of plants and soils used in wetland creation or restoration; | |
| | | | (j) Measures to be implemented during and after construction to avoid adverse impacts related to proposed activities; | |
| | | | (k) A management plan comprising all aspects of operation and maintenance, including water management practices, vegetation establishment, exotic and nuisance species control, fire management, and control of access; | |
| | | | (l) A proposed monitoring plan to demonstrate mitigation success; | |
| | | | (m) A description of the activities proposed to control exotic and nuisance species should these become established in the mitigation area. The mitigation proposal must include reasonable measures to assure that these species do not invade the mitigation area in such numbers as to affect the likelihood of success of the project; | |
| | | | (n) A description of anticipated site conditions in and around the mitigation area after the mitigation plan is successfully implemented; | |
| | | | (o) A comparison of current fish and wildlife habitat to expected habitat after the mitigation plan is successfully implemented; | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (p) For mitigation plans with projected implementation costs in excess of $25,000, an itemized estimate of the cost of implementing mitigation as set forth in **section 10.3.7.7, below;** | |
| | | | (q) Evidence that the applicant has legal access to the mitigation area and authority to perform the mitigation, and documentation granting the Agency a reasonable right of legal access to the mitigation area and the authority to conduct the mitigation should the applicant fail to do so; and | |
| | | | (r) Any additional necessary supporting information required by Chapter 62-345, F.A.C. | |
| 230.94(c)(6)(i) and (ii) | (6) *Determination of credits.* A description of the number of credits to be provided, including a brief explanation of the rationale for this determination. (See §230.93(f).) (i) For permittee-responsible mitigation, this should include an explanation of how the compensatory mitigation project will provide the required compensation for unavoidable impacts to aquatic resources resulting from the permitted activity. (ii) For permittees intending to secure credits from an approved mitigation bank or in-lieu fee program, it should include the number and resource type of credits to be secured and how these were determined. | Applicant's Handbook Volume I, section 10.3.2 | Volume I, section 10.3.2 - Guidelines for the Amount of Mitigation  Chapter 62-345, F.A.C., Uniform Mitigation Assessment Method (UMAM), establishes a standardized procedure for assessing functions provided by wetlands and other surface waters, the amount those functions are reduced by proposed impact, and the amount of mitigation needed to offset that impact. The Agency will be responsible for verifying the information provided and applying this assessment method to determine the amount of mitigation necessary to offset the proposed impacts.  Chapter 62-345, F.A.C., also establishes the criteria to award and deduct mitigation bank or regional offsite mitigation area credits. The Agency will be responsible for verifying that information and applying this assessment method to determine the potential amount of mitigation to be provided by the bank or regional offsite mitigation area.  Paragraphs 62-345.100(3), (5), (6), (7), (8), and (9), F.A.C., provide exceptions from the application of UMAM to determine the amount of mitigation necessary to offset adverse impacts. | |
| 230.94(c)(7) | (7) *Mitigation work plan.* Detailed written specifications and work descriptions for the compensatory mitigation project, including, but not limited to, the geographic boundaries of the project; construction methods, timing, and sequence; source(s) of water, including connections to existing waters and uplands; methods for establishing the desired plant community; plans to | Applicant's Handbook Volume I, sections 10.3.1.2.1 and 10.3.3.2 | **Itemized criteria requirements of § 230.94(c)(7) vs. Volume I:**  **The geographic boundaries of the project:**  Volume I, section 10.3.1.2.1 An applicant proposing offsite mitigation must provide reasonable assurance that the permitted mitigation will be conducted by an entity | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | control invasive plant species; the proposed grading plan, including elevations and slopes of the substrate; soil management; and erosion control measures. For stream compensatory mitigation projects, the mitigation work plan may also include other relevant information, such as planform geometry, channel form (e.g., typical channel cross-sections), watershed size, design discharge, and riparian area plantings. | | with the financial, legal, and administrative capability to implement the mitigation plan in accordance with the terms and conditions of the permit, if issued, pursuant to Rule 62-330.301(1)(j), F.A.C. Compliance with this requirement can be demonstrated when an entity has sufficient ownership interest or control in the land in accordance with section 4.2.3(d) of this Volume. <br><br> Volume I, section 10.3.3.2(a), and (b) <br> (a) A soils map of the mitigation area and other soils information pertinent to the specific mitigation actions proposed; <br> (b) A topographic map of the mitigation area and adjacent hydrologic contributing and receiving areas; <br><br> **Construction methods, timing, and sequence:** <br><br> Volume I, section 10.3.3.2(f), and (g) <br> (f) Construction drawings detailing proposed topographic alterations and all structural components associated with proposed activities; <br> (g) Proposed construction activities, including a detailed schedule for implementation; <br><br> **Sources of water, including connections to existing waters and uplands:** <br><br> Volume I, section 10.3.3.2(b) – (d) <br> (b) A topographic map of the mitigation area and adjacent hydrologic contributing and receiving areas; <br> (c) A hydrologic features map of the mitigation area and adjacent hydrologic contributing and receiving areas; <br> (d) A description of current hydrologic conditions affecting the mitigation area; <br><br> **Methods for establishing the desired plant community:** <br><br> Volume I, section 10.3.3.2(e), (h), (i), (k), and (l) <br> (e) A map of vegetation communities in and around the mitigation area; <br> (h) A vegetation-planting scheme if planting is proposed, and schedule for implementation; <br> (i) Sources of plants and soils used in wetland creation or restoration; <br> (k) A management plan comprising all aspects of operation and maintenance, including water management practices, vegetation establishment, exotic and nuisance species control, fire management, and control of access; | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | (l) A proposed monitoring plan to demonstrate mitigation success; | |
| | | | **Plans to control invasive plant species:** | |
| | | | Volume I, section 10.3.3.2(k), and (m) | |
| | | | (k) A management plan comprising all aspects of operation and maintenance, including water management practices, vegetation establishment, exotic and nuisance species control, fire management, and control of access; | |
| | | | (m) A description of the activities proposed to control exotic and nuisance species should these become established in the mitigation area. The mitigation proposal must include reasonable measures to assure that these species do not invade the mitigation area in such numbers as to affect the likelihood of success of the project; | |
| | | | **The proposed grading plan, including elevations and slopes of the substrate:** | |
| | | | Volume I, section 10.3.3.2(f), and (g) | |
| | | | (f) Construction drawings detailing proposed topographic alterations and all structural components associated with proposed activities; | |
| | | | (g) A description of anticipated site conditions in and around the mitigation area after the mitigation plan is successfully implemented; | |
| | | | **Soil management:** | |
| | | | Volume I, section 10.3.3.2(i), (j), and (m) | |
| | | | (i) Sources of plants and soils used in wetland creation or restoration; | |
| | | | (j) Measures to be implemented during and after construction to avoid adverse impacts related to proposed activities; | |
| | | | (n) A description of anticipated site conditions in and around the mitigation area after the mitigation plan is successfully implemented; | |
| | | | **Erosion control measures:** | |
| | | | Volume I, section 10.3.3.2(j) | |
| | | | (j) Measures to be implemented during and after construction to avoid adverse impacts related to proposed activities; | |
| | | | **Stream compensatory mitigation:** | |
| | | | These "additional" items are already covered under the items in Volume I, section 10.3.3.2. The information provided would be specific to streams, as needed. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 230.94(c)(8) | (8) *Maintenance plan.* A description and schedule of maintenance requirements to ensure the continued viability of the resource once initial construction is completed. | Applicant's Handbook Volume I, section 10.3.3.2(k) | Volume I, section 10.3.2(k) -      A management plan comprising all aspects of operation and maintenance, including water management practices, vegetation establishment, exotic and nuisance species control, fire management, and control of access; | |
| 230.94(c)(9) | (9) *Performance standards.* Ecologically-based standards that will be used to determine whether the compensatory mitigation project is achieving its objectives. (See §230.95.) | Applicant's Handbook Volume I, section 10.3.6 | Volume I, section 10.3.6 - Mitigation Success

Mitigation success will be measured in terms of whether the objectives of the mitigation are expected to be realized. The success criteria to be included in permit conditions will specify the minimum requirements necessary to attain a determination of success. The mitigation shall be deemed successful by the Agency when all applicable water quality standards are met, the mitigation area has achieved viable and sustainable ecological and hydrological functions and the specific success criteria contained in the permit are met. If success is not achieved within the time frame specified within the permit, remedial measures shall be required. Monitoring requirements shall remain in effect until success is achieved as specified in the permit. Maintenance requirements shall remain in effect as specified in the permit. | |
| 230.94(c)(10) | (10) *Monitoring requirements.* A description of parameters to be monitored in order to determine if the compensatory mitigation project is on track to meet performance standards and if adaptive management is needed. A schedule for monitoring and reporting on monitoring results to the district engineer must be included. (See §230.96.) | Applicant's Handbook Volume I, section 10.3.4

404 Handbook, section 8.5.6.1 | Volume I, section 10.3.4 - Monitoring Requirements for Mitigation Areas

If applicable, applicants shall monitor the progress of mitigation areas until success can be demonstrated as provided in section 10.3.6, below. Monitoring parameters, methods, schedules, and reporting requirements will be specified in permit conditions.

404 Handbook, section 8.5.6.1 - Monitoring
The compensatory mitigation plan shall provide for a monitoring period that is sufficient to demonstrate that the compensatory mitigation project has met performance standards, but not less than five years. A longer monitoring period shall be required for aquatic resources with slow development rates (e.g., forested wetlands, bogs). Following project implementation, the Agency shall reduce or waive the remaining monitoring requirements upon a determination that the compensatory mitigation project has achieved its performance standards. The Agency may also extend the original monitoring period upon a determination that performance standards have not been met or the compensatory mitigation project is not on track to meet them. The Agency shall revise monitoring requirements when remediation or adaptive management is required. | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 230.94(c)(11) | (11) *Long-term management plan.* A description of how the compensatory mitigation project will be managed after performance standards have been achieved to ensure the long-term sustainability of the resource, including long-term financing mechanisms and the party responsible for long-term management. (See §230.97(d).) | Applicant's Handbook Volume I, section 10.3.3.2(k)<br><br>404 Handbook, section 8.5.6.3 | Volume I, section 10.3.3.2(k) -    A management plan comprising all aspects of operation and maintenance, including water management practices, vegetation establishment, exotic and nuisance species control, fire management, and control of access;<br><br>404 Handbook, section 8.5.6.3 Long-term Protection and Management -<br>(a) The real estate instrument, management plan, or other long-term protection mechanism must contain a provision requiring 60-day advance notification to the Agency before any action is taken to void or modify the instrument, management plan, or long-term protection mechanism, including transfer of title to, or establishment of any other legal claims over, the compensatory mitigation site.<br>(b) The permit conditions shall identify the party responsible for ownership and all long-term management of the compensatory mitigation project. The permit conditions shall, where applicable, contain provisions allowing the permittee to transfer the long-term management responsibilities of the compensatory mitigation project site to a land stewardship entity, such as a public agency, non-governmental organization, or private land manager, after review and approval by the Agency. The land stewardship entity need not be identified in the original permit, as long as the future transfer of long-term management responsibility is approved by the Agency.<br>(c) A long-term management plan shall include a description of long-term management needs, annual cost estimates for these needs, and identify the funding mechanism that will be used to meet those needs.<br>(d) Any provisions necessary for long-term financing shall be addressed in the original permit. The Agency shall require provisions to address inflationary adjustments and other contingencies, as appropriate. Appropriate long-term financing mechanisms include non-wasting endowments, trusts, contractual arrangements with future responsible parties, and other appropriate financial instruments. In cases where the long-term management entity is a public authority or government agency, that entity shall provide a plan for the long-term financing of the site.<br>(e) Any long-term financing mechanisms shall be approved by the Agency in advance of the authorized impacts. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 230.94(c)(12) | (12) *Adaptive management plan.* A management strategy to address unforeseen changes in site conditions or other components of the compensatory mitigation project, including the party or parties responsible for implementing adaptive management measures. The adaptive management plan will guide decisions for revising compensatory mitigation plans and implementing measures to address both foreseeable and unforeseen circumstances that adversely affect compensatory mitigation success. (See §230.97(c).) | 62-331.130(2), F.A.C. 404 Handbook, section 8.5.6.2 | 62-331.130(2), F.A.C. – Mitigation proposals other than the purchase of mitigation bank or in-lieu fee program credits shall include an adaptive management plan. The plan shall include information about the party or parties responsible for implementing adaptive management measures, including the information required in Volume I, section 10.3.1.2.1. 404 Handbook, section 8.5.6.2 – Adaptive Management (a) If the compensatory mitigation project cannot be constructed in accordance with the approved mitigation plans, the permittee shall notify the Agency. Any significant modification of the compensatory mitigation project requires approval from the Agency. (b) If monitoring or other information indicates that the compensatory mitigation project is not progressing towards meeting its performance standards as anticipated, the responsible party shall notify the Agency as soon as possible. The Agency shall evaluate and pursue measures to address deficiencies in the compensatory mitigation project. The Agency shall consider whether the compensatory mitigation project is providing ecological benefits comparable to the original objectives of the compensatory mitigation project. (c) The Agency, in consultation with the responsible party (and other state, federal, tribal, and local agencies, as appropriate), will determine the appropriate measures. The measures may include, but are not limited to, site modifications, design changes, revisions to maintenance requirements, and revised monitoring requirements. The measures shall be designed to ensure that the modified compensatory mitigation project provides aquatic resource functions comparable to those described in the mitigation plan objectives. (d) Performance standards shall be revised in accordance with adaptive management to account for measures taken to address deficiencies in the compensatory mitigation project. Performance standards shall also be revised to reflect changes in management strategies and objectives if the new standards provide for ecological benefits that are comparable or superior to the approved compensatory mitigation project. No other revisions to performance standards shall be allowed except in the case of natural disasters. | |
| 230.94(c)(13) | (13) *Financial assurances.* A description of financial assurances that will be provided and how they are | Applicant's Handbook Volume I, section 10.3.7 | Volume I, section 10.3.7 - Financial Responsibility for Mitigation. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | sufficient to ensure a high level of confidence that the compensatory mitigation project will be successfully completed, in accordance with its performance standards (see §230.93(n)). | | As part of compliance with paragraph 62-330.301(1)(i), F.A.C., where an applicant proposes mitigation, the applicant shall provide proof of financial responsibility to: <br><br> (a) Conduct the mitigation activities; <br><br> (b) Conduct any necessary management of the mitigation site; <br><br> (c) Conduct monitoring of the mitigation; <br><br> (d) Prepare and submit monitoring reports to the Agency; and <br><br> (e) Conduct any necessary corrective action indicated by the monitoring. | |
| 230.94(c)(14) | (14) *Other information.* The district engineer may require additional information as necessary to determine the appropriateness, feasibility, and practicability of the compensatory mitigation project. | Applicant's Handbook Volume I, section 10.3.3.2(r) | Volume I, section 10.3.3.2(r) - Any additional necessary supporting information required by Chapter 62-345, F.A.C. | |
| 230.95(a) and (b) | Ecological performance standards | | | |
| 230.96(a) | (1) Monitoring the compensatory mitigation project site is necessary to determine if the project is meeting its performance standards, and to determine if measures are necessary to ensure that the compensatory mitigation project is accomplishing its objectives. ... | Applicant's Handbook Volume I, sections 10.3.4 and 10.3.6 | Volume I, section 10.3.4 - Monitoring Requirements for Mitigation Areas <br><br> If applicable, applicants shall monitor the progress of mitigation areas until success can be demonstrated as provided in section 10.3.6, below. Monitoring parameters, methods, schedules, and reporting requirements will be specified in permit conditions. <br><br> Volume I, section 10.3.6 - Mitigation Success <br><br> Mitigation success will be measured in terms of whether the objectives of the mitigation are expected to be realized. The success criteria to be included in permit conditions will specify the minimum requirements necessary to attain a determination of success. The mitigation shall be deemed successful by the Agency when all applicable water quality standards are met, the mitigation area has achieved viable and sustainable ecological and hydrological functions and the specific success criteria contained in the permit are met. If success is not achieved within the time frame specified within the permit, remedial measures shall be required. Monitoring requirements shall remain in effect until success is achieved as specified in the permit. Maintenance requirements shall remain in effect as specified in the permit. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 230.96(b) | (b) *Monitoring period.* The mitigation plan must provide for a monitoring period that is sufficient to demonstrate that the compensatory mitigation project has met performance standards, but not less than five years. A longer monitoring period must be required for aquatic resources with slow development rates (e.g., forested wetlands, bogs). Following project implementation, the district engineer may reduce or waive the remaining monitoring requirements upon a determination that the compensatory mitigation project has achieved its performance standards. Conversely the district engineer may extend the original monitoring period upon a determination that performance standards have not been met or the compensatory mitigation project is not on track to meet them. The district engineer may also revise monitoring requirements when remediation and/or adaptive management is required. | 404 Handbook, section 8.5.6.1 | <u>404 Handbook, section 8.5.6.1 – Monitoring</u><br><br>The compensatory mitigation plan shall provide for a monitoring period that is sufficient to demonstrate that the compensatory mitigation project has met performance standards, but not less than five years. A longer monitoring period shall be required for aquatic resources with slow development rates (e.g. forested wetlands, bogs). Following project implementation, the Agency shall reduce or waive the remaining monitoring requirements upon a determination that the compensatory mitigation project has achieved its performance standards. The Agency may also extend the original monitoring period upon a determination that performance standards have not been met or the compensatory mitigation project is not on track to meet them. The Agency shall revise monitoring requirements when remediation or adaptive management is required. | |
| 230.96(c) | (c) *Monitoring reports.* (1) The district engineer must determine the information to be included in monitoring reports. This information must be sufficient for the district engineer to determine how the compensatory mitigation project is progressing towards meeting its performance standards, and may include plans (such as as-built plans), maps, and photographs to illustrate site conditions. Monitoring reports may also include the results of functional, condition, or other assessments used to provide quantitative or qualitative measures of the functions provided by the compensatory mitigation project site.<br><br>(2) The permittee or sponsor is responsible for submitting monitoring reports in accordance with the special conditions of the DA permit or the terms of the instrument. Failure to submit monitoring reports in a timely manner may result in compliance action by the district engineer.<br><br>(3) Monitoring reports must be provided by the district engineer to interested federal, tribal, state, and local resource agencies, and the public, upon request. | Applicant's Handbook Volume I, section 10.3.6 | Volume I, section 10.3.6 - Mitigation Success<br><br>Mitigation success will be measured in terms of whether the objectives of the mitigation are expected to be realized. The success criteria to be included in permit conditions will specify the minimum requirements necessary to attain a determination of success. The mitigation shall be deemed successful by the Agency when all applicable water quality standards are met, the mitigation area has achieved viable and sustainable ecological and hydrological functions and the specific success criteria contained in the permit are met. If success is not achieved within the time frame specified within the permit, remedial measures shall be required. Monitoring requirements shall remain in effect until success is achieved as specified in the permit. Maintenance requirements shall remain in effect as specified in the permit. | |
| 230.97 | Management | | | |
| 230.97(a)(1) | (a) *Site protection.* (1) The aquatic habitats, riparian areas, buffers, and uplands that comprise the overall compensatory mitigation project must be provided long-term protection through real estate instruments or | Applicant's Handbook Volume I, section 10.3.5 and 10.3.8 | Volume I, section 10.3.5 - Protection of Mitigation Areas<br><br>Applicants shall propose and be responsible for implementing methods that assure that mitigation areas will not be adversely impacted by | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | other available mechanisms, as appropriate. Long-term protection may be provided through real estate instruments such as conservation easements held by entities such as federal, tribal, state, or local resource agencies, non-profit conservation organizations, or private land managers; the transfer of title to such entities; or by restrictive covenants. For government property, long-term protection may be provided through federal facility management plans or integrated natural resources management plans. When approving a method for long-term protection of non-government property other than transfer of title, the district engineer shall consider relevant legal constraints on the use of conservation easements and/or restrictive covenants in determining whether such mechanisms provide sufficient site protection. To provide sufficient site protection, a conservation easement or restrictive covenant should, where practicable, establish in an appropriate third party (e.g., governmental or non-profit resource management agency) the right to enforce site protections and provide the third party the resources necessary to monitor and enforce these protections. | | incidental encroachment or secondary activities that might compromise mitigation success or long-term viability.<br><br>Volume I, section 10.3.8 - Real property conveyances.<br><br>(a) All conservation easements, deed restrictions, and restrictive covenants accepted for mitigation purposes shall be granted in perpetuity without encumbrances, unless such encumbrances do not adversely affect the ecological viability of the mitigation. All liens and mortgages shall be released or subordinated to the conservation easement. All conservation easements shall be consistent with Section 704.06, F.S., and shall contain restrictions that ensure the ecological viability of the site.<br><br>(b) All real property conveyances shall be in fee simple and by statutory warranty deed, special warranty deed, or other deed, without encumbrances that adversely affect the integrity of the preservation. The Agency shall also accept a quit claim deed if necessary to aid in clearing minor title defects or otherwise resolving boundary questions.<br><br>(c) The use of the applicable Form 62-330.301(8) through 62-330.301(17) shall constitute consistency with Section 704.06, F.S. Where the applicant demonstrates that project specific conditions necessitate deviation from language of the accepted forms, alternative language shall be accepted provided that it meets the provisions of Section 704.06, F.S. and section 10. 3. 8 of this Volume. Each of these forms are in Appendix C of this Volume, and a copy of the form may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C. | |
| 230.97(a)(2) | (2) The real estate instrument, management plan, or other mechanism providing long-term protection of the compensatory mitigation site must, to the extent appropriate and practicable, prohibit incompatible uses (e.g., clear cutting or mineral extraction) that might otherwise jeopardize the objectives of the compensatory mitigation project. Where appropriate, multiple instruments recognizing compatible uses (e.g., fishing or grazing rights) may be used. | This language is in our incorporated conservation easement forms (62-330.301(6), F.A.C.) | 3. Prohibited Uses. Except for activities that are permitted or required by the Permit (or any modification thereto) (which may include restoration, creation, enhancement, maintenance, monitoring activities, or surface water management improvements) or other activities described herein or in the Management Plan (if any), any activity on or use of the Conservation Easement Area inconsistent with the purpose of this Conservation Easement is prohibited. Without limiting the generality of the foregoing, the following activities are expressly prohibited in or on the Conservation Easement Area: a. Construction or placing of buildings, roads, signs, billboards or other | |

| Federal Law (40 CFR §…) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | | | advertising, utilities, or other structures on or above the ground; b. Dumping or placing of soil or other substance or material as landfill, or dumping or placing of trash, waste, or unsightly or offensive materials; c. Removing, destroying or trimming trees, shrubs, or other vegetation, except: i. The removal of dead trees and shrubs or leaning trees that could cause damage to property is authorized; ii. The destruction and removal of noxious, nuisance or exotic invasive plant species as listed on the most recent Florida Exotic Pest Plant Council's List of Invasive Species is authorized; iii. Activities authorized by the Permit or described in the Management Plan or otherwise approved in writing by the Grantee are authorized; and iv. Activities conducted in accordance with a wildfire mitigation plan developed with the Florida Forest Service that has been approved in writing by the Grantee are authorized. No later than thirty (30) days before commencing any activities to implement the approved wildfire mitigation plan, Grantor shall notify the Grantee in writing of its intent to commence such activities. All such activities may only be completed during the time period for which the Grantee approved the plan; d. Excavation, dredging, or removal of loam, peat, gravel, soil, rock, or other material substance in such manner as to affect the surface; e. Surface use except for purposes that permit the land or water area to remain in its natural, restored, enhanced, or created condition; f. Activities detrimental to drainage, flood control, water conservation, erosion control, soil conservation, or fish and wildlife habitat preservation including, but not limited to, ditching, diking, clearing, and fencing; g. Acts or uses detrimental to such aforementioned retention of land or water areas; and h. Acts or uses which are detrimental to the preservation of the structural integrity or physical appearance of sites or properties having historical, archaeological, or cultural significance | |
| 230.97(a)(3) | (3) The real estate instrument, management plan, or other long-term protection mechanism must contain a provision requiring 60-day advance notification to the district engineer before any action is taken to void or modify the instrument, management plan, or long-term protection mechanism, including transfer of title to, or establishment of any other legal claims over, the compensatory mitigation site. | N/A | | The state holds the conservation easement in perpetuity, and it cannot be modified without Agency approval. |
| 230.97(a)(4) | (4) For compensatory mitigation projects on public lands, where Federal facility management plans or integrated natural resources management plans are used to provide long-term protection, and changes in statute, regulation, or agency needs or mission results in an incompatible use on public lands originally set | NA for state program (see 373.4135, F.S.) | | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | aside for compensatory mitigation, the public agency authorizing the incompatible use is responsible for providing alternative compensatory mitigation that is acceptable to the district engineer for any loss in functions resulting from the incompatible use. | | | |
| 230.97(a)(5) | (5) A real estate instrument, management plan, or other long-term protection mechanism used for site protection of permittee-responsible mitigation must be approved by the district engineer in advance of, or concurrent with, the activity causing the authorized impacts. | 404 Handbook, section 8.5.4 | 404 Handbook, section 8.5.4 - Timing of Compensatory Mitigation Implementation of the compensatory mitigation project shall be, to the maximum extent practicable, in advance of or concurrent with the authorized impacts. Temporal loss shall be compensated for in accordance with appropriate calculations for time lag in accordance with Rule 62-345.600, F.A.C., except paragraph 62-345.600(1)(b), F.A.C., which is not applicable to the State 404 Program. | |
| 230.97(b) | (b) Sustainability. Compensatory mitigation projects shall be designed, to the maximum extent practicable, to be self-sustaining once performance standards have been achieved. This includes minimization of active engineering features (e.g., pumps) and appropriate siting to ensure that natural hydrology and landscape context will support long-term sustainability. Where active long-term management and maintenance are necessary to ensure long-term sustainability (e.g., prescribed burning, invasive species control, maintenance of water control structures, easement enforcement), the responsible party must provide for such management and maintenance. This includes the provision of long-term financing mechanisms where necessary. Where needed, the acquisition and protection of water rights must be secured and documented in the permit conditions or instrument. | Applicant's Handbook Volume I, section 10.3.3.1 | Volume I, section 10.3.3.1 - Applicants shall provide reasonable assurance that proposed mitigation will:<br><br>(a)   Offset adverse impacts due to regulated activities; and<br><br>(b)   Achieve mitigation success by providing viable and sustainable ecological and hydrological functions.<br><br>The use of credits from a mitigation bank permitted under Part IV of Chapter 373, F.S., or a Regional Offsite Mitigation Area under Section 373.4135, F.S., is not subject to sections 10.3.3.2 through 10.3.8, below. | |
| 230.97(c)(1) | (c) Adaptive management. (1) If the compensatory mitigation project cannot be constructed in accordance with the approved mitigation plans, the permittee or sponsor must notify the district engineer. A significant modification of the compensatory mitigation project requires approval from the district engineer. | 62-331.130(2), F.A.C.<br><br>404 Handbook, section 8.5.6.2(a) | (2) Mitigation proposals other than the purchase of mitigation bank or in-lieu fee program credits shall include an adaptive management plan. The plan shall include information about the party or parties responsible for implementing adaptive management measures, including the information required in Volume I, section 10.3.1.2.1.<br><br>404 Handbook, section 8.5.6.2(a) - Adaptive Management<br><br>(a)   If the compensatory mitigation project cannot be constructed in accordance with the approved mitigation plans, the permittee shall notify the Agency. Any significant modification of the compensatory mitigation project requires approval from the Agency. | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| 230.97(c)(2) | (2) If monitoring or other information indicates that the compensatory mitigation project is not progressing towards meeting its performance standards as anticipated, the responsible party must notify the district engineer as soon as possible. The district engineer will evaluate and pursue measures to address deficiencies in the compensatory mitigation project. The district engineer will consider whether the compensatory mitigation project is providing ecological benefits comparable to the original objectives of the compensatory mitigation project. | 404 Handbook, section 8.5.6.2(b) | 404 Handbook section 8.5.6.2(b) – Adaptive Management (b) If monitoring or other information indicates that the compensatory mitigation project is not progressing towards meeting its performance standards as anticipated, the responsible party shall notify the Agency as soon as possible. The Agency shall evaluate and pursue measures to address deficiencies in the compensatory mitigation project. The Agency shall consider whether the compensatory mitigation project is providing ecological benefits comparable to the original objectives of the compensatory mitigation project. | |
| 230.97(c)(3) | (3) The district engineer, in consultation with the responsible party (and other federal, tribal, state, and local agencies, as appropriate), will determine the appropriate measures. The measures may include site modifications, design changes, revisions to maintenance requirements, and revised monitoring requirements. The measures must be designed to ensure that the modified compensatory mitigation project provides aquatic resource functions comparable to those described in the mitigation plan objectives. | 404 Handbook, section 8.5.6.2(c) | 404 Handbook, section 8.5.6.2(c) – Adaptive Management (c) The Agency, in consultation with the responsible party (and other state, federal, tribal, and local agencies, as appropriate), will determine the appropriate measures. The measures may include, but are not limited to, site modifications, design changes, revisions to maintenance requirements, and revised monitoring requirements. The measures shall be designed to ensure that the modified compensatory mitigation project provides aquatic resource functions comparable to those described in the mitigation plan objectives. | |
| 230.97(c)(4) | (4) Performance standards may be revised in accordance with adaptive management to account for measures taken to address deficiencies in the compensatory mitigation project. Performance standards may also be revised to reflect changes in management strategies and objectives if the new standards provide for ecological benefits that are comparable or superior to the approved compensatory mitigation project. No other revisions to performance standards will be allowed except in the case of natural disasters. | 404 Handbook, section 8.5.6.2(d) | 404 Handbook, section 8.5.6.2(d) – Adaptive Management (d) Performance standards shall be revised in accordance with adaptive management to account for measures taken to address deficiencies in the compensatory mitigation project. Performance standards shall also be revised to reflect changes in management strategies and objectives if the new standards provide for ecological benefits that are comparable or superior to the approved compensatory mitigation project. No other revisions to performance standards shall be allowed except in the case of natural disasters. | |
| 230.97(d)(1) | (d) Long-term management. (1) The permit conditions or instrument must identify the party responsible for ownership and all long-term management of the compensatory mitigation project. The permit conditions or instrument may contain provisions allowing the permittee or sponsor to transfer the long-term management responsibilities of the compensatory mitigation project site to a land stewardship entity, such as a public agency, non-governmental organization, or private land manager, after review and | 404 Handbook, section 8.5.6.3(b) | 404 Handbook, section 8.5.6.3(b) – Long-term Protection Management (b)The permit conditions shall identify the party responsible for ownership and all long-term management of the compensatory mitigation project. The permit conditions shall, where applicable, contain provisions allowing the permittee to transfer the long-term management responsibilities of the compensatory mitigation project site to a land stewardship entity, such as a public agency, non-governmental organization, or private land manager, after review and approval by the Agency. The land stewardship entity need not be | |

| Federal Law (40 CFR §...) | Federal Requirement | State Law (in addition to general authority granted by Section 373.4146, F.S.) | State Law Text | Comments |
|---|---|---|---|---|
| | approval by the district engineer. The land stewardship entity need not be identified in the original permit or instrument, as long as the future transfer of long-term management responsibility is approved by the district engineer. | | identified in the original permit, as long as the future transfer of long-term management responsibility is approved by the Agency. | |
| 230.97(d)(2) | (2) A long-term management plan should include a description of long-term management needs, annual cost estimates for these needs, and identify the funding mechanism that will be used to meet those needs. | 404 Handbook, section 8.5.6.3(c) | 404 Handbook, section 8.5.6.3(c) – Long-term Protection Management (c) A long-term management plan shall include a description of long-term management needs, annual cost estimates for these needs, and identify the funding mechanism that will be used to meet those needs. | |
| 230.97(d)(3) | (3) Any provisions necessary for long-term financing must be addressed in the original permit or instrument. The district engineer may require provisions to address inflationary adjustments and other contingencies, as appropriate. Appropriate long-term financing mechanisms include non-wasting endowments, trusts, contractual arrangements with future responsible parties, and other appropriate financial instruments. In cases where the long-term management entity is a public authority or government agency, that entity must provide a plan for the long-term financing of the site. | 404 Handbook, section 8.5.6.3(d) | 404 Handbook, section 8.5.6.3 - Long-term Protection and Management (d) Any provisions necessary for long-term financing shall be addressed in the original permit. The Agency shall require provisions to address inflationary adjustments and other contingencies, as appropriate. Appropriate long-term financing mechanisms include non-wasting endowments, trusts, contractual arrangements with future responsible parties, and other appropriate financial instruments. In cases where the long-term management entity is a public authority or government agency, that entity shall provide a plan for the long-term financing of the site. | |
| 230.97(d)(4) | (4) For permittee-responsible mitigation, any long-term financing mechanisms must be approved in advance of the activity causing the authorized impacts. | 404 Handbook, section 8.5.6.3 | 404 Handbook, section 8.5.6.3 - Long-term Protection and Management (e) Any long-term financing mechanisms shall be approved by the Agency in advance of the authorized impacts. | |
| 230.98 | Mitigation banks and in-lieu fee programs | NA for state program | | |

# *General Counsel's Statement*

## July 31, 2020

## Introduction

The Clean Water Act (CWA), in accordance with 40 C.F.R. Part 233, 33 U.S.C §§ 1344(g)-(h), provides states the ability to assume the Section 404 dredge and fill program in certain waters, subject to Environmental Protection Agency (EPA) approval of a state's program submission. In part, a state's program submission must include a statement signed by the state Attorney General or the attorney for the state agency (General Counsel) which has independent legal counsel with the authority to represent the state in court on all matters pertaining to the state program. 40 C.F.R. § 233.12(a), and 40 C.F.R. § 233.10. More specifically:

- A state that seeks to administer a 404 program must submit to the EPA's Regional Administrator a statement that the laws and regulations of the state provide adequate authority to carry out the program and meet applicable requirements of 40 C.F.R. Part 233; 40 C.F.R. § 233.10(c); and 40 C.F.R. § 233.12.
- The statement must cite specific statutes and administrative regulations which are lawfully adopted at the time the statement is signed and which shall be fully effective by the time the program is approved, and where appropriate, judicial decisions which demonstrate adequate authority. 40 C.F.R. § 233.12(a).
- Where more than one agency has responsibility for administering the state program, the statement must include certification that each agency has full authority to administer the program within its category of jurisdiction and that the state, as a whole, has full authority to administer a complete state Section 404 program. 40 C.F.R. § 233.12(d).
- The statement must contain a legal analysis of the effect of state law regarding the prohibition on taking private property without just compensation on the successful implementation of the state's program. 40 C.F.R. § 233.12(c).

