**36 CFR PART 800 -- PROTECTION OF HISTORIC PROPERTIES (incorporating amendments effective August 5, 2004)**

**Subpart A -- Purposes and Participants**

Sec.
800.1   Purposes.
800.2   Participants in the Section 106 process.

**Subpart B -- The Section 106 Process**

800.3   Initiation of the section 106 process.
800.4   Identification of historic properties.
800.5   Assessment of adverse effects.
800.6   Resolution of adverse effects.
800.7   Failure to resolve adverse effects.
800.8   Coordination with the National Environmental Policy act.
800.9   Council review of  Section 106 compliance.
800.10 Special requirements for protecting National Historic Landmarks.
800.11 Documentation standards.
800.12 Emergency situations.
800.13 Post-review discoveries.

**Subpart C -- Program Alternatives**

800.14 Federal agency program alternatives.
800.15 Tribal, State and Local Program Alternatives. (Reserved)
800.16 Definitions.
Appendix A – Criteria for Council involvement in reviewing individual section 106 cases

**Authority:** 16 U.S.C. 470s.

**Subpart A-Purposes and Participants**

**§ 800.1  Purposes.**

(a) *Purposes of the section 106 process.*  Section 106 of the National Historic Preservation Act requires Federal agencies to take into account the effects of their undertakings on historic properties and afford the Council a reasonable opportunity to comment on such undertakings.  The procedures in this part define how Federal agencies meet these statutory responsibilities. The section 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties, commencing at the early stages of project planning.  The goal of consultation is to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties.

(b) *Relation to other provisions of the act.*  Section 106 is related to other provisions of the act designed to further the national policy of historic preservation.  References to those provisions are included in this part to identify circumstances where they may affect actions taken to meet section 106 requirements.  Such provisions may have their own implementing regulations or guidelines and are not intended to be implemented by the procedures in this part except insofar as they relate to the section 106 process.  Guidelines, policies and procedures issued by other agencies, including the Secretary, have been cited in this part for ease of access and are not incorporated by reference.

(c) *Timing.*  The agency official must complete the section 106 process "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license."  This does not prohibit agency official from conducting or authorizing nondestructive project planning activities before completing compliance with section 106, provided that such actions do not restrict the subsequent consideration of alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties. The agency official shall ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking.

**§ 800.2  Participants in the Section 106 process.**

(a) *Agency official.*  It is the statutory obligation of the Federal agency to fulfill the requirements of section 106 and to ensure that an agency official with jurisdiction over an undertaking takes legal and financial responsibility for section 106 compliance in accordance with subpart B of this part.  The agency official has approval authority for the undertaking and can commit the Federal agency to take appropriate action for a specific undertaking as a result of section 106 compliance.  For the purposes of subpart C of this part, the agency official has the authority to commit the Federal agency to any obligation it may assume in the implementation of a program alternative.  The agency official may be a State, local, or tribal government official who has been delegated legal responsibility for compliance with section 106 in accordance with Federal law.

(1) *Professional standards.*  Section 112(a)(1)(A) of the act requires each Federal agency responsible for the protection of historic resources, including archeological resources, to ensure that all actions taken by employees or contractors of the agency shall meet professional standards under regulations developed by the Secretary.

(2) *Lead Federal agency.*  If more than one Federal agency is involved in an undertaking, some or all the agencies may designate a lead Federal agency, which shall identify the appropriate official to serve as the agency official who shall act on their behalf, fulfilling their collective responsibilities under section 106.  Those Federal agencies that do not designate a lead Federal agency remain individually responsible for their compliance with this part.

(3) *Use of contractors.*  Consistent with applicable conflict of interest laws, the agency official may use the services of applicants, consultants, or designees to prepare information, analyses and recommendations under this part.  The agency official remains legally responsible for all required findings and determinations.  If a document or study is prepared by a non-Federal party, the agency official is responsible for ensuring that its content meets applicable standards and guidelines.

(4) *Consultation.*  The agency official shall involve the consulting parties described in paragraph (c) of this section in findings and determinations made during the section 106 process. The agency official should plan consultations appropriate to the scale of the undertaking and the scope of Federal involvement and coordinated with other requirements of other statutes, as applicable, such as the National Environmental Policy Act, the Native American Graves Protection and Repatriation Act, the American Indian Religious Freedom Act, the Archeological Resources Protection Act and agency-specific legislation.  The Council encourages the agency official to use to the extent possible existing agency procedures and mechanisms to fulfill the consultation requirements of this part.

(b) *Council.*  The Council issues regulations to implement section 106,

provides guidance and advice on the application of the procedures in this part, and generally oversees the operation of the section 106 process. The Council also consults with and comments to agency officials on individual undertakings and programs that affect historic properties.

(1) *Council entry into the section 106 process.* When the Council determines that its involvement is necessary to ensure that the purposes of section 106 and the act are met, the Council may enter the section 106 process. Criteria guiding Council decisions to enter the section 106 process are found in appendix A to this part. The Council will document that the criteria have been met and notify the parties to the section 106 process as required by this part.

(2) *Council assistance.* Participants in the section 106 process may seek advice, guidance and assistance from the Council on the application of this part to specific undertakings, including the resolution of disagreements, whether or not the Council is formally involved in the review of the undertaking. If questions arise regarding the conduct of the section 106 process, participants are encouraged to obtain the Council's advice on completing the process.

(c) *Consulting parties.* The following parties have consultative roles in the section 106 process.

(1) *State historic preservation officer.*

(i) The State historic preservation officer (SHPO) reflects the interests of the State and its citizens in the preservation of their cultural heritage. In accordance with section 101(b)(3) of the act, the SHPO advises and assists Federal agencies in carrying out their section 106 responsibilities and cooperates with such agencies, local governments and organizations and individuals to ensure that historic properties are taking into consideration at all levels of planning and development.

(ii) If an Indian tribe has assumed the functions of the SHPO in the section 106 process for undertakings on tribal lands, the SHPO shall participate as a consulting party if the undertaking takes place on tribal lands but affects historic properties off tribal lands, if requested in accordance with § 800.3(c)(1), or if the Indian tribe agrees to include the SHPO pursuant to § 800.3(f)(3).

(2) *Indian tribes and Native Hawaiian organizations.*

(i) *Consultation on tribal lands.*

(A) *Tribal historic preservation officer.* For a tribe that has assumed the responsibilities of the SHPO for section 106 on tribal lands under section 101(d)(2) of the act, the tribal historic preservation officer (THPO) appointed or designated in accordance with the act is the official representative for the purposes of section 106. The agency official shall consult with the THPO in lieu of the SHPO regarding undertakings occurring on or affecting historic properties on tribal lands.

(B) *Tribes that have not assumed SHPO functions.* When an Indian tribe has not assumed the responsibilities of the SHPO for section 106 on tribal lands under section 101(d)(2) of the act, the agency official shall consult with a representative designated by such Indian tribe in addition to the SHPO regarding undertakings occurring on or affecting historic properties on its tribal lands. Such Indian tribes have the same rights of consultation and concurrence that the THPOs are given throughout subpart B of this part, except that such consultations shall be in addition to and on the same basis as consultation with the SHPO.

(ii) *Consultation on historic properties of significance to Indian tribes and Native Hawaiian organizations.* Section 101(d)(6)(B) of the act requires the agency official to consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties that may be affected by an undertaking. This requirement applies regardless of the location of the historic property. Such Indian tribe or Native Hawaiian organization shall be a consulting party.

(A) The agency official shall ensure that consultation in the section 106 process provides the Indian tribe or Native Hawaiian organization a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects. It is the responsibility of the agency official to make a reasonable and good faith effort to identify Indian tribes and Native Hawaiian organizations that shall be consulted in the section 106 process. Consultation should commence early in the planning process, in order to identify and discuss relevant

preservation issues and resolve concerns about the confidentiality of information on historic properties.

(B) The Federal Government has a unique legal relationship with Indian tribes set forth in the Constitution of the United States, treaties, statutes, and court decisions. Consultation with Indian tribes should be conducted in a sensitive manner respectful of tribal sovereignty. Nothing in this part alters, amends, repeals, interprets or modifies tribal sovereignty, any treaty rights, or other rights of an Indian tribe, or preempts, modifies or limits the exercise of any such rights.

(C) Consultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes. The agency official shall consult with representatives designated or identified by the tribal government or the governing body of a Native Hawaiian organization. Consultation with Indian tribes and Native Hawaiian organizations should be conducted in a manner sensitive to the concerns and needs of the Indian tribe or Native Hawaiian organization.

(D) When Indian tribes and Native Hawaiian organizations attach religious and cultural significance to historic properties off tribal lands, section 101(d)(6)(B) of the act requires Federal agencies to consult with such Indian tribes and Native Hawaiian organizations in the section 106 process. Federal agencies should be aware that frequently historic properties of religious and cultural significance are located on ancestral, aboriginal, or ceded lands of Indian tribes and Native Hawaiian organizations and should consider that when complying with the procedures in this part.

(E) An Indian tribe or a Native Hawaiian organization may enter into an agreement with an agency official that specifies how they will carry out responsibilities under this part, including concerns over the confidentiality of information. An agreement may cover all aspects of tribal participation in the section 106 process, provided that no modification may be made in the roles of other parties to the section 106 process without their consent. An agreement may grant the Indian tribe or Native Hawaiian organization additional rights to participate or concur in agency decisions in the section 106 process beyond those specified in subpart B of this part. The agency official shall

provide a copy of any such agreement to the Council and the appropriate SHPOs.

(F) An Indian tribe that has not assumed the responsibilities of the SHPO for section 106 on tribal lands under section 101(d)(2) of the act may notify the agency official in writing that it is waiving its rights under § 800.6(c)(1) to execute a memorandum of agreement.

(3) *Representatives of local governments.* A representative of a local government with jurisdiction over the area in which the effects of an undertaking may occur is entitled to participate as a consulting party. Under other provisions of Federal law, the local government may be authorized to act as the agency official for purposes of section 106.

(4) *Applicants for Federal assistance, permits, licenses and other approvals.* An applicant for Federal assistance or for a Federal permit, license or other approval is entitled to participate as a consulting party as defined in this part. The agency official may authorize an applicant or group of applicants to initiate consultation with the SHPO/THPO and others, but remains legally responsible for all findings and determinations charged to the agency official. The agency official shall notify the SHPO/THPO when an applicant or group of applicants is so authorized. A Federal agency may authorize all applicants in a specific program pursuant to this section by providing notice to all SHPO/THPOs. Federal agencies that provide authorizations to applicants remain responsible for their government to government relationships with Indian tribes.

(5) *Additional consulting parties.* Certain individuals and organizations with a demonstrated interest in the undertaking may participate as consulting parties due to the nature of their legal or economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties.

(d) *The public.*

(1) *Nature of involvement.* The views of the public are essential to informed Federal decisionmaking in the section 106 process. The agency official shall seek and consider the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on historic properties, the likely interest of the public in the effects on historic properties, confidentiality concerns of private individuals and businesses, and the relationship of the Federal involvement to the undertaking.

(2) *Providing notice and information.* The agency official must, except where appropriate to protect confidentiality concerns of affected parties, provide the public with information about an undertaking and its effects on historic properties and seek public comment and input. Members of the public may also provide views on their own initiative for the agency official to consider in decisionmaking.

(3) *Use of agency procedures.* The agency official may use the agency's procedures for public involvement under the National Environmental Policy Act or other program requirements in lieu of public involvement requirements in subpart B of this part, if they provide adequate opportunities for public involvement consistent with this subpart.

**Subpart B-The section 106 Process**

**§ 800.3 Initiation of the section 106 process.**

(a) *Establish undertaking.* The agency official shall determine whether the proposed Federal action is an undertaking as defined in § 800.16(y) and, if so, whether it is a type of activity that has the potential to cause effects on historic properties.

(1) *No potential to cause effects.* If the undertaking is a type of activity that does not have the potential to cause effects on historic properties, assuming such historic properties were present, the agency official has no further obligations under section 106 or this part.

(2) *Program alternatives.* If the review of the undertaking is governed by a Federal agency program alternative established under § 800.14 or a programmatic agreement in existence before January 11, 2001, the agency official shall follow the program alternative.

(b) *Coordinate with other reviews.* The agency official should coordinate the steps of the section 106 process, as appropriate, with the overall planning schedule for the undertaking and with any reviews required under other authorities such as the National Environmental Policy Act, the Native American Graves Protection and Repatriation Act, the American Indian Religious Freedom Act, the Archeological Resources Protection Act and agency-specific legislation, such as section 4(f) of the Department of Transportation Act. Where consistent with the procedures in this subpart, the agency official may use information developed for other reviews under Federal, State or tribal law to meet the requirements of section 106.

(c) *Identify the appropriate SHPO and/or THPO.* As part of its initial planning, the agency official shall determine the appropriate SHPO or SHPOs to be involved in the section 106 process. The agency official shall also determine whether the undertaking may occur on or affect historic properties on any tribal lands and, if so, whether a THPO has assumed the duties of the SHPO. The agency official shall then initiate consultation with the appropriate officer or officers.

(1) *Tribal assumption of SHPO responsibilities.* Where an Indian tribe has assumed the section 106 responsibilities of the SHPO on tribal lands pursuant to section 101(d)(2) of the act, consultation for undertakings occurring on tribal land or for effects on tribal land is with the THPO for the Indian tribe in lieu of the SHPO. Section 101(d)(2)(D)(iii) of the act authorizes owners of properties on tribal lands which are neither owned by a member of the tribe nor held in trust by the Secretary for the benefit of the tribe to request the SHPO to participate in the section 106 process in addition to the THPO.

(2) *Undertakings involving more than one State.* If more than one State is involved in an undertaking, the involved SHPOs may agree to designate a lead SHPO to act on their behalf in the section 106 process, including taking actions that would conclude the section 106 process under this subpart.

(3) *Conducting consultation.* The agency official should consult with the SHPO/THPO in a manner appropriate to the agency planning process for the undertaking and to the nature of the undertaking and its effects on historic properties.

(4) *Failure of the SHPO/THPO to respond.* If the SHPO/THPO fails to respond within 30 days of receipt of a request for review of a finding or determination, the agency official may either proceed to the next step in the process based on the finding or determination or consult with the Council in lieu of the SHPO/THPO. If the SHPO/THPO re-enters the section 106 process, the agency official shall continue the consultation without being required to reconsider previous findings or determinations.

(d) *Consultation on tribal lands*. Where the Indian tribe has not assumed the responsibilities of the SHPO on tribal lands, consultation with the Indian tribe regarding undertakings occurring on such tribe's lands or effects on such tribal lands shall be in addition to and on the same basis as consultation with the SHPO. If the SHPO has withdrawn from the process, the agency official may complete the section 106 process with the Indian tribe and the Council, as appropriate. An Indian tribe may enter into an agreement with a SHPO or SHPOs specifying the SHPO's participation in the section 106 process for undertakings occurring on or affecting historic properties on tribal lands.

(e) *Plan to involve the public*. In consultation with the SHPO/THPO, the agency official shall plan for involving the public in the section 106 process. The agency official shall identify the appropriate points for seeking public input and for notifying the public of proposed actions, consistent with § 800.2(d).

(f) *Identify other consulting parties*. In consultation with the SHPO/THPO, the agency official shall identify any other parties entitled to be consulting parties and invite them to participate as such in the section 106 process. The agency official may invite others to participate as consulting parties as the section 106 process moves forward.

(1) *Involving local governments and applicants*. The agency official shall invite any local governments or applicants that are entitled to be consulting parties under § 800.2(c).

(2) *Involving Indian tribes and Native Hawaiian organizations*. The agency official shall make a reasonable and good faith effort to identify any Indian tribes or Native Hawaiian organizations that might attach religious and cultural significance to historic properties in the area of potential effects and invite them to be consulting parties. Such Indian tribe or Native Hawaiian organization that requests in writing to be a consulting party shall be one.

(3) *Requests to be consulting parties*. The agency official shall consider all written requests of individuals and organizations to participate as consulting parties and, in consultation with the SHPO/THPO and any Indian tribe upon whose tribal lands an undertaking occurs or affects historic properties, determine which should be consulting parties.

(g) *Expediting consultation*. A consultation by the agency official with the SHPO/THPO and other consulting parties may address multiple steps in §§ 800.3 through 800.6 where the agency official and the SHPO/THPO agree it is appropriate as long as the consulting parties and the public have an adequate opportunity to express their views as provided in § 800.2(d).

### § 800.4 Identification of historic properties.

(a) *Determine scope of identification efforts*. In consultation with the SHPO/THPO, the agency official shall:

(1) Determine and document the area of potential effects, as defined in § 800.16(d);

(2) Review existing information on historic properties within the area of potential effects, including any data concerning possible historic properties not yet identified;

(3) Seek information, as appropriate, from consulting parties, and other individuals and organizations likely to have knowledge of, or concerns with, historic properties in the area, and identify issues relating to the undertaking's potential effects on historic properties; and

(4) Gather information from any Indian tribe or Native Hawaiian organization identified pursuant to § 800.3(f) to assist in identifying properties, including those located off tribal lands, which may be of religious and cultural significance to them and may be eligible for the National Register, recognizing that an Indian tribe or Native Hawaiian organization may be reluctant to divulge specific information regarding the location, nature, and activities associated with such sites. The agency official should address concerns raised about confidentiality pursuant to § 800.11(c).

(b) *Identify historic properties*. Based on the information gathered under paragraph (a) of this section, and in consultation with the SHPO/THPO and any Indian tribe or Native Hawaiian organization that might attach religious and cultural significance to properties within the area of potential effects, the agency official shall take the steps necessary to identify historic properties within the area of potential effects.

(1) *Level of effort*. The agency official shall make a reasonable and good faith effort to carry out appropriate identification efforts, which may include background research, consultation, oral history interviews,

sample field investigation, and field survey. The agency official shall take into account past planning, research and studies, the magnitude and nature of the undertaking and the degree of Federal involvement, the nature and extent of potential effects on historic properties, and the likely nature and location of historic properties within the area of potential effects. The Secretary's Standards and Guidelines for Identification provide guidance on this subject. The agency official should also consider other applicable professional, State, tribal and local laws, standards and guidelines. The agency official shall take into account any confidentiality concerns raised by Indian tribes or Native Hawaiian organizations during the identification process.

(2) *Phased identification and evaluation*. Where alternatives under consideration consist of corridors or large land areas, or where access to properties is restricted, the agency official may use a phased process to conduct identification and evaluation efforts. The agency official may also defer final identification and evaluation of historic properties if it is specifically provided for in a memorandum of agreement executed pursuant to § 800.6, a programmatic agreement executed pursuant to § 800.14 (b), or the documents used by an agency official to comply with the National Environmental Policy Act pursuant to § 800.8. The process should establish the likely presence of historic properties within the area of potential effects for each alternative or inaccessible area through background research, consultation and an appropriate level of field investigation, taking into account the number of alternatives under consideration, the magnitude of the undertaking and its likely effects, and the views of the SHPO/THPO and any other consulting parties. As specific aspects or locations of an alternative are refined or access is gained, the agency official shall proceed with the identification and evaluation of historic properties in accordance with paragraphs (b)(1) and (c) of this section.

(c) *Evaluate historic significance*.

(1) *Apply National Register criteria*. In consultation with the SHPO/THPO and any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to identified properties and guided by the Secretary's Standards and Guidelines for Evaluation, the agency official shall

apply the National Register criteria (36 CFR part 63) to properties identified within the area of potential effects that have not been previously evaluated for National Register eligibility.  The passage of time, changing perceptions of significance, or incomplete prior evaluations may require the agency official to reevaluate properties previously determined eligible or ineligible.  The agency official shall acknowledge that Indian tribes and Native Hawaiian organizations possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them.

(2) *Determine whether a property is eligible.* If the agency official determines any of the National Register criteria are met and the SHPO/THPO agrees, the property shall be considered eligible for the National Register for section 106 purposes.  If the agency official determines the criteria are not met and the SHPO/THPO agrees, the property shall be considered not eligible. If the agency official and the SHPO/THPO do not agree, or if the Council or the Secretary so request, the agency official shall obtain a determination of eligibility from the Secretary pursuant to 36 CFR part 63.  If an Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to a property off tribal lands does not agree, it may ask the Council to request the agency official to obtain a determination of eligibility.

(d) *Results of identification and evaluation.*

(1) *No historic properties affected.* If the agency official finds that either there are no historic properties present or there are historic properties present but the undertaking will have no effect upon them as defined in § 800.16(i), the agency official shall provide documentation of this finding, as set forth in § 800.11(d), to the SHPO/THPO. The agency official shall notify all consulting parties, including Indian tribes and Native Hawaiian organizations, and make the documentation available for public inspection prior to approving the undertaking.

(i) If the SHPO/THPO, or the Council if it has entered the section 106 process, does not object within 30 days of receipt of an adequately documented finding, the agency official's responsibilities under section 106 are fulfilled.

(ii) If the SHPO/THPO objects within 30 days of receipt of an adequately documented finding, the agency official shall either consult with the objecting party to resolve the disagreement, or forward the finding and supporting documentation to the Council and request that the Council review the finding pursuant to paragraphs (d)(1)(iv)(A) through (d)(1)(iv)(C) of this section. When an agency official forwards such requests for review to the Council, the agency official shall concurrently notify all consulting parties that such a request has been made and make the request documentation available to the public.

(iii) During the SHPO/THPO 30 day review period, the Council may object to the finding and provide its opinion regarding the finding to the agency official and, if the Council determines the issue warrants it, the head of the agency. A Council decision to provide its opinion to the head of an agency shall be guided by the criteria in appendix A to this part. The agency shall then proceed according to paragraphs (d)(1)(iv)(B) and (d)(1)(iv)(C) of this section.

(iv)(A) Upon receipt of the request under paragraph (d)(1)(ii) of this section, the Council will have 30 days in which to review the finding and provide the agency official and, if the Council determines the issue warrants it, the head of the agency with the Council's opinion regarding the finding. A Council decision to provide its opinion to the head of an agency shall be guided by the criteria in appendix A to this part. If the Council does not respond within 30 days of receipt of the request, the agency official's responsibilities under section 106 are fulfilled.

(B) The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall take into account the Council's opinion before the agency reaches a final decision on the finding.

(C) The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall then prepare a summary of the decision that contains the rationale for the decision and evidence of consideration of the Council's opinion, and provide it to the Council, the SHPO/THPO, and the consulting parties. The head of the agency may delegate his or her duties under this paragraph to the agency's senior policy official. If the agency official's initial finding will be revised, the agency official shall proceed in accordance with the revised finding. If the final decision of the agency is to affirm the initial agency finding of no historic properties affected, once the summary of the decision has been sent to the Council, the SHPO/THPO, and the consulting parties, the agency official's responsibilities under section 106 are fulfilled.

(D) The Council shall retain a record of agency responses to Council opinions on their findings of no historic properties affected. The Council shall make this information available to the public.

(2) *Historic properties affected.* If the agency official finds that there are historic properties which may be affected by the undertaking, the agency official shall notify all consulting parties, including Indian tribes or Native Hawaiian organizations, invite their views on the effects and assess adverse effects, if any, in accordance with § 800.5.

## § 800.5 Assessment of adverse effects.

(a) *Apply criteria of adverse effect.* In consultation with the SHPO/THPO and any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to identified historic properties, the agency official shall apply the criteria of adverse effect to historic properties within the area of potential effects.  The agency official shall consider any views concerning such effects which have been provided by consulting parties and the public.

(1) *Criteria of adverse effect.* An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association. Consideration shall be given to all qualifying characteristics of a historic property, including those that may have been identified subsequent to the original evaluation of the property's eligibility for the National Register. Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative.

(2) *Examples of adverse effects.* Adverse effects on historic properties include, but are not limited to:

(i) Physical destruction of or damage to all or part of the property;

(ii) Alteration of a property, including restoration, rehabilitation, repair, maintenance, stabilization, hazardous material remediation and provision of handicapped access, that is not consistent with the Secretary's Standards for the Treatment of Historic Properties (36 CFR part 68) and applicable guidelines;

(iii) Removal of the property from its historic location;

(iv) Change of the character of the property's use or of physical features within the property's setting that contribute to its historic significance;

(v) Introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features;

(vi) Neglect of a property which causes its deterioration, except where such neglect and deterioration are recognized qualities of a property of religious and cultural significance to an Indian tribe or Native Hawaiian organization; and

(vii) Transfer, lease, or sale of property out of Federal ownership or control without adequate and legally enforceable restrictions or conditions to ensure long-term preservation of the property's historic significance.

(3) *Phased application of criteria.* Where alternatives under consideration consist of corridors or large land areas, or where access to properties is restricted, the agency official may use a phased process in applying the criteria of adverse effect consistent with phased identification and evaluation efforts conducted pursuant to § 800.4(b)(2).

(b) *Finding of no adverse effect.* The agency official, in consultation with the SHPO/THPO, may propose a finding of no adverse effect when the undertaking's effects do not meet the criteria of paragraph (a)(1) of this section or the undertaking is modified or conditions are imposed, such as the subsequent review of plans for rehabilitation by the SHPO/THPO to ensure consistency with the Secretary's Standards for the Treatment of Historic Properties (36 CFR part 68) and applicable guidelines, to avoid adverse effects.

(c) *Consulting party review.* If the agency official proposes a finding of no adverse effect, the agency official shall notify all consulting parties of the finding and provide them with the documentation specified in § 800.11(e). The SHPO/THPO shall have 30 days from receipt to review the finding.

(1) *Agreement with, or no objection to, finding.* Unless the Council is reviewing the finding pursuant to paragraph (c)(3) of this section, the agency official may proceed after the close of the 30 day review period if the SHPO/THPO has agreed with the finding or has not provided a response, and no consulting party has objected. The agency official shall then carry out the undertaking in accordance with paragraph (d)(1) of this section.

(2) *Disagreement with finding.*

(i) If within the 30 day review period the SHPO/THPO or any consulting party notifies the agency official in writing that it disagrees with the finding and specifies the reasons for the disagreement in the notification, the agency official shall either consult with the party to resolve the disagreement, or request the Council to review the finding pursuant to paragraphs (c)(3)(i) and (c)(3)(ii) of this section. The agency official shall include with such request the documentation specified in § 800.11(e). The agency official shall also concurrently notify all consulting parties that such a submission has been made and make the submission documentation available to the public.

(ii) If within the 30 day review period the Council provides the agency official and, if the Council determines the issue warrants it, the head of the agency, with a written opinion objecting to the finding, the agency shall then proceed according to paragraph (c)(3)(ii) of this section. A Council decision to provide its opinion to the head of an agency shall be guided by the criteria in appendix A to this part.

(iii) The agency official should seek the concurrence of any Indian tribe or Native Hawaiian organization that has made known to the agency official that it attaches religious and cultural significance to a historic property subject to the finding. If such Indian tribe or Native Hawaiian organization disagrees with the finding, it may within the 30 day review period specify the reasons for disagreeing with the finding and request the Council to review and object to the finding pursuant to paragraph (c)(2)(ii) of this section.

(3) *Council review of findings.*

(i) When a finding is submitted to the Council pursuant to paragraph (c)(2)(i) of this section, the Council shall review the finding and provide the agency official and, if the Council determines the issue warrants it, the head of the agency with its opinion as to whether the adverse effect criteria have

been correctly applied. A Council decision to provide its opinion to the head of an agency shall be guided by the criteria in appendix A to this part. The Council will provide its opinion within 15 days of receiving the documented finding from the agency official. The Council at its discretion may extend that time period for 15 days, in which case it shall notify the agency of such extension prior to the end of the initial 15 day period. If the Council does not respond within the applicable time period, the agency official's responsibilities under section 106 are fulfilled.

(ii)(A) The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall take into account the Council's opinion in reaching a final decision on the finding.

(B) The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall prepare a summary of the decision that contains the rationale for the decision and evidence of consideration of the Council's opinion, and provide it to the Council, the SHPO/THPO, and the consulting parties. The head of the agency may delegate his or her duties under this paragraph to the agency's senior policy official. If the agency official's initial finding will be revised, the agency official shall proceed in accordance with the revised finding. If the final decision of the agency is to affirm the initial finding of no adverse effect, once the summary of the decision has been sent to the Council, the SHPO/THPO, and the consulting parties, the agency official's responsibilities under section 106 are fulfilled.

(C) The Council shall retain a record of agency responses to Council opinions on their findings of no adverse effects. The Council shall make this information available to the public.

(d) *Results of assessment.*

(1) *No adverse effect.* The agency official shall maintain a record of the finding and provide information on the finding to the public on request, consistent with the confidentiality provisions of § 800.11(c). Implementation of the undertaking in accordance with the finding as documented fulfills the agency official's responsibilities under section 106 and this part. If the agency official will not conduct the undertaking as proposed in the finding, the agency official shall reopen consultation under paragraph (a) of this section.

(2) *Adverse effect.* If an adverse effect is found, the agency official shall consult further to resolve the adverse effect pursuant to § 800.6.

## § 800.6  Resolution of adverse effects.

(a) *Continue consultation*. The agency official shall consult with the SHPO/THPO and other consulting parties, including Indian tribes and Native Hawaiian organizations, to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize or mitigate adverse effects on historic properties.

(1) *Notify the Council and determine Council participation*. The agency official shall notify the Council of the adverse effect finding by providing the documentation specified in § 800.11(e).

(i) The notice shall invite the Council to participate in the consultation when:

(A) The agency official wants the Council to participate;

(B) The undertaking has an adverse effect upon a National Historic Landmark; or

(C) A programmatic agreement under § 800.14(b) will be prepared;

(ii) The SHPO/THPO, an Indian tribe or Native Hawaiian organization, or any other consulting party may at any time independently request the Council to participate in the consultation.

(iii) The Council shall advise the agency official and all consulting parties whether it will participate within 15 days of receipt of notice or other request. Prior to entering the process, the Council shall provide written notice to the agency official and the consulting parties that its decision to participate meets the criteria set forth in appendix A to this part. The Council shall also advise the head of the agency of its decision to enter the process. Consultation with Council participation is conducted in accordance with paragraph (b)(2) of this section.

(iv) If the Council does not join the consultation, the agency official shall proceed with consultation in accordance with paragraph (b)(1) of this section.

(2) *Involve consulting parties*. In addition to the consulting parties identified under § 800.3(f), the agency official, the SHPO/THPO and the Council, if participating, may agree to invite other individuals or organizations to become consulting parties. The agency official shall invite any individual or organization that will assume a specific role or responsibility

in a memorandum of agreement to participate as a consulting party.

(3) *Provide documentation*. The agency official shall provide to all consulting parties the documentation specified in § 800.11(e), subject to the confidentiality provisions of § 800.11(c), and such other documentation as may be developed during the consultation to resolve adverse effects.

(4) *Involve the public*. The agency official shall make information available to the public, including the documentation specified in § 800.11(e), subject to the confidentiality provisions of § 800.11(c). The agency official shall provide an opportunity for members of the public to express their views on resolving adverse effects of the undertaking. The agency official should use appropriate mechanisms, taking into account the magnitude of the undertaking and the nature of its effects upon historic properties, the likely effects on historic properties, and the relationship of the Federal involvement to the undertaking to ensure that the public's views are considered in the consultation. The agency official should also consider the extent of notice and information concerning historic preservation issues afforded the public at earlier steps in the section 106 process to determine the appropriate level of public involvement when resolving adverse effects so that the standards of § 800.2(d) are met.

(5) *Restrictions on disclosure of information*. Section 304 of the act and other authorities may limit the disclosure of information under paragraphs (a)(3) and (a)(4) of this section. If an Indian tribe or Native Hawaiian organization objects to the disclosure of information or if the agency official believes that there are other reasons to withhold information, the agency official shall comply with § 800.11(c) regarding the disclosure of such information.

(b) *Resolve adverse effects*.

(1) *Resolution without the Council*.

(i) The agency official shall consult with the SHPO/THPO and other consulting parties to seek ways to avoid, minimize or mitigate the adverse effects.

(ii) The agency official may use standard treatments established by the Council under § 800.14(d) as a basis for a memorandum of agreement.

(iii) If the Council decides to join the consultation, the agency official shall follow paragraph (b)(2) of this section.

(iv) If the agency official and the SHPO/THPO agree on how the adverse

effects will be resolved, they shall execute a memorandum of agreement. The agency official must submit a copy of the executed memorandum of agreement, along with the documentation specified in § 800.11(f), to the Council prior to approving the undertaking in order to meet the requirements of section 106 and this subpart.

(v) If the agency official, and the SHPO/THPO fail to agree on the terms of a memorandum of agreement, the agency official shall request the Council to join the consultation and provide the Council with the documentation set forth in § 800.11(g). If the Council decides to join the consultation, the agency official shall proceed in accordance with paragraph (b)(2) of this section. If the Council decides not to join the consultation, the Council will notify the agency and proceed to comment in accordance with § 800.7(c).

(2) *Resolution with Council participation*. If the Council decides to participate in the consultation, the agency official shall consult with the SHPO/THPO, the Council, and other consulting parties, including Indian tribes and Native Hawaiian organizations under § 800.2(c)(3), to seek ways to avoid, minimize or mitigate the adverse effects. If the agency official, the SHPO/THPO, and the Council agree on how the adverse effects will be resolved, they shall execute a memorandum of agreement.

(c) *Memorandum of agreement*. A memorandum of agreement executed and implemented pursuant to this section evidences the agency official's compliance with section 106 and this part and shall govern the undertaking and all of its parts. The agency official shall ensure that the undertaking is carried out in accordance with the memorandum of agreement.

(1) *Signatories*. The signatories have sole authority to execute, amend or terminate the agreement in accordance with this subpart.

(i) The agency official and the SHPO/THPO are the signatories to a memorandum of agreement executed pursuant to paragraph (b)(1) of this section.

(ii) The agency official, the SHPO/THPO, and the Council are the signatories to a memorandum of agreement executed pursuant to paragraph (b)(2) of this section.

(iii) The agency official and the Council are signatories to a

memorandum of agreement executed pursuant to § 800.7(a)(2).

(2) *Invited signatories*.

(i) The agency official may invite additional parties to be signatories to a memorandum of agreement. Any such party that signs the memorandum of agreement shall have the same rights with regard to seeking amendment or termination of the memorandum of agreement as other signatories.

(ii) The agency official may invite an Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties located off tribal lands to be a signatory to a memorandum of agreement concerning such properties.

(iii) The agency official should invite any party that assumes a responsibility under a memorandum of agreement to be a signatory.

(iv) The refusal of any party invited to become a signatory to a memorandum of agreement pursuant to paragraph (c)(2) of this section does not invalidate the memorandum of agreement.

(3) *Concurrence by others*. The agency official may invite all consulting parties to concur in the memorandum of agreement. The signatories may agree to invite others to concur. The refusal of any party invited to concur in the memorandum of agreement does not invalidate the memorandum of agreement.

(4) *Reports on implementation*. Where the signatories agree it is appropriate, a memorandum of agreement shall include a provision for monitoring and reporting on its implementation.

(5) *Duration*. A memorandum of agreement shall include provisions for termination and for reconsideration of terms if the undertaking has not been implemented within a specified time.

(6) *Discoveries*. Where the signatories agree it is appropriate, a memorandum of agreement shall include provisions to deal with the subsequent discovery or identification of additional historic properties affected by the undertaking.

(7) *Amendments*. The signatories to a memorandum of agreement may amend it. If the Council was not a signatory to the original agreement and the signatories execute an amended agreement, the agency official shall file it with the Council.

