

# Everglades Coalition

1000 Friends of Florida
Angler Action Foundation
Audubon Florida
Audubon of Southwest Florida
Audubon of the Western Everglades
Audubon Society of the Everglades
Backcountry Fly Fishers of Naples
Calusa Waterkeeper
Cape Coral Friends of Wildlife
Center for Biological Diversity
Conservancy of Southwest Florida
Defenders of Wildlife
"Ding" Darling Wildlife Society
Earthjustice
Environment Florida
Everglades Foundation
Everglades Law Center
Everglades Trust
Florida Bay Forever
Florida Conservation Voters Education Fund
Florida Defenders of the Environment
Florida Keys Environmental Fund
Florida Native Plant Society
Florida Oceanographic Society
Friends of the Arthur R. Marshall
Loxahatchee National Wildlife Refuge
Friends of the Everglades
Hendry-Glades Audubon Society
International Dark-Sky Association,
FL Chapter
Izaak Walton League of America
Izaak Walton League Florida Division
Izaak Walton League Florida Keys Chapter
Izaak Walton League Mangrove Chapter
Lake Worth Waterkeeper
Last Stand
League of Women Voters of Florida
Martin County Conservation Alliance
Miami Pine Rocklands Coalition
Miami Waterkeeper
National Audubon Society
National Parks Conservation Association
National Wildlife Refuge Association
Natural Resources Defense Council
North Carolina Outward Bound School
Ocean Research & Conservation Association
Peace River Audubon Society
Reef Relief
Sanibel-Captiva Conservation Foundation
Sierra Club
Sierra Club Florida Chapter
Sierra Club Broward Group
Sierra Club Calusa Group
Sierra Club Central Florida Group
Sierra Club Loxahatchee Group
Sierra Club Miami Group
South Florida Audubon Society
Southern Alliance for Clean Energy
The Florida Wildlife Federation
The Institute for Regional Conservation
The National Wildlife Federation
Theodore Roosevelt Conservation
Partnership
Tropical Audubon Society

March 31, 2020

Heather Mason
Environmental Administrator
Florida Department of Environmental Protection
2600 Blair Stone Road
Tallahassee, Florida 32399
Heather.Mason@FloridaDEP.gov

**Re: State 404 Program Public Hearing, Request for Postponement**

Dear Ms. Mason:

The Everglades Coalition has over 60 member organizations committed to the protection and restoration of America's Everglades. We have repeatedly expressed opposition to the state's plan to assume jurisdiction over the federal Clean Water Act Section 404 dredge and fill permitting program. We are now concerned that the Department intends to conduct public comment on its State 404 Program proposal in the midst of the growing COVID-19 pandemic, and to hold no public hearings on this issue of critical importance to the state.

By way of background, on February 19, 2020, the Department published proposed rules to create the State 404 Program, making public comments due March 11, 2020. On March 1, 2020, Governor Ron DeSantis issued an executive order directing the declaration of a public health emergency in the state arising from the novel coronavirus, COVID-19. *See* Exec. Order No. 20-51, https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-51.pdf. On March 9, 2020, the Governor declared a state of emergency, finding that COVID-19 poses a risk to the entire state of Florida. *See* Exec. Order No. 20-52, https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-52.pdf.

On March 9, 2020, the Everglades Coalition requested that the Department heed the considerable public opposition to assumption and maintain the current system of state and federal authority over wetlands permitting, including review under the National Environmental Policy Act (NEPA) in waters of the United States. We also requested that, at a minimum, the Department hold public hearings around the state to permit stakeholders to express their views on this issue of exceptional importance. On March 11, the Department noticed a single public hearing to be held in Tallahassee on April 2, 2020, in conjunction with a webinar.

*Committed to full protection and restoration of America's Everglades*

In the intervening weeks, the COVID-19 pandemic has grown exponentially throughout the country and in Florida. As of March 23, 2020, Florida's Department of Health is reporting that there are more than 1,100 confirmed cases of COVID-19 in the state, with another 1,000 people being monitored. *See* https://experience.arcgis.com/experience/96dd742462124fa0b38ddedb9b25e429 (last accessed March 23, 2020, 2:00 PM). Positive cases have now been confirmed in 47 Florida counties. The pandemic has resulted in school closures, supply shortages, business restrictions, a steep rise in unemployment, and strains on our economy and health care system. On March 17, 2020, Governor DeSantis announced that all schools would remain closed until April 15, 2020. *See* Florida coronavirus update for Tuesday: Three field hospitals slated to open; K-12 schools to close through April 15; state announces 7th death, 216 positive tests, Orlando Sentinel (Mar. 18, 2020).

On March 23, 2020, the Department announced that in light of federal social distancing guidance in response to the COVID-19 pandemic, it would hold no public hearings. The Department stated instead that it would offer three webinars on April 2, 2020, April 6, 2020 and April 10, 2020, and extend the comment period to April 17, 2020.

In light of current conditions, the Everglades Coalition strenuously objects to the Department's intention to proceed with public comment at a time when the public in Florida cannot meaningfully participate. Communities across the state are struggling to protect themselves and their loved ones from contracting a deadly virus. At the same time, they are struggling with the burdens of reduced services (school closures), loss of income and economic stability, short supplies of basic household necessities and caring for their families. Proceeding with public comment on the State 404 Program during this time of crisis for Florida communities would preclude meaningfully public participation.

Moreover, while the Everglades Coalition supports the Department's observance of federal social distancing guidance, webinars are no substitute for public hearings. Webinars may be helpful when paired with public hearings, providing access to those unable to travel, but are not equivalent to public hearings for a variety of reasons. Many affected stakeholders may not have the technological capabilities or know-how to participate by webinar. In addition, not all Floridians have access to reliable internet and many public facilities providing access like coffee shops and libraries have closed as a result of the current pandemic.

Members of the public should be afforded the opportunity to participate meaningfully in hearings in person with the Department. And since 404 assumption is a statewide issue, the public should be afforded the opportunity to participate in hearings where they live. Because that is not possible at this time, the Department should postpone the public comment and hearings until those can proceed with adequate opportunity for public participation.

The Department's proposed rulemaking for a State 404 program is discretionary. It is not an essential government function or statutorily mandated. It is not necessary to protect the public or the environment. To the contrary, it only places additional strains on state government resources during a time of crisis, to deal with a non-exigent matter of great public importance at a time when the public is struggling and cannot meaningfully participate.

*Committed to full protection and restoration of America's Everglades*

We therefore respectfully request that the Department postpone the public comment period on the proposed State 404 Program during the pendency of this statewide public health emergency.  We further request that the Department schedule in-person public hearings on the matter once the public health emergency has subsided.

Sincerely,

Mark Perry                                          Marisa Carrozzo
Co-Chair                                            Co-Chair

cc:  Noah Valenstein

 **Everglades Coalition**

1000 Friends of Florida
Angler Action Foundation
Audubon Florida
Audubon of Southwest Florida
Audubon of the Western Everglades
Audubon Society of the Everglades
Backcountry Fly Fishers of Naples
Calusa Waterkeeper
Cape Coral Friends of Wildlife
Center for Biological Diversity
Conservancy of Southwest Florida
Defenders of Wildlife
"Ding" Darling Wildlife Society
Earthjustice
Environment Florida
Everglades Foundation
Everglades Law Center
Everglades Trust
Florida Bay Forever
Florida Conservation Voters Education Fund
Florida Defenders of the Environment
Florida Keys Environmental Fund
Florida Native Plant Society
Florida Oceanographic Society
Friends of the Arthur R. Marshall
Loxahatchee National Wildlife Refuge
Friends of the Everglades
Hendry-Glades Audubon Society
International Dark-Sky Association,
FL Chapter
Izaak Walton League of America
Izaak Walton League Florida Division
Izaak Walton League Florida Keys Chapter
Izaak Walton League Mangrove Chapter
Lake Worth Waterkeeper
Last Stand
League of Women Voters of Florida
Martin County Conservation Alliance
Miami Pine Rocklands Coalition
Miami Waterkeeper
National Audubon Society
National Parks Conservation Association
National Wildlife Refuge Association
Natural Resources Defense Council
North Carolina Outward Bound School
Ocean Research & Conservation Association
Peace River Audubon Society
Reef Relief
Sanibel-Captiva Conservation Foundation
Sierra Club
Sierra Club Florida Chapter
Sierra Club Broward Group
Sierra Club Calusa Group
Sierra Club Central Florida Group
Sierra Club Loxahatchee Group
Sierra Club Miami Group
South Florida Audubon Society
Southern Alliance for Clean Energy
The Florida Wildlife Federation
The Institute for Regional Conservation
The National Wildlife Federation
Theodore Roosevelt Conservation
Partnership
Tropical Audubon Society

March 9, 2020

Heather Mason
Environmental Administrator
Florida Department of Environmental Protection
2600 Blair Stone Road
Tallahassee, Florida 32399
Heather.Mason@FloridaDEP.gov

**Re: February 19, 2020 Notice of Proposed Rules Regarding 404
Assumption**

Dear Ms. Mason:

The Everglades Coalition has over 60 member organizations committed to
the protection and restoration of America's Everglades.  In 2018, the
Everglades Coalition passed the enclosed resolution opposing SB1402 and
HB7043, the bills that authorized the Department to pursue state assumption
of federal Clean Water Act Section 404 dredge and fill permitting.

We write to express our opposition to the state's proposed rules to assume
jurisdiction over the federal wetlands permitting authority.  The state's
proposal would remove the U.S. Army Corps of Engineers' role in
reviewing and issuing Section 404 dredge and fill permits in assumed
waters, including the Corps' environmental analysis process under the
National Environmental Policy Act (NEPA). There remains uncertainty
about how compliance with other important environmental laws, including
the Endangered Species Act, would be ensured.  The state's proposal does
not include the provision for any additional staff or financial resources to
undertake the 404 programs.

Florida has already lost a substantial amount of historical wetlands, and
remaining intact wetland ecosystems are at risk from the projected human
population increase to 33.7 million residents by 2070.  Florida is one of the
most biodiverse areas in the nation, and is home to dozens of listed species.
In the face of increased growth and development, the protection and
restoration of the Greater Everglades—an ecosystem largely comprised of
wetland habitats—is better accomplished by maintaining the existing
involvement of both state and federal authorities.

*Committed to full protection and restoration of America's Everglades*

450 N. Park Road # 301, Hollywood FL 33021  |  www.evergladescoalition.org  |  info@evergladescoalition.org

We therefore respectfully request that the Department abandon the pursuit of assumption, and maintain the current process for the benefit of Florida's wetlands. At a minimum, we request that the Department hold public hearings around the state to permit stakeholders to express their views on this issue of exceptional importance.

Respectfully,

Mark Perry
Co-Chair

Marisa Carrozzo
Co-Chair



# Everglades Coalition

1000 Friends of Florida
Arthur R. Marshall Foundation
Audubon Florida
Audubon of Southwest Florida
Audubon of the Western Everglades
Audubon Society of the Everglades
Backcountry Fly Fishers of Naples
Bullsugar Alliance
Caloosahatchee River Citizens Association/
   Riverwatch
Center for Biological Diversity
Clean Water Action
Conservancy of Southwest Florida
Defenders of Wildlife
"Ding" Darling Wildlife Society
Earthjustice
Environment Florida
Everglades Foundation
Everglades Law Center
Everglades Trust
Florida Conservation Voters Education Fund
Florida Defenders of the Environment
Florida Keys Environmental Fund
Florida Native Plant Society
Florida Oceanographic Society
Friends of the Arthur R. Marshall
Loxahatchee National Wildlife Refuge
Friends of the Everglades
Hendry-Glades Audubon Society
International Dark-Sky Association,
   FL Chapter
Izaak Walton League of America
Izaak Walton League Florida Division
Izaak Walton League Florida Keys Chapter
Izaak Walton League Mangrove Chapter
Last Stand
League of Women Voters of Florida
Loxahatchee River Coalition
Martin County Conservation Alliance
Miami Pine Rocklands Coalition
Miami Waterkeeper
National Audubon Society
National Parks Conservation Association
National Wildlife Refuge Association
Natural Resources Defense Council
North Carolina Outward Bound School
Ocean Research & Conservation Association
Reef Relief
Sanibel-Captiva Conservation Foundation
Save It Now, Glades!
Sierra Club
Sierra Club Florida Chapter
Sierra Club Broward Group
Sierra Club Calusa Group
Sierra Club Central Florida Group
Sierra Club Loxahatchee Group
Sierra Club Miami Group
Snook and Gamefish Foundation
South Florida Audubon Society
Southern Alliance for Clean Energy
The Florida Wildlife Federation
The Institute for Regional Conservation
The National Wildlife Federation
The Urban Environment League of
   Greater Miami
Theodore Roosevelt Conservation
   Partnership
Tropical Audubon Society

**Resolution Opposing SB1402 and HB7043:  State Assumption of Federal Section 404 Dredge and Fill Permitting Authority**

WHEREAS, SB1402/HB7043 would allow Florida to take over aspects of the Clean Water Act Section 404 program and would remove the Army Corps of Engineers from reviewing projects that propose dredging or filling in wetlands; and

WHEREAS, removal of the Army Corps of Engineers as a federal regulator creates uncertainty in how other federal laws will be complied with, including the National Environmental Policy Act, Magnuson-Stevens Act, and National Historic Preservation Act, amongst others; and

WHEREAS, it has not been determined how the state of Florida -which is one of the most biodiverse areas in the nation, that is home to dozens of listed species- would address Endangered Species Act compliance; and

WHEREAS, the state of Florida has stated that it does not anticipate additional financial resources will be needed to take on the Clean Water Act Section 404 program, even though reviewers would need to be trained on Clean Water Act and would be responsible for reviewing permits under a differing set of regulations than exists under the state's wetland regulatory program; and

WHEREAS, wetlands are critical to cleansing water, helping to recharge groundwater supplies, providing fish and wildlife habitat, and maintaining a natural infrastructure that helps store flood waters and provide resiliency in storm events; and

WHEREAS, Florida has already lost a substantial amount of historical wetlands, and remaining intact wetland ecosystems are at risk from the projected human population increase to 33.7 million residents by 2070.

WHEREAS, in the face of increased growth and development, the protection and restoration of the Greater Everglades –an ecosystem largely comprised of wetland habitats- is better accomplished by maintaining the existing oversight from federal agencies.

THEREFORE BE IT RESOLVED:

The Everglades Coalition with its over 60 member organizations committed to the protection and restoration of America's Everglades, hereby opposes SB1402 and its House companion HB7043, as originally filed, which would allow the state of Florida to pursue wetland permitting under the federal Clean Water Act Section 404.

*Committed to full protection and restoration of America's Everglades*

450 N. Park Road # 301, Hollywood FL 33021 | www.evergladescoalition.org | info@evergladescoalition.org



# FLORIDA DEPARTMENT OF
# Environmental Protection

Marjory Stoneman Douglas Building
3900 Commonwealth Boulevard
Tallahassee, FL 32399

**Ron DeSantis**
Governor

**Jeanette Nuñez**
Lt. Governor

**Noah Valenstein**
Secretary

November 2, 2020

SUBMITTED VIA E-MAIL (404Assumption-FL@epa.gov)

**Docket ID No. EPA–HQ–OW–2018–0640**

The Honorable David P. Ross
Assistant Administrator, Office of Water
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington DC 20460

Re:   Florida's Request to Assume Administration of a Clean Water Act Section 404
Program (published at 85 Fed. Reg. 57,853)

Dear Assistant Administrator Ross:

On behalf of the Florida Department of Environmental Protection (FDEP), I am writing in support of Florida's application to assume a Clean Water Act (CWA) Section 404 program. For the first time in decades, a state has undertaken the significant task of submitting a complete application to obtain approval of a Section 404 program. This was an enormous effort by FDEP and other stakeholders. We greatly appreciate EPA's timely and thorough review of our program application materials. Assumption of the 404 program, if approved by EPA, would be a major achievement both for EPA and the State of Florida.

FDEP would also like to thank EPA for extensive public engagement on FDEP's application. EPA has provided an opportunity for public written comments and also held two public hearings. EPA's public engagement followed our extensive state rulemaking process under state law – a process that also allowed valuable opportunities for public engagement and input.

The purpose of this letter is to address a few issues raised by commenters, including: (1) the completeness of Florida's application; (2) protection of listed species; (3) historic preservation and consultation with Florida's Tribes; (4) state resources to implement a 404 program in Florida; and (5) state enforcement. We trust that this information will be helpful to EPA as it considers the comments submitted by stakeholders.

Complete Application

Contrary to some of the public comments, FDEP's 404 assumption application is "complete," as EPA has correctly concluded, based on the requirements of the CWA and its implementing regulations found at 40 C.F.R. part 233. Section 404(g) of the CWA requires that a state submit "a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact." 33 U.S.C. § 1344(g). A state application must also include "a statement from the attorney general (or the attorney for those State agencies which have independent legal counsel) … that the laws of such State … provide adequate authority to carry out the described program." *Id.* Under the applicable regulations, a state 404 assumption application must provide the items listed at 40 C.F.R. 233.10 (e.g., letter from the Governor, Attorney General's statement, agencies agreements, etc.). Additional requirements for a state program are set forth in the rest of Part 233, including Subpart C (permit requirements), Subpart D (program operation), and Subpart E (compliance evaluation and enforcement). Florida's application contained each of these required items along with sufficient detail and explanation to allow for EPA to review and consider the assumption request in accordance with the requirements of Section 404(g) and (h).

In the public comment process, some commenters argued that Florida's program lacks an adequate description of the waters covered by the state 404 program. That concern is incorrect. Our application clearly explains the waters for which the State of Florida would assume permitting responsibility and those which would remain under the regulatory purview of the U.S. Army Corps of Engineers. This is also described in the memorandum of understanding entered between Florida and the Corps of Engineers. In particular, we would direct your attention to page 2, section II, A-C of the memorandum of understanding. Furthermore, additional information can be found in the 404 Applicant Handbook Sections 2.0(b)41 and 4.1, and in the Retained Waters List in Appendix A of the 404 Handbook.

One commenter raised a concern over the 300-foot guideline the Corps and FDEP agreed to use to delineate the boundary of adjacent (and therefore retained) wetlands within the Florida-Corps Memorandum of Agreement (MOA). The commenter asserted that 300 feet was an arbitrary distance. Contrary to this assertion, this approach is based on a reasonable delineation as agreed upon by FDEP and the Corps. This approach was also reflected in the Final Report of the Assumable Waters Subcommittee (Final Report dated May 10, 2017), which is available for review on EPA's website at https://www.epa.gov/cwa404g/nacept-assumable-waters-subcommittee-final-report-may-10-2017.

In that report, the Assumable Waters Subcommittee recommended an approach labeled "Wetlands Alternative C3," where the Corps retains all wetlands landward to a default 300-foot administrative boundary that is adjustable to accommodate the unique regulatory, typographical, and hydrological needs of the state. In recommending this approach, the Subcommittee agreed that a distance of 300 feet is "fully adequate to protect federal navigation interests" and allows the state to protect wetlands and water quality as required by the CWA. *See* Final Report at p. 27 and 33. The Subcommittee favored Alternative C3 over the two other implementation strategies (Alternatives C1 and C2) because it retained the strengths of the previous two strategies, while

also allowing the local resource needs and existing programs from states and tribes to effectively incorporate Section 404 requirements into their existing framework. *Id.* at 28. To further determine the efficacy of Wetlands Alternative C3, the Subcommittee measured the strategy against eight criteria. These ranged from whether C3 was, as a whole, consistent with Section 404(g) and the CWA, to whether it provides clarity and efficiency in determining retained and assumable wetlands even outside 404 jurisdiction. The Subcommittee found it met all eight independent criteria and provided the level of effectiveness and regulatory certainty the Subcommittee determined was necessary for 404 permitting. *Id.* at 33. On July 30, 2018, the Assistant Secretary of the Army (Civil Works), R.D. James, accepted the Subcommittee's recommendation via a memorandum available on the Corps' website at https://api.army.mil/e2/c/downloads/525981.pdf.

Some commenters suggested that Florida's application is not "complete" or otherwise lacks adequate information about ESA protections because the anticipated biological opinion and incidental take statement, which would accompany EPA's final decision concerning Florida's application, is not yet available for review. This concern misunderstands the requirements of Section 7 consultation and how it relates to EPA's determination on an assumption application. Florida's 404 application, and EPA's public notice documents, describe species protection at length along with the programmatic consultation process. We would refer commenters to FDEP's 404 Applicant's Handbook Sections 1.3.3, and 5.2.3, and to Rules 62-331.053(a)4 and 62-331.248(3)(k). If commenters would like a detailed overview of the programmatic consultation process, it can be found in Appendix A(1) of the Program Description, pages 17-24. Notably, public comment is not required for a biological opinion and/or incidental take statement that accompanies a final action by EPA in these circumstances.[1]

Protection of Fish & Wildlife

Not only does Florida's application include adequate information, but Florida's overall approach is fully protective of the environment, including our state's wetlands and fish and wildlife species. FDEP has entered agreements with the Corps of Engineers and EPA, as well as a pending agreement with the U.S. Fish and Wildlife Service and the Florida Fish and Wildlife Conservation Commission to ensure a robust program that provides full protection for our state's wetlands. Approval of Florida's application would demonstrate a workable pathway for states interested in administering their own Section 404 programs. This is especially true for protection of threatened and endangered species and their habitats.

Florida's application provides for ESA consultation at the front end of the process, as well as allows for site-specific technical assistance under the terms and conditions of an anticipated programmatic biological opinion and incidental take statement. Some states may wish to pursue this same ESA programmatic consultation approach in appropriate circumstances, but all states would still reserve the flexibility to follow other lawful approaches that match state-

---

[1] *See*, *e.g.*, *Cooling Water Intake Structure Coal. v. EPA*, 898 F.3d 173 (2d Cir. 2018), amended, 905 F.3d 49, 78 (2d Cir. 2018) ("[T]here is no independent right to public comment with regard to consultations conducted under §7(a)(2) of the ESA…So no procedural infirmity arises in failing to provide notice of or an opportunity to comment on the biological opinion or other determinations by the Services.").

specific needs and contexts, which is the essence of cooperative federalism. Indeed, federal law encourages the flexible use of Section 7 consultation to achieve the objectives of the Endangered Species Act.  As the Eleventh Circuit has explained:

> Section 7(a)(2) of the ESA does not require that consultation under the act take place in any particular manner. Section 7(a)(2) simply directs the federal agency to "insure" in consultation with the [Services] that its actions are not likely to jeopardize the existence of listed species or their critical habitat. See 16 U.S.C. § 1536(a)(2). It is for the agencies to determine how best to structure consultation to fulfill Section 7(a)(2)'s mandate.

*Defenders of Wildlife v. U.S. Dept. of Navy*, 733 F.3d 1106, 1121-22 (11th Cir. 2013).

Florida's approach does not "bypass" species protection, as some commenters suggest. The opposite is true. Florida's approach, which would include the results of programmatic consultation under the ESA, ensures a careful, comprehensive process of engagement with both federal and state fish and wildlife agencies to ensure that 404 permitted activities do not jeopardize listed species or adversely modify critical habitat. In many ways, Florida's program – operating consistent with the results of programmatic consultation between EPA and the Services – will go above and beyond the requirements of federal law and ensure more robust protections for threatened or endangered species.

As mentioned above, Florida's proposed approach does not mean that an ESA section 7 consultation will be required for all state approvals or that all states must follow the same path as Florida's when developing their 404 program.  For states like Florida that develop a fully assumed 404 program, including assumption of the ability to issue permits for projects that may affect listed species, Section 7 consultation applies.  Conversely, for states that wish to pursue one of the other options suggested by commenters – i.e., fashion a 404 program that completely avoids ESA impacts, federalizes permits, or requires Section 10 permits - then Section 7 consultation may not be necessary. Indeed, when New Jersey applied for 404 assumption, EPA engaged in informal Section 7 consultation and concluded that the assumption by New Jersey of the 404 program would not adversely affect listed species or critical habitat in that context.

Some commenters have incorrectly suggested that programmatic consultation will place the state's 404 program under an "interminable" consultation situation where programmatic consultation is "reinitiated every time there's a regulatory change" such as a listing of a new species or designation of new critical habitat.  This concern is misplaced.  Nothing in the ESA would require re-initiation of formal consultation in this manner. Programmatic consultation under the ESA is flexible enough to provide for the addition of new species to the list of protected species as well as the additional designation of critical habitat. Such additions would then become part of the species review conducted under the terms and conditions of a programmatic biological opinion and incidental take statement.

In implementing the State 404 program, FDEP will send copies of all permit applications and its preliminary site-specific determination of potential effects to listed species to the USFWS for review and comment. This coordination is to ensure that any permit issued by FDEP is not

likely to jeopardize the continued existence of any listed or proposed species, or adversely modify or destroy designated critical habitat (pursuant to 40 CFR § 233.20(a)).  Upon coordination, FDEP will consider any information that USFWS provides as technical assistance and will include all species protection measures that the USFWS may recommend as permit conditions or deny the request for a permit, whether the permit conditions are designed to avoid jeopardizing an ESA-listed species or adverse modification of designated critical habitat, or whether permit conditions are designed to avoid or minimize the amount of incidental take when the take or other effects would not be likely to jeopardize a species or adversely modify designated critical habitat. This exchange of information between USFWS and FDEP falls within the broad scope of "technical assistance" as described in the ESA's implementing regulations and the USFWS' Interagency Consultation Handbook.

Another commenter incorrectly argues that the programmatic approach will not provide state 404 permittees with take liability protection.  This comment is incorrect and reflects a misunderstanding of how programmatic consultation has worked in other contexts and how it would work here. Under Florida's proposed programmatic consultation approach, liability protection under ESA Section 7 should extend to state 404 permittees who comply with the terms and conditions of the technical assistance process set forth in an applicable biological opinion with incidental take system, to the extent issued by the Services here. To avoid any uncertainty, we would encourage EPA and the Services to be very clear that, in this programmatic consultation context, take liability protection extends to state 404 permittees.[2]

At least one commenter misinterprets the 2015 ESA rulemaking as constraining programmatic consultations and then further suggests that the recent changes to the ESA Section 7 regulations (in the 2019 ESA reform regulations) have constrained programmatic consultations to an even narrower set of circumstances. This view is also incorrect. In the 2015 rulemaking and even more so in the 2019 rulemaking, the Services expanded and promoted the use of programmatic consultation as a viable path to streamline and improve the incidental take authorization process. For example, in the preamble to the ESA reform rules adopted by the Services in August 2019, the Services explained that programmatic consultation is a "***consultation technique that is being used with increasing frequency***" and that the reform rules "***promote the use of programmatic consultations as effective tools that can improve both process efficiency and conservation in consultations***." 84 Fed. Reg. at 44996.  The Services further explained that Section 7 of the ESA "***provides significant flexibility***" and that "various forms of programmatic consultations have been successfully implemented for many years now" – a "general practice" that the 2019 rules intended to "codify." *Id.* ("programmatic consultation process offers great flexibility and can be strategically developed…").

---

[2] The Justice Department, on behalf of EPA, addressed this issue in a legal brief filed with the U.S. Court of Appeals for the Second Circuit in the 316(b) litigation, explaining: "Here, facilities have an incentive to comply with the technical assistance process and recommendations in order to obtain incidental take exemptions as part of their compliance with the NPDES permit process instead of going through a separate, additional process under ESA §10."

Preservation of Historic and Cultural Resources and Coordination with Florida's Tribes

Contrary to some commenters' views, Florida's 404 program will ensure the protection of historic and cultural resources in the State. FDEP has entered into an agreement with the State Historic Preservation Officer (SHPO), setting forth a consultation process called the "historic properties review," for assessing the potential effects that an activity in a pending 404 permit application may have on historic properties, and for avoiding, minimizing, or mitigating any adverse effects on highly-valued sites. This collaborative consultation process includes tribes, local governments, applicants, and the public, and is designed to complement established procedures for permit processing and public notice under the State 404 Program. In addition to the historic properties review, the State has promulgated regulations to ensure that all activities, including those authorized under State 404 general permits, require a "no effect" or "no adverse effect" determination by the SHPO prior to a permit authorization (Rules 62-330.302, F.A.C. and 62-331.201, F.A.C.). Furthermore, the regulations require immediate further consultation and coordination, and the ceasing of all work, in the event of unanticipated discoveries during construction (Rules 62-330.350 and 62-331.201, F.A.C.).

As reflected in the State's program submittal, FDEP is also committed to working closely with Florida's Tribes. The rule provisions in Chapter 62-331, cited above, resulted from extensive cooperative engagement with the Seminole Tribe of Florida and the Miccosukee Tribe of Florida, as did the aforementioned Operating Agreement with the State Historic Preservation Officer. The consultation envisioned under the historic properties review will provide the Tribes with greater participation in the review of applications under the State 404 permitting program, even more than they currently have under the current Corps regulatory program. For instance, the Tribes will have an opportunity to review and comment on applications during the FDEP's initial review and will have the ability to inform and add to the FDEP's Requests for Additional Information (RAIs) to permit applicants. This advanced coordination is in addition to the Tribe's ability to participate during the public notice and comment period, as well as the consultation that occurs as the result of an unanticipated discoveries during construction of an authorized project. Consistent with consultation set forth in 106(b) of the NHPA, the Operating Agreement further provides the Tribes with the opportunity to offer effects determinations, participate in the resolution of adverse effects, and request federal review in the event of disagreements with FDEP and/or the SHPO.

State Agency Resources

Some commenters have suggested that FDEP lacks the resources to handle assumption of the 404 program. This is incorrect. As fully supported in Florida's application, FDEP has the legal authority and agency resources, with the support of Florida's Governor and Legislature, to administer the Section 404 program. Upon assumption, the Section 404 program will be administered by the FDEP, through its dedicated staff of over 200 wetland scientists and professionals across the state. In addition, FDEP has a dedicated listed species coordinator and tribal and historical resources coordinator. FDEP's intimate knowledge of state aquatic resources, coupled with the efficiency and proven success of its own wetland permitting

program, will ensure that the Section 404 program will be implemented in a scientifically sound and protective manner.

FDEP's ability to successfully assume the 404 program is supported by Florida's handling of other federally-delegated programs, like the NPDES permit program, which Florida has been operating under EPA-delegation since October 2000. Florida has likewise successfully operated its existing state dredge and fill regulatory program known as the "Environmental Resource Permitting" or "ERP" program for over 20 years. FDEP estimates that the requirements of the ERP program overlap with federal requirements under Section 404 of the Clean Water Act by approximately 85%. Because of this significant overlap, Florida's staff is already poised to perform the types of review required under Section 404 of the Clean Water Act. Additional training is currently being provided to staff to further ensure program readiness.

Some contend that the State 404 program would not protect as many different types of wetlands as the federal regulations do. This is also incorrect. Unlike the Corps, the state's jurisdiction over wetlands is not limited to Waters of the United States (WOTUS). Under the current ERP Program, all wetlands and other surface waters that are jurisdictional under Chapter 62-340, F.A.C., Florida's delineation rule, are protected. This includes isolated wetlands that are not considered WOTUS. For efficiency sake, all wetlands and other surface waters that are jurisdictional under Chapter 62-340, F.A.C. will be treated as WOTUS under the State 404 Program unless the applicant provides documentation that a water is not a WOTUS. Even if FDEP agrees the water is not a WOTUS for 404 purposes, that wetland or other surface water will still be protected under the ERP program, which will remain in place after assumption.

A few commenters incorrectly asserted that FDEP's rules fails to regulate the list of "Special Aquatic Sites" in Subpart E of the 404(b)(1) Guidelines. These sites are clearly included in FDEP's regulations at "Special Aquatic Sites" in section 2.0 of the State 404 Program Handbook and Florida Administrative Code Rule 62-331.053.

Simply put, the assertions that Florida does not have adequate resources to operate the 404 program are unfounded and wrong. FDEP has demonstrated its ability to manage this program via the highly successful operation of its NPDES and ERP programs over the past 20 years. Moreover, the Florida Legislature, with support of the Florida Governor, passed a law charging FDEP with "the power and authority" to assume and implement 404 permitting program from the EPA.

<u>Compliance & Enforcement</u>

Contrary to the views of some commenters, Florida unquestionably has the enforcement authorities under state law necessary to implement its own state 404 program. As EPA recognized when it adopted the Part 233 requirements for State 404 Assumption in 1988, the Clean Water "does not specify that a State must have penalties equal to the Federal penalties or at any other particular level for an approvable program." 53 Fed. Reg. at 20771 (1988). Instead, Part 233 sets forth certain general requirements for purposes of ensuring comparable enforcement at the state level including. Specifically, Section 233.41 requires that states have the authority to stop unauthorized activity; enjoin threatened or continuing violations; assess civil

penalties for 404 violations of at least $5,000 per day of violation; assess criminal remedies for instances of willful violations or criminally negligent violations of at least $10,000 per day of violation as well as power to seek criminal fines for knowing false statements and other similar criminal conduct in an amount of at least $5,000 for each instance of violation. Likewise, Section 233.41 requires similar burdens of proof and mens rea under state law as federal law. As demonstrated in its complete application, Florida meets these requirements.

Florida not only meets these legal requirements under Section 233.41, but it is also well-prepared to address the compliance and enforcement responsibilities of the program from a functional standpoint. FDEP (formerly "FDER") has been enforcing Florida's dredge and fill regulations since the early 1970s; thus, it already has proven compliance and enforcement protocols in place that have been progressively enhanced for a half century. The bulk of the compliance and enforcement activities are conducted by FDEP's six district offices, with guidance from a centralized team of professionals in Tallahassee and legal support from FDEP's Office of General Counsel. Governor DeSantis bolstered FDEP's enforcement capabilities earlier this year by signing the Environmental Accountability bill into law which, among other enhancements, increased the civil penalty for 404 violations to 3 times the amount allowable under Section 233.41. FDEP's Office of General Counsel handles FDEP's civil enforcement litigation throughout the state. The State's Attorney General is also authorized to bring civil enforcement actions for injunctive relief on behalf of the State.

In addition, FDEP has an independent Environmental Crimes Unit comprised of 18 sworn law enforcement officers who are deployed throughout the state to investigate and enforce criminal violations of Florida's environmental laws. This unit was transferred to FDEP by the Florida Legislature in 2019 in response to Governor DeSantis's express direction to ensure strong enforcement of Florida's environmental laws for years to come. Fla. Exec. Order No. 19-12 (Jan. 10, 2019); Ch. 19-141, Laws of Fla. FDEP's law enforcement officers often work closely with Florida's many other law enforcement agencies, such as county Sheriff's departments and the state Fish and Wildlife Conservation Commission officers, when they have shared jurisdiction. All of the State's law enforcement officers with jurisdiction over environmental crimes, including FDEP's Environmental Crimes Unit, work closely with FDEP's dedicated staff of scientists, engineers, and environmental professionals that will administer Florida's 404 program. When arrests are made, one of Florida's 20 State Attorney's offices coordinate with FDEP's district offices and Office of General Counsel to prosecute the case in criminal court.

Again, Florida not only meets the legal compliance and enforcement requirements under Section 233.41 for 404 Assumption, but it also has a proven record of successfully enforcing environmental violations for decades. Under Governor DeSantis's leadership, the Florida Legislature has recently instituted measures that will enhance Florida's compliance and enforcement efforts – both criminally and civilly – for years to come.

Conclusion

As an important part of the Clean Water Act's cooperative federalism structure, 404 assumption will ensure greater protection of Florida's water resources, reduce duplication of effort and overall expenditures by state and federal authorities, and better align the Section 404 program with other programs for which Florida already has primary responsibility. Approval of Florida's application would also demonstrate a workable pathway for states interested in administering their own Section 404 programs, while also providing valuable flexibility for EPA and individual states to develop programs that match state-specific needs.

Thank you for your consideration of the foregoing responses to various comments submitted during EPA's public comment process.

Sincerely,

Noah Valenstein



November 2, 2020

Mr. Kelly Laycock
Oceans, Wetlands and Streams Protection Branch
USEPA Region 4
61 Forsyth St., SW
Atlanta, GA 30303

*Via:* 404Assumption-FL@epa.gov & regulations.gov

Re:    **Comments in Opposition to State of Florida's Application to Assume
       Administration of a Clean Water Act Program (Docket # EPA-HQ-
       OW-2018-0640-0001; EPA-HQ-OW-2018-0640)**

Dear Mr. Laycock:

We write on behalf of several local, state and national conservation organizations devoted to
protecting Florida's lands, water and wildlife to urge the U.S. Environmental Protection Agency
("EPA") to deny Florida's request for authorization to assume jurisdiction over permitting under
Section 404(a) of the Clean Water Act of 1972 ("CWA"), 33 U.S.C. § 1344, in waters of the
United States.[1]  *See* State of Florida's Program Submission to Assume the Clean Water Act
Section 404 Permitting Program (Aug. 20, 2020) [hereinafter "Assumption Application"];
Florida's Request to Assume Administration of a Clean Water Act Section 404 Program, 85 Fed.
Reg. 57,853 (Sept. 16, 2020).  The environmental community, which is comprised of countless
Florida families, has steadfastly opposed Florida's effort to assume a Section 404 program
because this would jeopardize vital natural resources at a time of unprecedented population
growth combined with striking environmental degradation.  These concerns have been echoed by
the public, which also has consistently voiced opposition to Florida's proposal.

---

[1] These comments are filed on behalf of Center for Biological Diversity, Conservancy of Southwest
Florida, Florida Wildlife Federation, Miami Waterkeeper and St. Johns' Riverkeeper.  The comments
are also endorsed by Environmental Confederation of Southwest Florida, Friends of the Everglades,
the National Parks Conservation Association, Natural Resources Defense Council and Sierra Club.

FLORIDA OFFICES

111 SOUTH MARTIN LUTHER KING JR. BLVD.                    4500 BISCAYNE BLVD., SUITE 201
TALLAHASSEE, FL 32301                                                    MIAMI, FL 33137
T: 850.681.0031                                                      T: 305.440.5232

FLOFFICE@EARTHJUSTICE.ORG    WWW.EARTHJUSTICE.ORG

**Introduction**

Under the Clean Water Act, the purpose of Section 404 includes restoring and maintaining "the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredge and fill material," recognizing that the degradation and destruction of wetlands is "among the most severe environmental impacts." <u>See</u> 40 C.F.R. § 230.1(a). The Clean Water Act, and the rules promulgated thereunder, create an important, and deservedly complex regulatory framework aimed at achieving these goals.

Florida's proposed program claims no such lofty goals. To the contrary, the State has repeatedly articulated its objectives as streamlining the permit process in order to approve permits more quickly, and at less cost, to developers. To achieve this goal, Florida has proposed a program full of gaps and shortcuts that are not consistent with federal law.

Of particular concern, Florida proposes to take on the consequential responsibility of a Section 404 program without devoting an additional cent of resources to the undertaking. The proposal comes at a time when the State has consistently failed to meet its existing obligations regarding environmental protection, and when it faces severe budget shortfalls as a result of dramatic revenue losses related to the COVID-19 pandemic.

Florida's application must be denied for at least three reasons: (1) the submission is not complete, (2) the proposed program is not as stringent as federal law, and (3) Florida is not equipped to administer and enforce Section 404. Approving Florida's application would jeopardize the State's vital wetlands and the species and communities that rely on them.

For ease of reference and review, these comments are organized into five main sections. Part I addresses Florida's failure to protect the environment, and its disastrous environmental record even as the State proceeded to pursue assumption. Part II describes Florida's move to enact legislation authorizing assumption, the extensive public opposition to that legislation, and the authorizing legislation's language.

Part III addresses the complex and highly contested matter of identifying assumable versus retained waters in Florida, including the U.S. Army Corps of Engineers' ("Corps") 2018 public notice and comment period that was begun as a result of Florida's intention to pursue assumption, but then abruptly terminated without explanation. Part IV describes the Florida Department of Environmental Protection's ("FDEP") rule-making process for purposes of developing an assumption program, including a highly flawed rule development phase, the publication of incomplete proposed rules, and the limitation of public comment to a time in Florida when the public was most distracted by the emerging coronavirus crisis, and its impact on health, jobs, child care, food security and safety.

2

In Part V, we outline the gross deficiencies in Florida's application to the EPA, beginning in Section A with the incompleteness of the application. In Part V. B. we provide a comprehensive review of deficiencies in the application on the merits.

Part V. B.1. includes a detailed review of Florida's failures to demonstrate adequate authority to carry out a Section 404 program, as well as many areas in which the state program is not as stringent as federal law. The topics addressed include the failure to adopt and comply with all 404(b)(1) Guidelines; unlawful rules related to general permits, emergency permits, permit conditions and permit application processes; the failure to meet coordination requirements, provide for adequate public notice, and ensure adequate process for decisions on permit applications; the failure to meet requirements for compliance evaluation programs; inadequate enforcement authority, including less stringent state criminal liability and inadequate opportunities for public participation in enforcement; and the failure to address the effect of state takings law on implementation of the program.

Part V.B.2. addresses how Florida's scheme fails to ensure protection of listed species under the Endangered Species Act ("ESA"). Part V.B.3. discusses the insufficiency of resources available to FDEP to adequately implement a Section 404 program. Part V.B.4. outlines the on-going failures in FDEP's enforcement record, demonstrating FDEP's incapacity to adequately enforce existing programs, much less adopt a new one. Part V.B.5. addresses differences between state and federal access to the courts for purposes of challenging 404 permits and pursuing citizen suits.

Part V.B.6. describes the on-going failure to adequately define assumable versus retained waters in Florida, and provides additional information that must be considered to ensure that the full breadth of retained waters is identified. Part V.B.7. demonstrates how Florida's waterways, and the public, cannot afford to lose existing federal safeguards under federal law.

Taken separately, and collectively, the gross deficiencies in Florida's submission require that the application be denied.

## I. Florida's Failure to Protect the Environment

Florida enjoys some of the most vast, and valuable, wetlands in the United States. These wetlands provide essential services to support clean water, resilience, and biodiversity. They also provide economic value because of the critical interstate industries, such as tourism, that rely heavily on visitors' attraction to Florida's natural environment.

Yet in recent years, FDEP has been gutted, resulting in devastating harm to Florida's wetlands and water quality. FDEP has regularly failed to meet its obligations to adequately enforce

3

environmental protections already under its purview.  It cannot possibly establish that it is capable of doing more, with less, today.

### A.  Florida's Exceptional Waterways

Florida's water resources are stunning and uniquely complex.  The State's distinctive peninsular shape, flat topography and karst terrain create prolific coastlines, rivers, springs and lakes.  With almost 1,200 miles of coastline, more than 7,500 lakes (greater than 10 acres), 33 first-magnitude springs, and approximately 27,561 linear miles of rivers and streams, water is one of Florida's most prominent features.  See Elizabeth Purdum, Florida Waters:  A Water Resources Manual from Florida's Water Management District 49 (2002) (Exhibit 1).

Countless valuable wetlands are widely distributed throughout the State, including the renowned Everglades and Big Cypress Swamp.  See, e.g., Albert Hine, Geology of Florida, 17–18 (2009) (Exhibit 2).  With approximately 11 million acres of wetlands, Florida has more wetlands than any of the other conterminous states.  U.S. Geologic Surv., National Water Summary on Wetland Resources: Water Supply Paper 2425 (1996) (Exhibit 3).  These often shallow wetlands are vast and diverse and include rare habitats such as mangrove swamps and hydric hammocks.  See Purdum, supra, at 49.  In addition to these expansive surface waters, Florida has more groundwater than any other state.  See id.

Florida's waters help sustain some of the world's most diverse species.  Florida lies within the North American Coastal Plan, the World's 36th Biodiversity Hotspot, and is considered the richest area biologically for endemic species.  Zenaida Kotala, Florida Declared a Global Biodiversity Hotspot, UCF Today, Feb. 26, 2016 (Exhibit 4).  Freshwater resources in Florida provide nesting, foraging, wintering and migrating habitats for numerous species of fish and wildlife.  Fla. Fish & Wildlife Conservation Comm'n, Florida's Freshwater Priority Resources: A Guide for Future Management 1 (2018) (Exhibit 5).

These resources are relied on by high numbers of threatened and endangered plants (26% of them rely on wetlands) and animals (45% of them rely on wetlands) and, as such, are designated as critical habitat under the Endangered Species Act.  Id.  Due to having one of the highest rates of habitat loss, Florida's water resources and the species that depend on them are some of the most threatened.  See Denise Rocus & Frank Mazzotti, Threats to Florida's Biodiversity, University of Florida/IFAS Extension (1996) (Exhibit 6); Kotala, supra.

In addition, Florida's waters are critical to several multi-billion dollar industries, including agriculture and tourism, affecting interstate commerce.  See, e.g., Tourism Fast Facts, Visit Florida (last visited Nov. 1, 2020) (Exhibit 7); Florida Agriculture Overview and Statistics, Fla. Dep't of Agric. & Consumer Servs. (last visited Nov. 1, 2020) (Exhibit 8).

**B. Florida's Disastrous Environmental Record**

In recent years, FDEP has grossly failed to meet its existing obligations.  A 2014 Editorial in
Florida's leading paper, the Tampa Bay Times, decried FDEP's recent record as "an
environmental disaster."  Editorial, The Rick Scott Record: An Environmental Disaster, Tampa
Bay Times, Sept. 5, 2014 (Exhibit 9).  FDEP's failures stem from reduced water management
budgets, rushed permitting, weakened enforcement, widespread layoffs provoking a brain drain
of experts in the field, and the replacement of experts with political appointees focused on
advancing business interests rather than environmental stewardship.

A 2016 analysis released by Public Employees for Environmental Responsibility ("PEER")
found that FDEP had opened 81% fewer enforcement cases, collected the lowest number of fines
in 28 years, and assessed no penalties in a third of the cases.  Press Release, PEER, Scott's
Undeclared Polluters' Holiday Stains Florida (Aug. 17, 2016) (Exhibit 10); PEER, Report on
Enforcement Efforts by the Florida Department of Environmental Protection Calendar Year 2015
(2016) (Exhibit 11).  See also Jimmy Orth, State Failing to Protect Our Waterways, St. Johns
Riverkeeper, Feb. 1, 2013 (compilation of newspaper articles describing the State's
environmental record) (Exhibit 12).

**II. Florida's Assumption Legislation**

It was against this backdrop of demonstrably inadequate environmental protection that, in 2017,
FDEP sought authorization from the state legislature to pursue assumption of the Section 404
program.  See State Assumption of Federal Section 404 Dredge and Fill Permitting Authority,
S.B. 1402, 2017 Leg. (Fla. 2018) (Exhibit 13).  A similar effort had been considered, but
rejected, in 2005, after FDEP concluded that the complexity of Florida's extensive waterways
weighed against assumption, and that for assumption in Florida to be feasible, several changes to
state and federal law would be required. See Fla. Dep't of Env't Prot., Consolidation of State and
Federal Wetland Permitting Programs Implementation of House Bill 759 (Chapter 2005-273,
Laws of Florida) 2–5 (Sept. 30, 2005) (Exhibit 14).  At that time, FDEP also recognized that
assumption would require "substantial staff resources" in order for the State to be able to take on
the additional responsibilities and workload required under federal law.  Id. at 3–4, 6–7.

A January 19, 2018, bill analysis recognized that FDEP would have to undertake a number of
activities that might generate costs to the agency, including those related to rulemaking,
modifications to its existing applications, databases and permit tracking systems, program
administration, and permit processing.  FDEP assured legislators, however, that it did "not
anticipate an increase in permitting administration expenditures" with assumption, and that it
"believe[d] that, upon assumption, the processing of state 404 permits, as well as enforcement
activities for state 404 permits, can be absorbed without an increase in staffing or administrative

costs." Bill Analysis and Fiscal Impact Statement: S.B. 1402, 2017 Leg., at 16 (Fla. Feb. 13, 2018) (Exhibit 15).

FDEP therefore sought no resources from the legislature to develop, implement, operate and enforce Section 404.  FDEP advised legislators it would not even charge permittees a fee for Section 404 permits.  Id.

### A.  Floridians Object to Legislation Authorizing Pursuit of Assumption

On January 22, 2018, Waterkeepers from across Florida urged legislators to reject the proposed legislation, citing concerns about FDEP taking on an additional program without additional resources.  In particular, the Waterkeepers pointed out how FDEP "already woefully under-regulates" stormwater permits delegated to the State by the federal government under the Clean Water Act.  Letter from Rachel Silverstein, Miami Waterkeeper, et al., to Senate Environmental Preservation and Conservation Committee Members, Jan. 22, 2018 (Exhibit 16).

On January 29, 2018, the State's leading paper urged against allowing Florida to undertake assumption in light of FDEP's inadequate resources and performance.  Editorial, Don't Let Florida Take Over Wetlands Permitting, Tampa Bay Times, Feb. 4, 2018 (Exhibit 17) (raising concerns about the reductions in FDEP's workforce and funding for environmental programs; "There is no reason to have confidence that the state agency is prepared to take on this obligation ... The wetlands are too important to Florida's economy and to public safety in a coastal state to put the interests of developers ahead of the general good.").

In February 2018, the Everglades Coalition issued a resolution opposing the legislation. Everglades Coal., Resolution Opposing SB1402 and HB7043: State Assumption of Federal State 404 Dredge and Fill Permitting Authority (Feb. 2018) (Exhibit 18).  On behalf of its more than 60 member organizations, the Everglades Coalition identified a number of concerns regarding state assumption and the risk to Florida's remaining wetlands, which are critical to cleansing water, recharging groundwater, providing fish and wildlife habitat and storm resiliency. The Coalition concluded that "in the face of increased growth and development, the protection and restoration of the Greater Everglades—an ecosystem largely comprised of wetland habitats—is better accomplished by maintaining the existing oversight from federal agencies."  Id.

On March 9, 2018, former FDEP Secretary Victoria Tschinkel urged the Governor to veto the bill, which she observed had been rushed on behalf of those who seek "fast and simple permitting" rather than in the best interests of the State.  Victoria Tschinkel, Florida's Treasured Wetlands on the Eve of Destruction—We Cannot Allow It, Orlando Sentinel, Mar. 9, 2018 (Exhibit 19).  Former Secretary Tschinkel noted, among other things, that "Florida has already

lost half its wetlands, with great negative effects on water quality, fish nurseries, wildlife habitat and flood control."  Id.

On March 23, 2018, Governor Scott signed the bill into law.  The Governor's signing statement approving the legislation stated that it granted FDEP "the authority *to explore whether the state should* issue 404 permits."  Letter from Gov. Rick Scott to Sec. Kenneth W. Detzner, Mar. 23, 2018 (Exhibit 20) (emphasis added).  Nothing in the legislation required FDEP to proceed with assumption.

### B.  Florida's Statutory Authorization to Pursue Assumption

Florida Statutes § 373.4146 codified the legislation authorizing FDEP to pursue Section 404 assumption.  Id.  Among other things, the statute authorizes FDEP to "adopt any federal requirements, criteria, or regulations necessary to obtain assumption," including "the guidelines specified in 40 C.F.R. part 230 and the public interest review criteria in 33 C.F.R. s. 320.4(a)." Fla. Stat. § 373.4146(2).

The statute provides that "[p]rovisions of state law which conflict with federal requirements identified in subsection (2) do not apply to state administered section 404 permits."  Id. § 373.4146(3).  The statute does not specify, however, what those conflicts are, nor does it enact any changes to state law to resolve state and federal law conflicts.

As set forth in detail below, Florida law conflicts with federal law in several critical respects. Moreover, Florida's proposal does not create a Section 404 program that is as stringent as that which exists under federal law.  The program submission must therefore be denied.

### III. Florida's Assumable Waters, Federal Retained Waters

Florida Statutes § 373.4146 failed to grapple with one of the most critical questions regarding assumption: the question of which waters will be assumed.  Instead, the provision tautologically defines "state assumed waters" as those "waters of the United States that the state assumes permitting authority over pursuant to [Section 404]."  Id. § 373.4146(1).

The question of which waters the State intends to assume jurisdiction over, however, is central to an evaluation of the program.  See 40 C.F.R. § 233.11(h) (state submission must include a "[d]escription of the waters of the United States over which the State assumes jurisdiction [and a] description of the waters over which the federal government retains jurisdiction.").

In light of the centrality of this question for purposes of Florida's interest in assumption, on March 19, 2018, the Corps initiated a 30-day public comment period to end on April 20, 2018,

"regarding use of waters in the state of Florida for navigation … [including] identification of those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities" for purposes of navigability analyses to determine "which waters are subject to permitting authority under Section 10" and "determining the waters that would be retained by the Corps if the EPA approves the State's application for Section 404 Program assumption." U.S. Dep't of the Army, Public Notice: Determination of Navigable Waters, Mar. 19, 2018 (Exhibit 21).[2]

As a result of the Corps' notice, a number of stakeholders across Florida prepared to submit comments on the \question of assumable versus retained waters. As evidenced by the FDEP's 2005 Report describing the complexity of Florida's waterways, properly identifying the scope of retained waters is essential both to those who seek maximum protection for those vital resources, and for the regulated community that seeks clarity when it comes to permit requirements.

On April 10, 2018, however, the Corps issued an "Updated Public Notice" summarily terminating the comment period effective immediately, deeming "the comment period originally set to expire on April 20, 2018 ... closed until further notice." U.S. Dep't of the Army, Updated Public Notice: Cessation of Public Comment Period, Apr. 10, 2018 (Exhibit 23). The Corps provided no explanation for its sudden reversal.

Notwithstanding the Corps' abrupt and unexplained change of course, many stakeholders proceeded to submit comments in accordance with the original deadline of April 18, 2018. This included comments by Senator Bob Graham on behalf of the Florida Conservation Coalition, which is comprised of more than 80 organizations, Letter from Bob Graham, Fla. Conservation Coal., to U.S. Dep't of the Army, Apr. 18, 2018 (Exhibit 24), as well as comments by the Sierra Club, Audubon Florida, Conservancy of Southwest Florida, and Florida's Water and River Keepers. Letter from Amber Crooks, Conservancy of Sw. Fla., to U.S. Dep't of the Army, Apr. 18, 2018 (Exhibit 25); Letter from Rachel Silverstein, Miami Waterkeeper, et al., to Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 17, 2018 (Exhibit 26); Letter from Julie Wraithmell, Audubon Fla., to Donald W. Kinard, U.S. Army Corps of Eng'rs (Exhibit 27); Letter from Frank Jackalone, Sierra Club Fla. Chapter, to Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 16, 2018 (Exhibit 28).

In a letter we submitted, we reminded the Corps about Florida's extensive water resources and unique hydrology, and that any navigability study would require a thorough analysis of numerous waterways to determine which waters may be assumable. This undertaking would

---

[2] On April 5, 2018, the Corps posted its solicitation for public comment on this matter on the website for the Jacksonville District. Press Release, U.S. Army Corps of Eng'rs, Corps Seeks Public Comment Regarding Water Use for Navigation (Apr. 5, 2018) (Exhibit 22).

require special attention to the rivers, streams and adjacent wetlands located throughout the State.  We further noted that determining the adjacency of wetlands in particular will require time, investigation and evidence and will be of critical importance to Florida's residents and economies.  These determinations would have to be based on technical information, hydrology and science.  By necessity, adjacency determinations would have to be made case by case, based on site-specific characteristics of the area's hydrology, topography and vegetation, among other factors.  To perform such studies, it would be imperative to solicit information from the public, as there are entities and individuals with relevant expertise located throughout the State.  Letter from Tania Galloni, Earthjustice, to Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 18, 2018 (Exhibit 29).

Other commenters echoed similar concerns.  The Sierra Club demonstrated that even at the time, the Corps' lists of navigable waters was incomplete and inadequate.  Letter from Frank Jackalone, Sierra Club Fla. Chapter, to Jason A. Kirk, U.S. Army Corps of Eng'rs, supra.  The Corps' list identified 492 rivers and creeks and 110 lakes.  A supplement to the list totaled 1,767 rivers and creeks and 1,186 lakes.  The text prefacing that supplement included the disclaimer that "[t]he District makes no claim that these lists are complete or completely accurate."  U.S. Army Corps of Eng'rs, Supplement to the Jacksonville District Navigable Waters Lists (Oct. 5, 2017) (Exhibit 30).

The Conservancy of Southwest Florida submitted scores and scores of additional waterways that it urged the Corps to consider as navigable as well for Section 10 purposes.  Letter from Amber Crooks, Conservancy of Sw. Fla., to the U.S. Dep't of the Army, supra.  Audubon Florida urged the Corps to use the October 2017 list as a baseline and to supplement that list with additional navigable waterways subject to Section 10 Rivers and Harbors Act jurisdiction. Letter from Julie Wraithmell, Audubon Fla., to Donald W. Kinard, U.S. Army Corps of Eng'rs, supra.  Florida's Water and River Keepers emphasized the critical importance of the Corps properly identifying all Section 10 waters in the State.  Letter from Rachel Silverstein, Miami Waterkeeper, et al. to Colonel Jason A. Kirk, U.S. Army Corps of Eng'rs, supra.

The Corps provided no response to any of these public comments.  And, more than two years later, there has been no "further notice" and no further solicitation for comment on the Corps' determinations regarding Florida's retained waters.

## IV. Florida's Section 404 Rule-Making

Meanwhile, Florida proceeded to initiate rule-making to develop its Section 404 program.  Florida's rule-making process was marred by a number of deficiencies throughout.  Those problems have resulted in the State's grossly inadequate program submission now under review.

### A.  Florida's Rule Development

On May 11, 2018, FDEP initiated rule development for the purposes of developing its Section 404 program.  FDEP described the purpose and effect of its undertaking as:

> Section 404 of the Clean Water Act (404) provides states the option of assuming administration of the federal dredge and fill permit program in certain waters. By obtaining 404 assumption, Florida will be able to provide a streamlined permitting procedure where an applicant will come to the state to obtain both the Environmental Resource Permitting and 404 authorizations. This will avoid duplication, provide greater certainty to the regulated community, conserve resources, and will afford the state greater control over its natural resources while complying with federal law.

44 Fla. Admin. Reg. 2321 (May 11, 2018).  Notably, FDEP's stated objectives did *not* include enhancing protection of Florida's waterways, ecosystems or communities.  To the contrary, FDEP's objectives were identified as streamlining permitting, avoiding duplication, providing greater certainty to the regulated community, conserving resources and exerting greater "control over [the State's] natural resources."  Id.

FDEP held rule development workshops in Tallahassee on May 30, 2018, in Orlando on May 31, 2018, and in Ft. Myers on June 1, 2018. Although Florida law requires that agencies holding public workshops make available staff who can respond to questions and comments on a rule in development, Fla. Stat. § 120.54(2)(c), members of the public who attended these workshops raised a number of concerns that were left unanswered.  Letter from Tania Galloni, Earthjustice, to Noah Valenstein, Fla. Dep't of Env't Prot., Jul. 9, 2018 (Exhibit 31).

These included questions about how listed species would be protected, which waters would remain under federal jurisdiction, and how FDEP would assume the 404 program without any funding when the state agency is already under-resourced.  Members of the public also expressed concerns about FDEP's reliance on memoranda of agreement that had not been completed or made available to the public for comment.  FDEP responded that the MOAs would be made available for public comment, but they never were.

On October 1, 2018, FDEP issued a Statement of Estimated Regulatory Costs ("SERC").  Fla. Dep't Env't Prot., Statement of Estimated Regulatory Cost, 62-331 (Oct. 1, 2018) (Exhibit 32) [hereinafter "404 Assumption SERC"].  In Florida, a SERC is required whenever a proposed rule is "likely to directly or indirectly increase regulatory costs in excess of $200,000 in the aggregate in this state within 1 year after the implementation of the rule."  Fla. Stat. § 120.54(3)(b)(1)(b). In estimating regulatory costs, a SERC "shall include," among other things, "[a]n economic analysis showing whether the rule directly or indirectly … [i]s likely to increase regulatory costs,

including any transactional costs,[3] in excess of $1 million in the aggregate within 5 years after the implementation of the rule."  Id. § 120.541(2)(a)(3).

In the SERC for its Section 404 program, FDEP estimated that there are an average of 723 permits currently issued by the Corps under Section 404, and that this would total about 3,615 permits over 5 years.  FDEP, however, provided *no estimate* of the resources it would take for the State to review, issue, monitor, and enforce those permits.

FDEP omitted any reference to additional, related tasks that would require resources, such as determining whether the State has jurisdiction over a proposed project under a state-assumed program, providing guidance to applicants on the new requirements and processes, making exemption determinations, reviewing applications that are ultimately not granted, conducting investigations, meeting monitoring and reporting requirements, reviewing and issuing permit modifications and revocation, and public notice and public hearing requirements.

Under Florida law, a SERC must include "[a] good faith estimate of the number of individuals and entities likely to be required to comply with the rule, together with a general description of the types of individuals likely to be affected by the rule."  Id. § 120.541(2)(b).  While FDEP's SERC acknowledged the more than 3,600 additional permits the State would now have jurisdiction over, that number answers only part of the question.  See 404 Assumption SERC at 2–3.  The number of individuals and entities likely to be "required to comply with the rule" includes not only those who are granted permits, but anyone who may seek to discharge dredged or fill material into waters of the United States, and those who make such discharges without authorization.

Similarly, FDEP stated that the only persons likely to be affected are those who are "currently subject to a 404 permit" issued by the Corps.  This response demonstrates that FDEP takes an unduly narrow view of operating a 404 program, and as a consequence, has taken an unreasonably limited view of the number of individuals and entities likely to be affected.  FDEP wholly failed to provide a general description of those who are likely to be affected, other than existing permittees.

A SERC must also include "[a] good faith estimate of the cost to the agency, and to any other state and local government entities, of implementing and enforcing the proposed rule, and any anticipated effect on state or local revenues."  Fla. Stat. § 120.541(2)(c).  FDEP responded to this

---

[3] "Transactional costs" are defined as "direct costs that are readily ascertainable based upon standard business practices, and include filing fees, the cost of obtaining a license, the cost of equipment required to be installed or used or procedures required to be employed in complying with the rule, additional operating costs incurred, the cost of monitoring and reporting, and any other costs necessary to comply with the rule."  Fla. Stat. § 120.541(2)(d).

question by claiming "none."  FDEP's response failed to account for costs to other state agencies it intends to rely on to operate a 404 program, including Florida's Fish and Wildlife Commission and the State Historic Preservation Office.  404 Assumption SERC at 3, E.1, E.3; Assumption Application B, app. c--d, j.

FDEP stated that it "intends to implement the proposed rule with existing resources" and "intends to enforce the proposed rule with existing resources."  404 Assumption SERC at 3, E.1, E.3.  FDEP's response provides no good faith estimate *of the cost* and therefore no reasonable basis to support the conclusion that this cost can be borne by "existing resources."  FDEP's response also begs the question of why the agency has existing resources that are not being used to serve its existing duties under state law, and whether appropriations for existing programs may lawfully be used for other purposes.

In response to the requirement to provide "[a] good faith estimate of the transactional costs likely to be incurred by individuals and entities, including local government entities," Fla. Stat. § 120.541(2)(d), FDEP again stated "none," asserting that "[t]his proposed rule will only affect the department."  404 Assumption SERC at 3-4, E.2, E.4.  Here, FDEP again failed to acknowledge and account for the other state agencies that would incur costs related to a 404 program.

The only costs that FDEP estimated were those related to "multiple 5-year permit applications for large projects that will take more than 5 years to complete," which FDEP estimated would cost $600,000 per year.  But even the bases for this calculation remain unclear.  FDEP did not specify who is expected to bear these costs, and for what exactly.  FDEP did not include in this estimate the cost of the initial permit on the basis that it would be the same as a permit from the Corps, see 404 Assumption SERC at 3, at n. 1, but did not explain whether or why the subsequent permit cost would be any different.  FDEP also averred that these estimated costs would be offset by savings, but again did not specify what those savings would be and to whose benefit they would inure.

FDEP failed to identify the costs it would incur to process each individual 404 permit, or to manage all the general permits over which it seeks to assume jurisdiction, much less to perform all of the additional duties that operating a 404 Program would require.  Yet even if one were to use FDEP's estimate of $5,000 for a long-term project permit renewal as a baseline, that cost alone for the more than 700 permit actions FDEP expects to take would cost $3,500,000 per year.

FDEP summarily added that "[t]here will be an overall cost savings to the regulated public," but did not in any way quantify that statement, provide an estimate of the costs to FDEP and thus to Florida taxpayers, or account for the loss of environmental review necessary to protect Florida's wetlands and the communities and industries that rely on Florida's natural environment.

Indeed, the benefits of the proposed program were touted as including costs savings related to *avoiding* review under the National Environmental Policy Act ("NEPA"), the reduction in time to process permits, and "allow[ing] the permittee to access the value of [large] projects sooner than if the permit was issued under the federal 404 program."  404 Assumption SERC at F., G.

### B. Florida's Proposed Rules, Coronavirus Comment Period

On February 19, 2020, FDEP published the totality of its proposed rules, including proposed revisions to Chapter 62-330, the proposed promulgation of Chapter 62-331, the Draft 404 Handbook, and the same SERC.  Fla. Dep't of Env't Prot., Notice of Proposed Rule, 62-330 (Feb. 19, 2020) (Exhibit 33).  In response to the notice, many affected persons requested that FDEP hold a public hearing, in accordance with Florida law, see Fla. Stat. § 120.54(3)(c)1, which FDEP ultimately set for April 2, 2020.  See, e.g., Letter and Resolution from Everglades Coalition to Heather Mason, Fla. Dep't of Env't Prot., Mar. 9, 2020 (Exhibit 34); Fla. Dep't of Env't Prot., Notice of Hearing, 62-330 (Mar. 11, 2020) (Exhibit 35).

On March 1, 2020, however, Governor Ron DeSantis issued an executive order directing the declaration of a public health emergency in the State arising from the novel coronavirus, COVID-19.  See Exec. Order No. 20-51 (Fla. 2020) (Exhibit 36).  On March 9, 2020, the Governor declared a state of emergency, finding that COVID-19 posed a risk to the entire state of Florida. See Exec. Order No. 20-52 (Fla. 2020) (Exhibit 37).

On March 17, 2020, Governor DeSantis announced that all schools would remain closed until April 15, 2020. See Orlando Sentinel Staff, Florida Coronavirus Update for Tuesday: Three Field Hospitals Slated to Open; K-12 Schools to Close through April 15; State Announces 7th Death, 216 Positive Tests, Orlando Sentinel, Mar. 17, 2020 (Exhibit 38).  Governor DeSantis also imposed drastic restrictions on certain service industries, including restaurants and bars, to reduce the spread of the virus. See Exec. Order No. 20-68 (Fla. 2020) (Exhibit 39).

On March 19, 2020, we requested that FDEP postpone the hearing until no earlier than May 15, 2020, in light of the emergency conditions facing Floridians and the health, economic and child care hardships Florida families and small businesses suddenly found themselves facing.  Letter from Tania Galloni, Earthjustice, to Heather Mason, Fla. Dep't of Env't Prot., Mar. 19, 2020 (Exhibit 40).

On March 23, 2020, FDEP issued a superseding notice of hearing, announcing that the public hearing related to this rulemaking would take place via three separate video conferences on April 2, 6, and 10th and that the public comment period for the rulemaking was extended until

midnight on April 17, 2020.  Fla. Dep't of Env't Prot., Notice of Hearing, 62-330 (as revised Mar. 23, 2020) (Exhibit 41).

On March 30, 2020, the Florida Conservation Coalition ("FCC") urged FDEP to suspend its rule-making in light of the public health emergency, and to resume at a time when the public could meaningfully participate.  Letter from Bob Graham & Lee Constantine, Fla. Conservation Coal., to Noah Valenstein, Fla. Dep't of Env't Prot., Mar. 30, 2020 (Exhibit 42).  FCC observed that proceeding with rulemaking at this exceptionally difficult time for a struggling public was not "an essential government function or statutorily mandated" and "not necessary to protect the public or the environment."  On March 31, 2020, the Everglades Coalition raised similar concerns.  Letter from Mark Perry & Marisa Carrozzo, Everglades Coal., to Heather Mason, Fla. Dep't of Env't Prot., Mar. 31, 2020 (Exhibit 43).  On April 1, 2020, Governor DeSantis extended the stay at home order until April 30, 2020.  Exec. Order 20-91 (Fla. 2020) (Exhibit 44).

On April 17, 2020, FDEP again notified interested parties that "due to these extenuating circumstances" related to COVID-19, FDEP would hold two additional telephonic hearings on April 24 and April 27, 2020.  FDEP also extended the public comment period for this rulemaking to midnight on April 30, 2020.

On April 20, 2020, as COVID-19 cases in Florida continued to grow exponentially, and Florida families experienced growing unemployment with little relief in sight, Florida's Waterkeepers urged FDEP to suspend rulemaking so the public could meaningfully participate.  Letter from Lisa Rinaman, Waterkeepers Fla., to Heather Mason, Fla. Dep't of Env't Prot., Apr. 20, 2020 (Exhibit 45).  The Waterkeepers again highlighted that proceeding with 404 program rulemaking was far from an essential activity.

FDEP did not heed any of these calls, and ended the opportunity for public comment on April 30, 2020.  This was a time of great uncertainty, especially in parts of the State then hit the hardest with cases of COVID-19, and was well before American society had begun to come to terms with extensive community spread of the coronavirus, and settle into some form of a "new normal."

FDEP's proposal remained fundamentally flawed in several respects, including: (1) FDEP's decision to remove references to memoranda of agreement ("MOA") with federal agencies from the proposed rules, and not to disclose the content of those MOAs so as to allow for public comment before the State submits an application to the EPA, despite having told the public that it would; (2) a lack of clarity around the definition of waters of the United States, retained waters and assumed waters; (3) the failure to properly define administrative boundaries; (4) the risk to Tribes of loss of consultation rights and protections for impacts to adjacent lands; (5) differences between state and federal wetlands delineation methodologies, and the impacts of those

differences; (6) the failure to adopt all Section 404(b)(1) Guidelines; (7) questions around the role of water management districts and FDEP's intentions regarding further delegation; (8) the rationale for proposing the less protective 300 foot buffer, and its lack of basis in science; (9) inadequate consideration of secondary and cumulative impacts; (10) the failure to assess the impacts of proposed general permits and provide those analyses for public input; and (11) the failure to articulate how endangered species would be protected.  Letter from Tania Galloni, Earthjustice, to Heather Mason, Fla. Dep't of Env't Prot., Apr. 30, 2020 (Exhibit 46).

In response to some of the concerns raised, FDEP acknowledged that key issues were not resolved (including those relating to protection of listed species, which the public was told was part of an MOA process "still in its infancy"), claimed that certain critical topics such as staffing and resources were "outside the scope" of the public comment opportunity, and advised that the public should direct their concerns to the EPA rather than to their state agency crafting the plan that would ultimately be submitted. Id.[4]  FDEP then proceeded to finalize its rules.

That FDEP limited the information available to the public, and then further confined the public comment period to the very time period when Floridians were most focused on their health, jobs and families as a result of statewide public health emergency was a disservice to the public.  It resulted in a grossly inadequate program.  It also deprived the public of a meaningful opportunity to comment and be heard.  It further undermined public confidence in FDEP's responsiveness to the community.  It is emblematic of why the EPA should not entrust administration of the federal Clean Water Act Section 404 program to the State.

**V. Florida's Submission to the EPA**

Florida's application must be denied for at least three reasons: (1) the submission is not complete, (2) the proposed program is not as stringent as federal law, and (3) Florida is not equipped to administer and enforce Section 404.  Approving the State's application would jeopardize the State's vital wetlands and the species and communities that rely on them.

---

[4] See also Transcript of Public Hearing, Florida Department of Environmental Protection's February 19, 2020, Notice of Proposed Rules for Florida Administrative Code Chapters 62-330 and 62-331 (Apr. 2, 2020) (Exhibit 47); Transcript of Public Hearing, Florida Department of Environmental Protection's February 19, 2020, Notice of Proposed Rules for Florida Administrative Code Chapters 62-330 and 62-331 (Apr. 6, 2020) (Exhibit 48); Transcript of Public Hearing, Florida Department of Environmental Protection's February 19, 2020, Notice of Proposed Rules for Florida Administrative Code Chapters 62-330 and 62-331 (Apr. 10, 2020) (Exhibit 49); Transcript of Public Hearing, Florida Department of Environmental Protection's February 19, 2020, Notice of Proposed Rules for Florida Administrative Code Chapters 62-330 and 62-331 (Apr. 24, 2020) (Exhibit 50); Transcript of Public Hearing, Florida Department of Environmental Protection's February 19, 2020, Notice of Proposed Rules for Florida Administrative Code Chapters 62-330 and 62-331 (Apr. 27, 2020) (Exhibit 51).

**A. EPA Should Reverse Completeness Determination As Florida's Application Fails to Satisfy 40 C.F.R. §233.11**

On August 20, 2020, Florida submitted its application package to the EPA. On August 28, 2020, the EPA acknowledged receipt and deemed the application complete. Letter from Mary S. Walker, U.S. Env't Prot. Agency, to Gov. Ron DeSantis, Aug. 28, 2020 (Exhibit 52). On September 16, 2020, EPA published a Federal Register notice stating that it had received "a complete program submission" for 404 assumption from the State of Florida on August 20, 2020. See 85 Fed. Reg. 57,853.

Based on its determination that the submission was complete, the EPA initiated a 45-day public comment period that concludes on November 2, 2020, as required by the Clean Water Act and the Administrative Procedure Act ("APA"), 40 C.F.R. § 233.15(e) and 5 U.S.C. § 553, and is set to make a decision on the application by December 18, 2020. See 33 U.S.C. § 1344(h)(1) (providing for decision on application within 120 days of receipt); 40 C.F.R. § 233.15(a) (120-day statutory review period begins when the EPA receives complete State program submission as set out in 40 C.F.R. § 233.10).

Florida's submission, however, is incomplete in at least three critical respects: (1) failing to demonstrate how the State will ensure no jeopardy to listed species to comply with the Section 404(b)(1) Guidelines' no-jeopardy provision, 33 U.S.C. § 1344(h)(1)(a), 40 C.F.R. §§ 230.10(b)(3), 233.11(a)–(c), given that the State is relying on processes and procedures that have yet to be developed; (2) failing to adequately identify the waters that would be assumed under its proposed program, id. § 233.11(h); (3) failing to provide complete information regarding how it would implement, operate and enforce a Section 404 program, particularly given the substantial impact the COVID-19 pandemic has had on State coffers, id. § 233.11(d).

At the October 21, 2020, the EPA public hearing on Florida's submission, we urged the EPA to reverse its completeness determination in light of critical omissions in Florida's application. We reiterated and elaborated on those concerns in our October 23, 2020, again requesting reconsideration of the completeness determination, and suspension of the public comment period until the deficiencies are cured. See id. § 233.15(a) (providing that statutory review period shall not begin if the EPA finds that a State's submission is incomplete).

Permitting the public only to comment on an incomplete application undermines the agency's rulemaking by precluding meaningful testing, denies fairness to affected parties, and precludes the opportunity to develop evidence in the record that will prove necessary to judicial review, should the EPA grant the application, as the State and industry supporters of the program have indicated they fully expect will happen. 5 U.S.C. § 553; Small Refiner Lead Phase-Down Task

Force v. U.S. Env't Prot. Agency, 705 F.2d 506, 547 (D.C. Cir. 1983) (internal citations and quotation marks omitted).

We fully adopt and incorporate herein the issues raised in the hearing and in our letter.  Letter from Bonnie Malloy, Earthjustice, to Kelly Laycock, U.S. Env't Prot. Agency, Oct. 23, 2020 (Exhibit 53); Transcript of Public Comment Hearing, Application by the State of Florida to Assume Administration of the Clean Water Act Section 404 Permitting (Oct. 21, 2020) (Exhibit 54) [hereinafter "Oct. 21, 2020, Hearing Transcript"]; Transcript of Public Comment Hearing, Application by the State of Florida to Assume Administration of the Clean Water Act Section 404 Permitting (Oct. 27, 2020) (Exhibit 55) [hereinafter "Oct. 27, 2020, Hearing Transcript"].

And we again urge the EPA to reverse its determination that the application is complete or to extend the review period pursuant to 40 C.F.R. § 233.15(g) and the public comment period until all materials are provided and the public is given adequate notice and opportunity to comment in accordance with federal law. See also Clean Water Section 404 Program Definition and Permit Exemptions; Section 404 State Program Regulations, 53 Fed. Reg. 20,764, 20,767 (Jun. 6, 1988). Alternatively, the EPA should deny the application for incompleteness.

Notwithstanding the fatal deficiencies in Florida's application, stakeholders from across Florida participated in the EPA's hearings on the program submission, which were held virtually on October 21 and October 27, 2020.  Aside from a handful of representatives from industries with a financial interest in accelerated and cheaper permits, the overwhelming view expressed by commenters, including Florida legislators and the Florida Department of Agriculture and Consumer Services, was to oppose Florida's request to assume.  Oct. 21, 2020, Hearing Transcript; Oct. 27, 2020, Hearing Transcript.

## B.  EPA Should Deny Florida's Submission on the Merits

As demonstrated below, Florida's application must also be denied on the merits.  Florida's submission fails to provide all components of a complete program submission as required under 40 C.F.R. §§ 233.10(b), 233.11.  It fails to fully describe the State's permitting, administrative, judicial review, and other procedures, id. § 233.11(b), particularly insofar as these are less stringent than, or conflict with, federal law.  It fails to adequately describe all agencies with responsibilities to administer the program, and fails to provide a reasonable accounting of the resources that would be required of each of these agencies to properly implement, operate and enforce a 404 program.  Id. § 233.11(c)-(e).

Florida's submission fails to adequately describe the State's compliance evaluation and enforcement programs, particularly with regard to areas where the State's programs are less stringent than, or conflict with, federal law.  Id. § 233.11(g).  Florida also fails to address how

the State will coordinate enforcement strategy with the Corps and EPA, as required under 40 C.F.R. § 233.11(g).

Florida's description of the waters of the United States over which the State hopes to assume jurisdiction, id. § 233.11(h), is grossly lacking. The same is true of the State's description of the waters over which the federal government retains jurisdiction, a list that has been unreasonably and unduly reduced by the Corps since the State initiated rulemaking to develop an assumption program.

At its core, Florida's submission fails to demonstrate that the State has adequate legal authority to carry out the program and meet all requirements under the Clean Water Act. id. § 233.12(a). The application must therefore be denied.

1. **Florida's Scheme Does Not Grant Adequate Authority to Carry Out Section 404, And is not As Stringent As Federal Law**

To apply for approval to assume the Section 404 program, Florida was required to submit a statement demonstrating "that the laws and regulations of the State … provide adequate authority to carry out the program and meet the applicable requirements of this part." Id. The statement must also address the effect of State law regarding the prohibition against takings. Id. § 233.12(c). Where more than one agency will have "responsibility for administering" the program, the statement must include certification "that each agency has full authority to administer the program within its category of jurisdiction[.]" Id.

To meet this requirement, FDEP has submitted a statement by its General Counsel. Assumption Application C. The General Counsel's statement, however, fails to establish adequate authority to carry out the program and meet Section 404 requirements. This includes failures regarding general permits, emergency permits, permit conditions, coordination requirements, public notice, permit review and determinations, compliance evaluation and enforcement. Permeating many of these areas, FDEP has also failed to adopt and failed to establish compliance with all Section 404(b)(1) Guidelines. We begin with those issues first.

a. **Failure to Adopt and Comply with 404(b)(1) Guidelines**

The General Counsel's statement avers broadly that no permit shall issue unless in compliance with the Clean Water Act and Section 404(b)(1) Guidelines, Assumption Application C at 4, but fails to establish that this is in fact the case. It is evident from Florida's submission that the State declined to adopt the 404(b)(1) Guidelines. Instead, the State relies on a patchwork of State rules and regulations that, even when cobbled together, fail to satisfy 404(b)(1). Even when appearing to adopt some of the language in the Guidelines, the State adds qualifications and caveats that

result in a less stringent standard than under federal law. These failures permeate a number of regulatory requirements, rendering them individually and collectively inadequate under federal law.

The 404(b)(1) Guidelines are intended to "restore and maintain the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredged or fill material." 40 C.F.R. § 230.1(a). The federal program also creates a presumption against granting a 404 permit by incorporating a "fundamental principle": "dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." Id. § 230.1(c). The State's purpose, by contrast, is "to provide a streamlined permitting procedure" for ERP and 404 permits.

Rather than incorporating the guiding principles of the 404 program, the State's regulation titled "Intent, Purpose, and Implementation" merely covers methods to be used, conflicts of laws, and coordination between the ERP and 404 permitting programs. Fla. Dep't of Env't Prot., Notice of Proposed Rule, 62-330 (Feb. 19, 2020); Fla. Admin. Code 62-331.010. Through these omissions, the State has failed to satisfy the requirements of the 404(b)(1) Guidelines.

> (1) Failure to Adopt 404(b)(1) Definitions

As to the terms used in the State's program, 40 C.F.R. § 230.3, FDEP omits or alters consequential definitions from the 404(b)(1) Guidelines in a manner that limits the breadth and scope of the State's program. First, the State's program fails to define the following terms that appear in 40 C.F.R. § 230.3: "carrier of contaminant," "discharge point," "disposal site," "extraction site," "territorial sea," "waters of the United States," and "wetlands." Without established definitions, neither the public nor the regulated community can have any clear indication as to how the State may interpret and apply those terms. Moreover, the State's omission of these terms raises the question of whether FDEP's applications will be consistent with 404(b)(1).

Particularly troubling is that the State's definition of "pollution" is much narrower than the federal definition in that it only covers pollution that is at a high enough level or amount to be potentially harmful. The federal guideline defines "pollution" as "the man-made or man-induced alteration of the chemical, physical, biological or radiological integrity of an aquatic ecosystem." Id. § 230.3(k). The Florida definition, by contrast, states that pollution §means alterations "in quantities or at levels which are or may be potentially harmful or injurious to human health or welfare, animal or plant life, or property or which unreasonably interfere with the enjoyment of life or property." Fla. Stat. § 403.031(7). Tacking these qualifiers onto what constitutes

"pollution" means that the State would include fewer activities under that definition than would fall under the federal regulation's definition.

The State's proposal also does not adopt, reference, or mention the federal definition of waters of the United States. Instead, the proposed program uses the term "state-assumed waters," which it defines as "all waters of the United States that are not retained waters." Fla. Dep't of Env't Prot., State 404 Program Applicants' Handbook § 1.1 [hereinafter "404 Handbook"].[5] Florida's authorizing legislation similarly defines "state-assumed waters" as "waters of the United States that the state assumes permitting authority over pursuant to s. 404 of the Clean Water Act … and rules promulgated thereunder." Fla. Stat. § 373.4146(1). This definition has no substance and does not reflect the federal definition of waters of the United States.

The State's definition of "mixing zone" omits important clarifying language that it "should not be considered as a place where wastes and water mix and not as a place where effluents are treated." Compare 40 C.F.R. § 230.3(h) with 404 Handbook § 2.0(25). Without this added description, the FDEP's provision would allow a broader definition of a "mixing zone" that would result in a less stringent State program.

The federal guidelines have separate definitions for dredged material and fill material. 40 C.F.R. § 232.2. "Dredged material" means "material that is excavated or dredged from waters of the United States." Id. And "fill material" means "(1) Except as specified in paragraph (3) of this definition, … material placed in waters of the United States where the material has the effect of: (i) Replacing any portion of a water of the United States with dry land; or (ii) Changing the bottom elevation of any portion of a water of the United States. (2) Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in the waters of the United States. (3) The term fill material does not include trash or garbage." Id.

The State proposes to cover both definitions in the term "material," Assumption Application B, app. j-3, at 8–9, which is defined as "matter of any kind, such as sand, clay, silt, rock, dredged material, construction debris, solid waste, pilings or other structures, ash, and residue from industrial and domestic processes. The term does not include the temporary use and placement of lobster pots, crab traps, or similar devices or the placement of oyster clutch." Environmental Resource Permit Applicant's Handbook, vo. 1 [hereinafter "ERP Handbook"]. It is difficult to understand how the State's definition could explain what "dredge material" is when it is used as

---

[5] Florida's rules and regulations are obtuse, having relegated key aspects to applicant handbooks rather than providing for them in the rules, which will create confusion for regulators, the regulated community, affected parties, the public and the courts.

an example of "material." Moreover, the State definition does not include the specifics outlined in the definition of "fill material," which is defined based on the function it performs rather than its physical state.

### (2) Failure to Adopt 404(b)(1) Procedures

As to General Procedures to be Followed, 40 C.F.R. § 230.5, the State largely incorporated this guideline into the 404 Handbook, but then added qualifying language that restricts the permitting conditions that FDEP must address when issuing a state 404 permit. For example, the federal rule provides that the agency must evaluate dredge and fill material to "determine the possibility of chemical contamination or physical incompatibility of the material to be discharged." Id. The State, however, limited this requirement only to situations where chemical contamination may violate state water quality standards or toxic effluent standards or prohibitions. 404 Handbook § 8.2(g). By restraining its consideration of chemical contamination, the State's program is less restrictive than the federal program.

As to General Permits ("GP"), 40 C.F.R. § 230.7, the State failed to incorporate the full set of requirements for issuance of a GP. The 404(b)(1) Guidelines state that a GP complies with the guidelines if the permitting authority determines that: (1) "The activity in such category are similar in nature and similar in their impact upon water quality and the aquatic environment"; (2) "The activities in such category will have only minimal adverse effects when performed separately"; and (3) "The activities in such category will have only minimal cumulative adverse effects on water quality and the aquatic environment. Id. § 230.7(a). The State's program, however, omits the requirement that GPs may only be issued if "[t]he activities in such category are similar in nature and similar in their impact upon water quality and in the aquatic environment." See Fla. Admin. Code 62-331.200–01.

The State also failed to incorporate the requirements that FDEP must follow when issuing GPs. The 404(b)(1) Guidelines require the permitting authority to "set forth in writing an evaluation of the potential individual and cumulative impacts of the category of activities to be regulated under the General Permit." 40 C.F.R. § 230.7(b). Moreover, the 404(b)(1) Guidelines require that the State complete this evaluation before the GP is issued and must publish the results with the final permit. Id. The State, by contrast, has not adopted any procedures for it to follow when considering and issuing GPs. See Fla. Admin. Code. 62-331.200–01, 62-330.401. Instead, it takes the position that the State must follow the requirements of 40 C.F.R. pt. 233 when creating a GP, "but this information is not presented in the rule." Assumption Application B, app. j-3, at 58. However, 40 C.F.R. § 233.21 requires compliance with the 404(b)(1) Guidelines, and it is unclear how the State could ensure compliance with the guidelines without incorporating them into the State's program. Notably, and as discussed further below, the State also seeks to issue

21

GPs with the program submitted, even though it has failed to take any of the required steps to do so lawfully.

As to Restrictions on Discharge, 40 C.F.R. § 230.10, federal regulations prohibit any discharge that "causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard." Id. Rather than adopting this language, the State has proposed an alternative prohibition that would prohibit discharges that "[c]auses or contributes to violations of any applicable State water quality standard, *except when temporarily within a mixing zone proposed by the applicant and approved by the Agency*." Fla. Admin. Code 62-331.053(2) (emphasis added). Where the 404(b)(1) Guidelines require the permitting authority to "consider" dilution areas when determining whether violations would occur, the State program creates an exemption for temporary violations in those areas.

The State program also fails to incorporate the requirement that a determination of whether a discharge would cause or contribute to significant degradation of wetlands or other surface waters be based on factual determinations, evaluations, and tests required by the 404(b)(1) Guidelines "subparts B and G, after consideration of subparts C through F, with special emphasis on the persistence and permanence of the effects outlined in those subparts." 40 C.F.R. § 230.10(c). However, as described in these comments, the State has failed to fully incorporate the provisions that appear in those subparts. The State also fails to include the requirement to put "special emphasis on the persistence and permanence of the effects" outlined in those subparts.

Regarding the requirement that discharges not jeopardize the continued existence of endangered or threatened species, or result in the likelihood of the destruction or adverse modification of critical habitat, id. § 230.10(b)(3), the State has promulgated language to say that "compliance with any requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission, the U.S. Fish & Wildlife Service, and the National Marine Fisheries Service for purposes of the State 404 Program, and review, as it pertains to endangered or threatened species, by the U.S. Environmental Protection Agency" "shall be determinative for purposes of evaluating violations of this subparagraph." Fla. Admin. Code 62-331.053(3)(a)(4). As discussed below in Section V.B.2, however, the technical assistance process is still being developed, and depends on other agencies who lack the resources necessary to carry out review of all State 404 permits. FDEP has failed to even submit information related to the available resources of those agencies, much less establish that those resources exist and are adequate.

As to Factual Determinations, 40 C.F.R. § 230.11, the 404(b)(1) Guidelines lay out specific, factual determinations that permitting authorities must use to determine the individual, cumulative, and secondary effects of a proposed discharge of dredged or fill material on physical substrate; water circulation, fluctuation, and salinity; suspended particulate/turbidity;

contaminants; aquatic ecosystem and organism; and the proposed disposal site.  Id.  The State's regulations do not incorporate or apply the guideline's defined set of factual determinations.  And they do not require FDEP to make the requisite factual determinations when considering whether to issue a 404 permit.

Although Fla. Admin. Code 62-331.053(6) contains broad categories of effects considered to determine whether a permit will cause or contribute to significant degradation of wetlands or other surface waters, that section fails to incorporate the specific effects identified in 40 C.F.R. § 230.11, and leaves broad discretion for FDEP to interpret what effects it will consider.  It also omits consideration of effects on physical substrate, water circulation, fluctuation, salinity, and suspended particulate/turbidity, and only includes vague descriptions of the other potential effects of a proposed project that must be considered.

FDEP also relies on Fla. Admin. Code 62-330.301, but that provision only places obligations on permit applicants to provide "reasonable assurances" that their proposed projects will not cause adverse effects.[6]  The federal guidelines, importantly, obligate *the permitting authority* to make factual findings on those effects, rather than relying whole cloth on assurances submitted by permit applicants.  40 C.F.R. § 230.11.  FDEP has not adopted such a requirement for itself.  This regulation also fails to include the full swath of identified effects from Section 230.11.[7]

As to Findings of Compliance or Noncompliance with the Restrictions on Discharge, 40 C.F.R. § 230.12, the 404(b)(1) Guidelines require that the permitting authority, after deciding whether to issue or deny a permit, must make findings that "include the factual determinations required by § 230.11, and a brief explanation of any adaptation of these Guidelines to the activity under consideration."  40 C.F.R. § 230.12(b).  The state regulations do not require the agency to make the factual determinations laid out in 40 C.F.R. § 230.11, and therefore do not require that the agency include those factual determinations in any final permit decisions.

### (3) Failure to Adopt 404(b)(1) Consideration of Impacts

Subparts C–F identify a whole host of impacts that must be considered when reviewing a permit and identify the significance of each for purposes of meeting the Clean Water Act's objectives.  Florida fails to adopt or implement these considerations for Section 404 permits.  Subpart C requires the permitting authority to consider potential impacts to substrate, suspended particulates/turbidity, water, current patterns and water circulation, normal water fluctuations, ad

---

[6] ERP Handbook § 5.5.4.1 says that the agency makes permitting decisions based on a determination of whether the permit applicant provided these reasonable assurances.  However, determining whether an applicant's assurances are reasonable is a far cry from making the factual determination whether a proposed project will cause adverse effects.

[7] These same flaws are present in the ERP Handbook §§ 10.2.7, 10.2.8, and 11.0.

salinity gradients.  40 C.F.R. §§ 230.20–25.  Subpart D requires the permitting authority to consider potential impacts to endangered species, fish, crustaceans, mollusks, other aquatic organisms, and wildlife.  Id. §§ 230.30–32.  Subpart E requires the permitting authority to consider potential impacts to sanctuaries and refuges, wetlands, mud flats, vegetated shallows, coral reefs, and riffle and pool complexes.  Id. §§ 230.40–45.  Subpart F requires the permitting authority to consider the potential impacts to water supplies, fisheries, recreation, aesthetics, and parks by defining these categories of effects and outlining specific adverse effects that could occur within each of these categories.  Id. §§ 230.50–54.

Rather than adopt these criteria, the State's submission cites to a patchwork of complicated, piecemeal elements of ERP and state 404 regulations and applicant handbooks in an effort to claim that these constitute an equivalent program.  Assumption Application B, app. j-3, at 79–100.  But they do not add up.

For example, 40 C.F.R. § 230.31 defines "aquatic organisms in the food web," and then describes the possible loss of environmental characteristics and values that could result from dredge and fill activities:

> The discharge of dredged or fill material can variously affect populations of fish, crustaceans, mollusks and other food web organisms through the release of contaminants which adversely affect adults, juveniles, larvae, or eggs, or result in the establishment or proliferation of an undesirable competitive species of plant or animal at the expense of the desired resident species. Suspended particulates settling on attached or buried eggs can smother the eggs by limiting or sealing off their exposure to oxygenated water. Discharge of dredged and fill material may result in the debilitation or death of sedentary organisms by smothering, exposure to chemical contaminants in dissolved or suspended form, exposure to high levels of suspended particulates, reduction in food supply, or alteration of the substrate upon which they are dependent. Mollusks are particularly sensitive to the discharge of material during periods of reproduction and growth and development due primarily to their limited mobility. They can be rendered unfit for human consumption by tainting, by production and accumulation of toxins, or by ingestion and retention of pathogenic organisms, viruses, heavy metals or persistent synthetic organic chemicals. The discharge of dredged or fill material can redirect, delay, or stop the reproductive and feeding movements of some species of fish and crustacea, thus preventing their aggregation in accustomed places such as spawning or nursery grounds and potentially leading to reduced populations. Reduction of detrital feeding species or other representatives of lower trophic levels can impair the flow of energy from primary consumers to higher trophic levels. The reduction or potential elimination of food chain organism populations decreases the overall productivity and nutrient export capability of the ecosystem.

Id.  The provisions cited by the State fail to incorporate either the definition or the potential effects laid out in this 404(b)(1) Guideline.  See Fla. Admin. Code 62-330.301(1)(d)–(e) (creating broad conditions for permit issuance that activities not adversely affect functions that serve fish and wildlife or affect the quality of receiving waters such that the state water quality standards are not met); id. 62-330.302(1)(a)(1), (2), (4) (requiring permittees to provide reasonable assurances about broadly defined effects of the proposed activity to the public health, safety, or welfare or the property of others; the conservation of fish and wildlife, including endangered or threatened species and their habitats; fishing, recreational values or marine productivity); ERP Handbook § 10.2.3.1(a)–(b) (generally requiring evaluation of public health and impacts to shellfish harvesting); id. § 10.2.3.4(a)–(b) (generally requiring consideration of effects to sport or commercial fisheries or marine productivity; existing recreational uses of wetlands); id. § 10.2.5 (generally requiring consideration of effects to waters used for shellfish harvesting).

The same omissions are evident for substrate, 40 C.F.R. § 230.20, suspended particulates/ turbidity, id. § 230.21, water, id. § 230.22, current patterns and water circulation, id. § 230.23, normal water fluctuations, id. § 230.24, salinity gradients, id. § 230.25, threatened and endangered species, id. § 230.30, fish, crustaceans, mollusks and other aquatic organisms in the food web, id. § 230.31, wildlife, id. § 230.32, sanctuaries and refuges, id. § 230.40, wetlands, id. § 230.41, mud flats, id. § 230.42, vegetated shallows, id. § 230.43, coral reefs, id. § 230.44, riffle and pool complexes, id. § 230.45, municipal and private water supplies, id. § 230.50, recreational and commercial fisheries, id. § 230.51, water-related recreation, id. § 230.52, and parks, national and historical monuments, national seashores, wilderness areas, research sites and similar preserves, id. § 230.54.

The only provision in Subparts C–F that the State incorporated into its program was for aesthetics.  Compare id. § 230.53 with 404 Handbook § 8.3.2.  For aesthetics, the State incorporated the federal provision word-for-word.  404 Handbook § 8.3.2.  This demonstrates that the State knew how to appropriately adopt the Guidelines, but that it chose not to do so for any of the other categories in Subparts C–F.

### (4) Failure to Adopt 404(b)(1) Compensatory Mitigation

Subpart J outlines the compensatory mitigation program for losses of aquatic resources associated with dredge and fill activities.  Again, here, the State attempts to use a grab bag of ERP and state 404 program regulations and guidelines to cobble together what it identifies as equivalent to the lengthy provisions of Subpart J.  However, the rules contain meaningful omissions and differences so that the State program fails to maintain the stringency of these 404(b)(1) Guidelines.  Many of these issues arise in the failure to use the federal definitions of terms relevant to mitigation.  40 C.F.R. § 230.92.

For example, the 404 Handbook does not include the definitions from § 230.92 for "advance credits," "credit," "days," "debit," "fulfillment of advance credit sales of an in-lieu fee program," "in-lieu fee program instrument," "instrument," "mitigation banking instrument" and "release of credits."  Compare 40 C.F.R. § 230.92 with 404 Handbook § 2.0(b).

There are also meaningful changes to the definitions the State did incorporate.  For the definition of "preservation" in the 404 Handbook, the State omits the following language from 40 C.F.R. § 230.92:  "Preservation does not result in a gain of aquatic resource area or functions." Compare 40 C.F.R. § 230.92 with 404 Handbook § 2.0(b).

The State's definition of "creation," which is intended to incorporate the federal definition of "establishment," omits a vital clarification in the federal definition:  "Establishment results in a gain in aquatic resource area and functions."  Compare 40 C.F.R. § 230.92 with ERP Handbook vo. 1.  This change means that under the State's definition, creation of wetlands could occur even if there is no "gain" in environmental resource functions.

For the definition of "functional capacity," the State points to its definition of "ecological value." The federal guidelines define "functional capacity" as the degree to which an area performs a specific function.  40 C.F.R. § 230.92.  The State's definition of "ecological value," by contrast, is much more restrictive and is couched in "values" as compared to "functions."  Fla. Stat. 373.403(18).  Instead, "ecological value" means the "value of functions performed by uplands, wetlands, and other surface waters to the abundance, diversity, and habitats of fish, wildlife, and listed species.  These functions include, but are not limited to, providing cover and refuge; breeding, nesting, denning, and nursery areas; corridors for wildlife movement; food chain support; and natural water storage, natural flow attenuation, and water quality improvement, which enhances fish, wildlife, and listed species utilization."  Id.  These terms are not equivalent.

The State's definition of "temporal loss" omits the following from the federal guideline: "[H]igher compensation ratios may be required to compensate for temporal loss.  When the compensatory mitigation project is initiated prior to, or concurrent with, the permitted impacts, the district engineer may determine that compensation for temporal loss is not necessary, unless the resource has a long development time."  Compare 40 C.F.R. § 230.92 with 404 Handbook § 2.0(49).  This additional language creates substantive requirements for permit writers, and the State program fails to incorporate it.

As to General Compensatory Mitigation Requirements, 40 C.F.R. § 230.93, the State alters or omits vital portions of this Section, thereby creating less stringent requirements for its mitigation program.

The State's tepid incorporation of the watershed approach to compensatory mitigation falls short of the Federal requirements. The State does not incorporate the federal provision that a watershed approach is "not appropriate in areas where watershed boundaries do not exist, such as marine areas." Compare 40 C.F.R. § 230.93(c)(2)(v) with 404 Handbook § 8.5.2(a)(4). The State omits requirements on the amount of information that a permittee must provide to support a watershed approach. 40 C.F.R. § 230.93(c)(3)(iii). The State program also fails to incorporate the size restrictions for the watershed to be used in a watershed approach intended to ensure that the aquatic resources provided through compensation activities will effectively compensate for adverse environmental impacts resulting from activities authorized by dredge and fill permits. Id. § 230.93(c)(4).

Regarding site selection criteria, the State ignored the federal factors that must be considered when selecting a mitigation site to ensure that the compensatory mitigation project site is "ecologically suitable for providing the desired aquatic resource functions." Id. § 230.93(d)(vi).

The State's program does not adopt requirements that would apply to permit writers as they consider different types of mitigation. The federal rule requires permit writers to document specific findings before permitting out-of-kind compensatory mitigation, a provision absent from the State's program. Id. § 230.93(e)(2)–(3). The State's program also omits the requirement that the permit writer "require a mitigation ratio greater than one-to-one where necessary." Id. § 230.93(f)(2).

Lastly, the State's requirements for demonstrating financial responsibility are not as strict as those required under 40 C.F.R. § 230.93(n)(1). Federal regulations require financial assurances to ensure a high level of confidence that the compensatory mitigation project will be successfully completed, a standard not incorporated into the State program. Compare id. with ERP Handbook § 10.3.7. The State creates an exemption for projects that have a mitigation cost estimate less than $25,000, but the federal rules do not have a threshold below which a financial responsibility demonstration is no longer required. Compare ERP Handbook § 10.3.7.1 with 40 C.F.R. § 230.93(n)(1). Rather than giving permit writers the ability to determine the necessary amount of required financial assurances, 40 C.F.R. § 230.93(n)(2), the State instead creates a blanket amount of 110% of the cost estimate. ERP Handbook § 10.3.7.2.

### b. Unlawful Promulgation of General Permits, 40 C.F.R. §233.21

The General Counsel states that FDEP intends to administer a limited number of regional permits until they expire and that the State "has promulgated a series of general permits." Assumption Application C at 4. The State's rules developed for the 404 program submission purport to include dozens of general permits. Fla. Admin. Code 62-331.210–48. The State, however, has failed to lawfully promulgate any general permit.

As to a state assumed program, federal regulations provide that "[t]he Director  may issue a general permit for categories of similar activities if he determines that the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment."  40 C.F.R. § 233.21(b).  The terms "State Director" and "Director" are defined as "the chief administrative officer of any State … operating an approved program[.]"  Id. § 233.2.

The Director of Florida's proposed program, however, has not made *any* determinations that the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment.  When FDEP proposed to promulgate dozens of general permits modeled after general permits previously developed by the Corps on a national level, the agency provided *zero* evidence of any analysis or study to warrant such a determination.

Instead, FDEP seems to believe that it can simply parrot the language of general permits developed at a national, rather than state, level, and promulgate those for operation at the state level without any process.  But the language of the federal regulation governing general permits is clear:  "[t]he Director may issue a general permit for categories of similar activities *if he determines* that the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment."  Id. § 233.21(b) (emphasis added).  FDEP did not subject these purported general permits to any study, did not notify the public of any basis to support the propriety of such general permits, did not provide an opportunity for the public to comment on the intention to make any determination under this regulation, and has not provided affirmative evidence of having made an independent, fact-based determination.

FDEP cites no legal authority to disregard the plain language of 40 C.F.R. § 233.21(b).  Moreover, FDEP's approach, which purports to give effect to "its" general permits for a duration of five years from the date of the State program's approval, is contrary to five-year limitation on general permits.  FDEP's approach therefore not only fails to rely on a proper determination necessary to support the issuance of general permits.  It also would unlawfully extend general permits issued initially by the Corps beyond their statutorily limited five-year duration.   33 U.S.C. § 1344(e)(2).  This outcome is also unreasonable.  Federal law requires the Corps to review its general permits, and the determinations underlying them, every five years.  To allow Florida to extend the Corps' underlying rationale beyond the five-year statutory limitation to support continued issuance of general permits for years thereafter conflicts with federal law.  Id.

FDEP's proposed program is also less restrictive than 40 C.F.R. § 233.21.  The State's regulation unreasonably restricts its ability to require notice of intent of coverage under a GP, omitting the

federal catchall that the agency can require notice "as appropriate." Compare Fla. Admin. Code 62-331.200(3) with 40 C.F.R. § 233.21(d). The State regulation restricts the notice requirement to specifically identified circumstances and limits FDEP's authority to require notice whenever appropriate.

The State has limited its authority by only allowing FDEP to require an individual permit where "sufficient cause exists," which is then defined as a "likelihood that the project will cause more than minimal adverse environmental effects." Fla. Admin. Code 62-331.200(6). The federal rules, by contrast, allow the Director to do so "based on concerns for the aquatic environment," including compliance with the requirement for GPs to have only minimal individual and cumulative adverse environmental effects. 40 C.F.R § 233.21(e). Further, the State's rules omit the automatic revocation of GP coverage once the agency requires an individual permit. Compare Fla. Admin. Code 62-331.200(6) with 40 C.F.R. § 233.21(e).

### c. Unlawful Expansion of Emergency Permits, 40 C.F.R. §233.22

The General Counsel Statement avers that Fla. Admin. Code 62-331.110 implements the emergency permit requirements of 40 C.F.R. § 233.22, citing only to subsections (b)(3)–(7). Assumption Application C at 5. Importantly, however, the State creates a much broader set of situations when an emergency permit may be granted than what is authorized under federal law.

Under federal regulations, an emergency permit may only be given "if unacceptable harm to life or severe loss of physical property is likely to occur before a permit could be issued or modified under procedures normally required." 40 C.F.R. § 233.22(a). The State, instead, would allow for the issuance of emergency permits to abate emergency conditions which "pose and imminent or existing serious threat or danger and require immediate action to protect public health, safety, or welfare, or the water resources of the Agency, including the health of aquatic and wetland-dependent species; a public water supply; or recreational, commercial, industrial, agricultural, or other reasonable uses." Fla. Admin. Code 62-331.110(1).

The State's grant of broader authority to issue emergency permits than what is allowed under federal law reflects a less stringent program than the federal program because emergency permits are granted more quickly and with less opportunity for process and review than regular permits. Compare Fla. Admin. Code 62-331.110 with id. 62-331.050–60.

### d. Unlawful Limitation of Permit Conditions, 40 C.F.R. §233.23

The General Counsel Statement summarily declares that FDEP satisfies the requirements to comply with federal guidelines, even though many of the 404(b)(1) Guidelines are absent from the State rules, see Section V.B.1.a.

Additionally, the State's regulations omit important requirements outlined in 40 C.F.R. § 233.23: The State omits "minimize" from the federal requirement that permittees "take all reasonable steps to minimize or prevent any discharge in violation of this permit." Compare Fla. Admin. Code 62-331.054(2)(b) with 40 C.F.R. § 233.23(c)(4). The State's regulation omits minimum requirements for individual permits specifying that at least monitoring, reporting, and recordkeeping requirements must include "monitoring and reporting of any expected leachates, reporting of noncompliance, planned changes or transfer of the permit." Compare Fla. Admin. Code 62-331.054(d) with 40 C.F.R. § 233.23(c)(7).  FDEP's regulations failed to include the requirement that discharges minimize adverse impacts through *restoration*, and instead only includes minimization through mitigation. Compare Fla. Admin. Code with 40 C.F.R. § 233.23(c)(9).  The State's proposed program also omits the requirement for a specific identification and complete description of the authorized activity, instead relying on permit templates that are not incorporated by regulation and do not operate with the force of law.  40 C.F.R. § 233.23(c)(1).

### e. Unlawful Permit Application Process, 40 C.F.R. § 233.30

The General Counsel Statement avers that Fla. Admin. Code 62-331.060(1) implements the requirements of 40 C.F.R § 233.30(b)(1)–(4).  Assumption Application C at 6.  However, the State uses different terms that would restrict the information that must be included in a permit application as compared to federal law.  For example, the federal regulations require a description of "methods of discharge" whereas the State uses the term "construction methods," which is not defined by either the State regulations or the 404 Handbook.  Compare Fla. Admin. Code 62-331.060(1)(e) with 40 C.F.R. § 233.30(b)(3).  The plain meanings of the words "construction" and "discharge" are not equivalent.

The State also fails to incorporate the federal requirement regarding how much detail permit applications must include.  Pursuant to 40 C.F.R. § 233.30(d), "[t]he level of detail shall be reasonably commensurate with the type and size of discharge, proximity to critical areas, likelihood of long-lived toxic chemical substances, and potential level of environmental degradation."  Id.  This language appears only in Appendix C of the 404 Handbook, which is described as guidance for conducting an alternatives analysis based on guidance from the Army Corps Jacksonville District.  404 Handbook, app. C.  It is not included as a requirement for permit applications generally and is not incorporated into the rules themselves.

### f. Failure to Meet Coordination Requirements, 40 C.F.R. § 233.3

The federal rules require that permits "shall be coordinated with federal and federal-state water related planning and review processes."  40 C.F.R. § 233.3.  The General Counsel Statement

fails to provide any information or citation to demonstrate that the State has satisfied this requirement. Assumption Application C at 6. Instead, in the Comparison referenced by the General Counsel and added in Florida's assumption package, FDEP admits that they "did not add this [requirement] to the rule," but states that they "plan to engage in this kind of coordination whenever possible." Assumption Application B, app. j-3, at 32. FDEP has thus failed to ensure compliance with federal coordination requirements. That FDEP may "plan" to coordinate "whenever possible" falls far short of the requirement that permits "shall" be coordinated. Because the State failed to incorporate this requirement into its regulatory program, its program is less stringent than the federal program and must be denied.

### g. Inadequate Public Notice, 40 C.F.R. § 233.32

The General Counsel Statement avers that Fla. Admin. Code 62-331.060(2)–(3) fully satisfies the public notice requirements of 40 C.F.R. § 233.32(a)–(c), (e). Assumption Application C at 6–7. However, that is not the case. The federal rules require that public notice be given whenever the following actions occur: (1) receipt of a permit application, (2) preparation of a draft general permit, (3) consideration of a major modification to an issued permit, (4) scheduling of a public hearing, and (5) issuance of an emergency permit. 40 C.F.R. § 233.32(a). Florida's regulations, on the other hand, do not require public notice for receipt of a permit application. Fla. Admin. Code 62-331.060(2)–(3).

### h. Inadequate Process for Decision on Permit Application, 40 C.F.R. § 233.34

The General Counsel Statement rightfully explains that the permit decision-making process requires that permit decisions be reviewed for compliance with 404(b)(1) Guidelines. Assumption Application C at 7. However, as we explain in Section V.B.1.a, the State has not adopted or incorporated all of the 404(b)(1) Guidelines.

### i. Failure to Meet Requirements for Compliance Evaluation Programs, 40 C.F.R. § 233.40

The General Counsel Statement claims that the State "has authority to enforce rules and regulations" for the State 404 Program. Assumption Application C at 9. However, that statement falls short of the federal requirement that a state "shall maintain a program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with permit conditions." 40 C.F.R. § 233.40(a). As explained in Section V.B.1.k.5, however, the State does not maintain a program to identify violations in its current programs and has not shown how it would be able to do so for a Section 404 program. Having authority and actually using that authority to identify and enforce against violations are two very different things.

Although the State's regulations may provide authority, the State has categorically failed to show it has the resources to "maintain" such a program.  See Section V.B.1.k.4.

### j. Inadequate Enforcement Authority, 40 C.F.R. § 233.41

The General Counsel claims that Florida law is consistent with and no less stringent than the Clean Water Act enforcement requirements.  Assumption Application C at 10.  A vital aspect of administering a 404 enforcement program, however, is having adequate staffing and resources. As demonstrated further below, FDEP has not established that it has acquired the resources that would be required to administer and enforce a 404 program.  In addition, in light of FDEP's grossly inadequate enforcement record, the EPA cannot reasonably conclude that FDEP would adequately enforce a 404 program when it cannot even adequately enforce the programs currently under its supervision.  See SectionV.B.1.k.4.

### (1) State Criminal Liability Less Stringent Than Federal Criminal Liability

Significantly, Florida law regarding criminal enforcement is not as stringent as federal law. Under 40 C.F.R. § 233.41(a)(3)(ii), for example, a criminal violation is established by showing (1) a discharge of dredged or filled material, (2) without a required permit or in violation of a permit condition, (3) that is committed willfully or with criminal negligence.  Id.

Under Fla. Stat. § 373.430(1)(a), on the other hand, a criminal violation would require proof of an additional element, namely that the pollution (discharge) "caused actual harm or injury to human health or welfare, animal, plant, or aquatic life or property."  See, e.g., State v. Hamilton, 388 So. 2d 561 (Fla. 1980) (interpreting identical provision to require proof of actual harm or injury to sustain a criminal conviction).

By requiring an additional element of proof, the state law fails to provide as stringent criminal liability as exists under federal law for unlawful discharges of dredged and fill material.

Moreover, Section 309(c) of the Clean Water Act makes it a crime to *negligently* violate "any permit condition […] in a permit issued under section 404 of this title," or to *negligently* "introduce into a sewer system or into a publicly owned treatment works any pollutant or hazardous substance which such person knew or reasonably should have known could cause personal injury or property damage [or] causes such treatment works to violate any effluent limitation or condition in any permit."  33 U.S.C. § 1319(c)(1)(A), (B).  The penalty for such a violation is a fine between $2,500 and $25,000 per day, per violation and/or imprisonment of up to one year; this penalty is doubled for a second violation.  Id.

Four circuits have held that this provision requires only proof of simple negligence:  the Courts of Appeal for the Third, Fifth, Ninth, and Tenth Circuits.[8]  This creates a conflict between the Clean Water Act and both the federal regulation and the state statute at issue in this matter.

Under Florida law, it is unconstitutional to criminally penalize "mere negligent conduct" since that fails to provide "clearly ascertainable standards of guilt by which a citizen may gauge his conduct."  State v. Hamilton, 388 So. 2d 561, 563-64 (Fla. 1980).  Florida law therefore is not as stringent as to criminal enforcement as is the Clean Water Act.  Moreover, this conflict is a matter of Florida constitutional law, and so it cannot be resolved by mere amendment of Florida statutes or regulations.

40 C.F.R. § 233.41(b)(2) states that "*the burden of proof and degree of knowledge or intent required under State law for establishing violations under […] this section shall be no greater than the burden of proof or degree of knowledge or intent EPA must bear when it brings an action under the Act.*"  Id. (emphasis added).  Because criminal negligence in the state statute is a higher level of intent that simple negligence in the Clean Water Act, the Florida Statute conflicts with federal law, and does not provide as stringent criminal enforcement as does federal law.  See also Idaho Conservation League, Petitioner, v. U.S. Environmental Protection Agency, Case No. 18-72684 (9th Cir. Sep. 10, 2020) (Exhibit 56) (the EPA abused its discretion in approving a state delegated program with a *mens rea* standard greater than the burden of proof required of the EPA).

Lastly, Florida law provides shorter statutes of limitation for enforcement of environmental crimes.  Under federal law, criminal enforcement actions brought under 33 U.S.C. § 1319(c) are generally subject to a five-year statute of limitations.  See United States v. Ursitti, 543 F. Supp. 2d 971, 974 (C.D. Ill. 2008) (in case involving a criminal violation of the CWA, citing to § 3282(a) and stating "[t]here is a five-year statute of limitations for criminal offenses, which is applicable to the offenses charged in this case"); see also Joseph J. Lisa, Negligence-Based Environmental Crimes:  Failing to Exercise Due Care Can Be Criminal, 18 Vill. Envtl. L.J. 1, 43 n. 109 (2007) (citing 33 U.S.C. § 3282(a) as the applicable statute of limitations provision for criminal enforcement actions under Section 1319(c)).

The statutes of limitation applicable to violations under state law, however, are between one year and three years, depending on the severity of the offense.  Fla. Stat. § 373.430(1)(a)–(c) (identifying crimes relating to pollution, failure to comply with permit requirements, and fraud);

---

[8]    United States v. Maury, 695 F.3d 227, 259 (3d Cir. 2012); United States v. Pruett, 681 F.3d 232, 243 (5th Cir. 2012); United States v. Ortiz, 427 F.3d 1278, 1283 (10th Cir. 2005); United States v. Hanousek, 176 F.3d at 1120 (9th Cir. 1999).

id. § 373.430(3)–(5) (setting degree of offense depending on the crime); id. § 775.15 (setting for statute of limitations depending on the severity of the offense).

State law regarding criminal enforcement is therefore deficient also in this regard, making its program less stringent than the federal one.

Although 40 C.F.R. § 233.41(d)(1) authorizes the EPA to approve a state program that has less stringent *penalties* than available under federal law,[9] there is nothing in the Clean Water Act that authorizes the EPA to approve a state program with an enforcement scheme that is less stringent than the federal one in terms of criminal culpability, burden of proof and statutes of limitations. To the contrary, these failures render the program non-approvable.

(2) Public Participation (Enforcement), 40 C.F.R. § 233.41(b)(1)

In addition, pursuant to 40 C.F.R. § 233.41(b)(1), the State "shall provide for public participation in the State enforcement process through either a right of citizen intervention or an assurance that the State will (1) investigate citizen complaints, (2) not oppose citizen intervention, and (3) provide public notice and comment on any proposed settlement of a State enforcement action." Id. § 230.41(e). The General Counsel provides a blanket statement that the State has "authority" to comply with these requirements without citing any law or regulation providing that authority. Assumption Application C at 11.

The General Counsel also relies on the MOA with the EPA to say it has provided assurance that it will comply with 40 C.F.R. § 233.41(e)(2). Assumption Application C at 11. The MOA merely states, "FDEP shall provide for public participation in the State 404 Permit Program enforcement process pursuant to 40 C.F.R. § 233.41(e)(2)." Memorandum of Agreement between Fla. Dep't of Env't Prot. & U.S. Env't Prot. Agency at III.I (Jul. 31, 2020). FDEP, however, has failed to identify any requirement in the state law or regulations to ensure compliance with the requirements of 40 C.F.R. § 233.41(e)(2). Although assurances to the EPA may be helpful, when they are not incorporated into state law, there is a question regarding the extent to which the public is able to enforce those obligations.

**k. Failure to Address Effect of State Takings Law on Successful Implementation of Program, 40 C.F.R. § 233.12**

The General Counsel Statement must contain a legal analysis of the effect of State law regarding the prohibition on taking private property without just compensation on the successful

---

[9] Note that the State has claimed that this regulatory provision was "not applicable" to the State's application. Assumption Application B, app. j-3, at 54.

implementation of the State's program.  40 C.F.R. § 233.12(c).  Rather than providing this analysis, the Statement focuses on the notion that no matter how broadly Florida courts interpret regulatory takings law, their decisions would be subject to review by the Supreme Court of the United States.  Assumption Application C at 12.  This reductionist position completely dodges the requirement to provide an actual analysis of the effect of Florida law on the prohibition against takings, since the blanket statement that takings law is ultimately subject to U.S Supreme Court review would apply to any state's submission or statutory scheme.  The claim also ignores that the U.S. Supreme Court is a court of limited review, which only grants a select number of petitions for certiorari each year.  See *Supreme Court: The Statistics*, 131 Harv. L. Rev. 403, 410 tbl. II(B) (2017) (1.2% of petitions for certiorari were granted review in the 2016 Term).  "Review on a writ of certiorari is not a matter of right, but of judicial discretion" and it "will be granted only for compelling reasons."  Sup. Ct. R. 10.

In addition to relying on a theoretical U.S. Supreme Court backstop, the General Counsel emphasizes that under Florida law, even when a private property owner brings an as-applied challenge to a regulation, that challenge can proceed without invalidating the underlying regulation.  Assumption Application C at 12.  This analysis appears to suggest that as long as the underlying regulatory program remains valid, takings law does not inhibit successful implementation of Florida's program.  However, the real question is whether it is easier for private property owners to bring regulatory takings cases pursuant to Florida law such that less 404 permit mitigation would occur under a State program as compared to a federal program.  The State has not answered that question.

Importantly, the General Counsel Statement completely fails to address the Bert J. Harris, Jr., Private Property Rights Protection Act, Fla. Stat. 70.001 et seq. ("Harris Act"), which Florida's legislature enacted "to provide a remedy for private landowners where their property has been inordinately burdened by government action, but the government action does not amount to a constitutional taking."  *Cascar, LLC v. City of Coral Gables*, 274 So. 3d 1231, 1234 (Fla. Dist. Ct. App. 2019) (citing Fla. Stat. 70.001(1)) (emphasis added).  The General Counsel failed to flag, much less address, how this Act would not interfere with operation of a 404 program.  Without this explanation, the State has failed to meet the requirements of 40 C.F.R. § 233.12.

## 2.  Florida's Scheme Does Not Ensure Protection of Species Listed Under the Endangered Species Act

Of particular consequence in Florida, the State's assumption application does not comply with the Clean Water Act's 404(b)(1)'s no jeopardy requirement.  The State wholly fails to demonstrate how the state program would ensure no jeopardy to listed species.  FDEP instead relies on an anticipated, future programmatic biological opinion hoped to be produced from the EPA's ESA Section 7 consultation that would improperly punt all ESA determinations to state

agencies.  See Assumption Application B, app. j-2, at 5 (stating "coordination between the
USFWS and FDEP related to the proposed action's effects on species will occur through the
technical assistance process, which is anticipated to be outlined in the USFWS's biological
opinion based on information included in the biological assessment submitted by EPA");
Memorandum of Understanding between Fla. Fish & Wildlife Conservation Comm'n, U.S. Fish
& Wildlife Servs., & the Fla. Dep't of Env't Prot., Aug. 5, 2020 (Exhibit 57).

Under a programmatic Section 7 consultation, the EPA must review Florida's proposed criteria
and process for ensuring state issued permits will not cause jeopardy to listed species.  More
importantly, the EPA may only approve Florida's program if it determines the program fulfills
the no jeopardy requirement.  40 C.F.R. § 233.15(g).  According to FDEP, "[b]ecause of the
terms and conditions anticipated in the Program assumption BiOp and its [Incidental Take
Statement ("ITS")], the State 404 program would not issue a permit that would jeopardize the
continued existence of a species or adversely modify designated critical habitats."  Fla. Dep't
Env't Prot., ESA Biological Assessment for Clean Water Act Section 404 Assumption by the
State of Florida iv (Jul. 24, 2020) (Exhibit 58) [hereinafter "BA"].  FDEP's application however
does not contain any such criteria or even the Biological Assessment.  Without the criteria in
FDEP's application of how it will achieve this requirement, the EPA cannot (1) determine
Florida's application is complete, (2) determine whether Florida can fulfill the guidelines' no
jeopardy mandate or (3) approve Florida's assumption.  See 40 C.F.R. §§ 233.1(a), 233.15(g);
Letter from Bonnie Malloy, supra.

Even if a programmatic biological opinion were produced prior to the EPA's assumption
decision deadline, it was not part of FDEP's application and has not been part of the
administrative review process or subject to notice and comment.  40 C.F.R. § 233.15(a), (e)
(requiring the EPA to provide a comment period of not less than 45 days on a state's complete
application and provide a copy to U.S. Fish & Wildlife Service ("USFWS") and National Marine
Fisheries Service ("NMFS") to review and comment).  The EPA would be ignoring its own
procedural regulations, and basic tenets of administrative law, to allow Florida to retroactively
complete its application and circumvent notice and comment requirements.  The EPA simply
cannot approve Florida's assumption application based on a biological opinion outside the

public's scrutiny, when the State is relying on that opinion to claim compliance with requirements to assume jurisdiction over the 404 program.[10]

Tellingly, in anticipation of Florida's application, the EPA sought public comment on whether consultation under ESA Section 7 is required when the EPA reviews a state or tribal request to assume CWA § 404 duties. 85 Fed. Reg. 30,953 (May 21, 2020). The EPA's former position was that this was a non-discretionary decision and thus did not trigger ESA Section 7 consultation. Letter from Peter S. Silva, U.S. Env't Prot. Agency, to Steven Brown, Env't Council of the States, Dec. 27, 2010 (Exhibit 59). Florida, however, urged the EPA to reverse course, and it did.

While we agree that consultation should take place,[11] Florida's proposal (now adopted by the EPA) for how a programmatic biological opinion would be treated as ensuring no jeopardy is gravely flawed. Moreover, the actual process Florida claims it will follow to ensure no jeopardy has not been finalized, much less submitted for public review and comment. As a result, two flaws fatal to Florida's application emerge: (1) Florida has not demonstrated that its program will ensure no jeopardy, and (2) the public has been deprived of an opportunity to review Florida's plan and so be able to comment on whether Florida's proposal will ensure no jeopardy.

With over 130 listed species, more than 7,700 lakes (greater than 10 acres), 33 first-magnitude springs, 11 million acres of wetlands, almost 1,200 miles of coastline, and approximately 27,561 linear miles of rivers and streams, water and biodiversity are two of Florida's most prominent features.[12] Section 7 consultation in Florida therefore will involve analyzing limitless projects blanketing most of the State to determine their potential impacts on numerous listed species. FDEP admits in its Biological Assessment that "[b]ecause of the statewide nature of this request, the numerous covered species and diverse habitats, as well as lack of knowledge with respect to

---

[10] Moreover, similar to pesticide registrations, 404 program assumption has broad geographical effects making ESA Section 7 consultation one of the most complex which should generate national consultation procedures like public comment. See U.S. Fish & Wildlife Servs. & Nat'l Marine Fisheries Serv., Endangered Species Consultation Handbook 5-3 to 5-4 (Mar. 1998) (Exhibit 60) (Comparing 404 program assumption to pesticides registrations which generates national consultation requests); U.S. Env't Prot. Agency, et al, Enhancing Stakeholder Input in the Pesticide Registration Review and ESA Consultation Processes and Development of Economically and Technologically Feasible Reasonable and Prudent Alternatives, Doc. Id. EPA-HQ-OPP-2012-0442-0038 (Mar. 19, 2013) (Exhibit 61) (providing pesticide registrations with public comment because of ensuring protection of the species will benefit from the general public's input).
[11] See Letter from Kristen L. Boyles, Earthjustice, to Kathy Hurld, U.S. Env't Prot. Agency, Jul. 6, 2020 (Exhibit 62).
[12] See Fla. Fish & Wildlife Conservation Comm'n, Florida's Official Endangered And Threatened Species List, 4 (2018) (Exhibit 63); Purdum, supra; Fla. Dep't of State, Quick Facts (Exhibit 64); U.S. Geologic Survey, supra; Fla. Dep't of Env't Prot., 2016 Integrated Water Quality Assessment for Florida 34 (2016) (Exhibit 65).

where and what type of future permits may be requested, a meaningful site-specific and species-specific analysis is not possible this BA." Fla. Dep't of Env't Prot., ESA Biological Assessment for Clean Water Act Section 404 Assumption by the State of Florida iv (Jul. 24, 2020) (Exhibit 58); see also Letter from James Murphy, Nat'l Wildlife Fed'n, to Kathy Hurld, U.S. Env't Prot. Agency, Jul. 6, 2020 (Exhibit 66). FDEP, however, expects a programmatic biological opinion to be completed in only a few months' time to allow the EPA to meet its assumption decision deadline (which stems from the erroneous determination that Florida's application was complete when submitted).

ESA Section 7 consultation on whether the EPA's approval of Florida's assumption application will jeopardize listed species is a complex, fact intensive analysis. ESA Section 7(a)(2) first places a procedural obligation on the EPA to initiate consultation with FWS and NMFS "at the earliest possible time" to determine what effects a state's assumption of the Section 404 program may have on endangered and threatened species and their critical habitats. ESA § 7(a)(2) next places a substantive obligation on the EPA to ensure its actions will not jeopardize the continued existence of endangered and threatened species or destroy or adversely modify their critical habitats. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

The ESA's implementing regulations dictate the precise requirements for satisfying this substantive obligation. Letter from Kristen L. Boyles, supra. To fulfill the ESA Section 7 consultation requirement, USFWS and NMFS must use the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2), (b)(4). Note that even mixed programmatic actions require incidental take statements at the programmatic level if the actions are "reasonably certain to cause take and are not subject to further section 7 consultation." 50 C.F.R. § 402.14(i)(6). The agency cannot merely list a state's threatened and endangered species, dismiss further analysis as requiring too much speculation, or punt all meaningful analysis to the state at some future time.

Florida, however, has proposed that USFWS and NMFS engage in a one-time consultation that would only identify procedural requirements for state permitting under Section 404 needed to support the USFWS' determination that assumption would not result in jeopardy to any listed species. Fla. Dep't of Env't Prot., EPA Approval of State Assumption of Clean Water Act Section 404 Program: Streamlined Approach to Address Endangered Species Act Incidental Take Coverage 1–2 (Exhibit 67). FDEP even provided a Biological Assessment to the EPA in hopes to achieve this goal. FDEP's Biological Assessment was never subject to notice and comment during the State's rulemaking process, nor has it been during the EPA's consideration of the State's 404 program application.

Although referenced in Florida's application, the Biological Assessment has proceeded in a parallel process outside the public eye. Like the anticipated programmatic biological opinion, the Biological Assessment is not part of FDEP's application and therefore cannot be relied on to

satisfy the no jeopardy mandate.  Moreover, the Biological Assessment suffers numerous flaws
that render it inadequate to support a programmatic biological opinion.

At its core, the Biological Assessment fails to be as protective as the current federal process.
First, the Biological Assessment fails to provide site-specific information, thereby preventing the
intended state implementing agencies (FDEP and the Florida Fish and Wildlife Conservation
Commission ("FWCC")) from even determining the effect of various specific permitting actions.
Without site-specific information, FDEP's jeopardy analysis will be flawed.  For example, the
Biological Assessment includes only about half a page on the state mammal, the critically
endangered Florida Panther, even though it is estimated that the current remaining population is
only 120–230 adult individuals[13] and is in danger of extinction.[14]  With such little information,
how can FDEP which has no expertise in the subject be able, even at the project level, to conduct
the necessary analysis to ensure no jeopardy?

Additionally, the Biological Assessment provides very limited—almost nonexistent—
information about the cumulative impacts of the State's assumption program.  The Biological
Assessment fails to adequately address the environmental baseline, status of the species, effects
of the action, or reasonable and prudent measures designed to reduce any take identified.
Instead, these are all punted to the state agencies to decide at the project level.  There are other
flaws contained in the Biological Assessment  as well, including but limited to, lack of
information on what constitutes "suitable habitat;" unreasonably short timeframe for USFWS to
decide if it will comment; FDEP and FWCC will make effect determinations and assume no
comment from USFWS if there is silence (no duty to check); designation of the key deer and red
cockaded woodpecker as not regularly utilizing wetlands despite their state or county wetland
dependent designations.  BA at 87, tbl. 3-1, 23.

While programmatic consultation allows consultation on an agency's multiple actions on a
program, including a proposed program or regulation that provides a framework for future
proposed actions, 50 C.F.R. § 402.02, under Florida's proposal, the truncated consultation would
essentially give the EPA wholesale approval from the USFWS and NMFS for specified and
foreseeable actions without any analysis of the effects of the whole action, jeopardy
determinations, or take limits, all in direct contravention to the ESA's mandate, implementing
regulations, and numerous court holdings.  See, e.g., Conner v. Burford, 848 F.2d 1441, 1453–54
(9th Cir. 1988); N. Slope Borough v. Andrus, 642 F.2d 589, 608 (D.C. Cir. 1980); Wild Fish
Conservancy v. Salazar, 628 F.3d 513, 521 (9th Cir. 2010); Forest Serv. Empls. for Env't Ethics
v. U.S. Forest Serv., 726 F. Supp. 2d 1195, 1225–26 (D. Mont. 2010).  Under such an approach,

---

[13] See U.S. Fish and Wildlife Serv., Florida Panther Population Estimate Updated, Feb. 22, 2017
(Exhibit 69); U.S. Fish and Wildlife Serv., Florida Panther Recovery Plan, 3rd rev. at viii (2008)
(Exhibit 69).
[14] See U.S. Fish and Wildlife Serv., Florida Panther 5-Year Review 19 (2009) (Exhibit 70).

the USFWS and NMFS will have failed to fully consult on the action and the EPA will not satisfy its burden to ensure that the proposed action is not likely to jeopardize listed species or destroy or adversely modify critical habitat.

Indeed, even under a programmatic consultation, if assumption is approved, the jeopardy analysis cannot end there. States like Florida must *still* ensure there will be no jeopardy to listed species prior to the issuance of permits for the discharge of dredged or fill material pursuant to the Clean Water Act's 404(b)(1) guidelines. A state's program must be at least as stringent as the federal program, which expressly requires that both individual and general permits comply with the ESA. Overarching programmatic consultation does not relieve the State of its responsibility to determine at the site-specific permit level whether there will be no jeopardy to listed species prior to the issuance of permits for the discharge of dredged or fill material pursuant to the Clean Water Act's 404(b)(1) guidelines. FDEP's application however is silent on how this will be accomplished.

What is known about the EPA's Section 7 consultation process demonstrates that it is flawed in other respects as well, rendering any potential resulting programmatic biological opinion insufficient. First, NMFS made a critical error when failing to consider the entire area that will be affected by Florida's assumption. See 16 U.S.C. 1536(a)(2); 50 C.F.R. § 402.02. Accordingly, NMFS is not engaging in the Section 7 consultation on Florida's 404 assumption, and the EPA will not satisfy its consultation duty. NMFS instead is merely "assum[ing] that the EPA will make a 'no effect' determination for NMFS' ESA-listed species that were originally identified as part of this proposed assumption." Id. This notion is based on NMFS' recent determination that "Endangered Species Act (ESA)-listed species under NMFS' jurisdiction do not occur in waters that are assumable by the state." See Letter from Cathryne Tortorici, Nat'l Marine Fisheries Serv., to Heather Mason, Fla. Dep't of Env't Prot., Apr. 15, 2020 (Exhibit 71).[15] NMFS' jurisdictional determination however is inconsistent with federal law.

Section 7 consultation must occur for species and critical habitat that are in the "action area" and "action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. 402.02(d). NMFS holds that all of the species under its jurisdiction occur in waters that will be retained under the Corps' jurisdiction and thus the agency need not consult. To the contrary, the "action area" isn't limited to the assumed waters, it also includes areas that would experience downstream impacts. Without consulting NMFS, there will be no consideration of whether the no-jeopardy mandate in

---

[15] Based on NMFS' determination, FDEP's Memorandum of Understanding (MOU) with USFWS and FWCC outlining their plan for state agencies' technical assistance and limited federal oversight excludes NMFS all together.

the Clean Water Act's 404(b)(1) Guidelines is achievable for NMFS' species experiencing downstream impacts.

Next, Florida's proposal is also asking the EPA to delegate its obligations under ESA Section 7(a)(2) to non-federal parties. FDEP's application and MOU with USFWS and FWCC lay out a process whereby the EPA will rely on a future, abridged programmatic biological opinion that merely instructs FDEP and FWCC to determine at the project level if an activity may affect listed species or critical habitat, determine whether there will be jeopardy, and determine what conditions may be necessary to ensure no jeopardy. FDEP's proposal unlawfully delegates the initial effects determination to FDEP (and likely the applicant who will be asked to identify whether species are affected). These determinations must be made by a federal agency. See 16 U.S.C. § 1536(a)(2); Selkirk Conservation All. v. Forsgren, 336 F.3d 944, 955 (9th Cir. 2003) ("[F]ederal agencies cannot delegate the protection of the environment to public-private accords."); Gerber v. Norton, 294 F.3d 173, 184–86 (D.C. Cir. 2002) (USFWS may not delegate species protection obligations to a private permit applicant).

Yet FDEP's application relies on FWCC's assistance to determine impacts to listed species to justify FDEP's ability to adequately ensure no jeopardy to species and to satisfy the Clean Water Act's 404(b)(1) guidelines. See, e.g., Assumption Application B, app. (a)-1. FDEP's application and MOU with USFWS and FWCC creates a procedure for FDEP and FWCC to conduct the necessary species analyses and in fact perform more functions than the Corps currently does under the Federal 404 program. FDEP and FWCC will do initial determinations, determine the adequacy of avoidance measures, and determine the effect of the project. FDEP is relying on FWCC to "ease the transition of the State 404 Program, providing faster and more accurate project reviews and effect determinations as compared to FDEP staff alone." Assumption Application B, app. j-2, at 9–10. While the MOU states USFWS' position is "determinative," there is nothing requiring USFWS to act nor is the MOU incorporated by law. Id. Moreover, USFWS' oversight on future permits is limited and highly dependent on their ability—and desire—to respond within the anticipated insanely tight timeclock restrictions. BA at 77. Indeed, nothing in state law prevents FDEP from ignoring USFWS's recommendations.[16]

Lastly, the Florida Constitution grants FWCC only the power to regulate wildlife and freshwater and marine life. Fla. Const, art. IV, § 9. FDEP has not demonstrated that it has the authority to regulate species under state law that it now claims it would exercise in a state-assumed program. In addition, under Florida law, FWCC is constitutionally barred from regulating water pollution. "Unless provided by general law, [FWCC] shall have no authority to regulate matters relating to air and water pollution." Id. FWCC therefore cannot lawfully exercise its authority over species

---

[16] Indeed, the fact that some of FDEP's, USFWS', and FWCC's duties and requirements only appear in the MOU raises questions as to their enforceability by affected private citizens.

regulation to act as an essential decision-maker in Section 404, which is a water pollution program.

### 3. FDEP Does Not Have Sufficient Resources to Adequately Implement a State 404 Program

FDEP lacks the necessary the resources to properly implement, operate and enforce a State 404 program, particularly when FDEP has been unable to adequately resource its existing obligations. The substantial impact the COVID-19 pandemic has had on state coffers only strains FDEP's resources further, undermining its baseless claim that it can take on a 404 program without a cent in additional resources.[17]

FDEP's application summarily asserts it can rely on existing resources to administer and enforce a 404 program while failing to disclose, among other things: (1) FDEP's failure to meet existing regulatory obligations; (2) the significant budget cuts brought on by the global pandemic; and (3) the resource status and needs of other state agencies on which FDEP expects to rely to fulfill obligations under Section 404.

To determine the adequacy of Florida's authority and ability to administer the Clean Water Act Section 404 program, the EPA must assess the funding and manpower available for program administration and the estimated workload. 40 C.F.R. § 233.1(a); 40 C.F.R. § 233.11. As raised already to the EPA, the holes in FDEP's application alone require the EPA to deny Florida's application or determine that FDEP's application is incomplete and require an adequate funding and staffing plan before resuming review of its application. See 40 C.F.R. § 233.11(d) (program description must include "[a] description of the funding and manpower which will be available for program administration"); Letter from Bonnie Malloy, supra.

FDEP's fanciful plan entails "reallocat[ing] existing positions and staff time from elsewhere in [FDEP]" (without demonstrating that FDEP has no competing duty to meet its "elsewhere" obligations) and offset the workforce losses to existing programs with new "efficiencies throughout [FDEP]" (without articulating what those efficiencies would be). Assumption Application B, app. e., at 8. FDEP however only vaguely addresses these supposed "efficiencies" in its application—with a few potential examples like online applications—but fails to identify or quantify the workload or positions these basic efforts would eliminate or quantify gains that might be realized.

---

[17] FDEP has also recently been given more new duties to complete with limited staff and resources. Ryan Dailey, Florida DEP Gets New Duties, Including Septic Systems Oversight, Under New Law, WFSU, Jun. 30, 2020 (Exhibit 72). The Florida legislature recently transferred authority of septic tank inspection from the Florida Department of Health to FDEP. FDEP was also directed to update its regulations that apply to storm water systems. Id.

In short, FDEP asks the EPA to take its word that the agency will figure its way out of having to allocate a single cent to operate and enforce an entire federal wetlands permitting program that has cost other states millions of dollars to undertake.[18]  This fails to demonstrate FDEP's ability to competently administer a state program, and calls into question the adequacy of any program that would not require a penny more to run.

FDEP's 404 Assumption Application likewise does not fully address or disclose all costs that will necessarily be associated with administering a 404 Program.  For example, FDEP fails to address: initial resources needed to process all pending (160) applications at the time of assumption, resource needs and costs required for compliance and enforcement of the pending applications that are approved, sufficient staffing, an adequate audit process, costs associated with reissuing general permits, the large area of permits where the claimed "85%" overlap of work with the ERP Program will not be achieved, and several costs associated with implementation.  See Doug Fry Aff. (Nov. 2, 2020) (Exhibit 73).

More specifically, FDEP will have to take over an estimated 160 pending 404 permit applications but has failed to even identify how many *trained* staff it has or will be needed to address this sudden influx and the necessary compliance and enforcement which will automatically follow.  Id. at 5–8.  FDEP has also not substantiated how they arrived at this 85% overlap figure which would not apply to FDEP's new workload of processing 404 permits for activities permitted under the ERP Program by the Water Management Districts and delegated local governments.  Id. at 15.  For these 404 permits, FDEP would not be processing the ERP permit nor does it have the in-house expertise to do so.  Id. at 15–17.  The projects processed under the ERP program by the Water Management Districts, for instance, are typically much larger in size and scope (i.e., seawall versus 10,000 acre commercial development), require in depth engineering review, involve hydrology expertise, and are more often located in inland freshwater systems (opposed to FDEP's experience with ERP in mainly coastal systems).  Id.

The staffing numbers that FDEP has provided are unrealistically low, id. at 8–10, and have not been supported with the underlying data necessary to evaluate them.  See Assumption Application B, app. e (tables are missing underlying data and limited methodology is unclear).  These estimates also failed to account for the time spent reviewing permits that were denied or withdrawn.  Id. at 8.

FDEP's proposal also includes reliance on other state agencies, FWCC and the State Historic Preservation Office ("SHPO"), to ensure protection of listed species and cultural resources.

---

[18] Compare 404 Assumption SERC with Fla. Dep't of Env't Prot., Statement of Estimated Regulatory Cost, 62-330 (2012) (Exhibit 74).

Memorandum of Understanding between Fla. Fish & Wildlife Conservation Comm'n, U.S. Fish & Wildlife Servs., & the Fla. Dep't of Env't Prot., Aug. 5, 2020; Operating Agreement between Fla. Dep't of Env't Prot. & the Fla. Div. of Hist. Ress.-State Hist. Pres. Officer Regarding the State 404 Program, Aug. 6, 2020.  However, Florida's description of funding and manpower contains no information regarding the funding and manpower, if any, available at either of those state agencies to meet the obligations of an assumed 404 program.  FDEP's memorandums also do not commit these agencies to increasing their budgets to implement the Florida Program. Assumption Application B, app. j-1, j-2.

Interestingly, staff at both of those agencies have even expressed concern with FDEP's plan and their ability to administer the 404 program.  See Email from Lisa Gregg, Special Activity License Program, Fla. Fish & Wildlife Comm'n, to Jennifer Goff, Conservation Planning Services, Fla. Fish & Wildlife Comm'n, Jan. 14, 2020, 11:26 EST ("FDEP permit processors can't keep up with their current workload now and appropriately consider the impacts of proposed actions to fish and wildlife resources even if you hand it to them on a platter, much less if you added to their workload."); Operating Agreement between Fla. Dep't of Env't Prot. & the Fla. Div. of Hist. Ress.-State Hist. Pres. Officer Regarding the State 404 Program at 9 (draft) (rev'd May 29, 2020) (Exhibit 75) (in response to a 15-day response deadline for a permittee' pre-review request SHPO employee stated "Providing consistent comments within 15 days may not be feasible for our Compliance Section.").

The unprecedented budget strains the State is now facing will make it impossible to recover any semblance of staffing and funding that would make assumption of a Section 404 program feasible any time soon.  Tax revenues for the State plummeted in April, May and June 2020 as a result of the pandemic.  In July 2020, Governor DeSantis vetoed $1 billion in spending from the 2020–2021 budget in response to the crisis.  In August 2020, Florida agencies were asked to cut 8.5% of their budgets to adjust for the anticipated $3.4 billion loss for Fiscal year 2020–2021 resulting from the pandemic.  See Christine Sexton, Florida Agencies Asked to Cut 8.5 Percent to Adjust for COVID-19, Tampa Bay Times, Aug. 12, 2020 (Exhibit 76); Fla. Off. of Econ. & Demographic Rsch., Executive Summary:  Revenue Estimating Conference for the General Revenue Fund & Financial Outlook Statement (Aug. 14, 2020) (Exhibit 77).

Florida has not acknowledged these important facts, much less addressed how its state agencies can be expected to do more—namely administer a new, complex Section 404 program—with so much less.  See, e.g., Doug Fry Aff.  FDEP's claim that it will be able to operate a Section 404 program without any additional funding from the State is untenable as further evidenced by the millions of dollars (ranging from 2–3 million to as much as 18 million) other states pursuing

assumption have estimated it to cost.[19]  FDEP's position can only mean it would treat a 404 program the same as its existing ERP program or suggests that FDEP simply will not adequately implement, operate or enforce a Section 404 program.  Both are indefensible and require the EPA to deny FDEP's assumption application.

> **4.  FDEP's Enforcement Record Continues to Demonstrate an Incapacity to Adequately Enforce Existing Programs, Much Less Adopt New Ones**

As was described above, FDEP was gutted in recent years.  Editorial: The Rick Scott Record: An Environmental Disaster, Tampa Bay Times, supra (observing that the Rick Scott administration had reduced water management budgets, rushed through permitting, weakened enforcement, caused widespread layoffs, provoked a brain drain of experts in the field, and replaced experts with political appointees focused on advancing business interests rather than environmental stewardship).

As a result, FDEP has been unable to meet its existing obligations to operate and enforce programs already under its purview.  This fact is amply demonstrated in the widespread impaired waters throughout the State, as well as the recurring toxic algae crisis that has made national headlines and FDEP's grossly inadequate record of enforcing its existing programs.  See, e.g., Doug Fry Aff. (Exhibit 73); PEER, Report on Enforcement Efforts by the Florida Department of Environmental Protection: Calendar Year 2019 6 (2020) (Exhibit 81).

Year after year, analyses of FDEP's enforcement record have demonstrated an inability or unwillingness to meet enforcement obligations, ensure compliance with existing programs, and ultimately provide requisite protection to the State's valuable natural resources.  See Press Release, PEER, Florida Eco-Noncompliance Rises as Enforcement Wanes, Jun. 22, 2020 (Exhibit 82); PEER, Report on Enforcement Efforts By the Florida Department of Environmental Protection Calendar Year 2019 (2020) (Exhibit 81); Press Release, PEER, Fewer Florida Eco-Inspections Equals Less Compliance, Sept. 17, 2019 (Exhibit 83); PEER, Report on Enforcement Efforts By the Florida Department of Environmental Protection Calendar Year 2018 (2019) (Exhibit 84); Press Release, PEER, Florida Racks up Second Worst Eco-Enforcement in 30+ Years, Jul. 17, 2018 (Exhibit 85); PEER, Report on Enforcement Efforts By

---

[19] See, e.g., Va. Dept. of Env't Quality, Study of Costs and Benefits of State Assumption of the Federal § 404 Clean Water Act Permitting Program 2 (Dec. 2012), (Exhibit 78) (estimating assumption to cost $18 million over the first 5 years and $3.4 million annually thereafter); Minnesota Federal Clean Water Act Section 404 Permit Program Feasibility Study ix (Jan. 2017), (Exhibit 79) (estimated cost increase for state agencies is 4.796 million per year plus a one-time $3 million cost for developing online permitting systems); Az. Dep't of Env't Quality, Clean Water Act § 404 Assumption Roadmap Review Meeting 22 (Exhibit 80) (estimating assumption to cost $2.5 million annually and to be funded by application fees).

the Florida Department of Environmental Protection Calendar Year 2017 (2018) (Exhibit 86); Press Release, PEER Florida Eco-Enforcement Still Scraping Bottom, Aug. 29, 2017 (Exhibit 87); PEER, Report on Enforcement Efforts By the Florida Department of Environmental Protection Calendar Year 2016 (2017) (Exhibit 88).

FDEP's own performance audits and employee testing show that it has failed in many respects to effectively administer its existing ERP Program, the same program the state now touts as the reason why it can so easily assume a 404 program without any additional resources.  Internal audit records and employee testing provided to Earthjustice in response to public records requests demonstrate that FDEP has failed to adequately administer the ERP program and show FDEP's consistent inability to properly review permit applications and monitor and enforce issued permits.

For example, in 2013, FDEP staff were tested along with staff from Water Management Districts and specific counties in Florida to assess their skills in delineating wetlands.  2013 Training Test Module Result Summary and Analysis (Exhibit 89)  "Though each [FDEP] district tended to have a few relatively high scores, the rest fell across a very wide range, often with the majority being below the statewide average."  Id.

The same issues arise when reviewing the audit reports of FDEP staff's ERP permits.  For example, the ERP Individual Permit Review for 2015 found that FDEP staff completed site inspections when required in less than half of reviewed examples, most documentation of wetlands impacts was "minimal," and only 24% of projects reviewed that required mitigation provided appropriate mitigation.  Allyson Minick & Heather Mason, Submerged Lands & Env't Res. Coordination, Fla. Dep't of Env't Prot., 2015 ERP Individual Permit Reviews 13–14 (as edited 2017) (Exhibit 90).  More recent audits of individual permits continue this pattern: few site inspections when required, inadequate mitigation required, and documentation of wetlands impacts missing.  See (Exhibit 91) (compilation of individual permit audits provided to Earthjustice in response to public records requests).

Individual audits of compliance and enforcement activities for FDEP's existing ERP program that were provided to Earthjustice in response to public records requests are similarly littered with examples of inadequate documentation, assessment of insufficient or inaccurate penalties, requiring inappropriate or insufficient corrective actions.  See (Exhibit 92) (compilation of compliance and enforcement audits provided to Earthjustice in response to public records requests)

Testimony during EPA's public hearings on Florida's assumption application also revealed extensive concerns over FDEP's failure to competently administer many of its other programs as well, such as its Total Maximum Daily Loads Program, Basin Management Action Plans, and

National Pollutant Discharge Elimination System Stormwater Program.  Oct. 21, 2020, Hearing Transcript; Oct. 27, 2020, Hearing Transcript.

The consequences of allowing an ill-equipped FDEP to administer the proposed Section 404 program are made all the more stark by the EPA's decision to waive almost all oversight of Florida's program otherwise available under the Clean Water Act, see 33 U.S.C. § 1344(j)-(k), that is not required to be retained under 40 C.F.R. § 233.51(b).  Memorandum of Agreement between Fla. Dep't of Env't Prot. & U.S. Env't Prot. Agency at III(b) (Jul. 31, 2020).  EPA has not approved an assumption program in decades, and much has changed in the law and wetlands science since the early 1990s.  Never has a state with the vast waterways, wetlands and listed species that Florida enjoys assumed the 404 program.  For EPA to ensure this high-stakes assumption program complies with Section 404, EPA would have to retain the maximum monitoring and oversight possible for a minimum of two years before relinquishing its Section 404(j) authority.

In any event, the fundamental flaws in Florida's proposed program, combined with its utter lack of resources and capacity to undertake a Section 404 program, demonstrate that the application must be denied.

## 5. Florida Does Not Afford Comparable Access to the Courts As That Available Under Federal Law

Critical to citizen enforcement of a Section 404 program, Florida's access to the courts is far more restrictive than that allowed under federal law.  In its description of the "Administrative and Judicial Review" procedures available in Florida, FDEP fails to mention any of the State's several features that make Florida's administrative and judicial review procedures far more restrictive those available under federal law.  Assumption Application B, app. b.

For example, Florida's "Environmental Protection Act" only authorizes "a citizen *of the state*" to maintain an action for injunctive relief to compel government enforcement of environmental laws or against a person or non-governmental entity for violating our environmental laws.  Fla. Stat. § 403.412(2)(a) (emphasis added).  Paragraph (7) similarly states that "[i]n a matter pertaining to a federally delegated or approved program, *a citizen of the state* may initiate an administrative proceeding under this subsection if the citizen meets the standing requirements for judicial review of a case or controversy pursuant to Article III of the United States Constitution." Id. § 403.412(7) (emphasis added).  The ability to intervene in proceedings brought under this statute is also limited to "citizens of the state."  Id. § 403.412(5).

Federal law, on the other hand, authorizes citizen suits under the Clean Water Act by "any citizen," 33 U.S.C. § 1365(a) (authorizing suit alleging violation of limitations under the chapter

or against EPA for failure to perform non-discretionary duty or act).  The term "citizen" is defined as "a person or persons having an interest which is or may be adversely affected."  33 U.S.C. § 1365(g).  Unlike the State's law, federal law does not require the adversely affected person to be a citizen of the state where the interest lies.

In addition, a litigant bringing an action under Fla. Stat. § 403.412 is subject to a mandatory fee-shifting provision that has no analog under the Clean Water Act.  Under Fla. Stat. § 403.412(2)(f), attorneys' fees must be imposed in favor of any prevailing party and against the losing party, notwithstanding the good faith or merit of the litigant's position.  While the State's statute exempts actions involving a state-issued National Pollution Discharge Elimination System permit from this mandatory fee-shifting provision, there is no such exemption for actions involving a Section 404 permit.  Id. § 403.412(2)(f).  Mandatory fee shifting under Fla. Stat. § 403.412 operates as a barrier to court access for litigants unwilling or unable to risk an adverse fee award no matter the strength of their case.

The Clean Water Act's citizen suit provisions, by contrast, do not require mandatory fee shifting to the prevailing party.  Rather, the court "*may* award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party" as the court deems appropriate.  33 U.S.C. § 1365(d) (emphasis added).

Florida's Administrative Procedure Act also restricts access to courts as compared to federal law, by severely limiting the ability to establish standing.  To establish associational standing, for example, organizations must demonstrate that a "substantial number" of their members "are substantially affected" by the challenged conduct.  See Florida Home Builders Ass'n v. U.S. Dep't of Labor, 412 So.2d 351 (Fla. 1982); Farmworker Rights Org., Inc. v. Dep't of Health & Rehab. Servs., 417 So.2d 753, 754–55 (Fla. 1st Dist. Ct. App. 1982) (to establish associational standing under section 120.57(1) organization must demonstrate that "a substantial number of its members, although not necessarily a majority, are substantially affected by the challenged rule," that "the subject matter of the challenged rule is within the association's general scope of interest and activity," and that "the relief requested is of a type appropriate for a trade association to receive on behalf of its members."); St. Johns Riverkeeper, Inc. v. St. Johns River Water Mgmt., 54 So. 3d 1051, 1054 (Fla. Dist. Ct. App. 2011) (under Florida APA, associational standing requires showing of harm to substantial interests of a substantial number of members; finding standing under sections 120.569 and 120.57 where organization had 1,500 members, including 50 in the relevant county, and that there had been more than 1,100 member participant ecological boat trips to the area); Friends of the Everglades, Inc. v. Bd. of Trustees of Int'l Imp. Tr. Fund, 595 So. 2d 186, 188 (Fla. Dist. Ct. App. 1992).

Under federal law, on the other hand, associational standing may be established on the basis of a single member's harms resulting from the challenged conduct.  See Sierra Club v. Johnson, 436

F.3d 1269, 1279 (11th Cir. 2006) (associational standing of Sierra Club satisfied by affidavit of one member who suffered injury in fact).

Florida's more restrictive access to the courts would deprive affected parties of the ability to vindicate rights and ensure citizen enforcement of Section 404.  This further demonstrates that the State should not be permitted to assume the program.

### 6.  Florida Has Not Adequately Defined Assumable Waters vs. Retained Waters

As demonstrated above, the issue of identifying Florida's assumable, versus retained, waters is a contentious issue with enormous consequences for the protections that will be afforded to Florida's waterways.  The Corps' sudden retreat to an exceedingly restrictive view of retained waters is unreasonable, and not based in fact.  We object to Florida's unduly expansive view of assumable waters—and to the Corps' unduly restrictive view of retained waters—and fully incorporate the comments raised in our letter to the Corps on April 18, 2018, as well as in our October 23, 2020, letter to EPA.  Letter from Tania Galloni, Earthjustice, to Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 18, 2018, supra; Letter from Bonnie Malloy, supra.

The Corps' failure to follow through on its 2018 notice and comment opportunity for stakeholders to weigh in on this critical question, and the Corps' failure to perform the requisite navigability assessments contemplated with that public notice, undermines the validity of its current view that so few waters belong on its retained list.  To the contrary, federal law requires that the Corps retain jurisdiction over many more important waterways in Florida.  The Corps' ceding jurisdiction over those waters to Florida for purposes of 404 assumption violates the Rivers and Harbors Act and renders EPA approval of such a program untenable.

In addition, the Corps has advised in the MOA between FDEP and the Corps, 40 C.F.R. §233.14, to provide a retained waters GIS layer to the FDEP.  However, this information has not been provided to the public, despite multiple requests, nor, to the undersigned's knowledge, has it been provided to the State.

The Corps has not indicated whether that GIS layer will simply identify retained waters, whether it will actually depict their mean high water lines (MHWL)/ordinary high water marks (OHWM), or the actual pre-determined location of the administrative boundary.  It can be quite difficult for staff and applicants to determine such lines, marks, and boundaries, particularly if an applicant's property is not located directly abutting the MHWL/OHWM (where those lines might be discernable by an applicant without a survey), and can be costly where the lines/marks need to be determined by a registered professional.

The only information provided to the public and the EPA is a list of waters provided in FDEP's application. 404 Handbook B, app. A. This list however fails to list numerous waterbodies that were previously on the Corps Retained Waters List in 2017 and that were submitted to the Corps during its comment period in 2018 discussed above in section III. The Conservancy of Southwest Florida and Waterkeepers Florida both submit comments addressing these missing waters which are incorporated herein. Letter from Amber Crooks, Conservancy of Sw. Fla., to Kelly Laycock, U.S. Env't Prot. Agency, Nov. 2, 2020 (Exhibit 93); Letter from Rachel Silverstein, Miami Waterkeeper, et al., to Kelly Laycock, U.S. Env't Prot. Agency, Nov. 2, 2020 (Exhibit 94).

Lastly, Florida's adoption of an only 300-foot buffer zone is unreasonable and inadequate. The only other states to have assumed a 404 program have utilized the more protective 1,000 foot buffer, and no less should be required of Florida in order to satisfy the Clean Water Act.

### 7. Florida's Waterways, Public Cannot Afford to Lose Existing Federal Safeguards

Florida's unique, and exceptionally valuable, waterways require the maximum protection available under federal law, not a reduction in protections that would follow from FDEP's assumption of Section 404. History has taught that the availability of NEPA review, and the involvement of the Corps in wetlands permitting, have been essential to safeguarding precious resources in Florida.

### a. NEPA Safeguards Are Essential Protecting Florida's Wetlands

As stated above, Florida has touted the loss of NEPA review under an assumed state program as a "benefit" and "cost-saving" measure for permit applicants. It is a massive net loss, however, to the public and to protection of Florida's waterways.

Enacted in response to mounting crises across the nation, NEPA promised to correct the blind eye that American policymakers had long turned to environmental impacts of federal agency actions. See S. Rep. No. 91-296, at 4–5 (1969) ("As a result of this failure to formulate a comprehensive national policy, environmental decisionmaking largely continues to proceed as it has in the past. Policy is established by default and inaction. Environmental problems are only dealt with when they reach crisis proportions. Public desires and aspirations are seldom consulted. Important decisions concerning the use and the shape of man's future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades."). Congress recognized that "[t]raditional policies were primarily designed to enhance the production of goods and to increase the gross national product .... [b]ut [that], as a nation, we have paid a price for our material well-being." Id. With the understanding that "the Nation cannot continue to pay the price of past abuse," id., Section

101 of NEPA imposes on the national government an obligation "to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." NEPA § 101(a), codified at 42 U.S.C. § 4331(a). The government thus had the "continuing responsibility" to, among other things, "assure for all Americans, safe, healthful, productive, and esthetically and culturally pleasing surroundings." Id. § 101(b)(2).

NEPA also looked to the future: Congress committed the federal government to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations." Id. § 101(b)(1). Prior to NEPA, federal policymaking did not systematically consider long-term environmental degradation. Instead, the "pursuit of narrower, more immediate goals" had fostered increasing "threats to the environment and the Nation's life support system." See S. Rep. No. 91-296, at 8–9 ("The challenge of environmental management is, in essence, a challenge of modern man to himself. The principal threats to the environment and the Nation's life support system are those that man has himself induced in the pursuit of material wealth, greater productivity, and other important values. These threats—whether in the form of pollution, crowding, ugliness, or in some other form—were not achieved intentionally. They were the spinoff, the fallout, and the unanticipated consequences which resulted from the pursuit of narrower, more immediate goals."). NEPA was enacted as a change in course, forcing policymakers to consider "the long-range implications of many of the critical environmental problems" facing the nation. See id. at 8.

To fulfill its promises, NEPA mandated that federal agencies consider the environmental impacts of their decisions. NEPA § 102. Congress directed federal agencies to meet three goals: First, federal decisions must be informed by detailed environmental analyses. Second, decision makers must develop, study, and consider alternative courses of actions allowing a comparison of the potential environmental impacts of such alternatives. Id. § 102(2)(C)(iii), (E); see Pub. L. No. 94-83 (1975) (amending section 102(2) of NEPA). And third, agencies must involve the public in this evaluation and decisionmaking process.

To this end, NEPA requires that the government:

> utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment[.]

NEPA § 102(2)(A). Agencies must also provide a "detailed statement" on the environmental impacts of proposed decisions "significantly affecting the quality of the human environment" (known as an environmental impact statement or EIS). Id. § 102(2)(C). Within that detailed statement, agencies must disclose "any" unavoidable adverse environmental effects of the

decision. Id. § 102(2)(C)(ii). And they must disclose "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." Id. § 102(2)(C)(v). Moreover, NEPA does not allow agencies to ignore analytic gaps: agencies must find ways to properly weigh "unquantified environmental amenities and values." See id. § 102(2)(b).

NEPA directs federal decisionmakers to study and consider alternatives to their decisions, allowing comparisons the environmental impacts of such alternatives. See id. § 102(2)(C)(iii), (E); Pub. L. No. 94-83 (1975) (amending section 102(2) of NEPA). In particular, federal agencies must "study, develop, and describe appropriate alternatives to recommended courses of action" in "any proposal which involves unresolved conflicts concerning alternative uses of available resources," even if its impacts do not rise to the level requiring an EIS. NEPA § 102(2)(E). See Pub. L. No. 94-83 (1975) (amending section 102(2) of NEPA).

NEPA mandates inclusion of and disclosure to the public and other governmental entities of environmental impact analyses. The statute broadly directs agencies to act "in cooperation" with governmental entities and the public in the decision-making process. NEPA § 101(a). Further, agencies must make available "advice and information useful in restoring, maintaining, and enhancing the quality of the environment" to "States, counties, municipalities, institutions, and individuals." Id. § 102(2)(G).

Unfortunately, as explored in more detail herein, Florida's proposed assumption of the Section 404 program conflicts with NEPA's mandate. The proposal, if accepted, would lead Florida's agencies to make decisions with significant, and sometimes devastating, environmental impacts without ever considering those impacts in advance. It would raise barriers to public participation. And at the end of the day, it would lead to poor decisions, increased litigation, and less transparency.

There are many examples where the NEPA process has been essential to improving proposed projects that would otherwise have had devastating impacts in Florida. The 2005 draft EIS for the Everglades Agricultural Area Reservoir, for example, was the document that first raised issues related to water quality highlighting the need for additional stormwater treatment acreage as part of the project. The approach to water quality has improved in the most recent iteration of the project earlier this year as environmental groups and agencies acknowledged the importance of adequately addressing this important issue. The Corps' initial 2018 NEPA analyses helped further refine areas of uncertainty associated with the project that once addressed will improve its final design and performance. Letter from S. Ansley Samson, Everglades Law Ctr., & Shannon Estenoz, Everglades Found, to Mary B. Neumayr, Council on Env't Quality, Aug. 20, 2018 (Exhibit 95).

The Combined Operations Plan for the southern portion of the Central and Southern Florida (C&SF) Project involved three increments of changes to operations in the southern portion of the C&SF Project (over 3+ years).  Through the associated NEPA processes, environmental and economic stakeholders in South Florida and the Florida Keys were able to articulate proposed operational changes to improve environmental conditions in Florida Bay, relying in part on the information made available in draft EISs and environmental assessments describing the proposed changes.  Stakeholders continue to raise these issues in ongoing discussions of a final operations plan for recently constructed restoration infrastructure.  Because of NEPA, agencies were fully informed of the broad range of stakeholder perspectives and of uncertainties related to the extent to which these projects will deliver the return on taxpayer investment they are intended to produce when operated under certain conditions.  Id.

Florida has no state statutory counterpart to NEPA.  Approving a state 404 program in Florida therefore deprives the public of the procedural protections and opportunity to participate that are available under federal law through NEPA.

State-issued permits would not be held to NEPA standards, or be subject to challenge in federal court for failing to comply with NEPA.  The public would thus be deprived of necessary safeguards to ensure vital protections.

NEPA safeguards under federal law have been vital to protecting wetlands in Florida when federal agencies have fallen short of their obligations.  In Florida Wildlife Federation v. United States Army Corps of Engineers, 401 F. Supp. 2d 1298 (S.D. Fla. 2005), for example, deficiencies in complying with the NEPA process for a major development with significant impacts on wetlands planned for Palm Beach County ultimately resulted in modification and re-location of the project to avoid those impacts. There are many such examples where, when the federal government failed to meet NEPA obligations, the agency was held to account under NEPA, resulting in better process and outcomes for Florida's environment.  (Exhibit 96) (compilation of articles from Florida, Protect NEPA, https://protectnepa.org/success-stories/florida (last visited Nov. 2, 2020)).

### b.  The Corps Has Served As Essential Backstop to Harmful FDEP Permit Approvals

As testimony throughout EPA's public hearings illuminated, the Corps has acted as a backstop for FDEP decisions that were not sufficiently protective of the environment.  Oct. 21, 2020, Hearing Transcript; Oct. 27, 2020, Hearing Transcript.  Whether it is the reduced potential for local political pressure or application of the NEPA process, the Corps does not always agree with FDEP on what is permittable activities.  For example, in 2016, FDEP issued a permit for a mitigation bank known as Long Bar Pointe for 260.8 acres along 2 miles of coastline fronting on

Sarasota Bay to Long Bar Pointe.  Fla. Dep't of Env't Prot., Notice of Intent to Issue Environmental Resource/Mitigation Bank Permit, No. 338349-001, Apr. 28, 2016 (Exhibit 97). This was a highly controversial project that resulted in the demotion and firing of two FDEP employees who raised concerns over the permit application.  Bruce Ritchie, DEP Employee Suspended in 2012 Speaks Out About Her Experience—and the Future, Politico, Mar. 3, 2017 (Exhibit 98) (Former FDEP employee discussing her demotion and the permittee's ability to pressure FDEP); Kathy Prucnell, Environmentalist Appeals Long Bar-DEP Mitigation Permit, Islander (last visited Oct. 31, 2020) (Exhibit 99); Kathy Prucnell, Trio of FISH, Waterkeeper, McClash Challenge Long Bar Permit, FISH Blog, May 24, 2016 (Exhibit 100).  Months after FDEP's permit approval, the Corps refused to permit the Long Bar Pointe Mitigation Bank finding it did not have the potential to provide sufficient compensatory mitigation to compensate for unavoidable impacts to waters of the United States.  Letter from Donald K. Kinard, Army Corps, to Pete Logan, Long Bar Pointe, Sept. 14, 2016 (Exhibit 101).  The Corps denied the mitigation bank application a second time on May 5, 2017.  Letter from Donald K. Kinard, Army Corps, to Pete Logan, Long Bar Pointe, May 5, 2017 (Exhibit 102); Hannah Morse, *Corps Denies Long Bar Pointe's Second Mitigation Bank Proposal*, Bradenton Herald, May 5, 2017 (Exhibit 103).  In other words, the Corps did not think it could actually operate as a mitigation bank.

**Conclusion**

Based on the foregoing, we respectfully urge EPA to deny Florida's application.

Sincerely,

Tania Galloni
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd.
Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

Bonnie Malloy
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

Christina I. Reichert
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd.
Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
creichert@earthjustice.org

Copies to:

Colonel Andrew Kelly, District Commander
Department of the Army
Jacksonville District Corps of Engineers
P.O. Box 4970
Jacksonville, Florida 32232-0019
Via Email Andrew.d.kelly@usace.army.mil; CESAJ-OC@usace.army.mil

Leopoldo Miranda, Regional Director
U.S. Fish and Wildlife Services
Regional Director's Office-R4
1875 CENTURY BOULEVARD, SUITE 400
Atlanta, Georgia 30345-3319
Via Email Leopoldo_miranda@fws.gov

Roy E. Crabtree, Ph.D., Regional Administrator
National Marine Fisheries Service
Southeast Regional Office
263 13th Avenue South
St. Petersburg, FL, 33701
Via Email Roy.Crabtree@noaa.gov

*Nov. 2, 2020 Comment Letter to the U.S. Environmental Protection Agency from Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper re: Florida's Request To Assume Administration of a Clean Water Act Program [EPA-HQ-OW-2018-0640-0001]*

# EXHIBIT 1



A Water Resources Manual from Florida's Water Management Districts



# Credits



*Author*
Elizabeth D. Purdum
Institute of Science and Public Affairs
Florida State University

*Cartographer*
Peter A. Krafft
Institute of Science and Public Affairs
Florida State University

*Graphic Layout and Design*
Jim Anderson, Florida State University
Pati Twardosky, Southwest Florida Water Management District

*Project Manager*
Beth Bartos, Southwest Florida Water Management District

*Project Coordinators*
Sally McPherson, South Florida Water Management District
Georgann Penson, Northwest Florida Water Management District
Eileen Tramontana, St. Johns River Water Management District

———————————————

For more information or to request additional copies,
contact the following water management districts:

Northwest Florida Water Management District
850-539-5999  **www.state.fl.us/nwfwmd**

St. Johns River Water Management District
800-451-7106  **www.sjrwmd.com**

South Florida Water Management District
800-432-2045  **www.sfwmd.gov**

Southwest Florida Water Management District
800-423-1476  **www.WaterMatters.org**

Suwannee River Water Management District
800-226-1066  **www.mysuwanneeriver.com**

April 2002

The water management districts do not discriminate upon the basis of any individual's disability status. Anyone requiring reasonable accommodation under the ADA should contact the Communications and Community Affairs Department of the Southwest Florida Water Management District at (352) 796-7211 or 1-800-423-1476 (Florida only), extension 4757; TDD only 1-800-231-6103 (Florida only).

# Contents



CHAPTER 1
## THE HUMAN FRAMEWORK — 1
The First Floridians ......................................... 2
Drainage, Flood Control and Navigation .............. 6
Modern Water Management ................................ 10
    1970s ....................................................... 10
    1980s ....................................................... 13
    1990s ....................................................... 13
Conclusion .................................................... 14
The Human Framework Time Line ........................ 18

CHAPTER 2
## WATER: IT'S MAGIC — 34
Water's Structure ............................................ 35
    Water's Amazing Properties............................. 35
Global Water Cycle .......................................... 36
Water Cycle in Florida ...................................... 37
Weather and Climate ........................................ 40
    Floods and Droughts .................................... 41
    Storms ..................................................... 43
The Global Picture ........................................... 46
    El Niño and La Niña .................................... 46
    Global Warming .......................................... 48
Conclusion..................................................... 48

CHAPTER 3
## FLORIDA'S WATER RESOURCES — 49
Watersheds .................................................... 50
Ground Water ................................................. 53
    Aquifers ................................................... 53
    Sinkholes .................................................. 55
    Springs .................................................... 57
Surface Water ................................................ 57
    Rivers ...................................................... 57
    Lakes ...................................................... 59
    Wetlands .................................................. 59
    Estuaries .................................................. 62
Conclusion .................................................... 62

CHAPTER 4
WATER AND LIFE: NATURAL SYSTEMS . . . . . . 63
  Ancient Origins .................................................. 63
  Ecosystems ........................................................ 65
      Soils ............................................................ 66
      Ecosystem Processes: Water and Fire .................. 68
  Natural Communities ......................................... 68
  Conclusion ........................................................ 73


CHAPTER 5
WATER SUPPLY AND WATER QUALITY. . . . . . . 74
  Water Use ......................................................... 76
      Definitions .................................................... 76
      Types of Uses ............................................... 76
      Worldwide Water Use and Trends ...................... 78
      Florida Water Use and Trends .......................... 79
  Water Reuse ..................................................... 80
  Water Quality ................................................... 81
      Causes and Sources of Water Pollution ............... 82
      Florida Water Quality and Trends .................... 83
  Conclusion ........................................................ 85


CHAPTER 6
FORWARD TO THE PAST . . . . . . . . . . . . . . . . . . 86
  Restoration ....................................................... 87
      Kissimmee-Okeechobee-Everglades Restoration... 87
      Tampa Bay ................................................... 91
      Upper St. Johns River Basin ............................ 93
      Longleaf Pine Restoration ............................... 94
      Suwannee River Basin .................................... 95
  Conclusion ........................................................ 95


LINKS TO PROJECT WET ACTIVITIES. . . . . . . . 96
GLOSSARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99
REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . .103
INDEX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .107

*Chapter 1*

# The Human Framework



*We see things not as they are, but as we are.*

— Henry Major Tomlinson, Out of Soundings, 1931

## KEY IDEAS

- Water has played a critical role in the settlement of Florida since the first humans arrived around 14,000 years ago.
- Water resources exist within legal, social, economic and political contexts.
- Early in Florida's development as a state, the main themes of water management were drainage, flood control and navigation.
- Today, Floridians are actively seeking ways to preserve, protect and restore water resources.
- Modern water management in Florida is governed by the Water Resources Act of 1972, one of the most innovative laws of its kind in the nation.

## VOCABULARY

Drainage

Ecosystem restoration

Flood control

Hammocks

Land acquisition

Limestone

Minimum flows and levels

Navigation

Prior appropriation

Reasonable and beneficial use

Riparian

Savanna

Water allocation

Water supply

In Florida for at least 14,000 years, human settlement has been shaped by water. Although its official nickname is "The Sunshine State," Florida could very well be called "The Water State." Florida is surrounded on three sides by water. Its landmass is underlain by water-filled **limestone**: highly porous rock formed over millennia from shells and bones of sea animals. The Florida Keys, a gentle arc of islands extending 93 kilometers (150 miles) south of the peninsula to Key West, are coral rock covered in most places with a thin layer of sand. Florida's abundance of sinkholes, springs, rivers and lakes is partly the result of the rising and falling of sea level. The sea is also largely responsible for the state's many bays, inlets and islands. On average, more rain falls in Florida (135 centimeters or 53 inches) per year than in any other state in the nation besides Louisiana, which receives an average of 140 centimeters (55 inches) (Henry et al. 1994). In Florida, rain does not always fall when and where it is needed, and sometimes too much rain falls too quickly.

Water management in Florida today has evolved from lessons learned through experience, as well as from changing philosophies about natural resources and the environment. Early in the state's history, Floridians were most concerned about **drainage**, **flood control** and **navigation**. Natural resources were to be used, controlled and modified. Wetlands were drained for farms, groves and houses. Canals were cut to facilitate drainage and to improve navigation. Floodwaters were held back with engineering works. Wastes were discharged without treatment into rivers, lakes and coastal waters. Florida was thought to have too much

1

water. Now, the value and the finite nature of Florida's water resources are clear. Water managers today are concerned with water quality protection, **water supply** planning and water resources development, and preservation and protection of the natural environment. Conserving, protecting and restoring natural systems, while ensuring an adequate supply of water, remains one of Florida's greatest challenges.

# The First Floridians

About 14,000 years ago, people first entered the Florida peninsula. Known as "Paleoindians," these original Floridians survived by hunting mastodons, camels, mammoths, bison and horses. At the time, much of the world's water was frozen in glaciers, sea level was much lower than it is today, and Florida was a dry, large, grassy prairie. Many present-day rivers, springs and lakes had yet to be formed; even groundwater levels were far lower than they are today. Sources of fresh water were limited, and finding them was critical to the survival of the Paleoindians and the animals they hunted for food. The Paleoindians lived and hunted near springs and lakes. Many of these sites are now under water. Archeologists have found bone and stone weapons and tools in many springs and rivers, and even offshore in the Gulf of Mexico.

About 9000 B.C., glaciers melted, sea level rose and Florida's climate became wetter. As forests replaced grasslands, big game animals disappeared. A larger number of rivers and lakes afforded many more suitable places for people to live. By 3000 B.C., when Florida's climate became similar to today's climate, people occupied almost every part of the present state. Numerous settlements developed in coastal regions in southwest, northwest and northeast Florida, as well as along the St. Johns River (Milanich 1995). People took full advantage of the plentiful supply of fish and shellfish. Along the coasts and the banks of rivers and bays, huge mounds of shells from millions of prehistoric meals began to accumulate.

When Spanish explorers arrived in Florida in the 1500s, an estimated 350,000 Native Americans were living throughout the present-day state (Milanich 1995). The Apalachee and Timucuan in the north were farmers and grew corn, beans and squash. Their large villages were often located near the region's many lakes and rivers. Although they grew food, the Apalachee and Timucuan still obtained part of their diet from hunting, fishing and gathering of wild plants. The Native Americans living in the southern part of the peninsula continued to live exclusively off the natural bounty of the land and the sea.

The Belle Glade people lived on the vast **savanna** around Lake Okeechobee. They built villages on mounds and earthen embankments, and connected them by canoe highways.

Along the southwest coast, a remarkable people called the Calusa lived by fishing, gathering shellfish, collecting plants and hunting. The Seminole Indians later immortalized the Calusa by naming the major river in the region the Caloosahatchee, "river of the Calusa." A single chief ruled the Calusa's vast domain. They lived in large villages and developed elaborate political, social and trade networks, as well as highly sophisticated art. They traveled into the gulf in canoes lashed together to form catamarans. This level of cultural development is usually only obtained with agriculture. Only by growing crops do people usually have enough food to support villages and to allow some individuals to specialize in pursuits other than obtaining food. However, the Calusa's natural environment was so rich that they were able to grow and thrive without crops.

By the early 1700s, virtually all the members of Florida's original Native American groups were gone, many having succumbed to European diseases for

which they had no resistance. Remnants of other southeastern Indian groups, later known as the Seminoles, began to move into the now abandoned fertile farmlands around the lakes and rivers in northern Florida. The only permanent settlements of any consequence were St. Augustine, Pensacola and Key West.



## Paleoindian Period
### 12,000 Years Ago

Florida shoreline

Adapted from Milanich 1995

0         100   Miles

0         100   Kilometers

3



*Seminole Indian Village, Royal Palm Hammock, 1920s*

Source: Florida State Archives

## THE SEMINOLES
### ADAPTATION TO A WATERY WILDERNESS

The Seminole Indians — with their dugout canoes, chickees, and loose, colorful patchwork clothing — have long been associated with south Florida. But the Seminoles did not originate in south Florida or any place else in the state. Their ancestors were members of populous tribes and chiefdoms from other parts of the southeastern United States. These groups — the Oconee, Yuchi, Alabama, Yamasee, Hitchiti, Koasati and dozens of others — were called "Creeks" by English settlers.

The Creeks were farmers and hunters. Corn was their principal crop, and each year the Creeks celebrated its ripening with the Green Corn Dance. Some Creeks lived in towns of 5,000 to 15,000 people. These towns were built around a plaza, which included a square ground (a square flat cleared area). In the center of the square ground was the ceremonial fire with four logs pointing in cardinal directions. At one end was a circular council house where men discussed political affairs. Family compounds consisted of a cooking house, a winter house and a storage house. Other Creeks lived outside of towns along the banks of rivers and streams in family camps (Weisman 1999).

Creeks in towns and in the countryside were linked together by clans. All Creeks belonged to clans, family groups named after animals or natural events. Some Creek clans were the Bear, Deer, Wildcat, Tiger (Panther), Wolf, Alligator, Wind and Turkey. Both male and female children belonged to the clan of their mother and remained a part of this clan for their entire lives. Clans lived together in camps or in the same part of town. When you visited a new town or a new part of Creek country, other members of your clan welcomed you.

4

By the 18th century, Creek clothing was a blend of European and traditional Indian styles. The men wore cloth turbans, belts, beads, and leggings and jackets of deerskin. Women wore long dresses of manufactured cloth.

The Creeks traveled long distances on the Southeast's numerous rivers and streams in dugout canoes. They were skilled hunters, and the men spent much of their time hunting deer and other animals. Creeks traded the pelts of the animals they hunted for European traders' guns and other manufactured items.

By the early 1700s, small bands of Creeks began migrating into northern Florida, at first to hunt and later to farm lands once occupied by the Timucuan and Apalachee Indians. These groups were now gone, their members having died in conflicts with Europeans or from European diseases for which they had no resistance.

The name "Seminole" was first recorded in field notes accompanying a 1765 map of Florida. Most scholars believe it was derived from the Spanish "cimarrone," meaning "wild" or "runaway." By 1800, many of the Seminoles were prospering, raising cattle and growing crops. Some lived in two-story houses and owned slaves. These newcomers to Florida had built towns from the Apalachicola River to the St. Johns River and from south Georgia to the Caloosahatchee River.

As the American colonists settled more and more of the South, more Indians fled to Florida. Soon, however, Florida lands also became desirable to the colonists. The Treaty of Payne's Landing, signed in 1832, required the Indians to give up their Florida lands and move to Indian Territory in the West. The Seminoles refused and a 7-year war ensued, fought between the Seminoles and the United States in the swamps and hammocks of central Florida. At the end of the war, several hundred Seminoles were forcibly shipped to Indian Territory, while others escaped into the watery wilderness of Big Cypress Swamp and the Everglades.

It was on the **hammocks**, small tree islands in the midst of marsh and swampland, that the Seminoles made their home. Never a maritime or aquatic culture, like the Calusa Indians who had lived before them in southern Florida, the Seminoles adapted their traditional ways of making a living — farming, raising livestock and hunting — to their new wetter and warmer home.

They settled in clan camps rather than in towns. Although no longer united around towns, clan camps came together each year for the traditional Green Corn Dance. They cleared trees from the center of the hammocks and grew corn, squash, melons and peas on the rich soil. They ran their cattle on lands that were dry enough. Their reliance on wild plants and animals increased. They ate the new shoots of cabbage palm and prepared flour (known as coontie) from the root of the tropical tuber zamia. They continued to hunt deer and hunted the then-abundant manatee, which they called "giant beaver."

They abandoned their traditional four-walled board cabin for chickees, distinctive open-air structures built of cypress poles with palmetto-thatched roofs. The local environment provided all the materials they needed for construction. They traveled between settlements in dugout canoes, and they exchanged their deerskin garments for fewer, more loosely fitting cotton clothes.

After the Civil War, the Seminoles, like their Creek ancestors, began to hunt commercially. They provided traders with skins of otters, deer, raccoons and alligators, as well as with feathers from the thousands of tropical birds found in the Everglades (Kersey 1975). Women in cities in America and Europe fueled the market for plumes with their insatiable desire for exotic feathers used to decorate their hats.

By early in the twentieth century, the Seminoles' world changed again. Plume hunting was outlawed in an effort to save the remaining birds. Illegal trade continued and ended only when women's fashions changed (Weisman 1999). The physical environment

5

was also rapidly changing. Roads were being built, land was being drained for agriculture, and new communities were springing up overnight. In order to survive, the Seminoles had to adapt. This time they adapted by responding to the growing tourist market (West 1998). They entertained tourists with alligator wrestling and later with airboat rides. Women used hand-cranked sewing machines to more quickly sew the colorful cotton patchwork for which the Seminoles are famous. Seminole dolls and patchwork clothing became popular tourist items.

By the 1960s the Seminoles had separated into two political groups: the Seminole Tribe of Florida and the Miccosukee Tribe. A group of about 100 individuals continued to live in the Everglades and chose not to enroll in either tribe.

Today, tourism is still an important aspect of the Seminole culture and economy. Both the Seminole Tribe and the Miccosukee Tribe operate high-stakes bingo palaces. On its Big Cypress reservation, the Seminole Tribe attracts tourists with its Ah-Tha-Thi-Ki ("to learn") Museum, Big Cypress Hunting Adventures, and Billie Swamp Safari. The Seminoles also run multi-million dollar cattle and citrus operations and maintain a fleet of aircraft. But they still pass their legends on from generation to generation and they still belong to clans (Bear, Panther, Wind, Otter, Snake, Bird, Deer and Big Town). They continue to gather each spring in a secret location far from the hustle and bustle of the modern world to reaffirm their identity and survival through the Green Corn Dance.

## Drainage, Flood Control and Navigation

When Florida became a state in 1845, most of its 70,000 inhabitants lived in the north. The state had few assets other than land, much of which was unsuitable for development without drainage and flood control. Water remained the main avenue of travel, and Floridians clamored for canals and river improvements. As early as 1824, the legislative council of the territory had proposed a ship canal across north Florida to spare ships the long and dangerous journey around the peninsula.

At statehood, Congress granted the state 500,000 acres (202,400 hectares) of federal land outright for "internal improvements." Five years later, the state received an additional 20 million acres (8 million hectares) through an act that transferred all "land unfit for cultivation due to its swampy and overflowed condition." In 1881, the state sold 4 million acres (1.6 million hectares) at 25 cents per acre to Philadelphia businessman Hamilton Disston.

The following year, Disston began to dig canals in the upper Kissimmee River basin and the Caloosahatchee-Lake Okeechobee region. These waterways were to drain the land in the interior of the state and to provide corridors to transport crops and commercial products.

As the 1800s drew to a close, Florida remained largely dependent on water transport. Phosphate had been discovered in the Peace River valley, and boats equipped with steam dredges were used to mine the sand bars. Steamboats carried passengers and freight to coastal ports and to hundreds of riverside docks. Florida's leading product, lumber, was transported by water to markets in Europe and the northeastern United States. Construction of railroads in the late 1800s opened virgin forests to the growing lumber and naval stores (turpentine and rosin) industries. Before railroads, water transportation limited lumbering to the banks along major rivers and streams. During times when rivers were low, logs

could not be transported to markets and water-powered saw mills had to be shut down.

Meanwhile, Florida's mineral springs, spas, rest homes and warm climate began to attract northern visitors seeking relief from rheumatism and from asthma and other lung ailments. Steamboat tours along the major rivers of north and central Florida became very popular, especially with hunters. In fact, by the late 1800s, game animals along the middle St. Johns River had become scarce.

As the twentieth century dawned, south Florida was still largely in its natural state.

In 1904, Napoleon Bonaparte Broward was elected governor by promising to drain the Everglades. Established in 1913, the Everglades District became the first of several districts that carried out drainage projects in south Florida.

Drainage projects around Lake Okeechobee encouraged settlement and development of agriculture, but the region was still vulnerable to the catastrophic effects of extremely strong hurricanes that swept across south Florida in the 1920s. During the 1926 hurricane, the dike along the southern perimeter of the lake broke, killing more than 400 people in the Moore



## Navigation
### 1880–1900

Source: Fernald and Purdum 1996

# Growth of
# Water Control System
# South Florida

——— Major canal existing at given date

——— New canal since last date

········· Major levee



1920



1930



1950



1960



1970

Source: Fernald and Purdum 1996

8

Haven area. During the 1928 hurricane, wind-blown water overflowed the lake, drowning more than 2,000 people. As a consequence, the Okeechobee Flood Control District was established in 1929. The U.S. Army Corps of Engineers began a major program of flood control in Florida, including construction of the 53-kilometer-long (85-mile-long) Herbert Hoover Dike flanking Lake Okeechobee.

In 1947, two more hurricanes and floods hit south Florida. Again, the existing network of canals and levees failed to protect farms and newly populous coastal communities. In response, Congress passed the Flood Control Act of 1948, calling for a huge multistage flood control project designed and constructed by the U.S. Army Corps of Engineers. The Central and Southern Florida Flood Control District was created by the Florida Legislature in 1949 to operate and maintain the massive project.

Streams and lakes were also modified in other parts of Florida. In the late 1800s and early 1900s, land was drained in the Ocklawaha and Peace river basins for farms, and canals were dug to create navigation routes for shipping vegetables, citrus, timber and other products. Coastal navigation waterways were also under construction, and the Intracoastal Waterway from Jacksonville to Miami was completed in 1912. The waterway provided a safer means of travel along the often hazardous east coast, and it linked river channels and the Okeechobee Waterway to Florida's deep-water coastal ports.

Construction of major water control works continued into the 1960s. In 1961, Congress authorized the Four River Basins, Florida Project for flood control in the Tampa Bay area. Construction of the Kissimmee Canal began in 1962. Work on the Cross Florida Barge Canal, first begun in 1935, resumed in the 1960s with the installation of major locks and dams on the Withlacoochee and Ocklawaha rivers. Opposition to this canal grew steadily during the late 1960s until President Nixon halted construction in 1971. Controversy

about the Rodman Dam and Reservoir portion of the Cross Florida Barge Canal project persists to this day. Various environmental groups have called for removal of the dam and the restoration of the Ocklawaha River. Portions of the Kissimmee River, channelized barely 30 years ago, are now being restored.

## 1972
## YEAR OF THE ENVIRONMENT

- Florida Water Resources Act creates regional water management districts and establishes a permit system for allocating water use.

- Land Conservation Act authorizes the sale of state bonds to purchase environmentally endangered lands.

- Environmental Land and Water Management Act creates Development of Regional Impact and Area of Critical State Concern programs.

- The Comprehensive Planning Act requires development of a state comprehensive plan.

- First public hearing on the restoration of the Kissimmee River.

- Federal Clean Water Act sets "swimmable and fishable" as goal for all U.S. waters.

- Florida citizens approve a constitutional amendment authorizing $240 million in state bonds for the Department of Natural Resources to purchase environmentally endangered lands.

# Modern Water Management

## 1970s

Attitudes toward water and the environment began to change as the consequences of uncontrolled growth and damage to the natural environment became more and more evident. During 1970–71, Florida experienced its worst drought to date, spurring state leaders to action. Four major pieces of legislation were enacted by the 1972 Legislature: the Environmental Land and Water Management Act, the Comprehensive Planning Act, the Land Conservation Act, and the Water Resources Act. These laws are based on the philosophy that land use, growth policy and water management cannot be separated, a theme that continues to this day.

Florida's institution of water management is unique — regional agencies, established by the Legislature and recognized in the state constitution, based on hydrologic boundaries and funded by a tax usually reserved for local government.

The 1972 Water Resources Act established five water management districts with broad authority and responsibilities. Responsibilities encompass the four broad categories of water supply (including conservation and allocation), water quality, flood protection and natural systems management.

## Water Management Districts



Arrows indicate the general direction of water flow

• Main office

Northwest Florida Water Management District
81 Water Management Drive
Havana, FL 32333-4712          1-850-539-5999

Suwannee River Water Management District
9225 County Road 49
Live Oak, FL 32060          1-800-226-1066

St. Johns River Water Management District
4049 Reid Street
Palatka, FL 32177          1-800-451-7106

Southwest Florida Water Management District
2379 Broad Street
Brooksville, FL 34604-6899          1-800-423-1476

South Florida Water Management District
3301 Gun Club Road
West Palm Beach, FL 33406-4680          1-800-432-2045

10

# Water Deficiency and Surplus



Deficiency or Surplus

-100   0   100   200  Centimeters
-40   0   40   80  Inches

Source: Fernald and Purdum 1998

## WATER LAW

Study this map. What differences do you notice between the eastern and western United States?

Significantly less water is available in the western United States than in the eastern United States. This fact has resulted in two very different systems of law governing the use of water.

### Western Water Law

In the West, water is often scarce. Cities and farms may be long distances from sources of water. Western water law, also called the **prior appropriation** doctrine, is based upon the premise that water is a property right derived from a historic claim to water — "first in time, first in right." The first person or entity, such as an agricultural business, a mining company or a city, to withdraw the water from a stream or an aquifer had rights to continue to do so. These originated during the Gold Rush. Mining required diversion of water, and miners wanted certainty that they would have enough water to continue their operations. Later the doctrine of prior appropriation was modified to include the requirement that the water must be used for beneficial purposes.

Water rights in the West are separate from land rights. A water right is a very valuable commodity that can be bought and sold and passed from one generation to the next.

<u>Advantages</u>: Certainty. Users know they will continue to have water indefinitely.

<u>Disadvantages</u>: May lead to waste by discouraging conservation since reduction in water use may lead to reduction in water rights. Relatively uneconomic or socially

although some people think that free market forces will transfer water rights to the most economical uses. Water needs of natural systems may not be met because all of the water in a stream may have been appropriated for human uses.

### Eastern Water Law

Water is considerably more abundant in the eastern United States than it is in the western United States. Eastern water law, also called the **riparian** system, is based on the premise that the riparian, the landowner along the shore, had the right to use the water for boating, fishing, swimming or viewing. Riparians also have a right to take as much water as they want to use on their land as long as they do not interfere with the reasonable use of water by other riparians. Landowners have a similar right to withdraw ground water for use on overlying land.

Advantages: Generally more protective of the water resources than Western law.

Disadvantages: Restricted commercial and other uses of water on nonriparian lands. Ongoing riparians constantly had to adjust to new riparians. Courts had to resolve disputes on a case-by-case basis.

### Florida Water Law

Florida water law, found in Chapter 373 of the *Florida Statutes* (available on the Web at www.leg.state.fl.us), is considered by many to combine the best aspects of Western (prior appropriation) and Eastern (riparian) law. In Florida, water is a resource of the state. It is not owned by anyone.

Consumptive use permits: Water is allocated by a permit system administered by the five water management districts. The allocation system is designed to (1) prevent waste, (2) provide certainty to existing users, (3) provide equal rights irrespective of economic power, (4)

future users by requiring water managers to address comprehensive planning and resource development. Permits to use water are issued by the water management districts and may be issued for up to 50 years. The quantity of water available for use under a permit may be reduced during droughts.

To obtain a permit, the applicant must establish three things: the use is **reasonable and beneficial**, the use will not interfere with any presently existing legal use of the water, and the use is consistent with the public interest. If there is not enough water for all proposed uses, the water management districts are to make decisions based on which use best serves the public interest. If all the competing applicants equally serve the public interest, preference is given to the existing permit holder.

Unlike the Western system of prior appropriation, Florida law discourages the long-distance transfer of water across hydrologic boundaries. A transfer must not diminish the availability of water for present and future needs of the sending area, and the receiving area must have exhausted all reasonable local sources and options. In addition, the transfer of water across county boundaries is discouraged.

**Minimum flows and levels**: Florida water law requires the water management districts to establish minimum flows for all rivers, streams and canals. This means the districts must identify an amount of water flow below which further withdrawals would cause significant harm to the water resource or to the ecology of the area. The law also requires the water management districts to establish minimum levels for ground water and surface waters (rivers, streams, canals, lakes and wetlands) below which further withdrawals would cause harm to the water resource. Surface waters less than 25 acres (10 hectares) generally are exempt from this requirement.

Determining minimum flows and levels requires complex scientific and technical analyses. The water management districts are

now making progress in establishing minimum flows and levels, which will play a much greater role in water resources planning and permitting in the future.

<u>Advantages</u>: Consumptive use permits help ensure that the use of water in Florida is reasonable and beneficial. Some degree of certainty is given by permits that give the right to withdraw a certain amount of water for a

given time period. The minimum flow provision and the restrictions on the long-distance transport of water help protect the water resources and the environment.

<u>Disadvantages</u>: Terms such as "public interest," "reasonable and beneficial" and "significant harm" are open to interpretation and may result in conflicts that have to be resolved through the courts.

The districts are drawn on watershed boundaries. These are natural drainage basins, not political boundaries. Water management districts are overseen at the state level by the Department of Environmental Protection. They are governed by a board appointed by the Governor and approved by the Senate. They are funded to do the job of water management by a tax granted to them by the people of Florida in 1976. However, the budgets of the districts are closely monitored by the Governor's Office and by the Legislature.

### 1980s

In the late 1970s and early 1980s, protection of Florida's ground water, the primary source of drinking water in the state, became a major issue. The 1983 Task Force on Water Issues reported that the threat of contamination of ground water and related surface waters from hazardous wastes, sewage, industrial wastes and pesticides had become a major problem. The Legislature passed the Water Quality Assurance Act, granting the Department of Environmental Regulation more authority to protect ground water and to clean up contaminated resources.

In 1985, the Florida Legislature passed the Surface Water Improvement and Management Act (SWIM), the first statewide program for protecting or restoring waters of regional or statewide significance. The initial legislation named the first six water bodies to be restored and

protected under SWIM: Lake Apopka, Tampa Bay, Lake Okeechobee, Biscayne Bay, the Indian River Lagoon and lower St. Johns River.

### 1990s

Throughout the 1990s, Florida continued to protect environmentally sensitive lands, critical water resources and vital habitats through **land acquisition** efforts. With programs such as Preservation 2000 and Save Our Rivers, Florida has carried out the largest land acquisition effort in the nation. In the last quarter of the twentieth century, Florida purchased 2.1 million acres (850,000 hectares) of conservation and resource-based recreation land. In combination with land protected by local and federal programs or under private conservation management, these purchases protect and preserve 7.6 million acres (3.1 million hectares) of land (about 22 percent of the land in Florida).

In the 1990s, major **ecosystem restoration** projects and land acquisition programs were undertaken throughout the state. The Everglades Forever Act, passed by the Legislature in 1994, outlines a comprehensive program for restoring water quality and improving the amount, timing and distribution of water flows for the entire south Florida ecosystem (Kissimmee River-Lake Okeechobee-Everglades-Florida Bay). In the St. Johns River Water Management District, restoration projects began in the Lower St. Johns River Basin,

13

## WATER KNOWS NO POLITICAL BOUNDARIES

The Apalachicola-Chattahoochee-Flint River Basin (ACF) is located within three states — Georgia, Alabama and Florida. The headwaters are in Georgia above Lake Lanier near Atlanta. The basin terminates in northwest Florida where the Apalachicola River flows into Apalachicola Bay on the Gulf of Mexico. In 1990, Florida joined with Alabama in a federal lawsuit over the Army Corps of Engineers' and Georgia's plan to reallocate water in Lake Lanier for the Atlanta urban area's water supply. In 1997, after years of negotiations, the three states entered into the ACF River Basin Compact, ratified by the three state legislatures and Congress. The Compact directed the three states to develop a water allocation formula to apportion the water in this river system.

The Suwannee River Basin begins in Georgia in the Okefenokee Swamp and ends in the Gulf of Mexico. Two of the Suwannee's major tributaries, the Withlacoochee (distinct from the southern Withlacoochee) and the Alapaha, also originate in Georgia. In the 1990s, the Suwannee River Water Management District and the Florida Department of Environmental Protection and their counterpart agencies in Georgia formed the Suwannee Basin Interagency Alliance. This group is working to develop a basinwide management planning and river protection program that, for the first time, will address the entire watershed.

Lake Apopka, the Indian River Lagoon, and the upper Ocklawaha River Basin. In the Northwest Florida Water Management District, restoration began in portions of Tates Hell Swamp, formerly ditched and drained for pine plantations. In the Suwannee River Water Management District, large parcels within the 100-year floodplain of the Suwannee River are being acquired, protected, and restored where necessary. In the Southwest Florida Water Management District, over 30 ecosystem restoration projects are under various stages of development for the Tampa Bay estuarine ecosystem.

In 1999, the Florida Legislature passed the Florida Forever Act, the successor to Preservation 2000. The act provides $300 million per year for 10 years for land acquisition, water resources protection, ecosystem restoration, and urban parks and open space. Half of the water management districts' allocation (35 percent) may be used for water resources development, including restoring aquifer recharge, capturing and storing of excess flows of surface water, surface water reservoirs, and implementing aquifer storage and recovery.

## Conclusion

The basic water management framework established by the 1972 Water Resources Act has remained intact. The Department of Environmental Protection and the water management districts jointly implement a broad range of programs related to water supply, flood protection, water quality and natural systems protection.

Water supply and **water allocation** have emerged as paramount issues for the next century. In some areas of the state, demands for water are beginning to exceed the capacity of aquifers and surface waters to meet these demands. Competition for water is increasing. The effects of withdrawing more ground water than rainfall can replenish are evidenced by saltwater intrusion, diminished spring flow, dried-out marshes and disappearing lakes. In some areas, new, easily developed, clean sources of water no longer exist. Alternative sources can be developed, but at higher costs than traditional sources. Although Florida is in many ways "The Water State," its supplies are not boundless.

14

# Conservation Lands
# 2001



Conservation lands are relatively undeveloped lands. They help protect our freshwater supply, are home to a rich array of plants and animals, and provide recreation and refuge to residents and tourists. Many of the lands Florida was anxious to sell for drainage and development early in its history are now once again in public ownership. Included are state, federal and local government conservation lands, as well as privately owned parcels.

Conservation lands

Source: Florida Natural Areas Inventory 2001

15

# Florida's Population Growth



Source: U.S. Bureau of the Census

Each square represents 50,000 inhabitants

15,982,000

9,747,000

4,952,000

1,897,000

968,000

529,000

269,000

140,000

34,700

1830  1860  1880  1900  1920  1940  1960  1980  2000

# Population Density
# 2000



**Persons per Square Mile**

Fewer than 50
50–99
100–899
900–2,000
Over 2,000

Source: U.S. Bureau of the Census

17

# The Human Framework Time Line



**12,000 B.C.**
First Floridians
enter the Florida
peninsula.

**1774**
The Suwannee River is
"The cleanest and purest
of any river. . . almost as
transparent as the air we
breathe."
— Naturalist William Bartram

**1821**
Spain cedes East and West
Florida to the United States



**1500**
Beginning of Spanish
exploration of Florida.

350,000 Native Americans living
throughout the present-day state.

**1827**
"In appearance it [northern Florida] is
entirely unlike any part of the United
States. The lakes abound in fish, trout,
brim, perch and soft-shelled turtle; and
in the winter with wild fowl."
— Judge Henry M. Brackenridge

Source: Florida State Archives



*Timucuan Indians depositing grain in public granary*

18

**1848**
Secretary of the Treasury Buckingham Smith declares the Everglades can be reclaimed by digging canals. Stephen R. Mallory, collector of customs at Key West, warns "it will be found wholly out of the question to drain all the Everglades."

**1851**
Board of Internal Improvement established to transfer wetlands to private companies for drainage. Dr. John Gorrie of Apalachicola patents a process for making ice; he used the process to cool the rooms of his patients.

**1835**
Steamboats begin arriving in Florida.

**1845**
Florida statehood. Federal government grants 500,000 acres of land to the state for "internal improvements."

**1850**
U.S. Congress conveys all swamp and overflowed lands to the state.


Source: Florida State Archives


*Dr. John Gorrie*

19



*John Muir ca. 1870*

Source: Florida State Archives

**1867**
Florida is "so watery and vine tied that pathless wanderings are not easily possible in any direction."
— John Muir

**1875**
The Ocklawaha River is "the sweetest waterlane in the world" and Silver Springs Run is a "journey over transparency."
— Sidney Lanier, *Florida: Its Scenery, Climate, and History*

**1866**
Governor Davis Walker grants William Gleason over 6 million acres based on his proposal to drain swamplands east and south of the Everglades.

**1870**
Jacksonville becomes a major port for lumber production and export.

**1868**
State's first water pollution law establishes a penalty for defiling or corrupting springs and water supplies.

Source: Florida State Archives



*Lumber wharf, Jacksonville, 1870s*

Source: Florida State Archives



*Water hyacinths, Lake Monroe, between 1903 and 1906*

**1879**
Santa Fe Canal Company constructs two canals from Waldo to Melrose via Lake Alto and Lake Santa Fe.

**1881**
State of Florida sells 4 million acres of land near Lake Okeechobee and in the Kissimmee River basin to Hamilton Disston of Philadelphia for 25 cents per acre.

**1884**
Mrs. W. F. Fuller plants water hyacinths along the shore of her home on the St. Johns River.

**1882**
Disston links Lake Okeechobee outlet to the Gulf coast via the Caloosahatchee River. ". . . by their insane shooting at everything, the tourists were driving all birds, alligators, and animals from this portion of the [Ocklawaha] river."
— George Barbour, *Florida for Tourists, Invalids, and Settlers*

Source: Florida State Archives



*Steamboat on the Ocklawaha River, 1877*

21

Source: Florida State Archives



*Frost damage to citrus crop*

**1886**
Freeze and hurricane destroy north-central Florida's citrus industry.

**1894–95**
Great Freeze ends commercial agriculture industry in north Florida.

**1889**
Phosphate is discovered near Dunnellon.

Source: Florida State Archives



*Early phosphate mine*

**1900**

"The existing practices of lumbermen in cutting timber land so close . . . [left] no young trees unscathed to form new forests, and when the pine disappears, it is replaced by utterly worthless scrub."

— *Pensacola Daily News, March 27*

**1900**

"[I]n our very midst, we have a tract of land one hundred and thirty miles long and seventy miles wide that is as much unknown to the white man as the heart of Africa."

— Hugh L. Willoughby, *Across the Everglades*

Source: Florida State Archives



*Reclaiming the great Everglades, 1912*

**1904**

Napoleon Broward elected governor on a promise to drain the Everglades for gardens and farms.

23

Source: Florida State Archives



*Florida East Coast Railway, Key West Extension, crossing Long Key Viaduct*

**1906**

John Gifford introduces melaleuca as the ideal plant for drying the Everglades.

**1912**

The Flagler Railroad to Key West is completed.

Intracoastal Waterway from Jacksonville to Miami is completed.

**1907**

Everglades Drainage District established.

**1913**

"Drainage of the Florida Everglades is entirely practicable and can be accomplished at a cost which the value of the reclaimed land will justify, the cost being very small."

— Florida Everglades Engineering Commission

Source: Florida State Archives



*Former Governor Jennings and family with press tour of Everglades Drainage Project, 1907*

Source: Florida State Archives



*Tamiami Trail blazers*

**1916**
Construction of the Tamiami Trail begins.

**1920s**
South Florida real estate boom; Carl Fisher transforms wet, mangrove-fringed island to resort of Miami Beach; saltwater intrusion in St. Petersburg's municipal well fields.

Source: Florida State Archives



*Bathing beauties at the beach*

25

**1931**
Gulf Intracoastal Waterway extended from Pensacola to Carrabelle.

**1929**
Okeechobee Drainage District formed. In *From Eden to Sahara: Florida's Tragedy*, John Kunkel Small predicts that, once drained, Florida will become a desert.

**1926**
Hurricane kills 400 in Lake Okeechobee area.

**1935**
Construction begins on the Cross Florida Barge Canal; "Labor Day Hurricane" hits the Keys, killing 400.



**1928**
Hurricane kills 2,000 south of Lake Okeechobee when earthen dike fails to contain Lake Okeechobee: "The monstropolous beast had left his bed. The two hundred miles an hour wind had loosed his chains. He seized hold of his dikes and ran forward until he met the quarters; uprooted them like grass and rushed on after his supposed-to-be-conquerors, rolling the dikes, rolling the houses, rolling the people in the houses along with other timbers. The sea was walking the earth with a heavy heel."
— Zora Neale Hurston,
    *Their Eyes Were Watching God*

Source: Florida State Archives



*Funeral service for hurricane victims, 1928*

Source: Florida State Archives



*Drought, Everglades*

**1931–45**
Florida experiences drought, saltwater contamination in wells along the coast, and fires in dry muck soils in the former Everglades.

**1937**
Work suspended on the Cross Florida Barge Canal.

| 1935 | 1940 | 1945 |

**1937**
U.S. Army Corps of Engineers completes 85-mile-long Herbert Hoover Dike flanking three-quarters of Lake Okeechobee.

**1941–45**
In World War II, Florida became a training ground for tens of thousands of soldiers. Many later returned as tourists or to become residents.

Source: Florida State Archives



27

Source: Florida State Archives



*President Harry Truman with John Pennekamp at dedication of Everglades National Park, 1947*

**1947**
Two hurricanes flood Miami. First algal blooms reported in Lake Apopka. Everglades National Park opens — "There are no other Everglades in the world."
— Marjory Stoneman Douglas,
   *The Everglades: River of Grass*

**1949**
Florida Legislature creates the Central and Southern Florida Flood Control District to act as local sponsor for the federally authorized project.

**1948**
Congress authorizes the Central and Southern Florida Flood Control Project; U.S. Army Corps of Engineers proposes three water conservation areas.

**1955**
State Board of Health declares Peace River "is now suffering severely from excessive organic and chemical pollution."

Source: Florida State Archives



*Kissimmee River, Canal 38*

**1964**
U.S. Army Corps of Engineers recommends construction of a $12.5 million hurricane levee across Hillsborough Bay at Tampa. "God was good to this country . . . But in His wisdom the Creator left something for men to do for themselves."
— *President Lyndon B. Johnson, Groundbreaking for the Florida Cross State Barge Canal*

**1962**
Construction of the Kissimmee Canal begins.

**1957**
Jim Woodruff Lock and Dam on the Apalachicola River becomes fully operational.

**1960**
Hurricane Donna floods Tampa Bay Area.

| 1955 | 1960 | 1965 |
|------|------|------|

**1959**
Suwannee River Authority and Peace River Valley Water Conservation and Drainage District created.

**1961**
Congress authorizes the Four River Basins, Florida Project for flood control in Tampa area; the Southwest Florida Water Management District is created; south Florida receives only 30 inches of rain.

**1965**
Congress enacts the Federal Water Quality Act.

29

**1971**
Congress orders U.S. Army Corps of Engineers to deliver more water to Everglades National Park; construction of the Florida Cross State Barge Canal halted; canalization of the Kissimmee completed.

**1966**
Central and Southern Florida Flood Control District pumps excess water from farmlands into water conservation areas, drowning hundreds of deer.

**1972**
Year of the Environment (see page 9)

**1970**
Four River Basins, Florida project is halted for restudy; first Earth Day.

**1974**
Big Cypress National Preserve, located in Ochopee, Florida, next to the Everglades National Park, was established.

**1965** — **1970** — **1975**

**1966–67**
Fifteen new sinkholes appear in central Florida, indicating a serious drop in the water table.

**1970–71**
State experiences worst drought to date.

**1973**
Record flood occurs in the upper reaches of the Suwannee River basin.

**1969**
United States Geological Survey map shows area in southwestern Polk County as a "caution area" for further water withdrawals.

**1970s**
Escambia Bay experiences repeated massive fish kills.

Source: Suwannee River Water Management District



*Suwannee River at Dowling Park, April 1973 flood*

30

**1976**
Summary Report on the Special Project to
Prevent Eutrophication of Lake
Okeechobee finds "water delivered to Lake
Okeechobee from the Kissimmee River by
Canal-38 contributes significantly to the
eutrophication of the Lake."

**1985**
Elevated levels of nitrogen
detected in the upper reaches
of the Suwannee River.

**1980**
Florida Hazardous Waste Management
Act enacted. Floridan aquifer levels in
Ft. Walton Beach area had declined as
much as 100 feet below sea level.

**1984**
The Warren S. Henderson
Wetlands Protection Act is
enacted.

**1982–83**
Over 400 drinking water wells in
northeastern Jackson County
found to be contaminated by the
pesticide ethylene dibromide.

**1977**
Upper St. Johns
River Basin
Restoration
Project begins.

**1979**
Conservation and
Recreation Lands
(CARL) Trust Fund
established.

**1981**
Florida Legislature creates
Water Management Lands
Trust Fund, provides
funding for Save Our
Rivers land-buying
program.

**1983**
Florida Water Quality
Assurance Act establishes
statewide groundwater
monitoring network;
Governor Bob Graham
announces the Save Our
Everglades program.

31

**1993**
The State Department of Natural Resources and Department of Environmental Regulation are merged into the Department of Environmental Protection. The Department of Community Affairs estimates 1.3 million Floridians live in areas subject to flooding.

**1988**
St. Johns River Water Management District begins restoration of Lake Apopka.

**1994**
Everglades Forever Act outlines major elements of Everglades restoration; Tropical Storms Alberto and Beryl and Hurricane Opal flood Panhandle.

**1986**
Florida Legislature establishes the nation's first program to clean up contamination from leaking underground petroleum storage tanks.

**1990**
Preservation 2000 provides $300 million per year over 10 years to purchase ecologically valuable lands.

**1987**
Florida Surface Water Improvement and Management (SWIM) Act enacted.

**1989**
Southwest Florida Water Management District declares northern Tampa Bay, eastern Tampa Bay, and Highlands Ridge as water use caution areas.

**1995**
Florida Water Plan adopted by the Department of Environmental Protection declares "water must be managed to meet the water needs of the people while maintaining, protecting, and improving the state's natural systems."

Source:
South Florida Water Management District



*Hurricane Andrew, 1992*

**1992**
Hurricane Andrew strikes southern Dade County, causing $16 billion in damages; Congress directs the U.S. Army Corps of Engineers to undertake restoration of the Kissimmee River; Southwest Florida Water Management District combines its three water use caution areas to establish the Southern Water Use Caution Area.

Photo credit:
St. Johns River Water Management District



**1996**
Water management districts
required to submit priority lists
and schedules for establishment
of minimum flows and levels.

**1999**
Florida Forever Act provides $300 million
dollars per year for 10 years for land
acquisition, water resources protection
and supply, ecosystem restoration, and
urban parks and open space.

*Upper St. Johns River Basin, 1995*



Photo credit: Diane Sterling



**1997**
Florida Legislature defines regional
water supply planning responsibilities
of the five water management districts,
local governments, and utilities;
Legislature approves an agreement with
Alabama and Georgia establishing the
basis for an interstate compact on the
Apalachicola/Chattahoochee/Flint
River system; 38 percent of flow from
Florida's domestic wastewater treatment
plants is reused.

*Pitcher plants, Apalachicola National Forest*

33

*Chapter 2*

# Water: It's Magic

*"If there is magic on this planet,*
*it is in water."*

— Loren Eisley, Naturalist and Philosopher

*"One question I ask of you:*
*Where flows the water?*
*Deep in the ground in the gushing spring,*
*A water of magic power — The water of life!*
*Life! O give us this life!"*

— Native Hawaiian poem

## KEY IDEAS

- Water is critical for all life on Earth.
- Water has many amazing chemical and physical properties.
- Most of the water on Earth is salt water.
- Only 3 percent of the Earth's water is fresh water and less than 1 percent of the fresh water is available for use. Most fresh water is frozen in glaciers and polar ice caps.
- Water is continuously circulating between the sky, land and sea.
- No significant amount of water enters or leaves the global water cycle.
- Water does enter and leave Florida's water cycle.
- Rainfall in Florida varies with season and location.
- Florida is susceptible to extreme weather events including tornadoes, hurricanes, floods, thunderstorms and droughts.
- Florida's climate is influenced by global patterns.

## VOCABULARY

| | |
|---|---|
| Atom | La Niña |
| Capillarity | Liquid |
| Condensation | Molecule |
| Drought | Precipitation |
| El Niño | Saltwater intrusion |
| Evaporation | Solid |
| Evapotranspiration | Solvent |
| Flood | Stormwater runoff |
| Gas | Surface tension |
| Global warming | Surface water |
| Ground water | Tornado |
| Humid subtropical | Transpiration |
| Hurricane | Tropical savanna |
| Hydrologic divide | Water budget |
| | Water cycle |

The wonders and life-giving powers of water have awed and intrigued people throughout the world. To many, water came first in the unfolding of creation. Only after water did land appear, then plants and animals, and then humans. The Winnebago Indians of Wisconsin speak of the Earthmaker. Sitting alone in empty space, the Earthmaker began to cry, and as his tears fell, the waters of the Earth formed. For the Maori of New Zealand and the Crow Indians of the North American plains, in the beginning there was no land on Earth, only water. The Book of Genesis describes Earth before creation as dark, with water covering all the land. Scientists believe life on Earth began in water, where it remained for 3 billion years. About 450 million years ago, plants began to grow out of water, but only on wet ground (Hooper and Coady 1998). Today, water covers 75 percent of the Earth.

Water is essential for all life processes. Plants and animals are between 50 and 97 percent water. The human body is 70 percent water. Protoplasm, the basic material of all living cells, is a solution of fats, carbohydrates, proteins, salts and other chemicals in water. Sap in plants and blood in animals are largely water. Humans can live almost 30 days without food, but only about three to four days without water.

Water's cleansing, healing and renewing powers are unmatched by any other resource on Earth. Religions baptize their initiates in water, and the aged and infirm continue to flock to springs thought to have special healing powers. Water is

*IN THE BEGINNING*

The world was covered with water, and Old Man and all the animals floated about on a raft. Old Man sent a beaver to bring up some mud, but the water was too deep. Old Man next sent a loon but the water was still too deep. At last he dispatched a muskrat. After a long time, the muskrat surfaced with a clump of mud in its paws. Old Man made the land and all the people from the mud retrieved by the muskrat.

— Plains Indians

The Sun-father and the Moon-mother ordered their children to leave the heavens and to live on the Earth. But Earth was completely flooded with water, and the children were afraid. The elk, the bravest of all animals, went with them. The elk dove into the water and called for the wind to dry the land. Joyous, the elk rolled on the new land, and plants sprang up from the loose hair he left behind.

— Osage Indians

Source: Feder 1997

fun as well as awe-inspiring and is the single most sought-after recreational resource on Earth.

Water and the lack of water can also bring death and destruction. People have always feared the devastating effects of floods, droughts and storms. Modern technology has helped us predict these events and prepare for them, but their occurrence is still largely beyond our control.

## Water's Structure

Water has some remarkable chemical and physical properties. The water **molecule** is simple: two hydrogen **atoms** bound to one oxygen atom. An extremely strong bond called a covalent bond connects these atoms. The two hydrogen atoms are always at an angle of exactly 104.5 degrees from each other, making all diagrams of water molecules "look like the ears on a round head of a panda" (Watson 1988). Because the fit between the atoms is so perfect, water is among the most stable compounds in nature. The tiniest droplet of water contains more than 300 trillion water molecules.

### WATER'S AMAZING PROPERTIES

• Water is the only substance that exists in nature as a **liquid**, a **solid** and a **gas**.

• Water circulates continuously between land, sky and sea.

• Pure water is odorless, transparent and, for many people, tasteless. Taste is often from minerals or other items dissolved in the water.

• Unlike most liquids, water expands rather than shrinks when cooled.

Thus, water is lighter in its solid state than it is in its liquid state. This is why ice floats. Imagine how different the world would be if ice sank. In colder climates, rivers, lakes and ponds would be frozen solid, and fish and other aquatic life would be unable to survive the winter.

• Water holds heat much better than air does. Air temperature may change rapidly, but water temperature changes slowly. On a cool summer night, seawater is still warm enough for a swim.

35

• Water is the universal **solvent**. This means that more substances will dissolve in water than in other liquids. This property makes water very useful for washing clothes, dishes and human skin. It also means water becomes contaminated or polluted very easily.

• Water shapes the surface of the Earth. In combination with gravity, wind and expansion and contraction caused by freezing and thawing, water can dissolve rocks, wear down mountains and hills, and sculpt drainage basins.

• Water has **surface tension**. Surface tension occurs when two substances that do not mix freely, such as air and water, come into contact. The water molecules draw closer together and cling or adhere to each other like little magnets, causing

the surface to shrink (Wick 1997). Because of surface tension, insects can skate across the surface of a pond, which seems to have a skin. Surface tension also holds molecules together in drops.

• Water has **capillarity**. Capillaries are long, slender, tubelike structures. Water rises in capillaries because of the attraction of water molecules to each other and to the molecules on the side of the solid capillary. For example, if you rest a straw in a glass of liquid, the liquid rises in the straw above the level of liquid in the glass. This is because of capillarity, which results from the attraction of the water molecules to each other and to the molecules in the straw. Because of capillarity, plants are able to draw water from the ground up through their roots and stems.

## Global Water Cycle

Until the late 1980s, scientists assumed the amount of water on Earth was fixed and finite. Now some scientists believe that Earth's water supply may be constantly growing as a result of huge "snowballs" that enter the Earth's gravitational field from outer parts of the solar system. These snowballs, about the size of small houses, are thought to melt and evaporate when they approach the Earth (Frank 1990, cited in Pielou 1998). In any event, this possible addition is relatively insignificant in relation to the vast amount of water constantly on Earth.

Water on Earth today has been here for millions and perhaps billions of years. Scientists believe water originated early in the Earth's history from hydrogen and oxygen in the gas cloud from which our universe formed.

In 1998 in Monahans, Texas, five boys were playing basketball when they heard what sounded like a sonic boom. In a nearby vacant lot, they saw a black rock the size of a grapefruit. One of the boys picked up the still-warm rock and



**World's Water**

1% of the water on Earth is FRESH WATER that we can use for drinking, transportation, heating and cooling, industry and agriculture

2% of the water on Earth is in GLACIER ICE

97% of the water on Earth is SALT WATER

WORLD'S WATER

handed it to his father, who correctly identified it as a meteorite. Inside was a minute amount of liquid water, the first ever found in a meteorite. Scientists believe this water dates from very early in the solar system and may be 4.5 billion years old. This finding supports the theory that water is indeed very ancient. It also suggests that perhaps there were other places in the solar system where life may have developed.

Nearly all of the water on Earth is salt water. Less than 3 percent is fresh water and most of this is locked up in glaciers and polar ice caps. Less than 1 percent of the world's water is fresh water available for human and nature's use.

The water on Earth is continuously circulating between the air or atmosphere, the land and the sea. The ways in which water moves around, above, on and within the Earth is the hydrologic or **water cycle**.

The sun is the energy source for the water cycle, causing water to evaporate from lakes, rivers and oceans, as well as from land surfaces and vegetation. When water evaporates, it changes to a gas (water vapor) and rises in the air. When the water vapor rises and meets cold air, it condenses, forming water droplets, or what we see as clouds or fog. This process is called **condensation**. Water droplets combine into water drops and return to the Earth as **precipitation** in the form of rain, sleet, hail or snow.

Exactly how clouds produce rain has eluded meteorologists until recently. In 1999, Dutch scientists using a supercomputer to model cloud behavior announced that rain is produced when whirling masses of water, a few centimeters in diameter, force water droplets outward by centrifugal force. These droplets then collide and grow. To fall to the ground as precipitation, they need to reach a diameter greater than 20 micrometers (Environmental News Network online, November 16, 1999).

Some rain is absorbed by vegetation or evaporates before it reaches the ground. Some evaporates after it reaches the surface. Some soaks into the ground and is taken up by the roots of plants and then released back into the air through the leaves of the plants in a process called **transpiration**. The combination of **evaporation** and transpiration is referred to as **evapotranspiration**. Some rain soaks beneath the water table into underground units of water-bearing rock called aquifers. The remainder becomes surface or **stormwater runoff** that flows over the ground to wetlands, lakes, ponds, rivers and oceans.

A water molecule's trip from the atmosphere and back may be very long or very short. It may stay in the atmosphere for only a few days or it may remain deeply buried in cavities in the earth or frozen in polar ice caps for thousands of years.

## Water Cycle in Florida

No significant amount of water enters or leaves the global water cycle. The water cycle in Florida, however, is an open system. Florida's water cycle includes the flow of **surface water** and **ground water** from Georgia and Alabama into northern and northwestern Florida, as well as outflows to the Atlantic Ocean and the Gulf of Mexico. Hydrologist Garald Parker was the first to discover that neither surface water nor ground water crosses a

line snaking across the peninsula from Cedar Key on the Gulf to New Smyrna Beach on the Atlantic (Betz 1984). This line is known as the **hydrologic divide**. South of the hydrologic divide, Florida is an island as far as fresh water is concerned: it totally depends on rainfall for its fresh water, including ground water stored in aquifers. North of the hydrologic divide, Florida receives water from outside the state.

# Florida's Water Cycle



Source: Fernald and Purdum 1998

An average of 150 billion gallons of rain falls each day in Florida. Another 26 billion gallons flows into the state, mostly from rivers originating in Georgia and Alabama. Nearly 70 percent of the rain (107 billion gallons) returns to the atmosphere through evaporation and plant transpiration (evapotranspiration). The remainder flows to rivers or streams or seeps into the ground and recharges aquifers. Each day in Florida, 2.7 billion gallons are incorporated into products or crops, consumed by humans or livestock, or otherwise removed from the immediate environment (consumptive use).

# Hydrologic Divide



Most of the Florida peninsula is a hydrologic island. It depends totally on local rainfall to meet its freshwater needs. Only 44 percent of the state's rain falls south of the hydrologic divide; yet that area is home to 78 percent of the state's permanent population and accounts for 75 percent of the state's water use (Betz 1984).

39

# Weather and Climate

Florida has two types of climate: **humid subtropical** in the northern two-thirds of the state and **tropical savanna** in the southern third and the Keys. A humid subtropical climate is cooler than a tropical savanna climate, especially in the winter months, and lacks distinct wet and dry seasons. A tropical savanna climate is warm year-round and has distinct rainy and dry seasons. The rainy season in south Florida is in the summer and early fall, when thunderstorms occur nearly every afternoon. The dry season is in the winter. In the United States, only portions of Hawaii share this climate type. A tropical savanna climate is also found in nearly half of Africa, parts of the Caribbean Islands, central and southern Brazil and southeast Asia (Henry, Portier and Coyne 1994).

An average of 135 centimeters (53 inches) of rain falls each year in Florida. Some areas, however, receive considerably more, while some areas receive considerably less than this amount. Wewahitchka in the Panhandle receives an average of 175 centimeters (69 inches) and Key West receives only 102 centimeters (40 inches). Rainfall throughout the state varies considerably from season to season and from year to year, as well as from place to place.

The variability of rainfall in Florida cannot be overemphasized: it is quite possible for it to rain on one side of the street and not the other! Stations within the same city often record large differences in the amount of rainfall. For instance, in the greater Miami area, Miami Beach receives an average of 114 centimeters (45 inches) annually, and the Miami airport receives an average of 143 centimeters (56 inches) annually. Many counties have distinct rainfall zones based on Florida's subtle geographic features, vegetation and water bodies.

## Climate Types



Source: Diane Sterling

Source: Florida Department of Commerce

Source: Henry 1998

Humid subtropical

Tropical savanna

4

# Average Annual Rainfall



| Inches | Centimeters |
|--------|-------------|
| 44 | 112 |
| 48 | 122 |
| 52 | 132 |
| 56 | 142 |
| 60 | 152 |
| 64 | 163 |

1961–1990

The wettest places in Florida are in the Panhandle and in the southeastern part of the state. In the Panhandle, abundant rain falls throughout the year. In southeast Florida, the Gulf Stream contributes both moisture and instability to the air. There, especially just inland from the coast, thunderstorms are very frequent from May through October. In contrast to other parts of the state, these storms are likely to occur during the night as well as during the afternoon and early evening. The lowest amounts of rainfall occur in the Keys and the central portion of the peninsula.

Source: Henry 1998

## FLOODS AND DROUGHTS

**Floods** and droughts have always been a natural part of Florida's weather pattern. Many natural systems are adapted to and dependent on these events. Floodwaters bring needed nutrients to river floodplains, bays and estuaries. Fires from lightning (more common during droughts) help maintain certain natural communities, such as pine flatwoods, prairies and scrub. Without regular, naturally occurring fires, these communities will succeed to hardwood forests or will burn catastrophically, as occurred in portions of northern and central Florida in the summer of 1998 because of accumulation of pine needles and other fuel. The problems associated with floods and droughts cause more severe impacts because population growth in Florida has been permitted in places that naturally flood or because too much growth has been permitted in places without enough water. Because parts of Florida have large numbers of people, large water demands for agriculture and industry and relatively small capacity to store water, extended periods of low rainfall usually result in water shortages.

41



## Statewide Annual Rainfall

Florida's average rainfall varies greatly from year to year. However, averages in a state as large and as diverse as Florida may be misleading. In a year with "average" rainfall, one part of the state may have been very dry and another part may have been very wet!

In the Sunshine State, when it rains, it usually pours, and floods may result. Floods generally occur in winter and early spring in northern Florida from heavy rain accompanying cold fronts. In summer and fall, all of Florida is susceptible to flooding from thunderstorms and **hurricanes**. Human activities can create environments prone to flooding. Practices that remove soil and vegetation can increase an area's vulnerability to flooding. In northern Florida, flooding usually occurs along rivers. In southern Florida, flooding may occur in any low-lying area. Dikes, canals and other stormwater systems have been built in south and southwest Florida to help prevent flooding in developed areas.

Although Florida is one of the wettest states in the nation, it is still sometimes affected by **droughts** (extended periods of low rainfall). Moderate droughts occur frequently, and severe droughts occur in some part of the state about every six years. In the 1980s, a series of droughts occurred in the state. In 1988–89, rainfall in Key West was less than one-fifth the normal amount and in southwest Florida, groundwater levels were at a record low, causing many sinkholes to form. In June and July of 1998, extremely dry conditions in northern and central Florida resulted in more than 2,300 wildfires that consumed 200,000 hectares (500,000 acres), destroyed 368 houses and forced the evacuation of 130,000 people.

Rainfall deficits have continued since 1998 until the present (May 2001) throughout the state. These deficits would statistically be expected to occur only once every 100 to 200 years. The flow of the Apalachicola River and the depth of Lake Okeechobee have dropped to all-time lows. The St. Johns River Water Management District has experienced vast fluctuations in rainfall levels from one end of the district to the other. Calendar year 2000 was the driest on record (since 1915) in the Southwest Florida Water Management District. In some parts of the Southwest Florida Water Management District, drought conditions have increased the potential for sinkhole development, water quality problems and drying up of private wells.

During droughts, when the level of fresh water in the ground is lowered, salt water may move into freshwater portions of aquifers in a process known as **saltwater intrusion**. Because droughts reduce recharge, they can have a major

**Rainfall**
1961–1990

Source: Henry 1998

Throughout Florida, summer is the wettest season as a result of nearly daily thunderstorms. Hurricanes may also bring large amounts of rain. Winter and spring are the driest seasons in south Florida. Preceding cold fronts, significant amounts of rain usually fall in the Panhandle and north-central Florida during the winter.

impact on our underground water supply. Since salt water is heavier than fresh water, it occupies the lower portions of the aquifer. If the freshwater level is lowered by pumping and not replaced by recharge, salt water can flow in or rise up and contaminate underground freshwater supplies.

## STORMS

Florida's peninsular shape, converging sea breezes, position relative to the Atlantic high pressure system, and tropical and subtropical location make it an ideal spawning ground for thunderstorms. Peninsular Florida is the thunderstorm capital of North America. "Tampa" may come from

43

# Monthly Water Budgets



Source: Henry 1998

Hydrologists calculate **water budgets**, formulas used by hydrologists to determine water surpluses and deficits in an area, to help determine where and when these surpluses and deficits are most likely to occur. This knowledge is essential for planning and management. Floods may occur during times of surpluses, and water shortages may occur during times of deficits, particularly in high population areas. Irrigation of crops is usually necessary during periods of water deficits. In Florida, a water deficiency exists throughout the year in Key West. To meet its freshwater needs, Key West depends on either water pumped from the mainland or desalination. In the peninsula, deficits are common in winter and spring. Water deficits rarely occur in the Panhandle, but floods may occur during times of surpluses, particularly during the winter.

an Indian word meaning "stick of fire" (Henry, Portier and Coyne 1994) and is often referred to as the lightning capital of the United States. The Gulf coast from Tampa to Ft. Myers is one end of a lightning belt that stretches across the state to Daytona Beach and Cape Kennedy. Over 200 hours of thunderstorms occur each year in southwestern Florida.

Florida is also susceptible to hurricanes and **tornadoes**. Nearly 40 percent of all hurricanes that have made landfall in the United States have hit Florida. The most common points of landfall are in the Panhandle and along the southern portion of the peninsula. Hurricanes typically bring from 12 to 30 centimeters (5 to 12 inches) of rain, but have brought as much as

# Hurricane Tracks
# 1886–1996



Source: Henry 1998

98 centimeters (38.7 inches) or as little as 1 centimeter (0.5 inches) (Henry 1998). South Florida was spared severe hurricanes from 1965 until 1992, when Andrew crossed southern Dade County, causing 26 deaths and over $3 billion in damages.

Florida also suffers from tornado damage, averaging 45 tornadoes each year. In Florida, tornadoes develop under four conditions: along the squall line ahead of an advancing cold front, along the squall line where masses of warm air converge, in isolated local summer thunderstorms, and within feeder bands associated with hurricanes (Winsberg 1990). Numerous water spouts that are in essence "mini-tornadoes" also occur.

45

# Effects of El Niño



Source: Florida Consortium 1999

## The Global Picture

### EL NIÑO AND LA NIÑA

Florida's climate is strongly influenced by the temperatures of the Atlantic and Pacific oceans (Henry 1998). When the temperature of the Atlantic near the equator is higher than normal, less rain falls on Florida. This is a result of changing wind patterns that bring less moisture over Florida from the Gulf of Mexico.

Even more of an influence on Florida's weather are El Niño and La Niña, phenomena that occur in the Pacific Ocean off the coast of Peru. **El Niño** is an unseasonably warm ocean current that generally occurs every 3 to 7 years and lasts an average of about a year to 15 months.

46



**Underwater after 15-foot rise in sea level**
**Underwater after 25-foot rise in sea level**

Global warming may cause a rise in sea level along the world's coastlines as glaciers melt. Because so much of Florida's population is along the coast, any rise in sea level poses a threat. If sea level were to rise 15 feet (4.5 meters), nearly all of Florida south of Lake Okeechobee would be underwater, and the remaining Gulf and Atlantic coastlines would be many miles inland from their current location.

Source: Lane 1994

Peruvian fishermen first identified the event and named it El Niño after the Christ Child because it appeared off their coast around Christmas. Scientists do not fully understand this phenomenon. It begins when Pacific trade winds become weak and the top layer of the eastern Pacific gets warmer and warmer. The mass of clouds created by the warm water is carried eastward by the subtropical jet stream. **La Niña** (also sometimes called El Viejo) is the opposite of El Niño. La Niña occurs when stronger than normal trade winds stir up

cooler water from the ocean depths.

El Niño years bring greater than normal amounts of rainfall to Florida in the winter than La Niña or neutral years, as well as more intense and frequent storms from the Gulf of Mexico. La Niña years bring less winter rainfall. Hurricanes, which originate in the Atlantic, are less frequent during El Niño years than during La Niña or neutral years.

By monitoring the Pacific Ocean west of Peru, scientists can now forecast El Niño and La Niña

(Florida Consortium 1999). This knowledge is critical to agriculture, forestry and emergency management. Winter vegetables and fruits are a big industry in Florida. Growers now know whether they are likely to face a wet or a dry growing season. Strawberry growers, for example, have learned to plant drought-tolerant varieties during La Niña years (Florida Consortium 1999). Dry La Niña winters may mean greater risk of forest fires in the normally dry spring. During El Niño years, although winters are wetter than normal, springs tend to be drier than normal in many parts of the state. These conditions may result in fires in early summer, as occurred in June 1998. Knowledge of La Niña helps emergency managers plan in advance for a hurricane season that will probably be more active than normal.

## GLOBAL WARMING

In January 2001, over 700 scientists from more than 100 countries met in Shanghai, China, to discuss world climate change. They reviewed the data and agreed that the average global surface temperature has risen by 0.6 degrees centigrade over the twentieth century, and the sea level has risen between 0.1 and 0.2 meters. They predict temperatures will rise between 1.0 and 3.5 degrees centigrade over the coming century, causing more frequent floods and droughts, rising oceans and expansion of temperate climates northward. The group concluded that most of the warming observed over the last 50 years is attributable to human activities, specifically burning of fossil fuels such as coal and oil.

Although global warming is not accepted by the entire scientific community, some scientists predict that **global warming** will impact several aspects of Florida's climate (Henry 1998). While global rainfall levels are expected to increase, rainfall in Florida is expected to decrease as temperatures rise. According to some researchers, reduced rainfall and fewer winter storms reaching Florida would result from a predicted northward shift of the jet stream. Another study, however, indicated that summer rainfall would increase, particularly in the Panhandle. Droughts may also be more severe if temperatures rise, because rainfall would likely be more variable. Will the frequency and intensity of hurricanes reaching Florida increase with global warming? Early studies indicated that Florida might experience more frequent and more intense hurricanes in a warmer world, but more recent studies indicate that the threat from hurricanes will not likely increase significantly in the near future (Henry 1998).

## Conclusion

Water is basic to all life on Earth. "Living things depend on water but water does not depend on living things. It has a life of its own"(Pielou 1998:x). The hydrologic cycle continues regardless of the activities of the millions of life forms it nourishes. Rain falls or fails to fall, rivers flow to the sea, snow falls and lakes freeze, hurricanes form over the warm seas, water seeps through the soil to replenish aquifers.

Today, humans have spread throughout the globe and have the power to influence the waters of the world on a scale unprecedented in our history. Burning of fossil fuels is contributing to global warming, which is predicted to bring more rain to some parts of the world and less to others. In many places, aquifers, rivers and lakes are being depleted and polluted. The water now on Earth is essentially all the water we will ever have. Yes, water is magic. It is up to us to respect and protect it.

*Chapter 3*

# Florida's Water Resources



*"Florida is blessed with water. Water makes the difference between desert and flourishing green plants, as much of the land around the earth at the same latitude is desert."*
— Peggy Lantz, The Florida Water Story

## KEY IDEAS

• Most of Florida's water is ground water.
• No rocks. No water.
• Ground water is replenished by rainfall.
• Surface water in the form of rivers, lakes, bays and wetlands is abundant.
• Much of Florida has a karst terrain with sinkholes, underground caverns and an active interchange between surface water and ground water.
• Pollution on the land's surface may end up in drinking water.
• Wetlands perform many valuable functions and are protected by law from development.
• Estuaries are nursery areas for many sport and commercial fish and shellfish.

## VOCABULARY

Alluvial river

Aquaculture

Aquifer

Blackwater river

Brackish

Discharge

Drainage basin

Estuary

Fill

First-magnitude springs

Karst

Recharge

Runoff

Sheetflow

Sinkhole

Spring

Spring-fed river

Streamflow

Tributary

Watershed

Wetland

Florida is, indeed, blessed with water. Yet you cannot see most of Florida's fresh water: it seeps beneath the ground through sand and gravel and flows through cracks and channels in underlying limestone. The amount of ground water under Florida's forests, pastures, cities, marshes, roads, schools and suburbs is mind-boggling: more than a quadrillion gallons. This is equivalent to about one-fifth of the water in all five of the Great Lakes, 100 times as much water as in Lake Meade on the Colorado River, and 30,000 times the daily flow to the sea of Florida's 13 major rivers (Conover 1973). In fact, Florida has more available ground water in aquifers than any other state.

Florida also has abundant surface water in springs, rivers, lakes, bays and wetlands. Of the 84 **first-magnitude springs** (those that discharge water at a rate of 100 cubic feet per second or more) in the United States, 33 are in Florida — more than in any other state. Within Florida's boundaries are approximately 16,000 kilometers (10,000 miles) of rivers and streams and 7,800 lakes (Kautz et al. 1998). Although more than half of Florida's original wetlands have been drained or developed (Noss and Peters 1995), the state still has vast and diverse wetlands. The Florida Everglades and Big Cypress Swamp cover much of southern Florida, and some Florida wetland communities, such as mangrove swamps and hydric (wet) hammocks, rarely occur in other states.

In Florida, ground water and surface water are connected, often in complicated and changing ways that are invisible at the land's surface. Lakes may disappear into sinkholes, springs may bubble up through new breaks in underlying

rocks, and water may flow one way at the land's surface and quite a different way underground. This is because much of Florida has what geologists term a **karst** landscape.

Karst landscapes are underlain by limestone (mostly calcium carbonate), a soluble rock composed of shell fragments, limey mud and sand. Limestone is easily dissolved by water charged with carbon dioxide ($CO_2$). As rain falls, it mixes with $CO_2$ in the air. As it soaks through the ground's surface, the water gathers more $CO_2$ from decaying plants. Water charged with $CO_2$ forms a weak acid (carbonic acid) that reacts with limestone to dissolve it.

In many parts of the world, land slopes gradually to the sea. "One can always walk downhill, arriving eventually at a stream that can be followed to a river, which can be followed to the ocean. A characteristic feature of karst landscapes is that the land usually slopes down into closed depressions from which the only exit is underground" (White 1988:19–20).

The name *karst* derives from the Slovenian *kars,* meaning rock, and was first used by the Germans to describe a high plateau in Slovenia with numerous caves and disappearing streams. Karst is now used to describe similar areas around the world. Well-developed karst features may also be found in south-central Kentucky, the Yucatan peninsula, parts of Cuba and Puerto Rico, southern China and western Malaysia, as well as in Florida. Rivers and streams are few and even absent in most karst areas of the world. Because Florida has high water tables and flat terrain, karst areas in Florida have more rivers and streams than karst areas elsewhere.


Photo credit: Joann Mossa


*Limestone banks, Suwannee River*

# Watersheds

Today, rather than looking at land and water resources as separate, unrelated parts, water managers consider the connections within a watershed or **drainage basin**. Every part of the Earth's land surface is within a watershed. Divides (ridges, peaks or areas of high ground) separate watersheds. Because water flows downhill, rain falling on these divides may flow in opposite directions, becoming part of different watersheds. For example, from the Great Divide in North America the continent's river systems flow in opposite directions.

A **watershed** is the land area that contributes runoff, or surface water flow, to a water body. The water resources within a watershed are affected primarily by what happens on the land within that watershed. Anything on the land within the watershed, however far from the water body, can eventually reach and impact that water resource. Some examples of contaminants that may be picked up by water in the watershed are soil particles (suspended materials) and chemicals (dissolved materials), such as nutrients, pesticides, oils and gasoline residues.

The shape of the land defines a watershed. Water flows both above and below the ground from points of higher elevation to points of lower elevation through the force of gravity. Rainfall that is not absorbed by the soil but flows to a larger body of water is known as **runoff**; runoff collects in channels such as streams, rivers and canals. The small channels, in turn, flow to larger channels and eventually flow to the sea. These channels or streams are also known as **tributaries**. The slope of the land, as well as



**Surface Water Drainage**

Source: Mossa 1998

51

the amount and type of vegetation and soil and the type of land use, determine the rate and amount of runoff that enters a water body. More water soaks through sandy soils than through clay soils; gentle slopes allow more time for rain to soak into the ground or to evaporate than do steep slopes; and natural areas generally allow more water to enter the ground than areas that are covered with houses or pavement. Vegetation also absorbs water and slows its movement.

Florida's karst terrain and flat topography sometimes make determining watershed boundaries difficult. In some places the drainage pattern is best described as "disjointed" because streams and rivers do not form continuous channels on the land surface (Mossa 1998) — they may disappear underground in sinks or depressions. Large rivers may form from springs issuing from the aquifer, and surface water watersheds may be quite different from groundwater watersheds. Some portions of Florida are poorly drained (Mossa 1998). There are few or no streams or channels in these areas, and water flows across the surface through extensive swamps or marshes. This is known as **sheetflow**.



## Watersheds

■ River watershed

□ Small local streams draining coastal regions

■ Lake Okeechobee integrated drainage — small local streams draining into Lake Okeechobee

■ Disjointed drainage — these areas without continuous natural channels may drain into surrounding basins or into the sea through marshes, swamps, ground water or constructed channels. In south Florida's managed watershed, drainage is by canals more often than by marshes, swamps or ground water.

Source: Mossa 1998

52

In much of south Florida, the natural landscape has been altered with huge public works projects, making the region a managed watershed. Canals, pumping stations and water-control structures, such as dikes and weirs, have altered the watershed. The historic swamps, marshes and associated sheetflow are greatly altered or are replaced by urban development and agriculture and drained by canals. Public and private entities are responsible for water movement, especially the discharge of floodwater.

# Ground Water

## AQUIFERS

**Aquifers** are underground rocks that hold water. In Florida, three aquifers are used for water supply: the Floridan aquifer, the intermediate aquifer and the surficial aquifer. In northwest Florida, the surficial aquifer is called the sand and gravel aquifer, and in southeast Florida it is called the Biscayne aquifer.

The Floridan aquifer has been called Florida's rain barrel (Parker 1951) and is one of the most productive aquifers in the world. Each day Floridians use about 2.5 billion gallons of water from the Floridan aquifer. It underlies 250,000 square kilometers (100,000 square miles) in southern Alabama, southeastern Georgia, southern South Carolina and all of Florida. Over most of Florida, the Floridan aquifer is covered by sand, clay or limestone that ranges in thickness from a few feet in parts of west-central and north-central Florida to hundreds of feet in southeastern Georgia, northeastern Florida, southeastern Florida and the



**Aquifers**

Unnamed surficial aquifers
Sand and gravel aquifer
Biscayne aquifer
No surficial aquifer

Intermediate aquifer
No intermediate aquifer

Floridan aquifer
No Floridan aquifer

Source: Berndt 1998

53

westernmost Panhandle. Within the aquifer, water may travel quickly or very slowly. In parts of the aquifer with caves and large conduits, water may travel several miles in only a few hours. Where water-filled spaces are small and underground routes convoluted, it may take days, weeks or even years for water to travel the same distance.

In the past several decades, increased pumping of ground water has lowered water levels in the Floridan aquifer in several places in Florida and Georgia, including the Panhandle, northeastern and southwestern Florida, and southeastern and coastal Georgia (Berndt et al. 1998).

Water is replaced in the Floridan aquifer by rainfall that soaks into the ground. This is referred to as **recharge**. Recharge does not occur everywhere. In some places (mostly along the coasts and south of Lake Okeechobee) water flows out of, rather than into, the aquifer. This is referred to as **discharge**. In other areas, thick clay covers the aquifer and slows or stops the downward flow of water. Areas of high recharge only occur in about 15 percent of the state and include the well-drained sand ridges of central and west-central Florida. Sand is porous, which means water can easily flow through it. Limiting intensive development in high



**Recharge To and Discharge From the Floridan Aquifer**

Recharge in Inches per Year

- 0–1
- 1–10
- Greater than 10

Discharge in Inches per Year

- 0–2
- 2–5
- Greater than 5

Source: Berndt 1998

recharge areas is critical for maintaining water supplies: water cannot soak through pavement.

In some parts of Florida, the Floridan aquifer is not a suitable or drinkable source of fresh water. In some places, it is too far below the surface; in other places, the water is salty. The surficial sand and gravel aquifer is the major source of fresh water in Escambia and Okaloosa counties in northwest Florida, and the surficial Biscayne aquifer is the major source of fresh water in Dade and Broward counties in southeast Florida. Between the surficial aquifers and the Floridan aquifer in some parts of the state is the intermediate aquifer. This aquifer is an important source of fresh water in Sarasota, Charlotte and Glades counties. The remainder of the state uses the Floridan aquifer as its main source of drinking water.

## SINKHOLES

Sinkholes are dramatic testimony to the fragile nature of the limestone underlying the state. A **sinkhole** is a depression in the land surface caused when rainwater dissolves limestone near the ground surface or when the roofs of underground channels and caverns collapse. Under natural conditions, solution sinkholes form slowly and expand by the gradual erosion of subsurface limestone caused by rainwater. Dredging, constructing reservoirs, diverting surface water and pumping large amounts of ground water may result in the abrupt formation of collapse-type sinkholes (Berndt et al. 1998). Loss of water from underground cavities, compounded by drought, may cause the overlying rock and earth to collapse. Weight on the top of the caverns caused by heavy rains or construction may also result in collapse.

### SINKHOLE PHENOMENON

In early March 1998, as a drilling company was drilling an irrigation well for a future golf course in western Pasco County, a massive sinkhole opened up and threatened to swallow the entire drilling rig. Although the driver got the rig out in time, a crane had to retrieve a truck from the 150-foot-wide, 15-foot-deep sinkhole. Shortly after this event, nearly 700 sinkholes, most only a few feet wide, appeared in the surrounding area.

While sinkholes are common in the area, "this event was unique," according to Mark Stewart, chairman of the Geology Department at the University of South Florida. "I know of no other recent event in Florida that opened so many sinkholes in one small area."

According to Tony Gilboy, hydrogeologist for the Southwest Florida Water Management District, the phenomenon began when the contractor drilled a hole into the Floridan aquifer for an irrigation well. As he cleaned out the hole using compressed air, a common development practice, a large underground cavity collapsed, resulting in the large sinkhole near the drill rig. The force of several tons of dirt falling into the cavity caused a massive pressure wave through the aquifer, producing the nearly 700 smaller sinkholes on the surrounding property. Heavy rains, which the area had been experiencing, may also have contributed by putting pressure on the underground cavities, causing them to collapse.

## DISAPPEARING WATERS

The Indians called Lake Jackson in Leon County *Okeeheepkee*, meaning "disappearing waters." Between September 13 and 16, 1999, that is precisely what the lake did as approximately 30 million gallons of water drained out of the southern portion of the lake through Porter Hole Sink into the vast underlying Floridan aquifer, like bathwater out of a tub. In a few short days about half of the popular 4,000-acre lake had gone dry. Water depth in the lake had been steadily dropping during the long dry summer from a norm of 8 feet to only 2–3 feet. Water levels in the aquifer also dropped. At this point, either a plug blocking the sinkhole washed out, taking the lake with it, or once the lake level dropped below a certain level, the remainder drained into the partially opened sinkhole. With the water gone, all that was visible at the land surface was a canyon cut by the water and a hole 26 feet deep and 8 feet wide in the Torreya Formation underlying the lake. As the local confining unit for the Floridan aquifer, the Torreya Formation is a combination of clays, sands and some carbonates with relatively low permeability. Exploring the hole, Florida Geological Survey geologist Dr. Tom Scott found a passage to the northwest about 20 feet into the Floridan aquifer. Several months later two passages were visible, the one to the northwest that had expanded to 30 feet and one to the east running about 30 feet. In the spring of 2000, the remainder of the lake, the northern portion, drained through Lime Sink.

Although some homeowners may not be happy with the loss of their lakefront property, and fishermen will have to go elsewhere,



*Lake Jackson*                    Photo credit: Tom Scott

Pollutants and sediments from runoff and nutrients from fertilizer and dead vegetation build up in the water and on the lake bottom. When the lake is dry, the sediment is hardened and compacted by air and sunlight. Exposure to the air also oxidizes some of the nutrients. The Northwest Florida Water Management District, Leon County, the Florida Department of Environmental Protection and the Florida Fish and Wildlife Conservation Commission opted to help nature along by removing some of the nutrient-rich sediments from the dry lake bed. When the lake refills, its water quality and its ecology will be improved.

Lake Jackson is a closed basin — no water enters or leaves the lake through streams or rivers. Nor does ground water enter the lake through major springs. The lake is totally dependent on rainfall. A return to normal rainfall amounts should cause the lake to refill by replenishing the aquifer and possibly plugging the sinkhole with the sediments that run off the dry lake bottom.

Lake Jackson has gone dry several other times during the twentieth century — in 1907, 1909, 1932, 1935, 1936, 1957 and 1982. According to geologist Scott, when the Spanish arrived in the 1500s they chronicled a prairie, not a lake. In 1716, Spaniard Diego de Peña also found a vast prairie where he reported seeing over 300 buffalo and a few cows. In 1959, another sinkhole in the lake bottom, Lime Sink, was plugged with cement and various objects as people tried to help nature along. After draining, the lake can stay dry for years, but in 1982 the lake refilled in

## SPRINGS

Springs are a "window" into the aquifer from which they flow. Cool in the summer and warm in the winter, they are among the most sought-after of all the state's natural and scenic resources. Most of Florida's springs are found in the northern half of the state and flow from the Floridan aquifer. As rainwater enters and recharges the aquifer, pressure is exerted on the water already in the aquifer. This pressure causes the water to move through cracks and tunnels in the aquifer. Sometimes this water flows out naturally to the land surface at places called **springs**. When the openings are large, spring flow may become the source of rivers. The Ichetucknee is an example of a river created by a spring. Springs also make substantial contributions to the flow of other rivers. Manatee, Fanning, Troy and Blue springs contribute nearly 368 million gallons each day to the Suwannee River.

For thousands of years, Native Americans settled near springs and fished in spring-fed streams. Spanish explorer Ponce de Leon came to Florida seeking a Fountain of Youth, as well as gold and other treasures. Travelling in Florida in 1774, botanist William Bartram described water issuing from one of the springs along the St. Johns River as "perfectly diaphanous," with fish appearing "as plain as lying on a table before your eyes, although many feet deep in water" (Van Doren 1955:135). Today, springs are popular with both tourists and residents. Many of Florida's largest springs have been incorporated into state parks, including Manatee, Homosassa, Silver, Wakulla and Ichetucknee. Wakulla and Silver springs have been popular locations for movies. Majorie Kinnan Rawlings' *The Yearling,* as well as more than 100 episodes of the popular TV series *Sea Hunt,* were filmed at Silver Springs. The *Creature from the Black Lagoon* and some of the Tarzan movies were shot at Wakulla Springs.

Rain falling onto nearby recharge areas and entering the aquifer is the source of most of Florida's ground water, including water that flows from springs. Contrary to popular belief, underground rivers do not carry water into Florida from other states (Spechler and Schiffer 1995). Caverns in the aquifer are sometimes large and interconnected and may transmit water underground for several miles, but there are no underground rivers. The 320 known springs in the state discharge nearly 8 billion gallons of water each day, more than all the fresh water used in the state each day (Spechler and Schiffer 1995).

Large withdrawals of water from wells near a spring can cause the flow of the spring to stop. Silt or sediments building up in the spring can also cause loss of flow. The only large spring in Florida known to have ceased flowing is Kissengen Spring, about 4 miles southeast of Bartow (Berndt et al. 1998). The spring stopped flowing in 1950 (Rosenau et al. 1976).

# Surface Water

## RIVERS

Florida's largest rivers are in the northern part of the state. Portions of the watersheds of many of these rivers are in Georgia and Alabama. Even the largest rivers in Florida — the Apalachicola, the Suwannee and the St. Johns — have only a fraction of the flow of the continent's and the world's largest rivers.

In the Panhandle, rivers flow south to the gulf; along the west coast, rivers flow west to the gulf. In the central portion of the peninsula, streamflow is south. In the lower southeastern portions of the peninsula, rivers flow east to the Atlantic. In the northeastern and east-central portions of the peninsula, the St. Johns River flows north to the Atlantic and other rivers flow east to the Atlantic. The only major river that does not flow to the gulf or to the Atlantic is the Kissimmee River, which flows south and discharges to Lake Okeechobee (Nordlie 1990).

## WHAT IS STREAMFLOW?

**Streamflow**, also known as discharge, is the volume of water passing a point in a certain amount of time. The slope of the watershed surrounding the stream or river, the permeability and water storage capacity of the surrounding soils, and the rainfall pattern all affect streamflow. Current or velocity measures the distance traveled by the water during a certain length of time. Velocity depends on the depth of the stream or river, the slope and friction due to the texture of the bottom and the shape of the river or stream channel. Velocity is highest just under the water's surface because the friction between water and air is slight. Faster currents are found at the outside of a bend. The stream's force erodes the outer edges. Slower water is found on the inside of a turn and is often where soils will be deposited, forming sandbars.

Bottom type is closely related to the velocity of streamflow. Fast water has more energy and scours or carries away all but the largest particles of soil, sand or rock. So the bottoms of fast-flowing rivers and streams are rock, rubble and gravel. These are generally found in the upper stretches of a river system. Slower water allows fine particles (sand, silt and clay) to be deposited, resulting in sandy or mucky bottoms.

In the United States, river discharge is most commonly measured in cubic feet per second. In her book *Fresh Water*, British Columbian naturalist E. C. Pielou outlines a method for measuring flow in a small stream. (Be sure to select a stream that is safe to wade.)

<u>Materials</u>: rope marked at equal intervals, measuring stick, stop watch, oranges

**1.** Select a straight area in a stream and stretch a rope across it. The rope should have marks at equal intervals. Four or five intervals should be sufficient. Secure the rope across the stream. One way to do so is to tie it around trees.

**2.** Wade in and measure the depth of the water below each of the interval marks. Calculate the area of the cross section by averaging the depth and multiplying by the width of the stream. OR, measure depth in three places across the stream in a straight line, then divide the total by four to get the average depth of the stream. The reason you take three depth measurements and divide by four is to take into account the shallow areas of the stream.

**3.** Select a length of stream to measure the velocity and mark each end with an object such as a rock. A distance two or three times the width of the stream is usually enough.

**4.** Measure the velocity by putting a float in the stream and using a stopwatch to measure the amount of time it takes for the float to travel from the upstream marker to the downstream marker. An orange or an orange peel may be used as a float. Repeat until you have recorded velocities below each marked interval on the rope. Average the velocities and multiply by 0.85 (this number corrects for the fact that velocity has only been measured at the surface).

**5.** Calculate streamflow by multiplying the corrected average velocity by the area of the cross section.

Professional hydrologists use special instruments called current meters to measure streamflow.

---

Florida's rivers may be classified as predominantly alluvial, blackwater or spring-fed. **Alluvial rivers**, such as the great Mississippi, have large, well-defined drainage basins, carry high sediment loads and have large forested floodplains. These rivers typically flood each year (usually in the winter in Florida),

depositing a rich load of sediment. All of Florida's alluvial rivers are in the Panhandle. The Apalachicola, Choctawhatchee, Escambia and Ochlockonee are examples.

**Blackwater rivers** have dark, stained waters from decomposing plant materials. Typically they drain pine flatwoods and cypress swamps. Many of Florida's rivers are

blackwater types, including New River in northwest Florida, which drains Tates Hell Swamp, and the Withlacoochee, Hillsborough and Peace rivers in central Florida, which begin in the Green Swamp (Clewell 1991).

**Spring-fed rivers** are most common in the karst regions of north-central Florida where limestone is close to the ground surface. Spring water is cool year-round, and clear. The Wakulla, Silver, Weekiwachee, Rainbow and Crystal rivers are spring runs issuing from five of Florida's 33 first-magnitude springs. The Chipola, St. Marks, Aucilla, Santa Fe, Ocklawaha and Homosassa are also spring-fed rivers (Clewell 1991).

Many Florida rivers are a mixture of these types. For example, the Suwannee begins as a blackwater river draining the Okefenokee Swamp. As it travels south, it becomes a spring-fed river, as many springs contribute to its flow. As it approaches the gulf, it has a low-forested floodplain characteristic of alluvial rivers (Kautz et al. 1998).

## LAKES

Florida has thousands of lakes, large and small. By far the largest (1,890 square kilometers or 730 square miles) is Lake Okeechobee, which extends into Glades, Hendry, Martin, Okeechobee and Palm Beach counties. Lake Okeechobee, the second largest lake wholly within the United States, has an average depth of 2.6 meters (8.6 feet) (VanArman et al. 1998). Most of Florida's other lakes are also shallow (between 2 and 9 meters, or 6.5 and 29.5 feet, deep), although a few sinkhole lakes are hundreds of feet deep (Heath and Conover 1981). Over one-third of the lakes in Florida are found in four central Florida counties (Osceola, Orange, Lake and Polk).

Most of Florida's lakes were formed in the same manner as sinkholes. Ground water dissolved limestone, forming underground cavities; the roof of these cavities collapsed, forming a depression, which then filled with ground water and rainwater. Other lakes were once depressions in the sea bottom, and still others were carved out by rivers.

According to Thomas Scott, many theories exist for the origin of Lake Okeechobee, including meteorite impact, compaction of underlying rock deposits and faulting along the northern part of an ancient lagoon (pers. com). Dr. Scott, a geologist with the Florida Geological Survey, thinks the lake developed from a large lagoon that existed at the northern end of the Everglades.

In addition to natural lakes, Florida abounds in constructed lakes and ponds created by digging into the shallow water table for **fill** (sand and rock), for irrigation, mining or **aquaculture** (commercially growing fish or other water species). Lakes and ponds are also designed and created to manage stormwater runoff from developed areas or to serve as reservoirs.

## WETLANDS

*Wetlands* is a general term for portions of land periodically covered by fresh water or salt water. Over the past 400 years numerous words have been used to describe these areas including *swamp*, *tidal swamp*, *coastal swamp*, *marsh*, *tidal marsh*, *salt marsh*, *salt meadow*, *bog*, *fen*, *morass*, *overflowed land* and *quagmire* (Moss 1980). Terminology has changed as people's perceptions of the value of these lands have changed. The term *wetlands* began to appear in the 1950s, along with a concern for the preservation of these lands as wildlife habitat (Moss 1980). In 1953, the U.S. Fish and Wildlife Service defined wetlands as "lowlands covered with shallow and sometimes temporary or intermittent waters….and holding water long enough to grow moist-soil plants" (quoted in Moss 1980:200). The wetlands definition found in Florida law today (Chapter 373.019, *FS*) is based on vegetation and soil, as well as on the hydrologic conditions. Topography is no longer considered part of the definition. Some wetlands actually have higher elevation than surrounding land.

Wetlands are often classified as swamps or marshes, depending on

## FLORIDA'S LEGAL DEFINITION OF WETLANDS

Source: Southwest Florida Water Management District



*Wetland boundaries appear clearly demarcated by vegetation in this picture. When this is not the case, scientists rely on hydrologic indicators and soil analysis.*

In Florida, when a proposed land use potentially affects a wetland, a permit is required. The permitting criteria first attempt to ensure that the wetland will be preserved. When some impact to the wetland is unavoidable, the permit conditions may require restoration or mitigation at another site. Wetland mitigation usually means that more wetlands than those impacted will be preserved, protected or restored either at the impacted site or at another site.

In order to protect wetlands and their valuable functions, it is necessary to understand exactly what they are. As defined in subsection 373.019 (22), *F.S.*, wetlands are those areas

> inundated or saturated by surface water or ground water at a frequency and a duration sufficient to support, and under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soils. Soils present in wetlands generally are classified as hydric or alluvial, or possess characteristics that are associated with reducing soil conditions. The prevalent vegetation in wetlands generally consists of facultative or obligate hydrophytic macrophytes that are typically adapted to areas having soil conditions described above. These species, due to morphological, physiological, or reproductive adaptations, have the ability to grow, reproduce, or persist in aquatic environments or anaerobic soil conditions. Florida wetlands generally include swamps, marshes, bayheads, bogs, cypress domes and strands, sloughs, wet prairies, riverine swamps and marshes, hydric seepage slopes, tidal marshes, mangrove swamps and other similar areas. Florida wetlands generally do not include longleaf or slash pine flatwoods with an understory dominated by saw palmetto.

Even with such a long and specific definition, identifying wetlands and determining their boundaries is not easy. Wetland determination is based on three factors — hydrology, soil and plants. Identification and delineation are based on applied science and require field tests. Throughout Florida, all government agencies now use the same method to identify wetlands. The methods are Florida-specific rather than national or global. The complete methodology is set forth in the *Florida Administrative Code*, Chapter 17-340. Simply stated, wetlands must have at least two out of the following three conditions:

The hydrology — Wetlands are affected by the frequency and duration of water upon the land. There are thirteen hydrologic indicators of wetlands, such as water marks, algal mats and aquatic plants and animals.

The soil — Wetland soils are saturated or ponded long enough to develop anaerobic, or low oxygen, conditions in the upper part of the soil. There are twelve hydric (wet) soil indicators, such as a sulfur odor, dark color and muck or peat.

The plants — Wetlands have more plants that grow, reproduce or persist in saturated or wet conditions than uplands. These are called obligate or facultative-wet plants. Common examples are cypress trees, willow, bull rush and cattails.

You should contact your water management district before doing work in, on or around a wetland.

whether the vegetation is dominated by trees (swamps) or by grasses (marshes). Cypress ponds, strands, prairies, river swamps, floodplains, freshwater marshes, wet prairies, salt marshes and mangrove swamps are all wetlands.

Wetlands perform many valuable functions. They provide vital habitats for fish and wildlife. They improve water quality by trapping nutrients such as nitrogen and phosphorus, toxic substances and disease-causing microorganisms. They slow and intercept runoff, protect shorelines and banks from erosion, and protect upland areas from floods.

Wetlands once covered half of Florida. Over one-half of these wetlands have been drained for agriculture, flood control and residential development. Extensive areas of remaining wetlands include the Everglades and Big Cypress Swamp in southern Florida, Green Swamp in central Florida, Okefenokee Swamp near the Florida-Georgia border, and Tates Hell Swamp in northwest Florida.



## Wetlands
### 1989

**Wetlands**

### Pre-1900 Wetlands

Source: Fernald and Purdum 1998

61

## ESTUARIES

The word *estuary* is derived from the Latin *aestuarium*, meaning boiling tide. Estuaries are coastal areas where the freshwater current of rivers meets the incoming saltwater tide of the sea. Water in estuaries is **brackish**; that is, it is less salty than the seawater and more salty than the river water. Estuaries by definition are unstable and change with the tide as well as with the season. Many plants and animals are adapted to the changing conditions found in estuaries. Estuaries are the breeding and nursery areas for most sea life.

Along Florida's coasts, Native Americans left behind huge shell mounds, testament to the abundance of food found in estuaries. Today, Florida estuaries still produce many kinds and vast amounts of sport and commercial fish and shellfish. For example, the Apalachicola estuary provides between 80 and 90 percent of Florida's oysters (Livingston 1983).

Florida's estuaries vary greatly in size and shape. Some estuaries such as tidal creeks and spring-fed streams entering the Gulf of Mexico are only a few acres in area, whereas the mangrove forests and brackish portions of the Florida Everglades are 1,000 square miles. On the gulf coast many of the estuaries end in bays. On the Atlantic coast many of the estuaries are long and narrow and bordered by barrier islands.

The health of an estuary depends on



## Florida's Estuaries

1  Pensacola Bay
2  Choctawhatchee Bay
3  St. Andrew Bay
4  Apalachicola Bay
5  Apalachee Bay
6  Suwannee River
7  Tampa Bay
8  Sarasota Bay
9  Charlotte Harbor
10 Caloosahatchee River
11 Rookery Bay
12 North Ten Thousand Islands
13 South Ten Thousand Islands
14 Florida Bay
15 Biscayne Bay
16 Indian River
17 St. Johns River
18 St. Marys River/Cumberland Sound

Data from National Oceanic and Atmospheric Administration

frequent but gradual changes in the amount of fresh water and nutrients it receives. This in turn depends on the health of wetlands. Forested river swamps and freshwater marshes produce nutrients to feed plants and animals in estuaries; they slow floodwaters so that estuaries do not receive too much fresh water too quickly; and they help keep soil from eroding and clogging estuaries with sediment.

## Conclusion

The health of all of Florida's vast water resources depends on us. Choices we make in one place or regarding one type of water resource may have unforeseen and undesirable consequences elsewhere. Nutrients and pesticides applied to land many kilometers away from a pristine river may seep into the aquifer and end up in the river through spring discharge. Clear-cutting forested floodplains may harm fish and shellfish by decreasing nutrients and increasing sediment. Excessive pumping of ground water may result in saltwater intrusion or drying of wetlands.

Yes, Florida is blessed with water. It's up to us to use it wisely.

*Chapter 4*

# Water and Life: Natural Systems



*"Florida is a complex living creature,
and subtlety is its most endearing quality."*
— Clay Henderson, President, Florida Audubon Society

## KEY IDEAS

- Water is the link connecting all of Florida's natural communities.
- Water is the major defining feature of Florida's natural communities.
- Hydrology and soils determine the kinds of plants that grow.
- Plants in turn attract and support various kinds of animals.
- Healthy uplands are critical for maintaining healthy aquatic ecosystems.
- Florida is a global hot spot of biodiversity and has many rare communities, as well as more endangered plants and animals than any other state except Hawaii and California.
- Human disruption of natural processes affects natural communities.

## VOCABULARY

Coral reefs

Dry prairies

Ecosystem

Endemic

Entisols

Hardwood hammock

Histosols

Hydrogenase

Hydrology

Hydroperiod

Insectivorous plants

Limnologist

Mangroves

Marsh

Microbes

Natural community

Pine flatwoods

Pleistocene

Prescribed burns

Scrub

Seagrass beds

Slough

Steepheads

Strand

Swamp

Symbiotic

Uplands

Water and its antithesis, fire, account for much of the subtlety we see in Florida's natural communities. The Florida Natural Areas Inventory, a project of The Nature Conservancy and the Florida Department of Environmental Protection, recognizes 81 distinct natural communities in Florida. No state east of the Mississippi can rival Florida in its abundance and diversity of plants and animals. Florida also has more endangered and threatened plants and animals than any other state except California and Hawaii (U.S. Fish and Wildlife Service 2000).

The state was colonized over many thousands of years by species from continental areas to the north and tropical Caribbean areas to the south. Some species, such as the American beech and the white oak, reach the southern limits of their ranges in the Florida Panhandle. Others, such as gumbo limbo and Bahama lysiloma, reach the northern limits of their ranges in southern Florida. Semi-isolation by ocean on three sides has contributed to a high percentage (8 percent) of **endemics** in Florida (plant, fish, amphibian, reptile, bird and mammal species native to nowhere else in the world) (Governor's Office 1999).

## Ancient Origins

During the **Pleistocene** Epoch (from about 1.8 million to 10,000 years ago), massive ice sheets formed over the northern latitudes in at least four separate events, and sea levels around the world fell by as much as 400 feet. During the warmer interglacial periods, sea levels rose as high as 150 feet above their current level, leaving only the highest land

areas of Florida, such as the central highlands, exposed as islands. The Appalachian Mountains eroded and marine currents carried a steady supply of sand south to portions of Florida, then below sea level. A blanket of sand was deposited over the underlying limestone, infilling the irregular rock surface and forming a relatively featureless sea bottom. As sea level fell, these flat, shallow sea bottoms eventually emerged from the sea to become today's pineland ecosystems. Sand dunes and sand ridges formed along the coastlines as sea level varied. Many of these once-coastal regions are the sites of today's scrub and sandhill ecosystems.

## IN DEFENSE OF MUD

*A spoonful of soil contains more microorganisms than the number of people on Earth.*



*Species diversity in soil: 30,000 species of bacteria, 1.5 million species of fungi, 60,000 species of algae and 100,000 species of protozoa.*

Over 30 years ago, Edward S. Deevey, Jr., delivered a statement to the National Water Commission entitled "In Defense of Mud." Deevey, a distinguished **limnologist** (one who studies inland waters) argued that mud, as the habitat of essential microorganisms, is as important as water to the health of this planet. Mud is not all the same, and different kinds of microorganisms require different kinds of muddy water. By conserving different kinds of mud, we conserve different, yet essential microorganisms, as well as different types of water resources. Lakes, swamps, marshes and estuaries all have different kinds of mud and associated microorganisms.

Deevey is concerned with a common yet "dangerous misapprehension: the idea that balanced living systems consist of animals plus plants. As long as the sun shines and the plants are green, it seems to follow that animals and people have nothing to worry about. The truth, of course, is that no living system is ever balanced without microbes" (1970:7).

Microorganisms that live only in mud produce **hydrogenase**, a catalyst for recycling natural materials. Hydrogenase breaks down nitrogen and sulfur in dead matter to forms that can be used by plants to grow new tissue. These microorganisms also help reduce pollution by breaking down harmful compounds and contributing oxygen to the atmosphere. Hydrogenase-producing microorganisms are found in the mud of lakes, swamps, marshes and estuaries.

Deevey concludes that the most valuable inhabitants of wetlands are sulfate-reducing bacteria. Destruction of wetlands has reduced these bacteria and their habitat by half, but the amount of airborne sulfur they need to process has more than doubled as a result of industrial pollution. "To the last generation of conservationists, the haunts of coot and heron seemed to need no reasoned defense from anybody. Henceforth, I believe, the 'new conservation' can take a more worldly stand. Its basis is that hydrogenase, like water and oxygen, is no longer a 'free good,' but a commodity more precious than we know" (1970:8).

The next time you watch a sunset over the endless expanse of saw grass in the Everglades, fish on a lake or hear an osprey call as you paddle a canoe down a river, think of the mud beneath the water. Without it, there would be no saw grass or fish or birds.

Before the Pleistocene, naturally acidic rain and ground water flowed through and dissolved the limestone rock of the Florida land form, forming a web of underground caverns and conduits. During low sea level periods in Pleistocene times, these conduits often collapsed, creating many of the sinkholes, springs and lakes that punctuate the modern Florida landscape. In the central portion of the peninsula, dissolution and collapse of the underlying limestone created lakes and large valleys, such as Lake Apopka in the Central Valley.

# Ecosystems

Water is the thread connecting all ecosystems on Earth, as well as the sculptor of ancient and modern land forms. In Florida, water flows from upland ecosystems through rivers, swamps and freshwater marshes, and eventually to salt marshes, mangroves, seagrass beds and coral reefs along the coast.

An **ecosystem** is a community of **microbes**, plants and animals, including humans, interacting with one another and with the physical environment where they live. The term *natural community* is frequently used interchangeably with the term ecosystem, although ecosystems may encompass more than one natural community. The physical environment includes soils, water and nutrients, as well as human-made structures and alterations. In a healthy ecosystem, living and nonliving components provide a framework through which solar energy is transferred and within which nutrients such as nitrogen and phosphorus circulate. English botanist Sir Arthur Tansley coined the word *ecosystem* in 1935 from the Greek root *oikos,* meaning house. Ecosystems are place and life functioning together.

An ecosystem can be as small as a community of bacteria, insects and microscopic plants living in rainwater collected in the crook of a tree, or larger than the Kissimmee River-Lake Okeechobee-Everglades-Florida Bay ecosystem. The Earth itself is one huge ecosystem. The size of an ecosystem, and often its boundaries, are arbitrary and depend on the needs and interests of the investigator. Sometimes the observer can clearly see boundaries between ecosystems. In other instances, ecosystems blend gradually one into another. In Florida, changes in moisture, soil fertility, fire frequency and human alteration often occur over very short distances and result in clear and striking changes in the landscape: a scrub community adjoins a cypress pond, a tropical hammock stands out from surrounding pineland (Myers and Ewel 1990).

Scientists do not agree on any one way to classify ecosystems. Most ecosystem classifications are based on vegetation, the physical landscape and environmental factors. In Florida, one key defining factor is water. **Hydrology**, combined with type of soil, determines the kinds of plants that grow. Plants in turn attract and support various kinds of animals. Although animals are critical components of ecosystems, many animals use more than one ecosystem, especially during different times of their life cycles. Thus it is far easier to define ecosystems by plant than by animal life.

In Florida, ecosystems may be divided into **uplands** (pinelands, scrub, dry prairies and hardwood hammocks), swamps (river swamps, cypress swamps), marshes (freshwater marshes, salt marshes), lakes, rivers and coastal systems (seagrass beds, mangroves and coral reefs). Healthy uplands are critical for maintaining healthy aquatic ecosystems. The type and condition of uplands influence the amount and

**65**

the quality of water reaching lakes, streams and estuaries. Plants in uplands slow runoff and prevent soil from eroding. Many uplands are also groundwater recharge areas.

Much of Florida is a subtle mosaic of uplands and lowlands. Within an expanse of cypress swamp or marsh, slash pines will grow on the slightly higher and drier ground. In Florida, a few inches difference in elevation is all that separates lowlands from uplands.

Prior to European settlement, pine flatwoods, interspersed with cypress swamps, bay swamps and herbaceous wetlands, were the most extensive vegetation type, covering 35.3 percent of Florida. The second most abundant type was longleaf pine/xeric oak, which covered 20 percent of Florida.

Modern Florida is dominated by pine forests, cropland and rangeland, urban and barren lands and old fields. Pine forests still dominate in the Panhandle and northern third of the peninsula, although these are more likely to be managed timber plantations than natural pinelands (Kautz et al. 1998). Cropland and pastureland dominate in the south-central portion of the peninsula. Urban development is most common in coastal areas, along the I-4 corridor and around Jacksonville. Today in Florida, freshwater marshes and wet prairies are most abundant, dominating the Everglades of south Florida and the upper St. Johns River valley. Upland hardwood forests are also abundant, occurring largely along river bluffs, in coastal areas, and as small, scattered patches in north Florida. Mixed hardwood swamps are most common along the floodplains of Panhandle rivers, in the floodplain of the Wekiva River, and in the extensive wetlands systems of Dixie County. Cypress swamps are most abundant in the Big Cypress Swamp in south Florida, Green Swamp in central Florida and the Pinhook Swamp region of north Florida. Dry prairies are found scattered throughout the south-central portion of the peninsula.

## STEEPHEADS: FLORIDA'S MOUNTAINS

Photo credit: ©The Nature Conservancy 1994



*Ashe's magnolia, an endangered plant of steephead forests*

**Steepheads** are a distinct type of slope forest found in northern Florida. A steephead forms when ground water leaks through porous sand onto a sloping surface at the head of a stream. The ground water removes sand from the bottom of the slope, causing the sand above to slump down and to be carried away by the flowing ground water. Heads of steephead streams are low in relation to their mouths: they erode from the bottom up (Means 1981). Other streams develop from gully erosion. Surface runoff from rainfall washes sediments off the ground's surface gradually, eroding land from the top down. Gully-eroded streams depend on rainfall for their flow, whereas steephead streams have a steady flow of constant-temperature spring water. Steephead forests contain many endemics, as well as rare northern plants. The endangered Okaloosa darter is found exclusively in steephead streams.

## SOILS

Florida's soils are generally sandy and low in fertility. Well-drained loamy soils occur only in the western highlands, which extend approximately 30 miles south of the Alabama and Georgia borders. Deep and excessively drained sands, **Entisols**, often referred to as sandhills, occur in the western highlands of the Panhandle and on the central ridge from the vicinity of the Suwannee River in north-central Florida south to





Source: Kautz et al. 1998

south-central Florida. These areas are important for groundwater recharge. Poorly drained sandy soils are the most common soils in the state, occurring in pine flatwoods. Poorly drained organic soils underlain by limestone or marl (**Histosols**) occur on flat lands primarily in the Everglades and in the upper Ocklawaha River.

## ECOSYSTEM PROCESS
## WATER AND FIRE

Floods, fires from lightning and droughts are common in Florida and often occur in quick succession. Plants, animals and natural communities have evolved a variety of adaptations to deal with these stresses and changes. Pond cypress, for example, survive better than bald cypress in nutrient-poor, still waters. Longleaf pine's ability to withstand fire, even in its "grass" seedling stage, is well known. Fire also produces minerals necessary for longleaf pine germination (Abrahamson and Hartnett 1990).

**Hydroperiod**, the duration of standing water, plays a strong role in determining the location of the various wetland communities. Forested wetlands along floodplains of major rivers are typically inundated for one to six months each year. In hammocks where limestone is near the surface, the ground is frequently damp from groundwater seepage. Freshwater marshes typically have shallow standing water (less than 12 inches deep) from 7 to 12 months each year (Kautz et al. 1998).

In southern Florida, water levels varied greatly between wet and dry seasons and from year to year. Naturalist and adventurer A. W. Dimock describes a canoe trip he took in 1908: "We began the trip in canoes, but ended in an oxcart. We paddled and wallowed through two hundred miles of flower-clad lakes and boggy, moccasin-infested trails, zigzagging from border to border of the Florida Everglades and were hauled for 5 days on pine-covered strands of sand….Last year we crossed the 'Glades from west to east, in a power boat, over the deepest water known for a decade. This year, from Cape Sable to Lake Okeechobee, we could seldom find water to float a canoe" (Tebeau 1966:15).

Naturally occurring wildfires, as well as water, have played a defining role in shaping Florida's natural communities. Florida has one of the highest frequencies of lightning strikes of any region in the United States and more thunderstorm days than anywhere in the country (Abrahamson and Hartnett 1990). As a result of thousands of years of frequent lightning-set wildfires, many natural communities in Florida have come to depend on fire. Pinelands, prairies, scrubs and marshes all require regularly occurring fire. Without fire, hardwoods will invade a site and, over time, a hardwood forest will replace the original vegetation.

Today, roads, fire lanes and the need to protect lives and property have limited naturally occurring wildfires. Many fire-maintained communities are no longer able to sustain themselves without help. Forests must now be burned under **prescribed** conditions in order to reduce fuel and to eliminate hardwoods.

## Natural Communities



**Pine flatwoods**: The most common plant community in Florida, **pine flatwoods** have acidic sandy soil with some peat and often a clay layer one to three feet below the surface. They are usually moist during the rainy season and sometimes even flood. Fire is required to prevent their transformation to hardwood forests. Vegetation density varies from nearly closed to open and

## THE KISSIMMEE PRAIRIE

Dry prairies are very rare communities. Their diversity distinguishes them from vast grasslands, also called prairies, such as the Great Plains of North America and the steppes of Asia. Dry prairies are becoming even scarcer because they are highly desirable for farming and development.

Dry prairies are nearly level, treeless expanses of saw palmetto, drought-tolerant grasses and small shrubs interspersed with oak and cabbage-palm hammocks, marshes and ponds. The term "dry prairie" is somewhat of a misnomer, as these areas may have water at or above ground surface for a month or more during the summer wet season. They are only dry when compared to other treeless communities of central Florida — wet prairies and marshes.

The Kissimmee Prairie, most of which is protected in public ownership, is a prime example of the dry prairie. The Kissimmee River State Preserve, north of Lake Okeechobee in south-central Florida, offers great opportunities for wildlife observation, particularly in the winter months during bird migration periods when visitors can usually see several distinctive and rare birds, including the crested caracara, the burrowing owl, the sandhill crane, the Florida grasshopper sparrow and the snail kite.

The Kissimmee Prairie was Florida's early cattle country. "Cow-hunters" once drove cattle across the open range of the Kissimmee Prairie to the west coast of Florida for export to Cuba. In Florida, cattlemen were not called cowboys, for the work was too rugged for mere "boys." Here, the cow-hunter used the powerful and very loud cow whip to drive cattle, hunt and communicate across the vast land. According to oral history, "Florida Cracker" referred originally to those who used these whips.

almost savanna-like (Alden et al. 1998). Thickets of saw palmetto are frequently present. Pine flatwoods are home to the endangered red-cockaded woodpecker and the threatened eastern indigo snake.



**Scrub**: Florida **scrub** is a series of desert-like islands in a sea of marshes, swamps and pine flatwoods (Ripple 1997). Thousands of years ago, arid scrub land stretched from the western United States through the southern United States east to the Atlantic Ocean. The climate changed, and all that now remains of scrub in the southern United States are a few patches on ancient sand dunes in Florida. Although scrub receives as much rain as nearby areas, rain passes rapidly through the thick layer of well-drained sand to the underlying aquifer. Like desert plants, scrub plants have evolved ways of efficiently gathering and retaining moisture. Plants and animals are also able to survive relatively infrequent yet intense fires. The most common scrub plants are sand pine, rosemary and several species of dwarfed, gnarled evergreen scrub oak.



**Dry prairies**: Open grasslands with scattered saw palmettos and oak/cabbage-palm hammocks once stretched north and west of Lake Okeechobee and along the Kissimmee River. Most of Florida's **dry prairies** have been converted to ranch land. Remaining dry prairies are important habitat for the threatened crested caracara and the burrowing owl. Dry prairies occasionally flood for short

periods during the rainy season. Fires every one to four years maintain their grassy landscapes dominated by wiregrass and broomsedge.



**Hardwood hammocks**: Florida has no vast forests of hardwoods. Instead, it has small (usually less than 20 hectares, or 49 acres) islands of hardwoods found on ground that's slightly higher than the surrounding landscape. **Hardwood hammocks** have rich organic soil, acidic sandy loam with dissolved limestone or clay over limestone. Hammocks rarely flood or burn. Vegetation is thick and more than 150 species of trees and plants, including beautiful and rare orchids and bromeliads, are found here. In south Florida, hardwood hammocks provide critical habitat for the endangered Florida panther.



**Swamps**: Florida has a remarkable diversity of **swamps**. Hardwood swamps occur along rivers in north Florida and in **strands** along sloughs in south Florida. **Sloughs** are broad shallow channels of flowing water corresponding to linear depressions in underlying limestone. The most common type of swamp in Florida is the cypress swamp, which occurs in all parts of Florida except the Keys. Cypress belong to the same family as redwoods and sequoias. Two types are recognized: the bald cypress and the pond cypress. Bald cypress is most easily distinguished at maturity from pond cypress by its feather-like leaves (Nelson 1994). Because cypress seeds cannot germinate underwater, they require land that is dry for part of the year. They are typically wet 200–300 days out of the year. Cypress swamps are favored nesting spots for the endangered wood stork.



**Marshes**: Florida has expansive freshwater **marshes**, salt marshes and even bogs. The largest freshwater marsh in the state is the Everglades, where saw grass stretches as far as the eye can see, interrupted only by an occasional tropical hardwood hammock or cypress head. Saw grass is a sedge, not a true grass, and its sharp teeth can tear clothes and cut skin. Soils in freshwater marshes are wet about 250 days each year. Natural ground fires are ignited by lightning in the dry season and prevent bushes and trees from growing. Freshwater marshes support flocks of wading birds, as well as alligators and fish.

Vast salt marshes can still be seen along much of Florida's coast, even in areas where coastal development has been intense. Salt marshes have characteristics of both terrestrial and marine ecosystems and support many visiting, as well as resident, animals. Vegetation must tolerate at least periodic inundation by salt water keyed to tides and is commonly dominated by smooth cordgrass and black needlerush. Several hundred species of benthic microalgae and phytoplankton are found in salt marshes. Salt marshes are nursery grounds for many fish and shellfish of commercial and recreational importance and are the exclusive home of three birds — clapper rails, long-billed marsh wrens and seaside sparrows (Montague and Weigert 1990).

The coastal lowlands of Mississippi, Alabama and Florida were once a nearly continuous bog and habitat for one of North America's most unusual assemblages of plants and animals, including **insectivorous plants**. The leaves of one of these — the pitcher plant — are so distinctive that these wetlands are often called pitcher plant bogs (see picture, page 33). Over 90 percent of the bogs have been lost to development. Bogs develop on acidic water-saturated, nutrient-poor, sandy soil that rarely floods. The soil lies on top of an impermeable layer of rock or clay that prevents water from draining. Pine Barrens tree frogs, ribbon snakes and cottonmouths are common in bogs. Endemic plants include violet flowered butterwort, tropical waxweed, Harper's beauty and white birds-in-a-nest.



**Lakes**: Most of Florida's 7,800 lakes were formed by dissolution of underlying limestone, collapse of the overlying land surface and flow of ground water into the resulting cavity. Most Florida lakes are small, shallow and in the peninsula's central sandy ridge. These sandhill lakes are naturally very clear, are nutrient-poor and usually have closed basins (that is, no streams flow either in or out). These lakes are typically surrounded by emergent vegetation and frequently support submersed grasses, such as maidencane. Many Florida lakes are polluted by the discharge of nutrients, other pollutants and siltation from human development. Increase in lake nutrients has contributed to the explosion of invasive exotic plants such as water hyacinth and hydrilla. Twenty-one established exotic fish species also compete with native fish (Kautz et al. 1998).



**Rivers**: Florida has three main types of rivers: alluvial rivers, spring-fed rivers and blackwater rivers. Floodplains along alluvial rivers contain a wide variety of hardwoods, shrubs and woody plants. The rivers themselves contain 100 to 152 species of fish. The Apalachicola River system encompasses more rare and endangered species of plants and animals than any other river system in Florida. In spring-fed rivers, submerged vegetation is abundant because of water clarity. Spring-fed rivers also support abundant populations of mussels and snails, which in turn support mussel- and snail-eating turtles and fish. One small spring along the Ichetucknee River is the only place in the world where the sand grain snail is found. The federally endangered Gulf sturgeon travels from a coastal estuary up the spring-fed Suwannee River to spawn. Blackwater rivers drain pinelands and swamps. Submerged vegetation is limited because the water is dark and acidic from the tannin and humic acids produced in the pinelands and swamps. Blackwater rivers have lower fish and invertebrate species diversity than spring-fed or alluvial rivers, due in part to the high acidity of the water. The three-lined salamander, the southern dusky salamander and the mud salamander are commonly found in blackwater rivers.



**Dunes and Maritime Forests**: Grasses such as sea oats grow on dunes closest to the water's edge, and a

variety of forest vegetation (maritime forests) grows on the more stable dunes inland from the coastline. Going south from Cape Canaveral on the east coast and from Tampa on the west coast, vegetation gradually changes from a dominance of temperate species to a dominance of tropical species. At least 22 species of endemic plants are found on dunes and in maritime forests in Florida. Atlantic and gulf beaches themselves are the most important nesting site for loggerhead turtles in the Western Hemisphere, as well as for several species of shore birds, including the endangered snowy plover. Exotic plants such as Australian pine and Brazilian pepper are a serious problem along many of Florida's beaches.



**Mangroves**: **Mangroves** are limited by temperature to the tropics and subtropics and are established along low wave-energy coastlines in those parts of the state. Mangrove forests grow in zones of red, black and white mangroves with buttonwoods (not a true mangrove) on the upland fringe. Water fluctuations are important to mangrove forest development. Fluctuating water levels, waterlogged sediments and salt water exclude most other plants. Mangroves have specially adapted roots that allow them to grow and propagate in water. Mangroves and buttonwoods also have a variety of means of dealing with fluctuations in salinity. Red mangroves, for example, filter fresh water from seawater at the root surface, whereas black and white mangroves and buttonwoods excrete excess

salt via salt glands at the leaf surface (Odum and McIvor 1990). Mangrove forests are valuable habitat for a wide range of invertebrates, fish, amphibians, reptiles, birds and mammals, including the endangered American crocodile, the endangered hawksbill sea turtle, the endangered Atlantic ridley sea turtle, the endangered Florida manatee and the threatened Atlantic salt marsh snake. Mangroves are important nursery areas for sport and commercial fish and shellfish, including spiny lobster, pink shrimp, mullet, tarpon, snook and mangrove snapper. Mangroves are easily destroyed by oil spills and herbicides.



**Seagrass beds**: Seven species of seagrass are found in Florida's coastal waters. The most common are turtle, shoal and manatee grasses. **Seagrass beds** are excellent habitat for many fishes, crustaceans and shellfish, and are critical nursery areas for young marine animals. Bay scallops, blue crabs and spotted sea trout are examples of species that depend on seagrass beds. Seagrasses are also a major part of the diets of manatees and sea turtles and are substrate for epiphytic (attached) algae, a critical component of the marine food web.



**Coral Reefs**: **Coral reefs** are among Florida's most spectacular and beautiful natural communities. Found in the shallow

waters off southeast Florida and the Florida Keys, coral reefs require transparent, warm and relatively nutrient-poor waters. Only the surface layers of coral reefs are alive. The reef's limestone base is composed of skeletal deposits of dead corals and algae. Microscopic algae live **symbiotically** in the outer parts of the coral polyp. Over 100 species and subspecies of coral and algae are found in Florida's coral reefs, as well as numerous other species of recreational and commercial value, including spiny lobster, grouper, snapper, parrot fish and butterfly fish. Many reef species live in narrow niches and have specialized food requirements and complex life cycles.

## Conclusion

People have been part of the ecosystems of Florida for more than 10,000 years. For most of this time, human population was relatively low and human use of natural resources did not cause any significant decrease in the ability of the environment to maintain clean air and water, as well as productive, biologically diverse ecosystems. In the past 200 years, however, human uses have had enormous impacts. Deforestation in the north, wetland drainage in the south, agriculture in the center and urbanization along the coasts and the I-4 corridor have caused massive losses of natural ecosystem diversity and productivity. In Florida, the major challenge of the next century will be to create an environmentally, as well as economically, sustainable way of living (Kautz et al. 1998).

Chapter 5

# Water Supply and Water Quality

*"Not only is the level of the water in the global well getting low, the water is also polluted, sometimes to the point where it is no longer drinkable."*

— Julie Stauffer, The Water Crisis, 1998, p. xi

*"Although water is part of a global system, how it is used and managed locally and regionally is what really counts. Unlike oil, wheat and most other important commodities, water is needed in quantities too large to make it practical to transport long distances."*

— Sandra Postel, Last Oasis, 1992, p. 23

## KEY IDEAS

- Florida's future depends on a continued supply of adequate amounts of clean fresh water for human consumption and for natural systems.
- The amount of water changed by human activity is far greater than the amount of water directly used by humans.
- In some places in Florida, the demand for fresh water is greater than supply.
- Florida's water management districts are committed to finding new ways to meet the demand for water.
- Pollution is anything that causes an imbalance in or harms the natural environment.
- Scientists use a number of tests and measures to determine water quality.
- Pollution takes two main forms: point source pollution and non-point source pollution.

## VOCABULARY

| | |
|---|---|
| Aquifer storage and recovery | Nutrients |
| Best management practices | pH |
| Conductivity | Point source pollution |
| Desalination | Pollution |
| Detention pond | Public supply |
| Dissolved oxygen | Reclaimed water |
| Drip irrigation | Retention pond |
| Environmental pollution | Reuse |
| Filtration | Turbidity |
| Impervious surface | Wastewater |
| Irrigation | Water Use Caution Areas |
| Non-point source pollution | Xeriscaping |

Florida's future depends on a continued supply of adequate clean fresh water. Water quality and water quantity are both important: it does little good to have vast amounts of polluted water. Plants, fish and other animals, as well as humans, all require adequate amounts of clean water.

The quantity of water changed by human activity is far greater than the amount of water directly used by humans (Betz 1984). Each time humans withdraw ground water or surface water for a particular purpose, waste is generated. Household use generates **wastewater** from toilets, sinks, showers, bathtubs, dishwashers and washing machines; phosphate mining generates phosphate slime; manufacturing generates chemical waste; irrigation generates runoff containing nutrients from fertilizers, as well as from pesticides and herbicides. Even rain contains impurities generated by burning of fossil fuels, dust and ash. It's not enough to be careful about the amount of water we use. We must also do our best to return it to the environment as pure as possible.

Some places in Florida, such as the Florida Keys and St. Petersburg, never had enough fresh water to support large-scale development. Each day, 16 million gallons of water flow from wells near Homestead, on the mainland of Florida, to the Florida Keys. Water travels through a 130-mile-long pipeline supplying water all the way to Key West. St. Petersburg, "a peninsula on a peninsula" with the highest population density in Florida (3,100 persons per square mile), ran out of water in the 1920s and now relies on well fields in Hillsborough and Pasco counties. In other places, water use is rapidly surpassing inexpensive water supply.

# Water Resource Caution Areas (WRCAs) in Florida



Source: Florida's water management districts, February 1995

Fast-growing Charlotte County gets water from DeSoto County, and Sarasota County gets water from wells in Manatee County. Other parts of Florida are also experiencing shortages. Water levels in the Floridan aquifer in coastal Walton, Okaloosa and Santa Rosa counties in the Panhandle have dropped as much as 100 feet below sea level. Near Orlando, groundwater levels have dropped 25 feet in places, and the flow in springs in the Wekiva River basin has diminished. Titusville on the east coast has notified the St. Johns River Water Management District that by 2010 it will not have enough water to meet the needs of projected growth.

Water resource caution areas, (also referred to as **water use caution areas**), places where water is either scarce or contaminated, now cover thousands of square miles throughout the state. The most extensive water resource caution areas are in southwest Florida in all or parts of Pasco, Pinellas, Hillsborough, Sarasota, Charlotte, DeSoto, Polk and Highlands counties.

Florida's water management districts are committed to finding new ways of meeting the demand for water. Providing high-quality drinking water is expensive, and using that water to meet all water needs is unnecessary. Floridians will increasingly use alternative supplies of water to meet nonpotable demands, instead of seeking new, often far-away and more pristine sources. **Reclaimed water**, for example, can be used to irrigate golf courses and landscaping, as well as in industrial processes and power generation. The use of **desalination**, particularly of brackish ground water, is increasing in Florida's populated areas. Another

way to increase water supply is conservation and increased efficiency. Household fixtures, such as toilets and showers, that save water are now available. Landscaping with native, drought-tolerant plants (**Xeriscaping**) also helps conserve water. Agriculture and industry have begun to implement new and more efficient ways of using water. Water management districts have begun to explore the option of storing water in aquifers during times of abundant rainfall and withdrawing it during times when rainfall is scarce, a process known as **aquifer storage and recovery** (see illustration, page 90).

# Water User

## DEFINITIONS

Agencies, such as the U.S. Geological Survey (USGS) that keep track of how much water is used for various purposes, distinguish between withdrawal uses, consumptive uses and nonwithdrawal uses. Withdrawal is the act of taking water from a source for storage or use. In many cases, water is withdrawn from its source and returned to its original source within a short period of time. Water withdrawn from a river to cool power plant equipment and then returned to the river is an example. Some of the withdrawn water is consumed; that means the water is no longer available for immediate reuse. Evaporation, plant transpiration and incorporation into a product are all consumptive uses. When water is withdrawn for irrigation, for example, some evaporates, some transpires and some is incorporated into plants. The remainder may return to the surface water or groundwater source from which it originated. Nonwithdrawal uses include use by natural systems, recreation use and use for transportation.

## TYPES OF USES

The USGS collects and compiles water withdrawal data in Florida and throughout the United States. USGS distinguishes between saline water and freshwater use and between surface water and groundwater use. Data are collected in the following water use categories: public supply, domestic self-supplied, commercial-industrial self-supplied (including mining), agricultural self-supplied (including livestock), recreational irrigation and power generation (cooling of thermoelectric power plants).

**Public supply** includes systems that serve more than 400 people or use more than 10,000 gallons of water each day. Public-supply systems provide water to households, businesses and industries. Domestic self-supplied is water withdrawn by the user for household use, usually from individual wells. Agricultural self-supplied includes **irrigation**, the process of supplying water to areas of land to make them suitable for growing crops, sod and landscaping plants, as well as water for livestock.

Recreational irrigation was a new water use category in 1995. It includes withdrawals for the irrigation of land used for recreational purposes. Golf courses are the largest users in this category. Before 1995, recreational irrigation was included under agricultural self-supplied.

### HOW MUCH IS A MILLION GALLONS OF WATER?

Agencies that keep track of water use usually do so in million of gallons used each day (mgd). Visualizing such a large number is difficult. Think about a bathtub or a swimming pool. A bathtub can hold about 50 gallons of water. You would have to take 20,000 baths before you used a million gallons of water! How big do you think a swimming pool would have to be to hold a million gallons of water? It would have to be 10 feet deep, 50 feet wide and 267 feet long! (USGS 2001)

## Total and Per-Capita Global Water Withdrawals



Source: Gleick 1998

## Water Withdrawals in the United States



Source: Gleick 1998

# WORLDWIDE WATER USE AND TREND

Agriculture is the single largest user of water in Florida and in the world. Two-thirds of all the water withdrawn worldwide from surface water and groundwater sources is used for agriculture (Postel 1992). Many of the world's farmers irrigate in the same ways their ancestors did thousands of years ago: by flooding or channeling water across the land. Postel (1992) estimates the overall efficiency of agricultural water use worldwide is only 40 percent, meaning that over half of all water diverted for agriculture never produces food.

Industry also uses vast amounts of water. Even if water is not part of the final product, it is likely to have been used in the industrial process that created the product. For example, paper is manufactured from wood that is washed and soaked in vats of water and chemicals to form pulp. The pulp is rinsed, squeezed dry and then pressed into paper (Prentice Hall 2000). Many industries, such as power plants and steel mills, use high volumes of water to cool down hot machinery.

Worldwide household use is a third leading use of water. Most of us take safe, plentiful water for granted, but in many parts of the world women and children still spend hours every day walking to shallow wells, collecting water in jugs and carrying it home.

Most people in Florida and in other parts of the United States get their water from public-supply systems. When you have hundreds of people living in a square kilometer, it is much more efficient and safer to have the county or city water department deliver water to households than to have each household drill its own well or build its own water tank. Public water systems supply water to schools, businesses and industries, as well as to homes.

In the past century, population growth, industrial development and expansion of irrigated agriculture have resulted in an enormous increase in the amount of water used throughout the world. Throughout the first 75 years of the twentieth century, absolute and per capita demand for water throughout the world

| Liters of Water Typically Used to Produce Products in the United States | |
|---|---|
| 1 automobile | 400,000 |
| 900 kg of paper for bags | 32,800 |
| 1 kg of cotton | 8,800 |
| 1 kg of aluminum | 8,800 |
| 1 kg of beef | 7,000 |
| 1 kg of rice | 5,000 |
| 1 kg of steel | 2,200 |
| 1 liter of gasoline | 75 |

| Domestic Water Use (liters) | |
|---|---|
| showering 5 minutes | 95 |
| brushing teeth | 10 |
| washing hands | 7.5 |
| flushing standard toilet | 23 |
| flushing low-flow toilet | 6 |
| washing one load of laundry | 151 |
| running dishwasher | 19 |
| washing dishes by hand | 114 |

increased. Beginning in the mid-1980s and early 1990s, however, these trends reversed in the United States and water use began to decrease despite continued increases in population and economic wealth. Between 1980 and 1995, water use in the United States declined by nearly 10 percent. The two largest components of United States water use — thermoelectric cooling and agricultural irrigation — declined by about 10 percent. Industrial use dropped even more than thermoelectric cooling and agriculture (40 percent), as industrial water use efficiency improved and as the mix of United States industry changed. Part of the decline in agricultural use is a consequence of the availability of more efficient methods of irrigation. **Drip irrigation** is a process whereby water is applied directly to the roots. It was first developed in Israel and has expanded worldwide.

## FLORIDA WATER USE AND TRENDS

In 1995, ground water accounted for 60 percent of the water withdrawn in Florida. Nearly 93 percent of the state's population relied on ground water for their drinking water needs, far more than any other state in the nation (Solley et al. 1998). The majority of ground water is withdrawn from the Floridan aquifer, although the Biscayne aquifer is the primary source of potable water in south Florida and the sand and gravel aquifer is the main source of potable water in portions of west Florida. Groundwater withdrawals steadily increased between 1950 and 1990, but decreased 7 percent between 1990 and 1995, even though the population increased 9 percent, from 12.94 to 14.15 million. Following trends in the United States as a whole, use of water for agricultural irrigation, industry and thermoelectric cooling has also decreased in Florida, due to more efficient use.

# Florida Freshwater Use
## 1995



Surface Water



Ground Water

Source: Marella 1999



**Freshwater Withdrawals**

Source: Marella 1999

Statewide per capita residential use of water has decreased from an average of 144 gallons per day in 1980 to 103 gallons per day in 1995. This decrease has resulted from conservation efforts, including the use of more efficient toilets and showers, use of reclaimed water for lawn irrigation, and use of water-saving landscape techniques (Marella 1999). Florida households still use one-half of their water for landscape irrigation.

Florida ranks low (30th in the nation) in withdrawals of fresh surface water. Between 1990 and 1995, withdrawals of surface water increased by less than 1 percent. The primary uses of fresh surface water are for agricultural irrigation and as cooling water for power plants. Major sources of fresh surface water for irrigation are Lake Okeechobeee, Lake Apopka, the Caloosahatchee River and the marshlands associated with the headwaters of the St. Johns River. In some parts of the state, surface water is a significant component of public supply. Hillsborough River and the Tampa Bypass Canal supply Hillsborough County, and Deer Point Lake Reservoir supplies Bay County.

## Water Reuse

Florida has become a leader among states in the **reuse** of water. Every day, 60 gallons of wastewater for each person flows out of homes and into sewers. As this wastewater travels miles through the collection system, it is diluted by ground water that infiltrates joints and defects in the sewers. By the time wastewater reaches the treatment facility, its volume has increased to about 100 gallons per person per day. Wastewater is now about 99.9 percent water and 0.1 percent pollutants. After treatment, wastewater can be safely used for many purposes.

State law requires reuse within water resource caution areas. In 1999, the total capacity of all reuse systems in Florida was about 1.04 billion gallons per day, nearly half of the total permitted capacity of all domestic wastewater treatment facilities in the state. A total of 523 million gallons per day of reclaimed water was reused in 1999.

Reclaimed water is being used for landscape irrigation (including golf courses, parks, highway medians, playgrounds and residential properties), agricultural irrigation (including irrigation of edible crops), aesthetic uses (decorative ponds, pools and fountains), groundwater recharge, industrial uses (for cooling, process or wash waters), wetlands creation, restoration and enhancement and fire protection (use in hydrants and sprinklers).

# Water Quality

Good quality water in adequate amounts is indispensable for the water we drink, but it is also essential for many other uses. We cannot safely swim or fish in polluted waters nor can Florida's natural systems survive without adequate water of good quality.

The recreational and ecological values of good quality water and other natural resources are frequently acknowledged but are rarely considered in management decisions because we don't buy and sell them as we do other commodities. An article published in 1997 (Costanza et al.) in the journal *Nature* summarizes and synthesizes studies aimed at estimating the value of ecological functions and services. The authors conclude that the economic value of Earth's natural systems averages $33 trillion per year, which is 1.2 times as much economic value created by humans and measured by the combined gross national product of all the countries in the world.

Scientists use a number of tests and measures to help them determine water quality. These include turbidity, nutrient levels, pH, dissolved oxygen, conductivity and temperature.

**Turbidity** is characterized by a cloudy or muddy appearance caused by suspended solids that decrease the ability of the sunlight to penetrate the water. The most common suspended solids are soil particles and algae. Water may sometimes be naturally turbid because of high amounts of organic debris, erosion, or waves or floods that suspend sediments.

High turbidity reduces underwater plant growth by limiting sunlight penetration and photosynthesis. A decrease in plant growth results in a decrease in the number of organisms that depend on plants for food and shelter. Soil particles also affect the health of fish by clogging and irritating their gills. Turbid waters may suffocate some aquatic plants and animals and impair reproduction and development of eggs and larvae.

**Nutrients** in the proper amount are necessary for healthy aquatic systems, but in excess, nutrients, primarily nitrogen and phosphorus, can be harmful. Nutrients come from runoff containing fertilizer, waste from leaking septic tanks, decaying lawn debris and animal wastes. When too many nutrients are present, certain plants grow explosively and crowd out other plants, creating a monoculture. Increases in nutrients may result in algal blooms in lakes and rivers. When algae multiplies rapidly, it uses up dissolved oxygen, leaving less available for other forms of aquatic life. Excess nutrients also frequently increase nonnative nuisance plants, such as water hyacinth and hydrilla.

The measure of the amount of hydrogen ions (H+) and hydroxide ions (OH-) in a solution is **pH** (potential of hydrogen). The more acidic a solution, the greater the amount of hydrogen ions. The more basic or alkaline the solution, the greater the amount of hydroxide ions. The pH scale ranges from 0 to 14

The lower the pH, the more acidic the solution is; the higher the pH, the more basic the solution is. A solution with a pH of 7 is neutral, neither basic nor acidic. Pure water has a pH of 7. Orange juice has a pH of 4 and battery acid has a pH of 0.5. Milk of Magnesia has a pH of 10 and lye has a pH of 14. Most aquatic organisms prefer water with a pH ranging from 6.5 to 8.5. As acidity rises (pH falls), other compounds in contact with the water or the soil may release toxic elements (for example, aluminum and mercury). Stormwater runoff containing leakage from faulty sewer lines or septic tanks, runoff from agricultural areas and acid rain can all decrease pH in lakes, rivers and estuaries, threatening aquatic organisms and releasing potentially harmful elements.

**Dissolved oxygen** in water is essential for the survival of nearly all aquatic plants and animals. Aquatic organisms, including most fish, generally thrive when dissolved oxygen levels are 5 parts per million (ppm) or greater. Oxygen in the water comes from the air and as a byproduct of photosynthesis. The cooler the water, the more dissolved oxygen it will hold. However, at night when photosynthesis stops, animals continue to use oxygen and the dissolved oxygen content of water drops.

**Conductivity** refers to how well the water conducts or transmits an electrical current. Pure distilled water does not conduct a current. As the concentration of minerals and salts in the water increases, however, conductivity rises. Conductivity is therefore an indirect measure of the mineral content of water. Sediments from stormwater runoff and intrusion of seawater increase the mineral content of water. Increases in conductivity may indicate water quality problems from increased salinity or increased sediment. Both of these make water less useful to humans and to natural systems.

Temperature affects the growth and life cycles of many aquatic organisms.

Nearly all organisms have a temperature range they prefer or even require. Sediments can absorb heat and increase water temperature. Stormwater runoff from heated impervious surfaces and power plant outfalls also increases water temperature. As water temperature increases, the life cycles of aquatic insects may accelerate. The growth of algae generally increases, whereas the growth of other plants such as aquatic grasses may decrease. Other aquatic organisms may become more sensitive and vulnerable to disease and their reproductive cycles may be disrupted with increased temperatures.

## CAUSES AND SOURCES OF WATER POLLUTION

Although **pollution** is often defined as contamination by harmful chemicals or waste materials, **environmental pollution** can be *anything* that harms or causes an imbalance in plants and animals in their natural habitat — even though the substance may not be harmful to humans. For example, phosphorus and nitrogen are common elements of most fertilizers. They are not harmful to humans. However, nitrogen runoff can be a pollutant in saltwater bays and estuaries, such as Tampa Bay and the Indian River Lagoon, and phosphorus runoff can be a pollutant in freshwater habitats such as the Everglades and Lake Apopka and other freshwater lakes because it causes an imbalance in the natural system.

Pollution is usually caused by human activities. Pollutants aren't always detectable by smell, sight or taste. Water may look and smell clean and even taste fine, but it may still be contaminated and unsafe for drinking.

Despite successes in cleaning up some water pollution, many modern pollutants are very difficult to remove, and it is obviously better not to pollute in the first place. Heavy metals and synthetic chemicals pose particular hazards to humans and other forms of life.

Heavy metals, such as lead and mercury,

can interfere with production of hormones and with reproduction. Lead can further result in physical and mental developmental problems in children. Other metals, such as copper and zinc, are less dangerous to humans but are toxic to aquatic life (Stauffer 1998).

More than 10 million chemicals are manufactured today. Most are used in agriculture and industry. Some break down quickly, whereas others, like heavy metals, remain in the environment for decades. Fewer than 2 percent of these chemicals have been fully tested with regard to human health risks, and no health information is available for more than 70 percent of them (Stauffer 1998).

Water may be polluted in two general ways: by **point source pollution** and by **non-point source pollution**. With point source pollution, the cause of the problem can be traced to a single source, for example, a pipe discharging waste from a factory. Non-point source pollution is more diffuse and originates from diverse sources over a wider area.

In the past, pollution from industrial and domestic point sources was common. Stronger regulations, new technologies and more advanced treatment of wastes have reduced point source pollution. Today most water quality problems result from non-point source pollution, including stormwater runoff, septic tanks, runoff from croplands, dairies, feedlots and farms, and erosion from construction sites and unpaved roads. Non-point source pollution carries pesticides and fertilizers from lawns and fields, oil and greases from roads and parking lots, sediments from construction sites and clear-cutting of trees, and wastes from improperly functioning septic tanks.

In 1982, the state of Florida implemented a rule to reduce stormwater runoff. Since 1982, all new developments have been required to use **best management practices** (BMPs) to minimize runoff during construction and to treat stormwater after construction. These BMPs include requiring swales, **retention ponds, detention ponds** and detention ponds with **filtration**.

## FLORIDA WATER QUALITY AND TREND

Because Florida is so populous and has grown so rapidly, an important source of pollution, particularly of surface water, is urban storm water. Surface water quality problems occur with the greatest frequency in heavily populated areas — the southeast, in the central region near Orlando, in the St. Johns River basin particularly around Jacksonville, in Pensacola Bay and its tributaries, in the Peace River basin and along the west coast between Tampa and Naples. Water bodies whose watersheds include large urban areas and intensive industry and agriculture have the poorest water quality.

Developed areas have a much higher proportion of **impervious surface** than rural areas. Impervious surfaces are covered with buildings or asphalt, concrete and other materials that prevent water from seeping into the ground. As a consequence, the volume of storm water increases, carrying pollutants with it.

The Florida Department of Environmental Protection monitors water quality in over 600 surface water bodies throughout the state. Between 1986 and 1995, the water quality in 71 percent of these water bodies was unchanged, the water quality of 20 percent improved, and the water quality of 9 percent declined. In general, improvements were related to better control of point source pollution, particularly discharges from wastewater treatment plants. Declines in water quality generally resulted from increases in stormwater runoff.

Florida's ground water, as well as its surface water, is vulnerable to contamination. Large portions of the state are covered with well-drained sandy soils overlying porous limestone. High

83

## The Effect of Covered Surfaces on Runoff



Source: Fernald and Purdum 1998

amounts of rainfall contribute to the potential for contamination of ground water: in many places, anything on the surface is likely to percolate through to the ground water. Connection between ground water and surface water also means that anything found in surface water is likely to find its way into ground water and vice versa.

In the 1980s, hundreds of wells in Florida were found to be contaminated with the soil fumigant ethylene dibromide (EDB). Other wells were found to be contaminated with dry-cleaning solvent and gasoline from leaking underground storage tanks. This resulted in standards for water well construction and water testing within areas of known groundwater contamination. Ground water in Florida has also been found to be contaminated with nitrate from fertilizers or leachate from septic tanks. Nitrate contamination of ground water may cause "blue baby syndrome," a condition affecting human infants under 6 months of age. High levels of nitrates decrease the amount of oxygen carried in the baby's blood. The skin around the eyes, mouth and feet appear blue. The syndrome may also cause difficulty breathing, loss of consciousness, convulsions and even death.



## Monitored Surface Water Quality Trends
### 1986–1995

Better
No change
Worse

Source: Fernald and Purdum 1998

## Conclusion

Although the analysis of water quality and water pollution is complex, the need for adequate amounts of clean water is clear. Some major water quality problems of the past, particularly waterborne epidemics, are now well controlled. We must face new challenges resulting from a fast-growing population, industry and intensive agriculture.

As water becomes scarcer, it will undoubtedly become more expensive, not just in Florida but throughout the world.

"In most countries, water is priced at only a fraction of its real cost. The working assumption is that it's an unlimited public resource, and the result is that few consumers have any incentive to use it sparingly. Yet the time is coming when water must be treated as [a] valuable [resource], like oil, not free, like air" (Voyage Publishing 1996).

85

*Chapter 6*

# Forward to the Past

*"The strength of the many is greater than the strength of the individual organization."*
— Participant in Indiana Grand Kankalee Marsh Restoration Project (Yaffee et al. 1996)



*"You can't look at ecosystem management only in terms of what it can do for native plant and animal species. From the standpoint of sustainability, people have to be strongly involved."*
— Participant in Oak Mountain Partnership, Colorado (Yaffee et al. 1996)

## KEY IDEAS

• Many of Florida's natural systems have been radically changed and fragmented by human development.

• Water no longer flows unimpeded from uplands to coastal estuaries.

• Florida has responded to the loss, degradation and fragmentation of the natural environment with one of the most aggressive and farsighted land acquisition programs in the nation.

• Land acquisition alone is not enough. These lands must be managed and in many cases effectively restored.

• Throughout Florida, ecosystems are being restored.

• We cannot return to what used to be, but we can restore, protect and better manage what we have.

## VOCABULARY

Degradation

Edge habitat

Finger-fill canals

Habitat fragmentation

Invasive exotics

Land restoration

Stormwater treatment areas

Beginning in the 1800s, many of Florida's natural systems were radically changed. Thousands of acres were drained for agriculture. Thousands more were drained for houses for the steady stream of new residents. Rivers were straightened and canals were dug for drainage and flood control and to make travel easier for ships and barges. Rivers were dammed for hydroelectric power and to create lakes for recreation. Forests were cut and trees were tapped for turpentine and rosin. In northern Florida, centuries-old longleaf pine trees were replaced with acre upon acre of fast-growing slash pine. Farther south, ancient cypress were logged and the land left bare.

Today, agricultural enterprises, businesses, houses, cities and roads cover 43 percent of the Florida landscape. Forests and wetlands comprise the other 57 percent. However, humans have left their imprint on nearly all of this remaining land. Most of the forests are now straight rows of young trees, the original trees having been logged. Also, many natural areas have been affected by **invasive exotics** (plants and animals from elsewhere) that "crowd out" native species (Kautz et al. 1998).

A serious consequence of the conversion of the natural Florida landscape to human uses has been the fragmentation of remaining natural habitats. Water no longer flows unimpeded from uplands to coastal estuaries. Wide-ranging species such as the endangered Florida panther and the black bear face hazards as they cross barriers such as

roads and levees that isolate and fragment their habitats. **Habitat fragmentation** increases the amount of "**edge**" **habitat**. Although edges are desirable for some game species, such as deer and rabbits, and for some birds, such as song sparrows and cardinals, excessive amounts of edge are undesirable for interior forest dwellers. Edges of forests are also hotter and drier than the forests themselves and may become dominated by common weeds, whereas forest interiors are more diverse and support more rare species (Kautz et al. 1998).

Florida has responded to the loss, **degradation** and fragmentation of the natural environment with one of the most aggressive and farsighted land acquisition programs in the nation. As of March 2001, 8.7 million acres, covering nearly a quarter of the state, were publicly managed conservation lands (Florida Natural Areas Inventory, unpublished data). But public acquisition is not enough: there must be land management and in many instances, **land restoration**. In the past century, conservation efforts focused on acquisition and preservation, basically putting a fence around what's left, according to former U.S. Secretary of the Interior Bruce Babbitt. "We have finally come to recognize that that's not enough. We cannot meet our obligation to the protection of creation by saying 'fence off the back 40,' put somebody in a uniform from the National Park Service here and say we've taken care of our obligation." Today an "ecological revolution," in Babbitt's words, is occurring: it is ecological, not political, boundaries that are critical. You can't preserve or manage or restore public lands in isolation from the landscapes of which they are a part.

## Restoration

Many things can be taken apart, but some, such as biological systems, are very difficult to put back together again. On the surface, a biological system may look like it's "fixed," but it might not work. Some parts may be missing, some may be forgotten or some may not be put back in the proper relationship to other parts. Complexity and diversity tend to be hallmarks of unaltered systems, and this makes restoration very difficult. Like a broken eggshell, a fragmented and altered ecosystem that is put back together may never be as strong and resilient as the original. In spite of these challenges, throughout Florida, ecosystems are being "put back together."

### KISSIMMEE–OKEECHOBEE EVERGLADES RESTORATION

The U.S. Army Corps of Engineers and the South Florida Water Management District are embarking on the most ambitious ecosystem restoration ever undertaken in the United States. At an estimated cost of $7.8 billion, a 50-year plan provides the road map for reviving what was once an uninterrupted ecosystem from the Kissimmee River valley, through Lake Okeechobee, through the water conservation areas and Everglades National Park, to Florida Bay and the coral reefs. This plan is the culmination of eight years of scientific study and unprecedented cooperation among local, state and federal governments, Indian nations, environmentalists, farmers and urban water utilities.

Many people think of the Everglades as Everglades National Park. They picture a vast expanse of saw grass immortalized by Marjory Stoneman Douglas in her famous book, *The Everglades: River of Grass*. But the Everglades ecosystem is much larger and more diverse. It begins near Orlando, north of the chain of lakes that feeds the Kissimmee River and Lake Okeechobee, and it ends at Florida Bay and the coral reefs.

The natural landscape of the Everglades system was designed to hold water. During wet periods, water overflowed the southern banks of

 

**Historic Flow**

**Current Flow**

Source: South Florida Water Management District

Lake Okeechobee and continued in a sheetlike fashion across the Everglades. Immediately south of Lake Okeechobee was a custard apple and cypress forest where Seminole Indians hid from federal troops during the Second Seminole War. An eastern coastal ridge and a western inland ridge bound this "river of grass" that slopes imperceptibly from north to south, about one inch per mile. Just south of the lake, in what is now the vast sugar cane and vegetable fields of the Everglades agricultural area, saw grass was the dominant species. The current water conservation areas were once a mixture of sawgrass marsh and tree islands, and were home to huge flocks of birds and other wildlife, including endangered and threatened species such as black bear and the Florida panther. Uplands were pine/palmetto flatwoods and hardwood hammocks. Taylor Slough and Shark River Slough moved water through

what is now Everglades National Park to salt marshes and mangrove swamps along Florida Bay and the Gulf of Mexico. During dry times, wildfires were common and were a vital force that helped maintain the balance of natural communities.

The Everglades landscape began to change in 1882 when Hamilton Disston attempted to channelize the Caloosahatchee and the Kissimmee rivers. In 1904, modification of the south Florida environment accelerated when Napoleon Bonaparte Broward was elected governor of Florida on a promise to "drain the Everglades." Between 1905 and 1927, six major canals and channelized rivers were connected to Lake Okeechobee for drainage and navigation. People began to settle and farm newly drained land south and east of Lake Okeechobee.

In 1926, and again in 1928, hundreds of people died when hurricane winds blew water out of Lake Okeechobee and flooded

surrounding areas. As a consequence, an 85-mile-long dike was built encircling Lake Okeechobee. In 1947, two more hurricanes flooded south Florida. In response, in 1948, Congress authorized the Central and Southern Florida Flood Control Project, a massive public works project. The project encompassed 18,000 square miles, covered 16 counties and included 1,000 miles of canals, 720 miles of levees, and almost 200 water-control structures. With the completion of the project, the Kissimmee-

# Comprehensive Everglades Restoration Plan



The Central and Southern Florida Flood Control Project was designed and built in the 1940s and 1950s.

The Comprehensive Everglades Restoration Plan is designed to meet the multiple needs of the twenty-first century.

Source: South Florida Water Management District

89

Okeechobee-Everglades ecosystem became a managed watershed. People, not nature, determined where and, to some degree, how much water would flow.

The Central and Southern Florida Flood Control Project opened vast areas for agriculture and urban development, making it possible for more and more people to live in south Florida. It did so at tremendous ecological cost to the Everglades. While the population of *people* in south Florida has risen from 500,000 in the 1950s to more than 6 million today, the number of wading birds in Everglades National Park has declined by 95 percent. Sixty-eight plant and animal species are threatened or endangered and over 1.5 million acres are infested with invasive exotic plants. And, because of seasonal rainfall, subtropical climate extremes and very flat topography, south Florida still occasionally experiences both floods and water shortages.

The Comprehensive Everglades Restoration Plan passed by Congress in 2000 addresses all these concerns. It is a blueprint that aims to:

• Improve the health of over 2.4 million acres of south Florida ecosystem, including Everglades National Park and the Water Conservation Areas.
• Improve the health of Lake Okeechobee.
• Eliminate damaging freshwater releases to estuaries.
• Improve water deliveries to Florida and Biscayne bays.
• Improve water quality.
• Enhance water supply.
• Maintain existing flood protection.

The current Everglades is only about half the size of the Everglades that existed 100 years ago. While the historic Everglades can never be regained, much of what remains can be improved. Restoration addresses four fundamental issues regarding water: quantity, quality, timing and distribution.

*Quantity:* Each day an average of 1.7 billion gallons of fresh water that once flowed through the ecosystem are discharged to the ocean and gulf. This water is lost for both humans and natural systems. Under the restoration plan, much of this water will be captured in surface and



Source: South Florida Water Management District

underground storage areas until it is needed. More than 217,000 acres of new reservoirs and wetlands and 300 underground storage and recovery wells are planned. Most of the water captured will be used for environmental restoration with some reserved for urban and agricultural uses.

*Quality:* Increased nutrients, especially phosphorus, cause negative changes to the plant communities of the Everglades. Florida's 1994 Everglades Forever Act addresses this water quality issue by mandating the construction of artificial wetlands, called **stormwater treatment areas**, to reduce nutrients and improve water quality before water enters the Everglades.  The Comprehensive Plan employs storage and treatment areas that further improve water quality in freshwater releases to the Everglades and Lake Okeechobee and that reduce undesirable freshwater discharges to coastal waters.

*Timing:* Cycles of flood and drought were vital to the historic functioning of the Everglades ecosystem. Under the restoration plans, the timing of water held and released into the ecosystem will more closely match natural patterns.

*Distribution:* To improve natural area connectors and to enhance overland flow, more than 240 miles of levees and canals will be removed from the Everglades. Portions of the Tamiami Trail (U.S. Highway 41) will be rebuilt with bridges and culverts, allowing a more natural flow of water across the land into Everglades National Park. In the Big Cypress National Preserve, the levee that separates the preserve from the Everglades will be removed, restoring more-natural overland water flow.

## TAMPA BAY

Tampa Bay is Florida's largest open-water estuary, with a surface area of nearly 400 square miles and a watershed of 2,200 square miles. Tampa Bay borders portions of Polk, Pasco, Hillsborough, Pinellas and Manatee  counties. Up to 70 percent of saltwater fish, crabs and shrimp spend part of their life cycles in estuaries where there is shelter, abundant food and protection from large predators that swim in the open sea.

Tampa Bay is the year-round home to more than 100 dolphins and a winter refuge for the endangered Florida manatees that congregate around the warm-water outfalls of power plants. Economically, the bay yields $5 billion annually from trade, tourism and fishing. Along the bay are three major seaports, and more than 100,000 boats are registered to residents of Pinellas, Hillsborough and Manatee counties. Tampa Bay has been designated an "estuary of national significance" by the National Estuary Program.

Beginning in 1950, population in the bay area began to soar. Industrial and residential development, **finger-fill canals**, farms and causeways altered nearly all of the bay's original shoreline. In 1961, following devastating flooding from Hurricane Donna, the Florida Legislature created the Southwest Florida Water Management District to work with the U.S. Army Corps of Engineers to provide flood control around Tampa Bay. During the resulting Four River Basins, Florida Project, a regional flood detention area, a major canal and several shorter canals were constructed. These facilities were designed to store and (if needed) divert floodwaters around Tampa, but they also altered the timing and quantity of fresh water flowing into the bay — factors that are important to the bay's productivity. Also impacting the bay was the discharge by Tampa of 70 million gallons a day of partially treated wastewater.

Algal blooms and fish kills were common in the bay. Water was so murky that divers couldn't see their own hands. Forty percent of the seagrass beds were lost, and bottom sediments were nearly devoid of life. Populations of fish and birds declined, along with their habitats.

The biggest culprit in the decline of the bay was nutrients, primarily nitrogen, from wastewater discharges and stormwater runoff. In the late 1960s, in response to citizen complaints, a federal investigation recommended substantial reduction in the amount of nutrients entering the bay. The Florida Legislature responded by requiring that wastewater be



Source: Kautz et al. 1998

treated to advanced standards before it was discharged to the bay. In 1979, the city of Tampa, with substantial help from the federal government, upgraded its sewage treatment plant.

The bay responded. Seagrass grew where it had not grown for decades, indicating a healthier, more productive system. Water became clearer and bottom sediments again supported life. In Hillsborough Bay, once the most polluted portion of the Tampa Bay system, soft corals and sea squirts have begun growing. Scallops, which completely disappeared from Tampa Bay during the 1960s due in part to heavily polluted water, have recently returned.

In 1998, local governments, regulatory agencies and the Southwest Florida Water Management District signed the Tampa Bay Estuary Program Interlocal Agreement, a comprehensive long-term plan for preserving and restoring Tampa Bay. Goals of the plan include restoring at least 2,000 acres of coastal habitat and increasing seagrass beds to 40,000 acres. The Southwest Florida Water Management District has acquired 14,100 acres of land within the Tampa Bay/Anclote River watershed and has proposed acquisition of another 1,673 acres. The Southwest Florida Water Management District is in the process of restoring 2,500 acres of coastal habitat. The number of fish species in one restored area, Peanut Lake, increased from 12 to 26, and the number of popular game and commercial species such as mullet, menhaden, snook, redfish and black drum also increased. Restored coastal areas are also being used by many endangered, threatened or protected species of birds.

Wastewater discharges have decreased, but population growth is expected to continue. The challenge will be to control pollution from industries and automobiles and from stormwater runoff from streets, parking lots and law

## ST. JOHNS RIVER BASIN

The St. Johns River arises in the freshwater marshes of St. Lucie and Indian River counties and flows north 440 km (273 miles) to Jacksonville. At Jacksonville, the river turns and continues east 40 km (25 miles) to empty into the Atlantic Ocean at Mayport. The St. Johns River drops only 8 meters (26 feet) in elevation from source to mouth, resulting in many shallow pools — referred to as lakes — along its length. The Upper St. Johns River Basin extends nearly 80 miles from Ft. Drum Creek to the confluence of the Econlockhatchee River, and encompasses over 1 million acres. Remember, because the river flows north, "up is down." That is, the Upper St. Johns River Basin is the southernmost part of the river.

Through the 1800s, there were over 400,000 acres of floodplain marsh in the Upper St. Johns River Basin. Beginning at the turn of the century and accelerating in the 1940s and 1950s, thousands of acres of marsh were diked and drained for agriculture. By the 1970s, nearly two-thirds of the floodplain marsh was lost, resulting in flooding, declines in water quality and decreases in fish and wildlife populations. Remaining wetlands suffered from increased nutrients pumped from untreated agricultural runoff into the marsh.

In 1954, following devastating flooding from hurricanes in the 1940s, Congress authorized construction of engineering works in the Upper St. Johns River Basin as part of the Central and Southern Florida Flood Control Project. Flooding was to be reduced by diverting large amounts of water from the St. Johns Basin to the Indian River Lagoon through a canal. Large upland reservoirs west of the river valley were to detain flood flows. In 1972, the

Photo credit: St. Johns River Water Management District



*Slough and cypress head in Upper St. Johns River Basin*

project was halted for a study required by the National Environmental Protection Act of 1969. After the study cited adverse environmental impacts from stormwater discharges to the Indian River Lagoon, as well as increased likelihood of water quality and habitat degradation in the upper basin, the state withdrew its sponsorship of this project, and it was abandoned.

In 1977, the basin became the responsibility of the St. Johns River Water Management District. After extensive study, the District developed a new plan and in 1988 embarked on one of the most ambitious and innovative river restoration projects in the nation. Unlike the original plan that relied exclusively

on engineering works, the new plan was semi-structural in design. As part of the plan, water-control structures allow water to sheetflow unimpeded through the river's marshes.

Nearly a century after they were first altered, 125,000 acres of marsh (many of which had been drained and converted to pastureland) in Indian River, Brevard and Osceola counties have been restored. Since restored areas were so large, the District relied on natural processes to restore wetlands. Natural soil moisture and processes of seed dispersal and germination occurred. When the vegetation was well established, the site was hydrologically connected to the adjacent marsh.

These restored marshes have reduced damage from floods, improved water quality, drastically reduced stormwater discharge to the Indian River Lagoon, restored fish and wildlife habitat and increased opportunities for public recreation.

To further improve water quality, 20,000 acres of reservoirs have been created as a buffer between agricultural land and the marshes. These reservoirs collect water from surrounding citrus groves and cattle ranches. Some contaminants settle in the reservoirs, resulting in



Source: Diane Sterling

cleaner water flowing into the marshes and ultimately into the river.

Wildlife now abounds in the restored marshes. The basin supports an estimated 60,000 wading birds. In 1990, the federally endangered Everglades snail kite returned to its historic nesting area in the Upper St. Johns River Basin. It was estimated in 1991 that habitat for more than 25 percent of the entire statewide population of Everglades snail kite is in the Upper St. Johns River Basin due to improved habitat there.

## LONGLEAF PINE RESTORATION

Longleaf pine forests — also known as sandhills and flatwoods on sandhill sites — originally stretched from Virginia to eastern Texas, covering 6.9 million acres in Florida's upper peninsula and Panhandle regions. These forests are home to hundreds of species, including the federally endangered red-cockaded woodpecker and the declining gopher tortoise. Longleaf pine forests have one of the most diverse plant populations on Earth because of frequent lightning fires, which keep one species from outcompeting the other. Twenty-seven federally listed species and 99 federal candidate species are associated with longleaf pine forests.

Many longleaf pine forests are important groundwater recharge areas. In portions of northwest Florida, water percolates through sandy soil in longleaf pine forests and re-emerges downslope where it forms steephead valleys and ravines.

Destruction of longleaf pine forests began in earnest after the Civil War and has accelerated in the last 50 years. Since

94

World War II, Florida's longleaf pine forests have been cut at an annual rate of 130,000 acres and largely replaced by single-species plantations of slash pine. These plantations do not support the diversity of the original sandhill and flatwoods communities. Habitat fragmentation and alteration of natural fire regime have left the remaining longleaf pine forests in poor condition.

The Northwest Florida Water Management District is restoring thousands of acres within its 16 counties, including many where longleaf pine once thrived. The District has purchased more than 180,000 acres of environmentally important lands, primarily along river systems and other sensitive water resources areas within the Panhandle. Since 1993, more than 8,000 acres have been restored to their natural state and condition along the Choctawhatchee, Chipola, Apalachicola, Escambia and Yellow rivers and the Holmes and Econfina creek areas. Efforts have focused on reforestation of areas that once contained extensive stands of longleaf pine and wiregrass habitat, although restoration activities also included other pine species such as loblolly, slash and shortleaf, as well as mixed hardwoods. About 4.4 million longleaf pines have been planted on District lands, as well as 563,000 wiregrass plugs, 85,000 loblolly pines, 452,000 slash pines, 28,000 shortleaf pines and 482,000 mixed hardwoods. More than four thousand acres have been restored within the Econfina Creek Water Management Area, along the Econfina Creek corridor. Econfina Creek is an especially sensitive area, since the creek flows into Deer Point Lake Reservoir, which serves as the public water supply source for Panama City and the surrounding area.

## SUWANNEE RIVER BASIN

Dredging, draining, and pumping have not occurred on the Suwannee River, so the river has not been altered or impacted by such activities. Water quality has declined due to increasing urban and agricultural development. However, the Suwannee River Water Management District has the opportunity to address the problems before they become excessive. The solutions in the Suwannee watershed are non-engineering and non-structural and involve buying floodplains to filter out nutrients and other contaminants naturally and to provide flood protection. In addition, the water management district seeks to secure the cooperation of local governments, agriculture, industry and residents in preventing pollution.

## Conclusion

Florida once had extensive and highly productive ecosystems, many of which were altered and degraded by urban and agricultural development. Much of the activity resulted from a lack of knowledge concerning how ecosystems function, how they are interrelated and the ways in which they help sustain people. There is currently a need to restore the function and integrity of what remains.

We cannot return to what used to be, but we can restore, protect and more effectively manage what we have. Sound science needs to be the foundation, and communication, education and public involvement, the cornerstones.

95

# Links to Project WET Activities



Project WET (Water Education for Teachers) is a nonprofit water education program for educators and young people, grades K–12. The *Project WET Curriculum and Activity Guide* was published in 1995 by The Watercourse and the Western Regional Environmental Education Council and contains more than 90 water education activities. These guides are distributed through water resources workshops that also provide local-, regional-and state-specific information to participants. In Florida, Project WET is sponsored by the St. Johns River,

Southwest Florida and South Florida water management districts and the Florida Department of Environmental Protection.

The following activities from the *Project WET Curriculum and Activity Guide* are especially appropriate for the content of each chapter. For Sunshine State Standards correlations for these activities, please visit the Southwest Florida Water Management District's Web site's Information and Education Section at **WaterMatters.org**, or call 1-800-423-1476, ext. 4757, to request a copy.

Chapter 1 — The Human Framework
    The First Floridians
        *Water Celebration*, page 446, grades 3–8
        *Water Messages in Stone*, page 455, grades 3–8
    Drainage, Flood Control and Navigation
        *Dust Bowls and Failed Levees*, page 303, grades 9–12
    Modern Water Management
        *Humpty Dumpty*, page 316, grades 3–8
        *Hot Water*, page 389, grades 9–12
        *Perspectives*, page 397, grades 6–12
    Water Law
        *Pass the Jug*, page 393, grades 3–12, K–2 option
        *Water Bill of Rights*, page 403, grades 3–12
        *Common Water*, page 232, grades 3–8, K–2 option

Chapter 2 — Water: It's Magic!
    Introduction
        *Wish Book*, page 460, grades 6–12
        *Water Messages in Stone*, page 454, grades 3–8
        *Aqua Bodies*, page 63, grades K–5
        *Aqua Notes*, page 66, grades K–5

Water's Structure
    *Hangin' Together*, page 35, grades 3–12
    *Adventures in Density*, page 25, grades 3–12
    *Molecules in Motion*, page 47, grades K–8
    *Water Match*, page 50, grades K–5
    *What's the Solution?* page 54, grades 3–8
    *$H_2$Olympics*, page 30, grades 3–8
Global Water Cycle
    *Thirsty Plants*, page 116, grades 6–8
    *Imagine!* page 157, grades 3–8
    *The Incredible Journey*, page 161, grades 3–8
    *Just Passing Through*, page 166, grades 3–8
    *Old Water*, page 171, grades 3–8
    *Poetic Precipitation*, page 182, grades 3–8, K–2 option
Floods and Droughts
    *AfterMath*, page 289, grades 3–8
    *Nature Rules!* page 262, grades 6–12
Storms
    *The Thunderstorm*, page 196, grades K–12
    *Water Models*, page 201, grades 3–8

Chapter 3 — Florida's Water Resources
Watersheds
    *Branching Out!* page 129, grades 6–8
    *Capture, Store, and Release*, page 133, grades 4–5
    *Rainy-Day Hike*, page 186, grades 4–8
    *Color Me a Watershed*, page 223, grades 9–12
Ground Water
    *Get the Ground Water Picture*, page 136, grades 6–12
Surface Water
    *Stream Sense*, page 191, grades K–5
    *Back to the Future*, page 293, grades 6–12
Wetlands
    *Life in the Fast Lane*, page 79, grades 3–8
    *Wetland Soils in Living Color*, page 212, grades 6–8
    *Capture, Store, and Release*, page 133, grades 4–5
Estuaries
    *Salt Marsh Players*, page 99, grades 4–5

Chapter 4 — Water and Life: Natural Systems
Ancient Origins
    *Common Water*, page 232, grades 6–8
    *People of the Bog*, page 89, grades 6–12
    *Energetic Water*, page 242, grades 4–8
Ecosystems
    *The Life Box*, page 76, grades K–5
    *Macroinvertebrate Mayhem*, page 322, grades 4–8

Soils
    *Wetland Soils in Living Color*, page 212, grades 6–8
Ecosystem Processes: Water and Fire
    *A House of Seasons*, page 155, grades K–3
Natural Communities
    *Salt Marsh Players*, page 99, grades 4–5
    *Water Address*, page 122, grades 4–8

Chapter 5 — Water Supply and Water Quality
    Water Use
        *Common Water*, page 232, grades 6–8
        *A Drop in the Bucket*, page 238, grades 6–8
        *Irrigation Interpretation*, page 254, grades 4–8
        *The Long Haul*, page 260, grades K–12
        *Water Meter*, page 271, grades 4–8
        *Water Works*, page 274, grades 4–8
        *Every Drop Counts*, page 307, grades 4–8
        *Choices and Preferences, Water Index*, page 367, grades 6–12
        *Dilemma Derby*, page 377, grades 6–12
        *Easy Street*, page 382, grades 6–8
        *Water Concentration*, page 407, grades 4–5
        *Water Court*, page 413, grades 9–12
    Water Reuse
        *Sparkling Water*, page 348, grades 6–12
    Water Quality
        *Water Actions*, page 12, grades 6–12
        *No Bellyachers*, page 85, grades 4–8
        *Poison Pump*, page 93, grades 6–8
        *Super Sleuths*, page 107, grades 6–12
        *Just Passing Through*, page 166, grades 4–8
        *Sum of the Parts*, page 267, grades 4–8
        *A-maze-ing Water*, page 219, grades K–5
        *Where Are the Frogs*? page 279, grades 6–8
        *The CEO*, page 300, grades 9–12
        *A Grave Mistake*, page 311, grades 6–12
        *The Pucker Effect*, page 338, grades 6–12
        *Reaching Your Limits*, page 344, grades 4–8
        *Sparkling Water*, page 348, grades 6–12
        *Super Bowl Surge*, page 353, grades 4–12

Chapter 6 — Forward to the Past
    Restoration
        *Humpty Dumpty*, page 316, grades 4–8
        *Pass the Jug*, page 392, grades 6–8
        *Perspectives*, page 397, grades 6–12

# Glossary

**Alluvial river** — a type of river with a large, well-defined drainage basin that carries a high sediment load and has a large forested floodplain

**Aquaculture** — the cultivation of fish or shellfish

**Aquifer** — a layer of underground rock or sand that stores water

**Aquifer storage and recovery** — the process by which fresh surface water or ground water is injected deep into an aquifer and fresh water pumped to the surface at some later time from the same well

**Atom** — the smallest part of an element that exists in nature

**Best management practices** — methods designed to minimize harm to the environment

**Blackwater river** — a type of river that drains pine flatwoods and cypress swamps and that has dark, stained waters from decomposing plant material

**Brackish** — fresh water that is mixed with salt water

**Capillarity** — process by which water rises in tubes (capillaries) because of the attraction of water molecules to each other and to the molecules on the sides of the tubes

**Condensation** — moisture produced when warm water vapor mixes with cooler air in the atmosphere to form clouds or fog

**Conductivity** — measure of the ability of a substance to conduct an electric charge; indicates presence of minerals or salts

**Coral reefs** — structure formed over thousands of years by the limestone remains of millions of tiny animals (coral)

**Degradation** (habitat) — the result of human disturbances and land-use changes commonly associated with urban and agricultural development, as well as with exotic plant invasion, to the extent that habitat size and/or quality becomes negatively impacted

**Desalination** — any of numerous processes that remove salt from seawater or brackish water

**Detention pond** — a pond constructed to slow stormwater runoff and to allow the sediment in the runoff to settle to the bottom

**Discharge** — flowing or issuing out

**Dissolved oxygen** — oxygen dissolved in water — comes from the air and as a by-product of photosynthesis

**Drainage** — process of removing water from the land

**Drainage basin** — land area that contributes runoff to a water body; also known as a watershed

**Drip irrigation** — most efficient form of irrigation whereby water is delivered through pipes directly to the plants' roots

**Drought** — a long period of time with little or no rain

**Dry prairies** — expansive native grass and shrub lands occurring on very flat terrain

**Ecosystem** — a community of plants and animals and their physical environment

**Ecosystem restoration** — Re-establishing and maintaining the health, sustainability and biological diversity of natural systems

**Edge habitat** — the area between natural community types

99

**El Niño** — unseasonably warm ocean current that occurs in the Pacific Ocean off the coast of Peru every 3 to 7 years

**Endemic** — an animal or plant restricted in its distribution to one or a few places

**Entisols** — soils of slight and recent development, common along rivers and floodplains

**Environmental pollution** — anything that harms or causes an imbalance in plants and animals in their natural habitat

**Estuary** — a place where fresh water and salt water mix

**Evaporation** — process by which water changes from a liquid to a vapor (gas)

**Evapotranspiration** — the total loss of water to the atmosphere by evaporation from land and water surface and by transpiration from plants

**Fill** — material taken from the land as a result of drainage

**Filtration** — to hold and filter runoff through seepage

**Finger-fill canals** — canals created by dredging wetlands; resulting fill is used to build dry land, usually for houses

**First-magnitude spring** — one that discharges water at a rate of 100 cubic feet per second or more

**Flood** — the overflow of water onto an area that is normally dry

**Flood control** — means used to control floods, may be structural (dams, dikes) or nonstructural (limiting development in floodplains)

**Gas** — a physical form of a substance as a vapor; generally invisible

**Global warming** — warming of the Earth's surface thought to result from the burning of fossil fuels

**Ground water** — water under the ground in aquifers

**Habitat fragmentation** — isolated patches of habitat remaining after land is cleared

**Hammocks** — small tree islands in the midst of marsh and swampland

**Hardwood hammock** — biologically diverse community growing on elevated coastal ridges and islands of ground slightly higher than surrounding wetlands

**Histosols** — soils that contain large amounts of organic material derived from decayed organisms

**Humid subtropical** — climate of most of Florida except the southern tip of the peninsula, characterized by cooler temperatures in the winter and lack of distinct wet and dry seasons

**Hurricane** — a storm with winds of 74 mph or greater

**Hydrogenase** — catalyst for recycling natural materials produced by microorganisms in mud

**Hydrologic divide** — area across which water does not flow

**Hydrology** — study of water's properties, movement and distribution

**Hydroperiod** — amount of time water is standing on the land's surface

**Impervious surface** — material such as asphalt and concrete that does not allow water to pass through it

**Insectivorous plants** — plants that digest insects

**Invasive exotics** — nonnative species of plants and animals that outcompete native species

**Irrigation** — the application of water to an area

**Karst** — type of terrain underlain by limestone and characterized by caves, sinkholes and disappearing streams

**La Niña** — opposite of El Niño; occurs when stronger than normal Pacific trade winds stir up cooler water from the ocean depths

**Land acquisition** — purchasing land, as for conservation

**Land restoration** — returning the land to its former integrity

**Limestone** — highly porous rock formed over millennia from shells and bones of sea animals

**Limnologist** — one who studies inland water

**Liquid** — the physical form of a substance that flows

**Mangroves** — trees that grow along Florida's southern coasts; most plentiful in salt water where few other trees are able to survive

**Marsh** — area of shallow water covered with grasses

**Microbes** — microscopic organisms such as viruses and bacteria

**Minimum flows and levels** — the limit at which further water withdrawals would cause significant harm to the water resource or ecology of the area

**Molecule** — group of atoms bonded together

**Natural community** — interdependent association of plants, animals and microorganisms

**Navigation** — traveling or transporting goods by water

**Non-point source pollution** — pollution that does not come from a single point or location

**Nutrients** — substances that provide sources of energy and growth for plants and animals

**pH** — a measure of the amount of hydrogen ions (H+) and hydroxide (OH-) in a solution

**Pine flatwoods** — characterized by low, flat topography; poorly drained and nutrient-poor, acidic, sandy soils; and an open woodland vegetation with a pine overstory.

**Pleistocene** — geologic epoch beginning about 2 million years ago and ending about 10,000 years ago; also known as the Ice Ages

**Point source pollution** — contamination that can be traced to a single point or location

**Pollution** — contamination of water, soil or air by harmful chemicals or waste materials

**Precipitation** — condensed water vapor that falls to the Earth in the form of rain, snow, sleet or hail

**Prescribed burns** — controlled fires set by land managers to mimic natural processes

**Prior appropriation** — doctrine of water use common in the West whereby the first water user had continued rights to withdraw and use the water

**Public supply** — water delivered to homes, schools, businesses and other users by a utility company

**Reasonable and beneficial use** — doctrine of water use set forth in Florida law whereby use of water must be both reasonable and beneficial

**Recharge** — the process of water seeping into the ground and refilling the aquifer

**Reclaimed water** — water collected and often treated after use

**Retention pond** — constructed pond where storm water is held

**Reuse** — use of reclaimed water for various purposes, most commonly for landscape irrigation

**Riparian** — along the shore of a river or another water body

**Runoff** — rainfall that is not absorbed by the soil but flows to a larger body of water

**Saltwater intrusion** — the phenomenon occurring when salt water moves laterally inland from the seacoast or vertically from saltwater zones in the aquifer, mixing with and replacing fresh water

**Savanna** — a flat grassland of tropical or subtropical regions

**Scrub** — a type of natural community found on extremely well-drained sands along ancient shorelines and islands; dominated by sand pine or xeric oak

**Seagrass beds** — expanses of plants that flower and produce fruits and seeds in seawater

**Sheetflow** — the movement of water, like a sheet, across a surface — moving not in channels, but as a whole mass

**Sinkhole** — depression in the land surface caused when rainwater dissolves limestone near the ground surface or when the roofs of underground channels and caverns collapse

**Slough** — shallow channels of slow-moving water

**Solid** — the physical form of a substance that has three fixed dimensions

**Solvent** — a liquid that dissolves other substances

**Spring** — natural flow of water at the Earth's surface caused by pressure of ground water

**Spring-fed river** — a type of river with cool clear water issuing from springs

**Steepheads** — a unique natural community found in Florida and created when water seeps from the aquifer eroding land from the ground up

**Stormwater runoff** — rainwater that runs off land surfaces into the nearest body of water

**Stormwater treatment areas** — artificial wetlands used to reduce nutrients and improve water quality

**Strand** — a linear swamp

**Streamflow** — the amount of water that flows past a given point at a given time; usually measured in cubic feet per second

**Surface tension** — attraction of water molecules at the surface of a liquid

**Surface water** — water found on the surface of the Earth (rivers, lakes, streams, ponds, wetlands, oceans and seas)

**Swamp** — wetland predominantly covered with trees

**Symbiotic** — characteristic of the relationship between two different kinds of organisms that are interdependent; each gains benefits from the other

**Tornado** — a violent rotating column of air capable of mass destruction

**Transpiration** — the process by which plants give off moisture through the surface of their leaves

**Tributary** — small stream or river that flows into a larger stream or river

**Tropical savanna** — type of climate found in southern Florida, characterized by distinct wet and dry seasons

**Turbidity** — the degree of cloudiness of water caused by suspended solids

**Uplands** — higher parts of the landscape

**Wastewater** — water that has been used and is no longer clean

**Water allocation** — the distribution of water among various users

**Water budget** — formula used by hydrologists to help determine water surpluses and deficits in an area

**Water cycle** — continuous cycling of water between earth and sky

**Water restoration** — restoring water bodies to a more natural state

**Water supply** — amount of water available for human and other uses

**Water use caution area** — an area that is experiencing, or is anticipated to experience within the next 20 years, critical water resource problems

**Watershed** — land area that contributes runoff to a water body; also known as a drainage basin

**Wetland** — area that supports plants adapted to wet soil and often to changes in water level

**Xeriscaping** — a type of landscaping designed to use water efficiently

# Reference



## CHAPTER 1

Fernald, E. A., and E. D. Purdum, eds. *Atlas of Florida*. Gainesville: University Press of Florida, 1996.

Fernald, E. A., and E. D. Purdum. *Water Resources Atlas of Florida*. Tallahassee: Institute of Science and Public Affairs, Florida State University, 1998.

Henry, J. A., K. M. Portier and J. Coyne. *The Climate and Weather of Florida*. Sarasota, Florida: Pineapple Press, 1994.

Kersey, H. *Pelts, Plumes and Hides: White Traders among the Seminole Indians, 1870–1930*. Gainesville: University of Florida Press, 1975.

Milanich, J. T. *Florida Indians and the Invasion from Europe*. Gainesville: University Press of Florida, 1995.

Weisman, B. R. *Unconquered People: Florida Seminoles and Miccosukee Indians*. Gainesville: University Press of Florida, 1999.

West, P. *The Enduring Seminoles: From Alligator Wrestling to Ecotourism*. Gainesville: University Press of Florida, 1998.

## CHAPTER 2

Betz, J. V. "The Human Impact on Water." In Edward A. Fernald and Donald J. Patton, eds. *Water Resources Atlas of Florida*. Tallahassee: Florida State University, 1984.

Feder, N. *Two Hundred Years of North American Indian Art*. New York: Praeger, 1997.

Fernald, E. A., and E. D. Purdum. *Water Resources Atlas of Florida*. Tallahassee: Institute of Science and Public Affairs, Florida State University, 1998.

Florida Consortium (Florida State University, COAPS, University of Florida, IFAS and University of Miami, RSMAS). "El Niño, La Niña and Florida's Climate: Effects on Agriculture and Forestry." 1999.

Henry, J. A. "Weather and Climate." In Edward A. Fernald and Elizabeth D. Purdum, eds. *Water Resources Atlas of Florida*. Tallahassee: Institute of Science and Public Affairs, Florida State University, 1998.

Henry, J. A., K. M. Portier and J. Coyne. *The Climate and Weather of Florida*. Sarasota, Florida: Pineapple Press, 1994.

Hooper, M., and C. Coady. *The Drop in My Drink: The Story of Water on Our Planet*. New York: Vintage Children's Books, 1998.

Lane, E. "Florida's Geological History and Geological Resources." Florida Geological Survey Special Publication No. 35. Tallahassee, Florida. 1994.

Pielou, E. C. *Fresh Water*. Chicago: University of Chicago Press, 1998.

Watson, Lyall. *The Water Planet*. New York: Crown Publishing, Inc., 1988.

Wick, W. *A Drop of Water*. New York: Scholastic Press, 1997.

Winsberg, Mart D. *Florida's Weather*. Orlando: University of Florida Press, 1990.

## CHAPTER 3

Berndt, M. P., E. T. Oaksford and G. L. Mahon. "Groundwater." In E. A. Fernald and E. D. Purdum, eds. *Water Resources Atlas of Florida*. Tallahassee: Institute of Science and Public Affairs, Florida State University, 1998.

Clewell, A. F. "Florida Rivers: The Physical Environment." In Robert J. Livingston, ed. *The Rivers of Florida*. New York: Springer-Verlag, 1991.

Conover, C. S. *Florida's Water Resources*. Gainesville: Institute of Food and Agricultural Sciences, University of Florida, 1973.

Fernald, E. A., and E. D. Purdum. *Water Resources Atlas of Florida*. Tallahassee: Institute of Science and Public Affairs, Florida State University, 1998.

Heath, R. C., and C. S. Conover. "Hydrologic Almanac of Florida." U.S. Geological Survey Open-File Report 81-1107. Tallahassee, Florida, 1981.

Kautz, R. S., K. Haddad, T. S. Hoehn, T. Rogers, E. Estevez, and T. Atkeson. "Natural Systems." In E. A. Fernald and E. D. Purdum, eds. *Water Resources Atlas of Florida*. Tallahassee: Institute of Science and Public Affairs, Florida State University, 1998.

Lantz, P. *The Florida Water Story*. Sarasota, Florida: Pineapple Press, 1998.

Livingston, R. J. "Resource Atlas of the Apalachicola Estuary." Florida Sea Grant College, Report Number 55. Gainesville, Florida, 1983.

Moss, D. "Historic Changes in Terminology for Wetlands." *Coastal Zone Management Journal*. 8(3):215:226, 1980.

Mossa, J. "Surface Water." In Edward A. Fernald and Elizabeth D. Purdum, eds. *Water Resources Atlas of Florida*. Tallahassee: Institute of Science and Public Affairs, Florida State University, 1998.

Nordlie, F. G. "Rivers and Springs." In R. L. Myers and J. J. Ewel, eds. *Ecosystems of Florida*. Orlando: University of Central Florida Press, 1990.

Noss, R. F., and R. L. Peters. "Endangered Ecosystems: A Status Report on America's Vanishing Habitat and Wildlife." Washington, D. C.: Defenders of Wildlife, 1995.

Parker, G. G. "Geologic and Hydrologic Factors in the Perennial Yield of the Biscayne Aquifer." *American Water Works Association Journal* 43:810–843, 1951.

Pielou, E. C. *Fresh Water*. Chicago: University of Chicago Press, 1998.

Rosenau, J. C., G. L. Faulkner, C. W. Hendry, Jr., and R. W. Hull. "Springs of Florida." Florida Bureau of Geology Bulletin 31. Tallahassee, Florida, 1976.

Spechler, R. M., and D. M. Schiffer. "Springs of Florida." U.S. Geological Survey Fact Sheet FS-151-95. Tallahassee, Florida, 1995.

Van Doren, M., ed. *Travels of William Bartram*. New York: Dover, 1955.

VanArman, J., W. Park, P. Nicholas, P. Strayer, A. McLean, B. Rosen, and J. Gross. "South Florida Water Management District." In E. A. Fernald and E. D. Purdum, eds. *Water Resources Atlas of Florida*. Tallahassee: Institute of Science and Public Affairs, Florida State University, 1998.

White, W. B. *Geomorphology and Hydrology of Karst Terrains*. New York: Oxford University Press, 1988.

## CHAPTER 4

Abrahamson, W. G., and D. C. Hartnett. "Pine Flatwoods and Dry Prairies." In R. L. Myers and J. J. Ewel, eds. *Ecosystems of Florida*. Orlando: University of Central Florida Press, 1990.

Alden, P., R. Cech and G. Nelson. *National Audubon Society Field Guide to Florida*. New York: Knoft, 1998.

Deevey, Edward S., Jr. "In Defense of Mud." *Ecological Society of America* 51(1970): 5–8.

Governor's Office. Nature 2000 Task Force. "Preserving Florida's Biodiversity." Tallahassee, Florida, 1999.

Kautz, R. S., K. Haddad, T. S. Hoehn, T. Rogers, E. Estevez and T. Atkeson. "Natural Systems." In E. A. Fernald and E. D. Purdum, eds. *Water Resources Atlas of Florida*. Tallahassee: Institute of Science and Public Affairs, Florida State University, 1998.

Means, D. B. "Steepheads: Florida's Little-Known Canyon Lands." ENFO December:1–4, 1981.

Montague, C. L., and R. G. Weigert. "Salt Marshes." In R. L. Myers and J. J. Ewel, eds. *Ecosystems of Florida*. Orlando: University of Central Florida Press, 1990.

Myers, R. L., and J. J. Ewel, eds. *Ecosystems of Florida*. Orlando: University of Central Florida Press, 1990.

Nelson, Gil. *The Trees of Florida*. Sarasota: Pineapple Press, 1994.

Odum, W. E., and C. C. McIvor "Mangroves." In R. L. Myers and J. J. Ewel, eds. *Ecosystems of Florida*. Orlando: University of Cental Florida Press, 1990.

Ripple, J. *Southwest Florida's Wetland Wilderness*. Gainesville: University Press of Florida, 1997.

Tebeau, C. W. *A History of Florida*. Coral Gables: University of Miami Press, 1966.

U.S. Fish and Wildlife Service. www.fws.gov (2000).

## CHAPTER 5

Betz, J. V. "Water Use." In Edward A. Fernald and Donald J. Patton, eds. *Water Resources Atlas of Florida*. Tallahassee: Florida State University, 1984.

Costanza, Robert, R. d'Arge, R. deGroot, S. Naeem, K. Limburg, J. Paruelo, R. V. O'Neill, R. Raskin, P. Sutton and M. Vander Belt.  "The Value of the World's Ecosystem Services and Natural Capital." *Nature Magazine* May 15, 1997:253–260.

Fernald, E. A., and E. D. Purdum. *Water Resources Atlas of Florida*. Tallahassee: Institute of Science and Public Affairs, Florida State University, 1998.

Gleick, Peter H. *The World's Water 1998–1999*. Washington, D.C.: Island Press, 1998.

Marella, R. L. "Water Withdrawals, Use, Discharge, and Trends in Florida, 1995." U.S. Geological Survey, 1999.

Postel, S. *Last Oasis: Facing Water Scarcity*. New York: Norton, 1992.

Prentice Hall Science Explorer. *Earth's Waters*. Needham, Massachusetts: Prentice Hall, 2000.

Solley, W. B., R. R. Pierce and H. A. Perlman. "Estimated Use of Water in the U.S. in 1995." U.S. Geological Survey, 1998.

Stauffer, J. *The Water Crisis*. London: Earthscan, 1998.

(USGS) U.S. Geological Survey Water Science for Schools. www.usgs.gov/education 2001.

Voyage Publishing. "As Global Demand for Water Grows, Observers Offer Differing Solutions." *Science and the Environment*, 1996.

## CHAPTER 6

Kautz, R. S., K. Haddad, T. S. Hoehn, T. Rogers, E. Estevez and T. Atkeson. "Natural Systems." In E. A. Fernald and E. D. Purdum, eds. *Water Resources Atlas of Florida*. Tallahassee: Institute of Science and Public Affairs, Florida State University, 1998.

Yaffee, S. L., A. F. Phillips, I. C. Frentz, P. W. Hardy, S. M. Maleki and B. E. Thorpe. *Ecosystem Management in the United States*. Washington, D. C.: Island Press, 1996.

# Index



ACF River Basin Compact — 14

Alabama — 4, 14, 37, 38, 51, 53, 57, 66, 71

Alapaha River — 14

Alluvial rivers — 58, 59, 71, 99

Apalachee Indians — 2, 5, 62

Apalachicola-Chattahoochee-Flint River Basin (ACF) — 14, 33

Apalachicola River — 5, 14, 29, 42, 57, 58, 71, 95

Aquaculture — 59, 99

Aquifer — 11, 14, 31, 37, 38, 39, 42, 43, 48, 49, 52, (fig.)53, 54, 55, 56, 57, 62, 69, 75, 76, 79, 90, 99

Aquifer storage and recovery — 14, 76, (fig) 90, 99

Archeologists — 2

Atom — 35, 99

Bays — 1, 2, 49, 62, 82, 92

Best management practices — 83, 99

Big Cypress — 5, 6, 30, 49, 61, 66, 91

Biscayne Bay — 13, 62, 90

Blackwater river — 58, 59, 71, 99

Brackish — 62, 75, 99

Broward, Napoleon Bonaparte — 7, 23, 88

Caloosahatchee — 2, 5, 6, 21, 80, 88

Calusa — 2, 5

Canals — 1, 6, 9, 12, 19, 21, 42, 50, 53, 86, 88, 89, 91, 93

Capillarity — 36, 99

Central and Southern Florida Flood Control — 9, 28, 30, 89, 90, 93

Climate — 2, 7, 34, 35, (fig.)40, 46, 48, 69, 90

Comprehensive Everglades Restoration Plan — 90

Comprehensive Planning Act — 9, 10

Condensation — 37, 39, 99

Conductivity — 81, 82, 99

Congress — 6, 9, 14, 19, 28, 29, 30, 32, 89, 90, 93

Conservation — 10, 13, (fig.)15, 28, 76, 80, 87

Consumptive use — 76

Consumptive use permits — 12, 13

Coral reefs — 65, 72, 73, 87, 99

Covalent bond — 35

Creeks — 4, 5

Cross Florida Barge Canal — 9, 26, 27, 30

Deficiency — (fig.)11

Degradation — 87, 99

Department of Environmental Protection — 13, 14, 32, 56, 63, 83

Department of Natural Resources — 9, 32

Desalination — 44, 75, 99
Detention pond — 83, 99
Discharge — (fig.)54, 58, 62, 71, 91, 94, 99
Dissolved oxygen — 81, 82, 99
Disston, Hamilton — 6, 21, 88
Drainage — 1, 6, 7, 13, 15, 19, 24, 36, (fig.)51, 52, 56, 73, 86, 88, 99
Drainage basin — 13, 36, 50, 58, 99
Drip irrigation — 79, 99
Drought — 10, 12, 27, 30, 34, 35, 41, 42, 48, 55, 68, 69, 76, 91, 99
Dry prairies — 65, 66, 69, 99
Dunes — 64, 69, 71, 72
Eastern Water Law — 12
Ecosystem — 13, 14, 63, 64, 65, 68, 70, 73, 86, 87, 90, 91, 95, 99
Ecosystem restoration — 13, 14, 87, 99
Edges — 87, 99
El Niño — (fig.)46, 47, 48, 100
Endemic — 63, 66, 71, 72, 100
Entisols — 66, 100
Environmental Land and Water Management Act — 9, 10
Environmental pollution — 82, 100
Escambia Bay — 30
Estuaries — 41, 49, (fig.)62, 64, 66, 71, 82, 86, 90, 91,100
Eutrophication — 31
Evaporation — 37, 38, 39, 76, 100
Evapotranspiration — 37, 38, 84, 100
Everglades — 5, 6, 7, 13, 19, 20, 23, 24, 27, 28, 30, 31, 32, 49, 59, 61, 62, 64, 65, 66, 68, 70, 82, 87,
    88, 90, 91, 94
Everglades Forever Act — 13, 91
Federal Clean Water Act — 9
Fill — 59, 100
Filtration — 83, 100
Finger-fill canals — 91, 100
Fires — 41, 42, 48, 63, 65, 68, 69, 70, 88, 94, 95
First-magnitude springs — 49, 59, 100
Flood — 9, 30, 32, 34, 35, 41, 42, 44, 48, 58, 61, 68, 69, 70, 71, 78, 81, 89, 90, 91, 93, 94, 100
Flood control — 1, 6, 9, 61, 86, 91,100
Flood Control Act of 1948 — 9
Flood protection — 10, 14, 90, 95
Floodplains — 14, 41, 58, 59, 61, 62, 66, 68, 71, 93, 95
Floodwaters — 1, 41, 53, 62, 91
Florida Bay — 13, 65, 87, 88
Florida Forever Act — 14, 33
Florida Water law — 12
Florida Water Resources Act — 9
Flow — (fig.)88
Four River Basins, Florida Project — 9, 29, 30, 91
Fresh water — 2, 15, 34, 36, 37, 39, 42, 43, 44, 49, 55, 57, 59, 62, 72, 74, 76, (fig.)79, (fig.)80, 82,
    90, 91
Freshwater marshes — 61, 62, 65, 66, 68, 70, 93

Gas — 35, 36, 37, 100
Georgia — 37, 53, 54, 57, 61, 66
Glaciers — 2, 34, 36, 37, 47
Global warming — (fig.)47, 48, 100
Gold Rush — 11
Ground water — 2, 12, 13, 14, 31, 37, 38, 39, 49, 52, 53, 54, 55, 56, 57, 59, 60, 62, 65, 66, 68, 71, 74, 75, 76, 78, 79, 80, 81, 83, 84, 90, 94, 100
Gulf — 2, 14, 21, 37, 38, 39, 44, 46, 47, 57, 59, 62, 72, 88, 90
Habitat fragmentation - 87, 95, 100
Hammocks — 5, 49, 65, 68, 69, 70, 88, 100
Hardwood hammock — 65, 70, 88, 100
Herbert Hoover Dike — 9, 27
Histosols — 68, 100
Humid subtropical — 40, 100
Hurricane — 7, 9, 22, 26, 28, 29, 32, 34, 42, 43, 44, (fig.)45, 47, 48, 88, 89, 91, 93, 100
Hydric hammocks — 49
Hydrogenase — 64, 100
Hydrologic cycle — (fig.)39
Hydrologic divide — 37, (fig.)39, 100
Hydrology — 60, 63, 65, 100
Hydroperiod — 68, 100
Impervious surface — 82, 83, 84, 100
Indian River Lagoon — 13, 14, 82, 93, 94
Insectivorous plants — 71, 100
Intracoastal Waterway — 9, 24, 26
Invasive exotics — 71, 86, 90, 100
Irrigation — 44, 59, 74, 76, 79, 80, 81, 100
Karst — 49, 50, 52, 59, 100
Keys — 1, 40, 41, 70, 73
Kissimmee Canal — 9, 29
Kissimmee River — 6, 9, 13, 21, 30, 31, 32, 57, 65, 69, 87, 88, 90
La Nina — 46, 47, 48, 100
Lake Apopka — 13, 14, 28, 32, 65, 80, 82
Lake Lanier — 14
Lake Okeechobee — 2, 6, 7, 9, 13, 21, 26, 27, 31, 42, 47, 52, 54, 57, 59, 65, 68, 69, 80, 87, 88, 89, 90, 91
Lakes — 1, 2, 3, 9, 12, 14, 35, 37, 48, 49, 56, 59, 64, 65, 66, 68, 71, 81, 82, 86, 93
Land acquisition — 13, 14, 33, 86, 87, 92, 101
Land Conservation Act — 9, 10
Land restoration — 87, 101
Legislature — 9, 10, 13, 14, 28, 31, 32, 33, 91
Lightning — 41, 44, 68, 70, 94
Limestone — 1, 49, 50, 53, 55, 59, 64, 65, 68, 70, 71, 73, 84, 101
Limnologist — 64, 101
Liquid — 35, 36, 37, 101
Longleaf pine — 66, 68, 86, 94, 95
Lower St. Johns River — 13
Lumber — 6, 20, 23
Mangrove — 62, 65, 72, 101
Mangrove swamps — 49, 60, 61, 88

Maritime forests — 71, 72

Marsh — 14, 49, 52, 53, 59, 60, 61, 62, 64, 65, 66, 67, 68, 69, 70, 88, 93, 94, 101

Miccosukee Tribe — 6

Microbes — 65, 101

Minimum flows and levels — 12, 13, 33, 101

Molecule — 35, 36, 37, 101

Native Americans — 2, 18, 57, 62

Natural community — 41, 63, 65, (fig.)67, 68, 73, 88, 101

Natural systems — 2, 10, 12, 14, 32, 41, 74, 76, 81, 82, 86, 90

Navigation — 1, (fig.)7, 9, 88, 101

Non-point source pollution — 74, 83, 101

Northwest Florida Water Management District — (fig.)10, 14, 56, 75, 80, 95

Nutrients — 41, 50, 56, 61, 62, 65, 71, 74, 81, 91, 93, 95, 101

Ocklawaha River —- 9, 20, 21, 59, 68

Okeechobee Flood Control District — 9

Okeechobee Waterway — 9

Okefenokee Swamp — 14, 59, 61

Paleoindians — 2, (fig.)3

Peace River — 6, 9, 28, 29, 59, 83

Percolation — (fig.)39

pH — 81, 82, 101

Phosphate — 6, 22, 74

Pine flatwoods — 58, 68, 69, 88, 101

Pleistocene — 63, 65, 101

Point source pollution — 74, 83, 101

Polar ice caps — 34, 37

Pollution (polluted) — 20, 28, 36, 49, 56, 64, 71, 74, 80, 81, 82, 83, 85, 92, 93, 95, 101

Population — (fig.)16, (fig.)17, 39, 41, 44, 47, 73, 74, 78, 79, 85, 90, 91, 93, 94

Prairie — 2, 41, 56, 61, 65, 66, 68, 69

Precipitation — 37, (fig.)39, 101

Prescribed burns — 68, 101

Preservation — 2, 59, 87

Preservation 2000 — 13, 14, 32

Prior appropriation — 11, 12, 101

Public supply — 76, 78, 80, 101

Rain (rainfall, rainwater, rainy) — 1, 14, 34, 37, 38, 40, (fig.)41, (fig.)42, (fig.)43, 44, 46, 47, 48, 49, 50, 52, 53, 54, 55, 57, 59, 65, 66, 68, 69, 70, 74, 76, 82, 84, 90

Rainfall — see rain

Reasonable and beneficial use — 12, 13, 101

Recharge — 14, 42, 43, (fig.)54, 55, 57, 66, 68, 81, 94, 101

Reclaimed water — 75, 80, 81, 101

Retention pond — 83, 101

Reuse — 80, 81, 89, 101

Riparian — 12, 101

Rivers — 1, 2, 3, 4, 5, 6, 7, 9, 12, 35, 37, 38, 39, 42, 49, 50, 52, 56, 57, 58, 59, 62, 65, 68, 70, 71, 76, 81, 82, 86, 88, 93, 94, 95

Rodman Dam and Reservoir — 9

Runoff — (fig.)39, 50, 52, 56, 59, 61, 66, 74, 81, 82, 83, (fig.)84, 92, 93, 101

Salt water — 27, 34, 37, 42, 43, 59, 62, 70, 72

Saltwater intrusion — 14, 25, 42, 62, 101
Savanna — 2, 40, 69, 101
Save Our Rivers — 13, 31
Scrub — 41, 64, 65, (fig.)67, 68, 69, 102
Sea — 1, 2, 34, 35, 37, 49, 50, 52, 59, 62, 91
Sea level — 1, 2, 31, 48, 63, 64, 65, 75
Seagrass beds — 65, 72, 91, (fig.)92, 102
Seminole Indians — 2, 3, 4, 5, 6, 88
Seminole Tribe of Florida — 6
Sheetflow — 52, 53, 89, 94, 102
Sinkholes — 1, 30, 42, 49, 55, 56, 59, 65, 102
Slough — 70, 102
Solid — 35, 81, 102
Solvent — 36, 102
South Florida Water Management District — (fig.)10, 75, 80, 87
Southern Water Use Caution Area — 32
Southwest Florida Water Management District — (fig.)10, 14, 29, 32, 42, 55, 75, 80, 91, 92
Spanish — 2, 5, 18, 56, 57
Spring-fed rivers — 58, 59, 71, 102
Springs — 1, 2, 7, 20, 34, 49, 52, 56, 57, 59, 65, 75, 102
Steepheads — 66, 102
St. Johns River — 2, 5, 7, 21, 57, 62, 66, 80, 83, 93
St. Johns River Water Management District — (fig.)10, 13, 32, 42, 75, 80, 93
Stormwater runoff — 37, 59, 82, 83, 91, 102
Stormwater treatment areas — 91, 102
Strand — 61, 70, 102
Streamflow — 58, 102
Streams — 4, 5, 9, 11, 12, 38, 49, 50, 52, 56, 58, 66, 71
Surface tension — 36, 102
Surface water — 12, 13, 14, 37, 38, 49, 50, 52, 55, 60, 74, 76, 78, 79, 80, 83, 84, 85, 89, 90, 102
Surface Water Improvement and Management Act — 13, 32
Surplus — (fig.)11
Suwannee Basin Interagency Alliance — 14
Suwannee River — 14, 18, 29, 30, 31, 57, 59, 62, 66, 71, 95
Suwannee River Basin — 14, 95
Suwannee River Water Management District — (fig.)10, 14, 75, 80
Swamp — 5, 19, 20, 52, 53, 59, 60, 61, 64, 65, 66, 69, 70, 71, 102
Symbiotic — 102
Tampa Bay — 9, 13, 14, 29, 32, 62, 82, 91, 92
Tates Hell Swamp — 14, 59, 61
Temperature — 35, 46, 48, 72, 81, 82
Thunderstorms — 34, 40, 41, 42, 43, 44, 45, 68
Time line — 18-33
Timucuan — 2, 5, 18
Tornado — 34,44, 45, 102
Tourists — 6, 15, 21, 27, 57
Transpiration — 37, 38, 39, 76, 102
Treaty of Paynes Landing — 5
Tributaries — 50, 102
Tropical savanna — 40, 102

Turbidity — 81, 102
Uplands — 65, 66, 72, 86, 88, 102
Upper St. Johns River Basin — 31, 93, 94
U.S. Army Corps of Engineers — 9, 87, 91
U.S. Geological Survey — 76
Wastes — 1, 82, 83
Wastewater — 33, 74, 80, 81, 83, 89, 91, 93, 102
Water allocation — 10, 14, 102
Water budget — (fig.)44, 102
Water control — (fig.)8, 9, 53, 94
Water cycle — 34, 36, 37, (fig.)38, 102
Water law — 11
Water management — 1, 10, 13
Water management districts — 9, (fig.)10, 12, 13, 14, 33, 74, 75, 76, 80
Water quality — 2, 10, 13, 14, 42, 56, 61, 74, 81, 82, 83, (fig.)85, 90, 91, 93, 94, 95
Water Quality Assurance Act — 13, 31
Water Resources Act of 1972 — 1, 10, 14
Water restoration — 102
Water supply — 2, 10, 14, 33, 36, 43, 74, 76, 90, 102
Water use — (fig.)78, (fig.)79
Water use (resource) caution areas — 32, (fig.)75, 81, 102
Water withdrawals — (fig.)77, (fig.)80
Watershed — 13, 14, 50, (fig.)52, 57, 58, 83, 90, 91, 95, 102
Western Water Law — 11, 12
Wetlands — 1, 12, 19, 31, 37, 49, 59, 60, (fig.)61, 62, 64, 66, 68, 71, 81, 86, 91, 93, 102
Withlacoochee River — 9, 14, 59
World's water — (fig.)36
Xeriscape — 76, 80, 102



*Nov. 2, 2020 Comment Letter to the U.S. Environmental Protection Agency from Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper re: Florida's Request To Assume Administration of a Clean Water Act Program [EPA-HQ-OW-2018-0640-0001]*

# EXHIBIT 2



**Florida**

# Geology of Florida

## Albert C. Hine

*College of Marine Science*
*University of South Florida*

Oblique aerial photograph of a barrier island (Cayo Costa) on Florida's Gulf of Mexico coastline that is actively prograding as a result of a local abundance of quartz sand. A large, complex, vegetated offshore spit system has built up on an ebb-tidal delta creating a small lagoon which may become a freshwater wetland or lake in time if sufficient sand is supplied to stabilize the spit. This photograph amply demonstrates how tidal inlets affect adjacent shorelines.



Geologic Map of the State of Florida with lithostratigraphic units and cross sections. Map generated by the Florida Geological Survey. See names of individual contributors printed on map.

# ESSENTIAL QUESTIONS TO ASK

**Florida.1    Introduction**
- *What is the link between natural scenery and geology?*
- *Why is geology important?*
- *What are the primary geomorphologic features that dominate Florida's topography?*

**Florida.2    State of Florida and the Florida Platform**
- *For coastal or island states, does geology end at the coastline, and why or why not?*
- *What geologic features define the Florida Platform?*
- *What is a prominent former sea-level indicator?*

**Florida.3    A Brief Geologic History of Florida**
- *What are the three fundamental components of the Florida Platform?*
- *Where did the basement rocks come from?*
- *What are the four basic ingredients needed to construct a carbonate platform?*

**Florida.4    The Emergence of Modern Florida**
- *What types of rocks constitute the Florida Keys?*
- *Why does Florida have so many wetlands?*
- *Why are there significant plant-dominated shorelines in Florida?*

Note: The Geological Society of America's 1999 Geologic Time Scale was used: www.geosociety.org/science/timescale/timescl.pdf

© 2009 Brooks/Cole, a part of Cengage Learning. ALL RIGHTS RESERVED. No part of this work covered by the copyright hereon may be reproduced or used in any form or by any means—graphic, electronic, or mechanical, including photocopying, recording, taping, Web distribution or information storage and retrieval systems—without the written permission of the publisher. The Adaptable Courseware Program consists of products and additions to existing Brooks/Cole products that are produced from camera-ready copy. Peer review, class testing, and accuracy are primarily the responsibility of the author(s). Geology of Florida/Albert C. Hine – First Edition ISBN 13: 978-1-426-62839-9; ISBN 10: 1-426-62839-0. Printed in Canada.

# Florida.1
# Introduction

Geology is amazing in that it provides a rational, scientific explanation for landscapes and their accompanying scenery. One does not need an earth science background to be in awe of the Himalayas or the Grand Canyon. But the origin of the Himalayas, for example, and how these mountains affect their own weather to produce the glaciers that have sculpted them provide a scientific perspective that makes them all the more wonderful. Even subtle variations in the Earth's surface provide geologic narratives. So, in this sense, geology is a powerful tool to understand much of what we see in the physical world and all life contained therein. It is a visual science like no other. Additionally, geologic knowledge leads us to locate critical resources that we consume, provides us with knowledge to protect and conserve those resources and our environment, and provides us a tool to predict and therefore prepare for events that affect our lives. So, geology's societal relevance is unquestioned.

Those who teach geology can lead students to outcroppings to see the rocks that compose the Earth's crust and to peer into the Earth's past. If you live in the western United States, geology is before you in the vistas of the Rocky Mountains, for example. Mountain ranges exhibit extraordinary scenic diversity, are pure beauty, and are pure geology—three qualities that should be linked in everyone's mind.

In Florida, on the other hand, with its maximum elevation at only approximately 105 meters (in the Panhandle) and much of south Florida virtually flat, with only a few meters of relief and lying only a few meters above sea level, the geologic past is mostly out of sight (Figure Florida.1). The surface morphology of Florida is dominated mostly by subtle paleoshorelines from previous sea-level highstands, **karst**-generated lakes, and small river drainage basins (Figure Florida.2). What we see are modern geologic (and biologic) environments—some that are world famous, such as the Everglades, the coral reefs, and the beaches. But, where did all of this come from? Does Florida have a geologic history other than the usual mantra about having been "derived from the sea"? If so, what events of the geologic past converged to produce the Florida we see today?

▶ **Figure Florida.1**   Image of Florida showing topography and basic morphologic features. Much of Florida is low topographically, with the highest elevations associated with the dissected coastal plain in the Panhandle. Ancient shoreline trends are shown cut by the modern river drainage system.



High: 114 M

Low: 0 M

0          200 km

Image from Florida Geological Survey



▶ **Figure Florida.2**  Digital orthophoto quarter quadrangle image of north-central Florida showing basic morphological features—linear paleoshoreline trends punctuated by sinkholes. Small, modern drainage patterns are common as well.

This chapter seeks to answer these questions, and in doing so has the following two objectives: (1) to provide a rapid transit through geologic time to describe the key events of Florida's past, emphasizing processes, and (2) to present some of the high-profile modern geologic features in Florida that have made the state a world-class destination for visitors.

### Section Florida.1 Summary

● The science of geology explains the Earth's topography and therefore its scenery and scenic diversity.

● Florida is topographically low and flat, so little of its geologic history is revealed in its geomorphology. Most of this history is hidden deep beneath the surface. Florida's surface is dominated by (1) past sea-level events revealed in paleoshorelines, scarps, and terraces; (2) the present-day river drainage patterns; and (3) karst features.

● Florida supports significant modern geologic environments such as (1) long and diverse coastlines and estuaries, (2) coral reefs, (3) and wetlands.

## Florida.2
## State of Florida and the Florida Platform

Most people think of Florida in terms of its land portion that is defined by the shoreline and the state's boundaries with Georgia and Alabama. But, as a geologic entity with distinct geologic boundaries, Florida is a platform that extends well offshore, out to the base of its continental slope to the east and south and to the base of the West Florida Escarpment to the west. Consider it to be a huge, flat plateau with sloping sides that drop off into deep water. The elevation of today's sea level defines the size of the state of Florida and shape of the coastline. However, this view is but a snapshot in time. Sea level has fluctuated over significant amplitudes (hundreds of meters) and over many cycles whose periods have extended from thousands to millions of years, not counting the very high frequency cycles driven by climate, weather, and the astronomical tides. During the glacial and interglacial cycles of the Quaternary, sea level rose and fell by approximately 120 meters. We are in an interglacial period now, but some 18,000 years ago (18 kya), during the Last Glacial Maximum (LGM), so much water had been withdrawn from the ocean to form the Northern Hemisphere's continental ice sheets that Florida's west coast would have been approximately 150 kilometers farther out on the west Florida shelf. The state of Florida, as defined by its coastline, would have been twice the size that it is today. As evidence, geological oceanographers have identified and radiocarbon-dated a number of drowned shorelines that were once active thousands of years ago at lower sea level but that are now submerged in deep water—these are called paleoshorelines.

In a geologic sense, Florida is much more aptly defined by the margins of the Florida Platform: (1) the base of the West Florida Escarpment at sea to the west (approximately 3,200 meters deep), (2) the now-buried Georgia Channel System that extends southwest to northeast across south Georgia on the north, and (3) the Straits of Florida to the east and south (Figure Florida.3). The Florida Platform was once part of the much larger Florida–Bahamas Platform that was bounded by rift or **transcurrent** (faulted) margins farther to



▶ **Figure Florida.3**  Map of the Florida–Bahamas–Greater Antilles region. Florida, the Blake Plateau, and the Bahamas were all part of one enormous carbonate platform. The structural boundaries defining this area are shown. The Straits of Florida now separate the Florida Platform from the Bahamas Platform.

Image from Google Earth

**4**    Geology of Florida

▶ **Figure Florida.4**   Generalized west-to-east cross-section extending across the Florida and Bahamas platforms. The carbonate Florida Platform was built on mostly Paleozoic and Mesozoic rocks that once formed part of Africa and South America. This basement antecedent high forms the backbone of peninsular Florida. In some places, the carbonates are approximately 14 kilometers thick. This huge platform is defined by two major submarine erosional escarpments—the West Florida Escarpment (approximately 2 kilometers relief) and the Florida–Bahamas Escarpment (approximately 4 kilometers relief). A thin quartz sand veneer overlies the Florida Platform.



Image from Google Earth

the east where the submarine relief of the Florida-Bahamas Escarpment is more than 4,000 meters (Figure Florida.4).

This chapter focuses primarily on peninsular Florida and not the Panhandle. The geology of the Panhandle is essentially a southern extension of Georgia and Alabama. Additionally, this chapter presents the key events that have shaped Florida over geologic time. The stratigraphic nomenclature, formational names, ages, and **lithologies** may be found in many other resources.

### Section Florida.2 Summary

• The geology of Florida should not be defined by the present-day coastline, which is but a snapshot in geologic time. Instead, the geology of Florida is defined by geologic features that outline the much larger Florida Platform.

• The size of the emergent, dry, subaerially exposed portion of the Florida Platform has varied enormously over geologic time due to numerous sea-level fluctuations.

## Florida.3
# A Brief Geologic History of Florida

### Building Blocks
Now that the lateral extent of the Florida Platform has been defined, we turn to its vertical, internal extent, which consists of three building blocks, or components. First, the Florida Platform rests on Paleozoic-age to Mesozoic-age igneous and metasedimentary rocks that form its basement—continental crust and thinned **transitional crust**. This forms

the backbone of peninsular Florida. Second, lying on top of this backbone is a 2- to 6-kilometer-thick carbonate (limestone, dolomite) and **evaporite** sedimentary rock succession punctured by dissolution features, many of which have surficial expression (see Figure Florida.4). Finally, these sedimentary rocks are covered by a relatively thin 1- to 150-meter veneer of mostly **siliciclastic** sands—at least on the subaerially exposed portion of the Florida Platform. The quartz cover is what we all see when we look at the ground closely, and it is also visible from afar in space.

### Where to Begin?
The basement rocks underlying Florida originally extended across South America and northwest Africa, forming one continental landmass located at the South Pole (Figure Florida.5a). Over millions of years in the late Paleozoic, the megacontinent Pangaea was assembled and the Yucatan–Florida–Bahamas basement rocks were located approximately 10,000 kilometers to the north, in the central portion of the megacontinent far from any ocean (Figure Florida.5b). As part of the **Wilson cycle**, megacontinents break up and form new ocean basins. Approximately 250 million years ago (250 mya), Laurentia (North America) and Gondwana (most of the rest of the continental mass including Africa and South America) began to pull apart, and by 180 mya the early North Atlantic Ocean began to form, with **oceanic crust** (basaltic, extrusive igneous rocks) appearing. Through a very complex and poorly understood rifting system over the next 40 million years, the North Atlantic Ocean widened, the Gulf of Mexico opened, and the proto–Caribbean Sea opened. Ultimately, this east-to-west seafloor-spreading propagation formed a global, tropical seaway called Tethys.

However, the rifting and seafloor spreading in the North Atlantic split off a segment of northwestern Africa, leaving it behind as part of the new North American Plate. This would become the basement beneath much of peninsular Florida. During the early part of the extension phase, a rift valley system, or a series of **grabens**, formed across southern Georgia. Had rifting and seafloor spreading continued to occur here, northern peninsular Florida never would have formed. Instead, the rifting ceased, leaving behind a graben complex that filled with seawater during sea-level highstands, thus separating and isolating *northern* peninsular Florida from the rest of North America by a current-dominated seaway (Georgia Channel Seaway system).

Nearly simultaneously, two continental blocks (the Yucatan Block and the Florida Straits Block) were transported by a different seafloor spreading, or **transform fault** system, that eventually formed the Gulf of Mexico ocean basin. One of these blocks, the Florida Straits Block, moved to the east along a transform fault. The space created became part of the Gulf of Mexico. The Florida Straits Block now underlies the *southern* portion of the peninsular Florida and much of the Bahama Banks. The formerly active fault is now known as the Bahamas Fracture Zone and extends northwest to southeast beneath *central* peninsular Florida, separating the



**ⓐ** Pre-Pangaean distribution of continental fragments in the early Paleozoic ocean (approximately 500 mya). Note that Florida straddles the connection between South America and Africa and lies at the South Pole.



**ⓑ** Reconstruction of the megacontinent Pangaea about 250 mya. Note that Florida lies between South America and Africa, well inland from any oceanic influence. By this time, Florida basement rocks had migrated, via plate tectonic processes, approximately 10,000 kilometers to the north across the equator. Rocks from both of these continents underlie northern Florida, south Georgia, and southeast South Carolina.

Figures modified from Redfern, 2001

northern peninsular Florida basement rocks from the southern peninsular Florida basement rocks (see Figure Florida.3). The Bahamas Fracture Zone also forms the eastern margin of much of the central and southern Bahamas, now defined by the Bahamas Escarpment mentioned earlier.

Because the northern peninsular Florida basement rocks were once part of northwestern Africa and the southern peninsular Florida basement rocks were probably once part of South America, they are **exotic terrains**. They are exotic in that they had been imported from non–North American sources and have little resemblance to basement rocks that constituted Laurentian (North American) basement rocks, which are of different age and different rock type (**lithology**). The granites, metasedimentary rocks, and extrusive volcanics forming the Florida–Bahamas basement rocks do not crop out and are known only from geophysical remote sensing techniques (gravity and magnetic anomalies) and by direct sampling from boreholes.

So, what was to become the Florida–Bahamas Platform has distinct structural and topographic crustal boundaries (see Figure Florida.3). It is bounded by (1) the failed rift to the north, which became the Georgia Channel Seaway (sometimes known as the Suwannee Straits); (2) the North Atlantic Ocean to the east, defined by both a rifted passive margin (Blake Plateau to the gap between Little and Great Bahama Banks) and the Bahamas **Fracture Zone** (north central and southern Bahamas); (3) the proto–Caribbean Sea to the south, a rifted or faulted margin (eventually to become a **collision margin**); and (4) the Gulf of Mexico to the west, another complex rifted margin defined by a crustal boundary.

The Florida–Bahamas Platform later (during the middle to Late Cretaceous) became two separate carbonate depositional areas with the formation of the Straits of Florida, which now separates the Florida Platform and the Bahamas Platform. The Florida Platform, connected to the North American continent, has been influenced by sediments and water (both surface and subsurface) emanating from this larger landmass. The Bahamas Platform, now detached and separated from the North American continent by seaways, has been unaffected from terrestrial influences and has had a different geologic history.

## Building the Carbonate Platform

With the Florida basement rocks now in place (along with the Yucatan and northern Bahamas), shallow-water carbonate sedimentary environments formed. Eventually, by the Middle Jurassic, a thick succession of carbonate rocks produced one of the largest carbonate platform complexes ever seen on Earth. The prolific production of carbonate sediments and the thick stratigraphic succession resulted from the convergence of the following four ingredients: (1) an extensive, elevated basement surface on which to develop a carbonate platform; (2) a tropical or subtropical latitude setting so that the basement surface was bathed by warm, shallow seawater during high sea levels; (3) marine sedimentary environments that were protected from the southeastern North American continental margin influences such as fluvial (river) runoff and coastal sedimentation that might have inhibited carbonate production; and (4) early, rapid subsidence that would provide the required space (**accommodation space**) to allow thick carbonate stratigraphic units to form.

These factors allowed for the development of a huge carbonate platform to form in the Yucatan–Florida–Bahamas area. They also allowed this platform to extend all the way up to present-day Nova Scotia to form a gigaplatform—6,000 kilometers long, up to 1,000 kilometers wide in places, and eventually up to 14 kilometers thick—probably the largest carbonate platform complex ever on Earth. The platform-building zenith appeared approximately 140 mya in the Late Jurassic. Eventually, the platforms extending up the North American east coast were finally buried, where they now lie several kilometers beneath the present-day siliciclastic-dominated continental shelves.

Carbonate platforms often have predictable distribution of depositional environments. Along **rimmed margins**, which face the deep ocean, there is a slope or steep escarpment that plunges into as much as 5 kilometers of water (see Figure Florida.4). Here, sediments that are shed from the platform top accumulate to form the platform slope. These are fine-grained sediments that may have coarser material embedded within, sometimes huge, building-size blocks that have slumped downslope because of gravity-induced instability. The shallow margin may be dominated by reef-building organisms that form a rigid framework or strong tidal flows on or off the platform may form extensive sand bores (which consist of **ooids** or rounded skeletal grains). During the Mesozoic, **rudistid** (a bivalve) reefs were dominant—not coral reefs. Farther into the platform, the wave and tidal energy dissipates and a huge, shallow shelf lagoon resides. Here, a benthic community of seagrasses, calcareous-producing algae, mollusks, bryozoans, foraminifera, and many other calcareous-secreting organisms produce carbonate sedimentary material ranging from coarse shelly gravel to fine-grained muds. Carbonate islands made from wind-blown carbonate sand dunes, extensive tidal flats, beaches, offshore sand bodies, interior lakes, and the like create a complex mosaic of closely spaced but quite different sedimentary environments. The carbonate sediments formed in these depositional environments eventually became carbonate rock (Figure Florida.6).

With the Florida–Bahamas Platform approximately 1,000 kilometers wide, water circulation at the middle of the platform at times became very sluggish, evaporation began to dominate, salinities became elevated, and eventually evaporite minerals such as **gypsum** and **anhydrite** precipitated. Later dissolution of these evaporites within the platform yielded **hypersaline brines**, which continue to sustain strange and unusual life forms in the deep waters along the southwestern Florida platform margin, where they leak out into the deep marine environment. Here, the brines support **chemosynthetic** organisms similar to those found at vents along the mid-ocean ridge. Finding these vent-type benthic communities (bacterial mats, tube worms, clams, shrimp, etc.) in waters approximately 3 kilometers deep at the base of the West Florida Escarpment has been one of the major oceanographic discoveries in Florida in recent decades.

The extended sea-level highstand during the Cretaceous Greenhouse Earth and its prolonged warmth were essential



▶ **Figure Florida.6**  Digital orthophoto quarter quadrangle image of a limestone rock quarry near the west Florida Gulf of Mexico coastline. Florida is a major producer of carbonate rock.

to the early formation of the carbonate gigabank (a really big platform—bigger than a megabank). When sea level was lower, this huge platform was subaerially exposed, creating unconformities that define the boundaries of stratigraphic units. But, essentially, for millions of years, shallow-water carbonate sedimentary environments persisted and created much of the thick carbonate cover overlying the now deeply buried basement rocks. Later, starting in the early Cenozoic, a number of geologic events significantly altered the pristine carbonate sedimentary regime.

## Altering the Platform

**Platform Drowning—Stressing the Carbonate Factory**
The first of the platform-altering events was the drowning of the west Florida margin starting in the Early to middle Cretaceous (100 to 80 mya). Drowning means that the seafloor's ability to accumulate carbonate sediments is less than the overall subsidence rate. As a result, the shelf becomes deeper and eventually falls below the **photic zone**, thus compromising the ability of the **carbonate factory** to produce sediments. A distinctive character of the Florida Platform is the broad, wide, gently westward sloping **ramp** (not a shallow rim) of the west Florida shelf that terminates approximately 1,800 meters deep on top of the West Florida Escarpment (see Figure Florida.4). The West Florida Escarpment then drops precipitously, to 3,200 meters in the deep Gulf of Mexico. Some speculate that this broad, wide, sloping shelf may have resulted from environmental crises involving global **oceanic anoxic events** (OAE) that initially stressed the carbonate factory during the Cretaceous.

From approximately 100 to 80 mya, significant volcanic emanations on the oceanic crust from deep mantle plumes (from primarily the western Pacific Ocean) enriched the atmosphere with carbon dioxide ($CO_2$), a potent greenhouse

gas. As a result of high $CO_2$, global temperature and thus global sea level rose to probably its highest elevation in the Earth's history (combination of no glaciers, seawater expansion, and smaller ocean basin volume). This period of time is called the Greenhouse Earth. Global warmth probably reduced atmospheric circulation, and the oceans became stratified with anoxic water lying beneath a shallow mixed zone. This stratification allowed anoxic water to move up onto shallow carbonate platforms during times of high sea level, sometimes destroying benthic communities and their ability to produce carbonate sediment. This lack of sediment production, coupled with persistent passive margin tectonic subsidence, caused the west Florida margin to fall below the photic zone. Rather than a wide, shallow, flat-topped carbonate platform, a gently sloping carbonate ramp formed, ever deepening to the west, drowning the carbonate sediment production factory.

These environmental crises (OAEs) might have formed a portion of the Straits of Florida and some of the seaways within the modern Bahamas, thus segmenting this gigabank into smaller shallow banks separated by deep seaways. This selective drowning to the south and east may have begun to separate Florida from the Bahamas by forming a deep seaway. It is possible that the Cuban collision (see later discussion of the **Antillean Orogeny**) with the Yucatan–Florida–Bahamas Platform contributed to the drowning and segmentation of the Florida–Bahamas Platform as well.

Thus, the platform segmentation is an important event in that it defines when Florida and the northern Bahamas became separated into distinctly different geologic provinces. Before, they were essentially the same feature. Afterward, the Bahamas remained isolated from the effects (i.e., enhanced nutrients, low oxygen, turbidity from river runoff, sands from **longshore sand transport**) of the North American continent and remain one of the classic carbonate-producing environments in the world. Florida remained attached to North America and began to be influenced by siliciclastic input, particularly starting in the early to middle Cenozoic.

**Antillean Orogeny—Deforming the Platform** From the Middle Jurassic to the Early Paleocene, the Florida–Bahamas carbonate platform extended into the proto–Caribbean Sea much farther south than it does today. However, a tectonic collision between a Cretaceous volcanic island arc system and this carbonate platform complex created the Greater Antilles. This tectonic collision is called the Antillean **Orogeny**, and it occurred approximately 56 to 50 mya.

The geologic details of the origin and tectonic history of the modern Caribbean ocean basin and its effects on its margins are some of the most complex and controversial topics in plate tectonic motion studies today. However, there is widespread acceptance that the Greater Antilles volcanic island arc system began to form about 120 mya in the eastern Pacific Ocean associated with a **subduction zone**. This island arc (leading edge of the Caribbean Plate)



▶ **Figure Florida.7**   Diagram depicting the Caribbean Plate migrating into the gap between North America and South America at 72 mya. The Greater Antilles, including Cuba, eventually collided with the Yucatan–Florida–Bahamas Platform approximately 56 mya, consuming the south margin of this carbonate platform complex.

migrated some 2,000 kilometers to the northeast into the proto–Caribbean Sea through the 3,000-kilometer gap that separates North America from South America (Figure Florida.7). It consumed the proto–Caribbean Sea ocean basin crust through subduction. By approximately 84 mya, the island arc moved by the Yucatan Block (Platform), breaking off a carbonate section that eventually became westernmost Cuba. By 56 mya, the island arc collided with the passive south margin of the Florida–Bahamas carbonate platform.

Because the Florida–Bahamas Platform is relatively less dense material (limestone) than ocean crust (igneous rocks), these thick carbonates were too buoyant to be subducted. The relative movement of the volcanic arc carrying the early Greater Antilles islands essentially stalled. But there was significant deformation and uplift as a result, creating folds, thrust sheets, and faults in Cuba. In western Cuba, Jurassic carbonate slope **facies** derived from the shallow platforms to the north were uplifted to form 300-meter-high, steep-sided, rounded hills called **mogotes**, which were sculpted by 50 million years of karstic erosional processes, as suggested before.

However, this topography and tectonically derived structures are not seen in Florida. The geologic and topographic contrast between south Florida and central-western Cuba could not be more different. The overall effects of this orogenic event on the Florida–Bahamas Platform were that perhaps as much as 50 kilometers of carbonate platform (and associated slope) material became part of Cuba and that **flexural loading** as a result of the collision depressed southern Florida, creating the southern Straits of Florida and likely drowning part of the Florida–Bahamas Platform.

So, although there does not appear to be significant uplift and deformation in peninsular Florida as a result of the Antillean Orogeny, the collision with this Cretaceous island arc did contribute to Florida's isolation by possibly establishing, deepening, and extending the southern Straits of Florida.



▶ **Figure Florida.8**  Cartoon depiction of subterranean dissolution of carbonate rock that forms variously shaped and oriented cavities.



▶ **Figure Florida.9**  Map showing distribution of sinkholes in Florida. Note that sinkholes are more likely to be located in central and north Florida, where older carbonate rocks crop out or are covered only by a thin veneer of quartz-rich sediment. (See geologic map on inside cover.)

**The K/T Boundary Bolide Event—A Nonevent in Florida**  One of best known geologic events is identified by the **K/T boundary** (65.5 mya). The extinction of the dinosaurs is widely attributed to the impact of a large meteorite into the nearby Yucatan Peninsula. Florida was but a short distance away, and one might expect a noticeable geologic effect. Because this extraterrestrial event predates the tectonic collision between Cuba and the Florida–Bahamas carbonate margin, there was a small but deepwater basin between the Greater Antilles and the carbonate platform. The shock of the impact event probably destabilized the high-relief carbonate platform slopes, producing enormous submarine landslides. Portions of these **sediment gravity flows** (landslides) can now be found uplifted in Cuba, but there is no evidence that this impact had a significant effect

on the later development of the Florida Platform. If any evidence of this event exists within the Florida Platform, it lies deep in the subsurface. Nevertheless, the **tsunami** formed by this event should have washed across the submerged platform, probably leaving some yet-undetected signature in the sediments and rocks.

**Groundwater and Springs—Dissolving the Platform**  Almost from the initial deposition of the first carbonate rocks on top of the basement, acidic groundwaters began to dissolve cavities within them and etched subaerially exposed surfaces on them. Karstification is both an internal and an external process. As the carbonate rocks became older and thicker, these dissolved, open spaces or caves became larger and more interconnected. Some caves extend for many kilometers and may occur at great depth into the subsurface (Figure Florida.8). When freshwater tables are supported by surrounding saline groundwater, **mixing-zone** dissolution occurs and causes more cavities to form. Additionally, rocks fracture because of differential loading or subsidence, seismic activity, earth tides, **intraplate stress**, and other ongoing earth forces, thus further interconnecting subterranean open spaces.

In sedimentary rocks, **aquifers** form where there is prominent groundwater flow through relatively distinct zones. Beneath the Florida Platform lies the Florida aquifer system—a huge porous and permeable zone (extending into Alabama, Georgia, and South Carolina, where it is recharged by rainfall and surface runoff). The Florida aquifer system fulfills much of the freshwater needs for the people, industry, and agriculture in the state.

Where cavities form near the ground surface, sinkholes create depressions that fill with water, thus vertically linking surface waters and the underlying aquifer (Figures Florida.9 and Florida.10). In the past sinkholes were used as waste-disposal sites—which provided the potential for widespread subterranean pollution. Much of Florida's geomorphology is dominated by sinkhole-derived lakes that form as a result of sinkhole clusters. There are approximately 7,700 karst-formed lakes more than 10 acres (approximately 4,000 square meters) in size in Florida. Perhaps the 100-meter-wide, 30-meter-deep sinkhole that appeared over a 3-day period in May 1981 in Winter Park, causing $4 million in damage, is the best known example of relatively recent sinkhole activity in Florida and the geohazard such sinkholes pose (Figure Florida.10).

Where the **potentiometric surface** is projected above a sinkhole, **artesian conditions** exist because water flows from the orifice and forms a spring. Florida is world famous for its "gin-clear" springs that make for popular tourist attractions with glass-bottom boats, as well as public parks for recreation. Of the 78 known first-magnitude springs (meaning they discharge more than 100 cubic feet per second— 8.5 cubic meters per second) in the United States, Florida boasts 33 of them. There are more than 700 springs in Florida (Figure Florida.11). These springs have nearly constant temperature year-round and are warmer than coastal waters are in the winter; thus, they attract manatees. Concentrations of

▶ **Figure Florida.10** Aerial photo of the famous Winter Park sinkhole that suddenly appeared in May 1981.



Photograph from Tom Scott

these protected marine mammals make springs even more environmentally significant. Given sufficient discharge, these springs form rivers, perhaps the most famous of which is the Suwannee River, which is fed by at least 50 known springs and probably countless more. The Big Bend coast of Florida has many of these spring-fed streams, which commonly have Native American names such as Pithlachascotee, Weeki Wachee, Chassahowitzka, Homosassa, Waccasassa,

Withlacoochee, and Wakulla (Figure Florida.11). Some smaller streams emanate from springs and flow across the ground surface, only to disappear down another sinkhole.

Seafloor investigation has shown that springs are actively discharging onto Florida's continental shelf. Additionally, a number of springs discharge warm (approximately 31°C) seawater and mineral-enriched (i.e., $Cl^{-1}$, $SO_4^{-2}$, $Na^{+1}$, $K^{+1}$, $Ca^{+2}$, $Mg^{+2}$, and $HCO_3^{-2}$) water, indicating an interior source and plumbing system distinct from the clear freshwater. The most famous example is Warm Mineral Spring (an onshore spring) in Sarasota County, commonly referred to as Ponce de León's Fountain of Youth. Sinkholes and springs are also paleontologic and archeologic treasure troves containing fossils, bones, and artifacts.

Along the Big Bend coast, Eocene rocks of the Ocala Limestone are exposed and have been etched by karst processes—probably for millions of years (Figure Florida.12). This sediment-starved coastline features countless limestone high areas that support less-salt-tolerant plants within the extensive open marine marshes forming island hammocks. Probe-rod profile cross-sections across this marsh show that local relief of the underlying carbonate rocks is nearly 10 meters, revealing extensive rock dissolution (inland, karst areas often have buried sinks with a relief of more than 50 meters). Indeed, some marsh creeks do not meander as expected but are confined to **rectilinear fracture patterns** in the carbonate bedrock lying in the very shallow subsurface. Where they are drowned by

▶ **Figure Florida.11** Map showing distribution of springs in Florida. Location of major springs is similar to that of Florida's sinkholes.



Map from Gary Maddox, Florida Department of Environmental Protection

sea-level rise, these rocky high areas partially support huge oyster reefs.

Finally, an unresolved issue in Florida's geology is the elevation of west-central peninsular Florida, where these karstified Eocene carbonates crop out. Rocks of similar age lie hundreds of meters in the subsurface in the northern Bahamas, for example. This elevated area, properly known as the Ocala Platform, has been called the Ocala Arch, the Ocala Upland, the Ocala Blister Dome, and the Ocala Uplift, but the process of uplift has not been fully explained or widely accepted. One explanation (not fully accepted) attributes the process to **isostatic adjustment**, which is caused by the dissolution and export of carbonate rock mass, whereby the dissolved rock leaves the platform. This would allow uplift to occur as a result of a reduction in the **lithostatic load**. Perhaps there are other regional tectonic processes at work, but this theory does demonstrate a potentially significant additional effect of widespread dissolution of rocks within carbonate platforms.

**Hydrocarbons in Florida**    Fluids other than water that migrate through rocks include oil and gas. In spite of the fact that Florida borders the Gulf of Mexico, one of the giant hydrocarbon provinces on Earth, there is relatively little oil or gas produced from land-based sites in Florida. There are two widely spaced oil fields—the Sunniland trend in south peninsular Florida and the Jay trend in the western Panhandle. Approximately 100 kilometers offshore the extreme western Panhandle in the DeSoto Canyon area, in water depths ranging from hundreds of meters to 1,000 meters, is a highly productive area—particularly for gas. But this area is located off-platform in a geologic sense and is not related to the shallow-water carbonate rocks that underlie most of the Florida Platform. The relatively low hydrocarbon productivity from the platform is most likely a result of the lack of source rocks and structural and stratigraphic features that are required to trap upwardly migrating hydrocarbons.

**Siliciclastic Invasion—Burying the Platform**    As mentioned earlier, the third building block constituting the Florida Platform is the thin siliciclastic veneer overlying the limestone and dolomite carbonates. Although volumetrically tiny compared to the volume of carbonate rock that forms the Florida Platform, the quartz sand cover is what people see when they visit the state. Indeed, the sand on the state's famous beaches is mostly quartz, admixed with skeletal debris from nearshore benthic communities. This skeletal material is what makes for the great sea-shell hunting on Florida's beaches. But quartz sand is the dominant sediment on those beaches.

Quartz ($SiO_2$) is the most abundant mineral (**feldspar** is the most abundant mineral in oceanic crust) in the continental crust of the Earth and one of the most durable. Quartz sediments are originally produced during the mechanical and chemical weathering of granitic type rocks—found in deeply eroded mountain ranges. Therefore, Florida's quartz sand must have originated in the southern Appalachian Mountains. There is no local source of quartz because the crystalline basement rocks are deeply buried.

Thus, the following two questions immediately come to mind: (1) when did quartz-rich sands (and gravels) reach peninsular Florida, and (2) what was the mode of sediment transport?

The Georgia Channel Seaway (see Figures Florida.3 and Florida.13) acted as a dynamic boundary by preventing nutrient-rich and turbid waters from negatively affecting the carbonate sediment-producing factory for much of the Mesozoic and up until the middle Oligocene. Probably during the extreme sea-level lowstand during the middle Oligocene (approximately 28 mya), prograding river deltas filled in the Georgia Channel Seaway so that, during the ensuing sea-level highstand, quartz sediments could be transported across the seaway and onto the northern portion of the Florida Platform. Once reaching the platform, a long, complex transport pathway extended all the way down peninsular Florida, terminating at the Pourtales Terrace, a submarine erosional feature lying in 200 to 300 meters of water (Figure Florida.14). Beneath the Everglades and the Florida Keys lies the Long Key Formation of the Late Miocene to Late Pliocene that contains quartz gravel and is approximately 150 meters thick. How such significant quantities of siliciclastic sediment could travel such a great distance down the highest part of the platform and be deposited in deep water has been the subject of some conjecture.

One theory says that much of the north to south transport occurred by longshore currents set up by breaking waves on beaches. The extensive, linear **beach ridges** seen in aerial photos or in space imagery indicate that Florida has been influenced by multiple sea-level fluctuations in the past (see Figures Florida.1 and Florida.2). With a net southerly transport, sands and gravels in the surf zone associated with these paleoshorelines must have been the dominant mode of movement, terminating at the southern end of the Lake Wales Ridge—a primary geomorphologic feature that extends down the peninsula. South of this feature, quartz sand and gravel transport occurred in a paleofluvial system, as shown by a southward-prograding delta system that probably terminated at the present location of the Florida Keys. Here, river deltas probably introduced these sediments into the marine system, which built a siliciclastic shelf and slope system that ultimately reached the 250- to 400-meter-deep Pourtales Terrace. This concluded a nearly 1,000-kilometer-long siliciclastic sediment transport system that began with quartz sediments being released from the basement rocks that form the Piedmont and Blue Ridge of the southern Appalachian Mountains.

In the Pleistocene, carbonate sedimentation conditions returned, and these siliciclastic sediments were covered and buried beneath what are now the Everglades and the Keys.

**Phosphates—Changing the Platform's Oceanographic Regime**    During the Miocene, several specific events on the Florida Platform converged to create a unique depositional

▶ **Figure Florida.12**   Geologic map of Florida illustrating exposure of Eocene-age and Oligocene-age limestone in the Big Bend area. The exposed rocks are karstified and have an irregular surface that, when flooded, forms hundreds of marsh islands. The lack of sedimentary cover on this karst surface and the low wave energy have formed this unusual marsh-dominated, open-marine coastline.



From the Florida Geological Survey

**12**    Geology of Florida

▶ **Figure Florida.13** Cartoon illustrating the Georgia Channel Seaway system (also known as the Suwannee Straits) that separates peninsular Florida from the North American mainland. This seaway occupies the structural low formed by the failed rift basin or graben when North America and Africa separated. Currents (paleo–Loop Current) flowed through this seaway and prevented nutrient-rich and turbid waters from reaching the shallow, clear, pristine waters covering the Florida Platform during elevated sea levels. Eventually, river deltas from the north filled in the seaway during lowered sea level, thus allowing siliciclastic sediment to reach and cover the Florida Platform.



From Redfern, 2001

setting—unlike anything before in Florida's geologic history. Phosphate sediments were formed on and within the seafloor during periods of sea-level highstand. (Sea level was probably approximately 40 meters higher than today and high enough to submerge most of peninsular Florida beneath a broad, shallow sea.)

During these multiple, elevated sea-level events, a component of the Loop Current traversed the top of the platform and was deflected southward into slightly deeper water by the shallower portion of central peninsular Florida. This deflection produced persistent **upwelling**, which stimulated **primary productivity**—algal blooms enriched by nutrients from below and fueled by **photosynthesis** from above. Primary productivity created a very fertile environment that could support abundant complex marine life, including one of the ocean's greatest, top-of-the-food-chain predators that ever lived—the great shark *Carcharodon (Carcharocles) megalodon* (a possible ancestor of today's great white shark). This huge shark grew to 18 meters and weighed 20 tons (Figure Florida.15). This animal had to consume 2% of its body weight daily, or nearly 800 pounds. So, the shallow ocean covering central peninsular Florida had to provide a huge array of marine life to support *C. megalodon* and the many other sharks whose redeposited teeth are ubiquitous in modern rivers and along certain beaches. Along the meander bends of the rivers in central Florida and along

beaches where Miocene stratigraphic units (Hawthorn Group) are eroded, such as Venice Beach on west-central Florida coast, shark teeth, as well as fossils from marine animals (alligators, marine mammals, and fish) and nonmarine animals (horses, rhinoceroses, bears, peccaries, and sloths), are easily found. The nonmarine animals (sabertooth cats, mastodons, mammoths, etc.) occupied central Florida during intervening sea-level lowstands during and after the Miocene and post-Miocene—resedimentation mixes both together. Indeed, central Florida is one of the great fossil-hunting places in the world.

But it is the mining of phosphate as a key ingredient for fertilizer that has provided one of the most important geology-based industries in Florida. In fact, Florida leads all other states in the production of phosphate. Any bag of fertilizer prominently displays three numbers, such as 10-15-20. These numbers refer to percentage weight in nitrogen (N), phosphorus (expressed as $P_2O_5$), and potash ($K_2O$—potassium), respectively. All three elements are essential for life (hence they are called nutrients). Other, "trace" elements such as iron (Fe) and copper (Cu) also may be included. Phosphorus (P) is essential to life in that it helps "shape" the DNA molecule and plays a vital role in the way living matter provides energy for biochemical reactions in cells; it also strengthens bones and teeth. Ninety percent of phosphate mined is used to make fertilizer. Phosphorus is also used in animal feed and is found in other products, such as toothpaste and soft drinks.

A natural source of phosphorus is organic matter itself, and the ocean conveniently provides large quantities of organic matter in the form of **phytoplankton** (marine plants growing in upwelling zones where nutrients and sunlight mix). Where the water is shallow, marine plant organic matter can sink to the seafloor without being consumed, where it becomes buried. After burial, a chemical reaction forms phosphorus-rich minerals such as francolite. Other relatively insoluble phosphorus-rich minerals may form as well, but the final product is called **phosphate**, or **phosphorite** if enriched. Sedimentary particles of phosphate range from mud to gravel size, but the mining process prefers the sand-size particles. The phosphate-rich stratigraphic units, part of the Hawthorn Group, generally underlie up to 10 meters of quartz-sand overburden, which is stripped off by huge, electrically powered draglines—some of the biggest mobile machines made (Figure Florida.16a). Land reclamation after the strip mining is required (Figure Florida.16b). Radon gas is also a health hazard posed by the strip-mining process. The gas is produced by radioactive decay of naturally elevated uranium associated with the phosphate deposits. Structures built on reclaimed land have to be carefully ventilated to prevent radioactive radon gas accumulation inside. Radon gas (Rn 222) is much heavier than normal air and is easily trapped in buildings as it escapes upward.

The mud fraction of the mined sediment is sent to huge slime ponds held back by earthen dams, where the fine-grained particles eventually settle out. These slime ponds can be seen from space (Figure Florida.17). The sand-size phosphate is separated from quartz and carbonate sand-size

▶ **Figure Florida.14**   Depiction of the siliciclastic sediment transport pathway extending from south Georgia to the Straits of Florida. Sediments were transported by longshore transport and formed multiple shorelines down most of peninsular Florida. These sediments were further transported to the south, probably via high-discharge, local rivers and streams, and formed river deltas that extended to the Florida Keys. Marine currents and downslope sediment gravity processes carried the siliciclastics into the deep water of the Straits of Florida.



From Hine et al., in press

**14**    Geology of Florida

▶ **Figure Florida.15**   Growth series of *C. megalodon* jaws. The huge shark lived in the Miocene ocean, which was extremely fertile with abundant food. This enormous predator and many other species of smaller sharks left behind millions of teeth that can be found in river beds and on Florida's beaches. The teeth are the most durable part of the shark skeleton.



Photo from the Florida Museum of Natural History, Gainesville; taken by A. C. Hine

▶ **Figure Florida.16**



ⓐ Results of dragline mining of phosphate sediments. The process removes the overburden and then extracts the phosphate-rich sediments.



ⓑ A wetlands reclaimed area that once looked like the scene in panel a.

Photos taken by A. C. Hine

particles and sent to a chemical processing plant. At a chemical processing plant, the phosphorus is removed from the parent mineral using sulfuric acid ($H_2SO_4$); this process produces large quantities of gypsum ($CaSO_4$), which contains uranium as an unwanted by-product. The gypsum cannot be used for other industrial purposes and is piled high in huge stacks that may be the highest landform nearby and can be seen from great distances. These gypsum stacks pose significant environmental hazards for the state, particularly in their potential to pollute groundwater. The finished product, concentrated phosphorus granules, is exported to fertilizer plants, where the other nutrients and trace elements are added.

This period of phosphatization on the Florida Platform is an important and unique component for Florida's geologic history. Neither during the great lengths of time in the Mesozoic while the carbonate platform was being built nor in the early or late Cenozoic did such environmental parameters converge to create this unusual depositional setting. And such conditions have not occurred since.

## Section Summary Florida.3

● The three fundamental components of the Florida Platform are (1) basement rocks of mostly Paleozoic age (some Mesozoic); (2) carbonate rocks of Mesozoic and Cenozoic age; and (3) siliciclastic sediments, primarily quartz sand that arrived in the Cenozoic.

● Most of the basement rocks were part of the former Gondwana. Florida's basement rocks were situated between South America and northwest Africa. Collectively, they form an exotic terrain because they were not once part of North American basement rocks.

● A piece of northwest Africa that remained attached to North America during early rifting formed the northern portion of Florida, southern Georgia, and southeastern South Carolina. The Florida Straits Block formed the southern portion of peninsular Florida. These two basement pieces are separated by a former transform fault (Bahamas Fracture Zone), which runs northwest to southeast beneath middle peninsular Florida.

● The following four ingredients are needed to construct a carbonate platform: (1) an extensive, elevated basement surface; (2) a tropical or subtropical setting (low latitude); (3) marine sedimentary environments that are protected from the southeast North American continental margin

▶ **Figure Florida.17**   Digital orthophoto quarter quadrangle image of slime ponds in central peninsular Florida. These are huge artificial bodies of water supported by earthen dikes into which muddy water is placed so that the fine-grained particles separated from the coarser sediment can settle out of suspension. The water is then recycled.



influences; and (4) early, rapid subsidence that provides the required accommodation space for thick carbonate stratigraphic units to fill in.

● In a wide, shallow carbonate platform, water exchange with the open ocean is greatly reduced. This leads to increased salinity because of evaporation. Eventually this leads to the precipitation of evaporite minerals.

● Carbonate-producing sedimentary environments (carbonate factory) may not be able to produce or retain sediments (because of export) to keep up with sea-level rise or long-term tectonic subsidence or both. If the carbonate platform and its carbonate sediment-producing factory cannot keep up, it becomes submerged deeper and deeper with time. With submergence into darkness, the light-dependent, benthic organisms can no longer exist because the seafloor has subsided below the photic zone. Thus, the platform is "drowned."

● A carbonate-rimmed margin has a shallow reef and/or islands perched along the edge just before the platform drops off abruptly into deeper water. A carbonate ramp is a shelf that deepens gradually seaward.

● The middle Cretaceous is known as the period of Greenhouse Earth because of the elevated $CO_2$ levels, enhanced warmth, lack of ice, and elevated sea level.

● The Yucatan–Florida–Bahamas Platform complex was deformed when the southern extent of the complex was uplifted and incorporated into Cuba. Also, the southern Straits of Florida were probably formed as a result of flexural loading during the collision.

● The meteorite (bolide) that struck the Yucatan Peninsula, defining the K/T boundary, might have caused the collapse of the carbonate platform margins leading to submarine landslides. Coarse sediments may have been transported onto and across the Florida Platform as a result of the tsunami washing over it. However, to date no evidence of this impact event has been found within the Florida Platform.

● Fracturing of rocks leads to enhanced permeability, slightly acidic rainfall, and mixing of different salinity water masses. This mixing creates slightly undersaturated water (with respect to calcium carbonate) that is capable of dissolving limestone. The process of dissolving carbonate rock forms cavities within the rock—some of which collapse, creating sinkholes on the surface. Sinkhole formation and "acid-etching" of the surface carbonates both create karst topography.

● Widespread dissolution of carbonate rocks produces a large aquifer. Flowing water in the aquifer provides a rich water resource for humans.

● Quartz sediment comes from quartz crystals weathered out of granitic rocks or from weathered metamorphic or quartz-rich sedimentary rocks found in the southern Appalachian Mountains.

● When the Georgia Channel Seaway complex began to fill in during the middle Oligocene, river deltas emanating from the southern Appalachian Mountains or Piedmont could bring siliciclastic sediments to the Florida Platform.

● Convergence of the following events produced phosphate deposition: (1) high sea level, (2) upwelling caused by deflected currents, (3) burial of organic matter on the seafloor, and (4) anoxic conditions within sediment.

● Mining of phosphate leads to the following environmental problems: (1) radiation from radon gas, (2) environmental/ ecological degradation caused by strip mining, (3) gypsum stacks containing radiation, and (4) slime ponds.

## Florida.4
## Emergence of Modern Florida

When the siliciclastic influx from the north and the paleoceanographic regime that simulated phosphate deposition both ceased by the late Tertiary and early Quaternary, shallow-water carbonate deposition returned to south Florida, ultimately forming the Keys and their associated reefs. Strontium dating tells us that carbonate rocks lying on top of the siliciclastic sediments began to accumulate 2.0 to 1.5 mya. It was during this time that an elevated, shallow-water shelf had begun to replace the ramp down which river deltas during the Pliocene had transported quartz sands and gravels. It marked the return of carbonate sedimentation. Since this middle to Late Pliocene sea-level highstand event, at least five additional sea-level highstands, including the present highstand, have provided additional sequences to the carbonate

▶ **Figure Florida.18**    Fossil *in situ* coral in Key Largo Limestone exposed in outcrop. The upper Keys are made up of a coral reef that formed approximately 125 kya when sea level was about 6 meters higher than it is today. Distance across the image is about 60 cm.



Photo by A. C. Hine

edifice of south Florida. The last sea-level highstand (approximately 125 kya) was approximately 6 meters higher than the present-day sea level and produced the limestone that forms much of the modern Keys. Three well-known rock units were formed during this sea-level highstand event: (1) the Miami Limestone (oolitic **grainstone**), (2) the Key Largo Limestone (reef rock; Figure Florida.18), and (3) the Anastasia Formation (coquina shell rich).

These units all formed at the same time and represent a lateral facies change in depositional environment. The rocky islands constituting the upper Keys (Figure Florida.19a) were once a linear band of reefs that formed in water that was deeper than it is now. These rocks form the Key Largo Limestone (fossil coral reef rock). The lower Keys (also rocky

▶ **Figure Florida.19**



ⓐ Digital orthophoto quarter quadrangle image of Florida Keys. The upper Keys are former coral reefs that run parallel to the shelf edge, making up the Key Largo Limestone.



ⓑ The lower Keys are cemented, tidal sand bars formed by strong ebb-and-flood currents that flow on and off the shelf margin. These limestone ridges, approximately 125 kya, trend normal to the shelf edge and are made of Miami Limestone.

islands, but not fossil coral reefs) to the south, and the area in Miami area to the north, were tidal bars formed by strong ebb-and-flood tidal currents that flowed on and off the shelf margin (Figure Florida.19b).

The lower Keys are fundamentally different in terms of geomorphology and lithology than the upper Keys because they are made of cemented oolitic grainstone (a type of carbonate, sand-size sediment) and not reef rock. These former tidal bars also lie north of the upper Keys reef rock and extend to the boundary between Broward and Palm Beach counties.

These individual islands (the former tidal bars) are oriented normal to the bank edge, in contrast to the upper Keys, which run parallel to the bank edge. The reef rock (commonly called keystone) of the upper Keys was mined extensively at Windley Key—now the Windley Key Fossil Reef State Park (http://www.floridastateparks.org/windleykey)—where excavations reveal hundreds if not thousands of fossil corals in their original growth position (see Figure Florida.18). It is one of the best coral reef outcrops in the United States. These reef rocks have been the source of the facing stone used for many building in south Florida.

The Miami Limestone and the Key Largo Limestone have been subaerially exposed for approximately 125 k.y. A distinctive feature covering these rocks is a red impermeable crust called caliche (also called duricrust)—a lithified **paleosol** that formed during this 125 k.y. time frame. The reddish color comes from their 4% to 6% iron content, derived from atmospheric dust that arrived from Africa. Actually, the various Pleistocene-age carbonate formations within the Miami and Key Largo Limestones are defined by similar crusts, making these features significant stratigraphic markers.

Finally, near Boca Raton, the Miami Limestone interfingers with the Anastasia Formation, which extends northward along the east coast of Florida.

## Wetlands

Florida is well-known for its freshwater wetlands, which result from the state's flat topography, low elevation, high water table, poor surface drainage, and humid subtropical climate. Starting with the Okefenokee Swamp mostly in south Georgia (which is partially drained by Florida's Suwannee River) and extending south to where the Everglades discharges into Florida Bay, wetlands commonly dominate the state's scenery (Figure Florida.20). Originally viewed as useless swampland that provided breeding areas for disease-carrying mosquitoes, these areas once were drained by digging canals. But wetlands



▶ **Figure Florida.20**   Distribution of rivers and wetlands in Florida. Wetlands, including the Everglades, are numerous in Florida because of its flat terrain, restricted drainage, low elevation, and humid climate.

Suwannee River

—— Major Rivers

—— Canals

Lakes/Wetland Complex

Wetlands

0            200 km

Map from U.S. Geological Survey

now are viewed as critically important environments and ecological habitats and are mostly protected.

From a geologic perspective, wetlands are modern equivalents of ancient coal-forming environments. Geologists have used the lower coastal plain of the southeastern United States, including north Florida, as a modern analog to explain the abundant Carboniferous coal deposits mined in the Appalachian Mountains of Kentucky, West Virginia, and Pennsylvania. Other important wetlands are associated with slow-moving streams such as the Withlacoochee River (Green Swamp) and the Kissimmee River. Finally, wetlands are potentially important archeological sites because of the anoxic conditions (good for preservation) found in their organic-rich sediments.

A discussion of the geology of Florida would not be complete without mention of the Everglades, a unique wetland environment on Earth and the third largest national park (by area) in the lower 48 states (Figures Florida.21a and Florida.21b). The Everglades is better known for its ecology and its wildlife than as a geologic environment. Most likely, such "rivers of grass" were probably more common in the geologic past, particularly during the extreme sea-level highstands that flooded low-lying subtropical and tropical continents.

The Everglades, 60 kilometers wide and 160 kilometers long, dominates the geography of south Florida. A southward-moving sheet of freshwater supports mainly saw grass (*Cladium jamaicense*). The Everglades is laterally confined to south-central peninsular Florida by higher terrain on both the eastern and the western margins. It rests on a broad, flat, nearly featureless carbonate rock surface, which formed the floor of a shelf lagoon during the last interglacial event approximately 125 kya, when sea level was about 6 meters higher than it is today. When subaerially exposed during the ensuing sea-level lowstand, the carbonate sediments deposited on the seafloor became cemented and formed the base of the Everglades.

The Everglades is an unusual environment, which required a confluence of unusual conditions to form: (1) a broad, low-relief gently sloping surface; (2) a surface positioned nearly at sea level so that there is a broad transition between nonmarine and marine environments; (3) a surface flow of water laterally confined by elevated margins; (4) sufficient rainfall; (5) no substantive vertical exchange with **permeable** units beneath to reduce surface runoff; and (6) **oxidation** of organic matter so that wide, expansive, and highly water-tolerant grasslands grow rather than heavily wooded swamps. However, in some depressions in the Everglades, approximately 4 meters of mangrove peat have accumulated. But, for the most part, over great expanses, the Pleistocene limestone karst surface is exposed. In some areas, this karst limestone surface is overlain by up to 1 meter of calcite mud, the precipitate of carbonate-charged freshwater.

The Everglades has been greatly affected by human development in south Florida. About 50% of the original area of the Everglades has been converted to agriculture. The diversion of water flow, the heavy use of fertilizers, and the introduction of exotic plant and animal species form the greatest environmental threats. Additionally, the specter

▶ **Figure Florida.21**



ⓐ Digital orthophoto quarter quadrangle (DOQQ) image of the Everglades. This freshwater "river of grass" is confined laterally by topographically higher areas so that flow is directed to the south into Florida Bay—a very low-energy carbonate mud-dominated environment. This is one of the most unusual geologic and biologic environments on Earth.



ⓑ Oblique aerial photo of western portion of Everglades revealing wide expanses of very shallow water and plant communities typical of this environment.

Tom Scott, Florida Geological Survey

of rising sea level caused by global climate change could convert this vast wetland into a shallow, open sea with only a 1- to 2-meter rise, which some predict might happen in the next 100 to 200 years. The Everglades is at a crucial point in its history: it appears that human activity, either directly or indirectly, may cause this unique environment to shift upslope further landward or even disappear.

## Coastlines

Florida has one of the longest coastlines in the United States, and it is this feature, perhaps, that draws so many people to the state (see cover photo). Beautiful beaches (see Figures Florida.22 and Florida.23) have made Florida's coastline world famous but, surprisingly, as much as 33% of the coast consists of sand-barren, rocky, and vegetated

▶ **Figure Florida.22**   Typical "Chamber of Commerce" beach scene in Florida. Sands are almost entirely composed of quartz.



▶ **Figure Florida.24**   Map showing five major coastal sectors of Florida. Most people know about Florida's famous white, sandy beaches, but approximately 33% of Florida's coastline is dominated by plants and mud.



Figure from Randazzo and Jones, 1997

▶ **Figure Florida.23**   Red mangrove (*Rhizophora mangle*) that is commonly found in low energy coastal environments of central Florida. These plants dominate the Ten Thousand Islands coastal zone of southwest Florida.



©2008 JUPITERIMAGES

(marsh and mangrove) zones. From the western Panhandle to Key West, and up to Jacksonville, there is enormous coastal variability resulting from differences in sediment supply, biologic activity, wave energy, tidal range, storm frequency, and climate. Pensacola and Key West enjoy significantly different climates and therefore significantly different coastal environments, ranging from **washover**-dominated sandy barrier islands along the northern Gulf coast to Pleistocene-age reefs and lithified submarine carbonate sand bores that form the Keys. Figure Florida.24 shows the five primary coastal compartments that define Florida's coastline. These compartments can be divided into two major coastal types: (1) barrier islands or (2) plant dominated. The coastline of the islands forming the Keys is generally highly variable, ranging from rocky and small pocket beaches to plant-dominated coastline, and is not included in this scheme. No barrier islands occur in the Florida Keys.

**Barrier Islands**   Florida's barrier islands constitute the single largest coastline category and dominate the state's east coast. Barrier islands are the coastal features that are the most heavily affected by development, and they also are extremely vulnerable to chronic erosion, storm-surge flooding, and inlet migration. Hence most coastal engineering structures are found along barrier-island coastlines. Managing coastal development is a huge environmental issue in Florida. Also, densely populated areas pose large risks during hurricane season, for both people and infrastructure.

The barrier islands are geologically young features—most formed in the past few thousand years, probably as a result of reduced rate of sea-level rise in the late Holocene. It was during this time, when there was an abundance of sand, that barrier islands **prograded**, or built seaward, by creating beach ridges and widened. These islands eventually supported maritime forests. Sanibel Island is an outstanding example of this process, with its multiple beach ridges covered with trees (Figure Florida.25a). Where local or regional sand supply was reduced, washover-dominated barrier islands formed. These narrow, topographically lower islands were (and are) more frequently flooded by storm surge, which causes water-carrying sand to flow from the seaward side into the back-barrier lagoon. Through this process these islands migrate or transgress landward. Barrier island migration poses huge problems for human habitation and development because of the seaward-side sand loss. Santa Rosa Island along the Panhandle is a good example of a washover-dominated barrier island (Figure Florida.25b). Where heavily developed, many of these islands support lengthy seawalls and require frequent sand replenishment.

20    Geology of Florida

▶ **Figure Florida.25**



ⓐ DOQQ image of Sanibel Island—a seaward-prograding, beach ridge–and maritime forest–dominated barrier island. This type of island has an abundance of sand because it lies at the end of a longshore transport system.



ⓑ Image of Santa Rosa Island on the western Florida Panhandle coast. This is a washover-dominated island that is easily flooded during storm surges. The flooding erodes sand from the seaward side and deposits it on the lagoon side, causing the entire island to migrate landward.

The length of a barrier island is defined by its tidal inlets, which allow tidal waters in lagoons to be exchanged with the open ocean. The inlets are unstable because of the longshore transport of sand in the surf zone moving along adjacent beaches, causing inlets to migrate laterally or fill in. Stabilizing the inlets has also posed an enormous coastal management issue—one that is controversial and costly.

An excellent example of a barrier island that demonstrates a variety of geomorphologic and environmental features is Caladesi Island in Pinellas County (Figure Florida.26). The island is a state park accessible only by boat. The island supports a back-barrier mangrove, a maritime forest on beach ridges (former dune ridges), and actively forming vegetated dunes. It also features a closed, or filled, inlet to the south and an active inlet to the north. The north end of this island has been overwashed by storm surges.

Florida's barrier-island coast also contains two distinct major geomorphologic features: (1) the Apalachicola River Delta, rimmed by beach ridge–dominated barrier islands projecting out into the Gulf of Mexico, and (2) the Cape Canaveral **cuspate foreland** that projects out into the Atlantic Ocean on the east coast (Figure Florida.27a and Florida.27b). Aerial and space imagery clearly shows that cuspate forelands formed in this location during previous sea-level highstands, suggesting that this coastal feature might be controlled by underlying **antecedent topography**.

**Plant-Dominated Coastlines—Big Bend Coastline**
Florida's Gulf of Mexico coast has two large sectors that lack sufficient sand to form barrier islands. Additionally, both have very low wave energy. Hence they are dominated by plants. In the Big Bend area, karstified Eocene to Oligocene limestone crops out (see Figure Florida.12) and supports a thin muddy marsh dominated by *Juncus roemerianus*—or black needle rush (Figure Florida.28a and Florida.28b). This area receives sufficiently frequent freezes to make survival of mangroves impossible. Karst bedrock high areas in the marsh support small islands of trees called marsh hammocks. Offshore, these bedrock nubs support oyster reefs—some of these massive shell beds extend for tens of kilometers in the nearshore zone parallel to the marsh coast. Marsh tidal creeks commonly follow rectilinear joint patterns in the bedrock rather than meandering freely. Because of the very low topographic gradient on the limestone bedrock surface (1/5,000 ratio), the Big Bend area has very low wave energy and may be viewed as an incipient **epicontinental sea**.

**Plant-Dominated Coastlines—Ten Thousand Islands**
South of the west-central barrier islands (extending just north of Tampa Bay to just south of Naples) are the Ten Thousand Islands, which are mangrove islands (Figure Florida.29). Mangroves outcompete marsh grasses in warmer climates, so this area appears vastly differently than the Big Bend coast.



► **Figure Florida.26**   Digital orthophoto quarter quadrangle image of Caladesi Island. This is an important barrier island to visit because it displays a range of geologic and biologic environments.

**22**    Geology of Florida

▶ **Figure Florida.27**



ⓐ DOQQ image of St. Vincent Island—an excellent example of a beach ridge–dominated barrier island. This is one of the barrier islands rimming the Apalachicola River Delta. These barrier islands occur here because of the abundance of sand once provided by the river delta.



ⓑ DOQQ image of the Cape Canaveral cuspate foreland showing the modern feature and a Pleistocene-age counterpart just landward. A cuspate foreland along this part of Florida's east coast has probably been present over many sea-level fluctuations. Its location may be controlled be underlying antecedent topography or spatial changes in offshore wave energy.

▶ **Figure Florida.28**



ⓐ DOQQ image of Florida's Big Bend marsh-dominated coastline. The coastline is low wave energy and is starved of sand-size sediment—hence no barrier islands and few beaches have developed. Instead, the irregular karst surface on exposed limestone supports a thin, open-marine marsh. The karst topography controls the distribution of marsh islands, marsh hammocks, and tidal creeks.



ⓑ DOQQ image of detail of a marsh-dominated coast illustrating numerous marsh islands, oyster reefs, marsh peninsulas, and extensive tidal creeks (Crystal Bay).



▶ **Figure Florida.29**   DOQQ image of the Ten Thousand Islands coastline along the southwest Florida low wave energy and sand-size sediment–starved coastline. Here, mangroves dominate and the influence from karst topography is greatly reduced from that of the Big Bend open-marine, marsh coastline.

The Ten Thousand Islands coast is very low wave energy. It is a mud-dominated area that does not have a dominant karst limestone surface; rather, it is underlain by a 3- to 4-meter layer of mangrove peat. Numerous mangrove islands are separated by tidal channels. To the south, the islands merge into continuous mangrove strands. There are numerous, morphologically complex open bays that are partially filled with oyster reefs. Vermetid gastropod reefs are also present. This coastal system started to form about 3 kya on a low gradient shelf and has prograded approximately 8 kilometers seaward at some sites.

## Coral Reefs

The coral reefs seaward of the Florida Keys form the only reef tract within the 48 contiguous states and therefore are extremely popular with tourists and for scientific study because of their accessibility. This reef tract extends west of the Keys and becomes a series of distinct reefal banks (Dry Tortugas, Tortugas Bank, and Riley's Hump). Drilling into this reef tract reveals that its morphology is controlled by earlier reefs that formed during the late Pleistocene sea-level highstands (Figures Florida.30 and Florida.31a). Most modern Holocene reefs are only a few meters thick at most, and some of these modern reefs display classic **spur-and-groove**

**morphology**. Additionally, the outer reef supports the traditional zones of a typical ecological reef—back reef, reef flat, reef crest, reef front, and fore reef. These ecological zones contain a specifically defined mix of coral-reef species and



▶ **Figure Florida.30**   High-resolution seismic profile across the outer main reef system that lies seaward of the Florida Keys. There are multiple reef lines in places called outlier reefs. The numbers are radiocarbon ages and show that the Holocene coral cover (formed 9 to 8 kya) is relatively thin and perched on much older Pleistocene-age reefs (formed 100 to 80 kya).

Figure modified from Lidz et al. 2006

▶ **Figure Florida.31**



(a) Multibeam color image showing detailed **bathymetry** of Riley's Hump reef bank.

(b) Multibeam color image of the southern portion of Pulley Ridge, revealing a drowned barrier island that has been preserved because of rapid cementation of carbonate sands.

Panel a from Mallinson et al., 2003; panel b from Jarrett et al., 2005

other benthic assemblages. Behind the more massive outer reefs are thousands of smaller patch reefs that were constructed by a less diverse coral fauna.

The Keys coral reefs, unfortunately, have experienced widespread environmental degradation. Several factors have contributed to this: (1) extensive human infrastructure introducing excessive nutrients and turbidity; (2) possibly increased sea surface temperatures; (3) possibly increased ultraviolet (UV) exposure; and (4) diseases introduced, perhaps, from African dust events. Additionally, even recent **ocean acidification** may have an impact on the living coral community far into the future, but this is highly speculative at the moment. There are now widespread zones where no living stony corals remain. In these areas, coral has been replaced by soft coral, algal, and sponge benthic communities.

A recent discovery much farther to the west in much deeper water (65 to 75 meters) revealed a healthy light-dependent coral reef mantling a cemented paleoshoreline—Pulley Ridge (Figures Florida.31b, and Florida.32). Here, rather than having **inimical shelf waters**, this portion of the platform is bathed by oligotrophic waters from Loop Current incursions, thus allowing the deepest light-dependent coral reef on the U.S. continental shelf to thrive.

## Section Florida.4 Summary

● The Florida Keys are made up of the following three types of rock: (1) reef rock—Key Largo Limestone; (2) oolitic grainstone—Miami Limestone; and (3) paleosols, caliche, and duricrust.

● Florida has so many wetlands because of its flat topography, low elevation (near sea level), restricted drainage and high water table, and humid climate. The low, regional shelf gradient and sand-starved areas have produced marsh- and mangrove-dominated coastlines that lack beaches and barrier islands. Both are mud-dominated sedimentary systems. The Big Bend marsh coast is situated on a karst carbonate rock surface that controls much of the coastal morphology. To the south, the Ten Thousand Island coastline is dominated by many mangrove islands. Mangrove plants are extremely sensitive to freezes, so they rarely extend north of the Tampa Bay area. Carbonate rock does not significantly affect the coastal morphology along this coastline.

● If sea level rose a couple of meters, much of the low-lying Everglades would be flooded by seawater, which would form a broad, shallow, open sea.

● Washover-dominated barrier islands are topographically low and are easily flooded during storm surges. This allows sand from the seaward beach to be transported across the island. These islands migrate landward into their lagoons in this manner. Beach ridge–dominated

barrier islands have an abundance of sand brought to them in the longshore transport system, build dunes, are topographically higher and prograde seaward.

● The topography created by former reef structures affects the formation of new coral reefs on the Florida shelf. Also, the marine environmental conditions (warm, clear, normal salinity) are ideal for coral reef development.

● Highly turbid, nutrient-rich marine waters that have large changes in temperature hinder development of coral reefs. Excess human infrastructure leads to pollution of seawater, which also harms the reefs.

● The development of the deep coral reef at Pulley Ridge resulted from a hard substrate in the form of a cemented-drowned beach ridge–dominated barrier island that was frequently bathed by very clear, oligotrophic waters.



▶ **Figure Florida.32**  Bottom photo of the typically very thin, platy, light-dependent living corals on the Florida Ridge drowned barrier-island shoreline. These corals are growing in 65 to 75 meters of water, making this the deepest known light-dependent coral reef on the U.S. continental shelf.

Photographs from Tim Taylor

## Acknowledgments

I would like to thank all of my graduate students who have worked on various aspects of Florida's geology, particularly the marsh coastlines, the continental shelf, the paleoshorelines, and the coral reefs. Special thanks go to Dr. Stanley D. Locker, whose expertise, imagination, and effort were essential to the success of most of the fieldwork our group performed in Florida. Stan is simply amazing. I would like to thank many people with whom I have worked over the years or with whom I have discussed Florida geology issues, especially Richard (Skip) A. Davis, Stan Riggs, Bob Halley, Gene Shinn, Kevin Cunningham, Tom Missimer, Pamela Hallock, Jeff Ryan, Hank Mullins, Conrad Neumann, Charlie Paull, Don McNeill, Dave Mallinson, Terry Edgar, Jack Kindinger, Dan Belknap, Tom Scott, Gren Draper, Hal Wanless, Dick Buffler, Bob Ginsburg, Barbara Lidz, Ellen Prager, and Walt Jaap. The research performed was funded mostly by NOAA-Sea Grant, NOAA-NURC, ONR, USGS-St. Petersburg, and FL-DEP. Ann Tihansky at the USGS has been a great help. The USGS provided a number of images, as did the Florida Wildlife Research Institute and the Florida Geological Survey. Gary Maddox, Florida Department of Environmental Protection, provided an important image. Thanks go to Mr. Tim Taylor of the *R/V Tiburon*, Inc., for use of the underwater photos of Pulley Ridge. I thank Dr. David Palandro and Rene Baumstark for providing the vertical images (DOQQ) of various sections of Florida. I thank the Florida Geological Survey for much advice and assistance.

I thank two anonymous reviewers as well as Drs. Don McNeill, Thomas Scott, Mark Stewart, Grenville Draper, and Eugene Shinn for reviewing sections of this chapter.

# Review Workbook

## ESSENTIAL QUESTIONS SUMMARY

### Florida.1  Introduction
■ *What is the link between natural scenery and geology?*
All topography on Earth, from natural scenery and mountain ranges to small sinkholes, is controlled by past geological processes. Determining what those processes have been and when they occurred explains how the shape of the Earth's surface (and therefore scenery with plants) was created.

■ *Why is geology important?*
Geology provides us with tools to understand the Earth's past so that we can protect the present and prepare for the future. It is a science that allows us to understand and mitigate hazards posed by Earth's processes, to find raw materials needed to drive our modern society, and to develop techniques to minimize human impact on natural systems.

■ *What are the primary geomorphologic features that dominate Florida's topography?*
The primary geomorphologic features of Florida's topography include paleoshorelines, beach ridges, terraces, karst-formed lakes and depressions, rivers, and wetlands.

### Florida.2  State of Florida and the Florida Platform
■ *For coastal or island states, does geology end at the coastline, and why or why not?*
No, stratigraphic sections and geologic structures continue seaward beneath the coastline, shelf and slope, ultimately reaching some other geologic boundary or transition.

■ *What geologic features define the Florida Platform?*
Faulted margins resulting from rifting or transcurrent motion define the original Florida Platform before collision with the Antilles volcanic island arc. The sedimentary cover and major morphologic features are controlled by the antecedent topography created by these structural features.

■ *What is a prominent former sea-level indicator?*
Two examples are preserved shorelines above or below present-day sea level and now-dead, former shallow-water coral reefs that lie in deep water.

**Florida.3  A Brief Geologic History of Florida**
■ *What are the three fundamental components of the Florida Platform?*
The three fundamental components of the Florida Platform are (1) basement rocks of mostly Paleozoic age (some Mesozoic); (2) carbonate rocks of Mesozoic and Cenozoic age; and (3) siliciclastic sediments, primarily quartz sand, that arrived in the Cenozoic.

■ *Where did the basement rocks come from?*
Most of the basement rocks were part of the former Gondwana. Florida's basement rocks were situated between South America and northwest Africa. Collectively, they formed an exotic terrain because they were not once part of North American basement rocks.

■ *What are the four basic ingredients needed to construct a carbonate platform?*
The following four ingredients are needed to construct a carbonate platform:

1. An extensive, elevated basement surface.
2. A tropical or subtropical setting (low latitude).

3. Marine sedimentary environments that are protected from continental margin influences.
4. Early, rapid subsidence that provides the required accommodation space for thick carbonate stratigraphic units to fill in.

**Florida.4  Emergence of Modern Florida**
■ *What types of rocks constitute the Florida Keys?*
The Florida Keys are made up of the following three types of rock:

1. Reef rock—Key Largo Limestone.
2. Oolitic grainstone—Miami Limestone.
3. Paleosols, caliche, duricrust.

■ *Why does Florida have so many wetlands?*
Florida has so many wetlands because of its flat topography, low elevation (near sea level), restricted drainage and high water table, and humid climate.

■ *Why are there significant plant-dominated shorelines in Florida?*
The low, regional shelf gradient and sand-starved areas have produced marsh and mangrove-dominated coastlines that lack beaches and barrier islands. Both are mud-dominated sedimentary systems. The Big Bend marsh coast is situated on a karst carbonate rock surface that controls much of the coastal morphology. To the south, the Ten Thousand Island coastline is dominated by many mangrove islands. Mangrove plants are extremely sensitive to freezes, so they rarely extend north of the Tampa Bay area. Carbonate rock does not significantly affect the coastal morphology along this coastline.

## ESSENTIAL TERMS TO KNOW

**Accommodation space** – the space in which sediments can accumulate, for example, a very shallow continental shelf has little accommodation space (little water depth) in which sediments can build vertically.

**Anhydrite** – evaporite mineral anhydrous calcium sulfate ($CaSO_4$).

**Antecedent topography** – topography created from a previous geologic event that might control follow-on geologic processes and sedimentation.

**Antillean Orogeny** – tectonic collision between the leading edge of the northeast migrating Caribbean Plate supporting a volcanic island arc system and a section of the passive margin of the North American Plate supporting a carbonate platform system (Yucatan–Florida–Bahamas Platform complex). This collision occurred largely between 56 mya and 50 mya. The result of the collision eventually created the modern Greater Antilles Islands of Cuba, Hispaniola, Puerto Rico, and Jamaica. See **Orogeny**.

**Aquifer** – a section of rock that is permeable and water bearing, from which groundwater can be easily extracted.

**Artesian conditions** – water that will flow upward out of a well without need for pumping as a result of an aquifer being confined by an impermeable cover.

**Bathymetry** – measurement of depth below sea level in the ocean.

**Beach ridges** – a continuous line of sand dunes along a coastline that commonly is vegetated. They form when an abundance of sand is introduced to the beach by the longshore transport system, and the sand dries out on the beach during low tide. Onshore winds then blow the sand inland to be trapped by the first line of vegetation. Here is where the beach ridge (actually a dune line) begins to form.

**Bolide** – a very large impactor. The United States Geological Survey uses the term to mean a generic, large crater-forming projectile "*to imply that we do not know the precise nature of the impacting body . . . whether it is a rocky or metallic asteroid, or an icy comet, for example*".

**Carbonate factory** – general term for a sedimentary depositional system that generates carbonate sediments.

**Chemosynthetic or Chemosynthesis** – a biologic conversion of carbon molecules such as $CO_2$ and nutrients into organic matter using oxidation of inorganic molecules. The inorganic molecules include hydrogen sulfide or methane as the source of energy rather than sunlight in photosynthesis.

**Collision margin** – continental landmass on a plate boundary that has collided with another plate boundary. The west coast of South America is a good example of a modern collision margin.

**Cuspate foreland** – a triangular, bulbous projection on a sandy coast caused by variations in direction and magnitude of the longshore transport of sediment.

**Epicontinental sea** – a large body of shallow salt water that overlies a continent. Hudson Bay is a good example.

**Evaporite** – minerals formed by the evaporation of water—generally seawater that becomes brine and the crystals form in the brine.

**Exotic terrain** – a body of continental crust that has been imported from another source area.

**Facies** – body of rock or sediment with specific or distinctive characteristics.

**Feldspar** – group of rock-forming minerals making up 60% of the Earth's crust. They are K, Al, Ca, Na silicates.

**Flexural loading** – elastic response of crust when mass in form of rocks, sediments, or water is placed on it.

**Fracture zone** – linear feature in ocean crust resulting from motion along a transform fault.

**Graben** – a normal-fault-bounded linear basin.

**Grainstone** – a carbonate rock consisting of cemented, sand-size carbonate grains.

**Gypsum** – a common evaporite mineral ($CaSO_4 \cdot 2H_2O$).

**Hypersaline brines** – waters that are super-enriched in dissolved salts.

**Inimical shelf waters** – seawater on the shelf that is harmful to reef growth because it is too warm, too cold, too nutrient rich, or too turbid.

**Intraplate stress** – tectonic forces transmitted within and inside a single tectonic plate sometimes deforming the plate interior.

**Isostatic adjustment** – a response of the crust when a load is placed on it or removed; that is, the crust moves downward when an ice sheet accumulates on it during an ice age and rebounds upward when the ice sheet melts.

**K/T boundary** – time boundary between Cretaceous (abbreviated as "K" by convention) and Tertiary (T) occurring 65.5 mya. It is widely accepted that an extraterrestrial object (see **Bolide**) impacted the Earth, forming a huge crater beneath the modern Yucatan. It is also widely accepted that this event caused mass extinction of life, including extinction of the dinosaurs.

**Lithology** – a type of rock, e.g., granite, ooid grainstone.

**Lithostatic load** – a mass of rock or sediment placed on a section of crust (this can create an isostatic adjustment).

**Longshore sand transport** – movement of sand in the surf zone along the beach by breaking waves.

**Mixing zone** – a groundwater condition whereby freshwater and saltwater mix along a boundary generally in coastal areas. Where this occurs, dissolution of carbonate rock is accelerated.

**Mogotes** – geomorphologic features encountered in the Caribbean, especially in Cuba. They are hills (approximately 300 meters high) of limestone and represent mature karst topography. They are characterized by their rounded, towerlike structure.

**Ocean acidification** – decreasing pH or increasing acidity of seawater caused when elevated $CO_2$ in the atmosphere is absorbed into the ocean.

**Oceanic anoxic event (OAE)** – when the Earth's ocean became depleted of oxygen beneath the surface waters. OAEs occurred during periods of high $CO_2$ and warm temperatures and caused mass extinctions. The middle Cretaceous was a time of multiple OAEs.

**Oceanic crust** – denser portion of the Earth's crust underlying ocean basins consisting of magnesium-rich and iron-rich silicate minerals. Extrusive rocks are basalts; intrusive rocks are gabbros.

**Oligotrophic** – water that is lacking in nutrients and therefore very clear easily transmitting light.

**Ooids/oolitic** – sand-size carbonate grains that have a nucleus (e.g., skeletal fragment, fecal pellet) coated by layers of additional carbonate mineral. Oolitic means a mixture of ooids and other carbonate sand-size sediment.

**Orogeny** – a mountain-building event caused by plate motion, leading to a collision of the edges of two plates.

**Oxidation** – loss of electrons by a molecule, atom, or ion. Carbon can be oxidized to make carbon dioxide ($CO_2$).

**Paleosol** – a fossil soil horizon sometimes lithified to a form a distinctive crust.

**Permeable** – an ability of rocks or sediments to transmit fluid. Aquifers are permeable, so groundwater easily flows through them.

**Phosphate** – a charged group of atoms, or an ion made up of a phosphorus atom and four oxygen atoms ($PO_4$) and carries three negative charges. The phosphate ion combines with various atoms and molecules within living organisms to form many different compounds essential to life. It is the common name for sedimentary deposits containing grains having minerals with the element phosphorus (P) in their structure.

**Phosphorite** – a sediment or rock with high concentration of phosphate.

**Photic zone** – the depth of water within which photosynthesis can occur. This is highly dependent on water clarity, but generally is less than 200 meters deep.

**Photosynthesis** – a biochemical process in which light energy (sunlight) is turned into chemical energy by using $CO_2$ and $H_2O$ to form organic matter and releasing $O_2$.

**Phytoplankton** – group of microscopic plants that grow in the surface waters of the ocean as a result of photosynthesis. Phytoplankton is the base of the ocean's food chain.

**Potentiometric surface** – a potentiometric surface is the imaginary line where a given reservoir of fluid will "equalize out to" if allowed to flow vertically in an aquifer. Potentiometric surfaces explain how phenomena like artesian wells occur.

**Primary productivity** – the production of plants or algae in the surface waters by photosynthesis.

**Prograded** – building seaward, such as prograding river deltas or prograding shorelines.

**Ramp** – a carbonate shelf that gradually deepens further offshore. The west Florida shelf, Campeche Bank, and the Persian Gulf are good examples.

**Rectilinear fracture pattern** – a fracture pattern in rocks oriented as right angles.

**Rimmed margin** – a carbonate shelf or platform that is flat and shallow and has an elevated depositional rim, such as coral reefs and/or islands seaward of which the platform drops off steeply into much deeper water. The Great Barrier Reef or windward margins of the Bahamas are good examples.

**Rudistid** – a type of bivalve (mollusk, now extinct) dominating and forming reefs in the Mesozoic. All reefs are not necessarily made of corals.

**Sediment gravity flow** – sedimentary process or deposit formed by sediment-laden, higher density bottom currents flowing downslope.

**Siliciclastic** – sediment that has a mineralogy containing silicon. Quartz is the dominant siliciclastic sediment.

**Spur-and-groove morphology** – a series of ridges and ravines oriented downslope along the high-energy, seaward side of a reef.

**Stratigraphic succession** – a vertical section of sedimentary rocks (one sedimentary rock formation resting on top and therefore succeeding the one below it).

**Subduction zone** – an area on Earth where two tectonic plates meet and move toward one another, with one sliding underneath the other and moving down into the mantle, at rates typically measured in centimeters per year.

**Transcurrent** – a strike-slip, or horizontal motion along a large-scale fault system.

**Transform fault** – a special type of strike-slip fault that terminates abruptly at spreading centers.

**Transitional crust** – a type of the Earth's crust formed along rifted margins that includes extension and mixing of continental and oceanic crust.

**Tsunami** – a series of waves created as the seafloor is rapidly displaced vertically. Earthquakes, mass movements (underwater landslides), some volcanic eruptions, large asteroid impacts, and testing of nuclear weapons at sea all have the potential to generate a tsunami.

**Unconformity** – a buried erosion surface separating two rock masses or strata of different ages, indicating that sediment deposition was not continuous.

**Upwelling** – water that is brought up from the depth by currents. Generally, these waters are enriched in nutrients.

**Vermetid** – a marine gastropod (snail) that forms calcareous shell tubes in masses and creates reefs.

**Volcanic island arc** – a chain of volcanic islands formed by plate tectonics as an oceanic tectonic plate subducts under another tectonic plate and produces magma.

**Washover** – sand deposited on a barrier island type of coastline during a storm.

**Wilson cycle** – the opening and closing of an ocean basin.

## REVIEW QUESTIONS

What fundamentally controls the shape of a state's coastline over various geologic time periods?

How did the Gulf of Mexico form?

Explain why there are two components of Florida's basement rocks.

Why would a wide, shallow carbonate platform produce evaporite minerals?

What is meant by platform drowning?

What is the difference between a rimmed margin and a ramp?

What is the Greenhouse Earth?

How was the Yucatan–Florida–Bahamas Platform complex deformed?

What might have been the effects on the Florida Platform resulting from the bolide impact at the K-T boundary?

What ingredients are necessary for extensive internal and surficial karst features to develop?

Do springs always produce cool freshwater?

Of what importance is the dissolution of carbonate rocks in the Florida Platform?

Where does the quartz sediment originate?

How and when were quartz-rich sediments introduced onto the Florida Platform?

Which events converged to produce phosphate deposition?

Why were there so many large marine predators in the Miocene?

Why are marine and terrestrial fossils mixed together?

What are some of the environmental problems associated with mining phosphate?

If sea level rose a couple of meters, what would the Everglades look like?

What is the primary difference between a washover-dominated barrier island and a beach ridge–dominated barrier island?

What is a fundamental control on the distribution of coral reefs on the Florida shelf?

## APPLY YOUR KNOWLEDGE QUESTIONS

1. Calculate the average rate of subsidence of the edge of the western margin of the Florida Platform since the time of the middle Cretaceous unconformity or sequence boundary. You will need to determine the depth below modern-day sea level of this surface and the age of the middle Cretaceous (answer is in one of the figures). If sea level was approximately 200 m higher at that point in time, how would it factor into your calculation? Now, assuming the western margin of Florida Platform was in shallow water at the time of the middle Cretaceous, how fast would it take to drown this area given a photic zone that is 200 m deep? What other factors would have to be considered in this calculation?

2. If the west Florida shelf has a gradient of 1:3000, what was the average rate of shoreline movement (horizontal translation) over the past 18,000 years when sea level was approximately 120 m lower than it is today as a result of the Last Glacial Maximum?

3. Using Google Earth imagery, print out a section of central peninsular Florida and map the major geomorphologic features.

## FLORIDA RESOURCES

Bryan, J. R., Scott, T. M., & Means, G. H. (2008). *Roadside geology of Florida*. Missoula, MT: Mountain Press Publishing.

Cape Canaveral National Seashore: http://www.nps.gov/cana/

Everglades National Park: http://nps.gov/ever/

Florida Association of Professional Geologists: http://fapg.aipg.org

Florida Department of Environmental Protection: http://www.dep.state.fl.us/coastal/

Florida Fish and Wildlife Research Institute: http://floridamarine.org/

Florida Geological Survey: http://www.dep.state.fl.us/geology/

Florida Keys National Marine Sanctuary: http://floridakeys.noaa.gov/

Florida Museum of Natural History: http://flmnh.ufl.edu

Florida's Water Management Districts: http://www.dep.state.fl.us/secretary/watman/

Mulberry Phosphate Museum, Mulberry, FL, 863-425-2823.

U.S. Geological Survey in Florida: http://fisc.er.usgs.gov/

Windley Key Fossil Reef Geological State Park: http://www.floridastateparks.org/windleykey/default.cfm

**Summary of Content**

The geologic past of Florida is mostly out of sight with its maximum elevation at only ~105 m (in the panhandle) and much of south Florida is virtually flat. The surface of Florida is dominated by subtle shorelines from previous sea-level high-stands, karst-generated lakes, and small river drainage basins What we see are modern geologic (and biologic) environments, some that are world famous such as the Everglades, the coral reefs, and the beaches. But, where did all of this come from? Does Florida have a geologic history other than the usual mantra about having been "derived from the sea"? If so, what events of the geologic past converged to produce the Florida we see today?

To answer these questions, this module has two objectives: (1) to provide a rapid transit through geologic time to describe the key events of Florida's past emphasizing processes, and (2) to present the high-profile modern geologic features in Florida that have made the State a world-class destination for visitors.

**About the Author**

**Albert C. Hine** is the Associate Dean and Professor in the College of Marine Science at the University of South Florida. He earned his A.B. from Dartmouth College; M.S. from the University of Massachusetts, Amherst; and Ph.D. from the University of South Carolina, Columbia—all in the geological sciences. Dr. Hine is a broadly-trained geological oceanographer who has addressed sedimentary geology and stratigraphy problems from the estuarine system out to the base of slope. Along with his associates and graduate students, they have defined the response of coastal and shelf depositional systems to sea-level fluctuations, climate changes, western boundary currents, antecedent topography, and sediment supply. Specifically this includes geologic origin and evolution of submerged paleo-shorelines, reefs (relict and active), shelf sand bodies, open marine marsh systems, barrier islands, and back-barrier environments and how they might have interacted with each other in the past.

Areas of specialization for Dr. Hine include: Geologic processes and products of shallow marine sedimentary environments. Development, history, stratigraphy, and sedimentation of carbonate platforms. Coastal geology, coastal wetlands, sequence stratigraphy, interpretation of seismic reflection data and seafloor mapping and interpretation.



© 2008 JUPITERIMAGES



Visit Cengage Learning
Custom Solutions online at
www.cengagecustom.com

For your lifelong learning needs:
www.academic.cengage.com



*Nov. 2, 2020 Comment Letter to the U.S. Environmental Protection Agency from Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper re: Florida's Request To Assume Administration of a Clean Water Act Program [EPA-HQ-OW-2018-0640-0001]*

# EXHIBIT 3.a



# Florida's Wetlands
# An Update on
# Status and Trends
# 1985 to 1996

# Florida's Wetlands

## *An Update on Status and Trends, 1985 to 1996*

Thomas E. Dahl
U.S. Fish and Wildlife Service
Branch of Habitat Assessment
Washington, D.C.

## Acknowledgments

Many people within the U.S. Fish and Wildlife Service have provided technical, administrative or editorial support for this project. The author would like to thank the following individuals: Dr. Mamie Parker, Ms. Kathleen Short and Mr. William Knapp, Mr. Everett Wilson, Fisheries and Habitat Conservation; Dr. Benjamin Tuggle, Division of Resource and Habitat Conservation; Mr. John Cooper, of the Branch of Habitat Assessment. Numerous personnel from the National Wetlands Inventory Center in St. Petersburg, FL. helped with data preparation, collection and field reconnaissance.

Technical review of the manuscript was provided by the following experts: Mr. William Ainslie, Chief, Wetlands Section, U.S. Environmental Protection Agency.

The author and U.S. Fish and Wildlife Service wish to acknowledge Richard Young*, Cartographer, who was responsible for digital data verification and who produced many of the data tables and Geographic Information System graphics in this report.

*Current address U.S. Fish and Wildlife Service, Portland, OR.

Atlanta, GA; Dr. Ken Burnham Cooperative Research Unit, Colorado State University, Ft. Collins, CO; Mr. John Hefner, Ecological Services, U.S. Fish and Wildlife Service, Atlanta, GA; Dr. Wiley Kitchens, Florida Cooperative Fish and Wildlife Research Unit, University of Florida, Gainesville, FL.; Mr. Andreas Mager, Jr., Assistant Regional Administrator, Habitat Conservation Division, NOAA–National Marine Fisheries Service, St. Petersburg, FL; and Mr. Steve Rockwood Waterfowl Biologist, Florida Fish and Wildlife Conservation Commission, Fellsmere, FL.

All photographs are by the author unless otherwise noted. Publication layout and final illustration of the report were done by Ms. Elizabeth Ciganovich, and photographs were revised by Ms. Marta Anderson and Ms. Erinn Dornaus, U.S. Geological Survey, Cartography and Publishing Program, Madison, WI.

This report should be cited as follows:

T. E. Dahl. 2005. Florida's wetlands: an update on status and trends 1985 to 1996. U.S. Department of the Interior, Fish and Wildlife Service, Washington, D.C. 80 pp.



*Cover photograph: Forested wetland, Collier County, Florida.*

# Conversion Table

U.S. Customary to Metric

| | | | | |
|---|---|---|---|---|
| inches (in.) | x | 25.40 | = | millimeters (mm) |
| inches (in.) | x | 2.54 | = | centimeters (cm) |
| feet (ft) | x | 0.3048 | = | meters (m) |
| miles (mi) | x | 1.609 | = | kilometers (km) |
| nautical miles (nmi) | x | 1.852 | = | kilometers (km) |
| square feet (ft$^2$) | x | 0.0929 | = | square meters (m$^2$) |
| square miles (mi$^2$) | x | 2.590 | = | square kilometers (km$^2$) |
| acres (A) | x | 0.4047 | = | hectares (ha) |
| gallons (gal) | x | 3.785 | = | liters (L) |
| cubic feet (ft$^3$) | x | 0.02831 | = | cubic meters (m$^3$) |
| acre-feet (A-ft) | x | 1233.5 | = | cubic meters (m$^3$) |
| ounces (oz) | x | 28.3495 | = | grams (g) |
| pounds (lb) | x | 0.4536 | = | kilograms (kg) |
| short tons (tons) | x | 0.9072 | = | metric tons (t) |
| British Thermal Units (BTU) | x | 0.2520 | = | kilocalories (kcal) |
| Fahrenheit degrees (F) | → | 0.556 (F – 32) | = | Celsius degrees (C) |

Metric to U.S. Customary

| | | | | |
|---|---|---|---|---|
| millimeters (mm) | x | 0.03937 | = | inches (in.) |
| centimeters (cm) | x | 0.3937 | = | feet (ft) |
| meters (m) | x | 3.281 | = | feet (ft) |
| kilometers (km) | x | 0.6214 | = | miles (mi) |
| square meters (m$^2$) | x | 10.764 | = | square feet (ft$^2$) |
| square kilometers (km$^2$) | x | 0.3861 | = | square miles (mi$^2$) |
| hectares (ha) | x | 2.471 | = | acres (A) |
| liters (L) | x | 0.2642 | = | gallons (gal) |
| cubic meters (m$^3$) | x | 35.31 | = | cubic feet (ft$^3$) |
| cubic meters (m$^3$) | x | 0.0008110 | = | acre-feet (A-ft) |
| milligrams (mg) | x | 0.00003527 | = | ounces (oz) |
| grams (g) | x | 0.03527 | = | ounces (oz) |
| kilograms (kg) | x | 2.2046 | = | ounces (oz) |
| metric tons (t) | x | 2204.62 | = | pounds (lb) |
| metric tons (t) | x | 1.102 | = | short tons (tons) |
| kilocalories (kcal) | x | 3.968 | = | British Thermal Units (BTU) |
| Celsius degrees (C) | → | 1.8 (C) + 32 | = | Fahrenheit degrees (F) |

# Contents

Executive Summary.........................................................................................................................7

Introduction ...............................................................................................................................10

Study Area and Procedures.........................................................................................................12

Results: Status, Distribution and Trends.....................................................................................33

Discussion ..................................................................................................................................46

Summary ....................................................................................................................................67

Literature Cited ..........................................................................................................................69

Appendix A: Definitions of Habitat Categories Used in the Florida Status and Trends Study...................74

Appendix B: Changes in Florida's wetland classifications, 1985 and 1996.......................................78

# List of Figures

Figure 1. General locator map of Florida names and places referenced in the text .......................................12

Figure 2. Map of the physiographic sampling strata used in this study ......................................................13

Figure 3. Exposed tidal flats of an intertidal estuarine wetland in Wakulla County, Florida, 1993 .............14

Figure 4. Florida's barrier islands, 1996 ...............................................................................................15

Figure 5. High altitude, color infrared photograph of a portion of Shark Valley, Florida Everglades, 1996 .....................................................................................................................16

Figure 6. Mangrove islands (red) as shown on color infrared photography of Florida Bay, 1996................17

Figure 7. Florida's major water bodies, 1996 ........................................................................................18

Figure 8. Freshwater springs near Ocala, Florida, 1993.........................................................................19

Figure 9. Florida counties, 1996 ..........................................................................................................19

Figure 10. Sample plot distribution within Florida, 1996 .......................................................................22

Figure 11. Sample of 1996 color infrared aerial photography used to identify and classify wetlands...........23

Figure 12. Original wetland area in Florida and estimated remaining portion.............................................33

Figure 13. Average annual net wetland loss in Florida (Sources: Hefner 1986, Frayer and Hefner 1991, this study) ...................................................................................................34

Figure 14. Net loss of wetlands to uplands, 1985 to 1996...........................................................34

Figure 15. Distribution of estuarine emergent wetland in Florida, 1996 ....................................37

Figure 16. Distribution of estuarine shrub wetland in Florida, 1996...........................................38

Figure 17. Proximity of urban areas to Florida's wetlands, 1996................................................39

Figure 18. Long term trends of intertidal wetland types in Florida, 1950s to 1996 .....................41

Figure 19. Long term trends of freshwater wetland types in Florida, 1950s to 1996...................45

Figure 20. Net losses and gains of wetlands to various land use types, 1985 to 1996 ..................45

Figure 21. Example of intertidal wetlands along Florida's coastline in close proximity to development...........................................................................................................................46

Figure 22. Florida's sand beaches offer recreational, commercial and aesthetic benefits to people............46

Figure 23. Loss and gain of Florida's estuarine nonvegetated wetlands, 1985 to 1996 .................48

Figure 24. Estuarine salt marsh of north Florida dominated by black needlerush (*Juncus roemerianus*), 1994 ..........................................................................................................49

Figure 25. Mangroves and surrounding waters of Florida Bay, 1991 ...........................................50

Figure 26. Mangroves were concentrated within Federal, State and other conservation lands along Florida's Gulf Coast, 1996.........................................................................................50

Figure 27. Mangrove rehabilitation project in Fort De Soto Park, Pinellas County .....................51

Figure 28. Loss or gain of estuarine shrub habitat between 1985 and 1996. .................................51

Figure 29. Freshwater forested wetland dominated by red maple (Acer rubrum) and water oak (Quercus nigra), St. John's River, Florida ...........................................................................53

Figure 30. Forest wetlands gained or converted from various cover-types, 1985 to 1996..............54

Figure 31. Forested wetlands lost or converted to various cover-types, 1985 to 1996....................54

Figure 32. Loss of forested wetlands to uplands, 1985 to 1996 ....................................................55

Figure 33. Example of freshwater shrub wetland, Corkscrew Swamp, Florida, 1994 ...................55

Figure 34. Loss of freshwater shrub wetlands to uplands, 1985 to 1996 ......................................56

Figure 35. Example of a freshwater emergent wetland in central Florida, 1996............................56

Figure 36. 1985 and 1994 color infrared aerial photograph of wetlands and small lakes, Hatchbend, Florida ...............................................................................................................57

Figure 37. Loss of freshwater emergent wetlands to uplands, 1985 to 1996 ................................57

Figure 38. A constructed freshwater pond in a residential neighborhood, Brandenton, Florida, 1996.......58

Figure 39. Long term trends of freshwater pond area in Florida..................................................58

Figure 40. 1985 and 1994 color infrared aerial photographs near Panama City, Florida .............59

Figure 41. Acres of new ponds created from uplands in Florida, 1985 to 1996 ...........................................59

Figure 42. A wetland creation/restoration site in southwestern Florida, 1999 ...............................................60

Figure 43. Percentage of wetland area restored or created (ponds and emergent wetlands) from various upland land uses in Florida, 1985 to 1996 ...............................................................................64

Figure 44. Conservation lands designated as Federal, State, local or private preserves, refuges, parks, reserves, or sanctuaries in Florida, 1996. ...........................................................................................65

# List of Tables

Table 1. Wetland, deepwater and upland categories used in this study.............................................................21

Table 2. Wetland habitat descriptions, characteristic plant species and classification ....................................28

Table 3. Change in wetland area for selected wetland and deepwater categories, 1985 to 1996....................35

Table 4. Estimated acreage of wetlands within the physiographic regions of Florida, 1996 ..........................36

Table 5. Comparison of marine and estuarine wetland area for Florida and the conterminous United States (Sources: Dahl 2000, this study)...................................................................................................39

Table 6. Mean area and size range of individual estuarine wetlands within sample units in Florida, 1996 ............................................................................................................................................................39

Table 7. Changes in estuarine and marine intertidal wetlands, 1985 to 1996..................................................40

Table 8. Changes in marine and estuarine intertidal wetlands, 1985 to 1996..................................................41

Table 9. Distribution of freshwater wetland types by physiographic region in Florida, 1996.......................43

Table 10. Mean area and size range of individual freshwater wetlands within sample units in Florida, 1996 .......................................................................................................................................................43

Table 11. Changes in freshwater wetlands, 1985 to 1996 .................................................................................44



# Executive Summary

Before Florida became a State in 1845, there were an estimated 20.3 million acres (8.2 million ha) of wetlands. Over time, wetlands have been drained, dredged, filled, leveled, and flooded to the extent that about half of the original wetland acreage remained.

The U.S. Fish and Wildlife Service has produced a series of status and trends reports on Florida's wetlands. The first (Hefner 1986) estimated the rate of wetland conversion to have been 72,000 acres (29,150 ha) per year between the mid 1950s and the mid 1970s. Those estimates captured trends from the period preceding efforts to protect and restore wetlands. Society's views about wetlands have changed considerably and interest in the preservation of wetlands has increased as the values of wetlands have become more fully understood. This became evident in the Service's updated wetlands status and trends report for Florida (Hefner and Frayer 1991) that covered the period from the mid 1970s to the mid 1980s. During that period the estimated rate of wetland loss had declined to 23,700 acres (9,600 ha) per year.

The Emergency Wetlands Resources Act (Public Law 99–645) was enacted to promote the conservation of our Nation's wetlands. The Act required the Service to conduct wetland status and trend studies of the Nation's wetlands at periodic intervals. This report has been produced as a supplemental effort and details the status and trends of Florida's wetlands from 1985 to 1996. It has provided the most recent and comprehensive estimates of the status and trends of wetland habitats within the State.

An interagency group of statisticians developed the design for the national status and trends study. Within Florida, the study design was stratified, random sampling with 636 randomly selected sample plots, each four square miles (2,560 acres or 1,040 ha) in area. These plots were examined, using remotely sensed data in combination with field work, to determine wetland change. Twenty two percent of the plots were field verified, and rigorous quality control measures were taken to ensure data integrity and quality. Estimates of changes over time were made for wetland area and by wetland type.

The study incorporated all wetlands, regardless of land ownership, as part of the sampled landscape. Because wetlands in coastal areas are important to a variety of fish and wildlife, a supplemental sampling stratum was added along the Atlantic and Gulf coastal fringes.

Determining what caused wetland loss or gain was an important part of assessing the effectiveness of policy or management actions. As part of this study, the Service worked with other Federal agencies to examine and field test wetland loss and gain attribution categories which included upland urban development, upland agriculture, upland silviculture, upland rural development, and other miscellaneous lands.



*Corkscrew Swamp, Collier County, Florida.*

7

# Status of Wetlands in Florida, 1996

Florida's wetlands included coastal estuaries, mangrove islands, wet prairies, freshwater springs, cypress swamps, cattail marshes and many other types. Wetlands were found throughout the State from the Dry Tortugas to the Okefenokee Swamp along the Georgia border and from Cape Canaveral to the Gulf Islands near Pensacola.

In 1996, an estimated 11.4 million acres (4.6 million ha) of wetlands found in Florida occupied approximately 29 percent of area of the State, a greater percentage of the land surface than any other state in the conterminous United States.

Ninety percent of Florida's wetlands by area were freshwater systems. The remaining 10 percent were marine or estuarine intertidal wetlands. Of the original wetland area in Florida, about 56 percent remained.

The estimated average annual rate of wetland loss was 5,000 acres (2,030 ha) between 1985 and 1996. This was an 81 percent decline in the annual rate of loss as reported for the 1970s to 1980s. Important factors that contributed to the decline in the wetland loss rate included Federal, State and local legislation, ordinances and initiatives that protected wetland habitats, the application and enforcement of wetland protection measures, elimination of some incentives for wetland drainage, public education and outreach about the value and functions of wetlands, private land initiatives, coastal monitoring and protection programs, and programs and policies that promoted wetland restoration and creation.

## Marine and Estuarine Wetlands

An estimated 314,400 acres (127,290 ha) of estuarine emergent or saltmarsh wetlands, 616,300 acres (249,510 ha) of estuarine shrubs and 206,400 acres (83,560 ha) of estuarine

and marine nonvegetated vegetated wetlands occurred in Florida. These nonvegetated wetlands were commonly referred to as shores, sand or mud flats, bars and shoals.

Florida's coastal zone contained about 21 percent of all estuarine and marine wetlands found in the conterminous United States. A high percentage (92 percent) of estuarine shrub wetlands found in the conterminous U.S. were located in Florida, whereas only 8 percent of the estuarine emergent (salt marsh) wetlands were found along the State's coast lines. An estimated 31 percent of all nonvegetated estuarine and marine habitats within the conterminous United States were found in Florida.

The mean size of emergent salt marsh wetlands and estuarine shrub wetlands in the sample sites were slightly less than 23 acres (9 ha). The estuarine nonvegetated wetlands sampled averaged just over 10 acres (4 ha).

Florida's intertidal wetlands sustained a net loss of 500 acres (200 ha) or less than 1 percent during this study period. Compared with the results from the 1970s to 1980s, there was an 83 percent decline in the loss rate of marine and estuarine wetlands.

The estimated loss of 17 acres (7 ha) of estuarine emergent wetland to upland was statistically insignificant. Seventy five percent of the estuarine shrub losses were attributable to some form of coastal development. This may have involved construction of bridges, roadways, urban or suburban development or other infrastructure. Twenty percent of the estuarine shrub losses were attributed to agriculture and 5 percent were due to other unidentified upland land uses.

Seventy-one percent of the losses to estuarine shores was attributed to urban expansion along the coast. The remaining 29 percent was due to expansion of other unidentified types of upland land use.

The conversion of marine and estuarine wetlands to deepwater habitats involved losses to open water bay bottoms (deep water estuaries), or open ocean.

## Freshwater Wetlands

There were an estimated 10.2 million acres (4.1 million ha) of freshwater wetlands in Florida in 1996. Freshwater wetlands made up 90 percent of all wetland area in the State. An estimated 98 percent were vegetated while the remaining 2 percent were open water ponds.

Within the freshwater system, approximately 5.6 million acres (2.3 million ha) were forested wetlands, 1.8 million acres (725,000 ha) were shrubs, 2.6 million acres (1.1 million ha) were emergent wetlands or marshes and 241,000 acres (98,000 ha) were freshwater ponds.

The size of freshwater wetlands in this study indicated forested wetlands were larger than shrubs or emergent wetlands. Forested wetlands averaged 17.7 acres (7 ha) with emergent marshes and shrub wetlands each averaging 9.9 acres (4 ha) and 7.1 acres (3 ha) respectively. The mean size of freshwater ponds was 1.7 acres (0.7 ha).

Florida's freshwater wetlands declined by an estimated 52,000 acres (21,100 ha) or 0.5 percent between 1985 and 1996. This was an average annual net loss of 4,740 acres (1,920 ha) and represented an 82 percent decline in the rate of loss since the 1970s to 1980s era.

Freshwater vegetated wetlands declined by an estimated 91,000 acres (36,800 ha) or 0.9 percent. Freshwater emergent wetlands exhibited the largest losses declining by an estimated 260,000 acres (10,500 ha) or 9.0 percent. These losses were partially offset by gains in other freshwater wetland types.

Freshwater forested wetlands exhibited a net gain over the course of this study. This was in contrast to long term trends which had exhibited continual decline since the 1950s. There was an estimated net

gain of 22,500 acres (9,100 ha) due in large part to the maturation of shrub wetlands reclassified as forested wetlands. Forested wetland gains resulted from the conversion of almost 300,000 acres (118,500 ha) of shrub wetland to forested wetland. The vast majority of these lands were in production of wood products for lumber, pulp, chip and paper products.

There were an estimated 1,791,100 acres (725,140 ha) of wetland shrubs in 1996. This represented a gain of an estimated 146,400 acres (59,300 ha) or almost 9 percent. There was a close interrelationship between wetland shrub acreage and wetland forest acreage as many areas were rotating from shrub to forest following timber cutting. There was also a large amount of emergent wetland (306,000 acres or 123,900 ha) that was converted to shrub wetland during this study period.

From the 1970s to 1980s, the estimated loss of freshwater emergent wetlands was 110,000 acres (44,500 ha). This study indicated the loss rate of freshwater emergent wetland more than doubled as an estimated 260,200 acres (105,340 ha) were lost in Florida between 1985 and 1996. The conversion of freshwater emergent wetland to shrub wetland involved 286,900 acres (116,150 ha). Changes of the magnitude that occurred in Florida between 1985 and 1996

were indicative of prolonged periods of drought that allowed woody plants to become established in emergent wetlands, or the invasion of shrubs such as Brazilian Pepper or *Melaleuca*.

Freshwater ponds increased in area by over 39,000 acres (15,800 ha), almost 20 percent. Forested wetland area increased slightly (0.4 percent) while shrub wetlands increased by an estimated 8.9 percent. These gains largely overshadowed the losses to freshwater emergents.

# *Attribution of Wetland Losses*

Net losses of wetland between 1985 and 1996 were attributed to urban and rural development, (72 percent) and agriculture (28 percent). Small net gains were recorded from silviculture and the "other uplands" land use categories.

Urban development destroyed a variety of freshwater wetland types. Losses attributed to urban expansion were fairly evenly divided between freshwater forested, shrub and emergent wetlands.

Loss of wetlands to urban and rural development involved drainage for homes, resorts, golf courses, industry, roads, bridges and other infrastructure. It occurred in

high growth areas throughout the State. Collectively urban and rural development activities accounted for an estimated 72 percent of the net wetland losses.

Development outside established urban areas was termed rural development and included road construction, buildings for homes or industry, mining operations, golf courses, etc. Rural development was responsible for more freshwater forested wetland loss than other land use categories. An estimated 26,400 acres (10,700 ha) of forested wetlands were lost to rural development

Much of the wetland acreage loss to agriculture occurred in southern Florida where freshwater emergent wetlands were converted to citrus production, horticulture, growing landscape or other ornamental plants, greenhouses, sod farms and other agricultural uses. The net losses attributed to agriculture declined by 79 percent compared to the estimated losses attributed to agriculture from the 1970s to 1980s. There were an estimated 127,940 acres (51,800 ha) of wetlands that were restored or created from uplands. Approximately 67 percent took place on agricultural lands. Agricultural programs that promote wetland restoration, pond creation and land retirement were responsible for these gains.





*St. Marks National Wildlife Refuge, an emergent marsh on Florida's Gulf Coast.*

9

# Introduction

The mission of the U. S. Fish and Wildlife Service is to conserve, protect, and enhance fish and wildlife and their habitats for the continuing benefit of the American people. The Service has responsibility for the protection and stewardship of endangered wildlife, migratory birds, certain marine mammals, and their habitats. Changes in the status of wetlands potentially affects migratory and endangered species. Florida's coastal, inland waters and wetlands provide habitats for a large number of resident species and are the wintering destination for many other migratory species. Approximately 75 species of mammals, 283 species of birds, 122 reptiles, 57 amphibians and 126 fishes can be found in the State (Millsap *et al.* 1990). Forty two of these species are listed as endangered by the U. S. Fish and Wildlife Service. The Florida

panther (*Felis concolor coryi*), West Indian manatees (*Trichechus manatus*) and five species of sea turtles are critically endangered and require Federally designated species coordinators.

Wetlands support Florida's fish and wildlife populations. Coastal beaches provide nesting habitat for thirteen species of shorebirds and about 90 percent of all loggerhead sea turtles nesting in the United States (U.S. Fish and Wildlife Service 1996). Estuaries and near shore habitats are nurseries for ecologically and economically important fish and shellfish. Herons, egrets, ibises, spoonbills and storks reside in wetlands and are a conspicuous part of Florida's wildlife resources (Runde 1991). Seventeen percent of Florida's wildlife species are not found elsewhere in the United States. Some portions of south

*Florida wetland wildlife, below from left to right: whooping crane (Grus americana), manatee (Trichechus manatus), great egret (Ardea alba), wood stork (Mycteria americana), green tree frog (Hyla cinera), and loggerhead turtle (Caretta caretta).*







*Shrimping boats and fisherman in Florida. (Photos courtesy of National Oceanic and Atmospheric Administration.)*

Florida support the only subtropical ecological communities in the continental U.S. making it one of North America's most important reservoirs of biological diversity.

People also benefit from Florida's abundant wetland and water resources. Much of the State's tourist industry is based on the ability to access and enjoy coastal waters and beaches. Inland waters support sport fishing, canoeing, boating and other water sports. Wetlands provide opportunities for viewing and photographing nature, birdwatching, hunting and other outdoor activities. Other products produced by wetlands are used by industry or commercial enterprises. Coastal waters support commercial and recreational fisheries. Cypress mulch and peat are used for horticultural purposes, timber products for construction and manufacturing, mineral extraction and freshwater supplies are all be associated with wetlands in Florida.

The Emergency Wetlands Resources Act of 1986 (Public Law 99–645) was enacted to promote the conservation of our Nation's wetlands. The Act requires that the Fish and Wildlife Service conduct wetland status and trend studies of the Nation's wetlands at periodic intervals. This is accomplished by the use of a stratified, random sampling design where sample plots are examined with the use of remotely sensed imagery, in combination with field work, to determine wetland

change. The most recent study detailed the status and trends of our Nation's wetlands from 1986 to 1997 (Dahl 2000). It provided the most comprehensive estimates of the current status and trends of wetland habitats. Although designed as part of the national assessment, the data collected as part of that effort meet criteria for providing statistical estimates of wetland status and trends for the State of Florida. The following sections report the results of the Florida data analysis.

Previous Service reports on Florida's wetland trends have used a similar subset of the national status and trends data set (Hefner and Brown 1984; Hefner 1986; Frayer and Hefner 1991). Those reports examined Florida's wetland trends from the 1950s to 1970s, and from the 1970s to 1980s, respectively. Data from those studies indicated that Florida had lost substantial wetland acreage. The cypress strands fringing the Atlantic coastal ridge, the pond apple forests south of Lake Okeechobee and the tropical hardwood hammocks were some of the wetland types that had been greatly reduced over time (U.S. Fish and Wildlife Service 1996). These types, once conspicuous and expansive landscapes, were reduced to highly fragmented remnant ptaches in South Florida (Davis and Ogden 1994).

With the advent of measures to conserve wetlands during the 1970s and 1980s, Florida's wetland loss

rates declined (Frayer and Hefner 1991). However, since that time, the population has continued to increase dramatically. Florida ranked seventh in the Nation for population growth between 1990 and 2000. This growth has necessarily been accompanied by extensive land-use changes and increasing demand for water, resources and space. In addition, invasive species have spread, compromising the function and value of wetlands and waterways throughout the state. The presence of invasive species in wetlands and waterways has been problematic, and reconciling increasing demands for water resources has continued as an issue in Florida. These circumstances, accompanied by extensive land use changes, have generated continued interest in the status of the State's wetlands. Many challenges to maintaining wetland habitat availability and quality remain.

This report presents the latest wetland status information on Florida's wetland resources and provides estimates of losses or gains that occurred between 1985 and 1996. The data for the State were the first to be analyzed beyond the national data set and provide new information about wetland trends specific to Florida. These data have been supplemented with additional sources of information on wetland community types to provide a more comprehensive understanding of Florida's wetland resources.

# Study Area and Procedures

A combination of geological history, climate, geography, environmental forces and human habitation have shaped Florida's landscape. Florida's 8,400 miles (5,220 km) of coastline, 13 river basins and nearly 8,000 lakes have been vital to the state's recreation and tourism industry (GAP Commission 2001). Water has been key to many of Florida's unique ecosystems. Coastal estuaries, mangrove islands, wet prairies, freshwater springs, cypress swamps, cattail marshes and many other types were found throughout the State from the Dry Tortugas to the Okefenokee Swamp along the Georgia border and from Cape Canaveral to the Gulf Islands near Pensacola (Figure 1).



*Figure 1. General locator map of Florida names and places referenced in the text.*

The total land area of Florida was approximately 58,560 square miles (151,670 sq. km)[1]. Florida's mean elevation was 100 ft. (31 m) (Sharp 1992). Throughout south Florida and in the coastal stretches of the Big Bend area, relief of less than 6 feet (2 m) was widespread (Fernald and Purdum 1992). The landscape included coastal estuaries, beach and dune complexes, dense subtropical vegetation in the south and temperate hardwood forests in the north. Karstic (i.e. limestone) relief features including caves, sinks and low hills occurred in the north western portion of the State. Water bodies, whether they were coastal or inland were common, and no portion of the State was more than 60 miles (97 km) from salt water (Marth and Marth 1992). Florida was considered the wettest State with more wetland and surface water area than other States in the conterminous U.S. (Dahl 1990).

For this study, Florida was stratified into three physiographic regions (Figure 2). These included:

[1]This study incorporated some estuarine embayments not included in the total land area figure.



*The Myakka River.*

Myakka River State Park

**Physiographic Region**

Gulf-Atlantic Rolling Plain

Gulf-Atlantic Coastal Flats

Coastal Zone

*Figure 2. Map of the physiographic sampling strata used in this study.*



*Figure 3. Exposed tidal flats of an intertidal estuarine wetland in Wakulla County, Florida, 1993.*



# *Coastal Zone*

The Coastal Zone encompassed the near-shore areas of Florida and included barrier islands, coastal marshes, exposed tidal flats (Figure 3) and other features not in the landward physiographic zones. The Coastal Zone represents an area where salt water was the overriding influence on biological systems and was not synonymous with any State or Federal jurisdictional coastal zone definitions.

Florida had 8,426 miles (13,557 km) of tidal shoreline bordering both the Atlantic Ocean and the Gulf of Mexico. Included as part of this coastline were 700 miles (1,126 km) of sand beaches and 4,510 islands 10 acres (4.1 ha) or larger (Morris 1991).

Few rock shorelines occurred along the Florida coast. These were high energy intertidal environments where beach or coral had weathered to form irregularly shaped rocky

features 1–3 meters high (Duever *et al*. 1982). Rock shoreline stretched discontinuously from south of St. Augustine to Jupiter Inlet. Rocky shores were also found on the windward side of some of the Florida Keys.

There were numerous islands that formed barriers between the Atlantic Ocean, the Gulf of Mexico and the mainland. Some segments of Florida's barrier islands have been designated as part of the Federal Coastal Barrier Resources System. The Barrier Islands Act of 1983 removed undeveloped islands from Federal flood insurance protection and resulted in 33 locations being designated as coastal barriers under this legislation. The system was expanded to include several more sites by the Coastal Barrier Improvement Act of 1990 (U.S. Dept. of Interior 1995). In all, 67 sites encompassing 285,146 acres (115,444 ha) of coastal island segments were designated as part of this system in Florida (Figure 4).



*Cedar Key*

*Coastal vacation and residential development, Indian Rocks Beach*

*Figure 4. Florida's barrier islands, 1996.*

15

# *Gulf-Atlantic Coastal Flats*

The Gulf-Atlantic Coastal Flats physiographic region described by Hammond (1970), encompassed most of the Florida peninsula. The Coastal Flats were characteristically level, but low beach ridges provided some topographic relief as tree hammocks rose slightly above the surrounding landscape (Bailey 1980).

The Everglades covered much of south Florida. These vast wetlands occupied a flat marl and limestone shelf covered with shallow peat deposits (Figure 5). Elevations in the Everglades drainage system ranged from 14 feet (4.3 m) near Lake Okeechobee to sea level at Florida Bay. Slopes averaged less that 2 inches per mile (3 cm per km) as water flowed in a southwestern direction across the Everglades and into Florida Bay (McPherson and Halley 1996).

The Big Cypress Preserve, adjacent to the Everglades was made up of cypress strands, wooded sloughs and wet prairies (Duever *et al.* 1986).



*Figure 5. High altitude, color infrared photograph of a portion of Shark Valley, Florida Everglades, 1996. (Aerial photo courtesy of USGS.)*

Quad center: 80°47'W 25°39'N

South and west of the Everglades and the Big Cypress Preserve are the Ten Thousand Islands. This area supported the most extensive mangrove swamp in the United States (U.S. Fish and Wildlife Service 1996). The mangrove islands were dissected by numerous tidal channels dotted with Indian mound hammocks of slightly higher elevation which support a variety of tropical trees (Figure 6). The Everglades, contiguous with the Big Cypress Preserve and the Ten Thousand Islands area, form one of the largest expanses of wetlands found in the conterminous United States.

The Gulf-Atlantic Coastal Flats also included many highly populated urban centers such as Miami/Ft. Lauderdale/West Palm Beach, Tampa/St. Petersburg, Ft. Myers, Orlando, Jacksonville and Pensacola. Much of Florida's citrus and vegetable crop were grown in this region of the State.



*Figure 6. Mangrove islands (red) as shown on color infrared photography of Florida Bay, 1996. (Aerial photo courtesy of FL DEP)*

Quad center:
81°29'W 25°50'N

17

## Gulf-Atlantic Rolling Plain

The Gulf-Atlantic Rolling Plain included a portion of the northern panhandle, and the northern part of peninsular Florida. It was contiguous with physiographic zones extending south from Alabama and Georgia. This region of the State, as delineated by Hammond (1970), was an area of slightly higher elevation and it supported largely temperate-zone vegetation (Duever *et al.* 1982). Omernik (1987) described similar physiographic settings as smooth to irregular plains with a mosaic of crop land, forest, pasture and urbanized areas.

## Other Important Facets of Florida's Water Resources

Water has sustained many of the State's unique ecosystems and has been key to the recreation and tourism industry (Figure 7). Florida's 8,426 miles (5,220 km) of coastline provide vast socioeconomic value as well as important ecological resources.

There were 34 major river systems in Florida (Marth and Marth 1992). Collectively, there were 1,711 rivers and streams that made up

an estimated 10,550 miles (16,975 km) of flowing water systems in Florida (Morris 1991). Alluvial rivers originating in piedmont Alabama and Georgia and running south through the Florida panhandle carried sediments made up of sand, silt or clays. Others originiating in the coastal plain are dominated by base flows. Examples include the Suwannee and St. Johns Rivers where waters were often colored black from the high levels of tannic acid in the runoff from surrounding swamp hardwoods. (The wetlands surrounding these rivers were often referred to in colloquial terms as "red river bottoms" or "red river swamp" and "black water river bottoms" depending on the origins



**Deepwater Habitats**

Large Lakes

Rivers

*Figure 7. Florida's major water bodies, 1996.*

of the river water.) The wetlands adjacent to these rivers provide food chain support, fish and wildlife habitat, erosion control, water quality protection, flood storage and control and deep aquifer recharge (Taylor *et al.* 1990).

Other freshwater resources included 7,800 lakes, nearly all naturally formed from sink holes or solutional depressions. Lake Okeechobee is the Nation's second largest freshwater lake wholly within the U.S. borders. Geologists have estimated that Florida may have nearly 600 freshwater springs (Figure 8), a number classified as first magnitude springs with average flows of greater than 100 cubic feet/sec (2.8 cubic meters/sec) (Morris 1991).

There were 67 counties in Florida (Figure 9). Between 1990 and 2000 Florida's population increased by 23.5 percent making it the fourth most populous state in the Nation (U.S. Census Bureau 2002). Tourism was the leading industry, agriculture was second as Florida was one of the top producers of citrus, sugarcane, tomatoes, foliage, honey and strawberries (Marth and Marth 1992).



*Figure 8. Freshwater springs near Ocala, Florida, 1993.*

*Figure 9. Florida counties, 1996.*

# Study Methods

## Wetland Definition and Classification

Cowardin *et al.* (1979) was used to define wetland for this study. This ecological definition was the National standard for wetland mapping, monitoring and data reporting as determined by the Federal Geographic Data Committee. It was a two-part definition as indicated below:

*Wetlands are lands transitional between terrestrial and aquatic systems where the water table is usually at or near the surface or the land is covered by shallow water.*

*For purposes of this classification, wetlands must have one or more of the following* three attributes: (1) at least periodically, the land supports predominantly hydrophytes, (2) the substrate is predominantly undrained hydric soil, and (3) the substrate is nonsoil and is saturated with water or covered by shallow water at some time during the growing season of each year.

Habitat category definitions used in this study appear in synoptic form in Table 1. Complete definitions of wetland types and land use categories used to conduct this study are in Appendix A.

## Study Design

Within the physiographic regions described above, sample plots were randomly allocated in proportion to the amount of wetland acreage expected to occur within each stratum. Each sample plot was 2.0 miles (3.218 km) on a side, or 4 square miles total area equaling 2,560 acres (1,036 ha). Six-hundred-and-thirty-six sample plots were analyzed in this study (Figure 10). For each sample plot, aerial photography (i.e. digital orthophoto quarter quadrangle) was acquired and interpreted to identify wetlands, deepwater habitats and uplands. Plots were initially allocated to strata based on the best information available about wetland area and variability by strata and on a standard optimal-allocation formula for stratified simple-random sampling. This stratification scheme had ecological, statistical, and practical advantages because the physiographic divisions within Florida coincided with factors that effected wetland distribution and





*One of the world's largest and deepest freshwater springs, Wakulla Springs is a pristine river sanctuary.*





*Florida panther (Felis concolor coryi). (Photo courtesy of Everglades National Park.)*

**Table 1. Wetland, deepwater, and upland categories used in this study. The definitions for each category appear in Appendix A.**

| Category | Common Description |
| --- | --- |
| *Salt Water Habitats* | |
| Marine Subtidal* | Open ocean |
| Marine Intertidal | Near shore |
| Estuarine Subtidal* | Open water/bay bottoms |
| Estuarine Intertidal Emergents | Salt marsh |
| Estuarine Intertidal Forested/Shrub | Mangroves or other estuarine shrubs |
| Estuarine Unconsolidated Shore | Beaches/bars |
| Estuarine Aquatic Bed** | Submerged or floating estuarine vegetation |
| *Riverine (may be tidal or nontidal)* | River systems |
| *Freshwater Habitats* | |
| Palustrine Forested | Forested swamps |
| Palustrine Shrub | Shrub wetlands |
| Palustrine Emergents | Inland marshes/wet meadows |
| Palustrine Unconsolidated Shore | Shore beaches/bars |
| Palustrine Unconsolidated Bottom | Open water ponds |
| Palustrine Aquatic Bed | Floating aquatic/submerged vegetations |
| Lacustrine | Lakes and reservoirs |
| *Uplands* | |
| Agriculture | Cropland, pasture, managed rangeland |
| Urban | Cities and incorporated developments |
| Forested Plantations | Planted or intensively managed forests, silviculture |
| Rural Development | Nonurban developed areas and infrastructure |
| Other Uplands | Rural uplands not in any other category; barren lands |

*Deepwater habitat

**Technical limitations described in the text

abundance. Thus, this study design was well suited for determining wetland acreage and trends.

Wetland changes were determined by intensive analysis of the aerial photography (Figure 11), interpretation of wetland types and hydrologic conditions, and determination of the changes that occurred between the respective target dates. The mean dates of the aerial photography used to determine wetland trends were 1985 and 1996, with the difference being an average of 11 years. For this study, wetlands 3 acres (1.2 ha) and larger composed the target population. Actual results indicated that for each wetland category included in the study, the minimum size represented was less than 1.0 acre (0.4 ha). However, not all wetlands less than the target size category were detected.

Changes in areal extent or type of wetland observed on the sample plots between 1985 and 1996 were recorded. Field verification of features on the aerial photography was done for 138 plots or 22 percent of the total sample. Field verification addressed questions regarding image interpretation, land use coding, and attribution of wetland gains or losses. Field work was also done as a quality control measure to verify that plot delineations were correct. Verification involved field visits to a cross section of wetland types and geographical settings. Field work was used to update sample plots based on observations of on-the-ground conditions. Low level reconnaissance was done by helicopter for some plots inaccessible on the ground. Representatives from three Federal agencies (Natural Resources Conservation Service, Fish and Wildlife Service and U.S.

Geological Survey) participated in field reconnaissance trips and quality control reviews from April 1999 through May 2000.

For each sample plot, the extent of change among all wetland types between the two dates of photography was used to estimate the total area of each wetland type. Areas of the sample plot that had been identified in previous eras as wetlands but that were no longer wetlands, were placed into five land use categories, which included agriculture, upland forested plantations, upland areas of rural development, upland urban landscapes and other miscellaneous lands. The outputs from this analysis were change matrices that provided estimates of wetland area by type and observed changes over time. The advantages of this design were that it focused entirely on



**Status and Trends 4-Square Mile Sample Plots (636 Total)**

*Figure 10. Sample plot distribution within Florida, 1996.*

monitoring wetland change, it was used to monitor conversions between ecologically different wetland types, and it measured wetland gains and losses.

Advances in computerized cartography helped to reduce labor intensive tasks and to improve data quality and geospatial integrity. Newer technologies allowed the generation of existing digital plot files at any scale to directly overlay onto an image base. The wetlands interpreter viewed the new imagery and made change notations directly on the image overlay. This process was greatly facilitated by the use of rectified digital orthophoto quarter quadrangle imagery obtained with the assistance of the Florida Department of Environmental Protection. Because the plot information was already in a spatially rectified file, any change information could be inserted to the correct geospatial position in the plot boundary. Area information was recalculated from the new digital file by use of a geographic information system. This process eliminated manual drafting, registered the image overlays to georeferenced coordinates, and reduced imprecise lines (line pixel width) inherent in older scanning technologies.



*Figure 11. Sample of 1996 color infrared aerial photography used to identify and classify wetlands. (Aerial photo courtesy of FL DEP.)*

Quad center:
82 19'W 28 18'N

The geospatial analysis capability built into this study provided a complete digital database to better assist analysis of wetland change information. Rigorous quality control inspections were built into the interpretation, data collection and analysis processes. A more complete description of the techniques used to accomplish the interpretation, registration, and change detection is provided in various technical manuals (U.S. Fish and Wildlife Service 1994a, 1994b). Detailed discussion of the geographic information systems design, quality control procedures and the statistical aspects of the study design were presented by Dahl (2000).

This study produced estimates of total wetland area and changes for the State of Florida, and included all lands and waters of the State within the sampling frame, regardless of land ownership. Statistical estimates were used to expand the sample data to specific physiographic regions, wetland types or were generated for the entire State. The reliability of each estimate generated was expressed as the percent coefficient of variation (% C.V.) associated with that estimate. This study was designed to measure changes in wetland area without further assessment of species composition or wetland quality.

## Study Limitations

Due to the limitations of using aerial photography as the primary data source to detect wetlands, certain habitats were excluded from this study by design. These included:

- **Small Limesinks or Limestone Sinkholes**—These cavities or depressions were variable in size and were associated with partially or completely collapsed limestone rock. They were considered a type of wetland if they were observed to hold standing water. Large limesinks or sinkholes were detected on the aerial photography and included in the study results based on their cover type. However, many limesinks were small (less than 1 acre or .5 ha), and tree canopies or other vegetation may have masked their presence. In these instances, sinkholes were excluded from the report analyses because they were not detectable.

- **Seagrasses or Submerged Aquatic Vegetation**—The detection of submerged aquatic vegetation was difficult using aerial photography without extensive surface-level observations, tide stage data, water clarity data and low surface waves (Ferguson *et al.* 1993). Seagrasses and other submerged plants inhabited the intertidal and subtidal zones of estuaries and near shore coastal waters (Orth *et al.* 1990). The four most common seagrasses found in Florida were widgeon grass (*Ruppia maritima*), shoal grass (*Halodule wrightii*), turtle grass (*Thalassia testudinum*) and manatee grass (*Syringodium filiforme*).

  Collectively, Florida had been reported to have between 1.9 and 2.7 million acres (769,230 to 1,093,100 ha) of seagrasses (Sargent *et al.* 1995). Florida's seagrasses were not delineated as part of this study.

- **Reefs**—Tropical reef communities (coral or tuberficid worm reefs) were found offshore



*Unique coastal marsh ecosystem of Mashes Island County Park, Wakulla County, Florida.*

in south Florida waters. These reefs range in water depth from less than 1 m to 41 m. Maximum coral reef development was restricted to the south and western portions of the State, along a line extending from Soldier Key to the Dry Tortugas (Jaap 1984). Oyster (*Crassostrea virginica*) reefs also occurred in the intertidal zone adjacent to marshes or mud flats (Bahr and Lanier 1981). There were also approximately 329 permitted artificial reefs in Florida coastal waters. Most of these occurred in deep water, however several were in 7 to 8 feet (2–2.5 m) of water (Pybas 1991).

Coral reefs were concentrated complexes of corals and other organisms that constructed a limestone structure in shallow waters (Jaap 1984). They were important links to a number of fishery and benthic marine resources and along with seagrasses and mangroves formed a vital component of the coastal ecosystem. The only emergent coral reefs in the conterminous U.S. were located in the Florida Keys extending south from Miami and Soldier Key to the Dry Tortugas. This narrow band of shallow water (<10 m) reef habitat covered approximately 360 sq. km and was the planets third largest barrier reef system in the world (Miller and Crosby 1998). Coral reef extent and changes were not quantified as part of this study. Although data from other studies were available for only limited geographical sites, there has been widespread agreement that coral reef area has been declining (Millhouser *et al.* 1998).

- **Ephemeral Water**—When defining and classifying wetlands Cowardin *et al.* (1979) did not recognize ephemeral water areas as a wetland type. Therefore, ephemeral water areas were not included in this study.

# *Attribution of Freshwater Wetland Losses in Florida*

The process of identifying or attributing cause for wetland losses or gains has been investigated by both the Service and the Natural Resources Conservation Service.

During 1998 and 1999, the Natural Resources Conservation Service and the Service launched a concerted effort to develop a uniform system of definitions to attribute wetland losses and gains to their causes. The categories used to determine the cause of wetland losses and gains are described below.

### Agriculture

The definition of agriculture followed Anderson *et al.* (1976) and included land used primarily for the production of food and fiber. Agricultural activity was shown by distinctive geometric field and road patterns on the landscape and/or by tracks produced by livestock or mechanized equipment. Agricultural land uses included horticultural crops, row and close grown crops, hayland, pastureland, native pastures and range land and farm infrastructures. Examples of agricultural activities within each land use included:

**Horticultural crops** consisted of orchard fruits (limes, bananas, grapefruit, oranges, peaches, avocados, other citrus and like species). Also included were nuts such as almonds, pecans and walnuts; vineyards including



Everglades National Park

*The roseate spoonbill (Ajaia ajaja) prefers mangrove swamp and salt marsh habitats. (Photo courtesy of Everglades National Park.)*

25

grapes and hops; bush-fruit such as blueberries; berries such as strawberries or raspberries; and commercial flower and fern growing operations.

**Row and Close Grown Crops** included field and sugar cane, sweet corn, sorghum, soybeans, cotton, peanuts, tobacco, sugar beets, potatoes, other truck vegetables including melons, beets, cabbage, cauliflower, pumpkins, tomatoes, sunflower and watermelon. Close grown crops also included wheat, oats, barley, sod, ryegrass, and similar graminoids.

**Hayland and pastureland** included grass, legumes, summer fallow and grazed native grassland.

**Other farmland** included farmsteads and ranch headquarters, commercial feedlots, greenhouses, hog facilities, nurseries and poultry facilities.

## Forested Plantations

Forested plantations consisted of planted and managed forest stands and included planted pines, Christmas tree farms, clear cuts and other managed forest stands. These were identified by observing the following remote sensing indicators: 1) trees planted in rows or blocks; 2) forested blocks growing with uniform crown heights; and 3) logging activity and use patterns.

## Rural Development

Rural developments occurred in rural and suburban settings outside distinct cities and towns. They were characterized by nonintensive land use and sparse building density. Typically, a rural development was a crossroads community that had a corner gas station and a convenience store and were surrounded by sparse residential housing. Scattered suburban communities located outside of a major urban centers were also included in this category as were some industrial and commercial complexes; isolated transportation, power, and communication facilities; strip mines; quarries; and recreational areas such as golf courses. Major highways through rural development areas were included in the rural development category.

## Urban Development

Urban land consisted of areas of intensive use in which much of the land was covered by structures (high building density). Urbanized areas were cities and towns that provided goods and services through a central business district. Services such as banking, medical and legal office buildings, supermarkets and department stores made up the business center of a city. Commercial strip developments along main transportation routes, shopping centers, contiguous dense residential areas, industrial and commercial complexes, transportation, power and communication facilities, city parks, ball fields and golf courses were included in the urban category.

## Other Land Uses

Other Land Use was composed of uplands not characterized by the previous categories. Typically these lands included native prairie, unmanaged or nonpatterned upland forests and scrub lands, and barren land. Lands in transition between different uses were also in this category.

Transitional lands were lands in transition from one land use to another. They generally occurred in large acreage blocks of 40 acres (16 ha) or more. They were characterized by the lack of any remote sensor information that would enable the interpreter to reliably predict future use. The transitional phase occurred when wetlands were drained, ditched, filled, leveled or the vegetation has been removed and the area was temporarily bare.

During April, 1999, cooperative interagency field evaluations were conducted to test the definitions used by the Service on the wetland status and trends plots to attribute wetland losses or gains. Field exercises involving the participation of the Service and the Natural Resources Conservation Service were conducted in central and south Florida. These exercises consisted of a careful review of determinations made on 31 sample plots. Field evaluation of these plots resulted in no disagreement among agency representatives with how the Service attributed wetland losses or gains as to cause.

*Florida's Everlades during a dry season, 1990.*



**Table 2. Wetland habitat descriptions, characteristic plant species and classification designation(s) as found in this study.**

| Habitat—Community Type and Synonyms | Description | Characteristic Plant Species | References | Designation for This Study |
|---|---|---|---|---|
| | | *Coastal Zone* | | |
| **Mangrove Forest—** Mangrove Swamp; Shrub; Mangle; Tidal Swamp; Mangrove Islands | Salt tolerant trees that are adapted to continual flooding and salt water. Mangroves grow along low energy shorelines in the subtropical intertidal communities that tolerate very little frost. They are most common in the southern portions of the State particularly south of Charlotte Harbor, in the Ten Thousand Islands area and along Florida Bay. | Red mangrove (*Rhizophora mangle*) Black mangrove (*Avicennia germinans*) White mangrove (*Laguncularia racemosa*) Buttonwood (*Conocarpus erecta*) | Florida Natural Areas Inventory and Florida Dept. of Nat. Resources (1990), Florida Soil Conservation Service (1982), Odum *et al.* (1982), Odum and McIvor (1990), U.S. Army Corps of Engineers (1988). | Estuarine Shrub |
| **Salt Marsh** | Estuarine salt marshes are tidally flooded communities dominated by species of grasses, rushes or sedges that form along low wave-energy coastlines and river mouths. Marshes dominated by black needlerush (often in nearly pure stands) are most common growing on mud deposits flooded by high tide. They are found primarily from Apalachicola Bay south to Tampa Bay and form as much as 50 percent of Florida's salt marsh area. Smooth cordgrass is adapted to frequent tidal flooding and a saline environment. This species is prevelent in the coastal marshes along the Atlantic coast in the northeastern part of the State. | Black needlerush (*Juncus Roemerianus*) Smooth cordgrass (*Spartina alterniflora*) Seashore saltgrass (*Distichlis spicata*) Saltmeadow cordgrass (*Spartina patens*) Glasswort (*Salicornia spp.*) Saltwort (*Batis maritima*) | Carlton (1977), Dressler *et al.* (1987), Drew and Schomer (1984), Florida Natural Areas Inventory and Florida Dept. of Nat. Resources (1990), Montague and Wiegert (1990). | Estuarine Emergent |
| **Brackish Marsh** | These wetlands, composed of herbaceous species, are characterized by low or fluctuating salinity. These areas are subject to tidal influence as well as freshwater inflows such that neither estuarine nor freshwater plants attain full dominance. | Saltmeadow cordgrass (*Spartina patens*) Sea ox-eye (*Borrichia frutescens*) Saltmarsh aster (*Aster tenuifolius*) Sawgrass (*Cladium jamaicense*) Bulrushes (*Scirpus spp.*) Big cordgrass (*Spartina cynosuroides*) Marshelder (*Iva frutescens*) | Carlton (1977), Florida Natural Areas Inventory and Florida Dept. of Nat. Resources (1990), Stout (1984), Wolfe *et al.* (1988). | Estuarine or Palustrine Emergent |
| **Beach** | Sand or mud beaches are nonvegetated wetlands periodically inundated by wave action between low and high tide. The sediments are usually sand or mud. | Nonvegetated | Gore (1992) | Estuarine or Marine Intertidal Unconsolidated Shore |
| **Flats, Shoals, Bars** | Tidal flats are composed of sand or mud found in hyper-saline conditions along the coast or on the landward side of barrier islands. Shallow water sand flats become exposed at low tide. They may become sparsely vegetated by scattered succulent halophytic forbs. Oyster bars develop in low-energy tidal areas with inflows of freshwater from sources such as rivers and tidal creeks. These areas are always nonvegetated and may become completely submerged at high tide. | Nonvegetated or sparsely vegetated flats: Saltwort (*Batis maritima*) Glasswort (*Salicornia spp.*) Salt grass (*Distichlis spicata*) Sea bite (*Suaeda linearis*)  Nonvegetated, often partly submerged and dominated by the eastern oyster (*Crassostrea virginica*) | U.S. Army Corps of Engineers (1988). | Estuarine or Marine Intertidal Flats or Reefs |

**Table 2. Wetland habitat descriptions, characteristic plant species and classification designation(s) as found in this study—Continued.**

| Habitat—Community Type and Synonyms | Description | Characteristic Plant Species | References | Designation for This Study |
|---|---|---|---|---|
| | | *Coastal Zone—Continued* | | |
| **Open Water Estuary** | Deep water portion of bays, inlets or sounds | Nonvegetated | Bahr and Lanier (1981), Florida Natural Areas Inventory and Florida Dept. of Nat. Resources (1990). | Estuarine Subtidal |
| **Open Ocean** | Deep water | Nonvegetated | | Marine Subtidal |
| | | *Coastal Flats and Rolling Plain* | | |
| **Forested Wetland** | | | | |
| Cypress Ponds; Cypress Strand; Cypress Gall; Cypress Dome | Dome swamps or cypress ponds are characterized as shallow, usually circular or oval depressions dominated by cypress, black gum or tupelo. "Strands" refer to shallow elongated depressions or channels dominated by cypress trees. These wetlands are flooded for long periods during the year. They are common where high water tables and topographic depressions allow these wetlands to develop as isolated islands intermixed with pine flatwoods and pastures. | Bald cypress (*Taxodium distichum*) Pond cypress (*Taxodium ascendens*) Black gum (*Nyssa sylvatica*) Water tupelo (*Nyssa aquatica*) | Darst *et al.* (1996), Ewel and Odum (1986), Lake County Water Authority (1995). | Palustrine (Freshwater) Forested |
| Hydric Hammock; Hardwood Hammock | This forested wetland type occurs at low elevations and usually on thin soils of sand and loam over limestone. They are most common in north and central Florida and support a diversity of plant species. These wetlands flood occasionally, but for short periods of time. | American elm (*Ulmus americana*) Red maple (*Acer rubrum*) Cabbage palm (*Sabal palmetto*) Sweet bay (*Magnolia virginiana*) Sweetgum (*Liquidambar styraciflua*) Water oak (*Quercus nigra*) Laurel oak (*Quercus laurifolia*) Box Elder (*Acer negundo*) Swamp ash (*Fraxinus pauciflora*) | Florida Natural Areas Inventory and Florida Dept. of Nat. Resources (1990), Vince *et al.* (1989), Simons *et al.* (1989), Ward (1943). | Palustrine (Freshwater) Forested |
| Bayheads | Bayheads are forested wetlands with a mix of broadleaf and evergreen bay tree species. They are almost continually saturated but may be inundated with shallow water. Soils of bayhead wetlands are organic and acidic. | Loblolly bay (*Gordonia lasianthus*) Swamp bay (*Persea borbonia*) Sweet bay (*Magnolia virginiana*) Sweetgum (*Liquidambar styraciflua*) Slash pine (*Pinus elliottii*) Black gum (*Nyssa sylvatica*) Willow (*Salix spp.*) | Florida Natural Areas Inventory and Florida Dept. of Nat. Resources (1990), Lake County Water Authority (1995), U.S. Army Corps of Engineers (1988). | Palustrine (Freshwater) Forested |
| Mixed Hardwood Swamp; Floodplain Swamp; Bottomland Swamp | These forested wetlands are dominated by deciduous tree species and are found in seasonally flooded basins, on flooded soils along river or stream channels and in depressions or oxbows within river floodplains. Soils are variable mixtures of sand, organic and alluvial sediments. Seasonal and often prolonged inundation is a characteristic. | Bald cypress (*Taxodium distichum*) Red maple (*Acer rubrum*) Dahoon holly (*Ilex cassine*) Pop ash (*Fraxinus caroliniana*) Cabbage palm (*Sabal palmetto*) Black gum (*Nyssa sylvatica*) Winged elm (*Ulmus alata*) Willow (*Salix spp.*) Sweetgum (*Liquidambar styraciflua*) Water oak (*Quercus nigra*) Overcup oak (*Quercus lyrata*) Water Tupelo (*Nyssa aquatica*) Water Hickory (*Carya aquatica*) Green Ash (*Fraxinus pennsylvania*) Laurel oak (*Quercus laurifolia*) | Ewel (1990), Florida Natural Areas Inventory and Florida Dept. of Nat. Resources (1990), Ward (1943), Wolfe *et al.* (1988). | Palustrine (Freshwater) Forested |

**Table 2. Wetland habitat descriptions, characteristic plant species and classification designation(s) as found in this study—Continued.**

| Habitat—Community Type and Synonyms | Description | Characteristic Plant Species | References | Designation for This Study |
|---|---|---|---|---|
| | | *Coastal Flats and Rolling Plain—Continued* | | |
| Pine Flatwoods | Pine flatwoods may be Florida's most common ecological community. They occur on flat, poorly drained, sandy soils that are underlain by clay or hardpan. Wet pine flatwoods will have standing water for several weeks during the rainy season. In Florida, pine flatwoods may be a mixture of wetland and upland. | Long leaf pine (*Pinus palustris*) Slash pine (*Pinus elliottii*) Loblolly pine (*Pinus taeda*) Pond pine (*Pinus serotina*) | Abrahamson and Hartnett (1990), U.S. Army Corps of Engineers (1988). | Palustrine (Freshwater) Forested |
| **Shrub Wetlands** | | | | |
| Dwarf or Scrub Cypress | Dwarf or scrub cypress wetlands are found on frequently flooded rock or marl soils in south Florida. The largest concentration of these wetlands is in the Big Cypress region in the southwestern part of the State. These wetlands have low densities of stunted pond cypress with sparse understories. | Pond cypress (*Taxodium asendens*) | Duever et al. 1986, Ewel (1990), Ward (1943). | Palustrine (Freshwater) Shrub |
| Shrub Swamp | Florida's shrub wetlands are characterized by dense shrubbery in areas where the water table is close to the surface and standing water pockets are common. They often border pine flatwoods, cypress or blackgum swamp forests. | Titi (*Cyrilla racemiflora*) Black titi (*Cliftonia monophylla*) Swamp haw (*Viburnum nudum*) Swamp honeysuckle (*Rhododendron viscosum*) Buttonbush (*Cephalanthus occidentalis*) Sweet pepperbush (*Clethra alnifolia*) Willows (*Salix spp.*) Stiff Cornel (*Cornus foemina*) Alder (*Alnus serrulata*) | U.S. Army Corps of Engineers (1988), Wolfe *et al.* (1988). | Palustrine (Freshwater) Shrub |
| Shrub Bogs | There are a small number of bogs in Florida that are found around lakeshores, in dome swamps and in sink holes (generally north of Highlands County). Shrub bogs occur on peat substrate that is continually saturated. Characteristic vegetation is composed of sphagnum moss and dense evergreen shrub thickets. | Sphagnum moss (*Sphagnum spp.*) Black titi (*Cliftonia monophylla*) Pond pine (*Pinus serotina*) White cedar (*Chamaecyparis thyoides*) Buttonbush (*Cephalanthus occidentalis*) Sundew (*Drosera capillaris*) Pitcher plant (*Sarracenia minor*) | Florida Natural Areas Inventory and Florida Dept. of Nat. Resources (1990), U.S. Army Corps of Engineers (1988), Wolfe *et al.* (1988). | Palustrine (Freshwater) Shrub |
| **Freshwater Marsh** | | | | |
| Long Hydroperiod | Deep marsh—may contain more than 110 species of hydrophytic plants. | White water lily (*Nymphaea odorata*) Neverwet (*Orontium aquaticum*) Yellow lotus (*Nelumbo lutea*) Naiad (*Najas guadalupensis*) Bladderwort (*Utricularia spp.*) Pondweed (*Potamogeton spp.*) | Gunderson (1994), Hart and Newman (1995), Kushlan (1990). | Palustrine (Freshwater) Emergent |
| Moderate Hydroperiod | Shallow marsh—may contain more than 175 species of hydrophytic plants. | Cattail (*Typha spp.*) Bullrush (*Scirpus spp.*) Pickerelweed (*Pontederia lanceolata*) Arrowhead (*Sagittaria latifolia*) Spikerush (*Eleocharis spp.*) Maidencane (*Panicum hemitomon*) Fire flag (*Thalia geniculata*) Tracy's beakrush (*Rynchospora tracyi*) | | |

**Table 2.** Wetland habitat descriptions, characteristic plant species and classification designation(s) as found in this study—Continued.

| Habitat—Community Type and Synonyms | Description | Characteristic Plant Species | References | Designation for This Study |
|---|---|---|---|---|
| *Coastal Flats and Rolling Plain—Continued* | | | | |
| Short Hydroperiod | Includes swales and wet prairies, which occur in low areas throughout Florida. These wetlands are often dry for part of the year. Some wet prairies in Florida support over 320 species of herbaceous and woody hydrophytes. | Maidencane (*Panicum hemitomon*) Saw grass (*Cladium jamaicensis*) Muhly (*Muhlenbergia fillipes*) Cordgrass (*Spartina bakeri*) White-topped sedge (*Dichromena colorata*) St. John's-wort (*Hypericum fasciculatum*) Spikerush (*Eleocharis cellulosa*) | | |
| Freshwater Pond | Many manmade ponds in Florida have been created for water retention, aesthetic purposes, or agricultural use. These open water ponds may be maintained or periodically treated to be free of vegetation. Other areas such as borrow pits or excavations have filled with water over time and may be fairly deep or lack nutrients to support aquatic vegetation. Other ponds throughout the State support submerged, floating or emergent wetland vegetation. These wetlands are characteristically small (less than 20 acres or 8 ha) and hold shallow water during years of normal precipitation. | Pickerel weed (*Pontederia lanceolata*) Arrowhead (*Sagittaria latifolia*) Rushes (*Juncus spp.*) Duck weeds (*Lemna spp.*) Spatterdock (*Nuphar luteum*) Water lily (*Nymphaea odorata*) Water shield (*Brasenia schreberi*) Bladderworts (*Utricularia spp.*) | Hart and Newman (1995), U.S. Army Corps of Engineers (1988). | Palustrine (Freshwater) Unconsolidated Bottom (Ponds) |
| Springs | Florida has numerous freshwater springs which originate from artesian openings in the underground aquifer. Springs are usually clear and have sand bottoms or exposed limestone along a central channel. Many of the larger springs are used extensively for recreation particularly fishing, snorkeling, tubing, canoeing and swimming. | Southern Naiad (*Najas guadalupensis*) Tape grass (*Vallisneria americana*) Eelgrass (*Sagittaria latifolia*) Pond weed (*Zannichellia palustris*) Muskgrass (*Chara spp.*) Wild Rice (*Zizania aquatica*) | Florida Natural Areas Inventory (1990) and Florida Dept. of Nat. Resources (1990), Nordlie (1990). | Palustrine (Freshwater) Unconsolidated Bottom or Palustrine Emergent |





Everglades National Park

*A canal in the Everglades.*



*Rookery Bay National Estuarine Research Reserve.*

Rookery Bay National Estuarine Research Reserve

# Results: Status, Distribution and Trends

This study estimated that in 1996 there were 11.4 million acres (4.6 million ha) of wetlands in Florida. Wetlands occupied approximately 29 percent of the area of the State, a greater percentage of the land surface than any other state in the conterminous United States (Dahl 1990). The bulk (90 percent) of Florida's wetlands by area were freshwater systems. The remaining 10 percent were marine or estuarine intertidal wetlands. About 56 percent of the original wetland area of Florida remained in 1996 (Figure 12). Wetland data for Florida from 1985 to 1996 are presented in Appendix B, and are summarized in Table 3.

The estimated average annual rate of wetland loss was 5,000 acres (2,030 ha) between 1985 and 1996. This was an 81 percent decline in the annual rate of loss as reported for the 1970s to 1980s (Figure 13). Between 1985 and 1996, estimated wetland losses in Florida made up about 12 percent of the total National wetland loss.

Results from this study indicated that 11.5 percent of Florida's wetlands were located within the coastal zone physiographic region. The majority of wetlands, by area, were within the Gulf-Atlantic Coastal Flats (82.7 percent) and smaller percentage (5.8 percent)



*Figure 12. Original wetland area in Florida and estimated remaining portion.*

were located in the Rolling Plain physiographic region (Table 4).

Urban and rural development accounted for an estimated 72 percent of the total estimated loss. Agriculture was attributed with the remaining 28 percent of the losses (Figure 14). Small gains in wetland were attributed to upland forest plantations, the "other" uplands category and from deepwater.

Florida also had an estimated 4.3 million acres (1.8 million ha) of deepwater lakes.



*Pond created by mineral extraction.*



*Figure 13. Average annual net wetland loss in Florida (Sources: Hefner 1986, Frayer and Hefner 1991, this study).*

*Figure 14. Net loss of wetlands to uplands, 1985 to 1996.*



**Table 3. Change in wetland area for selected wetland and deepwater categories, 1985 to 1996. The coefficient of variation (CV) for each entry (expressed as a percentage) is given in parentheses.**

| Wetland/Deepwater Category | Estimated Area, 1985 | Estimated Area, 1996 | Change, 1985–96 | Change (in Percent) |
|---|---|---|---|---|
| **Intertidal Habitats** | | | | |
| Marine Intertidal | 27.5 (38.1) | 26.5 (38.3) | -1.0 (*) | -3.6 |
| Estuarine Intertidal Nonvegetated[1] | 183.4 (20.8) | 179.8 (20.8) | -3.5 (*) | -1.9 |
| Estuarine Intertidal Vegetated[2] | 926.7 (10.7) | 930.7 (10.7) | 4.0 (63.1) | 0.4 |
| All Intertidal Wetlands | 1,137.6 (9.3) | 1,137.1 (9.3) | -0.5 (73.0) | <-0.1 |
| **Freshwater Habitats** | | | | |
| Freshwater Nonvegetated[3] | 201.4 (7.7) | 240.6 (7.4) | 39.2 (24.3) | 19.5 |
| Freshwater Vegetated[4] | 10,085.5 (3.9) | 9,994.2 (3.9) | -91.3 (46) | -0.9 |
| Freshwater Emergent | 2,897.1 (9.6) | 2,636.9 (9.9) | -260.2 (26.7) | -9.0 |
| Freshwater Forested | 5,543.7 (4.8) | 5,566.2 (5.0) | 2.5 (*) | -2.3 |
| Freshwater Shrub | 1,644.7 (9.3) | 1,791.1 (8.7) | 146.4 (80.8) | 6.6 |
| All Freshwater Wetlands | 10,085.5 (3.8) | 10,234.8 (3.8) | -52.1 (80.2) | -0.5 |
| **All Wetlands** | 11,424.5 (3.6) | 11,371.9 (3.5) | -52.6 (79.7) | -0.5 |
| **Deepwater Habitats** | | | | |
| Lacustrine[5] | 1,696.2 (16.6) | 1,676.4 (16.7) | -19.8 (*) | -1.2 |
| Riverine | 135.3 (32.5) | 136.7 (32.3) | 1.4 (60.6) | 1.0 |
| Estuarine Subtidal | 2,504.7 (5.4) | 2,530.1 (5.3) | 25.4 (94.9) | 1.0 |
| All Deepwater Habitats | 4,336.2 (7.2) | 4,343.2 (7.1) | 7.0 (*) | 0.2 |
| **All Wetlands and Deepwater Habitats[1,2]** | 15,760 (2.7) | 15,715.1 (2.7) | -45.6 (*) | -0.3 |

* Statistically unreliable
[1] Includes the categories: Estuarine Intertidal Unconsolidated Shore.
[2] Includes the categories: Estuarine Intertidal Emergent and Estuarine Intertidal Shrub.
[3] Includes the categories: Palustrine Aquatic Bed, Palustrine Unconsolidated Bottom and Palustrine Unconsolidated Shore.
[4] Includes the categories: Palustrine Emergent, Palustrine Forested and Palustrine Shrub.

**Table 4. Estimated acreage of wetlands within the physiographic regions of Florida, 1996.**

| Wetland Category | 1996 Area | | Percent CV |
| --- | --- | --- | --- |
| | Acres | Hectares | |
| **Coastal Zone** | | | |
| Freshwater Wetlands | | | |
| Freshwater forested | 73,430 | 29,717 | 26.3 |
| Freshwater shrub | 42,742 | 17,298 | 21.9 |
| Freshwater emergent | 57,827 | 23,402 | 37.1 |
| Freshwater unconsolidated shore | 69 | 28 | 67.1 |
| Freshwater unconsolidated bottom | 14,224 | 5,756 | 17.6 |
| Freshwater aquatic bed | 608 | 246 | 58.4 |
| Total Freshwater wetland area for region | 188,900 | 76,447 | 19.4 |
| Intertidal Wetlands | | | |
| Estuarine intertidal shrub | 614,930 | 248,859 | 13.7 |
| Estuarine intertidal emergent | 291,466 | 117,955 | 17.3 |
| Estuarine intertidal unconsolidated shore | 179,674 | 72,713 | 20.8 |
| Total Estuarine wetland area for region | 1,086,070 | 439,527 | 9.6 |
| Marine intertidal | 28,855 | 10,463 | 39.1 |
| Total Marine wetland area for region | 25,855 | 10,463 | 39.1 |
| Total wetland area for region | 1,300,825 | 526,437 | 8.3 |
| **Gulf-Atlantic Coastal Flats** | | | |
| Freshwater Wetlands | | | |
| Freshwater forested | 4,975,550 | 2,013,577 | 5.5 |
| Freshwater shrub | 1,682,972 | 681,090 | 9.2 |
| Freshwater emergent | 2,524,909 | 1,021,817 | 10.3 |
| Freshwater unconsolidated shore | 8,356 | 3,382 | 31.0 |
| Freshwater unconsolidated bottom | 174,100 | 70,457 | 9.0 |
| Freshwater aquatic bed | 15,659 | 6,337 | 21.2 |
| Total Freshwater area for region | 9,381,546 | 3,796,660 | 4.1 |
| Intertidal Wetlands | | | |
| Estuarine intertidal shrub | 1,378 | 558 | 55.0 |
| Estuarine intertidal emergent | 22,933 | 9,281 | 79.0 |
| Estuarine intertidal unconsolidated shore | 245 | 99 | 59.6 |
| Total Estuarine wetland area for region | 24,556 | 9,938 | 75.5 |
| Marine intertidal | 606 | 245 | 98.2 |
| Total Marine wetland area for region | 606 | 245 | 98.2 |
| Total wetland area for region | 9,406,708 | 3,806,843 | 4.1 |
| **Gulf-Atlantic Rolling Plain** | | | |
| Freshwater Wetlands | | | |
| Freshwater forested | 517,266 | 209,335 | 10.2 |
| Freshwater shrub | 65,411 | 26,472 | 21.8 |
| Freshwater emergent | 54,176 | 21,925 | 25.8 |
| Freshwater unconsolidated shore | 579 | 234 | 54.7 |
| Freshwater unconsolidated bottom | 23,026 | 9,318 | 15.4 |
| Freshwater aquatic bed | 3,986 | 1,613 | 31.1 |
| Total Freshwater area for region | 664,444 | 268,897 | 9.6 |
| Total wetland area for region | 664,444 | 268,897 | 9.6 |

# Intertidal Marine and Estuarine Wetlands

## Status and Distribution:

This study estimated there were slightly more than 1.1 million acres (460,300 ha) of marine and estuarine wetlands, comprising 10 percent of the area of all wetlands in Florida. This included an estimated 314,400 acres (127,290 ha) of estuarine emergent or saltmarsh wetlands, 616,300 acres (249,510 ha) of estuarine shrubs and 206,400 acres (83,560 ha) of estuarine and

marine nonvegetated wetlands. Nonvegetated wetlands were commonly referred to as shores, sand or mud flats, bars and shoals.

The approximate distribution and abundance of estuarine emergent wetlands along Florida's coast line is shown in Figure 15. These saltmarsh habitats were found in embayments, estuaries and behind coastal barriers along the Atlantic seaboard and the Gulf of Mexico. Saltmarsh vegetation was sparse or absent along the shorelines of Sarasota County, the Florida Keys and the highly urbanized areas of Palm Beach, Broward and northern Dade counties. Saltmarshes were more extensive in the "Big Bend" region

of Apalachicola Bay and along the coastal inlets of Nassau and Duval counties in the northeast portion of the State.

In 1996, there were an estimated 616,300 acres (249,400 ha) of estuarine shrub wetlands in Florida. The estuarine shrubs were comprised of halophytic trees and shrubs growing in brackish or saline tidal waters. This category was dominated by species of mangroves (*Rhizophora mangle, Avicennia germinans and Laguncularia racemosa*).[2] Mangroves represented subtropical or tropical intertidal

[2]This study did not differentiate distribution or extent at the species level.



**Cover of Estuarine Emergents, in Percent**

- <5
- 5–9
- 10–19
- 20–49
- 50

*Figure 15. Distribution of estuarine emergent wetland in Florida, 1996.*

communities that tolerated very little or no frost (Tomlinson 1986). They were most common in the subtropical portions of the State particularly south of Charlotte Harbor, in the Ten Thousand Islands area and along Florida Bay (Figure 16). Less dense stands of estuarine shrubs were found in Biscayne Bay, the Indian River Lagoon, Tampa Bay, Ponce de Leon Inlet and Homosassa Bay. The occurrence of estuarine shrubs was observed extending as far north as the St. Mary's River Inlet and Apalachee Bay, however, these areas may have contained salt tolerant shrub species other than mangroves.

Almost all (97.8 percent) estuarine wetlands were located in the Coastal Zone. However, some estuarine emergent, shrub and nonvegetated wetlands extended into the Coastal Flats physiographic region (2.2 percent). This occurred primarily along tidal rivers and salt water canal systems.

Florida's coastal zone contained about 21 percent of all estuarine and marine wetlands and 92 percent of the estuarine shrub wetlands found in the conterminous United States. Whereas, only 8 percent of all estuarine emergent (salt marsh) wetlands were found along the State's coast lines (Table 5). An estimated 31 percent of all nonvegetated estuarine and marine habitats within the conterminous United States were found in Florida.

The mean size of emergent salt marsh wetlands and estuarine shrub wetlands within the sample sites were slightly less than 23 acres (9 ha). The estuarine nonvegetated wetlands sampled averaged just over 10 acres (4 ha) (Table 6).

Although much of Florida's population lives along or close to the coastline, less than 10 percent of the marine and estuarine wetlands sampled were located within or adjacent to urban areas (Figure 17).



**Occurrence of Estuarine Shrubs**

Present or Sparse

Some Estuarine Shrubs

Shrubs More Common

*Figure 16. Distribution of estuarine shrub wetland in Florida, 1996.*

**Table 5. Comparison of marine and estuarine wetland area for Florida and the conterminous United States. (Sources: Dahl 2000; this study.)**

| Wetland Category | Conterminous U.S. 1986–97 (Thousands of Acres) | | Florida Area 1996 (in Acres) | Florida Trend (in Percent) | Florida Area as Percentage of National Totals |
|---|---|---|---|---|---|
| | 1997 Area | Trend (in Percent) | | | |
| Marine Intertidal | 130.9 | –2.2 | 26.5 | –3.6 | 20.2 |
| Estuarine Nonvegetated | 580.1 | –0.3 | 179.9 | –1.9 | 31.0 |
| Estuarine Emergent | 3,942.4 | –14.5 | 314.4 | –0.6 | 8.0 |
| Estuarine Shrub | 672.8 | +6.6 | 616.3 | +1.0 | 91.6 |

**Table 6. Mean area and size range of individual estuarine wetlands within sample units in Florida, 1996.**

| Wetland Category | Mean Acres (Hectares) | Range, in Acres (Hectares) |
|---|---|---|
| Estuarine Shrub | 22.8 (9.2) | .02 to 2,500 (.008 to 1,013) |
| Estuarine Emergent | 22.9 (9.3) | .02 to 1,225 (.008 to 508) |
| Estuarine Flats/Bars | 10.1 (4.0) | .05 to 1,021 (.02 to 414) |



*Figure 17. Proximity of urban areas to Florida's wetlands, 1996.*

39

*Nov. 2, 2020 Comment Letter to the U.S. Environmental Protection Agency from Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper re: Florida's Request To Assume Administration of a Clean Water Act Program [EPA-HQ-OW-2018-0640-0001]*

# EXHIBIT 3.b

## Trends from 1985 to 1996

Marine and estuarine nonvegetated wetlands declined by an estimated 4,500 acres (1,820 ha) between 1985 and 1996. Most of these losses were believed to have been the result of coastal erosion and storms.

Estuarine vegetated wetlands, which combined estuarine emergents and shrubs, increased slightly during this study period. Although estuarine emergents declined in area by about 1,800 acres (730 ha), this was overshadowed by increases in estuarine shrub wetlands yielding a net gain for the estuarine vegetated category as seen in Table 7. Estuarine shrubs increased by an estimated 5,800 acres (2,350 ha). Overall, intertidal estuarine vegetated wetlands increased by approximately 4,000 acres (1,620 ha) between 1985 and 1996.

Intertidal nonvegetated losses were ameliorated by the estuarine

vegetated wetland gains. Florida's intertidal wetlands sustained a net loss of 500 acres (200 ha) or less than 1 percent during this study period. Frayer and Hefner (1991) reported a net decline of 2,900 acres (1,170 ha) to all marine and estuarine wetlands from the 1970s and 1980s. Compared with the results of this study there was an 83 percent decline in the loss rate of marine and estuarine wetlands.

Long-term trends in intertidal wetland types are shown in Figure 18.

## Attribution of Losses and Conversions —Marine and Estuarine Wetlands

The area of marine and estuarine wetland lost to uplands is shown in Table 8. The loss of 17 acres (7 ha) of estuarine emergent wetland to upland was statistically insignificant. Seventy-five percent of the estuarine shrub losses were attributable to

some form of coastal development. This may have involved construction of bridges, roadways, urban or suburban development or infrastructure. Twenty percent of the estuarine shrub losses were attributed to agriculture and 5 percent were due to other unidentified upland land uses.

Seventy-one percent of the losses to estuarine shores were attributed to urban expansion along the coast. The remaining 29 percent of the loss to upland from this category was due to expansion of other unidentified types of upland land use.

The conversion of marine and estuarine wetlands to deepwater habitats involved losses to open water bay bottoms (deep water estuaries), or open ocean.

## Table 7. Changes in estuarine and marine intertidal wetlands, 1985 to 1996. The coefficient of variation (CV) for each entry (expressed as a percentage) is given in parentheses.

| Wetland Category | Area in Thousands of Acres | | | |
| --- | --- | --- | --- | --- |
| | Estimated Area, 1985 | Estimated Area, 1996 | Gain or Loss, 1985–96 | Area (as Percentage) of All Intertidal Wetland, 1996 |
| Nonvegetated | | | | |
| Marine Intertidal | 27.5 (38.1) | 26.5 (38.3) | −1.0 (*) | 2.3 |
| Estuarine Intertidal Nonvegetated | 183.4 20.8 | 179.9 20.8) | −3.5 (*) | 15.8 |
| Vegetated | | | | |
| Estuarine Emergent | 316.2 (17.2) | 314.4 (17.0) | −1.8 (*) | 27.7 |
| Estuarine Shrub | 610.5 (13.7) | 616.3 (13.7) | 5.8 (83.8) | 54.2 |
| Estuarine Intertidal Vegetated1 | 926.7 (10.7) | 930.8 (10.7) | 4.0 (63.1) | 81.9 |
| Net Intertidal Change | 1,137.6 | 1,137.1 | −0.5 | 100 |

*Statistically unreliable

1Includes the category: Estuarine Unconsolidated Shore.

1Includes the categories: Estuarine Emergent and Estuarine Shrub.

**Table 8.** Changes in marine and estuarine intertidal wetlands, 1985–96.

| Wetland Category | Percentage of All Intertidal Wetland in Florida, 1996 | Change, 1985–96, in Percent | Acres | | Change as Percentage of Intertidal Gross Change |
| --- | --- | --- | --- | --- | --- |
| | | | Area Lost to Upland | Area Converted to Deepwater | |
| Marine Intertidal | 2.3 | –4.0 | 0 | 657 | 6.5 |
| Estuarine Nonvegetated | 15.8 | –1.9 | 249 | 6,561 | 67.8 |
| Estuarine Emergent | 27.7 | –0.6 | 17 | 290 | 3.1 |
| Estuarine Shrub | 54.2 | 1.0 | 2,185 | 90 | 22.6 |
| **Gross Change to Intertidal Wetlands** | | | 2,451 | 7,598 | 100 |





*Figure 18. Long term trends of intertidal wetland types in Florida, 1950s to 1996.*

# Freshwater Wetlands

## Status and Distribution

In 1996, there were an estimated 10.2 million acres (4.1 million ha) of freshwater (palustrine) wetlands that comprised 90 percent of all wetland area in the State. An estimated 98 percent were vegetated the remaining 2 percent were open water ponds. Nationwide, Florida had an estimated 10.2 percent of all freshwater wetlands in the conterminous United States.

Of these freshwater wetlands, there were an estimated 5.6 million acres (2.3 million ha) of forested wetlands, 1.8 million acres (725,000 ha) of shrubs, 2.6 million acres (1.1 million ha) of emergent wetlands or marshes and 241,000 acres (98,000 ha) of freshwater ponds. Almost 92 percent of these wetlands were located in the Coastal Flats physiographic region of the State.

Freshwater forested wetlands were distributed throughout the State excluding much of the Everglades and the Florida Keys. Forested wetlands were sparse in Pinellas, Marion, Suwanee, Hendry, Glades and Okeechobee counties. Forested wetlands were most dense in the Fakahatchee Strand and Big Cypress Preserve areas of Collier County, and the Big Bend counties of Levy, Dixie, Taylor, Jefferson, Wakulla, Franklin and Gulf. Bottomlands adjacent to river and stream systems and the wet pine flatwood areas of the Florida Panhandle also contained moderate numbers of forested wetlands. Pockets of forested swamps also occurred in Volusia County east of Lake George, the Green Swamp area of Polk County and around Blue Cypress Lake in Indian River County.

Freshwater emergent wetland distribution was concentrated in what was the historic Everglades ecosystem, extending from Lake Okeechobee through the Everglades National Park including the western margins of St. Lucie and Martin Counties. Emergent marshes and wet prairies were also prevalent in DeSoto and Charlotte Counties. The Kissimmee River system in Okeechobee and Osceola Counties as well as the St. John's River system in Volusia, Brevard and Indian River Counties supported considerable emergent wetlands as did Sumpter



Sawgrass Lake, Florida.

and Lake Counties in central Florida.

Few freshwater wetlands were found within the Coastal Zone physiographic region. These occurred in the interior portions of barrier islands, and where rivers flowed into coastal estuaries. Less that 2 percent of Florida's freshwater wetlands were located in this coastal stratum (Table 9).

The Coastal Flats contained most of the freshwater wetlands in Florida. Almost 90 percent of the forested wetlands, 94 percent of the freshwater shrubs and nearly 96 percent of freshwater emergent marshes were in the Coastal Flats.

A small percentage of freshwater shrubs and emergents was found in the Rolling Plain. Some forested wetlands (about 9 percent) were also found in this physiographic region.

The size of freshwater wetlands contained within the sampling of this study indicated forested wetlands had a mean size larger than shrubs or emergent wetlands (Table 10). Forested wetlands were 17.7 acres (7 ha) with emergent marshes and shrub wetlands 9.9 acres (4 ha) and 7.1 acres (3 ha) respectively. The mean size of freshwater ponds identified in this study was 1.7 acres (0.7 ha).

There was a noticeable difference in the type of freshwater wetland found within or adjacent to urban areas in Florida. About 25 percent of the forested wetlands sampled were in urban settings, whereas less than 3 percent of freshwater shrub wetlands and 5 percent of the emergent wetlands occurred in urban areas.

## Trends from 1985 to 1996

Florida's freshwater wetlands declined by an estimated 52,000 acres (21,100 ha) or 0.5 percent between 1985 and 1996. This was an average annual net loss of 4,740 acres (1,920 ha). The average annual rate of freshwater wetland loss had declined 82 percent since the 1970s to the 1980s.

Freshwater vegetated wetlands declined by an estimated 91,000 acres (36,800 ha) or 0.9 percent. Freshwater emergent wetlands exhibited the largest losses declining by an estimated 260,000 acres (10,500 ha) or 9.0 percent (Table 11).

## Table 9. Distribution of freshwater wetland types by physiographic region in Florida, 1996.

| Physiographic Region | Estimated Area in Acres (Hectares) | Percent CV[1] | Percentage of Total Freshwater Wetland |
|---|---|---|---|
| Gulf-Atlantic Rolling Plain | 66,444 (268,897) | 9.6 | 6 |
| Gulf-Atlantic Coastal Flats | 9,381,546 (3,796,660) | 4.1 | 92 |
| Coastal Zone | 188,900 (76,447) | 19.4 | 2 |
| **Total Freshwater Wetland** | **10,234,890 (4,142,003)** | **3.8** | **100** |

[1] Percent coefficient of variation is expressed as (standard error/mean)*100.

## Table 10. Mean area and size range of individual freshwater wetlands within sample units in Florida, 1996.

| Wetland Category | Mean Acres (Hectares) | Range in Acres (Hectares) |
|---|---|---|
| Freshwater Forested | 17.7 (7.2) | .02 to 2,554 (.008 to 1,034) |
| Freshwater Shrub | 7.1 (2.9) | .02 to 2,339 (.008 to 947) |
| Freshwater Emergent | 9.9 (4.0) | .02 to 2,5571 (.008 to 1,036) |
| Freshwater Ponds | 1.7 (0.7) | .03 to 1432 (.012 to 58) |
| Other Miscellaneous Freshwater Types | 2.0 (0.8) | .02 to 80 (.008 to 32) |

The upper size limit was restricted by sample plot size.

The upper size limit reflected the area of ponds connected in series.

Freshwater ponds increased in area by over 39,000 acres (15,800 ha), almost 20 percent. Forested wetland area increased slightly (0.4 percent) while shrub wetlands increased by an estimated 8.9 percent. These gains largely overshadowed the losses of freshwater emergents wetlands.

Long term trends in freshwater wetland types indicated that freshwater ponds continued to increase over time. Freshwater forested wetlands reversed a long term trend and sustained a net gain in area, while emergent wetlands continued to decline (Figure 19).

### Attribution of Losses and Conversions —Freshwater Wetlands

Net losses of freshwater wetland between 1985 and 1996 were attributed to rural development,

urban development and agriculture (Figure 20). Small net gains were recorded from silviculture and the "other uplands" land use categories.

Loss of wetlands to urban and rural development involved drainage for homes, resorts, golf courses, industry, roads, bridges and other infrastructure. Urban and rural development activities accounted for an estimated 72 percent of the net wetland losses.

Agriculture accounted for an estimated 28 percent loss of freshwater wetlands. Primarily in south Florida, where emergent wetlands were converted to citrus production, horticulture, growing landscape or other ornamental plants, greenhouses, sod farms and other uses. The net losses attributed to agriculture declined by 79 percent compared to the estimated losses

attributed to agriculture during the 1970s to 1980s.

## Freshwater Lakes and Reservoirs

About 49,000 acres (19,800 ha) of freshwater lakes were created from uplands between 1985 and 1996. Despite these gains, lacustrine deepwater areas experienced a net decline of 19,700 acres (8,000 ha), or 1.2 percent. The loss of deepwater habitats to freshwater wetlands helped offset wetland losses to upland land uses.

**Table 11. Changes in freshwater wetlands, 1985 to 1996. The coefficient of variation (CV) for each entry (expressed as a percentage) is given in parentheses.**

| Wetland Category | Area in Thousands of Acres | | | |
|---|---|---|---|---|
| | Estimated Area, 1985 | Estimated Area, 1996 | Change, 1985–96 | Change (in Percent) |
| Freshwater Vegetated Wetlands | | | | |
| Freshwater Forested | 5,543.7 (4.8) | 5,566.2 (5.0) | 22.5 (*) | 0.4 |
| Freshwater Shrub | 1,644.76 (9.3) | 1,791.1 (8.7) | 146.5 (80.8) | 8.9 |
| Freshwater Emergent | 2,897.1 (9.6) | 2,636.9 (9.9) | –260.3 (26.7) | –9.0 |
| All Freshwater Vegetated Wetlands | 10,085.5 (3.9) | 9,994.2 (3.9) | –91.3 (46) | –0.9 |
| Freshwater Nonvegetated Wetlands | | | | |
| Ponds* | 195.1 (7.9) | 231.6 (7.5) | 36.5 (25.1) | 18.7 |
| Miscellaneous Types | 6.3 (19.6) | 9.0 (28.9) | 2.7 (86.2) | 42.9 |
| All Freshwater Nonvegetated Wetlands | 201.4 (7.7) | 240.6 (7.4) | 39.2 (24.3) | 19.5 |
| **All Freshwater Wetlands** | **10,286.9 (3.8)** | **10,234.8 (3.8)** | **–52.1 (80.2)** | **–0.5** |

*Statistically unreliable.

Includes the categories Freshwater Aquatic Bed and Freshwater Unconsolidated Bottom.

44



Figure 19. Long term trends of freshwater wetland types in Florida, 1950s to 1996.



Figure 20. Net losses and gains of wetlands to various land use types, 1985 to 1996.

45

# Discussion

## *Intertidal Marine and Estuarine Wetlands*

Three major categories of estuarine and marine wetlands were included in this study: estuarine intertidal emergents (salt and brackish water marshes), estuarine shrubs (mangrove swamps or mangles and other salt tolerant woody species), and estuarine and marine intertidal nonvegetated wetlands. This later category included exposed coastal beaches subject to tidal flooding, as well as sand bars, tidal mud flats, shoals, and sand spits.

In 1996, Florida had an estimated 1.1 million acres (460,300 ha) of marine and estuarine wetlands. Twenty-one percent of all intertidal wetlands in the conterminous United States were found in Florida. While only 8 percent of the estuarine salt marsh vegetation in the lower 48 States was found along Florida's coastline, the State harbored over 91 percent of the estuarine shrub habitat of the Nation.

Less than 1 percent of Florida's wetland losses between 1985 and 1996 were intertidal wetlands. During previous eras, development along the Gulf and Atlantic coast was probably at the expense of wetlands and open land (Lynch *et al.* 1976; Lins 1980). Because



Figure 21. Jupiter Inlet, Florida, 1997. (Photo courtesy of NOAA).

Figure 22. Lauderdale by the Sea. (Photo courtesy of NOAA.)

intertidal wetlands often occupy prime scenic locations immediately along the coastline, in the past, many were developed for residential and resort communities (Figure 21). Other studies have indicated that as of 1995, over 60 percent of Floridians lived within 5 miles of the coast (Florida Coastal Management Program 1999a). However, since then, most of Florida's shoreline habitats have been protected either by regulation or through public ownership. These mechanisms in combination with continued outreach and educational efforts have been responsible for reducing intertidal wetland losses between 1986 and 1997.

Although the net loss of marine and estuarine wetland was small, in the estuarine environment there were important changes. An estimated three times as much estuarine wetland was converted to deepwater than was lost to upland. The conversion to deepwater primarily affected nonvegetated intertidal wetlands as a result of scouring, sediment movement, or shifts of sand or mud substrates resulting from dredging, coastal storms, wave action, or water currents.

# Nonvegetated Marine and Estuarine Wetlands

Nonvegetated intertidal wetlands included sand and mud flats, beaches flooded by the tides at regular intervals and shallow water features such as sand bars and shoals. It was estimated that there were more than 206,000 acres (83,600 ha) of marine and estuarine nonvegetated wetlands in 1996 than there were in 1985.

Intertidal flats were nonvegetated (or sparsely vegetated) saline areas that were inundated during high tides or storms. These flats were usually composed of sand or mud and were found scattered along Florida's coastline. When flooded with shallow water, sand flats provided habitat for sport fish such as the sand sea trout (*Cynoscion arenarius*), bonefish (*Albula vulpes*), tarpon (*Magalops atlanticus*), snook (*Centropomus undecimalis*), and red drum (*Sciaenops ocellatus*). Exposed flats of sand or mud provided habitat

for many organisms important to intertidal food web such as polychaete worms, crustaceans, mollusks and amphipods (Livingston 1990).

Florida's sand beaches have provided considerable recreational, commercial and aesthetic benefits to people (Figure 22). This wetland type has also been important to unique wildlife species. For example, the green sea turtle (*Chelonia mydas*) and the loggerhead sea turtle (*Caretta caretta*) use sandy beaches for nesting sites. The highest nest densities of loggerhead turtles have been found in southern Broward County from Cape Canaveral to Sebastian Inlet (Hopkins and Richardson 1984). Florida beaches have also been important as nesting habitats for several species of shore birds (Johnson and Barbour 1990).

The constant movement of sediment and water resulting from tidal influences, wave action and coastal storms, made these wetlands dynamic. The erosion and accretion of sand or mud was a continual process in response to the number and severity of coastal



*The loggerhead sea turtle (Caretta caretta) uses sandy beaches for neting. A tracking device was attached to this turtle before it returned to the sea. (Ron Hagerty)*

storms, wind and wave action, and currents. Coastal storm frequency and strength may have modified the rates of sediment deposition and erosion (Williams et al. 1999). By scouring away sand flats or bars, or depositing sand to create or elongate sand spits and shallow water shoals, coastal storms had the potential to reconfigure long stretches of shoreline.

Dredging, placement of fill, beach renourishment or construction of shoreline armorment also has affected coastal sediments in shallow water environments. Coastal armoring including the construction of sea walls, jetties, bulkheads, stabilization of shorelines or protecting inlets may have exacerbated or relocated some of the coastal erosion processes (Bergquist 1996).

Florida had an estimated 206,400 acres (38,560 ha) of marine and estuarine nonvegetated wetland in 1996. Frayer and Hefner (1991) reported that Florida had experienced a net gain of 4,000 acres (1,620 ha) in nonvegetated intertidal wetland from the 1970s to the 1980s. Results from this study estimated a net loss of 4,500 acres (1,820 ha) of nonvegetated intertidal wetland between 1985 and 1996. This trend corresponded with data collected between 1989 and 1993 that indicated an increase in shoreline erosion of nearly 7 percent in Florida (Florida Coastal Management Program 1999a). Certain segments of Florida's coastline exhibited erosion and accretion of sediments between 1985 and 1996 (Figure 23). These types of intertidal wetlands have demonstrated temporal changes in the past. The long term trends indicated an overall reduction in the losses that were reported for nonvegetated intertidal wetlands from the 1950s to 1970s.

# Estuarine Emergent Wetlands

Estuarine emergent (saltmarsh) vegetation occurred along low energy shorelines often behind barrier islands or within embayments and tidal river systems. Estuarine emergent marshes were typified by salt-tolerant plants periodically flooded by tidal waters (Cowardin et al. 1979). Researchers have found plant species vary depending on location (Carlton 1977; Duever et al. 1982; Montague and Wiegert 1990). Those found along the Atlantic coast in Nassau, Duval and St. Johns counties for example, were dominated by smooth cordgrass (Spartina alterniflora). Whereas, salt marshes along the Gulf of Mexico (Dixie, Levy and Taylor counties) were generally dominated by black needle rush



Figure 23. Loss and gain of Florida's estuarine non-vegetated wetlands, 1985 to 1996.

Loss Due to Erosion or Subsidence

Gain Due to Accretion or Deposition

(*Juncus roemerianus*) as shown in Figure 24.

The ecological value of estuarine salt marsh wetlands has been well documented (Livingston 1984, Montague and Wiegert 1990). These wetlands were important as nursery areas for fishes, shellfish, crustaceans and other benthic organisms. Salt marshes also provided valuable habitat for birds and other wildlife, help transport valuable nutrients, prevent erosion and buffer the impacts of coastal storms.

Salt marsh vegetation accounted for less than one third of the estimated intertidal wetlands in Florida in 1996. There were an estimated 314,000 acres (127,290 ha). These marshes decreased by an estimated 1,800 acres (730 ha) or 0.6 percent between 1985 and 1996. This continued a downward trend that has been documented since the 1950s, albeit the rate of decline has slowed considerably. Only modest

losses to upland land use (17 acres or 7 ha) and deepwater systems (290 acres or120 ha) were observed.

Estuarine salt marsh was lost to deepwater where the vegetation was scoured or buried by sediments, or was washed away by rising water or turbulent wave action. Without sufficient support around the plant base and root structures, vegetation fragmented and washed away. This occurred along the coast lines of Citrus and Hernando counties. Statewide this was only a minor cause for the decline in salt marsh,



*Mashes Island County Park, Wakulla County, Florida.*

accounting for only 3 percent of estuarine salt marsh decline.

Modest estuarine salt marsh gains were observed in the counties of Wakulla and Taylor along the Gulf Coast and, Duval and St. John's County along the Atlantic. These gains helped offset losses of salt marsh that occurred elsewhere in the State.

The major factor in the net decline of salt marsh wetlands was the conversion to estuarine shrubs primarily along the Gulf coast in Sarasota, Charlotte, Lee, Collier, Monroe and south Dade counties.





*Figure 24. Estuarine salt marsh of north Florida dominated by black needlerush (Juncus roemerianus), 1994.*

# Estuarine Shrub Wetlands

The most notable component of the estuarine shrub category were the mangroves (Figure 25). Florida has always been the primary location of mangrove wetlands in the United States. Mangrove species are uniquely adapted to saline environments and ecologically, mangroves have supported a diversity of wildlife (Odum and McIvor 1990). Mangrove communities and surrounding waters of south Florida support more than 220 species of fish, 24 species of reptiles and amphibians, 18 mammals and 181 bird species (U.S. Fish and Wildlife Service 1996). Other values of mangrove wetlands include exporting organic matter to coastal food chains, stabilizing shorelines and protecting inland areas from hurricane damage (Mitsch and Gosselink 1993).

The geographic extent of mangroves has been influenced by cold temperatures, hurricanes, and human induced stressors (Spalding *et al.* 1997). There has been general agreement among researchers that the greatest concentrations of mangroves occurred along the southern tier of counties including Lee, Collier, Monroe and Dade (U.S. Fish and Wildlife Service 1996, Spalding et al. 1997, Wilson 1998).



*Figure 25. Mangroves and surrounding waters of Florida Bay, 1991.*

Spalding *et al.* (1997) also noted that large expanses of mangroves occurred in protected areas such as Everglades National Park. Results from this study have also indicated a close relationship between mangrove wetland distribution in south Florida and Federal or State designated conservation areas (Figure 26). Conversely, only 7 percent of all estuarine shrub wetlands were associated with urban areas.

Occurrences of estuarine shrub wetlands in north Florida may have included woody species other than mangroves. Mitsch and Gosselink (1993) indicated that the northern-most extent of black mangrove (*A. geminans*) occurred at about 30 degrees N. latitude. Although scattered stands of mangrove shrubs have been found along the north coast of the Gulf of Mexico (Odum and McIvor 1990), these wetlands have been exposed to freezing temperatures that greatly reduced their number and distribution. Other salt-tolerant or invasive woody plants in these northern wetlands included false willow (*Baccharis angustifolia*), saltbush (*Baccharis halimifolia*), buttonwood (*Conocarpus erectus*), bay cedar (*Suriana maritina*) and Brazilian pepper (*Schinus terebinthifolius*).

## Occurrence of Estuarine Shrubs

- Present or Sparse
- Some Estuarine Shrubs
- Shrubs More Common
- Conservation Areas



*Figure 26. Mangroves were concentrated within Federal, State and other conservation lands along Florida's Gulf Coast, 1996.*

Estuarine shrub area increased in Florida from 610,500 acres (247,170 ha) to 616,300 acres (249,510 ha) between 1985 and 1996. Historically, thousands of acres of mangroves were destroyed by dredging, ditching, diking or filling wetlands along Florida's coastline (Patterson 1986; Odum and McIvor 1990). There has also been ongoing controversy over continued development of golf courses and residential housing along marginal mangrove habitats (Twilley 1998). Specific legal protection for mangrove wetlands was enacted by the State in 1985. This, in combination with mangrove restoration and conservation practices, such as restrictive removal and pruning, has helped increase the extent of mangroves in south Florida (Figure 27). This has resulted in slight increases in estuarine shrub wetland area.

A contributing factor that accounted for increased estuarine shrub area, was the invasion and establishment of exotic shrub species within and bordering estuarine wetlands. Brazilian pepper (*Schinus terebinthifolius*) for example, was capable of establishment in a broad range of hydrologic conditions including intertidal mangroves (McCann *et al.* 1996). When viewed from aerial photography, monospecific stands of this invasive species appeared within the intertidal zone. Duever *et al.* (1986) and Habeck (1995) recognized exotic shrub invasion was a continuing problem in Florida. Without qualitative or species specific information, determining the ecological impact of the increased extent of exotic shrubs observed within the estuarine shrub category was not possible. This study was designed to measure changes in wetland area by generalized life form (woody shrubs) without further assessment of species composition or wetland quality.

Although some estuarine shrub wetlands were lost to open water systems, most of the losses were attributed to upland land use. An estimated 75 percent (1,635 acres or 662 ha) of the estuarine shrub area converted to upland was due to construction activities or land development along the shoreline (Figure 28).



Figure 27. Mangrove rehabilitation project in Fort De Soto Park, Pinellas County.

**Losses to Upland Developed Land Use**

**Gains**

Figure 28. Loss or gain of estuarine shrub habitat between 1985 and 1996.

51

# Exotic Plant Species in Florida's Wetlands

No discussion of Florida's wetlands would be complete without some acknowledgment of the presence of harmful exotic species in the ecosystem. Because of the subtropical climate and abundance of aquatic habitats, Florida is especially susceptible to infestations of exotic aquatic and wetland plants (FL Coastal Management Program 1999b). Exotic aquatic plants such as Hydrilla (*Hydrilla verticillata*) can choke waterways, inhibit navigation and recreational activities, reduce spawning habitat for fish and degrade water supplies (McCann *et al.* 1996). Other exotic wetland plants such as *Melaleuca quinquenervia* (Cajeput) and Brazilian Pepper (*Schinus terebinthifolius*) have demonstrated a remarkable ability to invade and colonize of Florida's landscape. These plants often form monospecific stands that dominate natural flora (U.S. Department of Interior 1994). Several of Florida's more notorious exotic plants include the following:

**Hydrilla** (*Hydrilla verticillata*): This plant has become a serious aquatic weed problem in Florida's freshwater environments. Hydrilla grows rapidly in waterways and will out-compete native submerged aquatic plant communities (FL Coastal Management Program 1999b). By the early 1990s hydrilla had infested more than 40 percent of Florida's public waters and was spreading (McCann



*Hydrilla verticillata or "water thyme." (Photo courtesy of Colette Jacona, U.S. Geological Survey.)*

*et al.* 1996). In 1995, Florida's Invasive Aquatic Plants Inventory indicated that hydrilla was most widespread in the waters of Alachua, Brevard, Citrus, Gulf, Highlands, Leon, Okechobee, Osceola, Polk, and Seminole Counties (FL Dept. of Environmental Protection 1996b).

**Water hyacinth** (*Eichhornia crassipes*): This floating aquatic plant is one of the most prolific plant species to inhabit Florida's lakes, rivers and canals systems. Water hyacinth blocks waterways and limits boat traffic, recreation, and wildlife use. Large expanses of this plant impede the ability of the snail kite (*Rostrhamus sociabilis*) to find important food items (Griffen 1989) and mats of water hyacinth can crowd out native aquatic plants and thus reduce biological diversity in freshwater ecosystems. The extent of water hyacinth has been reduced due to control efforts by the State and U.S. Army Corps of Engineers. In 1995, acres of water hyacinth could still be found in Okechobee, Osceola, Seminole and St. Johns counties (FL Dept. of Environmental Protection 1996b).



*Water hyacinth filling a canal. (Photo courtesy of Dr. Terry McTique, NOAA)*

**Melaleuca** (*Melaleuca quinquenervia*), Cajeput or Punk Tree: This tree species is perhaps the most insidious exotic to invade Florida's wetlands. The principal reason for its original introduction in Florida, was for drying up the Everglades (Thayer *et al.*1990). Melaleuca trees can grow up to 25 m tall and exist in soil conditions ranging from dry sand to muck covered with several feet of water (Tarver *et al.* 1988). Although there are no precise estimates of the extent of Melaleuca throughout the State, the species is prevalent throughout south Florida. Within the Everglades and Big Cypress National Preserve, it has



*Melaleuca or punk tree. (Photo courtesy of the South Florida Water Management District.)*

invaded the cypress-pine ecosystem and displaced areas of cypress (*Taxodium distichum*) with dense monospecific Melaleuca forest (Myers 1986). There are concerns for the long-term protection of regional water tables, increased expenditures for the treatment of allergies caused by this plant, degradation of wildlife habitat and the high costs associated with control and eradication (McCann *et al.* 1996).

**Brazilian Pepper** (*Schinus terebinthifolius*): Brazilian pepper is an aggressive shrub species that grows well under a range of conditions including coastal mangrove sites, along dikes, levees or ponds, hammocks, and drier pinelands (Tarver *et al.* 1988). These plants often create a dense canopy and eliminate almost all herbaceous understory (Ewel 1978). In the 1990s, it was reported that thousands of acres existed in central, and south Florida, the Florida Keys and other islands of the State (Bennett and Habeck 1991). Because of its environmental tolerance, Brazilian pepper is a threat to invade and colonize both freshwater and some estuarine wetlands in Florida.



*Brazilian pepper. (U.S. Fish and Wildlife Service.)*

# Freshwater Wetlands

Florida's freshwater wetland resources have been tremendously important. Commercially valuable products such as hardwood timber, softwood for pulp and paper products, cypress mulch for gardening, and bottled spring water come from wetland areas. The long growing season and abundant forage supplied by wetland vegetation fringing many Florida lakes have made 8–10 pound largemouth bass (*Micropterus salmoides*) an angler's delight. Some Florida springs and their surrounding wetlands hide archeological or paleontologic discoveries of scientific significance.

Four major types of freshwater wetlands were included within this study. Three of these types were based on vegetative life form and included forested wetlands, woody shrubs and wetlands dominated by emergent or herbaceous plants. The fourth type was freshwater ponds less than 20 acres (8.0 ha).

In 1996, there were an estimated 10,234,800 acres (4,143,600 ha) of freshwater wetlands in Florida. In the conterminous United States, freshwater wetlands occupied about 5 percent of land surface (Dahl 2000). Freshwater wetlands occupied slightly over 27 percent of Florida's land area, making Florida the wettest State by area in the lower 48 United States.

This study indicated that Florida had 11 percent of all forested wetland area in the conterminous U.S.; 10 percent of the wetland shrubs and 10 percent of the wetland emergents, by area. Slightly more than 4 percent of the Nation's open water ponds occurred in the State. Freshwater wetlands sustained 99 percent of the all wetland losses in Florida between 1985 and 1996.

Between 1985 and 1996, freshwater forested and shrub wetlands and freshwater ponds had increased in area. These gains were offset by large losses of freshwater emergent wetlands. When wetland trends



*Figure 29. Freshwater forested wetland dominated by red maple (Acer rubrum) and water oak (Quercus nigra), St. John's River, Florida.*

for the three vegetated freshwater wetland categories (emergent, shrub and forest) were combined there was an estimated net loss of over 91,000 acres (36,940 ha). Freshwater ponds (nonvegetated) increased in area by an estimated 39,200 acres (15,860 ha). The net result was that freshwater wetlands in Florida declined by and estimated 52,000 acres (21,080 ha).

## Freshwater Forested Wetlands

Forested wetlands were most abundant. In 1996, there were an estimated 5,566,200 acres (2,253,500 ha). This comprised 54 percent of the total freshwater area for the State. Forested wetlands appeared in many different ecological associations and included wet pine flatwoods, mixed hardwoods, river swamps, cypress domes, and hydric hammocks (Figure 29).

Species diversity and forested wetland community types decreased as sampling progressed from the more temperate northern part of

the State to south Florida. The proportion of forested wetland to emergent marsh also changed in a north to south gradient within the State. In the panhandle region, wetland forest to marsh ratios have been approximated at 10:1, whereas the ratio was 3:1 in central Florida and 1:5 in south Florida (FL Dept. of Comm. Affairs 1988).

Freshwater forested wetlands exhibited a net gain in area over the course of this study. This was in contrast to long term trends which have continually declined since the 1950s. Frayer and Hefner (1991) reported a net loss of 184,000 acres (74,500 ha) of forested wetland from the 1970s to the 1980s. This study estimated a net gain of 22,500 acres (9,100 ha) because of the maturation of shrub wetlands that became forested wetlands. Net gains in forested wetland area did not result from restoration of former wetland or creation of new wetland from uplands. The net gain of forested wetland from uplands was 46 acres (19 ha) over the 11 years

and statistically was not significant (Figure 30). Forested wetland gains resulted from the conversion of almost 300,000 acres (118,500 ha) of shrub wetland to wet forest. Most of these lands were observed in production of wood products for lumber, pulp, chip and paper products.

Timber production has been a major land use activity in Florida's forested wetlands (Ewel 1990, Hart and Newman 1995). The amount of forested wetland in a cyclical pattern of growth, cutting and regrowth increased substantially over the past two decades. From the 1970s to 1980s, approximately 234,000 acres (94,700 ha) of wetland trees and shrub habitats alternated between more mature forested wetland stands and wet shrubs once the trees were cut. The amount or wetland area included in the wetland shrub, to forest, to shrub cycle had more than doubled to 500,000 acres (202,400 ha) by 1996.

Large blocks of wetland area changed classification from forested to other wetland types (primarily shrubs) as seen in Figure 31. The long term effects of changes in forested wetland community structure and composition on wildlife populations and other environmental aspects was unclear. Some researchers have reported that silvicultural activities changed the character of the surrounding landscape, and possibly changed the hydroperiod, water depth, water quality and ultimately the fish and wildlife value (Hart and Newman 1995). Others have indicated that cutting and replacement of Florida's old forests with single species that were commercially more desirable seriously damaged the wildlife value of forests (FL Dept. Env. Protection 1996a).

In recent years, silvicultural best management practices have given more emphasis to protecting and maintaining certain wildlife values during forestry activities (FL Dept. of Ag. and Consumer Services 1993). During this study, forestry practices did not result in a loss of wetland area. Forested and shrub



Figure 30. Forest wetlands gained or converted from various cover-types, 1985 to 1996.



Figure 31. Forested wetlands lost or converted to various cover-types, 1985 to 1996.

wetland areas retained their wetland characteristics and a small gain in wetland area resulted from what had formerly been upland managed forest.

Forested wetland losses to various upland land use categories indicated that these wetlands remained vulnerable to urban and rural development. Construction activities in urban and urbanizing rural settings accounted for 79 percent of forested wetland losses to upland (Figure 32). Development activities in rural areas accounted for over 26,400 acres (10,700 ha) of forested wetland loss. This occurred throughout Florida, and included building development on the urban fringe, bridge and road construction, industrial development, construction of recreational facilities and

expansion of other infrastructure as a result of rapid growth. An estimated 11,500 acres (4650 ha) of forested wetland area was lost within urbanized cities and towns. Although Frayer and Hefner (1991) did not use a "rural development" upland category to describe wetland losses, their findings indicated that urban development accounted for over 39,000 acres (15,830 ha) of forested wetland loss during the previous decade.

Agriculture was attributed with the loss of an estimated 6,700 acres (2,700 ha) during the 11 year period. This was a 20-percent reduction in the rate of forested wetland loss attributed to agriculture between the 1970s and 1980s (Frayer and Hefner 1991).

Other miscellaneous upland land uses were attributed with 7 percent of the forested wetland loss to uplands during the study.

## Freshwater Shrub Wetlands

Shrub wetlands included areas dominated by woody vegetation less than 20 feet tall (6 m) (Figure 33). In Florida's shrub swamps, titi (*Cyrilla racemiFla. ora*), black titi (*Cliftonia monophylla*), swamp honeysuckle (*Rhododendron viscosum*), swamp haw (*Viburnum nudum*), willow (*Salix spp.*) and swamp bay (*Persea palustris*) were common species. Many shrub wetlands had been invaded by Brazillian pepper (*Shinus terebinthifolius*) or *Melaleuca quinquenervia*.

Cowardin *et al.* (1979) did not distinguish between true wetland shrub communities and wetlands dominated by tree species less than 20 feet tall (6 m). Consequently, all small, wet trees were classified as shrub wetlands. This included "dwarf" or "scrub" cypress wetlands



*Figure 32. Loss of forested wetlands to uplands, 1985 to 1996.*

(Ewel 1990) that were common in south Florida especially in the Big Cypress National Preserve.

There were an estimated 1,791,100 acres (725,140 ha) of wetland classified as shrubs in 1996. This represented a gain of an estimated 146,400 acres (59,300 ha) or almost 9 percent between 1985 and 1996. Trends in wetland shrubs were strongly influenced by the interrelationship between wetland shrub acreage and wetland forests. Also, there was also a large amount of emergent wetland (306,000 acres or 123,900 ha) converted to shrub wetland during this study.

The increased amount of shrub wetland may have been the result of drier conditions. Several authors (Mitsch and Ewel 1979, Ewel 1990) have discussed the importance of hydroperiod and fire frequency to species composition and productivity in Florida wetlands. Wilson and Loomis (1967) and Mitsch and Gosselink (1993) presented the concepts of classical hydrarch succession where shallow water lakes or wetlands tended to move toward drier sites and eventually became terrestrial habitat. Changes in hydrologic conditions did influence these trends however; there has been little information on



*Figure 33. Example of freshwater shrub wetland, Corkscrew Swamp, Florida, 1994.*

the long term dynamics of species composition or life form transition that have resulted from drier conditions over regional landscapes.



Of the freshwater shrub wetlands converted to upland, 54 percent or 21,100 acres (8,550 ha) were drained for urban and rural development purposes. Another 11,600 acres (4,700 ha) were lost to agriculture and 6,500 acres (2,630 ha) were lost to other miscellaneous uplands (Figure 34). There were gains to the wetland shrub category from upland forested plantations during this period.

*Figure 34. Loss of freshwater shrub wetlands to uplands, 1985 to 1996.*

### Freshwater Emergent Wetlands

Emergent wetlands generally contained shallow water and were dominated by herbaceous plants (Figure 35). They included areas known as marsh, swale, slough, wet prairie, wet savanna, reed swamps and glades. Relatively frequent fires in combination with fluctuating water levels have maintained the integrity of many of Florida's emergent wetlands (Kushlan 1990).

Emergent wetlands supported abundant wildlife that included aquatic invertebrates, fishes, amphibians, reptiles and mammals.

Most notable among the wildlife supported by these wetlands were the wading birds. There were 16 species of wading birds in Florida with representatives from three families: the herons (Ardeidae), the storks (Ciconiidae), and the ibises and spoonbills (Threskiornithidae) (Collopy and Jelks 1989). Freshwater wetlands provided feeding habitats that were important to the survival of these wading bird species. During the wet season (June through November) many emergent wetlands were flooded with shallow water that maximized prey production for birds (Collopy and Jelks 1989).

Other values provided by emergent wetlands benefitted people. Aesthetics have played an important role in defining natural areas throughout Florida's landscape.

The "River of Grass" formed by the Everglades, Homosassa Springs, Cypress Gardens, Silver Springs and Myakka River State Park were all examples. Emergent wetlands also provided environmental quality values. They were important components of the hydrologic cycle, retained flood waters and served as depositories for nutrients.

In 1996, there were an estimated 2,636,900 acres (1,067,600 ha) of freshwater emergent wetland in Florida. Emergent wetlands declined by an estimated 9 percent between 1985 and 1996. This was the largest decrease of any wetland category sampled, and these losses overshadowed the area gained in forested, shrub wetlands and freshwater ponds.



*Figure 35. Example of a freshwater emergent wetland in central Florida, 1996.*

56

Frayer and Hefner (1991) estimated the loss of freshwater emergent wetlands to have been 110,000 acres (44,500 ha) between the mid 1970s and 1980s. Results from this study indicated the loss rate more than doubled, an estimated 260,200 acres (105,340 ha).

The conversion of freshwater emergent wetland to shrub wetland involved 286,900 acres (116,150 ha). Historically there have always been small conversions between wetland types (i.e. shrub to emergent and emergent to shrub) based on duration and intensity of flooding or frequency of wildfires (Figure 36). Changes of the magnitude that occurred in Florida between 1985 and 1996 were indicative of prolonged periods of drought that allowed woody plants to become established in emergent wetlands, or the invasion of shrubs such as Brazilian pepper or *Melaleuca*.

Agriculture was responsible for some of the emergent wetland loss to upland land uses. An estimated 98,400 acres (39,800 ha) were lost to upland agriculture. Numerous wetlands were also restored or created on land previously classified as agricultural uplands. An estimated 60,100 acres (2,430 ha) of agricultural upland were converted to emergent wetlands and offset some of the losses. Wetland restoration, creation, land retirement or set aside programs were responsible for many of these changes in land use. A net loss of 38,300 acres (15,500 ha) was attributed to agricultural land use. That accounted for 63 percent of the losses to upland (Figure 37).

1985

1994







*Figure 36. 1985 and 1994 color infrared aerial photographs of wetlands and small lakes, Hatchbend, Florida. (Photos courtesy of FL DEP.)*



*Figure 37. Loss of freshwater emergent wetlands to uplands, 1985 to 1996.*

57



*Figure 38. A constructed freshwater pond in a residential neighborhood, Brandenton, Florida, 1996.*

Under the definitions of upland land uses used by the Fish and Wildlife Service to conduct this study, agriculture was a broadly applied term that included many agricultural products not limited to commodity crops or traditional row crop agriculture. For example in 1997, Florida led the Nation in the production of 18 major agriculture commodities including sugarcane, oranges, grapefruit, fresh tomatoes, bell peppers, ferns, sweet corn, snap beans, fresh cucumbers, tangerines, temple oranges, fresh squash, radishes, gladioli, tangelos, eggplant, and house plants (FL Dept. of Ag. and Consumer Services 1998). Florida also produced watermelons, endive, mushrooms, peanuts, tobacco, limes, other citrus, potatoes, blueberries, strawberries, lettuce, carrots, cabbage, and ornamental plants and trees for homes, offices and gardens. Agriculture as a land use category in this study also included buildings, field roads and infrastructure directly associated with agricultural operations. Many of the products listed above were not covered under the "Swampbuster" provisions of the Farm Bill and wetlands were subject to drainage without penalty. Citrus production in Florida had expanded the number of acres in production from 1985–86

to 1995–96 by about 266,000 acres (107,700 ha) (FL Dept. of Ag. and Consumer Services 1998). Some of that expansion resulted in drained wetlands.

Urban and rural development were attributed with 18 and 19 percent of the freshwater emergent losses to uplands, respectively. "Other" upland land uses and upland forested plantations were responsible for net gains back to emergent wetland. Each category showed the creation or restoration of about 4,900 acres (2,000 ha).

## Freshwater Ponds

Freshwater ponds (Figure 38) continued to increase throughout the State. Between 1985 and 1996 pond area increased by 39,200 acres (15,900 ha). This was almost a 20 percent increase over the previous decade and continued a long term upward trend (Figure 39).

This study included freshwater ponds that were functionally and qualitatively different, and there were many different kinds of ponds found throughout Florida. Some were natural, others manmade.



*Figure 39. Long term trends of freshwater pond area in Florida.*

Open water ponds were created as water retention basins in urban areas, water traps on golf courses (Figure 40), ornamental landscape features for housing or office developments or as a result of rock mining operations. All of these met the wetland definition of Cowardin *et al.* (1979). Very few ponds for catfish farming have been created in Florida (U.S. Dept. of Ag. National Agricultural Statistics Service 2001).

Freshwater ponds exhibited net increases from all of the upland categories with the exception of rural development. About 23,700 acres (9,600 ha) of freshwater ponds were created on agricultural lands between 1985 and 1996.

Upland agriculture was the largest contributor to the freshwater ponds category (Figure 41). Rural development activities were responsible for an estimated 2,000-acre (800 ha) loss in ponds. This was due to the reclamation of open water bodies that had been created during phosphate mining operations.



1985



1994



Figure 40. 1985 and 1994 color infrared aerial photographs near Panama City, Florida. (Photos courtesy of FL DEP.)



Figure 41. Acres of new ponds created from uplands in Florida, 1985 to 1996.

# Wetland Restoration, Protection and Conservation Efforts

There has been considerable emphasis in the last decade on wetland restoration or rehabilitation activities. Many worthwhile projects have been completed by Federal, State, local and private organizations and citizens (Figure 42). In Florida, the term restoration has been used to describe various management practices such as beach clean-up, removal of exotic plants from existing wetlands or the enhancement of condition. The term "restoration" has also been used to describe the return of land area to a former condition or function. Some projects designed to restore hydrologic function or remove exotic species from wetlands have not increased the area of the wetland base. Thus, while successful restoration projects have been very beneficial, the amount of wetland area has not changed. Direct comparisons of wetland restoration estimates from this study with other studies using different definitions of restoration cannot be made.

Gains in wetlands from upland land uses were tabulated as part of this study. Emergent wetland and ponds predominated the wetland from upland restorations. There were an estimated 127,940 acres (51,800 ha) of restoration or creation from uplands in Florida. Approximately 67 percent of the wetland restoration or creation took place on agricultural lands. Agricultural programs that promote wetland restoration, pond creation and land retirement were responsible for these gains. Wetland restoration or creation was dominated by open water pond creation in urban areas and accounted for a small percentage of the wetland area restored or created between 1985 and 1996. Rural development and managed forest plantations accounted for 6 percent each of the wetland area restored or created. "Other" upland land use restored or created 18 percent of the wetland area (Figure 43).



*Figure 42. A wetland creation/restoration site in southwestern Florida, 1999.*

*A waterway in the Everglades.*



# EVERGLADES RESTORATION PROJECT

Extending more than half the length of the Florida peninsula, the watershed of Florida's Everglades once covered more than 10,800 square miles (27,970 sq. km). This large wetland complex was interconnected by rivers, lakes open ponds, marshes, tree islands, wooded hammocks, bays and coastal mangrove swamps. Surface water traveled slowly from Lake Kissimmee 200 miles (320 km ) southwest to reach Florida Bay and the Gulf of Mexico.

During the 1900s, more than half of the wetlands that made up this vast ecosystem were destroyed or degraded, many having been drained or filled for agriculture or residential housing (U.S. Fish and Wildlife Service 1996). Canals and levees were constructed to drain, retain or alter the hydrology of the wetlands of south Florida. As a result of these alterations, most of the peripheral wet prairie, cypress forests and all of the custard apple (*Annona Glabra*) forest that were associated with the historic Everglades have been lost (Davis *et al.* 1994).



*Habitat restoration. (Robert Owens)*

By 1990, competition for water in south Florida was intense. There were competing demands to support rapidly growing population centers, agriculture and meet the water resource demands of State and Federal parks, reserves, sanctuaries and preserves (McPherson and Halley 1996). The remaining Everglades comprised about 2,300 square miles (5,960 sq. km), three fifths of which was impounded and managed as water conservation

areas (Lord 1993). The wetlands of the Everglades had been drastically reduced in size and some suffered from mercury contamination. Others suffered water quality problems, water supply and diversion controversies, declining wildlife populations, increasing pressure from ecotourism, urban and agricultural expansion, and an influx of exotic plant species (Dahl and Allord 1996).

During the early 1990s, five Federal Departments, the Environmental Protection Agency, in partnership with the tribes, State and local agencies, reached a consensus that the Everglades should be restored. The South Florida Ecosystem Restoration Initiative was developed



*Native pond apple and spatterdock. (Photo courtesy of the South Florida Water Management District.)*



*Fish and Wildlife Service firefighters monitor a prescribed burn. (John and Karen Hollingsworth)*

to restore and maintain, to the extent possible, the elements of the south Florida ecosystem to resemble the natural functions of a healthy, balanced and functioning freshwater, estuarine and marine environment (U.S. Fish and Wildlife Service 1996).

Restoring the Everglades remains an enormous challenge that involves returning essential functions to a large and diverse ecosystem. It constitutes the largest wetland restoration effort ever undertaken, and is estimated to cost billions of dollars and take up to 30 years to complete (Eggleston *et al.* 2000). The ability to manage the hydrology of the Kissimmee River, Lake Okeechobee, the Everglades and associated waters, while providing for the needs of urban, rural and agricultural users will determine the future of natural resources of south Florida.



*Research on the Everglades System. (Photo courtesy of Everglades National Park.)*

*Wetlands of the Everglades. (Photo courtesy of Everglades National Park.*



1911            1990

*The extent of the greater Everglades system in South Florida, 1911 and 1990.*

As human development pressures have continued in Florida, there have been increased demands placed on all natural resources. Land needs for wildlife habitat, recreation, green space and surface water protection have been increasingly threatened. In response, Florida has identified acquisition of environmentally sensitive lands as one of its most important strategies for environmental protection (FL Dept. Environmental Protection 1996a). The Conservation and Recreation Lands Program, Save Our Rivers, Save Our Coasts, Land Acquisition Trust Fund Programs and the Preservation 2000 program represented commitments on the part of the State and the Water Management Districts to acquire environmentally important lands. There were almost 7 million acres (2,834,000 ha) of land that had been acquired between State and Federal agencies in Florida (FL Dept. Environmental Protection 1996a). Many of these lands included important wetland habitats. As shown in Figure 44, these lands have been acquired in key coastal wetland areas, the Everglades and the south Florida ecosystem, key watersheds or rivers and other strategic locations for the protection of endangered species or rare habitat types.

Land acquisition has been only one part of the conservation strategy. Many wetlands in Florida have other special designations to help ensure recognition of value or protection. Some of these designations have included the following: National Estuarine Research Reserves, National Marine Sanctuaries, National Estuary Program, Florida



*Wetland creation and wildlife habitat restoration on lands overlook historic Pelican Island National Wildlife Refuge in 2002. (George Gentry)*

Aquatic Preserves, International Biosphere Reserve, World Heritage Site, and Wetland of International Importance (Ramsar Sites).

Florida had also identified "Strategic Habitat Conservation Areas." These lands (about 4.8 million acres or 1,943,300 ha), were subject to loss and degradation because of development pressure and represented some of Florida's most "at risk" resources (FL Dept. Environmental Protection 1996a).

Other important factors that were part of Florida's wetland conservation efforts included Federal, State and local legislation, ordinances and initiatives. Darst *et al.* (1996) has provided a comprehensive discussion of

the many government agencies involved in wetland conservation efforts in Florida. The application and enforcement of wetland protection measures, elimination of some incentives for wetland drainage, public education and outreach, private land initiatives, coastal monitoring and protection programs, and wetland restoration and creation actions also contributed to wetland conservation over the past decade. Private organizations have also had an important role in wetland conservation and protection in Florida. Many private-interest groups have kept the public informed on wetland issues, organized citizen networks and lobbied for wetland protection measures (Darst *et al.* 1996).



*Figure 43. Percentage of wetland area restored or created (ponds and emergent wetlands) from various upland land uses in Florida, 1985 to 1996.*



*Protected wetlands provide recreation for people and habitat
for native plants and animals. Birdwatchers (above) enjoy
a sunny day of spotting birds at Ding Darling National
Wildlife Refuge. (George Gentry) An alligator surfaces to rest
on a log at the Corkscrew Sanctuary in Collier County (right).*

Federal

State

Other

*Figure 44. Conservation lands designated as Federal,
State, local or private preserves, refuges, parks, reserves, or
sanctuaries in Florida, 1996.*



# Summary

Wetlands have been an important part of Florida's landscape as they have provided many values to wildlife and people. The U.S. Fish and Wildlife Service has developed and maintained a program to assess changes in the Nation's wetland acreage. The statistical design used in the National trend study also produced reliable wetland area estimates for Florida. Six-hundred-and-thirty-six sample plots were analyzed using digital orthophoto quarter quadrangles to identify wetlands, deepwater habitats and uplands. Changes in areal extent or type of wetland observed in the sample plots between 1985 and 1996 were recorded. Field verification was accomplished for 138 plots or 22 percent of the sample. During April 1999, cooperative interagency field evaluations were conducted to test the definitions used by the Service on the wetland status and trends plots to attribute wetland losses or gains. The study produced estimates of total wetland area and changes for Florida that included all lands and waters of the State regardless of land ownership.

As of 1996, Florida had 11.4 million acres (4.6 million ha) of wetlands. Of this, 10 percent were estuarine and 90 percent were freshwater wetlands. Between 1985 and 1996 the average annual net loss of wetlands in Florida was 5,000 acres (2,030 ha). This rate of loss was an 81-percent reduction from the annual rate reported for the previous decade by the Service. Urban and rural development accounted for an estimated 72 percent of the loss. Agriculture was attributed with the remaining 28 percent of the losses. Small gains in wetland were attributed to upland silviculture, the "other" uplands category as well as an increase from deepwater. Although Florida had not reached "no-net-loss" of wetlands,

there had been dramatic progress made in slowing the rate of loss.

Less than one percent of the wetland losses that occurred between 1985 and 1996 were intertidal wetlands, as marine and estuarine wetlands declined by an estimated 500 acres (200 ha) over the 11-year period. These losses were attributed to construction activities along the coast, and coastal erosion. Most of Florida's shoreline had been protected either by regulation or through public ownership. These mechanisms in combination with continued awareness and educational efforts were responsible for reducing intertidal wetland losses between 1986 and 1997.

There were an estimated 10,234,800 acres (4,143,600 ha) of freshwater wetlands. Between 1985 and 1996, freshwater forested and shrub wetlands and freshwater ponds increased in area. These gains were offset by large losses to freshwater emergent wetlands. Florida's freshwater wetlands declined by an estimated 52,000 acres (21,100 ha) or 0.5 percent between 1985 and 1996. This was an average annual net loss of 4,740 acres (1,920 ha) for the period. The average annual rate of freshwater wetland loss declined 82 percent since the 1970s to the 1980s era.

There were an estimated 127,940 acres (51,800 ha) of wetlands restored or created from uplands in Florida. Approximately 67 percent took place on agricultural lands. Agricultural programs that promote wetland restoration, pond creation and land retirement were responsible for these gains.

Of the net wetland losses to upland land use, the urban and rural



Rookery Bay
National
Estuarine
Research Reserve.

development categories were attributed with 72 percent of the losses. Agriculture was attributed with 28 percent of the losses. Net gains came from silviculture and the "other" upland categories. There was no net loss attributed to silvicultural practices. There were gains to the wetland shrub category and freshwater emergents from upland silviculture. There was also a net gain in wetland from the "Other" upland land use category.

The wetland loss rate in Florida has been reduced substantially since the last half of the 20th century. The State and the Federal Government had purchased substantial amounts of land for conservation and recreational purposes. Parks, preserves and management areas protect exemplary remnants of most of Florida's natural ecosystems (Myers and Ewel 1990). Restoration efforts have been underway to try and rehabilitate some of Florida's watersheds and wetlands. In the future, Florida faces difficult challenges to try and balance economic growth, rapid population immigration and growth with limited natural resources, land and carrying capacity. Wetlands were a pervasive feature of the landscape, and will remain an important benchmark to the ecological and economic sustainability of Florida and the Nation.





*Corkscrew Sanctuary.*

# Literature Cited

Abrahamson, W.G. and D. C. Hartnett. 1990. Pine Flatwoods and dry prairies. *In*. R.L. Myers and J.J. Ewel (*eds.*). Ecosystems of Florida. University of Central Florida Press, Orlando, FL. pp. 103–149.

Anderson, J.R., E.E. Hardy, J.T. Roach and R.E. Winter. 1976. A land use and land cover classification system for use with remote sensor data. U.S. Geological Survey Professional Paper 964. U.S. Geological Survey, Washington, D.C. 28 p.

Bahr, L.M. and W.P. Lanier. 1981. The ecology of intertidal oyster reefs of the south Atlantic coast: A community profile. U.S. Fish and Wildlife Service, Office of Biological Services, Washington, D.C. FWS/OBS 81/15. 105 p.

Bailey, R. G. 1980. Description of the ecoregions of the United States. U.S. Department of Agriculture, Forest Service. Miscellaneous Publication Number 1391. 77 p.

Bennett, F.D. and D.H. Habeck. 1991. Brazilian peppertree-prospects for biological control in Florida. *In*. T.D. Center, R.F. Doren, R.L. Hofstetter, R.L. Myers and L.D. Whiteaker (*eds.*). Proceedings of the symposium on exotic pest plants, National Park Service, Denver, CO. NPS/NREVER/NRTR–91/06.

Bergquist, G.T. 1996. Florida State of the coast report. Florida Coastal Management Program, Florida Department of Community Affairs, Tallahassee, FL. 28 p.

Carlton, J.M. 1977. A survey of selected coastal vegetation communities of Florida. Florida Department of Natural Resources Marine Research Laboratory. Florida Marine Research  Publication Number 30, St. Petersburg, FL. 40 p.

Collopy, M.W. and H.L. Jelks. 1989. Distribution of foraging wading birds in relation to the physical and biological characteristics of freshwater wetlands in southwest Florida. Florida Game and Fresh Water Fish Comm. Nongame Wildlife. Program Final Rept. 102 p.

Cowardin, L.M, V. Carter, F.C. Golet, and E.T. LaRoe. 1979. Classification of wetlands and deepwater habitats of the United States. Department of the Interior, U.S. Fish and Wildlife Service, Washington, D.C 131 p.

Dahl, T.E. 1990. Wetlands losses in the United States 1780s to 1980s. Department of the Interior, U.S. Fish and Wildlife Service, Washington, D.C. 21 p.

Dahl, T. E. 2000. Status and trends of wetlands in the conterminous United States 1986 to 1997. U.S. Department of the Interior, Fish and Wildlife Service, Washington, D.C. 82 p.

Dahl, T.E. and J.G. Allord. 1996. History of wetlands in the conterminous United States. National Water Summary on Wetland Resources. U.S. Geological Water-Supply Paper 2425, Reston, VA. pp. 19–26.

Darst, M.R., H.M. Light and B.F. McPherson. 1996. Florida wetland resources. *In*. National water summary on wetland resources. U.S. Geological Survey, Water-Supply Paper 2425, Reston, VA. pp. 153–160.

Davis, S.M., L.H. Gunderson, W.A Park and J.E. Mattson. 1994. Landscape dimensions, composition, and function in a changing Everglades ecosystem. *In*. S.M. Davis and J.C. Ogden (*eds.*) Everglades—The ecosystem and its restoration. St. Lucie Press, Delray Beach, FL.  pp. 419–444.

Davis, S.M. and J.C. Ogden. 1994. Everglades—The ecosystem and its restoration. St. Lucie Press, Delray Beach, FL. pp. 1–7.

Dressler, R.L., D.W. Hall, K.D. Perkins

and N.H. Williams. 1987. Identification manual for wetland plant species of Florida. Institute of Food and Agricultural Sciences SP–35. Gainesville, FL. 297 p.

Drew, R.D. and N.S. Schomer. 1984. An ecological characterization of the Caloosatchee River/Big Cypress Watershed. U.S. Fish and Wildlife Service, FWS/OBS–82/58.2. Washington, D.C. 225 p.

Duever, L.C., J.F. Meeder and M.J. Duever. 1982. Ecological portion Florida peninsula natural region theme study. Final Report to the National Park Service, U.S. Department of Interior. National Audubon Society. Ecosystem Research Unit, Naples, FL. 398 p.

Duever, M.J., J.E. Carlson, J.F. Meeder, L.C. Duever, L.H. Gunderson, L.A. Riopelle, T.R. Alexander, R.L. Meyers and D.P. Spangler. 1986. The Big Cypress National Preserve. Research Report No. 8, National Audubon Society, New York, NY. 455 p.

Eggleston, J.R., T.L. Embry, R.H. Mooney, L. Wedderburn, C.R. Goodwin, H.S. Henkel, K.M.H. Pegram, and T.J. Enright. 2000. The U.S. Geological Survey program on the South Florida Ecosystem: 2000 proceedings. Presentations made at the Greater Everglades Ecosystem Restoration Conference, December 11–15, 2000, Naples, FL. Open-File Report 00–449. 246 p.

Ewel, J. 1978. Ecology of Schinus. Schinus—Technical proceedings of techniques for control of Schinus in south Florida: A workshop for natural area managers. Unpublished report of Sanibel-Captiva Conservation Foundation, Ft. Myers, FL. 87 p.

Ewel, K.C. 1990. Swamps. In. R.L. Myers and J.J. Ewel (eds.). Ecosystems of Florida. University of Central Florida Press, Orlando, FL. pp. 281–323.

Ewel, K.C. and H.T. Odum. 1986. Ecological patterns in cypress swamps. In. K.C. Ewel and H.T. Odum (eds.). Cypress Swamps. University of Florida Press, Gainesville, FL. pp. 5–6.

Ferguson, R.L., L.L. Wood and D.B. Graham. 1993. Monitoring spatial change in seagrass

habitat with aerial photography. Photogrammetric Engineering and Remote Sensing. 59(6): 1033–1038.

Fernald, E.A. and E.D. Purdum. 1992. Atlas of Florida. University Press of Florida, Institute of Science and Public Affairs, Florida State University, Gainesville, FL. 280 p.

Florida Bureau of Aquatic Plant Management. 1996. Invasive aquatic plants inventory. Florida Environmental Publishing, Inc., Gainesville, FL.

Florida Coastal Management Program. 1999a. Florida Assessment of Coastal Trends—Disruption of coastal physical processes—Miles of eroding shoreline. Florida Department of Community Affairs, Tallahassee, FL. 143 p.

Florida Coastal Management Program. 1999b. Florida Assessment of Coastal Trends—Degradation and restoration of coastal ecosystems—Change in acreage of invasive non-indigenous (exotic) aquatic plants. Florida Department of Community Affairs, Tallahassee, FL. 143 p.

Florida Department of Agriculture and Consumer Services. 1998. Florida Agricultural Facts—Florida Agriculture Overview. Tallahassee, FL. unk. p.

Florida Department of Agriculture and Consumer Services. 1993. Silviculture Best Management Practices. Tallahassee, FL. 98 p.

Florida Department of Community Affairs. 1988. Mapping and Monitoring of Agricultural Lands Project (1984–1987) County data. Tallahassee, FL. unk. p.

Florida Department of Environmental Protection. 1996a. Strategic Assessment of Florida's Environment—Change in Wildlife Habitat/Strategic Habitat Conservation Areas. Tallahassee, FL. pp. 26–31.

Florida Department of Environmental Protection. 1996b. Invasive aquatic plants inventory. Bureau of Aquatic Plant Management, Tallahassee, FL. unk. p.

Florida Natural Areas Inventory and Florida Department of Natural Resources. 1990. Guide of the natural communities of Florida. Tallahassee, FL. 111 p.

Florida Soil Conservation Service. 1992.

Soil and water relationships of Florida's ecological communities: Ecological community No. 19—Mangrove Swamps. Soil Survey Staff, Gainesville, FL. 20 p.

Frayer, W.E and J.M. Hefner. 1991. Florida wetlands status and trends, 1970s to 1980s. U.S. Fish and Wildlife Service, Atlanta, GA. 31 p.

GAP Commission. 2001. The Florida critical benchmarks goals report. The Florida Commission on Government Accountability to the People, Tallahassee, FL. unk. p.

Gore, R.H. 1992. The Gulf of Mexico. Pineapple Press Inc., Sarasota, FL. 384 p.

Griffen, J. 1989. The Everglades kite. Aquaties 11(3):17–19.

Gunderson, L.H. 1994. Vegetation of the Everglades: Determinants of community composition. In. S.M. Davis and J.C. Ogden (eds.) Everglades—The ecosystem and its restoration. St. Lucie Press, Delray Beach, FL. pp. 323–340.

Habeck, D.H. 1995. Biological control of Brazilian peppertree. The Florida Naturalist. Vol. 68, No. 1. Florida Audubon Society, Casselberry, FL. pp. 9–11.

Hammond, E.H. 1970. Physical subdivisions of the United States of America. In. U.S. Geological Survey. National atlas of the United States of America. Department of the Interior, Washington, D.C. 61 p.

Hart, R. and J.R. Newman. 1995. The importance of isolated wetlands to fish and wildlife in Florida. Florida Game and Fresh Water Fish Commission, Nongame Wildlife Program Project Report. Tallahassee, FL. 145 p.

Hefner, J.M. 1986. Wetlands of Florida 1950s to 1970s. In. Estevez, E.D., J. Miller, J. Morris and R. Hamman (eds.). Managing Cumulative Effects in Florida Wetlands. New College Environmental Studies Program Publication No. 37. Omnipress, Madison, WI. pp. 23–31.

Hefner, J.M. and J.D. Brown 1984. Wetland trends in the southeastern United States. Wetlands. Vol. 4. pp. 1–11.

Hopkins, S.R. and J.J. Richardson. (eds.). 1984. Recovery plan for marine turtles. Marine Turtle

Recovery Team, National Marine Fisheries Service, Department of Commerce. Washington, D.C. unk. p.

Jaap, W.C. 1984. The ecology of the south Florida coral reefs: A community profile. U.S. Fish and Wildlife Service, Washington, D.C. FWS/OBS 82/08. 138 p.

Johnson, A.F. and M.G. Barbour. 1990. Dunes and maritime forests. In. R.L. Myers and J.J. Ewel (eds.). Ecosystems of Florida. University of Central Florida Press, Orlando, FL. pp. 429–480.

Kushlan, J.A. 1990. Freshwater marshes. In. R.L. Myers and J.J. Ewel (eds.). Ecosystems of Florida. University of Central Florida Press, Orlando, FL. pp. 324–363.

Lake County Water Authority, 1995. Our vital wetlands. Lake County Water Authority, Tavares, FL. 28 p.

Langbein, W.B. and K.T. Iseri. 1960. General introduction and hydrologic definitions manual of hydrology. Part 1. General surface water techniques. U.S. Geological Survey, Water-Supply Paper 1541–A, Reston, VA. 29 p.

Lins, H.F., Jr. 1980. Patterns and trends of land use and land cover on Atlantic and Gulf coast barrier islands, U.S. Geological Survey Professional Paper 1156, Reston, VA. unk. p.

Livingston, R. J. 1984. The ecology of the Apalachicola Bay system: An estuarine profile. U.S. Department of the Interior, Fish and Wildlife Service, FWS/OBS–82/05, Washington, D.C. 148 p.

Livingston, R. J. 1990. Inshore marine habitats. In. Myers, R.L. and J.J. Ewel (eds.). Ecosystems of Florida. University of Central Florida Press, Orlando, FL. pp. 549–573.

Lord, L.A. 1993. Guide to Florida environmental issues and information. Florida Conservation Foundation, Winter Park, FL. 364 p.

Lynch, M.P., B.L. Laird, N.B. Theberge and J.C. Jones. (eds.). 1976. An assessment of estuarine and nearshore marine environments. Special Report in Applied Marine Science and Ocean Engineering No 93. OBS, Fish and Wildlife Service, Department of the Interior, Washington, D.C. 132 p.

Marth, D. and M.J. Marth. 1992. Florida Almanac 1992 –1993. Pelican Publishing Company, Gretna, LA. 432 p.

McCann, J.A., L.N. Arkin and J.D. Williams. 1996. Nonindigenous aquatic and selected terrestrial species of Florida. University of Florida, Center for Aquatic Plants, Gainesville, FL.

McPherson, B.F. and R. Halley. 1996. The south Florida environment— A region under stress. U.S. Geological Survey Circular 1134. National Water-Quality Assessment Program. Department of the Interior, U.S. Geological Survey, Reston, VA. 61 p.

Miller, S.L. and M.P. Crosby. 1998. The extent and condition of U.S. coral reefs—NOAA's State of the Coast Report. National Oceanic and Atmospheric Administration, Silver Spring, MD.

Millhouser, W.C., J. McDonough, J.P. Tolson and D. Slade. 1998. Managing coastal resources— NOAA's State of the Coast Report. National Oceanic and Atmospheric Administration, Silver Spring, MD.

Millsap, B.A., J.A. Gore, D.E. Runde and S.I. Cerulean. 1990. Setting priorities for the conservation of fish and wildlife species in Florida. Wildl. Monog. 111:1–57.

Mitsch, W.J. and K.C. Ewel. 1979. Comparative biomass and growth of cypress in Florida wetlands. Am. Midl. Nat. 101:417–426.

Mitsch, W.J. and J.G. Gosselink. 1993. Wetlands (2nd edition). Van Norstrand Reinhold, New York, NY. 722 p.

Montague, C.L. and R.G. Wiegert. 1990. Salt marshes. In. Myers, R.L. and J.J. Ewel (eds.). Ecosystems of Florida. University of Central Florida Press, Orlando, FL. pp. 481–516.

Morris, A. 1991. The Florida handbook 1991–1992. The Peninsular Publishing Company, Tallahassee, FL. 720 p.

Myers, R.L. 1986. Ecological compression of Taxodium distichum var. nutans by Melaleuca quinquenervia in southern Florida. In. K.C. Ewel and H.T. Odum (eds.). Cypress Swamps. University of Florida Press, Gainesville, FL.

pp. 358–364.

Myers, R.L. and J.J. Ewel. 1990. Problems, prospects, and strategies for conservation. In. Myers, R.L. and J.J. Ewel (eds.). Ecosystems of Florida. University of Central Florida Press, Orlando, FL. pp. 619–632

Nordlie, F.G. 1990. Rivers and springs. In. Myers, R.L. and J.J. Ewel (eds.). Ecosystems of Florida. University of Central Florida Press, Orlando, FL. pp. 392–425.

Odum, W.E. and C.C. McIvor. 1990. Mangroves. In. R.L. Myers and J.J. Ewel (eds.). Ecosystems of Florida. University of Central Florida Press, Orlando, FL. pp. 517–548.

Odum, W.E., C.C. McIvor and T.J. Smith, III. 1982. The ecology of the mangroves of south Florida: A community profile. U.S. Fish and Wildlife Service, Office of Biological Services, Washington, D.C. FWS/OBS 81/24. 144 p.

Omernik, J. M. 1987. Ecoregions of the conterminous United States. Supplement to the Annals of the Association of American Geographers, 77 (1): pp. 118–125.

Orth, R.J., K.A. Moore and J.F. Nowak. 1990. Monitoring seagrass distribution and abundance patterns: A case study from the Chesapeake Bay. Pages 111–123. In. S.J. Kiraly, F.A. Cross and J.D Buffington (eds.). Federal coastal wetland mapping programs. Biol. Rept. 90 (18). Department of the Interior, U. S. Fish and Wildlife Service, Washington, D.C.

Patterson, S.G. 1986. Mangrove community boundary interpretation and detection of areal change on Marco Island Florida: Application of digital image processing and remote sensing techniques. U.S. Department of the Interior, National Wetlands Research Center, Washington, D.C. Biol. Rept. 86(10).

Patton, J.E. and W.S. Judd. 1986. Vascular flora of Paynes Prairie Basin and Alachua Sink Hammock, Alachua County, FL. Castanea 51, 88–110.

Pybas, D.W. 1991. Atlas of artificial reefs in Florida. Florida Sea Grant College Program, University of FL., Gainesville. Sea Grant

Educational Bulletin 20. 40 p.

Reed, P.B. 1988. National list of plant species that occur in wetlands. NERC–88/18.40. Department of the Interior. U.S. Fish and Wildlife Service, Washington, D.C.

Runde, D.E. 1991. Trends in wading bird nesting populations in Florida 1976 –1978 and 1986–1989. Nongame Wildlife Section, Division of Wildlife, Florida Game and Freshwater Fish Commission. Tallahassee, FL. 90 p.

Sargent, F.J., W.B. Sargent, T.J. Leary, D.W Crewz and C.R. Kruer. 1995. Scarring of Florida's seagrass: assessment and management options. Florida Marine Research Institute Report TR–1 unk. p.

Sharp, J.G. 1992. Florida facts and figures (21st edition). Florida Trend Magazines, Inc., St. Petersburg, FL. 40 p.

Simons, R.W., S.W. Vince and S.R. Humphrey. 1989. Hydric hammocks: A guide to management. U.S. Fish and Wildlife Service Biological Report 85 (7.26 Supplement), Washington, D.C. 89 p.

Spalding, M.D., F. Blasco and C.D. Field (eds.). 1997. World Mangrove Atlas. The International Soc. for Mangrove Ecosystems, Okinawa, Japan. 178 p.

Stout, J. 1984. The ecology of irregularly flooded salt marshes of the northeastern Gulf of Mexico: A community profile. U.S. Fish and Wildlife Service Biological Report 85 (7.1). Washington, D.C. 98 p.

Tarver, D.P., J.A. Rogers, M.J. Mahler and R.L. Lazor. 1988. Aquatic and wetland plants of Florida, 4th edition. Bureau of Aquatic Plant Management, Florida Department of Natural Resources, Tallahassee, FL. 125 p.

Thayer, D.D., K.K. Langeland, W.T. Haller and J.C. Joyce. 1990. Weed control in aquaculture and farm ponds. Florida cooperative extension service, University of Florida, Gainesville, FL. 24 pp.

Taylor, J.R. , M.A. Cardamone and W.J. Mitsch. 1990. Bottomland

hardwood forests: Their functions and values. In. Gosselink, J.G., L.C. Lee and T.A. Muir (eds.). Ecological Processes and Cumulative Impacts: Illustrated by Bottomland Hardwood Wetland Ecosystems. Lewis Publishers, Inc. Chelsea, MI. pp. 13–86.

Tomlinson, P.B. 1986. The Botany of Mangroves. Cambridge University Press. 419 p.

Twilley, R.R. 1998. Mangrove wetlands. In.. Messina, M.G. and W.H. Conner (eds.). Southern Forested Wetlands: Ecology and Management. Lewis Publishers, CRC Press, Boca Raton, FL. pp. 445-473.

U.S. Army Corps of Engineers. 1988. A guide to selected Florida wetland plants and communities. CESAJP 1145–2–1, Jacksonville District: Regulatory Division, Jacksonville, FL. 319 p.

U.S. Census Bureau. 2002. State and County Quickfacts—Florida. On-line resources@www.quickfacts. census.gov/qfd.

U.S. Department of Agriculture. 1975. Soil taxonomy: A basic system of soil classification for making and interpreting soil surveys. Department of Agriculture. Soil Conservation Service, Soil Survey Staff, Agricultural Handbook 436, Washington, D.C. 754 p.

U.S. Department of Agriculture. 1991. Hydric Soils of the United States. Soil Conservation Service, Miscellaneous Publication Number 1491, Washington, D.C. pages unnumbered.

U.S. Department of Agriculture, National Agricultural Statistics Service. 2001. Florida State Report, Florida Aquaculture. Washington, D.C.

U.S. Department of the Interior. 1994. Big Cypress National Preserve. Briefing statements for 1994—National Park Service, Washington, D.C. 14 pp.

U.S. Department of the Interior. 1995. Coastal Barrier Improvement Act; Technical corrections to the Coastal Barrier Resources

System; Notice. Part V, Fish and Wildlife Service. Federal Register, February 23, 1995, 60 (36). pp. 10268–10283.

U.S. Fish and Wildlife Service. 1994a. Continuous wetlands trend analysis project specifications (photo-interpretation and cartographic procedures). Wetland Status and Trends, National Wetlands Inventory Center, St. Petersburg, FL. 60 p.

U.S. Fish and Wildlife Service. 1994b. Technical specifications and protocols for Status and Trends digital files. Wetland Status and Trends, National Wetlands Inventory Center, St. Petersburg, FL. 35 p. plus appendices.

U.S. Fish and Wildlife Service. 1996. The South Florida Ecosystem. U.S. Fish and Wildlife Service—South Florida Ecosystem Office, Vero Beach, FL. 45 p. plus Appendices.

Vince, S.W., S.R. Humphrey and R.W. Simons. 1989. The ecology of hydric hammocks: A community profile. U.S. Fish and Wildlife Service Biological Report 85(7.26). Washington, D.C. 81 p.

Ward, D.B. 1943. Rare and endangered biota of Florida: Volume five—Plants. University Press of Florida, Gainesville, FL. 175 p.

Wilson, R.F. 1998. Mangroves in Florida, U.S.A. Wetlands Journal 10 (1): pp 12–20.

Wilson, C.L. and W.E. Loomis. 1967. Botany, 4th ed. Holt, Rinehart and Winston, New York, NY. 626 p.

Williams, K. A.S. Pinzon, R.P. Stumpf and E.A. Raabe. 1999. Sea-level rise and coastal forests on the Gulf of Mexico. Open-File Report 99–441. U.S. Department of the Interior, Geological Survey, Center for Coastal Geology, St. Petersburg, FL. 87 p. plus Appendices.

Wolfe, S. H., J.A. Reidenauer and D.B. Means. 1988. An ecological characterization of the Florida panhandle. U.S. Fish and Wildlife Service Biological Report 88(12). Washington, D.C. 277 p.

*Right: Mangrove thicket of coastal south Florida.*



# Appendix A.

# Definitions of Habitat Categories Used in This Status and Trends Study

## Wetlands[1]

In general terms, wetlands are lands where saturation with water is the dominant factor determining the nature of soil development and the types of plant and animal communities living in the soil and on its surface. The single feature that most wetlands share is soil or substrate that is at least periodically saturated with or covered by water. The water creates severe physiological problems for all plants and animals except those that are adapted for life in water or in saturated soil.

Wetlands are lands transitional between terrestrial and aquatic systems where the water table is usually at or near the surface or the land is covered by shallow water. For purposes of this classification wetlands must have one or more of the following three attributes: (1) at least periodically, the land supports predominantly hydrophytes;[2] (2) the substrate is predominantly undrained hydric soil, [3] and (3) the substrate is non-soil and is saturated with water or covered by shallow water at some time during the growing season of each year.

The term wetland includes a variety of areas that fall into one of five categories: (1) areas with hydrophytes and hydric soils, such as those commonly known as marshes, swamps, and bogs; (2) areas without hydrophytes but with hydric soils—for example, flats where drastic fluctuation in water level, wave action, turbidity, or high concentration of salts may prevent the growth of hydrophytes; (3) areas with hydrophytes but non-hydric soils, such as margins of impoundments or excavations where hydrophytes have become established but hydric soils have not yet developed; (4) areas without soils but with hydrophytes such as the seaweed-covered portions of rocky shores; and (5) wetlands without soil and without hydrophytes, such as gravel beaches or rocky shores without vegetation.

**Marine System**   The Marine System consists of the open ocean overlying the continental shelf and its associated high energy coastline. Marine habitats are exposed to the waves and currents of the open ocean. Salinities exceed 30 parts per thousand, with little or no dilution except outside the mouths of estuaries. Shallow coastal indentations or bays without appreciable freshwater inflow and coasts with exposed rocky islands that provide the mainland with little or no shelter from wind and waves, are also considered part of the Marine System because they generally support typical marine biota.

**Estuarine System**   The Estuarine System consists of deepwater tidal habitats and adjacent tidal wetland that are usually semienclosed by land but have open, partly obstructed, or sporadic access to the open ocean, and in which ocean water is at least occasionally diluted by freshwater runoff from the land. The salinity may be periodically increased above that of the open ocean by evaporation. Along some low energy coastlines there is appreciable dilution of sea water. Offshore areas with typical estuarine plants and animals, such as red mangroves (*Rhizophora mangle*) and eastern oysters (*Crassostrea virginica*), are also included in the Estuarine System.

[1] Adapted from Cowardin *et al*. 1979.
[2] The U.S. Fish and Wildlife Service has published the list of plant species that occur in wetlands of the United States (Reed 1988).
[3] U.S. Department of Agriculture has developed the list of hydric soils for the United States (U.S. Department of Agriculture 1991).

Marine and Estuarine Subsystems

**Subtidal**     The substrate is continuously submerged by marine or estuarine waters.

**Intertidal**     The substrate is exposed and flooded by tides. Intertidal includes the splash zone of coastal waters.

## Palustrine System

The Palustrine (freshwater) System includes all non-tidal wetlands dominated by trees, shrubs, persistent emergents, emergent mosses or lichens, farmed wetlands, and all such wetlands that occur in tidal areas where salinity due to ocean derived salts is below 0.5 parts per thousand. It also includes wetlands lacking such vegetation, but with all of the following four characteristics: (1) area less than 20 acres (8 ha); (2) active wave formed or bedrock shoreline features are lacking; (3) water depth in the deepest part of basin less than 6.6 feet (2 meters) at low water; and (4) salinity due to ocean derived salts less than 0.5 parts per thousand.

## Classes

**Unconsolidated Bottom**     Unconsolidated Bottom includes all wetlands with at least 25 percent cover of particles smaller than stones, and a vegetative cover less than 30 percent. Examples of unconsolidated substrates are: sand, mud, organic material, cobble-gravel.

**Aquatic Bed**     Aquatic Beds are dominated by plants that grow principally on or below the surface of the water for most of the growing season in most years. Examples include seagrass beds[4], pondweeds (*Potamogeton spp.*), wild celery (*Vallisneria americana*), waterweed (*Elodea spp.*), and duckweed (*Lemna spp.*).

**Unconsolidated Shore**     Unconsolidated Shore includes all wetland habitats having two characteristics: (1) unconsolidated substrates with less than 75 percent areal cover of stones, boulders or bedrock and; (2) less than 30 percent areal cover of vegetation other than pioneering plants.

**Emergent Wetland**     Emergent Wetlands are characterized by erect, rooted, herbaceous hydrophytes, excluding mosses and lichens. This vegetation is present for most of the growing season in most years. These wetlands are usually dominated by perennial plants.

**Shrub Wetland**     Shrub Wetlands include areas dominated by woody vegetation less than 20 feet (6 meters) tall. The species include true shrubs, young trees, and trees or shrubs that are small or stunted because of environmental conditions.

**Forested Wetland**     Forested Wetlands are characterized by woody vegetation that is 20 feet (6 meters) tall or taller.



**Palustrine Farmed**     Farmed Wetlands are wetlands that meet the Cowardin *et al.* definition where the soil surface has been mechanically or physically altered for production of crops, but where hydrophytes will become re-established if farming is discontinued.

---

[4]Although some seagrass beds may be evident on aerial photography, water and climatic conditions often prevent their detection.

# Deepwater Habitats

Wetlands and deepwater habitats are defined separately because the term wetland has not included deep permanent water bodies. For the purposes of conducting status and trends studies, riverine and lacustrine are considered deepwater habitats. Elements of marine or estuarine systems can be wetland or deepwater. Palustrine includes only wetland habitats.

Deepwater habitats are permanently flooded land lying below the deepwater boundary of wetlands. Deepwater habitats include environments where surface water is permanent and often deep, so that water, rather than air, is the principal medium within which the dominant organisms live, whether or not they are attached to the substrate. As in wetlands, the dominant plants are hydrophytes; however, the substrates are considered non-soil because the water is too deep to support emergent vegetation (U.S. Department of Agriculture 1975).

**Riverine System**  The Riverine System includes deepwater habitats contained within a channel, with the exception of habitats with water containing ocean derived salts in excess of 0.5 parts per thousand. A channel is "an open conduit either naturally or artificially created which periodically or continuously contains moving water, or which forms a connecting link between two bodies of standing water" (Langbein and Iseri 1960).

**Lacustrine System**  The Lacustrine System includes deepwater habitats with all of the following characteristics: (1) situated in a topographic depression or a dammed river channel; (2) lacking trees, shrubs, persistent emergents, emergent mosses or lichens with greater than 30 percent coverage; (3) total area exceeds 20 acres (8 ha). Similar wetland and deepwater habitats totaling less than 20 acres may also be included in the Lacustrine System if an active, wave-formed or bedrock shoreline feature makes up all or part of the boundary, or if the water depth in the deepest part of the basin exceeds 6.6 feet (2 meters) at low water.





*Snorkeler at Fort Jefferson on the Dry Tortugas. (Photo courtesy of Everglades National Park.)*

# Uplands

**Agriculture[5]**

Agricultural land may be defined broadly as land used primarily for production of food and fiber. Agricultural activity is evidenced by distinctive geometric field and road patterns on the landscape and the traces produced by livestock or mechanized equipment. Examples of agricultural land use include cropland and pasture; orchards, groves, vineyards, nurseries, cultivated lands, and ornamental horticultural areas including sod farms; confined feeding operations; and other agricultural land including livestock feed lots, farmsteads including houses, support structures (silos) and adjacent yards, barns, poultry sheds, etc.

**Urban**

Urban land is comprised of areas of intensive use in which much of the land is covered by structures (high building density). Urbanized areas are cities and towns that provide the goods and services needed to survive by modern day standards through a central business district. Services such as banking, medical and legal office buildings, supermarkets, and department stores make up the business center of a city. Commercial strip developments along main transportation routes, shopping centers, contiguous dense residential areas, industrial and commercial complexes, transportation, power and communication facilities, city parks, ball fields and golf courses can also be included in the urban category.

**Forested Plantation**

Forested plantations include areas of planted and managed forest stands. Planted pines, Christmas tree farms, clear cuts, and other managed forest stands, such as hardwood forestry are included in this category.



Forested plantations can be identified by observing the following remote sensing indicators: 1) trees planted in rows or blocks; 2) forested blocks growing with uniform crown heights; and 3) logging activity and use patterns.

**Rural Development**

Rural developments occur in sparse rural and suburban settings outside distinct urban cities and towns. They are characterized by non-intensive land use and sparse building density. Typically, a rural development is a cross-roads community that has a corner gas station and a convenience store which are surrounded by sparse residential housing and agriculture. Scattered suburban communities located outside of a major urban center can also be included in this category as well as some industrial and commercial complexes; isolated transportation, power, and communication facilities; strip mines; quarries; and recreational areas such as golf courses, etc. Major highways through rural development areas are included in the rural development category.

**Other Land Use**

Other Land Use is composed of uplands not characterized by the previous categories. Typically these lands would include native prairie; unmanaged or non-patterned upland forests and scrub lands; and barren land. Lands in transition may also fit into this category. Transitional lands are changing from one land use to another. They generally occur in large acreage blocks of 40 acres (16 ha) or more and are characterized by the lack of any remote sensor information that would enable the interpreter to reliably predict future use. The transitional phase occurs when wetlands are drained, ditched, filled, leveled, or the vegetation has been removed and the area is temporarily bare.

---

Adapted from Anderson et al. 1976

# Appendix B.

This table presents estimates of acreage by classification, and the number of acres that changed classification between 1985 and 1996. The rows identify the 1985 classification; the columns identify the classification and acreage for 1996. The number under the acreage estimate for each entry is the percent coefficient of variation for that estimate.

|  |  | Saltwater | | | | | | | Freshwater | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | Marine Subtidal | Marine Intertidal | Estuarine Subtidal | Estuarine Intertidal Aquatic Bed | Estuarine Intertidal Emergent | Estuarine Intertidal Shrub | Estuarine Intertidal Unconsolidated Shore | Palustrine Aquatic Bed | Palustrine Emergent | Palustrine Forested | Palustrine Shrub |
| Saltwater | Marine Subtidal | 179568 (42) | 774 (72) | 24722 (96) | 0 (—) | 0 (—) | 0 (—) | 1293 (77) | 0 (—) | 0 (—) | 0 (—) | 0 (—) |
|  | Marine Intertidal | 515 (60) | 25577 (39) | 142 (96) | 0 (—) | 0 (—) | 31 (96) | 1262 (66) | 0 (—) | 0 (—) | 0 (—) | 0 (—) |
|  | Estuarine Subtidal | 0 (—) | 0 (—) | 2497709 (5) | 0 (—) | 1626 (60) | 429 (46) | 8549 (21) | 0 (—) | 0 (—) | 0 (—) | 0 (—) |
|  | Estuarine Intertidal Aquatic Bed | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) |
|  | Estuarine Intertidal Emergent | 0 (—) | 0 (—) | 250 (60) | 0 (—) | 306194 (17) | 9612 (41) | 76 (51) | 0 (—) | 0 (—) | 0 (—) | 0 (—) |
|  | Estuarine Intertidal Shrub | 0 (—) | 0 (—) | 90 (82) | 0 (—) | 5206 (59) | 602541 (14) | 156 (80) | 0 (—) | 0 (—) | 0 (—) | 0 (—) |
|  | Estuarine Intertidal Unconsolidated Shore | 0 (—) | 0 (—) | 6661 (41) | 0 (—) | 954 (67) | 3647 (47) | 171990 (22) | 0 (—) | 0 (—) | 0 (—) | 0 (—) |
| Freshwater | Palustrine Aquatic Bed | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 16251 (19) | 4163 (27) | 14 (98) | 1160 (37) |
|  | Palustrine Emergent | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 48 (96) | 0 (—) | 1082 (43) | 2412070 (11) | 9968 (80) | 306204 (19) |
|  | Palustrine Forested | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 7 (98) | 41654 (11) | 5261776 (5) | 187284 (26) |
|  | Palustrine Shrub | 0 (—) | 0 (—) | 114 (96) | 0 (—) | 0 (—) | 0 (—) | 0 (.) | 24 (96) | 19310 (18) | 292778 (31) | 1285364 (9) |
|  | Palustrine Unconsolidated Bottom | 0 (—) | 0 (—) | 22 (98) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 1085 (34) | 9590 (17) | 655 (98) | 770 (29) |
|  | Palustrine Unconsolidated Shore | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 1214 (48) | 0 (—) | 232 (53) |
|  | Palustrine Farmed | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 14 (98) | 0 (—) | 14 (98) |
| Deepwater | Lacustrine | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 922 (64) | 66501 (21) | 0 (—) | 5116 (50) |
|  | Riverine | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 51 (70) | 0 (—) | 7 (98) |
| Upland | Agriculture | 0 (—) | 0 (—) | 76 (95) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 7 (98) | 60134 (30) | 94 (98) | 1465 (44) |
|  | Urban | 0 (—) | 0 (—) | 111 (68) | 0 (—) | 0 (—) | 0 (—) | 221 (78) | 18 (81) | 343 (87) | 0 (—) | 14 (98) |
|  | Forested Plantations | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 4937 (56) | 628 (60) | 1325 (62) |
|  | Rural Development | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 0 (—) | 43 (96) | 0 (—) | 2490 (46) | 0 (—) | 401 (91) |
|  | Other | 0 (—) | 111 (96) | 280 (79) | 0 (—) | 228 (58) | 0 (—) | 131 (94) | 7 (98) | 14109 (34) | 332 (98) | 1764 (54) |
| Acreage Totals, 1996 |  | 180083 (42) | 26462 (38) | 2530116 (5) | 0 (—) | 314398 (17) | 616308 (14) | 179019 (21) | 20253 (18) | 2696911 (10) | 5599246 (5) | 1791124 (9) |

*1985 Classification and Acreage*

78

and Acreage

| Palustrine Unconsolidated Bottom | Palustrine Unconsolidated Shore | Palustrine Farmed | Deepwater | | Upland | | | | | Acreage Totals, 1985 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Lacustrine | Riverian | Agriculture | Urban | Forested Plantations | Rural Development | Other | | |
| 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | 206458 38 | Marine Subtidal |
| 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | 27327 38 | Marine Intertidal |
| 43 98 | 0 — | 0 — | 0 — | 0 — | 14 96 | 48 70 | 0 — | 208 86 | 0 — | 2504716 5 | Estuarine Subtidal |
| 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | Estuarine Intertidal Aquatic Bed |
| 17 96 | 0 — | 0 — | 0 — | 0 — | 7 96 | 10 96 | 0 — | 0 — | 0 — | 316207 17 | Estuarine Intertidal Emergent |
| 118 56 | 0 — | 0 — | 0 — | 0 — | 442 70 | 743 50 | 0 — | 892 58 | 107 94 | 619485 14 | Estuarine Intertidal Shrub |
| 0 — | 0 — | 0 — | 0 — | 0 — | 0 — | 176 77 | 0 — | 0 — | 73 60 | 183400 21 | Estuarine Intertidal Unconsolidated Shore |
| 1723 25 | 58 98 | 0 — | 79 98 | 78 98 | 313 45 | 129 54 | 0 — | 433 60 | 72 98 | 21452 17 | Palustrine Aquatic Bed |
| 3664 13 | 2507 42 | 8149 41 | 12799 52 | 1191 62 | 98438 29 | 11231 35 | 125 78 | 14275 24 | 9186 49 | 2907002 10 | Palustrine Emergent |
| 3213 29 | 108 98 | 98 82 | 492 46 | 0 — | 6789 28 | 11487 35 | 582 28 | 26421 38 | 3802 49 | 5543746 5 | Palustrine Forested |
| 2617 29 | 58 87 | 0 — | 635 74 | 253 101 | 13086 35 | 10645 45 | 645 51 | 10884 46 | 8208 51 | 1644682 9 | Palustrine Shrub |
| 144481 8 | 606 45 | 287 61 | 1541 43 | 0 — | 1590 37 | 1487 61 | 202 71 | 6822 65 | 237 43 | 170678 8 | Palustrine Unconsolidated Bottom |
| 794 48 | 3468 24 | 0 — | 79 82 | 0 — | 61 60 | 135 54 | 0 — | 314 52 | 0 — | 6206 20 | Palustrine Unconsolidated Shore |
| 23 98 | 0 — | 1997 47 | 0 — | 0 — | 152 39 | 0 — | 0 — | 0 — | 0 — | 2500 38 | Palustrine Farmed |
| 2860 44 | 0 — | 0 — | 1611999 17 | 0 — | 0 — | 5157 75 | 0 — | 3615 54 | 101 60 | 1636171 17 | Lacustrine |
| 0 — | 0 — | 0 — | 0 — | 135142 33 | 0 — | 0 — | 0 — | 87 98 | 0 — | 135257 33 | Riverine |
| 25288 21 | 353 57 | 946 40 | 34103 49 | 0 — | | | | | | | Agriculture |
| 3258 28 | 0 — | 0 — | 579 65 | 0 — | | | | | | | Urban |
| 2768 47 | 1205 98 | 79 98 | 4250 85 | 0 — | | | | | | | Forested Plantations |
| 5233 27 | 250 71 | 0 — | 8076 48 | 14 98 | | | | | | | Rural Development |
| 9150 21 | 52 70 | 0 — | 1801 47 | 14 98 | | | | | | | Other |
| 211351 8 | 9005 29 | 11496 31 | 1676485 17 | 138672 32 | | | | | | | Acreage Totals, 1996 |



U.S. Department of the Interior
U.S. Fish & Wildlife Service

http://www.fws.gov/

February 2005

*Nov. 2, 2020 Comment Letter to the U.S. Environmental Protection Agency from Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper re: Florida's Request To Assume Administration of a Clean Water Act Program [EPA-HQ-OW-2018-0640-0001]*

# EXHIBIT 4

10/27/2020     Florida Declared a Global Biodiversity Hotspot | University of Central Florida News | UCF Today - University of Central Florida Articles - Orlando, FL News

Case 1:21-cv-00119-RDM    Document 56    Filed 06/22/21    Page 311 of 312



SECTIONS

COLLEGES & CAMPUS NEWS

# Florida Declared a Global Biodiversity Hotspot

BY ZENAIDA KOTALA
FEBRUARY 26, 2016



The North American Coastal Plain – the low-lying land stretching from Texas to Florida to New England – was recently named the 36th biodiversity hotspot in the world, highlighting the importance of this region, but signaling concerns over threats to the plant and animal life there.

To be recognized as a global biodiversity hotspot, a region must contain at least 1,500 endemic plant species found nowhere else in the world and have experienced more than 70 percent habitat loss. The Coastal Plain has 1,816 endemic plants and has suffered an 85.5 percent loss of natural habitat. The loss of habitat shows no sign of slowing, according to several studies. Florida is entirely within the Coastal Plain and is the richest area biologically, but also the most threatened.

"We are suffering the highest rate of habitat loss because we have the highest rate of human population growth within the region," said Reed Noss, a University of Central Florida biology professor who was the lead author of a scientific study that landed Florida and the rest of the North American Coastal Plain on the list.

The Critical Ecosystem Partnership Fund created the biodiversity hotspot list based on scientific study. The list represents some of the world's most remarkable places that are also the most threatened. These places are reservoirs of plant and animal life and the highest priorities for conservation.

"Florida, in term of endemic species, is the hottest spot within the Coastal Plain," Noss said. Among the one-of-a-kind species in danger are species of turtles, frogs, freshwater fish, mice, birds and many types of plants and invertebrates.

Noss, who has been studying biodiversity conservation for more than 40 years said it is critical to protect the hotspots within the hotspot that have the highest biological values.

"We need more funding for the Florida Forever conservation fund, a continuation of which voters approved in 2014," Noss said. "It designates billions of dollars to land and water conservation over the next 20 years, but the Florida Legislature has ignored this mandate by diverting the vast majority of the funding to routine operating expenses."

Also important is to manage growth and stop urban sprawl, he said.

Noss directs the SPICE (Science and Planning in Conservation Ecology) Lab at the University of Central Florida. His research group is diverse, with ongoing projects including avian conservation, studies of the impacts of road and animal crossings, fire ecology, large carnivore conservation, and the effects of sea-level rise and climate change on Florida's biodiversity. Noss is also president of the Florida Institute for Conservation Science and has directed ecological and conservation studies in Florida, throughout the Southeastern United States, Pacific Northwest, Rocky Mountains and Canada.

Critical Ecosystem Partnership Fund is a joint initiative of l'Agence Française de Développement, Conservation International, the European Union, the Global Environment Facility, Japan, the MacArthur Foundation and the World Bank.

To read more about the hotspot list click here.

f SHARE    🐦 TWEET    8 SHARE

Case 1:21-cv-00119-RDM    Document 56    Filed 06/22/21    Page 312 of 312

f SHARE    𝕏 TWEET    ⊠ SHARE

**MORE HEADLINES**

**UCF Downtown Maker Space Reconfigures Layout to Reopen for Projects**

October 27, 2020

**UCF Homecoming 2020 in 14 Photos**

October 26, 2020

**How Fake News Affects U.S. Elections**

October 26, 2020

**UCF Researcher Is Working to Extend Battery Life in Smartphones, Electric Cars**

October 26, 2020

**MORE ABOUT COLLEGE OF SCIENCES**

**UCF Experts Weigh in as Coronavirus Captures Headlines**

October 26, 2020

**Chemistry Student Working to Develop Sustainable Technology to Clean Water Worldwide**

October 22, 2020

**The True Story Behind Horror Movies**

October 20, 2020

**MORE ABOUT COLLEGES & CAMPUS NEWS**

**UCF's Center that Helps Preserve, Share History Awarded National Grant**

October 26, 2020

**What Fans Need to Know for UCF's Homecoming Game**

October 22, 2020

**UCF Receives $7.5 Million Grant to Help Save Relationships During COVID-19**

October 21, 2020

**MORE TOPICS**

UCF Alumni    College of Sciences    Reed Noss

UNIVERSITY OF CENTRAL FLORIDA

About UCF    Contact Us    Faculty    Privacy Policy    Online Degrees    Pegasus    Policies    Public Records    Regulations    UCF News

4000 Central Florida Blvd. Orlando, Florida, 32816 | 407.823.2000

© University of Central Florida