The summaries set forth below identify the federal requirements which Florida must meet and the statutes and rules which provide the State of Florida with adequate authority to carry out the program and meet applicable requirements. Unless otherwise provided, the applicable statutory and regulatory authorities for Florida to assume and implement the federal 404 program are found in: Part IV, Chapter 373, F.S.; Chapters 62-330 (Environmental Resource Permitting), 62-340 (Delineation of the Landward Extent of Wetlands and Surface Waters), and 62-331 (State 404 Program), F.A.C.; the Applicant's Handbook Volume I (incorporated by reference in paragraph 62-330.010(4)(a), F.A.C.) and the State 404 Program Applicant's Handbook (incorporated by reference in subsection 62-331.010(5), F.A.C.). Additional authorities applicable to the State 404 Program include Chapters 120 (Administrative Procedures Act) and 403 (Environmental Control), F.S., and Chapters 62-4 (Permits), and 62-110 (Exceptions to the Uniform Rules of Procedure).

Chapter 62-331, F.A.C., the State 404 Applicant's Handbook, the amendments to Chapter 62-330, F.A.C., and Applicant's Handbook Volume I are adopted and shall become fully effective upon EPA's publication of state program approval via Federal Register notice.

<u>Purpose and Scope of Program</u>

40 C.F.R. § 233.1: A state program must regulate all discharges of dredged or fill material into waters regulated by the State under Section 404*(g)-(1)*, except as provided in Section 404(f) and 40 C.F.R. § 232.3 (which exempt specified activities from permitting requirements). Nothing precludes a state from operating or enforcing requirements which are more stringent or from operating a program with greater scope, than required under 40 C.F.R. Part 233. Where an approved state program has a greater scope than required by federal law, the additional coverage is not part of the EPA-approved program and is not subject to EPA oversight or enforcement. While the state may impose more stringent requirements, it may not impose any less stringent requirements for any purpose. The approved state program shall, at all times, be conducted in accordance with the requirements of the CWA and 40 C.F.R. Part 233.

FLORIDA AUTHORITY: Florida has authority to regulate all waters in the state, subject to the specified exemptions set forth in Sections 373.406, 373.4145, and 403.813, F.S. *See* § 373.023, F.S. This authority includes the regulation of dredging and filling in surface waters or wetlands, as delineated in Section 373.421(1), F.S., through its statewide environmental resource permitting (ERP) program. *See generally* §§ 373.4131; 373.414; 373.4143; and 373.4144, F.S. "Surface waters," "waters in the state" and "wetlands" are defined by statute in Section 373.019, F.S., and are more expansive than those waters regulated by the CWA.

Pursuant to the authority granted in Section 373.4146, F.S., Florida is seeking to assume the CWA Section 404 dredge and fill program for implementation in waters of the United States, as defined in 40 C.F.R. Part 120, that the state assumes pursuant to Section 404 of the CWA. This authority includes adopting any federal requirements, criteria, or regulations necessary to obtain assumption, including, but not limited to, the guidelines specified in 40 C.F.R. Part 230 and the public interest review criteria in 33 C.F.R. § 320.4(a), and to implement the 404 dredge and fill permitting program in conjunction with the environmental resource permitting program established in Chapter 373, F.S., and Chapter 62-330, F.A.C.

Provisions of state law that conflict with federal requirements do not apply to state 404 permits. § 373.4146(3), F.S. As such, the exemptions to ERP permitting established in Sections 373.406, 373.4145, and 404.813, F.S., do not apply to state 404 permits. § 373.4146(4), F.S. Rather, the state has the authority to regulate all discharges of dredged or fill material into waters regulated by the state under Sections 404 *(g)-(l),* subject only to the exemptions provided in 33 U.S.C. § 404(f) and 40 C.F.R. § 232.3.

The State has promulgated Chapter 62-331, F.A.C., to bridge the gap between existing state and federal law, thus ensuring that the State 404 Program is at least as stringent as, and meets the requirements of, the CWA and 40 C.F.R. Part 230.

Indian Country, as defined in 18 U.S.C. § 1151, is not included in Florida's 404 program.

3

<u>Permit Prohibitions</u>

40 C.F.R. § 233.20: This regulation provides that no permit shall be issued by the state unless in compliance with the requirements of the CWA and its implementing regulations, including the 404(b)(1) guidelines; when there is an unresolved objection by the Regional Administrator; when the discharge would be in an unpermitted disposal site or would fail to comply with a restriction imposed under Section 404(c) of the CWA; or if issuance of the permit will impede navigation.

FLORIDA AUTHORITY: Subsection 62-331.053(3)(a), F.A.C., implements the prohibition in 40 C.F.R. § 233.20(a) by providing that "No permit shall be issued … When the project is inconsistent with the requirements of [Chapter 62-331] and the 404 Handbook." The state has prepared a regulatory crosswalk that demonstrates each specific provision in state rule that implement the criteria set forth in the CWA, and 40 C.F.R. Parts 230 through 233. Paragraph 62-331.053(3)(d), F.A.C., implements the prohibition in 40 C.F.R. § 233.20(b) by providing that "[n]o permit shall be issued . . . "[w]hen the EPA has objected to issuance of the permit and the objection has not been resolved." Paragraph 62-331.053(3)(e), F.A.C., implements the prohibition in § 233.20(c) by providing that "[n]o permit shall be issued . . . [w]hen the proposed dredge or fill activity would be in an area which has been prohibited, withdrawn, or denied as a disposal site by the EPA under Section 404(c) of the CWA, or when the activity would fail to comply with a restriction imposed thereunder." Paragraph 62-331.053(3)(f), F.A.C., implements the prohibition in § 233.20(d), by providing that "[n]o permit shall be issued . . . [i]f the Corps determines, after consultation with the Secretary of the Department in which the Coast Guard is operating, that anchorage and navigation of any of the navigable waters would be substantially impaired."

<u>General Permits</u>

40 C.F.R. § 233.21: A state may administer and enforce general permits previously issued by the Corps. Additionally, a state may issue general permits for categories of similar activities that will cause only minimal adverse environmental effects when performed separately and only minimal cumulative adverse effects. Any general permit shall comply with the federal guidelines; contain the conditions specified in 40 C.F.R. § 233.23; describe the specific activity authorized; describe the precise area of the authorized activity; contain predischarge notification requirements as appropriate; and if necessary allow an individual permit to be required after a general permit is issued.

FLORIDA AUTHORITY: The state intends to administer and enforce a limited number of regional general permits issued by the Corps until they expire. Pursuant to 40 C.F.R. § 233.14(b)(3), these general permits, and the procedures whereby the Department and Corps will exchange relevant information, are identified in the Memorandum of Agreement (MOA) between the State of Florida Department of Environmental Protection (DEP) and the U.S. Army Corps of Engineers (Corps).

In addition, the state has promulgated a series of general permits in Chapter 62-331, F.A.C., which authorize activities that meet the conditions specified in 40 C.F.R. § 233.21. They comply with the federal guidelines, describe the authorized activity and area, contain any appropriate predischarge notification requirements, and allow for the issuance of an individual permit after the issuance of

a general permit. The permit conditions for general permits are provided in Rule 62-330.405, except subsections (7) and (10), and Rule 62-331.201, F.A.C. The conditions in Chapter 62-331 are specific to the 404(b)(1) Guidelines, applicable Section 303 water quality standards, applicable Section 307 effluent standards and prohibitions, and the criteria set forth in 40 C.F.R. 233.23. Subsection 62-331.200(6), F.A.C., provides the circumstances under which an individual permit may be required after a general permit is issued.

Emergency Permits

40 C.F.R. § 233.22: A state may issue temporary emergency permits in instances where unacceptable harm to life or severe loss of physical property is otherwise likely to result, so long as such permits are limited to 90 days duration, contain appropriate restoration as a condition, can be terminated at any time to protect human health or the environment, and are the subject of public notice ten days after issuance, as well as expeditious federal agency consultation.

FLORIDA AUTHORITY: Rule 62-331.110, F.A.C. implements the requirements for the issuance of emergency authorizations. Subsection (3) of this rule limits the duration of emergency authorizations to 90 days and subsection (6) provides for circumstances where the emergency permit holder must apply for a permit within the 90-day authorization period. Subsection (4) provides for the termination of an emergency authorization without process any time DEP determines it necessary to protect human health or the environment. Subsection (5) provides for notice and an opportunity to comment as soon as possible but no later than 10 days after issuance, and subsection (7) provides for consultation with EPA, the Corps, U.S. Fish and Wildlife Service (FWS), the tribes, and the National Marine Fisheries Service (NMFS), as applicable.

Permit Conditions

40 C.F.R. § 233.23: Each state issued 404 permit must include specified conditions which assure compliance with federal guidelines, water quality standards and effluent standards and prohibitions; be of a fixed term as limited under the CWA; identify the specifics and scope of the authorized activity; and identify the purpose, type and quantity of discharge. The regulations also include requirements that the permittee stop work if necessary for compliance, take reasonable steps to minimize or prevent violations, inform the agency when non-compliance occurs, provide information requested by the agency, monitor and report as appropriate and keep records, allow the agency to inspect and enter its premises, and minimize the impacts of its discharges.

FLORIDA AUTHORITY: Rules 62-330.350, 62-331.053, and 62-331.054, F.A.C. implement the general permit conditions for individual permits. The conditions in Chapter 62-331.053 are specific to the 404(b)(1) guidelines, applicable Section 303 water quality standards, and applicable Section 307 effluent standards and prohibitions. The state has prepared a regulatory crosswalk that demonstrates each specific state rule that implements the criteria set forth in the 404(b)(1) guidelines. Rule 62-330.054 implements the criteria set forth in 40 C.F.R. § 233.23(c). In addition, Rule 62-331.090, F.A.C., limits the duration of permits to the maximum timeframe allowable under federal law.

5

<u>Permit Application Process</u>

40 C.F.R. § 233.30: The permit application process contains procedures that must be followed to apply for an individual permit. These procedures require applicants provide their name, address and telephone number, and the addresses of adjacent property owners, § 233.30(b)(1); to describe the proposed activity, including its location, purpose and intended use, to describe the scheduling of the activity, the location and dimension of adjacent structures, and all other needed approvals, § 233.30(b)(2); to describe the type, composition, source and quantity of materials to be discharged, the method of discharge, and the site and plans for disposal of dredged or fill material, § 233.30(b)(3); and to certify that all information provided is accurate and that the applicant is aware of the penalties for providing false information. § 233.30(b)(4). All activities reasonably related to the proposed project should be included in the application. § 233.30(b)(5). In addition, the applicant will be required to furnish additional information the State deems appropriate to evaluate the application, and to provide a detailed analysis of environmental considerations. § 233.30(c)&(d).

FLORIDA AUTHORITY: Paragraph 62-331.060(1), F.A.C., implements the application requirements in 40 C.F.R. §§ 233.30(b)(1) – (4). Paragraph 62-331.051(2), F.A.C., implements the application requirement in § 233.30(b)(5). Paragraph 62-331.052(1), F.A.C., implements the application requirement in § 233.30(c). The state provides permit applicants guidance regarding the level of detail needed when analyzing the environmental considerations required under Section 233.30(d) in its applicant's handbooks.

<u>Coordination Requirements</u>

40 C.F.R. § 233.31: A state must give any other state which may be affected by a permit action the opportunity to submit written comments on and object to a proposed permit. The regulation also requires a state to coordinate its permitting activity with federal and state water planning and review processes.

FLORIDA AUTHORITY: Rule 62-331.060(5), F.A.C., implements the coordination requirements in 40 C.F.R. § 233.31 by providing a process by which any state whose waters may be affected by a proposed activity may submit written comments and suggest permit conditions within the public notice comment period. The rule provides for EPA review should the State not accept the recommendations.

<u>Public Notice</u>

40 C.F.R. § 233.32: This regulation specifies the circumstances and manner in which the public must be notified of and given the opportunity to comment on certain agency actions. The regulation also specifies information required to be included in the public notices, and the procedures required to give notice of any public hearing.

FLORIDA AUTHORITY: Subsections 62-331.060(2) – (3), F.A.C., fully implement the public notice requirements of 40 C.F.R. § 233.32(a) – (c) and (e) for individual permits, emergency permits, major modifications and the scheduling of a public hearing. Draft general permits that are promulgated through the rulemaking process are open to public notice and comment pursuant to

Section 120.54, F.S. Subsection 62-331.060(2), F.A.C., and Section 5.3.1 of the 404 Applicant's Handbook require that all notices, including those for applications noticed pursuant to subsection 62-331.060(8), F.A.C., must contain the information required by 40 C.F.R. § 233.32(d).

Public Hearing

40 C.F.R. § 233.33: This regulation identifies the circumstances under which a public hearing must be held on a permit action and contains the procedures applicable to such a hearing. Any interested person may request a public hearing, in writing, during the public comment period. The state shall hold a hearing whenever it determines there is a significant degree of public interest in an application or draft general permit and may hold a hearing when it determines a hearing would be useful to making a decision on an application or draft general permit. Any person may submit oral or written comments or information concerning the application. The public comment period shall automatically be extended at the close of the hearing or as determined by the presiding officer. All public hearings shall be recorded and the record of proceedings shall be made available to the public.

FLORIDA AUTHORITY: Section 62-331.060(4), F.A.C., implements the standards and procedures for public meetings required by 40 C.F.R. § 233.33(a)-(d). Paragraph 62-331.060(3)(c), F.A.C., implements the provisions of 40 C.F.R. § 233.33(c), regarding the extension of the public comment period. Hearings on draft general permits that are promulgated through the rulemaking process are subject to procedures set forth in Section 120.54, F.S., and are mandatory when requested by a member of the public.

Decision on Permit Application

40 C.F.R. § 233.34: The permit decision-making process contains requirements for making permit decisions, including requirements that permit applications be reviewed for compliance with the 404(b)(1) guidelines and/or equivalent state environmental criteria as well as any other applicable State laws or regulations; that no permit may be issued unless compliance with 40 C.F.R. § 233.20 is achieved; and that the State's determination must be available to the public before becoming final. In addition, all comments received in response to the public notice, and public hearing if one is held, must be considered and all comments and the record of any public hearing shall be made part of the official record on the application.

FLORIDA AUTHORITY: The issuance of all individual permits is conditioned on compliance with Rules 62-330.301, 62-330.302, F.A.C., as well as Rule 62-331.053, F.A.C., which collectively contain the state environmental criteria equivalent to the 404(b)(1) guidelines. The state has prepared a regulatory crosswalk that demonstrates each specific state rule that implements the criteria set forth in the 404(b)(1) guidelines. Additionally, pursuant to Rule 62-331.070, F.A.C., no permit may be issued without compliance with state water quality standards, the Coastal Zone Management Program, and as detailed above, the prohibitions set forth in 40 C.F.R. § 233.20. The state's determination is available to the public prior to it becoming final via Rule 62-331.060, F.A.C., and the official record is available to the public through Florida's public records laws (e.g., Chapter 119, F.S.).

<u>Permit Issuance and Effective Date</u>

40 C.F.R. § 233.35: These regulations set forth the procedures for finalizing an application following EPA review. In instances where EPA comments on a permit, the state issues the permit under the procedures set forth in 40 C.F.R. § 233.50. In instances where EPA does not comment on a permit, permit decisions shall be made after the close of the public comment period, with notice to the applicant, and the reasons for any denial shall be set forth in writing. The regulation also provides that a permit shall become effective upon signature by the appropriate state official and the applicant.

FLORIDA AUTHORITY: Rule 62-331.052(3), F.A.C., implements the provisions of 40 C.F.R. § 233.35, including the process set forth in 40 C.F.R. § 233.50.

<u>Permit Modification, Suspension, or Revocation</u>

40 C.F.R. § 233.36: This regulation specifies certain circumstances under which permits may be modified, suspended, or revoked. These circumstances include instances of non-compliance; misrepresentation during the application process; the issuance of a general permit when an individual permit would have been appropriate; changes in circumstances since permit issuance; the presence of significant, previously unavailable information; and revised regulations. The regulation further provides that, with the exception of minor modifications, permit modifications must be subject to public notice and comment and to coordinate with federal review agencies. Minor modifications may use abbreviated procedures and are available to: correct typographical errors; increase the frequency of monitoring or reporting; allow for a change in ownership or operational control over a project; provide for minor modification of project plans that do not significantly change the character, scope and/or purpose of the project; or extend the term of a permit so long as the modification does not extend the term of the permit beyond the maximum timeframe allowable under federal law and does not result in any increase in the amount of dredged or fill material allowed to be discharged.

FLORIDA AUTHORITY: The suspension or revocation of permits shall be conducted in accordance with Section 373.429, F.S. The state will process applications for modifications in accordance with Rule 62-330.315(1) through (3), F.A.C., and Section 6.2 of Applicant's Handbook Volume I, as applicable. The state will reevaluate the circumstances and conditions of a permit considering the factors set forth in Rule 62-331.080(2), F.A.C., which implements the criteria set forth in 40 C.F.R. § 233.36(a). Rule 62-330.315(2), F.A.C., sets forth the types of requests that will qualify for minor modifications, and provides that minor modifications are not subject to public notice and comment. Pursuant to paragraph 62-331.080(4), major modifications and the suspension or revocation of permits are subject to the public notice requirements set forth in Rule 62-331.060, F.A.C.

<u>Signature on Application</u>

40 C.F.R. § 233.37: This regulation requires a permit application to be signed by the applicant, or an authorized agent if accompanied by a statement by that person designating the agent. The signature of the applicant or agent will be understood to be an affirmation that he possesses or

represents the person who possesses the requisite property interest to undertake the activity proposed in the application.

FLORIDA AUTHORITY: Rule 62-331.051(1), F.A.C., implements the requirements of 40 C.F.R. § 233.37, by requiring an applicant use Form 62-330.060(1) – "Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands." Part 4, Section A of this Form requires the signature of the applicant or the applicant's agent; Section B requires the certification of real property interest; and Section C requires the Designation of Authorized Agent (if applicable). Noticed general permits require the use of Form 62-330.402(1), which requires substantially the same information and certification.

## Continuation of Expiring Permits

40 C.F.R. § 233.38: This regulation prohibits the continuation of any Corps 404 permit beyond its expiration date under federal law after assumption. States authorized to administer the 404 Program may continue Corps or State issued permits until the effective date of the new permits, if State law allows. Otherwise, the discharge is being conducted without a permit from the time of expiration of the old permit to the effective date of a new State-issued permit, if any.

FLORIDA AUTHORITY: Rule 62-331.090, F.A.C., implements the requirements of 40 C.F.R. § 233.38 by providing that the duration of individual permits will be specified in the permit but shall not exceed the maximum timeframe allowable under federal law and reasonably necessary to complete the project. In addition, Section 6 of the 404 Handbook provides that individual permits may be administratively continued while an application for a new permit is under review when unexpected project delays cause a project to require more time to complete.

## Electronic Reporting

40 C.F.R. § 233.39: This regulation requires states to satisfy the requirements for electronic reporting in 40 C.F.R. Part 3 in its state program if the state chooses to receive electronic documents.

FLORIDA AUTHORITY: The Department receives electronic documents through its ESSA (Electronic Self-Service Application Portal) and EzDMR (Electronic Discharge Monitoring Report) applications, which have been compliant with CROMERR (EPAs Cross Media Electronic Reporting Rule) since January 2012.

## Requirements for Compliance Evaluation Programs

40 C.F.R. § 233.40: This regulation requires a state maintain a program designed to identify violators, to have authority to enter and inspect a violator's property, including the ability to copy records, take samples, and otherwise to investigate compliance with the state program, and to have a method for receiving information from the public on violations.

FLORIDA AUTHORITY: The State has authority to enforce rules and regulations promulgated under Part IV of Chapter 373, F.S., including the Environmental Resource Permit (ERP) program and the State 404 Program. Such regulatory violations include failure to obtain a required permit

or failure to comply with permit conditions. *See* §§ 373.129(1) and (7); 373.430(1), F.S. Several state statutes grant the Department the authority to access and inspect sites, take samples and gather information and evidence. §§ 373.423, 403.091, F.S. Other sources of site access authority include permits, consent orders, other administrative orders, permission forms, easements and licenses, inspection warrants, and court orders. *See generally* Chapters 373 and 403, F.S., and more specifically §§ 403.091, 403.121(2), F.S. *See also* Rules 62-331.054(1), 62-330.350(1)(m), 62-331.201(1), 62-330.405(8), and Applicant's Handbook Volume I, Section 1.7. Florida has procedures for receiving and considering information from the public on violations contained in Section 403.412(2), F.S.

<u>Enforcement Authority Requirements</u>

40 C.F.R. § 233.41: This regulation requires a state have authority to restrain unauthorized activity, to sue to enjoin violations, and to assess or to sue to recover civil penalties of at least $5,000 per day for each civil violation, and of at least $10,000 per day of each criminal violation. In addition, a state must be able to seek criminal fines of at least $5,000 for providing false information or tampering with a monitoring device and must be able to assess a civil or criminal violation for each day during which a violation continues.

FLORIDA AUTHORITY: Florida law is consistent with and no less stringent than the specified enforcement provisions. *See* §§ 373.129 and 373.430, F.S. DEP has the authority to restrain unauthorized activity, §§ 373.129(1) and 373.430(1); to enjoin and abate violations of statutes, rules, and orders adopted pursuant to Chapter 373 F.S., § 373.129(2); and to recover civil penalties up to $15,000 per violation, § 373.129(5).

DEP can seek criminal remedies against someone who willfully, or with criminal negligence (with reckless indifference or gross careless disregard), discharges dredged or fill material without the required permit or in violation of any permit condition, in the amount of $10,000. §§ 373.430(5) and (6); and knowingly makes false statements, representation or certification in any application, record, report, plan, or other document filed or required to be maintained part IV, Chapter 373, or falsifies tampers with or knowingly renders inaccurate any monitoring device or method required to be maintained under the permit in an amount of $10,000. § 373.430(5), F.S.

Each date during which a violation occurs constitutes a separate offense. §§ 373.129(5); 373.430(3), F.S. *See also* §§ 373.129(7), 403.121(1) and (2), 403.131, 403.141, and 403.161, F.S. Additionally, the EPA may overfile pursuant to Section 309 of the CWA.

<u>Public Participation</u>

40 C.F.R. § 233.41(e): This regulation requires a state to assure public participation in enforcement proceedings by either authorizing citizens to intervene in civil or administrative proceedings as of right, or by investigating and giving written responses to citizen complaints; not opposing permissive intervention; and giving the public a 30-day comment period on any proposed settlement of an enforcement action.

FLORIDA AUTHORITY: Florida has adequate legal authority to comply with 40 C.F.R. § 233.41(e)(2) and has provided assurance that it will comply with 40 C.F.R. § 233.41(e)(2) in its MOA with the EPA.

Program Reporting

40 C.F.R. § 233.52: This regulation requires the State to report annually to the EPA an evaluation of the State's administration of the program identifying problems the State has encountered and recommendations for resolving them. The draft report should be submitted within 90 days of the completion of the annual period (as identified in the MOA) and made available for public inspection. EPA will review the report and transmit any comments, after which the State has 30 days to finalize the annual report.

FLORIDA AUTHORITY: Florida has adequate legal authority to comply with 40 C.F.R. § 233.52 and has provided assurance that it will comply with 40 C.F.R. § 233.52 in its MOA with the EPA.

Effect of State Takings Law on Successful Implementation of Program

40 C.F.R. § 233.12: A state seeking authority to administer the federal 404 program must analyze the effect its takings law will have on successful implementation of the state 404 program. Under the Takings Clause in the Fifth Amendment to the United States Constitution, a state must compensate owners when the adoption or application of a law impinges on an owner's property interests, a scenario commonly described as a "regulatory taking." As interpreted, courts may require compensation for regulatory takings under a variety of circumstances, including: where the government's action removes all economically viable use of property; when a government action is deemed to have caused a physical invasion of property; when an "ad hoc" analysis (referred to as the *Penn Central* test) triggers a compensation requirement; and where a government unreasonably requires an exaction (e.g., a conservation easement) of property as a condition to a permit, without an appropriate nexus to the adverse effects that the permitted activity would cause.

Procedurally, until very recent times, federal courts required property owners to seek compensation in state courts before proceeding to federal court for compensation under a Fifth Amendment claim (at least, where state law allowed for an appropriate state remedy). In June 2019, the United States Supreme Court (in the *Knick* decision) departed from the line of cases requiring the exhaustion of state remedies. Presently, if an owner were to make a claim against the State of Florida for compensation as a result of an alleged taking, the owner could proceed directly to federal court against the Department, in which case the Department would be similarly situated to the Corps in the same scenario.

Long before *Knick*, Florida courts recognized a claim for inverse condemnation to provide remedies for alleged regulatory takings. Presumably, notwithstanding the *Knick* decision, Florida courts will continue to allow those claims – leading to the theoretical possibility that Florida courts could expand state liability for compensation. For the reasons discussed below, this process will not interfere with the state's successful implementation of the program.

FLORIDA AUTHORITY: Article 10, Section 6, of the Florida Constitution prohibits the taking of private property for public use without just compensation, the same as Amendment 5 of the Bill of Rights. One Florida Court has held that the standard for a "taking" under the Florida Constitution is identical to the standard under the Fifth Amendment (at least for res judicata purposes), and it is unlikely that Florida courts would expand liability for regulatory takings under the Florida Constitution, beyond the federal standard. Likewise, given the potential for review of a decision by the Florida Supreme Court to the United States Supreme Court, there is no reason to suppose that Florida courts would interpret the Fifth Amendment beyond the standards presently imposed by federal courts.

Most importantly, Florida courts have recognized the distinction between an invalid agency action and an agency action that will require compensation as a regulatory taking. Under *Key Haven* and other Florida cases, an owner must either accept that agency action is valid, and then proceed in inverse condemnation, or pursue all administrative remedies to challenge the validity of agency action before seeking compensation in an inverse condemnation action. For many reasons, a potential taking does not mean that agency action is invalid under Florida law. As a result, even where a Florida agency is faced with an allegation that its position will lead to a taking, it may still successfully implement the regulation without regard to the question of a taking. For that reason alone, takings law will not inhibit the successful implementation of Florida's program.

<u>Signing Authority for General Counsel's Statement</u>

40 C.F.R. § 233.12: Where more than one agency has responsibility for administering the state program, the statement must include certification that each agency has full authority to administer the program within its category of jurisdiction. The attorney signing the statement must be the state Attorney General, or the attorney for the state agencies which have independent legal counsel and must have the authority to represent the state agency in court on all matters pertaining to the state program.

FLORIDA AUTHORITY: DEP has responsibility for administering Florida's 404 program. *See* §§ 373.473, 373.4146 and 403.061, F.S. The attorney signing this statement is the independent legal counsel for DEP and has the duty and authority to represent DEP in court on all matters pertaining to the state 404 program. *See* §§ 20.255(2)(c) and 403.805(1), F.S.

_____

Justin G. Wolfe
General Counsel, Florida Department of Environmental Protection

**MEMORANDUM OF AGREEMENT BETWEEN
THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION
AND THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

I.  GENERAL

A.  Purpose

This Memorandum of Agreement (MOA or Agreement) is entered into by and between the Florida Department of Environmental Protection (FDEP) and Region IV of the United States Environmental Protection Agency (EPA) for the purpose of defining the federal and state roles in carrying out the policies, regulations, and procedures necessary to administer the State of Florida permit program established pursuant to Section 404 of the Clean Water Act (CWA), Title 33 of the United States Code (U.S.C.), § 1251 *et seq.* (hereinafter "State 404 Permit Program"), and to facilitate program coordination between FDEP and EPA. FDEP does not exercise jurisdiction over Indian country, as that term is defined in 18 U.S.C. § 1151 and does not seek such authority through this Agreement. This Agreement does not create any substantive standards relating to any aspect of the 404 Permit Program or impose any legal obligations on the public.

B.  Authorities

(1) The legal basis for the State's assumption of the 404 program is provided by Section 404(g)(1) of the CWA. The regulations implementing Section 404(g)(1) and assumption of the 404 program under the CWA are found at 40 C.F.R. Parts 230, 231, 232 and 233.

(2) FDEP shall administer and enforce the State 404 Permit Program in accordance with those state laws and administrative rules that are components of the federally authorized State 404 Permit Program in the State of Florida (40 C.F.R. § 233.72), and in accordance with Section 404 State Program Regulations (40 C.F.R. Part 233), the CWA, Section 404(b)(1) Guidelines (40 C.F.R. Part 230, Section 404(b)(1) Guidelines for Specifications of Disposal Sites for Dredged or Fill Material) (hereinafter "404(b)(1) Guidelines"), and provisions contained in this Agreement and the Memorandum of Agreement between FDEP and the United States Army Corps of Engineers (Corps). The State 404 Permit Program will operate in accordance with any applicable biological opinion issued in accordance with the Endangered Species Act of 1973 (ESA). FDEP will not administer or enforce authority over Indian country, as that term is defined in 18 U.S.C. § 1151. In the event a question arises whether activities proposed in a permit application or draft general permit are within Indian country, and thus should be processed by the Corps, information regarding the issue may be presented to FDEP during the comment period and may also be provided to EPA. Such information shall be considered by EPA in exercising its CWA authority

to oversee FDEP's program and may, as appropriate, provide a basis for EPA to comment upon, object to, or make recommendations with respect to the permit application or draft general permit.[1]

C.  Effective Date and Revisions

(1) This Agreement shall be executed by FDEP and EPA and shall take effect at the time of EPA approval of the State 404 Permit Program, which shall be the effective date published in the Federal Register.

(2) FDEP and EPA agree to maintain a high level of cooperation and coordination and to work in partnership to assure successful and effective administration of the State 404 Permit Program.

(3) Nothing in this Agreement shall be construed to restrict in any way EPA's authority to fulfill its oversight and enforcement responsibilities under the CWA, nor shall it restrict FDEP's enforcement responsibilities under Florida law.

(4) This Agreement, and procedures established in conformance with it, shall be reviewed periodically by FDEP and EPA. Either party may request in writing an amendment or modification to the Agreement. Amendments and modifications to this Agreement shall be in writing and shall be effective upon completion of the process outlined in 40 C.F.R. § 233.16 and upon signature of both parties. If the State 404 Permit Program authorization is amended or modified in a manner that would affect this Agreement, this Agreement shall be amended or modified as appropriate.

(5) This Agreement shall remain in effect until it is amended, modified, or replaced; EPA withdraws authorization pursuant to 40 C.F.R. § 233.53(b); or FDEP voluntarily transfers the program to the Corps according to the criteria and procedures established in 40 C.F.R. § 233.53(a).

D.  Confidentiality

(1) All of the information EPA transfers to FDEP will be provided subject to the procedures and limitations of 40 C.F.R. § 233.3 and Florida will handle this information pursuant to applicable Florida law.

(2) Any information obtained or used in the administration of the State 404 Permit Program shall be available to EPA and EPA will manage this information in accordance with any

---

[1] Title 18 U.S.C. § 1151 defines "Indian country" as: (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same. Under this definition, Indian reservations include lands held in trust by the United States for an Indian tribe even if such lands have not been formally designated as an Indian reservation.

rights and privileges under applicable laws and regulations. If information has been submitted to FDEP under a claim of confidentiality, FDEP must inform EPA of such a claim. All information submitted by FDEP subject to a claim of confidentiality shall be treated in accordance with the procedures of 40 C.F.R. Part 2, 40 C.F.R. § 233.3(c), and applicable law.

E.   Computing Time Periods

In computing any period of time prescribed by this Agreement, the day on which the designated period of time begins shall not be included. Saturdays, Sundays, and state and federal holidays shall be included. When a stated time expires on a Saturday, Sunday, or legal holiday, the stated time period shall be extended to include the next business day.

F.   Florida DEP Agreement with Corps

(1) Prior to the assumption of the 404 Permit Program by FDEP, the Jacksonville District of the Corps administered the 404 Permit Program in Florida. The District Engineer of the Jacksonville District has been delegated the authority to enter into a Memorandum of Agreement which will identify procedures to facilitate the transfer of the 404 Permit Program to FDEP as laid out in the regulations at 40 C.F.R. Part 233 and pursuant to CWA requirements.