(8) *Termination*. If any signatory determines that the terms of a memorandum of agreement cannot be or are not being carried out, the signatories

shall consult to seek amendment of the agreement. If the agreement is not amended, any signatory may terminate it. The agency official shall either execute a memorandum of agreement with signatories under paragraph (c)(1) of this section or request the comments of the Council under § 800.7(a).

(9) *Copies*. The agency official shall provide each consulting party with a copy of any memorandum of agreement executed pursuant to this subpart.

## § 800.7 Failure to resolve adverse effects.

(a) *Termination of consultation*. After consulting to resolve adverse effects pursuant to § 800.6(b)(2), the agency official, the SHPO/THPO, or the Council may determine that further consultation will not be productive and terminate consultation. Any party that terminates consultation shall notify the other consulting parties and provide them the reasons for terminating in writing.

(1) If the agency official terminates consultation, the head of the agency or an Assistant Secretary or other officer with major department-wide or agency-wide responsibilities shall request that the Council comment pursuant to paragraph (c) of this section and shall notify all consulting parties of the request.

(2) If the SHPO terminates consultation, the agency official and the Council may execute a memorandum of agreement without the SHPO's involvement.

(3) If a THPO terminates consultation regarding an undertaking occurring on or affecting historic properties on its tribal lands, the Council shall comment pursuant to paragraph (c) of this section.

(4) If the Council terminates consultation, the Council shall notify the agency official, the agency's Federal preservation officer and all consulting parties of the termination and comment under paragraph (c) of this section. The Council may consult with the agency's Federal preservation officer prior to terminating consultation to seek to resolve issues concerning the undertaking and its effects on historic properties.

(b) *Comments without termination*. The Council may determine that it is appropriate to provide additional advisory comments upon an undertaking for which a memorandum of agreement will be executed. The Council shall provide them to the

agency official when it executes the memorandum of agreement.

(c) *Comments by the Council*.

(1) *Preparation*. The Council shall provide an opportunity for the agency official, all consulting parties, and the public to provide their views within the time frame for developing its comments. Upon request of the Council, the agency official shall provide additional existing information concerning the undertaking and assist the Council in arranging an onsite inspection and an opportunity for public participation.

(2) *Timing*. The Council shall transmit its comments within 45 days of receipt of a request under paragraph (a)(1) or (a)(3) of this section or § 800.8(c)(3), or termination by the Council under § 800.6(b)(1)(v) or paragraph (a)(4) of this section, unless otherwise agreed to by the agency official.

(3) *Transmittal*. The Council shall provide its comments to the head of the agency requesting comment with copies to the agency official, the agency's Federal preservation officer, all consulting parties, and others as appropriate.

(4) *Response to Council comment*. The head of the agency shall take into account the Council's comments in reaching a final decision on the undertaking. Section 110(l) of the act directs that the head of the agency shall document this decision and may not delegate his or her responsibilities pursuant to section 106. Documenting the agency head's decision shall include:

(i) Preparing a summary of the decision that contains the rationale for the decision and evidence of consideration of the Council's comments and providing it to the Council prior to approval of the undertaking;

(ii) Providing a copy of the summary to all consulting parties; and

(iii) Notifying the public and making the record available for public inspection.

## § 800.8 Coordination With the National Environmental Policy Act.

(a) *General principles*.

(1) *Early coordination*. Federal agencies are encouraged to coordinate compliance with section 106 and the procedures in this part with any steps taken to meet the requirements of the National Environmental Policy Act (NEPA). Agencies should consider their section 106 responsibilities as early as possible in the NEPA process, and plan

their public participation, analysis, and review in such a way that they can meet the purposes and requirements of both statutes in a timely and efficient manner. The determination of whether an undertaking is a "major Federal action significantly affecting the quality of the human environment," and therefore requires preparation of an environmental impact statement (EIS) under NEPA, should include consideration of the undertaking's likely effects on historic properties. A finding of adverse effect on a historic property does not necessarily require an EIS under NEPA.

(2) *Consulting party roles.* SHPO/THPOs, Indian tribes and Native Hawaiian organizations, other consulting parties, and organizations and individuals who may be concerned with the possible effects of an agency action on historic properties should be prepared to consult with agencies early in the NEPA process, when the purpose of and need for the proposed action as well as the widest possible range of alternatives are under consideration.

(3) *Inclusion of historic preservation issues.* Agency officials should ensure that preparation of an environmental assessment (EA) and finding of no significant impact (FONSI) or an EIS and record of decision (ROD) includes appropriate scoping, identification of historic properties, assessment of effects upon them, and consultation leading to resolution of any adverse effects.

(b) *Actions categorically excluded under NEPA.* If a project, activity or program is categorically excluded from NEPA review under an agency's NEPA procedures, the agency official shall determine if it still qualifies as an undertaking requiring review under section 106 pursuant to § 800.3(a). If so, the agency official shall proceed with section 106 review in accordance with the procedures in this subpart.

(c) *Use of the NEPA process for section 106 purposes.* An agency official may use the process and documentation required for the preparation of an EA/FONSI or an EIS/ROD to comply with section 106 in lieu of the procedures set forth in §§ 800.3 through 800.6 if the agency official has notified in advance the SHPO/THPO and the Council that it intends to do so and the following standards are met.

(1) *Standards for developing environmental documents to comply with Section 106.* During preparation of the EA or draft EIS (DEIS) the agency official shall:

(i) Identify consulting parties either pursuant to § 800.3(f) or through the NEPA scoping process with results consistent with § 800.3(f);

(ii) Identify historic properties and assess the effects of the undertaking on such properties in a manner consistent with the standards and criteria of §§ 800.4 through 800.5, provided that the scope and timing of these steps may be phased to reflect the agency official's consideration of project alternatives in the NEPA process and the effort is commensurate with the assessment of other environmental factors;

(iii) Consult regarding the effects of the undertaking on historic properties with the SHPO/THPO, Indian tribes and Native Hawaiian organizations that might attach religious and cultural significance to affected historic properties, other consulting parties, and the Council, where appropriate, during NEPA scoping, environmental analysis, and the preparation of NEPA documents;

(iv) Involve the public in accordance with the agency's published NEPA procedures; and

(v) Develop in consultation with identified consulting parties alternatives and proposed measures that might avoid, minimize or mitigate any adverse effects of the undertaking on historic properties and describe them in the EA or DEIS.

(2) *Review of environmental documents.*

(i) The agency official shall submit the EA, DEIS or EIS to the SHPO/THPO, Indian tribes and Native Hawaiian organizations that might attach religious and cultural significance to affected historic properties, and other consulting parties prior to or when making the document available for public comment. If the document being prepared is a DEIS or EIS, the agency official shall also submit it to the Council.

(ii) Prior to or within the time allowed for public comment on the document, a SHPO/THPO, an Indian tribe or Native Hawaiian organization, another consulting party or the Council may object to the agency official that preparation of the EA, DEIS or EIS has not met the standards set forth in paragraph (c)(1) of this section or that the substantive resolution of the effects on historic properties proposed in an EA, DEIS or EIS is inadequate. If the agency official receives such an objection, the agency official shall refer the matter to the Council.

(3) *Resolution of objections.* Within 30 days of the agency official's referral of an objection under paragraph (c)(2)(ii) of this section, the Council shall review the objection and notify the agency as to its opinion on the objection.

(i) If the Council agrees with the objection:

(A) The Council shall provide the agency official and, if the Council determines the issue warrants it, the head of the agency with the Council's opinion regarding the objection. A Council decision to provide its opinion to the head of an agency shall be guided by the criteria in appendix A to this part. The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall take into account the Council's opinion in reaching a final decision on the issue of the objection.

(B) The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall prepare a summary of the decision that contains the rationale for the decision and evidence of consideration of the Council's opinion, and provide it to the Council. The head of the agency may delegate his or her duties under this paragraph to the agency's senior Policy Official. If the agency official's initial decision regarding the matter that is the subject of the objection will be revised, the agency official shall proceed in accordance with the revised decision. If the final decision of the agency is to affirm the initial agency decision, once the summary of the final decision has been sent to the Council, the agency official shall continue its compliance with this section.

(ii) If the Council disagrees with the objection, the Council shall so notify the agency official, in which case the agency official shall continue its compliance with this section.

(iii) If the Council fails to respond to the objection within the 30 day period, the agency official shall continue its compliance with this section.

(4) *Approval of the undertaking.* If the agency official has found, during the preparation of an EA or EIS that the effects of an undertaking on historic properties are adverse, the agency official shall develop measures in the EA, DEIS, or EIS to avoid, minimize, or mitigate such effects in accordance with paragraph (c)(1)(v) of this section. The agency official's responsibilities under section 106 and the procedures in this

subpart shall then be satisfied when either:

(i) a binding commitment to such proposed measures is incorporated in

(A) the ROD, if such measures were proposed in a DEIS or EIS; or

(B) an MOA drafted in compliance with § 800.6(c); or

(ii) the Council has commented under § 800.7 and received the agency's response to such comments.

(5) *Modification of the undertaking.* If the undertaking is modified after approval of the FONSI or the ROD in a manner that changes the undertaking or alters its effects on historic properties, or if the agency official fails to ensure that the measures to avoid, minimize or mitigate adverse effects (as specified in either the FONSI or the ROD, or in the binding commitment adopted pursuant to paragraph (c)(4) of this section) are carried out, the agency official shall notify the Council and all consulting parties that supplemental environmental documents will be prepared in compliance with NEPA or that the procedures in §§ 800.3 through 800.6 will be followed as necessary.

**§ 800.9 Council review of section 106 compliance.**

(a) *Assessment of agency official compliance for individual undertakings.* The Council may provide to the agency official its advisory opinion regarding the substance of any finding, determination or decision or regarding the adequacy of the agency official's compliance with the procedures under this part. The Council may provide such advice at any time at the request of any individual, agency or organization or on its own initiative. The agency official shall consider the views of the Council in reaching a decision on the matter in question.

(b) *Agency foreclosure of the Council's opportunity to comment.* Where an agency official has failed to complete the requirements of section 106 in accordance with the procedures in this part prior to the approval of an undertaking, the Council's opportunity to comment may be foreclosed. The Council may review a case to determine whether a foreclosure has occurred. The Council shall notify the agency official and the agency's Federal preservation officer and allow 30 days for the agency official to provide information as to whether foreclosure has occurred. If the Council determines foreclosure has occurred, the Council shall transmit the determination to the

agency official and the head of the agency. The Council shall also make the determination available to the public and any parties known to be interested in the undertaking and its effects upon historic properties.

(c) *Intentional adverse effects by applicants.*

(1) *Agency responsibility.* Section 110(k) of the act prohibits a Federal agency from granting a loan, loan guarantee, permit, license or other assistance to an applicant who, with intent to avoid the requirements of section 106, has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, has allowed such significant adverse effect to occur, unless the agency, after consultation with the Council, determines that circumstances justify granting such assistance despite the adverse effect created or permitted by the applicant. Guidance issued by the Secretary pursuant to section 110 of the act governs its implementation.

(2) *Consultation with the Council.* When an agency official determines, based on the actions of an applicant, that section 110(k) is applicable and that circumstances may justify granting the assistance, the agency official shall notify the Council and provide documentation specifying the circumstances under which the adverse effects to the historic property occurred and the degree of damage to the integrity of the property. This documentation shall include any views obtained from the applicant, SHPO/THPO, an Indian tribe if the undertaking occurs on or affects historic properties on tribal lands, and other parties known to be interested in the undertaking.

(i) Within thirty days of receiving the agency official's notification, unless otherwise agreed to by the agency official, the Council shall provide the agency official with its opinion as to whether circumstances justify granting assistance to the applicant and any possible mitigation of the adverse effects.

(ii) The agency official shall consider the Council's opinion in making a decision on whether to grant assistance to the applicant, and shall notify the Council, the SHPO/THPO, and other parties known to be interested in the undertaking prior to granting the assistance.

(3) *Compliance with Section 106.* If an agency official, after consulting with

the Council, determines to grant the assistance, the agency official shall comply with §§ 800.3 through 800.6 to take into account the effects of the undertaking on any historic properties.

(d) *Evaluation of Section 106 operations.* The Council may evaluate the operation of the section 106 process by periodic reviews of how participants have fulfilled their legal responsibilities and how effectively the outcomes reached advance the purposes of the act.

(1) *Information from participants.* Section 203 of the act authorizes the Council to obtain information from Federal agencies necessary to conduct evaluation of the section 106 process. The agency official shall make documentation of agency policies, operating procedures and actions taken to comply with section 106 available to the Council upon request. The Council may request available information and documentation from other participants in the section 106 process.

(2) *Improving the operation of section 106.* Based upon any evaluation of the section 106 process, the Council may make recommendations to participants, the heads of Federal agencies, and the Secretary of actions to improve the efficiency and effectiveness of the process. Where the Council determines that an agency official or a SHPO/THPO has failed to properly carry out the responsibilities assigned under the process in this part, the Council may participate in individual case reviews conducted under such process in addition to the SHPO/THPO for such period that it determines is necessary to improve performance or correct deficiencies. If the Council finds a pattern of failure by a Federal agency in carrying out its responsibilities under section 106, the Council may review the policies and programs of the agency related to historic preservation pursuant to section 202(a)(6) of the act and recommend methods to improve the effectiveness, coordination, and consistency of those policies and programs with section 106.

**§ 800.10 Special requirements for protecting National Historic Landmarks.**

(a) *Statutory requirement.* Section 110(f) of the act requires that the agency official, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to any National Historic Landmark that may be directly and adversely affected by an undertaking. When

commenting on such undertakings, the Council shall use the process set forth in §§ 800.6 through 800.7 and give special consideration to protecting National Historic Landmarks as specified in this section.

(b) *Resolution of adverse effects*. The agency official shall request the Council to participate in any consultation to resolve adverse effects on National Historic Landmarks conducted under § 800.6.

(c) *Involvement of the Secretary*. The agency official shall notify the Secretary of any consultation involving a National Historic Landmark and invite the Secretary to participate in the consultation where there may be an adverse effect. The Council may request a report from the Secretary under section 213 of the act to assist in the consultation.

(d) *Report of outcome*. When the Council participates in consultation under this section, it shall report the outcome of the section 106 process, providing its written comments or any memoranda of agreement to which it is a signatory, to the Secretary and the head of the agency responsible for the undertaking.

**§ 800.11  Documentation standards.**

(a) *Adequacy of documentation*. The agency official shall ensure that a determination, finding, or agreement under the procedures in this subpart is supported by sufficient documentation to enable any reviewing parties to understand its basis. The agency official shall provide such documentation to the extent permitted by law and within available funds. When an agency official is conducting phased identification or evaluation under this subpart, the documentation standards regarding description of historic properties may be applied flexibly. If the Council, or the SHPO/THPO when the Council is not involved, determines the applicable documentation standards are not met, the Council or the SHPO/THPO, as appropriate, shall notify the agency official and specify the information needed to meet the standard. At the request of the agency official or any of the consulting parties, the Council shall review any disputes over whether documentation standards are met and provide its views to the agency official and the consulting parties.

(b) *Format*. The agency official may use documentation prepared to comply with other laws to fulfill the requirements of the procedures in this subpart, if that documentation meets the standards of this section.

(c) *Confidentiality*.

(1) *Authority to withhold information*. Section 304 of the act provides that the head of a Federal agency or other public official receiving grant assistance pursuant to the act, after consultation with the Secretary, shall withhold from public disclosure information about the location, character, or ownership of a historic property when disclosure may cause a significant invasion of privacy; risk harm to the historic property; or impede the use of a traditional religious site by practitioners. When the head of a Federal agency or other public official has determined that information should be withheld from the public pursuant to these criteria, the Secretary, in consultation with such Federal agency head or official, shall determine who may have access to the information for the purposes of carrying out the act.

(2) *Consultation with the Council*. When the information in question has been developed in the course of an agency's compliance with this part, the Secretary shall consult with the Council in reaching determinations on the withholding and release of information. The Federal agency shall provide the Council with available information, including views of the SHPO/THPO, Indian tribes and Native Hawaiian organizations, related to the confidentiality concern. The Council shall advise the Secretary and the Federal agency within 30 days of receipt of adequate documentation.

(3) *Other authorities affecting confidentiality*. Other Federal laws and program requirements may limit public access to information concerning an undertaking and its effects on historic properties. Where applicable, those authorities shall govern public access to information developed in the section 106 process and may authorize the agency official to protect the privacy of non-governmental applicants.

(d) *Finding of no historic properties affected*. Documentation shall include:

(1) A description of the undertaking, specifying the Federal involvement, and its area of potential effects, including photographs, maps, drawings, as necessary;

(2) A description of the steps taken to identify historic properties, including, as appropriate, efforts to seek information pursuant to § 800.4(b); and

(3) The basis for determining that no historic properties are present or affected.

(e) *Finding of no adverse effect or adverse effect*. Documentation shall include:

(1) A description of the undertaking, specifying the Federal involvement, and its area of potential effects, including photographs, maps, and drawings, as necessary;

(2) A description of the steps taken to identify historic properties;

(3) A description of the affected historic properties, including information on the characteristics that qualify them for the National Register;

(4) A description of the undertaking's effects on historic properties;

(5) An explanation of why the criteria of adverse effect were found applicable or inapplicable, including any conditions or future actions to avoid, minimize or mitigate adverse effects; and

(6) Copies or summaries of any views provided by consulting parties and the public.

(f) *Memorandum of agreement*. When a memorandum of agreement is filed with the Council, the documentation shall include, any substantive revisions or additions to the documentation provided the Council pursuant to § 800.6(a)(1), an evaluation of any measures considered to avoid or minimize the undertaking's adverse effects and a summary of the views of consulting parties and the public.

(g) *Requests for comment without a memorandum of agreement*. Documentation shall include:

(1) A description and evaluation of any alternatives or mitigation measures that the agency official proposes to resolve the undertaking's adverse effects;

(2) A description of any reasonable alternatives or mitigation measures that were considered but not chosen, and the reasons for their rejection;

(3) Copies or summaries of any views submitted to the agency official concerning the adverse effects of the undertaking on historic properties and alternatives to reduce or avoid those effects; and

(4) Any substantive revisions or additions to the documentation provided the Council pursuant to § 800.6(a)(1).

**§ 800.12 Emergency situations.**

(a) *Agency procedures*.  The agency official, in consultation with the appropriate SHPOs/THPOs, affected Indian tribes and Native Hawaiian organizations, and the Council, is encouraged to develop procedures for taking historic properties into account during operations which respond to a disaster or emergency declared by the President, a tribal government, or the Governor of a State or which respond to other immediate threats to life or property.  If approved by the Council, the procedures shall govern the agency's historic preservation responsibilities during any disaster or emergency in lieu of §§ 800.3 through 800.6.

(b) *Alternatives to agency procedures*.  In the event an agency official proposes an emergency undertaking as an essential and immediate response to a disaster or emergency declared by the President, a tribal government, or the Governor of a State or another immediate threat to life or property, and the agency has not developed procedures pursuant to paragraph (a) of this section, the agency official may comply with section 106 by:

(1) Following a programmatic agreement developed pursuant to § 800.14(b) that contains specific provisions for dealing with historic properties in emergency situations; or

(2) Notifying the Council, the appropriate SHPO/THPO and any Indian tribe or Native Hawaiian organization that may attach religious and cultural significance to historic properties likely to be affected prior to the undertaking and affording them an opportunity to comment within seven days of notification.  If the agency official determines that circumstances do not permit seven days for comment, the agency official shall notify the Council, the SHPO/THPO and the Indian tribe or Native Hawaiian organization and invite any comments within the time available.

(c) *Local governments responsible for section 106 compliance*.  When a local government official serves as the agency official for section 106 compliance, paragraphs (a) and (b) of this section also apply to an imminent threat to public health or safety as a result of a natural disaster or emergency declared by a local government's chief executive officer or legislative body, provided that if the Council or SHPO/THPO objects to the proposed action within seven days, the agency official shall comply with §§ 800.3 through 800.6.

(d) *Applicability*.  This section applies only to undertakings that will be implemented within 30 days after the disaster or emergency has been formally declared by the appropriate authority.  An agency may request an extension of the period of applicability from the Council prior to the expiration of the 30 days.  Immediate rescue and salvage operations conducted to preserve life or property are exempt from the provisions of section 106 and this part.

§ 800.13  Post-review discoveries.

(a) *Planning for subsequent discoveries*.

(1) *Using a programmatic agreement*.  An agency official may develop a programmatic agreement pursuant to § 800.14(b) to govern the actions to be taken when historic properties are discovered during the implementation of an undertaking.

(2) *Using agreement documents*.  When the agency official's identification efforts in accordance with § 800.4 indicate that historic properties are likely to be discovered during implementation of an undertaking and no programmatic agreement has been developed pursuant to paragraph (a)(1) of this section, the agency official shall include in any finding of no adverse effect or memorandum of agreement a process to resolve any adverse effects upon such properties.  Actions in conformance with the process satisfy the agency official's responsibilities under section 106 and this part.

(b) *Discoveries without prior planning*.  If historic properties are discovered or unanticipated effects on historic properties found after the agency official has completed the section 106 process without establishing a process under paragraph (a) of this section, the agency official shall make reasonable efforts to avoid, minimize or mitigate adverse effects to such properties and:

(1) If the agency official has not approved the undertaking or if construction on an approved undertaking has not commenced, consult to resolve adverse effects pursuant to § 800.6; or

(2) If the agency official, the SHPO/THPO and any Indian tribe or Native Hawaiian organization that might attach religious and cultural significance to the affected property agree that such property is of value solely for its scientific, prehistoric, historic or archeological data, the agency official may comply with the

Archeological and Historic Preservation Act instead of the procedures in this part and provide the Council, the SHPO/THPO, and the Indian tribe or Native Hawaiian organization with a report on the actions within a reasonable time after they are completed; or

(3) If the agency official has approved the undertaking and construction has commenced, determine actions that the agency official can take to resolve adverse effects, and notify the SHPO/THPO, any Indian tribe or Native Hawaiian organization that might attach religious and cultural significance to the affected property, and the Council within 48 hours of the discovery.  The notification shall describe the agency official's assessment of National Register eligibility of the property and proposed actions to resolve the adverse effects.  The SHPO/THPO, the Indian tribe or Native Hawaiian organization and the Council shall respond within 48 hours of the notification.  The agency official shall take into account their recommendations regarding National Register eligibility and proposed actions, and then carry out appropriate actions.  The agency official shall provide the SHPO/THPO, the Indian tribe or Native Hawaiian organization and the Council a report of the actions when they are completed.

(c) *Eligibility of properties*.  The agency official, in consultation with the SHPO/THPO, may assume a newly-discovered property to be eligible for the National Register for purposes of section 106.  The agency official shall specify the National Register criteria used to assume the property's eligibility so that information can be used in the resolution of adverse effects.

(d) *Discoveries on tribal lands*.  If historic properties are discovered on tribal lands, or there are unanticipated effects on historic properties found on tribal lands, after the agency official has completed the section 106 process without establishing a process under paragraph (a) of this section and construction has commenced, the agency official shall comply with applicable tribal regulations and procedures and obtain the concurrence of the Indian tribe on the proposed action.

**Subpart C-Program Alternatives**

**§ 800.14  Federal agency program alternatives.**

(a) *Alternate procedures.* An agency official may develop procedures to implement section 106 and substitute them for all or part of subpart B of this part if they are consistent with the Council's regulations pursuant to section 110(a)(2)(E) of the act.

(1) *Development of procedures.* The agency official shall consult with the Council, the National Conference of State Historic Preservation Officers or individual SHPO/THPOs, as appropriate, and Indian tribes and Native Hawaiian organizations, as specified in paragraph (f) of this section, in the development of alternate procedures, publish notice of the availability of proposed alternate procedures in the Federal Register and take other appropriate steps to seek public input during the development of alternate procedures.

(2) *Council review.* The agency official shall submit the proposed alternate procedures to the Council for a 60-day review period. If the Council finds the procedures to be consistent with this part, it shall notify the agency official and the agency official may adopt them as final alternate procedures.

(3) *Notice.* The agency official shall notify the parties with which it has consulted and publish notice of final alternate procedures in the Federal Register.

(4) *Legal effect.* Alternate procedures adopted pursuant to this subpart substitute for the Council's regulations for the purposes of the agency's compliance with section 106, except that where an Indian tribe has entered into an agreement with the Council to substitute tribal historic preservation regulations for the Council's regulations under section 101(d)(5) of the act, the agency shall follow those regulations in lieu of the agency's procedures regarding undertakings on tribal lands. Prior to the Council entering into such agreements, the Council will provide Federal agencies notice and opportunity to comment on the proposed substitute tribal regulations.

(b) *Programmatic agreements.* The Council and the agency official may negotiate a programmatic agreement to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings.

(1) *Use of programmatic agreements.* A programmatic agreement may be used:

(i) When effects on historic properties are similar and repetitive or are multi-State or regional in scope;

(ii) When effects on historic properties cannot be fully determined prior to approval of an undertaking;

(iii) When nonfederal parties are delegated major decisionmaking responsibilities;

(iv) Where routine management activities are undertaken at Federal installations, facilities, or other land-management units; or

(v) Where other circumstances warrant a departure from the normal section 106 process.

(2) *Developing programmatic agreements for agency programs.*

(i) The consultation shall involve, as appropriate, SHPO/THPOs, the National Conference of State Historic Preservation Officers (NCSHPO), Indian tribes and Native Hawaiian organizations, other Federal agencies, and members of the public. If the programmatic agreement has the potential to affect historic properties on tribal lands or historic properties of religious and cultural significance to an Indian tribe or Native Hawaiian organization, the agency official shall also follow paragraph (f) of this section.

(ii) *Public Participation.* The agency official shall arrange for public participation appropriate to the subject matter and the scope of the program and in accordance with subpart A of this part. The agency official shall consider the nature of the program and its likely effects on historic properties and take steps to involve the individuals, organizations and entities likely to be interested.

(iii) *Effect.* The programmatic agreement shall take effect when executed by the Council, the agency official and the appropriate SHPOs/THPOs when the programmatic agreement concerns a specific region or the president of NCSHPO when NCSHPO has participated in the consultation. A programmatic agreement shall take effect on tribal lands only when the THPO, Indian tribe or a designated representative of the tribe is a signatory to the agreement. Compliance with the procedures established by an approved programmatic agreement satisfies the agency's section 106 responsibilities for all individual undertakings of the program covered by the agreement until

it expires or is terminated by the agency, the president of NCSHPO when a signatory, or the Council. Termination by an individual SHPO/THPO shall only terminate the application of a regional programmatic agreement within the jurisdiction of the SHPO/THPO. If a THPO assumes the responsibilities of a SHPO pursuant to section 101(d)(2) of the act and the SHPO is signatory to programmatic agreement, the THPO assumes the role of a signatory, including the right to terminate a regional programmatic agreement on lands under the jurisdiction of the tribe.

(iv) *Notice.* The agency official shall notify the parties with which it has consulted that a programmatic agreement has been executed under paragraph (b) of this section, provide appropriate public notice before it takes effect, and make any internal agency procedures implementing the agreement readily available to the Council, SHPO/THPOs, and the public.

(v) If the Council determines that the terms of a programmatic agreement are not being carried out, or if such an agreement is terminated, the agency official shall comply with subpart B of this part with regard to individual undertakings of the program covered by the agreement.

(3) *Developing programmatic agreements for complex or multiple undertakings.* Consultation to develop a programmatic agreement for dealing with the potential adverse effects of complex projects or multiple undertakings shall follow § 800.6. If consultation pertains to an activity involving multiple undertakings and the parties fail to reach agreement, then the agency official shall comply with the provisions of subpart B of this part for each individual undertaking.

(4) *Prototype programmatic agreements.* The Council may designate an agreement document as a prototype programmatic agreement that may be used for the same type of program or undertaking in more than one case or area. When an agency official uses such a prototype programmatic agreement, the agency official may develop and execute the agreement with the appropriate SHPO/THPO and the agreement shall become final without need for Council participation in consultation or Council signature.

(c) *Exempted categories.*

(1) *Criteria for establishing.* The Council or an agency official may propose a program or category of undertakings that may be exempted

from review under the provisions of subpart B of this part, if the program or category meets the following criteria:

(i) The actions within the program or category would otherwise qualify as "undertakings" as defined in § 800.16;

(ii) The potential effects of the undertakings within the program or category upon historic properties are foreseeable and likely to be minimal or not adverse; and

(iii) Exemption of the program or category is consistent with the purposes of the act.

(2) *Public participation.* The proponent of the exemption shall arrange for public participation appropriate to the subject matter and the scope of the exemption and in accordance with the standards in subpart A of this part. The proponent of the exemption shall consider the nature of the exemption and its likely effects on historic properties and take steps to involve individuals, organizations and entities likely to be interested.

(3) *Consultation with SHPOs/THPOs.* The proponent of the exemption shall notify and consider the views of the SHPOs/THPOs on the exemption.

(4) *Consultation with Indian tribes and Native Hawaiian organizations.* If the exempted program or category of undertakings has the potential to affect historic properties on tribal lands or historic properties of religious and cultural significance to an Indian tribe or Native Hawaiian organization, the Council shall follow the requirements for the agency official set forth in paragraph (f) of this section.

(5) *Council review of proposed exemptions.* The Council shall review an exemption proposal that is supported by documentation describing the program or category for which the exemption is sought, demonstrating that the criteria of paragraph (c)(1) of this section have been met, describing the methods used to seek the views of the public, and summarizing any views submitted by the SHPO/THPOs, the public, and any others consulted. Unless it requests further information, the Council shall approve or reject the proposed exemption within 30 days of receipt, and thereafter notify the relevant agency official and SHPO/THPOs of the decision. The decision shall be based on the consistency of the exemption with the purposes of the act, taking into consideration the magnitude of the exempted undertaking or program and the likelihood of impairment of historic

properties in accordance with section 214 of the act.

(6) *Legal consequences.* Any undertaking that falls within an approved exempted program or category shall require no further review pursuant to subpart B of this part, unless the agency official or the Council determines that there are circumstances under which the normally excluded undertaking should be reviewed under subpart B of this part.

(7) *Termination.* The Council may terminate an exemption at the request of the agency official or when the Council determines that the exemption no longer meets the criteria of paragraph (c)(1) of this section. The Council shall notify the agency official 30 days before termination becomes effective.

(8) *Notice.* The proponent of the exemption shall publish notice of any approved exemption in the Federal Register.

(d) *Standard treatments.*

(1) *Establishment.* The Council, on its own initiative or at the request of another party, may establish standard methods for the treatment of a category of historic properties, a category of undertakings, or a category of effects on historic properties to assist Federal agencies in satisfying the requirements of subpart B of this part. The Council shall publish notice of standard treatments in the Federal Register.

(2) *Public participation.* The Council shall arrange for public participation appropriate to the subject matter and the scope of the standard treatment and consistent with subpart A of this part. The Council shall consider the nature of the standard treatment and its likely effects on historic properties and the individuals, organizations and entities likely to be interested. Where an agency official has proposed a standard treatment, the Council may request the agency official to arrange for public involvement.

(3) *Consultation with SHPOs/THPOs.* The Council shall notify and consider the views of SHPOs/THPOs on the proposed standard treatment.

(4) *Consultation with Indian tribes and Native Hawaiian organizations.* If the proposed standard treatment has the potential to affect historic properties on tribal lands or historic properties of religious and cultural significance to an Indian tribe or Native Hawaiian organization, the Council shall follow the requirements for the agency official set forth in paragraph (f) of this section.

(5) *Termination.* The Council may terminate a standard treatment by publication of a notice in the Federal Register 30 days before the termination takes effect.

(e) *Program comments.* An agency official may request the Council to comment on a category of undertakings in lieu of conducting individual reviews under §§ 800.4 through 800.6. The Council may provide program comments at its own initiative.

(1) *Agency request.* The agency official shall identify the category of undertakings, specify the likely effects on historic properties, specify the steps the agency official will take to ensure that the effects are taken into account, identify the time period for which the comment is requested and summarize any views submitted by the public.

(2) *Public participation.* The agency official shall arrange for public participation appropriate to the subject matter and the scope of the category and in accordance with the standards in subpart A of this part. The agency official shall consider the nature of the undertakings and their likely effects on historic properties and the individuals, organizations and entities likely to be interested.

(3) *Consultation with SHPOs/THPOs.* The Council shall notify and consider the views of SHPOs/THPOs on the proposed program comment.

(4) *Consultation with Indian tribes and Native Hawaiian organizations.* If the program comment has the potential to affect historic properties on tribal lands or historic properties of religious and cultural significance to an Indian tribe or Native Hawaiian organization, the Council shall follow the requirements for the agency official set forth in paragraph (f) of this section.

(5) *Council action.* Unless the Council requests additional documentation, notifies the agency official that it will decline to comment, or obtains the consent of the agency official to extend the period for providing comment, the Council shall comment to the agency official within 45 days of the request.

(i) If the Council comments, the agency official shall take into account the comments of the Council in carrying out the undertakings within the category and publish notice in the Federal Register of the Council's comments and steps the agency will take to ensure that effects to historic properties are taken into account.

(ii) If the Council declines to comment, the agency official shall continue to comply with the requirements of §§ 800.3 through 800.6 for the individual undertakings.

(6) *Withdrawal of comment.* If the Council determines that the consideration of historic properties is not being carried out in a manner consistent with the program comment, the Council may withdraw the comment and the agency official shall comply with the requirements of §§ 800.3 through 800.6 for the individual undertakings.

(f) *Consultation with Indian tribes and Native Hawaiian organizations when developing program alternatives.* Whenever an agency official proposes a program alternative pursuant to paragraphs (a) through (e) of this section, the agency official shall ensure that development of the program alternative includes appropriate government-to-government consultation with affected Indian tribes and consultation with affected Native Hawaiian organizations.

(1) *Identifying affected Indian tribes and Native Hawaiian organizations.* If any undertaking covered by a proposed program alternative has the potential to affect historic properties on tribal lands, the agency official shall identify and consult with the Indian tribes having jurisdiction over such lands. If a proposed program alternative has the potential to affect historic properties of religious and cultural significance to an Indian tribe or a Native Hawaiian organization which are located off tribal lands, the agency official shall identify those Indian tribes and Native Hawaiian organizations that might attach religious and cultural significance to such properties and consult with them. When a proposed program alternative has nationwide applicability, the agency official shall identify an appropriate government for consultation with Indian tribes and consult with Native Hawaiian organizations in accordance with existing Executive orders, Presidential memoranda and applicable provisions of law.

(2) *Results of consultation.* The agency official shall provide summaries of the views, along with copies of any written comments, provided by affected Indian tribes and Native Hawaiian organizations to the Council as part of the documentation for the proposed program alternative. The agency official and the Council shall take those views

into account in reaching a final decision on the proposed program alternative.

§ 800.15  Tribal, State, and local program alternatives. (Reserved)

§ 800.16 Definitions.

(a) *Act* means the National Historic Preservation Act of 1966, as amended, 16 U.S.C. 470-470w-6.

(b) *Agency* means agency as defined in 5 U.S.C. 551.

(c) *Approval of the expenditure of funds* means any final agency decision authorizing or permitting the expenditure of Federal funds or financial assistance on an undertaking, including any agency decision that may be subject to an administrative appeal.

(d) *Area of potential effects* means the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist. The area of potential effects is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking.

(e) *Comment* means the findings and recommendations of the Council formally provided in writing to the head of a Federal agency under section 106.

(f) *Consultation* means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process. The Secretary's "Standards and Guidelines for Federal Agency Preservation Programs pursuant to the National Historic Preservation Act" provide further guidance on consultation.