(2) FDEP's Memorandum of Agreement with the Corps stipulates permit processing responsibilities for activities which involve non-assumable waters, as well as transfer of permitting authority from the Corps to FDEP. The Memorandum of Agreement identifies the state waters to be regulated, coordination procedures, general permit procedures, transfer of records, protection of navigation or anchorage, permitting for Corps water resource projects, mitigation and instrument approval, and permitting for emergency work. The legal effect of the Memorandum of Agreement between FDEP and the Corps is conditioned upon approval of the State 404 Permit Program.

G.   Florida Memorandum of Understanding with the United States Fish and Wildlife Service and the Florida Fish and Wildlife Conservation Commission (FWC)

(1) In the event that a programmatic biological opinion and incidental take statement are issued by the USFWS, and that biological opinion's conclusion or reasonable and prudent alternatives or measures relies on the establishment of a technical assistance process with FDEP, FDEP will engage in a technical assistance process with the USFWS for State 404 Permits. The roles and responsibilities of each agency in the technical assistance process will be established in the Memorandum of Understanding between FDEP, FWC, and the USFWS.

(2) Given the existing relationship between FDEP and FWC regarding the protection of fish and wildlife resources for the FDEP Environmental Resource Permitting Program, and the existing relationship between FWC and the USFWS established in the ESA Section 6 Coordination Agreement, the FWC may engage with the USFWS on behalf of FDEP for the species coordination reviews in the State 404 Permit Program. The roles and responsibility for

each agency will be established in the Memorandum of Understanding between FDEP, FWC, and the USFWS.

      H.      Operating Agreement with the Florida Division of Historical Resources – State Historic Preservation Officer (SHPO)

      The Operating Agreement between FDEP and SHPO sets forth a consultation process, called the "historic properties review," for assessing the potential effects a State 404 Program permit application may have on historic properties and for avoiding, minimizing, or mitigating any adverse effects on historic properties. The historic properties review includes consultation with tribes, local governments, applicants and the public and is designed to complement established procedures for permit processing and public notice under the State 404 Program.

      I.      Florida Memorandum of Understanding with Other Agencies

      FDEP may enter into agreements with other agencies. To the extent any of these agreements, understandings, or parts of these agreements or understandings conflict with the requirements of the CWA, implementing regulations, or other assumption related statutes or implementing regulations, the agreement or that part of the agreement will not become part of the assumed program. Any revisions to the State 404 Permit Program must comply with the procedures established in 40 C.F.R. § 233.16.

## II.  PERMIT APPLICATION REVIEW AND PERMIT ISSUANCE

      A.  Lead Agency Responsibility for State 404 Permit Program

      (1) FDEP will be the lead agency in Florida for administering the State 404 Permit Program in State-assumed waters, as defined in section 373.4146(1), F.S. FDEP shall administer the State 404 Permit Program as approved by EPA using this Agreement, applicable state and federal laws, and any separate working agreements entered into by FDEP and included as part of the EPA approved state program. EPA shall review the State 404 Permit Program established by FDEP in order to ensure consistency with the program reporting requirements of 40 C.F.R. § 233.52. FDEP shall also allow EPA to routinely review State records, reports, and files relevant to the administration and enforcement of the approved program consistent with 40 C.F.R. § 233.13(b). This does not preclude EPA from initiating independent or parallel enforcement actions in accordance with Sections 309 and 404(n) of the CWA.

      (2) FDEP is responsible for making final permit decisions pursuant to Rule 62-331, F.A.C., including final determinations of compliance with FDEP State 404 permit regulations and protective measures recommended by the USFWS during project technical assistance. FDEP acts as the project manager for the evaluation of all permit applications and is responsible for requesting and evaluating information concerning all permit applications. FDEP will obtain and utilize this information in a manner that moves the regulatory process towards a final permit decision as rapidly as practicable. FDEP will not evaluate applications as a project opponent or advocate – but

instead will maintain an objective evaluation, fully considering all relevant factors. FDEP will fully consider and address EPA's views, permit conditions, and objections when determining whether to issue the permit, to issue the permit with conditions and/or mitigation, or to deny the permit. Pursuant to its authority under Section 404(b)(1) of the CWA, EPA may provide comments identifying its views regarding compliance with the Section 404(b)(1) Guidelines and as authorized under Section 404(c) of the CWA. The comments will be submitted within the time frames established in this agreement and applicable statutes and regulations.

(3) FDEP may delegate the State 404 Permit Program to other State governmental regulatory agencies in Florida but will maintain oversight and will retain the ability to revise or rescind permits issued by the delegated entities. If FDEP proposes to delegate all or part of the State 404 Permit Program, such delegation is not effective until the EPA Regional Administrator approves the delegation pursuant to 40 C.F.R. § 233.16.

B.  Waiver of EPA Review

(1) Pursuant to Section 404(k) of the CWA and 40 C.F.R. § 233.51, EPA waives the requirements of Section 404(j) and the regulations adopted thereunder regarding federal review of FDEP permit applications for all but the following categories of permits:

a.  Draft general permits;

b.  Discharges with reasonable potential for affecting endangered or threatened species as determined by USFWS;[2]

c.  Discharges with reasonable potential for adverse impacts on waters of another state or tribe;

d.  Discharges known or suspected to contain toxic pollutants in toxic amounts (Section 101(a)(3) of the CWA) or hazardous substances in reportable quantities (Section 311 of the CWA);

e.  Discharges located in proximity of a public water supply intake;

f.  Discharges within critical areas established under state or federal law, including but not limited to national and state parks; fish and wildlife sanctuaries or refuges; national and historical monuments; wilderness areas and preserves; sites identified or proposed under the National Historic Preservation Act; and components of the National Wild and Scenic Rivers System;

---

[2] For the purposes of the State 404 Program, a project has a reasonable potential for affecting endangered or threatened species (40 C.F.R. § 233.51(b)(2)) if it has been determined during the technical assistance process described in the anticipated biological opinion and MOU referenced in Section I.G, above, that the project may affect federally listed species or their critical habitat.

g. Discharges impacting compensatory mitigation sites, including mitigation banks, in lieu fee program sites, and permittee responsible mitigation sites; and

h. Discharges impacting sites that are owned or managed by federal entities, and activities by an applicant that is a federal entity.

(2) EPA may terminate waiver of the review of categories of permit applications outlined in this Agreement pursuant to 40 C.F.R. § 233.51(a).

(3) FDEP shall supply the EPA Regional Administrator with copies of public notices for permit applications for which permit review has been waived whenever requested by EPA, pursuant to 40 C.F.R. § 233.50(a)(1).

(4) FDEP or the applicant may request EPA review of specific projects that would otherwise not require EPA oversight.

(5) When FDEP receives a new permit application for continued work on a long term project for which a permit with a long term planning document attached for reference had been previously issued, pursuant to subsection 62-331.051(2), F.A.C., or receives an application for a permit to complete a project that a permittee is unable to complete within the original duration of the permit, pursuant to subsection 62-331.051(3), F.A.C., FDEP will identify fundamentally new factual information included in the new permit application that was not in the prior permit application. In such instances, EPA intends to focus its review on matters related to such new factual information.

C. Coordination with Other States and Tribes

(1) Whenever FDEP receives an application for a permit that has a reasonable potential to impact the waters of the states of Alabama or Georgia, or waters within "Indian country," as that term is defined at 18 U.S.C. § 1151, FDEP shall transmit a copy of the public notice to the potentially impacted state or federally recognized tribe (per the list published annually by the Secretary of the Interior pursuant to Section 104 of the Federally Recognized Indian Tribe List Act of 1994 (Pub. L. No. 103-454, 108 Stat. 4791, 4792)) and to EPA. EPA and FDEP shall work together to identify regulatory contacts in these other states and tribes.

a. FDEP shall provide the potentially impacted state or tribe the opportunity to submit written comments within the public comment period and suggest permit conditions regarding the potential impact of the proposed project. In addition to the comment period, tribes may, to the extent desired, engage with FDEP during its initial review of an application, as set forth in the FDEP/SHPO Operating Agreement described in Section I.H above.

b. FDEP shall consider the comments and concerns of the potentially impacted state or tribe when making a decision on the application and shall provide a copy of the final permit decision to a state or tribe that provides comments. If FDEP does not accept these

recommendations, FDEP shall provide written notification to the affected state or tribe and the EPA Regional Administrator prior to permit issuance of FDEP's decision not to accept the recommendations together with supporting rationale. The EPA Regional Administrator shall then have the time provided for in 40 C.F.R. § 233.50(d) to comment upon, object to, or make recommendations with respect to a permit application.

   c. Pursuant to 40 C.F.R. § 233.50, EPA may object to the issuance of a State 404 permit by FDEP if it finds that the proposed project would fail to comply with the 404(b)(1) Guidelines due to the impact on waters of another state or waters within "Indian country," as that term is defined at 18 U.S.C. § 1151. In this instance, FDEP shall proceed as specified in Section 404(j) of the CWA and Section D of this Agreement.

   (2) Both EPA and FDEP agree that this Agreement does not determine what constitutes "Indian country" as that term is defined in 18 U.S.C. § 1151.

  D. Permit Processing and Federal Comment

   (1) Federal oversight of State permits shall proceed in accordance with the requirements of Section 404(j) of the CWA and 40 C.F.R. Part 233, Subpart F. The subsequent paragraphs in this section highlight certain aspects of that oversight process for the sake of clarity for the agencies and members of the public, but do not override or replace the comprehensive applicable statutory and regulatory requirements.

   (2) FDEP shall promptly submit public notices, via weblink, providing EPA access to complete permit applications in the categories identified in Section II.B.(1) of this Agreement for review and coordination in accordance with Section 404(j) of the CWA and 40 C.F.R. Part 233, Subpart F.

   (3) In addition to the information required by 40 C.F.R. § 233.32(d), the public notice shall include: (1) a determination of the effect the proposed activity will have on listed species and/or their critical habitat and proposed protection measures resulting from the species coordination process; and (2) a determination of the effect the proposed activity will have on historic properties and any recommendations to avoid, minimize, or mitigate adverse effects on historic properties resulting from the historic properties review process.

   (4) Material submitted to EPA, which may be forwarded by electronic means, shall include:

   a. A copy of the public notice for any complete permit application received by FDEP, except those for which permit review has been waived under this Agreement. Any supplemental or additional materials submitted to FDEP, including but not limited to information on project alternatives, environmental assessment, or mitigation plans, shall also be forwarded promptly to EPA. Whenever requested by EPA, FDEP shall supply copies of public notices for

permit applications, or supplemental materials, even for projects for which permit review has been waived.

b.  A copy of each draft general permit whenever FDEP intends to issue a general permit that affects State-assumed waters, including minor project categories defined under State law.

c.  For permit applications that are subject to federal review, and for draft general permits, notification of when FDEP takes a significant action pursuant to 40 C.F.R. § 233.50(a)(3).

d.  A copy of every permit issued and a copy of any denial of a permit.

e.  A copy of FDEP's response to comments or recommendations made by another state or tribe if FDEP does not accept such recommendations.

(5) EPA shall, within 30 calendar days from the date of receipt of a permit application or draft general permit from FDEP, notify FDEP if EPA intends to review the permit application or draft general permit. EPA reserves the right to object within 90 days based upon information received during the public comment period. If FDEP has been so notified, the permit shall not be issued until after the receipt of such comments or 90 days of the Regional Administrator's receipt of the public notice, draft general permit or FDEP's response (40 C.F.R. § 233.31(a)), whichever comes first. The Regional Administrator may notify FDEP within 30 days of receipt that there is no comment but that EPA reserves the right to object within 90 days of receipt, based on any new information identified by the public during the comment period or at a hearing. 40 C.F.R. § 233.50(d).

(6) EPA shall provide a copy of each public notice, each draft general permit, and other information needed for review of the application to the Corps, USFWS, and National Marine Fisheries Service (NMFS) within 10 days of receipt, pursuant to 40 C.F.R. § 233.50(b). The final decision to comment, object, or make recommendations with respect to permit conditions shall be made by EPA. EPA shall submit a written statement of its comments, objections or recommendations to FDEP in accordance with the requirements of, and in the timeframes specified in, Section 404(j) of the CWA and 40 C.F.R. § 233.50. EPA will endeavor to provide comments, objections, or recommendations within the timeframe specified in Florida law, to the extent that the timeframe does not conflict with federal law. FDEP shall notify EPA of FDEP's decision deadlines for each application or draft general permit.

(7) FDEP shall respond to any such comments or objections received from EPA in the manner specified in Section 404(j) of the CWA and 40 C.F.R. Part 233. FDEP shall provide a copy of a draft permit that satisfies the EPA Regional Administrator's objection or requirement for a permit condition, or FDEP shall provide its intent to deny the permit application to EPA as provided by Section 404(j) of the CWA and 40 C.F.R. Part 233.

(8) FDEP also administers a State Environmental Resource Permit (ERP) program, which is a separate permitting program from the State 404 Program and may cover similar or the same projects as those permitted under the State 404 Program. If FDEP does not resolve an objection or requirement for a Section 404 permit condition for which there is a State ERP Permit, the State ERP permit does not provide authorization under Section 404 of the CWA, and the applicant shall be notified of this fact in writing.

(9) FDEP shall contact EPA, the Corps, USFWS, and NMFS to solicit comments pertaining to issuance of an emergency permit as soon as possible after the emergency permit is requested, but no later than the day of issuance of the emergency permit. FDEP shall send a copy of the written emergency permit to the EPA.

(10)    FDEP may administratively continue expiring Corps-issued or State-issued permits until the effective date of a new permit, if any, consistent with 40 C.F.R. § 233.38, or a decision is made not to issue a new permit.

E.  Coordination of Mitigation Banking

FDEP and EPA agree that mitigation banking projects shall be subject to review according to procedures established in 40 C.F.R. Part 230, Subpart J. Mitigation banking instruments and in-lieu fee program instruments shall be processed by the Corps in accordance with 40 C.F.R. Part 230, Subpart J. FDEP may co-chair any applicable interagency coordination effort and EPA may participate at its discretion.

III. COMPLIANCE MONITORING AND ENFORCEMENT

A.  EPA will continue to directly implement its authority for the 404 Permit Program in "Indian country," as that term is defined at 18 U.S.C. § 1151, including conducting necessary compliance monitoring and enforcement actions for activities and sites located on Indian country.

B.  EPA will retain responsibility for any pending enforcement actions undertaken by EPA prior to the date of EPA's approval of the State 404 Permit Program. FDEP shall have primary responsibility for compliance monitoring and enforcement of the State 404 Permit Program. FDEP will take timely and appropriate enforcement action against persons in violation of permit conditions of permits issued pursuant to the State 404 Permit Program and against persons conducting unauthorized discharges of dredged or fill material into waters of the United States over which FDEP has assumed jurisdiction under the State 404 Permit Program.

C.  FDEP shall notify EPA of the status of compliance and enforcement actions through submission of an annual report described in Section IV.B. of this Agreement.

D.  EPA may request the opportunity to review any compliance and enforcement record. FDEP shall provide to EPA a copy of the file when requested. Claims of confidentiality for such information shall be governed by 40 C.F.R. § 233.3.

E.   FDEP shall coordinate with EPA when a violation is identified that is within the permit and discharge categories in Section II.B.(1) of this Agreement. FDEP shall provide a summary of the unauthorized activity and inform EPA of the status of the file as enforcement actions are taken, including any decision to accept an after-the-fact permit application. In the event that an after-the-fact permit application is accepted, FDEP shall follow the permit review procedures set forth in this Agreement, the CWA and its implementing regulations.

F.   FDEP may refer information regarding possible or alleged violations to EPA and may request that EPA consider initiating a parallel or independent enforcement action. Such circumstances include, but are not limited to:

(1) Violations that have or have a reasonable potential to have direct impacts on waters of a tribe or another state;

(2) Major or repeat offenses; and

(3) Violations that have, or will potentially have, major adverse resource impacts or impacts on special federal resources, such as federally listed threatened or endangered species.

G.   EPA may initiate independent or parallel enforcement actions in accordance with Sections 309 and 404(n) of the CWA.

H.   If FDEP proposes to resolve a compliance or enforcement issue through a consent agreement (administrative or judicial), and where the impact of the violation is such that federal review would not be waived as described in Section II.B.(1) of this Agreement, FDEP shall provide EPA 30 days to review and comment on the draft consent agreement prior to signature. If EPA objects to a provision of the draft consent agreement, the executed consent agreement implementing that provision shall not constitute authorization under Section 404 of the CWA. FDEP shall provide a copy of the executed consent agreement and any after-the-fact State 404 permits to EPA.

I.   FDEP shall provide for public participation in the State 404 Permit Program enforcement process pursuant to 40 C.F.R. § 233.41(e)(2).

J.   Prior to proceeding with federal enforcement action against a possible or alleged State 404 Permit Program permit violator or unauthorized discharge, and for purposes of providing notice only, EPA shall inform FDEP (specifically to the Secretary of FDEP or his/her designee) that federal enforcement action is to be initiated. It is expected that preliminary staff discussions will take place between EPA and FDEP representatives before initiation of federal enforcement actions.

K.   When a violation is identified that may affect the waters of tribes and/or other states, FDEP shall provide a summary of the violation and inform the tribes and/or other states of the

status of the file as enforcement actions are taken, including any decision to accept an after-the-fact permit application.

IV. PROGRAM MAINTENANCE

    A.  Program Review and Oversight

    EPA may conduct periodic evaluations of the State 404 Permit Program in accordance with Section 404(i) of the CWA.

    B.  Reporting

        (4) FDEP shall submit to EPA, and make available for public inspection, an annual report evaluating Florida's administration of the State 404 Permit Program, providing a summary of any significant changes in program operations or procedures and identifying problems encountered in administration of its program and recommendations for resolving those problems. The report shall include the elements required by 40 C.F.R. § 233.52(b).

        (5) Within 60 days of receipt of the draft annual report, EPA will complete review of the report and transmit comments, questions, or requests for additional evaluation and/or information to FDEP.

        (6) Within 30 days of receipt of EPA's comments, FDEP will finalize the annual report, incorporating and/or responding to EPA's comments and will transmit the final report to EPA. EPA will publish notice of availability of the final annual report upon acceptance.

        (7) The period for the annual report shall be the State fiscal year ending June 30th, and the report shall be submitted to EPA by September 30th of each year.

    C.  State 404 Permit Program Modifications

        (1) FDEP shall promptly notify EPA of any proposed or actual change to FDEP's statutory or regulatory authority or any other modifications which are significant to administration of the State 404 Permit Program, including, but not limited to:

        a.  An action by the State Legislature to strike down or limit State authorities, or that contemplates cessation of the administration of the Section 404 Permit Program by the State of Florida.

        b.  An action by a State court striking down or limiting State authorities.

        c.  Revision of the State's legal authorities needed to maintain consistency with changes to applicable federal regulations.

        d.  Proposed transfer of the program in whole or in part to another State agency.

(2) In response to notification of a change in the State 404 Permit Program in accordance with paragraph (1), EPA shall inform FDEP in writing of any specific concerns regarding State authority and shall provide the State an opportunity to make any necessary program revisions in accordance with 40 C.F.R. § 233.16(d).

    a.  If the proposed revisions are not substantial, notice of approval may be given by letter to the Governor or designee, per 40 C.F.R. § 233.16(d)(2).

    b.  If EPA determines that the proposed revisions are substantial, EPA shall publish notice of the proposed revisions, provide opportunity for a public hearing, consult with the Corps, USFWS, and NMFS, and review the proposed modification in accordance with 40 C.F.R. § 233.16(d)(3). Such changes shall not be effective until review and approval by EPA and publication of notice in the Federal Register.

(3) Whenever EPA has reason to believe that circumstances have changed with respect to the State 404 Permit Program, EPA may request, and FDEP shall provide, a supplemental Attorney General's statement, program description, or other documents or information necessary to evaluate the State 404 Permit Program's compliance with the requirements of the CWA and regulations at 40 C.F.R. Part 233.

(4) If FDEP determines that it will no longer administer the State 404 Permit Program, FDEP shall provide notice to EPA and the Corps not less than 180 days prior to cessation of program operation, and shall arrange for transfer of all program materials to the Corps.

(5) Pursuant to 40 C.F.R. § 233.16(b), FDEP shall revise the State 404 Permit Program as necessary because of a modification to 40 C.F.R. Part 233 or any other applicable Federal statute or regulation. The program shall be revised within one year of the date of promulgation of such regulation, except if the State must amend or enact a statute in order to make the required revision, the revision shall take place within two years.

(6) Any program modifications that necessitate modifications to this Agreement shall not be effective until the modified agreement is signed by FDEP and EPA, and EPA gives notice of approval of program modifications.

V.  GENERAL PROVISIONS

A.    The Parties are entering into this Agreement based solely on the representations and warranties herein and not based on any promises, representations, and/or warranties not found herein.

B.    This MOA does not create any right or benefit, substantive or procedural, enforceable by law or equity, by any persons, their officers or employees, or any other person. This MOA does not apply to any person outside of FDEP and EPA.

C.    The signatory agencies do not waive any administrative claims, positions, or interpretations they may have with respect to the applicability or enforceability of the CWA, the ESA, the NHPA, Florida laws, or implementing regulations.

D.    Nothing in this MOA shall be interpreted as obligating the signatory agencies for the expenditure of funds in excess of appropriations authorized by law, or otherwise commit the signatory agencies to actions for which they lack statutory authority.

E.    The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

F.    If any provision of this Agreement is held to be illegal or invalid by a court of competent jurisdiction, such provision shall be deemed to be severed and deleted, and neither such provision, nor its severance and deletion, shall affect the validity of the remaining provisions.

## VI.    SIGNATURES

**Florida Department of Environmental Protection**

_____    7/31/2020
Noah Valenstein                     (Date)
Secretary

**United States Environmental Protection Agency Region IV**

_____    7/31/2020
Mary S. Walker                      (Date)
Regional Administrator

**MEMORANDUM OF AGREEMENT BETWEEN
THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION
AND THE DEPARTMENT OF THE ARMY**

I.    GENERAL

    A.    Purpose and Authority

        (1)    Section 404 of the Clean Water Act (CWA), 33 U.S.C. § 1344, authorizes the Secretary of the Army, acting through the Chief of Engineers, to regulate the discharge of dredged or fill material into waters of the United States. The U.S. Army Corps of Engineers, Jacksonville District (Corps), currently administers the Section 404 program in the State of Florida.

        (2)    Section 404(g) of the CWA, 33 U.S.C. § 1344(g), authorizes a state, with approval from the United States Environmental Protection Agency (EPA), to administer its own permit program for the discharge of dredged or fill material into certain waters of the United States (State 404 Program) in lieu of the permitting program implemented by the Corps. The EPA has promulgated regulations at 40 C.F.R. Part 233 outlining, among other things, its requirements for approving a state program.

        (3)    The State of Florida (State) is submitting its program to regulate the discharge of dredged or fill material in compliance with the above-cited authorities. This Memorandum of Agreement (Agreement) between the State and the Corps fulfills the requirements of 40 C.F.R. § 233.14.

        (4)    The Florida Department of Environmental Protection (DEP), pursuant to Part IV of Chapter 373, Florida Statutes, is authorized to issue permits for regulated activities conducted in State regulated waters, including the discharge of dredged and fill material. The Secretary of DEP is given the authority to issue permits pursuant to Part IV of Chapter 373, Florida Statutes, and is the State official charged with administering the State 404 Program when the program is approved in accordance with 40 C.F.R. Part 233.

    B.    Effective Date and Revisions

        (1)    This Agreement shall be executed by DEP and the Corps and shall take effect at the time of EPA approval of the State 404 Program, which shall be the effective date published in the Federal Register.

        (2)    DEP and the Corps agree to maintain a high level of cooperation and coordination and to work in partnership to assure successful and effective implementation of the programs regulating the discharge of dredged or fill material into waters of the United States.

        (3)    This Agreement, and any procedures established in conformance with it, shall be reviewed periodically, or at least once every 12 months, by DEP and the Corps, except as otherwise provided herein. Either party may request in writing an amendment or modification to

the Agreement. Amendments and modifications shall be in writing and shall be effective upon the signature of both parties and approval by EPA.

(4)    This Agreement shall remain in effect until the State 404 Program authorization is modified by EPA, pursuant to 40 C.F.R. § 233.16, in a manner that would affect this Agreement, until EPA's approval is withdrawn pursuant to 40 C.F.R. § 233.53(b), or until DEP voluntarily transfers program responsibilities to the Corps according to the criteria and procedures established in 40 C.F.R. § 233.53(a).

(5)    In the event DEP proposes to transfer all or part of the State 404 Program to another State agency in accordance with 40 C.F.R. § 233.16, either this Agreement will be modified to add that other State agency or a new Memorandum of Agreement between the Corps and that State agency will be required.

## II.    WATERS TO BE RETAINED

A.    Pursuant to 404(g) of the CWA, the Corps will retain permitting authority under Section 404 of the CWA for those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto.[1]  The Corps will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Attachment A), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. For purposes of this Agreement, the administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the Corps is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water.  In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the Corps will retain jurisdiction to the landward boundary of the project for the purposes of that project only. All waters of the United States not retained by the Corps will be assumed by DEP as part of its State 404 Program (State assumed waters). The Corps will provide Retained Waters GIS layers to DEP, and will update the GIS layers as necessary, in accordance with II.C. and III.B, below.

B.    The Corps shall retain responsibility for permitting the discharge of dredged and fill material in waters of the United States within "Indian country," as that term is defined at 18 U.S.C. § 1151. Title 18 U.S.C. §1151 defines "Indian country" as: (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original

---

[1] Section 404(g) of the CWA, 33 U.S.C. § 1344(g), is interpreted and implemented in accordance with Assistant Secretary of the Army for Civil Works, Memorandum dated July 30, 2018, Subject: *Clean Water Act Section 404(g)-Non-Assumable Waters*.

or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same. Indian reservations include lands held in trust by the United States for an Indian tribe even if such lands have not been formally designated as an Indian reservation.

C.    Modifications to the Retained Waters List and Retained Waters List GIS layers, including identification of the head of navigation, will be made in the following circumstances: when the Corps makes a navigability determination;[2] a Federal court makes a navigability determination; the United States Congress makes a navigability determination; there are applicable rule changes; or pursuant to Section III.B., below. Any modifications to the Retained Waters List which affect the area of jurisdiction are subject to EPA approval pursuant to 40 C.F.R. § 233.16(d). Nothing in this Agreement affects the authority of the Corps to make determinations of navigability pursuant to 33 C.F.R. Part 329.

III.    JOINT COORDINATION PROCEDURES

A.    When an application or verification request is received by either party, the application will be screened using the Retained Waters List and GIS layers to determine if the proposed activity will occur within Corps retained waters, as identified in Section II, above. When a proposed activity falls within retained waters, DEP will, within five calendar days of receipt, refer the applicant to the Corps. Likewise, when a proposed activity falls within State assumed waters, the Corps will, within five calendar days of receipt, refer the applicant to DEP.

B.    If DEP has reason to believe a proposed activity is within the Corps' jurisdiction as defined in Section II.A., above, but is not within the Retained Waters List or depicted in the retained waters GIS layers, DEP will request the Corps determine whether the project falls within retained waters. The Corps shall provide its determination within seven calendar days of receipt of DEP's request. In the event the Corps determines the proposed activity falls within its jurisdiction, DEP will refer the applicant to the Corps. Within 30 calendar days, the Corps will update its GIS layer and Retained Waters List accordingly.

C.    In accordance with Section 10 of the Rivers and Harbors Act of 1899 (RHA), the Corps has regulatory jurisdiction over all obstructions and alterations of navigable waters of the United States, the construction of any structures in or over navigable waters of the United States, and any work affecting the course, location, condition, or capacity of navigable waters of the United States, as defined in 33 C.F.R. Part 329. This includes permit authority under Section 10 of the RHA for those waters that are jurisdictional based solely on historic use (Section 10 historic waters). While the Corps retains authority over Section 10 historic waters, upon the effective date of this Agreement, the State assumes responsibility for permitting the discharge of dredged or fill material within Section 10 historic waters. Therefore, discharges of dredged or fill material in Section 10 historic waters will require a Section 10 permit from the Corps and a 404 permit from

---

[2] 33 C.F.R. § 329.14

DEP. Nothing in this Agreement affects the authority of the Corps in implementing regulatory programs pursuant to the RHA.

IV.    EXISTING PERMITS AND PENDING PERMIT APPLICATIONS

A.    Individual Permits

(1)    The time limit for completing work authorized under a Department of the Army (DA) individual permit issued prior to the effective date of assumption for the discharge of dredged or fill material in State assumed waters will remain the expiration date stated in the permit instrument. After the effective date of assumption, an applicant must apply for a new permit from DEP for any work that remains incomplete by the expiration date. The Corps will not review requests for extension of time and will refer the applicant to DEP to apply for a new permit under the State 404 Program.  DEP may administratively continue an expiring Corps permit until the effective date of a new permit, if any, consistent with 40 C.F.R. § 233.38, or a decision is made not to issue a new permit.

(2)    The Corps retains authority to make minor modifications to DA permits in State assumed waters.  Minor modifications are generally ministerial in nature, and shall include the following: a) to correct errors or typographical mistakes; b) to incorporate changes requested by the Corps; c) to change due dates for reporting or performance deadlines; d) to transfer a permit upon a change in ownership or control; and e) to make minor technical changes. Minor modifications may include other minor changes; however, in no case will a minor modification expand the volume or amount, enlarge the footprint, change the location, or extend the duration of the authorized discharge. The Corps will refer modifications that it determines, in its sole discretion, to fall outside the scope of a minor modification to DEP for evaluation of a permit under the State 404 Program.

B.    General Permits

(1)    The time limit for completing the work under a DA general permit verified prior to the effective date of assumption for the discharge of dredged or fill material in State assumed waters will remain the expiration date stated in the verification letter, to include 12 months after expiration if work has commenced or is under contract to commence. After the effective date of assumption, any work that remains incomplete by the expiration date must receive a new permit from DEP under the State 404 Program. Requests for modifications of verifications under a DA general permit within State assumed waters shall be made to DEP. After the effective date of assumption, no new verifications under general permits will be issued by the Corps within State assumed waters.

(2)    Upon EPA approval of the State 404 Program, the FDEP will assume

administration of the following Regional General Permits in State assumed waters: SAJ-13 (Aerial Transmission Lines in Florida); SAJ-14 (Sub-aqueous Utility and Transmission Lines in Florida); SAJ-86 (Residential, Commercial, Recreational and Institutional Fill in the Choctawhatchee Bay, Lake Powell, and West Bay Basins, Bay and Walton Counties, Florida); SAJ-90 (Residential, Commercial & Institutional Developments in Northeast Florida); SAJ-103 (Residential Fill in Holley By The Sea, a Subdivision in Santa Rosa County); SAJ-105 (Residential, Commercial, Recreational and Institutional Fill in the West Bay Watershed of Bay County, Florida); and SAJ-114 (Residential, Commercial, Recreational and Institutional Fill in the Choctawhatchee Bay and St. Andrew's Bay Watersheds located in Bay County and Walton County, Florida). The Corps will transfer relevant information, files, and records to DEP, pursuant to 40 C.F.R. § 233.14(b)(3).

C.    Records Transfer

Upon notification of program approval from EPA, the Corps will transfer to DEP any pending Section 404 program permit application files, including requests for verifications of Regional General Permits identified in Section IV.B(2) above, within State assumed waters. Upon request by DEP, the Corps will provide copies of specific permits for purposes of DEP issuing a new permit. Transfer methods shall be mutually agreed upon by the Corps and DEP.

V.    REVIEW OF APPLICATIONS FOR STATE PROGRAM PERMITS

A.    Anchorage and Navigation

DEP shall not issue a permit if notified that the Corps has determined, in accordance with 40 C.F.R. § 233.20(d), that anchorage and navigation of any navigable waters would be substantially impaired.

B.    Corps Civil Works Projects

(1)    Section 14 of the RHA (33 U.S.C. § 408) (Section 408) mandates that any use or alteration of a Corps Civil Works project by another party is subject to the approval of the Corps.  Within five calendar days of receipt of a permit application or verification request, DEP agrees to inform the Corps and instruct the applicant to contact the appropriate Corps Section 408 contact person for any activities that may use or alter an existing Corps Civil Works project. Existing Corps Civil Works projects are found in the Jacksonville District Regulatory Source Book, which the Corps will update as necessary. Within 14 calendar days of receipt of the notification from DEP, the Corps will notify DEP if the Corps' approval is required pursuant to Section 408, in which case the State agrees to delay any final State actions until Section 408 review is complete or include a special condition in the permit requiring Section 408 permission prior to construction that will include the Corps' Section 408 contact information. However, where DEP is processing a

verification of a general permit identified in Section IV.B(2), the State agrees that it cannot verify coverage under the general permit until the Corps issues an authorization pursuant to Section 408.

(2)    Corps Civil Works projects involving the discharge of dredged or fill material into waters of the United States must be developed in accordance with the guidelines promulgated under Section 404(b)(1) of the CWA, as amended, unless exempted by Section 404(f) of the CWA.  For Corps Civil Works projects in State assumed waters, other than projects specifically authorized by Congress for which the Corps has applied or will apply Section 404(r) of the CWA, the Corps and DEP will develop and follow, as practicable, mutually agreed upon procedures for submission of information necessary for DEP to process an application for a permit under the State 404 Program.