(g) *Council* means the Advisory Council on Historic Preservation or a Council member or employee designated to act for the Council.

(h) *Day* or *days* means calendar days.

(i) *Effect* means alteration to the characteristics of a historic property qualifying it for inclusion in or eligibility for the National Register.

(j) *Foreclosure* means an action taken by an agency official that effectively precludes the Council from providing comments which the agency official can meaningfully consider prior to the approval of the undertaking.

(k) *Head of the agency* means the chief official of the Federal agency responsible for all aspects of the agency's actions. If a State, local or tribal government has assumed or has

been delegated responsibility for section 106 compliance, the head of that unit of government shall be considered the head of the agency.

(l)(1) *Historic property* means any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior. This term includes artifacts, records, and remains that are related to and located within such properties. The term includes properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization and that meet the National Register criteria.

(2) The term *eligible for inclusion in the National Register* includes both properties formally determined as such in accordance with regulations of the Secretary of the Interior and all other properties that meet the National Register criteria.

(m) *Indian tribe* means an Indian tribe, band, nation, or other organized group or community, including a native village, regional corporation or village corporation, as those terms are defined in section 3 of the Alaska Native Claims Settlement Act (43 U.S.C. 1602), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

(n) *Local government* means a city, county, parish, township, municipality, borough, or other general purpose political subdivision of a State.

(o) *Memorandum of agreement* means the document that records the terms and conditions agreed upon to resolve the adverse effects of an undertaking upon historic properties.

(p) *National Historic Landmark* means a historic property that the Secretary of the Interior has designated a National Historic Landmark.

(q) *National Register* means the National Register of Historic Places maintained by the Secretary of the Interior.

(r) *National Register criteria* means the criteria established by the Secretary of the Interior for use in evaluating the eligibility of properties for the National Register (36 CFR part 60).

(s)(1) *Native Hawaiian organization* means any organization which serves and represents the interests of Native Hawaiians; has as a primary and stated purpose the provision of services to Native Hawaiians; and has demonstrated expertise in aspects of

historic preservation that are significant to Native Hawaiians.

(2) *Native Hawaiian* means any individual who is a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawaii.

(t) *Programmatic agreement* means a document that records the terms and conditions agreed upon to resolve the potential adverse effects of a Federal agency program, complex undertaking or other situations in accordance with § 800.14(b).

(u) *Secretary* means the Secretary of the Interior acting through the Director of the National Park Service except where otherwise specified.

(v) *State Historic Preservation Officer (SHPO)* means the official appointed or designated pursuant to section 101(b)(1) of the act to administer the State historic preservation program or a representative designated to act for the State historic preservation officer.

(w) *Tribal Historic Preservation Officer (THPO)*means the tribal official appointed by the tribe's chief governing authority or designated by a tribal ordinance or preservation program who has assumed the responsibilities of the SHPO for purposes of section 106 compliance on tribal lands in accordance with section 101(d)(2) of the act.

(x) *Tribal lands* means all lands within the exterior boundaries of any Indian reservation and all dependent Indian communities.

(y) *Undertaking* means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license or approval.

(z) *Senior policy official* means the senior policy level official designated by the head of the agency pursuant to section 3(e) of Executive Order 13287.

**Appendix A to Part 800 -- Criteria for Council Involvement in Reviewing Individual section 106 Cases**

(a) *Introduction*.  This appendix sets forth the criteria that will be used by the Council to determine whether to enter an individual section 106 review that it normally would not be involved in.

(b) *General policy*.  The Council may choose to exercise its authorities under the section 106 regulations to participate in an individual project pursuant to the following criteria. However, the Council will not always elect to participate even though one or more of the criteria may be met.

(c) *Specific criteria*.  The Council is likely to enter the section 106 process at the steps specified in the regulations in this part when an undertaking:

(1) *Has substantial  impacts on important historic properties*.  This may include adverse effects on properties that possess a national level of significance or on properties that are of unusual or noteworthy importance or are a rare property type; or adverse effects to large numbers of historic properties, such as impacts to multiple properties within a historic district.

(2) *Presents important questions of policy or interpretation*.  This may include questions about how the Council's regulations are being applied or interpreted, including possible foreclosure or anticipatory demolition situations; situations where the outcome will set a precedent affecting Council policies or program goals; or the development of programmatic agreements that alter the way the section 106 process is applied to a group or type of undertakings.

(3) *Has the potential for presenting procedural problems*. This may include cases with substantial public controversy that is related to historic preservation issues; with disputes among or about consulting parties which the Council's involvement could help resolve; that are involved or likely to be involved in litigation on the basis of section 106; or carried out by a Federal agency, in a State or locality, or on tribal lands where the Council has previously identified problems with section 106 compliance pursuant to § 800.9(d)(2).

(4) *Presents issues of concern to Indian tribes or Native Hawaiian organizations*.  This may include cases where there have been concerns raised about the identification of, evaluation of or assessment of effects on historic properties to which an Indian tribe or Native Hawaiian organization attaches religious and cultural significance; where an Indian tribe or Native Hawaiian organization has requested Council involvement to assist in the resolution of adverse effects; or where there are questions relating to policy, interpretation or precedent under section 106 or its relation to other authorities, such as the Native American Graves Protection and Repatriation Act.

# The National Historic Preservation Act
**As amended through December 16, 2016
and Codified in Title 54 of the United States Code**

[The National Historic Preservation Act ("Act") became law on October 15, 1966, Public Law 89-665, and was codified in title 16 of the United States Code. Various amendments followed through the years. On December 19, 2014, Public Law 13-287 moved the Act's provisions from title 16 of the United States Code to title 54, with minimal and non-substantive changes to the text of the Act and a re-ordering of some of its provisions. This document shows the provisions of the Act as they now appear in title 54 of the United States Code.

The Act's name (the "National Historic Preservation Act") is found in the notes of the very first section of title 54. 54 U.S.C. § 100101 note. While Public Law 13-287 did not repeal the Act's findings, for editorial reasons those findings were not included in the text of title 54. The findings are still current law. However, rather than citing to the U.S. Code, when referring to the findings one may cite to: "Section 1 of the National Historic Preservation Act, Pub. L. No. 89-665, as amended by Pub. L. No. 96-515." For ease of use, this document reproduces the text of those findings before proceeding to the title 54 text.

Finally, the attachment at the end of this document attempts to assist those preservation stakeholders who for many years have referred to the Act's various provisions according to the section numbers used in the 1966 public law and subsequent amendments ("old sections"). The attachment cross-references each of the old sections to the corresponding outdated title 16 legal cite and current title 54 legal cite.]

**Section 1 of the National Historic Preservation Act, Pub. L. No. 89-665, as amended by Pub. L. No. 96-515:**

... (b) The Congress finds and declares that—

(1) the spirit and direction of the Nation are founded upon and reflected in its historic heritage;

(2) the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American people;

(3) historic properties significant to the Nation's heritage are being lost or substantially altered, often inadvertently, with increasing frequency;

(4) the preservation of this irreplaceable heritage is in the public interest so that its vital legacy of cultural, educational, aesthetic, inspirational, economic, and energy benefits will be maintained and enriched for future generations of Americans;

(5) in the face of ever-increasing extensions of urban centers, highways, and residential, commercial, and industrial developments, the present governmental and nongovernmental historic preservation programs and activities are inadequate to insure future generations a genuine opportunity to appreciate and enjoy the rich heritage of our Nation;

(6) the increased knowledge of our historic resources, the establishment of better means of identifying and administering them, and the encouragement of their preservation will improve the planning and execution of Federal and federally assisted projects and will assist economic growth and development; and

(7) although the major burdens of historic preservation have been borne and major efforts initiated by private agencies and individuals, and both should continue to play a vital role, it is nevertheless necessary and appropriate for the Federal Government to accelerate its historic preservation programs and activities, to give maximum encouragement to agencies and individuals undertaking preservation by private means, and to assist State and local governments

and the National Trust for Historic Preservation in the United States to expand and accelerate their historic preservation programs and activities.

# Title 54 of the United States Code
## Subtitle III—National Preservation Programs
### Division A—Historic Preservation

### Subdivision 1—General Provisions

# Chapter 3001—Policy
Sec.
300101. Policy

**54 U.S.C. § 300101. Policy**

It is the policy of the Federal Government, in cooperation with other nations and in partnership with States, local governments, Indian tribes, Native Hawaiian organizations, and private organizations and individuals, to—

(1) use measures, including financial and technical assistance, to foster conditions under which our modern society and our historic property can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations;

(2) provide leadership in the preservation of the historic property of the United States and of the international community of nations and in the administration of the national preservation program;

(3) administer federally owned, administered, or controlled historic property in a spirit of stewardship for the inspiration and benefit of present and future generations;

(4) contribute to the preservation of nonfederally owned historic property and give maximum encouragement to organizations and individuals undertaking preservation by private means;

(5) encourage the public and private preservation and utilization of all usable elements of the Nation's historic built environment; and

(6) assist State and local governments, Indian tribes and Native Hawaiian organizations, and the National Trust to expand and accelerate their historic preservation programs and activities.

# Chapter 3003—Definitions
Sec.
300301. Agency.
300302. Certified local government.
300303. Council.
300304. Cultural park.
300305. Historic conservation district.
300306. Historic Preservation Fund.
300307. Historic preservation review commission.
300308. Historic property.
300309. Indian tribe.
300310. Local government.

300311. National Register.
300312. National Trust.
300313. Native Hawaiian.
300314. Native Hawaiian organization.
300315. Preservation or historic preservation.
300316. Secretary.
300317. State.
300318. State historic preservation review board.
300319. Tribal land.
300320. Undertaking.
300321. World Heritage Convention.

## § 300301. Agency

In this division, the term ''agency'' has the meaning given the term in section 551 of title 5.

## § 300302. Certified local government

In this division, the term ''certified local government'' means a local government whose local historic preservation program is certified pursuant to chapter 3025 of this title.

## § 300303. Council

In this division, the term ''Council'' means the Advisory Council on Historic Preservation established by section 304101 of this title.

## § 300304. Cultural park

In this division, the term ''cultural park'' means a definable area that—

(A) is distinguished by historic property, prehistoric property, and land related to that property; and

(B) constitutes an interpretive, educational, and recreational resource for the public at large.

## § 300305. Historic conservation district

In this division, the term ''historic conservation district'' means an area that contains—

(1) historic property;

(2) buildings having similar or related architectural characteristics;

(3) cultural cohesiveness; or

(4) any combination of features described in paragraphs (1) to (3).

## § 300306. Historic Preservation Fund

In this division, the term ''Historic Preservation Fund'' means the Historic Preservation Fund established under section 303101 of this title.

## § 300307. Historic preservation review commission

In this division, the term ''historic preservation review commission'' means a board, council, commission, or other similar collegial body—

(1) that is established by State or local legislation as provided in section 302503(a)(2) of this title; and

(2) the members of which are appointed by the chief elected official of a jurisdiction (unless State or local law provides for appointment by another official) from among—

(A) professionals in the disciplines of architecture, history, architectural history, planning, prehistoric and historic archeology, folklore, cultural anthropology, curation, conservation, and landscape architecture, or related disciplines, to the extent that those professionals are available in the community; and

(B) other individuals who have demonstrated special interest, experience, or knowledge in history, architecture, or related disciplines and will provide for an adequate and qualified commission.

### § 300308. Historic property

In this division, the term "historic property" means any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register, including artifacts, records, and material remains relating to the district, site, building, structure, or object.

### § 300309. Indian tribe

In this division, the term "Indian tribe" means an Indian tribe, band, nation, or other organized group or community, including a Native village, Regional Corporation or Village Corporation (as those terms are defined in section 3 of the Alaska Native Claims Settlement Act (43 U.S.C. 1602)), that is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

### § 300310. Local government

In this division, the term "local government" means a city, county, township, municipality, or borough, or any other general purpose political subdivision of any State.

### § 300311. National Register

In this division, the term "National Register" means the National Register of Historic Places maintained under chapter 3021 of this title.

### § 300312. National Trust

In this division, the term "National Trust" means the National Trust for Historic Preservation in the United States established under section 312102 of this title.

### § 300313. Native Hawaiian

In this division, the term "Native Hawaiian" means any individual who is a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes Hawaii.

### § 300314. Native Hawaiian organization

(a) IN GENERAL.—In this division, the term "Native Hawaiian organization" means any organization that—

(1) serves and represents the interests of Native Hawaiians;

(2) has as a primary and stated purpose the provision of services to Native Hawaiians; and

(3) has demonstrated expertise in aspects of historic preservation that are culturally significant to Native Hawaiians.

(b) INCLUSIONS.—In this division, the term "Native Hawaiian organization" includes the Office of Hawaiian Affairs of Hawaii and Hui Malama I Na Kupuna O Hawai'i Nei, an organization incorporated under the laws of the State of Hawaii.

### § 300315. Preservation or historic preservation

In this division, the term "preservation" or "historic preservation" includes—

(1) identification, evaluation, recordation, documentation, curation, acquisition, protection, management, rehabilitation, restoration, stabilization, maintenance, research, interpretation, and conservation;

(2) education and training regarding the foregoing activities; or

(3) any combination of the foregoing activities.

### § 300316. Secretary

In this division, the term "Secretary" means the Secretary acting through the Director.

### § 300317. State

In this division, the term "State" means—

(1) a State, the District of Columbia, Puerto Rico, Guam, American Samoa, the Virgin Islands, and the Northern Mariana Islands; and

(2) the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau.

### § 300318. State historic preservation review board

In this division, the term "State historic preservation review board" means a board, council, commission, or other similar collegial body established as provided in section 302301(2) of this title—

(1) the members of which are appointed by the State Historic Preservation Officer (unless otherwise provided for by State law);

(2) a majority of the members of which are professionals qualified in history, prehistoric and historic archeology, architectural history, architecture, folklore, cultural anthropology, curation, conservation, landscape architecture, and related disciplines; and

(3) that has the authority to—

    (A) review National Register nominations and appeals from nominations;

    (B) review appropriate documentation submitted in conjunction with the Historic Preservation Fund;

    (C) provide general advice and guidance to the State Historic Preservation Officer; and

    (D) perform such other duties as may be appropriate.

**§ 300319. Tribal land**

In this division, the term ''tribal land'' means—

    (1) all land within the exterior boundaries of any Indian reservation; and

    (2) all dependent Indian communities.

**§ 300320. Undertaking**

In this division, the term ''undertaking'' means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including—

    (1) those carried out by or on behalf of the Federal agency;

    (2) those carried out with Federal financial assistance;

    (3) those requiring a Federal permit, license, or approval; and

    (4) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

**§ 300321. World Heritage Convention**

In this division, the term ''World Heritage Convention'' means the Convention concerning the Protection of the World Cultural and Natural Heritage, done at Paris November 23, 1972 (27 UST 37).

## Subdivision 2—Historic Preservation Program

# Chapter 3021—National Register of Historic Places

Sec.
302101. Maintenance by Secretary.
302102. Inclusion of properties on National Register.
302103. Criteria and regulations relating to National Register, National Historic Landmarks, and World Heritage List.
302104. Nominations for inclusion on National Register.
302105. Owner participation in nomination process.
302106. Retention of name.
302107. Regulations.
302108. Review of threats to historic property.

§ 302101. Maintenance by Secretary

The Secretary may expand and maintain a National Register of Historic Places composed of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture.

§ 302102. Inclusion of properties on National Register

(a) IN GENERAL.—A property that meets the criteria for National Historic Landmarks established pursuant to section 302103 of this title shall be designated as a National Historic Landmark and included on the National Register, subject to the requirements of section 302107 of this title.

(b) HISTORIC PROPERTY ON NATIONAL REGISTER ON DECEMBER 12, 1980.—All historic property included on the National Register on December 12, 1980, shall be deemed to be included on the National Register as of their initial listing for purposes of this division.

(c) HISTORIC PROPERTY LISTED IN FEDERAL REGISTER OF FEBRUARY 6, 1979, OR PRIOR TO DECEMBER 12, 1980, AS NATIONAL HISTORIC LANDMARKS.—All historic property listed in the Federal Register of February 6, 1979, or prior to December 12, 1980, as National Historic Landmarks are declared by Congress to be National Historic Landmarks of national historic significance as of their initial listing in the Federal Register for purposes of this division and chapter 3201 of this title, except that in the case of a National Historic Landmark district for which no boundaries had been established as of December 12, 1980, boundaries shall first be published in the Federal Register.

§ 302103. Criteria and regulations relating to National Register, National Historic Landmarks, and World Heritage List

The Secretary, in consultation with national historical and archeological associations, shall—

(1) establish criteria for properties to be included on the National Register and criteria for National Historic Landmarks; and

(2) promulgate regulations for—

(A) nominating properties for inclusion on, and removal from, the National Register and the recommendation of properties by certified local governments;

(B) designating properties as National Historic Landmarks and removing that designation;

(C) considering appeals from recommendations, nominations, removals, and designations (or any failure or refusal by a nominating authority to nominate or designate);

(D) nominating historic property for inclusion in the World Heritage List in accordance with the World Heritage Convention;

(E) making determinations of eligibility of properties for inclusion on the National Register; and

(F) notifying the owner of a property, any appropriate local governments, and the general public, when the property is being considered for inclusion on the National

Register, for designation as a National Historic Landmark, or for nomination to the World Heritage List.

### § 302104. Nominations for inclusion on National Register

(a) NOMINATION BY STATE.—Subject to the requirements of section 302107 of this title, any State that is carrying out a program approved under chapter 3023 shall nominate to the Secretary property that meets the criteria promulgated under section 302103 of this title for inclusion on the National Register. Subject to section 302107 of this title, any property nominated under this subsection or under section 306102 of this title shall be included on the National Register on the date that is 45 days after receipt by the Secretary of the nomination and the necessary documentation, unless the Secretary disapproves the nomination within the 45-day period or unless an appeal is filed under subsection (c).

(b) NOMINATION BY PERSON OR LOCAL GOVERNMENT.—Subject to the requirements of section 302107 of this title, the Secretary may accept a nomination directly from any person or local government for inclusion of a property on the National Register only if the property is located in a State where there is no program approved under chapter 3023 of this title. The Secretary may include on the National Register any property for which such a nomination is made if the Secretary determines that the property is eligible in accordance with the regulations promulgated under section 302103 of this title. The determination shall be made within 90 days from the date of the nomination unless the nomination is appealed under subsection (c).

(c) NOMINATION BY FEDERAL AGENCY.—Subject to the requirements of section 302107 of this title, the regulations promulgated under section 302103 of this title, and appeal under subsection (d) of this section, the Secretary may accept a nomination directly by a Federal agency for inclusion of property on the National Register only if—

> (1) completed nominations are sent to the State Historic Preservation Officer for review and comment regarding the adequacy of the nomination, the significance of the property and its eligibility for the National Register;

> (2) within 45 days of receiving the completed nomination, the State Historic Preservation Officer has made a recommendation regarding the nomination to the Federal Preservation Officer, except that failure to meet this deadline shall constitute a recommendation to not support the nomination;

> (3) the chief elected officials of the county (or equivalent governmental unit) and municipal political jurisdiction in which the property is located are notified and given 45 days in which to comment;

> (4) the Federal Preservation Officer forwards it to the Keeper of the National Register of Historic Places after determining that all procedural requirements have been met, including those in paragraphs (1) through (3) above; the nomination is adequately documented; the nomination is technically and professionally correct and sufficient; and may include an opinion as to whether the property meets the National Register criteria for evaluation;

> (5) notice is provided in the Federal Register that the nominated property is being considered for listing on the National Register that includes any comments and the recommendation of the State Historic Preservation Officer and a declaration whether the State Historic Preservation Officer has responded within the 45 day-period of review provided in paragraph (2); and

> (6) the Secretary addresses in the Federal Register any comments from the State Historic Preservation Officer that do not support the nomination of the property on the National Register before the property is included in the National Register.

(d) APPEAL.—Any  person or local government may  appeal to the Secretary—

(1) a nomination of any property for inclusion on the National Register; and

(2) the failure of a nominating authority to nominate a property in accordance with this chapter.

## § 302105. Owner participation in nomination process

(a) REGULATIONS.—The  Secretary shall promulgate regulations requiring that before any property may be included on the National Register or designated as a National Historic Landmark, the owner of the property, or a majority of the owners of the individual properties within a district in the case of a historic district, shall be given the opportunity (including a reasonable period of time) to concur in, or object to, the nomination of the property for inclusion or designation. The regulations shall include provisions to carry out this section in the case of multiple ownership of a single property.

(b) WHEN PROPERTY SHALL  NOT BE INCLUDED  ON NATIONAL  REGISTER OR DESIGNATED  AS NATIONAL HISTORIC LANDMARK.—If  the  owner of any privately owned property, or a majority of the owners of privately owned properties within the district in the case of a historic district, object to inclusion or designation, the property shall not be included on the National Register or designated as a National Historic Landmark until the objection is withdrawn.

(c) REVIEW BY SECRETARY.—The  Secretary shall review the nomination of the property when an objection has been made and shall determine whether  or not the property is eligible for inclusion or designation. If the Secretary determines that the property is eligible for inclusion or designation, the Secretary shall inform the Advisory Council on Historic Preservation, the appropriate State Historic Preservation Officer, the appropriate chief elected local official, and the owner or owners of the property of the Secretary's determination.

## § 302106. Retention of name

Notwithstanding section 43(c) of the Act of July 5, 1946 (known as the Trademark Act of 1946) (15 U.S.C. 1125(c)), buildings and structures on or eligible for inclusion on the National Register (either individually or as part of a historic district), or designated as an individual landmark or as a contributing building in a historic district by a unit of State or local government, may retain the name historically associated with the building or structure.

## § 302107. Regulations

The Secretary shall promulgate regulations—

(1) ensuring that significant prehistoric and historic artifacts, and associated records, subject to subchapter I of chapter 3061, chapter 3125, or the Archaeological Resources Protection Act of 1979 (16 U.S.C.  470aa et seq.) are deposited in an institution with adequate long-term curatorial capabilities;

(2) establishing a uniform process and standards for documenting historic property by public agencies and private parties for purposes of incorporation into, or complementing,  the national historical architectural and engineering records in the Library of Congress; and

(3) certifying local governments, in accordance with sections 302502 and 302503 of this title, and for the  transfer of funds pursuant to section 302902(c)(4) of this title.

**§ 302108. Review of threats to historic property**

At least once every 4 years, the Secretary, in consultation with the Council and with State Historic Preservation Officers, shall review significant threats to historic property to—

(1) determine the kinds of historic property that may be threatened;

(2) ascertain the causes of the threats; and

(3) develop and submit to the President and Congress recommendations for appropriate action.

## Chapter 3023—State Historic Preservation Programs

Sec.
302301. Regulations.
302302. Program evaluation.
302303. Responsibilities of State Historic Preservation Officer.
302304. Contracts and cooperative agreements.

**§ 302301. Regulations**

The Secretary, in consultation with the National Conference of State Historic Preservation Officers and the National Trust, shall promulgate regulations for State Historic Preservation Programs. The regulations shall provide that a State program submitted to the Secretary under this chapter shall be approved by the Secretary if the Secretary determines that the program provides for—

(1) the designation and appointment by the chief elected official of the State of a State Historic Preservation Officer to administer the program in accordance with section 302303 of this title and for the employment or appointment by the officer of such professionally qualified staff as may be necessary for those purposes;

(2) an adequate and qualified State historic preservation review board designated by the State Historic Preservation Officer unless otherwise provided for by State law; and

(3) adequate public participation in the State Historic Preservation Program, including the process of recommending properties for nomination to the National Register.

**§ 302302. Program evaluation**

(a) WHEN EVALUATION SHOULD OCCCUR.—Periodically, but not less than every 4 years after the approval of any State program under section 302301 of this title, the Secretary, in consultation with the Council on the appropriate provisions of this division, and in cooperation with the State Historic Preservation Officer, shall evaluate the program to determine whether it is consistent with this division.

(b) DISAPPROVAL OF PROGRAM.—If, at any time, the Secretary determines that a major aspect of a State program is not consistent with this division, the Secretary shall disapprove the program and suspend in whole or in part any contracts or cooperative agreements with the State and the State Historic Preservation Officer under this division, until the program is consistent with this division, unless the Secretary determines that the program will be made consistent with this division within a reasonable period of time.

(c) OVERSIGHT.—The Secretary, in consultation with State Historic Preservation Officers, shall establish oversight methods to ensure State program consistency and quality without imposing undue review burdens on State Historic Preservation Officers.

(d) STATE FISCAL AUDIT AND MANAGEMENT SYSTEM.—

(1) SUBSTITUTION FOR COMPARABLE FEDERAL SYSTEMS.—At the discretion of the Secretary, a State system of fiscal audit and management may be substituted for comparable Federal systems so long as the State system—

(A) establishes and maintains substantially similar accountability standards; and

(B) provides for independent professional peer review.

(2) FISCAL AUDITS AND REVIEW BY SECRETARY.—The Secretary—

(A) may conduct periodic fiscal audits of State programs approved under this subdivision as needed; and

(B) shall ensure that the programs meet applicable accountability standards.

## § 302303. Responsibilities of State Historic Preservation Officer

(a) IN GENERAL.—It shall be the responsibility of the State Historic Preservation Officer to administer the State Historic Preservation Program.

(b) PARTICULAR RESPONSIBILITIES.—It shall be the responsibility of the State Historic Preservation Officer to—

(1) in cooperation with Federal and State agencies, local governments, and private organizations and individuals, direct and conduct a comprehensive statewide survey of historic property and maintain inventories of the property;

(2) identify and nominate eligible property to the National Register and otherwise administer applications for listing historic property on the National Register;

(3) prepare and implement a comprehensive statewide historic preservation plan;

(4) administer the State program of Federal assistance for historic preservation within the State;

(5) advise and assist, as appropriate, Federal and State agencies and local governments in carrying out their historic preservation responsibilities;

(6) cooperate with the Secretary, the Council, other Federal and State agencies, local governments, and private organizations and individuals to ensure that historic property is taken into consideration at all levels of planning and development;

(7) provide public information, education, and training and technical assistance in historic preservation;

(8) cooperate with local governments in the development of local historic preservation programs and assist local governments in becoming certified pursuant to chapter 3025;

(9) consult with appropriate Federal agencies in accordance with this division on—

(A) Federal undertakings that may affect historic property; and

(B) the content and sufficiency of any plans developed to protect, manage, or reduce or

mitigate harm to that property; and

(10) advise and assist in the evaluation of proposals for rehabilitation projects that may qualify for Federal assistance.

### § 302304. Contracts and cooperative agreements

(a) STATE.—A State may carry out all or any part of its responsibilities under this chapter by contract or cooperative agreement with a qualified nonprofit organization or educational institution.

(b) SECRETARY.—

(1) IN GENERAL.—

(A) AUTHORITY TO ASSIST SECRETARY.—Subject to paragraphs (3) and (4), the Secretary may enter into contracts or cooperative agreements with a State Historic Preservation Officer for any State authorizing the Officer to assist the Secretary in carrying out one or more of the following responsibilities within that State:

(i) Identification and preservation of historic property.

(ii) Determination of the eligibility of property for listing on the National Register.

(iii) Preparation of nominations for inclusion on the National Register.

(iv) Maintenance of historical and archeological data bases.

(v) Evaluation of eligibility for Federal preservation incentives.

(B) AUTHORITY TO MAINTAIN NATIONAL REGISTER.— Nothing in subparagraph (A) shall be construed to provide that any State Historic Preservation Officer or any other person other than the Secretary shall have the authority to maintain the National Register for properties in any State.

(2) REQUIREMENTS.—The Secretary may enter into a contract or cooperative agreement under paragraph (1) only if—

(A) the State Historic Preservation Officer has requested the additional responsibility;

(B) the Secretary has approved the State historic preservation program pursuant to sections 302301 and 302302 of this title;

(C) the State Historic Preservation Officer agrees to carry out the additional responsibility in a timely and efficient manner acceptable to the Secretary and the Secretary determines that the Officer is fully capable of carrying out the responsibility in that manner;

(D) the State Historic Preservation Officer agrees to permit the Secretary to review and revise, as appropriate in the discretion of the Secretary, decisions made by the Officer pursuant to the contract or cooperative agreement; and

(E) the Secretary and the State Historic Preservation Officer agree on the terms of additional financial assistance to the State, if there is to be any, for the costs of carrying

out that responsibility.

(3) ESTABLISH CONDITIONS AND CRITERIA.—For each significant program area under the Secretary's authority, the Secretary shall establish specific conditions and criteria essential for the assumption by a State Historic Preservation Officer of the Secretary's duties in each of those programs.

(4) PRESERVATION PROGRAMS AND ACTIVITIES NOT DIMINISHED.— Nothing in this chapter shall have the effect of diminishing the preservation programs and activities of the Service.

## Chapter 3025—Certification of Local Governments

Sec.
302501. Definitions.
302502. Certification as part of State program.
302503. Requirements for certification.
302504. Participation of certified local governments in National Register nominations.
302505. Eligibility and responsibility of certified local government.

### § 302501. Definitions

In this chapter:

(1) DESIGNATION.—The term ''designation'' means the identification and registration of property for protection that meets criteria established by a State or locality for significant historic property within the jurisdiction of a local government.

(2) PROTECTION.—The term ''protection'' means protection by means of a local review process under State or local law for proposed demolition of, changes to, or other action that may affect historic property designated pursuant to this chapter.

### § 302502. Certification as part of State program

Any State program approved under this subdivision shall provide a mechanism for the certification by the State Historic Preservation Officer of local governments to carry out the purposes of this division and provide for the transfer, in accordance with section 302902(c)(4) of this title, of a portion of the grants received by the States under this division, to those local governments.

### § 302503. Requirements for certification

(a) APPROVED STATE PROGRAM.—Any local government shall be certified to participate under this section if the applicable State Historic Preservation Officer, and the Secretary, certify that the local government—

(1) enforces appropriate State or local legislation for the designation and protection of historic property;

(2) has established an adequate and qualified historic preservation review commission by State or local legislation;

(3) maintains a system for the survey and inventory of historic property that furthers the purposes of chapter 3023;

(4) provides for adequate public participation in the local historic preservation program, including the process of recommending properties for nomination to the National Register; and

(5) satisfactorily performs the responsibilities delegated to it under this division.

(b) NO APPROVED STATE PROGRAM.—Where there is no State program approved under sections 302301 and 302302 of this title, a local government may be certified by the Secretary if the Secretary determines that the local government meets the requirements of subsection (a). The Secretary may make grants to the local government certified under this subsection for purposes of this subdivision.

## § 302504. Participation of certified local governments in National Register nominations

(a) NOTICE.—Before a property within the jurisdiction of a certified local government may be considered by a State to be nominated to the Secretary for inclusion on the National Register, the State Historic Preservation Officer shall notify the owner, the applicable chief local elected official, and the local historic preservation commission.

(b) REPORT.—The local historic preservation commission, after reasonable opportunity for public comment, shall prepare a report as to whether the property, in the Commission's opinion, meets the criteria of the National Register. Within 60 days of notice from the State Historic Preservation Officer, the chief local elected official shall transmit the report of the commission and the recommendation of the local official to the State Historic Preservation Officer.

(c) RECOMMENDATION.—

(1) PROPERTY NOMINATED TO NATIONAL REGISTER.—Except as provided in paragraph (2), after receipt of the report and recommendation, or if no report and recommendation are received within 60 days, the State shall make the nomination pursuant to section 302104 of this title. The State may expedite the process with the concurrence of the certified local government.

(2) PROPERTY NOT NOMINATED TO NATIONAL REGISTER.—If both the commission and the chief local elected official recommend that a property not be nominated to the National Register, the State Historic Preservation Officer shall take no further action, unless, within 30 days of the receipt of the recommendation by the State Historic Preservation Officer, an appeal is filed with the State. If an appeal is filed, the State shall follow the procedures for making a nomination pursuant to section 302104 of this title. Any report and recommendations made under this section shall be included with any nomination submitted by the State to the Secretary.

## § 302505. Eligibility and responsibility of certified local government

Any local government—

(1) that is certified under this chapter shall be eligible for funds under section 302902(c)(4) of this title; and

(2) that is certified, or making efforts to become certified, under this chapter shall carry out any responsibilities delegated to it in accordance with such terms and conditions as the Secretary considers necessary or advisable.

# Chapter 3027—Historic Preservation Programs and Authorities for Indian Tribes and Native Hawaiian Organizations

Sec.
302701. Program to assist Indian tribes in preserving historic property.

302702. Indian tribe to assume functions of State Historic Preservation Officer.
302703. Apportionment of grant funds.
302704. Contracts and cooperative agreements.
302705. Agreement for review under tribal historic preservation regulations.
302706. Eligibility for inclusion on National Register.

## § 302701. Program to assist Indian tribes in preserving historic property

(a) ESTABLISHMENT OF PROGRAM.—The Secretary shall establish a program and promulgate regulations to assist Indian tribes in preserving their historic property.

(b) COMMUNICATION AND COOPERATION.—The Secretary shall foster communication and cooperation between Indian tribes and State Historic Preservation Officers in the administration of the national historic preservation program to—

(1) ensure that all types of historic property and all public interests in historic property are given due consideration; and

(2) encourage coordination among Indian tribes, State Historic Preservation Officers, and Federal agencies in historic preservation planning and in the identification, evaluation, protection, and interpretation of historic property.

(c) TRIBAL VALUES.—The program under subsection (a) shall be developed in a manner to ensure that tribal values are taken into account to the extent feasible. The Secretary may waive or modify requirements of this subdivision to conform to the cultural setting of tribal heritage preservation goals and objectives.

(d) SCOPE OF TRIBAL PROGRAMS.—The tribal programs implemented by specific tribal organizations may vary in scope, as determined by each Indian tribe's chief governing authority.

(e) CONSULTATION.—The Secretary shall consult with Indian tribes, other Federal agencies, State Historic Preservations Officers, and other interested parties concerning the program under subsection (a).

## § 302702. Indian tribe to assume functions of State Historic Preservation Officer

An Indian tribe may assume all or any part of the functions of a State Historic Preservation Officer in accordance with sections 302302 and 302303 of this title, with respect to tribal land, as those responsibilities may be modified for tribal programs through regulations issued by the Secretary, if—

(1) the Indian tribe's chief governing authority so requests;

(2) the Indian tribe designates a tribal preservation official to administer the tribal historic preservation program, through appointment by the Indian tribe's chief governing authority or as a tribal ordinance may otherwise provide;

(3) the tribal preservation official provides the Secretary with a plan describing how the functions the tribal preservation official proposes to assume will be carried out;

(4) the Secretary determines, after consulting with the Indian tribe, the appropriate State Historic Preservation Officer, the Council (if the Indian tribe proposes to assume the functions of the State Historic Preservation Officer with respect to review of undertakings under section 306108 of this title), and other Indian tribes, if any, whose tribal or aboriginal land may be affected by conduct of the tribal preservation program, that—

(A) the tribal preservation program is fully capable of carrying out the

functions specified in the plan provided under paragraph (3);

(B) the plan defines the remaining responsibilities of the Secretary and the State Historic Preservation Officer; and

(C) the plan provides, with respect to properties neither owned by a member of the Indian tribe nor held in trust by the Secretary for the benefit of the Indian tribe, at the request of the owner of the properties, that the State Historic Preservation Officer, in addition to the tribal preservation official, may exercise the historic preservation responsibilities in accordance with sections 302302 and 302303 of this title; and

(5) based on satisfaction of the conditions stated in paragraphs (1), (2), (3), and (4), the Secretary approves the plan.