C.    Emergency Permits

In accordance with 40 C.F.R. § 233.22(d), DEP shall consult in an expeditious manner with the Corps about issuance of an emergency permit in State assumed waters.

D.    State 404 Permits

In accordance with 40 C.F.R. § 233.50(j), if DEP has received an EPA objection or requirement for a permit condition to a permit application or draft general permit in State assumed waters, and in the event that DEP neither satisfies EPA's objections or requirement for a permit condition nor denies the permit, the Corps shall process the permit application.  DEP will provide a copy of the administrative record to the Corps using an agreed upon method to facilitate the Corps' review.

E.    Designation of a Non-Federal Representative

If DEP receives an EPA objection or requirement for a permit condition and neither satisfies EPA's objection or requirement for a permit condition nor denies the permit, and, pursuant to the process in 40 C.F.R. § 233.50(j), responsibility for permitting has shifted to the Corps, under Endangered Species Act (ESA) implementing regulations, the Corps may designate a non-federal representative, such as DEP, the Florida Fish and Wildlife Conservation Commission, or the permit applicant to conduct informal ESA consultation or prepare a biological assessment, pursuant to 50 C.F.R. § 402.08. Upon receipt of a permit application package from DEP for a project that has the reasonable potential for affecting endangered or threatened species, the Corps may in its sole discretion, designate the State or the applicant as a non-federal representative for purposes of conducting informal ESA consultation or preparing a biological assessment by giving written notice to designated non-Federal representative. If a permit applicant is involved that is not the designated non-Federal representative, then the applicant and Corps must agree on the choice of the designated non-Federal representative. If a biological assessment is prepared by the designated non-Federal representative, the Corps shall furnish guidance and supervision and shall independently review and evaluate the scope and contents of the biological assessment.

6

## VI.    COORDINATION OF MITIGATION BANKING

### A.    Mitigation Bank Instruments and In-Lieu Fee Program Agreements

Mitigation banking instruments and in-lieu fee program instruments shall be processed by the Corps in accordance with 33 C.F.R. Part 332. DEP may co-chair any applicable interagency coordination effort.

### B.    Permits for Mitigation Bank and In-Lieu Fee Projects

With respect to permits for mitigation banks and in-lieu fee projects issued after the effective date of assumption, the boundary of the mitigation bank or of a project under an in-lieu fee program (as distinct from the service area) will be the project boundary for purposes of Section II.A., above, for authorization of discharge of dredged or fill material.

### C.    Use of Credits from Corps Approved Mitigation Banks for State 404 Permits

DEP may approve the use of credits from a Corps-approved mitigation bank or in-lieu fee program to provide compensatory mitigation for permits issued under the State 404 Program, as long as the use of credits is consistent with the approved mitigation banking instrument or in-lieu fee instrument.

## VII.    ENFORCEMENT

### A.    After the effective date of State assumption, the Corps will continue to monitor compliance and enforce the terms and conditions of all DA individual and general permits issued or verified in State assumed waters prior to the effective date of assumption. For general permits previously issued by the Corps but administered by the State after the effective date of assumption, DEP will monitor compliance and enforce the terms of any verifications it issues.

### B.    The Corps will not be responsible for enforcing against unauthorized discharges of dredged or fill material in violation of the CWA which occur in State assumed waters after the effective date of assumption.  Unauthorized discharges include discharges that exceed the volume or amount of discharge authorized under a permit, that occur outside of the areas authorized for discharge under a permit, or that occur outside the period specified in a permit.

### C.    Except as provided in Section D, DEP will be responsible for enforcing against unauthorized discharges of dredged or fill material in violation of the CWA which occurred in State assumed waters prior to the effective date of State assumption.

### D.    The Corps will remain the lead agency for ongoing enforcement actions against unauthorized discharges of dredged or fill material in violation of the CWA or against noncompliance with the terms and conditions of a DA permit in State assumed waters that have not been resolved prior to the effective date of State assumption (hereinafter Ongoing Enforcement Action).  If there is an unusual circumstance concerning an Ongoing Enforcement Action, the

parties to this Agreement may discuss DEP taking the lead. For those instances where the Corps, on its own or in coordination with EPA or the United States Department of Justice, resolves an Ongoing Enforcement Action, the Corps will consult with DEP as practicable, and will provide DEP a copy of any consent decree or settlement agreement. DEP will be responsible for issuing any after-the-fact permit for the discharge of dredged or fill material.

VIII.    COMMUNICATION BETWEEN PARTIES

A.    Communication and record sharing between the parties of this Agreement may be accomplished through electronic means.

B.    Following execution of this Agreement, DEP and the Corps will meet as necessary to discuss issues related to State assumption. Following the effective date of State assumption, the Corps and DEP shall meet on a biweekly basis during the first six months of State assumption in order for the Corps and DEP to ensure effective coordination in the implementation of this Agreement.

IX.    GENERAL PROVISIONS

A.    The Parties are entering into this Agreement based solely on the representations and warranties herein and not based on any promises, representations, and/or warranties not found herein.

B.    This Agreement does not create any right or benefit, substantive or procedural, enforceable by law or equity, by any persons, their officers or employees, or any other person. This Agreement does not apply to any person outside of the Corps and DEP.

C.    The signatory agencies do not waive any administrative claims, positions, or interpretations they may have with respect to the applicability or enforceability of the CWA, the ESA, the National Historic Preservation Act, or any other applicable federal or State laws or regulations.

D.    Nothing in this Agreement shall be interpreted as obligating the signatory agencies for the expenditure of funds in excess of appropriations authorized by law, or otherwise commit the signatory agencies to actions for which they lack statutory authority.

E.    Nothing in this Agreement shall affect any of the Corps' tribal trust responsibilities.

F.    The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

G.    If any provision of this Agreement is held to be illegal or invalid by a court of competent jurisdiction, such provision shall be deemed to be severed and deleted; and neither such provision, nor its severance and deletion, shall affect the validity of the remaining provisions.

X.    SIGNATURES

**Florida Department of Environmental Protection**

**07/31/2020**

_____
Noah Valenstein          (Date)
Secretary

**Department of the Army**

**08/05/2020**

_____
R.D. James          (Date)
Assistant Secretary of the Army
(Civil Works)

# Federal Statutes and Regulations

## Table of Contents

CWA Section 404(g) Regulations on State and Tribal Section 404 Program Assumption

CWA Section 404(b)(1) Guidelines (40 CFR 230)

National Historic Preservation Act Section 106 Implementing Regulations at 36 CFR Part 800

The National Historic Preservation Act

**Environmental Protection Agency**                                    **Pt. 230**

10 days prior to the proposed disposal date, notify the EPA Regional Administrator and the District Commander of the U.S. Coast Guard that the vessel has been cleaned and is available for inspection; the vessel may be transported for dumping only after EPA and the Coast Guard agree that the requirements of paragraph (a)(3) of this section have been met.

(5) Disposal of these vessels shall take place in a site designated on current nautical charts for the disposal of wrecks or no closer than 22 kilometers (12 miles) from the nearest land and in water no less than 50 fathoms (300 feet) deep, and all necessary measures shall be taken to insure that the vessels sink to the bottom rapidly and that marine navigation is not otherwise impaired.

(6) Disposal shall not take place in established shipping lanes unless at a designated wreck site, nor in a designated marine sanctuary, nor in a location where the hulk may present a hazard to commercial trawling or national defense (see 33 CFR part 205).

(7) Except in emergency situations, as determined by the U.S. Army Corps of Engineers and/or the U.S. Coast Guard, disposal of these vessels shall be performed during daylight hours only.

(8) Except in emergency situations, as determined by the U.S. Army Corps of Engineers and/or the District Commander of the U.S. Coast Guard, the Captain-of-the-Port (COTP), U.S. Coast Guard, and the EPA Regional Administrator shall be notified forty-eight (48) hours in advance of the proposed disposal. In addition, the COTP and the EPA Regional Administrator shall be notified by telephone at least twelve (12) hours in advance of the vessel's departure from port with such details as the proposed departure time and place, disposal site location, estimated time of arrival on site, and the name and communication capability of the towing vessel. Schedule changes are to be reported to the COTP as rapidly as possible.

(9) The National Ocean Survey, NOAA, 6010 Executive Blvd., Rockville, MD 20852, shall be notified in writing, within 1 week, of the exact coordinates of the disposal site so that it may be marked on appropriate charts.

# PART 230—SECTION 404(b)(1) GUIDELINES FOR SPECIFICATION OF DISPOSAL SITES FOR DREDGED OR FILL MATERIAL

### Subpart A—General

Sec.
230.1  Purpose and policy.
230.2  Applicability.
230.3  Definitions.
230.4  Organization.
230.5  General procedures to be followed.
230.6  Adaptability.
230.7  General permits.

### Subpart B—Compliance With the Guidelines

230.10  Restrictions on discharge.
230.11  Factual determinations.
230.12  Findings of compliance or non-compliance with the restrictions on discharge.

### Subpart C—Potential Impacts on Physical and Chemical Characteristics of the Aquatic Ecosystem

230.20  Substrate.
230.21  Suspended particulates/turbidity.
230.22  Water.
230.23  Current patterns and water circulation.
230.24  Normal water fluctuations.
230.25  Salinity gradients.

### Subpart D—Potential Impacts on Biological Characteristics of the Aquatic Ecosystem

230.30  Threatened and endangered species.
230.31  Fish, crustaceans, mollusks, and other aquatic organisms in the food web.
230.32  Other wildlife.

### Subpart E—Potential Impacts on Special Aquatic Sites

230.40  Sanctuaries and refuges.
230.41  Wetlands.
230.42  Mud flats.
230.43  Vegetated shallows.
230.44  Coral reefs.
230.45  Riffle and pool complexes.

### Subpart F—Potential Effects on Human Use Characteristics

230.50  Municipal and private water supplies.
230.51  Recreational and commercial fisheries.
230.52  Water-related recreation.
230.53  Aesthetics.
230.54  Parks, national and historical monuments, national seashores, wilderness

areas, research sites, and similar preserves.

### Subpart G—Evaluation and Testing

230.60  General evaluation of dredged or fill material.
230.61  Chemical, biological, and physical evaluation and testing.

### Subpart H—Actions To Minimize Adverse Effects

230.70  Actions concerning the location of the discharge.
230.71  Actions concerning the material to be discharged.
230.72  Actions controlling the material after discharge.
230.73  Actions affecting the method of dispersion.
230.74  Actions related to technology.
230.75  Actions affecting plant and animal populations.
230.76  Actions affecting human use.
230.77  Other actions.

### Subpart I—Planning To Shorten Permit Processing Time

230.80  Advanced identification of disposal areas.

### Subpart J—Compensatory Mitigation for Losses of Aquatic Resources

230.91  Purpose and general considerations.
230.92  Definitions.
230.93  General compensatory mitigation requirements.
230.94  Planning and documentation.
230.95  Ecological performance standards.
230.96  Monitoring.
230.97  Management.
230.98  Mitigation banks and in-lieu fee programs.

AUTHORITY: Secs. 404(b) and 501(a) of the Clean Water Act of 1977 (33 U.S.C. 1344(b) and 1361(a)).

SOURCE: 45 FR 85344, Dec. 24, 1980, unless otherwise noted.

## Subpart A—General

### § 230.1  Purpose and policy.

(a) The purpose of these Guidelines is to restore and maintain the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredged or fill material.

(b) Congress has expressed a number of policies in the Clean Water Act. These Guidelines are intended to be consistent with and to implement those policies.

(c) Fundamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern.

(d) From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines. The guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources.

### § 230.2  Applicability.

(a) These Guidelines have been developed by the Administrator of the Environmental Protection Agency in conjunction with the Secretary of the Army acting through the Chief of Engineers under section 404(b)(1) of the Clean Water Act (33 U.S.C. 1344). The Guidelines are applicable to the specification of disposal sites for discharges of dredged or fill material into waters of the United States. Sites may be specified through:

(1) The regulatory program of the U.S. Army Corps of Engineers under sections 404(a) and (e) of the Act (see 33 CFR Parts 320, 323 and 325);

(2) The civil works program of the U.S. Army Corps of Engineers (see 33 CFR 209.145 and section 150 of Pub. L. 94–587, Water Resources Development Act of 1976);

(3) Permit programs of States approved by the Administrator of the Environmental Protection Agency in accordance with section 404(g) and (h) of the Act (see 40 CFR parts 122, 123 and 124);

(4) Statewide dredged or fill material regulatory programs with best management practices approved under section 208(b)(4)(B) and (C) of the Act (see 40 CFR 35.1560);

(5) Federal construction projects which meet criteria specified in section 404(r) of the Act.

**Environmental Protection Agency**                                    **§ 230.3**

(b) These Guidelines will be applied in the review of proposed discharges of dredged or fill material into navigable waters which lie inside the baseline from which the territorial sea is measured, and the discharge of fill material into the territorial sea, pursuant to the procedures referred to in paragraphs (a)(1) and (2) of this section. The discharge of dredged material into the territorial sea is governed by the Marine Protection, Research, and Sanctuaries Act of 1972, Pub. L. 92–532, and regulations and criteria issued pursuant thereto (40 CFR parts 220 through 228).

(c) Guidance on interpreting and implementing these Guidelines may be prepared jointly by EPA and the Corps at the national or regional level from time to time. No modifications to the basic application, meaning, or intent of these Guidelines will be made without rulemaking by the Administrator under the Administrative Procedure Act (5 U.S.C. 551 *et seq.*).

**§ 230.3  Definitions.**

For purposes of this part, the following terms shall have the meanings indicated:

(a) The term *Act* means the Clean Water Act (also known as the Federal Water Pollution Control Act or FWPCA) Pub. L. 92–500, as amended by Pub. L. 95–217, 33 U.S.C. 1251, *et seq.*

(b) The term *adjacent* means bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes, and the like are "adjacent wetlands."

(c) The terms *aquatic environment* and *aquatic ecosystem* mean waters of the United States, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals.

(d) The term *carrier of contaminant* means dredged or fill material that contains contaminants.

(e) The term *contaminant* means a chemical or biological substance in a form that can be incorporated into, onto or be ingested by and that harms aquatic organisms, consumers of aquatic organisms, or users of the aquatic environment, and includes but is not limited to the substances on the 307(a)(1) list of toxic pollutants promulgated on January 31, 1978 (43 FR 4109).

(f)–(g) [Reserved]

(h) The term *discharge point* means the point within the disposal site at which the dredged or fill material is released.

(i) The term *disposal site* means that portion of the "waters of the United States" where specific disposal activities are permitted and consist of a bottom surface area and any overlying volume of water. In the case of wetlands on which surface water is not present, the disposal site consists of the wetland surface area.

(j) [Reserved]

(k) The term *extraction site* means the place from which the dredged or fill material proposed for discharge is to be removed.

(l) [Reserved]

(m) The term *mixing zone* means a limited volume of water serving as a zone of initial dilution in the immediate vicinity of a discharge point where receiving water quality may not meet quality standards or other requirements otherwise applicable to the receiving water. The mixing zone should be considered as a place where wastes and water mix and not as a place where effluents are treated.

(n) The term *permitting authority* means the District Engineer of the U.S. Army Corps of Engineers or such other individual as may be designated by the Secretary of the Army to issue or deny permits under section 404 of the Act; or the State Director of a permit program approved by EPA under section 404(g) and section 404(h) or his delegated representative.

(o) The term *pollutant* means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials not covered by the Atomic Energy Act, heat, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into water. The legislative history of the Act reflects that "radioactive materials" as included within the definition of "pollutant" in section 502 of the Act means only radioactive materials

which are not encompassed in the definition of source, byproduct, or special nuclear materials as defined by the Atomic Energy Act of 1954, as amended, and regulated under the Atomic Energy Act. Examples of radioactive materials not covered by the Atomic Energy Act and, therefore, included within the term ''pollutant'', are radium and accelerator produced isotopes. See *Train* v. *Colorado Public Interest Research Group, Inc.,* 426 U.S. 1 (1976).

(p) The term *pollution* means the man-made or man-induced alteration of the chemical, physical, biological or radiological integrity of an aquatic ecosystem.

(q) The term *practicable* means available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes.

(q-1) *Special aquatic sites* means those sites identified in subpart E. They are geographic areas, large or small, possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values. These areas are generally recognized as significantly influencing or positively contributing to the general overall environmental health or vitality of the entire ecosystem of a region. (See §230.10(a)(3))

(r) The term *territorial sea* means the belt of the sea measured from the baseline as determined in accordance with the Convention on the Territorial Sea and the Contiguous Zone and extending seaward a distance of three miles.

(s) The term *waters of the United States* means:

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(2) All interstate waters including interstate wetlands;

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are used or could be used for industrial purposes by industries in interstate commerce;

(4) All impoundments of waters otherwise defined as waters of the United States under this definition;

(5) Tributaries of waters identified in paragraphs (s)(1) through (4) of this section;

(6) The territorial sea;

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (s)(1) through (6) of this section; waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA (other than cooling ponds as defined in 40 CFR 423.11(m) which also meet the criteria of this definition) are not waters of the United States.

Waters of the United States do not include prior converted cropland. Notwithstanding the determination of an area's status as prior converted cropland by any other federal agency, for the purposes of the Clean Water Act, the final authority regarding Clean Water Act jurisdiction remains with EPA.

(t) The term *wetlands* means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas.

[45 FR 85344, Dec. 24, 1980, as amended at 58 FR 45037, Aug. 25, 1993]

## § 230.4  Organization.

The Guidelines are divided into eight subparts. Subpart A presents those provisions of general applicability, such as purpose and definitions. Subpart B establishes the four conditions which must be satisfied in order to make a finding that a proposed discharge of

dredged or fill material complies with the Guidelines. Section 230.11 of subpart B, sets forth factual determinations which are to be considered in determining whether or not a proposed discharge satisfies the subpart B conditions of compliance. Subpart C describes the physical and chemical components of a site and provides guidance as to how proposed discharges of dredged or fill material may affect these components. Subparts D through F detail the special characteristics of particular aquatic ecosystems in terms of their values, and the possible loss of these values due to discharges of dredged or fill material. Subpart G prescribes a number of physical, chemical, and biological evaluations and testing procedures to be used in reaching the required factual determinations. Subpart H details the means to prevent or minimize adverse effects. Subpart I concerns advanced identification of disposal areas.

### §230.5  General procedures to be followed.

In evaluating whether a particular discharge site may be specified, the permitting authority should use these Guidelines in the following sequence:

(a) In order to obtain an overview of the principal regulatory provisions of the Guidelines, review the restrictions on discharge in §230.10(a) through (d), the measures to minimize adverse impact of subpart H, and the required factual determinations of §230.11.

(b) Determine if a General permit (§230.7) is applicable; if so, the applicant needs merely to comply with its terms, and no further action by the permitting authority is necessary. Special conditions for evaluation of proposed General permits are contained in §230.7. If the discharge is not covered by a General permit:

(c) Examine practicable alternatives to the proposed discharge, that is, not discharging into the waters of the U.S. or discharging into an alternative aquatic site with potentially less damaging consequences (§230.10(a)).

(d) Delineate the candidate disposal site consistent with the criteria and evaluations of §230.11(f).

(e) Evaluate the various physical and chemical components which charac-

terize the non-living environment of the candidate site, the substrate and the water including its dynamic characteristics (subpart C).

(f) Identify and evaluate any special or critical characteristics of the candidate disposal site, and surrounding areas which might be affected by use of such site, related to their living communities or human uses (subparts D, E, and F).

(g) Review Factual Determinations in §230.11 to determine whether the information in the project file is sufficient to provide the documentation required by §230.11 or to perform the pretesting evaluation described in §230.60, or other information is necessary.

(h) Evaluate the material to be discharged to determine the possibility of chemical contamination or physical incompatibility of the material to be discharged (§230.60).

(i) If there is a reasonable probability of chemical contamination, conduct the appropriate tests according to the section on Evaluation and Testing (§230.61).

(j) Identify appropriate and practicable changes to the project plan to minimize the environmental impact of the discharge, based upon the specialized methods of minimization of impacts in subpart H.

(k) Make and document Factual Determinations in §230.11.

(l) Make and document Findings of Compliance (§230.12) by comparing Factual Determinations with the requirements for discharge of §230.10.
This outline of the steps to follow in using the Guidelines is simplified for purposes of illustration. The actual process followed may be iterative, with the results of one step leading to a reexamination of previous steps. The permitting authority must address all of the relevant provisions of the Guidelines in reaching a Finding of Compliance in an individual case.

### §230.6  Adaptability.

(a) The manner in which these Guidelines are used depends on the physical, biological, and chemical nature of the proposed extraction site, the material to be discharged, and the candidate disposal site, including any other important components of the ecosystem

being evaluated. Documentation to demonstrate knowledge about the extraction site, materials to be extracted, and the candidate disposal site is an essential component of guideline application. These Guidelines allow evaluation and documentation for a variety of activities, ranging from those with large, complex impacts on the aquatic environment to those for which the impact is likely to be innocuous. It is unlikely that the Guidelines will apply in their entirety to any one activity, no matter how complex. It is anticipated that substantial numbers of permit applications will be for minor, routine activities that have little, if any, potential for significant degradation of the aquatic environment. It generally is not intended or expected that extensive testing, evaluation or analysis will be needed to make findings of compliance in such routine cases. Where the conditions for General permits are met, and where numerous applications for similar activities are likely, the use of General permits will eliminate repetitive evaluation and documentation for individual discharges.

(b) The Guidelines user, including the agency or agencies responsible for implementing the Guidelines, must recognize the different levels of effort that should be associated with varying degrees of impact and require or prepare commensurate documentation. The level of documentation should reflect the significance and complexity of the discharge activity.

(c) An essential part of the evaluation process involves making determinations as to the relevance of any portion(s) of the Guidelines and conducting further evaluation only as needed. However, where portions of the Guidelines review procedure are "short form" evaluations, there still must be sufficient information (including consideration of both individual and cumulative impacts) to support the decision of whether to specify the site for disposal of dredged or fill material and to support the decision to curtail or abbreviate the evaluation process. The presumption against the discharge in § 230.1 applies to this decision-making.

(d) In the case of activities covered by General permits or section

208(b)(4)(B) and (C) Best Management Practices, the analysis and documentation required by the Guidelines will be performed at the time of General permit issuance or section 208(b)(4)(B) and (C) Best Management Practices promulgation and will not be repeated when activities are conducted under a General permit or section 208(b)(4)(B) and (C) Best Management Practices control. These Guidelines do not require reporting or formal written communication at the time individual activities are initiated under a General permit or section 208(b)(4)(B) and (C) Best Management Practices. However, a particular General permit may require appropriate reporting.

§ 230.7  General permits.

(a) *Conditions for the issuance of General permits.* A General permit for a category of activities involving the discharge of dredged or fill material complies with the Guidelines if it meets the applicable restrictions on the discharge in § 230.10 and if the permitting authority determines that:

(1) The activities in such category are similar in nature and similar in their impact upon water quality and the aquatic environment;

(2) The activities in such category will have only minimal adverse effects when performed separately; and

(3) The activities in such category will have only minimal cumulative adverse effects on water quality and the aquatic environment.

(b) *Evaluation process.* To reach the determinations required in paragraph (a) of this section, the permitting authority shall set forth in writing an evaluation of the potential individual and cumulative impacts of the category of activities to be regulated under the General permit. While some of the information necessary for this evaluation can be obtained from potential permittees and others through the proposal of General permits for public review, the evaluation must be completed before any General permit is issued, and the results must be published with the final permit.

(1) This evaluation shall be based upon consideration of the prohibitions

**Environmental Protection Agency**                                            **§ 230.10**

listed in § 230.10(b) and the factors listed in § 230.10(c), and shall include documented information supporting each factual determination in § 230.11 of the Guidelines (consideration of alternatives in § 230.10(a) are not directly applicable to General permits);

(2) The evaluation shall include a precise description of the activities to be permitted under the General permit, explaining why they are sufficiently similar in nature and in environmental impact to warrant regulation under a single General permit based on subparts C through F of the Guidelines. Allowable differences between activities which will be regulated under the same General permit shall be specified. Activities otherwise similar in nature may differ in environmental impact due to their location in or near ecologically sensitive areas, areas with unique chemical or physical characteristics, areas containing concentrations of toxic substances, or areas regulated for specific human uses or by specific land or water management plans (e.g., areas regulated under an approved Coastal Zone Management Plan). If there are specific geographic areas within the purview of a proposed General permit (called a draft General permit under a State 404 program), which are more appropriately regulated by individual permit due to the considerations cited in this paragraph, they shall be clearly delineated in the evaluation and excluded from the permit. In addition, the permitting authority may require an individual permit for any proposed activity under a General permit where the nature or location of the activity makes an individual permit more appropriate.

(3) To predict cumulative effects, the evaluation shall include the number of individual discharge activities likely to be regulated under a General permit until its expiration, including repetitions of individual discharge activities at a single location.

## Subpart B—Compliance With the Guidelines

### § 230.10  Restrictions on discharge.

NOTE: Because other laws may apply to particular discharges and because the Corps of Engineers or State 404 agency may have additional procedural and substantive requirements, a discharge complying with the requirement of these Guidelines will not automatically receive a permit.

Although all requirements in § 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities.

(a) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

(1) For the purpose of this requirement, practicable alternatives include, but are not limited to:

(i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters;

(ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters;

(2) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

(3) Where the activity associated with a discharge which is proposed for a special aquatic site (as defined in subpart E) does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact

259

on the aquatic ecosystem, unless clearly demonstrated otherwise.

(4) For actions subject to NEPA, where the Corps of Engineers is the permitting agency, the analysis of alternatives required for NEPA environmental documents, including supplemental Corps NEPA documents, will in most cases provide the information for the evaluation of alternatives under these Guidelines. On occasion, these NEPA documents may address a broader range of alternatives than required to be considered under this paragraph or may not have considered the alternatives in sufficient detail to respond to the requirements of these Guidelines. In the latter case, it may be necessary to supplement these NEPA documents with this additional information.

(5) To the extent that practicable alternatives have been identified and evaluated under a Coastal Zone Management program, a section 208 program, or other planning process, such evaluation shall be considered by the permitting authority as part of the consideration of alternatives under the Guidelines. Where such evaluation is less complete than that contemplated under this subsection, it must be supplemented accordingly.

(b) No discharge of dredged or fill material shall be permitted if it:

(1) Causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard;

(2) Violates any applicable toxic effluent standard or prohibition under section 307 of the Act;

(3) Jeopardizes the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of a habitat which is determined by the Secretary of Interior or Commerce, as appropriate, to be a critical habitat under the Endangered Species Act of 1973, as amended. If an exemption has been granted by the Endangered Species Committee, the terms of such exemption shall apply in lieu of this subparagraph;

(4) Violates any requirement imposed by the Secretary of Commerce to protect any marine sanctuary designated under title III of the Marine Protection, Research, and Sanctuaries Act of 1972.

(c) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States. Findings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations, and tests required by subparts B and G, after consideration of subparts C through F, with special emphasis on the persistence and permanence of the effects outlined in those subparts. Under these Guidelines, effects contributing to significant degradation considered individually or collectively, include:

(1) Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites.

(2) Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical, and chemical processes;

(3) Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy; or

(4) Significantly adverse effects of discharge of pollutants on recreational, aesthetic, and economic values.

(d) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem. Subpart H identifies such possible steps.

§ 230.11   Factual determinations.

The permitting authority shall determine in writing the potential short-term or long-term effects of a proposed

discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment in light of subparts C through F. Such factual determinations shall be used in §230.12 in making findings of compliance or non-compliance with the restrictions on discharge in §230.10. The evaluation and testing procedures described in §230.60 and §230.61 of subpart G shall be used as necessary to make, and shall be described in, such determination. The determinations of effects of each proposed discharge shall include the following:

(a) *Physical substrate determinations.* Determine the nature and degree of effect that the proposed discharge will have, individually and cumulatively, on the characteristics of the substrate at the proposed disposal site. Consideration shall be given to the similarity in particle size, shape, and degree of compaction of the material proposed for discharge and the material constituting the substrate at the disposal site, and any potential changes in substrate elevation and bottom contours, including changes outside of the disposal site which may occur as a result of erosion, slumpage, or other movement of the discharged material. The duration and physical extent of substrate changes shall also be considered. The possible loss of environmental values (§230.20) and actions to minimize impact (subpart H) shall also be considered in making these determinations. Potential changes in substrate elevation and bottom contours shall be predicted on the basis of the proposed method, volume, location, and rate of discharge, as well as on the individual and combined effects of current patterns, water circulation, wind and wave action, and other physical factors that may affect the movement of the discharged material.

(b) *Water circulation, fluctuation, and salinity determinations.* Determine the nature and degree of effect that the proposed discharge will have individually and cumulatively on water, current patterns, circulation including downstream flows, and normal water fluctuation. Consideration shall be given to water chemistry, salinity, clarity, color, odor, taste, dissolved gas levels, temperature, nutrients, and eu-

trophication plus other appropriate characteristics. Consideration shall also be given to the potential diversion or obstruction of flow, alterations of bottom contours, or other significant changes in the hydrologic regime. Additional consideration of the possible loss of environmental values (§§230.23 through 230.25) and actions to minimize impacts (subpart H), shall be used in making these determinations. Potential significant effects on the current patterns, water circulation, normal water fluctuation and salinity shall be evaluated on the basis of the proposed method, volume, location, and rate of discharge.

(c) *Suspended particulate/turbidity determinations.* Determine the nature and degree of effect that the proposed discharge will have, individually and cumulatively, in terms of potential changes in the kinds and concentrations of suspended particulate/turbidity in the vicinity of the disposal site. Consideration shall be given to the grain size of the material proposed for discharge, the shape and size of the plume of suspended particulates, the duration of the discharge and resulting plume and whether or not the potential changes will cause violations of applicable water quality standards. Consideration should also be given to the possible loss of environmental values (§230.21) and to actions for minimizing impacts (subpart H). Consideration shall include the proposed method, volume, location, and rate of discharge, as well as the individual and combined effects of current patterns, water circulation and fluctuations, wind and wave action, and other physical factors on the movement of suspended particulates.

(d) *Contaminant determinations.* Determine the degree to which the material proposed for discharge will introduce, relocate, or increase contaminants. This determination shall consider the material to be discharged, the aquatic environment at the proposed disposal site, and the availability of contaminants.

(e) *Aquatic ecosystem and organism determinations.* Determine the nature and degree of effect that the proposed discharge will have, both individually and cumulatively, on the structure and

261

function of the aquatic ecosystem and organisms. Consideration shall be given to the effect at the proposed disposal site of potential changes in substrate characteristics and elevation, water or substrate chemistry, nutrients, currents, circulation, fluctuation, and salinity, on the recolonization and existence of indigenous aquatic organisms or communities. Possible loss of environmental values (§ 230.31), and actions to minimize impacts (subpart H) shall be examined. Tests as described in § 230.61 (Evaluation and Testing), may be required to provide information on the effect of the discharge material on communities or populations of organisms expected to be exposed to it.

(f) *Proposed disposal site determinations.* (1) Each disposal site shall be specified through the application of these Guidelines. The mixing zone shall be confined to the smallest practicable zone within each specified disposal site that is consistent with the type of dispersion determined to be appropriate by the application of these Guidelines. In a few special cases under unique environmental conditions, where there is adequate justification to show that widespread dispersion by natural means will result in no significantly adverse environmental effects, the discharged material may be intended to be spread naturally in a very thin layer over a large area of the substrate rather than be contained within the disposal site.

(2) The permitting authority and the Regional Administrator shall consider the following factors in determining the acceptability of a proposed mixing zone:

(i) Depth of water at the disposal site;

(ii) Current velocity, direction, and variability at the disposal site;

(iii) Degree of turbulence;

(iv) Stratification attributable to causes such as obstructions, salinity or density profiles at the disposal site;

(v) Discharge vessel speed and direction, if appropriate;

(vi) Rate of discharge;

(vii) Ambient concentration of constituents of interest;

(viii) Dredged material characteristics, particularly concentrations of constituents, amount of material, type

of material (sand, silt, clay, etc.) and settling velocities;

(ix) Number of discharge actions per unit of time;

(x) Other factors of the disposal site that affect the rates and patterns of mixing.

(g) *Determination of cumulative effects on the aquatic ecosystem.* (1) Cumulative impacts are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material. Although the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems.

(2) Cumulative effects attributable to the discharge of dredged or fill material in waters of the United States should be predicted to the extent reasonable and practical. The permitting authority shall collect information and solicit information from other sources about the cumulative impacts on the aquatic ecosystem. This information shall be documented and considered during the decision-making process concerning the evaluation of individual permit applications, the issuance of a General permit, and monitoring and enforcement of existing permits.

(h) *Determination of secondary effects on the aquatic ecosystem.* (1) Secondary effects are effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material. Information about secondary effects on aquatic ecosystems shall be considered prior to the time final section 404 action is taken by permitting authorities.

(2) Some examples of secondary effects on an aquatic ecosystem are fluctuating water levels in an impoundment and downstream associated with the operation of a dam, septic tank leaching and surface runoff from residential or commercial developments on fill, and leachate and runoff from a sanitary landfill located in waters of the U.S. Activities to be conducted on fast land created by the discharge of

dredged or fill material in waters of the United States may have secondary impacts within those waters which should be considered in evaluating the impact of creating those fast lands.