## § 302703. Apportionment of grant funds

In consultation with interested Indian tribes, other Native American organizations, and affected State Historic Preservation Officers, the Secretary shall establish and implement procedures for carrying out section 302902(c)(1)(A) of this title with respect to tribal programs that assume responsibilities under section 302702 of this title.

## § 302704. Contracts and cooperative agreements

At the request of an Indian tribe whose preservation program has been approved to assume functions and responsibilities pursuant to section 302702 of this title, the Secretary shall enter into a contract or cooperative agreement with the Indian tribe permitting the assumption by the Indian tribe of any part of the responsibilities described in section 302304(b) of this title on tribal land, if—

(1) the Secretary and the Indian tribe agree on additional financial assistance, if any, to the Indian tribe for the costs of carrying out those authorities;

(2) the Secretary finds that the tribal historic preservation program has been demonstrated to be sufficient to carry out the contract or cooperative agreement and this division; and

(3) the contract or cooperative agreement specifies the continuing responsibilities of the Secretary or of the appropriate State Historic Preservation Officers and provides for appropriate participation by—

(A) the Indian tribe's traditional cultural authorities;

(B) representatives of other Indian tribes whose traditional land is under the jurisdiction of the Indian tribe assuming responsibilities; and

(C) the interested public.

## § 302705. Agreement for review under tribal historic preservation regulations

The Council may enter into an agreement with an Indian tribe to permit undertakings on tribal land to be reviewed under tribal historic preservation regulations in place of review under regulations promulgated by the Council to govern compliance with section 306108 of this title, if the Council, after consultation with the Indian tribe and appropriate State Historic Preservation Officers, determines that the tribal preservation regulations will afford historic property consideration equivalent to that afforded by the Council's regulations.

§ 302706. Eligibility for inclusion on National Register

(a) IN GENERAL.—Property of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization may be determined to be eligible for inclusion on the National Register.

(b) CONSULTATION.—In carrying out its responsibilities under section 306108 of this title, a Federal agency shall consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to property described in subsection (a).

(c) HAWAII.—In carrying out responsibilities under section 302303 of this title, the State Historic Preservation Officer for Hawaii shall—

(1) consult with Native Hawaiian organizations in assessing the cultural significance of any property in determining whether to nominate the property to the National Register;

(2) consult with Native Hawaiian organizations in developing the cultural component of a preservation program or plan for the property; and

(3) enter into a memorandum of understanding or agreement with Native Hawaiian organizations for the assessment of the cultural significance of a property in determining whether to nominate the property to the National Register and to carry out the cultural component of the preservation program or plan.

# Chapter 3029—Grants

Sec.
302901. Awarding of grants and availability of grant funds.
302902. Grants to States.
302903. Grants to National Trust.
302904. Direct grants for the preservation of properties included on National Register. 302905. Religious property.
302906. Grants and loans to Indian tribes and nonprofit organizations representing ethnic or minority groups.
302907. Grants to Indian tribes and Native Hawaiian organizations.
302908. Grants to the Federated States of Micronesia, the Republic of the Marshall Islands, and the Republic of Palau.
302909. Prohibited use of grant amounts.
302910. Recordkeeping.

## § 302901. Awarding of grants and availability of grant funds

(a) IN GENERAL.—No grant may be made under this division unless application for the grant is submitted to the Secretary in accordance with regulations and procedures prescribed by the Secretary.

(b) GRANT NOT TREATED AS TAXABLE INCOME.—No grant made pursuant to this division shall be treated as taxable income for purposes of the Internal Revenue Code of 1986 (26 U.S.C. 1 et seq.).

(c) AVAILABILITY.—The Secretary shall make funding available to individual States and the National Trust as soon as practicable after execution of a grant agreement. For purposes of administration, grants to individual States and the National Trust each shall be deemed to be one grant and shall be administered by the Service as one grant.

## § 302902. Grants to States

(a) IN GENERAL.—The Secretary shall administer a program of matching grants to the States for the purposes of carrying out this division.

(b) CONDITIONS.—

    (1) IN GENERAL.—No grant may be made under this division—

        (A) unless the application is in accordance with the comprehensive statewide historic preservation plan that has been approved by the Secretary after considering its relationship to the comprehensive statewide outdoor recreation plan prepared pursuant to chapter 2003 of this title;

        (B) unless the grantee has agreed to make reports, in such form and containing such information, as the Secretary may from time to time require;

        (C) unless the grantee has agreed to assume, after completion of the project, the total cost of the continued maintenance, repair, and administration of the property in a manner satisfactory to the Secretary; or

        (D) until the grantee has complied with such further terms and conditions as the Secretary may consider necessary or advisable.

    (2) WAIVER.—The Secretary may waive the requirements of subparagraphs (A) and (C) of paragraph (1) for any grant under this division to the National Trust.

    (3) AMOUNT LIMITATION.—

        (A) IN GENERAL.—No grant may be made under this division for more than 60 percent of the aggregate costs of carrying out projects and programs under the administrative control of the State Historic Preservation Officer as specified in section 302303 of this title in any one fiscal year.

        (B) SOURCE OF STATE SHARE OF COSTS.—Except as permitted by other law, the State share of the costs referred to in subparagraph (A) shall be contributed by non-Federal sources.

    (4) RESTRICTION ON USE OF REAL PROPERTY TO MEET NONFEDERAL SHARE OF COST OF PROJECT.—No State shall be permitted to utilize the value of real property obtained before October 15, 1966, in meeting the non-Federal share of the cost of a project for which a grant is made under this division.

(c) APPORTIONMENT OF GRANT AMOUNTS.—

    (1) BASES FOR APPORTIONMENT.—The amounts appropriated and made available for grants to the States—

        (A) for the purposes of this division shall be apportioned among the States by the Secretary on the basis of needs as determined by the Secretary; and

        (B) for projects and programs under this division for each fiscal year shall be apportioned among the States as the Secretary determines to be appropriate.

    (2) NOTIFICATION.—The Secretary shall notify each State of its apportionment under paragraph (1)(B) within 30 days after the date of enactment of legislation appropriating funds under this division.

(3) REAPPORTIONMENT.—Any amount of any apportionment that has not been paid or obligated by the Secretary during the fiscal year in which the notification is given or during the 2 fiscal years after that fiscal year shall be reapportioned by the Secretary in accordance with paragraph (1)(B). The Secretary shall analyze and revise as necessary the method of apportionment. The method and any revision shall be published by the Secretary in the Federal Register.

(4) TRANSFER OF FUNDS TO CERTIFIED LOCAL GOVERNMENTS.— Not less than 10 percent of the annual apportionment distributed by the Secretary to each State for the purposes of carrying out this division shall be transferred by the State, pursuant to the requirements of this division, to certified local governments for historic preservation projects or programs of the certified local governments. In any year in which the total annual apportionment to the States exceeds $65,000,000, 50 percent of the excess shall also be transferred by the States to certified local governments.

(5) GUIDELINES FOR USE AND DISTRIBUTION OF FUNDS TO CERTIFIED LOCAL GOVERNMENTS.— The Secretary shall establish guidelines for the use and distribution of funds under paragraph (4) to ensure that no certified local government receives a disproportionate share of the funds available, and may include a maximum or minimum limitation on the amount of funds distributed to any single certified local government. The guidelines shall not limit the ability of any State to distribute more than 10 percent of its annual apportionment under paragraph (4), nor shall the Secretary require any State to exceed the 10 percent minimum distribution to certified local governments.

(d) ADMINISTRATIVE COSTS.—The total direct and indirect administrative costs charged for carrying out State projects and programs shall not exceed 25 percent of the aggregate costs (except in the case of a grant to the Federated States of Micronesia, the Republic of the Marshall Islands, or the Republic of Palau).

## § 302903. Grants to National Trust

(a) SECRETARY OF THE INTERIOR.—The Secretary may administer grants to the National Trust consistent with the purposes of its charter and this division.

(b) SECRETARY OF HOUSING AND URBAN DEVELOPMENT.—The Secretary of Housing and Urban Development may make grants to the National Trust, on terms and conditions and in amounts (not exceeding $90,000 with respect to any one structure) as the Secretary of Housing and Urban Development considers appropriate, to cover the costs incurred by the National Trust in renovating or restoring structures that the National Trust considers to be of historic or architectural value and that the National Trust has accepted and will maintain (after the renovation or restoration) for historic purposes.

## § 302904. Direct grants for the preservation of properties included on National Register

(a) ADMINISTRATION OF PROGRAM.—The Secretary shall administer a program of direct grants for the preservation of properties included on the National Register.

(b) AVAILABLE AMOUNT.—Funds to support the program annually shall not exceed 10 percent of the amount appropriated annually for the Historic Preservation Fund.

(c) USES OF GRANTS.—

(1) IN GENERAL.—Grants under this section may be made by the Secretary, in consultation with the appropriate State Historic Preservation Officer—

        (A) for the preservation of—

                (i) National Historic Landmarks that are threatened with demolition or impairment; and

                (ii) historic property of World Heritage significance;

        (B) for demonstration projects that will provide information concerning professional methods and techniques having application to historic property;

        (C) for the training and development of skilled labor in trades and crafts, and in analysis and curation, relating to historic preservation; and

        (D) to assist individuals or small businesses within any historic district included on the National Register to remain within the district.

    (2) LIMIT ON CERTAIN GRANTS.—A grant may be made under subparagraph (A) or (D) of paragraph (1) only to the extent that the project cannot be carried out in as effective a manner through the use of an insured loan under section 303901 of this title.

## § 302905. Religious property

    (a) IN GENERAL.—Grants may be made under this chapter for the preservation, stabilization, restoration, or rehabilitation of religious property listed on the National Register if the purpose of the grant—

    (1) is secular;

    (2) does not promote religion; and

    (3) seeks to protect qualities that are historically significant.

    (b) EFFECT OF SECTION.—Nothing in this section shall be construed to authorize the use of any funds made available under this subdivision for the acquisition of any religious property listed on the National Register.

## § 302906. Grants and loans to Indian tribes and nonprofit organizations representing ethnic or minority groups

    The Secretary may, in consultation with the appropriate State Historic Preservation Officer, make grants or loans or both under this subdivision to Indian tribes and to nonprofit organizations representing ethnic or minority groups for the preservation of their cultural heritage.

## § 302907. Grants to Indian tribes and Native Hawaiian organizations

    The Secretary shall administer a program of direct grants to Indian tribes and Native Hawaiian organizations for the purpose of carrying out this division as it pertains to Indian tribes and Native Hawaiian organizations. Matching fund requirements may be modified. Federal funds available to an Indian tribe or Native Hawaiian organization may be used as matching funds for the purposes of the Indian tribe's or Native Hawaiian organization's conducting its responsibilities pursuant to this subdivision.

**§ 302908. Grants to the Federated States of Micronesia, the Republic of the Marshall Islands, and the Republic of Palau**

(a) IN GENERAL.—As part of the program of matching grant assistance from the Historic Preservation Fund to States, the Secretary shall administer a program of direct grants to the Federated States of Micronesia, the Republic of the Marshall Islands, and the Republic of Palau in furtherance of the Compact of Free Association between the United States and the Federated States of Micronesia and the Marshall Islands, approved by the Compact of Free Association Act of 1985 (48 U.S.C. 1901 et seq., 2001 et seq.), and the Compact of Free Association between the United States and Palau, approved by the Joint Resolution entitled "Joint Resolution to approve the 'Compact of Free Association' between the United States and Government of Palau, and for other purposes" (48 U.S.C. 1931 et seq.) or any successor enactment.

(b) GOAL OF PROGRAM.—The goal of the program shall be to establish historic and cultural preservation programs that meet the unique needs of each of those nations so that at the termination of the compacts the programs shall be firmly established.

(c) BASIS OF ALLOCATING AMOUNTS.—The amounts to be made available under this subsection shall be allocated by the Secretary on the basis of needs as determined by the Secretary.

(d) WAIVERS AND MODIFICATIONS.—The Secretary may waive or modify the requirements of this subdivision to conform to the cultural setting of those nations. Matching funds may be waived or modified.

**§ 302909. Prohibited use of grant amounts**

No part of any grant made under this subdivision shall be used to compensate any person intervening in any proceeding under this division.

**§ 302910. Recordkeeping**

A recipient of assistance under this division shall keep—

(1) such records as the Secretary shall prescribe, including records that fully disclose—

(A) the disposition by the recipient of the proceeds of the assistance;

(B) the total cost of the project or undertaking in connection with which the assistance is given or used; and

(C) the amount and nature of that portion of the cost of the project or undertaking supplied by other sources; and

(2) such other records as will facilitate an effective audit.

# Chapter 3031—Historic Preservation Fund

Sec.
303101. Establishment.
303102. Content.
303103. Use and availability.

## § 303101. Establishment

To carry out this division (except chapter 3041) and chapter 3121, there is established in the Treasury the Historic Preservation Fund.

## § 303102. Funding

For each of fiscal years 2012 to 2023, $150,000,000 shall be deposited in the Historic Preservation Fund from revenues due and payable to the United States under section 9 of the Outer Continental Shelf Lands Act (43 U.S.C. 1338), section 7433(b) of title 10, or both, notwithstanding any provision of law that those proceeds shall be credited to miscellaneous receipts of the Treasury.

## § 303103. Use and availability

Amounts in the Historic Preservation Fund shall be used only to carry out this division and shall be available for expenditure only when appropriated by Congress. Any amount not appropriated shall remain available in the Historic Preservation Fund until appropriated for those purposes. Appropriations made pursuant to this section may be made without fiscal year limitation.

# Chapters 3033 Through 3037—Reserved

# Chapter 3039—Miscellaneous

Sec.
303901. Loan insurance program for preservation of property included on National Register.
303902. Training in, and dissemination of information concerning, professional methods and techniques for preservation of historic property.
303903. Preservation education and training program.

## § 303901. Loan insurance program for preservation of property included on National Register

(a) ESTABLISHMENT.—The Secretary shall establish and maintain a program by which the Secretary may, on application of a private lender, insure loans (including loans made in accordance with a mortgage) made by the lender to finance any project for the preservation of a property included on the National Register.

(b) LOAN QUALIFICATIONS.—A loan may be insured under this section if—

(1) the loan is made by a private lender approved by the Secretary as financially sound and able to service the loan properly;

(2) the amount of the loan, and interest rate charged with respect to the loan, do not exceed the amount and rate established by the Secretary by regulation;

(3) the Secretary has consulted the appropriate State Historic Preservation Officer concerning the preservation of the historic property;

(4) the Secretary has determined that the loan is adequately secured and there is reasonable assurance of repayment;

(5) the repayment period of the loan does not exceed the lesser of 40 years or the expected life of the asset financed;

(6) the amount insured with respect to the loan does not exceed 90 percent of the loss sustained by the lender with respect to the loan; and

(7) the loan, the borrower, and the historic property to be preserved meet such other terms and conditions as may be prescribed by the Secretary by regulation, especially terms and conditions relating to the nature and quality of the preservation work.

(c) CONSULTATION.—The Secretary shall consult with the Secretary of the Treasury regarding the interest rate of loans insured under this section.

(d) LIMITATION ON AMOUNT OF UNPAID PRINCIPAL BALANCE OF LOANS.—The aggregate unpaid principal balance of loans insured under this section may not exceed the amount that has been deposited in the Historic Preservation Fund but which has not been appropriated for any purpose.

(e) INSURANCE CONTRACTS.—Any contract of insurance executed by the Secretary under this section may be assignable, shall be an obligation supported by the full faith and credit of the United States, and shall be incontestable except for fraud or misrepresentation of which the holder had actual knowledge at the time it became a holder.

(f) CONDITIONS AND METHODS OF PAYMENT AS RESULT OF LOSS.— The Secretary shall specify, by regulation and in each contract entered into under this section, the conditions and method of payment to a private lender as a result of losses incurred by the lender on any loan insured under this section.

(g) PROTECTION OF FINANCIAL INTERESTS OF FEDERAL GOVERNMENT.—  In entering into any contract to insure a loan under this section, the Secretary shall take steps to ensure adequate protection of the financial interests of the Federal Government.  The Secretary may—

(1) in connection with any foreclosure proceeding, obtain, on behalf of the Federal Government, the historic property securing a loan insured under this section; and

(2) operate or lease the historic property for such period as may be necessary to protect the interest of the Federal Government and to carry out subsection (h).

(h) CONVEYANCE TO GOVERNMENTAL OR NONGOVERNMENTAL ENTITY OF PROPERTY ACQUIRED BY FORECLOSURE.—

(1) ATTEMPT TO CONVEY TO ENSURE PROPERTY'S PRESERVATION AND USE.—In any case in which historic property is obtained pursuant to subsection (g), the Secretary shall attempt to convey the property to any governmental or nongovernmental entity under conditions that will ensure the property's continued preservation and use. If, after a reasonable time, the Secretary, in consultation with the Council, determines that there is no feasible and prudent means to convey the property and to ensure its continued preservation and use, the Secretary may convey the property at the fair market value of its interest in the property to any entity without restriction.

(2) DISPOSITION OF FUNDS.—Any funds obtained by the Secretary in connection with the conveyance of any historic property pursuant to paragraph (1) shall be deposited in the Historic Preservation Fund and shall remain available in the Historic Preservation Fund until appropriated by Congress to carry out this division.

(i) ASSESSMENT OF FEES IN CONNECTION WITH INSURING LOANS.— The Secretary may assess appropriate and reasonable fees in connection with insuring loans under this

section. The fees shall be deposited in the Historic Preservation Fund and shall remain available in the Historic Preservation Fund until appropriated by Congress to carry out this division.

(j) TREATMENT OF LOANS AS NON-FEDERAL FUNDS.—Notwithstanding any other provision of law, any loan insured under this section shall be treated as non-Federal funds for the purposes of satisfying any requirement of any other provision of law under which Federal funds to be used for any project or activity are conditioned on the use of non-Federal funds by the recipient for payment of any portion of the costs of the project or activity.

(k) INELIGIBILITY OF DEBT OBLIGATION FOR PURCHASE OR COMMITMENT TO PURCHASE BY, OR SALE OR ISSUANCE TO, FEDERAL FINANCING BANK.—No debt obligation that is made or committed to be made, or that is insured or committed to be insured, by the Secretary under this section shall be eligible for purchase by, or commitment to purchase by, or sale or issuance to, the Federal Financing Bank.

## § 303902. Training in, and dissemination of information concerning, professional methods and techniques for preservation of historic property

The Secretary shall develop and make available to Federal agencies, State and local governments, private organizations and individuals, and other nations and international organizations pursuant to the World Heritage Convention, training in, and information concerning, professional methods and techniques for the preservation of historic property and for the administration of the historic preservation program at the Federal, State, and local level. The Secretary shall also develop mechanisms to provide information concerning historic preservation to the general public including students.

## § 303903. Preservation education and training program

The Secretary, in consultation with the Council and other appropriate Federal, tribal, Native Hawaiian, and non-Federal organizations, shall develop and implement a comprehensive preservation education and training program. The program shall include—

(1) standards and increased preservation training opportunities for Federal workers involved in preservation-related functions;

(2) preservation training opportunities for other Federal, State, tribal and local government workers, and students;

(3) technical or financial assistance, or both, to historically black colleges and universities, to tribal colleges, and to colleges with a high enrollment of Native Americans or Native Hawaiians, to establish preservation training and degree programs; and

(4) where appropriate, coordination with the National Center for Preservation Technology and Training of—

(A) distribution of information on preservation technologies;

(B) provision of training and skill development in trades, crafts, and disciplines related to historic preservation in Federal training and development programs; and

(C) support for research, analysis, conservation, curation, interpretation, and display related to preservation.

## Subdivision 3—Advisory Council on Historic Preservation

## Chapter 3041—Advisory Council on Historic Preservation

Sec.
304101. Establishment;
vacancies.
304102. Duties of Council.
304103. Cooperation between Council and instrumentalities of executive branch of Federal Government.
304104. Compensation of members of Council.
304105. Administration.
304106. International Centre for the Study of the Preservation and Restoration of Cultural Property.
304107. Transmittal of legislative recommendations, testimony, or comments to any officer or agency of the United States prior to submission to Congress.
304108. Regulations, procedures, and guidelines.
304109. Budget submission.
304110. Report by Secretary to Council.
304111. Reimbursements from State and local agencies.
304112. Effectiveness of Federal grant and assistance programs.

### § 304101. Establishment; vacancies

(a) ESTABLISHMENT.— There  is established as an independent agency of the United States Government an Advisory Council on Historic Preservation, which shall be composed of the following members:

(1) A Chairman appointed by the President selected  from the general public.

(2) The Secretary.

(3) The Architect of the Capitol.

(4) The Secretary of Agriculture and the heads of 7 other agencies of the United States (other than the Department of the Interior), the activities of which affect historic preservation, designated by the President.

(5) One Governor appointed by the President.

(6) One mayor appointed by the President.

(7) The President of the National Conference of State Historic Preservation Officers.

(8) The General Chairman of the National Association of Tribal Historic Preservation Officers.

(9) The Chairman of the National Trust.

(10) Four experts in the field of historic preservation appointed by the President from architecture, history, archeology, and other appropriate disciplines.

(11) Three members  from the general public, appointed by the President.

(12) One member  of an Indian tribe or Native Hawaiian organization who represents the interests of the Indian tribe or Native Hawaiian organization of which he or she is a member, appointed by the President.

(b) DESIGNATION OF SUBSTITUTES.—Each member  of the Council specified in paragraphs (2) to (5) and (7) through (9) of subsection (a) may designate another officer of the  department, agency, or

organization to serve on the Council instead of the member, except that, in the case of paragraphs (2) and (4), no officer other than an Assistant Secretary or an officer having major department wide or agency-wide responsibilities may be designated.

(c) TERM OF OFFICE.—Each member of the Council appointed under paragraphs (10) through (12) of subsection (a) shall serve for a term of 4 years from the expiration of the term of the member's predecessor. The members appointed under paragraphs (5) and (6) shall serve for the term of their elected office but not in excess of 4 years. An appointed member, other than the Chairman of the Council, may not serve more than 2 terms. An appointed member whose term has expired shall serve until that member's successor has been appointed.

(d) VACANCIES.—A vacancy in the Council shall not affect its powers, but shall be filled, not later than 60 days after the vacancy commences, in the same manner as the original appointment (and for the balance of the unexpired term).

(e) CHAIRMAN.—

(1) After January 20, 2017, the Chairman shall—

(A) be appointed by the President, by and with the advice and consent of the Senate;

(B) serve at the will of the President;

(C) serve full time; and

(D) be compensated at the rate provided for Level V of the Executive Schedule Pay Rates under section 5316 of title 5.

(2) The Chairman shall serve for a term of 4 years and may be reappointed once, for a total of not more than 8 years of service as Chairman, except that a Chairman whose appointment has expired under this paragraph shall serve until his or her successor has been appointed. The term of a Chairman shall start (regardless of actual appointment date) on January 20 after each general Presidential election. The first Chairman appointed after the date of enactment of this paragraph shall have a first term commencing on January 20, 2017, and ending on January 19, 2021.

(3) The Chairmen before the first appointment of a Chairman in accordance with paragraph (1) of this subsection shall receive $100 per diem when engaged in the performance of the duties of the Council, and shall receive reimbursement for necessary traveling and subsistence expenses incurred by them in the performance of the duties of the Council.

(f) DESIGNATION OF VICE CHAIRMAN.—The President shall designate a Vice Chairman from the members appointed under paragraph (5), (6), (10), or (11) of subsection (a). The Vice Chairman shall perform the functions of the Chairman during the absence or disability of the Chairman or when the office is vacant.

(g) QUORUM.—Thirteen members of the Council shall constitute a quorum.

## § 304102. Duties of Council

(a) DUTIES.—The Council shall—

(1) advise the President and Congress on matters relating to historic preservation, recommend measures to coordinate activities of Federal, State, and local agencies and private institutions and individuals relating to historic preservation, and advise on the dissemination of information pertaining to those activities;

26

(2) encourage, in cooperation with the National Trust and appropriate private agencies, public interest and participation in historic preservation;

(3) recommend the conduct of studies in such areas as—

(A) the adequacy of legislative and administrative statutes and regulations pertaining to historic preservation activities of State and local governments; and

(B) the effects of tax policies at all levels of government on historic preservation;

(4) advise as to guidelines for the assistance of State and local governments in drafting legislation relating to historic preservation;

(5) encourage, in cooperation with appropriate public and private agencies and institutions, training and education in the field of historic preservation;

(6) review the policies and programs of Federal agencies and recommend to Federal agencies methods to improve the effectiveness, coordination, and consistency of those policies and programs with the policies and programs carried out under this division; and

(7) inform and educate Federal agencies, State and local governments, Indian tribes, other nations and international organizations and private groups and individuals as to the Council's authorized activities.

(b) ANNUAL REPORT.—The Council annually shall submit to the President a comprehensive report of its activities and the results of its studies and shall from time to time submit additional and special reports as it deems advisable. Each report shall propose legislative enactments and other actions as, in the judgment of the Council, are necessary and appropriate to carry out its recommendations and shall provide the Council's assessment of current and emerging problems in the field of historic preservation and an evaluation of the effectiveness of the programs of Federal agencies, State and local governments, and the private sector in carrying out this division.

## § 304103. Cooperation between Council and instrumentalities of executive branch of Federal Government

The Council may secure directly from any Federal agency information, suggestions, estimates, and statistics for the purpose of this chapter. Each Federal agency may furnish information, suggestions, estimates, and statistics to the extent permitted by law and within available funds.

## § 304104. Compensation of members of Council

The members of the Council specified in paragraphs (2), (3), and (4) of section 304101(a) of this title shall serve without additional compensation. The Chairman of the Council shall be compensated as provided in subsection (e) of section 304101. The other members of the Council shall receive $100 per diem when engaged in the performance of the duties of the Council. All members of the Council shall receive reimbursement for necessary traveling and subsistence expenses incurred by them in the performance of the duties of the Council.

## § 304105. Administration

(a) EXECUTIVE DIRECTOR.—There shall be an Executive Director of the Council who shall be appointed by the Chairman with the concurrence of the Council in the competitive service at a rate within the General Schedule, in the competitive service at a rate that may exceed the rate prescribed for the highest rate established for grade 15 of the General Schedule under section 5332 of title 5, or in the

Senior Executive Service under section 3393 of title 5. The Executive Director shall report directly to the Chairman and perform such functions and duties as the Chairman may prescribe.

(b) GENERAL COUNSEL AND APPOINTMENT OF OTHER ATTORNEYS.—

　　　(1) GENERAL COUNSEL.—The Council shall have a General Counsel, who shall be appointed by the Executive Director. The General Counsel shall report directly to the Executive Director and serve as the Council's legal advisor.

　　　(2) APPOINTMENT OF OTHER ATTORNEYS.—The Executive Director shall appoint other attorneys as may be necessary to—

　　　　　(A) assist the General Counsel;

　　　　　(B) represent the Council in court when appropriate, including enforcement of agreements with Federal agencies to which the Council is a party;

　　　　　(C) assist the Department of Justice in handling litigation concerning the Council in court; and

　　　　　(D) perform such other legal duties and functions as the Executive Director and the Council may direct.

(c) APPOINTMENT AND COMPENSATION OF OFFICERS AND EMPLOYEES.—The Executive Director of the Council may appoint and fix the compensation of officers and employees in the competitive service who are necessary to perform the functions of the Council at rates not to exceed that prescribed for the highest rate for grade 15 of the General Schedule under section 5332 of title 5. The Executive Director, with the concurrence of the Chairman, may appoint and fix the compensation of not to exceed 5 employees in the competitive service at rates that exceed that prescribed for the highest rate established for grade 15 of the General Schedule under section 5332 of title 5 or in the Senior Executive Service under section 3393 of title 5.

(d) APPOINTMENT AND COMPENSATION OF ADDITIONAL PERSONNEL.— The Executive Director may appoint and fix the compensation of such additional personnel as may be necessary to carry out the Council's duties, without regard to the civil service laws and chapter 51 and subchapter III of chapter 53 of title 5.

(e) EXPERT AND CONSULTANT SERVICES.—The Executive Director may procure expert and consultant services in accordance with section 3109 of title 5.

(f) FINANCIAL AND ADMINISTRATIVE SERVICES.—

　　　(1) SERVICES TO BE PROVIDED BY SECRETARY, AGENCY, OR PRIVATE ENTITY.—Financial and administrative services (including those related to budgeting, accounting, financial reporting, personnel and procurement) shall be provided the Council by the Secretary or, at the discretion of the Council, another agency or private entity that reaches an agreement with the Council, for which payments shall be made in advance, or by reimbursement, from funds of the Council in such amounts as may be agreed on by the Chairman of the Council and the head of the agency or the authorized representative of the private entity that will provide the services.

　　　(2) FEDERAL AGENCY REGULATIONS RELATING TO COLLECTION APPLY.—When a Federal agency affords those services, the regulations of that agency under section 5514(b) of title 5 for the collection of indebtedness of personnel resulting from erroneous payments shall apply to the collection of erroneous payments made to or on behalf of a Council employee, and regulations of

28

that agency under sections 1513(d) and 1514 of title 31 for the administrative control of funds shall apply to appropriations of the Council. The Council shall not be required to prescribe those regulations.

(g) FUNDS, PERSONNEL, FACILITIES, AND SERVICES.—

(1) PROVIDED BY FEDERAL AGENCY.—Any Federal agency may provide the Council, with or without reimbursement as may be agreed on by the Chairman and the agency, with such funds, personnel, facilities, and services under its jurisdiction and control as may be needed by the Council to carry out its duties, to the extent that the funds, personnel, facilities, and services are requested by the Council and are otherwise available for that purpose. Any funds provided to the Council pursuant to this subsection shall be obligated by the end of the fiscal year following the fiscal year in which the funds are received by the Council.

(2) OBTAINING ADDITIONAL PROPERTY, FACILITIES, AND SERVICES AND RECEIVING DONATIONS OF MONEY.—To the extent of available appropriations, the Council may obtain by purchase, rental, donation, or otherwise additional property, facilities, and services as may be needed to carry out its duties and may receive donations of money for that purpose. The Executive Director may accept, hold, use, expend, and administer the property, facilities, services, and money for the purposes of this division.

(h) RIGHTS, BENEFITS, AND PRIVILEGES OF TRANSFERRED EMPLOYEES.—Any employee in the competitive service of the United States transferred to the Council under section 207 of the National Historic Preservation Act (Public Law 89–665) retains all the rights, benefits, and privileges pertaining to the competitive service held prior to the transfer.

(i) EXEMPTION FROM FEDERAL ADVISORY COMMITTEE ACT.—The Council is exempt from the Federal Advisory Committee Act (5 U.S.C. App.).

(j) PROVISIONS THAT GOVERN OPERATIONS OF COUNCIL.—Subchapter II of chapter 5 and chapter 7 of title 5 shall govern the operations of the Council.

## § 304106. International Centre for the Study of the Preservation and Restoration of Cultural Property

(a) AUTHORIZATION OF PARTICIPATION.—The participation of the United States as a member in the International Centre for the Study of the Preservation and Restoration of Cultural Property is authorized.

(b) OFFICIAL DELEGATION.—The Council shall recommend to the Secretary of State, after consultation with the Smithsonian Institution and other public and private organizations concerned with the technical problems of preservation, the members of the official delegation that will participate in the activities of the international Centre for the Study of the Preservation and Restoration of Cultural Property on behalf of the United States. The Secretary of State shall appoint the members of the official delegation from the persons recommended to the Secretary of State by the Council.

## § 304107. Transmittal of legislative recommendations, testimony, or comments to any officer or agency of the United States prior to submission to Congress

No officer or agency of the United States shall have any authority to require the Council to submit its legislative recommendations, or testimony, or comments on legislation to any officer or agency of the United States for approval, comments, or review, prior to the submission of the recommendations, testimony, or comments to Congress. When the Council voluntarily seeks to obtain the comments or review of any officer or agency of the United States, the Council shall include a description of the actions in its legislative recommendations, testimony, or comments on legislation that it transmits to Congress.

**§ 304108. Regulations, procedures, and guidelines**

(a) IN GENERAL.—The Council may promulgate regulations as it considers necessary to govern the implementation of section 306108 of this title in its entirety.

(b) PARTICIPATION BY LOCAL GOVERNMENTS.—The Council shall by regulation establish such procedures as may be necessary to provide for participation by local governments in proceedings and other actions taken by the Council with respect to undertakings referred to in section 306108 of this title that affect the local governments.

(c) EXEMPTION FOR FEDERAL PROGRAMS OR UNDERTAKINGS.—The Council, with the concurrence of the Secretary, shall promulgate regulations or guidelines, as appropriate, under which Federal programs or undertakings may be exempted from any or all of the requirements of this division when the exemption is determined to be consistent with the purposes of this division, taking into consideration the magnitude of the exempted undertaking or program and the likelihood of impairment of historic property.

**§ 304109. Budget submission**

(a) TIME AND MANNER OF SUBMISSION.—The Council shall submit its budget annually as a related agency of the Department of the Interior.

(b) TRANSMITTAL OF COPIES TO CONGRESSIONAL COMMITTEES.— Whenever the Council submits any budget estimate or request to the President or the Office of Management and Budget, it shall concurrently transmit copies of that estimate or request to the Committee on Natural Resources and Committee on Appropriations of the House of Representatives and the Committee on Energy and Natural Resources and Committee on Appropriations of the Senate.

**§ 304110. Report by Secretary to Council**

To assist the Council in discharging its responsibilities under this division, the Secretary at the request of the Chairman shall provide a report to the Council detailing the significance of any historic property, describing the effects of any proposed undertaking on the affected property, and recommending measures to avoid, minimize, or mitigate adverse effects.

**§ 304111. Reimbursements from State and local agencies**

Subject to applicable conflict of interest laws, the Council may receive reimbursements from State and local agencies and others pursuant to agreements executed in furtherance of this division.

**§ 304112. Effectiveness of Federal grant and assistance programs**

(a) COOPERATIVE AGREEMENTS.—The Council may enter into a cooperative agreement with any Federal agency that administers a grant or assistance program for the purpose of improving the effectiveness of the administration of the program in meeting the purposes and policies of this division. The cooperative agreement may include provisions that modify the selection criteria for a grant or assistance program to further the purposes of this division or that allow the Council to participate in the selection of recipients, if those provisions are not inconsistent with the grant or assistance program's statutory authorization and purpose.

(b) REVIEW OF GRANT AND ASSISTANCE PROGRAMS.—The Council may—

(1) review the operation of any Federal grant or assistance program to evaluate the effectiveness of the program in meeting the purposes and policies of this division;

(2) make recommendations to the head of any Federal agency that administers the program to further the consistency of the program with the purposes and policies of this division and to improve its effectiveness in carrying out those purposes and policies; and

(3) make recommendations to the President and Congress regarding the effectiveness of Federal grant and assistance programs in meeting the purposes and policies of this division, including recommendations with regard to appropriate funding levels.

## Subdivision 4—Other Organizations and Programs

## Chapter 3051—Historic Light Station Preservation

Sec.
305101. Definitions.
305102. Duties of Secretary in providing a national historic light station program.
305103. Selection of eligible entity and conveyance of historic light stations.
305104. Terms of conveyance.
305105. Description of property.
305106. Historic light station sales.

### § 305101. Definitions

In this chapter:

(1) ADMINISTRATOR.—The term ''Administrator'' means the Administrator of General Services.