### § 230.12 Findings of compliance or non-compliance with the restrictions on discharge.

(a) On the basis of these Guidelines (subparts C through G) the proposed disposal sites for the discharge of dredged or fill material must be:

(1) Specified as complying with the requirements of these Guidelines; or

(2) Specified as complying with the requirements of these Guidelines with the inclusion of appropriate and practicable discharge conditions (see subparts H and J) to minimize pollution or adverse effects to the affected aquatic ecosystems; or

(3) Specified as failing to comply with the requirements of these Guidelines where:

(i) There is a practicable alternative to the proposed discharge that would have less adverse effect on the aquatic ecosystem, so long as such alternative does not have other significant adverse environmental consequences; or

(ii) The proposed discharge will result in significant degradation of the aquatic ecosystem under § 230.10(b) or (c); or

(iii) The proposed discharge does not include all appropriate and practicable measures to minimize potential harm to the aquatic ecosystem; or

(iv) There does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with these Guidelines.

(b) Findings under this section shall be set forth in writing by the permitting authority for each proposed discharge and made available to the permit applicant. These findings shall include the factual determinations required by § 230.11, and a brief explanation of any adaptation of these Guidelines to the activity under consideration. In the case of a General permit, such findings shall be prepared at the time of issuance of that permit rather than for each subsequent discharge under the authority of that permit.

## Subpart C—Potential Impacts on Physical and Chemical Characteristics of the Aquatic Ecosystem

NOTE: The effects described in this subpart should be considered in making the factual determinations and the findings of compliance or non-compliance in subpart B.

[45 FR 85344, Dec. 24, 1980, as amended at 73 FR 19687, Apr. 10, 2008]

### § 230.20 Substrate.

(a) The substrate of the aquatic ecosystem underlies open waters of the United States and constitutes the surface of wetlands. It consists of organic and inorganic solid materials and includes water and other liquids or gases that fill the spaces between solid particles.

(b) Possible loss of environmental characteristics and values: The discharge of dredged or fill material can result in varying degrees of change in the complex physical, chemical, and biological characteristics of the substrate. Discharges which alter substrate elevation or contours can result in changes in water circulation, depth, current pattern, water fluctuation and water temperature. Discharges may adversely affect bottom-dwelling organisms at the site by smothering immobile forms or forcing mobile forms to migrate. Benthic forms present prior to a discharge are unlikely to recolonize on the discharged material if it is very dissimilar from that of the discharge site. Erosion, slumping, or lateral displacement of surrounding bottom of such deposits can adversely affect areas of the substrate outside the perimeters of the disposal site by changing or destroying habitat. The bulk and composition of the discharged material and the location, method, and timing of discharges may all influence the degree of impact on the substrate.

### § 230.21 Suspended particulates/turbidity.

(a) Suspended particulates in the aquatic ecosystem consist of fine-grained mineral particles, usually smaller than silt, and organic particles. Suspended particulates may enter water bodies as a result of land runoff, flooding, vegetative and

planktonic breakdown, resuspension of bottom sediments, and man's activities including dredging and filling. Particulates may remain suspended in the water column for variable periods of time as a result of such factors as agitation of the water mass, particulate specific gravity, particle shape, and physical and chemical properties of particle surfaces.

(b) Possible loss of environmental characteristics and values: The discharge of dredged or fill material can result in greatly elevated levels of suspended particulates in the water column for varying lengths of time. These new levels may reduce light penetration and lower the rate of photosynthesis and the primary productivity of an aquatic area if they last long enough. Sight-dependent species may suffer reduced feeding ability leading to limited growth and lowered resistance to disease if high levels of suspended particulates persist. The biological and the chemical content of the suspended material may react with the dissolved oxygen in the water, which can result in oxygen depletion. Toxic metals and organics, pathogens, and viruses absorbed or adsorbed to fine-grained particulates in the material may become biologically available to organisms either in the water column or on the substrate. Significant increases in suspended particulate levels create turbid plumes which are highly visible and aesthetically displeasing. The extent and persistence of these adverse impacts caused by discharges depend upon the relative increase in suspended particulates above the amount occurring naturally, the duration of the higher levels, the current patterns, water level, and fluctuations present when such discharges occur, the volume, rate, and duration of the discharge, particulate deposition, and the seasonal timing of the discharge.

### § 230.22  Water.

(a) Water is the part of the aquatic ecosystem in which organic and inorganic constituents are dissolved and suspended. It constitutes part of the liquid phase and is contained by the substrate. Water forms part of a dynamic aquatic life-supporting system. Water clarity, nutrients and chemical content, physical and biological content, dissolved gas levels, pH, and temperature contribute to its life-sustaining capabilities.

(b) Possible loss of environmental characteristics and values: The discharge of dredged or fill material can change the chemistry and the physical characteristics of the receiving water at a disposal site through the introduction of chemical constituents in suspended or dissolved form. Changes in the clarity, color, odor, and taste of water and the addition of contaminants can reduce or eliminate the suitability of water bodies for populations of aquatic organisms, and for human consumption, recreation, and aesthetics. The introduction of nutrients or organic material to the water column as a result of the discharge can lead to a high biochemical oxygen demand (BOD), which in turn can lead to reduced dissolved oxygen, thereby potentially affecting the survival of many aquatic organisms. Increases in nutrients can favor one group of organisms such as algae to the detriment of other more desirable types such as submerged aquatic vegetation, potentially causing adverse health effects, objectionable tastes and odors, and other problems.

### § 230.23  Current patterns and water circulation.

(a) Current patterns and water circulation are the physical movements of water in the aquatic ecosystem. Currents and circulation respond to natural forces as modified by basin shape and cover, physical and chemical characteristics of water strata and masses, and energy dissipating factors.

(b) Possible loss of environmental characteristics and values: The discharge of dredged or fill material can modify current patterns and water circulation by obstructing flow, changing the direction or velocity of water flow, changing the direction or velocity of water flow and circulation, or otherwise changing the dimensions of a water body. As a result, adverse changes can occur in: Location, structure, and dynamics of aquatic communities; shoreline and substrate erosion and deposition rates; the deposition of suspended particulates; the rate and

**Environmental Protection Agency**                                                 **§ 230.30**

extent of mixing of dissolved and suspended components of the water body; and water stratification.

### § 230.24  Normal water fluctuations.

(a) Normal water fluctuations in a natural aquatic system consist of daily, seasonal, and annual tidal and flood fluctuations in water level. Biological and physical components of such a system are either attuned to or characterized by these periodic water fluctuations.

(b) Possible loss of environmental characteristics and values: The discharge of dredged or fill material can alter the normal water-level fluctuation pattern of an area, resulting in prolonged periods of inundation, exaggerated extremes of high and low water, or a static, nonfluctuating water level. Such water level modifications may change salinity patterns, alter erosion or sedimentation rates, aggravate water temperature extremes, and upset the nutrient and dissolved oxygen balance of the aquatic ecosystem. In addition, these modifications can alter or destroy communities and populations of aquatic animals and vegetation, induce populations of nuisance organisms, modify habitat, reduce food supplies, restrict movement of aquatic fauna, destroy spawning areas, and change adjacent, upstream, and downstream areas.

### § 230.25  Salinity gradients.

(a) Salinity gradients form where salt water from the ocean meets and mixes with fresh water from land.

(b) Possible loss of environmental characteristics and values: Obstructions which divert or restrict flow of either fresh or salt water may change existing salinity gradients. For example, partial blocking of the entrance to an estuary or river mouth that significantly restricts the movement of the salt water into and out of that area can effectively lower the volume of salt water available for mixing within that estuary. The downstream migration of the salinity gradient can occur, displacing the maximum sedimentation zone and requiring salinity-dependent aquatic biota to adjust to the new conditions, move to new locations if possible, or perish. In the freshwater zone,

discharge operations in the upstream regions can have equally adverse impacts. A significant reduction in the volume of fresh water moving into an estuary below that which is considered normal can affect the location and type of mixing thereby changing the characteristic salinity patterns. The resulting changed circulation pattern can cause the upstream migration of the salinity gradient displacing the maximim sedimentation zone. This migration may affect those organisms that are adapted to freshwater environments. It may also affect municipal water supplies.

NOTE: Possible actions to minimize adverse impacts regarding site characteristics can be found in subpart H.

## Subpart D—Potential Impacts on Biological Characteristics of the Aquatic Ecosystem

NOTE: The impacts described in this subpart should be considered in making the factual determinations and the findings of compliance or non-compliance in subpart B.

### § 230.30  Threatened and endangered species.

(a) An endangered species is a plant or animal in danger of extinction throughout all or a significant portion of its range. A threatened species is one in danger of becoming an endangered species in the foreseeable future throughout all or a significant portion of its range. Listings of threatened and endangered species as well as critical habitats are maintained by some individual States and by the U.S. Fish and Wildlife Service of the Department of the Interior (codified annually at 50 CFR 17.11). The Department of Commerce has authority over some threatened and endangered marine mammals, fish and reptiles.

(b) Possible loss of values: The major potential impacts on threatened or endangered species from the discharge of dredged or fill material include:

(1) Covering or otherwise directly killing species;

(2) The impairment or destruction of habitat to which these species are limited. Elements of the aquatic habitat which are particularly crucial to the continued survival of some threatened or endangered species include adequate

265

good quality water, spawning and maturation areas, nesting areas, protective cover, adequate and reliable food supply, and resting areas for migratory species. Each of these elements can be adversely affected by changes in either the normal water conditions for clarity, chemical content, nutrient balance, dissolved oxygen, pH, temperature, salinity, current patterns, circulation and fluctuation, or the physical removal of habitat; and

(3) Facilitating incompatible activities.

(c) Where consultation with the Secretary of the Interior occurs under section 7 of the Endangered Species Act, the conclusions of the Secretary concerning the impact(s) of the discharge on threatened and endangered species and their habitat shall be considered final.

### § 230.31 Fish, crustaceans, mollusks, and other aquatic organisms in the food web.

(a) Aquatic organisms in the food web include, but are not limited to, finfish, crustaceans, mollusks, insects, annelids, planktonic organisms, and the plants and animals on which they feed and depend upon for their needs. All forms and life stages of an organism, throughout its geographic range, are included in this category.

(b) Possible loss of values: The discharge of dredged or fill material can variously affect populations of fish, crustaceans, mollusks and other food web organisms through the release of contaminants which adversely affect adults, juveniles, larvae, or eggs, or result in the establishment or proliferation of an undesirable competitive species of plant or animal at the expense of the desired resident species. Suspended particulates settling on attached or buried eggs can smother the eggs by limiting or sealing off their exposure to oxygenated water. Discharge of dredged and fill material may result in the debilitation or death of sedentary organisms by smothering, exposure to chemical contaminants in dissolved or suspended form, exposure to high levels of suspended particulates, reduction in food supply, or alteration of the substrate upon which they are dependent. Mollusks are particularly sensitive to the discharge of material during periods of reproduction and growth and development due primarily to their limited mobility. They can be rendered unfit for human consumption by tainting, by production and accumulation of toxins, or by ingestion and retention of pathogenic organisms, viruses, heavy metals or persistent synthetic organic chemicals. The discharge of dredged or fill material can redirect, delay, or stop the reproductive and feeding movements of some species of fish and crustacea, thus preventing their aggregation in accustomed places such as spawning or nursery grounds and potentially leading to reduced populations. Reduction of detrital feeding species or other representatives of lower trophic levels can impair the flow of energy from primary consumers to higher trophic levels. The reduction or potential elimination of food chain organism populations decreases the overall productivity and nutrient export capability of the ecosystem.

### § 230.32 Other wildlife.

(a) Wildlife associated with aquatic ecosystems are resident and transient mammals, birds, reptiles, and amphibians.

(b) Possible loss of values: The discharge of dredged or fill material can result in the loss or change of breeding and nesting areas, escape cover, travel corridors, and preferred food sources for resident and transient wildlife species associated with the aquatic ecosystem. These adverse impacts upon wildlife habitat may result from changes in water levels, water flow and circulation, salinity, chemical content, and substrate characteristics and elevation. Increased water turbidity can adversely affect wildlife species which rely upon sight to feed, and disrupt the respiration and feeding of certain aquatic wildlife and food chain organisms. The availability of contaminants from the discharge of dredged or fill material may lead to the bioaccumulation of such contaminants in wildlife. Changes in such physical and chemical factors of the environment

may favor the introduction of undesirable plant and animal species at the expense of resident species and communities. In some aquatic environments lowering plant and animal species diversity may disrupt the normal functions of the ecosystem and lead to reductions in overall biological productivity.

NOTE: Possible actions to minimize adverse impacts regarding characteristics of biological components of the aquatic ecosystem can be found in subpart H.

## Subpart E—Potential Impacts on Special Aquatic Sites

NOTE: The impacts described in this subpart should be considered in making the factual determinations and the findings of compliance or non-compliance in subpart B. The definition of special aquatic sites is found in §230.3(q–1).

### §230.40 Sanctuaries and refuges.

(a) Sanctuaries and refuges consist of areas designated under State and Federal laws or local ordinances to be managed principally for the preservation and use of fish and wildlife resources.

(b) Possible loss of values: Sanctuaries and refuges may be affected by discharges of dredged or fill material which will:

(1) Disrupt the breeding, spawning, migratory movements or other critical life requirements of resident or transient fish and wildlife resources;

(2) Create unplanned, easy and incompatible human access to remote aquatic areas;

(3) Create the need for frequent maintenance activity;

(4) Result in the establishment of undesirable competitive species of plants and animals;

(5) Change the balance of water and land areas needed to provide cover, food, and other fish and wildlife habitat requirements in a way that modifies sanctuary or refuge management practices;

(6) Result in any of the other adverse impacts discussed in subparts C and D as they relate to a particular sanctuary or refuge.

### §230.41 Wetlands.

(a)(1) Wetlands consist of areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.

(2) Where wetlands are adjacent to open water, they generally constitute the transition to upland. The margin between wetland and open water can best be established by specialists familiar with the local environment, particularly where emergent vegetation merges with submerged vegetation over a broad area in such places as the lateral margins of open water, headwaters, rainwater catch basins, and groundwater seeps. The landward margin of wetlands also can best be identified by specialists familiar with the local environment when vegetation from the two regions merges over a broad area.

(3) Wetland vegetation consists of plants that require saturated soils to survive (obligate wetland plants) as well as plants, including certain trees, that gain a competitive advantage over others because they can tolerate prolonged wet soil conditions and their competitors cannot. In addition to plant populations and communities, wetlands are delimited by hydrological and physical characteristics of the environment. These characteristics should be considered when information about them is needed to supplement information available about vegetation, or where wetland vegetation has been removed or is dormant.

(b) Possible loss of values: The discharge of dredged or fill material in wetlands is likely to damage or destroy habitat and adversely affect the biological productivity of wetlands ecosystems by smothering, by dewatering, by permanently flooding, or by altering substrate elevation or periodicity of water movement. The addition of dredged or fill material may destroy wetland vegetation or result in advancement of succession to dry land species. It may reduce or eliminate nutrient exchange by a reduction of the system's productivity, or by altering

current patterns and velocities. Disruption or elimination of the wetland system can degrade water quality by obstructing circulation patterns that flush large expanses of wetland systems, by interfering with the filtration function of wetlands, or by changing the aquifer recharge capability of a wetland. Discharges can also change the wetland habitat value for fish and wildlife as discussed in subpart D. When disruptions in flow and circulation patterns occur, apparently minor loss of wetland acreage may result in major losses through secondary impacts. Discharging fill material in wetlands as part of municipal, industrial or recreational development may modify the capacity of wetlands to retain and store floodwaters and to serve as a buffer zone shielding upland areas from wave actions, storm damage and erosion.

### § 230.42 Mud flats.

(a) Mud flats are broad flat areas along the sea coast and in coastal rivers to the head of tidal influence and in inland lakes, ponds, and riverine systems. When mud flats are inundated, wind and wave action may resuspend bottom sediments. Coastal mud flats are exposed at extremely low tides and inundated at high tides with the water table at or near the surface of the substrate. The substrate of mud flats contains organic material and particles smaller in size than sand. They are either unvegetated or vegetated only by algal mats.

(b) Possible loss of values: The discharge of dredged or fill material can cause changes in water circulation patterns which may permanently flood or dewater the mud flat or disrupt periodic inundation, resulting in an increase in the rate of erosion or accretion. Such changes can deplete or eliminate mud flat biota, foraging areas, and nursery areas. Changes in inundation patterns can affect the chemical and biological exchange and decomposition process occurring on the mud flat and change the deposition of suspended material affecting the productivity of the area. Changes may reduce the mud flat's capacity to dissipate storm surge runoff.

### § 230.43 Vegetated shallows.

(a) Vegetated shallows are permanently inundated areas that under normal circumstances support communities of rooted aquatic vegetation, such as turtle grass and eelgrass in estuarine or marine systems as well as a number of freshwater species in rivers and lakes.

(b) Possible loss of values: The discharge of dredged or fill material can smother vegetation and benthic organisms. It may also create unsuitable conditions for their continued vigor by: (1) Changing water circulation patterns; (2) releasing nutrients that increase undesirable algal populations; (3) releasing chemicals that adversely affect plants and animals; (4) increasing turbidity levels, thereby reducing light penetration and hence photosynthesis; and (5) changing the capacity of a vegetated shallow to stabilize bottom materials and decrease channel shoaling. The discharge of dredged or fill material may reduce the value of vegetated shallows as nesting, spawning, nursery, cover, and forage areas, as well as their value in protecting shorelines from erosion and wave actions. It may also encourage the growth of nuisance vegetation.

### § 230.44 Coral reefs.

(a) Coral reefs consist of the skeletal deposit, usually of calcareous or silicaceous materials, produced by the vital activities of anthozoan polyps or other invertebrate organisms present in growing portions of the reef.

(b) Possible loss of values: The discharge of dredged or fill material can adversely affect colonies of reef building organisms by burying them, by releasing contaminants such as hydrocarbons into the water column, by reducing light penetration through the water, and by increasing the level of suspended particulates. Coral organisms are extremely sensitive to even slight reductions in light penetration or increases in suspended particulates. These adverse effects will cause a loss of productive colonies which in turn provide habitat for many species of highly specialized aquatic organisms.

## §230.45 Riffle and pool complexes.

(a) Steep gradient sections of streams are sometimes characterized by riffle and pool complexes. Such stream sections are recognizable by their hydraulic characteristics. The rapid movement of water over a coarse substrate in riffles results in a rough flow, a turbulent surface, and high dissolved oxygen levels in the water. Pools are deeper areas associated with riffles. Pools are characterized by a slower stream velocity, a steaming flow, a smooth surface, and a finer substrate. Riffle and pool complexes are particularly valuable habitat for fish and wildlife.

(b) Possible loss of values: Discharge of dredged or fill material can eliminate riffle and pool areas by displacement, hydrologic modification, or sedimentation. Activities which affect riffle and pool areas and especially riffle/pool ratios, may reduce the aeration and filtration capabilities at the discharge site and downstream, may reduce stream habitat diversity, and may retard repopulation of the disposal site and downstream waters through sedimentation and the creation of unsuitable habitat. The discharge of dredged or fill material which alters stream hydrology may cause scouring or sedimentation of riffles and pools. Sedimentation induced through hydrological modification or as a direct result of the deposition of unconsolidated dredged or fill material may clog riffle and pool areas, destroy habitats, and create anaerobic conditions. Eliminating pools and meanders by the discharge of dredged or fill material can reduce water holding capacity of streams and cause rapid runoff from a watershed. Rapid runoff can deliver large quantities of flood water in a short time to downstream areas resulting in the destruction of natural habitat, high property loss, and the need for further hydraulic modification.

NOTE: Possible actions to minimize adverse impacts on site or material characteristics can be found in subpart H.

## Subpart F—Potential Effects on Human Use Characteristics

NOTE: The effects described in this subpart should be considered in making the factual determinations and the findings of compliance or non-compliance in subpart B.

## §230.50 Municipal and private water supplies.

(a) Municipal and private water supplies consist of surface water or ground water which is directed to the intake of a municipal or private water supply system.

(b) Possible loss of values: Discharges can affect the quality of water supplies with respect to color, taste, odor, chemical content and suspended particulate concentration, in such a way as to reduce the fitness of the water for consumption. Water can be rendered unpalatable or unhealthy by the addition of suspended particulates, viruses and pathogenic organisms, and dissolved materials. The expense of removing such substances before the water is delivered for consumption can be high. Discharges may also affect the quantity of water available for municipal and private water supplies. In addition, certain commonly used water treatment chemicals have the potential for combining with some suspended or dissolved substances from dredged or fill material to form other products that can have a toxic effect on consumers.

## §230.51 Recreational and commercial fisheries.

(a) Recreational and commercial fisheries consist of harvestable fish, crustaceans, shellfish, and other aquatic organisms used by man.

(b) Possible loss of values: The discharge of dredged or fill materials can affect the suitability of recreational and commercial fishing grounds as habitat for populations of consumable aquatic organisms. Discharges can result in the chemical contamination of recreational or commercial fisheries. They may also interfere with the reproductive success of recreational and commercially important aquatic species through disruption of migration and spawning areas. The introduction of pollutants at critical times in their life cycle may directly reduce populations of commercially important aquatic organisms or indirectly reduce them by reducing organisms upon which they depend for food. Any of

269

these impacts can be of short duration or prolonged, depending upon the physical and chemical impacts of the discharge and the biological availability of contaminants to aquatic organisms.

### § 230.52 Water-related recreation.

(a) Water-related recreation encompasses activities undertaken for amusement and relaxation. Activities encompass two broad categories of use: consumptive, e.g., harvesting resources by hunting and fishing; and non-comsumptive, e.g. canoeing and sight-seeing.

(b) Possible loss of values: One of the more important direct impacts of dredged or fill disposal is to impair or destroy the resources which support recreation activities. The disposal of dredged or fill material may adversely modify or destroy water use for recreation by changing turbidity, suspended particulates, temperature, dissolved oxygen, dissolved materials, toxic materials, pathogenic organisms, quality of habitat, and the aesthetic qualities of sight, taste, odor, and color.

### § 230.53 Aesthetics.

(a) Aesthetics associated with the aquatic ecosystem consist of the perception of beauty by one or a combination of the senses of sight, hearing, touch, and smell. Aesthetics of aquatic ecosystems apply to the quality of life enjoyed by the general public and property owners.

(b) Possible loss of values: The discharge of dredged or fill material can mar the beauty of natural aquatic ecosystems by degrading water quality, creating distracting disposal sites, inducing inappropriate development, encouraging unplanned and incompatible human access, and by destroying vital elements that contribute to the compositional harmony or unity, visual distinctiveness, or diversity of an area. The discharge of dredged or fill material can adversely affect the particular features, traits, or characteristics of an aquatic area which make it valuable to property owners. Activities which degrade water quality, disrupt natural substrate and vegetational characteristics, deny access to or visibility of the resource, or result in changes in odor, air quality, or noise

levels may reduce the value of an aquatic area to private property owners.

### § 230.54 Parks, national and historical monuments, national seashores, wilderness areas, research sites, and similar preserves.

(a) These preserves consist of areas designated under Federal and State laws or local ordinances to be managed for their aesthetic, educational, historical, recreational, or scientific value.

(b) Possible loss of values: The discharge of dredged or fill material into such areas may modify the aesthetic, educational, historical, recreational and/or scientific qualities thereby reducing or eliminating the uses for which such sites are set aside and managed.

NOTE: Possible actions to minimize adverse impacts regarding site or material characteristics can be found in subpart H.

## Subpart G—Evaluation and Testing

### § 230.60 General evaluation of dredged or fill material.

The purpose of these evaluation procedures and the chemical and biological testing sequence outlined in § 230.61 is to provide information to reach the determinations required by § 230.11. Where the results of prior evaluations, chemical and biological tests, scientific research, and experience can provide information helpful in making a determination, these should be used. Such prior results may make new testing unnecessary. The information used shall be documented. Where the same information applies to more than one determination, it may be documented once and referenced in later determinations.

(a) If the evaluation under paragraph (b) indicates the dredged or fill material is not a carrier of contaminants, then the required determinations pertaining to the presence and effects of contaminants can be made without testing. Dredged or fill material is most likely to be free from chemical, biological, or other pollutants where it is composed primarily of sand, gravel, or other naturally occurring inert material. Dredged material so composed is

**Environmental Protection Agency**                                    **§ 230.61**

generally found in areas of high current or wave energy such as streams with large bed loads or coastal areas with shifting bars and channels. However, when such material is discolored or contains other indications that contaminants may be present, further inquiry should be made.

(b) The extraction site shall be examined in order to assess whether it is sufficiently removed from sources of pollution to provide reasonable assurance that the proposed discharge material is not a carrier of contaminants. Factors to be considered include but are not limited to:

(1) Potential routes of contaminants or contaminated sediments to the extraction site, based on hydrographic or other maps, aerial photography, or other materials that show watercourses, surface relief, proximity to tidal movement, private and public roads, location of buildings, municipal and industrial areas, and agricultural or forest lands.

(2) Pertinent results from tests previously carried out on the material at the extraction site, or carried out on similar material for other permitted projects in the vicinity. Materials shall be considered similar if the sources of contamination, the physical configuration of the sites and the sediment composition of the materials are comparable, in light of water circulation and stratification, sediment accumulation and general sediment characteristics. Tests from other sites may be relied on only if no changes have occurred at the extraction sites to render the results irrelevant.

(3) Any potential for significant introduction of persistent pesticides from land runoff or percolation;

(4) Any records of spills or disposal of petroleum products or substances designated as hazardous under section 311 of the Clean Water Act (See 40 CFR part 116);

(5) Information in Federal, State and local records indicating significant introduction of pollutants from industries, municipalities, or other sources, including types and amounts of waste materials discharged along the potential routes of contaminants to the extraction site; and

(6) Any possibility of the presence of substantial natural deposits of minerals or other substances which could be released to the aquatic environment in harmful quantities by man-induced discharge activities.

(c) To reach the determinations in § 230.11 involving potential effects of the discharge on the characteristics of the disposal site, the narrative guidance in subparts C through F shall be used along with the general evaluation procedure in § 230.60 and, if necessary, the chemical and biological testing sequence in § 230.61. Where the discharge site is adjacent to the extraction site and subject to the same sources of contaminants, and materials at the two sites are substantially similar, the fact that the material to be discharged may be a carrier of contaminants is not likely to result in degradation of the disposal site. In such circumstances, when dissolved material and suspended particulates can be controlled to prevent carrying pollutants to less contaminated areas, testing will not be required.

(d) Even if the § 230.60(b) evaluation (previous tests, the presence of polluting industries and information about their discharge or runoff into waters of the U.S., bioinventories, etc.) leads to the conclusion that there is a high probability that the material proposed for discharge is a carrier of contaminants, testing may not be necessary if constraints are available to reduce contamination to acceptable levels within the disposal site and to prevent contaminants from being transported beyond the boundaries of the disposal site, if such constraints are acceptable to the permitting authority and the Regional Administrator, and if the potential discharger is willing and able to implement such constraints. However, even if tests are not performed, the permitting authority must still determine the probable impact of the operation on the receiving aquatic ecosystem. Any decision not to test must be explained in the determinations made under § 230.11.

**§ 230.61  Chemical, biological, and physical evaluation and testing.**

NOTE: The Agency is today proposing revised testing guidelines. The evaluation and

271

testing procedures in this section are based on the 1975 section 404(b)(1) interim Guidelines and shall remain in effect until the revised testing guidelines are published as final regulations.

(a) No single test or approach can be applied in all cases to evaluate the effects of proposed discharges of dredged or fill materials. This section provides some guidance in determining which test and/or evaluation procedures are appropriate in a given case. Interim guidance to applicants concerning the applicability of specific approaches or procedures will be furnished by the permitting authority.

(b) *Chemical-biological interactive effects.* The principal concerns of discharge of dredged or fill material that contain contaminants are the potential effects on the water column and on communities of aquatic organisms.

(1) *Evaluation of chemical-biological interactive effects.* Dredged or fill material may be excluded from the evaluation procedures specified in paragraphs (b)(2) and (3) of this section if it is determined, on the basis of the evaluation in § 230.60, that the likelihood of contamination by contaminants is acceptably low, unless the permitting authority, after evaluating and considering any comments received from the Regional Administrator, determines that these procedures are necessary. The Regional Administrator may require, on a case-by-case basis, testing approaches and procedures by stating what additional information is needed through further analyses and how the results of the analyses will be of value in evaluating potential environmental effects.

If the General Evaluation indicates the presence of a sufficiently large number of chemicals to render impractical the identification of all contaminants by chemical testing, information may be obtained from bioassays in lieu of chemical tests.

(2) *Water column effects.* (i) Sediments normally contain constituents that exist in various chemical forms and in various concentrations in several locations within the sediment. An elutriate test may be used to predict the effect on water quality due to release of contaminants from the sediment to the water column. However, in the case of fill material originating on land which

may be a carrier of contaminants, a water leachate test is appropriate.

(ii) Major constituents to be analyzed in the elutriate are those deemed critical by the permitting authority, after evaluating and considering any comments received from the Regional Administrator, and considering results of the evaluation in § 230.60. Elutriate concentrations should be compared to concentrations of the same constituents in water from the disposal site. Results should be evaluated in light of the volume and rate of the intended discharge, the type of discharge, the hydrodynamic regime at the disposal site, and other information relevant to the impact on water quality. The permitting authority should consider the mixing zone in evaluating water column effects. The permitting authority may specify bioassays when such procedures will be of value.

(3) *Effects on benthos.* The permitting authority may use an appropriate benthic bioassay (including bioaccumulation tests) when such procedures will be of value in assessing ecological effects and in establishing discharge conditions.

(c) Procedure for comparison of sites.

(1) When an inventory of the total concentration of contaminants would be of value in comparing sediment at the dredging site with sediment at the disposal site, the permitting authority may require a sediment chemical analysis. Markedly different concentrations of contaminants between the excavation and disposal sites may aid in making an environmental assessment of the proposed disposal operation. Such differences should be interpreted in terms of the potential for harm as supported by any pertinent scientific literature.

(2) When an analysis of biological community structure will be of value to assess the potential for adverse environmental impact at the proposed disposal site, a comparison of the biological characteristics between the excavation and disposal sites may be required by the permitting authority. Biological indicator species may be useful in evaluating the existing degree of stress at both sites. Sensitive species representing community components colonizing various substrate types

272

within the sites should be identified as possible bioassay organisms if tests for toxicity are required. Community structure studies should be performed only when they will be of value in determining discharge conditions. This is particularly applicable to large quantities of dredged material known to contain adverse quantities of toxic materials. Community studies should include benthic organisms such as microbiota and harvestable shellfish and finfish. Abundance, diversity, and distribution should be documented and correlated with substrate type and other appropriate physical and chemical environmental characteristics.

(d) *Physical tests and evaluation.* The effect of a discharge of dredged or fill material on physical substrate characteristics at the disposal site, as well as on the water circulation, fluctuation, salinity, and suspended particulates content there, is important in making factual determinations in §230.11. Where information on such effects is not otherwise available to make these factual determinations, the permitting authority shall require appropriate physical tests and evaluations as are justified and deemed necessary. Such tests may include sieve tests, settleability tests, compaction tests, mixing zone and suspended particulate plume determinations, and site assessments of water flow, circulation, and salinity characteristics.

## Subpart H—Actions To Minimize Adverse Effects

NOTE: There are many actions which can be undertaken in response to §203.10(d) to minimize the adverse effects of discharges of dredged or fill material. Some of these, grouped by type of activity, are listed in this subpart. Additional criteria for compensation measures are provided in subpart J of this part.

### §230.70 Actions concerning the location of the discharge.

The effects of the discharge can be minimized by the choice of the disposal site. Some of the ways to accomplish this are by:

(a) Locating and confining the discharge to minimize smothering of organisms;

(b) Designing the discharge to avoid a disruption of periodic water inundation patterns;

(c) Selecting a disposal site that has been used previously for dredged material discharge;

(d) Selecting a disposal site at which the substrate is composed of material similar to that being discharged, such as discharging sand on sand or mud on mud;

(e) Selecting the disposal site, the discharge point, and the method of discharge to minimize the extent of any plume;

(f) Designing the discharge of dredged or fill material to minimize or prevent the creation of standing bodies of water in areas of normally fluctuating water levels, and minimize or prevent the drainage of areas subject to such fluctuations.

### §230.71 Actions concerning the material to be discharged.

The effects of a discharge can be minimized by treatment of, or limitations on the material itself, such as:

(a) Disposal of dredged material in such a manner that physiochemical conditions are maintained and the potency and availability of pollutants are reduced.

(b) Limiting the solid, liquid, and gaseous components of material to be discharged at a particular site;

(c) Adding treatment substances to the discharge material;

(d) Utilizing chemical flocculants to enhance the deposition of suspended particulates in diked disposal areas.

### §230.72 Actions controlling the material after discharge.

The effects of the dredged or fill material after discharge may be controlled by:

(a) Selecting discharge methods and disposal sites where the potential for erosion, slumping or leaching of materials into the surrounding aquatic ecosystem will be reduced. These sites or methods include, but are not limited to:

(1) Using containment levees, sediment basins, and cover crops to reduce erosion;

(2) Using lined containment areas to reduce leaching where leaching of

273

chemical constituents from the discharged material is expected to be a problem;

(b) Capping in-place contaminated material with clean material or selectively discharging the most contaminated material first to be capped with the remaining material;

(c) Maintaining and containing discharged material properly to prevent point and nonpoint sources of pollution;

(d) Timing the discharge to minimize impact, for instance during periods of unusual high water flows, wind, wave, and tidal actions.