(2) ELIGIBLE ENTITY.—The term ''eligible entity'' means—

(A) any department or agency of the Federal Government; or

(B) any department or agency of the State in which a historic light station is located, the local government of the community in which a historic light station is located, a nonprofit corporation, an educational agency, or a community development organization that—

(i) has agreed to comply with the conditions set forth in section 305104 of this title and to have the conditions recorded with the deed of title to the historic light station; and

(ii) is financially able to maintain the historic light station in accordance with the conditions set forth in section 305104 of this title.

(3) FEDERAL AID TO NAVIGATION.—

(A) IN GENERAL.—The term ''Federal aid to navigation'' means any device, operated and maintained by the United States, external to a vessel or aircraft, intended to assist a navigator to determine position or safe course, or to warn of dangers or obstructions to navigation.

(B) INCLUSIONS.—The term ''Federal aid to navigation'' includes a light, lens, lantern, antenna, sound signal, camera, sensor, piece of electronic navigation equipment, power source, or other piece of equipment associated with a device described in subparagraph (A).

(4) HISTORIC LIGHT STATION.—The term "historic light station" includes the light tower, lighthouse, keeper's dwelling, garages, storage sheds, oil house, fog signal building, boat house, barn, pumphouse, tramhouse support structures, piers, walkways, underlying and appurtenant land and related real property and improvements associated with a historic light station that is a historic property.

## § 305102. Duties of Secretary in providing a national historic light station program

To provide a national historic light station program, the Secretary shall—

(1) collect and disseminate information concerning historic light stations;

(2) foster educational programs relating to the history, practice, and contribution to society of historic light stations;

(3) sponsor or conduct research and study into the history of light stations;

(4) maintain a listing of historic light stations; and

(5) assess the effectiveness of the program established by this chapter regarding the conveyance of historic light stations.

## § 305103. Selection of eligible entity and conveyance of historic light stations

(a) PROCESS AND POLICIES.—The Secretary and the Administrator shall maintain a process and policies for identifying, and selecting, an eligible entity to which a historic light station could be conveyed for education, park, recreation, cultural, or historic preservation purposes, and to monitor the use of the light station by the eligible entity.

(b) APPLICATION REVIEW.—

(1) IN GENERAL.—The Secretary shall—

(A) review all applications for the conveyance of a historic light station, when the agency with administrative jurisdiction over the historic light station has determined the property to be excess property (as that term is defined in section 102 of title 40); and

(B) forward to the Administrator a single approved application for the conveyance of the historic light station.

(2) CONSULTATION.—When selecting an eligible entity, the Secretary shall consult with the State Historic Preservation Officer of the State in which the historic light station is located.

(c) CONVEYANCE OR SALE OF HISTORIC LIGHT STATIONS.—

(1) CONVEYANCE BY ADMINISTRATOR.—Except as provided in paragraph (2), after the Secretary's selection of an eligible entity, the Administrator shall convey, by quitclaim deed, without consideration, all right, title, and interest of the United States in and to a historic light station, subject to the conditions set forth in section 305104 of this title. The conveyance of a historic light station under this chapter shall not be subject to the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11301 et seq.) or section 416(d) of the Coast Guard Authorization Act of

1998 (Public Law 105–383, 14 U.S.C. 93 note).

(2) HISTORIC LIGHT STATION LOCATED WITHIN A SYSTEM UNIT OR A REFUGE WITHIN NATIONAL WILDLIFE REFUGE SYSTEM.—

> (A) APPROVAL OF SECRETARY REQUIRED.—A historic light station located within the exterior boundaries of a System unit or a refuge within the National Wildlife Refuge System shall be conveyed or sold only with the approval of the Secretary.

> (B) CONDITIONS OF CONVEYANCE.—If the Secretary approves the conveyance of a historic light station described in subparagraph (A), the conveyance shall be subject to the conditions set forth in section 305104 of this title and any other terms or conditions that the Secretary considers necessary to protect the resources of the System unit or wildlife refuge.

> (C) CONDITIONS OF SALE.—If the Secretary approves the sale of a historic light station described in subparagraph (A), the sale shall be subject to the conditions set forth in paragraphs (1) to (4) and (8) of subsection (a), and subsection (b), of section 305104 of this title and any other terms or conditions that the Secretary considers necessary to protect the resources of the System unit or wildlife refuge.

> (D) COOPERATIVE AGREEMENTS.—The Secretary is encouraged to enter into cooperative agreements with appropriate eligible entities with respect to historic light stations described in subparagraph (A), as provided in this division, to the extent that the cooperative agreements are consistent with the Secretary's responsibilities to manage and administer the System unit or wildlife refuge.

## § 305104. Terms of conveyance

(a) IN GENERAL.—The conveyance of a historic light station shall be made subject to any conditions, including the reservation of easements and other rights on behalf of the United States, that the Administrator considers necessary to ensure that—

> (1) the Federal aids to navigation located at the historic light station in operation on the date of conveyance remain the personal property of the United States and continue to be operated and maintained by the United States for as long as needed for navigational purposes;

> (2) there is reserved to the United States the right to remove, replace, or install any Federal aid to navigation located at the historic light station as may be necessary for navigational purposes;

> (3) the eligible entity to which the historic light station is conveyed shall not interfere or allow interference in any manner with any Federal aid to navigation or hinder activities required for the operation and maintenance of any Federal aid to navigation without the express written permission of the head of the agency responsible for maintaining the Federal aid to navigation;

> (4)  (A) the eligible entity to which the historic light station is conveyed shall, at its own cost and expense, use and maintain the historic light station in accordance with this division, the Secretary of the Interior's Standards for the Treatment of Historic Properties contained in part 68 of title 36, Code of Federal Regulations, and other applicable laws; and

> (B) any proposed changes to the historic light station shall be reviewed and approved by the Secretary in consultation with the State Historic Preservation Officer of the State in which the historic light station is located, for consistency with section 800.5(a)(2)(vii) of

33

title 36, Code of Federal Regulations and the Secretary's Standards for Rehabilitation contained in section 67.7 of title 36, Code of Federal Regulations;

(5) the eligible entity to which the historic light station is conveyed shall make the historic light station available for education, park, recreation, cultural, or historic preservation purposes for the general public at reasonable times and under reasonable conditions;

(6) the eligible entity to which the historic light station is conveyed shall not sell, convey, assign, exchange, or encumber the historic light station, any part of the historic light station, or any associated historic artifact conveyed to the eligible entity in conjunction with the historic light station conveyance, including any lens or lantern, unless the sale, conveyance, assignment, exchange, or encumbrance is approved by the Secretary;

(7) the eligible entity to which the historic light station is conveyed shall not conduct any commercial activity at the historic light station, at any part of the historic light station, or in connection with any associated historic artifact conveyed to the eligible entity in conjunction with the historic light station conveyance, in any manner, unless the commercial activity is approved by the Secretary; and

(8) the United States shall have the right, at any time, to enter the historic light station without notice, for purposes of operating, maintaining, and inspecting any aid to navigation and for the purpose of ensuring compliance with this section, to the extent that it is not possible to provide advance notice.

(b) MAINTENANCE OF AID TO NAVIGATION.—Any eligible entity to which a historic light station is conveyed shall not be required to maintain any Federal aid to navigation associated with a historic light station, except any private aid to navigation permitted to the eligible entity under section 83 of title 14.

(c) REVERSION.—In addition to any term or condition established pursuant to this section, the conveyance of a historic light station shall include a condition that the historic light station, or any associated historic artifact conveyed to the eligible entity in conjunction with the historic light station conveyance, including any lens or lantern, at the option of the Administrator, shall revert to the United States and be placed under the administrative control of the Administrator, if—

(1) the historic light station, any part of the historic light station, or any associated historic artifact ceases to be available for education, park, recreation, cultural, or historic preservation purposes for the general public at reasonable times and under reasonable conditions that shall be set forth in the eligible entity's application;

(2) the historic light station or any part of the historic light station ceases to be maintained in a manner that ensures its present or future use as a site for a Federal aid to navigation;

(3) the historic light station, any part of the historic light station, or any associated historic artifact ceases to be maintained in compliance with this division, the Secretary of the Interior's Standards for the Treatment of Historic Properties contained in part 68 of title 36, Code of Federal Regulations, and other applicable laws;

(4) the eligible entity to which the historic light station is conveyed sells, conveys, assigns, exchanges, or encumbers the historic light station, any part of the historic light fixture, or any associated historic artifact, without approval of the Secretary;

(5) the eligible entity to which the historic light station is conveyed conducts any commercial activity at the historic light station, at any part of the historic light station, or in conjunction with any associated historic artifact, without approval of the Secretary; or

34

(6) at least 30 days before the reversion, the Administrator provides written notice to the owner that the historic light station or any part of the historic light station is needed for national security purposes.

(d) LIGHT STATIONS ORIGINALLY CONVEYED UNDER OTHER AUTHORITY.—On receiving notice of an executed or intended conveyance by an owner that received from the Federal Government under authority other than this division a historic light station in which the United States retains a reversionary or other interest and that is conveying it to another person by sale, gift, or any other manner, the Secretary shall review the terms of the executed or proposed conveyance to ensure that any new owner is capable of or is complying with any and all conditions of the original conveyance. The Secretary may require the parties to the conveyance and relevant Federal agencies to provide information as is necessary to complete the review. If the Secretary determines that the new owner has not complied or is unable to comply with those conditions, the Secretary shall immediately advise the Administrator, who shall invoke any reversionary interest or take other action as may be necessary to protect the interests of the United States.

## § 305105. Description of property

(a) IN GENERAL.—The Administrator shall prepare the legal description of any historic light station conveyed under this chapter. The Administrator, in consultation with the Secretary of Homeland Security and the Secretary, may retain all right, title, and interest of the United States in and to any historical artifact, including any lens or lantern, that is associated with the historic light station and located at the historic light station at the time of conveyance. Wherever possible, the historical artifacts should be used in interpreting the historic light station. In cases where there is no method for preserving lenses and other artifacts and equipment in situ, priority should be given to preservation or museum entities most closely associated with the historic light station, if they meet loan requirements.

(b) ARTIFACTS.—Artifacts associated with, but not located at, a historic light station at the time of conveyance shall remain the property of the United States under the administrative control of the Secretary of Homeland Security.

(c) COVENANTS.—All conditions placed with the quitclaim deed of title to the historic light station shall be construed as covenants running with the land.

(d) SUBMERGED LAND.—No submerged land shall be conveyed under this chapter.

## § 305106. Historic light station sales

(a) IN GENERAL.—

(1) WHEN SALE MAY OCCUR.—If no applicant is approved for the conveyance of a historic light station pursuant to sections 305101 through 305105 of this title, the historic light station shall be offered for sale.

(2) TERMS OF SALE.—Terms of the sales—

(A) shall be developed by the Administrator; and

(B) shall be consistent with the requirements of paragraphs (1) to (4) and (8) of subsection (a), and subsection (b), of section 305104 of this title.

(3) COVENANTS TO BE INCLUDED IN CONVEYANCE DOCUMENTS.— Conveyance documents shall

include all necessary covenants to protect the historical integrity of the historic light station and ensure that any Federal aid to navigation located at the historic light station is operated and maintained by the United States for as long as needed for that purpose.

(b) NET SALE PROCEEDS.—

(1) DISPOSITION AND USE OF FUNDS.—Net sale proceeds from the disposal of a historic light station—

(A) located on public domain land shall be transferred to the National Maritime Heritage Grants Program established under chapter 3087 in the Department of the Interior; and

(B) under the administrative control of the Secretary of Homeland Security—

(i) shall be credited to the Coast Guard's Operating Expenses appropriation account; and

(ii) shall be available for obligation and expenditure for the maintenance of light stations remaining under the administrative control of the Secretary of Homeland Security.

(2) AVAILABILITY OF FUNDS.—The funds referred to in paragraph (1)(B) shall remain available until expended and shall be available in addition to funds available in the Coast Guard's Operating Expense appropriation for that purpose.

## Chapter 3053—National Center for Preservation Technology and Training

Sec.
305301. Definitions.
305302. National Center for Preservation Technology and Training.
305303. Preservation Technology and Training Board.
305304. Preservation grants.
305305. General provisions.
305306. Service preservation centers and offices.

### § 305301. Definitions

In this chapter:

(1) BOARD.—The term "Board" means the Preservation Technology and Training Board established pursuant to section 305303 of this title.

(2) CENTER.—The term "Center" means the National Center for Preservation Technology and Training established pursuant to section 305302 of this title.

### § 305302. National Center for Preservation Technology and Training

(a) ESTABLISHMENT.—There is established within the Department of the Interior a National Center for Preservation Technology and Training. The Center shall be located at Northwestern State University of Louisiana in Natchitoches, Louisiana.

(b) PURPOSES.—The purposes of the Center shall be to—

(1) develop and distribute preservation and conservation skills and technologies for the identification, evaluation, conservation, and interpretation of historic property;

(2) develop and facilitate training for Federal, State, and local resource preservation professionals, cultural resource managers, maintenance personnel, and others working in the preservation field;

(3) take steps to apply preservation technology benefits from ongoing research by other agencies and institutions;

(4) facilitate the transfer of preservation technology among Federal agencies, State and local governments, universities, international organizations, and the private sector; and

(5) cooperate with related international organizations including the International Council on Monuments and Sites, the International Center for the Study of Preservation and Restoration of Cultural Property, and the International Council on Museums.

(c) PROGRAMS.—The purposes shall be carried out through research, professional training, technical assistance, and programs for public awareness, and through a program of grants established under section 305304 of this title.

(d) EXECUTIVE DIRECTOR.—The Center shall be headed by an Executive Director with demonstrated expertise in historic preservation appointed by the Secretary with advice of the Board.

(e) ASSISTANCE FROM SECRETARY.—The Secretary shall provide the Center assistance in obtaining such personnel, equipment, and facilities as may be needed by the Center to carry out its activities.

## § 305303. Preservation Technology and Training Board

(a) ESTABLISHMENT.—There is established a Preservation Technology and Training Board.

(b) DUTIES.—The Board shall—

(1) provide leadership, policy advice, and professional oversight to the Center;

(2) advise the Secretary on priorities and the allocation of grants among the activities of the Center; and

(3) submit an annual report to the President and Congress.

(c) MEMBERSHIP.—The Board shall be comprised of—

(1) the Secretary;

(2) 6 members appointed by the Secretary, who shall represent appropriate Federal, State, and local agencies, State and local historic preservation commissions, and other public and international organizations; and

(3) 6 members appointed by the Secretary on the basis of outstanding professional qualifications, who represent major organizations in the fields of archeology, architecture, conservation, curation, engineering, history, historic preservation, landscape architecture, planning, or preservation education.

## § 305304. Preservation grants

(a) IN GENERAL.—The Secretary, in consultation with the Board, shall provide preservation technology and training grants to eligible applicants with a demonstrated institutional capability and

commitment to the purposes of the Center, in order to ensure an effective and efficient system of research, information distribution, and skills training in all the related historic preservation fields.

(b) GRANT REQUIREMENTS.—

(1) ALLOCATION.—Grants provided under this section shall be allocated in such a fashion as to reflect the diversity of the historic preservation fields and shall be geographically distributed.

(2) LIMIT ON AMOUNT A RECIPIENT MAY RECEIVE.—No grant recipient may receive more than 10 percent of the grants allocated under this section within any year.

(3) LIMIT ON ADMINISTRATIVE COSTS.—The total administrative costs, direct and indirect, charged for carrying out grants under this section may not exceed 25 percent of the aggregate costs.

(c) ELIGIBLE APPLICANTS.—Eligible applicants may include—

(1) Federal and non-Federal laboratories;

(2) accredited museums;

(3) universities;

(4) nonprofit organizations;

(5) System units and offices and Cooperative Park Study Units of the System;

(6) State Historic Preservation Offices;

(7) tribal preservation offices; and

(8) Native Hawaiian organizations.

(d) STANDARDS AND METHODS.—Grants shall be awarded in accordance with accepted professional standards and methods, including peer review of projects.

## § 305305. General provisions

(a) ACCEPTANCE OF GRANTS AND TRANSFERS.—The Center may accept—

(1) grants and donations from private individuals, groups, organizations, corporations, foundations, and other entities; and

(2) transfers of funds from other Federal agencies.

(b) CONTRACTS AND COOPERATIVE AGREEMENTS.—Subject to appropriations, the Center may enter into contracts and cooperative agreements with Federal, State, local, and tribal governments, Native Hawaiian organizations, educational institutions, and other public entities to carry out the Center's responsibilities under this chapter.

(c) ADDITIONAL FUNDS.—Funds appropriated for the Center shall be in addition to funds appropriated for Service programs, centers, and offices in existence on October 30, 1992.

§ 305306. Service preservation centers and offices

To improve the use of existing Service resources, the Secretary shall fully utilize and further develop the Service preservation (including conservation) centers and regional offices. The Secretary shall improve the coordination of the centers and offices within the Service, and shall, where appropriate, coordinate their activities with the Center and with other appropriate parties.

# Chapter 3055—National Building Museum

Sec.
305501. Definitions.
305502. Cooperative agreement to operate museum.
305503. Activities and functions.
305504. Matching grants to Committee.
305505. Annual report.

## § 305501. Definitions

In this chapter:

(1) BUILDING ARTS.—The term "building arts" includes all practical and scholarly aspects of prehistoric, historic, and contemporary architecture, archeology, construction, building technology and skills, landscape architecture, preservation and conservation, building and construction, engineering, urban and community design and renewal, city and regional planning, and related professions, skills, trades, and crafts.

(2) COMMITTEE.—The term "Committee" means the Committee for a National Museum of the Building Arts, Incorporated, a nonprofit corporation organized and existing under the laws of the District of Columbia, or its successor.

## § 305502. Cooperative agreement to operate museum

To provide a national center to commemorate and encourage the building arts and to preserve and maintain a nationally significant building that exemplifies the great achievements of the building arts in the United States, the Secretary and the Administrator of General Services shall enter into a cooperative agreement with the Committee for the operation of a National Building Museum in the Federal building located in the block bounded by Fourth Street, Fifth Street, F Street, and G Street, Northwest in Washington, District of Columbia. The cooperative agreement shall include provisions that—

(1) make the site available to the Committee without charge;

(2) provide, subject to available appropriations, such maintenance, security, information, janitorial, and other services as may be necessary to ensure the preservation and operation of the site; and

(3) prescribe reasonable terms and conditions by which the Committee can fulfill its responsibilities under this division.

## § 305503. Activities and functions

The National Building Museum shall—

(1) collect and disseminate information concerning the building arts, including the establishment of a national reference center for current and historic documents, publications, and research

relating to the building arts;

(2) foster educational programs relating to the history, practice, and contribution to society of the building arts, including promotion of imaginative educational approaches to enhance understanding and appreciation of all facets of the building arts;

(3) publicly display temporary and permanent exhibits illustrating, interpreting and demonstrating the building arts;

(4) sponsor or conduct research and study into the history of the building arts and their role in shaping our civilization; and

(5) encourage contributions to the building arts.

### § 305504. Matching grants to Committee

The Secretary shall provide matching grants to the Committee for its programs related to historic preservation. The Committee shall match the grants in such a manner and with such funds and services as shall be satisfactory to the Secretary, except that not more than $500,000 may be provided to the Committee in any one fiscal year.

### § 305505. Annual report

The Committee shall submit an annual report to the Secretary and the Administrator of General Services concerning its activities under this chapter and shall provide the Secretary and the Administrator of General Services with such other information as the Secretary may consider necessary or advisable.

## Subdivision 5—Federal Agency Historic Preservation Responsibilities

## Chapter 3061—Program Responsibilities and Authorities

Subchapter I—In General
Sec.
306101. Assumption of responsibility for preservation of historic property.
306102. Preservation program.
306103. Recordation of historic property prior to alteration or demolition.
306104. Agency Preservation Officer.
306105. Agency programs and projects.
306106. Review of plans of transferees of surplus federally owned historic property.
306107. Planning and actions to minimize harm to National Historic Landmarks.
306108. Effect of undertaking on historic property.
306109. Costs of preservation as eligible project costs.
306110. Annual preservation awards program.
306111. Environmental impact statement.
306112. Waiver of provisions in event of natural disaster or imminent threat to national security.
306113. Anticipatory demolition.
306114. Documentation of decisions respecting undertakings.

Subchapter II—Lease, Exchange, or Management of Historic Property
306121. Lease or exchange.
306122. Contracts for management of historic property.

Subchapter III—Protection and Preservation of Resources
306131. Standards and guidelines.

## Subchapter I—In General

**§ 306101. Assumption of responsibility for preservation of historic property**

(a) IN GENERAL.—

(1) AGENCY HEAD RESPONSIBILITY.—The head of each Federal agency shall assume responsibility for the preservation of historic property that is owned or controlled by the agency.

(2) USE OF AVAILABLE HISTORIC PROPERTY.—Prior to acquiring, constructing, or leasing a building for purposes of carrying out agency responsibilities, a Federal agency shall use, to the maximum extent feasible, historic property available to the agency, in accordance with Executive Order No. 13006 (40 U.S.C. 3306 note).

(3) NECESSARY PRESERVATION.—Each Federal agency shall undertake, consistent with the preservation of historic property, the mission of the agency, and the professional standards established pursuant to subsection (c), any preservation as may be necessary to carry out this chapter.

(b) GUIDELINES FOR FEDERAL AGENCY RESPONSIBILITY FOR AGENCY-OWNED HISTORIC PROPERTY.—In consultation with the Council, the Secretary shall promulgate guidelines for Federal agency responsibilities under this subchapter (except section 306108).

(c) PROFESSIONAL STANDARDS FOR PRESERVATION OF FEDERALLY OWNED OR CONTROLLED HISTORIC PROPERTY.—The Secretary shall establish, in consultation with the Secretary of Agriculture, the Secretary of Defense, the Smithsonian Institution, and the Administrator of General Services, professional standards for the preservation of historic property in Federal ownership or control.

**§ 306102. Preservation program**

(a) ESTABLISHMENT.—Each Federal agency shall establish (except for programs or undertakings exempted pursuant to section 304108(c) of this title), in consultation with the Secretary, a preservation program for the identification, evaluation, and nomination to the National Register, and protection, of historic property.

(b) REQUIREMENTS.—The program shall ensure that—

(1) historic property under the jurisdiction or control of the agency is identified, evaluated, and nominated to the National Register;

(2) historic property under the jurisdiction or control of the agency is managed and maintained in a way that considers the preservation of their historic, archeological, architectural, and cultural values in compliance with section 306108 of this title and gives special consideration to the preservation of those values in the case of property designated as having national significance;

(3) the preservation of property not under the jurisdiction or control of the agency but potentially affected by agency actions is given full consideration in planning;

(4) the agency's preservation-related activities are carried out in consultation with other Federal, State, and local agencies, Indian tribes, Native Hawaiian organizations carrying out historic preservation planning activities, and the private sector; and

41

(5) the agency's procedures for compliance with section 306108 of this title—

    (A) are consistent with regulations promulgated by the Council pursuant to section 304108(a) and (b) of this title;

    (B) provide a process for the identification and evaluation of historic property for listing on the National Register and the development and implementation of agreements,
in consultation with State Historic Preservation Officers, local governments, Indian tribes, Native Hawaiian organizations, and the interested public, as appropriate, regarding the means by which adverse effects on historic property will be considered; and

(c) provide for the disposition of Native American cultural items from Federal or tribal land in a manner consistent with section 3(c) of the Native American Graves Protection and Repatriation Act (25 U.S.C. 3002(c)).

## § 306103. Recordation of historic property prior to alteration or demolition

Each Federal agency shall initiate measures to ensure that where, as a result of Federal action or assistance carried out by the agency, a historic property is to be substantially altered or demolished—

    (1) timely steps are taken to make or have made appropriate records; and

    (2) the records are deposited, in accordance with section 302107 of this title, in the Library of Congress or with such other appropriate agency as the Secretary may designate, for future use and reference.

## § 306104. Agency Preservation Officer

The head of each Federal agency (except an agency that is exempted under section 304108(c) of this title) shall designate a qualified official as the agency's Preservation Officer who shall be responsible for coordinating the agency's activities under this division. Each Preservation Officer may, to be considered qualified, satisfactorily complete an appropriate training program established by the Secretary under section 306101(c) of this title.

## § 306105. Agency programs and projects

Consistent with the agency's missions and mandates, each Federal agency shall carry out agency programs and projects (including those under which any Federal assistance is provided or any Federal license, permit, or other approval is required) in accordance with the purposes of this division and give consideration to programs and projects that will further the purposes of this division.

## § 306106. Review of plans of transferees of surplus federally owned historic property

The Secretary shall review and approve the plans of transferees of surplus federally owned historic property not later than 90 days after receipt of the plans to ensure that the prehistorical, historical, architectural, or culturally significant values will be preserved or enhanced.

## § 306107. Planning and actions to minimize harm to National Historic Landmarks

Prior to the approval of any Federal undertaking that may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark. The head of

the Federal agency shall afford the Council a reasonable opportunity to comment with regard to the undertaking.

### § 306108. Effect of undertaking on historic property

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property. The head of the Federal agency shall afford the Council a reasonable opportunity to comment with regard to the undertaking.

### § 306109. Costs of preservation as eligible project costs

A Federal agency may include the costs of preservation activities of the agency under this division as eligible project costs in all undertakings of the agency or assisted by the agency. The eligible project costs may include amounts paid by a Federal agency to a State to be used in carrying out the preservation responsibilities of the Federal agency under this division, and reasonable costs may be charged to Federal licensees and permittees as a condition to the issuance of the license or permit.

### § 306110. Annual preservation awards program

The Secretary shall establish an annual preservation awards program under which the Secretary may make monetary awards in amounts of not to exceed $1,000 and provide citations for special achievement to officers and employees of Federal, State, and certified local governments in recognition of their outstanding contributions to the preservation of historic property. The program may include the issuance of annual awards by the President to any citizen of the United States recommended for the award by the Secretary.

### § 306111. Environmental impact statement

Nothing in this division shall be construed to—

(1) require the preparation of an environmental impact statement where the statement would not otherwise be required under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.); or

(2) provide any exemption from any requirement respecting the preparation of an environmental impact statement under that Act.

### § 306112. Waiver of provisions in event of natural disaster or imminent threat to national security

The Secretary shall promulgate regulations under which the requirements of this subchapter (except section 306108) may be waived in whole or in part in the event of a major natural disaster or an imminent threat to national security.

### § 306113. Anticipatory demolition

Each Federal agency shall ensure that the agency will not grant a loan, loan guarantee, permit, license, or other assistance to an applicant that, with intent to avoid the requirements of section 306108 of this title, has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, has allowed the significant adverse effect to occur, unless the agency, after consultation with the Council, determines that circumstances justify granting the assistance despite the adverse effect created or permitted by the applicant.

### § 306114. Documentation of decisions respecting undertakings

With respect to any undertaking subject to section 306108 of this title that adversely affects any historic property for which a Federal agency has not entered into an agreement pursuant to regulations issued by the Council, the head of the agency shall document any decision made pursuant to section 306108 of this title. The head of the agency may not delegate the responsibility to document a decision pursuant to this section. Where an agreement pursuant to regulations issued by the Council has been executed with respect to an undertaking, the agreement shall govern the undertaking and all of its parts.

## Subchapter II—Lease, Exchange, or Management of Historic Property

### § 306121. Lease or exchange

(a) AUTHORITY TO LEASE OR EXCHANGE.—Notwithstanding any other provision of law, each Federal agency, after consultation with the Council—

(1) shall, to the extent practicable, establish and implement alternatives (including adaptive use) for historic property that is not needed for current or projected agency purposes; and

(2) may lease historic property owned by the agency to any person or organization, or exchange any property owned by the agency with comparable historic property, if the agency head determines that the lease or exchange will adequately ensure the preservation of the historic property.

(b) PROCEEDS OF LEASE.—Notwithstanding any other provision of law, the proceeds of a lease under subsection (a) may be retained by the agency entering into the lease and used to defray the costs of administration, maintenance, repair, and related expenses incurred by the agency with respect to that property or other property that is on the National Register that is owned by, or are under the jurisdiction or control of, the agency. Any surplus proceeds from the leases shall be deposited in the Treasury at the end of the 2d fiscal year following the fiscal year in which the proceeds are received.

### § 306122. Contracts for management of historic property

The head of any Federal agency having responsibility for the management of any historic property may, after consultation with the Council, enter into a contract for the management of the property. The contract shall contain terms and conditions that the head of the agency considers necessary or appropriate to protect the interests of the United States and ensure adequate preservation of the historic property.

## Subchapter III—Protection and Preservation of Resources

### § 306131. Standards and guidelines

(a) STANDARDS.—

(1) IN GENERAL.—Each Federal agency that is responsible for the protection of historic property (including archeological property) pursuant to this division or any other law shall ensure that—

(A) all actions taken by employees or contractors of the agency meet professional standards under regulations developed by the Secretary in consultation with the Council, other affected agencies, and the appropriate professional societies of archeology, architecture, conservation, history, landscape architecture, and planning;

(B) agency personnel or contractors responsible for historic property meet qualification standards established by the Office of Personnel Management in consultation with the Secretary and appropriate professional societies of archeology, architecture, conservation, curation, history, landscape architecture, and planning; and

(C) records and other data, including data produced by historical research and archeological surveys and excavations, are permanently maintained in appropriate databases and made available to potential users pursuant to such regulations as the Secretary shall promulgate.

(2) CONSIDERATIONS.—The standards referred to in paragraph (1)(B) shall consider the particular skills and expertise needed for the preservation of historic property and shall be equivalent requirements for the disciplines involved.

(3) REVISION.—The Office of Management and Budget shall revise qualification standards for the disciplines involved.

(b) GUIDELINES.—To promote the preservation of historic property eligible for listing on the National Register, the Secretary shall, in consultation with the Council, promulgate guidelines to ensure that Federal, State, and tribal historic preservation programs subject to this division include plans to—

(1) provide information to the owners of historic property (including architectural, curatorial, and archeological property) with demonstrated or likely research significance, about the need for protection of the historic property, and the available means of protection;

(2) encourage owners to preserve historic property intact and in place and offer the owners of historic property information on the tax and grant assistance available for the donation of the historic property or of a preservation easement of the historic property;

(3) encourage the protection of Native American cultural items (within the meaning of section 2 of the Native American Graves Protection and Repatriation Act (25 U.S.C. 3001)) and of property of religious or cultural importance to Indian tribes, Native Hawaiian organizations, or other Native American groups; and

(4) encourage owners that are undertaking archeological excavations to—

(A) conduct excavations and analyses that meet standards for federally-sponsored excavations established by the Secretary;

(B) donate or lend artifacts of research significance to an appropriate research institution;

(C) allow access to artifacts for research purposes; and

(D) prior to excavating or disposing of a Native American cultural item in which an Indian tribe or Native Hawaiian organization may have an interest under subparagraph (B) or (C) of section 3(a)(2) of the Native American Graves

Protection and Repatriation Act (25 U.S.C. 3002(a)(2)(B), (C)), give notice to and consult with the Indian tribe or Native Hawaiian organization.

## Subdivision 6—Miscellaneous

# Chapter 3071—Miscellaneous

Sec.
307101. World Heritage Convention.
307102. Effective date of regulations.
307103. Access to information.
307104. Inapplicability of division to White House, Supreme Court building, or United States Capitol.
307105. Attorney's fees and costs to prevailing parties in civil actions.
307106. Authorization for expenditure of appropriated funds.
307107. Donations and bequests of money, personal property, and less than fee interests in historic property.
307108. Privately donated funds.

### § 307101. World Heritage Convention

(a) AUTHORITY OF SECRETARY.—In carrying out this section, the Secretary of the Interior may act directly or through an appropriate officer in the Department of the Interior.

(b) PARTICIPATION BY UNITED STATES.—The Secretary shall direct and coordinate participation by the United States in the World Heritage Convention in cooperation with the Secretary of State, the Smithsonian Institution, and the Council. Whenever possible, expenditures incurred in carrying out activities in cooperation with other nations and international organizations shall be paid for in such excess currency of the country or area where the expense is incurred as may be available to the United States.

(c) NOMINATION OF PROPERTY TO WORLD HERITAGE COMMITTEE.— The Secretary shall periodically nominate property that the Secretary determines is of international significance to the World Heritage Committee on behalf of the United States. No property may be nominated unless it has previously been determined to be of national significance. Each nomination shall include evidence of such legal protections as may be necessary to ensure preservation of the property and its environment (including restrictive covenants, easements, or other forms of protection). Before making any nomination, the Secretary shall notify the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate.

(d) NOMINATION OF NON-FEDERAL PROPERTY TO WORLD HERITAGE COMMITTEE REQUIRES WRITTEN CONCURRENCE OF OWNER.—No non-Federal property may be nominated by the Secretary to the World Heritage Committee for inclusion on the World Heritage List unless the owner of the property concurs in the nomination in writing.

(e) CONSIDERATION OF UNDERTAKING ON PROPERTY.—Prior to the approval of any undertaking outside the United States that may directly and adversely affect a property that is on the World Heritage List or on the applicable country's equivalent of the National Register, the head of a Federal agency having direct or indirect jurisdiction over the undertaking shall take into account the effect of the undertaking on the property for purposes of avoiding or mitigating any adverse effect.

### § 307102. Effective date of regulations

(a) PUBLICATION IN FEDERAL REGISTER.—No final regulation of the Secretary shall become effective prior to the expiration of 30 calendar days after it is published in the Federal Register during which either or both Houses of Congress are in session.

(b) DISAPPROVAL OF REGULATION BY RESOLUTION OF CONGRESS.— The regulation shall not become effective if, within 90 calendar days of continuous session of Congress after the date of promulgation, both Houses of Congress adopt a concurrent resolution, the matter after the resolving clause of which is as follows: "That Congress disapproves the regulation promulgated by the Secretary dealing with the matter of , which regulation was transmitted to Congress on , " the blank spaces in the resolution being appropriately filled.

(c) FAILURE OF CONGRESS TO ADOPT RESOLUTION OF DISAPPROVAL OF REGULATION.—If at the end of 60 calendar days of continuous session of Congress after the date of promulgation of a regulation, no committee of either House of Congress has reported or been discharged from further consideration of a concurrent resolution disapproving the regulation, and neither House has adopted such a resolution, the regulation may go into effect immediately. If, within the 60 calendar days, a committee has reported or been discharged from further consideration of such a resolution, the regulation may go into effect not sooner than 90 calendar days of continuous session of Congress after its promulgation unless disapproved as provided for.

(d) SESSIONS OF CONGRESS.—For purposes of this section—

> (1) continuity of session is broken only by an adjournment sine die; and

> (2) the days on which either House is not in session because of an adjournment of more than 3 days to a day certain are excluded in the computation of 60 and 90 calendar days of continuous session of Congress.

(e) CONGRESSIONAL INACTION OR REJECTION OF RESOLUTION OF DISAPPROVAL NOT DEEMED APPROVAL OF REGULATION.—Congressional inaction on or rejection of a resolution of disapproval shall not be deemed an expression of approval of the regulation.

### § 307103. Access to information

(a) AUTHORITY TO WITHHOLD FROM DISCLOSURE.—The head of a Federal agency, or other public official receiving grant assistance pursuant to this division, after consultation with the Secretary, shall withhold from disclosure to the public information about the location, character, or ownership of a historic property if the Secretary and the agency determine that disclosure may—

> (1) cause a significant invasion of privacy;

> (2) risk harm to the historic property; or

> (3) impede the use of a traditional religious site by practitioners.

(b) ACCESS DETERMINATION.—When the head of a Federal agency or other public official determines that information should be withheld from the public pursuant to subsection (a), the Secretary, in consultation with the Federal agency head or official, shall determine who may have access to the information for the purpose of carrying out this division.