### § 230.73 Actions affecting the method of dispersion.

The effects of a discharge can be minimized by the manner in which it is dispersed, such as:

(a) Where environmentally desirable, distributing the dredged material widely in a thin layer at the disposal site to maintain natural substrate contours and elevation;

(b) Orienting a dredged or fill material mound to minimize undesirable obstruction to the water current or circulation pattern, and utilizing natural bottom contours to minimize the size of the mound;

(c) Using silt screens or other appropriate methods to confine suspended particulate/turbidity to a small area where settling or removal can occur;

(d) Making use of currents and circulation patterns to mix, disperse and dilute the discharge;

(e) Minimizing water column turbidity by using a submerged diffuser system. A similar effect can be accomplished by submerging pipeline discharges or otherwise releasing materials near the bottom;

(f) Selecting sites or managing discharges to confine and minimize the release of suspended particulates to give decreased turbidity levels and to maintain light penetration for organisms;

(g) Setting limitations on the amount of material to be discharged per unit of time or volume of receiving water.

### § 230.74 Actions related to technology.

Discharge technology should be adapted to the needs of each site. In determining whether the discharge operation sufficiently minimizes adverse environmental impacts, the applicant should consider:

(a) Using appropriate equipment or machinery, including protective devices, and the use of such equipment or machinery in activities related to the discharge of dredged or fill material;

(b) Employing appropriate maintenance and operation on equipment or machinery, including adequate training, staffing, and working procedures;

(c) Using machinery and techniques that are especially designed to reduce damage to wetlands. This may include machines equipped with devices that scatter rather than mound excavated materials, machines with specially designed wheels or tracks, and the use of mats under heavy machines to reduce wetland surface compaction and rutting;

(d) Designing access roads and channel spanning structures using culverts, open channels, and diversions that will pass both low and high water flows, accommodate fluctuating water levels, and maintain circulation and faunal movement;

(e) Employing appropriate machinery and methods of transport of the material for discharge.

### § 230.75 Actions affecting plant and animal populations.

Minimization of adverse effects on populations of plants and animals can be achieved by:

(a) Avoiding changes in water current and circulation patterns which would interfere with the movement of animals;

(b) Selecting sites or managing discharges to prevent or avoid creating habitat conducive to the development of undesirable predators or species which have a competitive edge ecologically over indigenous plants or animals;

(c) Avoiding sites having unique habitat or other value, including habitat of threatened or endangered species;

**Environmental Protection Agency**                                    **§ 230.80**

(d) Using planning and construction practices to institute habitat development and restoration to produce a new or modified environmental state of higher ecological value by displacement of some or all of the existing environmental characteristics. Habitat development and restoration techniques can be used to minimize adverse impacts and to compensate for destroyed habitat. Additional criteria for compensation measures are provided in subpart J of this part. Use techniques that have been demonstrated to be effective in circumstances similar to those under consideration wherever possible. Where proposed development and restoration techniques have not yet advanced to the pilot demonstration stage, initiate their use on a small scale to allow corrective action if unanticipated adverse impacts occur;

(e) Timing discharge to avoid spawning or migration seasons and other biologically critical time periods;

(f) Avoiding the destruction of remnant natural sites within areas already affected by development.

[45 FR 85344, Dec. 24, 1980, as amended at 73 FR 19687, Apr. 10, 2008]

**§ 230.76  Actions affecting human use.**

Minimization of adverse effects on human use potential may be achieved by:

(a) Selecting discharge sites and following discharge procedures to prevent or minimize any potential damage to the aesthetically pleasing features of the aquatic site (e.g. viewscapes), particularly with respect to water quality;

(b) Selecting disposal sites which are not valuable as natural aquatic areas;

(c) Timing the discharge to avoid the seasons or periods when human recreational activity associated with the aquatic site is most important;

(d) Following discharge procedures which avoid or minimize the disturbance of aesthetic features of an aquatic site or ecosystem;

(e) Selecting sites that will not be detrimental or increase incompatible human activity, or require the need for frequent dredge or fill maintenance activity in remote fish and wildlife areas;

(f) Locating the disposal site outside of the vicinity of a public water supply intake.

**§ 230.77  Other actions.**

(a) In the case of fills, controlling runoff and other discharges from activities to be conducted on the fill;

(b) In the case of dams, designing water releases to accommodate the needs of fish and wildlife;

(c) In dredging projects funded by Federal agencies other than the Corps of Engineers, maintain desired water quality of the return discharge through agreement with the Federal funding authority on scientifically defensible pollutant concentration levels in addition to any applicable water quality standards;

(d) When a significant ecological change in the aquatic environment is proposed by the discharge of dredged or fill material, the permitting authority should consider the ecosystem that will be lost as well as the environmental benefits of the new system.

## Subpart I—Planning To Shorten Permit Processing Time

**§ 230.80  Advanced identification of disposal areas.**

(a) Consistent with these Guidelines, EPA and the permitting authority, on their own initiative or at the request of any other party and after consultation with any affected State that is not the permitting authority, may identify sites which will be considered as:

(1) Possible future disposal sites, including existing disposal sites and nonsensitive areas; or

(2) Areas generally unsuitable for disposal site specification;

(b) The identification of any area as a possible future disposal site should not be deemed to constitute a permit for the discharge of dredged or fill material within such area or a specification of a disposal site. The identification of areas that generally will not be available for disposal site specification should not be deemed as prohibiting applications for permits to discharge dredged or fill material in such areas. Either type of identification constitutes information to facilitate individual or General permit application and processing.

275

(c) An appropriate public notice of the proposed identification of such areas shall be issued;

(d) To provide the basis for advanced identification of disposal areas, and areas unsuitable for disposal, EPA and the permitting authority shall consider the likelihood that use of the area in question for dredged or fill material disposal will comply with these Guidelines. To facilitate this analysis, EPA and the permitting authority should review available water resources management data including data available from the public, other Federal and State agencies, and information from approved Coastal Zone Management programs and River Basin Plans;

(e) The permitting authority should maintain a public record of the identified areas and a written statement of the basis for identification.

## Subpart J—Compensatory Mitigation for Losses of Aquatic Resources

Source: 73 FR 19687, Apr. 10, 2008, unless otherwise noted.

### § 230.91 Purpose and general considerations.

(a) *Purpose.* (1) The purpose of this subpart is to establish standards and criteria for the use of all types of compensatory mitigation, including on-site and off-site permittee-responsible mitigation, mitigation banks, and in-lieu fee mitigation to offset unavoidable impacts to waters of the United States authorized through the issuance of permits by the U.S. Army Corps of Engineers (Corps) pursuant to section 404 of the Clean Water Act (33 U.S.C. 1344). This subpart implements section 314(b) of the 2004 National Defense Authorization Act (Pub. L. 108–136), which directs that the standards and criteria shall, to the maximum extent practicable, maximize available credits and opportunities for mitigation, provide for regional variations in wetland conditions, functions, and values, and apply equivalent standards and criteria to each type of compensatory mitigation. This subpart is intended to further clarify mitigation requirements established under the Corps and EPA regula-

tions at 33 CFR part 320 and this part, respectively.

(2) This subpart has been jointly developed by the Secretary of the Army, acting through the Chief of Engineers, and the Administrator of the Environmental Protection Agency. From time to time guidance on interpreting and implementing this subpart may be prepared jointly by EPA and the Corps at the national or regional level. No modifications to the basic application, meaning, or intent of this subpart will be made without further joint rulemaking by the Secretary of the Army, acting through the Chief of Engineers and the Administrator of the Environmental Protection Agency, pursuant to the Administrative Procedure Act (5 U.S.C. 551 *et seq.*).

(b) *Applicability.* This subpart does not alter the circumstances under which compensatory mitigation is required or the definition of "waters of the United States," which is provided at § 230.3(s). Use of resources as compensatory mitigation that are not otherwise subject to regulation under section 404 of the Clean Water Act does not in and of itself make them subject to such regulation.

(c) *Sequencing.* (1) Nothing in this section affects the requirement that all DA permits subject to section 404 of the Clean Water Act comply with applicable provisions of this part.

(2) Pursuant to these requirements, the district engineer will issue an individual section 404 permit only upon a determination that the proposed discharge complies with applicable provisions of 40 CFR part 230, including those which require the permit applicant to take all appropriate and practicable steps to avoid and minimize adverse impacts to waters of the United States. Practicable means available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. Compensatory mitigation for unavoidable impacts may be required to ensure that an activity requiring a section 404 permit complies with the Section 404(b)(1) Guidelines.

(3) Compensatory mitigation for unavoidable impacts may be required to

ensure that an activity requiring a section 404 permit complies with the Section 404(b)(1) Guidelines. During the 404(b)(1) Guidelines compliance analysis, the district engineer may determine that a DA permit for the proposed activity cannot be issued because of the lack of appropriate and practicable compensatory mitigation options.

(d) *Accounting for regional variations.* Where appropriate, district engineers shall account for regional characteristics of aquatic resource types, functions and services when determining performance standards and monitoring requirements for compensatory mitigation projects.

(e) *Relationship to other guidance documents.* (1) This subpart applies instead of the ''Federal Guidance for the Establishment, Use, and Operation of Mitigation Banks,'' which was issued on November 28, 1995, the ''Federal Guidance on the Use of In-Lieu Fee Arrangements for Compensatory Mitigation Under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act,'' which was issued on November 7, 2000, and Regulatory Guidance Letter 02–02, ''Guidance on Compensatory Mitigation Projects for Aquatic Resource Impacts Under the Corps Regulatory Program Pursuant to Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act of 1899'' which was issued on December 24, 2002. These guidance documents are no longer to be used as compensatory mitigation policy in the Corps Regulatory Program.

(2) In addition, this subpart also applies instead of the provisions relating to the amount, type, and location of compensatory mitigation projects, including the use of preservation, in the February 6, 1990, Memorandum of Agreement (MOA) between the Department of the Army and the Environmental Protection Agency on the Determination of Mitigation Under the Clean Water Act Section 404(b)(1) Guidelines. All other provisions of this MOA remain in effect.

### §230.92 Definitions.

For the purposes of this subpart, the following terms are defined:

*Adaptive management* means the development of a management strategy that anticipates likely challenges associated with compensatory mitigation projects and provides for the implementation of actions to address those challenges, as well as unforeseen changes to those projects. It requires consideration of the risk, uncertainty, and dynamic nature of compensatory mitigation projects and guides modification of those projects to optimize performance. It includes the selection of appropriate measures that will ensure that the aquatic resource functions are provided and involves analysis of monitoring results to identify potential problems of a compensatory mitigation project and the identification and implementation of measures to rectify those problems.

*Advance credits* means any credits of an approved in-lieu fee program that are available for sale prior to being fulfilled in accordance with an approved mitigation project plan. Advance credit sales require an approved in-lieu fee program instrument that meets all applicable requirements including a specific allocation of advance credits, by service area where applicable. The instrument must also contain a schedule for fulfillment of advance credit sales.

*Buffer* means an upland, wetland, and/or riparian area that protects and/or enhances aquatic resource functions associated with wetlands, rivers, streams, lakes, marine, and estuarine systems from disturbances associated with adjacent land uses.

*Compensatory mitigation* means the restoration (re-establishment or rehabilitation), establishment (creation), enhancement, and/or in certain circumstances preservation of aquatic resources for the purposes of offsetting unavoidable adverse impacts which remain after all appropriate and practicable avoidance and minimization has been achieved.

*Compensatory mitigation project* means compensatory mitigation implemented by the permittee as a requirement of a DA permit (i.e., permittee-responsible mitigation), or by a mitigation bank or an in-lieu fee program.

*Condition* means the relative ability of an aquatic resource to support and maintain a community of organisms

having a species composition, diversity, and functional organization comparable to reference aquatic resources in the region.

*Credit* means a unit of measure (e.g., a functional or areal measure or other suitable metric) representing the accrual or attainment of aquatic functions at a compensatory mitigation site. The measure of aquatic functions is based on the resources restored, established, enhanced, or preserved.

*DA* means Department of the Army.

*Days* means calendar days.

*Debit* means a unit of measure (e.g., a functional or areal measure or other suitable metric) representing the loss of aquatic functions at an impact or project site. The measure of aquatic functions is based on the resources impacted by the authorized activity.

*Enhancement* means the manipulation of the physical, chemical, or biological characteristics of an aquatic resource to heighten, intensify, or improve a specific aquatic resource function(s). Enhancement results in the gain of selected aquatic resource function(s), but may also lead to a decline in other aquatic resource function(s). Enhancement does not result in a gain in aquatic resource area.

*Establishment* (creation) means the manipulation of the physical, chemical, or biological characteristics present to develop an aquatic resource that did not previously exist at an upland site. Establishment results in a gain in aquatic resource area and functions.

*Fulfillment of advance credit sales of an in-lieu fee program* means application of credits released in accordance with a credit release schedule in an approved mitigation project plan to satisfy the mitigation requirements represented by the advance credits. Only after any advance credit sales within a service area have been fulfilled through the application of released credits from an in-lieu fee project (in accordance with the credit release schedule for an approved mitigation project plan), may additional released credits from that project be sold or transferred to permittees. When advance credits are fulfilled, an equal number of new advance credits is restored to the program sponsor for sale or transfer to permit applicants.

*Functional capacity* means the degree to which an area of aquatic resource performs a specific function.

*Functions* means the physical, chemical, and biological processes that occur in ecosystems.

*Impact* means adverse effect.

*In-kind* means a resource of a similar structural and functional type to the impacted resource.

*In-lieu fee program* means a program involving the restoration, establishment, enhancement, and/or preservation of aquatic resources through funds paid to a governmental or non-profit natural resources management entity to satisfy compensatory mitigation requirements for DA permits. Similar to a mitigation bank, an in-lieu fee program sells compensatory mitigation credits to permittees whose obligation to provide compensatory mitigation is then transferred to the in-lieu program sponsor. However, the rules governing the operation and use of in-lieu fee programs are somewhat different from the rules governing operation and use of mitigation banks. The operation and use of an in-lieu fee program are governed by an in-lieu fee program instrument.

*In-lieu fee program instrument* means the legal document for the establishment, operation, and use of an in-lieu fee program.

*Instrument* means mitigation banking instrument or in-lieu fee program instrument.

*Interagency Review Team* (IRT) means an interagency group of federal, tribal, state, and/or local regulatory and resource agency representatives that reviews documentation for, and advises the district engineer on, the establishment and management of a mitigation bank or an in-lieu fee program.

*Mitigation bank* means a site, or suite of sites, where resources (e.g., wetlands, streams, riparian areas) are restored, established, enhanced, and/or preserved for the purpose of providing compensatory mitigation for impacts authorized by DA permits. In general, a mitigation bank sells compensatory mitigation credits to permittees whose obligation to provide compensatory mitigation is then transferred to the

**Environmental Protection Agency**                    **§ 230.92**

mitigation bank sponsor. The operation and use of a mitigation bank are governed by a mitigation banking instrument.

*Mitigation banking instrument* means the legal document for the establishment, operation, and use of a mitigation bank.

*Off-site* means an area that is neither located on the same parcel of land as the impact site, nor on a parcel of land contiguous to the parcel containing the impact site.

*On-site* means an area located on the same parcel of land as the impact site, or on a parcel of land contiguous to the impact site.

*Out-of-kind* means a resource of a different structural and functional type from the impacted resource.

*Performance standards* are observable or measurable physical (including hydrological), chemical and/or biological attributes that are used to determine if a compensatory mitigation project meets its objectives.

*Permittee-responsible mitigation* means an aquatic resource restoration, establishment, enhancement, and/or preservation activity undertaken by the permittee (or an authorized agent or contractor) to provide compensatory mitigation for which the permittee retains full responsibility.

*Preservation* means the removal of a threat to, or preventing the decline of, aquatic resources by an action in or near those aquatic resources. This term includes activities commonly associated with the protection and maintenance of aquatic resources through the implementation of appropriate legal and physical mechanisms. Preservation does not result in a gain of aquatic resource area or functions.

*Re-establishment* means the manipulation of the physical, chemical, or biological characteristics of a site with the goal of returning natural/historic functions to a former aquatic resource. Re-establishment results in rebuilding a former aquatic resource and results in a gain in aquatic resource area and functions.

*Reference aquatic resources* are a set of aquatic resources that represent the full range of variability exhibited by a regional class of aquatic resources as a result of natural processes and anthropogenic disturbances.

*Rehabilitation* means the manipulation of the physical, chemical, or biological characteristics of a site with the goal of repairing natural/historic functions to a degraded aquatic resource. Rehabilitation results in a gain in aquatic resource function, but does not result in a gain in aquatic resource area.

*Release of credits* means a determination by the district engineer, in consultation with the IRT, that credits associated with an approved mitigation plan are available for sale or transfer, or in the case of an in-lieu fee program, for fulfillment of advance credit sales. A proportion of projected credits for a specific mitigation bank or in-lieu fee project may be released upon approval of the mitigation plan, with additional credits released as milestones specified in the credit release schedule are achieved.

*Restoration* means the manipulation of the physical, chemical, or biological characteristics of a site with the goal of returning natural/historic functions to a former or degraded aquatic resource. For the purpose of tracking net gains in aquatic resource area, restoration is divided into two categories: re-establishment and rehabilitation.

*Riparian areas* are lands adjacent to streams, rivers, lakes, and estuarine-marine shorelines. Riparian areas provide a variety of ecological functions and services and help improve or maintain local water quality.

*Service area* means the geographic area within which impacts can be mitigated at a specific mitigation bank or an in-lieu fee program, as designated in its instrument.

*Services* mean the benefits that human populations receive from functions that occur in ecosystems.

*Sponsor* means any public or private entity responsible for establishing, and in most circumstances, operating a mitigation bank or in-lieu fee program.

*Standard permit* means a standard, individual permit issued under the authority of section 404 of the Clean Water Act.

*Temporal loss* is the time lag between the loss of aquatic resource functions caused by the permitted impacts and

the replacement of aquatic resource functions at the compensatory mitigation site. Higher compensation ratios may be required to compensate for temporal loss. When the compensatory mitigation project is initiated prior to, or concurrent with, the permitted impacts, the district engineer may determine that compensation for temporal loss is not necessary, unless the resource has a long development time.

*Watershed* means a land area that drains to a common waterway, such as a stream, lake, estuary, wetland, or ultimately the ocean.

*Watershed approach* means an analytical process for making compensatory mitigation decisions that support the sustainability or improvement of aquatic resources in a watershed. It involves consideration of watershed needs, and how locations and types of compensatory mitigation projects address those needs. A landscape perspective is used to identify the types and locations of compensatory mitigation projects that will benefit the watershed and offset losses of aquatic resource functions and services caused by activities authorized by DA permits. The watershed approach may involve consideration of landscape scale, historic and potential aquatic resource conditions, past and projected aquatic resource impacts in the watershed, and terrestrial connections between aquatic resources when determining compensatory mitigation requirements for DA permits.

*Watershed plan* means a plan developed by federal, tribal, state, and/or local government agencies or appropriate non-governmental organizations, in consultation with relevant stakeholders, for the specific goal of aquatic resource restoration, establishment, enhancement, and preservation. A watershed plan addresses aquatic resource conditions in the watershed, multiple stakeholder interests, and land uses. Watershed plans may also identify priority sites for aquatic resource restoration and protection. Examples of watershed plans include special area management plans, advance identification programs, and wetland management plans.

### § 230.93  General compensatory mitigation requirements.

(a) *General considerations.* (1) The fundamental objective of compensatory mitigation is to offset environmental losses resulting from unavoidable impacts to waters of the United States authorized by DA permits. The district engineer must determine the compensatory mitigation to be required in a DA permit, based on what is practicable and capable of compensating for the aquatic resource functions that will be lost as a result of the permitted activity. When evaluating compensatory mitigation options, the district engineer will consider what would be environmentally preferable. In making this determination, the district engineer must assess the likelihood for ecological success and sustainability, the location of the compensation site relative to the impact site and their significance within the watershed, and the costs of the compensatory mitigation project. In many cases, the environmentally preferable compensatory mitigation may be provided through mitigation banks or in-lieu fee programs because they usually involve consolidating compensatory mitigation projects where ecologically appropriate, consolidating resources, providing financial planning and scientific expertise (which often is not practical for permittee-responsible compensatory mitigation projects), reducing temporal losses of functions, and reducing uncertainty over project success. Compensatory mitigation requirements must be commensurate with the amount and type of impact that is associated with a particular DA permit. Permit applicants are responsible for proposing an appropriate compensatory mitigation option to offset unavoidable impacts.

(2) Compensatory mitigation may be performed using the methods of restoration, enhancement, establishment, and in certain circumstances preservation. Restoration should generally be the first option considered because the likelihood of success is greater and the impacts to potentially ecologically important uplands are reduced compared to establishment, and the potential gains in terms of aquatic resource

**Environmental Protection Agency**                                    **§ 230.93**

functions are greater, compared to enhancement and preservation.

(3) Compensatory mitigation projects may be sited on public or private lands. Credits for compensatory mitigation projects on public land must be based solely on aquatic resource functions provided by the compensatory mitigation project, over and above those provided by public programs already planned or in place. All compensatory mitigation projects must comply with the standards in this part, if they are to be used to provide compensatory mitigation for activities authorized by DA permits, regardless of whether they are sited on public or private lands and whether the sponsor is a governmental or private entity.

(b) *Type and location of compensatory mitigation.* (1) When considering options for successfully providing the required compensatory mitigation, the district engineer shall consider the type and location options in the order presented in paragraphs (b)(2) through (b)(6) of this section. In general, the required compensatory mitigation should be located within the same watershed as the impact site, and should be located where it is most likely to successfully replace lost functions and services, taking into account such watershed scale features as aquatic habitat diversity, habitat connectivity, relationships to hydrologic sources (including the availability of water rights), trends in land use, ecological benefits, and compatibility with adjacent land uses. When compensating for impacts to marine resources, the location of the compensatory mitigation site should be chosen to replace lost functions and services within the same marine ecological system (e.g., reef complex, littoral drift cell). Compensation for impacts to aquatic resources in coastal watersheds (watersheds that include a tidal water body) should also be located in a coastal watershed where practicable. Compensatory mitigation projects should not be located where they will increase risks to aviation by attracting wildlife to areas where aircraft-wildlife strikes may occur (e.g., near airports).

(2) *Mitigation bank credits.* When permitted impacts are located within the service area of an approved mitigation bank, and the bank has the appropriate number and resource type of credits available, the permittee's compensatory mitigation requirements may be met by securing those credits from the sponsor. Since an approved instrument (including an approved mitigation plan and appropriate real estate and financial assurances) for a mitigation bank is required to be in place before its credits can begin to be used to compensate for authorized impacts, use of a mitigation bank can help reduce risk and uncertainty, as well as temporal loss of resource functions and services. Mitigation bank credits are not released for debiting until specific milestones associated with the mitigation bank site's protection and development are achieved, thus use of mitigation bank credits can also help reduce risk that mitigation will not be fully successful. Mitigation banks typically involve larger, more ecologically valuable parcels, and more rigorous scientific and technical analysis, planning and implementation than permittee-responsible mitigation. Also, development of a mitigation bank requires site identification in advance, project-specific planning, and significant investment of financial resources that is often not practicable for many in-lieu fee programs. For these reasons, the district engineer should give preference to the use of mitigation bank credits when these considerations are applicable. However, these same considerations may also be used to override this preference, where appropriate, as, for example, where an in-lieu fee program has released credits available from a specific approved in-lieu fee project, or a permittee-responsible project will restore an outstanding resource based on rigorous scientific and technical analysis.

(3) *In-lieu fee program credits.* Where permitted impacts are located within the service area of an approved in-lieu fee program, and the sponsor has the appropriate number and resource type of credits available, the permittee's compensatory mitigation requirements may be met by securing those credits from the sponsor. Where permitted impacts are not located in the service area of an approved mitigation bank, or the approved mitigation bank does not have the appropriate number and

281

resource type of credits available to offset those impacts, in-lieu fee mitigation, if available, is generally preferable to permittee-responsible mitigation. In-lieu fee projects typically involve larger, more ecologically valuable parcels, and more rigorous scientific and technical analysis, planning and implementation than permittee-responsible mitigation. They also devote significant resources to identifying and addressing high-priority resource needs on a watershed scale, as reflected in their compensation planning framework. For these reasons, the district engineer should give preference to in-lieu fee program credits over permittee-responsible mitigation, where these considerations are applicable. However, as with the preference for mitigation bank credits, these same considerations may be used to override this preference where appropriate. Additionally, in cases where permittee-responsible mitigation is likely to successfully meet performance standards before advance credits secured from an in-lieu fee program are fulfilled, the district engineer should also give consideration to this factor in deciding between in-lieu fee mitigation and permittee-responsible mitigation.

(4) *Permittee-responsible mitigation under a watershed approach.* Where permitted impacts are not in the service area of an approved mitigation bank or in-lieu fee program that has the appropriate number and resource type of credits available, permittee-responsible mitigation is the only option. Where practicable and likely to be successful and sustainable, the resource type and location for the required permittee-responsible compensatory mitigation should be determined using the principles of a watershed approach as outlined in paragraph (c) of this section.

(5) *Permittee-responsible mitigation through on-site and in-kind mitigation.* In cases where a watershed approach is not practicable, the district engineer should consider opportunities to offset anticipated aquatic resource impacts by requiring on-site and in-kind compensatory mitigation. The district engineer must also consider the practicability of on-site compensatory mitigation and its compatibility with the proposed project.

(6) *Permittee-responsible mitigation through off-site and/or out-of-kind mitigation.* If, after considering opportunities for on-site, in-kind compensatory mitigation as provided in paragraph (b)(5) of this section, the district engineer determines that these compensatory mitigation opportunities are not practicable, are unlikely to compensate for the permitted impacts, or will be incompatible with the proposed project, and an alternative, practicable off-site and/or out-of-kind mitigation opportunity is identified that has a greater likelihood of offsetting the permitted impacts or is environmentally preferable to on-site or in-kind mitigation, the district engineer should require that this alternative compensatory mitigation be provided.

(c) *Watershed approach to compensatory mitigation.* (1) The district engineer must use a watershed approach to establish compensatory mitigation requirements in DA permits to the extent appropriate and practicable. Where a watershed plan is available, the district engineer will determine whether the plan is appropriate for use in the watershed approach for compensatory mitigation. In cases where the district engineer determines that an appropriate watershed plan is available, the watershed approach should be based on that plan. Where no such plan is available, the watershed approach should be based on information provided by the project sponsor or available from other sources. The ultimate goal of a watershed approach is to maintain and improve the quality and quantity of aquatic resources within watersheds through strategic selection of compensatory mitigation sites.

(2) *Considerations.* (i) A watershed approach to compensatory mitigation considers the importance of landscape position and resource type of compensatory mitigation projects for the sustainability of aquatic resource functions within the watershed. Such an approach considers how the types and locations of compensatory mitigation projects will provide the desired aquatic resource functions, and will continue to function over time in a changing landscape. It also considers the habitat requirements of important species, habitat loss or conversion trends,

sources of watershed impairment, and current development trends, as well as the requirements of other regulatory and non-regulatory programs that affect the watershed, such as storm water management or habitat conservation programs. It includes the protection and maintenance of terrestrial resources, such as non-wetland riparian areas and uplands, when those resources contribute to or improve the overall ecological functioning of aquatic resources in the watershed. Compensatory mitigation requirements determined through the watershed approach should not focus exclusively on specific functions (e.g., water quality or habitat for certain species), but should provide, where practicable, the suite of functions typically provided by the affected aquatic resource.

(ii) Locational factors (e.g., hydrology, surrounding land use) are important to the success of compensatory mitigation for impacted habitat functions and may lead to siting of such mitigation away from the project area. However, consideration should also be given to functions and services (e.g., water quality, flood control, shoreline protection) that will likely need to be addressed at or near the areas impacted by the permitted impacts.

(iii) A watershed approach may include on-site compensatory mitigation, off-site compensatory mitigation (including mitigation banks or in-lieu fee programs), or a combination of on-site and off-site compensatory mitigation.

(iv) A watershed approach to compensatory mitigation should include, to the extent practicable, inventories of historic and existing aquatic resources, including identification of degraded aquatic resources, and identification of immediate and long-term aquatic resource needs within watersheds that can be met through permittee-responsible mitigation projects, mitigation banks, or in-lieu fee programs. Planning efforts should identify and prioritize aquatic resource restoration, establishment, and enhancement activities, and preservation of existing aquatic resources that are important for maintaining or improving ecological functions of the watershed. The identification and prioritization of resource needs should be as specific as possible, to enhance the usefulness of the approach in determining compensatory mitigation requirements.

(v) A watershed approach is not appropriate in areas where watershed boundaries do not exist, such as marine areas. In such cases, an appropriate spatial scale should be used to replace lost functions and services within the same ecological system (e.g., reef complex, littoral drift cell).

(3) *Information Needs.* (i) In the absence of a watershed plan determined by the district engineer under paragraph (c)(1) of this section to be appropriate for use in the watershed approach, the district engineer will use a watershed approach based on analysis of information regarding watershed conditions and needs, including potential sites for aquatic resource restoration activities and priorities for aquatic resource restoration and preservation. Such information includes: Current trends in habitat loss or conversion; cumulative impacts of past development activities, current development trends, the presence and needs of sensitive species; site conditions that favor or hinder the success of compensatory mitigation projects; and chronic environmental problems such as flooding or poor water quality.

(ii) This information may be available from sources such as wetland maps; soil surveys; U.S. Geological Survey topographic and hydrologic maps; aerial photographs; information on rare, endangered and threatened species and critical habitat; local ecological reports or studies; and other information sources that could be used to identify locations for suitable compensatory mitigation projects in the watershed.

(iii) The level of information and analysis needed to support a watershed approach must be commensurate with the scope and scale of the proposed impacts requiring a DA permit, as well as the functions lost as a result of those impacts.

(4) *Watershed Scale.* The size of watershed addressed using a watershed approach should not be larger than is appropriate to ensure that the aquatic resources provided through compensation activities will effectively compensate

for adverse environmental impacts resulting from activities authorized by DA permits. The district engineer should consider relevant environmental factors and appropriate locally-developed standards and criteria when determining the appropriate watershed scale in guiding compensation activities.

(d) *Site selection.* (1) The compensatory mitigation project site must be ecologically suitable for providing the desired aquatic resource functions. In determining the ecological suitability of the compensatory mitigation project site, the district engineer must consider, to the extent practicable, the following factors:

(i) Hydrological conditions, soil characteristics, and other physical and chemical characteristics;

(ii) Watershed-scale features, such as aquatic habitat diversity, habitat connectivity, and other landscape scale functions;

(iii) The size and location of the compensatory mitigation site relative to hydrologic sources (including the availability of water rights) and other ecological features;

(iv) Compatibility with adjacent land uses and watershed management plans;

(v) Reasonably foreseeable effects the compensatory mitigation project will have on ecologically important aquatic or terrestrial resources (e.g., shallow sub-tidal habitat, mature forests), cultural sites, or habitat for federally- or state-listed threatened and endangered species; and

(vi) Other relevant factors including, but not limited to, development trends, anticipated land use changes, habitat status and trends, the relative locations of the impact and mitigation sites in the stream network, local or regional goals for the restoration or protection of particular habitat types or functions (e.g., re-establishment of habitat corridors or habitat for species of concern), water quality goals, floodplain management goals, and the relative potential for chemical contamination of the aquatic resources.

(2) District engineers may require on-site, off-site, or a combination of on-site and off-site compensatory mitigation to replace permitted losses of aquatic resource functions and services.

(3) Applicants should propose compensation sites adjacent to existing aquatic resources or where aquatic resources previously existed.

(e) *Mitigation type.* (1) In general, in-kind mitigation is preferable to out-of-kind mitigation because it is most likely to compensate for the functions and services lost at the impact site. For example, tidal wetland compensatory mitigation projects are most likely to compensate for unavoidable impacts to tidal wetlands, while perennial stream compensatory mitigation projects are most likely to compensate for unavoidable impacts to perennial streams. Thus, except as provided in paragraph (e)(2) of this section, the required compensatory mitigation shall be of a similar type to the affected aquatic resource.

(2) If the district engineer determines, using the watershed approach in accordance with paragraph (c) of this section that out-of-kind compensatory mitigation will serve the aquatic resource needs of the watershed, the district engineer may authorize the use of such out-of-kind compensatory mitigation. The basis for authorization of out-of-kind compensatory mitigation must be documented in the administrative record for the permit action.

(3) For difficult-to-replace resources (e.g., bogs, fens, springs, streams, Atlantic white cedar swamps) if further avoidance and minimization is not practicable, the required compensation should be provided, if practicable, through in-kind rehabilitation, enhancement, or preservation since there is greater certainty that these methods of compensation will successfully offset permitted impacts.

(f) *Amount of compensatory mitigation.* (1) If the district engineer determines that compensatory mitigation is necessary to offset unavoidable impacts to aquatic resources, the amount of required compensatory mitigation must be, to the extent practicable, sufficient to replace lost aquatic resource functions. In cases where appropriate functional or condition assessment methods or other suitable metrics are available, these methods should be used where practicable to determine how

**Environmental Protection Agency**                                **§ 230.93**

much compensatory mitigation is required. If a functional or condition assessment or other suitable metric is not used, a minimum one-to-one acreage or linear foot compensation ratio must be used.