(c) CONSULTATION WITH COUNCIL.—When information described in subsection (a) has been developed in the course of an agency's compliance with section 306107 or 306108 of this title, the Secretary shall consult with the Council in reaching determinations under subsections (a) and (b).

### § 307104. Inapplicability of division to White House, Supreme Court building, or United States Capitol

Nothing in this division applies to the White House and its grounds, the Supreme Court building and its grounds, or the United States Capitol and its related buildings and grounds.

**§ 307105. Attorney's fees and costs to prevailing parties in civil actions**

In any civil action brought in any United States district court by any interested person to enforce this division, if the person substantially prevails in the action, the court may award attorney's fees, expert witness fees, and other costs of participating in the civil action, as the court considers reasonable.

**§ 307106. Authorization for expenditure of appropriated funds**

Where appropriate, each Federal agency may expend funds appropriated for its authorized programs for the purposes of activities carried out pursuant to this division, except to the extent that appropriations legislation expressly provides otherwise.

**§ 307107. Donations and bequests of money, personal property, and less than fee interests in historic property**

(a) MONEY AND PERSONAL PROPERTY.—The Secretary may accept donations and bequests of money and personal property for the purposes of this division and shall hold, use, expend, and administer the money and personal property for those purposes.

(b) LESS THAN FEE INTEREST IN HISTORIC PROPERTY.—The Secretary may accept gifts or donations of less than fee interests in any historic property where the acceptance of an interest will facilitate the conservation or preservation of the historic property. Nothing in this section or in any provision of this division shall be construed to affect or impair any other authority of the Secretary under other provision of law to accept or acquire any property for conservation or preservation or for any other purpose.

**§ 307108. Privately donated funds**

(a) PROJECTS FOR WHICH FUNDS MAY BE USED.—In furtherance of the purposes of this division, the Secretary may accept the donation of funds that may be expended by the Secretary for projects to acquire, restore, preserve, or recover data from any property included on the National Register, as long as the project is owned by a State, any unit of local government, or any nonprofit entity.

(b) CONSIDERATION OF FACTORS RESPECTING EXPENDITURE OF FUNDS.—

(1) IN GENERAL.—In expending the funds, the Secretary shall give due consideration to—

(A) the national significance of the project;

(B) its historical value to the community;

(C) the imminence of its destruction or loss; and

(D) the expressed intentions of the donor.

(2) FUNDS AVAILABLE WITHOUT REGARD TO MATCHING REQUIREMENTS.—Funds expended under this subsection shall be made available without regard to the matching requirements established by sections 302901 and 302902(b) of this title, but the recipient of the funds shall be permitted to utilize them to match any grants from the Historic Preservation Fund.

(c) TRANSFER OF UNOBLIGATED FUNDS.—The Secretary may transfer unobligated funds previously donated to the Secretary for the purposes of the Service, with the consent of the donor, and any funds so transferred shall be used or expended in accordance with this division.

| Old Section Name | Old Title 16 Legal Cite | Current Title 54 Legal Cite |
|---|---|---|
| Section 1 | 16 U.S.C. 470(a) | 54 U.S.C. 100101 note. It provides the short title: the "National Historic Preservation Act." |
| | 16 U.S.C. 470(b) | Not repealed but omitted from the text of title 54. It provides findings for the National Historic Preservation Act. It is still valid law and may be cited as: Section 1 of the National Historic Preservation Act, Pub. L. No. 89-665, as amended by Pub. L. No. 96-515. |
| Section 2 | 16 U.S.C. 470–1 | 54 U.S.C. 300101 |
| Section 101 | 16 U.S.C. 470a(a)(1)(A) (1st sentence) | 54 U.S.C. 302101 |
| | 16 U.S.C. 470a(a)(1)(A) (last sentence) | 54 U.S.C. 302106 |
| | 16 U.S.C. 470a(a)(1)(B) | 54 U.S.C. 302102 |
| | 16 U.S.C. 470a(a)(2) | 54 U.S.C. 302103 |
| | 16 U.S.C. 470a(a)(3) through (5) | 54 U.S.C. 302104 |
| | 16 U.S.C. 470a(a)(6) | 54 U.S.C. 302105 |
| | 16 U.S.C. 470a(a)(7) | 54 U.S.C. 302107 |
| | 16 U.S.C. 470a(a)(8) | 54 U.S.C. 302108 |
| | 16 U.S.C. 470a(b)(1) | 54 U.S.C. 302301 |
| | 16 U.S.C. 470a(b)(2) | 54 U.S.C. 302302 |
| | 16 U.S.C. 470a(b)(3) | 54 U.S.C. 302303 |
| | 16 U.S.C. 470a(b)(4) | 54 U.S.C. 302304 |
| | 16 U.S.C. 470a(b)(5) | Repealed as obsolete. It provided that any State historic preservation program in effect under prior authority of law could be treated as an approved program for purposes of 16 U.S.C. 470a(b) until the earlier of the date on which the Secretary approved a program submitted by the State under 16 U.S.C. 470a(b) or 3 years after December 12, 1992. |
| | 16 U.S.C. 470a(b)(6) | 54 U.S.C. 302304 |
| | 16 U.S.C. 470a(c)(1) (1st sentence) | 54 U.S.C. 302502 |
| | 16 U.S.C. 470a(c)(1) (2d, last sentences) | 54 U.S.C. 302503 |
| | 16 U.S.C. 470a(c)(2) | 54 U.S.C. 302504 |
| | 16 U.S.C. 470a(c)(3) | 54 U.S.C. 302505 |
| | 16 U.S.C. 470a(c)(4) | 54 U.S.C. 302501 |
| | 16 U.S.C. 470a(d)(1) | 54 U.S.C. 302701 |
| | 16 U.S.C. 470a(d)(2) | 54 U.S.C. 302702 |
| | 16 U.S.C. 470a(d)(3) | 54 U.S.C. 302703 |
| | 16 U.S.C. 470a(d)(4) | 54 U.S.C. 302704 |
| | 16 U.S.C. 470a(d)(5) | 54 U.S.C. 302705 |
| | 16 U.S.C. 470a(d)(6) | 54 U.S.C. 302706 |
| | 16 U.S.C. 470a(e)(1) | 54 U.S.C. 302902 |
| | 16 U.S.C. 470a(e)(2) | 54 U.S.C. 302903 |
| | 16 U.S.C. 470a(e)(3)(A) | 54 U.S.C. 302904 |
| | 16 U.S.C. 470a(e)(3)(B) | 54 U.S.C. 302906 |
| | 16 U.S.C. 470a(e)(3)(C) | 54 U.S.C. 302904 |
| | 16 U.S.C. 470a(e)(4) | 54 U.S.C. 302905 |
| | 16 U.S.C. 470a(e)(5) | 54 U.S.C. 302907 |
| | 16 U.S.C. 470a(e)(6) | 54 U.S.C. 302908 |
| | 16 U.S.C. 470a(f) | 54 U.S.C. 302909 |
| | 16 U.S.C. 470a(g), (h) | 54 U.S.C. 306101 |
| | 16 U.S.C. 470a(i) | 54 U.S.C. 303902 |
| | 16 U.S.C. 470a(j) | 54 U.S.C. 303903 |
| Section 102 | 16 U.S.C. 470b(a) (1st sentence paragraph (1)) | 54 U.S.C. 302901 |
| | 16 U.S.C. 470b(a) (1st sentence paragraphs (2) through (6)) | 54 U.S.C. 302902 |
| | 16 U.S.C. 470b(a) (2d sentence) | 54 U.S.C. 302902 |
| | 16 U.S.C. 470b(a) (last sentence) | 54 U.S.C. 302901 |
| | 16 U.S.C. 470b(b) | 54 U.S.C. 302902 |
| | 16 U.S.C. 470b(c) | Previously repealed. |
| | 16 U.S.C. 470b(d) (relating to remaining cost of project) | 54 U.S.C. 302902 |
| | 16 U.S.C. 470b(d) (relating to availability) | 54 U.S.C. 302901 |

| | 16 U.S.C. 470b(e) | 54 U.S.C. 302902 |
|---|---|---|
| Section 103 | 16 U.S.C. 470c | 54 U.S.C. 302902 |
| Section 104 | 16 U.S.C. 470d | 54 U.S.C. 303901 |
| Section 105 | 16 U.S.C. 470e | 54 U.S.C. 302910 |
| Section 106 | 16 U.S.C. 470f | 54 U.S.C. 306108 |
| Section 107 | 16 U.S.C. 470g | 54 U.S.C. 307104 |
| Section 108 | 16 U.S.C. 470h (1st paragraph) | 54 U.S.C. 303101 |
| | 16 U.S.C. 470h (last paragraph 1st sentence) | 54 U.S.C. 303102 |
| | 16 U.S.C. 470h (last paragraph last sentence) | 54 U.S.C. 303103 |
| Section 109 | 16 U.S.C. 470h–1 | 54 U.S.C. 307108 |
| Section 110 | 16 U.S.C. 470h–2(a)(1) | 54 U.S.C. 306101 |
| | 16 U.S.C. 470h–2(a)(2) | 54 U.S.C. 306102 |
| | 16 U.S.C. 470h–2(b) | 54 U.S.C. 306103 |
| | 16 U.S.C. 470h–2(c) | 54 U.S.C. 306104 |
| | 16 U.S.C. 470h–2(d) | 54 U.S.C. 306105 |
| | 16 U.S.C. 470h–2(e) | 54 U.S.C. 306106 |
| | 16 U.S.C. 470h–2(f) | 54 U.S.C. 306107 |
| | 16 U.S.C. 470h–2(g) | 54 U.S.C. 306109 |
| | 16 U.S.C. 470h–2(h) | 54 U.S.C. 306110 |
| | 16 U.S.C. 470h–2(i) | 54 U.S.C. 306111 |
| | 16 U.S.C. 470h–2(j) | 54 U.S.C. 306112 |
| | 16 U.S.C. 470h–2(k) | 54 U.S.C. 306113 |
| | 16 U.S.C. 470h–2(l) | 54 U.S.C. 306114 |
| Section 111 | 16 U.S.C. 470h–3(a), (b) | 54 U.S.C. 306121 |
| | 16 U.S.C. 470h–3(c) | 54 U.S.C. 306122 |
| Section 112 | 16 U.S.C. 470h–4 | 54 U.S.C. 306131 |
| Section 113 (Repealed) | 16 U.S.C. 470h–5 | Repealed as obsolete. It provided that the Secretary study the suitability and feasibility of alternatives for controlling illegal interstate and international traffic in antiquities and not later than 18 months after October 30, 1992, submit to Congress a report detailing the Secretary's findings and recommendations from the study. |
| Section 201 | 16 U.S.C. 470i | 54 U.S.C. 304101 |
| Section 202 | 16 U.S.C. 470j | 54 U.S.C. 304102 |
| Section 203 | 16 U.S.C. 470k | 54 U.S.C. 304103 |
| Section 204 | 16 U.S.C. 470l | 54 U.S.C. 304104 |
| Section 205 | 16 U.S.C. 470m | 54 U.S.C. 304105 |
| Section 206 | 16 U.S.C. 470n | 54 U.S.C. 304106 |
| Section 207 (Repealed) | 16 U.S.C. 470o | Repealed as obsolete. It provided that personnel, property, records, and unexpended balances of funds be transferred by the Department of the Interior to the Advisory Council on Historic Preservation within 60 days of the effective date of Public Law 94–422, which was approved on September 28, 1976. |
| Section 208 | 16 U.S.C. 470p | 54 U.S.C. 304105 |
| Section 209 | 16 U.S.C. 470q | 54 U.S.C. 304105 |
| Section 210 | 16 U.S.C. 470r | 54 U.S.C. 304107 |
| Section 211 | 16 U.S.C. 470s | 54 U.S.C. 304108 |
| Section 212 | 16 U.S.C. 470t(a) (1st sentence) | 54 U.S.C. 304109 |
| | 16 U.S.C. 470t(a) (last sentence) | Repealed as unnecessary. It authorized to be appropriated amounts necessary to carry out this part. |
| | 16 U.S.C. 470t(b) | 54 U.S.C. 304109 |
| Section 213 | 16 U.S.C. 470u | 54 U.S.C. 304110 |
| Section 214 | 16 U.S.C. 470v | 54 U.S.C. 304108 |
| Section 215 | 16 U.S.C. 470v–1 | 54 U.S.C. 304111 |
| Section 216 | 16 U.S.C. 470v–2 | 54 U.S.C. 304112 |
| Section 301 | 16 U.S.C. 470w(1) | 54 U.S.C. 300301 |
| | 16 U.S.C. 470w(2) | 54 U.S.C. 300317 |
| | 16 U.S.C. 470w(3) | 54 U.S.C. 300310 |

| | 16 U.S.C. 470w(4) | 54 U.S.C. 300309 |
|---|---|---|
| | 16 U.S.C. 470w(5) | 54 U.S.C. 300308 |
| | 16 U.S.C. 470w(6) | 54 U.S.C. 300311 |
| | 16 U.S.C. 470w(7) | 54 U.S.C. 300320 |
| | 16 U.S.C. 470w(8) | 54 U.S.C. 300315 |
| | 16 U.S.C. 470w(9) | 54 U.S.C. 300304 |
| | 16 U.S.C. 470w(10) | 54 U.S.C. 300305 |
| | 16 U.S.C. 470w(11) | 54 U.S.C. 300316 |
| | 16 U.S.C. 470w(12) | 54 U.S.C. 300318 |
| | 16 U.S.C. 470w(13) | 54 U.S.C. 300307 |
| | 16 U.S.C. 470w(14) | 54 U.S.C. 300319 |
| | 16 U.S.C. 470w(15) | 54 U.S.C. 300302 |
| | 16 U.S.C. 470w(16) | 54 U.S.C. 300303 |
| | 16 U.S.C. 470w(17) | 54 U.S.C. 300313 |
| | 16 U.S.C. 470w(18) | 54 U.S.C. 300314 |
| Section 302 | 16 U.S.C. 470w–1 | 54 U.S.C. 307106 |
| Section 303 | 16 U.S.C. 470w–2 | 54 U.S.C. 307107 |
| Section 304 | 16 U.S.C. 470w–3 | 54 U.S.C. 307103 |
| Section 305 | 16 U.S.C. 470w–4 | 54 U.S.C. 307105 |
| Section 306 | 16 U.S.C. 470w–5(a) (1st sentence) | 54 U.S.C. 305502 |
| | 16 U.S.C. 470w–5(a) (last sentence) | 54 U.S.C. 305503 |
| | 16 U.S.C. 470w–5(b) | 54 U.S.C. 305502 |
| | 16 U.S.C. 470w–5(c) | 54 U.S.C. 305504 |
| | 16 U.S.C. 470w–5(d) | Repealed as obsolete. It provided for the renovation of the site on which the National Museum for the Building Arts is located. |
| | 16 U.S.C. 470w–5(e) | 54 U.S.C. 305505 |
| | 16 U.S.C. 470w–5(f) | 54 U.S.C. 305501 |
| Section 307 | 16 U.S.C. 470w–6 | 54 U.S.C. 307102 |
| Section 308 | 16 U.S.C. 470w–7(a) | 54 U.S.C. 305102 |
| | 16 U.S.C. 470w–7(b) | 54 U.S.C. 305103 |
| | 16 U.S.C. 470w–7(c) | 54 U.S.C. 305104 |
| | 16 U.S.C. 470w–7(d) | 54 U.S.C. 305105 |
| | 16 U.S.C. 470w–7(e) | 54 U.S.C. 305101 |
| Section 309 | 16 U.S.C. 470w–8 | 54 U.S.C. 305106 |
| Section 401 | 16 U.S.C. 470x | Not repealed but omitted from the text of title 54. It provides the following findings regarding the National Center for Preservation Technology and Training provisions: "The Congress finds and declares that, given the complexity of technical problems encountered in preserving historic properties and the lack of adequate distribution of technical information to preserve such properties, a national initiative to coordinate and promote research, distribute information, and provide training about preservation skills and technologies would be beneficial." It may be cited as Pub. L. No. 102-175, title XL, § 4022, 106 Stat. 4765 (1992). |
| Section 402 | 16 U.S.C. 470x–1 | 54 U.S.C. 305301 |
| Section 403 | 16 U.S.C. 470x–2 | 54 U.S.C. 305302 |
| Section 404 | 16 U.S.C. 470x–3 | 54 U.S.C. 305303 |
| Section 405 | 16 U.S.C. 470x–4 | 54 U.S.C. 305304 |
| Section 406 | 16 U.S.C. 470x–5 | 54 U.S.C. 305305 |
| Section 407 | 16 U.S.C. 470x–6 | 54 U.S.C. 305306 |

| Section 401* | 16 U.S.C. 470a–1 | 54 U.S.C. 307101 (a) through (d). * = These are legislative provisions that were enacted to codify requirements of the World Heritage Convention, and were included among the National Historic Preservation Act Amendments of 1980. However, they were not technically part of the National Historic Preservation Act. Their "Section 401" and "Section 402" numbering in the first column refers to their section numbers under the public law that enacted the 1980 amendments, rather than their numbering for the National Historic Preservation Act itself. However, their "old section" names are included since, particularly in the case of "Section 402," below, those are section names that have been popularly used by practitioners. |
| --- | --- | --- |
| Section 402* | 16 U.S.C. 470a–2 | 54 U.S.C. 307101 (e). See "*" notes, above. This is the section that imposes requirements similar to "Section 106" regarding projects outside the United States. |



October 23, 2020

Mr. Kelly Laycock
Oceans, Wetlands and Streams Protection Branch
USEPA Region 4
61 Forsyth St., SW
Atlanta, GA 30303

*Via:* 404Assumption-FL@epa.gov & regulations.gov

> **Re:**  **Request to Reconsider Completeness Determination Regarding
> State of Florida's Application to Assume Administration of a Clean
> Water Act Program (Docket # EPA-HQ-OW-2018-0640-0001; EPA-
> HQ-OW-2018-0640)**

Dear Mr. Laycock:

We write to urge the U.S. Environmental Protection Agency ("EPA") to reconsider its
determination that the State of Florida has submitted a "complete" application to assume
jurisdiction over the Clean Water Act Section 404 program.[1]  As demonstrated below, Florida's
application was not, and is not, complete regarding at least three issues: protection of listed
species, identification of assumed waters, and staffing.  EPA should suspend the public comment
period and review of Florida's application until the State cures these deficiencies and submits a
complete program proposal to the agency.  See 40 C.F.R. § 233.15(a) (statutory review period
shall not begin if EPA finds that a State's submission is incomplete).

On September 16, 2020, EPA published a Federal Register notice stating that it had received "a
complete program submission" for 404 assumption from the State of Florida on August 20, 2020.
See Florida's Request to Assume Administration of a Clean Water Act Section 404 Program, 85
Fed. Reg. 57,853 (Sept. 16, 2020).  Based on its determination that the submission was complete,
EPA initiated a 45-day public comment period that concludes on November 2, 2020, as required
by the Clean Water Act and the Administrative Procedure Act ("APA"), 40 C.F.R. § 233.15(e)
and 5 U.S.C. § 553, and is set to make a decision on the application by December 18, 2020.  See
33 U.S.C. § 1344(h)(1) (providing for decision on application within 120 days of receipt); 40

---

[1] We previously made this request in oral comments at EPA's October 21, 2020, virtual public
hearing on Florida's application.

FLORIDA OFFICES

111 SOUTH MARTIN LUTHER KING JR. BLVD.                    4500 BISCAYNE BLVD., SUITE 201
TALLAHASSEE, FL 32301                                                                  MIAMI, FL 33137
T: 850.681.0031                                                                          T: 305.440.5232

FLOFFICE@EARTHJUSTICE.ORG    WWW.EARTHJUSTICE.ORG

C.F.R. § 233.15(a) (120-day statutory review period begins when EPA receives complete State program submission as set out in 40 C.F.R. § 233.10).

Public notice requirements under the APA are (1) intended to improve the quality of agency rulemaking by ensuring that regulations are tested by exposure to diverse public comment; (2) an essential component of fairness to affected parties; and (3) an opportunity for parties to develop evidence in the record to support their objections to a rule, which in turn enhances the quality of judicial review.  5 U.S.C. § 553; Small Refiner Lead Phase-Down Task Force v. U.S. Env't Prot. Agency, 705 F.2d 506, 547 (D.C. Cir. 1983) (internal citations and quotation marks omitted).

In this case, the State of Florida has failed to provide a complete program submission to EPA, and EPA should reverse its determination otherwise.  Permitting the public only to comment on an incomplete application undermines the agency's rulemaking by precluding meaningful testing, denies fairness to affected parties, and precludes the opportunity to develop evidence in the record that will prove necessary to judicial review, should EPA grant the application, as the State and industry supporters of the program have indicated they fully expect will happen.

**Incomplete Submission Regarding Endangered Species Act Protections**

First, the State has not demonstrated how it will ensure no jeopardy to listed species to comply with the Section 404(b)(1) Guidelines' no-jeopardy provision.  33 U.S.C. § 1344(h)(1)(a) (state must demonstrate it has authority to issue permits which "apply, and assure compliance with, any applicable requirements of this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section, and sections 1317 and 1343 of  this title"); 40 C.F.R. § 230.10(b)(3) (prohibits issuance of permits that will "[j]eopardize[] the continued existence of species listed as endangered or threatened under the [ESA], or result[] in likelihood of the destruction or adverse modification … [of] critical habitat" unless an exemption is granted by the Endangered Species Committee).  See also 40 C.F.R. § 233.11(a)–(c) (requiring that State assumption application include description of scope and structure of State's proposed program, description of State's permitting procedures, and description of structure and organization of all State agencies that will be involved, including the responsibilities of each and how they will coordinate administration of the program).

Instead, the State has indicated that it will rely on an anticipated programmatic biological opinion and an anticipated, associated incidental take statement it expects will result from a Section 7 consultation that is apparently underway between EPA and U.S. Fish and Wildlife Services and the National Marine Fisheries Services.  See Memorandum of Agreement between Florida Department of Environmental Protection and the United States Environmental Protection Agency, Jul. 31, 2020; Memorandum of Understanding between Florida Fish and Wildlife Conservation Commission, United States Fish and Wildlife Services, and the Department of Environmental Protection, Aug. 5, 2020.  As this information was not submitted with the State's August 20, 2020, application, the program submission was not complete.  Further, without the

2

ability to review this critical information, affected parties are unable to provide informed comments on whether Florida will be able to meet the no-jeopardy requirements.

Indeed, it was not until August 27, 2020, that EPA agreed with Florida's novel premise that the agency is required to consult with the Services if a decision to approve a 404 assumption application may affect listed species or designated critical habitat (reversing EPA's prior, longstanding position on this issue). U.S. Env't Prot. Agency, Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals (2020) (Exhibit 1). EPA indicated that it would henceforth engage in a one-time Section 7 programmatic consultation which would allow the Services to issue "a programmatic biological opinion and programmatic incidental take statement for the state or tribal permitting program."

EPA further stated that:

> The [programmatic] biological opinion and incidental take statement could establish additional procedural requirements and permitting conditions or measures *that help ensure the state or tribal permitting program and individual permits issued pursuant to that program*, as well as EPA's approval of that program, *do not result in jeopardy to any listed species. This process*, assuming compliance with any applicable permit conditions or measures, *would* extend ESA Section 9 liability protections to individual permits issued pursuant to the state or tribal program and *place state and tribal CWA Section 404 permitting on equal footing with the Corps' permitting program.*

Id. at 7 (emphasis added).

Taken together, EPA and Florida's positions demonstrate that the yet-to-be-completed consultation, and the yet-to-be-completed biological opinion and incidental take statement that are expected to result from consultation, are an essential component of Florida's assumption application. As a result, Florida's program submission too is not complete, and EPA's determination to the contrary is in error.

As things stand, Florida cannot possibly establish that its program, and any permits that would issue under the program, comply with federal law. See, e.g., 33 U.S.C. § 1344(h)(1)(A)(i) (a state plan to assume dredge and fill permitting must comply with the guidelines issued under § 404(b)(1)); 40 C.F.R. § 233.23 (requiring that "[f]or each permit the [state] Director shall establish conditions which assure compliance with all applicable statutory and regulatory requirements, including the 404(b)(1) Guidelines"). And affected parties cannot possibly provide meaningful comment on whether Florida will ensure no jeopardy to listed species, a matter of fundamental fairness to which they are entitled under the APA.

3

**Incomplete Identification of Assumed Waters**

Second, Florida has failed to identify the waters that would be assumed under its proposed program. EPA regulations require an assumption application to include "[a] description of the waters of the United States within a State over which the State assumes jurisdiction under the approved program" and a description of the waters within the state over which the U.S. Army Corps of Engineers retains jurisdiction if the program is approved. 40 C.F.R. § 233.11(h).

To start, Florida has created an unnecessary labyrinth for anyone to try to understand the waters that are implicated in its assumption application. In fact, none of the program-related definitions are provided by statute or in the State's implementing regulations, but rather appear in an applicant handbook. See Fla. Admin. Code Ann. r. 62-331.030 (providing that "Terms used in this Chapter are defined in section 2.0 of the 404 Handbook").
The 404 Handbook, in turn, defines "State-assumed Waters" or "Assumed Waters" by reference to the Florida legislation that authorized (but did not require) the Florida Department of Environmental Protection to pursue assumption. See Fla. Dep't of Env't Prot., State 404 Program Applicant's Handbook § 2.0(b)(47) [hereinafter "404 Handbook"] ("'State-assumed Waters' or 'Assumed Waters' means those waters as defined in Section 373.4146(1), F.S."). Florida Statutes Section 373.4146(1) provides no further clarity, stating simply that "the term 'state assumed waters' means waters of the United States that the state assumes permitting authority over pursuant to s. 404 of the Clean Water Act, Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq., and rules promulgated thereunder, for the purposes of permitting the discharge of dredge or fill material." In other words, Florida defines state-assumed waters as those waters over which the state assumes jurisdiction.

The 404 Handbook does provide an actual definition for the opposite of state-assumed waters, which are the "Retained Waters." 404 Handbook § 2.0(b)(41). Although Florida's definition does not explain this to the reading public, retained waters are navigable waters over which the U.S. Army Corps of Engineers would retain exclusive permitting jurisdiction under Section 10 of the Rivers and Harbors Act of 1899 if state assumption is granted. 33 U.S.C. § 403. Among other things, Florida explicitly defines "Retained Waters" as including those "identified in the Retained Waters List (Appendix A). 404 Handbook § 2.0(b)(41). Appendix A, in turn, consists of a 4-page list of rivers and creeks, mostly by name only), dated August 23, 2019.

The "Retained Waters List" maintained by the U.S. Army Corps of Engineers ("Corps") for Florida has been the subject of substantial controversy and change since Florida began its efforts to assume the 404 program in 2018. On March 19, 2018, the Corps initiated a 30-day public comment period to end on April 20, 2018, "regarding use of waters in the state of Florida for navigation … [including] identification of those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities" for purposes

of navigability analyses to determine "which waters are subject to permitting authority under
Section 10" and "determining the waters that would be retained by the Corps if the EPA
approves the State's application for Section 404 Program assumption."  U.S. Dep't of the Army,
Public Notice: Determination of Navigable Waters, Mar. 19, 2018 (Exhibit 2).  On April 5, 2018,
the Corps posted its solicitation for public comment on this matter on the website for the
Jacksonville District.  Press Release, U.S. Army Corps of Eng'rs, Corps Seeks Public Comment
Regarding Water Use for Navigation (Apr. 5, 2018),
https://www.saj.usace.army.mil/Media/News-Releases/Article/1485269/corps-seeks-public-comment-regarding-water-use-for-navigation (Exhibit 3).

On April 10, 2018, the Corps issued an "Updated Public Notice" summarily terminating the
comment period effective immediately, deeming "the comment period originally set to expire on
April 20, 2018 . . . closed until further notice."  U.S. Dep't of the Army, Updated Public Notice:
Cessation of Public Comment Period, Apr. 10, 2018 (Exhibit 4).  More than two years later,
there has been no "further notice," and no further opportunity for the public to comment on this
matter of exceptional public importance, even now that Florida has submitted its 404 application
to EPA.

Notably, however, the Corps' list of Retained Waters that appears to be part of Florida's
submission to EPA (4 pages long) is drastically reduced as compared to the Retained Waters list
supplement produced by the Corps in October 2017 (17 pages long).

Notwithstanding the Corps' abrupt and unexplained change of course in soliciting public
comment in 2018, we, and several other members of the public, submitted comments in line with
the original deadline of April 18, 2018.  This included comments by Senator Bob Graham, on
behalf of the Florida Conservation Coalition, as well as the Sierra Club, Audubon Florida, The
Conservancy of Southwest Florida, and Florida's Water and River Keepers.

In our letter, we reminded the Corps about Florida's extensive water resources and unique
hydrology, and that any navigability study would require a thorough analysis of numerous
waterways to determine which waters may be assumable.  This undertaking would require
special attention to the rivers, streams and adjacent wetlands located throughout the State.  We
further noted that determining the adjacency of wetlands in particular will require time,
investigation and evidence and will be of critical importance to Florida's residents and
economies.  These determinations must be based on technical information, hydrology and
science.  By necessity, adjacency determinations must be made case by case, based on site-
specific characteristics of the area's hydrology, topography and vegetation, among other factors.
To perform such studies, it will be imperative to solicit information from the public, as there are
entities and individuals with relevant expertise located throughout the State.

Other commenters echoed similar concerns.  The Sierra Club demonstrated that even at the time, the Corps' lists of navigable waters was incomplete and inadequate.  Letter from Frank Jackalone, Sierra Club Fla. Chapter, to Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 16, 2018 (Exhibit 5).  The Corps' list identified 492 rivers and creeks and 110 lakes.  A supplement to the list totaled 1,767 rivers and creeks and 1,186 lakes.  The text prefacing that supplement stated that "[t]he District makes no claim that these lists are complete or completely accurate."

The Conservancy of Southwest Florida submitted scores and scores of additional waterways that it urge the Corps to consider as navigable as well for Section 10 purposes.  Letter from Amber Crooks, Conservancy of Sw. Fla., to the Dep't of the Army, Apr. 18, 2018 (Exhibit 6).  Audubon Florida urged the Corps to use the October 2017 list as a baseline and to supplement that list with additional navigable waterways subject to Section 10 Rivers and Harbors Act jurisdiction.  Letter from Julie Wraithmell, Audubon Fla., to Donald W. Kinard, U.S. Army Corps of Eng'rs, Apr. 17, 2018 (Exhibit 7).  Florida's Water and River Keepers emphasized the critical importance of the Corps properly identifying all Section 10 waters in the State.  Letter from Rachel Silverstein, Miami Waterkeeper, et al. to Colonel Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 18, 2018 (Exhibit 8).

Florida's 404 program submission to EPA, however, contends with none of this.  It purports to limit the "Retained Waters" to an anemic 4-page list that is vague, incomplete and has not been subject to notice and comment.  Indeed, the list is grossly lacking as it reflects a far more restrictive view of retained waters than the Corps possessed in 2017, and the Corps has failed to engage the public in performing an adequate navigability study that would accurately reflect the scope of exclusive federal jurisdiction.

Moreover, Florida has failed to provide the public with GIS or other mapping that would in fact demonstrate the scope of the jurisdiction it intends to claim if its 404 assumption application is granted.  Without this information, members of the public across the state are unable to evaluate and comment on the impact this proposal will have on the waters that are of ecological and economic benefit to them.  By failing to adequately and accurately identify those waters over which the state would assume jurisdiction, Florida's application is incomplete.

**Incomplete Description of Available Funding and Staffing**

Third, Florida has failed to provide EPA and the public with complete information regarding how it would implement, operate and enforce a Section 404 program, particularly given the substantial impact the COVID-19 pandemic has had on State coffers.  See 40 C.F.R. § 233.11(d) (program description must include "[a] description of the funding and manpower which will be available for program administration").

As a preliminary matter, the Florida Department of Environment Protection has stated that its 404 program would also rely on staff and resources from two other state agencies, namely the

Florida Fish and Wildlife Commission and the State Historic Preservation Office, to ensure protection of listed species and cultural resources. Memorandum of Understanding between Florida Fish and Wildlife Conservation Commission, United States Fish and Wildlife Services, and the Department of Environmental Protection, Aug. 5, 2020; Operating Agreement between Florida Department of Environmental Protection and the Florida Division of Historical Resources-State Historic Preservation Officer Regarding the State 404 Program, Aug. 6, 2020. However, Florida's description of funding and manpower contains no information regarding the funding and manpower, if any, available at either of those state agencies to meet the obligations of an assumed 404 program.

Instead, Florida relies solely on resources purportedly available at the Department of Environmental Protection. In doing so, however, Florida completely fails to disclose to EPA that state coffers are under severe strain as a result of the COVID-19 pandemic that since March 2020 has infected more than 750,000 Floridians, and resulted in the deaths of another 16,267 Floridians. Fla. Dep't of Health, Florida COVID-19 Dashboard, https://fdoh.maps.arcgis.com/apps/opsdashboard/index.html#/8d0de33f260d444c852a615dc7837 c86 (last visited Oct. 23, 2020) (Exhibit 9).

Tax revenues for the state plummeted in April, May and June 2020 as a result of the pandemic. In July 2020, Governor DeSantis vetoed $1 billion in spending from the 2020-2021 budget in response to the crisis. In August 2020, Florida agencies were asked to cut 8.5% of their budgets to adjust for budget shortfalls resulting from the pandemic. See Christine Sexton, *Florida Agencies Asked to Cut 8.5 Percent to Adjust for COVID-19*, Tampa Bay Times, Aug. 12, 2020, https://www.tampabay.com/florida-politics/buzz/2020/08/12/florida-agencies-asked-to-cut-85-percent-to-adjust-for-covid-19. (last visited Oct. 23, 2020) (Exhibit 10).

Florida has not acknowledged these important facts, much less addressed how its state agencies can be expected to do more—namely implement, operate and enforce a Section 404 program—with so much less. Indeed, as several commenters noted during EPA's October 21, 2020, public hearing on the application, the Department already is unable to meet its obligations to operate and enforce programs already under its purview. This fact is amply demonstrated in the widespread impaired waters throughout the State, as well as the recurring toxic algae crisis that has made national headlines and the Department's grossly inadequate record of enforcing its existing programs.

The fact is that resources at the Department have been gutted in recent years. *Editorial: The Rick Scott Record: An Environmental Disaster*, Tampa Bay Times, Sept. 5, 2014, https://www.tampabay.com/opinion/editorials/editorial-the-rick-scott-record-an-environmental-disaster/2196359/ (observing that the Rick Scott administration had reduced water management budgets, rushed through permitting, weakened enforcement, caused widespread layoffs,

7

provoked a brain drain of experts in the field, and replaced experts with political appointees focused on advancing business interests rather than environmental stewardship). (last visited Oct. 23, 2020) (Exhibit 11).

The unprecedented budget strains the state is facing will make it impossible to recover any semblance of staffing and funding that would make assumption of a Section 404 program feasible any time soon.

The Department's claim that it will be able to operate a Section 404 program without any additional funding from the State—a fundamentally flawed premise that the legislature relied on when granting the authority for the state agency to pursue assumption—is untenable.  It either reflects the Department's erroneous belief that Section 404 is merely "duplicative" of state regulations (it is not), demonstrates the Department's intention to treat its pre-existing regulations and Section 404 as one and the same (it may not), or suggests that the Department simply will not adequately implement, operate or enforce a Section 404 program (it cannot).