(2) The district engineer must require a mitigation ratio greater than one-to-one where necessary to account for the method of compensatory mitigation (e.g., preservation), the likelihood of success, differences between the functions lost at the impact site and the functions expected to be produced by the compensatory mitigation project, temporal losses of aquatic resource functions, the difficulty of restoring or establishing the desired aquatic resource type and functions, and/or the distance between the affected aquatic resource and the compensation site. The rationale for the required replacement ratio must be documented in the administrative record for the permit action.

(3) If an in-lieu fee program will be used to provide the required compensatory mitigation, and the appropriate number and resource type of released credits are not available, the district engineer must require sufficient compensation to account for the risk and uncertainty associated with in-lieu fee projects that have not been implemented before the permitted impacts have occurred.

(g) *Use of mitigation banks and in-lieu fee programs.* Mitigation banks and in-lieu fee programs may be used to compensate for impacts to aquatic resources authorized by general permits and individual permits, including after-the-fact permits, in accordance with the preference hierarchy in paragraph (b) of this section. Mitigation banks and in-lieu fee programs may also be used to satisfy requirements arising out of an enforcement action, such as supplemental environmental projects.

(h) *Preservation.* (1) Preservation may be used to provide compensatory mitigation for activities authorized by DA permits when all the following criteria are met:

(i) The resources to be preserved provide important physical, chemical, or biological functions for the watershed;

(ii) The resources to be preserved contribute significantly to the ecological sustainability of the watershed. In determining the contribution of those resources to the ecological sustainability of the watershed, the district engineer must use appropriate quantitative assessment tools, where available;

(iii) Preservation is determined by the district engineer to be appropriate and practicable;

(iv) The resources are under threat of destruction or adverse modifications; and

(v) The preserved site will be permanently protected through an appropriate real estate or other legal instrument (e.g., easement, title transfer to state resource agency or land trust).

(2) Where preservation is used to provide compensatory mitigation, to the extent appropriate and practicable the preservation shall be done in conjunction with aquatic resource restoration, establishment, and/or enhancement activities. This requirement may be waived by the district engineer where preservation has been identified as a high priority using a watershed approach described in paragraph (c) of this section, but compensation ratios shall be higher.

(i) *Buffers.* District engineers may require the restoration, establishment, enhancement, and preservation, as well as the maintenance, of riparian areas and/or buffers around aquatic resources where necessary to ensure the long-term viability of those resources. Buffers may also provide habitat or corridors necessary for the ecological functioning of aquatic resources. If buffers are required by the district engineer as part of the compensatory mitigation project, compensatory mitigation credit will be provided for those buffers.

(j) *Relationship to other federal, tribal, state, and local programs.* (1) Compensatory mitigation projects for DA permits may also be used to satisfy the environmental requirements of other programs, such as tribal, state, or local wetlands regulatory programs, other federal programs such as the Surface Mining Control and Reclamation Act, Corps civil works projects, and Department of Defense military construction projects, consistent with the terms and

285

requirements of these programs and subject to the following considerations:

(i) The compensatory mitigation project must include appropriate compensation required by the DA permit for unavoidable impacts to aquatic resources authorized by that permit.

(ii) Under no circumstances may the same credits be used to provide mitigation for more than one permitted activity. However, where appropriate, compensatory mitigation projects, including mitigation banks and in-lieu fee projects, may be designed to holistically address requirements under multiple programs and authorities for the same activity.

(2) Except for projects undertaken by federal agencies, or where federal funding is specifically authorized to provide compensatory mitigation, federally-funded aquatic resource restoration or conservation projects undertaken for purposes other than compensatory mitigation, such as the Wetlands Reserve Program, Conservation Reserve Program, and Partners for Wildlife Program activities, cannot be used for the purpose of generating compensatory mitigation credits for activities authorized by DA permits. However, compensatory mitigation credits may be generated by activities undertaken in conjunction with, but supplemental to, such programs in order to maximize the overall ecological benefits of the restoration or conservation project.

(3) Compensatory mitigation projects may also be used to provide compensatory mitigation under the Endangered Species Act or for Habitat Conservation Plans, as long as they comply with the requirements of paragraph (j)(1) of this section.

(k) *Permit conditions.* (1) The compensatory mitigation requirements for a DA permit, including the amount and type of compensatory mitigation, must be clearly stated in the special conditions of the individual permit or general permit verification (see 33 CFR 325.4 and 330.6(a)). The special conditions must be enforceable.

(2) For an individual permit that requires permittee-responsible mitigation, the special conditions must:

(i) Identify the party responsible for providing the compensatory mitigation;

(ii) Incorporate, by reference, the final mitigation plan approved by the district engineer;

(iii) State the objectives, performance standards, and monitoring required for the compensatory mitigation project, unless they are provided in the approved final mitigation plan; and

(iv) Describe any required financial assurances or long-term management provisions for the compensatory mitigation project, unless they are specified in the approved final mitigation plan.

(3) For a general permit activity that requires permittee-responsible compensatory mitigation, the special conditions must describe the compensatory mitigation proposal, which may be either conceptual or detailed. The general permit verification must also include a special condition that states that the permittee cannot commence work in waters of the United States until the district engineer approves the final mitigation plan, unless the district engineer determines that such a special condition is not practicable and not necessary to ensure timely completion of the required compensatory mitigation. To the extent appropriate and practicable, special conditions of the general permit verification should also address the requirements of paragraph (k)(2) of this section.

(4) If a mitigation bank or in-lieu fee program is used to provide the required compensatory mitigation, the special conditions must indicate whether a mitigation bank or in-lieu fee program will be used, and specify the number and resource type of credits the permittee is required to secure. In the case of an individual permit, the special condition must also identify the specific mitigation bank or in-lieu fee program that will be used. For general permit verifications, the special conditions may either identify the specific mitigation bank or in-lieu fee program, or state that the specific mitigation bank or in-lieu fee program used to provide the required compensatory mitigation must be approved by the district engineer before the credits are secured.

(l) *Party responsible for compensatory mitigation.* (1) For permittee-responsible mitigation, the special conditions of the DA permit must clearly indicate the party or parties responsible for the implementation, performance, and long-term management of the compensatory mitigation project.

(2) For mitigation banks and in-lieu fee programs, the instrument must clearly indicate the party or parties responsible for the implementation, performance, and long-term management of the compensatory mitigation project(s). The instrument must also contain a provision expressing the sponsor's agreement to assume responsibility for a permittee's compensatory mitigation requirements, once that permittee has secured the appropriate number and resource type of credits from the sponsor and the district engineer has received the documentation described in paragraph (l)(3) of this section.

(3) If use of a mitigation bank or in-lieu fee program is approved by the district engineer to provide part or all of the required compensatory mitigation for a DA permit, the permittee retains responsibility for providing the compensatory mitigation until the appropriate number and resource type of credits have been secured from a sponsor and the district engineer has received documentation that confirms that the sponsor has accepted the responsibility for providing the required compensatory mitigation. This documentation may consist of a letter or form signed by the sponsor, with the permit number and a statement indicating the number and resource type of credits that have been secured from the sponsor. Copies of this documentation will be retained in the administrative records for both the permit and the instrument. If the sponsor fails to provide the required compensatory mitigation, the district engineer may pursue measures against the sponsor to ensure compliance.

(m) *Timing.* Implementation of the compensatory mitigation project shall be, to the maximum extent practicable, in advance of or concurrent with the activity causing the authorized impacts. The district engineer shall require, to the extent appropriate and practicable, additional compensatory mitigation to offset temporal losses of aquatic functions that will result from the permitted activity.

(n) *Financial assurances.* (1) The district engineer shall require sufficient financial assurances to ensure a high level of confidence that the compensatory mitigation project will be successfully completed, in accordance with applicable performance standards. In cases where an alternate mechanism is available to ensure a high level of confidence that the compensatory mitigation will be provided and maintained (e.g., a formal, documented commitment from a government agency or public authority) the district engineer may determine that financial assurances are not necessary for that compensatory mitigation project.

(2) The amount of the required financial assurances must be determined by the district engineer, in consultation with the project sponsor, and must be based on the size and complexity of the compensatory mitigation project, the degree of completion of the project at the time of project approval, the likelihood of success, the past performance of the project sponsor, and any other factors the district engineer deems appropriate. Financial assurances may be in the form of performance bonds, escrow accounts, casualty insurance, letters of credit, legislative appropriations for government sponsored projects, or other appropriate instruments, subject to the approval of the district engineer. The rationale for determining the amount of the required financial assurances must be documented in the administrative record for either the DA permit or the instrument. In determining the assurance amount, the district engineer shall consider the cost of providing replacement mitigation, including costs for land acquisition, planning and engineering, legal fees, mobilization, construction, and monitoring.

(3) If financial assurances are required, the DA permit must include a special condition requiring the financial assurances to be in place prior to commencing the permitted activity.

(4) Financial assurances shall be phased out once the compensatory mitigation project has been determined

by the district engineer to be successful in accordance with its performance standards. The DA permit or instrument must clearly specify the conditions under which the financial assurances are to be released to the permittee, sponsor, and/or other financial assurance provider, including, as appropriate, linkage to achievement of performance standards, adaptive management, or compliance with special conditions.

(5) A financial assurance must be in a form that ensures that the district engineer will receive notification at least 120 days in advance of any termination or revocation. For third-party assurance providers, this may take the form of a contractual requirement for the assurance provider to notify the district engineer at least 120 days before the assurance is revoked or terminated.

(6) Financial assurances shall be payable at the direction of the district engineer to his designee or to a standby trust agreement. When a standby trust is used (e.g., with performance bonds or letters of credit) all amounts paid by the financial assurance provider shall be deposited directly into the standby trust fund for distribution by the trustee in accordance with the district engineer's instructions.

(o) *Compliance with applicable law.* The compensatory mitigation project must comply with all applicable federal, state, and local laws. The DA permit, mitigation banking instrument, or in-lieu fee program instrument must not require participation by the Corps or any other federal agency in project management, including receipt or management of financial assurances or long-term financing mechanisms, except as determined by the Corps or other agency to be consistent with its statutory authority, mission, and priorities.

## § 230.94   Planning and documentation.

(a) *Pre-application consultations.* Potential applicants for standard permits are encouraged to participate in pre-application meetings with the Corps and appropriate agencies to discuss potential mitigation requirements and information needs.

(b) *Public review and comment.* (1) For an activity that requires a standard DA permit pursuant to section 404 of the Clean Water Act, the public notice for the proposed activity must contain a statement explaining how impacts associated with the proposed activity are to be avoided, minimized, and compensated for. This explanation shall address, to the extent that such information is provided in the mitigation statement required by 33 CFR 325.1(d)(7), the proposed avoidance and minimization and the amount, type, and location of any proposed compensatory mitigation, including any out-of-kind compensation, or indicate an intention to use an approved mitigation bank or in-lieu fee program. The level of detail provided in the public notice must be commensurate with the scope and scale of the impacts. The notice shall not include information that the district engineer and the permittee believe should be kept confidential for business purposes, such as the exact location of a proposed mitigation site that has not yet been secured. The permittee must clearly identify any information being claimed as confidential in the mitigation statement when submitted. In such cases, the notice must still provide enough information to enable the public to provide meaningful comment on the proposed mitigation.

(2) For individual permits, district engineers must consider any timely comments and recommendations from other federal agencies; tribal, state, or local governments; and the public.

(3) For activities authorized by letters of permission or general permits, the review and approval process for compensatory mitigation proposals and plans must be conducted in accordance with the terms and conditions of those permits and applicable regulations including the applicable provisions of this part.

(c) *Mitigation plan.* (1) *Preparation and Approval.* (i) For individual permits, the permittee must prepare a draft mitigation plan and submit it to the district engineer for review. After addressing any comments provided by the district engineer, the permittee must prepare a final mitigation plan, which

**Environmental Protection Agency** §230.94

must be approved by the district engineer prior to issuing the individual permit. The approved final mitigation plan must be incorporated into the individual permit by reference. The final mitigation plan must include the items described in paragraphs (c)(2) through (c)(14) of this section, but the level of detail of the mitigation plan should be commensurate with the scale and scope of the impacts. As an alternative, the district engineer may determine that it would be more appropriate to address any of the items described in paragraphs (c)(2) through (c)(14) of this section as permit conditions, instead of components of a compensatory mitigation plan. For permittees who intend to fulfill their compensatory mitigation obligations by securing credits from approved mitigation banks or in-lieu fee programs, their mitigation plans need include only the items described in paragraphs (c)(5) and (c)(6) of this section, and the name of the specific mitigation bank or in-lieu fee program to be used.

(ii) For general permits, if compensatory mitigation is required, the district engineer may approve a conceptual or detailed compensatory mitigation plan to meet required time frames for general permit verifications, but a final mitigation plan incorporating the elements in paragraphs (c)(2) through (c)(14) of this section, at a level of detail commensurate with the scale and scope of the impacts, must be approved by the district engineer before the permittee commences work in waters of the United States. As an alternative, the district engineer may determine that it would be more appropriate to address any of the items described in paragraphs (c)(2) through (c)(14) of this section as permit conditions, instead of components of a compensatory mitigation plan. For permittees who intend to fulfill their compensatory mitigation obligations by securing credits from approved mitigation banks or in-lieu fee programs, their mitigation plans need include only the items described in paragraphs (c)(5) and (c)(6) of this section, and either the name of the specific mitigation bank or in-lieu fee program to be used or a statement indicating that a mitigation bank or in-lieu fee program will be used (contin-

gent upon approval by the district engineer).

(iii) Mitigation banks and in-lieu fee programs must prepare a mitigation plan including the items in paragraphs (c)(2) through (c)(14) of this section for each separate compensatory mitigation project site. For mitigation banks and in-lieu fee programs, the preparation and approval process for mitigation plans is described in §230.98.

(2) *Objectives.* A description of the resource type(s) and amount(s) that will be provided, the method of compensation (i.e., restoration, establishment, enhancement, and/or preservation), and the manner in which the resource functions of the compensatory mitigation project will address the needs of the watershed, ecoregion, physiographic province, or other geographic area of interest.

(3) *Site selection.* A description of the factors considered during the site selection process. This should include consideration of watershed needs, on-site alternatives where applicable, and the practicability of accomplishing ecologically self-sustaining aquatic resource restoration, establishment, enhancement, and/or preservation at the compensatory mitigation project site. (See §230.93(d).)

(4) *Site protection instrument.* A description of the legal arrangements and instrument, including site ownership, that will be used to ensure the long-term protection of the compensatory mitigation project site (see §230.97(a)).

(5) *Baseline information.* A description of the ecological characteristics of the proposed compensatory mitigation project site and, in the case of an application for a DA permit, the impact site. This may include descriptions of historic and existing plant communities, historic and existing hydrology, soil conditions, a map showing the locations of the impact and mitigation site(s) or the geographic coordinates for those site(s), and other site characteristics appropriate to the type of resource proposed as compensation. The baseline information should also include a delineation of waters of the United States on the proposed compensatory mitigation project site. A prospective permittee planning to secure credits from an approved mitigation

bank or in-lieu fee program only needs to provide baseline information about the impact site, not the mitigation bank or in-lieu fee project site.

(6) *Determination of credits.* A description of the number of credits to be provided, including a brief explanation of the rationale for this determination. (See § 230.93(f).)

(i) For permittee-responsible mitigation, this should include an explanation of how the compensatory mitigation project will provide the required compensation for unavoidable impacts to aquatic resources resulting from the permitted activity.

(ii) For permittees intending to secure credits from an approved mitigation bank or in-lieu fee program, it should include the number and resource type of credits to be secured and how these were determined.

(7) *Mitigation work plan.* Detailed written specifications and work descriptions for the compensatory mitigation project, including, but not limited to, the geographic boundaries of the project; construction methods, timing, and sequence; source(s) of water, including connections to existing waters and uplands; methods for establishing the desired plant community; plans to control invasive plant species; the proposed grading plan, including elevations and slopes of the substrate; soil management; and erosion control measures. For stream compensatory mitigation projects, the mitigation work plan may also include other relevant information, such as planform geometry, channel form (e.g., typical channel cross-sections), watershed size, design discharge, and riparian area plantings.

(8) *Maintenance plan.* A description and schedule of maintenance requirements to ensure the continued viability of the resource once initial construction is completed.

(9) *Performance standards.* Ecologically-based standards that will be used to determine whether the compensatory mitigation project is achieving its objectives. (See § 230.95.)

(10) *Monitoring requirements.* A description of parameters to be monitored in order to determine if the compensatory mitigation project is on track to meet performance standards

and if adaptive management is needed. A schedule for monitoring and reporting on monitoring results to the district engineer must be included. (See § 230.96.)

(11) *Long-term management plan.* A description of how the compensatory mitigation project will be managed after performance standards have been achieved to ensure the long-term sustainability of the resource, including long-term financing mechanisms and the party responsible for long-term management. (See § 230.97(d).)

(12) *Adaptive management plan.* A management strategy to address unforeseen changes in site conditions or other components of the compensatory mitigation project, including the party or parties responsible for implementing adaptive management measures. The adaptive management plan will guide decisions for revising compensatory mitigation plans and implementing measures to address both foreseeable and unforeseen circumstances that adversely affect compensatory mitigation success. (See § 230.97(c).)

(13) *Financial assurances.* A description of financial assurances that will be provided and how they are sufficient to ensure a high level of confidence that the compensatory mitigation project will be successfully completed, in accordance with its performance standards (see § 230.93(n)).

(14) *Other information.* The district engineer may require additional information as necessary to determine the appropriateness, feasibility, and practicability of the compensatory mitigation project.

§ 230.95  Ecological performance standards.

(a) The approved mitigation plan must contain performance standards that will be used to assess whether the project is achieving its objectives. Performance standards should relate to the objectives of the compensatory mitigation project, so that the project can be objectively evaluated to determine if it is developing into the desired resource type, providing the expected functions, and attaining any other applicable metrics (e.g., acres).

(b) Performance standards must be based on attributes that are objective

and verifiable. Ecological performance standards must be based on the best available science that can be measured or assessed in a practicable manner. Performance standards may be based on variables or measures of functional capacity described in functional assessment methodologies, measurements of hydrology or other aquatic resource characteristics, and/or comparisons to reference aquatic resources of similar type and landscape position. The use of reference aquatic resources to establish performance standards will help ensure that those performance standards are reasonably achievable, by reflecting the range of variability exhibited by the regional class of aquatic resources as a result of natural processes and anthropogenic disturbances. Performance standards based on measurements of hydrology should take into consideration the hydrologic variability exhibited by reference aquatic resources, especially wetlands. Where practicable, performance standards should take into account the expected stages of the aquatic resource development process, in order to allow early identification of potential problems and appropriate adaptive management.

§230.96 **Monitoring.**

(a) *General.* (1) Monitoring the compensatory mitigation project site is necessary to determine if the project is meeting its performance standards, and to determine if measures are necessary to ensure that the compensatory mitigation project is accomplishing its objectives. The submission of monitoring reports to assess the development and condition of the compensatory mitigation project is required, but the content and level of detail for those monitoring reports must be commensurate with the scale and scope of the compensatory mitigation project, as well as the compensatory mitigation project type. The mitigation plan must address the monitoring requirements for the compensatory mitigation project, including the parameters to be monitored, the length of the monitoring period, the party responsible for conducting the monitoring, the frequency for submitting monitoring reports to the district engineer, and the party re-

sponsible for submitting those monitoring reports to the district engineer.

(2) The district engineer may conduct site inspections on a regular basis (e.g., annually) during the monitoring period to evaluate mitigation site performance.

(b) *Monitoring period.* The mitigation plan must provide for a monitoring period that is sufficient to demonstrate that the compensatory mitigation project has met performance standards, but not less than five years. A longer monitoring period must be required for aquatic resources with slow development rates (e.g., forested wetlands, bogs). Following project implementation, the district engineer may reduce or waive the remaining monitoring requirements upon a determination that the compensatory mitigation project has achieved its performance standards. Conversely the district engineer may extend the original monitoring period upon a determination that performance standards have not been met or the compensatory mitigation project is not on track to meet them. The district engineer may also revise monitoring requirements when remediation and/or adaptive management is required.

(c) *Monitoring reports.* (1) The district engineer must determine the information to be included in monitoring reports. This information must be sufficient for the district engineer to determine how the compensatory mitigation project is progressing towards meeting its performance standards, and may include plans (such as as-built plans), maps, and photographs to illustrate site conditions. Monitoring reports may also include the results of functional, condition, or other assessments used to provide quantitative or qualitative measures of the functions provided by the compensatory mitigation project site.

(2) The permittee or sponsor is responsible for submitting monitoring reports in accordance with the special conditions of the DA permit or the terms of the instrument. Failure to submit monitoring reports in a timely manner may result in compliance action by the district engineer.

291

(3) Monitoring reports must be provided by the district engineer to interested federal, tribal, state, and local resource agencies, and the public, upon request.

### § 230.97  Management.

(a) *Site protection.* (1) The aquatic habitats, riparian areas, buffers, and uplands that comprise the overall compensatory mitigation project must be provided long-term protection through real estate instruments or other available mechanisms, as appropriate. Long-term protection may be provided through real estate instruments such as conservation easements held by entities such as federal, tribal, state, or local resource agencies, non-profit conservation organizations, or private land managers; the transfer of title to such entities; or by restrictive covenants. For government property, long-term protection may be provided through federal facility management plans or integrated natural resources management plans. When approving a method for long-term protection of non-government property other than transfer of title, the district engineer shall consider relevant legal constraints on the use of conservation easements and/or restrictive covenants in determining whether such mechanisms provide sufficient site protection. To provide sufficient site protection, a conservation easement or restrictive covenant should, where practicable, establish in an appropriate third party (e.g., governmental or non-profit resource management agency) the right to enforce site protections and provide the third party the resources necessary to monitor and enforce these site protections.

(2) The real estate instrument, management plan, or other mechanism providing long-term protection of the compensatory mitigation site must, to the extent appropriate and practicable, prohibit incompatible uses (e.g., clear cutting or mineral extraction) that might otherwise jeopardize the objectives of the compensatory mitigation project. Where appropriate, multiple instruments recognizing compatible uses (e.g., fishing or grazing rights) may be used.

(3) The real estate instrument, management plan, or other long-term protection mechanism must contain a provision requiring 60-day advance notification to the district engineer before any action is taken to void or modify the instrument, management plan, or long-term protection mechanism, including transfer of title to, or establishment of any other legal claims over, the compensatory mitigation site.

(4) For compensatory mitigation projects on public lands, where Federal facility management plans or integrated natural resources management plans are used to provide long-term protection, and changes in statute, regulation, or agency needs or mission results in an incompatible use on public lands originally set aside for compensatory mitigation, the public agency authorizing the incompatible use is responsible for providing alternative compensatory mitigation that is acceptable to the district engineer for any loss in functions resulting from the incompatible use.

(5) A real estate instrument, management plan, or other long-term protection mechanism used for site protection of permittee-responsible mitigation must be approved by the district engineer in advance of, or concurrent with, the activity causing the authorized impacts.

(b) *Sustainability.* Compensatory mitigation projects shall be designed, to the maximum extent practicable, to be self-sustaining once performance standards have been achieved. This includes minimization of active engineering features (e.g., pumps) and appropriate siting to ensure that natural hydrology and landscape context will support long-term sustainability. Where active long-term management and maintenance are necessary to ensure long-term sustainability (e.g., prescribed burning, invasive species control, maintenance of water control structures, easement enforcement), the responsible party must provide for such management and maintenance. This includes the provision of long-term financing mechanisms where necessary. Where needed, the acquisition and protection of water rights must be secured

**Environmental Protection Agency**                                    **§ 230.98**

and documented in the permit conditions or instrument.

(c) *Adaptive management.* (1) If the compensatory mitigation project cannot be constructed in accordance with the approved mitigation plans, the permittee or sponsor must notify the district engineer. A significant modification of the compensatory mitigation project requires approval from the district engineer.

(2) If monitoring or other information indicates that the compensatory mitigation project is not progressing towards meeting its performance standards as anticipated, the responsible party must notify the district engineer as soon as possible. The district engineer will evaluate and pursue measures to address deficiencies in the compensatory mitigation project. The district engineer will consider whether the compensatory mitigation project is providing ecological benefits comparable to the original objectives of the compensatory mitigation project.

(3) The district engineer, in consultation with the responsible party (and other federal, tribal, state, and local agencies, as appropriate), will determine the appropriate measures. The measures may include site modifications, design changes, revisions to maintenance requirements, and revised monitoring requirements. The measures must be designed to ensure that the modified compensatory mitigation project provides aquatic resource functions comparable to those described in the mitigation plan objectives.

(4) Performance standards may be revised in accordance with adaptive management to account for measures taken to address deficiencies in the compensatory mitigation project. Performance standards may also be revised to reflect changes in management strategies and objectives if the new standards provide for ecological benefits that are comparable or superior to the approved compensatory mitigation project. No other revisions to performance standards will be allowed except in the case of natural disasters.

(d) *Long-term management.* (1) The permit conditions or instrument must identify the party responsible for ownership and all long-term management of the compensatory mitigation project. The permit conditions or instrument may contain provisions allowing the permittee or sponsor to transfer the long-term management responsibilities of the compensatory mitigation project site to a land stewardship entity, such as a public agency, non-governmental organization, or private land manager, after review and approval by the district engineer. The land stewardship entity need not be identified in the original permit or instrument, as long as the future transfer of long-term management responsibility is approved by the district engineer.

(2) A long-term management plan should include a description of long-term management needs, annual cost estimates for these needs, and identify the funding mechanism that will be used to meet those needs.

(3) Any provisions necessary for long-term financing must be addressed in the original permit or instrument. The district engineer may require provisions to address inflationary adjustments and other contingencies, as appropriate. Appropriate long-term financing mechanisms include non-wasting endowments, trusts, contractual arrangements with future responsible parties, and other appropriate financial instruments. In cases where the long-term management entity is a public authority or government agency, that entity must provide a plan for the long-term financing of the site.

(4) For permittee-responsible mitigation, any long-term financing mechanisms must be approved in advance of the activity causing the authorized impacts.

**§ 230.98 Mitigation banks and in-lieu fee programs.**

(a) *General considerations.* (1) All mitigation banks and in-lieu fee programs must have an approved instrument signed by the sponsor and the district engineer prior to being used to provide compensatory mitigation for DA permits.

(2) To the maximum extent practicable, mitigation banks and in-lieu fee project sites must be planned and designed to be self-sustaining over time, but some active management and maintenance may be required to ensure

293

their long-term viability and sustainability. Examples of acceptable management activities include maintaining fire dependent habitat communities in the absence of natural fire and controlling invasive exotic plant species.

(3) All mitigation banks and in-lieu fee programs must comply with the standards in this part, if they are to be used to provide compensatory mitigation for activities authorized by DA permits, regardless of whether they are sited on public or private lands and whether the sponsor is a governmental or private entity.

(b) *Interagency Review Team.* (1) The district engineer will establish an Interagency Review Team (IRT) to review documentation for the establishment and management of mitigation banks and in-lieu fee programs. The district engineer or his designated representative serves as Chair of the IRT. In cases where a mitigation bank or in-lieu fee program is proposed to satisfy the requirements of another federal, tribal, state, or local program, in addition to compensatory mitigation requirements of DA permits, it may be appropriate for the administering agency to serve as co-Chair of the IRT.

(2) In addition to the Corps, representatives from the U.S. Environmental Protection Agency, U.S. Fish and Wildlife Service, NOAA Fisheries, the Natural Resources Conservation Service, and other federal agencies, as appropriate, may participate in the IRT. The IRT may also include representatives from tribal, state, and local regulatory and resource agencies, where such agencies have authorities and/or mandates directly affecting, or affected by, the establishment, operation, or use of the mitigation bank or in-lieu fee program. The district engineer will seek to include all public agencies with a substantive interest in the establishment of the mitigation bank or in-lieu fee program on the IRT, but retains final authority over its composition.

(3) The primary role of the IRT is to facilitate the establishment of mitigation banks or in-lieu fee programs through the development of mitigation banking or in-lieu fee program instruments. The IRT will review the prospectus, instrument, and other appropriate documents and provide comments to the district engineer. The district engineer and the IRT should use a watershed approach to the extent practicable in reviewing proposed mitigation banks and in-lieu fee programs. Members of the IRT may also sign the instrument, if they so choose. By signing the instrument, the IRT members indicate their agreement with the terms of the instrument. As an alternative, a member of the IRT may submit a letter expressing concurrence with the instrument. The IRT will also advise the district engineer in assessing monitoring reports, recommending remedial or adaptive management measures, approving credit releases, and approving modifications to an instrument. In order to ensure timely processing of instruments and other documentation, comments from IRT members must be received by the district engineer within the time limits specified in this section. Comments received after these deadlines will only be considered at the discretion of the district engineer to the extent that doing so does not jeopardize the deadlines for district engineer action.

(4) The district engineer will give full consideration to any timely comments and advice of the IRT. The district engineer alone retains final authority for approval of the instrument in cases where the mitigation bank or in-lieu fee program is used to satisfy compensatory mitigation requirements of DA permits.

(5) *MOAs with other agencies.* The district engineer and members of the IRT may enter into a memorandum of agreement (MOA) with any other federal, state or local government agency to perform all or some of the IRT review functions described in this section. Such MOAs must include provisions for appropriate federal oversight of the review process. The district engineer retains sole authority for final approval of instruments and other documentation required under this section.

(c) *Compensation planning framework for in-lieu fee programs.* (1) The approved instrument for an in-lieu fee program must include a compensation planning framework that will be used to select,

**Environmental Protection Agency** §230.98

secure, and implement aquatic resource restoration, establishment, enhancement, and/or preservation activities. The compensation planning framework must support a watershed approach to compensatory mitigation. All specific projects used to provide compensation for DA permits must be consistent with the approved compensation planning framework. Modifications to the framework must be approved as a significant modification to the instrument by the district engineer, after consultation with the IRT.

(2) The compensation planning framework must contain the following elements:

(i) The geographic service area(s), including a watershed-based rationale for the delineation of each service area;

(ii) A description of the threats to aquatic resources in the service area(s), including how the in-lieu fee program will help offset impacts resulting from those threats;

(iii) An analysis of historic aquatic resource loss in the service area(s);

(iv) An analysis of current aquatic resource conditions in the service area(s), supported by an appropriate level of field documentation;

(v) A statement of aquatic resource goals and objectives for each service area, including a description of the general amounts, types and locations of aquatic resources the program will seek to provide;

(vi) A prioritization strategy for selecting and implementing compensatory mitigation activities;

(vii) An explanation of how any preservation objectives identified in paragraph (c)(2)(v) of this section and addressed in the prioritization strategy in paragraph (c)(2)(vi) satisfy the criteria for use of preservation in §230.93(h);

(viii) A description of any public and private stakeholder involvement in plan development and implementation, including, where appropriate, coordination with federal, state, tribal and local aquatic resource management and regulatory authorities;

(ix) A description of the long-term protection and management strategies for activities conducted by the in-lieu fee program sponsor;

(x) A strategy for periodic evaluation and reporting on the progress of the program in achieving the goals and objectives in paragraph (c)(2)(v) of this section, including a process for revising the planning framework as necessary; and

(xi) Any other information deemed necessary for effective compensation planning by the district engineer.

(3) The level of detail necessary for the compensation planning framework is at the discretion of the district engineer, and will take into account the characteristics of the service area(s) and the scope of the program. As part of the in-lieu fee program instrument, the compensation planning framework will be reviewed by the IRT, and will be a major factor in the district engineer's decision on whether to approve the instrument.

(d) *Review process.* (1) The sponsor is responsible for preparing all documentation associated with establishment of the mitigation bank or in-lieu fee program, including the prospectus, instrument, and other appropriate documents, such as mitigation plans for a mitigation bank. The prospectus provides an overview of the proposed mitigation bank or in-lieu fee program and serves as the basis for public and initial IRT comment. For a mitigation bank, the mitigation plan, as described in §230.94(c), provides detailed plans and specifications for the mitigation bank site. For in-lieu fee programs, mitigation plans will be prepared as in-lieu fee project sites are identified after the instrument has been approved and the in-lieu fee program becomes operational. The instrument provides the authorization for the mitigation bank or in-lieu fee program to provide credits to be used as compensatory mitigation for DA permits.

(2) *Prospectus.* The prospectus must provide a summary of the information regarding the proposed mitigation bank or in-lieu fee program, at a sufficient level of detail to support informed public and IRT comment. The review process begins when the sponsor submits a complete prospectus to the district engineer. For modifications of approved instruments, submittal of a new prospectus is not required; instead,

the sponsor must submit a written request for an instrument modification accompanied by appropriate documentation. The district engineer must notify the sponsor within 30 days whether or not a submitted prospectus is complete. A complete prospectus includes the following information:

(i) The objectives of the proposed mitigation bank or in-lieu fee program.

(ii) How the mitigation bank or in-lieu fee program will be established and operated.

(iii) The proposed service area.

(iv) The general need for and technical feasibility of the proposed mitigation bank or in-lieu fee program.

(v) The proposed ownership arrangements and long-term management strategy for the mitigation bank or in-lieu fee project sites.

(vi) The qualifications of the sponsor to successfully complete the type(s) of mitigation project(s) proposed, including information describing any past such activities by the sponsor.