**Conclusion**

As demonstrated above, Florida has failed to provide EPA with a complete program submission in at least three, critical respects.  EPA should therefore suspend the public comment period and review of Florida's application until the State cures these deficiencies and submits a complete program proposal to the agency.  See 40 C.F.R. § 233.15(a) (providing that statutory review period shall not begin if EPA finds that a State's submission is incomplete).

In the alternative, we request that EPA extend the review period pursuant to 40 C.F.R. § 233.15(g) and the public comment period until all materials are provided and the public is given adequate notice and opportunity to comment in accordance with federal law. See also Clean Water Section 404 Program Definition and Permit Exemptions; Section 404 State Program Regulations, 53 Fed. Reg. 20,764, 20,767 (June 6, 1988).

Sincerely,

Bonnie Malloy
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

8

Tania Galloni
Fla. Bar No. 619221
Christina I. Reichert
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

# Exhibit 1



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

OFFICE OF WATER

**Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals**

Pursuant to Section 404 of the Clean Water Act (CWA), 33 U.S.C. 1344, the U.S. Army Corps of Engineers (Corps) is authorized to permit the discharge of dredged or fill material into "waters of the United States." States and federally recognized tribes may assume authority to implement the CWA Section 404 permitting program within their respective jurisdictions from the Corps by submitting a request to the U.S. Environmental Protection Agency (EPA or Agency), as Congress authorized the EPA Administrator to approve program transfers from the Corps to the states and tribes. In the past, EPA has taken the position that such program transfer decisions do not involve an exercise of discretion warranting consultation under Section 7 of the Endangered Species Act (ESA), 16 U.S.C. 1536, meaning EPA would not need to consult with the U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) (hereafter referred to as "the Services") when acting on an assumption application from a state or tribe. EPA has reconsidered its prior position, articulated in 2010, that the decision to approve a state or tribal CWA Section 404 program does not trigger ESA Section 7 consultation. Going forward, EPA has determined that it should consult with the Services under Section 7 of the ESA if a decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or designated critical habitat.

**I. Background**

To assume the CWA Section 404 permitting program, states and tribes must develop permit programs for discharges of dredged or fill material consistent with the requirements of the CWA and implementing regulations at 40 C.F.R. part 233 and submit a request to assume any such program to EPA. States and tribes must administer and implement programs that are consistent with and no less stringent than the requirements of the CWA and implementing regulations. 40 C.F.R. 233.1(d). The Administrator "shall approve" an assumption request if the state or tribal program satisfies the requirements of the CWA Section 404(h)(1). 33 U.S.C. 1344(h)(2)(A). If the Administrator fails to make a determination within 120 days of receiving the request, the program shall be deemed approved. 33 U.S.C. 1344(h)(3).

Section 7 of the ESA directs each federal agency to ensure, in consultation with one or both of the Services, as appropriate, that "any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence" of listed species or result in the destruction or adverse modification of designated critical habitat. 16 U.S.C. 1536(a)(2). ESA Section 7 consultation is not required if the agency determines that an action will not affect listed species or designated critical habitat. ESA Section 7 applies to "all actions in which there is discretionary Federal involvement or control." 50 C.F.R. 402.03.

In December 2010, EPA articulated its position that ESA Section 7 consultation is not applicable to CWA Section 404 program transfer decisions. EPA stated at that time that a 2007 U.S. Supreme Court decision from another context, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ("*NAHB*"), controlled the inquiry. In *NAHB*, the Supreme Court held that because the transfer of CWA National Pollutant Discharge Elimination System (NPDES) permitting authority to a state "is not discretionary, but rather is mandated once a State has met the criteria set forth in Section 402(b) of the CWA, it follows that a transfer of NPDES permitting authority does not trigger Section 7(a)(2)'s consultation and no-jeopardy requirements." 551 U.S. at 673. The Supreme Court held that "[w]hile EPA may exercise some judgment in determining whether a State has demonstrated that it has the authority to carry out Section 402(b)'s enumerated statutory criteria, the statute clearly does not grant it the discretion to add an entirely separate prerequisite to the list. Nothing in the text of Section 402(b) authorizes the EPA to consider the protection of threatened or endangered species as an end in itself when evaluating a transfer application." *Id.* at 671.

EPA evaluated this decision in response to a December 6, 2010 letter sent to the Agency by the Environmental Council of the States (ECOS) and the Association of State Wetland Managers (ASWM) asking whether EPA must conduct an ESA Section 7 consultation prior to approving or disapproving a Section 404 program request. The Agency responded to ECOS and ASWM in a December 27, 2010 letter ("2010 Letter"), see Docket ID No. EPA–HQ–OW–2020–0008, stating that, as in the CWA Section 402(b) context, when considering a CWA Section 404 program transfer request, EPA is only permitted to evaluate the specified criteria in CWA Section 404(h) and does not have discretion to add requirements to the list in CWA Section 404(h), including considerations of potential impacts to endangered and threatened species through ESA Section 7 consultation with the Services.

EPA stated in the 2010 Letter that although there are some differences between CWA Sections 402 and 404, the Supreme Court's reasoning in *NAHB* applies to EPA's approval of a CWA Section 404(g) permitting program. Section 404(h)(2) of the CWA states that if the Administrator determines that a state program submitted under CWA Section 404(g)(1) has the authority set forth in CWA Section 404(h)(1), then the Administrator "shall approve" the state's application to transfer the CWA Section 404 permitting program. The 2010 Letter acknowledged that "there are some differences between § 402(b) and § 404(h)," but concluded that those differences did not render EPA's action approving a state CWA Section 404 program a "discretionary federal action." The letter did not address the specific differences between the approval requirements of the CWA Section 402 and 404 programs that EPA now recognizes are relevant to the applicability of ESA Section 7. The 2010 Letter concluded that EPA's decision as to whether to approve a state CWA Section 404 program action is non-discretionary and ESA consultation is not required.

In July 2019, EPA received a request from the Florida Department of Environmental Protection (FDEP) asking EPA to engage in an ESA Section 7 consultation with the Services in connection with EPA's initial review of Florida's request to assume the CWA Section 404 program. FDEP provided a white paper asserting that ESA Section 7 consultation is required in the CWA Section 404 assumption context based on the unique statutory text of CWA Section 404 and its associated legislative history, which, in FDEP's view, differs in critical respects from other state delegation programs administered by EPA to which ESA Section 7 does not apply. FDEP stated that EPA's position was articulated in a two-page letter a few weeks after receiving the ECOS and ASWM letter and failed to acknowledge the critical distinctions between the statutory text of CWA Section 404 and the Section 402 program at issue in *NAHB*. FDEP also questioned the 2010 Letter's reliance on the legislative history of CWA Section 404

to support the non-discretionary nature of a state assumption decision, arguing that the legislative history supports the opposite conclusion.

The white paper explained that when a state or tribe administers the CWA Section 404 program, permittees must avoid adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10, which involves a burdensome process for both permit applicants and government agencies. The white paper characterized the lack of incidental take coverage in state- or tribe-assumed programs as a significant hurdle to establishing an effective and efficient CWA Section 404 program in Florida and estimated that approximately ten percent of CWA Section 404 permits issued in Florida require some form of incidental take coverage.

The white paper viewed a one-time ESA Section 7 programmatic consultation in connection with EPA's initial review of an assumption application as an efficient and legally-defensible approach to resolving the lack of incidental take coverage for permittees and permitting agencies. An ESA Section 7 consultation on EPA's potential approval of Florida's program would allow the Services to issue a programmatic biological opinion and a programmatic incidental take statement, which could identify procedural requirements for state permitting under CWA Section 404 needed to support the Services' determination that assumption would not result in jeopardy to any listed species. Subject to the Services' incidental take statement and provided these requirements are followed, FDEP stated that this process would bring state CWA Section 404 permits within the ESA Section 7(o)(2) exemption from take liability.

## II. Public Comment

On May 21, 2020, EPA initiated a 45-day public comment period through an announcement in the Federal Register titled "Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program Is Nondiscretionary for Purposes of Endangered Species Act Section 7 Consultation" (Docket ID No. EPA-HQ-OW-2020-0008). EPA sought public comment regarding whether to reconsider its position that it lacks discretionary involvement or control within the meaning of 50 C.F.R. 402.03 when acting on a state or tribal application to administer the CWA Section 404 program sufficient to trigger ESA Section 7 consultation requirements. EPA identified the positions articulated in the FDEP white paper, as well as other considerations that may be relevant to this issue, and requested comment on whether EPA can and should engage in an ESA Section 7 consultation with the Services in connection with EPA's initial review of a state or tribal request to assume the CWA Section 404 program. The public comment period closed on July 6, 2020, and EPA received comments from a variety of stakeholders.

Several commenters stated that EPA's decision regarding a request to assume the CWA Section 404 permit program involves an exercise of discretion warranting consultation under ESA Section 7. These commenters recommended that EPA engage in a single ESA Section 7 programmatic consultation with the Services in connection with EPA's initial review of an assumption application. The commenters said that this process would enable the Services to issue a programmatic biological opinion and a programmatic incidental take statement, which could identify procedural requirements for state and tribal CWA Section 404 permits. They indicated that this approach could support a determination on the part of the Services that assumption would not result in jeopardy to any listed species and would ensure that activities authorized under state- or tribal CWA Section 404 permits would not be liable for incidental take as long as the terms and conditions of permitting are met.

Other commenters agreed that EPA's approval of a state or tribal CWA Section 404 permitting program is discretionary and thus triggers the requirements for consultation under Section 7 of the ESA. However, the commenters expressed concern about how states or tribes would ensure that the ESA's requirements are being applied at the project-specific level. These commenters said that EPA's consultation regarding whether to approve or disapprove an assumption request does not alleviate ESA liability concerns related to actions authorized by future state or tribal CWA Section 404 permits.

Certain commenters asserted that the Supreme Court's decision in *NAHB* applies to EPA's approval of CWA Section 404 programs, in addition to its approval of CWA Section 402 programs, and therefore EPA lacks discretion to consult under ESA Section 7 in approving state or tribal requests to assume permitting authority under CWA Section 404. These commenters argued that EPA's role under both the CWA Section 402 and 404 programs is limited to determining whether states and tribes have the legal authority Congress has specified; if the criteria are satisfied, EPA lacks the discretion to deny an application. The commenters also expressed concern that, as a practical matter, the agencies will spend significant time and resources collecting data and conducting analyses for a consultation but may not ultimately provide states and private landowners with incidental take protection under the ESA.

### III. ESA Section 7 Applies to CWA Section 404 Program Assumption Decisions

Following the release of the May 2020 Federal Register Notice and its review of public comments, EPA has reconsidered the position articulated in the 2010 Letter to ECOS and ASWM. EPA concludes that the Agency's decision as to whether to approve a state or tribal request to assume the CWA Section 404 permit program involves an exercise of discretion warranting consultation under ESA Section 7 if EPA determines that such an approval action may affect a listed species or designated critical habitat. EPA's current view is that the *NAHB* decision, while informative, does not control in the CWA Section 404 program assumption context because Congress established a framework in which ESA concerns could be addressed when delegating authority to the Agency to transfer permitting responsibility from the Corps to individual states and tribes. That ability is absent in the list of factors Congress instructed EPA to consider when authorizing states to take on NPDES permitting authority.

For example, CWA Section 404(h)(1)(A) requires the Administrator to determine whether a state or tribe seeking CWA Section 404 program assumption has the authority to issue permits which apply and assure compliance with the CWA Section 404(b)(1) Guidelines. Those Guidelines include a provision that prohibits the permitting of a discharge if it jeopardizes the continued existence of endangered or threatened species or results in the likelihood of the destruction or adverse modification of designated critical habitat. 40 C.F.R. 230.10(b)(3). EPA's regulations state that in determining compliance with the CWA Section 404(b)(1) Guidelines, where ESA Section 7 consultation occurs, the Services' conclusions "concerning the impact of the discharge on threatened and endangered species and habitat shall be considered final." 40 C.F.R. 230.30(c). The CWA Section 404(b)(1) Guidelines were first promulgated in 1975, including the current prohibition on issuing permits jeopardizing threatened or endangered species, *before* Congress enacted CWA Section 404(g). 40 Fed. Reg. 41,292, 41,296 (Sept. 5, 1975). Thus, Congress was aware when requiring state or tribal program compliance with the CWA Section 404(b)(1) Guidelines that the no jeopardy mandate would apply to all permits issued by states and tribes.

Unlike the statutory construct governing EPA's delegation of NPDES program authority under CWA Section 402, EPA is required to seek and consider comments from the Services when deciding whether to approve a state or tribal request to assume the CWA Section 404 permitting program. Under CWA Section 404(g)(2), EPA must provide the Services with an opportunity to comment on a state or tribal

program submission. CWA Section 404(g)(2) provides that within ten days after receipt of a program assumption submission, EPA shall provide copies of the program application to the Corps and FWS. EPA extended that statutory direction to NMFS by regulation. 40 C.F.R. 233.15(d). CWA Section 404(h)(1) directs EPA to consider comments submitted by the Corps and FWS when determining whether a state or tribe has the requisite authority and meets the CWA statutory requirements with respect to implementing the CWA Section 404 program. EPA's regulations make clear that EPA should provide heightened attention to comments from the Services, providing that in issuing its approval or disapproval of a state or tribal program, EPA shall provide a responsiveness summary of significant comments received and its responses. EPA "shall respond individually to comments received from the Corps, FWS, and NMFS." 40 C.F.R. 233.15(g).

By requiring EPA to consider the Services' comments before deciding to approve an assumption request, and requiring states and tribes to comply with the CWA Section 404(b)(1) Guidelines when issuing permits under an assumed program, the CWA provides EPA with discretionary involvement and control that triggers the need for ESA Section 7 consultation when EPA's action may affect listed species. EPA has discretion regarding *the extent to which* it takes into account the Services' comments and can do so with an eye towards ensuring compliance with the CWA Section 404(b)(1) Guidelines. States and tribes are not required to consult on their individual permitting decisions, see 16 U.S.C. 1536(a)(2), so the program approval stage provides the most reasonable and efficient point in which to help ensure a process is in place to consider potential adverse impacts to species resulting from those permitting decisions. EPA has discretionary authority at that stage to shape program implementation to ensure compliance with the CWA Section 404(b)(1) Guidelines. This discretionary authority is unique to the transfer of CWA Section 404 permitting authority. There is no requirement in CWA Section 402 for EPA to take into consideration the views of the Services, and there is no corollary in the CWA Section 402 program to the CWA Section 404(b)(1) Guidelines. These provisions in CWA Section 404 provide discretion to EPA that is not present in the Section 402 context.

The legislative history of CWA Section 404 supports the argument for consultation. According to the Senate Report accompanying enactment of the assumption authority:

> The committee amendments relating to the Fish and Wildlife Service are designed to (1) recognize the particular expertise of that agency and the relationship between its goals for fish and wildlife protection and the goals of the Water Act, and (2) encourage the exercise of its capabilities in the early stages of planning. By soliciting the views of the principal Federal agencies involved in the review of these programs at an early stage, objections can be resolved that might otherwise surface later and impede the operation of a State program approved by the Administrator. This consultation preserves the Administrator's discretion in addressing the concerns of these agencies, yet affords them reasonable and early participation which can both strengthen the State program and avoid delays in implementation. That is, early participation in the development and design of programs, guidelines, and regulations should serve to reduce the emphasis now placed on the review by the Fish and Wildlife Service of individual applications for permits under the Water Act.

S. Rep. 95-370, at 78 (1977). The report expresses a preference for early engagement with FWS at the program approval stage with the goal of reducing engagement at the individual permitting stage while preventing comments at the permitting stage that might lead to a permit objection.

While the legislative history does not specifically mention ESA Section 7 consultation, Congress used the phrase "consultation" at the developmental stage of state programs while recognizing EPA's "discretion" in considering the FWS's comments and ensuring efficient and effective program implementation following approval. Ensuring that federal decisions contemplate, where appropriate, potential impacts to listed species at a stage where those impacts can be most efficiently addressed is one of the hallmarks of the ESA Section 7 consultation process. The legislative history therefore supports programmatic consultation more so than suggesting that formal consultation is not required.

In *NAHB*, the Supreme Court held that ESA Section 7 consultation on an NPDES program transfer could impose conditions beyond those found in Section 402(b). 551 U.S. at 663-664. The Court stated that "[w]hile EPA may exercise some judgment in determining whether a State has demonstrated that it has the authority to carry out Section 402(b)'s enumerated statutory criteria, the statute clearly does not grant it the discretion to add another entirely separate prerequisite to that list." *Id.* at 671. In the CWA Section 404 context, however, an ESA consultation will not impose an entirely separate condition. Instead, ESA consultation will fulfill Congress's statutory directive that the Services provide input on a state program prior to EPA's approval. By allowing for consideration of the views of the Services through their comments and incorporation of the no jeopardy requirement from the CWA Section 404(b)(1) Guidelines, the statute provides authority for EPA to consult and consider protection of listed species in the approval decision.

In *NAHB*, the Supreme Court found that the canon against implied repeals supports the interpretation that the transfer of CWA Section 402 programs was a non-discretionary agency action. This reasoning is not applicable in the CWA Section 404 assumption context. The Court stated: "An agency cannot simultaneously obey the differing mandates set forth in Section 7(a)(2) of the ESA and the Section 402(b) of the CWA, and consequently the statutory language – read in light of the canon against implied repeals – does not itself provide clear guidance as to which command must give way." 551 U.S. at 666. In the CWA Section 402 context, the Court found that approval of the state's permitting authority was non-discretionary and "comports with the canon against implied repeals because it stays Section 7(a)(2)'s mandate where it would effectively override otherwise mandatory statutory duties." *Id*. at 670. CWA Section 404 is distinguishable from CWA Section 402 because Congress required EPA to solicit comment from the FWS at the program approval stage and because the statute incorporates the jeopardy prohibition by reference to the CWA Section 404(b)(1) Guidelines. Here, ESA Section 7(a)(2)'s mandate does not override EPA's statutory duties but instead fits into the existing statutory structure.

## IV. Implementation

On August 20, 2020, EPA received a request from the State of Florida to assume administration of the CWA Section 404 program. For Florida and other states and tribes seeking to assume the CWA Section 404 program, EPA intends to engage in a one-time ESA Section 7 programmatic consultation with the Services in connection with the initial review of an assumption request if a

6

decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or designated critical habitat. To initiate consultation, the Agency will submit a biological evaluation to the Services, which evaluates the potential effects of EPA's potential approval of an assumption request on ESA-listed species, proposed species, designated critical habitat, and proposed critical habitat (50 C.F.R. 402.12). A biological evaluation also considers whether EPA's approval of an assumption request is likely to adversely affect any species or habitat.

For Florida and other states and tribes seeking to assume administration of the CWA Section 404 permitting program, EPA's engagement in a one-time ESA Section 7 programmatic consultation with the Services in connection with the initial review of an assumption application would allow one or both of the Services, as appropriate, to issue a programmatic biological opinion and programmatic incidental take statement for the state or tribal permitting program. The biological opinion and incidental take statement could establish additional procedural requirements and permitting conditions or measures that help ensure the state or tribal permitting program and individual permits issued pursuant to that program, as well as EPA's approval of that program, do not result in jeopardy to any listed species. This process, assuming compliance with any applicable permit conditions or measures, would extend ESA Section 9 liability protections to individual permits issued pursuant to the state or tribal program and place state and tribal CWA Section 404 permitting on equal footing with the Corps' permitting program. This streamlined permitting process would reduce costs and duplication of effort by state or tribal and federal authorities and facilitate more effective and efficient state and tribal CWA Section 404 programs. This programmatic consultation approach will ensure that listed species are protected while avoiding additional ESA Section 10 processes to obtain similar liability protections.

EPA disagrees with the comments stating that EPA's consultation regarding whether to approve or disapprove a request to assume the CWA Section 404 program does not alleviate existing ESA liability related to actions authorized by future state or tribal CWA Section 404 permits. The Services are required, as part of formal consultation, to prepare an incidental take statement if such take is reasonably certain to occur and will not violate ESA Section 7(a)(2). 50 C.F.R. 402.14(g)-(i). If, pursuant to the ESA regulations, the Services provide an incidental take statement, then "any taking which is subject to a statement as specified in [50 C.F.R. 402.14(i)(1)] and which is in compliance with the terms and conditions of that statement is not a prohibited taking under the [ESA], and no other authorization or permit under the [ESA] is required." 50 C.F.R. 402.14(i)(5).

At the individual permit level, the CWA Section 404(b)(1) Guidelines prohibit discharges that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by the Services. See 40 C.F.R. 233.20; 40 C.F.R. 230.10(b)(3). EPA anticipates that states and tribes may develop different program structures and coordination mechanisms to meet these requirements and any conditions of a programmatic incidental take statement, depending on factors such as the structure and expertise of the state and tribal agencies, provisions of state and tribal law, previous coordination among state or tribal and federal agencies, the number of ESA-considered species and extent of critical habitat, and other factors. States and tribes maintain the existing flexibilities in developing their CWA Section 404 programs to meet these requirements.

EPA's determination that CWA Section 404 provides the requisite discretionary involvement or control for the ESA to apply to EPA's approval of a state or tribal CWA Section 404 program does not modify or alter the application of the ESA to other EPA actions not analyzed here, such as actions under the CWA (other than state assumption of CWA Section 404 programs), Safe Drinking Water Act, the

Resource Conservation and Recovery Act, or other statutes implemented by EPA. For example, there are significant differences in how the CWA Section 402 and 404 programs operate, legally and procedurally, and nothing in this memorandum modifies established precedent and procedures for the NPDES permitting program. Likewise, EPA's determination that EPA has the discretion to consult on CWA Section 404 program approvals does not apply to actions by other federal agencies. EPA and other federal agencies must evaluate each federal activity considering the relevant implementing statute and the relevant factual situations to determine if the ESA consultation requirement attaches.

DAVID ROSS    Digitally signed by DAVID
ROSS
Date: 2020.08.27 13:35:21
-05'00'

_____
David P. Ross,                    Date
Assistant Administrator

# Exhibit 2



**DEPARTMENT OF THE ARMY**
JACKSONVILLE DISTRICT CORPS OF ENGINEERS
POST OFFICE BOX 4970
JACKSONVILLE, FLORIDA  32232-0019

REPLY TO
ATTENTION OF

March 19, 2018

Regulatory Division

# *PUBLIC NOTICE*

# *Determination of Navigable Waters*

<u>TO WHOM IT MAY CONCERN</u>:  The Jacksonville District, U.S. Army Corps of Engineers (Corps), seeks input from the public regarding the use of waters within the State of Florida for navigation.

<u>BACKGROUND:</u>  Pursuant to 33 C.F.R. § 329.4, navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce.  A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity.

Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403) (Section 10) requires a Department of the Army (DA) permit for certain activities in, over, or under navigable waters of the United States.  A determination whether a waterbody is a navigable water of the United States is made by the division engineer and is based on a report of findings prepared at the district level according to specific criteria (33 C.F.R. § 329.14(b)).

In an effort to provide clarity to the regulated public regarding which waters are subject to permitting authority under Section 10, the Corps is performing an analysis of waterways in the state of Florida to determine the extent of navigability and identify the limits of Section 10 jurisdiction.

These navigability studies are required by regulation to be conducted and updated whenever a question arises regarding the navigability of a waterbody.  Where no determination has been made, a report of findings will be prepared and forwarded to the Division engineer for approval (33 C.F.R. § 329.15(a)).  Tabulated lists of final determinations of navigability are to be maintained in each district office, and be updated as necessitated by court decisions, jurisdictional inquiries, or other changed conditions (33 C.F.R. § 329.16(a)).

Section 404(a) of the Clean Water Act of 1972 (CWA), 33 U.S.C. § 1344, authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue DA permits for

the discharge of dredged or fill material into waters of the United States (Section 404 Program). Pursuant to Section 404(g) of the CWA, the Florida Department of Environmental Protection (DEP) is pursuing approval from the United States Environmental Protection Agency (EPA) to assume the Section 404 Program and administer its own individual and general permit program.  State assumption of the Section 404 Program would be limited to certain waters and does not include navigable waters of the United States.  The navigability studies will also assist with determining the waters that would be retained by the Corps if the EPA approves the State's application for Section 404 Program assumption.  The Regulations governing the assumption process can be found at 40 C.F.R. §233.

**To assist with completion of the navigability studies, the Corps is seeking comments from the public regarding use of waters in the state of Florida for navigation.  This includes identification of those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities.**

COMMENTS:  Comments should be submitted in writing to the District Engineer or sent via email to the below addresses within 30 days from the date of this notice.  Please include mapping, figures, coordinates, etc. that clearly identify the reach of the associated waterbody and documentation relating to navigation, commerce, and recreation.

DEPARTMENT OF THE ARMY
JACKSONVILLE DISTRICT CORPS OF ENGINEERS
REGULATORY DIVISION
ATTN: DETERMINATION OF NAVIGABLE WATERS
P. O. BOX 4970
JACKSONVILLE, FLORIDA 32232-0019


Navigability_Determination@usace.army.mil




for

Donald W. Kinard
Chief, Regulatory Division

# Exhibit 3

Case 1:21-cv-00119-RDM Document 55-3 Filed 06/22/21 Page 91 of 129



JACKSONVILLE DISTRICT

Search Jacksonville District

ABOUT    BUSINESS WITH US    MISSIONS    LOCATIONS    CAREERS    MEDIA    LIBRARY    CONTACT

HOME > MEDIA > NEWS RELEASES

## News Release Archive

2018 (16)

2017 (80)

2016 (92)

2015 (107)

2014 (75)

2013 (92)

2012 (95)

2011 (67)

# Corps seeks public comment regarding water use for navigation

 SHARE      Email    Print

*Posted 4/5/2018*

Release no. 18-022

**Contact**

Nakeir Nobles

The U.S. Army Corps of Engineers, Jacksonville District is seeking public comment regarding the use of waters within the State of Florida for navigation. The comment period closes April 18.

Section 10 of the Rivers and Harbors Act of 1899 requires a Department of the Army permit for certain activities in, over, or under navigable waters of the United States. Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce.

To provide clarity to the public regarding which waters are subject to permitting authority under Section 10, the Corps is performing an analysis of waterways in the State of Florida to determine the extent of navigability and identify the limits of Section 10 jurisdiction.

To assist with completion of the navigability studies, the Corps is seeking comments from the public regarding use of waters in the state of Florida for navigation. This includes identification of those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities.

Comments should be submitted in writing to the District Engineer or sent via email to the below addresses:


DEPARTMENT OF THE ARMY

JACKSONVILLE DISTRICT CORPS OF ENGINEERS

REGULATORY DIVISION

ATTN: DETERMINATION OF NAVIGABLE WATERS

P. O. BOX 4970

JACKSONVILLE, FLORIDA 32232-0019

Navigability_Determination@usace.army.mil

The complete public notice can be found on the Jacksonville District's Regulatory Public Notice web page at:

http://www.saj.usace.army.mil/Missions/Regulatory/Public-Notices/Article/1468709/navigability-determination/

-30-

environmental    Jacksonville District    regulatory    U.S. Army Corps of Engineers (USACE)    waters of the United States

       

| | | |
|---|---|---|
| Accessibility | Link Disclaimer | Site Map |
| Contact Us | No Fear Act | USA.gov |
| FOIA | Privacy & Security | |
| Information Quality Act | Public Inquiries | |

# Exhibit 4



**DEPARTMENT OF THE ARMY**
JACKSONVILLE DISTRICT CORPS OF ENGINEERS
POST OFFICE BOX 4970
JACKSONVILLE, FLORIDA  32232-0019

REPLY TO
ATTENTION OF

April 10, 2018

Regulatory Division

# *UPDATED PUBLIC NOTICE*

## *Cessation of Public Comment Period*

<u>TO WHOM IT MAY CONCERN</u>:  The Jacksonville District, U.S. Army Corps of Engineers (Corps), is terminating the comment period for a previously issued public notice titled "Determination of Navigable Waters" and dated March 19, 2018.  As of today, the comment period originally set to expire on April 20, 2018, is considered closed until further notice.

for

Donald W. Kinard
Chief, Regulatory Division

# Exhibit 5



April 16, 2018

To: Jason A. Kirk, District Commander;
Copy: Donald W. Kinard, Chief, Regulatory Div.
Department of the Army
Jacksonville District Corps of Engineers
ATTN: Determination of Navigable Waters
P.O. Box 4970
Jacksonville, FL 32232-0019

**Re:  Proposed Florida Department of Environmental Protection's assumption of delegation of Section 404 Dredge and Fill Permitting authority; Jacksonville District Corps of Engineers Public Notice dated March 19, 2018 seeking public comment regarding Determination of Navigable Waters; Jacksonville District Corps of Engineers Public Notice dated April 10, 2018 titled Cessation of Public Comment Period**

Dear Colonel Kirk:

Sierra Club Florida demands that the Corps completely rectify its inventory of Florida's navigable waters before any actions take place with regard to the assumption of delegation of Section 404 dredge and fill permitting authority by Florida's Department of Environmental Protection (FDEP).  In the penultimate paragraph of the Public Notice dated March 19, 2018 (appendix A) the phrase "To assist with completion of the navigability studies,"  makes it clear that the Corps does not have a complete inventory of the navigable waters of the state. Sierra relied on the information in the public notice dated March 19, 2018 specifying the close of the public commment as April 18, 2018 as the deadline for submitting the requested information. In the Public Notice dated April 10, 2018 (Appendix B), the public comment period was peremptorily closed leaving us no clear official avenue to participate as requested in the original Public Notice.  If the Corps had disclosed in advance that the time limit for submission of additional information was April 10, comments and additional information would have been filed by that date.

Discussion:
Allowing the FDEP assumption of delegation process to move forward in the absence of an accurate inventory of Florida's navigable waters threatens the destruction of even more of our state's posterity by potentially opening vast swaths of protected wetlands to be  drained to make way for new development, including open pit mining.  Proponents of such destructive large scale projects have considerable influence in state elections and policy, and their interests are not congruent with those of the state or nation, or the intent of the Clean Water Act.  The Corps in

discharging its duty to the federal interest in protecting the nation's waters specified in Section 404 (g)(1) must retain its authority over *all* of those specified waters.  In order to fulfill that responsibility, the Corps must know which waters fall into the (g)(1) category.  Florida has lost over 9.3 million acres  of its original wetland areas[1]   to development and must not lose any more.  Florida has managed without section 404 permitting authority for forty-six years; a delay of another six months or a year to acquire essential information will not cause lasting damage.

The Corps' lists of navigable waters are incomplete and inadequate.  They total 492 Rivers and Creeks and 110 Lakes.  The Supplement to those lists totals 1767 Rivers and Creeks and 1186 Lakes and the text prefacing the Supplement's lists includes this sentence, "The District makes no claim that these lists are complete or completely accurate." Thousands of acres of Florida's most important environmental lands could be effectively destroyed if the Government doesn't get the right list of what has to be protected.  These lists were done in a rush and the Corps needs to go back and fix them.

Among the numerous resources listing Florida's water bodies are:
- the FDEP 2016 Integrated Water Quality Assessment for Florida, June 2016 (https://floridadep.gov/sites/default/files/2016-Integrated-Report.pdf) in Table 2.1. Florida atlas (p. 34) lists:
  - Total number of rivers and streams:  More than 1,700 / 27,561 linear miles
  - Total number of ditch and canal miles:  47,708 linear miles
  - Number of lakes, reservoirs, and ponds:  7,748 (area greater than or equal to 10 acres)
  - Number of known springs:  1,089
- The USF Water Institute's Florida Atlas of Lakes lists 5466 lakes (http://www.wateratlas.usf.edu/atlasoflakes/florida/)
- The 1982 Gazetteer of Florida Lakes refers to 7318 lakes, 3191 named. 624 are over 100 acres; 1483 over 25 acres  (http://ufdc.ufl.edu/AA00001540/00001)

These partial and uncertain lists require USACE  to go back to the drawing board and contact the officials of each water management district, county, municipality, soil and water conservation district, and the like to find out from the people on the ground where navigable waters are.  The Corps should also preserve the ability of waterways to provide a means of transportation for commerce by recognizing the historic use  of small Florida streams for commerce during the navigation era of the 19th and early 20th century, when waterways were the only practical avenues of communication.  See 'Short summary of the use of Florida waters for small scale commerce during the navigation era.' (Appendix C).

Determination of Navigability Public Notices from the Jacksonville District:
Despite the assertion in the Public Notice of March 19, 2018 that the Corps is performing an analysis of waterways in the state of Florida "in an effort to provide clarity to the regulated public," it is clear that the determination of navigability is a fundamental responsibility of the Corps, especially in light of FDEP's pursuit of assumption of delegation. Section 329 of the Code of Federal Regulations makes this clear:

[1] See report of the University of Florida Institute of Food and Agriculture Sciences Florida Wetlands Report (2015) available at https://soils.ifas.ufl.edu/wetlandextension/threats.htm

**§ 329.14 Determination of <u>navigability</u>.**
https://www.law.cornell.edu/cfr/text/33/329.14

**(a) *Effect on determinations.*** Although conclusive determinations of <u>navigability</u> can be made only by federal Courts, those made by federal agencies are nevertheless accorded substantial weight by the courts. **It is therefore necessary that when jurisdictional questions arise, district personnel carefully investigate those waters which may be subject to Federal regulatory <u>jurisdiction</u> under guidelines set out above, as the resulting determination may have substantial impact upon a judicial body**. Official determinations by an agency made in the past can be revised or reversed as necessary to reflect changed rules or interpretations of the law. *(emphases added)*

The langauge of 329.14 (a), "when jurisdictional questions arise", applies. In this case the question is whether the USACE or FDEP will have authority over waters and wetlands that may or may not fall within Section 404 (g)(1). This is not a discretionary activity for the Corps, it is necessary. The Draft Memorandum of Agreement between FDEP and the Corps (Appendix D) contains the following paragraph:

> III. WATERS TO BE ASSUMED A. All waters of the United States, as defined at 40 C.F.R. 232.2, within the State will be assumed by DEP as part of its State 404 Program, with the exception of those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement, as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto as described in Section III.B., below. **For purposes of this agreement, the Corps shall retain permitting authority over those Section 10, Rivers and Harbors Act of 1899 waters, which have been included, as of the effective date of this MOA, on the Jacksonville District Navigable Waters List for the State of Florida in Attachment A**, <u>except those waters included on the list based solely on their historical use</u>. This is consistent with the majority recommendations in the May 2017 Final Report of the Assumable Waters Subcommittee. *(emphases added)*

As of the date of this writing, the Jacksonville District Navigable Waters Lists (http://www.saj.usace.army.mil/Portals/44/docs/regulatory/sourcebook/other_permitting_factors/Jacksonville%20District%20Section%2010%20Waters.pdf) (Appendix E) lists 492 Rivers and Creeks and 110 Lakes. The third sentence of the text preceding the lists reads, **"However, complete lists of all rivers, creeks, ponds, and lakes subject to Corps section 10 authority are not available."** The Supplement to those lists dated October 5, 2017 (http://www.saj.usace.army.mil/Portals/44/docs/regulatory/sourcebook/other_permitting_factors/20171005SupplementToJacksonvilleDistrictSection10Waters.pdf?ver=2017-10-05-123156-363) (Appendix F) as noted above is prefaced by the caveat that "The District makes no claim that these lists are complete or completely accurate." The process of delegating assumption of permitting authority to FDEP must not continue until complete lists are available. The MOA excerpted above in bolded text would, if adopted today, usurp USACE's appropriate jurisdiction over (g)(1) waters simply because no complete list exists. The underlined text in the excerpt

4

takes as determinative the majority recommendations of the 2017 Final Report of the Assumable Waters Subcommittee (Appendix G) which is contrary to the USACE's Minority Recommendation.