(vii) For a proposed mitigation bank, the prospectus must also address:

(A) The ecological suitability of the site to achieve the objectives of the proposed mitigation bank, including the physical, chemical, and biological characteristics of the bank site and how that site will support the planned types of aquatic resources and functions; and

(B) Assurance of sufficient water rights to support the long-term sustainability of the mitigation bank.

(viii) For a proposed in-lieu fee program, the prospectus must also include:

(A) The compensation planning framework (see paragraph (c) of this section); and

(B) A description of the in-lieu fee program account required by paragraph (i) of this section.

(3) *Preliminary review of prospectus.* Prior to submitting a prospectus, the sponsor may elect to submit a draft prospectus to the district engineer for comment and consultation. The district engineer will provide copies of the draft prospectus to the IRT and will provide comments back to the sponsor within 30 days. Any comments from IRT members will also be forwarded to the sponsor. This preliminary review is optional but is strongly recommended. It is intended to identify potential issues early so that the sponsor may attempt to address those issues prior to the start of the formal review process.

(4) *Public review and comment.* Within 30 days of receipt of a complete prospectus or an instrument modification request that will be processed in accordance with paragraph (g)(1) of this section, the district engineer will provide public notice of the proposed mitigation bank or in-lieu fee program, in accordance with the public notice procedures at 33 CFR 325.3. The public notice must, at a minimum, include a summary of the prospectus and indicate that the full prospectus is available to the public for review upon request. For modifications of approved instruments, the public notice must instead summarize, and make available to the public upon request, whatever documentation is appropriate for the modification (e.g., a new or revised mitigation plan). The comment period for public notice will be 30 days, unless the district engineer determines that a longer comment period is appropriate. The district engineer will notify the sponsor if the comment period is extended beyond 30 days, including an explanation of why the longer comment period is necessary. Copies of all comments received in response to the public notice must be distributed to the other IRT members and to the sponsor within 15 days of the close of the public comment period. The district engineer and IRT members may also provide comments to the sponsor at this time, and copies of any such comments will also be distributed to all IRT members. If the construction of a mitigation bank or an in-lieu fee program project requires a DA permit, the public notice requirement may be satisfied through the public notice provisions of the permit processing procedures, provided all of the relevant information is provided.

(5) *Initial evaluation.* (i) After the end of the comment period, the district engineer will review the comments received in response to the public notice, and make a written initial evaluation as to the potential of the proposed mitigation bank or in-lieu fee program to provide compensatory mitigation

**Environmental Protection Agency**                                          **§ 230.98**

for activities authorized by DA permits. This initial evaluation letter must be provided to the sponsor within 30 days of the end of the public notice comment period.

(ii) If the district engineer determines that the proposed mitigation bank or in-lieu fee program has potential for providing appropriate compensatory mitigation for activities authorized by DA permits, the initial evaluation letter will inform the sponsor that he/she may proceed with preparation of the draft instrument (see paragraph (d)(6) of this section).

(iii) If the district engineer determines that the proposed mitigation bank or in-lieu fee program does not have potential for providing appropriate compensatory mitigation for DA permits, the initial evaluation letter must discuss the reasons for that determination. The sponsor may revise the prospectus to address the district engineer's concerns, and submit the revised prospectus to the district engineer. If the sponsor submits a revised prospectus, a revised public notice will be issued in accordance with paragraph (d)(4) of this section.

(iv) This initial evaluation procedure does not apply to proposed modifications of approved instruments.

(6) *Draft instrument.* (i) After considering comments from the district engineer, the IRT, and the public, if the sponsor chooses to proceed with establishment of the mitigation bank or in-lieu fee program, he must prepare a draft instrument and submit it to the district engineer. In the case of an instrument modification, the sponsor must prepare a draft amendment (e.g., a specific instrument provision, a new or modified mitigation plan), and submit it to the district engineer. The district engineer must notify the sponsor within 30 days of receipt, whether the draft instrument or amendment is complete. If the draft instrument or amendment is incomplete, the district engineer will request from the sponsor the information necessary to make the draft instrument or amendment complete. Once any additional information is submitted, the district engineer must notify the sponsor as soon as he determines that the draft instrument or amendment is complete. The draft

instrument must be based on the prospectus and must describe in detail the physical and legal characteristics of the mitigation bank or in-lieu fee program and how it will be established and operated.

(ii) For mitigation banks and in-lieu fee programs, the draft instrument must include the following information:

(A) A description of the proposed geographic service area of the mitigation bank or in-lieu fee program. The service area is the watershed, ecoregion, physiographic province, and/or other geographic area within which the mitigation bank or in-lieu fee program is authorized to provide compensatory mitigation required by DA permits. The service area must be appropriately sized to ensure that the aquatic resources provided will effectively compensate for adverse environmental impacts across the entire service area. For example, in urban areas, a U.S. Geological Survey 8-digit hydrologic unit code (HUC) watershed or a smaller watershed may be an appropriate service area. In rural areas, several contiguous 8-digit HUCs or a 6-digit HUC watershed may be an appropriate service area. Delineation of the service area must also consider any locally-developed standards and criteria that may be applicable. The economic viability of the mitigation bank or in-lieu fee program may also be considered in determining the size of the service area. The basis for the proposed service area must be documented in the instrument. An in-lieu fee program or umbrella mitigation banking instrument may have multiple service areas governed by its instrument (e.g., each watershed within a State or Corps district may be a separate service area under the instrument); however, all impacts and compensatory mitigation must be accounted for by service area;

(B) Accounting procedures;

(C) A provision stating that legal responsibility for providing the compensatory mitigation lies with the sponsor once a permittee secures credits from the sponsor;

(D) Default and closure provisions;

(E) Reporting protocols; and

(F) Any other information deemed necessary by the district engineer.

(iii) For a mitigation bank, a complete draft instrument must include the following additional information:

(A) Mitigation plans that include all applicable items listed in § 230.94(c)(2) through (14); and

(B) A credit release schedule, which is tied to achievement of specific milestones. All credit releases must be approved by the district engineer, in consultation with the IRT, based on a determination that required milestones have been achieved. The district engineer, in consultation with the IRT, may modify the credit release schedule, including reducing the number of available credits or suspending credit sales or transfers altogether, where necessary to ensure that all credits sales or transfers remain tied to compensatory mitigation projects with a high likelihood of meeting performance standards;

(iv) For an in-lieu fee program, a complete draft instrument must include the following additional information:

(A) The compensation planning framework (see paragraph (c) of this section);

(B) Specification of the initial allocation of advance credits (see paragraph (n) of this section) and a draft fee schedule for these credits, by service area, including an explanation of the basis for the allocation and draft fee schedule;

(C) A methodology for determining future project-specific credits and fees; and

(D) A description of the in-lieu fee program account required by paragraph (i) of this section.

(7) *IRT review.* Upon receipt of notification by the district engineer that the draft instrument or amendment is complete, the sponsor must provide the district engineer with a sufficient number of copies of the draft instrument or amendment to distribute to the IRT members. The district engineer will promptly distribute copies of the draft instrument or amendment to the IRT members for a 30 day comment period. The 30-day comment period begins 5 days after the district engineer distributes the copies of the draft instrument or amendment to the IRT. Following the comment period, the district engi-

neer will discuss any comments with the appropriate agencies and with the sponsor. The district engineer will seek to resolve issues using a consensus based approach, to the extent practicable, while still meeting the decision-making time frames specified in this section. Within 90 days of receipt of the complete draft instrument or amendment by the IRT members, the district engineer must notify the sponsor of the status of the IRT review. Specifically, the district engineer must indicate to the sponsor if the draft instrument or amendment is generally acceptable and what changes, if any, are needed. If there are significant unresolved concerns that may lead to a formal objection from one or more IRT members to the final instrument or amendment, the district engineer will indicate the nature of those concerns.

(8) *Final instrument.* The sponsor must submit a final instrument to the district engineer for approval, with supporting documentation that explains how the final instrument addresses the comments provided by the IRT. For modifications of approved instruments, the sponsor must submit a final amendment to the district engineer for approval, with supporting documentation that explains how the final amendment addresses the comments provided by the IRT. The final instrument or amendment must be provided directly by the sponsor to all members of the IRT. Within 30 days of receipt of the final instrument or amendment, the district engineer will notify the IRT members whether or not he intends to approve the instrument or amendment. If no IRT member objects, by initiating the dispute resolution process in paragraph (e) of this section within 45 days of receipt of the final instrument or amendment, the district engineer will notify the sponsor of his final decision and, if the instrument or amendment is approved, arrange for it to be signed by the appropriate parties. If any IRT member initiates the dispute resolution process, the district engineer will notify the sponsor. Following conclusion of the dispute resolution process, the district engineer will notify the sponsor of his final decision, and if the instrument or amendment is approved,

**Environmental Protection Agency**                    **§ 230.98**

arrange for it to be signed by the appropriate parties. For mitigation banks, the final instrument must contain the information items listed in paragraphs (d)(6)(ii), and (iii) of this section. For in-lieu fee programs, the final instrument must contain the information items listed in paragraphs (d)(6)(ii) and (iv) of this section. For the modification of an approved instrument, the amendment must contain appropriate information, as determined by the district engineer. The final instrument or amendment must be made available to the public upon request.

(e) *Dispute resolution process.* (1) Within 15 days of receipt of the district engineer's notification of intent to approve an instrument or amendment, the Regional Administrator of the U.S. EPA, the Regional Director of the U.S. Fish and Wildlife Service, the Regional Director of the National Marine Fisheries Service, and/or other senior officials of agencies represented on the IRT may notify the district engineer and other IRT members by letter if they object to the approval of the proposed final instrument or amendment. This letter must include an explanation of the basis for the objection and, where feasible, offer recommendations for resolving the objections. If the district engineer does not receive any objections within this time period, he may proceed to final action on the instrument or amendment.

(2) The district engineer must respond to the objection within 30 days of receipt of the letter. The district engineer's response may indicate an intent to disapprove the instrument or amendment as a result of the objection, an intent to approve the instrument or amendment despite the objection, or may provide a modified instrument or amendment that attempts to address the objection. The district engineer's response must be provided to all IRT members.

(3) Within 15 days of receipt of the district engineer's response, if the Regional Administrator or Regional Director is not satisfied with the response he may forward the issue to the Assistant Administrator for Water of the U.S. EPA, the Assistant Secretary for Fish and Wildlife and Parks of the U.S. FWS, or the Undersecretary for

Oceans and Atmosphere of NOAA, as appropriate, for review and must notify the district engineer by letter via electronic mail or facsimile machine (with copies to all IRT members) that the issue has been forwarded for Headquarters review. This step is available only to the IRT members representing these three federal agencies, however, other IRT members who do not agree with the district engineer's final decision do not have to sign the instrument or amendment or recognize the mitigation bank or in-lieu fee program for purposes of their own programs and authorities. If an IRT member other than the one filing the original objection has a new objection based on the district engineer's response, he may use the first step in this procedure (paragraph (e)(1) of this section) to provide that objection to the district engineer.

(4) If the issue has not been forwarded to the objecting agency's Headquarters, then the district engineer may proceed with final action on the instrument or amendment. If the issue has been forwarded to the objecting agency's Headquarters, the district engineer must hold in abeyance the final action on the instrument or amendment, pending Headquarters level review described below.

(5) Within 20 days from the date of the letter requesting Headquarters level review, the Assistant Administrator for Water, the Assistant Secretary for Fish and Wildlife and Parks, or the Undersecretary for Oceans and Atmosphere must either notify the Assistant Secretary of the Army (Civil Works) (ASA(CW)) that further review will not be requested, or request that the ASA(CW) review the final instrument or amendment.

(6) Within 30 days of receipt of the letter from the objecting agency's Headquarters request for ASA(CW)'s review of the final instrument, the ASA(CW), through the Director of Civil Works, must review the draft instrument or amendment and advise the district engineer on how to proceed with final action on that instrument or amendment. The ASA(CW) must immediately notify the Assistant Administrator for Water, the Assistant Secretary for Fish and Wildlife and Parks,

299

and/or the Undersecretary for Oceans and Atmosphere of the final decision.

(7) In cases where the dispute resolution procedure is used, the district engineer must notify the sponsor of his final decision within 150 days of receipt of the final instrument or amendment.

(f) *Extension of deadlines.* (1) The deadlines in paragraphs (d) and (e) of this section may be extended by the district engineer at his sole discretion in cases where:

(i) Compliance with other applicable laws, such as consultation under section 7 of the Endangered Species Act or section 106 of the National Historic Preservation Act, is required;

(ii) It is necessary to conduct government-to-government consultation with Indian tribes;

(iii) Timely submittal of information necessary for the review of the proposed mitigation bank or in-lieu fee program or the proposed modification of an approved instrument is not accomplished by the sponsor; or

(iv) Information that is essential to the district engineer's decision cannot be reasonably obtained within the specified time frame.

(2) In such cases, the district engineer must promptly notify the sponsor in writing of the extension and the reason for it. Such extensions shall be for the minimum time necessary to resolve the issue necessitating the extension.

(g) *Modification of instruments.* (1) *Approval of an amendment to an approved instrument.* Modification of an approved instrument, including the addition and approval of umbrella mitigation bank sites or in-lieu fee project sites or expansions of previously approved mitigation bank or in-lieu fee project sites, must follow the appropriate procedures in paragraph (d) of this section, unless the district engineer determines that the streamlined review process described in paragraph (g)(2) of this section is warranted.

(2) *Streamlined review process.* The streamlined modification review process may be used for the following modifications of instruments: changes reflecting adaptive management of the mitigation bank or in-lieu fee program, credit releases, changes in credit releases and credit release schedules, and changes that the district engineer determines are not significant. If the district engineer determines that the streamlined review process is warranted, he must notify the IRT members and the sponsor of this determination and provide them with copies of the proposed modification. IRT members and the sponsor have 30 days to notify the district engineer if they have concerns with the proposed modification. If IRT members or the sponsor notify the district engineer of such concerns, the district engineer shall attempt to resolve those concerns. Within 60 days of providing the proposed modification to the IRT, the district engineer must notify the IRT members of his intent to approve or disapprove the proposed modification. If no IRT member objects, by initiating the dispute resolution process in paragraph (e) of this section, within 15 days of receipt of this notification, the district engineer will notify the sponsor of his final decision and, if the modification is approved, arrange for it to be signed by the appropriate parties. If any IRT member initiates the dispute resolution process, the district engineer will so notify the sponsor. Following conclusion of the dispute resolution process, the district engineer will notify the sponsor of his final decision, and if the modification is approved, arrange for it to be signed by the appropriate parties.

(h) *Umbrella mitigation banking instruments.* A single mitigation banking instrument may provide for future authorization of additional mitigation bank sites. As additional sites are selected, they must be included in the mitigation banking instrument as modifications, using the procedures in paragraph (g)(1) of this section. Credit withdrawal from the additional bank sites shall be consistent with paragraph (m) of this section.

(i) *In-lieu fee program account.* (1) The in-lieu fee program sponsor must establish a program account after the instrument is approved by the district engineer, prior to accepting any fees from permittees. If the sponsor accepts funds from entities other than permittees, those funds must be kept in separate accounts. The program account

**Environmental Protection Agency**                      **§ 230.98**

must be established at a financial institution that is a member of the Federal Deposit Insurance Corporation. All interests and earnings accruing to the program account must remain in that account for use by the in-lieu fee program for the purposes of providing compensatory mitigation for DA permits. The program account may only be used for the selection, design, acquisition, implementation, and management of in-lieu fee compensatory mitigation projects, except for a small percentage (as determined by the district engineer in consultation with the IRT and specified in the instrument) that can be used for administrative costs.

(2) The sponsor must submit proposed in-lieu fee projects to the district engineer for funding approval. Disbursements from the program account may only be made upon receipt of written authorization from the district engineer, after the district engineer has consulted with the IRT. The terms of the program account must specify that the district engineer has the authority to direct those funds to alternative compensatory mitigation projects in cases where the sponsor does not provide compensatory mitigation in accordance with the time frame specified in paragraph (n)(4) of this section.

(3) The sponsor must provide annual reports to the district engineer and the IRT. The annual reports must include the following information:

(i) All income received, disbursements, and interest earned by the program account;

(ii) A list of all permits for which in-lieu fee program funds were accepted. This list shall include: the Corps permit number (or the state permit number if there is no corresponding Corps permit number, in cases of state programmatic general permits or other regional general permits), the service area in which the authorized impacts are located, the amount of authorized impacts, the amount of required compensatory mitigation, the amount paid to the in-lieu fee program, and the date the funds were received from the permittee;

(iii) A description of in-lieu fee program expenditures from the account, such as the costs of land acquisition, planning, construction, monitoring,

maintenance, contingencies, adaptive management, and administration;

(iv) The balance of advance credits and released credits at the end of the report period for each service area; and

(v) Any other information required by the district engineer.

(4) The district engineer may audit the records pertaining to the program account. All books, accounts, reports, files, and other records relating to the in-lieu fee program account shall be available at reasonable times for inspection and audit by the district engineer.

(j) *In-lieu fee project approval.* (1) As in-lieu fee project sites are identified and secured, the sponsor must submit mitigation plans to the district engineer that include all applicable items listed in § 230.94(c)(2) through (14). The mitigation plan must also include a credit release schedule consistent with paragraph (o)(8) of this section that is tied to achievement of specific performance standards. The review and approval of in-lieu fee projects will be conducted in accordance with the procedures in paragraph (g)(1) of this section, as modifications of the in-lieu fee program instrument. This includes compensatory mitigation projects conducted by another party on behalf of the sponsor through requests for proposals and awarding of contracts.

(2) If a DA permit is required for an in-lieu fee project, the permit should not be issued until all relevant provisions of the mitigation plan have been substantively determined, to ensure that the DA permit accurately reflects all relevant provisions of the approved mitigation plan, such as performance standards.

(k) *Coordination of mitigation banking instruments and DA permit issuance.* In cases where initial establishment of the mitigation bank, or the development of a new project site under an umbrella banking instrument, involves activities requiring DA authorization, the permit should not be issued until all relevant provisions of the mitigation plan have been substantively determined. This is to ensure that the DA permit accurately reflects all relevant provisions of the final instrument, such as performance standards.

301

(l) *Project implementation*. (1) The sponsor must have an approved instrument prior to collecting funds from permittees to satisfy compensatory mitigation requirements for DA permits.

(2) Authorization to sell credits to satisfy compensatory mitigation requirements in DA permits is contingent on compliance with all of the terms of the instrument. This includes constructing a mitigation bank or in-lieu fee project in accordance with the mitigation plan approved by the district engineer and incorporated by reference in the instrument. If the aquatic resource restoration, establishment, enhancement, and/or preservation activities cannot be implemented in accordance with the approved mitigation plan, the district engineer must consult with the sponsor and the IRT to consider modifications to the instrument, including adaptive management, revisions to the credit release schedule, and alternatives for providing compensatory mitigation to satisfy any credits that have already been sold.

(3) An in-lieu fee program sponsor is responsible for the implementation, long-term management, and any required remediation of the restoration, establishment, enhancement, and/or preservation activities, even though those activities may be conducted by other parties through requests for proposals or other contracting mechanisms.

(m) *Credit withdrawal from mitigation banks*. The mitigation banking instrument may allow for an initial debiting of a percentage of the total credits projected at mitigation bank maturity, provided the following conditions are satisfied: the mitigation banking instrument and mitigation plan have been approved, the mitigation bank site has been secured, appropriate financial assurances have been established, and any other requirements determined to be necessary by the district engineer have been fulfilled. The mitigation banking instrument must provide a schedule for additional credit releases as appropriate milestones are achieved (see paragraph (o)(8) of this section). Implementation of the approved mitigation plan shall be initiated no later than the first full growing season after the date of the first credit transaction.

(n) *Advance credits for in-lieu fee programs*. (1) The in-lieu fee program instrument may make a limited number of advance credits available to permittees when the instrument is approved. The number of advance credits will be determined by the district engineer, in consultation with the IRT, and will be specified for each service area in the instrument. The number of advance credits will be based on the following considerations:

(i) The compensation planning framework;

(ii) The sponsor's past performance for implementing aquatic resource restoration, establishment, enhancement, and/or preservation activities in the proposed service area or other areas; and

(iii) The projected financing necessary to begin planning and implementation of in-lieu fee projects.

(2) To determine the appropriate number of advance credits for a particular service area, the district engineer may require the sponsor to provide confidential supporting information that will not be made available to the general public. Examples of confidential supporting information may include prospective in-lieu fee project sites.

(3) As released credits are produced by in-lieu fee projects, they must be used to fulfill any advance credits that have already been provided within the project service area before any remaining released credits can be sold or transferred to permittees. Once previously provided advance credits have been fulfilled, an equal number of advance credits is re-allocated to the sponsor for sale or transfer to fulfill new mitigation requirements, consistent with the terms of the instrument. The number of advance credits available to the sponsor at any given time to sell or transfer to permittees in a given service area is equal to the number of advance credits specified in the instrument, minus any that have already been provided but not yet fulfilled.

(4) Land acquisition and initial physical and biological improvements must be completed by the third full growing

**Environmental Protection Agency**                          **§ 230.98**

season after the first advance credit in that service area is secured by a permittee, unless the district engineer determines that more or less time is needed to plan and implement an in-lieu fee project. If the district engineer determines that there is a compensatory mitigation deficit in a specific service area by the third growing season after the first advance credit in that service area is sold, and determines that it would not be in the public interest to allow the sponsor additional time to plan and implement an in-lieu fee project, the district engineer must direct the sponsor to disburse funds from the in-lieu fee program account to provide alternative compensatory mitigation to fulfill those compensation obligations.

(5) The sponsor is responsible for complying with the terms of the in-lieu fee program instrument. If the district engineer determines, as a result of review of annual reports on the operation of the in-lieu fee program (see paragraphs (p)(2) and (q)(1) of this section), that it is not performing in compliance with its instrument, the district engineer will take appropriate action, which may include suspension of credit sales, to ensure compliance with the in-lieu fee program instrument (see paragraph (o)(10) of this section). Permittees that secured credits from the in-lieu fee program are not responsible for in-lieu fee program compliance.

(o) *Determining credits.* (1) *Units of measure.* The principal units for credits and debits are acres, linear feet, functional assessment units, or other suitable metrics of particular resource types. Functional assessment units or other suitable metrics may be linked to acres or linear feet.

(2) *Assessment.* Where practicable, an appropriate assessment method (e.g., hydrogeomorphic approach to wetlands functional assessment, index of biological integrity) or other suitable metric must be used to assess and describe the aquatic resource types that will be restored, established, enhanced and/or preserved by the mitigation bank or in-lieu fee project.

(3) *Credit production.* The number of credits must reflect the difference between pre- and post-compensatory mitigation project site conditions, as determined by a functional or condition assessment or other suitable metric.

(4) *Credit value.* Once a credit is debited (sold or transferred to a permittee), its value cannot change.

(5) *Credit costs.* (i) The cost of compensatory mitigation credits provided by a mitigation bank or in-lieu fee program is determined by the sponsor.

(ii) For in-lieu fee programs, the cost per unit of credit must include the expected costs associated with the restoration, establishment, enhancement, and/or preservation of aquatic resources in that service area. These costs must be based on full cost accounting, and include, as appropriate, expenses such as land acquisition, project planning and design, construction, plant materials, labor, legal fees, monitoring, and remediation or adaptive management activities, as well as administration of the in-lieu fee program. The cost per unit credit must also take into account contingency costs appropriate to the stage of project planning, including uncertainties in construction and real estate expenses. The cost per unit of credit must also take into account the resources necessary for the long-term management and protection of the in-lieu fee project. In addition, the cost per unit credit must include financial assurances that are necessary to ensure successful completion of in-lieu fee projects.

(6) *Credits provided by preservation.* These credits should be specified as acres, linear feet, or other suitable metrics of preservation of a particular resource type. In determining the compensatory mitigation requirements for DA permits using mitigation banks or in-lieu fee programs, the district engineer should apply a higher mitigation ratio if the requirements are to be met through the use of preservation credits. In determining this higher ratio, the district engineer must consider the relative importance of both the impacted and the preserved aquatic resources in sustaining watershed functions.

(7) *Credits provided by riparian areas, buffers, and uplands.* These credits should be specified as acres, linear feet, or other suitable metrics of riparian area, buffer, and uplands respectively.

303

Non-aquatic resources can only be used as compensatory mitigation for impacts to aquatic resources authorized by DA permits when those resources are essential to maintaining the ecological viability of adjoining aquatic resources. In determining the compensatory mitigation requirements for DA permits using mitigation banks and in-lieu fee programs, the district engineer may authorize the use of riparian area, buffer, and/or upland credits if he determines that these areas are essential to sustaining aquatic resource functions in the watershed and are the most appropriate compensation for the authorized impacts.

(8) *Credit release schedule.* (i) *General considerations.* Release of credits must be tied to performance based milestones (e.g., construction, planting, establishment of specified plant and animal communities). The credit release schedule should reserve a significant share of the total credits for release only after full achievement of ecological performance standards. When determining the credit release schedule, factors to be considered may include, but are not limited to: The method of providing compensatory mitigation credits (e.g., restoration), the likelihood of success, the nature and amount of work needed to generate the credits, and the aquatic resource type(s) and function(s) to be provided by the mitigation bank or in-lieu fee project. The district engineer will determine the credit release schedule, including the share to be released only after full achievement of performance standards, after consulting with the IRT. Once released, credits may only be used to satisfy compensatory mitigation requirements of a DA permit if the use of credits for a specific permit has been approved by the district engineer.

(ii) For single-site mitigation banks, the terms of the credit release schedule must be specified in the mitigation banking instrument. The credit release schedule may provide for an initial debiting of a limited number of credits once the instrument is approved and other appropriate milestones are achieved (see paragraph (m) of this section).

(iii) For in-lieu fee projects and umbrella mitigation bank sites, the terms of the credit release schedule must be specified in the approved mitigation plan. When an in-lieu fee project or umbrella mitigation bank site is implemented and is achieving the performance-based milestones specified in the credit release schedule, credits are generated in accordance with the credit release schedule for the approved mitigation plan. If the in-lieu fee project or umbrella mitigation bank site does not achieve those performance-based milestones, the district engineer may modify the credit release schedule, including reducing the number of credits.

(9) *Credit release approval.* Credit releases for mitigation banks and in-lieu fee projects must be approved by the district engineer. In order for credits to be released, the sponsor must submit documentation to the district engineer demonstrating that the appropriate milestones for credit release have been achieved and requesting the release. The district engineer will provide copies of this documentation to the IRT members for review. IRT members must provide any comments to the district engineer within 15 days of receiving this documentation. However, if the district engineer determines that a site visit is necessary, IRT members must provide any comments to the district engineer within 15 days of the site visit. The district engineer must schedule the site visit so that it occurs as soon as it is practicable, but the site visit may be delayed by seasonal considerations that affect the ability of the district engineer and the IRT to assess whether the applicable credit release milestones have been achieved. After full consideration of any comments received, the district engineer will determine whether the milestones have been achieved and the credits can be released. The district engineer shall make a decision within 30 days of the end of that comment period, and notify the sponsor and the IRT.

(10) *Suspension and termination.* If the district engineer determines that the mitigation bank or in-lieu fee program is not meeting performance standards or complying with the terms of the instrument, appropriate action will be taken. Such actions may include, but are not limited to, suspending credit

**Environmental Protection Agency** § 230.98

sales, adaptive management, decreasing available credits, utilizing financial assurances, and terminating the instrument.

(p) *Accounting procedures.* (1) For mitigation banks, the instrument must contain a provision requiring the sponsor to establish and maintain a ledger to account for all credit transactions. Each time an approved credit transaction occurs, the sponsor must notify the district engineer.

(2) For in-lieu fee programs, the instrument must contain a provision requiring the sponsor to establish and maintain an annual report ledger in accordance with paragraph (i)(3) of this section, as well as individual ledgers that track the production of released credits for each in-lieu fee project.

(q) *Reporting.* (1) *Ledger account.* The sponsor must compile an annual ledger report showing the beginning and ending balance of available credits and permitted impacts for each resource type, all additions and subtractions of credits, and any other changes in credit availability (e.g., additional credits released, credit sales suspended). The ledger report must be submitted to the district engineer, who will distribute copies to the IRT members. The ledger report is part of the administrative record for the mitigation bank or in-lieu fee program. The district engineer will make the ledger report available to the public upon request.

(2) *Monitoring reports.* The sponsor is responsible for monitoring the mitigation bank site or the in-lieu fee project site in accordance with the approved monitoring requirements to determine the level of success and identify problems requiring remedial action or adaptive management measures. Monitoring must be conducted in accordance with the requirements in § 230.96, and at time intervals appropriate for the particular project type and until such time that the district engineer, in consultation with the IRT, has determined that the performance standards have been attained. The instrument must include requirements for periodic monitoring reports to be submitted to the district engineer, who will provide copies to other IRT members.

(3) *Financial assurance and long-term management funding report.* The district engineer may require the sponsor to provide an annual report showing beginning and ending balances, including deposits into and any withdrawals from, the accounts providing funds for financial assurances and long-term management activities. The report should also include information on the amount of required financial assurances and the status of those assurances, including their potential expiration.

(r) *Use of credits.* Except as provided below, all activities authorized by DA permits are eligible, at the discretion of the district engineer, to use mitigation banks or in-lieu fee programs to fulfill compensatory mitigation requirements for DA permits. The district engineer will determine the number and type(s) of credits required to compensate for the authorized impacts. Permit applicants may propose to use a particular mitigation bank or in-lieu fee program to provide the required compensatory mitigation. In such cases, the sponsor must provide the permit applicant with a statement of credit availability. The district engineer must review the permit applicant's compensatory mitigation proposal, and notify the applicant of his determination regarding the acceptability of using that mitigation bank or in-lieu fee program.

(s) *IRT concerns with use of credits.* If, in the view of a member of the IRT, an issued permit or series of issued permits raises concerns about how credits from a particular mitigation bank or in-lieu fee program are being used to satisfy compensatory mitigation requirements (including concerns about whether credit use is consistent with the terms of the instrument), the IRT member may notify the district engineer in writing of the concern. The district engineer shall promptly consult with the IRT to address the concern. Resolution of the concern is at the discretion of the district engineer, consistent with applicable statutes, regulations, and policies regarding compensatory mitigation requirements for DA permits. Nothing in this section limits the authorities designated to IRT agencies under existing statutes or regulations.

305

(t) *Site protection.* (1) For mitigation bank sites, real estate instruments, management plans, or other long-term mechanisms used for site protection must be finalized before any credits can be released.

(2) For in-lieu fee project sites, real estate instruments, management plans, or other long-term protection mechanisms used for site protection must be finalized before advance credits can become released credits.

(u) *Long-term management.* (1) The legal mechanisms and the party responsible for the long-term management and the protection of the mitigation bank site must be documented in the instrument or, in the case of umbrella mitigation banking instruments and in-lieu fee programs, the approved mitigation plans. The responsible party should make adequate provisions for the operation, maintenance, and long-term management of the compensatory mitigation project site. The long-term management plan should include a description of long-term management needs and identify the funding mechanism that will be used to meet those needs.

(2) The instrument may contain provisions for the sponsor to transfer long-term management responsibilities to a land stewardship entity, such as a public agency, non-governmental organization, or private land manager.

(3) The instrument or approved mitigation plan must address the financial arrangements and timing of any necessary transfer of long-term management funds to the steward.

(4) Where needed, the acquisition and protection of water rights should be secured and documented in the instrument or, in the case of umbrella mitigation banking instruments and in-lieu fee programs, the approved mitigation site plan.

(v) *Grandfathering of existing instruments.* (1) *Mitigation banking instruments.* All mitigation banking instruments approved on or after July 9, 2008 must meet the requirements of this part. Mitigation banks approved prior to July 9, 2008 may continue to operate under the terms of their existing instruments. However, any modification to such a mitigation banking instrument on or after July 9, 2008, including

authorization of additional sites under an umbrella mitigation banking instrument, expansion of an existing site, or addition of a different type of resource credits (e.g., stream credits to a wetland bank) must be consistent with the terms of this part.

(2) *In-lieu fee program instruments.* All in-lieu fee program instruments approved on or after July 9, 2008 must meet the requirements of this part. In-lieu fee programs operating under instruments approved prior to July 9, 2008 may continue to operate under those instruments for two years after the effective date of this rule, after which time they must meet the requirements of this part, unless the district engineer determines that circumstances warrant an extension of up to three additional years. The district engineer must consult with the IRT before approving such extensions. Any revisions made to the in-lieu-fee program instrument on or after July 9, 2008 must be consistent with the terms of this part. Any approved project for which construction was completed under the terms of a previously approved instrument may continue to operate indefinitely under those terms if the district engineer determines that the project is providing appropriate mitigation substantially consistent with the terms of this part.

## PART 231—SECTION 404(c) PROCEDURES

Sec.
231.1  Purpose and scope.
231.2  Definitions.
231.3  Procedures for proposed determinations.
231.4  Public comments and hearings.
231.5  Recommended determination.
231.6  Administrator's final determinations.
231.7  Emergency procedure.
231.8  Extension of time.

AUTHORITY: 33 U.S.C. 1344(c).

SOURCE: 44 FR 58082, Oct. 9, 1979, unless otherwise noted.

### § 231.1  Purpose and scope.

(a) The Regulations of this part include the procedures to be followed by the Environmental Protection agency in prohibiting or withdrawing the specification, or denying, restricting, or