### § 329.15 Inquiries regarding determinations.
https://www.law.cornell.edu/cfr/text/33/329.15

 **(c)** Specific inquiries regarding the ***jurisdiction*** of the Corps of Engineers can be answered only after a determination whether (1) the waters are navigable waters of the United States or

**(2)** If not navigable, whether the proposed type of activity may nevertheless so affect the navigable waters of the United States that the assertion of regulatory jurisdiction is deemed necessary.

Since the MOA between FDEP and USACE will set the parameters of Corps and state jurisdictions, it is essential that a complete and accurate list of (g)(1) waters be available.

### § 329.16 Use and maintenance of lists of determinations.
https://www.law.cornell.edu/cfr/text/33/329.16

**(a)** Tabulated lists of final determinations of navigability are to be maintained in each district office, and be updated as necessitated by court decisions, jurisdictional inquiries, or other changed conditions.

**(b)** It should be noted that the lists represent only those waterbodies for which determinations have been made; absence from that list should not be taken as an indication that the waterbody is not navigable.

**(c)** Deletions from the list are not authorized. If a change in status of a waterbody from navigable to non-navigable is deemed necessary, an updated finding should be forwarded to the division engineer; changes are not considered final until a determination has been made by the division engineer.

Section 329.16 (a) requires the maintenance of tabulated lists of final determinations of navigability.  That responsibility is not satisfied by the current lists of waters that have been determined to be navigable if the supplemental lists are included as they are, by the USACE's admission, possibly incomplete and/or inaccurate.  At best, those lists are necessary but not sufficient as 329.16 (b) makes crystal clear.  Finally, 329.16 (c) says "Deletions from the list are not authorized."  The elimination of  "waters included on the list based solely on their historical use" cited in the Draft MOA between USACE and FDEP would effectively remove these waters from the lists of waters that have been determined to be navigable without following the required procedures of subsection (c).

The Public Notice dated April 10, 2018 titled Cessation of Public Comment Period effectively denies Sierra and others of the opportunity to provide important information to USACE and weakens the ability of the Corps to fulfill its responsibility to determine the navigability of all the waters of the state that may come into question during the assumption of delegation process. The peremptory denial of an official conduit for comment on this important issue belies

recognition by USACE that the existing lists of Florida's navigable waters are inadequate and insufficient to meet regulatory and legal requirements. Additionally, the April 10 notice incorrectly identifies the public comment deadline as April 20 instead of April 18. Whether this is a typographical error or a cynical effort to convince members of the public who still wanted to submit their comments to do so after the actual deadline passed so it could be ignored is impossible to know.

Under these circumstances, the USACE must reopen the comment period, and comply with its rules and governing law by correcting the errors in its lists of navigable waters.

Thank you for your prompt attention to this matter.

Sincerely,


Frank Jackalone
Florida Chapter Director
Sierra Club
1990 Central Avenue
St. Petersburg, FL 33712
727-824-8813, Extension 302


**ATTACHMENTS (7)**

**LIST OF APPENDICES**

Appendix A - Public Notice dated March 19, 2018
Appendix B - Public Notice dated April 10, 2018
Appendix C - Short summary of the use of Florida waters for small scale commerce during the navigation era
Appendix D - Draft Memorandum of Agreement between FDEP and the Corps
Appendix E - Jacksonville District Navigable Waters Lists (http://www.saj.usace.army.mil/Portals/44/docs/regulatory/sourcebook/other_permitting_factors/Jacksonville%20District%20Section%2010%20Waters.pdf)
Appendix F – Supplement to Jacksonville District Navigable Waters Lists (www.saj.usace.army.mil/Portals/44/docs/regulatory/sourcebook/other_permitting_factors/20171005SupplementToJacksonvilleDistrictSection10Waters.pdf?ver=2017-10-05-123156-363)
Appendix G - 2017 Final Report of the Assumable Waters Subcommittee

Exhibit 6

CONSERVANCY
of Southwest Florida
OUR WATER, LAND, WILDLIFE, FUTURE.

*Protecting Southwest Florida's unique natural environment and quality of life ... now and forever.*

April 18, 2018                                             *Sent via email*

Department of the Army
Jacksonville District Corps of Engineers
Regulatory Division
Attn: Determination of Navigable Waters
PO Box 4970
Jacksonville, FL 32232-0019

The Conservancy of Southwest Florida is writing on behalf of our over 6,000 supporters, in regards to the navigability of waters in southwest Florida. The Conservancy strongly opposes the state of Florida assuming Clean Water Act Section 404 permitting authority.

This letter and its attachments should be considered as a response to the Army Corps of Engineers (ACOE) Public Notice dated March 19, 2018, entitled "Determination of Navigable Waters,'[1] along with additional forthcoming comments from the Conservancy and our partners. These comments should be used to provide clarity regarding which waters should be considered as subject to retained ACOE permitting authority under Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403). Additional information-gathering by the ACOE and other stakeholders will be needed to ensure that these determinations are made utilizing a transparent process and complete best available scientific information.

We are very concerned with the original limited public commenting window that the ACOE issued, and even more concerned with the updated public notice dated April 10, 2018[2] that stated the public comment period was closed in advance of the.original published deadline.

In preparation of these comments, the Conservancy has reviewed a document entitled "Jacksonville District Navigable Waters List" (a 6 page document that has been attached to the draft Memorandum of Agreement between the Florida Department of Environmental Protection and the Department of the Army that will be referred to in this letter as the "old list") and a document called "Supplement to the Jacksonville District Navigable Waters List" dated October 5, 2017 (a 17 page document that will be referred to in this letter as the "new list"), both enclosed.

ACOE should use the new 17-page list as their starting point with the inclusion of 139 waters that appear to be removed from the old 6-page list (see Attachment A). It is unclear why these waters dropped off the list, so again we ask that ACOE adopt the most expansive list of retained *waters;* including all waters that have previously been identified as navigable.

---

[1] Army Corps of Engineers, 2018. Public Notice. Determination of Navigable Waters. March 19, 2018.
[2] Army Corps of Engineers, 2018. Updated Public Notice; Cessation of Public Comment Period. April 10, 2018.

Conservancy of Southwest Florida has been awarded Charity Navigator's prestigious 4-Star top rating for good governance, sound fiscal management and commitment to accountability and transparency. Charity Navigator is America's largest and most respected independent evaluator of charities.

1495 Smith Preserve Way I Naples, Florida 34102 I 239.262.0304 I Fax 239.262.0672 I www.con$ervancy.org

Further, the waters identified below :-while not an exhaustive list and not a complete description of past, current or potential future commerce, commercial,or recreational activity- may also meet the definition of navigable and should be considered for retention under ACOE purview under Section 10 of Rivers and Harbors[3]:

Charlotte County area

- Alligator Creek (on both lists): has recreational activity including paddling
- Bear Branch (on new list)
- Big Dead Creek (missing from both lists)
- Buck Creek (on both lists)
- Charlotte Harbor (missing from both lists): has recreational activity including paddling
- Charlie Creek (on new list): has recreational activity including paddling
- Coral Creek (on new list)
- Curry Creek (on new list)
- Deer Prairie Creek (on new list)
- Horse Creek (on new list)
- Howard Creek (on both lists)
- Jacks Branch (on new list)
- Joshua Creek (on new list)
- Lee Branch (on new list)
- Lewis Creek (missing from both lists)
- Little Alligator Creek (on new list)
- Myakka River (on both lists): has recreational activity including paddling
- North Fork Alligator Creek (on new list)
- Oyster Creek (on new list)
- Paynes Creek (missing from both lists)
- Peace River (on both lists): has commercial and recreational activity including sightseeing operators and paddling
- Rock Creek (on new list)[4]
- Sam Knight Creek (on new list)
- Shell Creek (on both lists): has recreational activity including paddling
- South Fork Alligator Creek[5] (missing from both lists)
- West Branch Coral Creek (on new list)
- Whidden Creek (on new list)

---

[3] Decades of administrative action and case law relating to the CWA and RHA have established that use in "interstate or foreign commerce" can also include use for recreational commerce activities such as fishing, swimming and boating. *See, e.g., State of Utah By & Through Div. of Parks & Recreation v. Marsh,* 740 F.2d 799, 803-04 (10th Cir. 1984) (interstate commerce included recreational use of lake by interstate travelers for fishing, hunting, boating, camping,wildlife viewing and other activities).

[4] There is a Rock Creek in Charlotte County area, as well as in the Collier County area. It is unclear which Rock Creek is listed on the new Supplemental list.

[5] The new Supplemental list includes a "South Prong Alligator Creek."

<u>Collier County area</u>
- Barron River (on both lists): has recreational activity including paddling and boating
- Barron Canal (missing from both lists)
- Blackwater River (on both lists): has recreational activity including paddling
- Camp Keais Strand (missing from both lists)
- City of Marco area canals
- Clam Bay/Pass (missing from both lists): has recreational activity including paddling
- Cocohatchee River (on both lists): has recreational activity including paddling
- Cocohatchee Canal (missing from both lists): has recreational activity including boating
- Cow Slough (missing from both lists)
- East River (on both lists)
- Fakahatchee Bay (missing from both lists)
- Fakahatchee River (on both lists)
- Fakahatchee Strand (missing from both lists): has recreational activity including paddling
- Faka Union River (on new list)
- Faka Union Bay (missing from both lists)
- Faka Union Canal (missing from both lists): has recreational activity including paddling and boating
- Ferguson River (on new list)
- Haldeman Creek (missing from both lists): has recreational activity including paddling and boating
- Golden Gate Canal (missing from both lists): has recreational activity including Conservancy of Southwest Florida boat tour and kayaking
- Gordon River (on new list): has recreational activity including Conservancy of Southwest Florida boat tour and kayaking
- Henderson Creek (on both lists): has recreational activity including paddling and boating
- Lake Trafford (missing from both lists): has commercial and recreational activity including fishing, airboat operators, sightseeing operators, and marina
- Little Hickory Bay (missing from both lists)
- Naples Bay (missing from both lists)
- New River (on both lists)
- Okaloacoochee Slough (missing from both lists)
- Pumpkin Bay (missing from both lists) - paddling
- Silver Strand (missing from both lists)
- Rock Creek (on new list): has recreational activity including boating
- Rookery Bay (missing from both lists): has recreational activity including paddling
- Turner River (on both lists): has commercial and recreational activity including sightseeing operators and paddling
- Water Turkey Bay (missing from both lists)
- Whitney River (on both lists)
- Wiggins Pass (missing from both lists): has recreational_ activity including paddling

<u>Lee, Hendry, and Glades County areas</u>
- Bedman Creek (on new list): has recreational activity including paddling
- Bee Branch (on new list)
- Billy Creek (on both lists): has recreational activity including paddling

- Caloosa Creek (missing from both lists): has recreational activity including paddling
- Caloosahatchee River (on both lists): has recreational activity including paddling
- Caloosahatchee Canal (on new list)
- Catfish Creek (on new list)
- City of Cape Coral canals (missing from both lists): has recreational activity including paddling, fishing, and boating
- Cypress Branch (on new list)
- Cypress Creek (on both lists): has recreational activity including paddling
- Daugherty Creek (missing from both lists): has recreational activity including paddling
- Deadmans Branch (on new list)
- Deep Lagoon Canal (missing from both lists): has recreational activity including paddling
- Estero River (on both lists): has commercial and recreational activity including paddling
- Estero Bay (missing from both lists): has recreational activity including paddling and boating
- Fisheating Creek (on both lists): has commercial and recreational activity including sightseeing operators and paddling
- Fitcher's Creek (missing from both lists): has recreational activity including paddling
- Fort Simmons Branch (on new list)
- Four Mile Cove[6] (missing from both lists): has recreational activity including paddling
- Gasparilla Sou.nd (missing from both lists): has commercial and recreational activity including, paddling, boating, sightseeing operators
- Gator Slough (on the new list) : has recreational activity including paddling
- Goodno Canal (missing from both lists)
- Hancock Creek (on new list): has recreational activity including paddling
- Hendry Creek (on new list)
- Hickey Creek (on new list): has recreational activity including paddling
- Imperial River (on both lists): has commercial and recreational activity including paddling and sightseeing operators
- Jewfish Creek (on new list): has recreational activity including paddling
- Jug Creek (missing from both lists): has recreational activity including paddling, fishing, boating
- Lake Hicpochee (missing from both lists): ha recreational activity including paddling
- Lake Okeechobee (missing from new list): has commercial and recreational activity including paddling, marina, resort
- Lake Okeechobee Rim Canal (missing from new list)
- Lake Okeechobee Waterway (missing from new list): has commercial and recreational activity including boating
- Long Hammock Creek (missing from both lists)
- Manuel Branch (on new list): has recreational activity including paddling
- Marsh Point Creek (missing from both lists): has recreational activity including paddling
- Matlacha Pass (missing from both lists): has commercial and recreational activity including paddling, boating, and shellfish harvesting
- Mullock Creek (on new list): has recreational activity including paddling
- Nine Mile Canal (missing from both lists)
- Oak Creek (on new list): has recreational activity including paddling
- Orange River (on both lists): has commercial and recreational activity including paddling

---

[6] The new Supplemental list includes a "Four Mile Branch" and "Four Mile Creek."

- Otter Creek (on new list): has recreational activity including paddling
- Owl Creek (on new list): has recreational activity including paddling
- Palm Creek (missing from both lists)
- Pine Island Creek (on new list)
- Pine Island Sound (missing from both lists): has commercial and recreational activity including paddling and boating
- Pollywog Creek (on new list)
- Popash Creek (on new list): has recreational activity including paddling
- Powell Creek (on new list)
- Roberts Canal (missing from both lists)
- San Carlos Bay (missing from both lists): has recreational activity including paddling and boating
- Sanibel River (missing from both lists): has recreational activity including paddling
- Shell Creek[7] (on both lists): has recreational activity including· paddling
- Six Mile Cypress Slough (missing from both lists)
- Spanish Creek (on new list): has recreational activity including paddling
- Spring Creek (on both lists): has recreational activity including paddling
- St. James Creek (missing from both lists): has recreational activity including paddling
- Stroud Creek (on new list):-has recreational activity including paddling
- Telegraph Creek (on new list): has recreational activity including paddling
- Ten Mile Canal (missing from both lists): has recreational activity including paddling
- Townsend Canal (missing from both lists)
- Trout Creek (on both lists): has recreational activity including paddling
- Whiskey Creek (on new list): has recreational activity including paddling
- Yellow Fever Creek (on new list): has recreational activity including paddling
- Yucca Pen Creek

If you have any questions about our letter, please contact me at (239) 262-0304, ext. 286. Thank you for considering our comments.

Sincerely,

Amber Crooks
Environmental Policy Manager

ENCLOSURES: Navigable Waters List (6 pages)
          Supplement to the Jacksonville District Navigable Waters List dated October 5, 2017
          (17 pages)

---

[7] There is a Shell Creek in Charlotte County area, as well as in the Lee County area. It is unclear which Shell Creek is listed.

Attachment A

Waters that were on the 6-page document but not included in the 17-page update (2017):

Rivers and Creeks

1. Alligator Lake - Lake Gentry
2. Barrentine Creek
3. Big Marco River
4. Big Mud Creek
5. Black Creek (Walton County)
6. Blue Hole Creek
7. Blue Springs Run
8. Bonnet Creek
9. Boynton Canal
10. Brick-Alligator Lake Canal
11. Broward Creek
12. C-15 Canal
13. C-17 Canal
14. C-18 Canal
15. C-23 Canal
16. C-24 Canal
17. C-51 Canal
18. Chicopit Bay
19. Co"ldwater Creek
20. Coon Lake-Lake Lizzie Canal
21. Coral Gables Waterway
22. Cormorant Creek
23. Cowhead Creek
24. Dania Cut-Off Canal
25. Deblieu Canal
26. Doctors Lake
27. Gulley Creek
28. Haines Creek
29. Hatchett Creek
30. Hatchineha Canal
31. Hillsboro Canal
32. Hillsboro River
33. Hitchens Creek
34. Holiday Harbor
35. Hudson Bayou

36. Indian River North
37. Jackson Canal
38. Johnson Creek (Gulf County}
39. Jones Swamp Creek
40. Kentner Creek
41. L-40 Canal
42. L-8 Canal
43. Lafayette Creek
44. Lake Ajay-Fells Cove Canal
45. Lake Apopka-Beauclerc Canal
46. Lake Ashby Canal
47. Lake Center-Coon Canal
48. Lake Griffin-Lake Canal
49. Lake Hart-Ajay Canal
50. Lake Joel-Myrtle Canal
51. Lake Joel-Trout Canal
52. Lake Lizzie-Alligator Canal
53. Lake Mary Jane-Hart Canal
54. Lake Myrtle-Mary Jane Canal
55. Lake Okeechobee Rim Canal
56. Lake Okeechobee Waterway
57. Lake Preston-Myrtle Canal
58. Lake Worth Lagoon
59. Lehigh Central
60. Little Clapboard Creek
61. Little Double Creek
62. Little Mud Creek
63. Lopez River
64. Moore's Creek (Martin County)
65. Morris Dead River
66. Morrison Creek
67. Murphy Creek
68. Myakkahatchee Creek
69. NN Creek
70. North New River Canal
71. Old Channel
72. Pea River
73. Phelps Creek
74. Poncho Creek
75. Rocky Creek
76. Salt Creek

77. Short Canal
78. Snell Creek
79. South Port Canal
80. Stranahan River
81. Summer Haven River
82. Tarpon River
83. Trout-Coon Lake Canal
84. Turkey Creek
85. Warf Creek
86. West Branch*[8]
87. West Palm Beach' Canal
88. Woodruff Creek
89. Wrights Creek (Walton County)

1. Blue Cypress Lake
2. Blue Lagoon
3. Brick Lake
4. Cherry Lake
5. Coon Lake
6. Dumbfoundling Bay
7. Fells Cove
8. Lake Ajay
9. Lake Apopka
10. Lake Ashby
11. Lake Beauciair
12. Lake Carlton
13. Lake Center
14. Lake Dora
15. Lake Gentry
16. Lake Hatchineha
17. Lake Hell 'n Blazes
18. Lake Isokpoga
19. Lake Jackson
20. Lake Jessup
21. Lake Joel
22. Lake Kissimmee

---

[8] West Branch Blockhouse Creek, Coral Creek, Lightwood Knot Creek, Mare Creek, & South Prong Alafia River included in the update.

23. Lake Lizzie
24. Lake Manatee
25. Lake Mary Jane
26. Lake Minnehaha
27. Lake Minneola
28. Lake Nellie
29. Lake Okeechobee
30. Lake Ola
31. Lake Powel
32. Lake Preston
33. Lake Rosalie
34. Lake Santa Fe
35. Lake Talquin
36. Lake Tarpon
37. Lake Thonotosassa
38. Lake Tohopekaliga
39. Lake Washington
40. Lake Weohyakapka
41. Lake Winder
42. Lake Yale
43. Little Lake Harris
44. Little Lake Santa Fe
45. Lochloosa Lake
46. Loughman Lake
47. Rodman Reservoir
48. Spring Garden Lake
49. Tsala Apopka Lake
50. Ward Lake (Manatee County)

# Exhibit 7

# Audubon FLORIDA

April 17, 2018

Mr. Donald W. Kinard
Chief, Regulatory Division
Jacksonville District Corps of Engineers
P. O. Box 4970
Jacksonville, FL 32232-0019

RE: Comments regarding the Determination of Navigable Waters in Florida

Dear Mr. Kinard,

As the State of Florida moves toward assumption of the Section 404 Program of the Clean Water Act (CWA), a determination must be made regarding which waters are to remain within federal jurisdiction. Audubon Florida appreciates the importance of this effort and thanks the Corps for soliciting input from the public. We also support and anticipate a public process leading to the creation of the related Memoranda of Agreement between the state and federal agencies.

We offer the following comments on the creation of the navigable waters list. In general, Audubon supports the positions put forth by the Corps in the Final Report of the Assumable Waters Subcommittee in 2017 and believes this reasoning should be the basis for the current effort. Listed below are the steps we feel the Corps should take to create the list of the waters and wetlands to remain within their administrative authority.

1. **Begin with the waters listed on the "Supplement to the Jacksonville District Navigable Waters Lists" dated October 5, 2017.**

The October 5, 2017 list should represent the baseline from which to build the complete list of retained waters. This list should be augmented with additions based on the suggestions that follow.

2. **Add waters on Indian lands that are assumable by tribes under the CWA section 404.**

Since tribes could request assumption of waters on their lands at a future date they should remain under the authority of the Corps.

3. **The Corps should retain wetlands adjacent to navigable waters according to the guidance and process that has been in place for many years.**

Wetlands considered adjacent to a navigable water are those that contribute to its continued navigability. Changes in the conditions of these wetlands will have direct impacts on navigable waters and should be included in the list of retained waters under authority of the Corps. Given Florida's unique, highly transmissive karst geology, the identification of adjacent waters should go beyond a simple examination of distance from a navigable water and should consider groundwater flow.

4. **The Corps should add waters and wetlands that are connected to recreation and tourism, Florida's primary industry and chief source of interstate and international commerce.**

The EPA defines "Waters of the U.S." in part by their use for interstate and international commerce, including recreation and travel tourism (emphasis added):

> *40 CFR 230.3(s) The term waters of the United States means:*
> 1. *All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;*
> 2. *All interstate waters including interstate wetlands;*
> 3. *All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:*
>     a. ***Which are or could be used by interstate or foreign travelers for recreational or other purposes; or***
>     b. *From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or*
>     c. *Which are used or could be used for industrial purposes by industries in interstate commerce;*

Accordingly, the Corps' Section 10 criteria must ensure that navigable waters and their adjacent wetlands which support tourism and recreational use are not assumable by the state. These uses, especially throughout Florida, clearly involve interstate and international commerce.

Thank you for considering our comments. Florida's assumption of Section 404 permitting will be very complex and will require careful development to ensure state implementation will be no less protective than existing federal standards. A public process to develop this assumed program will be essential. Please keep Audubon Florida apprised of continued work on this issue as it of great importance to our organization and our members throughout the state.

Sincerely,

Julie Wraithmell
Interim Executive Director

Exhibit 8



Colonel Jason A. Kirk, District Commander
Jacksonville District Corps of Engineers
Regulatory Division
Att'n: Determination of Navigable Waters
P.O. Box 4970
Jacksonville, Florida  32232-0019

April 18, 2018
*Via Email* Jason.a.kirk@usace.army.mil, Navigability_Determination@usace.army.mil

Dear Colonel Kirk:

On behalf of our respective organizations, we are writing to request that the U.S. Army Corps of Engineers adopt the broadest interpretation of navigable waters under the Clean Water Act (CWA). Florida's waterways are uniquely connected and thus should be comprehensively and collectively protected under the Clean Water Act. We oppose any attempt to undermine these protections through unnecessary reclassification of waterways and we sincerely urge the Corps to maintain permitting authority over these important resources.

CWA Section 404 requires permits for the discharge of dredge and fill material into Waters of the United States, including wetlands. Florida has particularly fragile and critical areas that are regulated by Section 404 dredge and fill permits, and which require the highest level of review and scrutiny. We believe that the federal government is best able to conduct this review given their historic jurisdiction and agency expertise in this area. The federal authority to govern our waters has its origins in the Commerce Clause of the Constitution due to the central role our waterways and seas play in interstate commerce. Traditionally, wetlands have been subject to federal jurisdiction as well due to their critical role in providing watershed connectivity. As such, we strongly believe that CWA authority should remain with the federal government and any delegation to the state would be inappropriate and incongruous with the spirit of the law. Our organizations vehemently oppose the state of Florida's attempt to assume this jurisdiction.

Due to the value of these resources to our state, we urge the Corps to apply a broad interpretation to navigable waters in order to maintain federal control of these waterways. We request the Corps fully assess Florida's water bodies to ensure the Florida Navigable Waters List is complete and completely accurate. In addition, we urge the Corps to provide adequate public involvement and transparency during the process to update Florida's Navigable Waters.

In addition, we fully support comments submitted by Earthjustice regarding the navigability of waters in the State of Florida within the meaning of Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, for purposes of determining the Corps' jurisdiction should the U.S. Environmental Protection Agency (EPA) grant Florida's anticipated request to administer its own permitting program under Section 404(a) of the Clean Water Act of 1972 (CWA), 33 U.S.C. § 1344, in waters of the United States.

Each signatory is an independent organization and member of Waterkeeper Alliance, a global movement of on-the-water advocates who patrol and protect over 100,000 miles of rivers, streams and coastlines in North and South America, Europe, Australia, Asia and Africa. More than 300 Waterkeeper Organizations worldwide combine firsthand knowledge of their waterways with an unwavering commitment to the rights of their communities and to the rule of law.

Sincerely,
Rachel Silverstein
Miami Waterkeeper

Georgia Ackerman
Apalachicola Riverkeeper

Marty Baum
Indian Riverkeeper

Jen Lomberk
Matanzas Riverkeeper

Rick Frey
St. Marys Riverkeeper

Harrison Langley
Collier County Waterkeeper

John Cassani
Calusa Waterkeeper

Lisa Rinaman
St. Johns Riverkeeper

Andrew Hayslip
Tampa Bay Waterkeeper

Andy Mele & Justin Bloom
Suncoast Waterkeeper

John Quarterman
Suwannee Riverkeeper

Reinaldo Diaz
Lake Worth Waterkeeper

Laurie Murphy
Emerald Coastkeeper

# Exhibit 9



# Exhibit 10


ADVERTISEMENT

≡ **Tampa Bay Times**

NEWS / FLORIDA POLITICS / **THE BUZZ**

# Florida agencies asked to cut 8.5 percent to adjust for COVID-19

The directive came after the pandemic caused tax revenues to plummet in April, May and June and after DeSantis vetoed $1 billion in spending from the 2020-2021 budget.

   



The Florida Legislature is facing steep budget cuts for the state budget, but has so far refused to hold a special session.

By **Christine Sexton**



# Tampa Bay Times

Published Aug. 12

TALLAHASSEE — Getting ready for the possibility of a special legislative session to balance Florida's budget, Gov. Ron DeSantis' administration and top House and Senate appropriations staff have called on state agencies to draw up ways to slice 8.5 percent from their current budgets to address "the expected shortfall" as a result of the COVID-19 pandemic.

The direction to look for reductions does not mean such cuts will be made in the fiscal year 2020-2021 budget, which took effect July 1. It was included in annual budget instructions sent to state agencies in mid-July.

But it came after the pandemic caused tax revenues to plummet in April, May and June and after DeSantis vetoed $1 billion in spending from the 2020-2021 budget. DeSantis made the vetoes in hopes of conserving cash and aligning the budget, which lawmakers passed in March as the pandemic was starting to hit, with the economic realities stemming from business shutdowns and job losses.

A D V E R T I S E M E N T



Despite frequent requests from Democrats, DeSantis and Republican legislative leaders have shown no willingness to hold a special session before the November elections. But with the fiscal year running through June 30, they could be faced with making budget cuts at some point.

While DeSantis vetoed $1 billion, he signed a $92.2 billion budget into law that included high-profile issues such as $500 million to increase teacher pay, $625





million for the Everglades and other water-related projects and $100 million for
the Florida Forever conservation program. He also approved 3 percent pay raises
for state workers.

When he signed the budget in June, DeSantis said he was convinced "we'll be able
to weather the storm and do it right," noting that the state had bolstered its
reserves and had received money through a federal-stimulus law known as the
CARES Act.



SPONSORED CONTENT

*HOW TO CLEAN by adidas* ⬈

*By adidas*

But DeSantis said on a radio show Monday that the pandemic will "loom" over
every budget and policy debate during the 2021 legislative session, which starts in
March.

"We are using intelligently the CARES Act money in a way that I think will keep us
whole," DeSantis said during an appearance on the Preston Scott show on WFLA
radio in Tallahassee. "So, as we go into the legislative session, from a budget
perspective, I think we'll probably be OK for this fiscal year. I think the question
is, is how robust is the recovery from the coronavirus shutdown? And if it's robust,
that gives us more options. If it's not, then we may have to make some more
tough decisions."

ADVERTISEMENT



A panel of economists will meet Friday to revise estimates of state general revenue, which plays a critical role in funding schools, health programs and prisons.

But economists recently said the state finished the 2019-2020 fiscal year on June 30 with $1.88 billion less in revenues than what was previously anticipated.

The declining revenues also come at a time when more Floridians have enrolled in Medicaid. Enrollment in the health-care program for poor, elderly and disabled people is expected to balloon by more than 14 percent during the current fiscal year, with economists predicting an average monthly enrollment of 4.36 million people.

DeSantis' office did not immediately respond to requests for comments about the memo directing agencies to look at possible budget cuts. But Senate spokeswoman Katie Betta called the reduction exercise prudent.

**Become a Florida politics expert by signing up
for The Buzz with Steve Contorno**

Steve's free, weekly newsletter brings top
political news and analysis right to your
inbox.

 Tampa Bay Times

*TYPE YOUR EMAIL ADDRESS HERE*

**SIGN UP**

Find all our newsletters



"It is common for (a legislative budget request) instructions to include an exercise evaluating current year cuts during times when there are significant unknown and unpredictable factors impacting the state budget," Betta said.

Betta added that another "data point will be available later in the week" when the panel of economists update the general revenue estimates.

The July 15 budget memo also requires state agencies to compile recommendations on 10 percent worth of reductions for the 2021-2022 fiscal year, which will start July 1.

ADVERTISEMENT



Ad removed. Details

The 10 percent reduction is part of a routine budget exercise. The governor's office and legislative budget officials made "optional" a portion of that exercise that allows agencies to make a priority listing of the programs or services targeted for potential reductions.

---

**UP NEXT:** Amendment 3 would suppress Black representation in Florida, new report says

---

# Exhibit 11

ADVERTISEMENT

OPINION

# Editorial: The Rick Scott record: an environmental disaster

   



Diver Josh Lunsford uses a vacuum pump to pull out nitrate-rich sediment from Chassahowitzka Springs as a part of a springs restoration project. Gov. Rick Scott ended a springs restoration initiative launched by Gov. Jeb Bush, and did nothing to push a bipartisan bill in the Senate that would have spent hundreds of millions of dollars to clean up springs.

Published Sep. 5, 2014

For the last 50 years, Florida's governors have been reasonably responsible stewards of the state's fragile environment. They initiated efforts to clean up rivers and bays, buy and preserve millions of acres of sensitive land, manage

## Tampa Bay Times

strength and preserve the Everglades. Developers and agricultural interests still got their way too often in the state's boom-or-bust economy, but Tampa Bay is cleaner and more land is protected from development than a generation or two ago. In just four years, Gov. Rick Scott has put those accomplishments at risk.

Scott has bulldozed a record of environmental protection that his Republican and Democratic predecessors spent decades building. He weakened the enforcement of environmental laws and cut support for clean water, conservation and other programs. He simultaneously made it easier for the biggest polluters and private industries to degrade the state's natural resources. While the first-term Republican attempts to transform himself into an environmentalist during his re-election campaign, his record reflects a callous disregard for the state's natural resources and no understanding of how deeply Floridians care about their state's beauty and treasures.

ADVERTISEMENT



Scott changed the direction of environmental policy from the start, appointing a Jacksonville shipping executive with "insights on the challenges businesses face in the permitting process" as the secretary of the Department of Environmental Protection. He asked the Legislature for smaller budgets for DEP every year except for this election year. But the governor's stinginess is only part of the problem. He also triggered a brain drain among regulators, sided with polluters and developers over public health, refused to acknowledge the impact of man-made climate change and stalled any serious attempt to address water quality, land conservation or growth management.

Enforcement

In his first year, Scott forced the state's five regional water management districts to reduce their budgets by $700 million and filled their appointed boards with

## Tampa Bay Times

developers, land use lawyers and others more interested in granting permits than preservation. That triggered cuts to water supply, restoration and other projects, and led to widespread layoffs at the water management districts that turned them into shells of their former selves. The Scott administration undercut enforcement and dampened public input on development as it eliminated the state's growth management agency. DEP offered bonuses to employees to speed up permitting, and its departing regulatory chief boasted this year that the agency cut wait times for permits by two-thirds.

ADVERTISEMENT

Scott's political appointees created a chilling culture at the DEP. The former deputy secretary ordered the agency's top wetlands expert to approve a permit that she said would violate state law. After Connie Bersok refused, she was suspended and investigated by the agency. She was later vindicated, and the project was dropped.

Water

In what was a priority for big polluters, Scott waged a protracted fight with the federal government over long-delayed clean water standards. The Environmental Protection Agency eventually caved to the pressure and gave the state too much discretion, a transparent attempt by the Obama administration to boost the president's popularity in Florida during his re-election campaign. In 2012, Scott killed a statewide septic tank inspection program that would have been key to reducing water pollution. He ended a springs restoration initiative launched by Gov. Jeb Bush. This year, he did nothing to push a bipartisan bill in the Senate that would have spent hundreds of millions of dollars cleaning up the springs. He did ask for $55 million in his budget for springs, but instead the Legislature agreed to only $30 million.

Conservation

The economic meltdown caused spending for the Florida Forever land conservation program to drop by nearly two-thirds by the time Scott took office from its high-water mark years ago. But spending in Scott's first three years dropped significantly, from $100 million the year he came into office, to $27 million in 2012 and $17 million in 2013. Most of the money committed in the last two years has not been cash but permission to use money from the sale of surplus

Case 1:21-cv-00119-RDM    Document 55-3    Filed 06/22/21    Page 128 of 129

Tampa Bay Times

administration scrapped the effort without selling a single acre.



ADVERTISEMENT

Now Scott wants to pave over his record with a campaign plan that calls for more than $1 billion in spending over the next decade. He would commit $500 million each for springs restoration and alternative water supply projects. His proposal far exceeds what he budgeted for springs and conservation land during his first term, and he offers no suggestions for how to raise the money. The governor also calls for tougher legislation to punish polluters, which would be another major shift in direction.

It is difficult to imagine Scott increasing environmental enforcement when the number of such cases dropped by nearly two-thirds after his first year. Or pursuing a more robust effort to buy endangered land when the land-buying office has been decimated. Or following through on ambitious promises to emphasize restoration of the Everglades after he signed legislation that caps the sugar industry's financial liability for the cleanup. Scott also made it easier for private companies to tap the state's supply of reclaimed water even as he made it much harder for the public to challenge water and mining permit applications. He even signed legislation that fast-tracked the permitting process for gas pipelines and restricted how many times local officials may ask developers questions about their permit applications.

## Tampa Bay Times

The governor won't even say whether he supports the land and water conservation measure, Amendment 1, that will appear on the November ballot. If that measure passes, the state would lock in funding for conservation by dedicating revenue from the tax on property sales. Advocates say the amendment, which could raise $19 billion over 20 years, is needed to protect environmental funding from the annual whims of state lawmakers. It's also needed to protect Florida from governors like the incumbent, who has no sense of Florida and its values.

Scott wants voters to believe he has turned green. His record shows he has been the least environmentally sensitive governor in the last half-century, and there is no reason to expect there would be a sudden transformation in a second term.

---

**UP NEXT:**   Column: When more of a good thing is bad

---

## YOU MIGHT ALSO LIKE

**Pinellas County's final $2.6 billion budget prioritizes the rainy day fund**

Yesterday

PINELLAS   NEWS

---

**Federal aid for Florida's unemployed has run out. What's next?**

Sep. 20