*Nov. 2, 2020 Comment Letter to the U.S. Environmental Protection Agency from Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper re: Florida's Request To Assume Administration of a Clean Water Act Program [EPA-HQ-OW-2018-0640-0001]*

# EXHIBIT



Florida's Freshwater Priority Resources
A Guide for Future Management
A statewide assessment of public freshwater resources to focus aquatic restoration and enhancement efforts.
FWC

# Florida's Freshwater Priority Resources: A Guide for Future Management 2018



Florida Fish and Wildlife Conservation Commission
*Aquatic Habitat Conservation and Restoration Section*

*Recommended Citation:*

Florida Fish and Wildlife Conservation Commission (FWC). 2018. Florida's Freshwater Priority Resources: A Guide for Future Management. Tallahassee, Florida.

# Table of Contents

**Section I: Need for Wetland Assessment ........ 1**

Purpose of Assessment ........ 2

Future Considerations........ 2

**Section II: Identification of Freshwater Resources ........ 3**

Rivers and Streams........ 3

Non-forested Wetlands ........ 6

Forested Wetlands ........ 6

Lakes ........ 6

Prioritization Process........ 10

**Section III: Priority Resources ........12**

Northwest Region ........ 12

North Central Region........ 15

Northeast Region........ 18

Southwest Region ........ 21

South Region........ 24

**Section IV: Merging Priority Resources into Management Activities ........27**

## List of Figures and Tables

**Figure 1**. Florida's major freshwater habitat types........ 4

**Figure 2.** Florida's rivers and streams ........ 5

**Figure 3.** Florida's non-forested wetlands ........ 7

**Figure 4.** Florida's forested wetlands ........ 8

**Figure 5.** Florida's natural and artificial lakes........ 9

**Figure 6.** High-priority aquatic resources of the Northwest Region. ........ 13

**Figure 7.** High-priority aquatic resources of the North Central Region ........ 16

**Figure 8.** High-priority aquatic resources of the Northeast Region ........ 19

**Figure 9.** High-priority aquatic resources of the Southwest Region ........ 22

**Figure 10**. High-priority aquatic resources of the South Region ........ 25

**Table 1.** Summary of public aquatic resources assessed and resulting high-priority resources ........ 11

**Literature Cited ........29**

# SECTION I: Need for Wetland Assessment

Florida's freshwater aquatic resources are some of the most dynamic and ecologically unique habitats in the state. Habitat types include a diverse assemblage of sandhill and sinkhole lakes, bottomland hardwood forest, numerous softwater, calcareous and seepage streams, freshwater marshes and wet prairies, cypress swamps, alluvial rivers and associated floodplain marshes, spring and spring runs, and the Everglades. Ecologically, wetlands themselves serve as a critical interface between terrestrial habitats and many of the state's lakes, rivers and streams intercepting runoff and serving as natural water treatment facilities for the assimilation of phosphorous and nitrogen, heavy metals, and other toxic substances (Kautz et al. 1998). These aquatic resources provide nesting, foraging, wintering and migrating habitat for many species of fish and wildlife, including waterfowl, shorebirds, wading birds and songbirds as well as spawning grounds, nurseries, and food resources for fish, aquatic amphibians and insects. Many aquatic resources are identified as critical habitat under the provisions of the Endangered Species Act due to the high numbers of threatened and endangered plants (26%) and animals (45%) that directly or indirectly rely on wetlands and aquatic resources for survival (Niering 1988, Hammer 1992, Flynn 1996, Environmental Protection Agency [EPA] 2016a, EPA 2016b). Economically, aquatic resources contribute significantly to Florida's $38.3 billion outdoor recreation industry (Outdoor Industry Association 2011) as many recreational activities such as camping, hunting, fishing, birding, and photography take place in Florida's aquatic habitats. Accordingly, these activities support over 329,000 jobs and contribute $2.5 billion through state and local taxes.

At statehood, an estimated 20.3 million acres of wetlands existed in Florida (Dahl 1990). However, Florida was thought to have too much water and Floridians were most concerned about drainage, flood control, and navigation (Purdum 2002). As a result, wetlands were drained for farms, groves, and houses. Canals were cut to facilitate drainage and improve navigation. Floodwaters were held back with engineering works. Wastes were discharged without treatment into rivers, lakes, and coastal waters. Many water bodies became isolated from their historic flood plains, resulting in reduced and greatly altered aquatic habitat. Furthermore, water management activities have reduced the surface area of lakes, and water-level regulation schedules prevent natural fluctuations that otherwise maintain the health of these ecosystems (Kautz et al. 1998). Consequently, approximately 45% (9 million acres) of Florida's wetlands and aquatic resources have been converted, altered or destroyed, the most of any state (Dahl 2005, Estevez et al. 1984). Most of the net losses (72%) are attributed to urban and rural development with the remaining 28% resulting from agriculture activities (Dahl 2005). As of 2010, an estimated 11.3 million acres of wetlands existed in Florida, which represents approximately 31% of the area of the state, a greater percentage of the land surface than any other state in the conterminous United States (Dahl 2005, U.S. Department of Agriculture [USDA] 2015). Roughly 90% of Florida's wetlands consist of freshwater systems including approximately 32,000 lakes (U.S. Geological Survey [USGS] 2016). The remaining 10% includes marine and estuarine wetlands.

Florida's 2015 population estimate exceeded 20.2 million (U.S. Census Bureau 2015) and water managers today are concerned with water quality protection, water supply planning, water resources development, and preservation and protection of the natural environment. By 2030, Florida's population projection is expected to increase to 24.6 million, a 22% increase (University of Florida-Bureau of Economic and Business Research 2015). Conserving, protecting, and restoring natural systems, while ensuring an adequate water supply, remains one of Florida's greatest challenges (Purdum 2002). Despite Florida's storied history of wetland impacts, aquatic resources are major economic drivers contributing to quality of life for a variety of stakeholders at the local, regional and national scale. The diverse waterbodies that sustain our fish and wildlife populations are a concern for many citizens due to a rapidly changing landscape. Population growth, water withdrawals, water level stabilization in natural lakes, sedimentation, non-native species introduction and expansion, cultural eutrophication, and climate change are significant threats that will continue to have an impact on fish and wildlife populations.

FWC

*Alteration of wetlands in the Florida Everglades includes created ditches and canals. Florida's wetlands have been largely altered, converted, or destroyed.*

## Purpose of Assessment

Floridians' commitment to the natural resources of the state through passage of the Florida Water and Land Conservation Initiative (F.S. 375.041) provides an opportunity to continue to manage existing freshwater aquatic habitats, restore and enhance altered or manipulated freshwater habitats, and to incorporate innovative, science-based techniques to improve conservation efforts.

Thus, the purpose of this document is to assimilate current geographical and geospatial information on Florida's freshwater aquatic habitats and associated fish and wildlife species that depend on these resources. Using a science-based approach, a prioritization analysis was conducted to identify and locate publicly-owned aquatic resources. This information will help guide future management considerations that will provide the greatest conservation benefit from management, restoration and enhancement. This information further strengthens the Florida Fish and Wildlife Conservation Commission's (FWC) accountability in making informed, science-based decisions when expending legislatively appropriated funds towards public trust resources, benefiting not only fish and wildlife resources, but Florida citizens as well.

## Future Considerations

With Florida's increasing human population, encroachment and development continues into natural areas, stressing aquatic habitats and the fish and wildlife that depend on healthy wetlands. Furthermore, to meet human demand, large volumes of freshwater will be required to meet basic everyday consumption needs. Because sizeable acreages of freshwater habitats are privately held within Florida, preservation and protection of these resources may be crucial to maintaining quality fish and wildlife habitat. These aquatic resources are an integral component in maintaining wildlife corridors and reducing habitat fragmentation.

The FWC should evaluate opportunities to preserve and protect these privately-held aquatic resources. This can be accomplished through collaboration with other state and federal conservation agency partnerships.

# SECTION II: Identification of Freshwater Resources

For the purposes of this guide, and to ensure relative consistency with the 2018 revision of Florida's State Wildlife Action Plan (SWAP), Florida's freshwater aquatic habitat types are grouped into four major categories: 1) rivers and streams, 2) non-forested wetlands, 3) forested wetlands, and 4) lakes (Figure 1).

## Rivers and Streams

Rivers and streams are natural, flowing waters bound by channel banks that flow from a source to the downstream limits of tidal influence, or in some cases, discharge directly into the ocean (Nordlie 1990, Figure 2). Over 1,700 rivers and streams flow over Florida and are classified based on flow velocity, temperature, dissolved oxygen concentration, substratum, and water hardness (Fernald and Patton 1984, Nordlie 1990).

By flow, the four largest rivers are the Apalachicola, Suwannee, Choctawhatchee, and Escambia, all in north Florida. Stream flow varies little from month to month, but is highly variable seasonally and geographically across the state. Flow is based on several factors including the relatively low variability of average monthly rainfall, relatively high rate of evapotranspiration in summer, the large volume of slowly-released water from Florida's numerous lakes, and the large and relatively stable flow of ground water to rivers and streams from the aquifer system (Kenner 1969). Florida's rivers and streams contain a great diversity of plants, fish and wildlife. Due to the variety, fragility, and uniqueness of Florida's rivers and streams, many fish and wildlife species, including multiple endemic species, depend on these systems. Florida's rivers and streams are categorized as follows: spring run, alluvial, tidally-influenced, seepage, riverine sandbar, and blackwater (Florida Natural Areas Inventory [FNAI] 2010).

FWC

*Non-forested wetland, Split Oak Forest WEA near Orlando, Florida.*

# Florida's Major Freshwater Habitat Types

| Rivers and streams: | Non-forested wetlands: | Forested wetlands: | Lakes: |
|---|---|---|---|
| Natural waters, bound by channel banks, that flow from a source to the downstream limits of tidal influence or discharge into the ocean. | Large alluvial floodplains or shallow depressions typically dominated by grasses, herbs, and shrubs. | Typically alongside rivers and streams, lakes, and seepage basins, dominated by trees adapted to aquatic environments. | Standing water bodies of natural origin, with a surface area measuring one or more acres. In Florida, often interconnected with groundwater. |

***Figure 1.*** *Florida's major freshwater habitat types: rivers and streams, non-forested wetlands, forested wetlands, and lakes.*

Identification of Freshwater Resources

# Florida's Rivers and Streams

Natural rivers and streams
Alluvial stream
Blackwater stream
Riverine sandbar
Seepage stream
Spring-run stream
Tidally-influenced stream
N
0
50
100
150
200
Total river and stream miles in Florida: 98,809
Miles are estimated by accessibility from either a public boat ramp or public conservation area.
Privately owned:
43,041 miles (44%)
Publicly owned:
55,768 miles (56%)

***Figure 2.*** *Florida's rivers and streams. Rivers and streams were identified and mapped utilizing U.S. Geologic Survey National Hydrography Dataset (NHD) Plus (USGS 2016, McKay et. al. 2012) which includes the Strahler order of stream reaches. Streams not included in the NHD Plus were assumed to be a Strahler order of 1. Furthermore, rivers and streams were based at the hydrologic unit code (HUC) 12. These sources are slight deviations from the calculations used in Florida's State Wildlife Action Plan (2017).*

5 Florida Fish and Wildlife Conservation Commission

## Non-Forested Wetlands

Non-forested wetlands are one of the most widespread and abundant wetland types in Florida and are typically associated with large alluvial floodplains, or occur in shallow depressions throughout the state (Figure 3). As the name implies, non-forested wetlands consist of early successional plant species such as grasses, herbs, and small shrubs. If a woody canopy is present, it is generally sparse and often stunted. Recurring fire and other forms of disturbance, especially during the early growing season, is crucial in maintaining an early successional, non-woody vegetative community.

The hydrologic regime, soils and disturbance frequency can define the sub-classification of non-forested wetlands. Generally, marshes are flooded seven to twelve months a year and occur in sandy, clay, marl and organic soils (Kushlan 1990). Hydroperiod and inundation depth will influence the types of plants that grow. Emergent or floodplain marshes are shallowly flooded (less than one foot deep) for shorter periods and include emergent grasses and herbaceous plants such as sedges, rushes, and cattails. Marshes containing floating-leaved plants (e.g., water-lilies, duck weed, spatterdock) or submersed plants (e.g., eel grass, coontail, pondweed) tend to be flooded year-round at depths greater than two feet. Other types of non-forested wetlands include prairies and bogs in which the soils are typically saturated during the rainy season and may or may not contain standing water. Vegetation usually consists of a mixture of wetland and herbaceous plants, some of which are facultative, or found growing in non-wetland soils.

## Forested Wetlands

Forested wetlands occupy 10% of Florida's land area and occur along rivers and streams, lakes, and seepage basins (Figure 4). Forested wetlands are dominated by hydrophytic trees that are adapted to aquatic environments. Many types of forested wetland communities can be found in Florida, such as cypress swamps, bottomland hardwood forest, bay swamps, and hydric hammocks. Similar to non-forested wetlands, the hydrologic regime, soils, and inundation depth influence and determine the classification of forested wetland at a given site. For example, bottomland hardwoods typically occur in the northern latitudes of the peninsula under relatively short hydroperiods (three to six months per year), whereas cypress swamps are found throughout the state, but under a more protracted hydroperiod (more than nine months per year).

Trees typically associated with forested wetlands include water hickory, river birch, Florida elm, live oak, bald and pond cypress, water tupelo, swamp ash, and cabbage palm. Other forested wetlands are characterized by the presence of broad-leaved evergreens, such as sweetbay, loblolly bay and swamp bay intermixed with deciduous hardwoods.

## Lakes

Florida has approximately 31,978 natural lakes with a surface area of one acre or more (Figure 5). This habitat category is comprised exclusively of standing water bodies of natural origin. In addition to natural lakes, the FWC currently manages numerous "artificial" impoundments and reservoirs (Commission Managed Impoundments – CMIs) for fish and wildlife benefit and recreational use. The great majority of natural lakes were formed or enlarged by dissolution of the underlying limestone by acidic surface waters. As a result, many retain an intimate connection with groundwater, and lack a natural surface outflow. Others may be connected to aquatic caves by underground fissures or bedding planes. Some are landlocked and dependent on rainfall as their only source of water, while others have surface water inlets and outlets. Many of those with surface water inlets and outlets, such as the Kissimmee chain of lakes, have been altered by the construction of water control structures and canals.

Florida's lakes are usually less than 10 feet (3 m) deep, with sand, silt, or organic bottom substrates. Depending on the water chemistry, vegetation in the lakes can vary from nonexistent, to a fringe of emergent plants at the shoreline, to a complete covering of floating plants. Introduced, non-native aquatic species are a major threat to this habitat. For more information about Florida's natural lakes, please visit FNAI's Guide to the Natural Communities of Florida, 2010 Edition.

# Florida's Non-Forested Wetlands

***Figure 3.*** *Florida's non-forested wetlands. This habitat is broken into 5 classifications. Nearly 5.5 million acres of freshwater non-forested habitat exists in the state, nearly half of which is publicly managed. Data source: FNAI Cooperative Land Cover (v3.2) and FNAI 2016 Florida Managed Areas.*

# Florida's Forested Wetlands

***Figure 4.*** *Florida's forested wetlands. Slightly more than half of the 4 million acres of forested wetlands in Florida are publicly-managed. Data source: FNAI Cooperative Land Cover (3.2) and FNAI 2016 Florida Managed Areas.*

# Florida's Natural and Artificial Lakes

***Figure 5.*** *Florida's natural and artificial lakes. While the number of privately-owned lakes exceeds publicly-owned lakes, the total surface area acreage of publicly-owned lakes is nearly five times more than that of privately-owned lakes. Lakes were identified and mapped utilizing U.S. Geologic Survey National Hydrography Dataset. Only public natural lakes greater than 50 acres were used in the assessment.*

## Prioritization Process

The process of prioritizing the four major aquatic habitat types began by partitioning out publicly-owned lands from those held in private ownership.

Because there are tens of thousands of miles of rivers and streams in Florida, these resources were consolidated into sub-watershed boundaries (Hydrologic Unit Code-12; U.S. Fish and Wildlife Service [USFWS] 2002, USGS 2017). Sub-watersheds, which range in size from 10,000 to 40,000 acres, provide the best available resolution of priority stream locations. Using the National Hydrography Dataset stream flowlines (USGS 2016), 1,295 sub-watersheds were identified, of which 1,235 contained publicly accessible streams. Streams within each sub-watershed were weighted for analysis by Strahler order and length (the larger the stream, the higher the priority value).

Non-forested and forested wetlands were partitioned out by selecting the appropriate sub-classes for each habitat type utilizing the 2016 FNAI Cooperative Land Cover layer and clipping them from the FNAI 2016 Florida Managed Areas layer. Over 2,500 public conservation areas were identified, of which 1,835 contained either forested or non-forested wetlands. Many contained both wetland types. Public conservation areas with wetlands classified as artificial impoundments (e.g., T.M Goodwin Waterfowl Management Area) were excluded from this assessment. The FWC recognizes that many of these conservation areas provide high fish and wildlife resource values, significant water quality and quantity benefits, and numerous recreational opportunities. Although excluded from the prioritization analysis, these areas are intensely managed by FWC and cooperating agencies.

Lakes were considered public if they were accessible from a public boat ramp or public waterway, which resulted in nearly 14,000 public lakes. In order to focus FWC's efforts on those public lakes with the greatest capacity to influence habitat restoration efforts, we excluded those less than 50 acres for analysis. This process resulted in 324 public lakes greater than or equal to 50 acres for prioritization (FWC 2012b).

Collectively, this information was used to create four new "base" geospatial data layers, one for each of the four publicly-owned/accessible aquatic habitat types. An iterative, analytical process was then used to overlay additional physical and biological data layers (referred to as variables or parameters) on top of the four base layers to evaluate their presence (or absence) and importance to the resource. These variables, identified below, were grouped into three categories, each comprised of four geospatial parameters (seven each for lakes, FWC 2012b).

Variables evaluated over base layers to determine ranking of regional aquatic resources:

**1) Socio-Economic –** provide a measure of public outdoor recreational opportunities (parameters include recreational trails, population centers, hunting and fishing opportunities, and FWC management areas);

**2) Fish And Wildlife Resources –** designed to highlight ecological significance of each aquatic resource and how it relates to fish and wildlife function (i.e., public waterbody/wetland size, threatened, endangered, and species of greatest conservation need, avian focal areas, hydrological units); and

**3) Management Emphasis –** designed to measure biological significance that relate to the need and opportunity for aquatic habitat restoration and include information such as impaired waters, road density, land cover, hydrologic modification, invasive aquatic and wetland plants, and riparian/freshwater buffers.

Identify public conservation areas containing wetland habitats and sub-watersheds containing public streams → Analyze identified areas using consistent, measurable variables → Within each region, rank results of the analysis using natural break → **RESULT:** Regionally prioritized areas for each habitat type

*Prioritization process for areas containing aquatic resources in FWC's five regions. The resulting priorities will help inform allocation of resources to manage and enhance aquatic habitats throughout Florida.*

## Identification of Freshwater Resources

Each publicly-owned aquatic resource that was partitioned out as described on the preceding page received a score ranging between zero and one for each variable evaluated. For example, the avian focal areas variable identifies important focal areas for waterfowl, wading birds, land birds, seabirds, and shorebirds. If a publicly-owned aquatic resource did not fall within any of the avian focal areas, that aquatic resource received a score of zero for that variable. However, if the aquatic resource fell within one of the five focal areas, it would receive a score of 0.20, and a score of 0.40 if it fell within two of the five areas, etc. The scores for each public aquatic resource by habitat type were then summed across all variables and grouped for each of FWC's five regions. A Jenks natural breaks optimization classification (Jenks 1967, Jenks and Caspall 1971) was used to rank (low, medium low, medium, medium high and high) each aquatic resource, by habitat type for each of the five regions.

Table 1 summarizes the number of public aquatic resources assessed by habitat type for each region, along with those identified as high priority. Aquatic resources classified as medium high, medium, medium low and low are presented, by region, in Appendix B of the online version of Florida's Freshwater Priority Resources Document.

***For more detailed information on the identification of habitat types, how public lands were partitioned out, or the geo-spatial data variables utilized, please refer to Appendix A of the online version of Florida's Freshwater Priority Resources: A Guide for Future Management. The document can be located at MyFWC.com/AquaticHabitats.***

***Table 1.*** *Summary of public aquatic resources assessed and resulting high-priority resources. Resources were assessed within the four major aquatic habitat types, and within each FWC Region.*

| Aquatic Habitat Type | | Rivers & Streams | | Non-Forested Wetlands | | Forested Wetlands | | Lakes | |
|---|---|---|---|---|---|---|---|---|---|
| FWC Region | | Sub-Watersheds | Stream Miles | Conservation Areas | Wetland Acres | Conservation Areas | Wetland Acres | Number >50 Acres | Total Acres |
| Northwest | Assessed | 340 | 16,376 | 201 | 162,117 | 230 | 708,343 | 35 | 53,819 |
| | High-Priority | 42 | 2,408 | 12 | 124,282 | 11 | 500,515 | 4 | 21,653 |
| North Central | Assessed | 231 | 8,513 | 247 | 118,058 | 340 | 438,285 | 30 | 53,625 |
| | High-Priority | 42 | 2,523 | 28 | 70,612 | 35 | 238,776 | 5 | 35,475 |
| Northeast | Assessed | 259 | 9,949 | 380 | 353,258 | 407 | 486,371 | 137 | 330,940 |
| | High-Priority | 39 | 2,824 | 26 | 221,732 | 30 | 265,518 | 11 | 116,867 |
| Southwest | Assessed | 270 | 10,514 | 361 | 148,090 | 414 | 246,212 | 117 | 113,894 |
| | High-Priority | 29 | 1,739 | 43 | 77,035 | 65 | 134,618 | 1 | 27,262 |
| South | Assessed | 136 | 9,592 | 242 | 2,082,248 | 243 | 542,255 | 4 | 450,277 |
| | High-Priority | 16 | 2,443 | 29 | 1,875,738 | 20 | 416,009 | 1 | 448,000 |

# SECTION III: Priority Resources

This section includes high-priority aquatic resources identified within each FWC region. Priority rivers and streams are referenced by the sub-watershed in which they occur, rather than the individual stream name. In many cases, the given name of the sub-watershed may include "Lake," as in Lake Munson, a high-priority sub-watershed in the Northwest Region. Readers are reminded that these are not priority lakes, but refer to the names of sub-watersheds containing priority rivers and streams.

## Northwest Region

High-priority aquatic resources are clustered around Apalachicola, west of Tallahassee, and east of Pensacola (Figure 6). Sub-watersheds such as Tate's Hell Swamp-Cash Creek, Cat Creek, Carters Mill Branch and Lake Jackson are noted for their high socio-economic importance, management emphasis, and fish and wildlife values. Other high-ranking sub-watersheds include Blounts Bay Frontal and East River-Apalachicola River Frontal. This region contains numerous seepage/steephead and softwater streams (Tonsmeire et al. 1996), important for recreational value and high species diversity (Florida Department of Environmental Protection [DEP] 2005).

Priority conservation areas containing non-forested and forested wetlands include Apalachicola National Forest, Apalachicola River Wildlife and Environmental Area (WEA), Tate's Hell State Forest, and Tate's Hell Wildlife Management Area (WMA). Tate's Hell State Forest, a 202,437-acre conservation area comprised of 27,506 acres of non-forested and 45,813 acres of forested wetlands was the only conservation area in the region to rank high in all three categories (socio-economic importance, management emphasis, and fish and wildlife values). The hydrology within many of the conservation areas was substantially altered in the 1960's with the construction of roads and associated ditches and the establishment of slash pine plantations. These impacts degraded wetlands through drainage and altered freshwater flows into the Apalachicola Bay. Restoration efforts are now underway to reconnect wetlands to restore fresh water flow to the Bay. FWC staff also actively work to restore ephemeral wetlands, benefitting threatened and endangered species such as the Florida bog frog and frosted flatwoods salamander.

Lake Talquin in the Tallahassee area, one of the four high-priority lakes in the region, is an 8,088-acre reservoir in Gadsden County formed in the 1920s by damming the Ochlocknee River. Lake Talquin is nationally known for its high-quality black crappie fishery and supports at least 10 public boat ramps, seven public fishing piers, and six fish camps. Enhancement activities include drawdowns, re-establishment of native vegetation through transplanting efforts, and stocking of largemouth bass.

Multiple public and private partners within the region such as DEP, the Northwest Florida Water Management District, the USFWS, the U.S. Forest Service (USFS), The Nature Conservancy, and Apalachicola Riverkeeper provide opportunities to leverage funds for aquatic restoration and enhancement. The FWC's Aquatic Habitat Restoration and Enhancement Sub-Section (AHRE) maintains staff near Tallahassee and Crestview for riverine restoration and management of multiple water-bodies and wetlands throughout the region.

FWC

*Lake Munson near Tallahassee is a popular urban waterbody within a high-priority sub-watershed for the Apalachee Bay-St. Marks sub-basin.*

Priority Resources

# Northwest Region

Pensacola
Panama City
Apalachicola
Tallahassee
Managed Conservation Areas
Regional boundary
Aquatic habitat types
Rivers and streams
Non-forested wetlands
Forested and non-forested wetlands
Forested wetlands
Lakes
0 5 10 20 30 40
Miles
0 5 10 20 30 40
Kilometers
N

***Figure 6.*** *High-priority aquatic resources of the Northwest Region*

13

Florida Fish and Wildlife Conservation Commission

# Northwest Region Legend

1 Lake Lafayette
2 Lake Munson
3 Fisher Lake
4 Wakulla Springs
5 Goose Creek-Walker Creek Frontal
6 Old Creek-Skipper Creek Frontal
7 Lower St. Marks River
8 Lake Jackson
9 Reed Swamp
10 Lower Little River-Lake Talquin
11 East Lake Talquin
12 Central Lake Talquin
13 Buckhorn Creek-Sopchoppy River
14 Lower Sopchoppy River
15 Ochlocknee Bay
16 Race Pond
17 West Lake Seminole
18 Kelly Branch
19 Kennedy Creek
20 Little Owl Creek
21 Juniper Cove Swamp
22 Brothers River
23 East River-Apalachicola River Frontal
24 Carter's Mill Branch
25 Thousand Yard Bay
26 Lower Crooked River
27 Cat Creek
28 Carabelle River
29 Tate's Hell Swamp-Cash Creek
30 Blounts Bay Frontal
31 Peach Creek
32 Eastern Lake-Phillips Inlet Frontal
33 McQuage Bayou-Mack Bayou Frontal
34 Boggy Bayou-Choctawatchee Bay
35 Deadfall Creek-Yellow River
36 Turkey Hen Creek-Shoal River
37 Ninemile Creek-Blackwater River
38 Lower Big Juniper Creek
39 Pensacola Bay
40 Lower Sandy Creek
41 Pine Log Creek
42 White River
43 Gil Waters Preserve at Lake Munson
44 Lake Talquin State Park
45 Wakulla State Forest
46 Apalachicola National Estuarine Research Reserve
47 Apalachicola National Forest
48 Apalachicola River WEA
49 Blackwater River State Forest
50 Eglin Air Force Base
51 Lake Talquin State Forest
52 St. Marks National Wildlife Refuge
53 Tate's Hell State Forest
54 Tate's Hell WMA
55 Apalachicola River WMA
56 Aucilla WMA
57 Lake Iamonia
58 Lake Jackson
59 Lake Miccosukee
60 Lake Talquin/JT Budd Pond

*Note: Numerical values are for identification purposes only and do not represent ranking order*

## North Central Region

The North Central region contains unique wetlands supporting diverse wildlife. High-priority aquatic resources identified in this region are centered close to Jacksonville, Gainesville, Inverness and Chiefland (Figure 7). The highest scoring sub-watersheds include the Homosassa River near Inverness and Lochloosa Lake south of Gainesville, both of which ranked high for their management emphasis, socio-economic importance, and fish and wildlife values. Other high ranking sub-watersheds include: Lower Pablo Creek and Governors Creek near Jacksonville; Newnans Lake, Hogtown Creek, and Hatchet Creek near Gainesville; and Crystal River, West Lake Rousseau-Cross Florida Barge Canal, and Barnett Creek-Black Point Swamp Frontal near Inverness/ Chiefland.

The highest-ranking conservation areas for non-forested and forested wetlands include the Palatka-to-Lake Butler State Trail east of Gainesville, and Timucuan Ecological and Historic Preserve in Jacksonville. In the Inverness/Chiefland area, the Cedar Key Scrub State Reserve, Crystal River Preserve State Park and Withlacoochee Gulf Preserve (Yankeetown Conservation Area) all ranked high. Restoration and enhancement activities conducted by AHRE staff in this region have largely focused on streams. Activities include the installation of hardened low-water crossings and bank stabilization practices to minimize siltation and the transportation of sediments.

High-priority lakes are centered near Gainesville and Inverness. Gainesville-area lakes include Orange, Lochloosa, and Newnans, which are noted for their high fish and wildlife values and their socio-economic importance. In particular, Orange and Lochloosa lakes are designated as "Outstanding Florida Waters," a special protection due to their natural attributes. In 2016, FWC developed the Orange Lake Management Plan, incorporating the input from stakeholders to help guide restoration and enhancement activities (FWC 2016). Lakes Rousseau and Tsala Apopka, near Inverness, include expansive marshes and numerous boat ramps and public piers. Many commercial businesses exist along the highly residential shores of these water bodies. Though not highly productive fisheries, these lakes are important habitat for many other wildlife species and for recreation. Restoration and enhancement of these lakes are guided by a detailed study conducted on sediments and vegetation characteristics of the Tsala Apopka Chain of Lakes (FWC 2008).

Management responsibilities of these priority resources falls mainly to FWC's Wildlife and Habitat Management Section (WHM), the water management districts, DEP, the USFWS and the USFS. The diversity of public partners within close proximity of high-priority aquatic resources, provide multiple opportunities for restoration and enhancement. AHRE staff is actively involved with the restoration, enhancement and management of multiple aquatic resources and has project management staff located in Ocala, Eustis, and the Gainesville area. Enhancement activities employed on these systems in the past include organic sediment scrapping, tussock harvesting and shredding, herbicide plant management, sediment removal from springs and construction of low-water crossings on streams.

FWC

*Manatee Springs and its associated spring run provide critical habitat for Florida manatees.*

# North Central Region

***Figure 7.*** *High-priority aquatic resources of the North Central Region.*

# North Central Region Legend

| No. | Name | No. | Name | No. | Name | No. | Name |
|---|---|---|---|---|---|---|---|
| 1 | Ocean Pond | 22 | Juniper and Withlacoochee Rivers | 43 | Camp Chowenwow Park | 64 | Paynes Prairie Preserve State Park |
| 2 | Hampton Lake | 23 | Bradley Lake | 44 | Cedar Keys National Wildlife Refuge | 65 | Potts Preserve |
| 3 | Amelia River | 24 | Moccasin Slough | 45 | Big Bend WMA | 66 | Timucuan Ecological and Historic Preserve |
| 4 | Nassau Sound-Fort George Inlet | 25 | Rousseau-Cross-Florida Barge Canal | 46 | Camp Blanding Military Reservation | 67 | Waccasassa Bay Preserve State Park |
| 5 | Hatchet Creek | 26 | Tenmile and Lower Cow Creeks | 47 | Cedar Key Scrub State Reserve | 68 | Wannee Conservation Area |
| 6 | Hogtown Creek | 27 | Barnett and Black Point Creeks | 48 | Chassahowitzka National Wildlife Refuge | 69 | Withlacoochee State Trail |
| 7 | Gum Root Slough | 28 | Thousandmile and Helverson Creeks | 49 | Chassahowitzka River and Coastal Swamp | 70 | Withlacoochee Gulf Preserve |
| 8 | Paynes Prairie | 29 | Bumblebee Creek | 50 | Crystal River Preserve National Wildlife Refuge | 71 | Andrews WMA |
| 9 | Newnans Lake | 30 | Howard and Shired Creeks | 51 | Crystal River Preserve State Park | 72 | Crystal River Archeological State Park |
| 10 | Lochloosa Lake | 31 | Butler and Shired Creeks | 52 | Egans Creek Greenway | 73 | Ellie Schiller Homosassa Springs Wildlife State Park |
| 11 | Lower North Fork of Black Creek | 32 | Aucilla River-Apalachee Bay | 53 | Flying Eagle Preserve | 74 | Fort Caroline National Memorial |
| 12 | Black Creek-St. Johns River | 33 | Falling Creek | 54 | Gothe State Forest | 75 | M.K. Rawlings Park |
| 13 | Governor's Creek | 34 | Robinson Creek | 55 | Jennings State Forest | 76 | Manatee Springs State Park |
| 14 | Clapboard Creek | 35 | Sugar Creek | 56 | Kathryn Abbey Hanna State Park | 77 | Ralph E. Simmons State Forest |
| 15 | Lower Pablo Creek | 36 | Lower Withlacoochee River | 57 | Lochloosa Wildlife Conservation Area | 78 | Twin Rivers State Forest |
| 16 | Chicopit Bay | 37 | Sun Springs | 58 | Lower Suwannee National Wildlife Refuge | 79 | Yellow Jacket Conservation Area |
| 17 | Little Rocky and Cedar Creeks | 38 | North Old Town Hammock | 59 | Machaba Balu Preserve | 80 | Lake Rousseau |
| 18 | Crystal River | 39 | Bell Springs | 60 | Marine Corps Support Facility-Blount Island | 81 | Lochloosa Lake |
| 19 | Salt River | 40 | Suwannee River | 61 | Mayport Naval Station | 82 | Newnans Lake |
| 20 | Homosassa River | 41 | Upper Olustee Creek | 62 | Osceola National Forest | 83 | Orange Lake |
| 21 | Mason Creek-Seven Cabbage Cutoff | 42 | Alligator Lake-Ichetucknee River | 63 | Palatka-to-Lake Butler Trail | 84 | Tsala Apopka Chain of Lakes |

*Note: Numerical values are for identification purposes only and do not represent ranking order*

## Northeast Region

The Northeast region is notable for the high acreage of lakes and non-forested wetlands, second only to the South Region. The majority of high-priority sites are between Palatka and Titusville, with a small cluster occurring south of Kissimmee (Figure 8). Although high-priority sub-watersheds are spread throughout the region, most are located west of Titusville. These include Ruth Lake, the Lower Econolockhatchee River, and the Indian River Lagoon. Others located in and around Eustis and Palatka include Lake Monroe, Pellicer Creek-Big Mulberry Branch Frontal, and Lower Tolomata River. These sub-watersheds score high for their management emphasis, and either high or medium-high for socio-economic importance and fish and wildlife resources values.

Priority conservation areas containing non-forested and forested wetlands include the Little Big Econ State Forest, Seminole Ranch Conservation Area, and Tosohatchee Wildlife Management Area. Other high-ranking conservation areas include the Ocala National Forest east of Ocala, and Withlacoochee State Forest west of Kissimmee. In particular, the Ocala National Forest is a 383,689-acre conservation area comprised of 12,186 acres of non-forested and 45,061 acres of forested wetlands. This critical conservation area contains more than 600 lakes, rivers, pothole marshes, and sinkhole lakes, including three first-magnitude springs. Hydrologic issues exist along numerous USFS roads due to both recreational use and timber management. AHRE staff is currently working with the USFS on hydrologic restoration and enhancement of numerous aquatic resources within the Ocala National Forest.

FWC

*Emeralda Marsh Conservation Area, a restored agricultural area in central Florida.*

High-priority lakes in the region include the Kissimmee Chain of Lakes (KCOL) (Lakes Kissimmee, Tohopekaliga, East Lake Tohopekaliga, Hatchineha, Jackson and Marian). Lake Jackson and Lake Marian are components of Three Lakes Wildlife Management Area, which also contains priority non-forested and forested wetlands. These aquatic resources are located within 30 minutes of Kissimmee, one of Florida's most popular tourist destinations. The KCOL is a world-renowned largemouth bass fishery that hosts hundreds of fishing tournaments annually and is vital to Osceola and Polk counties' economies. The KCOL also provides important habitat for the endangered Everglade snail kite. Furthermore, the KCOL lakes are classified as Fish Management Areas by FWC and Osceola County and provide extensive recreational opportunities, including waterfowl hunting, alligator hunting, and ecotourism. Unfortunately, stabilized water levels on the KCOL cause accelerated lake succession resulting in undesirable dense vegetation and organic sediment accumulation. AHRE and FWC Invasive Plant Management (IPM) staff routinely treat nuisance and invasive aquatic plants throughout the lakes with herbicides to maintain desirable plant communities for fish and wildlife habitat. Additionally, littoral habitat is managed through selective mechanical removal of dense nuisance plant communities and organic sediment using floating equipment under inundated conditions or earth-moving equipment under drawdown conditions.

Wetland habitats in the Northeast Region are highly valued for recreational opportunities and diversity. However, the proximity of many wetlands and streams to urbanized and developed lands, water supply needs, and flood protection has resulted in the degradation of many of these aquatic resources (DEP 2006a). Partnerships exist for restoration and enhancement within the region including Friends of Turkey Creek, Volusia County Land Conservation Program, DEP's Watershed Restoration Program, and the St. Johns River Water Management District (SJRWMD). In this region, FWC shares management and conservation responsibility of these resources with DEP's Central District, and the SJRWMD. AHRE teams are located in Eustis and Kissimmee, and several project management staff are located near Vero Beach.

# Northeast Region

*Figure 8.* *High-priority aquatic resources of the Northeast Region*

# Northeast Region Legend

1. North St. John's Marsh
2. North Marsh of Lake Washington
3. Lake Washington
4. Lake Poinsett
5. Halfway Lake
6. Lower Jim Creek
7. Tootoosahatchee Creek
8. Clark Lake
9. Ruth Lake
10. Puzzle Lake
11. Lower Econolockhatchee River
12. Lake Harvey
13. Lake Monroe
14. Little Wekiva River
15. Rock Springs Run
16. Wekiva Springs
17. Wekiva River
18. Spring Garden Creek
19. Lake Woodruff
20. Lake Beresford
21. Lake Dexter
22. Hitchens Creek
23. Lake George
24. Lake Eustis
25. Lake Yale
26. Lake Griffin
27. Mud Prairie Swamp
28. Pellicer Creek- Big Mulberry Branch Frontal
29. Lower Tolomato River
30. North Banana River
31. Newfound Harbor
32. South Banana River
33. Indian River Lagoon
34. Mosquito Lagoon
35. Fort Pierce Inlet-Indian River
36. Lake Hatchineha
37. Lake Marian
38. Fodderstack Slough
39. Lake Kissimmee
40. Enchanted Forest Sanctuary
41. Welaka National Fish Hatchery
42. Blue Cypress Conservation Area
43. Buck Lake Conservation Area
44. Chain of Lakes Park
45. Charles H. Bronson State Forest
46. Green Swamp Wilderness Preserve
47. Kissimmee Chain of Lakes Area
48. Lake George State Forest
49. Lake Woodruff Natonal Wildlife Refuge
50. Little Big Econ State Forest
51. Lower Wekiva River Preserve State Park
52. Marjorie Harris Carr Cross Florida Greenway
53. Merritt Island National Wildlife Refuge
54. Ocala National Forest
55. Ocklawaha Prairie Restoration Area
56. Orlando Wetlands Park
57. River Lakes Conservation Area
58. Rock Springs Run State Reserve
59. Salt Lake WMA
60. Seminole Ranch Conservation Area
61. Seminole State Forest
62. Three Forks Conservation Area
63. Three Lakes WMA
64. Tosohatchee WMA
65. Withlacoochee State Forest
66. Canaveral National Seashore
67. Cape Canaveral Air Station
68. Caravelle Ranch WMA
69. Emeralda Marsh Conservation Area
70. Sunnyhill Restoration Area
71. Welaka State Forest
72. Blue Cypress Lake
73. East Lake Tohopekailga
74. Lake Griffin
75. Lake Harris
76. Lake Hatchineha
77. Lake Jackson
78. Lake Jesup
79. Lake Kissimmee
80. Lake Marian
81. Lake Panasoffkee
82. Lake Tohopekailga

*Note: Numerical values are for identification purposes only and do not represent ranking order*

## Southwest Region

High-priority aquatic resources are distributed along the west coast south of Brooksville to Fort Myers (Figure 9). Most priority sub-watersheds are located between Sarasota and the Fort Myers area near mouths of the Myakka River and Peace Rivers. Others are located between Tampa and Lakeland.

The highest-ranked sub-watersheds include: Yellow Fever Creek-Fourmile Cove serving the Caloosahatchee River; Tippecanoe Bay and Rock Creek-Oyster Creek Frontal in Port Charlotte at the confluence of the Myakka River and Peace River; and Cow House Creek, Spillway 20, and Palm River northeast of Tampa. All these sub-watersheds received high values for their management emphasis, socio-economic importance, and fish and wildlife values. Yellow Fever Creek-Fourmile Cove and Tippecanoe Bay also contained the greatest number of weighted stream-miles.

Babcock Ranch Preserve, the region's highest-ranking conservation area, contains 7,397 acres of non-forested wetlands and 15,554 acres of forested wetlands. The preserve anchors a conservation corridor of public and private land that stretches from Lake Okeechobee to the Gulf of Mexico and spans a diverse mosaic of pinelands, including both wet and mesic pine flatwoods, dry prairie ecosystems interspersed with cypress domes, and cypress swamps. Other high-ranked conservation areas include Ann Dever Memorial Regional Park, Oscar Scherer State Park, South Venice Lemon Bay Preserve in Port Charlotte, and Circle B Bar Reserve in Lakeland. The two conservation areas with the greatest acreages of high-priority forested and non-forested wetlands include Avon Park Air Force Base and Fred C. Babcock-Cecil M. Webb Wildlife Management Area (a sister conservation area to Babcock Ranch Preserve). Both conservation areas rank high for their socio-economic and fish and wildlife values, but rank medium in their management emphasis because of high preservation value.

Although the Southwest Region is home to 116 public lakes greater than 50 acres, Lake Istokpoga, a 27,692-acre natural lake south of Sebring, is the only high-priority lake in the region. Recreation on Lake Istokpoga is important to the local and regional economies. The recreational fishery alone generates 3 to 6 million dollars for the local economy, which supports numerous fishing guides, six fish camps and other local businesses (Bell and Bonn 2004). Lake Istokpoga has been identified by the USFWS as a priority management area for the Everglade snail kite. Management, restoration and enhancement of the lake's nearly 5,000-acre littoral marsh is an important component in kite population recovery. The lake also serves as a flood-control outlet for its watershed and a downstream water-supply source for agriculture (Bell and Bonn 2004, SFWMD 2005). Stabilized water levels and reversal of the natural fluctuation cycle within Istokpoga have fostered an undesirable expansion of invasive and nuisance plant species that displace more diverse aquatic vegetation communities. Management on Lake Istokpoga is based on an integrated habitat management approach and is broken into four primary activities: herbicide management, mechanical removal of nuisance plants and organic sediments, revegetation with native aquatic species, and prescribed fire.

With nearly 100 high-priority aquatic resources spread throughout the region, multiple opportunities exist for restoration and enhancement. Partners in restoration and conservation efforts include the Charlotte Harbor National Estuary Program, DEP, the Southwest Florida Water Management District (SWFWMD), USFWS, U.S Department of Defense, the National Park Service, and multiple cities, counties, and non-governmental organizations (NGO) (FWC 2012a). FWC shares primary management responsibilities of many of the region's conservation areas and water resources with DEP's Southwest and South Districts. AHRE habitat management activities includes hydrologic restoration to restore natural flows; vegetation community enhancement through herbicide treatment of nuisance plants; introduction of prescribed fire; removal of organic sediment from lake bottoms; transplanting of herbaceous emergent plants; and installation of desirable native woody species on tree islands, lake shorelines, and river and stream banks. AHRE staff includes project managers in the Port Charlotte and Sebring areas.

# Southwest Region



*Figure 9. High-priority aquatic resources of the Southwest Region*

# Southwest Region Legend

1. Big Creek Palatlakaha River
2. Hendry/Cow Creek
3. Lower Caloosahatchee River
4. Yellow Fever Creek-Fourmile Cove
5. Lake Parker
6. Lake Hancock
7. Curry Creek
8. Lower Myakka River
9. Tippecanoe Bay
10. Upper Alligator Creek
11. Lower Alligator Creek
12. Yucca Pen Creek
13. Philippee Creek
14. Alligator Creek
15. Rock/Oyster Creeks
16. Buck/Coral Creeks
17. Manatee River-Warner Bayou
18. Cypress Creek-Little Manatee River
19. Indian Creek-Hillsborough River
20. Upper Hillsborough River
21. Cow House Creek
22. Spillway 20-Middle Hillsborough River
23. Palm River
24. Chassohowitzka River
25. Mud/Higginbotham Creeks
26. Weeki Watchee River
27. Gator Creek
28. Lower Withlacoochee Swamp
29. Ashley Bay
30. J. N. Ding Darling National Wildlife Refuge
31. Street Sanctuary
32. Withlacoochee River Park
33. Ann Dever Memorial Regional Park
34. Avon Park Air Force Range
35. Babcock Ranch Preserve
36. Balm-Boyette Scrub Nature Preserve
37. Brooker Creek Buffer Preserve
38. Brooker Creek Preserve
39. Cedar Point Environmental Park
40. Charlotte Harbor Preserve State Park
41. Chassahowitzka WMA
42. Circle B Bar Reserve
43. Clam Bayou Nature Preserve
44. Clear Springs Preserve
45. Colt Creek State Park
46. Charlotte Harbor Preserve State Park
47. Deer Prairie Creek/ Churchill and Jordyn Parcels
48. Estero Bay Preserve State Park
49. Babcock/Webb WMA
50. Hillsborough River State Park
51. Lake Hancock Conservation Area
52. Lake Wales Ridge State Forest
53. Lake Wales Ridge WEA
54. Linda Pederson Preserve/ Jenkins Creek Preserve
55. Little Gator Creek WEA
56. Little Manatee River State Conservation Area
57. Little Manatee River State Park
58. Lower Hillsborough Flood Detention Area
59. McKay Bay Greenway
60. Myakka River State Park
61. North Tampa Mitigation Bank
62. Oscar Scherer State Park
63. Saddle Creek County Park
64. Sanibel-Captiva Conservation Lands
65. Sleeping Turtles Preserve South
66. South Venice Lemon Bay Preserve
67. Starkey Wilderness Preserve
68. T. Mabry Carlton, Jr. Memorial Reserve
69. Temple Terrace Riverfront Park
70. Tenoroc Fish Management Area
71. Upper Hillsborough Conservation Area
72. Weekiwatchee Preserve
73. Wolf Branch Creek Nature Preserve
74. Yucca Pens Unit/ Babcock-Webb WMA
75. Amberjack Environmental Park
76. Anclote Gulf Park
77. Boyd Hill Nature Preserve
78. Cockroach Bay Preserve State Park
79. Crews Lake Wilderness Park
80. Delaney Creek Area
81. Florida Institute for Saltwater Heritage Preserve
82. Hammock Park
83. Homeland Heritage Park
84. IMC Peace River Park
85. John Chesnut Senior Park
86. Koreshan State Historic Park
87. Lettuce Lake Regional Park
88. MacDill Air Force Base
89. Sawgrass Lake Park
90. Scout Park
91. Shamrock Park and Nature Center
92. Sleeping Turtles Preserve
93. Tampa Bay Estuarine Ecosystem-Teco Tract
94. Tippecanoe Environmental Park
95. South Florida Ecological Research Area
96. Upper Saddle Creek/ Schaller Tract
97. Walsingham Park
98. Lake Istokpaga

*Note: Numerical values are for identification purposes only and do not represent ranking order*

## South Region

Although high-priority aquatic resources are distributed throughout the region, a cluster exists between Okeechobee and West Palm Beach (Figure 10). High-priority sub-watersheds include the North and South Forks of the St. Lucie River, Corbett Wildlife Management Area, Lower West Palm Beach Canal, Tamiami Canal and Boca Raton Inlet-Port Everglades outside of Miami. This area supports a population of approximately 6.3 million people (U.S. Census Bureau 2015) resulting in major impacts to these sub-watersheds. Many natural rivers and streams have been channelized to serve as water conveyance systems for agriculture, flood control and numerous water treatment and water supply reservoirs (DEP 2004, 2006b and 2006c).

High-priority non-forested and forested wetlands include conservation areas such as the Arthur R. Marshall Loxahatchee National Wildlife Refuge, Loxahatchee Slough Natural Area, and J.W. Corbett Wildlife Management Area, all within a 15-minute drive of West Palm Beach. Others, such as Everglades National Park, Big Cypress National Preserve, and Holey Land and Rotenberger Wildlife Management Areas, are in the heart of the historic Everglades south of Lake Okeechobee. The Big Cypress National Preserve and Everglades National Park received high socio-economic importance and fish and wildlife values, but only medium values for management emphasis indicating that these conservation areas may benefit as much from preservation of their existing resources as from restoration or enhancement efforts. Although these high-priority conservation areas provide critical habitat for endangered species such as the Florida panther, Everglade snail kite and Cape Sable seaside sparrow (USFWS 1999), many have been impacted due to water management strategies for flood control and water supply.

Lake Okeechobee, the only high-priority lake identified in the region, is a multiple-use resource that supports economically valuable commercial and recreational sport fisheries, provides flood control, and serves as a water-supply reservoir for agriculture and urban areas (Bell 1987, SFWMD-FDACS-DEP 2011). Two marsh areas totaling 28,610 acres in Lake Okeechobee are designated as Audubon sanctuaries (Anderson 2000).

Lake Okeechobee is used by waterfowl, shorebirds, and wading birds for nesting and foraging and is specified as critical habitat for the Everglades snail kite (David 1994a, Smith et al. 1995, Gray et al. 2009, USFWS 1999). Excessive high-water levels and nutrient enrichment continue to detrimentally impact vegetation communities, ecological processes, and fish and wildlife resources on Lake Okeechobee (David 1994b, Aumen 1995, Havens and James 2005, Johnson et al. 2007).

Within the South Region, numerous conservation efforts are being conducted by federal, state, county, private, tribal, and non-profit agencies. The Comprehensive Everglades Restoration Plan (CERP), a multi-billion-dollar joint effort between the U.S. Army Corps of Engineers (USACE) and State of Florida, is a long-term integrated plan to restore, preserve, and protect the Everglades and the South Florida ecosystem while providing for other water-related needs of the region, including water supply and flood protection (USACE and SFWMD 1999). CERP includes most of the high-priority rivers and streams, non-forested and forested wetlands, and lakes in the region. AHRE staff in the region includes a management team in Okeechobee and project management staff located in the West Palm Beach Regional office.

***High-priority aquatic resources of the South Region are clustered in an area supporting 6.3 million people.***

AHRE habitat management activities in the region include removal of man-made barriers, and the installation of culverts and hardened low water crossings. Vegetation management activities include: the use of herbicides to remove dense stands of nuisance plants followed by prescribed fire to restore and stimulate natural vegetative communities; harvesting and disposal of vegetated tussock material impacting marshes; removal of organic sediment from lake bottoms; transplanting of herbaceous emergent plants; and planting desirable native woody species on tree islands, lake shorelines, and river and stream banks.

Priority Resources

# South Region

Managed Conservation Areas
Regional boundary
Aquatic habitat types
Rivers and streams
Non-forested wetlands
Forested and non-forested wetlands
Forested wetlands
Lakes
Okeechobee
West Palm Beach
Naples
Fort Lauderdale
Miami
Key West
0 5 10 20 30 40
Miles
0 5 10 20 30 40
Kilometers
N

*Figure 10. High-priority aquatic resources of the South Region*

25 Florida Fish and Wildlife Conservation Commission

# South Region Legend

1. Corbett WMA
2. East Bolles Canal
3. Water Conservation Area 3A
4. Everglades National Park
5. North Fork of St. Lucie River
6. South Fork of St. Lucie River
7. Indian River-St. Lucie Inlet
8. Upper Loxahatchee Slough
9. Lower West Palm Beach Canal
10. Lake Osborne
11. Hillsborough Canal
12. Cypress Creek Canal
13. North Fork of New River Canal
14. South New River Canal-West
15. Boca Raton Inlet-Port Everglades
16. Tamiami Canal
17. Corkscrew Regional Ecosystem Watershed
18. L-31 N Transition Lands Regional Conservation Area
19. Hugh Taylor Birch State Park
20. Hungryland Slough Natural Area
21. Kissimmee Prairie Preserve State Park
22. Loxahatchee River Watershed Restoration Project
23. Monroe County Managed Areas
24. Rookery Bay National Estuarine Research Reserve
25. Seabranch Preserve State Park
26. South Fork Addition/Halpatiokee Regional Park
27. Southern Glades WEA
28. Sweetbay Natural Area
29. Arthur R, Marshall Loxahatchee Natural Wildlife Refuge
30. Big Cypress National Reserve
31. Dupuis Reserve
32. Everglades & Francis S. Taylor WMA
33. Everglades National Park
34. Fisheating Creek WMA
35. Holey Land WMA
36. J.W. Corbett WMA
37. John C. & Mariana Jones/Hungryland WEA
38. Jonathan Dickinson State Park
39. Kissimmee River Public Use Area
40. Loxahatchee Slough Natural Area
41. Okaloacoochee Slough State Forest
42. Picayune Strand State Forest
43. Rotenberger WMA
44. Savannas Preserve State Park
45. Stormwater Treatment Area
46. Easterlin State Park
47. Florida Keys Overseas Heritage State Trail
48. Oxbow Eco-Center
49. Lake Okeechobee

*Note: Numerical values are for identification purposes only and do not represent ranking order*

# SECTION IV: Merging Priority Resources into Management Activities

The prioritization of aquatic resources within each FWC region provides a science-based decision framework for identifying those resources that will likely produce the greatest ecological benefits. This process will further refine the methodology AHRE staff currently uses in developing project proposals.

The AHRE Standing Team, comprised of various FWC statewide subject matter experts, was initiated in 2005 to review and prioritize project proposals submitted for funding. The Standing Team developed a comprehensive application which staff must complete each year when submitting project proposals. The Standing Team members discuss all submitted projects at an annual team meeting and independently score each proposal. Scores are then compiled to develop a ranking list, which is used to generate a project workplan for the upcoming funding year. This process has been effective in ensuring project proposals are thoroughly evaluated for their ecological benefits, resource values, and impacts to fish and wildlife populations. Furthermore, this process provides a measure of fiscal accountability to ensure appropriate use of state allocated funds.

FWC

*Fisheating Creek WMA, in the South Region, is identified as a high-priority area because of its valuable non-forested and forested wetlands.*

In 2009, the project proposal application was revised to incorporate the Aquatic Restoration Prioritization and Evaluation Tool (ARPET) as an objective, quantifiable reference in project evaluation. The ARPET synthesizes existing socio-economic, ecological, and environmental data in a GIS platform for the purposes of identifying and prioritizing public lakes for potential restoration. This analysis represents an important component of executing a more expedient and cost-effective framework for aquatic restoration and further strengthens our proposal selection process and fiscal responsibility.

Through the development of ARPET and this assessment of priority resources, an increased focus will be placed on those aquatic resources with the greatest conservation, restoration and enhancement needs within each FWC Region. Regional Teams will be established to aid in the development and submittal of project proposals. Regional Teams will consist of FWC staff from various Offices, Divisions, and the Institute who are familiar with and have local knowledge pertinent to the priority aquatic resources within the region. Many of the priority aquatic resources are owned and managed by governmental entities other than the FWC, thus representatives from appropriate external governmental partners and conservation organizations will be asked to participate on Regional Teams. Coordinating with internal and external partners will build stronger synergistic relationships with our stakeholders, increase our scientific and technical knowledge of these resources, and provide opportunities to leverage or cost-share restoration and enhancement funds.

Regional Teams will be provided detailed maps and access to digital tools and resources utilized in the analysis of aquatic resources and identified during the development of this guide. This tool will allow Regional Team members to query the databases and various GIS layers to further investigate and aid in the development of project proposals for submittal for funding consideration. Regional Teams will be directed to give greater consideration and emphasis

FWC

*Fishing on the Wacissa River in the Northwest Region.*

in developing project proposals that address high-priority aquatic resources within their respective FWC Region, with the goal of increasing comprehensive management of these aquatic resources. All project proposals generated by the five Regional Teams will be submitted for review by the AHRE Standing Team. The AHRE Standing Team will have the responsibility to score and rank Regional Team high-priority proposals and develop a recommended slate of statewide prioritized projects for funding consideration.

In summary, the process of building upon previous effective conservation measures and applying new, innovative science-based techniques represents a continued evolution to improve and refine methodologies to restore, enhance and manage Florida's aquatic resources in a comprehensive manner. Support for these measures is paramount and FWC will continue to engage directly with our stakeholders, expand participation with our partners, and communicate our actions and decisions with those connected to the public trust resources managed by FWC.

## Literature Cited

Anderson, J.M. 2000. Wildlife sanctuaries and the Audubon Society: places to hide and seek. University of Texas Press. Austin.

Aumen, N.G. 1995. The history of human impacts, lake management, and limnological research on Lake Okeechobee, Florida (USA). Archive for Hydrobiology, Advances in Limnology 45:1-16.

Bell, F.W. 1987. The economic impact and valuation of the recreational and commercial fishing industries of Lake Okeechobee, Florida. Florida Game and Fresh Water Fish Commission, Tallahassee Florida.

Bell, F.W. and M.A. Bonn. 2004. Economic sectors at risk from invasive aquatic weeds at Lake Istokpoga, Florida. Florida Department of Environmental Protection, Tallahassee Florida.

Dahl, T.E. 1990. Wetlands losses in the United States 1780's to 1980's. U.S. Department of the Interior, Fish and Wildlife Service, Washington, D.C.

Dahl, T.E. 2005. Florida's wetlands: an update on status and trends 1985 to 1996. U.S. Department of the Interior, Fish and Wildlife Service, Washington, D.C.

David, P.G. 1994a. Wading bird nesting at Lake Okeechobee, Florida: an historic perspective. Colonial Waterbirds 17(1):69-77.

David, P.G. 1994b. Wading bird use of Lake Okeechobee relative to fluctuating water levels. Wilson Bulletin 106(4):719-732.

Environmental Protection Agency (EPA). 2016a. The EPA watershed academy. <https://www.epa.gov/sites/production/files/2016-02/documents/wetlandfunctionsvalues.pdf>. Accessed 10 March 2017.

EPA. 2016b. Why are Wetlands Important. *<https://www.epa.gov/wetlands/why-are-wetlands-important Environmental Protection Agency>*. Accessed 10 March 2017.

Estevez, E.D., B.J. Hartman, R. Kautz, and E. D. Purdum. 1984. "Ecosystems of surface waters" In E.A. Fernald and D.J. Patton. 1984. Water resources atlas of Florida. Institute of Science and Public Affairs, Florida State University, Tallahassee, Florida.

Fernald, E.A., and D.J. Patton. 1984. Water resources atlas of Florida. Institute of Science and Public Affairs, Florida State University, Tallahassee, Florida.

Florida Department of Environmental Protection (FDEP). 2004. Water quality assessment report: St. Lucie and Loxahatchee. Division of Water Resource Management, Bureau of Watershed Management, Tallahassee, Florida, USA.

FDEP. 2005. Water quality assessment report: Apalachicola-Chipola. Division of Water Resource Management, Tallahassee, Florida.

FDEP. 2006a. Water quality assessment report: Upper St. Johns. Division of Water Resource Management, Tallahassee, Florida.

FDEP. 2006b. Water quality assessment report: Biscayne Bay-Southeast Coast. Division of Water Resource Management, Tallahassee, Florida.

FDEP. 2006c. Water quality assessment report: Lake Worth Lagoon-Palm Beach Coast. Division of Water Resource Management, Tallahassee, Florida.

Florida Fish and Wildlife Conservation Commission (FWC). 2008. Diagnostic survey of sediment and vegetation on the Tsala Apopka Chain of Lakes. Prepared by PB Americas, Orlando, Florida.

FWC. 2012a. Florida's wildlife legacy initiative: Florida's state wildlife action plan. Tallahassee, Florida, USA.

FWC. 2012b. Aquatic restoration prioritization and evaluation tool (ARPET). Tallahassee, Florida.

FWC. 2016. Orange Lake habitat management plan. Prepared by Normandeau Associates, Inc., Gainesville, Florida.

Florida Natural Areas Inventory. 2010. Guide to the natural communities of Florida: 2010 edition. Florida Natural Areas Inventory, Tallahassee, Florida.

Flynn, Kathryn. 1996. Understanding wetlands and endangered species; definitions and relationships. Alabama Cooperative Extension System, ANR-979. Auburn University, Alabama.

Gray, P.N., B. Pranty, G.R. Schrott and J.W. Tucker. 2009. Shorebird and larid use of mudflats at Lake Okeechobee, Florida, during drought conditions. Florida Field Naturalists 37(2):33-44.

Hammer, D.A. 1992. Creating freshwater wetlands. Lewis Publishers, Inc. Chelsea, Minnesota.

Havens, K.E. and R.T. James. 2005. The phosphorous mass balance of Lake Okeechobee Florida: Implications for eutrophication management. Lake and Reservoir Management 21(2):139-148.

Jenks, G.F. 1967. The Data Model Concept in Statistical Mapping, International Yearbook of Cartography 7:186–190.

Jenks, G.F. and F.C. Caspall. 1971. Error on choroplethic maps: definition, measurement, reduction. Annals of the Associations of American Geographers, 61(2):217-244.

Johnson, K.G., M.A. Allen, and K.E. Havens. 2007. A review of littoral vegetation, fisheries, and wildlife responses to hydrologic variation at Lake Okeechobee. Wetlands 1:110-126.

Kautz, R.S., K. Haddad, T.S. Hoehn, T. Rogers, E. Estevez, and T. Atkeson. 1998. Natural systems in E.A. Fernald and E.D. Purdum, eds. Water resources atlas of Florida. Tallahassee: Institute of Science and Public Affairs, Florida State University. Tallahassee, Florida.

Kenner, W.E. 1969. Seasonal variation of streamflow in Florida. Prepared by United States Geological Survey in cooperation with the Bureau of Geology, Florida Department of Natural Resources, Tallahassee, Florida.

Kushlan, J.A. 1990. Freshwater marshes. Pp. 324-363 in R.L. Myers and J.J. Ewel, eds. Ecosystems of Florida. University of Central Florida Press, Orlando, Florida.

McKay S.K., I. Linkov, J.C. Fischenich, S.J. Miller, and J. Valverde. 2012. Ecosystem restoration objectives and metrics. EBA Technical Notes Collection. ERDC TN-EMRRP-EBA-12-16.Vicksburg, MS: U.S. Army Engineer Research and Development Center. *http://cw-environment.usace.army.mil/eba/*

Niering, W.A. 1988. Endangered, threatened and rare wetland plants and animals of the continental United States, in Hook, D.D., McKee, W.H., Jr., Smith, H.K., and others, The ecology and management of wetlands–Volume I–The ecology of wetlands: Portland, Oregon. Timber Press.

Nordlie, F. 1990. Rivers and springs. Pages 392-425 in R.L. Myers and J.J. Ewel, eds. Ecosystems of Florida. University of Central Florida Press, Orlando, Florida.

Outdoor Industry Association. 2011. The outdoor recreation economy. Outdoor Industry Association, Boulder, Colorado.

Purdum, E.D. 2002. Florida waters: a water resources manual from Florida's water management districts. St. Johns River Water Management District, Palatka, Florida.

## Literature Cited

Smith, J.P., J.R. Richardson, and M.W. Collopy. 1995. Foraging habitat selection among wading birds *(Ciconiiformes)* at Lake Okeechobee, Florida (USA) in relation to hydrology and vegetative cover. Archive for Hydrobiologie, Advances in Limnology 45:247-285.

South Florida Water Management District (SFWMD). 2005. Minimum flows and levels for Lake Istokpoga. South Florida Water Management District, West Palm Beach, Florida.

SFWMD, Florida Department of Agricultural and Consumer Services (FDACS), and FDEP. 2011. Lake Okeechobee protection plan: 2011 update. SFWMD, West Palm Beach, Florida.

Tonsmeire, D., D.J. Cairns, E. Hemmert, and P.L. Ryan. 1996. Apalachicola River and Bay management plan. Northwest Florida Water Management District, Havana, Florida.

University of Florida-Bureau of Economic and Business Research. 2015. Florida population studies: Bulletin 171, April 2015.

U.S. Army Corps of Engineers (USACE) and SFWMD. 1999. Central and Southern Florida project comprehensive review study, final integrated feasibility report and programmatic environmental impact statement. USACE, Jacksonville District, Jacksonville, FL, and SFWMD, West Palm Beach, Florida.

U.S. Department of Agriculture. 2015. Summary report: 2012 natural resources inventory. Natural Resources Conservation Service, Washington DC and Center for Survey Statistics and Methodology, Iowa State University. Ames, Iowa.

U.S. Census Bureau. 2015. Annual estimates of the resident population: April 1, 2010 to July 1, 2015.

U.S. Fish and Wildlife Service (USFWS). 1999. South Florida multi-species recovery plan. Fish and Wildlife Service; Atlanta, Georgia.

USFWS. 2002. Hydrologic unit codes. *<https://www.fws.gov/r5gomp/me/nrcs/HUCprimer.pdf>*. Accessed 10 March 2017.

U.S. Geologic Survey (USGS). 2016. Hydrography. *<www.https://nhd.usgs.gov.>* Accessed 17 March 2017.

USGS. 2017. Water resources of the United States, hydrologic unit maps. *<https://water.usgs.gov/GIS/huc.html>*. Accessed 22 March 2017.



Visit MyFWC.com/AquaticHabitats
for an interactive story map of Florida's
Freshwater Priority Resources:
A Guide for Future Management
FWC



FLORIDA FISH AND WILDLIFE
CONSERVATION COMMISSION
Florida Fish and Wildlife
Conservation Commission
MyFWC.com

*Nov. 2, 2020 Comment Letter to the U.S. Environmental Protection Agency from Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper re: Florida's Request To Assume Administration of a Clean Water Act Program [EPA-HQ-OW-2018-0640-0001]*

# EXHIBIT 6

UF | IFAS Extension
UNIVERSITY of FLORIDA

SSWEC70

# Threats to Florida's Biodiversity[1]

Denise Rocus and Frank J. Mazzotti[2]

Look at a map of Florida, and what do you see? A spider web of roadways crisscrossing the state, converging on towns, from a small corner grocery store and gas station to huge metropolitan areas that sprawl for miles. A land that was once considered uninhabitable now has the fourth highest population in the country, and is expanding at a rate of over 600 people per day (ENFO Report).

## Background

The land that was uninhabitable because of swamps and marshes is now kept dry through a network of canals. The dense forests have been cleared to make room for developments. Coastal prairie, pine flatwoods, hardwood hammocks, have all been sacrificed in the name of progress.

**Part of Florida's heritage still remains.** Florida is one of the most species-rich states in the nation. But even this biological diversity is being threatened. The roadways that allow us to maneuver around the state confine wildlife to isolated tracts of land. Our homes remain dry, but the wetlands' wildlife are struggling to survive with a new, unnatural hydrological regime. We cut down forests to build our homes and feed our growing population, while destroying the homes and food of our native wildlife.

Obviously, Florida's native species are suffering. According to the US Fish and Wildlife Service's rankings, there are 70 endangered (not including threatened, etc.) species in Florida, ranking it second in the nation, behind California. To date efforts to preserve biological diversity have mostly been centered on preserving individual species and tracts of land. By looking at the threats to Florida's biodiversity, we may be able to come up with some additional approaches.

While viewing Florida's landscape, you may notice that natural habitats have not only been lost, but also fragmented into different size patches. Roads serve as barriers, confining many species of wildlife within restricted areas. In these small habitat patches, organisms must carry out life functions within the area, or must attempt to cross into other suitable areas. These options have different outcomes, depending on the specific traits of the species in question, and the size of the patch in which they occur.

For species that are able to remain in a small area for their entire life cycle, a small patch may seem at first to be suitable habitat. However, small, isolated areas can accommodate only a few individuals of any particular species. In this situation, inbreeding becomes a potential problem. Individuals in one patch have few alternatives for breeding partners, as they are unable to mix and mingle with individuals from different areas, as would occur naturally. Inbreeding can be a destructive process, as it leads to the depression of reproductive potential and reduced adaptability to a constantly changing environment.

For far-ranging animals, these barriers cause even more problems. For example, very few of the remaining habitat patches are large enough to provide the spatial needs of a Florida panther or a Florida black bear. Florida panthers normally occur in densities of one panther per 50,000 acres.

1. This document is SSWEC70, one of a series of the Department of Wildlife Ecology and Conservation, UF/IFAS Extension. Original publication date October 1996. Reviewed July 2017. Visit the EDIS website at http://edis.ifas.ufl.edu.

2. Denise Rocus, former wildlife information specialist, UF/IFAS Extension Broward County; and Frank J. Mazzotti, professor, UF/IFAS Fort Lauderdale Research and Education Center; UF/IFAS Extension, Gainesville, FL 32611.

The Institute of Food and Agricultural Sciences (IFAS) is an Equal Opportunity Institution authorized to provide research, educational information and other services only to individuals and institutions that function with non-discrimination with respect to race, creed, color, religion, age, disability, sex, sexual orientation, marital status, national origin, political opinions or affiliations. For more information on obtaining other UF/IFAS Extension publications, contact your county's UF/IFAS Extension office.

U.S. Department of Agriculture, UF/IFAS Extension Service, University of Florida, IFAS, Florida A & M University Cooperative Extension Program, and Boards of County Commissioners Cooperating. Nick T. Place, dean for UF/IFAS Extension.

Hence, even in very large tracts of available land, there is still not enough habitat for more than a few individuals per tract. It is instinctive for animals such as a Florida panther to establish territories, and to avoid other panthers' territories, even if this means attempting to cross some of those barriers, the roadways.

A far-ranging species may choose to attempt crossing the roadway for a variety of reasons, such as finding food, suitable cover, or mates. In fact, this has become such a common occurrence that vehicular collisions are an immediate threat to Florida's wildlife. As roadways are widened to accommodate higher speeds and heavy volumes of traffic, the odds of successfully making it across diminish. Automobile collisions have been implicated as a major cause of mortality for several of Florida's large threatened or endangered species, including the Florida panther, Florida black bear, Key deer, bald eagle, and American crocodile.

If one considers collisions with boats, the West Indian manatee is added to that list. Vehicular collisions are not only dangerous for wildlife, but for humans as well. Four hundred thirty one vehicle collisions with animals during 1990 were considered serious enough to be reported to the Florida Department of Highway Safety and Motor Vehicles. Of these collisions, there were four human fatalities, 380 human injuries, and an average estimated property damage of $3,395 per accident, testifying to a problem for both wildlife and humans alike.

Mobile species are not only dodging cars, but these animals also have a greater risk of encountering other human imposed risks, such as pets, livestock, illegal hunting, traps, and other hazards associated with urban areas. The loss of large carnivorous species is not only a loss to biological diversity, but it also diminishes our regard for the wildness of an area.

Another threat from a fragmented landscape is the expansion of non-native and native weedy species. A weedy species is one that is already common throughout many types of environments; raccoons are an example. With the loss of large native carnivores, medium-sized animals such as raccoons and opossums face little threat from predators and are able to expand populations. Increasing populations of such species causes problems for other species. For instance, the raccoon is an avid predator of eggs of endangered marine turtles and American crocodiles, alligators and many native forest songbirds.

In ecology, all things are inter-connected: the loss of contiguous habitat leads to the loss of large native carnivores, which leads to population increases in medium-sized mammals such as raccoons, which in turn leads to increased predation on many other native wildlife species. At this point, the foundation of the ecosystem begins to break down from the loss of biological diversity, as the loss of one species sets off chain reactions that reverberate throughout the whole system.

The threat of some non-native species in Florida comes from their ability to displace native species. Many non-native species survive because of their aggressiveness and tolerance of disturbed environments, which provide artificial sources of food and shelter. Non-native species also tend to tolerate or thrive in fragmented landscapes, and as Florida's natural areas become more and more fragmented, it opens up more habitat for the species that prefer those areas.

*For example, forest edges (within 100 yards of an opening) are the preferred habitat of the brown-headed cowbird, a native species that is expanding its range, which parasitizes the nests of native songbirds* .

When the forest is one contiguous habitat, the area of edge habitat is very small in comparison to the area of interior forest, and the cowbird does not penetrate into the interior portions. When the forest becomes fragmented into many small patches, most habitats are edge habitats. The cowbird has free access to the entire area and all songbird nests within.

In Florida, for every native species that is lost, ten non-native species have become established. While this may be an increase in species richness, it is not an increase in ecological integrity, as non-natives tend not to contribute to the system as a whole.

While Florida's native species are forced to compete with non-native species on small, isolated patches of habitat that are surrounded by roadways full of high speed traffic, they must also cope with the loss of actual acreage. Habitat loss is the most common cause of the decline in wildlife populations. For instance, if ten percent of a forest is cleared, you can expect a percentage of that area's wildlife to disappear. Species are usually adapted only for a particular type of habitat, and when that habitat is destroyed or altered, it may not provide the same quantity or quality of food, water, and shelter. If the alterations are severe, the area may cease to be a viable habitat for species that originally occurred there.

**Occasionally, alterations of habitat can occur without actually losing area.** If we look at an area the size of

Everglades National Park and Big Cypress National Preserve, you may wonder why those areas are unable to support their original array of species. Together they encompass over 2.2 *million* acres of more-or-less contiguous habitat. The alterations in the Everglades area comes from changes in the water cycle. Many species are dependent on the natural water cycle to signal nesting and breeding times and to provide sufficient food supplies. The effects of a human-regulated hydrological regime on wading birds has been devastating, especially on the wood stork, now an endangered species. The decline of the wood stork can be seen as a biological indicator, revealing the decline in the overall health of ecosystem itself. Since wood storks are so visible, and there is such a wealth of information concerning their past populations, their current status can be viewed as being representative of many other native species that are not as easily observed.

According to a Florida Fish and Wildlife Conservation Commission study, 44% of all of Florida's vertebrates are known or suspected to be declining in number or distribution. This should be viewed as a warning that current efforts aimed at preserving species are not enough. We often hear about deforestation occurring in Brazil, but do we ever hear that Florida's forest loss rate is more than double that of Brazil?

**How can we hope to save Florida's wildlife if we continue to destroy habitat?** Conservation and management is possible, but federal, state, regional, and local agencies must work together to implement an ecosystem approach to management, which understands that all things are interconnected. The loss of each piece of the puzzle has implications throughout the ecological landscape.

## What You Can Do

- Urge your state and federal representatives to support greenways, wildlife movement corridors, and more highway wildlife underpasses.

- Support the nongame program of the Florida Fish and Wildlife Conservation Commission (FWC).

- Visit national, state, and local parks where resident naturalists describe local ecosystems, and look into volunteer activities at these locations.

- Attend public hearings concerning land and water use decisions. Become informed, then get involved.

- Encourage conscientious driving habits that include obeying the posted speed limits, and keeping alert to avoid hitting wildlife.

- Plant a refuge for wildlife in your own backyard.
- Join conservation organizations active in your region.

*Nov. 2, 2020 Comment Letter to the U.S. Environmental Protection Agency from Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper re: Florida's Request To Assume Administration of a Clean Water Act Program [EPA-HQ-OW-2018-0640-0001]*

# EXHIBIT 7

 (/)

Log In (/Log-In)

# Tourism Fast Facts

You are here: Home (/) › About Us (/about-us/) › What We Do (/about-us/what-we-do/) › Tourism Fast Facts

With its progressive and proactive marketing initiatives, VISIT FLORIDA has successfully increased the economic advantages that tourism brings to the Sunshine State.

The tax revenues generated by tourism-related spending represent a primary source of state government funding that helps to build roads, support schools, pay for health care and other vital programs and preserve nature settings.

**2014 Fast Facts**

- $82.0 billion - Spending Related to Tourism
- $21.4 billion - Amount Generated in Payroll (2013)[2]
- $4.9 billion - Total State Sales Tax Revenue to Tourism (23 percent of taxes collected)
- 98.9 million[1] - Total Number of Visitors to Florida
- 1,145,800 - Number of Floridians Employed in Tourism Related Industry Categories
- $155.90 - Average Amount Spent by Each Domestic Visitor per Day in Florida

**Tourism related spending for:**

- $21.1 billion - Lodging
- $36.3 billion - Restaurants/dining
- $13.8 billion - Admissions
- $10.7 billion - Other

[1] *Preliminary figure, subject to revision.*

[2] *Source: U.S. Travel Association - the Payroll Generated estimate is produced by U.S. Travel using the Trave Economic Impact Model (http://www.projecttimeoff.com/research/reports/travel-economic-impact-model). For more information on estimates regarding the Impact of Travel on Florida's economy, visit the U.S. Travel Association's Travel Effect website (http://www.projecttimeoff.com/).*

## Contact us

2540 W. Executive Center Circle
Suite 200
Tallahassee, Florida 32301
United States

partner@VISITFLORIDA.org (mailto:partner@VISITFLORIDA.org)

VISIT FLORIDA® is accredited by the Destination Marketing Accreditation Program (DMAP) of Destinations International.

## Audience Sites

- Visitors (http://www.visitflorida.com)
- Meeting Planners (http://www.visitflorida.com/en-us/florida-meeting-planners.html)
- Media (http://media.visitflorida.com)
- Travel Professionals (http://www.visitflorida.com/en-us/travelprofessionallanding.html)

Copyright 2020 VISIT FLORIDA®.

(https://twitter.com/floridatourism)

(https://www.facebook.com/floridatourism)

(https://www.linkedin.com/company/47972)

(http://www.sharealittlesun.com/) (http://tourismworksforflorida.org/)

*Nov. 2, 2020 Comment Letter to the U.S. Environmental Protection Agency from Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper re: Florida's Request To Assume Administration of a Clean Water Act Program [EPA-HQ-OW-2018-0640-0001]*

# EXHIBIT 8

Commissioner Nicole "Nikki" Fried

Home / Agricultu / **Florida Agriculture Overview and Statistics**

# Florida Agriculture Overview and Statistics

Through a cooperative federal-state program, the Florida Agricultural Statistics Service (FASS) gathers agricultural data and compiles current statistics. This service is provided in cooperation with the U.S. Department of Agriculture's National Agricultural Statistics Service and the University of Florida's Institute of Food and Agricultural Sciences. FASS provides producers of agricultural commodities with unbiased and reliable information to assist them in making production and marketing decisions.

In 2017, Florida had 47,000 commercial farms and ranches, using a total of 9.45 million acres. Florida ranked first in the U.S. in value of production of cucumbers, grapefruit, oranges, squash, sugarcane, fresh market snap beans, and fresh market tomatoes. The state ranked second in value of production of bell peppers, strawberries, watermelons, fresh market cabbage and fresh market sweet corn. Florida also ranked fourth nationally in the value of production of peanuts.

## Total Production Value of Florida Products — 2017

| Product | Percent of U.S. Value | Value in Dollars |
|---|---|---|

| | | |
|---|---|---|
| Oranges | 56 percent | $1.07 billion |
| Grapefruit | 54 percent | $136 million |
| Cucumbers (Processing) | 38 Percent | $97 million |
| Tomatoes (Fresh Market) | 34 Percent | $262 million |
| Bell Peppers (Fresh Market) | 32 percent | $206 million |
| Cucumbers (Fresh Market) | 32 percent | $76.3 million |
| Watermelons | 23 percent | $136 million |
| Sweet Corn (Fresh Market) | 22 percent | $158 million |
| Snap Beans (Fresh Market) | 21 percent | $70.8 million |
| Squash | 17 percent | $29.7 million |
| Cabbage (Fresh Market) | 11 percent | $42 million |
| Strawberries | 10 percent | $337 million |

| | | |
|---|---|---|
| Peanuts | 9 percent | $154 million |
| Source: USDA National Agricultural Statistics Services<br>*2017 Cash Receipts Total | | |

# Farms and Land in Farms

In 2017, Florida had 47,000 commercial farms, using a total of 9.45 million acres. There were 5,600 farms with sales exceeding $100,000. The average farm size was 201 acres. Florida ranks 18th among all states in number of farms and 29th in land in farms.

| Year | Total Number of Farms | Total Acres | Average Farm Size |
|---|---|---|---|
| 2017 | 47,000 | 9,450,000 | 201 acres |
| 2016 | 47,100 | 9,410,000 | 200 acres |
| 2015 | 47,300 | 9,450,000 | 200 acres |
| 2014 | 47,600 | 9,500,000 | 200 acres |
| 2013 | 48,000 | 9,550,000 | 199 acres |
| 2012 | 47,700 | 9,550,000 | 200 acres |
| 2011 | 47,500 | 9,250,000 | 195 acres |

| | | | |
|---|---|---|---|
| 2010 | 47,500 | 9,250,000 | 195 acres |
| 2009 | 47,500 | 9,250,000 | 195 acres |
| 2008 | 47,500 | 9,250,000 | 195 acres |
| 2007 | 47,500 | 9,300,000 | 196 acres |
| 2006 | 41,000 | 9,460,000 | 231 acres |
| 2005 | 42,000 | 9,570,000 | 228 acres |
| 2004 | 43,200 | 9,830,000 | 228 acres |

# Cash Receipts

Farm cash receipts from marketing Florida agricultural products in 2017 amounted to $7.467 billion, a decrease of $290 million from 2016. Nationally, Florida ranks fourth in the value of vegetable and melon cash receipts at $1.194 billion, 11th in crop cash receipts with a value of $6.08 billion, and 18th in total cash receipts.

| Commodity | 2017 Receipts | Percent of Total |
|---|---|---|
| All Commodities | $7,467,374,000 | 100 |
| Citrus | $1,032,227,000 | 13.8 |
| Other Fruits and Nuts | $429,541,000 | 5.8 |

| | | |
|---|---|---|
| Vegetables and Melons | $1,194,709,000 | 16 |
| Field Crops | $289,862,000 | 3.9 |
| Other Crops and Products (Including Floriculture) | $2,088,015,000 | 28 |
| Milk | $535,350,000 | 7.2 |
| Cattle and Calves | $580,080,000 | 7.8 |
| Poultry and Eggs | $331,297,000 | 4.4 |
| Cane for Sugar/Seed | $629,775,000 | 8.4 |
| Other Livestock | $311,864,000 | 4.2 |

# Horticulture

In 2017, Florida ranked second in the nation in the production of greenhouse, nursery and miscellaneous products with cash receipts totaling over $2.088 billion. While FASS does not currently report cash receipts for floriculture specifically, the industry is estimated to contribute over $1 billion of this total. This represents a decrease of approximately $40 million from 2016.

# Vegetables, Melons and Berries

The 2017 value of production for the seven major vegetable crops, potatoes, berries and watermelons totaled $1.616 billion, up $13 million from 2016. The ranking from the highest to lowest value of the berry, vegetable and melon crops is:

1. Strawberries

2. Tomatoes
3. Bell peppers
4. Sweet corn
5. Cucumbers
6. Watermelons
7. Potatoes
8. Blueberries
9. Snap beans
10. Sweet potatoes

Crops that increased in percentage and value from 2016 were: potatoes (+8 percent), sweet potatoes (+37 percent), cucumbers (+16 percent), bell peppers (+64 percent), watermelon (+23 percent) and blueberries (+58 percent).

# Citrus

Florida accounted for 45 percent of the total U.S. citrus production with 78.1 million boxes of citrus in the 2016-2017 season, California totaled 51 percent, and Texas and Arizona combined for 4 percent. Florida's all orange production decreased 16 percent to 68.8 million boxes. All grapefruit production is down nearly 28 percent to 7.76 million boxes. Production of tangerines decreased from the previous season as well.

# Florida Citrus Production

| Citrus Crop Year | Sales On-Tree Value |
|---|---|
| 2016-2017 | $780,700,000 |
| 2015-2016 | $947,542,000 |
| 2014-2015 | $1,034,114,000 |

| | |
|---|---|
| 2013-2014 | $1,173,181,000 |
| 2012-2013 | $1,164,763,000 |
| 2011-2012 | $1,640,423,000 |
| 2010-2011 | $1,368,626,000 |
| 2009-2010 | $1,131,107,000 |
| 2008-2009 | $1,046,735,000 |
| 2007-2008 | $1,283,994,000 |
| 2006-2007 | $1,499,112,000 |
| 2005-2006 | $1,024,610,000 |
| 2004-2005 | $754,169,000 |
| 2003-2004 | $891,500,000 |

# Forestry

As of 2014, Florida timberland ownership, which supports the forest products industry, was 71 percent private, 1 percent state and local, and 11 percent federal. Florida's 15.4 million acres of timberlands supported economic activities that generated $16.09 billion in total output impacts in 2014.

Total other property income impacts, such as interests, rents, royalties and

dividends were $2.15 billion in 2014, with the largest share generated by pulp and paper manufacturing at $1.71 billion. Forest tract management and logging activities generated $269 million, the secondary forest products sectors generated $218 million, and lumber, veneer and panels manufacturing generated $1.02 million.

# Field Crops

The 2017 total value of production of corn, cotton, cottonseed, hay, peanuts, soybeans and wheat totaled $354 million, an increase of 6 percent from the previous year's total of $334 million. The total value of peanut production increased 44 percent and was valued at $154 million. The total value of corn production increased 8 percent and was valued at $24.7 million. The value of wheat production increased 4 percent over the previous year, and was valued at $2.07 million. The value of soybean production decreased 54 percent and was valued at $4.21 million. The value of cottonseed production decreased 47 percent and was valued at $4.55 million. The value of cotton production decreased 18 percent and was valued at $52.4 million. The value of hay production decreased 10 percent and was valued at $117 million.

# Livestock

All cattle and calves on Florida farms and ranches as of January 1, 2018, including dairy cattle, totaled 1.63 million head, down 70,000 from 2016. The three top-ranking counties for cattle were Okeechobee, Highlands and Osceola. Beef cows in Florida were 886,000 head, down 22,000 head from the previous year. Nationally, Florida ranked 13th in beef cows and 18th in total cattle. Calves born during 2017 totaled 790,000 head, down 20,000 head from 2016.

# Florida County Value of Agricultural Products Sold in 2012

This information is provided by USDA Ag Census every five years. The next update will be in 2019. Sales for the following counties cannot be disclosed due to a confidentiality requirement: Baker, Clay, Columbia, Duval, Okaloosa and Union.

| County | Total |
|---|---|
| Palm Beach | $999 million |
| Miami-Dade | $604 million |
| Hendry | $499 million |
| Hillsborough | $378 million |
| Polk | $350 million |
| Manatee | $298 million |
| Suwannee | $296 million |
| Highlands | $273 million |
| Okeechobee | $257 million |
| Orange | $262 million |
| Collier | $203 million |
| Hardee | $218 million |
| DeSoto | $198 million |
| Marion | $188 million |

| St. Lucie | $168 million |
|---|---|
| Martin | $165 million |
| Indian River | $145 million |
| Lake | $142 million |
| Volusia | $111 million |
| Osceola | $109 million |
| Glades | $107 million |
| Lee | $106 million |
| Charlotte | $103 million |
| Alachua | $101 million |
| Jackson | $93 million |
| Gilchrist | $89 million |
| Lafayette | $88 million |
| Levy | $80 million |
| Pasco | $74 million |

| | |
|---|---|
| Pasco | $74 million |
| St. Johns | $70 million |
| Santa Rosa | $63 million |
| Gadsden | $54 million |
| Madison | $52 million |
| Jefferson | $48 million |
| Broward | $47 million |
| Brevard | $46 million |
| Hamilton | $45 million |
| Putnam | $44 million |
| Escambia | $43 million |
| Sumter | $42 million |
| Walton | $29 million |
| Holmes | $29 million |
| Hernando | $28 million |

| | |
|---|---|
| Seminole | $27 million |
| Sarasota | $25 million |
| Calhoun | $20 million |
| Dixie | $19 million |
| Flagler | $17 million |
| Citrus | $14 million |
| Washington | $14 million |
| Bradford | $13 million |
| Monroe | $11 million |
| Nassau | $6 million |
| Taylor | $6 million |
| Leon | $4 million |
| Bay | $3 million |
| Pinellas | $3 million |
| Wakulla | $2 million |

| | |
|---|---|
| Liberty | $2 million |
| Franklin | Less than $1 million |

# Exports

In 2017, Florida ranked third among U.S. states, with agricultural exports topping $4 billion, according to the U.S. Census Bureau.

# Top Florida Agricultural Exports — 2017

| Commodity Group | Export Value (Millions — USD) |
|---|---|

| | USD) |
|---|---|
| Meats, Fresh and Frozen | $599 |
| Miscellaneous Edible Preps | $454 |
| Prepared Vegetables and Fruit | $360 |
| Dairy Products | $346 |
| Beverages | $334 |
| Edible Fruit and Nuts | $329 |
| Edible Vegetables | $291 |
| Source: Euromonitor International | |

# Florida's Agricultural Importers — 2017

| Country | Total |
|---|---|
| Canada | $747 million |
| Mexico | $250 million |

| | |
|---|---|
| Dominican Republic | $216 million |
| Bahamas | $210 million |
| Panama | $165 million |
| Netherlands | $143 million |
| Colombia | $139 million |
| Trinidad & Tobago | $120 million |
| Guatemala | $111 million |
| Costa Rica | $103 million |
| Source: Euromonitor International | |

# Agriculture Industry

Aerial Application of Seed, Pesticides and Fertilizer (https://www.fdacs.gov/Agriculture-Industry/Aerial-Application-of-Seed-Pesticides-and-Fertilizer)

Ag Innovation (https://www.fdacs.gov/Agriculture-Industry/Ag-Innovation)

Agricultural Awards and Honors (https://www.fdacs.gov/Agriculture-Industry/Agricultural-Awards-and-Honors)

Agricultural Dealer's Licenses (https://www.fdacs.gov/Agriculture-Industry/Agricultural-Dealer-s-Licenses)

Agricultural Inspection Stations (https://www.fdacs.gov/Agriculture-Industry/Agricultural-Inspection-Stations)

Agricultural Worker Safety FAQ (https://www.fdacs.gov/Agriculture-Industry/Agricultural-Worker-Safety-FAQ)

Aquaculture (https://www.fdacs.gov/Agriculture-Industry/Aquaculture)

Bees/Apiary (https://www.fdacs.gov/Agriculture-Industry/Bees-Apiary)

Best Management Practices (BMPs) (https://www.fdacs.gov/Agriculture-Industry/Best-Management-Practices-BMPs)

Certified Florida Farm Wineries and Vineyards (https://www.fdacs.gov/Agriculture-Industry/Certified-Florida-Farm-Wineries-and-Vineyards)

Exporting Florida Agricultural Products (https://www.fdacs.gov/Agriculture-Industry/Exporting-Florida-Agricultural-Products)

FDACS Report: The Impacts of Mexico's Ag Exports on Florida Agriculture (https://www.fdacs.gov/Agriculture-Industry/FDACS-Report-The-Impacts-of-Mexico-s-Ag-Exports-on-Florida-Agriculture)

Feed Distributor Licensing (https://www.fdacs.gov/Agriculture-Industry/Feed-Distributor-Licensing)

Fertilizer Licensing and Tonnage Reporting (https://www.fdacs.gov/Agriculture-Industry/Fertilizer-Licensing-and-Tonnage-Reporting)

Florida Agricultural Statistics Service (https://www.fdacs.gov/Agriculture-Industry/Florida-Agricultural-Statistics-Service)

**Florida Agriculture Overview and Statistics** (https://www.fdacs.gov/Agriculture-Industry/Florida-Agriculture-Overview-and-Statistics)

Florida Farm To You (https://www.fdacs.gov/Agriculture-Industry/Florida-Farm-To-You)

Florida Market Bulletin (https://www.fdacs.gov/Agriculture-Industry/Florida-Market-Bulletin)

Florida Seafood and Aquaculture Overview and Statistics (https://www.fdacs.gov/Agriculture-Industry/Florida-Seafood-and-Aquaculture-Overview-and-Statistics)

Florida Young Farmer and Rancher Resources (https://www.fdacs.gov/Agriculture-Industry/Florida-Young-Farmer-and-Rancher-Resources)

"Fresh From Florida" Industry Membership (https://www.fdacs.gov/Agriculture-Industry/Fresh-From-Florida-Industry-Membership)

Fruit and Vegetables (https://www.fdacs.gov/Agriculture-Industry/Fruit-and-Vegetables)

Heat Illness (https://www.fdacs.gov/Agriculture-Industry/Heat-Illness)

Horses/Equine (https://www.fdacs.gov/Agriculture-Industry/Horses-Equine)

Keep Florida Growing (https://www.fdacs.gov/Agriculture-Industry/Keep-Florida-Growing)

Livestock (https://www.fdacs.gov/Agriculture-Industry/Livestock)

Pests and Diseases (https://www.fdacs.gov/Agriculture-Industry/Pests-and-Diseases)

Plants and Nurseries (https://www.fdacs.gov/Agriculture-Industry/Plants-and-Nurseries)

Seed Dealer Licensing (https://www.fdacs.gov/Agriculture-Industry/Seed-Dealer-Licensing)

State Farmers Markets (https://www.fdacs.gov/Agriculture-Industry/State-Farmers-Markets)

Water (https://www.fdacs.gov/Agriculture-Industry/Water)

# Program Resources

- 2018 International Report (https://www.fdacs.gov/ezs3download/download/82384/2391270/Media/Files/Marketing-Development-Files/international-report-2018.pdf) [ 5.3 MB ]
- Agricultural Marketing Orders (https://www.fdacs.gov/Agriculture-Industry/Fruit-and-Vegetables/Agricultural-Marketing-Orders-FAQ)

- Exporting Florida Agriculture Products (https://www.fdacs.gov/Agriculture-Industry/Exporting-Florida-Agricultural-Products)
- Florida Agricultural Statistics Service (http://www.nass.usda.gov/Statistics_by_State/Florida/)
- Florida Agriculture by the Numbers 2016 Statistical Report (https://www.fdacs.gov/ezs3download/download/78734/2318004/Media/Files/Marketing-Development-Files/AgStats2016_Comp%201.17.18.pdf) [ 9.5 MB ]
- Florida Agriculture by the Numbers 2015 Statistical Report (https://www.fdacs.gov/ezs3download/download/77051/2218360/Media/Files/Marketing-Development-Files/Florida_Agriculture_by_the_Numbers_2015_Statistical_Report.pdf) [ 4.4 MB ]
- Florida Seafood and Aquaculture Overview and Statistics (https://www.fdacs.gov/Agriculture-Industry/Florida-Seafood-and-Aquaculture-Overview-and-Statistics)
- Major Shipping Routes of Florida Products (https://www.fdacs.gov/ezs3download/download/22770/515351/majorshippingroutes.pdf) [ 2.2 MB ]
- USDA Census of Agriculture (http://www.agcensus.usda.gov/index.php)

## Contact Us

(850) 617-7317
Dan.Sleep@FDACS.gov




11/1/2020 Case 1:21-cv-00119-RDM Document 56-1 Filed 06/22/21 Page 64 of 785 Florida Agriculture Overview and Statistics / Florida Department of Agriculture & Consumer Services

(https://www.facebook.com/FDACS)  (https://twitter.com/FDACS)

**©2019-2020 Florida Department of Agriculture and Consumer Services**

**Florida Capitol — Tallahassee, Florida 32399-0800**

Questions? 1-800-HELP-FLA (1-800-435-7352) or 1-800-FL-AYUDA (1-800-352-9832) ,

Mon.–Fri. 8 a.m.–5 p.m. EST | LIVE CHAT

https://www.fdacs.gov/Agriculture-Industry/Florida-Agriculture-Overview-and-Statistics 19/19

*Nov. 2, 2020 Comment Letter to the U.S. Environmental Protection Agency from Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper re: Florida's Request To Assume Administration of a Clean Water Act Program [EPA-HQ-OW-2018-0640-0001]*

# EXHIBIT 58



Ochlockonee River State Park, Florida

# ESA Biological Assessment for Clean Water Act Section 404 Assumption by the State of Florida

July 24, 2020



# ESA Biological Assessment for Clean Water Act Section 404 Assumption by the State of Florida

July 24, 2020

Supplemental information prepared by the Florida Department of Environmental Protection to assist in the evaluation of impacts to species listed and considered by the Endangered Species Act.

Florida Department of Environmental Protection
Submerged Lands and Environmental Resources Coordination
2600 Blair Stone Road MS 2500
Tallahassee, FL 32399-2400

Note for printing: Pages for Appendix C are 8.5” x 14”



# Executive Summary

In accordance with the Endangered Species Act of 1973 (ESA) and its implementing regulations, the purpose of this Biological Assessment (BA) is to evaluate the potential effects of the United States Environmental Protection Agency's (EPA) potential approval of the State of Florida's Assumption and administration of Section 404 of the Clean Water Act (CWA) on ESA-listed species, proposed species, designated critical habitat and proposed critical habitat (50 Code of Federal Regulations [CFR] § 402.12). The BA will consider whether EPA's approval of the Assumption request (Action) is likely to adversely affect any species or habitat. EPA is the federal agency charged with approving or denying the state's request, pursuant to the CWA implementing regulations (40 CFR § 233 *et seq*). The Florida Department of Environmental Protection (FDEP) is the state agency requesting administration of the CWA Section 404 Program (Assumption).

On July 17, 2019, the FDEP sent a request to EPA that sought designation, pursuant to 50 CFR §402.08, to serve as a non-federal representative to prepare the subject BA for possible ESA section 7 consultation. The EPA designated FDEP as the non-federal representative to prepare this BA in a letter dated December 12, 2019, consistent with 50 CFR § 402.08. In a separate letter to the U.S. Department of Commerce and the Department of the Interior dated December 13, 2019, the EPA stated that it would voluntarily engage in informal consultation with the Services (the United States Fish and Wildlife Service [USFWS] and the National Oceanic and Atmospheric Administration [NOAA] National Marine Fisheries Service [NMFS]).

FDEP requested input on a draft species list for Florida's BA from the USFWS and the NMFS on November 22, 2019.  On April 15, 2020, NMFS responded to FDEP that ESA-listed species under NMFS' jurisdiction do not occur in waters that are assumable by the state (see Appendix A). They stated that based on their review, while there is shared jurisdiction for the Gulf Sturgeon between NMFS and USFWS, the USFWS is responsible for consultations regarding sturgeon and critical habitat in riverine habitat units. NMFS further states that the riverine critical habitat units and river areas where Gulf Sturgeon are known to occur are all listed by the USACE as retained waters. Based on NMFS' determination, this BA makes a "no effect" determination for NMFS jurisdictional species.

If approved, the State's Assumption of the dredge and fill permitting program under Section 404 of the CWA for waters assumable by the State would be implemented by processes and procedures described in state regulations (Chapters 62-330, and 62-331, Florida Administrative Code [F.A.C.]), Memorandums of Agreement with EPA and the United States Army Corps of Engineers (USACE), and a Memorandum of Understanding with the Florida Fish and Wildlife Conservation Commission (FWC) and the USFWS. Should EPA request formal consultation with USFWS at the time of EPA's review of whether to approve Assumption of the State 404 program, USFWS may issue a programmatic biological opinion (Program assumption BiOp). The opinion may include conditions that guide implementation of the State 404 program. If the USFWS determines that the Action is not likely to jeopardize the continued existence of ESA-listed species and is not likely to destroy or adversely modify designated critical habitat, the Program assumption BiOp may also include an incidental take statement (ITS) with reasonable and prudent measures and terms and conditions that must be complied with during the implementation of the State 404 program, as well as description of triggers for reinitiation of the Program assumption BiOp.

Florida's request to assume the administration of the CWA Section 404 permit program only includes those Waters of the United States (WOTUS) not retained by the USACE; referred to as assumed waters or State-assumed waters.  The USACE will retain permitting responsibility for the discharge of dredged or fill material in those waters defined as "Retained Waters". This definition can be found in the State 404 Handbook in

Chapter 2.0 and the process to determine whether a project is in retained, or assumed waters, is described in Chapter 4.1 of the Handbook. In addition, Appendix A of the State 404 Handbook includes the Retained Waters List maintained by the USACE. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only.

In accordance with section 7 regulations, this BA only evaluates effects to ESA-considered species, which includes ESA-listed species, their critical habitats, those species proposed to be listed and their proposed critical habitat, candidate species, petitioned species, and those otherwise under review for potential ESA listing. For the sake of clarity in understanding the State's implementation of the State 404 program and the ERP program, the State 404 program would address species that may not be listed under the ESA, but are protected under other federal or state laws. Examples of these types of laws include the Bald and Golden Eagle Protection Act (16 USC § 668 et seq.) and the Migratory Bird Treaty Act of 1918 (16 USC §§ 703-712 (§ 709 omitted). Also, all ESA proposed, candidate, and petitioned plant and animal species with ranges within Florida are discussed in this BA, to provide a thorough review of Florida's potentially at-risk species, and because the lists of threatened and endangered species may be modified to include some or all of the petitioned species, depending upon the outcome of those status reviews. This BA evaluates the effects of the that EPA's approval for the State of Florida Assumption of Section 404 of the CWA would have on listed species in present time, and analyzes effects into the future. All species that are currently listed, proposed to be listed or might be listed in the future are discussed, with evaluations of effects on respective guilds. At bottom, this review evaluates the effects the State's 404 program would have on any species that are currently listed or may become listed in the future because implementation of the State's 404 program is the direct effect of EPA's approval of Florida's Assumption of Section 404 of the CWA.

This BA analyzes a total of 235 plant and animal species in the State of Florida that are federally listed as endangered (95), threatened (44), or is ESA-considered (96). Species that must be addressed pursuant to Section 404 of the CWA and Chapter 62-331, F.A.C. for the State 404 program, are federally listed species or species proposed to be listed under the ESA (a total of 141 species). If these listed species have designated critical habitats, or critical habitats proposed to be designated, the adverse effects and impacts to those habitats must also be analyzed and addressed in the State 404 program. See Table 3-1 for the list of species discussed in this BA.

Because of the statewide nature of this request, the numerous covered species and diverse habitats, as well as lack of knowledge with respect to where and what type of future permits may be requested, a meaningful site-specific and species-specific analysis is not possible this BA. Since the State 404 program is implemented through future state-issued 404 permits authorizing activities, a programmatic BA is appropriate to describe the regulatory process by which the State of Florida will make determinations on the issuance of State 404 permits. The BA will address how the process will consider effects to listed endangered and threatened species or species proposed to be listed so that the effects of this Action may be analyzed. The BA describes the effects of the Action, which includes a broad array of activities that are likely to be authorized in the future and a general description of the ESA-listed species and their habitat ranges and critical habitats that are likely to be affected by such activities. These descriptions include baseline discussions, historical perspectives of previous permitting by the USACE, an estimate of the physical, chemical, or biotic stressors to species that are likely to be produced, and a description of the processes and

mechanisms to avoid and minimize the adverse effects of these activities on ESA-listed species and designated critical habitats.

In implementing the State 404 program, FDEP will send copies of all permit applications and its preliminary site-specific determination of potential effects to listed species to the USFWS for review and comment (see Chapter 7 for details). This coordination is to ensure that any permit issued by FDEP is not likely to jeopardize the continued existence of any listed or proposed species, or adversely modify or destroy designated critical habitat (pursuant to 40 CFR § 233.20(a)).  Upon coordination, FDEP will consider any information that USFWS provides as technical assistance and will include all species protection measures that the USFWS may recommend as permit conditions or deny the request for a permit, whether the permit conditions are designed to avoid jeopardizing an ESA-listed species or adverse modification of designated critical habitat, or whether permit conditions are designed to avoid or minimize the amount of incidental take when the take or other effects would not be likely to jeopardize a species or adversely modify designated critical habitat. This exchange of information between USFWS and FDEP falls within the broad scope of "technical assistance" as described in the ESA's implementing regulations and the USFWS' Interagency Consultation Handbook.

The FWC will partner with FDEP to assist in the coordination of federally listed species reviews with the USFWS, expanding FWC's current review of impacts to federally listed and State-listed species during the Environmental Resource Permitting (ERP) process (Chapter 62-330, F.A.C.). The interactions between agencies will inform applicants of the importance of implementing impact avoidance and minimization measures on listed species in order to be eligible for authorization of their proposed activities, all while maintaining compliance with the ESA.

The State 404 program rule [Rules 62-331.053(3)(a)4, 62-331.201(3)(k), and 62-331-248(3)(k) F.A.C.] and EPA regulations (40 CFR 233.20, 40 CFR 230.10(b)(3)) prohibits issuance of a permit that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by USFWS and confirms that USFWS conclusions about the effects of State 404 permits on listed species are determinative (40 CFR § 230.30(c). FDEP will monitor adverse effect determinations on listed species and critical habitat by incorporating information into their permit tracking database, similar to the information collected by the USACE. This data collection will assist in facilitating compliance with permit conditions and can also be shared with USFWS. Failure to include the protection measures as permit conditions that are designed to avoid jeopardy or adverse modification of designated critical habitat would ultimately result in the State either denying the permit or the State informing EPA that it will neither issue nor deny the permit, which would result in EPA transferring the permit to the USACE for processing in accordance with 40 CFR 233.50(j).

It is the intent of the FDEP to resolve all disputes and objections with USFWS prior to EPA's review during the public noticing process. FDEP, FWC and USFWS are entering into a Memorandum of Understanding which includes a resolution process. This process, and the State's rule requirement that USFWS's recommendations and conditions are determinative, it is unlikely that issues would need to be elevated to EPA.  During their review, EPA may comment upon, object to, or make recommendations with respect to a permit pursuant to 40 CFR § 233.50. As stated in 40 CFR § 233.50(j), in the event a state that has assumed CWA Section 404 responsibilities neither satisfies EPA's objections or requirements for a permit condition, nor denies the permit, the EPA will transfer the permit to the USACE and the USACE shall process the permit application, which would trigger a section 7 consultation between USACE and USFWS and NMFS

During the analysis of existing Florida permitting data provided by the USACE for fiscal years 2014 through 2018, approximately 7% of past USACE Section 404 permit application reviews were formal consultations. It is reasonable to anticipate that the past number of applications submitted for that five-year period provides an approximation of the number and types of proposed permitting activities that may occur over the next five-year period. Further analysis of this data shows that a small proportion of the total number of ESA-listed species accounted for the majority of consultations. Many of the species subject to frequent ESA consultation have programmatic consultation keys or programmatic biological opinions, which can help guide or inform future reviews and impact assessments by FDEP, FWC and USFWS. See Chapter 4.2.1 regarding the limitations of the USACE queried data used in the analyses of this BA, and interpretation using the USACE database and shapefile.

Historical CWA Section 404 permitting by the USACE resulted in issuance of permits for one or more projects that adversely affected one or more listed species and their critical habitats. The USACE Section 404 process, in accordance with section 7 of the ESA, employed various conservation measures to avoid and minimize adverse effects. Because of the reasonable and prudent measures and terms and conditions anticipated in the Program assumption BiOp and its Incidental Take Statement (ITS), the State 404 program would not issue a permit that would jeopardize the continued existence of a species or adversely modify designated critical habitats. Similar to the USACE Section 404 program, however, the State 404 program may result in the issuance of one or more permits with projects that “may adversely affect” an ESA-listed species and/or designated critical habitat. These adverse effects would be addressed during the technical assistance process between FDEP and USFWS.

This BA is provided to assist in the review of potential effects to ESA-listed endangered and threatened species anticipated with the State of Florida’s request for the Assumption of Section 404 of the CWA.

# Table of Contents

1. Purpose of Biological Assessment ..... 1
1.1 Objectives of Action ..... 1
1.2 The History of Florida's Request for Assumption ..... 3
1.3 Organization of the Document ..... 5
2. Action & Action Area ..... 6
2.1 Description of Action ..... 6
2.2 Types of Future Activities to be Authorized by Florida's 404 Program ..... 7
2.3 Description of Action Area ..... 13
2.4 Ecosystems/Habitats Located Within the Action Area ..... 18
2.4.1 Discussion of Aquatic Ecosystems and Habitats ..... 18
2.4.2 Discussion of Terrestrial Ecosystems and Habitats ..... 21
3. ESA-considered Species Potentially Affected by the Action ..... 22
3.1 ESA-considered Species and Critical Habitat in the Action Area ..... 35
3.2 NMFS-Listed Species ..... 36
3.3 State-Listed Species ..... 36
4. Baseline Conditions ..... 37
4.1 Regulatory Baseline ..... 37
4.1.1 Federal Wetland Regulations ..... 37
4.1.2 Florida Wetlands Regulations ..... 39
4.2 Environmental Baseline ..... 41
4.2.1 Historical Federal Permitting: Habitat ..... 43
4.2.2 Historical Federal Permitting: ESA Consultations ..... 47
5. Potential Effects on ESA-considered Species ..... 56
5.1 Types of Effects ..... 57
5.1.1 Biotic Stressors ..... 57
5.1.2 Physical Stressors ..... 57
5.1.3 Physicochemical Water Quality Stressors ..... 58
5.2 Potential Effects ..... 58
5.2.1 Mammals ..... 58
5.2.2 Birds ..... 60
5.2.3 Reptiles ..... 61
5.2.4 Amphibians ..... 62
5.2.5 Fish ..... 62
5.2.6 Insects ..... 63

5.2.7 Crustaceans ..... 63
5.2.8 Mollusks ..... 64
5.2.9 Plants ..... 64
6. Cumulative Effects ..... 65
6.1 Effects of Non-Federal Activities ..... 65
6.1.1 Watershed Development ..... 65
6.1.2 Increased Water Use ..... 68
6.1.3 Climate Change ..... 70
6.1.4 Summary of Cumulative Effects of Non-Federal Activities ..... 71
7. State 404 Program Species Coordination ..... 71
7.1 Federally and State-listed Species Coordination Review ..... 72
7.2 State 404 Program and Prior-existing USFWS HCPs and BiOps ..... 73
7.3 State 404 Program Species Coordination Process ..... 74
7.4 Application Review ..... 75
7.4.1 Technical Assistance with the USFWS ..... 76
7.4.2 EPA Oversight and Review ..... 80
7.5 Species Assessments ..... 83
7.5.1 Identifying Project Area and Affected Species ..... 83
7.5.2 Assessments Using Available Federal Decision Tools ..... 83
7.5.3 Case by Case Assessments When Tools Are Not Available ..... 86
7.6 Impact/Affect Determinations and Protective Measures ..... 88
7.6.1 Impact and Affect Determinations ..... 89
7.6.2 Developing and Ensuring Protective Measures ..... 90
7.6.3 Statements of Adverse Impact in Public Notices ..... 93
7.6.4 Dispute Resolution between FDEP and USFWS and USFWS-EPA Coordination ..... 94
8. Conclusions ..... 95
9. Literature Cited ..... 99
10. Lists of Contacts and Preparers ..... 103

# Figure Index

Figure 2-1 Example of activities authorized by the USACE 404 program ........ 15
Figure 2-2 Example of activities authorized by USACE and FDEP ........ 16
Figure 2-3 Example of a linear project ........ 17
Figure 4-1 Historic freshwater flows compared to freshwater flows after C&SF Project ........ 42
Figure 4-2 Future Ecosystem Conditions based on CERP ........ 43
Figure 4-3 Acreage of Authorized Fill, by Wetland Type ........ 46
Figure 4-4 Locations of ESA Consultations in Action Area, 2014 - 2018 ........ 54
Figure 4-5 Concentrations of ESA consultations in the Action Area, 2014 - 2018 ........ 55
Figure 6-1 Comparison of projected 2010-2070 population change in four Florida Regions ........ 66
Figure 6-2 A comparison of the State development scenarios ........ 67
Figure 6-3 State Water Scenarios (gallons/day/acre) ........ 69
Figure 7-1 Species Coordination Overview ........ 82

# Table Index

Table 2-1 Freshwater Non-Forested Wetlands ........ 18
Table 2-2 Freshwater Forested Wetlands ........ 19
Table 2-3 Lakes ........ 19
Table 2-4 Rivers and Streams ........ 20
Table 2-5 Estuarine Areas ........ 20
Table 2-6 Aquatic Caves ........ 21
Table 2-7 Sandhill and Scrub Areas ........ 22
Table 2-8 Dry Prairie and Pine Rockland Areas ........ 22
Table 3-1 ESA Species Potentially Affected by the Action ........ 23
Table 4-1 Authorized Areas and Acreages by Wetland Type, 2014 - 2018 ........ 45
Table 4-2a Consultation Types for Federal Actions Totals, FY 2014 – 2018 ........ 49
Table 4-2b Consultation Types for Federal Actions by Year, FY 2014 – 2018 ........ 49
Table 4-3a ESA Consultations Without Programmatic, By Species, 2014-2018 ........ 49
Table 4-3b ESA Consultations with Programmatic, 2014-2018 ........ 51
Table 6-1 Historic Water Use in Florida (millions of gallons per day) ........ 69
Table 7-1 Programmatic Consultations and Consultation Keys in Florida, 2010 - 2019 ........ 84

# Appendix Index

Appendix A April 15, 2020 Letter from NMFS to FDEP Regarding NMFS Jurisdiction ..................... 105

Appendix B Species Accounts ..................................................................................................... 108

Appendix C Effects of the Action on ESA-listed Species ............................................................. 102

Appendix D Figures 1 through 6 .................................................................................................. 154

Appendix E Dredge and Fill Activities as Defined in the Corps Database .................................... 161

# Acronyms

| | |
|---|---|
| Wildlife Plan | Florida's State Wildlife Action Plan (FWC) |
| assumption | Assumption of Section 404 of CWA by the State of Florida |
| BA | Biological Assessment |
| BMP | Best Management Practices |
| BiOp | Biological Opinion |
| C&SF | Central and Southern Florida |
| CERP | Comprehensive Everglades Restoration Plan |
| CFR | Code of Federal Regulations |
| CWA | Clean Water Act |
| CWIS | Cooling Water Intake Structure |
| EIS | Environmental Impact Statement |
| ECOS | Environmental Conservation Online System |
| EPA | United States Environmental Protection Agency |
| ERP | Environmental Resource Permit |
| ESA | Endangered Species Act |
| F.A.C. | Florida Administrative Code |
| FDEP | Florida Department of Environmental Protection |
| FEMA | Federal Emergency Management Agency |
| FLCCS | Florida Land Cover Classification System |
| FNAI | Florida Natural Areas Inventory |
| F.S. | Florida Statutes |
| FWC | Florida Fish and Wildlife Conservation Commission |
| GIS | Geographic Information Systems |
| HCP | Habitat Conservation Plan |
| IPaC | Information for Planning and Consultation |
| ITS | Incidental Take Statement |
| MOA | Memorandum of Agreement |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| NWP | Nationwide Permit |

| | |
|---|---|
| PEM | Palustrine Emergent |
| PFO | Palustrine Forested |
| PSS | Palustrine Shrub Scrub |
| RAI | Request for Additional Information |
| SFWMD | South Florida Water Management District |
| SLOPES | Standard Local Operating Procedures for Endangered Species |
| USACE | United States Army Corps of Engineers |
| USC | United States Code |
| USFWS | United States Fish and Wildlife Service |
| WMDs | Water Management Districts |
| WOTUS | Waters of the United States |

# Glossary

**CWA** means the Clean Water Act (also known as the Federal Water Pollution Control Act or FWPCA) Pub. L. 92–500, as amended by Pub. L. 95–217, 33 USC 1251, et seq. (Rule 62-331.030, F.A.C., State 404 Handbook section 2.0(b)1).

**Action** means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by federal agencies in the United States or upon high seas (50 CFR § 402.02).  For the purposes of this document, the Action would be the EPA's approval of the State of Florida's request for the assumption of the administration and permitting of Section 404 of the CWA.

**Action Area** means all areas to be affected directly or indirectly by the Federal Action, and not merely the immediate area involved in the Action (50 CFR § 402.02).

**Activity** for the purposes of the State 404 program only, means "discharge of dredged material" and/or "discharge of fill material" as those terms are defined in 40 CFR § 232.2 (Rule 62-331.030, F.A.C.).

**Administratively complete** means an application that contains all the items required under the public noticing requirements of Rule 62-331.060, F.A.C.

**Affect/effect** as a verb, to "affect" means is to bring about a change. The "effect" (usually a noun) is the result of a change. "Affect" appears in section 7 of the ESA (16 USC § 153) and "Effect" appears throughout ESA section 7 regulations (50 CFR § 402 *et seq*) and guidance documents (ESA section 7 Consultation Handbook).

**Assumed waters** (or **State-assumed waters)** State-assumed waters are all waters of the United States that are not retained waters (as identified in Chapter 62-331, F.A.C., and State 404 Handbook).

**Avoidance** means mitigating a resource impact by selecting the least-damaging project type, spatial location and extent compatible with achieving the purpose of the project.  Avoidance is achieved through an analysis of appropriate and practicable alternatives and a consideration of impact footprint.

**Assumption** means a state has requested and the EPA has approved a state dredge and fill permitting program to be administered in lieu of, Section 404 program administered by the USACE for discharges into assumed waters.

**Best available data** to assure the quality of the science used to establish official positions, decisions, and actions taken by the State of Florida during the review of State 404 program permit applications, the quality of the biological, ecological, technical, and other relevant information that is used will only be that which is reliable, credible and represents the best data available. Under statute 7(a)(2), the USFWS is required to use the best available science. In the context of the ESA, the USFWS and NMFS has a policy statement that further describes best available data (see Notice of Interagency Cooperative Policy on Information Standards Under the Endangered Species Act 1994).

**Biological opinion** means a document which includes 1) the opinion of the Fish and Wildlife Service or the National Marine Fisheries Service as to whether or not a federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of designated critical habitat; 2) a summary of information on which the opinion is based; and 3) a detailed discussion of the effects of the action on listed species or designated critical habitat (50 CFR § 402.02, 50 CFR § 402.14(h)).

**Candidate species** means a plant and animal taxa considered for possible addition to the list of Endangered and Threatened Species. These are taxa for which USFWS as on file sufficient information on biological vulnerability and threat(s) to support issuance of a proposal to list, but issuance of a proposed rule is currently

precluded by higher priority listing actions (50 CFR § 424.02, ESA section 7 Consultation Handbook).

**Conservation** means to use all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which protective measures are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking (ESA 16 U.S.C. § 1532(3)).

**Critical habitat** for a threatened or endangered species means 1) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of Section 1533, on which are found those physical or biological features essential to the conservation of the species and which may require special management considerations or protection; and 2) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of Section 1533, upon a determination by the Secretary of the Interior or the Secretary of Commerce that such areas are essential for the conservation of the species (ESA 16 U.S.C.  § 1532(5)).

**Cumulative effects** are those effects of future State or private activities, not involving federal activities, that are reasonably certain to occur within the action area of the action subject to coordination. For the purposes of this document, this definition only applies to ESA section 7 analyses (50 CFR § 402.02).

**Destruction or adverse modification of critical habitat** means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species (50 CFR § 402.02).

**Effects of the action** are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action (50 CFR § 402.02).

**Endangered species** means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of the ESA would present an overwhelming and overriding risk to man (ESA 16 U.S.C. § 1532(6)).

**Endangered or threatened species** in this document refers to those animal species that are identified as federally endangered or threatened by the USFWS or NMFS, and those animal species that are identified as State-listed by the FWC; it also means plant species identified as endangered or threatened by the USFWS or by the Florida Department of Agriculture and Consumer Services when such plants are located in a wetland or other surface water (Rule 62-330.021, F.A.C.).

**Environmental baseline** refers to the condition of the listed species or its designated critical habitat in the Action Area, without the consequences to the listed species or designated critical habitat caused by the proposed Action. The environmental baseline includes the past and present impacts of all federal, state, or private actions and other human activities in the action area, the anticipated impacts of all proposed federal projects in the action area that have already undergone formal or early ESA section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline (50 CFR § 402.02).

**ESA-considered** refers to species that are either listed, proposed, petitioned, or considered candidates for listing under the Endangered Species Act.

**Fish or wildlife** means any member of the animal kingdom, including without limitation any mammal, fish, bird (including any migratory, nonmigratory, or endangered bird for which protection is also afforded by treaty or other international agreement), amphibian, reptile, mollusk, crustacean, arthropod or other invertebrate, and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof. (ESA 16 U.S.C. § 1532(8)).

**Incidental take** refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by a federal agency or applicant (50 CFR § 402.02).

**Jeopardize the continued existence of** means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species (50 CFR § 404.02).

**Listed species** refers to any species of fish, wildlife or plant which has been determined to be endangered or threatened under section 4 of the ESA or under Chapter 68A-27, F.A.C.

**May affect** is the appropriate conclusion made by a federal action agency in the context of the ESA or by the State in the context of the State 404 program when a proposed activity is reasonably certain to affect any ESA-listed listed species or designated critical habitat.

**Minimization** means mitigating an aquatic resource impact by managing the severity of a project's impact on resources at the selected site. Minimization is achieved through the incorporation of appropriate and practicable design and risk avoidance measures.

**No effect** is the appropriate conclusion when the action agency determines its action will not affect a listed species or designated critical habitat per ESA.

**Practicable** means available and capable of being done after taking into consideration cost, existing technology, and logistics considering overall project purposes (Rule 62-331.030, F.A.C.).

**Programmatic consultation** (under ESA implementing regulations 50 CFR § 402.02) is a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the USFWS to consult on the effects of programmatic actions such as:

(1) Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and
(2) A proposed program, plan, policy, or regulation providing a framework for future proposed actions.

**Project area** or **Project site** means that a portion of the State-assumed waters where specific dredging or filling activities are permitted and consist of a bottom surface area, any overlying volume of water, and any mixing zones. In the case of wetlands on which surface water is not present, the project area consists of the wetland surface area (Rule 62-331.030, F.A.C.). In the context of the review of State 404 permit applications for endangered and threatened species, also includes those areas outside the immediate area of activity which may affect listed species using those areas.

**Protection measures** means those avoidance and minimization measures to address adverse impacts to listed species and critical habitat under the State 404 program. Protection measures recommended by the USFWS are incorporated as conditions to the State 404 permit. Examples of protection measures include, but are not limited to, project design changes and operational restrictions for the protection of species (i.e., seasonal restrictions for construction work). (as used in Chapter 62-331, F.A.C.).

**Proposed species** any species of fish, wildlife or plant that is proposed in the Federal Register to be listed under section 4 of the Endangered Species Act (50 CFR § 402.02).

**Reasonable potential to affect** for the purposes of this document and for the State of Florida's 404 program, refers to a project that has a reasonable potential for affecting endangered or threatened species (40 CFR § 233.51(b)(2)) where it has been determined during the species coordination process that the project may affect federally listed species or their critical habitat.

**Retained Waters** means those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The USACE will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A of State 404 Handbook), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only (Rule 62-331.030, F.A.C.).

**Section 7 consultation** refers to section 7(a)(2) of the ESA that requires federal agencies to use their authorities to further the conservation of listed species, including the requirement to consult with the USFWS to ensure that they are not undertaking, funding, permitting or authorizing actions likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat.

**Section 404** a section of the federal CWA that establishes a program to regulate the discharge of dredged and fill material into the WOTUS, including wetlands.

**Services(s)** describes the USFWS and/or the NMFS.

**Species coordination** is a process to address potential adverse effects to threatened or endangered species, ensuring compliance with Florida Chapter 62-331, F.A.C., and the ESA. This process includes coordination between the FDEP, FWC, and the USFWS during the review of submitted State 404 permit applications. Recommendations for avoiding and minimizing the effects of a project to federally listed species and their critical habitat is provided by technical assistance from the USFWS.

**Species coordination lead or State species lead** is the designated FDEP or FWC staff person who coordinates with the USFWS and is the point of contact for all ESA species issues during the review of a specific State 404 application. FDEP and FWC staff will decide on a project by project basis which agency will act as the State's species lead on the project when coordinating with the USFWS. Factors that will be considered in this decision include the complexity of the coordination and relative workloads.

**State 404 program** is the FDEP permitting program (Chapter 62-331, F.A.C.) that fulfills the requirements of the Section 404 of the CWA in a similar manner as the USACE 404 program, post-assumption, if approved by the EPA.

**Stream** means any river, creek, slough, or natural watercourse in which water usually flows in a defined bed or channel. It is not essential that the flowing be uniform or uninterrupted. The fact that some part of the bed or channel shall have been dredged or improved does not prevent the watercourse from being a stream (§ 373.019(20), F.S.).

**Stressors** are any physical, chemical, or biological alteration of resources (i.e., increase, decrease, or introduction) that can induce an adverse organism response. Stressors can act directly on an individual, or indirectly through impacts to resources.

**Surface water** means water upon the surface of the earth, whether contained in bounds created naturally or artificially or diffused. Water from natural springs shall be classified as surface water when it exits from the spring onto the earth's surface (§ 373.019(21), F.S.).

**Take** means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect or attempt to engage in any such conduct. (ESA 16 U.S.C. § 1532(19)) **Harass** is further defined as actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include but are not limited to, breeding, feeding, or sheltering. **Harm** is further defined to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns such as breeding, feeding, or sheltering (ESA implementing regulations 50 CFR § 17.3).

**Technical assistance** refers to a coordination process described in the ESA section 7 Consultation Handbook (1998) that outlines a variety of ways in which the USFWS provide expertise and guidance on an individual project basis. In the context of State 404 permit application reviews, the USFWS assists the State of Florida by providing information, reviews, and recommendations on effect determinations and protective measures to ensure compliance with the ESA and Chapter 62-331, F.A.C.

**Technically complete** means a State 404 application where each application item is adequate to allow the FDEP to determine if the proposed project complies with Chapter 62-331, F.A.C. If a project requires both an ERP and a State 404 program authorization, the State 404 program review shall not be considered complete until the ERP review is complete. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met (Rule 62-331.030, F.A.C.).

**Threatened species** means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range (ESA 16 U.S.C.§ 1532(20)).

**Uplands** means areas that are not wetlands or other surface waters, as delineated pursuant to Rules 62-340.100 through 62-340.550, F.A.C., as ratified by § 373.4211, F.S.

**USACE 404 program** refers to the administration and permitting responsibilities by the USACE for Section 404 of the CWA, prior to any assumption by the State of Florida.

**Waters of the State** are as defined in § 403.031(13), F.S.

**Waters of the United States (WOTUS)** means those waters defined in the regulations under 40 CFR 230(s).

**Wetland** means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas ( 40 CFR § 232.2).

**Works** means all artificial structures, including, but not limited to, ditches, canals, conduits, channels, culverts, pipes, and other construction that connects to, draws water from, drains water into, or is placed in or across the waters in the State [§ 373.403(5), F.S.] and includes all types of dredging and filling to create, remove, or locate structures in, on, or over wetlands or other surface waters (Rule 62-330.021, F.A.C.).

# 1.    Purpose of Biological Assessment

The purpose of this BA is to evaluate the effects of the EPA potential approval of the State of Florida's request for Assumption and administration of Section 404 of the CWA. The BA will consider whether EPA's approval of the Assumption request (Action) is likely to adversely affect species listed, or proposed to be listed under the Endangered Species Act (ESA), as well as designated critical habitat and proposed critical habitat for those species (50 Code of Federal Regulations [CFR] § 402.12). EPA is the federal agency charged with approving or denying the state's request, pursuant to the CWA implementing regulations (40 CFR § 233 *et seq*). The FDEP is the state agency requesting administration of Section 404 of the CWA (Assumption).

Florida's request to assume the administration of Section 404 of the CWA only includes those WOTUS not retained by the USACE, referred to as assumed waters or State-assumed waters. The USACE will retain permitting responsibility for the discharges of dredged or fill material into those waters defined as "Retained Waters". The definition of retained waters can be found in the State 404 Handbook in Chapter 2.0 and the process to determine whether a project is located in retained, or assumed waters, is described in Chapter 4.1 of the State 404 Handbook. In addition, Appendix A of the Handbook includes the Retained Waters List maintained by the USACE.

## 1.1    Objectives of Action

By assuming permitting responsibilities under Section 404 of the CWA, the State of Florida would be able to have an active, major role in the implementation of the CWA within its jurisdiction. This would allow the State to more effectively and efficiently address regional issues by permitting both State and Federal (assumed waters) discharges of dredged or fill material through the Florida Environmental Resource Permitting program (ERP) per Chapter 62-330, F.A.C. and State 404 program per Chapter 62-331, F.A.C. authorizations. The ability to review these two regulatory requirements by the State, at the same time, is expected to provide consistency, certainty, and timeliness to the regulated community.

For Florida to assume administration of Section 404 of the CWA, pursuant to the provisions of 40 CFR §233.10, the State must submit an application for Assumption package to the EPA Region IV Administrator:

1.  Letter from the Governor of Florida requesting program approval;

2.  Complete program description as set forth in 40 CFR § 233.11;

3.  Attorney General's statement, as set forth in 40 CFR § 233.12;

4.  Memorandum of Agreement (MOA) with the EPA Regional Administrator, as set forth in Section 40 CFR § 233.13;

5.  MOA with the Secretary of the Army, as set forth in 40 CFR § 233.14; and

6.  Copies of all applicable state statutes and regulations, including those governing applicable state administrative procedures.

The EPA has stated that it will voluntarily engage in consultation with the United State Fish and Wildlife Service (USFWS) and the National Marine Fisheries Service (NMFS) under section 7 of the ESA in their letter dated December 15, 2019 to FDEP. This allows FDEP to act as a non-federal representative to develop this

BA to assist in EPA's review of potential impacts to ESA-listed species. If approved, the State's Assumption of the dredge and fill permitting program under Section 404 of the CWA for waters assumable by the State would be implemented by processes and procedures described in state regulations (Chapters 62-330, and 62-331, Florida Administrative Code [F.A.C.]), Memorandums of Agreement with EPA and the United States Army Corps of Engineers (USACE), and a Memorandum of Understanding with the Florida Fish and Wildlife Conservation Commission (FWC) and the USFWS. Should EPA request formal consultation with USFWS at the time of their review of whether to approve Assumption of the State 404 program, USFWS may issue a programmatic biological opinion (Program assumption BiOp). The opinion may include conditions that guide implementation of the State 404 program. If the USFWS determines that the Action is not likely to jeopardize the continued existence of ESA-listed species and is not likely to destroy or adversely modify designated critical habitat, the Program assumption BiOp may also include an incidental take statement (ITS) with reasonable and prudent measures and terms and conditions that must be complied with in the implementation of the State 404 program, which would trigger a section 7 consultation between USACE and USFWS and NMFS

*The Programmatic Biological Assessment*

In accordance with section 7 regulations, this BA only evaluates effects to ESA-listed species and those species proposed to be listed and their critical habitat or proposed critical habitat. For the sake of clarity in understanding the State's implementation of the State 404 program and the ERP program, the State 404 program would address species that may not be listed under the ESA, but are protected under other federal or state laws. Examples of these types of laws include the Bald and Golden Eagle Protection Act (16 USC § 668 et seq.) and the Migratory Bird Treaty Act of 1918 (16 USC §§ 703-712 (§ 709 omitted).

Also ESA proposed, candidate, and petitioned plant and animal species with ranges within Florida are discussed in this BA, to provide a thorough review of Florida's potentially at-risk species, and because the lists of species that are listed as threatenedmay be modified to include some or all of these petitioned species, depending on the outcome of the status review. This BA analyzes a total of 235 plant and animal species in the State of Florida that are federally listed as endangered (95), threatened (44), or is ESA-considered (96). The effects of the potential approval by EPA for the State of Florida assuming Section 404 of the CWA on listed species is discussed in present time, and are estimated for the future. All species that are currently listed, proposed to be listed or that might be listed in the future are discussed, with evaluations of effects on respective guilds. This review helps evaluate the effects of the State 404 program on any species that are currently listed or those we are aware of that may become listed in the next 10 to 20 years.

Because of the statewide nature of this request, the numerous covered species and diverse habitats, as well as lack of knowledge with respect to where and what type of future permits may be requested, a meaningful site-specific and species-specific analysis is not possible. Since the State 404 program is implemented through future State-issued 404 permit actions, a programmatic BA is appropriate to describe the regulatory process by which the State of Florida will make determinations on the issuance of State 404 permits. The BA will address how that subsequent process will consider effects to listed endangered and threatened species, or species proposed to be listed so that the effects of this Action may be analyzed.

This BA and any future Program assumption BiOp will address future impacts and effects programmatically, through assessing the regulatory process by which the State of Florida will issue Section 404 permits, and by establishing a technical assistance process with the USFWS for species coordination. More specifically, the components of State 404 program establish the process and responsibilities for FDEP to follow to effectively

implement the State 404 program. This programmatic consultation would examine whether and to what degree EPA's review and approval of the State 404 program ensures that implementation of the program is not likely to jeopardize the continued existence of endangered or threatened species, or result in the destruction or adverse modification of critical habitat.

As recently recognized by the USFWS, "various forms of programmatic consultations have been successfully implemented for many years now" (84 CFR 44996). To help guide development of a biological assessment, Florida considered prior examples of programmatic consultation that involved rules applicable to large areas that also involved state-issued permits. For example, in 2013, EPA developed a programmatic biological evaluation for a rulemaking under Section 316(b) of the CWA that revised requirements for Cooling Water Intake Structures (CWIS) at existing facilities. This proposed rule change, called the 316(b) rule, governs permits issued by states, so it was national in scope and covered a large number (312) of ESA-listed species. In 2014, the USFWS and NMFS responded with a programmatic Biological Opinion that the action was not likely to jeopardize the continued existence of ESA-listed species, and was not likely to destroy or adversely modify designated critical habitat, and included an ITS. EPA issued the final rule in 2014.

The 316(b) Rule and the Biological Opinion were challenged in the United States Court of Appeals for the Second Circuit (*Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49 (2d Cir. 2018). The Court rejected the petitioner's challenges, most of which it deemed challenges to the Biological Opinion's "programmatic" approach, and upheld the rule and the Biological Opinion. The petitioners also alleged that the Services failed to comply with the statutory requirements for an ITS. However, the Court found that given their commitment to the technical assistance process, the agencies' justification for not immediately quantifying take was adequate. Upon implementation of the rule, any potential incidental take would be monitored through the permitting process. The Court also found that the ITS's reasonable and prudent measure specifying that EPA exercise its oversight authority in connection with the technical assistance process set forth in the rule to address impacts on listed species, was adequate.

This BA adopts a similar approach. However, post-assumption implementation in the case of an Assumption under CWA Section 404 is also guided by regulations found at 40 CFR § 233, which contain specific requirements regarding the issuance of permits by a State 404 program. The State of Florida's 404 program (Chapter 62-331, F.A.C.) has a structure and technical assistance process that requires a review of species listed by the ESA at the time future permit applications are received. This approach ensures that if a new species is listed or a listed species' status changes after the EPA's review of this BA and application Assumption package, the effects of any State 404 permit on the new species or its status change would be reviewed by USFWS.  If the State 404 program's processes are proposed to be changed significantly in the future, those proposed changes would be submitted to EPA for review before implementation and may trigger reinitiation of consultation with USFWS.

## 1.2    The History of Florida's Request for Assumption

On March 23, 2018, the Florida Governor signed into law Rule 2018-88, Laws of Florida, granting FDEP with the power and authority to adopt rules to assume and implement the Section 404 dredge and fill program (creating § 373.4146, F.S.). Since that time, FDEP has drafted Chapter 62-331, F.A.C. to implement the State 404 program, and drafted Memorandums of Agreement with the EPA and the USACE, as required by 40 CFR § 233.13. In addition, a Memorandum of Understanding has been drafted between FDEP, FWC and USFWS to better facilitate post-assumption implementation

On July 17, 2019, the FDEP sent a request to EPA that sought designation, pursuant to 50 CFR §402.08, to serve as a non-federal representative to prepare the subject BA for possible ESA section 7 consultation. The EPA designated FDEP as the non-federal representative to prepare this BA in a letter dated December 12, 2019, consistent with 50 CFR § 402.08. This designation allowed FDEP to consult informally with the USFWS and NMFS, to coordinate on the list of species that may be affected and to coordinate on potential processes for the review of State 404 permits.

FDEP requested input on a draft species list for Florida's application package for Assumption from the USFWS and the NMFS on November 22, 2019.  On April 15, 2020, NMFS responded to FDEP with the conclusion that ESA-listed species under NMFS jurisdiction do not occur in waters that are assumable by the state. Based on their review, they stated that where there is shared jurisdiction for the Gulf Sturgeon between NMFS and USFWS, and the USFWS is responsible for consultations regarding sturgeon and critical habitat in riverine habitat units. NMFS further states that the riverine critical habitat units and river areas where Gulf Sturgeon are known to occur are all listed by the USACE as retained waters. Based on their determination, this BA makes a "no effect" determination for NMFS jurisdictional species.

A brief sequence of recent events and actions by the State of Florida pertaining to the Assumption are as follows:

- On March 23, 2018, the Governor signed into law Rule 2018-88, Laws of Florida, which created § 373.4146, F.S., granting FDEP with the power and authority to adopt rules to assume and implement the Section 404 dredge and fill program.

- In 2018 FDEP began work with both EPA and the USACE to draft separate memorandums of agreement that describe the commitments and responsibilities of each agency, should the Assumption be approved by the EPA. FDEP also began assembly of other required components that will constitute a complete Assumption request package per 40 CFR § 233.10-14(b).

- In May 2018, FDEP published a Notice of Rule Development to implement the State 404 program and held three rulemaking workshops to collect public comment on the draft rule, Chapter 62-331, F.A.C.  The workshops were held on May 5th, May 31st and June 1st, 2018. This rule has been created to implement the State 404 program and to include federal requirements that are not currently covered under the ERP program.

- On July 17, 2019, the FDEP sent a request to EPA that sought designation, pursuant to 50 CFR § 402.08, to serve as a non-federal representative for ESA section 7 consultation to prepare the subject BA.

- On September 18, 2019, EPA, FDEP, United States Department of Interior, USFWS, and USACE members attended a meeting to discuss Florida's proposal to use programmatic consultation for ESA purposes under the Section 404 Assumption.

- On November 22, 2019, FDEP sent a request to USFWS and NMFS to review a preliminary list of affected species for the BA.

- On December 12, 2019, the FDEP Secretary received a response from the EPA Region IV Administrator approving the requested non-federal representative designation, allowing FDEP to move forward with the development of this BA. The letter indicated that at the request of FDEP, EPA would voluntarily engage in consultation with the Services on approving Florida's program.

- In February 2020, FDEP published a Notice of Proposed Rule to implement the State 404 program and in April, held five rulemaking hearings to collect public comment on the draft rule, Chapter 62-331, F.A.C. The hearings occurred on April 2nd, April 6th, April 10th, April 24th, and April 27th.

- In February 2020, FDEP, FWC and USFWS began work to draft a Memorandum of Understanding (MOU) to describe commitments, roles and responsibilities in the State 404 program's species coordination process, should the Assumption be approved by the EPA.

- Additional public hearings were held in March and April 2020 regarding rulemaking for Chapter 62-331, F.A.C.

- On April 15, 2020, NMFS responded to FDEP's November 22, 2019 letter with the conclusion that ESA-Listed species under NMFS' jurisdiction do not occur in waters that are assumable by the State.

- On June 8th, 2020, the Final Notice of Proposed Rule Change for Chapter 62-331, F.A.C. was published.

## 1.3    Organization of the Document

This BA is organized as follows:

- **Chapter 1** provides an overview of the objectives of the Action, whereby the State of Florida would assume the administration of Section 404 of the CWA in those waters not retained by the USACE and offers a history (timeline) of actions leading up to FDEP's request for Assumption.

- **Chapter 2** provides descriptions and details of the request for Assumption and describes the Action Area. It also identifies the ecosystems/habitats evaluated in the remainder of the document.

- **Chapter 3** identifies ESA-listed species evaluated in the remainder of the document and describes sources of information for the ESA-listed, NMFS-listed, State-listed species, and critical habitat within the Action Area.

- **Chapter 4** develops the baseline environmental conditions prior to the Action. Further, it provides a brief history of the regulatory framework prior to (and leading up to) the Action.

- **Chapter 5** analyzes the potential effects of the Action on ESA-listed species and designated critical habitat.

- **Chapter 6** considers the cumulative effect of non-Federal actions that are reasonably certain to occur within the Action Area in the foreseeable future.

- **Chapter 7** discusses species coordination, avoidance and minimization measures, obtaining USFWS technical assistance, and discusses various tools and guidelines for species review and decision making.

- **Chapter 8** provides an effects determination for ESA-listed species and their critical habitat and concluding remarks regarding subsequent actions that will be required.

- **Chapter 9** provides a listing of the references/citations utilized to prepare this document.

The April 15, 2020 letter from NMFS to FDEP stating that it does not have assets (ESA-listed species) that may be affected by this Action is provided in Appendix A.  Species accounts on those ESA-listed, candidate, or under review species in Florida potentially affected by the Section 404 Assumption are contained in

Appendix B. Additional information pertaining to the effects of the Action on ESA-listed species, map figures, and a list of dredge and fill activities as described in the USACE database are contained in Appendices C, D, and E respectively.

# 2.    Action & Action Area

## 2.1  Description of Action

This BA analyzes the potential EPA Action; approval of Florida's Assumption for administration of Section 404 of the CWA in State-assumed waters. If the State of Florida's request for Assumption is approved, FDEP would assume regulatory responsibility over all dredging and filling activities in WOTUS not retained by USACE pursuant to 33 USC § 1344(g) (see Chapter 2.3, Description of Action Area). The subsequent issuance of State 404 permits and any ensuing adverse effects to ESA-listed species or critical habitat caused by permitted activities is an effect or consequence of EPA's approval of the State 404 program.

Per Section 404(g) of the CWA, 33 USC. § 1344(g), a state, with approval from the EPA, may be authorized to administer its own permit program for the discharge of dredge or fill material into certain WOTUS in lieu of the permitting program implemented by the USACE. The EPA has promulgated regulations at 40 CFR § 233 outlining, among other things, its requirements for approving a State 404 program.

The Secretary of FDEP is the State official charged with administering the State 404 program when the program is approved in accordance with 40 CFR § 233 and has authority to issue permits pursuant to Part IV of § 373, F.S. In accordance with § 373.4146, F.S., FDEP has the power and authority to issue permits for regulated activities conducted in State assumed waters.

The FDEP, the water management districts (WMDs) and certain local governments delegated by FDEP jointly implement Florida's Environmental Resource Permitting (ERP) program. The agencies' responsibilities are divided according to the Operating and Delegation Agreement (operating agreements) and the geographic regions of the WMDs. At this time, the administration and implementation of the State 404 program is limited to the FDEP. It is anticipated that the State 404 program may be delegated to the WMDs by FDEP in the future. If this is considered, approval from the EPA will be required prior to implementation. Upon approval, these agencies' will be provided training and will be required to follow the same procedures outlined for the State 404 program.

If approved, Florida's State 404 program will regulate discharges of dredge or fill material in those areas where USACE does not retain jurisdiction (assumed waters). EPA's review of the proposed State 404 program includes Chapter 62-331, F.A.C., which will include requirements of federal law that are not addressed in the existing state regulations for dredge and fill permitting (such as noticing provisions, alternatives analysis, and the federal mitigation hierarchy, etc.). The State 404 rule, Chapter 62-331, F.A.C., also includes definitions, procedures for review and agency action on exemption requests, processes for Individual Permits, public notice requirements, procedures regarding mitigation banking, and procedures and descriptions for General Permits created to correspond to the federal Nationwide Permits and appropriate regional general permits as granted by the USACE. EPA's review of this program will also include the State 404 program's Handbook (State 404 Handbook) and new forms, incorporated by rule reference.

## 2.2 Types of Future Activities to be Authorized by Florida's 404 Program

This chapter discusses the different types of future proposed activities that may be issued by the State of Florida as State 404 program permits. A list of the types of future activities that may be authorized under the Section 404 Assumption is included below. A more expansive list is available in Appendix E, which was derived from the USACE project information database. All the activities in the Appendix E list, however, may not be applicable to the State 404 program. Dredging and filling activities include but are not limited to:

- Discharge of fill material
- Dredging
- Ecological restoration
- Discharge of dredged material
- Excavation associated with the discharge of dredged or fill material
- Other (Aquaculture, Work, Aerial or Submarine cable crossings)
- Conversion of waters type (forested wetland to emergent wetland, stream to lake)
- Commercial developments
- Residential developments
- Single-family residence
- Agriculture
- Utilities
- Roadways
- Airports
- Marinas
- Docks
- Piers
- Boat Ramps
- Dams
- Levees
- Mining activities
- Mitigation
- Restoration

### *Proposed Activities Authorized or Exempt Under Program*

Types of activities the State 404 program will regulate include all dredge and fill activities within the State assumed waters. Construction activities, including excavation and filling of wetlands, may impact ESA-listed species and habitat occurring in those areas. Other effects associated with dredge and fill construction include, but are not limited to, turbidity, decreased water quality, noise, pollution (including exhaust and new sources of light), short- or long-term hydrodynamic changes in the area and its surroundings, and changes in wet and dry periodicity. Permitted projects may have adverse impacts, and those impacts will be taken into consideration during the permitting process, with protection measures identified and implemented to avoid or reduce those impacts. The proposed activities and exemptions below are excerpts from 40 CFR § 232 and select definitions from 40 CFR § 232.2, also summarized in Appendix B of the State 404 Handbook:

*Discharge of dredged material.*

(1) Except as provided below in paragraph (2), the term "discharge of dredged material" means any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the waters of the United States. The term includes, but is not limited to, the following:
   (i) The addition of dredged material to a specified discharge site located in waters of the United States;

 

 

(ii) The runoff or overflow, associated with a dredging operation, from a contained land or water disposal area; and

(iii) Any addition, including redeposit other than incidental fallback, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized land clearing, ditching, channelization, or other excavation.

(2) The term discharge of dredged material does not include the following:

(i) Discharges of pollutants into waters of the United States resulting from the onshore subsequent processing of dredged material that is extracted for any commercial use (other than fill). These discharges are subject to Section 402 of the Clean Water Act even though the extraction and deposit of such material may require a permit from the Corps or applicable state.

(ii) Activities that involve only the cutting or removing of vegetation above the ground (e.g., mowing, rotary cutting, and chain sawing) where the activity neither substantially disturbs the root system nor involves mechanized pushing, dragging, or other similar activities that redeposit excavated soil material.

(iii) Incidental fallback.

(3) Section 404 authorization is not required for the following:

(i) Any incidental addition, including redeposit, of dredged material associated with any activity that does not have or would not have the effect of destroying or degrading an area of waters of the U.S. as defined in paragraphs (4) and (5) of this definition; however, this exception does not apply to any person preparing to undertake mechanized land clearing, ditching, channelization and other excavation activity in a water of the United States, which would result in a redeposit of dredged material, unless the person demonstrates to the satisfaction of the Corps, or EPA as appropriate, prior to commencing the activity involving the discharge, that the activity would not have the effect of destroying or degrading any area of waters of the United States, as defined in paragraphs (4) and (5) of this definition. The person proposing to undertake mechanized land clearing, ditching, channelization or other excavation activity bears the burden of demonstrating that such activity would not destroy or degrade any area of waters of the United States.

(ii) Incidental movement of dredged material occurring during normal dredging operations, defined as dredging for navigation in navigable waters of the United States, as that term is defined in 33 CFR part 329, with proper authorization from the Congress or the Corps pursuant to 33 CFR part 322; however, this exception is not applicable to dredging activities in wetlands, as that term is defined at §232.2(r) of this chapter.

(iii) Certain discharges, such as those associated with normal farming, silviculture, and ranching activities, are not prohibited by or otherwise subject to regulation under Section 404. See 40 CFR 232.3 for discharges that do not require permits.

(4) For purposes of this section, an activity associated with a discharge of dredged material destroys an area of waters of the United States if it alters the area in such a way that it would no longer be a water of the United States.

Note: Unauthorized discharges into waters of the United States do not eliminate Clean Water Act jurisdiction, even where such unauthorized discharges have the effect of destroying waters of the United States.

(5)  For purposes of this section, an activity associated with a discharge of dredged material degrades an area of waters of the United States if it has more than a de minimis (i.e., inconsequential) effect on the area by causing an identifiable individual or cumulative adverse effect on any aquatic function.

*Discharge of fill material.*

(1)  The term "discharge of fill material" means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills; placement of overburden, slurry, or tailings or similar mining-related materials;" after the words "utility lines; and artificial reefs.

(2)  In addition, placement of pilings in waters of the United States constitutes a discharge of fill material and requires a Section 404 permit when such placement has or would have the effect of a discharge of fill material. Examples of such activities that have the effect of a discharge of fill material include, but are not limited to, the following: Projects where the pilings are so closely spaced that sedimentation rates would be increased; projects in which the pilings themselves effectively would replace the bottom of a waterbody; projects involving the placement of pilings that would reduce the reach or impair the flow or circulation of waters of the United States; and projects involving the placement of pilings which would result in the adverse alteration or elimination of aquatic functions.

   (i)  Placement of pilings in waters of the United States that does not have or would not have the effect of a discharge of fill material shall not require a Section 404 permit. Placement of pilings for linear projects, such as bridges, elevated walkways, and powerline structures, generally does not have the effect of a discharge of fill material. Furthermore, placement of pilings in waters of the United States for piers, wharves, and an individual house on stilts generally does not have the effect of a discharge of fill material. All pilings, however, placed in the navigable waters of the United States, as that term is defined in 33 CFR part 329, require authorization under section 10 of the Rivers and Harbors Act of 1899 (see 33 CFR part 322).

*40 CFR § 232.3 Activities not requiring permits.*

Except as specified in paragraphs (a) and (b) of this section, any discharge of dredged or fill material that may result from any of the activities described in paragraph (c) of this section is not prohibited by or otherwise subject to regulation under this part.

(a) If any discharge of dredged or fill material resulting from the activities listed in paragraph (c) of this section contains any toxic pollutant listed under section 307 of the Act, such discharge shall be subject to any

applicable toxic effluent standard or prohibition and shall require a Section 404 permit.

(b) Any discharge of dredged or fill material into waters of the United States incidental to any of the activities identified in paragraph (c) of this section must have a permit if it is part of an activity whose purpose is to convert an area of the waters of the United States into a use to which it was not previously subject, where the flow or circulation of waters of the United States may be impaired or the reach of such waters reduced. Where the proposed discharge will result in significant discernable alterations to flow or circulation, the presumption is that flow or circulation may be impaired by such alteration.

Note: For example, a permit will be required for the conversion of a cypress swamp to some other use or the conversion of a wetland from silvicultural to agricultural use when there is a discharge of dredged or fill material into waters of the United States in conjunction with construction of dikes, drainage ditches or other works or structures used to affect such conversion. A conversion of Section 404 wetland to a non-wetland is a change in use of an area of waters of the U.S. A discharge which elevates the bottom of waters of the United States without converting it to dry land does not thereby reduce the reach of, but may alter the flow or circulation of, waters of the United States.

(c) The following activities are exempt from Section 404 permit requirements, except as specified in paragraphs (a) and (b) of this section:

(1)(i) Normal farming, silviculture and ranching activities such as plowing, seeding, cultivating, minor drainage, and harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices, as defined in paragraph (d) of this section.

(ii) (A) To fall under this exemption, the activities specified in paragraph (c)(1) of this section must be part of an established (i.e., ongoing) farming, silviculture, or ranching operation, and must be in accordance with definitions in paragraph (d) of this section. Activities on areas lying fallow as part of a conventional rotational cycle are part of an established operation.

(B) Activities which bring an area into farming, silviculture or ranching use are not part of an established operation. An operation ceases to be established when the area in which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operation. If an activity takes place outside the waters of the United States, or if it does not involve a discharge, it does not need a Section 404 permit whether or not it was part of an established farming, silviculture or ranching operation.

(2) Maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, bridge abutments or approaches, and transportation structures. Maintenance does not include any modification that changes the character, scope, or size of the original fill design. Emergency reconstruction must occur within a reasonable period of time after damage occurs in order to qualify for this exemption.

(3) Construction or maintenance of farm or stock ponds or irrigation ditches or the maintenance (but not construction) of drainage ditches. Discharge associated with siphons, pumps, headgates, wingwalls, weirs, diversion structures, and such other facilities as are appurtenant and functionally related to irrigation ditches are included in this exemption.

(4) Construction of temporary sedimentation basins on a construction site which does not include placement of fill material into waters of the United States. The term “construction site” refers to any site involving the erection of buildings, roads, and other discrete structures and the installation of support facilities necessary for construction and utilization of such structures. The term also includes any other land areas which involve land-disturbing excavation activities, including quarrying or other mining activities, where an increase in the runoff of sediment is controlled through the use of temporary sedimentation basins.

(5) Any activity with respect to which a State has an approved program under section 208(b)(4) of the Act which meets the requirements of section 208(b)(4)(B) and (C).

(6) Construction or maintenance of farm roads, forest roads, or temporary roads for moving mining equipment, where such roads are constructed and maintained in accordance with best management practices (BMPs) to assure that flow and circulation patterns and chemical and biological characteristics of waters of the United States are not impaired, that the reach of the waters of the United States is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized. The BMPs which must be applied to satisfy this provision include the following baseline provisions:

(i) Permanent roads (for farming or forestry activities), temporary access roads (for mining, forestry, or farm purposes) and skid trails (for logging) in waters of the United States shall be held to the minimum feasible number, width, and total length consistent with the purpose of specific farming, silvicultural or mining operations, and local topographic and climatic conditions;
(ii) All roads, temporary or permanent, shall be located sufficiently far from streams or other water bodies (except for portions of such roads which must cross water bodies) to minimize discharges of dredged or fill material into waters of the United States;
(iii) The road fill shall be bridged, culverted, or otherwise designed to prevent the restriction of expected flood flows;
(iv) The fill shall be properly stabilized and maintained to prevent erosion during and following construction;
(v) Discharges of dredged or fill material into waters of the United States to construct a road fill shall be made in a manner that minimizes the encroachment of trucks, tractors, bulldozers, or other heavy equipment within the waters of the United States (including adjacent wetlands) that lie outside the lateral boundaries of the fill itself;
(vi) In designing, constructing, and maintaining roads, vegetative disturbance in the waters of the United States shall be kept to a minimum;
(vii) The design, construction and maintenance of the road crossing shall not disrupt the migration or other movement of those species of aquatic life inhabiting the water body;
(viii) Borrow material shall be taken from upland sources whenever feasible;

(ix) The discharge shall not take, or jeopardize the continued existence of, a threatened or endangered species as defined under the Endangered Species Act, or adversely modify or destroy the critical habitat of such species;

(x) Discharges into breeding and nesting areas for migratory waterfowl, spawning areas, and wetlands shall be avoided if practical alternatives exist;

(xi) The discharge shall not be located in the proximity of a public water supply intake;

(xii) The discharge shall not occur in areas of concentrated shellfish production;

(xiii) The discharge shall not occur in a component of the National Wild and Scenic Rivers System;

(xiv) The discharge of material shall consist of suitable material free from toxic pollutants in toxic amounts; and

(xv) All temporary fills shall be removed in their entirety and the area restored to its original elevation.

(d)   For purpose of paragraph (c)(1) of this section, cultivating, harvesting, minor drainage, plowing, and seeding are defined as follows:

(1) Cultivating means physical methods of soil treatment employed within established farming, ranching and silviculture lands on farm, ranch, or forest crops to aid and improve their growth, quality, or yield.

(2) Harvesting means physical measures employed directly upon farm, forest, or ranch crops within established agricultural and silvicultural lands to bring about their removal from farm, forest, or ranch land, but does not include the construction of farm, forest, or ranch roads.

(3)(i) Minor drainage means:

(A) The discharge of dredged or fill material incidental to connecting upland drainage facilities to waters of the United States, adequate to effect the removal of excess soil moisture from upland croplands. Construction and maintenance of upland (dryland) facilities, such as ditching and tiling, incidental to the planting, cultivating, protecting, or harvesting of crops, involve no discharge of dredged or fill material into waters of the United States, and as such never require a Section 404 permit;

(B) The discharge of dredged or fill material for the purpose of installing ditching or other water control facilities incidental to planting, cultivating, protecting, or harvesting of rice, cranberries or other wetland crop species, where these activities and the discharge occur in waters of the United States which are in established use for such agricultural and silvicultural wetland crop production;

(C) The discharge of dredged or fill material for the purpose of manipulating the water levels of, or regulating the flow or distribution of water within, existing impoundments which have been constructed in accordance with applicable requirements of the Act, and which are in established use for the production or rice, cranberries, or other wetland crop species.
Note: The provisions of paragraphs (d)(3)(i) (B) and (C) of this section apply to areas that are in established use exclusively for wetland crop production as well as areas in established use for conventional wetland/non-wetland crop rotation (e.g., the rotations of rice and soybeans) where such rotation results in the cyclical or intermittent temporary dewatering of such areas.

(D) The discharge of dredged or fill material incidental to the emergency removal of sandbars, gravel bars, or other similar blockages which are formed during flood flows or other events, where such blockages close or constrict previously existing drainageways and, if not promptly removed, would result in damage to or loss of existing crops or would impair or prevent the plowing, seeding, harvesting or cultivating of crops on land in established use for crop production. Such

removal does not include enlarging or extending the dimensions of, or changing the bottom elevations of, the affected drainageway as it existed prior to the formation of the blockage. Removal must be accomplished within one year after such blockages are discovered in order to be eligible for exemption.

(ii) Minor drainage in waters of the United States is limited to drainage within areas that are part of an established farming or silviculture operation. It does not include drainage associated with the immediate or gradual conversion of a wetland to a non-wetland (e.g., wetland species to upland species not typically adequate to life in saturated soil conditions), or conversion from one wetland use to another (for example, silviculture to farming).

In addition, minor drainage does not include the construction of any canal, ditch, dike or other waterway or structure which drains or otherwise significantly modifies a stream, lake, swamp, bog or any other wetland or aquatic area constituting waters of the United States. Any discharge of dredged or fill material into the waters of the United States incidental to the construction of any such structure or waterway requires a permit.

(4) Plowing means all forms of primary tillage, including moldboard, chisel, or wide-blade plowing, discing, harrowing, and similar physical means used on farm, forest or ranch land for the breaking up, cutting, turning over, or stirring of soil to prepare it for the planting of crops. Plowing does not include the redistribution of soil, rock, sand, or other surficial materials in a manner which changes any area of the waters of the United States to dryland. For example, the redistribution of surface materials by blading, grading, or other means to fill in wetland areas is not plowing. Rock crushing activities which result in the loss of natural drainage characteristics, the reduction of water storage and recharge capabilities, or the overburden of natural water filtration capacities do not constitute plowing. Plowing, as described above, will never involve a discharge of dredged or fill material.

(5) Seeding means the sowing of seed and placement of seedlings to produce farm, ranch, or forest crops and includes the placement of soil beds for seeds or seedlings on established farm and forest lands.

(e) Federal projects which qualify under the criteria contained in Section 404(r) of the Act are exempt from Section 404 permit requirements but may be subject to other State or Federal requirements.

## 2.3   Description of Action Area

The Action Area is defined as "all areas to be affected directly or indirectly by the Federal Action and not merely the immediate area involved in the Action" (50 CFR § 402.02; and Subsection 62-331.010(2), F.A.C.). For the review of this Action, the Action Area encompasses the geographic extent of the FDEP Assumption of Section 404 permitting within the entire State of Florida. The Action Area consists of, and is limited to, the State-assumed waters and areas affected directly or indirectly by the Federal Action.

Florida's request to assume the administration of the CWA Section 404 permitting only includes those Waters of the United States (WOTUS) not retained by the USACE; referred to as assumed waters or State-assumed waters.  The USACE will retain permitting responsibility for the discharge of dredged or fill material in those waters defined as "Retained Waters". This definition can be found in the State 404 Handbook in Chapter 2.0 and the process to determine whether a project is located in retained, or assumed waters, is described in

Chapter 4.1 of the 404 Handbook. In addition, Appendix A of the 404 Handbook includes the Retained Waters List maintained by the USACE. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only.

The USACE also retains permitting authority for projects within "Indian country" as that term is defined at 18 USC §1151 (provided below):

> "Except as otherwise provided in Sections 1154 and 1156 of this title, the term "Indian country," as used in this chapter, means
>
> a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,
>
> b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and
>
> c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.
>
> A list of "Indian country" can be found online in the USACE Jacksonville District Regulatory Division Sourcebook.
>
> The boundary of a mitigation bank, excluding the service area, shall be considered the project boundary, even if only a portion of the bank requires a dredge and fill permit under Section 404 of the CWA."

Federal and state-approved dredge and fill activities may occur in isolation or adjacent to one another. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only (Figure 2-1). Projects that fall entirely outside of the 300-foot buffer of the retained waters will be permitted by the State 404 program (Project 3 in Figure 2-2). Linear projects that have some portion of dredge and fill activities in retained waters will be entirely authorized and permitted by the USACE, even if dredge and fill activities occur in wetlands landward of the 300-foot buffer (Figure 2-3).



Figure 2-1 Example of activities authorized by the USACE 404 program



Figure 2-2 Example of activities authorized by USACE and FDEP

Projects 1, 2, and 3 show the difference between retained and assumed waters responsibilities. Project 3 would be authorized by FDEP.



Figure 2-3 Example of a linear project

Linear projects may sometimes be miles long, but if there are dredge or fill activities waterward of the 300-foot guideline within the project boundary, the project is considered within retained waters and will be processed by the USACE.

## 2.4 Ecosystems/Habitats Located Within the Action Area

The State of Florida has several widely used land cover classification systems that define habitat/land use across the entire state. Each classification plays an integral role in the FWC's Florida's State Wildlife Action Plan (Wildlife Plan). The Wildlife Plan was the main resource for descriptions of ecosystems within the proposed Action Area. The key systems referenced for this BA are the Natural Communities Classification developed by the Florida Natural Areas Inventory (FNAI) and the Florida Land Cover Classification System (FLCCS) developed by FWC. FLCCS is a combination of several systems to include the FNAI Natural Communities Classification. The discussion below summarizes major wetland types within Florida, including freshwater non-forested wetlands, freshwater forested wetlands, lakes, rivers and streams, and estuarine wetlands. Each of the major types includes a variety of more specific sub-types (Tables 2-1 through 2-6).

### 2.4.1 Discussion of Aquatic Ecosystems and Habitats

Florida's freshwater ecosystem includes 7,800 freshwater lakes, 700 springs, 11 million acres of wetlands, more than 1,700 rivers and streams, and numerous underground aquifers (Fernald and Purdum 1998) (Appendix D, Figure 1). It is through these systems that freshwater eventually makes its way to the nearly 2,000 miles of Florida coastline and marine ecosystem.

#### *Freshwater Non-Forested Wetlands*

Florida's freshwater non-forested wetlands habitats include shrubby or herbaceous, non-tidal perennial communities in floodplains or depressions (Appendix D, Figure 2). In Florida, these habitats generally consist of sandy, clay, marl, and organic soils with a seven to 12-month hydroperiod. Fire in the summer months is often essential for these habitats to thrive. Freshwater non-forested wetlands can be divided into two major types: marshes and prairies/bogs (Table 2-1). Freshwater marshes are characterized by deeper, long inundation periods and tall emergent and floating-leaved species. Prairies and bogs are characterized by shallow, periodic inundation and are dominated by aquatic grasses, sedges, and/or titi (FWC 2019).

Table 2-1 Freshwater Non-Forested Wetlands

| Major Type | Includes | Acres |
|---|---|---|
| Marshes | Depression Marsh, Basin Marsh, Coastal Interdunal Swale, Floodplain Marsh, and Glades Marsh | 2,743,064 |
| Prairies and Bogs | Wet Prairie, Shrub Bog, Marl Prairie, and Seepage Slope | 1,714,632 |

Source: FWC 2019

#### *Freshwater Forested Wetlands*

Freshwater forested wetlands occur in floodplains and depressional areas adjacent to large rivers, creeks, and lakes throughout Florida (Appendix D, Figure 3). The various types of freshwater forested wetlands are defined by their distinct fire frequency, hydroperiod, accumulated organic material, and water source. Areas with longer hydroperiods encourage the growth of cypress and tupelos, and areas with short hydroperiods support more hydrophytic hardwoods. Freshwater forested wetlands (Table 2-2) consist of a wide variety of soil types and diverse plant communities.

Table 2-2 Freshwater Forested Wetlands

| Major Type | Includes | Acres |
|---|---|---|
| Coniferous Dominated Wetlands | Wet Flatwoods, Pond Pine, Atlantic White Cedar, and Slash Pine Swamp Forest | 782,518 |
| Cypress/Tupelo | Dome Swamp, Basin Swamp, Strand Swamp, and Floodplain Swamp | 1,534,202 |
| Hardwood Dominated Wetlands | Baygall, Hydric Hammock, Bottomland Forest, and Alluvial Forest | 1,531,214 |
| Other Wetland Forested Mixed | Cypress/Hardwood Swamps and Cypress/Pine/Cabbage Palm | 1,514,386 |

Source: FWC 2019

### *Lakes*

Ponds and lakes are non-flowing water bodies in natural depressions but lacking persistent emergent vegetation except around their perimeters (Appendix D, Figure 4). Many of Florida's natural lakes are shallow and lack a natural surface outflow though some may be connected to aquatic caves. The majority of Florida's natural lakes are permanent, with some lakes thought to have held water for thousands of years (Table 2-3). Lakes provide essential habitat for a variety of terrestrial, semi-aquatic, and aquatic species.

Table 2-3 Lakes

| Major Type | Includes | Acres |
|---|---|---|
| Limnetic Lake | Clastic Upland Lake, Coastal Dune Lake, Flatwoods/Prairie Lake, Marsh Lake, River Floodplain Lake, Swamp Lake, Sinkhole Lake, Coastal Rockland Lake, and Sandhill Lake | 24,786 |

Source: FWC 2019

### *Rivers and Streams*

Florida's rivers and streams are characterized as natural, flowing waters from their source to the limits of tidal influence and bounded by channel banks (FNAI 2010) (Appendix D, Figure 5). Of the 1,700 rivers that flow through Florida, twenty-three are considered major rivers. Species such as the Okaloosa Darter and Shortnose Sturgeon rely on these waterways. Florida contains an abundance of springs that originate from the underground aquifer. These springs are noted for their high water clarity, low sedimentation, stable channels, and openings that are less than 40 feet wide. Table 2-4 below provides several habitat classes of rivers and streams in Florida.

Table 2-4 Rivers and Streams

| Major Type | Includes |
| --- | --- |
| River | Alluvial River |
| Streams | Blackwater Stream, Calcareous Stream, Seepage Stream, Spring-run Stream, and Tidally-influenced Stream |
| Springs | Major Springs – 32 count |

Source: FWC 2019

### *Estuarine*

The estuarine ecosystem is the tidally influenced zone landward to the point at which seawater becomes significantly diluted with freshwater inflow from the land (FNAI 2010) (Appendix D, Figure 6). This ecosystem occurs in the intertidal or supratidal zones, is dominated by herbaceous or woody halophytic vascular plants, and experiences salinity levels 0.5 parts per thousand and higher. Species diversity is low due to the extreme physiological stressors in these habitats.

Soils in mangrove swamps and salt marshes are typically muck/sand or limestone substrate and are inundated by daily tides with saltwater creating anoxic conditions. Both systems are found in relatively flat, low-wave energy areas. Salt marshes are dominated by vascular plants (saltmarsh cordgrass, needle rush, and saltwort). Mangrove swamps are usually stands of one of the three species present in Florida: red, white, and black mangroves (Table 2-5).

Table 2-5 Estuarine Areas

| Major Type | Acres |
| --- | --- |
| Mangrove Swamp | 614,097 |
| Salt Marsh | 378,677 |

Source: FWC 2019

### *Subterranean*

Natural chambers in the karstic limestone underlay much of northern and central Florida. These cavities are in the twilight, middle, and deep zones, and as such are characterized by animals that are in the trogloxenes, troglophiles, and troglobites groups. Many caves in Florida alternate between aquatic and terrestrial due to the rise and fall of water levels, though most cave systems are permanently inundated by groundwater (Table 2-6). Caves that are submerged are typically associated with spring systems. Due to the stability of conditions in caves, species that rely on these systems are very sensitive to any changes in environmental conditions. Caves provide supporting habitat for various salamanders, bats, crayfish, amphipods, and isopods.

Table 2-6 Aquatic Caves

| Major Type | Caves |
|---|---|
| Aquatic | 105 |
| Terrestrial | 64 |

Source: FWC 2019

### 2.4.2 Discussion of Terrestrial Ecosystems and Habitats

Although terrestrial habitats are not regulated under the CWA, many ESA-listed species that occupy assumed waters also require or utilize adjacent uplands. Upland portions of permitted activities are also subject to ESA consultation as part of permit review. Thus, terrestrial habitat types are briefly summarized below.

Florida's terrestrial ecosystem includes approximately 3.7 million acres of natural habitats that are essential breeding, foraging, and refuge areas for many species. Florida has very little topographic relief, with the highest point at 328 feet above sea level. Slight changes in elevation result in habitat changes, with some upland communities at an only slightly greater elevation than adjacent wetlands. Diverse terrestrial ecosystems provide important habitat for a large variety of wildlife, including the Florida Panther, Gopher Tortoise, salamanders and frogs breeding in inclusions of ephemeral wetlands, and bats and crayfish living in caves (FWC 2019). Though uphill terrestrial habitats help to filter rainwater to lower elevations connected to freshwater habitats, only select ecosystems from the Wildlife Plan are discussed herein due to their relation to the Action Area.

#### *High Pine and Scrub*

High pine and scrub ecosystems are uplands with deep, sandy soils and mesic to xeric woodlands or shrublands. If present, open canopies consist of pine or a mixture of pine and deciduous hardwoods. Upland natural pine is often associated with and grades into upland mixed woodland, upland hardwoods, or sandhill.

Sandhill and scrub are mostly present in the panhandle and central Florida in upland areas with sand substrates. Sandhill is dominated by widely spaced longleaf pine, a midstory of oaks, and an herbaceous understory, all that rely on a frequent fire regime. Temporary wetlands in sandhills provide essential breeding habitat for a number of animal species. Scrub habitats are characterized by open to dense shrub cover with or without a pine canopy, with the midstory typically consisting of evergreen scrubby oaks and/or Florida rosemary. Temporary wetlands found in scrub provide foraging and breeding habitat for numerous species (Table 2-7).

Table 2-7 Sandhill and Scrub Areas

| Major Type | Acres |
|---|---|
| Sandhill | 775,775 |
| Scrub | 400,308 |
| Upland Coniferous | 444,728 |
| Upland Mixed Woodland | 10,939 |

Source: FWC 2019

### *Dry Prairie and Pine Rockland*

Dry prairie and pine rockland are characterized by low to non-existent canopy cover with mixed shrubs and herbs in the understory. Dry prairies occur on very flat terrain with wetlands scattered throughout. Pine rocklands are extremely rare habitats that occur on shallow soils over elevated areas of limestone bedrock and are bordered by wet prairies, rockland hammock, or mangroves (Table 2-8).

Table 2-8 Dry Prairie and Pine Rockland Areas

| Major Type | Acres |
|---|---|
| Dry Prairie | 155,891 |
| Pine Rockland | 16,867 |

Source: FWC 2019

# 3. ESA-considered Species Potentially Affected by the Action

Table 3-1 includes 235 species: 139 listed and 96 considered by the ESA which occur or could occur within the Action Area and which may potentially be affected by the Action. Table 3-1 forms the basis of the analysis of the effects in Chapter 5. Species that have been petitioned for listing been included because some of these species may be added to the federal list in the future. The programmatic nature of this BA, and the proposed structure of the species coordination process address future listing status changes for listed species and any new species that may be listed that may not be included in this BA. At the time of a State 404 application review, any changes in listing status for affected species will be addressed during species coordination and technical assistance with the USFWS. Asterisks in this table indicate species that are also State-listed.

Table 3-1 ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| ***MAMMALS*** | | | | |
| Sherman's Short-tailed Shrew* | *Blarina brevicauda shermani* | Under review[1] | No | Yes |
| Gray Wolf | *Canis lupus* | Endangered | Yes | No |
| Red Wolf | *Canis rufus* | Endangered | No | Yes |
| Florida Bonneted Bat | *Eumops floridanus* | Endangered | No | Yes |
| Florida Salt Marsh Vole | *Microtus pennsylvanicus dukecampbelli* | Endangered | No | Yes |
| Gray Bat | *Myotis grisescens* | Endangered | No | Yes |
| Little Brown Bat | *Myotis lucifugus occultus* | Under review | No | Yes |
| Indiana Bat | *Myotis sodalis* | Endangered | Yes | No |
| Key Largo Woodrat | *Neotoma floridana smalli* | Threatened | No | Yes |
| Key Deer | *Odocoileus virginianus clavium* | Endangered | No | No |
| Rice Rat | *Oryzomys palustris natator* | Endangered | Yes | Yes |
| Pine Island Rice Rat | *Oryzomys palustris planirostris* | Under review[1] | No | Yes |
| Sanibel Island Rice Rat* | *Oryzomys palustris sanibeli* | Under review[1] | No | Yes |
| Tricolored Bat | *Perimyotis subflavus* | Under review[1] | No | Yes |
| Key Largo Cotton Mouse | *Peromyscus gossypinus allapaticola* | Endangered | No | Yes |
| Choctawhatchee Beach Mouse | *Peromyscus polionotus allophrys* | Endangered | No | No |
| Southeastern Beach Mouse | *Peromyscus polionotus niveiventris* | Threatened | No | No |
| St. Andrew Beach Mouse | *Peromyscus polionotus peninsularis* | Endangered | Yes | No |
| Anastasia Island Beach Mouse | *Peromyscus polionotus phasma* | Endangered | No | No |
| Perdido Key Beach Mouse | *Peromyscus polionotus trissyllepsis* | Endangered | No | No |
| Florida Panther | *Puma [=Felis] concolor coryi* | Endangered | No | Yes |

Table 3-1 ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Insular Hispid Cotton Rat | *Sigmodon hispidus insulicola* | Under review[1] | No | No |
| Lower Keys Rabbit | *Sylvilagus palustris hefneri* | Endangered | No | Yes |
| West Indian Manatee | *Trichechus manatus* | Threatened | Yes | Yes |
| ***BIRDS*** | | | | |
| Cape Sable Seaside Sparrow | *Ammodramus maritimus mirabilis* | Endangered | Yes | Yes |
| Florida Grasshopper Sparrow | *Ammodramus savannarum floridanus* | Endangered | No | No |
| Saltmarsh Sparrow | *Ammospiza caudacutas* | Under review | No | Yes |
| Florida Scrub-Jay | *Aphelocoma coerulescens* | Threatened | No | No |
| Rufa Red Knot | *Calidris canutus rufa* | Threatened | No | Yes (tidal flats) |
| Ivory-billed Woodpecker | *Campephilus principalis* | Endangered | No | Yes |
| Piping Plover | *Charadrius melodus* | Threatened - Atlantic Coast DPS, which occurs in Florida | Yes | Yes (intertidal beaches) |
| Whooping Crane | *Grus americana* | Endangered | Yes | Yes |
| Eastern Black Rail | *Laterallus jamaicensis ssp. jamaicensis* | Under review[1] | No | Yes |
| Wood Stork | *Mycteria americana* | Threatened | No | Yes |
| Eskimo Curlew | *Numenius borealis* | Endangered | No | Yes |
| Red-cockaded Woodpecker | *Picoides borealis* | Endangered | No | No |
| Audubon's Crested Caracara | *Polyborus plancus audubonii* | Threatened | No | Yes |
| Black-capped Petrel | *Pterodroma hasitata* | Proposed for listing as Threatened | No | No |
| Everglade Snail Kite | *Rostrhamus sociabilis plumbeus* | Endangered | Yes | Yes |

Table 3-1 ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Roseate Tern | *Sterna dougallii dougallii* | Threatened - Caribbean population, which occurs in Florida | No | No |
| Bachman's Wood Warbler | *Vermivora bachmanii* | Endangered | No | Yes |
| Golden-winged Warbler | *Vermivora chrysoptera* | Under review[1] | No | Yes |
| ***REPTILES*** | | | | |
| American Alligator | *Alligator mississippiensis* | Threatened - due to similarity of appearance | No | Yes |
| Spotted Turtle | *Clemmys guttata* | Under review[1] | No | Yes |
| American Crocodile | *Crocodylus acutus* | Threatened | Yes | Yes |
| Eastern Diamondback Snake | *Crotalus adamanteus* | Under review[1] | No | No |
| Key Ringneck Snake* | *Diadophis punctatus acricus* | Under review[1] | No | No |
| Eastern Indigo Snake | *Drymarchon corais couperi* | Threatened | No | Yes, especially in north Florida |
| Gopher Tortoise* | *Gopherus polyphemus* | Candidate - eastern population, which occurs in Florida (western population listed as Threatened) | No | No |
| Escambia Map Turtle | *Graptemys ernsti* | Under review[1] | No | Yes (streams) |
| Southern Hognose Snake | *Heterodon simus* | Not warranted 12-month finding | No | No |
| Apalachicola Common Kingsnake | *Lampropeltis getula meansi* | Under review[1] | No | Yes |
| Alligator Snapping Turtle | *Macrochelys termminckii* | Under review[1] | No | Yes (streams) |
| Atlantic Salt Marsh Snake | *Nerodia clarkii taeniata* | Threatened | No | Yes (streams) |

Table 3-1 ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Florida Pine Snake* | *Pituophis melanoleucus mugitus* | Under review[1] | No | No |
| Bluetail Mole Skink | *Plestiodon egregius lividus* | Threatened | No | No |
| Sand Skink | *Plestiodon reynoldsi* | Threatened | No | No |
| Florida Red-bellied (Florida Panhandle) Turtle | *Pseudemys nelsoni* | Under review[1] | No | Yes (streams) |
| Florida Scrub Lizard | *Sceloporus woodi* | Under review[1] | No | No |
| Short-tailed Snake* | *Stilosoma extenuatum* | Under review[1] | No | No |
| Rim Rock Crowned Snake* | *Tantilla oolitica* | Under review[1] | No | No |
| ***AMPHIBIANS*** | | | | |
| Reticulated Flatwoods Salamander | *Ambystoma bishopi* | Endangered | No | Yes |
| Frosted Flatwoods Salamander | *Ambystoma cingulatum* | Threatened | No | Yes |
| Georgia Blind Salamander* | *Eurycea wallacei* | Under review[1] | No | Yes (aquatic caves) |
| Gopher Frog | *Lithobates capito* | Under review[1] | No | Yes |
| Gulf Hammock Dwarf Siren | *Pseudobranchus striatus lustricolus* | Under review[1] | No | Yes |
| ***FISH*** | | | | |
| Shortnose Sturgeon | *Acipenser brevirostrum* | Endangered | No | Yes (streams) |
| Gulf Sturgeon | *Acipenser oxyrinchus [=oxyrhynchus] desotoi* | Threatened | Yes | Yes (streams) |
| Atlantic Sturgeon | *Acipenser oxyrinchus oxyrinchus* | Endangered - South Atlantic DPS, which occurs in Florida | Yes | Yes (streams) |
| Okaloosa Darter | *Etheostoma okalossae* | Threatened | No | Yes (streams) |
| Saltmarsh Topminnow* | *Fundulus jenkinsi* | Under review[1] | No | Yes (streams) |

Table 3-1 ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Smalltooth Sawfish | *Pristis pectinate* | Endangered - US DPS (Bahaman DPS also listed as Endangered) | Yes | Yes (streams) |
| ***MOLLUSKS*** | | | | |
| Southern Elktoe | *Alasmidonta triangulata* | Under review[1] | No | Yes (streams) |
| Fat Threeridge | *Amblema neislerii* | Endangered | Yes | Yes (streams) |
| Rayed Creekshell | *Anodontoides radiatus* | Under review[1] | No | Yes (streams) |
| Pygmy Siltsnail Snail | *Cincinnatia parva* | Under review[1] | No | Yes (streams) |
| Ponderous Siltsnail Snail | *Cincinnatia ponderosa* | Under review[1] | No | Yes (streams) |
| Delicate Spike | *Elliptio arctata* | Under review[1] | No | Yes (streams) |
| Chipola Slabshell | *Elliptio chiplolaensis* | Threatened | Yes | Yes (streams) |
| Purple Bankclimber | *Elliptoideus sloatianus* | Threatened | Yes | Yes (streams) |
| Tapered Pigtoe | *Fusconaia burki* | Threatened | Yes | Yes (streams) |
| Narrow Pigtoe | *Fusconaia escambia* | Threatened | Yes | Yes (streams) |
| Round Ebonyshell | *Fusconaia rotulata* | Endangered | Yes | Yes (streams) |
| Southern Sandshell | *Hamiota australis* | Threatened | Yes | Yes (streams) |
| Shinyrayed Pocketbook | *Lampsilis subangulata* | Endangered | Yes | Yes |
| Gulf Moccasinshell | *Medionidus penicillatus* | Endangered | Yes | Yes (streams) |
| Ochlockonee Moccasinshell | *Medionidus simpsonianus* | Endangered | Yes | Yes (streams) |
| Suwannee Moccasinshell | *Medionidus walker* | Threatened | Yes | Yes (streams) |
| Stock Island Tree Snail | *Orthalicus reses [not incl. nesodryas]* | Threatened | No | Yes |
| Oval Pigtoe | *Pleurobema pyriforme* | Endangered | Yes | Yes (streams) |

Table 3-1 ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Fuzzy Pigtoe | *Pleurobema strodeanum* | Threatened | Yes | Yes (streams) |
| Southern Kidneyshell | *Ptychobranchus jonesi* | Endangered | Yes | Yes (streams) |
| Choctaw Bean | *Villosa choctawensis* | Endangered | Yes | Yes |
| ***CRUSTACEANS*** | | | | |
| Cypress Crayfish | *Cambarellus blacki* | Under review[1] | No | Yes |
| Florida Cave Amphipod | *Crangonyx grandimanus* | Under review[1] | No | Yes (aquatic caves) |
| Hobb's Cave Amphipod | *Crangonyx hobbsi* | Under review[1] | No | Yes (aquatic caves) |
| Squirrel Chimney Cave Shrimp | *Palaemonetes cummingi* | Threatened | No | Yes (aquatic caves) |
| Orange Cave Crayfish | *Procambarus acherontis* | Under review[1] | No | Yes |
| Coastal Flatwoods Crayfish | *Procambarus apalachicolae* | Under review[1] | No | Yes |
| Silver Glen Springs Crayfish | *Procambarus attiguus* | Under review[1] | No | Yes (aquatic caves) |
| Bigcheek Cave Crayfish | *Procambarus delicatus* | Under review[1] | No | Yes (aquatic caves) |
| Panama City Crayfish** | *Procambarus econfinae* | Proposed for listing as Threatened | No | Yes |
| Santa Fe Cave Crayfish* | *Procambarus erythrops* | Under review[1] | No | Yes (aquatic caves) |
| Orange Lake Cave Crayfish | *Procambarus franzi* | Under review[1] | No | Yes (aquatic caves) |
| Coastal Lowland Cave Crayfish | *Procambarus leitheuser* | Under review[1] | No | Yes (aquatic caves) |
| Florida Cave Crayfish | *Procambarus lucifugus* | Under review[1] | No | Yes (aquatic caves) |
| Miami Cave Crayfish | *Procambarus milleri* | Under review[1] | No | Yes (aquatic caves) |
| Putnam County Cave Crayfish | *Procambarus morrisi* | Under review[1] | No | Yes (aquatic caves) |

Table 3-1 ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Pallid Cave Crayfish | *Procambarus pallidus* | Under review[1] | No | Yes (aquatic caves) |
| Black Creek Crayfish | *Procambarus pictus* | Under review[1] | No | Yes (streams) |
| Spider Cave Crayfish | *Troglocambarus maclanei* | Under review[1] | No | Yes (aquatic caves) |
| ***INSECTS*** | | | | |
| Logan's Agarodes Caddisfly | *Agarodes logani* | Under review[1] | No | Yes (streams) |
| Florida Leafwing | *Anaea troglodyta floridalis* | Endangered | Yes | No |
| Frosted Elfin Butterfly | *Callophrys irus* | Under review | No | No |
| Miami Tiger Beetle | *Cicindelidia floridana* | Endangered | No | No |
| Nickerbean Blue Butterfly | *Cyclargus ammon* | Threatened - due to similarity of appearance | No | No |
| Miami Blue Butterfly | *Cyclargus thomasi bethunebakeri* | Endangered | No | No |
| Monarch Butterfly | *Danaus plexippus plexippus* | Under review[1] | No | No |
| Duke's Skipper Butterfly | *Euphyes dukesi calhouni* | Under review[1] | No | Yes |
| Palatka Skipper Butterfly | *Euphyes pilatka klotsi* | Under review[1] | No | Yes |
| Westfall's Clubtail Dragonfly | *Gomphus westfalli* | Under review[1] | No | Yes (streams) |
| Ceraunus Blue Butterfly | *Hemiargus ceraunus antibubastus* | Threatened - due to similarity of appearance | No | No |
| Schaus Swallowtail Butterfly | *Heraclides aristodemus ponceanus* | Endangered | No | No |
| Gulf Coast Solitary Bee | *Hesperapis oraria* | Under review[1] | No | No |
| Sykora's Hydroptila Caddisfly | *Hydroptila sykorai* | Under review[1] | No | Yes (streams) |
| Morse's Little Plain Brown Sedge Caddisfly | *Lepidostoma morsei* | Under review[1] | No | Yes (streams) |

Table 3-1 ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Cassius Blue Butterfly | *Leptotes cassius theonus* | Threatened - due to similarity of appearance | No | No |
| Purple Skimmer Dragonfly | *Libellula jesseana* | Under review[1] | No | Yes (lakes) |
| American Burying Beetle | *Nicrophorus americanus* | Endangered | No | No |
| Little Oecetis Longhorn Caddisfly | *Oecetis parva* | Under review[1] | No | Yes (lakes) |
| Southern Snaketail Dragonfly | *Ophiogomphus australis* | Under review[1] | No | Yes (streams) |
| Blue Calamintha Bee | *Osmia calaminthae* | Under review[1] | No | No |
| Calvert's Emerald Dragonfly | *Somatochlora calverti* | Under review[1] | No | Yes (streams) |
| Bartram's Scrub-hairstreak | *Strymon acis bartrami* | Endangered | Yes | No |
| Yellow-sided Clubtail Dragonfly | *Stylurus potulentus* | Under review[1] | No | Yes (streams) |
| Three-toothed Long-Horned Caddisfly | *Triaenodes tridontus* | Under review[1] | No | Yes (streams) |
| ***PLANTS*** | | | | |
| Meadow Joint-vetch | *Aeschynomene pratensis* | Under review[1] | No | Yes |
| Crenulate Lead-plant | *Amorpha crenulata* | Endangered | No | No |
| Blodgett's Silverbush | *Argythamnia blodgettii* | Threatened | No | No |
| Four-petal Pawpaw | *Asimina tetramera* | Endangered | No | No |
| Purpledisk Honeycombhead Sunflower | *Balduina atropurpurea* | Under review[1] | No | Yes |
| Apalachicola Wild Indigo | *Baptisia megacarpa* | Under review[1] | No | Yes |
| Florida Bonamia | *Bonamia grandiflora* | Threatened | No | No |
| Florida Brickell-bush | *Brickellia mosieri* | Endangered | Yes | No |
| Brooksville Bellflower | *Campanula robinsiae* | Endangered | No | Yes |

Table 3-1 ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Fragrant Prickly-apple | *Cereus eriophorus var. fragrans* | Endangered | No | No |
| Deltoid Spurge | *Chamaesyce deltoidea ssp. deltoidea* | Endangered | No | No |
| Pineland Sandmat | *Chamaesyce deltoidea pinetorum* | Threatened | No | No |
| Wedge Spurge | *Chamaesyce deltoidea serpyllum* | Endangered | No | No |
| Garber's Spurge | *Chamaesyce garberi* | Threatened | No | No |
| Big Pine Partridge Pea | *Chamaecrista lineata keyensis* | Endangered | No | No |
| Pygmy Fringe-tree | *Chionanthus pygmaeus* | Endangered | No | No |
| Cape Sable Thoroughwort | *Chromolaena frustrata* | Endangered | Yes | No |
| Florida Golden Aster | *Chrysopsis floridana* | Endangered | No | No |
| Florida Perforate Cladonia | *Cladonia perforata* | Endangered | No | No |
| Pigeon Wings | *Clitoria fragrans* | Threatened | No | No |
| Short-Leaved Rosemary | *Conradina brevifolia* | Endangered | No | No |
| Etonia Rosemary | *Conradina etonia* | Endangered | No | No |
| Apalachicola Rosemary | *Conradina glabra* | Endangered | No | No |
| Florida Semaphore Cactus | *Consolea corallicola* | Endangered | Yes | No |
| Ciliate-Leaf Tickseed Sunflower | *Coreopsis integrifolia* | Endangered | Yes | Yes |
| Avon Park Harebells | *Crotalaria avonensis* | Endangered | No | No |
| Okeechobee Gourd | *Cucurbita okeechobeensis ssp. okeechobeensis* | Endangered | No | Yes |
| Florida Prairie-Clover | *Dalea carthagenensis floridana* | Endangered | No | No |
| Beautiful Pawpaw | *Deeringothamnus pulchellus* | Endangered | No | Yes |
| Rugel's Pawpaw | *Deeringothamnus rugelii* | Endangered | No | Yes |
| Garrett's Mint | *Dicerandra christmanii* | Endangered | No | No |

Table 3-1 ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Longspurred Mint | *Dicerandra cornutissima* | Endangered | No | No |
| Scrub Mint | *Dicerandra frutescens* | Endangered | No | No |
| Lakela's Mint | *Dicerandra immaculata* | Endangered | No | No |
| Florida Pineland Crabgrass | *Digitaria pauciflora* | Threatened | No | Yes |
| Clam-shell Orchid | *Encyclia cochleata var. triandra* | Not warranted 12-month finding | No | No |
| Big Cypress Epidendrum Orchid | *Epidendrum strobiliferum* | Under review[1] | No | No |
| Blackbract Pipewort | *Eriocaulon nigrobracteatum* | Under review[1] | No | Yes |
| Scrub Buckwheat | *Eriogonum longifolium var. gnaphalifolium* | Threatened | No | No |
| Snakeroot (Wedgeleaf Eryngo) | *Eryngium cuneifolium* | Endangered | No | No |
| Telephus Spurge | *Euphorbia telephioides* | Threatened | No | No |
| Small's Milkpea | *Galactia smallii* | Endangered | No | No |
| Harper's Beauty | *Harperocallis flava* | Endangered | No | No |
| Aboriginal Prickly-apple | *Harrisia (=Cereus) aboriginum (=gracilis)* | Endangered | Yes | No |
| Florida Hartwrightia Sunflower | *Hartwrightia floridana* | Under review[1] | No | Yes |
| Henry's Spider-lily | *Hymenocallis henryae* | Under review[1] | No | No |
| Highlands Scrub Hypericum | *Hypericum cumulicola* | Endangered | No | No |
| Edison's Ascyrum St. Johns Wort | *Hypericum edisonianum* | Under review[1] | No | Yes |
| Smooth Barked St. Johns Wort | *Hypericum lissophloeus* | Under review[1] | No | Yes |
| Yellow Anisetree | *Illicium parviflorum* | Not warranted 12-month finding | No | Yes |
| Beach Jacquemontia | *Jacquemontia reclinata* | Endangered | No | No |

Table 3-1 ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Cooley's Water-willow | *Justicia cooleyi* | Endangered | No | Yes |
| Scrub Blazingstar | *Liatris ohlingerae* | Endangered | No | No |
| Panhandle Lily | *Lilium iridollae* | Under review[1] | No | Yes |
| Bog Spicebush | *Lindera subcoriacea* | Under review[1] | No | Yes |
| Sand Flax | *Linum arenicola* | Endangered | No | Yes |
| Carter's Small Flowered Flax | *Linum carteri carteri* | Endangered | Yes | Yes |
| West's Flax | *Linum westii* | Under review[1] | No | Yes |
| Boykin's Lobelia | *Lobelia boykinii* | Under review[1] | No | Yes |
| Raven's Seedbox | *Ludwigia ravenii* | Under review[1] | No | Yes |
| Scrub Lupine | *Lupinus aridorum* | Endangered | No | No |
| Curtis' Loosestrife | *Lythrum curtissii* | Under review[1] | No | Yes |
| Lowland Loosestrife | *Lythrum flagellare* | Under review[1] | No | Yes |
| White Birds-in-a-nest | *Macbridea alba* | Threatened | No | Yes |
| Godfrey's Stitchwort | *Minuartia godfreyi* | Under review[1] | No | Yes |
| Needleleaf or Narrowleaf Naiad Water-nymph | *Najas filifolia* | Under review[1] | No | Yes |
| Britton's Beargrass | *Nolina brittoniana* | Endangered | No | No |
| Cape Sable Orchid | *Oncidium undulatum* | Under review[1] | No | Yes |
| Papery Whitlow-wort | *Paronychia chartacea* | Threatened | No | No |
| Key Tree Cactus | *Pilosocereus robinii* | Endangered | No | No |
| Godfrey's Butterwort | *Pinguicula ionantha* | Threatened | No | Yes |

Table 3-1 ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Lewton's Polygala Milkwort | *Polygala lewtonii* | Endangered | No | No |
| Tiny Polygala Milkwort | *Polygala smallii* | Endangered | No | No |
| Horton Wireweed (Small) | *Polygonella basiramia* | Endangered | No | No |
| Sandlace (Woody Wireweed) | *Polygonella myriophylla* | Endangered | No | No |
| Florida Pondweed | *Potamogeton floridanus* | Under review[1] | No | Yes |
| Scrub Plum | *Prunus geniculata* | Endangered | No | No |
| White Meadowbeauty | *Rhexia parviflora* | Under review[1] | No | Yes |
| Panhandle Meadowbeauty | *Rhexia salicifolia* | Under review[1] | No | Yes |
| Chapman Rhododendron | *Rhododendron chapmanii* | Endangered | Yes | Yes |
| Hairy Peduncled Beakrush | *Rhynchospora crinipes* | Under review[1] | No | Yes |
| Miccosukee Gooseberry | *Ribes echinellum* | Threatened | No | Yes |
| Eared Coneflower | *Rudbeckia auriculata* | Under review[1] | No | Yes |
| Florida Willow | *Salix floridana* | Under review[1] | No | Yes |
| Gulf Sweet Pitcherplant | *Sarracenia rubra ssp. gulfensis* | Under review[1] | No | Yes |
| American Chaffseed | *Schwalbea americana* | Endangered | No | Yes |
| Florida Skullcap | *Scutellaria floridana* | Threatened | No | Yes |
| Everglades Bully | *Sideroxylon reclinatum ssp. austrofloridense* | Threatened | No | Yes |
| Georgia Bully | *Sideroxylon thorne* | Under review[1] | No | No |
| Fringed Campion | *Silene polypetala* | Endangered | No | No |
| Gentian Pinkroot | *Spigelia gentianoides* | Endangered | No | No |

Table 3-1 ESA Species Potentially Affected by the Action

| Common Name | Scientific Name | Federal Status | Critical Habitat Designated | Are wetlands, waters or adjacent uplands regularly utilized by the species? |
|---|---|---|---|---|
| Cooley's Meadow Rue | *Thalictrum cooleyi* | Endangered | No | Yes |
| Florida Torreya | *Torreya taxifolia* | Endangered | No | No |
| Florida Bristle Fern | *Trichomanes punctatum ssp. floridanum* | Endangered | No | No |
| Ocala Vetch | *Vicia ocalensis* | Not warranted 12-month finding | No | Yes |
| Wide-leaf Warea | *Warea amplexifolia* | Endangered | No | No |
| Carter's Mustard | *Warea carteri* | Endangered | No | No |
| Karst Pond Xyris | *Xyris longisepala* | Under review[1] | No | Yes |
| Florida Ziziphus (Jujube) | *Ziziphus celata* | Endangered | No | No |

[1]Substantial 90-day Finding
*Species/subspecies is also State-listed in Florida (i.e., State threatened)
**State Species of Special Concern (SSC)

## 3.1 ESA-considered Species and Critical Habitat in the Action Area

As noted, the Action is EPA's approval of Florida's Assumption of Section 404 permitting and the transfer of permitting responsibility from USACE to FDEP in State-assumed waters. If the State 404 program is approved, FDEP would assume regulatory responsibility over dredging and filling activities in WOTUS not retained by USACE pursuant to 33 USC § 1344(g).

All ESA-listed, proposed, candidate, and petitioned plant and animal species under USFWS jurisdiction and with ranges within Florida are discussed in this BA. The status of listed species can change from year to year, and species that have been petitioned for ESA-listing have also been included because some of these species may be listed in the future. Including a comprehensive analysis in this BA for the list of species in Table 3-1 helps evaluate the effects of the State 404 program on any species that are currently listed or that are currently under review and may become listed in the future. Table 3-1 includes all species analyzed in Chapter 5, although a few species were determined to be likely "no effect" findings because they are believed to be extirpated in Florida or any effects were considered to be insignificant or discountable.

Species dependent on aquatic systems are more likely to be affected by the Action; however, upland species may also be present in staging areas or along access routes or otherwise within or affected by individual

project action areas. If adverse impacts/effects to upland species would not occur "but for" the Action, those adverse impacts must be addressed. Thus, upland species have been retained in the analysis.

Information for the species analyzed in this document was gathered from the USFWS Environmental Conservation Online System (ECOS) and various documents linked from ECOS, including 5-year reviews, Recovery Plans, and Species Status Assessments. Secondary references cited in ECOS documents were reviewed as necessary. For species under review for ESA-listing, petitions to list and 90-day and/or 12-month findings were reviewed. The amount of information available for under review species ranged from minimal to considerable, depending on the species. For some species, extensive additional literature was available; for others, relatively little is known.

As the precise locations of future permit applications are not known at this time, no attempt was made to generate detailed range maps or analyze species distributions relative to anticipated impacts. Without knowledge of future permit locations, it is impractical to determine the amount of overlap between project sites and species at this time. However, a relatively small number of species have repeatedly occurred in large numbers of past consultations, and these are identified in the Effects analysis chapter (Chapter 5) of this BA.

Similarly, critical habitat was not mapped because the locations of future permit applications are not precisely known at this time. Conservation tools are available online, including Geographic Information System (GIS) downloads for critical habitats and habitat ranges, including the ECOS system mentioned above. Additional tools are also available at https://www.fws.gov/southeast/conservation-tools/. The USFWS's Information for Planning and Consultation (IPaC) website (https://ecos.fws.gov/ipac/) can also be used to determine whether critical habitats or habitat ranges exist within a project area. Table 3-1 identifies whether or not critical habitat has been designated for each ESA-listed species. For species with designated critical habitat, future State 404 permit review will evaluate whether the project location is within a critical habitat unit.

Each State 404 permit application within assumed waters will identify the location and extent of proposed activities, allowing identification of ESA-listed species present or potentially present, and presence or absence of designated critical habitat (using IPaC, FNAI database, etc.). This data will be used to determine potential effects on ESA-listed species on a project-specific basis.

## 3.2   NMFS-Listed Species

FDEP requested input on a draft species list for Florida's application package for Assumption from the USFWS and the NMFS on November 22, 2019. On April 15, 2020, NMFS responded to FDEP with the conclusion that ESA-listed species under NMFS' jurisdiction do not occur in waters that are assumable by the State (See Appendix A). They stated that where there is shared jurisdiction for the Gulf sturgeon between NMFS and USFWS, the USFWS is responsible for consultations regarding sturgeon and critical habitat in riverine habitat units. NMFS further states that the riverine critical habitat units and river areas where Gulf Sturgeon are known to occur are all listed by the USACE as retained waters. While ESA-listed species under NMFS jurisdiction are anticipated to only occur in retained waters, they are included in this BA as part of the comprehensive review of all Florida's imperiled species. Based on the NMFS' letter, this BA will reflect the NMFS' recommendation of "no effect" for species under NMFS jurisdiction.

## 3.3   State-Listed Species

Although this BA focuses on federal ESA-listed, proposed, or under review species, there is considerable overlap with Florida's State-listed species (FWC 2018). The current listing status of all of Florida's federal and

state listed species is found in Chapter 68A-27, F.A.C. It is noteworthy that Florida's definition of "take" is identical to the federal definition (Chapter 68A-27.003, F.A.C.). See Chapter 7.1 for additional information regarding State-listed species.

# 4. Baseline Conditions

This chapter identifies and describes all known natural and anthropogenic sources of impact on ESA-considered species and the condition of their habitats in the Action Area, except those caused by the Action. The purpose of the environmental baseline is to provide the context for the impacts of the Action with regard to the impacts of all the other human activities that are also affecting the ESA-considered species.

This environmental baseline describes wetlands status and trends within Florida, and implications for ESA-considered species. The baseline assessment focuses on factors influencing habitat and those which affect the distribution and abundance of ESA-considered species. The baseline also includes past and present impacts of federal, state, and private activities within the Action Area, and activities underway at present (i.e., coincident with the Assumption). The Action Area was previously defined and described in Chapter 2.

## 4.1 Regulatory Baseline

### 4.1.1 Federal Wetland Regulations

Section 404 of the CWA (33 USC § 1344) establishes a program to regulate the discharge of dredged or fill material into WOTUS, inclusive of wetlands. The Administrator of the EPA, in conjunction with the Secretary of the Army, acting through the Chief of Engineers, established guidelines for regulating such discharges under Section 404(b)(1) of the CWA (40 CFR § 230). The EPA and the USACE jointly implement the regulation and permitting of such proposed activities. In Florida, the USACE Jacksonville District acts as the regulatory agency that issues Section 404 dredge and fill permits.

***Individual Permits***

To receive a dredge and fill permit authorization from the USACE, an applicant must demonstrate the following under 40 CFR § 230.10:

- No practicable alternative to the proposed activity exists that would have less adverse impact on the aquatic ecosystem;
- The proposed activity will not:
    - violate State water quality standards,
    - violate any applicable toxic effluent standard or prohibition,
    - jeopardize the continued existence of Endangered and Threatened species, or result in the likelihood of destruction or adverse modification of critical habitat
    - violate any requirement imposed to protect a marine sanctuary;
- The proposed activity will not cause or contribute to significant degradation of WOTUS; and
- The applicant has taken appropriate and practicable steps that will minimize potential adverse impacts of the discharge on the aquatic ecosystem.

The USACE will request any additional information required to deem an application complete, typically within 15 days of receipt of the application. Once the agency deems the application to be complete, the USACE publishes a public notice within 15 days to receive comments from interested and/or affected parties on the proposed action.

Following receipt of an application and evaluation as to the completeness of the application, the USACE is charged with evaluating the effects of the proposed action on ESA-listed species or designated critical habitat. Where a proposed action may affect a listed species or critical habitat, USACE coordinates and/or consults with the Services prior to issuing any permit. If the USACE determines the proposed activity may affect any endangered or threatened species or their critical habitat, beneficially or adversely, the USACE District Engineer will initiate consultation with the Services. If the USACE District Engineer makes a determination from the submitted application that the proposed activity would not affect ESA-listed species or their critical habitat, the public notice will contain a statement attesting to such and consultation with the Services is not required.

The comment period is typically 30 days; upon receipt of comments, the USACE evaluates the comments received, provides them to the applicant, and determines whether a public hearing is required. Following the comment period (and a public hearing if conducted), the USACE makes a determination as to whether the Section 404 permit should be issued. This determination is based on applicable regulations governing the activity as well as comments received as part of the record. The USACE District Engineer will either prepare a Statement of Findings or – where an Environmental Impact Statement (EIS) has been prepared – a Record of Decision on all permit decisions. The final action of the USACE is either the signature of the issuing official on the authorizing document (a USACE Permit) or a signature on a letter notifying the application of the denial of the permit. An issued permit will contain conditions to follow in execution of the work; a denial will contain written documentation of the reason(s) for the denial.

### *General Permits*

A general permit is issued for structures, work, or discharges that will result in only minimal adverse effects. General permits are issued on a nationwide, regional, or state basis for particular categories of activities. There are three types of general permits – Nationwide Permits, Regional General Permits, and Programmatic General Permits. General permits (which are reviewed by the Services) are usually valid for five years and may be re-authorized by the USACE (the Services will review the proposed reauthorizations).

### *Nationwide Permits*

On a five-year basis, the USACE issues Nationwide Permits (NWPs) pursuant to Section 404(e) of the CWA (33 USC § 1344) and Section 10 of the Rivers and Harbors Act of 1899 (33 USC § 401 et seq.). As of January 6, 2017, there were a total of 52 NWPs. The NWPs streamline the requirements of the CWA and are informed by extensive feedback from the public and other key stakeholders. NWPs provide expedited review of projects that have minimal impact on the aquatic environment. Categories of activities that may be covered under the NWPs include linear transportation projects, bank stabilization activities, aquatic habitat restoration, residential development, commercial and industrial developments, aids to navigation, and certain maintenance activities.

In 2017, the USACE added two new NWPs in addition to the 50 that were in place in 2012. One addition provides a mechanism for an efficient authorization process for the removal of low-head dams to restore streams and enhance public safety; the second addition covers the construction and maintenance of living shorelines to control erosion in coastal areas (adapted from USACE news release dated January 6, 2017)

(https://www.usace.army.mil/Media/News-Releases/News-Release-Article-View/Article/1043614/army-corps-of-engineers-revises-and-renews-nationwide-permits/; accessed January 30, 2020).

#### *Regional General Permits*

As of February 2020, the USACE Jacksonville District has issued 18 general permits. Each regional general permit has specific terms and conditions, all of which must be met for project-specific actions to be verified as compliant with and covered by the respective general permit.

#### *Programmatic General Permits*

Programmatic General Permits are based on an existing state, local, or other federal programs and designed to avoid duplication of that program. The USACE Jacksonville District lists 12 programmatic general permits - one of which is only applicable to Puerto Rico (https://www.usace.army.mil/Missions/Civil-Works/Regulatory-Program-and-Permits/Obtain-a-Permit/; accessed January 30, 2020).

### 4.1.2 Florida Wetlands Regulations

Part IV of § 373, F.S. regulates dredging and filling in wetlands and other surface waters, such as: the construction, alteration, operation, maintenance, abandonment, and removal of stormwater management systems, dams, impoundments, reservoirs, works (including, but not limited to, ditches, canals, conduits, channels, culverts, pipes, and other artificial structures), and appurtenant works (artificial improvements to a dam).

This statute authorizes FDEP and the five water management districts (WMDs) in the state to jointly implement Florida's ERP program. The responsibilities of the agencies are divided according to Operating Agreements between FDEP and the particular WMD. Provisions in the statute allow for FDEP to approve local government programs to implement the ERP program on behalf of the FDEP and the WMDs. As of January 2020, full delegation has been given to Broward County and minor works delegated to the Environmental Protection Commission for Hillsborough County.

The ERP program operates in addition to the USACE Section 404 program that regulates activities in WOTUS. All state, local, and regional governments in Florida delineate wetlands in accordance with state methodology (Chapter 62-340, F.A.C.) instead of the federal wetland delineation method (Section 404 of the CWA and the Federal Manual for Identifying and Delineating Jurisdictional Wetlands). While the ERP application is issued, withdrawn, or denied in accordance with state statutory and rule criteria (briefly summarized below), agency action on the ERP application also constitutes any needed water quality certification (waiver thereto) under Section 401 of the CWA, and coastal zone consistency concurrence statements with Florida's federally-approved Coastal Zone Management program under section 307 (Coastal Zone Management Act). These State ERP reviews and approvals by FDEP, WMD, or delegated local governments are not connected to, dependent upon, nor do they influence the USACE permit review processes under Section 404 of the CWA. Therefore, the USACE must take separate action to issue or deny any needed federal permit under Section 404 of the CWA and/or section 10 of the Rivers and Harbors Act of 1899, and the USACE decision to issue a permit may or may not be consistent with the State's decision to issue an ERP permit.

To receive an ERP, an applicant must demonstrate that the proposed activity will not be harmful to the water resources of the state and will not be inconsistent with the overall objectives of Florida rules and statutes. The applicant must provide reasonable assurance that the activity will not violate the applicable state water quality

standards and that the activity is not contrary to the public interest for all waters that are not designated as Aquatic Preservers or Outstanding Florida Waters. For activities in those designated waters, the applicant must provide reasonable assurance that the proposed activity will be clearly in the public interest. Surface water quality standards are published in Chapter 62-302, F.A.C. In addition, FDEP provides policy guidance on anti-degradation in Rule 62-4.242, F.A.C., and in Rule 62-302.300, F.A.C, which allows for the protection of water quality above the minimum required for classification. Further, FDEP administers the Impaired Waters Rule (Chapter 62-303, F.A.C.), and has established Total Maximum Daily Load criteria (Chapter 62-304, F.A.C.) (FDEP 2020b). It is the intent of FDEP and the WMDs that these criteria are implemented in a manner that achieves a programmatic goal and a project-permitting goal of no net loss in wetlands or other surface water functions.

To determine whether an activity is not contrary to the public interest or is clearly in the public interest, the FDEP must consider and balance the following criteria:

- Whether the activity will adversely affect the public health, safety, or welfare or the property of others;
- Whether the activity will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;
- Whether the activity will adversely affect navigation or the flow of water or cause harmful erosion or shoaling;
- Whether the activity will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity;
- Whether the activity will be of a temporary or permanent nature;
- Whether the activity will adversely affect or will enhance significant historical and archaeological resources; and
- The current condition and relative value of functions being performed by areas affected by the proposed activity.

FDEP provides a copy of all notices of ERP applications for individual permits that propose regulated activities in, on, or over wetlands or other surface waters to the FWC for review and comment. The FDEP and FWC frequently work together on non-regulatory issues as well as regulatory. Examples of the many collaboration efforts include habitat restoration projects, management of State Parks and management of species on other State-owned easements and property.

In accordance with the provisions of § 373.4141, F.S., the FDEP shall review the ERP application to determine if it is complete. If the application is incomplete, FDEP must request additional information (RAI) within 30 days. The applicant must respond to such requests within 90 days. Within 30 days after receipt of such additional information, FDEP must review the submitted material for completeness. The WMD processing procedures for ERP vary somewhat to accommodate the requirements of their specific Governing Boards.

In accordance with § 120, F.S., FDEP must decide whether it should issue or deny an ERP within 60 days after receipt of the original application, the last item of timely requested additional material, or the applicant's written request to begin processing the permit application. Application completeness is determined by whether the applicant has submitted all materials required for review as specified by rule and statute. The WMDs also are subject to this requirement, but their ERP processing procedures vary by each district to

accommodate the requirements of their different Governing Boards. Pursuant to § 120.60(1), F.S., any application that FDEP or the WMD does not approve or deny within 60 days is considered approved by default.

Once issued, ERP permits are valid for the life of the system (which includes all structures and works authorized for construction or land alteration). The ERP permit does not automatically expire after the construction phase (typically five years) of a project but continues to cover operation (use) of the system in perpetuity.

Under current regulations for permit issuance, an applicant proposing any activity that is expected to result in impacts to both federal and state jurisdictional wetlands or other surface waters must obtain both a Section 404 permit from the USACE and an ERP permit from FDEP or the WMDs. There is the potential for duplication of effort to obtain what, in some cases, results in nearly identical permits for anticipated impacts to the same extent of wetlands and other surface waters. The timelines for review and issuance of a federal Section 404 Permit and a State ERP permit can vary substantially. The State of Florida has an interest in assuming the federal permitting responsibility for Section 404 and will preserve the environmental protections afforded by federal law; the result should increase efficiency and consistency in the application review and issuance process while ensuring a framework that will maintain protections for listed species and their critical habitats.

## 4.2 Environmental Baseline

### *Wetlands*

In 1845, the State of Florida contained an estimated 20.3 million acres of wetlands (Dahl 2005). By 1996, only about half of the original wetlands remained (USFWS 1996). From the mid-1950s through the mid-1970s, prior to the CWA, the rate of wetland loss has been estimated at 72,000 acres per year (Hefner 1986). In the following decade, wetland loss decreased to an estimated 23,700 acres per year (Hefner et al. 1994).

As of 1996, an estimated 11.4 million acres of wetlands covered about 29 percent of the surface area of Florida, more than any other state in America at that time. Of these wetlands, 90 percent or about 10.2 million acres were freshwater wetlands. The average annual net loss of wetlands from 1985 through 1996 was 4,740 acres, and freshwater forested wetlands exhibited a net gain. During the 1985-1996 interval, 72 percent of wetland loss was attributed to development and 28 percent to agriculture (Dahl 2005).

### *Central and Southern Florida Project*

The Central and Southern Florida (CS&F) Project for flood control and other purposes was authorized by the Flood Control Act of 1948 as an improvement plan for flood control, drainage, and other purposes over an 18,000-square-mile area of central and south Florida. This project authorized the diversion of water to the Atlantic Ocean and the Gulf of Mexico through canals and the diversion of water southwest through the Everglades. The project provided benefits for human populations that were able to build, grow, and develop these new lands. The Everglades Agricultural Area was developed for the production of food, and areas further east became densely populated cities, including Miami, Ft. Lauderdale, and West Palm Beach. Unfortunately, the project also resulted in the modification and loss of 2,400 square miles of freshwater wetlands, including the Everglades (USACE 2019a). See Figure 4-1 for a comparison of historic freshwater flows compared to water flows today.



Figure 4-1 Historic freshwater flows compared to freshwater flows after C&SF Project

Source: USACE and SFWMD 2007

### *Everglades Restoration*

Florida's everglades are twice the size of New Jersey, comprised of a mixture of dense forests and open prairies, sunny croplands and shady swamps, rural areas and cities. The South Florida Ecosystem Restoration Program, a partnership between the federal government and the State of Florida, consists of a suite of projects that focus on the C&SF system. In 2000, congressional authorization created the Comprehensive Everglades Restoration Plan (CERP), which is the single largest of the program's efforts. CERP is a 50/50 partnership between the federal government and the State of Florida. It is a program to restore, protect, and preserve water resources in central and southern Florida, including the Everglades. The USACE is the lead federal agency, and the South Florida Water Management District (SFWMD) is the lead State agency in this effort.

For 20 years, the CERP program has been designing, planning, and constructing multiple components of the South Florida Ecosystem Restoration Program. The goal of these efforts is to eventually improve 2.4 million acres of south Florida's wetlands ecosystems (including Everglades National Park), by reducing high volume discharges from Lake Okeechobee to the estuaries and improve water delivery to the Florida and Biscayne Bays, as well as enhance the freshwater supply (USACE 2019b). See Figure 4-2 for a depiction of the Everglades restoration project and the associated improvements to future ecosystem conditions.



Figure 4-2 Future Ecosystem Conditions based on CERP

Source: USACE and SFWMD 2007

### 4.2.1 Historical Federal Permitting: Habitat

WOTUS, as defined under currently applicable regulations and guidance, are regulated by the USACE under Section 404 of the CWA, and by FDEP and the WMDs. The following discussion is based on data provided by the USACE and characterizes Section 404 permits issued from 2014 through 2018. The habitat types are from Wildlife Plan and Guide to the Natural Communities of Florida (FNAI 2010), and each includes multiple subtypes. These are cross walked with Cowardin types used for USACE reporting; while similar, definitions may not match entirely.

Table 4-1 summarizes wetland permits issued in Florida by the USACE over the most recently available five-year period, from FY 2014 through FY 2018. Permitted wetland fill is presented by type of wetland and acreage; the dataset is limited to wetlands mostly within the Action Area covered by the current document and does not include all wetlands in the state. For the first four years of the period, permitted wetland fill ranged from 1,587 to 2,417 acres per year, then more than doubled to 4,363 acres in FY 2018 reportedly because of a confluence of multiple larger one-time projects being permitted in that year. The mean annual permitted acreage for the period was 2,423 acres per year. This suggests that annual wetland loss has remained at or below levels identified in previous decades. The numbers in Table 4-1 do not include offsets from wetland mitigation, wetland dredge, or grant-funded restoration. Based on national data, mitigation and restoration

likely result in lower net loss of wetlands and even net gains for some habitat types in some years (1998-2004), although in 2004-2009 there was a continued national net loss (Dahl 2011).

As indicated in Table 4-1, wetland fill impacts within the Action Area were primarily to palustrine wetlands. Impacts on other wetland types were considerably less in comparison. Palustrine wetlands provide habitat for numerous ESA-listed species.

**NOTES regarding interpretation of USACE data:**

A single 404 permit may authorize activities that affect multiple wetlands or surface waters areas within the project area. So, the total number of areas will be larger than the total number of permits issued.

The USACE data assigns an ID number for each WOTUS that is delineated on a site, and that number is in the Table 4-1 under the column “Number of Areas”. The acreages for these areas under the column “Total Acres” represent the entire footprint of the fill authorized for each area, not just the amount of WOTUS that was adversely impacted. (R. Barron, USACE, personal communication, April 16, 2020).

The USACE has been developing a GIS shapefile to depict the retained waters. At the time of this BA, the draft shapefile (February 2019) does not include all of the retained and tidal waters noted in the USACE list of retained water (particularly canal systems in southwest and south Florida). Because it was the best available information at the time, FDEP queried the USACE project data by overlaying it with the draft retained water shapefile. This was performed in order to estimate the number and types of projects in State-assumed waters, outside of boundaries of the draft USACE retained waters file. Due to the limitations of the geographically referenced shapefile, the USACE permit-related data in this BA does not accurately represent projects/permits in only assumed waters. Please note that this data was used to analyze and depict general data trends for this BA, and not serve as a source for definitive quantitative data. Tables and Figures in this BA that use this data likely overestimate the number of projects that will be in assumed waters but is presented here as best available information. The data provided in Table 4-1 and Figure 4-3 likely inadvertently include some retained waters and may include values for some section 10 projects.

Table 4-1 Authorized Areas and Acreages by Wetland Type, 2014 - 2018

| Cowardin Type | FY 14 | | FY 15 | | FY 16 | | FY 17 | | FY 18 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number[1] of Areas | Total Acres | Number of Areas | Total Acres | Number of Areas | Total Acres | Number of Areas | Total Acres | Number of Areas | Total Acres |
| Estuarine | 29 | 2.71 | 39 | 6.85 | 22 | 5.55 | 55 | 17.3 | 112 | 10.82 |
| Lacustrine | 29 | 10.39 | 26 | 48.86 | 35 | 9.29 | 24 | 17.45 | 32 | 12.46 |
| Marine | 6 | 0.46 | 2 | 0.03 | 4 | 3.08 | 11 | 59.91 | 15 | 10.58 |
| Palustrine | 740 | 1,491.65 | 788 | 1,452.29 | 786 | 2,162.99 | 990 | 1,851.78 | 1,234 | 4,141.19 |
| Riverine | 130 | 432.94 | 124 | 78.95 | 169 | 235.75 | 141 | 44.34 | 238 | 188.06 |
| **Total** | **934** | **1,938.15** | **979** | **1,586.98** | **1,016** | **2,416.66** | **1,221** | **1,990.78** | **1,631** | **4,363.11** |

[1]The Number of Areas represents the number of WOTUS areas authorized. A single 404 permit may authorize multiple WOTUS areas, so the number of areas will exceed the number of permits issued. Also see Notes subsection under 4.2.1 regarding areas and acreages. FY = Federal Fiscal Year (October through September)

Source: USACE Jacksonville District



Figure 4-3 Acreage of Authorized Fill, by Wetland Type

A single 404 permit may authorize multiple WOTUS areas, so the number of areas will exceed the number of permits issued. Also see Notes subsection under 4.2.1 regarding areas and acreages. FY = Federal Fiscal Year (October through September). Source: USACE Jacksonville District

### *Freshwater Non-forested Wetlands – Palustrine Wetlands including Palustrine Emergent (PEM) and Palustrine Shrub Scrub (PSS)*

As shown in Table 4-1, freshwater non-forested wetlands (assumed to be roughly equivalent to combined PEM and PSS Cowardin Types) are associated with a considerable number of the permitted activities in Florida from FY 2014 through 2018; the number of WOTUS areas authorized ranged from 263 to 542, and the acreage ranged from 320 to 2,069 annually. Although freshwater non-forested wetlands are among the most extensive in Florida (about 5.4 million acres) (FWC 2019), Table 4-1 suggests that Section 404 permitted fill activities disproportionately affected this habitat type.

### *Freshwater Forested Wetlands*

Freshwater forested wetlands (assumed to be roughly equivalent to Palustrine Forested (PFO) Cowardin Types) accounted for an even greater number of permitted fill activities from FY 2014 through 2018; the number of WOTUS areas authorized ranged from 354 to 622, and the acreage ranged from 727 to 1,980.

Freshwater forested wetlands include about 4.2 million acres or about 10 percent of Florida’s land area. Table 4-1 suggests that Section 404 permitted fill activities disproportionately affected this habitat type.

#### *Lakes*

Lakes (assumed to be roughly equivalent to lacustrine Cowardin Types) accounted for a relatively small proportion of permitted activities: 24 to 32 WOTUS areas authorized from FY 2014 through 2018, and nine to 48 acres. Lakes cover almost 1.3 million acres in Florida, with much of the surface area in public ownership.

#### *Rivers and Streams*

Rivers and streams (assumed to be roughly equivalent to riverine Cowardin Types) accounted for 124 to 238 WOTUS areas authorized from FY 2014 through 2018, and 79 to 432 acres with considerable year to year variation. Estuarine Cowardin Type wetlands may also fall in this category, with a small area included in assumed waters; 22 to 112 WOTUS areas associated with permits were issued for estuarine wetlands, including three to 17 acres of impacts.

#### *Marine*

Relatively small areas of marine habitat (assumed to be equivalent to marine Cowardin Types) are within assumed waters; WOTUS areas authorized ranged from two to 15 per year, including less than one to about 10 acres of impacts per year.

#### *Uplands*

While uplands are not regulated under state wetland regulations, under the CWA and ESA, if uplands include listed species which can be adversely affected as a result of the Action, those impacts/effects must be addressed. ESA-listed species could be affected by Actions on uplands that are associated with wetlands permits such as construction of access roads or staging areas, and many species utilize both wetland and upland habitat. Thus, such features are often included as part of the species coordination process for a State 404 permit application review.

#### *Inventories and Surveys for Habitat Types and Quantities*

The most current information on Florida habitat types is summarized in the Wildlife Plan and is also available as GIS layers from the FNAI. While this information is in some cases based on site-specific inventories or surveys, it is presented at the statewide level. A statewide approach is believed to be appropriate for this statewide Programmatic BA. Available GIS layers can be used to map specific wetlands, at a scale that can be presented in a statewide view or mapped on a finer scale when needed.

### 4.2.2 Historical Federal Permitting: ESA Consultations

Baseline conditions were derived from the USACE permit database provided by the Regulatory Division of the USACE Jacksonville District, which encompasses federal fiscal years 2014 through 2018. This database includes all temporary and permanent permitted wetland impacts by Cowardin code, permit authorization type, dredge or fill acreage approved, and a project site coordinate. The database also includes all ESA consultations by type, agency, closure method, ESA-listed species potentially affected, and a corresponding object identification number that links the ESA consultations with the permitted wetland impacts.

Please see the Notes subsection in 4.2.1 for details regarding interpretation of the data in this BA. Tables 4-2a and 4-2b show the types of consultations for ESA-listed species for the USACE consultation data involving permanent and temporary dredge and fill actions in Florida from 2014 through 2018. We estimate that out of those past Section 404 permit applications reviewed, 7.08 percent of reviews were reasonably certain to

result in take (n=~368 permit reviews out of 5,195). This percentage was calculated using the USACE Jacksonville District permitting database's "Formal" choice in the "Consultation Type" field, since most of the formal consultations can be assumed to be associated with activities that may cause incidental take. The percentages of all types of consultations are shown for the five-year period is shown in Table 4.2a.  In Table 2b, this data is shown annually for years 2014-2018. Approximately 14 percent resulted in "Informal" type consultations. As shown in Table 4.2, over ~79 percent of findings over the period 2014-2018 were covered by existing programmatic consultations or decision tools. For the USACE permit data collected during the years 2014-2018, a small proportion of the total number of ESA-listed species accounted for the majority of consultations. During this time, many of the species subject to frequent consultation had existing decisions tools such as consultation keys or programmatic biological opinions. For those species, such decision tools can help guide future consultations and assist FDEP when assessing potential effects of proposed actions.

Of the 139 listed and two (2) proposed species in the Action Area, 84 have been the subject of ESA consultations in the past five years. Two species (Eastern Indigo Snake and Wood Stork) accounted for 56.6 percent of species-level consultations, and just 15 species accounted for 93.3 percent of all species-level consultations (see Table 4-3a and Table 4-3b; note that most consultations include more than one species, therefore these numbers may represent a smaller number of consultations). Recent consultations are not distributed evenly within the Action Area and can be especially dense in areas of rapid growth and development (see Figures 8 and 9).

Discrepancies in the numbers between Tables 4-2 and Table 4-3 are explained as follows. Each permit may have several habitat types and species associated with it that may require input from either the USFWS or NMFS, sometimes both. Due to the availability of tools such as programmatic consultations and consultation keys, some species for a given permit may be covered under a programmatic consultation while others may require a formal or informal consultation. This results in the possibility of multiple species in the USACE database being associated with one USACE-assigned ESA Action Identification number based on their closure method and consultation type while other species associated with the permit fall into a different ESA Action Identification number.

Table 4-2a Consultation Types for Federal Actions Totals, FY 2014 – 2018

| ESA Determination | Total # (2014-2018) | % of Total |
|---|---|---|
| Formal | 368 | 7.08 |
| Informal | 710 | 13.67 |
| Programmatic | 4117 | 79.25 |
| **Total** | **5195** | **100** |

Source: USACE Jacksonville District

Table 4-3b Consultation Types for Federal Actions by Year, FY 2014 – 2018

| ESA Determination | Total # 2014 | Total # 2015 | Total # 2016 | Total # 2017 | Total # 2018 | % of Total |
|---|---|---|---|---|---|---|
| Formal | 41 | 61 | 63 | 80 | 123 | 7.08 |
| Informal | 137 | 131 | 127 | 131 | 184 | 13.67 |
| Programmatic | 811 | 738 | 740 | 883 | 945 | 79.25 |
| **Total** | **994** | **942** | **933** | **1096** | **1252** | **100** |

Source: USACE Jacksonville District

Table 4-4a ESA Consultations Without Programmatic, By Species, 2014-2018

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| ***Mammals*** | | | |
| Florida Bonneted Bat, (*Eumops floridanus*) | 383 | Choctawhatchee Beach Mouse, (*Peromyscus polionotus allophrys*) | 1 |
| Key Largo Woodrat, (*Neotoma floridana smalli*) | 1 | Southeastern Beach Mouse, (*Peromyscus polionotus niveiventris*) | 2 |
| Key Deer, (*Odocoileus virginianus clavium*) | 2 | St. Andrew Beach Mouse, (*Peromyscus polionotus peninsularis*) | 3 |
| Rice Rat, (*Oryzomys palustris natator*) | 2 | Florida Panther, (*Puma (=felis*) | 108 |
| Key Largo Cotton Mouse, (*Peromyscus gossypinus allapaticola*) | 1 | Lower Keys Marsh Rabbit, (*Sylvilagus palustris hefneri*) | 2 |
| ***Birds*** | | | |
| Cape Sable Sparrow, Seaside (*Ammodramus maritimus mirabilis*) | 9 | Wood Stork, (*Mycteria americana*) | 216 |
| Florida Grasshopper Sparrow, (*Ammodramus savannarum floridanus*) | 45 | Red-Cockaded Woodpecker, (*Picoides borealis*) | 230 |

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| Florida Scrub-Jay, (*Aphelocoma coerulescens*) | 143 | Audubon's Crested Caracara, (*Polyborus plancus audubonii*) | 142 |
| Red Knot, (*Calidris canutus rufa*) | 8 | Everglade Snail Kite, (*Rostrhamus sociabilis plumbeus*) | 121 |
| Piping Plover, (*Charadrius melodus*) | 19 | - | - |
| ***Reptiles*** | | | |
| American Alligator, (*Alligator mississippiensis*) | 2 | Gopher Tortoise, (*Gopherus polyphemus*) | 1 |
| American Crocodile, (*Crocodylus acutus*) | 12 | Atlantic Salt Marsh Snake, (*Nerodia clarkii taeniata*) | 6 |
| Eastern Indigo Snake, (*Drymarchon couperi*) | 207 | Bluetail Mole Skink, (*Plestiodon egregius lividus*) | 31 |
| Sand Skink, (*Plestiodon reynoldsi*) | 59 | - | - |
| ***Amphibians*** | | | |
| Reticulated Flatwoods Salamander, (*Ambystoma bishopi*) | 4 | - | - |
| ***Fish*** | | | |
| Shortnose Sturgeon, (*Acipenser brevirostrum*) | 5 | Atlantic Sturgeon, (*Acipenser oxyrinchus oxyrinchus*) | 6 |
| Smalltooth Sawfish, (*Pristis pectinata*) | 188 | Okaloosa Darter, (*Etheostoma okaloosae*) | 1 |
| ***Mollusks*** | | | |
| Fat threeridge, (*Amblema neislerii*) | 3 | Gulf Moccasinshell, (*Medionidus penicillatus*) | 4 |
| Chipola Slabshell, (*Elliptio chipolaensis*) | 3 | Ochlockonee Moccasinshell, (*Medionidus simpsonianus*) | 3 |
| Purple Bankclimber, (*Elliptoideus sloatianus*) | 5 | Choctaw Bean, (*Villosa chocctawensis*) | 6 |
| Tapered Pigtoe, (*Fusconaia burkei*) | 5 | Stock Island Tree Snail, (*Orthalicus reses* (not incl. nesodryas) | 1 |
| Narrow Pigtoe, (*Fusconaia escambia*) | 3 | Oval Pigtoe, (*Pleurobema pyriforme*) | 6 |
| Round Ebonyshell, (*Fusconaia rotulata*) | 2 | Fuzzy Pigtoe, (*Pleurobema strodeanum*) | 6 |
| Southern Sandshell, (*Hamiota australis*) | 6 | Southern Kidneyshell, (*Ptychobranchus jonesi*) | 6 |
| Shinyrayed Pocketbook, (*Lampsilis subangulata*) | 4 | - | - |

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| ***Crustaceans*** | | | |
| N/A | - | N/A | - |
| ***Insects*** | | | |
| Schaus Swallowtail Butterfly, (*Heraclides aristodemus ponceanus*) | 1 | - | - |
| ***Plants*** | | | |
| Telephus Spurge, (*Euphorbia telephioides*) | 12 | Miccosukee Gooseberry, (*Ribes echinellum*) | 2 |
| Florida Torreya, (*Torreya taxifolia*) | 1 | American Chaffseed, (*Schwalbea americana*) | 1 |
| Key Tree Cactus, (*Pilosocereus robinii*) | 2 | Fringed Campion, (*Silene polypetala*) | 1 |
| Chapman Rhododendron, (*Rhododendron chapmanii*) | 1 | - | - |

Source: USACE Jacksonville District

Table 4-5b ESA Consultations with Programmatic, 2014-2018

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| ***Mammals*** | | | |
| West Indian Manatee, (*Trichechus manatus*) | 493 | Choctawhatchee Beach Mouse, (*Peromyscus polionotus allophrys*) | 1 |
| Florida Bonneted Bat, (*Eumops floridanus*) | 411 | Southeastern Beach Mouse, (*Peromyscus polionotus niveiventris*) | 3 |
| Key Largo Woodrat, (*Neotoma floridana smalli*) | 1 | St. Andrew Beach Mouse, (*Peromyscus polionotus peninsularis*) | 4 |
| Key Deer, (*Odocoileus virginianus clavium*) | 5 | Florida Panther, (*Puma (=felis*) | 197 |
| Rice Rat, (*Oryzomys palustris natator*) | 5 | Lower Keys Marsh Rabbit, (*Sylvilagus palustris hefneri*) | 6 |
| Key Largo Cotton Mouse, (*Peromyscus gossypinus allapaticola*) | 1 | - | - |
| ***Birds*** | | | |
| Cape Sable Sparrow, Seaside (*Ammodramus maritimus mirabilis*) | 9 | Wood Stork, (*Mycteria americana*) | 2681 |

Table 4-5b ESA Consultations with Programmatic, 2014-2018

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| Florida Grasshopper Sparrow, (*Ammodramus savannarum floridanus*) | 57 | Red-Cockaded Woodpecker, (*Picoides borealis*) | 298 |
| Florida Scrub-Jay, (*Aphelocoma coerulescens*) | 199 | Audubon's Crested Caracara, (*Polyborus plancus audubonii*) | 175 |
| Red Knot, (*Calidris canutus rufa*) | 9 | Everglade Snail Kite, (*Rostrhamus sociabilis plumbeus*) | 159 |
| Ivory-Billed Woodpecker, (*Campephilus principalis*) | 1 | Kirtland's Warbler, (*Setophaga kirtlandii* (= *dendroica kirtlandii*) | 2 |
| Piping Plover, (*Charadrius melodus*) | 29 | Roseate Tern, (*Sterna dougallii dougallii*) | 1 |
| ***Reptiles*** | | | |
| American Alligator, (*Alligator mississippiensis*) | 2 | Gopher Tortoise, (*Gopherus polyphemus*) | 1 |
| American Crocodile, (*Crocodylus acutus*) | 33 | Atlantic Salt Marsh Snake, (*Nerodia clarkii taeniata*) | 6 |
| Eastern Indigo Snake, (*Drymarchon couperi*) | 2697 | Bluetail Mole Skink, (*Plestiodon egregius lividus*) | 31 |
| Sand Skink, (*Plestiodon reynoldsi*) | 66 | - | - |
| ***Amphibians*** | | | |
| Reticulated Flatwoods Salamander, (*Ambystoma bishopi*) | 6 | - | - |
| ***Fish*** | | | |
| Shortnose Sturgeon, (*Acipenser brevirostrum*) | 15 | Atlantic Sturgeon, (*Acipenser oxyrinchus oxyrinchus*) | 16 |
| Smalltooth Sawfish, (*Pristis pectinata*) | 305 | Okaloosa Darter, (*Etheostoma okaloosae*) | 1 |
| ***Mollusks*** | | | |
| Fat threeridge (*Amblema neislerii*) | 6 | Gulf Moccasinshell, (*Medionidus penicillatus*) | 6 |
| Chipola Slabshell, (*Elliptio chipolaensis*) | 6 | Ochlockonee Moccasinshell, | 6 |
| Purple Bankclimber, (*Elliptoideus sloatianus*) | 8 | Choctaw Bean, (*Villosa choctawensis*) | 9 |
| Tapered Pigtoe, (*Fusconaia burkei*) | 8 | Stock Island Tree Snail, (*Orthalicus reses* (not incl. *nesodryas*) | 2 |

Table 4-5b ESA Consultations with Programmatic, 2014-2018

| Species | # of Consultations | Species | # of Consultations |
|---|---|---|---|
| Narrow Pigtoe, (*Fusconaia escambia*) | 3 | Oval Pigtoe, (*Pleurobema pyriforme*) | 11 |
| Round Ebonyshell, (*Fusconaia rotulata*) | 2 | Fuzzy Pigtoe, (*Pleurobema strodeanum*) | 7 |
| Southern Sandshell, (*Hamiota australis*) | 7 | Southern Kidneyshell, (*Ptychobranchus jonesi*) | 7 |
| Shinyrayed Pocketbook, (*Lampsilis subangulata*) | 6 | - | - |
| ***Crustaceans*** | | | |
| N/A | - | N/A | - |
| ***Insects*** | | | |
| Miami Blue Butterfly, (*Cyclargus* (*=hemiargus*) | 1 | Schaus Swallowtail Butterfly, (*Heraclides aristodemus ponceanus*) | 1 |
| ***Plants*** | | | |
| Beautiful Pawpaw, (*Deeringothamnus pulchellus*) | 1 | Chapman Rhododendron, (*Rhododendron chapmanii*) | 1 |
| Telephus Spurge, (*Euphorbia telephioides*) | 12 | Miccosukee Gooseberry, (*Ribes echinellum*) | 2 |
| Florida Torreya, (*Torreya taxifolia*) | 1 | American Chaffseed, (*Schwalbea americana*) | 1 |
| Aboriginal Prickly-Apple, (*Harrisia* (*=cereus*) | 0 | Fringed Campion, (*Silene polypetala*) | 1 |
| Key Tree Cactus, (*Pilosocereus robinii*) | 3 | - | - |

Source: USACE Jacksonville District

Figure 4-4  Locations of ESA Consultations in Action Area, 2014 - 2018



Figure 4-5 Concentrations of ESA consultations in the Action Area, 2014 - 2018



# 5.     Potential Effects on ESA-considered Species

Effects of an action are all consequences to listed species or critical habitat that are caused by the action, including the consequences of other activities that are caused by the action. A consequence is caused by the action if it would not occur but for the action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action (50 CFR §402.02). The Action studied in this BA is EPA's approval of the State's Assumption of the dredge and fill permitting program under Section 404 of the CWA for waters assumable by the State. A direct consequence of the Action is that an applicant must go through the State 404 permitting process for a permit in waters assumed by the State and may not go directly to the USACE to get a 404 permit to place fill in State-assumed waters. Therefore, the effects of the EPA approving the Program Assumption are 1) the USACE would no longer be allowed to issue a wetland fill permit in assumable waters, 2) FDEP would be the only entity allowed to issue 404 permits in assumable waters, and 3) the consequence of FDEP issuing 404 permits would be the placement of dredge material in wetlands, which in turn would alter the environment where ESA-considered species may exist or designated critical habitat may exist.

The Action is not expected to substantially increase or decrease the number of Section 404-type authorized activities post-assumption as compared to before Assumption, since the only expected change will be the entity processing the permits. The State 404 program's processes and structure will be consistent with CWA requirements and Section 404 analysis of species and aquatic resources and potential effects of proposed fill or dredge activities. It is reasonable to expect that permitting history available by the USACE for the interval 2014-2018 approximates the number and types of permitting activities that might be anticipated for the next five-year interval. See Chapter 4.2.1 regarding the limitations of the data used in the analyses of this BA, regarding the interpretations of the USACE database and shapefile.

The precise number and locations of future Section 404 permit applications are unknown. Some can be predicted well in advance, such as large public works projects with long lead times and planning horizons. However, most applications, especially from individuals or private entities, are less predictable. While precise locations are mostly unknown, as shown in Figures 8 and Figure 9 consultations related to Section 404 applications tend to cluster in rapidly developing regions of the state.

Using the best available data on recent (past five years) permitting activities as a baseline (see Chapter 4), as well as ecological theory, professional judgment, and the information included in the species accounts in Appendix B, we conducted a qualitative assessment of the potential effects of the Action on species and designated critical habitat. We did not distinguish direct and indirect effects based on 2019 updates to the section 7 implementing regulations of the ESA (50 CFR § 402); however, both immediate impacts and those delayed in time were considered.

Table C.1 in Appendix C summarizes the potential impacts of dredge and fill activities on ESA-listed and proposed to be listed species. This stressor table is intended to identify potential effects and facilitate analysis of which effects are reasonably likely to occur as a result of activities authorized, if Assumption of Section 404 is approved. A detailed analysis of potential effects in the future is not possible, because, as stated above, the exact locations, amounts, and types of impacts are not yet known. We briefly summarize major categories of impacts below, followed by a discussion of potential effects on major taxa.

## 5.1   Types of Effects

The following discussion is not exhaustive but includes some of the more common influencing factors and consequences to species that may result from dredge and fill activities. There is a spectrum of effects to consider, including beneficial effects, but for the purposes of this BA the focus will be on potential adverse effects. For example, there is a level of disturbance without a detectable sign of effect (e.g. a wood stork flushed off a nest but returns before the eggs are harmed). There is also disturbance with a detectable sign of effect (e.g. a wood stork is flushed off a nest and the eggs overheat and die). Heightened levels of effect include injury that is observable or detectable, such as a failure to reproduce because of physiological or ecological effects of the action, or the death of one or more individuals.

There is also a spectrum of likelihoods that an effect may occur from a theoretical or conceptual standpoint. The likelihood that an effect may occur can be described by how confident a reviewer may be that something is actually going to occur. These levels of likelihood that something will occur include potential, unlikely, possible, likely, more than likely, and reasonably certain. Potential stressors or effects to the species and to the essential physical and biological features of any critical habitat are discussed below and summarized in Appendix C, but also must be assessed during the review of State 404 permit applications.

### 5.1.1   Biotic Stressors

Biotic stress is stress that occurs as a result of damage done to an organism by other living organisms, such as bacteria, viruses, fungi, parasites, beneficial and harmful insects, weeds, and cultivated or native plants. Dredge and fill activities can alter competitive balances, change predator/prey relationships, or encourage the establishment of invasive plants or animals, which can alter habitat structure. Loss or decrease, or colonization or increase, of a species can cascade through multiple trophic levels and, in some cases, even contribute to habitat alteration (monotypic stands of invasive plants).

### 5.1.2   Physical Stressors

Physical stressors should be assessed individually and cumulatively, when assessing potential biological impacts. An example of a physical stressor could be the physical diversion of a stream to another location, which may adversely impact the habitat for the flora and fauna using the original location of the stream. Other examples include the construction of new, improvements to, and even the removal of dams, weirs, and culverts, the removal of wetlands and surface waters by filling with materials, and the creation of surface waters by dredging and excavation. Physical stressors include direct mortality (burying or trapping of individual animals by fill or equipment placing fill), especially for smaller, less mobile species; it can also result in loss of habitat and displacement of more mobile species able to escape the immediate effect. Fill of part of a wetland can contribute to loss of function even if most of the wetland remains intact.

Dredging can result in temporary to permanent loss of aquatic bottom communities, and sedimentation can reduce visibility, clog gills of aquatic species, and bury immobile organisms. Recovery from dredge effects may require hours to years, depending on the habitat, substrate type, and the extent of the disturbance.

Fragmentation can affect species that migrate seasonally between habitat types (pond breeding salamanders which spend the summer in uplands up to hundreds of feet away) or which have large home ranges and frequently move among resource types (Eastern Indigo Snake or Florida Panther). It can also disrupt metapopulations, especially for short-lived invertebrates dependent on stochastic environments, reducing the frequency of recolonization of otherwise suitable habitat.

Changes to hydrologic regime may include lowering of groundwater levels, increased runoff, or altered hydroperiod. Changes that result in early drying of ponds or wetlands may result in mortality to pond breeding amphibian larvae or small fish, while conversion of a seasonal wetland to a permanent pond may allow colonization by large predators, including stocking of game fish.

Some construction activities (e.g., pile driving or dredging) can result in air or underwater noise and vibration effects. Analysis of and attempting to reduce these effects has become more common in recent years. Construction activities such as noise, vibration, as well as visual disturbance, may alter the behavior of ESA-listed species.

Even measures intended to reduce effects can sometimes have unintended consequences. Some projects have relocated ESA-listed species, but little follow-up monitoring has been done to document success or failure of the translocations.

### 5.1.3 Physicochemical Water Quality Stressors

Physicochemical stress results from environmental factors such as food/nutrition, toxins, metabolic disorders, infections, and inflammation. Water Quality changes are commonly associated with dredge and fill activities, although these are not always easy to describe. Effects can include changes in water temperature, gas or oil dripping from construction equipment or generators to fill of a wetland, eliminating or reducing natural filtration of sediment and pollutants and resulting in degradation of downstream habitat. Dredging may also re-suspend environmental contaminants in sediment (common in industrial areas). Changes to nutrient cycling or exchange are even less obvious and may result from new activities occurring on or adjacent to the filled areas.

## 5.2 Potential Effects

The following discussion is grouped by major taxa and discusses potential effects of the Action by future activities that may be authorized, should the State 404 program be approved, within guilds of species with similar habitat needs or life-history traits. These effects are similar to the effects of the current USACE Section 404 process for granting or denying permits, only will be performed by the State 404 program process as a consequence of the Action, if approved. It is assumed that overall, the future number and/or any rate of increase for State 404 applications and the general types of activities and overall dredge or fill quantities will be similar to those permitted in similar jurisdictional waters as past requests for permits by the USACE, and would not change due to an approval of the State’s request for Assumption.

### 5.2.1 Mammals

Twenty-four mammalian species/subspecies are included in Appendix C, Table C.1. Two of these mammals are extirpated from the state and are therefore excluded from further consideration in this BA. General habitat preferences in Florida can group the remaining twenty mammals into the following broad categories: wetland/marsh (six mammals), forests/grasslands/swamps (two mammals), tropical hardwood hammock/mangrove (three mammals), caves (four mammals), pine rockland (one mammal), beach/scrub dune (five mammals), and aquatic (one mammal). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species’/subspecies’ microhabitat preferences) is presented in Table C.1.

In general, all mammalian species under consideration in this BA that occupy or frequent WOTUS or adjacent habitats during any stage of their life histories and behaviors may be disturbed by activities during periods when authorized activity-related noise and vibration exceed baseline levels. Such activities may also disturb the natural behavior of ESA-considered species due to visual disturbance during construction activities.

ESA-considered mammals that occupy wetlands and marshes in Florida include voles, rabbits, and rats. These species/subspecies may occupy or use wetland/marsh habitat during all or a portion of their life history (e.g., for breeding, foraging, or shelter). Marsh and wetland species are likely to be directly affected by impacts to their habitat from future authorized dredge and fill activities, which may also result in habitat fragmentation. Changes in existing hydrological regimes and water quality associated with future authorized activities could also degrade the quality of wetland/marsh habitat and vegetation (e.g., allow for invasion of non-native vegetation). Dredge and fill activities are also frequently associated with coastal development. Development of marshes/wetlands may create suitable conditions for non-native predators (e.g., cats and dogs) and competitors (e.g., *Rattus rattus*), which would also impact these ESA-considered species via increased ecological pressures.

Carnivores with large home ranges (e.g., Florida Panther and Red Wolf) occupy a diverse range of habitats, such as forests, grasslands, and swamps in Florida (as well as pine rocklands). Due to the restricted range of the Red Wolf on protected land in Florida (limited to St. Vincent Island, a USFWS National Wildlife Refuge), future activities authorized by the State 404 program are not likely to adversely affect the species. However, future permitted activities may impact the Florida Panther through direct impacts to habitat (dredge and fill), habitat fragmentation, and changes to existing hydrological regimes/water quality. Habitat fragmentation is one of the primary threats to this subspecies and a limit to its recovery.

Tropical hardwood hammock/mangrove ESA-considered mammal species (bats, rats, and mice) are likely to be impacted by future permitted activities via habitat fragmentation from fill or impacts to hydrology/water quality. Several species require fresh sources of drinking water, and their prey items are also dependent on these landscape features. In addition, impacts to habitat, including fragmentation, may create opportunities for non-native predators (e.g., cats) to colonize/thrive. The extent of tropical hardwood hammock and mangrove, particularly in south Florida, has declined significantly over the last several decades as a result of development, and further fragmentation could have significant impacts on ESA-considered species (USFWS 1999).

Several ESA-considered bat species/subspecies occur in limestone karst cave regions of the Florida Panhandle. Most of these bats are rare/unlikely to occur in the state, and future permitted activities are unlikely to adversely affect them. However, the Tricolored Bat is a permanent resident throughout Florida and occupies caves as well as woodland habitat and urban landscapes. Water features are also important to the species as foraging habitat. Direct impacts on the species' habitat (fill) as well as an increase in habitat fragmentation or impacts to hydrological regimes/water quality, may adversely affect the species.

The Key Deer (as well as the Florida Panther) inhabits pine rocklands. Pine rockland (as well as hammock) contains a substantial portion of the deer's forage plants, freshwater, and cover, which is especially important for fawning. Ongoing threats to the species include urbanization. Through direct impacts to habitat via fill, as well as habitat fragmentation and impacts to water quality, future permitted activities could have an impact on the subspecies.

Several ESA-considered beach mice occupy dune systems vegetated by sea oats and adjacent scrub (dominated by oaks and sand pine or palmetto) in coastal Florida. The predominant factors of decline for

these mice are habitat loss due to alteration or conversion of dunes (from human development and use) as well as predation by non-native predators. Direct impacts to habitat via fill, dredging, and habitat fragmentation (which may make habitat for hospitable for non-native predators) could affect these species.

The West Indian Manatee is the only ESA-listed aquatic marine mammal considered in this BA. Florida manatees occur in freshwater, brackish, and marine environments, including coastal river estuaries, sloughs, canals, creeks, and lagoons. The species requires a source of freshwater for drinking. Threats to the species include human-caused mortality (watercraft collisions), interactions with commercial fishing gear, pollution, exposure to cold/loss of warm-water refugia, red tides, and impacts to habitat. Future activities authorized by the State 404 program could affect this species from dredge and fill activities, increases in vessel storage and operation, and impacts on habitat, including changes in hydrologic regimes, water quality, water control structures, and habitat fragmentation.

### 5.2.2 Birds

Nineteen avian species/subspecies are included in Appendix C, Table C.1. Five of these birds are extirpated from the state and are therefore excluded from further impact analysis in this BA. The remaining 14 birds can be grouped by general habitat preferences in Florida into the following broad categories: marsh/wetland birds (five birds), upland scrub birds (one bird), coastal tidal/marine birds (four birds), grassland birds (two birds), pine savanna birds (one bird), and forest/forested wetlands birds (one bird). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is also presented in Appendix C, Table C.1.

In general, all avian species under consideration in this BA that occupy or frequent WOTUS or adjacent habitats during any stage of their life histories may be disturbed by future permitted activities during periods project noise and vibration exceed baseline levels. In addition, these activities may also alter the natural behavior of ESA-considered via visual disturbance during construction activities.

Marsh/wetland avian species may be affected by any direct impacts to their habitat (nesting, foraging, roosting, overwintering, or stop-over site habitat). Physical impacts to their habitat associated with future State 404 permits may include fill, dredging, and habitat fragmentation. In addition, fill of marsh/wetland habitat may result in a change to existing hydrologic regimes that could impact prey availability, via providing better conditions for invasive/competing prey species or reducing habitat for prey). Changes in hydrology also have the potential to flood habitat and nesting areas (resulting in nest failure), allow aquatic or terrestrial predators easier access to nests (during flooding vs. receding water conditions), and change the existing nutrient cycle. Changes in hydrology may result in high nitrogen levels in marshes/wetlands. The habitat then may become choked by an overabundance of emergent vegetation. Future permitted activities may also result in changes to water quality that could impact existing marsh/wetland vegetation and prey items (reducing habitat suitability for the species).

The only upland scrub avian species under evaluation is the Florida Scrub-jay. Florida Scrub-jays occupy early successional xeric scrub and scrub flatwood habitat in relict sand dunes in north and central Florida. This xeric habitat is well-drained but may be interspersed with swale marshes. Direct impacts associated with permitted activities that could affect the species include placement of fill, alteration of hydrologic regimes, and habitat fragmentation (a major issue that hampers the recovery of this species).

Direct impacts of future permitted activities on coastal tidal/marine avian species may include fill, dredging, and habitat fragmentation of nesting and foraging habitat (beaches, mudflats, intertidal areas, and inlets).

Shoreline stabilization efforts, in particular, threaten several coastal avian species (i.e., fortification by riprap and other hardscape reduces available habitat). Permitted activities may also result in changes to hydrologic regimes and water quality in coastal areas.

Grassland (or dry prairie) avian species may be impacted if authorized dredge or fill activities result in diminished habitat quality via habitat fragmentation or changes to existing hydrologic regimes. Throughout Florida, grassland habitat is declining and highly fragmented. This habitat may also be mismanaged by suppression of natural fire regimes (USFWS 1999). Additional habitat loss and fragmentation may impact grassland species. Many grassland species also nest on or close to the ground and are highly susceptible to nest flooding (could occur with altered hydrological conditions in the grassland).

The only pine savanna avian species under evaluation is the Red-cockaded Woodpecker. Pine savanna ecosystems (or "high pine") are characterized by widely spaced pine trees and extensive ground cover. Wetlands may be interspersed in low-lying areas. This habitat is almost extinct and highly fragmented in Florida. Also, the quality of existing high pine forests may be hampered by fire suppression (USFWS 1999). Pine savanna avian species may be impacted if authorized dredge or fill activities result in diminished habitat quality via habitat fragmentation or changes to existing hydrologic regimes.

Forest/forested wetlands avian species may be impacted if future authorized dredge or fill activities result in diminished habitat quality via habitat fragmentation or changes to existing hydrologic regimes and water quality. Many of the forest/forested wetland obligate species under evaluation are extirpated from the State of Florida. Habitat fragmentation may expose the remaining forest/forested wetland avian species to increased predation risk and nest failure (Stephens et al. 2004). Altered hydrology and water quality may impact prey availability as well.

### 5.2.3   Reptiles

Nineteen reptiles are included in Appendix C, Table C.1. These reptiles can be grouped by general habitat preferences in Florida into the following broad categories: wetland/marsh/freshwater (seven reptiles), swamp/saltwater (one reptile), pine flatwoods (two reptiles), pine rocklands (two reptiles), and sandhill/scrub flatwood (seven reptiles). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is presented in Appendix C, Table C.1.

Wetland/marsh/freshwater reptile species in Florida may be affected by any direct impacts to their habitat (foraging, breeding, loafing, etc.). Dredge and fill activities in wetlands, marshes, and freshwater (ponds, rivers, streams), including ditching, diking, and impoundments, may result in habitat fragmentation and potentially impact both prey and predator populations (both native and invasive species). In addition, species that spend a large portion of their lives in water are likely to be impacted by changes in hydrological regimes, water quality, and vegetation composition (e.g., increased levels of sedimentation, impacts to burrowing mud substrate, and changes in emergent/submergent vegetation). Impacts are anticipated to be similar for species that inhabit swamps/forested wetlands and saltwater mangroves.

Pine flatwoods serve as a mesic successional stage between hardwood hammock and wet flatwoods (USFWS 1999). This habitat is threatened by conversion or loss and degradation from fire suppression. Species restricted to pine flatwoods are unlikely to be adversely affected by future State 404 permits. However, species that range between pine flatwoods and other habitat types such as wet flatwoods may be affected by direct impacts to habitat and habitat fragmentation.

In Florida, large areas of pine rockland habitats are protected on federal lands. However, particularly around Miami and the Keys, this habitat is on private land and under threat from development, conversion to agriculture, fire suppression, and invasive species (USFWS 1999). Pine rocklands are interspersed with areas of freshwater wetlands. Species associated with these wetland features may be affected by direct impacts to habitat as well as habitat fragmentation.

Sandhill/scrub flatwoods are xeric, well-drained areas of prairie, hammock, and scrub. These habitats are threatened by conversion, degradation, and fragmentation. The species that are found in sandhill/scrub flatwoods are not typically associated with wetlands/WOTUS during their life histories. The future permits under the State 404 program are not likely to adversely affect species that occupy these habitats.

#### 5.2.4 Amphibians

Five amphibians are included in Appendix C, Table C.1. These include species that utilize seasonal wetlands to breed and then disperse into surrounding upland habitat (three amphibians); species restricted to aquatic caves (one amphibian); and subspecies that primarily utilize perennial wetlands but which always had a restricted distribution and may now be extirpated (one amphibian).

Pond breeding species are easily affected by direct fill of wetlands and by hydrology alteration, especially shortening of pond hydroperiod, which may strand aquatic larvae prior to metamorphosis. As these species move between upland and wetland habitat, fragmentation is a concern. In other parts of the United States, the USFWS sometimes explicitly considers fragmentation in making effects determinations and making conservation recommendations for pond-breeding ESA-listed amphibians (R. Henry pers. comm.). Fire suppression is believed to be a concern for some species in some habitat types. Pond breeding amphibians are also at risk because they utilize seasonal isolated wetlands, which often are not subject to CWA jurisdiction. For cave-dwelling amphibians, water quality degradation, both chemical and from sedimentation, could have adverse effects. Hydrology alteration is also a concern.

Most ESA-considered amphibians in Florida have relatively small distributions. Fully implemented safeguards, such as careful review to identify occurrences associated with future permitting and with adequate avoidance and minimization measures including minimization of fragmentation near utilized wetlands, would ensure that effects would remain at or below baseline conditions.

#### 5.2.5 Fish

Six species/subspecies of fish are included in Appendix C, Table C.1 including three types of sturgeon associated with larger rivers and estuaries, two other coastal species, and one species associated with smaller streams. The stream species (Okaloosa Darter) is especially at risk of fragmentation or direct habitat loss because of a restricted range and very limited mobility; however, most populations are currently managed, and the species is considered to be stable at present. The estuarine and coastal species are less likely to be affected by small amounts of dredge or fill because they tend to occur in larger and more contiguous habitats, although sedimentation, water quality degradation, and to a lesser extent direct habitat loss are potential effects. As fish are, by definition, fully aquatic, they are frequently affected by CWA activities. Should these species be found in State-assumed waters, coordination with the Services and important safeguards may need to be identified during permit review, such as implementation of Best Management Practices (BMPs), and avoidance and minimization measures.

### 5.2.6   Insects

Twenty-five species/subspecies of insects are included in Appendix C, Table C.1 including 11 butterflies, five caddisflies, five dragonflies, two bees, and two beetles. Two of these insects, the American Burying Beetle and the Three-toothed Long-horned Caddisfly, are extirpated from the state and therefore excluded from further consideration in this BA. The majority of these ESA-considered insects are threatened by the use of pesticides for agricultural purposes (e.g., Monarch Butterfly's loss of milkweed host plant) and biocides/insecticides for mosquito control.

All of the caddisfly and dragonfly species face similar threats associated with spring, stream, river, and lake modifications. They may be directly affected by impacts to their habitat from future authorized dredge and fill activities, which may also result in habitat fragmentation. Given that both groups spend the larval stage of their life cycles in an aquatic habitat, they are especially vulnerable to changes in water quality conditions (e.g., siltation, pollution, and eutrophication) and changes to existing hydrological regimes. Thus, changes in existing hydrological regimes and water quality could also degrade the quality of aquatic habitat and vegetation (e.g., allow for invasion of non-native vegetation).

ESA-considered insects that occupy wetlands, marshes, and swamps in Florida include the Palatka Skipper and Duke's Skipper butterflies and the Calvert's Emerald Dragonfly. These species are likely to be directly affected by impacts to their habitat from future authorized dredge and fill activities, which may also result in habitat fragmentation. Changes in existing hydrological regimes and water quality could also degrade the quality of wetland/marsh habitat and vegetation (e.g., allow for invasion of non-native vegetation). Dredge and fill activities are also frequently associated with coastal development and, in turn, habitat fragmentation.

Species that occupy forests, woodlands, pine barrens, pine rocklands, and/or grasslands in Florida (e.g., Monarch Butterfly, Florida Leafwing, Frosted Elfin Butterfly, Ceraunus Blue Butterfly, Cassius Blue Butterfly, Bartram's Scrub-hairstreak, and Miami Tiger Beetle) do not use wetlands or WOTUS during any stage of their life history. Future permits under the State 404 program are not likely to adversely affect species that occupy these habitats.

Coastal or tropical hardwood hammocks, dunes, sand pine, and/or scrub obligate insect species (e.g., Gulf Coast Solitary Bee, Nickerbean Blue Butterfly, Miami Blue Butterfly, and Blue Calamintha Bee) may be impacted by habitat fragmentation from fill. These impacts may occur where waters/wetland habitat is interspersed with or border these habitat types. As insects are declining on a global scale, impacts to habitat and other resources that factor into species' life history could affect ESA-considered species recovery.

### 5.2.7   Crustaceans

Nineteen crustacean species/subspecies are included in Appendix C, Table C.1. These species can be grouped by general habitat preferences in Florida into the following broad categories: pond/river/stream species (four crustaceans) and cave/well/sinkhole species (15 crustaceans). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is presented in Appendix C, Table C.1.

Future authorizations under the State 404 program may impact pond/river/stream crustaceans (crayfish) via direct mortality or physical alteration of habitat through dredge and fill activities. Dredge and fill activities may also fragment habitat, change existing hydrological regimes, and affect water quality. All of the crayfish species under consideration in the Action Area are highly sensitive to and already threatened by impacts to both surface and groundwater quality (e.g., changes in temperature, flow, siltation levels, etc.). Changes in

water quality (e.g., an increase in nitrogen levels) may also create favorable conditions for invasive aquatic vegetation or change existing levels and/or species composition of native vegetation. This could decrease the quality of the existing crayfish habitat.

Crustaceans (crayfish and amphipods) that inhabit caves, wells, sinkholes, and other subterranean water features may also experience indirect mortality and/or impacts to habitat as a result of dredge and fill activities in or adjacent to occupied areas. Many cave/well obligates are extremely restricted in range (some species are only known from one or two localities). Any changes in habitat conditions could potentially result in species extirpation. Cave/subterranean crustaceans are also highly threatened by changes in hydrology. Any future activities that would deplete groundwater/aquifers results in changes in flow and, in turn, impacts availability of detrital food items or burrowing habitat. Water quality impacts (increase in nitrogen or sediment levels) may also affect the species. In addition, many cave-dwelling species are dependent on cave-roosting bats, specifically their guano, as a food source. Impacts on cave-roosting bat populations may also affect these crustaceans by reducing food availability.

### 5.2.8 Mollusks

As freshwater mussels are, by definition, fully aquatic, they are likely to be impacted by dredge and fill activities. Twenty-one species of mollusks are included in Appendix C, Table C.1, including 18 types of freshwater mussels that are associated with varying sizes of springs, creeks, and rivers, two freshwater snails, and one tree snail. The freshwater mussel species all face similar threats associated with habitat modification. These include direct habitat modifications such as impoundments, dredging/channelization, stream bed destabilization, and streamflow depletion (e.g., water extraction). They are especially vulnerable to changes in water quality conditions (e.g., excessive sedimentation, environmental contaminants, and eutrophication) and changes to existing hydrological regimes. Similarly, as filter feeders, they are vulnerable to changes in nutrient cycling. Given the reliance all freshwater mussels have on host fish during the larval period of their life cycle, impoundments or other effects influencing host fish species may affect these species. Additionally, mollusk species may be threatened by the invasive species (e.g., Asiatic Clam (*Corbicula fluminea*)), which could be spread by dredge and fill activities. Tree Snails are less likely to be affected as they occur in terrestrial, arboreal environments; nonetheless, direct habitat fragmentation is possible.

### 5.2.9 Plants

Ninety-nine plants are included in Appendix C, Table C.1. These species/subspecies/varieties can be grouped by guild into the following categories: lichens, graminoids, annual forbs, perennial forbs, sub-shrubs, shrubs, cacti, and trees. These groups are intentionally broad for this macro analysis. Impact analysis on the species/subspecies/varietal level (that takes into consideration microhabitat preferences) is presented in Appendix C, Table C.1.

Nine annual forbs are included in this analysis. Five of these forbs occur primarily in wetland habitats, including non-forested wetlands such as prairies, as well as ponds and lakes, ditches, and road shoulders. Fifty-five perennial forbs are included, and roughly half of these occur in wetland habitats. They occur in a variety of specific habitats within freshwater non-forested and freshwater forested wetlands, including wet prairies, cypress swamps, bogs, fens, and seeps. Some occur in pond or lake habitats, and others occur in floodplains or along the banks of rivers or streams. Two epiphytic orchids in this category grow on trees in forested wetlands. One grass and one sedge species included in this analysis may be affected as well.

Four sub-shrubs, six shrubs, and two tree species considered in the analysis occur in wetland habitats, or in habitats which may border wetlands, and which may be affected by future activities that may be permitted under the State 404 program. These species occur in both freshwater non-forested and freshwater-forested wetlands. The sole lichen species and the four cacti species occur in upland habitats that are not likely to be affected.

Many of the species analyzed in this document have experienced substantial habitat loss and range restrictions due to a number of factors, including development and land conversion, alteration of fire regimes and fire suppression, threats from invasive species, and changes to hydrologic regimes. Some have been impacted by forestry practices or horticultural collection. Direct impacts to several of the plants may occur from future authorized fill or dredging activities (which could result in direct mortality or direct impact on wetland habitats). Indirect impacts from wetland dredge or fill activities may affect not only hydrophytes but also some upland species occurring in habitats that border wetlands, from the building of access roads or staging areas. Other indirect impacts include changes in hydrology, water quality, nutrient alteration, and competitive pressure that may arise from shifts in species composition.

# 6.    Cumulative Effects

Cumulative effects are defined as the effects of future non-federal activities, including Tribal, state, local, and private actions on ESA-considered species or their critical habitat that are reasonably certain to occur in the Action Area for this BA. While these effects will likely occur regardless of the agency responsible for administering the requirements in Section 404 of the CWA, they are considered during the analysis of this Action.  Any future State 404 program permits would also consider cumulative effects.

## 6.1    Effects of Non-Federal Activities

ESA regulations (50 CFR § 402.02; § 402.14) require the action agency to evaluate all effects of a proposed non-federal activity. Effects of an activity may occur later in time and may include consequences occurring outside the immediate area involved. Cumulative effects are those effects of future State or private activities, not involving federal activities, that are reasonably certain to occur within the Action Area of the federal Action subject to consultation 50 CFR § 402.02.

There are existing anthropogenic stressors currently impacting ESA-listed species. In addition, there are national-scale, non-federal activities that are reasonably certain to occur. These include watershed development, increased water use, and climate change (USEPA 2013). The "What is Your Vision for Florida's Future? Florida 2070 and Water 2070 Joint Project," prepared by 1000 Friends of Florida, University of Florida Geoplan Center, and Florida Department of Agriculture and Consumer Services (2017), addresses the current anthropogenic stressors that will impact development and water use in Florida in the future.

### 6.1.1    Watershed Development

Florida's population continues to grow rapidly, and it is expected that 33.7 million people will reside in Florida by 2070 - nearly 15 million more than were in residence in 2010 (1000 Friends of Florida et al. 2017). The greatest projected population growth is observed in the Central region of Florida (Figure 6-1). If growth continues as projected, nearly one-third of Florida's land will be developed, and development-related water demand will more than double. Due to the significant increase of projected development, especially in the

Central region of Florida, agricultural lands will be consumed by residential, commercial, or industrial activity; therefore, agricultural irrigation development is expected to decrease except for the Southern region of Florida.

Figure 6-1 Comparison of projected 2010-2070 population change in four Florida Regions

Source: 1000 Friends of Florida et al. 2017

Projected development scenarios for the State of Florida depict a significant increase in land use between 2010 and 2070 (Figure 6-2). It is expected that by 2070, developed land in Florida will increase from 6,275,000 acres to 11,648,000 acres, growing by 15.55 percent (1000 Friends of Florida, et al. 2016). As a result of increased civil and industrial development, land usage for agricultural purposes in the State of Florida is expected to decrease from 7,586,000 acres to 5,422,000 acres by 2070. However, increased development has the potential for various adverse effects in terms of water quality.

Developmental activity associated with new construction, as well as the overall growth of urban areas, directly affect the stormwater quality and can result in detrimental effects for aquatic communities. Not only does the increased flow from additional stormwater drainage systems affect receiving water bodies, but the stormwater runoff quality that is impacted by developmental activities such as litter, chemicals, metals, nutrients, pesticides, bacteria, sediment loads, and organic matter can harm biological health. These various pollutants and how they can impact water quality are discussed below.



Figure 6-2 A comparison of the State development scenarios

Source: 1000 Friends of Florida et al. 2016

Increased sedimentation loads in water systems can result from construction and agricultural activities. There are significant differences in suspended solid concentrations between urban and non-urban stream systems. For example, a study comparison in South Carolina documented a higher total suspended solid concentration value of 2.7 kilograms per square meter per year in an urbanized coastal stream compared to a nearby forested stream that reported a value of 1.6 kilograms per square meter per year (Nagy et al. 2011). Both suspended and accumulated sediment can have adverse impacts. Sedimentation can infill porous areas in a stream/riverbed, eliminating niche areas that multiple aquatic organisms use for egg protection and/or attachment surfaces. Suspended sedimentation can lead to increased turbidity, which not only decreases dissolved oxygen levels (one of the most critical components of water quality) but also can interfere with benthic organisms and their feeding abilities. Makepeace et al. (1995) found that turbid water can be detrimental to aquatic biota. The authors found that total suspended solids concentration between 25 and 100 milligrams per liter “could reduce a river’s primary biological productivity by 13 percent to 50 percent” (Makepeace et al. 1995).

Pollutants, including chemicals, bacteria, metals, oils, and pesticides are commonly found in stormwater runoff. These substances and increased concentration levels in urban stormwater can be correlated with construction, developmental, and agricultural activities. Dependent on various factors, these chemicals and substances can result in either acute or chronic detrimental effects to biological life. Stream hydrologic, microbial, and physiochemical data collected in watershed areas in Florida with impervious surfaces ranging from 0-15 percent displayed higher pH, specific conductivity, elevated temperature, higher loads of nutrients (Cl-, NO3-, SO2-4_, Na+, K+, Mg2+, Ca2+, and total phosphorus), higher bacterial concentrations (fecal coliform and *Escherichia coli*,) and increased hydrologic flashiness in areas with greater impervious surfaces (Nagy et al. 2011). The expected trend of exponential developmental growth of approximately 15.55 percent by 2070 for the State of Florida will increase impervious surface areas; conversely, stormwater quality will decrease while flow rates will demonstrate hydrologic flashiness. The combined hydrologic flashes and influx of toxic substances in stormwater will negatively influence biological communities.

Heavy nutrient pollution is deemed one of America's most challenging environmental problems and is mainly influenced by nitrogen and phosphorus loading. Sources of heavy nutrient loading include but are not limited to agriculture, urban stormwater runoff, wastewater, power generation, and private fertilizer usage. Heavy concentrations of dissolved nitrogen and phosphorus in freshwater systems stimulate plant growth, especially algal growth, which ultimately can harm biological life due to the lack of available dissolved oxygen. A two-year monitoring study on reefs in Florida found that harmful algal blooms alter entire fish assemblages and can reduce both abundance and species richness (Baumberger 2008). With development in Florida increasing in the future, increased construction and higher rates of urban stormwater will consequently increase heavy nutrient loading in aquatic systems and reduce biotic diversity.

Another issue specific to Florida, related to watershed developmental concerns, is the potential for saltwater intrusion into confined aquifer systems. Historical evidence since the 1930s documents the concerns and issues related to saltwater intrusion in Florida as a result of encroaching development. In many areas around Florida, draining efforts were initiated to provide dry land for both developmental and agricultural purposes. There are severe and current concerns for the drinking water of nearly 2.5 million residents of Miami-Dade County, due to saltwater intrusion of the Biscayne aquifer stem (a consequence of the draining of the Everglades to allow for development) (Prinos 2014). As of 2011, Prinos determined that 463 square miles ($mi^2$) of the Biscayne aquifer had been intruded with saltwater. Further pump-out of wetland or lake areas in Florida to create additional areas for development could impact groundwater quality by saltwater intrusion mechanisms.

### 6.1.2 Increased Water Use

An increase in population size will place higher demands on the supply of water. Table 6-1 provides the historical water use data in Florida from 1975-2000. A large source of freshwater for the state of Florida is from underground aquifer systems. With growing pressures of climate change, influxes of anthropogenic demands, and unstable weather patterns, aquifer systems will be unable to meet recharge rates to suffice these conditions. Projected data report that by 2070, development-related freshwater demands will increase as much as 100 percent compared to 2010 (Figure 6-3). The Florida statewide demand for water in 2010 was 5,269,311,481 gallons per day; however, by 2070, the demand is expected to increase to 8,094,862,839 gallons per day. (1000 Friends of Florida et al. 2017). It is estimated that approximately 90 percent of the consumed water in the State of Florida is sourced from groundwater, and only 10 percent is from surface water (Holt 2005).

Table 6-1 Historic Water Use in Florida (millions of gallons per day)

| Category | 1975 | 1980 | 1985 | 1990 | 1995 | 2000 |
|---|---|---|---|---|---|---|
| Public Supply | 1124 | 1406 | 1685 | 1925 | 2079 | 2437 |
| Domestic self-supplied | 228 | 243 | 259 | 299 | 297 | 199 |
| Commercial – industrial mining | 883 | 700 | 709 | 770 | 692 | 563 |
| Agricultural irrigation[a] | 2930 | 3026 | 2798 | 3495 | 3244 | 3923 |
| Recreational irrigation[b] | n/a | n/a | 182 | 310 | 281 | 411 |
| Power generation | 1608 | 1326 | 680 | 784 | 637 | 659 |
| **Total** | **6773** | **6701** | **6313** | **7583** | **7230** | **8192** |

n/a – Not available; b – Withdrawals for turfgrass and landscaping; – Withdrawals for crops, livestock, and fish farming

Source: Holt 2005, reprinted from Bureau of Economic and Business Research, University of Florida, Table 8:40, Florida Statistical Abstracts 2003

The higher demands for groundwater result in the extensive pumping of aquifer systems, which can result in saltwater intrusion. Depleting existing aquifer storage potential and further, harming future aquifer water quality by saltwater intrusion is expected as a consequence of increased water demands for the State of Florida. Receiving an average of 4.6 feet of rainfall annually, Florida has the second-highest precipitation rate behind Louisiana. With climatic changes and differing seasonal patterns, precipitation is likely to be influenced in the future. Approximately 70 percent of annual rainfall in Florida is lost due to evaporation and the remaining 30 percent flows through pervious surfaces to aquifers, surface water bodies, or to impervious surfaces (Holt 2005). Rising temperatures associated with climate change will increase the evaporation rates of Florida precipitation, therefore reducing overall recharge rates of surface and groundwater systems.

Figure 6-3 State Water Scenarios (gallons/day/acre)

Source: 1000 Friends of Florida et al. 2016

Impacts of increased water demand may include reduced depth, areal coverage, and habitat quality for many aquatic communities and aquatic threatened and endangered species. Anthropogenic water demands are also likely to be exacerbated by climate change (see below), leading to greater hydrological variability with an increased probability of drought in many regions.

#### 6.1.3 Climate Change

Florida is among the states in the United States most vulnerable to climate change. The extent of coastline in Florida, along with its low elevation and heavy development of coastal and inland areas, will result in large-scale impacts both to human development and biological habitat as climate changes and sea levels continue to rise. According to the Fourth National Climate Assessment (4th NCA), "The Southeast's diverse natural systems, which provide many benefits to society, will be transformed by climate change. Changing winter temperature extremes, wildfire patterns, sea levels, hurricanes, floods, droughts, and warming ocean temperatures are expected to redistribute species and greatly modify ecosystems. As a result, the ecological resources that people depend on for livelihood, protection, and well-being are increasingly at risk, and future generations can expect to experience and interact with natural systems that are much different than those that we see today."

Annual average temperatures throughout the Southeast United States have been increasing since the 1970s. The decade of the 2010s through 2017 was warmer than any previous decade, with much of this warming being experienced as higher nighttime temperatures and longer freeze-free season lengths. (4th NCA) Statistically significant warming is projected for all parts of the United States through the next century, although, in the Southeast, that trend will be somewhat mitigated by latent heat release from increases in evapotranspiration. Average annual temperatures are projected to increase by 3.4°F to 4.3°F by the middle of the 2000s, and between 4.4°F and 7.7°F by 2100 (Vose et al. 2017).

Warmer winter temperatures in Florida will drive some ecosystem changes, especially when combined with sea level rise. Mangroves are being documented in more northerly locations than previously, thanks to more winters without freeze events, and are beginning to replace *Spartina* marshes. As sea level rises, mangroves and other tidal marsh species may be blocked from migrating up-gradient by sea walls, roads, ditches, or other natural or manmade landscape features, and may drown in place.

Landfall of tropical storms and hurricanes has occurred more frequently in Florida than any other state and increasing sea surface temperatures are expected to increase the frequency of high-intensity tropical cyclones (Mendelsohn et al. 2012). Additionally, increasing sea surface temperature has already negatively impacted Florida's coral reefs. As the ocean becomes more acidic due to the uptake of atmospheric carbon, it will become increasingly difficult for a variety of marine invertebrates to produce calcium carbonate shells and skeletons. This will impact biodiversity and the ecosystem services these species provide. These include shellfisheries production, wave and storm surge attenuation, water filtration, tourism, and transfer of energy via trophic processes to recreationally and commercially important finfish species.

Localized changes in precipitation regimes are also expected to occur due to climate change and will likely have a negative impact on a variety of habitats and species. Periods of unstable precipitation patterns of severe storms followed by longer drought periods pose not only risks for threatened and endangered species but also humans. Abiotic factors such as hydroperiod, water table height, salinity gradient, and surface water depth are likely to be disrupted as precipitation patterns change. Southeast Florida has already experienced hydroclimate variability, which has increased drought conditions causing decreased surface water levels,

decreased groundwater recharge rates, lower groundwater tables, and ultimately leads to higher risks of saltwater intrusion (Abiy 2019).

Climate change impacts associated with rising sea levels pose immediate and long-term risks for land management practices of Florida. Coastal degradation and land loss due to sea-level rise will result in land fragmentation and habitat loss for biological organisms. Changes in abiotic factors from a number of climate change-related drivers are likely to cause habitats and species to shift their ranges in response. In addition to biological habitat loss, rising sea levels will also reduce available land in Florida for development. A study of ESA-listed subspecies in Florida showed both high vulnerability and low adaptive capacity in response to rising sea levels and habitat fragmentation (Benscoter et al. 2013). This will be especially problematic for habitats that are unable to migrate because of natural or anthropogenic barriers, and for species that are rare, occur in isolated populations, and/or have poor dispersal capabilities. Sustainable and climate change specific planning should be at the forefront of developmental planning, conservation efforts, and land usage for the State of Florida. The FWC has an adaptation guide, *A Guide to Climate Change Adaptation for Conservation* that can be found on their website at https://myfwc.com/media/5864/adaptation-guide.pdf. For more information about what the FWC is doing to address the impacts of climate change on fish and wildlife in Florida, see their website at: https://myfwc.com/conservation/special-initiatives/climate-change/.

### 6.1.4 Summary of Cumulative Effects of Non-Federal Activities

As compared to the regulatory baseline, the Action does not authorize any new activities or increased discharge of pollutants that would significantly increase the magnitude of adverse cumulative environmental impacts to ESA-listed species, and the implementation of the State 404 program by FDEP will ensure effects on ESA-listed species will be evaluated and addressed at project-level.

# 7. State 404 Program Species Coordination

***This Chapter is written as if the State has assumed the CWA 404 program***

The following chapter describes the ESA-listed species coordination process that will occur if the EPA were to approve FDEP's request to assume the dredge and fill permitting program under Section 404 of the CWA for waters assumable by the State. The intention of presenting this section as if the State has assumed the CWA 404 program is to describe the effects of the Action by articulating the changes to the process that would occur as the result of EPA's approval. It is also to establish a clear difference between the pre-assumption coordination between federal agencies (section 7 consultation between USFWS and EPA), from the potential post-assumption coordination between federal and state agencies (technical assistance between USFWS and FDEP as part of the State 404 program species coordination process).

The State 404 program rule [Rules 62-331.053(3)(a)4, 62-331.201(3)(k), and 62-331-248(3)(k) F.A.C] and EPA regulations (40 CFR 233.20, 40 CFR 230) prohibits issuance of a permit that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by USFWS and confirms that USFWS conclusions about the effects of 404 permits on listed species are determinative.

The USFWS will review State 404 permit applications and provide, through technical assistance, recommendations to FDEP on a project-by-project basis to ensure adverse effects to ESA-listed species are

avoided and minimized, and to ensure that no State 404 permits will be issued that will jeopardize the continued existence of a listed or proposed to be listed species, or result in adverse modification of critical habitat. This process will also assist USFWS in monitoring any incidental take that is reasonably certain to occur. Under this process, the USFWS will not be issuing any project-by-project incidental take statements (ITS). The anticipated Program assumption BiOp will have a programmatic ITS that will exempt all incidental take associated with State 404 permits from being considered prohibited take under section 9 of the ESA. However, the section 9 exemption provided in the programmatic ITS is contingent on the EPA, FDEP, and the State 404 permit applicant complying with processes and conditions described in the BA, state rules, and any reasonable and prudent measures and terms and conditions provided in the USFWS Program assumption BiOp and it's ITS.

The State 404 program rule includes stipulations (Rules 62-331.053(3)(a)4, 62-331.201(3)(k), and 62-331-248(3)(k) F.A.C. that prohibit issuance of a permit that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by USFWS. This is ensured by the technical assistance process between the FDEP and USFWS.

The scope of Chapter 62-331, F.A.C. is statewide, covering a wide range of construction activities that are reasonably certain to affect a wide variety of listed species and their habitats. The word "impact" used in Chapters 62-330 and 62-331, F.A.C. describes effects similar to "may affect" and "adverse effects" under the ESA. The terms "effect" and "impact" are used interchangeably throughout this document. The review will be in accordance with the requirements and processes specified in the BA, the MOAs, the MOU, Chapter 62-331, F.A.C., and the anticipated Program assumption BiOp. Figure 7-1 at the end of this chapter depicts an overview of the species coordination process.

## 7.1    Federally and State-listed Species Coordination Review

While this BA and this chapter focuses on the species review coordination for federally listed species, it is important to note that both the State 404 permit and the State ERP permit require protections for both federally listed and State-listed species. If a project requires both a State 404 permit and a State ERP permit, protection measures for federally listed species will be incorporated as permit conditions to both permits. In addition, protection measures for State-listed species will be incorporated as permit conditions to both permits. The species review processes for the the State 404 permit and the species review processes for the ERP permit will be similar, with the FDEP permit processor and the FWC permit reviewer working together as a team to resolve issues related to both ESA-listed species and species listed in Chapter 68A-27, F.A.C. The species coordination process outlined in this BA as well as the Memorandum of Understanding between FDEP, FWC and the USFWS will ensure that measures for ESA-listed species that may conflict with measures for a State-listed species that use the same habitat types will be addressed.

The Florida Fish and Wildlife Conservation Commission (FWC) is already involved in the review of many ERP applications and provides FDEP recommended wildlife-related permit conditions, including those that are federally proposed to be listed. In many cases, FWC is the lead conservation agency for federally proposed or candidate species in Florida. A number of species analyzed in this BA are State-listed and under federal review. FWC provides useful resources for State-listed species, including species summary pages with conservation goals, identification of threats, current protections, and links to species action plans and biological status review reports (FWC 2016). These resources include valuable information for future permit

application reviews and can help to identify effective measures to reduce the adverse impacts resulting from project activities.

Florida's Imperiled Species Management Plan (FWC 2016) includes integrated conservation strategies as well as other useful material intended to benefit multiple species. Effective conservation strategies can provide protections that improve the status of an imperiled species and contribute to a decision not to federally list the species.

## 7.2    State 404 Program and Prior-existing USFWS HCPs and BiOps

In some cases, a landowner or project proponent have a project that had undergone previous section 7 consultation with the USFWS and is covered by a valid BiOp or is covered by a valid Habitat Conservation Plan (HCP) and Incidental Take Permit (ITP). Briefly, Congress recognized the need for a process to reduce conflicts between listed species and economic development, in addition to the permits to authorize take from scientific research or certain other conservation actions. As such, the ESA was amended to add an exemption for incidental take of listed species that would result from non-Federal activities (section 10(a)(1)[B] of the ESA). To obtain a permit from USFWS for such take, an applicant must develop a habitat conservation plan (HCP) that meets specific requirements identified in section 10(a)(2)(A) of the ESA and its implementing regulations at 50 CFR § 17.22 and § 17.32 and 50 CFR § 222.25, § 222.27, and § 222.31. HCPs are planning documents that describe the anticipated effects of the proposed taking; how those impacts will be minimized or mitigated; and how the HCP is to be funded. Additional information about Habitat Protection Planning can be found at: https://www.fws.gov/endangered/what-we-do/hcp-overview.html.

The Habitat Conservation Planning Handbook (December 2016) and a USFWS Memorandum dated April 22, 2020 provide guidance regarding how approved HCPs or new HCPs being developed are integrated with the ESA section 7(a)(2) consultations with other federal agencies. This guidance specifically addresses potential federal agency permit actions within an HCP area for activities where take has been authorized in an ESA section 10 permit.

In summary, the guidance provides the USACE the ability to recognize the pre-existing HCP/ITP and use it to comply with section 7 of the ESA. Whether the USACE has been involved in the development of the HCP or not, there is still a streamlined section 7 process that can occur if the USACE 404 permit application's activities are also covered by the HCP within the HCP plan area, and the effects of to all ESA-listed species and/or critical habitat were analyzed in the USFWS's biological opinion. The streamlined process involves the USACE requesting consultation with the USFWS, describing the proposed activities and asking if those activities are consistent with those covered in the HCP and analyzed in the biological opinion. If so, the USFWS would issue a brief letter to the USACE agreeing that the proposed permit is consistent with the HCP and biological opinion, and that extends the exemption of the prohibition against take to the USACE. However, the streamlined process may not be available if a proposed USACE permit project's actions involve activities, species, or areas that were not covered in the biological opinion associated with the HCP, or the USACE intends to authorize the action in a manner that is inconsistent with biological opinion.

It is FDEP's intent to adopt this guidance for its species coordination process to insure consistent and adequate protections for species and regulatory certainty to the regulated community, satisfying the requirements in Chapters 62-331, and 62-330, F.A.C. After technical assistance with the USFWS to confirm that the activities in the proposed State 404 permit are consistent with the HCP and biological opinion, FDEP will incorporate by reference in the State 404 permit, the terms and conditions contained in the approved HCP or biological opinion. Compliance with the HCP requires project applicants to implement the applicable and

appropriate avoidance and minimization measures, and any other applicable terms and conditions as contained in the HCP. In addition, FDEP and/or FWC may participate in the development of HCPs when staff are available, to help ensure that all State requirements are covered appropriately under the HCP.

## 7.3 State 404 Program Species Coordination Process

The State 404 program, based on Chapter 62-331, F.A.C., requires the analysis for whether effects to listed species and their critical habitats have reasonable potential to occur, and if so, further determines whether those effects are "likely to be an adverse effect", or "not likely to be an adverse effect". If adverse effects/impacts may occur, conditions or measures to avoid and minimize the impacts would be included as permit conditions and implemented by the Permittee. This State 404 program species assessment is modeled after the federal processes for determining, avoiding, and minimizing effects to listed species and ensures compliance with the ESA and the CWA during State 404 permit application review and permit issuance.

The resulting species coordination processes are intended to fulfill the following criteria when reviewing future State 404 permit applications: (1) the scope of the action is adequately described; (2) the physical, chemical, or biotic stressors to species that are likely to be produced as a result of the action is estimated; (3) the adverse effects of such activities on ESA-listed species and designated critical habitat is minimized; (4) applicants participating in permitted activities are informed, encouraged, and screened for potential incidental take exemption eligibility as required by permit issuance; (5) likely adverse effects on listed species and critical habitat are monitored and evaluated; (6) permit compliance is monitored and enforced; and (7) if new information becomes available (including inadequate protection for species or low levels of compliance), the action is re-evaluated and modified if warranted.

The FWC has partnered with FDEP to assist with the coordination of federally listed species reviews, which would take place concurrently with their review of impacts to State-listed species (per Chapters 62-330, F.A.C. and 68A-27, F.A.C.) for the State 404 and ERP programs. The FWC may assist FDEP as the State's species coordination lead to be the point of contact for coordination with the USFWS. FWC may provide information and other preliminary assessment assistance to USFWS as USFWS reviews State 404 permit applications and develops recommendations for FDEP/FWC to avoid and minimize adverse impacts to listed species and their habitats.

### *Key commitments for the species coordination process*

The species coordination process includes a USFWS review of all State 404 permit applications for consistency with the ESA and an EPA review of applications with a reasonable potential to affect ESA-listed species. Key commitments between FDEP, FWC, and the USFWS to ensure a successful species coordination review process include:

- FDEP's processes and procedures to review State 404 applications will be similar to and will utilize the USFWS-approved permitting guidance that is currently used by the USACE, to ensure consistency with CWA and ESA requirements.
- FDEP, FWC, and USFWS will participate in a State 404 program species coordination technical team. This technical team will oversee the species coordination process, including but not limited to: assisting in the transition of 404 permitting by participating in training efforts; providing a process to elevate questions and decision-making to a group with technical expertise, as needed; assist in

refining coordination processes, procedures, and future improvements, as needed, related to State of Florida permitting under Chapter 62-331, F.A.C.

- Prior to assuming 404 permitting, FDEP and FWC permit review staff will be trained in the new State 404 program species coordination procedures and processes. The FDEP, FWC and the USFWS will collaborate on developing the training materials, and the FWC and the USFWS be invited to participate in the in-person and/or virtual training meetings for FDEP permit review staff.
- All State 404 applications will be forwarded to USFWS for review, the majority of which will include FDEP or FWC preliminary determinations for effects to ESA-listed species or species proposed to be listed within a few days of the application provided to the USFWS. These preliminary determinations may include possible effects for species found onsite, potential impacts to critical habitat, and potential protective measures that may address the effects and impacts.
- Technical assistance in individual project-by-project reviews from the USFWS may be accomplished by individual USFWS staff or by USFWS-approved effect determination tools, as described below.
- FDEP will incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the USFWS to avoid jeopardizing listed species and/or adversely modifying designated or proposed critical habitat. In addition, if:

  1) the applicant for a State 404 permit is the holder of a valid and active biological opinion, or Habitat Conservation Plan Incidental Take Permit (HCP/ITP), or a similar binding agreement that is issued by the USFWS and

  2) the species and activities described in the State 404 permit application are covered in the Program assumption BiOp, HCP/ITP (or similar agreement), then no additional avoidance and minimization measures would be required. FDEP would provide the documentation in order for USFWS review the project. If the USFWS concludes that a permit application is likely to jeopardize or adversely modify designated critical habitat and no protection measures are available to reduce the risk to an acceptable level, FDEP will issue a Notice of Intent to Deny the permit.

## 7.4 Application Review

### *State 404 Program Application Review Process*

FDEP will review all submitted applications or additional information provided by the applicant in response to FDEP's request for additional information, for administrative and technical completeness. Upon receipt, submitted applications will be forwarded to all appropriate State and Federal agencies for comment, including FWC and USFWS.FDEP will request any additional information required to publish public notice pursuant to Rule 62-331.060, F.A.C. (administrative completeness), and to determine if the proposed activity meets the conditions for issuance in Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. (technical completeness).

The provisions described in the Applicant's Handbook (Volume I, sections 5.5.3.5 through 5.5.3.7, which govern an applicant's timeframes to respond to requests for additional information) apply to applications for State 404 permits. Once FDEP has determined that an application is administratively complete, FDEP will provide public notice as described in Subsection 62-331.060(2), F.A.C.

Permit applications will not be considered technically complete until the ERP review, if required, is complete. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met. (See Rule 62-331.070, F.A.C., and section 5 of the State 404 Handbook). FDEP may request additional information as necessary during its review of any information it receives during the public comment period, at a public meeting, or during federal review.

#### *Application Timelines*

Pursuant to Rule 62-331.052, F.A.C., FDEP will review the application within 30 days of receipt of an application for a permit, or receipt of any additional information provided by the applicant in response to FDEP's request for additional information, for: 1) administrative and technical completeness; 2) request any additional information required to publish the public notice; and 3) determine if the proposed activity meets the conditions for issuance. The applicant may voluntarily submit a written waiver of the above 30-day timeclock requirement to allow more time for FDEP to determine if additional information is required. However, FDEP is not obligated to accept the waiver or to delay sending the request for additional information. FDEP may request additional information as necessary during its review of any information that FDEP receives during the public comment period, at a public meeting, or during federal review.

Within 10 days of FDEP determining that an application is administratively complete pursuant to subsection 62-331.060(1), F.A.C., FDEP will provide public notice as described in subsection 62-331.060(2), F.A.C. In addition, FDEP will send a copy of the public notice to EPA for those projects that EPA reviews, in accordance with section 5.2.5 of the 404 Handbook. EPA review timelines and potential public meetings are discussed in section 7.4.2.

FDEP will provide public notice within 10 days of the following: 1) FDEP determination that an application for an individual permit or major modification is administratively complete; 2) FDEP notification to a permittee of revocation or suspension of a permit; and 3) issuance of an emergency field authorization. The FDEP shall provide public notice 30 days prior to any scheduled public meeting for such projects.

From date of publication, interested parties may express their views concerning the permit application, modification, revocation, or suspension for a period of 30 days, or 15 days for the projects listed in 62-331.060(b)(3)(b). The public notice comment period shall automatically be extended to the close of any public meeting, if one is held. The presiding officer may also extend the comment period at the public meeting.

### 7.4.1 Technical Assistance with the USFWS

Similar to the USACE Section 404 permit review process, applicants submitting a State 404 permit application will be required to submit information that allows FDEP (and USFWS) to sufficiently assess potential adverse impacts of the proposed project on listed species and their designated critical habitats. To that end, the following information will be required as part of the State 404 application:

- Description of the proposed activity
- Description of the specific areas affected by the activity
- Description of listed species/critical habitat that are present in the area affected by the activity
- Description on the manner in which species may be affected by the activity
- Analysis of any cumulative effects, which are the effects of future State or private activities that are reasonably certain to occur within the project area

- Relevant information (e.g., species surveys, etc.)
- When needed, proposed project designs and proposed conservation measures that would avoid and minimize the expected impacts to listed species and their habitats.

If incomplete, additional information will be requested during the information gathering and review processes and forwarded by FDEP to the FWC and USFWS.

As part of the species coordination process, FDEP will provide copies of all State 404 permit applications to the USFWS and FWC. At the time each application is submitted to USFWS (or within a short period after submittal), FDEP or FWC will include a preliminary determination to the USFWS as to whether listed or proposed to be listed species are expected to be present, and whether the species will be affected. If this preliminary review finds that ESA-listed or proposed to be listed species may be affect, this effect determination from the State to the USFWS will also include a request for USFWS to review the forwarded information and submit questions or recommendations regarding the permit application in order to adequately review the project. In some cases, after all needed information about the application has been received, FDEP or FWC may provide the USFWS with a preliminary protective measures for the USFWS to review or develop the protective measures in coordination with the USFWS.

The State's lead for species coordination may be FWC staff, or the permit processor with FDEP, depending on the complexity of the request and the workload. Regardless of the designated staff to be the point person for coordinating with the USFWS, both State agencies will work together as a team for all projects with listed species issues. For each State 404 permit application review, staff with FWC and FDEP will determine who will take the lead to coordinate with the USFWS and will copy the other reviewer on all correspondence. The State species lead will provide, and/or validate the applicant's submittal of a preliminary list of species anticipated to be affected, identification of project areas, preliminary impact/effect determinations, and preliminary proposed impact avoidance and minimization measures (protection measures) for federally listed and State-listed endangered or threatened species (and species proposed to be listed) and their habitats. Upon coordination with the USFWS on appropriate protection measures for federally listed species, FDEP will incorporate the USFWS-recommended measures as permit conditions, or will issue a Notice of Intent to Deny the permit.

#### *Estimated Species Review Timelines*

Times frames are identified in State regulations (see *Application Timelines* under 7.4 above), however, there are transitional timelines between these timeframes, and they are estimated and described in the steps below.

1) FDEP receives a permit application.

2) Within 3-5 days, FDEP sends a copy to USFWS and FWC. Within a day or two, FWC sends preliminary affected species list and type of effects determination to USFWS.

3) Within 10-15 days of receipt, USFWS may send to FDEP [no longer than 20 days from the date received by FDEP]:

    a) For incomplete or General Permit applications: Provide comment or any questions it has about missing information; or

b) For complete applications: Provide comment or notify FDEP of intent to comment with request for notification of deadline.

4) Within 30 days from receipt, FDEP must request additional information (RAI) from applicant or deem the application complete.

5) After FDEP receives additional info, FDEP has 30 days to review the response and:

   a) Request clarification of answers to the questions; or

   b) Notify applicant their application is complete.

6) During the RAI process, FWC and USFWS determine affected species, affected critical habitats, types of effects, and potential protective measures. These determinations are forwarded to FDEP, preferably before the application is deemed complete.

7) After application is deemed complete, FDEP has 10 days to issue a public notice for applications for individual permits.

8) The public notice is provided to EPA and USFWS.

9) The public notice comment period is 15 days for minor projects and 30 days for more complicated ones.

10) If EPA has waived review, then after the public comment period closes, FDEP has either 60 or 90 days to issue or deny the permit.

11) If EPA reviews the public notice, then the 40 CFR 233.50 regulations and timeframes govern the timeframes and process of permit review.

   a) EPA has 10 days to send a copy of the public notice to USFWS.

   b) USFWS has 15 days to notify EPA it intends to comment

   c) USFWS has 50 days from receipt of public notice from EPA to send comments to EPA

   d) EPA has 90 days to send comments or objection to FDEP. The final decision to comment, object, or to require permit conditions will be made by EPA.

12) Because applications that are deemed as “no effects” by FDEP will not be subject to EPA review, the USFWS will have a shorter amount of time to review and provide FDEP with additional information to consider.

   a) The total time that USFWS will have a permit application that is not subject to EPA review is 15 days to send questions about missing information to FDEP, plus another 15 for FDEP to send that request to the applicant, plus the 20 days FDEP has to let the applicant know the permit is complete, plus 10 days for FDEP to issue the public notice, plus 15-30 days for the public comment period. Therefore, the potential maximum amount of time USFWS would have to review and comment on a permit application that is not subject to EPA review would be approximately 75-90 days, depending on whether the public comment period was 15 days or 30 days. If the application had all the necessary information at the start then the time for USFWS review and comment would be 55-70 days, depending on whether the public comment period was 15 days or 30 days.

b)  Therefore, it will be important for FWC and USFWS to work with FDEP to develop an efficient system to promptly check applications for completeness and their potential to affect listed species to ensure "no effects" are accurate determinations.

### *Identifying applications that may pose adverse impacts*

The FDEP/FWC species coordination and technical assistance with the USFWS may begin before the application's public notice is posted. The USFWS will receive applications prior to FDEP posting a public notice and USFWS may submit information and questions to FDEP prior to FDEP posting a public notice. The public notice will also go to the USFWS, and details regarding the type of effects/impacts to species and their critical habitat as well as proposed protection measures that may have been suggested by USFWS will be included in the public notice. The technical assistance process between the USFWS, FDEP, and FWC will not be considered complete until any modifications are incorporated as a result of the public notice. If needed, technical assistance with the USFWS may continue during and after the public notice period.

Upon receiving an application, FDEP and FWC will review the submittal by the applicant and preliminarily identify the affected species, affected project area, and critical habitats. The species lead is responsible for making a preliminary determination for affected species, affected project area and critical habitats, and assess whether, and what type of, adverse impacts to endangered or threatened species and their critical habitats is expected. The FDEP will forward the application to FWC and the USFWS within three-five days of receipt. The species lead will contact the USFWS and send their preliminary assessments to the USFWS as soon as possible. Response from USFWS are due to FDEP within 20 days of FDEP's receipt of information.

For example, if FDEP received an application on June 1st and forwarded it to USFWS on June 5th, any questions USFWS need to be answered must be relayed through the species coordinator by June 20th. If USFWS has no questions, technical assistance continues. All comment deadlines for USFWS's response will be included in FDEP/FWC request to USFWS.

- If FDEP/FWC does not get a response from the USFWS by the deadline for questions or comments, the lack of a response will be considered a "no comment" and no further information from the USFWS is needed. If the State species coordinator believes that effects may be significant and the lack of response may be in error, they will contact the USFWS asap to confirm. In addition, the USFWS will receive a copy of all public notices and may provide comments to EPA and/or FDEP at that time.

- For the determination of potential affected species, project area or impact/effect on the species, if FDEP/FWC receives a response from USFWS with additional information to consider, the information will be re-evaluated and resubmitted to USFWS, if needed.

- Once it has been determined by FDEP/FWC that an application will have no adverse impacts or adverse effects to federally listed endangered or threatened species (or species proposed to be listed) and the USFWS has not submitted information or questions that would lead the State to reconsider its determination, the species review concludes for that application. If the applicant modifies the project activities or increases the project area as the application is continued to be reviewed, FDEP/FWC/USFWS may re-evaluate the application with this information, if warranted.

- Once it has been determined by FDEP/FWC that an application may cause an adverse impact or adverse effect to federally listed endangered or threatened species (or species proposed to be

listed), technical assistance with USFWS continues in order to determine if, and how, the impacts and effects can be addressed with protection measures.

***Coordination of protective measures with the USFWS***

- For applications determined to have an adverse impact to federally listed or species proposed to be listed, the species coordination lead will forward all available information to the USFWS with a request for additional technical assistance.
- The FDEP/FWC species coordination lead will compile additional information or questions needed to complete the review, including information or questions from the USFWS, to forward to FDEP. These questions and requested information will be incorporated into the FDEP's RAI to the applicant.
- The species coordination lead will coordinate with the USFWS regarding potential protection measures that may offset the anticipated adverse impacts. In some cases, depending upon the project, the USFWS may submit recommendations to FDEP/FWC. In other cases, the species coordination lead will compile a package that presents the proposed protection measures and transmit the package to USFWS for their review and comment.
- After USFWS provides/agrees with recommended protection measures appropriate to offset the expected adverse impacts associated with the proposed project, the protection measures are incorporated into the public notice as proposed permit conditions.
    - If modifications are made during the public comment period that may change the original conclusion, FDEP reviewers will forward this information to FWC and USFWS for further review and comment.
    - If no modifications are made, or if the modifications during the public notice process can be addressed by FDEP/FWC/USFWS, protective measures are incorporated into the permit as special conditions and the species review concludes for that application.
- If the review by FDEP, FWC, and USFWS concludes that adverse impacts are likely to jeopardize the continued existence of a species, or will destroy, or adversely modify critical habitat, either of the following alternatives may occur, depending upon the project:
    - Additional protection measures that will satisfy the requirements of the ESA and avoid jeopardy or adverse modification are developed in coordination with or as recommended by USFWS, FDEP incorporates those measures as permit conditions and processes the permit; or
    - The FDEP issues an "Intent to Deny" the application for a permit.

### 7.4.2 EPA Oversight and Review

In accordance with the FDEP-EPA MOA and governing federal regulations (40 CFR § 233), EPA will retain federal oversight authority on the issuance of State 404 permits, with the ability to review applications, review proposed protection measures/conditions and, if necessary, recommend additional protection measures if deemed prudent and practicable. EPA's federal authority also allows EPA to intervene in the application review process, if needed, where there may be disagreements or issues that need to be resolved. FDEP can also request EPA's assistance in the application review process for the same reasons, if needed.

Pursuant to 40 CFR § 233.51(b)(2), there are specific categories of discharge EPA can waive Federal review of State 404 permit applications. Discharges with reasonable potential for affecting endangered or threatened species, however, are not waived and must be reviewed. For those projects subject to EPA review, FDEP will send a copy of the public notice to EPA, in accordance with section 5.2.5 of the State 404 Handbook (also 40 CFR § 233.50(a)(1)). Under the State 404 program, projects with reasonable potential for affecting listed or proposed to be listed species are the projects that have been determined by FDEP and FWC, in coordination with USFWS, to affect listed species. Details regarding the level of effects to species and their critical habitat as well as proposed protection measures will be included in the public notice.

Within 30 days of receipt of notice, EPA will notify FDEP of the intent to comment upon, object to, or make recommendations with respect to a permit application, draft general permit or FDEP's failure to accept the recommendations of an affected state pursuant to § 233.31(a). Within this time period, EPA may also request information from FDEP if the information provided is inadequate to determine whether the permit application or draft permit meets the requires of the CWA, 40 CFR § 233.50, and the 404(b)(1) Guidelines. EPA may notify FDEP that there is no comment but reserves the right to object within 90 days of receipt, based on any new information brought out by the public during the comment period or at a hearing.

Pursuant to 40 CFR § 233.50(b), EPA will provide a copy of each public notice, each draft general permit, and other information needed for review of the application to the USACE, USFWS, and NMFS, within 10 days of receipt. These agencies will notify the EPA within 15 days of their receipt if they wish to comment on the public notice or draft general permit. Such agencies should submit their evaluation and comments to EPA within 50 days of such receipt. The final decision to comment, object, or to require permit conditions will be made by EPA.

If EPA has given notice to FDEP of the intent to comment, those comments shall be submitted within 90 days of the receipt of the public notice, draft general permit, or FDEP's failure to accept the recommendations of an affected State. An FDEP permit shall not be issued until after the receipt of such comments or 90 days of the EPA's receipt of the public notice, draft general permit, or FDEP's response (§ 233.31(a), whichever comes first. Within 90 days, the EPA will provide a written statement with comments, objections, or recommendations; and the actions that must be taken by FDEP in order to eliminate any objections (see 40 CFR § 233.50(e) for more details). FDEP shall not issue a permit until steps required by EPA to eliminate an objection or incorporate a requirement for a permit condition to a permit application or draft general permit. Within 90 days of FDEP receipt of EPA's comments, EPA may hold a public hearing on the objection or requirement (see 40 CFR § 233.50(g) and (h) for more details).

If no public hearing is held, within 90 days of receipt of EPA's comments, FDEP shall either issue the permit revised to satisfy EPA's objections or notify EPA of its intent to deny the permit. In the event FDEP neither satisfies EPA's objections, requirement for a permit condition, nor denies the permit, EPA shall transfer the permit application to the USACE for processing.

Figure 7-1 Species Coordination Overview



## 7.5    Species Assessments

The structure of the species coordination process discussed in the previous section allows for the determination of effects regulated activities may have on a listed species and/or critical habitat that is consistent with past processes regulated by the CWA and the ESA. It also will identify, through coordination with USFWS, practicable, implementable process for developing protective measures that may avoid or minimize potential adverse impacts of the regulated activity consistent with past consultations under the USACE 404 program.

### 7.5.1    Identifying Project Area and Affected Species

The first step in assessing potential adverse impacts to listed species or those proposed to be listed as endangered or threatened, as well as their habitats, is to define the project area (similar to the "action area" during a federal section 7 consultation). The project area can be larger than the immediate area of activity, since it is an identification of all areas that may affect listed species and their habitats directly or indirectly by the project's activities.

For species within the USFWS's jurisdiction, the USFWS's Information for Planning and Consultation (IPaC) website (https://ecos.fws.gov/ipac/) allows for the user to draw a polygon to represent the project area. The project area must include the proposed project's potential impacts to the affected species and their habitats, even those traditionally considered as offsite, if the impacts would occur as a result of approval of the project. By creating a polygon that is geographically referenced, the system will produce a preliminary list of resources for the area chosen. This list of species and habitats will be considered preliminary, because all potential adverse effects need to be determined (and some species may need to be confirmed by on-site surveys) and verified during the State and Federal species reviews. The result of this online search will also include critical habitats that overlap with the project area. While critical habitat is a special designation under the ESA, during project reviews all occupied habitat within the species range that may be adversely affected will be considered if the project's activity may affect listed species, even that which is not designated as critical habitat under the ESA.

### 7.5.2    Assessments Using Available Federal Decision Tools

Once there is a proposed affected species list, the State's species coordination lead determines (preliminarily or concurrently with the USFWS) whether adverse effects/impacts are likely to occur. The types of impacts that may occur could be beneficial to species and their critical habitat or could adversely impact or adversely affect them. Adverse impacts to species include the potential for harm to members of the species, such as injury, death, or those that occur by loss of feeding, breeding, or sheltering resources due to a project's activities affecting habitat where members of the species exist. Adverse impacts also include the potential for jeopardizing the continued existence of a species, or adversely modifying critical habitat. Adverse effects/impacts, or types of harm to one or more individuals, can result directly from dredging and filling activities involved with construction or demolition proposed by the project, as well as secondary impacts caused by the ongoing operations of the project once constructed. Assessment of adverse cumulative impacts must be considered during the review of State 404 permit applications; the assessment of expected impacts to species that may be caused from a particular project must be considered along with the impacts that may have been caused from past authorized projects, as well as those future projects that are reasonably certain to occur. Adverse impacts to habitats, particularly critical habitats, include alteration or destruction of

the physical and biological characteristics of that habitat. These characteristics are important to the listed species using the area, and harm to species may occur temporarily during construction or permanently during operation or by alteration of the habitat.

For some species, the IPaC system provides Federal species guidelines. These guidelines include General Project Design Guidelines, Habitat Assessment Guidelines, Species Survey Guidelines, Effects Determination (consultation and/or dichotomous) Keys, conservation measures, guidance for determining whether a species 'may be present', proactive management suggestions, Species Assessment Guides (SAGs) or Standard Local Operating Procedures for Endangered Species (SLOPES).

Programmatic consultations, when available, help identify where impacts/effects will occur and whether technical assistance with the USFWS is needed. Some programmatic consultations do not exempt take; rather, they attempt to avoid take through setting project-specific criteria that either determines a project is "not likely to adversely affect" a listed species or critical habitat, or sets avoidance and minimization measures that allow a "not likely to adversely affect" determination to be made. Because these consultation keys and programmatic biological opinions cover many of the species which are most often the subject of ESA section 7 consultations in Florida, they include many useful measures to identify, avoid, or minimize adverse effects to ESA-listed species.

These tools, particularly SLOPES, benefit the species, the USFWS, and the regulated community by:

- Increasing the effect determinations' accuracy and consistency;
- Improving completeness and efficiency in the documentation of the administrative record;
- Decreasing the amount of staff and time needed to complete coordination; and
- Improving ESA-listed species conservation and compliance with the ESA.

These tools also provide a major benefit to the regulated community because they are available to the public and may be used by the applicant during the pre-application and application phases. An applicant is often able to identify any potential effects of the proposed project and be able to consider whether effects could be avoided or minimized before a significant amount of planning resources have been expended.

Lists or links to other biological opinions, including a few additional examples of programmatic biological opinions, can be found on the USFWS Vero Beach Field Office website at https://www.fws.gov/verobeach/Programmatic%20Consultations.html. Additional information and tools can also be found at https://www.fws.gov/northflorida/Tools2Use/consult-landowner-refs.htm. A few examples of these are included in Table 7-1 below.

Table 7-1 Programmatic Consultations and Consultation Keys in Florida, 2010 - 2019

| Name of Consultation | Year Published | Species | Exempts Incidental Take |
|---|---|---|---|
| FEMA National Flood Insurance Program Projects (Florida Keys) | 2014 | American Crocodile | No |
| Eastern Indigo Snake Consultation Key | 2017 | Eastern Indigo Snake | No |
| Florida Bonneted Bat Consultation Key | 2019 | Florida Bonneted Bat | No |

| Name of Consultation | Year Published | Species | Exempts Incidental Take |
|---|---|---|---|
| Florida Panther Effect Determination Key | 2007 | Florida Panther | No |
| Natural Resources Conservation Services Working Lands for Wildlife Program | 2012 | Gopher Tortoise | No |
| Piping Plover Programmatic Biological Opinion | 2013 | Piping Plover | Yes |
| Sand Placement Programmatic Biological Opinion | 2015 | Sea Turtles and Beach Mice | Yes |
| Department of Housing and Urban Development Loan Projects | 2010 | Various | No |
| FEMA Conditional Letters of Map Revision | 2014 | Various | No |
| Clearance to Proceed with Federally Insured Loan and Grant Projects | 2016 | Various | No |
| West Indian Manatee Programmatic Biological Opinion | 2011 | West Indian Manatee | No |
| Guidance to Proceed with Events Authorized by the US Coast Guard | 2016 | West Indian Manatee and Sea Turtles | No |
| Wood Stork Programmatic Key (North and South Florida) | 2010 | Wood Stork | No |

Source: USFWS 2019a

Some types of guidelines are considered decision tools (i.e., SLOPES, dichotomous keys, etc.), and can assist in determining not only whether an impact/effect will likely occur and may also recommend protection measures appropriate for specific species and specific activities. For example, effect determinations for wide-ranging species such as the Eastern Indigo Snake rely on whether an individual was detected on site and the size of the habitat loss. The Wood Stork determination key is also used extensively and has had some success. As stated in chapter 4.2.2., the Eastern Indigo Snake and Wood Stork accounted for 56.6 percent of all species-level consultations in Florida between 2014 and 2018. Species guidelines, or decision guidance tools, are also available independently from the IPaC system on the USFWS website.

These types of tools provide consistent criteria to reach impact/effect determinations and will be used by the State's species coordination lead to facilitate the USFWS's review. The review process for species with these types of decision tools will likely be slightly different and simplified compared to those species that do not have these tools. In the beginning of the review of a State 404 permit application, the State's species lead will use these decision tools to arrive at impact/effect determinations and potential protection measures. This preliminary review will be submitted to the USFWS with a request for technical assistance, allowing the USFWS to concur with the conclusions, or provide additional information that may change the conclusions. Once the species review outcome is finalized, technical assistance from the USFWS ends for those species and the protection measures are incorporated as conditions to any State 404 permit that is issued.

### 7.5.3   Case by Case Assessments When Tools Are Not Available

For those species or activities that do not have federal species guidelines or decision tools, a case by case assessment must be performed. A preliminary assessment will be performed by the applicant and verified or expanded upon by the FDEP/FWC species coordination lead. Applicants will need to provide all of the information necessary to perform an assessment of potential impacts to listed species and their habitats, as well as submitting proposed protection measures to avoid and minimize the anticipated impacts.

The following factors should be considered when evaluating the impacts/effects of the activity:

- Proximity of the activity to the species and/or designated critical habitat;

- Location and extent of the area of disturbance;

- Timing (with regards to sensitive periods of a species lifecycle);

- Duration of the activity or impact;

- Disturbance frequency, and

- Nature of the effect (elements of a lifecycle, population size, variability, or distribution, physical and biological features of habitat, etc.).

Federal species guidelines, information on IPaC, USFWS specific species webpages, the results of species surveys, (see Table 7.2 below for guidance), relevant scientific literature, species accounts in Appendix B of this document, stressors and effects in Appendix C with discussion in Chapter 5 of this document, and other available sources of information are reviewed to develop preliminary conclusions of impact/effect as well as develop any potential protection measures.

Physical or Biological Features essential to the conservation of the species as identified in the final rules designating critical habitat for specific listed species should be considered to determine whether there may be adverse modification of critical habitat.

Table 7.2 Interpreting the results of species surveys

| Suitable habitat present in the project area? | Species Survey Result | Conclusion | Next Step | Comments |
|---|---|---|---|---|
| No | N/A | Species unlikely to be present | No technical assistance needed. Document conclusion in project record | Consider the potential for the species habitat to become established in the project area before the activity is complete |
| Yes | Species not detected[1] | Species unlikely to be present | – | Review species-specific survey protocols; make sure survey methods and results are sufficient to support conclusion |
| Yes | No survey data or surveys inconclusive | Species unlikely to be present until new information shows it exists | Review potential impacts/effects to critical habitats | |
| Yes | Positive survey data | Species is present | | |

[1] Within species range and preferred habitat type

The species coordination lead will use the information from the applicant and assess all the data available to them to determine if there will be impacts to any listed species and the severity of adverse impacts to each species and habitats present in the project area. For projects with large amounts of acreage or that are intensive in the amount of activities proposed, or with multiple species and critical habitats, a written assessment determining preliminary anticipated adverse impacts and protection measures to avoid and minimize those impacts would be developed. This preliminary review will be submitted to the USFWS with a request for technical assistance or would be developed in coordination with the USFWS. The USFWS would agree with the conclusions and recommended protection measures or provide additional information that may change the conclusions and protective measures. Once the species coordination review and technical assistance with the USFWS is completed, the species coordination process with the USFWS ends for those species and the protection measures are incorporated as conditions to any State 404 permit that is issued. At any time during the review of State 404 permit applications, if modifications to the project are proposed after the species coordination process, the species review will be revisited with the USFWS. If modification occurs after the application is granted, and the modification causes effects not previously considered by USFWS, the applicant may be liable for any take under section 9 of the ESA.

## 7.6 Impact/Affect Determinations and Protective Measures

The word "impact" used in Chapters 62-330 and 62-331, F.A.C. describes effects similar to "may affect" and "adverse effects" under ESA. Throughout this document, these terms are used interchangeably. The State 404 program has two standards of review regarding the protection of listed species: the species protections required under CWA and ESA, and the species protections required under State Chapters 62-330, and 62-331, F.A.C. Under State rules, the requirements of CWA and ESA are incorporated into the species review process for adverse impacts to listed species and their habitats. The State rules are broad; the ERP rule and State 404 program rule protect not only federally listed and State-listed species, but all fish and wildlife in Florida.

While the State 404 program has been developed to meet the requirements of CWA and ESA, it also relies on the requirements of the existing State ERP program. The ERP program requires the applicant to provide reasonable assurances that the proposed activities will not damage or harm the water resources of the State nor reduce the value of wetland functions including functions provided to fish, wildlife and listed species. A state or federally listed species' ability to nest or den cannot be interrupted by negative impacts to the uplands or wetlands a listed species uses. Subsection 62-330.301(1)(d), F.A.C. requires an applicant provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment "will <u>not adversely impact</u> the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters" to obtain approval for a permit. This review also includes consideration for secondary and cumulative impacts.

There is case law that has defined the terms "adversely impact" regarding listed species that should be considered while reviewing State 404 program and ERP program applications (*Metro. Dade County v. Coscan Florida*, 609 *So. 2d 644, 649-50 (Fla. Dist. Ct. App. 1992).* The Florida District Court of Appeals overruled the recommended order from the administrative hearing, finding that the hearing officer ruled under the federal standard rather than the Florida standard. The federal standard is stated as "whether the project would jeopardize the continued existence of an endangered species", whereas the Florida standard is stated as "whether the project would adversely impact" an endangered species. According to the District Court, any impacts that adversely affect a species should be considered (and addressed if warranted), regardless of whether those impacts result in jeopardizing the continued existence of the entire species. Therefore, under Florida law, the standards for addressing adverse impacts/effects to listed species includes not only a prohibition of issuing permits that may jeopardize the continued existence of the species, but it also includes a requirement to identify and address adverse impacts to ESA-listed species.

Protection measures are defined as those avoidance and minimization measures to address adverse impacts to listed species and critical habitat. Protection measures, in the form of avoidance and minimization measures recommended by the USFWS, are incorporated as conditions to the State 404 permit. Examples of protection measures include but are not limited to project design changes and operational restrictions for the protection of species (i.e., seasonal restrictions for construction work).

For the purposes of the affected species list for this BA, anticipated stressors are outlined in Table C.1.a and anticipated effect determinations are noted in Table C.1.b in Appendix C. During future reviews of State 404 permit applications, however, all potential impacts and effects to species and their habitat will be assessed and addressed during project by project permit application reviews.

### 7.6.1 Impact and Affect Determinations

When decision tools are not available, the determination of whether a project's activities will affect endangered or threatened species is preliminarily made by FDEP and FWC, and confirmed with USFWS during the technical assistance process. Information about a species should be cross-referenced with knowledge of the project's activities and the project area to help predict whether and how the species at any life stage will respond when exposed to the effects of the activities. Based on best available data, if any of the following occurs it will be determined that the project will adversely impact/effect the species and technical assistance with the USFWS to determine possible protective measures is required. The following statements can be used as guidance for the determination of "may adversely impact":

- Data indicate the species may be exposed to the elements of the activity and respond deleteriously upon exposure to elements of the activity or to stressors produced by the activity; or
- Data indicate the proposed activity will cause changes to the physical and biological features of critical habitat and produces exposure or stressor to species.

As the species coordination process progresses during the review of a State 404 permit application, proposed activities will be assessed for potential effects to species. The USFWS will confirm whether adverse impacts are anticipated to occur, and how significant the impacts are expected to affect the species or critical habitats. These determinations can be categorized as follows:

- No Effect/No Impact
- Not Likely to Adversely Affect/Impact
- Likely to Adversely Affect/Impact
- Jeopardizes the Continued Existence of the Species, and/or Destroys or Adversely Modifies Critical Habitat

#### *No Effect/No Impact*

If physical or biological features essential to the conservation of the species are not present or are present but will not be affected in the project area, then no further review of effects/impacts to critical habitats is required. In addition, a determination of "No Effect/No Impact" would be made if listed species do not occur and do not have the potential to occur on a site. If neither the species nor the critical habitat will respond in any manner, no further review of adverse impacts to species is required and technical assistance with the USFWS is concluded.

#### *Not Likely to Adversely Affect/Impact*

This determination is reached when there is reasonable certainty that a proposed activity may affect a species or designated critical habitat, but the effect is not anticipated to cause harm to a member of the species, nor cause adverse impacts to critical habitat that would result in harm to a listed species dependent on that habitat. The impact expected may not require protective measures (if discountable, or insignificant) or it may be deemed as not likely to adversely affect via required protective measures to avoid and minimize the effects.

#### *Likely to Adversely Affect/Impact*

This determination is reached when there is reasonable certainty that a proposed activity may adversely affect a species or designated critical habitat, and the effect is anticipated to cause harm to a member of the species and/or cause adverse impacts to critical habitat that would result in harm to a listed species dependent on that habitat. Harm to an individual(s) means injury or death. The level of harm, however, may not result in jeopardizing the continued existence of the species or destroying or adversely modifying critical habitat. The adverse impact expected is likely to require protective measures to avoid and minimize the effects.

#### *Jeopardizes the Continued Existing of the Species and/or Destroys or Adversely Modifies Critical Habitat*

The State 404 program rule includes stipulations (Rules 62-331.053(3)(a)4, 62-331.201(3)(k), and 62-331-248(3)(k) F.A.C. that prohibit issuance of a permit that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by USFWS. Through technical assistance with the USFWS, the FDEP and FWC will be informed of when a proposed project and its activities is anticipated to jeopardize the continued existence of the species, or if critical habitat is destroyed, or adversely modified. Under these circumstances, the FDEP, FWC, USFWS and the applicant will discuss to determine what, if any, protective measures may be appropriate.

It should be noted that the continued existence of a species could still be in question even without anticipated harm to individuals, but if there were harm to the resources the species depend on. An example would be a project site that includes pines trees that are 70-90 years old, and a listed species has been verified as being onsite with habitat requirements for that age of pine tree. The applicant proposes to cut all the trees before they reach the age of 70 or just after they reach the age of 90. The applicant's proposed protection measures only includes making sure no species are present in each tree before they are cut down. This project area would leave only pine trees younger than 70 years old. If this activity was taken across the entire range of the listed species onsite, it could jeopardize the existence of the species without directly or indirectly taking (as defined by ESA section 9) individual members of the species.

### 7.6.2 Developing and Ensuring Protective Measures

After the determination of "may adversely effect/impact" and the level of adverse impact, the species coordination process continues between the State species coordination lead and the USFWS during the review of a State 404 permit application. In order to move towards authorization of an activity, the project's adverse effects/impacts to species and habitat that have been identified must be avoided and minimized by implementing protective measures. Those protective measures may likely either modify the project design, modify the project operation, or follow species-specific protective measures. Early in the review process, the species lead will draft and compile the applicant's information as well as their own assessment and forward to the USFWS for review. The assessment may also be done in coordination with the USFWS, depending upon the project. The USFWS may agree with the proposed preliminary impact review and proposed protection measures, and the finalized assessment and recommendations will be provided to the applicant in the form of comments and draft permit conditions. The USFWS may also recommend additional avoidance and minimization measures, provide recommendations for appropriate permit conditions if none were proposed in the informational package sent to them, or state that the proposed measures are not adequate.

Some of the federal species guidelines discussed in the previous subsection of this chapter provide minimization measures that are considered standard conditions for adverse effects associated with common, minor activities. For other species, there are typical minimization measures for common activities that are frequently incorporated into permits as standard conditions that may not be associated with programmatic guidance but can be found in biological opinions. Some projects, particularly those with a greater level of adverse impacts or multiple activities and/or multiple species that may be affected, have a need for a more comprehensive assessment and intensive coordination with USFWS.

In addition to species-specific protective measures, thorough assessments of adverse impacts to habitat must be performed in order to ensure alterations to habitat do not adversely affect listed species. There are various methods for avoiding and minimizing effects of dredge and fill activities within wetlands. Some impacts can be avoided or minimized through BMPs (e.g., silt fences, turbidity curtains, containing dredge materials during dewatering, transfer and storage), while others require administrative restrictions or permit conditions (e.g., contractor education, not refueling equipment within 100 feet of wetlands) to protect wetlands, waters, or "at-risk" species. A major administrative control that compensates for wetland destruction is wetland mitigation. Wetland mitigation includes the enhancement, restoration, establishment, and/or preservation of wetlands that serve to offset unavoidable impacts on wetlands (FDEP 2019b). Governments and agencies have used this policy across North America with notable levels of success (NAWCCC 2000). The species coordination process will avoid and minimize adverse impacts to habitat when practicable.

In addition, FDEP intends to incorporate adaptive management into the State 404 process as needed, particularly as it pertains to wetland compensatory mitigation projects. Per the FDEP's State 404 handbook, wetland compensatory mitigation projects that cannot be constructed in accordance with the approved mitigation plans will require FDEP approval prior to any significant modifications. Wetland compensatory mitigation projects not progressing toward meeting their performance standards will be evaluated for measures to address deficiencies and a determination as to whether these modifications will result in the project meeting its original ecological objectives. These modifications/measures may include but are not limited to site modifications, design changes, revisions to maintenance requirements, and revised monitoring requirements. The measures shall be designed to ensure that the modified compensatory mitigation project provides aquatic resource functions comparable to those described in the mitigation plan objectives. Performance standards will be revised to address deficiencies in wetland compensatory mitigation projects and to reflect changes in management strategies and objectives if the new standards provide for ecological benefits that are comparable or superior to the approved compensatory mitigation project. No other revisions to performance standards shall be allowed except in the case of natural disasters.

### *Best Management Practices for Wetland Protection*

BMPs, including schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of WOTUS from discharges of dredged or fill material, will be implemented for all projects under the State 404 program. BMPs include methods, measures, practices, or design and performance standards which facilitate compliance with the Section 404(b)(1) Guidelines (40 CFR § 230), effluent limitations or prohibitions under Section 307(a), and applicable water quality standards.

Wetland mitigation measures included in a Section 404 application may also offset effects or result in longer-term beneficial effects to ESA-listed species; however, they are part of the wetland protection process of the State 404 and ERP processes and not a requirement of the ESA coordination.

### *Protective Measures for Plants and Animals*

In Florida, fifty-four (54) plant species are on the federal list of endangered species and 14 are on the federal list of threatened species. The ESA (16 USC § 1531) provides protection to both endangered and threatened plants and animals. The ESA, however, does not prohibit the destruction, damage or transplantation of protected plants unless such activities involve an endangered species on federal land or if the activities occur in violation of state laws. If a person wishes to develop private land, with no federal jurisdiction involved, and if the proposal is in accordance with state law, then the potential destruction, damage, or movement of endangered or threatened plants does not violate ESA. Further, a section 10 ESA incidental take permit is only needed in situations where a non-federal project is likely to result in "take" of a listed species of fish or wildlife; there is no such process for plants.

But while incidental take does not apply to plants, an assessment of jeopardy and adverse modification to critical habitat under section 7(a)(2) applies to plants. For the State 404 program, 40 CFR § 233.51(2), and 40 CFR § 233.20(a) would prohibit issuance of a State 404 permit that will jeopardize a plant species or adversely modify its critical habitat. FDEP will incorporate any reasonable and prudent measures and terms and conditions provided by the USFWS into permit conditions for a State 404 permit for such a project.

Endangered, threatened and commercially exploited plant species in Florida are regulated by the Florida Department of Agriculture and Consumer Services, by their Division of Plant Industry. Florida's State ERP program under Chapter 62-330, F.A.C. and the State 404 program under Chapter 62-331, F.A.C. include plants in the definition of endangered and threatened species, which requires consideration of adverse impacts resulting from activities authorized under these programs. During the permit review process for each type of permit, FDEP will evaluate potential impacts and effects to listed plant species. This evaluation may include a request to the USFWS for recommendations to avoid and reduce anticipated impacts. For those types of projects where jeopardy is not expected to occur and no adverse modification to critical habitat is expected, some projects may still need protective measures incorporated as permit conditions in order to adequately conserve endangered and threatened plant species.

The State 404 program, the State ERP program, and the ESA provide protection to both endangered and threatened plants and animals. As with animals, there could be a situation in which a federally listed plant is located in the upland portion of the project area that is adjacent to assumable waters and would be affected by the permit. As discussed in subsection 3.1., the State 404 program is required to consider adverse impacts in uplands that would not occur except for the authorization of the proposed activity. In addition, while the State 404 program does not have jurisdiction in isolated wetlands, the ERP program does have jurisdiction and can address adverse impacts to animal and plant species dependent on these wetlands.

***Ensuring Protection for Endangered and Threatened Species in Florida***

The State of Florida is required to incorporate all USFWS recommendations for protection measures as State 404 program permit conditions (Subsection 62-331.054(1), F.A.C.). The existing working relationship and coordination during the review of projects would continue between the FDEP and the USACE. The FDEP will add fields in their permitting tracking database that will continue the collection of data done by the USACE for past Section 404 permits. This data will continue the monitoring of adverse effects on listed species and critical habitat, facilitating the State's ability to do compliance.

In the current ERP program, FWC provides recommendations to FDEP and the WMDs for State-listed species and some federally listed species, such as manatees and sea turtles. FWC has offered to assist FDEP in the State 404 program review for impacts to federally listed species, and the current collaboration between FDEP and FWC will be enhanced by the Assumption. FWC and the USFWS have a long-standing partnership and a current ESA section 6 Cooperative Agreement for conserving Florida's federally endangered and threatened wildlife. This relationship between FWC and USFWS will bring an existing level of cooperation, knowledge, and expertise to the State 404 program. In addition, FDEP, FWC and USFWS have entered into a Memorandum of Understanding to identify commitments, roles and responsibilities regarding species coordination for the State 404 program as well as the ERP program.

The State 404 program species coordination process involves the applicant, FDEP, FWC and USFWS, and encourages compliance by the applicant to avoid and minimize adverse effects, reducing the expected impacts to listed species and their habitats. The interactions between agencies and the applicant will inform applicants of the importance of this process in order to be eligible for authorization of their proposed activities and in order to ensure compliance with the ESA.

#### 7.6.3 Statements of Adverse Impact in Public Notices

While many adverse effects can be avoided and minimized during the species coordination review process, impacts that are likely to adversely affect a species (e.g. likely to cause incidental take or jeopardy) or critical habitat (e.g. destroy or adversely modify critical habitat) must be recorded, monitored, provided to the USFWS for tracking and species conservation purposes. These types of projects will receive the most stringent review and be documented in the Public Notice as well as the FDEP database and project file.

The public notice, required by Rule 62-331.060, F.A.C., will include an effect determination statement and include the proposed protection measures, if known at the time of publication. The effect determinations statements for species may include one of the following: "No Effect/Impact", "Not Likely to Adversely Affect/Impact", "Likely to Adversely Affect/Impact", or "Jeopardizes the Continued Existence of the Species" for endangered or threatened species or species proposed to be listed. The effect determination statements for critical habitat may include one of the following: "Destroys Critical Habitat" or "Adversely Modifies Critical Habitat" for designated critical habitat or habitat proposed to be designated as critical.

The USFWS will receive copies of all applications when submitted, including those FDEP/FWC has preliminarily determined as "No Effect/No Impact". If the USFWS elected to not respond to these types of applications upon first submittal, they will still receive public notices for these applications and may elect to comment at that time. Receiving public notices for all applications also provides an opportunity for the USFWS to re-review all of the effect determinations made by the State and provide oversight of the species coordination process. Along with the public notice, the USFWS will receive copies of all applications and

supplemental information submitted for applications required to be publicly noticed, with all stated effect or no effect determinations.

With the public notice, EPA will receive copies of all applications with a determination other than “No Effect/Impact”. This provides an opportunity for the EPA to monitor the effectiveness of the species coordination process and to provide oversight for CWA and ESA compliance.

#### 7.6.4 Dispute Resolution between FDEP and USFWS and USFWS-EPA Coordination

To be clear, as stated elsewhere in this BA, State 404 permits (as with USACE 404 permits) must comply with Section 404(b)(1) guidelines which include a stipulation that "Where consultation with the Secretary of the Interior occurs under section 7 of the Endangered Species Act, the conclusions of the Secretary concerning the impact(s) of the discharge on threatened and endangered species and their habitat shall be considered final" (per 40 CFR § 230.30(c). Furthermore, per the State 404 Chapter 62-331, F.A.C. and CWA 404(g) and 404(b)(1) guidelines: 404 permits may not be issued if doing so jeopardizes the continued existence of species of plants and animals listed as endangered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of a designated critical habitat.

For permits that would result in injury or harm to individuals of a listed species but whose impacts would not jeopardize the continued existence of the species or cause adverse modifications to critical habitat, FDEP shall incorporate USFWS-recommended protection measures as permit conditions to fulfill compliance with the anticipated Program assumption BiOp and for any subsequent anticipated incidental take to be exempted from the prohibitions of section 9.

In the event FDEP questions or disagrees with a local USFWS office about the necessity of project-specific, species-specific USFWS-recommended protection measures being added as permit conditions for the purpose of either 1) avoiding jeopardy to a ESA-listed species or adverse modification of critical habitat; or 2) for the purpose of mimiizing incidental take to fish and wildlife, the following steps would guide the resolution process.

1. If there is a dispute that occurs between FDEP and USFWS <u>prior</u> to FDEP issuing a public notice for a permit application, the dispute resolution process will only involve the State (FDEP and FWC) and the State-level USFWS Ecological Services (ES) office. The processes detailed in the 2020 FDEP, FWC, USFWS Endangered Species Coordination Memorandum of Understanding will be followed and the Florida 404 Endangered Species technical team composed of FDEP, FWC, and USFWS staff and decision-makers will assist in resolving any local disputes. The EPA will not be involved at this stage but may later be involved should it receive a copy of the public notice from FDEP. EPA would then coordinate with FDEP, the USFWS, NMFS, and USACE per the EPA’s federal oversight regulations pertaining to state 404 permits (40 CFR 233.50). In the highly <u>unlikely</u> event the dispute is not resolved between FDEP and USFWS prior to the state’s deadline for issuing a public notice and the USFWS has not settled on a final conclusion (e.g., USFWS local office’s recommendations are being reviewed by higher levels within USFWS),, FDEP will prepare a public notice that reflects FDEP's position and submit that public notice to EPA (per EPA's regulations governing federal oversight of State 404 permits - 40 CFR § 233.50) along with a transmittal letter to EPA that succinctly presents the relevant facts, FDEP's position, and conveys that the USFWS is formulating its final comments/position.

2. Per 40 CFR § 233.50, EPA will then transmit FDEP's public notice to USFWS within 10 days of receipt. USFWS will notify EPA within 15 days of receipt on whether it will submit comments. USFWS will have 50 days from receipt to provide comments to EPA. EPA shall make final decisions to comment, object or to require permit conditions (per 40 CFR 233.50) and shall consider USFWS conclusions concerning impacts to ESA-listed species to be final (per CFR 230.30(c). FDEP or any interested person can ask EPA to hold a public hearing on EPA's objection or required permit conditions. At any point and whether or not EPA has a public hearing, FDEP may accept EPA's conditions and issue the permit, deny the permit, or notify EPA that it is neither issuing or denying the permit. In the latter case, EPA would transfer the permit application to the Corps for processing (per 40 CFR § 233.50).

# 8. Conclusions

This BA evaluates the effects of the potential approval by EPA for the State of Florida assuming Section 404 of the CWA on listed species in present time, and estimates effects into the future. All species that are currently listed, proposed to be listed or might be listed in the future are discussed, with evaluations of effects on respective guilds. This review helps evaluate the effects of the State 404 program on any species that are currently listed or may become listed in the future.

This BA analyzes a total of 235 plant and animal species in the State of Florida that are federally listed as endangered (95), threatened (44), or is ESA-considered. Species that must be addressed pursuant to Section 7 of the ESA, Section 404 of the CWA and Chapter 62-331, F.A.C. for the State 404 program, are federally listed species or species proposed to be listed under the ESA (a total of 141 species). If these listed species have designated critical habitats, or critical habitats proposed to be listed, the adverse effects and impacts to those habitats must also be analyzed and addressed under the State 404 program.

If approved, the State’s Assumption of the dredge and fill permitting program under Section 404 of the CWA for waters assumable by the State would be implemented by processes and procedures described in state regulations (Chapters 62-330, and 62-331, F.A.C.), MOAs with EPA and USACE, and an MOU with the FWC and the USFWS. Should EPA request formal consultation with USFWS at the time of EPA’s review of whether to approve Assumption of the State 404 program, USFWS may issue a Program assumption BiOp. The opinion may include conditions that guide implementation of the State 404 program. If the USFWS determines that the Action is not likely to jeopardize the continued existence of ESA-listed species and is not likely to destroy or adversely modify designated critical habitat, the Program assumption BiOp may also include an ITS with reasonable and prudent measures and terms and conditions that must be complied with during the implementation of the State 404 program.

In implementing the State 404 program, FDEP will request technical assistance from the USFWS in order to address federally listed species and critical habitat issues. This coordination is to ensure that any permit issued by FDEP is not likely to jeopardize the continued existence of any listed species or adversely modify or destroy designated critical habitat (pursuant to 40 CFR § 233.20(a)). As such, FDEP will consider all information provided by USFWS and will include all species protection measures recommended by USFWS as conditions to the State 404 permit.

If Section 404 of the CWA is assumed by the State of Florida, it will allow the State to assess and regulate all activities that will occur in assumed waters, integrating protections that were previously regulated by two

different programs. Chapter 62-331, F.A.C., by referencing much of the existing State ERP Chapter 62-330, F.A.C., will facilitate the State's implementation of the CWA requirements and provide a more comprehensive approach to the protection of WOTUS and Florida's habitats and species.

The State 404 program is designed to provide equivalent conservation of ESA-listed species as the currently operating USACE Section 404 program. The ability of the State of Florida to process applications with permitting authority equivalent to Section 404 of the CWA in conjunction with the State ERP program allows for addressing potential adverse effects to both federally listed or State-listed species more comprehensively, consistently and efficiently. Conservation strategies for some species will benefit multiple species that share the same habitat. Some State-listed species are also proposed to be federally listed and assessing the expected adverse impacts from proposed projects for all listed species at the same time is likely to improve conservation efforts. It is also possible that the Action could improve efficiencies in processing applications as well as enhance the consistency of decision making, resulting in greater predictability to both the regulated and the conservation communities.

Florida's State ERP program is jointly implemented by FDEP, the WMDs and certain local governments delegated by FDEP. At this time, the administration and implementation of the State 404 program is limited to the FDEP. It is anticipated, however, that the State 404 program may be delegated to the WMDs by FDEP in the future. If this is considered, approval from the EPA will be required prior to implementation. Upon approval, these agencies' will be provided training and will be required to follow the same procedures outlined for the State 404 program.

### *Effect of the Action on Tribal Resources or Interests*

Consultations on permit actions taking place on waters in Indian Country would continue to be conducted by the USACE, as they are at present. The Section 404 Assumption rules include a procedure to offer an opportunity for tribal comment by the Seminole Tribe of Florida and the Miccosukee Tribe of Indians of Florida on any applications within a buffer zone around these lands.

A public notice will be sent to the Seminole Tribe of Florida Environmental Resource Management Department for any activity that is within six miles of the Seminole Tribe of Florida's Big Cypress or Brighton Reservations; within two miles of the Seminole Tribe of Florida's Immokalee, Lakeland, or Fort Pierce Reservations; within one mile of the Seminole Tribe of Florida's Tampa, Coconut Creek, or Hollywood Reservations; within the Seminole Tribe's reserved rights areas, including but not limited to: within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A.

A public notice will be sent to the Miccosukee Tribe of Indians of Florida for any activity that is within two miles of the Miccosukee Federal Reservation; Miccosukee Reserve Area; Krome Avenue, Dade Corners, Cherry Ranch, or Sherrod Ranch Reservations; and Coral Way, Lambick, or Sema Trust Properties. Also, for any activity within the Miccosukee Tribe's reserved rights areas, including but not limited to: within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A. With these provisions, no substantial difference in effects on tribal resources would be expected under the Action.

### *Uncertainty Associated with the Effects Determination*

The precise locations and types of activities included in future permit applications are unknown at this time. It is assumed that overall, the future number and/or any rate of increase for State 404 applications and the

general types of activities and overall dredge or fill quantities will be similar to those permitted in similar jurisdictional waters as past requests for permits by the USACE, and would not change due to an approval of the State's request for Assumption. The number of applications and the total quantities may vary over time and with economic fluctuations and would be greatest in areas of rapid growth where the number of proposed projects tends to be high. However, over shorter timeframes, one or a few large projects (for example, a major infrastructure initiative) can result in a concentration of proposed impacts in a given area or a given set of habitat types, with effects on one or a few species. Not all individual project proposals are known or can be anticipated in advance.

Other uncertainties can include the introduction of new invasive species, the spread of new pathogens, or other biotic or abiotic factors that can affect ESA-listed species or populations. For example, chytrid fungus and white-nose syndrome have contributed to the loss of populations of amphibians and bats, respectively, in recent years. Unexpected changes in the status of an ESA-listed species can lead to the increased importance of future project-level decisions, which under baseline conditions would have little effect on the species. Similarly, recovery of species can lead to increased resilience and, ultimately, in some cases, to delisting. If there are uncertainties, FDEP will work closely with the USFWS on a project by project basis to address those uncertainties and any impacts to ESA-listed species or their critical habitat to ensure effects are avoided and minimized.

### *Conclusions*

Historical Section 404 permitting by the USACE resulted in issuance of permits for one or more projects that adversely affected one or more listed species and their critical habitats. The USACE Section 404 process, in accordance with section 7 of the ESA, employed various conservation measures to avoid and minimize adverse effects. And similar to the USACE 404 program, the State 404 program may result in permitting the discharge of dredged or fill material that may adversely affect one or more ESA-listed species and designated critical habitats. While State 404 permits can potentially have significant adverse effects on the aquatic environment and ESA-listed species, many effects can be avoided and minimized during the technical assistance process between FDEP and the USFWS, as demonstrated in the past through the USACE Section 404 review and permitting processes.

It is anticipated that with technical assistance to be set in place by a USFWS Program assumption biological opinion, Chapter 62-331 F.A.C., and Memorandums of Agreement provided in FDEP's Assumption application package, the Action will result in procedural and substantive protections that are at least as protective as the protections afforded by the USACE Section 404 program and through section 7 consultation with the USACE under the ESA. The State 404 program is prohibited from issuing a permit that would jeopardize the continued existence of a species or adversely modify designated critical habitats because of the prohibition in the 404(b) Guidelines. The State's Assumption of CWA Section 404 permit program is not expected to result in significant changes from the number, type, or location of permit applications and proposed projects typically issued by the USACE. This BA is provided to assist in the review of potential effects to ESA-listed endangered and threatened species anticipated with the State of Florida's request for the Assumption of Section 404 of the CWA.

# 9. Literature Cited

16 United States Code (USC) Chapter 35, Sections 1531, 1532, and 1536. The Endangered Species Act of 1973.

18 United States Code (USC) Chapter 53, Section 1151. Indian Country Defined.

33 Code of Federal Regulations (CFR) Part 322. Permits for Structures or Work in or Affecting Navigable Waters of the United States.

40 Code of Federal Regulations (CFR) Part 232 and 233. 404 State Program Regulations.

50 Code of Federal Regulations (CFR) Part 402. Interagency Cooperation-Endangered Species Act of 1973, As Amended.

1000 Friends of Florida, University of Florida Geoplan Center, and Florida Department of Agriculture and Consumer Services. 2017. A Special Report – What is Your Vision for Florida's Future? Florida 2070 and Water 2070 Joint Project. https://1000friendsofflorida.org/florida2070/ (01/15/2020).

Abiy, A. Z., A. M. Melesse, W. Abtew, and D. Whitman. 2019. Rainfall trend and variability in Southeast Florida: Implications for freshwater availability in the Everglades. *PLOS ONE* **14**(2): e0212008.

Baumberger, R. E. 2008. The impacts of harmful algal blooms on a Florida reef fish community. Master's thesis. Florida Atlantic University, Boca Raton, Florida, USA. https://fau.digital.flvc.org/islandora/object/fau%3A2853/datastream/OBJ/view/impacts_of_harmful_algal_blooms_on_a_Florida_reef_fish_community.pdf.

Benscoter, A. M., J. S. Reece, R. F. Noss, L.A. Brandt, F. J. Mazzotti, et al. 2013. Threatened and endangered subspecies with vulnerable ecological traits also have high susceptibility to sea level rise and habitat fragmentation. *PLOS ONE* **8**(8): e70647.

Dahl, T. E. 2005. Status and trends of wetland sin the conterminous United States 1998 to 2004. U.S. Fish and Wildlife Service, Fisheries and habitat Conservation, Washington, District of Columbia, USA.

Dahl, T. E. 2011. Status and trends of wetlands in the conterminous United States 2004-2009. U.S. Department of the Interior, Fish and Wildlife Service, Washington, District of Columbia, USA.

Fernald, E. A., and E. D. Purdum. 1998. *Water resources atlas of Florida*. Institute of Science and Public Affairs, Florida State University, Tallahassee, Florida, USA.

Florida Administrative Code (FAC) Chapter 62-330. Environmental Resource Permitting.

Florida Administrative Code (FAC) Chapter 62-331. State 404 program.

Florida Administrative Code (FAC) Chapter 68A-27. Rules Relating to Endangered or Threatened Species.

Florida Department of Environmental Protection (FDEP). 2019b. Wetlands Mitigation. Available online at: https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/mitigation. Accessed January 27, 2020.

Florida Department of Environmental Protection (FDEP). 2020a. State 404 program applicant's handbook. FDEP. Version 02/11/2020. https://floridadep.gov/water/water/content/water-resource-management-rules-development. (02/24/2020).

Florida Department of Environmental Protection (FDEP). 2020b. Water Quality Standards. FDEP. floridadep.gov/DEAR/Water-Quality-Standards. (02/16/2020).

Florida Fish and Wildlife Conservation Commission (FWS). 2016. Florida's Imperiled Species Management Plan. November 2016, with amendments incorporated December 2018. Tallahassee.

Florida Fish and Wildlife Conservation Commission (FWC). 2018. Florida's endangered and threatened species. Updated December 2018. FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2019. Florida's Wildlife Legacy Initiative: Florida's State Wildlife Action Plan. Tallahassee, Florida, USA.

Florida Natural Areas Inventory (FNAI). 2010. Guide to the natural communities of Florida. 2010 edition. Tallahassee, Florida, USA. http://fnai.org/PDF/FNAI-Natural-Community-ClassificationGuide-2010_20150218.pdf. (02/24/2020).

Florida Statutes (F.S.) Chapter 373. Water Resources.

Hefner, J. M. 1986. Wetlands of Florida, 1950s to 1970s. Pp. 23-31 *in:* E. D. Estevez, J. Miller, J. Morris, and R. Hamman (eds.), *Managing Cumulative Effects in Florida Wetlands*. New College Environmental Studies program Publication No. 37. Omnipress, Madison, Wisconsin, USA.

Hefner, J. M., B. O. Wilen, T. E. Dahl, and W. E. Frayer. 1994. Southeast wetlands; status and trends, mid-1970's to mid-1980's. Department of Interior, Fish and Wildlife Service, Atlanta, Georgia, USA.

Holt, L. 2005. Avoiding a water crisis in Florida: how should water resources be managed in response to growth? *Florida Water Resources Journal* (October):16-22.

Makepeace, D. K., D. W. Smith, and S. J. Stanley. 1995. Urban stormwater quality: summary of contaminant data. *Critical Reviews in Environmental Science and Technology* **25**:93-139.

Mendelsohn, R., K. Emauel, S. Chonabayshi, and L. Bakkenshen. 2012. The impacts of climate change on global tropical cyclone damage. *Nature Climate Change* **2**: 205-209.

Nagy, R. C., B. G. Lockaby, L. Kalin, and C. Anderson. 2011. Effects of Urbanization on Stream Hydrology and Water Quality: the Florida Gulf Coast. *Hydrological Processes* **26**:2019-2030.

National Marine Fisheries Service (NMFS). 2009. Recovery plan for smalltooth sawfish (*Pristis pectinata*). Prepared by the smalltooth sawfish recovery team for the National Marine Fisheries Service, Silver Spring, Maryland, USA.

National Oceanic and Atmospheric Administration (NOAA) Fisheries. 2020. Smalltooth sawfish. Species directory. https://www.fisheries.noaa.gov/species/smalltooth-sawfish#overview. (01/07/2020).

NatureServe. 2020. NatureServe Explorer: An online encyclopedia of life [web application]. Version 7.1. NatureServe, Arlington, Virginia, USA. http://explorer.natureserve.org/. (01/15/2020).

North American Wetlands Conservation Council (Canada) (NAWCCC). 2000. Wetland Mitigation in Canada. A Framework for Application. No. 2000-1 Available online at: http://nawcc.wetlandnetwork.ca/Wetland%20Mitigation%202000-1.pdf. Accessed January 28, 2020.

Prinos, S. T. 2014. Origins and delineation of saltwater intrusion in the Biscayne Aquifer and changes in the distribution of saltwater in Miami-Dade County, Florida. *Scientific Investigations Report*. doi:10.3133/sir20145025.

U.S. Army Corps of Engineers (USACE). 2019a. Central and Southern Florida (C&SF) project – fact sheet. USACE, Jacksonville District, Jacksonville, Florida, USA. https://www.saj.usace.army.mil/About/Congressional-Fact-Sheets-2019/C-SF-Project-C/. (02/24/2020).

U.S. Army Corps of Engineers (USACE). 2019b. Ecosystem restoration. USACE, Jacksonville District, Jacksonville, Florida, USA. https://www.saj.usace.army.mil/Missions/Environmental/Ecosystem-Restoration/. (02/24/2020).

U.S. Army Corps of Engineers (USACE) and South Florida Water Management District (SFWMD). 2007. Broward County Water Preserve Areas Comprehensive Everglades Restoration Plan (CERP) Final Project Implementation Report and EIS Briefing to the Civil Works Review Board. https://usace.contentdm.oclc.org/digital/collection/p16021coll7/id/5154. (01/27/2020).

U.S. Environmental Protection Agency (USEPA). 2013. ESA biological evaluation for CWA section 316(b) rulemaking. USEPA, Office of Water Engineering and Analysis Division, Washington, District of Columbia, USA.

U. S. Fish and Wildlife Service. 1996. The South Florida ecosystem. South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 1999. South Florida multi-species recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2001. Florida manatee recovery plan, (*Trichechus manatus latirostris*), Third Revision. U.S. Fish and Wildlife Service. Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019a. Consultation guidance - programmatic consultations. USFWS South Florida Ecological Services Field Office, Vero Beach, Florida, USA. https://www.fws.gov/verobeach/Programmatic%20Consultations.html. (02/24/2020).

U.S. Fish and Wildlife Service and National Marine Fisheries Service (USFWS and NMFS). 2014. Endangered Species Act Section 7 consultation, programmatic biological opinion on the U.S. Environmental Protection Agency's issuance and implementation of the final regulations Section 316(b) of the Clean Water Act. USFWS, Endangered Species Program, Division of Environmental Review, Arlington, Virginia, USA; NMFS, Office of Protected Resources, Endangered Species Act, Interagency Cooperation Division, Silver Spring, Maryland, USA.

Vose, R.S., D.R. Easterling, K.E. Kunkel, A.N. LeGrande, and M.F. Wehner, 2017: Temperature changes in the United States. In: *Climate Science Special Report: Fourth National Climate Assessment, Volume I* [Wuebbles, D.J., D.W. Fahey, K.A. Hibbard, D.J. Dokken, B.C. Stewart, and T.K. Maycock (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, pp. 185-206, doi: 10.7930/J0N29V45

# 10. Lists of Contacts and Preparers

## FDEP 404 Assumption BA – List of Contacts

Doug Beason – Florida Department of Environmental Protection

Mary Duncan – Florida Department of Environmental Protection

Stephanie Gray – Florida Department of Environmental Protection

Heather Mason – Florida Department of Environmental Protection

Benjamin Melnick – Florida Department of Environmental Protection

Ravi Sharma – Florida Department of Environmental Protection

John Truitt – Florida Department of Environmental Protection

Florida Fish and Wildlife Conservation Commission – conservationplanningservices@myfwc.com z

## FDEP 404 Assumption BA – List of Preparers

**Lead Authors**

Michael Barnett – GHD

Eric Dohner – GHD

Dean Goodin – GHD

Ken Mierzwa – GHD

Emma Pattison – GHD

Genevieve Rozhon – GHD

Cindy Dohner – Cindy K. Dohner, LLC

Mary Duncan – Florida Department of Environmental Protection

**Section Authors (Species)**

Nicole Charlton – GHD

Joslyn Curtis – GHD

Amy Douglas – GHD

Amy Livingston – GHD

Kerry McNamee – GHD

Elizabeth Meisman – GHD

Elissa Overton – GHD

James Seery – GHD

Jordan Widmaier – GHD

### GIS/Graphics

Elizabeth-Noelle Morata – GHD

### Technical Editors

Mikeila Morgan – GHD

Justyn Patterson – GHD

### Technical Support

Laura Lawlor – GHD

Jason Curole – GHD

# Appendix A

## April 15, 2020 Letter from NMFS to FDEP Regarding NMFS Jurisdiction



UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
Silver Spring, MD 20910

April 15, 2020

Heather Mason, PWS
Environmental Administrator
Florida Department of Environmental Protection
Submerged Lands and Environmental Resources Coordination
2600 Blair Stone Road, MS 2500
Tallahassee, FL 32399-2400

RE: National Marine Fisheries Service in the Clean Water Act Section 404 Assumption by the State of Florida

Dear Ms. Mason:

On November 22, 2019, the National Marine Fisheries Service (NMFS) received your request for input on a draft species list for Florida's assumption of Clean Water Act Section 404 permitting from the U.S. Army Corps of Engineers (USACE). Through subsequent communications with you and your staff, a review of state mapping products, NMFS'own mapping analysis, and a review of state-provided documents about the assumption, we conclude that Endangered Species Act (ESA)-listed species under NMFS' jurisdiction do not occur in waters that are assumable by the state.

We specifically analyzed the possible spatial overlap of the assumption with waters used by shortnose sturgeon, Atlantic sturgeon, smalltooth sawfish, and Gulf sturgeon. Based on that analysis, shortnose sturgeon and Atlantic sturgeon occur in the St. Marys and St. Johns Rivers, which are included on the USACE retained waters list. Smalltooth sawfish occur in waters "subject to the ebb and flow of the tide" which will also remain under the USACE's jurisdiction, per the draft State 404 Program Applicant's Handbook definition of "Retained Waters." Therefore, the USACE will retain ESA Section 7 responsibility for proposed Section 404 actions in the waterways where NMFS's trust resources are most likely to occur.

For Gulf sturgeon, which has shared jurisdiction between NMFS and the U.S. Fish and Wildlife Service, the U.S. Fish and Wildlife Service is responsible for all consultations regarding Gulf sturgeon and critical habitat in riverine habitat units (final rule designating critical habitat for the Gulf sturgeon – 68 FR 13370). Rivers in Florida that include riverine critical habitat units (i.e., Escambia, Yellow, Choctawhatchee, Apalachicola, and Suwannee rivers) and river areas where Gulf sturgeon are known to occur (e.g., lower Ochlockonee River) are all listed by the USACE as retained waters.

Based on this determination we also assume that the Environmental Protection Agency will make a "no effect" determination for NMFS' ESA-listed species that were originally identified as part of this proposed assumption.



We appreciate all the information and assistance you provided in making this determination. If you have any questions, please contact Dr. Pat Shaw-Allen at (301) 427-8473, or by e-mail at pat.shaw-allen@noaa.gov or me at (301) 427-8495 or by e-mail at cathy.tortorici@noaa.gov.

Sincerely,

TORTORICI.CATHRYN.E.1365826850 Digitally signed by TORTORICI.CATHRYN.E.1365826850 Date: 2020.04.15 13:25:25 -04'00'

Cathryn E. Tortorici
Chief, ESA Interagency Cooperation Division
Office of Protected Resources

cc: Karen Myers, US Fish and Wildlife Service
Robert Tawes, US Fish and Wildlife Service
David Bernhart, NMFS, Southeast Regional Office

# Appendix B
## Species Accounts

## Vertebrates

### MAMMALS

### Sherman's Short-tailed Shrew

Sherman's Short-tailed Shrew (*Blarina brevicauda shermani = Blarina carolinensis shermani*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

The small range of the subspecies in southwestern Florida extends from Fort Myers to near Royal Palm in Lee County (Benedict et al. 2006), although it has not been located since 1955. Current status is unknown, and it is possible the species has been extirpated. Habitat is described as edges of marshes or shallow depressions, mesic flatwoods, with abundant grasses (FNAI 2001a); also drainage ditches with abundant grass cover (Layne 1978). Threats include habitat loss and predation by cats (Layne 1992).

### Gray Wolf

The Gray Wolf (*Canis lupus*), was first listed as endangered effective March, 11, 1967 (32 FR 4001). Various populations throughout the west were listed after this date (43 FR 9607, 76 FR 25590, 43 FR 9607). Critical habitat has been designated in Michigan and Minnesota (43 FR 9607). There have been multiple proposals to delist the Gray Wolf (USFWS 2020a). On May 14, 2019, the US Fish and Wildlife Service (USFWS, the Service) announced a proposal to delist the Gray Wolf, except for the Mexican Wolf (*Canis lupus baileyi*) subspecies (84 FR 21312). This decision is controversial and some organizations believe delisting is premature (CBD 2020a).

Gray Wolves are a keystone terrestrial predator. They feed primarily on ungulates, and utilize a wide range of habitats (USFWS 2020a). In North America, their historic range spanned much of Canada, the US, and Mexico (International Wolf Center 2020, NatureServe 2020). There is disagreement in the scientific community regarding Gray Wolf taxonomy and how many subspecies there are within the United States (International Wolf Center 2020). 'American' Gray Wolves were nearly driven extinct as a result of federal extermination programs. Protection of Gray Wolves has resulted in substantial increases to population numbers, in part due to reintroduction programs. However, Gray Wolves have only returned to an approximate 10 percent of their historic range in the US. Gray Wolves remain extirpated from Florida. Ongoing threats include direct persecution, often as a result of conflicts with livestock, and habitat fragmentation (limiting population growth and genetic diversity) (CBD 2020a).

### Red Wolf

The Red Wolf (*Canis rufus*) is listed as endangered effective March, 11, 1967 (32 FR 4001), except for experimental populations in areas of North Carolina and Tennessee (51 FR 26564). Critical habitat has not been designated (USFWS 2020a).

Red Wolves were nearly driven to extinction as a result of predator control programs and habitat loss (CBD 2019a). The historical range for Red Wolves included North Carolina, Tennessee, and Texas (USFWS 2020a), and may have been much larger spanning the Southeast, the lower Midwest, and into southern Pennsylvania and New York (Weller 2018). A captive breeding program began in 1973 and was largely successful until the mid-2000s (FWC 2020a, CBD 2019a). These captive-bred wolves were reintroduced as experimental populations on several National Wildlife Refuges in North Carolina. In addition, one breeding pair was introduced to St. Vincent Island, Florida (FWC 2020a, USFWS 2020c). A multi-generational pack was present on the island as of 2019 (USFWS 2020c). The species occupies coastal prairies, forests, and swamps within these areas. A major threat to Red Wolf populations is loss of genetic diversity from interbreeding with coyotes (*Canis latrans*) (FWC 2020a). Additionally, incidental take of Red Wolves (mistaken for coyotes) in North Carolina has caused substantial

declines in the reintroduced population (CBD 2019a).

### Florida Bonneted Bat

The Florida Bonneted Bat (*Eumops floridanus*) was listed as endangered effective November 1, 2013 (78 FR 61003). Critical habitat has not been designated for this species, although designation was expected to occur in 2014 (FWC 2013).

The Florida Bonneted Bat (previously the Florida Mastiff Bat) is the largest bat species in Florida. The species has an extremely restricted range and only occupies pineland, tropical hardwood, and mangrove habitat in Charlotte, Collier, Lee, Monroe, and Miami-Dade counties. It is known from a total of nine locations. Areas of freshwater wetlands are also important to the species (78 FR 61003). Very limited information is available on the species' natural history. The Florida Bonneted Bat does not undergo periods of hibernation and the species is active year-round, although they may engage in torpor during cold weather. The bats roost singly or in small colonies in tree cavities (including Red-cockaded Woodpecker cavities), buildings, foliage, and rock crevices, as well as artificial roosts (FWC 2011a, 2013). Peak breeding season is in April (USFWS 2018a). Florida Bonneted Bats give birth from June through September (a second breeding season may also occur in January or February) (78 FR 61003, FWS 2013). They feed on insects primarily from the orders Coleoptera, Diptera, and Hemiptera (FWC 2013).

The species' range contracted due to habitat loss (urbanization) in the mid-1900s (FWC 2011a, 2013). Current threats to the species include a restricted range and small population size, loss of forested habitat via urbanization, limited roost sites, environmental stochasticity, and pesticides (FWC 2013, USFWS 2018a). The current population size is estimated to be a few hundred individuals and the species is considered to be critically endangered (FWC 2011a, 2013).

### Florida Salt Marsh Vole

The Florida Salt Marsh Vole (*Microtus pennsylvanicus dukecampbelli*) was listed as endangered effective February 13, 1991 (56 FR 1457). Critical habitat has not been designated (USFWS 2020a).

The Florida Salt Marsh Vole is a subspecies of the Meadow Vole. This subspecies is endemic to the central Gulf coast of Florida and is only known from 32 kilometers of salt marsh habitat. The species occurs between the Lower Suwannee River and the Withlacoochee River, Levy County, Florida, predominantly located on state or federal conservation lands. This distribution appears to be a relic from a formerly large range along the Gulf coast (when sea levels were lower and suitable habitat extended west of the current coastline of Florida) (USFWS 2019a).

Habitat for this species has been documented to include the following vegetation: saltgrass (*Distichlis spicata*), smooth cordgrass (*Spartina alterniflora*) and black needle rush (*Juncus roemerianus*) (USFWS 1997, 2019). Because of its rarity, the life history and reproductive behavior of the Florida Salt Marsh Vole have not been well studied. Life history of the Meadow Vole has been well studied and some aspects are expected to be similar to that of the Florida Salt Marsh Vole. Typically, Meadow Voles are active both day and night and feed on a variety of plant matter, including bark, grass, roots, and seeds. Voles have a high reproductive rate and breed throughout most the year with a peak of breeding activity occurring in the spring. The life span of voles is short; typically, few individuals live longer than six months (USFWS 2019a).

The decline of the species appears to be due to climatic changes and associated rise in sea level (USFWS 1997, 2019). Encroachment of mangroves into Florida Salt Marsh Vole habitat may be a new threat. Given a very limited range and only a few known locations within 32 kilometers of each other, an environmental or human-caused stochastic event could cause a catastrophic decline or possibly extinction of this subspecies (USFWS 2019a).

### Gray Bat

The Gray Bat (*Myotis grisescens*) was listed as endangered effective May 3, 1976 (41 FR 17736). Critical habitat

has not been designated (USFWS 2020a).

The Gray Bat occurs in limestone karst regions of Alabama, Arkansas, Kentucky, Missouri, Tennessee, and Indiana (USFWS 1982). The species roosts colonially in caves year-round, occupying deep, vertical, colder caves and mines in the winter (hibernacula at 1 °C to -4 °C) and warmer caves with restricted rooms or domed ceilings during the summer. Environmental conditions aid in thermoregulation (USFWS 1982, USFWS 2009a). Summer caves are typically located near bodies of open fresh water (foraging habitat) (USFWS 1982). In Florida, the species occurs in a single county (Jackson) in the northwest Panhandle. Roosting (including some maternity roosts) has been documented in nine caves in this county (USACE 2007). The bats breed in early fall and then hibernate from October or November to March.

Females enter hibernation a few weeks before males (USFWS 1982). Pups are born in May or June. The species feeds on aquatic insects including mayflies, caddisflies, and stoneflies (USFWS 2009a).

The majority of high priority maternity sites for this species have been protected. Approximately 95 percent of the total population size is confined to nine caves. The species was increasing in the early 2000s (USFWS 2009a); however, nationwide population data is not available post the discovery of white- nose syndrome in Gray Bats. Although large declines have not yet been documented, they are possible (USFWS 2012a, Powers et al. 2016). Threats to the species include roost disturbance (environmental or human-caused) and white-nose syndrome (USFWS 1982, USFWS 2012a).

### Little Brown Bat

The Little Brown Bat (*Myotis lucifugus lucifugus,* formerly *M. l. occultus*) is under review for listing by the USFWS (NatureServe 2020). On January 21, 2010, the Center for Biological Diversity petitioned the USFWS to close caves to protect bat species from becoming exposed to white-nose syndrome (caused by the fungus *Pseudogymnoascus destructans*) and petitioned for the listing of several other bat species. On June 29, 2011, the USFWS determined that the petition may be warranted, and a status review was initiated (however, not for the Little Brown Bat) (76 FR 38095).

The Little Brown Bat is widely distributed across North America with the exception of the southern Great Plains, southeastern California, and the coastal southeast, in regions with suitable hibernacula (caves and mines). There are currently five recognized subspecies of *Myotis lucifugus* although there is now evidence that these may be five distinct species (Morales and Carstens 2018, Kunz and Reichard 2010). The subspecies that occurs in Florida is *Myotis lucifugus lucifugus*. The northeastern US is considered to be the core range of the species. The Little Brown Bat has been occasionally detected in northern Florida, although it is not common in the state (Kunz and Reichard 2010). General habitat requirements include forested or herbaceous wetlands, hardwood and mixed forest, grassland, and scrub (NatureServe 2020).

The species migrates between winter hibernacula and summer roost sites. Mating occurs during fall swarming, from August through October. Females store sperm over the winter. Characteristics of winter hibernacula include caves or mines with high humidity and stable temperatures above freezing (typically between 2 °C to 12°C). Winter hibernacula may be located up to 300 kilometers from summer roosts. Summer maternity colonies are located in tree cavities and man-made structures such as barns and attics (Kunz and Reichard 2010). Females give birth in late spring or early summer (NatureServe 2020). The species feeds on a variety of insects from the orders Diptera, Lepidoptera, Coleoptera, Thrichoptera, Ephemeroptera, and Neuroptera (Kunz and Reichard).

Prior to the introduction of white-nose syndrome to the US, the species population was estimated to be greater than 6.5 million. This species appears to have experienced one of the highest mortality rates from white-nose syndrome in North America, and the population is in rapid decline. Current estimates put the northeast population at a 99 percent chance of extinction by 2026 (CBD 2010b, Kunz and Reichard 2010). Threats to the species

include white-nose syndrome, climate change, pesticides, mortality from wind turbines, and habitat modification or destruction (CBD 2010b, Kunz and Reichard 2010, NatureServe 2020).

### Indiana Bat

The Indiana Bat (*Myotis sodalis*) was listed as endangered effective March 11, 1967 under the Endangered Species Preservation Act of 1966 (32 FR 4001). Critical habitat was designated for the species on September 24, 1976 (41 FR 41914).

The Indiana Bat is found in karst regions of the east-central US. There are no current records of the species in Florida (USFWS 2009b). However, there has been one historical winter record of the species in Old Indian Cave in Jackson County (pre 1995). During the winter, the species hibernates colonially in caves and mines (exhibits site fidelity). Winter hibernacula temperatures are above freezing but below 10 °C. The species hibernates from October through April. In the summer, the species roosts behind the bark of large trees (live trees or dead snags) in wooded wetlands, riparian forest, bottomland, floodplains, and uplands. Mating occurs shortly before hibernation in the fall (fall "swarming"). Breeding females may migrate up to 575 kilometers between winter and summer habitat. In contrast, non-breeding females and males remain close to their winter hibernacula and may roost singly in trees. Breeding females form maternity roosts. Maternity roost trees are typically next to an opening in the forest such as a forest edge, gap in the canopy, or along a fence line. Females give birth to one pup in June or July. Foraging habitat consists of open habitats or areas with an open understory in forests, along forest edges, and in riparian areas. The species feeds on prey items primarily from the orders Coleoptera, Diptera, Lepidoptera, and Trichoptera (USFWS 2007a).

The population size is currently estimated as 537,297 bats, with 71 percent of the population located in Indiana and Missouri. From the 1960s to the early 2000s, the species declined as a result of habitat destruction, habitat modification, and roost disturbance (USFWS 2007a). The total population size increased in the early 2000s, thanks to recovery efforts (USFWS 2009b); however, since 2007, the population declined again by 19 percent, primarily due to the spread of white-nose syndrome. Current threats to the species include roost disturbance, white-nose syndrome, climate change, environmental contaminants, collisions with man-made objects, mining operations, forest fragmentation, invasive species, and loss/degradation of habitat (including swarming and migration habitat; USFWS 2019b).

### Key Largo Woodrat

The Key Largo Woodrat (*Neotoma floridana smalli*) was originally listed as threatened under the Endangered Species Conservation Act of 1969 (USFWS 1999a). It was listed as endangered under an emergency rule effective September 21, 1983 (48 FR 43040) and protection continued through a final rule in 1984 (49 FR 34504). The USFWS announced the initiation of the latest five-year review of the species in 2016 (81 FR 59650). Critical habitat has not been designated (USFWS 2020a). The subspecies was protected in conjunction with the Key Largo Cotton Mouse (*Peromyscus gossypinus allapaticola*) because of their similar habitat requirements.

The Key Largo Woodrat is a subspecies of the Eastern Woodrat (*Neotoma floridana*). The subspecies inhabits tropical hardwood hammock forests (48 FR 43040). The historic range of the Key Largo Woodrat spanned all of Key Largo. Unfortunately, as a result of development, much of the hammock forest habitats have been destroyed. Currently the subspecies is limited to North Key Largo, which is approximately half of its historical range (USFWS 1999a). Woodrats are well-known for their large stick nests (USFWS 1999a). The subspecies is omnivorous, with a diet primarily composed of buds, leaves, and fruit from a variety of plants (USFWS 1999a, 2020b).

Key Largo Woodrats were introduced to Lignumvitae Key in 1970 (48 FR 43040). Although the subspecies is not historically native there, it hosts similar hammock forest habitats as those found on Key Largo. Key Largo Woodrats appear to have been extirpated on Lignumvitae Key by 1990 (USFWS 1999a). A captive propagation program began in 2002 because the causes of continued decline were undetermined. The Key Largo Woodrat's

small and isolated populations are especially vulnerable to extinction because of a wide range of threats including demographic factors and natural catastrophes (USFWS 2018b). Predation poses another significant risk, as they are depredated by a wide range of raptorial, reptilian, and mammalian (including free-roaming cats) predators (USFWS 1999a).

Reintroduction efforts have been largely unsuccessful because of high predation (USFWS 2018b).

### Key Deer

The Key Deer (*Odocoileus virginianus clavium*) was listed as endangered effective March 11, 1967 (32 FR 4001). Critical habitat has not been designated (USFWS 2020a).

The Key Deer is found in the Florida Keys within 11 island complexes from Johnson Keys to Sugarloaf Key. Each of these complexes are considered a subpopulation which collectively form a metapopulation. Key Deer are concentrated on Big Pine Key and No Name Key, which are home to approximately three- quarters of the metapopulation. The historical range of the subspecies extended into Marathon and Key West; however, these areas are now too urbanized to support Key Deer populations. The subspecies selectively uses hammock and pine rockland upland habitats. These habitats contain a substantial portion of their forage plants, fresh water, and cover, which is especially important for fawning. The diet of Key Deer is primarily composed of red mangrove (*Rhizophora mangle*) as well as a wide variety of other plants (USFWS 2010a).

Roads and fences fragment deer habitat as well as cause direct mortality. Despite high annual mortality rates, the population growth rate appears stable (USFWS 2010a). Ongoing threats include urbanization (documented to increase deer habituation and result in conflicts between dogs and deer) and vehicular collisions. The Service has translocated animals from the core areas to periphery islands in an attempt to bolster the metapopulation (USFWS 2010a).

### Rice Rat

The Lower Keys population of the Rice Rat, also known as the Silver Rice Rat, (*Oryzomys palustris natator = O. argentatus*) was listed as endangered effective May 30, 1991 (56 FR 19809) due to its low population numbers (restricted to wetlands on eight of the Lower Keys, Florida). Rice Rats in mainland Florida are not listed. Critical habitat was designated in 1993 (58 FR 45030) and includes nine keys or groups of keys inhabited by the species.

Rice Rat habitat includes contiguous mangrove swamps, saltmarsh flats, buttonwood transition vegetation (Goodyear 1987), and fresh water cattail marshes (56 FR 19809). Generally, the rats use mangrove habitats for foraging and higher elevation saltmarsh flats for nesting and foraging (Forys et al. 1996). They are primarily nocturnal and have large home ranges, with some individuals traveling up to 325 meters at a time (Spitzer 1983, Forys et al. 1996). Although Rice rats may breed throughout the year, few juveniles have been observed during population studies (Forys et al. 1996, NatureServe 2020). A reproduction rate may be due to limited resources. Rice Rats are impacted by the continued development of the Lower Keys, increased populations of predators (such as raccoons, cats, and dogs), and through competition with introduced Black Rats (*Rattus rattus*) (Goodyear 1992).

### Pine Island Rice Rat

The Pine Island Rice Rat (*Oryzomys palustris planirostris*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

The subspecies is known from only two occurrences, on Pine Island and the adjacent mainland. The Pine Island Rice Rat has been found in a garbage dump, in an adjacent herbaceous wetland, and in runways with Cotton Rats (*Sigmodon*) (Layne 1978). Little is known about the species ecology, though they have been noted to feed on stems of cord-grass (*Spartina* spp.), smut grass (*Sporoborus* spp.), and shoreline purslane (*Sesuvium* spp.)

(Hamilton 1955). To complete the species review, habitat requirements should be studied in more detail and additional taxonomic study has been recommended. The Pine Island Rice Rat's habitat is threatened with habitat destruction by filling and draining of wetlands and invasion of woody plants (NatureServe 2020).

### Sanibel Island Rice Rat

The Sanibel Island Rice Rat (*Oryzomys palustris sanibeli*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

The subspecies is known only from one Florida island that is currently being extensively developed (Sanibel Island). The Sanibel Island Rice Rat's preferred habitat is along the edge of freshwater swamps of artesian origin, including swales and cattail stands. While the subspecies is protected in part on Ding Darling National Wildlife Refuge, it is threatened by habitat destruction through drainage, filling of marshes, lowering of the water table for human use, and woody plant invasion. Due to the limited information available on this subspecies, ecological studies are required to establish comprehensive management plans and the effects of major hurricanes (NatureServe 2020).

### Tricolored Bat

The Tricolored Bat, formally known as the Eastern Pipistrelle, (*Perimyotis subflavus*) was petitioned for listing on June 14, 2016 (CBD and DOW 2016), and the 90-day finding found that listing may be warranted (82 FR 60362). The species remains under review at this time (USFWS 2020a).

The Tricolored Bat is found throughout eastern North and Central America and the US Midwest (CBD and DOW 2016). The species is a permanent resident throughout the Florida peninsula. However, the majority of records are from the Panhandle (CBD and DOW 2016, NatureServe 2020). Habitat preferences include open landscapes bordered by woodland (e.g., hardwood woodlands, grasslands, abandoned fields, and urban landscapes) (CBD and DOW 2016). The species migrates between summer roosting areas and winter hibernacula. Summer and winter sites are typically less than 100 kilometers apart. Winter hibernacula are located in the deepest part of caves and mines with high thermal stability and temperatures typically in the range of -6 °C to 14 °C (CBD and DOW 2016). Summer roosting sites, including maternity colonies, are located in barns and other man-made structures as well as tree foliage. Males and non-breeding females may also use the winter hibernacula as a roost during the summer (CBD and DOW 2016, NatureServe 2020). The species mates during fall "swarming" outside of winter hibernacula. Females store sperm, overwinter, and give birth to two pups in the later summer. Tricolored Bats forage near water and in early successional forests and feed on a variety of insects, primarily from the orders Homoptera, Coleopteran, and Diptera (CBD and DOW 2016, USFWS 2019c).

This species has experienced precipitous population declines resulting from white-nose syndrome mortality (CBD and DOW 2016). Threats to the species include white-nose syndrome, human disturbance of hibernacula, habitat loss and modification, pesticides, climate change, and mortality from wind energy (CBD and DOW 2016, USFWS 2019c).

### Key Largo Cotton Mouse

The Key Largo Cotton Mouse (*Peromyscus gossypinus allapaticola*) was listed as endangered under an emergency rule effective September 21, 1983 (48 FR 43040), and protection continued through a final rule in 1984 (49 FR 34504). The USFWS announced the initiation of the latest five-year review of the species in 2016 (81 FR 59650). Critical habitat has not been designated (USFWS 2020a). The species was protected simultaneously with the Key Largo Woodrat (*Neotoma floridana smalli*) because of similar habitat requirements and the fact that the Cotton Mouse constructs its leaf-lined lairs in close proximity to or within Key Largo Woodrat nests (48 FR 43040, USFWS 2015a).

The Key Largo Cotton Mouse is a subspecies of the widespread southeastern species, *P. gossypinus.* The subspecies inhabits tropical hardwood hammock forests, one of the most limited and threatened ecosystem types in the state of Florida (48 FR 43040), as well as nearby Salicornia coastal strands. The historical range of the Key Largo Cotton Mouse spanned all of Key Largo to Tavernier on Plantation Key. Unfortunately, as a result of development, much of the hammock forest habitats have been destroyed and currently the species is limited to North Key Largo, an area delineated as north of the US Highway 1 and County Road 905 intersection (USFWS 2015a). Key Largo Cotton Mice were introduced to Lignumvitae Key in 1970 (48 FR 43040). Although the subspecies was not historically native there, it hosts similar hammock forest habitats as those found on Key Largo (USFWS 1999a).The Cotton Mouse is herbivorous, with a diet composed of fruits, seeds, and leaves (USFWS 2015a).

The last sighting of a Cotton Mouse on Lignumvitae Key was in 1977 (USFWS 2019d). Fortunately, much of their remaining habitat on Key Largo has been acquired and protected. However, free-roaming cats and loss of hammock forest habitat through sea level rise (e.g., salt intolerant forest) are ongoing threats to their populations (USFWS 2015a).

### Choctawhatchee Beach Mouse

The USFWS listed the Choctawhatchee Beach Mouse (*Peromyscus polionotus allophrys*) as Endangered effective June 6, 1985 (50 FR 23872). Critical habitat has not been designated (USFWS 2020a).

The historical distribution of the Choctawhatchee Beach Mouse included Florida's western Gulf Coast, as well as the barrier between Choctawhatchee Bay and St. Andrew Bay (USFW 1987). Remaining populations of this subspecies exist in the sand dunes on Shell Island, Grayton Beach, and Topsail Hill (FWC 2020b). This species occurs in beach dune systems vegetated by sea oats (*Uniola paniculata*) and beach grasses, and adjacent interior scrub areas populated by oaks including yaupon (*Ilex vomitoria)*, marsh-elder (*Iva spp.*), scrub oak (*Quercus myrtifolia),* sand-live oak (*Quercus virginiana var. maritima)* and sand pine (*Pinus clausa*), saw palmetto (*Sereona repens*), and slash pine (*Pinus elliotti)*. Optimal habitat for the Choctawhatchee Beach Mouse should include: high maximum elevation of coastal sand dunes; relatively great difference between maximum dune height and minimum interdunal elevation; close proximity of forest; sparse ground cover; and relatively low cover of sea oats. The fruits of beach grass are readily available to the mice, but those of sea oats are usually obtainable only after they have been blown down by heavy winds. The Choctawhatchee Beach Mouse also likely eats invertebrates in the late winter or early spring when seeds are scarce (USFWS 1987). The breeding season for the subspecies starts in November and ends in early January. Females reach reproductive maturity at six weeks of age and produce two to seven mice per litter (70 FR 94426). The predominant factor of decline for this subspecies is habitat loss due to alteration or conversion of dunes for human development and use (USFWS 1987).

More than two-thirds of this species' habitat has been lost as a result of real estate development (USFWS 1987).

### Southeastern Beach Mouse

The Southeastern Beach Mouse (*Peromyscus polionotus niveiventris*) was listed as threatened effective June 12, 1989 (54 FR 20598). Critical habitat has not been designated (USFWS 2020a).

This Southeastern Beach Mouse is a coastal subspecies of the Oldfield Mouse (*Peromyscus polionotus*), (USFWS 2005a). The original distribution of the Southeastern Beach Mouse included approximately 280 kilometers of the central eastern coast of Florida from Ponce Inlet, Volusia County, southward to Hollywood, Broward County, and possibly as far south as Miami Beach in Dade County. Remaining populations of this species exist in Volusia County (Canaveral National Seashore to 11 kilometers north of the Volusia-Brevard County line); Brevard County (Canaveral National Seashore, Merritt Island National Wildlife Refuge, and Cape Canaveral Air Force Station); scattered localities in Indian River County (Sebastian Inlet State Recreation Area, Seavie Subdivision, Treasure Shores Park, and Turtle Trail Public Beach access area); and St. Lucie County (Pepper Park and Fort Pierce Inlet State Recreation Area). As of 1993, this species occupies approximately 80 kilometers of beach (USFWS 1993).

This species occurs in beach dune systems vegetated by sea oats (*Uniola paniculata*) and dune panic grass (*Panicum* spp.), and adjacent interior scrub areas populated by oaks and sand pine (*Pinus clausa*) or palmetto (*Sabal* spp.; USFWS 2005a). The best habitat for Southeastern Beach Mouse is characterized by patches of bare, loose, sandy soil. Sea oats must be blown to the ground for the mice to eat, and during the spring and early summer; when seeds are scarce, beach mice may eat invertebrates. The breeding season for the Southeastern Beach Mouse starts in November and ends in early January.

Females reach reproductive maturity at six weeks of age, and produce two to seven mice per litter (USFWS 2005a). The predominant factors of decline for this species are habitat loss due to alteration or conversion of dunes due for human development and use, and destruction of habitat due to hurricanes and storms (USFWS 1993).

### St. Andrew Beach Mouse

The St. Andrew Beach Mouse (*Peromyscus polionotus peninsularis*) was listed as endangered effective January 19, 1999 (63 FR 70053). Critical habitat has been designated and includes dunes in Bay and Gulf counties, Florida (71 FR 60238).The USFWS announced the initiation of the latest five-year review of the subspecies in 2018 (83 FR 38320).

The St. Andrew Beach Mouse is one of the eight beach mice subspecies. Its historical range spanned from East Pass of St. Andrew Bay, along the coastline of St. Joseph Bay to St. Joseph Peninsula, and east to Money Bayou. The two existing populations of St. Andrew Beach Mouse inhabit East Crooked Island in Bay County and St. Joseph Peninsula in Gulf County. Habitat requirements include primary and secondary scrub dune ecosystems. The subspecies constructs burrows within the dunes, especially in steep, well-vegetated areas. The Beach Mouse feeds primarily on the seeds and fruits of dune plants as well as insects (USFWS 2010b).

The St. Andrew Beach Mouse population on East Crooked Island was presumed extinct in 1994. However, reintroduction efforts have led to a reestablished population there. St. Andrew Beach Mice face a suite of threats primarily related to habitat loss or degradation via urbanization and stochastic environmental events. Predation by feral cats is also a significant threat (USFWS 2010b).

### Anastasia Island Beach Mouse

The Anastasia Island Beach Mouse (*Peromyscus polionotus phasma*) was listed as endangered effective June 12, 1989 (54 FR 20598). Critical habitat has not been designated (USFWS 2020a).

This species historically occurred from the Duval-St. Johns County line southward to Matanzas Inlet, St. Johns County along Florida's northern east coast (USFWS 1993). Currently, two populations of this species exist on Anastasia Island: at Anastasia Island State Park and Fort Matanzas National Monument (USFWS 1993, USFWS 2005a). This species occurs in beach dune systems vegetated by sea oats (*Uniola paniculata*) and dune panic grass (*Panicum* spp.), and adjacent interior scrub areas populated by oaks and sand pine or palmetto (USFWS 2005a). Prime habitat for Anastasia Island Beach Mouse is characterized by patches of bare, loose, sandy soil. (USFWS 1993). Sea oats must be blown to the ground for the mice to eat. During the spring and early summer, when seeds are scarce, beach mice may eat invertebrates. The breeding season for beach mice starts in November and ends in early January.

Females reach reproductive maturity at six weeks of age, and produce two to seven mice per litter (USFWS 2005a).

The predominant factors of decline for this species are habitat loss through alteration or conversion of dunes due to human development and use and destruction of habitat due to hurricanes and storms (USFWS 1993). In 1992, mice from Anastasia Island were reintroduced into suitable historical habitat between Ponte Vedra Beach and South Ponte Vedra Beach in north St. Johns County at the Guana- Tolomato-Matanzas National Estuarine

Research Reserve (formerly Guana River State Park). The reintroduced population is surviving, although in low numbers (USFWS 2005a).

### Perdido Key Beach Mouse

The Perdido Key Beach Mouse (*Peromyscus polionotus trissyllepsis*) was listed as endangered effective June 6, 1985 (50 FR 23872). Critical habitat was designated on June 6, 1985 (50 CFR § 17) and revised most recently in 2006 (71 FR 60238).

The species' current range is restricted to Perdido Key in Florida, with critical habitats identified in Gulf State Park, West Perdido Key, Perdido Key State Park, Gulf Beach, and Gulf Islands National Seashore. The Perdido Key Beach Mouse is a nocturnal herbivore that feeds primarily on dune plant seeds such as sea oats (*Uniola paniculata*) and beach grass (*Panicum amarum*); it is also known to prey on insects, likely as a result of seasonal fluctuations in seed availability. They require a mosaic of frontal and scrub dunes for food, burrow sites, and refuge habitat. The frontal dunes have a cover of sea oats, blue stem (*Schizachyrium scoparium*), beach grass, and beach goldenrod (*Chrysoma pauciflosculosa*) while the scrub dunes are dominated by scrub live oak (*Quercus geminata*) with gopher apple (*Licania michauxii*) and green briar (*Smilax* spp.) ground covers. The importance of scrub dunes for this species was recognized through the revision to its critical habitat in 2006 (71 FR 60238). Threats to the species include loss/fragmentation of habitat for land development, tropical storm damage and mortality, and predation by non-native species (71 FR 60238). In addition, predicted future sea level rise and associated flooding is expected to produce increased habitat fragmentation and isolation (USFWS 2019e).

### Florida Panther

Florida Panther (*Puma* (= *Felis*) *concolor coryi*) was listed as endangered effective March 10, 1967 (32 FR 4001). The Service announced the initiation of the latest five-year review of the species in 2017 (82 FR 29916). Critical habitat has not been designated (USFWS 2020a).

The historic range of the Florida Panther included Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, South Carolina, and Tennessee (USFWS 2020a). The subspecies is now limited to a single population in southern Florida (inhabits less than five percent of its historic range). Panther habitat preferences are closely associated with prey abundance (USFWS 2008a). Habitats with dense understory vegetation are also important as they provide cover for panthers to hunt, rest, and den (USFWS 2020a). Panthers have vast home ranges, occur at low densities, and require large swaths of contiguous habitat (USFWS 2008a). Although their population numbers have increased substantially from 12 to 20 individuals in the 1970s to 100 to 120 in 2007, Florida Panther incompatibility with urbanization continues to limit the recovery of this subspecies. Habitat fragmentation and loss also serve as significant threats to Florida Panthers. Additionally, vehicular collisions continue to limit the subspecies' population growth (USFWS 2020a).

### Insular Hispid Cotton Rat

The Insular Hispid Cotton Rat *(Sigmodon hispidus insulicola)* was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

The Insular Hispid Cotton Rat currently has a range of <100-250 square kilometers within peninsular Florida and the Keys. The preferred habitat is herbaceous wetlands, grasslands, shrubland, and mixed woodlands (NatureServe 2020). Populations apparently undergo large annual fluctuations. Pregnant and lactating females have been recorded in May and August with a litter size of 2-4 young (Layne 1978).

Further research is required to determine subspecies life history, ecology, habitat requirements, and population sizes. The rat is threatened by habitat destruction from urbanization (NatureServe 2020).

### Lower Keys Rabbit

The Lower Keys Rabbit, also known as the Lower Keys Marsh Rabbit, *(Sylvilagus palustris hefneri*) was listed as endangered effective June 23, 1990 (55 FR 25588). Critical habitat has not been designated (USFWS 2020a).

The subspecies is endemic to a very small area (<100-250 square kilometers) in the Florida Keys (NatureServe 2020). The Lower Keys Rabbit likely breeds year-round, with a peak from December through to June. Gestation lasts approximately 30-37 days. The rabbit's habitat is at risk due to development, dredging and filling of wetlands, human exploitation of very limited fresh water, and impacts from predators such as cats, dogs, and human poachers (Wolfe 1992). The population has been categorized as "declining" (USFWS 1990). Recommended conservation efforts focus on protecting the rabbit's preferred marshland habitat and areas used in dispersal, including the lower-mangrove and upland-forest (Forys and Humphrey 1996).

### West Indian Manatee

The West Indian Manatee *(Trichechus manatus)* was listed as endangered effective March 11, 1967 under the Endangered Species Preservation Act of 1966 (32 FR 4001). Listing was revised in 1970 to include the Caribbean subspecies and South American subspecies *(T. m. manatus)* (35 FR 18319). The species was down-listed to Threatened on April 5, 2017 (82 FR 16668). Critical habitat was designated in 1976 (50 CFR § 17.95(a)).

There are two subspecies of West Indian Manatee, *T. m. manatus* and *T. m. latirostris*. The latter of these subspecies occurs in Florida and the Gulf of Mexico (USFWS 1999b, 2007). There are four unique Florida sub-populations/management units (there is genetic exchange amongst populations) that exhibit varying degrees of site fidelity: the Upper St. Johns River subpopulation, the Northwest subpopulation, the southwest subpopulation, and the Atlantic Coast subpopulation (USFWS 2007b). Florida manatees occur in freshwater, brackish and marine environments including coastal river estuaries, sloughs, canals, creeks, and lagoons (USFWS 1999b). The species requires a source of freshwater for drinking (USFWS 2001). They are not cold-tolerant, prefer waters with temperatures above 68°F, and remain in warm-water sites around the state during the winter (e.g. warm water springs and power plant outfall sites) (USFWS 2001, USFWS 2007b). Breeding may occur year-round, although peak breeding is suspected to occur from March through November. Manatees form "mating herds" (one female and multiple males) to breed. Manatees reach sexual maturity at around four years. Gestation is roughly 11 to 14 months, and females may give birth to one or two calves per litter. The species feeds on submerged and emergent floating vegetation such as seagrass, hydrilla (*Hydrilla verticillata*), and smooth cordgrass *(Spartina alterniflora)* (USFWS 2001).

The most recent population estimate (2015), put the Florida population at 6,350 manatees (82 FR 16668). Recent analysis indicates this population is stable or increasing throughout much of the state (USFWS 2014a). Threats to the species include human-caused mortality (watercraft collisions), interactions with commercial fishing gear, pollution, exposure to cold/loss of warm-water refugia, and red tides (*Gymnodinium breve*) (USFWS 2007b, USFWS 2014a).

## BIRDS

### Cape Sable Seaside Sparrow

The Cape Sable Seaside Sparrow (*Ammodramus maritimus mirabilis*) was listed as endangered effective March 11, 1967 under the Endangered Species Preservation Act of 1966 (32 FR 4001). Critical habitat was designated in Collier, Dade, and Monroe counties in Florida in 1977 (42 FR 47840). This designation was revised in 2007 (72 FR 62736).

The Cape Sable Seaside Sparrow is non-migratory and inhabits freshwater marl prairies with muhly grass (*Muhlenbergia filipes*) in the Everglades National Park. These marl prairies are defined by short hydroperiods, densely clumped grasses, and periodic fires (USFWS 1999b). Within the park, populations are located at Shark River Slough, Big Cypress Preserve, and at Taylor Slough in the Southern Glades Wildlife and Environmental Area (the subspecies occurs entirely on public conservation lands) (USFWS 2019f). Nesting occurs from late February through early August and a pair may raise multiple broods per season (USFWS 1999b). The subspecies builds their nests in clumps of grass a few centimeters above the ground; nests are highly susceptible to floods during the breeding season (USFWS 2019f). The Cape Sable Seaside Sparrow will feed on a variety of invertebrate prey items including spiders, caterpillars, worms, beetles, and shrimp (USFWS 1999b). Subspecies recovery has been hampered by altered hydrology in the region which has impacted their prairie habitat (Central and Southern Florida Project) (USFWS 1999b, 2010). Threats to the subspecies include habitat loss and conversion, nest predation, climate change, fires, and sea level rise (USFWS 2019f, USFWS 2010c). This subspecies is considered to be in decline (USFWS 2010c).

### Florida Grasshopper Sparrow

The Florida Grasshopper Sparrow (*Ammodramus savannarum floridanus*) was listed as endangered effective September 2, 1986 (51 FR 27492). Critical habitat has not been designated (USFWS 2020a).

The Florida Grasshopper is a non-migratory subspecies of grasshopper sparrow that inhabits dry, treeless, flat prairies in central and southern Florida. These prairies are dominated by saw palmetto (*Serenoa repens*), dwarf oaks (*Quercus minima*), bluestems (*Andropogon* spp.), St. John's wort (*Hypericum* spp.), and wiregrass (*Aristida stricta*). They avoid areas of dense vegetation and accumulated litter (breeding grasslands defined by a history of frequent fires) (51 FR 27492). The range of the Florida Grasshopper Sparrow is currently restricted to Avon Park Air Force Range, Kissimmee Prairie Preserve State Park, Three Lakes Wildlife Management Area, and three private ranches (USFWS 2019g). The Florida Grasshopper Sparrow was historically more widespread, but a 95 percent decrease in habitat since pre-settlement times has severely restricted the subspecies' distribution.

The Florida Grasshopper Sparrow breeds from early April through late June, although at some locations they breed through September. They are ground nesters. Nest structure includes a shallow scrape in sand substrate with a dome-shaped cup of woven grasses. Grasshopper Sparrows prey on insects (e.g., beetles, crickets, and moths) and will also feed on seeds (USFWS 1999b). Threats to the subspecies include habitat loss, degradation, fragmentation (conversion of native prairie to agriculture), unfavorable hydrology (though management or natural phenomena), and predation (particularly by the red imported fire ant, *Solenopsis invicta*). The subspecies also has a high risk of extinction due to factors such as environmental stochasticity and loss of genetic diversity (USFWS 2019g). The subspecies is in decline and there are only an estimated 23 breeding pairs remaining in the wild (USFWS 2008b, USFWS 2019g). The USFWS is currently engaged in a captive propagation program (USFWS 2019g).

### Saltmarsh Sparrow

The Saltmarsh Sparrow, also known as the Saltmarsh Sharp-tailed Sparrow, (*Ammospiza caudacuta*) is proactively being assessed for listing by USFWS. The Service is currently conducting a Species Status Assessment (USFWS 2018c). The species remains under review at this time (USFWS 2020a).

As their name implies, this species has a strong habitat association with tidal saltmarshes. Their breeding range extends along the Atlantic Coast from Maine to Virginia. Their wintering range covers similar coastal habitats from Maryland to Florida, with concentrated numbers from South Carolina to northern Florida.

Their populations have experienced substantial declines since the 1990s or earlier, with an estimated 75 percent decline from 1998 to 2012. This decline was caused primarily by habitat degradation of coastal marshes. Other factors such as sea level rise are threats to their breeding populations (Greenlaw et al. 2018). Having been listed as Vulnerable (international status) for quite some time, the species was up- listed to Endangered during the latest assessment in 2018 (BirdLife International 2018).

### Florida Scrub-jay

The Florida Scrub-jay (*Aphelocoma coerulescens*) was listed as threatened effective June 6, 1987 (52 FR 20715). Critical habitat has not been designated (USFWS 2020a).

The Florida Scrub-jay is a non-migratory corvid that serves as the state's only endemic bird species (USFWS 2019h). The species is restricted to early successional xeric scrub and scrub flatwood habitat in relict dunes located on Florida's central ridges and coasts, in areas defined by historic fires (USFWS 1999b, USFWS 2007c, USFWS 2019h). Habitat requirements include low densities of pine trees, a minimum of 50 percent scrub oak cover, and open areas of sand or minimal herbaceous vegetation (USFWS 2019h). Florida Scrub-jay's may live in pairs or family groups and the species engages in cooperative breeding with helpers at the nest (USFWS 2019h). Territory size is a minimum of 5 hectares. The species defends their territory year-round (USFWS 2015b). Nesting occurs from March through the end of July. Florida Scrub-jays typically construct their nests in sand live oak (*Quercus geminate*), scrub oak (*Q. inopina*), or myrtle oaks (*Q. myrtifolia*). Nests consist of a cup constructed out of oak twigs and woven with palmetto or cabbage palm (*Sabal palmetto*). The species feeds on insects such as grasshoppers, beetles, and butterfly or moth larvae (USFWS 2015b).

Historically, the Florida Scrub-jay occupied 39 counties in Florida. They have been functionally extirpated from nine of these counties and the species is in decline (USFWS 1999b, USFWS 2007c, USFWS 2019h). Currently, about 25 percent of the state's population is located in areas that have urbanized, and research indicates that these urban populations are not sustainable (USFWS 2014b). Threats to the species include habitat loss, fragmentation, degradation (through urbanization and fire suppression), predation, and epidemic diseases (USFWS 1999b, USFWS 2015b, USFWS 2019h).

### Rufa Red Knot

The Rufa Red Knot (*Calidris canutus rufa*) was listed as threatened effective January 12, 2015 (79 FR 73705 73748). Critical habitat has not been designated (USFWS 2020a).

The Rufa Red Knot is one of the six subspecies of Red Knot (Baker et al. 2013). They follow one of the longest known migrations, traveling roughly 15,000 kilometers from their breeding grounds in the central Canadian arctic to their overwintering grounds as far south as Tierra del Fuego at the tip of South America (USFWS 2019i). Nests are constructed as scrapes on bare tundra habitat. Usually four eggs are laid which the male is left to care for after hatching (Baker et al. 2013). There are four concentrated overwintering areas, including the Southeast US, the Northwest Gulf of Mexico, the northern coast of South America, and Tierra del Fuego (USFWS 2019i). Delaware Bay is an important stopover site on their spring migration path (79 FR 73705).

Overharvested by market hunting in the 19th Century, their populations seemed to have largely recovered after the passage of the Migratory Bird Treaty Act (USFWS 2019i). However, a crash in Horseshoe Crab population (*Limulus polyphemus*) during the 2000s (a primary prey item), caused Rufa Red Knot populations to plummet (79 FR 73705). Other prey items include marine invertebrates, such as bivalves and amphipods (Baker et al. 2013). Red Knots face a suite of ongoing environmental and anthropogenic threats across their range (79 FR 73705), specifically the threat of sea level rise inundating their coastal habitats (Kieffer 2014).

### Ivory-billed Woodpecker

The Ivory-billed Woodpecker (*Campephilus principalis*) was listed as endangered effective March 11, 1967 (32 FR 4001). Critical habitat has not been designated (USFWS 2020a). The Service announced the initiation of the latest five-year review of the species in 2018 (83 FR 20092).

The Ivory-billed Woodpecker was the largest woodpecker species in North America. (Jackson 2002, USFWS 2020a). The historical range of the Ivory-billed Woodpecker included the southeast US (Arkansas, Florida, Georgia, Illinois, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Oklahoma, South Carolina, Tennessee, and Texas) and the main island of Cuba. It inhabited old-growth forests with abundant beetle larvae – its primary food source. Dense swamps were selected for nesting. Parents excavated nest cavities in dead portions of both live trees and snags, usually below a dead branch (Jackson 2002).

Ivory-billed Woodpeckers were historically harvested by humans for food and regalia (by Native Americans), souvenirs and trade, and as scientific specimens for personal natural history collections (Jackson 2002). This overexploitation along with habitat destruction led to the species' demise (USFWS 2010d). The last accepted sightings were in 1938 in the US and in 1948 in Cuba. There is a great deal of contention whether Ivory-billed Woodpeckers are still extant, given recent reported sightings; however, none of these sightings have been confirmed (Jackson 2002). Nonetheless, reports over the last several decades have prompted surveys across multiple states and some suggestive evidence has been found (USFWS 2010d).

### Piping Plover

The Piping Plover (*Charadrius melodus*) Great Lakes Distinct Population Segment (DPS; *C. m. circumcinctus*) was listed as endangered effective January 10, 1986 (50 FR 50726). The Atlantic Coast and Northern Great Plains populations (*C. m. melodus* and *C. m. circumcinctus*, respectively) were listed as threatened at the same time (50 FR 50726). Critical habitat was designated for this species on May 7, 2001 and September 11, 2002 (for separate breeding populations; 66 FR 22938, 67 FR 57637). Critical habitat for wintering populations was designated on July 10, 2001 (66 FR 36038). Critical habitat was revised several times via court rulings and final critical habitat was published on May 19, 2009 (74 FR 23476).

The Piping Plover is a migratory shorebird that breeds along the Atlantic Coast from Canada to North Carolina and along inland rivers and lakes in the Great Plains and Great Lakes regions (three independent populations with two subspecies). Piping Plovers winter along the Gulf Coast, Southern Atlantic Coast (including Florida), Bahamas, and the West Indies (USFWS 1999b). Fall migration occurs from June through August while peak spring migration occurs in April (Elliott-Smith and Haig 2004). The largest number of wintering birds are routinely found in Texas; however, a significant proportion of the species also winters in states along the Gulf Coast, including Florida (USFWS 2015c). The species exhibits site fidelity to migration and wintering sites (USFWS 2009c). On their breeding grounds, the species favor open, sparsely vegetated sand or gravel beaches for nesting. Nesting microhabitat within these larger landscape features includes open ground adjacent to bunches of grass, logs, or other conspicuous items in an otherwise barren landscape. Nest scrapes are also constructed in areas relatively free of vegetative cover. These scrapes are lined with debris such as shell fragments or pebbles. Both adults will share in incubating and parental care duties. The species typically forages within five meters of the water's edge and feeds on a variety of freshwater, saltwater, terrestrial, and benthic invertebrates (Elliot-Smith and Haig 2004). Wintering habitat preferences in Florida include bay beaches (vs. ocean facing beaches) and inlets with exposed

intertidal areas and tide cast wrack (USFWS 2009c).

Threats to the species include habitat loss and degradation from urbanization and some shoreline stabilization efforts, sea level rise, predation, and anthropogenic disturbance (USFWS 2009c, USFWS 2015c). A recent population viability analysis revealed that the species is highly sensitive to extinction risk (USFWS 2015c). Modeling of the Great Plains and Great Lakes populations have indicated that the species has a low probability of persisting for more than 100 years (Elliott-Smith and Haig 2004).

### Whooping Crane

The Whooping Crane (*Grus americana*) was listed as endangered effective March 11, 1967 under the Endangered Species Preservation Act of 1966 (32 FR 4001). Critical habitat was designated for the species on May 15, 1978 (43 FR 20938). Critical habitat was revised on July 21, 1997 (62 FR 38932).

Brought back from the brink of extinction by intensive recovery efforts, the Whooping Crane is an environmental success story. Population declines (the population sank to only 15 individuals in 1941) were primarily the result of shooting and destruction of prairie habitat (CWS and USFWS 2007, USFWS 2012b). Historically, the documented breeding range of the Whooping Crane included tall and mixed-grass prairie marshes throughout the central US and Canada. Wintering locations included tall grass prairie, wetlands, deltas, and interior tablelands along the southeast and Gulf Coast, including Florida. Currently, four populations of Whooping Cranes exist in North America, only one of which is self- sustaining. This naturally occurring population, the Aransas/Wood Buffalo population, nests in in the Northwest Territories and Alberta within Wood Buffalo National Park and winters along the Texas Gulf Coast at the Aransas National Wildlife Refuge (Urbanek and Lewis 2015). Two reintroduction efforts (out of an initial four) are ongoing, the Eastern Migratory Population and the Louisiana non-migratory population (USFWS 2012b, Urbanek and Lewis 2015). Reintroduced Whooping Cranes in Florida, located in the Kissimmee Prairie area, are designated as an experimental, non-essential population (population size of five as of March 2019; 58 FR 5647, International Crane Foundation 2019). Reintroduction efforts in Florida were hampered by drought conditions and ceased in 2005 (USFWS 2012b). As of the winter of 2018/2019, the national wild population comprised of over 505 individuals (Butler and Harrell 2019).

Whooping Cranes breed in April and May (CWS and USFWS 2007). The preferred nesting habitat for the species is shallow, silty-bottom wetlands with trees such as willow, spruce, and birch. The species is well known for their elaborate courtship displays. Nests are constructed on shallow water islands out of surrounding vegetation (e.g., bulrush, cattail, etc.). The species is omnivorous and feeds on crustaceans, fish, amphibians, small reptiles, tubers, insects, berries, and grains (Urbanek and Lewis 2015). During fall migration, the Aransas/Wood Buffalo population leaves their breeding grounds in Canada between September and October. The birds take roughly 50 days to reach their wintering grounds at the Aransas National Wildlife Refuge on the Gulf Coast. Spring migration is initiated between late March and mid-April and may take as little as 10 days (CWS and USFWS 2007, Urbanek and Lewis 2015). The species remains at risk due to numerous factors such as environmental degradation, genetic bottlenecks, climate change, and natural disasters (USFWS 2012b). In addition, the slow reproductive rate of the species hampers breeding efforts (CWS and USFWS 2007).

### Eastern Black Rail

The Eastern Black Rail (*Laterallus jamaicensis jamaicensis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The subspecies remains under review at this time (USFWS 2020a).

The Eastern Black Rail is a subspecies of the Black Rail that inhabits brackish, freshwater, and saltwater wetlands with dense vegetation cover in eastern North and Central American and the Caribbean. While some populations are migratory, in Florida the subspecies is present year-round. On the Florida Gulf Coast, breeding habitat is dominated by black needlerush (*Juncus roemerianus*) and cordgrass (*Spartina* spp.), coastal saltgrass (*Distichlis spicata*), Jamaican swamp sawgrass (*Cladium jamaicense*), and wax myrtle (*Myrica cerifera*). The breeding

season spans from March through August. Nest cups are built out of emergent, herbaceous plants in a clump of vegetation over mud or shallow water usually at higher elevations in the marsh; these are required refugia to survive high water events as these rails do not typically fly. Nest failure is common with flooding and heavy rain. Average clutch size is seven eggs (USFWS 2018d). Eastern Black Rails feed on seeds and a variety of invertebrate prey including aquatic beetles, weevils, and snails (Eddleman et al. 19994, USFWS 2018d).

The subspecies has undergone a significant range contraction in the last century. Historic and current threats to the subspecies include marsh habitat loss, degradation, fragmentation (conversion to urban or agricultural lands and sea level rise), stochastic events, and incompatible land management. Historically, mosquito abatement measures in the region may have also reduced habitat for the subspecies. Currently, there are an estimated 200 to 500 breeding pairs in Florida. The subspecies is considered to have a low level of resiliency in the southeast and further extirpations are anticipated (USFWS 2018d).

### Wood Stork

The Wood Stork (*Mycteria americana*) was listed as endangered effective March 29, 1984 (49 FR 7332). The species was downlisted to Threatened effective June 30, 2014 (79 FR 37077). Critical habitat has not been designated (USFWS 2020a).

The Wood Stork is a wading bird that occurs in the southeastern US, Cuba, Hispaniola, as well as Central and South America. The populations currently listed under the ESA are located in Florida, Georgia, the Carolinas, Alabama, and Mississippi (USFWS 2007d). The Wood Stork was originally listed due to population declines in the early and mid-1900s, stemming from inhibited/reduced natural wetland function in south Florida ecosystems tied to water management practices including the Central and Southern Florida project (USFWS 1999b, USFWS 2007d).

The species inhabits freshwater, estuarine wetlands, cypress and mangrove swamps, stock ponds, and seasonally flooded agricultural areas (USFWS 1996a, USFWS 1999b, USFWS 2007d). Wood Storks breed in colonies. In Florida, major colonies are located in the following counties: Broward, Charlotte, Collier, Miami-Dade, Hardee, Indian River, Lee, Monroe, Osceola, Palm Beach, Polk, St. Lucie, and Sarasota (USFWS 1999b). Nesting site features include tall trees either in water (swamps) or located on islands surrounded by water. In Florida, the nesting season runs from October to June (USFWS 1996a, USFWS 1999b). Nests are platforms constructed out of sticks, Spanish moss, and leaves and may be placed in a variety of tree species including bald cypress (*Taxodium distichum*), swamp black gum (*Nyssa biflora*), southern willow (*Salix carolina*), and red mangroves (*Rhizophora mangle*) (USFWS 1999b, USFWS 1996a). Wood Storks feed on fish, and the species is heavily dependent on hydrology (dropping water levels) to concentrate fish in foraging areas (USFWS 1996a). Although not a traditional migrant, the species tends to disperse following the breeding season and in response to local environmental conditions (Coulter et al. 1999). Since its initial listing, the species' status has improved, with an increase in breading pairs and nesting colonies across the southeast. In addition, the species has undergone a range extension. Based on the most recent USFWS five-year review, 50 to 75 percent of recovery objectives have been achieved. Current threats to the species include wetland habitat loss, fragmentation, and modification (USFWS 2007d).

### Eskimo Curlew

The Eskimo Curlew (*Numenius borealis*) is listed as endangered effective March 11, 1967 (32 FR 4001). Critical habitat has not been designated (USFWS 2020a).

The historical range for the Eskimo Curlew covered all 48 contiguous states (including Florida), as well as Alaska. Currently, the Eskimo Curlew may still occur in Alaska, Nebraska, and Texas (USFWS 2020a).

Eskimo Curlews were not well studied before their decline and little is known about their biology (USFWS 2016a). Only two confirmed breeding sites for Eskimo Curlews exist from tundra areas in the Northwest Territories of Canada (Gill et al. 1998, USFWS 2016a). Their breeding range likely included tundra habitats in the Northwest

Territories, Nunavut, and possibly Alaska and eastern Russia. Nests were constructed as simple scrapes on bare ground with typically four eggs (USFWS 2016a). As long-distant migrants, they traveled from their breeding grounds to overwinter in the Pampas regions of Argentina, Brazil, Uruguay, Chile, and Patagonia (Gill et al. 1998, USFWS 2016a). Their diet was based on an annual cycle with dependence on insect eggs, larvae, and adults during their northward migration and on ericaceous berries and marine invertebrates during their southward migration. They utilized prairie habitats in the Midwestern United States on their spring migration and a variety of terrestrial and coastal habitats on their fall migration (Gill et al. 1998).

Eskimo Curlew population numbers were once thought to range in the hundreds of thousands (USFWS 2016a). However, by the end of the 19th century, their populations had declined precipitously as a result of market hunting (USFWS 2016a, Lewis 2018). Other contributing factors were habitat loss with the conversion of grasslands for agricultural use and the extinction of one of their primary food sources, the Rocky Mountain Grasshopper (*Melanoplus spretus*) (Lewis 2018). The last confirmed sighting dates from 1963 from a specimen collected in Barbados.

Based on multiple analyses, the USFWS concluded the likelihood that Eskimo Curlews are extant is extremely low (USFWS 2016a). However, the Service has not declared the species extinct because of recent potential sightings in the last two decades (USFWS 2016a). At this time there is no expectation of presence in Florida.

### Red-cockaded Woodpecker

The Red-cockaded Woodpecker (*Picoides borealis*) was listed as endangered effective October 8, 1970 (35 FR 16047). Critical habitat has not been designated (USFWS 2020a).

The Red-cockaded Woodpecker is a keystone species endemic to old growth, pine savanna ecosystems in the southeastern US (USFWS 2003a). These pine ecosystems are defined by longleaf pine (*Pinus palustris*), shortleaf pine (*P. echinata*), loblolly (*P. taeda*), or slash pine (*P. elliottiil*) and abundant herbaceous groundcover. Red-cockaded Woodpeckers underwent precipitous population declines in the 1800s and 1900s due to habitat loss (logging and agriculture), incompatible forest management practices, and fire suppression (USFWS 2003a). There are currently 10 core populations of the species remaining, and the total population was estimated as 14,068 in 2003 (USFWS 2003a, USFWS 2006). In Florida, the largest populations occur in the Panhandle. Estimated population size for the state is roughly 1,500 pairs (USFWS 1999b). Red-cockaded Woodpeckers are non-migratory and territorial year-round. The species feeds on arthropods, beetles, moths, and a variety of other insects as well as fruits and seeds. They breed cooperatively in family groups (have helpers at the nest) (USFWS 2003a). The species is limited by the availability of old growth pines; the species excavates their own cavities, a process which may take several years. Nest trees are frequently infected with a heartwood fungus (*Phellinus pini*). These trees are in open stands with little to no hardwood midstory or overstory (Jackson 1994, USFWS 2003a). The nesting season in Florida runs from April through June (USFWS 1999b).

Threats to the species include suppression of natural fire regimes (which allows encroachment of hardwoods in habitat), genetic stochasticity, and habitat loss (USFWS 2003a). The species status is considered to be improving, bolstered by intensive management efforts including creation of artificial nest cavities, translocation, and prescribed burning (USFWS 2006).

### Audubon's Crested Caracara

Audubon's Crested Caracara (*Polyborus plancus audubonii*) was listed as threatened effective August 5, 1987 (52 FR 25229). Recent taxonomic data indicates that Florida caracaras should be recognized as a discrete population of the Northern Crested Caracara (*Caracara cheriway*) (Dove and Banks 1999, USFWS 2008c). Critical habitat has not been designated (USFWS 2020a).

The Northern Crested Caracara is a distinctive, medium-sized raptor that inhabits open, upland prairies, interspersed with ponds, marshes, and cabbage palm hammocks in south-central Florida. The species' current

range is limited to the following counties: Brevard, Charlotte, Collier, De Soto, Glades, Hardee, Hendry, Highlands, Indian River, Manatee, Martin, Okeechobee, Osceola, Palm Beach, Polk, and St. Lucie (Morrison and Dwyer 2012).

Northern Crested Caracaras in Florida are non-migratory (USFWS 2008c). The majority of occupied habitat and nesting occurs on private rather than public lands. Nests are built in tall trees (e.g., cabbage palms) bordering open habitat and nest fidelity is common (Morrison and Dwyer 2012). Crested Caracaras may breed year-round in Florida although the majority of nesting occurs from October through March (Dwyer 2010). The species feeds on road-kill carrion as well as invertebrates and a variety of vertebrate prey (fish, reptiles, birds, eggs, etc.) (USFWS 2008c, Morrison and Dwyer 2012). The species has declined throughout its range from the 1900s to the 1980s (USFWS 1999b). Threats to the species include habitat loss, degradation, and fragmentation, specifically from urbanization in south-central Florida (particularly loss or conversion of cattle ranches). Loss of natural fire regimes also have resulted in habitat homogeneity that threatens the species. In addition, this population is isolated from other breeding populations (closest is Cuba) and may be subjected to factors such as reduced gene flow and loss of genetic diversity (USFWS 2008c).

### Black-capped Petrel

The Black-capped Petrel (*Pterodroma hasitata*) was proposed for listing as Threatened under the Endangered Species Act on October 9, 2018 (83 FR 50560). The species remains under review at this time (USFWS 2020a).

The Black-capped Petrel, or regionally “diablotín” (“little devil”), is a pelagic seabird that nests on the island of Hispaniola and forages offshore of the southeastern US. The species exhibits nest site fidelity (83 FR 50560). The majority of nest sites are located in the Parc National La Visite. Nesting habitat includes high elevation montane forests. Nest burrows are located in rocky substrate on steep slopes, rock crevices, and caves and lined with twigs and pine needles. Black-capped Petrels lay one egg per breeding attempt; therefore, productivity and fecundity are inherently low. The species commonly forages in flocks at night or in the early morning in the Gulf Stream in areas with upwellings (USFWS 2018e). Prey items include crustaceans, squid, and fish (83 FR 50560). Historically, the species was harvested on Hispaniola for consumption. Current threats to the species include breeding habitat loss from deforestation and forest fires, climate change, invasive predators, and human population growth (USFWS 2018, NatureServe 2020). Currently, the estimated number of breeding birds on Hispaniola is 500 to 1,000 and population resiliency is considered to be low. Off the coast of Florida, Black-capped Petrels may be found year-round in relatively shallow waters near shore (USFWS 2018e, NatureServe 2020).

### Everglade Snail Kite

The Everglade Snail Kite, also known as the Snail Kite, (*Rostrhamus sociabilis plumbeus = Rostrhamus sociabilis*) was listed as endangered effective March 11, 1967 under the Endangered Species Preservation Act of 1966 (32 FR 4001). Critical habitat was designated for the subspecies on August 11, 1977 (42 FR 40685). The designation was revised on September 22, 1977 (42 FR 47840).

The Everglade Snail Kite is a non-migratory raptor that resides in central and South Florida, Cuba, and Honduras (AOU 1983, USFWS 1999b). In Florida, the historic distribution of the species was considerably larger than the current range and included most of the peninsula. The distribution of Everglade Snail Kite is currently limited to the following freshwater ecosystems: Upper St. Johns marshes, Kissimmee River Basin, Lake Okeechobee, Loxahatchee Slough, the Everglades, and Big Cypress basin. Species habitat preferences include freshwater marshes with shallow water, patchy emergent vegetation, and large expanses of open water for foraging. Emergent vegetation is important for nesting habitat. Other important habitat features include communal roosts, typically in riparian tree species within or bordering the marsh/lake, which are used throughout the year (USFWS 1999b). Snail Kites nest in patches of emergent marsh vegetation such as sawgrass (*Cladium jamaicense*) and cattails (*Typha* spp.) over water. The species may also nest in small trees such as willows (*Salix spp*), pond cypress (*Taxodium ascendens*), and paperbarks (*Melaleuca*). Nests are a loose platform of woven sticks and

herbaceous vegetation. The Snail Kite is a specialist that preys on the native Florida Apple Snail (*Pomacea paludosa*), but is also adapting to prey on the Exotic Apple Snail (*Pomacea insularum*; USFWS 2019j). Shallow, open, calm and clear water is required for foraging habitat (USFWS 1999b).

Threats to the species include habitat loss and fragmentation, hydrology management practices in the state (that may directly or indirectly impact both the kite and its prey), predation, invasive species (predators as well as the Exotic Apple Snail), and anthropogenic sources of disturbance. Another threat to the species is that designated critical habitat does not closely match habitat currently being used by the species (USFWS 2019j). The subspecies is considered to be in decline, and juvenile survival has been trending downward in the last decade (USFWS 2008d, USFWS 2019j).

### Roseate Tern

The Roseate Tern (*Sterna dougallii dougallii*) is managed as two separate populations. The Northeast population is listed as endangered and the Caribbean population as Threatened effective November 2, 1987 (52 FR 42064). The Service announced the initiation of a five-year species review in 2018 (83 FR 39113). Critical habitat has not been designated (USFWS 2020a).

The range of the Roseate Tern includes the two listed populations as well as populations in Britain, France, the Azores, Canary Islands, and southeastern Africa (USFWS 2010e). They almost solely breed in large colonies on islands (Nisbet et al. 2014). A metapopulation of the Caribbean Roseate Tern is known to breed in 12 areas of the Florida Keys (USFWS 2010e, Nisbet et al. 2014). High colony site fidelity has been documented in the Northeast population. Nests are simple scrapes on the ground comprised of sand, rock, or vegetation. The species feeds on small marine fish (Nisbet et al. 2014).

Historically, Roseate Terns suffered declines as a result of overharvesting for the millinery trade (52 FR 42064). The species continues to be particularly vulnerable because of its small and localized nesting populations. These habitats face a variety of threats such as erosion, invasive plant species, sea level rise, and intensification of storms. For instance, severe winter storms in 2005 substantially eroded colony sites within Florida, resulting in the species relocating to other areas for breeding. Additionally, breeding colonies often experience substantial pressure from mammalian predators. In Canada, displacement from colony sites by competing gulls is a significant threat (USFWS 2010e).

### Bachman's Wood Warbler

Bachman's Wood Warbler, hereafter Bachman's Warbler per recent naming standards, (*Vermivora bachmanii*) was listed as endangered effective March 11, 1967 (32 FR 4001). Critical habitat has not been designated (USFWS 2020a). This species is considered to be extinct by most authorities (Hamel 2011).

Historically, this species bred in the southeastern US and wintered in Cuba and the Isle of Youth. However, habitat loss on both the breeding and wintering grounds and other population pressures beginning in the 1800s resulted in considerable species declines. The Bachman's Warbler is now considered to be one of the rarest passerines in North America. It has not been documented in the states since 1962 and the last sighting in Cuba is from 1981 (USFWS 2015d, Hamel 2018).

Habitat preferences and behavior of the species are not well understood. Breeding habitat likely consisted of bottomland hardwood forested wetlands with an understory of cane/bamboo (*Arundanaria gigantea*) or palmetto (*Sabal minor*). Longleaf pine forest and brackish marsh habitat may also have served as breeding habitat. All documented nests (cups of grass and leaves) have been located in dense understory close to the ground. Wintering habitat potentially included the Cuban lowlands, but this is not well documented (Hamel 2018). Historical threats to the species included habitat loss from palustrine forested wetland habitat conversion to agriculture (sugar cane production) as well as logging. Diet included invertebrates. Bachman's Warblers were previously documented in Florida while passing through on migration (breeding has not been documented in the state)

(Hamel 2011, USFWS 2015d). The species is not currently known to occur in Florida (USFWS 1999b).

### Golden-winged Warbler

The Golden-winged Warbler (*Vermivora chrysoptera*) was petitioned for listing on February 10, 2010 by a private citizen (Sewell 2010), and the 90-day finding determined that the listing may be warranted (76 FR 31920). The species remains under review at this time (USFWS 2020a).

The Golden-winged Warbler is a neotropical migrant that breeds in upland and wetland forest landscapes in the Great Lakes and Appalachian regions of North America and winters in Central and South America. The species occurs in Florida strictly during migration (Confer et al. 2011, Roth 2012). Migration records from the state are primarily clustered in the Panhandle with few records from the coast. Habitat on migration is not well documented, but may include forest edge and second-growth forest (Confer et al. 2011). On their breeding grounds, the species is associated with early successional, disturbed habitats with dense shrubs, often near forest edges, with low to moderate canopy cover (76 FR 31920, Confer et al. 2011). Golden-winged Warblers construct their nests on the ground or in a grassy tussock. Nests are constructed out of woven plant material including leaves and bark (Confer et al. 2012). The species feeds on moths, larvae, and spiders (76 FR 31920, Confer et al. 2011)

This species is declining throughout its range as a result of habitat loss (on both the breeding and wintering grounds), degradation (through fire suppression and development), fragmentation, cowbird nest parasitism, and competition and hybridization with the co-occurring Blue-winged Warbler (*Vermivora cyanoptera*) (76 FR 31920, Confer 2011, Roth et al. 2012). This species also is known to have high levels of mortality during migration from building strikes (Roth et al. 2012). Extensive management of breeding habitat in the northeast and Great Lakes regions has successfully bolstered regional populations (McNeil et al. 2017).

## REPTILES

### American Alligator

The American Alligator (*Alligator mississippiensis*) was listed as endangered effective March 11, 1967 (32 FR 4001). This was prompted by decimation of their populations as a result of unregulated harvesting.

Federal protections and wide scale recovery efforts led to a swift recovery and the species is no longer considered to be “biologically endangered or threatened” (52 FR 21059). Based on similarity of appearance to the American Crocodile, which is currently listed under the Endangered Species Act, the American Alligator was reclassified to Threatened in 1975 (40 FR 44412). Critical habitat has not been designated (USFWS 2020a).

The American Alligator is one of the two native crocodilian species to North American, the other being the American Crocodile (70 FR 15052). The range of the American Alligator includes Georgia, Louisiana, Mississippi, North Carolina, Oklahoma, South Carolina, Florida, and Texas. The majority (83 percent) of Alligator habitat available within this range is concentrated in Florida, Louisiana, and Texas (52 FR 21059). They utilize a variety of wetland habitats including but not limited to marshes, ponds, lakes, rivers, swamps, bayous, and canals. Females construct nest mounds from debris (e.g., vegetation, rocks, mud, etc.), often in marshes or near lakes and rivers. As opportunistic predators, they feed on a wide array of prey from invertebrates as juveniles to deer as large adults (NatureServe 2020).

### Spotted Turtle

The Spotted Turtle (*Clemmys guttata*) was petitioned for listing on July 11, 2012 (CBD 2012) and the 90- day finding in 2015 determined that listing may be warranted (80 FR 37568). The species remains under review at this time (USFWS 2020a).

Although the range of the Spotted Turtle is extensive and extends from the Great Lakes along the Atlantic Coast

and into northern Florida (Ernst and Lovich 2009), the species has apparently been extirpated from many regions resulting in disjunct populations (CBD 2012). Habitat includes a variety of shallow, isolated wetlands with clean water, soft substrate, and emergent or submerged vegetation (Ernst and Lovich 2009). The species may engage in terrestrial movements, especially in spring. In cold weather, hibernation occurs in water depths of 56 to 94 centimeters with muddy bottoms and dense vegetation (CBD 2012). Spotted Turtle populations tend to be small and isolated, and dispersal ability is limited (van Dijk 2010, Anthonysamy et al. 2014). Threats to the species include habitat destruction and loss of wetlands, collection for the pet trade, road mortality, and invasive species (Ernst and Lovich 2009, van Dijk 2010).

### American Crocodile

The American Crocodile (*Crocodylus acutus*) is managed as two separate populations, those in Florida and those that occur in the rest of the United States. The US population of American Crocodile was listed as endangered effective October 25, 1975 (40 FR 44149). The Florida population was classified as a distinct population segment and listed as threatened effective May 1, 2006 (71 FR 13027). In 1978, the Saltwater (estuarine) Crocodile (*Crocodylus porosus*) was listed as endangered because of the similarity in appearance (44 FR 75074, 70 FR 15052). Critical habitat has been designated (41 FR 41914, 42 FR 47840), and includes “portions of Biscayne Bay south of Turkey Point, northeast Florida Bay, including the Keys, and the mainland extending as far west as Flamingo” as well as Everglades National Park (70 FR 15052).

The American Crocodile is one of the two crocodilian species native to North America. The broader range of the American crocodile includes the Caribbean Islands and the Atlantic and Pacific coastal regions along southern Mexico, Central America, and northern South America. In Florida, at the northern extent of its range, it is limited to the southern tip of Florida and the Florida Keys, with the historic core concentrated in Miami-Dade, Broward, and Monroe Counties. Crocodile habitat includes mangrove-lined bays, swamps, and marshes (70 FR 15052). Adult crocodiles are powerful predators and feed primarily on fish (NatureServe 2020), as well as a wide array of prey including birds, mammals, crabs, and turtles. Young specialize in fish and aquatic invertebrates (USFWS 2020a). They are primarily nocturnal, aiding in prey ambush. Earthen nests are constructed on well-drained soils in close proximity to water, often along ditches and beaches. Females lay an average of 38 eggs, and often will not nest every year. The nest must be excavated by the female after the young have hatched (70 FR 15052).

The American Crocodile was historically common across southern Florida, with breeding records as far north as Lake Worth. Their populations were decimated because of habitat loss from development and excessive human persecution. At the time of listing in 1975, only an estimated 10 to 20 breeding females remained in Florida (40 FR 44149). Through the protections afforded by listing, their populations grew from 200 to 300 individuals in 1975 to 500 to 1,000 individuals in 2005 (70 FR 15052). As of 2005, the mainland shore of Florida Bay between Cape Sable and Key Largo makes up the majority of the current breeding range (70 FR 15052). They may be expanding their range back into the Florida Keys, but nesting is only known from Key Largo (70 FR 15052).

### Eastern Diamondback Rattlesnake

The Eastern Diamondback Rattlesnake (*Crotalus adamanteus*) was petitioned for listing on August 22, 2011 (CBD 2011a), and the 90-day finding determined that listing may be warranted (77 FR 27403). The species remains under review at this time (USFWS 2020a).

Although the species was historically distributed through much of the southeast from Louisiana to North Carolina, there have reportedly been considerable declines over much of the range (Means 1986, Waldron et al. 2008, CBD 2011a). In Florida, large sub-populations remain in the northern peninsula and the eastern and southern Panhandle (Timmerman and Martin 2003); however, populations in other parts of the state have been considerably reduced or in some cases extirpated (Means 2010). About half of the currently occupied range is in Florida (Timmerman and Martin 2003). The primary pre-settlement habitat was longleaf pine savanna (Means 2006), although other open-canopy habitats with a dense herbaceous understory are also utilized today. In addition to

habitat conversion or loss, rattlesnakes are actively targeted for malicious killing by humans (Means 2010).

### Key Ringneck Snake

The Key Ringneck Snake (*Diadophis punctatus acricus*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding determined that listing may be warranted (76 FR 59835). The subspecies remains under review at this time (USFWS 2020a).

Distribution is restricted to five Lower Keys: Key West, Big Pine, Little Torch, Middle Torch, and No Name keys. Presence on a few additional keys which have suitable habitat is possible but unverified (Weaver et al. 1992). Habitat includes pine rocklands and rockland hammocks, usually near permanent fresh water (Lazell 1989, FNAI 2001a). Up to 98 percent of pine rockland habitat has reportedly been lost (Bentzien 1987) and what remains has been fragmented. There have been few recent surveys for Key Ringneck Snakes (and relatively few individuals found) (CBD 2012). Storm surge and sea level rise could be a future risk given the low elevation of much of the remaining habitat (FWC 2011b).

### Eastern Indigo Snake

The Eastern Indigo Snake (Drymarchon couperi = Drymarchon corais couperi) was listed as threatened effective March 3, 1978 (43 FR 4026). Critical habitat has not been designated (USFWS 2020a).

Indigo Snakes are currently considered to be extirpated or very rare in the Florida Panhandle (Enge et al. 2013). The majority of recent records are in Peninsular Florida south of Gainesville. Indigo Snakes require large patches greater than 4000 hectares of contiguous, good quality habitat with few roads and sufficient shelter sites, such as Gopher Tortoise burrows (USFWS 2019k). Individual home ranges are large, from tens to several hundred hectares. A variety of upland and lowland habitat types are utilized, generally with a preference for upland habitat (Bauder et al. 2018). Winter shelter is a key structural component, and may include Gopher Tortoise burrows, hollowed root channels, hollow logs, stump holes, rodent or armadillo burrows, or other similar shelter (Hyslop et al. 2014, Bauder et al. 2017, USFWS 2019k).

There have been considerable Indigo Snake population declines reported, including a 97 percent loss in the Florida Panhandle and 56 percent loss in Peninsular Florida. Out of 83 total historic populations, 53 remain extant, although only four are considered to have high resiliency. Major threats to the species include habitat fragmentation, fire suppression leading to eventual habitat degradation, and road mortality (USFWS 2019k).

### Gopher Tortoise

The Gopher Tortoise (*Gopherus polyphemus*) is managed as two separate populations, western and eastern. The western Gopher Tortoise population was listed as threatened effective August 6, 1987 (52 FR 25376). The Gopher Tortoise eastern population was petitioned for listing on January 18, 2006 (USFWS 2018f). The listing was determined to be warranted; however, the species has been precluded from listing because of delays from higher priority listings (USFWS 2018f). Thus, the eastern population remains a Candidate for listing (USFWS 2020a). Critical habitat has not been designated (USFWS 2020a).

The western Gopher Tortoise population occurs west of the Mobile and Tombigbee Rivers in Alabama, Louisiana, and Mississippi (USFWS 2020a). The eastern Gopher Tortoise population occurs east of the Mobile and Tombigbee Rivers in Alabama, Georgia, Florida, and South Carolina (USFWS 2020a). The majority of the eastern population occurs in Florida (CBD 2020b). The species is associated with habitats characterized by dry sandy soils, open canopy cover, and abundant herbaceous vegetation (USFWS 2018f). Gopher Tortoises are considered a keystone species because the burrows they dig are utilized by 360 other species (CBD 2020b). The primary threats to Gopher Tortoise populations include habitat loss, degradation, and fragmentation (84 FR 54732).

### Escambia Map Turtle

The Escambia Map Turtle (*Graptemys ernsti*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

This species is endemic to very few relatively small river systems in western Florida and adjacent southern Alabama where it is locally abundant, with populations appearing to be relatively stable (NatureServe 2020). The species usually favors areas with good flow, avoids backwaters and salt water, and nests along sandbars and river berms. Basking individuals are conspicuous from late spring to fall, despite being present year-round. Florida currently has a state possession limit of two turtles, however it is illegal to buy or sell the species or its parts. Future management recommends the acquisition of remaining private floodplain and bordering uplands in both Escambia and Yellow river systems, and to identify and control sources of pollution within those river systems (FNAI 2001a).

### Southern Hognose Snake

The Southern Hognose Snake (*Heterodon simus*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding in 2015 determined that listing may be warranted (80 FR 37568). Following further review in 2019, the USFWS announced that the listing was not warranted based on likely population persistence (84 FR 53336).

The Southern Hognose Snake is endemic to the Coastal Plain of the southeastern United States. The species range extent includes 200,000 to 2,500,000 square kilometers with a presumed population of at least several thousand. The main threats to the species are loss of habitat through fire and urban development, fragmentation, and invasive species such as red imported fire ants and feral hogs (USFWS 2019l). The Southern Hognose Snake inhabits open, xeric habitats with well-drained, sandy soils, dominated by pine or pine-oak woodland with an open canopy and grassy understory (Enge et al. 2016). They spend a considerable amount of time burrowed in the soil and may use their snout to excavate buried toads (NatureServe 2020). Further studies are required to determine the factor or combination of factors that have caused the population to decline. Once established, management strategies can be implemented.

### Apalachicola Kingsnake

The Apalachicola Kingsnake (*Lampropeltis getula meansi*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding determined that listing may be warranted (80 FR 37568). The subspecies remains under review at this time (USFWS 2020a). The petition requested listing of the subspecies if recognized, or as a distinct population segment (DPS) level if not recognized. Krysko et al. (2017) presented further genetic evidence that the Apalachicola Kingsnake may be a distinct species.

Endemic to the Florida panhandle, the range of the Apalachicola Kingsnake is limited to Franklin and Liberty Counties between the Apalachicola and Ochlockonee Rivers and south of Telogia Creek. Some intergradation with the nominate subspecies has been reported in surrounding counties (Krysko and Judd 2006). Habitat has been described as wetland margins within longleaf pine flatwoods. The Apalachicola Kingsnake has been found in freshwater marshes in the Apalachicola River estuary and behind the Franklin County beachfront (Moler 1992). The subspecies has declined considerably since the 1970s in part due to extensive development in the southern Apalachicola region, where only two to three percent of the original longleaf pine savanna is estimated to remain intact (Noss et al. 1995, Krysko and Smith 2005).

### Alligator Snapping Turtle

The Alligator Snapping Turtle (*Macrochelys temminckii*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding determined that listing may be warranted (80 FR 37568). Despite a lawsuit filed by the Center for Biological Diversity in 2016 pressing for more timely protection, the species remains under review at this time (CBD 2016, USFWS 2020a). A recent genetic study proposed two new species (*Macrochelys apalachicolae* and *Macrochelys suwanniensis*) that had previously been considered Alligator Snapping Turtle (Thomas et al.

2014, CBD 2016).

Alligator Snapping Turtles are fully aquatic (except while nesting), foraging on the bottom of permanent water bodies. Their diet consists primarily of aquatic animals, supplemented with carrion and plants (NatureServe 2020). They are secretive and occupy large home ranges (NatureServe 2020).

Alligator Snapping Turtle populations are experiencing drastic declines and the species has been extirpated from much of their historic range, including Iowa, Illinois, Kentucky, Missouri and Tennessee. Extant populations remain in Alabama, Arkansas, Florida, Georgia, Indiana, Kansas, Louisiana, Mississippi, Oklahoma, and Texas. Primary threats to their populations are overharvest in the exotic trade market and habitat loss (CBD 2012).

### Atlantic Salt Marsh Snake

The Atlantic Salt Marsh Snake (*Nerodia clarkii taeniata*) was listed as threatened effective December 29, 1977 (42 FR 60743). Critical habitat has not been designated (USFWS 2020a). The 2008 and 2019 five- year reviews prioritized taxonomic and genetic analysis because status at both the specific and subspecific levels is unknown and in question. Analysis reportedly was scheduled for completion late in 2019 (USFWS 2019m) but is not yet available. Earlier work suggests that the subspecies may not be genetically, morphologically, or ecologically distinct (Territo 2013, Parkinson et al. 2016).

As currently defined, the range of the Atlantic Salt Marsh Snake is believed to be restricted to coastal marshes in Volusia County, Florida (Territo 2013). Habitat is described as brackish coastal marshes dominated by pickleweed (*Salicornia* spp.) and saltgrass (*Distichlis spicata*); black mangrove (*Avicennia* spp.) may also be present. Habitat loss due to development and habitat degradation resulting from ditching, diking, and impoundments has had a negative impact on the species, but these impacts have slowed in recent years (USFWS 2019m). Florida Natural Areas Inventory mapped 3,696 hectares of suitable habitat for the subspecies, of which 95 hectares are protected within public lands (FNAI 2007). Nearly 400 hectares of salt marsh have recently been restored in Volusia County. Northward encroachment of mangrove swamp replacing brackish marsh is reportedly a threat to subspecies habitat (USFWS 2019m).

### Florida Pine Snake

The Florida Pine Snake (*Pituophis melanoleucas mugita*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding in 2015 determined that listing may be warranted (80 FR 37568).

This southeastern Coastal Plain species occurs from South Carolina to Alabama, including Florida north of the Everglades (Ernst and Ernst 2003). Preferred habitat is characterized by well-drained sandy soils and relatively open canopy, including sandhills, xeric hammock, scrubby flatwoods, and dry prairie (Enge 1997, Franz 2005). In northern Florida, most observational reports are from sandhill or high pine habitat. The number of reports has decreased over time, suggesting an ongoing population decline (Franz 2005). Major threats are thought to include collecting, road mortality, and habitat loss (Franz 1992, Golden et al. 2009).

### Bluetail Mole Skink

The Bluetail Mole Skink (*Plestiodon egregious lividus* = *Eumeces egregious lividus*) was listed as threatened effective December 7, 1987 (52 FR 42658). Critical habitat has not been designated (USFWS 2020a).

The subspecies has been reported from 23 localities, almost all of them on the Lake Wales Ridge in Highlands, Polk, and Osceola Counties; about half the localities are on public lands (Turner et al. 2006, USFWS 2007e). Because the subspecies is fossorial, spending much of its time underground, little abundance information is available. Populations are associated with scrub and sandhill habitat, and are believed to require loose soils, moderate soil temperatures, and presence of vegetation (although much of this information is inferred from studies of related species) (Mushinsky and McCoy 1999, Gianopulos et al. 2001). Threats to the subspecies include habitat fragmentation and a lack of site management resulting in dense overgrown vegetation.

### Sand Skink

The Sand Skink (*Plestiodon reynoldsi = Neoseps reynoldsi*) was listed as threatened effective December 7, 1987 (52 FR 42658). Critical habitat has not been designated (USFWS 2020a).

The species has been reported from 73 localities, 70 of them on the Lake Wales Ridge in central Florida (Turner et al. 2006, USFWS 2007e). The species is fossorial, spending much of its time underground; presence of loose, uncompacted, coarse-grained soil is thought to be an important habitat component. Populations are associated with scrub and sandhill habitat (Mushinsky and McCoy 1999, Gianopulos et al. 2001). Occasional fire is important to keep sites open, although Sand Skink densities tend to be somewhat higher on sites which have not burned in several years (Schrey et al. 2011), suggesting that there is a range of optimal fire frequency. Threats to the species include habitat fragmentation and a lack of site management resulting in dense overgrown vegetation. About 85 percent of pre-settlement sand scrub habitat has been lost to development, and only about six percent is currently protected (Turner et al. 2007). There is some evidence that populations may persist in lower densities in altered habitat as long as loose, dry soil is present (USFWS 2007e).

### Florida Red-Bellied (Florida Panhandle) Turtle

The Florida Red-bellied (Florida Panhandle) Turtle (*Pseudemys nelsoni* pop. 1) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (77 FR 27403). The species remains under review at this time (USFWS 2020a). There is no evidence of taxonomic distinctness between the Panhandle and peninsular populations in Florida; however, the populations are separated by a considerable physical distance (NatureServe 2020).

The Florida Panhandle population is restricted to the lower Apalachicola/Chipola River drainage, associated delta, and off-shore islands in the Florida Panhandle (NatureServe 2020). The remainder of the population is found from Suwannee River area south, primarily in Florida with extensions into Georgia. The species inhabits water rich with aquatic plant life, such as streams, ponds, lakes, ditches, sloughs, marshes, and mangrove-bordered creeks (Gleaton 2020). It is threatened by drought, predators, and (though now illegal) harvesting for food by turtle trappers. The Florida Red-bellied (Florida Panhandle) Turtle requires extensive survey work to verify its occurrence, population size, habitat use, and ecological and biological processes to establish appropriate management plans (NatureServe 2020).

### Florida Scrub Lizard

The Florida Scrub Lizard (*Sceloporus woodi*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding in 2016 determined that listing may be warranted (81 FR 63160). The species remains under review at this time (USFWS 2020a).

Endemic to Florida, the range consists of four disjunct areas: Ocala National Forest and vicinity in the northern Peninsula; portions of Polk and Highlands Counties in central inland Florida; Atlantic Coast scrub from Brevard to Broward Counties; and Gulf Coast scrub in Lee and Collier Counties (DeMarco 1992).

Habitat is limited to evergreen oak scrub and young sand pine scrub; and to a lesser extent sandhills adjacent to scrub or scrubby flatwoods. Both open areas and mature trees are required, and habitat is exclusively xeric (Hammerson 2007a). Density tends to be higher in recently burned areas (Tiebout and Anderson 2001, Schrey et al 2011). Declines are attributed to loss and fragmentation of sand scrub habitats and fire suppression (Whelan 1995).

#### Short-tailed Snake

The Short-tailed Snake (*Stilosoma extenuatum = Lampropeltis extenuata*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding in 2015 determined that listing may be warranted as of early 2020 (80 FR 56423). The species remains under review at this time (USFWS 2020a).

Found only in northern and central Florida, Short-tailed Snake preferred habitat includes dry upland habitats of sandhill, xeric hammock, and sand pine scrub (FNAI 2001a). They are rarely seen above ground and are known to burrow or use soil, fallen logs, or debris for shelter. Little is known about the ecology of this snake; as such, further studies on ecology, behavior, life history, movement patterns, and other natural history would be valuable to understand and effectively manage this species (NatureServe 2020).

### Rim Rock Crowned Snake

The Rim Rock Crowned Snake (*Tantilla oolitica*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90-day finding in 2015 determined that listing may be warranted (80 FR 37568). The species remains under review at this time (USFWS 2020a).

The range of the Rim Rock Crowned Snake is small, restricted to eastern Dade County around Miami and to several of the Keys. Most of the Dade County range is extirpated and what remains is fragmented, Very few specimens have been collected from this area (Hammerson 2007b). Habitat includes pine rockland and rockland hammock as well as disturbed urban environments including vacant lots, roadsides, and pastures (Hines and Bradley 2009, CBD 2012). In natural habitat types, refugia include crevices in oolitic limestone, rock rubble, or accumulated organic matter in depressions within the rock (Enge et al. 2003).

Animals are sometimes found under surface cover including rocks, downed woody debris, or palmetto leaves (Rochford et al. 2010, Yirka et al. 2010). Habitat loss and fragmentation are the primary threats to the species (CBD 2012).

## AMPHIBIANS

### Reticulated Flatwoods Salamander

The Reticulated Flatwoods Salamander (*Ambystoma bishopi*) was listed as endangered effective March 12, 2009, and critical habitat was designated simultaneously (74 FR 6700).The listing recognized Flatwoods Salamanders west of the Apalachicola and Flint Rivers as a distinct species from the Frosted Flatwoods Salamander, as originally proposed by Pauly et al. (2007).

Breeding occurs in the fall in acidic seasonal wetlands; eggs are inundated and larvae hatch after subsequent rains. Breeding ponds range from relatively open-canopy to dense canopy cypress domes, and are located within longleaf pine-dominated flatwoods or savannas with a predominantly wiregrass understory (Palis 1997, USFWS 2015e). Fire suppression may have led to increased canopy closure Gorman et al. 2013). Adults, and juveniles after leaving the ponds, spend most of their time underground in crayfish burrows or root channels (USFWS 2015e). The Florida range is entirely west of the Apalachicola River. Of the 20 populations known at the time of listing (11 on private land, nine on public land), only six were known to be extant as of 2014 (USFWS 2015e). All of these populationsare on public land, and five of them are in Florida. Private lands have not been extensively surveyed and status there is unknown.

### Frosted Flatwoods Salamander

The Flatwoods Salamander (*Ambystoma cingulatum*) was listed as threatened effective May 3, 1999 (54 FR 15691). Following a taxonomic revision which recognized two species of Flatwoods Salamander (Pauly et al. 2007), the listing was revised with the Frosted Flatwoods Salamander retaining Threatened status and defined as including populations east of the Apalachicola River (74 FR 6700). Critical habitat was designated for the Frosted Flatwoods Salamander in 2009 (74 FR 6700).

The Frosted Flatwoods Salamander has a disjunct range in parts of Florida, Georgia, and South Carolina; the historic Florida distribution included a band from the Apalachicola River to east of Tallahassee, and a separate area west of Jacksonville. Of the 25 populations identified in the original listing, only nine are confirmed extant

(USFWS 2019n). In Florida, five populations are within Apalachicola National Forest, and two are within St. Marks National Wildlife Refuge.

The Frosted Flatwoods Salamander breeds in the fall, depositing eggs in small depressions which are inundated by subsequent rains (Palis 1995, 1997). Aquatic larvae metamorphose from March to May and disperse from the ponds (Palis 1995). Terrestrial adult habitat is typically within mesic longleaf pine (Pinus palustris)/wiregrass flatwoods or savanna, or slash pine (Pinus elliottii)/sawgrass (USFWS 2019n).

Juveniles and adults spend considerable time underground in crayfish burrows or root channels (Petranka 1998). The species' population is in decline (USFWS 2019n). Habitat management recommendations include actions to increase herbaceous vegetation cover (Gorman et al 2014).

### Georgia Blind Salamander

The Georgia Blind Salamander (*Eurycea wallacei* = *Hadeotriton wallacei*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

Distribution is restricted to the karst region of the Marianna Lowlands-Dougherty Plain physiographic region of Florida and adjacent Georgia (NatureServe 2020). There are at least 22 localities in the Chipola River watershed of Jackson County, one in Calhoun County, and five in the Lower Choctawatchee River watershed of Washington County (Fenolio et al 2013, NatureServe 2020). Georgia Blind Salamanders are fully aquatic, neotenic, and restricted to streams and pools within caves. Presence may be associated with bat droppings (Means 2005). Although density may be high at some localities, there are no reliable population estimates because of the difficulty of sampling within caves (Fenolio et al 2013). Primary threats include habitat loss and water quality degradation (NatureServe 2020).

### Gopher Frog

The Gopher Frog (*Lithobates capito*) was petitioned for listing on July 11, 2012 (CBD 2012), and the 90- day finding determined that listing may be warranted (80 FR 37568). The species remains under review at this time (USFWS 2020a).

The Gopher Frog is a southeastern Coastal Plain species, extending from North Carolina to Florida with isolated populations in Alabama and Tennessee. Gopher Frogs historically occurred throughout Florida except in the Everglades (CBD 2012). Habitat is primarily fire-maintained xeric uplands (Greenberg and Tanner 2008), with breeding occurring in fishless semi-permanent emergent wetlands (Bailey 1991).

Gopher Frogs are commensal with Gopher Tortoises, relying on tortoise burrows for shelter (Kent et al 1997).

Although the historic range is extensive, Gopher Frog populations are thought to be in significant decline (Bailey 1991, CBD 2012). Threats include loss or degradation of longleaf pine (*Pinus palustris*) habitat as a result of logging and fire suppression, as well as wetland loss, introduction of fish into wetlands, ATV use, and reduced Gopher Tortoise populations (CBD 2012).

### Gulf Hammock Dwarf Siren

The Gulf Hammock Dwarf Siren (*Pseudobranchus striatus lustricolus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The subspecies remains under review at this time (USFWS 2020a).

The Gulf Hammock Dwarf Siren was described in 1951 from 11 specimens found in Levy and Citrus Counties, and has not been observed since. The survival and even the validity of the subspecies is uncertain because of the small number of available specimens and long interval since detection (NatureServe 2020). Habitat is believed to

be restricted to hydric hardwood hammocks within a small geographic area, where they burrow in the soft mud at wetland margins. Threats within the historic range include commercial forestry, habitat conversion for agriculture or development, and hydrology alteration (FWC 2008).

## FISH

### Shortnose Sturgeon

The Shortnose Sturgeon *(Acipenser brevirostrum)* was listed as endangered effective March 11, 1967 (32 FR 4001). Critical habitat has not been designated (USFWS 2020a).

The Shortnose Sturgeon's historical range spans riverine and estuarine waters along the Atlantic coast of North America from the Indian River in Florida to the St. John River in Canada. There are three metapopulations distributed across this area: northern, mid-Atlantic, and southern. The current range is disjunct, with a 402 kilometer gap between the northern and mid-Atlantic metapopulations and the southern metapopulation (NOAA 2020). The species is managed across 19 distinct population segments (DPSs) (NMFS 1998).

As primarily an amphidromous fish, Shortnose Sturgeon are born in freshwater rivers in which they live and spend most of their adult lives, making short trips to marine waters for foraging (NOAA 2020). Some populations in the southern range exhibit estuarine anadromous life histories, but adults remain in estuaries rather than foraging offshore and only engage in short-distance migrations (NMFS 1998). In the southern portion of their range, spawning occurs from January to April (NOAA 2020). Spawning habitat typically includes the uppermost reach of a river (NMFS 1998). Adult sturgeons are characterized as benthic feeders, primarily upon mollusks and crustaceans (NOAA 2020).

Extensive overfishing contributed to initial declines. Pollution and habitat impediments as a result of industrial development has prevented the recovery of this species (NMFS 1998). Ongoing major threats include habitat impediment (e.g., dams), habitat degradation (e.g., dredging and poor water quality), and fisheries bycatch (NOAA 2020).

### Gulf Sturgeon

The Gulf Sturgeon (*Acipenser oxyrinchus desotoi*, formerly known as *Acipenser oxyrhynchus desotoi*), was as Threatened effective October 30, 1991 (56 FR 49653). Critical habitat was designated for the Gulf Sturgeon on March 19, 2003 (68 FR 13370).

The Gulf Sturgeon is primarily confined to the eastern Gulf of Mexico and classified as a subspecies of Atlantic Sturgeon (*Acipenser oxyrinchus oxyrinchus*) (NatureServe 2020). This anadromous fish spends much of its adult life foraging in the Gulf during colder months of the year, returning to natal freshwater river systems to spawn from February to April (FNAI 2001a). The species may migrate as far as 225 kilometers upriver to spawn. Spawning typically occurs over substrates consisting of hard clay, rubble, and gravel (NatureServe 2020). Adults return to the Gulf of Mexico in late fall and young-of-the-years remain in their natal rivers for as long as 12 months before moving into the lower estuarine habitats (68 FR 13370). Adult sturgeons are characterized as bottom feeders, utilizing their barbels to scan the benthos primarily in search of invertebrates such as brachiopods, insect larvae, mollusks, worms and crustaceans (56 FR 49653).

Initially, population declines were the product of overfishing for caviar, smoked fish, and isinglass. Damming and disconnection of spawning grounds from the Gulf of Mexico is one of the current major factors contributing to the species decline. Other factors such as habitat modification due to dredging, navigation maintenance activities, and water pollution also pose potential threats (68 FR 13370). In Florida, the Gulf Sturgeon distribution extends from all major Panhandle river systems east to the Suwannee River (FNAI 2001a). The species seen as far southeast as Florida Bay, although these observations coincide with especially cold years and are rare (68 FR 13370).

### Atlantic Sturgeon

The Atlantic Sturgeon *(Acipenser oxyrinchus oxyrinchus)* is managed across five distinct population segments (DPSs) all of which were federally listed in 2012: the Carolina DPS, Chesapeake Bay DPS, New York Bight DPS, and South Atlantic DPS are listed as endangered; and the Gulf of Maine DPS is listed as threatened (77 FR 5913, 77 FR 5880). The South Atlantic DPS was listed as endangered effective April 6, 2012 (77 FR 5913). Critical habitat was designated for all DPSs in 2017 (82 FR 39160). Critical habitat for the South Atlantic DPS includes the Edisto, Combahee-Salkehatchie, Savannah, Ogeechee, Altamaha, Ocmulgee, Oconee, Satilla, and St. Marys Rivers in South Carolina, Georgia, and Florida (82 FR 39160).

The species' historical range spans riverine and coastal waters along the Atlantic coast of North America from Florida to Canada. As an anadromous fish, adults spend their lives foraging in the Atlantic Ocean, with records as far north as Iceland. Adults return to their natal freshwater rivers to spawn in springtime every one to five years. Adult sturgeons are characterized as bottom feeders, utilizing their barbels to scan the benthos primarily in search of invertebrates such as mollusks, worms, crustaceans, and fish (NOAA Fisheries 2020).

Extensive overfishing contributed to initial species declines (NOAA Fisheries 2020). Despite a moratorium on all Atlantic Sturgeon fisheries that began in 1998, some populations have continued to decline (77 FR 5913). Current threats include fisheries bycatch, habitat degradation (e.g., dredging and poor water quality), habitat impediment (e.g. dams), and vessel strikes (FWC 2020c, NOAA Fisheries 2020).

### Okaloosa Darter

The Okaloosa Darter (*Etheostoma okaloosae*) was originally listed as endangered efffective June 4, 1973 (38 FR 14678). The species was downlisted to Threatened effective May 2, 2011 (76 FR 18087). Critical habitat has not been designated (USFWS 2020a).

The species occurs only in Florida, with the range limited to six streams (Toms, Turkey, Mill, Swift, East Turkey, and Rocky Creeks) in two Florida Panhandle counties (Walton and Okaloosa). An estimated 98.7 percent of the occupied range is within and managed by Eglin Air Force Base (76 FR 18087). Habitat is typically dense vegetation, root mats, and detritus along clear, flowing stream margins (FNAI 2001a). Holt et al. (2013) reported that individual fish remained within relatively small areas, with 22 percent of individuals remaining in the same 20-meter reach for one year; fish infrequently crossed open, sandy, mid-channel areas to the other side. Most populations are believed to be stable or increasing at present and vulnerability is primarily due to the small range and limited number of occurrences (NatureServe 2020).

### Saltmarsh Topminnow

The Saltmarsh Topminnow (*Fundulus jenkinsi*) was petitioned for listing on September 3, 2010 (WildEarth Guardians and Felsen 2010), and the 90-day finding determined that listing may be warranted (76 FR 49412). The species remains under review at this time (USFWS 2020a).

Habitat includes small meandering channels of brackish marshes dominated by cordgrass (*Spartina alterniflora*) and needle grass rush (*Juncus roemerianus*). Channel and marsh salinities are in the range of 1-4 parts per thousand (ppt) (Lopez et al. 2011). Patchy populations occur along the Gulf Coast from Texas (Galveston Bay) to Florida. In Florida, the species is restricted to the estuary of the Escambia River (Gilbert and Relyea 1992).

### Smalltooth Sawfish

The US distinct population segment (DPS) of Smalltooth Sawfish (Pristis pectinate) was listed as endangered on April 1, 2003 (68 FR 15674). The Bahamian DPS was listed as endangered in 2014 (79 FR 73977). In 2009, two areas along the southwestern coast of Florida were designated as critical habitat for the US DPS (74 FR 45353).

This species has a circumtropical distribution, from Brazil through the Caribbean and Central America, the Gulf of

Mexico, and the Atlantic Coast of the United States (NMFS 2009). NMFS regulates the US DPS in four regions of the eastern US including Florida. Peninsular Florida has the largest number of capture records on the East Coast (NMFS 2018). The species occurs off the southwest coast of Florida from about Charlotte Harbor through the Everglades (NOAA Fisheries 2020). Currently, Smalltooth Sawfish can only be found regularity in south Florida between the Caloosahatchee River and the Florida Keys (NMFS 2009). Habitat includes shallow coastal waters of most warm seas. The species is found very close to shore in muddy and sandy bottoms, seldom descending to depths greater than 10 meters. They are often found in sheltered bays, on shallow banks, and in estuaries or river mouths (NMFS 2009). Juvenile Smalltooth Sawfish generally live in estuaries during their first two years (habitats fringed with vegetation, especially red mangroves (*Rhizophora mangle*)), and move into more coastal habitats upon reaching two meters in length. Female Smalltooth Sawfish may have 7 to 14 pups at a time, gestate for 12 months, and give birth every other year (NOAA Fisheries 2020). This species generally subsists on small schooling fish, crustaceans and other bottom-dwelling organisms (NMFS 2009), and utilize their rostra (or "saw") to slash through schools of fish and to find shrimp and crabs on the seafloor (NOAA Fisheries 2020).

The species has declined as a result of habitat loss (development of the Florida waterfront) and bycatch (NMFS 2009, NMFS 2018, NOAA Fisheries 2020). Historically, Smalltooth Sawfish were often accidentally caught in fishing nets, and often killed rather than released unharmed (NOAA Fisheries 2020). This threat has been reduced with the 1995 enactment of the Florida Net Ban Amendment and improved education reform (NMFS 2009, NOAA Fisheries 2020). It is likely that the population is currently at a level less than 5 percent of its size at the time of European settlement (NMFS 2009).

## Invertebrates

### MOLLUSKS

#### Southern Elktoe

The Southern Elktoe (*Alasmidonta triangulata*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Southern Elktoe is listed by several other entities, including Critically Imperiled by NatureServe, Endangered by the IUCN, and Endangered by the American Fisheries Society (CBD 2010a, NatureServe 2010).

The Southern Elktoe is a rare freshwater mussel that lives in sandy substrates, such as sandbars, of rivers and larger creeks with moderate currents. Its range is limited to a single river system, the Apalachicola Basin, which includes the Chattachoochee River in Alabama and Georgia, the Flint River in Georgia, and the Apalachicola and lower Chipola rivers in Florida (CBD 2010a, NatureServe 2020).

Adults are detritivores and the glochidia (larvae) are parasitic, though specificity of fish hosts is not known (NatureServe 2020). The species has suffered severe declines (70 to 90 percent) and there are less than five populations remaining within its range. Major threats to the species include habitat degradation and fragmentation caused by dredging, impoundment, sedimentation, water extraction, and drought (CBD 2010a).

#### Fat Threeridge

The Fat Threeridge (*Amblema neislerii*) was listed as endangered effective April 15,, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

The Fat Threeridge is endemic to Georgia and Florida. In Florida, their distribution is limited to the Chipola and Apalachicola rivers (FNAI 2001a). Fat Threeridge Mussels typically inhabit the main channels of small to large rivers where the current is slow to moderate and the substrate varies from gravel to cobble to a mixture of sand and sandy mud (Williams and Butler 1994).

Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and zooplankton from the water column for food (Fuller 1974). This mussel is a short-term brooder with gravid females observed in late May and June, suggesting the mussel releases glochidia in summer. Glochidia are parasitic and released in a white web-like structure to wrap around fish hosts. Fish hosts include Speckled Madtom (*Noturus leptocanthus*), Weed Shiner (*Notropis texanus*), Bluegill (*Lepomis macrochirus*), Redear sunfish (*Lepomis microlophus*), Largemouth Bass (*Micropterus salmoides*), and Blackbanded Darter (*Percina nigrofasciata*) (O'Brien and Williams 2002). Adults are relatively nonmotile and significant dispersal only occurs via glochidia (NatureServe 2020). The primary factors contributing to population declines are anthropogenic habitat degradation caused by sedimentation, channelization, impoundment, and environmental contaminants that alter water quality (USFWS 2003b).

### Rayed Creekshell

The Rayed Creekshell (*Anodontoides radiates = A. radiatus*, formerly *Strophitus radiatus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Rayed Creekshell is listed by several other entities, including Imperiled by NatureServe, Near Threatened by the IUCN, and as a Special Concern species by the American Fisheries Society (CBD 2010a, NatureServe 2020).

The Rayed Creekshell has a sporadic distribution throughout Alabama, Florida, Georgia, Louisiana, and Mississippi. Specifically it is known from the Apalachicola, Chattahoochee and Flint to Tickfaw River system, the Yazoo River (a tributary of the Mississippi drainage), as well as the Mobile and Apalachicola drainages. Recent surveys have also discovered Rayed Creekshells in several new locations. In Florida, they are known from only Gadsden County (NatureServe 2020). Rayed Creekshells live in the mud, sand, or gravel of large rivers as well as medium to small sized creeks in areas of moderate currents (CBD 2010a).

Rayed Creekshells are detritivores and the glochidia (larvae) are parasitic and feed on the outer gill of fish (though specificity of fish hosts is not known). Gravid females have been observed in September and December (NatureServe 2020). Although distribution historically may have always been sporadic and rare, recent survey efforts have resulted in low numbers at formerly known sites, suggesting up to a 30 percent population decline. Major threats to their populations are associated with stream modifications and come from a variety of sources including pesticide use, deforestation, damming, and water extraction for human consumption (CBD 2010a).

### Pygmy Siltsnail

The Pygmy Siltsnail (*Cincinnatia parva = Floridobia parva*) was first petitioned for listing in 1984 (46 FR 21664), with multiple petitions since that point. The species was again petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The species is considered Critically Imperiled by NatureServe (NatureServe 2020).

This species is restricted to Blue Spring (St. John's River system) in Volusia County, Florida; specifically the spring run section (approximately 0.5 kilometers long) (NatureServe 2020). Blue Spring is a freshwater karst spring run, characterized by clear circular pools with abundant aquatic vegetation and silty- sand/gravel substrate over limestone (CBD 2010a). Little to no information is available on the species' list history (NatureServe 2020). Threats to the species include recreational activities (Blue Spring is a popular recreation site), increased sedimentation from erosion and logging practices, invasive species, and any impacts to water quality. The single population also places the species at high risk of extinction from stochastic events. The population is considered in decline (CBD 2010a).

### Ponderous Siltsnail

The Ponderous Siltsnail, formerly known as Ponderosa Spring Siltsnail, *(Cincinnatia ponderosa = Floridobia*

*ponderosa)* was first petitioned for listing in 1984 (49 FR 21664). The species has been under review on several occasions (54 FR 554, 56 FR 58804, 59 FR 58982). The species was again petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Ponderous Siltsnail is listed by several other entities including as Critically Imperiled by NatureServe and as Vulnerable by the IUCN (CBD 2010a).

The Ponderous Siltsnail is a rare freshwater snail only known to occur in Sanlando Springs and the following approximate 450 meters of Little Wekiva River below it in Seminole County, Florida (NatureServe 2020). The species is commonly found in vegetated areas as well as in sand and gravel. The Ponderous Siltsnail is vulnerable due to its extremely limited range. In addition, habitat degradation (including water quality impacts from recreation and nearby urban areas) are threats to the species (CBD 2010a). Sanlando Springs has been dammed to be used as a recreational swimming hole (NatureServe 2020). Like other freshwater springs in Florida, there are many other threats to Ponderous Siltsnail habitat including saltwater intrusion, groundwater extraction for human consumption, and pollution from development (CBD 2010a).

### Delicate Spike

The Delicate Spike (*Elliptio arctata*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Delicate Spike is listed by several other entities, including Imperiled Globally and in Florida by NatureServe, and as a Special Concern species by the American Fisheries Society (CBD 2010a, NatureServe 2020).

The Delicate Spike is a river mussel. Adults are detritivores and glochidia (larvae) are parasitic on fish, though specificity of fish hosts is not known (NatureServe 2020). Its historic range included much of the eastern Gulf Coast drainages in Alabama, Florida, Georgia, Mississippi, and Tennessee. Specifically, it is known from the Apalachicola Basin in Georgia and Florida (Panhandle) west to the Pearl River drainage in Mississippi. Delicate Spike live in areas of moderate currents among large rocks or in the sand and gravel underneath them. Historically they were also common in headwater streams and river bars (CBD 2010a).

The Delicate Spike has been extirpated from many of its historic drainages and populations may become genetically isolated. The species is declining across its range, especially within the Coosa-Tallapoosa and Choctawhatchee-Escambia drainages. Delicate Spike populations face a wide array of threats related to habitat degradation including damming, eutrophication and pollution, water extraction, deforestation, bank scouring, and sedimentation (CBD 2010a).

### Chipola Slabshell

The Chipola Slabshell (*Elliptio chipolaensis*) was listed as threatened effective April 15, 1998 (63 FR 12664). Critical habitat has been designated and encompasses several rivers and streams in Florida (as well as other states not described here) including: Econfina Creek, Chipola River, Apalachicola River, Upper Ochlockonee River, Ochlockonee River, and Santa Fe River and New River (72 FR 64286).

The Chipola Slabshell is one of seven rare and listed freshwater mussel species that are evaluated together because they are endemic to eastern Gulf Slope tributaries of the Apalachicolan Region in southeast Alabama, southwest Georgia, and north Florida. The Chipola Slabshell was named from the Chipola River in Florida where it was first described and thought to be endemic. Recent records have documented its presence in a tributary of the Chattahoochee River as well as in Alabama (63 FR 12664). It lives in muddy and silty-sand substrates in areas with slow to moderate currents (NatureServe 2020). It has been extirpated from approximately one-third of its historical range (USFWS 2007f). Bluegill (*Lepo mis macrochirus*) and centrarchids (sun fishes) are likely main host fish species for parasitic larvae (glochidia) (63 FR 12664, USFWS 2007f). Like other freshwater mussels, adults are detritivores (filter feeders) and are likely very long-lived (examples of up to 130 years of age in other species (63 FR 12664). Given its extremely limited distribution and ongoing severe declines (over 75 percent of the

population size), this species is particularly vulnerable to extinction. Ongoing threats include dams, stream channelization, pollution, and sedimentation (NatureServe 2020).

### Purple Bankclimber

The Purple Bankclimber (*Elliptoideus sloatianus*) was listed as threatened effective April 15, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

The Purple Bankclimber is endemic to Alabama, Georgia, and Florida, where they are found in the Apalachicola-Chattahoochee-Flint and Ochlockonee river basins (63 FR 12664). The species is believed to be extirpated from the Chipola and Chattahoochee rivers, making it no longer extant in Alabama (63 FR 12664). However, one individual was observed from the Chattahoochee River in December 2000; the most recent record from that river since the 1800s (Brim Box and Williams 2000). Depending on the river system, the preferred habitat of the Purple Bankclimber seems to vary slightly. In general, they are typically observed in small to large rivers, often in the main channels, where there is moderate current (Clench and Turner 1956, NatureServe 2020). They seem to prefer sand substrate but have also been observed in fine gravel, muddy sand, and sand/limestone. They are frequently observed at depths greater than three meters (Brim Box and Williams 2000).

This species is thought to be a summer releasing mussel as gravid females have been observed in the Ochlockonee River from February through April (NatureServe 2020). They produce parasitic glochidia (NatureServe 2020). Glochidia transformation has occurred on Eastern Mosquitofish (*Gambusia holbrooki*), Guppy (*Poecilia reticulata*), and Blackbanded Darter (*Percina nigrofasciata*) (O'Brien and Williams 2002). Adult Bankclimbers are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller 1974). Adults are relatively nonmotile and only move to burrow deeper into the sediment or travel passively downstream during high flow events. Dispersal occurs through glochidia transportation through infected fish movement (NatureServe 2020). The primary factors contributing to species decline are habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants (68 FR 42419).

### Tapered Pigtoe

The Tapered Pigtoe (*Fusconaia burkei*) was listed as threatened effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The Tapered Pigtoe is an endemic species found in the Choctawhatchee River drainage in Alabama and Florida. Within this river drainage, its distribution also includes several oxbow lakes in Florida. Tapered Pigtoe are found in areas with slow to moderate currents in medium creeks to medium rivers, where the substrate is stable and consists of sand, small gravel, or sandy mud (77 FR 61663). They are also occasionally found in floodplain lakes (Williams and Butler 1994).

Little is known about the specific life history of this mussel, although, based on closely related species, they are thought to be short-term brooders (NatureServe 2020). Gravid females have been observed from mid-March through May, and possibly June (Pilarczyk et al. 2006).Their glochidia are parasitic. Blacktail Shiner (*Cyprinella venusta*) are confirmed to produce glochidia transformation (White et al. 2008). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller 1974). Adults are relatively nonmotile and only move to burrow deeper into the sediment (NatureServe 2020). Dispersal occurs via glochidia transportation on parasitized fish. The primary factors contributing to their population decline are habitat degradation caused by excessive sedimentation, streambed destabilization, and environmental contaminants (77 FR 61663).

### Narrow Pigtoe

The Narrow Pigtoe (*Fusconaia escambia*) was listed as threatened effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The Narrow Pigtoe is an endemic species with its presence limited to two river systems that drain through northwestern Florida: the Escambia River and Yellow River (77 FR 61663). This mussel is typically found in substrate consisting of sand, gravel, sandy gravel, or silty sand and prefers slow to moderate currents within small to medium sized streams and rivers (CBD 2010a). Little is known about the specific life history of this mussel, although they are thought to be short-term brooders, with gravid females observed in June containing eggs and glochidia (CBD 2010a, Mirarchi et al. 2004). Their glochidia are believed to be parasitic larvae, a common reproductive strategy shared among most freshwater mussels (NatureServe 2020). The host fish species for larvae development is currently unknown (77 FR 61663, Mirarchi et al. 2004). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and zooplankton from the water column for food (Fuller 1974).

Threats to the species include habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants altering the water quality (77 FR 61663). The total species population size of the Narrow Pigtoe is estimated to be low, around 2,500 to 10,000 individuals. Surveys of sites currently supporting the species averaged three individuals per site; this likely contributes to low recruitment (NatureServe 2020).

### Round Ebonyshell

The Round Ebonyshell (*Fusconaia rotulata*) was listed as endangered effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The Round Ebonyshell has one of the most restricted ranges of all North American unionids (NatureServe 2020). It is endemic to the Escambia River drainage in Alabama and Florida where it is only found in the main river channel (77 FR 61663). The habitat for this species consists of areas with moderate current on sand and gravel substrate (Williams and Butler 1994).

Little is known about the specific life history of this mussel, although based on closely related species, they are thought to be short-term brooders (NatureServe 2020). Gravid females have been observed in the spring and summer (77 FR 61663). Their glochidia are believed to be parasitic larvae, a common reproductive strategy shared among most freshwater mussels (NatureServe 2020). The host fish species for larvae development is currently unknown (77 FR 61663, NatureServe 2020). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller, 1974). Adults are relatively nonmotile but may passively move downstream during high flow events. Dispersal likely occurs via glochidia transportation on parasitized fish (NatureServe 2020). Primary factors contributing to the species decline are habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants. Due to the limited species distribution, the Round Ebonyshell is at a high risk of catastrophic events such as flood scour, contaminated spills, and activities associated with streambed destabilization (77 FR 61663).

### Southern Sandshell

The Southern Sandshell (*Hamiota australis*) was listed as threatened effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The Southern Sandshell is an endemic species limited to the Escambia, Choctawhatchee, and Yellow River drainages that flow through Alabama and northwestern Florida. In Florida, the species has only been observed within the Choctawhatchee and Yellow River drainages. Southern Sandshell habitat includes areas with slow to moderate currents in small creeks and rivers, where the substrate is stable and consists of sand or a mix of sand and fine gravel (77 FR 61663). This mussel also relies on clear water to complete its life cycle, as it is one of the few mussels to produce a super conglutinate lure to attract a host fish (NatureServe 2020).

This Southern Sandshell is believed to be a long-term brooder with females remaining gravid from late summer/autumn to the following spring (77 FR 61663, Blalock-Herod et al. 2002). This species produces parasitic glochidia (NatureServe 2020). A host fish species has not been identified, although predatory centrarchids such as basses are believed to be a suitable host based on closely related mussel species (77 FR 61663). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller 1974).

Adults are relatively nonmotile but may passively move downstream during high flow events. Dispersal likely occurs via glochidia transportation on parasitized fish (NatureServe 2020). The primary factors contributing to the species' decline are habitat degradation caused by excessive sedimentation, stream bed destabilization, impoundment, and environmental contaminants (77 FR 61663, NatureServe 2020). In addition, habitat fragmentation is likely to limit the dispersal and reproductive capabilities of this species (Williams et al. 2008).

### Shinyrayed Pocketbook

The Shinyrayed Pocketbook (*Lampsilis subangulata*) was listed as endangered effective April 15, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

The Shinyrayed Pocketbook is endemic to Alabama, Georgia, and Florida, where they are found in the Apalachicola-Chattahoochee-Flint and Ochlockonee river systems. In Florida, their distribution is limited to the Chipola and Ochlockonee rivers (FNAI 2001a). Shinyrayed Pocketbook habitat includes areas with slow to moderate currents in medium sized creeks to rivers, where the substrate consists of clean sand or silty sand (Williams and Butler 1994). Individuals are often found in areas where the current strength and sediment particle size are transitional, such as the interface of stream channel and sloping bank habitats (NatureServe 2020).

Gravid females have been observed from December through August and it is suggested that nearly an entire year of incubation is required for glochidia to reach full maturity. Glochidia are parasitic and released from late May to early July to attract a host. The primary host fish for this mussel are Spotted Bass (*Micropterus punctulatus*) and Largemouth Bass (*Micrjjopterus salmoides*) (O'Brien and Brim Box 1999). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller 1974). Adults are relatively non-motile and significant dispersal occurs via glochidia transportation on parasitized fish (NatureServe 2020). The primary factors contributing to their population decline are anthropogenic habitat degradation caused by sedimentation, channelization, impoundment, and environmental contaminants (USFWS 2003b).

### Gulf Moccasinshell

The Gulf Moccasinshell (*Medionidus penicillatus*) was listed as endangered effective April 15, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

While the range of the Gulf Moccasinshell has been debated due to lack of strong populations and presence at sample sites, it is generally considered to be restricted to the Apalachicola-Chattahoochee- Flint river system and Ecofina Creek in Alabama, Georgia, and Florida (USFWS 2003b). In Florida, populations of this species are found in the Chipola River, Ecofina Creek, and potentially the Choctawhatchee, Yellow, and Apalachicola Rivers (may be extirpated; FNAI 2001a). Gulf Moccasinshell habitat includes areas with a slow to moderate current in medium-sized creeks to large rivers where the substrate consists of sand and gravel or silty sand (Williams and Butler 1994).

Gravid females have been observed in March, April, September, and November. Due to the timing of these gravid female observations, it is suggested that this species is an overwintering mussel and releases glochidia in the summer. Glochidia are parasitic and the primary fish host includes Brown Darter (*Etheostoma edwini*) and Blackbanded Darter (*Percina nigrofasciata*) (O'Brien and Williams 2002). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and

zooplankton from the water column for food (Fuller 1974).

Adults are relatively nonmotile and typically only voluntarily move to burrow deeper into the sediment or travel passively downstream during high flow events. Dispersal occurs through glochidia transportation through infected fish movement (NatureServe 2020). The primary threats to the species include habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants altering the water quality (USFWS 2003b).

### Ochlockonee Moccasinshell

The Ochlockonee Moccasinshell (*Medionidus simpsonianus*) was listed as endangered effective April 15, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

The Ochlockonee Moccasinshell is an endemic species. Its range is restricted to one river system, Ochlockonee River, in Florida and Georgia (FNAI 2001a). Most observations of this rare mussel have been from large creeks where there is current. The species seems to prefer substrates that are primarily sand with some gravel (William and Butler 1994).

Due to the rarity of the species, specific life history is not well understood but is assumed to be similar to related species. It likely overwinters glochidia and releases in summer, using darters as host fish (USFWS 2003b). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and zooplankton for food (Fuller 1974). Adults are relatively non-motile and only move to burrow deeper into the sediment or travel passively downstream during high flow events. Dispersal occurs via glochidia transportation of parasitized fish (NatureServe 2020). The primary factors contributing to the species' decline is habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining and environmental contaminants altering water quality (USFWS 2003b).

### Suwannee Moccasinshell

The Suwannee Moccasinshell (*Medionidus walkeri*) was listed as threatened effective November 7, 2016 (81 FR 69417). Critical habitat was proposed on November 27, 2019 and is awaiting public comment and a final rule (84 FR 65325).

The Suwannee Moccasinshell is a rare freshwater mussel that lives in the mud, muddy sand, sand, and gravel of larger streams with moderate flows. The species generally occurs in proximity to large woody debris (80 FR 60335, CBD 2010a, NatureServe 2020). Its range is limited to a single river system in Florida and Georgia: the Suwannee River system. There are less than five populations within this range (CBD 2010a).

Adults are detritivores and the glochidia (larvae) are parasitic; main host species include the Blackbanded Darter (*Percina nigrofasciata*) and the Brown Darter (*Etheostoma edwini*) (84 FR 65325, NatureServe 2020). The following five criteria are required to support Suwannee Moccasinshell: stable stream, stable substrates, natural flow regimes, suitable water quality conditions, and presence of host fish species (84 FR 65325). The species has undergone extreme declines (70-90 percent), and it is now only known from the main channel of the Suwannee River and the lower Santa Fe River in Florida (CBD 2010a, 80 FR 60335). Population declines are the result of chemical pollution (e.g., industrial pulp mill in the Withlacoochee watershed), sedimentation from logging and agriculture, development, pollution from mining and agriculture, invasive species (Asiatic Clam (*Corbicula fluminea*)), stream channel instability, water extraction, and eutrophication (CBD 2010a, 81 FR 69417). Additionally, the species has been overharvested by shell collectors (CBD 2010a).

### Stock Island Tree Snail

The Stock Island Tree Snail (*Orthalicus reses = O. s. reses*, [not incl. *nesodryas*]) was listed as threatened effective August 2, 1978 (43 FR 28932). Critical habitat has not been designated (USFWS 2020a). The Service

announced the initiation of the latest five-year review on the species in 2018 (83 FR 38320). The Stock Island Tree Snail is also listed by the Florida Fish and Wildlife Conservation Commission as Endangered (USFWS 2009d).

The Stock Island Tree Snail is an arboreal snail endemic to tropical hammock hardwood trees (USFWS 2009d, NatureServe 2019). Its historical range included many of the western Florida Key islands, including Key West, the lower Keys, and Key Vaca. Its range was limited to Stock Island at the time of listing (43 FR 28932). As of 2006, the current range encompasses 25 known sites within the Florida Keys and two sites on the Florida mainland in Monroe and Miami-Dade counties (USFWS 2009d). The species feeds on lichens, fungi, and algae in the trees they live on (NatureServe 2020).

The Stock Island Tree Snail underwent a significant range reduction as a result of urbanization (43 FR 28932). Relocation efforts by hobbyists have spread Stock Island Tree Snails to areas beyond their historical range, particularly to Key Largo (USFWS 2009d). Current threats to the species include habitat degradation and loss. Additionally, poaching, hurricanes, and droughts are significant threats (NatureServe 2020).

### Oval Pigtoe

The Oval Pigtoe (*Pleurobema pyriforme*) waslisted as endangered effective April 15, 1998 (63 FR 12664). Critical habitat was designated on November 15, 2007 (72 FR 64286).

The Oval Pigtoe is endemic to Georgia, Alabama, and Florida. Their center of distribution is generally limited to the Apalachicola-Chattahoochee-Flint and Ochlockonee river basins (63 FR 12664). In Florida, the species is found in the Apalachicola, Chipola, Suwanee, and Ochlockonee river systems, as well as Ecofina creek (63 FR 12664, NatureServe 2020). Oval Pigtoe habitat includes areas with slow to moderate current in medium-sized creeks to small rivers, where the substrate is silty sand to sand and gravel (Williams and Butler 1994).

Adults are relatively nonmotile and typically only move to burrow deeper into the sediment. Dispersal occurs via glochidia transportation on parasitized fish. Individuals observed in the Apalachicola- Chattahoochee-Flint basin were gravid between March through July, indicating that fertilization may take place in late winter to early spring and that the species is a summer releasing mussel (NatureServe 2020). Glochidia transformation has occurred on the gills of Sailfin Shiner (*Pteronotropis hypselopterus*), Eastern Mosquitofish (*Gambusia holbrooki*), and Guppy (*Poecilia reticulata*) (NatureServe 2020, O'Brien and Williams 2002). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and zooplankton from the water column for food (Fuller 1974). The primary factors contributing to species decline are habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants (68 FR 42419).

### Fuzzy Pigtoe

The Fuzzy Pigtoe (*Pleurobema strodeanum*) was listed as threatened effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The Fuzzy Pigtoe is an endemic species with its presence limited to three river systems that drain through northwestern Florida: the Escambia, Choctawhatchee, and Yellow River. The species is exceedingly rare within the Yellow River, with only a single documented observation in 2010 (77 FR 61663). Fuzzy Pigtoe habitat includes areas with moderate flow in medium-sized creek and rivers where the substrate is sand to silty sand (Williams and Butler 1994, Williams et al. 2000).

The mussel is a short-term brooder, with gravid females observed from mid-March to May. Their glochidia are parasitic, a common reproductive strategy shared among most freshwater mussels. Host species include the Blacktail Shiner (*Cyprinella venusta*) (White et al. 2008). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, likely siphoning water to collect detritus, algae, and zooplankton from the water column for food (Fuller 1974). Adults are relatively nonmotile and typically only move to burrow deeper

into the sediment. Dispersal occurs via glochidia transportation through infected fish movement (NatureServe 2020). The primary factors contributing to population declines are habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants altering the water quality (77 FR 61663).

### Southern Kidneyshell

The Southern Kidneyshell (*Ptychobranchus jonesi*) was listed as endangered effective November 9, 2012 (77 FR 61663). Critical habitat was designated simultaneously (77 FR 61663).

The distribution of the Southern Kidneyshell is limited to the Escambia, Choctawhatchee, and Yellow River drainages that flow through Alabama and northwestern Florida. In Florida, recent occurrences of the Southern Kidneyshell have only been observed within the Choctawhatchee River drainage. Their habitat requirements are not fully understood; however, individuals are typically observed in areas with slow to moderate currents in medium creeks to small rivers, where the substrate consists of firm sand (77 FR 61663). Additionally, recent surveys conducted in the Choctawhatchee basin found their preferred habitat to be stable substrates near bedrock outcroppings (Gangloff and Hartfield 2009).

Little is known about the specific life history of this mussel although, based on closely related species, they are thought to be long-term brooders (Mirarchi et al. 2004, NatureServe 2020). Females are gravid from autumn through spring/summer of the following year. Their glochidia are believed to be parasitic. A host fish species has not been identified, although darters are believed to be a suitable host based on closely related mussel species (77 FR 61663). Adults are characterized as filter feeders, positioning themselves on or near the substrate surface, siphoning water to collect detritus, algae, and zooplankton from the water column (Fuller, 1974). Adults are relatively nonmotile, but may passively move downstream during high flow events. Dispersal likely occurs via glochidia transportation on parasitized fish (NatureServe 2020). Primary factors contributing to their population decline are habitat degradation caused by excessive sedimentation, stream bed destabilization, impoundment, and environmental contaminants (77 FR 61663, NatureServe 2020). In addition, habitat fragmentation and host fish disappearance will likely limit the dispersal and reproductive capabilities of this species (NatureServe 2020). Due to the limited species distribution, the Southern Kidneyshell is vulnerable to stochastic environmental and human-caused events (CBD 2010a).

### Choctaw Bean

The Choctaw Bean (*Villosa choctawensis*, formerly *Obovaria choctawensis*) was listed as endangered effective November 9, 2012 (77 FR 61663). Critical habitat has been designated and encompasses habitat in the following Florida counties: Bay, Escambia, Holmes, Jackson, Okaloosa, Santa Rosa, Walton, and Washington (as well as other rivers in Alabama not described here) (76 FR 61482). In 2019, the USFWS announced the initiation of the latest five-year review of the species (84 FR 14669).

The Choctaw Bean is one of eight listed freshwater mussel species that are endemic to the East Gulf Coastal Plain Physiographic Region. Its range includes the Escambia, Yellow, and Choctawhatchee rivers systems in Florida and Alabama. It lives in silty sand and sandy clay substrates in medium-sized creeks and rivers with moderate currents. Adults are detritivores and the glochidia (larvae) are parasitic, though specificity of fish hosts is not known (76 FR 61482). Despite still occurring across much of its historical range, population numbers are low and declining, and the Choctaw bean can no longer be found from many historical sites. Its populations within the Escambia River drainage have become fragmented (76 FR 61482). The primary threat to this species is habitat loss and degradation (NatureServe 2020).

## CRUSTACEANS

### Cypress Crayfish

The Cypress Crayfish (*Cambarellus blacki*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Cypress Crayfish is listed by several other entities, including Endangered by the IUCN, Endangered by the American Fisheries Society, and as Critically Imperiled by NatureServe (CBD 2010a).

The Cypress Crayfish is a rare freshwater crayfish that inhabits cypress ponds. It is usually found within submergent and emergent vegetation (CBD 2010a, NatureServe 2019). The species range is limited to one locality in Escambia County, Florida (CBD 2010a). Further surveys are needed to locate potential nearby populations (NatureServe 2019). Its limited range and number of populations make the species vulnerable. The major threat facing Cypress Crayfish is expansion of a nearby oil production facility (CBD 2010a).

### Florida Cave Amphipod

The Florida Cave Amphipod (*Crangonyx grandimanus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). Despite the Service announcing the species review of Florida Cave Amphipod in 1984 (49 FR 21664), 1989 (54 FR 554), 1991 (56 FR 58804), and 1994 (59 FR 58982), it has yet to be listed and remains under review at this time (USFWS 2020a). The Florida Cave Amphipod is listed by several other entities, including Imperiled by NatureServe, as Vulnerable by the IUCN, and as a Species of Greatest Conservation Need in Florida (CBD 2010a, NatureServe 2020).

The Florida Cave Amphipod is a stygobitic amphipod which inhabits caves, wells, and karst springs. Its range spans 12 counties (Alachua, Citrus, Dade, Gilchrist, Hernando, Leon, Levy, Madison, Marion, Pasco, Suwanne, and Wakulla) in Florida, with the Ochlockonee River serving as its western boundary. Despite this seemingly large range, the species is uncommon and population numbers are low. The species is likely threatened by changes in detrital flows and depletion of aquifers (CBD 2010a).

### Hobb's Cave Amphipod

The Hobb's Cave Amphipod (*Crangonyx hobbsi*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835 59862). Listing was first deemed warranted but precluded in 1984 (49 FR 2485). Despite the Service announcing the species review of Florida Cave Amphipod in 1984 (49 FR 21664), 1989 (54 FR 554), 1991 (56 FR 58804), and 1994 (59 FR 58982), the species remains under review at this time (USFWS 2020a). The Hobb's Cave Amphipod is listed by several other entities, including Critically Imperiled by NatureServe and as Vulnerable by the IUCN (CBD 2010a).

The Hobb's Cave Amphipod is a troglobitic freshwater amphipod that inhabits subterranean caves and wells (NatureServe 2020). It is often associated with limestone and detritus, and found near cave entrances. Its range spans 13 counties (Alachua, Citrus, Columbia, Dade, Gilchrist, Hernando, Leon, Levy, Madison, Marion, Pasco, Suwannee, and Wakulla) in Florida, primarily in the northern portion of the peninsula as well as the Panhandle. It is likely threatened by changes in detrital flows and depletion of aquifers (CBD 2010a).

#### Squirrel Chimney Cave Shrimp

The Squirrel Chimney Cave Shrimp (*Palaemonetes cummingi*) was listed as threatened effective June 23, 1990 (55 FR 25588). Critical habitat has not been designated (USFWS 2020). A petition to delist the species was put forth by the Florida Game and Freshwater Fish Commission in 1997. However, the USFWS found that the petition did not present substantial scientific or commercial information indicating that delisting this species due to extinction may be warranted (63 FR 67618).

The Squirrel Chimney Cave Shrimp was discovered in 1953 and is only known from the Squirrel Chimney, a small sinkhole that connects to a flooded cave system near Gainesville, Alachua County, Florida. Due to a lack of evidence of cave shrimp from other surveyed caves, it is believed that the Squirrel Chimney Cave Shrimp is the

only cave shrimp in Florida (USFWS 2016b, 2018g). Habitat for this species includes groundwater within a flooded limestone cave (FNAI 2001a). The water temperature in Squirrel Chimney is approximately 20°C throughout the year. Other than an apparent drop in water levels between the 1970 surveys and 1990 surveys, there were no indications of any significant change in the physical environment at Squirrel Chimney; both water level and water quality have remained the same since 1992 (USFWS 2016b).Threats to the species include expanded development associated with the growth of Gainesville, Florida, which may alter land uses and groundwater in the vicinity of Squirrel Chimney (USFWS 2016b, 2018g). Stormwater runoff, septic tank drainage fields, aquifer recharge, herbicide/fertilizer use, and erosion/sediment deposition are some of the primary factors impacting groundwater quality. A small fish, the Redeye Chub (*Notropis harperi*), was detected in Squirrel Chimney during 1994 to 1996 surveys. This species is believed to prey on Squirrel Chimney Cave Shrimp; therefore, predation may also constitute a threat to the species (USFWS 2016b).

### Orlando Cave Crayfish

The Orlando Cave Crayfish (*Procambarus acherontis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). Listing was first deemed warranted but precluded in 1984 by the USFWS (Service) (49 FR 2485). Despite the Service announcing review of the species in 1984 (49 FR 21664), 1989 (54 FR 554), 1991 (56 FR 58804), and 1994 (59 FR 58982), the species remains under review at this time (USFWS 2020a). The Orlando Cave Crayfish is listed by several other entities, including Endangered by the IUCN, Endangered by the American Fisheries Society, Critically Imperiled by NatureServe, as Rare by the Florida Committee on Rare and Endangered Plants and Animals, and as a Species of Greatest Conservation Need by the state of Florida (CBD 2010a, NatureServe 2020).

The Orlando Cave Crayfish is a troglobitic freshwater crayfish that inhabits aquifers. It is associated with karst and the entrances of springs, sinkholes, and underground water features. Its range is limited to the central Florida Peninsula (Seminole and Orange counties). All of the four remaining populations are within the vicinity of Orlando. The species type locality was destroyed when the well they lived in collapsed. The major threat facing Orlando Cave Crayfish is expanding human populations and development (CBD 2010a).

### Coastal Flatwoods Crayfish

The Coastal Flatwoods Crayfish (*Procambarus apalachicolae*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). In the state of Florida, the species is listed as Imperiled (NatureServe 2020). It is listed as endangered on the IUCN Red List (Crandall 2010).

The species occurs in the Apalachicola coastal flatwoods of northwest Florida in Bay and Gulf Counties. Coastal Flatwoods Crayfish inhabit still waters when water levels are high and burrow when waters recede (USFWS 2014c). The species is usually found in detritus accumulations on the bottom of pools caused by root mats and logs, interspersed between areas of turbulence (Franz and Franz 1979). Coastal Flatwoods Crayfish are susceptible to pollution, changes in water temperature, siltation, and other changes in water quality.

### Silver Glen Springs Crayfish

The Silver Glen Springs Crayfish (*Procambarus attiguus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). In the state of Florida, the species is listed as Critically Imperiled (NatureServe 2020). It is listed as Critically Endangered on the IUCN Red List (USFWS 2020a).

This species has been documented from only one cave system in Ocala Natural Forest, Silver Glen Springs, Marion County, Florida. The species is potentially threatened by water pollution and disturbance from tourists (snorkelers and scuba divers, as the cave is a popular recreation area). This species may have late reproductive maturity and a long life span, which make it particularly susceptible to loss of individuals. As a cave species, Silver

Glen Springs Crayfish are likely sensitive to changes in habitat, especially water quality (NatureServe 2020).

### Bigcheek Cave Crayfish

The Bigcheek Cave Crayfish (*Procambarus delicates*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The Service may drop the species from further review because it could already be extinct (this is not confirmed as its population has likely always been very small and difficult to detect due its deep-cave habitat) (CBD 2018, NatureServe 2019). The Bigcheek Cave Crayfish is listed by several other entities, including Critically Endangered by the IUCN, Endangered by the American Fisheries Society, and Critically Imperiled by NatureServe (Crandall and Cordeiro 2010, CBD 2018, NatureServe 2020). The species has not been seen in decades, with the last sighting dating 1976 or 1985 (CBD 2018, NatureServe 2020).

The Bigcheek Cave Crayfish is a troglobitic freshwater crayfish that inhabits subterranean caves (BD 2018, NatureServe 2020). This species has extremely specific habitat requirements and they are limited to only one cave system at Alexander Springs within the Ocala National Forest, Lake County, Florida (Crandall and Cordeiro 2010, CBD 2018, NatureServe 2020). Their population is threatened by disturbance and habitat degradation from recreational use, as these cave systems are located within National Forest property readily accessible to the general public (CBD 2018, NatureServe 2020).

### Panama City Crayfish

The Panama City Crayfish (*Procambarus econfinae*) was proposed as Threatened on January 3, 2018 (83 FR 330). A formal listing decision has not been made as of January 2020 (USFWS 2020a).

This species occupies shallow, often ephemeral, vegetated, freshwater systems in pine flatwoods or wet prairie/marsh habitats of Bay County, Florida. After the majority of its habitat was converted to slash pine plantations or residential/commercial development, the species has been relegated to grassy ditches or swales of slash pine plantations, utility rights-of-way, and other relic wetland habitats protected on easements (83 FR 330, USFWS 2017a). These crayfish require specific types of substrate that allow them to burrow down to the water table, where they can remain hydrated to survive dry seasons or droughts. If soils are too sandy or do not hold water long enough, sustained colonization of this species is not supported. This species occupies the surface water primarily when it is present, and utilizes its burrows when surface water recedes (USFWS 2017a). Threats to this species include habitat loss, degradation, and fragmentation; development; hydrologic alterations; silviculture practices; and collection for fish bait (83 FR 330).

### Santa Fe Cave Crayfish

The Santa Fe Cave Crayfish (*Procambarus erythrops*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Santa Fe Cave Crayfish is listed by several other entities, including Endangered by the IUCN and the American Fisheries Society (CBD 2010a).

The Santa Fe Cave Crayfish is a troglobitic freshwater crayfish that inhabits subterranean pools (CBD 2010a, NatureServe 2020). Its range is limited to five locations within southern Suwannee County, Florida (CBD 2010a). These may make up five populations or only one as they may be interconnected through passageways in the aquifer (NatureServe 2020). It lives within detritus at the entrances of subterranean caves and sinkholes. The Santa Fe Cave Crayfish requires waters with low flows so that detritus is able to build up. It is particularly long-lived, with documented recaptures of crayfish at least 16 years old. The species is threatened by hydrological changes, particularly pollution (there is a garbage dump at one of their known localities) and saltwater intrusion (CBD 2010a).

### Orange Lake Cave Crayfish

The Orange Lake Cave Crayfish (*Procambarus franzi*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Orange Lake Cave Crayfish is listed by several other entities, including Critically Imperiled by NatureServe, Endangered by the IUCN, Endangered by the American Fisheries Society, and as a Species of Greatest Conservation Need in Florida (CBD 2010a).

The Orange Lake Cave Crayfish is a troglobitic freshwater crayfish that inhabits subterranean caves (CBD 2010a, NatureServe 2020). It is associated with bat colonies and the detrital input provided. Its range is limited to Marion County, Florida, where it is known from three cave locations near Orange Lake. These three locations may represent a single population, as sites are part of the same chamber and likely interconnected. The species is particularly vulnerable because of its limited range and small numbers. The species may be sensitive to impacts to water quality from nearby quarrying (CBD 2010a).

### Coastal Lowland Cave Crayfish

The Coastal Lowland Cave Crayfish (*Procambarus leitheuseri*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Coastal Lowland Cave Crayfish is listed by several other entities, including Vulnerable by the IUCN, Endangered by the American Fisheries Society, Critically Imperiled by NatureServe, as Rare by the Florida Committee on Rare and Endangered Plants, and as a Species of Greatest Conservation Need by the state of Florida (CBD 2010a).

The Coastal Lowland Cave Crayfish is a troglobitic freshwater crayfish that inhabits deep, subterranean, karst cave systems (CBD 2010a, NatureServe 2020). Most areas of occurrence are tidally influenced and associated with silt. Specimens have been documented at depths of over 60 meters. The species' range is limited to Pasco and Hernando counties, Florida. There are only eight known localities which may represent fewer populations, as five of these are within five kilometers of each other. Populations are threatened by changes in water quality such as increased saltwater intrusion resulting from extraction of groundwater for human consumption. The species is additionally threatened by rapid urbanization in this part of Florida (CBD 2010a).

### Florida Cave Crayfish

The Florida Cave Crayfish (*Procambarus lucifugus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted for both the species and its two subspecies, Withlacoochee Light-fleeing Cave Crayfish (*P. l. lucifugus*) and Vampire Crayfish (*P. l. alachua*) (76 FR 59835). All three remain under review at this time (USFWS 2020a). The Florida Cave Crayfish is listed by several other entities, including Least Concern by the IUCN, Endangered and Threatened by the American Fisheries Society, and Imperiled by NatureServe (NatureServe 2020).

The Florida Cave Crayfish is a troglobitic freshwater crayfish that inhabits karstic subterranean caves and sinkholes (CBD 2010a, NatureServe 2020). Its range spans Florida counties from Citrus and Hernando north to Marion. It feeds primarily on bat guano, as well as invertebrates, and is associated with bat roosting caves. Populations are threatened directly by water quality degradation and indirectly by threats facing bat populations (CBD 2010a).

### Miami Cave Crayfish

The Miami Cave Crayfish (*Procambarus milleri*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Miami Cave Crayfish is listed by several other entities, including Critically Imperiled by NatureServe, Endangered by the IUCN, Endangered by the American Fisheries Society, and as a Species of Greatest Conservation Need in Florida (CBD 2010a).

The Miami Cave Crayfish is a rare troglobitic freshwater crayfish that inhabits wells (CBD, NatureServe 2020). The species is likely recently adapted (from an evolutionary standpoint) to subterranean living based on a lack of blindness that typify troglobitic creatures. Until recently, the species range was known only from a single population in Miami, Florida, from a well on a nursery and garden store property (CBD 2010a). It has since been found at over a dozen sites and those sites may be interconnected, including populations within the nearby Everglades (NatureServe 2020). As the species has an extremely limited range and population size within a metropolitan area, with continually increasing human pressures on aquifers, this species is especially vulnerable to extinction (CBD 2010a).

### Putnam County Cave Crayfish

The Putnam County Cave Crayfish (*Procambarus morrisi*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Putnam County Cave Crayfish is listed by several other entities, including Imperiled by NatureServe, Critically Endangered by the IUCN, Endangered by the American Fisheries Society, and as a Species of Greatest Conservation Need by the state of Florida (CBD 2010a).

The Putnam County Cave Crayfish is a troglobitic freshwater crayfish that inhabits subterranean sinkholes (CBD 2010a, NatureServe 2020). As their name implies, this species has extremely specific habitat requirements and they are limited to a single cave called Devil's Sink in Putnam County, Florida. This single population is particularly vulnerable to threats posed by water quality degradation as a result of heavy recreational use, pollution (including direct dumping), and groundwater depletion for human consumption (CBD 2010a). The population is at imminent risk of extinction if the entrance to the sinkhole is sealed by human-caused erosion (CBD 2010a).

### Pallid Cave Crayfish

The Pallid Cave Crayfish (*Procambarus pallidus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Pallid Cave Crayfish is listed by several other entities, including Imperiled by NatureServe, Vulnerable by the AFS, and as a Species of Greatest Conservation Need by the state of Florida (CBD 2010a).

The Pallid Cave Crayfish is a freshwater crayfish that inhabits caves (CBD 2010a, NatureServe 2020). It is associated with areas of high flows and karst. Its range is limited to Florida, with records from Alachua, Columbia, Gilchrist, Hamilton, Lafayette, Levy, Madison, and Suwannee counties.

Populations are threatened by pollution (because of their likely sensitivity to chemicals) and by disturbance from recreational diving. A large kill of Pallid Cave Crayfish in the upper Suwannee River was suspected to have been the result of a pollution event (CBD 2010a).

### Black Creek Crayfish

The Black Creek Crayfish, also known as the Spotted Royal Crayfish, (*Procambarus pictus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Black Creek Crayfish is listed by several other entities, including as a Species of Special Concern in the state of Florida and as as Near Threatened by the IUCN (CBD 2010a).

The species occurs in a geographically small area of northeastern Florida – Clay, Putnam, and Duval counties (FNAI 2001a). Black Creek Crayfish inhabit small, relatively swift, sand-bottomed, tannic-stained streams, often emanating from sandhills and flowing through or from swampy terrain. Black Creek Crayfish are usually found in detritus accumulations on the bottom of pools caused by root mats and logs, interspersed between areas of turbulence (Franz and Franz 1979). They are restricted to a few small stream systems. Most known localities are

within the Black and Rice creek drainages. Black Creek Crayfish are susceptible to pollution, changes in water temperature, siltation, and other changes in water quality. Protection of inhabited headwater and secondary streams, especially within the Black and Rice creek drainages, is therefore critical to the species' survival (NatureServe 2020).

### Spider Cave Crayfish

The Spider Cave Crayfish (*Troglocambarus maclanei)* was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Spider Cave Crayfish is listed by several other entities, including as Imperiled by NatureServe, as Vulnerable by the AFS, and as a Species of Greatest Conservation Need by the state of Florida (CBD 2010a).

The Spider Cave Crayfish is a troglobitic freshwater crayfish that inhabits subterranean caves and sinkholes near areas with fresh detrital input, such as bat caves (CBD 2010a, NatureServe 2020). Its range spans 16 localities from Suwannee County to Hernando County, along an approximate 130 kilometers area in Florida. It is often associated with karst and fine silt. The Spider Cave Crayfish is frequently seen hanging upside down from cave ceilings. It is likely an aquatic predator of smaller invertebrates. Major threats to the species include anthropogenic impacts on water quality and reduced detritus flows (CBD 2010a). Three of the species' known localities are popular sites for recreational diving and face acute degradation (NatureServe 2020).

## INSECTS

### Logan's Agarodes Caddisfly

Logan's Agarodes Caddisfly (*Agarodes logani*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

The species has a very small range and has only been observed from one stream in Gadsden County, Florida (NatureServe 2020). The stream is spring-fed and runs through a deep ravine on the Florida Agriculture and Mechanical University Farm (CBD 2010a). As the population is restricted to such a small area and adjacent to an active farm, the species is at risk from farming practices, which may result in pollution, siltation, or habitat degradation (NatureServe 2020).

### Florida Leafwing Butterfly

The Florida Leafwing Butterfly (*Anaea troglodyta floridalis*) was listed as endangered effective September 11, 2014 (79 FR 47221). Critical habitat has been designated and includes areas of pine rockland habitat (79 FR 47179).

The historical range of the Florida Leafwing Butterfly spanned south Florida, including Miami-Dade, Monroe, Collier, Martin Palm Beach, and Broward counties (78 FR 49878). This may be the most imperiled butterfly subspecies given that it has experienced drastic declines and is now extirpated from nearly 96 percent of its historical range. No individuals have been detected since 2006 (78 FR 49878, NatureServe 2020) and the only population within Everglades National Park is known to be extant. The species has only one host plant, the pineland croton (*Croton linearis*), upon which larvae develop and feed (78 FR 49878). The species is highly restricted to pine rockland habitats which support its host plant. Adult diets are varied and include rotting fruit, dung, and nectar (NatureServe 2020). Both adults and larvae (instars) use cryptic mimicry to blend in with its host plant. Florida Leafwings are non-migratory butterflies with a multivoltine life history (multiple generations each year) (78 FR 49878). This species may be at imminent risk of extinction as the pine rockland habitats on which it depends are very limited and continue to be destroyed by development and tropical storm events (NatureServe 2020).

### Frosted Elfin

The Frosted Elfin (*Callophrys irus*) is proactively being assessed for listing by USFWS and a listing determination is expected by September 30, 2023. An interim Species Status Assessment was completed in 2018 (USFWS 2018h). The species remains under review at this time (USFWS 2020a).

The current range of Frosted Elfin spans 25 states in the eastern US. The three described subspecies of Frosted Elfin (*Callophrys irus irus*, *C. i. hadros*, and *C. i. arsace*) occupy separate distributions. *C. i. irus* has the largest range, spanning interior areas from Florida to New York, and east through Ohio, Michigan, and Wisconsin. Frosted Elfins are small non-migratory butterflies with a univoltine lifespan (a single adult flight period) (USFWS 2018h). They are reliant on pine barren habitat which supports their host plants, blue lupine (*Lupinus* spp.) and wild indigo (*Baptisia* spp.; USFWS 2019o). They also need various nectar plants nearby in addition to their host plants (USFWS 2018h).

There are records from 20 counties in Florida (Thom 2013). The species has been extirpated from large portions of their historical range (USFWS 2018h, USFWS 2019p). The major causes of population decline are habitat loss caused by development, invasive species, succession, and incompatible vegetation management, as well as the limiting factor of small population sizes (USFWS 2018h, USFWS 2019o).

### Miami Tiger Beetle

The Miami Tiger Beetle (*Cicindelidia floridana*) was listed as endangered effective November 4, 2016 (81 FR 68985). Critical habitat has not been designated (USFWS 2020a).

This species was rediscovered in 2007 after not being seen since 1934 (and believed to be extinct). This species was first discovered in the Northern Biscayne Pinelands region, around Miami and North Miami Cities in Miami-Dade County, Florida. The region was known for its large, quartz sand areas within rare pine rockland habitat. The 2007 rediscovery of this species was made in the Richmond Heights area of south Miami, known as Richmond Pine Rocklands on Miami Rock Ridge. Limited studies on this species' microhabitat preferences suggest that it prefers open, bare, white to gray sandy areas of two to six square meters with less than five percent organic matter. There were only two known extant populations of this beetle at the time of listing (80 FR 79533).

This species is a day-active predator that moves quickly to seize other small arthropods, such as ants. The larvae of this species are grub-like with large mandibles. Larvae occupy a permanent ground burrow that is flush with the soil surface. The larvae anchor themselves in the burrow and ambush small arthropods when they come close. Efforts in the 1970s to relocate the species found that the type locality had been destroyed and developed. Threats to this species include habitat loss, degradation, and fragmentation; development; non-native species encroachment; and specimen collection by enthusiasts (80 FR 79533).

### Nickerbean Blue Butterfly

The Nickerbean Blue Butterfly (*Cyclargus ammon*) was listed as threatened effective April 6, 2012, due to similarity of appearance to the Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) (77 FR 20948). Critical habitat has not been designated (USFWS 2020a).

The range of the Nickerbean Blue Butterfly includes the Bahamas and Cuba, where it is native, as well as Big Pine Key in Florida, where it has colonized. It occupies tropical hardwood hammock forests, especially in forest openings and edges. Larvae develop and feed on Nickerbean (*Cesalpinia bahamensis*). Adults feed on a variety of nectar plants, including Croton (*Codiaeum variegatum*). Although listed because of similar appearance, this species seems to be stable as evidenced by range expansion and stable populations on Big Pine Key where other butterfly species are declining (NatureServe 2020).

### Miami Blue Butterfly

The Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) was listed as endangered on effective April 6, 2012.

Critical habitat has not been designated (USFWS 2020a).

The Miami Blue Butterfly is a Florida endemic that occurs in open, sunny areas of coastal hardwood hammocks, dunes, and scrub habitat in the Florida Keys (Bahia Honda State Park and Key West National Wildlife Refuge; although the Bahia Honda population may now be extirpated). Research indicates that the species is non-migratory/sedentary, but additional studies are needed to confirm this information (77 FR 20948, CBD 2011b). The species is present year-round, with multiple overlapping generations (eight to 10 generations per year). Individuals are believed to be in diapause from December through April. Adult Miami Blue Butterflies only live around nine days in the wild (77 FR 20948, CBD 2011b). Generation time from egg to adults is roughly 30 to 40 days (77 FR 20948). The species lays eggs on the following host plants: blackbead (*Pithecellobium* spp.), nickerbean (*Caesalpinia* spp.), balloonvine (*Cardiospermum* spp.) and acacia (*Acacia* spp). The Miami Blue Butterfly has a symbiotic relationship with several ant species (commonly *Camponotus floridanus*), which tend the butterfly pupae/instars on host plants and feed on liquid from their nectary organ (77 FR 20948). The butterflies feed on nectar from plants in the Boraginaceae, Asteraceae, Fabaceae, Polygonaceae, and Verbenaceae families (77 FR 20948).

The range of the species has contracted significantly (originally found from Tampa Bay to the Keys). The species was believed to be extirpated in the early 1990s, until a small population was rediscovered in 1999 on Bahia Honda Key. Reintroduction efforts of the species have largely been unsuccessful (77 FR 20948). The Miami Blue Butterfly population size is estimated to be in the low hundreds. Current threats to the species include habitat loss and fragmentation, illegal collection, pesticides, impacts to host plants from introduced iguanas, loss of genetic diversity, and stochastic environmental events (natural or human- caused) (CDB 2011, USFWS 2012c).

### Monarch Butterfly

The Monarch Butterfly (*Danaus plexippus plexippus*) was petitioned for listing on August 26, 2014 (CBD et al. 2014), and the 90-day finding determined that listing may be warranted (79 FR 78775). The listing decision has been delayed from June 2019 to December 2020 (Monarch Joint Venture 2019).

The subspecies, *D. p. plexippus*, is distributed across North America in the spring and summer months (Encyclopedia Britannica 2019). They rely on milkweed (*Asclepias* spp.) for larval development and various nectar plants for adult food (CBD et al. 2014). The Continental Divide splits their overwintering populations: those on the eastern side typically overwinter in Mexico, while those on the western side overwinter in California (Pelton et al. 2016). There are resident Monarch populations in southern Florida where growing seasons continue and climates remain temperate year-round (Williams 2015). Statewide, Florida Monarchs have experienced an 80 percent decline since 2005 (Marchese and Hoose 2018).

Monarch populations face many threats, but primary among these is the loss of their host plants (milkweed) as a result of intensive pesticide use, particularly glyphosate (CBD et al. 2014).

### Duke’s Skipper Butterfly

The Duke’s Skipper Butterfly (*Euphyes dukesi calhouni*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). This subspecies may become elevated to the level of a full species and, should that occur, the Center for Biological Diversity petitioned for either the subspecies or species to be listed (CBD 2010a). The subspecies is remains under review at this time (USFWS 2020a). The Duke’s Skipper Butterfly is considered Imperiled by NatureServe (CBD 2010a).

This subspecies is known from at least seven and up to 12 counties in the northern Florida peninsula including: Brevard, Dixie, Duval, Hernando, Hillsborough (thought to be extirpated), Orange, Pasco, Pinellas, Polk, Seminole, Sumter, Taylor, and Volusia (NatureServe 2020). There are 17 known occurrences of this butterfly. This subspecies inhabits sedge patches within wetlands and swamps dominated by cypress (*Cupressus* spp.), gum (*Eucalyptus* spp.), red maple (*Acer rubrum)*, or mixed canopy (CBD 2010a). Larval foodplants are narrowfruit

horned beaksedge (*Rynchospora inundata*), millet beaksedge (*Rynchospora miliacea*), and an unidentified sedge (*Carex*) species. Adults visit flowers such as buttonbush (*Cephalanthus occidentalis*) and pickerel weed (*Pontederia cordata*) (NatureServe 2020). Threats to the species include conversion of wetland habitat to urbanization, development, and pesticides (CBD 2010a).

#### Palatka Skipper Butterfly

The Palatka Skipper Butterfly (*Euphyes pilatka klotsi*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Palatka Skipper Butterfly is listed by several other entities, including Critically Imperiled by NatureServe and as a Species of Greatest Conservation Need in Florida (CBD 2010a, NatureServe 2020).

The range of the Palatka Skipper Butterfly is limited to a few islands in the Florida Keys: Big Pine, Big Torch, Cudjoe, No Name, Sugarloaf, and Stock Island. They inhabit areas dominated by sawgrass near mangroves in tropical pinelands and sawgrass marshes (CBD 2010a). Larvae develop and feed on sawgrass leaves (NatureServe 2020). This species is rare, with only 10 adults detected during intensive surveys spanning two years. Major threats to the subspecies include habitat loss as a result of development and the use of insecticides (CBD 2010a).

### Westfall's Clubtail Dragonfly

The Westfall's Clubtail Dragonfly (*Gomphus westfalli*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Westfall's Clubtail Dragonfly is considered Critically Imperiled by Nature Serve (NatureServe 2020).

The Westfall's Clubtail Dragonfly is a small dragonfly which requires specialized habitat: sphagnum bog trickles and streams in areas that undergo periodic burning. Larvae develop in silt and adults forage in nearby forests. The species is limited to only four streams within or near Blackwater River State Forest in Santa Rosa County, Florida. The primary threats to their populations are "excessive clearcutting" and altered fire regimes. Their extremely limited range (only about 25 kilometers) makes their populations especially vulnerable (CBD 2010a).

### Ceraunus Blue Butterfly

The Ceraunus Blue Butterfly (*Hemiargus ceraunus antibubastus*) was emergency listed as threatened effective August 10, 2011, due to similarity of appearance to the Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) (76 FR 49408). Critical habitat has not been designated (USFWS 2020a).

The Ceraunus Blue is a neotropical butterfly that occurs in Arizona, California, Florida, Kansas, New Mexico, Nevada, and Texas (NatureServe 2020). In Florida, Ceraunus Blue Butterflies occur year-round and inhabit grasslands, parks, roadsides, and open woodlands. Host plants includes herbaceous legumes such as rosary pea (*Abrus precatorius*) (UF IFAS 2019). The population in Florida is considered Apparently Secure (NatureServe 2020).

### Schaus Swallowtail Butterfly

The Schaus Swallowtail Butterfly (*Heraclides aristodemus ponceanus*) was listed as threatened effective May 4, 1976 (41 FR 17736). Due to continued declines after listing, its status was reclassified to Endangered effective October 1, 1984 (49 FR 34501). Critical habitat has not been designated (USFWS 2020a).

The historical range of the Schaus Swallowtail Butterfly spanned Upper and Lower Matacumbe Keys and Lignumvitae Key north to areas surrounding Miami on the Florida mainland (USFWS 2008e). It is currently limited to Key Biscayne National Park (USFWS 2020a). Larvae develop and feed on torchwood (*Amyris elemifera*)

(NatureServe 2020). Adults are nectivores (NatureServe 2008). The adult flight period spans late April to June, and occasionally into late summer. Although the subspecies is non-migratory, they are known to fly between islands. Populations are threatened by habitat destruction and biocides (as a result of mosquito control) (NatureServe 2020). This species is especially vulnerable to extinction because of its isolated and small populations and limited range. Reintroduction efforts have been somewhat successful, resulting in reproduction. However, these efforts have not improved long-term population trends (USFWS 2008e).

### Gulf Coast Solitary Bee

The Gulf Coast Solitary Bee (*Hesperapis oraria*) was petitioned for listing on March 27, 2019 (CBD 2019b), and the 90-day finding determined that listing may be warranted (84 FR 69713). The species remains under review at this time (USFWS 2020a). The Gulf Coast Solitary Bee is considered Critically Imperiled by NatureServe (NatureServe 2020).

The Gulf Coast Solitary Bee is extremely rare and the only known member of its family in the eastern US (CBD 2019b). The historical range of the Gulf Coast Solitary Bee was limited to barrier islands and a narrow shoreline band (one to two km) along the Gulf Coast from eastern Mississippi to northeastern Florida (Kopec and Burd 2017, NatureServe 2020). Currently it is only found in Florida in state and national parks and is reduced to a mere six populations (CBD 2019b). The species has one obligate host plant: the Coastal Plain Honeycombhead (*Balduina angustifolia*). It relies solely on this plant for all its pollen and nectar. The Coastal Plain Honeycombhead is is reliant upon the Gulf Coast Solitary Bee to transfer its pollen and cannot reproduce without it (Kopec and Burd 2017). This plant only grows in sandy coastal dune habitats and the bee nests in these sandy soils (NatureServe 2020).

Given its extremely limited range and host specificity, this species is at imminent risk of extinction (Kopec and Burd 2017). Threats include habitat loss, degradation, and fragmentation as a result of development; pesticide use; competition with European honeybees; sea level rise and hurricanes (intensified by climate change); limited genetic diversity; and a lack of protection (Kopec and Burd 2017, CBD 2019b). The Gulf Coast Solitary Bee is considered a flagship species for habitat conservation and an indicator species of barrier island and Gulf Coast ecosystem health (CBD 2019b).

### Sykora's Hydroptila Caddisfly

Sykora's Hydroptila Caddisfly (*Hydroptila sykorai*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Sykora's Hydroptila Caddisfly is considered Critically Imperiled by NatureServe (CBD 2010a).

This species has a very small range and is only known from two spring-run streams in Gadsden County, Florida. Both localities are located 25 kilometers apart, with one stream flowing through the Florida Agriculture and Mechanical University Farm (NatureServe 2020, CBD 2010a). The species is at risk of nearby farming practices which may result in pollution, siltation, or habitat degradation (CBD 2010a).

### Morse's Little Plain Brown Sedge Caddisfly

Morse's Little Plain Brown Sedge Caddisfly (*Lepidostoma morsei*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Morse's Little Plain Brown Sedge Caddisfly is listed by several other entities, including as Critically Imperiled in Florida by NatureServe and Threatened by the Florida Committee on Rare and Endangered Plants and Animals (CBD 2010a).

This is an extremely rare species and its habitat is not well understood. This caddisfly occurs in flowing water habitats, typically soft blackwater streams, associated with decaying plant matter. Similar to other members of the

Lepidostomatidae family, larvae are aquatic and produce protective tube-cases out of sand, vegetation, and other available materials. As caddisflies spend a large part of their life as aquatic larvae, this species is sensitive to siltation and pollution caused by practices such as unsustainable forestry and conversion of land to agricultural use (CBD 2010a). This species is endemic to the southeastern US in very limited locations within its range. In Florida, it is only known from Little Alaqua Creek in Walton County (NatureServe 2020).

### Cassius Blue Butterfly

The Cassius Blue Butterfly (*Leptotes cassius theonus*) was emergency listed as threatened effective August 10, 2011, due to similarity of appearance to the Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) (76 FR 49408). Critical habitat has not been designated (USFWS 2020a).

The Cassius Blue Butterfly occurs in Florida, Texas, Virginia, and Kansas. The species may also pass through other southeast states during migration. The Florida subspecies, *theonus*, is a primarily non- migratory resident of coastal habitats in the central and south peninsula (although the species may engage in migratory movements during cold spurts). The subspecies occurs in grassland, urban areas, hardwood forests, and scrub (NatureServe 2020). Host plants for the subspecies include members of the pea family (Fabaceae) and leadwort (Plumbaginacea). Populations are considered to be secure (NatureServe 2020).

### Purple Skimmer Dragonfly

The Purple Skimmer Dragonfly (*Libellula jesseana*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Purple Skimmer Dragonfly is listed by several other entities, including Critically Imperiled by NatureServe and Vulnerable by the IUCN (CBD 2010a, NatureServe 2020).

The Purple Skimmer Dragonfly is medium-sized, lacustrine, Florida-endemic dragonfly species. Its distribution includes nine eastern Peninsula counties, and two Panhandle counties (Bay and Washington). Historically, there were 15 known populations within this range. Currently, the species may only remain at a single lake within a state park. They utilize clear, sand-bottomed lakes bordered by maiden-cane grass and St. John's Wort shrubs (*Hypericum* spp.). Adults feed on invertebrates in nearby woodlands or shrublands. This species is extremely sensitive to pollution and eutrophication, and is unable to survive in polluted habitats. In degraded habitats, even with only slight eutrophication, the common and closely related Golden-winged Skimmer (*L. auripennis*) outcompetes and displaces Purple. The major threat to Purple Skimmer populations is lakeshore development and impacts to water quality (CBD 2010a).

### American Burying Beetle

The American Burying Beetle (*Nicrophorus americanus*) was listed as endangered effective July 13, 1989 (54 FR 29652). Critical habitat has not been designated (USFWS 2020a). The species is under consideration for downlisting to Threatened status (84 FR 19013).

The historic range of the American Burying Beetle spanned 35 states. There are no known extant populations of this species in Florida. Current populations exist in Rhode Island, South Dakota, Nebraska, Texas, Oklahoma, and Arkansas (USFWS 2019q). A Michigan record from 2017 is under investigation (84 FR 19013).

The American Burying Beetle is a nocturnal carrion beetle species active from late spring through early fall. They bury themselves in moist soil to hibernate for the winter. Reproduction occurs in the spring and early summer. They are considered habitat generalists and do not appear to be limited by vegetation types as long as food, shelter, and moisture are available. Its specialization toward the use of larger carrion compared to that used by other carrion beetles is suspected to be a factor in its decline. Changing land use practices and conversion of lands to intensive agriculture or for other development purposes fragments the habitat and reduces the availability of its preferred carrion, with other site-specific factors varying across its current range (USFWS 2019q).

### Little Oecetis Longhorn Caddisfly

Little Oecetis Longhorn Caddisfly (*Oecetis parva*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Oecetis Longhorn Caddisfly is listed by several other entities, including as Critically Imperiled in Florida by NatureServe and a State Historical in Alabama (CBD 2010a).

This species is found in northern and central Florida with only one individual recorded outside of Florida, from Wright's Creek, Alabama (NatureServe 2020). In Florida, occurrences have been recorded in the Apalachicola River, Choctawhatchee River, Kissimmee River, Oklawaha River, upper St. Johns River, and St. Marks River (CBD 2010a). The species inhabits natural lakes and springs, especially within the Ocala National Forest (NatureServe 2020). Due to their high abundances in healthy lake systems, they are thought to be an excellent bioindicator of lake health in Florida (Rasmussen et al. 2008). It is thought that this species is sensitive to activities that affect water quality and hydrologic regimes such as agriculture, urban development, forestry, water withdrawal, and nutrient loading (CBD 2010a). The primary threat to their populations is negative changes to water quality (CBD 2010a).

Findings from Rasmussen at al. (2008) report indicate six new occurrences of this species. Based on these surveys, the population trend was recommended to be reassigned from unknown to stable (Rasmussen et al. 2008).

### Southern Snaketail Dragonfly

The Southern Snaketail Dragonfly (*Ophiogomphus australis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Southern Snaketail Dragonfly is listed by several other entities, including Critically Imperiled by NatureServe and Endangered by the IUCN flows (CBD 2010a, NatureServe 2020).

The Southern Snaketail Dragonfly may be a subspecies of *O. incurvatus* (CBD 2010a). Its historical range encompassed Florida, Georgia, Louisiana, and Mississippi (NatureServe 2020). It is known from three streams and rivers in Louisiana and Mississippi. Additionally, previously misidentified specimens of *O. australis* have been documented at Englin Air Force Base in Okaloosa County, Florida. It inhabits graveled streams and requires consistent water flows and clean water. Major threats to their populations are water quality degradation from a variety of sources including gravel mining, pesticide use, and deforestation. Recent population trends have shown an estimated 10 to 30 percent decline (CBD 2010a).

### Blue Calamintha Bee

The Blue Calamintha Bee (*Osmia calaminthae*) was petitioned for listing on February 5, 2015 (DoW 2015), and the 90-day finding determined that listing may be warranted (80 FR 56423). The species remains under review at this time (USFWS 2020a). The Blue Calamintha Bee is considered Critically Imperiled by NatureServe (NatureServe 2020).

The Blue Calamintha Bee is restricted to sandy scrub habitats at four sites in the southern Lake Wales Ridge in Highlands County, Florida. The species is believed to be a specialist on the Florida state threatened Ashe's calamint (*Calamintha ashei*), which occurs in sand pine and scrub habitat in the Florida central highlands and southeastern Georgia. Some of the bee's known populations are within protected areas, but they are still subject to pesticide drift and destructive off-road recreational activities. Other populations occur in unprotected lands (Rightmyer et al. 2011).

### Calvert's Emerald Dragonfly

Calvert's Emerald Dragonfly (*Somatochlora calverti*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835)). The species remains under review at this time (USFWS 2020a). Calvert's Emerald Dragonfly is listed by several other entities, including as Vulnerable in Florida by NatureServe and Near Threatened by the IUCN (CBD 2010a).

Habitat is unknown but is thought to include "boggy forest seepages" (CBD 2010a). Most North American Calvert's Emerald Dragonfly are associated with cool groundwater for breeding, with adult foraging taking place in surrounding wetland and upland habitats. Other species of Calvert's Emerald breed in graminoid fens and sedge meadows fed by cool groundwater, small streams in woody ravines, or boggy wooded seeps (Mierzwa et al. 1995, CBD 2010a). Due to the typically cool temperatures associated with groundwater sources, the larval period can be prolonged - up to three to five years in some species.

Related Hine's Emerald Dragonfly (*S. hineana*) larvae escape drought or extreme temperatures by retreating into crayfish burrows (Pintor and Soluk 2006).

Calvert's Emerald Dragonfly has been reported in Florida from a handful of localities in the Panhandle including Torreya State Park, Blackwater River State Forest, Ralph E. Simmons State Forest, and Apalachicola National Forest (CBD 2010a, Odonta Central 2019, USFWS 2019o). There is an unverified report from Apalachicola Bluffs Preserve (CBD 2010a). Populations are believed to be small, and breeding habitat is often limited in extent (Paulson 2018). The short adult flight season, cryptic behavior and difficulty of sampling larvae, and difficulty distinguishing *Somatochlora* species hampers survey efforts.

### Bartram's Scrub-hairstreak Butterfly

The Bartram's Scrub-hairstreak Butterfly (*Strymon acis bartrami*) was listed as endangered effective August 12, 2014 (79 FR 47221). Critical habitat was designated within Miami-Dade and Monroe Counties, specifically on Big Pine Key, Navy Wells Pineland Preserve, Richmond Pine Rocklands, and in Everglades National Park. (79 FR 47179).

The Bartram's Scrub-hairstreak is restricted to pine rockland habitat in southern Florida (USFWS 2015f). The subspecies occurs on Big Pine Key, Everglades National Park (Long Pine Key), and in Miami-Dade County (e.g., Navy Wells Pineland Preserve and the Richmond Pine Rocklands). The pineland croton is the host plant for Bartram's Scrub-hairstreak and occurrence records for the species are never more than five meters from host plants (the species is primarily sedentary/non-migratory). The subspecies is threatened by fire suppression, habitat loss, and climate change/sea level rise (USFWS 2015f).

### Yellow-sided Clubtail Dragonfly

The Yellow-sided Clubtail Dragonfly (*Stylurus potulentus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Westfall's Clubtail Dragonfly is listed by several other entities, including as Imperiled by NatureServe and Vulnerable by the IUCN (CBD 2010a, NatureServe 2020).

The Yellow-sided Clubtail is a medium-sized slender dragonfly. Its range extends through the Florida Panhandle and coastal Mississippi (NatureServe 2020). The species requires pristine stream and river habitats with sandy bottoms. Within its range, it occupies only seven streams and one river. The species is highly sensitive to impacts to water quality. The major threat to Yellow-sided Clubtail Dragonflies is pollution as a result of development, clearcutting, and pesticide use. Its limited range makes populations particularly vulnerable (CBD 2010a).

### Three-Toothed Long-horned Caddisfly

The Three-toothed Long-horned Caddisfly (*Triaenodes tridontus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species

remains under review at this time (USFWS 2020a). The Three-toothed Long-horned Caddisfly is listed by several other entities, including as Critically Imperiled by NatureServe and Extinct by the IUCN (CBD 2010a).

The species is only known historically from Oklahoma, the Florida Panhandle, and the Coastal Plain of Alabama. However, the last occurrence in Florida was in 1938. It is believed that the only extant population occurs in Alabama, with the most recent observation of the species occurring in coastal plains streams in Clarke and Perry County in 1991 (NatureServe 2020). Due to this species rarity and few observations, little is known about the species' specific life history and habitat requirements other than it being an aquatic benthic dweller.

## PLANTS

### Meadow Jointvetch

Meadow Jointvetch (*Aeschynomene pratensis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Meadow Jointvetch is listed by several other entities, including as Endangered by the state of Florida and Critically Imperiled in Florida by NatureServe (CBD 2010a).

In Florida, this plant only occurs in Collier, Dade, and Monroe Counties; there are 11 known populations (CBD 2010a). Its range outside of Florida extends to the Caribbean and South America (NatureServe 2020). Meadow Jointvetch is classified as a perennial herb species, often observed growing in pine rocklands, marl prairies, cypress domes, and swales (FNAI 2001b, NatureServe 2020). The primary threats to this species are the drainage and conversion of wetland habitat and competition with invasive exotic species (CBD 2010a).

### Crenulate Lead-plant

Crenulate Lead-plant (*Amorpha crenulata = Amorpha herbacea* var. *crenulata*) was listed as endangered effective July 18, 1985 (50 FR 29345). Critical habitat has not been designated (USFWS 2020a).

Crenulate Lead-plant is characterized as a deciduous, perennial shrub, capable of growing 1.5 meters tall. There are currently only six known populations of this species, all located within Dade County, Florida (FNAI 2001b). It is restricted to poorly drained Opalocka sands within pine rocklands or in wet prairies with Opalocka-rock outcrop complex soils. Frequent fires are a natural process of pine rocklands, and it is presumed that Crenulate Lead-plant is adapted to this environment (USFWS 1999b). It is estimated that 99 percent of Crenulate Lead-plant habitat has been lost (FNAI 2001b). This is mainly the result of development, although remaining habitat is also at risk due to fire suppression (NatureServe 2020).

Current threats to the species include fire suppression in pine rocklands, which results in encroachment by tropical hardwood hammock (unsuitable habitat for the lead-plant), invasive species, and urbanization (50 FR 29345, NatureServe 2020).

### Blodgett's Silverbush

Blodgett's Silverbush, also known as Blodgett's Wild Mercury, (*Argythamnia blodgettii*) was listed as threatened effective October 31, 2016 (81 FR 66842). Critical habitat has not been designated (USFWS 2020a).

This species is restricted to the Florida mainland and the Florida Keys in Miami-Dade and Monroe counties. There are approximately 15-20 known occurrences, and fewer than 10,000 individual plants. The species grows in the low, moist limestone areas near margins of pine rocklands, rockland hammocks, and coastal berm; particularly in open sunny gaps or along edges (NatureServe 2020). It flowers and fruits all year (FNAI 2001b). This species has a considerable amount of its habitat to urbanization. Fire suppression and exotic species invasion are immediate threats to the species. (NatureServe 2020).

### Four-petal Pawpaw

The Four-petal Pawpaw (*Asimina tetramera*) was listed as endangered effective September 26, 1986 (USFWS 2020a). Critical habitat has not been designated (USFWS 2020a).

This large shrub/tree (one to three meters) grows in sand pine scrub communities on the inland prehistoric dunes of Martin and Palm Beach Counties, Florida. It is adapted to disturbances such as fire and hurricanes and grows back from its root system (51 FR 34415). As of 2018, this species was known to be extant in only 15 locations out of 26 historically documented occurrence sites (USFWS 2019r). Threats to this species include fire suppression, overgrowth of surrounding trees, non-native species encroachment, development, habitat loss/degradation, and population fragmentation (51 FR 34415, USFWS 2009e, USFWS 2019r).

### Purpledisk Honeycombhead Sunflower

Purpledisk Honeycombhead Sunflower, also known as Purple Balduina, (*Balduina atropurpurea*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

Purpledisk Honeycombhead Sunflower is listed by several other entities, including as Endangered by the state of Florida and Critically Imperiled in Florida by NatureServe (CBD 2010a).Purpledisk Honeycombhead Sunflower is a perennial member of the Asteraceae family that occurs in southeastern and southcentral Georgia and northeast Florida. It is possibly extirpated from the Florida Panhandle and adjacent Alabama. Disjunct historic occurrences were known in southeast North Carolina and northcentral South Carolina, but these occurrences have not been observed recently. Only seven populations are known in Florida (NatureServe 2020).

General habitat for Purpledisk Honeycombhead Sunflower is wet savanna and bog (Nature Serve 2020). Specific habitats include wet pine flatwoods and savannas, seepage slopes, pitcherplant bogs, and wet ditches (FNAI 2001b). Associated species usually include either longleaf pine (*Pinus palustris*) or slash pine (*Pinus elliotti*). Much of the naturally rare habitats of this species have been altered or destroyed by fire suppression or drained and converted for agriculture and pine plantations. This species is threatened by encroachment of woody vegetation and alterations to hydrology such as wetland drainage and improper firebreak construction (Nature Serve 2020).

### Apalachicola Wild Indigo

Apalachicola Wild Indigo (*Baptisia megacarpa*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).Apalachicola Wild Indigo is listed by several other entities, including as Endangered by the state of Florida and Imperiled in Florida by NatureServe (CBD 2010a).

This plant is characterized as a perennial herb capable of growing up to 1.2 meters tall. Its range is limited to southeast Alabama, southwest Georgia and in the adjacent Holmes, Gadsden, and Liberty Counties in Florida (NatureServe 2020). It is typically observed growing in mixed hardwood and hardwood-pine forests, often in close proximity to a floodplain, streams, or ravines (CBD 2010a). This species is primarily at risk due to habitat loss and fragmentation cause by land development, stream impoundment, and forestry management practices (NatureServe 2020). Competition with invasive species such as Japanese honeysuckle (*Lonicera japonica*) and human collection add additional pressure in some localities (NatureServe 2020). Approximately 20 known populations of this species exist, often with low number of individuals (CBD 2010a).

### Florida Bonamia

The Florida Bonamia (*Bonamia grandiflora*) was listed as threatened effective November 2, 1987 (52 FR 42068). Critical habitat has not been designated (USFWS 2020a).

The Florida Bonamia is a perennial, herbaceous vine with prostrate stems reaching one meter or greater in length. The Florida Bonamia inhabits clearings or openings in shrublands and chaparral in deep, white, dry sands of

ancient dunes and sandy ridges in central Florida. Species occurrences have been documented in the following counties: Hardee, Highlands, Lake, Marion, Orange, and Polk (NatureServe 2020). Fire stimulates flowering and seed production in mature plants, germination of seed, and causes turnover of the large seed bank mainly found in the top centimeter of soil surrounding the plant (USFWS 1996b). The species is in decline as approximately 62 percent of known populations occur on private, unprotected lands vulnerable to destruction if they are developed or continue to be unmanaged (USFWS 2017b).

### Florida Brickell-bush

The Florida Brickell-bush (*Brickellia mosieri*) was listed as endangered effective October 6, 2014 (78 FR 61273). Critical habitat was designated in Miami-Dade county in Florida (80 FR 49845). *Brickellia mosieri* is a synonym for the more recently accepted taxonomic name *B. eupatorioides* var. *floridana*.

Florida Brickell-bush is a perennial herb that is endemic to Miami Rock Ridge in Miami-Dade County, Florida. Older literature suggested this species had a wider distribution, occurring in surrounding states; however, this has since been proven false. Florida Brickell-bush habitat includes pine rockland communities with sandy soils dominated by open canopy slash pine (*Pinus elliottii* var. *densa*). In addition, an open shrub canopy is required; shrubs include saw palmetto (*Serenoa repens*) and wax myrtle (*Myrica cerifera*), among others (80 FR 49845). The remaining populations are under threat from housing development, fire suppression, and encroachment of invasive plants (NatureServe 2020).

### Brooksville Bellflower

Brooksville Bellflower (*Campanula robinsiae*) was listed as endangered effective July 27, 1989 (54 FR 31190). Critical habitat has not been designated (USFWS 2020a).

Native to Brooksville Ridge, Hernando County, Florida, there are only four, possibly five, sites that are currently occupied by this species: one site at Burns Prairie (Florida Fish and Wildlife Conservation Commission Wildlife Management Area), one site on privately owned land known as the Young site, and three sites at Hillsborough River State Park. Only four of these sites, at Burns Prairie in Hernando County and Hillsborough River State Park in Hillsborough County, meet the recovery criteria of being protected.

The species is found in wet prairie and along the edges of ponds near pastureland or adjacent hardwood forests (NatureServe 2020). The population size of this species has fluctuated due to factors such as altered hydrology and drought. Seeds may remain dormant for long periods until high levels of cumulative rainfall stimulate germination and the annual life cycle. There has been a loss of large oaks that would historically have shaded the soil and kept soils moist, which is required for seed germination (USFWS 2019s). Urbanization and habitat alteration has resulted in poor water quality and low water levels resulting in the loss of populations. Cattle grazing and trampling are also threats to the species as well as invasive plant species (FNAI 2001b). Displacement by skunk vine (*Paederia foetida*) is an increasing problem. (NatureServe 2020).

### Fragrant Prickly-apple

The Fragrant Prickly-apple (*Cereus eriophorus* var. *fragrans = Harrisia fragrans*) was listed as endangered effective November 1, 1985. Critical habitat has not been designated (USFWS 2020a).

The Fragrant Prickly-apple occurs in at least 10 confirmed locations in Florida; nine of these are within an area of about 16 kilometers by one kilometer around Savannas Preserve State Park in St. Lucie County. There is also one disjunct population at Canaveral National Seashore in Volusia County, Florida, and one unconfirmed occurrence reported in Indian River County. Unraveling the historical distribution of this species was problematic due to misidentification with the more common Simpson's prickly-apple (*Cereus gracilis* var. *simpsonii*). The range for the fragrant prickly-apple is hypothesized to included Volusia, St. Lucie, Brevard, and Indian River Counties. It prefers to grow in coastal hammock communities but is also found in sand pine habitats. It thrives in partial sun and mature climax communities that experience infrequent fires. Threats to this varietal include habitat

loss/degradation, population fragmentation, poaching, insect predation, invasive species encroachment (plant species as well as feral hogs), herbicide, and stochastic events (USFWS 2010f, NatureServe 2020).

### Deltoid Spurge

The Deltoid Spurge (*Chamaesyce deltoidea* ssp. *deltoidea*) was listed as endangered effective July 18, 1985 (50 FR 29345). Critical habitat has not been designated (USFWS 2020a).

The Deltoid Spurge is an herbaceous, mat-forming plant endemic to the pine rocklands with scattered shrubs and exposed limestone of Miami rock ridge in Miami-Dade Country, Florida (FNAI 2001b, USFWS 2010g). The species underwent precipitous population declines as a result of urban expansion in the Miami area (USFWS 1999b). The species is threatened by habitat destruction, fire suppression (allows for encroachment of unsuitable tropical hammock), and by invasive species (NatureServe 2020).

### Pineland sandmat

Pineland sandmat (*Chamaesyce deltoidea pinetorum*) was listed as threatened effective October 6, 2017 (82 FR 46691). Critical habitat has not been designated (USFWS 2020a).

Pineland sandmat is a perennial herbaceous species endemic to South Florida, occurring in Miami-Dade County. The historic and current range of pineland sandmat is restricted to an area of 68 kilometers, only within the southern portion of the Miami Rock Ridge, from Homestead to the Long Pine Key region of Everglades National Park. Pineland sandmat is most abundant within the Long Pine Key region of Everglades National Park. It also occurs on County-owned conservation lands adjacent to the Park (82 FR 46991). Pineland sandmat occurs in pine rocklands, which are characterized by an open canopy of South Florida slash pine (*Pinus elliottii* var. *densa*) with a patchy understory of tropical and temperate shrubs and palms, and a rich herbaceous layer containing many species that are endemic to South Florida.

Weathered oolitic limestone outcrops (known as pinnacle rock) are common in pine rocklands. Pine rocklands are maintained by regular fire, which historically occurred at three to seven-year intervals. This habitat is now maintained with prescribed fire, which prevents succession to rockland hammock, and reduces woody competition for pineland sandmat which is not shade tolerant. Pine rocklands are prone to annual flooding during the wet season; however, pineland sandmat generally occurs in higher elevation pine rocklands that are less subject to flooding (81 FR 70282). Ninety-eight percent of pine rocklands, the only habitat for pineland sandmat outside of Everglades National Park, has been lost to development (82 FR 46991). Habitat for pineland sandmat is also susceptible to natural disturbance such as hurricanes, frost events, and sea level rise (81 FR 70282, NatureServe 2020).

### Wedge spurge

The Wedge Spurge (*Chamaesyce deltoidea* ssp. *serpyllum*) was listed as endangered effective October 31, 2016. Critical habitat has not been designated (USFWS 2020a).

This short-lived, perennial, tap-rooted herb grows on upland, rocky soils in pine rocklands and along roadways where non-native lawn grasses are not the dominant vegetation. It is only known to occur on Big Pine Key in Monroe County, Florida. The spurge responds positively to fire. From 1996 to 2013, this species' population size fluctuated somewhat, but overall it has been relatively stable. Severe natural disturbances, such as hurricanes, have contracted and restricted the range and distribution of this plant on Big Pine Key (80 FR 58535). Threats to this species include habitat loss/degradation, development, roadside maintenance, invasive species encroachment, fire suppression, over-shading, and stochastic events (81 FR 66842, NatureServe 2020).

### Garber's Spurge

Garber's Spurge (*Chamaesyce garberi* ≡ *Euphorbia garberi*) was listed as threatened effective July 18, 1985. Critical habitat has not been designated (USFWS 2020a).

As of the 2007 USFWS five-year review, this species consisted of 17 populations: 14 on the Keys of Monroe County, two in Miami-Dade County, and one at Cape Sable in Everglades National Park (USFWS 2007g). This short-lived herb grows on dry, sandy substrates in ecotone areas between hammocks and pine rocklands and coastal beach dune ridges (50 FR 29345, USFWS 2007g). Populations sprout vigorously in response to disturbances, e.g., after fires or hurricanes. Threats to this species include habitat destruction/degradation in the Keys (mainland populations exist on protected lands), fire suppression, invasive species encroachment, and possibly Key deer herbivory (USFWS 2007g).

### Big Pine Partridge Pea

Big Pine Partridge Pea (*Chamaecrista lineata keyensis*) was listed as endangered effective October 31, 2016 (81 FR 66842). Critical habitat has not been designated (USFWS 2020a).

Formerly known from several Monroe County Keys, this species is now found only on Big Pine Key. There are an estimated 10,000 plants on the island, many in the National Key Deer Refuge (FNAI 2001b). The subspecies is shade intolerant and requires periodic burning to reduce competition. Required habitat is very uncommon; these plants occur only on the edges of rockland hammocks and pinelands in the pine rocklands. It occupies a narrow habitat range, and typically occurs in small numbers. Current fire management occurs in early summer/late winter (prescribed management of co-occurring federally endangered Key Deer). Competing invasive species include Brazilian pepper (*Schinus terebinthifolius*), earleaf acacia (*Acacia auriculiformis*), natal grass (*Rhynchelytrum repens*), shrub verbena (Lantana camara), and tongue tree (*Albezia lebbeck*). Some of these species are known to affect fire return interval because of their extreme flammability. The subspecies is threatened by habitat alteration, altered fire regimes, development, and non-native plants. Based on the extremely narrow range, catastrophic events such as hurricanes and tropical storms may also result in extirpation of the subspecies (FNAI 2001b, NatureServe 2020).

### Pygmy Fringe-tree

Pygmy Fringe-tree (*Chionanthus pygmaeus*) was listed as endangered effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

Pygmy Fringe-tree is endemic to south-central peninsular Florida where it occurs primarily in sand pine scrub, as well as high pineland, dry hammocks, and transitional habitats (USFWS 1999b). Sand pine scrub vegetation consists of sand pine (*Pinus clausa*) with shrubby evergreen oaks (USFWS 1987).

Pygmy Fringe Tree is known from west of Lake Apopka in Lake County, northwestern Osceola County, and the Lake Wales Ridge in Polk and Highlands Counties, including the Saddle Blanket Lakes Scrub Preserve and Highlands Hammock State Park (USFWS 1999b), and in Orange County (Nature Serve 2020). One of the largest populations is in the Carter Creek scrubs in Highlands County where it occurs with turkey oak (*Quercus laevis*), a species more typical of a high pine community (USFWS 1999b).

Pygmy Fringe-tree is a fire dependent, long-lived shrub or small tree, with stems rising from branches buried by blowing sand (USFWS 1999b). Sand pine scrub vegetation burns infrequently and intensely, approximately every 20 to 70 years, and Pygmy Fringe Tree reproduces from root sprouts post fire. It is also known to reproduce occasionally by seed. The species is similar to the widespread white fringe-tree (*Chionanthus virginicus*), who's range extends into central Florida. The two species appear to hybridize in habits other than scrub, though they are distinct species (USFWS 1999b). Threats to the Pygmy Fringe- tree include habitat loss to residential development and conversion to citrus groves. It is also threatened by collection for horticultural use (USFWS 1987).

### Cape Sable Thoroughwort

Cape Sable Thoroughwort (*Chromolaena frustrata*) was listed as endangered effective November 25, 2013 (78 FR 63795). Critical habitat was designated on January 8, 2014 (79 FR 1551).

The species is endemic to South Florida and the Keys. Current occurrences are known from Boca Grande Key in the far west, Big Munson Island in the Newfound Harbor Keys, and a cluster of keys farther east: Long Key, Lignumvitae Key, Lower Matecumbe Key, and Upper Matecumbe Key. Cape Sable Thoroughwort is also known from the Flamingo/Cape Sable region on the mainland (NatureServe 2020). Habitat consists of coastal rock barrens and berms and the sunny edges of rockland hammock (FNAI 2001b).

The Cape Sable Thoroughwort is severely threatened by loss of habitat, fragmentation of populations, and invasion of exotic plants, expecially Brazilian pepper (*Schinus terebinthifolius*), carrotwood (*Cupaniopsis anacardioides*), and latherleaf (*Colubrina asiatica*). Sea level rise is also a threat to this species. Given the species' narrow range, fragmented distribution, and the small population size, Cape Sable Thoroughwort is vulnerable to stochastic environmental events (NatureServe 2020).

### Florida Golden Aster

The Florida Golden Aster (*Chrysopsis floridana*) was listed as endangered effective May 16, 1986 (51 FR 17974). Critical habitat has not been designated (USFWS 2020a). The species has a high recovery potential and the Service recommended the species listing be reduced from Endangered to Threatened (USFWS 2009f). An initiation of review and request for information was published on September 23, 2014 (79 FR 56821).

The species is endemic to Florida and restricted to the west-central region of the state. It occurs in sunny habitats with bare patches of sand in sand pine scrub and on ecotones between this habitat and scrubby flatwoods. It also inhabits disturbed areas of loose sand (FNAI 2001b). The Florida Golden Aster is known from the following counties: Hardee, Highlands, Hillsborough, Manatee, and Pinellas (NatureServe 2020). The species is under threat due to habitat loss and degradation through residential development and suppression of natural fire regimes (USFWS 2009f). The Florida Golden Aster was introduced to 10 sites where the species was not known to occur naturally, increasing the estimated global population size from 21,000 to 46,000 individuals (NatureServe 2020).

### Florida Perforate Cladonia

The Florida Perforate Cladonia (*Cladonia perforata*) was listed as endangered effective April 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

The Florida Perforate Cladonia is a conspicuous lichen, endemic to Florida and restricted to small areas in northwest, central, and southeast portions of the state (NatureServe 2020). The species inhabits rosemary scrub on the Florida Pandhandle coasts, Lake Wales Ridge, and Atlantic Coastal Ridge and it is known from fewer than 30 populations (FNAI 2001b). Florida Perforate Cladoniais threatened by trampling, over- collection, fire, and habitat loss from urbanization (NatureServe 2020). The recovery potential of the species is also hampered by slow reproductive growth as well limited opportunities for dispersal and population expansion due to habitat loss and fragmentation (USFWS 2007h).

### Pigeon Wings

Pigeon Wings (*Clitoria fragrans*) was listed as threatened effective April 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

The species is a perennial herb that blooms from May to June (FNAI 2001b). Pigeon Wings are endemic to central Florida, inhabiting undisturbed clearings of xeric sandhill and scrub communities on well-drained soils, and turkey oak barrens with wire grass (*Aristida stricta*), bluejack (*Quercus incana*) and turkey oak (*Quercus laevis*) (FNAI 2001b, NatureServe 2020). Threats to the species include habitat loss from urbanization and agriculture (USFWS 2008f, NatureServe 2020).

### Short-leaved Rosemary

The Short-leaved Rosemary (*Conradina brevifolia*) was listed as endangered effective August 11, 1993 (58 FR 37432). Critical habitat has not been designated (USFWS 2020a).

Short-leaved Rosemary is a perennial, aromatic shrub growing from a woody root to one meter high. The species is known from approximately 30 occurrences on the Lake Wales Ridge of central Florida, with only a few of those populations having greater than 25 individuals (NatureServe 2020). The Short-leaved Rosemary inhabits xeric white sands supporting evergreen-Florida rosemary-sand pine scrub (USFWS 2008g). Populations are at risk of habitat loss due to conversion to citrus groves, residential, recreational, and commercial development. Short-leaved Rosemary is also a target of over-collection for horticulture (NatureServe 2020).

### Etonia Rosemary

The Etonia Rosemary (*Conradina etonia*) was listed as endangered effective August 11, 1993 (58 FR 37432). Critical habitat has not been designated (USFWS 2020a).

This shrub species was described relatively recently in 1991. There are two known populations, one in Etonia Creek State Forest and one in Interlachen Estates Subdivision, in Putnam County, Florida. Two populations were thought to have been found in Dunn's Creek State Park, but genetic research revealed these populations to be a separate species entirely (*C. cygniflora*). This species prefers sunny, disturbed sites in sand pine or shrubby oak communities. Within the subdivision, plants are found along roadsides or with subdivided lots of at least 0.4 hectare. Healthy populations are associated with natural fire regimes.

Threats to this species include habitat degradation due to lack of management and fire suppression (USFWS 2019t, NatureServe 2020).

### Apalachicola Rosemary

The Apalachicola Rosemary (*Conradina glabra*) was listed as endangered on August 11, 1993 (58 FR 37432). Critical habitat has not been designated (USFWS 2020a).

This shrub species was described relatively recently in 1962. Most of the known populations are currently found in an extremely limited area of 1,000 to 1,470 hectares in Liberty County, Florida. It is believed this species was more abundant across former sandhill habitats, but by the 1950s the silviculture industry had destroyed most of that habitat. This species is adapted to relatively frequent, low-intensity fires that maintain healthy mature populations. Historically in sandhill communities, these fires occurred on average every one to 10 years. A few populations of this plant occur on private land, two populations have been reintroduced on Nature Conservancy land, and only one population currently exists on public land at the Sweetwater Creek Track in Torreya State Park. Continuing threats to this species include habitat destruction/modification, range curtailment, and herbicide application (USFWS 2017c).

### Florida Semaphore Cactus

The Florida Semaphore Cactus (*Consolea corallicola* = *Opuntia corallicola*) was listed as endangered effective November 25, 2013 (78 FR 63795). Critical habitat was designated in the Florida Keys (81 FR 3865).

The Florida semaphore cactus is a Florida endemic cactus. The Florida Semaphore Cactus grows on bare rock or areas of loose rock such as talus and scree slopes. It is also found in shallow soil areas of hardwood hammocks near sea level. Only three naturally occurring populations of this species remain on Swan Key, Little Torch Key, and Key Largo. Reintroduction efforts have been initiated on other keys (USFWS 2013). Threats to the species include large hurricanes, its small population size, over-collection, urbanization, sea level rise, and introduced species, such as a moth that feeds on cacti (NatureServe 2020).

### Ciliate-leaf Tickseed Sunflower

Ciliate-leaf Tickseed Sunflower (*Coreopsis intergrifolia*) was listed as endangered effective October 6, 2014 (79 FR 52567). Critical habitat was designated effective September 16, 2015 (80 FR 49845).

This species occurs from southeastern South Carolina south to the Panhandle of Florida. It is reported from five counties in northern Florida (Calhoun, Jackson, Nassau, St. Johns, and Washington). Habitat consists of low floodplain woodlands, streambanks, floodplains of blackwater streams (especially over limestone), and the edges of swamp forests bordering longleaf pinelands or brackish marshes. Soil is characterized by moist, sandy loam. Threats to the species include damming of streams, clearcutting bottomlands, herbicides, cattle grazing, and anthropogenic disturbance at high use recreation areas (NatureServe 2020).

### Avon Park Harebells

The Avon Park Harebells (*Crotalaria avonensis*) was listed as endangered effective April 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

The Avon Park Harebells is endemic to Florida and known from only three sites in Polk and Highlands counties near Avon Park (58 FR 25746, NatureServe 2020). The species is found onlyon xeric white sand scrub. Avon Park Harebells are small, deciduous, perennial herbs that grow from a deep taproot, blooming from March to June. It is thought that the deep taproot, combined with being deciduous, helps the species survive the dry winter months and fires common for their habitat (NatureServe 2020).

Populations are threatened by fragmentation and habitat loss through the development of citrus groves, cattle pastures, and housing subdivisions (USFWS 1999c). A five-year review of the species indicated a need to preserve the remaining populations of Avon Park Harebells and to research the life history and propagation with and without disturbance (USFWS 1999c, NatureServe 2020).

### Okeechobee Gourd

The Okeechobee Gourd (*Cucurbita okeechobeensis* ssp. *okeechobeensis*) was listed as endangered effective August 11, 1993 (58 FR 37432), and revised on April 1, 1994 (59 FR 15345), due to a technical correction to the scientific name. Critical habitat has not been designated (USFWS 2020a).

The Okeechobee Gourd is found in swampy forests and hammocks on muck soils and are restricted to disturbed, uncultivated areas (e.g., ditch banks, wet road shoulders; NatureServe 2020). There are only two natural populations known in Florida, one on Lake Okeechobee and the other along St. Johns River (USFWS 2009g). Threats to the species include habitat destruction and modification (USFWS 2019u).

### Florida Prairie-clover

The Florida Prairie-clover (*Dalea carthagenensis floridana*) was listed as endangered effective November 6, 2017 (82 FR 46691). Critical habitat has not been designated (USFWS 2020a).

This short-lived, perennial shrub is endemic to Florida. It grows in tropical savanna pine rockland, rockland hammock, marl prairie, and coastal berm habitats. This subspecies is likely extirpated from Everglades National Park. Only nine populations of this subspecies are currently extant. Florida Prairie-clover is threatened by habitat loss/fragmentation, fire suppression, non-native species encroachment, recreational activities, and stochastic events (82 FR 46691).

### Beautiful Pawpaw

Beautiful Pawpaw (*Deeringothamnus pulchellus*) was listed as endangered effective September 26, 1986 (50 FR 45634). Critical habitat has not been designated (USFWS 2020a).

Half of the existing Beautiful Pawpaw shrubs are found in xeric, mesic, and hydric pine flatwoods on two preserves in western Charlotte and Lee counties (eastern Florida) (USFWS 2020a). Approximately 5,000 plants remain (FNAI 2001b). In 1996, 200 individual Beautiful Pawpaws were relocated from private agricultural land on Pine Island, where habitat destruction was anticipated, to unoccupied habitat in Lee County (USFWS 2020a).

Beautiful Pawpaw thrives alongside open slash pine (*Pinus elliotti*) or longleaf pine (*Pinus palustris*) flatwoods with evergreen blueberries (*Vaccinium myrsinites*), saw palmetto (*Serenoa repens*), wax myrtle, (*Myrica cerifera*), flag pawpaw (*Asimia reticulate*), and dwarf live oak (*Quercus minima*) in the understory. Soils in these habitats are poorly drained sandy substrates (FNAI 2001b).

Decline of the Beautiful Pawpaw is due to loss of available habitat from urbanization, degradation, and fire suppression (USFWS 1999). Fire not only creates clearings to let in sunlight, but the heat promotes germination as well. Other threats to the species include exotic invasive species such as the Brazilian pepper (*Schinus terebinthifolius*), the leafroller caterpillar (*Choristoneura parallela*), and feral pigs (FNAI 2001b).

### Rugel's Pawpaw

The Rugel's Pawpaw (*Deeringothamnus rugelii*) was listed as endangered effective October 27, 1986 (51 FR 34415). Critical habitat has not been designated (USFWS 2020a).

The Rugel's Pawpaw is a low-growing shrub (USFWS 2009h). Its range is extremely limited and it can only be found in Volusia County in the northeastern Florida peninsula (USFWS 2018i, NatureServe 2020). Its historic range included Seminole County (NatureServe 2020). The species is known from approximately 33 occurrences, mostly in the vicinity of New Smyrna Beach (USFWS 2009h, USFWS 2018i). There are two additional sites with introduced populations. It thrives in mesic and wet flatwood habitats dominated by slash pine (*Pinus elliotttii* var. *densa*) or longleaf pine (*Pinus palustris*) and associated with poorly drained sandy soils. Additionally, it is sometimes found along roadsides. Rugel's Pawpaw is often associated with netted pawpaw (*Asimina reticulate*), common pawpaw (*A. triloba*), tarflower (*Bejaria racemose*), shiny liona/fetterbrush (*Lyonia lucida*), dwarf live oak (*Quercus minima*), saw palmetto (*Serenoa repens*), and shiny blueberry (*Vaccinnium myrsinites*). These natural communities require regular fire intervals (USFWS 2018i). This species is threatened by habitat loss from urbanization, industrial timber, and fire suppression (NatureServe 2020).

### Garrett's Mint

Garrett's Mint (*Dicerandra christmanii*) was listed as endangered effective December 2, 1985 (50 FR 45621). Critical habitat has not been designated (USFWS 2020a).

Garrett's Mint is a perennial shrub; flowering occurs from July through November. It is dependent on insects for pollination as well as on regular fire disturbance for long-term survival. Based on studies of a similar mint species, populations may decline after only five years without fire. Its range is limited to Highlands County in Florida, specifically, to a six-kilometer stretch along Lake Wales Ridge. This distribution has been fragmented by development. The species thrives in gaps within xeric oak-hickory scrub habitat. It grows exclusively on soils composed of fairly well-drained yellow sands (USFWS 2009i). The limited area where this species is found is threatened by habitat loss and degradation from urbanization (NatureServe 2020).

### Longspurred Mint

The Longspurred Mint *(Dicerandra cornutissima)* was listed as endangered, effective November 1, 1985 (50 FR 45621). Critical habitat has not been designated (USFWS 2020a).

This short-lived plant has 15 known occurances in Marion and Sumter Counties, Florida (USFWS 2005b). The majority of the occurances are on the Cross Florida Greenway State Recreation and Conservation area in Maron County. Unfortunately, the Marion County sites are no longer sutabile habitat due to increasing development and

road widening projects (USFWS 2005b). Fire suppression and invasive exotic species are also a factor. (USFWS 2005b).

Strongly aromatic, this low growing shrub is found alongside sand pine scrub and turkey oak communities. It can spread on the edges of roads and vigerously along streets (USFWS 2018j). It prefers forested woodland, shrub and chaparral communities throughout the scrub and sandhill in openings (USFWS 2018j).

### Scrub Mint

Scrub Mint (*Dicerandra frutescens*) was listed as endangered effective November 1, 1985 (50 FR 45621). Critical habitat has not been designated (USFWS 2020a).

Scrub Mint is an aromatic shrub that blooms from August to February (FNAI 2001b). Scrub Mint is endemic to Highlands County in central Florida (NatureServe 2020) and inhabits yellow sand soil types supporting sand pine scrub or oak-hickory scrub vegetation. These habitats are currently threatened by residential, commercial, and agricultural development and modification due to long-term fire suppression (USFWS 2009j).

### Lakela's Mint

The Lakela's Mint (*Dicerandra immaculata*) was listed as endangered effective May 15, 1985 (50 FR 20212). Critical habitat has not been designated (USFWS 2020a).

This short, hemispheric shrub species grows in the disturbed, well-drained, sterile sand of ancient inland dunes. It is endemic to coastal sand pine scrub in Indian River and St. Lucie Counties in Florida (50 FR 20212, NatureServe 2020). Its historical range was limited to an area approximately three kilometers wide by five kilometers long. In 1991 and 1992, transplants were introduced to the Hobe Sound National Wildlife Refuge in Martin County. Similar to other scrub mints, it is believed this species is adapted to patchy, infrequent fires to maintain an open canopy and facilitate new recruitment. Threats to this species include habitat loss, degradation, and fragmentation; altered fire regimes; development; feral hogs; and non-native plant species encroachment (USFWS 2008h).

### Florida Pineland Crabgrass

Florida Pineland Crabgrass (*Digitaria pauciflora*) was listed as threatened effective October 6, 2017 (82 FR 46691). Critical habitat has not been designated (USFWS 2020a).

The species is currently known only from one site of approximately 8,000 hectares in Everglades National Park, Florida (NatureServe 2020). Florida Pineland Crabgrass commonly occurs in the ecotone between pine rockland and grassy marl prairie habitats, extending somewhat into both (Bradley and Gann 1999). Florida Pineland Crabgrass is a perennial clump-forming grass. The main threat to this species is alteration of the hydrology of the Everglades National Park. Extensive urban development, rising sea levels, invasive species, and altered fire regimes also threaten the population (USFWS 2004).

### Clam-shell Orchid

The Clam-shell Orchid (*Encyclia cochleata* var. *triandra*) was petitioned for listing on April 20, 2010 (CBD 2010a). On October 7, 2019, listing was deemed not warranted after review (84 FR 53336). The Clam- shell Orchid is considered Imperiled by NatureServe (CBD 2010a).

The Clam-shell Orchid is relatively abundant in southern Florida from Ft. Lauderdale to further south, especially in Big Cypress and near West Lake in Everglades National Park (Dade, Collier, and Monroe counties). Habitat includes forested hardwood wetlands, hammocks, and buttonwood/cypress strands. The Clam-shell Orchid grows on buttonwood and red mangroves. Although current population levels are adequate to sustain the variety, widespread collecting of the native form has significantly impacted populations. However, populations in very inaccessible portions of Big Cypress National Preserve and Everglades National Park are well-protected

(NatureServe 2020).

### Big Cypress Epidendrum Orchid

The Big Cypress Epidendrum Orchid (*Epidendrum strobiliferum*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Big Cypress Epidendrum Orchid is listed by several other entities, including as Endangered by the state of Florida and Critically Imperiled by NatureServe (CBD 2010a).

Big Cypress Epidendrum Orchid is widespread in tropical America including Collier County in South Florida, the West Indies, Central and South America, Mexico to Brazil, and Cuba (USFWS 2020a). It is a very small, perennial epiphytic orchid that flowers through the winter and can be found in pop ash (*Fraxinus caroliniana*) and pond apple (*Annona glabra*) swamps and sloughs (FNAI 2001b, CBD 2010a). Big Cypress Epidendrum Orchid has been severely reduced by plant poaching and wetland habitat destruction (FNAI 2001b).

### Blackbract Pipewort

Blackbract Pipewort, also known as Dark Headed Hatpins, (*Eriocaulon nigrobracteatum*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Blackbract Pipewort is listed by several other entities, including as Endangered by the state of Florida and Critically Imperiled by NatureServe (CBD 2010a).

The species is endemic to the Gulf Coast lowlands of the east-central Florida Panhandle in Bay, Calhoun, and Gulf counties (FNAI 2001b). The Florida Natural Areas Inventory reports 12 occurrence records in its database as of 2014 (NatureServe 2020). The Blackbract Pipework occurs in open wet bog/fen wetland habitat at stream heads or on open, grassy seepage slopes. In addition, habitat includes deep sapric muck soils of nutrient-poor, somewhat oxygen-rich and acidic mires, with little wood or Sphagnum moss present in the muck (poor fens; FNAI 2001b). Within this habitat, the plants are locally abundant in areas saturated by groundwater seepage and in seep spring rivulets (NatureServe 2020). The Blackbract Pipewort flowers in March and goes to seed in April and May. This species is threatened by development and road and power line maintenance adversely affects the hydrology of seepage slope habitat in a number of the occurrences. Shading by shrubs is also a primary threat (the result of suppressed fire regimes) (NatureServe 2020).

### Scrub Buckwheat

Scrub Buckwheat (*Eriogonum longifolium* var. *gnaphalifolium*) was listed as threatened effective April 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

Scrub Buckwheat is a perennial herb that blooms from May to October or after fire (FNAI 2001b). The species is endemic to central Florida and occurs in dry pinelands, sandhills, scrub, and ecotones between scrub and high pineland. The Scrub Buckwheat is threatened by habitat loss through development of citrus groves, pine plantations, and residential housing (USFWS 2018k, NatureServe 2020).

### Snakeroot

Snakeroot, also known as Wedge-leaf Eryngo, (*Eryngium cuneifolium*) was listed as endangered effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

This species has an extremely restricted range with approximately 20 occurrences, all occurring in Highlands County, central Florida. Most of these occurrences are located on three preserves (FNAI 2001b). It inhabits areas of open sand, including blowouts and other highly disturbed soil surfaces such as road shoulders (Christman and Judd 1990). Snakeroot is currently threatened by habitat loss from development and modification due to long-term fire suppression (USFWS 2010h).

### Telephus Spurge

The Telephus Spurge (*Euphorbia telephioides*) was listed as threatened effective May 8, 1992 (57 FR 19813). Critical habitat has not been designated (USFWS 2020a).

The Telephus Spurge is a perennial herb (NatureServe 2020). This species is currently only known from Bay, Gulf, and Franklin counties in Florida. It inhabits longleaf pine savannas, scrubby and mesic flatwoods, and coastal scrub on low sand ridges near the Gulf of Mexico (FNAI 2001b). It can be subdioecious (having separate male and female plants) or monoecious (having both male and female flowers on the same plant). Subdioecious plants ensure genetic variation through reducing outcrossing; however, this can also reduce the effective reproductive population if the population is comprised of only one sex (USFWS 2008i). The species needs fire to maintain community structure and is threatened by habitat degradation due to forestry practices, lack of prescribed fire, and by urban development (NatureServe 2020).

### Small’s Milkpea

Small’s Milkpea (*Galactia smallii*) was listed as endangered effective July 18, 1985 (50 FR 29345). Critical habitat has ot been designated (USFWS 2020a).

This species is known from only 11 occurrences, all located in a small area of Dade County, South Florida (NatureServe 2020). It inhabits redland pine rocklands with South Florida slash pine (*Pinus elliottii*), saw palmetto (*Serenoa repens*), willow bustic (*Dipholis saliciolia*), and poisonwood (*Metopium toxiferum*) (FNAI 2001b). The species prefers open sun and little shade and can be threatened by shading from hardwoods (USFWS 2010i). Threats to this species include residential, commercial, and agricultural development, succession in the absence of fire, and competition from invasive species (NatureServe 2020). Ninety-eight percent of the original pine rockland habitat has disappeared, resulting in just six remaining populations on five managed areas (FNAI 2001b).

### Harper's Beauty

The Harper's Beauty (*Harperocallis flava*) was listed as endangered effective November 1, 1979 (44 FR 56862). Critical habitat has not been designated (USFWS 2020a).

This species is a perennial herb that grows in the ecotones between sunny, open wet prairies and wetter shrub/tree areas, such as cypress swamps, roadside depressions, seepage savannas between pinelands, pine flatwood bogs, and ditches in the vicinity of pine plantations near flatwood habitats. Current occurrence records are known from Liberty, Franklin, and Bay Counties in Florida (USFWS 2016c).

Genetic studies on this plant show low genetic diversity within the species and some suggestions of instability within its genetics (e.g., a threat to the species) (NatureServe 2020). Other threats to Harper’s Beauty include horticultural collection, timber production processes, habitat degradation due to lack of management, road widening, development, hydrology modification, and fire suppression (USFWS 2016c).

### Aboriginal Prickly-apple

The Aboriginal Prickly-apple (*Harrisia aboriginum*) was listed as endangered effective October 24, 2013 (78 FR 63795). Critical habitat was designated on January 22, 2016. (81 FR 3865).

The Aboriginal Prickly-apple is a cylindrical-stemmed cactus measuring up to six meters in height (78 FR 63804, USFWS 2020a). It occurs on Florida’s southwest coast and is often established on shell mounds or shelly substrates (NatureServe 2020, USFWS 2020a). This species occurs in coastal berms, coastal grasslands (78 FR 63805), coastal strand vegetation, and tropical coastal hammocks, with trees such as gumbo limbo (*Bursera simaruba*), wild lime (*Zanthoxylum fagara*), and/or live oak (*Quercus virginiana*). It may be found near, but never within mangrove communities (USFWS 2020a). Threats to this species include the destruction and modification of habitat, bonfires, vandalism, and competition with non-native plants such as Brazilian pepper (*Schinus*

*terebinthifolius*) and leather leaf (*Chamaedaphne calyculata*) (78 FR 63806).

### Florida Hartwrightia

Florida Hartwrightia (*Hartwrightia floridana*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Florida Hartwrightia is considered Imperiled in Florida and Critically Imperiled in Georgia by NatureServe (NatureServe 2020).

This perennial herb species is known to inhabit areas near the Florida-Georgia border. Occurrences have been documented in the following Florida counties: Highlands, Clay, Nassau, Polk, and Putnam. The species grows in wet, organic mats such as peat bogs/fens or forested wetlands (e.g., slash pine/longleaf pine/saw palmetto flatwoods, pineland swamps/bogs), and seepage areas that are acidic. In the last 40 years, only 50 occurrences of this species have been reported. Threats to this species include incompatible hydrological practices, habitat conversion (pine plantations or pasture), fire suppression, and canopy encroachment (NatureServe 2020).

### Henry's Spider-lily

Henry's Spider-lily (*Hymenocallis henryae*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Henry's Spider-lily is considered Imperiled in Florida by NatureServe (NatureServe 2020).

This perennial, bulbous herb is known only from the south-central Florida Panhandle in Bay, Franklin, Gulf, Liberty, and Walton Counties. It grows at the edges of dome swamps, between these and flatwood or wet prairie habitats. Only 20 occurrences of this species are known. Threats to Henry's Spider-lily include horticultural collecting, development, hog damage, hydrology alteration, habitat conversion (pine plantations), fire suppression, and canopy encroachment (NatureServe 2020).

### Highlands Scrub Hypericum

Highlands Scrub Hypericum (*Hypericum cumulicola*) was listed as endangered effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

This perennial, tap-rooted herb/subshrub grows in the openings of dry, upland sand pine, oak scrub, and rosemary scrub communities. It is known from a limited distribution in the southern Polk and Highlands Counties of Florida along the ancient, inland dune ridge or along sandy road edges (52 FR 2227, USFWS 2008j, NatureServe 2020). Populations of this species are invigorated following fire events, though effects are temporally delayed (15 years at least, but not more than 50 years between events; USFWS 2008j).

Threats to this species include citrus farming, urban development, off-highway-vehicle/trampling damage, invasive species encroachment, fire suppression, extreme climate conditions (droughts, flooding, and frost), and stochastic events (USFWS 2008j, NatureServe 2020).

### Edison's Ascyrum St. John's Wort

Edison's Ascyrum St. John's Wort (*Hypericum edisonianum*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Edison's Ascyrum St. John's Wort is considered Imperiled in Florida (CBD 2010a).

The species is endemic to central peninsular Florida and occurs in depressions in scrub, cutthroat seeps, flatwoods ponds, lake margins, and wet prairies. Although it is locally abundant due to its thicket-forming habit, it is only found at 25 sites and only in five of these sites are conservation areas (FNAI 2001b). The species has been documented in the following Florida counties: Polk, Highlands, Glades, and DeSoto.

The primary threat to the species is loss of habitat due to extreme development pressure, wetland drainage, fire

suppression, and agriculture (NatureServe 2020).

### Smooth-barked St. John's Wort

Smooth-barked St. John's Wort (*Hypericum lissophloeus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Smooth-barked St. John's Wort is listed by several other entities, including as Endangered by the state of Florida and Imperiled by NatureServe (CBD 2010a).

Smooth-barked St. John's Wort is endemic to the karst pond area of Bay and Washington Counties in the Florida Panhandle. It occurs on the fluctuating shores and shallow water of karst sinkhole ponds and small sandhill lakes (FNAI 2001b, NatureServe 2020). Although its range is limited, it may be locally abundant, even the most abundant shrub on the shores of the ponds where it occurs. Occurrences may number in the thousands. The species is known to form a solid ring around the ponds. Smooth-barked St. John's Wort is threatened by rapid lakeshore development in the region, disturbance of upland habitats leading to increased erosion into ponds, prolonged droughts, and increased recreational use of ponds (NatureServe 2020). Future recommendations include preservation of natural lakeshore vegetation, preventing conversion of lakeshores to sandy beaches, and halting the erosion into lakes from upland developments and logging practises (FNAI 2001b).

### Yellow Anisetree

The Yellow Anisetree, also known as Star Anise, (*Illicium parviflorum*) was petitioned for listing on September 27, 2011 (76 FR 59835). On October 7, 2019, listing was deemed not warranted based on the moderate to high resiliency of the species (84 FR 53336).

The Yellow Anisetree is widely used as an ornamental landscaping plant in southeastern US; however, it is only known from fewer than 20 native occurrences in central Florida (NatureServe 2020). The species blooms from April to June. Fruit are woody, star-shaped, and distinctive all year (FNAI 2001b). The Yellow Anisetree is restricted to habitats with continually moist soils, such as sandy loams or sandy peat mucks, on the banks of spring-run or seepage streams, hydric hammock, and bottomland forest (FNAI 2001b, NatureServe 2020). Threats to the species include logging or hydrology-altering practices in forested wetlands and collection by hobbyists (FNAI 2001b).

### Beach Jacquemontia

Beach Jacquemontia (*Jacquemontia reclinata*) was listed as endangered effective November 24, 1993 (58 FR 14357). Critical habitat has not been designated (USFWS 2020a).

Beach Jacquemontia is a perennial vine endemic to coastal vegetated dunes, disturbed marine hammock, and woodland habitat in Palm Beach, Broward, and Dade Counties, Florida. There were 22 occurrences of the species in 2018 (USFWS 1999, FNAI 2001b, NatureServe 2020). Common vegetative associates include sea grape (*Coccoloba uvifera*), cabbage palm (*Sabal palmetto*), poisonwood (*Metopium toxiferum*), Madagascar periwinkle (*Catharanthus roseus*), croton (*Croton involucrate*), gopher apple (*Licania michauxii*), prickly pear cactus (*Opuntia* spp.), sandspurs (*Cenchrus* spp.), sea oats (*Uniola paniculata*) and other shrubs and dwarfed trees (USFWS 2020a). Beach Jacquemontia population are in decline due to loss of available habitat from urbanization, degradation, beach erosion, and invasive species (NatureServe 2019).

### Cooley's Water-willow

Cooley's Water-willow (*Justicia cooleyi*) was listed as endangered effective July 27, 1989 (54 FR 31190). Critical habitat has not been designated (USFWS 2020a).

This species occurs within an extremely limited range in central Florida flatwoods. The Cooley's Water- willow only occurs on Brooksville Ridge in Hernando County, Florida and at one location in Sumter County. (USFWS 2019v,

NatureServe 2020). The Cooley's Water-willow is a rhizomatous, perennial herb found in mesic hardwood hammocks and pine forests underlain by limestone (FNAI 2001b). Soil composition includes sandy loams or silty clay loams (FNAI 2001b, NatureServe 2020). The species has declined as a result of habitat loss via lime and phosphate mining, timber harvesting, and agricultural and urban development. Current threats to the species include habitat loss and encroachment of invasive species in Cooley's Water-willow habitat (USFWS 2019v).

### Scrub Blazingstar

Scrub Blazingstar (*Liatris ohlingerae*) was listed as endangered effective July 27, 1989 (54 FR 31190). Critical habitat has not been designated (USFWS 2020a).

Scrub Blazingstar is characterized as an erect, perennial herb (NatureServe 2020). This species is endemic to Florida and has a limited range, occurring along the Lake Wales Ridge in Polk and Highlands counties (FNAI 2001b). It is restricted to sand pine and open oak-rosemary scrub habitats, often along the ecotone between rosemary balds and surrounding scrub habitats (USFWS 1999, NatureServe 2020). This habitat is often a dynamic vegetative complex dependent on the frequency and intensity of fires, which maintain ideal growing conditions for this species. The species is threatened by habitat loss due to agriculture, commercial, residential, and recreational purposes. Fire suppression is another factor that has caused habitat degradation as areas that were once used by this species are continually becoming overgrown (USFWS 1999).

### Panhandle Lily

Panhandle Lily (*Lilium iridollae*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Panhandle Lily is considered Imperiled in Florida by NaturServe (CBD 2010a).

The range of the Panhandle Lily is contested due to taxonomic uncertainty regarding plants of the Carolinas and Virginia, which are treated by many as a distinct species (Sandhill Lily, *Lilium pyrophilum*) (Skinner and Sorrie 2002; Nature Serve 2020). Taking the broader view of the range, including plants that many consider to be the Sandhill Lily, the range for Panhandle Lily is discontinuous from southern Alabama and northwest Florida north to Virginia. If the Sandhill Lily is accepted as a distinct species, then the range of Panhandle Lily includes only four counties in the western Florida panhandle and three counties in adjacent southern Alabama. General habitats for Panhandle Lily include bogs and fens, herbaceous wetlands, and scrub-shrub wetlands. It inhabits baygalls, wet flatwoods, seepage slopes, and the edges of bottomland forests typically in sandy peat or loamy soils (Nature Serve 2020).

The quality and extent of potential habitat for Panhandle Lily has declined due to fire suppression and drainage for conversion to silviculture and agriculture (Nature Serve 2020). Habitat conversion has resulted in considerable permanent impacts to the species. Panhandle Lily has showy flowers that are attractive to collectors and an entire population was removed from the Conecuh National Forest by collectors. Additional threats include cattle grazing and potentially insect herbivory (CBD 2010a, Nature Serve 2020).

### Bog Spicebush

Bog Spicebush (*Lindera subcoriacea*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Bog Spicebush is considered Vulnerable by NatureServe (NatureServe 2020).

The Bog Spicebush occurs on the Atlantic and Gulf Coast plains from southern Virginia south to Florida and west to Louisiana. There are currently over 100 occurrences; most of them consist of very small populations located on sites that will require active management for the plants to persist. The plants occupy a relatively narrow ecological niche and have a correspondingly spotty distribution within the range. In the deep south, Bog Spicebush is not found outside the wettest portions of rare, sphagnum bog habitats. This species is found streamside and in

seepage bogs, with sphagnum moss, titi, and other evergreen shrubs. The species is clonal, and most sites have only one to five genetic individuals (FNAI 2001b).

The general lack of fire in these habitats during the last 50 or more years has placed the plants under increased stress from competing shrubs and trees. Restoring fire to the landscapes via controlled burns would reverse this trend. This is becoming increasingly difficult with continued development of surrounding longleaf pine/wiregrass uplands for housing, agriculture, timber management, and pinestraw raking. Other known or perceived threats to the species include siltation of streamheads, logging, road building, draining and of bogs and wetlands (NatureServe 2020).

### Sand Flax

Sand flax *(Linum arenicola,* formerly *Cathartolinum arenicola)* was listed as endangered, effective October 31, 2016 (81 FR 66842). Critical habitat has not been designated (USFWS 2020a).

Sand flax is a perennial herb that flowers from February to September. Its historical range encompasses Miami-Dade County and many islands in the Florida Keys. As of 2016, there were eight extant populations known from Miami-Dade County and four from the Florida Keys (80 FR 58535). Sand flax thrives in pine rockland and flatwoods, dry marl prairie, as well as in disturbed areas (e.g. roadsides) (80 FR 58535, FNAI 2001b, NatureServe 2020). It grows in rocky soils, often near exposed limestone. It has been described as occurring in solution pits and shallow soil of ephemeral pools on limerock in open pinelands, pineland clearings and adjacent roadsides (NatureServe 2020). These natural communities require regular fire intervals. Currently, it is more commonly found in disturbed areas than within intact pine rocklands (80 FR 58535). This species is threatened by habitat loss from urbanization, agriculture, and fire suppression (NatureServe 2020).

### Carter’s Small Flowered Flax

Carter’s Small Flowered Flax (*Linum carteri carteri*) was listed as endangered effective October 6, 2014 (79 FR 52567). Critical habitat was designated on August 17, 2015 (80 FR 49845).

The subspecies is restricted to eastern Miami-Dade County, Florida, in the vicinity of the Miami metropolitan area on conservation lands. Plants occur in highly disturbed margins of Miami Rockridge Pine Rocklands and in mowed open areas. Carter’s Small Flowered Flax has declined as a result of habitat loss to residential and commercial development and agricultural conversion throughout South Florida pine rocklands. Pine rockland habitat in Miami-Dade County has been reduced to roughly 11 percent of its historical extent and, outside of Everglades National Park, only about one percent of these pinelands remain (as fragmented patches).The small number of populations and scarcity of individuals makes this species vulnerable to effects of stochastic processes and catastrophic phenomena. In addition, extant plants appear to exhibit somewhat weak reproduction: plants collected in August, at the end of the fruiting season, had few seeds (NatureServe 2020). Current threats to Carter’s Small Flowered Flax include fire suppression and invasive species (FNAI 2000).

### West's Flax

The West's Flax (*Linum westii*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). NatureServe ranks this species as Critically Imperiled (NatureServe 2020).

This perennial herb grows in full sun, sandy, meagerly vegetated edges of wetlands such as bogs, marshes, shallow ponds, slash pine-saw palmetto flatwoods, cypress ponds, ditches, and soggy prairies. There are 20 known extant populations scattered across northeast Florida in Liberty, Franklin, Gulf, Okaloosa, and Clay Counties. It is possibly under-reported because it only blooms at dusk and is not easily distinguished from similar species. Surveys in 2013 were not able to find plants at many of the historic locations. The species responds well to controlled burning every two to three years. Threats to West’s Flax include fire suppression, changes in

hydrology, and commercial logging operations (NatureServe 2020).

### Boykin's Lobelia

Boykin's Lobelia (*Lobelia boykinii*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Boykin's Lobelia is considered Imperiled by NatureServe (NatureServe 2020).

Boykin's Lobelia is a perennial herb, growing 40 to 80 centimeters tall. The species has blue flowers with a white eye at the throat. Blooming occurs from May through August; flowering is dependent on fluctuating water levels (NatureServe 2020). Boykin's Lobelia inhabits forested, herbaceous, or scrub-shrub wetlands and occurs throughout much of the Coastal Plain, from North Carolina south to Florida, and west to Mississippi (Weakley 2012). They are obligate outcrossers, meaning they may limit seed production in small populations to reduce inbreeding depression. As Boykin's Lobelia is a self-incompatible species, this can have drastic effects on population size and density across years (Bates 1996, Moreno 2003, Royo et al. 2008). The Boykin's Lobelia's wetland habitats are threatened with drainage and conversion to tree farms or agriculture; this has led to a decline in the species' populations (NatureServe 2020).

### Raven's Seedbox

Raven's Seedbox (*Ludwigia ravenii*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Raven's Seedbox is considered Critically Imperiled in Florida by NatureServe (CBD 2010a).

Raven's Seedbox is a perennial herb in the evening primrose family (*Primulaceae*) (Nature Serve 2020). Occurrences are known from the Coastal Plain of southeastern Virginia, eastern North Carolina, southeastern South Carolina, and northeastern Florida. At least 17 of the nearly 30 occurrences of this species are known to be historic and, at present, only five to six occurrences are known to be extant.

Extant occurrences are known from North Carolina and Virginia. Raven's Seedbox may be extirpated from Florida, where it has not been observed since 1982. The only record of Raven's Seedbox in Florida is from Clay County in the northeastern part of the state. Raven's Seedbox is a wetland obligate, and general habitat for this species include bogs, fens and forested wetlands. Specific habitat includes open, wet, peaty places such as ditches and the margins of swamps, ponds, or bogs. In Virginia, all extant populations are in ditches and power line right-of-ways (Nature Serve 2020).

Populations of Raven's Seedbox are composed of scattered individuals (Nature Serve 2020). The species is self-compatible, a trait that could result in low genetic diversity of the species and potentially influence its long-term survival. The ditches and power lines occupied by this species are threatened by herbicide use, excavation and deepening of ditches, and road widening and paving (Nature Serve 2020).

### Scrub Lupine

The Scrub Lupine (*Lupinus aridorum = Lupinus westianus* var. *aridorum*) was listed as endangered effective April 7 1987 (52 FR 11172). Critical habitat has not been designated (USFWS 2020a).

This short-lived perennial subshrub is currently known only from 12 extant populations in Orange and Polk Counties in Florida (USFWS 2016d). The Scrub Lupine grows on fine, well-drained, sandy soils in openings of sand pine scrub, oak scrub, and rosemary scrub, usually where there has been disturbance (USFWS 2016d, NatureServe 2020). Three natural populations and three introduced populations occur on protected lands, while the remaining populations exist on private land that is vulnerable to development (USFWS 2016d). Due to its short life cycle of four to six years, populations can fluctuate significantly from year to year, with some populations decreasing and increasing by hundreds from one year to the next (USFWS 2016d, NatureServe 2020). Excluding the three managed populations on protected sites, the species is declining (USFWS 2016d). Threats to this

species include urban development, recreational damage, disease, insect herbivory, fire suppression, and stochastic events (USFWS 2016d, NatureServe 2020).

### Curtis' Loosestrife

Curtis' Loosestrife (*Lythrum curtissii*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Curtis' Loosestrife is considered Critically Imperiled by NatureServe (NatureServe 2020).

This perennial herb species grows in wet areas, such as bogs, seeps, acid or calcareous swamps, karst ponds, creek swamps, floodplains, tidal flats, streambanks, and tidal river mouths of Florida and Georgia. In Florida, occurrences of this species are known from Liberty, Franklin, Gadsden, Putnam, and St. Johns counties, Florida. There are also vague, non-specific location reports from Bay, Calhoun, and Levy counties in Florida. Threats to this species are known to be soil disturbance (tilling, grading, etc.), herbicide application on roadsides, fire suppression, and hydrology alteration (NatureServe 2020).

### Lowland Loosestrife

Lowland Loosestrife (*Lythrum flagellare*) was petitioned for listing in April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under at this time (USFWS 2020a). Lowland Loosestrife is listed by several other entities, including as Endangered by the state of Florida and Imperiled in Florida by NatureServe (CBD 2010a).

This species is characterized as a sprawling perennial herb with a creeping rhizome (NatureServe 2020). It lives in herbaceous wetlands and is often observed growing in mucky or sandy-peat muck soils on the peripheries of ponds, ditch banks, and edges of cypress depressions (NatureServe 2020). This plant has a small range in the west central portion of the Florida peninsula, with individuals found in Charlotte, Collier, Dade, Desoto, Glades, Henry, Lee, Manatee, Okeechobee, and Sarasota Counties. The primary threat to Lowland Loosestrife is habitat loss through drainage, canopy closure, fire suppression, and logging (CBD 2010a).

### White Birds-in-a-nest

The White Birds-in-a-nest (*Macbridea alba*) was listed as threatened effective June 8, 1992 (57 FR 19813). Critical habitat has not been designated (USFWS 2020a).

The White Birds-in-a-nest is a perennial herb that blooms from May to mid-July. It is endemic to the Florida Panhandle, occurring in Bay, Gulf, Franklin, and Liberty counties (USFWS 2009k), and isthreatened by habitat degradation due to intensive forestry practices and lack of prescribed fire (NatureServe 2020). This species inhabits wet to mesic pine flatwoods, seepage bogs, savannas, and occasionally drier sites with longleaf pine (*Pinus palustris*) and runner oaks (*Quercus pumila*) (FNAI 2001b, NatureServe 2020). It is capable of both sexual and vegetative (via rhizomes) reproduction; however, self-fertilized seeds have been observed to exhibit inbreeding depression (USFWS 2009k).

### Godfry's Stitchwort

Godfry's Stitchwort (*Minuartia godfreyi*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Godfry's Stitchwort is listed by several other entities, including as Endangered by the state of Florida and Critically Imperiled in Florida by NatureServe (CBD 2010a).

This perennial herb grows in herbaceous wetlands such as creek banks, roadside ditches, tidal freshwater marshes, delta post oak flatwoods, saline wet prairies, and wet meadows. As of 2011, NatureServe reported between six and 20 known occurrences of this species ranging from central Tennessee to coastal North Carolina south to Florida, with only three populations believed to be of good viability/integrity. In Florida, the species is

restricted to Taylor County. Threats to this species include habitat destruction/conversion from roadside construction or commercial logging operations (NatureServe 2020).

### Needleleaf Waternymph

Needleleaf Waternymph, also known as Narrowleaf Naiad, (*Najas filifolia*) was petitioned for listing in April 20, 2010 (CBD 2010a), and the 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Needleleaf Waternymph is listed by several other entities, including as Threatened by the state of Florida and Critically Imperiled in Florida by NatureServe (CBD 2010a).

This species is characterized as a floating annual plant, which typically inhabits shallow, dark (tannic-acid tinted) water of ponds and lakes (FNAI 2001b). The range of the Needleleaf Waternymph extends from the Florida Panhandle down through the Florida peninsula and parts of southwestern Georgia (NatureServe 2020). As of 2000, this species was only reported in Santa Rosa and Leon Counties, Florida, and in Decatur County, Georgia (CBD 2010a). Occurrences have also been recorded in the Blackwater River (FNAI 2001b). This species is at risk due to habitat destruction caused by damming and other practices that alter hydrological regimes (NatureServe 2020). As an aquatic species, the Needleleaf Waternymph also faces risk of predation by grass carp (*Ctenopharyngodon idella*), an introduced/invasive herbivorous fish (CBD 2010a).

### Britton's Beargrass

Britton's Beargrass (*Nolina brittoniana*) was listed as endangered on April 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

The species is found in the following Florida counties: Hardee, Hernando, Highlands, Lake, Orange, Osceola, Polk, and Marion counties of Florida. Britton's Beargrass habitat includes forest/woodland, sand/dune, and shrubland/chaparral habitat with fine-textured, well-drained sands. Associated plant species include saw palmetoo (*Serenoa repens*), scrub palmetto (*Sabal etonia*), crooked-wood (*Lyonia ferruginea*), sand heath (*Ceratiola ericoides*), Feay's palafox (*Palafoxia feayi*), and pineland threeawn (*Aristida stricta*) (NatureServe 2020). The species flowers from March through May (USFWS 2020a).

More than 90 percent of Britton's Beargrass habitat has been lost to citrus agriculture and rapid urbanization. It is also declining due to fire suppression, which results in a dense canopy cover. About 100 populations remain, with half of these occurring on 10 conservation areas. The species has also been impacted by off-road vehicles in some locations (FNAI 2001b).

### Cape Sable Orchid

The Cape Sable Orchid (*Oncidium undulatum = Trichocentrum undulatum*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Cape Sable Orchid is considered Critically Imperiled in Florida by NatureServe (CBD 2010a).

The Cape Sable Orchid is an epiphytic orchid that produces a large, showy, many-flowered inflorescence. From April to September, they produce many glossy brown to yellow-green flowers that are marked with brown (NAOCC 2019). It is known to inhabit buttonwood stands in southern Florida and is infrequently found in remote cypress sloughs in Big Cypress National Preserve (NatureServe 2020). The Cape Sable Orchid consists of a shoot with one tough leathery leaf; they grow on the trunks and branches of trees and can reach one to five meters in height. Although it is widely distributed in the West Indies, Mexico, Central America, and northern South America, it was been petitioned for federal listing based on its overutilization for commercial purposes and the inadequacy of existing regulatory mechanisms (76 FR 59835).

### Papery Whitlow-wort

The species *Paronychia chartacea* was listed as threatened effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

The species *Paronychia chartacea* is a small, herbaceous member of the pink family (Caryophyllaceae) that forms low mats. Papery Whitlow-wort (*Paronychia chartacea* ssp. *chartacea*), is a short-lived perennial subspecies which occurs in scrub habitats on the Lake Wales Ridge and adjacent uplands in central Florida. It occurs in Lake, Polk, Highland, Orange and Glade counties (USFWS 2008k). The natural habitat for Papery Whitlow-wort is rosemary scrub, which is also known as the rosemary phase of sand pine (*Pinus clausca*) scrub (USFWS 1999). Papery Whitlow-wort also occurs in scrubby flatwoods or adjacent firelines and sandy roads (USFWS 2008k). The subspecies depends on occasional fires, or equivalent mechanical land disturbance to maintain bare sand habitats. It is vulnerable to destruction by off-road vehicles that drive through openings between shrubs, and it is threatened by lack of fire or other disturbance (USFWS 1999). Crystal Lake Nailwort, (*P. c. minima*) was first recognized as a separate subspecies in 1991 and its prior range is unknown. The Crystal Lake Nailwort is an annual occurring almost exclusively on the sandy margins of karst ponds in the Florida Panhandle. It is currently known from only Washington and Bay Counties (USFWS 2008k). At the time of listing, the two distinct subspecies of *Paronychia chartacea* were not recognized. Both subspecies are endemic to Florida, and geographically isolated (USFWS 2008k). *Paronychia chartacea* is primarily threatened by habitat loss (USFWS 1999).

### Key Tree Cactus

The Key Tree Cactus (*Pilosocereus robinii* = *Cereus robinii*,) was listed as endangered effective July 19, 1984 (49 FR 29237). Critical habitat has not been designated (USFWS 2020a).

This tree-cactus is found only on the Keys of Monroe County, Florida and in Cuba; only seven populations are extant. It grows on sandy soils with limestone geology in hardwood hammocks and thorn scrub communities just above high tide levels. Threats to this species include illegal horticultural collection, development/habitat conversion, population fragmentation, sea level rise/increased soil salinity, deer herbivory, and stochastic events (USFWS 2010j, NatureServe 2020).

### Godfrey’s Butterwort

Godfrey’s Butterwort (*Pinguicula ionantha*) was listed as threatened effective August 11, 1993 (58 FR 37432). Critical habitat has not been designated (USFWS 2020a).

Godfrey’s Butterwort is a perennial herb. Flowering occurs February to April (FNAI 2001b). This carnivorous plant thrives in bog habitats within longleaf pine savannas including bogs, seeps, wet pine flatwoods, wet prairies, and ditches; it is frequently seen growing directly in the water (FNAI 2001b, USFWS 2018l, NatureServe 2020). Godfrey’s Butterwort may also occur in open peat or sandy peat soils (USFWS 2018l). It is highly dependent upon regular fire regimes for population growth (NatureServe 2020). Its range includes in Bay, Calhoun, Franklin, Gulf, Liberty, and Wakulla counties in Florida (USFWS 2018l). The main threats facing this species are habitat conversion and degradation associated with fire suppression and silviculture practices (NatureServe 2020). It has already been extirpated from several sites as a result of these threats. Recent survey efforts have documented 24 remaining populations out of 83 known historical occurrence sites (USFWS 2018l).

### Lewton's Polygala

The Lewton's Polygala, as known as Lewton’s polygala milkwort, (*Polygala lewtonii*) was listed as endangered effective May 7, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

This short-lived, perennial, tap-rooted herb grows exclusively on dry, well-drained, yellow sand areas of sandhill and oak-hickory scrub communities. In Florida, the species occurs in the following counties: Marion, Lake, Osceola, Orange, Polk, and Highlands. Its range includes the Lake Wales Ridge and Mount Dora Ridge. This species is adapted to patchy, infrequent fires to maintain an open canopy and facilitate new recruitment. While

mature plants rarely survive fires, seedlings sprout readily. Threats to this species include habitat loss, degradation, and fragmentation; altered fire regimes; urbanization; off-highway- vehicle/trampling damage; and non-native plant species encroachment (USFWS 2010k).

### Tiny Polygala Milkwort

The Tiny Polygala Milkwort (*Polygala smallii*) was listed as endangered effective July 18, 1985 (50 FR 29345). Critical habitat has not been designated (USFWS 2020a).

The species is endemic to the southern portion of Florida's Atlantic Coastal Ridge, an area that is rapidly being converted into commercial and residential developments (NatureServe 2020). The Tiny Polygala Milkwort is a small perennial herb that grows up to 10 centimeters high and blooms year-round (FNAI 2001b). The species inhabits areas of open grassy pineland, sandy pine rockland, scrubby flatwoods, and sandhill. It is often found in disturbed areas and relies on fire or other means of suppressing competition from other plants (NatureServe 2020). Its distribution is fragmented and clusters of sites are separated by an average of 61 kilometers (USFWS 2010l). Threats to the species include urban development, invasive species, and fire suppression (FNAI 2001b).

### Horton Wireweed

Horton Wireweed (*Polygonella basiramia*) was listed as endangered effective Febuary 20, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

This species is a short-lived, tap-rooted herb that is endemic to central Florida's Polk and Highlands counties along the Winter Haven, Bombing Range, and Lake Wales Ridges. It grows only on moderately drained, white sand gaps, typically in rosemary scrub or oak scrub communities. It is semi-dependent on patchy, infrequent fire to maintain the open scrub canopy and the bare sand microhabitat it requires. Fire kills mature plants, and the species does not have a persistent soil seed bank. Reestablishment is reliant on neighboring, unburned plants for reseeding (USFWS 2010m). Threats to this species include off-road vehicle damage, habitat degradation due to lack of management/altered fire regimes, development, citrus grove conversion, pedestrian trampling, and non-native plant species encroachment (USFWS 2010m, NatureServe 2020).

### Sandlace

Sandlace, also known as Woody Wireweed or Small's Jointweed, (*Polygonella myriophylla*) was listed as endangered effective May 27, 1993 (58 FR 25746). Critical habitat has not been designated (USFWS 2020a).

Sandlace is a sprawling perennial subshrub, which forms large mats along the ground through clonal growth (58 FR 25746, USFWS 2010n). It is a slow-growing and long-lived species. Flowering occurs throughout much of the year, except January and February (USFWS 2010n). Its range includes Orange, Osceola (just one location), and Polk counties in Florida (58 FR 25746). The species has been documented recently at 113 occurrences of 140 known historic occurrences. Sandlace inhabits sandy gaps in Florida scrublands (USFWS 2010n), as well as disturbed areas. The species prefers to grow in areas with xeric, white sandy soils. It is adapted to long intervals of eight to 30 years between fire disturbances (USFWS 2010n). This species is threatened by habitat loss from urbanization and agriculture (NatureServe 2020).

### Florida Pondweed

The Florida Pondweed (*Potamogeton floridanus*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a).

This species is known from only four recorded occurrences within a single drainage (the Blackwater River and its tributaries) in Santa Rosa County, Florida (NatureServe 2020). It is a submerged aquatic herb that inhabits slow-moving blackwater streams and rivers (FNAI 2001b). The species is at risk of destruction, modification, or

curtailment of its habitat or range, and from inadequate protection under existing regulatory mechanisms (76 FR 59835).

### Scrub Plum

The Scrub Plum (*Prunus geniculata*) was listed as endangered effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

The Scrub Plum is a deciduous shrub that blooms from January to February (FNAI 2001b). It is endemic to central Florida and inhabits fairly open areas of sandhill and oak scrub, responds vigorously to fire disturbance, and cannot withstand soil disturbance or shade (NatureServe 2020). The species is declining due to rapid loss of habitat from conversion to citrus groves and residential housing and fire suppression (NatureServe 2020). The Scrub Plum has extremely low recruitment, which impedes population growth (USFWS 2017d).

### White Meadowbeauty

White Meadowbeauty, also known as the Small-flowered Meadowbeauty, (*Rhexia parviflora*)) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). White Meadowbeauty is listed by several other entities, including as Endangered by the state of Florida and Imperiled in Florida by NatureServe (CBD 2010a).

It is a perennial herb that blooms from June to August (FNAI 2001b). The species occurs mainly in the Florida Panhandle, southeast Alabama, and Georgia. It is uncommon within its known range and only a few individuals exist per population. The White Meadowbeauty inhabits seepage slopes, margins of ponds, and shallow depressions associated with pine-palmetto flatwoods and savannas of the Gulf Coastal Plain (NatureServe 2020). The species is sensitive to changes in ground and surface hydrology and has been nearly eliminated from private lands due to logging and wetland drainage (FNAI 2001b).

### Panhandle Meadowbeauty

Panhandle Meadowbeauty (*Rhexia salicifolia*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Panhandle Meadowbeauty is listed by several other entities, including as Threatened by the state of Florida, Imperiled in Florida by NatureServe, and a Species of Concern by the USFWS (CBD 2010a).

Panhandle Meadowbeauty is a tall, perennial, herbaceous species in the Melastomataceae (meadow beauty) family. It is known from approximately 50 to 80 occurrences scattered through the western and central Florida Panhandle and adjacent to Alabama, and from one location in Georgia (Nature Serve 2020). Panhandle Meadowbeauty is an obligate wetland species and grows in full sun in wet sandy or sandy-peaty areas of sinkhole pond shores, interdunal swales, margins of depression marshes, flatwood ponds, and sandhill upland lakes. Approximately half of the known occurrences of Panhandle Meadowbeauty are from the shores of private karst ponds that are often scraped to create “beaches” (FNAI 2001b). Panhandle Meadowbeauty is highly threatened by land use conversion, habitat fragmentation, and human disturbance (off-road vehicle use and mowing of pond margins), and threatened to a lesser extent by forest management practices. Additional threats include erosion and run- off from pine plantations and lakeside developments, which cause damage to shorelines and alter the hydrology of karst ponds (Nature Serve 2020).

### Chapman Rhododendron

Chapman Rhododendron (*Rhododendron chapmanii* = *R. minus* var. *chapmanii*) was listed as endangered effective May 23, 1979 (44 FR 24248). Critical habitat has not been designated (USFWS 2020a).

The Chapman Rhododendron is a perennial, evergreen shrub with egg-shaped or elliptic leaves alternately arranged on the stem; the plant can reach heights of three meters. It has a fairly narrow flowering period of two to three weeks beginning in mid-March or early-April (NatureServe 2020). The Chapman Rhododendron inhabits the transitional area between upland mesic or scrubby flatwoods and floodplain swamps or baygalls. The species is occasionally found within mesic pine flatwoods or on sandhills at low elevations. These habitats are fire-dependent and the species prolifically resprouts and flowers following fire (USFWS 2019w). Threats to the species include development, timber harvesting, agriculture, inadequate fire management, and invasive species (USFWS 2019w).

### Hairy-peduncled Beaked-rush

Hairy-peduncled Beaked-rush (*Rhynchospora crinipes*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). The Hairy-peduncled Beaked-rush is listed by several other entities, including as Endangered by the state of Florida and Critically Imperiled in Florida by NatureServe (CBD 2010a).

This perennial sedge was first collected and described in the 1800s. Over 100 years passed before additional sightings were reported. Since then, 18 occurrences were discovered in Florida, 11 in Alabama, four in North Carolina, one in Mississippi, and eight in Georgia. The Hairy-peduncled Beaked rush is known to occur in Gulf, Liberty, Okaloosa, and Santa Rosa Counties in Florida. It grows in riparian habitats, along the stream channels and terraces, or sand-clay bars. Threats to the species include hydrology alteration (river damming and flow alteration), sand and gravel extraction, urbanization, military training activities, siltation from logging, and water quality degradation (NatureServe 2020).

### Miccosukee Gooseberry

Miccosukee Gooseberry (*Ribes echinellum*) was listed as threatened effective August 19, 1985 (50 FR 29338). Critical habitat has not been designated (USFWS 2020a).

This shrub was first discovered on the shores of Lake Miccosukee in Jefferson County, Florida. It has since been found at two more locations around the lake, and two locations 322 kilometers to the northeast in McCormick and Edgefield Counties, South Carolina. The Miccosukee Gooseberry grows in mesic forest communities, such as oak-hickory. Threats to this species include development, invasive species encroachment, and logging activity (NatureServe 2020, USFWS 2015g).

### Eared Coneflower

Eared Coneflower (*Rudbeckia auriculata*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Eared Coneflower is considered Critically Imperiled in Florida by NatureServe (CBD 2010a).

The species is almost completely restricted to the Coastal Plain and has been reported in Alabama, Georgia, and Florida. In Florida, the species occurs in Walton County (Panhandle) (Wunderlin et al. 2020). It occurs in full sun in open bogs, seeps, swamps, ditches, swales, wet openings in woodlands, and occasionally in the partial shade at the edges of hardwood swamps. Only a few number of occurrences inhabit healthy native habitat, with the majority inhabiting highly modified habitat conditions such as utility corridors, roadsides, and pastures. Threats to this species include herbicide application, grazing, silviculture practices impacting soil hydrology, and encroachment of woody species into the open habitat (NatureServe 2020).

### Florida Willow

Florida Willow (*Salix floridana*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90- day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Florida Willow is listed by several other entities, including as Imperiled in Florida by NatureServe

and Vulnerable by IUCN (CBD 2010a).

According to NatureServe, there are only 22 known occurrences of this species, with less than 500 individuals left. There are 18 extant populations in Florida, two in Alabama, and two in Georgia. Many of these populations are on protected lands. This small tree/shrub grows in saturated, calcareous soils. It is found growing in roadside ditches, near springs, hydric hammocks, and densely wooded floodplains.

Threats to this species include hydrology changes, ditch clearing, water quality degradation, invasive species encroachment, and pine plantation conversion (NatureServe 2020).

### Gulf Sweet Pitcherplant

Gulf Sweet Pitcherplant (*Sarracenia rubra* ssp. *gulfensis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Gulf Sweet Pitcherplant is listed by several other entities, including as Imperiled in Florida by NatureServe and Endangered by the IUCN (CBD 2010a).

This perennial, carnivorous herb grows in saturated sandy-muck conditions. It thrives in full sunlight or partial shade; the subspecies is not drought tolerant. Habitat includes springhead bogs, the heads of small streams, shallow pond borders, or meandering watercourses. The subspecies occurs in Florida's western Panhandle from Holmes County to Santa Rosa County. There is little information on population size for this subspecies. Threats to Gulf Sweet Pitcherplant include urbanization, habitat destruction/conversion, and altered hydrological conditions (NatureServe 2020).

### American Chaffseed

American Chaffseed (*Schwalbea americana*) was listed as endangered effective September 29, 1992 (57 FR 44703). Critical habitat has not been designated (USFWS 2020a).

American Chaffseed is a perennial herb that blooms from April to June/July along the eastern seaboard and Gulf Coast (USFWS 2019x). In Florida, the species is known from the following counties: Gadsden, Leon, Okaloosa, and Putnam in populations throughout the Southeastern US (NatureServe 2020). Recent surveys have documented only three extant populations in the state (all of which are protected, on Blackwater River State Forest and Horseshoe Plantation) (USFWS 2019y). Habitat consists of open landscapes dominated by frequent fire: pine flatwoods, savannas, and peaty wetlands (USFWS 1995). In terms of microhabitat, the species occurs in areas of disturbance (e.g., roadside ditches, canal banks, and railroad crossings) (USFWS 2019y). Soils are acidic and moist to dry and sandy, sandy/peat, or sandy loam (USFWS 1995). American Chaffseed is dependent on frequent fires to thrive (USFWS 2019y).

Historically, the species occurred along coastal plains from New England to Florida and along the Gulf to the west. Most populations were extirpated as a result of habitat loss from urban and agricultural development. Current threats to the species include habitat loss, collection by hobbyists, and fire suppression (NatureServe 2020). The species is currently in decline (USFWS 2019x).

### Florida Skullcap

The Florida Skullcap (*Scutellaria floridana*) was listed as threatened effective May 8, 1992 (57 FR 19813). Critical habitat has not been designated (USFWS 2020a).

This species is a Florida endemic that grows in only four counties of the Panhandle region: Bay, Gulf, Franklin, and Liberty. Since the 1980s, there has been a 30 percent decline in the species population size; many of the losses are due to development and timber harvest. This species grows in wet areas in longleaf pine flatwoods, prairies, and grassy bog communities near forests and shrub wetlands that are fire-dependent. It grows in sandy, acidic, low nutrient soils in the ecotones between wetlands and mesic areas. Florida Skullcap grows in full sun or light

shade and flowers vigorously after fire. The species is under threat from timber industry practices, habitat modification/destruction, and fire suppression (USFWS 2019z).

### Everglades Bully

The Everglades Bully (*Sideroxylon reclinatum* ssp. *austrofloridense*) was listed as threatened effective October 6, 2017 (82 FR 46691). Critical habitat has not been designated (USFWS 2020a).

There is some debate about the taxonomic distinction of this subspecies of the Everglades Bully (*S. reclinatum* ssp. *reclinatum*). The Everglades Bully is a Florida endemic shrub that grows only in tropical savanna pine rockland and marl prairie habitats of the southeastern peninsular Florida. The Everglades Bully is adapted to natural fire regimes, as well as the seasonal, months-long flooding of marl prairie communities. Its current range includes only Big Cypress National Park and Long Pine Key. This subspecies is threatened by habitat loss/fragmentation, fire suppression, non-native species encroachment, recreation activities, and stochastic events (82 FR 46691).

### Georgia Bully

Georgia Bully, also known as Swamp Buckthorn, (*Sideroxylon thornei*) has been under review for listing many times since 1975 (USFWS 2020a). It was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). Georgia Bully is listed by several other entities including as Critically Imperiled in Florida by NatureServe, and as Endangered by the State of Georgia (CBD 2010a).

Georgia Bully is a thorny shrub (NatureServe 2020). Flowering occurs in May and June (CBD 2010a). It thrives in low-lying oak flatwoods. Soils in these habitats include wetlands atop limestone and areas of high moisture saturation. Its range covers southern Georgia and scattered locations in Alabama and Florida. In Florida, it is known from Franklin, Escambia, and Jackson Counties. The primary threat to this species is habitat degradation, particularly associated with hydrological shifts (e.g., conversion of wetlands for agricultural or silviculture uses) (CBD 2010a).

### Fringed Campion

The Fringed Campion (*Silene polypetala* = *Silene catesbaei*) was listed as endangered effective February 19, 1991 (56 FR 1932). Critical habitat has not been designated (USFWS 2020a).

This perennial herb grows in two disjunct areas, one in central Georgia and the other on the Georgia- Florida border near the Flint and Apalachicola Rivers (56 FR 1932). It grows on well-drained, sandy-loam soils in mesic hardwood forests, typically on north-facing slopes or in ravines (56 FR 1932, USFWS 2015h). Threats to this species include habitat loss/degradation, logging management practices, and invasive species, as well as population fragmentation/low genetic diversity, and deer herbivory (USFWS 2015h, NatureServe 2020).

### Gentian Pinkroot

Gentian Pinkroot (*Spigelia gentianoides*) was listed as endangered effective December 26, 1990 (55 FR 49046). Critical habitat has not been designated (USFWS 2020a).

Gentian Pinkroot is a perennial herb (FNAI 2001b). Flowering typically occurs in May and June, but may be observed earlier or later in the year. The species thrives in upland mixed oak-pine forests (FNAI 2001b, USFWS 2018m). Preferred soils are well-drained and commonly include exposed limestone and calcareous soil types, as well rich in humus (USFWS 2018m). This species is currently limited to Jackson and Calhoun counties, Florida. Its historic range encompasses several adjacent counties (55 FR 9472), including Washington, Calhoun, Jackson, Gadsden, and Liberty counties in Florida and Geneva County in southern Alabama (FNAI 2001b, USFWS 2018m,

NatureServe 2020). There were only three populations at the time of listing (55 FR 9472). Since that time, five new populations were discovered; however, two of them have been extirpated and currently only two remain (FNAI 2001b, NatureServe 2020). The main threat to these remaining populations is silviculture practices (NatureServe 2020).

A new variety of Gentian Pinkroot was described in 1996: *Spigelia gentianoides* var. *alabamensis* (USFWS 2018). This was included in recovery plan analyses. Based on recent genetic research, Spigelia gentianoides var. alabamensis is now considered a distinct species, pinkroot (*Spigelia alabamensis*). This species inhabits nearly treeless glades associated with Ketona Dolomite (USFWS 2018m).

### Cooley's Meadowrue

Cooley's Meadowrue (*Thalictrum cooleyi*) was listed as endangered effective February 7, 1989 (54 FR 5935). Critical habitat has not been designated (USFWS 2020a).

Cooley's Meadowrue is a perennial herb that occurs in grass-sedge bogs and wet pine savannahs, flatwoods, and seepage slopes in North Carolina, Florida, and Georgia. The species needs some type of disturbance such as fire or mowing to maintain its open habitat (FNAI 2001b, USFWS 2017e). In Florida, the species is restricted to one occurrence in Walton County on a timber company land utility right-of-way through former flatwoods. However, this occurrence may be extirpated (FNAI 2001b, USFWS 2009l, NatureServe 2020). Plants often found in association with Cooley’s Meadowrue include tulip poplar (*Liriodendron tulipifera*), bald cypress (*Taxodium distichum*), and/or Atlantic white cedar (*Chamaecyparis thyoides*) (USFWS 2017e). The species is threatened by fire suppression, herbicides, urbanization, timber harvest, and utility maintenance in habitat areas (USFWS 2017e).

### Florida Torreya

The Florida Torreya (*Torreya taxifolia*) was listed as endangered effective January 23, 1984 (49 FR 2783). Critical habitat has not been designated (USFWS 2020a).

This conifer tree species is found only along ravine slopes on the eastern bank of the Apalachicola River in Florida and Georgia. In Florida, the species occurs in the Panhandle in Liberty and Gadsten counties. Before the 1950s, the Florida Torreya used to be one of the most abundant tree species in the Apalachicola Bluff region. Experts estimate that the species has lost at least 98.5 percent of its population since that time, with only an estimated 500 to 600 trees still left on the landscape. These remaining trees do not appear to reach reproductive maturity due to disease-related mortality, and all population viability models show that natural populations of this species will inevitably go extinct. Some conservationists are making controversial efforts to translocate this species to areas north of its current known range. Threats to this species include soil chemistry changes associated with hydrology disruption, fire suppression, and disease (USFWS 2010o).

#### Florida Bristle Fern

The Florida Bristle Fern, also known as Florida Filmy Fern, (*Trichomanes punctatum* ssp. *floridanum*) was listed as endangered effective October 6, 2015 (80 FR 60440). Critical habitat has not been designated (USFWS 2020a).

The subspecies has two distinct metapopulations, one in Central and one is South Florida (Sumter and Miami-Dade Counties) (USFWS 2018n). Within these metapopulations, there are only six documented populations (USFWS 2018n). The subspecies inhabits tree trunks in hammocks, edges of limesinks, and limestone boulders, often with mosses and liverworts (FNAI 2001b). The Florida Bristly Fern is threatened by multiple factors: extreme curtailment of its habitat; habitat destruction, conversion and fragmentation; destruction or damage from foot traffic and recreational vehicles; invasive species; sea level rise; incompatible hydrological management strategies; and climatic changes in seasonal precipitation as well as temperature and storm cycles (USFWS 2018, NatureServe 2020).

### Ocala Vetch

Ocala Vetch (*Vicia ocalensis*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90- day finding determined that listing may be warranted (76 FR 59835). On October 10, 2019, the species was determined to not be warranted for listing (84 FR 53336).

This species is characterized as an herbaceous perennial vine. It is often observed growing in sandy peat of open, wet thickets along the margins of spring runs and streambanks. This plant has a small range and is only found in two Florida counties (Lake and Marion) (NatureServe 2020). All known occurrences are from Ocala National Forest and Lake Woodruff National Wildlife Refuge (FNAI 2001b). This species is not particularly vulnerable to agriculture and land development as it is currently only known to occur on federally protected land; however, hydrological changes caused by logging and competition with invasive species still pose a threat to this species (NatureServe 2020).

### Wide-leaf Warea

Wide-leaf Warea, also known as the Clasping Warea and Wideleaf Pinelandcress, (*Warea amplexifolia*) was listed as endangered effective April 29, 1987 (52 FR 15501). Critical habitat has not been designated (USFWS 2020a).

The Wide-leaf Warea is an annual herb growing from 30 to 100 centimeters high. It flowers in September and October (FNAI 2001b). Occurrence records are from the following Florida counties: Lake, Polk, Osceola, and Orange. The species is restricted to longleaf pine and turkey oak sandhill habitats in central Florida and requires frequent fire (every one to three years) to maintain the open habitat in which it thrives. Microhabitat features include sandy substrate and direct sunlight. This habitat has been highly fragmented and degraded, and is threatened by the development of citrus groves and residential housing (NatureServe 2020).

### Carter's Mustard

Carter's Mustard (*Warea carteri*) was listed as endangered effective January 21, 1987 (52 FR 2227). Critical habitat has not been designated (USFWS 2020a).

Carter's Mustard occurs along Lake Wales Ridge in central Florida. One occurrence is also known from coastal scrub habitat in Brevard County on Florida's Atlantic Coast (however, this occurrence has not been recently relocated). The species occurred historically in the Miami metropolitan area but is extirpated from that region (USFWS 2020a). The species occurs in xeric, shrub-dominated, sandhill, scrubby flatwood, inland, and coastal scrub habitats. Carter's Mustard appears only after fire (USFWS 1999). The primary threat to the species is habitat loss or modification (habitat frequently converted to citrus groves or urban development) (FNAI 2001b).

### Karst Pond Xyris

The Karst Pond Xyris (*Xyris longisepala*) was petitioned for listing on April 20, 2010 (CBD 2010a), and the partial 90-day finding determined that listing may be warranted (76 FR 59835). The species remains under review at this time (USFWS 2020a). NatureServe has designated this species Imperiled in Florida (NatureServe 2020).

This perennial herb has between 50 to 90 known occurrences. Occurrences are from Bay, Leon, Okaloosa, Wakulla, Walton, and Washington counties in Florida, and two sites in Covington County, Alabama. It grows in open, sunny wetlands; along the edges of sandy lime-sink lakes/ponds; and upland, sandhill lakes. It usually grows in abundance along the shores of water. Threats to this species include vegetation removal/mowing associated with residential infrastructure, silt deposition from upland disturbance, and recreational activities (off-road vehicles and other shore edge trampling; NatureServe 2020).

### Florida Ziziphus

The Florida Ziziphus (*Ziziphus celata*) was listed as endangered effective July 27, 1989 (54 FR 31190). Critical

habitat has not been designated (USFWS 2020a).

This species was thought to be extinct when it was first described from a 36-year-old herbarium specimen in 1984. Since then, 14 locations of this species were discovered (USFWS 2009m). All remaining populations exist in Polk and Highlands Counties, on the Lake Wales Ridge in central Florida. It grows on the xeric, yellow sand paleo-dunes of Central Florida (USFWS 2019aa). Florida Ziziphus is a short (1.5 meter), thorny, clonal, hermaphroditic shrub. Research shows that this species is sterile when fertilized with its own pollen or with the pollen of an individual of the same genotype. Almost all the remaining wild populations have become so isolated from one another that they are now composed of genetically identical, fragmented individuals (USFWS 2009m, USFWS 2019aa). Since the most recent USFWS five- year review in 2009, four populations were reintroduced on protected lands (USFWS 2019aa). Threats to this species include habitat destruction/conversion, fire suppression, invasive plants, and genetic isolation (USFWS 2009m).

**Literature Cited for Species Accounts**

American Ornithologists' Union (AOU). 1983. Check list of North-American birds. Sixth edition. American Ornithologists' Union, Baltimore, Maryland, USA.

Anthonysamy, W. J. B., M. J. Dreslik, D. Mauger, and C. A. Phillips. 2014. A preliminary assessment of habitat partitioning in a freshwater turtle community at an isolated preserve. Copeia 2014:269-278.

Bailey, M. A. 1991. The dusky gopher frog in Alabama. Journal of the Alabama Academy of Science 62: 28-34.

Baker, A., P. Gonzalez, R. I. G. Morrison, and B. A. Harrington. 2013. Red knot (Calidris canutus), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.563 (01/07/2020)

Bates, R. 1996. The reproductive biology of Lobelia boykinii. M.S. thesis, University of North Carolina at Greensboro, Greensboro, North Carolina, USA.

Bauder, J. M., D. J. Stevenson, C. S. Sutherland, and C. J. Jenkins. 2017. Occupancy of potential overwintering habitat on protected lands by two imperiled snake species in the coastal plain of the southeastern United States. Journal of Herpetology 51:73-88.

Bauder, J. M., D. R. Breininger, M. R. Bolt, R. Breininger, M. L. Legare, C.L. Jenkins, B. B. Rothermel, and K. McGarigal. 2018. Multi-level, multi-scale habitat selection by a wide-ranging, federally threatened snake. Landscape Ecology 33:743-763.

Benedict, R. A., H. H. Genoways, and J. R. Choate. 2006. Taxonomy of short-tailed shrews (genus Blarina) in Florida. Occasional Papers, Museum of Texas Tech University 251:1-19.

Bentzien, M. M. 1987. Agency draft recovery plan for five rockland plant species. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

BirdLife International. 2018. Ammospiza caudacuta. In: IUCN 2019. IUCN Red List of threatened species. Version 2019.3. http://dx.doi.org/10.2305/IUCN.UK.2018-2.RLTS.T22721129A131887480.en (01/05/2020)

Blalock-Herod, H. N., J. J. Herod, and J. D. Williams. 2002. Evaluation of conservation status, distribution, and reproductive characteristics of an endemic Gulf Coast freshwater mussel, Lampsilis australis (Bivalvia: Unionidae). Biodiversity and Conservation 11:1877-1887.

Bocetti, C. I., D. M. Donner, and H. F. Mayfield. 2014. Kirtland's warbler (Setophaga kirtlandii), version 2.0. A. F. Poole, editor. The Birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.19 (01/14/2020)

Bradley, K. A., and G. D. Gann. 1999. Status summaries of 12 rockland plant taxa in southern Florida. The Institute for Regional Conservation. Report submitted to the U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

Brim Box, J. and J. D. Williams. 2000. Unionid mollusks of the Apalachicola Basin in Alabama, Florida, and Georgia. Alabama Museum of Natural History Bulletin 21:1-143.

Butler, M. J., and W. Harrell. 2019. Whooping Crane survey results: winter 2018-2019. U.S. Department of the Interior, Fish and Wildlife Service, National Wildlife Refuge System, Division of Biological Services, Albuquerque, New Mexico and U.S. Department of the Interior, Fish and Wildlife Service, Ecological

Services, Aransas National Wildlife, Austwell, Texas, USA. https://www.fws.gov/uploadedFiles/WHCR_Winter_Update_2018_2019percent20(1).pdf (01/09/2020)
Canadian Wildlife Service and US Fish and Wildlife Service (CWS and USFWS). 2007. International recovery plan for the whooping crane. Ottawa: Recovery of Nationally Endangered Wildlife (RENEW), Ottawa, QC and U.S. Department of the Interior, Fish and Wildlife Service, Southwest Regional Office, Albuquerque, New Mexico, USA.

Center for Biological Diversity (CBD). 2010a. Petition to list 404 aquatic, riparian and wetland species from the southeastern United States as threatened or endangered under the Endangered Species Act. CBD, Tucson, Arizona, USA.

Center for Biological Diversity (CBD). 2010b. Petition for rulemaking to enact immediate cave closures to protect bat species from white-nose syndrome; to promulgate a rule governing the "take" of endangered bat species; and to designate as significant all caves on federal lands in the continental United States. CBD, Washington, District of Columbia, USA.

Center for Biological Diversity (CBD). 2011a. Petition to list the eastern diamondback rattlesnake (Crotalus adamanteaus) as threatened under the endangered species act. CBD, Circle Pines, Minnesota, USA.

Center for Biological Diversity (CBD). 2011b. Emergency petition to list the Miami blue butterfly (Cyclargus thomasi bethunebakeri) as endangered under the Endangered Species Act. CBD, Flagstaff, Arizona, USA.

Center for Biological Diversity (CBD). 2012. Petition to list 53 amphibians and reptiles in the United States as threatened or endangered species under the Endangered Species Act. CBD, Circle Pines, Minnesota, USA.

Center for Biological Diversity (CBD). 2016. Lawsuit filed to push alligator snapping turtles closer to Endangered Species Act protection. CBD, Tucson, Arizona, USA. https://www.biologicaldiversity.org/news/press_releases/2016/alligator-snapping-turtle-03-16-2016.html (01/15/2020)

Center for Biological Diversity (CBD). 2018. Letter to FWS on reviews of Southeast species. CBD, Tucson, Arizona, USA.

Center for Biological Diversity (CBD). 2019a. Red wolf revised recovery plan: notice of intent to sue for violations of the Endangered Species Act. CBD, Circle Pines, Minnesota, USA.

Center for Biological Diversity (CBD). 2019b. Petition to list the Gulf Coast solitary bee (Hesperapis oraria) under the Endangered Species Act and concurrently designate critical habitat. CBD, Portland, Oregon, USA.

Center for Biological Diversity (CDB). 2020a. America's gray wolves: a long road to recovery. CBD, Tucson, Arizona, USA. https://www.biologicaldiversity.org/campaigns/gray_wolves/. (01/09/2020).

Center for Biological Diversity (CBD). 2020b. Saving the gopher tortoise. CBD, Tucson, Arizona, USA. https://www.biologicaldiversity.org/species/reptiles/gopher_tortoise/index.html (01/03/2020)

Center for Biological Diversity (CBD) et al. 2014. Petition to protect the monarch butterfly (Danaus plexippus plexippus) under the Endangered Species Act. CBD, Tucson, Arizona, USA.

Center for Biological Diversity (CBD) and Defenders of Wildlife (DOW). 2016. Petition to list the tricolored bat Perimyotis subflavus as threatened or endangered under the Endangered Species Act. CBD, Washington, District of Columbia, USA.

Christman, S. P., and W. S. Judd. 1990. Notes on plants endemic to Florida scrub. Florida Scientist 53: 52-73.

Clench, W. J. and R. D. Turner. 1956. Freshwater mollusks of Alabama, Georgia, and Florida from the Escambia to the Suwanee River. Bulletin of the Florida State Museum Biological Sciences 1:97-239.

Confer, J. L., P. Hartman, and A. Roth. 2011. Golden-winged warbler (Vermivora chrysoptera), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.20 (01/09/2020)

Coulter, M. C., J. A. Rodgers Jr., J. C. Ogden, and F. C. Depkin.1999. Wood stork (Mycteria americana), version 2.0. A. F. Poole and F. B. Gill, editors. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.409 (01/13/2019)

Crandall, K. A. 2010. Procambarus apalachicolae. In: IUCN 2019. IUCN Red List of threatened species. Version 2019.3. https://dx.doi.org/10.2305/IUCN.UK.2010-3.RLTS.T18191A7762594.en (01/13/2020)

Crandall, K. A. and J. Cordeiro. 2010. Procambarus delicatus. In: IUCN 2019. IUCN Red List of threatened species. Version 2019.3.http://dx.doi.org/10.2305/IUCN.UK.2010- 3.RLTS.T18196A7774195.en (01/07/2020)

Defenders of Wildlife (DoW). 2015. A petition to list the blue calamintha bee (Osmia calaminthae) as an endangered, or alternatively as a threatened, species pursuant to the endangered species act and for the designation of critical habitat for this species. DoW, Denver, Colorado, USA.

DeMarco, V. 1992. Florida scrub lizard Sceloporus woodi. Stejneger. Pages 141-145 in P. E. Moler, editor. Rare and endangered biota of Florida: Vol. III. Amphibians and reptiles. University Press of Florida, Gainesville, Florida, USA.

Dove, C. J., and R. C. Banks. 1999. A taxonomic study of crested caracaras (Falconidae). Wilson Bulletin 111: 330-339.

Dwyer, J. F. 2010. Ecology of non-breeding and breeding crested caracaras (Caracara cheriway) in Florida. Doctoral dissertation, Virginia Polytechnic Institute and State University, Blacksburg, Virginia, USA.

eBird. 2019. An online database of bird distribution and abundance. http://www.ebird.org. (01/15/2020)

Eddleman, W. R., R. E. Flores, and M. Legare. 1994. Black rail (Laterallus jamaicensis), version 2.0. A. F. Poole and F. B. Gill, editors. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.123 (01/07/2020)

Elliott-Smith, E. and S. M. Haig. 2004. Piping Plover (Charadrius melodus), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.2 (01/10/2020)

Encyclopedia Britannica. 2019. Monarch Butterfly. Encyclopedia Britannica, Inc., Chicago, Illinois, USA. https://www.britannica.com/animal/monarch-butterfly (01/03/2020)

Enge, K. M. 1997. A standardized protocol for drift-fence surveys. Commission Technical Report No. 14. Florida Game and Fresh Water Fish Tallahassee, Florida, USA.

Enge, K. M., B. A. Millsap, T. J. Doonan, J. A Gore, N. J. Douglass, and G. L. Sprandel. 2003. Conservation plans for biotic regions in Florida containing multiple rare or declining wildlife taxa. Bureau of Wildlife Diversity Conservation Final Report. Florida Fish and Wildlife Conservation Commission, Tallahassee, Florida, USA.

Enge, K. M., D. J. Stevenson, M. J. Elliott, and J. M. Bauder. 2013. The historical and current distribution of the eastern indigo snake (Drymarchon couperi). Herpetological Conservation and Biology 8:288-307.

Enge, K., J. D., Mays, R. Butryn, and E. P. Hill. 2016. Status assessments of the southern hognose snake, Florida pinesnake, short-tailed kingsnake, and eastern diamond-backed rattlesnake in Florida, Gainesville. Florida Fish and Wildlife Conservation Commission, Fish and Wildlife Research Institute, Gainesville, Florida, USA.

Ernst, C. H., and E. M. Ernst. 2003. Snakes of the United States and Canada. Smithsonian Books, Washington, District of Columbia, USA.

Ernst, C. H., and J. E. Lovich. 2009. Turtles of the United States and Canada. The John Hopkins University Press, Baltimore, Maryland, USA.

Fenolio, D. B., M. L. Niemiller, M. Levy, and B. Martinez. 2013. Conservation status of the Georgia blind salamander (Eurycea wallacei) from the Floridan Aquifer of Florida and Georgia. Reptiles and Amphibians Conservation and Natural History 20:97-111.

Florida Fish and Wildlife Conservation Commission (FWC). 2008. Wildlife habitats: Legacy natural lakes. FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2011a. Florida bonneted bat biological status review report. FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2011b. Key ringneck snake biological status review report. FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2013. A species action plan for the Florida bonneted bat (Eumops floridanus). FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2020. Atlantic sturgeon. FWC, Tallahassee, Florida, USA. https://myfwc.com/wildlifehabitats/profiles/freshwater/atlantic-sturgeon/. (2/10/2020)

Forys, E. A., and S. R. Humphrey. 1996. Home range and movements of the Lower Keys marsh rabbit in a highly fragmented habitat. Journal of Mammalogy 77:1042-1048.

Florida Fish and Wildlife Conservation Commission (FWC). 2020a. Red wolf. FWC, Tallahassee, Florida, USA. https://myfwc.com/wildlifehabitats/profiles/mammals/land/red-wolf/ (01/03/2020)

Florida Fish and Wildlife Conservation Commission (FWC). 2020b. Choctawhatchee Beach Mouse. FWC, Tallahassee, Florida, USA. https://myfwc.com/wildlifehabitats/profiles/mammals/land/choctawhatchee-beach-mouse (01/19/2020)

Florida Fish and Wildlife Conservation Commission (FWC). 2020c. Atlantic Sturgeon. https://myfwc.com/wildlifehabitats/profiles/freshwater/atlantic-sturgeon (01/11/2020)

Florida Natural Areas Inventory (FNAI). 2001a. Field guide to the rare animals of Florida. FNAI, Florida Resources and Environmental Analysis Center, Florida State University, Tallahassee, Florida, USA. www.fnai.org (01/15/2020)

Florida Natural Areas Inventory (FNAI). 2001b. Field guide to the rare plants of Florida. FNAI, Florida Resources and Environmental Analysis Center, Florida State University, Tallahassee, Florida, USA. www.fnai.org (01/15/2020)

Florida Natural Areas Inventory (FNAI). 2007. Florida Forever conservation needs assessment technical report, version 2.2. FNAI, Tallahassee, Florida, USA.

Forys, E. A., P. A. Frank, and R. S. Kautz. 1996. Recovery actions for the lower keys marsh rabbit, silver rice rat, and stock island tree snail. Unpublished report to Florida Game and Fresh Water Fish Commission, Cooperative Agreement No. 1448-0004-94-9164, Tallahassee, Florida, USA.

Franz, R. 1992. Florida pine snake Pituophis melanoleucus mugitus Barbour. Pages 254-258 in P. E. Moler, editor. Rare and endangered biota of Florida: Vol. III. Amphibians and reptiles. University Press of Florida, Gainesville, Florida, USA.

Franz, R. D. 2005. Up close and personal: a glimpse into the life of the Florida pine snake in a North Florida sand hill. Pages 120-131 in W. E. Meshaka, Jr., and K. J. Babbitt, editors. Amphibians and reptiles: status and conservation in Florida. Krieger, Malabar, Florida, USA.

Franz, R., and L. M. Franz. 1979. Distribution, habitat preference and status of populations of the Black Creek crayfish, Procambarus (Ortmannicus) pictus (Decapoda: Cambaridae) Florida Science 42:13-18.

Fuller, S. L. H. 1974. Chapter 8: Clams and mussels (Mollusca: Bivalvia). Pages 215-273 in C.W. Hart, Jr. and S.L.H. Fuller, editors. Pollution ecology of freshwater invertebrates. Academic Press, New York, New York, USA.

Gangloff, M. M. and P. W. Hartfield. 2009. Seven populations of the southern kidneyshell (Ptychobranchus jonesi) discovered in the Choctawhatachee River basin, Alabama. Southeastern Naturalist 8:245-254.

Gianopulos, K. D., H. R. Mushinsky, and E. D. McCoy. 2001. Response of the threatened sand skink (Neoseps reynoldsi) to controlled burning and clear cutting in Florida sand pins scrub habitat. Proceedings of the Florida Scrub Symposium, Orlando, Florida, USA.

Gilbert, C. R., and K. Relyea. 1992. Saltmarsh topminnow, Fundulus jenkinsi. Pp 68-72 in: C. R. Gilbert, editor. Rare and endangered biota of Florida: Volume II. Fishes.

Gill, R. E., P. Canevari, and E. H. Iversen. 1998. Eskimo curlew (Numenius borealis), version 2.0. A. F. Poole and F. B. Gill, editors. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.347 (01/02/2020)

Gleaton, A. 2020. Species profile: Florida redbelly turtle (Pseudemys nelsoni). Savannah River ecology laboratory, University of Georgia, Athens, Georgia, USA. https://srelherp.uga.edu/turtles/psenel.htm. (01/08/2020)

Golden, D. M., P. Winkler, P. Woerner, G. Fowles, W. Pitts, and D. Jenkins. 2009. Status assessment of the northern pine snake (Pituophis m. melanoleucus) in New Jersey: an evaluation of trends and threats. New Jersey Department of Environmental Protection, Trenton, New Jersey, USA.

Goodyear, N. C. 1992. Spatial overlap and dietary selection of native rice rats and exotic black rats. Journal of Mammalogy 73:186-200.

Goodyear, N.C. 1987. Distribution and habitat of the silver rice rat, Oryzomys argentatus. Journal of Mammalogy 68:692-695.

Gorman, T. A., C. A. Hass, and J. G. Himes. 2013. Evaluating methods to restore amphibian habitat in fire-suppressed pine flatwoods wetlands. Fire Ecology 9:96-109.

Gorman, T. A., S. D. Powell, K. C. Jones, and C. A. Haas. 2014. Microhabitat characteristics of egg deposition sites used by Reticulated Flatwoods Salamanders. Herpetological Conservation and Biology 9:543-550.

Greenberg, C. H., and G. W. Tanner. 2008. Long-term landscape scale monitoring of amphibians uplands of the Ocala National Forest, Florida. Final report. Florida Fish and Wildlife Conservation Commission, Tallahassee, Florida, USA.

Greenlaw, J. S., C. S. Elphick, W. Post, and J. D. Rising. 2018. Saltmarsh sparrow (Ammospiza caudacuta), version 2.1. P. G. Rodewald, editor. The Birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.sstspa.02.1 (01/05/2020)

Hamel, P. B. 2011. Bachman's warbler (Vermivora bachmanii), version 2.0. A. F. Poole, editor. The Birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.150 (01/07/2020)

Hamel, P. B. 2018. Bachman's warbler, a species in peril. 2nd edition. Smithsonian Institution Press, Washington, District of Columbia, USA.

Hamilton, W. J., Jr. 1955. Two new rice rats (genus Orzomys) from Florida. Proceedings of the Biological Society of Washington 78:83-86.

Hammerson, G. A. 2007a. Sceloporus woodi. In: IUCN 2019. IUCN Red List of threatened species. Version 2019.3. https://dx.doi.org/10.2305/IUCN.UK.2007.RLTS.T64160A12742089.en (01/13/2020)

Hammerson, G.A. 2007b. Tantilla oolitica. In: IUCN 2019. IUCN Red List of threatened species. Version 2019.3. https://dx.doi.org/10.2305/IUCN.UK.2007.RLTS.T63954A12731242.en (01/13/2020)

Hines, K. N., and K. A. Bradley. 2009. Assessment of the status and distribution of the endemic rim rock crowned snake (Tantilla oolitica) in Miami-Dade and Monroe counties, Florida. Final Report Grant Agreement No. 401817G006. The Institute for Regional Conservation, Miami, Florida, USA.

Hobbs, H. H., Jr. 1942. The crayfishes of Florida. University of Florida Biological Science Series 3:21-179.

Hobbs, H. H., Jr., and C. W. Hart, Jr. 1959. The freshwater decapod crustaceans of the Apalachicola drainage system in Florida, southern Alabama, and Georgia. Bulletin of the Florida State Museum 4:145-191.

Holt, D. E., H. L. Jelks, and F. Jordan. 2013. Movement and longevity of imperiled okaloosa darters (Etheostoma okaloosae). Copiea 2013:653-659.

Hyslop, N. L., J. M. Meyers, R. J. Cooper, and D. J. Stevenson. 2014. Effects of body size and sex of Drymarchon couperi (eastern indigo snake) on habitat use, movements, and home range size in Georgia. Journal of Wildlife Management 78:101-111.

International Crane Foundation. 2019. Whooping crane eastern population update - March 2019. International Crane Foundation, Barboo, Wisconsin, USA. https://www.savingcranes.org/whooping-crane-eastern-population-update-march-2019. (01/09/2020)

International Wolf Center. 2020. Types of wolves. International Wolf Center. Minneapolis, Minnesota, USA. https://wolf.org/wolf-info/basic-wolf-info/types-of-wolves/ (01/09/2020)

Jackson, J. A. 1994. Red-cockaded Woodpecker (Dryobates borealis), version 2.0. A. F. Poole and F. B. Gill, editors. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.85 (01/10/2020)

Jackson, J. A. 2002. Ivory-billed woodpecker (Campephilus principalis), version 2.0. A. F. Poole and F. B. Gill, editors. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.711 (01/13/2020)

Kent, D. M., M. A. Langston, and D. W. Hanf. 1997. Observations of vertebrates associated with gopher tortoise burrows in Orange County, Florida. Florida Scientist 60:197-201.

Kieffer, S. 2014. Rufa red knot gets listed. National Audubon Society, Manhattan, New York, USA. https://www.audubon.org/news/rufa-red-knot-gets-listed (01/07/2020)

Kopec, K., and L. A. Burd. 2017. A systematic status review of North American and Hawaiian native bees. Center for Biological Diversity, Tucson, Arizona, USA.
Krysko, K. L. and D. J. Smith. 2005. The decline and extirpation of kingsnakes, Lampropeltis getula, in Florida. Pp 132-141 in: W. E. Meshaka, Jr. and K. J. Babbitt, editors. Status and conservation of Florida amphibians and reptiles. Krieger, Malabar, Florida, USA.

Krysko, K. L. and W. S. Judd. 2006. Morphological systematics of kingsnakes, Lampropeltis getula complex (Serpentes: Colubridae), in the eastern United States. Zootaxa 1193: 1-39.

Krysko, K. L., L. P. Nunez, C. E. Newman, and B. W. Bowen. 2017. Phylogenetics of kingsnakes, Lampropeltis getula complex (Serpentes: Colubbridae), in eastern North America. Journal of Heredity 108:226-238.

Kunz, T. H., and J. D. Reichard. 2010. Status review of the little brown myotis (Myotis lucifugus) and determination that immediate listing under the Endangered Species Act is scientifically and legally warranted. Boston University, Boston, Massachusetts, USA.

Layne, J. N. 1992. Sherman's short-tailed shrew Blarina carolinensis shermani. Pages 328-334 in S. R. Humphrey, editor. Rare and endangered biota of Florida: Vol. I. Mammals. University Press of Florida, Gainesville, Florida, USA.

Layne, J. N., editor. 1978. Rare and endangered biota of Florida: Vol. I. Mammals. University Press of Florida, Gainesville, Florida, USA.

Lazell, J.D., Jr. 1984. A new marsh rabbit (Sylvilagus Palustris) from Florida's Lower Keys. Journal of Mammalogy 65:26-33.
Lazell, J. D., Jr. 1989. Wildlife of the Florida Keys: a natural history. Island Press, Covelo, California, USA.

Lewis, A. 2018. The Eskimo curlew hasn't been seen in 55 years. Is It Time to Declare It Extinct? National Audubon Society, Manhattan, New York, USA. https://www.audubon.org/news/the-eskimo-curlew-hasnt-been-seen-55-years-it-time-declare-it-extinct# (01/02/2020)

Lopez, J. D., M. S. Peterson, J. Walker, G. L. Grammer, and M. S. Woodrey. 2011. Distribution, abundance, and habitat characterization of the saltmarsh topminnow, Fundulus jenkinsi (Everman 1892). Estuaries and Coasts 34:148-158.

Marchese, H. and N. V. Hoose. 2018. Florida monarch butterfly populations have dropped 80 percent since 2005. Florida Museum of Natural History, Gainesville, Florida, USA. https://www.floridamuseum.ufl.edu/science/florida-monarch/ (01/03/2020)

McNeil, D. J., K. R. Aldinger, M. H. Bakermans, J. A. Lehman, A. C. Tisdale, J. A. Jones, P. B. Wood, D. A. Buehler, C. G. Smalling, L. Siefferman, and J. L. Larkin. 2017. An evaluation and comparison of conservation guidelines for an at-risk migratory songbird. Global Ecology and Conservation 9:90-103.

Means, D.B. 1986. Life history and ecology of the eastern diamondback rattlesnake (Crotalus adamanteus). Final Project Report. Florida Game and Fresh Water Fish Commission, Tallahassee, Florida, USA.

Means, D. B. 2005. Haideotriton wallacei Carr, 1939. Georgia blind salamander. Pages 779-780 in M. Lannoo, editor. Amphibian declines: the conservation status of United States species. University of California Press, Berkeley, California, USA.

Means, D. B. 2006. Vertebrate faunal diversity of longleaf pine ecosystems. In S. Jose et al., editors. The longleaf pine ecosystem: ecology, silviculture, and restoration. Springer, New York, New York, USA.

Means, D. B. 2010. Time to end rattlesnake roundups: the ecological impacts of a long tradition. The Wildlife Professional Winter 2010:65-67.

Mierzwa, K. S. (ed.). 1995. The hine's emerald dragonfly in Illinois: an assessment of population dynamics and habitat use. Unpublished report, TAMS Consultants, Chicago.

Mirarchi, R. E., J. T. Garner, M. F. Mettee, and P.E. O'Neil. 2004. Alabama wildlife. Volume 2. Imperiled aquatic mollusks and fishes. University of Alabama Press, Tuscaloosa, Alabama, USA.

Moler, P. E. 1992. Rare and endangered biota of Florida: Volume III. Amphibians and reptiles. University Press of Florida, Gainesville.

Moler, P., and K. A. Crandall. 2010. Procambarus pictus. In: IUCN 2019. The IUCN Red List of threatened species. Version 2019.3. https://dx.doi.org/10.2305/IUCN.UK.2010-3.RLTS.T18213A7811189.en. (01/13/2020)

Monarch Joint Venture. 2019. Monarch butterfly ESA listing decision deadline extended. Monarch Joint Venture, St. Paul, Minnesota, USA. https://monarchjointventure.org/news-events/news/monarch-butterfly-esa-listing-decision-deadline-extended (01/03/2020)

Morales, A. E. and B. C. Carstens. 2018. Evidence that Myotis lucifugus "subspecies" are five nonsister species, despite gene flow. Systematic Biology 67:756-769.

Moreno, R. 2003. Genetic variation in three populations of a rare plant Lobelia boykinii: A microsatellite analysis. M.S. thesis, University of North Carolina at Greensboro, Greensboro, North Carolina, USA.

Morrison, J. L., and J. F. Dwyer. 2012. Crested caracara (Caracara cheriway), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.249 (01/06/2019)

Mushinsky, H. R., and E. D. McCoy. 1999. Studies of the sand skink (Neoseps reynoldsi) in Central Florida. Final report to Walt Disney Imagineering. University of South Florida, Tampa, Florida, USA.

National Marine Fisheries Service (NMFS). 1998. Final Recovery Plan for the Shortnose Sturgeon Acipenser brevirostrum. NMFS, Silver Spring, Maryland, USA.

National Marine Fisheries Service (NMFS). 2009. Recovery plan for smalltooth sawfish (Pristis pectinata). NMFS, Silver Spring, Maryland, USA.

National Marine Fisheries Service (NMFS). 2018. Smalltooth sawfish (Pristis pectinata) 5-year review: summary and evaluation of United States distinct population segment of smalltooth sawfish. NMFS, Southeast Regional Office, St. Petersburg, Florida, USA.

National Oceanic and Atmospheric Administration (NOAA) Fisheries. 2020. Species Directory. NOAA Fisheries. NOAA Fisheries, Office of Protected Resources, Silver Spring, Maryland, USA. https://www.fisheries.noaa.gov/species (2/11/2020)

NatureServe. 2020: NatureServe Explorer An online encyclopedia of life [web application]. Version 7.1. NatureServe, Arlington, Virginia, USA. http://explorer.natureserve.org/ (01/15/2020)

Nisbet, I. C. T., M. Gochfeld, and J. Burger. 2014. Roseate tern (Sterna dougallii), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.370 (01/10/2020)

North American Orchid Conservation Center (NAOCC). 2019. Trichocentrum undulatum. NAOCC, Smithsonian Environmental Research Center, Edgewater, Maryland, USA. https://goorchids.northamericanorchidcenter.org (12/ 23/2019)

Noss, R. F., E. T. LaRoe, and J. M. Scott. 1995. Endangered ecosystems of the United States: a preliminary assessment of loss and degradation. Biological Report 28. U.S. Department of the Interiro, National Biological Service, Washington, District of Columbia, USA.
O'Brien, C. A. and J. Brim Box. 1999. Reproductive biology and juvenile recruitment of the shinyrayed pocketbook, Lampsilis subangulata (Bivalvia: Unionidae) in the Gulf Coastal Plain. The American Midland Naturalist 142:129-140.

O'Brien, C. A. and J. D. Williams. 2002. Reproductive biology of four freshwater mussels (Bivalvia: Unionidae) endemic to eastern gulf coastal plain drainages of Alabama, Florida, and Georgia. American Malacological Bulletin 17:147-158.

Odonata Central. 2019. Somatochlora calverti. www.odonatacentral.org (12/13/2019)

Palis, J. G. 1995. Larval growth, development, and metamorphosis of Ambystoma cingulatum on the Gulf Coastal Plain of Florida. Florida Scientist 58:352-358.

Palis, J. G. 1997. Distribution, habitat, and status of the flatwoods salamander (Ambystoma cingulatum) in Florida, USA. Herpetological Natural History 5:53-65.

Parkinson, C. L., M. DiMeo, and K. Mercier. 2016. Evaluating mole skink and salt marsh snake subspecific taxonomy in Florida using genomics. Interim Report Submitted to the U.S. Fish and Wildlife Service. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

Paulson, D. R. 2018. Somatochlora calverti. In: IUCN 2019. The IUCN Red List of threatened species. Version 2019.3 https://dx.doi.org/10.2305/IUCN.UK.2018-1.RLTS.T20341A80697450.en (12/13/2019)

Pauly, G. B., O. Piskurek, and H. B. Shaffer. 2007. Phylogeographic concordance in the southeastern United States: The flatwoods salamander, Ambystoma cingulatum, as a test case. Molecular Ecology 16:415-429.

Pelton, E., S. Jepsen, C. Schultz, C. Fallon, and S. H. Black. 2016. State of the monarch butterfly overwintering sites in California. Report to the U.S. Fish and Wildlife Service. The Xerces Society for Invertebrate Conservation, Portland, OR, USA.

Petranka, J. W. 1998. Salamanders of the United States and Canada. Smithsonian Institution Press, Washington, District of Columbia, USA.

Pilarczyk, M. M., P. M. Stewart, D. N. Shelton, and D. J. Williams. 2006. Current and recent historical freshwater mussel assemblages in the Gulf Coastal plains. Southeastern Naturalist 5: 205-226.

Pintor, L. M., and D. A. Soluk. 2006. Evaluating the non-consumptive, positive effects of a predator in the persistence of an endangered species. Biological Conservation 130:584-591.

Post, W. and J. S. Greenlaw. 2018. Seaside sparrow (Ammospiza maritima), version 2.1. P. G. Rodewald, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.seaspa.02.1 (01/07/2020)

Powers, K. E., R. J. Reynolds, W. Orndorff, B. A. Hyzy, C .S. Hobson, and W. M. Ford. 2016. Monitoring the status of gray bats (Myotis grisescens) in Virginia, 2009-2014, and potential impacts of white-nose Syndrome. Southeastern Naturalist 12:127-137.

Rasmussen, A. K., D. R. Denson, S. C. Harris. 2008. Status of caddisflies (Insecta: Trichoptera) in greatest conservation need in Florida. Final report, Agreement Number 06009.
Florida Fish and Wildlife Conservation Commission, Tallahassee, Florida, USA.

Rightmyer, M. G, M. Deyrup, J. S. Ascher, and T. Griswold. 2011. Osmia species (Hymenoptera, Megachilidae) from the southeastern United States with modified facial hairs: taxonomy, host plants, and conservation status. Contributions Celebrating Kumar Krishna. ZooKeys 148:257-278.

Rochford, M., K. Hines, and F. J. Mazzotti. 2010. Tantilla oolitica (rim rock crowned snake). Defensive behavior. Herpetological Review 41: 99.

Roth, A. M., R. W. Rohrbaugh, T. Will, and D. A. Buehler, editors. 2012. Golden-winged warbler status review and conservation plan. Cornell Lab of Ornithology, Golden-winged Warbler Working Group, National Widlife Federation, U.S. Fish and Wildlife Service.

Royo, A. A., R. Bates, and E. P. Lacey. 2008. Demographic constraints in three populations of Lobelia boykinii: A rare wetland endemic. The Journal of the Torrey Botanical Society 135:189-199.

Schrey, A. W., A. M. Fox, H. R. Mushinsky, and E. D. McCoy. 2011. Fire increases variance in genetic characteristics of Florida sand skink (Plestiodon reynoldsi) local populations. Molecular Ecology 20:56-66.

Schrey, A. W., K. G. Ashton, S. Heath, E. D. McCoy, and H. R. Mushinsky. 2011. Fire alters patterns of genetic diversity among 3 lizard species in Florida scrub habitat. Journal of Heredity 102:399-409.

Skinner, M. W. and B. A. Sorrie. 2002. Conservation and ecology of Lilium pyrophilium, a new species of Liliaceae from the Sandhills region of the Carolinas and Virginia, U.S.A. Novon 12:94-105.

Sewell, A. 2010. Petition to List the Golden-winged Warlber (Vermivora chrysoptera) as a Threatened or Endangered Species under the U.S. Endangered Species Act. Sewell, State College, Pennsylvania, USA.

Spitzer, N. C., 1983. Aspects of the biology of the silver rice rat Oryzomys argentatus. M.S. Thesis, University of Rhode Island, South Kingstown, Rhode Island, USA.

Territo, G. P. 2013. Biogeography and systematics of Nerodia clarkia/Nerodia fasciata clade in Florida. M.S. Thesis. University of Central Florida, Orlando, Florida, USA.

Thom, M. D. 2013. The ecology and conservation of Callophrys irus godart: The role of fire and microhabitat. Doctoral dissertation, University of Florida, Gainesville, Florida, USA.

Thomas, T. M., M. C. Granatosky, J. R. Bourque, K. L. Krysko, P. E. Moler, T. Gamble, E. Suarez, E. Leone, K. M. Enge, and J. Roman. 2014. Taxonomic assessment of alligator snapping turtles (Chelydridae: Macrochelys), with the description of two new species from the southeastern United States. Zootaxa 3786:141-165.

Tiebout, H.M., III and R.A. Anderson. 2001. Mesocosm experiments on habitat choice by an endemic lizard: implications for timber management. Journal of Herpetology 35:173-185.

Timmerman, W. and W. Martin. 2003. Conservation guide to the eastern diamondback rattlesnake. Society for the Study of Amphibians and Reptiles, Shoreview, Minnesota, USA.

Turner, W. R., D. S. Wilcove, and H. M. Swaim. 2006. State of the scrub: Conservation progress, management responsibilities, and land acquisition priorities for imperiled species of Florida's Lake Wales Ridge. Final report to USFWS, South Florida Ecological Services Office, Vero Beach, Florida, USA.

University of Florida Institute of Food and Agricultural Sciences (UF IFAS). 2019. Cassius blue butterfly (Leptotes cassius theonus). UF IFAS, Gainesville, Florida, USA. http://entnemdept.ufl.edu/creatures/bfly/cassius_blue.htm (01/23/2020)

U.S. Army Corps of Engineers (USACE). 2007. Assessment of the population status of the Gray Bat (Myotis grisescens), status review, DOD initiatives, and results of a multi-agency effort to survey wintering populations at major hibernacula, 2005-2007. USACE, Army Endangered Species Research Program, US Army Engineer Research and Development Center, Vicksburg, Mississippi, USA.

U.S. Fish and Wildlife Service (USFWS). 1982. Gray bat recovery plan. U.S. Department of the Interior, Fish and Wildlife Reference Service, Colorado Ecological Services Office, Denver, Colorado, USA.

U.S. Fish and Wildlife Service (USFWS). 1987. Recovery plan for the Choctawhatchee, Perdido Key and Alabama beach mouse. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1990. Endangered and threatened species recovery program: report to Congress. U.S. Department of the Interior, Fish and Wildlife Service, Washington, District of Columbia, USA.

U.S. Fish and Wildlife Service (USFWS). 1993. Recovery plan for the Anastasia Island beach mouse and southeastern beach mouse. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1995. American chaffseed (Schwalbea americana) recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, New Jersey Field Office, Pleasantville, New Jersey, USA.

U.S. Fish and Wildlife Service. 1996a. Revised recovery plan for the US breeding population of the wood stork. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1996b. Recovery plan for nineteen central Florida scrub and high pineland plants (revised). USFWS, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1997. Recovery plan for the Florida salt marsh vole (Microtus pennsylvanicus dukecampbelli). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1999a. Key Largo woodrat (Neotoma floridana smalli) recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 1999b. South Florida multi-species recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 1999c. Avon Park harebells (Crotalaria avonensis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2001. Florida manatee recovery plan, (Trichechus manatus latirostris), Third Revision. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA

U.S. Fish and Wildlife Service. 2003a. Recovery plan for the red-cockaded woodpecker (Picoides borealis): second revision. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2003b. Agency draft recovery plan for endangered fat threeridge (Amblema neislerii), shinyrayed pocketbook (Lampsilis subangulata), gulf moccasinshell (Medionidus penicillatus), ochlockonee moccasinshell (Medionidus simpsonianus), and oval pigtoe (Pleurobema pyriforme); and threatened chipola slabshell (Elliptio chipolaensis), and purple bankclimber (Elliptoideus sloatianus). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2004. Species assessment and listing priority assignment form – Digitaria pauciflora. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2005a. Anastasia Island beach mouse (Peromyscus poliomotus phasma) and southeastern beach mouse (Peromyscus polionotus niveiventris). U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2005b. Longspurred mint (Dicerandra cornutissima) species account biologue. Summary and Evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville Florida.

U.S. Fish and Wildlife Service (USFWS). 2006. Red-cockaded Woodpecker (Picoides borealis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service,Clemson Ecological Services Field Office, Clemson, South Carolina, USA.

U.S. Fish and Wildlife Service (USFWS). 2007a. Indiana bat (Myotis sodalis) draft recovery plan: first revision. U.S. Department of the Interior, Fish and Wildlife Service, Great Lakes-Big Rivers Regional Office, Fort Snelling, Minnesota, USA.

U.S. Fish and Wildlife Service (USFWS). 2007b. West Indian manatee (Trichechus manatus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007c. Florida scrub-jay (Aphelocoma coerulescens) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007d. Wood Stork (Mycteria americana) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service Southeast Region, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007e. Bluetail mole skink (Eumeces egregious lividus) and sand skink (Neoseps reynoldsi) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007f. Fat threeridge (Amblema neislerii), shinyrayed pocketbook (Lampsilis subangulata), gulf moccasinshell (Ifedionidus penicillatus), ochlockonee moccasinshell (Medionidus simpsonianus), oval pigtoe (Pleurobema pyriforme), chipola slabshell (Elliptio chipolaensis), purple bankclimber (Elliptoideus sloatianus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007g. Garber's spurge (Chamaesyce garberi) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2007h. Florida perforate cladonia (Cladonia perforata) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008a. Florida panther recovery plan, Third Revision. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2008b. Florida grasshopper sparrow (Ammodramus savannarum floridanus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008c. Florida population of the Audubon's crested caracara (Polyborus plancus audubonii) = northern crested caracara (Caracara cheriway) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008d. Everglade snail kite (Rostrhamus sociabilis plumbeus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008e. Schaus swallowtail butterfly (Heraclides aristodemus ponceanus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008f. Pigeon wings (Clitoria fragrans) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008g. Short-leaved rosemary (Conradina brevifolia) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008h. Lakela's mint (Dicerandra immaculata) 5-Year Review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008i. Euphorbia telephioides (Telephus spurge) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2008j. Highlands scrub hypericum (Hypericum cumulicola) 5- year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Region, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service. 2008k. Papery whitlow-wort (Paryonchia chartacea) 5-year Review: Summary and Evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida.

U.S. Fish and Wildlife Service (USFWS). 2009a. Gray bat (Myotis grisescens) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Missouri Ecological Services Field Office, Columbia, Missouri, USA.

U.S. Fish and Wildlife Service (USFWS). 2009b. Indiana bat (Myotis sodalis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Bloomington Ecological Services Field Office, Bloomington, Indiana, USA.

U.S. Fish and Wildlife Service (USFWS). 2009c. Piping plover (Charadrius melodus) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Northeast Region, Hadley, Massachusetts, and the Midwest East Lansing Field Office, Michigan, USA.

U.S. Fish and Wildlife Service (USFWS). 2009d. Stock Island tree snail (Orthalicus reses (not including nesodryas)) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009e. Four-petal pawpaw (Asimina tetramera) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009f. Florida golden aster (Chrysopsis floridana) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009g. Okeechobee gourd (Cucurbita okeechobeensis ssp. okeechobeensis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009h. Species account: Rugel's pawpaw (Deeringothamnus rugelii). U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009i. Garrett's mint (Dicerandra christmanii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009j. Scrub mint (Dicerandra frutescens) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2009k. Macbridea alba (white birds-in-a-nest) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish & Wildlife Service (USFWS). 2009l. Cooley's meadowrue (Thalictrum cooleyi) 5-year review, summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Carolina Ecological Services Office, Raleigh, North Carolina, USA.

U.S. Fish and Wildlife Service (USFWS). 2009m. Florida ziziphus (Ziziphus celata) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish & Wildlife Service (USFWS). 2010a. Key deer (Odocoileus virginianus clavium) 5 year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Region, Atlanta, Georgia, USA.

U.S. Fish & Wildlife Service (USFWS). 2010b. The St. Andrew beach mouse (Peromyscus polionotus peninsularis) recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010c. Cape Sable seaside sparrow (Ammodramus maritimus mirabilis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish & Wildlife Service (USFWS). 2010d. Recovery plan for the ivory-billed woodpecker (Campephilus principalis). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2010e. Caribbean roseate tern and North Atlantic roseate tern (Sterna dougallii dougallii), 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Northeast Regional Office, Hadley, Massachusetts, USA and Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2010f. Fragrant prickly-apple (Cereus eriophorus var. fragrans) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010g. Deltoid Spurge (Chamaesyce deltoidea ssp. deltoidea) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Service Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010h. Snakeroot (Eryngium cuneifolium) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010i. Small’s milkpea (Galactia smallii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010j. Key tree-cactus (Pilosocereus robinii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010k. Lewton's polygala (Polygala lewtonii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010l. Tiny polygala (Polygala smallii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2010m. Wireweed (Polygonella basiramia) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS) 2010n. Sandlace (Polygonella myriophylla) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

US Fish and Wildlife Service (USFWS). 2010o. Torreya taxifolia (Florida torreya) 5-year review: summary and evaluation. September 2017. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2012a. White-nose syndrome confirmed in federally endangered gray bats. U.S. Department of the Interior, Fish and Wildlife Service, Office of Public Affairs, Falls Church, Virginia, USA. https://www.fws.gov/news/ShowNews.cfm?ID=348CC168-D4C6-F1B4- 4AF2C93DFD8E2473 (01/13/2020)

U.S. Fish and Wildlife Service (USFWS). 2012b. Whooping crane (Grus americana) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Aransas National Wildlife Refuge, Austwell, Texas, and Corpus Christi Ecological Service Field Office, Texas, USA.

U.S. Fish and Wildlife Service (USFWS). 2012c. Recovery outline for Miami blue butterfly (Cyclargus thomasi bethunebakeri). U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2013. Recovery outline for Consolea corallicola (Florida semaphore cactus). U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2014a. West Indian manatee (Trichechus manatus) Florida stock (Florida subspecies, Trichechus manatus latirostris), stock assessment report. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2014b. Florida scrub-jay umbrella Habitat Conservation Plan and Environmental Assessment. Revision 1. https://www.fws.gov/northflorida/Scrub-Jays/Docs/Umbrella/20121000_FSJ_Umbrella_HCP_EA_2014rev.pdf (01/09/2020)
U.S. Fish and Wildlife Service (USFWS). 2014c. At-risk species in Florida's Panhandle. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2015a. Status of the species - Key Largo cotton mouse. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2015b. Status of the species - Florida scrub-jay (Aphelocoma coerulescens). U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2015c. Recovery Plan for the Northern Great Plains piping plover (Charadrius melodus) in two volumes. Volume I: Draft breeding recovery plan for the Northern Great Plains piping plover (Charadrius melodus) and Volume II: Draft revised recovery plan for the wintering range of the Northern Great Plains piping plover (Charadrius melodus) and comprehensive conservation strategy for the piping plover (Charadrius melodus) in its coastal migration and wintering range in the continental United States. U.S. Department of the Interior, Fish and Wildlife Service, Colorado Ecological Services Office, Denver, Colorado, USA.

U.S. Fish and Wildlife Service (USFWS). 2015d. Bachman's warbler (Vermivora bachmanii) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Carolina Ecological Services Office, Charleston, South Carolina, USA.

U.S. Fish and Wildlife Service. 2015e. Reticulated flatwoods salamander (Ambystoma bishopi) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2015f. Status of the Species – Bartram's scrub-hairstreak (Strymon acis bartrami). U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2015g. Ribes echinellum (Miccosukee gooseberry) 5-Year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2015h. Fringed campion (Silene catesbaei = Silene polypetala) 5-year review: summary and evaluation., U.S. Department of the Interior, Fish and Wildlife Service, Georgia Ecological Services Field Office, Athens, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2016a. Eskimo curlew (Numenius borealis) 5-Year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Fairbanks Fish and Wildlife Field Office, Fairbanks, Alaska, USA.

U.S. Fish and Wildlife Service (USFWS). 2016b. Squirrel chimney cave shrimp (Palaemonetes cummingi). 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2016c. Harperocallis flava-Harper's beauty 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2016d. Scrub lupine (Lupinus aridorum) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2017a. Species status assessment report for the Panama City crayfish, Version 1.1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.
U.S. Fish and Wildlife Service (USFWS). 2017b. Florida bonamia (Bonamia grandiflora) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2017c. Conradina glabra (Apalachicola rosemary) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2017d. Scrub plum (Prunus geniculata) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

US Fish & Wildlife Service (USFWS). 2017e. Cooley's meadowrue (Thalictrum cooleyi). U.S. Department of the Interior, Fish and Wildlife Service, Raleigh Ecological Field Office, Raleigh, North Carolina, USA. https://www.fws.gov/raleigh/species/es_cooleys_meadowrue.html (01/24/2020)

U.S. Fish and Wildlife Service (USFWS). 2018a. Recovery outline for Florida bonneted bat (Eumops floridanus). U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018b. Key Largo woodrat (Neotoma floridana smalli) 5-year review: summary and evaluation - 2018 update. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018c. U.S. Fish and Wildlife Service Region 5 Endangered Species Act Update July 25, 2018. U.S. Department of the Interior, Fish and Wildlife Service, Northeast Regional Office, Hadley, Massachusetts, USA.

U.S. Fish and Wildlife Service (USFWS). 2018d. Species status assessment for the eastern black rail (Laterallus jamaicensis jamaicensis). Version 1.2. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2018e. Species status assessment report for the black-capped petrel (Pterodroma hasitata). Version 1.1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2018f. U.S. Fish and Wildlife listing species assessment and listing priority assignment form: Gopherus polyphemus. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2018g. Species account: squirrel chimney cave shrimp. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018h. Species status assessment report for the frosted elfin (Callophrys irus), Version 1.2. U.S. Department of the Interior, Fish and Wildlife Service, New York Field Office, Cortland, New York, USA.

U.S. Fish and Wildlife Service (USFWS). 2018i. Rugel's pawpaw (Deeringothamnus rugelii) 5 year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018j. Longspurred mint (Dicerandra cornutissima) 5-Year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville Florida, USA.
U.S. Fish and Wildlife Service (USFWS). 2018k. Scrub buckwheat (Eriogonum longifolium var. gnaphalifolium) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018l. Pinguicula ionantha godfrey's butterwort 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018m. Spigelia gentianoides gentian pinkroot 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2018n. Recovery outline for Florida bristle fern (Trichomanes punctatum ssp. floridanum). U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019. Florida salt marsh vole (Microtus pennsylvanicus dukecampbelli) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Field Office, Jacksonville, Florida.

U.S. Fish and Wildlife Service (USFWS). 2019b. Indiana bat (Myotis sodalis) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Indiana Ecological Services Field Office, Bloomington, Indiana, USA.

U.S. Fish and Wildlife Service (USFWS). 2019c. Conserving South Carolina's at-risk species: species facing threats to their survival - tricolored bat. U.S. Department of the Interior, Fish and Wildlife Service, South Carolina Ecological Services Field Office, Charleston, South Carolina, USA.

U.S. Fish and Wildlife Service (USFWS). 2019d. Recovery plan for the endangered Key Largo cotton mouse (Peromyscus gossypinus allapaticola) amendment. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019e. Perdido Key beach mouse recovery plan amendment. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019f. Recovery plan for Cape Sable seaside sparrow (Ammodramus maritimus mirabilis) draft amendment 1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019g. Recovery plan for Florida grasshopper sparrow (Ammodramus savannarum floridanus) Amendment 1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019h. Recovery plan for the Florida scrub-jay (Aphelocoma coerulescens). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019i. Recovery outline for the rufa red knot (Calidris canutus rufa). U.S. Department of the Interior, Fish and Wildlife Service, New Jersey Field Office, Galloway, New Jersey, USA.

U.S. Fish and Wildlife Service (USFWS). 2019j. Recovery plan for the endangered everglade snail kite (Rostrhamus sociabilis plumbeus) Amendment 1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019k. Species status assessment (SSA) report for the eastern indigo snake (Drymarchon couperi). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019l. Species status assessment report for the southern hognose snake (Heterodon simus). Version 1.1. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019m. Atlantic salt marsh snake (Nerodia clarkii taeniata) 5- year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Field Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service. 2019n. Frosted Flatwoods salamander (Ambystoma cingulatum) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019o. Conserving South Carolina’s at-risk species. U.S. Department of the Interior, Fish & Wildlife Service, South Carolina Field Office, Charleston, South Carolia, USA. www.fws.gov/southeast/endangered-species-act/at-risk-species (12/13/2019)

U.S. Fish and Wildlife Service (USFWS). 2019p. Frosted elfin. U.S. Department of the Interior, Fish & Wildlife Service, Northeast Regional Office, Hadley, Massachusetts, USA. https://www.fws.gov/northeast/frosted-elfin/index.html (01/02/2020)

U.S. Fish and Wildlife Service (USFWS). 2019q. Species status assessment report for the American burying beetle Nicrophorus americanus. U.S. Department of the Interior, Fish and Wildlife Service, Oklahoma Ecological Services Field Office, Tulsa, Oklahoma, USA.

U.S. Fish and Wildlife Service (USFWS). 2019r. Recovery plan for the endangered Asimina tetramera (four-petal pawpaw). U U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019s. Brooks bellflower (Campanula robinsiae) 5-year review: summary and evaluations. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019t. Etonia rosemary (Conradina etonia) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019u. Recovery plan amendment for the endangered Cucurbita okeechobeensis ssp. okeechobeensis (Okeechobee gourd). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office Atlanta, Georgia, USA.

US Fish & Wildlife Service (USFWS). 2019v. Cooley's water-willow (Justicia cooleyi) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019w. Rhododendron minus var. champanii (Chapman's Rhododendron) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019x. American chaffseed (Schwalbea americana) recovery plan amendment 1. U.S. Department of the Interior, Fish and Wildlife Service, New Jersey Ecological Services Field Office, Pleasantville, New Jersey, USA.

U.S. Fish and Wildlife Service (USFWS). 2019y. American chaffseed (Schwalbea americana) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, South Carolina Ecological Services Field Office, Charleston, South Carolina, USA.

U.S. Fish and Wildlife Service (USFWS). 2019z. Scutellaria floridana (Florida skullcap) 5-year review: summary and evaluation. U.S. Department of the Interior, Fish and Wildlife Service, Panama City Field Office, Panama City, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2019aa. Lake Wales Ridge plants recovery plan amendment. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2020a. Environmental Conservation Online System (ECOS). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA. https://ecos.fws.gov/ (01/15/2020)

U.S. Fish and Wildlife Service (USFWS). 2020b. Key Largo woodrat (Neotoma floridana smalli) 5-year review: summary and evaluation - 2018 update. U.S. Department of the Interior, Fish and Wildlife Service, South Florida Ecological Services Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 2020c. St. Vincent National Wildlife Refuge update. U.S. Department of the Interior, Fish and Wildlife Service, St. Vincent National Wildlife Refuge, Apalachicola, Florida, USA. https://www.fws.gov/refuge/st_vincent/ (01/20/2020)

Urbanek, R. P. and J. C. Lewis. 2015. Whooping crane (Grus americana), version 2.0. A. F. Poole, editor. The birds of North America. Cornell Lab of Ornithology, Ithaca, New York, USA. https://doi.org/10.2173/bna.153 (01/09/2020)

van Dijk, P.P. 2011. Clemmys guttata. In: IUCN 2019. The IUCN Red List of Threatened Species. Version 2019.3. https://dx.doi.org/10.2305/IUCN.UK.2011-1.RLTS.T4968A11103766.en (01/13/2020)

Waldron, J., S. Welch, and S. Bennett. 2008. Vegetation structure and habitat specificity of a declining North American reptile: A remnant of former landscapes. Biological Conservation 141:2477-82.

Weakley, A. S. 2012. Flora of the Carolinas, Virginia, Georgia, northern Florida, and surrounding areas. Working Draft of 30 November 2012. University of North Carolina Herbarium (NCU), North Carolina Botanical Garden, University of North Carolina at Chapel Hill, North Carolina, USA. http://herbarium.unc.edu/flora.htm (12/23/2019)

Weaver, W. G., S. P. Christman, and P. E. Moler. 1992. Big Pine Key ringneck snake, Diadophis punctatus acricus Paulson. Pages 146-149 in P. E. Moler, editor. Rare and endangered biota of Florida: Volume III. Amphibians and reptiles. University Press of Florida, Gainesville, Florida, USA.

Weller, E. 2018. 5 year review: red wolf (Canis rufus). U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

Whelan R. J. 1995. The ecology of fire. Cambridge University Press, Cambridge, UK.

White, M. P., H. N. Blalock-Herod, and P. M. Stewart. 2008. Life history and fish host identification for Fusconaia burkei and Pleurobema strodeanum (Bivalvia: Unionidae). American Malacological Bulletin 24:121-125.

White, M.P., H.N. Blalock-Herod, and P.M. Stewart. 2008. Life history and fish host identification for Fusconaia burkei and Pleurobema strodeanum (Bivalvia: Unionidae). American Malacological Bulletin 24:121-125.

WildEarth Guardians and S. Felsen. 2010. Petition to list the saltmarsh topminnow (Fundulus jenkinsi) under the US Endangered Species Act. WildEarth Guardians, Santa Fe, New Mexico, USA.
Williams, J. D., A. E. Bogan, and J. T. Garner. 2008. Freshwater mussels of Alabama & the Mobile Basin in Georgia, Mississippi, & Tennessee. University of Alabama Press, Tuscaloosa, Alabama, USA.

Williams, J. D. and R. S. Butler. 1994. Class Bivalvia, Order Unionoida, freshwater bivalves. Pages 53- 128, 740-742 in M. Deyrup and R. Frantz, editors. Rare and endangered biota of Florida: Volume 4. Invertebrates. University Press of Florida, Gainesville, Florida, USA.

Williams, J. D., H. N. Blalock, A. Benson, and D. N. Shelton. 2000. Distribution of the freshwater mussel fauna (Bivalvia: Margaritiferidae and Unionidae) in the Escambia and Yellow river drainages in southern Alabama and western Florida. Final Report for the US Fish and Wildlife Service, North Florida Ecological Services Office, Jacksonville, Florida, USA.

Williams, M. J. 2015. Monarchs make Florida home. U.S. Department of Agriculture, Natural Resources Conservation Service, Gainesville, Florida, USA. https://www.nrcs.usda.gov/wps/portal/nrcs/detail/fl/newsroom/releases/?cid=NRCSEPRD363613 (01/03/2020)

Wolfe, J. L. 1992. Lower Keys marsh rabbit Silvilagus palustris herneri. in S. R. Humphrey, editor. Rare and endangered biota of Florida: Vol. I. Mammals. University Press of Florida, Gainesville, Florida, USA.

Wunderlin, R. P., B.F. Hansen, A. R. Franck, and F. B. Essig. 2020. Atlas of Florida Plants. Institute for Systematic Botany, University of South Florida, Tampa, Florida, USA. http://florida.plantatlas.usf.edu/plant.aspx?id=4103 (01/24/2020)

Yirka, M. A., J. N. Flowers, M. D. Martin, K. R. Messenger, and N. A. Shepard. 2010. Geographic distribution: *Tantilla oolitica* (rim rock crowned snake). *Herpetological Review* 41:382.

# Appendix C

## Effects of the Action on ESA-listed Species

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| ***Mammals*** | | | | | | | | | | | | | | | |
| Wetland/ marsh | Sherman's Short-tailed Shrew (*Blarina brevicauda shermani*) | URS | N | Y | N/A | - | | | | X | X | X | X | | X |
| Forest/ grasslands/ swamp | Gray Wolf (*Canis lupus*) | E | Y | N | N/A | - | | | | X | | X | | | |
| Forest/ grasslands/ swamp | Red Wolf (*Canis rufus*) | E | N | Y | N/A | - | X | | | X | | X | | | |
| Tropical hardwood hammock/ mangrove | Florida Bonneted Bat (*Eumops floridanus*) | E | N | Y | N/A | 411 | | | | X | | X | X | | X |
| Wetland/ marsh | Florida Salt Marsh Vole (*Microtus pennsylvanicus dukecampbelli*) | E | N | Y | N/A | | | | | X | X | X | X | | X |
| Caves | Gray Bat (*Myotis grisescens*) | E | N | Y | N/A | - | | | | X | | X | | | |
| Caves | Little Brown Bat (*Myotis lucifugus occultus*) | UR | N | Y | N/A | - | | | | X | | X | X | | X |
| Caves | Indiana Bat (*Myotis sodalis*) | E | Y | N | N/A | - | | | | X | | X | | | |
| Tropical hardwood hammock/ mangrove | Key Largo Woodrat (*Neotoma floridana smalli*) | T | N | Y | N/A | 1 | | X | | X | | X | | | |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Pine rockland | Key Deer (*Odocoileus virginianus clavium*) | E | N | N | N/A | 5 | | | | X | | X | X | | X |
| Wetland/ marsh | Rice Rat (*Oryzomys palustris natator*) | E | Y | Y | N/A | 5 | X | X | | X | X | X | X | | X |
| Wetland/ marsh | Pine Island Rice Rat (*Oryzomys palustris planirostris*) | URS | N | Y | N/A | - | | | X | X | X | X | X | | X |
| Wetland/ marsh | Sanibel Island Rice Rat (*Oryzomys palustris sanibeli)* | URS | N | Y | N/A | - | | | X | X | | X | X | | X |
| Caves | Tricolored Bat (*Perimyotis subflavus*) | URS | N | Y | N/A | - | | | | X | | X | X | | X |
| Tropical hardwood hammock/ mangrove | Key Largo Cotton Mouse (*Peromyscus gossypinus allapaticola*) | E | N | Y | N/A | 1 | | X | | X | X | X | X | | X |
| Beach/ scrub dune | Choctawhatchee Beach Mouse (*Peromyscus polionotus allophrys*) | E | N | N | N/A | 1 | | | | X | X | X | | | |
| Beach/ scrub dune | Southeastern Beach Mouse (*Peromyscus polionotus niveiventris*) | T | N | N | N/A | 3 | | | | X | X | X | | | |
| Beach/ scrub dune | St. Andrew Beach Mouse (*Peromyscus polionotus peninsularis*) | E | Y | N | N/A | 4 | | X | | X | X | X | | | |
| Beach/ scrub dune | Anastasia Island Beach Mouse | E | N | N | N/A | - | | | | X | X | X | | | |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| | (*Peromyscus polionotus phasma*) | | | | | | | | | | | | | | |
| Beach/ scrub dune | Perdido Key Beach Mouse (*Peromyscus polionotus trissyllepsis*) | E | N | N | N/A | - | | X | X | X | X | X | | | |
| Forests/ grasslands/ swamps | Florida Panther (*Puma* [=*Felis*] *concolor coryi*) | E | N | Y | N/A | 197 | | | | X | X | X | X | | |
| Wetland/ marsh | Insular Hispid Cotton Rat (*Sigmodon hispidus insulicola*) | URS | N | N | N/A | - | | | | X | | X | X | | X |
| Wetland/ marsh | Lower Keys Rabbit (*Sylvilagus palustris hefneri*) | E | N | Y | N/A | 6 | | X | X | X | X | X | X | | X |
| Aquatic | West Indian Manatee (*Trichechus manatus*) | T | Y | Y | N/A | 493 | | | | X | X | X | X | | X |
| ***Birds*** | | | | | | | | | | | | | | | |
| Wetland/ marsh | Cape Sable Seaside Sparrow (*Ammodramus maritimus mirabilis*) | E | Y | Y | N/A | 9 | | | | X | X | X | X | | X |
| Grassland | Florida Grasshopper Sparrow (*Ammodramus savannarum floridanus*) | E | N | N | N/A | 57 | | | | X | | X | X | | |
| Wetland/ marsh | Saltmarsh Sparrow (*Ammospiza caudacutas*) | UR | N | Y | N/A | - | | | | X | X | X | X | | X |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Upland scrub | Florida Scrub-jay (*Aphelocoma coerulescens*) | T | N | N | N/A | 199 | | | | X | | X | X | | |
| Coastal tidal/marine | Rufa Red Knot (*Calidris canutus rufa*) | T | N | Y (tidal flats) | N/A | 9 | | | | X | X | X | X | | X |
| Forest/ forested wetland | Ivory-billed Woodpecker (*Campephilus principalis*) | E | N | T | N/A | 1 | | | | X | | X | X | | X |
| Coastal tidal/marine | Piping Plover (*Charadrius melodus*) | T* | Y | Y (intertidal beaches) | N/A | 29 | | | | X | X | X | X | | X |
| Grassland | Whooping Crane (*Grus americana*) | E | Y | Y | N/A | | | | | X | X | X | X | | X |
| Wetland/ marsh | Eastern Black Rail (*Laterallus jamaicensis* ssp. *jamaicensis*) | URS | N | Y | N/A | - | | | | X | X | X | X | | X |
| Wetland/ marsh | Wood Stork (*Mycteria americana*) | T | N | Y | N/A | 2681 | | X | | X | X | X | X | | X |
| Grassland | Eskimo Curlew (*Numenius borealis*) | E | N | Y | N/A | - | | | | X | | X | X | | |
| Pine savanna | Red-cockaded Woodpecker (*Picoides borealis*) | E | N | N | N/A | 298 | | | | X | | X | X | | |
| Grassland | Audubon's Crested Caracara (*Polyborus plancus audubonii*) | T | N | Y | N/A | 175 | | X | | X | | X | X | | X |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Coastal tidal/marine | Black-capped Petrel (*Pterodroma hasitata*) | P | N | N | N/A | - | | | | | X | | | | |
| Wetland/ marsh | Everglade Snail Kite (*Rostrhamus sociabilis plumbeus*) | E | Y | Y | N/A | 159 | | X | X | X | | X | X | X | X |
| Forest/ forested wetland | Kirtland's Warbler (*Setophaga kirtlandii = Dendroica kirtlandii*) | D | N | N | N/A | 2 | | | | X | | X | | | |
| Coastal tidal/marine | Roseate Tern (*Sterna dougallii dougallii*) | T* | N | N | N/A | 1 | | | | X | X | X | | | |
| Forest/ forested wetland | Bachman's Wood Warbler (*Vermivora bachmanii*) | E | N | Y | N/A | - | | | | X | | X | X | | |
| Forest/ forested wetland | Golden-winged Warbler (*Vermivora chrysoptera*) | URS | N | Y | N/A | - | | | | X | | X | X | | X |
| ***Reptiles*** | | | | | | | | | | | | | | | |
| Wetland/ marsh/ freshwater | American Alligator (*Alligator mississippiensis*) | TS | N | Y | N/A | 2 | | X | | X | X | X | X | | X |
| Wetland/ marsh/ freshwater | Spotted Turtle (*Clemmys guttata*) | URS | N | Y | N/A | - | X | X | X | X | X | X | X | | X |
| Swamp/ saltwater | American Crocodile (*Crocodylus acutus*) | T | Y | Y | N/A | 33 | | X | | X | X | X | X | | X |
| Pine flatwoods | Eastern Diamondback Snake | URS | N | N | N/A | - | | | | X | | X | | | |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| | (*Crotalus adamanteus*) | | | | | | | | | | | | | | |
| Pine rocklands | Key Ringneck Snake (*Diadophis punctatus acricus*) | URS | N | N | N/A | - | | | | X | | X | | | |
| Pine flatwoods | Eastern Indigo Snake (*Drymarchon corais couperi*) | T | N | Y | N/A | 2697 | | | | X | | X | X | | |
| Sandhill/ scrub flatwoods | Gopher Tortoise (*Gopherus polyphemus*) | C* | N | N | N/A | 1 | | | | X | | X | | | |
| Wetland/ marsh/ freshwater | Escambia Map Turtle (*Graptemys ernsti*) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Sandhill/ scrub flatwoods | Southern Hognose Snake (*Heterodon simus*) | NW | N | N | N/A | - | | | | X | | X | | | |
| Wetland/ marsh/ freshwater | Apalachicola Common Kingsnake (*Lampropeltis getula meansi*) | URS | N | Y | N/A | - | | X | | X | X | X | X | | |
| Wetland/ marsh/ freshwater | Alligator Snapping Turtle (*Macrochelys termminckii*) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Wetland/ marsh/ freshwater | Atlantic Salt Marsh Snake (*Nerodia clarkii taeniata*) | T | N | Y (streams) | N/A | 6 | | X | | X | X | X | X | | X |
| Sandhill/ scrub flatwoods | Florida Pine Snake (*Pituophis melanoleucus mugitus*) | URS | N | N | N/A | - | | | | X | | X | | | |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Sandhill/ scrub flatwoods | Bluetail Mole Skink (*Plestiodon egregius lividus*) | T | N | N | N/A | 31 | | | | X | | X | | | |
| Sandhill/ scrub flatwoods | Sand Skink (*Plestiodon reynoldsi*) | T | N | N | N/A | 66 | | | | X | | X | | | |
| Wetland/ marsh/ freshwater | Florida Red-bellied Turtle (*Pseudemys nelsoni*) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Sandhill/ scrub flatwoods | Florida Scrub Lizard (*Sceloporus woodi*) | URS | N | N | N/A | - | | | | X | | X | | | |
| Sandhill/ scrub flatwoods | Short-tailed Snake (*Stilosoma extenuatum*) | URS | N | N | N/A | - | | | | X | | X | | | |
| Pine rocklands | Rim Rock Crowned Snake (*Tantilla oolitica*) | URS | N | N | N/A | - | | | | X | | X | | | |
| ***Amphibians***[a] | | | | | | | | | | | | | | | |
| Pond breeding | Reticulated Flatwoods Salamander (*Ambystoma bishopi*) | E | N | Y | N/A | 6 | | | | X | | X | X | | X |
| Pond breeding | Frosted Flatwoods Salamander (*Ambystoma cingulatum*) | T | N | Y | N/A | - | | | | X | | X | X | | X |
| Cave | Georgia Blind Salamander (*Eurycea wallacei*) | URS | N | Y (aquatic caves) | N/A | - | | | | | | | X | | X |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Pond breeding | Gopher Frog (*Lithobates capito*) | URS | N | Y | N/A | - | | | | X | | X | X | | X |
| Aquatic | Gulf Hammock Dwarf Siren (*Pseudobranchus striatus lustricolus*) | URS | N | Y | N/A | - | | | X | X | X | X | X | X | X |
| ***Fishes*** | | | | | | | | | | | | | | | |
| Sturgeon | Shortnose Sturgeon (*Acipenser brevirostrum*) | E | N | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Sturgeon | Gulf Sturgeon (*Acipenser oxyrinchus* [=*oxyrhynchus*] *desotoi*) | T | Y | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Sturgeon | Atlantic Sturgeon (*Acipenser oxyrinchus oxyrinchus*) | E* | Y | Y (streams) | N/A | - | | X | | | | | | | X |
| Benthic insectivore | Okaloosa Darter (*Etheostoma okalossae*) | T | N | Y (streams) | N/A | 1 | X | X | X | X | X | X | X | X | X |
| Topminnow | Saltmarsh Topminnow (*Fundulus jenkinsi*) | URS | N | Y (streams) | N/A | - | X | X | X | X | X | X | X | X | X |
| Sawfish | Smalltooth Sawfish (*Pristis pectinate*) | E* | Y | Y (streams) | N/A | 305 | | X | | X | X | X | X | X | X |
| ***Mollusks*** | | | | | | | | | | | | | | | |
| Mussel | Southern Elktoe (*Alasmidonta triangulata*) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | X | X |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Mussel | Fat Threeridge (*Amblema neislerii*) | E | Y | Y (streams) | N/A | 6 | | X | | X | X | X | X | X | X |
| Mussel | Rayed Creekshell (*Anodontoides radiatus*) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | X | X |
| Snail | Pygmy Siltsnail Snail (*Cincinnatia parva*) | URS | N | Y (streams) | N/A | - | | | | X | X | X | X | X | X |
| Snail | Ponderous Siltsnail Snail (*Cincinnatia ponderosa*) | URS | N | Y (streams) | N/A | - | | | | X | X | X | X | X | X |
| Mussel | Delicate Spike (*Elliptio arctata*) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | X | X |
| Mussel | Chipola Slabshell (*Elliptio chiplolaensis*) | T | Y | Y (streams) | N/A | 6 | | X | | X | X | X | X | X | X |
| Mussel | Purple Bankclimber (*Elliptoideus sloatianus*) | T | Y | Y (streams) | N/A | 8 | | X | | X | X | X | X | X | X |
| Mussel | Tapered Pigtoe (*Fusconaia burki*) | T | Y | Y (streams) | N/A | 8 | | X | | X | X | X | X | X | X |
| Mussel | Narrow Pigtoe (*Fusconaia escambia*) | T | Y | Y (streams) | N/A | 3 | | X | | X | X | X | X | X | X |
| Mussel | Round Ebonyshell (*Fusconaia rotulata*) | E | Y | Y (streams) | N/A | 2 | | X | | X | X | X | X | X | X |
| Mussel | Southern Sandshell (*Hamiota australis*) | T | Y | Y (streams) | N/A | 7 | | X | | X | X | X | X | X | X |
| Mussel | Shinyrayed Pocketbook (*Lampsilis subangulata*) | E | Y | Y | N/A | 6 | | X | | X | X | X | X | X | X |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Mussel | Gulf Moccasinshell (*Medionidus penicillatus*) | E | Y | Y (streams) | N/A | 6 | | X | | X | X | X | X | X | X |
| Mussel | Ochlockonee Moccasinshell (*Medionidus simpsonianus*) | E | Y | Y (streams) | N/A | 6 | | X | | X | X | X | X | X | X |
| Mussel | Suwannee moccasinshell (*Medionidus walker*) | T | Y | Y (streams) | N/A | | X | X | X | X | X | X | X | X | X |
| Snail | Stock Island Tree Snail (*Orthalicus reses* [not incl. *nesodryas*]) | T | N | Y | N/A | 2 | | | | X | | X | | | |
| Mussel | Oval Pigtoe (*Pleurobema pyriforme*) | E | Y | Y (streams) | N/A | 11 | | X | | X | X | X | X | X | X |
| Mussel | Fuzzy Pigtoe (*Pleurobema strodeanum*) | T | Y | Y (streams) | N/A | 7 | | X | | X | X | X | X | X | X |
| Mussel | Southern Kidneyshell (*Ptychobranchus jonesi*) | E | Y | Y (streams) | N/A | 7 | | X | | X | X | X | X | X | X |
| Mussel | Choctaw Bean (*Villosa choctawensis*) | E | Y | Y | N/A | 9 | | X | | X | X | X | X | X | X |
| ***Crustaceans*** | | | | | | | | | | | | | | | |
| Pond/ river/ stream | Cypress Crayfish (*Cambarellus blacki*) | URS | N | Y | N/A | - | | | | X | X | X | X | | X |
| Cave/well/ sinkhole | Florida Cave Amphipod | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| | (*Crangonyx grandimanus*) | | | | | | | | | | | | | | |
| Cave/well/ sinkhole | Hobb's Cave Amphipod (*Crangonyx hobbsi*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |
| Cave/well/ sinkhole | Squirrel Chimney Cave Shrimp (*Palaemonetes cummingi*) | T | N | Y (aquatic caves) | N/A | - | | | X | X | | X | X | X | X |
| Cave/well/ sinkhole | Orange Cave Crayfish (*Procambarus acherontis*) | URS | N | Y | N/A | - | | | | X | | X | X | | X |
| Pond/river/ stream | Coastal Flatwoods Crayfish (*Procambarus apalachicolae*) | URS | N | Y | N/A | - | | | | X | X | X | X | | X |
| Cave/well/ sinkhole | Silver Glen Springs Crayfish (*Procambarus attiguus*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |
| Cave/well/ sinkhole | Bigcheek Cave Crayfish (*Procambarus delicatus*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |
| Pond/river/ stream | Panama City Crayfish (*Procambarus econfinae*) | P | N | Y | N/A | - | | | | X | X | X | X | | X |
| Cave/well/ sinkhole | Santa Fe Cave Crayfish (*Procambarus erythrops*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Cave/well/ sinkhole | Orange Lake Cave Crayfish (*Procambarus franzi*) | URS | N | Y (aquatic caves) | N/A | - | | X | | X | | X | X | X | X |
| Cave/well/ sinkhole | Coastal Lowland Cave Crayfish (*Procambarus leitheuser*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |
| Cave/well/s inkhole | Florida Cave Crayfish (*Procambarus lucifugus*) | URS | N | Y (aquatic caves) | N/A | - | | X | | X | | X | X | X | X |
| Cave/well/ sinkhole | Miami Cave Crayfish (*Procambarus milleri*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |
| Cave/well/ sinkhole | Putnam County Cave Crayfish (*Procambarus morrisi*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |
| Cave/well/ sinkhole | Pallid Cave Crayfish (*Procambarus pallidus*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | | X | X | | X |
| Cave/well/ sinkhole | Black Creek Crayfish (*Procambarus pictus*) | URS | N | Y (aquatic caves) | N/A | - | | | | X | X | X | X | | X |
| Cave/well/ sinkhole | Spider Cave Crayfish (*Troglocambarus maclanei*) | URS | N | Y (aquatic caves) | N/A | - | | X | | X | | X | X | X | X |
| ***Insects*** | | | | | | | | | | | | | | | |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| | | | | | | | Major Stressors Associated with the Proposed Action | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Caddisfly | Logan's Agarodes Caddisfly (*Agarodes logani*) | URS | N | Y (streams) | N/A | - | | | | X | X | X | X | X | X |
| Butterfly | Florida Leafwing (*Anaea troglodyta floridalis*) | E | Y | N | N/A | - | | | | X | | X | | | |
| Butterfly | Frosted Elfin Butterfly (*Callophrys irus*) | UR | Y | N | N/A | - | | | X | X | | X | | | |
| Beetle | Miami Tiger Beetle (*Cicindelidia floridana*) | E | N | N | N/A | - | | | X | X | | X | | | |
| Butterfly | Nickerbean Blue Butterfly (*Cyclargus ammon*) | TS | N | N | N/A | - | | | | X | | X | | | |
| Butterfly | Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) | E | N | N | N/A | 1 | | | X | X | | X | | | |
| Butterfly | Monarch Butterfly (*Danaus plexippus plexippus*) | URS | N | N | N/A | - | | | | X | | X | | | |
| Butterfly | Duke's Skipper Butterfly (*Euphyes dukesi calhouni*) | URS | N | Y | N/A | - | | | | X | | X | X | | X |
| Butterfly | Palatka Skipper Butterfly (*Euphyes pilatka klotsi*) | URS | N | Y | N/A | - | | | | X | | X | X | | |
| Dragonfly | Westfall's Clubtail Dragonfly (*Gomphus westfalli*) | URS | N | Y (streams) | N/A | - | X | X | | X | X | X | X | | X |
| Butterfly | Ceraunus Blue Butterfly (*Hemiargus ceraunus antibubastus*) | TS | N | N | N/A | - | | | | X | | X | | | |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Butterfly | Schaus Swallowtail Butterfly (*Heraclides aristodemus ponceanus*) | E | N | N | N/A | 1 | | | | X | | X | X | | |
| Bee | Gulf Coast Solitary Bee (*Hesperapis oraria*) | URS | N | N | N/A | - | | | | X | | X | | | |
| Caddisfly | Sykora's Hydroptila Caddisfly (*Hydroptila sykorai*) | URS | N | Y (streams) | N/A | - | | | | X | X | X | X | | X |
| Caddisfly | Morse's Little Plain Brown Sedge Caddisfly (*Lepidostoma morsei*) | URS | NN | Y (streams) | N/A | - | | | | X | X | X | X | | X |
| Butterfly | Cassius Blue Butterfly (*Leptotes cassius theonus*) | TS | | N | N/A | - | | | | X | | X | | | |
| Dragonfly | Purple Skimmer Dragonfly (*Libellula jesseana*) | URS | N | Y (lakes) | N/A | - | X | X | | X | X | X | X | X | X |
| Beetle | American Burying Beetle (*Nicrophorus americanus*) | E | N | N | N/A | - | | | | | | X | | | |
| Caddisfly | Little oecetis longhorn caddisfly (*Oecetis parva*) | URS | N | Y (lakes) | N/A | - | | | | X | X | X | X | X | X |
| Dragonfly | Southern Snaketail Dragonfly (*Ophiogomphus australis*) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Bee | Blue Calamintha Bee (*Osmia calaminthae*) | URS | N | N | N/A | - | | | | X | | X | | | |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Dragonfly | Calvert's Emerald Dragonfly (*Somatochlora calverti*) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| Butterfly | Bartram's Scrub-hairstreak (*Strymon acis bartrami*) | E | Y | N | N/A | - | | | | X | | X | | | |
| Dragonfly | Yellow-sided Clubtail Dragonfly (*Stylurus potulentus*) | URS | N | Y (streams) | | - | | X | | X | X | X | X | | X |
| Caddisfly | Three-toothed Long-horned Caddisfly (*Triaenodes tridontus*) | URS | N | Y (streams) | N/A | - | | X | | X | X | X | X | | X |
| ***Plants*** | | | | | | | | | | | | | | | |
| Subshrub | Meadow Joint-vetch (*Aeschynomene pratensis*) | URS | N | Y | OBL | | | | X | X | | | | | |
| Shrub | Crenulate Lead-plant (*Amorpha crenulata*) | E | N | N | FAC | 2 | | | | X | | X | | | |
| Perennial Forb | Blodgett's Silverbush (*Argythamnia blodgettii*) | T | N | N | NL (UPL) | | | | X | | | X | | | |
| Shrub | Four-petal Pawpaw (*Asimina tetramera*) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Perennial Forb | Purpledisk Honeycombhead Sunflower (*Balduina atropurpurea*) | URS | N | Y | FACW | | | | | X | | | X | | |
| Perennial Forb | Apalachicola Wild Indigo (*Baptisia megacarpa*) | URS | N | Y | FACW | | | | X | X | | X | X | | |

-

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Perennial Forb | Florida Bonamia (*Bonamia grandiflora*) | T | N | N | NL (UPL) | | | | | | | | | | |
| Subshrub | Florida Brickell-bush (*Brickellia mosieri*) | E | Y | N | NL (UPL) | | | | X | | | | | | |
| Annual Forb | Brooksville Bellflower (*Campanula robinsiae*) | E | N | Y | FACW | | | | X | X | | | X | | X |
| Cactus | Fragrant Prickly-apple (*Cereus eriophorus* var. *fragrans*) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Perennial Forb | Deltoid Spurge (*Chamaesyce deltoidea* ssp. *Deltoidea*) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Perennial Forb | Pineland Sandmat (*Chamaesyce deltoidea pinetorum*) | T | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Wedge Spurge (*Chamaesyce deltoidea serpyllum*) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Annual Forb | Garber's Spurge (*Chamaesyce garberi*) | T | N | N | NL (UPL) | | | | X | | | | | | |
| Subshrub | Big Pine Partridge Pea (*Chamaecrista lineata keyensis*) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Shrub | Pygmy Fringe-tree (*Chionanthus pygmaeus*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Subshrub | Cape Sable Thoroughwort | E | N | N | NL (UPL) | 1 | | | X | | | | | | |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| | (*Chromolaena frustrate*) | | | | | | | | | | | | | | |
| Perennial Forb | Florida Golden Aster (*Chrysopsis floridana*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Lichen | Florida Perforate Cladonia (*Cladonia perforate*) | E | N | N | N/A | | | | | | | X | | | |
| Perennial Forb | Pigeon Wings (*Clitoria fragrans*) | F | N | N | NL (UPL) | | | | | | | | | | |
| Shrub | Short-leaved Rosemary (*Conradina brevifolia*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Shrub | Etonia Rosemary (*Conradina etonia*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Shrub | Apalachicola Rosemary (*Conradina glabra*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Cactus | Florida Semaphore Cactus (*Consolea corallicola*) | E | Y | N | NL (UPL) | | | | X | | | | | | |
| Perennial Forb | Ciliate-leaf Tickseed Sunflower (*Coreopsis integrifolia*) | E | Y | Y | FACW | | | | | X | | X | X | | |
| Perennial Forb | Avon Park Harebells (*Crotalaria avonensis*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Annual Forb | Okeechobee Gourd (*Cucurbita okeechobeensis* ssp. *okeechobeensis*) | E | N | Y | OBL | | | | | X | | X | X | | |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Shrub | Florida Prairie-Clover (*Dalea carthagenensis floridana*) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Subshrub | Beautiful Pawpaw (*Deeringothamnus pulchellus*) | E | N | Y | FAC | | | | X | | | | | | |
| Subshrub | Rugel's Pawpaw (*Deeringothamnus rugelii*) | E | N | Y | FACW | | | | | X | | | X | | |
| Perennial Forb | Garrett's Mint (*Dicerandra christmanii*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Longspurred Mint (*Dicerandra cornutissima*) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Perennial Forb | Scrub Mint (*Dicerandra frutescens*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Lakela's Mint (*Dicerandra immaculate*) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Graminoid | Florida Pineland Crabgrass (*Digitaria pauciflora*) | T | N | Y | FACW | | | | X | X | | | X | | |
| Perennial Forb | Clam-shell Orchid (*Encyclia cochleata* var. *triandra*) | NW | N | N | NL (UPL) | | | | | X | | | X | | |
| Perennial Forb | Big Cypress Epidendrum Orchid (*Epidendrum strobiliferum*) | URS | N | N | NL (UPL) | | | | | X | | | X | | |
| Perennial Forb | Blackbract Pipewort (*Eriocaulon nigrobracteatum*) | URS | N | Y | OBL | | | | | X | | | X | X | |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Perennial Forb | Scrub Buckwheat (*Eriogonum longifolium* var. *gnaphalifolium*) | T | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Snakeroot (Wedgeleaf Eryngo) (*Eryngium cuneifolium*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Telephus Spurge (*Euphorbia telephioides*) | T | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Small's Milkpea (*Galactia smallii*) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Perennial Forb | Harper's Beauty (*Harperocallis flava*) | E | N | N | FACW | | | | | X | | | X | | |
| Cactus | Aboriginal Prickly-apple (*Harrisia* (=*Cereus*) *aboriginum* (=*gracilis*)) | E | Y | N | FACU | 3 | | | X | | | | | | |
| Perennial Forb | Florida Hartwrightia Sunflower (*Hartwrightia floridana*) | URS | N | Y | OBL | | | | | X | | | | X | |
| Perennial Forb | Henry's Spider-lily (*Hymenocallis henryae*) | URS | N | N | OBL | | | | | X | | | | | |
| Perennial Forb | Highlands Scrub Hypericum (*Hypericum cumulicola*) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Shrub | Edison's Ascyrum St. Johns Wort | URS | N | Y | OBL | | | | | X | | | | | |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| | (*Hypericum edisonianum*) | | | | | | | | | | | | | | |
| Subshrub | Smooth Barked St. Johns Wort (*Hypericum lissophloeus*) | URS | N | Y | OBL | 1 | | | | X | | | X | | X |
| Tree | Yellow Anisetree (*Illicium parviflorum*) | NW | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | Beach Jacquemontia (*Jacquemontia reclinata*) | E | N | N | NL (UPL) | | | | X | | | X | | | |
| Perennial Forb | Cooley's Water-willow (*Justicia cooleyi*) | E | N | Y | FACW | | | | X | X | | | X | | |
| Perennial Forb | Scrub Blazingstar (*Liatris ohlingerae*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Panhandle Lily (*Lilium iridollae*) | URS | N | Y | OBL | | | | | X | | X | | | |
| Shrub | Bog Spicebush (*Lindera subcoriacea*) | URS | N | Y | OBL | 1 | | | | X | | | X | | |
| Perennial Forb | Sand Flax (*Linum arenicola*) | E | N | Y | OBL | | | | X | X | | | X | | |
| Annual Forb | Carter's Small Flowered Flax (*Linum carteri carteri*) | E | Y | Y | FACW | | | | X | X | | X | | | |
| Perennial Forb | West's Flax (*Linum westii*) | URS | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | Boykin's Lobelia (*Lobelia boykinii*) | URS | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | Raven's Seedbox (*Ludwigia ravenii*) | URS | N | Y | OBL | | | | | X | | | X | | |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Subshrub | Scrub Lupine (*Lupinus aridorum*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Subshrub | Curtis' Loosestrife (*Lythrum curtissii*) | URS | N | Y | OBL | 1 | | | | X | X | | X | | |
| Perennial Forb | Lowland Loosestrife (*Lythrum flagellare*) | URS | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | White Birds-in-a-nest (*Macbridea alba*) | T | N | Y | FACW | | | | | X | | | X | | |
| Perennial Forb | Godfrey's Stitchwort (*Minuartia godfreyi*) | URS | N | Y | FACW | | | | | X | | | X | | |
| Annual Forb | Needleleaf or Narrowleaf Naiad Water-nymph (*Najas filifolia*) | URS | N | Y | OBL | | | | X | X | | | X | | |
| Subshrub | Britton's Beargrass (*Nolina brittoniana*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Cape Sable Orchid (*Oncidium undulatum*) | URS | N | Y | NL (UPL) | | | | | X | | | X | | |
| Annual Forb | Papery Whitlow-wort (*Paronychia chartacea*) | T | N | N | NL (UPL) | | | | | X | | | X | | |
| Cactus | Key tree Cactus (*Pilosocereus robinii*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Godfrey's Butterwort (*Pinguicula ionantha*) | T | N | Y | OBL | | | | | X | | | | | |
| Perennial Forb | Lewton's Polygala Milkwort (*Polygala lewtonii*) | E | N | N | NL (UPL) | | | | X | | | | | | |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Perennial Forb | Tiny Polygala Milkwort (*Polygala smallii*) | E | N | N | FACU | | | | X | | | | | | |
| Annual Forb | Horton Wireweed (small) (*Polygonella basiramia*) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Perennial Forb | Sandlace (Woody Wireweed) (*Polygonella myriophylla*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Florida Pondweed (*Potamogeton floridanus*) | URS | N | Y | OBL | | | | | X | | | X | | X |
| Shrub | Scrub Plum (*Prunus geniculate*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | White Meadowbeauty (*Rhexia parviflora*) | URS | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | Panhandle Meadowbeauty (*Rhexia salicifolia*) | URS | N | Y | OBL | | | | | X | | X | X | X | X |
| Shrub | Chapman Rhododendron (*Rhododendron chapmanii*) | E | Y | Y | FACW | 2 | | | X | X | | | | | |
| Graminoid | Hairy Peduncled Beakrush (*Rhynchospora crinipes*) | URS | N | Y | OBL | | | | | X | X | | X | | X |
| Shrub | Miccosukee Gooseberry (*Ribes echinellum*) | T | N | Y | FAC | 1 | | | X | X | | | | | |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| Perennial Forb | Eared Coneflower (*Rudbeckia auriculata*) | URS | N | Y | FACW | | | | | X | | | X | | |
| Tree | Florida Willow (*Salix floridana*) | URS | N | Y | FACW | | | | X | X | | | X | | X |
| Perennial Forb | Gulf Sweet Pitcherplant (*Sarracenia rubra* ssp. *gulfensis*) | URS | N | Y | OBL | | | | | X | | | X | | |
| Perennial Forb | American Chaffseed (*Schwalbea americana*) | E | N | Y | FAC | | | | | X | X | | X | | |
| Perennial Forb | Florida Skullcap (*Scutellaria floridana*) | T | N | Y | OBL | | | | | X | | | X | | |
| Shrub | Everglades Bully (*Sideroxylon reclinatum* ssp. *austrofloridense*) | T | N | Y | FAC | | | | | X | | | X | | |
| Shrub | Georgia Bully (*Sideroxylon thorne*) | URS | N | N | NL (UPL) | | | | | X | | | | | |
| Perennial Forb | Fringed Campion (*Silene polypetala*) | E | N | N | NL (UPL) | | | | X | | | | | | |
| Perennial Forb | Gentian Pinkroot (*Spigelia gentianoides*) | E | N | N | NL (UPL) | | | | | | | | | | |
| Perennial Forb | Cooley's Meadow Rue (*Thalictrum cooleyi*) | E | N | Y | FACW | | | | | X | | | X | | |
| Tree | Florida Torreya (*Torreya taxifolia*) | E | N | N | NL (UPL) | | | | | | | | X | | |
| Perennial Forb | Florida Bristle Fern (*Trichomanes* | E | N | N | NL (UPL) | | | | X | | | X | | | |

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Major Stressors Associated with the Proposed Action | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| | | | | | | | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |
| | *punctatum* ssp. *floridanum*) | | | | | | | | | | | | | | |
| Perennial Forb | Ocala Vetch (*Vicia ocalensis*) | NW | N | Y | OBL | 3 | | | X | | | | X | | |
| Annual Forb | Wide-leaf Warea (*Warea amplexifolia*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Annual Forb | Carter's Mustard (*Warea carteri*) | E | N | N | NL (UPL) | | | | | | | X | | | |
| Perennial Forb | Karst Pond Xyris (*Xyris longisepala*) | URS | N | Y | OBL | | | | | X | | | X | | |
| Shrub | Florida Ziziphus (Jujube) (*Ziziphus celata*) | E | N | N | NL (UPL) | 1 | | | X | | | X | | | |

**Header Key:**
CN (SN) - Common Name (Scientific Name)
FLS – Federal Listing Status under the Endangered Species Act (ESA)
CH? – Has critical habitat been designated?
Wetlands - Are wetlands or waters regularly utilized by the species?
# ESA – Number of ESA consultations for this species in Florida over the last five years
IS – Wetland indicator status (plant-specific)
Competition – Competitive balance alteration
Predation – Predator/prey relationship alteration
Invasive species – Invasive species introduction/colonization
Hydro – Changes in hydrologic regime
Nutrients – Nutrient cycle exchange/alteration
WQ – Water Quality

**Table Text Key:**
[a] – Certain amphibian species may also be threatened by relocation during project activities (as this impact was not broadly applicable to other species, it was not included as a column in the table)

C.1.a. - Effects of the Action on ESA-listed Species - Stressors

| | | | | | | | Major Stressors Associated with the Proposed Action | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Biotic | | | Physical | | | | Chemical | |
| Guild | CN (SN) | FLS | CH? | Wetlands | IS | # ESA | Competition | Predation | Invasive Species | Fill | Dredging | Habitat Fragmentation | Hydro | Nutrients | WQ |

FLS – E (Endangered), T (Threatened), TS (Threatened due to Similarity of Appearance), C (Candidate), P (Proposed for listing), UR (Under Review), URS (Under Review, Substantial Finding), NW (Not Warranted Finding), * (Listing status of DPS that occurs in Florida. Other DPSs may have different listing statuses in other region).

CH – Y (Yes), N (No)

IS – OBL (Obligate), FACW (Facultative Wetland), FAC (Facultative), UPL (Upland), FACU (Facultative Upland), NL UPL (Not Listed, Generally Assumed to be Upland)

C.1.b.- Effects of the Action on ESA-listed Species - Findings

| Guild | CN (SN) | FLS | CH? | Finding | Comments (ESA determinations made for all species, including proposed, to encompass possibility for future listings) |
|---|---|---|---|---|---|
| ***Mammals*** | | | | | |
| Wetland/ marsh | Sherman's Short-tailed Shrew (*Blarina brevicauda shermani*) | URS | N | No effect | Habitat is described as edges of marshes or shallow depressions, mesic flatwoods, with abundant grasses; also drainage ditches with abundant grass cover. Threats include habitat loss and predation by cats. Current status is unknown, and it is possible thespecies has been extirpated (has not been located since 1995). As the species is likely extirpated, this action will have no effect on the subspecies. |
| Forest/ grasslands/ swamp | Gray Wolf (*Canis lupus*) | E | Y | No effect | As this species is extirpated from Florida, this action will have no effect on the species. |
| Forest/ grasslands/ swamp | Red Wolf (*Canis rufus*) | E | N | NLAA | The species occupies coastal prairies, forests, and swamps within these areas. In Florida, range limited to one island (St. Vincent; a USFWS National Wildlife Refuge). A major threat to Red Wolf populations is loss of genetic diversity from interbreeding with coyotes. As the species only occurs on protected lands, this action is NLAA the species. |
| Tropical hardwood hammock/mang rove | Florida Bonneted Bat (*Eumops floridanus*) | E | N | LAA | Occupies pineland, tropical hardwood, and mangrove habitat. Areas of freshwater wetlands are also important to the species. The bats roost singly or in small colonies in tree cavities (including Red-cockaded Woodpecker cavities), buildings, foliage, and rock crevices, as well as artificial roosts. Current threats to the species include a restricted range and small population size, habitat loss, limited roost sites, environmental stochasticity, and pesticides. Through impacts to habitat (loss and fragmentation) and water quality, the action could result in a LAA determination. |
| Wetland/ marsh | Florida Salt Marsh Vole (*Microtus pennsylvanicus dukecampbelli*) | E | N | LAA | Species occurs in salt marsh habitat. Decline of the species appears to be due to climatic changes and associated rise in sea level. Through impacts to habitat (loss and fragmentation) and water quality, the action could result in a LAA determination. |
| Caves | Gray Bat (*Myotis grisescens*) | E | N | NLAA | In Florida, the species occurs in a single county (Jackson) in the northwest Panhandle (limestone karst region). Threats to the species include roost disturbance (environmental or human-caused) and white-nose syndrome. Roosting (including some maternity roosts) has been documented in nine caves in this county (on both public and private and). Due to the restricted range of the species in Florida and the fact that the species has not recently used maternity caves in the state, the action is NLAA the species. |

| | | | | | |
|---|---|---|---|---|---|
| Caves | Little Brown Bat (*Myotis lucifugus occultus*) | UR | N | NLAA | The Little Brown Bat has been occasionally detected in northern Florida, although it is not common in the state. General habitat requirements include forested or herbaceous wetlands, hardwood and mixed forest, grassland, and scrub. Threats to the species include white-nose syndrome, climate change, pesticides, mortality from wind turbines, and habitat modification or destruction. Species is extremely uncommon in Florida and the action is NLAA the subspecies. |
| Caves | Indiana Bat (*Myotis sodalis*) | E | Y | NLAA | There are no current records of the species in Florida. However, there has been one historical winter record of the species in Old Indian Cave in Jackson County. Due to the restricted range of the species in Florida and the fact that the species has not recently been detected in the state, the action is NLAA the species. |
| Tropical hardwood hammock/mangrove | Key Largo Woodrat (*Neotoma floridana smalli*) | T | N | LAA | Inhabits tropical hardwood hammock forests. Currently the species is limited to North Key Largo, with is approximately half of its historical range. The woodrat's small and isolated populations are especially vulnerable to extinction because of a wide range of threats including demographic factors and natural catastrophes. Predation poses another significant risk, as they are depredated by a wide range of raptorial, reptilian, and mammalian (including free-roaming cats) predators. Based on the limited range and habitat preferences of the species, the action could result in a LAA determination. |
| Pine rockland | Key Deer (*Odocoileus virginianus clavium*) | E | N | LAA | Key Deer is found in the Florida Keys within 11 island complexes from Johnson Keys to Sugarloaf Key. Selectively uses hammock and pine rockland upland habitats. These habitats contain a substantial portion of their forage plants, fresh water, and cover, which is especially important for fawning. Ongoing threats include urbanization and vehicular collisions. Through direct impacts to habitat via fill, habitat fragmentation, and water quality, the action could result in a LAA determination. |
| Wetland/ marsh | Rice Rat (*Oryzomys palustris natator*) | E | Y | LAA | Inhabits mangrove swamps, saltmarsh flats, buttonwood transition vegetation, and fresh water cattail marshes in the lower Florida Keys. Rice rats are impacted by the continued development of the Lower Keys (dredge and fill), increased populations of predators (such as raccoons, cats, and dogs), and through competition with introduced black rats (*Rattus rattus*). Based on all the above-listed threats and impacts, this action could result in a LAA determination. |
| Wetland/ marsh | Pine Island Rice Rat (*Oryzomys palustris planirostris*) | URS | N | LAA | Subspecies is known from only two occurrences: on Pine Island (Florida Keys) and the adjacent mainland. Occurs in herbaceous wetlands. The rat's habitat is threatened with habitat destruction by filling and draining of wetlands and invasion of woody plants. Through impacts to habitat, water quality, and introduction of invasive species, this action could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Wetland/ marsh | Sanibel Island Rice Rat (*Oryzomys palustris sanibeli)* | URS | N | LAA | Restricted to Sanibel island. Occurs along the edge of freshwater swamps of artesian origin, including swales and cattail stands. While the subspecies is protected in part on Ding Darling National Wildlife Refuge, it is threatened by habitat destruction through drainage, filling of marshes, lowering of the water table for human use, and woody plant invasion. Through impacts to habitat, water quality, and introduction of invasive species, the action could result in a LAA determination. |
| Caves | Tricolored Bat (*Perimyotis subflavus*) | URS | N | LAA | The species is a permanent resident throughout the Florida peninsula. However, the majority of records are from the Panhandle. Habitat preferences include open landscapes bordered by woodland (e.g. hardwood woodlands, grasslands, abandoned fields, and urban landscapes. Roosts in caves and mines in the winter and trees, man-made structures, and caves in the summer. Tricolored Bats forage near water and in early successional forests. Threats to the species include white-nose syndrome, human disturbance of hibernacula, habitat loss and modification, pesticides, climate change, and mortality from wind energy . Action could result in habitat fragmentation for the species as well as impacts to hydrology and water quality. This could result in a LAA determination. |
| Tropical hardwood hammock/mang rove | Key Largo Cotton Mouse (*Peromyscus gossypinus allapaticola*) | E | N | NLAA | Inhabits tropical hardwood hammock forests as well as nearby Salicornia coastal strands. Currently the species is limited to North Key Largo (mostly on protected habitat). Free-roaming cats loss of hammock forest habitat through sea level rise (e.g., salt intolerant forest) are ongoing threats to their populations. Due to the species restricted range, primarily on protected land, the action is NLAA the subspecies. |
| Beach/ scrub dune | Choctawhatchee Beach Mouse (*Peromyscus polionotus allophrys*) | E | N | LAA | This species occurs in beach dune systems vegetated by sea oats (*Uniola paniculata*) and beach grasses, and adjacent interior scrub areas populated by oaks and sand pine or palmetto. Remaining populations of this subspecies exist in the sand dunes on Shell Island, Grayton Beach, and Topsail Hill in Florida. The predominant factor of decline for this species is habitat loss due to alteration or conversion of dunes (from human development and use). Through direct impacts to habitat via fill, dredging, and habitat fragmentation, the action could result in a LAA determination. |
| Beach/ scrub dune | Southeastern Beach Mouse (*Peromyscus polionotus niveiventris*) | T | N | LAA | Species occurs in beach dune systems vegetated by sea oats (*Uniola paniculata*) and dune panic grass, and adjacent interior scrub areas populated by oaks and sand pine or palmetto. The predominant factors of decline for this species are habitat loss due to alteration of conversion of dunes due to human development and use, and destruction of habitat due to hurricanes and storms. Through direct impacts to habitat via fill, dredging, and habitat fragmentation, the action could result in a LAA determination. |
| Beach/ scrub dune | St. Andrew Beach Mouse (*Peromyscus polionotus peninsularis*) | E | Y | LAA | Two existing populations of St. Andrew Beach Mouse inhabit East Crooked Island in Bay County and St. Joseph Peninsula in Gulf County. Habitat requirements include primary and secondary scrub dune ecosystems. St. Andrew Beach Mice face a suite of threats primarily related to habitat loss or degradation via urbanization and stochastic environmental events. Predation by feral cats is also a significant threat. Impacts to habitat could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Beach/ scrub dune | Anastasia Island Beach Mouse (*Peromyscus polionotus phasma*) | E | N | LAA | Currently, two populations of this subspecies exist on Anastasia Island: at Anastasia Island State Park and Fort Matanzas National Monument. This species occurs in beach dune systems vegetated by sea oats and dune panic grass and adjacent interior scrub areas populated by oaks and sand pine or palmetto. As the species strictly occurs on protected lands, the action is NLAA the subspecies. Possible adverse effects with restoration projects |
| Beach/ scrub dune | Perdido Key Beach Mouse (*Peromyscus polionotus trissyllepsis*) | E | N | LAA | Restricted to Perdido Key in Florida. Requires a mosaic of frontal and scrub dunes for food, burrow sites, and refuge habitat. Threats to the species include loss/fragmentation of habitat for land development, tropical storm damage and mortality, and predation by non-native species. Impacts to could result in a LAA determination. |
| Forests/ grasslands/swamps | Florida Panther (*Puma* [=*Felis*] *concolor coryi*) | E | N | LAA | Subspecies is limited to a single population in southern Florida. Panthers have vast home ranges, occur at low densities, and require large swaths of contiguous habitat. Incompatibility with urbanization continues to limit the recovery of this subspecies. Habitat fragmentation and loss also serve as significant threats to panthers. Additionally, vehicular collisions continue to limit panther population growth. Impacts to habitat (fragmentation) could result in a LAA determination. |
| Wetland/ marsh | Insular Hispid Cotton Rat (*Sigmodon hispidus insulicola*) | URS | N | LAA | Occurs within peninsular Florida and the Keys. The preferred habitat is herbaceous wetlands, grasslands, shrubland, and mixed woodlands. The rat is threatened by habitat destruction from urbanization. Impacts to habitat could result in a LAA determination. |
| Wetland/ marsh | Lower Keys Rabbit (*Sylvilagus palustris hefneri*) | E | N | LAA | Restricted to a small area of the Florida Keys. Occurs in saltmarsh, hammocks, and flatwoods. The rabbit's habitat is at risk due to development, dredging and filling of wetlands, human exploitation of very limited fresh water, and impacts from predators such as cats, dogs, and human poachers. Impacts to habitat could result in a LAA determination. |
| Aquatic | West Indian Manatee (*Trichechus manatus*) | T | Y | LAA | Florida manatees occur in freshwater, brackish and marine environments including coastal river estuaries, sloughs, canals, creeks, and lagoons. The species requires a source of freshwater for drinking. Threats to the species include human-caused mortality (watercraft collisions), interactions with commercial fishing gear, pollution, exposure to cold/loss of warm-water refugia, red tides, and impacts to habitat. Impacts to habitat and water quality could result in a LAA determination. |
| ***Birds*** | | | | | |
| Wetland/ marsh | Cape Sable Seaside Sparrow (*Ammodramus maritimus mirabilis*) | E | Y | LAA | Non-migratory residents of freshwater to brackish marshes. Inhabits freshwater marl prairies with muhly grass (short-hydroperiods, densely clumped grasses, and periodic fires). Impacts to wetland habitat and changes in hydrological regimes and water quality could result in a LAA determination. |
| Grassland | Florida Grasshopper Sparrow (*Ammodramus savannarum floridanus*) | E | N | LAA | Inhabits dry, treeless, flat prairies in central and southern Florida. Species is a ground nester and changes in hydrologic regimes have resulted in nest loss via flooding. Action could result in habitat fragmentation and changes in hydrologic regimes. This could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Wetland/ marsh | Saltmarsh Sparrow (*Ammospiza caudacutas*) | UR | N | LAA | Species inhabits coastal tidal marshes. Impacts to habitat, hydrology, and water quality could result in a LAA determination. |
| Upland scrub | Florida Scrub-jay (*Aphelocoma coerulescens*) | T | N | LAA | Restricted to early successional xeric scrub and scrub flatwood habitat in relict dunes located on Florida's central ridges and coasts, in areas defined by historic fires. Habitat interspersed with wetlands/swales. Action could result in habitat fragmentation for the species. This could result in a LAA determination. |
| Coastal tidal/marine | Rufa Red Knot (*Calidris canutus rufa*) | T | N | LAA | Any impacts to coastal waters (fill, dredging, etc.) could impact this species and could result in a LAA determination. |
| Forest/ forested wetland | Ivory-billed Woodpecker (*Campephilus principalis*) | E | N | No effect | This species is extirpated and potentially extinct. The action will have no effect on this species. |
| Coastal tidal/marine | Piping Plover (*Charadrius melodus*) | T* | Y | LAA | Wintering habitat preferences in Florida include bay beaches (vs. ocean facing beaches) and inlets with exposed intertidal areas and tide cast wrack. Threats to the species include habitat loss and degradation from urbanization and some shoreline stabilization efforts and sea level rise. Impacts to habitat, hydrology, and water quality could result in a LAA determination. |
| Grassland | Whooping Crane (*Grus americana*) | E | Y | NLAA | Wintering locations included tall grass prairie, wetlands, deltas, and interior tablelands along the southeast and Gulf Coast, including Florida. Reintroduced Whooping Cranes in Florida, located in the Kissimmee Prairie area (state protected land), are designated as an experimental, non-essential population (outside of federal lands, experimental populations are treated as proposed species; within federal lands, treated as threatened). Population size in Florida was 5 as of March 2019. The species is extirpated from all other areas of Florida. If actions occur on Kissimmee Prairie, the action may affect but is not likely to adversely affect the species. |
| Wetland/ marsh | Eastern Black Rail (*Laterallus jamaicensis* ssp. *jamaicensis*) | URS | N | LAA | Inhabits brackish, freshwater, and saltwater wetlands with dense vegetation cover. Impacts to habitat, hydrology, and water quality could result in a LAA determination. |
| Wetland/ marsh | Wood Stork (*Mycteria americana*) | T | N | LAA | Inhabits freshwater, estuarine wetlands, cypress and mangrove swamps, stock ponds, and seasonally flooded agricultural areas. Species dependent on hydrology to concentrate prey (fish). Altered hydrology regimes could impact foraging habitat. Impacts to prey resources, habitat, hydrology, and water quality could result in a LAA determination. |
| Grassland | Eskimo Curlew (*Numenius borealis*) | E | N | No effect | Extirpated (Florida likely only a historic stopover site only during migration). This action would have no effect on the species. |
| Pine savanna | Red-cockaded Woodpecker (*Picoides borealis*) | E | N | LAA | Endemic to old growth, pine savanna ecosystems. Action could result in habitat fragmentation for the species and could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Grassland | Audubon's Crested Caracara (*Polyborus plancus audubonii*) | T | N | LAA | Inhabits open, upland prairies, interspersed with ponds, marshes, and cabbage palm hammocks in south-central Florida. The majority of occupied habitat and nesting occurs on private lands. The species feeds on road-kill carrion as well as invertebrates and a variety of vertebrate prey (fish, reptiles, birds, eggs, etc.). Impacts to prey, habitat, and water quality could result in a LAA determination. |
| Coastal tidal/marine | Black-capped Petrel (*Pterodroma hasitata*) | P | N | No effect | Nests on the island of Hispaniola and forages offshore of the southeastern U.S. Off the coast of Florida, Black-capped Petrels may be found year-round in relatively shallow waters near shore. As this action does not encompass marine fill off the coast of Florida, the action will have no effect on this species. |
| Wetland/ marsh | Everglade Snail Kite (*Rostrhamus sociabilis plumbeus*) | E | Y | LAA | Species habitat preferences include freshwater marshes with shallow water, patchy emergent vegetation, and large expanses of open water for foraging. Threats to the species include habitat loss and fragmentation, hydrology management practices in the state (that may directly or indirectly impact both the kite and its prey), predation, invasive species (predators as well as the exotic apple snail (*Pomacea* spp.). Impacts associated with the action (including all of the above) could result in a LAA determination. |
| Coastal tidal/marine | Roseate Tern (*Sterna dougallii dougallii*) | T* | N | LAA | A metapopulation of the Caribbean Roseate Tern is known to breed in 12 areas of the Florida Keys. Species may nest on the ground or the roofs of buildings. Microhabitat features at nest sites include open sand, coral rubble, or rock. Impacts of the action associated with fill, and dredging in coastal areas could result in a LAA determination. |
| Forest/ forested wetland | Bachman's Wood Warbler (*Vermivora bachmanii*) | E | N | No effect. | The species is not known to currently occur in Florida. Species inhabited bottomland hardwood forested wetlands but is now believed to be extirpated. This action will have no effect on the species. |
| Forest/ forested wetland | Golden-winged Warbler (*Vermivora chrysoptera*) | URS | N | LAA | The species occurs in Florida strictly during migration. Habitat on migration is not well-documented, but may include forest edge and second-growth forest. Species hybridizes with Golden-winged Warbler, but this is not an issue in Florida as no breeding occurs in the state. Impacts to habitat, including fragmentation, and changes in hydrology/water quality could result in a LAA determination. |
| ***Reptiles*** | | | | | |
| Wetland/ marsh/ freshwater | American Alligator (*Alligator mississippiensis*) | TS | N | LAA | Inhabits variety of wetland habitats including but not limited to marshes, ponds, lakes, rivers, swamps, bayous, canals, and canals. The species is no longer considered to be "biologically endangered or threatened" but remains listed because of similarity of appearance. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Wetland/ marsh/ freshwater | Spotted Turtle (*Clemmys guttata*) | URS | N | LAA | Inhabits variety of shallow, isolated wetlands with clean water, soft substrate, and emergent or submerged vegetation. Major threats include habitat destruction and loss of wetlands, collection for the pet trade, road mortality, and invasive species. Through impacts to habitat, hydrology, and water quality, as well as aiding in the spread of invasive species, the action is LAA the species. |

| | | | | | |
|---|---|---|---|---|---|
| Swamp/ saltwater | American Crocodile (*Crocodylus acutus*) | T | Y | LAA | Inhabits mangrove-lined bays, swamps, creeks, and inland swamps. Major threats include habitat loss from development. Through impacts to habitat, hydrology, and water quality, the action is LAA the species. |
| Pine flatwoods | Eastern Diamondback Snake (*Crotalus adamanteus*) | URS | N | LAA | Inhabits longleaf pine savanna, and other open-canopy habitats with a dense herbaceous understory. Major threats include habitat conversion or loss, and malicious killing by humans. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands may be impacted. |
| Pine rocklands | Key Ringneck Snake (*Diadophis punctatus acricus*) | URS | N | LAA | Inhabits pine rocklands and rockland hammocks, usually near permanent fresh water in the Florida Keys. Storm surge and sea level rise could be a future risk given the low elevation of much of the remaining habitat. Action could result in habitat fragmentation of this species and could result in a LAA determination. |
| Pine flatwoods | Eastern Indigo Snake (*Drymarchon corais couperi*) | T | N | LAA | Inhabits variety of upland and lowland habitat types. Major threats to the species include habitat fragmentation, fire suppression leading to eventual habitat degradation, and road mortality. Action could result in habitat fragmentation of this species and could result in a LAA determination. |
| Sandhill/ scrub flatwoods | Gopher Tortoise (*Gopherus polyphemus*) | C* | N | LAA | Inhabits areas characterized by dry sandy soils, open canopy cover, and abundant herbaceous vegetation. Major threats include habitat loss, degradation, and fragmentation. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Wetland/ marsh/ freshwater | Escambia Map Turtle (*Graptemys ernsti*) | URS | N | LAA | Inhabits rivers with good flow, avoids backwaters and salt water, and nests along sandbars and river berms. Major threats include pollution. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Sandhill/ scrub flatwoods | Southern Hognose Snake (*Heterodon simus*) | NW | N | LAA | Inhabits open, xeric habitats with well-drained, sandy soils, dominated by pine or pine-oak woodland with an open canopy and grassy understory. Further studies are required to determine the factor or combination of factors that have caused the population to decline. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Wetland/ marsh/ freshwater | Apalachicola Common Kingsnake (*Lampropeltis getula meansi*) | URS | N | LAA | Inhabits wetland margins within longleaf pine flatwoods. Major threats include habitat loss. Through impacts to habitat, and hydrology, the action could result in a LAA determination. |
| Wetland/ marsh/ freshwater | Alligator Snapping Turtle (*Macrochelys termminckii*) | URS | N | LAA | Inhabits permanent water bodies. Major threats include overharvest in the exotic trade market and habitat loss.Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Wetland/ marsh/ freshwater | Atlantic Salt Marsh Snake (*Nerodia clarkii taeniata*) | T | N | LAA | Inhabits brackish coastal marshes. Major threats include habitat loss due to development and habitat degradation resulting from ditching, diking, and impoundments. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Sandhill/ scrub flatwoods | Florida Pine Snake (*Pituophis melanoleucus mugitus*) | URS | N | LAA | Inhabits well-drained sandy soils and relatively open canopy, including sandhills, xeric hammock, scrubby flatwoods, and dry prairie. Major threats are thought to include collecting, road mortality, and habitat loss. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Sandhill/ scrub flatwoods | Bluetail Mole Skink (*Plestiodon egregius lividus*) | T | N | LAA | Inhabits scrub and sandhill habitat, and is believed to require loose soils, moderate soil temperatures, and presence of vegetation. Major threats include habitat fragmentation and a lack of site management resulting in dense overgrown vegetation. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Sandhill/ scrub flatwoods | Sand Skink (*Plestiodon reynoldsi*) | T | N | LAA | Inhabits scrub and sandhill habitat and loose, un-compacted, coarse-grained soil is thought to be an important habitat component. Major threats include habitat fragmentation and a lack of site management resulting in dense overgrown vegetation. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Wetland/ marsh/ freshwater | Florida Red-bellied Turtle (*Pseudemys nelsoni*) | URS | N | LAA | Inhabits water rich with aquatic plant life, such as streams, ponds, lakes, ditches, sloughs, marshes, and mangrove-bordered creeks. Major threats include drought, predators, and illegal harvesting for food by turtle trappers. Through impacts to habitat, and hydrology, the action could result in a LAA determination. |
| Sandhill/ scrub flatwoods | Florida Scrub Lizard (*Sceloporus woodi*) | URS | N | LAA | Inhabits evergreen oak scrub and young sand pine scrub; and to a lesser extent sandhills adjacent to scrub or scrubby flatwoods. Major threats include habitat loss and fragmentation, and fire suppression. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Sandhill/ scrub flatwoods | Short-tailed Snake (*Stilosoma extenuatum*) | URS | N | LAA | Inhabits dry upland habitats of sandhill, xeric hammock, and sand pine scrub. Little is known about threats to this species. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Pine rocklands | Rim Rock Crowned Snake (*Tantilla oolitica*) | URS | N | LAA | Inhabits pine rockland and rockland hammock as well as disturbed urban environments including vacant lots, roadsides, and pastures. Major threats include habitat loss and fragmentation. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| ***Amphibians*** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Pond breeding | Reticulated Flatwoods Salamander (*Ambystoma bishopi*) | E | N | LAA | Requires breeding ponds and surrounding upland; impacts or fragmentation of either can cause LAA. |
| Pond breeding | Frosted Flatwoods Salamander (*Ambystoma cingulatum*) | T | N | LAA | Requires breeding ponds and surrounding upland; impacts or fragmentation of either can cause LAA. |
| Cave | Georgia Blind Salamander (*Eurycea wallacei*) | URS | N | NLAA | Limited to aquatic caves, alteration of hydrology or WQ is major concern. Based on habitat preferences, this action is NLAA the species. |
| Pond breeding | Gopher Frog (*Lithobates capito*) | URS | N | LAA | Requires breeding ponds and surrounding upland; impacts or fragmentation of either can cause LAA. |
| Aquatic | Gulf Hammock Dwarf Siren (*Pseudobranchus striatus lustricolus*) | URS | N | No effect | Extirpated, limited historic range. The action will have no effect on this species. |
| ***Fishes*** | | | | | |
| Sturgeon | Shortnose Sturgeon (*Acipenser brevirostrum*) | E | N | No effect | Inhabits rivers and estuaries. Major threats include habitat impediment (e.g., dams), habitat degradation (e.g., dredging and poor water quality), and fisheries bycatch. Through impacts to aquatic habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Sturgeon | Gulf Sturgeon (*Acipenser oxyrinchus* [=*oxyrhynchus*] *desotoi*) | T | Y | No effect | Inhabits rivers and Gulf of Mexico waters, but not expected in Action Area. Major threats include damming and disconnection of spawning grounds, as well as habitat modification due to dredging, navigation maintenance activities, and water pollution. Impacts to aquatic habitat, hydrology, and water quality. |
| Sturgeon | Atlantic Sturgeon (*Acipenser oxyrinchus oxyrinchus*) | E* | Y | No effect | Inhabits riverine and Atlantic coast waters, but not expected in Action Area. Major threats include fisheries bycatch, habitat degradation (e.g., dredging and poor water quality), habitat impediment (e.g. dams), and vessel strikes. Impacts to aquatic habitat, hydrology, and water quality. |
| Benthic insectivore | Okaloosa Darter (*Etheostoma okalossae*) | T | N | LAA | Inhabits dense vegetation, root mats, and detritus along clear, flowing stream margins in rivers. Most populations are believed to be stable or increasing at present, and vulnerability is primarily due to the small range and limited number of occurrences. Through impacts to aquatic habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Topminnow | Saltmarsh Topminnow (*Fundulus jenkinsi*) | URS | N | LAA | Inhabits small meandering channels of brackish marshes. Major threats include pollution and habitat destruction. Impacts to aquatic habitat, hydrology, and water quality. |
| Sawfish | Smalltooth Sawfish (*Pristis pectinate*) | E* | Y | No effect | Inhabits estuaries and coastal waters, but not expected in Action Area. Major threats include habitat loss and bycatch. Impacts to aquatic habitat, hydrology, and water quality. |
| ***Mollusks*** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Mussel | Southern Elktoe (*Alasmidonta triangulata*) | URS | N | LAA | Inhabits sandy substrates, such as sandbars, of rivers and larger creeks with moderate currents. Major threats include habitat degradation and fragmentation caused by dredging, impoundment, sedimentation, water extraction, and drought. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Fat Threeridge (*Amblema neislerii*) | E | Y | LAA | Inhabits the main channels of small to large rivers where the current is slow to moderate and the substrate varies from gravel to cobble to a mixture of sand and sandy mud. Major threats include anthropogenic habitat degradation caused by sedimentation, channelization, impoundment, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Rayed Creekshell (*Anodontoides radiatus*) | URS | N | LAA | Inhabits mud, sand, or gravel of large rivers as well as medium to small sized creeks in areas of moderate currents. Major threats are associated with stream modifications and come from a variety of sources including pesticide use, deforestation, damming, and water extraction. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Snail | Pygmy Siltsnail Snail (*Cincinnatia parva*) | URS | N | LAA | Inhabits Blue Spring, a freshwater karst spring run. Major threats include recreational activities, increased sedimentation from erosion and logging practices, invasive species, and any impacts to water quality. Impacts to freshwater spring habitat, changes in hydrological regimes and water quality could result in a LAA determination. |
| Snail | Ponderous Siltsnail Snail (*Cincinnatia ponderosa*) | URS | N | LAA | Inhabits vegetated areas, as well as in sand and gravel, in springs and rivers. Major threats include saltwater intrusion, groundwater extraction for human consumption, and pollution from development. Impacts to freshwater spring and stream habitat, changes in hydrological regimes and water quality could result in a LAA determination. |
| Mussel | Delicate Spike (*Elliptio arctata*) | URS | N | LAA | Inhabits areas of moderate currents among large rocks or in the sand and gravel underneath them. Major threats are related habitat degradation including damming, eutrophication and pollution, water extraction, deforestation, bank scouring, and sedimentation. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Chipola Slabshell (*Elliptio chiplolaensis*) | T | Y | LAA | Inhabits muddy and silty- sandy substrates in areas with slow to moderate currents. Major threats include dams, stream channelization, pollution, and sedimentation. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Purple Bankclimber (*Elliptoideus sloatianus*) | T | Y | LAA | Inhabits small to large rivers, often in the main channels, where there is moderate current. Major threats include habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Mussel | Tapered Pigtoe (*Fusconaia burki*) | T | Y | LAA | Inhabit areas with slow to moderate currents in medium creeks to medium rivers and occasionally floodplain lakes, where the substrate is stable and consists of sand, small gravel, or sandy mud. Major threats are habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Narrow Pigtoe (*Fusconaia escambia*) | T | Y | LAA | Inhabits substrate consisting of sand, gravel, sandy gravel, or silty sand and prefers slow to moderate currents within small to medium sized streams and rivers. Major threats include habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Round Ebonyshell (*Fusconaia rotulata*) | E | Y | LAA | Inhabits areas in rivers with moderate current on sand and gravel substrate. Major threats include habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Southern Sandshell (*Hamiota australis*) | T | Y | LAA | Inhabits areas with slow to moderate currents in small creeks and rivers, where the substrate is stable and consists of sand or a mix of sand and fine gravel. Major threats include habitat degradation caused by excessive sedimentation, stream bed destabilization, impoundment, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Shinyrayed Pocketbook (*Lampsilis subangulata*) | E | Y | LAA | Inhabits areas with slow to moderate currents in medium sized creeks to rivers, where the substrate consists of clean sand or silty sand. Major threats include anthropogenic habitat degradation caused by sedimentation, channelization, impoundment, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Gulf Moccasinshell (*Medionidus penicillatus*) | E | Y | LAA | Inhabits areas with a slow to moderate current in medium sized creeks to large rivers where the substrate consists of sand and gravel or silty sand. Major threats include habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Ochlockonee Moccasinshell (*Medionidus simpsonianus*) | E | Y | LAA | Inhabits sand with some gravel substrates in large creeks with current. Major threats include habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Mussel | Suwannee moccasinshell (*Medionidus walker*) | T | Y | LAA | Inhabits mud, muddy sand, sand, and gravel of larger streams with moderate flows. Major threats include chemical pollution, sedimentation from logging and agriculture, development, pollution from mining and agriculture, invasive species (experiences with the Asiatic Clam (*Corbicula fluminea*)), stream channel instability, water extraction, and eutrophication. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Snail | Stock Island Tree Snail (*Orthalicus reses* [not incl. *nesodryas*]) | T | N | LAA | Inhabits tropical hammock hardwood trees. Major threats include habitat degradation and loss. Action could result in habitat fragmentation of this species and could result in a LAA determination. |
| Mussel | Oval Pigtoe (*Pleurobema pyriforme*) | E | Y | LAA | Inhabits areas with slow to moderate current in medium-sized creeks to small rivers, where the substrate is silty sand to sand and gravel. Major threats include habitat alteration caused by impoundments, channelization, stream flow depletion, sedimentation, gravel mining, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Fuzzy Pigtoe (*Pleurobema strodeanum*) | T | Y | LAA | Inhabits areas with moderate flow in medium sized creek and rivers where the substrate is sand to silty sand. Major threats include habitat degradation caused by excessive sedimentation, stream bed destabilization, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Southern Kidneyshell (*Ptychobranchus jonesi*) | E | Y | LAA | Inhabits areas with slow to moderate currents in medium creeks tor small rivers, where the substrate consists of firm sand and near bedrock outcroppings. Major threats include habitat degradation caused by excessive sedimentation, stream bed destabilization, impoundment, and environmental contaminants. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| Mussel | Choctaw Bean (*Villosa choctawensis*) | E | Y | LAA | Inhabits silty sand and sandy clay substrates in medium-sized creeks and rivers with moderate currents. Major threats are habitat loss and degradation. Impacts to stream habitat, changes in hydrological regimes and water quality, or those that could affect their fish host species could result in a LAA determination. |
| ***Crustaceans*** | | | | | |
| Pond/ river/ stream | Cypress Crayfish (*Cambarellus blacki*) | URS | N | LAA | Inhabits cypress ponds. It is usually found within submergent and emergent vegetation. The major threat facing Cypress Crayfish is expansion of a nearby oil production facility. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Florida Cave Amphipod (*Crangonyx grandimanus*) | URS | N | LAA | Inhabits caves, wells, and karst springs. The species is likely threatened by changes in detrital flows and depletion of aquifers. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Cave/well/ sinkhole | Hobb's Cave Amphipod (*Crangonyx hobbsi*) | URS | N | LAA | Inhabits subterranean caves and wells. It is often associated with limestone and detritus, and found near cave entrances. It is likely threatened by changes in detrital flows and depletion of aquifers. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Squirrel Chimney Cave Shrimp (*Palaemonetes cummingi*) | T | N | LAA | Only known from the Squirrel Chimney, a small sinkhole that connects to a flooded cave system near Gainesville, Alachua County, Florida. Habitat for this species includes groundwater within a flooded limestone cave. Threats to the species include expanded development associated with the growth of Gainesville, Florida, which may alter land uses and groundwater in the vicinity of Squirrel Chimney. Stormwater runoff, septic tank drainage fields, aquifer recharge, herbicide/fertilizer use, and erosion/sediment deposition are some of the primary factors impacting groundwater quality. A small fish, the Redeye Chub (*Notropis harperi*), was detected in Squirrel Chimney during 1994-1996 surveys; this species is believed to prey on Squirrel Chimney Cave Shrimp. Therefore predation may also constitute a threat to the species. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Orange Cave Crayfish (*Procambarus acherontis*) | URS | N | LAA | Inhabits aquifers. It is associated with karst and the entrances of springs, sinkholes, and underground water features. The major threat facing Orlando Cave Crayfish is expanding human populations and development. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Pond/river/strea m | Coastal Flatwoods Crayfish (*Procambarus apalachicolae*) | URS | N | LAA | Inhabits still waters when water levels are high and burrows when waters recede. The species is usually found in detritus accumulations on the bottom of pools caused by root mats and logs, interspersed between areas of turbulence. They are restricted to a few small stream systems. Species is susceptible to pollution, changes in water temperature, siltation, and other changes in water quality. Protection of inhabited headwater and secondary streams is critical to the species' survival. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Silver Glen Springs Crayfish (*Procambarus attiguus*) | URS | N | LAA | This species has been documented from only one cave system in Ocala Natural Forest, Silver Glen Springs, Marion County, Florida. The species is threatened potentially by water pollution and disturbance from tourists (snorkelers and scuba divers, as the cave is a popular recreation area). Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Bigcheek Cave Crayfish (*Procambarus delicatus*) | URS | N | NLAA | Inhabits subterranean caves. Limited to only one cave system at Alexander Springs within the Ocala National Forest, Lake County, Florida. Their population is threatened by disturbance and habitat degradation from recreational use. As the species only occurs on federally-protect land, the action is NLAA the species. |

| | | | | | |
|---|---|---|---|---|---|
| Pond/river/stream | Panama City Crayfish (*Procambarus econfinae*) | P | N | LAA | Occupies shallow, often ephemeral, vegetated, freshwater systems in pine flatwoods or wet prairie/marsh habitats of Bay County, Florida. Threats to this species include habitat loss/degradation/fragmentation, development, hydrologic alterations, silviculture practices, and collection for fish bait. Through impacts to habitat, hydrology, and water quality, the action is could result in a LAA determination. |
| Cave/well/ sinkhole | Santa Fe Cave Crayfish (*Procambarus erythrops*) | URS | N | LAA | Inhabits subterranean pools within southern Suwannee County, Florida. The Santa Fe Cave Crayfish requires waters with low flows. The species is threatened hydrological changes, pollution, and saltwater intrusion. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Orange Lake Cave Crayfish (*Procambarus franzi*) | URS | N | LAA | Inhabits subterranean caves. It is associated with bat colonies and the detrital input provided. Its range is limited to Marion County, Florida, where it is known from three cave locations near Orange Lake. The species is particularly vulnerable because of its limited range and small numbers. The species may be sensitive to impacts to water quality from nearby quarrying. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Coastal Lowland Cave Crayfish (*Procambarus leitheuser*) | URS | N | LAA | Inhabits deep, subterranean, karst cave systems. Most areas of occurrence are tidally influenced and associated with silt. Populations are threatened by changes in water quality such as increased saltwater intrusion resulting from extraction of groundwater for human consumption. The species is additionally threatened by rapid urbanization. Through impacts to habitat, hydrology, and water quality, the action is could result in a LAA determination. |
| Cave/well/sinkhole | Florida Cave Crayfish (*Procambarus lucifugus*) | URS | N | LAA | Inhabits karstic subterranean caves and sinkholes. Populations are threatened directly by water quality degradation and indirectly by threats facing bat populations (species feeds on bat guano; "prey"). Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Miami Cave Crayfish (*Procambarus milleri*) | URS | N | LAA | Inhabits wells. It has been found at over a dozen sites, those these sites may be interconnected, including populations within the nearby Everglades As the species has an extremely limited range and population size within a metropolitan area, with continually increasing human pressures on aquifers, this species is especially vulnerable to extinction. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Putnam County Cave Crayfish (*Procambarus morrisi*) | URS | N | LAA | Limited to a single cave called Devil's Sink in Putnam County, Florida. This single population is particularly vulnerable to threats posed by water quality degradation as a result of heavy recreational use, pollution (including direct dumping), and groundwater depletion for human consumption. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Pallid Cave Crayfish (*Procambarus pallidus*) | URS | N | LAA | Inhabits caves. It is associated with areas of high flows and karst. Populations are threatened by pollution (because of their likely sensitivity to chemicals) and by disturbance from recreational diving. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Cave/well/ sinkhole | Black Creek Crayfish (*Procambarus pictus*) | URS | N | LAA | Inhabits small, relatively swift, sand-bottomed, tannic-stained streams, often emanating from sandhills and flowing through or from swampy terrain. Black Creek Crayfish are susceptible to pollution, changes in water temperature, siltation, and other changes in water quality. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Cave/well/ sinkhole | Spider Cave Crayfish (*Troglocambarus maclanei*) | URS | N | LAA | Inhabits subterranean caves and sinkholes near areas with fresh detrital input, such as bat caves. Major threats to the species include anthropogenic impacts on water quality and reduced detritus flows. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| ***Insects*** | | | | | |
| Caddisfly | Logan's Agarodes Caddisfly (*Agarodes logani*) | URS | N | LAA | Has only been observed from one stream in Gadsden County, Florida. As the population is restricted to such a small area and adjacent to an active farm, the species is at risk from farming practices which may result in pollution, siltation, or habitat degradation. Impacts to stream habitat near this species location, changes in hydrological regimes and water quality could result in a LAA determination. |
| Butterfly | Florida Leafwing (*Anaea troglodyta floridalis*) | E | Y | LAA | Inhabits pine rocklands. The species has only one host plant, the pineland croton (*Croton linearis*). Only one population within Everglades National Park is known to be extant. This species may be at imminent risk of extinction as the pinelands habitats on which it depends are very limited and continue to be destroyed by development and tropical storm events. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Butterfly | Frosted Elfin Butterfly (*Callophrys irus*) | UR | Y | LAA | Inhabits pine barrens. The major causes of population decline to their populations are habitat loss caused by development, invasive species, succession, and incompatible vegetation management, as well as the limiting factor of small population sizes. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Beetle | Miami Tiger Beetle (*Cicindelidia floridana*) | E | N | LAA | Prefers open, bare, white to gray sandy areas in pine rockland habitat. Threats to this species include habitat loss/degradation/fragmentation, development, non-native species encroachment, and specimen collection by enthusiasts. Habitat fragmentation could result in a LAA determination. |
| Butterfly | Nickerbean Blue Butterfly (*Cyclargus ammon*) | TS | N | LAA | Inhabits tropical hardwood hammock forests. Listed because of similar appearance, otherwise species seems stable. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |

| | | | | | |
|---|---|---|---|---|---|
| Butterfly | Miami Blue Butterfly (*Cyclargus thomasi bethunebakeri*) | E | N | LAA | Inhabits coastal hardwood hammocks, dunes, and scrub habitats. Current threats to the species include habitat loss and fragmentation, illegal collection, pesticides, impacts to host plants from introduced iguanas, loss of genetic diversity, and stochastic environmental events (natural or human-caused). Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Butterfly | Monarch Butterfly (*Danaus plexippus plexippus*) | URS | N | LAA | Widespread. Monarch populations face many threats, but primary among these is the loss of their host plants (milkweed, *Asclepias* spp.) as a result of intensive pesticide use, particularly glyphosate. Habitat fragmentation associated with the action could result in a LAA determination. |
| Butterfly | Duke's Skipper Butterfly (*Euphyes dukesi calhouni*) | URS | N | LAA | Inhabits sedge patches within wetlands and swamps. Threats include conversion of wetland habitat to urbanization, and pesticides. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Butterfly | Palatka Skipper Butterfly (*Euphyes pilatka klotsi*) | URS | N | LAA | Inhabits areas dominated by sawgrass near mangroves in tropical pinelands and sawgrass marshes. Major threats to the subspecies include habitat loss as a result of development, and the use of insecticides. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Dragonfly | Westfall's Clubtail Dragonfly (*Gomphus westfalli*) | URS | N | LAA | Inhabits sphagnum-bog trickles and streams. The primary threats to their populations are "excessive clearcutting" and altered fire regimes. Their extremely limited range (only about 25 kilometers) makes their populations especially vulnerable. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Butterfly | Ceraunus Blue Butterfly (*Hemiargus ceraunus antibubastus*) | TS | N | LAA | Inhabits grasslands, parks, along roadsides, and open woodlands. Listed because of similar appearance. The population in Florida is considered secure. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Butterfly | Schaus Swallowtail Butterfly (*Heraclides aristodemus ponceanus*) | E | N | LAA | It is currently limited to the Florida Keys. Populations are threatened by habitat destruction and biocides (as a result of mosquito control). This species is especially vulnerable to extinction because of its small size, isolated and small populations, and limited range. Through impacts to habitat (fragmentation and changes in hydrology), the action could result in a LAA determination. |
| Bee | Gulf Coast Solitary Bee (*Hesperapis oraria*) | URS | N | LAA | Inhabits sandy coastal dunes. Threats include: habitat loss, degradation, and fragmentation as a result of development; pesticide use; competition with European Honeybees; sea level rise and hurricanes (intensified by climate change); limited genetic diversity; and a lack of protection. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |

| | | | | | |
|---|---|---|---|---|---|
| Caddisfly | Sykora's Hydroptila Caddisfly (*Hydroptila sykorai*) | URS | N | LAA | This species has a very small range and is only known from two spring- run streams in Gadsden County, Florida. The species is at risk of nearby farming practices which may result in pollution, siltation, or habitat degradation. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Caddisfly | Morse's Little Plain Brown Sedge Caddisfly (*Lepidostoma morsei*) | URS | NN | LAA | Inhabits flowing waters, typically soft blackwater streams. This species is sensitive to siltation and pollution caused by practices such as unsustainable forestry and conversion of land to agricultural use. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Butterfly | Cassius Blue Butterfly (*Leptotes cassius theonus*) | TS | | LAA | Inhabits grassland, urban areas, hardwood forests, and scrub. Listed because of similar appearance, otherwise species seems stable. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Dragonfly | Purple Skimmer Dragonfly (*Libellula jesseana*) | URS | N | LAA | Inhabits "clear-water, sand-bottomed lakes bordered by maiden-cane grass and St. John's Wort shrubs. Currently, the species might may only remain at a single lake within a state park. This species is extremely sensitive to pollution and eutrophication. The major threat to populations is lakeshore development and impacts to water quality. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Beetle | American Burying Beetle (*Nicrophorus americanus*) | E | N | No effect | Extirpated in Florida. This action would have no effect on the species. |
| Caddisfly | Little oecetis longhorn caddisfly (*Oecetis parva*) | URS | N | LAA | Inhabits natural lakes and springs. This species is sensitive to activities that affect water quality and hydrologic regimes such as agriculture, urban development, forestry, water withdrawal, and nutrient loading. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Dragonfly | Southern Snaketail Dragonfly (*Ophiogomphus australis*) | URS | N | LAA | Inhabits graveled streams. Major threats to their populations are water quality degradation from a variety of sources including gravel mining, pesticide use, and deforestation. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Bee | Blue Calamintha Bee (*Osmia calaminthae*) | URS | N | LAA | Inhabits sand pine and scrub habitat, as a specialist on the threatened Asher's calamint (*Calamintha ashei*).Threats include pesticide drift and destructive off-road recreational activities. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |
| Dragonfly | Calvert's Emerald Dragonfly (*Somatochlora calverti*) | URS | N | LAA | Habitat is unknown but is thought to include "boggy forest seepages." Little is known about the threats that affect this species. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Butterfly | Bartram's Scrub-hairstreak (*Strymon acis bartrami*) | E | Y | LAA | Inhabits pine rocklands. The pineland croton is the host plant. The subspecies is threated by fire suppression, habitat loss, and climate change/sea level rises. Although the species does not use wetlands/waters of the US during any stage of their life history, the action is LAA the species because uplands adjacent to wetlands could be impacted. |

| | | | | | |
|---|---|---|---|---|---|
| Dragonfly | Yellow-sided Clubtail Dragonfly (*Stylurus potulentus*) | URS | N | LAA | Inhabits pristine stream and river habitats with sandy bottoms. The major threat is pollution as a result of development, clearcutting, and pesticide use. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Caddisfly | Three-toothed Long-horned Caddisfly (*Triaenodes tridontus*) | URS | N | No effect | Extirpated in Florida. This action would have no effect on the species. |
| ***Plants*** | | | | | |
| Subshrub | Meadow Joint-vetch *(Aeschynomene pratensis*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and potential for invasive species introduction, the action could result in a LAA determination. |
| Shrub | Crenulate Lead-plant (*Amorpha crenulata*) | E | N | LAA | This species is restricted to poorly-drained Opalocka sands within pine rocklands or in wet prairies with Opalocka-rock outcrop complex soil. Impacts to wetlands may affect this species. Through impacts to habitat, the action could result in a LAA determination. |
| Perennial Forb | Blodgett's Silverbush (*Argythamnia blodgettii*) | T | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Shrub | Four-petal Pawpaw (*Asimina tetramera*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Purpledisk Honeycombhead Sunflower (*Balduina atropurpurea*) | URS | N | LAA | Habitat for this species includes wet pine flatwoods and savannas, seepage slopes, pitcherplant bogs, and wet ditches. Through impacts to habitat and changes in hydrologic regime, the action could result in a LAA determination. |
| Perennial Forb | Apalachicola Wild Indigo (*Baptisia megacarpa*) | URS | N | LAA | Habitat includes mixed hardwood and hardwood-pine forests, in proximity to floodplains, streams, or ravines. Through impacts to habitat, changes in hydrologic regime, and potential for invasive species introduction, the action could result in a LAA determination. |
| Perennial Forb | Florida Bonamia (*Bonamia grandiflora*) | T | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Subshrub | Florida Brickell-bush (*Brickellia mosieri*) | E | Y | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Annual Forb | Brooksville Bellflower (*Campanula robinsiae*) | E | N | LAA | There are only four, possibly five sites where this wetland dependent species occurs. Four of these sites meet recovery criteria of being protected. If wetland impacts occurred at the site on private land, this could result in a LAA determination. This species occurs in wet prairies and along the edges of ponds near pastureland or in adjacent hardwood forests. |

| | | | | | |
|---|---|---|---|---|---|
| Cactus | Fragrant Prickly-apple (*Cereus eriophorus* var. *fragrans*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the varietal. |
| Perennial Forb | Deltoid Spurge (*Chamaesyce deltoidea* ssp. *Deltoidea*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the subspecies. |
| Perennial Forb | Pineland Sandmat (*Chamaesyce deltoidea pinetorum*) | T | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the subspecies. |
| Perennial Forb | Wedge Spurge (*Chamaesyce deltoidea serpyllum*) | E | N | No effect | This species is has a very restricted range. It is endemic to, and known only from Big Pine Key. However, habitat for this species is upland pine rocklands and along roadways. Based on habitat requirements, the action is anticipated to have no effect on the subspecies. |
| Annual Forb | Garber's Spurge (*Chamaesyce garberi*) | T | N | No effect. | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Subshrub | Big Pine Partridge Pea (*Chamaecrista lineata keyensis*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Shrub | Pygmy Fringe-tree (*Chionanthus pygmaeus*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Subshrub | Cape Sable Thoroughwort (*Chromolaena frustrate*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Florida Golden Aster (*Chrysopsis floridana*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Lichen | Florida Perforate Cladonia (*Cladonia perforate*) | E | N | No effect. | Occurs in dry scrub environments. The action is anticipated to have no effect on the species. |
| Perennial Forb | Pigeon Wings (*Clitoria fragrans*) | F | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Shrub | Short-leaved Rosemary (*Conradina brevifolia*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |

| | | | | | |
|---|---|---|---|---|---|
| Shrub | Etonia Rosemary (*Conradina etonia*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Shrub | Apalachicola Rosemary (*Conradina glabra*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Cactus | Florida Semaphore Cactus (*Consolea corallicola*) | E | Y | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Ciliate-leaf Tickseed Sunflower (*Coreopsis integrifolia*) | E | Y | LAA | This species occurs in floodplain and streambank habitats, on the edges of swamp forests, and the borders of brackish marshes. Through impacts to habitat and changes in hydrology, the action could result in a LAA determination. |
| Perennial Forb | Avon Park Harebells (*Crotalaria avonensis*) | E | N | No effect | Habitat is xeric white sand scrub. However, this species is known from only three sites in Polk and Highlands Counties near Avon Park. The action is anticipated to have no effect on the species. |
| Annual Forb | Okeechobee Gourd (*Cucurbita okeechobeensis* ssp. *okeechobeensis*) | E | N | LAA | There are only two natural populations of this annual vine in Florida. It is a wetland obligate formerly known from swampy forest and hammocks. This species is presently restricted to the banks of ditches and wet road shoulders. Through impacts to habitat and changes in hydrologic regime, the action is LAA the species. |
| Shrub | Florida Prairie-Clover (*Dalea carthagenensis floridana*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the subspecies. |
| Subshrub | Beautiful Pawpaw (*Deeringothamnus pulchellus*) | E | N | LAA | This facultative species generally occurs in upland habitat in xeric and mesic pine flatwoods. As pine flatwoods are often bordered by wetlands, impacts to wetland habitats may affect this species. Through potential introduction of invasive species, the action could result in a LAA determination. |
| Subshrub | Rugel's Pawpaw (*Deeringothamnus rugelii*) | E | N | LAA | This species occurs in mesic and wet flatwood habitats. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Garrett's Mint (*Dicerandra christmanii*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Longspurred Mint (*Dicerandra cornutissima*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Scrub Mint (*Dicerandra frutescens*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |

| | | | | | |
|---|---|---|---|---|---|
| Perennial Forb | Lakela's Mint (*Dicerandra immaculate*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Graminoid | Florida Pineland Crabgrass (*Digitaria pauciflora*) | T | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat, hydrology, and potential invasive species introduction, the action could result in a LAA determination. |
| Perennial Forb | Clam-shell Orchid (*Encyclia cochleata* var. *triandra*) | NW | N | LAA | Epiphytic orchid occurring on trees in wetlands so impacts to wetlands may impact this species. Through impacts to habitat and changes in hydrologic regime, the action could result in a LAA determination. |
| Perennial Forb | Big Cypress Epidendrum Orchid (*Epidendrum strobiliferum*) | URS | N | LAA | Habitat for this epiphytic orchid is generally pop ash and pond apple inhabiting swamps and sloughs which would be affected by impacts to wetlands. Impacts to habitat could result in LAA determination. |
| Perennial Forb | Blackbract Pipewort (*Eriocaulon nigrobracteatum*) | URS | N | LAA | This species is endemic to Florida and occurs in wetland habitats. Impacts to habitat and changes in hydrology/nutrient cycles could result in a LAA determination. |
| Perennial Forb | Scrub Buckwheat (*Eriogonum longifolium* var. *gnaphalifolium*) | T | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the varietal. |
| Perennial Forb | Snakeroot (Wedgeleaf Eryngo) (*Eryngium cuneifolium*) | E | N | No effect | This is an upland species and although it has an extremely restricted range, most of the 20 known occurrences are located on three preserves. The action is anticipated to have no effect on the species. |
| Perennial Forb | Telephus Spurge (*Euphorbia telephioides*) | T | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Small's Milkpea (*Galactia smallii*) | E | N | No effect | This Florida endemic species is known from only six populations in pine rockland habitat. However, five of these populations are on managed areas. Based on this restricted range on protected lands, the action is anticipated to have no effect on the species. |
| Perennial Forb | Harper's Beauty (*Harperocallis flava*) | E | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Impacts to habitat and changes in hydrology could result in a LAA determination. |
| Cactus | Aboriginal Prickly-apple (*Harrisia* (=*Cereus*) *aboriginum* (=*gracilis*)) | E | Y | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Florida Hartwrightia Sunflower (*Hartwrightia floridana*) | URS | N | LAA | This species occurs in a variety of wetland habitats including acidic seeps and bogs among others. Impacts to habitat, hydrology, and nutrient cycles could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Perennial Forb | Henry's Spider-lily (*Hymenocallis henryae*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Impacts to habitat and changes in hydrology could result in a LAA determination. |
| Perennial Forb | Highlands Scrub Hypericum (*Hypericum cumulicola*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Shrub | Edison's Ascyrum St. Johns Wort (*Hypericum edisonianum*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Subshrub | Smooth Barked St. Johns Wort (*Hypericum lissophloeus*) | URS | N | LAA | This species occurs on the fluctuating shores of karst ponds and small sandhill lakes. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Tree | Yellow Anisetree (*Illicium parviflorum*) | NW | N | LAA | Occurs on the banks of spring run or seepage springs, hydric hammock, and bottomland forest. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Beach Jacquemontia (*Jacquemontia reclinata*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Cooley's Water-willow (*Justicia cooleyi*) | E | N | LAA | This Florida endemic species occurs in several wetland habitats including streams, swamp woodlands, and also in mesic hammocks. Through impacts to habitat, hydrology, and the potential fo invasive species introduction, the action could result in a LAA determination. |
| Perennial Forb | Scrub Blazingstar (*Liatris ohlingerae*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Panhandle Lily (*Lilium iridollae*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat, the action could result in a LAA determination. |
| Shrub | Bog Spicebush (*Lindera subcoriacea*) | URS | N | LAA | This species has a narrow ecological niche. It is often found in sphagnum bogs, or seepage bogs. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Sand Flax (*Linum arenicola*) | E | N | LAA | Nature Serve reports this species occurs in temporary pools of palustrine habitats, and further states that it is documented from solution pits and shallow soils of ephemeral pools on limerock in open pinelands. Through impacts to habitat and hydrology, the action could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Annual Forb | Carter's Small Flowered Flax (*Linum carteri carteri*) | E | Y | LAA | This species occurs in disturbed margins of pine rocklands. Pine rockland habitat has been greatly reduced, especially outside of Everglades National Park, where only one percent of pinelands remain as fragmented patches. Through impacts to habitat and potential for invasive species introduction, the action is LAA the species. |
| Perennial Forb | West's Flax (*Linum westii*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Boykin's Lobelia (*Lobelia boykinii*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Raven's Seedbox (*Ludwigia ravenii*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Subshrub | Scrub Lupine (*Lupinus aridorum*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Subshrub | Curtis' Loosestrife (*Lythrum curtissii*) | URS | N | LAA | Occurs in bogs, seeps, acid or calcareous swamps, karst ponds, creek swamps, floodplains, tidal flats, streambanks, and tidal river mouths. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Lowland Loosestrife (*Lythrum flagellare*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | White Birds-in-a-nest (*Macbridea alba*) | T | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Godfrey's Stitchwort (*Minuartia godfreyi*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Annual Forb | Needleleaf or Narrowleaf Naiad Water-nymph (*Najas filifolia*) | URS | N | LAA | Habitat for this annual aquatic species is typically tannic-acid tinted ponds and lakes. Through impacts to habitat, hydrology, and potential invasive species introduction, the action is LAA the species. |
| Subshrub | Britton's Beargrass (*Nolina brittoniana*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Cape Sable Orchid (*Oncidium undulatum*) | URS | N | LAA | This is an epiphytic orchid that attaches to tree trunks in hammocks, cypress swamps, buttonwood forest, and cypress swamps. Through impacts to habitat and hydrology, the action could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Annual Forb | Papery Whitlow-wort (*Paronychia chartacea*) | T | N | LAA | There are two distinct subspecies, both are listed. *Paryonychia chartacea* ssp. *minima* occurs almost exclusively on the sandy margins of karst ponds and impacts to Karst ponds could result in a LAA determination for this subspecies. |
| Cactus | Key tree Cactus (*Pilosocereus robinii*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Godfrey's Butterwort (*Pinguicula ionantha*) | T | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat, the action could result in a LAA determination. |
| Perennial Forb | Lewton's Polygala Milkwort (*Polygala lewtonii*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Tiny Polygala Milkwort (*Polygala smallii*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Annual Forb | Horton Wireweed (small) (*Polygonella basiramia*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Sandlace (Woody Wireweed) (*Polygonella myriophylla*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Florida Pondweed (*Potamogeton floridanus*) | URS | N | LAA | Submerged aquatic herb inhabiting slow moving backwater streams and rivers. Known form only the Blackwater River and its tributaries. Through impacts to habitat and hydrology/water quality, the action could result in a LAA determination. |
| Shrub | Scrub Plum (*Prunus geniculate*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | White Meadowbeauty (*Rhexia parviflora*) | URS | N | LAA | Occurs in wetland habitats and is sensitive to changes in ground and surface hydrology. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Panhandle Meadowbeauty (*Rhexia salicifolia*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat, hydrology, nutrient cycles, and water quality, the action could result in a LAA determination. |
| Shrub | Chapman Rhododendron (*Rhododendron chapmanii*) | E | Y | LAA | This species usually inhabits the transitional area between upland mesic or scrubby flatwoods and floodplain swamps or baygalls. Through impacts to habitat and potential introduction of invasive species, the action could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Graminoid | Hairy Peduncled Beakrush (*Rhynchospora crinipes*) | URS | N | LAA | Occurs in riparian habitats along stream channels and terraces and sand-caly bars. Through impacts to habitat, hydrology, and water quality, the action could result in a LAA determination. |
| Shrub | Miccosukee Gooseberry (*Ribes echinellum*) | T | N | LAA | This species occurs in mesic forest communities. Through impacts to habitat and potential introduction of invasive species, the action could result in a LAA determination. |
| Perennial Forb | Eared Coneflower (*Rudbeckia auriculata*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Tree | Florida Willow (*Salix floridana*) | URS | N | LAA | This species occurs in roadside ditches, near springs, hydric hammocks, and densely wooded floodplains. Through impacts to habitat, hydrology, and potential introduction of invasive species, the action could result in a LAA determination. |
| Perennial Forb | Gulf Sweet Pitcherplant (*Sarracenia rubra* ssp. *gulfensis*) | URS | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | American Chaffseed (*Schwalbea americana*) | E | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Perennial Forb | Florida Skullcap (*Scutellaria floridana*) | T | N | LAA | A LAA finding without a species-specific comment presented in this column, was made for several wetland associated species. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Shrub | Everglades Bully (*Sideroxylon reclinatum* ssp. *austrofloridense*) | T | N | LAA | This species occurs in low-lying oak flatwoods. Through impacts to habitat and hydrology, the action could result in a LAA determination. |
| Shrub | Georgia Bully (*Sideroxylon thorne*) | URS | N | LAA | This species occurs in wet woods bordering streams or cypress ponds so there is potential for this species to be affected by impacts to wetlands. Through impacts to habitat, the action could result in a LAA determination. |
| Perennial Forb | Fringed Campion (*Silene polypetala*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Gentian Pinkroot (*Spigelia gentianoides*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Cooley's Meadow Rue (*Thalictrum cooleyi*) | E | N | LAA | This species occurs in bogs and wet pine savannahs, flatwoods and seepage slopes. In Florida this species is known from only one occurrence, on a timber company land utility right of way through former flatwoods. This population may be extirpated (USFWS 2009). However as this possible occurrence is on private property, impacts could occur. Through impacts to habitat and hydrology, the action could result in a LAA determination. |

| | | | | | |
|---|---|---|---|---|---|
| Tree | Florida Torreya (*Torreya taxifolia*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Perennial Forb | Florida Bristle Fern (*Trichomanes punctatum* ssp. *floridanum*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on this subspecies. |
| Perennial Forb | Ocala Vetch (*Vicia ocalensis*) | NW | N | NLAA | All known occurrences of this obligate wetland species are from the Ocala National Forest and Lake Woodruff National Wildlife Refuge. It is threatened by hydrologic changes from logging. However, since all known occurrences are on protected land, the action is NLAA the species. |
| Annual Forb | Wide-leaf Warea (*Warea amplexifolia*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |
| Annual Forb | Carter's Mustard (*Warea carteri*) | E | N | No effect | A no effects finding without a species-specific comment presented in this column, was generally made for upland species not thought to occur in or on margins of wetland habitats. The action is anticipated to have no effect on the species. |

FLS – Federal Listing Status under the Endangered Species Act (ESA) CH? –
Has critical habitat been designated?

**Table Text Key:**

FLS – E (Endangered), T (Threatened), TS (Threatened due to Similarity of Appearance), C (Candidate), P (Proposed for listing), UR (Under Review), URS (Under Review, Substantial Finding), NW (Not Warranted Finding), * (Listing status of DPS that occurs in Florida. Other DPSs may have different listing statuses in other region).

CH – Y (Yes), N (No)

Finding – NLAA (May Affect Not Likely to Adversely Affect), LAA (May Affect Likely to Adversely Affect)

# Appendix D
## Figures 1 through 6



Alabama
Georgia
Florida
Gulf of Mexico
Legend
Freshwater Forested Wetlands
Freshwater Non-Forested Wetlands
Natural Lakes and Ponds
Rivers and Streams
Data Disclaimer
** Some habitat distributions or locations may be misrepresented on this map due to size, resolution, map overlay difficulties and insufficient data sources **
Paper Size ANSI A
0 10 20 30 40
Miles
Map Projection: Transverse Mercator
Horizontal Datum: North American 1983
Grid: NAD 1983 StatePlane Florida West FIPS 0902 Feet
N
Florida Department of Environmental Protection
404 Assumption Biological Assessment
Project No. 11206416
Revision No. -
Date June 16, 2020
Combined Freshwater Wetlands
FIGURE 1

Alabama
Georgia
Florida
Gulf of Mexico
Legend
Freshwater Non-Forested Wetlands
Marshes
Prairies and Bogs
Data Disclaimer
** Some habitat distributions or locations may be misrepresented on this map due to size, resolution, map overlay difficulties and insufficient data sources **
Paper Size ANSI A
0 10 20 30 40
Miles
Map Projection: Transverse Mercator
Horizontal Datum: North American 1983
Grid: NAD 1983 StatePlane Florida West FIPS 0902 Feet
N
FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION
Florida Department of Environmental Protection
404 Assumption Biological Assessment
Freshwater Habitats
Non-Forested Wetlands
Project No. 11206416
Revision No. -
Date June 16, 2020
FIGURE 2

Alabama
Georgia
Florida
Gulf of
Mexico
Legend
Coniferous Dominated Wetlands
Cypress /Tupelo
Other Wetland Forest Mixed
Hardwood Dominated Wetlands
Data Disclaimer
** Some habitat distributions or locations may be misrepresented on this map due to size, resolution, map overlay difficultues and insufficient data sources **
Paper Size ANSI A
0 10 20 30 40
Miles
Map Projection: Transverse Mercator
Horizontal Datum: North American 1983
Grid: NAD 1983 StatePlane Florida West FIPS 0902 Feet
N
FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION
Florida Department of Environmental Protection
404 Assumption Biological Assessment
Freshwater Habitats
Freshwater Forested Wetlands
Project No. 11206416
Revision No. -
Date June 16, 2020
FIGURE 3

Alabama
Georgia
Florida
Gulf of Mexico
Legend
Natural Lakes and Ponds
Data Disclaimer
** Some habitat distributions or locations may be misrepresented on this map due to size, resolution, map overlay difficulties and insufficient data sources **
Paper Size ANSI A
0 10 20 30 40
Miles
Map Projection: Transverse Mercator
Horizontal Datum: North American 1983
Grid: NAD 1983 StatePlane Florida West FIPS 0902 Feet
N
FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION
Florida Department of Environmental Protection
404 Assumption Biological Assessment
Freshwater Habitats
Lakes
Project No. 11206416
Revision No. -
Date June 16, 2020
FIGURE 4

Alabama
Georgia
Florida
Gulf of Mexico
Legend
Rivers and Streams
Data Disclaimer
** Some habitat distributions or locations may be misrepresented on this map due to size, resolution, map overlay difficulties and insufficient data sources **
Paper Size ANSI A
0 10 20 30 40
Miles
Map Projection: Transverse Mercator
Horizontal Datum: North American 1983
Grid: NAD 1983 StatePlane Florida West FIPS 0902 Feet
N
Florida Department of Environmental Protection
404 Assumption Biological Assessment
Freshwater Habitats
Rivers and Streams
Project No. 11206416
Revision No. -
Date June 16, 2020
FIGURE 5

Alabama
Georgia
Florida
Gulf of Mexico
Legend
Mangrove Swamp
Salt Marsh
Tidal Flat
Data Disclaimer
** Some habitat distributions or locations may be misrepresented on this map due to size, resolution, map overlay difficulties and insufficient data sources **
Paper Size ANSI A
0 10 20 30 40
Miles
Map Projection: Transverse Mercator
Horizontal Datum: North American 1983
Grid: NAD 1983 StatePlane Florida West FIPS 0902 Feet
N
Florida Department of Environmental Protection
404 Assumption Biological Assessment
Estuarine Wetlands
Project No. 11206416
Revision No. -
Date June 16, 2020
FIGURE 6

# Appendix E
## Dredge and Fill Activities as Defined in the Corps Database

| Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx) |
|---|
| \ AGRICULTURE \ CONVERSION |
| \ AGRICULTURE \ NON-EXEMPT |
| \ AQUACULTURE \ FINFISH |
| \ AQUACULTURE \ PLANTS |
| \ AQUACULTURE \ SHELLFISH |
| \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE |
| \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ COMMERCIAL |
| \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RECREATIONAL, \ DEVELOPMENT \ COMMERCIAL |
| \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ COMMERCIAL |
| \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |
| \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ ENERGY GENERATION \ NUCLEAR |
| \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ STRUCTURE \ INTAKE/OUTFALL |
| \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ STRUCTURE \ UTILITY LINE OR STRUCTURE |
| \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE) |
| \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ TRANSPORTATION \ ROADS \ CULVERT |
| \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ TRANSPORTATION \ UTILITY \ AERIAL |
| \ DEVELOPMENT \ COMMERCIAL |
| \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE |
| \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |
| \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ INDUSTRIAL |
| \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ INDUSTRIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RECREATIONAL |
| \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE |
| \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |
| \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |
| \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ DEVELOPMENT \ COMMERCIAL, \ STRUCTURE \ BULKHEAD |
| \ DEVELOPMENT \ COMMERCIAL, \ STRUCTURE \ INTAKE/OUTFALL |
| \ DEVELOPMENT \ COMMERCIAL, \ TRANSPORTATION \ AIRPORT \ FACILITY |
| \ DEVELOPMENT \ COMMERCIAL, \ TRANSPORTATION \ RAIL \ FACILITY |
| \ DEVELOPMENT \ COMMERCIAL, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ STRUCTURE \ INTAKE/OUTFALL |
| \ DEVELOPMENT \ COMMERCIAL, \ TRANSPORTATION \ ROADS \ CULVERT |
| \ DEVELOPMENT \ INDUSTRIAL |
| \ DEVELOPMENT \ INDUSTRIAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ COMMERCIAL |

| Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx) |
|---|
| \ DEVELOPMENT \ INDUSTRIAL, \ DEVELOPMENT \ COMMERCIAL |
| \ DEVELOPMENT \ RECREATIONAL |
| \ DEVELOPMENT \ RECREATIONAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE |
| \ DEVELOPMENT \ RECREATIONAL, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |
| \ DEVELOPMENT \ RECREATIONAL, \ MITIGATION \ RESTORATION \ WETLAND, \ MITIGATION \ ENHANCEMENT |
| \ DEVELOPMENT \ RECREATIONAL, \ STRUCTURE \ BOAT RAMP |
| \ DEVELOPMENT \ RECREATIONAL, \ STRUCTURE \ DOCK \ FIXED, \ STRUCTURE \ BREAKWATER |
| \ DEVELOPMENT \ RECREATIONAL, \ TRANSPORTATION \ ROADS \ CULVERT, \ STRUCTURE \ BULKHEAD |
| \ DEVELOPMENT \ RECREATIONAL, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE |
| \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ COMMERCIAL |
| \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE |
| \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |
| \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |
| \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ COMMERCIAL |
| \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ MITIGATION \ ENHANCEMENT, \ MITIGATION \ CREATION |
| \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ STRUCTURE \ MARINA, \ DREDGING \ NAVIGATION \ PRIVATE |
| \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ STRUCTURE \ MARINA, \ STRUCTURE \ BOAT RAMP |
| \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE) |
| \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ DEVELOPMENT \ COMMERCIAL |
| \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ TRANSPORTATION \ UTILITY \ BURIED |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ COMMERCIAL |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ COMMERCIAL, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ RECREATIONAL |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY, \ DEVELOPMENT \ COMMERCIAL |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ DREDGING \ CHANNELIZATION, \ STRUCTURE \ BOAT LIFT |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ OTHER \ BANK STABILIZATION |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ OTHER \ INDIAN TRIBE OR STATE 404 PROGRAM |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ STRUCTURE \ BULKHEAD |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ STRUCTURE \ DOCK \ FIXED |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ STRUCTURE \ MARINA |

| Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx) |
| --- |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ STRUCTURE \ MISCELLANEOUS |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE) |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ ROADS \ CULVERT |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ TRANSPORTATION \ ROADS \ CULVERT |
| \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ DREDGING \ BOAT SLIP |
| \ DREDGING \ CHANNELIZATION |
| \ DREDGING \ CHANNELIZATION, \ STRUCTURE \ WEIR |
| \ DREDGING \ DISPOSAL |
| \ DREDGING \ DISPOSAL, \ DREDGING \ MAINTENANCE, \ STRUCTURE \ INTAKE/OUTFALL |
| \ DREDGING \ GENERAL |
| \ DREDGING \ GENERAL, \ OTHER \ BANK STABILIZATION, \ MITIGATION \ ENHANCEMENT |
| \ DREDGING \ GENERAL, \ STRUCTURE \ BOAT RAMP, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ DREDGING \ GENERAL, \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW), \ OTHER \ BANK STABILIZATION |
| \ DREDGING \ MAINTENANCE |
| \ DREDGING \ MAINTENANCE, \ DREDGING \ BOAT SLIP, \ STRUCTURE \ BOAT HOUSE |
| \ DREDGING \ MAINTENANCE, \ DREDGING \ CHANNELIZATION |
| \ DREDGING \ MAINTENANCE, \ DREDGING \ GENERAL |
| \ DREDGING \ MAINTENANCE, \ OTHER \ BANK STABILIZATION |
| \ DREDGING \ MAINTENANCE, \ OTHER \ INDIAN TRIBE OR STATE 404 PROGRAM |
| \ DREDGING \ MAINTENANCE, \ STRUCTURE \ BULKHEAD |
| \ DREDGING \ MAINTENANCE, \ STRUCTURE \ GABION |
| \ DREDGING \ MAINTENANCE, \ STRUCTURE \ WATER CONTROL |
| \ DREDGING \ MAINTENANCE, \ STRUCTURE \ WATER CONTROL, \ STRUCTURE \ WEIR |
| \ DREDGING \ MAINTENANCE, \ TRANSPORTATION \ PIPELINE \ MAINTENANCE |
| \ DREDGING \ NAVIGATION \ PRIVATE, \ TRANSPORTATION \ ROADS \ MAINTENANCE |
| \ ENERGY GENERATION \ NATURAL GAS |
| \ ENERGY GENERATION \ NATURAL GAS, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE |
| \ ENERGY GENERATION \ NATURAL GAS, \ TRANSPORTATION \ UTILITY \ STRUCTURE |
| \ ENERGY GENERATION \ SOLAR |
| \ MINING AND DRILLING \ DRILLING \ ACCESS |
| \ MINING AND DRILLING \ DRILLING \ FACILITIES |
| \ MINING AND DRILLING \ MINING \ FACILITES |
| \ MINING AND DRILLING \ MINING \ GRAVEL, \ MINING AND DRILLING \ MINING \ SAND |
| \ MINING AND DRILLING \ MINING \ OTHER MINERAL |
| \ MINING AND DRILLING \ MINING \ PHOSPHATE |

| Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx) |
| --- |
| \ MINING AND DRILLING \ MINING \ ROCK |
| \ MINING AND DRILLING \ MINING \ SAND |
| \ MINING AND DRILLING \ MINING \ SAND, \ MINING AND DRILLING \ MINING \ ROCK |
| \ MITIGATION \ CREATION |
| \ MITIGATION \ CREATION, \ DREDGING \ MAINTENANCE |
| \ MITIGATION \ ENHANCEMENT |
| \ MITIGATION \ ENHANCEMENT, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE |
| \ MITIGATION \ FISH/WILDLIFE \ CREATION |
| \ MITIGATION \ FISH/WILDLIFE \ CREATION, \ OTHER \ BANK STABILIZATION |
| \ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT |
| \ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ DEVELOPMENT \ RECREATIONAL |
| \ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ MITIGATION \ FISH/WILDLIFE \ CREATION, \ MITIGATION \ RESTORATION \ WETLAND |
| \ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ MITIGATION \ RESTORATION \ WETLAND, \ MITIGATION \ FISH/WILDLIFE \ CREATION |
| \ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ OTHER \ DAMS \ LOW WATER, \ MITIGATION \ RESTORATION \ WETLAND |
| \ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT, \ TRANSPORTATION \ ROADS \ CULVERT |
| \ MITIGATION \ FISH/WILDLIFE \ PLANTING |
| \ MITIGATION \ FISH/WILDLIFE \ RESTORATION |
| \ MITIGATION \ MITIGATION BANK |
| \ MITIGATION \ MITIGATION BANK, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |
| \ MITIGATION \ MITIGATION BANK, \ MITIGATION \ PRESERVATION, \ MITIGATION \ RESTORATION \ WETLAND |
| \ MITIGATION \ RESTORATION \ STREAM |
| \ MITIGATION \ RESTORATION \ STREAM, \ MITIGATION \ CREATION, \ MITIGATION \ RESTORATION \ WETLAND |
| \ MITIGATION \ RESTORATION \ STREAM, \ MITIGATION \ RESTORATION \ WETLAND |
| \ MITIGATION \ RESTORATION \ STREAM, \ MITIGATION \ RESTORATION \ WETLAND, \ OTHER \ DAMS \ REMOVAL |
| \ MITIGATION \ RESTORATION \ WETLAND |
| \ MITIGATION \ RESTORATION \ WETLAND, \ AGRICULTURE \ CONVERSION |
| \ MITIGATION \ RESTORATION \ WETLAND, \ DEVELOPMENT \ RECREATIONAL |
| \ MITIGATION \ RESTORATION \ WETLAND, \ MITIGATION \ CREATION, \ MITIGATION \ RESTORATION \ STREAM |
| \ MITIGATION \ RESTORATION \ WETLAND, \ MITIGATION \ RESTORATION \ STREAM |
| \ MITIGATION \ RESTORATION \ WETLAND, \ TRANSPORTATION \ ROADS \ CULVERT |
| \ MITIGATION \ WETLAND RECLAMATION |
| \ MITIGATION \ WETLAND RECLAMATION, \ DREDGING \ MAINTENANCE |
| \ OTHER \ BANK STABILIZATION |
| \ OTHER \ BANK STABILIZATION, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ OTHER \ BANK STABILIZATION, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |

| Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx) |
|---|
| \ OTHER \ BANK STABILIZATION, \ DREDGING \ GENERAL |
| \ OTHER \ BANK STABILIZATION, \ DREDGING \ MAINTENANCE |
| \ OTHER \ BANK STABILIZATION, \ DREDGING \ NAVIGATION \ PRIVATE |
| \ OTHER \ BANK STABILIZATION, \ MITIGATION \ ENHANCEMENT |
| \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ BULKHEAD |
| \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ GABION |
| \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ INTAKE/OUTFALL |
| \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ INTAKE/OUTFALL, \ DREDGING \ GENERAL |
| \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ MAINTENANCE |
| \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ MARINA, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |
| \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ WATER CONTROL |
| \ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT |
| \ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ BRIDGE \ MAINTENANCE |
| \ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ ROADS \ MAINTENANCE |
| \ OTHER \ CLEANUP HAZARDOUS OR TOXIC WASTES |
| \ OTHER \ DAMS \ COFFER |
| \ OTHER \ DAMS \ COFFER, \ OTHER \ BANK STABILIZATION |
| \ OTHER \ DAMS \ GENERAL |
| \ OTHER \ DAMS \ LOW WATER, \ OTHER \ DAMS \ REMOVAL |
| \ OTHER \ DAMS \ MAINTENANCE |
| \ OTHER \ DAMS \ MAINTENANCE, \ STRUCTURE \ GABION, \ STRUCTURE \ WATER CONTROL |
| \ OTHER \ DAMS \ REMOVAL |
| \ OTHER \ DAMS \ REMOVAL, \ MITIGATION \ WETLAND RECLAMATION |
| \ OTHER \ DAMS \ RESERVOIR |
| \ OTHER \ DAMS \ WEIR |
| \ OTHER \ DAMS \ WEIR, \ OTHER \ DAMS \ MAINTENANCE |
| \ OTHER \ INDIAN TRIBE OR STATE 404 PROGRAM |
| \ OTHER \ RESTRICTED AREAS |
| \ OTHER \ SURVEY ACTIVITIES |
| \ STRUCTURE \ BOAT LIFT |
| \ STRUCTURE \ BOAT LIFT, \ STRUCTURE \ DOCK \ FIXED |
| \ STRUCTURE \ BOAT LIFT, \ STRUCTURE \ MISCELLANEOUS, \ STRUCTURE \ DOCK \ FIXED |
| \ STRUCTURE \ BOAT RAMP |
| \ STRUCTURE \ BOAT RAMP, \ DREDGING \ GENERAL, \ DEVELOPMENT \ COMMERCIAL |
| \ STRUCTURE \ BOAT RAMP, \ STRUCTURE \ DOCK \ FIXED, \ DEVELOPMENT \ RECREATIONAL |

| Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx) |
|---|
| \ STRUCTURE \ BOAT RAMP, \ STRUCTURE \ MARINA |
| \ STRUCTURE \ BREAKWATER |
| \ STRUCTURE \ BREAKWATER, \ MITIGATION \ FISH/WILDLIFE \ CREATION |
| \ STRUCTURE \ BRIDGE/RELATED WORK |
| \ STRUCTURE \ BRIDGE/RELATED WORK, \ STRUCTURE \ INTAKE/OUTFALL |
| \ STRUCTURE \ BRIDGE/RELATED WORK, \ STRUCTURE \ MAINTENANCE |
| \ STRUCTURE \ BRIDGE/RELATED WORK, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT |
| \ STRUCTURE \ BRIDGE/RELATED WORK, \ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW) |
| \ STRUCTURE \ BRIDGE/RELATED WORK, \ TRANSPORTATION \ ROADS \ CULVERT |
| \ STRUCTURE \ BRIDGE/RELATED WORK, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ STRUCTURE \ BULKHEAD |
| \ STRUCTURE \ BULKHEAD, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |
| \ STRUCTURE \ BULKHEAD, \ DREDGING \ BOAT SLIP |
| \ STRUCTURE \ BULKHEAD, \ DREDGING \ BOAT SLIP, \ STRUCTURE \ DOCK \ FIXED |
| \ STRUCTURE \ BULKHEAD, \ DREDGING \ MAINTENANCE, \ STRUCTURE \ DOCK \ FIXED |
| \ STRUCTURE \ BULKHEAD, \ OTHER \ BANK STABILIZATION |
| \ STRUCTURE \ BULKHEAD, \ STRUCTURE \ DOCK \ FIXED |
| \ STRUCTURE \ BULKHEAD, \ STRUCTURE \ DOCK \ FIXED, \ STRUCTURE \ BOAT LIFT |
| \ STRUCTURE \ BULKHEAD, \ STRUCTURE \ INTAKE/OUTFALL |
| \ STRUCTURE \ BULKHEAD, \ STRUCTURE \ MAINTENANCE |
| \ STRUCTURE \ BULKHEAD, \ STRUCTURE \ MARINA |
| \ STRUCTURE \ BULKHEAD, \ STRUCTURE \ UTILITY LINE OR STRUCTURE |
| \ STRUCTURE \ BULKHEAD, \ STRUCTURE \ WATER CONTROL |
| \ STRUCTURE \ DOCK \ FIXED |
| \ STRUCTURE \ DOCK \ FIXED, \ DEVELOPMENT \ COMMERCIAL |
| \ STRUCTURE \ DOCK \ FIXED, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |
| \ STRUCTURE \ DOCK \ FIXED, \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ BREAKWATER |
| \ STRUCTURE \ DOCK \ FIXED, \ STRUCTURE \ BOAT LIFT |
| \ STRUCTURE \ DOCK \ FIXED, \ STRUCTURE \ BULKHEAD |
| \ STRUCTURE \ DOCK \ FIXED, \ TRANSPORTATION \ AIRPORT \ RUNWAY, \ STRUCTURE \ BOAT RAMP |
| \ STRUCTURE \ DOCK \ FLOATING |
| \ STRUCTURE \ ELEV REC DECK |
| \ STRUCTURE \ GABION |
| \ STRUCTURE \ GABION, \ STRUCTURE \ MAINTENANCE, \ STRUCTURE \ UTILITY LINE OR STRUCTURE |
| \ STRUCTURE \ GABION, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT |
| \ STRUCTURE \ INTAKE/OUTFALL |

| Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx) |
|---|
| \ STRUCTURE \ INTAKE/OUTFALL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE |
| \ STRUCTURE \ INTAKE/OUTFALL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ STRUCTURE \ MAINTENANCE |
| \ STRUCTURE \ INTAKE/OUTFALL, \ DEVELOPMENT \ COMMERCIAL |
| \ STRUCTURE \ INTAKE/OUTFALL, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |
| \ STRUCTURE \ INTAKE/OUTFALL, \ DREDGING \ MAINTENANCE |
| \ STRUCTURE \ INTAKE/OUTFALL, \ ENERGY GENERATION \ NATURAL GAS |
| \ STRUCTURE \ INTAKE/OUTFALL, \ OTHER \ BANK STABILIZATION |
| \ STRUCTURE \ INTAKE/OUTFALL, \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ MAINTENANCE |
| \ STRUCTURE \ INTAKE/OUTFALL, \ OTHER \ DAMS \ WEIR |
| \ STRUCTURE \ INTAKE/OUTFALL, \ STRUCTURE \ MAINTENANCE |
| \ STRUCTURE \ INTAKE/OUTFALL, \ STRUCTURE \ UTILITY LINE OR STRUCTURE |
| \ STRUCTURE \ INTAKE/OUTFALL, \ STRUCTURE \ WATER CONTROL |
| \ STRUCTURE \ INTAKE/OUTFALL, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ STRUCTURE \ INTAKE/OUTFALL, \ TRANSPORTATION \ UTILITY \ MAINTENANCE |
| \ STRUCTURE \ MAINTENANCE |
| \ STRUCTURE \ MAINTENANCE, \ OTHER \ BANK STABILIZATION |
| \ STRUCTURE \ MAINTENANCE, \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ WATER CONTROL |
| \ STRUCTURE \ MAINTENANCE, \ STRUCTURE \ INTAKE/OUTFALL |
| \ STRUCTURE \ MAINTENANCE, \ STRUCTURE \ WATER CONTROL |
| \ STRUCTURE \ MAINTENANCE, \ STRUCTURE \ WATER CONTROL, \ STRUCTURE \ WEIR |
| \ STRUCTURE \ MAINTENANCE, \ STRUCTURE \ WEIR |
| \ STRUCTURE \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ CULVERT |
| \ STRUCTURE \ MARINA |
| \ STRUCTURE \ MARINA, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ STRUCTURE \ MARINA, \ DREDGING \ NAVIGATION \ PRIVATE |
| \ STRUCTURE \ MARINA, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ STRUCTURE \ MISCELLANEOUS |
| \ STRUCTURE \ MISCELLANEOUS, \ DEVELOPMENT \ RECREATIONAL |
| \ STRUCTURE \ MISCELLANEOUS, \ OTHER \ BANK STABILIZATION, \ STRUCTURE \ BULKHEAD |
| \ STRUCTURE \ MISCELLANEOUS, \ STRUCTURE \ WATER CONTROL, \ OTHER \ DAMS \ WEIR |
| \ STRUCTURE \ PIER \ NON-RESIDENTIAL |
| \ STRUCTURE \ PILE/DOLPHIN, \ DREDGING \ BOAT SLIP |
| \ STRUCTURE \ RAMP |
| \ STRUCTURE \ RAMP, \ STRUCTURE \ RECREATIONAL |
| \ STRUCTURE \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ CULVERT |
| \ STRUCTURE \ MARINA |

| Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx) |
| --- |
| \ STRUCTURE \ RECREATIONAL |
| \ STRUCTURE \ RECREATIONAL, \ DEVELOPMENT \ RECREATIONAL |
| \ STRUCTURE \ RECREATIONAL, \ STRUCTURE \ PIER \ NON-RESIDENTIAL, \ OTHER \ BANK STABILIZATION |
| \ STRUCTURE \ RECREATIONAL, \ STRUCTURE \ WATER CONTROL |
| \ STRUCTURE \ REMOVAL |
| \ STRUCTURE \ REMOVAL, \ TRANSPORTATION \ UTILITY \ MAINTENANCE |
| \ STRUCTURE \ SCIENTIFIC DEVICE |
| \ STRUCTURE \ UNSPECIFIED |
| \ STRUCTURE \ UNSPECIFIED, \ DREDGING \ MAINTENANCE |
| \ STRUCTURE \ UNSPECIFIED, \ STRUCTURE \ WATER CONTROL |
| \ STRUCTURE \ UTILITY LINE OR STRUCTURE |
| \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE |
| \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ DEVELOPMENT \ INDUSTRIAL |
| \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ DEVELOPMENT \ RECREATIONAL |
| \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ ENERGY GENERATION \ OIL |
| \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ MITIGATION \ ENHANCEMENT |
| \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ OTHER \ BANK STABILIZATION |
| \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ STRUCTURE \ INTAKE/OUTFALL |
| \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ STRUCTURE \ MAINTENANCE |
| \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ STRUCTURE \ WATER CONTROL |
| \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ TRANSPORTATION \ UTILITY \ ACCESS ROAD |
| \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ TRANSPORTATION \ UTILITY \ AERIAL |
| \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ TRANSPORTATION \ UTILITY \ BURIED |
| \ STRUCTURE \ UTILITY LINE OR STRUCTURE, \ TRANSPORTATION \ UTILITY \ MAINTENANCE |
| \ STRUCTURE \ WATER CONTROL |
| \ STRUCTURE \ WATER CONTROL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE |
| \ STRUCTURE \ WATER CONTROL, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |
| \ STRUCTURE \ WATER CONTROL, \ DEVELOPMENT \ RECREATIONAL |
| \ STRUCTURE \ WATER CONTROL, \ DREDGING \ MAINTENANCE |
| \ STRUCTURE \ WATER CONTROL, \ MITIGATION \ CREATION |
| \ STRUCTURE \ WATER CONTROL, \ STRUCTURE \ INTAKE/OUTFALL |
| \ STRUCTURE \ WATER CONTROL, \ STRUCTURE \ MAINTENANCE |
| \ STRUCTURE \ WATER CONTROL, \ STRUCTURE \ WEIR |
| \ STRUCTURE \ WATER CONTROL, \ TRANSPORTATION \ ROADS \ CULVERT |
| \ STRUCTURE \ WEIR |
| \ STRUCTURE \ WEIR, \ STRUCTURE \ BULKHEAD |

| Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx) |
|---|
| \ TRANSPORTATION \ AIRPORT \ FACILITY |
| \ TRANSPORTATION \ AIRPORT \ FACILITY, \ TRANSPORTATION \ AIRPORT \ MAINTENANCE |
| \ TRANSPORTATION \ AIRPORT \ FACILITY, \ TRANSPORTATION \ ROADS \ CULVERT |
| \ TRANSPORTATION \ AIRPORT \ MAINTENANCE |
| \ TRANSPORTATION \ AIRPORT \ MAINTENANCE, \ STRUCTURE \ WATER CONTROL |
| \ TRANSPORTATION \ AIRPORT \ RUNWAY |
| \ TRANSPORTATION \ AIRPORT \ RUNWAY, \ TRANSPORTATION \ AIRPORT \ FACILITY |
| \ TRANSPORTATION \ AIRPORT \ RUNWAY, \ TRANSPORTATION \ AIRPORT \ MAINTENANCE |
| \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW) |
| \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW), \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE) |
| \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW), \ TRANSPORTATION \ ROADS \ CULVERT |
| \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW), \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW), \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ ROADS \ CULVERT |
| \ TRANSPORTATION \ BRIDGE \ MAINTENANCE |
| \ TRANSPORTATION \ BRIDGE \ MAINTENANCE, \ STRUCTURE \ BRIDGE/RELATED WORK |
| \ TRANSPORTATION \ BRIDGE \ MAINTENANCE, \ TRANSPORTATION \ BRIDGE \ PROTECTION |
| \ TRANSPORTATION \ BRIDGE \ PROTECTION |
| \ TRANSPORTATION \ BRIDGE \ REMOVAL, \ MITIGATION \ FISH/WILDLIFE \ ENHANCEMENT |
| \ TRANSPORTATION \ BRIDGE \ REMOVAL, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT |
| \ TRANSPORTATION \ BRIDGE \ REMOVAL, \ TRANSPORTATION \ RAIL \ FACILITY |
| \ TRANSPORTATION \ BRIDGE \ REMOVAL, \ TRANSPORTATION \ ROADS \ CULVERT |
| \ TRANSPORTATION \ BRIDGE \ REPLACEMENT |
| \ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ OTHER \ BANK STABILIZATION |
| \ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ STRUCTURE \ BRIDGE/RELATED WORK |
| \ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ STRUCTURE \ MAINTENANCE |
| \ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ STRUCTURE \ UNSPECIFIED |
| \ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ TRANSPORTATION \ ROADS \ CULVERT |
| \ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ TRANSPORTATION \ PIPELINE \ ACCESS ROAD |
| \ TRANSPORTATION \ PIPELINE \ ACCESS ROAD, \ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ PIPELINE \ STRUCTURE |
| \ TRANSPORTATION \ PIPELINE \ AERIAL |
| \ TRANSPORTATION \ PIPELINE \ BURIED |
| \ TRANSPORTATION \ PIPELINE \ BURIED, \ OTHER \ DAMS \ COFFER |
| \ TRANSPORTATION \ PIPELINE \ BURIED, \ STRUCTURE \ UTILITY LINE OR STRUCTURE |
| \ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ PIPELINE \ AERIAL |
| \ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |

| Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx) |
|---|
| \ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ UTILITY \ STRUCTURE |
| \ TRANSPORTATION \ PIPELINE \ MAINTENANCE |
| \ TRANSPORTATION \ PIPELINE \ MAINTENANCE, \ TRANSPORTATION \ PIPELINE \ BURIED |
| \ TRANSPORTATION \ PIPELINE \ STRUCTURE |
| \ TRANSPORTATION \ PIPELINE \ STRUCTURE, \ DREDGING \ GENERAL |
| \ TRANSPORTATION \ PIPELINE \ STRUCTURE, \ TRANSPORTATION \ PIPELINE \ BURIED, \ TRANSPORTATION \ PIPELINE \ ACCESS ROAD |
| \ TRANSPORTATION \ PIPELINE \ SUBMERGED |
| \ TRANSPORTATION \ RAIL \ BRIDGE |
| \ TRANSPORTATION \ RAIL \ FACILITY |
| \ TRANSPORTATION \ RAIL \ FACILITY, \ STRUCTURE \ WATER CONTROL |
| \ TRANSPORTATION \ RAIL \ MAINTENANCE |
| \ TRANSPORTATION \ RAIL \ MAINTENANCE, \ TRANSPORTATION \ RAIL \ BRIDGE |
| \ TRANSPORTATION \ RAIL \ TRACK |
| \ TRANSPORTATION \ RAIL \ TRACK, \ TRANSPORTATION \ RAIL \ BRIDGE, \ TRANSPORTATION \ UTILITY \ SUBMERGED |
| \ TRANSPORTATION \ RAIL \ TRACK, \ TRANSPORTATION \ RAIL \ MAINTENANCE, \ DEVELOPMENT \ INDUSTRIAL |
| \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE) |
| \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE |
| \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ DEVELOPMENT \ RECREATIONAL |
| \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |
| \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ MINING AND DRILLING \ MINING \ PHOSPHATE |
| \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW) |
| \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ BRIDGE \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ ROADS \ CULVERT |
| \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ ROADS \ MAINTENANCE |
| \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE), \ TRANSPORTATION \ UTILITY \ ACCESS ROAD |
| \ TRANSPORTATION \ ROADS \ CULVERT |
| \ TRANSPORTATION \ ROADS \ CULVERT, \ DEVELOPMENT \ RESIDENTIAL \ SINGLE FAMILY |
| \ TRANSPORTATION \ ROADS \ CULVERT, \ DREDGING \ MAINTENANCE |
| \ TRANSPORTATION \ ROADS \ CULVERT, \ MITIGATION \ ENHANCEMENT |
| \ TRANSPORTATION \ ROADS \ CULVERT, \ OTHER \ BANK STABILIZATION |
| \ TRANSPORTATION \ ROADS \ CULVERT, \ STRUCTURE \ MAINTENANCE |
| \ TRANSPORTATION \ ROADS \ CULVERT, \ STRUCTURE \ WATER CONTROL |
| \ TRANSPORTATION \ ROADS \ CULVERT, \ STRUCTURE \ WEIR |

| Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx) |
|---|
| \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW) |
| \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT |
| \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT, \ TRANSPORTATION \ ROADS \ MAINTENANCE |
| \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE) |
| \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ MAINTENANCE |
| \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE) |
| \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ DEVELOPMENT \ RECREATIONAL |
| \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ OTHER \ BANK STABILIZATION |
| \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT |
| \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ STRUCTURE \ INTAKE/OUTFALL |
| \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ STRUCTURE \ RECREATIONAL |
| \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ BRIDGE \ CONSTRUCTION (NEW) |
| \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT |
| \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ ROADS \ CROSSING (NON BRIDGE) |
| \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ ROADS \ CULVERT |
| \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ MAINTENANCE |
| \ TRANSPORTATION \ ROADS \ IMPROVEMENTS, \ TRANSPORTATION \ ROADS \ MAINTENANCE |
| \ TRANSPORTATION \ ROADS \ LOGGING |
| \ TRANSPORTATION \ ROADS \ MAINTENANCE |
| \ TRANSPORTATION \ ROADS \ MAINTENANCE, \ DEVELOPMENT \ RECREATIONAL |
| \ TRANSPORTATION \ ROADS \ MAINTENANCE, \ OTHER \ BANK STABILIZATION |
| \ TRANSPORTATION \ ROADS \ MAINTENANCE, \ OTHER \ BANK STABILIZATION, \ TRANSPORTATION \ ROADS \ CULVERT |
| \ TRANSPORTATION \ ROADS \ MAINTENANCE, \ STRUCTURE \ BRIDGE/RELATED WORK |
| \ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ BRIDGE \ REPLACEMENT |
| \ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ CULVERT |
| \ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ CULVERT, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ TRANSPORTATION \ ROADS \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ TRANSPORTATION \ UTILITY \ ACCESS ROAD |
| \ TRANSPORTATION \ UTILITY \ ACCESS ROAD, \ DREDGING \ BOAT SLIP, \ STRUCTURE \ DOCK \ FLOATING |
| \ TRANSPORTATION \ UTILITY \ ACCESS ROAD, \ TRANSPORTATION \ UTILITY \ AERIAL |
| \ TRANSPORTATION \ UTILITY \ ACCESS ROAD, \ TRANSPORTATION \ UTILITY \ MAINTENANCE |
| \ TRANSPORTATION \ UTILITY \ AERIAL |

| Appendix E Dredge and Fill Activities as Defined in the Corps Database (WorkType.xlsx) |
|---|
| \ TRANSPORTATION \ UTILITY \ AERIAL, \ STRUCTURE \ UTILITY LINE OR STRUCTURE |
| \ TRANSPORTATION \ UTILITY \ AERIAL, \ TRANSPORTATION \ ROADS \ MAINTENANCE |
| \ TRANSPORTATION \ UTILITY \ AERIAL, \ TRANSPORTATION \ UTILITY \ ACCESS ROAD |
| \ TRANSPORTATION \ UTILITY \ AERIAL, \ TRANSPORTATION \ UTILITY \ MAINTENANCE |
| \ TRANSPORTATION \ UTILITY \ AERIAL, \ TRANSPORTATION \ UTILITY \ STRUCTURE |
| \ TRANSPORTATION \ UTILITY \ AERIAL, \ TRANSPORTATION \ UTILITY \ SUBMERGED |
| \ TRANSPORTATION \ UTILITY \ BURIED |
| \ TRANSPORTATION \ UTILITY \ BURIED, \ DEVELOPMENT \ ASSOCIATED INFRASTRUCTURE, \ DEVELOPMENT \ RESIDENTIAL \ MULTI- FAMILY |
| \ TRANSPORTATION \ UTILITY \ BURIED, \ DEVELOPMENT \ COMMERCIAL, \ TRANSPORTATION \ UTILITY \ STRUCTURE |
| \ TRANSPORTATION \ UTILITY \ BURIED, \ STRUCTURE \ UTILITY LINE OR STRUCTURE |
| \ TRANSPORTATION \ UTILITY \ BURIED, \ TRANSPORTATION \ PIPELINE \ BURIED |
| \ TRANSPORTATION \ UTILITY \ BURIED, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ TRANSPORTATION \ UTILITY \ BURIED, \ TRANSPORTATION \ UTILITY \ AERIAL |
| \ TRANSPORTATION \ UTILITY \ BURIED, \ TRANSPORTATION \ UTILITY \ SUBMERGED |
| \ TRANSPORTATION \ UTILITY \ MAINTENANCE |
| \ TRANSPORTATION \ UTILITY \ MAINTENANCE, \ STRUCTURE \ UTILITY LINE OR STRUCTURE |
| \ TRANSPORTATION \ UTILITY \ MAINTENANCE, \ TRANSPORTATION \ ROADS \ MAINTENANCE |
| \ TRANSPORTATION \ UTILITY \ MAINTENANCE, \ TRANSPORTATION \ UTILITY \ BURIED |
| \ TRANSPORTATION \ UTILITY \ MAINTENANCE, \ TRANSPORTATION \ UTILITY \ STRUCTURE |
| \ TRANSPORTATION \ UTILITY \ STRUCTURE |
| \ TRANSPORTATION \ UTILITY \ STRUCTURE, \ STRUCTURE \ REMOVAL |
| \ TRANSPORTATION \ UTILITY \ STRUCTURE, \ STRUCTURE \ UTILITY LINE OR STRUCTURE |
| \ TRANSPORTATION \ UTILITY \ STRUCTURE, \ TRANSPORTATION \ PIPELINE \ BURIED |
| \ TRANSPORTATION \ UTILITY \ STRUCTURE, \ TRANSPORTATION \ ROADS \ IMPROVEMENTS |
| \ TRANSPORTATION \ UTILITY \ STRUCTURE, \ TRANSPORTATION \ UTILITY \ BURIED |
| \ TRANSPORTATION \ UTILITY \ STRUCTURE, \ TRANSPORTATION \ UTILITY \ MAINTENANCE |
| \ TRANSPORTATION \ UTILITY \ SUBMERGED |
| \ TRANSPORTATION \ UTILITY \ SUBMERGED, \ STRUCTURE \ WEIR |
| \ TRANSPORTATION \ UTILITY \ SUBMERGED, \ TRANSPORTATION \ UTILITY \ AERIAL |

# Congress of the United States
Washington, DC 20515

November 2, 2020

The Honorable David P. Ross
Assistant Administrator, Office of Water
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington DC 20460

Dear Assistant Administrator Ross:

As you consider Florida's request to assume a Clean Water Act (CWA) Section 404 program, we, the co-chairs of the Everglades Caucus, urge you to strongly weigh the benefits of a protective, responsive, and streamlined permitting program on the restoration of America's Everglades.

The Everglades is an incredibly vital wetland system in South Florida that provides drinking water to more than 8 million residents and refuge to much of the region's biodiversity. Congress has invested billions of dollars into restoring this national treasure alongside similar investments by the State of Florida.

While important restoration progress has been made in recent years, the overall program has been plagued by design, permitting, and construction delays under the U.S. Army Corps of Engineers. On several occasions, the State of Florida and the South Florida Water Management District have had to assume responsibility for certain project elements from the Corps of Engineers to expedite project delivery at lower cost.

Expedited construction of the Central Everglades Planning Project, the Everglades Agricultural Area Reservoir, and other projects around Lake Okeechobee are essential to improving the health of the Everglades ecosystem and enhancing the resilience of the communities that live, work, and recreate there as well. With so much at stake, we can no longer accept unwarranted delays in permitting for ecosystem restoration projects.

With the authority to administer a Section 404 program, we believe that the Florida Department of Environmental Protection would accomplish the task of permitting these critical projects in a significantly more timely and responsive manner than the Corps. Thank you for your full and fair consideration of the State of Florida's request, consistent with applicable statutes and regulations.

Sincerely,

Mario Diaz-Balart
Member of Congress

Alcee L. Hastings
Member of Congress

PRINTED ON RECYCLED PAPER

Transcription details:

| | |
|---|---|
| Date: | 21-Oct-2020 |
| Input sound file: | Virtual Public Hearings on Florida's Request to Assume Administration of a Clean Water Act Section 404 Program.mp4 |

Transcription results:

Jeaneanne Gettle: Good morning. I'm Jeaneanne Gettle, Director of the Water Division at the US Environmental Protection Agency's regional office in Atlanta, Georgia. Welcome and thank you for joining this public hearing concerning Florida's request to assume administration of a Clean Water Act Section 404 program. We recognize that the natural resources in Florida are critically important to each of you, your communities, and to the State of Florida. Our agenda today is very simple. I will begin by making brief remarks, provide background and context. Then our facilitator will explain the comment process, and we will start the public comment process in approximately 15 minutes. I'm here virtually with several EPA colleagues. We will be listening to your comments throughout this hearing, so I would like to introduce them to you. As I say their name, they will have their video on. Rosemary Calli, Tom McGill, Matt Hicks, Kathy Hurld, Kavita Nagrani, Christopher Parker, Mita Ghosh, James Morgan, Whitney Beck, Michael Creswell, Erica Jones, Kelly Laycock, and Simma Kupchan will be joining us by the phone.

To set the stage for this hearing, I'd like to provide some background and context. On August 20th, the US Environmental Protection Agency received from the governor of the State of Florida a complete program submission for regulating discharges of dredged or fill material into waters within the jurisdiction of the state in accordance with the Clean Water Act. Pursuant to Clean Water Act, Section 404(h) and EPA's implementing regulations, EPA opened a 45-day comment period which ends on November 2nd, 2020. As part of this process, EPA has also scheduled two public hearings, the one today and another public hearing on October 27th. In addition to our review of the package submitted by Florida, EPA also initiated a programmatic consultation under Section 106 of the National Historic Preservation Act, or NHPA, and is soliciting comments pursuant to NHPA, implementing regulations during the 45-day comment period ending November 2nd, 2020. [crosstalk]

EPA has three primary roles pursuant Section 404(g) of the Clean Water Act. The first role is to work with states or tribes to enhance their program capacity and capability through mechanisms such as Wetland Protect Program Development Grants [crosstalk]-- Jan, can you mute the person speaking, please? The agency's second responsibility is to review requests by states and tribes to assume administration of a Clean Water Act 404 permitting program. This is the stage that we are currently in relative to Florida's request. Under the Clean Water Act, EPA must evaluate the request and approve or disapprove the request based on factors I will speak about in a moment. The third role for EPA is that of oversight. Whenever a state or tribe assumes a program, EPA retains an oversight role. For purposes of the Clean Water Act Section 404, that would generally entail coordinating federal comments, reviewing programmatic modifications, and if necessary, withdrawing program approval.

In order to approve a state or tribe's assumption of a Clean Water Act Section 404 program, the EPA must find that the program is consistent with and no less stringent than the requirements found in the Clean Water Act and associated implementing regulations. The assumed program must have equivalent scope of jurisdiction, meaning it covers all waters of the United States not retained by the Army Corps of Engineers. It must regulate at least the same activities. It must provide sufficient public notice and allow for public participation. The program must also ensure compliance with the regulations known as the Clean Water Act Section 404(b)(1) Guidelines and have adequate enforcement authorities.

The purpose of today's hearing is for EPA to listen to comments regarding Florida's request to assume administration of a Clean Water Act Section 404 program. Today EPA's role is to listen. So while during this hearing my EPA colleagues and I may occasionally ask a question or respond to a question of clarification, we will not otherwise be engaging with or responding to commenters. This hearing is being recorded for transcription purposes, and that transcription will become part of the official administrative record for this request. In addition, you can continue to provide written comments until November 2nd, 2020 as described in EPA's Federal Register notice on regulations.gov. If you are making an oral comment today and would like to also provide that to us in written

comment form or send us any additional information or attachments associated with your oral comment, then we certainly encourage you to do so by November 2nd, 2020, the public comment deadline.

Following the close of the public comment period, EPA will review and consider all comments received as well as the complete submittal from Florida before we make a final decision about this request. Oral and written comments will be given equal consideration. As part of that process, EPA will prepare a responsiveness summary, which will provide EPA responses to the significant comments received during the comment period. I want to emphasize that no decision on Florida's request has been made at this time. After considering Florida's submittal, all comments, data, and information received through the November 2nd, 2020 comment deadline, EPA's regional administrator Mary Walker will make a final decision by December 17th. If EPA approves the state's program, we will publish a notice of this decision in the Federal Register along with the agency's responsiveness summary of significant comments. If EPA disapproves the state's 404 program, we will notify the state of the reasons for the disapproval and of any revisions or modifications to the state's program which are necessary to obtain approval. This public hearing is your opportunity to hear—is our opportunity to hear directly from you. Thank you again for being here and participating in this process. I will now turn the floor over to Jan Connery, the facilitator for this hearing, to describe the oral comment process we will follow today and to moderate this hearing. Thank you very much.

Jan Connery: Thank you, Jeaneanne. My name is Jan Connery. I'm with ERG, a contractor to EPA. And as Jeaneanne said, I will be serving as your facilitator for this hearing. I'm working today with my colleague Meredith Outterson at ERG, who is our webinar coordinator for the hearing. I'm very pleased to see that we are joined by over 130 members of the public this morning. Twenty-four of you have signed up to make an oral comment, and many others of you are here to listen to the comments today. Welcome, everyone, and thank you so much for participating. As Jeaneanne said, the purpose of this hearing is for EPA to hear oral comments from the public. So I'm going to start by describing the comment process that we'll be following. First I'm going to describe the order in which we'll take commenters, and then I will provide details about the process.

So we're going to start with comments from four public officials, and then after that, we'll take comments from folks in the order that each of you registered to comment. We have organized commenters into five time blocks, a half hour each, and each commenter should have received an email yesterday from Meredith at ERG notifying you which group you're in and your unique speaker number. So as we get to each time block, I'm going to be displaying the names of the commenters in that block in the order that you will be speaking. And that way, everyone at this hearing will be able to clearly know who is speaking at each time and who is on deck to speak next. So if the listed commenter isn't available at the time that I call on them, I will simply move to the next person on the list. And then if they are able to join us later, I will fit that commenter in as soon as we can so that we are able to hear their comment.

If we get ahead of schedule, as sometimes happens on these virtual hearings, then I will move on to the next person on the list. And we—sorry. If we get ahead of schedule, we may take short breaks. But if we do that, I will provide clear information to you about when we will reconvene. So our hearing is scheduled to run for up to three hours. And we also anticipate that we may be able to fit in—if we have enough time when we're ahead of schedule, we may be able to fit in additional commenters in that time or at the end of the hearing, as time allows. Now, this would be folks who didn't sign up to comment, didn't preregister to do so but are on the hearing now and are thinking, "Well, actually, I would like to make a comment." So if there's anyone who is thinking would like to comment today, even though you didn't preregister, what you can do at any time during this hearing is use the hand icon to raise your virtual hand. That way, we'll be able to see who's interested, and then as we can, if we have the opportunity during the hearing because we're a little ahead of schedule or at the end, we'll be taking folks in the order that you have raised your virtual hand. So I wanted to let you know that now so you'll be able to think about that and let us know if you're interested. So whether you're preregistered or whether we're able to fit you in, everyone will be following the comment process I'm going to describe to you now. Apologies, I should have advanced to this slide. Okay. So this is speaker order. I've talked about that. Yes. And you'll be receiving a chat message shortly before your speaker group is called. And you'll be unmuted when we announce your name.

Okay. So the comment process. To minimize background noise, we have all of you muted right now. And I will be calling on each commenter when it's your time to speak, and then you will be unmuted by Meredith, and you'll know

that you're unmuted because you'll hear an automated voice telling you that. I'm going to ask you to start by stating your name and affiliation, and if you're representing yourself, then you just need to say, "Representing self." So as was noted in the original a Federal Register notice and other communications, every commenter will have a maximum of five minutes to speak. And it's fine if you take less time, but five minutes is your maximum. So after you've stated your name and affiliation, I'm going to be starting an electronic timer that you'll be able to see on screen. So if you're commenting, please keep an eye on that timer so that you can be aware of when you're approaching your five minutes. As a matter of fairness to all commenters, it is important to respect that time limit, so be sure to wrap up as you see you're approaching five minutes. Now, if you had more to say that you weren't able to fit in during that limit, as Jeaneanne said, you are welcome and encouraged to submit the additional information as a written comment no later than the November 2nd public comment deadline.

So after you've made your comment, please stay on the line. Occasionally, EPA may have a question of clarification. If so, Jeaneanne will ask the question at that point, and you may respond. And then when the clarification is concluded, we will remute your line and proceed to the next commenter, using the same process. So for commenters, in the email that Meredith sent to you yesterday, we recommended that if you can, connecting by phone during the time you're making your comment for the audio portion offers a better audio quality. I mean, obviously, you'll still be connected to the webinar visually. But we do recommend connecting by phone if you're making a comment, if that's convenient to do. Meredith provided details about how to do that in the email she sent yesterday. If you're going to do that, please try to do that and connect by phone at least 20 minutes prior to the anticipated time of your comment. And if you experience any-- or we observe that you experience any audio issues any time during your comment, the beginning or in the middle, what we're going to do is mute your line, and Meredith will send you a message to suggest adjustments to your audio and continue working with you till we solve the issue. And then we'll give you a chance to make your comments as soon as we can, after we resolve the issue.

So lastly, just a couple of things for anyone on today's hearing, whether you are commenting or listening. If you are experiencing any technical difficulties, whether you're a comment or a listener or have any questions, you can contact Meredith by using the questions box with the questions icon, and she'll work with you to troubleshoot that issue. And as we are about to start the comment process, I just want to say finally that Jeaneanne and all the folks on the EPA team who are here to listen are-- well, we'll be listening throughout the hearing and taking notes. As the lead official for this hearing, Jeaneanne will be on video the entire time. But that said, you'll see her taking notes and perhaps taking a drink of water and so on, as she would normally do if this were an in-person hearing. But she would like you to know that she is as present for you and listening. So you'll be observing that during this hearing. Okay. So we are now ready to move to the first set of commenters. Here you see the list of folks who are in the first group. And I believe you can now see the timer on the screen over in the lower right. And I will be turning off my video. You don't need to see me anymore. Our first commenter is Annette Taddeo. So Annette, would you please begin by stating your name and affiliation? And then you can go right into your comment, and you'll have five minutes at that point.

Annette Taddeo: Thank you very much. Good morning. This is Senator Annette Taddeo. I represent Senate District 40 in the Florida Senate. I'm here to speak against the State of Florida's request. The EPA should allow the Army Corps to maintain its jurisdiction over Florida's water rather than grant the state's request for jurisdiction. The Army Corps is best able to achieve the necessary level of review due to their historic expertise and resources. The fact of the matter is the Florida Department of Environmental Protection does not have the resources to undertake this massive permitting responsibility. The state agency did not have the resources before the recession, and it certainly will not have them in the near future, when the Florida legislature is expected to make budget cuts because of lost tax revenues. Wetlands are critical to cleansing water and maintaining a natural infrastructure that provides resiliency during storms. In the face of increasing development statewide, the protection and restoration of Florida's wetlands and water resources must be given the greatest possible attention. Furthermore, during these uncertain times, Florida should focus on the pandemic and not force through rash changes in environmental policies. Thank you for giving me the chance to talk about this.

Jeaneanne Gettle: Thank you, Senator Taddeo. I don't believe that we have any clarifying comment or question.

Jan Connery: Okay. Great. Thanks, Jeaneanne. It looks like our second speaker, Ananta Nath, is not yet with us, so we're going to go down to the next speaker, which is Lauren Peters. So Lauren, would you please begin by stating your name and affiliation? And then you'll have five minutes for your comment.

Lauren Peters: I'm Lauren Peters of the Florida Department of Transportation District One. And I will say I had requested to comment because I was unsure of whether or not I would want to speak on this matter. And at this moment, I have no comment.

Jan Connery: Oh, okay. That was fast.

Thank you.

Thank you very much. Right. Then we will move to the next speaker, and that's Noah Valenstein. Noah, would you please begin by stating your name and affiliation?

Justin Wolfe: Good morning and thank you. This is Justin Wolfe. Can you hear me?

Jan Connery: Oh, Justin Wolfe instead of Noah?

Justin Wolfe: I just wanted to make sure you could hear me. I'm the General Counsel for the Florida Department of Environmental Protection, and I'm speaking today on behalf of Secretary Valenstein and Florida DEP.

Jan Connery: Okay. We can hear you just fine. Please go ahead.

Justin Wolfe: Thank you. First we wanted to thank EPA for holding today's public hearing concerning the State of Florida's application to assume the Clean Water Act Section 404 program. For the first time in decades, a state has undertaken the significant task of submitting a complete application to obtain approval of a Section 404 program. This was an enormous effort by FDEP and other stakeholders, and we greatly appreciate EPA's timely and thorough review of our program application materials. If approved, assumption of a 404 program will be a major achievement for both EPA and the State of Florida. In these brief remarks, I wanted to address a few key issues for EPA's consideration and to ensure the public that is-- ensure that the public is fully informed about how Florida's 404 program would operate in full compliance with federal and state law.

First, Florida has the legal authority and agency resources necessary to properly and fully implement the Section 404 program for the state. Upon assumption, Section 404 program will be administered by FDEP through its dedicated staff of over 200 wetland scientists and professionals across the state. Florida's intimate-- or FDEP's intimate knowledge of state aquatic resources, coupled with the efficiency and proven success of its own wetland permitting program will ensure that the Section 404 program will be implemented in a scientifically sound and protective manner. Moreover, Florida is well-prepared to address the compliance and enforcement responsibilities of the program. Governor Ron DeSantis recently signed into law the Environmental Accountability Bill, which strengthens FDEP's enforcement capabilities by increasing the monetary amount of penalties up to three times the amount required by federal law.

Second, Florida's approach is fully protective of the environment, including our state's wetlands and fish and wildlife species. FDEP has entered into agreements with the US Army Corps of Engineers and EPA as well as a pending agreement with the US Fish and Wildlife Service and the Florida Fish and Wildlife Conservation Commission to ensure a robust program that provides full protection for our state's wetlands and species. Likewise, Florida's approach provides for a programmatic Endangered Species Act consultation at the front end of the process, when EPA is reviewing the 404 assumption application as well as allows for site-specific technical assistance under the terms and conditions of an anticipated programmatic biological opinion and its incidental take statement. In no way, shape, or form does Florida's approach bypass species protection. The opposite is true. Florida's approach ensures a careful comprehensive process of engagement with both federal and state fish and wildlife agencies to ensure that 404-permitted activities do not jeopardize listed species or adversely modify critical habitat. In many ways, Florida's program will go above and beyond the requirements of federal law and ensure more robust protections for our state's threatened or endangered species.

Florida's 404 program will also ensure protection of historic and cultural resources in the state. We have entered an agreement with the State Historic Preservation Office, setting forth a consultation process called historic properties review for assessing the potential effects that the state 404 program permit application may have on historic properties and for avoiding, minimizing, or mitigating any adverse effects on historic properties. The historic properties review includes consultation with tribes, local governments, applicants, and the public and is designed to complement established procedures for permit processing and public notice under the state 404 program. We are also committed to working together with Florida's tribes. Our application resulted from extensive cooperative engagement with the Seminole Tribe of Florida and the Miccosukee Tribe of Florida, as reflected in the state's program submittal.

In closing, as an important part of the Clean Water Act's cooperative federalism structure, 404 assumption will ensure greater protection of Florida's water resources, reduce duplication of effort and overall expenditures by state and federal authorities, and better align the Section 404 program with other programs for which Florida already has primary responsibility. Approval of Florida's application would also demonstrate a workable pathway for states interested in administering their own Section 404 programs while also providing valuable flexibility for EPA and individual states to develop programs that match state-specific needs. Thank you very much.

Jan Connery: Thank you, Mr. Wolfe.

Okay. Thank you. Appreciate your staying within the time limit. All right. So we will move to our next speaker. That's Christina, and apologies if I mispronounce your name, but Reichert. Christina, would you like to state your name and affiliation for us and then begin your comment?

Christina Reichert: Hello. My name is Christina Reichert, and I'm providing testimony on behalf of Earthjustice. The Department of Environmental Protection's incomplete and inadequate application to take over the Clean Water Act 404 program must be rejected. Florida's wetlands are vital for the safety and wellbeing of Floridians, with their role in keeping our drinking water clean, controlling floods, and creating a buffer against hurricanes. Wetlands also provide crucial habitat for the incredible biodiversity in the state. Protecting wetlands serves national interests and resiliency, clean water, and biodiversity. The department's track record for protecting the environment in Florida has proven that it should not assume this program.

First, we request that the EPA reverse its September 2020 determination that the department's application is complete because it has major gaps that include meaningful public comment. The public does not currently have the information necessary to meaningfully comment on the state's proposal, and EPA does not have the information it needs to ensure that the state's program will satisfy the Section 404(b)(1) Guidelines. At the state level, the department left substantial questions unanswered, and the public was unable to fully weigh in on the department's plans. The department promised to answer those questions when it submitted its application to EPA, but they remain unanswered. First, the department's application fails to identify the waters that Florida's program would cover, which is critical information for the public to know so they can assess how their interests will be affected. Second, the department has not explained how the state's listed species will be protected and instead points to an anticipated programmatic biological opinion that was not included in the state's application package and is not available to the public. In fact, this process is still being completed. These significant gaps will only cause confusion and create a risk of legal liability. The EPA must reject the department's attempt to speed through this process with a partial application when assumption implicates the future protection of vital state wetlands.

Second, we ask the EPA to reject the department's application to assume the 404 program because the department is simply unable to implement, operate, and enforce the state 404 program without additional funding and staffing. The department has failed also to show that taking over the 404 program will not jeopardize the survival and recovery of protected species in the state. And federal review and protections are essential to safeguarding Florida's critically important wetlands, drinking water, and biodiversity. First, the department lacks the resources, staff, and funding to implement, operate, and enforce the state 404 program, especially given the economic effects of COVID-19. The department has proven ill equipped to adequately protect the environment and cultural resources in Florida, given dramatic cuts to staffing, reductions in expertise, and inadequate enforcement of existing environmental mandates. Despite its inability to implement and enforce its current programs, the department claims it needs no

additional resources to run a state Section 404 program. This position is unrealistic and flies in the face of other states that spent millions of dollars to create and implement their 404 programs.

Second, Florida's unprecedented approach to listed species must be rejected. The department has proposed to engage in a one-time programmatic consultation that does little more than identify procedures for overburdened and inexperienced state employees to follow when processing permits. Although programmatic consultation can provide a framework for future proposed actions, the truncated consultation in Florida's proposal is in contravention to the ESA's mandate, implementing regulations, and court order holdings. Finally, Floridians cannot afford to lose the protections of federal laws that are triggered when federal agencies operate a 404 program. Federal laws are essential to protect Florida's vital wetlands from local political pressure and special interests, particularly given the fast population growth and development in the state. Federal operation of the 404 program triggers a myriad of other federal protections, including the Endangered Species Act that protects the rarest and most at-risk wildlife in our state, the Magnuson-Stevens Act that protects the essential fish habitat in our world-class fisheries, the National Environmental Policy Act that ensures the public has a voice in government decision-making, and the National Historic Preservation Act that protects our history and cultural resources. The State of Florida has no substitute for these federal laws and protections. Moreover, Florida does not provide the same access to courts as is available under federal law. The EPA must reject this request.

Thank you.

Jeaneanne Gettle: Thank you, Ms. Reichert.

Jan Connery: Okay. With no questions of clarification, we will move to the next set of speakers, and that is speaker group two. Our first speaker here is Lindsay Dubin. Lindsay, please begin by saying your name and affiliation.

Lindsay Dubin: Hi. My name is Lindsay Dubin, and I'm a staff attorney at Defenders of Wildlife. Thank you so much for the opportunity to speak today. While we are opposed overall to the State of Florida's assumption of the Clean Water Act 404 permitting program, we're today asking the EPA to suspend permit review and provide members of the public with an opportunity to comment on Florida's completed application. And in order for the application to be completed, at a minimum, it must include the biological opinion and the incidental take statement resulting from EPA's and the Fish and Wildlife Service's consultation on Florida's assumption request. Now, we have serious concerns about the impact that Florida's assumption of the Section 404 permitting program will have on wildlife, such as the iconic Florida panther, Florida manatees, loggerhead sea turtles, the Saint Andrew beach mouse, and piping plovers. And their predicaments are made all the more dire by impacts we've started to see involving climate change. We question the state's ability to ensure the safety of these and dozens of other species that are on the brink of extinction, where it is in control of this program.

Now, state environmental agencies already are stretched quite thin. Budgets have shifted in light of the pandemic. Environmental enforcement has plummeted when compared to 10 years ago, and the state has made no commitments to adding staff or financial resources to its program administration. Now the public is being asked to take a leap of faith that the state can handle this important responsibility under Section 404. However, we've seen no demonstration that this is the case. Now, this is because the Clean Water Act and its regulations provide that federal agencies and, in turn, any state that assumes 404 permitting control can guarantee before issuing a permit that a project won't jeopardize the future existence of a listed species, nor will it adversely modify critical habitat. And members of the public have a right to comment on whether or not, for this program, we'll be able to achieve that same end. However, it's our understanding that the State of Florida will use a programmatic biological opinion and a one-size-fits-all incidental take statement on its request to assume control of the 404 program to develop these guardrails. So the application that was submitted by the State of Florida was incomplete because it didn't fully address its responsibility to ensure of its no-jeopardy mandate. And so as members of the public, we therefore have not been able to see what this program will look like and what its impacts will be on endangered species.

A little bit less than a month ago, I sent an email to the agency requesting information on this process, and I was told that consultation was still underway, so no ITS nor a buyout had been completed. I had asked for the biological evaluation, which is a precursor to formal consultation, and I was told that I would need to submit a Freedom of Information Act to receive that documentation. It is unclear to me whether or not consultation has been completed,

but either way, in order for members of the public to be able to assess what the impacts that this program will have on endangered species and whether or not Florida will be able to achieve the no-jeopardy mandate in the Clean Water Act regulations, members of the public must be provided with information resulting from this consultation process because the application that we've been provided is simply incomplete. And because of that, we are now requesting that EPA suspend consideration of this assumption package until the application has been completed and until the public has been given a new window to comment of at least 45 days on the completed application, which must include the biological opinion and the ITS. Thank you so much for your time and consideration.

Jeaneanne Gettle: Thank you, Ms. Dubin. We have no follow-up questions.

Jan Connery: Great. Thank you, Lindsay. Next speaker, and that is Kelly Cox. Please go ahead, Kelly.

Kelly Cox: Thank you and thank you for the opportunity to speak. My name is Kelly Cox. I'm the general counsel for Miami Waterkeeper. Today I'm providing testimony on behalf of Miami Waterkeeper and Waterkeepers Florida. Miami Waterkeeper is a Miami-based nonprofit organization that seeks to defend and protect South Florida's watershed. We operate in Miami-Dade and Broward counties, and we are members of the Waterkeeper Alliance. Waterkeepers Florida represents more than 45,000 square miles of watershed in the State of Florida. Miami Waterkeeper and Waterkeepers Florida are both opposed to the State of Florida's request to assume Clean Water Act Section 404 authority from the Army Corps. And that's because Florida's waterways are uniquely connected and are critical to our public health, our economy, and our environment. The State of Florida relies on a clean water economy. Everglades National Park alone generates more than $100 million annually in tourism revenue, and our outdoor recreation industry generates $58.6 billion annually. Our state's widely recognized as the sport fishing capital of the world, and our waterways support billions of dollars in commerce each year and create tens of thousands of jobs for Floridians.

Our state has particularly fragile and critical areas that are regulated by Section 404 dredge and fill permits and which require the highest level of review and scrutiny. Currently, federal Section 404 permits and state ERP permits overlap in that both must be obtained for impacts above regulatory thresholds in federal waters. The additional oversight provided by the federal government is critical to adequately protecting our water resources. What's more, this delegation to FDEP would add additional regulatory burden to the department, which is already under-resourced for its current responsibilities. For example, FDEP is woefully behind schedule on total maximum daily load development and is regularly behind enforcement actions related to the National Pollutant Discharge Elimination System Permit Program. Miami Waterkeeper and waterkeeper organizations across the state have actually had to initiate independent and NPDES permit compliance review to attempt to bridge this gap in regulatory enforcement, a duty that surely should not be tasked to a nonprofit organization.

That said, FDEP is not well positioned to assume the additional responsibilities and permanent demands associated with this program. Additional responsibilities will divert resources away from these critical pre-existing duties, and the department lacks the resources, staff, and funding to implement, operate, and enforce the 404 program. Our state is experiencing an economic downturn due to COVID-19, and the department has felt these effects. Budgets have been cut and staff support has been reduced. And yet, FDEP continues with this application that would cost taxpayers millions of dollars to just get it off the ground. FDEP should focus instead on their existing obligations, such as enforcement and mitigation rather than seeking additional responsibilities that we already know they will not be able to adequately oversee. The department's claims that it can fold a 404 program into its existing program should be rejected. It's not feasible and it's not tenable for Florida's water resources.

Additionally, there has been substantial public opposition to the state's proposed assumption of Section 404 authority. FDEP has moved forward with this application during a global pandemic during which families are struggling to put food on the table and care for their loved ones. Despite this opposition and these very clear limits on public participation, FDEP has continued to move forward with this application, and that's deeply inappropriate, it's not inclusive, and it doesn't reflect the public's position on this matter. So on behalf of Miami Waterkeeper and Waterkeepers Florida, our hundreds of members and thousands of acres of watersheds, I urge the EPA to reject FDEP's 404 assumption application package. This assumption is not in the best interests of Floridians or Florida water resources. Thank you.

Jeaneanne Gettle: Thank you, Ms. Cox. We have no clarifying questions.

Jan Connery: Thanks, Jeaneanne. In that case, we'll move to our next speaker, and that is Amber Crooks. Amber, please begin by stating your name and affiliation.

Amber Crooks: Yes. Hi. You can hear me okay?

Jan Connery: Yes. Just fine, Amber. Please go ahead.

Okay. Great. My name is Amber Crooks. Good morning. I'm here today on behalf of the Conservancy of Southwest Florida and over 7,000 supporting families. The conservancy was founded over 50 years ago to protect Rookery Bay and the Ten Thousand Islands from a road to nowhere. To this day, we continue to comment at all three levels of government, local, state, and federal, three levels that we believe should remain to protect our wetlands from overdevelopment and drainage. We ask that you deny Florida's request to assume the 404 program, as we do not believe the program meets the requirements, the state does not have the budgetary resources to take it on, and the implications to the National Environmental Policy Act and the Endangered Species Act are far too great to overcome. Throughout the process, Florida has stated that they do not intend to charge applicant fees for this program and that they can take on the awesome burden of the Clean Water Act Section 404 program without additional staffing or administrative funding. However, the state and federal permitting programs are distinctive, not duplicative, as the state program defines and assesses cumulative impacts and secondary impacts in a different way than the Clean Water Act.

Further, FDEP staff will have a large learning curve of implementing 404(b)(1) guidelines and coordinating endangered species cases of which they are not currently knowledgeable. FDEP will be relying on a state wildlife agency, the Florida Fish and Wildlife Conservation Commission, to perform vital functions in their effort to attempt compliance with the ESA. However, FWC's financial commitments and expected workloads are not a part of this application, yet the MOU, which as we know, the Federal Service hasn't yet signed, states that FWC will be relied on to analyze effects and minimization measures relative to Florida's 130-plus federally listed species although trying to also uphold their own mandates for state species. The State of Florida is in a fiscal freefall. Even before the current health crisis, the state was not providing assurances of sufficient resources. Now we see the state has an estimated $2.7 billion shortfall, and I recently heard it may actually be up to about $5 billion for the next fiscal year, which will of course impact FDEP and FWC's ability to take on the 404 program.

Secondly, we are extremely concerned about the impact of assumption on federal protections. Today I'll focus with my limited time on NEPA. The language in FDEP's program does not compare to the benefit of having NEPA as a tool to protect our wetlands. FDEP's program does not include initiating environmental impact statements when a project poses significant impact to the environment. FDEP has simultaneously claimed that the elimination of NEPA would be a cost savings to the regulated community while also stating that the 404(b)(1) Guidelines are equally protective. But both cannot be true. We have seen firsthand the power of NEPA to help protect wetlands. In 2010, the Army Corps announced two proposed EISs down here in Southwest Florida that they deemed necessary to protect drinking water supplies and conservation lands. This prompted the withdrawal of large mining projects, totaling over 13,000 acres in one EIS study area. In the other EIS study area, the effort resulted in a reduction of 500 acres of wetland impacts to 60 acres of wetland impacts, all while FDEP, on the other hand, had permitted all of these projects in just a three-year period, allowing 100-- or excuse me, 1,000 acres of impacts in those wetlands. The Army Corps' use of NEPA is the major reason that these projects are not already built, which would have caused irreversible damage in the heart of the Western Everglades.

And finally, although I could spend some time going into detail about how unsuited the FDEP permitting system is for public noticing purposes, I've got limited time, so I want to conclude our comments by calling into question the validity of the list of retained waters that were included in Florida's submittal. The conservancy has provided a list of waters that should be reviewed for inclusion, and the Army Corps itself had a much longer list, 17 pages versus 16 pages of waters it had actually released for public commenting that also appear to contain waters that should be reviewed for retention. As you know, wetlands help cleanse water, can store up to a million gallons of water per acre during times of flood, and as Naples felt during Hurricane Irma, it helps protect our communities from storms. So we

need every tool in the arsenal to protect our remaining wetlands, both as it's related to our quality of life but also to our economy. We respectfully ask that you deny Florida's request to assume the 404 program. Thank you so much.

Jeaneanne Gettle: Thank you, Ms. Crooks. We have no clarifying question.

Jan Connery: Great. Thanks. So our next speaker, Brian, isn't here yet, but we are on his schedule, so he may join us, and we'll circle back to him. So what we're going to do is take Preston, who is here, as our next speaker. I also see that two folks have raised their virtual hands, Christopher and Michelle. So because we're ahead of schedule, after Preston, Christopher, heads up. I'm going to be calling on you and then Michelle. And both of you will be commenting in exactly the same way that you've been observing everyone else, stating your name and affiliation, and then up to five minutes for a comment. So right now we'll go to Preston. Preston, please begin by saying your name and affiliation.

One moment, Preston.

Meredith Outterson: Just unmuting you. One second. There you go. Please go ahead, Preston.

Jan Connery: Preston, we can't hear you. Are you there?

Meredith Outterson: Preston, you're unmuted on our end, but please be sure that your computer or phone is unmuted on your end.

[silence]

Jan Connery: Okay. Well, I think what we may need to do is also circle back to Preston. So Meredith, perhaps you can work with him and see if we can get his audio going. So let's go ahead with Christopher Emmanuel. Meredith, can you unmute Christopher, please?

Meredith Outterson: Yes. Christopher, you've been unmuted.

Christopher Emmanuel: Thank you very much. My name is Christopher Emmanuel. I'm a policy director at the Florida Chamber of Commerce, the state's largest business association. The Florida Chamber of Commerce [crosstalk]--

Jan Connery: Mr. Emmanuel, could you spell your last name for me, please?

Christopher Emmanuel: Forgive me. It's Emmanuel. That's Echo, Mike, Mike, Alfa, November, Uniform, Echo, Lima.

Jan Connery: Thank you very much. I appreciate that.

Christopher Emmanuel: The Florida Chamber of Commerce appreciates the EPA and the State of Florida's efforts to transition the 404 wetland permitting authority to the state, and we fully support the EPA's approval of Florida's formal request to assume this program. The significance of the EPA and the State of Florida's progress towards establishing a state Section 404 permitting program cannot be overstated. You and your talented team at the EPA should be commended for overcoming the factors that have stymied other efforts for the past 40 years for this important assumption. And the EPA and the state are on the precipice of a major victory for cooperative federalism. The state's proposed program will boost the protection of Florida's wetlands by having some of the same statewide team of experts who already administer Florida's statewide wetlands programs also administer this similar 404 program. This streamlined approach is good for Florida's environment, supported by Florida businesses, and passed the Florida legislature with bipartisan and near unanimous support. The Florida Department of Environmental Protection has developed a comprehensive permitting program that carefully and completely protects Florida's natural resources in the same way that the EPA is a well-funded, well-structured, and well-thought-out system. This robust program easily meets the Clean Water Act's assumption criteria under Section 404, and accordingly, it should be approved. On behalf of Florida's businesses and residents, the Florida Chamber of Commerce appreciates your considerations and respectfully asks for you to support the FDEP's request to assume this program. Thank you.

Jeaneanne Gettle: Thank you, Mr. Emmanuel. We have no follow-up questions. I would just comment that if you weren't on our original schedule and you are going to comment, I would appreciate if you would spell your first and last name so that we have it correct in the record. Thank you.

Jan Connery: Okay. Great. Well, we are going to move on to the second person who has raised their virtual hand to let us know that they would like to comment. And if anyone has joined us since my opening remarks and explanation of the process, we do anticipate having and already have a little additional time during this hearing. So if you are someone who did not already register to comment, then you are able to raise your virtual hand to let us know that you'd like us, if we can, to fit in your comment as we have time during this hearing. So you're welcome to do that. The next person who's taken advantage of that opportunity is Michelle Mackey. And Michelle, per Jeaneanne's request right now, please start by not only stating your name and affiliation, but also spelling your name as well, and then proceed to your comment. You'll have five minutes.

Michelle Mackey: Hi there. Thanks for allowing me to speak. My name is Michelle Mackey. That's M-I-C-H-E-L-L-E M-A-C-K-E-Y. And I am just representing myself as a member of the public. I don't have as much a comment as I do questions because I'm still kind of developing an understanding of how Florida's control will affect regional areas. So I'm curious if anyone can break down how Florida's control will affect smaller scale neighborhoods that are closest to the wetlands, like Naples, for example. And I'm curious if anyone can provide examples of ways in which Florida has been deficient in protecting cultural resources. That was mentioned before. So yeah, I just really had questions.

Jeaneanne Gettle: Right. So Ms. Mackey, this is a public hearing, and we are not in-- we're not in a position to really provide explanations and responses. I encourage you to go to the Federal Register to read about the assumption process and also to EPA's website, where we talk about the assumption process. What I can tell you is that wetlands permits go down to the local level, and so they do impact where wetlands are present, and that there are a number of nuances to that that you should look at the Federal Register and look at the application submitted by the State of Florida. With regard to cultural resources, I would refer you back to the State of Florida and to their State Historic Preservation Office for that question.

Michelle Mackey: Great. Thank you so much.

Jan Connery: Okay. Thank you. So yeah. So we have a little additional time as well, and we are still ahead of schedule. I see that more folks have raised their virtual hand, so we will go to the next. And the next person who's raised their hand is John Goolsby. Meredith, would you please unmute John's line?

Meredith Outterson: Yes. John, you're unmuted now, so please, you can go ahead and unmute on your side and provide your comment to EPA.

Jan Connery: And please, John, start by stating and spelling your name and let us know your affiliation, and then you'll have five minutes for your comment. Okay. We're not able to hear John. Are you muted at your end, John? Okay. Well, we're not--

John Goolsby: I'm sorry. Let me try that.

Jan Connery: Okay. Now we can hear you just fine.

John Goolsby: It's a different unmuting button. Yeah. This is John Goolsby. It's G-O-O-L-S-B-Y. And I am a environmental consultant in Florida, and I've been doing so for 40-plus years and was a former water management district regulator. I support the assumption request, and the DEP and water management districts appear to be well equipped to assume the Corps permitting program. And I assume that Florida will sufficiently fund this effort as needed as the program would be implemented, and they would understand what the associated costs would be. Florida already protects its waters and wetlands and can easily assume the Corps program without additional adverse effects to the wetlands. We do not need the additional layer of bureaucracy and permanent costs that are now evident. Having state control will likely reduce the review timeframes significantly and benefit Florida businesses and agricultural entities. And thank you very much.

Jeaneanne Gettle: Thank you, Mr. Goolsby. We have no clarifying questions.

Jan Connery: Okay. I just want to circle back and see if Preston may have solved his issues with-- Preston, are you there? If you're muted at your end, please unmute yourself. Okay. All right. Well--

Yeah. And for purposes of people on the phone, do you think that we could have Meredith explain where the buttons are to unmute and to make sure that people are aware of the way they should unmute their phones, just as a review?

Meredith Outterson: Sure.

Jan Connery: Go ahead.

[crosstalk].

Meredith Outterson: Again, so if you're registered to speak or we're calling on you, I will unmute you on our end of the webinar. But you may also be muted on your end if your computer is muted as a whole. So on your computer itself, there's a mute and unmute button on your keyboard. It's usually in the upper right-hand corner of your keyboard. So you could try there. If we can't hear you as you're speaking, you may be fully muted on your end. And if you're on the phone, there are buttons you press to unmute, which I believe is #6. Oh, it looks like we might have Preston now. Preston, go ahead.

Jan Connery: We're still not--

Meredith Outterson: Preston, you're showing as green audio now, but we're still not hearing you. Are you speaking? Could you speak up into the microphone?

Maybe you need to increase the volume or something.

So Preston, I'll send you a chat to try to help you resolve this issue. We do want to take your comment.

Jan Connery: Okay. All right. Well, again, we are still ahead of schedule, so we do have another person who's raised their virtual hand. That is Ed Thomas. So Meredith, if you would unmute Ed's line, please. And Ed, you're going to start by stating and spelling your name and also providing your affiliation, and then you'll have up to five minutes. Please go ahead.

Ed Thomas: Okay. Can you hear me?

Jan Connery: Yeah.

We can hear you just fine.

Ed Thomas: Can you hear me?

Jan Connery: Yep.

Ed Thomas: Okay. Awesome. Awesome. Awesome. So Ed Thomas. It's E-D, and then Thomas, T-H-O-M-A-S. I'm with The Fertilizer Institute, and we represent the nation's manufacturers, retailers, and wholesalers of fertilizers. So I'd like to state for the record today that fertilizer is a key ingredient for growing food needed to feed the world's burgeoning population. The United States is among the world's largest producers of nitrogen-based fertilizer and phosphate. The fertilizer industry is responsible for more than 30,000 jobs and more than $8 billion in economic activity in the State of Florida alone. TFI and its members have a strong interest concerning regulatory and permitting requirements at the federal and state level [inaudible] in a way that cannot hinder economic growth while continuing to protect our environment. Clean Water Act Section 404 authorizes the Secretary of the Army acting through the Chief of Engineers to issue permits for discharge of dredge of fill material in navigable waters. Under Section 404(g) of the Clean Water Act, the state can seek to obtain authority to administer its own permit program or discharge of dredge or fill materials in navigable waters within its jurisdiction. If the EPA Administrator determines, pursuant to Section 404(h)(2)(A) of the Clean Water Act, that the state has the required authority to issue permits [inaudible] program, then the administrator is required to approve the state's assumption of the program.

TFI is in support of Florida's request and believes the EPA has provided for the record-- the record shows that the State of Florida has fully satisfied the statutory requirement to warrant transfer of the Section 404 dredge and fill permit program from the US Army Corps of Engineers to the state. The Florida DEP already operates the

Environmental Resources Permit Program to regulate the disposal of dredge or fill material in state waters pursuant to state law. As outlined in the memorandum of agreement between the Florida DEP and the EPA, the state's assumption of the Section 404 permit program will not undermine existing environmental protections or EPA oversight of the state's permit program. However, transferring the Section 404 permit program to the State of Florida will lead to greater efficiency and streamlined procedures where a single-state permit would be able to satisfy both federal and state requirements. This would provide permit applicants greater certainty, prevent conflicts, and avoid unnecessary delays and expenses that result from the current dual-permit program.

So although we do have some concerns with EPA's decision to change its longstanding interpretation of the applicability of the Section 7 Consultation Process to its decisions whether to approve a state assumption request, TFI appreciates that EPA engaged the public and undertook a notice and comment process before making change. TFI also notes the outcome of this program would provide liability protection against any [inaudible] that would result in the Section 404 permit issued by the state, although it remains to be seen whether a programmatic review would be able to [inaudible] impacts that may result in the state's assumption of the state 404 permit program. TFI supports EPA's goal of providing certainty and a regulated community through programmatic biological opinions and incidental take statements. For the reasons stated in this public comment period, we support Florida's request to assume the Clean Water Act Section 404 permit program. Thank you.

[crosstalk].

Jeaneanne Gettle: We have no clarifying questions.

Jan Connery: Okay. Great. Well, thanks very much, Ed. So we are a little bit ahead of schedule. So as mentioned, I think we're going to take a short break so that we realign and that the next group of speakers will start at 10:15. So what we're going to do is--

Meredith Outterson: So, Jan, I think we've resolved Preston's audio issues, so we're going to-- let's try him one more time.

Jan Connery: Oh, okay. We do have Preston. Well, that's terrific. Okay. Let's take Preston, and then we'll take a briefer break. Preston, please go ahead and state your name and affiliation and then comment. Well, still not hearing Preston, Meredith.

Meredith Outterson: Yeah. Not quite yet. Okay. Preston, we'll keep working.

Jan Connery: All righty. Okay. So we are going to take a break and resume at 10:15, which is in just about 10 minutes. So Meredith, can you please mute everyone until then? And we'll start promptly at 10:15 AM with speaker group number three.

And thanks to everyone who's participated so far.

[silence during the break]

Jan Connery: Hello, everyone. It's 10:15, so we will be resuming the public hearing. This is Jan Connery. I'm the facilitator for this hearing. For the benefit of anyone who is just joining us now, we are taking public commenters in the order that they signed up to comment when they registered. And we are also finding that we have opportunities here and there where we have a little extra time and are able to take additional speakers. In other words, anyone who didn't sign up to comment originally but finds today that they would like to comment period-- if you would like to do that, you can signal that to us by raising your virtual hand using the hand icon, and we'll make a note of that, and we will be happy to fit you in as time allows. So Meredith, are we good to go, good to proceed with everything?

Meredith Outterson: Yes.

Jan Connery: Okay. Excellent. Well, we are now starting speaker group three, and our first speaker here is Marjorie Laurent.

Do we have Mr. Robertson yet?

Meredith Outterson: I am still working with Mr. Robertson, so we will circle back to him once we think we have the audio issues solved.

Jan Connery: Thank you very much.

Okay. Yeah. So we will start with the first speaker in group three. That is Marjorie Laurent. Marjorie, please state your name and affiliation and then begin your comment. You will have five minutes.

Marjorie Laurent: Good morning. Can you hear me?

Jan Connery: Yes. We can hear you just fine.

Marjorie Laurent: All right. My name is Marjorie Laurent, and I am speaking to you today as a private citizen. I'm objecting to the Florida Department of Environmental Protection's proposal to assume jurisdiction under Section 404 of the Clean Water Act for wetland permitting in the waters of the United States. I know as a private citizen how the present FDEP permit process cuts out public scrutiny and allows latitude in self-reporting and omission of responses on permit applications. I have an example. A recently issued FDEP permit for a marina development in Boca Ciega Bay, where I live, is allowed inadequate information, omissions of answers to questions, and inadequate public notice in the process of approval. The rules the FDEP has in place for the type of permit needed for that marina project do not protect the interests of the public but favor the permit applicant. If FDEP is allowed to administer Section 404, federal oversight will be gone. That essential check to balance the interests of the public with the use of our waterways will be disastrous. The FDEP does not have the resources to undertake this massive permitting responsibility. The FDEP does not have the intention to allocate any of the new funding resources required or responsible permitting processes. The state merely wants to streamline a process specifically put in place to protect our valuable natural resources. This streamlining will significantly weaken the process.

It's important to note that the FDEP is a permitting agency, not an environmental protection agency. FDEP actively looks for ways to help those seeking permits to be successful in obtaining those permits because it's bias is inherent in the permit-issuing process. Complying with state and federal regulations becomes vitally important to the interests of the public and to balance that with the interests or the rights of appropriate equal use of Florida's waters. This makes the FDEP's plan to take over Section 404 a conflict of interest that would be a disservice to the public. Section 404 requires permits to be applied for the use and discharge of dredged and fill materials into the waters of the United States, including wetlands. Florida has particularly fragile and critical areas that are regulated by 404 and which require the highest level of review and scrutiny. Currently, federal Section 404 permits and FDEP environmental resource permits overlap, and they must be obtained in cases where the impacts rise above the regulatory thresholds in federal waters. This additional insight provided by the federal government and agency expertise in this area is critical to adequate protection of the Florida waterways.

If FDEP takes over this process, it will eliminate the original additional scrutiny of federal laws that apply to federal permit actions. For instance, under the FDEP's proposed rules, there are no specifications for process or procedures to assure compliance with Section 7 of the Endangered Species mandates, assuring the protection of the many listed species which live in Florida's water bodies to deleterious actions. Additionally, the requirements for federal agencies to prepare extensive environmental impact statements for a major federal action significantly affecting the quality of the human environment would no longer be required as there are no state laws requiring such a crucial review by the FDEP. I would strongly urge you to disapprove the FDEP's request to assume the administration of this Section 404 of the Clean Water Act.

[silence]

[crosstalk]. Jeaneanne Gettle: We have no clarifying questions.

Thank you.

Jan Connery: Great. Okay. So our next speaker, Christian Wagley, had let us know just prior to this hearing that they were not going to make a comment. So we're going to take the next three speakers, who I understand are all with us. So we'll go next to Lance Pierce. Lance, if you would please state your name and affiliation and then begin your comment. You will have five minutes. Meredith--

Meredith Outterson: Lance, you've been unmuted, so please go ahead and provide your comment.

Jan Connery: Or check if you are muted at your end, Lance, because we're still not able to hear you. Is there any way in which you have muted yourself and need to unmute?

Meredith Outterson: Still not hearing you, Lance. I can send you a chat message and try to help you resolve the issue.

Jan Connery: Okay. Great. So yeah, Meredith will work with you, Lance, to get that resolved. We will go then--

Meredith Outterson: We should have Preston on the line now. We think the issue is resolved there.

Jan Connery: Oh, fantastic. Okay. Let's go back to Preston then. And Preston was in an earlier group of speakers there. There is Preston. Okay. Preston, glad that we could get you connected. Please start by stating your name and affiliation and then proceed with your comment. You'll have five minutes.

Preston Robertson: Thank you. Preston Robertson, Florida Wildlife Federation. And can you hear me?

Jan Connery: Yes. We can hear you just fine now.

Preston Robertson: Hey. Thank you for your persistence. The Wildlife Federation is a statewide nonpartisan conservation organization. And I'd like to thank y'all first of all for-- at the beginning of this talk, you very correctly said that water is the economic and environmental lifeblood of this state, probably more so than any other state in the union. And the Federation really feels we need as much protection as we can over this vital resource. Now, we do know and have some problems with the application itself that EPA put-- sorry, the DEP put forth. It doesn't list the exact waters that are going to be impacted, nor does it fully explain how endangered species are going to be protected. We have more listed species in this state because we're subtropical, at least in the southern part than any other state in the continental US. And so it's critical that these questions be answered.

The other thing I wanted to bring forth is there have been folks talking about how regulation needs to be streamlined. To me that means an elimination of boxes that need to be checked to ensure that this resource is protected. We all need to keep in mind that this is a public resource. I mean, our potable water and our recharge areas are critical for life in this state, and not just life for us but for all of our wildlife that makes the state special. They proceeded with rulemaking even though there was strong opposition to this effort. And I fully agree with the previous speakers that have said we're in an economic downturn here because of the COVID pandemic, and it just seems somewhat odd that we are pursuing what more than likely would cost a tremendous amount of tax dollars to change a system that is presently working to provide the most protection to our water resources. I would also ask - and I'm sure you have - to just look at DEP's website about the impaired water bodies in this state. They have a very difficult job. We have 22 million people in this state, 1,000 people coming in every day, and every single one of those folks has an impact on our water quality and quantity. But the impaired water bodies list on the website is extensive, and they have been impaired for many, many years. So we simply don't believe that for this very critical issue, DEP has the resources staff-wise or is ensured of the financial resources to actually conduct this program to the benefit of the public and of this public resource. Thank you.

Jeaneanne Gettle: Thank you, Mr. Robertson. We have no clarifying questions. And I appreciate your patience in working through the audio issue. Thank you.

Jan Connery: Okay. So we will now go back to our speaker list. We are in speaker group three, and our next speaker is Lance. Now, Meredith, have you been able to-- oh, no. Okay. I see. Right. We're going to go to Eric first. Meredith is still working with Lance. So Eric, would you please begin by stating your name and affiliation? And then you will have five minutes for your comment. Meredith, is Eric unmuted?

Meredith Outterson: Yes. Yes. It looks like he--

Eric Hughes: Yes. Yes. Can you hear me?

Jan Connery: Yes.

Yes. We can hear you now very well.

Eric Hughes: Thank you very much. My name is Eric Hughes, and I am a private citizen. I have 37 years of career with the EPA and Wetlands Protection. My wife and I had lived in-- I'm getting feedback here, but I'm going to try to get through. We live in [inaudible], north of Jacksonville. We've lived here for 24 years. I want to thank EPA Region 4 for putting on these virtual public hearings. Okay. I began working for EPA in the wetlands program in 1979. That would have been the third year of Jimmy Carter's administration. I've worked wetlands regulatory all over the State of Florida for many, many years. For the first 17, working out of Atlanta, then coming down to Jacksonville, being co-located with the Jacksonville District Corps of Engineers as the EPA liaison to the Everglades project, working closely with the water management districts and DEP and continuing to work 404 regulatory. I'm proud to say that I am the recipient of three EPA superior performance awards, one silver medal and two bronze medals, also two Corps of Engineers command awards medals for my work with the other agencies. So I've been there, done that, folks. Also, in 1993, '94, when I was in Atlanta, we did issue and I helped administer a $300,000 grant to DEP for them to do a detailed evaluation of exactly what we're talking about today and wisely decided not to move forward with that. Okay. I got a lot to get through here.

The Corps of Engineers administers and has administer the program, and they have a district engineer and his staff, and they frankly are much more buffered from political influence than DEP and especially the water management districts. Okay. And I'm not happy to say this, but it is there reality. Okay. And DEP and especially the water management district protecting wetlands doesn't get it done effectively. The applicant is reviewed as the client for the staff people, not the natural environment. Okay. The natural environment routinely is getting the short end of the deal. In a recent September 17th news article in the Florida Phoenix, journalist Craig Pittman interviewed the DEP press secretary, who's claimed that DEP had somewhere in the vicinity of 400 staffers around the state to take this program over. That's a ludicrous statement. Now, this morning, we're hearing Justin Wolfe say it's 200. Is it 400? Is it 200? Is it 80? What is it? Okay.

One of the huge issues with this, if you understand the state wetland program, the ERP program—the Environmental Resource Permitting Program, like 85% of the permitting is done at the water management districts, not DEP. So the question here obviously is if this program is delegated by EPA down to DEP, is DEP going to come back in 18 months or 24 months on bended knee and say, "Oh, we need to delegate the program down to the water management districts"? The water management districts are extremely vulnerable to political influence by the governor's office and most especially by the legislature. Corps of Engineers, Department of Defense, much more buffered, okay, from this political influence. DEP doesn't deny permits; neither do to the water management districts. Look at the statistics. I'd be shocked if they denied more than 1% of permits. That's not a protection.

Okay. A couple other points. I'm running out of time. NEPA compliance. There is no DEP Florida equivalent of NEPA compliance. Endangered Species Act compliance. That's inadequate. I don't have time to talk about this whole idea of lateral retaining versus assumed water. So the states proposing 300 feet lateral. That's based on politics, not science. In 1994, New Jersey agreed to 1,000 feet, so there's no consistency there. And last but not least, and it pains me to say this, the EPA staffing levels in Atlanta are completely insufficient to provide adequate oversight of this delegated program. Thank you. I will be providing written comments.

Jeaneanne Gettle: Thank you, Mr. Hughes. We have no clarifying questions.

Jan Connery: Okay. Well, I'm happy to say that it looks like we are able to take Lance's comment now. So let's give that a shot. Lance, can you give us your name and affiliation and then start your comment?

Lance Pierce: Hey. Good morning. I'm Lance Pierce, the executive director of the Association of Florida Community Developers. We're a statewide association comprised of major community development companies in Florida. Our mission is to provide a leadership role in the creation of quality community development and the formulation of a responsible approach to the planning and development of Florida's future. Preserving Florida's environment and protecting our state natural resources has always been a priority for AFCD and our members who rely a great deal on a strong quality of life that will attract people to live in their mixed use planned community. Our association and our membership unequivocally support DEP's efforts to assume the 404 permitting program in Florida. The Florida Department of Environmental Protection's assumption of the 404 permitting program will provide an effective and efficient planning and policy framework for our members. And in turn, it will encourage and support economic development while retaining Florida's many natural assets for generations to come. Frequent and significant delays

in the processing of Section 404 permit applications at federal level add time and project costs to many of our members' development while doing nothing to protect our state's natural resources.

Because of the impact this process has to many of our members across the state, AFCD has been a willing and committed partner throughout the assumption process and continues to work closely with leaders at FDEP and EPA through the development of this program. We are committed to continue working with our state counterpart at DEP, which has decades of experience in processing environmental resource permits and the expertise to process wetlands permits faster while maintaining the same level of environmental protection. We respect and appreciate Secretary Valenstein's efforts to develop a Section 404 wetland permitting program at state level that it's good for both our environment and Florida's regulated community. On behalf of Florida's development community, AFCD appreciates your consideration of our request for assistance on this nationally significant cooperative federalism initiative. We look forward to supporting both EPA and FDEP as the state assumption of Section 404 permitting program advances toward completion. Thank you for your time today and thank you for the hearing.

Jeaneanne Gettle: Thank you, Mr. Pierce. We have no clarifying questions.

Thank you.

Jan Connery: We'll move now to our next speaker, and that is David Childs. David, please say your name and affiliation. Then you'll have five minutes.

David Childs: Hi. Thank you. Good morning. My name is David Childs. Good to see you this morning, Jeaneanne. On behalf of the Environmental Committee of the Florida Electric Power Coordinating Group, or FCG, as it's commonly known, I offer these comments in support of the State of Florida's request to administer the Clean Water Act Section 404 wetland program. By way of background, the FCG is comprised of member investor-owned electric utilities, rural electric cooperatives, and municipal utilities on environmental issues affecting the electric utility industry. So when you flip on a light switch in Florida or your air conditioning provides much-needed relief during our hot summer months down here, think of us. The FCG has a long history of working cooperatively with state and federal regulatory agencies to address initiatives that affect Florida's electric utility industry. This includes the federal NPDES permitting program, which Florida has been successfully administering for decades, as well as the TMDL program in which Florida state-level implementation serves as a model for the rest of the nation on how to restore impaired water bodies.

In addition to being engaged in those programs, the majority of the FCG member utilities hold and must periodically apply for permits issued by the Army Corps of Engineers under the federal Clean Water Act Section 404 program. The FCG strongly supports Florida and EPA's efforts in transitioning the entire 404 program to the state, which we view as a major component of EPA's cooperative federalism initiative. In our experience, at the federal level, high staff turnover, workloads, cumbersome processes, and even the occasional government shutdown lead to delays in processing Section 404 permit applications. Florida's environmental resource permits, which are the state-level equivalent of the federal Section 404 permit, are regularly received months or even years in advance of their federal counterparts. The two permits are often indistinguishable aside from the permit-issuing state.

Through its decades of experience of processing environmental resource permits, Florida developed the resources and expertise to process wetland permits faster while maintaining the same level of environmental protection. DEP is staffed with geologists, hydrologists, engineers, and environmental scientists who are experts in Florida's diverse and unique environmental features. Likewise, DEP's counterparts at the Florida Fish and Wildlife Conservation Commission have extensive understanding of Florida's endangered and threatened species and their habitats. These are dedicated state professionals, and they know Florida well, and they care about its natural resources. Under the leadership of DEP Secretary Valenstein, Florida has now developed a Section 404 wetland permitting program at the state level that carefully and comprehensively protects Florida's natural resources. This program easily meets the Clean Water Act Section 404 assumption criteria. The state's proposed program will boost the protection of Florida's wetlands by having the same statewide team of experts who already administer Florida's state-level wetlands program to also administer the similar federal program. This streamlined approach is good for Florida's environment, and it's good for Florida's regulated community, including the FCG electric utility members. We fully support the

approval of the state's request to assume the program and appreciate your time and consideration of our comments this morning. Thank you.

Jeaneanne Gettle: Thank you, Mr. Childs. We have no clarifying questions.

Jan Connery: Okay. Great. Well, we have reached the end of speaker group four, so we do have a little extra time. There's one person who's raised their hand, and they would like to comment today. That is Jen Lomberk. So Meredith, if you could unmute Jen. And Jen, because you were not preregistered, when you say your name also spell your name, provide your affiliation, and then you will have five minutes to comment.

Jen Lomberk: Good morning. Can you hear me?

Jan Connery: Very well.

Jen Lomberk: Fantastic. My name is Jen Lomberk. The last name is L-O-M-B-E-R-K. I am the Matanzas Riverkeeper. We are a nonprofit advocacy group that works in Saint Augustine, Florida, and I am also the vice chair of the Waterkeepers Florida regional entity, which was introduced earlier by my colleague down with Miami Waterkeeper. Thank you for the opportunity to comment this morning. I would like to note that Waterkeepers Florida and Matanzas Riverkeeper are both opposed to the Department of Environmental Protection's attempts to assume Clean Water Act Section 404 dredge and fill permitting authority from the Army Corps of Engineers for several reasons.

So to begin, Florida's proposed program contains significant gaps. By way of example, the department's assumption application really fails to adequately describe the waters that would be assumed if the application were to be granted, which is obviously critical information. The maps that were provided are low resolution and, frankly, impossible to read with any degree of specificity. The list of waters that was provided was similarly vague, with no specification about where these waterways are located. There are many waterways across the state that share the same name, so listing a waterway like Deep Creek, for example, with no description of location is pretty confusing and insufficient to notify the public and to inform the program. Furthermore, most of the swamps and wetlands located in my watershed in Saint Johns in Flagler County would also lose federal oversight if FDEP assumes 404 authority. The Saint Augustine and Saint Johns County coastal areas already experience regular sunny day flooding and particularly devastating flooding during storm events. Every single week, FDEP approves new environmental resource permits that allow the destruction of wetlands. So we're essentially experiencing a death by a thousand cuts situation here. Losing a few acres of wetlands every week adds up over the course of years, and it's our position that the current system isn't protective enough and this new structure would be even worse.

Additionally, the department lacks the resources, staff, and funding to appropriately implement, operate, and enforce a state 404 program. The other states that have assumed 404 authority have requested significant additional funding and staff to administer the program. And Florida has claimed that it would require no additional resources. As everyone's well aware, over the past decade, FDEP has experienced significant budget and staffing cuts that have left gaping holes in their current water regulatory programs. I would really like to push back against the previous comment touting the success of the state's TMDL and NPDES programs. But by way of example, with regard to the water quality standards program, there are sites across my watershed in Northeast Florida that are not meeting water quality standards, that have not been regularly tested in the past decade. There are water body segments in my watershed that have been impaired for years for which no TMDL or BMAP has been developed because that program is so far behind schedule. In fact, there are almost 30 impaired WBIDs within the watershed that I work in, and only one has a TMDL, and that one still doesn't even have a BMAP.

So at the statewide level, there are 4,209 water body segments that have been assessed by FDEP, and only 1,451 are designated as category two or attaining some designated use. So to simplify that, only roughly one-third of water body segments statewide are actually attaining water quality standards. Of the 1,724 unique impairments on the 2020 FDEP comprehensive verified list, 65% of those impairments have occurred in the past eight years. So this suggests a trend that water bodies are becoming impaired faster than the current TMDL program is able to improve the water quality standards-- the water quality in order to attain those standards. With respect to the NPDES program, an independent study about a decade ago illustrated that the states stormwater design standards are really falling short of meeting the pollution reduction goals outlined in the rule, which has contributed to the rampant nutrient pollution that we have right now. So I would respectfully request that FDEP utilize any additional

resource capacity to address the deficits in their current programs rather than attempting to take on this new program. The additional burden of the 404 program would further exacerbate the already stressed programs that they administer, and our wetlands really can't afford to suffer any more than they already are. Thank you so much for the opportunity to comment.

Jeaneanne Gettle: Thank you very much, Ms. Lomberk. We have no clarifying questions.

Jan Connery: Okay. Well, we are pretty much exactly on time right now with respect to the start of the next speaker group. But that said, so far we just have one person on. Let's move to the next speaker group. Oh, okay. So you can see that is Jeff Shapiro. So we are going to start with Jeff. We're going to keep an eye on whether we see the other four. But to the extent that we don't, when Jeff is done, we have a few folks here, three of the four in the final speaker group. So we will be taking those folks early if we don't see the others join us from speaker group four. Just a heads-up to all of you who are here from group five. So Jeffrey, please start by saying your name and affiliation, and then you'll have five minutes.

And Jeff-- okay.

Jeffrey Shapiro: Hello. Can you hear me?

Jan Connery: Yes. We can. Thank you.

Jeffrey Shapiro: Yes. My name is Jeffrey Shapiro, J-E-F-F-R-E-Y S-H-A-P-I-R-O, speaking as a private citizen. I simply want to state that I oppose the state's application permit process. I believe that the process will be purely administrative. The water management district was decimated during the previous eight years of the previous administration. So that's all I had to say. Thank you very much.

Jan Connery: Okay. Thank you.

Jeaneanne Gettle: Thank you, Mr. Shapiro. We have no clarifying questions.

Jan Connery: Okay. So at this point, we are going to move down to the folks who are here from the next speaker group, meanwhile keeping an eye out for anyone else and fold them in as they get here. So we are going down to-- Gabriel will be our next speaker. Gabriel, Meredith, will unmute you. Then please say your name and affiliation, and you'll have five minutes for your comment.

Meredith Outterson: And Gabriel, it looks like you're still muted on your end, so please try pressing the unmute button on your computer.

Gabriel Almedo: Here we go. Hello. My name is Gabriel Almedo. That's spelled A-L-M-E-D-O, Almedo. I am a born and raised Florida native, and I'm representing myself. As I just said, I was born and raised right here in Florida, and I've lived in this state throughout my entire life. And I've had the privilege to experience Florida's wetlands firsthand, and I've seen the many examples of ecological destruction, as recently with Biscayne Bay, where we've seen many fish dying, and we have lost around 90% of our seagrass beds. So when I heard that the EPA plans to give our state control of the Clean Water program, this has me concerned as a citizen of the State of Florida. Hold on. Give me a minute. Our wetlands not only provide-- okay. Giving our state control of critical wetlands is a very scary thought, and we could potentially lose these wetlands to development. That means we would lose land that provides critical habitat for many of our state's threatened and endangered species, like our state animal, the Florida panther. And we would also lose land that is used by the citizens for outdoor recreation. And as some speakers here mentioned, our ecotourism produced over billions and billions of dollars in revenue, and in my opinion, our state cannot handle any more infrastructure. We have built too much as it is. And as Floridians, it is our job to preserve many of Florida's natural beauty as we possibly can to ensure that future generations can enjoy. And I plan to take my future children to witness Florida's natural beauty in person and not show them a picture in a book showing what natural Florida used to look like. So I think the EPA should reject the state's request. Thank you.

Jeaneanne Gettle: Thank you, Mr. Almedo. We have no clarifying questions.

Jan Connery: Okay. We will move to our next speaker, and that is Marilyn Vazquez Almedo. Marilyn, please say your name and affiliation and then begin your comment.

Marilyn Almedo: Yes. Hi. My name is Marilyn Vazquez Almedo. I'm speaking on behalf of-- I'm a citizen and I'm just representing myself. Good morning. My name is Marylin Almedo, and I'm a native Floridian. I've lived in various parts of Florida, and I've seen the beauty and uniqueness that the state has to offer. And by the same token, I have seen the urban sprawl take over, the continual construction of more homes, shopping centers, and resorts, traffic congestion, and the making of more highways to address a problem that really has no solution. How can it when lobbyists and developers [inaudible]--

Jan Connery: I'm sorry, Marilyn. We are experiencing some audio issues.

Meredith Outterson: I think I've fixed it now, so you should be able to continue now, Marilyn.

Jan Connery: All right. We apologize. I did stop your time, so let's give it another go.

Marilyn Almedo: That's okay. Okay. The continual construction of more homes, shopping centers, and resorts, traffic congestion, and the making of more highways to address a problem that doesn't really provide a solution. And how can it when lobbyists and developers have gotten their way and continue to build? We're literally bursting at the seams. We've seen the effects of pollution on Biscayne Bay, with dying fish and seagrass beds gone, wildlife and human conflict as we continue to encroach on their habitat, and the effects of climate change and rising sea levels and the effect that this is already having on areas of our state. To think that the state now wants to take over a federal program to issue permits for development on sensitive wetlands is scary. With all the cuts that the state's Department of Environmental Protection has gone through, I do not believe that they are equipped to handle these requests. And with no specific wetlands identified or waterways, it makes me even more suspicious.

This shouldn't be about making money. Development will have a long-lasting effect on our environment and our citizens. We've lost respect for our environment. We're losing our natural history, and we will lose our right to enjoy the wonders of our state then that our tax dollars have maintained not only for our citizens to enjoy but to maintain what is left of the delicate balance that is our ecosystem here in Florida. As the saying goes, insanity is doing the same thing over and over again and expecting different results. While we keep doing the same things, not only the results are the same; they're getting worse. If these sensitive areas are made available for development, the consequences will be long lasting and permanent not only to our environment or wildlife but to us as well. I would like to be able to take my grandchild to see our native Florida, to appreciate what we have and respect it for what it is.

So my question is, when is enough enough? When we have developed everything that we can and see the consequences of this development? When we experience the strain or depletion of our natural resources and quality in life? Lobbyists and developers lining their pockets as well as those who have something to gain because let's not kid ourselves. It happens. The development of these lands will focus on the immediate monetary power and influential gains and not on long-term consequences that development on these lands will have. No respect for environment, wildlife, for the citizens of the state if these lands are developed. So I ask again. When is enough enough? I guess when we have nothing left to build on and created a concrete jungle, when some have decided to eliminate everything that is Florida for their personal gain with no consideration for the consequences on the environment, our wildlife, and our citizens. So I strongly urge that the EPA reject the state's request. Thank you.

Jeaneanne Gettle: Thank you, Ms. Almedo. We have no clarifying questions.

Jan Connery: Good. We will move to our next speaker, and that is Karen Garren. Karen, please begin by saying your name and affiliation, and you'll have five minutes here.

Karen Garren: Good morning, all. My name is Karen Garren. I'm a resident of Gainesville, Alachua County, Florida, home of the University of Florida. I've been a resident of Florida since 1978. My email address is literally "iloveflorida." I'm a wildlife biologist and was formerly an adjunct professor at Santa Fe Community College. My husband, Robert, is a wetland biologist, a superb botanist, and an environmental consultant. He assists property owners in compliance with wetland regulation and protection. He's the one familiar with codes and ordinances, so I won't be citing any. Since the mid-1970s, wetland economic values of filter purification of water, sponge absorption of floodwaters, and recharge of aquifers has been recognized and protected to some extent through regulation of permitted disturbances and development impacts. Florida had established water management districts to review

permitting of water use. The Department of Natural Resources was absorbed into the Department of Environmental Protection.

For the last couple of decades, wetland protection in Florida has been eroded by governing administrations. The permitting process has been, quote, "fast-tracked," unquote, accelerating deadlines for review and decisions. Acreage sites of wetlands to be considered for permitting has been increased. Water management districts staff and scientists have been dismissed or had their opinions stifled. District governing boards have been stacked with development interests. Although, quote, "government in the sunshine," unquote, requires transparency and public comment period, it is all for show. Qualified technical advisers had testimony disqualified. Constitutional amendments protecting natural resources that have been passed by ballot elections have been stalled, subverted, and ignored. Legislation has been passed requiring public opinion statements to come from, quote, "stakeholders," unquote, criteria established by the state. While disturbance of designated wetland soils is regulated, every year, tens of thousands of cypress trees are chipped to be sold as mulch. Florida governing administrations have made a deal with the devil, and the devil is money. One only has to look at Florida's coastal development to recognize the lack of protection for our natural processes and property integrity.

Florida's unique springs ecosystems are nutrient polluted and disappearing due to poorly regulated upland watershed activities, poorly regulated aquifer withdrawal, and outright sale to water bottling companies. Florida's Everglades ecosystems have been decimated by agriculture chewing up lands to the edges of the national park. Little to no consideration is given to connectivity of wildlife habitat, protection of endangered plants and ecosystems with the threats of climate change and sea level rise. Florida's agencies are not qualified or motivated to assume responsibilities for federally regulated natural resources. There is currently insufficient staff to review permitting requests. Compliance of permitting conditions remains poorly monitored and enforced. Wetland buffers are negatively impacted. To assume permitting, budgeting compromises will have to be made in funding education and the health system. The continuation of rampant development is unsustainable. At some point, a compromised economic paradigm must be initiated. This is part of a push to eliminate federal oversight and establish premise of the state's authority, but some issues don't stop at state boundaries. I urge the EPA to deny Florida's request to assume regulation of wetland impacts. And if any Florida elected officials are listening, close the Buckman Canal and remove the dam from the Ocklawaha River. Thank you very much for your time.

Jeaneanne Gettle: Thank you, Ms. Garren. We have no follow-up questions.

Jan Connery: Okay. Well, we are significantly ahead of schedule as four speakers from the group four didn't show up. So we have taken the folks who are present right now. And I do want to remind everyone that because we have extra time, we'd be very happy to add commenters. If you are someone who's joined us recently and hasn't yet heard, you can signal to us that you'd like to make a comment by raising your virtual hand and you'd like to do that, please do that now. This is one of those opportunities where we certainly could take your comment. Any commentaries that we add today during the hearing will follow the same process that you've been observing with other commenters. So, Meredith, I know we had someone who had raised their hand but then lowered it again. Have you been able to check and confirm whether that individual would like to speak?

Meredith Outterson: I have not been able to confirm yet. Let's see.

Jan Connery: Okay. But a hand is raised?

Meredith Outterson: Yes. So Raymond Schnell, let's go to you next.

Jan Connery: Okay. Yes. Raymond Schnell did raise his hand. We've confirmed he'd like to speak. So Raymond, because you are being added today, would you please start by stating and then spelling your name for the record? And then you'll have up to five minutes for your comment.

Raymond Schnell: Yes. Hello. Can you hear me?

Jan Connery: Yes. We can now. Please go ahead.

Raymond Schnell: Hey. My name is Raymond Schnell, S-C-H-N-E-L-L. And I'm speaking to you as a private citizen. I've lived in Miami-Dade County for over 30 years. I've been an active water sportsman for that time. I've seen the quality

of the water in Biscayne Bay and other areas in the Everglades change significantly over that time. I object strongly to the State of Florida taking over this project or the permitting on this. I think if that happens, it will just be an invitation for developers to do whatever they would like to do. And that's all I have to say. Thank you.

Jan Connery: Okay. Thank you very much.

Jeaneanne Gettle: Thank you, Mr. Schnell.

Jan Connery: Meredith, I think a hand may have gotten raised. Can you check for me, please?

Meredith Outterson: Yes. So our next person who raised their hand to speak stand-by is Matthew Schwartz. So Matthew, I'll be unmuting you now.

Jan Connery: Yep. Great. We do have time for Matthew's comment. So yes, Matthew, please go ahead. State and then spell your name for the record, and then you'll have up to five minutes.

Matthew Schwartz: Okay. Thanks. My name is Matthew Schwartz, S-C-H-W-A-R-T-Z, and I'm representing the South Florida Wildlands Association in these comments. I don't have prepared comments because I actually just found out about this meeting very, very recently. And this morning, ironically, I was addressing the final task force meeting of the M-CORES project, and that's a great example, by the way, speaking of moving permitting authority from the federal government to the State of Florida. So let's look at that project as an example. So this is a project that never received any kind of needs analysis, any kind of environmental analysis. It was approved by the Florida state legislature, signed by Governor DeSantis, and then the Florida Department of Transportation assembled three task forces, one for each leg of the project, and that's the Southwest Florida Connector, the Central Florida Turnpike Extension to bring it to the Suncoast, and then another project to run the Suncoast Expressway all the way up to the Florida-Georgia border, about 320 miles of new highway through the entire western part of the state, through wetlands, over streams, rivers, all kinds of places where the Army Corps of Engineers would normally do wetlands permitting.

I'm a little bit amused in a way because when I see people saying, "Well, don't transfer authority to the state. Keep it with the federal government." I've been on the Army Corps' distribution email list for wetland permits that come in, and I can tell you-- I mean, I barely have time-- I don't have time to read them. I said barely. I don't have time to read them. They come in like rain. And I'm listening to some of the comments that some of the people made before I spoke. And it's true what they were saying. Florida has been transformed. In one of the task force meetings, somebody referred to it as Generica. It's not that agencies or developers are trying to kill the state. It's incidental to what they're doing. The destruction, the ecological destruction of wetlands, is incidental to their economic goals of development, and that's a major-- or if not the major industry in Florida is developing. And so I'm sidetracking, but the Army Corps-- I think the only thing the state and-- not the state so much as the developers who want this moved from the feds to the state is they don't like the length of time it takes for the feds to approve a permit. It's not that they don't approve permits. They approve everything.

In fact, I would-- I don't know if you know of any, but I know of barely any Army Corps of Engineers wetlands permits that get denied. They all got approved eventually. But they take time, and the developers don't like that because they have construction costs and equipment and planning, and they want to get their projects going. So they want it moved from the feds to the state to speed up that process. And that's pretty transparent, by the way. It's pretty transparent. The FWC who is asked to consult on a lot of these projects rarely has any comment. Or if they do, it's pretty simple, and they have no teeth anyway. I mean, even if they do make a comment on the state level, it's just advisory. The US Fish and Wildlife Service will usually be brought in on wetlands issues because there's almost always endangered species or threatened species, federally listed species that are being impacted by these wetland development projects. So that triggers consultation between the Army Corps of Engineers and the US Fish and Wildlife Service. The US Fish and Wildlife Service will then dutifully write a biological opinion, which unfortunately, also almost always okays the project. Sometimes they add some mitigation. They add some minimization. They add a little bit of avoidance here and there. But by and large, the projects go through.

So because I'm here talking to the EPA, and you have oversight over a lot of these issues, I guess this is an opportunity to say, well, first of all, don't transfer authority to the state. That's absolutely a no-brainer. We've got to

keep this within the federal government, within a process that at least gives the opportunity, the NEPA process that gives the opportunity for the public to weigh in with comprehensive comments about the impacts of a project before it goes through. So we want it to stay within the federal government, but you as EPA also have a role to play in ensuring that the quality of life in this state - human life, wildlife, the quality of our waters - is protected. So I see my time is running out. Like I said, I didn't have prepared comments, but I hope you take it to some consideration, some of the things I said today. Our state is in bad shape, and it's not getting better. It's deteriorating rapidly. I work mainly with the Florida panther. Nobody will ever get a Nobel Peace Prize for discovering what's causing panthers to go extinct or any of the dozens and dozens of wildlife species. So [crosstalk].

Thank you. Thank you.

Jan Connery: Thank you very much.

Jeaneanne Gettle: Thank you, Mr. Schwartz. We have no clarifying questions.

Jan Connery: Okay. Again, I want to remind everyone that we do have extra time, so if you would like to make a comment, you just need to use the hand symbol to raise your virtual hand to let us know that. Meredith, I don't think we have any additional hands raised right now. Can you confirm that for me, please?

Meredith Outterson: We have one person with their hand raised, Richelle McClain.

Jan Connery: Oh, Richelle McClain. Okay. Very good. Well--

[crosstalk].

Jan Connery: --we certainly have time to pick Richelle now. So Meredith will unmute you, Richelle. And please start by saying and spelling your name for the record, giving us your affiliation, and you will have five minutes for your comment. Okay. Is Richelle unmuted, Meredith?

Meredith Outterson: Yes. You are unmuted, but it looks like you're muted on your side, so if you want to hit the unmute button on your computer, that should-- there you go. Are you speaking? We can't hear you yet. Looks like Richelle is having audio problems. If you're using a headset, you could try unplugging the headset. If not, I can work with you in the chat to help you switch over to the phone call audio, which should help resolve the problem. [crosstalk]--

Jan Connery: Okay. Well, we're still not hearing anything, I guess, Meredith, so you'll need to work with her. And we did have four commenters from group four who we haven't seen yet. Meredith, I want to confirm we still aren't seeing them. Mark, Larry, Richard, and Robert.

Meredith Outterson: Correct. They're still not on the line.

Jan Connery: Okay. Well, then what I suggest we do is we'll take another break so that Meredith can work with the person who would like to speak to get the audio going. It is now 11:13, so let's come back at 11:20. It's going to be a very brief break. That's about eight minutes, so I'm going to put a slide up indicating we'll have a short break. It won't have the time on it, unfortunately, because we didn't realize we were going to break at this time, but we'll be resuming at 11:20 AM Eastern time, and then we will take anyone who has raised their hand. So again, if you'd like to make a comment and you haven't yet raised your hand, please do that. It looks like we're going to have time for that, and we'll take anyone who signed up. We'll take any of our registered speakers who were with us then. And so we'll talk to you again at 11:20 AM.

Jeaneanne Gettle: Oh, Jan, why don't we go ahead and wait till 11:25?

Jan Connery: 11:25? Okay. Right. All right. The break will be-- 11:25, so that would be 11-- I'm sorry. Yeah. 11 minutes break. So we will be back then.

Jeaneanne Gettle: Thank you.

[silence during the break]

Jan Connery: If you're just joining us, we are taking a break until 11:25 AM, and we will resume then.

[silence during the break]

Jan Connery: If you're just joining us, we are taking a short break. The public hearing will resume at 11:25 AM.

[silence during the break]

Jan Connery: Hello, everyone. It's 11:25 AM. So we will resume the public hearing for Florida's request to assume administration of the Clean Water Act Section 404 program. This is Jan Connery at ERG, a contractor to EPA, the facilitator for this hearing. It is 11:25 AM. The hearing will run for another 35 minutes. We have a few speakers who had signed up to comment, and we do not yet see them on the hearing. That means that we do have time to take comments from anyone who would like to make a comment and may not have registered to speak officially. You are welcome to signal that you'd like to make a comment by raising your virtual hand, the hand icon that you see on the dashboard. That way, we'll know you'd like to comment. We'll be taking first anyone who does join us, if they do, and has already registered to speak. But so far, again, not seeing anyone there. For the additional commenters, we'll be taking the folks who raised their hands. We don't see a lot of hands raised at this point, so that offers the opportunity for some of you who've spoken, if there's anything you would like to add to your comment, there may be time for that again, as time allows. Before we end at noon, you're welcome to raise your virtual hand for that purpose as well. But we do have a couple of folks lined out up now who we're going to take. So our first commenter-- and - I'm just going to scroll back so that shows that we are taking comments right now, although it obviously isn't the correct person speaking, but in case anyone joins us. So our next commenter, this is someone who has raised their virtual hand, would like to make a comment now. That's Richelle McClain. Richelle, you're going to be unmuted by Meredith. You should start by stating your name and affiliation, spelling your name for the record, and then begin your comment. And you'll have five minutes.

Richelle McClain: Okay. Thank you. Hello. My name is Richelle McClain. R-I-C-H-E-L-L-E, McClain, M-C-C-L-A-I-N. I am a Florida resident. So I'm representing myself as a citizen. And I'm in school again because of COVID, so I've been working on studying the Everglades. It's been my project as a writer, and I'm very [inaudible] speaking about it and writing about it and understanding it. But what I have come across some of my research is that the scientists and engineers are definitely the ones who know what they're talking about, and they have to convince the politicians and developers to do the right thing. But that said, the laws and the bills for the clean water, the EPA that does look over our environments I believe is very important, and it should stay with the EPA. The Clean Water Act, I guess, Section 404, which I'm pretty new to, is supposed to give control from the federal to the states. And I don't know who would control it at the state level. Maybe the Southwest Florida management or the Army Corps, I'm not sure. But, I mean, the Clean Water Act is the basic structure of regulating discharges into the waters of the United States and regulating quality standards for surface waters. And then that was back in the '40s, I believe, and in 1972 included the wetlands, so that I found in Florida Forever. And I've worked developers here for 20 years, and I do understand all the red tape that they have to go through. And I would like to see personally a lot of conservation land being acquired again by Florida Forever, even restructuring the land development and redistricting some of this land. And of course, restoring the Everglades is a big deal that I would like to see happen and continue happening. And so I would vote no to give the states total control. I think it's a concerted effort between federal and states developer. And so that's what I would like to say today. Thank you very much for your time.

Jeaneanne Gettle: Thank you, Ms. McClain. We have no follow-up questions. Thank you.

Okay. So we do have one other person so far who has raised their hand. That's Eric Hughes. So Eric, state and spell your name, provide your affiliation, and you'll have up to five minutes.

Eric Hughes: Okay. Can you hear me?

Jan Connery: Yes, we can.

Eric Hughes: Okay. Last name is Hughes, H-U-G-H-E-S. First name is Eric, E-R-I-C. Private citizen living in [inaudible], Florida, north of Jacksonville. Thank you for letting me speak additionally. I want to focus on a couple points. There is a difference between the state and the Corps of Engineers' implementation of the two different wetland programs. I

totally understand the comment from Mr. Schwartz in terms of the fact that, yes, in fact, the Corps of Engineers, with input from EPA and the Fish and Wildlife Service, actually doesn't deny very many permits. However, the Corps regulatory process is much more stringent and drives a much harder bargain and focuses much more on reducing wetland impacts of projects, minimization, avoidance. The state program, the ERP, is very good to private mitigation [inaudible]. So basically, there's not a lot of minimization or avoidance. If you're a developer, you've got resources, you get a consultant, they go out, they do a mitigation analysis, and you write a check. You're basically buying your permit.

The other major thing that people need to be aware of - and I think people like myself who've been around notice [inaudible] now - the Corps of Engineers is a military entity, and they in fact are much more buffered from the hardcore influence of the Florida legislature and the governor's office. And then the lobbyists are overrunning and have been overrunning Tallahassee forever. So you get a new district engineer every three years, and that's their command military entity the Corps of Engineers employees, their 404 staffers. Certainly, they've got pressure, but it's nothing compared to what's going on at the water management districts and to a lesser extent, DEP. Okay. Another point I'd like to touch on is the water management district governing boards. These are all political appointees. They totally come down and control the water management district employees. Nothing I want to say. I hold the career Florida DEP and water management staffers in very high regard. I would never say anything really negative about these people. They're very good people. Unfortunately, they're working for a very political management structure. Next comment. The retained versus the assumed waters. I know this is highly technical, and I don't really have time to talk about it, but the state is proposing a 300-foot lateral limit adjacent [inaudible] the navigable waters [inaudible]. ERP is totally arbitrary, and it's totally inconsistent with the last time this determination was made by the State of New Jersey in cooperation with the EPA and the Corps of Engineers, where they at least implemented 1,000 lateral feet. So think about the additional protection of those waters. I think that's really the main points I want to make. Thank you for this opportunity.

Jan Connery: Okay. Thank you.

Jeaneanne Gettle: Thank you, Mr. Hughes. We have no follow-up questions.

Jan Connery: Great. Thank you. We do have someone else who did raise their virtual hand. And again, a reminder, if anyone would like to comment, you're welcome to let us know by raising your virtual hand right now. We do have a few minutes before the end of this hearing at noon. Our next commenter is Bruce Ritchie. Please start by saying and spelling your name, letting us know your affiliation, and then you'll have five minutes.

Bruce Ritchie: I raised my hand by accident and took it back down. Thank you.

Jan Connery: Oh. Okay. Sorry. I didn't see it'd been taken back down. All righty. So I am not seeing any other hands raised right now. And Meredith, I believe you've been checking to see whether any of the folks who have signed up have joined us. Where do we stand with them?

Meredith Outterson: So none of our missing speakers have arrived, but we would love to take their comment if they do, so I will keep checking.

Jan Connery: Okay. Okay. I noticed that someone has asked - they weren't able to join until 15 minutes into the hearing - about a record of the hearing. There is going to be a transcript of the hearing. And, Jeaneanne, that's going to be publicly available, I believe, at some point. Is that correct?

Jeaneanne Gettle: Once we receive the transcript, then anyone who requests it through the Freedom of Information Act will be able to have a copy of the transcript.

Jan Connery: Okay. Okay. So Jeaneanne, we don't have anyone else right now.

Jeaneanne Gettle: So what we will do is we will go to-- we will still be here. We will remain and keep this hearing open until noon, Eastern time. And we will continue to monitor to see if anyone raises their hands and check back with an audio check about every five minutes. For the last five minutes of the hearing, we will open it back up and do some closing remarks. So if you are online and you decide you want to make a comment, you can still do so. You can

send us a chat. You can raise your hand, and we'll see that and come back on and take your comments. Does that work, Jan?

Jan Connery: Sure. And I think we will check again at 11:45, I think, to see if anyone raised their hand, and then at 11:50 and 11:55 we could even take one more person or possibly two if they speak briefly. So at five-minute intervals, on the five minutes, we'll check, and we will resume audio if we see hands raised. Okay.

Jeaneanne Gettle: And I will still be here. I'm just going to turn my camera off.

[silence]

Jan Connery: Hello, everyone. It is 11:45. Yes.

Jeaneanne Gettle: I just need to make one clarification before we go on. I wanted to let the participants know that with regard to the transcripts, we will also place those transcript in the public record. So it would be available through the public record as well. But it is also available through a request under the Freedom of Information Act. Thank you.

Jan Connery: All right. Thanks so much for clarifying that, Jeaneanne. So we are resuming the public hearing, as noted a few minutes ago. We have invited anyone who is joining us. If you'd like to comment, we have a little bit of extra time before we end at noon, but we'd love to fit you in if we could. You can signal that to us by raising your virtual hand. And that would include people who've already commented, if they would like to add to what they had said. You may raise your hand. So as time allows, we will take you. And we do have one person who's taken us up on that offer. So we'll go again to Eric Hughes. You will again have for up to five minutes. Eric, please remind us of your name and affiliation. I don't think you need to spell your name again for us. I think we're all set there. Meredith, is Eric's microphone unmuted?

Meredith Outterson: Yes. Now it should be. Here we go.

Eric Hughes: All right. Can you hear me?

Jan Connery: Yes. We can hear you just fine.

Eric Hughes: Yes. I'm a private citizen. I'm a retired EPA Region 4 wetlands employee, 37 years. I've retired in December of 2016.

Jan Connery: And your name?

Eric Hughes: Again, my last name is Hughes. First name is Eric. And I want to thank you for providing me this opportunity for additional comment, and I will be providing written comments and [inaudible]. This last topic pains me, but I think it's important that transparency is very important here. So EPA is supposed to provide meaningful oversight to any delegated 404 program. So what's the staffing level in EPA Region 4 in the wetlands program. Now, I've worked in that program for well over 30 years. Okay. I think the maximum number of people that we had reviewing the Corps of Engineers' public notices to the 404 permits maximum was four. I think we've always had one or maybe one and a half persons doing enforcement for the entire State of Florida. Now, they were basically focusing on the really bad cases that the Corps of Engineers referred to us. These people are working really hard. So the question, which is an uncomfortable question, especially in this format, how in the world is with that staffing level EPA going to do a serious job, a legitimate job, a meaningful job of overseeing the delegated program? What level of commitment is the EPA Region 4 Administrator going to provide anybody as to whether there's going to be a substantial increase in EPA staffing for the 404 program in Atlanta to actually provide meaningful oversight? I don’t feel good talking about this, but it's the truth. That's the level of staffing, and there's a huge difference between providing written comments to the Corps of Engineers employees on focused large 404 projects versus being responsible for overseeing an entire permit program by the State of Florida, which is probably going to be - I have no idea - 1,000, 1,500 permit decisions a year? We have to be transparent about this. Thank you for providing me this opportunity.

Jeaneanne Gettle: Thank you, Mr. Hughes. We don't have any follow-up questions. Thank you.

Jan Connery: Okay. Well, I see that Richelle McClain has raised her hand. So Richelle, we'd be happy to give you-- I'm sorry. Bruce Ritchie. I think Bruce Ritchie is next and then Richelle. Oh, Bruce.

Meredith Outterson: So Jan, I checked with Bruce. He says his hand keeps accidentally getting raised, but he doesn't want to comment.

Jan Connery: Oh. Okay. All right. Okay. So Richelle, we'd be happy to give you some more time. Again, please start with your name and affiliation. You don't need to spell it again for us. But then you'll have five minutes.

Richelle McClain: Hi. I'm sorry. I just wanted to say-- my name is Richelle McClain. And in light of Eric Hughes's statement there, which I had a feeling that that was like that-- but I just wanted to say I don't understand both of the laws enough to be able to vote yay or nay on this. But I did want to get my voice out there because I do love the Everglades so much. There is no place on earth like the Everglades. And I do want to be part of the restoration project. So with that said, I just wanted to-- I just wanted to say that just for the record. Thank you very much.

Jan Connery: And your affiliation again, Richelle, please?

Richelle McClain: I am a citizen, a Florida resident.

Jan Connery: Right. Okay. Thank you. Yep.

Jeaneanne Gettle: Thank you, Ms. McClain.

Jan Connery: Thank you.

Okay. So I'm not seeing other hands raised. And Meredith, we don't have any of the folks who haven't yet commented but had signed up, so were on the list. I don't believe we have any of those with us right now.

Meredith Outterson: Correct.

Jan Connery: But we'd go to them if we did. So, Jeaneanne, it's 11:51 right now. We have nine minutes remaining.

Jeaneanne Gettle: Right. We will keep the hearing open for the next nine minutes or eight minutes at this point in time. If anyone wants to make a comment, you're welcome to do so. I would remind you that in addition to this public hearing, we have another public hearing, October 27th, which is from 5:00 PM to 8:00 PM - we'll be using the same format - and that you can also submit written comments to us through November 2nd of 2020. And the location for submission of written comments is included in our Federal Register. We will have a transcript of this public hearing and of the next public hearing that will be available in the docket or through a FOIA request to our agency. And I will just remain on the line until noon. And if someone raises their hand between now and noon, we will take that comment.

Jan Connery: Yes. And I would encourage you to raise it as soon as you can because as we get closer to noon, there'll be less time to comment. And Jeaneanne will have some brief closing remarks just before noon. So we'll be keeping an eye out for raised hands and-- oh, now we have a hand raised. It's Amber Crooks. So Amber, I believe you haven't yet spoken. We'd be very happy to give you some time right now. We're going to start by having you say your name and affiliation and spell your name, please. And then you'll have five minutes to comment.

Amber Crooks: Yes. You can hear me okay?

Jan Connery: Perfectly. Thank you.

Amber Crooks: Yes. I did speak earlier. My name is Amber Crooks. The last name is spelled C-R-O-O-K-S. And I'm with the Conservancy of Southwest Florida. Given the opportunity to add a little bit more to our prior comments-- and we were trying to be mindful of the five-minute cutoff. But we did want to speak a little bit about Endangered Species Act. And we focused on NEPA earlier. But we also have concerns about how the ESA will be complied with. Well, we believe that EPA will need to undergo that plan Section 7 review on the overarching issue of assumption, which may actually be significant enough to warrant an EIS be done by the US Fish and Wildlife Service. We do believe that the one-time programmatic opinion is not an adequate way to meet the requirements of the ESA. As you all know, Florida has several times the amount of listed species than the other two states that currently have assumed the

program. Of course, Florida is being chewed up by development as the third most populous state in the union. A programmatic approach is not going to be able to accurately assess take or ensure no-jeopardy of our cherished wildlife. And that's what I have prepared to say today, and I know that in our formal comments that we will be further articulating many of these concerns, but given the opportunity here to add a little bit more to today's comments, I just wanted to verbalize this. Thank you so much for the extra opportunity to add to our comments.

Jeaneanne Gettle: Thank you, Ms. Crooks. We don't have any questions as a follow-up, but thank you.

Jan Connery: Okay. So right now, not seeing any additional hands. I'll just note we have five minutes left. So there are just a few minutes where we could take a somewhat briefer comment, if anyone would like to raise their hand. We're going to be on the line the next few minutes, but wrapping up about a minute before noon, so.

[silence]

Jeaneanne Gettle: Okay. Jan, if you're ready, I'll go ahead and make our closing statements, if that's--

Jan Connery: Yes. [crosstalk].

Jeaneanne Gettle: [crosstalk] Anyone else with their hand up?

Jan Connery: No, we've got no one else. So I think you're safe to do that. It is almost noon right now, so please go ahead, Jeaneanne.

Jeaneanne Gettle: So again, I'm Jeaneanne Gettle. I'm the director of the Water Division at EPA Region 4, and I would like to thank each of you. And on behalf of Mary Walker, the regional administrator in Region 4, I would like to thank you for your participation in this public hearing. The comments that we received will be considered and evaluated as the EPA makes its final decision on the application received from Florida. As indicated earlier, following the close of the public comment on November 2nd, 2020, EPA will review and consider all comments received during the public comment period, both in writing and from the public hearings, so the oral comments as well. If EPA approves of the state's 404 program, a notice of decision will be published in the Federal Register. EPA will also prepare a responsiveness summary of significant comments received during the comment period and EPA's response to those comments. Additional information regarding these procedures is available by contacting Mr. Kelly Laycock at 404-562-9262 or at 404assumption, all one word, 404assumption-fl@epa.gov. Again, I want to thank you for your participation. We appreciate your interest in this issue, and I hope that you have a good rest of your day. We will now be closing the public hearing.

Transcription details:

| | |
|---|---|
| Date: | 27-Oct-2020 |
| Input sound file: | Virtual Public Hearings on Florida’s Request to Assume Administration of a Clean Water Act Section 404 Program (1).mp4 |

Transcription results:

00:04 Jeaneanne Gettle: Good evening. I am Jeaneanne Gettle, director of the Water Division at the US Environmental Protection Agency's regional office in Atlanta, Georgia. Welcome and thank you for joining this public hearing concerning Florida's request to assume administration of a Clean Water Act Section 404 program. We recognize that the natural resources in Florida are critically important to each of you, your communities, and to the state of Florida. Our agenda today is quite simple. I will begin by making brief remarks to provide background and context. Then, our facilitator will explain the comment process, and we will then start the public comment process in approximately 15 minutes. I am here virtually with several EPA colleagues. We will be listening to your comments throughout this hearing, so I would like to introduce them to you. As I say their name and role at EPA, they will show their video. So let me introduce them now: Rosemary Calli, Tom McGill, Matt Hicks, Kathy Hurld, Mita Ghosh, JT Morgan-

01:42 --Whitney Beck, Michael Creswell, and Kelly Laycock. They will all be listening, but they will not have their cameras on as we continue with the public hearing. I will have my camera on and I may look down at times while I take notes. To set the stage for this hearing, I'd like to provide some background and context. On August 20th, 2020, the United States Environmental Protection Agency received from the governor of the state of Florida a complete program submission for regulating discharges of dredged or film material into waters within the jurisdiction of the state in accordance with the Clean Water Act. Pursuant to the Clean Water Act Section 404(h) and EPA's implementing regulations, EPA opened a 45-day comment period, which ends on November 2nd, 2020. As part of this process, EPA has also scheduled two public hearings: the one today, and we had one last week on October 21st. This is the second of the two hearings. In addition to our review of the package submitted by Florida, EPA also initiated a programmatic consultation under Section 106 of the National Historic Preservation Act, or NHPA, and is soliciting comments pursuant to NHPA implementing regulations during the 45-day comment period, ending November 2nd, 2020.

03:24 EPA has three primary roles pursuant to Section 404(g) of the Clean Water Act. The first role is to work with the states or tribes to enhance their program capacity and capability through mechanisms such as Wetland Program Development Grants and technical assistance. The agency's second responsibility is to review requests by states or tribes to assume administration of a Clean Water Act 404 permitting program. This is the stage we are currently in, relative to Florida's request. Under the Clean Water Act, EPA must evaluate the request and to approve or disapprove the request based on the factors, I will speak about in a moment. The third role for EPA is that of oversight. Whenever a state or tribe assumes a program, EPA retains an oversight role. For purposes of the Clean Water Act Section 404, that would generally entail coordinating federal comments; reviewing programmatic modifications; and, if necessary, withdrawing program approval. In order to approve a state's or tribe's assumption of a Clean Water Act Section 404 program, the EPA must find that the program is consistent with, and no less stringent than, the requirements found in the Clean Water Act and associated implementing regulations. The assumed program must have equivalent scope of jurisdiction, meaning it covers all waters of the United States not retained by the United States Corps of Engineers; it must regulate at least the same activities; it must provide sufficient public notice and allow for public

participation; the program must also ensure compliance with the regulations known as the Clean Water Act Section 404(b)(1) guidelines and have adequate enforcement authorities.

05:27 The purpose of today's hearing is for EPA to listen to comments regarding Florida's request to assume administration of a Clean Water Act Section 404 program. Today, EPA's role is to listen. So while during this hearing my EPA colleagues and I may occasionally ask a question or respond to a question of clarification, we will not otherwise be engaging with or responding to commenters. This hearing is being recorded for transcription purposes and that transcription will become part of the official administrative record for this request. In addition, you can continue to provide written comments until November 2nd, 2020, as described in EPA's Federal Register Notice on regulations.gov. If you are making an oral comment today and would like to also provide that to us as a written comment or send us any additional information or attachments associated with your oral comment, then we certainly encourage you to do so by the November 2nd, 2020 public comment deadline.

06:39 Following the close of the public comment period, EPA will review and consider all comments received, as well as the complete submittal from Florida before we make a final decision about this request. Oral and written comments will be given equal consideration. As part of that process, EPA will prepare a responsiveness summary which will provide EPA responses to the significant comments received during the comment period. I want to emphasize that no decision on Florida's request has been made at this time. After considering Florida's submittal, all comments, data, and information received through November 2nd, EPA's regional administrator, Mary Walker, will make a final decision on or before December 17th, 2020. If EPA approves the state's 404 program, we will publish notice of this decision in the Federal Register, along with the agency's responsiveness summary of significant comments. If EPA disapproves the state's 404 program, we will notify the state of the reasons for the disapproval, and of any revisions or modifications to the state's program which are necessary to obtain approval. This public hearing is our opportunity to hear directly from you. Thank you again for being here and participating in this process. I will now turn the floor over to Jan, the facilitator for this evening, to describe the oral comment process we will follow today and to moderate this hearing. Thank you. Jan.

08:25 Jan Connery: Thank you, Jeaneanne. Hello, everyone. As Jeaneanne said, I'm Jan Connery. I'm with ERG, a contractor to EPA providing facilitation and logistical support for this hearing. I'm working with my colleague, Meredith Outterson, at ERG, who is our webinar coordinator. I see that we have over 90 people who've joined us right now, and probably some others will be in the next three hours. And we also have 34 folks who've signed up to make an oral comment, with many others of you here to listen to the comments during this hearing. So, as Jeaneanne said, the purpose of this hearing is for EPA to listen to the oral public comments. So I'm going to describe the comment process that we'll be using and then we'll proceed directly to the public comments. So, first, I'm going to talk about speaker order. We're going to hear from two public officials to start with, and after that, we're going to take comments in the order that each of you registered to speak. We've organized commenters into six time blocks. Everyone who pre-registered to comment should have received an email this weekend - or in some cases, Monday, or even Tuesday - from Meredith at ERG, notifying you about your speaker group and your speaker number within that group. Each commenter will receive a chat message shortly before your speaker group is called. So that way, you'll know your time is coming up very shortly. As we proceed to each group, I'm going to be displaying the name of commenters in the time block on-screen, in the order that they're going to speak. So that way, all attendees to this webinar can clearly know who is speaking each time and who's on deck to speak next. If a listed commenter is not available when I call on them, I'm going to move to the next person on the list. And then, if that person joins us later, we will fit them in as soon as possible after they join us so that we can hear their comment. All commenters during this hearing will be following the same process.

10:49 So when it's your turn to speak, I'm going to be calling your name, and then Meredith will unmute your line at our end. Right now, we have everyone muted by default so that we can

minimize background noise. So Meredith will unmute you, but, also, please make sure you're unmuted at your end. Most often, when I call on someone and we can't hear them, it's because you're muted at your end and you just have to click an unmute button there. So I will start-- I'll ask you to start by stating your name and affiliation. And if you're representing yourself, you can just say that. As noted in the Federal Register Notice about this hearing, every commenter will have up to five minutes to speak. So after you say your name and affiliation, I will start an electronic timer that you will see in the bottom-right of your screen, so you'll be able to know how your time is doing. Please keep an eye on that so that as you approach the five minute mark, you know you'll need to wrap up pretty soon. And as a matter of fairness to all commenters, please do respect that time limit. If you have more to say that you weren't able to fit into your comment, as Jeaneanne said, you're welcome to provide that in a written comment as part of the written comment process by the November 2nd public comment deadline. So after you've finished your comment, please stay on the line. Occasionally, as Jeaneanne said, EPA may have a question of clarification about a comment. And if so, Jeaneanne will ask that question, and at that point, you may respond. And then, when the clarification is concluded, Meredith will mute your line and we'll proceed to the next commenter and use the same process for every commenter.

12:41 There are just a few technical details we'd like you to know about if you're commenting. As noted in the email that Meredith sent you, for best audio quality, a headset is great, if you happen to have one. If your internet connection can be a little bit shaky, we highly recommend that you join us by phone for the period in which you'll be commenting. And instructions for doing that are provided in the email that Meredith sent you either this weekend or on Monday or Tuesday. Again, please make sure you're unmuted at your end. But if an audio issue arises, as it sometimes does, then Meredith will mute you and work with you to provide support to resolve the issue, and then we'll take your comment as soon as we can after the issue has been resolved. And for everyone on this hearing, whether you're making a comment or here to listen, if you have any technical difficulties, please use the question box to ask for help.

13:45 So before we get to the comment process, I want to note one more thing. We do have a pretty full house, just in terms of how many commenters have signed up in the time available in the three hours we have. But, that said, sometimes, commenters don't show up, never show up. And, sometimes, folks comment for less than five minutes. So, here and there, we could have a little additional time. If we do - and I can't guarantee we will or how much it will be, but to the extent that we do - then we'll be happy to take additional commenters up to five minutes each. These would be folks who hadn't pre-registered to comment but have decided that you'd like to make a comment today. The way you can signal to me that you'd like to comment is by raising your virtual hand, which you're welcome to do at any time during the hearing. Again, we can't guarantee we'll have time. But if we do, we'll fit folks in in the time that we see that hands are raised, to the extent that we can before the 8:00 PM end time for this hearing. Okay. So with that, I believe we can proceed to our first commenter. This is our first speaker group. And our first commenter is Jose Rodriguez. Meredith, do we have Jose on the line?

15:11 Meredith Outterson: Yes, we do. And, Jose, it looks like you are still muted on your end. So if you just press to unmute-- there you go.

15:21 Jose Rodriguez: Hi, everyone. May I proceed?

15:23 Meredith Outterson: Yes. Please do so. You can start.

15:28 Jose Rodriguez: I very much appreciate the opportunity to participate in the rulemaking by providing this comment. My name is Jose Javier Rodriguez. I'm a state senator representing the half a million residents of Miami-Dade who live in District 37 of the Florida Senate. My view is that this district would be negatively impacted by the FDEP's assumption of permitting authority, given the impact on our waterways and wetlands, sensitive natural areas, all areas that are important to us. And, for that reason, I express opposition to the state's proposed assumption of

Section 404 authority over dredge and fill permitting. To be clear, again, in my view, the assumption of this process by FDEP would eliminate additional scrutiny of federal law that applies to federal permit actions. And throughout Florida, but particularly in the district that I serve, the fragile and critical areas regulated by the 404 dredge and fill permits would, again, lose the high level of scrutiny that currently would come with them. And, again, I would like my opposition reflected. That is all. Thank you.

16:48    Jeaneanne Gettle: Thank you very much. Thank you. We have no clarifying questions.

16:53    Meredith Outterson: Great. Okay. In that case, we will move to the next speaker.

17:01    Michelle Diffenderfer: Hi, this is Michelle Diffenderfer.

17:03    Meredith Outterson: Yes. Please go ahead, Michelle. Start with your name and affiliation.

17:07    Michelle Diffenderfer: Yes. Michelle Diffenderfer from the law firm of Lewis, Longman & Walker, on behalf of the Seminole Tribe of Florida here today. I will not be making any comments on the record. I want to cede my time to the remainder of the public. We've already had consultation with the EPA. We appreciate you having these public hearings. Thank you.

17:26    Jan Connery: Okay, great. In that case, we will move to the next speaker and that is Kent Wimmer. Kent, please start by stating your name and affiliation, and then you'll have five minutes.

17:40    Kent Wimmer: Good evening. My name is Kent Wimmer. I'm a senior representative with Defenders of Wildlife. Defenders of Wildlife was founded in 1947. We're a national non-profit conservation organization focused solely on wildlife and habitat conservation and the safeguarding of biodiversity. Defenders of Wildlife has more than 105,000 members and supporters in Florida. Defenders will be submitting a letter describing how the DEP has failed to demonstrate how the agency can achieve the no jeopardy mandate with respect to the engagement process and protection of species under the Endangered Species Act. Specific issues to be addressed in our forthcoming letter include, number one, any state-wide, one-size-fits-all, incidental take statement resulting from consultation on the Florida program would violate the Endangered Species Act. Number two, the assumption application fails to demonstrate the DEP can comply with the no jeopardy mandate in the Section 404(b)(1) guidelines. Number three, DEP lacks the resources to implement the Florida program. Number four, DEP cannot be expected to ensure Section 404 permit compliance. And, finally, number five, the EPA has denied the public a meaningful opportunity to comment on the assumption application's effects on listed species. Thank you very much. We look forward to submitting our letter prior to the deadline.

19:32    Jeaneanne Gettle: Thank you, Mr. Wimmer. We have no questions.

19:37    Jan Connery: Great. We will move to our next speaker. That is Rachael Uhland. Rachel, please start by stating your name and affiliation, and then you'll have five minutes.

19:46    Rachael Uhland: Thank you. Can everyone hear me?

19:48    Jan Connery: Yes, we can.

19:49    Rachael Uhland: Thank you. Good evening. My name is Rachael Uhland and I'm providing testimony on behalf of Earthjustice. We oppose Florida's application to assume jurisdiction over the Section 404 program. Throughout this process, we have identified gaps in Florida's proposal, both to DEP and to EPA. We, again, ask that EPA reconsider its September 2020 determination that the application is complete, because it is not. There is public opposition to Florida's application. Most Floridians consider the environment and climate issues to be important to them. Floridians expressed their opposition to DEP's effort during the state rulemaking process. They made their voices heard, even though DEP insisted on limiting public comment to a period in March and April when Floridians were focused on their livelihoods during a pandemic. DEP

also did not answer a number of questions about its proposal, such as questions on staffing and funding, claiming that they were beyond the scope of the state-level process. They stated those gaps would be filled in when the application reached EPA, but those questions remain. Which waters are covered? How will the program be operated with no additional resources? How will the state ensure compliance with the ESA and protection of our listed species? We appreciate the opportunity to participate now in these public hearings held by EPA. However, there are issues here, too. EPA set a deadline for the public to sign up that was two weeks before the first public hearing, effectively providing very little notice for those who wish to speak. And while EPA ultimately allowed those who joined only to listen in a chance to speak, others who may have wanted to speak did not know that this would be an option and missed the opportunity to be heard at the hearing. The hearings are further undermined by the fact that DEP's application continues to be incomplete. This makes it impossible for the public to provide complete comments.

21:51     In the program description, DEP states that its proposed program will provide a streamlined permitting procedure. In other words, the state's objective is to grant permits faster. What Florida needs, however, is more scrutiny and review of permit applications that threaten our wetlands, not less. In Florida, DEP considers permit applicants to be their constituency, rather than the public and the state's natural resources. In the prior EPA public hearing, only industry interest supported assumption, and they did this with claims of delay at the federal level. But what developers see as delay actually reflects things such as vital NEPA review, public participation, analysis of listed species issues, and other elements intended to ensure protection of Florida's environment. In 2005, DEP also considered assumption and realistically determined it would be too costly. The only two states - New Jersey and Michigan - to have assumed 404 jurisdictions spent millions of dollars on their programs. In Michigan, the state's 2002-2003 wetlands program budget was nearly $7 million. Other states, like Arizona, have decided not to pursue assumption, given the burden that this would impose on taxpayers. No state with extensive coastlines, wetlands, and biodiversity that Florida enjoys has assumed jurisdiction. Moreover, state budgets at the country will be heavily affected by this pandemic and Florida is no exception. Florida has asked their state agencies to consider an 8.5% cut for this current year due to the pandemic. DEP has not acknowledged this fact, much less dealt with it in its proposal to EPA. Florida's application makes no mention of the resources of other state agencies that are similarly strained, but which DEP claims will be part of its assumed program, such as Florida Fish and Wildlife Commission and the State Historic Preservation Office. These agencies have acknowledged that they do not have the staffing or the resources to take on the additional responsibility of assumption. To conclude, since DEP has not complied with the Clean Water Act's requirements, EPA must reject DEP's application to the assumption of the 404 program. Thank you.

24:18     Jeanenne Gettle: Thank you, Miss Uhland. We have no additional questions.

24:23     Jan Connery: Great. We'll move to the-- we'll move to the next speaker and that is Jeffrey Blank. Please start by stating your name and affiliation, and then you'll have five minutes.

24:33     Jeffrey Blank: Hello. My name is Jeffrey Blank. I'm representing myself as a Florida resident. I implore the EPA to not allow Florida take over administration of the Clean Water Act Section 404. Florida has repeatedly shown its inability to handle programs on a statewide basis. Their utter disaster with the Florida state unemployment system illustrates this, leaving millions of Floridians without the needed and deserved unemployment payments because they could not properly access the broken unemployment system during the COVID-19 crisis. Florida's fix? Hire the same company that gave them a broken system to fix a system they could not get right the first time. Florida's refusal to allow the Affordable Care Act to be handled by the federal government, having it handled locally, and leaving millions of Floridians with little or no proper medical coverage, shows how badly Florida government handles large programs. One can only guess at the damage the Florida government will do, given the chance to handle such an

important program as Section 404 of the Clean Water Act. Our already delicate and troubled waters in and around Florida - can you say red tide? - would become more permanently destroyed ecosystem, leaving a disaster of epic proportions for generations to come. Allowing Florida to assume administration of this important federal EPA program has the potential to cost taxpayers billions of dollars in repairing the damage that another poorly handled Florida program would cause, not to mention irreparable damage to our environment. This would end up with less proper review and attention.

26:26   The Florida State DEP agency has cut staffing in recent years. If they move staff from other programs, as they say they will, into this, what would happen to the other programs? Are they short-changed? How are those programs going to function? Removing the federal oversight puts our environment at tremendous, unnecessary greater risk. In the face of increased development statewide, the protection and restoration of Florida's wetlands and water resources must be given the greatest possible attention. At the very least, this move must be postponed until time when the public may be fully involved - not one while we are still fighting and concerning ourselves with COVID - so we may have true full public participation. I implore you, do not give the Florida government another chance to show how badly they can mess up another program through mismanagement, backdoor deals, and awarding contracts to the lowest bidder. Our environment and our waters are too important for our future and our children's future. Thank you.

27:42   Jeanenne Gettle: Thank you, Mr. Blank. We have no further questions.

27:47   Jan Connery: Okay. We're going to move to our next speaker and that is Anna Upton. Anna, please say your name and affiliation, and then you'll have five minutes.

27:57   Anna Upton: Good evening. My name is Anna Upton. I'm speaking on behalf of the Everglades Foundation. Wetlands are of critical importance throughout Florida. The largest wetland in Florida is the Everglades. Taxpayers have spent billions of dollars over the course of decades to restore this treasured, unique ecosystem. The US Army Corps of Engineers has a track record of delaying permitting for the most important Everglades restoration projects, the most recent example of which is the A-2 Stormwater Treatment Area, which was an essential water quality feature of the Everglades reservoir. Everglades restoration projects should receive permits that are both environmentally protective and issued in a timely fashion.

28:42   The Everglades Foundation is focused on getting clean water to the Everglades, and into Florida Bay, as soon as possible. If the state assumes the Section 404 permitting process, it should accelerate critical Everglades restoration projects and save money in the long run. Assumptions should enable Everglades restoration to proceed with the sense of urgency it deserves, while maintaining the high level of review and protection required by Section 404. The US Environmental Protection Agency should only approve assumption if the State's program meets rigorous federal standards for wetlands and includes the same federal oversight and citizen supervision as the currently delegated NPDES program does. If assumption is granted, we expect the state of Florida to ensure the Department of Environmental Protection continues to have the necessary resources and capacity to review permit applications and exercise its new authority in a manner that protects Florida's precious and diminishing wetland resources. After all, wetlands safeguard Florida communities from the effects of climate change, they provide tremendous water quality benefits, they support fish and wildlife habitat, and they mitigate against flooding. And they are worthy of the highest level of protection. Thank you.

30:07   Jeanenne Gettle: Thank you, Miss Upton. I have no clarifying questions.

30:14   Jan Connery: Okay. We're going to move to the next speaker group. And I understand that our first two speakers are not here yet. So we're going to go to Kurt Spitzer as our next speaker. Kurt, please say your name and affiliation, and then you'll have five minutes.

| | |
|---|---|
| 30:32 | Kurt Spitzer: Thank you. I'm Kurt Spitzer and I'm here with us today on behalf of the Florida Stormwater Association. We had one quick suggestion for an amendment to the rules, and that is that a certain percentage of the permits issued under the delegated program each year should be reviewed - audited, so to speak - for consistency with the criteria and conditions of the project's permit, and also, the project's consistency with state and federal policy and water quality standards. And we will follow up with a more detailed explanation of that suggestion prior to the deadline for the written comments. |
| 31:30 | [silence] |
| 31:31 | Jeanenne Gettle: Thank you, Mr. Spitzer. I have no clarifying questions. |
| 31:37 | Jan Connery: Okay. We're going to go next to Lisa Rinaman. |
| 31:47 | Lisa Rinaman: My name is Lisa Rinaman. I'm the St. Johns Riverkeeper. Thank you for the opportunity to speak. Our non-profit organization based in Jacksonville, Florida works to defend the St. Johns River and advocate for its protection throughout its 8,800 square mile watershed, including the river's wetlands that provide water quality filtration, flood control, and habitat. We are also a member of Waterkeepers Florida, a coalition of 14 Waterkeepers from across the state, and the international Waterkeeper Alliance. On behalf of our St. Johns Riverkeeper members, and as chair of Waterkeepers Florida, I formally submit our opposition to the state of Florida's request to assume Clean Water Act Section 404 authority. Florida's waterways are uniquely connected and are critical to our public health, our economy, and our environment. Our stake has fragile and critical areas that are regulated by Section 404 dredge and fill permits, and which require the highest level of review and scrutiny. Currently, federal Section 404 permits and state environmental resource permits overlap, and that must be obtained for impacts above regulatory thresholds and federal waters. This additional oversight provided by the federal government is critical to adequately protect our water resources. This important checks and balances has protected many acres of wetlands throughout Florida and within our watershed that would have been lost without federal oversight. |
| 33:27 | As an example, our organization, along with Sierra Club Florida, spent five years trying to save the wetlands at the headwaters of two major tributaries to the St. Johns. These wetlands have been influenced by development. However, the size of the remaining system, its location, its ecological diversity, and its function as a headwaters to Julington and Pottsburg Creeks, and its maturity, classified these as high- to very high-quality urban wetlands. These wetlands were also identified as essential fish habitat by the South Atlantic Fishery Management Council and designated as wetlands of regional significance by the Florida Fish and Wildlife Commission. Unfortunately, the St. Johns River Water Management District approved a permit that would have allowed the developer to destroy these high-quality urban wetlands. Fortunately, the Army Corps of Engineers denied the developer's application to destroy these acres of federally defined wetlands, largely due to their value. Sadly, according to the recently released 2019 Lower St. Johns River Report, wetlands within our watershed continue to be lost due to development pressures, which will likely contribute to flooding from storm surge and sea-level rise, as well as we lose their ability to filter out pollution, contributing to ongoing toxic blue-green algae. The estimated nutrient pollution removal by St. Johns River wetlands alone is valued at more than $1 billion every single year. |
| 35:03 | Florida's water quality and resiliency from sea-level rise depend on wetlands protection. We need more oversight and more protection, not less. This delegation would add additional regulatory burden to the Florida Department of Environmental Protection, which is already under-resourced for its current responsibilities. For example, FDEP is woefully behind schedule on total maximum daily load development and is regularly behind in enforcement actions related to the National Pollutant Discharge Elimination System permit programs. FDEP is not well-positioned to assume the additional responsibilities and permitting demands associated with the 404 program. Additional responsibilities will divert resources away from these critical pre- |

existing duties, as well as leave Florida wetlands vulnerable. The department lacks resources, staff, and funding to implement, operate, and enforce the 404 program, and our state is experiencing an economic downturn due to COVID-19. Budgets have been cut, staff support has been reduced, and yet, Florida Department of Environmental Protection continues with this application. On behalf of the St. Johns Riverkeeper and Waterkeepers Florida and our hundreds of members and thousands of acres of watersheds, I urge the EPA to reject the FDEP's 404 assumption application package. This assumption is not in the best interests of Floridians or Florida water resources. Thank you for the opportunity to speak.

36:42    Jeanenne Gettle: Thank you. I have no clarifying questions.

36:47    Jan Connery: Okay. Well, so far, we have four folks in group two that are not yet at the hearing, so we'll keep an eye out for them. But that is good news for people who've raised their hands. We have a few folks on our standby list, so we're going to go there now because we are ahead of schedule. And then we will get back to our speaker order after taking a few of our standby commenters. So we're going to go next to our first standby speaker and that's Jane West. Jane, please start by saying your name and affiliation, and then you'll have five minutes.

37:30    Jane West: Thank you. Good evening. My name is Jane West. I am the policy and planning director for 1000 Friends of Florida and an environmental litigator for the last 22 years. 1000 Friends is Florida's leading growth management watchdog, advocating for saving special places and building better communities. The Clean Water Act was implemented in 1972 because the states were failing, rather catastrophically, to manage the waters within their jurisdiction. Recent failures in Florida's water quality demonstrate that our state agencies are simply not poised to handle the grave responsibility of effectively managing our water resources. DEP staff and budget were severely cut back by the Scott administration and have not come close to fully recovering. The COVID pandemic makes funding even more unlikely anytime soon. The lack of requisite resources to ensure proper protection of Florida's wetlands is a primary concern.

38:27    Florida has already lost over half of its wetlands, with great negative effects on water quality, fish nurseries, wildlife habitat, and flood control. Since the federal permitting program commenced in 1975, Florida has consistently rejected responsibility for the program because of the decrease in wetland protection and lack of funding for the additional work that it involves. So we can't afford the changes contemplated in this proposed rule. State assumption will not protect Florida's imperiled natural resources. The state assumption fails to meet your own criteria because it will not be consistent with, and no less stringent than, the current federal program. As such, we encourage you to reject this request for the state of Florida to assume administration of the Clean Water Act Section 404 program. Thank you so much for your time.

39:20    Jeanenne Gettle: Thank you, Miss West. I have no clarifying questions.

39:24    Jan Connery: Great. Thanks, Jane. I'm glad we could fit you in. We're going to go to our next standby speaker, and that is Amber Crooks. Amber, please tell us your name and affiliation.

39:35    Amber Crooks: You can hear me?

39:38    Jan Connery: Yes, we can. Very well.

39:40    Amber Crooks: Great! Glad to have the opportunity. Hello, my name is Amber Crooks and I'm an environmental policy manager with the Conservancy of Southwest Florida. I did testify last week with the Conservancy's comments, but tonight, I would like to read into the record a resolution that was passed by the Everglades Coalition that opposed the state of Florida taking on the Clean Water Act Section 404 program. If you're not aware, the Everglades Coalition is an alliance of more than 60 local, state, and national conservation and environmental organizations dedicated to the Greater Everglades Ecosystem. The Conservancy of Southwest Florida is one of those organizations. The resolution was passed originally in 2013 and speaks to the state legislative bills that advance the assumption package you see before you today.

40:29 The resolution reads, and I quote, "Whereas, assumption would allow Florida to take over aspects of the Clean Water Act Section 404 program and would remove the Army Corps of Engineers from reviewing projects that oppose dredging or filling of wetlands. And whereas, removal of the Army Corps of Engineers as a federal regulator creates uncertainty in how other federal laws will be complied with, including the National Environmental Policy Act, Magnuson-Stevens Act, and National Historic Preservation Act, among others. And whereas, it has not been determined how the state of Florida, which is one of the most biodiverse areas in the nation and is home to dozens of listed species, would address Endangered Species Act compliance. And whereas, the state of Florida has stated it does not anticipate additional financial resources will be needed to take on the Clean Water Act Section 404 program, even though reviewers would need to be trained on Clean Water Act and would be responsible for reviewing permits under a differing set of regulations that exist with the state's wetland regulatory program. And whereas, wetlands are critical to cleansing water, helping to recharge groundwater supplies, providing fish and wildlife habitat, and maintaining a natural infrastructure that helps store floodwaters and provide resiliency in storm events. And whereas, Florida has already lost a substantial amount of historic wetlands and our remaining intact wetland ecosystems are at risk from a projected human population increase to 33.7 million residents by 2070. And whereas, in the face of increased growth and development, the protection and restoration of the Greater Everglades, an ecosystem largely comprised of wetland habitats, is better accomplished by maintaining the existing oversight from federal agencies. Therefore, be it resolved, the Everglades Coalition, with its over 60 member organizations committed to the protection and restoration of America's Everglades, hereby opposes SB 1402, which would allow the state of Florida to pursue wetland permitting under the Clean Water Act Section 404."

42:33 As I conclude, I just want to also mention that the Everglades Coalition also reached consensus on two additional documents opposing assumption in 2020, this year. In their letters, dated March 9th, 2020, and March 31st, 2020, the Everglades Coalition again expressed concern and opposition to Florida's assumption of the 404 program. We will be providing a copy of these documents to your records. But we thought it was important for you to be aware of these efforts by the Everglades Coalition and I thank you for the time to read these into the record. Thank you.

43:10 Jeanenne Gettle: Thank you, Miss Crooks. I have no questions.

43:17 Jan Connery: Okay. Well, we have time for a couple more standby speakers. So we're going to go next to Drew Martin.

43:28 Drew Martin: Hello, this is Drew Martin. Can you hear me?

43:30 Jan Connery: Yes, just fine. Please start with your name and affiliation.

43:34 Drew Martin: My name is Drew Martin.

43:35 Jan Connery: And also, sorry, Drew, would you spell your name for us?

43:40 Drew Martin: D-R-E-W M-A-R-T-I-N. I'm the conservation sheriff of the Loxahatchee Group of the Sierra Club. I'm also a member of the Conservation Committee of the state chapter of the Sierra Club in Florida.

43:57 I am opposed to the assumption of the 404 permitting by DEP. First off, already, I don't believe DEP has the resources to assume this. There is no plan to give DEP any additional funding to pay for this. Under the COVID situation, DEP will actually have, possibly, less funding. The other problem I see is that the federal government has much greater resources: the EPA, the Army Corps of Engineers, and many more scientists. They will also follow the mandatory laws, such as the NEPA. I'm concerned that DEP will ignore these laws. Florida, under DEP, has a terrible record of protecting wetlands. Florida has probably lost more wetlands than any other state in the union. Florida, originally, was almost entirely wetlands in the south part of Florida, south of Lake Okeechobee, with the exception of the coastal ridge. Much of that land has been drained. With

the onslaught of climate change, I believe that we will have even less wetlands to give up. Yet, this whole reason that DEP wants to assume this and the whole reason this law was passed was to make it easier for the state of Florida to destroy wetlands.

45:29    This is not about protecting wetlands. This is about destroying wetlands. And that is the basic reason why the legislature of Florida passed this law to take over the assumption of 404 permitting. Further, it is my concern that the destruction of wetlands at a time when we are threatened by climate change and our stormwater situation is extremely poor will make matters even worse. There is a very poor record of mitigation in the state of Florida. Many mitigation banks have been incorrectly handled. There's a great deal of destruction of wetlands all around our developed areas. We are really asking you not to move forward with this assumption on the part of the state of Florida. We are asking you to go ahead and deny this decision. It also should be mentioned that the state of Michigan is actually trying to give up their assumption of wetlands permitting. So we really think that this is the sort of thing that you should not move forward with. We see no evidence that the state of Florida could adequately take over the assumption of wetlands permitting. We see no ability from staff. We see no ability from funding. We see only things getting worse. We think that the EPA and the Army Corps of Engineers should maintain this. Further, as Amber Brooks stated, the Everglades Coalition opposes this, and numerous, numerous environmental groups oppose this. Thank you.

47:20    Jeanenne Gettle: Thank you, Mr. Martin. I have no clarifying questions.

47:25    Jan Connery: Great. And we'll go to another standby commenter. Chris Pettit. Please start by saying and spelling your first and last name, Chris, and then give us your affiliation, and then you'll have five minutes.

47:42    Chris Pettit: Thanks. This is Chris Pettit, P-E-T-T-I-T; C-H-R-I-S, first name. I'm the director of the Office of Agricultural Water Policy for the Florida Department of Agriculture and Consumer Services. We just wanted to comment on the proposed delegation. We appreciate the ability to continue to engage and just wanted to note that a clean and safe environment continues to be vital in sustaining our way of life and economic foundation. Our lands, our wetlands, marshes, estuaries are vital to maintaining and improving the sustainable recharge for our groundwater aquifers, clean and safe waterways. Any number of businesses that provide significant revenue to the benefit of those that live, work, and enjoy life in our state depend on those waters. Given the value of those resources and wetlands to the citizens of the state, and given the significant amounts of input that have been provided, any delegation that is approved should contain assurances that existing levels of protection of the natural resources will be preserved, that sufficient resources are available, and remain available for the Department of Environmental Protection to implement their regulatory programs in an efficient and effective manner. The elimination of additional federal scrutiny for projects that have the potential to significantly impact those resources requires that any existing state programs demonstrate the ability to protect those resources.

49:13    I will note that the two states that have previously assumed 404 authority have encountered significant challenges in areas that have been raised by a number of speakers previously, and that they have had to make significant changes in order to keep those programs after a subsequent review by EPA. To date, at least to the satisfaction of interested parties, adequate evidence has not been provided that DEP has the resources to tackle the significant increases in workload that will be required by the delegation, or that existing state regulatory programs are adequate to provide sufficient protections to the water resources of the state in the face of increasing development impacts, climate change, and other factors that continue to reduce the state's open lands and agricultural landscapes. As such, any delegation should ensure the preservation of levels of public participation and comment afforded by the National Environmental Policy Act through the development of EIS for projects with sustainable impacts. The delegation should also require the State to demonstrate that the protection of species

against possible loss of protections and stringent levels of review that are provided by ESA will be maintained. As part of any delegation, DEP should demonstrate that the State program adequately explores practicable alternatives prior to allowing for mitigation and ensures that cumulative impacts are properly incorporated as any part of an impact analysis that's undertaken. The Department continues to be supportive of exploring all those opportunities to ensure progress on vital environmental restoration and water resource protection projects being implemented through local government state agency programs, two point, the efficient and effective implementation of projects tied to Everglades restoration, and the ability to get those done are paramount. However, the protections that are required pursuant to a delegation should remain in place. Regulatory programs should ensure consistency, efficiency, transparency, public participation, and the ultimate protection of the water resources of Florida for the benefit of its citizens. We remain committed to working with its agency partners on both the state and federal level to ensure that those goals are realized. Thank you very much.

51:45   Jeanenne Gettle: Thank you, Mr. Pettit. I have no clarifying questions.

51:50   Jan Connery: Great Well, we have time for another standby speaker, so we're going to go to Albert Gomez. Please start by saying and spelling your name, give us your affiliation, and then you'll have five minutes.

52:04   Albert Gomez: Yes, this is Albert Gomez. I'm on the Steering Committee for the Biscayne Bay Marine Health Summit and I'm a citizen of South Florida. I just wanted to mention my opposition of Florida's request for assumption of the Section 404. Specifically, two metrics. Personally, doing ride-alongs and checking South Florida's NPDES standards, we've miserably failed. And in most cases, it's the public and local advocacy groups that are pointing out these failures and calling on DEP to come in and validate what we're seeing as failures in the field. And, effectively, that's getting harder every day, I think, since 2010, when over 500 wetland scientists were axed, based on a budget cut from the Scott administration. So, effectively, we move forward to now, most, if not very few, of those wetland scientists have been replaced. So to consider that they will be able to assume the added responsibility of permitting assessment and environmental review is just not viable. It doesn't make any sense.

53:28   Furthermore, they've already had the responsibility of managing the Water Compliance Enforcement Program. And if you look over the time that they've managed that program, there's been, probably, an 80%-- maybe, 70 to 80 percent degradation in wetlands on the areas that they're managing. So it's showing that their management responsibilities are not meeting the modus of what they were tasked to do. So you add those together with this added responsibility, knowing that we're in a COVID crisis, we have massive budget shortfalls. At the Summit, we're requesting for more water sampling representatives where there is no money to fulfill that obligation or that requirement, because we know we need it down here in South Florida. So, effectively, if we just load those up into a pro and con, the cons far outweighed the pros for wanting to fast track a permit, for SERP, or anything. Even though those things are very, very positive, you need to have the oversight and the environmental review in order to accurately approve permits. To just pass this along and consider that DEP will be able to handle it when-- there are amazing individuals DEP, don't get me wrong. That said, it's not cutting mustard and, realistically, this is setting us up for failure in the long run. So I'm hoping - from a layman's, you're taking comments - that this is not the right move. And it's not the right move based on fact, metrics, and past experience. Thank you.

55:16   Jeanenne Gettle: Thank you, Mr. Gomez. I have no questions.

55:21   Jan Connery: Okay. In that case, we'll go to our next standby speaker. That is Dr. Neal Schleifer. Would you please say and spell your name for us? Give us your affiliation, and then you'll have five minutes.

55:36 Neal Schliefer: Hi, I'm Dr. Neal Schliefer. That's N-E-A-L S-C-H-L-I-E-F-E-R. I'm president of the Paradise Cove Association in Sarasota, Florida and I'll be relatively brief. We just want to state our opposition to assumption of the Clean Water Act Section 404 by the State. Others have stated already how important the wetlands are. And Florida is neither prepared nor properly funded. The State; that is, the state of Florida take over administration of the Clean Water Act. Also, there's too much politics involved. There's too much partisan politics and pro-development in the State to objectively protect the wetlands. So, therefore, we oppose state assumption of the Clean Water Act. Thank you.

56:32 Jeanenne Gettle: Thank you, Dr. Schleifer. I have no further questions.

56:39 Jan Connery: Okay. Well, we don't have more standby speakers. We are a little ahead of schedule but we do have a couple of folks from speaker group three on the line, so that's where we're going to go next. Some of our group two, we haven't seen them yet. So our next speaker is Kayla Barretto. Kyla, please give us your name and affiliation, and then you'll have five minutes.

57:08 Meredith Outterson: So, Kayla, it looks like you're still muted on your end, so-- there you go.

57:12 Kayla Barretto: Sorry. I apologize.

57:15 Meredith Outterson: Go right ahead.

57:16 Kayla Barretto: Can you hear me now?

57:17 Meredith Outterson: Yep, you're good to go.

57:18 Kayla Barretto: All right. Hi, my name is Kayla Barretto. I am actually a resident of Miami-Dade. I have no affiliation. And I thought this was supposed to be questions, but I will try and do comments here. I just wanted to reiterate what Rachel Uhland said about little notice that we got. I only found out about this because of Carl Harrison writing an article about this situation. And I find it's a poor situation on our environments, alone on our ecosystem in Florida. We depend on our wetlands and our ecosystem. It's horrendous of all the development that has been going on. I live in Miami-Dade alone, and the development that's going on here, on our wetlands, is horrendous. I don't have no affiliation with no actual organization, but me just living here and observing what's going on around me, I worry about the environment, I worry about the animals, the wildlife that we have here, the displacement of our wildlife. And why is it that everything is just up and going so fast without actual proper sitting down and looking at the permits that are being approved for a lot of these projects that are happening on our wetlands?

58:34 So that's just basically, kind of, what I really wanted to stress about, is our environment, is the wildlife, the ecosystem, our wetlands. I think that that should be the most important thing, instead of overpopulation. We have so much traffic as it is already. All the pro-development politicians that are in, they are only for pro-development and developing our county, instead of actually being more concerned about our environment and what it can do for us. We're already in climate change and it's worse this year than ever. It's a constant, constant, just developing without actually thinking about the prolonged effects of our wetlands. We're already below sea level here in Miami-Dade. Why do we need any more developments? It's completely unnecessary. So I'm opposing the request they assume administration of the Clean Water Act Section 404 program. Thank you.

59:35 Jeanenne Gettle: Thank you, Miss Barretto. I have no clarifying questions.

59:41 Jan Connery: Okay. Good. Well, in that case, we'll go to our next commenter and that is Alison.

59:54 Jan Connery: Meredith, I think you may need to mute someone. So we will go to our next commenter. That is Alison. Anton has not yet joined us. We're a little ahead of schedule, so we may be hearing from him and circle back to him when he joins, if he does. Alison, please start with your name and affiliation, and then you'll have five minutes.

01:00:18    Alison Kelly: Can you hear me?

01:00:19    Jan Connery: Yes, we can.

01:00:21    Alison Kelly: Okay. Wonderful. This is Alison Kelly. I am a senior attorney with the Natural Resources Defense Council, which is also an organizational member of the Everglades Coalition. We have significant concerns about the State's assumption of this program, and therefore, must oppose at this time. The concerns include the Department's failure to adequately enforce environmental protection already under its purview, the already severe degradation of wetlands in the State, the lack of resources to undertake a critically important federal program, the inability to protect endangered and threatened species, and the adequacy of consultation regarding impacts to tribal, historic, and cultural resources. This program must be as stringent as the current federal program, and Florida has not submitted enough evidence to show that it has met this bar. The Department's assumption application fails to describe or list the waters that will be assumed if Florida's application is granted, which is critical information for members of the public to determine the impacts to their interests. The Department has failed to explain how endangered species will be adequately protected and the Department does not have adequate staffing resources or experience necessary to permit and enforce Section 404 requirements. I should note that I was also a regulatory enforcement attorney doing wetland enforcement for the Department and the South Florida Water Management District, so I am able to answer a few questions on that, if you have any.

01:01:40    Also, there is a global pandemic taking place. We should not even be considering things of this magnitude at this sensitive time. Folks are losing their jobs. They are getting sick. They are taking care of family members who are sick. This is completely inappropriate and we cannot have meaningful and fair, transparent public comment during this time. At a minimum, this should be tabled until the global pandemic is behind us. And despite numerous attempts to have virtual hearings, not everyone is privileged enough like I am at this moment to have broadband internet access. I think this came up in another planning effort, as well, called M-CORES. Also, the Department does not have adequate resources to take over this program. They're already quite overwhelmed with the Environmental Resource Permit program, the state wetland permitting program. It's unclear how they're going to staff this, how they're going to train existing staff when these folks are already overworked. How are we going to organize the Department's enforcement responsibilities and permitting with the water management districts under memoranda of agreement? For example, the South Florida Water Management District handles most of the larger wetland permits and enforcement under the Environmental Resource Permit program, pursuant to an operating agreement with the Department. Will most of this responsibility now goes to the water management districts? And do they have the resources necessary to do this?

01:03:03    Florida will lose vital federal review and protections. Florida's critically important wetlands and endangered species must be held to the highest review standards to protect our resources from local political pressure and special interest, given how fast population growth and development is occurring. Federal operation on the 404 permit triggers a myriad of other federal protections under the Endangered Species Act, National Environmental Policy Act, and National Historic Preservation Act, that protects our cultural resources. We need to make sure that this oversight and this accountability remains. Also, DEP does not currently do meaningful enforcement of its own permits and programs, including the Environmental Resource Permit program. So how is it going to enforce 404 requirements? According to the Public Employees for Environmental Responsibility, the number of enforcement cases open in 2019 rose slightly, but this largest number of cases was about 469 cases, compared to the 1500 cases that were open in 2010. So we're not enforcing as many cases currently as we have in the past. This includes the dredge and fill program, which oversees the development of Florida's wetlands. It dropped 36% in 2019. So how is this going to be any different with enforcement of the 404 program? With dramatic cuts to staffing, reductions in expertise, and inadequate enforcement of existing environmental

mandates, the Department currently fails to adequately protect wetlands. And I don't see how this is going to change by assuming this program.

01:04:30    We also need to protect our endangered species. Streamlining wetlands permits will destroy these precious water resources that many endangered species in Florida, over 130 listed species, call home. And this is not in the best interests of Floridians or the United States. While programmatic consultation can provide a framework for future actions, under Florida's proposal, this truncated consultation will essentially give approval for foreseeable actions and take of endangered species without permit level review. So based on the foregoing, we feel the EPA must deny the Florida application to assume the 404 permitting program at this time. Thank you.

01:05:11    Jeanenne Gettle: Thank you, Miss Kelly. I am going to provide one clarification. The function package that we have received is for assumption by the state of Florida, to be administered by the Florida Department of Environmental Protection.

01:05:27    Jan Connery: Okay. Thank you. We'll go to our next speaker, and that will be Beth Alvi. Beth, please start by saying your name and affiliation, and then you'll have five minutes.

01:05:42    Beth Alvi: Thank you. Good evening. I'm Beth Alvi, director of policy with Audubon Florida. Audubon Florida appreciates the opportunity to comment on the State's request to assume a 404 program. I will share some of our concerns and my colleague, Chris Farrell, will follow with the remainder of our comments. We are concerned that the state of Florida does not have adequate resources to assume a 404 program at this time. A successful program would require significant additional resources within the Department of Environmental Protection, and, most likely, within the Florida Fish and Wildlife Conservation Commission as well. The State has not indicated that it will be collecting fees for the 404 permitting program. And the State has not considered an increase in the budget of either agency to accommodate the new responsibilities of the 404 program. As well, due to fiscal constraints resulting from the pandemic, the State is exploring significant reductions in state agency budgets.

01:06:46    In its application, the State suggests it will handle all additional work by redirecting the existing workforce. Such an approach will surely result in a loss of rigor from their existing regulatory and restoration programs. We have heard concerns that the Corps' permitting slows down the pace of completion of much-needed restoration projects and that there is a need to streamline processes. Audubon is responsible for a few Gulf restoration projects in Florida that required Army Corps 404 permits. Audubon Florida did not find their procedures to be a barrier, nor did we face any unnecessary delays in the permitting and review process. We have valued the Corps' participation in permitting our projects. Finally, we feel the Department of Environmental Protection would best serve the people of Florida by concentrating on improving the existing ERP program. Analysis by Audubon; NOA, the agency; the National Academy of Sciences; the US Fish and Wildlife Service have shown deficiency in both state and federal wetland permitting programs. Wetland losses, clearly, have compromised Florida's water quality, flood protection, dry season wildfire resilience, water supply, and economic and environmental health. The governor's Executive Order 19-12 clearly articulates statewide environmental priorities, which include restoration and protection of wetlands and watersheds. Audubon strongly recommends that the Department focus its restored resources on implementing these priorities and improving wetland protection outcomes in its Environmental Resource Permitting program before assuming another wetland regulatory program. Thank you.

01:08:39    Jeanenne Gettle: Thank you, Miss Alvi. I have no clarifying questions.

01:08:43    Jan Connery: Okay. We will move to the next speaker and that is Chris Farrell. Chris, please say your name and affiliation, and then you'll have five minutes.

01:08:52    Chris Farrell: My name is Chris Farrell, with Audubon Florida. I'll share a few additional concerns we have, based on the information in the State's application package. We conclude it's premature for EPA to grant this assumption because the program description is not full and

complete as required, does not guarantee a program that's as stringent as the current one, and it faces significant outstanding legal concerns that could work against the goal of streamlining permitting in the state. More information is needed to consider the program full and complete and some discrepancies in the program application need to be corrected. For example, the State's 404 Applicant's Handbook says the Department of Environmental Protection may use various resources to determine a project's potential impact on listed species. But it doesn't state any minimum level of due diligence that will be completed. Additionally, it now appears the process described in the handbook has changed and the Florida Fish and Wildlife Conservation Commission will be making the initial listed species determinations, rather than the Department. So these issues would need to be clarified for what the exact procedures are that are going to be followed. Further, the State does not sufficiently describe how they'll replace important protections from federal laws that normally apply to federal actions. When the Corps issues a 404 permit, the decision's subject to NEPA. Occasionally, NEPA leads the quarter completing an Environmental Impact Statement for projects that have significant potential for environmental impacts. Completion of an EIS takes time, personnel, expertise, and stakeholder involvement. State's plan does not explain in sufficient detail how they would replicate such detailed analyses and their modest expectations for additional workload requirements do not appear to account for such detailed efforts. Section 7 consultation from the Fish and Wildlife Service is not mandated for state permits. The State has submitted an MOU that explains how cooperation with FWS may work, but our understanding is the MOU has not been signed by FWS yet. The public and the EPA cannot evaluate the State's plans for assumption without knowing all parties are committed to the actions described in the MOU and that are anticipated by DEP.

01:11:11    Another issue that needs more time for consideration relates to the liability for take of listed species from projects with state permits. It's been suggested by the State that a programmatic consultation for assumption would cover all permits the state issues. This is an incredibly controversial legal statement and has not been given sufficient time for a review, and it would most certainly be tested in court. EPA's position for the last 10 years held that programmatic consultations were not even part of the assumption process, a position that was just reversed months ago after the State submitted a white paper to EPA. FWS has engaged in programmatic consultations in the past, but these were used to facilitate the permitting of repeated actions that have similar and predictable impacts. The State's example of the EPA's cooling water intake structure rule as a precedent for a programmatic consultation for a permit program doesn't really hold up. That program deals with one very specific impact from one industry and restricts applicants to a small number of solutions. The 404 program deals with an incredibly wide variety of projects and potential impacts, ones that cannot be captured in a programmatic fashion. If the legal argument that a programmatic review protects all permits falls through, permittees will need to seek separate protection for incidental take. And, as the state says in their white paper, this situation would lead to a regulatory program more burdensome than the existing federal one. For these reasons and others we will submit in writing, we believe it's clear that EPA should reject the State's request to assume a 404 program at this time. Thank you.

01:12:57    Jeanenne Gettle: Thank you, Mr. Farrell. I have no clarifying questions.

01:13:02    Jan Connery: Okay, very good. We are once again ahead of schedule. So we have a couple of folks who've raised their hands and would like to speak on our standby list. And we're going to go to the first of those and that is Jim Tatum. Jim, please start by spelling your name and saying your name and affiliation, and then you'll have five minutes.

01:13:30    Meredith Outterson: So, Jim, just a heads up that it looks like you're still muted on your end. So if you're speaking, we can't hear you yet. Please try unmuting on your keyboard or headset.

01:13:38    Okay. Can you hear me now?

01:13:40    Yes, we can hear you very well.

01:13:42 Jim Tatum: My name is Jim Tatum, T-A-T-U-M, and I represent Our Santa Fe River, which is a non-profit from Fort White, Florida. We strongly oppose the assumption of the Florida DEP for this program, and mainly because the DEP, historically, cannot control its water resources in Florida. With this further control removed-- the federal government removed, it would take away a form of checks and balances and our DEP would then fast track the permits. Our rivers and springs have been in decline constantly over time and most of our North Florida rivers and Central Florida rivers are about 30% less of flow now and at historic times. By the DEP's own admission, they have produced failed VMAPs. They admit that they will not work. The MFLs that they produce are not realistic. Our rivers, already, have significantly harm. Finally, we would say that the DEP does not have the resources to do this. But, more importantly, they do not have the political will to protect these resources. One last thing with this. It would be a continuation of a dangerous trend we see of a power grab in Tallahassee, wanting to try to do everything and taking, especially, power away from municipalities and home rule. Thank you very much.

01:15:25 Jeanenne Gettle: Thank you, Mr. Tatum. I have no clarifying questions.

01:15:29 Jan Connery: Good. We will move next to another standby speaker, Christopher Michaelessi. Please say and spell your name for us and let us know your affiliation, and then you'll have five minutes.

01:15:49 Meredith Outterson: Hey, Christopher. Same comment as for Jim, it looks like you're muted on your end. So please try unmuting on your keyboard or headset so that we can hear your comment. Still can't hear you at the moment. I can work with you behind the scenes to try to solve the issue.

01:16:12 Jan Connery: All right. Well, in that case, we do have a number of folks in our next speaker group, which is group four. So we'd like to take them. And our first speaker is Marian Ryan. Please say your name and affiliation for us, Marian, and then you'll have five minutes.

01:16:34 Marian Ryan: Hi, my name is Marian Ryan. I'm the conservation chair of the Ancient Islands Group of the Sierra Club Florida. Our group encompasses Polk, Highlands, Hardee, Desoto, and Sumter counties. Florida's request to take over federal permitting under the Clean Water Act Section 404 must be denied. Our Sierra group has been reviewing phosphate mining permits for years and it has been hard enough to ensure that 404 permits issued by the US Army Corps of Engineers provide enough protections for wetlands. If the state takes over, it will be even more difficult to stop politically influential mining and development interests from destroying our remaining wetlands and polluting our waters. A prime example is Mosaic's plan to mine some additional 14,000 acres within the Peace River basin, which has already been deeply and irreparably scarred by phosphate mining. Our group also encompasses a large portion of the Green Swamp, headwaters of four major rivers, and an important wildlife corridor for Central Florida. This designated area and critical state concern has always struggled to attract the agency protections that it deserves, and it once again is suffering from an empty desk in Tallahassee.

01:17:49 FDEP has been understaffed and overwhelmed for years just trying to maintain their own programs. The promise to hire additional, low-paid staff to assume 404 permitting requirements is a promise to fail. FDEP will continue to be a training ground and stepping stone to other higher-paying agencies and private enterprise, ensuring that our wetlands and wildlife will suffer. To give you a hint of Florida's current attitude towards growth management and the environment, the former Department of Environment-- the former Department of Community Affairs was reorganized in 2011 into what is now the Department of Economic Opportunity. Given the serious ground and surface water quality and quantity issues, that suffer has long endured and is trending negatively, as well as the perilous status of so many of our wetland-dependent species, we urge you to deny Florida's request. We will submit further comments in writing. Thank you.

01:18:54 Jeanenne Gettle: Thank you, Miss Ryan. I have no follow-up questions.

01:19:00    Jan Connery: Okay. We will move to our next commenter. That is Tom Knuckey. Tom, please give us your name and affiliation, and then you may start your comment.

01:19:13    Tom Knuckey: Hello. Thank you. My name is Tom Knuckey and I am not affiliated with any group. I'm calling as a concerned Florida citizen in Central Florida. I'm a lifelong Floridian of over 50 years and I've seen the destruction of our environment by pro-business and development groups, especially in the past 10 years and in the last two administrations. I'm calling tonight to express my opposition to Florida's DEP request to administer the Clean Water Act Section 404. The DEP is underfunded and under-resourced to take on such a critical responsibility for the future of Florida, for the future of our businesses, for the future ecotourism, for the residents, for the wildlife, and for the appropriate water storage and water quality. DEP's resources have been cut over the past 10 years. Under the previous administration, over 600 DEP employees either lost their job or were forced to leave. The funding has not returned to DEP and DEP is unprepared to take on this significant program for the protection of clean water. The funding at DEP is at the whim of the state politicians and under the current COVID epidemic and pandemic, we are not able to, as Florida citizens, be able to make sure, under our balanced budget provisions, that the funding of DEP will rise to the occasion to meet this responsibility. In fact, the plan doesn't even address how this is going to be funded. Also, it's my opinion that the Florida DEP, although they're made up of good employees, are unfit to be able to take on this heavy challenge of carrying the responsibilities that the Army Corps of Engineers actively done a good job of over the past decades. And finally, my closing concern is that DEP is subject to the influence of politicians and lobbyists through the Florida legislature, and that's where this bill originated to take over the administration of the Clean Water Act. And I'm pleading with you, as other concerned Florida citizens are, to deny this request. Thank you.

01:21:19    Jeanenne Gettle: Thank you. I have no clarifying questions.

01:21:23    Jan Connery: Great. Then we'll move to our next speaker. That's Faith Bickner. Faith, please start with your name and affiliation, and then you'll have five minutes.

01:21:37    Meredith Outterson: Hi, Faith. If you're speaking, we can't hear you. There you go.

01:21:40    Faith Bickner: Can you hear me now? Okay. So I'm Faith Bickner. I'm speaking on behalf of the Center for Biological Diversity. First, thanks to the EPA staff here and the representatives of all the diverse groups, and also, the individual citizens. It's really cool to hear from so many people just calling from home. But that being said, these two barely publicized remote meetings really do not constitute the kind of public engagement warranted or mandated by federal law for what would be a rash major administrative rollback. I feel strongly that the EPA should decline FDEP's application to assume jurisdiction over the wetlands permitting under 404 of the Clean Water Act because the FDEP has failed to demonstrate the capacity to take on this major responsibility. And the consequences of those gaps would be really devastating. Firstly, FDEP's proposed program would illegitimately circumvent the requirements of the Endangered Species Act. The ESA is largely viewed as the strongest environmental protection statute in US federal governance and imposes strict requirements on any discretionary federal action. This includes the sections having duty to consult with the US Fish and Wildlife Services and NOAA Fisheries. When an agency action may affect a listed species, including, of course, issuance of a 404 permit, Section 7 consultation responsibilities apply to federal action, but wouldn't carry down to the state. And the EPA should continue to require permit-specific consultation for the many treasured endangered species in Florida waterways and should regard FDEP's application as incomplete until it meets that requirement. The truncated one-size-fits-all approach proposed by FDEP would constitute a vast stripping of protection to the many threatened and endangered species that live only in Florida waterways. I think another commenter mentioned that there's more than 130 threatened or endangered species living only in Florida water-- or living in Florida waterways. And we have to remember that when the ESA was being passed by Congress, we expressly declined to protect endangered species only where it was practicable, where it was

convenient and, instead, chose to afford protection of threatened and endangered species at the highest priority, regardless of how administratively inconvenient it may be to groups like The Fertilizer Institute. The people of Florida support the protection of endangered species, and not the continuous freefall of development transforming the State, which makes the exclusion of meaningful public participation in this process all the more unjust.

01:24:19     Moreover, the FDEP lacks the staffing, funding, and expertise to conduct these consultations or responsibly administer the 404 permitting program. Because the assumption of 404 responsibilities would require a Fish and Wildlife review of state-issued permits, which must also comply with water quality standards protective of endangered species, the FDEP would be immediately further overwhelmed by the incredible scale of consultation necessary to protect the many wetlands and endangered species of Florida. As noted by lifetime public servants at the last hearing, the FDEP has reduced its staffing and has already consistently failed to adequately operate the programs under its purview, while claiming that no additional resources would be needed to take on this enormous responsibility. FDEP has failed to submit a complete application in other ways, failing, one, to identify the waters the state program would cover, which make meaningful public comment and participation impossible; to specify the staffing and funding details necessary to operate the program; and three, details on how, exactly, it would "streamline" the current wetlands division, which is already understaffed and woefully behind on their current responsibilities. It's worth noting that another one of their responsibilities is a permitting task assumed from the federal government, The National Pollutant Discharge Elimination System, which, as was noted, I think, well at the last hearing, they're consistently behind and underperforming at. And lastly, just off the cuff, personally, the Florida legislature only approved the possibility. They didn't approve this application. They said, "Okay, the FDEP is approved to put together an application." And we're seeing that they applied for this job and we called their references, and they aren't qualified. If a potential employee shows up to work 1 out of every 20 days, you don't make a manager. The wetlands and the many treasured endangered species of Florida cannot be gambled with on such a massive scale. And to reiterate many other commenters' position that it's wildly inappropriate to be pushing such dramatic changes through at this time. I thank you so much for your time.

01:26:49     Jeanenne Gettle: Thank you, Miss Bickner. I have no clarifying questions.

01:27:00     Jan Connery: Okay. We'll go to our next speaker. We don't have Christian with us right now, so our next speaker will be Sandra Chiappetta. Sandra, please start with your name and affiliation, and then you'll have five minutes.

01:27:16     Sandra Chiappetta: Hello. Can you hear me?

01:27:17     Jan Connery: Yes, just fine. Please go ahead.

01:27:20     Sandra Chiappetta: My name is Sandra Chiappetta and I'm with Boca Ciega Bay Friends. I want to express my objection to the FDEP's proposal to assume administration under Section 404 of the Clean Water Act for wetland permitting in the waters of the United States. For decades, the FDEP's promise of environmental protection has taken a backseat to facilitating permits for development. Now, the State wants to further streamline that process by removing federal oversight. Currently, the United States Army Corps of Engineers provides written public notice to nearby property owners with an open comment period. This development feedback process ensures critical local knowledge is included in the environmental impact analysis for our shared water resources and endangered species. The FDEP considers public notice in any obscure publication anywhere in the same county, often miles from the area that will be impacted, sufficient public notice. This robs nearby property owners of proper written notice and robs them of their voice and protecting their properties from potentially environmentally damaging development proposals.

01:28:32 Here is an example based on my personal experience with the FDEP permit review process. Several years ago, I received a Corps public notice in the mail for a 71-boat marina expansion after the FDEP had already approved their permit and forwarded it onto the Corps. Questions on the FDEP permit application were answered incorrectly, important questions were left unanswered, and all the information was provided solely by the developer. The Manatee Biological Evaluation for this permit used outdated data; assumed, incorrectly, that the Slow Speed Manatee Zone was controlled and enforced; failed to address cumulative damage to the seagrass protection and restoration targets in the surrounding area, a critical manatee food source; and overlooked inadequate water ducts for surrounding areas, with some water ducts assumed and not even verified. The FDEP permit was approved for 71 40-foot boats with drafts up to four feet deep, with little consideration for hazards to navigation, without any consideration for county or city codes, and without adequate minimum water depths in all access areas, including a shoal across the entire north access area that has assumed water depths of minus three feet mean low water. FDEP approval with inadequate water depths will enable the developer to then request approval for environmentally damaging dredging for shoaling, even if that area has been shoaling for years, but has previously been dredged, even decades ago. This marina expansion covering an area the size of a football field was approved by the FDEP in an open, unprotected area, without consideration for costly potential damage to the marina itself, nearby properties, or protected seagrass ecosystems that could be caused by runaway boats during a hurricane. In stark contrast, the Corps permit included consideration for county and city codes and reviewed additional critical information supplied by the public and multiple agencies. The Coast Guard noted that the marina expansion was a major hazard to navigation. The Corps required the proposal to be downsized to conform to local codes to protect navigation rights and they requested a comprehensive and thick bottom seagrass survey throughout the footprint of the marina.

01:31:09 This is just one permit. Now, imagine that multiplied thousands of times over across the state, and it becomes clear why Florida's ecosystems in areas like Florida Bay, the Indian River Lagoon, and Biscayne Bay are collapsing. The current poor state of many of our shared Florida water resources is clear evidence of the FDEP's failure to adequately protect our aquatic preserves, wetlands, and coastal mangrove environment. Allowing the state to assume sole administration of the Clean Water Act Section 404 program would be a costly regulatory burden to the FDEP, which is already under-resourced for its current responsibilities. Since the EPA won't be providing any federal fundings, these additional responsibilities will divert limited state resources away from critical FDEP duties, and/or place additional financial burdens on county and city permitting agencies and Florida taxpayers. In a state where environmental concerns take a backseat to powerful political and business interests, less oversight is a recipe for environmental and economic disaster for our tourism economy. Please stop the FDEP from assuming jurisdiction. Thank you.

01:32:28 Jeanenne Gettle: Thank you, Miss Chiappetta. I have no follow-up questions.

01:32:38 Jan Connery: Okay. We are ahead of schedule, still, so we're going to circle back to-- is it Chris Michaelessi, I think? Please go ahead. Would you please say and spell your name for us, because you're a standby speaker? And then you'll have five minutes for your comment.

01:32:59 Chris Michaelessi: Can you hear me?

01:33:00 Jan Connery: Yes, we can.

01:33:02 Chris Michaelessi: Excellent. Thank you for your help. It's Chris, C-H-R-I-S, Michaelessi, M-I-C-H-A-E-L-E-S-S-I. I'm calling in under an alias for fear of retaliation from my former and current employer. My former employer is the Water Management District. I would like to commend Sandra for her number one example because that is what I have seen repeatedly in my position. I am an environmental engineer who worked with the State up until Rick Scott's beheading of everyone. I did not plan to speak. However, this is a very important problem that we face right

now. My unique perspective, along with Allison Kelly's, provides me the firsthand knowledge and experience of the permitting and enforcement sides of the state and the federal government. The new water rule, unfortunately, that was just passed several months ago, eliminates many of the provisions for wetland protections that we once had. This is the final speed bump for the developers of Florida to pave Florida for no other reason than political, and for padding of pockets of politicians. If they no longer have to go to the Army Corps of Engineers, they will obtain their permits within 30 days. That is statutorily how it works.

01:34:22    After Rick Scott, there is no more review of these huge, large-acre projects, unless the Army Corps gets a hold of them and does their scrutiny. My firsthand knowledge, since the passing of the new water rule, is in the last few months, over 600 acres of wetlands have gone without mitigation. We are now going to pass that baton to DeSantis and his cronies in order to pave all of the rest of the interior of Florida. We have red tide. We have Lake Okeechobee. We have this St. Johns River. Our water quality is horrendous in Florida because, at this point, the developers are taking over. I'm not going to reiterate what everyone else has said, because they are 100% correct, except for the one commenter. Approving this assumption is detrimental to Florida's ecology. It is 100% in the developer's pockets. The only goal of this is to get permits out the door faster. We would have been better off taking the money for this rulemaking, providing it to the Army Corps of Engineers in order to provide them better computer systems, in order to do a better, quicker, faster evaluation. Ultimately, that's what we need. It's unfortunate that we've lost all the wetland acres that we have and this is going to only perpetuate that faster. Until we get a new political system in place in Florida, this is the worst idea I have ever seen, besides the new water rule. That is all I have to say and thank you for your time.

01:35:59    Jeanenne Gettle: Thank you. I have no clarifying questions.

01:36:03    Jan Connery: Okay. We're going to go to our next standby speaker. That's Brad Cornell. Please say and spell your name for us, Brad, let us know your affiliation, and then you'll have five minutes.

01:36:21    Meredith Outterson: Hi, Brad. So you're showing as unmuted but we currently can't hear you. Can you try speaking up or speaking into the microphone? Okay. It seems like we're having a tech issue with Brad. Brad, I'll send you a chat message with some ideas and try to help you fix the issue.

01:36:43    Jan Connery: Okay. Well, we are, right now, Jeaneanne, a little over 20 minutes ahead of schedule. So this might be a good time-- we're roughly midway through. It might be a good time for a break until, maybe, 7:00. Our next group is booked to start at 7:15, so we'll still be ahead of schedule if we reconvene it at 7:00.

01:37:14    Jeanenne Gettle: We can reconvene at 7:00. In the meantime, if people want to raise their hands and we have time to add some people, then we can do that. And we can check to see if anyone who wasn't on before has now joined us.

01:37:28    Jan Connery: Yes, we'll certainly do that. And it's great that we do have time to add speakers. So yes, please do raise your hand during the break for us to let us know. Looks like we, probably, will have time to take, hopefully, everyone who might raise their hand during this hearing. So we'll see you back at 7:00 PM Eastern time.

01:37:49    Thank you.

01:59:20    [silence]

01:59:21    Jan Connery: Hello, everyone. Welcome back to the public hearing for Florida's request to assume administration of the Clean Water Act Section 404 program. This is Jan Connery. I'm with ERG, a contractor to EPA. I'm the facilitator for the meeting. If you're just joining us, we are a little bit ahead of schedule, so we are going to take a few standby commenters. Let me just get to the right slide here. Yeah. We're going take a-- we have a couple of folks who've raised their

virtual hand to let us know they'd like to speak. So we're going to take them. Then, we're going to proceed with speaker group five. And we have several folks from that group who are already here to speak. So you'll be receiving a message from our webinar coordinator, Meredith Outterson, just before it's your turn to speak to give you a heads up that your time is coming. And then, I will call on each person and ask you to start with your name and affiliation, and then you will have five minutes to comment. We'll have a timer displayed so you'll be able to see how well you're doing on time and be able to wrap up within your five minutes.

02:00:34     So right now, we are taking a couple of additional comments, folks who have raised their hands to let us know they want to speak. We may well have a little additional time to take more speakers. So if you're someone who did not sign up to comment but you've decided you would like to do so, as time allows, we invite you to raise your virtual hand. That will signal to us that you'd like to speak. You'll have up to five minutes, just like everyone else. A lot of people take less time. You don't have to take five minutes. That's up to you. And then as time allows, I will be calling on folks in the order in which you raised your virtual hand. So I want you to know that's an option as we start, in fact, to take the next two folks who have raised their hands. The first one is Brad Cornell. For all our standby speakers, we're asking you if you would spell your name, please, for us. Say your name and affiliation, and then start your comment. And, Brad, you will have five minutes at that point, so please go ahead, Brad.

02:01:40     Brad Cornell: Great, thanks. I'm Brad Cornell, and my name's spelled B-R-A-D C-O-R-N-E-L-L, and I'm the policy staff for Audubon Western Everglades, which is an organization founded in 1961, here in Southwest Florida. And I want to say that we really appreciate the opportunity to comment tonight. We do oppose EPA approving Florida's request to assume the Section 404 wetlands permitting program. And I want to share two reasons for that. First, the Memorandum of Understanding between DEP and the wildlife agency that's overseeing the service does not consider an important collaborative regulatory strategy to protect and recover federally listed species, called Habitat Conservation Planning, under Section 10 of the Endangered Species Act. I have personally worked with agencies and landowners and other allies on a large pending HCP in Southwest Florida and can attest to the collaborative strategy's potential to better protect many species on a large regional basis over many decades.

02:03:00     Unfortunately, the assumption application MOU with FWS poorly defines a statewide biological opinion and incidental take permit, neither of which have been done yet. And these appear, to us, to potentially conflict with the HCP Section 10 alternative to single project Section 7 reviews. This, to us, is unacceptable. It's an unacceptable conflict which must be resolved before any consideration of this application. Additionally, the second reason that we want to highlight is something that others have mentioned, and that is that Audubon Western Everglades objects to any wetland regulatory streamlining, combining a federal program with the state program, when both these programs have resulted in over 30,000 acres of wetland losses since 1996 in just Lee and Collier Counties alone. So that fact speaks to the ill preparation and the unready nature of DEP and the Army Corps of Engineers to combine their programs in the state of Florida. We recommend that DEP and the Corps consider strategies to improve their wetland outcomes much closer to a no net loss that is the national and state mandate. So as that, we recommend, again, that EPA deny the application by the State for assumption of the 404 program. Thanks for considering our comments.

02:04:45     Jeanenne Gettle: Thank you, Mr. Cornell. I have no clarifying questions.

02:04:52     Jan Connery: Great. We'll take one more standby speaker and then we'll start speaker group five. Our next standby speaker is Wendy Jenkins. Wendy, please say and spell your name for us, let us know your affiliation, and then you'll have five minutes.

02:05:06     Wendy Jerkins: Good evening. My name is Wendy Jerkins, W-E-N-D-Y, and my last name, Jerkins, J-E-R-K-I-N-S. Thank you for the opportunity to speak. I'm a community member in Broward County and I'm speaking for myself. I oppose Florida's application. I was born and raised in

Florida and it's disheartening to see that the State has not been a good steward of its critical natural resources. Florida has failed to fully protect its most compromised natural resources and it has not demonstrated a full willingness to protect Florida's wetlands and water. I'm concerned about what will happen, should authority be handed to Florida. I oppose Florida's application. Florida needs the critical oversight. Thank you for your time.

02:06:03 Jeanenne Gettle: Thank you, Miss Jerkins. I have no clarifying questions.

02:06:08 Jan Connery: Okay. We're going to go, now, to speaker group five. But, again, if you're listening, if you didn't register to comment, if you would like to make a comment, to the extent time allows, and it probably will, please feel free to raise your hand after we've taken the folks who are here. We will then fit in as many additional commenters as we can who've raised their hand, in the order that your hands are raised. That's your virtual hand, of course. All right. So we're going, now, to speaker group five. And our first commenter is Maureen Long. Maureen, please say your name and affiliation, and then you'll have five minutes for your comment.

02:06:52 Maureen Long: Can you hear me?

02:06:54 Jan Connery: Yes, we can. Very well.

02:06:56 Maureen Long: Thank you. Good evening and thank you for having me speak tonight. I'm Maureen Long. I'm a member of Friends of Fish Island. We're a grassroots conservation group here in St. Augustine, and I'm going to be speaking as a concerned Florida citizen. I oppose the state of Florida's request to assume administration of the Clean Water Act Section 404 program and ask you to consider Florida's unique vulnerabilities and what we, as stakeholders, stand to lose, should this request be granted. For 48 years, I have lived in St. Johns County, where we have seen explosive growth, as the second-fastest-growing county in Florida and the eighth fastest-growing county in the US, with a population increase of over 43% in just the last 10 years. Our community is not alone, as Florida is being developed at breakneck speed, ranking fourth in the country for its growth, with our population numbering over 20 million now, and estimated to be 21 million by next year. In recent years, Florida has experienced population impacts from climate change migration, following devastating Hurricane Maria. In this year alone, we have seen 1,000 people a day move here to seek shelter from the pandemic. Florida is a magnet for population influx. Urban development to meet these growing population needs has put enormous pressure on our limited natural resources, especially in flood-prone coastal areas that are already threatened by, or experiencing the impacts of, rising sea levels. In our community, we are struggling with how to address flooding from king tides and ordinary rain events that are repeatedly damaging businesses and homes. We are struggling with how to make our community more resilient from hurricane storm surge and flooding that seemed to worsen with each year. Careful reviewing permit applications to fill these low-lying areas may prove to be the most important safeguard that we have left. We have left this in order to protect our wetlands, our waterways, and the resiliency of our communities. Permitting to dredge, fill, and develop these areas should not be fast-tracked through state agencies. We also face critical water supply challenges within our state, as we look for ways to provide enough clean water to meet the demands of this rapidly growing population and to protect our aquatic ecosystems that are the lifeblood of our coastal communities, and of our state.

02:09:20 With nearly 6000 square miles of coastal and inland water, our tourism, recreation, and maritime industries are vital to Florida's economy, and all rely on having clean and healthy aquatic ecosystems and waterways. Maintaining an independent and objective review of 404 permits by the Army Corps is critical to ensure that important permitting decisions align with the intent of Florida law-- of federal law. Excuse me. Federal law to protect the interests of our natural resources and to ensure that they are not swayed or influenced by changing political agendas. The employees of the Florida DEP are hardworking people, but with the dramatic cuts to staffing, reductions in expertise, and inadequate enforcement of existing environmental mandates, the Department currently fails to adequately protect wetlands under its existing Environmental

Resource Permitting program. The FDEP combines three separate agencies in one. They serve 67 counties, which are divided into six districts. And they only have nine offices that serve over 58,000 square miles of Florida. The Florida Department of Environmental Protection doesn't have the proper capacity to take over the wetlands permitting that has been run by the US Army Corps of Engineers for decades. It can't even manage to enforce the environmental laws already under its purview. This controversial attempt by Florida DEP to assume authority over Clean Water Act permits the federal government at the request of wealthy developers. This does not sit well with the citizens of Florida. The public has repeatedly raised concerns about the FDEP's failure to meet its existing obligations on wetland protection, mitigation measures, and adequate enforcement of existing programs. The Department should, first, address and fix these issues before seeking approval to undertake a completely new set of responsibilities. Floridians do not want the FDEP to take over the 404 program, as we stand to lose too much from this change. For all of these reasons, I ask the EPA to deny Florida's request to assume administration of the Clean Water Act Section 404 program. Thank you.

02:11:36 Jeanenne Gettle: Thank you, Miss Long. I have no clarifying questions.

02:11:42 Jan Connery: Okay. In that case, we will move to our next speaker. That is Wendy Wood. Please start by stating your name and affiliation, and then you'll have five minutes.

02:11:53 Wendy Wood: Hello, my name is Wendy Wood. I was born and raised here in Florida, and I'm calling in because I oppose Florida's application to take over the permitting process for Section 404 of the Clean Water Act. And our wetlands are integral to the health and wellbeing of all of Floridians, sustaining life for human beings and all the other living creatures who are our neighbors. Earlier in history, people didn't know the importance of our wetlands. Now we know. We don't have an excuse. Let's use that knowledge to protect the remaining fragile ecosystems that we have left. Once water is fouled and wetlands are removed, there is no bringing those fragile ecosystems back. I also urge you to take into consideration that wetlands are carbon sinks and greenlighting development without due diligence will replace these carbon sinks with more impermeable surfaces that require lots of $CO_2$ to manufacture. I know that the Florida DEP is underfunded, it's understaffed, those people are working as hard as they can, and they're often under political attack. They should not be asked to take on more without more funding and binding protections from political retaliation. The feds are more thorough and impartial and they have more funds to oversee the examination process in these fragile ecosystems. So they're just better equipped to look at the whole picture. Once again, I hope that this is denied for the good of all Florida. Thank you.

02:13:57 Jeanenne Gettle: Thank you, Miss Wood. I have no clarifying questions.

02:14:02 Jan Connery: Great. Then we'll go to our next speaker and that is Annette Redwine.

02:14:07 Annette Redwine: Good evening. I'm Annette Redwine. I'm a retired teacher, Alachua County, Florida. I'm going to add my voice to all those that have already spoken, for I, too, believe that it is in the best interests of Florida's citizenry that the federal EPA retain administration for the Clean Water Act Section 404 and not allow the state of Florida to assume its administration. I say it lacks the resources, as everyone has said, both fiscal and human, to properly vet every application put forward. Consideration not only for the immediate future, but for 20, 50, 100 years into our future must be made because experience has taught us that the consequences of decisions made in our past, both intended and unintended, have stretched that far into Florida's future. Florida is a beautiful state. And our waterways, bays, and estuaries are a big part of why our state is so special. Further, these waters are also national treasures. I believe that the safety gateway that's in place to protect these precious resources must remain vigorous, and that careful thought and time for consideration must be given to every application. Having lived in Florida all 71 years of my life, I've witnessed how, when funds are lacking, Florida's legislature is given short shrift to the State's funding of education, ecology, and public health and safety. I've seen wetlands designated as protected in environment, and then, several years down the road,

the designation and the wetlands are lost. I'm sure you're familiar with the rather crass common expression that goes, "When money talks, poop walks." And Florida seems particularly vulnerable to this phenomenon. It is my belief that keeping the administration of the Section 404 within the purview of the federal EPA will get Florida's waters the best protection. Thanks for hearing me.

02:16:15     Jeanenne Gettle: Thank you, Miss Redwine. I have no clarifying questions.

02:16:19     Jan Connery: Okay. We'll move to our next speaker. Juanita is not yet with us, so that is going to be Elise Brady. Elise, please state your name and affiliation, and then you'll have five minutes.

02:16:38     Meredith Outterson: Elise, it looks like you're muted on your end, so please try on muting on your laptop or your headphones so that we can hear you. Still not able to hear you, Elise. If you want to try one more thing and then if not, I will work with you behind the scenes to try to fix the issue.

02:17:02     [silence]

02:17:18     Jan Connery: Okay. Meredith, it looks like, maybe, you'll need to work with Elise.

02:17:23     Meredith Outterson: Yes. It's not working at the moment. So Jan, let's go to our next scheduled--

02:17:27     Jan Connery: We'll go to Jessica. Jessica, please start by stating your name and affiliation, and then you'll have five minutes.

02:17:41     Jessica Dennis: Hi, good evening. Thank you for the opportunity to speak. My name is Jessica Dennis and I'm speaking on behalf of Miami Waterkeeper and our membership here in Miami, Florida. Miami Waterkeeper is a Miami-based nonprofit that works to ensure swimmable, drinkable, fishable water for all in South Florida, and is a member of Waterkeepers Florida and the broader Waterkeeper Alliance. I'm speaking this evening to oppose the state of Florida's request to assume Clean Water Act Section 404 authority from the Army Corps of Engineers. Florida's vast waterways and wetlands are what make Florida, Florida. They are uniquely connected to public health, our way of life, our culture, and our environment. Our state has particularly beloved, yet particularly fragile, areas that are regulated by Section 404 dredge and fill permits, which require the highest level of review and scrutiny. Federal oversight is critical to adequately protect our water resources. A delegation of Section 404 authority to the Florida Department of Environmental Protection would add a costly and extensive regulatory burden to the already under-resourced agency. For example, DEP is already regularly behind in enforcement actions related to the National Pollutant Discharge Elimination System permit program. Miami Waterkeeper and Waterkeeper organizations across the state have initiated an independent NPDES permit compliance review to attempt to bridge this gap in regulatory enforcement, a duty that should not be tasked to a nonprofit organization.

02:19:05     I worked as an intern for Miami Waterkeeper this summer while in law school. Part of my work focused on getting a fertilizer ordinance passed in Miami-Dade County. After a review of the county's two most recent municipal separate storm sewer systems permits, we discovered that the county was over a decade out of compliance with the permit mandate to have a basic fertilizer ordinance. If DEP fails to enforce even the most basic measures required by its own issued MS4 permits, how will it oversee the regulation of the discharge of dredge or fill materials into waters of the United States? Further, the state of Florida just transferred to the DEP the responsibility for regulating over 2,700,000 septic tanks that exist in the State. This is a huge undertaking in and of itself, and it is a stretch of the imagination to think that FDEP could now also accept the obligation to appropriately administer Section 404 permitting. FDEP is not well-positioned to assume the additional responsibilities and permitting demands associated with the 404 program. Additional responsibilities will divert resources away from these critical pre-existing duties.

02:20:08    The Department has wonderful, hardworking staff, but the underfunded Department lacks a quantity of resources, staff, and funding to implement, operate, and enforce the 404 program. Our state is experiencing an economic downturn due to COVID-19 and the Department has felt these effects. Budgets have been cut, staff support has been reduced, and yet, DEP continues with this application that would cost taxpayers millions of dollars just to get off the ground. FDEP should focus on existing obligations, such as enforcement and mitigation, rather than seeking additional responsibilities that we already know they will not be able to adequately oversee. The Department's claims that it can fold a 404 program into its existing programs should be rejected. It is not feasible and it is not tenable for Florida's water resources. There has been substantial public opposition to the State's proposed assumption of Section 404 authority. Despite this opposition and the limits on public participation, the DEP has continued to move forward. This is deeply inappropriate. It is not inclusive and does not reflect the public's position on this matter. I just want to add that I've been listening to every commenter, as you all have, since 5:00 PM today, and I have heard only one comment that was not adamantly opposed to DEP's proposed assumption of Clean Water Act Section 404 authority. On behalf of Miami Waterkeeper, our hundreds of members, and thousands of acres of watersheds, I urge EPA to reject DEP's Clean Water Act Section 404 assumption application package. This assumption is not in the best interests of Floridians or Florida water resources. Thank you.

02:21:38    Jeanenne Gettle: Thank you, Ms. Dennis. I have no clarifying questions.

02:21:44    Jan Connery: Okay. It looks like Elise is ready now. So we will-- sorry. We will go back to-- whoops, go back to Elise. There we go. Elise, please start by stating your name and affiliation, and then you'll have five minutes.

02:22:05    Elise Brady: Good evening. My name is Elise Brady. I am an artist and a climate reality leader. My husband and I have lived in St. Augustine for over 30 years. I am also a concerned Catholic here to bear witness to the state of our fragile environment and our obligation to protect it. In 2015, Pope Francis published Laudato Si, On Care for Our Common Home, a powerful letter to the entire world that urges us to live in communion with nature and each other. As people of goodwill, we understand that all living things are meant to flourish. Our charge to be responsible stewards of the Earth intersects with our mission to seek the common good. The Holy Father, with ecumenical leaders around the world, has made it clear that we cannot sacrifice or commodify nature's resources and people for profit or power. In 2016, Hurricane Matthew raked the coast of Northeast Florida and flooded St. Augustine. The storm brought a seven-foot surge and 275,000 gallons of sewer spillage into our Davis Shores neighborhood and our home. Following the storm, we lived in three places and our damaged home was demolished. We had hoped to rebuild, but less than a year after Matthew, Hurricane Irma struck, and our property was flooded again.

02:23:24    While we didn't realize it at the time, we were climate refugees, part of the growing number of people displaced by natural disasters. In 2018, 1.2 million Americans moved from their homes because of climate change. By 2100, 13 million Americans could be forced to relocate from rising sea levels and submerging coastlines. Indeed, far too many of our fellow Floridians have already suffered this fate. Florida's future is linked in every way to water: our health, livelihoods, cultural expressions, and environment. Wetlands comprise 29% of Florida's landscape, with many connecting to navigable waters. They provide rich habitat for biodiversity and beautiful places for contemplation and renewal. Protecting the delicate balance of our diverse water systems is paramount. If lost, we cannot reclaim it. The governor's pending application to assume Section 404 control of Florida's waters is an experiment of grand proportion in consequence. I am concerned that special interests, state budget constraints, lack of expertise, and potential outsourcing will lead to cutting corners and rubber stamping in the name of streamlining permits. Previous attempts elsewhere have deemed the undertaking far too costly and time-consuming, and have often led to legal disputes. Florida's exploding growth in the reality of global warming pose real threats to all life forms and our way of life. The complexities of coastal

development, toxic pollution, disappearing wetlands, endangered species, groundwater integrity, and sea-level rise resiliency, I believe, are best controlled by federal oversight. This provides a breadth of resources and expertise, coherent coordination of environmental regulations, and transparency. Thus, with all due respects, I ask you to deny Florida's application. In this moment of global crisis and chaos, we find ourselves at a crossroads of biblical proportion. For the sake of those who will inherit our common home, I am hopeful that we will move forward in solidarity with science as our guide, sustainability as our goal, and the common good as our North Star. Thank you for this opportunity to share my views.

02:25:52    Jeanenne Gettle: Thank you, Ms. Brady. I have no clarifying questions.

02:25:57    Jan Connery: Okay. We are now going to move to speaker group six. And we have, I think, all three folks in that group here. We're going to start with Neal. And Neal, please say your name and state your affiliation for us, and then you will have five minutes for your comment.

02:26:26    Neil Armingeon: I'm Neil Armingeon. I am speaking to you as a citizen from Jacksonville Beach. I have spent the last 28 years working for environmental groups and it's indeed ironic that I am here today to, in effect, defend the US Army Corps of Engineers. The 404 project, as it stands, has weaknesses. I, personally and organizationally, have filed multiple lawsuits against the Corps, probably written 150 letters for 404 comments. And yet, given all of that, I'm here tonight to say I oppose transferring the 404 project to the Florida Department of Environmental Protection. I have worked in this field. I have, with the St. Johns Riverkeeper, ended my career as the Matanzas Riverkeeper. Wetland protection is something that has not been at the forefront of any regulatory process. And at least with the EPA and the St. Johns River, for us, St. John's River Water Management District, we felt as if we had some backstop to, at least, file legal challenges, 401 certifications, etc. The idea that the Florida Department of Environmental Protection, FDEP, which, for those of us who know, means "don't expect protection"-- that these people can manage and oversee wetland protection in the state of Florida is ludicrous. I wish I could put it any other way. I doubt if there's any-- very few people in the DEP are prepared to, for example, handle wetland delineation. It, in effect, robs the public from any iota of the federal protection.

02:28:34    We, here in Florida-- the idea that the State is interested in, are participating in, protecting environment is a joke. I, and others on this call, have reminded you of the problems with the discharge permit projects. And so now, to insinuate that a short-staffed, underfunded organization like Florida DEP is now going to handle wetland protection is a farce. It's ironic, really, for me, to sit here and try to defend what has-- I have experience, almost, of three decades of the Army Corps of Engineers and others, protecting wetlands. And yet, that is my position. If we are going to support anything, I would support that the Army Corps of Engineers and the water management districts continue in their roles. What we are facing here is, basically, a political takeover of a protection project. We have a governor who doesn't care about the environment coming out for another governor who doesn't care about the environment. EPA, at its best, was always a backstop to some of these wetland issues. You can always hope - and I stress, hope - the EPA would actually elevate some of this. So the idea that the Florida Department of Environmental Protection has any knowledge, ability, willingness to protect the remaining wetlands in this state, frankly, is a joke. I am here not really expecting anything other than, in effect, you are our last hope. If EPA approves this transfer, then, I would say, the wetlands, the waters of this state have little or no chance of being protected. I appreciate the opportunity to speak to you tonight and, again, let me end by saying the idea that the Florida Department of Environmental Protection gives a damn about protecting Florida's wetlands is a joke. Thank you for this opportunity to participate.

02:31:28    Jeanenne Gettle: Thank you. I have no clarifying questions.

02:31:33    Jan Connery: Okay. Going to move to Chris, and then Diana. After that, we're going to take standby speakers. We have one so far. So I just want to remind everyone with us on the hearing right now, if you're someone who hasn't spoken, you didn't sign up before but you'd like to

speak now, even if it's a short comment, or you can have up to five minutes, we'd love to hear from you. I think we're going to have time to work a few more folks in. The way to let me know you'd like to speak is to raise your virtual hand, and then we will take folks in the order that we see the hands raised. So I invite you to do that if you're interested. And right now, we're going to go to Chris Costello as our next commenter. Chris, please start by saying your name and affiliation, and then you will have five minutes for your comment.

02:32:24    Chris Costello: Good evening. My name is Chris Costello. Am I coming through?

02:32:28    Jan Connery: Very well, thank you.

02:32:30    Chris Costello: Great. Thank you. I am a senior organizing manager with the Sierra Club, and I am speaking on behalf of the Sierra Club this evening. We, like others on the line this evening, agree that the EPA must reject Florida's request to assume 404 permitting authority. While we will submit additional written comments, we want to briefly address here the failure of the EPA and FDEP to ensure meaningful public participation in this process. Neither the State, nor the EPA, has had any legitimate reason to push forward this process during the pandemic. Our experience with virtual meetings during the last seven months and the timing of both the FDEP and EPA virtual public listening sessions on this matter underscore why the public has condemned this process. It has also solidified our understanding of the role actual in-person public hearings play in the democratic process. Virtual participation is an adjunct to a public hearing, but it is not equivalent. During these virtual sessions, as public hearings-- or, I'm sorry, defining these virtual sessions as public hearings ignores the important differences between in-person and virtual-only events and undermines the democratic process. The democratic process is, of course, of the utmost importance.

02:34:20    There is also method to the madness of the timing of the FDEP virtual sessions at the tumultuous beginning of the pandemic lockdown and the timing of the EPA virtual sessions right before the most contentious federal election we have ever experienced. That method is to effectively keep the public out of the process. State assumption is an unfathomable proposal to anyone who understands and appreciates the role wetlands play in the protection of Florida's water resources. It makes no sense, zero sense, when considering the job the State has done, or, more accurately, has not done when it comes to environmental protection. We adamantly and strenuously oppose state assumption. Moreover, we condemn the failure of the EPA and FDEP to ensure what should be the broadest of public participation, considering the import of this matter. Thank you.

02:35:36    Jeanenne Gettle: Thank you, Miss Costello. I have no clarifying question.

02:35:40    Jan Connery: We will move to our next speaker. That is Diana Umpierre. Diana, please say your name and affiliation, and then you'll have five minutes for your comment.

02:35:57    Meredith Outterson: Hi, Diana. It looks like you're muted on your end, so please try--

02:36:00    Diana Umpierre: Hello? Am I okay now?

02:36:03    Jan Connery: Yes. I think you are.

02:36:05    Diana Umpierre: Okay. You hear me okay?

02:36:07    Meredith Outterson: Yes, we can now. That sounds good, Diana. Please go ahead.

02:36:11    Diana Umpierre: Thank you very much. So my name is Diana Umpierre. I live in South Florida, just a few miles from the edge of what remains of the Everglades, a river of grass. I currently work for Sierra Club as the organizing representative for their Everglades Restoration Campaign. I also served as a volunteer chair of the International Dark-Sky Association for a chapter that seeks to protect the nocturnal environment, which is significantly important to the waters of the US, since so many species live there. I also worked for years as a geologist, sampling contamination in waters of the US, so I am very familiar with what is possible with a well-managed, well-staffed,

well-enforced, well-monitored 404 program under the Clean Water Act. I also work as a geoscientist for the Water Management District-- the South Florida Water Management District. And I was there when, in 2011, the former governor Scott slashed funding and laid off hundreds of employees from the Florida Department of Environmental Protection and the water management districts, including people that were very much involved in regulatory permitting and enforcement. I'm sure that is why he was able to brag once, and I quote, "Florida has successfully reduced its environmental permitting time down to just two days. And that's great." Well, end of quote.

02:37:39 I have a zillion reasons to express this strong opposition. As has been stated, Sierra Club very much opposes Florida assuming the 404 federal program permitting. To give an example, while Sierra still opposes the current design and keeps demanding a better design for the EAA Reservoir and the Stormwater Treatment Area that's part of Everglades restoration, we are very grateful that, thanks to the 404 permitting process that is under the Army Corps of Engineers, NEPA has been there to provide additional time for impact analysis, for an EIS, for more public input for a project that both the water management district and the Florida Department of Environmental Protection, the FDEP, wanted to rush. 404 permitting of the STA, which was done by the Army Corps, included a number of special conditions that I'm sure the DEP would not have mandated, changes that included things to deal with seepage concerns to, also, adding more monitoring to deal with a lot of uncertainty about water quality. Florida simply does not have a state law that parallels NEPA, which some has often referred to as democracy in action.

02:39:00 So we're very concerned with turning federal actions into state actions because they will impact the level of review, the interactions that go on between the federal and the state government agencies. We're very concerned that the State would have far less data and would no longer be subject to the kind of rigorous review that environmental impacts-- that, basically, will be mandated under NEPA, including project alternatives analysis. They will, basically, fast track development permits for developer interest, or for politicians that simply love press conferences to claim victories and rework cutting, instead of projects that actually cleaning our water, restoring wetlands, and protecting wildlife. FDEP does not have the check and balances that are needed when they review 404 permits. Essentially, if you approve this application, you will, essentially, be allowing the fox to guard the henhouse. And so we ask the EPA to please deny this application. Thank you very much.

02:40:18 Jeanenne Gettle: Thank you, Miss Umpierre. I have no clarifying questions.

02:40:25 Jan Connery: Okay. Those are all the folks who we have right now who have registered. We'll be keeping an eye out for folks who registered and were in line to speak earlier but haven't shown up. But in the meantime, we are going to go now to our standby speakers. I'm happy to see that three folks have raised their hand, in addition to the person we had to start with. So we've got four people on standby. And so anyone else is invited to raise their hand. We've got about 20 minutes, so I think we can at least fit the four in. We're going to start with Georgia Ackerman. And for everyone who's on standby, we're going to ask you not just to say your name but, also, to spell it for us so we have that for the record, and state your affiliation, and then you'll have up to five minutes to comment. So Georgia, please go ahead.

02:41:25 Meredith Outterson: Hi, Georgia. It looks like you're muted on your end, so please press the mute key on your keyboard or your headset so that we can hear you. Great.

02:41:35 Georgia Ackerman: Good evening. Thank you for coaching. I'm Georgia Ackerman. Georgia, just like the state, Ackerman, A-C-K-E-R-M-A-N. I'm riverkeeper and executive director at Apalachicola Riverkeeper. Thank you for the opportunity to provide comments. I'll be brief, as the concerns expressed by others across the state of Florida have been so well stated and I strongly echo their opposition. The EPA has many compelling, uplifting quotes on one of their web pages on environmental stewardship. And I wanted to share one with you that President George W. Bush made in the early 2000s. And he said, I quote, "Good stewardship of the

environment is not just a personal responsibility. It's a public value, our duty to use land well, and, sometimes, not to use it at all. This is a responsibility as citizens, but more than that, it's a calling as stewards of the Earth."

02:42:32    Apalachicola Riverkeeper is a member of Waterkeepers Florida and the international Waterkeeper Alliance. Waterkeepers are stewards of their watersheds. Like Dr. Seuss's beloved character, the Lorax, who speaks for the trees, waterkeepers speak up for our waterways on behalf of all Florida citizens. Apalachicola Riverkeeper is an independent non-profit organization of over 1,400 members. For over 20 years, we've been committed to the protection and restoration of the Apalachicola River and Bay. The Apalachicola River is Florida's largest in volume, and it flows over 100 miles through Florida's largest forested floodplain, from the Georgia-Florida line to the Gulf of Mexico, where it supports the productivity of the Apalachicola Bay and the eastern Gulf of Mexico. The region is recognized internationally for its biological diversity, much of it due to the vastness of its wetlands. It must remain well-protected. Apalachicola Riverkeeper, like St. Johns Riverkeeper, Matanzas Riverkeeper, Miami Waterkeeper, and all Waterkeepers Florida, oppose Florida's request to assume administration of the Clean Water Act Section 404 program. We will submit a detailed letter prior to the November 2nd deadline. Please deny this request. Thank you for your time.

02:43:50    [silence]

02:44:01    Jeanenne Gettle: Thank you, Ms. Ackerman. I have no clarifying questions.

02:44:05    Jan Connery: Great. We'll go to our next standby speaker and that is Holly-- and I hope I'm saying this right, Holly Schwartz. Anyway, you can tell us how you say your name, and also, please spell it for us and let us know your affiliation, and then you'll have five minutes.

02:44:25    Meredith Outterson: Holly, please check the mute on your end. There you go.

02:44:29    Holly Schwartz: Okay. Hi, you can hear me? Thank you.

02:44:32    Yes, we can. You're good.

02:44:34    Great. My name is Holly Schwartz. It's spelled H-O-L-L-Y S-C-H-A-R-T-Z. Somewhere, the Z disappeared. I am a policy associate with the Sanibel-Captiva Conservation Foundation in Lee County, Florida. And we advocate for environmental issues throughout the entire county. And, of course, I'd want to completely support all of the comments that have been made in opposition to this assumption. But I wanted to add that many of the speakers listed talked about DEP's lack of resources as a concern of implementing this program. And I'd like to provide some additional evidence to support that concern. And it would come from Florida's own transparency website, transparencyflorida.gov, which lists and shows a vacancy rate-- or a vacancy list of 279 positions for DEP alone. And before you get too excited and think, "Oh, great, they're going to fill 279 positions," it could be that those positions have been zeroed out and have just been sitting there. And I can tell you that we've been monitoring that vacancy rate for several years and it hasn't gotten any better. So that would lead one to be continually concerned that they are going to still continue to face a lack of resources. And I'm really glad that one of the previous speakers had mentioned the statutory requirement when ERPs are filed that they must be responded to within 30 days. I mean, that just further exacerbates the review time for such an important resource. So I'll keep it pretty brief and just say, I support the opposition and all of the comments made previously. And please consider how vitally important wetlands are to the state of Florida before approving or considering approval of this proposal. Thank you.

02:46:48    Jeanenne Gettle: Thank you, Miss Schwartz. I have no clarifying questions.

02:46:52    Jan Connery: Okay. We will move our next standby speaker, that is Sarah Younger. Sarah, please say and spell your name for us, let us know your affiliation, and you'll have up to five minutes for your comment.

02:47:11    Meredith Outterson: Hi, Sarah. We can't hear you yet. Please check the unmute your end.

02:47:18    Sarah Younger: Hi, my name's Sarah Younger. And that's spelled S-A-R-A-H Y-O-U-N-G-E-R. I live in Alachua County here in Florida. I'm speaking as a resident of the headwaters for the Floridan aquifer. I am very concerned if the State were to assume the role of permitting for the Section 404, or rulemaking 404 permits, as I understand, that that would lead to, perhaps, a faster track for development in our region. I understand that states have to demonstrate that their jurisdiction's equal in scope to the federal laws regarding the waters of the US and prove that their program is consistent with federal laws. I think it's clear that the State has been failing in its duty, as it stands right now. In fact, our water flows here in the springs have been reduced and we're very concerned about-- that the water quality concerns. And it also has to show that they'll have adequate funding because you can expect that the State would have to spend money in order to assume a program of this type. And if we've seen anything, it's that our state legislature has not been funding programs that serve to protect our environment at this time, in any that it demonstrates that they're able to bring these rivers back out of recovery, other than by changing the rules, which is where we are right now. So I'm urging you to reject this notion that they're ready to assume this program. And as a citizen of North Central Florida, I urge you to heed the advice of those who have been on this call. Also, undertaking this role as a river waterkeeper here as many of us have, we do also know the challenges of getting word out about these rules and how they get changed and how to be present for these meetings. I only learned of this meeting earlier today and I am a person who watches for these types of announcements. So I urge you to think about how you're making this information available to the public because it is evident to me that you're failing at that as well. So please do not grant the State this authority. They're not ready to receive that authority. And I thank you for your time.

02:50:17    Jeanenne Gettle: Thank you, Miss Younger. I have no clarifying questions.

02:50:22    Jan Connery: Okay. We have one more stand by commenter right now. And I think we could take an additional one. If there's someone who did want to raise their hand, you could do that. But right now, we're going to Susan Caruso. Susan, please start by saying and spelling your name for us and stating your affiliation, and then you'll have up to five minutes for your comment.

02:50:47    Susan Caruso: Hi. Good evening. My name is Susan Caruso, S-U-S-A-N-C-A-R-U-S-O. I am down here in Broward County with the Broward Sierra Club and I don't really have much to add to all the eloquent speakers who have gone before me tonight. But it seems I agree that the EPA should not grant the state of Florida's request and that they have a long way to go to prove that they have the wetlands in their best interests-- in the best interests of the citizens of the state of Florida. So thank you for the time to comment. That's all I have. Thank you.

02:51:35    Jeanenne Gettle: Thank you, Miss Caruso. I have no clarifying questions.

02:51:39    Jan Connery: Great. Well, we have another standby commenter, which is great. And I think we would have time for one more, if someone else would like to raise their hand. But right now, we're going to go to Matthew Schwartz. You probably know the drill, Matthew, but please state and spell your name, let us know your affiliation, and then you'll have up to five minutes.

02:52:04    Matthew Schwartz: Okay. So my name is Matthew Schwartz, M-A-T-T-H-E-W S-C-H-W-A-R-T-Z. I'm with the South Florida Wildlands Association, a regional organization that works on habitat and wildlife conservation in the Greater Everglades. And I spoke at the first meeting. I didn't think I was going to get to this one but somebody just called me and said you guys are going late. I'm out in the woods in Central Florida right now. But I want to bring up - and I'm just going to focus on one issue - this decision is coming at a time when the state of Florida, the lead agency is Florida Department of Transportation, is trying to get approved, the M-CORES project and that's 320, 330 miles of new highway from Collier to the Florida-Georgia border. That highway is going to be going through wetlands. It's going to be crossing streams and rivers. It's going to need all kinds of wetlands permits. And, normally, those would go through the Army Corps of Engineers.

02:53:11    We've been through this many, many times with these kinds of projects. I mean, not a project of this scale, I have to be honest. M-CORE is off the scale. I've never seen a project like that in the time I've been doing this work. You have to hearken back to the 1950s and the Florida Turnpike or the Cross Florida Barge Canal to get to a project of this size. This is a massive project with massive impacts to wildlife, wetlands, springs, all kinds of things. But the Army Corps would typically review a project like this, go into [inaudible] with the Fish and Wildlife Service if there was a chance of harm to endangered species. There's all kinds of endangered species that are in the corridor of M-CORES. So the fact that this request is happening now, I don't know. I mean, this has been something we've heard over the years. Is it in relation to M-CORES? Not sure. But we don't want this agency learning the ropes when M-CORES is going through wetlands permitting and they're going to permit 320 miles of new highway across wetlands in Florida and they're going to be the ones to consult with the US Fish and Wildlife Service, never having done it before. This is definitely not the time. Even if there was a time, start them out on some small projects. M-CORES is coming. They just finished the task force meetings. So M-CORES is in the pipeline. And the next step after the task forces released their final report in the middle of November, is they're going to start planning a route-- routes for 330 miles, 320 miles of new highway. And it's going to be a very, very difficult process. And we don't want this to happen. It's not that we have so much faith in the Army Corps of Engineers or the EPA to protect our interests in this issue. But at least there's a process in place to deal with these things. We've gone through it many, many times. The Army Corps knows the route, knows how to do this. The EPA has gotten involved in some projects and has weighed in on some projects.

02:55:22    The state of Florida-- I think people have said-- I didn't get to hear many of the comments but the person I spoke to on the phone was Drew Martin. He'd conveyed to me that a lot of the reason behind this, and I feel the same way, is that this is all about speed. The Army Corps doesn't deny applications, as a rule. But they do take their time. They do due diligence. They go through NEPA, when necessary. They turn it over to the Fish and Wildlife Service. What we think is happening here is just the developers don't want the delay. They want to speed this up. And the DEP is very willing to do that. So, in summary, don't do this. Keep the process. Keep the review process within the federal government. We have a new administration coming in. I don't know that. I don't know that, excuse me. I have no clue if that's happening or not. But if a new administration comes in, who knows what the new policies on the federal side will be. And maybe, they'll be a little bit more environmentally friendly and realize that we're in a different time now.

02:56:29    I mean, the secretary of the Department of Transportation was lauding the Florida Turnpike. They said, "Look what we did in the 1950s with the Florida turnpike. We could do it again today." Florida was a completely different state in the 1950s, in terms of population. I think the population in 1950 was somewhere in the neighborhood of 3 million, under 3 million; about the population of Miami-Dade today. So take the population of Miami-Dade, what it is today, spread it out over the entire peninsula, you'll have a sense of what Florida looked like in the 1950s. And here's a state secretary of transportation saying, "This was the good old days." So is that what he thinks is the good old days, doing another Florida turnpike at this point when so much wildlife, so much wetlands, the algae problems we have, the overcrowding, the quality of life--? Florida is an-- I mean, I'm sorry, Florida's an ecological disaster. It's a joke to most people who come here and they see the sprawl. Anyway, I could go on and on with this. I think you get the point. I think this is not the time to transfer this authority from the federal government to the state government, especially with the biggest project we've ever seen at the door. So thank you for listening to the comments and willing to take questions if you have any.

02:57:46    Jeanenne Gettle: Thank you, Mr. Schwartz. I have no clarifying questions.

02:57:51    Matthew Schwartz: Thank you.

02:57:54 Jan Connery: We have just one more person who has raised their hand. So this is going to be our final commenter. And that is Barbara Anjelucci. Barbara, you're going to start by saying and spelling your name, letting us know your affiliation, and then you'll have five minutes.

02:58:15 Barbara Anjelucci: Can you hear me?

02:58:17 Jan Connery: Yes, we can.

02:58:21 Barbara Anjelucci: Okay. My first name is Barbara. The last name is Anjelucci, A-N-J-E-L-U-C-C-I. I'm a resident of Florida. And I just want to tell you that many people move to Florida for the sunshine and its waters, generating billions for our economy. Wetlands play an integral part in that. And also, in cleaning pollutants out of water and control flooding. They must be protected and be highly regulated. NEPA provides for an EA or an EIS and public participation opportunities. States are not required to follow federal law, leaving our wetlands and ecosystems open to destruction and citizens' voices silent. In July of this year, the Trump administration announced rollbacks of a big [inaudible] environmental law, which they say will benefit the economy by speeding up construction projects. Overthrowing NEPA is one of the most dramatic changes the president has attempted to make to slash an environmental policy, though he has pushed to roll back at least 100 environmental rules. NEPA was enacted to require federal agencies to determine the possibly detrimental effects that major projects could have on surrounding environment. This NEPA requires government agencies to engage in, is intended to discover not only to [inaudible] effects that construction could have on climate change, but also takes into account how massive a public health crisis could affect citizens living nearby to proposed sites. Contamination and unprotected streams and rivers often flow into larger bodies of water, including drinking water sources.

03:00:36 Wetlands are more important than ever and should be protected by regulations. In light of all the above, we cannot trust the state of Florida to take over federal permitting. The other thing is that these virtual hearings, two of them, when this discussion has long term consequences. What about the people that have no technology? The EPA needs to conduct public hearings, when the time is appropriate, across the state. Because to move ahead with this with only two virtual hearings when the public cannot meaningfully participate does not provide due process to citizens. And also, I'd like to hear from the Army Corps. Have they been silenced on this? Well, I will tell you what I think. And I'm sorry if you're furrowing eyebrows. But this reversal of oversee of Section 404 is brought forward by industry polluters who look to satisfy their greed and profit at the expense of public health and destruction of our environment. Needless to say, I am totally against the state of Florida taking over Section 404. It truly is "Florida, don't expect protection". Thank you.

03:02:29 Jan Connery: Ma'am, could you spell your last name for me again?

03:02:32 Barbara Anjelucci: I'll do it again. It's A-N-J-E-L-U-C-C-I. The first name is Barbara.

03:02:46 Jan Connery: Thank you. Thank you, Barbara.

03:02:52 Jeanenne Gettle: I have no clarifying questions.

03:02:54 Barbara Anjelucci: Thanks.

03:02:57 Jan Connery: Jeaneanne, we are just a tiny bit over and we do have one more person who'd like to speak. Could we go for another couple minutes or so?

03:03:05 Jeanenne Gettle: Okay. We will do one more commenter, and then we will have to close out at that point in time.

03:03:13 Jan Connery: Yep. I think she had raised her hand just as I was saying we didn't have anymore. And that is our last one with the hand raised. So we are going to go to Susan Hill as our final

commenter. Susan, you probably know what to do. But state and spell your name for us, your affiliation, and you'll have up to five minutes. Please go ahead.

03:03:31     Susan Hill: Thank you for allowing me to speak. Can you hear me okay?

03:03:34     Jan Connery: Yes, just fine.

03:03:36     Susan Hill: My name is Susan Hill, S-U-S-A-N, last name H-I-L-L. And I've listened very carefully to all of the speakers and I agree with all of them in opposition to the assumption by the Florida Department of Environmental Protection to assume the responsibility for the 404 permitting process. If you decide to grant this, you will be delivering the final blow to our environment. And I would say to you, as someone who was born in Miami and have lived 60 some years in this state, that the people you have heard tonight are the only voices that we have in this state for Florida's environment. Imagine if you couldn't go home again to the place where you were born and grew up because it was rapidly becoming underwater and red tide was so severe that you wouldn't be able to breathe, or end up in the hospital, or have to move from your coastal home inland to get away from it. That is not an exaggeration of the state of Florida's environment. I remember. I was a kid in Miami in the 1950s and I can tell you that what has happened in just my lifetime is atrocious. And, in part, it is the responsibility of our state, who have not been good stewards of our environment. Florida has many vulnerabilities, as other speakers have mentioned. We are a magnet for people from all over the country coming and moving here. And I will tell you that since my retirement from the University of Florida four years ago, I've been involved in a lot of environmental efforts in the St. Augustine area. And developers have an overbearing reach to our politicians in this state. And that is not an exaggeration. And I am not too old to beg you to please do not approve this request by the Florida Department of Environmental Protection. If you do it, our environment here, our coastal wetlands, our waterways will be finished. Thank you so much for paying attention and allowing me to speak.

03:06:03     Jeanenne Gettle: Thank you, Miss Hill. I don't have any clarifying questions.

03:06:07     Jan Connery: Okay, well, that was our last commenter. So it's back over to you, Jeaneanne, for your closing remarks.

03:06:15     Jeanenne Gettle: Thank you. I would like to thank each of you for your participation in the public hearing. The comments that are received will be considered and evaluated as EPA makes its final decision. As indicated earlier, following the close of the public comment period on November 2nd, 2020, EPA will review and consider all comments received during the public comment period, comments received both in writing and from the public hearing. If EPA approves the State's 404 program, a notice of decision will be published in the Federal Register. EPA will also prepare a responsiveness summary of significant comments received during the comment period and EPA's response to these comments. Additional information regarding these procedures is available by contacting Mr. Kelly Laycock. His information is on the screen, at 404-562-9262 or at 404assumption-florida@EPA.gov. All of that is on the screen. Again, I thank you for your participation. If you have any other questions or comments, you can always reach EPA using the methods listed in the public notice and on the EPA's Region 4 website and in the Federal Register notice at regulations.gov. This hearing is adjourned. Thank you for your participation.



Attorneys at Law
llw-law.com

*Reply To: West Palm Beach*

November 2, 2020

**VIA EMAIL ONLY**
Mr. Kelly Laycock
Oceans, Wetlands and Streams Protection Branch
United States Environmental Protection Agency
Region 4, Atlanta Federal Center
61 Forsyth Street, SW, Atlanta, GA 30303
404Assumption-FL@epa.gov

**RE: Seminole Tribe of Florida's Comments on Florida's Request to Assume Administration of a Clean Water Act Section 404 Program - Docket ID No. EPA-HQ-OW-2018-0640**

Dear Mr. Laycock:

This firm represents the Seminole Tribe of Florida (Seminole Tribe). The Seminole Tribe is a federally recognized tribe pursuant to Section 16 of the Indian Reorganization Act of 1934. The Seminole Tribe enjoys broad authority under the Clean Water Act, the Water Rights Compact Among the Seminole Tribe of Florida, the State of Florida, and the South Florida Water Management District and the Tribal Water Code to protect Tribal waters. The Seminole Tribe has a significant interest in issues related to the State of Florida's (State/FDEP) application to seek assumption from the United States Environmental Protection Agency (EPA) of the Clean Water Act Section 404 Permitting Program (404 Program). The Seminole Tribe remains concerned about the impending loss of federal tribal consultation rights for the 404 Program in Florida. The Seminole Tribe sincerely appreciates FDEP's efforts to engage with and incorporate the Seminole Tribe's feedback during the development of the 404 Program.

01388281-1

**JACKSONVILLE**
245 Riverside Ave., Suite 510
Jacksonville, Florida 32202
T: 904.353.6410
F: 904.353.7619

**ST. PETERSBURG**
100 Second Ave., South
Suite 501-S
St. Petersburg, Florida 33701
T: 727.245.0820
F: 727.290.4057

**TALLAHASSEE**
315 South Calhoun St., Suite 830
Tallahassee, Florida 32301
T: 850.222.5702
F: 850.224.9242

**TAMPA**
301 West Platt St.
Suite 364
Tampa, Florida 33606
T: 813.775.2331

**WEST PALM BEACH**
515 North Flagler Dr., Suite 1500
West Palm Beach, Florida 33401
T: 561.640.0820
F: 561.640.8202

See Things Differently®

The Seminole Tribe participated in formal consultation with EPA on the State's 404 application pursuant to *Executive Order 13175*, *EPA Policy on Consultation and Coordination with Indian Tribes,* and *Section 106 of the National Historic Preservation Act*. As discussed with EPA in formal consultation, the Seminole Tribe has several remaining concerns with the State's application which need to be considered by EPA.

**EPA Review/Dispute Resolution Process**

Under 40 CFR 233.51, EPA cannot waive review of eight categories of applications, including applications whose discharges have a reasonable potential for adverse impacts on waters of another State or Tribe. At the request of the Seminole Tribe language was added to the State's two Memorandum of Agreement (MOA), one with EPA and the other with the United States Army Corps of Engineers (Corps). This language is to ensure that EPA is involved in any disputes over what constitutes Indian Country under the 404 Program. Additionally, FDEP in the 404 Applicant's Handbook at Section 5.2.5 has committed to include EPA in the review of any project where FDEP fails to accept the recommendations of an affected State or Tribe received during the public comment period. These recommendations may concern issues related to endangered species or cultural resources, in addition to impacts to Tribal waters. The Operating Agreement (OA) between FDEP and the State Historic Preservation Office (SHPO) also affirmed EPA's role in review of and participation in resolution of cultural resource-related disputes.

What remains unclear is the actual process for dispute resolution that will occur between EPA, FDEP, and the Seminole Tribe on non-waivable categories, Indian Country determinations, effects to cultural resources and endangered species. The Seminole Tribe raised this concern in consultation with EPA. EPA affirmed its commitment to Nation to Nation communications with the Seminole Tribe on these categories. In addition, EPA confirmed that the assumption regulations provide enough flexibility for coordination with the Seminole Tribe on 404 permit issues as they arise. Although the process for Tribal coordination on an elevated application has not yet been developed, the Seminole Tribe remains interested in working with EPA on a coordination process that reflects Nation to Nation communications. What is most important to the Seminole Tribe is that this coordination occur ahead of any future dispute arising on a specific 404 application.

**Coordination with the Advisory Council on Historic Preservation (ACHP)**

The Seminole Tribe concurs with EPA's determination that approval or disapproval of the State's 404 Program assumption application is a Federal Undertaking triggering a Programmatic Section 106 consultation under the National Historic Preservation Act. The Seminole Tribe appreciates EPA engaging in formal consultation pursuant to Section 106 and looks forward to continuing conversations with EPA, ACHP, and FDEP on the development of a Programmatic Agreement for

an assumed 404 Program. At the time the OA was provided to the Seminole Tribe for review and comment, EPA had not made this determination and therefore the OA does not currently reflect coordination with the ACHP. During consultation, EPA requested feedback from the Seminole Tribe on the role of the ACHP in a potential Programmatic Agreement. The Seminole Tribe provided EPA with suggestions for incorporation and requested a draft of the Programmatic Agreement for review. The Seminole Tribe also stated that it would like to be a signatory to any Programmatic Agreement. As of the date of submission of these comments, the Seminole Tribe has not received a response on the suggestions or the draft of the Programmatic Agreement. The Seminole Tribe strongly recommends a Programmatic Agreement be developed to clearly set forth in what circumstances EPA will involve the ACHP. This important Agreement should be made available for the Seminole Tribe's review and comment before EPA acts on the State's application.

**Endangered Species Protection**

Under the existing process for federal 404 permits, the Seminole Tribe frequently consults with the Service on projects with direct, secondary, and/or cumulative impacts to threatened and endangered species and habitats within a large geographic radius around the Seminole Tribe's lands. The Seminole Tribe is concerned that without a similar process for determining species impacts under a State 404 Program, a disproportionate burden could be placed on the Seminole Tribe's lands for species and habitat conservation. *Secretarial Order 3206: American Indian Tribal Rights, Federal–Tribal Trust Responsibilities, and the Endangered Species Act* clarifies the responsibilities of agencies, bureaus and offices of the Department of the Interior and the Department of Commerce when actions taken under authority of the Endangered Species Act and associated implementing regulations affect, or may affect Indian Lands, tribal trust resources, or the exercise of American Indian Tribal rights. Secretarial Order 3206 is intended to ensure Indian Tribes do not bear a disproportionate burden for the conservation of listed species, to avoid or minimize the potential for conflict and confrontation. FDEP is required to demonstrate to EPA that the 404 Program will comply with the 404(b)(1) Guidelines, including the requirement of "no jeopardy" for federally listed threatened and endangered species. EPA has shifted from its longstanding policy and has now determined that EPA's review of the endangered species protection in the proposed State 404 program is a discretionary action. EPA and the U.S. Fish and Wildlife Service (Service) did not consult with the Seminole Tribe on this important policy shift. Had the federal agencies consulted with the Seminole Tribe on this shift in policy, the Tribe would have expressed serious concerns with a programmatic approach.

The Seminole Tribe is concerned that a Programmatic Biological Opinion (BO) with Incidental Take Statement attempting to cover all species across Florida for direct, secondary, and cumulative impacts cannot effectively account for every potential future permitting action under the State 404 program. In addition, it appears that the proposed BO is also to cover take for

species and critical habitat that have yet to be listed and/or designated. The Seminole Tribe questions the legality of this. The Seminole Tribe is very concerned that this approach will lead to disproportionate effects to the Tribe for conservation of species due to increased opportunity for displacement of species pursuant to the State 404 program. The Seminole Tribe also remains concerned that the proposed Memorandum of Understanding between FDEP, the U.S. Fish and Wildlife Service (Service) and the Florida Fish and Wildlife Conservation Commission (FWC) submitted as part of FDEP's application package is not signed. A final signed MOU should be available for review before EPA acts on the State's application so that it is clear what the final process between the FDEP, the Service, FDEP and Florida Fish and Wildlife Conservation Commission (FWC) will be and what EPA's role will be, if any.

**Retained Versus Assumed Waters**

At this time no information has been provided to the Seminole Tribe or the public as to the exact waters of the State which will remain under Corps jurisdiction and which waters will be assumed by the State. The Seminole Tribe recognizes that FDEP is not seeking to assume the 404 Program in Indian Country. The Seminole Tribe reiterates prior requests to be provided GIS Layers of the retained versus assumed waters to ensure that Indian Country remains under the jurisdiction of the Corps 404 program and to better understand what waters adjacent to Indian Country will be assumed by the State.

**Utilization of Other State Agencies and Rules**

The Seminole Tribe does not believe that reliance on the State's existing Environmental Resource Permit Program (ERP), water management district (WMD) staff, FWC staff, and SHPO staff is a viable approach to a 404 Program. FDEP's proposed approach depends heavily on other State agencies, without adequate justification that those agencies have the resources required to implement the program. FDEP is also anticipated to undergo budget cuts in the upcoming year due to the financial impacts of the pandemic. The Seminole Tribe questions whether FDEP has adequate resources to effectively implement an assumed 404 Program.

FDEP's proposed 404 program is not as stringent as the federal program. In enacting legislation to pursue the 404 Program, the Florida Legislature granted FDEP broad authority to "adopt any federal requirement, criteria, or regulations necessary to obtain assumption, including but not limited to the guidelines specified in 40 C.F.R. Part 230 and the public interest review criteria in 33 C.F.R. S 320.4(a)." F.S. 373.4146(2) (2019). Rather than adopting the specific requirements of the 404(b)(1) Guidelines and the Corps' public interest criteria FDEP has referenced the State's Environmental Resource Permitting (ERP) rules and criteria which are in many areas different to and less stringent than the 404 criteria.

While there may be significant overlap between the 404 and ERP Programs, there are also several distinct differences that impact regulatory outcomes. FDEP's Rule 62-331 and 404 Handbook lack important federal Clean Water Act requirements that should be included for applicants and permit reviewers. FDEP's reliance on Section 10.2.1 of the ERP Applicant's Handbook Volume I to fulfill Subpart H of the 404(b)(1) Guidelines suffers from this shortcoming. Subpart H which provides regulations for Actions to Minimize Adverse Effects of 404 permits governs a variety of specific actions including: the location of the discharge; the material to be discharged; the material after discharge; the method of dispersion; technology-related actions; impacts to plant and animal populations; impacts on human use; and other actions. 40 CFR 230 Subpart H. FDEP's analysis of Rule 62-331 compared to the 404(b)(1) Guidelines on Subpart H acknowledges that Section 10.2.1 is not as specific as the Guidelines and asserts that the regulatory outcome will be the same. The Seminole Tribe disagrees with this assertion and believes that FDEP's program is not as stringent as the federal laws on this point.

Another example deals with the Corps' public interest review under 33 U.S.C. 320.4(a) versus the ERP public interest test incorporated into Rule 62-331. The federal public interest review contemplated in the CFRs referenced by the Florida Legislature requires review based on "probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." The standard of review under the ERP Program's Rule 62-330.302(1)(a) is that projects are "not contrary to the public interest" and only in instances of impacts to Outstanding Florida Waters must a project be clearly in the public interest. The ERP review does not consider cumulative impacts, which is clearly a requirement of the existing federal program. The federal regulations provide additional general criteria to consider in the evaluation of every application that are absent from the State's existing ERP program. 33 U.S.C. 320.4(a)(2). The ERP public interest review does not take into account additional factors to be considered, including but not limited to economics; aesthetics; land use; water supply and conservation; energy needs; and food and fiber needs. The Seminole Tribe made these recommendations to FDEP at the time of the State's rulemaking, however FDEP chose not to incorporate these changes. The Seminole Tribe remains concerned that the State 404 Program does not meet the requirements for assumption.

## FDEP General Permits

The Seminole Tribe understands that FDEP is relying upon analysis by Corps of Nationwide Permits for the General Permits under the State 404 Program. The Corps Nationwide Permit Program is set to expire in 2022, whereas FDEP's General Permits would remain valid for five years after assumption of the Program. The Seminole Tribe questions whether FDEP can rely on an analysis by the Corps if that analysis is no longer valid after the expiration of the Corps program. FDEP is required to independently provide proof that "the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only

minimal cumulative adverse effects on the environment." *See* 40 CFR 233.21(b). It is not clear that this has been done.

Additionally, the Corps is currently revising the Nationwide Permit Program to, among other thigs, update Nationwide 12 for Utility Lines and separate out Oil and Natural Gas Pipelines from Electric Utility and Communication Lines. FDEP's General Permit 62-331.215 adopted the Corps' 2017 Nationwide 12 language which has been challenged in the courts. The Seminole Tribe is concerned that EPA will be approving a state 404 program that will in essence grandfather in general permits that are no longer valid or legal in the rest of the country. A process for update of the State's proposed General Permits, to the extent they rely on the analysis and justification of the Corps' Nationwide Permit program, should be provided.

**Delegation to State Water Management Districts**

The Seminole Tribe has a longstanding relationship with the South Florida WMD related to the Water Rights Compact Among the Seminole Tribe of Florida, the State of Florida, and the South Florida Water Management District. The Seminole Tribe has spent the last several years and numerous resources developing relationships with FDEP as it takes on more state permitting activities that impact Tribal lands and as part of the State's development of the 404 Program. The Seminole Tribe is pleased that FDEP is pursuing a Tribal Coordinator to foster this relationship further. There remains a concern however that shortly after assumption FDEP may seek to delegate the 404 Program to the five State WMDs. Nothing in state or federal law prevents FDEP from pursuing this option. Currently the 404 Program is set up so that a significant part of the 404 review is conducted by WMD staff during the review of ERP applications. The Seminole Tribe is concerned that delegation to the WMDs would cause significant coordination burdens for the Seminole Tribe. Instead of coordinating with one agency's staff on all the facets of the program the Seminole Tribe would be forced to coordinate and educate all the WMDs on the unique rights regarding implementation of the 404 program as it relates to Indian Country, Tribal waters, cultural resources and species/habitat concerns. Advance notice and an opportunity for consultation and comment should be provided before EPA authorizes delegation in the future by the State.

**Conclusion**

The Seminole Tribe participated in the development of the State 404 Program, working with FDEP to address many of the Seminole Tribe's concerns. The Seminole Tribe appreciates the work of FDEP staff on that effort and the attempt to address many of the comments. However, the pending application continues to have several important deficiencies and areas of concern that

Mr. Kelly Laycock
U.S. EPA - Wetlands
Seminole Tribe of Florida's Comments
November 2, 2020
Page 7

were raised with the State and more recently in consultation with EPA that should be dealt with as part of EPA's consideration of the State's request for assumption.

Sincerely,

Michelle Diffenderfer
Rachael Santana

c. Mary Walker, EPA Regional Administrator Region 4
Matt Hicks, EPA Region 4
Michael Creswell, EPA Region 4
Eve Zimmerman, EPA Region 4
Katie Pugh, EPA Region 4
Stephanie Gray, FDEP
Jim Shore, Esquire – General Counsel, Seminole Tribe of Florida
Andrew J. Bowers – Executive Director of Operations
Paul N. Backhouse, Ph.D. RPA – Sr. Director, Heritage Environment Resources Office and Tribal Historic Preservation Officer
Stacy D. Myers – Sr. Scientist/Liaison, Heritage Environment Resources Office
Kevin M. Cunniff – Director, Environmental Resource Management Department
Anne H. Mullins, MCRP – Director, Tribal Historic Preservation Office

01388281-1

the subsequent need to complete all federal authorizations within 90 days of the date of issuance of the Commission staff's EA.

Persons who wish to comment only on the environmental review of this project should submit an original and two copies of their comments to the Secretary of the Commission. Environmental commenter's will be placed on the Commission's environmental mailing list and will be notified of any meetings associated with the Commission's environmental review process. Environmental commenter's will not be required to serve copies of filed documents on all other parties. However, the non-party commenters, will not receive copies of all documents filed by other parties or issued by the Commission and will not have the right to seek court review of the Commission's final order.

The Commission strongly encourages electronic filings of comments, protests and interventions in lieu of paper using the eFile link at *http://www.ferc.gov.* Persons unable to file electronically may mail similar pleadings to the Federal Energy Regulatory Commission, 888 First Street NE, Washington, DC 20426. Submissions sent via any other carrier must be addressed to: Kimberly D. Bose, Secretary, Federal Energy Regulatory Commission, 12225 Wilkins Avenue, Rockville, Maryland 20852.

Dated: December 16, 2020.

**Kimberly D. Bose,**

*Secretary.*

[FR Doc. 2020–28248 Filed 12–21–20; 8:45 am]

**BILLING CODE 6717–01–P**

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OW–2018–0640; FRL–10018–92–Region 4]**

## EPA's Approval of Florida's Clean Water Act Section 404 Assumption Request

**AGENCY:** Environmental Protection Agency.

**ACTION:** Notice.

**SUMMARY:** On August 20, 2020, the Environmental Protection Agency (EPA) received from the Governor of the State of Florida a complete program submission to assume regulating discharges of dredged or fill material into waters within the jurisdiction of the State in accordance with Clean Water Act (CWA) section 404(g–l). Receipt of the package initiated a 120-day statutory review period. After careful review of the package submitted, as well as consideration of comments submitted on the package by the U.S. Fish and Wildlife Service (USFWS), the National Marine Fisheries Service (NMFS), and the U.S. Army Corps of Engineers (Corps), comments received during consultation with tribes, and over 3,000 comments received from the public, EPA has determined that the State of Florida has the necessary authority to operate a CWA Section 404 program in accordance with the requirements found in CWA section 404(g–l) and EPA's implementing regulations. Therefore, EPA has taken final action to approve Florida's assumption of the program.

**DATES:** Florida's program assumption will be applicable December 22, 2020.

**FOR FURTHER INFORMATION CONTACT:** Mr. Kelly Laycock, Oceans, Wetlands and Streams Protection Branch, USEPA Region 4, 61 Forsyth St. SW, Atlanta, GA 30303; telephone number: (404) 562–9262; email address: *404Assumption-FL@epa.gov.*

**SUPPLEMENTARY INFORMATION:** The CWA established the Section 404 program, under which the Secretary of the Army, acting through the Chief of Engineers of the Corps, may issue permits for the discharge of dredged or fill material into waters of the United States as identified in the CWA. Section 404(g)(1) of the CWA provides states and tribes the option of submitting to EPA a request to assume administration of a CWA Section 404 program in certain waters within state or tribal jurisdiction.

The regulations establishing the requirements for the approval of state or tribal programs under section 404 of the CWA were published in the **Federal Register** at 53 FR 20764 (June 6, 1988) (40 CFR parts 232 and 233), and can be accessed at *https://www.epa.gov/cwa404g/statutory-and-regulatory-requirements-assumption-under-cwa-section-404.* ''State regulated waters'' are defined in 40 CFR 232.2.

The Corps generally retains CWA Section 404 permitting authority over waters of the United States within ''Indian country'' as that term is defined at 18 U.S.C. 1151, unless a tribe has assumed administration of a CWA Section 404 program within Indian country. *See* 40 CFR 233.1(b).

A state application to administer a Section 404 program must include the following: (a) A letter from the Governor of the state requesting program approval; (b) a complete program description as set forth in 40 CFR 233.11; (c) an Attorney General's statement or a statement from the attorney for those state or interstate agencies which have independent legal counsel, as set forth in 40 CFR 233.12; (d) a Memorandum of Agreement with the EPA Regional Administrator, as set forth in 40 CFR 233.13; (e) a Memorandum of Agreement with the Secretary of the Army, as set forth in 40 CFR 233.14; and (f) copies of all applicable state statutes and regulations, including those governing applicable state administrative procedures. 40 CFR 233.10.

On September 16, 2020, EPA published a **Federal Register** notice of its receipt of a complete program assumption request package (85 FR 57853), opened a public comment period, and scheduled two virtual public hearings on the Section 404 program submitted by Florida. EPA held virtual public hearings on October 21, 2020, and October 27, 2020, and received comments submitted to Docket ID No. EPA–HQ–OW–2018–0640 during the public comment period which ended November 2, 2020. EPA received and reviewed over 3,000 comments submitted during the comment period and public hearings, comments provided during tribal consultation, as well as comments from USFWS, NMFS, and the Corps. EPA also consulted under section 7 of the Endangered Species Act with the USFWS, and under section 106 of the National Historic Preservation Act (NHPA) with the Advisory Council on Historic Preservation (ACHP), the Florida State Historic Preservation Officer (Florida SHPO), the Florida Department of Environmental Protection (FDEP), and Indian tribes with interests in the State of Florida on its decision whether to approve Florida's program request. On December 16, 2020, EPA entered into a programmatic agreement with the ACHP, the Florida SHPO, and FDEP which evidences EPA's compliance with section 106 of the NHPA and its implementing regulations. The programmatic agreement became effective on December 16, 2020. EPA has concluded that the State of Florida and FDEP have the necessary authority to operate a program in accordance with the requirements found in CWA section 404 and 40 CFR part 233. EPA has met its requirements under ESA section 7(a)(2) by completing ESA consultation and receiving a ''no jeopardy'' Biological Opinion from the USFWS on November 17, 2020. A summary of the comments received, EPA's responses to the comments, and a memorandum documenting the basis for EPA's decision (''State of Florida's Request to Assume a Clean Water Act Section 404 Program'', December 17, 2020) can be found in the docket for this action

(Docket ID No. EPA–HQ–OW–2018–0640).

All documents in the docket are listed on the *http://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* confidential business information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form at the EPA Docket Center and Reading Room. Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are open by appointment only, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. For further information on the EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.* Publicly available docket materials are available electronically through *http://www.regulations.gov.*

Dated: December 17, 2020.

**Mary Walker,**

*Regional Administrator, EPA Region 4.*

[FR Doc. 2020–28232 Filed 12–18–20; 4:15 pm]

BILLING CODE 6560–50–P

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OLEM–2020–0527; FRL–10017–07–OLEM]**

**RIN 2050–ZA18**

## Interim PFAS Destruction and Disposal Guidance; Notice of Availability for Public Comment

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of availability for public comment.

**SUMMARY:** The National Defense Authorization Act for Fiscal Year 2020 (FY 2020 NDAA) was signed into law on December 19, 2019. Section 7361 of the FY 2020 NDAA directs the U.S. Environmental Protection Agency (EPA) to publish interim guidance on the destruction and disposal of perfluoroalkyl and polyfluoroalkyl substances (PFAS) and materials containing PFAS. The EPA is releasing the interim guidance for public comment. The guidance provides information on technologies that may be feasible and appropriate for the destruction or disposal of PFAS and PFAS-containing materials. It also identifies needed and ongoing research and development activities related to destruction and disposal technologies, which may inform future guidance.

**DATES:** Comments must be received on or February 22, 2021.

**ADDRESSES:** You may send comments, identified by Docket ID No EPA–HQ–OLEM–2020–0527, by any of the following methods:

- *Federal eRulemaking Portal: https://www.regulations.gov/* (our preferred method). Follow the online instructions for submitting comments.
- *Agency website: www.epa.gov/pfas.* Follow the online instructions for submitting comments.
- *Mail:* U.S. Environmental Protection Agency, EPA Docket Center, OLEM Docket, Mail Code 28221T, 1200 Pennsylvania Avenue NW, Washington, DC 20460.
- *Hand Delivery/Courier:* EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operations are 8:30 a.m.–4:30 p.m., Monday–Friday (except Federal Holidays).

*Instructions:* All submissions received must include the Docket ID No. for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov/,* including any personal information provided.

Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are closed to the public, with limited exceptions, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. We encourage the public to submit comments via *https://www.regulations.gov/,* as there may be a delay in processing mail and faxes. Hand deliveries and couriers may be received by scheduled appointment only. For further information on EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** Carlos Pachon, TIFSD, OSRTI, OLEM, 5023P, Environmental Protection Agency, 1200 Pennsylvania Ave. NW; email address, *pachon.carlos@epa.gov* or visit *www.epa.gov/pfas.*

**SUPPLEMENTARY INFORMATION:**

### I. General Information

*A. Does this action apply to Me?*

This interim guidance provides a summary of EPA's current knowledge of technologies for destruction or disposal of PFAS and PFAS-containing materials. This information may be useful to EPA staff, other federal agencies, states, tribes, and local governments, the public, including environmental and public interest groups, as well as commercial and industry groups.

**Peter Wright,**

*Assistant Administrator, Office of Land and Emergency Management.*

[FR Doc. 2020–28376 Filed 12–18–20; 4:15 pm]

BILLING CODE 6560–50–P

## FEDERAL DEPOSIT INSURANCE CORPORATION

## Notice to All Interested Parties of Intent To Terminate Receiverships

*Notice is hereby given* that the Federal Deposit Insurance Corporation (FDIC or Receiver), as Receiver for the institutions listed below, intends to terminate its receivership for said institutions.

NOTICE OF INTENT TO TERMINATE RECEIVERSHIPS

| Fund | Receivership name | City | State | Date of appointment of receiver |
|---|---|---|---|---|
| 10109 | Bradford Bank | Baltimore | MD | 08/28/2009 |
| 10110 | Affinity Bank | Ventura | CA | 08/28/2009 |
| 10156 | Greater Atlantic Bank | Reston | VA | 12/04/2009 |
| 10184 | George Washington Savings Bank | Orland Park | IL | 02/19/2010 |
| 10192 | Sun American Bank | Boca Raton | FL | 03/05/2010 |
| 10250 | Nevada Security Bank | Reno | NV | 06/18/2010 |
| 10254 | USA Bank | Port Chester | NY | 07/09/2010 |
| 10263 | First National Bank of the South | Spartanburg | SC | 07/16/2010 |
| 10419 | The First State Bank | Stockbridge | GA | 01/20/2012 |



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET, SW
ATLANTA, GEORGIA 30303-3104

December 17, 2020

Office of Governor Ron DeSantis
State of Florida
The Capitol
400 South Monroe St.
Tallahassee, Florida 32399-0001

Subject: Notice of Approval of Florida's Assumption of the Clean Water Act Section 404 Program

Dear Governor DeSantis:

The Environmental Protection Agency (EPA) has concluded its review of Florida's request to assume administration of a Clean Water Act (CWA) Section 404 program. After review of the program and consideration of all comments received, the EPA has concluded that Florida's program has the necessary authority to operate a CWA Section 404 program in accordance with the requirements found in CWA Sections 404(g-l) and EPA's implementing regulations. Therefore, I am very pleased to inform you that Florida's assumption of the CWA Section 404 program is approved. Florida will begin permitting responsibility for these discharges upon publication of EPA's approval in the Federal Register.

We appreciate the significant effort by the Florida Department of Environmental Protection in developing this program and memoranda of agreement that were enclosed with your submission, in coordination with the U.S. Army Corps of Engineers, U.S. Fish and Wildlife Service, U.S. National Marine Fisheries Service, the State Historic Properties Officer, Tribes, and my staff. EPA looks forward to working with you as you take on this additional responsibility managing the State's waters.

If you have any questions, please do not hesitate to call me at (404) 562-8357 or have a member of your staff contact Ms. Jeaneanne M. Gettle, Director of the Water Division, at (404) 562-9345.

Sincerely,

Mary S. Walker
Regional Administrator

cc:  The Honorable Noah Valenstein, Secretary
     Florida Department of Environmental Protection

     Mr. John Truitt, Deputy Secretary for Regulatory Programs
     Florida Department of Environmental Protection

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

On August 20, 2020, the U.S. Environmental Protection Agency (EPA) received from the Governor of the State of Florida a program submission requesting to assume regulating discharges of dredged or fill material into waters within the jurisdiction of the State in accordance with Clean Water Act (CWA) Section 404(g-l). EPA reviewed Florida's program submission and consistent with 40 C.F.R. § 233.15 determined that it was a complete request for State program approval that meets the submittal requirements of 40 C.F.R. § 233.10. Receipt of the complete package initiated a review period that included opportunity for public comment and two virtual public hearings. EPA received and reviewed over 3,000 comments submitted during the comment period and public hearings. EPA considered these comments in reaching its determination that the State program has the necessary authority to operate a CWA Section 404 program in accordance with the requirements found in CWA Section 404(g-*l*) and in 40 C.F.R. Part 233. Letters received from tribes via the federal docket are summarized and included in this document. Input from tribes received during consultation, other input received during consultation under Section 106 of the National Historic Preservation Act (NHPA), input from federal agencies pursuant to 40 C.F.R. § 233.15(f), and input from the U.S. Fish and Wildlife Service (USFWS) under Endangered Species Act (ESA) Section 7 consultation were considered and addressed separately from this response to public comments.

EPA has prepared a summary of significant public comments received and responses to these comments, consistent with 40 C.F.R. § 233.15(g). This responsiveness summary, or response to comments (RTC) document, is organized into nineteen topics. In this RTC, the Agency's responses appear in **bold text**.

**Table of Contents**

A. General support for Florida's assumption of a CWA Section 404 program ............ 4
EPA Response: ............ 4
B. General opposition to Florida's assumption of a CWA Section 404 program ............ 5
EPA Response: ............ 8
C. Public participation in review of Florida's submission and requests for extension ............ 9
Adequacy of public notice and opportunity to provide meaningful input ............ 9
EPA Response: ............ 10
Public access to Florida's application ............ 11
EPA Response: ............ 12
D. Completeness and sufficiency of Florida's program submission ............ 13
General comments on program submission elements ............ 13
EPA Response: ............ 17
Annual review of Florida Section 404 permits by EPA and USACE ............ 21
EPA Response: ............ 22

1

Florida's statutes and regulations, Stringency of Florida's Section 404 program ................. 22
EPA Response: ................................................................................................ 24
Completeness of FDEP's General Counsel Statement ........................................................ 28
EPA Response: ................................................................................................ 30
E. General permits and conditions ........................................................................... 33
EPA Response: ................................................................................................ 34
F. Delineation methodology ................................................................................... 35
EPA Response: ................................................................................................ 35
G. Compensatory mitigation ................................................................................... 37
Compensatory mitigation MOA ................................................................................... 37
EPA Response: ................................................................................................ 37
Permits issued by the State are subject to administrative challenge ................................ 38
EPA Response: ................................................................................................ 38
Alignment of the State Section 404 program and the Section 404(b)(1) Guidelines regarding compensatory mitigation ................................................................................... 38
EPA Response: ................................................................................................ 40
Differences between the State and federal program re: consistency of reviews .................... 42
EPA Response: ................................................................................................ 42
Compensatory mitigation in Florida under current programs ............................................ 43
EPA Response: ................................................................................................ 43
H. Funding and staffing of Florida's 404 program ........................................................... 44
EPA Response: ................................................................................................ 51
I. Streamlining of permitting .................................................................................. 55
Support for streamlining ......................................................................................... 55
EPA Response: ................................................................................................ 57
Opposition to streamlining ....................................................................................... 57
EPA Response: ................................................................................................ 59
J. Jurisdiction of Florida's program .......................................................................... 61
Army Corps of Engineers versus State jurisdiction ........................................................ 61
EPA Response: ................................................................................................ 65
Effect of New Navigable Waters Protection Rule (NWPR) .................................................. 66
EPA Response: ................................................................................................ 67
Project Boundary and 300' Guideline .......................................................................... 68

EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program December 16, 2020

EPA Response: 69
K. Compliance evaluation and enforcement 69
Florida's ability to address the compliance and enforcement responsibilities of the Section 404 program 69
EPA Response: 71
FDEP's enforcement program compared to the existing federal standard 73
EPA Response: 74
L. EPA oversight of state permitting 76
EPA Response: 77
M. NEPA and public participation 79
EPA Response: 80
N. Endangered Species Act (ESA) 83
EPA's policy on ESA consultation 83
Florida assumption of the Section 404 program and adequacy of protecting endangered species 87
Permits with potential ESA species 89
ESA coordination process during permit review (other than EPA oversight matters) 90
EPA Response: 90
O. State conflict of interest 103
EPA Response: 107
P. Protection of historic and cultural resources 108
NHPA Section 106 consultation 108
EPA Response: 108
Adequacy of protection of historic and cultural resources 109
EPA Response: 109
Operating Agreement between FDEP and the Florida State Historic Preservation Officer 109
EPA Response: 110
Q. Comments on consultation with tribes 110
EPA Response: 111
R. Comments outside the scope of this review 113
EPA Response: 113

3

## A.  General support for Florida's assumption of a CWA Section 404 program

Some commenters supported Florida's assumption as an important step in fulfilling the intent of Congress in the CWA's cooperative federalism structure where states manage their own water resources while achieving the goal of improved water quality.

In addition, several commenters anticipated that Florida's assumption would provide an example for other states to assume the Section 404 program in a way that matches the state's specific needs. Several commenters asserted that the State government would serve the people of Florida better than the federal government, and one commenter noted that the Florida Department of Environmental Protection (FDEP) is much more accessible to citizens with questions and concerns than federal agencies.

Some commenters noted the ability of FDEP and other State and local agencies to manage the Section 404 program efficiently and in a manner that protects the environment. These commenters asserted that Florida has developed a comprehensive permitting program that carefully and completely protects Florida's natural resources. The commenters stressed that the State's assumption of the Section 404 permit program will not undermine existing environmental protection and likely will improve protections. The commenters pointed out the professionalism and expertise of Florida staff and their concern for the environment in which they live, and commenters noted that Florida's staff are the first line of defense for Florida's environment. A commenter asserted that Florida's assumption of a Section 404 program will grant more localized control over ecological communities, which they stated will allow the FDEP's capable and passionate staff to administer a program that will be as stringent as if not more stringent than the existing program.

Some commenters who supported Florida's assumption stated that high staff turnover, increased workloads, and cumbersome processes on the part of federal permitting authorities, as well as legal challenges to draft federally issued permits, unnecessarily delay the federal government's issuance of Section 404 permits. These commenters assert that the delays add to the cost of housing in Florida. The commenters also noted that these delays do not occur when FDEP issues permits.

**EPA Response:**

**The Agency acknowledges these comments supporting Florida's assumption of a CWA Section 404 program. EPA agrees with commenters that assumption of the CWA Section 404 program by Florida supports the cooperative federalism framework of the CWA. EPA also agrees with commenters that Florida has the necessary resources and expertise to assume a Section 404 program. Additionally, EPA has reviewed Florida's permit review criteria and has determined that the State's program will result in the issuance of permits that comply with the Section 404(b)(1) Guidelines. (33 U.S.C. 1344(h)(1)(A); 40 C.F.R. § 233.20(a)). See Response to Comments Section H for a response to comments on workload, resources, and the expertise of FDEP. See Response to Comments Section I for a response to comments on streamlining.**

## B.  General opposition to Florida's assumption of a CWA Section 404 program

Many of the commenters opposing Florida's assumption of a Section 404 program stated that it will negatively impact Florida's environment, public health, safety, and economy. Commenters noted that Florida has the largest wetland ecosystem in the lower 48 states. Commenters expressed concern at the ongoing trend in wetland loss in the State and noted that Florida has already lost substantial amounts of historic wetlands and that the remaining wetlands are at increased risk from the projected human population increase as well as climate change.

Commenters emphasized the critical role of wetlands in Florida. Commenters listed a variety of important wetland benefits that have been compromised by wetland loss, and which they asserted are endangered by further wetland loss that Florida's assumption would exacerbate, including:

- Commenters asserted that wetlands provide natural water treatment and are critical to clean water and recharging the groundwater supply that Floridians depend on for their drinking water. A commenter also specifically noted that wetlands treat agricultural and stormwater runoff, stripping away nutrients that fuel toxic algae blooms. A commenter asserted that potable water is going to become a problem in Florida in the next 10 years and another commenter noted the problem of saltwater intrusion.

- Commenters asserted that wetlands provide crucial fish and wildlife habitat that supports Florida's biodiversity, including for federally listed endangered species.

- Commenters asserted that wetland biodiversity and beauty support Florida's important tourism industry (fishing, boating, bird watching and other ecologically based industries) that bring in billions of dollars to business and State and federal revenue. Commenters stated that Everglades National Park alone generates more than $100 million annually in tourism revenue. Commenters also stated that the outdoor recreation industry generates $58.6 billion annually and Florida is widely recognized as the Sport Fishing Capital of the World. Commenters maintained that Florida waterways support billions of dollars in commerce each year and create tens of thousands of jobs for Floridians.

- Commenters asserted that wetlands provide natural infrastructure that helps store and buffer floodwaters from storm events including hurricanes, preventing property damage and the loss of human life. One commenter stated that according to the National Oceanic and Atmospheric Administration (NOAA), we face a warmer, wetter climate with more storms and excessive rain.

- Commenters asserted that wetlands also provide dry season wildfire resilience.

Several commenters stated that the wetland services listed above provide "free ecosystem services" in the billions of dollars. The commenters asserted that any risk posed to these waterways is a direct risk to Floridians' economy and livelihoods. One commenter expressed concern for how Florida's control of Section 404 permitting will affect regional areas closest to wetlands.

Many commenters opposed Florida's assumption because they feared it would result in a loss of federal oversight and resources that would hinder wetland protection and result in greater loss of

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

wetland than under the current federal program. Some commenters did not think the current process should be changed at this time of wetland loss by eliminating federal agency involvement, but rather that this is the time for intense scrutiny that requires federal involvement. Many commenters opposed to assumption argued that the permitting process needs multiple agencies, and the federal agencies such as the Army Corps of Engineers (Corps), U.S. Fish and Wildlife Service (USFWS), the National Marine Fisheries Service (NMFS), and EPA should have a role in this process that the commenters see as reduced by Florida's assumption. These commenters argued that the multi-agency process provides more resources and expertise and better ability to coordinate elements of a thorough Section 404 program than the State could achieve alone. Some commenters also said that a federal oversight role is necessary to ensure the necessary objectivity and independence from local politics and private economic interests.

One commenter predicted that Florida's interpretation of "waters of the United States" could lead to destruction of the wetlands and the destruction of vitally important species in the State. The commenter noted that Florida has around 11.4 million acres of wetlands, with freshwater wetlands making up about 90 percent of the State's wetlands, and these wetlands are home to many different species, including endangered species.

Some commenters asserted that retaining responsibility at the federal level ensures consistency and uniformity in oversight and application of legal standards in Florida relative to similar activities across the country. Commenters noted that Florida wetlands include federal lands and represent a trust and investment for all U.S. citizens regardless of State boundaries.

Multiple commenters also pointed out that a state-assumed Section 404 program does not have the benefit of a National Environmental Policy Act (NEPA) analysis, and the much broader review performed for federally issued permit applications. A commenter indicated that NEPA helps ensure the highest level of public engagement and environmental analysis.

A commenter said that it was grateful that NEPA was followed for the proposed South Florida Water Management District Everglades Agricultural Area reservoir and stormwater treatment area, which allowed for additional time for an environmental impact statement (EIS), for federal review of the proposed alternative, and for more meaningful public input for the massive and costly project that both the State and local agencies have been rushing despite many valid concerns. The commenter stated that as a result, the Section 404 permit includes special conditions that FDEP may not have required, such as additional monitoring to verify water quality requirements are met, before water is delivered to the water conservation areas of the Everglades.

Some commenters provided specific examples that they said indicate that the current federal role is critical for permitting in the Everglades with its interlocking mosaic of wetlands managed by federal, State, and local agencies. Several commenters pointed out the need for continued federal oversight over the Greater Everglades ecosystem and over Florida's national parks and surrounding interconnected ecosystems. A commenter noted that the federal government is a partner to the world's largest ecosystem restoration project, Everglades restoration, authorized by Congress under the Comprehensive Everglades Restoration Plan (CERP). The commenter asserted that the federal government has made extraordinary investments in Everglades

6

restoration and has authorized Section 404 permits only after undertaking all necessary NEPA analysis. The commenter explained that there is a need to ensure that the many benefits of Everglades restoration and the extensive investments already made are not undermined by inadequate oversight of permits impacting wetlands and waters across the region. The commenter noted that to date federal oversight of the CWA Section 404 Program has ensured robust stakeholder engagement in many decisions and plans affecting Florida's wetlands and thus the national parks that anchor the Greater Everglades ecosystem. The commenter asserted it is unlikely that this level of public engagement will continue with State assumption.

One commenter expressed concern that Florida is unable to administer appropriate oversight to current environmental responsibilities and stated that the State should not be given more responsibilities. The commenter noted EPA and the Corps offer too much latitude to the State, and vague statutory requirements create a concern that administrators, legislators, and developers may take advantage of well-meaning personnel. Another commenter believed that Florida's assumption of CWA Section 404 authority would not be well organized, and the commenter expressed concern that future project applications would be similarly hidden from public view.

Some commenters expressed concern that FDEP and local agencies were not prepared to assume responsibility for a Section 404 program. Commenters asserted that Florida has a bad track record for protecting the environment and managing natural lands for the benefit for all who depend on the wetlands. Commenters stated that Florida needs to improve current wetland programs before assuming new ones, and pointed out that both federal and state wetland regulatory programs require "no net loss of wetlands." The commenters asserted that this objective has not been met by either federal or Florida programs on either preserving functions or acres based on Audubon, NOAA, National Academy of Sciences, and USFWS analyses and data.

Some commenters asserted that Florida has a poor track record in enforcing the CWA, specifically that FDEP is behind in establishing the TMDLs in most watersheds in the State, does not provide the oversight for best management practices (BMPs) as pledged, and does not properly manage the Basin Management Action Plans to get waterways off the impaired listing. A commenter continued that research has proven that BMPs for stormwater and agriculture are not meeting their intended pollution reduction goals, and there are sites across the State that have not had consistent water quality testing in years. One commenter recommended that the State concentrate on improving the existing ERP program, per the governor's Executive Order 19-12, rather than take on another wetland regulatory program.

One commenter added that legislation has been passed to make it more difficult for citizens to pass a ballot initiative to provide environmental protections, and recent court decisions have made it virtually impossible to file legal objections to massive developments and toxic waste disposal into State waters.

Some commenters suggested that approving Florida's assumption request would signify EPA's abandonment of its statutory responsibilities under the CWA.

**EPA Response:**

**EPA acknowledges that some commenters have concerns that Florida's assumption of a Section 404 program could lead to degradation of aquatic resources including wetlands, as well as concerns about the value of wetlands and ecosystem services in Florida as well as the wetland loss, habitat loss, and other environmental degradation that has already occurred in Florida. EPA also recognizes commenter concerns about the timing of the assumption process, given rapidly occurring environmental changes. The Agency disagrees that Florida's Section 404 program will decrease the environmental protections in the State because an assumed program must be consistent with and no less stringent than the requirements of the CWA and its implementing regulations. EPA has thoroughly reviewed Florida's permit review criteria and has determined that the State's program will result in the issuance of permits that comply with the CWA Section 404(b)(1) Guidelines (33 U.S.C. 1344(h)(1)(A); 40 C.F.R. § 233.20(a)). See also Response to Comments Section O regarding conflicts of interest.**

**EPA acknowledges the commenter's concern regarding future legislation; however, this is beyond the scope of this action. EPA has reviewed Florida's request and determined that it will result in the issuance of permits that comply with the Section 404(b)(1) Guidelines.**

**EPA understands that some commenters may prefer federal administration of the CWA Section 404 program for a variety of stated reasons. EPA also acknowledges commenters who benefitted from federal involvement in permitted restoration projects and notes that the federal government will maintain permitting authority in retained waters. However, cooperative federalism must be implemented consistent with the statutory framework under the CWA. Section 404(g)(1) of the CWA provides states and tribes the option of submitting to EPA a request to assume administration of a CWA Section 404 program in certain waters within state or tribal jurisdiction. Consistent with the overall cooperative federalism construct established by the CWA, it is EPA's responsibility to review a state or tribal request and approve or disapprove it based on the requirements of the CWA and implementing regulations and therefore EPA disagrees with the commenter who asserted that an approval signifies EPA's abandonment of its responsibilities under the CWA. EPA has reviewed Florida's submittal for assumption of a CWA Section 404 program and has determined that the state has met the statutory and regulatory requirements necessary to demonstrate their ability to assume a CWA Section 404 program. EPA disagrees that Florida's assumption of the CWA Section 404 program will necessarily reduce the amount of public engagement on decisions and plans affecting Florida's wetlands.**

**EPA acknowledges commenters concerns that NEPA-related analysis would not be conducted on assumed waters. However, state Section 404 permitting actions are not federal actions and are therefore not subject to NEPA review. See also Response to Comments Section M for responses to comments regarding NEPA analysis for a more thorough discussion.**

**EPA acknowledges the concern regarding Florida's interpretation of "waters of the United States." EPA disagrees that Florida's interpretation of "waters of the United States" will**

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**lead to destruction of state resources. Please see Response to Comments Section J regarding jurisdiction of Florida's program.**

**EPA acknowledges commenter concerns about the availability of staff and resources to appropriately administer Florida's Section 404 permitting program EPA finds that FDEP has committed sufficient resources and staffing to address anticipated workload. See Response to Comments Section H (Funding and staffing) for further discussion.**

**EPA disagrees with the commenter who expressed concern that future project applications would be hidden from public view as the State Section 404 program requires public notice, opportunity for a hearing, and availability of the permit application. See the State 404 Program Applicant's Handbook sections 5.3.1(a) and 5.3.1(b) for requirements for public hearings on permits and State regulations 62-331.060(1), F.A.C., 62-331.060(2), F.A.C., 62-331.060(3), F.A.C., and 62-331.060(4), F.A.C., for the requirements and timing governing public notice of and comment on permit applications.**

## C. Public participation in review of Florida's submission and requests for extension

### *Adequacy of public notice and opportunity to provide meaningful input*

Some commenters stated that the public was given enough time to appropriately respond and provide feedback on Florida's program. These commenters maintained that EPA gave public notice regarding the hearings and that EPA allowed for extensive public comment and engagement during the process.

Other commenters said that the public was not given enough notice that EPA would be hosting hearings on Florida's assumption, and another commenter asserted that they only found out about the hearings at the last minute. These commenters stated that there was not enough information available to the public and they believe that many people missed the hearings due to a lack of publicity. One commenter stated that increased public awareness would lead to better environmental protections because more people would have the opportunity to comment on the proposal. One commenter stated that there has been significant public opposition to Florida assuming Section 404 authority, and that—because of this opposition—it would be inappropriate to move forward with such limited public feedback.

Some commenters expressed opposition to only holding virtual public hearings, stating that virtual public hearings are not an appropriate substitute for in-person hearings, and that hearings should be postponed until they can either fully or partially be held in person. Some commenters stated that this "rulemaking" process has not been inclusive for public participation because webinars and phone conferences are inadequate compared to in-person hearings. Some commenters specifically requested that EPA hold in-person hearings to supplement the virtual public hearings once in-person hearings could be held safely. Other commenters believed that high levels of public participation are necessary to move forward with the proposal. One commenter specified that moving forward with such low public participation would be unjust.

9

Some commenters expressed concern that people without access to technology would be unable to participate in hearings conducted entirely online. Some commenters were worried that holding virtual hearings alone was exclusionary of those without the privilege of internet access. These commenters contended that FDEP should wait until the pandemic is over to hold hearings.

Some commenters believed that hearings should not take place until the COVID-19 pandemic is more under control. Commenters indicated that it was inappropriate to hold the hearings during a public health crisis. Multiple commenters said that due to the stressors of the COVID-19 pandemic, more time is needed in order to fully comment on the State's proposal. Commenters specified that the public could not meaningfully contribute during the height of the pandemic because issues of higher priority, such as the health and wellness of themselves and their families, were taking up too much of their focus, stated that moving forward during this time of international crisis due to COVID-19 is inappropriate. Commenters specifically requested a minimum extension of 180 days due to the current public health crisis. One of those commenters also cited the November 2020 general election as a reason to extend the opportunity for public feedback, noting that the State took two years to write the proposal, and that delaying the process by a few more months in order to hold additional webinar hearings would be justified. A few commenters stated that the State's assumption of Section 404 authority could have long-term consequences for the public, and that EPA must hold hearings in person to ensure that the public has an opportunity to discuss these consequences.

While other commenters suggested that hearings could be held during the COVID-19 pandemic, they contended that more advertising, transparency and time were necessary to ensure meaningful public participation.

**EPA Response:**

**EPA agrees with the commenters who asserted that sufficient public notice regarding the hearings and opportunity for public comment and engagement were provided during the review process. EPA disagrees with commenters asserting that the Agency provided insufficient public notice regarding hearings and opportunity for public comment and engagement. CWA Section 404(h)(1) provides EPA 120 days to make a decision on a program request, and the Agency complied with the procedures for approving programs which are found at 40 C.F.R. § 233.15. On September 16, 2020, EPA published in the Federal Register notice of EPA's receipt of a complete program request package (85 FR 57853), opened a 47-day public comment period, and scheduled virtual public hearings. EPA published notice of the State's submission in enough of the largest newspapers in Florida to attract statewide attention (Miami Herald, Orlando Sentinel, Palm Beach Post, Tallahassee Democrat, Tampa Bay Times). Additionally, EPA mailed notice to persons known to be interested in such matters. Existing mailing lists from Florida, the Corps, and USFWS as well as EPA's own mailing lists were used as a basis for this mailing. EPA posted notice of the State's submission and the public hearings on its webpage. EPA held virtual public hearings on October 21, 2020, and October 27, 2020, and received over 3,000 public comments submitted to Docket ID No. EPA-HQ-OW-2018-0640. The public hearings were attended by 137 and 186 participants, respectively, representing a variety of**

**stakeholders. EPA disagrees with assertions that more advertising, transparency, and time were necessary to ensure meaningful public participation and that there was low public participation with respect to EPA's action on Florida's request for assumption. EPA acknowledges commenter concerns about the opportunity for the public to participate in and respond to the public hearings and provide meaningful comments on Florida's submission, including concerns regarding virtual hearings due to COVID-19 and events such as the November 2020 election. EPA notes that consideration of such external factors are not criteria described in 40 C.F.R. Part 233 as a mechanism to halt EPA's statutory deadline once it receives for review a state program submission. Further, EPA's implementing regulations at 40 C.F.R. § 233.15 require only one public hearing and a comment period of not less than 45 days. EPA provided two public hearings and a public comment period of over 45 days. These virtual public hearings were also consistent with the memo issued by EPA's General Counsel titled, "Virtual Public Hearings and Meetings,"[1] which explains the Agency's position on the use of virtual public hearings to balance "actively working to combat the spread of the COVID-19 virus during the pandemic, while continuing [EPA's] mission." These two hearings provided commenters the opportunity to provide verbal comment in addition to or in lieu of written comments on Florida's program request package while protecting public health. For these reasons EPA does not agree that an extension of 180 days was necessary**

**EPA disagrees with commenters who asserted that virtual hearings are not an adequate substitute for in person hearings. In person hearings require participants to drive potentially long distances to participate in person, often requiring more time away from jobs and family than virtual hearings require for participation. EPA notes that virtual public hearings may allow for more people to participate who would otherwise not be able to attend in person.**

**EPA disagrees with commenters who raised equity issues regarding virtual hearings, as well as commenters who contended that virtual hearings are exclusionary of those without the privilege of internet access. EPA solicited, but received no requests for accommodation to ensure accessibility to the public hearings. EPA also provided the opportunity for the public to comment via letter or to call into the hearings. In addition, the public hearings were not the only opportunity to participate in this action. As noted above, EPA opened a public docket to receive written public comments on EPA's review of Florida's proposed program.**

### *Public access to Florida's application*

Some commenters stated that the public was not given full access to Florida's application materials, and that the public should be allowed to see the full application. More specifically, commenters said that EPA should give the public a minimum of 45 days to comment on the State's application, including on the Biological Opinion and the Incidental Take Statement. One of these commenters asserted that EPA should either suspend public comment to ensure that the

[1] https://www.epa.gov/sites/production/files/2020-04/documents/ogc_virtual_hearing_memo_4-16-2020.pdf

State's proposal is complete or extend the public review period until all the application materials are provided to the public by the State. Another of these commenters concluded that the current application is therefore incomplete and recommended that EPA deny the application unless more time is given for public review. One commenter specifically requested that the Biological Opinion and Incidental Take Statement be made public because they are critical aspects of the State's proposal that impact at-risk species in the state. Some commenters noted that FDEP's application has failed to explain how endangered species (under the Endangered Species Act) will be adequately protected under their proposed assumption of a Section 404 program. Some commenters noted that the application was lacking, and therefore the public could not consider the programmatic biological opinion and incidental take statement from USFWS and NMFS that will dictate the procedures to be followed at the permit review level to ensure jeopardy will be avoided. Some commenters expressed concern that EPA and FDEP stated that FDEP would rely on these documents to ensure that the State can comply with the no-jeopardy mandate in the Section 404(b)(1) Guidelines. A commenter also stated that the application doesn't include the Biological Assessment mentioned in the application, which would support programmatic determinations with the USFWS and NMFS. A commenter stated that denying the public a meaningful opportunity to comment on the State's complete application was in violation of CWA regulations, and that EPA needs to provide more information on how the application will impact the State's wildlife.

A commenter stated that FDEP limited the public comment period to the very time when the public was most struggling with the COVID-19 pandemic. The commenter stated that this action, combined with the incomplete application materials provided to the public, has further eroded the public's trust in FDEP.

**EPA Response:**

**EPA disagrees with commenters who asserted that the public was not given full or adequate access to Florida's application materials or that the Agency violated CWA regulations by denying the public a meaningful opportunity to review and comment on Florida's CWA Section 404 assumption request submittal. On September 16, 2020, EPA published in the Federal Register notice of EPA's receipt of a complete program request submittal. The State's submission was made publicly available online through the Federal eRulemaking Portal, Docket No. EPA-HQ-OW-2018-0640, the EPA's Docket Center, available at https://www.regulations.gov. EPA posted all materials submitted by Florida to EPA and opened a public comment period of 47 days for review of Florida's submittal. See Response to Comments Section C for further discussion of EPA's public involvement process. The Biological Opinion and Incidental Take Statement prepared by the USFWS in response to the EPA's initiation of ESA Section 7 consultation are not required elements of a state request to assume administration of a Section 404 program and do not require public comment under either the CWA implementing regulations at 40 C.F.R. Part 233 (governing state 404 programs) nor the ESA implementing regulations at 50 C.F.R. Part 402. For these reasons EPA disagrees with assertions that Florida's submittal was hidden from public view and that the public should be given a minimum of 45 days to comment on**

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**the Biological Opinion and Incidental Take Statement. See Response to Comments Section D for a response regarding why Florida's program submission request is not incomplete based on a lack of ESA-related documentation.**

**EPA acknowledges the commenters who expressed concern regarding FDEP's public input process during the development of their program; however, public engagement in FDEP's development of its program is outside the scope of this action. EPA's obligation is to ensure compliance with 40 C.F.R. Part 233.**

## D. Completeness and sufficiency of Florida's program submission

### *General comments on program submission elements*

Some commenters asserted that the Florida application to assume a CWA Section 404 program is complete. One of these commenters reasoned that if EPA determines that the State has the required authority to issue permits and administer the program, then EPA is required to approve the State's assumption of the program.

A commenter noted that a state Section 404 assumption application must provide the items listed at 40 C.F.R. § 233.10 (e.g., letter from the Governor, Attorney General's statement, agencies agreements, etc.); additional requirements for a state program are set forth in the rest of Part 233, including Subpart C (Permit Requirements); Subpart D (Program Operation); and Subpart E (Compliance Evaluation and Enforcement). The commenter asserted that Florida's application contained each of these required items along with sufficient detail and explanation to allow for EPA to review.

Many commenters opposed Florida's assumption of a Section 404 program claiming that FDEP's rush to take over wetlands permitting has created a proposal that is incomplete, full of uncertainty, does not provide the public with the information that was promised during the State rulemaking phase, and will create additional chaos in Florida. Multiple commenters argued that the State has failed to specifically identify which waters and wetlands will be assumed under State jurisdiction and which will be retained under the jurisdiction of the Corps. A commenter stated that the maps that were provided in the application are low resolution and nearly impossible to read with any specificity, adding that the list of waters is similarly vague, with no clarification about where these waterways are located. The commenter also argued that the list of waters that was provided was vague, with no specification about where the waterways are located. The commenter noted that many waterways across the State share the same name, so listing a waterway like "Deep Creek," for example, with no description of location is confusing and insufficient to notify the public and to inform the program. Some commenters questioned the history, accuracy, and completeness of the list of retained waters in the State 404 Handbook and argued that because the State's application does not contain a list or map of the assumable and retained waters, the application should be considered incomplete.

A commenter stated that the Corps has advised in the MOA between FDEP and the Corps to provide a retained waters GIS layer to the FDEP. The commenter pointed out that this information has not been provided to the public or to the State, and additionally, that the Corps

13

has not indicated whether that GIS layer will simply identify retained waters, whether it will actually depict their mean high water lines (MHWL)/ordinary high water marks (OHWM), or the actual pre-determined location of the administrative boundary. The commenter urged that the only information provided to the public and the EPA is a list of waters provided in FDEP's application. 404 Handbook B, app. A; the commenter argued this list fails to list numerous waterbodies that were previously on the Corps Retained Waters List in 2017 and that were submitted to the Corps during its comment period in 2018.

One commenter argued that Florida has failed to provide the public with GIS or other mapping that would demonstrate the scope of Florida's jurisdiction if the State assumes a CWA Section 404 program. The commenters argued that such a list would allow the public to evaluate and comment on the impact this proposal will have on the waters that are of ecological and economic benefit to them. The commenter concluded that as a result, Florida's application is incomplete.

One commenter representing the Seminole Tribe stated that no information has been provided to the Seminole Tribe as to the exact waters of the State which will remain under Corps jurisdiction and which waters will be assumed by the State. The commenter stated that the Seminole Tribe recognizes that FDEP is not seeking to assume the Section 404 program in Indian Country, and reiterated prior requests for GIS Layers of the retained versus assumed waters to ensure that Indian Country remains under the jurisdiction of the Corps Section 404 program and to better understand what waters adjacent to Indian Country will be assumed by the State.

One commenter noted that the State is crossed by many waterways, some of which are navigable under State law and others under federal law by various court decisions, and all have adjacent wetlands. The commenter predicted that the lack of clarity would lead to unnecessary litigation and confusion in the permitting process for future developments that impact waterways.

One commenter noted that some commenters have argued that Florida's program lacks an adequate description of the waters covered by the State 404 program and responded that this concern is incorrect. The commenter stated that the application clearly explains the waters for which Florida would assume permitting responsibility and those which would remain under the regulatory purview of the Corps. The commenter stated that this is also described in the memorandum of understanding entered between Florida and the Corps on page 2, section II, A-C. The commenter added that more information can be found in the State 404 Program Applicant's Handbook sections 2.0(b)41 and 4.1, and in the Retained Waters List in Appendix A of the State 404 Program Applicant's Handbook.

Several commenters contended that lack of key information in the State's application makes meaningful public comment and participation impossible. A commenter noted that critical aspects of the program are not present in sufficient detail, which makes it difficult for EPA and the public to assess the sufficiency of the program. Some commenters noted that missing documents from Florida's package (e.g., the Biological Assessment and a digital map of retained waters) restrict the public's ability to determine how projects in Florida might be affected by the rule change and the public's ability to form questions to both the FDEP and EPA. A commenter suggested that EPA suspend the public comment period and review of Florida's application until the State cures deficiencies and submits a complete program proposal to the Agency. A

commenter urged the EPA to reverse its determination that the application is complete, deny the application for incompleteness, or extend the review period pursuant to 40 C.F.R. § 233.15(g) and the public comment period until all materials are provided and the public is given adequate notice and opportunity to comment in accordance with federal law. A commenter suggested that EPA should ask the State to resubmit a complete package after addressing their concerns.

A commenter asserted that FDEP's proposal is fundamentally flawed in several respects, including: the failure to adopt all Section 404(b)(1) Guidelines; failure to satisfy 40 C.F.R. § 233.11; failure to provide all components of a complete program submission as required under 40 C.F.R. § 233.10(b); and failure to meet all the requirements under 40 C.F.R. § 233.12(a). The commenter concluded that the application must therefore be denied.

Some commenters indicated that the State's incomplete application package does nothing to guarantee that the State's protections will be as stringent as those provided under federal regulation. A commenter stated that EPA must reject the Department's attempt to speed through this process with a partial application when assumption implicates the future protection of vital State wetlands. A commenter specifically mentioned the lack of information for proper enforcement, insufficient list of retained waters, and no demonstration that sufficient resources will be available to State agencies to execute the work. A commenter noted that the State does not sufficiently describe how it will replace the important protections of federal laws that apply to federal actions (i.e., when the Corps issues a permit) that will no longer be relevant to State actions (i.e. regarding NEPA and Section 7 of ESA). A commenter noted that as part of any delegation, FDEP should be required to ensure that cumulative impacts are properly incorporated and considered as part of any impact analysis.

Some commenters asserted that the program faces significant outstanding legal concerns that could work against the goal of streamlining permitting in the State. The commenters offered as an example that the State's Section 404 Applicant's Handbook says the Department of Environmental Protection may use various resources to determine a project's potential impact on listed species, but noted that it does not specify a minimum level of due diligence that will be completed. Additionally, the commenters contended that it is unclear, based on the handbook, whether the Florida Fish and Wildlife Conservation Commission (FWC) or the FDEP will be making the initial listed species determinations. One commenter said the process has changed since the Handbook was developed and that the FWC will be making initial listed species determinations. A commenter specifically noted their concern for the iconic Florida panther, Florida manatees, loggerhead sea turtles, the Saint Andrew beach mouse, and piping plovers, stating that their predicaments are made all the more dire by impacts of climate change. This same commenter questioned the State's ability to ensure the safety of these and dozens of other species that are on the brink of extinction.

A commenter stated that Florida's application is incomplete because it lacks the memoranda of agreement that explain how FDEP would implement the program. A commenter expressed concern about FDEP's reliance on memoranda of agreement (MOA) that had not been completed or made available to the public for comment. The commenter asserted that FDEP's proposal remains fundamentally flawed in several respects, including: (1) FDEP's decision to remove

references to MOA with federal agencies from the proposed rules, and (2) the decision not to disclose the content of those MOAs so as to allow for public comment before the state submits an application to the EPA, despite having told the public that it would. One commenter pointed to statements from the August 27, 2020, EPA memorandum, "Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals," which specifies that the Section 7 consultation, programmatic biological opinion, and incidental intake statement are essential components of the application that must be considered prior to determining the program submission is complete. One commenter requested that EPA suspend consideration of the assumption package until commenters may weigh in on the full application, including the biological opinion and incidental take statement (ITS), and whether or not Florida will be able to achieve the no-jeopardy mandate.

A commenter noted that the memorandum of understanding between FDEP, FWC, and USFWS had not been signed by USFWS at the time the State submitting their assumption request. Therefore, the commenter asserted that EPA cannot consider the application complete without sufficient details that accurately reflect current thinking and a signed memorandum of understanding.

A commenter stated that EPA cannot waive review of certain categories of applications, including applications whose discharges have a reasonable potential for adverse impacts on waters of another state or tribe. The commenter noted that language was added to the State's two MOAs—one with EPA and the other with the Corps. This commenter stressed that this language is to ensure that EPA is involved in any disputes over what constitutes Indian country under the Section 404 program. Additionally, the commenter pointed out that FDEP in the Section 404 Applicant's Handbook at section 5.2.5 has committed to include EPA in the review of any project where FDEP fails to accept the recommendations of an affected state or tribe received during the public comment period. The commenter stated that the Operating Agreement between FDEP and the State Historic Preservation Office also affirmed EPA's role in review of and participation in resolution of cultural resource-related disputes.

One commenter claimed that Florida statutes unlawfully expand the use of emergency permits and provided examples of how the State requirements allow a broader set of situations in which an emergency permit may be granted, making them less stringent due to being granted more quickly with less time for process and review. The commenter also explained that the State's regulations omit requirements that appear in federal regulations. As an example, the commenter pointed out that FDEP's regulations failed to include the requirement that discharges minimize adverse impacts through restoration, and instead only includes minimization through mitigation. The commenter also stated that Florida fails to incorporate the federal requirement regarding how much detail permit applications must include.

A commenter noted that FDEP stated in its submission that the only persons likely to be affected by Florida's assumption are those who are "currently subject to a 404 permit" issued by the Corps. The commenter argued that this response demonstrates that FDEP takes an unduly narrow view of operating a Section 404 program, and as a consequence, has taken an unreasonably limited view of the number of individuals and entities likely to be affected. The commenter

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

concluded that FDEP wholly failed to provide a general description of those who are likely to be affected other than existing permittees.

**EPA Response:**

**EPA agrees with commenters who stated that Florida submitted a complete request for assumption of a CWA Section 404 program. EPA disagrees with commenters who asserted that Florida's request was incomplete because it did not include the required elements of 40 C.F.R. § 233.10, 40 C.F.R. § 233.11, 40 C.F.R. § 233.12, or because it did not include other specific documents, elements, or a sufficient level of detail. EPA issued a letter to Governor DeSantis on August 28, 2020, noting that EPA received the State's request on August 20, 2020, and that all program submission elements required by 40 C.F.R. § 233.10 were included as follows:**

- **Governor's Letter**
- **Program Description**
- **Statement from Justin G. Wolfe, General Counsel for the Florida Department of Environmental Protection**
- **Memorandum of Agreement with the EPA Region 4 Administrator**
- **Memorandum of Agreement with the Secretary of the Army**
- **Applicable State Statutes and Regulations**

**In making this determination, EPA concluded that the State's request included the program description elements required in 40 C.F.R. § 233.11. EPA subsequently issued a Federal Register notice seeking comment on Florida's program submission request, and the Agency made Florida's request publicly available (see Docket ID No. EPA-HQ-OW-2018-0640). The Agency disagrees that the application should be deemed incomplete or denied, or that the public comment period should be suspended or extended until documents identified by commenters are made publicly available.**

**EPA disagrees that Florida included insufficient detail in the State's program submission request regarding waters that would be retained by the Corps and waters that would be assumed by the State. The regulations at 40 C.F.R. § 233.11(h) require the program description to include "[a] description of the waters of the United States within a State over which the State assumes jurisdiction under the approved program; a description of the waters of the United States within a State over which the Secretary retains jurisdiction subsequent to program approval." Florida's Program Description, section h at 2, meets this requirement by providing a description of retained waters and noting that retained waters are also defined in section 2.0 of the State 404 Program Applicant's Handbook and listed in Appendix A of the Handbook. Some listed waters in Appendix A of the Handbook include the county name or a brief location description. Further, Section 6.1 of the Handbook as well as the Program Description, section j, make clear that the Corps retains permitting authority for projects within "Indian country" as that term is defined in 18 U.S.C. § 1151.**

17

**EPA recognizes commenter concerns that the Corps' GIS layers identifying retained waters were not available to the public during the public comment period. The FDEP-Corps MOA commits that the Corps will provide the GIS layers to FDEP. The GIS layers are intended to serve as a tool supporting identification of retained waters, but are not a requirement for a submittal to assume the CWA Section 404 program. EPA also recognizes that a GIS layer cannot depict a pre-determined administrative boundary, as this is dependent in part upon project-specific characteristics: "In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the Corps will retain jurisdiction to the landward boundary of the project for the purposes of that project only." (FDEP-Corps MOA, Section II.A.)**

**FDEP has also addressed cumulative impacts in the 404 Handbook section 8.3.5 Cumulative Effects which states:**

> **[U]nlike ERP reviews, the CWA does not limit analysis of cumulative effects to the resources within the impacted drainage basin. However, the drainage basin is a good starting point for review and will often be found to be the appropriate scale. Some projects will require cumulative effects reviewed on a larger or smaller scale depending on the size, project purpose, and resources proposed for impact. When reviewing cumulative effects, the Agency shall identify resources of concern and determine the potentially effected resource area(s). Compensatory mitigation for cumulative impacts shall comply with Volume I, section 10.2.8.**
>
> **Cumulative impacts are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual dredge or fill activities. Although the impact of a particular activity may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems.**
>
> **Cumulative effects attributable to dredge or fill activities in wetlands and other surface waters should be predicted to the extent reasonable and practical. The Agency shall collect information and solicit information from other sources, such as other permitting agencies, governmental agencies, or the public, about the cumulative impacts on the aquatic ecosystem. This information shall be documented and considered during the decision-making process concerning the evaluation of individual permit applications and monitoring and enforcement of existing permits.**

**EPA recognizes commenter concerns that the Corps Retained Waters List submitted as Attachment A to the FDEP-Corps MOA differs from previous Retained Waters Lists. The regulations describing the required elements of a state MOA with the Secretary of the Army in 40 C.F.R. § 233.14 do not specify a format or level of detail for identification of retained waters. The regulations only provide that the MOA shall include a "description of waters of the United States within the State over which the Secretary retains jurisdiction, as identified by the Secretary."**

**In response to the commenter who asserted that Florida did not sufficiently describe how it will replace the protection of federal laws that apply to federal actions, EPA notes that state Section 404 permitting actions are not federal actions and are administered under state authorities. The federal laws are not implemented by the State. However, EPA disagrees that Florida's program will lead to the degradation of wetlands and other waters of the United States. An assumed program must be consistent with and no less stringent than the requirements of the CWA and implementing regulations. EPA has reviewed Florida's permit review criteria and has determined that the State's program will result in the issuance of permits that comply with the CWA Section 404(b)(1) Guidelines. (33 U.S.C. § 1344(h)(1)(A); 40 C.F.R. § 233.20(a)). In response to a commenter who noted that the State did not adopt all of the Section 404(b)(1) Guidelines, EPA notes that state Section 404 programs are not required to adopt the Section 404(b)(1) Guidelines verbatim, but rather must be consistent with and no less stringent than the requirements of the CWA and regulations.**

**EPA disagrees with the commenter's statement that FDEP's proposal is also flawed because memoranda of agreement were incomplete, not signed by USFWS, or not made available for public comment. Both the MOA between FDEP and EPA and the MOA between the Corps and FDEP, which are elements of a program submission in accordance with 40 C.F.R. § 233.10, were fully executed when Florida submitted them to EPA as part of its request to administer a Section 404 program. Both MOAs were made available to the public for review and comment via the federal docket during the full public comment period, as required by 40 C.F.R. Part 233; the regulations do not require that the MOAs be subject to public notice and comment prior to the date of FDEP's submission.**

**EPA acknowledges the commenter who noted that EPA does not waive federal review of activities that fall into certain categories, including those with reasonable potential for adverse impacts on waters of another state or tribe; that FDEP is required to involve EPA if the State does not accept recommendations of an affected state or tribe; and that the FDEP-SHPO Operating Agreement recognizes EPA's role in review of activities with potential to affect sites identified or proposed under the National Historic Preservation Act.**

**EPA disagrees with commenters who asserted that Florida's request was incomplete because it did not include a biological opinion, biological assessment, or an incidental take statement, or provide details about how the state agencies would handle threatened and endangered species. Neither a biological opinion, biological assessment, nor an incidental take statement are required elements of Section 404 program submissions, as set forth in 40 C.F.R. § 233.10. Neither the CWA implementing regulations at 40 C.F.R. Part 233 nor the ESA implementing regulations at 50 C.F.R. Part 402 provide for public comment on biological assessments, biological opinions, or incidental take statements. Thus, Florida was not required to submit the ESA-related documents with their package.**

**With respect to how details about how FDEP will handle threatened and endangered species, EPA determined that Florida's rules, Program Description, and other documents provide sufficient details for the public to assess how the state plans to handle listed species**

EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program December 16, 2020

**issues. For example, the Program Description states: If the Department determines a project has potential to impact listed species or their habitat, the Department will coordinate with USFWS and/or FWC to provide recommendations for project design modifications or permit conditions that will avoid or minimize impacts to the listed species or their habitats. Program Description, Section (b), at 5. The Program Description also states that the MOU between FWC, and USFWS, and FDEP outlines coordination procedures for listed species reviews. Program Description, Section (j) – Additional Information at 2. The draft MOU between FWC, USFWS, and FDEP was included in the Appendix of the Program Description. Thus, the public had sufficient information about how the State planned to address issues pertaining to listed species and designated critical habitat in its program to evaluate the State's procedures and comment.**

**EPA disagrees with the commenter's assertion that the August 27, 2020 EPA memorandum entitled "Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals" states that the Section 7 consultation, programmatic biological opinion, and incidental intake statement are essential components of the application that must be considered prior to determining the program submission is complete. The August 27, 2020, memorandum does not make any statement to that effect. See Response to Comments Section N for responses to these and other concerns about species protection under Florida's program. See also Response to Comments Section D for a response regarding why Florida's program submission request is not incomplete based on a lack of ESA-related documentation.**

**In response to commenter questions about whether FDEP or FWC will be making initial species determinations if Florida assumes a Section 404 program, EPA notes that both the FDEP-FWC-FWS MOU and the Biological Opinion state that FWC and FDEP will jointly decide which agency will be the species coordination lead to coordinate the federally listed species review with the FWS for each application, and that FDEP and FWC will work as a team. EPA is confident this species review will be effective and disagrees with the commenter questioning whether Florida will be able to ensure the safety of species on the brink of extinction. This coordination process is further described in Response to Comments Section N.**

**EPA disagrees that Florida's emergency permit authorization is materially different from the federal emergency permit authorization and notes that incorporation by reference of federal requirements is not a requirement for assumption of the CWA Section 404 program. Under federal regulations, an emergency permit may only be given "if unacceptable harm to life or severe loss of physical property is likely to occur before a permit could be issued or modified under procedures normally required." 40 C.F.R. § 233.22(a). The State allows for the issuance of emergency permits to abate emergency conditions which pose an "imminent or existing serious threat or danger and require immediate action to protect public health, safety, or welfare, or the water resources of the Agency, including the health of aquatic and wetland-dependent species; a public water supply; or recreational, commercial, industrial, agricultural, or other reasonable uses." Fla. Admin. Code 62-331.110(1). While Florida's regulation lists the types of uses that**

20

**might warrant issuance of an emergency permit in greater detail than the more general regulation, the two authorities are not inconsistent. EPA's regulation addresses harm to life or severe loss of physical property, and it is reasonable to interpret those categories of harm as encompassing serious threat or danger to "the health of aquatic and wetland-dependent species; a public water supply; or recreational, commercial, industrial, agricultural, or other reasonable uses." EPA therefore finds that Florida meets the federal regulatory requirements addressing the authority of states and tribes to issue emergency permits.**

**EPA disagrees that FDEP takes an unreasonably narrow view of operating a Section 404 program or the number of individuals and entities likely to be affected. FDEP explained in its program description that it published a Notice of Rule Development for the State 404 Program rules on May 11, 2018. As part of the rule development process the Department held three rulemaking workshops throughout the state. Workshops were held in Tallahassee and online via webinar on May 30, 2018; in Orlando on May 31, 2018; and in Fort Myers on June 1, 2018. The public comment period ran from May 11, 2018 until July 31, 2018. All comments and public input were reviewed and incorporated into the draft rule as appropriate. The Department then published the Notice of Proposed Rule on February 19, 2020. Five public hearings were held via webinar and public comments and input were reviewed and incorporated as appropriate. Notices of Change were published on June 8, and June 11, 2020. Participants in FDEP's workshops and hearings and commenters reflected many sectors, including representatives from environmental organizations, prospective permit holders, and private citizens. FDEP therefore recognizes the wide range of stakeholders interested in its assumption request, but regardless, FDEP's view of the scope of stakeholders is not a requirement for EPA evaluation in determining whether FDEP's submittal to request assumption of a CWA Section 404 program is complete.**

### *Annual review of Florida Section 404 permits by EPA and USACE*

A commenter suggested that a certain percentage of the permits issued under the State 404 program be reviewed for consistency with the criteria and conditions of the project's permit. This could also include a check of the project's consistency with state and federal policy and water quality standards.

Another commenter recommended that a regular review of Section 404 permits issued by the State be specifically included as a part of the agreement between Florida and federal agencies in addition to any other programmatic review as required by federal regulations. The commenter recommended that at least 10 percent of the projects that have been issued a permit be reviewed by the EPA and Corps annually for consistency with state and federal policy and standards concerning the Section 404 program. The commenter suggested that the findings of each review be made available to the FDEP and the public.

**EPA Response:**

**EPA acknowledges the suggestion made by the commenter, and notes that the MOA between FDEP and EPA states that "EPA shall review the State 404 Permit Program established by FDEP in order to ensure consistency with the program reporting requirements of 40 C.F.R. § 233.52. FDEP shall also allow EPA to routinely review State records, reports, and files relevant to the administration and enforcement of the approved program consistent with 40 C.F.R. § 233.13(b). This does not preclude EPA from initiating independent or parallel enforcement actions in accordance with Sections 309 and 404(n) of the CWA." FDEP and EPA MOA, at p. 4.**

**Although EPA does waive the requirements of Section 404(j) and the regulations adopted thereunder regarding federal review of FDEP permit applications for certain categories of permits, in accordance with 40 C.F.R. § 233.51(a), FDEP still must supply EPA with copies of public notices for permit applications for which permit review has been waived, upon EPA's request. FDEP and EPA MOA, at p. 6. CWA Section 404(j) and the regulations at 40 C.F.R. § 233.50(b) require EPA to provide copies of permits for which review has not been waived to the Corps, USFWS, and NMFS for comment.**

**EPA has determined that these provisions of the MOA as well as the cited provisions of the CWA and implementing regulations which authorize EPA's review of FDEP's program are sufficient authorities to ensure the Agency can carry out its oversight role under the CWA, and disagrees that a specific percentage of projects issued by a permit must be reviewed annually.**

### *Florida's statutes and regulations, Stringency of Florida's Section 404 program*

Some commenters opposed Florida's assumption of a Section 404 program claiming that Florida's program is not as stringent as federal law. One commenter stated that the FDEP's rule-making process for developing a Section 404 program, including the development phase and publication of incomplete proposed rules, is highly flawed. The commenter pointed to examples, such as the statutory section that states that provisions of State law that conflict with federal law do not apply to State permitting. The commenter asserted that Florida's proposal neither specifies the conflicts nor enacts any changes to resolve conflicts or create a program as stringent as federal law. The commenter alleged that FDEP's proposal does not include rationale for proposing the less protective 300-foot buffer, and it does not fully describe the State's permitting, administrative, judicial review, and other procedures. Instead, the commenter said that the State's regulations cover methods to be used, conflicts of laws, and coordination between the ERP and Section 404 permitting programs.

One commenter argued that the State's program does not adopt or establish compliance with all of the Section 404(b)(1) Guidelines, but relies on a patchwork of State rules and regulations that have additional qualifications and caveats that result in less stringency. The commenter added that the State's program fails to define terms that appear in 40 C.F.R. § 230.3 such as "waters of the United States." Without clear definition, the commenter stated that it is unclear how the State will choose to define such terms. In particular, the commenter noted that the word "pollution"

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

covers only pollution that is at a high enough concentration to be potentially harmful, which could limit the number activities that fall under federal regulation. The commenter explained that the State's definition of "mixing zone" allows for a broad definition that would result in a less stringent State program. A commenter asserted that Florida's definitions of "dredge material" and "fill material" are unclear, and the latter is based on the function it performs rather than its physical state.

A commenter contended that although Florida's program largely incorporates the General Procedures to be followed from 40 C.F.R. § 230.5 into the State 404 Program Applicant's Handbook, the State has limited the General Procedures to be followed by adding qualifying language and provides the example that the State would only evaluate dredged and fill material to determine the possibility of chemical contamination in situations where the chemical contamination may violate State water quality standards or toxic effluent standards or prohibitions. (State 404 Program Applicant's Handbook section 8.2(g)). The commenter contended by restraining its consideration of chemical contamination, the State's program is less stringent than the federal program.

One commenter noted that the federal regulations require the permitting authority to "consider" dilution areas when determining whether violations would occur, but the State program creates an exemption for temporary violations in those areas if discharges occur temporarily within a mixing zone proposed by the applicant and approved by the agency.

A commenter stated that the State program fails to incorporate the requirement that a determination of whether a discharge would cause or contribute to significant degradation of wetlands or other surface waters be based on factual determinations, evaluations, and tests as required by the Section 404(b)(1) Guidelines. The commenter also pointed out that Florida has failed to include the requirement to put "special emphasis on the persistence and permanence of the effects" outlined in those subparts. The commenter stated that guidelines do not incorporate the federally defined set of factual determinations, nor do they require FDEP to make the requisite factual determinations when considering whether to issue a Section 404 permit. The commenter continued to argue that the Fla. Admin. Code R. 62-331.053(6) fails to incorporate the specific effects identified in 40 C.F.R. § 230.11 regarding contribution to significant degradation of wetlands or other surface waters and raises concerns the State's code omits consideration of or vaguely describes potential effects on physical substrate, water circulation, fluctuation, salinity, and suspended particulate/turbidity.

The commenter argued that the State program does not obligate FDEP to make factual findings to prove that proposed projects will not cause adverse effects. The commenter stated that the regulation fails to include the full effects from 40 C.F.R.§ 230.11. The commenter asserted that the State regulations do not require the agency to make factual determinations laid out in 40 C.F.R. § 230.11, and, therefore, do not require that the agency include those factual determinations in any final permit decision. The commenter stated that instead, the ERP Handbook section 5.5.4.1 says that the agency must determine whether an applicant's assurances are reasonable, which is less of a factual determination than federal requirements. The commenter stated that these flaws are also present in the ERP Handbook sections 10.2.7, 10.2.8,

23

and 11.0, and are additionally present for substrate, 40 C.F.R. §§ 230.20-230.25, 230.30-230.32, 230.40-230.45, 230.50-230.52, and 230.54. The commenter further asserted that the State did decide to include all the federal requirements for 40 C.F.R. § 230.53, aesthetics, and the commenter believed that this demonstrates Florida's recognition of the importance of adopting federal requirements, but the failure to do so consistently.

Two commenters stated that Florida cannot afford to lose the protection of federal laws that the Section 404 program under federal agencies provides. Another commenter mirrored this sentiment by observing that State assumption of the Section 404 program would mean losing the federal protections triggered by current Corps review.

A commenter stated that Florida law does not provide for access to the courts that federal law has, therefore making the State unfit to assume permitting responsibility. The commenter explained that FDEP fails to address any of the features that make Florida's administrative and judicial review procedures more restrictive than federal law. The commenter pointed out that the Florida statutes allow only citizens of the State that are adversely affected to intervene during proceedings brought under this statute, in contrast to federal law that authorizes any citizen to intervene during proceedings. This commenter further stated that mandatory fee shifting under Fla. Stat. § 403.412 is a barrier to court access for litigants unwilling or unable to risk an adverse fee award. Federal law does not provide for mandatory fee shifting. The commenter added that Florida's Administrative Procedure Act restricts access to courts by limiting the ability to establish standing to those who show harm to substantial interests of a substantial number of members. Under federal law, associational standing may be established on the basis of a single member's harms from the challenged conduct. The commenter opposed approval of Florida's assumption on the basis that Florida's more restrictive access to the courts would deprive affected parties of the ability to vindicate rights and ensure citizen enforcement.

**EPA Response:**

**EPA acknowledges the commenters that oppose Florida's assumption of the Section 404 program, asserting that it is not as stringent as the requirements of the CWA and regulations. In accordance with 40 C.F.R. Part 233, an assumed program must be consistent with and no less stringent than the requirements of the CWA and its implementing regulations. EPA has determined that Florida's program is consistent with and no less stringent than the federal program. EPA does not make a determination, and Florida is not required to provide information on whether Florida's program will go above and beyond the requirements of federal law.**

**In accordance with 40 C.F.R. § 233.10(f), one of the elements of a program submission that a state must submit if it seeks to administer a Section 404 program is copies of all applicable state statutes and regulations, including those governing applicable state administrative procedures. The General Counsel's Statement notes that "[p]rovisions of state law that conflict with federal requirements do not apply to state 404 permits. See § 373.4146(3), Fla. Stat." The statement also provides specific examples, such as exemptions to ERP permitting established in §§ 373.406, 373.4145, and 404.813, Fla. Stat., indicating these exemptions do not apply to State 404 permits, citing to § 373.4146(4), Fla. Stat. The**

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**General Counsel certifies that "the state has the authority to regulate all discharges of dredged or fill material into waters regulated by the state under Sections 404 (g)-(l), subject only to the exemptions provided in 33 U.S.C. § 404(f) and 40 C.F.R. § 232.3" and notes that "[t]he State has promulgated Chapter 62-331, F.A.C., to bridge the gap between existing state and federal law, thus ensuring that the State 404 Program is at least as stringent as, and meets the requirements of, the CWA and 40 C.F.R. Part 230." See Florida's General Counsel's Statement.**

**With respect to the commenter who alleged that FDEP's proposal does not include a rationale for proposing a 300-foot buffer, EPA notes that the State and the Corps negotiated this administrative line consistent with the July 30, 2018, Army Memorandum on CWA Section 404(g) – Non-Assumable Waters from Assistant Secretary of the Army for Civil Works R.D. James to the U.S. Army Corps of Engineers. In this memorandum, the Assistant Secretary found the apportionment of permitting authority, between the Corps and a state or tribe seeking to assume a Section 404 program, as recommended by the National Advisory Council for Environmental Policy and Technology (NACEPT), adheres to the language of the CWA and intent of Congress. NACEPT recommended a default of a 300-foot administrative line if another distance was not negotiated. Florida and the Corps negotiated a 300-foot administrative line except in cases where the project footprint crosses the administrative line. Where the project footprint crosses the administrative line, the Corps will retain permitting authority for the entire project. See the definition of "retained waters" in the State's Program Description, section a; see also the State 404 Program Applicant's Handbook section 2.0 (b) 41. EPA disagrees that a 300-foot line demarcating who is the permitting authority, the State or the Corps, is less protective. All Section 404 permits, whether issued by the State or the Corps, must comply with the Section 404(b)(1) Guidelines.**

**EPA acknowledges commenters who expressed concern about Florida's program complying with the Section 404(b)(1) Guidelines. Section 404(h) of the CWA states that EPA may approve a state or tribal request for assumption only if EPA determines, among other things, that the state or tribe has authority to issue permits which "apply, and assure compliance with, any applicable requirements of this section, including, but not limited to, the guidelines established under subsection (b)(1) . . . ." 33 U.S.C. 1344(h). States and tribes are not required to adopt or incorporate the Section 404(b)(1) Guidelines verbatim; however, implementation of state and tribal environmental review criteria must result in a permit that is as consistent with the Section 404(b)(1) Guidelines as would be a permit issued for the same discharge by the Corps. EPA has reviewed Florida's environmental review criteria and found them to be consistent with the Section 404(b)(1) Guidelines.**

**EPA acknowledges the commenter who alleged that the State's program does not define terms that appear in 40 C.F.R. § 230.3, such as "waters of the United States" and, therefore, it is unclear how the State will choose to define such terms. However, it is not the role of the State to define "waters of the United States" or other terms that appear in 40 C.F.R. § 230.3. The State is responsible for describing the waters of the United States within Florida over which it will assume jurisdiction under the approved program.**

25

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**Similarly, definitions of other terms that appear in 40 C.F.R. § 230.3 are not required if the State program description ensures consistency with the CWA and its implementing regulations. Nonetheless, EPA disagrees that the State has not provided a definition for terms such as "waters of the United States." Appendix j-3 of the Program Submission provides a cross walk of many federal and State terms utilized in their Section 404 program, and the State defines many terms in the program description of its submission package and the State 404 Program Applicant's Handbook and ERP Applicant Handbook.**

**In its Program Description, Florida indicates that the State's 404 program will apply to "state-assumed waters of the United States (WOTUS) as defined at 40 C.F.R. Part 120." See State Program Description section a, at p. 3. Further, "[t]o provide certainty, streamlining, and efficiency, the Department will consider that any wetlands or other surface waters delineated in accordance with Chapter 62-340, F.A.C., that are regulated under Part IV of Chapter 373, F.S. could be considered waters of the United States, and will treat them as if they are, unless the applicant requests a WOTUS jurisdictional determination, and provides documentation that clearly demonstrates a water is not a WOTUS, subject to Department verification and agreement."** ***Id.***

**The State utilizes and defines the term "activity" for the purposes of Florida's Section 404 program to mean "discharge of dredged material" and/or "discharge of fill material" as those terms are defined in 40 C.F.R. § 232.2" (see Appendix B of the State 404 Program Applicant's Handbook). The State further explains that the terms "dredge", "fill", "dredging", and "filling", shall be interchangeable with "activity" as defined in Florida's Section 404 program, when used within Chapter 62-331, F.A.C., or the State 404 Program Applicant's Handbook. (See Program Description, Appendix j-3).**

**The State defines "Mixing zone" in the State 404 Program Applicant's Handbook as "a limited volume of water serving as a zone of initial dilution in the immediate vicinity of a dredge <u>or</u> fill activity where receiving water quality may not meet quality standards or other requirements otherwise applicable to the receiving water."**

**EPA disagrees that the State program will be less restrictive and, therefore, inconsistent with the Section 404(b)(1) Guidelines. Section 8.2(g) of the State 404 Program Applicant's Handbook states that the State must "[e]valuate the material to be dredged or used as fill to determine the possibility of the presence of contaminants, including chemical contamination, that may violate state water quality standards listed in paragraph 62-330.301(1)(e), F.A.C., or any toxic effluent standard or prohibition under section 307 of the CWA"; "[c]heck for physical incompatibility of the material to be used as fill (examples – 1) muck should not be used as structural fill but may be appropriate for use in a wetland restoration project; 2) if a certain ecological community type is expected to colonize the fill, the fill should be appropriate for the desired species)." As structured, section 8.2 requires the State to evaluate the material to see if chemicals are present in concentrations that would result in violations of water quality standards or toxic effluent standards if discharged into WOTUS. The State regulations look at the impacts of the discharge, including impacts on water quality, both individually and cumulatively when considering**

26

**whether to issue, deny or condition a permit. Section 62-331.053(3), F.A.C. states that no permit shall be issued if it "causes or contributes to significant degradation of wetlands or other surface waters". A state permit may not be issued if such discharge will result in a violation of 40 C.F.R. § 230.10(b)(2). 40 C.F.R. § 233.20(a). Additionally, proposed permits with discharges that may contain toxic substances must be sent to the EPA for review pursuant to the non-waiver categories found in the State-EPA MOA and 40 C.F.R. § 233.51(4). Specifically, section 10.1.1 of the ERP Handbook (Appendix D) requires that applicants assure "(c) A regulated activity will not adversely affect the quality of receiving waters such that the water quality standards set forth in Chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including any antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), subsections 62-4.242(2) and (3), and Rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C., will be violated [paragraph 62-330.301(1)(e), F.A.C.]. EPA has determined that the evaluation required by section 8.2 of the 404 Handbook will not result in issuance of a permit inconsistent with the Section 404(b)(1) Guidelines.**

**EPA disagrees with commenters who asserted that Florida's program would be inconsistent with the Section 404(b)(1) Guidelines based on the State's regulatory requirements regarding mixing zones and consideration of dilution and dispersion. 40 C.F.R. § 230.10(b) states that "No discharge of dredged or fill material shall be permitted if it (1) Causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard." According to 62-331.053(3), F.A.C., "No permit shall be issued for the following: (a) When the project is inconsistent with the requirements of this Chapter and the 404 Handbook, including when the project: (1) Causes or contributes to violations of any applicable State water quality standard, except when temporarily within a mixing zone proposed by the applicant and approved by the Agency." EPA notes that although Florida's regulations do not include the exact same language as 40 C.F.R. § 230.10(b), which is not the standard for approval, the Agency has considered the State's regulatory language and determined that Florida's program will result in the issuance of permits that are consistent with and no less stringent than the requirements in the Section 404(b)(1) Guidelines.**

**EPA acknowledges commenters who expressed concern that Florida's program does not include the same language as the Section 404(b)(1) Guidelines regarding factual determinations, evaluations, and tests. EPA also acknowledges commenters who believed that Florida's regulations are not as detailed as the Section 404(b)(1) Guidelines. However, EPA disagrees with commenters who concluded that Florida's program is inconsistent with the Section 404(b)(1) Guidelines. Program Description Appendix j-3 compares the federal and State regulatory requirements regarding factual determinations, evaluations, and tests included in the Section 404(b)(1) Guidelines. EPA has carefully evaluated the State's requirements and has determined that they are consistent with and no less stringent than the Section 404(b)(1) Guidelines. EPA disagrees with the commenter who asserted that Florida's inclusion of "reasonable assurance" language in the Environmental Resource**

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**Permit Applicant's Handbook means that the State program is not consistent with federal requirements.**

**EPA disagrees with the commenter who asserted that Florida's program is inconsistent with 40 C.F.R. § 233.10(c) because Florida's regulations do not require FDEP to put "special emphasis on the persistence and permanence of the effects." Florida's Environmental Resource Permit Applicant's Handbook Volume 1, section 10.2.4, requires that "Reasonable assurances regarding water quality must be provided both for the short term and the long term, addressing the proposed construction, alteration, operation, maintenance, removal and abandonment of the project." Additionally, section 10.2.4.2 includes a list of "Long Term Water Quality Considerations." EPA determines that "special emphasis on the persistence and permanence of the effects" is captured in FDEP's consideration of both short-term and long-term water quality effects.**

**Florida's Section 404 program is not inconsistent with any federal requirements regarding access to a particular venue to pursue legal challenges. EPA acknowledges commenters who expressed concern with venue for where state permitting issues would be resolved on a judicial level. EPA's regulations do not require particular procedures or access to a federal venue for judicial review of state-issued permits, and nothing in Florida's judicial review procedures is inconsistent with federal requirements. Challenges to actions of a state in issuing or denying a permit pursuant to a state-assumed CWA program are typically heard in state court, and EPA recognizes that different states have different procedures for judicial review, and that those procedures may also differ from federal procedures. As the Seventh Circuit Court of Appeals explained in addressing EPA's and the Corps' failure to exercise jurisdiction over a Section 404 permit application where Michigan had assumed the Section 404 program, "[i]t is not the unique province of the federal courts to adjudicate administrative law challenges related to the Clean Water Act."** ***Menominee Indian Tribe of Wisconsin v. EPA*****, 947 F.3d 1065, 1071 (7th Cir. 2020).**

### *Completeness of FDEP's General Counsel Statement*

One commenter noted FDEP submitted a statement by its General Counsel, but fails to establish adequate authority to carry out the program and meet Section 404 requirements, including failures regarding general permits, emergency permits, permit conditions, coordination requirements, public notice, permit review and determinations, compliance evaluation and enforcement. The commenter alleged that the General Counsel's statement "avers broadly" that no permit shall issue unless in compliance with the CWA and Section 404(b)(1) Guidelines, but fails to establish that this is in fact the case. The commenter added that the General Counsel's Statement summarily declares that FDEP satisfies the requirements to comply with federal guidelines, even though many of the CWA Section 404(b)(1) Guidelines are absent from the state rules. The commenter provided multiple concerns and requested clarifications within the document, as follows.

The commenter took issue with the General Counsel's statement that F.A.C. 62-331.060(1) implements the requirements of 40 C.F.R. § 233.30(b)(1)–(4). Assumption Application C at 6.

28

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

The commenter explained that the State uses different terms that would restrict the information that must be included in a permit application as compared to federal law. The commenter provided, as an example, the federal regulations require a description of "methods of discharge," whereas the State uses the term "construction methods," which is not defined by either the State regulations or the 404 Handbook (referencing F.A.C. 62-331.060(1)(e) and 40 C.F.R. § 233.30(b)(3)). The commenter urged that the plain meanings of the words "construction" and "discharge" are not equivalent.

The commenter stated that federal rules require that permits "shall be coordinated with federal and federal-state water related planning and review processes," however, the General Counsel's Statement fails to provide any information or citation to demonstrate that the State has satisfied this requirement. The commenter expressed that FDEP admits that they "did not add this [requirement] to the rule," but states that they "plan to engage in this kind of coordination whenever possible." Assumption Application B, app. j-3, at 32. The commenter stated that FDEP has thus failed to ensure compliance with federal coordination requirements.

The commenter disagreed with the General Counsel's Statement premise that F.A.C. 62-331.060(2)–(3) fully satisfies the public notice requirements of 40 C.F.R. § 233.32(a)–(c), (e). The commenter argued that federal rules require that public notice be given whenever the following actions occur: (1) receipt of a permit application, (2) preparation of a draft general permit, (3) consideration of a major modification to an issued permit, (4) scheduling of a public hearing, and (5) issuance of an emergency permit. 40 C.F.R. § 233.32(a). The commenter pointed out that Florida's regulations, on the other hand, do not require public notice for receipt of a permit application. F.A.C. 62-331.060(2)–(3).

The commenter expressed concern with the General Counsel's Statement claim that the State "has authority to enforce rules and regulations" for the State 404 program (Assumption Application, section C at 9). The commenter stated that the statement falls short of the federal requirement that a state "shall maintain a program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with permit conditions." 40 C.F.R. § 233.40(a). The commenter added that the State does not maintain a program to identify violations in its current programs and has not shown how it would be able to do so for a Section 404 program.

The commenter added that the General Counsel's Statement must contain a legal analysis of the effect of State law regarding the prohibition on taking private property without just compensation on the successful implementation of the State's program. Rather than providing this analysis, the commenter alleged the Statement focuses "on the notion that no matter how broadly Florida courts interpret regulatory takings law, their decisions would be subject to review by the Supreme Court of the United States." The commenter argued that this position "completely dodges the requirement" to provide an actual analysis of the effect of Florida law on the prohibition against takings, noting that a blanket statement that takings law is ultimately subject to U.S Supreme Court review would apply to any state's submission or statutory scheme. The commenter urged that this claim also ignores that the U.S. Supreme Court is a court of limited review. The commenter further contended that the General Counsel emphasizes that

29

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

under Florida law, even when a private property owner brings an as-applied challenge to a regulation, that challenge can proceed without invalidating the underlying regulation. The commenter explained that this analysis appears to suggest that as long as the underlying regulatory program remains valid, takings law does not inhibit successful implementation of Florida's program. However, the commenter asserted that the State has not answered the question of whether it is easier for private property owners to bring regulatory takings cases pursuant to Florida law, such that less Section 404 permit mitigation would occur under a State program as compared to a federal program. The commenter added that the General Counsel's Statement completely fails to address the Bert J. Harris, Jr., Private Property Rights Protection Act, Fla. Stat. 70.001 et seq. ("Harris Act"), which Florida's legislature enacted "to provide a remedy for private landowners where their property has been inordinately burdened by government action, but the government action does not amount to a constitutional taking." The commenter urged that the General Counsel failed to flag, much less address, how this Act would not interfere with operation of a 404 program. Without this explanation, the commenter stressed that the State has failed to meet the requirements of 40 C.F.R. § 233.12.

**EPA Response:**

**EPA disagrees with the commenter's statements that the General Counsel's Statement fails to establish adequate authority to carry out and enforce the program and meet CWA Section 404 requirements. Please see Response to Comment Sections C, D, E, and K addressing Florida's requirements and procedures related to general permits, emergency permits, permit conditions, coordination requirements, public notice, permit review and determinations, compliance evaluation and enforcement. In particular, see Response to Comments Section K regarding enforcement for EPA's explanation as to why it concluded that Florida meets the federal requirement that a state "shall maintain a program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with permit conditions." 40 C.F.R. § 233.40(a).**

**EPA disagrees with the commenter's statement that the General Counsel's Statement fails to establish that Florida's program incorporates all of the requirements in the Section 404(b)(1) Guidelines. The General Counsel's Statement relies in part on Florida's comparison of federal and state law requirements, included as Appendix j-3 to the Program Description at 54-151, which lays out in precise detail Florida's requirements that reflect the federal Section 404(b)(1) Guidelines. Appendix j-3 makes clear that Florida's requirements implement the Section 404(b)(1) Guidelines; the requirements are codified at 62-4 and 62-330 (F.A.C.), and the Applicant's Handbook Volume I. Please see Response to Comment Section D addressing Florida's statutes and regulations and stringency of Florida's Section 404 program.**

**EPA disagrees with the commenter's statement that the General Counsel's Statement fails to demonstrate that Fla. Admin. Code 62-331.060(1) implements the requirements of 40 C.F.R. § 233.30(b)(1)–(4). As the commenter notes, federal regulations at 40 C.F.R. § 233.30(b)(3) provide that permit applications include "a description of the type, composition, source and quantity of the material to be discharged, the method of discharge,**

30

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**and the site and plans for disposal of the dredged or fill material." Florida's regulations require that permit applications list "[a] description of the type, composition, source, and quantity of the material to be dredged or used as fill; construction methods; and the site and plans for disposal of any dredged material including a description of spoil cells, dredged material management areas (DMMAs), and final disposal plans if the dredged material is not proposed to remain onsite." 62-331.060(1) (F.A.C.). Though Florida's rule does not explicitly require that the permit application describe the "method of discharge," EPA has concluded that the information in Florida's application, specifically the language in 62-331.060(1) (F.A.C.),which requires a "description of the type, composition, source, and quantity of material to be discharged; construction methods; and the site and plans for disposal of any dredged material" will ultimately provide the "method of discharge" to the permitting authority. The Attorney General's Statement was therefore accurate in concluding that Fla. Admin. Code 62-331.060(1) implements the requirements of 40 C.F.R. § 233.30(b)(1)–(4).**

**EPA disagrees with the commenter's statement that FDEP fails to ensure compliance with federal coordination requirements because its regulations do not codify the federal requirement that State Section 404 permits shall be coordinated with "Federal and Federal-State water related planning and review processes,"** ***citing*** **40 C.F.R. § 233.31(b). Florida's program description provides that "[t]he state plans to engage in this kind of coordination whenever possible." Program Description, app. j-3 at 11. In addition, Florida's program description and other assumption documents make clear that Florida will coordinate with federal and federal-State water-related planning and review processes. For example, the program description states that when both an ERP and State Section 404 permit is required, the ERP authorization will ensure that the project complies with state water quality standards and the Coastal Zone Management Program (Rule 62-331.070, F.A.C.). Program Description section b at 3. The program description also states that FDEP will coordinate with the State Historical Preservation Office (SHPO) and Tribal Historical Preservation Office (THPO), FWC, USFWS), NMFS, Water Management Districts (WMDs), and EPA following the procedures described in their respective operating agreements. See Program Description section b at 3, citing Program Description sections D (DEP/EPA MOA) and E (DEP/USACE MOA) and section (j) (DEP/FWC/FWS MOU and DEP/SHPO OA) and section 5.2 of the 404 Handbook. Given the open-ended nature of the regulatory exhortation to coordinate with "Federal and Federal-State water related planning and review processes," and the many commitments Florida has made to do so, Florida has amply documented its adherence to this regulatory requirement.**

**EPA disagrees with the commenter's statement that Florida's program does not satisfy the public notice requirements of 40 C.F.R. § 233.32(a)–(c), (e). EPA's regulations require that public notice be given whenever the following actions occur: (1) receipt of a permit application, (2) preparation of a draft general permit, (3) consideration of a major modification to an issued permit, (4) scheduling of a public hearing, and (5) issuance of an emergency permit. 40 C.F.R. § 233.32(a). While the language in Florida's regulations is not identical to the language in EPA's public notice requirements, Florida's approach is**

31

**similar to EPA's, will have the same practical effect as EPA's requirements, and satisfies public notice requirements of 40 C.F.R. § 233.32. Florida requires FDEP to provide public notice within 10 days of the following: an agency determination that an application for an individual permit or major modification is administratively complete; an agency notification to a permittee of revocation or suspension of a permit; and issuance of an emergency field authorization. F.A.C. 62-331.060 (Florida addresses general permits separately). Requiring public notice within 10 days of receipt of a complete permit application or major modification is not materially different, as a practical matter, from requiring public notice upon "receipt of a permit application" or "consideration of a major modification." EPA therefore concludes that Florida's public notice requirements are consistent with federal public notice requirements.**

**EPA disagrees with the commenter's contention that the General Counsel's Statement fails to analyze the effect of State law regarding the prohibition on taking private property without just compensation on the successful implementation of the State's program, and that instead it focuses "on the notion that no matter how broadly Florida courts interpret regulatory takings law, their decisions would be subject to review by the Supreme Court of the United States." This comment distorts Florida's analysis. In fact, the General Counsel's Statement explained that a Florida court has held that the standard for a "taking" under the Florida Constitution is identical to the standard under the Fifth Amendment (at least for res judicata purposes), and it is unlikely that Florida courts would expand liability for regulatory takings beyond the U.S. Supreme Court's standard. General Counsel's Statement at 12.**

**Moreover, EPA does not view the regulatory requirement that the General Counsel's Statement provide an analysis of takings law as necessarily requiring a state or tribe to show that under its legal regime, private property owners would face the identical hurdles that they face under federal law. The General Counsel's Statement that a potential taking does not invalidate an agency action under Florida law is simply helpful to demonstrate that takings law in Florida will not inhibit the successful implementation of Florida's program. In response to the commenter's statement that the General Counsel's Statement fails to address the Bert J. Harris, Jr., Private Property Rights Protection Act, Fla. Stat. 70.001 et seq., EPA's regulatory requirements do not require Florida to address this statute. First, the Private Property Rights Protection Act is limited to "as-applied" challenges and does not provide for facial challenges to statutes or regulations. *See M & H Profit, Inc. v. City of Panama City*, App. 1 Dist., 28 So.3d 71 (2009), *rehearing denied*, *review denied* 41 So.3d 218. The statute would therefore not affect Florida's authority to administer the Section 404 program. In addition, while Florida currently regulates dredging and filling into wetlands and other waters pursuant to its Environmental Resource Permit program, EPA's research has not found any cases in which FDEP's actions under that permitting program were challenged successfully pursuant to the Private Property Rights Protection Act. EPA therefore has no reason to think that this statute would impede the functioning of Florida's Section 404 program.**

**E. General permits and conditions**

A commenter noted that the State failed to incorporate the full set of requirements for issuance of general permits. The commenter asserted that the State's program omits the requirement that general permits may only be issued if "[t]he activities in such category are similar in nature and similar in their impact upon water quality and in the aquatic environment" (referencing Fla. Admin. Code 62-331.200–01).

The commenter stressed that the State also failed to incorporate the requirements that FDEP must follow when issuing general permits, asserting that the State has not adopted any procedures for it to follow when considering and issuing general permits, but rather, takes the position that the State must follow the requirements of 40 C.F.R. Part 233 when creating a general permit, "but this information is not presented in the rule" (referencing Assumption Application B, app. j-3, at 58). The commenter remarked that it is unclear how the State could ensure compliance with Section 404(b)(1) Guidelines without incorporating them into the State's program. The commenter added that the State seeks to issue general permits with the program submitted, even though it has failed to take any of the required steps to do so lawfully.

The commenter remarked that FDEP's proposed program is also less restrictive than 40 C.F.R. § 233.21, asserting that the State's regulation unreasonably restricts its ability to require notice of intent of coverage under a general permits, omitting the federal language that the agency can require notice "as appropriate" (comparing Fla. Admin. Code 62-331.200(3) with 40 C.F.R. § 233.21(d)). The commenter asserted that the State regulation restricts the notice requirement to specifically identified circumstances and therefore limits FDEP's authority to require notice whenever appropriate.

The commenter said that the State has further limited its authority by only allowing FDEP to require an individual permit where "sufficient cause exists," which is then defined as a "likelihood that the project will cause more than minimal adverse environmental effects." The commenter pointed out that federal rules, by contrast, allow the Director to do so "based on concerns for the aquatic environment," including compliance with the requirement for general permits to have only minimal individual and cumulative adverse environmental effects. The commenter added that the State's rules omit the automatic revocation of general permits coverage once the agency requires an individual permit (comparing Fla. Admin. Code 62-331.200(6) with 40 C.F.R. § 233.21(e)).

One commenter considered the proposal flawed in several respects and pointed out the failure to assess the impacts of proposed general permits and provide the analyses for public review. The commenter quoted federal regulatory language that "[t]he Director may issue a general permit for categories of similar activities if he determines that the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment" 40 C.F.R. § 233.21(b). The commenter stated that FDEP seems to believe that it can use language from general permits developed by the Corps at a national level without any process to adapt them to state use, without providing evidence of analysis to support this decision.

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

One commenter asserted that FDEP's approach, which purports to give effect to its general permits for a duration of five years from the date of the State program's approval, is contrary to the five-year limitation on general permits. The commenter stated that FDEP's approach therefore fails to rely on a proper determination necessary to support the issuance of general permits and would unlawfully extend general permits issued initially by the Corps beyond their statutorily limited five-year duration. The commenter asserted that federal law requires the Corps to review its general permits and the determinations underlying them every five years, and allowing Florida to extend the Corps' underlying rationale beyond the five-year statutory limitation conflicts with federal law.

A commenter suggested that Florida lacks expertise, staff, resources, and enforcement capabilities needed to implement its own Section 404 program and should instead work with the Corps to expand the scope of its state programmatic general permit.

**EPA Response:**

**EPA disagrees with the commenter that FDEP failed to incorporate the full requirements for issuance of general permits from the Section 404(b)(1) Guidelines. EPA acknowledges the commenter's concern of FDEP adopting general permits developed by the Corps. As stated in the General Counsel's Statement submitted by FDEP as part of its assumption request package, "the state intends to administer and enforce a limited number of regional general permits issued by the Corps until they expire. Pursuant to 40 C.F.R. § 233.14(b)(3), these general permits, and the procedures whereby the Department and Corps will exchange relevant information, are identified in the Memorandum of Agreement (MOA) between the State of Florida Department of Environmental Protection (DEP) and the U.S. Army Corps of Engineers (Corps). In addition, the State has promulgated a series of general permits in Chapter 62-331, F.A.C., which authorize activities that meet the conditions specified in 40 C.F.R. § 233.21. They comply with the federal regulations, describe the authorized activity and area, contain any appropriate pre-discharge notification requirements, and allow for the issuance of an individual permit after the issuance of a general permit. The permit conditions for general permits are provided in Rule 62-330.405, except subsections (7) and (10), and Rule 62-331.201, F.A.C. The conditions in Chapter 62-331 are specific to the 404(b)(1) Guidelines, applicable Section 303 water quality standards, applicable Section 307 effluent standards and prohibitions, and the criteria set forth in 40 C.F.R. § 233.23. Subsection 62-331.200(6), F.A.C., provides the circumstances under which an individual permit may be required after a general permit is issued."**

**EPA also disagrees with the commenter's statement that FDEP's proposed program is less restrictive than 40 C.F.R. § 233.21 on the grounds that the State's regulation restricts its ability to require notice of intent of coverage under general permits. Florida's regulations require any person constructing, operating, or otherwise engaging in projects under a general permit to provide notice at least thirty days prior to initiating the authorized activity. 62-330.402 (F.A.C.). Florida's regulations also specify the contents of these advance notices and processing procedures. *Id.* Florida's broad requirements for notices**

34

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**of intent of coverage under general permits satisfy and exceed the federal regulatory requirements for such notices.**

**EPA disagrees with the commenter who asserted that FDEP's general permits extend the Corps general permits beyond their statutory limitation of five years in duration. As the State program description appendix (a)-1 states on page 30, nationwide permits and the State's programmatic general permits "will no longer be applicable within assumed waters," and thus there is no extension of the Corps general permits in assumed waters. The State's program does include general permits which it incorporated into regulations at Florida Administrative Code Chapters 62-330 and 62-331. To provide consistency between the State and federal 404 programs, FDEP modeled many of the State's programmatic general permits after nationwide permits. These State general permits will be issued on the date the State program comes into effect and will have a five-year term. In crafting its programmatic general permits, FDEP did not simply incorporate by reference or copy existing Corps permits; it modified these permits including additional requirements, as appropriate, to ensure these permits comply with the Section 404(b)(1) Guidelines and State requirements including but not limited to the State's Environmental Resource Program permits, water quality standards, protection of listed species, and compliance with the State's Coastal Zone Management Plan. These general permits were available for comment as part of the program package approval and EPA has reviewed them as part of the program request. (See Section 3.2.1 of the State 404 Program Applicant's Handbook).**

**EPA disagrees with commenters who asserted that FDEP lacks the expertise, staff, resources, and enforcement capabilities needed to implement its own Section 404 program. EPA finds that FDEP has committed sufficient resources and staffing to address anticipated workload. See Response to Comments Section H for further discussion and responses to comments on this topic.**

## F. Delineation methodology

A commenter noted that there are differences between the State and federal wetlands delineation methodologies and the impacts of those differences is one of the reasons why the proposal is flawed.

A commenter observed that FDEP has developed a 92-page document and associated checklist for wetland delineation in lieu of site visits. The commenter maintains the current system in which the Water Management Districts and the Corps work cooperatively to ensure fair and equitable wetland assessments is appropriate. Another commenter says that there are few people in FDEP prepared to handle wetland delineation so there is no assurance of minimum protection under the statute.

**EPA Response:**

**Florida's Program Description contains a comparison of federal and State delineation methodologies. A delineation implementation strategy has been developed to ensure**

35

**consistent application of state wetland delineation methodology and is rooted in Florida Statute (373.4131, F.S.) and Rule (62-340.100(2), F.A.C.). This implementation strategy consists of: 1) regular trainings conducted annually by FDEP subject matter experts; 2) development and required use of the F.A.C. 62-340 Data Form; 3) desktop audits and field verifications; and 4) additional reporting of audits and verifications.**

**State and federal wetland delineation methodologies may differ, in part, because the definitions of "wetlands" under the CWA (*see* 33 C.F.R. § 328.3(c)(16) and 40 C.F.R. § 120.2(3)(xvi)) and state law may not be the same. *See* Appendices to the Resource and Programmatic Assessment for the Navigable Waters Protection Rule: Definition of "Waters of the United States." Indeed, the definition of "wetlands" under the CWA and the definition of "wetlands" under Florida law are different.[2] The appropriate analysis in the context of this rulemaking is Florida's ability to properly delineate "waters of the United States," including "adjacent wetlands." *See* 33 C.F.R. § 328.3(c)(1) and 40 C.F.R. § 120.2(3)(i). If properly implemented, the State methodology is no less stringent than the federal methodology and will produce the same wetland delineation and determination for purposes of the CWA. Federal wetland delineation methodology requires that hydrophytic vegetation, wetland hydrology and hydric soil indicators be present. *See* 1987 Corps of Engineers Wetlands Delineation Manual at 9–10. Florida's wetland delineation methodology only requires two of the three indicators be met. (See Chapter 62-340 F.A.C.) Historically, inconsistent application of the State and federal methodologies and differences in wetland plant ratings and hydric soil indicators have led to wetland boundary differences. Federal adoption of Natural Resource Conservation Service Hydric soil indicators in 2012 aligned hydric soil indicators with those used by the State and proper application of F.A.C. 62-340 in conjunction with the data form ensure that the tests required for a delineation under the CWA are utilized.**

**By way of background, FDEP, EPA, and Corps subject matter experts, as a test, applied the federal methodology and State methodology and then develop the implementation strategies. When applying F.A.C. 62-340, experts noted that with the development and use of the F.A.C. 62-340 data form and consistent application of F.A.C. 62-340 criteria**

---

[2] For purposes of the Clean Water Act, "wetlands" means "areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas." 33 C.F.R. § 328.3(c)(16) and 40 C.F.R. § 120.2(3)(xvi). Under Florida law, "wetlands" means "those areas that are inundated or saturated by surface water or groundwater at a frequency and a duration sufficient to support, and under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soils. Soils present in wetlands generally are classified as hydric or alluvial, or possess characteristics that are associated with reducing soil conditions. The prevalent vegetation in wetlands generally consists of facultative or obligate hydrophytic macrophytes that are typically adapted to areas having soil conditions described above. These species, due to morphological, physiological, or reproductive adaptations, have the ability to grow, reproduce, or persist in aquatic environments or anaerobic soil conditions. Florida wetlands generally include swamps, marshes, bayheads, bogs, cypress domes and strands, sloughs, wet prairies, riverine swamps and marshes, hydric seepage slopes, tidal marshes, mangrove swamps and other similar areas. Florida wetlands generally do not include longleaf or slash pine flatwoods with an understory dominated by saw palmetto." *See* Fla. Stat. section 373.019(27)).

**(wetland definition, A Test, B Test, C Test, and D Test), the State methodology is no less stringent than the federal methodology.**

**EPA disagrees with the commenter that a 92-page document and checklist will be used in lieu of site visits. FDEP has developed the Data Form Guide to assist staff in the field to implement Chapter 62-340, F.A.C. The content of this guide was compiled by FDEP's Submerged Lands and Environmental Resources Coordination group and the Wetland Evaluation and Training Team. The express purpose of this document is to provide guidance to regulatory staff in order to maintain consistency in the applied field methodologies for wetland delineation pursuant to Chapter 62-340, F.A.C.**

## G. Compensatory mitigation

### *Compensatory mitigation MOA*

Some commenters asserted that the compensatory mitigation memorandum of agreement provides that a federal mitigation bank located entirely in assumed waters would need to submit its implementation plans to FDEP for a State Section 404 program permit rather than receiving a permit from the Corps, often issued as a Nationwide 27 after receiving a Mitigation Banking Instrument (MBI) from the Corps. Commenters asserted this extra review step is burdensome, unnecessary, and contrary to the goal of greater review efficiency. Further, some commenters emphasized that mitigation bank applications submitted to the Corps for an MBI are subject to change during review and then those changes would need to be considered for the Section 404 dredged and fill permit review by FDEP. To prevent such delays, commenters requested that the Corps retain permitting authority for all the federal mitigation banks it authorizes. Another commenter contended that the agency reviewing the mitigation bank proposal should also be responsible for the associated authorization.

**EPA Response:**

**EPA acknowledges that the memorandum of agreement between the Corps and FDEP states that mitigation banking instruments and in-lieu fee program instruments shall be processed by the Corps in accordance with 33 C.F.R. Part 332 and that mitigation banks wholly in assumed waters would be permitted by FDEP. However, FDEP would continue to be a part of the Interagency Review Team [62-331.140(3) F.A.C.] that reviews mitigation banks and the memorandum of agreement allows FDEP to co-chair any applicable interagency coordination effort. Further, FDEP has adopted the language from the Corps' Nationwide Permit 27 as a general permit pursuant to 62-331.225 F.A.C., allowing the State to continue permitting mitigation banks much the same way as the current federal process. EPA acknowledges that mitigation bank applications submitted to the Corps for an MBI are subject to change during review and then those changes would need to be considered for Florida's 404 Program; however, this is no more burdensome that the current process for banks currently receiving Section 404 dredged and fill permits from the Corps.**

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

### *Permits issued by the State are subject to administrative challenge*

Some commenters noted that because the State Section 404 permit program and the Section 404(b)(1) Guidelines do not align, any administrative challenge to a State Section 404 program permit would be adjudicated under Florida law, which could result in a permit denial or modification of the Mitigation Banking Instrument. One commenter asserted that State Section 404 permits will be subject to challenge by affected parties under Florida's Administrative Procedure Act and provided examples of how such challenges have effectively delayed state mitigation bank permits through "legal maneuvering." To prevent such denial or modification of the MBI due to differences between the state and federal program, the commenter requested that the Corps retain permitting authority for all the federal mitigation banks it authorizes.

**EPA Response:**

**FDEP's comparison of federal and State law requirements lays out in precise detail Florida's requirements that reflect the federal Section 404(b)(1) Guidelines. Program Description Appendix j-3 at 54-151. The comparison makes clear that Florida's requirements implement the Section 404(b)(1) Guidelines; the requirements are codified at 62-4 and 62-330 F.A.C., the Applicant's Handbook Volume I, and a number of other locations. Florida's Section 404 program is consistent with the public participation requirements in EPA's implementing regulations at 40 C.F.R. Part 233. EPA's regulations do not require particular procedures for judicial review of state-issued permits. Challenges to actions of a state in issuing or denying a permit pursuant to a state-assumed Section 404 program are typically heard in state court under that state's laws, and state laws, in turn, are not required to have language identical to federal regulations so long as the actual requirements are the same. As the Seventh Circuit Court of Appeals explained in reviewing EPA's and the Corps' decision to decline to exercise jurisdiction over a Section 404 permit application where Michigan had assumed the Section 404 program, "[i]t is not the unique province of the federal courts to adjudicate administrative law challenges related to the Clean Water Act."** ***Menominee Indian Tribe of Wisconsin v. EPA*****, 947 F.3d 1065, 1071 (7th Cir. 2020);** ***citing In re Freshwater Wetlands Prot. Act Rules*****, 351 N.J.Super. 362, 798 A.2d 634, 643 (Ct. App. Div. 2002) (evaluating whether state 404 permit met federal standards);** ***see also Sierra Club Mackinac Chapter v. Dep't of Envtl. Quality*****, 277 Mich.App. 531, 747 N.W.2d 321, 331–32, 335 (2008) (concluding that pollution-discharge permit violated the CWA).**

### *Alignment of the State Section 404 program and the Section 404(b)(1) Guidelines regarding compensatory mitigation*

A commenter asserted that the State regulations have omissions and differences that arise from Florida's failure to use federal definitions of terms relevant to mitigation. For example, the commenter pointed out that the Section 404 Handbook does not include the definitions from 40 C.F.R. § 230.92 for "advance credits," "credit," "days," "debit," "fulfillment of advance credit sales of an in-lieu fee program," "in-lieu fee program instrument," "instrument," "mitigation banking instrument" and "release of credits" (compare 40 C.F.R. § 230.92 with Section 404

38

Handbook section 2.0(b)). The commenter emphasized that the State also alters or omits vital portions of the General Compensatory Mitigation Requirements. The commenter asserted that these omissions and differences result in a failure of the state to meet the stringency requirements of the Section 404(b)(1) Guidelines.

A commenter stated that as part of any delegation, FDEP should be required to demonstrate that existing State programs adequately explore practicable alternatives to impacts as part of the permitting process prior to allowing for compensatory mitigation.

A commenter also contended that the State's incorporation of the watershed approach to compensatory mitigation falls short of federal requirements. The commenter pointed out that the State does not incorporate the federal provision that a watershed approach is "not appropriate in areas where watershed boundaries do not exist, such as marine areas," omits requirements on the amount of information a permittee must provide to support a watershed approach, and fails to incorporate size restrictions for the watershed to be used.

In addition, the commenter asserted the State has ignored mitigation site selection criteria, possibly resulting in inadequate compensatory mitigation. The commenter contended the State ignores federal factors that must be considered when selecting a mitigation site. The commenter specifically pointed out that the state program does not adopt the requirement for permit writers to document specific findings before permitting out-of-kind mitigation or the option for a greater than one-to-one mitigation ratio.

Some commenters stated that requirements for demonstrating financial security are not as strict as those required under the federal statute. Commenters emphasized that federal regulations require financial assurances that provide a high level of confidence that a compensatory mitigation project will be successfully completed - a standard that is not incorporated into the State program. A commenter disagreed with a State exemption for projects with a mitigation cost estimate less than $25,000, which is also not in the federal rules. In addition, the commenter objected to the State's creation of a blanket amount of 110% of the cost estimate, rather than giving permit writers the ability to determine the amount.

A commenter contended that lack of equivalency between State 404 regulations and federal mitigation requirements - with respect to financial assurances and long-term management for permittee-responsible mitigation - will create market disincentives to the detriment of the Section 404 program's environmental goals. The commenter stated that permittees will logically seek out the lowest cost option for compliance and challenge any requirements that go beyond the regulatory minimum. The commenter added that national experience and studies confirm that financial assurances and long-term management planning are essential to durable mitigation offsets that maintain ecological success and last "in perpetuity." To address the issue, the commenter recommended that Florida adopt mitigation requirements equivalent to those in the 2008 Compensatory Mitigation Rule, emphasizing that equivalency supports a robust mitigation market by ensuring that all forms of mitigation are held to the same standards. Specifically, the commenter requested that FDEP revise the State 404 regulations to add two requirements: 1) financial assurances, and 2) a long-term management plan as necessary elements for any mitigation project.

A commenter concurred with Florida's approach to leave administration of the mitigation banking and in-lieu fee programs of the Section 404 program with the Jacksonville Corps District as currently proposed. However, the commenter recommended that Florida seek best practices in active, competitive Section 404 markets. The commenter cited the following best practices: comprehensive state regulations, clear understanding between state and federal regulators on respective authorities, use of project management tools and transparent meetings, strong adherence to a mitigation hierarchy, and, critically, dedicated and disciplined staff leading the State's program.

In addition, a commenter urged FDEP to outline more specific measures and commitments to ensure proficient permitting operations and administration of the assumed Section 404 program; including funding for additional staff hiring, training, public meeting engagements, and a publicly available information/resource database.

**EPA Response:**

**The memorandum of agreement between the Corps and FDEP states that mitigation banking instruments and in-lieu fee program instruments shall be processed by the Corps in accordance with 33 C.F.R. Part 332. As a result, Florida does not include in its State 404 program definitions pertaining strictly to the processing of mitigation banking and in-lieu fee instruments.**

**Regarding demonstration of exploring alternatives before considering compensatory mitigation, EPA notes that Florida provides for alternative analysis in F.A.C. 62-331.053(1) which states, "[N]o dredge or fill activity shall be permitted if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."**

**EPA notes that Florida addresses the watershed approach in the State 404 Program Applicant's Handbook 8.5.1 Compensatory Mitigation Hierarchy stating, "the required compensatory mitigation should be located within the same watershed as the impact site, and should be located where it is most likely to successfully replace lost functions and services, taking into account such watershed scale features as aquatic habitat diversity, habitat connectivity, relationships to hydrologic sources (including the availability of water rights), trends in land use, ecological benefits, and compatibility with adjacent land uses. When compensating for impacts to marine resources, the location of the compensatory mitigation site should be chosen to replace lost functions and services within the same marine ecological system (e.g., reef complex, littoral drift cell). Compensation for impacts to aquatic resources in coastal watersheds (watersheds that include a tidal water body) should also be located in a coastal watershed where practicable."**

**EPA points to FDEP providing for consideration of other mitigation prior to permitting out-of-kind mitigation in the State 404 Program Applicant's Handbook 8.5.1 Compensatory Mitigation Hierarchy stating, "[I]f, after considering opportunities for on-site, in-kind compensatory mitigation as provided in paragraph (d), above, the Agency**

**determines that these compensatory mitigation opportunities are not practicable, are unlikely to compensate for the permitted impacts, or will be incompatible with the proposed project, and an alternative, practicable off-site and/or out-of-kind mitigation opportunity is identified that has a greater likelihood of offsetting the permitted impacts or is environmentally preferable to on-site or in-kind mitigation, the Agency shall require that this alternative compensatory mitigation be provided." EPA also notes FDEP provides for higher than one-to-one ratios in the State 404 Permit Applicant's Handbook 8.5.5 Use of Preservation for Compensatory Mitigation, stating "where preservation is used to provide compensatory mitigation, to the extent appropriate and practicable the preservation shall be done in conjunction with aquatic resource restoration, establishment, and/or enhancement activities. This requirement may be waived by the Agency where preservation has been identified as a high priority using a watershed approach described in section 8.5.2 of this Handbook, but compensation ratios shall be higher."**

**EPA acknowledges the commenters' concern that federal regulations requiring financial assurances and long-term management plans are not incorporated into the State program. However, Florida indicates in the ERP Handbook 10.3.7 Financial Responsibility for Mitigation that financial assurances must be sufficient to: (a) Conduct the mitigation activities; (b) Conduct any necessary management of the mitigation site; (c) Conduct monitoring of the mitigation; (d) Prepare and submit monitoring reports to the Agency; and (e) Conduct any necessary corrective action indicated by the monitoring. Florida also provides requirements for long-term management plans in the State 404 Program Applicant's Handbook 8.5.6.3 stating:**

> **(a) The real estate instrument, management plan, or other long-term protection mechanism must contain a provision requiring 60-day advance notification to the Agency before any action is taken to void or modify the instrument, management plan, or long-term protection mechanism, including transfer of title to, or establishment of any other legal claims over, the compensatory mitigation site;**
>
> **(b) The permit conditions shall identify the party responsible for ownership and all long-term management of the compensatory mitigation project. The permit conditions shall, where applicable, contain provisions allowing the permittee to transfer the long-term management responsibilities of the compensatory mitigation project site to a land stewardship entity, such as a public agency, non-governmental organization, or private land manager, after review and approval by the Agency. The land stewardship entity need not be identified in the original permit, as long as the future transfer of long-term management responsibility is approved by the Agency;**
>
> **(c) A long-term management plan shall include a description of long-term management needs, annual cost estimates for these needs, and identify the funding mechanism that will be used to meet those needs;**
>
> **(d) Any provisions necessary for long-term financing shall be addressed in the original permit. The Agency shall require provisions to address inflationary**

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**adjustments and other contingencies, as appropriate. Appropriate long-term financing mechanisms include non-wasting endowments, trusts, contractual arrangements with future responsible parties, and other appropriate financial instruments. In cases where the long-term management entity is a public authority or government agency, that entity shall provide a plan for the long-term financing of the site; and**

**(e) Any long-term financing mechanisms shall be approved by the Agency in advance of the authorized impacts.**

**EPA acknowledges commenter concerns about the availability of funding for additional staff hiring, training, public meeting engagements, and a publicly available information/resource database. CWA Section 404(h) requires that the Administrator determine whether a state has the authority to "issue permits" that assure compliance with applicable requirements of the CWA, to ensure public participation in the permitting process, to abate permit violations, and to coordinate with other states, EPA, or other federal agencies as appropriate. EPA's implementing regulations, in turn, require the state's program description to include "[a] description of the funding and manpower which will be available for program administration," along with an estimate of the anticipated workload, e.g., number of discharges. 40 C.F.R. § 233.11(d). Florida's Program Description, Section (d), meets this requirement by providing a description of the funding and manpower that FDEP will dedicate to the program.**

**Neither the CWA nor the implementing regulations establish a particular threshold of staff or resources that states must commit to the Section 404 program. EPA views FDEP's commitment of resources and staffing sufficient to address anticipated workload. See also Response to Comments Section H regarding funding and staffing.**

### *Differences between the State and federal program re: consistency of reviews*

A commenter identified differences between the State and federal programs regarding mitigation, assessment of the impacts and associated mitigation, and mitigation banks. The commenter asserted that the Uniform Mitigation Assessment Method (F.A.C. Rule 62-345) was developed in close coordination with Corps staff, but the rule has not been adopted by the Corps. The commenter stated that it is not clear how different key aspects of project review and assessment will be addressed under the Florida assumption. The commenter noted that differences between the State and federal program, such as wetland delineation, wetland classifications (which are the basis of ecological assessment), mitigation prioritization, and time lag determination for wetland mitigation, will not result in more cohesive reviews or similar authorization. The commenter recommended that Florida's assumption of the CWA Section 404 program not be approved.

**EPA Response:**

**EPA acknowledges the commenter's concern that the Uniform Mitigation Assessment Method used by FDEP and developed in close coordination with Corps staff has not been adopted by the Corps. However, under 40 C.F.R. § 230.93(f) the amount of compensatory**

42

**mitigation does not require a specific functional or condition assessment method, instead stating, "[I]f the district engineer determines that compensatory mitigation is necessary to offset unavoidable impacts to aquatic resources, the amount of required compensatory mitigation must be, to the extent practicable, sufficient to replace lost aquatic resource functions. In cases where appropriate functional or condition assessment methods or other suitable metrics are available, these methods should be used where practicable to determine how much compensatory mitigation is required. If a functional or condition assessment or other suitable metric is not used, a minimum one-to-one acreage or linear foot compensation ratio must be used." FDEP will meet the standard outlined under 40 C.F.R. § 230.93(f) in the implementation of the program.**

### *Compensatory mitigation in Florida under current programs*

One commenter asserted that many mitigation banks in Florida have been incorrectly handled and as a result, there is much destruction of wetlands around developed areas. Another commenter proclaimed that mitigation in Florida has not worked well and that the State continues to see a significant loss of wetlands. The commenter continued by stating that turning the permitting program over to FDEP will only increase this loss because FDEP does not have the resources to evaluate these permits.

A commenter contended that FDEP often permits applicants to lead with mitigation plans rather than demonstrate avoidance and minimization from the beginning. The commenter stated this practice is completely contrary to the first two steps in the mitigation sequence of federal dredged and fill permitting - avoidance and minimization. The commenter asserted that any de-emphasis of avoidance and minimization as the highest priority will not provide adequate protection of Florida's wetlands.

A commenter stated that there is a difference between the State and the Corps of Engineers' implementation of the two different wetland programs, noting that the Corps regulatory process is much more stringent and drives a much harder bargain and focuses much more on reducing wetland impacts of projects, minimization, avoidance. However, the commenter argued that the State program—the ERP, is very good regarding private mitigation, resulting in very little minimization or avoidance. The commenter claimed that developers with resources can essentially buy their permit.

**EPA Response:**

**Mitigation banking instruments and in-lieu fee program instruments will continue to be processed by the Corps in accordance with 33 C.F.R. Part 332. FDEP would continue to be a part of the Interagency Review Team [62-331.140(3)] which reviews mitigation banks, as well as the memorandum of agreement between the Corps and FDEP which allows FDEP to co-chair any applicable interagency coordination effort. EPA acknowledges commenters' concerns that avoidance and minimization be considered prior to compensatory mitigation. 62-331.130 F.A.C. specifies that "[C]ompensatory mitigation shall be considered only after the requirements of Rule 62-331.053(1), F.A.C., have been met." Rule 62-331.053(1) F.A.C. states, "[N]o dredge or fill activity shall be permitted if**

**there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." EPA therefore concludes that Florida's approach to compensatory mitigation banking requirements is consistent with and no less stringent than the requirements of the CWA and its implementing regulations.**

## H.  Funding and staffing of Florida's 404 program

Some commenters who supported Florida's assumption of a Section 404 program contended that Florida will provide the adequate resources, FDEP has the necessary experience, and FDEP staff have the expertise for processing wetlands permits more efficiently than the Corps while maintaining the same level of environmental protection for wetlands. Some commenters specifically noted FDEP's staff of over 200 wetland scientists and professionals, FDEP's knowledge of state aquatic resources, and the proven success of FDEP's own wetland permitting program. One commenter stated that FDEP is staffed with experts in Florida's unique environmental features, while the Corps does not have such a broad array of subject matter experts. One commenter also stated that FDEP and its counterpart at the Fish and Wildlife Conservation Commission (FWC)  have extensive knowledge and understanding of Florida's endangered and threatened species and their habitats, they care specifically about Florida's natural resources, and their multiple offices around the state will ensure that resource specific issues are addressed, adding localized protections. A commenter further stated that FDEP's ability to assume the Section 404 program is supported by Florida's handling of other federally delegated programs, such as the CWA Section 402 permit program, as well as its existing state dredge and fill regulatory program, which is expected to overlap with the requirements under Section 404 by approximately 85%.

Many commenters opposed Florida's assumption of a Section 404 program expressing concern that FDEP lacks adequate resources, is underfunded, understaffed, and/or inexperienced, and is therefore unable to effectively manage the additional responsibility of a Section 404 program. One commenter suggested that Florida should instead work with the Corps to expand the scope of its state programmatic general permit program. Commenters opposing Florida's assumption stated that undertaking the additional responsibility of the assumption is not feasible for the state of Florida at this time, arguing that the state does not have the capacity to handle the additional workload. Some commenters argued that adequate evidence has not been provided to demonstrate that FDEP has the resources to handle the additional workload that will be required to run a Section 404 program. Other commenters concurred and specified further that Florida's application does not demonstrate adequate staffing, despite Florida's statement that its staff is sufficient and will not require additional resources or funding. Many commenters contended that Florida's assumption would add more regulatory burden to FDEP, and that the application does not explain how additional work under an assumed program would be funded. A commenter further added that FDEP has limited experience in this field and questionable ability to assume the volume of requests under the Section 404 program.

One commenter opposed to Florida's assumption stated that the permitting of such resources should never be given to a single agency, as no one agency has the necessary resources or manpower.

One commenter expressed that relying on the state's existing Environmental Resource Permitting (ERP) program, water management district staff, FWC staff, and State Historic Preservation Office (SHPO) staff is not a viable approach to a Section 404 program. The commenter added that FDEP's proposed approach depends heavily on other agencies without justifying that those agencies have the resources to implement the program. Another commenter also noted that Florida did not address the availability of funding and staff from FWC and the SHPO, which it plans to rely on for protection of species and cultural resources. A commenter maintained that staff at both of the agencies have expressed concern with the plan and their ability to administer the program. A commenter also noted that the application does not discuss FWC's financial commitments and workloads, despite the memorandum of agreement stating that FDEP will be relying on FWC to help with implementation. Another commenter stated that a successful program would require significant additional resources within FDEP and likely FWC as well and that Florida has not indicated intent to collect fees for the program and has not considered increasing the budget for either agency. A commenter asked if there are comprehensive workload estimates for water management districts, FDEP, FWC; whether there is a roadmap for where and when actions will occur; whether there is a way for the public to communicate with personnel informally; and whether there is a funded training program for all participants.

One commenter expressed concern that wetland systems will become fragmented by linear projects under FDEP's management. Some commenters stated that due to the value of the water resources and wetlands to the citizens of Florida, any delegation to FDEP must contain assurances that existing levels of protection will be preserved and that sufficient resources are available for FDEP. Some commenters stated that Florida's environment generates billions of dollars for the economy, and its water resources deserve the highest level of protection, which FDEP is not well-equipped to provide.

Some commenters contended that FDEP is already overwhelmed with the ERP program and the state wetland permitting program, and maintained that it is unclear how FDEP will staff the Section 404 program or train existing staff for the additional regulatory and financial burden when they are already overworked. Other commenters added that Florida's promise to hire additional low-paid staff for the Section 404 program will not hold true and that FDEP will continue to be a stepping-stone for higher paying agencies and private enterprise. Some commenters argued that Florida does not anticipate additional financial resources will be needed, but reviewers would need to be trained on the CWA and would be responsible for reviewing permits with different regulations than exist under the state wetland regulatory program.

A commenter contended that there has not been an independent assessment that the proposed staffing is reasonable or plausible and that there is no requirement for the state to maintain sufficient staffing moving forward. A commenter argued that FDEP's staffing estimates are unreasonably low and have not been supported with the data needed to evaluate them. A

commenter argued that the application does not provide a detailed economic analysis on the burdens for FDEP and taxpayers. The commenter continued that the provided analysis appears inadequate and underestimates the time and funding needed to complete a permit application, adding that FDEP did not address how it would handle the added workload, particularly in light of layoffs that were never filled and recent budget shortages.

Some commenters contended that previous decreases in staffing, including a cut of 600 positions (many of them scientists and wetland experts) under the administration of former Governor Scott, has left FDEP unprepared to take on additional duties. A commenter opposed Florida's assumption because they asserted FDEP staff has been shrinking over the past decade. Some commenters stated that budgetary resources devoted to environmental protection have been significantly cut, resulting in vacant job positions that have remained vacant. A commenter provided a table posted to the web showing a decrease of 450 staff in the past nine years. Some commenters noted that Florida's transparency website has indicated a high vacancy rate (279 vacancies when they prepared their comments) for FDEP for several years, which has led the commenter to believe that FDEP does not intend to fill those positions and will continue to face a lack of resources. One commenter noted inconsistencies in the number of staffers that FDEP claims to have and inquired about the actual number of FDEP staff.

A commenter further discussed the lack of skills among FDEP staff to delineate wetlands, the shortcomings of FDEP's implementation of the ERP program, and the extensive concerns expressed during EPA's public hearings over FDEP's failure to administer many of its programs. A commenter added that, due to these staffing cuts, staff members have said that they do not have the staff, time, or budget to perform proper analysis and research for permitting. Many commenters asserted that the state of Florida does not have the capacity to handle the additional permit processing workload and that delegation of these responsibilities would result in less protection of Florida's wetlands and reduced water quality. Another commenter stated that because staffing of the FDEP has been cut while increasing permit review workload over the past years, it is unrealistic to expect this program assumption to be handled properly without a substantial increase in appropriately trained and experienced staff resources, yet FDEP intends to carry out the program with existing resources. The commenter stated that the presented analyses likely do not reflect the reality of current and expected workloads, and that existing staff and the natural resources of Florida deserve better. A commenter noted that fines have decreased over the past decade from an average of about $12 million a year to less than $4 million, stating this decrease in fines is evidence of FDEP's decline in enforcement and that the lesser fines do not seem to be a result of increased compliance with regulations.

Some commenters opposed Florida's assumption of a CWA Section 404 program, asserting that Florida is operating under a flawed premise that there is substantial overlap between state and federal wetland regulations that would result in more efficient and consistent regulatory decisions. One commenter stated that FDEP's claim that it can operate the program without any additional funding is flawed, indicating that FDEP either believes wrongly that Section 404 is duplicative of state regulations, that it plans to treat its pre-existing regulations and Section 404 as one and the same, or that FDEP will not adequately implement, operate, or enforce the program. A commenter contended that FDEP has not substantiated how they arrived at their

figure of 85% overlap with the existing ERP Program. A commenter further stated that the state and federal programs are distinctive, not duplicative, and that FDEP staff would need to be trained on implementing the new guidelines and coordinating endangered species cases that they are not familiar with.

Some commenters expressed concern that the State of Florida does not have the means to administer a Section 404 program without federal assistance. A commenter opposed Florida's assumption of a Section 404 program because they asserted that FDEP is not well-qualified to administer the program and the commenter instead prefers the EPA administer the program. Commenters contended that the current, federally run Section 404 program has professional staff at the Corps ensuring that comments on every relevant issue are investigated by appropriate agencies. A commenter also noted that the Corps is currently responsible for directing functions related to wetland permitting to appropriate state agencies and warned that this would end if the state assumes control. A commenter argued that FDEP is depleted, unqualified, and not equipped to conduct proper Environmental Impact Statements for wetlands and to adequately protect them from development. As a result, the commenter requested that the Corps maintain authority.

Some commenters maintained that EPA, the Corps, and various other federal agencies such as the USFWS and the NMFS have the qualified staff and sufficient resources to properly manage the Section 404 program. Similarly, another commenter stated that the federal agencies are better equipped, are more thorough and impartial, and have the funding needed to oversee the program. One commenter stated that FDEP's Section 404 program would require more resources to match the work of the Corps and that this is beyond the capability of FDEP, as demonstrated by its pattern of decrease in resources. Another commenter noted that the Jacksonville District of the Corps delivered more than 11,000 actions in 2016, and even if FDEP were able to streamline the process, it would involve a significant investment of staff and training. According to the same commenter, the Jacksonville District of the Corps had a budget of $16 million in 2015, and FDEP would need to find comparable funds. Two commenters noted that this need for funds was one reason Florida chose not to assume the program in 2006, in addition to the fact that FDEP did not have enough staff. A commenter also argued that assumption of Section 404 authority is not in the public interest because it will create a multi-million-dollar taxpayer burden. The commenter noted that FDEP would need resources to generate comparable analyses to the EA and EIS reports currently produced by federal agencies. The commenter maintained that it was unlikely that the state could replace the value and level of protection offered by the current federal program without any additional resources.

Some commenters expressed concerns about how Section 404 program assumption would affect coordination with and resources of water management districts. One commenter asked how FDEP's enforcement responsibilities and permitting with the water management districts would be organized under memoranda of agreement. The commenter further noted that the South Florida Water Management District handles most of the larger wetland permits and enforcement under the ERP program, pursuant to an operating agreement with FDEP, and asked if most of this responsibility would go to the water management districts and whether they have the necessary resources.

Some commenters contended that the State of Florida does not have the staff capability to assume the 404 wetland permitting responsibilities and that program assumption would shift resources away from existing regulatory programs that further protect Florida's natural resources. A commenter expressed concern that the Section 404 program would create both an additional regulatory burden and a financial burden because FDEP would have to divert money from other responsibilities. Another commenter expressed concern with what will happen to other programs if FDEP moves staff to support the Section 404 program as they say they will. Some commenters claimed that Florida has not leveraged existing resources to support existing State programs that protect and improve wetlands and other waters, and these commenters asserted that the State has failed to show how it could effectively protect resources by administering the Section 404 program.

Some commenters asserted that FDEP is already failing in its responsibilities to protect waters via existing programs, which would be compounded with the additional burden of managing a Section 404 permitting program. Many of these same commenters also stressed that there is no commitment for additional federal funding to support the assumption and that resources may be diverted from critical FDEP duties to support an assumed program. A commenter opposed Florida's assumption because it would require significant additional resources within FDEP and likely FWC as well. The commenter expressed concern that section 62-331.120, Florida Administrative Code, states that no fees will be collected for the Section 404 program, and yet the state is not increasing the budget of either agency to accommodate new responsibilities. The commenter asserted that the State's suggestion of redirecting the existing workforce is not sufficient, especially since FDEP needs resources in its other efforts such as improving water quality sampling and assessment activities and the completion of TMDL reports and BMAPs. One commenter noted that FDEP is already unable to meet its current obligations, as evidenced by impaired waters across the state and the recurring toxic algae crisis. Some commenters stated that there are sites across the State that have not had consistent water quality testing in years. A commenter was concerned that Florida has already lost over half of its wetlands, with negative effects on water quality, fish nurseries, wildlife habitat, and flood control. A commenter added that the impaired waterbodies in Florida are extensive, citing the FDEP website, and stated that they have been impaired for many years.

Some commenters stated that Florida's assumption would add even more regulatory burden to FDEP, which is already under-resourced. These commenters reference the TMDLs and BMAPs for impaired waterbodies across the state for which FDEP already lacks progress, the BMPs for stormwater and agriculture that do not meet their intended pollution reduction goals, and the sites across the state that have not had consistent water quality testing in years. Some commenters suggested that Florida should demonstrate that it has the capacity to make a significant positive impact on current issues of stormwater and agricultural runoff before trying to assume new environmental regulations.

A commenter asserted that FDEP has failed at implementing NPDES standards in South Florida and has already had the responsibility of the Water Compliance Enforcement Program and that there has been increased wetland degradation in the areas they are managing. Some commenters noted that FDEP is already behind on TMDL development and on enforcement actions related to

the NPDES permit program. Nonprofit Waterkeeper organizations across the State have initiated an independent NPDES permit program to help bridge the gap, which the commenters stated should not be tasked to a nonprofit.

Commenters further noted that Governor DeSantis recently gave FDEP oversight of the entire State's 2,700,000 septic systems, a huge project for an underfunded agency. Another commenter pointed out that the State is already challenged with providing enough clean water for drinking and other personal use, springs that are at dangerously low levels, salt water intrusion into the Floridan Aquifer, and a growing population, and stated that it would be a mistake to allow FDEP to assume more permitting. A commenter added that FDEP has failed to protect or restore wetlands and water since Florida Forever funding was drastically reduced.

Some commenters opposed Florida's assumption of a Section 404 program because they asserted FDEP was "gutted" by the administration of former Governor Scott and does not have the resources to take on the additional Section 404 permitting. A commenter contended that under the Scott administration, the State's water management districts had to reduce their budgets by $700 million and that appointed boards were packed with people whose interests were in granting permits, not preservation of resources. One commenter was concerned that FDEP is now reduced in capacity and overwhelmed with permitting applications, so would be unable to take on the Section 404 program.

Some commenters said that FDEP has had severe budget cuts over several years and one commenter asserted that the State legislature, which controls the budget, really does not care about wetlands. Several commenters were concerned about the increased costs to State government due to the funding need to implement the Section 404 program. Commenters observed that governors have eliminated budgets for buying land to keep it natural and preserve ecosystems.

Some commenters opposed Florida's assumption of a Section 404 program because they expect that the ongoing COVID-19 pandemic will further limit FDEP's resources. One commenter specifically opposed Florida's assumption because they maintained that the State of Florida cannot manage its own unemployment program or the COVID pandemic. Another commenter declared that the state was already providing insufficient resources prior to the pandemic, with an estimated $2.7 billion shortfall that has only worsened, and this could impact FDEP and FWC's ability to take on the program. One commenter noted that, even during the pandemic, real estate demands for additional land have continued to grow especially near water and that once waters are destroyed, they are nearly impossible to restore. Two commenters noted that tax revenues are plummeting as a result of COVID-19. Another commenter noted that Florida's revenue losses over the next two years due to the COVID-19 pandemic are projected to be $5.4 billion and the Governor has directed all State agencies to cut their current budgets by 8.5 percent. These commenters stated that the extra financial strain of assuming Section 404 permitting would have a significantly negative impact on FDEP and would put ecosystems in further risk of exploitation. One commenter opposed Florida's assumption because the COVID-19 pandemic has suddenly increased recreational use of natural resources and it is not yet known what impact this will continue to have.

Some commenters expressed concern that FDEP's assumption of a Section 404 program would increase destruction of Florida's wetlands due to development. A commenter stated that FDEP is in disarray under Governor DeSantis and the commenter expressed concern that developers would be able to push through any projects they would like, resulting in negative environmental consequences. A commenter stated that Florida's assumption of a Section 404 program would make it much easier for developers to obtain permits and would result in loss of wetlands, which the commenter asserted are crucial to the health of Florida's fragile waterways and wildlife. A commenter opposed Florida's assumption because they believe State agencies may not have the power, resources, or will to resist developers with financial interests. A commenter contended that FDEP is not equipped for the additional responsibility and noted that Florida is losing wetlands at a rate of more than 8,500 acres per year. One commenter also noted that some communities depend on aquifers for potable water and those aquifers are recharged by wetlands that are being filled by developers.

Many commenters stated that giving regulatory control to an overburdened department will result in yielding to political pressure from developers with financial motives and disregard for conservation. Some commenters opposed Florida's assumption of a Section 404 program because FDEP does not have sufficient staffing and the agency is tied too closely to commercial interests to ensure that wetlands are protected and prioritized above rapid development. One commenter stated that this attempt by FDEP to assume authority was at the request of developers and that this does not sit well with the citizens of Florida. Another commenter also stated that many of the appointments to Florida's water management boards were made based on politics rather than experience or expertise in environmental management. The commenter further stated that FDEP cannot properly handle the program while it remains understaffed and operates under the direction of politically appointed senior staff.

A commenter contended that FDEP would likely overlook the needs of the environment in favor of development, noting that FDEP has cut funding from the Florida Forever program and from state land management. One commenter noted that FDEP looked into assuming a Section 404 program in 2006 but dropped the idea because builders were requesting so many permits that taking over the workload would overwhelm the agency. A commenter stated that population growth has not slowed in Florida, yet growth management initiatives have been repealed and the FDEP and water management districts have cut many scientific positions. A commenter stated that budgeting compromises will have to be made in funding education and the health system, and that the continuation of rampant development is unsustainable. Along a similar vein, commenters expressed concern that the decreased staff of FDEP has resulted in rapid approval of permits. One commenter further noted that this is especially important now, as the State's lawmakers enact legislation not supported by the majority, and State funds dwindle due to the economic downturn. A commenter added that although the staff works hard, they should not be asked to take on more work without more funding and protections from political retaliation.

One commenter stated that FDEP struggles to protect wetlands now and will be unable to protect the additional wetlands under the Section 404 program, noting a 60% loss of Florida's wetlands to date and a loss of more than 144,000 non-federal acres of rural lands between 2012 and 2017. A commenter opposed Florida's assumption stated that Florida's ERP program has been largely

ineffective in protecting wetlands. A commenter recommended that FDEP focus its resources on implementing the priorities in the Governor's Executive Order 19-12 (restoration and protection of wetlands and watersheds) and improving wetland protection outcomes in its ERP program before assuming another wetland regulatory program. The commenter stated that the state needs to improve current wetland programs before assuming new ones, and that the required objective of "no net loss of wetlands" for both federal and state programs has not been met, citing data from Audubon, NOAA, National Academy of Sciences, and USFWS analyses. The commenter stated that wetland losses have compromised Florida's water quality, flood protection, dry season wildfire resilience, water supply, and economic and environmental health.

Some commenters asserted that the two states that have assumed Section 404 permitting authority—Michigan and New Jersey—have had major issues with their 404 programs, and they were concerned that FDEP would also experience program challenges. One commenter added that Michigan and New Jersey have spent millions of dollars on their programs, and the commenter stated that Florida has considerably more wetlands and higher biodiversity than those states. A commenter stated that FDEP's plan to assume the program without any additional resources is unrealistic given other states have spent millions of dollars to undertake the program and provided a list of costs associated with the program that FDEP has failed to address. Similarly, a commenter asked how Florida would ensure protection of wetlands and ecosystems of the state, and the commenter recommended that Florida not assume the program because the state has so much water to regulate, which they asserted would lead to a very expensive program.

Some commenters indicated that attempts to assume the program in other states have proven too costly, time-consuming, and problematic, even having led to legal disputes. Two commenters noted that other states chose not to assume the program given the burden it would impose on taxpayers, pointing out that no state with coastlines, wetlands, and biodiversity as extensive as Florida's has assumed the program. One commenter pointed out that assuming the responsibilities of wetland permitting is very costly and the current system in which state of Florida has a shared rather than sole responsibility is a more efficient use of the Florida's limited resources of staff and funding.

**EPA Response:**

**EPA acknowledges the comments that support Florida's assumption of a Section 404 program based on FDEP's resource commitments, staff commitments, staff expertise, and demonstrated ability to administer statewide CWA and dredge and fill regulatory programs. EPA agrees that FDEP has met the statutory and regulatory requirements necessary to demonstrate their ability to assume the Section 404 program.**

**EPA acknowledges commenter concerns about the availability of staff, resources, and expertise to appropriately administer the State's Section 404 permitting program, including specific commenter concerns about previous FDEP staff cuts and department vacancies. EPA also acknowledges commenters who requested specific additional pieces of information, such as comprehensive workload estimates for water management districts, a roadmap for where and when actions will occur, and whether there is a funded training**

**program for all participants. EPA also acknowledges some commenters requested FDEP make additional commitments regarding resources.**

**CWA Section 404(h) requires that the Administrator determine whether a state has the authority to "issue permits" that assure compliance with applicable requirements of the CWA, to ensure public participation in the permitting process, to abate permit violations, and to coordinate with other states, EPA, or other federal agencies as appropriate. EPA's implementing regulations, in turn, require the state's program description to include "[a] description of the funding and manpower which will be available for program administration," along with an estimate of the anticipated workload, e.g., number of discharges. 40 C.F.R. § 233.11(d). EPA has determined that Florida's program description, section (d), meets this requirement by providing a description of the funding and manpower that FDEP will dedicate to the program.**

**Importantly, neither the CWA nor the implementing regulations establish a particular threshold of staff or resources that states must commit to the Section 404 program. EPA has found FDEP's commitment of resources and staffing sufficient to address anticipated workload associated with a Section 404 program. Florida estimated the anticipated workload by considering Corps permitting data for the previous five years and overlap with ERP permitting, in part using a Corps GIS analysis to compare retained versus assumed waters. Based on this analysis, FDEP found an 85% overlap between ERP and Section 404 program review requirements (Program Description, section e, at 9). Additionally, FDEP would only assume a portion of the Corps permitting load because the Corps retains jurisdiction over most Section 10 Rivers and Harbors Act waters and permitting in Indian country, and because the State already reviews permits per the State Programmatic General Permit issued by the Corps. The State then estimated processing time for permits based on their type (e.g., general permits versus individual permits; small, medium, or large projects; permitting or compliance activities), accounted for quality control auditing, determined staff hours required for such activities, and calculated staffing needs.**

**EPA agrees that the State currently operates a wetlands regulatory program as part of the ERP, which includes functional roles and staff with technical areas of expertise overlapping those of a CWA Section 404 program. "The ERP program is staffed with permit processors, compliance processors, and support professionals that are experts in or familiar with the subject matter required for effective review of applications under Section 404 of the Clean Water Act." (Program Description, section d, at 2). Florida has described their intention to redirect the current staff of 211 employees working in the state's ERP program to cover both ERP and the State 404 program, with an additional 18 positions reallocated for the state 404 program for a total of 229 positions (Program Description, section d, at 3). Annual salary and benefits would come to approximately $15,182,822, funded through various trust funds listed in the program description (Program Description, section d, at 2). Florida has provided a detailed breakdown of the ample permitting and compliance staff and managers that will be working in each of its districts. In total, the Districts will have 8 compliance managers and 7 compliance/permitting**

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**managers; and 33 compliance staff and 32 permitting/compliance staff (Program Description, section d, at 6-9).**

**Based on the information provided by FDEP, EPA finds that FDEP has provided the information necessary to demonstrate the agency has committed sufficient resources and staffing to address anticipated workload.**

**In response to commenters requesting additional information about the role of water management districts (WMDs) in Florida's Section 404 program, EPA notes that WMDs are not authorized to administer the Section 404 permitting program under Florida's current program structure. WMDs may administer components of the ERP program under state law, and as such, FDEP may coordinate with the WMDs when administering the Section 404 program. In Florida's Program Description Section (e) (p. 9), FDEP notes that, "[A]dditional coordination between DEP and WMDs and commenting agency coordination will add time to the process, so it is estimated that a State 404 Program authorization, on average, will add 50% to the staff time required to process a similarly-sized ERP (15% non-overlapping requirements, 35% WMD and commenting agency coordination)." EPA finds that FDEP appropriately accounted for workload in terms of coordinating with WMDs and other commenting agencies in the Section 404 permitting process.**

**EPA acknowledges commenters who noted that Florida's Section 404 permitting program may be expensive, given the many aquatic features in the state of Florida. EPA also acknowledges commenters who mentioned the costs to states who have assumed administration of a Section 404 program (i.e., New Jersey and Michigan), and the estimated costs to states who have considered assuming administration of a Section 404 program. Although states seeking to assume a Section 404 program must describe the funding available to administer the Section 404 program, as explained above, there is not a threshold cost that must be demonstrated for a state's program among the criteria in 40 C.F.R. Part 233 that EPA will apply in approving state programs under Section 404 of the Act. EPA determined that FDEP described the funding available to administer a Section 404 program and satisfied the associated regulatory criteria in doing so.**

**EPA recognizes that commenters may prefer federal administration of the CWA Section 404 program for a variety of stated reasons or may feel that permitting of wetland resources should never be managed by only one agency. However, Section 404(g)(1) of the CWA provides states and tribes the option of submitting to EPA a request to assume administration of a CWA Section 404 program in certain waters within state or tribal jurisdiction. EPA disagrees that Florida's program will lead to the degradation of wetlands and other waters due to the lack of staff, resources, or expertise, or for any other reason. EPA also disagrees that Florida's Section 404 program will be less environmentally protective than a program that is administered by the Corps. An assumed program is to be consistent with and no less stringent than the requirements of the CWA and its implementing regulations. EPA has reviewed Florida's permit review criteria and has determined that the state's program will result in the issuance of permits that comply with**

53

**the CWA Section 404(b)(1) Guidelines. (33 U.S.C 1344(h)(1)(A); 40 C.F.R. § 233.20(a)). In response to a commenter noting that FDEP would need to dedicate resources to produce EA or EIS reports, EPA notes that state Section 404 permitting actions are not federal actions and are therefore not subject to NEPA review.**

**EPA recognizes commenter concerns about the lack of resources dedicated to other state programs, including CWA programs such as the NPDES and TMDL programs. EPA also acknowledges commenter opinions about FDEP's current implementation of State programs and where the State of Florida should prioritize environmental protection resources, including commenter concerns that the state should focus their attention on existing programs rather than assuming a Section 404 program. The resources of other state programs are not one of the statutory or regulatory criteria that EPA is required to apply in reviewing state or tribal program requests. 33 U.S.C. 1344; 40 C.F.R. Part 233. Although these are not criteria included in the evaluation of a state's ability to assume the CWA Section 404 program, stakeholders can raise any concerns they may have with Florida's implementation of the NPDES, TMDL, or other programs in the context of EPA's oversight of Florida's administration of these programs. In addition, EPA retains an oversight role in the administration of the Section 404 program. See 33 U.S.C. § 1344(i), (j); 40 C.F.R. part 233, Subpart F.**

**EPA recognizes commenter concerns about the potential for political influences on environmental resource decisions, including Section 404 permitting decisions in an assumed program. However, EPA disagrees with commenters who asserted that Florida would be unable to protect wetlands and other waters in a State-assumed 404 program, or that political influences will result in a disregard for conservation or protection of wetland resources. EPA also disagrees that wetlands would be more susceptible to development in a State-assumed 404 program. An assumed program must be consistent with and no less stringent than the requirements of the CWA and its implementing regulations. EPA has reviewed Florida's permit review criteria and has determined that the State's program will result in the issuance of permits that comply with the Section 404(b)(1) Guidelines. (33 U.S.C. 1344(h)(1)(A); 40 C.F.R. § 233.20(a)). Please see also Response to Comments Section L regarding EPA's oversight of State permitting.**

**EPA acknowledges commenters who reference FDEP's inquiry into assuming the Section 404 program in 2006. Additionally, EPA acknowledges commenters who referenced other states who have chosen not to assume a Section 404 program, or legal disputes that have arisen in other attempts to assume a Section 404 program. Neither FDEP's 2006 consideration or other states' rational for choosing not to apply to assume the Section 404 program are under review in determining whether FDEP has satisfied the necessary statutory and regulatory criteria in this application.**

**Finally, EPA acknowledges commenter concerns about staffing and resources given the COVID pandemic. However, EPA has found that Florida has committed sufficient resources to administer a Section 404 program.**

## I.   Streamlining of permitting

### *Support for streamlining*

Some commenters provided general support for streamlining the state and federal permitting processes, as they asserted that it would make permitting more efficient and expedite permit review for a range of private and public projects and still protect the environment. Several commenters asserted that streamlining of the permit process will make it more efficient by reducing the current unnecessary duplication of effort, time, and expense, given that the substantive requirements of the State's Environmental Resource Permit (ERP) program and the Section 404 program overlap by approximately 85%. Two commenters said that the single State permit would be able to satisfy both federal and state requirements and provide permit applicants greater certainty, prevent conflicts, and avoid unnecessary delays and expenses that result from the current dual-permit program.

Some commenters stated that Florida ERPs are often received prior to their federal counterparts because of unnecessary federal delays, and that despite the time difference, the permits are often indistinguishable. A commenter provided the example of six general conditions that are required to be included in every individual Section 404 permit, while 18 general conditions must be included in individual ERPs (citing 33 C.F.R. Part 325, Appendix A; cf Rule 62-330.350, F.A.C.). Furthermore, some commenters said that federal review often introduces new issues of concern in the final hours, further delaying the process and increasing cost. The same commenters claimed that the unnecessary delays are costly, and that such delays increase the cost of Florida housing, preventing families from buying a home. These commenters contended that by allowing Florida to assume Section 404 permitting, families seeking home ownership will be relieved from at least one price pressure point. Several commenters also claimed that the delays and increased costs do not add any meaningful environmental protection. These commenters claimed that Florida is prepared to launch a program that protects Florida's wetlands while avoiding costly delays.

A commenter supported Florida's assumption because they asserted it would eliminate the need for an additional layer of bureaucracy and permitting costs. The commenter also noted that state control would likely reduce the review timeframes significantly, benefitting Florida businesses and agricultural entities.

Some commenters highlighted issues with the federal process that streamlining would address. One commenter stated that at the federal level, high staff turnover, workloads, inefficient and untimely review processes, and open-ended timeframes for legal challenges lead to frequent and significant delays in the processing of Section 404 permit applications. The commenter provided the example, which they say is not uncommon, of the Corps assigning new reviewers mid-project because of staffing changes, which leads to delays.

One commenter urged EPA to continue to remove obstacles to Section 404 state assumption and work with other states to make the CWA more efficient for permittees and effective in environmental protection. A commenter noted that approval of Florida's application would also demonstrate a workable pathway for states interested in administering their own Section 404

programs while also providing valuable flexibility for EPA and individual states to develop programs that match state-specific needs.

Some comments focused on the positive impact of faster permit issuance on restoration efforts in the Everglades. These commenters expect that the Everglades restoration efforts will benefit from expedited permit delivery timelines, allowing state and federal agencies to move forward with construction of key infrastructure more quickly than they are able to do today. A commenter noted that expedited construction of the Central Everglades Planning Project, the Everglades Agricultural Area Reservoir, and other projects around Lake Okeechobee are essential to improving the health of the Everglades ecosystem and enhancing the resilience of the communities that live, work, and recreate there as well. This commenter noted that while important restoration progress has been made in recent years, the overall program has been plagued by design, permitting, and construction delays under the Corps. The same commenter further stated that on several occasions, the state of Florida and the South Florida Water Management District have had to assume responsibility for certain project elements from the Corps to expedite project delivery at lower cost. The commenter concluded that with so much at stake, unwarranted delays in permitting for ecosystem restoration projects are no longer acceptable, and they believe that the FDEP would accomplish the task of permitting these critical projects in a significantly more timely and responsive manner than the Corps.

Some commenters noted the expertise of the FDEP that they asserted would support streamlining and result in environmental protection. A commenter also noted that FDEP reviewers are accustomed to following strict timeclocks for processing ERPs and requesting additional information necessary to render a final permitting decision (citing § 373.4141, Fla. Stat., and Rule 62-4.055, F.A.C.). This commenter asserted that lengthy delays in state application reviews are uncommon, as the Florida permitting process is designed to winnow issues until all questions are resolved and a permit is either issued or denied. Id. Some commenters contrasted this with the Section 404 permitting process which they asserted provides no meaningful time constraints for agency decisions.

Some commenters pointed out that unlike the Section 404 program, the State ERP program regulates not only activities in connected wetlands and surface waters, but also most alterations of land that change the flow of water, even if the activity is in uplands (citing §§ 373.413, 373.414, Fla. Stat.). Some commenters stated that the State's proposed program will boost the protection of Florida's wetlands and water resources by having the same statewide team of experts who already administer the state-level ERP program also administer the substantially similar federal Section 404 program.

Some commenters pointed out that Floridians care deeply about their environment and unique natural resources, and can deliver the benefits of streamlining while sustaining protections for wetlands and endangered species that are no less rigorous than today under federal 404 program administration. These commenters pointed to the FDEP as best positioned to utilize local knowledge, scientific expertise, and robust stakeholder engagement to assess the potential impacts of permitted activities, delineate protective conditions for permitted activities, and set suitable compensatory mitigation requirements. They also asserted that the FDEP would

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

accomplish the task of permitting these critical projects in a significantly more timely and responsive manner than the Corps.

**EPA Response:**

**EPA acknowledges the commenters who pointed out the multiple potential benefits of having a streamlined state and federal permit program, including reduced delays, increased efficiencies, and reduced costs that can benefit different stakeholders such as homeowners, agricultural industries, developers, and proponents of restoration projects. In response to these comments, the Agency notes that the extent to which a state's Section 404 program results in streamlined procedures, saving time, or saving money is not among the criteria in 40 C.F.R. Part 233 that EPA applies in approving state programs under Section 404 of the Act.**

**EPA acknowledges commenters who noted FDEP's expertise in Florida's aquatic resources, including FDEP's ability to quickly and efficiently evaluate permit applications without sacrificing environmental quality. EPA agrees that FDEP is well suited to understand and manage Florida's aquatic resources. EPA agrees with commenters who asserted that Florida's assumption of the Section 404 program, including any streamlining that may occur as a result, will maintain protections of aquatic resources including wetlands. EPA has reviewed Florida's permit review criteria and has determined that the state's program will result in the issuance of permits that comply with the Section 404(b)(1) Guidelines (33 U.S.C. 1344(h)(1)(A); 40 C.F.R. § 233.20(a)).**

**EPA acknowledges commenters who noted that Florida's assumption could provide an example for other states interested in administering their own Section 404 programs. The Agency recognizes the benefits of assumed programs and will continue to use the criteria in 40 C.F.R. Part 233 to evaluate applications for assumption of state programs under Section 404 of the Act.**

### *Opposition to streamlining*

Some commenters asserted that streamlining will weaken the permit review process with negative environmental results. One commenter stated that an ERP permit application processing timeclock leads to default issuance of an ERP permit, while the federal Section 404 permit application review process has no such default issuance mechanism.

A commenter expressed concern that the emphasis of the state's commitment to "streamline" the wetland permitting process for the sake of continued development exhibits a lack of commitment to properly review the impact of wetland loss. They noted that the state of Florida has already lost over 50% of its historical wetlands and the state's assumption to speed through the permitting process will exacerbate this loss. Many commenters stated that streamlining the wetland permitting process without a more complete understanding of the cumulative impacts of wetland loss would be catastrophic for Florida's ecosystems that are already struggling. A commenter expressed concern that streamlining wetlands permits will destroy water resources that serve as home for many endangered species in Florida, over 130 listed species.

57

A commenter also maintained that the current Section 404 permit process allows for a comprehensive review by federal agencies, including EPA, USFWS, NMFS, and the Corps, who have extensive experience and expertise in federal threatened and endangered species. They disagreed with the state's suggestion that this federal expertise would still be available, as they believe that the planned permit "streamlining" will not allow for the appropriate time for these important consultations to take place.

A commenter noted concerns expressed by Florida assumption proponents that the Corps' permitting slows down completion of much-needed restoration projects and therefore there is a need to streamline processes. The commenter asserted that Audubon Florida, which is responsible for a few Gulf restoration projects in Florida that required Corps Section 404 permits, did not find Corps' procedures to be a barrier, nor did they face any unnecessary delays in the permitting and review process. The commenter stated that Audubon Florida valued the Corps' participation in permitting their projects. Another commenter also commented that Audubon Western Everglades objects to any wetland regulatory streamlining, combining a federal program with the state program, when both programs have resulted in over 30,000 acres of wetland losses since 1996 in Lee and Collier Counties alone. The commenter asserted that those wetland losses speak to the ill preparation and the unready nature of FDEP and the Corps to combine their programs in the state of Florida.

One commenter expressed concern that special interests, state budget constraints, lack of expertise, and potential outsourcing will lead to cutting corners and rubber stamping in the name of streamlining permits. A commenter expressed concern about political motivations or monetary drivers that could fast-track development at the expense of the environment. A commenter noted that wetlands protection in Florida has been eroded by governing administrations as the permitting process has been "fast-tracked," accelerating deadlines for review and decisions. This commenter went on to assert: acreage sites of wetlands to be considered for permitting has been increased; water management district staff and scientists have been dismissed or had their opinions stifled; district governing boards have been stacked with development interests; qualified technical advisers had testimony disqualified; constitutional amendments protecting natural resources that have been passed by ballot elections have been stalled, subverted, and ignored; legislation has been passed requiring public opinion statements to come from "stakeholders," as defined by the state. The commenter stated that while disturbance of designated wetland soils is regulated, every year tens of thousands of cypress trees are chipped to be sold as mulch. The commenter concluded that Florida governing administrations have been motivated by money, and as a result, Florida's coastal development has not been adequately protected.

Several commenters opposing Florida's assumption expressed concern that approval of Florida's assumption would fast-track development permits. Some commenters asserted that the state favors developers, often at the expense of Florida waterways, and these commenters believe that Florida's assumption will fast-track development permits for powerful special interests. A commenter asserted that if Florida's program is approved, development permits for powerful special interests that want to exploit Florida's wetlands for profit will be "fast-tracked," despite the objections of Floridians whose livelihoods and recreation rely on wetland conservation.

A commenter stated that the State WMDs process over 70% of the ERP permit actions. The commenter noted that due to the existing political and policy influences on the State ERP program, the FDEP/WMD permitting staff see the permit applicants, not the natural environment and the wetland/water resources of Florida, as their clients. The commenter maintained that the FDEP and the WMD ERP permitting programs hardly ever actually deny ERP permits, authorizing destruction of wetlands for development projects.

A commenter contended that what Florida needs is more scrutiny and review of permit applications that threaten wetlands, not less. The commenter stated that in Florida, FDEP considers permit applicants to be their constituency, rather than the public and the state's natural resources. The commenter noted that in the October 21, 2020, EPA public hearing, only industry interest supported assumption with claims of delay at the federal level. The commenter contended that what developers see as delay reflects things such as vital NEPA review, public participation, analysis of listed species issues, and other elements intended to ensure protection of Florida's environment.

A commenter asserted that the Corps does not deny applications, as a rule, but they do take their time. The commenter stated that the Corps does due diligence, goes through NEPA, when necessary, and relies on the USFWS. The commenter contended that the developers want to minimize delay and process, and that the FDEP is very willing to do that.

A commenter also raised concerns about streamlining in the context of the M-CORES project, which they stated is 320 miles of new highway from Collier to the Florida-Georgia border that will go through wetlands and cross streams and rivers. The commenter noted that the M-CORES project will need multiple wetland permits which normally would go through the Corps. The commenter stated that now is not the time to streamline the process for this project.

A commenter noted that with sustainability plans set forth by counties and cities to prepare for sea level rise and climate change, now is the wrong time to streamline the destruction of what few natural resources Florida has left. The commenter also noted that climate change is impacting Florida, and that wetlands are one of the tools to reduce these impacts. The commenter believes this is the wrong time to make destruction of wetlands more streamlined and easier on developers.

**EPA Response:**

**EPA disagrees that FDEP will fast-track or streamline permits without appropriate environmental review and that FDEP's assumption of the Section 404 program will result in negative environmental impacts. EPA notes that FDEP's proposed Section 404 program complies with the timelines and procedures that are required by federal law. Please also see Response to Comments Sections N and P for descriptions of review processes related to the ESA and NHPA, and Response to Comments Section O regarding conflict of interest comments. Florida's State 404 Program Applicant's Handbook (pages 20-21) notes that:**

> **"Several procedures and rules for agency action are required by Section 404 of the CWA, but not by ERP, causing conflict between some State 404 Program and ERP program processes and timeframes.**

> **For example, when a project requires both an ERP and a State 404 Program permit, some portions of the ERP review are likely to be completed faster than the State 404 Program review because of public notice, EPA review requirements, or the need to coordinate with other state and federal agencies. This means that a project may be permittable under Chapter 62-330, F.A.C., (ERP) after the ERP review, but as a result of comments received during the 404 public notice or other aspects of the 404 review, the project may require modifications under the State 404 Program.**
>
> **It is the intent of the Agencies to process the State 404 Program and ERP authorizations concurrently as much as possible. For this reason, the applicant is given the choice, in the application form, to waive the timeframes for issuance pertaining to ERP review when the State 404 Program review may take longer to complete."**

**EPA recognizes that commenters may prefer federal administration of the Section 404 program for a variety of stated reasons and recognizes those commenters who stated they had not experienced delays when working with a federal agency administering the Section 404 program. EPA also recognizes commenters who expressed concern about major infrastructure projects affecting assumed waters that may be permitted under a newly assumed program. However, Section 404(g)(1) of the CWA authorizes states and tribes to submit to EPA a request to assume administration of a Section 404 program in certain waters within state or tribal jurisdiction. Importantly, EPA has determined that FDEP has met the statutory and regulatory requirements necessary to demonstrate their ability to assume the Section 404 program. Additionally, nothing in the assumption of a Section 404 program precludes a state from obtaining federal expertise in making a permitting decision. Further, EPA acknowledges commenters who benefited from federal involvement in permitted restoration projects and notes that the federal government will maintain permitting authority in retained waters.**

**One commenter asserted concerns with the readiness of FDEP and the Corps to "combine" their programs. With respect to the actual assumption procedures, 40 C.F.R. § 233.14 states that the Corps-FDEP MOA should explicitly outline procedures whereby the Secretary will, upon program approval, transfer to the State pending 404 permit applications for discharges in State regulated waters. This information can be found in the Corps-FDEP MOA submitted as part of Florida's program assumption package.**

**EPA acknowledges commenters who were concerned that Florida's assumption of the Section 404 program could lead to degradation of aquatic resources including wetlands, as well as commenters who expressed concern about wetland loss, habitat loss, and other environmental degradation that has already occurred in the state of Florida. EPA also recognizes commenter concerns about the timing of Florida's program assumption, given rapidly occurring environmental changes. However, EPA disagrees that Florida's Section 404 program will decrease the environmental protections in the State or will result in destruction of Florida's natural resources because an assumed program must be consistent with and no less stringent than the requirements of the CWA and its implementing**

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**regulations. EPA has reviewed Florida's permit review criteria and has determined that the State's program will result in the issuance of permits that comply with the CWA Section 404(b)(1) Guidelines (33 U.S.C. 1344(h)(1)(A); 40 C.F.R. § 233.20(a)). EPA acknowledges commenters who expressed concern about cumulative impacts to wetlands, and EPA notes that the Section 404(b)(1) Guidelines require consideration of both individual and cumulative impacts.**

**EPA also recognizes commenters who expressed concern about political motivations or monetary drivers that could fast-track development at the expense of the environment. In response to commenter concerns about FDEP or the WMDs fast-tracking ERP permits, the Agency notes that Section 404 permits have different timelines and federal regulatory requirements. Additionally, EPA notes that WMDs are not authorized to administer the Section 404 permitting program under Florida's currently proposed program structure. EPA has reviewed Florida's permit review criteria and determined that resulting permits will comply with the Section 404(b)(1) Guidelines. See also Response to Comments Section O on conflicts of interest.**

## J. Jurisdiction of Florida's program

### *Army Corps of Engineers versus State jurisdiction*

Two commenters argued that identifying the waters the State intends to assume jurisdiction over is central to an evaluation of the program and noted that 40 C.F.R. § 233.11(h) requires that a state submission must include a "[d]escription of the waters of the United States over which the state assumes jurisdiction [and a] description of the waters over which the federal government retains jurisdiction." One commenter argued that Florida Statutes § 373.4146 failed to address the question of which waters will be assumed, and instead, only tautologically defines "state assumed waters" as those "waters of the United States that the state assumes permitting authority over pursuant to [Section 404]." Id. § 373.4146(1). The commenter argued that this definition has no substance and does not reflect the federal definition of waters of the United States. The commenter noted that the State's proposal also does not adopt, reference, or mention the federal definition of waters of the United States; instead, the proposed program uses the term "state-assumed waters," which it defines as "all waters of the United States that are not retained waters." Florida's 404 Handbook section 1.1. Florida's authorizing legislation similarly defines "state-assumed waters" as "waters of the United States that the state assumes permitting authority over pursuant to Section 404 of the Clean Water Act … and rules promulgated thereunder." Fla. Stat. § 373.4146(1).

One commenter noted that Florida's 404 Handbook section 2.0(b)(41) provides a definition for the opposite of State-assumed waters, which are the "Retained Waters," which are navigable waters over which the Corps would retain exclusive permitting jurisdiction under Section 10 of the Rivers and Harbors Act of 1899 if State assumption is granted. (See 33 U.S.C. § 403). The commenter further noted that Florida explicitly defines "Retained Waters" as including those "identified in the Retained Waters List (Appendix A)" (see 404 Handbook section 2.0(b)(41)).

61

The commenter asserted that Appendix A, in turn, consists of a four-page list of rivers and creeks, mostly by name only, dated August 23, 2019.

One commenter noted that none of the program-related definitions are provided by Florida's statute or in the State's implementing regulations, but rather appear in an applicant handbook. The commenter noted that § 62-331.030, F.A.C. states that "Terms used in this Chapter are defined in section 2.0 of the 404 Handbook." The commenter further noted that the FDEP's State 404 Program Applicant's Handbook k at four 2.0(b)(47), in turn, defines "State-assumed Waters" or "Assumed Waters" to mean "those waters as defined in Section 373.4146(1), F.S." and that Florida Statutes Section 373.4146(1) provides no further clarity and simply states that "the term 'state assumed waters' means waters of the United States that the State assumes permitting authority pursuant to Section 404 of the Clean Water Act, , and rules promulgated thereunder, for the purposes of permitting the discharge of dredge or fill material." The commenter concluded that Florida defines State-assumed waters as those waters over which the State assumes jurisdiction.

Several commenters noted that the list of waters that would be "Retained Waters" in FDEP's Section 404 Handbook (see section 2.0(b)(41) and Appendix A), is substantially shorter than the list of Retained Waters produced by the Corps' in October 2017. A commenter noted that the "Retained Waters List" maintained by the Corps for Florida has been the subject of substantial change since Florida began its efforts to assume the Section 404 program in 2018. One commenter specifically noted that the Corps' list of Retained Waters that appears to be part of Florida's submission to EPA is only four pages compared to the 17 page Retained Waters list supplement produced by the Corps in October 2017. Two commenters argued that neither the State nor the Corps has provided a compelling justification for the large differences between the proposed list of retained waters and the original list provided by the Corps in October 2017 when the State began the assumption process. The commenters cited, as an example, that it is not clear why a lake like Lake Trafford is no longer on the list when it has important recreational bass fishing, a marina, and has seen a significant investment of funds from the Corps to restore water quality.

A commenter noted that on March 19, 2018, the Corps initiated a 30-day public comment period to end on April 20, 2018, "regarding use of waters in the state of Florida for navigation … [including] identification of those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities" for purposes of navigability analyses to determine "which waters are subject to permitting authority under Section 10" and "determining the waters that would be retained by the Corps if the EPA approves the State's application for Section 404 program assumption."[3] The commenter noted that on April 5, 2018, the Corps posted its solicitation for public comment on this matter on the website for the Jacksonville District,[4] but on April 10, 2018, the Corps issued an "Updated

---

[3] Commenter's reference: U.S. Dep't of the Army, Public Notice: Determination of Navigable Waters, Mar. 19, 2018 (Exhibit 2. See DCN EPA-HQ-OW-2018-0640-0052-A1).

[4] Commenter's reference: Press Release, U.S. Army Corps of Eng'rs, Corps Seeks Public Comment Regarding Water Use for Navigation (Apr. 5, 2018),https://www.saj.usace.army.mil/Media/News-

EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program December 16, 2020

Public Notice" summarily terminating the comment period effective immediately, deeming "the comment period originally set to expire on April 20, 2018 . . . closed until further notice."[5] The commenter stated after more than two years, there has been no "further notice," and no further opportunity for the public to comment, even now that Florida has submitted its Section 404 program application to EPA.

A commenter reported that in comments submitted by the original deadline of April 18, 2018, they reminded the Corps about Florida's extensive water resources and unique hydrology, and that any navigability study would require a thorough analysis of numerous waterways and site-specific hydrology and other factors to determine which waters may be assumable and the adjacency of wetlands located throughout the State. Two commenters noted that other commenters in 2018 echoed similar concerns and submitted lists of additional waterways that the Corps should consider navigable, but Florida's 404 program submission to EPA accounts for none of these additional submissions and purports to limit the "Retained Waters" to a four-page list that is vague, incomplete and has not been subject to notice and comment. The commenters argued that the current list is grossly lacking because it reflects a far more restrictive view of retained waters than the Corps possessed in 2017, and the Corps has failed to engage the public in performing an adequate navigability study that would accurately reflect the scope of exclusive federal jurisdiction. As a result, according to the commenters, the Corps' ceding jurisdiction over those waters to Florida for purposes of 404 assumption violates the Rivers and Harbors Act and renders EPA approval of such a program untenable.

One commenter compared the list found at Appendix A of Florida's 404 Handbook and the list of navigable waters that the Jacksonville District of the Corps has on its website, accessed on October 28, 2020. The commenter documented differences between the two lists in their comment letter and noted that some waterways have been added to the August 23, 2019 list, but about 29 waterways are on the navigable waters list currently on the Corps' website that are not found on the list of retained waters provided by FDEP in their 404 Handbook. The commenter also expressed concern that neither the list contained in the FDEP 404 Handbook nor the list on the Corps' website are complete because on October 5, 2017, the Corps provided a supplemental list of navigable waters for public comment that was 17-pages long. The commenter stated that this longer list of waters was intended to supplement the navigable waters list, and that many navigable Florida waterbodies appear to be missing from the list used by FDEP in its assumption package submittal. The commenter provided a copy of the 17-page supplement and a copy of an earlier letter describing additional waters that may be considered for inclusion on the list. The commenter argued that it is evident that the requirement to provide a description of the assumed versus retained waters is incomplete and, thus, FDEP's program description is invalid.

One commenter provided a list of waters that it contends should remain under the Corps' jurisdiction (see Docket ID No. EPA–HQ–OW–2018–0640-0425). The commenter formally

---

Releases/Article/1485269/corps-seeks-public-comment-regarding-water-use-for-navigation (Exhibit 3. See DCN EPA-HQ-OW-2018-0640-0052-A1).

[5] Commenter's reference: U.S. Dep't of the Army, Updated Public Notice: Cessation of Public Comment Period, Apr. 10, 2018 (Exhibit 4. See DCN EPA-HQ-OW-2018-0640-0052-A1).

63

requested that these waters be included in the list of waters retained under the Corps' Section 404 permitting authority should this application package move forward.

Several commenters argued that an obvious example of waters of the United States that should be retained by the Corps are the waters of the Greater Everglades Ecosystem, including the waters of the Kissimmee Valley, Lake Okeechobee, the Water Conservation Areas, Shark River Slough, Big Cypress Swamp, the Ten Thousand Islands, Biscayne Bay, Rookery Bay, and Florida Bay. A commenter stated that these waters are commercially vital, attracting significant interstate and international fishing and tourism uses. The commenter argued that retention would reinforce the shared responsibilities of State and federal partners and provide consistency for the ongoing permitting, construction, and implementation of the Comprehensive Everglades Restoration Plan (CERP), ensuring all CERP projects will be subject to the same review process. Finally, the commenter asserted that the highly connected nature of waters in the "River of Grass" that flow across the surface and through the porous limestone of the aquifers as they supply drinking water to millions of Floridians and fresh water to Biscayne Bay and Florida Bay makes it difficult to separate any individual water from those subject to Section 10.

One commenter provided an example of how the State's plan to assume Section 404 permitting responsibilities provides little clarity on which jurisdiction would be responsible for permit approval that impacts large swaths of wetlands in Lee County. The commenter stated that they had been working to oppose a proposed development in mangrove wetlands in a Lee County zoned Coastal High Hazard Area that would eliminate 36 acres of mangrove habitat by dredging and filling new canals for 55 home sites with docks and a new boat basin with several adverse environmental effects. The commenter stated questions regarding this development have not been addressed by the FDEP's application to the EPA, specifically, which waters will be assumed by the State of Florida and how will Florida address federally listed and endangered species. The commenter argued that the issues associated with this proposed residential development cannot be properly addressed when both the public and the applicant cannot verify exactly who is the permit authority. The commenter argued that clarity on these issues must be included in the State's application to the EPA before approval is considered.

A commenter disagreed with other commenters who stated that the State 404 program would not protect as many different types of wetlands as the federal regulations do, pointing out that State jurisdiction over wetlands is not limited to waters of the United States (WOTUS). The commenter stated that under the current ERP Program, all wetlands and other surface waters that are jurisdictional under Chapter 62-340, F.A.C., Florida's delineation rule, are protected, including isolated wetlands that are not considered WOTUS. The commenter stated that, for efficiency's sake, all wetlands and other surface waters that are jurisdictional under Chapter 62-340, F.A.C. should be treated as WOTUS under the State 404 Program unless the applicant provides documentation that a water is not a WOTUS. The commenter added that even if FDEP agrees the water is not a WOTUS for 404 purposes, that wetland or other surface water should still be protected under the ERP program, which will remain in place after assumption.

The commenter also argued that other commenters incorrectly asserted that FDEP's rules fail to regulate the list of "Special Aquatic Sites" in Subpart E of the Section 404(b)(1) Guidelines. The

commenter stated these sites are clearly included in FDEP's regulations at "Special Aquatic Sites" in section 2.0 of the State 404 Handbook and Florida Administrative Code Rule 62-331.053.

**EPA Response:**

**EPA disagrees with the commenter who alleged that the State's proposal does not adopt, reference, or mention the federal definition of "waters of the United States." In its Program Description, Florida indicates that the State's 404 program will apply to "state-assumed waters of the United States (WOTUS) as defined at 40 C.F.R. Part 120." Further, "[t]o provide certainty, streamlining, and efficiency, the Department will consider that any wetlands or other surface waters delineated in accordance with Chapter 62-340, F.A.C., that are regulated under Part IV of Chapter 373, F.S. could be considered waters of the United States, and will treat them as if they are, unless the applicant requests a WOTUS jurisdictional determination, and provides documentation that clearly demonstrates a water is not a WOTUS, subject to Department verification and agreement."**

**Florida's Program Description, section (h) at 2, notes that state assumed waters are all waters of the United States that are not retained waters. EPA disagrees with commenter assertions that this definition of assumed waters is inappropriate, confusing, or does not meet the requirements of 40 C.F.R. § 233.11(h).**

**EPA disagrees with commenters who asserted that the permitting process will lack clarity about which waters are retained or assumed, including commenters who provided specific geographic examples. The Corps-FDEP MOA includes specific information about how retained waters will be identified and how the Corps and FDEP will coordinate to ensure applications are being processed by the appropriate permitting authority.**

**EPA disagrees with the commenter who alleged that none of the program-related definitions are provided by Florida's statute or in the State's implementing regulations, but rather appear in an applicant handbook. The State 404 Program Applicant's Handbook, which includes definitions and terms in Section 2.0, is incorporated by reference into 63-331.010(5), F.A.C., and, therefore, is set forth as a regulation.**

**EPA acknowledges commenter concerns about changes to the retained waters list that have occurred over time, as well as those commenters who stated that they should have been previously afforded the ability to comment on the retained waters list, and commenters who believe their previous comments should have been incorporated into the retained waters list. However, as described above, the Agency has determined that the State provided the program description information on retained and assumed waters that is required by 40 C.F.R. § 233.11(h). Further, the retained waters list, itself, is a part of Florida's package and has been subject to notice and comment as part of EPA's decision-making process. EPA reviewed the retained waters list that was submitted to it with Florida's package. EPA disagrees with commenter assertions that historical events or changing perspectives on retained and assumed waters should affect whether Florida's program submission is complete or should affect the Agency's approval or disapproval of**

**Florida's program. The note at 40 C.F.R. § 233.11(h) directs states to obtain from the Corps an identification of waters of the United States over which the Corps will retain permitting jurisdiction. The Corps undertook a multiyear effort to identify which waters for which they would retain Section 404 permitting authority. The retained waters list has not changed since package submission. Should the retained waters list be amended in the future, it will be subject to EPA approval of a program revision for use in Florida's program.**

**EPA acknowledges commenters who believe certain waters should have been included or excluded from the retained waters list, and commenters who believe that a different methodology should have been used to develop the list. Additionally, EPA notes commenter concerns regarding potential differences between Corps navigable waters lists and the retained waters list in Florida's program submission request. EPA disagrees that Florida and the Corps used an inappropriate methodology to determine retained and assumed waters. Consistent with CWA Section 404(g)(1) and as described in Florida's program submission request, the Corps will retain permitting authority under Section 404 of the CWA for those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The approach for identifying the waters assumed by Florida and waters retained by the Corps is consistent with recommendations included in the July 30, 2018, Memorandum from the Assistant Secretary of the Army to the Corps regarding how to identify retained waters.**

**Section 10 waters under the Rivers and Harbors Act, 33 U.S.C. § 403, are different from retained waters because Section 404(g)(1) of the CWA, 33 U.S.C. § 1344(g)(1), allows states to assume navigable waters that are navigable based on historic use only whereas Section 10 waters under the Rivers and Harbors Act include all navigable waters as defined by the Rivers and Harbors Act. CWA jurisdiction is separate and defined at 33 C.F.R. 328.3; 40 C.F.R. § 120.2. In addition, the MOA between FDEP and the Corps addresses how modifications are made to the retained waters list.**

### *Effect of New Navigable Waters Protection Rule (NWPR)*

One commenter stated that the recently completed Navigable Waters Protection Rule in conjunction with the proposed program will greatly improve the overall environmental permitting process in Florida, which already regulates activities impacting wetlands under State law. The commenter asserted that by moving quickly to approve Florida's assumption submission, the EPA will improve the CWA and establish a model for other states to follow as they pursue CWA Section 404 assumption in future years.

Two commenters opposed ceding of the authority of the EPA and the Corps through Florida's assumption because many wetland areas in the State of Florida are ephemeral streams and isolated wetlands, and these are no longer considered "waters of the United States" under the

Navigable Waters Protection Rule. One commenter predicted that the Navigable Waters Protection Rule eliminates many of the provisions for wetland protections that were once present and that this would encourage more rapid development of wetlands in Florida. The commenter noted that developers must no longer go to the Corps and can obtain permits within 30 days, and there is no more review of large multi-acre projects, unless the Corps gets a hold of them and does their scrutiny. The commenter stated that, based on firsthand knowledge, over 600 acres of wetlands have gone without mitigation in the months since the promulgation of the Navigable Waters Protection Rule.

One commenter recommended that the State recognize and apply the status of waters of the United States as classified under existing/valid Corps approved jurisdictional determinations. Specifically, the commenter recommended that Florida should consider waters to be waters of the United States unless applicants provide Corps-approved jurisdictional determinations that conclude waters are not waters of the United States.

**EPA Response:**

**The definition of "waters of the United States" that was recently revised by the Navigable Waters Protection Rule, *see* 85 Fed. Reg. at 22,250 (April 21, 2020), cannot be, and is not, redefined in this action. However, EPA disagrees with commenters who expressed concern that Florida's assumption of a CWA Section 404 program could exacerbate environmental degradation in conjunction with the revised definition of waters of the United States. The Navigable Waters Protection Rule became effective on June 22, 2020. Presently, the rule is being implemented by EPA and the Corps in Florida and throughout the rest of the country except in the State of Colorado.[6] In the Program Description that Florida submitted as part of its assumption package, the State indicates that its Section 404 program will apply to "state-assumed waters of the United States as defined at 40 C.F.R. Part 120." Assumption does not reduce the scope of CWA jurisdiction but, instead, shifts responsibility for administering the Section 404 program for certain waters of the United States from the federal government to authorized states and tribes.**

**As described above, EPA has determined that the State's program will result in the issuance of permits that comply with the CWA Section 404(b)(1) Guidelines. (33 U.S.C. § 1344(h)(1)(A); 40 C.F.R. § 233.20(a)).**

**EPA disagrees with commenters who recommended that a Corps approved jurisdictional determination should be required to identify waters that are not waters of the United States. While applicants may provide such determinations, the State is not required to rely on and has not proposed to rely on Corps approved jurisdictional determinations as the only source of information that can be used to identify waters that are not waters of the United States. EPA has determined that Florida's program will be consistent with and no less stringent than the requirements of the CWA and federal regulations. Additionally,**

[6] On June 19, 2020, the U.S. District Court for the District of Colorado stayed the effective date of the Navigable Waters Protection Rule in the State of Colorado; an appeal of that injunction is currently under review by the U.S. Court of Appeals for the 10th Circuit.

**neither EPA nor the Corps have a role under the CWA in determining what waters are "waters of the states," as those waters are defined according to state law. See Appendices to the Resource and Programmatic Assessment for the Navigable Waters Protection Rule: Definition of "Waters of the United States."**

### *Project Boundary and 300' Guideline*

Several commenters opposed the State's recommended 300-foot administrative boundary around navigable waters to determine additional wetland projects to be reviewed by the Corps because they argued that this boundary is too narrow given Florida's unique geology and hydrology.

Commenters noted that the sub-surface connection among waterbodies is much greater in Florida's highly transmissive karst environment and requires a boundary that more accurately reflects the extent to which neighboring wetlands impact navigable waters. These commenters recommended that the guideline should be based on a scientific evaluation of Florida's geophysical characteristics rather than the 300-foot default guideline proposed in the Final Report of the Assumable Waters Subcommittee. These commenters noted that the Final Report stated the buffer could be determined at the State level to consider natural features. Some commenters asserted that the 300-foot lateral/adjacent FDEP determination is entirely a political determination that should disqualify FDEP from assuming the federal Section 404 program.

Some commenters asserted that the only other states to have assumed a Section 404 program have utilized a more protective 1,000-foot buffer, and no less should be required of Florida in order to satisfy the CWA. One commenter asserted that the ERP program is arbitrary and inconsistent with the fact that when a similar determination was made by the State of New Jersey in cooperation with EPA and the Corps, a buffer of 1,000 feet was implemented.

One commenter responded to other commenters that the 300-foot buffer is not arbitrary and is based on a reasonable delineation as agreed upon by FDEP and the Corps. The commenter stated that this approach was also reflected in the Final Report of the Assumable Waters Subcommittee (Final Report dated May 10, 2017; available for review on EPA's website at https://www.epa.gov/cwa404g/nacept-assumable-waters-subcommittee-final-report-may-10-2017). The commenter stated that the Assumable Waters Subcommittee recommended an approach labeled "Wetlands Alternative C3," where the Corps retains all wetlands landward to a default 300-foot administrative boundary that is adjustable to accommodate the unique regulatory, typographical, and hydrological needs of the state. In recommending this approach, according to the commenter, the Subcommittee agreed that a 300-foot distance is "fully adequate to protect federal navigation interests" and allows the state to protect wetlands and water quality as required by the CWA. See Final Report at p. 27 and 33. According to the commenter, the Subcommittee favored Alternative C3 over the two other implementation strategies (Alternatives C1 and C2) because it retained the strengths of the previous two strategies, while also allowing the local resource needs and existing programs from states and tribes to effectively incorporate Section 404 requirements into their existing framework. *Id.* at 28. The commenter stated that, to further determine the efficacy of Wetlands Alternative C3, the Subcommittee measured the strategy against eight criteria that ranged from whether C3 was, as a whole, consistent with

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

Section 404(g) and the CWA, to whether it provides clarity and efficiency in determining retained and assumable wetlands even outside 404 jurisdiction. The commenter stated that the Subcommittee found C3 met all eight independent criteria and provided the level of effectiveness and regulatory certainty the Subcommittee determined was necessary for 404 permitting. *Id.* at 33. The commenter reported that on July 30, 2018, the Assistant Secretary of the Army (Civil Works), R.D. James, accepted the Subcommittee's recommendation via a memorandum (available on the Corps' website at https://api.army.mil/e2/c/downloads/525981.pdf).

**EPA Response:**

**EPA disagrees with commenters who asserted that the 300-foot administrative boundary is arbitrary or that the 300-foot administrative boundary is not environmentally protective. EPA notes that the boundary was based on a reasonable delineation that was agreed upon by FDEP and the Corps. Furthermore, the Final Report of the Assumable Water Subcommittee recommended that retained adjacent wetlands be established using an administrative boundary, with a default of 300 feet. EPA agrees with commenters who noted that the Final Report provides states and tribes with the flexibility to adjust the boundary based on their unique circumstances, including but not limited to regulatory authority, topography, and hydrology. However, EPA disagrees with commenters who asserted that Florida must justify or reconsider the administrative boundary based on such factors. EPA also disagrees with commenters who asserted that Florida should broaden its administrative boundary based on the administrative boundaries of other states that have assumed a CWA Section 404 program.**

**EPA also notes that the commenter assertion that the only other states to have assumed a Section 404 program have utilized a more protective 1,000-foot buffer is not accurate. The State of Michigan does not have a 1,000-foot administrative line. The extent of adjacent wetlands over which the Corps retains authority in the Michigan is determined by the Corps on a case-by-case basis, generally including wetlands in close proximity to retained waters, and having a direct surface water connection to and within the influence of the ordinary high water mark of those waters. Regardless, the distance limits of the administrative boundary do not determine the degree of "protectiveness" over jurisdictional wetlands; in all cases, wetlands meeting the definition of "waters of the United States" pursuant to 33 C.F.R. § 328.3 and 40 C.F.R. § 120.2 are jurisdictional and regulated under the CWA. The distance limit of the administrative boundary simply establishes whether those jurisdictional wetlands are regulated by the Corps as retained waters or regulated by the state as assumed waters.**

## K. Compliance evaluation and enforcement

*Florida's ability to address the compliance and enforcement responsibilities of the Section 404 program*

A commenter expressed support for Florida's assumption of Section 404 program responsibilities, asserting that Florida meets the legal requirements under 40 C.F.R. § 233.41 and

69

is "well-prepared to address the compliance and enforcement responsibilities of the program." This commenter noted that FDEP already has proven compliance and enforcement protocols in place as it has been enforcing Florida's dredged and fill regulations since the early 1970s. This commenter also remarked that Florida's legislature has "recently instituted measures that will enhance Florida's compliance and enforcement efforts."

Some commenters voiced support for FDEP's ability to adequately enforce the laws necessary to implement Florida's Section 404 program. One commenter argued that Florida has demonstrated in its application that it can fulfill the enforcement requirements of 40 C.F.R. Part 233, saying that FDEP has the "authority to stop unauthorized activity; enjoin threatened or continuing violations; assess civil penalties for 404 violations of at least $5,000 per day of violation; assess criminal remedies for instances of willful violations or criminally negligent violations of at least $10,000 per day of violation as well as power to seek criminal fines for knowing false statements and other similar criminal conduct in an amount of at least $5,000 for each instance of violation." Likewise, the commenter claimed that Florida meets the 40 C.F.R. § 233.41 requirements for burden of proof and *mens rea* under state law and is well-prepared to address the compliance and enforcement responsibilities of the program. The commenter added that FDEP has been enforcing Florida's dredged and fill regulations for nearly 50 years and has proven compliance and enforcement protocols in place.

Commenters also explained that the recently enacted Environmental Accountability legislation has increased the civil penalty for Section 404 violations to three times the amount allowable under 40 C.F.R. § 233.41. One commenter highlighted FDEP's independent Environmental Crimes Unit, consisting of 18 sworn law enforcement officers who are deployed throughout the State to investigate and enforce criminal violations of Florida's environmental laws. The commenter added that these officers work closely with Florida's many other law enforcement agencies, such as county Sheriff's departments and the State Fish and Wildlife Conservation Commission officers, and with FDEP's dedicated staff of scientists, engineers, and environmental professionals that will administer Florida's Section 404 program. The commenter also stated that when arrests are made, one of Florida's 20 State Attorney's offices coordinate with FDEP's district offices and Office of General Counsel to prosecute the case in criminal court.

Some commenters expressed opposition to Florida's assumption of Section 404 program responsibilities, asserting that FDEP's record shows an inability and/or unwillingness to enforce the law under Florida's Section 404 program. A commenter expressed concern that the State could not be expected to ensure compliance with new Section 404 permits, because it has not met its responsibilities for the programs already under its jurisdiction. One commenter stated that FDEP "does not currently do meaningful enforcement of its own permits and programs, including the Environmental Resource Permit program" and questioned how it would enforce Section 404 requirements. The commenter noted that FDEP was enforcing fewer cases than in the past. A commenter pointed out that, "last year, only 65% of the FDEP-regulated facilities inspected by the agency were actually in compliance with the terms of their authorizations." This commenter provided data from the public record (EPA-HQ-OW-2018-0640-0346) to support its claim, observing that FDEP took action against only 12.4% of the cases on noncompliance. A

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

commenter observed that "FDEP's own performance audits and employee testing show that it has failed in many respects to effectively administer its existing ERP Program" and "show FDEP's consistent inability to properly review permit applications and monitor and enforce issued permits." This commenter also provided data (EPA-HQ-OW-2018-0640-0386) from public records indicating that "audits of compliance and enforcement activities for FDEP's existing ERP program" were "littered with examples of inadequate documentation, assessment of insufficient or inaccurate penalties, [and] requiring inappropriate or insufficient corrective actions."

Another commenter claimed that FDEP's enforcement efforts were ineffective and that FDEP has done nothing to enforce clean water requirements. The commenter noted that, instead of cleaning up impaired waters, FDEP merely adds areas to the Section 303(d) list required under the Clean Waterways Act. One commenter reported that "the number of enforcement cases opened by Florida's existing dredge and fill program dropped by 36% from 2018 to 2019" and that "FDEP only assessed penalties in 342 of the 3,774 instances of noncompliance and only collected 44% of the penalties assessed." This commenter concluded that "FDEP is not adequately enforcing its current programs and thus should not be granted the power to oversee yet another program." Another commenter affirmed this sentiment, stating that FDEP has failed to adequately enforce current environmental regulations. This commenter observed that "according to DEP's own reporting, 80% of the state of Florida waterways are considered degraded," noting also that: "FDEP is sorely behind in the development of TMDLs and BMAPs for impaired waterbodies across the state, [and that] FDEP-established BMPs for stormwater and agriculture are not meeting their intended pollution reduction goals." This commenter agreed with other commenters in concluding that "additional responsibilities will divert resources away from these critical pre-existing duties." Another commenter echoed these concerns, stating that Florida removed almost all enforcement of their ERP permits since 2011. Some commenters observed that FDEP's ability to enforce of Florida's environmental laws has been weakened by recent Florida legislative and administrative actions, and that, under former Governor Rick Scott, "senior staff of the FDEP were dismissed, enforcement was restrained, and prosecutions and fines reduced."

Some commenters stated that "FDEP's enforcement record continues to demonstrate an incapacity to adequately enforce existing programs, much less adopt new ones." One commenter concluded that "analyses of FDEP's enforcement record have demonstrated an inability or unwillingness to meet enforcement obligations, ensure compliance with existing programs, and ultimately provide requisite protection to the State's valuable natural resources."

**EPA Response:**

**EPA acknowledges the comment supporting Florida's ability to carry out compliance and enforcement responsibilities of its Section 404 program, including the State's legal authorities and history of implementing and enforcing a similar program in the State. EPA also acknowledges commenters' concerns regarding ensuring compliance with the Section 404 program. CWA Section 404(h)(1)(G) requires states to have authority "[t]o abate violations of the permit or the permit program, including civil and criminal penalties and**

71

**other ways and means of enforcement" in order to assume the Section 404 program. EPA's regulations further elaborate that a state must have the authority (1) to restrain immediately and effectively any person from engaging in any unauthorized activity; (2) to sue to enjoin any threatened or continuing violation of any program requirement; and (3) to assess or sue to recover civil penalties in the requisite amounts prescribed in the federal regulations and to seek criminal remedies as prescribed. 40 C.F.R. §§ 233.40, 233.41. EPA finds that Florida satisfies these regulatory requirements.**

**In its submission, Florida described its compliance evaluation and enforcement programs in detail in section (g) of its Program Description: "Description of the State's Compliance Evaluation and Enforcement Programs (Required by 40 C.F.R. §233.11(g)). Florida's comparison of federal and state law requirements also lays out in detail Florida's requirements that reflect the federal compliance evaluation programs. Program Description Appendix j-3 at 40-46. The comparison makes clear that Florida has the requisite authority required in the federal regulatory requirements governing compliance; Florida's requirements are codified at Fla. Stat. §§ 373.129, 373.423, 373.430, 403.091, and 403.161; 62-330.350, 330.405 (F.A.C.); and 62-331.054, 62-331.201 (F.A.C.); the OGC Enforcement Manual, Chapter 4, and a number of other locations.**

**EPA's evaluation of a state's request to assume a Section 404 program does not require an analysis of the state's prior implementation and enforcement of a separate program. The way in which a state has implemented similar, existing programs (including the enforcement rate for existing violations, degree of documentation, amount of penalties, and extent of corrective actions) that fall within its enforcement discretion, may depend on the availability of information and resources. Further, EPA acknowledges that there are a variety of mechanisms, beyond formal enforcement actions, that a regulatory agency may employ to maintain and achieve compliance among regulated entities. These informal approaches may include compliance assistance and notices of noncompliance. Finally, EPA notes that under CWA Section 309 and Section 404(n), EPA retains independent civil and criminal enforcement authority relating to both unpermitted discharges under CWA Section 301 and conditions or limitations in permits issued by a State under CWA Section 404.**

**EPA has determined that FDEP has demonstrated the ability to ensure compliance with the Section 404 program. Importantly, FDEP is not required to have the same criminal negligence standard as EPA with respect to assessing criminal penalties pursuant to FDEP's assumed CWA Section 404 program. See the response to comments immediately below for additional discussion on the required standard of negligence in an assumed CWA Section 404 program. EPA agrees with commenters who asserted that FDEP has demonstrated in its application that it has the necessary mechanisms to fulfill the enforcement requirements of 40 C.F.R. Part 233. EPA finds that Florida has the requisite enforcement authorities to abate violations, as required by the CWA and its implementing regulations, adequate documentation procedures, and adequate resources to carry out the compliance evaluation and enforcement responsibilities involved in the assumption of a Section 404 program.**

### *FDEP's enforcement program compared to the existing federal standard*

One commenter pointed out multiple examples of what they saw as deficiencies in FDEP's ability to properly enforce the Section 404 program in a manner equivalent to the existing federal standard, including: the ongoing failures in FDEP's enforcement record, inadequate enforcement authority, less stringent state criminal liability, and inadequate opportunities for public participation in enforcement, concluding that these examples demonstrate FDEP's "incapacity to adequately enforce existing programs, much less adopt a new one." The commenter provided an example of a 2016 analysis by the group "PEER" showing how enforcement actions during the previous year decreased. This commenter also noted that Florida's submission "fails to adequately describe the state's compliance evaluation and enforcement programs" and that "Florida also fails to address how the state will coordinate enforcement strategy with the Corps and EPA, as required under 40 C.F.R. § 233.11(g)."

A commenter observed that, although the "General Counsel claims that Florida law is consistent with and no less stringent than the Clean Water Act enforcement requirements," FDEP may lack adequate staffing and resources to properly administer and enforce a Section 404 program. This commenter called attention to the fact that Florida law regarding criminal enforcement is not as stringent as federal law, in that Florida law requires proof that the discharge "caused actual harm or injury to human health or welfare, animal, plant, or aquatic life or property." This commenter further noted that, "under Florida law, it is unconstitutional to criminally penalize "mere negligent conduct" because that fails to provide "clearly ascertainable standards of guilt by which a citizen may gauge his conduct."" A commenter observed that, "because criminal negligence in the state statute is a higher level of intent that simple negligence in the Clean Water Act, the Florida Statute conflicts with federal law, and does not provide as stringent criminal enforcement as does federal law." A commenter also pointed out that Florida law provides for shorter statutes of limitation (1 to 3 years) for enforcement of environmental crimes than the 5-year period under federal law, making its program less stringent than the federal one. A commenter concluded by stating that "there is nothing in the Clean Water Act that authorizes the EPA to approve a state program with an enforcement scheme that is less stringent than the federal one in terms of criminal culpability, burden of proof and statutes of limitations. To the contrary, these failures render the program non-approvable."

A commenter also noted that Florida's program was deficient in public participation. The commenter indicated that, while 40 C.F.R. § 233.41(e)(1) requires the State provide for public participation, the General Counsel provides a blanket statement that the state has "authority" to comply with these requirements without citing any law or regulation providing that authority. A commenter also observed that, while the MOA between EPA and FDEP states that "FDEP shall provide for public participation in the State 404 Permit Program enforcement process pursuant to 40 C.F.R. § 233.41(e)(2)," FDEP "has failed to identify any requirement in the state law or regulations to ensure compliance with the requirements of 40 C.F.R. § 233.41(e)(2)." This commenter questioned the extent to which the public is able to enforce the public participation obligations when such obligations are not incorporated into State law.

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**EPA Response:**

**EPA acknowledges commenters' concerns about FDEP's ability to properly enforce the Section 404 program. EPA disagrees with these concerns. In its submission, Florida described its compliance evaluation and enforcement programs in detail in section (g) of its Program Description: "Description of the State's Compliance Evaluation and Enforcement Programs (Required by 40 C.F.R. §233.11(g))," including a description of how the State will coordinate its enforcement strategy with that of the Corps and EPA. Florida has also addressed the way in which it intends to coordinate its enforcement strategy with the Corps and EPA, respectively, in its Memorandum of Agreement with the Corps at Section VII and its Memorandum of Agreement with EPA at Section III. EPA finds that Florida has adequate staffing and resources to ensure compliance and enforce violations of an assumed Section 404 program.**

**EPA also disagrees with commenters who asserted that Florida's program is deficient in public participation. EPA notes that Florida's MOA with the Agency states that "FDEP shall provide for public participation in the State 404 Permit Program enforcement process pursuant to 40 C.F.R. § 233.41(e)(2)" and that Florida has authority to provide for such participation. The federal regulations at 40 C.F.R. § 233.41(e)(2) require that states must provide for public participation in the enforcement process through, among another option, "(2) Assurance that the State agency or enforcement authority will: (i) Investigate and provide written responses to all citizen complaints submitted pursuant to State procedures; (ii) Not oppose intervention by any citizen when permissive intervention may be authorized by statute, rule, or regulation; and (iii) Publish notice of and provide at least 30 days for public comment on any proposed settlement of a State enforcement action" (emphasis added). Florida has provided such assurance, as required, in its MOA with EPA, and EPA is not aware of anything in Florida's laws or regulations that is inconsistent with Florida's assurance. EPA's regulations codifying its approval of Florida's 404 Program will make clear that the MOA is part of the State-administered program, as is the General Counsel's Statement. EPA may withdraw program approval if the State's enforcement program fails to comply with the federal regulatory requirements, as well as if the State program fails to comply with the terms of the MOA with EPA. 40 C.F.R. §§ 233.53(b)(3) and (4). EPA's approval of Florida's 404 program may therefore rely in part on the State's commitment to adhere to certain federal regulatory requirements in the MOA with EPA and the General Counsel's Statement.**

**EPA disagrees with the commenter's statement that Florida's law requires "actual harm or injury to human health or welfare, animal, plant, or aquatic life or property" to establish a negligent violation. Florida recently changed its statute to provide that "fail[ure] to obtain any permit required by this part or by rule or regulation adopted pursuant thereto, [] violat[ion] or fail[ure] to comply with any rule, regulation, order, or permit adopted or issued by a water management district, the department, or local government pursuant to their lawful authority under this part," due to "reckless indifference or gross careless disregard," may be punishable by a fine of up to $10,000 or 60 days in jail, or by both, for each offense. Fl. Stat. 373.430(1)(a), (4). EPA interprets "reckless indifference or gross**

74

**careless disregard" to constitute a negligence standard and therefore finds that Florida satisfies the federal requirement to allow for prosecution of negligent permitting violations.**

**In response to the concern that Florida's program does not include the identical simple negligence standards and statutes of limitations as the federal program, EPA notes that the CWA does not require total uniformity between federal and state enforcement authorities. The CWA requires that EPA "shall approve" a state's application if it determines that the state has the authority to "abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement." See 33 U.S.C. 1344(h)(1)(G). In addressing the enforcement requirements for state programs, Congress did not use the words "all applicable," "same," or any phrase specific to any mens rea standard, let alone the Federal standard, as it did in other parts of CWA Sections 404(h). See 33 U.S.C. 1344(h). Indeed, when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."** ***Sebelius v. Cloer*****, 569 U.S. 369, 378 (2013) (internal quotations omitted). In contrast to the broad authority that CWA Section 404(h)(1)(G) provides to determine whether states and tribes have demonstrated adequate authority to abate violations, other aspects of state and tribal programs are explicitly required to have authority that is equivalent to or more stringent than EPA's authority. For example, states must have the authority "[t]o inspect, monitor, enter, and require reports to** ***at least the same extent*** **as required in section 1318 of this chapter," 33 U.S.C. 1344(h)(1)(B) (emphasis added). Similarly CWA Section 404(h)(1)(B) requires state-issued permits to "apply, and assure compliance with,** ***any applicable requirements of this section*****, including, but not limited to, the guidelines established under subsection (b)(1) of this section, and sections 1317 and 1343 of this title…" 33 U.S.C. 1344(h)(1)(A)(i) (emphasis added). The more general language used to address required state and tribe authorities to abate violations, and the absence of any citation to CWA Section 309, indicates that Congress allowed for variability between state or tribal approaches to certain aspects of enforcement.**

**EPA interprets the Agency's implementing regulations for CWA Section 404 to allow for approved state and tribal programs to have different approaches to criminal enforcement than the Federal government's approach. EPA's interpretation is consistent with the D.C. Circuit's decision in** ***NRDC v. U.S. EPA*****, 859 F.2d 156, 180-181 (D.C. Cir. 1988). There, the petitioner challenged the validity of 40 C.F.R. §123.27(a)(3) on the theory that it did not require states to have the same maximum criminal penalties as the federal program.** ***NRDC*****, 859 F.2d at 180. The court reasoned that the petitioner's argument involved a "logical infirmity" because it "presume[d] an unexpressed congressional intent that state requirements must mirror the federal ones," which is "inconsistent with the elements of the statutory scheme limiting operation of the provisions to enforcement efforts at the national level and explicitly empowering the Administrator to set the prerequisites for state plans."** ***Id.*** **at 180 (discussing 33 U.S.C. 1314(i)(2)(C)). The D.C. Circuit recognized EPA's "broad[] discretion to respect state autonomy in the criminal sector" and that the regulations "reflect the balancing of uniformity and state autonomy contemplated by the Act."** ***Id.*** **at**

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**180-81. The court therefore declined "to divest the Administrator of this authority" in the face of congressional silence. *Id.***

**EPA's interpretation is also consistent with the Ninth Circuit's decision in *Akiak Native Community v. EPA*, in which the Ninth Circuit declined to require that states have authority to impose administrative penalties identical to federal authority. S*ee Akiak Native Community*, 625 F.3d 1162, 1171–72 (9th Cir. 2010). In that case, the petitioner argued that the State of Alaska did not have adequate authority to abate violations because Alaska had to initiate a legal proceeding to assess civil penalties, whereas EPA could do so administratively. *Id.* at 1171. The Court held that because "[t]here is no requirement in the CWA . . . that state officials have the authority to impose an administrative penalty" and "[t]he language of the statute says nothing about administrative penalties," "there is no reason to conclude that Alaska lacks adequate enforcement authorities." *Id.* 1171–72.**

**Specifically with respect to the comments about ordinary negligence, EPA's longstanding interpretation that CWA Section 404 does not require states and tribes to have identical authorities to EPA's under CWA Section 309 is consistent with the Ninth Circuit's acknowledgement in *Idaho Conservation League v. EPA* that "a state program need not mirror the burden of proof and degree of knowledge or intent EPA must meet to bring an enforcement action." *Slip op.* at 3, *citing* Consolidated Permit Regulations, 45 Fed. Reg. at 33,382. While the Ninth Circuit held in an unpublished and non-binding decision outside the specific case before it that the plain language of the federal regulations requires states to incorporate the same criminal intent standards as EPA, EPA has proposed modifying its regulations to make them more clearly consistent with EPA's longstanding interpretation that the statute allows for greater flexibility. *See* 85 Fed. Reg. 80,713 (December 14, 2020). EPA's proposal is based on the interpretation of the CWA outlined here, that the CWA does not require total uniformity between federal and state enforcement authorities. *See id.***

**EPA finds that Florida's 404 program meets the statutory and regulatory standards governing approval of state programs, as EPA interprets these requirements.**

### L. EPA oversight of state permitting

Several commenters stated that EPA should retain oversight responsibilities of permitting in Florida. One commenter considered it necessary, especially given the rate of climate change, that Florida's waters be protected by EPA, stating that EPA is the regulatory body that will hold the highest standard of scrutiny. A commenter considered it necessary to ensure consistency and uniformity in oversight and application of legal standards. Another commenter noted that more destruction will occur if EPA and the Corps relinquish oversight. One commenter stated that the current dual permitting system between federal and state agencies provides oversight that the Florida regulatory system cannot provide alone. Some commenters felt EPA and the Corps are better equipped to handle permits associated with wetlands because FDEP is not able to handle the responsibility.

76

A commenter objected to EPA's decision to waive almost all oversight of Florida's program otherwise available under the CWA, especially since Florida has vast waterways, wetlands, and listed species. The commenter requested EPA retain the maximum monitoring and oversight possible for a minimum of two years before relinquishing its Section 404(j) authority. Some commenters worried that the amount of oversight and public review would be limited if the proposal was accepted.

A commenter noted that federal review has proved invaluable in stopping or modifying Florida programs that would have further endangered water resources, such as the Basin Management Action Plans that were deficient in strategy and funding to accomplish what the State legislature had demanded. A commenter suggested that EPA needs to continue its role in these permitting decisions.

A commenter discussed problems Saint Augustine and Saint Johns County have with flooding on regular, sunny days and devastating floods during storm events. The commenter explained that the state is losing a few acres of wetlands every week over the course of years, so the current system is not protective enough, and the proposed change offers even less protection. One commenter stated that with increased development statewide, the protection and restoration of Florida's wetlands and water resources must be given the greatest possible attention, rather than removing federal oversight. One commenter argued that federal review and protections are necessary to protect resources from local political pressure and special interest, given the rapid population growth and development.

A commenter recognized that federal Section 404 permits and Florida Environmental Resource Permits overlap. However, the commenter asserted that the additional federal oversight is critical for adequate protection of water resources, providing important checks and balances. The commenter gave an example wherein a local Water Management District approved a permit that would have allowed the developer to destroy high-quality urban wetlands, but the Corps denied the developer's application to destroy these acres of federally defined wetlands, largely due to their value.

One commenter was concerned that staffing levels in the EPA Region 4 office in Atlanta are insufficient to provide adequate oversight if a Section 404 program is assumed by Florida. The commenter mentioned that he had worked for the EPA Region 4 wetlands program for 30 years and said that only a small number of people were available to review the Corps' public notices. The commenter questioned how EPA could do a legitimate job of overseeing the program with the current level of staffing. The commenter was specifically concerned that EPA Region 4 wetlands program staff would be inadequate for reviewing the 1,000-2,000 Section 404 individual permit applications that would be processed annually and asked what commitments EPA Region 4 management would make to hire and train a sufficient number of wetland staffers needed for meaningful oversight.

**EPA Response:**

**EPA acknowledges some commenters' desire that it retain oversight of Section 404 permitting in Florida. As discussed above, Congress provided the option for states and**

**tribes to request assumption of the CWA Section 404 permit program. Consistent with the overall cooperative federalism construct established by the CWA, it is EPA's responsibility to review assumption requests consistent with the statute and its implementing regulations, and where the agency finds that a state or tribe has met its statutory and regulatory obligations demonstrating their ability to implement a CWA Section 404 program, to approve the assumption of that CWA Section 404 program by the state or tribe. EPA agrees with commenters that pointed out that the state assumption process is not a delegation of the Section 404 program to states and tribes. Congress has provided states and tribes the opportunity to assume primary responsibility for implementing a Section 404 program pursuant to state authorities. Additionally, EPA acknowledges commenters asserting that EPA should retain oversight authorities in Florida and notes that EPA maintains its role as the oversight agency, even following FDEP's assumption of a CWA Section 404 program.**

**EPA disagrees with comments suggesting that once Florida assumes a Section 404 program, it has sole jurisdiction of the CWA Section 404 program. The Corps will continue to administer the Section 404 program in retained waters within Florida, and EPA will oversee Florida's administration of the State 404 program. See 40 C.F.R. Part 233, Subpart F—Federal Oversight.**

**EPA disagrees with commenter's assertion that it has waived almost all oversight. In exerting its continued oversight responsibilities under the CWA, EPA will continue to review permits for:**

- **discharges with reasonable potential for affecting endangered or threatened species as determined by USFWS;**
- **discharges with reasonable potential for adverse impacts on waters of another state or tribe; discharges known or suspected to contain toxic pollutants in toxic amounts (Section 101(a)(3) of the CWA) or hazardous substances in reportable quantities (Section 311 of the CWA);**
- **discharges located in proximity of a public water supply intake;**
- **discharges within critical areas established under state or federal law, including but not limited to national and state parks, fish and wildlife sanctuaries or refuges, national and historical monuments, wilderness areas and preserves, sites identified or proposed under the NHPA, and components of the National Wild and Scenic Rivers System;**
- **discharges impacting compensatory mitigation sites, including mitigation banks, in lieu fee program sites, and permittee responsible mitigation sites; and**
- **discharges impacting sites that are owned or managed by federal entities, and activities by an applicant that is a federal entity.**

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**Further, FDEP must provide the EPA Regional Administrator with copies of public notices for permit applications for which permit review has been waived whenever requested by EPA, pursuant to 40 C.F.R. § 233.50(a)(1).**

**EPA disagrees with the commenter assertion that staffing levels in EPA's Region 4 office are insufficient to provide adequate oversight if Florida's Section 404 program is approved. EPA has sufficient staffing resources to fully implement all of its regulatory obligations under Section 404(g) and the provisions set forth in the MOA between EPA and FDEP. EPA has significant discretion under Section 404 as to how and where to utilize its staffing resources and has sufficient resources to conduct reviews of public notices for proposed projects in the Southeast both inside and outside of the scope of waters that are assumed by Florida.**

**EPA also disagrees with commenters asserting that FDEP is not equipped to handle permits associated with wetlands. EPA has reviewed FDEP's submittal and determined that FDEP has met all statutory and regulatory requirements necessary to demonstrate the State's ability to implement the CWA Section 404 program. Please see Section H for further discussion on FDEP's staffing and resources to assume the CWA Section 404 program.**

**EPA disagrees with commenters asserting that federal review and protections are necessary to protect resources from outside pressures. *See* the State 404 Program Applicant's Handbook (incorporated by reference in subsection 62-331.010(5) F.A.C.) for a description of the rules, procedures, standards, and criteria that apply to the State 404 program under Part IV of Chapter 373 of the Florida Statutes (F.S.).**

**EPA disagrees that FDEP will fast-track permits or provide permits because of outside pressures without providing the appropriate environmental review. *See* Response to Comments Section I for additional responses regarding streamlining of permitting.**

## M. NEPA and public participation

One commenter indicated support for avoiding NEPA review, stating that the transfer of authority to Florida will have the benefit of avoiding duplicative environmental reviews. The commenter stated that even with recent streamlining, compliance with NEPA delays the development of mining and other economically beneficial projects.

Several other commenters objected to Florida being granted authority for implementation of the Section 404 program, and asserted that the Florida program will not require the same level of data collection, in-depth analysis, and rigorous balancing of economic and environmental impacts of wetland projects because Florida has not made the statutory changes to set State law to be equivalent to the CWA, the ESA, the NHPA, and the NEPA. Some commenters stated that adequate replacements for tools related to NEPA are missing. Some commenters added that removal of the Corps as a federal regulator creates uncertainty in how other federal laws will be complied with, including the NEPA, Magnuson-Stevens Act, and NHPA.

79

Some commenters pointed out that this lack of parallel legal authority means that the proposed action is not a delegation, but an alternative program in which Florida has sole jurisdiction. Commenters stated that this parallel program would mean that a comprehensive scientific and economic review, as required by NEPA, will no longer apply. One commenter contended that if finalized, the proposal would lead Florida's agencies to make decisions with significant environmental impacts without ever considering those impacts in advance. Some commenters stated that Florida has a poor record of protecting wetlands from strip mining compared to the preservation achieved by NEPA review. Some commenters pointed out that Florida has touted the loss of NEPA review as a benefit and cost savings for permit applicants.

Many commenters asserted that Florida has not described how it will replace the important features of current federal law to provide commensurate protections. One commenter stated that Florida has not made the same statutory changes made by the states of New Jersey and Michigan when those states were granted Section 404 permitting responsibility. One commenter expressed concern that this departure from federal procedures would fast-track development that would pose threats to wildlife and unique Florida ecosystems. Some commenters stated that converting permitting from a federal to a state program would eliminate the checks and balances between federal and state agencies that occur under federal review. Several commenters stated that Section 404 program assumption would eliminate expert federal review and interactions between state and federal agencies that result in development of environmental impact statements and effective public participation opportunities.

Some commenters stated that without NEPA the public would not have the same opportunities to provide meaningful input on environmentally destructive plans by builders and resource exploiters. Some commenters stated that public review of proposed permits in Florida will be inadequate because the Florida process is less accessible to the public, does not provide access to information in a timely manner, and requires a costly administrative process for the public to challenge details of a proposed permit. Some commenters explained that the Florida process allows input only at the beginning of the process where there is little information about the proposed action and at the end via an often-costly challenge as part of a State administrative hearing. The commenters stated that meaningful public participation requires clear points where the public gets access to detailed environmental information about a proposed action, along with the agency's tentatively selected plan of action.

Some commenters were concerned that the public would lose the ability to challenge in federal court any permits that fail to comply with NEPA. Some commenters pointed out that because Florida has no statutory counterpart to NEPA, the public would be deprived of procedural protections and the opportunity to challenge permits in federal court. The commenters gave examples of the benefits of federal court review, including a case in which a federal court determined that NEPA did not allow the Corps to "segment" the project.

**EPA Response:**

**EPA acknowledges the comment that without a requirement for NEPA review under a state-assumed Section 404 program, duplication of some federal and state environmental review would be avoided.**

**EPA also acknowledges that NEPA does not apply to permits issued under Florida's Section 404 program, nor does it apply to EPA's decision to approve or deny Florida's request to assume the Section 404 program. The NEPA process begins when a federal agency develops a proposal to take a major federal action, as defined at 40 C.F.R. § 1508.1. State permitting actions are not federal actions. With regard to the comment that Florida has not passed laws or regulations equivalent to NEPA, EPA has determined that Florida's Section 404 program, including its statute and regulations, fulfills the requirements of the CWA and the regulations at 40 C.F.R. Part 233. EPA acknowledges commenters assertions that Florida has not made the same statutory changes as Michigan or New Jersey in response to their request to assume the CWA Section 404 program. However, nothing in the CWA or implementing regulations requires Florida to make the same statutory changes that other states who have assumed the CWA Section 404 program have made. EPA disagrees with commenters that the absence of State laws that parallel NEPA and other federal laws means that Section 404 permit decisions would be made with far less data, without rigorous review of the environmental impacts, and without the same level of review as federal review of project benefits versus environmental losses. Florida has chosen a different approach, using its other authorities to ensure sufficient disclosure of environmental impacts associated with permits proposed under its State 404 program, and EPA has determined that these processes and associated state authorities have satisfied the statutory and regulatory obligations for Florida to assume the CWA Section 404 program.**

**EPA acknowledges commenters who asserted that the act of assuming the CWA Section 404 program is not a delegation, but an alternative program in which Florida has sole jurisdiction. The state assumption process is not a delegation of the Section 404 program to states and tribes. Congress has provided states and tribes the opportunity to assume primary responsibility for implementing a Section 404 program pursuant to state authorities. EPA disagrees with comments suggesting that once Florida assumes the Section 404 program, it has sole jurisdiction of the CWA Section 404 program. The Corps will continue to administer the Section 404 program in retained waters within Florida, and EPA will maintain its oversight authority pursuant to the CWA and will oversee Florida's administration of the State 404 program.**

**EPA acknowledges commenters' concerns regarding the level of federal review and interaction on the state's permits under an assumed program, but EPA disagrees with the assertion that this interaction would be eliminate under Florida's 404 program. Florida's 404 program provides for significant state and federal interaction and review. As stated in Section (b) of Florida's Program Description: "Interagency coordination with the State Historical Preservation Office (SHPO) and Tribal Historical Preservation Office (THPO), Florida Fish and Wildlife Conservation Commission (FWC), U.S. Fish and Wildlife Service (FWS), National Marine Fisheries Service (NMFS), Water Management Districts (WMDs), and Environmental Protection Agency (EPA) will be conducted, as required, following the procedures described in their respective operating agreements (See sections D (DEP/EPA MOA) and E (DEP/USACE MOA) of the package and section (j) (DEP/FWC/FWS MOU and DEP/SHPO OA) of the program description) and section 5.2 of the 404 Handbook. A**

**commenting agency may submit questions or comments for the Department to include in the [Request for Additional Information (RAI)]. A commenting agency may also provide comments to EPA and request EPA object to a proposed activity. The Department will forward the applicant's response to the RAI to each commenting agency for review, if applicable. Additional conditions may be included in the final authorization based upon the recommendation of a commenting agency to avoid or minimize potential adverse effects due to the project."**

**The 404(b)(1) Guidelines are the substantive environmental review criteria for evaluating impacts of potential dredged or fill activities. While states and tribes are not required to adopt or incorporate the Section 404(b)(1) Guidelines verbatim, implementation of state and tribal environmental review criteria must result in a permit that is as consistent with the Section 404(b)(1) Guidelines as would be a permit issued for the same discharge by the Corps. EPA has reviewed Florida's State 404 program and found that administration of the program as proposed will result in permit reviews that will take into account the environmental effects of the permit action and that Florida's 404 program is consistent with and no less stringent than the requirements of the Section 404(b)(1) Guidelines. Permits issued under Florida's Section 404 program will be evaluated against the same environmental review criteria applicable to Corps-issued Section 404 permits.**

**With regard to the commenter who raised the "segmentation" issue, "subsection 62-331.051(2), F.A.C., provides that all activities reasonably related to a project shall be included in the same permit application, which means that the applicant should provide sufficient information for the Agency to review the entire scope of the project. This will enable the Agency to assess whether the project as a whole meets the requirements of Chapter 62-331, F.A.C., and [the State 404 Program Applicant's Handbook]." Section 5.3.2 of the State 404 Handbook states that for large projects that cannot be completed within the maximum five-year permit duration, "[t]he applicant shall create a long-term planning document that explains how the project is phased, what activities are expected to be completed within each phase, an expected permitting timeframe for each phase, and an assessment of cumulative impacts. The long-term planning document shall be made part of the project file that goes out on public notice and federal review if required under 40 C.F.R. § 233.51." See section 5.3.2 of the State 404 Program Applicant's Handbook. The State 404 Program Applicant's Handbook further provides that "[d]uring its review of the first phase of the project, the Agency shall analyze and review the entire project, as proposed in the long-term planning document, under all 404 requirements. This analysis and review shall become part of the project file and be a basis of the agency action on the first phase, and the long-term planning document shall be incorporated into the permit." See *id*.**

**EPA has determined that the public participation process set forth in Florida's Section 404 program is consistent with and no less stringent than the public participation requirements of 40 C.F.R. Part 233. Specifically, Florida's Section 404 program provides for public notice of proposed permits consistent with 40 C.F.R. § 233.32, including the information requirements of 40 C.F.R. § 233.32(d), and for public hearings consistent with 40 C.F.R. §**

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**233.33. EPA has also determined that the administrative procedures applicable to Florida's Section 404 program constitute sufficient due process for those wishing to contest a permitting decision under Florida's Section 404 program. The comparison between EPA's and Florida's regulations in the Program Description, Appendix j-3, makes clear that Florida's regulations and its State 404 Program Applicant's Handbook include all of the same public participation requirements that federal law requires. See Program Description, Appendix j-3 at 28-32; 62-331.060, F.A.C.; and the State 404 Program Applicant's Handbook section 5.3.1.**

**EPA acknowledges that NEPA does not apply to permits issued under Florida's 404 program and thus a NEPA-related challenge in federal court is unavailable. However, EPA's regulations do not require particular procedures for judicial review or access to particular venues, such as that of federal court, for state-issued permits, and nothing in Florida's judicial review procedures is inconsistent with federal requirements. Challenges to actions of a state in issuing or denying a permit pursuant to a state-assumed Section 404 program are typically heard in state court, and EPA recognizes that different states have different procedures for judicial review, and that those procedures may also differ from federal procedures. As the Seventh Circuit Court of Appeals explained, "[i]t is not the unique province of the federal courts to adjudicate administrative law challenges related to the Clean Water Act."** ***Menominee Indian Tribe of Wisconsin v. EPA*****, 947 F.3d 1065, 1071 (7th Cir. 2020) (upholding the district court's dismissal of a challenge to EPA's and the Corps' alleged failure to exercise jurisdiction over a Section 404 permit application where Michigan administers the Section 404 program.)**

**See Response to Comments Section N for EPA's response regarding ESA. See Response to Comments Section P for EPA's response regarding NHPA. See EPA's December 16, 2020 memorandum regarding its no effects determination to Essential Fish Habitat pursuant to the Magnuson-Stevens Act.**

## N. Endangered Species Act (ESA)

### *EPA's policy on ESA consultation*

A number of commenters supported Florida's assumption of the CWA Section 404 program. Specifically, one commenter voiced their support for EPA's decision to engage in programmatic consultation with the USFWS and agreed "that a programmatic biological opinion and incidental take statement, as contemplated in the Memorandum of Agreement between FDEP and USFWS, can be applied successfully in the State of Florida." Another commenter stated that the "resultant streamlined permitting process will reduce costs and duplication of effort by state and federal authorities."

One commenter refuted several objections that other commenters had made. This commenter stated that comments suggesting that Florida's application was incomplete or lacks adequate information "misunderstands the requirements of Section 7 consultation and how it relates to EPA's determination on an assumption application." This commenter noted that, "As the

83

Eleventh Circuit has explained: Section 7(a)(2) of the ESA does not require that consultation under the Act take place in any particular manner. Section 7(a)(2) simply directs the federal agency to "insure" in consultation with the [Services] that its actions are not likely to jeopardize the existence of listed species or their critical habitat. See 16 U.S.C. § 1536(a)(2). It is for the agencies to determine how best to structure consultation to fulfill Section 7(a)(2)'s mandate."

This commenter also asserted that "Florida's approach does not "bypass" species protection, as some commenters suggest," insisting that Florida's program "will go above and beyond the requirements of federal law and ensure more robust protections for threatened or endangered species." This commenter also refuted other commenters' suggestions that "programmatic consultation will place the state's 404 program under an 'interminable' consultation situation where programmatic consultation is 'reinitiated every time there's a regulatory change'", stating that "nothing in the ESA would require re-initiation of formal consultation in this manner." The commenter further stated that coordination between FDEP and USFWS—which would include FDEP sending copies of all permit applications and preliminary site-specific determinations to the USFWS for review and comment, considering any information that USFWS provides as technical assistance, and either including all species protection measures that the USFWS may recommend or denying the request for a permit—falls within the broad scope of "technical assistance" as described in the ESA's implementing regulations and the USFWS' Interagency Consultation Handbook. This commenter also contradicted the argument that "the programmatic approach will not provide state 404 permittees with take liability protection," stating that: "Under Florida's proposed programmatic consultation approach, liability protection under ESA Section 7 should extend to state 404 permittees who comply with the terms and conditions of the technical assistance process set forth in an applicable biological opinion with incidental take system."

One commenter who voiced support for Florida's assumption expressed their concern over "EPA's decision to change its longstanding interpretation of the applicability of the Section 7 Consultation Process to its decisions whether to approve a state assumption request."  One commenter contended that the programmatic consultation for assumption that would cover all permits the State issues is an incredibly controversial legal position that has not been given sufficient time for review, particularly in light of EPA's position for the past 10 years that programmatic consultations were not even part of the assumption process.

Some commenters noted that the Memorandum of Understanding between FDEP, the USFWS and the (FWC was incomplete as it was not signed and "it does not include any completed programmatic biological opinion or incidental take statement for the Florida 404 Program." Some of these commenters pointed out that the public could not evaluate the State's plans for assumption without knowing all the parties committed to the actions described in the MOU. One of these commenters observed that, without a signed MOA and any completed programmatic biological opinion or incidental take statement, there is "no way to assess the actual effectiveness of the proposed consultation process for federally protected species." One of these commenters insisted that "a final signed MOU should be available for review before EPA acts on the state's application so that it is clear what the final process between the FDEP, the Service, FDEP and [FWC] will be and what EPA's role will be." Another of these commenters asserted that the

proposal does not sufficiently describe how Florida will replace the important protections afforded by federal laws (NEPA, ESA) and federal agencies (USFWS), noting that "an adequate method for replacing Section 7 consultation has not been secured." The commenter explained that assumption removes the mandated involvement of USFWS and the National Marine Fisheries Service (NMFS) and their formal review process.

The commenter explained that assumption removes the mandated involvement of USFWS and the National Marine Fisheries Service (NMFS) and their formal review process. The commenter contended that the programmatic consultation for assumption that would cover all permits the state issues is an incredibly controversial legal position that has not been given sufficient time for review, particularly in light of EPA's position for the past 10 years that programmatic consultations were not even part of the assumption process. One commenter who voiced support for the proposal expressed their concern over "EPA's decision to change its longstanding interpretation of the applicability of the Section 7 Consultation Process to its decisions whether to approve a state assumption request."

Some commenters questioned whether Florida's assumption of CWA 404 responsibilities, including Section 7 consultations, would result in lesser protection for endangered species than if these responsibilities remained with the federal government agencies currently responsible for their enforcement. One of these commenters noted that the "truncated one-size-fits-all approach proposed by FDEP would constitute a vast stripping of protection to the many threatened and endangered species that live only in Florida waterways." Two commenters declared that "If the FDEP takes over this process, it would eliminate additional scrutiny of federal laws that apply to federal permits actions," including compliance with Section 7 of the ESA. Some commenters stated that the one-time programmatic opinion is not an adequate way to meet the requirements of the ESA due to the amount of listed species in Florida.

Some commenters expressed concern that the "ESA consultation process outlined in the MOU does not address an important collaborative strategy for protecting federally listed species called Habitat Conservation Planning (HCP) under ESA Section 10." These commenters noted that, although HCPs can achieve regional, multi-species, multi-applicant, and long-term mutual benefits compared to single-project reviews and Section 7 consultation," the state's proposed ESA consultation process would conflict with or undermine HCP regional collaboration efforts. These commenters support collaborative strategies for species protection.

One commenter questioned the USFWS' issuance of a "statewide incidental take statement (ITS) that would exempt Florida from the ESA's take prohibition when administering its Section 404 program," claiming that it violates the ESA because it was made "without an understanding of the impacts that the millions of combinations of possible covered activities would have on listed species and it was made based on unenforceable promises of future action." This same commenter contended there were several legal and technical deficiencies with the proposal, including a lack of consultation with NMFS as part of the process, and failure of EPA's Technical Assistance memorandum to outline the actual substance of the assistance process. The commenter stated that it would be impossible for any evaluation of future take resulting from Florida's assumption of Section 404 permitting to sufficiently establish procedural requirements

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

and permitting conditions or measures that would address all possible statewide permitting scenarios. The commenter stressed that the number of habitats and possible acres that would be affected by state assumption is far too vast to be adequately addressed in a one-size-fits-all statewide ITP, and the categories of potential projects and the potential sizes of projects are similarly too numerous to anticipate.

At least one commenter argued that the design of the Florida program precludes any meaningful oversight, even though the ITS would be directly issued to the EPA, as EPA appears to have no ongoing obligation to ensure that FDEP complies with the ESA after it has completed consultation on the assumption application. The commenter also noted that the conditions provided for in the MOU are not incorporated into law, and that FDEP's regulations also do not appear to commit the agency to incorporate recommendations made by the Service during technical assistance, and instead only appear to commit permittees to abiding by the recommendations resulting from the technical assistance process that FDEP chooses to incorporate.

One commenter argued that a truncated programmatic consultation would essentially give the EPA wholesale approval from the USFWS and NMFS for specified and foreseeable actions without any analysis of the effects of the whole action, jeopardy determinations, or take limits, all in direct contravention to the ESA's mandate, implementing regulations, and numerous court holdings. The commenter noted that, although the proposal insists that the State has promulgated language necessary for ensuring compliance, the technical assistance process is still being developed, and depends on other agencies who lack the resources necessary to carry out review of all state Section 404 permits. This commenter further noted that a programmatic biological opinion was not included in FDEP's application and stated that, "even if a programmatic biological opinion were produced prior to the EPA's assumption decision deadline, it was not part of FDEP's application and has not been part of the administrative review process or subject to notice and comment. The commenter stated that EPA cannot approve Florida's assumption application based on a biological opinion outside the public's scrutiny, when the State is relying on that opinion to claim compliance with requirements to assume jurisdiction over the Section 404 program. The commenter also reiterated that, like the anticipated programmatic biological opinion, the Biological Assessment is not part of FDEP's application. The commenter argued that the Biological Assessment suffers numerous flaws that render it inadequate to support a programmatic biological opinion. Finally, the commenter also pointed out that Florida's proposal asks EPA to delegate its obligations under ESA Section 7(a)(2) to non-federal parties, stating that "FDEP's proposal unlawfully delegates the initial effects determination to FDEP (and likely the applicant who will be asked to identify whether species are affected). These determinations must be made by a federal agency."

Another commenter argued that FDEP does not have the expertise to evaluate impacts on listed species, and the Florida Constitution designates FWC as the primary agency in matters related to wildlife. The commenter pointed out that although the FDEP states that it will rely partially on FWC for determinations related to listed species, they also state that they will rely on USFWS for final determination, but the commenter noted that nothing in the law prevents FDEP from ignoring USFWS's recommendations.

86

EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program December 16, 2020

### *Florida assumption of the Section 404 program and adequacy of protecting endangered species*

Some commenters stated their support for Florida's assumption of the Section 404 program, asserting that it will be protective of the State's fish and wildlife species and the environment. Commenters expressed that Florida's approach, and the threatened and endangered species and their habitats, would benefit from ESA consultations at the front end of the process, which does not bypass species protection. Another commenter emphasized that the FWC is committed to working with FDEP to ensure Florida's Section 404 program is successful and protective of Florida's wildlife and that the comprehensive process embodied in the anticipated programmatic biological opinion provides for meaningful engagement among the federal and state agencies and protection of federally listed species and their designated critical habitats. Another commenter noted that FDEP's agreements with the Corps, EPA, the USFWS, and FWC ensure a robust program that provides full protection for our state's wetlands and species. This commenter concluded by affirming that Florida's program will go above and beyond the requirements of federal law and ensure more robust protections for our state's threatened or endangered species.

Other commenters expressed opposition to Florida's assumption of a Section 404 Program, citing both general and specific concerns about how State assumption would impact compliance with the ESA. Some commenters expressed their opposition to the Florida assumption based on the proposal's lack of necessary details, insufficient requirements for interagency consultations, and expressed a general concern that Florida would not meet the requirements of the ESA. Multiple commenters submitted a form letter asserting that Florida's application does not provide complete details about how State agencies would handle threatened and endangered species under the Florida Section 404 program. In a different form letter, commenters emphasized that Florida's wetlands deserve protection, and that a transfer of oversight to Florida without clear assurance on how wildlife impacts will be addressed jeopardizes protections currently in place.

Commenters noted that Florida is home to more endangered species than New Jersey and Michigan, the only other states that have assumed Section 404 programs, and expressed concern that the State's assumption of responsibilities for a Section 404 program would impact compliance with the ESA and be likely to "result in less time and expertise involved in the analysis of project impacts on vulnerable wildlife." Commenters also opposed the State's proposed rules to assume jurisdiction over the federal wetlands permitting authority, stating that Florida has not adequately addressed how it will ensure protection of endangered species and maintain the stringent levels of review that are provided by the ESA. One commenter asserted that the proposed program would illegitimately circumvent the requirements of the ESA, including duty to consult with FWS and NMFS.

Commenters asserted that the Florida Section 404 program does not demonstrate that it can achieve the CWA's no-jeopardy mandate with respect to listed species. These commenters stated that the proposal does not provide reviewers enough information to make a decision regarding FDEP's ability to comply with the Section 404(b)(1) Guidelines' no-jeopardy provision with respect to the engagement process and protection of species under the ESA. Two of these commenters also noted that, "to the extent that FDEP limits its consideration of Section 404 permit authorizations to the Assumed Waters, the agency cannot ensure that it would be capable

87

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

of achieving the no-jeopardy mandate with respect to species and critical habitat in Retained Waters that are in the action area downstream from the permitted activity."

Some commenters expressed that a statewide "one-size-fits-all" ITS that provides FDEP with "near blanket authorization" to exempt Section 404 permit applicants from the ESA's take prohibition would violate the ESA. The commenter stated that an ITS of this nature would likely provide no limits on take or provide woefully inadequate limits to trigger re-initiation of consultation.

One commenter contended that the Biological Assessment "fails to be as protective as the current federal process," noting that "the Biological Assessment fails to provide site-specific information, thereby preventing the intended state implementing agencies (FDEP and the FWC) from even determining the effect of various specific permitting actions" and "the Biological Assessment provides very limited—almost nonexistent—information about the cumulative impacts of the State's assumption program." The commenter asserted that the Biological Assessment fails to adequately address the environmental baseline, status of the species, effects of the action, or reasonable and prudent measures designed to reduce any take identified, and contains other flaws, including lack of information on what constitutes "suitable habitat;" an unreasonably short timeframe for USFWS to decide if it will comment; FDEP and FWC will make effect determinations and assume no comment from USFWS if there is silence (no duty to check); and designation of the key deer and red cockaded woodpecker as not regularly utilizing wetlands despite their state or county wetland dependent designations. The commenter stated that the overarching programmatic consultation, particularly with these flaws, does not relieve the state of its responsibility to determine at the site-specific permit level whether there will be no jeopardy to listed species prior to the issuance of permits. Another commenter expressed concern that that "use of a Programmatic Biological Opinion between FDEP and the FWS and between FDEP and the NMFS is wholly inadequate to protect vulnerable ESA threatened and endangered plant and animal species from Section 404 authorized developmental impacts." This commenter concluded that this alone should disqualify FDEP from Section 404 program assumption.

One commenter added that flaws in EPA's Section 7 consultation process render any potential resulting Programmatic Biological Opinion insufficient. The commenter argued that the NMFS erred in failing to consider the entire area that will be affected by Florida's assumption and not engaging in the Section 7 consultation. The commenter contended that NMFS is merely "assum[ing] that EPA will make a 'no effect' determination for NMFS' ESA-listed species that were originally identified as part of this proposed assumption," based on NMFS' recent determination that "Endangered Species Act (ESA)-listed species under NMFS' jurisdiction do not occur in waters that are assumable by the state." The commenter urged that Section 7 consultation must occur for species and critical habitat that are in the "action area" and "action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." The commenter stated that without consulting NMFS, there will be no consideration of whether the no-jeopardy mandate in the CWA's Section 404(b)(1) Guidelines is achievable for NMFS' species experiencing downstream impacts.

88

One commenter asserted that "the state has failed to demonstrate that its program would conform to the CWA's 404 permitting regulations, "the 404(b)(1) Guidelines," with respect to matters involving ESA-listed species." This commenter warned that improper management of the program and failure to consider the entire action area affected by state assumption during ESA consultation would endanger the Florida Panther, the Florida bonneted bat, and the Everglades snail kite due to habitat loss and fragmentation.

Some commenters warned that Florida's assumption of CWA Section 404 program would result in reduced protection for endangered species, stressing that Florida's endangered species "cannot afford to lose the protection of federal laws that are triggered when federal agencies operate the 404 program." These commenters noted that the federal operation of the Section 404 program triggers a myriad of other federal protections, including: the ESA, the Magnuson-Stevens Act that protects the essential fish habitat in our world-class fisheries, the NEPA, and the NHPA, which protects our historical and cultural resources.

Some commenters observed that Florida contains many unique environments that provide critical habitat for hundreds of species that, although not endangered, could become endangered if development is allowed to proceed as a result of Florida's taking over regulation of the CWA and the ESA.

One commenter expressed concern that, if the federal Fish and Wildlife Coordination Act were replaced with a patchwork of memoranda of understanding between federal and state agencies, this would remove accountability for this vital public responsibility.

One commenter emphasized the original intent of the ESA was to protect endangered species, regardless of the practicality or convenience. Finally, one commenter asserted that compliance with the ESA was in itself inadequate.

### *Permits with potential ESA species*

Some commenters expressed concern about whether the State program would conform to the Section 404(b)(1) Guidelines to protect specific species and questioned the legal liability of a programmatic consultation for assumption that would cover all permits the State issues.

A commenter asked that the State take more time to consider the liability for take of listed species from projects with State permits. This commenter questioned the suggestion by the State that a programmatic consultation for assumption would cover all permits the State issues, asserting that "This is an incredibly controversial legal statement and has not been given sufficient time for a review, and it would most certainly be tested in court." This commenter noted that EPA has never considered programmatic consultations to be part of the assumption process until a few months ago, and that, in cases where they were used by USFWS, they "were used to facilitate the permitting of repeated actions that have similar and predictable impacts." This commenter observed that the "404 program deals with an incredibly wide variety of projects and potential impacts, ones that cannot be captured in a programmatic fashion" and concluded that legal actions could be taken against permittees for incidental take if "the legal argument that a programmatic review protects all permits falls through," which could lead to a regulatory program more burdensome than the existing federal program. One commenter questioned

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

whether an incidental take statement from a programmatic consultation could cover the permits issued by FDEP and withstand legal challenge.

*ESA coordination process during permit review (other than EPA oversight matters)*

Some commenters expressed concerns about the coordination between agencies during the permit review process. One commenter observed that the requirements of the Fish and Wildlife Coordination Act will be split among multiple agencies. The commenter contends that the State program's numerous Memoranda of Understanding prepared between the EPA, Corps, FDEP, USFWS, FL Water Management Districts, and the FWC only serve to obscure the accountability for protection of listed species. This commenter also noted that the Florida Legislature gave no additional authority to state agencies to protect endangered and threatened species.

Another commenter stated that FDEP's proposed technical assistance process is not modeled on the structured Section 7 consultation process that is legally required by the ESA, and further "fails to provide specific information about how and to what extent the [US Fish and Wildlife] Service will review permits that FDEP and FWC choose to share with it." The commenter observed that, instead of delineating specific mandatory actions, the proposal asserts that the USFWS will provide 'comments' on permit applications, that FDEP will 'coordinate' with other agencies regarding concerns raised at public hearings, and that it is 'anticipated' that the FDEP will participate in 'unspecified trainings,' create 'unspecified evaluation tools,' 'assisting' with determining species impacts, and developing habitat conservation or species management 'opportunities.'

One commenter expressed opposition to Florida's assumption, stating that the Florida Constitution grants the FWC power to regulate only wildlife and freshwater and marine life, and not pollution. The commenter asserted that FDEP has not demonstrated that it has the authority to regulate species under state law. The commenter concludes that the FWC cannot lawfully exercise its authority over species regulation to act as an essential decision-maker in Section 404, which is a water pollution program.

**EPA Response:**

**EPA acknowledges the comments in support of EPA's decision to undergo programmatic ESA consultation with the FWS. EPA agrees that a biological opinion and incidental take statement can be implemented in the State of Florida.**

**EPA notes the concern raised by a commenter regarding EPA's change in position on the applicability of ESA Section 7 consultation when EPA reviews whether to approve a state assumption request. EPA's determination that it should consult with the Services under Section 7 of the ESA if a decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or designated critical habitat is outside of the scope of the comment period on Florida's program submission as set forth in 40 C.F.R. § 233.15. This determination was discussed in an August 27, 2020 memorandum from David Ross, Assistant Administrator for the Office of Water, and titled "Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404**

90

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**Program Approvals." In the memorandum, EPA explained that on May 21, 2020, the Agency initiated a 45-day public comment period (which ended up being a total of 47 days) through an announcement in the Federal Register titled "Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program Is Nondiscretionary for Purposes of Endangered Species Act Section 7 Consultation." That public comment period closed on July 6, 2020, and EPA received comments from a variety of stakeholders.**

**In its August 27, 2020, memorandum, EPA determined that ESA Section 7 applies to EPA's decision as to whether to approve a state or tribal request to assume a CWA Section 404 program. That determination triggered the requirement for EPA to consult under ESA Section 7 if EPA determined that approval of Florida's CWA 404 program may affect a listed species or designated critical habitat. The analysis in a Section 7 consultation is whether the action is likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat. EPA is not required to make a determination whether Florida's program goes above and beyond that requirement of the federal ESA or other law. EPA has met its requirements to ensure no likely jeopardy to listed species or likely destruction or adverse modification to designated critical habitat under ESA Section 7(a)(2) by completing ESA consultation and receiving a "no jeopardy" Biological Opinion (BiOp) from the Service. EPA agrees with commenters that it is up to EPA and USFWS to structure the consultation and fulfill the Section 7(a)(2) requirement for the federal agency to insure that the federal agency action is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat. EPA and USFWS concluded ESA consultation on November 17, 2020, with a "no jeopardy" finding in the Biological Opinion, therefore no additional action for ESA consultation is required.**

**In response to a commenter asserting that a truncated programmatic consultation does not analyze effects of EPA's whole action, jeopardy determinations, or take limits, ESA implementing regulations set forth at 50 C.F.R. § 402.02 describe a programmatic consultation as a consultation that is addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the Services to consult on the effects of programmatic actions such as . . . [a] proposed program, plan, policy, or regulation providing a framework for future proposed actions. In its Biological Opinion, USFWS noted that "the scope of EPA's approval of FDEP's request to administer the CWA 404 program in assumable waters is essentially statewide, covering an array of operations that may affect a wide variety of ESA-proposed and -listed species and proposed and designated critical habitat" and that "[b]ecause this is a consultation on a programmatic action, it is not feasible, nor is it required, to conduct a meaningful site-specific and species-specific effects analysis in this BiOp."** ***U.S. Fish and Wildlife Service, Programmatic Biological Opinion for U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program Under Section 404 of the Clean Water Act (November 17, 2020)*** **at 54 ("Biological Opinion").**

**EPA disagrees with the commenter who stated that the biological assessment suffers numerous flaws and that the programmatic consultation process unlawfully delegates**

91

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**federal responsibilities to FDEP. EPA has engaged in an ESA Section 7 consultation for purposes of its proposed action, which is EPA's potential approval of the State of Florida's request for the assumption of the administration and permitting of a CWA Section 404 program. In accordance with 50 C.F.R. § 402.08, "the ultimate responsibility for compliance with section 7 remains with the Federal agency." EPA utilized FDEP's biological assessment in order to prepare its biological evaluation, which included an effects determination and which the EPA transmitted to the USFWS on September 2, 2020, to request formal consultation. As indicated in the Biological Opinion issued on November 17, 2020, by USFWS, "[t]he implementation of the State's program in evaluating permit applications, issuing or denying permits, compliance and enforcement of permit conditions, and all the ensuing execution of permitted activities by permittees are considered program activities emanating from the action and have been considered under this programmatic consultation and BiOp." Biological Opinion at 10.**

**EPA acknowledges the comments stating that neither the Biological Opinion, the Biological Assessment, an incidental take statement, or final MOU among FWC, FDEP, and USFWS were included as part of FDEP's application. However, EPA disagrees that FDEP is required to include these documents as part of its application, which, in turn, is subject to notice and comment. A biological assessment, biological opinion, or incidental take statement are not required elements of Section 404 program submissions, as set forth in 40 C.F.R. § 233.10. Further, the regulations set forth at 40 C.F.R. Part 233 describe the public participation procedures for approving state programs. Neither the CWA implementing regulations at 40 C.F.R. Part 233 (governing state 404 programs) nor the ESA implementing regulations at 50 C.F.R. Part 402 (interpreting and implementing ESA Section 7) require public comment on biological assessments, biological opinions, or incidental take statements. Additionally, although FDEP submitted a copy of the Memorandum of Understanding Between the FWC, the USFWS, and the FDEP, dated August 5, 2020, which was made available for public review as part of Florida's submission, this was not required by the CWA implementing regulations. See Response to Comments Section D regarding completeness of program submission.**

**EPA disagrees with assertions that Florida's assumption of a Section 404 program would result in lesser protection for endangered species. The USFWS Biological Opinion finds that the process developed by Florida in partnership with the USFWS and EPA is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat. Biological Opinion at 68. EPA makes no determination about whether Florida's program or protection of species "goes above and beyond the requirements of federal law."**

**EPA disagrees with the commenters stating that programmatic consultation will not provide incidental take coverage to permittees. The Services are required, as part of formal consultation, to prepare an incidental take statement if such take is reasonably certain to occur and will not violate ESA Section 7(a)(2). 50 C.F.R. 402.14(g)-(i). Pursuant to the ESA regulations, the USFWS provided an incidental take statement in the November 17, 2020 Biological Opinion. Thus, under the ESA regulations, "any taking which is subject to a**

92

**statement as specified in [50 C.F.R. 402.14(i)(1)] and which is in compliance with the terms and conditions of that statement is not a prohibited taking under the [ESA], and no other authorization or permit under the [ESA] is required." 50 C.F.R. 402.14(i)(5). In the present approval of Florida's CWA 404 program, the USFWS programmatic Biological Opinion and ITS states: "any take incidental to the execution of activities permitted by a State 404 permit issued through the implementation process described in this BiOp will be exempt from Section 9 and Section 4(d) prohibitions if the permittee implements all permit conditions such as effect minimization measures, monitoring, and reporting as agreed upon by the State, and the USFWS." Biological Opinion at 70.**

**USFWS' incidental take statement provides take protection to the State of Florida, but it does not provide take protection without an understanding of the impacts of permits on listed species. In addition, the take statement does not rely on unenforceable promises of future action and is not a one-size-fits all approach. The approach provides a process for assessing impacts to species on a project-level giving Florida's species consideration when projects are being considered. The USFWS' incidental take statement recognizes that project-specific information about impacts to listed species and designated critical habitat will be provided through implementation of the state program, EPA's oversight of the Section 404 program, and coordination of the federal review of the state-issued permits. USFWS will then have the opportunity to review the state permit applications and evaluate those projects, and coordinate and provide technical assistance to the state in order to minimize impacts to listed species and designated critical habitat. The Biological Opinion goes on to state:**

> **If it is determined, through technical assistance on permit reviews with State that take of ESA-listed species is still expected to occur after implementation of recommended minimization measures, the amount or extent of incidental take will be quantified, at that time by the appropriate Field Office of the USFWS, in coordination with FDEP/FWC. FDEP/FWC and USFWS will review reports and track the levels of take estimated through the technical assistance process and exempted by this Incidental Take Statement. Biological Opinion at 70.**

**Therefore, EPA disagrees with the commenters' assertion that the incidental take statement does not take into account an understanding of impacts to listed species and designated critical habitat. As established in the FWC-USFWS-FDEP MOU, USFWS has the ability to evaluate the impacts on a project-specific basis. In addition, EPA disagrees that incidental take coverage is provided by USFWS based on unenforceable promises of future action. In fact, USFWS' Biological Opinion provides incidental take coverage for permitting actions only if the permittee implements all permit conditions agreed upon by the State and USFWS. <u>See</u> Biological Opinion at 70. Consequently, the application of incidental take coverage is enforceable and will not be provided if the permittee does not implement the permit conditions.**

**EPA disagrees with commenter assertions that in approving Florida's Section 404 program, EPA and the State are required to "replace" ESA Section 7 consultation for the**

**State permitting program. ESA Section 7 applies only to federal agency actions, not state actions. Regardless, as a result of the ESA consultation between EPA and USFWS on EPA's approval of Florida's CWA Section 404 program, FDEP and USFWS will coordinate on state-issued permits and FDEP will incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the USFWS to avoid jeopardizing listed or proposed species and/or adversely modifying designated or proposed critical habitat. Biological Opinion at 68. See Response to Comments Section M regarding comments concerning replacement of NEPA protections.**

**EPA acknowledges the comment that HCPs can achieve certain benefits for species protection. However, EPA disagrees that the ESA consultation process would conflict with or undermine HCP collaboration efforts. EPA also disagrees with comments asserting that Florida has not ensured protection of listed species or maintained the levels of review provided by ESA. First, a programmatic consultation approach will ensure that species are protected similar to a case-specific application of ESA Section 10. Second, as the USFWS Biological Opinion recognizes:**

> **USFWS will be conducting the [USFWS commitments] through the technical assistance process, and not through section 7 or section 10 of the ESA. To clarify that USFWS coordination through a technical assistance process, USFWS will not "concur" with any effect determinations made by the State of Florida, but rather may provide comments and conditions that must be implemented in order for the permit to be issued. This process of USFWS coordination and technical assistance operates similarly to a section 7 consultation because it has a similar objectives of 1) ensuring a State 404 permit action is not likely to jeopardize a species or adversely modify or destroy critical habitat, and 2) minimizing and tracking the amount of incidental take if take is reasonably certain to occur. Biological Opinion at 20.**

**In addition, if FDEP chooses not to follow, or is unable to implement the Reasonable and Prudent Measures and associated Terms and Conditions of the Incidental Take Statement, project applicants may seek protections from the take prohibitions of the ESA by obtaining take authorization pursuant to section 10(a)(1)(A) and 10(a)(1)(B) of the ESA or exemption through a separate ESA Section 7(a)(2) consultation if another federal nexus exists. Biological Opinion at 70.**

**In response to a comment asserting that EPA appears to have no ongoing obligation to ensure that FDEP complies with the ESA after it has completed consultation on the assumption application, EPA notes that it maintains its role as the oversight agency following FDEP's assumption of the Section 404 program. EPA disagrees with the comment that FDEP's regulations do not appear to commit the Agency to incorporate recommendations made by the Service during technical assistance. Section 7.2.3 of the 404 Handbook requires FDEP to "incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the FWC, FWS, or NMFS under their respective authorities, to avoid jeopardizing listed species or**

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**adversely modifying designated or proposed critical habitat." Failure to include the protection measures as permit conditions that are designed to avoid jeopardy or adverse modification of designated critical habitat could ultimately result in the State either denying the permit or the State informing the EPA that it will neither issue nor deny the permit, which would result in the EPA transferring the permit to the Corps for processing in accordance with 40 C.F.R. § 233.50(j).**

**EPA disagrees with commenter assertions that it did not consult with NMFS, and that there was thus a legal or technical deficiency. In a letter dated April 15, 2020, NMFS responded to a request for input on a draft species list sent to it by FDEP, which was designated to serve as the EPA's non-federal representative for purposes of conducting informal consultation under Section 7 of the ESA. In the letter, NMFS concluded that ESA-listed species under NMFS' jurisdiction do not occur in waters that are assumable by the state. In accordance with 62-331.053, F.A.C., no permit shall be issued by the state when the project causes or contributes to violations of any applicable state water quality standard or to significant degradation of wetlands or other surface waters. Thus, where a species subject to jurisdiction under NMFS occurs in waters retained by the Corps that are located downstream from permitted activities in state-assumed waters, upstream protections provided by the state-issued permits would ensure that all action areas, including downstream areas that are indirectly affected by the action, have been considered.**

**FDEP's process for evaluating impacts to listed species and designated critical habitat involves FWC and USFWS (both state and federal agencies with expertise in impacts to listed species and designated critical habitat). The USFWS Biological Opinion recognizes the role of FWC:**

> **FDEP cannot authorize impacts, specifically incidental take, of State-listed species identified in Chapter 68A-27, F.A.C. Therefore, FDEP has historically coordinated protection and conservation of aquatic and terrestrial fish and wildlife species with the FWC. FWC's permit commenting authority was codified upon the agency's creation of Section 20.331(10), Fla. Stat. The FWC provides a list of potentially affected federally and State-listed species to FDEP during ERP application review. It also evaluates potential impacts to State-listed fish and wildlife for ERP Program project applications that are expected to affect species and habitat, and provides recommendations for permit conditions to the FDEP to minimize such effects. As described in the BE (Appendix A), FWC will continue to comment on ERP permits and will be commenting on State 404 permits should EPA approve FDEP's assumption of the 404 program, per the State 404 Program Rule (62-331, F.A.C.), the State ERP Rule (62-330, F.A.C), and the FDEP-FWC-USFWS MOU. Biological Opinion at 11.**

**EPA disagrees with the comment that nothing in the law prevents FDEP from ignoring USFWS's recommendation because the CWA Section 404(b)(1) Guidelines provide that no discharge of dredged or fill material shall be permitted if it jeopardizes the continued**

95

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**existence of listed species or results in the likelihood of the destruction or adverse modification of designated critical habitat. 40 C.F.R. § 230.10(b)(3). USFWS' Biological Opinion also states:**

> **The USFWS will receive all permit applications and public notices directly from FDEP in accordance with the FDEP-FWC-FWS MOU and 62-331, F.A.C. USFWS will also receive species effect assessments from FWC or FDEP. USFWS will review all permit applications and effects assessments received from FDEP and FWC. USFWS will submit questions, information and comments or measures necessary to minimize effects to ESA-listed species as needed. FDEP, in coordination with FWC, will receive, review, and incorporate any impact minimization measures received from USFWS into its permit actions pursuant to the FDEP, FWC, USFWS MOU and FDEP's State 404 program rule (62-331, F.A.C.). Biological Opinion at 12.**

**The Biological Opinion goes on to state:**

> **The State's lead for species coordination may be FWC staff, or the permit processor with FDEP, depending on the complexity of the request and the workload. Regardless of the designated staff to be the point person for coordinating with the USFWS, both State agencies will work together as a team for all projects with listed species issues. For each State 404 permit application review, staff with FWC and FDEP will determine who will take the lead to coordinate with the USFWS and will copy the other reviewer on all correspondence. The State species lead will provide, and/or validate the applicant's submittal of a preliminary list of species anticipated to be affected, identification of project areas, preliminary impact/effect determinations, and preliminary proposed impact avoidance and minimization measures (protection measures) for federally listed and State-listed endangered or threatened species (and species proposed to be listed) and their critical habitats. *Upon coordination with the USFWS on appropriate protection measures for federally listed species and their critical habitats, FDEP will incorporate the USFWS-recommended measures as permit conditions, or will issue a Notice of Intent to Deny the permit.* Biological Opinion at 16 (emphasis added).**

**Thus, FDEP is required to incorporate USFWS' recommendations into state-issued permits, ensuring that USFWS' recommendations will not be ignored, as the commenter asserts.**

**EPA acknowledges the comments stating that reinitiation of ESA consultation would not be required or "interminable." EPA recognizes that the ESA regulations state that, "[r]einitiation of consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and: (1) if the amount or extent of taking species in the incidental take statement is exceeded; (2) if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) if the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological**

96

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**opinion or written concurrence; or (4) if a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. 402.16. Reinitiation of ESA consultation may be required if one of the reinitiation triggers under the ESA regulations are met or if a state's CWA Section 404 program is revised. The question of whether reinitiation is required in a circumstance must be assessed in light of the legal requirements and facts at that time. The Biological Opinion's section on reinitiation states:**

> **For the purposes of this programmatic consultation, any exceedance of take for a State 404 permit action that has not been completed will be addressed as described in FDEP's term and condition number 9. Additionally, the listing of a new species or critical habitat shall not trigger reinitiation of consultation on this action (approval of Florida's assumption of the CWA 404 program). Since the State would administer the CWA 404 program, the USFWS has no obligation to conduct section 7 consultation on individual permits because the issuance of such a permit is not a Federal action. However, the State's regulations require that the State comply with the technical assistance process with USFWS for ESA listed species and critical habitat. Accordingly, any effects to newly listed species or their critical habitat would be sufficiently considered and addressed." Biological Opinion at 68.**

**EPA submitted a biological evaluation to the USFWS when it requested initiation of formal consultation under Section 7(a)(2) of the ESA. A biological evaluation is a similar document to a "biological assessment" except unlike biological assessments, a biological evaluation is prepared for non-construction activities. The purpose of a biological evaluation is to assess the potential effects of the federal agency action on listed species and designated critical habitat and determine whether the federal agency action is likely to adversely affect any such species or habitat. Biological assessments or evaluations are not intended to provide protections. The biological evaluation is part of the ESA consultation initiation request to the USFWS and is not a part of the State Section 404 program submission. EPA's biological evaluation contained the required analyses to initiate ESA Section 7 consultation, including an evaluation of the environmental baseline, status of the species, cumulative effects, and other analyses. See "ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida" August 2020. Biological evaluations are not required to include reasonable and prudent measures (reasonable and prudent measures are elements of a Biological Opinion issued by the USFWS or NMFS).**

**EPA initiated ESA consultation with the USFWS, and the USFWS issued a Biological Opinion on November 17, 2020, and found that the process developed by Florida in partnership with the USFWS and EPA is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat. The Biological Opinion contains the required analyses, including evaluation of the environmental baseline, an effects analysis, reasonable and prudent measures, and other elements required by USFWS's ESA implementing regulations. The CWA Section 404(b)(1) Guidelines prohibit the discharge of dredged or fill material if it jeopardizes the continued existence of listed species or results in the destruction or adverse modification of designated critical habitat.**

97

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**The State's process and rules and the USFWS Biological Opinion recognize this prohibition. See Biological Opinion at 30. In addition, the Biological Opinion states:**

> **EPA's approval of the State's 404 program activates the FDEP-FWC-USFWS MOU which establishes a process whereby the USFWS will be provided an opportunity to review all State 404 permit applications, and analyze impacts to ESA-listed species and designated critical habitat that may result from activities permitted by the State 404 program and provide technical assistance to FDEP with respect to avoiding and minimizing effects on ESA-listed species and their critical habitats. During this review, the USFWS will have an opportunity to provide additional information concerning potential effects to ESA-listed species, recommend measures to minimize effects, and provide monitoring and reporting recommendations on a project-specific and species-specific basis.**
>
> **Our opinion is that the proposed action (including the subsequent program activities it will cause) has built in a sufficiently structured process to insure that the State's administration of section 404 of the CWA in assumed waters is not likely to cause an appreciable reduction in the likelihood of both the survival and recovery of any listed species by reducing the reproduction, numbers or distribution of that species. It is also our opinion that the proposed action has built in a sufficiently structured process to insure State's administration of section 404 of the CWA in assumed waters is not likely to result in destruction or adverse modification of critical habitat. Biological Opinion at 68.**

**EPA disagrees that less time and expertise will be involved in the analysis of project impacts on vulnerable wildlife. The Biological Opinion makes clear that FWC and USFWS (as well as FDEP and EPA) will have roles in determining the impacts of projects on listed species and designated critical habitat. The Biological Opinion also recognizes that "FDEP will incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the USFWS to avoid jeopardizing listed or proposed species and/or adversely modifying designated or proposed critical habitat." Therefore, FDEP will have the benefit of USFWS' expertise on listed species and designated critical habitat impacts in the development of permit conditions.**

**EPA recognizes that the ESA describes "action area" to include those areas that also are indirectly affected by a federal action. In a letter dated April 15, 2020, NMFS responded to a request for input on a draft species list sent to it by FDEP, which was designated to serve as the EPA's non-federal representative for purposes of conducting informal consultation under Section 7 of the ESA. In the letter, NMFS concluded that ESA-listed species under NMFS' jurisdiction do not occur in waters that are assumable by the state. Thus, EPA was not required to consult with NMFS under ESA Section 7(a)(2). In addition, as set forth in a December 16, 2020, memorandum to the record, EPA determined that the decision to approve or disapprove Florida's request for assumption of a 404 program would have no adverse effects to Essential Fish Habitat, pursuant to the Magnuson-Stevens Fishery Conservation and Management Act (MSFCMA). Thus, EPA is not required to consult with**

98

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**NMFS under the MSFCMA. In accordance with 62-331.053, F.A.C., no permit shall be issued by the state when the project causes or contributes to violations of any applicable state water quality standard or to significant degradation of wetlands or other surface waters. Thus, where a species subject to jurisdiction under NMFS occurs in retained waters located downstream from permitted activities in state-assumed waters, upstream protections provided by the state-issued permits would ensure that all action areas, including downstream areas that are indirectly affected by the action, have been considered.**

**EPA acknowledges the commenters' concern that the FDEP submittal does not demonstrate that it can achieve the CWA's no-jeopardy mandate with respect to listed species. EPA disagrees with the commenters for the following reasons. The State 404 program rule at 62-331, F.A.C. prohibits issuance of a permit that is likely to jeopardize the continued existence of endangered or threatened species or result in the likely destruction or adverse modification of habitat designated as critical for these species. In addition, as stated above, the CWA Section 404(b)(1) Guidelines prohibit the discharge of dredged or fill material if it jeopardizes the continued existence of listed species or results in the likelihood of the destruction or adverse modification of designated critical habitat.**

**The program submission describes how the State will comply with the Section 404(b)(1) Guidelines, and EPA has determined that FDEP has demonstrated its ability to comply with the Section 404(b)(1) Guidelines. The Program Description states that the MOU between FWC, USFWS, and FDEP outlines coordination procedures for listed species reviews. Program Description, section (j) – Additional Information at 2. The draft MOU between FWC, USFWS, and FDEP was included in the appendix of the Program Description. FDEP will monitor adverse effect determinations on listed species and critical habitat by incorporating information into its permit tracking database, similar to the information collected by the Corps. This data collection will assist in facilitating compliance with permit conditions and can also be shared with USFWS. Failure to include the protection measures as permit conditions that are designed to avoid jeopardy or adverse modification of designated critical habitat would ultimately result in the State either denying the permit or the State informing the EPA that it will neither issue nor deny the permit, which could result in the EPA transferring the permit application to the Corps for processing in accordance with 40 C.F.R. § 233.50(j). The USFWS' Biological Opinion finds that this process is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat.**

**As for reinitiation of consultation and triggers, the Biological Opinion addresses those concerns, specifically stating:**

> **For the purposes of this programmatic consultation, any exceedance of take for a State 404 permit action that has not been completed will be addressed as described in FDEP's term and condition number 9. Additionally, the listing of a new species or critical habitat shall not trigger reinitiation of consultation on this action (approval of Florida's assumption of the CWA 404 program). Since the State would**

99

> **administer the CWA 404 program, the USFWS has no obligation to conduct section 7 consultation on individual permits because the issuance of such a permit is not a Federal action. However, the State's regulations require that the State comply with the technical assistance process with USFWS for ESA listed species and critical habitat. Accordingly, any effects to newly listed species or their critical habitat would be sufficiently considered and addressed. Biological Opinion at 73.**

**EPA's approval of Florida's CWA Section 404 program does not transfer regulation of the ESA to the State. ESA Section 7 applies only to federal agency actions, not state actions. Regardless, ESA protections will remain, because as a result of the ESA consultation between EPA and USFWS on EPA's approval of Florida's CWA Section 404 program, FDEP and USFWS will coordinate on state-issued permits and FDEP will incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the USFWS to avoid jeopardizing listed or proposed species and/or adversely modifying designated or proposed critical habitat.**

**EPA's approval of Florida's CWA Section 404 program does not alter the USFWS' authority under the Fish and Wildlife Coordination Act to provide assistance and cooperate with state and other agencies in the development, protection, rearing, and stocking of all species of wildlife, resources thereof, and their habitat. See 16 U.S. § 661(b). In addition, EPA has complied with ESA Section 7(a)(2) and has met its requirements to ensure no likely jeopardy to listed species or likely destruction or adverse modification to designated critical habitat by completing ESA consultation and receiving a "no jeopardy" Biological Opinion from the USFWS.**

**Finally, EPA's approval of Florida's CWA Section 404 program does mean that certain federal statutes will no longer apply to State-issued permits. Congress authorized the EPA Administrator to approve program transfers from the Corps to the states and tribes. Under CWA Section 404(h)(2), if the Administrator determines that a State that has submitted an application for a Section 404 program has the authority set forth in Section 404(h)(1), then the Administrator shall approve the program. The CWA does not provide the Administrator with the authority to consider whether federal laws will no longer apply or disapprove a state's program on that basis.**

**EPA acknowledges receipt of a comment that calls into question whether a programmatic consultation is appropriate given the wide variety of projects and impacts that are addressed through a Section 404 permitting program. As explained above, the ESA implementing regulations specifically authorize programmatic consultations, a process that has been specifically designed to address federal decisions involving more than individual projects and instead contemplate analyzing impacts from future similar activities. See 50 C.F.R. 402.02.**

**In addition, EPA received a "no jeopardy" Biological Opinion from USFWS on November 17, 2020. The Biological Opinion considered the listed species and designated critical habitat in the action area of EPA's approval and concluded that EPA's approval of Florida's CWA Section 404 program was not likely to jeopardize the continued existence of**

**listed species or result in the destruction or adverse modification of designated critical habitat. The Biological Opinion specifically considered the Florida panther, Everglades snail kite, and Florida bonneted bat. See Programmatic Biological Opinion for U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program under Section 404 of the Clean Water Act at 6.**

**Further, EPA disagrees with comments that the State will not be able to comply with the Section 404(b)(1) Guidelines, which prohibit the discharge of dredged or fill material if it jeopardizes the continued existence of listed species or results in the destruction or adverse modification of designated critical habitat. The State's process is designed to comply with the 404(b)(1) Guidelines. The State's rules and the USFWS Biological Opinion recognize this prohibition, and the Biological Opinion reaffirms that the State must follow 40 C.F.R. § 230.10(b)(3) in the issuance of permits.**

**Finally, EPA disagrees with comments suggesting that programmatic consultation could not yield an incidental take statement and could not cover the state-issued permits or that the Incidental Take Statement would be one-size fits all and provide a blanket take authorization. The USFWS' Biological Opinion finds that incidental take will be quantified and evaluated on a project-specific basis. The Biological Opinion relies on the technical assistance process between the State and Federal agencies to provide its no jeopardy conclusion and also to provide incidental take coverage. The State-issued permits will have limits on take. The Biological Opinion states:**

> **For proposed activities in which the State has permitting authority and for which incidental take of ESA-listed species is reasonably certain to occur, the amount and extent of incidental take anticipated from these proposed activities will be quantified and evaluated on a project-specific basis through the technical assistance process conducted between the USFWS and the State. Biological Opinion at 69.**

**EPA disagrees with the commenter who questioned whether an incidental take statement from a programmatic consultation could provide take protection for permits issued by FDEP. In *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49, 76-77 (2nd Cir. 2018), the Second Circuit held that a similar incidental take statement (one that did not specify a numerical cap on incidental take of species, allowed for the quantification of take at a the permit-level, and which applied to a broad array of state-issued permits) did comply with the ESA if the Biological Opinion explained why it was impracticable to express a numerical measure of take. Here, the Biological Opinion for EPA's approval of Florida's CWA Section 404 program provides sufficient explanation. The Biological Opinion explains that the "inability to anticipate the locations of future State 404 permit applications did not allow the Service to conduct site- and species-specific analyses to estimate the number of individuals that might be affected by the permitted activities." Biological Opinion at 69-70. The Biological Opinion goes on to explain that the State's program implementation, EPA's oversight of the State 404 program, and coordination of federal review of state permitting will provide project-specific information to USFWS. In**

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**addition, the Biological Opinion finds that USFWS will be able to evaluate projects and species conditions and provide technical assistance to the state to adjust permitting actions that may result in take. Biological Opinion at 70.**

**Importantly, the Biological Opinion states:**

> **If it is determined, through technical assistance on permit reviews with State that take of ESA-listed species is still expected to occur after implementation of recommended minimization measures, the amount or extent of incidental take will be quantified, at that time by the appropriate Field Office of the USFWS, in coordination with FDEP/FWC. FDEP/FWC and USFWS will review reports and track the levels of take estimated through the technical assistance process and exempted by this Incidental Take Statement. Biological Opinion at 70.**

**EPA disagrees with the commenter who alleged that the Florida Legislature provided no additional authority to State agencies to protect endangered and threatened species. Both the Section 404(b)(1) Guidelines and Florida's rules set forth at 62-331.053, F.A.C. prohibit the discharge of dredged or fill material if it jeopardizes the continued existence of listed species or results in the destruction or adverse modification of designated critical habitat. In Florida's General Counsel's Statement, Justin G. Wolfe, General Counsel for FDEP, states that Florida is seeking to assume the CWA Section 404 program pursuant to the authority granted in Section 373.4146, F.S.**

**One commenter asserted that FDEP's proposed technical assistance process is not modeled on the Section 7 consultation process that is required under the ESA. ESA Section 7 applies only to federal agency actions, not state actions. Regardless, as a result of the ESA consultation between EPA and USFWS on EPA's approval of Florida's CWA Section 404 program, FDEP and USFWS will coordinate on state-issued permits and FDEP will incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the USFWS to avoid jeopardizing listed species and/or adversely modifying designated or proposed critical habitat. Biological Opinion at 68.**

**EPA disagrees with the commenter who alleged that there is no delineating of specific mandatory actions regarding the coordination that is anticipated to occur among FDEP, USFWS, and FWC. Florida's rules and Program Description (submitted with its package) provide sufficient details for the public to assess how the State plans to handle listed species issues. For example, the Program Description states: "If the Department determines a project has potential to impact listed species or their habitat, the Department will coordinate with FWS and/or FWC to provide recommendations for project design modifications or permit conditions that will avoid or minimize impacts to the listed species or their habitats." Program Description, section (b), at 5. The Program Description also states that the MOU between FWC, USFWS, and FDEP outlines coordination procedures for listed species reviews. Program Description, Section (j) – Additional Information at 2. The draft MOU between FWC, USFWS, and FDEP was included in the appendix of the Program Description. Thus, the public had sufficient information about how the State**

102

**planned to address issues pertaining to listed species and designated critical habitat in its program and EPA has determined that FDEP demonstrated compliance with all statutory and regulatory requirements necessary to assume the CWA Section 404 program. The final, signed MOU was provided with the USFWS Biological Opinion and had no changes.**

**EPA disagrees with the commenter who stated that the FWC is constitutionally barred from regulating water pollution. The characterization that FDEP's application contemplates that FWC assumes a role in regulating water pollution once FDEP assumes the State 404 permitting program is incorrect. Rather, as described in the MOU among FWC, FWS, and FDEP, FWC proposes to provide preliminary effect assessments for federally listed species and their critical habitat, as well as provide preliminary impact avoidance and minimization measures that will become permit conditions during the FDEP review of project applications. Florida affirms that FDEP has responsibility for administering Florida's 404 program. Final General Counsel's Statement, signed by Justin G. Wolfe, General Counsel for FDEP.**

### O. State conflict of interest

Commenters who expressed opposition to Florida's assumption said that Florida has many powerful special interest groups that are more interested in making money than protecting or preserving the environment. Commenters' list of special interests includes developers, builders, water management districts, water management district boards, lobbyists, the State legislature, and State officials, including current and past governors. Commenters cited Florida's history of poor wetland protection and consistently expressed concerns that with a State-assumed program, special interests will further destroy Florida's wetlands and waterways in the name of profit. A commenter referenced wetland loses from various websites including the USDA and local Florida websites.

Some commenters stated that Florida's assumption will allow powerful special interests to increase development, fast track permits, weaken environmental protection, and exploit wetlands for profit. Commenter said that influential mining and development interests will now develop what is left of Florida's wetlands, and another commenter called Florida's assumption a "pay-to-play" situation. One commenter said that developers are behind Florida's assumption, in order to shorten the review process. A commenter cited the Urban Development Boundaries project in South Florida as an example of special interests dictating the approach to wetland development.

A few commenters claimed that State governors, senators, and the State legislature are "in the pocket" of developers, and one commenter said that Florida is run by developers. Other commenters said that FDEP, the State, State employees, State authorities, State agencies, and politicians are influenced by developers and special interests. One commenter said that regulators in the State are susceptible to developers and their money, and another commenter stated that politicians only look at the bottom line and are open to corruption. Some commenters contended that Florida State officials, influenced by outside parties, will reduce wetlands. One commenter stated that it is clear since the State's inception that Florida officials have proven unable to stand up to development and protect the State's natural resources. A commenter stated

that Florida has a history of back-room deals. Some commenters contend that Florida's assumption is a giveaway for developers to build and remove wetlands. Some commenters stated that political pressure will be put on the State to develop lands. Commenters also claimed that financial contributions to State campaigns could influence the implementation of Florida's program. Some commenters stated that the Florida government is only concerned about development and money, not environmental protection.

A commenter asserted that the Governor's Office and State Legislature have implemented and influenced the ERP program to the point that the FDEP/WMD staff see applicants as their "clients" and they hardly ever deny ERP permits authorizing the destruction of wetlands. The commenter said that WMDs' management bureaucracy is controlled by the Governing Boards (typically nine to 13 individuals) who are all political appointees of the sitting governor. The commenter said WMD Board members are typically developers, ranchers, big agricultural, and local politicians with little education in water resources. A commenter cited personal experience, contending that a particular Water Management District is corrupt and its former director is also a private consultant to real estate developers. A commenter said that if Florida assumed the Section 404 program, wetland protection would be under the whim of the governor and the political lobbyists that support the governor. Another commenter stated that Florida does not have a functioning water management system due to the governor. One commenter said that the State should appoint environmental and biological scientists to the State's governing boards and not developers and industrial experts.

A commenter stated that the last two administrations have significantly reduced scientific positions at FDEP and Water Management Districts, and in some cases replaced them with development-friendly individuals. Some commenters contended that Governor Rick Scott removed wetlands oversight by cutting 600 positions from the FDEP and packing the State governing boards with pro-development appointees, and the commenter contended that Governor DeSantis is going to do the same. A commenter stated that both the prior and current governor have stacked State governing boards with developers and pro-extraction individuals.

A commenter asserted that FDEP will not have the will or manpower to consider the environment. A commenter noted that the FDEP is an agency with appointees in charge, so it follows the governors' agendas. Another commenter added that assuming the Section 404 program is a way for the FDEP to court big business and developer interests. A commenter asserted that the CWA Section 404 program is susceptible to corruption by developers if the program is assumed by FDEP. A commenter said that the politically influenced FDEP will just fast-track permits. One commenter stated that FDEP is a permitting agency, not an environmental protection agency and actively looks for ways to help those seeking permits to be successful in obtaining those permits, which is inherently biased.

Many commenters opposing Florida's assumption expressed concerns that development interests would be prioritized over wetland protection by State agencies. Commenters emphasized that the FDEP is too close to local commercial interests and does not have the checks and balances needed when reviewing Section 404 permit applications from other State agencies and WMDs. Several commenters likened FDEP oversight to allowing the fox to guard the henhouse. Many

commenters stated that Florida's assumption is a "gift" to developers to build on and remove wetlands, costing all citizens in the process. Commenters pointed to the State claim that Florida's assumption will save time and money for developers and lower housing prices as cause for concern and some commenters said it would open the door to more rampant development. Commenters noted that real estate development pressures are always increasing in Florida, even during the current economic slowdown. Several commenters said the State's priority should be to preserve wetlands and not permit building.

A commenter stated that FDEP has become a rubber stamp for industry and businesses in Florida, and in the past decade, elected officials and their appointees have proven they are swayed by developers and industry. Another commenter agreed that special interests have influenced development and that FDEP needs checks and balances in place based on the destruction of wetlands for the last 20 years. A commenter stated that based on explicit statements and the history of administration in the State, the purpose of Florida's assumption is to let the State fast-track permitting and cater to special-interest developer groups. Another commenter mentioned that Florida has a long and unfortunate history of allowing political, developers, and other special interests to impact permitting and other environmental actions and emphasized that Floridians cannot jeopardize the remaining wetlands by putting their fate in the hands of an agency that is vulnerable to political and special interest influence.

Some commenters provided examples of concerns with FDEP's policies and management. A commenter asserted that the FDEP requires developers to provide public notice only in obscure publications as long as it is in the same county. A commenter asserted that FDEP used outdated data to approve the Manatee Biologic Evaluation permit without considering impacts to the Sea Grass Protection and Restoration Target Areas. A commenter cited other historical examples of what were perceived to be FDEP's failings. A commenter asserted that Blue Cypress Springs and Nestle's excessive withdrawal of water and incomplete standards for agricultural controls were such an example. Another commenter pointed to the pollution of Biscayne Bay.

A commenter pointed out that water quality has declined with massive algae blooms and the commenter blamed the decline on all levels of State and local government who are more accessible to lobbying by land development and agricultural interests. Many commenters asserted that history indicates that more wetlands and environmental resources will be lost if the State takes over the Section 404 permitting program. A commenter cited the State's record of poor environmental stewardship. Another commenter mentioned that State officials from the State cabinet and the Legislature and their subordinates cannot be entrusted to serve the public interest in environmental affairs and cited "non-constitutional" items such as fish-nets and pig farms in the State constitution that show the favor of special interests.

Some commenters asserted that there will be no checks and balances if FDEP assumes Section 404 permitting. Some commenters stated that when reviewing Section 404 permit applications, FDEP will not have the needed checks and balances from other State agencies and water management districts. The commenters emphasized that the federal government plays a critical role in balancing all variables in the permitting process.

One commenter stated that federal oversight is critical to ensure adequate protection of Florida waterways. The commenter contended that FDEP actively looks for ways to help those seeking permits to obtain permits and that FDEP's bias is inherent in the permit-issuing process; thus the commenter said that federal oversight is essential to strike a balance between the interests of the public versus interests of those seeking permits. A commenter contended that clear federal oversight and authority offers a critical layer of protection over Section 404 permitting, whereas FDEP's proposal limits those opportunities. The commenter cited Palm Beach County and the FL DOT's 2015 plan to widen State Road 7 as a situation in which federal agencies had multiple concerns and State agencies did not so the State agencies approved it. The commenter asserted that the State appellate court reversed the approval to force States agencies to review more carefully.

Some commenters stated that the federal agency is in a better position to make unbiased and uninfluenced decisions when it comes to protecting habitat of endangered wildlife and protecting freshwater sources. Many commenters urged the EPA to maintain federal protections and resources for Florida's wetlands and wildlife. One commenter said Florida needs strong federal protection that will not be pressured by developers. Some commenters said it is common knowledge that State officials are subject to pressures from State politicians while federal officials are not. A commenter was opposed to Florida's assumption out of concern that this transfer of authority from the federal government would likely result in a politicization of the permitting process.

A commenter stated that federal agencies have performed Section 404 permitting for decades in a way that protects the process from political and self-serving interests. Another commenter concurred, stating that the Corps will not be nearly as affected by pressure from the Florida legislature or the governor as would FDEP because the Corps is able to withstand politics and put the environment and water first. One commenter reiterated that Section 404 administration by the Corps is exposed to less political pressure and provides a necessary buffer between industry interests and review agencies. A commenter cited personal professional experience with both EPA and Corps and proclaimed that federal standards are high, and approval is predictable and stable, whereas State standards are choppy and political. A commenter asserted that State functions and standards do not strike a balance between protecting the environment and special interests. A commenter said that even though the Corps wants to straighten or dam waterways, at least they are not like the legislature, which they say is beholden to lobbyists. A commenter stated that even though Corps is not infallible, history indicates that they better serve as the objective arbiter of development. Similarly, another commenter asserted that as poor a record as federal officials have, State officials are even worse when it comes to sacrificing the State's environment to development interests.

A commenter noted that moving the program to the State removes the buffer that federal agencies use to act independently and wisely in the permitting process. One commenter pointed to the "amazing job" the federal government has done, whereas they asserted that the State will be pressured to make mistakes.

**EPA Response:**

**EPA acknowledges commenter concerns about the potential for political influence on environmental resource decisions, including Section 404 permitting decisions in an assumed program. However, EPA disagrees with commenters who asserted that Florida would be unable to protect wetlands and other waters in a State-assumed 404 program. EPA disagrees that wetlands would be more susceptible to development in a State-assumed 404 program. EPA also disagrees that political influence will result in FDEP making CWA Section 404 permitting decisions that are not based on appropriate environmental reviews. An assumed program must be consistent with and no less stringent than the requirements of the CWA and regulations. EPA has reviewed Florida's permit review criteria and has determined that the State's program will result in the issuance of permits that comply with the CWA Section 404(b)(1) Guidelines. (33 U.S.C. 1344(h)(1)(A); 40 C.F.R. § 233.20(a)).**

**EPA acknowledges commenters who expressed concern about political motivations or monetary drivers that could fast-track development at the expense of the environment. However, EPA disagrees that FDEP will fast-track permits without appropriate environmental review. EPA notes that FDEP's proposed Section 404 program complies with the timelines and procedures that are required by federal law. Florida's State 404 Program Applicant's Handbook (pages 20-21) notes that:**

> **"Several procedures and rules for agency action are required by Section 404 of the CWA, but not by ERP, causing conflict between some State 404 Program and ERP program processes and timeframes.**
>
> **For example, when a project requires both an ERP and a State 404 Program permit, some portions of the ERP review are likely to be completed faster than the State 404 Program review because of public notice, EPA review requirements, or the need to coordinate with other state and federal agencies. This means that a project may be permittable under Chapter 62-330, F.A.C., (ERP) after the ERP review, but as a result of comments received during the 404 public notice or other aspects of the 404 review, the project may require modifications under the State 404 Program.**
>
> **It is the intent of the Agencies to process the State 404 Program and ERP authorizations concurrently as much as possible. For this reason, the applicant is given the choice, in the application form, to waive the timeframes for issuance pertaining to ERP review when the State 404 Program review may take longer to complete."**

**EPA acknowledges commenter concerns about the availability of staff, resources, and expertise to appropriately administer the State's 404 permitting program, including specific commenter concerns about FDEP staff cuts. EPA finds that FDEP has committed sufficient resources and staffing to address anticipated workload. See Response to Comments Section H (Funding and staffing) and Response to Comments Section I (Streamlining) for additional discussion.**

**EPA recognizes that commenters may prefer federal administration of the CWA Section 404 program for a variety of stated reasons. However, Section 404(g)(1) of the CWA provides states and tribes the option of submitting to EPA a request to assume administration of a CWA Section 404 program in certain waters within state or tribal jurisdiction. EPA also appreciates the cooperative federalism framework which underpins the CWA and acknowledges that states are generally best suited to evaluate and manage their respective resources. EPA also disagrees that Florida's 404 program will be less environmentally protective than a program that is administered by the Corps. EPA has reviewed Florida's permit review criteria and determined that resulting permits will comply with the CWA Section 404(b)(1) Guidelines.**

**EPA also retains oversight authority of FDEP's CWA Section 404 program, including FDEP's appropriate exercise of control over activities required to be regulated under this part, such as permit issuance.**

## P. Protection of historic and cultural resources

### *NHPA Section 106 consultation*

One commenter agreed with EPA's determination that approval or disapproval of the State's Section 404 program assumption application is a federal undertaking triggering a programmatic Section 106 consultation under the NHPA.

Another commenter expressed appreciation to EPA for consulting with the Seminole Tribe of Florida pursuant to Section 106 on the development of a Programmatic Agreement (PA) for an assumed Section 404 program.

**EPA Response:**

**EPA acknowledges the statements from the commenters regarding consultation under Section 106 of the NHPA. The EPA engaged in consultation under Section 106 of the NHPA regarding the potential impacts of its decision to approve or disapprove Florida's Section 404 assumption request and decided to enter into a PA with the Advisory Council on Historic Preservation (ACHP), the Florida SHPO, and FDEP for its Section 106 compliance. The PA serves as a tool which sets forth a process to assure compliance with Section 106 of the NHPA in connection with EPA's program assumption decision, enhances coordination on the consideration of potential impacts on historic properties, seeks value-added outcomes from the Section 106 process, and provides a comprehensive process for resolution of disputes concerning effects determinations or resolution of adverse effects associated with State-issued 404 permits by utilizing the EPA's existing permit review framework under 40 C.F.R. § 233.50. FDEP and the SHPO also entered into an Operating Agreement (OA) on August 6, 2020, which sets forth a process to identify historic properties that may be impacted by Florida's issuance of Section 404 permits, and to develop recommendations for resolving adverse effects. The PA adopted the August 6, 2020 OA and its procedures and incorporated them into the PA.**

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

### *Adequacy of protection of historic and cultural resources*

Some commenters stated that Florida assumption does not adequately protect historic or culturally important places, including sites important to tribal nations. One commenter worried that State assumption could lead to less time and expertise in the analysis of project impacts on vulnerable wildlife, historic and cultural resources, including sites important to tribal nations. Multiple commenters submitted a form letter stating that the assumption does not adequately protect historic or culturally important places, including those of tribal significance. One commenter expressed concern that it is unclear how State assumption will impact the level of federal review needed to protect historic and cultural resources. Another commenter stated that the change does not adequately protect historic or culturally important places.

**EPA Response:**

**EPA acknowledges, but disagrees with, the commenters' concerns. The PA sets forth the procedural framework for compliance with Section 106 of the NHPA and should address the concerns expressed by the commenters. The state reviewers are Secretary of Interior-certified, and the PA and OA both establish and codify how historic and cultural resources will be protected through a tribal consultation process and a dispute resolution process to resolve disputes should they arise.**

### *Operating Agreement between FDEP and the Florida State Historic Preservation Officer*

One commenter described an agreement between FDEP and the Florida SHPO, which will ensure protection of historic and cultural resources through a consultation process called "historic properties review." The commenter explained that the review assesses the potential effects that a state Section 404 program permit application may have on historic properties and ways to avoid, minimize, or mitigate adverse effects. The review includes consultation with tribes, local governments, applicants, and the public and complements established procedures for permit processing and public notice under the State Section 404 program.

One commenter provided assurance that historic and cultural resources in the state will be protected if Florida assumes a Section 404 program. The commenter explained that FDEP has an agreement with the SHPO that outlines the "historic properties review" which assesses potential effects on historic properties from pending Section 404 permit applications. The commenter pointed out that the State also has regulations to ensure all activities, including Section 404 permitting, require a "no effect" or "no adverse effect" determination by the SHPO before a permit is authorized, and immediate ceasing of work and consultation if unanticipated discoveries are made during construction. The commenter also explained that the collaborative consultation process includes tribes, local governments, applicants, and the public, and is designed to complement established procedures for permit processing and public notice under the State 404 Program.

A commenter expressed concern that the OA does not currently reflect coordination with the ACHP and recommends a PA be developed to clearly set forth in what circumstances EPA will involve the ACHP. The commenter requested that the Seminole Tribe of Florida be a signatory

109

to any PA and that it be available to the Tribe for review before EPA decides on Florida's request to implement a Section 404 program.

A commenter provided specific comments and questions on the OA, requesting clarification on when, how, and with whom the state plans to consult with respect to tribal consultation. The questions centered on how the State consultation will differ from federal consultation, who will be consulted, and specific questions about the language used in the OA.

**EPA Response:**

**EPA agrees that the historic properties review set forth in the OA assesses the potential effects that a State Section 404 permit application may have on historic properties and ways to avoid, minimize, or mitigate adverse effects. EPA agrees that the OA does not reflect coordination with the ACHP, but that the PA, which adopts and incorporates the OA and its procedures for tribal consultation, review, and dispute resolution for historic properties, does provide for coordination with the ACHP. Disputes that cannot be resolved through the process outlined in the OA are elevated to the EPA for review. Consistent with the terms of the PA, the EPA will submit to the ACHP a copy of any proposed comments, objections, or recommendations that it develops with respect to permit applications that have the potential to impact historic properties or permit applications that are the subject of a historic properties dispute. Within 30 days of receipt, the ACHP may provide an advisory opinion which the EPA will consider, but need not follow, in finalizing its comments, objections, or recommendations with respect to the permit application. EPA also agrees with the commenter who noted that historic and cultural resources in the State will be protected if Florida assumes the CWA Section 404 program.**

**EPA considered the commenter's specific comments and questions on the OA. The OA and PA already address some of the commenter's comments (e.g., scope of Indian tribes consulted, consultation triggers, ACHP involvement). For other comments (e.g., forms of notice, expedited applications, confidentiality concerns, no-notice permits), EPA consulted with FDEP and Florida SHPO to develop its response. For more information, see EPA's administrative record regarding NHPA 106 compliance which includes a detailed response to commenter's questions and comments.**

### Q. Comments on consultation with tribes

One commenter asserted that historic and cultural resources in the State will be protected if Florida assumes administration of a Section 404 program. The commenter explained that FDEP has an agreement with SHPO that outlines the "historic properties review," which assesses potential effects on historic properties from pending Section 404 permit applications. The commenter pointed out that the State also has regulations to ensure all activities, including Section 404 permitting, require a "no effect" or "no adverse effect" determination by the SHPO before a permit is authorized, and immediate ceasing of work and consultation if unanticipated discoveries are made during construction. The commenter also described a commitment from FDEP to work with Florida's tribes, and stated that the level of consultation described provides

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

greater participation in the review of applications than tribes currently have. The commented asserted that tribes also will have the ability to inform and add to any requests for additional information in the permit approval process and provide public comments during the comment period. The commenter also explained that the FDEP-SHPO Operating Agreement (OA) further provides the Tribes with the opportunity to offer effects determinations, participate in the resolution of adverse effects, and request federal review in the event of disagreements with FDEP and/or the SHPO.

Another commenter reiterated that FDEP is committed to working together with Florida's tribes, as demonstrated by the cooperative engagement with the Seminole Tribe of Florida and the Miccosukee Tribe of Indians of Florida.

Another commenter considered a fundamental flaw of the FDEP's proposal to be the risk that tribes will lose consultation rights and protections for impacts to adjacent lands.

One commenter expressed concern that the Muscogee (Creek) Nation was not consulted earlier in the rulemaking process. The commenter noted that the Muscogee (Creek) Nation did not know about the proposed Florida Assumption until a meeting with EPA on October 15, 2020. The commenter asserted that the Nation should have been consulted earlier in the process, similar to consultation with other Florida tribes. The commenter referenced Florida's State 404 Program Description (EPA-HQ-OW-2018-0640), which states, "[A]dditionally, the Department has been working with EPA, the SHPO, and Indian Tribes in Florida to ensure that the outcomes of the state's process for protection of historical and cultural resources are at least as protective as those under the federal process." The commenter requested meaningful consultation between the Muscogee (Creek) Nation and the EPA.

Another commenter expressed concern that the process for dispute resolution between EPA, FDEP, and the Seminole Tribe of Florida is still not clear regarding non-waivable categories, Indian country determinations, and effects to cultural resources and endangered species. The commenter explained that EPA has confirmed its commitment to communications on these categories and agreed to provide flexible coordination with the Seminole Tribe; however, the process has not been developed. The commenter requested that the coordination between EPA and the Seminole Tribe of Florida occur before a dispute can arise.

**EPA Response:**

**EPA agrees with those commenters that acknowledge Florida's procedures for ensuring protection of historic and cultural resources in the State 404 program, and understands the concerns associated with the importance of cultural resource protections. Importantly, the Tribes will not lose consultation rights as part of the assumption process as continuing tribal engagement is incorporated into Florida's program.**

**With respect to notification, the Florida SHPO and FDEP entered into an OA on August 6, 2020. EPA was not a party to the OA. EPA received a complete assumption package from Florida on August 20, 2020. EPA sent the Muscogee (Creek) Nation (Muscogee) a request to consult on September 2, 2020. That request included detailed information about the assumption process. The Muscogee was also invited to a webinar on the assumption process**

111

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program* *December 16, 2020*

**on September 15, 2020. The first webinar was held on September 22, 2020. On October 1, 2020 the Muscogee notified EPA that they wanted to participate in consultation. The Muscogee provided a list of possible dates that they were available on or about October 9, 2020. The first available date that the Muscogee offered was October 15, 2020. EPA scheduled consultation on October 15, 2020 and participated in a phone call with the Muscogee. In that call EPA requested that the Muscogee submit any issues that they wanted considered or addressed in the PA. The Muscogee submitted written comments on the Section 404 assumption process, and the OA between the FDEP and Florida SHPO. EPA considered those comments in revising the draft PA.**

**EPA acknowledges the commenter's concern regarding dispute resolution among EPA, FDEP, and the Seminole Tribe of Florida. The EPA has oversight authority over the state CWA 404 program and may review state 404 individual permit applications and draft general permits. Pursuant to Section 404(j) of the CWA and 40 C.F.R. § 233.50, the EPA may in its discretion comment upon, object to, make recommendations, or take no action with respect to a state 404 individual permit application, draft general permit, or a state's failure to accept the recommendations of another state or Indian tribe whose waters may be affected by the issuance of a permit. Any such objection shall be based on the EPA's determination that the proposed permit is: (1) the subject of an interstate dispute under 40 C.F.R. § 233.31(a); and/or (2) outside the requirements of the CWA, the regulations at 40 C.F.R. Part 233, or the CWA Section 404(b)(1) Guidelines. Pursuant to the 40 C.F.R. 233.51 and the FDEP/EPA MOA, FDEP must provide EPA the opportunity to review permit applications that have a reasonable potential to impact to endangered or threatened species or waters of an Indian tribe, and permit applications with impacts to historic properties.**

**The FDEP/EPA MOA states that in the event a question arises whether activities proposed in a permit application or draft general permit are within Indian country, and thus should be processed by the Corps, information regarding the issue may be presented to FDEP during the comment period and may also be provided to EPA. Such information shall be considered by EPA in exercising its CWA authority to oversee FDEP's program and may, as appropriate, provide a basis for EPA to comment upon, object to, or make recommendations with respect to the permit application or draft general permit.**

**Section III.C. of the OA and Section V of the PA set forth a process whereby EPA may in its discretion develop comments, objections, or recommendations with respect to permit applications that have the potential to impact historic properties or permit applications that are the subject of a historic properties dispute FDEP elevates to EPA pursuant to subsections III.C.2. and 3. of the OA. The EPA may consult with Indian tribes, where appropriate, in developing its develop comments, objections, or recommendations. The ACHP, within 30 days of receipt of the EPA's proposed comments, objections, or recommendations may provide an advisory opinion which EPA will consider, but need not follow. EPA will transmit any final comments, objections, or recommendations to FDEP for resolution in accordance with 40 C.F.R. § 233.50.**

112

### R.  Comments outside the scope of this review

Commenters expressed their general concern for preserving the Everglades, for preserving Florida's wetlands and rivers, and for protecting the cultural resources of the State. One commenter asserted that the Corps has delayed permitting for Everglades restoration projects.

Several commenters provided information on other topics, such as ownership and directions to a specific property in Collier County. Some commenters also provided comments that they had previously submitted to FDEP regarding FDEP's rule development.

**EPA Response:**

**EPA acknowledges receipt of comments submitted pursuant to FDEP's rule development process, as well as the receipt of other comments regarding the state's natural resources and geography, but notes that these are beyond the scope of this action and are not responsive to the request for comment.**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET, SW
ATLANTA, GEORGIA 30303-3104

**August 28, 2020**

Lieutenant General Todd T. Semonite
Chief of Engineers and Commanding General
U.S. Army Corps of Engineers
Department of the Army
441 G Street NW
Washington, DC 20314-1000

Colonel Jason E. Kelly
Division Commander
U.S. Army Corps of Engineers
South Atlantic Division
60 Forsyth Street SW, Room 10M15
Atlanta, Georgia 30303-8801

Colonel Andrew D. Kelly
Commander and District Engineer
U.S. Army Corps of Engineers
Jacksonville District
P.O. Box 4970
Jacksonville, Florida 32232-0019

Subject: Notice of Receipt of a Complete Package from the State of Florida Requesting to Assume Administration of a Clean Water Act Section 404 Program

Dear General Semonite, Colonel A. Kelly and Colonel J. Kelly:

The U.S. Environmental Protection Agency is hereby providing notice that on August 20, 2020 we received a complete package from the State of Florida requesting to assume administration of a Clean Water Act (CWA) Section 404 program. With this letter, we are including a copy of the State's submission for your review and invite your comments on Florida's proposed program's consistency with the CWA.

The CWA established the Section 404 program, under which the U.S. Army Corps of Engineers (Corps) may issue permits for the discharge of dredged or fill material into "waters of the United States" as identified in the CWA. Section 404(g)(1) of the CWA provides states and tribes the option of submitting to the EPA a request to assume administration of a CWA Section 404 program in certain waters within state or tribal jurisdiction.

To assume a Section 404 program, a state or tribe must have authority to administer a permit program that regulates discharges of dredged or fill material consistent with the requirements of the CWA and its implementing regulations at 40 C.F.R. Part 233, and submit to the EPA a request to assume the program. In addition, a state or tribe's program must: (1) be at least as stringent as required by the CWA and its implementing regulations; (2) provide for sufficient public participation and; (3) ensure compliance with the *Section 404(b)(1) Guidelines* (40 C.F.R. Part 230), which provide environmental criteria for permit decisions; and (4) have adequate enforcement authority.

Any state that seeks to administer a Section 404 program under 40 C.F.R. Part 233 shall submit to the EPA Regional Administrator: (a) a letter from the Governor of the state requesting program approval; (b) a complete program description, as set forth in 40 C.F.R. § 233.11; (c) an Attorney General's statement, or a statement from the attorney for those state or interstate agencies which have independent legal counsel, as set forth in 40 C.F.R. § 233.12; (d) a Memorandum of Agreement with the EPA Regional Administrator, as set forth in 40 C.F.R. § 233.13; (e) a Memorandum of Agreement with the Secretary of the Army, as set forth in 40 C.F.R. § 233.14 and; (f) copies of all applicable state statutes and regulations, including those governing applicable state administrative procedures.

The EPA's receipt of the request by the State of Florida triggered the EPA's statutory review. The EPA has reviewed the State of Florida's submission and consistent with 40 C.F.R. § 233.15 has determined that it is a complete request that meets the submittal requirements of 40 C.F.R. § 233.10. The EPA will approve or disapprove the program on or before December 17, 2020. The EPA is also publishing notice of Florida's submission in the *Federal Register*.

With this letter, the EPA is inviting your comments on Florida's program submission. The link https://usepa.sharepoint.com/:f:/r/sites/R4/r4_wetlands_stream_regulatory_section/Shared%20Documents/Florida%20Assumption%20EPA%20Internal/Shared%20Package%20Folder?csf=1&web=1 provides a copy of Florida's submittal, which includes the following components: a letter from Florida Governor Ron DeSantis requesting program approval; a complete program description; Florida DEP General Counsel Justin G. Wolfe's statement; a Memorandum of Agreement with the EPA Regional Administrator; a Memorandum of Agreement with the Secretary of the Army; and copies of all applicable Florida statutes and regulations, including those governing applicable Florida administrative procedures. In case of any technical difficulties, please let us know, and we will provide the documents via an alternative mechanism. The regulations at 40 C.F.R. § 233.15(f) provide for the submission of written agency comments from the Corps, the U.S. Fish and Wildlife Service and the National Marine Fisheries Service to the EPA within 90 days of the EPA's receipt of a complete program submission. Accordingly, we request that you submit your comments no later than November 17, 2020.

If you have any questions regarding this matter, please do not hesitate to call me at (404) 562-9345 or have a member of your staff contact Mr. Kelly Laycock of my staff at (404) 562-9262 or 404Assumption-FL@epa.gov.

Sincerely,

JEANEANNE GETTLE
Digitally signed by JEANEANNE GETTLE
Date: 2020.08.28 15:56:41 -04'00'

Jeaneanne M. Gettle, Director
Water Division

cc:    Honorable R.D. James, Assistant Secretary of the Army, Department of the Army

       Mr. Ryan Fisher, Principal Deputy Assistant Secretary of the Army, Department of the Army

Transcription details:

| | |
|---|---|
| Date: | 27-Oct-2020 |
| Input sound file: | Virtual Public Hearings on Florida's Request to Assume Administration of a Clean Water Act Section 404 Program (1).mp4 |

Transcription results:

| | |
|---|---|
| 00:04 | Jeaneanne Gettle: Good evening. I am Jeaneanne Gettle, director of the Water Division at the US Environmental Protection Agency's regional office in Atlanta, Georgia. Welcome and thank you for joining this public hearing concerning Florida's request to assume administration of a Clean Water Act Section 404 program. We recognize that the natural resources in Florida are critically important to each of you, your communities, and to the state of Florida. Our agenda today is quite simple. I will begin by making brief remarks to provide background and context. Then, our facilitator will explain the comment process, and we will then start the public comment process in approximately 15 minutes. I am here virtually with several EPA colleagues. We will be listening to your comments throughout this hearing, so I would like to introduce them to you. As I say their name and role at EPA, they will show their video. So let me introduce them now: Rosemary Calli, Tom McGill, Matt Hicks, Kathy Hurld, Mita Ghosh, JT Morgan- |
| 01:42 | --Whitney Beck, Michael Creswell, and Kelly Laycock. They will all be listening, but they will not have their cameras on as we continue with the public hearing. I will have my camera on and I may look down at times while I take notes. To set the stage for this hearing, I'd like to provide some background and context. On August 20th, 2020, the United States Environmental Protection Agency received from the governor of the state of Florida a complete program submission for regulating discharges of dredged or film material into waters within the jurisdiction of the state in accordance with the Clean Water Act. Pursuant to the Clean Water Act Section 404(h) and EPA's implementing regulations, EPA opened a 45-day comment period, which ends on November 2nd, 2020. As part of this process, EPA has also scheduled two public hearings: the one today, and we had one last week on October 21st. This is the second of the two hearings. In addition to our review of the package submitted by Florida, EPA also initiated a programmatic consultation under Section 106 of the National Historic Preservation Act, or NHPA, and is soliciting comments pursuant to NHPA implementing regulations during the 45-day comment period, ending November 2nd, 2020. |
| 03:24 | EPA has three primary roles pursuant to Section 404(g) of the Clean Water Act. The first role is to work with the states or tribes to enhance their program capacity and capability through mechanisms such as Wetland Program Development Grants and technical assistance. The agency's second responsibility is to review requests by states or tribes to assume administration of a Clean Water Act 404 permitting program. This is the stage we are currently in, relative to Florida's request. Under the Clean Water Act, EPA must evaluate the request and to approve or disapprove the request based on the factors, I will speak about in a moment. The third role for EPA is that of oversight. Whenever a state or tribe assumes a program, EPA retains an oversight role. For purposes of the Clean Water Act Section 404, that would generally entail coordinating federal comments; reviewing programmatic modifications; and, if necessary, withdrawing program approval. In order to approve a state's or tribe's assumption of a Clean Water Act Section 404 program, the EPA must find that the program is consistent with, and no less stringent than, the requirements found in the Clean Water Act and associated implementing regulations. The assumed program must have equivalent scope of jurisdiction, meaning it covers all waters of the United States not retained by the United States Corps of Engineers; it must regulate at least the same activities; it must provide sufficient public notice and allow for public |

participation; the program must also ensure compliance with the regulations known as the Clean Water Act Section 404(b)(1) guidelines and have adequate enforcement authorities.

05:27     The purpose of today's hearing is for EPA to listen to comments regarding Florida's request to assume administration of a Clean Water Act Section 404 program. Today, EPA's role is to listen. So while during this hearing my EPA colleagues and I may occasionally ask a question or respond to a question of clarification, we will not otherwise be engaging with or responding to commenters. This hearing is being recorded for transcription purposes and that transcription will become part of the official administrative record for this request. In addition, you can continue to provide written comments until November 2nd, 2020, as described in EPA's Federal Register Notice on regulations.gov. If you are making an oral comment today and would like to also provide that to us as a written comment or send us any additional information or attachments associated with your oral comment, then we certainly encourage you to do so by the November 2nd, 2020 public comment deadline.

06:39     Following the close of the public comment period, EPA will review and consider all comments received, as well as the complete submittal from Florida before we make a final decision about this request. Oral and written comments will be given equal consideration. As part of that process, EPA will prepare a responsiveness summary which will provide EPA responses to the significant comments received during the comment period. I want to emphasize that no decision on Florida's request has been made at this time. After considering Florida's submittal, all comments, data, and information received through November 2nd, EPA's regional administrator, Mary Walker, will make a final decision on or before December 17th, 2020. If EPA approves the state's 404 program, we will publish notice of this decision in the Federal Register, along with the agency's responsiveness summary of significant comments. If EPA disapproves the state's 404 program, we will notify the state of the reasons for the disapproval, and of any revisions or modifications to the state's program which are necessary to obtain approval. This public hearing is our opportunity to hear directly from you. Thank you again for being here and participating in this process. I will now turn the floor over to Jan, the facilitator for this evening, to describe the oral comment process we will follow today and to moderate this hearing. Thank you. Jan.

08:25     Jan Connery: Thank you, Jeaneanne. Hello, everyone. As Jeaneanne said, I'm Jan Connery. I'm with ERG, a contractor to EPA providing facilitation and logistical support for this hearing. I'm working with my colleague, Meredith Outterson, at ERG, who is our webinar coordinator. I see that we have over 90 people who've joined us right now, and probably some others will be in the next three hours. And we also have 34 folks who've signed up to make an oral comment, with many others of you here to listen to the comments during this hearing. So, as Jeaneanne said, the purpose of this hearing is for EPA to listen to the oral public comments. So I'm going to describe the comment process that we'll be using and then we'll proceed directly to the public comments. So, first, I'm going to talk about speaker order. We're going to hear from two public officials to start with, and after that, we're going to take comments in the order that each of you registered to speak. We've organized commenters into six time blocks. Everyone who pre-registered to comment should have received an email this weekend - or in some cases, Monday, or even Tuesday - from Meredith at ERG, notifying you about your speaker group and your speaker number within that group. Each commenter will receive a chat message shortly before your speaker group is called. So that way, you'll know your time is coming up very shortly. As we proceed to each group, I'm going to be displaying the name of commenters in the time block on-screen, in the order that they're going to speak. So that way, all attendees to this webinar can clearly know who is speaking each time and who's on deck to speak next. If a listed commenter is not available when I call on them, I'm going to move to the next person on the list. And then, if that person joins us later, we will fit them in as soon as possible after they join us so that we can hear their comment. All commenters during this hearing will be following the same process.

10:49     So when it's your turn to speak, I'm going to be calling your name, and then Meredith will unmute your line at our end. Right now, we have everyone muted by default so that we can

minimize background noise. So Meredith will unmute you, but, also, please make sure you're unmuted at your end. Most often, when I call on someone and we can't hear them, it's because you're muted at your end and you just have to click an unmute button there. So I will start-- I'll ask you to start by stating your name and affiliation. And if you're representing yourself, you can just say that. As noted in the Federal Register Notice about this hearing, every commenter will have up to five minutes to speak. So after you say your name and affiliation, I will start an electronic timer that you will see in the bottom-right of your screen, so you'll be able to know how your time is doing. Please keep an eye on that so that as you approach the five minute mark, you know you'll need to wrap up pretty soon. And as a matter of fairness to all commenters, please do respect that time limit. If you have more to say that you weren't able to fit into your comment, as Jeaneanne said, you're welcome to provide that in a written comment as part of the written comment process by the November 2nd public comment deadline. So after you've finished your comment, please stay on the line. Occasionally, as Jeaneanne said, EPA may have a question of clarification about a comment. And if so, Jeaneanne will ask that question, and at that point, you may respond. And then, when the clarification is concluded, Meredith will mute your line and we'll proceed to the next commenter and use the same process for every commenter.

12:41 There are just a few technical details we'd like you to know about if you're commenting. As noted in the email that Meredith sent you, for best audio quality, a headset is great, if you happen to have one. If your internet connection can be a little bit shaky, we highly recommend that you join us by phone for the period in which you'll be commenting. And instructions for doing that are provided in the email that Meredith sent you either this weekend or on Monday or Tuesday. Again, please make sure you're unmuted at your end. But if an audio issue arises, as it sometimes does, then Meredith will mute you and work with you to provide support to resolve the issue, and then we'll take your comment as soon as we can after the issue has been resolved. And for everyone on this hearing, whether you're making a comment or here to listen, if you have any technical difficulties, please use the question box to ask for help.

13:45 So before we get to the comment process, I want to note one more thing. We do have a pretty full house, just in terms of how many commenters have signed up in the time available in the three hours we have. But, that said, sometimes, commenters don't show up, never show up. And, sometimes, folks comment for less than five minutes. So, here and there, we could have a little additional time. If we do - and I can't guarantee we will or how much it will be, but to the extent that we do - then we'll be happy to take additional commenters up to five minutes each. These would be folks who hadn't pre-registered to comment but have decided that you'd like to make a comment today. The way you can signal to me that you'd like to comment is by raising your virtual hand, which you're welcome to do at any time during the hearing. Again, we can't guarantee we'll have time. But if we do, we'll fit folks in in the time that we see that hands are raised, to the extent that we can before the 8:00 PM end time for this hearing. Okay. So with that, I believe we can proceed to our first commenter. This is our first speaker group. And our first commenter is Jose Rodriguez. Meredith, do we have Jose on the line?

15:11 Meredith Outterson: Yes, we do. And, Jose, it looks like you are still muted on your end. So if you just press to unmute-- there you go.

15:21 Jose Rodriguez: Hi, everyone. May I proceed?

15:23 Meredith Outterson: Yes. Please do so. You can start.

15:28 Jose Rodriguez: I very much appreciate the opportunity to participate in the rulemaking by providing this comment. My name is Jose Javier Rodriguez. I'm a state senator representing the half a million residents of Miami-Dade who live in District 37 of the Florida Senate. My view is that this district would be negatively impacted by the FDEP's assumption of permitting authority, given the impact on our waterways and wetlands, sensitive natural areas, all areas that are important to us. And, for that reason, I express opposition to the state's proposed assumption of

Section 404 authority over dredge and fill permitting. To be clear, again, in my view, the assumption of this process by FDEP would eliminate additional scrutiny of federal law that applies to federal permit actions. And throughout Florida, but particularly in the district that I serve, the fragile and critical areas regulated by the 404 dredge and fill permits would, again, lose the high level of scrutiny that currently would come with them. And, again, I would like my opposition reflected. That is all. Thank you.

16:48     Jeaneanne Gettle: Thank you very much. Thank you. We have no clarifying questions.

16:53     Meredith Outterson: Great. Okay. In that case, we will move to the next speaker.

17:01     Michelle Diffenderfer: Hi, this is Michelle Diffenderfer.

17:03     Meredith Outterson: Yes. Please go ahead, Michelle. Start with your name and affiliation.

17:07     Michelle Diffenderfer: Yes. Michelle Diffenderfer from the law firm of Lewis, Longman & Walker, on behalf of the Seminole Tribe of Florida here today. I will not be making any comments on the record. I want to cede my time to the remainder of the public. We've already had consultation with the EPA. We appreciate you having these public hearings. Thank you.

17:26     Jan Connery: Okay, great. In that case, we will move to the next speaker and that is Kent Wimmer. Kent, please start by stating your name and affiliation, and then you'll have five minutes.

17:40     Kent Wimmer: Good evening. My name is Kent Wimmer. I'm a senior representative with Defenders of Wildlife. Defenders of Wildlife was founded in 1947. We're a national non-profit conservation organization focused solely on wildlife and habitat conservation and the safeguarding of biodiversity. Defenders of Wildlife has more than 105,000 members and supporters in Florida. Defenders will be submitting a letter describing how the DEP has failed to demonstrate how the agency can achieve the no jeopardy mandate with respect to the engagement process and protection of species under the Endangered Species Act. Specific issues to be addressed in our forthcoming letter include, number one, any state-wide, one-size-fits-all, incidental take statement resulting from consultation on the Florida program would violate the Endangered Species Act. Number two, the assumption application fails to demonstrate the DEP can comply with the no jeopardy mandate in the Section 404(b)(1) guidelines. Number three, DEP lacks the resources to implement the Florida program. Number four, DEP cannot be expected to ensure Section 404 permit compliance. And, finally, number five, the EPA has denied the public a meaningful opportunity to comment on the assumption application's effects on listed species. Thank you very much. We look forward to submitting our letter prior to the deadline.

19:32     Jeaneanne Gettle: Thank you, Mr. Wimmer. We have no questions.

19:37     Jan Connery: Great. We will move to our next speaker. That is Rachael Uhland. Rachel, please start by stating your name and affiliation, and then you'll have five minutes.

19:46     Rachael Uhland: Thank you. Can everyone hear me?

19:48     Jan Connery: Yes, we can.

19:49     Rachael Uhland: Thank you. Good evening. My name is Rachael Uhland and I'm providing testimony on behalf of Earthjustice. We oppose Florida's application to assume jurisdiction over the Section 404 program. Throughout this process, we have identified gaps in Florida's proposal, both to DEP and to EPA. We, again, ask that EPA reconsider its September 2020 determination that the application is complete, because it is not. There is public opposition to Florida's application. Most Floridians consider the environment and climate issues to be important to them. Floridians expressed their opposition to DEP's effort during the state rulemaking process. They made their voices heard, even though DEP insisted on limiting public comment to a period in March and April when Floridians were focused on their livelihoods during a pandemic. DEP

also did not answer a number of questions about its proposal, such as questions on staffing and funding, claiming that they were beyond the scope of the state-level process. They stated those gaps would be filled in when the application reached EPA, but those questions remain. Which waters are covered? How will the program be operated with no additional resources? How will the state ensure compliance with the ESA and protection of our listed species? We appreciate the opportunity to participate now in these public hearings held by EPA. However, there are issues here, too. EPA set a deadline for the public to sign up that was two weeks before the first public hearing, effectively providing very little notice for those who wish to speak. And while EPA ultimately allowed those who joined only to listen in a chance to speak, others who may have wanted to speak did not know that this would be an option and missed the opportunity to be heard at the hearing. The hearings are further undermined by the fact that DEP's application continues to be incomplete. This makes it impossible for the public to provide complete comments.

21:51     In the program description, DEP states that its proposed program will provide a streamlined permitting procedure. In other words, the state's objective is to grant permits faster. What Florida needs, however, is more scrutiny and review of permit applications that threaten our wetlands, not less. In Florida, DEP considers permit applicants to be their constituency, rather than the public and the state's natural resources. In the prior EPA public hearing, only industry interest supported assumption, and they did this with claims of delay at the federal level. But what developers see as delay actually reflects things such as vital NEPA review, public participation, analysis of listed species issues, and other elements intended to ensure protection of Florida's environment. In 2005, DEP also considered assumption and realistically determined it would be too costly. The only two states - New Jersey and Michigan - to have assumed 404 jurisdictions spent millions of dollars on their programs. In Michigan, the state's 2002-2003 wetlands program budget was nearly $7 million. Other states, like Arizona, have decided not to pursue assumption, given the burden that this would impose on taxpayers. No state with extensive coastlines, wetlands, and biodiversity that Florida enjoys has assumed jurisdiction. Moreover, state budgets at the country will be heavily affected by this pandemic and Florida is no exception. Florida has asked their state agencies to consider an 8.5% cut for this current year due to the pandemic. DEP has not acknowledged this fact, much less dealt with it in its proposal to EPA. Florida's application makes no mention of the resources of other state agencies that are similarly strained, but which DEP claims will be part of its assumed program, such as Florida Fish and Wildlife Commission and the State Historic Preservation Office. These agencies have acknowledged that they do not have the staffing or the resources to take on the additional responsibility of assumption. To conclude, since DEP has not complied with the Clean Water Act's requirements, EPA must reject DEP's application to the assumption of the 404 program. Thank you.

24:18     Jeanenne Gettle: Thank you, Miss Uhland. We have no additional questions.

24:23     Jan Connery: Great. We'll move to the-- we'll move to the next speaker and that is Jeffrey Blank. Please start by stating your name and affiliation, and then you'll have five minutes.

24:33     Jeffrey Blank: Hello. My name is Jeffrey Blank. I'm representing myself as a Florida resident. I implore the EPA to not allow Florida take over administration of the Clean Water Act Section 404. Florida has repeatedly shown its inability to handle programs on a statewide basis. Their utter disaster with the Florida state unemployment system illustrates this, leaving millions of Floridians without the needed and deserved unemployment payments because they could not properly access the broken unemployment system during the COVID-19 crisis. Florida's fix? Hire the same company that gave them a broken system to fix a system they could not get right the first time. Florida's refusal to allow the Affordable Care Act to be handled by the federal government, having it handled locally, and leaving millions of Floridians with little or no proper medical coverage, shows how badly Florida government handles large programs. One can only guess at the damage the Florida government will do, given the chance to handle such an

important program as Section 404 of the Clean Water Act. Our already delicate and troubled waters in and around Florida - can you say red tide? - would become more permanently destroyed ecosystem, leaving a disaster of epic proportions for generations to come. Allowing Florida to assume administration of this important federal EPA program has the potential to cost taxpayers billions of dollars in repairing the damage that another poorly handled Florida program would cause, not to mention irreparable damage to our environment. This would end up with less proper review and attention.

26:26    The Florida State DEP agency has cut staffing in recent years. If they move staff from other programs, as they say they will, into this, what would happen to the other programs? Are they short-changed? How are those programs going to function? Removing the federal oversight puts our environment at tremendous, unnecessary greater risk. In the face of increased development statewide, the protection and restoration of Florida's wetlands and water resources must be given the greatest possible attention. At the very least, this move must be postponed until time when the public may be fully involved - not one while we are still fighting and concerning ourselves with COVID - so we may have true full public participation. I implore you, do not give the Florida government another chance to show how badly they can mess up another program through mismanagement, backdoor deals, and awarding contracts to the lowest bidder. Our environment and our waters are too important for our future and our children's future. Thank you.

27:42    Jeanenne Gettle: Thank you, Mr. Blank. We have no further questions.

27:47    Jan Connery: Okay. We're going to move to our next speaker and that is Anna Upton. Anna, please say your name and affiliation, and then you'll have five minutes.

27:57    Anna Upton: Good evening. My name is Anna Upton. I'm speaking on behalf of the Everglades Foundation. Wetlands are of critical importance throughout Florida. The largest wetland in Florida is the Everglades. Taxpayers have spent billions of dollars over the course of decades to restore this treasured, unique ecosystem. The US Army Corps of Engineers has a track record of delaying permitting for the most important Everglades restoration projects, the most recent example of which is the A-2 Stormwater Treatment Area, which was an essential water quality feature of the Everglades reservoir. Everglades restoration projects should receive permits that are both environmentally protective and issued in a timely fashion.

28:42    The Everglades Foundation is focused on getting clean water to the Everglades, and into Florida Bay, as soon as possible. If the state assumes the Section 404 permitting process, it should accelerate critical Everglades restoration projects and save money in the long run. Assumptions should enable Everglades restoration to proceed with the sense of urgency it deserves, while maintaining the high level of review and protection required by Section 404. The US Environmental Protection Agency should only approve assumption if the State's program meets rigorous federal standards for wetlands and includes the same federal oversight and citizen supervision as the currently delegated NPDES program does. If assumption is granted, we expect the state of Florida to ensure the Department of Environmental Protection continues to have the necessary resources and capacity to review permit applications and exercise its new authority in a manner that protects Florida's precious and diminishing wetland resources. After all, wetlands safeguard Florida communities from the effects of climate change, they provide tremendous water quality benefits, they support fish and wildlife habitat, and they mitigate against flooding. And they are worthy of the highest level of protection. Thank you.

30:07    Jeanenne Gettle: Thank you, Miss Upton. I have no clarifying questions.

30:14    Jan Connery: Okay. We're going to move to the next speaker group. And I understand that our first two speakers are not here yet. So we're going to go to Kurt Spitzer as our next speaker. Kurt, please say your name and affiliation, and then you'll have five minutes.

30:32    Kurt Spitzer: Thank you. I'm Kurt Spitzer and I'm here with us today on behalf of the Florida Stormwater Association. We had one quick suggestion for an amendment to the rules, and that is that a certain percentage of the permits issued under the delegated program each year should be reviewed - audited, so to speak - for consistency with the criteria and conditions of the project's permit, and also, the project's consistency with state and federal policy and water quality standards. And we will follow up with a more detailed explanation of that suggestion prior to the deadline for the written comments.

31:30    [silence]

31:31    Jeanenne Gettle: Thank you, Mr. Spitzer. I have no clarifying questions.

31:37    Jan Connery: Okay. We're going to go next to Lisa Rinaman.

31:47    Lisa Rinaman: My name is Lisa Rinaman. I'm the St. Johns Riverkeeper. Thank you for the opportunity to speak. Our non-profit organization based in Jacksonville, Florida works to defend the St. Johns River and advocate for its protection throughout its 8,800 square mile watershed, including the river's wetlands that provide water quality filtration, flood control, and habitat. We are also a member of Waterkeepers Florida, a coalition of 14 Waterkeepers from across the state, and the international Waterkeeper Alliance. On behalf of our St. Johns Riverkeeper members, and as chair of Waterkeepers Florida, I formally submit our opposition to the state of Florida's request to assume Clean Water Act Section 404 authority. Florida's waterways are uniquely connected and are critical to our public health, our economy, and our environment. Our stake has fragile and critical areas that are regulated by Section 404 dredge and fill permits, and which require the highest level of review and scrutiny. Currently, federal Section 404 permits and state environmental resource permits overlap, and that must be obtained for impacts above regulatory thresholds and federal waters. This additional oversight provided by the federal government is critical to adequately protect our water resources. This important checks and balances has protected many acres of wetlands throughout Florida and within our watershed that would have been lost without federal oversight.

33:27    As an example, our organization, along with Sierra Club Florida, spent five years trying to save the wetlands at the headwaters of two major tributaries to the St. Johns. These wetlands have been influenced by development. However, the size of the remaining system, its location, its ecological diversity, and its function as a headwaters to Julington and Pottsburg Creeks, and its maturity, classified these as high- to very high-quality urban wetlands. These wetlands were also identified as essential fish habitat by the South Atlantic Fishery Management Council and designated as wetlands of regional significance by the Florida Fish and Wildlife Commission. Unfortunately, the St. Johns River Water Management District approved a permit that would have allowed the developer to destroy these high-quality urban wetlands. Fortunately, the Army Corps of Engineers denied the developer's application to destroy these acres of federally defined wetlands, largely due to their value. Sadly, according to the recently released 2019 Lower St. Johns River Report, wetlands within our watershed continue to be lost due to development pressures, which will likely contribute to flooding from storm surge and sea-level rise, as well as we lose their ability to filter out pollution, contributing to ongoing toxic blue-green algae. The estimated nutrient pollution removal by St. Johns River wetlands alone is valued at more than $1 billion every single year.

35:03    Florida's water quality and resiliency from sea-level rise depend on wetlands protection. We need more oversight and more protection, not less. This delegation would add additional regulatory burden to the Florida Department of Environmental Protection, which is already under-resourced for its current responsibilities. For example, FDEP is woefully behind schedule on total maximum daily load development and is regularly behind in enforcement actions related to the National Pollutant Discharge Elimination System permit programs. FDEP is not well-positioned to assume the additional responsibilities and permitting demands associated with the 404 program. Additional responsibilities will divert resources away from these critical pre-

existing duties, as well as leave Florida wetlands vulnerable. The department lacks resources, staff, and funding to implement, operate, and enforce the 404 program, and our state is experiencing an economic downturn due to COVID-19. Budgets have been cut, staff support has been reduced, and yet, Florida Department of Environmental Protection continues with this application. On behalf of the St. Johns Riverkeeper and Waterkeepers Florida and our hundreds of members and thousands of acres of watersheds, I urge the EPA to reject the FDEP's 404 assumption application package. This assumption is not in the best interests of Floridians or Florida water resources. Thank you for the opportunity to speak.

36:42    Jeanenne Gettle: Thank you. I have no clarifying questions.

36:47    Jan Connery: Okay. Well, so far, we have four folks in group two that are not yet at the hearing, so we'll keep an eye out for them. But that is good news for people who've raised their hands. We have a few folks on our standby list, so we're going to go there now because we are ahead of schedule. And then we will get back to our speaker order after taking a few of our standby commenters. So we're going to go next to our first standby speaker and that's Jane West. Jane, please start by saying your name and affiliation, and then you'll have five minutes.

37:30    Jane West: Thank you. Good evening. My name is Jane West. I am the policy and planning director for 1000 Friends of Florida and an environmental litigator for the last 22 years. 1000 Friends is Florida's leading growth management watchdog, advocating for saving special places and building better communities. The Clean Water Act was implemented in 1972 because the states were failing, rather catastrophically, to manage the waters within their jurisdiction. Recent failures in Florida's water quality demonstrate that our state agencies are simply not poised to handle the grave responsibility of effectively managing our water resources. DEP staff and budget were severely cut back by the Scott administration and have not come close to fully recovering. The COVID pandemic makes funding even more unlikely anytime soon. The lack of requisite resources to ensure proper protection of Florida's wetlands is a primary concern.

38:27    Florida has already lost over half of its wetlands, with great negative effects on water quality, fish nurseries, wildlife habitat, and flood control. Since the federal permitting program commenced in 1975, Florida has consistently rejected responsibility for the program because of the decrease in wetland protection and lack of funding for the additional work that it involves. So we can't afford the changes contemplated in this proposed rule. State assumption will not protect Florida's imperiled natural resources. The state assumption fails to meet your own criteria because it will not be consistent with, and no less stringent than, the current federal program. As such, we encourage you to reject this request for the state of Florida to assume administration of the Clean Water Act Section 404 program. Thank you so much for your time.

39:20    Jeanenne Gettle: Thank you, Miss West. I have no clarifying questions.

39:24    Jan Connery: Great. Thanks, Jane. I'm glad we could fit you in. We're going to go to our next standby speaker, and that is Amber Crooks. Amber, please tell us your name and affiliation.

39:35    Amber Crooks: You can hear me?

39:38    Jan Connery: Yes, we can. Very well.

39:40    Amber Crooks: Great! Glad to have the opportunity. Hello, my name is Amber Crooks and I'm an environmental policy manager with the Conservancy of Southwest Florida. I did testify last week with the Conservancy's comments, but tonight, I would like to read into the record a resolution that was passed by the Everglades Coalition that opposed the state of Florida taking on the Clean Water Act Section 404 program. If you're not aware, the Everglades Coalition is an alliance of more than 60 local, state, and national conservation and environmental organizations dedicated to the Greater Everglades Ecosystem. The Conservancy of Southwest Florida is one of those organizations. The resolution was passed originally in 2013 and speaks to the state legislative bills that advance the assumption package you see before you today.

40:29    The resolution reads, and I quote, "Whereas, assumption would allow Florida to take over aspects of the Clean Water Act Section 404 program and would remove the Army Corps of Engineers from reviewing projects that oppose dredging or filling of wetlands. And whereas, removal of the Army Corps of Engineers as a federal regulator creates uncertainty in how other federal laws will be complied with, including the National Environmental Policy Act, Magnuson-Stevens Act, and National Historic Preservation Act, among others. And whereas, it has not been determined how the state of Florida, which is one of the most biodiverse areas in the nation and is home to dozens of listed species, would address Endangered Species Act compliance. And whereas, the state of Florida has stated it does not anticipate additional financial resources will be needed to take on the Clean Water Act Section 404 program, even though reviewers would need to be trained on Clean Water Act and would be responsible for reviewing permits under a differing set of regulations that exist with the state's wetland regulatory program. And whereas, wetlands are critical to cleansing water, helping to recharge groundwater supplies, providing fish and wildlife habitat, and maintaining a natural infrastructure that helps store floodwaters and provide resiliency in storm events. And whereas, Florida has already lost a substantial amount of historic wetlands and our remaining intact wetland ecosystems are at risk from a projected human population increase to 33.7 million residents by 2070. And whereas, in the face of increased growth and development, the protection and restoration of the Greater Everglades, an ecosystem largely comprised of wetland habitats, is better accomplished by maintaining the existing oversight from federal agencies. Therefore, be it resolved, the Everglades Coalition, with its over 60 member organizations committed to the protection and restoration of America's Everglades, hereby opposes SB 1402, which would allow the state of Florida to pursue wetland permitting under the Clean Water Act Section 404."

42:33    As I conclude, I just want to also mention that the Everglades Coalition also reached consensus on two additional documents opposing assumption in 2020, this year. In their letters, dated March 9th, 2020, and March 31st, 2020, the Everglades Coalition again expressed concern and opposition to Florida's assumption of the 404 program. We will be providing a copy of these documents to your records. But we thought it was important for you to be aware of these efforts by the Everglades Coalition and I thank you for the time to read these into the record. Thank you.

43:10    Jeanenne Gettle: Thank you, Miss Crooks. I have no questions.

43:17    Jan Connery: Okay. Well, we have time for a couple more standby speakers. So we're going to go next to Drew Martin.

43:28    Drew Martin: Hello, this is Drew Martin. Can you hear me?

43:30    Jan Connery: Yes, just fine. Please start with your name and affiliation.

43:34    Drew Martin: My name is Drew Martin.

43:35    Jan Connery: And also, sorry, Drew, would you spell your name for us?

43:40    Drew Martin: D-R-E-W M-A-R-T-I-N. I'm the conservation sheriff of the Loxahatchee Group of the Sierra Club. I'm also a member of the Conservation Committee of the state chapter of the Sierra Club in Florida.

43:57    I am opposed to the assumption of the 404 permitting by DEP. First off, already, I don't believe DEP has the resources to assume this. There is no plan to give DEP any additional funding to pay for this. Under the COVID situation, DEP will actually have, possibly, less funding. The other problem I see is that the federal government has much greater resources: the EPA, the Army Corps of Engineers, and many more scientists. They will also follow the mandatory laws, such as the NEPA. I'm concerned that DEP will ignore these laws. Florida, under DEP, has a terrible record of protecting wetlands. Florida has probably lost more wetlands than any other state in the union. Florida, originally, was almost entirely wetlands in the south part of Florida, south of Lake Okeechobee, with the exception of the coastal ridge. Much of that land has been drained. With

the onslaught of climate change, I believe that we will have even less wetlands to give up. Yet, this whole reason that DEP wants to assume this and the whole reason this law was passed was to make it easier for the state of Florida to destroy wetlands.

45:29    This is not about protecting wetlands. This is about destroying wetlands. And that is the basic reason why the legislature of Florida passed this law to take over the assumption of 404 permitting. Further, it is my concern that the destruction of wetlands at a time when we are threatened by climate change and our stormwater situation is extremely poor will make matters even worse. There is a very poor record of mitigation in the state of Florida. Many mitigation banks have been incorrectly handled. There's a great deal of destruction of wetlands all around our developed areas. We are really asking you not to move forward with this assumption on the part of the state of Florida. We are asking you to go ahead and deny this decision. It also should be mentioned that the state of Michigan is actually trying to give up their assumption of wetlands permitting. So we really think that this is the sort of thing that you should not move forward with. We see no evidence that the state of Florida could adequately take over the assumption of wetlands permitting. We see no ability from staff. We see no ability from funding. We see only things getting worse. We think that the EPA and the Army Corps of Engineers should maintain this. Further, as Amber Brooks stated, the Everglades Coalition opposes this, and numerous, numerous environmental groups oppose this. Thank you.

47:20    Jeanenne Gettle: Thank you, Mr. Martin. I have no clarifying questions.

47:25    Jan Connery: Great. And we'll go to another standby commenter. Chris Pettit. Please start by saying and spelling your first and last name, Chris, and then give us your affiliation, and then you'll have five minutes.

47:42    Chris Pettit: Thanks. This is Chris Pettit, P-E-T-T-I-T; C-H-R-I-S, first name. I'm the director of the Office of Agricultural Water Policy for the Florida Department of Agriculture and Consumer Services. We just wanted to comment on the proposed delegation. We appreciate the ability to continue to engage and just wanted to note that a clean and safe environment continues to be vital in sustaining our way of life and economic foundation. Our lands, our wetlands, marshes, estuaries are vital to maintaining and improving the sustainable recharge for our groundwater aquifers, clean and safe waterways. Any number of businesses that provide significant revenue to the benefit of those that live, work, and enjoy life in our state depend on those waters. Given the value of those resources and wetlands to the citizens of the state, and given the significant amounts of input that have been provided, any delegation that is approved should contain assurances that existing levels of protection of the natural resources will be preserved, that sufficient resources are available, and remain available for the Department of Environmental Protection to implement their regulatory programs in an efficient and effective manner. The elimination of additional federal scrutiny for projects that have the potential to significantly impact those resources requires that any existing state programs demonstrate the ability to protect those resources.

49:13    I will note that the two states that have previously assumed 404 authority have encountered significant challenges in areas that have been raised by a number of speakers previously, and that they have had to make significant changes in order to keep those programs after a subsequent review by EPA. To date, at least to the satisfaction of interested parties, adequate evidence has not been provided that DEP has the resources to tackle the significant increases in workload that will be required by the delegation, or that existing state regulatory programs are adequate to provide sufficient protections to the water resources of the state in the face of increasing development impacts, climate change, and other factors that continue to reduce the state's open lands and agricultural landscapes. As such, any delegation should ensure the preservation of levels of public participation and comment afforded by the National Environmental Policy Act through the development of EIS for projects with sustainable impacts. The delegation should also require the State to demonstrate that the protection of species

against possible loss of protections and stringent levels of review that are provided by ESA will be maintained. As part of any delegation, DEP should demonstrate that the State program adequately explores practicable alternatives prior to allowing for mitigation and ensures that cumulative impacts are properly incorporated as any part of an impact analysis that's undertaken. The Department continues to be supportive of exploring all those opportunities to ensure progress on vital environmental restoration and water resource protection projects being implemented through local government state agency programs, two point, the efficient and effective implementation of projects tied to Everglades restoration, and the ability to get those done are paramount. However, the protections that are required pursuant to a delegation should remain in place. Regulatory programs should ensure consistency, efficiency, transparency, public participation, and the ultimate protection of the water resources of Florida for the benefit of its citizens. We remain committed to working with its agency partners on both the state and federal level to ensure that those goals are realized. Thank you very much.

51:45 Jeanenne Gettle: Thank you, Mr. Pettit. I have no clarifying questions.

51:50 Jan Connery: Great Well, we have time for another standby speaker, so we're going to go to Albert Gomez. Please start by saying and spelling your name, give us your affiliation, and then you'll have five minutes.

52:04 Albert Gomez: Yes, this is Albert Gomez. I'm on the Steering Committee for the Biscayne Bay Marine Health Summit and I'm a citizen of South Florida. I just wanted to mention my opposition of Florida's request for assumption of the Section 404. Specifically, two metrics. Personally, doing ride-alongs and checking South Florida's NPDES standards, we've miserably failed. And in most cases, it's the public and local advocacy groups that are pointing out these failures and calling on DEP to come in and validate what we're seeing as failures in the field. And, effectively, that's getting harder every day, I think, since 2010, when over 500 wetland scientists were axed, based on a budget cut from the Scott administration. So, effectively, we move forward to now, most, if not very few, of those wetland scientists have been replaced. So to consider that they will be able to assume the added responsibility of permitting assessment and environmental review is just not viable. It doesn't make any sense.

53:28 Furthermore, they've already had the responsibility of managing the Water Compliance Enforcement Program. And if you look over the time that they've managed that program, there's been, probably, an 80%-- maybe, 70 to 80 percent degradation in wetlands on the areas that they're managing. So it's showing that their management responsibilities are not meeting the modus of what they were tasked to do. So you add those together with this added responsibility, knowing that we're in a COVID crisis, we have massive budget shortfalls. At the Summit, we're requesting for more water sampling representatives where there is no money to fulfill that obligation or that requirement, because we know we need it down here in South Florida. So, effectively, if we just load those up into a pro and con, the cons far outweighed the pros for wanting to fast track a permit, for SERP, or anything. Even though those things are very, very positive, you need to have the oversight and the environmental review in order to accurately approve permits. To just pass this along and consider that DEP will be able to handle it when-- there are amazing individuals DEP, don't get me wrong. That said, it's not cutting mustard and, realistically, this is setting us up for failure in the long run. So I'm hoping - from a layman's, you're taking comments - that this is not the right move. And it's not the right move based on fact, metrics, and past experience. Thank you.

55:16 Jeanenne Gettle: Thank you, Mr. Gomez. I have no questions.

55:21 Jan Connery: Okay. In that case, we'll go to our next standby speaker. That is Dr. Neal Schleifer. Would you please say and spell your name for us? Give us your affiliation, and then you'll have five minutes.

55:36 Neal Schliefer: Hi, I'm Dr. Neal Schliefer. That's N-E-A-L S-C-H-L-I-E-F-E-R. I'm president of the Paradise Cove Association in Sarasota, Florida and I'll be relatively brief. We just want to state our opposition to assumption of the Clean Water Act Section 404 by the State. Others have stated already how important the wetlands are. And Florida is neither prepared nor properly funded. The State; that is, the state of Florida take over administration of the Clean Water Act. Also, there's too much politics involved. There's too much partisan politics and pro-development in the State to objectively protect the wetlands. So, therefore, we oppose state assumption of the Clean Water Act. Thank you.

56:32 Jeanenne Gettle: Thank you, Dr. Schleifer. I have no further questions.

56:39 Jan Connery: Okay. Well, we don't have more standby speakers. We are a little ahead of schedule but we do have a couple of folks from speaker group three on the line, so that's where we're going to go next. Some of our group two, we haven't seen them yet. So our next speaker is Kayla Barretto. Kyla, please give us your name and affiliation, and then you'll have five minutes.

57:08 Meredith Outterson: So, Kayla, it looks like you're still muted on your end, so-- there you go.

57:12 Kayla Barretto: Sorry. I apologize.

57:15 Meredith Outterson: Go right ahead.

57:16 Kayla Barretto: Can you hear me now?

57:17 Meredith Outterson: Yep, you're good to go.

57:18 Kayla Barretto: All right. Hi, my name is Kayla Barretto. I am actually a resident of Miami-Dade. I have no affiliation. And I thought this was supposed to be questions, but I will try and do comments here. I just wanted to reiterate what Rachel Uhland said about little notice that we got. I only found out about this because of Carl Harrison writing an article about this situation. And I find it's a poor situation on our environments, alone on our ecosystem in Florida. We depend on our wetlands and our ecosystem. It's horrendous of all the development that has been going on. I live in Miami-Dade alone, and the development that's going on here, on our wetlands, is horrendous. I don't have no affiliation with no actual organization, but me just living here and observing what's going on around me, I worry about the environment, I worry about the animals, the wildlife that we have here, the displacement of our wildlife. And why is it that everything is just up and going so fast without actual proper sitting down and looking at the permits that are being approved for a lot of these projects that are happening on our wetlands?

58:34 So that's just basically, kind of, what I really wanted to stress about, is our environment, is the wildlife, the ecosystem, our wetlands. I think that that should be the most important thing, instead of overpopulation. We have so much traffic as it is already. All the pro-development politicians that are in, they are only for pro-development and developing our county, instead of actually being more concerned about our environment and what it can do for us. We're already in climate change and it's worse this year than ever. It's a constant, constant, just developing without actually thinking about the prolonged effects of our wetlands. We're already below sea level here in Miami-Dade. Why do we need any more developments? It's completely unnecessary. So I'm opposing the request they assume administration of the Clean Water Act Section 404 program. Thank you.

59:35 Jeanenne Gettle: Thank you, Miss Barretto. I have no clarifying questions.

59:41 Jan Connery: Okay. Good. Well, in that case, we'll go to our next commenter and that is Alison.

59:54 Jan Connery: Meredith, I think you may need to mute someone. So we will go to our next commenter. That is Alison. Anton has not yet joined us. We're a little ahead of schedule, so we may be hearing from him and circle back to him when he joins, if he does. Alison, please start with your name and affiliation, and then you'll have five minutes.

01:00:18    Alison Kelly: Can you hear me?

01:00:19    Jan Connery: Yes, we can.

01:00:21    Alison Kelly: Okay. Wonderful. This is Alison Kelly. I am a senior attorney with the Natural Resources Defense Council, which is also an organizational member of the Everglades Coalition. We have significant concerns about the State's assumption of this program, and therefore, must oppose at this time. The concerns include the Department's failure to adequately enforce environmental protection already under its purview, the already severe degradation of wetlands in the State, the lack of resources to undertake a critically important federal program, the inability to protect endangered and threatened species, and the adequacy of consultation regarding impacts to tribal, historic, and cultural resources. This program must be as stringent as the current federal program, and Florida has not submitted enough evidence to show that it has met this bar. The Department's assumption application fails to describe or list the waters that will be assumed if Florida's application is granted, which is critical information for members of the public to determine the impacts to their interests. The Department has failed to explain how endangered species will be adequately protected and the Department does not have adequate staffing resources or experience necessary to permit and enforce Section 404 requirements. I should note that I was also a regulatory enforcement attorney doing wetland enforcement for the Department and the South Florida Water Management District, so I am able to answer a few questions on that, if you have any.

01:01:40    Also, there is a global pandemic taking place. We should not even be considering things of this magnitude at this sensitive time. Folks are losing their jobs. They are getting sick. They are taking care of family members who are sick. This is completely inappropriate and we cannot have meaningful and fair, transparent public comment during this time. At a minimum, this should be tabled until the global pandemic is behind us. And despite numerous attempts to have virtual hearings, not everyone is privileged enough like I am at this moment to have broadband internet access. I think this came up in another planning effort, as well, called M-CORES. Also, the Department does not have adequate resources to take over this program. They're already quite overwhelmed with the Environmental Resource Permit program, the state wetland permitting program. It's unclear how they're going to staff this, how they're going to train existing staff when these folks are already overworked. How are we going to organize the Department's enforcement responsibilities and permitting with the water management districts under memoranda of agreement? For example, the South Florida Water Management District handles most of the larger wetland permits and enforcement under the Environmental Resource Permit program, pursuant to an operating agreement with the Department. Will most of this responsibility now goes to the water management districts? And do they have the resources necessary to do this?

01:03:03    Florida will lose vital federal review and protections. Florida's critically important wetlands and endangered species must be held to the highest review standards to protect our resources from local political pressure and special interest, given how fast population growth and development is occurring. Federal operation on the 404 permit triggers a myriad of other federal protections under the Endangered Species Act, National Environmental Policy Act, and National Historic Preservation Act, that protects our cultural resources. We need to make sure that this oversight and this accountability remains. Also, DEP does not currently do meaningful enforcement of its own permits and programs, including the Environmental Resource Permit program. So how is it going to enforce 404 requirements? According to the Public Employees for Environmental Responsibility, the number of enforcement cases open in 2019 rose slightly, but this largest number of cases was about 469 cases, compared to the 1500 cases that were open in 2010. So we're not enforcing as many cases currently as we have in the past. This includes the dredge and fill program, which oversees the development of Florida's wetlands. It dropped 36% in 2019. So how is this going to be any different with enforcement of the 404 program? With dramatic cuts to staffing, reductions in expertise, and inadequate enforcement of existing environmental

mandates, the Department currently fails to adequately protect wetlands. And I don't see how this is going to change by assuming this program.

01:04:30   We also need to protect our endangered species. Streamlining wetlands permits will destroy these precious water resources that many endangered species in Florida, over 130 listed species, call home. And this is not in the best interests of Floridians or the United States. While programmatic consultation can provide a framework for future actions, under Florida's proposal, this truncated consultation will essentially give approval for foreseeable actions and take of endangered species without permit level review. So based on the foregoing, we feel the EPA must deny the Florida application to assume the 404 permitting program at this time. Thank you.

01:05:11   Jeanenne Gettle: Thank you, Miss Kelly. I am going to provide one clarification. The function package that we have received is for assumption by the state of Florida, to be administered by the Florida Department of Environmental Protection.

01:05:27   Jan Connery: Okay. Thank you. We'll go to our next speaker, and that will be Beth Alvi. Beth, please start by saying your name and affiliation, and then you'll have five minutes.

01:05:42   Beth Alvi: Thank you. Good evening. I'm Beth Alvi, director of policy with Audubon Florida. Audubon Florida appreciates the opportunity to comment on the State's request to assume a 404 program. I will share some of our concerns and my colleague, Chris Farrell, will follow with the remainder of our comments. We are concerned that the state of Florida does not have adequate resources to assume a 404 program at this time. A successful program would require significant additional resources within the Department of Environmental Protection, and, most likely, within the Florida Fish and Wildlife Conservation Commission as well. The State has not indicated that it will be collecting fees for the 404 permitting program. And the State has not considered an increase in the budget of either agency to accommodate the new responsibilities of the 404 program. As well, due to fiscal constraints resulting from the pandemic, the State is exploring significant reductions in state agency budgets.

01:06:46   In its application, the State suggests it will handle all additional work by redirecting the existing workforce. Such an approach will surely result in a loss of rigor from their existing regulatory and restoration programs. We have heard concerns that the Corps' permitting slows down the pace of completion of much-needed restoration projects and that there is a need to streamline processes. Audubon is responsible for a few Gulf restoration projects in Florida that required Army Corps 404 permits. Audubon Florida did not find their procedures to be a barrier, nor did we face any unnecessary delays in the permitting and review process. We have valued the Corps' participation in permitting our projects. Finally, we feel the Department of Environmental Protection would best serve the people of Florida by concentrating on improving the existing ERP program. Analysis by Audubon; NOA, the agency; the National Academy of Sciences; the US Fish and Wildlife Service have shown deficiency in both state and federal wetland permitting programs. Wetland losses, clearly, have compromised Florida's water quality, flood protection, dry season wildfire resilience, water supply, and economic and environmental health. The governor's Executive Order 19-12 clearly articulates statewide environmental priorities, which include restoration and protection of wetlands and watersheds. Audubon strongly recommends that the Department focus its restored resources on implementing these priorities and improving wetland protection outcomes in its Environmental Resource Permitting program before assuming another wetland regulatory program. Thank you.

01:08:39   Jeanenne Gettle: Thank you, Miss Alvi. I have no clarifying questions.

01:08:43   Jan Connery: Okay. We will move to the next speaker and that is Chris Farrell. Chris, please say your name and affiliation, and then you'll have five minutes.

01:08:52   Chris Farrell: My name is Chris Farrell, with Audubon Florida. I'll share a few additional concerns we have, based on the information in the State's application package. We conclude it's premature for EPA to grant this assumption because the program description is not full and

complete as required, does not guarantee a program that's as stringent as the current one, and it faces significant outstanding legal concerns that could work against the goal of streamlining permitting in the state. More information is needed to consider the program full and complete and some discrepancies in the program application need to be corrected. For example, the State's 404 Applicant's Handbook says the Department of Environmental Protection may use various resources to determine a project's potential impact on listed species. But it doesn't state any minimum level of due diligence that will be completed. Additionally, it now appears the process described in the handbook has changed and the Florida Fish and Wildlife Conservation Commission will be making the initial listed species determinations, rather than the Department. So these issues would need to be clarified for what the exact procedures are that are going to be followed. Further, the State does not sufficiently describe how they'll replace important protections from federal laws that normally apply to federal actions. When the Corps issues a 404 permit, the decision's subject to NEPA. Occasionally, NEPA leads the quarter completing an Environmental Impact Statement for projects that have significant potential for environmental impacts. Completion of an EIS takes time, personnel, expertise, and stakeholder involvement. State's plan does not explain in sufficient detail how they would replicate such detailed analyses and their modest expectations for additional workload requirements do not appear to account for such detailed efforts. Section 7 consultation from the Fish and Wildlife Service is not mandated for state permits. The State has submitted an MOU that explains how cooperation with FWS may work, but our understanding is the MOU has not been signed by FWS yet. The public and the EPA cannot evaluate the State's plans for assumption without knowing all parties are committed to the actions described in the MOU and that are anticipated by DEP.

01:11:11    Another issue that needs more time for consideration relates to the liability for take of listed species from projects with state permits. It's been suggested by the State that a programmatic consultation for assumption would cover all permits the state issues. This is an incredibly controversial legal statement and has not been given sufficient time for a review, and it would most certainly be tested in court. EPA's position for the last 10 years held that programmatic consultations were not even part of the assumption process, a position that was just reversed months ago after the State submitted a white paper to EPA. FWS has engaged in programmatic consultations in the past, but these were used to facilitate the permitting of repeated actions that have similar and predictable impacts. The State's example of the EPA's cooling water intake structure rule as a precedent for a programmatic consultation for a permit program doesn't really hold up. That program deals with one very specific impact from one industry and restricts applicants to a small number of solutions. The 404 program deals with an incredibly wide variety of projects and potential impacts, ones that cannot be captured in a programmatic fashion. If the legal argument that a programmatic review protects all permits falls through, permittees will need to seek separate protection for incidental take. And, as the state says in their white paper, this situation would lead to a regulatory program more burdensome than the existing federal one. For these reasons and others we will submit in writing, we believe it's clear that EPA should reject the State's request to assume a 404 program at this time. Thank you.

01:12:57    Jeanenne Gettle: Thank you, Mr. Farrell. I have no clarifying questions.

01:13:02    Jan Connery: Okay, very good. We are once again ahead of schedule. So we have a couple of folks who've raised their hands and would like to speak on our standby list. And we're going to go to the first of those and that is Jim Tatum. Jim, please start by spelling your name and saying your name and affiliation, and then you'll have five minutes.

01:13:30    Meredith Outterson: So, Jim, just a heads up that it looks like you're still muted on your end. So if you're speaking, we can't hear you yet. Please try unmuting on your keyboard or headset.

01:13:38    Okay. Can you hear me now?

01:13:40    Yes, we can hear you very well.

| | |
|---|---|
| 01:13:42 | Jim Tatum: My name is Jim Tatum, T-A-T-U-M, and I represent Our Santa Fe River, which is a non-profit from Fort White, Florida. We strongly oppose the assumption of the Florida DEP for this program, and mainly because the DEP, historically, cannot control its water resources in Florida. With this further control removed-- the federal government removed, it would take away a form of checks and balances and our DEP would then fast track the permits. Our rivers and springs have been in decline constantly over time and most of our North Florida rivers and Central Florida rivers are about 30% less of flow now and at historic times. By the DEP's own admission, they have produced failed VMAPs. They admit that they will not work. The MFLs that they produce are not realistic. Our rivers, already, have significantly harm. Finally, we would say that the DEP does not have the resources to do this. But, more importantly, they do not have the political will to protect these resources. One last thing with this. It would be a continuation of a dangerous trend we see of a power grab in Tallahassee, wanting to try to do everything and taking, especially, power away from municipalities and home rule. Thank you very much. |
| 01:15:25 | Jeanenne Gettle: Thank you, Mr. Tatum. I have no clarifying questions. |
| 01:15:29 | Jan Connery: Good. We will move next to another standby speaker, Christopher Michaelessi. Please say and spell your name for us and let us know your affiliation, and then you'll have five minutes. |
| 01:15:49 | Meredith Outterson: Hey, Christopher. Same comment as for Jim, it looks like you're muted on your end. So please try unmuting on your keyboard or headset so that we can hear your comment. Still can't hear you at the moment. I can work with you behind the scenes to try to solve the issue. |
| 01:16:12 | Jan Connery: All right. Well, in that case, we do have a number of folks in our next speaker group, which is group four. So we'd like to take them. And our first speaker is Marian Ryan. Please say your name and affiliation for us, Marian, and then you'll have five minutes. |
| 01:16:34 | Marian Ryan: Hi, my name is Marian Ryan. I'm the conservation chair of the Ancient Islands Group of the Sierra Club Florida. Our group encompasses Polk, Highlands, Hardee, Desoto, and Sumter counties. Florida's request to take over federal permitting under the Clean Water Act Section 404 must be denied. Our Sierra group has been reviewing phosphate mining permits for years and it has been hard enough to ensure that 404 permits issued by the US Army Corps of Engineers provide enough protections for wetlands. If the state takes over, it will be even more difficult to stop politically influential mining and development interests from destroying our remaining wetlands and polluting our waters. A prime example is Mosaic's plan to mine some additional 14,000 acres within the Peace River basin, which has already been deeply and irreparably scarred by phosphate mining. Our group also encompasses a large portion of the Green Swamp, headwaters of four major rivers, and an important wildlife corridor for Central Florida. This designated area and critical state concern has always struggled to attract the agency protections that it deserves, and it once again is suffering from an empty desk in Tallahassee. |
| 01:17:49 | FDEP has been understaffed and overwhelmed for years just trying to maintain their own programs. The promise to hire additional, low-paid staff to assume 404 permitting requirements is a promise to fail. FDEP will continue to be a training ground and stepping stone to other higher-paying agencies and private enterprise, ensuring that our wetlands and wildlife will suffer. To give you a hint of Florida's current attitude towards growth management and the environment, the former Department of Environment-- the former Department of Community Affairs was reorganized in 2011 into what is now the Department of Economic Opportunity. Given the serious ground and surface water quality and quantity issues, that suffer has long endured and is trending negatively, as well as the perilous status of so many of our wetland-dependent species, we urge you to deny Florida's request. We will submit further comments in writing. Thank you. |
| 01:18:54 | Jeanenne Gettle: Thank you, Miss Ryan. I have no follow-up questions. |

01:19:00    Jan Connery: Okay. We will move to our next commenter. That is Tom Knuckey. Tom, please give us your name and affiliation, and then you may start your comment.

01:19:13    Tom Knuckey: Hello. Thank you. My name is Tom Knuckey and I am not affiliated with any group. I'm calling as a concerned Florida citizen in Central Florida. I'm a lifelong Floridian of over 50 years and I've seen the destruction of our environment by pro-business and development groups, especially in the past 10 years and in the last two administrations. I'm calling tonight to express my opposition to Florida's DEP request to administer the Clean Water Act Section 404. The DEP is underfunded and under-resourced to take on such a critical responsibility for the future of Florida, for the future of our businesses, for the future ecotourism, for the residents, for the wildlife, and for the appropriate water storage and water quality. DEP's resources have been cut over the past 10 years. Under the previous administration, over 600 DEP employees either lost their job or were forced to leave. The funding has not returned to DEP and DEP is unprepared to take on this significant program for the protection of clean water. The funding at DEP is at the whim of the state politicians and under the current COVID epidemic and pandemic, we are not able to, as Florida citizens, be able to make sure, under our balanced budget provisions, that the funding of DEP will rise to the occasion to meet this responsibility. In fact, the plan doesn't even address how this is going to be funded. Also, it's my opinion that the Florida DEP, although they're made up of good employees, are unfit to be able to take on this heavy challenge of carrying the responsibilities that the Army Corps of Engineers actively done a good job of over the past decades. And finally, my closing concern is that DEP is subject to the influence of politicians and lobbyists through the Florida legislature, and that's where this bill originated to take over the administration of the Clean Water Act. And I'm pleading with you, as other concerned Florida citizens are, to deny this request. Thank you.

01:21:19    Jeanenne Gettle: Thank you. I have no clarifying questions.

01:21:23    Jan Connery: Great. Then we'll move to our next speaker. That's Faith Bickner. Faith, please start with your name and affiliation, and then you'll have five minutes.

01:21:37    Meredith Outterson: Hi, Faith. If you're speaking, we can't hear you. There you go.

01:21:40    Faith Bickner: Can you hear me now? Okay. So I'm Faith Bickner. I'm speaking on behalf of the Center for Biological Diversity. First, thanks to the EPA staff here and the representatives of all the diverse groups, and also, the individual citizens. It's really cool to hear from so many people just calling from home. But that being said, these two barely publicized remote meetings really do not constitute the kind of public engagement warranted or mandated by federal law for what would be a rash major administrative rollback. I feel strongly that the EPA should decline FDEP's application to assume jurisdiction over the wetlands permitting under 404 of the Clean Water Act because the FDEP has failed to demonstrate the capacity to take on this major responsibility. And the consequences of those gaps would be really devastating. Firstly, FDEP's proposed program would illegitimately circumvent the requirements of the Endangered Species Act. The ESA is largely viewed as the strongest environmental protection statute in US federal governance and imposes strict requirements on any discretionary federal action. This includes the sections having duty to consult with the US Fish and Wildlife Services and NOAA Fisheries. When an agency action may affect a listed species, including, of course, issuance of a 404 permit, Section 7 consultation responsibilities apply to federal action, but wouldn't carry down to the state. And the EPA should continue to require permit-specific consultation for the many treasured endangered species in Florida waterways and should regard FDEP's application as incomplete until it meets that requirement. The truncated one-size-fits-all approach proposed by FDEP would constitute a vast stripping of protection to the many threatened and endangered species that live only in Florida waterways. I think another commenter mentioned that there's more than 130 threatened or endangered species living only in Florida water-- or living in Florida waterways. And we have to remember that when the ESA was being passed by Congress, we expressly declined to protect endangered species only where it was practicable, where it was

convenient and, instead, chose to afford protection of threatened and endangered species at the highest priority, regardless of how administratively inconvenient it may be to groups like The Fertilizer Institute. The people of Florida support the protection of endangered species, and not the continuous freefall of development transforming the State, which makes the exclusion of meaningful public participation in this process all the more unjust.

01:24:19    Moreover, the FDEP lacks the staffing, funding, and expertise to conduct these consultations or responsibly administer the 404 permitting program. Because the assumption of 404 responsibilities would require a Fish and Wildlife review of state-issued permits, which must also comply with water quality standards protective of endangered species, the FDEP would be immediately further overwhelmed by the incredible scale of consultation necessary to protect the many wetlands and endangered species of Florida. As noted by lifetime public servants at the last hearing, the FDEP has reduced its staffing and has already consistently failed to adequately operate the programs under its purview, while claiming that no additional resources would be needed to take on this enormous responsibility. FDEP has failed to submit a complete application in other ways, failing, one, to identify the waters the state program would cover, which make meaningful public comment and participation impossible; to specify the staffing and funding details necessary to operate the program; and three, details on how, exactly, it would "streamline" the current wetlands division, which is already understaffed and woefully behind on their current responsibilities. It's worth noting that another one of their responsibilities is a permitting task assumed from the federal government, The National Pollutant Discharge Elimination System, which, as was noted, I think, well at the last hearing, they're consistently behind and underperforming at. And lastly, just off the cuff, personally, the Florida legislature only approved the possibility. They didn't approve this application. They said, "Okay, the FDEP is approved to put together an application." And we're seeing that they applied for this job and we called their references, and they aren't qualified. If a potential employee shows up to work 1 out of every 20 days, you don't make a manager. The wetlands and the many treasured endangered species of Florida cannot be gambled with on such a massive scale. And to reiterate many other commenters' position that it's wildly inappropriate to be pushing such dramatic changes through at this time. I thank you so much for your time.

01:26:49    Jeanenne Gettle: Thank you, Miss Bickner. I have no clarifying questions.

01:27:00    Jan Connery: Okay. We'll go to our next speaker. We don't have Christian with us right now, so our next speaker will be Sandra Chiappetta. Sandra, please start with your name and affiliation, and then you'll have five minutes.

01:27:16    Sandra Chiappetta: Hello. Can you hear me?

01:27:17    Jan Connery: Yes, just fine. Please go ahead.

01:27:20    Sandra Chiappetta: My name is Sandra Chiappetta and I'm with Boca Ciega Bay Friends. I want to express my objection to the FDEP's proposal to assume administration under Section 404 of the Clean Water Act for wetland permitting in the waters of the United States. For decades, the FDEP's promise of environmental protection has taken a backseat to facilitating permits for development. Now, the State wants to further streamline that process by removing federal oversight. Currently, the United States Army Corps of Engineers provides written public notice to nearby property owners with an open comment period. This development feedback process ensures critical local knowledge is included in the environmental impact analysis for our shared water resources and endangered species. The FDEP considers public notice in any obscure publication anywhere in the same county, often miles from the area that will be impacted, sufficient public notice. This robs nearby property owners of proper written notice and robs them of their voice and protecting their properties from potentially environmentally damaging development proposals.

01:28:32     Here is an example based on my personal experience with the FDEP permit review process. Several years ago, I received a Corps public notice in the mail for a 71-boat marina expansion after the FDEP had already approved their permit and forwarded it onto the Corps. Questions on the FDEP permit application were answered incorrectly, important questions were left unanswered, and all the information was provided solely by the developer. The Manatee Biological Evaluation for this permit used outdated data; assumed, incorrectly, that the Slow Speed Manatee Zone was controlled and enforced; failed to address cumulative damage to the seagrass protection and restoration targets in the surrounding area, a critical manatee food source; and overlooked inadequate water ducts for surrounding areas, with some water ducts assumed and not even verified. The FDEP permit was approved for 71 40-foot boats with drafts up to four feet deep, with little consideration for hazards to navigation, without any consideration for county or city codes, and without adequate minimum water depths in all access areas, including a shoal across the entire north access area that has assumed water depths of minus three feet mean low water. FDEP approval with inadequate water depths will enable the developer to then request approval for environmentally damaging dredging for shoaling, even if that area has been shoaling for years, but has previously been dredged, even decades ago. This marina expansion covering an area the size of a football field was approved by the FDEP in an open, unprotected area, without consideration for costly potential damage to the marina itself, nearby properties, or protected seagrass ecosystems that could be caused by runaway boats during a hurricane. In stark contrast, the Corps permit included consideration for county and city codes and reviewed additional critical information supplied by the public and multiple agencies. The Coast Guard noted that the marina expansion was a major hazard to navigation. The Corps required the proposal to be downsized to conform to local codes to protect navigation rights and they requested a comprehensive and thick bottom seagrass survey throughout the footprint of the marina.

01:31:09     This is just one permit. Now, imagine that multiplied thousands of times over across the state, and it becomes clear why Florida's ecosystems in areas like Florida Bay, the Indian River Lagoon, and Biscayne Bay are collapsing. The current poor state of many of our shared Florida water resources is clear evidence of the FDEP's failure to adequately protect our aquatic preserves, wetlands, and coastal mangrove environment. Allowing the state to assume sole administration of the Clean Water Act Section 404 program would be a costly regulatory burden to the FDEP, which is already under-resourced for its current responsibilities. Since the EPA won't be providing any federal fundings, these additional responsibilities will divert limited state resources away from critical FDEP duties, and/or place additional financial burdens on county and city permitting agencies and Florida taxpayers. In a state where environmental concerns take a backseat to powerful political and business interests, less oversight is a recipe for environmental and economic disaster for our tourism economy. Please stop the FDEP from assuming jurisdiction. Thank you.

01:32:28     Jeanenne Gettle: Thank you, Miss Chiappetta. I have no follow-up questions.

01:32:38     Jan Connery: Okay. We are ahead of schedule, still, so we're going to circle back to-- is it Chris Michaelessi, I think? Please go ahead. Would you please say and spell your name for us, because you're a standby speaker? And then you'll have five minutes for your comment.

01:32:59     Chris Michaelessi: Can you hear me?

01:33:00     Jan Connery: Yes, we can.

01:33:02     Chris Michaelessi: Excellent. Thank you for your help. It's Chris, C-H-R-I-S, Michaelessi, M-I-C-H-A-E-L-E-S-S-I. I'm calling in under an alias for fear of retaliation from my former and current employer. My former employer is the Water Management District. I would like to commend Sandra for her number one example because that is what I have seen repeatedly in my position. I am an environmental engineer who worked with the State up until Rick Scott's beheading of everyone. I did not plan to speak. However, this is a very important problem that we face right

now. My unique perspective, along with Allison Kelly's, provides me the firsthand knowledge and experience of the permitting and enforcement sides of the state and the federal government. The new water rule, unfortunately, that was just passed several months ago, eliminates many of the provisions for wetland protections that we once had. This is the final speed bump for the developers of Florida to pave Florida for no other reason than political, and for padding of pockets of politicians. If they no longer have to go to the Army Corps of Engineers, they will obtain their permits within 30 days. That is statutorily how it works.

01:34:22    After Rick Scott, there is no more review of these huge, large-acre projects, unless the Army Corps gets a hold of them and does their scrutiny. My firsthand knowledge, since the passing of the new water rule, is in the last few months, over 600 acres of wetlands have gone without mitigation. We are now going to pass that baton to DeSantis and his cronies in order to pave all of the rest of the interior of Florida. We have red tide. We have Lake Okeechobee. We have this St. Johns River. Our water quality is horrendous in Florida because, at this point, the developers are taking over. I'm not going to reiterate what everyone else has said, because they are 100% correct, except for the one commenter. Approving this assumption is detrimental to Florida's ecology. It is 100% in the developer's pockets. The only goal of this is to get permits out the door faster. We would have been better off taking the money for this rulemaking, providing it to the Army Corps of Engineers in order to provide them better computer systems, in order to do a better, quicker, faster evaluation. Ultimately, that's what we need. It's unfortunate that we've lost all the wetland acres that we have and this is going to only perpetuate that faster. Until we get a new political system in place in Florida, this is the worst idea I have ever seen, besides the new water rule. That is all I have to say and thank you for your time.

01:35:59    Jeanenne Gettle: Thank you. I have no clarifying questions.

01:36:03    Jan Connery: Okay. We're going to go to our next standby speaker. That's Brad Cornell. Please say and spell your name for us, Brad, let us know your affiliation, and then you'll have five minutes.

01:36:21    Meredith Outterson: Hi, Brad. So you're showing as unmuted but we currently can't hear you. Can you try speaking up or speaking into the microphone? Okay. It seems like we're having a tech issue with Brad. Brad, I'll send you a chat message with some ideas and try to help you fix the issue.

01:36:43    Jan Connery: Okay. Well, we are, right now, Jeaneanne, a little over 20 minutes ahead of schedule. So this might be a good time-- we're roughly midway through. It might be a good time for a break until, maybe, 7:00. Our next group is booked to start at 7:15, so we'll still be ahead of schedule if we reconvene it at 7:00.

01:37:14    Jeanenne Gettle: We can reconvene at 7:00. In the meantime, if people want to raise their hands and we have time to add some people, then we can do that. And we can check to see if anyone who wasn't on before has now joined us.

01:37:28    Jan Connery: Yes, we'll certainly do that. And it's great that we do have time to add speakers. So yes, please do raise your hand during the break for us to let us know. Looks like we, probably, will have time to take, hopefully, everyone who might raise their hand during this hearing. So we'll see you back at 7:00 PM Eastern time.

01:37:49    Thank you.

01:59:20    [silence]

01:59:21    Jan Connery: Hello, everyone. Welcome back to the public hearing for Florida's request to assume administration of the Clean Water Act Section 404 program. This is Jan Connery. I'm with ERG, a contractor to EPA. I'm the facilitator for the meeting. If you're just joining us, we are a little bit ahead of schedule, so we are going to take a few standby commenters. Let me just get to the right slide here. Yeah. We're going take a-- we have a couple of folks who've raised their

virtual hand to let us know they'd like to speak. So we're going to take them. Then, we're going to proceed with speaker group five. And we have several folks from that group who are already here to speak. So you'll be receiving a message from our webinar coordinator, Meredith Outterson, just before it's your turn to speak to give you a heads up that your time is coming. And then, I will call on each person and ask you to start with your name and affiliation, and then you will have five minutes to comment. We'll have a timer displayed so you'll be able to see how well you're doing on time and be able to wrap up within your five minutes.

02:00:34    So right now, we are taking a couple of additional comments, folks who have raised their hands to let us know they want to speak. We may well have a little additional time to take more speakers. So if you're someone who did not sign up to comment but you've decided you would like to do so, as time allows, we invite you to raise your virtual hand. That will signal to us that you'd like to speak. You'll have up to five minutes, just like everyone else. A lot of people take less time. You don't have to take five minutes. That's up to you. And then as time allows, I will be calling on folks in the order in which you raised your virtual hand. So I want you to know that's an option as we start, in fact, to take the next two folks who have raised their hands. The first one is Brad Cornell. For all our standby speakers, we're asking you if you would spell your name, please, for us. Say your name and affiliation, and then start your comment. And, Brad, you will have five minutes at that point, so please go ahead, Brad.

02:01:40    Brad Cornell: Great, thanks. I'm Brad Cornell, and my name's spelled B-R-A-D C-O-R-N-E-L-L, and I'm the policy staff for Audubon Western Everglades, which is an organization founded in 1961, here in Southwest Florida. And I want to say that we really appreciate the opportunity to comment tonight. We do oppose EPA approving Florida's request to assume the Section 404 wetlands permitting program. And I want to share two reasons for that. First, the Memorandum of Understanding between DEP and the wildlife agency that's overseeing the service does not consider an important collaborative regulatory strategy to protect and recover federally listed species, called Habitat Conservation Planning, under Section 10 of the Endangered Species Act. I have personally worked with agencies and landowners and other allies on a large pending HCP in Southwest Florida and can attest to the collaborative strategy's potential to better protect many species on a large regional basis over many decades.

02:03:00    Unfortunately, the assumption application MOU with FWS poorly defines a statewide biological opinion and incidental take permit, neither of which have been done yet. And these appear, to us, to potentially conflict with the HCP Section 10 alternative to single project Section 7 reviews. This, to us, is unacceptable. It's an unacceptable conflict which must be resolved before any consideration of this application. Additionally, the second reason that we want to highlight is something that others have mentioned, and that is that Audubon Western Everglades objects to any wetland regulatory streamlining, combining a federal program with the state program, when both these programs have resulted in over 30,000 acres of wetland losses since 1996 in just Lee and Collier Counties alone. So that fact speaks to the ill preparation and the unready nature of DEP and the Army Corps of Engineers to combine their programs in the state of Florida. We recommend that DEP and the Corps consider strategies to improve their wetland outcomes much closer to a no net loss that is the national and state mandate. So as that, we recommend, again, that EPA deny the application by the State for assumption of the 404 program. Thanks for considering our comments.

02:04:45    Jeanenne Gettle: Thank you, Mr. Cornell. I have no clarifying questions.

02:04:52    Jan Connery: Great. We'll take one more standby speaker and then we'll start speaker group five. Our next standby speaker is Wendy Jenkins. Wendy, please say and spell your name for us, let us know your affiliation, and then you'll have five minutes.

02:05:06    Wendy Jerkins: Good evening. My name is Wendy Jerkins, W-E-N-D-Y, and my last name, Jerkins, J-E-R-K-I-N-S. Thank you for the opportunity to speak. I'm a community member in Broward County and I'm speaking for myself. I oppose Florida's application. I was born and raised in

Florida and it's disheartening to see that the State has not been a good steward of its critical natural resources. Florida has failed to fully protect its most compromised natural resources and it has not demonstrated a full willingness to protect Florida's wetlands and water. I'm concerned about what will happen, should authority be handed to Florida. I oppose Florida's application. Florida needs the critical oversight. Thank you for your time.

02:06:03 Jeanenne Gettle: Thank you, Miss Jerkins. I have no clarifying questions.

02:06:08 Jan Connery: Okay. We're going to go, now, to speaker group five. But, again, if you're listening, if you didn't register to comment, if you would like to make a comment, to the extent time allows, and it probably will, please feel free to raise your hand after we've taken the folks who are here. We will then fit in as many additional commenters as we can who've raised their hand, in the order that your hands are raised. That's your virtual hand, of course. All right. So we're going, now, to speaker group five. And our first commenter is Maureen Long. Maureen, please say your name and affiliation, and then you'll have five minutes for your comment.

02:06:52 Maureen Long: Can you hear me?

02:06:54 Jan Connery: Yes, we can. Very well.

02:06:56 Maureen Long: Thank you. Good evening and thank you for having me speak tonight. I'm Maureen Long. I'm a member of Friends of Fish Island. We're a grassroots conservation group here in St. Augustine, and I'm going to be speaking as a concerned Florida citizen. I oppose the state of Florida's request to assume administration of the Clean Water Act Section 404 program and ask you to consider Florida's unique vulnerabilities and what we, as stakeholders, stand to lose, should this request be granted. For 48 years, I have lived in St. Johns County, where we have seen explosive growth, as the second-fastest-growing county in Florida and the eighth fastest-growing county in the US, with a population increase of over 43% in just the last 10 years. Our community is not alone, as Florida is being developed at breakneck speed, ranking fourth in the country for its growth, with our population numbering over 20 million now, and estimated to be 21 million by next year. In recent years, Florida has experienced population impacts from climate change migration, following devastating Hurricane Maria. In this year alone, we have seen 1,000 people a day move here to seek shelter from the pandemic. Florida is a magnet for population influx. Urban development to meet these growing population needs has put enormous pressure on our limited natural resources, especially in flood-prone coastal areas that are already threatened by, or experiencing the impacts of, rising sea levels. In our community, we are struggling with how to address flooding from king tides and ordinary rain events that are repeatedly damaging businesses and homes. We are struggling with how to make our community more resilient from hurricane storm surge and flooding that seemed to worsen with each year. Careful reviewing permit applications to fill these low-lying areas may prove to be the most important safeguard that we have left. We have left this in order to protect our wetlands, our waterways, and the resiliency of our communities. Permitting to dredge, fill, and develop these areas should not be fast-tracked through state agencies. We also face critical water supply challenges within our state, as we look for ways to provide enough clean water to meet the demands of this rapidly growing population and to protect our aquatic ecosystems that are the lifeblood of our coastal communities, and of our state.

02:09:20 With nearly 6000 square miles of coastal and inland water, our tourism, recreation, and maritime industries are vital to Florida's economy, and all rely on having clean and healthy aquatic ecosystems and waterways. Maintaining an independent and objective review of 404 permits by the Army Corps is critical to ensure that important permitting decisions align with the intent of Florida law-- of federal law. Excuse me. Federal law to protect the interests of our natural resources and to ensure that they are not swayed or influenced by changing political agendas. The employees of the Florida DEP are hardworking people, but with the dramatic cuts to staffing, reductions in expertise, and inadequate enforcement of existing environmental mandates, the Department currently fails to adequately protect wetlands under its existing Environmental

Resource Permitting program. The FDEP combines three separate agencies in one. They serve 67 counties, which are divided into six districts. And they only have nine offices that serve over 58,000 square miles of Florida. The Florida Department of Environmental Protection doesn't have the proper capacity to take over the wetlands permitting that has been run by the US Army Corps of Engineers for decades. It can't even manage to enforce the environmental laws already under its purview. This controversial attempt by Florida DEP to assume authority over Clean Water Act permits the federal government at the request of wealthy developers. This does not sit well with the citizens of Florida. The public has repeatedly raised concerns about the FDEP's failure to meet its existing obligations on wetland protection, mitigation measures, and adequate enforcement of existing programs. The Department should, first, address and fix these issues before seeking approval to undertake a completely new set of responsibilities. Floridians do not want the FDEP to take over the 404 program, as we stand to lose too much from this change. For all of these reasons, I ask the EPA to deny Florida's request to assume administration of the Clean Water Act Section 404 program. Thank you.

02:11:36 Jeanenne Gettle: Thank you, Miss Long. I have no clarifying questions.

02:11:42 Jan Connery: Okay. In that case, we will move to our next speaker. That is Wendy Wood. Please start by stating your name and affiliation, and then you'll have five minutes.

02:11:53 Wendy Wood: Hello, my name is Wendy Wood. I was born and raised here in Florida, and I'm calling in because I oppose Florida's application to take over the permitting process for Section 404 of the Clean Water Act. And our wetlands are integral to the health and wellbeing of all of Floridians, sustaining life for human beings and all the other living creatures who are our neighbors. Earlier in history, people didn't know the importance of our wetlands. Now we know. We don't have an excuse. Let's use that knowledge to protect the remaining fragile ecosystems that we have left. Once water is fouled and wetlands are removed, there is no bringing those fragile ecosystems back. I also urge you to take into consideration that wetlands are carbon sinks and greenlighting development without due diligence will replace these carbon sinks with more impermeable surfaces that require lots of $CO_2$ to manufacture. I know that the Florida DEP is underfunded, it's understaffed, those people are working as hard as they can, and they're often under political attack. They should not be asked to take on more without more funding and binding protections from political retaliation. The feds are more thorough and impartial and they have more funds to oversee the examination process in these fragile ecosystems. So they're just better equipped to look at the whole picture. Once again, I hope that this is denied for the good of all Florida. Thank you.

02:13:57 Jeanenne Gettle: Thank you, Miss Wood. I have no clarifying questions.

02:14:02 Jan Connery: Great. Then we'll go to our next speaker and that is Annette Redwine.

02:14:07 Annette Redwine: Good evening. I'm Annette Redwine. I'm a retired teacher, Alachua County, Florida. I'm going to add my voice to all those that have already spoken, for I, too, believe that it is in the best interests of Florida's citizenry that the federal EPA retain administration for the Clean Water Act Section 404 and not allow the state of Florida to assume its administration. I say it lacks the resources, as everyone has said, both fiscal and human, to properly vet every application put forward. Consideration not only for the immediate future, but for 20, 50, 100 years into our future must be made because experience has taught us that the consequences of decisions made in our past, both intended and unintended, have stretched that far into Florida's future. Florida is a beautiful state. And our waterways, bays, and estuaries are a big part of why our state is so special. Further, these waters are also national treasures. I believe that the safety gateway that's in place to protect these precious resources must remain vigorous, and that careful thought and time for consideration must be given to every application. Having lived in Florida all 71 years of my life, I've witnessed how, when funds are lacking, Florida's legislature is given short shrift to the State's funding of education, ecology, and public health and safety. I've seen wetlands designated as protected in environment, and then, several years down the road,

the designation and the wetlands are lost. I'm sure you're familiar with the rather crass common expression that goes, "When money talks, poop walks." And Florida seems particularly vulnerable to this phenomenon. It is my belief that keeping the administration of the Section 404 within the purview of the federal EPA will get Florida's waters the best protection. Thanks for hearing me.

02:16:15 Jeanenne Gettle: Thank you, Miss Redwine. I have no clarifying questions.

02:16:19 Jan Connery: Okay. We'll move to our next speaker. Juanita is not yet with us, so that is going to be Elise Brady. Elise, please state your name and affiliation, and then you'll have five minutes.

02:16:38 Meredith Outterson: Elise, it looks like you're muted on your end, so please try on muting on your laptop or your headphones so that we can hear you. Still not able to hear you, Elise. If you want to try one more thing and then if not, I will work with you behind the scenes to try to fix the issue.

02:17:02 [silence]

02:17:18 Jan Connery: Okay. Meredith, it looks like, maybe, you'll need to work with Elise.

02:17:23 Meredith Outterson: Yes. It's not working at the moment. So Jan, let's go to our next scheduled--

02:17:27 Jan Connery: We'll go to Jessica. Jessica, please start by stating your name and affiliation, and then you'll have five minutes.

02:17:41 Jessica Dennis: Hi, good evening. Thank you for the opportunity to speak. My name is Jessica Dennis and I'm speaking on behalf of Miami Waterkeeper and our membership here in Miami, Florida. Miami Waterkeeper is a Miami-based nonprofit that works to ensure swimmable, drinkable, fishable water for all in South Florida, and is a member of Waterkeepers Florida and the broader Waterkeeper Alliance. I'm speaking this evening to oppose the state of Florida's request to assume Clean Water Act Section 404 authority from the Army Corps of Engineers. Florida's vast waterways and wetlands are what make Florida, Florida. They are uniquely connected to public health, our way of life, our culture, and our environment. Our state has particularly beloved, yet particularly fragile, areas that are regulated by Section 404 dredge and fill permits, which require the highest level of review and scrutiny. Federal oversight is critical to adequately protect our water resources. A delegation of Section 404 authority to the Florida Department of Environmental Protection would add a costly and extensive regulatory burden to the already under-resourced agency. For example, DEP is already regularly behind in enforcement actions related to the National Pollutant Discharge Elimination System permit program. Miami Waterkeeper and Waterkeeper organizations across the state have initiated an independent NPDES permit compliance review to attempt to bridge this gap in regulatory enforcement, a duty that should not be tasked to a nonprofit organization.

02:19:05 I worked as an intern for Miami Waterkeeper this summer while in law school. Part of my work focused on getting a fertilizer ordinance passed in Miami-Dade County. After a review of the county's two most recent municipal separate storm sewer systems permits, we discovered that the county was over a decade out of compliance with the permit mandate to have a basic fertilizer ordinance. If DEP fails to enforce even the most basic measures required by its own issued MS4 permits, how will it oversee the regulation of the discharge of dredge or fill materials into waters of the United States? Further, the state of Florida just transferred to the DEP the responsibility for regulating over 2,700,000 septic tanks that exist in the State. This is a huge undertaking in and of itself, and it is a stretch of the imagination to think that FDEP could now also accept the obligation to appropriately administer Section 404 permitting. FDEP is not well-positioned to assume the additional responsibilities and permitting demands associated with the 404 program. Additional responsibilities will divert resources away from these critical pre-existing duties.

02:20:08 The Department has wonderful, hardworking staff, but the underfunded Department lacks a quantity of resources, staff, and funding to implement, operate, and enforce the 404 program. Our state is experiencing an economic downturn due to COVID-19 and the Department has felt these effects. Budgets have been cut, staff support has been reduced, and yet, DEP continues with this application that would cost taxpayers millions of dollars just to get off the ground. FDEP should focus on existing obligations, such as enforcement and mitigation, rather than seeking additional responsibilities that we already know they will not be able to adequately oversee. The Department's claims that it can fold a 404 program into its existing programs should be rejected. It is not feasible and it is not tenable for Florida's water resources. There has been substantial public opposition to the State's proposed assumption of Section 404 authority. Despite this opposition and the limits on public participation, the DEP has continued to move forward. This is deeply inappropriate. It is not inclusive and does not reflect the public's position on this matter. I just want to add that I've been listening to every commenter, as you all have, since 5:00 PM today, and I have heard only one comment that was not adamantly opposed to DEP's proposed assumption of Clean Water Act Section 404 authority. On behalf of Miami Waterkeeper, our hundreds of members, and thousands of acres of watersheds, I urge EPA to reject DEP's Clean Water Act Section 404 assumption application package. This assumption is not in the best interests of Floridians or Florida water resources. Thank you.

02:21:38 Jeanenne Gettle: Thank you, Ms. Dennis. I have no clarifying questions.

02:21:44 Jan Connery: Okay. It looks like Elise is ready now. So we will-- sorry. We will go back to-- whoops, go back to Elise. There we go. Elise, please start by stating your name and affiliation, and then you'll have five minutes.

02:22:05 Elise Brady: Good evening. My name is Elise Brady. I am an artist and a climate reality leader. My husband and I have lived in St. Augustine for over 30 years. I am also a concerned Catholic here to bear witness to the state of our fragile environment and our obligation to protect it. In 2015, Pope Francis published Laudato Si, On Care for Our Common Home, a powerful letter to the entire world that urges us to live in communion with nature and each other. As people of goodwill, we understand that all living things are meant to flourish. Our charge to be responsible stewards of the Earth intersects with our mission to seek the common good. The Holy Father, with ecumenical leaders around the world, has made it clear that we cannot sacrifice or commodify nature's resources and people for profit or power. In 2016, Hurricane Matthew raked the coast of Northeast Florida and flooded St. Augustine. The storm brought a seven-foot surge and 275,000 gallons of sewer spillage into our Davis Shores neighborhood and our home. Following the storm, we lived in three places and our damaged home was demolished. We had hoped to rebuild, but less than a year after Matthew, Hurricane Irma struck, and our property was flooded again.

02:23:24 While we didn't realize it at the time, we were climate refugees, part of the growing number of people displaced by natural disasters. In 2018, 1.2 million Americans moved from their homes because of climate change. By 2100, 13 million Americans could be forced to relocate from rising sea levels and submerging coastlines. Indeed, far too many of our fellow Floridians have already suffered this fate. Florida's future is linked in every way to water: our health, livelihoods, cultural expressions, and environment. Wetlands comprise 29% of Florida's landscape, with many connecting to navigable waters. They provide rich habitat for biodiversity and beautiful places for contemplation and renewal. Protecting the delicate balance of our diverse water systems is paramount. If lost, we cannot reclaim it. The governor's pending application to assume Section 404 control of Florida's waters is an experiment of grand proportion in consequence. I am concerned that special interests, state budget constraints, lack of expertise, and potential outsourcing will lead to cutting corners and rubber stamping in the name of streamlining permits. Previous attempts elsewhere have deemed the undertaking far too costly and time-consuming, and have often led to legal disputes. Florida's exploding growth in the reality of global warming pose real threats to all life forms and our way of life. The complexities of coastal

development, toxic pollution, disappearing wetlands, endangered species, groundwater integrity, and sea-level rise resiliency, I believe, are best controlled by federal oversight. This provides a breadth of resources and expertise, coherent coordination of environmental regulations, and transparency. Thus, with all due respects, I ask you to deny Florida's application. In this moment of global crisis and chaos, we find ourselves at a crossroads of biblical proportion. For the sake of those who will inherit our common home, I am hopeful that we will move forward in solidarity with science as our guide, sustainability as our goal, and the common good as our North Star. Thank you for this opportunity to share my views.

02:25:52      Jeanenne Gettle: Thank you, Ms. Brady. I have no clarifying questions.

02:25:57      Jan Connery: Okay. We are now going to move to speaker group six. And we have, I think, all three folks in that group here. We're going to start with Neal. And Neal, please say your name and state your affiliation for us, and then you will have five minutes for your comment.

02:26:26      Neil Armingeon: I'm Neil Armingeon. I am speaking to you as a citizen from Jacksonville Beach. I have spent the last 28 years working for environmental groups and it's indeed ironic that I am here today to, in effect, defend the US Army Corps of Engineers. The 404 project, as it stands, has weaknesses. I, personally and organizationally, have filed multiple lawsuits against the Corps, probably written 150 letters for 404 comments. And yet, given all of that, I'm here tonight to say I oppose transferring the 404 project to the Florida Department of Environmental Protection. I have worked in this field. I have, with the St. Johns Riverkeeper, ended my career as the Matanzas Riverkeeper. Wetland protection is something that has not been at the forefront of any regulatory process. And at least with the EPA and the St. Johns River, for us, St. John's River Water Management District, we felt as if we had some backstop to, at least, file legal challenges, 401 certifications, etc. The idea that the Florida Department of Environmental Protection, FDEP, which, for those of us who know, means "don't expect protection"-- that these people can manage and oversee wetland protection in the state of Florida is ludicrous. I wish I could put it any other way. I doubt if there's any-- very few people in the DEP are prepared to, for example, handle wetland delineation. It, in effect, robs the public from any iota of the federal protection.

02:28:34      We, here in Florida-- the idea that the State is interested in, are participating in, protecting environment is a joke. I, and others on this call, have reminded you of the problems with the discharge permit projects. And so now, to insinuate that a short-staffed, underfunded organization like Florida DEP is now going to handle wetland protection is a farce. It's ironic, really, for me, to sit here and try to defend what has-- I have experience, almost, of three decades of the Army Corps of Engineers and others, protecting wetlands. And yet, that is my position. If we are going to support anything, I would support that the Army Corps of Engineers and the water management districts continue in their roles. What we are facing here is, basically, a political takeover of a protection project. We have a governor who doesn't care about the environment coming out for another governor who doesn't care about the environment. EPA, at its best, was always a backstop to some of these wetland issues. You can always hope - and I stress, hope - the EPA would actually elevate some of this. So the idea that the Florida Department of Environmental Protection has any knowledge, ability, willingness to protect the remaining wetlands in this state, frankly, is a joke. I am here not really expecting anything other than, in effect, you are our last hope. If EPA approves this transfer, then, I would say, the wetlands, the waters of this state have little or no chance of being protected. I appreciate the opportunity to speak to you tonight and, again, let me end by saying the idea that the Florida Department of Environmental Protection gives a damn about protecting Florida's wetlands is a joke. Thank you for this opportunity to participate.

02:31:28      Jeanenne Gettle: Thank you. I have no clarifying questions.

02:31:33      Jan Connery: Okay. Going to move to Chris, and then Diana. After that, we're going to take standby speakers. We have one so far. So I just want to remind everyone with us on the hearing right now, if you're someone who hasn't spoken, you didn't sign up before but you'd like to

speak now, even if it's a short comment, or you can have up to five minutes, we'd love to hear from you. I think we're going to have time to work a few more folks in. The way to let me know you'd like to speak is to raise your virtual hand, and then we will take folks in the order that we see the hands raised. So I invite you to do that if you're interested. And right now, we're going to go to Chris Costello as our next commenter. Chris, please start by saying your name and affiliation, and then you will have five minutes for your comment.

02:32:24    Chris Costello: Good evening. My name is Chris Costello. Am I coming through?

02:32:28    Jan Connery: Very well, thank you.

02:32:30    Chris Costello: Great. Thank you. I am a senior organizing manager with the Sierra Club, and I am speaking on behalf of the Sierra Club this evening. We, like others on the line this evening, agree that the EPA must reject Florida's request to assume 404 permitting authority. While we will submit additional written comments, we want to briefly address here the failure of the EPA and FDEP to ensure meaningful public participation in this process. Neither the State, nor the EPA, has had any legitimate reason to push forward this process during the pandemic. Our experience with virtual meetings during the last seven months and the timing of both the FDEP and EPA virtual public listening sessions on this matter underscore why the public has condemned this process. It has also solidified our understanding of the role actual in-person public hearings play in the democratic process. Virtual participation is an adjunct to a public hearing, but it is not equivalent. During these virtual sessions, as public hearings-- or, I'm sorry, defining these virtual sessions as public hearings ignores the important differences between in-person and virtual-only events and undermines the democratic process. The democratic process is, of course, of the utmost importance.

02:34:20    There is also method to the madness of the timing of the FDEP virtual sessions at the tumultuous beginning of the pandemic lockdown and the timing of the EPA virtual sessions right before the most contentious federal election we have ever experienced. That method is to effectively keep the public out of the process. State assumption is an unfathomable proposal to anyone who understands and appreciates the role wetlands play in the protection of Florida's water resources. It makes no sense, zero sense, when considering the job the State has done, or, more accurately, has not done when it comes to environmental protection. We adamantly and strenuously oppose state assumption. Moreover, we condemn the failure of the EPA and FDEP to ensure what should be the broadest of public participation, considering the import of this matter. Thank you.

02:35:36    Jeanenne Gettle: Thank you, Miss Costello. I have no clarifying question.

02:35:40    Jan Connery: We will move to our next speaker. That is Diana Umpierre. Diana, please say your name and affiliation, and then you'll have five minutes for your comment.

02:35:57    Meredith Outterson: Hi, Diana. It looks like you're muted on your end, so please try--

02:36:00    Diana Umpierre: Hello? Am I okay now?

02:36:03    Jan Connery: Yes. I think you are.

02:36:05    Diana Umpierre: Okay. You hear me okay?

02:36:07    Meredith Outterson: Yes, we can now. That sounds good, Diana. Please go ahead.

02:36:11    Diana Umpierre: Thank you very much. So my name is Diana Umpierre. I live in South Florida, just a few miles from the edge of what remains of the Everglades, a river of grass. I currently work for Sierra Club as the organizing representative for their Everglades Restoration Campaign. I also served as a volunteer chair of the International Dark-Sky Association for a chapter that seeks to protect the nocturnal environment, which is significantly important to the waters of the US, since so many species live there. I also worked for years as a geologist, sampling contamination in waters of the US, so I am very familiar with what is possible with a well-managed, well-staffed,

well-enforced, well-monitored 404 program under the Clean Water Act. I also work as a geoscientist for the Water Management District-- the South Florida Water Management District. And I was there when, in 2011, the former governor Scott slashed funding and laid off hundreds of employees from the Florida Department of Environmental Protection and the water management districts, including people that were very much involved in regulatory permitting and enforcement. I'm sure that is why he was able to brag once, and I quote, "Florida has successfully reduced its environmental permitting time down to just two days. And that's great." Well, end of quote.

02:37:39 I have a zillion reasons to express this strong opposition. As has been stated, Sierra Club very much opposes Florida assuming the 404 federal program permitting. To give an example, while Sierra still opposes the current design and keeps demanding a better design for the EAA Reservoir and the Stormwater Treatment Area that's part of Everglades restoration, we are very grateful that, thanks to the 404 permitting process that is under the Army Corps of Engineers, NEPA has been there to provide additional time for impact analysis, for an EIS, for more public input for a project that both the water management district and the Florida Department of Environmental Protection, the FDEP, wanted to rush. 404 permitting of the STA, which was done by the Army Corps, included a number of special conditions that I'm sure the DEP would not have mandated, changes that included things to deal with seepage concerns to, also, adding more monitoring to deal with a lot of uncertainty about water quality. Florida simply does not have a state law that parallels NEPA, which some has often referred to as democracy in action.

02:39:00 So we're very concerned with turning federal actions into state actions because they will impact the level of review, the interactions that go on between the federal and the state government agencies. We're very concerned that the State would have far less data and would no longer be subject to the kind of rigorous review that environmental impacts-- that, basically, will be mandated under NEPA, including project alternatives analysis. They will, basically, fast track development permits for developer interest, or for politicians that simply love press conferences to claim victories and rework cutting, instead of projects that actually cleaning our water, restoring wetlands, and protecting wildlife. FDEP does not have the check and balances that are needed when they review 404 permits. Essentially, if you approve this application, you will, essentially, be allowing the fox to guard the henhouse. And so we ask the EPA to please deny this application. Thank you very much.

02:40:18 Jeanenne Gettle: Thank you, Miss Umpierre. I have no clarifying questions.

02:40:25 Jan Connery: Okay. Those are all the folks who we have right now who have registered. We'll be keeping an eye out for folks who registered and were in line to speak earlier but haven't shown up. But in the meantime, we are going to go now to our standby speakers. I'm happy to see that three folks have raised their hand, in addition to the person we had to start with. So we've got four people on standby. And so anyone else is invited to raise their hand. We've got about 20 minutes, so I think we can at least fit the four in. We're going to start with Georgia Ackerman. And for everyone who's on standby, we're going to ask you not just to say your name but, also, to spell it for us so we have that for the record, and state your affiliation, and then you'll have up to five minutes to comment. So Georgia, please go ahead.

02:41:25 Meredith Outterson: Hi, Georgia. It looks like you're muted on your end, so please press the mute key on your keyboard or your headset so that we can hear you. Great.

02:41:35 Georgia Ackerman: Good evening. Thank you for coaching. I'm Georgia Ackerman. Georgia, just like the state, Ackerman, A-C-K-E-R-M-A-N. I'm riverkeeper and executive director at Apalachicola Riverkeeper. Thank you for the opportunity to provide comments. I'll be brief, as the concerns expressed by others across the state of Florida have been so well stated and I strongly echo their opposition. The EPA has many compelling, uplifting quotes on one of their web pages on environmental stewardship. And I wanted to share one with you that President George W. Bush made in the early 2000s. And he said, I quote, "Good stewardship of the

environment is not just a personal responsibility. It's a public value, our duty to use land well, and, sometimes, not to use it at all. This is a responsibility as citizens, but more than that, it's a calling as stewards of the Earth."

02:42:32    Apalachicola Riverkeeper is a member of Waterkeepers Florida and the international Waterkeeper Alliance. Waterkeepers are stewards of their watersheds. Like Dr. Seuss's beloved character, the Lorax, who speaks for the trees, waterkeepers speak up for our waterways on behalf of all Florida citizens. Apalachicola Riverkeeper is an independent non-profit organization of over 1,400 members. For over 20 years, we've been committed to the protection and restoration of the Apalachicola River and Bay. The Apalachicola River is Florida's largest in volume, and it flows over 100 miles through Florida's largest forested floodplain, from the Georgia-Florida line to the Gulf of Mexico, where it supports the productivity of the Apalachicola Bay and the eastern Gulf of Mexico. The region is recognized internationally for its biological diversity, much of it due to the vastness of its wetlands. It must remain well-protected. Apalachicola Riverkeeper, like St. Johns Riverkeeper, Matanzas Riverkeeper, Miami Waterkeeper, and all Waterkeepers Florida, oppose Florida's request to assume administration of the Clean Water Act Section 404 program. We will submit a detailed letter prior to the November 2nd deadline. Please deny this request. Thank you for your time.

02:43:50    [silence]

02:44:01    Jeanenne Gettle: Thank you, Ms. Ackerman. I have no clarifying questions.

02:44:05    Jan Connery: Great. We'll go to our next standby speaker and that is Holly-- and I hope I'm saying this right, Holly Schwartz. Anyway, you can tell us how you say your name, and also, please spell it for us and let us know your affiliation, and then you'll have five minutes.

02:44:25    Meredith Outterson: Holly, please check the mute on your end. There you go.

02:44:29    Holly Schwartz: Okay. Hi, you can hear me? Thank you.

02:44:32    Yes, we can. You're good.

02:44:34    Great. My name is Holly Schwartz. It's spelled H-O-L-L-Y S-C-H-A-R-T-Z. Somewhere, the Z disappeared. I am a policy associate with the Sanibel-Captiva Conservation Foundation in Lee County, Florida. And we advocate for environmental issues throughout the entire county. And, of course, I'd want to completely support all of the comments that have been made in opposition to this assumption. But I wanted to add that many of the speakers listed talked about DEP's lack of resources as a concern of implementing this program. And I'd like to provide some additional evidence to support that concern. And it would come from Florida's own transparency website, transparencyflorida.gov, which lists and shows a vacancy rate-- or a vacancy list of 279 positions for DEP alone. And before you get too excited and think, "Oh, great, they're going to fill 279 positions," it could be that those positions have been zeroed out and have just been sitting there. And I can tell you that we've been monitoring that vacancy rate for several years and it hasn't gotten any better. So that would lead one to be continually concerned that they are going to still continue to face a lack of resources. And I'm really glad that one of the previous speakers had mentioned the statutory requirement when ERPs are filed that they must be responded to within 30 days. I mean, that just further exacerbates the review time for such an important resource. So I'll keep it pretty brief and just say, I support the opposition and all of the comments made previously. And please consider how vitally important wetlands are to the state of Florida before approving or considering approval of this proposal. Thank you.

02:46:48    Jeanenne Gettle: Thank you, Miss Schwartz. I have no clarifying questions.

02:46:52    Jan Connery: Okay. We will move our next standby speaker, that is Sarah Younger. Sarah, please say and spell your name for us, let us know your affiliation, and you'll have up to five minutes for your comment.

02:47:11 Meredith Outterson: Hi, Sarah. We can't hear you yet. Please check the unmute your end.

02:47:18 Sarah Younger: Hi, my name's Sarah Younger. And that's spelled S-A-R-A-H Y-O-U-N-G-E-R. I live in Alachua County here in Florida. I'm speaking as a resident of the headwaters for the Floridan aquifer. I am very concerned if the State were to assume the role of permitting for the Section 404, or rulemaking 404 permits, as I understand, that that would lead to, perhaps, a faster track for development in our region. I understand that states have to demonstrate that their jurisdiction's equal in scope to the federal laws regarding the waters of the US and prove that their program is consistent with federal laws. I think it's clear that the State has been failing in its duty, as it stands right now. In fact, our water flows here in the springs have been reduced and we're very concerned about-- that the water quality concerns. And it also has to show that they'll have adequate funding because you can expect that the State would have to spend money in order to assume a program of this type. And if we've seen anything, it's that our state legislature has not been funding programs that serve to protect our environment at this time, in any that it demonstrates that they're able to bring these rivers back out of recovery, other than by changing the rules, which is where we are right now. So I'm urging you to reject this notion that they're ready to assume this program. And as a citizen of North Central Florida, I urge you to heed the advice of those who have been on this call. Also, undertaking this role as a river waterkeeper here as many of us have, we do also know the challenges of getting word out about these rules and how they get changed and how to be present for these meetings. I only learned of this meeting earlier today and I am a person who watches for these types of announcements. So I urge you to think about how you're making this information available to the public because it is evident to me that you're failing at that as well. So please do not grant the State this authority. They're not ready to receive that authority. And I thank you for your time.

02:50:17 Jeanenne Gettle: Thank you, Miss Younger. I have no clarifying questions.

02:50:22 Jan Connery: Okay. We have one more stand by commenter right now. And I think we could take an additional one. If there's someone who did want to raise their hand, you could do that. But right now, we're going to Susan Caruso. Susan, please start by saying and spelling your name for us and stating your affiliation, and then you'll have up to five minutes for your comment.

02:50:47 Susan Caruso: Hi. Good evening. My name is Susan Caruso, S-U-S-A-N-C-A-R-U-S-O. I am down here in Broward County with the Broward Sierra Club and I don't really have much to add to all the eloquent speakers who have gone before me tonight. But it seems I agree that the EPA should not grant the state of Florida's request and that they have a long way to go to prove that they have the wetlands in their best interests-- in the best interests of the citizens of the state of Florida. So thank you for the time to comment. That's all I have. Thank you.

02:51:35 Jeanenne Gettle: Thank you, Miss Caruso. I have no clarifying questions.

02:51:39 Jan Connery: Great. Well, we have another standby commenter, which is great. And I think we would have time for one more, if someone else would like to raise their hand. But right now, we're going to go to Matthew Schwartz. You probably know the drill, Matthew, but please state and spell your name, let us know your affiliation, and then you'll have up to five minutes.

02:52:04 Matthew Schwartz: Okay. So my name is Matthew Schwartz, M-A-T-T-H-E-W S-C-H-W-A-R-T-Z. I'm with the South Florida Wildlands Association, a regional organization that works on habitat and wildlife conservation in the Greater Everglades. And I spoke at the first meeting. I didn't think I was going to get to this one but somebody just called me and said you guys are going late. I'm out in the woods in Central Florida right now. But I want to bring up - and I'm just going to focus on one issue - this decision is coming at a time when the state of Florida, the lead agency is Florida Department of Transportation, is trying to get approved, the M-CORES project and that's 320, 330 miles of new highway from Collier to the Florida-Georgia border. That highway is going to be going through wetlands. It's going to be crossing streams and rivers. It's going to need all kinds of wetlands permits. And, normally, those would go through the Army Corps of Engineers.

02:53:11     We've been through this many, many times with these kinds of projects. I mean, not a project of this scale, I have to be honest. M-CORE is off the scale. I've never seen a project like that in the time I've been doing this work. You have to hearken back to the 1950s and the Florida Turnpike or the Cross Florida Barge Canal to get to a project of this size. This is a massive project with massive impacts to wildlife, wetlands, springs, all kinds of things. But the Army Corps would typically review a project like this, go into [inaudible] with the Fish and Wildlife Service if there was a chance of harm to endangered species. There's all kinds of endangered species that are in the corridor of M-CORES. So the fact that this request is happening now, I don't know. I mean, this has been something we've heard over the years. Is it in relation to M-CORES? Not sure. But we don't want this agency learning the ropes when M-CORES is going through wetlands permitting and they're going to permit 320 miles of new highway across wetlands in Florida and they're going to be the ones to consult with the US Fish and Wildlife Service, never having done it before. This is definitely not the time. Even if there was a time, start them out on some small projects. M-CORES is coming. They just finished the task force meetings. So M-CORES is in the pipeline. And the next step after the task forces released their final report in the middle of November, is they're going to start planning a route-- routes for 330 miles, 320 miles of new highway. And it's going to be a very, very difficult process. And we don't want this to happen. It's not that we have so much faith in the Army Corps of Engineers or the EPA to protect our interests in this issue. But at least there's a process in place to deal with these things. We've gone through it many, many times. The Army Corps knows the route, knows how to do this. The EPA has gotten involved in some projects and has weighed in on some projects.

02:55:22     The state of Florida-- I think people have said-- I didn't get to hear many of the comments but the person I spoke to on the phone was Drew Martin. He'd conveyed to me that a lot of the reason behind this, and I feel the same way, is that this is all about speed. The Army Corps doesn't deny applications, as a rule. But they do take their time. They do due diligence. They go through NEPA, when necessary. They turn it over to the Fish and Wildlife Service. What we think is happening here is just the developers don't want the delay. They want to speed this up. And the DEP is very willing to do that. So, in summary, don't do this. Keep the process. Keep the review process within the federal government. We have a new administration coming in. I don't know that. I don't know that, excuse me. I have no clue if that's happening or not. But if a new administration comes in, who knows what the new policies on the federal side will be. And maybe, they'll be a little bit more environmentally friendly and realize that we're in a different time now.

02:56:29     I mean, the secretary of the Department of Transportation was lauding the Florida Turnpike. They said, "Look what we did in the 1950s with the Florida turnpike. We could do it again today." Florida was a completely different state in the 1950s, in terms of population. I think the population in 1950 was somewhere in the neighborhood of 3 million, under 3 million; about the population of Miami-Dade today. So take the population of Miami-Dade, what it is today, spread it out over the entire peninsula, you'll have a sense of what Florida looked like in the 1950s. And here's a state secretary of transportation saying, "This was the good old days." So is that what he thinks is the good old days, doing another Florida turnpike at this point when so much wildlife, so much wetlands, the algae problems we have, the overcrowding, the quality of life--? Florida is an-- I mean, I'm sorry, Florida's an ecological disaster. It's a joke to most people who come here and they see the sprawl. Anyway, I could go on and on with this. I think you get the point. I think this is not the time to transfer this authority from the federal government to the state government, especially with the biggest project we've ever seen at the door. So thank you for listening to the comments and willing to take questions if you have any.

02:57:46     Jeanenne Gettle: Thank you, Mr. Schwartz. I have no clarifying questions.

02:57:51     Matthew Schwartz: Thank you.

02:57:54 Jan Connery: We have just one more person who has raised their hand. So this is going to be our final commenter. And that is Barbara Anjelucci. Barbara, you're going to start by saying and spelling your name, letting us know your affiliation, and then you'll have five minutes.

02:58:15 Barbara Anjelucci: Can you hear me?

02:58:17 Jan Connery: Yes, we can.

02:58:21 Barbara Anjelucci: Okay. My first name is Barbara. The last name is Anjelucci, A-N-J-E-L-U-C-C-I. I'm a resident of Florida. And I just want to tell you that many people move to Florida for the sunshine and its waters, generating billions for our economy. Wetlands play an integral part in that. And also, in cleaning pollutants out of water and control flooding. They must be protected and be highly regulated. NEPA provides for an EA or an EIS and public participation opportunities. States are not required to follow federal law, leaving our wetlands and ecosystems open to destruction and citizens' voices silent. In July of this year, the Trump administration announced rollbacks of a big [inaudible] environmental law, which they say will benefit the economy by speeding up construction projects. Overthrowing NEPA is one of the most dramatic changes the president has attempted to make to slash an environmental policy, though he has pushed to roll back at least 100 environmental rules. NEPA was enacted to require federal agencies to determine the possibly detrimental effects that major projects could have on surrounding environment. This NEPA requires government agencies to engage in, is intended to discover not only to [inaudible] effects that construction could have on climate change, but also takes into account how massive a public health crisis could affect citizens living nearby to proposed sites. Contamination and unprotected streams and rivers often flow into larger bodies of water, including drinking water sources.

03:00:36 Wetlands are more important than ever and should be protected by regulations. In light of all the above, we cannot trust the state of Florida to take over federal permitting. The other thing is that these virtual hearings, two of them, when this discussion has long term consequences. What about the people that have no technology? The EPA needs to conduct public hearings, when the time is appropriate, across the state. Because to move ahead with this with only two virtual hearings when the public cannot meaningfully participate does not provide due process to citizens. And also, I'd like to hear from the Army Corps. Have they been silenced on this? Well, I will tell you what I think. And I'm sorry if you're furrowing eyebrows. But this reversal of oversee of Section 404 is brought forward by industry polluters who look to satisfy their greed and profit at the expense of public health and destruction of our environment. Needless to say, I am totally against the state of Florida taking over Section 404. It truly is "Florida, don't expect protection". Thank you.

03:02:29 Jan Connery: Ma'am, could you spell your last name for me again?

03:02:32 Barbara Anjelucci: I'll do it again. It's A-N-J-E-L-U-C-C-I. The first name is Barbara.

03:02:46 Jan Connery: Thank you. Thank you, Barbara.

03:02:52 Jeanenne Gettle: I have no clarifying questions.

03:02:54 Barbara Anjelucci: Thanks.

03:02:57 Jan Connery: Jeaneanne, we are just a tiny bit over and we do have one more person who'd like to speak. Could we go for another couple minutes or so?

03:03:05 Jeanenne Gettle: Okay. We will do one more commenter, and then we will have to close out at that point in time.

03:03:13 Jan Connery: Yep. I think she had raised her hand just as I was saying we didn't have anymore. And that is our last one with the hand raised. So we are going to go to Susan Hill as our final

commenter. Susan, you probably know what to do. But state and spell your name for us, your affiliation, and you'll have up to five minutes. Please go ahead.

03:03:31    Susan Hill: Thank you for allowing me to speak. Can you hear me okay?

03:03:34    Jan Connery: Yes, just fine.

03:03:36    Susan Hill: My name is Susan Hill, S-U-S-A-N, last name H-I-L-L. And I've listened very carefully to all of the speakers and I agree with all of them in opposition to the assumption by the Florida Department of Environmental Protection to assume the responsibility for the 404 permitting process. If you decide to grant this, you will be delivering the final blow to our environment. And I would say to you, as someone who was born in Miami and have lived 60 some years in this state, that the people you have heard tonight are the only voices that we have in this state for Florida's environment. Imagine if you couldn't go home again to the place where you were born and grew up because it was rapidly becoming underwater and red tide was so severe that you wouldn't be able to breathe, or end up in the hospital, or have to move from your coastal home inland to get away from it. That is not an exaggeration of the state of Florida's environment. I remember. I was a kid in Miami in the 1950s and I can tell you that what has happened in just my lifetime is atrocious. And, in part, it is the responsibility of our state, who have not been good stewards of our environment. Florida has many vulnerabilities, as other speakers have mentioned. We are a magnet for people from all over the country coming and moving here. And I will tell you that since my retirement from the University of Florida four years ago, I've been involved in a lot of environmental efforts in the St. Augustine area. And developers have an overbearing reach to our politicians in this state. And that is not an exaggeration. And I am not too old to beg you to please do not approve this request by the Florida Department of Environmental Protection. If you do it, our environment here, our coastal wetlands, our waterways will be finished. Thank you so much for paying attention and allowing me to speak.

03:06:03    Jeanenne Gettle: Thank you, Miss Hill. I don't have any clarifying questions.

03:06:07    Jan Connery: Okay, well, that was our last commenter. So it's back over to you, Jeaneanne, for your closing remarks.

03:06:15    Jeanenne Gettle: Thank you. I would like to thank each of you for your participation in the public hearing. The comments that are received will be considered and evaluated as EPA makes its final decision. As indicated earlier, following the close of the public comment period on November 2nd, 2020, EPA will review and consider all comments received during the public comment period, comments received both in writing and from the public hearing. If EPA approves the State's 404 program, a notice of decision will be published in the Federal Register. EPA will also prepare a responsiveness summary of significant comments received during the comment period and EPA's response to these comments. Additional information regarding these procedures is available by contacting Mr. Kelly Laycock. His information is on the screen, at 404-562-9262 or at 404assumption-florida@EPA.gov. All of that is on the screen. Again, I thank you for your participation. If you have any other questions or comments, you can always reach EPA using the methods listed in the public notice and on the EPA's Region 4 website and in the Federal Register notice at regulations.gov. This hearing is adjourned. Thank you for your participation.

| Public Hearing Attendees | | |
|---|---|---|
| Florida's Request to Assume Administration of a Clean Water Act Section 404 Program | | |
| Virtual Public Hearings | | |
| October 27, 2020, 5:00pm to 8:00pm Eastern Daylight Time | | |
| | | |
| **Last Name** | **First Name** | **Organization** |
| Ackerman | Georgia | Apalachicola Riverkeeper |
| Allenbach | Becky | EPA |
| Alvi | Beth | Audubon Florida |
| Angelucci | Barbara | Citizen of Florida |
| Armingeon | Neil | Citizen |
| BLANK | JEFFREY | MySelf |
| Baker | Juanita | retired, professor emerita |
| Balcom | Ilia | Duke Energy |
| Barreto | Kaila | Barreto Family |
| Bickner | Faith | Vermont Law School; Center for Biological Diversity |
| Bloch | Elise | none |
| Bowland | Glennie | DWC Environmental Committee |
| Brady | Elyse | Laudato Si' Creation Care Ministry |
| Caruso | Susan | Broward Sierra Club |
| Cassani | John | Calusa Waterkeeper |
| Chelette | Angela | FDACS-OAWP |
| Chiappetta | Sandra | Boca Ciega Bay Friends |
| Ciarlariello | Carolin | Florida Department of Environmental Protection |
| Clark | Alex | Clearview Geographic LLC |
| Clark | Maria | U.S. EPA |
| Collins | Meagan | Watekeeper |
| Cornell | Brad | Audubon Western Everglades |
| Correa | Ana | Earthjustice |
| Costello | Cris | Sierra Club |
| Creswell | Michael | EPA |
| Crooks | Amber | Conservancy of Southwest Florida |
| Crosby | Tiffany | Atkins |
| Dailey | Tasha | Southwest Florida Water Management District |
| Dawson | Christopher | Gray-Robinson.com |

| Last Name | First Name | Organization |
|---|---|---|
| Dennis | Jessica | Miami Waterkeeper |
| Dickey | Kenneth | FDEP |
| Diffenderfer | Michelle | Lewis Longman & Walker |
| Duncan | Mary | Florida Department of Environmental Protection |
| Dussich | Sara | Florida Power & Light Company |
| Ellis | Lindsay | Colorado Department of Public Health and Environment |
| Farrell | Chris | Audubon Florida |
| Gagne | Albert | Southwest Florida Water Management District |
| Gates | Echo | Halff Associates, Inc. |
| Ghosh | Mita | USEAP |
| Gomez | Albert | Biscayne Bay Marine Health Summit |
| Gordon | Alexandra | Retired |
| Grantham | Tiffany | Island Time Of Hollywood/Full Moon Cottages |
| Gray | Stephanie | FDEP |
| Greenwood | Ken | NWFWMD |
| Greenwood | Kathleen | FDACS |
| Hardman | Curtis | FL DEP |
| Hermle | Corinne | FDACS-OAWP |
| Hill | Susan | Friends of Fish Island |
| Hogan-Charles | Mindy | USACE/SAJ-RD-WT |
| Hopkins | Danielle | Florida Stormwater Association |
| Howell | Mark | LG2 |
| Hulbert | John | AgReserves, Inc. |
| Irwin | Danielle | Cummins Cederberg |
| James | William | US Army Corps of Engineers |
| James | Mac | Fdep |
| Jerkins | Wendy | Community Member |
| Jones | Linda | Environmental organization(s) |
| Kelly | Alison | NRDC |
| Kendall | Donna | Florida Department of Environmental Protection |
| Kirchner | Michael | Florida Master Naturalist |
| Kleiner | Bri | Earthjustice |
| Knuckey | Tom | None |
| Kolanz | John | Otis & Bedingfield, LLC |

| Last Name | First Name | Organization |
|---|---|---|
| Krick | Debbie | Premier Reporting |
| Krilloff | Anton | Member of the public |
| LORAND | MARJORIE | None - Private citizen |
| Larson | Tom | Sierra Club Florida |
| Levey | Brian | Hunton Andrews Kurth LLP |
| Lomberk | Jen | Matanzas Riverkeeper |
| Long | Maureen | Friends of Fish Island |
| Mackey | Michelle | NYU Journalism Student |
| Malloy | Bonnie | Earthjustice |
| Malphurs | Carolyn | DRMP, Inc. |
| Martin | Drew | Loxahatchee Group, Sierra Club |
| Mason | Heather | FDEP |
| Masse | Kierstin | Taylor Engineering |
| Mathis | Elizabeth | Organize Florida - Disaster Resiliency Initiative |
| McClain | Richelle | Student |
| McElwain | Tunis | USACE |
| McGill | Thomas | EPA |
| Meinecke | Blake | Quest Ecology, Inc. |
| Mennella | Kathryn | None |
| Michaelessi | Christopher | Resident |
| Miklos | John | Bio Tech Consulting |
| Mills | Megan | FDEP |
| Minick | Allyson | FDEP |
| Morda | Claire | Sarasota Sailing Squadron |
| Morgan | JT | U.S. EPA |
| Padilla Ochoa | Daniel | Ocean Conservancy |
| Palm | Valentina | SFMN |
| Papayanis | Stephanie | Environmental Protection Agency |
| Petersen | Rafe | Holland and Knight |
| Pettit | Chris | FDACS |
| Platt | Bo | Brevard Indian River Lagoon Coalition |
| Rach | Timothy | FDEP |
| Rasnake | Erin | FDEP |
| Rauschenberger | Heath | USFWS |
| Redwine | Annette | Retired teacher |
| Reichert | Christina | Earthjustice |
| Reichert | Sheri | Public |

| Last Name | First Name | Organization |
|---|---|---|
| Rinaman | Lisa | St. Johns Riverkeeper |
| Rodriguez (State Senator) | Jose Javier | Florida Senate |
| Roff | Rhonda | Sierra Club Calusa Group |
| Roffer | mitchell | Fishing Oceanography, Inc. |
| Ruby Julien | Shannon | VHB |
| Ryan | Marian | Ancient Islands Sierra Group |
| Sampson | Zack | Tampa Bay Times |
| Samson | Ansley | Everglades Law Center |
| Santana | Rachael | Lewis Longman & Walker |
| Santangelo | Jenna | FPL |
| Schleifer | Dr. Neal | PCA |
| Schwart | Holly | Sanibel Captiva Conservation Foundation |
| Schwartz | Matthew | South Florida Wildlands Association |
| Seyfert | Jason | Florida Department of Environmental Protection |
| Spitzer | Kurt | KSA |
| Tatum | Jim | Our Santa Fe River, Inc. |
| Trotta | Thomas | Endangered Florida |
| Trudeau | Rebecca | St. Johns River Water Management District |
| Uhland | Rachael | Earthjustice |
| Ulrop | Laurie | Charlotte Co. Democratic Club |
| Umpierre | Diana | International Dark-Sky Assoc - FL Chapter |
| Upton | Anna | The Everglades Foundation, Inc. |
| Vinas | Nora | Florida Senate |
| Vining | Adrienne | Southwest Florida Water Management District |
| Wagley | Christian | Healthy Gulf |
| Warr | Megan | FDEP |
| West | Jane | 1000 Friends of Florida |
| Williams | Marsha | NA |
| Wimmer | Kent | Defenders of Wildlife |
| Wood | Windy | Humanity |
| Wood | Jeffrey | Baker Botts LLP |
| Young | Dawn | USEPA |
| Younger | Sarah | Suwannee-St. Johns Group Sierra Club |
| Zarbo | Mia | USACE |
| schwartz | martin | Marion County Audubon Society, Ocala FL |
| spingarn | dorothy | EPA OCEFT |
| vazquez | pamala | DEP |

| Public Hearing Attendees | | |
|---|---|---|
| Florida's Request to Assume Administration of a Clean Water Act Section 404 Program | | |
| Virtual Public Hearings | | |
| October 21, 2020, 9:00am to 12:00pm Eastern Daylight Time | | |
| | | |
| **Last Name** | **First Name** | **Organization** |
| Adams | Steve | Kleinfelder |
| Almedo | Gabriel | N/A |
| Alvi | Beth | Audubon Florida |
| Beasley | Camille | FDEP |
| Beaven | Lara | Inside EPA |
| Beeckler | Thomas | The Beeckler Company |
| Benbow | Kristin | Energy Transfer |
| Benn | Joel | St. Johns River Water Management District |
| Berlin | Jennifer | Democratic Women's Club of Indian River County |
| Bernardino | Frank | Anfield Consulting |
| Bickner | Faith | Vermont Law School; Center for Biological Diversity |
| Black | Alexis | Florida Department of Environmental Protection |
| Brown | Lynette | Breedlove, Dennis & Associates |
| Burdick | Melanie | EPA |
| Burke | Allyson | Inwood Consulting Engineers |
| Burrmann | Carla | Department of Environmental Protection |
| Butler | Jenn | FL DEP |
| Butler | Matthew | Isiminger & Stubbs Engineering |
| Canney | Emily | SFWMD |
| Carr | Christina | SRWMD |
| Childs | David | Florida Electric Power Coordinating Group |
| Ciarlariello | Carolin | Florida Department of Environmental Protection |
| Clark | Maria | U.S. EPA |
| Cole | Terry | Gunster |
| Cople | Penny | Breedlove, Dennis & Associates, Inc. |
| Correa | Ana | Earthjustice |
| Cory | Keyna | PUBLIC AFFAIRS CONSULTANTS |

| Last Name | First Name | Organization |
|---|---|---|
| Cox | Kelly | Miami Waterkeeper |
| Crooks | Amber | Conservancy of Southwest Florida |
| Currie | Steven | USACE |
| Davis | Joshua | FEMA |
| Dawson | Christopher | Gray-Robinson.com |
| Dhand | Allison | SWFWMD |
| Diamicis | michael | private |
| Dixon | Alicia | LCPA |
| Dubin | Lindsay | Defenders of Wildlife |
| Duncan | Mary | Florida Department of Environmental Protection |
| EKKA | SUJIT | AECOM |
| Earwood | Rachel | U.S. EPA, R4 |
| Eisenberg | Mindy | US EPA |
| Elsner | Rick | GLH Engineering |
| Emmanuel | Christopher | Florida Chamber of Commerce |
| English | Katherine | Pavese Law Firm |
| Farmer | Carolyn | USACE, Jacksonville District, Regulatory |
| Farrell | Chris | Audubon Florida |
| Fausel | Natalie | Anfield Consulting Group |
| Fellows | John | none |
| Fernandez | Edgar | Anfield Consulting |
| Ferngren | Jennifer | E Sciences |
| Galloni | Tania | Earthjustice |
| Garren | Karen | NA |
| Ghosh | Mita | USEAP |
| Gonzalez | Jose | FEMA |
| Goolsby | John | Consultant |
| Gray | Stephanie | FDEP |
| Guinn | Jonathan | FDEP |
| Haddle | Gary | Inwood Consulting Engineers, Inc. |
| Hall | Danielle | FPL |
| Harrison | Savanna | Florida Dept of Environmental Protection |
| Herrero | Laura | Johnson Engineering, Inc. |
| Hill | Michael | no affiliation |
| Hogan-Charles | Mindy | USACE/SAJ-RD-WT |

| Last Name | First Name | Organization |
|---|---|---|
| Holmes | Sharon | FDEP |
| Hopkins | Danielle | Florida Stormwater Association |
| Houck | Jason | Inwood Consulting Engineers, Inc. |
| Hovater | Kae | Florida Association of Mitigation Bankers |
| Howalt | Gary | Environmental Services, Inc. A Terracon Company |
| Hughes | Eric | Retired |
| Hulbert | John | AgReserves, Inc. |
| Hutchens | Helen | Miami Corporation |
| Irwin | Danielle | Cummins Cederberg |
| James | William | US Army Corps of Engineers |
| James | Mac | Fdep |
| Johnson | Joel | Florida Department of Transportation, District 7p |
| Jordan | Kelly | GreenLaw |
| Kaynor | Susan | USACE |
| Kendall | Donna | Florida Department of Environmental Protection |
| Killinger | Lee | None |
| Knoeck | Linda | USACE |
| Kohn | Jeff | public |
| Kolanz | John | Otis & Bedingfield, LLC |
| Krick | Debbie | Premier Reporting |
| LORAND | MARJORIE | None - Private citizen |
| Laycock | Kelly | USEPA |
| LeJeune | Danny | Kleinfelder |
| Levey | Brian | Hunton Andrews Kurth LLP |
| Lomberk | Jen | Matanzas Riverkeeper |
| Lyon | Casey | FDOT |
| Mackey | Michelle | NYU Journalism Student |
| Madden | Debbie | Gunster |
| Malloy | Bonnie | Earthjustice |
| Marrow | Barbara | Unitarian Universalist Congregation of Lake County |
| Masse | Kierstin | Taylor Engineering |
| Mayer | Tamara | Independent |
| Mayton | Tom | St. Johns River Water Management District |

| Last Name | First Name | Organization |
|---|---|---|
| McClain | Richelle | Student |
| McDaniel | Rob | SWFWMD |
| McElwain | Tunis | USACE |
| McGill | Thomas | EPA |
| Meyers | Alissa | City of Tallahassee |
| Miller | Brandon | FDEP |
| Mills | Megan | FDEP |
| Minick | Allyson | FDEP |
| Monies | Nicole | FDOT |
| Morgan | JT | U.S. EPA |
| Murawski | Edward | Kleinfelder |
| Murphy LoConte | Elizabeth | Individual |
| Nagrani | Kavita | U.S. Environmental Protection Agency |
| Neal | Letitia | E Sciences Inc. |
| Neldner | Tim | Heidt Design |
| Niemczyk | Sharon | Cardno, Inc. |
| Noah | Marcus | Kleinfelder |
| Northey | Edward | Florida Department of Transportation |
| Northrup | Jaime | ERS |
| O'Lone | Dan | U.S. EPA-R4 |
| Pepe | Thomas | City of South Miami |
| Peters | Lauren | Florida Department of Transportation |
| Pierce | Lance | Association of Florida Community Developers |
| Platt | Bo | Brevard Indian River Lagoon Coalition |
| Powers | Alissa | Manatee County government |
| Preston | Erin | SJRWMD |
| Prieto | Juan | Nova Consulting |
| Quincey | Irene | Pavese Law Firm |
| Rach | Timothy | FDEP |
| Rasmussen | Megan | Kisinger Campo & Associates |
| Rasnake | Erin | FDEP |
| Reiber | Michelle | SJRWMD |
| Reichert | Christina | Earthjustice |
| Reichert | Sheri | Public |
| Ritchie | Bruce | POLITICO |

| Last Name | First Name | Organization |
|---|---|---|
| Robertson | Preston | Florida Wildlife Federation, Inc. |
| Roff | Rhonda | Sierra Club Calusa Group |
| Rosbough | Robert | Florida Department of Environmental Protection |
| Ruby Julien | Shannon | VHB |
| Sabin | Krista | USACE |
| Sagan | Jennifer | Wood Environment & Infrastructure Solutions |
| Sampson | Zack | Tampa Bay Times |
| Samuels | Kelley | AECOM |
| Santana | Rachael | Lewis Longman & Walker |
| Santangelo | Jenna | FPL |
| Scherer | Riley | Inwood Consulting Engineers, Inc. |
| Schnell | Raymond | Schnell Biosciences LLC |
| Schoonover | Elizabeth | SJRWMD |
| Schwartz | Matthew | South Florida Wildlands Association |
| Sellers | Larry | Holland & Knight LLP |
| Sensi | Daniel | FDEP |
| Setchell | Brent | FDOT |
| Shapiro | Jeffrey | League of Women Voters of Alachua County |
| Sharma | Ravi | FDEP |
| Shepherd | Ben | Inwood Consulting Engineers, Inc. |
| Spitzer | Kurt | KSA |
| Staletovich | Jenny | WLRN Public Radio |
| Stamatiades | Athena | Private |
| Stevens | Chadwick | FDEP |
| Summerfield | Jonathan | Environmental Resource Solutions |
| Sweigert | Rebecca | Lee County Board of County Commissioners |
| T | B | LWDD |
| Taddeo | Annette | Florida Senate |
| Thomas | Ed | The Fertilizer Institute |
| Thomasson | Mark | Littlejohn Mann & Associates |
| Trudeau | Rebecca | St. Johns River Water Management District |
| Truitt | John | Florida DEP |

| Last Name | First Name | Organization |
|---|---|---|
| Turner | Jonathan | Florida DOT |
| Turner | Diana | fdep |
| Uhland | Rachael | Earthjustice |
| Upton | Anna | The Everglades Foundation, Inc. |
| Valenstein | Noah | FDEP |
| Vazquez-Almedo | Marilyn | N/A) |
| Wallace | Craig | Brevard Indian River Lagoon Coalition |
| Watson | Dorothy | Foley & Lardner LLP |
| Webber | Heather | FDEP |
| Westervelt | Hannah | Florida Department Of Environmental Protection |
| White | Savannah | City of North Port |
| Williams | Marsha | NA |
| Wilson | hans | Hans Wilson & Assoc. |
| Winkler | Mary | St. Johns River Water Management District |
| Wolfe | Justin | Florida Dept, of Environmental Protection |
| Wood | Jeffrey | Baker Botts LLP |
| Woods | Erica | Kitson & Partners |
| Wyskiel | Sharon | St. Johns River Water Management District |
| Young | Dawn | USEPA |
| colon | luis | South Florida Water Management District |
| dierolf | amy | Duke Energy |
| pidala | anthony | fdep |
| underhill | emily | lee county port authority |
| vazquez | pamala | DEP |



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET, SW
ATLANTA, GEORGIA 30303-3104

December 16, 2020

Mr. Reid Nelson, Director
Office of Federal Agency Programs
Advisory Council on Historic Preservation
Suite 803
1100 Pennsylvania Ave., NW
Washington, DC 20004

Dear Mr. Nelson:

On December 16, 2020, the Environmental Protection Agency (EPA) received Chairman Jorjani's signature on the Programmatic Agreement (PA) and an acknowledgment from the Advisory Council on Historic Preservation (ACHP) of EPA's "compliance with Section 106 of the National Historic Preservation Act (NHPA) and its implementing regulations," related to EPA's approval of Florida's request to assume a Clean Water Act (CWA) Section 404 program. EPA appreciates the ACHP's execution of the PA and confirmation of compliance with the NHPA. EPA, however, strongly disagrees with ACHP's characterization of the nature of the consultation with the Indian tribes.

As detailed below, EPA initiated consultation with the ACHP within a week of receiving a complete package from the State of Florida. Utilizing the U.S. Department of Housing and Urban Development's Tribal Directory Assessment Tool (TDAT), at the recommendation of the ACHP, EPA identified and met individually with each tribe to better understand their specific concerns and then met collectively to discuss the draft PA language. Consultation with the tribes started September 2, 2020, and continued for the duration of our statutory timeframe to consider Florida's request (120 days). During this time, EPA worked with the ACHP and other consulting parties to develop the PA. The final PA incorporated many of the comments made by the tribes, the ACHP, the Florida State Historic Preservation Officer (SHPO), and the Florida Department of Environmental Protection (FDEP), including the inclusion of a stipulation providing for continuing conversations with the tribes about how the PA will be implemented.

**History of Consultation**

On August 20, 2020, the EPA, Region 4, received a complete package from the State of Florida requesting to assume administration of a CWA Section 404 program per the provisions of Section 404(g)(1) of the CWA. EPA determined that approval of a state program under this provision is a federal undertaking pursuant to NHPA Section 106 and the ACHP implementing regulations at 36 C.F.R. Part 800. Set forth below are the actions EPA has taken to meet the requirements for consultation under the NHPA Section 106 and the ACHP implementing regulations. A more detailed record of EPA's efforts to consult is provided in Enclosure A.

EPA contacted the ACHP in August 2020, regarding Florida's request to assume the CWA Section 404 program. EPA indicated that it deemed approval of Florida's request to be a federal undertaking and that it intended to initiate consultation under NHPA Section 106 and 36 C.F.R. Part 800. EPA discussed with the ACHP its plan to comply with NHPA Section 106 and 36 C.F.R. Part 800 by entering into a programmatic agreement based on the August 6, 2020 Operating Agreement (OA) between the FDEP and the SHPO, and to issue a Federal Register notice inviting public comment on the potential effects of the undertaking on historic properties. EPA provided the ACHP a copy of Florida's request and the OA. EPA and the ACHP also discussed who EPA should consider inviting as consulting parties under NHPA Section 106 and 36 C.F.R. Part 800.

Florida's request to assume the CWA Section 404 program and any potential approval by EPA would exclude Indian country as defined at 18 U.S.C. § 1151, and thus exclude tribal lands as defined at 36 C.F.R. § 800.16(x). As a result, the relevant tribal role in the NHPA Section 106 process for this undertaking is established at NHPA Section 101(d)(6)(B). Based on advice from the ACHP, EPA consulted the TDAT at https://egis.hud.gov/TDAT/ to identify Indian tribes with interests in Florida. The TDAT listed the following eight federally-recognized Indian tribes as having interests in Florida: the Alabama-Coushatta Tribe of Texas; the Choctaw Nation of Oklahoma; the Coushatta Tribe of Louisiana; the Miccosukee Tribe of Indians of Florida; the Mississippi Band of Choctaw Indians; the Muscogee (Creek) Nation; the Poarch Band of Creek Indians; and the Seminole Tribe of Indians of Florida. EPA subsequently informed the ACHP that it had identified the aforementioned eight tribes and would be sending them invitations to consult on the potential effects of the undertaking, namely approval of Florida's request to assume the CWA Section 404 program. EPA received no suggested modifications to the list of federally-recognized Indian tribes from ACHP or information from the ACHP that would suggest EPA improperly identified the appropriate tribes for consultation.

On September 2, 2020, EPA sent letters to the following 11 parties inviting them to participate in the NHPA Section 106 consultation process regarding EPA's undertaking: ACHP; Florida SHPO; FDEP; the Alabama-Coushatta Tribe of Texas; the Choctaw Nation of Oklahoma; the Coushatta Tribe of Louisiana; the Miccosukee Tribe of Indians of Florida; the Mississippi Band of Choctaw Indians; the Muscogee (Creek) Nation; the Poarch Band of Creek Indians; and the Seminole Tribe of Indians of Florida. The letter to each consulting party identified the nature of the undertaking, EPA's plan to publish notice in the Federal Register of Florida's request and the opportunity for public comment, and an internet link to Florida's submittal to EPA requesting approval to assume the CWA Section 404 program. The letter also requested a response from each party within 30 days if the party was interested in consulting on the undertaking.

Based on advice from the ACHP, EPA reached out to the Florida SHPO for a listing of organizations to contact regarding the undertaking. Per Florida SHPO's recommendation, EPA included the Florida Anthropological Society, the Florida Archaeological Council, and the Florida Trust for Historic Preservation in its interested party email distribution. EPA emailed a letter to these parties that: (1) provided notice of EPA's receipt of the request from Florida; (2) solicited a public review and comment period on the State program which ran for 47 days; (3) announced two public hearings during the comment period; and (4) solicited public review and comment regarding consultation under the NHPA.

On September 16, 2020, EPA provided public notice in the Federal Register of its undertaking, potential impacts associated with the state's issuance of Section 404 permits, its intent to consult with the consulting parties under NHPA Section 106 and 36 CFR Part 800, its plans to consider the OA between FDEP and Florida SHPO as part of the NHPA Section 106 consultation process, and a request for public comment on its undertaking and notice of two virtual public hearings.

On September 22, 2020, EPA held an informational webinar designed to provide the tribes with an overview of the undertaking and the NHPA Section 106 consultation process so that the tribes could make an informed decision about whether they wanted to participate in the consultation process. During the webinar, EPA notified the tribes that it planned to comply with NHPA Section 106 by entering into a PA based on an operating agreement between FDEP and Florida SHPO which would serve as the foundation of the PA. Five of the eight tribes attended the informational webinar: the Alabama-Coushatta Tribe of Texas, the Choctaw Nation of Oklahoma, the Miccosukee Tribe of Indians of Florida, the Mississippi Band of Choctaw Indians, and the Seminole Tribe of Florida. During the webinar, EPA requested that the tribes identify any issues or concerns they had with the OA. As the Poarch Band of Creek Indians was not available to participate in the webinar held on September 22, 2020, EPA hosted a webinar for the Poarch Band of Creek Indians on October 7, 2020.

The following five tribes agreed to participate as consulting parties: Choctaw Nation of Oklahoma; the Miccosukee Tribe of Indians of Florida; the Muscogee (Creek) Nation, the Poarch Band of Creek Indians; and the Seminole Tribe of Florida.

EPA conducted a series of NHPA consultation meetings with the consulting parties on the following dates:

- On September 28, 2020, EPA hosted a consultation call with the Seminole Tribe of Florida as part of the NHPA Section 106 process and EPA's tribal consultation policy.
- On October 1, 2020, EPA hosted a consultation call with the Choctaw Nation of Oklahoma as part of the NHPA Section 106 process.
- On October 7, 2020, EPA hosted a consultation call with the Poarch Band of Creek Indians as part of the NHPA Section 106 process and EPA's tribal consultation policy.
- On October 8, 2020, EPA hosted a consultation call with the Miccosukee Tribe of Indians of Florida as part of the NHPA Section 106 process and EPA's tribal consultation policy.
- On October 15, 2020, EPA hosted a consultation call with the Muscogee (Creek) Nation as part of the NHPA Section 106 process.
- On October 30, 2020, EPA hosted a second consultation call with the Poarch Band of Creek Indians as part of the NHPA Section 106 process and EPA's tribal consultation policy.
- On December 1, 2020, EPA hosted a consultation call with FDEP and Florida SHPO as part of the NHPA Section 106 process regarding EPA's draft PA.
- On December 2, 2020, EPA hosted a consultation call with the consulting parties as part of the NHPA Section 106 process regarding EPA's draft PA.
- On December 3, 2020, EPA hosted a second consultation call with the Miccosukee Tribe of Indians of Florida as part of the NHPA Section 106 process and EPA's tribal consultation policy.
- On December 14, 2020, EPA hosted a final consultation call with all consulting parties as part of the NHPA Section 106 process regarding EPA's draft PA and how EPA addressed

many of the comments received from the consulting parties on the PA. The Poarch Band of Creek Indians accepted the invitation for this consultation call but did not participate.

During the September 22, 2020, informational webinar and during the NHPA Section 106 consultation meetings with the tribes, EPA explained that it planned to comply with NHPA Section 106 by entering into a PA based on the August 6, 2020 OA between FDEP and Florida SHPO, which would serve as the foundation of the PA. EPA provided information about where in the docket the OA could be found and upon request directly emailed documents to the tribes. During the informational webinar and the NHPA Section 106 consultation meetings, EPA encouraged tribes to identify issues, concerns or gaps that they identified with the OA so that EPA could attempt to address those through the PA. EPA considered and responded to all NHPA-related issues raised during these consultation meetings. As a result, the tribes had an opportunity to provide EPA with comments on the OA and issues associated with EPA's undertaking since September 2020.

EPA began negotiating a draft PA with the ACHP on October 21, 2020. EPA and the ACHP reached a tentative agreement on the draft PA language on November 24, 2020. EPA shared the draft PA with the consulting parties on November 25, 2020 and requested comments on the PA by noon December 7, 2020. EPA received, considered, and responded to comments from all the consulting parties and revised the PA to address many of the comments. EPA sent the consulting parties a revised PA on December 10, 2020, and met with the parties on December 14, 2020, to discuss the revisions. On December 16, 2020, EPA sent letters to the other consulting parties with responses to comments received from all consulting parties. Each letter also summarized EPA's communication with the recipient during the consultation process.

**Programmatic Agreement**

On December 16, 2020, EPA executed a PA with the ACHP, the Florida SHPO, and FDEP. EPA emailed the consulting parties a fully executed copy of the PA on December 16, 2020. A copy of the fully executed PA is included as Enclosure B.

**Response to Consulting Party Comments**

EPA received numerous comments from the consulting parties during NHPA consultation meetings hosted by EPA and in writing. EPA provided a response to many of these comments during the December 14, 2020 consultation meeting. On December 16, 2020, EPA sent letters to the other consulting parties with responses to comments received from all consulting parties. Each letter also summarized EPA's communication with the recipient during the consultation process. EPA's responses to comments received from the consulting parties, including the ACHP, is provided as Enclosure C to this letter. EPA was able to address many of the comments through the PA.

EPA appreciates the assistance and feedback it received from the ACHP during this process and looks forward to working with you to implement the PA should EPA decide to approve Florida's request to assume the CWA Section 404 program. In the meantime, please contact me at 404-562-8979 or at gettle.jeaneanne@epa.gov, if you have any questions.

Sincerely,

JEANEANNE GETTLE Digitally signed by JEANEANNE GETTLE
Date: 2020.12.16 20:28:01 -05'00'

Jeaneanne M. Gettle, Director
Water Division

Enclosures
   A. Communication with NHPA Section 106 Consulting Parties regarding EPA's Review of Florida's Request for Assumption of a Clean Water Act Section 404 Program
   B. Programmatic Agreement
   C. EPA Responses to Comments from the National Historic Preservation Act Section 106 Consulting Parties on Florida's Request for Assumption

**ENCLOSURE A**

EPA's Communication with NHPA Section 106 Consulting Parties regarding
EPA's Review of Florida's Request for Assumption of a Clean Water Act Section 404 Program

EPA's Communication with the ACHP

- 8/24/20- EPA letter issued to the ACHP regarding EPA's intent to initiate NHPA 106 consultation, plan for a programmatic agreement (PA) based on the state operating agreement (OA), and plan to issue a Federal Register Notice inviting public comment on EPA's 106 consultation.
- 8/25/20- Call between EPA and ACHP regarding plan for PA based on the state operating agreement, process for identifying interested tribes, and appropriate signatories to the PA.
- 8/25/20- ACHP email to EPA with a link https://egis.hud.gov/TDAT/ to review for tribes with interests in Florida that would be offered consultation.
- 9/2/20- EPA letter issued to the ACHP inviting them to consult under NHPA Section 106 with a link to access the documents that comprised Florida's request for Assumption.
- 9/4/20- EPA email to ACHP providing copies of certain parts of Florida's request for Assumption that related to protection of historic and cultural resources including the OA, EPA-FDEP MOA, Florida 404 Handbook, and a copy of Florida regulations at FL 62-331.This email also identified to ACHP the tribes and other parties EPA was consulting with regarding the undertaking.
- 9/25/20- EPA email to ACHP providing an update that an informational webinar was held for tribes and attached webinar slides. This email included additional information regarding the status of the consultation process, including EPA's communications with the tribes.
- 9/30/20 – ACHP email to EPA acknowledging EPA's September 4 and September 25 emails and the detailed information provided regarding the consultation process EPA was utilizing.
- 10/21/20- EPA email to ACHP providing draft PA for review.
- 10/26/20- Call between EPA and ACHP to discuss draft PA.
- 10/28/20- ACHP email to EPA providing edits to PA.
- 10/29/20- Call between EPA and ACHP to discuss draft PA.
- 11/2/20- ACHP email to EPA providing edits to PA.
- 11/20/20- EPA email to ACHP providing draft PA for ACHP review and comment.
- 11/20/20 - ACHP email to EPA providing edits to PA.
- 11/23/20- Call between EPA and ACHP to discuss draft PA.
- 11/24/20- Call between EPA and ACHP to discuss draft PA.
- 11/25/20- EPA email to consulting parties transmitting draft PA for review and comment.
- 12/2/20- EPA hosted call with consulting parties to discuss draft PA.
- 12/4/20- ACHP letter to EPA providing comments on draft PA.
- 12/10/20- EPA email to consulting parties transmitting revised PA.
- 12/14/20- EPA hosted call with consulting parties to discuss revisions to PA.

EPA's Communication with the office of the Florida State Historic Preservation Officer

- 9/2/20 - EPA letter issued to the SHPO inviting them to consult under NHPA Section 106 with a link to access the documents that comprised Florida's request for Assumption.
- 9/14/20- SHPO email confirming receipt of 9/2 letter and indicating FL SHPO would want to consult.
- 11/25/20- EPA email to consulting parties transmitting draft PA for review and comment.
- 12/1/20- EPA call with SHPO and FDEP to discuss draft PA.
- 12/2/20- EPA hosted call with consulting parties to discuss draft PA.
- 12/7/20- SHPO letter to EPA providing comments on draft PA.
- 12/10/20- EPA email to consulting parties transmitting revised PA.

- 12/14/20- EPA hosted call with consulting parties to discuss revisions to PA.

EPA's Communication with the Florida Department of Environmental Protection
- 9/2/20 - EPA letter issued to the State inviting them to consult under NHPA Section 106 with a link to access the documents that comprised Florida's request for Assumption.
- 9/4/20- FDEP email to EPA providing points of contact regarding NHPA consultation.
- 11/25/20- EPA email to consulting parties transmitting draft PA for review and comment.
- 12/1/20- EPA call with SHPO and the State to discuss draft PA.
- 12/2/20- EPA hosted call with consulting parties to discuss draft PA.
- 12/10/20- EPA email to consulting parties transmitting revised PA.
- 12/14/20- EPA hosted call with consulting parties to discuss revisions to PA.

EPA's Communication with the Alabama-Coushatta Tribe of Texas
- 9/2/20- EPA letter issued to the Tribe inviting them to consult under NHPA Section 106 with a link to access the documents that comprised Florida's request for Assumption.
- 9/15/20- EPA email to 8 tribes with an invitation to an Informational Webinar on 9/22/20.
- 9/22/20- EPA hosted the Informational Webinar.
- 9/22/20- EPA email to 8 tribes providing pdf of Webinar slides.
- 10/19/20- EPA letter issued to Tribe closing consultation due to lack of response.

EPA's Communication with the Choctaw Nation of Oklahoma
- 9/2/20- EPA letter issued to the Tribe inviting them to consult under NHPA Section 106 with a link to access the documents that comprised Florida's request for Assumption.
- 9/15/20- EPA email to 8 tribes with an invitation to an Informational Webinar on 9/22/20.
- 9/22/20- EPA hosted the Informational Webinar.
- 9/22/20- EPA email to 8 tribes providing pdf of Webinar slides.
- 9/22/20- Tribe issued email asking to be consulting party on NHPA.
- 10/1/20- EPA hosted call to consult on NHPA.
- 11/25/20- EPA email to consulting parties transmitting draft PA for review and comment.
- 12/2/20- NHPA PA call with all consulting parties.
- 12/4/20- Letter from Tribe with comments on draft PA.
- 12/10/20- EPA email to consulting parties transmitting revised PA.
- 12/14/20- EPA hosted call with consulting parties to discuss revisions to PA.

EPA's Communication with the Coushatta Tribe of Louisiana
- 9/2/20- EPA letter issued to the Tribe inviting them to consult under NHPA Section 106 with a link to access the documents that comprised Florida's request for Assumption.
- 9/15/20- EPA email to 8 tribes with an invitation to an Informational Webinar on 9/22/20.
- 9/22/20- EPA hosted the Informational Webinar (no participation from Tribe).
- 9/22/20- EPA email to 8 tribes providing pdf of Webinar slides.
- 10/19/20- EPA letter issued to Tribe closing consultation due to lack of response.

EPA's Communication with the Miccosukee Tribe of Indians of Florida
- 8/31/20- EPA letter issued to the Tribe inviting tribal consultation on FL Assumption.
- 9/2/20- EPA letter issued to the Tribe inviting them to consult under NHPA Section 106 with a link to access the documents that comprised Florida's request for Assumption.
- 9/15/20- EPA email to 8 tribes with an invitation to an Informational Webinar on 9/22/20.
- 9/22/20- EPA hosted the Informational Webinar.
- 9/22/20- EPA email to 8 tribes providing pdf of Webinar slides.

- 9/23/20- Tribe call to EPA with notification of their interest to consult under both the broader consultation on EPA's review of Florida's request for assumption and under NHPA.
- 9/23/20- EPA call with the Tribe to schedule consultation, and 10/8/20 was first date available for Tribe.
- 10/8/20- EPA hosted consultation call with the Tribe.
- 10/20/20- EPA email transmitting notes from consultation call on 10/8/20 and requesting feedback.
- 11/20/20- Tribe call to EPA requesting a second consultation call with potential date of 12/2/20.
- 11/24/20- EPA call and email to Tribe to try to schedule second consultation call.
- 11/25/20- EPA email to consulting parties transmitting draft PA for review and comment.
- 11/30/20- Email communication between EPA and the Tribe to schedule a call for 12/3/20.
- 12/2/20- NHPA PA call with all consulting parties.
- 12/3/20- EPA hosted 2nd consultation call with the Tribe.
- 12/9/20- Tribe letter issued to EPA transmitting comments on the draft PA.
- 12/10/20- Tribe email requesting a meeting with EPA and the Corps of Engineers.
- 12/10/20- EPA email to consulting parties transmitting revised PA.
- 12/11/20- EPA email transmitting notes from consultation call on 12/3/20 and requesting feedback.
- 12/14/20- EPA letter issued responding to the Tribe's request to meet with the Corps.
- 12/14/20- EPA hosted call with consulting parties to discuss revisions to PA.
- 12/16/20- EPA letter to the Tribe responding to the 12/10/20 email.

EPA's Communication with the Mississippi Band of Choctaw Indians
- 9/2/20- EPA letter issued to the Tribe inviting them to consult under NHPA Section 106 with a link to access the documents that comprised Florida's request for Assumption.
- 9/15/20- EPA email to 8 tribes with an invitation to an Informational Webinar on 9/22/20.
- 9/22/20- EPA hosted the Informational Webinar.
- 9/22/20- EPA email to 8 tribes providing pdf of Webinar slides.
- 10/19/20- EPA letter issued to Tribe closing consultation due to lack of response.

EPA's Communication with the Muscogee (Creek) Nation
- 9/2/20- EPA letter issued to the Tribe inviting them to consult under NHPA Section 106 with a link to access the documents that comprised Florida's request for Assumption.
- 9/15/20- EPA email to 8 tribes with an invitation to an Informational Webinar on 9/22/20.
- 9/22/20- EPA hosted the Informational Webinar (no participation from Tribe).
- 9/22/20- EPA email to 8 tribes providing pdf of Webinar slides.
- 10/1/20 – Email from Tribe requesting consultation on NHPA.
- 10/15/20- EPA hosted NHPA consultation call.
- 10/15/20- EPA email to Tribe transmitting Informational Webinar slides and OA
- 10/23/20- EPA email transmitting notes from consultation call.
- 11/2/20- Tribe letter issued to EPA with comments on the State's request for 404 Assumption.
- 11/25/20- EPA email to consulting parties transmitting draft PA for review and comment.
- 12/2/20- NHPA PA call with all consulting parties.
- 12/6/20- Letter from Tribe with comments on draft PA.
- 12/10/20- EPA email to consulting parties transmitting revised PA.
- 12/14/20- EPA hosted call with consulting parties to discuss revisions to PA.

EPA Communication with the Poarch Band of Creek Indians
- 8/31/20- EPA letter issued to the Tribe inviting tribal consultation on FL Assumption.
- 9/2/20- EPA letter issued to the Tribe inviting them to consult under NHPA Section 106 with a link to access the documents that comprised Florida's request for Assumption.

- 9/15/20- EPA email to 8 tribes with an invitation to an Informational Webinar on 9/22/20.
- 9/22/20- EPA hosted the Informational Webinar. (Tribe unavailable to participate).
- 9/22/20- EPA email to 8 tribes providing pdf of Webinar slides.
- 9/28/20- Tribe call to EPA with notification of their interest to consult.
- 10/7/20- EPA hosted consultation call.
- 10/7/20- EPA email to Tribe providing Informational Webinar slides and copy of OA.
- 10/22/20- EPA email to Tribe providing notes from 10/7/20 consultation call.
- 10/22/20- Email from Tribe requesting additional consultation meeting.
- 10/30/20- EPA hosted second consultation meeting.
- 11/13/20- EPA email to Tribe providing notes from 10/30/20 meeting.
- 11/25/20- EPA email to consulting parties transmitting draft PA for review and comment.
- 12/2/20- NHPA PA call with all consulting parties.
- 12/7/20- Letter from Tribe with comments on draft PA.
- 12/10/20- EPA email to consulting parties transmitting revised PA.
- 12/14/20- EPA hosted call with consulting parties to discuss revisions to PA. (Tribe did not participate)

EPA Communication with the Seminole Tribe of Florida
- 8/24/20-Email from an attorney on behalf of the Tribe requesting to consult on FL Assumption.
- 8/31/20- EPA letter issued to the Tribe inviting tribal consultation on FL Assumption with a link to access the documents that comprised Florida's request for Assumption.
- 9/2/20- EPA letter issued to the Tribe inviting them to consult under NHPA Section 106 with a link to access the documents that comprised Florida's request for Assumption.
- 9/3/20- Email from the Tribe with notification of their interest to consult on NHPA Section 106.
- 9/10/20- Email from an attorney on behalf of the Tribe requesting one combined consultation and a video conference to discuss consultation on 9/28/20.
- 9/15/20- EPA email to 8 tribes with an invitation to an Informational Webinar on 9/22/20.
- 9/22/20- EPA hosted the Informational Webinar.
- 9/22/20- EPA email to 8 tribes providing pdf of Webinar slides.
- 9/28/20- EPA hosted consultation meeting with the Tribe.
- 10/7/20- Email from the Tribe transmitting initial comments regarding the OA and PA.
- 10/15/20- EPA email to the Tribe providing notes from the 9/28/20 meeting.
- 11/2/20- Tribe letter issued to EPA with comments on the State's request for 404 Assumption.
- 11/25/20- EPA email to consulting parties transmitting draft PA for review and comment.
- 12/2/20- NHPA PA call with all consulting parties
- 12/7/20- Letter from Tribe with comments on draft PA.
- 12/10/20- EPA email to consulting parties transmitting revised PA.
- 12/14/20- EPA hosted call with consulting parties to discuss revisions to PA.

Transcription details:

Date: 21-Oct-2020

Input sound file: Virtual Public Hearings on Florida's Request to Assume Administration of a Clean Water Act Section 404 Program.mp4

Transcription results:

Jeaneanne Gettle: Good morning. I'm Jeaneanne Gettle, Director of the Water Division at the US Environmental Protection Agency's regional office in Atlanta, Georgia. Welcome and thank you for joining this public hearing concerning Florida's request to assume administration of a Clean Water Act Section 404 program. We recognize that the natural resources in Florida are critically important to each of you, your communities, and to the State of Florida. Our agenda today is very simple. I will begin by making brief remarks, provide background and context. Then our facilitator will explain the comment process, and we will start the public comment process in approximately 15 minutes. I'm here virtually with several EPA colleagues. We will be listening to your comments throughout this hearing, so I would like to introduce them to you. As I say their name, they will have their video on. Rosemary Calli, Tom McGill, Matt Hicks, Kathy Hurld, Kavita Nagrani, Christopher Parker, Mita Ghosh, James Morgan, Whitney Beck, Michael Creswell, Erica Jones, Kelly Laycock, and Simma Kupchan will be joining us by the phone.

To set the stage for this hearing, I'd like to provide some background and context. On August 20th, the US Environmental Protection Agency received from the governor of the State of Florida a complete program submission for regulating discharges of dredged or fill material into waters within the jurisdiction of the state in accordance with the Clean Water Act. Pursuant to Clean Water Act, Section 404(h) and EPA's implementing regulations, EPA opened a 45-day comment period which ends on November 2nd, 2020. As part of this process, EPA has also scheduled two public hearings, the one today and another public hearing on October 27th. In addition to our review of the package submitted by Florida, EPA also initiated a programmatic consultation under Section 106 of the National Historic Preservation Act, or NHPA, and is soliciting comments pursuant to NHPA, implementing regulations during the 45-day comment period ending November 2nd, 2020. [crosstalk]

EPA has three primary roles pursuant Section 404(g) of the Clean Water Act. The first role is to work with states or tribes to enhance their program capacity and capability through mechanisms such as Wetland Protect Program Development Grants [crosstalk]-- Jan, can you mute the person speaking, please? The agency's second responsibility is to review requests by states and tribes to assume administration of a Clean Water Act 404 permitting program. This is the stage that we are currently in relative to Florida's request. Under the Clean Water Act, EPA must evaluate the request and approve or disapprove the request based on factors I will speak about in a moment. The third role for EPA is that of oversight. Whenever a state or tribe assumes a program, EPA retains an oversight role. For purposes of the Clean Water Act Section 404, that would generally entail coordinating federal comments, reviewing programmatic modifications, and if necessary, withdrawing program approval.

In order to approve a state or tribe's assumption of a Clean Water Act Section 404 program, the EPA must find that the program is consistent with and no less stringent than the requirements found in the Clean Water Act and associated implementing regulations. The assumed program must have equivalent scope of jurisdiction, meaning it covers all waters of the United States not retained by the Army Corps of Engineers. It must regulate at least the same activities. It must provide sufficient public notice and allow for public participation. The program must also ensure compliance with the regulations known as the Clean Water Act Section 404(b)(1) Guidelines and have adequate enforcement authorities.

The purpose of today's hearing is for EPA to listen to comments regarding Florida's request to assume administration of a Clean Water Act Section 404 program. Today EPA's role is to listen. So while during this hearing my EPA colleagues and I may occasionally ask a question or respond to a question of clarification, we will not otherwise be engaging with or responding to commenters. This hearing is being recorded for transcription purposes, and that transcription will become part of the official administrative record for this request. In addition, you can continue to provide written comments until November 2nd, 2020 as described in EPA's Federal Register notice on regulations.gov. If you are making an oral comment today and would like to also provide that to us in written

comment form or send us any additional information or attachments associated with your oral comment, then we certainly encourage you to do so by November 2nd, 2020, the public comment deadline.

Following the close of the public comment period, EPA will review and consider all comments received as well as the complete submittal from Florida before we make a final decision about this request. Oral and written comments will be given equal consideration. As part of that process, EPA will prepare a responsiveness summary, which will provide EPA responses to the significant comments received during the comment period. I want to emphasize that no decision on Florida's request has been made at this time. After considering Florida's submittal, all comments, data, and information received through the November 2nd, 2020 comment deadline, EPA's regional administrator Mary Walker will make a final decision by December 17th. If EPA approves the state's program, we will publish a notice of this decision in the Federal Register along with the agency's responsiveness summary of significant comments. If EPA disapproves the state's 404 program, we will notify the state of the reasons for the disapproval and of any revisions or modifications to the state's program which are necessary to obtain approval. This public hearing is your opportunity to hear—is our opportunity to hear directly from you. Thank you again for being here and participating in this process. I will now turn the floor over to Jan Connery, the facilitator for this hearing, to describe the oral comment process we will follow today and to moderate this hearing. Thank you very much.

Jan Connery: Thank you, Jeaneanne. My name is Jan Connery. I'm with ERG, a contractor to EPA. And as Jeaneanne said, I will be serving as your facilitator for this hearing. I'm working today with my colleague Meredith Outterson at ERG, who is our webinar coordinator for the hearing. I'm very pleased to see that we are joined by over 130 members of the public this morning. Twenty-four of you have signed up to make an oral comment, and many others of you are here to listen to the comments today. Welcome, everyone, and thank you so much for participating. As Jeaneanne said, the purpose of this hearing is for EPA to hear oral comments from the public. So I'm going to start by describing the comment process that we'll be following. First I'm going to describe the order in which we'll take commenters, and then I will provide details about the process.

So we're going to start with comments from four public officials, and then after that, we'll take comments from folks in the order that each of you registered to comment. We have organized commenters into five time blocks, a half hour each, and each commenter should have received an email yesterday from Meredith at ERG notifying you which group you're in and your unique speaker number. So as we get to each time block, I'm going to be displaying the names of the commenters in that block in the order that you will be speaking. And that way, everyone at this hearing will be able to clearly know who is speaking at each time and who is on deck to speak next. So if the listed commenter isn't available at the time that I call on them, I will simply move to the next person on the list. And then if they are able to join us later, I will fit that commenter in as soon as we can so that we are able to hear their comment.

If we get ahead of schedule, as sometimes happens on these virtual hearings, then I will move on to the next person on the list. And we—sorry. If we get ahead of schedule, we may take short breaks. But if we do that, I will provide clear information to you about when we will reconvene. So our hearing is scheduled to run for up to three hours. And we also anticipate that we may be able to fit in—if we have enough time when we're ahead of schedule, we may be able to fit in additional commenters in that time or at the end of the hearing, as time allows. Now, this would be folks who didn't sign up to comment, didn't preregister to do so but are on the hearing now and are thinking, "Well, actually, I would like to make a comment." So if there's anyone who is thinking would like to comment today, even though you didn't preregister, what you can do at any time during this hearing is use the hand icon to raise your virtual hand. That way, we'll be able to see who's interested, and then as we can, if we have the opportunity during the hearing because we're a little ahead of schedule or at the end, we'll be taking folks in the order that you have raised your virtual hand. So I wanted to let you know that now so you'll be able to think about that and let us know if you're interested. So whether you're preregistered or whether we're able to fit you in, everyone will be following the comment process I'm going to describe to you now. Apologies, I should have advanced to this slide. Okay. So this is speaker order. I've talked about that. Yes. And you'll be receiving a chat message shortly before your speaker group is called. And you'll be unmuted when we announce your name.

Okay. So the comment process. To minimize background noise, we have all of you muted right now. And I will be calling on each commenter when it's your time to speak, and then you will be unmuted by Meredith, and you'll know

that you're unmuted because you'll hear an automated voice telling you that. I'm going to ask you to start by stating your name and affiliation, and if you're representing yourself, then you just need to say, "Representing self." So as was noted in the original a Federal Register notice and other communications, every commenter will have a maximum of five minutes to speak. And it's fine if you take less time, but five minutes is your maximum. So after you've stated your name and affiliation, I'm going to be starting an electronic timer that you'll be able to see on screen. So if you're commenting, please keep an eye on that timer so that you can be aware of when you're approaching your five minutes. As a matter of fairness to all commenters, it is important to respect that time limit, so be sure to wrap up as you see you're approaching five minutes. Now, if you had more to say that you weren't able to fit in during that limit, as Jeaneanne said, you are welcome and encouraged to submit the additional information as a written comment no later than the November 2nd public comment deadline.

So after you've made your comment, please stay on the line. Occasionally, EPA may have a question of clarification. If so, Jeaneanne will ask the question at that point, and you may respond. And then when the clarification is concluded, we will remute your line and proceed to the next commenter, using the same process. So for commenters, in the email that Meredith sent to you yesterday, we recommended that if you can, connecting by phone during the time you're making your comment for the audio portion offers a better audio quality. I mean, obviously, you'll still be connected to the webinar visually. But we do recommend connecting by phone if you're making a comment, if that's convenient to do. Meredith provided details about how to do that in the email she sent yesterday. If you're going to do that, please try to do that and connect by phone at least 20 minutes prior to the anticipated time of your comment. And if you experience any-- or we observe that you experience any audio issues any time during your comment, the beginning or in the middle, what we're going to do is mute your line, and Meredith will send you a message to suggest adjustments to your audio and continue working with you till we solve the issue. And then we'll give you a chance to make your comments as soon as we can, after we resolve the issue.

So lastly, just a couple of things for anyone on today's hearing, whether you are commenting or listening. If you are experiencing any technical difficulties, whether you're a comment or a listener or have any questions, you can contact Meredith by using the questions box with the questions icon, and she'll work with you to troubleshoot that issue. And as we are about to start the comment process, I just want to say finally that Jeaneanne and all the folks on the EPA team who are here to listen are-- well, we'll be listening throughout the hearing and taking notes. As the lead official for this hearing, Jeaneanne will be on video the entire time. But that said, you'll see her taking notes and perhaps taking a drink of water and so on, as she would normally do if this were an in-person hearing. But she would like you to know that she is as present for you and listening. So you'll be observing that during this hearing. Okay. So we are now ready to move to the first set of commenters. Here you see the list of folks who are in the first group. And I believe you can now see the timer on the screen over in the lower right. And I will be turning off my video. You don't need to see me anymore. Our first commenter is Annette Taddeo. So Annette, would you please begin by stating your name and affiliation? And then you can go right into your comment, and you'll have five minutes at that point.

Annette Taddeo: Thank you very much. Good morning. This is Senator Annette Taddeo. I represent Senate District 40 in the Florida Senate. I'm here to speak against the State of Florida's request. The EPA should allow the Army Corps to maintain its jurisdiction over Florida's water rather than grant the state's request for jurisdiction. The Army Corps is best able to achieve the necessary level of review due to their historic expertise and resources. The fact of the matter is the Florida Department of Environmental Protection does not have the resources to undertake this massive permitting responsibility. The state agency did not have the resources before the recession, and it certainly will not have them in the near future, when the Florida legislature is expected to make budget cuts because of lost tax revenues. Wetlands are critical to cleansing water and maintaining a natural infrastructure that provides resiliency during storms. In the face of increasing development statewide, the protection and restoration of Florida's wetlands and water resources must be given the greatest possible attention. Furthermore, during these uncertain times, Florida should focus on the pandemic and not force through rash changes in environmental policies. Thank you for giving me the chance to talk about this.

Jeaneanne Gettle: Thank you, Senator Taddeo. I don't believe that we have any clarifying comment or question.

Jan Connery: Okay. Great. Thanks, Jeaneanne. It looks like our second speaker, Ananta Nath, is not yet with us, so we're going to go down to the next speaker, which is Lauren Peters. So Lauren, would you please begin by stating your name and affiliation? And then you'll have five minutes for your comment.

Lauren Peters: I'm Lauren Peters of the Florida Department of Transportation District One. And I will say I had requested to comment because I was unsure of whether or not I would want to speak on this matter. And at this moment, I have no comment.

Jan Connery: Oh, okay. That was fast.

Thank you.

Thank you very much. Right. Then we will move to the next speaker, and that's Noah Valenstein. Noah, would you please begin by stating your name and affiliation?

Justin Wolfe: Good morning and thank you. This is Justin Wolfe. Can you hear me?

Jan Connery: Oh, Justin Wolfe instead of Noah?

Justin Wolfe: I just wanted to make sure you could hear me. I'm the General Counsel for the Florida Department of Environmental Protection, and I'm speaking today on behalf of Secretary Valenstein and Florida DEP.

Jan Connery: Okay. We can hear you just fine. Please go ahead.

Justin Wolfe: Thank you. First we wanted to thank EPA for holding today's public hearing concerning the State of Florida's application to assume the Clean Water Act Section 404 program. For the first time in decades, a state has undertaken the significant task of submitting a complete application to obtain approval of a Section 404 program. This was an enormous effort by FDEP and other stakeholders, and we greatly appreciate EPA's timely and thorough review of our program application materials. If approved, assumption of a 404 program will be a major achievement for both EPA and the State of Florida. In these brief remarks, I wanted to address a few key issues for EPA's consideration and to ensure the public that is-- ensure that the public is fully informed about how Florida's 404 program would operate in full compliance with federal and state law.

First, Florida has the legal authority and agency resources necessary to properly and fully implement the Section 404 program for the state. Upon assumption, Section 404 program will be administered by FDEP through its dedicated staff of over 200 wetland scientists and professionals across the state. Florida's intimate-- or FDEP's intimate knowledge of state aquatic resources, coupled with the efficiency and proven success of its own wetland permitting program will ensure that the Section 404 program will be implemented in a scientifically sound and protective manner. Moreover, Florida is well-prepared to address the compliance and enforcement responsibilities of the program. Governor Ron DeSantis recently signed into law the Environmental Accountability Bill, which strengthens FDEP's enforcement capabilities by increasing the monetary amount of penalties up to three times the amount required by federal law.

Second, Florida's approach is fully protective of the environment, including our state's wetlands and fish and wildlife species. FDEP has entered into agreements with the US Army Corps of Engineers and EPA as well as a pending agreement with the US Fish and Wildlife Service and the Florida Fish and Wildlife Conservation Commission to ensure a robust program that provides full protection for our state's wetlands and species. Likewise, Florida's approach provides for a programmatic Endangered Species Act consultation at the front end of the process, when EPA is reviewing the 404 assumption application as well as allows for site-specific technical assistance under the terms and conditions of an anticipated programmatic biological opinion and its incidental take statement. In no way, shape, or form does Florida's approach bypass species protection. The opposite is true. Florida's approach ensures a careful comprehensive process of engagement with both federal and state fish and wildlife agencies to ensure that 404-permitted activities do not jeopardize listed species or adversely modify critical habitat. In many ways, Florida's program will go above and beyond the requirements of federal law and ensure more robust protections for our state's threatened or endangered species.

Florida's 404 program will also ensure protection of historic and cultural resources in the state. We have entered an agreement with the State Historic Preservation Office, setting forth a consultation process called historic properties review for assessing the potential effects that the state 404 program permit application may have on historic properties and for avoiding, minimizing, or mitigating any adverse effects on historic properties. The historic properties review includes consultation with tribes, local governments, applicants, and the public and is designed to complement established procedures for permit processing and public notice under the state 404 program. We are also committed to working together with Florida's tribes. Our application resulted from extensive cooperative engagement with the Seminole Tribe of Florida and the Miccosukee Tribe of Florida, as reflected in the state's program submittal.

In closing, as an important part of the Clean Water Act's cooperative federalism structure, 404 assumption will ensure greater protection of Florida's water resources, reduce duplication of effort and overall expenditures by state and federal authorities, and better align the Section 404 program with other programs for which Florida already has primary responsibility. Approval of Florida's application would also demonstrate a workable pathway for states interested in administering their own Section 404 programs while also providing valuable flexibility for EPA and individual states to develop programs that match state-specific needs. Thank you very much.

Jan Connery: Thank you, Mr. Wolfe.

Okay. Thank you. Appreciate your staying within the time limit. All right. So we will move to our next speaker. That's Christina, and apologies if I mispronounce your name, but Reichert. Christina, would you like to state your name and affiliation for us and then begin your comment?

Christina Reichert: Hello. My name is Christina Reichert, and I'm providing testimony on behalf of Earthjustice. The Department of Environmental Protection's incomplete and inadequate application to take over the Clean Water Act 404 program must be rejected. Florida's wetlands are vital for the safety and wellbeing of Floridians, with their role in keeping our drinking water clean, controlling floods, and creating a buffer against hurricanes. Wetlands also provide crucial habitat for the incredible biodiversity in the state. Protecting wetlands serves national interests and resiliency, clean water, and biodiversity. The department's track record for protecting the environment in Florida has proven that it should not assume this program.

First, we request that the EPA reverse its September 2020 determination that the department's application is complete because it has major gaps that include meaningful public comment. The public does not currently have the information necessary to meaningfully comment on the state's proposal, and EPA does not have the information it needs to ensure that the state's program will satisfy the Section 404(b)(1) Guidelines. At the state level, the department left substantial questions unanswered, and the public was unable to fully weigh in on the department's plans. The department promised to answer those questions when it submitted its application to EPA, but they remain unanswered. First, the department's application fails to identify the waters that Florida's program would cover, which is critical information for the public to know so they can assess how their interests will be affected. Second, the department has not explained how the state's listed species will be protected and instead points to an anticipated programmatic biological opinion that was not included in the state's application package and is not available to the public. In fact, this process is still being completed. These significant gaps will only cause confusion and create a risk of legal liability. The EPA must reject the department's attempt to speed through this process with a partial application when assumption implicates the future protection of vital state wetlands.

Second, we ask the EPA to reject the department's application to assume the 404 program because the department is simply unable to implement, operate, and enforce the state 404 program without additional funding and staffing. The department has failed also to show that taking over the 404 program will not jeopardize the survival and recovery of protected species in the state. And federal review and protections are essential to safeguarding Florida's critically important wetlands, drinking water, and biodiversity. First, the department lacks the resources, staff, and funding to implement, operate, and enforce the state 404 program, especially given the economic effects of COVID-19. The department has proven ill equipped to adequately protect the environment and cultural resources in Florida, given dramatic cuts to staffing, reductions in expertise, and inadequate enforcement of existing environmental mandates. Despite its inability to implement and enforce its current programs, the department claims it needs no

additional resources to run a state Section 404 program. This position is unrealistic and flies in the face of other states that spent millions of dollars to create and implement their 404 programs.

Second, Florida's unprecedented approach to listed species must be rejected. The department has proposed to engage in a one-time programmatic consultation that does little more than identify procedures for overburdened and inexperienced state employees to follow when processing permits. Although programmatic consultation can provide a framework for future proposed actions, the truncated consultation in Florida's proposal is in contravention to the ESA's mandate, implementing regulations, and court order holdings. Finally, Floridians cannot afford to lose the protections of federal laws that are triggered when federal agencies operate a 404 program. Federal laws are essential to protect Florida's vital wetlands from local political pressure and special interests, particularly given the fast population growth and development in the state. Federal operation of the 404 program triggers a myriad of other federal protections, including the Endangered Species Act that protects the rarest and most at-risk wildlife in our state, the Magnuson-Stevens Act that protects the essential fish habitat in our world-class fisheries, the National Environmental Policy Act that ensures the public has a voice in government decision-making, and the National Historic Preservation Act that protects our history and cultural resources. The State of Florida has no substitute for these federal laws and protections. Moreover, Florida does not provide the same access to courts as is available under federal law. The EPA must reject this request.

Thank you.

Jeaneanne Gettle: Thank you, Ms. Reichert.

Jan Connery: Okay. With no questions of clarification, we will move to the next set of speakers, and that is speaker group two. Our first speaker here is Lindsay Dubin. Lindsay, please begin by saying your name and affiliation.

Lindsay Dubin: Hi. My name is Lindsay Dubin, and I'm a staff attorney at Defenders of Wildlife. Thank you so much for the opportunity to speak today. While we are opposed overall to the State of Florida's assumption of the Clean Water Act 404 permitting program, we're today asking the EPA to suspend permit review and provide members of the public with an opportunity to comment on Florida's completed application. And in order for the application to be completed, at a minimum, it must include the biological opinion and the incidental take statement resulting from EPA's and the Fish and Wildlife Service's consultation on Florida's assumption request. Now, we have serious concerns about the impact that Florida's assumption of the Section 404 permitting program will have on wildlife, such as the iconic Florida panther, Florida manatees, loggerhead sea turtles, the Saint Andrew beach mouse, and piping plovers. And their predicaments are made all the more dire by impacts we've started to see involving climate change. We question the state's ability to ensure the safety of these and dozens of other species that are on the brink of extinction, where it is in control of this program.

Now, state environmental agencies already are stretched quite thin. Budgets have shifted in light of the pandemic. Environmental enforcement has plummeted when compared to 10 years ago, and the state has made no commitments to adding staff or financial resources to its program administration. Now the public is being asked to take a leap of faith that the state can handle this important responsibility under Section 404. However, we've seen no demonstration that this is the case. Now, this is because the Clean Water Act and its regulations provide that federal agencies and, in turn, any state that assumes 404 permitting control can guarantee before issuing a permit that a project won't jeopardize the future existence of a listed species, nor will it adversely modify critical habitat. And members of the public have a right to comment on whether or not, for this program, we'll be able to achieve that same end. However, it's our understanding that the State of Florida will use a programmatic biological opinion and a one-size-fits-all incidental take statement on its request to assume control of the 404 program to develop these guardrails. So the application that was submitted by the State of Florida was incomplete because it didn't fully address its responsibility to ensure of its no-jeopardy mandate. And so as members of the public, we therefore have not been able to see what this program will look like and what its impacts will be on endangered species.

A little bit less than a month ago, I sent an email to the agency requesting information on this process, and I was told that consultation was still underway, so no ITS nor a buyout had been completed. I had asked for the biological evaluation, which is a precursor to formal consultation, and I was told that I would need to submit a Freedom of Information Act to receive that documentation. It is unclear to me whether or not consultation has been completed,

but either way, in order for members of the public to be able to assess what the impacts that this program will have on endangered species and whether or not Florida will be able to achieve the no-jeopardy mandate in the Clean Water Act regulations, members of the public must be provided with information resulting from this consultation process because the application that we've been provided is simply incomplete. And because of that, we are now requesting that EPA suspend consideration of this assumption package until the application has been completed and until the public has been given a new window to comment of at least 45 days on the completed application, which must include the biological opinion and the ITS. Thank you so much for your time and consideration.

Jeaneanne Gettle: Thank you, Ms. Dubin. We have no follow-up questions.

Jan Connery: Great. Thank you, Lindsay. Next speaker, and that is Kelly Cox. Please go ahead, Kelly.

Kelly Cox: Thank you and thank you for the opportunity to speak. My name is Kelly Cox. I'm the general counsel for Miami Waterkeeper. Today I'm providing testimony on behalf of Miami Waterkeeper and Waterkeepers Florida. Miami Waterkeeper is a Miami-based nonprofit organization that seeks to defend and protect South Florida's watershed. We operate in Miami-Dade and Broward counties, and we are members of the Waterkeeper Alliance. Waterkeepers Florida represents more than 45,000 square miles of watershed in the State of Florida. Miami Waterkeeper and Waterkeepers Florida are both opposed to the State of Florida's request to assume Clean Water Act Section 404 authority from the Army Corps. And that's because Florida's waterways are uniquely connected and are critical to our public health, our economy, and our environment. The State of Florida relies on a clean water economy. Everglades National Park alone generates more than $100 million annually in tourism revenue, and our outdoor recreation industry generates $58.6 billion annually. Our state's widely recognized as the sport fishing capital of the world, and our waterways support billions of dollars in commerce each year and create tens of thousands of jobs for Floridians.

Our state has particularly fragile and critical areas that are regulated by Section 404 dredge and fill permits and which require the highest level of review and scrutiny. Currently, federal Section 404 permits and state ERP permits overlap in that both must be obtained for impacts above regulatory thresholds in federal waters. The additional oversight provided by the federal government is critical to adequately protecting our water resources. What's more, this delegation to FDEP would add additional regulatory burden to the department, which is already under-resourced for its current responsibilities. For example, FDEP is woefully behind schedule on total maximum daily load development and is regularly behind enforcement actions related to the National Pollutant Discharge Elimination System Permit Program. Miami Waterkeeper and waterkeeper organizations across the state have actually had to initiate independent and NPDES permit compliance review to attempt to bridge this gap in regulatory enforcement, a duty that surely should not be tasked to a nonprofit organization.

That said, FDEP is not well positioned to assume the additional responsibilities and permanent demands associated with this program. Additional responsibilities will divert resources away from these critical pre-existing duties, and the department lacks the resources, staff, and funding to implement, operate, and enforce the 404 program. Our state is experiencing an economic downturn due to COVID-19, and the department has felt these effects. Budgets have been cut and staff support has been reduced. And yet, FDEP continues with this application that would cost taxpayers millions of dollars to just get it off the ground. FDEP should focus instead on their existing obligations, such as enforcement and mitigation rather than seeking additional responsibilities that we already know they will not be able to adequately oversee. The department's claims that it can fold a 404 program into its existing program should be rejected. It's not feasible and it's not tenable for Florida's water resources.

Additionally, there has been substantial public opposition to the state's proposed assumption of Section 404 authority. FDEP has moved forward with this application during a global pandemic during which families are struggling to put food on the table and care for their loved ones. Despite this opposition and these very clear limits on public participation, FDEP has continued to move forward with this application, and that's deeply inappropriate, it's not inclusive, and it doesn't reflect the public's position on this matter. So on behalf of Miami Waterkeeper and Waterkeepers Florida, our hundreds of members and thousands of acres of watersheds, I urge the EPA to reject FDEP's 404 assumption application package. This assumption is not in the best interests of Floridians or Florida water resources. Thank you.

Jeaneanne Gettle: Thank you, Ms. Cox. We have no clarifying questions.

Jan Connery: Thanks, Jeaneanne. In that case, we'll move to our next speaker, and that is Amber Crooks. Amber, please begin by stating your name and affiliation.

Amber Crooks: Yes. Hi. You can hear me okay?

Jan Connery: Yes. Just fine, Amber. Please go ahead.

Okay. Great. My name is Amber Crooks. Good morning. I'm here today on behalf of the Conservancy of Southwest Florida and over 7,000 supporting families. The conservancy was founded over 50 years ago to protect Rookery Bay and the Ten Thousand Islands from a road to nowhere. To this day, we continue to comment at all three levels of government, local, state, and federal, three levels that we believe should remain to protect our wetlands from overdevelopment and drainage. We ask that you deny Florida's request to assume the 404 program, as we do not believe the program meets the requirements, the state does not have the budgetary resources to take it on, and the implications to the National Environmental Policy Act and the Endangered Species Act are far too great to overcome. Throughout the process, Florida has stated that they do not intend to charge applicant fees for this program and that they can take on the awesome burden of the Clean Water Act Section 404 program without additional staffing or administrative funding. However, the state and federal permitting programs are distinctive, not duplicative, as the state program defines and assesses cumulative impacts and secondary impacts in a different way than the Clean Water Act.

Further, FDEP staff will have a large learning curve of implementing 404(b)(1) guidelines and coordinating endangered species cases of which they are not currently knowledgeable. FDEP will be relying on a state wildlife agency, the Florida Fish and Wildlife Conservation Commission, to perform vital functions in their effort to attempt compliance with the ESA. However, FWC’s financial commitments and expected workloads are not a part of this application, yet the MOU, which as we know, the Federal Service hasn't yet signed, states that FWC will be relied on to analyze effects and minimization measures relative to Florida's 130-plus federally listed species although trying to also uphold their own mandates for state species. The State of Florida is in a fiscal freefall. Even before the current health crisis, the state was not providing assurances of sufficient resources. Now we see the state has an estimated $2.7 billion shortfall, and I recently heard it may actually be up to about $5 billion for the next fiscal year, which will of course impact FDEP and FWC's ability to take on the 404 program.

Secondly, we are extremely concerned about the impact of assumption on federal protections. Today I'll focus with my limited time on NEPA. The language in FDEP's program does not compare to the benefit of having NEPA as a tool to protect our wetlands. FDEP's program does not include initiating environmental impact statements when a project poses significant impact to the environment. FDEP has simultaneously claimed that the elimination of NEPA would be a cost savings to the regulated community while also stating that the 404(b)(1) Guidelines are equally protective. But both cannot be true. We have seen firsthand the power of NEPA to help protect wetlands. In 2010, the Army Corps announced two proposed EISs down here in Southwest Florida that they deemed necessary to protect drinking water supplies and conservation lands. This prompted the withdrawal of large mining projects, totaling over 13,000 acres in one EIS study area. In the other EIS study area, the effort resulted in a reduction of 500 acres of wetland impacts to 60 acres of wetland impacts, all while FDEP, on the other hand, had permitted all of these projects in just a three-year period, allowing 100-- or excuse me, 1,000 acres of impacts in those wetlands. The Army Corps' use of NEPA is the major reason that these projects are not already built, which would have caused irreversible damage in the heart of the Western Everglades.

And finally, although I could spend some time going into detail about how unsuited the FDEP permitting system is for public noticing purposes, I've got limited time, so I want to conclude our comments by calling into question the validity of the list of retained waters that were included in Florida's submittal. The conservancy has provided a list of waters that should be reviewed for inclusion, and the Army Corps itself had a much longer list, 17 pages versus 16 pages of waters it had actually released for public commenting that also appear to contain waters that should be reviewed for retention. As you know, wetlands help cleanse water, can store up to a million gallons of water per acre during times of flood, and as Naples felt during Hurricane Irma, it helps protect our communities from storms. So we

need every tool in the arsenal to protect our remaining wetlands, both as it's related to our quality of life but also to our economy. We respectfully ask that you deny Florida's request to assume the 404 program. Thank you so much.

Jeaneanne Gettle: Thank you, Ms. Crooks. We have no clarifying question.

Jan Connery: Great. Thanks. So our next speaker, Brian, isn't here yet, but we are on his schedule, so he may join us, and we'll circle back to him. So what we're going to do is take Preston, who is here, as our next speaker. I also see that two folks have raised their virtual hands, Christopher and Michelle. So because we're ahead of schedule, after Preston, Christopher, heads up. I'm going to be calling on you and then Michelle. And both of you will be commenting in exactly the same way that you've been observing everyone else, stating your name and affiliation, and then up to five minutes for a comment. So right now we'll go to Preston. Preston, please begin by saying your name and affiliation.

One moment, Preston.

Meredith Outterson: Just unmuting you. One second. There you go. Please go ahead, Preston.

Jan Connery: Preston, we can't hear you. Are you there?

Meredith Outterson: Preston, you're unmuted on our end, but please be sure that your computer or phone is unmuted on your end.

[silence]

Jan Connery: Okay. Well, I think what we may need to do is also circle back to Preston. So Meredith, perhaps you can work with him and see if we can get his audio going. So let's go ahead with Christopher Emmanuel. Meredith, can you unmute Christopher, please?

Meredith Outterson: Yes. Christopher, you've been unmuted.

Christopher Emmanuel: Thank you very much. My name is Christopher Emmanuel. I'm a policy director at the Florida Chamber of Commerce, the state's largest business association. The Florida Chamber of Commerce [crosstalk]--

Jan Connery: Mr. Emmanuel, could you spell your last name for me, please?

Christopher Emmanuel: Forgive me. It's Emmanuel. That's Echo, Mike, Mike, Alfa, November, Uniform, Echo, Lima.

Jan Connery: Thank you very much. I appreciate that.

Christopher Emmanuel: The Florida Chamber of Commerce appreciates the EPA and the State of Florida's efforts to transition the 404 wetland permitting authority to the state, and we fully support the EPA's approval of Florida's formal request to assume this program. The significance of the EPA and the State of Florida's progress towards establishing a state Section 404 permitting program cannot be overstated. You and your talented team at the EPA should be commended for overcoming the factors that have stymied other efforts for the past 40 years for this important assumption. And the EPA and the state are on the precipice of a major victory for cooperative federalism. The state's proposed program will boost the protection of Florida's wetlands by having some of the same statewide team of experts who already administer Florida's statewide wetlands programs also administer this similar 404 program. This streamlined approach is good for Florida's environment, supported by Florida businesses, and passed the Florida legislature with bipartisan and near unanimous support. The Florida Department of Environmental Protection has developed a comprehensive permitting program that carefully and completely protects Florida's natural resources in the same way that the EPA is a well-funded, well-structured, and well-thought-out system. This robust program easily meets the Clean Water Act's assumption criteria under Section 404, and accordingly, it should be approved. On behalf of Florida's businesses and residents, the Florida Chamber of Commerce appreciates your considerations and respectfully asks for you to support the FDEP's request to assume this program. Thank you.

Jeaneanne Gettle: Thank you, Mr. Emmanuel. We have no follow-up questions. I would just comment that if you weren't on our original schedule and you are going to comment, I would appreciate if you would spell your first and last name so that we have it correct in the record. Thank you.

Jan Connery: Okay. Great. Well, we are going to move on to the second person who has raised their virtual hand to let us know that they would like to comment. And if anyone has joined us since my opening remarks and explanation of the process, we do anticipate having and already have a little additional time during this hearing. So if you are someone who did not already register to comment, then you are able to raise your virtual hand to let us know that you'd like us, if we can, to fit in your comment as we have time during this hearing. So you're welcome to do that. The next person who's taken advantage of that opportunity is Michelle Mackey. And Michelle, per Jeaneanne's request right now, please start by not only stating your name and affiliation, but also spelling your name as well, and then proceed to your comment. You'll have five minutes.

Michelle Mackey: Hi there. Thanks for allowing me to speak. My name is Michelle Mackey. That's M-I-C-H-E-L-L-E M-A-C-K-E-Y. And I am just representing myself as a member of the public. I don't have as much a comment as I do questions because I'm still kind of developing an understanding of how Florida's control will affect regional areas. So I'm curious if anyone can break down how Florida's control will affect smaller scale neighborhoods that are closest to the wetlands, like Naples, for example. And I'm curious if anyone can provide examples of ways in which Florida has been deficient in protecting cultural resources. That was mentioned before. So yeah, I just really had questions.

Jeaneanne Gettle: Right. So Ms. Mackey, this is a public hearing, and we are not in-- we're not in a position to really provide explanations and responses. I encourage you to go to the Federal Register to read about the assumption process and also to EPA's website, where we talk about the assumption process. What I can tell you is that wetlands permits go down to the local level, and so they do impact where wetlands are present, and that there are a number of nuances to that that you should look at the Federal Register and look at the application submitted by the State of Florida. With regard to cultural resources, I would refer you back to the State of Florida and to their State Historic Preservation Office for that question.

Michelle Mackey: Great. Thank you so much.

Jan Connery: Okay. Thank you. So yeah. So we have a little additional time as well, and we are still ahead of schedule. I see that more folks have raised their virtual hand, so we will go to the next. And the next person who's raised their hand is John Goolsby. Meredith, would you please unmute John's line?

Meredith Outterson: Yes. John, you're unmuted now, so please, you can go ahead and unmute on your side and provide your comment to EPA.

Jan Connery: And please, John, start by stating and spelling your name and let us know your affiliation, and then you'll have five minutes for your comment. Okay. We're not able to hear John. Are you muted at your end, John? Okay. Well, we're not--

John Goolsby: I'm sorry. Let me try that.

Jan Connery: Okay. Now we can hear you just fine.

John Goolsby: It's a different unmuting button. Yeah. This is John Goolsby. It's G-O-O-L-S-B-Y. And I am a environmental consultant in Florida, and I've been doing so for 40-plus years and was a former water management district regulator. I support the assumption request, and the DEP and water management districts appear to be well equipped to assume the Corps permitting program. And I assume that Florida will sufficiently fund this effort as needed as the program would be implemented, and they would understand what the associated costs would be. Florida already protects its waters and wetlands and can easily assume the Corps program without additional adverse effects to the wetlands. We do not need the additional layer of bureaucracy and permanent costs that are now evident. Having state control will likely reduce the review timeframes significantly and benefit Florida businesses and agricultural entities. And thank you very much.

Jeaneanne Gettle: Thank you, Mr. Goolsby. We have no clarifying questions.

Jan Connery: Okay. I just want to circle back and see if Preston may have solved his issues with-- Preston, are you there? If you're muted at your end, please unmute yourself. Okay. All right. Well--

Yeah. And for purposes of people on the phone, do you think that we could have Meredith explain where the buttons are to unmute and to make sure that people are aware of the way they should unmute their phones, just as a review?

Meredith Outterson: Sure.

Jan Connery: Go ahead.

[crosstalk].

Meredith Outterson: Again, so if you're registered to speak or we're calling on you, I will unmute you on our end of the webinar. But you may also be muted on your end if your computer is muted as a whole. So on your computer itself, there's a mute and unmute button on your keyboard. It's usually in the upper right-hand corner of your keyboard. So you could try there. If we can't hear you as you're speaking, you may be fully muted on your end. And if you're on the phone, there are buttons you press to unmute, which I believe is #6. Oh, it looks like we might have Preston now. Preston, go ahead.

Jan Connery: We're still not--

Meredith Outterson: Preston, you're showing as green audio now, but we're still not hearing you. Are you speaking? Could you speak up into the microphone?

Maybe you need to increase the volume or something.

So Preston, I'll send you a chat to try to help you resolve this issue. We do want to take your comment.

Jan Connery: Okay. All right. Well, again, we are still ahead of schedule, so we do have another person who's raised their virtual hand. That is Ed Thomas. So Meredith, if you would unmute Ed's line, please. And Ed, you're going to start by stating and spelling your name and also providing your affiliation, and then you'll have up to five minutes. Please go ahead.

Ed Thomas: Okay. Can you hear me?

Jan Connery: Yeah.

We can hear you just fine.

Ed Thomas: Can you hear me?

Jan Connery: Yep.

Ed Thomas: Okay. Awesome. Awesome. Awesome. So Ed Thomas. It's E-D, and then Thomas, T-H-O-M-A-S. I'm with The Fertilizer Institute, and we represent the nation's manufacturers, retailers, and wholesalers of fertilizers. So I'd like to state for the record today that fertilizer is a key ingredient for growing food needed to feed the world's burgeoning population. The United States is among the world's largest producers of nitrogen-based fertilizer and phosphate. The fertilizer industry is responsible for more than 30,000 jobs and more than $8 billion in economic activity in the State of Florida alone. TFI and its members have a strong interest concerning regulatory and permitting requirements at the federal and state level [inaudible] in a way that cannot hinder economic growth while continuing to protect our environment. Clean Water Act Section 404 authorizes the Secretary of the Army acting through the Chief of Engineers to issue permits for discharge of dredge of fill material in navigable waters. Under Section 404(g) of the Clean Water Act, the state can seek to obtain authority to administer its own permit program or discharge of dredge or fill materials in navigable waters within its jurisdiction. If the EPA Administrator determines, pursuant to Section 404(h)(2)(A) of the Clean Water Act, that the state has the required authority to issue permits [inaudible] program, then the administrator is required to approve the state's assumption of the program.

TFI is in support of Florida's request and believes the EPA has provided for the record-- the record shows that the State of Florida has fully satisfied the statutory requirement to warrant transfer of the Section 404 dredge and fill permit program from the US Army Corps of Engineers to the state. The Florida DEP already operates the

Environmental Resources Permit Program to regulate the disposal of dredge or fill material in state waters pursuant to state law. As outlined in the memorandum of agreement between the Florida DEP and the EPA, the state's assumption of the Section 404 permit program will not undermine existing environmental protections or EPA oversight of the state's permit program. However, transferring the Section 404 permit program to the State of Florida will lead to greater efficiency and streamlined procedures where a single-state permit would be able to satisfy both federal and state requirements. This would provide permit applicants greater certainty, prevent conflicts, and avoid unnecessary delays and expenses that result from the current dual-permit program.

So although we do have some concerns with EPA's decision to change its longstanding interpretation of the applicability of the Section 7 Consultation Process to its decisions whether to approve a state assumption request, TFI appreciates that EPA engaged the public and undertook a notice and comment process before making change. TFI also notes the outcome of this program would provide liability protection against any [inaudible] that would result in the Section 404 permit issued by the state, although it remains to be seen whether a programmatic review would be able to [inaudible] impacts that may result in the state's assumption of the state 404 permit program. TFI supports EPA's goal of providing certainty and a regulated community through programmatic biological opinions and incidental take statements. For the reasons stated in this public comment period, we support Florida's request to assume the Clean Water Act Section 404 permit program. Thank you.

[crosstalk].

Jeaneanne Gettle: We have no clarifying questions.

Jan Connery: Okay. Great. Well, thanks very much, Ed. So we are a little bit ahead of schedule. So as mentioned, I think we're going to take a short break so that we realign and that the next group of speakers will start at 10:15. So what we're going to do is--

Meredith Outterson: So, Jan, I think we've resolved Preston's audio issues, so we're going to-- let's try him one more time.

Jan Connery: Oh, okay. We do have Preston. Well, that's terrific. Okay. Let's take Preston, and then we'll take a briefer break. Preston, please go ahead and state your name and affiliation and then comment. Well, still not hearing Preston, Meredith.

Meredith Outterson: Yeah. Not quite yet. Okay. Preston, we'll keep working.

Jan Connery: All righty. Okay. So we are going to take a break and resume at 10:15, which is in just about 10 minutes. So Meredith, can you please mute everyone until then? And we'll start promptly at 10:15 AM with speaker group number three.

And thanks to everyone who's participated so far.

[silence during the break]

Jan Connery: Hello, everyone. It's 10:15, so we will be resuming the public hearing. This is Jan Connery. I'm the facilitator for this hearing. For the benefit of anyone who is just joining us now, we are taking public commenters in the order that they signed up to comment when they registered. And we are also finding that we have opportunities here and there where we have a little extra time and are able to take additional speakers. In other words, anyone who didn't sign up to comment originally but finds today that they would like to comment period-- if you would like to do that, you can signal that to us by raising your virtual hand using the hand icon, and we'll make a note of that, and we will be happy to fit you in as time allows. So Meredith, are we good to go, good to proceed with everything?

Meredith Outterson: Yes.

Jan Connery: Okay. Excellent. Well, we are now starting speaker group three, and our first speaker here is Marjorie Laurent.

Do we have Mr. Robertson yet?

Meredith Outterson: I am still working with Mr. Robertson, so we will circle back to him once we think we have the audio issues solved.

Jan Connery: Thank you very much.

Okay. Yeah. So we will start with the first speaker in group three. That is Marjorie Laurent. Marjorie, please state your name and affiliation and then begin your comment. You will have five minutes.

Marjorie Laurent: Good morning. Can you hear me?

Jan Connery: Yes. We can hear you just fine.

Marjorie Laurent: All right. My name is Marjorie Laurent, and I am speaking to you today as a private citizen. I'm objecting to the Florida Department of Environmental Protection's proposal to assume jurisdiction under Section 404 of the Clean Water Act for wetland permitting in the waters of the United States. I know as a private citizen how the present FDEP permit process cuts out public scrutiny and allows latitude in self-reporting and omission of responses on permit applications. I have an example. A recently issued FDEP permit for a marina development in Boca Ciega Bay, where I live, is allowed inadequate information, omissions of answers to questions, and inadequate public notice in the process of approval. The rules the FDEP has in place for the type of permit needed for that marina project do not protect the interests of the public but favor the permit applicant. If FDEP is allowed to administer Section 404, federal oversight will be gone. That essential check to balance the interests of the public with the use of our waterways will be disastrous. The FDEP does not have the resources to undertake this massive permitting responsibility. The FDEP does not have the intention to allocate any of the new funding resources required or responsible permitting processes. The state merely wants to streamline a process specifically put in place to protect our valuable natural resources. This streamlining will significantly weaken the process.

It's important to note that the FDEP is a permitting agency, not an environmental protection agency. FDEP actively looks for ways to help those seeking permits to be successful in obtaining those permits because it's bias is inherent in the permit-issuing process. Complying with state and federal regulations becomes vitally important to the interests of the public and to balance that with the interests or the rights of appropriate equal use of Florida's waters. This makes the FDEP's plan to take over Section 404 a conflict of interest that would be a disservice to the public. Section 404 requires permits to be applied for the use and discharge of dredged and fill materials into the waters of the United States, including wetlands. Florida has particularly fragile and critical areas that are regulated by 404 and which require the highest level of review and scrutiny. Currently, federal Section 404 permits and FDEP environmental resource permits overlap, and they must be obtained in cases where the impacts rise above the regulatory thresholds in federal waters. This additional insight provided by the federal government and agency expertise in this area is critical to adequate protection of the Florida waterways.

If FDEP takes over this process, it will eliminate the original additional scrutiny of federal laws that apply to federal permit actions. For instance, under the FDEP's proposed rules, there are no specifications for process or procedures to assure compliance with Section 7 of the Endangered Species mandates, assuring the protection of the many listed species which live in Florida's water bodies to deleterious actions. Additionally, the requirements for federal agencies to prepare extensive environmental impact statements for a major federal action significantly affecting the quality of the human environment would no longer be required as there are no state laws requiring such a crucial review by the FDEP. I would strongly urge you to disapprove the FDEP's request to assume the administration of this Section 404 of the Clean Water Act.

[silence]

[crosstalk]. Jeaneanne Gettle: We have no clarifying questions.

Thank you.

Jan Connery: Great. Okay. So our next speaker, Christian Wagley, had let us know just prior to this hearing that they were not going to make a comment. So we're going to take the next three speakers, who I understand are all with us. So we'll go next to Lance Pierce. Lance, if you would please state your name and affiliation and then begin your comment. You will have five minutes. Meredith--

Meredith Outterson: Lance, you've been unmuted, so please go ahead and provide your comment.

Jan Connery: Or check if you are muted at your end, Lance, because we're still not able to hear you. Is there any way in which you have muted yourself and need to unmute?

Meredith Outterson: Still not hearing you, Lance. I can send you a chat message and try to help you resolve the issue.

Jan Connery: Okay. Great. So yeah, Meredith will work with you, Lance, to get that resolved. We will go then--

Meredith Outterson: We should have Preston on the line now. We think the issue is resolved there.

Jan Connery: Oh, fantastic. Okay. Let's go back to Preston then. And Preston was in an earlier group of speakers there. There is Preston. Okay. Preston, glad that we could get you connected. Please start by stating your name and affiliation and then proceed with your comment. You'll have five minutes.

Preston Robertson: Thank you. Preston Robertson, Florida Wildlife Federation. And can you hear me?

Jan Connery: Yes. We can hear you just fine now.

Preston Robertson: Hey. Thank you for your persistence. The Wildlife Federation is a statewide nonpartisan conservation organization. And I'd like to thank y'all first of all for-- at the beginning of this talk, you very correctly said that water is the economic and environmental lifeblood of this state, probably more so than any other state in the union. And the Federation really feels we need as much protection as we can over this vital resource. Now, we do know and have some problems with the application itself that EPA put-- sorry, the DEP put forth. It doesn't list the exact waters that are going to be impacted, nor does it fully explain how endangered species are going to be protected. We have more listed species in this state because we're subtropical, at least in the southern part than any other state in the continental US. And so it's critical that these questions be answered.

The other thing I wanted to bring forth is there have been folks talking about how regulation needs to be streamlined. To me that means an elimination of boxes that need to be checked to ensure that this resource is protected. We all need to keep in mind that this is a public resource. I mean, our potable water and our recharge areas are critical for life in this state, and not just life for us but for all of our wildlife that makes the state special. They proceeded with rulemaking even though there was strong opposition to this effort. And I fully agree with the previous speakers that have said we're in an economic downturn here because of the COVID pandemic, and it just seems somewhat odd that we are pursuing what more than likely would cost a tremendous amount of tax dollars to change a system that is presently working to provide the most protection to our water resources. I would also ask - and I'm sure you have - to just look at DEP's website about the impaired water bodies in this state. They have a very difficult job. We have 22 million people in this state, 1,000 people coming in every day, and every single one of those folks has an impact on our water quality and quantity. But the impaired water bodies list on the website is extensive, and they have been impaired for many, many years. So we simply don't believe that for this very critical issue, DEP has the resources staff-wise or is ensured of the financial resources to actually conduct this program to the benefit of the public and of this public resource. Thank you.

Jeaneanne Gettle: Thank you, Mr. Robertson. We have no clarifying questions. And I appreciate your patience in working through the audio issue. Thank you.

Jan Connery: Okay. So we will now go back to our speaker list. We are in speaker group three, and our next speaker is Lance. Now, Meredith, have you been able to-- oh, no. Okay. I see. Right. We're going to go to Eric first. Meredith is still working with Lance. So Eric, would you please begin by stating your name and affiliation? And then you will have five minutes for your comment. Meredith, is Eric unmuted?

Meredith Outterson: Yes. Yes. It looks like he--

Eric Hughes: Yes. Yes. Can you hear me?

Jan Connery: Yes.

Yes. We can hear you now very well.

Eric Hughes: Thank you very much. My name is Eric Hughes, and I am a private citizen. I have 37 years of career with the EPA and Wetlands Protection. My wife and I had lived in-- I'm getting feedback here, but I'm going to try to get through. We live in [inaudible], north of Jacksonville. We've lived here for 24 years. I want to thank EPA Region 4 for putting on these virtual public hearings. Okay. I began working for EPA in the wetlands program in 1979. That would have been the third year of Jimmy Carter's administration. I've worked wetlands regulatory all over the State of Florida for many, many years. For the first 17, working out of Atlanta, then coming down to Jacksonville, being co-located with the Jacksonville District Corps of Engineers as the EPA liaison to the Everglades project, working closely with the water management districts and DEP and continuing to work 404 regulatory. I'm proud to say that I am the recipient of three EPA superior performance awards, one silver medal and two bronze medals, also two Corps of Engineers command awards medals for my work with the other agencies. So I've been there, done that, folks. Also, in 1993, '94, when I was in Atlanta, we did issue and I helped administer a $300,000 grant to DEP for them to do a detailed evaluation of exactly what we're talking about today and wisely decided not to move forward with that. Okay. I got a lot to get through here.

The Corps of Engineers administers and has administer the program, and they have a district engineer and his staff, and they frankly are much more buffered from political influence than DEP and especially the water management districts. Okay. And I'm not happy to say this, but it is there reality. Okay. And DEP and especially the water management district protecting wetlands doesn't get it done effectively. The applicant is reviewed as the client for the staff people, not the natural environment. Okay. The natural environment routinely is getting the short end of the deal. In a recent September 17th news article in the Florida Phoenix, journalist Craig Pittman interviewed the DEP press secretary, who's claimed that DEP had somewhere in the vicinity of 400 staffers around the state to take this program over. That's a ludicrous statement. Now, this morning, we're hearing Justin Wolfe say it's 200. Is it 400? Is it 200? Is it 80? What is it? Okay.

One of the huge issues with this, if you understand the state wetland program, the ERP program—the Environmental Resource Permitting Program, like 85% of the permitting is done at the water management districts, not DEP. So the question here obviously is if this program is delegated by EPA down to DEP, is DEP going to come back in 18 months or 24 months on bended knee and say, "Oh, we need to delegate the program down to the water management districts"? The water management districts are extremely vulnerable to political influence by the governor's office and most especially by the legislature. Corps of Engineers, Department of Defense, much more buffered, okay, from this political influence. DEP doesn't deny permits; neither do to the water management districts. Look at the statistics. I'd be shocked if they denied more than 1% of permits. That's not a protection.

Okay. A couple other points. I'm running out of time. NEPA compliance. There is no DEP Florida equivalent of NEPA compliance. Endangered Species Act compliance. That's inadequate. I don't have time to talk about this whole idea of lateral retaining versus assumed water. So the states proposing 300 feet lateral. That's based on politics, not science. In 1994, New Jersey agreed to 1,000 feet, so there's no consistency there. And last but not least, and it pains me to say this, the EPA staffing levels in Atlanta are completely insufficient to provide adequate oversight of this delegated program. Thank you. I will be providing written comments.

Jeaneanne Gettle: Thank you, Mr. Hughes. We have no clarifying questions.

Jan Connery: Okay. Well, I'm happy to say that it looks like we are able to take Lance's comment now. So let's give that a shot. Lance, can you give us your name and affiliation and then start your comment?

Lance Pierce: Hey. Good morning. I'm Lance Pierce, the executive director of the Association of Florida Community Developers. We're a statewide association comprised of major community development companies in Florida. Our mission is to provide a leadership role in the creation of quality community development and the formulation of a responsible approach to the planning and development of Florida's future. Preserving Florida's environment and protecting our state natural resources has always been a priority for AFCD and our members who rely a great deal on a strong quality of life that will attract people to live in their mixed use planned community. Our association and our membership unequivocally support DEP's efforts to assume the 404 permitting program in Florida. The Florida Department of Environmental Protection's assumption of the 404 permitting program will provide an effective and efficient planning and policy framework for our members. And in turn, it will encourage and support economic development while retaining Florida's many natural assets for generations to come. Frequent and significant delays

in the processing of Section 404 permit applications at federal level add time and project costs to many of our members' development while doing nothing to protect our state's natural resources.

Because of the impact this process has to many of our members across the state, AFCD has been a willing and committed partner throughout the assumption process and continues to work closely with leaders at FDEP and EPA through the development of this program. We are committed to continue working with our state counterpart at DEP, which has decades of experience in processing environmental resource permits and the expertise to process wetlands permits faster while maintaining the same level of environmental protection. We respect and appreciate Secretary Valenstein's efforts to develop a Section 404 wetland permitting program at state level that it's good for both our environment and Florida's regulated community. On behalf of Florida's development community, AFCD appreciates your consideration of our request for assistance on this nationally significant cooperative federalism initiative. We look forward to supporting both EPA and FDEP as the state assumption of Section 404 permitting program advances toward completion. Thank you for your time today and thank you for the hearing.

Jeaneanne Gettle: Thank you, Mr. Pierce. We have no clarifying questions.

Thank you.

Jan Connery: We'll move now to our next speaker, and that is David Childs. David, please say your name and affiliation. Then you'll have five minutes.

David Childs: Hi. Thank you. Good morning. My name is David Childs. Good to see you this morning, Jeaneanne. On behalf of the Environmental Committee of the Florida Electric Power Coordinating Group, or FCG, as it's commonly known, I offer these comments in support of the State of Florida's request to administer the Clean Water Act Section 404 wetland program. By way of background, the FCG is comprised of member investor-owned electric utilities, rural electric cooperatives, and municipal utilities on environmental issues affecting the electric utility industry. So when you flip on a light switch in Florida or your air conditioning provides much-needed relief during our hot summer months down here, think of us. The FCG has a long history of working cooperatively with state and federal regulatory agencies to address initiatives that affect Florida's electric utility industry. This includes the federal NPDES permitting program, which Florida has been successfully administering for decades, as well as the TMDL program in which Florida state-level implementation serves as a model for the rest of the nation on how to restore impaired water bodies.

In addition to being engaged in those programs, the majority of the FCG member utilities hold and must periodically apply for permits issued by the Army Corps of Engineers under the federal Clean Water Act Section 404 program. The FCG strongly supports Florida and EPA's efforts in transitioning the entire 404 program to the state, which we view as a major component of EPA's cooperative federalism initiative. In our experience, at the federal level, high staff turnover, workloads, cumbersome processes, and even the occasional government shutdown lead to delays in processing Section 404 permit applications. Florida's environmental resource permits, which are the state-level equivalent of the federal Section 404 permit, are regularly received months or even years in advance of their federal counterparts. The two permits are often indistinguishable aside from the permit-issuing state.

Through its decades of experience of processing environmental resource permits, Florida developed the resources and expertise to process wetland permits faster while maintaining the same level of environmental protection. DEP is staffed with geologists, hydrologists, engineers, and environmental scientists who are experts in Florida's diverse and unique environmental features. Likewise, DEP's counterparts at the Florida Fish and Wildlife Conservation Commission have extensive understanding of Florida's endangered and threatened species and their habitats. These are dedicated state professionals, and they know Florida well, and they care about its natural resources. Under the leadership of DEP Secretary Valenstein, Florida has now developed a Section 404 wetland permitting program at the state level that carefully and comprehensively protects Florida's natural resources. This program easily meets the Clean Water Act Section 404 assumption criteria. The state's proposed program will boost the protection of Florida's wetlands by having the same statewide team of experts who already administer Florida's state-level wetlands program to also administer the similar federal program. This streamlined approach is good for Florida's environment, and it's good for Florida's regulated community, including the FCG electric utility members. We fully support the

approval of the state's request to assume the program and appreciate your time and consideration of our comments this morning. Thank you.

Jeaneanne Gettle: Thank you, Mr. Childs. We have no clarifying questions.

Jan Connery: Okay. Great. Well, we have reached the end of speaker group four, so we do have a little extra time. There's one person who's raised their hand, and they would like to comment today. That is Jen Lomberk. So Meredith, if you could unmute Jen. And Jen, because you were not preregistered, when you say your name also spell your name, provide your affiliation, and then you will have five minutes to comment.

Jen Lomberk: Good morning. Can you hear me?

Jan Connery: Very well.

Jen Lomberk: Fantastic. My name is Jen Lomberk. The last name is L-O-M-B-E-R-K. I am the Matanzas Riverkeeper. We are a nonprofit advocacy group that works in Saint Augustine, Florida, and I am also the vice chair of the Waterkeepers Florida regional entity, which was introduced earlier by my colleague down with Miami Waterkeeper. Thank you for the opportunity to comment this morning. I would like to note that Waterkeepers Florida and Matanzas Riverkeeper are both opposed to the Department of Environmental Protection's attempts to assume Clean Water Act Section 404 dredge and fill permitting authority from the Army Corps of Engineers for several reasons.

So to begin, Florida's proposed program contains significant gaps. By way of example, the department's assumption application really fails to adequately describe the waters that would be assumed if the application were to be granted, which is obviously critical information. The maps that were provided are low resolution and, frankly, impossible to read with any degree of specificity. The list of waters that was provided was similarly vague, with no specification about where these waterways are located. There are many waterways across the state that share the same name, so listing a waterway like Deep Creek, for example, with no description of location is pretty confusing and insufficient to notify the public and to inform the program. Furthermore, most of the swamps and wetlands located in my watershed in Saint Johns in Flagler County would also lose federal oversight if FDEP assumes 404 authority. The Saint Augustine and Saint Johns County coastal areas already experience regular sunny day flooding and particularly devastating flooding during storm events. Every single week, FDEP approves new environmental resource permits that allow the destruction of wetlands. So we're essentially experiencing a death by a thousand cuts situation here. Losing a few acres of wetlands every week adds up over the course of years, and it's our position that the current system isn't protective enough and this new structure would be even worse.

Additionally, the department lacks the resources, staff, and funding to appropriately implement, operate, and enforce a state 404 program. The other states that have assumed 404 authority have requested significant additional funding and staff to administer the program. And Florida has claimed that it would require no additional resources. As everyone's well aware, over the past decade, FDEP has experienced significant budget and staffing cuts that have left gaping holes in their current water regulatory programs. I would really like to push back against the previous comment touting the success of the state's TMDL and NPDES programs. But by way of example, with regard to the water quality standards program, there are sites across my watershed in Northeast Florida that are not meeting water quality standards, that have not been regularly tested in the past decade. There are water body segments in my watershed that have been impaired for years for which no TMDL or BMAP has been developed because that program is so far behind schedule. In fact, there are almost 30 impaired WBIDs within the watershed that I work in, and only one has a TMDL, and that one still doesn't even have a BMAP.

So at the statewide level, there are 4,209 water body segments that have been assessed by FDEP, and only 1,451 are designated as category two or attaining some designated use. So to simplify that, only roughly one-third of water body segments statewide are actually attaining water quality standards. Of the 1,724 unique impairments on the 2020 FDEP comprehensive verified list, 65% of those impairments have occurred in the past eight years. So this suggests a trend that water bodies are becoming impaired faster than the current TMDL program is able to improve the water quality standards-- the water quality in order to attain those standards. With respect to the NPDES program, an independent study about a decade ago illustrated that the states stormwater design standards are really falling short of meeting the pollution reduction goals outlined in the rule, which has contributed to the rampant nutrient pollution that we have right now. So I would respectfully request that FDEP utilize any additional

resource capacity to address the deficits in their current programs rather than attempting to take on this new program. The additional burden of the 404 program would further exacerbate the already stressed programs that they administer, and our wetlands really can't afford to suffer any more than they already are. Thank you so much for the opportunity to comment.

Jeaneanne Gettle: Thank you very much, Ms. Lomberk. We have no clarifying questions.

Jan Connery: Okay. Well, we are pretty much exactly on time right now with respect to the start of the next speaker group. But that said, so far we just have one person on. Let's move to the next speaker group. Oh, okay. So you can see that is Jeff Shapiro. So we are going to start with Jeff. We're going to keep an eye on whether we see the other four. But to the extent that we don't, when Jeff is done, we have a few folks here, three of the four in the final speaker group. So we will be taking those folks early if we don't see the others join us from speaker group four. Just a heads-up to all of you who are here from group five. So Jeffrey, please start by saying your name and affiliation, and then you'll have five minutes.

And Jeff-- okay.

Jeffrey Shapiro: Hello. Can you hear me?

Jan Connery: Yes. We can. Thank you.

Jeffrey Shapiro: Yes. My name is Jeffrey Shapiro, J-E-F-F-R-E-Y S-H-A-P-I-R-O, speaking as a private citizen. I simply want to state that I oppose the state's application permit process. I believe that the process will be purely administrative. The water management district was decimated during the previous eight years of the previous administration. So that's all I had to say. Thank you very much.

Jan Connery: Okay. Thank you.

Jeaneanne Gettle: Thank you, Mr. Shapiro. We have no clarifying questions.

Jan Connery: Okay. So at this point, we are going to move down to the folks who are here from the next speaker group, meanwhile keeping an eye out for anyone else and fold them in as they get here. So we are going down to-- Gabriel will be our next speaker. Gabriel, Meredith, will unmute you. Then please say your name and affiliation, and you'll have five minutes for your comment.

Meredith Outterson: And Gabriel, it looks like you're still muted on your end, so please try pressing the unmute button on your computer.

Gabriel Almedo: Here we go. Hello. My name is Gabriel Almedo. That's spelled A-L-M-E-D-O, Almedo. I am a born and raised Florida native, and I'm representing myself. As I just said, I was born and raised right here in Florida, and I've lived in this state throughout my entire life. And I've had the privilege to experience Florida's wetlands firsthand, and I've seen the many examples of ecological destruction, as recently with Biscayne Bay, where we've seen many fish dying, and we have lost around 90% of our seagrass beds. So when I heard that the EPA plans to give our state control of the Clean Water program, this has me concerned as a citizen of the State of Florida. Hold on. Give me a minute. Our wetlands not only provide-- okay. Giving our state control of critical wetlands is a very scary thought, and we could potentially lose these wetlands to development. That means we would lose land that provides critical habitat for many of our state's threatened and endangered species, like our state animal, the Florida panther. And we would also lose land that is used by the citizens for outdoor recreation. And as some speakers here mentioned, our ecotourism produced over billions and billions of dollars in revenue, and in my opinion, our state cannot handle any more infrastructure. We have built too much as it is. And as Floridians, it is our job to preserve many of Florida's natural beauty as we possibly can to ensure that future generations can enjoy. And I plan to take my future children to witness Florida's natural beauty in person and not show them a picture in a book showing what natural Florida used to look like. So I think the EPA should reject the state's request. Thank you.

Jeaneanne Gettle: Thank you, Mr. Almedo. We have no clarifying questions.

Jan Connery: Okay. We will move to our next speaker, and that is Marilyn Vazquez Almedo. Marilyn, please say your name and affiliation and then begin your comment.

Marilyn Almedo: Yes. Hi. My name is Marilyn Vazquez Almedo. I'm speaking on behalf of-- I'm a citizen and I'm just representing myself. Good morning. My name is Marylin Almedo, and I'm a native Floridian. I've lived in various parts of Florida, and I've seen the beauty and uniqueness that the state has to offer. And by the same token, I have seen the urban sprawl take over, the continual construction of more homes, shopping centers, and resorts, traffic congestion, and the making of more highways to address a problem that really has no solution. How can it when lobbyists and developers [inaudible]--

Jan Connery: I'm sorry, Marilyn. We are experiencing some audio issues.

Meredith Outterson: I think I've fixed it now, so you should be able to continue now, Marilyn.

Jan Connery: All right. We apologize. I did stop your time, so let's give it another go.

Marilyn Almedo: That's okay. Okay. The continual construction of more homes, shopping centers, and resorts, traffic congestion, and the making of more highways to address a problem that doesn't really provide a solution. And how can it when lobbyists and developers have gotten their way and continue to build? We're literally bursting at the seams. We've seen the effects of pollution on Biscayne Bay, with dying fish and seagrass beds gone, wildlife and human conflict as we continue to encroach on their habitat, and the effects of climate change and rising sea levels and the effect that this is already having on areas of our state. To think that the state now wants to take over a federal program to issue permits for development on sensitive wetlands is scary. With all the cuts that the state's Department of Environmental Protection has gone through, I do not believe that they are equipped to handle these requests. And with no specific wetlands identified or waterways, it makes me even more suspicious.

This shouldn't be about making money. Development will have a long-lasting effect on our environment and our citizens. We've lost respect for our environment. We're losing our natural history, and we will lose our right to enjoy the wonders of our state then that our tax dollars have maintained not only for our citizens to enjoy but to maintain what is left of the delicate balance that is our ecosystem here in Florida. As the saying goes, insanity is doing the same thing over and over again and expecting different results. While we keep doing the same things, not only the results are the same; they're getting worse. If these sensitive areas are made available for development, the consequences will be long lasting and permanent not only to our environment or wildlife but to us as well. I would like to be able to take my grandchild to see our native Florida, to appreciate what we have and respect it for what it is.

So my question is, when is enough enough? When we have developed everything that we can and see the consequences of this development? When we experience the strain or depletion of our natural resources and quality in life? Lobbyists and developers lining their pockets as well as those who have something to gain because let's not kid ourselves. It happens. The development of these lands will focus on the immediate monetary power and influential gains and not on long-term consequences that development on these lands will have. No respect for environment, wildlife, for the citizens of the state if these lands are developed. So I ask again. When is enough enough? I guess when we have nothing left to build on and created a concrete jungle, when some have decided to eliminate everything that is Florida for their personal gain with no consideration for the consequences on the environment, our wildlife, and our citizens. So I strongly urge that the EPA reject the state's request. Thank you.

Jeaneanne Gettle: Thank you, Ms. Almedo. We have no clarifying questions.

Jan Connery: Good. We will move to our next speaker, and that is Karen Garren. Karen, please begin by saying your name and affiliation, and you'll have five minutes here.

Karen Garren: Good morning, all. My name is Karen Garren. I'm a resident of Gainesville, Alachua County, Florida, home of the University of Florida. I've been a resident of Florida since 1978. My email address is literally "iloveflorida." I'm a wildlife biologist and was formerly an adjunct professor at Santa Fe Community College. My husband, Robert, is a wetland biologist, a superb botanist, and an environmental consultant. He assists property owners in compliance with wetland regulation and protection. He's the one familiar with codes and ordinances, so I won't be citing any. Since the mid-1970s, wetland economic values of filter purification of water, sponge absorption of floodwaters, and recharge of aquifers has been recognized and protected to some extent through regulation of permitted disturbances and development impacts. Florida had established water management districts to review

permitting of water use. The Department of Natural Resources was absorbed into the Department of Environmental Protection.

For the last couple of decades, wetland protection in Florida has been eroded by governing administrations. The permitting process has been, quote, "fast-tracked," unquote, accelerating deadlines for review and decisions. Acreage sites of wetlands to be considered for permitting has been increased. Water management districts staff and scientists have been dismissed or had their opinions stifled. District governing boards have been stacked with development interests. Although, quote, "government in the sunshine," unquote, requires transparency and public comment period, it is all for show. Qualified technical advisers had testimony disqualified. Constitutional amendments protecting natural resources that have been passed by ballot elections have been stalled, subverted, and ignored. Legislation has been passed requiring public opinion statements to come from, quote, "stakeholders," unquote, criteria established by the state. While disturbance of designated wetland soils is regulated, every year, tens of thousands of cypress trees are chipped to be sold as mulch. Florida governing administrations have made a deal with the devil, and the devil is money. One only has to look at Florida's coastal development to recognize the lack of protection for our natural processes and property integrity.

Florida's unique springs ecosystems are nutrient polluted and disappearing due to poorly regulated upland watershed activities, poorly regulated aquifer withdrawal, and outright sale to water bottling companies. Florida's Everglades ecosystems have been decimated by agriculture chewing up lands to the edges of the national park. Little to no consideration is given to connectivity of wildlife habitat, protection of endangered plants and ecosystems with the threats of climate change and sea level rise. Florida's agencies are not qualified or motivated to assume responsibilities for federally regulated natural resources. There is currently insufficient staff to review permitting requests. Compliance of permitting conditions remains poorly monitored and enforced. Wetland buffers are negatively impacted. To assume permitting, budgeting compromises will have to be made in funding education and the health system. The continuation of rampant development is unsustainable. At some point, a compromised economic paradigm must be initiated. This is part of a push to eliminate federal oversight and establish premise of the state's authority, but some issues don't stop at state boundaries. I urge the EPA to deny Florida's request to assume regulation of wetland impacts. And if any Florida elected officials are listening, close the Buckman Canal and remove the dam from the Ocklawaha River. Thank you very much for your time.

Jeaneanne Gettle: Thank you, Ms. Garren. We have no follow-up questions.

Jan Connery: Okay. Well, we are significantly ahead of schedule as four speakers from the group four didn't show up. So we have taken the folks who are present right now. And I do want to remind everyone that because we have extra time, we'd be very happy to add commenters. If you are someone who's joined us recently and hasn't yet heard, you can signal to us that you'd like to make a comment by raising your virtual hand and you'd like to do that, please do that now. This is one of those opportunities where we certainly could take your comment. Any commentaries that we add today during the hearing will follow the same process that you've been observing with other commenters. So, Meredith, I know we had someone who had raised their hand but then lowered it again. Have you been able to check and confirm whether that individual would like to speak?

Meredith Outterson: I have not been able to confirm yet. Let's see.

Jan Connery: Okay. But a hand is raised?

Meredith Outterson: Yes. So Raymond Schnell, let's go to you next.

Jan Connery: Okay. Yes. Raymond Schnell did raise his hand. We've confirmed he'd like to speak. So Raymond, because you are being added today, would you please start by stating and then spelling your name for the record? And then you'll have up to five minutes for your comment.

Raymond Schnell: Yes. Hello. Can you hear me?

Jan Connery: Yes. We can now. Please go ahead.

Raymond Schnell: Hey. My name is Raymond Schnell, S-C-H-N-E-L-L. And I'm speaking to you as a private citizen. I've lived in Miami-Dade County for over 30 years. I've been an active water sportsman for that time. I've seen the quality

of the water in Biscayne Bay and other areas in the Everglades change significantly over that time. I object strongly to the State of Florida taking over this project or the permitting on this. I think if that happens, it will just be an invitation for developers to do whatever they would like to do. And that's all I have to say. Thank you.

Jan Connery: Okay. Thank you very much.

Jeaneanne Gettle: Thank you, Mr. Schnell.

Jan Connery: Meredith, I think a hand may have gotten raised. Can you check for me, please?

Meredith Outterson: Yes. So our next person who raised their hand to speak stand-by is Matthew Schwartz. So Matthew, I'll be unmuting you now.

Jan Connery: Yep. Great. We do have time for Matthew's comment. So yes, Matthew, please go ahead. State and then spell your name for the record, and then you'll have up to five minutes.

Matthew Schwartz: Okay. Thanks. My name is Matthew Schwartz, S-C-H-W-A-R-T-Z, and I'm representing the South Florida Wildlands Association in these comments. I don't have prepared comments because I actually just found out about this meeting very, very recently. And this morning, ironically, I was addressing the final task force meeting of the M-CORES project, and that's a great example, by the way, speaking of moving permitting authority from the federal government to the State of Florida. So let's look at that project as an example. So this is a project that never received any kind of needs analysis, any kind of environmental analysis. It was approved by the Florida state legislature, signed by Governor DeSantis, and then the Florida Department of Transportation assembled three task forces, one for each leg of the project, and that's the Southwest Florida Connector, the Central Florida Turnpike Extension to bring it to the Suncoast, and then another project to run the Suncoast Expressway all the way up to the Florida-Georgia border, about 320 miles of new highway through the entire western part of the state, through wetlands, over streams, rivers, all kinds of places where the Army Corps of Engineers would normally do wetlands permitting.

I'm a little bit amused in a way because when I see people saying, "Well, don't transfer authority to the state. Keep it with the federal government." I've been on the Army Corps' distribution email list for wetland permits that come in, and I can tell you-- I mean, I barely have time-- I don't have time to read them. I said barely. I don't have time to read them. They come in like rain. And I'm listening to some of the comments that some of the people made before I spoke. And it's true what they were saying. Florida has been transformed. In one of the task force meetings, somebody referred to it as Generica. It's not that agencies or developers are trying to kill the state. It's incidental to what they're doing. The destruction, the ecological destruction of wetlands, is incidental to their economic goals of development, and that's a major-- or if not the major industry in Florida is developing. And so I'm sidetracking, but the Army Corps-- I think the only thing the state and-- not the state so much as the developers who want this moved from the feds to the state is they don't like the length of time it takes for the feds to approve a permit. It's not that they don't approve permits. They approve everything.

In fact, I would-- I don't know if you know of any, but I know of barely any Army Corps of Engineers wetlands permits that get denied. They all got approved eventually. But they take time, and the developers don't like that because they have construction costs and equipment and planning, and they want to get their projects going. So they want it moved from the feds to the state to speed up that process. And that's pretty transparent, by the way. It's pretty transparent. The FWC who is asked to consult on a lot of these projects rarely has any comment. Or if they do, it's pretty simple, and they have no teeth anyway. I mean, even if they do make a comment on the state level, it's just advisory. The US Fish and Wildlife Service will usually be brought in on wetlands issues because there's almost always endangered species or threatened species, federally listed species that are being impacted by these wetland development projects. So that triggers consultation between the Army Corps of Engineers and the US Fish and Wildlife Service. The US Fish and Wildlife Service will then dutifully write a biological opinion, which unfortunately, also almost always okays the project. Sometimes they add some mitigation. They add some minimization. They add a little bit of avoidance here and there. But by and large, the projects go through.

So because I'm here talking to the EPA, and you have oversight over a lot of these issues, I guess this is an opportunity to say, well, first of all, don't transfer authority to the state. That's absolutely a no-brainer. We've got to

keep this within the federal government, within a process that at least gives the opportunity, the NEPA process that gives the opportunity for the public to weigh in with comprehensive comments about the impacts of a project before it goes through. So we want it to stay within the federal government, but you as EPA also have a role to play in ensuring that the quality of life in this state - human life, wildlife, the quality of our waters - is protected. So I see my time is running out. Like I said, I didn't have prepared comments, but I hope you take it to some consideration, some of the things I said today. Our state is in bad shape, and it's not getting better. It's deteriorating rapidly. I work mainly with the Florida panther. Nobody will ever get a Nobel Peace Prize for discovering what's causing panthers to go extinct or any of the dozens and dozens of wildlife species. So [crosstalk].

Thank you. Thank you.

Jan Connery: Thank you very much.

Jeaneanne Gettle: Thank you, Mr. Schwartz. We have no clarifying questions.

Jan Connery: Okay. Again, I want to remind everyone that we do have extra time, so if you would like to make a comment, you just need to use the hand symbol to raise your virtual hand to let us know that. Meredith, I don't think we have any additional hands raised right now. Can you confirm that for me, please?

Meredith Outterson: We have one person with their hand raised, Richelle McClain.

Jan Connery: Oh, Richelle McClain. Okay. Very good. Well--

[crosstalk].

Jan Connery: --we certainly have time to pick Richelle now. So Meredith will unmute you, Richelle. And please start by saying and spelling your name for the record, giving us your affiliation, and you will have five minutes for your comment. Okay. Is Richelle unmuted, Meredith?

Meredith Outterson: Yes. You are unmuted, but it looks like you're muted on your side, so if you want to hit the unmute button on your computer, that should-- there you go. Are you speaking? We can't hear you yet. Looks like Richelle is having audio problems. If you're using a headset, you could try unplugging the headset. If not, I can work with you in the chat to help you switch over to the phone call audio, which should help resolve the problem. [crosstalk]--

Jan Connery: Okay. Well, we're still not hearing anything, I guess, Meredith, so you'll need to work with her. And we did have four commenters from group four who we haven't seen yet. Meredith, I want to confirm we still aren't seeing them. Mark, Larry, Richard, and Robert.

Meredith Outterson: Correct. They're still not on the line.

Jan Connery: Okay. Well, then what I suggest we do is we'll take another break so that Meredith can work with the person who would like to speak to get the audio going. It is now 11:13, so let's come back at 11:20. It's going to be a very brief break. That's about eight minutes, so I'm going to put a slide up indicating we'll have a short break. It won't have the time on it, unfortunately, because we didn't realize we were going to break at this time, but we'll be resuming at 11:20 AM Eastern time, and then we will take anyone who has raised their hand. So again, if you'd like to make a comment and you haven't yet raised your hand, please do that. It looks like we're going to have time for that, and we'll take anyone who signed up. We'll take any of our registered speakers who were with us then. And so we'll talk to you again at 11:20 AM.

Jeaneanne Gettle: Oh, Jan, why don't we go ahead and wait till 11:25?

Jan Connery: 11:25? Okay. Right. All right. The break will be-- 11:25, so that would be 11-- I'm sorry. Yeah. 11 minutes break. So we will be back then.

Jeaneanne Gettle: Thank you.

[silence during the break]

Jan Connery: If you're just joining us, we are taking a break until 11:25 AM, and we will resume then.

[silence during the break]

Jan Connery: If you're just joining us, we are taking a short break. The public hearing will resume at 11:25 AM.

[silence during the break]

Jan Connery: Hello, everyone. It's 11:25 AM. So we will resume the public hearing for Florida's request to assume administration of the Clean Water Act Section 404 program. This is Jan Connery at ERG, a contractor to EPA, the facilitator for this hearing. It is 11:25 AM. The hearing will run for another 35 minutes. We have a few speakers who had signed up to comment, and we do not yet see them on the hearing. That means that we do have time to take comments from anyone who would like to make a comment and may not have registered to speak officially. You are welcome to signal that you'd like to make a comment by raising your virtual hand, the hand icon that you see on the dashboard. That way, we'll know you'd like to comment. We'll be taking first anyone who does join us, if they do, and has already registered to speak. But so far, again, not seeing anyone there. For the additional commenters, we'll be taking the folks who raised their hands. We don't see a lot of hands raised at this point, so that offers the opportunity for some of you who've spoken, if there's anything you would like to add to your comment, there may be time for that again, as time allows. Before we end at noon, you're welcome to raise your virtual hand for that purpose as well. But we do have a couple of folks lined out up now who we're going to take. So our first commenter-- and - I'm just going to scroll back so that shows that we are taking comments right now, although it obviously isn't the correct person speaking, but in case anyone joins us. So our next commenter, this is someone who has raised their virtual hand, would like to make a comment now. That's Richelle McClain. Richelle, you're going to be unmuted by Meredith. You should start by stating your name and affiliation, spelling your name for the record, and then begin your comment. And you'll have five minutes.

Richelle McClain: Okay. Thank you. Hello. My name is Richelle McClain. R-I-C-H-E-L-L-E, McClain, M-C-C-L-A-I-N. I am a Florida resident. So I'm representing myself as a citizen. And I'm in school again because of COVID, so I've been working on studying the Everglades. It's been my project as a writer, and I'm very [inaudible] speaking about it and writing about it and understanding it. But what I have come across some of my research is that the scientists and engineers are definitely the ones who know what they're talking about, and they have to convince the politicians and developers to do the right thing. But that said, the laws and the bills for the clean water, the EPA that does look over our environments I believe is very important, and it should stay with the EPA. The Clean Water Act, I guess, Section 404, which I'm pretty new to, is supposed to give control from the federal to the states. And I don't know who would control it at the state level. Maybe the Southwest Florida management or the Army Corps, I'm not sure. But, I mean, the Clean Water Act is the basic structure of regulating discharges into the waters of the United States and regulating quality standards for surface waters. And then that was back in the '40s, I believe, and in 1972 included the wetlands, so that I found in Florida Forever. And I've worked developers here for 20 years, and I do understand all the red tape that they have to go through. And I would like to see personally a lot of conservation land being acquired again by Florida Forever, even restructuring the land development and redistricting some of this land. And of course, restoring the Everglades is a big deal that I would like to see happen and continue happening. And so I would vote no to give the states total control. I think it's a concerted effort between federal and states developer. And so that's what I would like to say today. Thank you very much for your time.

Jeaneanne Gettle: Thank you, Ms. McClain. We have no follow-up questions. Thank you.

Okay. So we do have one other person so far who has raised their hand. That's Eric Hughes. So Eric, state and spell your name, provide your affiliation, and you'll have up to five minutes.

Eric Hughes: Okay. Can you hear me?

Jan Connery: Yes, we can.

Eric Hughes: Okay. Last name is Hughes, H-U-G-H-E-S. First name is Eric, E-R-I-C. Private citizen living in [inaudible], Florida, north of Jacksonville. Thank you for letting me speak additionally. I want to focus on a couple points. There is a difference between the state and the Corps of Engineers' implementation of the two different wetland programs. I

totally understand the comment from Mr. Schwartz in terms of the fact that, yes, in fact, the Corps of Engineers, with input from EPA and the Fish and Wildlife Service, actually doesn't deny very many permits. However, the Corps regulatory process is much more stringent and drives a much harder bargain and focuses much more on reducing wetland impacts of projects, minimization, avoidance. The state program, the ERP, is very good to private mitigation [inaudible]. So basically, there's not a lot of minimization or avoidance. If you're a developer, you've got resources, you get a consultant, they go out, they do a mitigation analysis, and you write a check. You're basically buying your permit.

The other major thing that people need to be aware of - and I think people like myself who've been around notice [inaudible] now - the Corps of Engineers is a military entity, and they in fact are much more buffered from the hardcore influence of the Florida legislature and the governor's office. And then the lobbyists are overrunning and have been overrunning Tallahassee forever. So you get a new district engineer every three years, and that's their command military entity the Corps of Engineers employees, their 404 staffers. Certainly, they've got pressure, but it's nothing compared to what's going on at the water management districts and to a lesser extent, DEP. Okay. Another point I'd like to touch on is the water management district governing boards. These are all political appointees. They totally come down and control the water management district employees. Nothing I want to say. I hold the career Florida DEP and water management staffers in very high regard. I would never say anything really negative about these people. They're very good people. Unfortunately, they're working for a very political management structure. Next comment. The retained versus the assumed waters. I know this is highly technical, and I don't really have time to talk about it, but the state is proposing a 300-foot lateral limit adjacent [inaudible] the navigable waters [inaudible]. ERP is totally arbitrary, and it's totally inconsistent with the last time this determination was made by the State of New Jersey in cooperation with the EPA and the Corps of Engineers, where they at least implemented 1,000 lateral feet. So think about the additional protection of those waters. I think that's really the main points I want to make. Thank you for this opportunity.

Jan Connery: Okay. Thank you.

Jeaneanne Gettle: Thank you, Mr. Hughes. We have no follow-up questions.

Jan Connery: Great. Thank you. We do have someone else who did raise their virtual hand. And again, a reminder, if anyone would like to comment, you're welcome to let us know by raising your virtual hand right now. We do have a few minutes before the end of this hearing at noon. Our next commenter is Bruce Ritchie. Please start by saying and spelling your name, letting us know your affiliation, and then you'll have five minutes.

Bruce Ritchie: I raised my hand by accident and took it back down. Thank you.

Jan Connery: Oh. Okay. Sorry. I didn't see it'd been taken back down. All righty. So I am not seeing any other hands raised right now. And Meredith, I believe you've been checking to see whether any of the folks who have signed up have joined us. Where do we stand with them?

Meredith Outterson: So none of our missing speakers have arrived, but we would love to take their comment if they do, so I will keep checking.

Jan Connery: Okay. Okay. I noticed that someone has asked - they weren't able to join until 15 minutes into the hearing - about a record of the hearing. There is going to be a transcript of the hearing. And, Jeaneanne, that's going to be publicly available, I believe, at some point. Is that correct?

Jeaneanne Gettle: Once we receive the transcript, then anyone who requests it through the Freedom of Information Act will be able to have a copy of the transcript.

Jan Connery: Okay. Okay. So Jeaneanne, we don't have anyone else right now.

Jeaneanne Gettle: So what we will do is we will go to-- we will still be here. We will remain and keep this hearing open until noon, Eastern time. And we will continue to monitor to see if anyone raises their hands and check back with an audio check about every five minutes. For the last five minutes of the hearing, we will open it back up and do some closing remarks. So if you are online and you decide you want to make a comment, you can still do so. You can

send us a chat. You can raise your hand, and we'll see that and come back on and take your comments. Does that work, Jan?

Jan Connery: Sure. And I think we will check again at 11:45, I think, to see if anyone raised their hand, and then at 11:50 and 11:55 we could even take one more person or possibly two if they speak briefly. So at five-minute intervals, on the five minutes, we'll check, and we will resume audio if we see hands raised. Okay.

Jeaneanne Gettle: And I will still be here. I'm just going to turn my camera off.

[silence]

Jan Connery: Hello, everyone. It is 11:45. Yes.

Jeaneanne Gettle: I just need to make one clarification before we go on. I wanted to let the participants know that with regard to the transcripts, we will also place those transcript in the public record. So it would be available through the public record as well. But it is also available through a request under the Freedom of Information Act. Thank you.

Jan Connery: All right. Thanks so much for clarifying that, Jeaneanne. So we are resuming the public hearing, as noted a few minutes ago. We have invited anyone who is joining us. If you'd like to comment, we have a little bit of extra time before we end at noon, but we'd love to fit you in if we could. You can signal that to us by raising your virtual hand. And that would include people who've already commented, if they would like to add to what they had said. You may raise your hand. So as time allows, we will take you. And we do have one person who's taken us up on that offer. So we'll go again to Eric Hughes. You will again have for up to five minutes. Eric, please remind us of your name and affiliation. I don't think you need to spell your name again for us. I think we're all set there. Meredith, is Eric's microphone unmuted?

Meredith Outterson: Yes. Now it should be. Here we go.

Eric Hughes: All right. Can you hear me?

Jan Connery: Yes. We can hear you just fine.

Eric Hughes: Yes. I'm a private citizen. I'm a retired EPA Region 4 wetlands employee, 37 years. I've retired in December of 2016.

Jan Connery: And your name?

Eric Hughes: Again, my last name is Hughes. First name is Eric. And I want to thank you for providing me this opportunity for additional comment, and I will be providing written comments and [inaudible]. This last topic pains me, but I think it's important that transparency is very important here. So EPA is supposed to provide meaningful oversight to any delegated 404 program. So what's the staffing level in EPA Region 4 in the wetlands program. Now, I've worked in that program for well over 30 years. Okay. I think the maximum number of people that we had reviewing the Corps of Engineers' public notices to the 404 permits maximum was four. I think we've always had one or maybe one and a half persons doing enforcement for the entire State of Florida. Now, they were basically focusing on the really bad cases that the Corps of Engineers referred to us. These people are working really hard. So the question, which is an uncomfortable question, especially in this format, how in the world is with that staffing level EPA going to do a serious job, a legitimate job, a meaningful job of overseeing the delegated program? What level of commitment is the EPA Region 4 Administrator going to provide anybody as to whether there's going to be a substantial increase in EPA staffing for the 404 program in Atlanta to actually provide meaningful oversight? I don’t feel good talking about this, but it's the truth. That's the level of staffing, and there's a huge difference between providing written comments to the Corps of Engineers employees on focused large 404 projects versus being responsible for overseeing an entire permit program by the State of Florida, which is probably going to be - I have no idea - 1,000, 1,500 permit decisions a year? We have to be transparent about this. Thank you for providing me this opportunity.

Jeaneanne Gettle: Thank you, Mr. Hughes. We don't have any follow-up questions. Thank you.

Jan Connery: Okay. Well, I see that Richelle McClain has raised her hand. So Richelle, we'd be happy to give you-- I'm sorry. Bruce Ritchie. I think Bruce Ritchie is next and then Richelle. Oh, Bruce.

Meredith Outterson: So Jan, I checked with Bruce. He says his hand keeps accidentally getting raised, but he doesn't want to comment.

Jan Connery: Oh. Okay. All right. Okay. So Richelle, we'd be happy to give you some more time. Again, please start with your name and affiliation. You don't need to spell it again for us. But then you'll have five minutes.

Richelle McClain: Hi. I'm sorry. I just wanted to say-- my name is Richelle McClain. And in light of Eric Hughes's statement there, which I had a feeling that that was like that-- but I just wanted to say I don't understand both of the laws enough to be able to vote yay or nay on this. But I did want to get my voice out there because I do love the Everglades so much. There is no place on earth like the Everglades. And I do want to be part of the restoration project. So with that said, I just wanted to-- I just wanted to say that just for the record. Thank you very much.

Jan Connery: And your affiliation again, Richelle, please?

Richelle McClain: I am a citizen, a Florida resident.

Jan Connery: Right. Okay. Thank you. Yep.

Jeaneanne Gettle: Thank you, Ms. McClain.

Jan Connery: Thank you.

Okay. So I'm not seeing other hands raised. And Meredith, we don't have any of the folks who haven't yet commented but had signed up, so were on the list. I don't believe we have any of those with us right now.

Meredith Outterson: Correct.

Jan Connery: But we'd go to them if we did. So, Jeaneanne, it's 11:51 right now. We have nine minutes remaining.

Jeaneanne Gettle: Right. We will keep the hearing open for the next nine minutes or eight minutes at this point in time. If anyone wants to make a comment, you're welcome to do so. I would remind you that in addition to this public hearing, we have another public hearing, October 27th, which is from 5:00 PM to 8:00 PM - we'll be using the same format - and that you can also submit written comments to us through November 2nd of 2020. And the location for submission of written comments is included in our Federal Register. We will have a transcript of this public hearing and of the next public hearing that will be available in the docket or through a FOIA request to our agency. And I will just remain on the line until noon. And if someone raises their hand between now and noon, we will take that comment.

Jan Connery: Yes. And I would encourage you to raise it as soon as you can because as we get closer to noon, there'll be less time to comment. And Jeaneanne will have some brief closing remarks just before noon. So we'll be keeping an eye out for raised hands and-- oh, now we have a hand raised. It's Amber Crooks. So Amber, I believe you haven't yet spoken. We'd be very happy to give you some time right now. We're going to start by having you say your name and affiliation and spell your name, please. And then you'll have five minutes to comment.

Amber Crooks: Yes. You can hear me okay?

Jan Connery: Perfectly. Thank you.

Amber Crooks: Yes. I did speak earlier. My name is Amber Crooks. The last name is spelled C-R-O-O-K-S. And I'm with the Conservancy of Southwest Florida. Given the opportunity to add a little bit more to our prior comments-- and we were trying to be mindful of the five-minute cutoff. But we did want to speak a little bit about Endangered Species Act. And we focused on NEPA earlier. But we also have concerns about how the ESA will be complied with. Well, we believe that EPA will need to undergo that plan Section 7 review on the overarching issue of assumption, which may actually be significant enough to warrant an EIS be done by the US Fish and Wildlife Service. We do believe that the one-time programmatic opinion is not an adequate way to meet the requirements of the ESA. As you all know, Florida has several times the amount of listed species than the other two states that currently have assumed the

program. Of course, Florida is being chewed up by development as the third most populous state in the union. A programmatic approach is not going to be able to accurately assess take or ensure no-jeopardy of our cherished wildlife. And that's what I have prepared to say today, and I know that in our formal comments that we will be further articulating many of these concerns, but given the opportunity here to add a little bit more to today's comments, I just wanted to verbalize this. Thank you so much for the extra opportunity to add to our comments.

Jeaneanne Gettle: Thank you, Ms. Crooks. We don't have any questions as a follow-up, but thank you.

Jan Connery: Okay. So right now, not seeing any additional hands. I'll just note we have five minutes left. So there are just a few minutes where we could take a somewhat briefer comment, if anyone would like to raise their hand. We're going to be on the line the next few minutes, but wrapping up about a minute before noon, so.

[silence]

Jeaneanne Gettle: Okay. Jan, if you're ready, I'll go ahead and make our closing statements, if that's--

Jan Connery: Yes. [crosstalk].

Jeaneanne Gettle: [crosstalk] Anyone else with their hand up?

Jan Connery: No, we've got no one else. So I think you're safe to do that. It is almost noon right now, so please go ahead, Jeaneanne.

Jeaneanne Gettle: So again, I'm Jeaneanne Gettle. I'm the director of the Water Division at EPA Region 4, and I would like to thank each of you. And on behalf of Mary Walker, the regional administrator in Region 4, I would like to thank you for your participation in this public hearing. The comments that we received will be considered and evaluated as the EPA makes its final decision on the application received from Florida. As indicated earlier, following the close of the public comment on November 2nd, 2020, EPA will review and consider all comments received during the public comment period, both in writing and from the public hearings, so the oral comments as well. If EPA approves of the state's 404 program, a notice of decision will be published in the Federal Register. EPA will also prepare a responsiveness summary of significant comments received during the comment period and EPA's response to those comments. Additional information regarding these procedures is available by contacting Mr. Kelly Laycock at 404-562-9262 or at 404assumption, all one word, 404assumption-fl@epa.gov. Again, I want to thank you for your participation. We appreciate your interest in this issue, and I hope that you have a good rest of your day. We will now be closing the public hearing.

**EPA Responses to Comments from the National Historic Preservation Act Section 106 Consulting Parties on
Florida's Request for Assumption**

On August 20, 2020, the Environmental Protection Agency, Region 4, received a complete package from the State of Florida requesting to assume administration of a Clean Water Act (CWA) Section 404 program. EPA determined that approval of the State's request is a federal undertaking pursuant to section 106 of the National Historic Preservation Act (NHPA or Act) of 1966, as amended and initiated consultation under the NHPA via letter on September 2, 2020. EPA subsequently engaged in consultation with the following parties:  the Advisory Council on Historic Preservation (ACHP); Florida State Historic Preservation Officer (FL SHPO); the Florida Department of Environmental Protection (FDEP); the Choctaw Nation of Oklahoma; the Miccosukee Tribe of Indians of Florida; the Mississippi Band of Choctaw Indians; the Muscogee (Creek) Nation; the Poarch Band of Creek Indians; and the Seminole Tribe of Indians of Florida. Set forth below are the comments EPA received from each party and a summary of our response to each comment. The comments themselves are shown in black font and the response is in red font. This document provides a response to all issues raised during the NHPA 106 consultation process.

Each bullet below includes a comment in black text followed by EPA's response in red text.

**Advisory Council on Historic Preservation (ACHP)**

- Given that the Operating Agreement (OA) establishes measures for consulting Indian tribes we would strongly urge EPA to consider their comments and address them within the OA to the extent possible. EPA is not a party to the OA and therefore cannot execute changes in that document specifically to address comments raised. However, EPA believes tribal comments regarding the OA are addressed through the Programmatic Agreement (PA), such as comments concerning reporting and monitoring, the Native American Graves Protection and Repatriation Act (NAGPRA), opportunities for tribal consultation during federal review, and ACHP involvement.

- The disconnect between the PA and the OA has the potential to leave Indian tribes out of implementation of the OA, without sufficient remedy available within the PA itself to rectify this omission. EPA does not agree that there is a disconnect between the documents and believes that the PA addresses comments made by the tribes relative to the OA. Additionally, both the PA and the OA establish and explain how historic and cultural resources will be protected through a tribal consultation process and establish a dispute resolution process to resolve disputes should they arise.

- The federal government has a unique legal relationship with federally recognized tribes, and the relationship cannot be delegated to a state agency without the tribes' approval, so this consultation now, with the federal agency, is critically important. EPA appreciates and values the Agency's government-to-government relationship with federally recognized tribes and has not delegated that relationship or our consultation obligations with such tribes. EPA has consulted with tribes with interests in Florida under Section 106 of the NHPA regarding EPA's undertaking of reviewing Florida's request to assume the CWA 404 program, and EPA has consulted with the three tribes located in Florida regarding Florida's request to assume the Clean Water Act (CWA) 404 program consistent with EPA's tribal consultation policy. We agree with the ACHP about the importance of the NHPA 106 consultation on the undertaking. Should

EPA approve the State's Section 404 program, the State would not assume permitting authority over any waters located in Indian country, as defined at 18 U.S.C. 1151. In those areas, the federal government retains its normal government-to-government consultation with the tribes. For waters outside of Indian country that the State assumes, the PA and OA, along with other assumption documents set forth the process for tribes to raise issues related to their interests to both Florida and to EPA.

- EPA has provided consulting parties with three business days to provide their comments on the PA, which is challenging for all consulting parties to do without advanced notice. It may also be difficult for EPA to meaningfully consider such comments and incorporate them into a revised PA within such a timeline. EPA sent letters inviting the consulting parties to participate in NHPA 106 consultation on EPA's undertaking on September 2, 2020. The Agency has hosted multiple meetings with the tribes, both individually and as a group. Initially EPA invited the eight tribes with interests in Florida to participate on a September 22nd informational webinar. During that webinar EPA provided information on Florida's request to assume the CWA 404 program and an overview of NHPA 106 consultation process that would be utilized. This was to assist the tribes in deciding whether to participate with EPA on NHPA 106 consultation on the undertaking. EPA explained during that meeting that the Agency planned to enter into a programmatic agreement that relied on the OA as a foundational document and provided information about where in the docket the OA could be found. EPA also provided email copies of the OA when requested. During the informational webinar we encouraged tribes to identify to EPA any issues, concerns or gaps in the OA so that, where appropriate, the Agency could address those through the PA. On September 28, October 1, October 7, October 8, October 15, October 30 and December 3, EPA had individual consultation meetings with the five tribes that chose to consult and again encouraged each tribe to identify concerns with the OA so that EPA could, where appropriate, address those concerns through language in the PA. EPA took under advisement all NHPA-related issues raised during these consultation meetings. As a result, the tribes have had an opportunity to provide EPA with comments on the OA and issues associated with EPA's undertaking since early September. EPA acknowledges that it shared the actual draft PA with consulting parties on November 25th and requested comments on the PA by noon December 7th, but EPA has considered all NHPA-related comments received that are pertinent to the PA since September in revising the PA.

- We strongly urge EPA and FDEP to schedule another consultation meeting with tribes in the next week to discuss and consider revisions and modifications to the PA and to the extent possible the OA, so that EPA can adequately respond to their concerns. EPA agreed to have a final consultation meeting with the consulting parties on December 14th and revised the PA to address many of the comments raised by the parties. Importantly, EPA's purpose for this final consultation meeting was to walk through how comments received were addressed in the PA.

- Should it be logistically challenging to do so within the time available, EPA and FDEP might consider extending the 120-day approval process to accommodate additional consultation to address tribal concerns. As we understand, such an extension could be granted upon the agreement of both EPA and FDEP.  EPA does not believe an extension of the 120-day review period is necessary, and the Agency notes that CWA Section 404(h) indicates that a state's request to assume administration of the 404 program "shall" be deemed approved if EPA fails to take action within 120 days of application. 33 U.S.C. §§ 1344(h)(1) and (3). NHPA 106 consultation was provided to the consulting parties beginning in early September 2020 and EPA has provided consultation opportunities to all tribes who requested consultation. This has included nine meetings with the consulting tribes. EPA does recognize that the tribes would like to have continuing conversations about how the PA will be implemented, and to that end, EPA

has added a new stipulation that: "within 30 days of the execution of this PA, EPA will engage in and complete further discussions with the FL SHPO, FDEP, the ACHP, and the Consulting Tribes, to consider potential amendments to this PA regarding continuing tribal consultation engagement and EPA oversight of the State's administration of its 404 program. Any amendment adopted pursuant to this clause must comply with subsection VIII. a. of this PA."

**Florida Department of Environmental Protection (FDEP)**

- FDEP provided edits to the PA on December 4th. Edits included: (1) inclusion of FDEP as signatory and party responsible for reporting and monitoring requirement; (2) addition of certain clarifying "Whereas" clauses; (3) changing threshold for amendment/termination of OA; (4) changing threshold and effect of amendment to PA; and (5) addition of a "good cause" condition for the termination of the PA. The EPA has incorporated FDEP's edits into the programmatic agreement.

**Florida State Historic Preservation Office (FL SHPO)**

- No Tribal Consultation: The comments provided by the participating Tribes during the Dec. 2 meeting indicate that additional effort is necessary on the part of the EPA to address Tribal concerns and questions. The draft PA is not clear about when EPA will initiate further consultation with Tribes or what process that consultation will follow. Although the Florida Department of Environmental Protection (FDEP) will be responsible for carrying out the day-to-day implementation of Section 404 permit reviews, the EPA will retain oversight of Florida's Section 404 program and the PA should clearly define procedures related to EPA's Tribal consultation following the assumption process. Should EPA approve the State's Section 404 program, the State would not assume permitting authority over any waters located in Indian country, as defined at 18 U.S.C. 1151. In those areas, the federal government retains its normal government-to-government consultation with the tribes. For waters outside of Indian country that the State assumes, the PA and OA, along with other assumption documents set forth the process for tribes to raise issues related to their interests to both Florida and to EPA. For example, the FDEP/EPA MOA states that "[I]n the event a question arises whether activities proposed in a permit application or draft general permit are within Indian country, and thus should be processed by the Corps, information regarding the issue may be presented to FDEP during the comment period and may also be provided to EPA. Such information shall be considered by EPA in exercising its CWA authority to oversee FDEP's program and may, as appropriate, provide a basis for EPA to comment upon, object to, or make recommendations with respect to the permit application or draft general permit." In addition, language was added to the "EPA Review" section of the PA to clarify that EPA may consult with tribes, where appropriate, on permit applications that have the potential to impact historic properties or permit applications that are the subject of a dispute submitted pursuant to Section III.C. of the OA.

- Plain Language Review: To explain how the PA will be implemented and the procedures it will follow, the document heavily references various federal and state laws, regulations, and agreements related to the assumption process. Although this may be legally sufficient, these references cause the PA, and the alternative process it allows, to be difficult to understand. We recommend revising the PA language so that a clear understanding of the process is stated in this agreement. EPA provided further clarification and information on process and roles in the revised draft of the PA. EPA kept the citation references to assure legal sufficiency.

- Clarifying FDEP's Role: The PA should further clarify FDEP's role in the agreement and Section 404 assumption. As our office currently understands, the PA does not assign FDEP roles or responsibilities not already assigned to the agency under other laws, regulations, and agreements related to Section 404 assumption. The PA should clarify and explain what roles and responsibilities FDEP is acquiring relative to historic properties under other laws, regulations, and agreements. The EPA has revised the PA to clarify FDEP's role in reporting and monitoring. FDEP has an extensive role in the historic properties review process outlined in the OA which is adopted and incorporated into the PA.
- Human Remains Discoveries: While other laws, regulations, and agreements address how human remains will be treated under Section 404 assumption, we recommend including a stipulation addressing the applicability of NAGPRA and Section 872.05, Florida Statutes. This will reinforce EPA's commitment to ensuring that human remains are treated appropriately under the PA. The revised PA more fully addresses Native American Grave Protection and Repatriation Act (NAGPRA), including: (1) EPA's role, (2) the notification process, and (3) Tribal concurrence before work continues. The signatory parties to the PA have committed to following all applicable laws, including NAGPRA where applicable. The EPA believes that NAGPRA, the PA, and the OA sufficiently address any concerns and establishes a sufficient and appropriate process for the discovery of human remains.
- Section III: Clarify that the Operating Agreement (OA) between FDEP and our office may be amended or terminated in accordance with the provisions included in the OA. The EPA has amended Section III to clarify that amendments or termination of the OA shall be in accordance with Section VII and VIII of the OA.

**Choctaw Nation of Oklahoma**

- Desire for individual consultations on individual projects. Should EPA approve the State's Section 404 program, the State would not assume permitting authority over any waters located in Indian country, as defined at 18 U.S.C. 1151. In those areas, the federal government retains its normal government-to-government consultation with the tribes. For waters outside of Indian country that the State assumes, the PA and OA, along with other assumption documents set forth the process for tribes to raise issues related to their interests to both Florida and to EPA. Language was added to the "EPA Review" section of the PA to make it clear that EPA may consult with tribes, where appropriate, on permit applications that have the potential to impact historic properties or permit applications that are the subject of a dispute submitted pursuant to Section III.C. of the OA. Both the PA and the OA also provide a dispute resolution process to resolve disputes should they arise.
- The Tribe wants to ensure they will have the opportunity to review individual projects for concerns. FDEP, through the terms of the OA, committed to direct engagement with the SHPO and interested tribes early in the application review process, including opportunities to inform FDEP's requests for additional information, provide effects determinations, and make recommendations for the resolution of adverse effects. The Tribe intends to offer additional comments for consideration in development of the programmatic agreement including: 1) post review discovery, 2) discovery of human remains, and 3) language regarding non-disclosure agreements and photography prohibitions. The Tribe's additional comments are summarized below. Please see EPA's response to those comments.

- For the actual procedures of NHPA compliance, this PA draws mostly on an Operating Agreement (OA) made between the Florida Department of Environmental Protection and the Florida SHPO.  Our understanding is that this agreement was finalized without considering the comments that have been submitted by federally recognized Tribes. It is EPA's understanding that the OA incorporated comments received by the FDEP from the Miccosukee Tribe of Indians of Florida and the Seminole Tribe of Florida. The PA also incorporated comments received from all consulting tribes and provides additional opportunities for consulting tribe involvement.

- In using this already finalized document as the core of NHPA compliance for this PA, the EPA is foreclosing on Tribes' ability to consult in a meaningful way.  We request that the OA document be reopened. During its NHPA Section 106 consultation, EPA asked tribes to identify any gaps, concerns, or issues related to the OA, has taken comments provided by the tribes into consideration in drafting the PA, and has made modifications to the PA, where appropriate. As such, EPA believes that the PA and OA, when considered together, address tribal interests.

- According to I.A.2.b.i. of the OA, the Florida Department of Environmental Protection, "shall consult with any tribes that attaches religious and cultural significance to historic properties that me be affected by an application." This conflicts with 36 CFR § 800.(2)(4), which indicates that federal agencies remain responsible for consultation with Tribes even when other NHPA Section 106 duties have been delegated.  Executive Order 13175 and the ACHP's statement on "Limitations on the Delegation of Authority by Federal Agencies to Initiate Tribal Consultation under Section 106 of the National Historic Preservation Act" both affirm this responsibility on the part of federal agencies.  A federal agency may delegate its government-to-government consultation responsibility towards a Tribe under the NHPA only with that Tribe's written consent. As this is has not occurred, the EPA still has the responsibility of conducting government-to-government consultation with Tribes on these permits.  This needs to be reflected in the OA and PA. EPA appreciates and values the Agency's government-to-government relationship with federally recognized tribes and has not delegated that relationship or consultation with such tribes. EPA's decision on Florida's request to assume the CWA Section 404 program is the relevant undertaking for purposes of NHPA 106 and associated consultation. EPA has consulted with interested tribes pursuant to NHPA 106 on this undertaking and has also consulted with tribes on the CWA 404 program decision consistent with EPA's tribal consultation policy. Should EPA approve the State's Section 404 program, the State would not assume permitting authority over any waters located in Indian country, as defined at 18 U.S.C. 1151, nor would the State assume EPA's consultation obligations. In those areas, the federal government retains its normal government-to-government consultation with the tribes. If Florida assumes the CWA Section 404 program, issuance of permits by the State would not be federal actions calling for government-to-government consultation. That said, EPA may consult with tribes, where appropriate, on permit applications that have the potential to impact historic properties or permit applications that are the subject of a dispute submitted pursuant to Section III.C. of the OA.  See Section V(b) of the PA.

- Section I.B.3. of the OA commits Tribes to specific compliance roles.  The PA relies upon the OA for the process of NHPA compliance. This can be remedied by reopening the OA and offering Tribes signatory status on the PA. The provision of the OA cited offers the tribes an opportunity to provide information but does not require their participation. The NHPA regulations at 36 CFR § 800.6(c)(2) provide that an entity should be an invited signatory (although is not a required signatory) when that entity assumes a responsibility under the agreement. The tribes do not assume responsibilities under either agreement.

- Section 1.B.4.d. indicates that the applicant will be responsible for coordinating historic properties review for general permit (no notice) applications.  This role needs to be clearly defined. EPA believes the applicant's role in coordinating historic properties review for no-notice general permits is sufficiently defined in the section of the OA cited and in FDEP's regulations at 62-331.200(3)(j), F.A.C.

- Regarding Section II.C.4.b. Human remains found in the navigable waterways of the United States are subject to NAGPRA.  Choctaw Nation's perspective is that neither the OA nor the PA can remove NAGPRA's jurisdiction from these Native American remains.  The OA needs to provide details about how the proposed notification and consultation process will work with EPA's responsibilities under NAGPRA. The revised PA directly addresses NAGPRA, including: (1) EPA's role, (2) the notification process, and (3) Tribal concurrence before work continues. Neither the OA nor the PA alter NAGPRA's jurisdiction over human remains found in "waters of the United States."

- The Choctaw Nation of Oklahoma will not support the PA until the issue of the EPA attempting to delegate its responsibility to conduct government-to-government consultation with federally recognized Tribes under NHPA and NAGPRA has been resolved. EPA's responsibility to conduct government-to-government consultation with federally recognized tribes is not being delegated. Should EPA approve the State's Section 404 program, the State would not assume permitting authority over any waters located in Indian country, as defined at 18 U.S.C. 1151. In those areas, the federal government retains its normal government-to-government consultation with the tribes. Issuance of State 404 permits is not a federal action triggering government-to-government consultation. Nonetheless, EPA may consult with tribes, where appropriate, on permit applications that have the potential to impact historic properties or permit applications that are the subject of a dispute submitted pursuant to Section III.C. of the OA. Furthermore, EPA agrees to comply with all applicable provisions of NAGPRA.

- Assuming that this can be resolved, the Choctaw Nation requests adding to the PA's stipulation 5 wording to the effect that the annual report of activities conducted under this agreement will be sent to all federally recognized Tribes that have expressed an historic interest in Florida, regardless of whether they are signatories to the PA. The PA stipulation now provides that copies of the annual report will be sent to all Consulting Tribes.

- Choctaw Nation requests adding a clause that will automatically terminate this PA after 5 years, unless the signatories agree to continue the agreement for another five years. EPA's approval of a State 404 permit program is final and does not automatically terminate at 5-year or other intervals. EPA can only revoke program approval under the provision of 33 U.S.C. § 1344(i). An automatic termination provision for the PA is therefore inappropriate. Instead, the PA provides that a meeting will be called to discuss issues identified in the annual report related to the PA and the OA, if any of the signatories or the Consulting Tribes request one. Furthermore, the PA provides appropriate termination provisions as negotiated by the parties. Pursuant to the PA: "Any signatory party to this PA may terminate this PA for good cause by providing 90 days' notice to the other signatory parties, provided that the signatory parties will meet during the period prior to termination to seek agreement on amendments or other actions that would avoid termination. If this PA is terminated, the EPA will either execute another programmatic agreement or seek, consider, and respond to the ACHP comments, which the ACHP shall transmit to the EPA within 45 days of request. The termination of this PA does not modify or alter the legal status of the assumed state program."

- Finally, the EPA has indicated that Tribes were selected for consultation on this PA via the information on HUD's website.  The HUD website was not created in full consultation with

Tribes and does not necessarily have accurate information on Tribal areas of interest. The Jena Band of Choctaw Indians and the Seminole Nation of Oklahoma should be afforded the opportunity to consult on this agreement as well. NHPA regulations require EPA to make a reasonable and good faith effort to identify tribes that shall be consulted in the NHPA Section 106 process. See 36 CFR 800.2(c)(2)(ii)(A). EPA believes it met this obligation. EPA coordinated with the ACHP and based on their recommendation used the HUD website. From that website, EPA identified and invited the following eight federally recognized tribes to consult: the Alabama-Coushatta Tribe of Texas; the Choctaw Nation of Oklahoma; the Coushatta Tribe of Louisiana; the Miccosukee Tribe of Indians of Florida; the Mississippi Band of Choctaw Indians; the Muscogee (Creek) Nation; the Poarch Band of Creek Indians; and the Seminole Tribe of Indians of Florida. This list of federally recognized tribes for which EPA intended to carry out consultation was provided to the ACHP and ACHP did not indicate that EPA needed to modify or add to this list.

**Miccosukee Tribe of Indians of Florida**

- The Tribe has cultural resources and an interest in a variety of lands. The Tribe believes permits on those lands should trigger government-to-government consultation and an opportunity for tribes to be involved in the project. Issuance of State 404 permits is not a federal action triggering government-to-government consultation. Nonetheless, EPA may consult with tribes, where appropriate, on permit applications that have the potential to impact historic properties or permit applications that are the subject of a dispute submitted pursuant to Section III.C. of the OA.

- The Tribe takes the position that all of Florida is still Indian country. The Tribe has cultural sites that would be in assumed waters and permits affecting those sites would not trigger consultation. The Tribe would like to get notice and have a chance to comment on all permits that could affect cultural resources. For example, reservoir releases in state-assumed waters may impact Tribal waters. In addition, the Tribe considers wetlands to be cultural resources, and these resources are extensively located throughout Florida. Should EPA approve the State's Section 404 program, the State would not assume permitting authority over any waters located in Indian country, as defined at 18 U.S.C. 1151. In addition, FDEP, through the terms of the OA, committed to direct engagement with the SHPO and interested tribes early in the application review process, including opportunities to inform FDEP's requests for additional information, provide effects determinations, and make recommendations for the resolution of adverse effects. FDEP has committed to providing notice on all permit applications where the tribes have expressed an interest in being notified. Pursuant to F.A.C. 62-331.060(2)(a)(8), FDEP will provide the Tribe with notice of "any activity that is within two miles of the Miccosukee Federal Reservation; Miccosukee Reserve Area; Krome Avenue, Dade Corners, Cherry Ranch, or Sherrod Ranch Reservations; and Coral Way, Lambick, or Sema Trust Properties. Also, for any activity within the Miccosukee Tribe's reserved rights areas, including but not limited to: within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A."

- In the Operating Agreement between the Florida Department of Environmental Protection (FDEP) and the State Historic Preservation Officer (SHPO), the timeframe for coordination with tribes is very narrow and too small of a window. FDEP, through the terms of the OA, committed to direct engagement with the SHPO and interested tribes early in the application review process, including opportunities to inform FDEP's requests for additional information.

- The Tribe currently gets notice from the Corps on all of the proposed 404 projects and does not see the same triggers in what the State is presenting for their program or in the NHPA Section 106 process. The Tribe would also like government-to-government consultation for all projects that affect Tribal resources. In accordance with the process described in Section II.A. of the OA, the FDEP will email THPO/tribes notification within five days of receipt of an application for a State 404 Program Permit and provide the THPO/tribes an opportunity to review the application for potential effects to cultural resources or historic properties of religious or cultural significance, seek additional information from the applicant, provide an effects determination, and provide initial recommendations for resolution of any adverse effects within an initial review period (i.e., before FDEP provides public notice of administratively complete State 404 Program individual permit applications). The PA and the OA also both establish a dispute resolution process related to the protection of historic and cultural resources to resolve disputes should they arise. As explained above, FDEP will send the Miccosukee Tribe of Indians of Florida notice of administratively complete permit applications for activities within areas of interest to the Tribe. See 62-331.060(2)(a)(8), F.A.C. Issuance of State 404 permits is not a federal action triggering government-to-government consultation. Nonetheless, EPA may consult with tribes, where appropriate, on permit applications that have the potential to impact historic properties or permit applications that are the subject of a dispute submitted pursuant to Section III.C. of the OA.
- The Tribe believes that certain lands, including the Everglades National Park and Big Cypress National Preserve, are Indian country as described in the enabling legislation for those lands. EPA understands the Tribe's interest in ensuring that the State will not assume permitting authority over waters in Indian country. Should EPA approve the State's Section 404 program, the State would not assume permitting authority over any waters located in Indian country, as defined at 18 U.S.C. 1151. EPA's decision on Florida's request to assume the Section 404 program does not redefine or change what is Indian country nor does it alter the legal status of any land. EPA believes that case-specific questions regarding permitting authority will be addressed during implementation of the State's 404 program, should it be approved.
- The Tribe's federally-codified Settlement Agreement with the State of Florida indicates that certain lands which the State has perpetually leased to the Tribe shall be treated as if they are reservation lands for certain purposes. The Tribe's position is that these leased lands are therefore Indian country. The Tribe explained that the State took the Tribe's land to build a portion of I-75, and the Tribe had a particular understanding of being provided reservation land at the time of the Settlement Agreement. The Tribe further explained that this issue has not been litigated because the State has agreed with the Tribe's interpretation. Section II.B of the Corps/FDEP MOA, submitted as part of Florida's package, states that retained waters include Indian country, as defined at 18 U.S.C. 1151. Section I.B.2 of the EPA/FDEP MOA likewise notes that FDEP will not administer or enforce authority over Indian country and states that "[i]n the event that a question arises whether activities proposed in a permit application or draft general permit are within Indian country, and thus should be processed by the Corps, information regarding the issue may be presented to FDEP during the comment period and may also be provided to EPA. Such information shall be considered by EPA in exercising its CWA authority to oversee FDEP's program and may, as appropriate, provide a basis for EPA to comment upon, object to, or make recommendations with respect to the permit application or draft general permit." Section 4.1 of the State 404 Program Applicant's Handbook, incorporated by reference into F.A.C. 62-331.010(5), also makes clear that the Corps retains jurisdiction for projects within Indian country. EPA's decision with respect to Florida's request to assume the Section 404 Program does not make a determination whether or not any specific lands, including the leased

lands, meet the definition of Indian country, as set forth at 18 U.S.C. 1151 nor does it affect the legal status of those or any other lands.

- The Tribe has not seen a copy of the final Operating Agreement between FDEP and the SHPO and has also not yet seen the draft Programmatic Agreement. The Tribe received the link to FDEP's assumption package which included the final OA on September 2, 2020 and received a draft PA on November 25, 2020.

- The Tribe does not want to be lumped with other Tribes on the Programmatic Agreement because Miccosukee Tribe has its own unique concerns. The EPA acknowledges the Tribe's decision; however, the EPA still attempted to address as many of the Tribe's comments and concerns as feasible in the provisions of the PA.

- The Tribe is concerned that the State legislature has passed a law that requires construction of a reservoir which has cultural burial grounds right in the middle of it. The Tribe is concerned that the State is bound by law and will not take appropriate measures to protect these cultural burial grounds. The Tribe does not support relocation, inundation or any effects on human remains. EPA acknowledges the Tribes comments and notes that if human remains are identified prior to, during, or after permitting, FDEP shall follow the provisions of II.C.4 of the OA. The OA establishes how historic and cultural resources will be protected through a tribal consultation process and a dispute resolution process to resolve disputes should they arise. FDEP shall notify the EPA of the discovery on the same day that it notifies the SHPO, and the Tribal Historic Preservation Officer (THPO)/tribes of the discovery. The PA signatory parties will comply with any applicable provisions of ARPA and NAGPRA. Activity authorized under the permit shall not resume without written authorization from FDEP, SHPO, the EPA, and THPO/tribes.

- The Tribe's understanding is that FDEP is not going to seek any more resources to run the 404 program, and they do not believe that FDEP can adequately manage the programs they have now. EPA finds that FDEP has committed sufficient resources and staffing to address anticipated workload. CWA Section 404(h) requires that the Administrator determine whether a state has the authority to "issue permits" that assure compliance with applicable requirements of the CWA, to ensure public participation in the permitting process, to abate permit violations, and to coordinate with other states, EPA, or other federal agencies as appropriate. EPA's implementing regulations, in turn, require the State's program description to include "[a] description of the funding and manpower which will be available for program administration," along with an estimate of the anticipated workload, e.g., number of discharges. 40 CFR 233.11(d). EPA has determined that Florida's program description, Section (d), meets this requirement by providing a description of the funding and manpower that FDEP will dedicate to the program. Importantly, neither the CWA nor the implementing regulations establish a particular threshold of staff or resources that states must commit to the Section 404 program. EPA has found FDEP's commitment of resources and staffing sufficient to address anticipated workload associated with a Section 404 program. The resources of other state programs are not among the criteria that EPA applies in reviewing state or tribal program requests. 33 U.S.C. 1344; 40 C.F.R. Part 233. Additionally, EPA retains its oversight responsibilities under the CWA with respect to Section 404 programs assumed by a state.

- The Tribe is concerned that FDEP will allow for Water Management Districts to take over a portion of the 404 permitting program permitting requirement and did not see anything in FDEP's proposed program that would prohibit that. Florida's 404 assumption package identifies FDEP as the sole permitting authority. Changes to any approved program would require approval pursuant to 40 C.F.R. Section 233.16(d).

- The Miccosukee Tribe affirmatively declines to join as a party to the drafted Programmatic Agreement (PA), and strongly objects to the process of grouping Native American Tribes as a

way to fast track the process. The EPA acknowledges the Miccosukee Tribes decision to not participate in the PA. Nevertheless, the EPA attempted to address the Miccosukee's comments and concerns as feasible in the provisions of the PA.

- The EPA and other Federal Agencies have a trust responsibility through a myriad of Federal regulations including Section 106 consultation and NAGPRA. Florida Department of Environmental Protection is legally limited in assuming these responsibilities, and the PA does not adequately describe a parallel process. The EPA is cognizant of its role as a federal agency under Section 106 of the NHPA and NAGPRA. EPA's decision on Florida's request to assume the CWA 404 program is the relevant undertaking for purposes of NHPA 106. EPA coordinated with the ACHP and based on their recommendation to use the HUD website to determine which tribes EPA should consult with.  From that website, EPA identified and invited the following eight federally recognized tribes to consult: the Alabama-Coushatta Tribe of Texas; the Choctaw Nation of Oklahoma; the Coushatta Tribe of Louisiana; the Miccosukee Tribe of Indians of Florida; the Mississippi Band of Choctaw Indians; the Muscogee (Creek) Nation; the Poarch Band of Creek Indians; and the Seminole Tribe of Indians of Florida. This list of federally recognized tribes for which EPA intended to carry out consultation was provided to the ACHP and ACHP did not indicate that EPA needed to modify or add to this list. EPA has consulted with the five of these tribes that accepted the invitation to consult pursuant to NHPA 106 and has also consulted with three of the five on the CWA 404 program decision consistent with EPA's tribal consultation policy. EPA is not delegating its NHPA consultation to the State. If Florida assumes the 404 program, issuance of permits by the State would not be a federal action triggering government-to-government consultation. That said, EPA may consult with tribes, where appropriate, on permit applications that have the potential to impact historic properties or permit applications that are the subject of a dispute submitted pursuant to Section III.C. of the OA. See Section V(b) of the PA. The PA also contains a NAGPRA provision that more clearly enumerates EPA's role and specifies that work will not proceed without written permission from the tribes.

- The trust responsibility cannot be delegated to the State without the Miccosukee Tribe's approval and the Miccosukee Tribe does not give approval for the EPA to neglect these responsibilities. The process of assumption as described in the PA drastically removes existing legal protections for sacred and culturally significant sites. As stated above, EPA is not delegating its NHPA 106 consultation or any NAGPRA responsibilities to the State.

- The 120-Day review by EPA should be extended until such protections can be afforded through the development of appropriate procedures. As explained above, EPA does not believe an extension of the 120-day review period is necessary or appropriate and that the OA and PA, along with provisions of Florida's program, provide protections for Tribal interests. EPA does recognize that the tribes would like to have continuing conversations about how the PA will be implemented, and to that end, EPA has added a new stipulation that: "within 30 days of the execution of this PA, EPA will engage in and complete further discussions with the FL SHPO, FDEP, the ACHP, and the Consulting Tribes, to consider potential amendments to this PA regarding continuing tribal consultation engagement and EPA oversight of the State's administration of its 404 program. Any amendment adopted pursuant to this clause must comply with subsection VIII. a. of this PA."

- The Tribe has traditional, aboriginal, and statutory rights to use and occupy the greater Everglades, Big Cypress National Preserve, Everglades National Park and Water Conservation 3A, in additional to its existing reservation properties. Among these are the right of occupation,

subsistence and traditional and cultural uses. The Tribe has significant culturally sensitive sites within these areas which are protected under the Native American Graves Protection and Repatriation Act (NAGPRA). The protection of these enumerated rights and the lands of the Tribe are ensured by the trust responsibility of the Federal Government to all tribal nations. The Environmental Protection Agency (EPA), and the Army Corps of Engineers (USA COE), as federal partners to the Miccosukee Tribe, must assure that the State of Florida's assumption of 404 permitting does not adversely impact or abrogate those rights. Should EPA approve the State's Section 404 program, the State would not assume permitting authority over any waters located in Indian country, as defined at 18 U.S.C. 1151. EPA's decision on Florida's request to assume the Section 404 program does not redefine or change what is Indian country nor does it alter the legal status of any land. In addition, Section II.B of the Corps/FDEP MOA, submitted as part of Florida's package, states that retained waters include Indian Country, as defined at 18 U.S.C. 1151. Section I.B.2 of the EPA/FDEP MOA likewise notes that FDEP will not administer or enforce authority over Indian Country and states that "[i]n the event that a question arises whether activities proposed in a permit application or draft general permit are within Indian country, and thus should be processed by the Corps, information regarding the issue may be presented to FDEP during the comment period and may also be provided to EPA. Such information shall be considered by EPA in exercising its CWA authority to oversee FDEP's program and may, as appropriate, provide a basis for EPA to comment upon, object to, or make recommendations with respect to the permit application or draft general permit." Section 6.1 of the State Program Applicant's Handbook, incorporated by reference into F.A.C. 62-331.010(5), also makes clear that the Corps retains jurisdiction for projects within Indian country. EPA's decision with respect to Florida's request to assume the Section 404 Program does not change the definition of Indian country as set forth at 18 U.S.C. 1151.

- The Miccosukee are concerned with the ability of the Florida Department of Environmental Protection (FDEP), to implement the proposed 404 program due to a lack of resources. FDEP has undergone dramatic cuts to staffing, reductions in expertise and inadequate enforcement of existing environmental mandates, particularly in recent years. Because of the adverse effect COVID-19 has had on local, state and federal governments, large shortfalls in budget expectations for the State may further impact DEP and their 404 program. EPA must carefully consider not only the adequacy of Florida's authority to administer the CWA § 404 program, 40 C.F.R. § 233.l(a), but also the funding and resources available for program administration and estimated workload to determine its ability to administer the program, 40 C.F.R. § 233.11. FDEP's claims that it can simply fold a 404 program into its existing ERP program and rely on staff and resources allocated by the legislature as necessary to operate only the ERP program, must be rejected. EPA acknowledges the concerns about the availability of staff, resources, and expertise to appropriately administer the State's Section 404 permitting program, including specific concerns about previous FDEP staff cuts and department vacancies. CWA Section 404(h) requires that the Administrator determine whether a state has the authority to "issue permits" that assure compliance with applicable requirements of the CWA, to ensure public participation in the permitting process, to abate permit violations, and to coordinate with other states, EPA, or other federal agencies as appropriate. EPA's implementing regulations, in turn, require the State's program description to include "[a] description of the funding and manpower which will be available for program administration," along with an estimate of the anticipated workload, e.g., number of discharges. 40 C.F.R. § 233.11(d). EPA has determined that Florida's program description, Section (d), meets this requirement by providing a description of the funding and manpower that FDEP will dedicate to the program. Importantly, neither the CWA nor the implementing regulations establish a particular threshold of staff or resources that states must

commit to the Section 404 program. EPA has found FDEP's commitment of resources and staffing sufficient to address anticipated workload associated with a Section 404 program. Florida estimated the anticipated workload by considering Corps permitting data for the previous five years and overlap with ERP permitting, in part using a Corps GIS analysis to compare retained versus assumed waters. Based on this analysis, FDEP found an 85% overlap between ERP and Section 404 program review requirements (Program Description, section e, at 9). Additionally, FDEP would only assume a portion of the Corps permitting load because the Corps retains jurisdiction over Section 10 Rivers and Harbors Act waters and permitting in Indian country, and because the State already reviews permits per the State Programmatic General Permit issued by the Corps. The State then estimated processing time for permits based on their type (e.g., general permits vs. individual permits; small, medium, or large projects; permitting or compliance activities), accounted for quality control auditing, determined staff hours required for such activities, and calculated staffing needs. EPA acknowledges that the State currently operates a wetlands regulatory program as part of the ERP, which includes functional roles and staff with technical areas of expertise overlapping those of a CWA Section 404 program. "The ERP program is staffed with permit processors, compliance processors, and support professionals that are experts in or familiar with the subject matter required for effective review of applications under Section 404 of the Clean Water Act." (Program Description, section d, at 2). Florida has described redirecting the current staff of 211 working in the State's ERP program to cover both ERP and the State 404 program, with an additional 18 positions reallocated for the State 404 program for a total of 229 positions (Program Description, section d, at 3). Annual salary and benefits would come to approximately $15,182,822, funded through various trust funds listed in the program description (Program Description, section d, at 2). Florida has provided a detailed breakdown of the ample permitting and compliance staff and managers that will be working in each of its districts.  In total, the Districts will have 8 compliance managers and 7 compliance/permitting managers; and 33 compliance staff and 32 permitting/compliance staff (Program Description, section d, at 6-9). Based on the information provided by FDEP, EPA finds that FDEP has provided the information necessary to demonstrate that the agency has committed sufficient resources and staffing to address anticipated workload.

- Federal action triggers a myriad of other federal protections, including the Endangered Species Act (ESA) that protect the rarest and most at-risk wildlife in our state, the Magnuson-Stevens Act that protects Essential Fish Habitat and our world-class fisheries, the National Environmental Policy Act (NEPA) that protects our quality of life and helps ensure good decision making, and the National Historic Preservation Act (NHPA) that protects our history and cultural resources. The State of Florida has no substitute for these federal laws. In the past, public participation through NEPA and the Corps' permitting authority have informed, modified and/or halted projects that were authorized by FDEP but would have been detrimental to Florida. Moreover, Florida has severely limited access to the courts and the ability of the Miccosukee to challenge unlawful permits in an independent forum. This creates an additional lack of oversight and accountability that would further undermine public confidence in a State 404 program and the ability of those affected to hold FDEP accountable when the State falls short. It is imperative that EPA deny this application unless and until the State adopts the same protections as NEPA, ESA and NHPA, and judicial mechanisms that ensure accountability. Florida's 404 program provides for significant state and federal interaction and review. As stated in Section (b) of Florida's Program Description: "Interagency coordination with the State Historical Preservation Office (SHPO) and Tribal Historical Preservation Office (THPO), Florida Fish and Wildlife Conservation Commission (FWC), U.S. Fish and Wildlife Service (FWS), National Marine Fisheries Service (NMFS), Water Management Districts (WMDs), and Environmental Protection Agency

(EPA) will be conducted, as required, following the procedures described in their respective operating agreements (See sections D (DEP/EPA MOA) and E (DEP/USACE MOA) of the package and section (j) (DEP/FWC/FWS MOU and DEP/SHPO OA) of the program description) and section 5.2 of the 404 Handbook. A commenting agency may submit questions or comments for the Department to include in the [Request for Additional Information (RAI)]. A commenting agency may also provide comments to EPA and request EPA object to a proposed activity. The Department will forward the applicant's response to the RAI to each commenting agency for review, if applicable. Additional conditions may be included in the final authorization based upon the recommendation of a commenting agency to avoid or minimize potential adverse effects due to the project." EPA acknowledges that NEPA does not apply to permits issued under Florida's 404 program and thus a NEPA-related challenge in federal court is unavailable. EPA's regulations do not require particular procedures for judicial review of state-issued permits, and nothing in Florida's judicial review procedures is inconsistent with federal requirements. Challenges to actions of a state in issuing or denying a permit pursuant to a state-assumed Section 404 program are typically heard in state court, and EPA recognizes that different states have different procedures for judicial review, and that those procedures may also differ from federal procedures. As the Seventh Circuit Court of Appeals explained in addressing EPA's and the Corps' failure to exercise jurisdiction over a Section 404 permit application where Michigan had assumed the Section 404 program, "[i]t is not the unique province of the federal courts to adjudicate administrative law challenges related to the Clean Water Act." Menominee Indian Tribe of Wisconsin v. EPA, 947 F.3d 1065, 1071 (7th Cir. 2020).

- Florida proposed an unprecedented approach that places our listed species in grave danger. Instead of evaluating impacts and potential jeopardy to listed species at the project-specific permit level, FDEP proposed that the U.S. Fish and Wildlife Service and National Marine Fisheries Service (Services) engage in a one-time programmatic consultation that would only identify procedural requirements for state permit processors to use to determine whether there will be jeopardy to listed species. While we agree that EPA must perform a S. 7 consultation on its decision to approve or disapprove a state's or tribe's assumption of the program, the Miccosukee are concerned that a programmatic consultation, especially as proposed by FDEP, will not be adequate to protect listed species in the State. Under a programmatic consultation, EPA must review Florida's proposed criteria and process for ensuring state issued permits will not cause jeopardy to listed species. More importantly, EPA may only approve Florida's program if it determines the program fulfills this requirement while taking into account comments from the Services and the Corps. (40 C.F.R. § 233.15(g)). The Miccosukee request that EPA require programmatic and permit-specific government-to-government consultation to ensure protection of species and deny Florida's application until these conditions are met. ESA implementing regulations set forth at 50 C.F.R. § 402.02 describe a programmatic consultation as "a consultation that is addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the Services to consult on the effects of programmatic actions such as . . . [a] proposed program, plan, policy, or regulation providing a framework for future proposed actions." In its Biological Opinion, USFWS noted that "the scope of EPA's approval of FDEP's request to administer the CWA 404 program in assumable waters is essentially statewide, covering an array of operations that may affect a wide variety of ESA-proposed and –listed species and proposed and designated critical habitat" and that "[b]ecause this is a consultation on a programmatic action, it is not feasible, nor is it required, to conduct a meaningful site-specific and species-specific effects analysis in this BiOp." U.S. Fish and Wildlife Service, Programmatic Biological Opinion for U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program Under

Section 404 of the Clean Water Act (November 17, 2020) at 54 ("Biological Opinion"). The State 404 program rule at 62-331, F.A.C. prohibits issuance of a permit that is likely to jeopardize the continued existence of endangered or threatened species or result in the likely destruction or adverse modification of habitat designated as critical for these species. In addition, as stated above, the CWA Section 404(b)(1) Guidelines prohibit the discharge of dredged or fill material if it jeopardizes the continued existence of listed species or results in the likelihood of the destruction or adverse modification of designated critical habitat. The program submission describes how the State will comply with the Section 404(b)(1) Guidelines. The Program Description states that the MOU between FWC, USFWS, and FDEP outlines coordination procedures for listed species reviews. Program Description, Section (j) – Additional Information at 2. The draft MOU between FWC, USFWS, and FDEP was included in the appendix of the Program Description. FDEP will monitor adverse effect determinations on listed species and critical habitat by incorporating information into its permit tracking database, similar to the information collected by the Corps. This data collection will assist in facilitating compliance with permit conditions and can also be shared with USFWS. Failure to include the protection measures as permit conditions that are designed to avoid jeopardy or adverse modification of designated critical habitat could ultimately result in the State either denying the permit or the State informing the EPA that it will neither issue nor deny the permit, which would result in the EPA transferring the permit to the Corps for processing in accordance with 40 C.F.R. § 233.50(j). The USFWS' Biological Opinion finds that this process is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat.

**Muscogee (Creek) Nation**

- There should be consultation with Tribes on the undertakings that would otherwise be taking place with the Corps. EPA appreciates and values the Agency's government-to-government relationship with federally recognized tribes and has not delegated that relationship or consultation with such tribes. EPA's decision on Florida's request to assume the CWA Section 404 program is the relevant undertaking for purposes of NHPA 106 and associated consultation. EPA has consulted with interested tribes pursuant to NHPA 106 on this undertaking and has also consulted with tribes on the CWA 404 program decision consistent with EPA's tribal consultation policy. Should EPA approve the State's Section 404 program, the State would not assume permitting authority over any waters located in Indian country, as defined at 18 U.S.C. 1151. EPA's decision on Florida's request to assume the Section 404 program does not redefine or change what is Indian country nor does it alter the legal status of any land. While issuance of state 404 permits is not a federal action triggering government-to-government consultation, EPA  may consult with tribes, where appropriate, on permit applications that have the potential to impact historic properties or permit applications that are the subject of a dispute submitted pursuant to Section III.C. of the OA.

- The Tribe noted that previously established Programmatic Agreements under section 106 of the NHPA often take a long time (e.g., up to a year). The Tribe does not believe a Programmatic Agreement can be completed within 2 months, as the process requires a lot of consultation and coordination. EPA has met with interested tribes and believes that the PA appropriately reflects their input, and therefore that additional time is not needed. In addition, EPA is required by the CWA to act on Florida's assumption request within 120 days. 33 U.S.C. §§ 1344 (h)(1) and (3). EPA does recognize that the tribes would like to have continuing conversations about how the PA will be implemented, and to that end, EPA has added a new stipulation that: "within 30 days of the execution of this PA, EPA will engage in and complete further discussions with the FL

SHPO, FDEP, the ACHP, and the Consulting Tribes, to consider potential amendments to this PA regarding continuing tribal consultation engagement and EPA oversight of the State's administration of its 404 program. Any amendment adopted pursuant to this clause must comply with subsection VIII. a. of this PA."

- The Tribe requested a draft of the Programmatic Agreement as soon as possible. The EPA provided the draft PA to the tribes on November 25, 2020. EPA sent letters inviting the consulting parties to participate in NHPA 106 consultation on EPA's undertaking on September 2, 2020. The Agency has hosted multiple meetings with the tribes, both individually and as a group. Initially EPA invited the eight tribes with interests in Florida to participate on a September 22nd informational webinar. EPA explained during that meeting that the Agency planned to enter into a programmatic agreement that relied on the OA as a foundational document and provided information about where in the docket the OA could be found, as well as provided email copies of the OA when requested. During the informational webinar we encouraged tribes to identify to EPA any issues, concerns or gaps in the OA so that, where appropriate, the Agency could address those through the PA. On September 28, October 1, October 7, October 8, October 15, October 30 and December 3, we had individual consultation meetings with the five tribes that chose to consult and again encouraged each tribe to identify concerns with the OA so that EPA could, where appropriate, address those concerns through language in the PA. EPA took under advisement all NHPA-related issues raised during these consultation meetings. As a result, the tribes have had an opportunity to provide EPA with comments on the OA and issues associated with EPA's undertaking since early September. EPA acknowledges that it shared the actual draft PA with consulting parties on November 25th and requested comments on the PA by noon December 7th, but EPA has considered all NHPA-related comments received that are pertinent to the PA since September in revising the PA.
- The Tribe requested a meeting with the Advisory Council on Historic Preservation and all interested Tribes to discuss and review the Programmatic Agreement. The EPA met with the ACHP, Florida SHPO, FDEP, and interested tribes on December 2, 2020. The EPA scheduled a follow-up meeting with these same parties on December 14, 2020.
- The Tribe expressed that they are a sovereign nation, not the public, and therefore should not be bound to a 30-day review period for projects that may impact culturally sensitive areas. FDEP, through the terms of the OA, committed to direct engagement with the SHPO and interested tribes early in the application review process, including opportunities to inform FDEP's requests for additional information, provide effects determinations, and make recommendations for the resolution of adverse effects. In addition to this initial review period, FDEP has committed to providing notice on all permit applications where the tribes have expressed an interest in being notified. EPA may consult with tribes, where appropriate, on permit applications that have the potential to impact historic properties or permit applications that are the subject of a dispute submitted pursuant to Section III.C. of the OA.
- The Tribe believes that the undertaking is an adverse effect. EPA acknowledges the Tribe's comment. The PA establishes procedures to appropriately address any effects of the undertaking and evidences EPA's compliance with Section 106 of the NHPA.
- The Tribe expressed that they are culturally connected with the Seminole Tribe and speak the same language. The EPA acknowledges the Tribe's comment.
- The Tribe expressed that they did not understand why EPA in this instance is viewing the EPA's review of the State of Florida's request as an undertaking that requires consultation under section 106 of the NHPA, while in other instances the EPA did not conduct section 106 consultation (e.g., the Tribe expressed that the EPA did not conduct 106 consultation in our

delegation of programs to Oklahoma). On August 27, 2020, EPA Assistant Administrator for Water, Mr. David Ross, signed a memorandum that changed the Agency's position regarding whether or not approval of state and tribal requests to assume a CWA Section 404 program is a discretionary action. This determination was made after the solicitation and consideration of input received through the Federal Register (EPA-HQ-OW-2020-0008-0001. FR Vol 85, No. 99; May 21, 2020) and letters to Tribes (see attachment May 18, 2020). In the memorandum EPA determined that going forward, the Agency should consult with the Services under section 7 of the Endangered Species Act if a decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or designated critical habitat (see "Memorandum: Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals").  The memo further states: "EPA's determination that CWA Section 404 provides the requisite discretionary involvement or control for the ESA to apply to EPA's approval of a state or tribal CWA Section 404 program does not modify or alter the application of the ESA to other EPA actions not analyzed here, such as actions under the CWA (other than state assumption of CWA Section 404 programs), Safe Drinking Water Act, the Resource Conservation and Recovery Act, or other statutes implemented by EPA." The same rationale and limitations of applicability regarding EPA's potential obligation to consult under the ESA on CWA Section 404 program approvals applies to EPA's undertakings pursuant to section 106 of the National Historic Preservation Act. This discretionary authority is unique to the transfer of CWA Section 404 permitting authority. There is no requirement in CWA Section 402 for EPA to take into consideration the views of the Services, and there is no corollary in the CWA Section 402 program to the CWA Section 404(b)(1) Guidelines. These provisions in CWA Section 404 provide discretion to EPA that is not present in the Section 402 context.

- The Tribe expressed that they do not understand why they were not consulted prior to the execution of the Memorandum of Agreement between EPA and the State of Florida and the execution of the Memorandum of Agreement between the U.S. Army Corps of Engineers and the State of Florida. EPA's decision on Florida's request to assume the CWA 404 program is the relevant undertaking for purposes of Section 106 of the NHPA. We have consulted with tribes pursuant to Section 106 of the NHPA and have also consulted on the State's CWA 404 program request consistent with EPA's tribal consultation policy. The tribes were free to express their views on the FDEP/EPA MOA, FDEP/Corps MOA, and any other aspect of the State's 404 assumption application during this consultation period

- OA, pg.1, I(A)(2)(b): "Indian Tribes" definition should only include federally recognized tribes. Bands, groups, and communities are public entities, not federally recognized tribes. Wanted to know where this language came from. The EPA acknowledges the Tribe's comment but points out that "bands, groups, and communities" are also included in the NHPA regulatory definition of Indian tribe: tribes mean "an Indian tribe, band, nation, or other organized group or community including a Native village, Regional Corporation or Village Corporations, as those terms are defined in section 3 of the Alaska Native Claims Settlement Act (43 U.S.C. 1602), that is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians. (54 U.S.C. 300309)."

- OA, pg.1, I(A)(2)(b): The Tribe is unaware of consultation on state undertakings as they have only been contacted about federal undertakings in the past. The Tribe asked for examples of when Tribes are consulted on state undertakings. For the State 404 permitting process, consultation triggers are described in detail in the OA. EPA recommends you contact the Florida SHPO to discuss Florida's process for tribal consultation on state undertakings, as well as for other examples when this has occurred.

- OA, pg.2, I(A)(2)(b)(i): The Tribe asked whether the State plans to consult with state recognized tribes? If so, the Tribe considers them to be the public and they should not be grouped with or consulted with federally recognized tribes. The State has indicated to EPA that it intends to consult with federally recognized tribes as part of the State 404 permitting process.
- OA, pg.2, I(B)(1): From the Tribe: "Who at the [FDEP] is conducting historic properties review? Who is making the NRHP determinations? An SOI-qualified historian, archaeologist, etc. is required to make these decisions. We need to see the CV or resumes of the [FDEP] Staff who will make these determinations. The lead agency (the [FDEP]) is responsible for making determinations of no effect, no adverse effect, no historic proprieties effected, adverse effect, etc. Will the [FDEP] do this or will the SHPO do this? Through Section 106 consultation, tribes are asked to concur with the State or lead agency's finding of effect or let them know if there are cultural or religious properties that could be impacted by the 404 permit." Both FDEP and Florida SHPO have State reviewers that are Secretary of the Interior-certified. Florida SHPO, in coordination with FDEP, conducts reviews of historic properties pursuant to the OA.
- OA, pg.3, I(B)(1)(b): The Tribe thinks the language stating that FDEP has duties and responsibilities "*To THPO or Indian Tribe when the interested Indian Tribe does not have a THPO."* is worded weirdly. Why not just put "federally recognized tribes with an area of interest?" This language is consistent with NHPA regulatory language at 36 C.F.R. Section 800.2(c)(2).
- OA, pg.3, I(B)(1)(b): From the Tribe: "Again, we have to remember that "Indian Tribe" as it is now, does not stipulate that they are federally recognized, but seems they could also be a band or some type of group (i.e. the public)." The State intends to consult with federally recognized tribes as part of the State 404 permitting process.
- OA, pg.4, I(B)(1)(d): From the Tribe: "Tribes and public/local governments are listed separately here, which is correct. Due to this, do not try to send the Muscogee (Creek) Nation public notices when we are not the public. We are a sovereign nation and we will not take public notices as consultation on projects." In accordance with the process described in Section II.A. of the OA, the FDEP will email THPO/tribes notification within five days of receipt of an application for a State 404 Program Permit and provide the THPO/tribes an opportunity to review the application for potential effects to cultural resources or historic properties of religious or cultural significance, seek additional information from the applicant, provide an effects determination, and provide initial recommendations for resolution of any adverse effects within an initial review period (i.e., before FDEP provides public notice of administratively complete State 404 Program individual permit applications). In addition to this initial review period, FDEP has committed to providing notice on all permit applications directly to tribes that have expressed an interest in being notified. The PA and the OA also both establish a dispute resolution process to resolve disputes should they arise regarding historic and cultural resources.
- OA, pg.4, I(B)(1)(d): From the Tribe: "How will the public be notified? Newspaper? Mail?" FDEP will publish notice on its website. FDEP also mails the notice to adjacent property owners.
- OA, pg.4, I(B)(1)(d): The OA states, "*In the event the [FDEP] employs a historic resource coordinator, the [FDEP] will coordinate with SHPO and the THPO/Indian Tribes to establish procedures to streamline certain categories of projects."* From the Tribe: "Streamlining certain projects would require another agreement document (e.g. programmatic agreement)." EPA acknowledges the Tribe's comment.
- OA, pg.5, I(B)(2)(c)(ii): Regarding FDEP's duty and responsibility to "*On the same day received, provide information related to an unanticipated discovery, effects to historic resources, or the identification of unmarked human remain on issued no-notice general permits, general permits,*

*and individual permits,"* the Tribe wants to know how this will be done. By email? Phone call? FDEP indicates this is typically done by email and phone.

- OA, pg.5, I(B)(3)(a)(i): Regarding FDEP's duty and responsibility to "*Review general permit and expedited applications to determine the presence or absence of cultural resources or historic properties of religious and cultural significance or request that the project be evaluated as an individual permit because of potential historical resources concerns,"* the Tribe asks: "Why are there expedited applications? This should not be a regular occurrence and putting this here makes it seem as if the agreement is giving them the chance to expedite all the applications they want. Why is this process needed? Are archaeological surveys required by applicants? Expedited applications only occur for subsequent phases of an on-going project. The entire project will be put out for comment for the first phase. For expedited applications, FDEP will review the changes to the permit not addressed during the previous permitting phase. Where there are no changes to the project, the notice will provide the public an opportunity to submit comments, materials, or evidence pertaining to identification of material site changes or potential noncompliance. The Florida SHPO can request an archeological survey on a specific permit or project.
- OA, pg.7, II(A)(1): Regarding FDEP's email/notification of consultation during the initial review of a state permit, the Tribe states, "This will not be a public notice to the Tribe. Additionally, we want information provided pertaining to any surveys or sites that are in the area (FLSHPO)." In accordance with the process described in Section II.A. of the OA, the FDEP will email THPO/tribes notification within five days of receipt of an application for a State 404 Program Permit. FDEP is working on a specific notification template format for the tribes. In addition, THPOs/tribes can ask FDEP to seek additional survey information. Information pertaining to any survey or sites will be subject to the confidential stipulation in the PA.
- OA, pg.9, II(B)(1)(a): Regarding the following procedures, *"[FDEP] will* provide *a public notice of all administratively complete State 404 Program individual permit applications pursuant to the provisions of Rule 62-331.060, F.A.C. SHPO, THPO/Indian Tribes shall receive an email notification of the public notice in accordance with paragraph 62-331.060(2)(a), F.A.C.,"* the Tribe states the following: "A public notice does not constitute tribal consultation. A consultation letter template should be made and used when notifying tribes and inviting them to consult on a state undertaking." We have notified Florida SHPO and FDEP of your comment as well. FDEP is working on a specific notification format for the tribes.
- OA, pg.9, II(B)(2): Regarding the following procedures, "*The public notice shall specifically mention and solicit comment on the historic properties review process, including any initial effects determinations and recommendations received by SHPO/THPO/Indian Tribes during the Department's initial review of the application. If the initial determination is that the activity will have no effect on historic properties, a "no potential to cause effect" or "no effect" statement shall be included in the public notice,"* the Tribe states the following, "This is a concern. Tribal comments should not be included in a public notice or be made available to the public. Also, the public should not receive an archaeological report. If any information is posted online for them to review with the application, then it should be highly redacted. Confidentiality is a major issue when identifying or when a project impacts a cultural site." The PA and OA address this concern by setting out a process for withholding confidential and sensitive information.
- OA, pg.10, II(D): The Tribe asked "Why do the no-notice [General] permits require a quick 15-day review? What is the nature of the no-notice permits? What are examples of when this would apply? Explain further." Under a no-notice permit the applicant is required to contact the Florida SHPO directly to determine if there are any properties determined to be eligible or potentially eligible for listing on the National Register of Historic Places before using a general permit. If

Florida SHPO identifies a potential adverse effect or issue then at that point, the no-notice permit is no longer applicable, and the applicant must contact FDEP and proceed under a general permit.

- OA, pg.13, III(B)(1)(b): Regarding the following statement on continued consultation on the resolution of adverse effects, "*The Department, the SHPO, and THPO/Indian Tribes, if participating, may agree to invite other individuals or organizations to become consulting parties,"* the Tribe asks, "What other individuals or organizations would be invited? For a disagreement, would the ACHP involved?" It is EPA's understanding that other individuals or organizations that may be invited to become consulting parties would include parties that may have an interest and/or consultative role in the historic properties review of State undertaking related to the administration of the State 404 permitting program. See Section I.A. of the OA. The ACHP may be involved in disputes that are elevated to EPA for review pursuant to Section III.C. of the OA and Section V of the PA.
- OA, pg.13, III(B)(1)(c): Regarding the following statement on continued consultation on the resolution of adverse effects, "*The Department shall make information available to the public, subject to any confidentiality requirements. The Department shall provide an opportunity for members of the public to express their views on resolving adverse effects of the undertaking*," the Tribe asks "Why would the public be involved if it is a disagreement between the Tribes and EPA? They should not be privy to this information." This language is consistent with language from the ACHP regulations contained in 36 CFR Section 800.6(a)(4).
- OA, pg.14, III(B)(2)(e): Regarding the following statement on the resolution of adverse effects, "*If agreement cannot be reached, the Department shall attempt to continue consultation to reach an acceptable agreement. However, if agreement is not possible, the Department shall proceed according to Section III.C*," the Tribe states "The ACHP should be involved if no agreement can be made." The PA provides for ACHP involvement when disputes are elevated.
- OA, pg.15, III(C)(3): Regarding the following statement on federal review, "*The Department shall, in accordance with paragraph 62-331.052(3)(b), F.A.C., notify the EPA if the Department does not accept the effect determination of a proposed activity or recommendations for the resolution of adverse effects of the THPO/Indian Tribes, together with the Department's reason for doing so, in which case the EPA can comment upon, object to, or make recommendations*," the Tribe asks "Who at the EPA will make this determination? What staff will work on this? Will they be an archaeologist? SOI-qualified individuals?" EPA officials will make the determination in consultation with ACHP.
- OA, pg.15, IV: Regarding the "Terms and Definitions" section, the Tribe states, "Add general permit" and "no-notice permit" to this." The OA is an agreement between the FDEP and the Florida SHPO; EPA is not a party to the OA. The OA is a final document that was submitted by the State of Florida as part of its completed assumption package.
- OA, pg.16, VI: Regarding the "Training Requirements, A-C" section, the Tribe states, "Yes, there should be training. The use of "occasional" means that it could happen a few times every year or just once every ten years. You need to define this better," and "Also, who will contact the Tribes so that they can provide training?" FDEP or Florida SHPO will be responsible for contacting the tribes for training. If the Tribe is interested in providing training, please contact FDEP or Florida SHPO.
- Comment to add Federally-recognized to tribe. The PA was revised to add a citation to the 40 C.F.R. Section 233.2 which provides a definition for Indian Tribe that includes "any Indian Tribe, band, group, or community recognized by the Secretary of the Interior and exercising governmental authority over a Federal Indian reservation."

- Comment to explain what is in Appendix A in first mention. The PA was revised to reference Appendix A later in the document.
- Comment to consider adding a WHEREAS that will outline the THPO role under Section 106 of the NHPA. The PA does not have a role for the THPO because this undertaking does not occur on Indian country. Should EPA approve the State's Section 404 program, the State would not assume permitting authority over any waters located in Indian country, as defined at 18 U.S.C. 1151. In those areas, the federal government retains its normal government-to-government consultation with the tribes.
- Comment that FDEP should be written out in first mention. The PA was revised to reflect this change.
- Comment asking why did EPA wait so long to give Tribes a draft PA for them to review? We know that ACHP received the Draft PA on Oct 21, 2020. Tribes received the PA on November 25th, one day before Thanksgiving and were asked to meet one week later for consultation. There has not been enough time for all parties who have interest and obligations under Section 106 to consulting meaningfully on this undertaking. EPA sent letters inviting the consulting parties to participate in NHPA 106 consultation on EPA's undertaking on September 2, 2020. The Agency has hosted multiple meetings with the tribes, both individually and as a group. Initially EPA invited the eight tribes with interests in Florida to participate on a September 22nd informational webinar. During that webinar, EPA provided information on Florida's request to assume the CWA 404 program and an overview of the NHPA 106 consultation process that would be utilized. This was to assist the tribes in deciding whether to participate with EPA on NHPA 106 consultation on the undertaking. EPA explained during that meeting that the Agency planned to enter into a programmatic agreement that relied on the OA as a foundational document and provided information about where in the docket the OA could be found, as well as provided email copies of the OA when requested. During the informational webinar we encouraged tribes to identify to EPA any issues, concerns or gaps in the OA so that, where appropriate, the Agency could attempt to address those through the PA. On September 28, October 1, October 7, October 8, October 15, October 30 and December 3, EPA had individual consultation meetings with the five tribes that chose to consult and again encouraged each tribe to identify concerns with the OA so that EPA could, where appropriate, address those concerns through language in the PA. EPA took under advisement all NHPA-related issues raised during these consultation meetings. As a result, the tribes have had an opportunity to provide EPA with comments on the OA and issues associated with EPA's undertaking since early September. EPA acknowledges that it shared the actual draft PA with consulting parties on November 25th and requested comments on the PA by noon December 7th, but EPA has considered all NHPA-related comments received that are pertinent to the PA since September in revising the PA.
- Comment asking why the Seminole Nation of Oklahoma wasn't contacted. The NHPA regulations require EPA to make a reasonable and good faith effort to identify tribes that shall be consulted in the NHPA Section 106 process. See 36 CFR 800.2(c)(2)(ii)(A). EPA believes it met this obligation. EPA coordinated with the ACHP and based on their recommendation used the HUD website. Using the HUD website, EPA identified and invited the following eight federally recognized tribes to consult: the Alabama-Coushatta Tribe of Texas; the Choctaw Nation of Oklahoma; the Coushatta Tribe of Louisiana; the Miccosukee Tribe of Indians of Florida; the Mississippi Band of Choctaw Indians; the Muscogee (Creek) Nation; the Poarch Band of Creek

Indians; and the Seminole Tribe of Indians of Florida. This list of federally recognized tribes for which EPA intended to carry out consultation was provided to the ACHP and the ACHP did not indicate that EPA needed to modify or add to this list.

- Comment stating there needs to be another WHEREAS that states the role of the tribes in the agreement. We are not the public. We are sovereign nations and deserve to be invited as a concurring party or an invited signatory to this agreement. Tribes who own lands in FL should be offered signatory status in our opinion. EPA appreciates the tribes' request to be a signatory. EPA has carefully considered tribal input in the development of the PA and believes the PA reflects important and appropriate opportunities for tribal involvement going forward, as well as well thought out dispute resolution processes. The signatories to the PA are those entities that are required parties under the NHPA regulations and those that assume a required responsibility under the PA.
- Comment asking about NAGPRA compliance, stating, "We generally suggest that you try to avoid removing and curating unmarked burials, especially those of likely Native Americans. If you are a NAGPRA reporting institution, you must comply with NAGPRA regulations for any remains or associated grave goods that you take into your possession (visit the National NAGPRA webpage for more information). Additionally, pursuant to Section 872.05(6)(c), *Florida Statutes*, the State Archaeological consults with the Seminole Tribe of Florida and the Miccosukee Tribe of Indians of Florida to determine the final disposition of Native American remains. The revised PA directly addresses NAGPRA in several provisions. The new language clarifies: (1) EPA's role, (2) the notification process, and (3) Tribal concurrence by the consulting tribes before work continues.
- Basically, FL has created laws that conflict with Federal laws and this PA will undermine our sovereignty since we are not in the State. It is important to point out that MCN has treaty lands in Florida (1739 Treaty of Coweta extended past St. Marys River to the St. Johns.) Should EPA approve the State's Section 404 program, the State would not assume permitting authority over any waters located in Indian country, as defined at 18 U.S.C. 1151. In those areas, the federal government retains its normal government-to-government consultation with the tribes. For waters outside of Indian country that the State assumes, the PA and OA, along with other assumption documents set forth the process for tribes to raise issues related to their interests to both Florida and to EPA. EPA has conducted government-to-government consultation with federally recognized Tribes, including the MCN. The PA provides the MCN along with the other consulting tribes an opportunity to resolve disputes over cultural resources by raising them to EPA. Furthermore, pursuant to the terms of the PA, all parties agree to comply with all applicable provisions of NAGPRA. EPA's decision with regard to Florida's request to assume the Section 404 Program does not alter treaty rights, make a determination whether or not any specific lands meet the definition of Indian country, as set forth at 18 U.S.C. 1151, or affect the legal status of those lands.
- Commenter asks the question, "EPA may review or will review state CWA 404 permits and draft general permits?" EPA may review state CWA 404 permits and draft general permits.
- Comment that the OA Procedures should be attached to PA as appendix. The OA will be attached as an appendix to the PA.
- Question of when the OA was finalized. August 6, 2020.

- Comment stating, "According to I.A.2.b.i. of the OA, the Florida Department of Environmental Protection, "shall consult with any Indian tribe that attaches religious and cultural significance to historic properties that me be affected by an application." This conflicts with 36 CFR 800.2(4), which indicates that federal agencies remain responsible for consultation with Tribes even when other NHPA Section 106 duties have been delegated.  Executive Order 13175 and the ACHP's statement on "Limitations on the Delegation of Authority by Federal Agencies to Initiate Tribal Consultation under Section 106 of the National Historic Preservation Act" both affirm this responsibility on the part of federal agencies.  A federal agency may delegate its government-to-government consultation responsibility towards a Tribe under the NHPA only with that Tribe's written consent. As this is has not occurred, the EPA still has the responsibility of conducting government-to-government consultation with Tribes on these permits.  This needs to be reflected in the OA and PA." EPA is not delegating government-to-government consultation with federally recognized Tribes under NHPA or NAGPRA. Should EPA approve the State's Section 404 program, the State would not assume permitting authority over any waters located in Indian country, as defined at 18 U.S.C. 1151. In those areas, the federal government retains its normal government-to-government consultation with the tribes. Issuance of State 404 permits is not a federal action triggering government-to-government consultation. Nonetheless, EPA has agreed through the PA to evaluate historic property disputes and to comply with all applicable provisions of NAGPRA.
- In comment to the statement, This PA adopts the OA and its procedures and incorporates them herein. The Florida SHPO may amend or terminate the OA if all signatories to this PA agree. In such an event, the PA shall be amended or terminated accordingly pursuant to the terms set forth below, the commenter asks, "What about tribes?  What about our comments on the OA?" The PA has an amendment and termination clause that addresses this issue.
- In response to the PA indicating FDEP will send tribes copies of public notices, the commenter states, "As stated previously in comments we submitted to EPA, federally recognized tribe are not the public and its insulting to treat a sovereign nation like the public." We have notified Florida SHPO and FDEP of your comment. FDEP is working on a specific notification format for the tribes.
- In response to the PA indicating the EPA will submit to the ACHP a copy of the proposed comments, objections, or recommendations and other pertinent documentation, the commenter states, "We want to be consulted here.  Please add Muscogee (Creek) Nation or 'Tribes' to this review consultation." Language regarding tribal consultation during a dispute has been added to the provisions of the PA.
- Commenter recommends adding Florida SHPO and tribes to the statement, "The EPA will transmit any final comments, objections, or recommendations to FDEP for resolution in accordance with 40 C.F.R. § 233.50." The EPA has added a provision adopting this request in the PA.
- Commenter asks about Tribes who are not signatories, stating, "EPA has not allowed us a seat at the table.  Confidentiality is a MAJOR concern for tribes" The EPA invited the eight tribes to consult on the 404 assumption process on September 2, 2020. EPA disagrees with this assertion. EPA held several virtual meetings with the tribes and incorporated language, where appropriate, to address their comments into the PA. The PA and the OA contain provisions setting out a process for withholding confidential and sensitive information. EPA appreciates the tribes'

request to be a signatory. The signatories to the PA are those entities that are required parties under the NHPA regulations and those that assume a required responsibility under the PA.

- Commenter recommends adding tribes to reporting and monitoring by adding them to those receiving annual reports and the ability to request meetings to discuss issues in the annual reports. The EPA has added a provision in the PA that Consulting Tribes shall receive annual reports and shall have the ability to request meetings to discuss issues identified in the annual report related to the PA and OA.

**Poarch Band of Creek Indians**

- OA relies on SHPO to make effects determination because FDEP doesn't have a qualified archeologist: FDEP has Secretary of the Interior-certified experts on staff to review.
- Need separate communication; SHPO response will not satisfy the Tribe. We have notified Florida SHPO and FDEP of your comment. FDEP is working on a specific notification format for the tribes.
- Shortened review period under the OA: FDEP, through the terms of the OA, committed to direct engagement with the SHPO and interested tribes early in the application review process, including opportunities to inform FDEP's requests for additional information.
- The Poarch Band of Creek Indians wants the NHPA Programmatic Agreement to include a process that ensures that cultural resources are identified, potential effects on those resources are identified, and sets forth how mitigation will be addressed. The OA 3(b)(2)(d) provides the following language: "if the Department, the SHPO, THPO agree on how adverse effects will be resolved then they will enter into a MOA and the consulting tribal parties will be invited to concur."
- The Poarch Band of Creek Indians requested a copy of the draft Programmatic Agreement as soon as possible and expressed concern that they would have sufficient time to review. The Poarch Band of Creek Indians were provided a copy of the draft PA on November 25, 2020.
- The Poarch Band of Creek Indians would prefer to receive a copy of a draft Programmatic Agreement before providing written comments regarding the NHPA consultation. The Poarch Band of Creek Indians were provided a copy of the draft PA on November 25, 2020. Written comments on the NHPA were accepted and responded to through December 14, 2020. EPA does recognize that the tribes would like to have continuing conversations about how the PA will be implemented, and to that end, EPA has added a new stipulation that: "within 30 days of the execution of this PA, EPA will engage in and complete further discussions with the FL SHPO, FDEP, the ACHP, and the Consulting Tribes, to consider potential amendments to this PA regarding continuing tribal consultation engagement and EPA oversight of the State's administration of its 404 program. Any amendment adopted pursuant to this clause must comply with subsection VIII. a. of this PA."
- Will FDEP adopt NWPs? To provide consistency between the State and federal 404 programs, FDEP modeled many of the State's programmatic general permits after nationwide permits. These State general permits will be issued on the date the State program comes into effect and will have a five-year term. In crafting its programmatic general permits, FDEP did not simply incorporate by reference or copy existing Corps permits; it modified these permits including additional requirements, as appropriate, to ensure these permits comply with the Section 404(b)(1) Guidelines and State requirements including but not limited to the State's Environmental Resource Program permits, water quality standards, protection of listed species,

and compliance with the State's Coastal Zone Management Plan. These general permits were available for comment as part of the program package approval and EPA has reviewed them as part of the program request. (See Section 3.2.1 of the State 404 Program Applicant's Handbook).

- Will FDEP perform NEPA? Issuance of state 404 permits is not a federal action triggering the requirement for a NEPA review.

- How stringent will EPA's oversight of Florida's 404 program be after first year or two? FDEP shall provide the signatory parties and the Consulting Tribes with an annual report for each State fiscal year ending June 30th by September 30th of each year that the PA is in effect. This annual report will summarize the actions taken to implement the terms of the PA and provide data about the historic properties review process under the OA, and, if necessary, recommend any actions or revisions to be considered, including amendments to the PA. The EPA will schedule a meeting to discuss issues identified in the annual report related to the PA and OA if any signatory or Consulting Tribe requests one. Further, EPA will retain its oversight obligations under the CWA.

- The consultation process with tribes in regard to the EPA Programmatic Agreement (PA) and the Operating Agreement (OA) has not been inclusive of tribal comments and concerns. Both documents are orientated toward inclusion of Florida State Department of Historic Preservation (SHPO) involvement while relegating roles and responsibilities to Tribes without tribal involvement. The OA was executed with the Florida SHPO when it was offered to tribes for comments. This process is unacceptable and does not adhere to the federal mandate for agencies to treat Tribes as sovereign nations. The PA relies heavily upon the OA with the Florida State Department of Historic Preservation (SHPO). The OA is an agreement between the FDEP and the Florida SHPO; EPA is not a party to the OA. The OA is a final document that was submitted by the State of Florida as part of its completed assumption package. It is our understanding the OA did incorporate comments received by the FDEP from the Miccosukee Tribe and the Seminole Tribe. During its NHPA 106 consultation, EPA asked tribes to identify any gaps, concerns, or issues related to the OA and has taken comments provided by the tribes into consideration in drafting the PA. As such, EPA believes that the PA and OA, when considered together, address tribal interests.

- In the OA the SHPO agrees to perform many of the function of an agency archaeologist: making determination of effect I. B.2.(a)(v) and recommendations to minimize, or mitigate adverse effects on historic properties I.B.2.(a)(vi). These responsibilities are then passed to Tribal Historic Preservation Offices (THPO) I.B.3 without their agreeing to accept the responsibilities. The provision of the OA cited offers the tribes or THPO an opportunity to provide information but does not require their participation.

- Both documents have numerous delegation of authority and assumption of authority that tribes were not a party to drafting. Without the opportunity to have meaningful contribution to what the agreements contain and are to be implemented the Poarch Band of Creek Indians cannot agree to and sign them. As the Poarch Band of Creek Indians have not agreed to an alternate process for consultation on Clean Water Act Section 404 permits issued by the State of Florida potential to effect historic properties, the Poarch Band of Creek Indians will expect the Environmental Protection Agency to follow 36 CFR 800 regulations. The EPA is cognizant of its role as a federal agency under Section 106 of the NHPA and NAGPRA. The EPA is not delegating its NHPA consultation role to the State. If Florida assumes the 404 program, issuance of permits by the State would not be a federal action triggering government-to-government consultation.

That said, if a historic properties dispute arises over of a proposed State 404 permit, both the PA and OA assure tribes the opportunity to raise the dispute to the EPA who, in consultation with the ACHP, will make a determination regarding the matter raised.

- The Poarch Band of Creek Indians support the recommendation of the Advisory Council for Historic Preservation that the Environmental Protection Agency and Florida Department of Environmental Protection to extend the 120-day approval process to allow adequate time to the Poarch Band of Creek Indians to contribute to the drafting of an acceptable PA. Based on the fact that NHPA Section 106 consultation was provided to the consulting parties beginning in early September, EPA does not believe an extension of the 120-day review period is necessary. EPA notes that it is required by the CWA to act on Florida's request to assume the 404permitting program within 120 days. 33 U.S.C. §§ 1344(h)(1) and (3). EPA does recognize that the tribes would like to have continuing conversations about how the PA will be implemented, and to that end, EPA has added a new stipulation that: "within 30 days of the execution of this PA, EPA will engage in and complete further discussions with the FL SHPO, FDEP, the ACHP, and the Consulting Tribes, to consider potential amendments to this PA regarding continuing tribal consultation engagement and EPA oversight of the State's administration of its 404 program. Any amendment adopted pursuant to this clause must comply with subsection VIII. a. of this PA."

**Seminole Tribe of Florida**

- The Seminole Tribe shared that previous agreements with ACHP and Programmatic Agreements have precluded the Tribe from having a strong say in site-specific situations where cultural significance is at issue. EPA revised the PA, where appropriate, to address many of the issues and concerns raised by the Seminole Tribe. That said, if a historic properties dispute arises over a proposed State 404 permit, both the PA and OA assure tribes the opportunity to raise the dispute to the EPA who, after conferring with the ACHP, will make a determination. The PA also contains a NAGPRA provision that more clearly enumerates EPA's role and specifies that work will not proceed without written permission from the tribes.
- The Seminole Tribe of Florida requested that EPA provide CWA elevation examples from other EPA Regions. Each situation will be addressed on a case-by-case basis, but the EPA intends to discuss with the tribe separately any relevant prior examples.
- The Seminole Tribe of Florida shared that they would have expected EPA to consult with them on this policy change. The Seminole Tribe of Florida treated their comments/process as if EPA's approval of Florida's program wouldn't be discretionary, and were not aware of the Federal Register Notice. EPA acknowledges the Tribe's expectation and while EPA did not formally consult on the policy change, EPA did solicit input from the public and tribes through multiple mechanisms including: emails sent on May 18, 2020, to EPA's lists of tribal environmental and natural resources directors in all 10 Regions and OW's list of tribal water contacts, which includes various internal and external tribal water contacts, organizations, and individuals who have asked to be kept up to date on such announcements. A copy of these emails is attached for reference. EPA would be happy to add any additional contacts for the Seminole Tribe to these lists if necessary. On August 31, 2020, EPA invited the Tribe to engage in government-to-government consultation on our action regarding Florida's request to assume a CWA section 404 program.

- The Seminole Tribe of Florida would appreciate consultation on national policies like the ESA policy change in the future. EPA acknowledges the Tribe's request for consultation on potential future policy changes and will continue to work with the Tribe consistent with the EPA guidance on Tribal Consultation.
- The Seminole Tribe asked whether the BiOp would be updated to account for new species or whether new species would be handled on a permit-by-permit basis. The Biological Opinion's section on reinitiation states that "the listing of a new species or critical habitat shall not trigger reinitiation of consultation on this action (approval of Florida's assumption of the CWA 404 program). Since the State would administer the CWA 404 program, the USFWS has no obligation to conduct section 7 consultation on individual permits because the issuance of such a permit is not a Federal action. However, the State's regulations require that the State comply with the technical assistance process with USFWS for ESA listed species and critical habitat. Accordingly, any effects to newly listed species or their critical habitat would be sufficiently considered and addressed." U.S. Fish and Wildlife Service, Programmatic Biological Opinion for U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program Under Section 404 of the Clean Water Act (November 17, 2020) at 68.
- The Seminole Tribe of Florida shared that endangered species issues are among the biggest issues and that they are commonly a subject of tribal consultation with the Corps, because of the tribe's geographic location. The EPA acknowledges the Seminole's comment.
- The Seminole Tribe of Florida is interested in having the ability to comment on a proposed project as a downstream affected jurisdiction. FDEP, through the terms of the OA, committed to direct engagement with the SHPO and interested tribes early in the application review process, including opportunities to inform FDEP's requests for additional information, provide effects determinations, and make recommendations for the resolution of adverse effects. FDEP has committed to providing notice on all permit applications where the tribes have expressed an interest in being notified. Pursuant to F.A.C. 62-331.080(2)(a), FDEP will provide the Tribe with notice for any activity that is within six miles of the Seminole Tribe of Florida's Big Cypress or Brighton Reservations; within two miles of the Seminole Tribe of Florida's Immokalee, Lakeland, or Fort Pierce Reservations; within one mile of the Seminole Tribe of Florida's Tampa, Coconut Creek, or Hollywood Reservations; within the Seminole Tribe's reserved rights areas, including but not limited to: within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A.
- The application from DEP states the GPs will last for 5 years from effective date of transfer, but the Corps existing permit program will expire in 2022. EPA acknowledges that the Corps' Nationwide Permits expire in 2022. However, pursuant to CWA Section 404(h)(1)(A)(ii) and 40 C.F.R. Section 233.23(b), the State may develop general permits for a term not to exceed 5 years.  FDEP's general permits will not extend the Corps general permits beyond their statutory limitation of five years in duration. As the State program description states on page 30, nationwide permits and the State's programmatic general permits "will no longer be applicable within assumed waters," and thus there is no extension of the Corps general permits in assumed waters. The State's program does include general permits which the State incorporated into regulations at Florida Administrative Code Chapters 62-330 and 62-331.
- The Seminole Tribe of Florida is concerned about cumulative effects of NWPs on Tribal lands. The EPA acknowledges the commenters concerns.
- The Seminole Tribe of Florida has been following NWP 12 for utilities with particular interest. The EPA acknowledges the Seminole's comment.

- The Seminole Tribe of Florida asked EPA to consider tribally-owned lands not in federal trust when thinking about impacts of general permits. EPA acknowledges the Tribe's comment and request.
- Currently, the Seminole tribe works with SFWMD. Tribe is concerned about coordinating with multiple state agencies and educating them on the tribe's special status; i.e., five WMDs if delegation occurs. The EPA acknowledges the comment. Florida's 404 assumption package identifies FDEP as the permitting authority. A change to Florida's approved program would require approval pursuant to 40 C.F.R. Section 233.16(d).
- ERP component makes up to 85% of overall requirements of 404, according to State package; WMD will be working hand-in-hand on 404 reviews. The EPA acknowledges the comment.
- The Seminole Tribe of Florida would like advance notice and a conversation with EPA if FL makes changes to the program such that Water Management Districts will be implementing the program, especially if the modification is just a letter modification. Florida's 404 assumption package identifies FDEP as the permitting authority. A change to Florida's approved program would require approval pursuant to 40 C.F.R. Section 233.16(d).
- The OA does not currently provide a process or eligibility criteria to determine under what circumstances EPA will involve the ACHP. These criteria should be developed with associated timeframes within the PA. The PA contains a detailed description of the dispute resolution process and ACHP's role.
- The Tribe requests that EPA involve ACHP in review of any disputes between the consulting parties on the area of potential effect and any disputes as to whether a site is eligible or potentially eligible for listing in the National Register of Historic Places (NRHP). These are areas of potential dispute that are not covered by the OA Federal Review section. If there is a dispute, this can be raised to EPA under the current dispute provisions contained in the PA.
- In instances where ACHP's involvement is requested, consulting or commenting Tribes should be provided an opportunity to discuss the dispute with ACHP and EPA. The PA provides an opportunity for the EPA to consult with the tribes when disputes are identified, where appropriate.
- The OA acknowledges at Section I. A.2.b.i that tribes possess special expertise in assessing the eligibility of cultural resources or historic properties that may possess religious and cultural significance. The Seminole Tribe requests that a similar statement be included in the PA. Similar language was included in the revised PA.
- The Tribe is also interested in the possibility of participating in the PA as an invited signatory due to the potential for FDEP's 404 Program to impact religious and culturally significant historic properties and the Seminole Tribe's foreseeable role as a consulting party under the OA.
- The Tribe requests to review the draft PA. The Tribe was provided a copy of the PA on November 25, 2020.
- The Tribe commented that the Operating Agreement does not currently reflect coordination with the ACHP. The PA contains provisions for ACHP coordination.
- The Tribe strongly recommends a Programmatic Agreement be developed to clearly set forth in what circumstances EPA will involve the ACHP. The PA contains provisions for ACHP coordination.
- The Tribe requested that they be a signatory to any Programmatic Agreement and that it be available to the Tribe for review before EPA decides on Florida's application to implement its own Section 404 Program. The Tribe was provided a copy of the PA on November 25, 2020. EPA appreciates the Tribe's request to be a signatory. The signatories to the PA are those entities

that are required parties under the NHPA regulations and those that assume a required responsibility under the PA.

- On September 2, 2020, the Seminole Tribe received an invitation to participate in a Section 106 consultation pursuant to the National Historic Preservation Act. The Seminole Tribe concurs with EPA's determination that approval or disapproval of the State's 404 Program assumption application is a Federal Undertaking triggering a Programmatic Section 106 consultation. On September 28, 2020, the Seminole Tribe participated in formal consultation with EPA on the State's 404 application pursuant to Executive Order 13175, EPA Policy on Consultation and Coordination with tribes, and Section 106 of the National Historic Preservation Act. As requested by EPA, on October 8, 2020 the Seminole Tribe provided comments on areas of the OA with SHPO that should be strengthened in a Programmatic Agreement (PA) with the Advisory Council on Historic Preservation (ACHP) and requested a copy of the draft PA. These comments were acknowledged but have not been responded to. We now understand that EPA did not provide ACHP with the Seminole Tribe's comments. Nor has EPA provided any of the other information to the Tribe that was requested during formal consultation on the assumption package. EPA addressed the Seminole Tribe's comments in the PA. The Seminole Tribe will receive a full response to the comments that it submitted.

- The Seminole Tribe did not receive the draft PA with ACHP until November 25, 2020, the day before the Thanksgiving holiday. The Seminole Tribe was given one week to review the PA before EPA continued consultation with the Seminole Tribe and other Tribes on December 2, 2020. Upon quick review of the PA prior to the consultation, most of the Seminole Tribe's feedback was not incorporated nor did EPA acknowledge the comments already made during the consultation. EPA has requested comments from the Tribes on the PA by noon on December 7th. The Seminole Tribe would like to echo the consultation concerns raised in the December 2 consultation meeting regarding the fast track timing of the PA. It is likely that if the 404 Program is approved, that other states will look to the process utilized by FDEP and EPA to pursue 404 assumption. Yet, despite the national importance of the PA and this consultation process, it appears the PA and protection of cultural resources within the 404 Program is not being given due consideration and an appropriate amount of time for consultation and comment. Review of a draft PA is customarily allotted a minimum of thirty days for Tribal review. It is inappropriate to ask Tribal sovereign nations to agree to a PA that will govern cultural resource review in less than a week's time. Further, the Seminole Tribe has asked to be a signatory or concurring party to the PA and the timeframe set forth by EPA for finalization of the PA does not give adequate time for the Seminole Tribal Council to consider and approve such an important PA. The Seminole Tribe does not believe that the process for the PA and tribal consultation under Section 106 has met EPA's trust responsibilities to Tribes. EPA gave the protection of cultural resources within the 404 Program appropriate time for consultation and comment. EPA revised the PA to address many of the issues and concerns raised by the Seminole Tribe. EPA appreciates the Tribe's request to be a signatory. The signatories to the PA are those entities that are required parties under the NHPA regulations and those that assume a required responsibility under the PA.

- Section III.C of the OA between the Florida Department of Environmental Protection (FDEP) and the State Historic Preservation Office governs Federal Review. Within that section, there are three instances where the FDEP sends an application to EPA for review: 1) during public notice

for projects within critical areas established under state or federal law, including sites identified or proposed under the NHPA; 2) where the consulting parties of the OA cannot agree on the effect determination of a proposed activity or where FDEP does not accept the recommendations of one of the consulting parties for the resolution of adverse effects; and 3) if the FDEP does not accept the effect determination of a proposed activity or recommendations for the resolution of adverse effects of the THPO/Indian Tribes. However, the OA does not currently provide a process for EPA to involve ACHP in review of any disputes between the consulting parties on the area of potential effect and any disputes as to whether a site is eligible or potentially eligible for listing in the National Register of Historic Places (NRHP). Within the OA, the Federal Review provisions fall under the section header "Effects Determinations and Resolution of Adverse Effects." The Seminole Tribe believes that the area of potential effect determination and whether a site is eligible or potentially eligible for listing in the NRHP are additional areas where disputes requiring EPA or ACHP resolution could arise but are not covered by the OA Federal Review section. The Seminole Tribe requests that these additional areas of review be added into the PA at Section IV. The broad language of subsection 1 and 2 of the PA dispute resolution addresses this concern, specifically the language in subsection 2, "where the consulting parties of the OA cannot agree on the effect determination of a proposed activity." A consulting party could raise a dispute of an effects determination based on a disagreement over an area of potential effects or a disagreement over the NRHP determination.

- In instances where ACHP's involvement is requested, consulting or commenting Tribes should be provided an opportunity to discuss the dispute with ACHP and EPA. Currently, ACHP has an informal process in place where ACHP and the Seminole Tribe can have a conversation to discuss the Tribe's concerns. As it stands in the draft PA, there is no mechanism that sets forth this opportunity for discussion in the event of a dispute. EPA added language regarding consultation in the dispute resolution process to address the Tribe's concerns.

- The OA acknowledges at Section I. A.2.b.i that Indian tribes possess special expertise in assessing the eligibility of cultural resources or historic properties that may possess religious and cultural significance. The Seminole Tribe requests that a similar statement be included in the PA. A provision utilizing similar language was added to the PA.

- The Seminole Tribe remains interested in the possibility of participating in the PA as an invited signatory due to the potential for FDEP's 404 Program to impact religious and culturally significant historic properties and the Seminole Tribe's foreseeable role as a consulting party under the OA. EPA appreciates the Tribe's request to be a signatory. The signatories to the PA are those entities that are required parties under the NHPA regulations and those that assume a required responsibility under the PA.

- The Seminole Tribe suggests that FDEP also be included as a signatory to the PA. The 404 Program implementation is FDEP's responsibility, not SHPO's. SHPO should not be the only signatory to the PA from the State. The EPA added FDEP as a signatory to the revised PA.

- The Seminole Tribe agrees with the other Tribes in the consultation that additional Tribes, such as the Seminole Nation of Oklahoma, should have been contacted for consultation. The Seminole Tribe disagrees with the EPA's mechanism for determining which Tribes should be contacted for consultation. Mere reference to a HUD website is insufficient. The NHPA regulations require EPA to make a reasonable and good faith effort to identify Indian Tribes that shall be consulted in the NHPA Section 106 process. See 36 CFR 800.2(c)(2)(ii)(A). EPA believes it

met this obligation. EPA coordinated with the ACHP and based on their recommendation used the HUD website. Using the HUD website, EPA identified and invited the following eight federally recognized tribes to consult: the Alabama-Coushatta Tribe of Texas; the Choctaw Nation of Oklahoma; the Coushatta Tribe of Louisiana; the Miccosukee Tribe of Indians of Florida; the Mississippi Band of Choctaw Indians; the Muscogee (Creek) Nation; the Poarch Band of Creek Indians; and the Seminole Tribe of Indians of Florida. This list of federally recognized tribes for which EPA intended to carry out consultation was provided to the ACHP and ACHP did not indicate that EPA needed to modify or add to this list.

- The Seminole Tribe concurs with the other Tribes that Section VI. Reporting and Monitoring should be updated to reflect whether it is FDEP or SHPO that is responsible for submission of the annual report. Further, all Tribes with an interest in Florida should be provided the report and an opportunity to request a meeting to discuss the annual report. EPA added the following language to address the Seminole Tribe's concern: FDEP shall provide the signatory parties and the Consulting Tribes with an annual report for each State fiscal year ending June 30th by September 30th of each year that the PA is in effect. This annual report will summarize the actions taken to implement the terms of this PA and provide data about the historic properties review process under the OA, and, if necessary, recommend any actions or revisions to be considered, including amendments to the PA.

- As the delegation to FDEP of the 404 Program is perpetual, the Seminole Tribe recommends that a provision be added to the PA that allows for evaluation of the OA and PA every 5 years. This evaluation should include an invitation to interested Tribes. The PA provides that an annual meeting can be requested by any of the signatories or the consulting tribes.

- What remains unclear is the actual process for dispute resolution that will occur between EPA, FDEP, and the Seminole Tribe on non-waivable categories, Indian Country determinations, effects to cultural resources and endangered species. The Seminole Tribe raised this concern in consultation with EPA. EPA affirmed its commitment to Nation to Nation communications with the Seminole Tribe on these categories. In addition, EPA confirmed that the assumption regulations provide enough flexibility for coordination with the Seminole Tribe on 404 permit issues as they arise. Although the process for Tribal coordination on an elevated application has not yet been developed, the Seminole Tribe remains interested in working with EPA on a coordination process that reflects Nation to Nation communications. What is most important to the Seminole Tribe is that this coordination occur ahead of any future dispute arising on a specific 404 application. EPA acknowledges the concern regarding dispute resolution among EPA, FDEP, and the Seminole Tribe of Florida. The EPA has oversight authority over the State CWA 404 program and may review State 404 individual permit applications and draft general permits. Pursuant to Section 404(j) of the CWA and 40 C.F.R. § 233.50, the EPA may in its discretion comment upon, object to, make recommendations, or take no action with respect to a state 404 individual permit application, draft general permit, or a state's failure to accept the recommendations of another state or Indian tribe whose waters may be affected by the issuance of a permit. Any such objection shall be based on the EPA's determination that the proposed permit is: (1) the subject of an interstate dispute under 40 C.F.R. § 233.31(a); and/or (2) outside the requirements of the CWA, the regulations at 40 C.F.R. Part 233, or the CWA Section 404(b)(1) Guidelines. Pursuant to the 40 C.F.R. 233.51 and the FDEP/EPA MOA, FDEP must provide EPA the opportunity to review permit applications that have a reasonable

potential to impact to endangered or threatened species or waters of an Indian tribe, and permit applications with impacts to historic properties. The FDEP/EPA MOA states that in the event a question arises whether activities proposed in a permit application or draft general permit are within Indian country, and thus should be processed by the Corps, information regarding the issue may be presented to FDEP during the comment period and may also be provided to EPA. Such information shall be considered by EPA in exercising its CWA authority to oversee FDEP's program and may, as appropriate, provide a basis for EPA to comment upon, object to, or make recommendations with respect to the permit application or draft general permit. Section III.C. of the OA and Section V of the PA set forth a process whereby EPA may in its discretion develop comments, objections, or recommendations with respect to permit applications that have the potential to impact historic properties or permit applications that are the subject of a historic properties dispute FDEP elevates to EPA pursuant to subsections III.C.2. and 3. of the OA. The EPA may consult with tribes, where appropriate, in developing its comments, objections, or recommendations. The ACHP, within 30 days of receipt of the EPA's proposed comments, objections, or recommendations may provide an advisory opinion which EPA will consider but need not follow. EPA will transmit any final comments, objections, or recommendations to FDEP for resolution in accordance with 40 C.F.R. § 233.50.

- The Seminole Tribe is concerned that a Programmatic Biological Opinion (BO) with Incidental Take Statement attempting to cover all species across Florida for direct, secondary, and cumulative impacts cannot effectively account for every potential future permitting action under the State 404 program. In addition, it appears that the proposed BO is also to cover take for species and critical habitat that have yet to be listed and/or designated. The Seminole Tribe questions the legality of this. The Seminole Tribe is very concerned that this approach will lead to disproportionate effects to the Tribe for conservation of species due to increased opportunity for displacement of species pursuant to the State 404 program. The Seminole Tribe also remains concerned that the proposed Memorandum of Understanding between FDEP, the U.S. Fish and Wildlife Service (Service) and the Florida Fish and Wildlife Conservation Commission (FWC) submitted as part of FDEP's application package is not signed. A final signed MOU should be available for review before EPA acts on the State's application so that it is clear what the final process between the FDEP, the Service, FDEP and Florida Fish and Wildlife Conservation Commission (FWC) will be and what EPA's role will be, if any. ESA implementing regulations set forth at 50 C.F.R. § 402.02 describe a programmatic consultation as a consultation that is addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the Services to consult on the effects of programmatic actions such as . . . [a] proposed program, plan, policy, or regulation providing a framework for future proposed actions. In its Biological Opinion, USFWS noted that "the scope of EPA's approval of FDEP's request to administer the CWA 404 program in assumable waters is essentially statewide, covering an array of operations that may affect a wide variety of ESA-proposed and –listed species and proposed and designated critical habitat" and that "[b]ecause this is a consultation on a programmatic action, it is not feasible, nor is it required, to conduct a meaningful site-specific and species-specific effects analysis in this BiOp." U.S. Fish and Wildlife Service, Programmatic Biological Opinion for U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program Under Section 404 of the Clean Water Act (November 17, 2020) at 54 ("Biological Opinion").The State 404 program

rule at 62-331, F.A.C. prohibits issuance of a permit that is likely to jeopardize the continued existence of endangered or threatened species or result in the likely destruction or adverse modification of habitat designated as critical for these species. In addition, as stated above, the CWA Section 404(b)(1) Guidelines prohibit the discharge of dredged or fill material if it jeopardizes the continued existence of listed species or results in the likelihood of the destruction or adverse modification of designated critical habitat. The program submission describes how the State will comply with the Section 404(b)(1) Guidelines, and EPA has determined that FDEP has demonstrated its ability to comply with the Section 404(b)(1) Guidelines. The Program Description states that the MOU between FWC, USFWS, and FDEP outlines coordination procedures for listed species reviews. Program Description, section (j) – Additional Information at 2. The draft MOU between FWC, USFWS, and FDEP was included in the appendix of the Program Description. FDEP will monitor adverse effect determinations on listed species and critical habitat by incorporating information into its permit tracking database, similar to the information collected by the Corps. This data collection will assist in facilitating compliance with permit conditions and can also be shared with USFWS. Failure to include the protection measures as permit conditions that are designed to avoid jeopardy or adverse modification of designated critical habitat would ultimately result in the State either denying the permit or the State informing the EPA that it will neither issue nor deny the permit, which could result in the EPA transferring the permit application to the Corps for processing in accordance with 40 C.F.R. § 233.50(j). The USFWS' Biological Opinion finds that this process is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat. The draft MOU between FWC, USFWS, and FDEP was included in the appendix of the Program Description. Thus, the public had sufficient information about how the State planned to address issues pertaining to listed species and designated critical habitat in its program and EPA has determined that FDEP demonstrated compliance with all statutory and regulatory requirements necessary to assume the CWA Section 404 program The final, signed MOU was provided with the USFWS Biological Opinion and had no changes.

- At this time no information has been provided to the Seminole Tribe or the public as to the exact waters of the State which will remain under Corps jurisdiction and which waters will be assumed by the State. The Seminole Tribe recognizes that FDEP is not seeking to assume the 404 Program in Indian Country. The Seminole Tribe reiterates prior requests to be provided GIS Layers of the retained versus assumed waters to ensure that Indian Country remains under the jurisdiction of the Corps 404 program and to better understand what waters adjacent to Indian Country will be assumed by the State. EPA disagrees that Florida included insufficient detail in the State's program submission request regarding waters that would be retained by the Corps and waters that would be assumed by the State and disagrees that insufficient detail will lead to unnecessary litigation and confusion in the permitting process. The regulations at 40 C.F.R. § 233.11(h) require the program description to include "[a] description of the waters of the United States within a State over which the State assumes jurisdiction under the approved program; a description of the waters of the United States within a State over which the Secretary retains jurisdiction subsequent to program approval." Florida's Program Description, section h at 2, meets this requirement by providing a description of retained waters and noting that retained waters are also defined in section 2.0 of the State 404 Program Applicant's Handbook and listed in Appendix A of the Handbook. Some listed waters in Appendix A of the Handbook include the

county name or a brief location description. Further, Section 6.1 of the Handbook as well as the Program Description section j make clear that the Corps retains permitting authority for projects within "Indian country" as that term is defined in 18 U.S.C. § 1151. EPA recognizes the concerns that the Corps' GIS layers identifying retained waters were not available to the public during the public comment period. The FDEP-Corps MOA commits that the Corps will provide the GIS layers to FDEP. The GIS layers are intended to serve as a tool supporting identification of retained waters, but are not a requirement for a submittal to assume the CWA Section 404 program. EPA also recognizes that a GIS layer cannot depict a pre-determined administrative boundary, as this is dependent in part upon project-specific characteristics: "In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the Corps will retain jurisdiction to the landward boundary of the project for the purposes of that project only." (FDEP-Corps MOA, Section II.A.)

- The Seminole Tribe does not believe that reliance on the State's existing Environmental Resource Permit Program (ERP), water management district (WMD) staff, FWC staff, and SHPO staff is a viable approach to a 404 Program. FDEP's proposed approach depends heavily on other State agencies, without adequate justification that those agencies have the resources required to implement the program. FDEP is also anticipated to undergo budget cuts in the upcoming year due to the financial impacts of the pandemic. The Seminole Tribe questions whether FDEP has adequate resources to effectively implement an assumed 404 Program. The resources of other state programs are not one of the statutory or regulatory criteria that EPA applies or is required to apply in reviewing state or tribal program requests. 33 U.S.C. 1344; 40 C.F.R. Part 233.

- FDEP's proposed 404 program is not as stringent as the federal program. In enacting legislation to pursue the 404 Program, the Florida Legislature granted FDEP broad authority to "adopt any federal requirement, criteria, or regulations necessary to obtain assumption, including but not limited to the guidelines specified in 40 C.F.R. Part 230 and the public interest review criteria in 33 C.F.R. S 320.4(a)." F.S. 373.4146(2) (2019). Rather than adopting the specific requirements of the 404(b)(1) Guidelines and the Corps' public interest criteria FDEP has referenced the State's Environmental Resource Permitting (ERP) rules and criteria which are in many areas different to and less stringent than the 404 criteria. In accordance with 40 C.F.R. Part 233, an assumed program must be consistent with and no less stringent than the requirements of the CWA and its implementing regulations. EPA has determined that Florida's program is consistent with and no less stringent than the federal program. EPA does not make a determination, and Florida is not required to provide information on, whether Florida's program will go above and beyond the requirements of federal law. In accordance with 40 C.F.R. § 233.10(f), one of the elements of a program submission that a state must submit if it seeks to administer a Section 404 program is copies of all applicable state statutes and regulations, including those governing applicable state administrative procedures. The General Counsel's Statement notes that "[p]rovisions of state law that conflict with federal requirements do not apply to state 404 permits. See § 373.4146(3), Fla. Stat." The statement also provides specific examples, such as exemptions to ERP permitting established in §§ 373.406, 373.4145, and 404.813, Fla. Stat., indicating these exemptions do not apply to State 404 permits, citing to § 373.4146(4), Fla. Stat. The General Counsel certifies that "the state has the authority to regulate all discharges of dredged or fill material into waters regulated by the state under Sections 404 (g)-(l), subject only

to the exemptions provided in 33 U.S.C. § 404(f) and 40 C.F.R. § 232.3" and notes that "[t]he State has promulgated Chapter 62-331, F.A.C., to bridge the gap between existing state and federal law, thus ensuring that the State 404 Program is at least as stringent as, and meets the requirements of, the CWA and 40 C.F.R. Part 230." See Florida's General Counsel's Statement.

- While there may be significant overlap between the 404 and ERP Programs, there are also several distinct differences that impact regulatory outcomes. FDEP's Rule 62-331 and 404 Handbook lack important federal Clean Water Act requirements that should be included for applicants and permit reviewers. FDEP's reliance on Section 10.2.1 of the ERP Applicant's Handbook Volume I to fulfill Subpart H of the 404(b)(1) Guidelines suffers from this shortcoming. Subpart H which provides regulations for Actions to Minimize Adverse Effects of 404 permits governs a variety of specific actions including: the location of the discharge; the material to be discharged; the material after discharge; the method of dispersion; technology-related actions; impacts to plant and animal populations; impacts on human use; and other actions. 40 CFR 230 Subpart H. FDEP's analysis of Rule 62-331 compared to the 404(b)(1) Guidelines on Subpart H acknowledges that Section 10.2.1 is not as specific as the Guidelines and asserts that the regulatory outcome will be the same. The Seminole Tribe disagrees with this assertion and believes that FDEP's program is not as stringent as the federal laws on this point. Section 404(h) of the CWA states that EPA may approve a state or tribal request for assumption only if EPA determines, among other things, that the state or tribe has authority to issue permits which "apply, and assure compliance with, any applicable requirements of this section, including, but not limited to, the guidelines established under subsection (b)(1) . . . ." 33 U.S.C. 1344(h). States and tribes are not required to adopt or incorporate the Section 404(b)(1) Guidelines verbatim; however, implementation of state and tribal environmental review criteria must result in a permit that is as consistent with the Section 404(b)(1) Guidelines as would be a permit issued for the same discharge by the Corps. EPA has reviewed Florida's environmental review criteria and found them to be consistent with the Section 404(b)(1) Guidelines.

- The Seminole Tribe understands that FDEP is relying upon analysis by Corps of Nationwide Permits for the General Permits under the State 404 Program. The Corps Nationwide Permit Program is set to expire in 2022, whereas FDEP's General Permits would remain valid for five years after assumption of the Program. The Seminole Tribe questions whether FDEP can rely on an analysis by the Corps if that analysis is no longer valid after the expiration of the Corps program. FDEP is required to independently provide proof that "the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment." See 40 CFR 233.21(b). It is not clear that this has been done. Additionally, the Corps is currently revising the Nationwide Permit Program to, among other thigs, update Nationwide 12 for Utility Lines and separate out Oil and Natural Gas Pipelines from Electric Utility and Communication Lines. FDEP's General Permit 62-331.215 adopted the Corps' 2017 Nationwide 12 language which has been challenged in the courts. The Seminole Tribe is concerned that EPA will be approving a state 404 program that will in essence grandfather in general permits that are no longer valid or legal in the rest of the country. A process for update of the State's proposed General Permits, to the extent they rely on the analysis and justification of the Corps' Nationwide Permit program, should be provided. To provide consistency between the State and federal 404 programs, FDEP modeled many of the State's programmatic general permits after nationwide permits. These State general permits will

be issued on the date the State program comes into effect and will have a five-year term. In crafting its programmatic general permits, FDEP did not simply incorporate by reference or copy existing Corps permits; it modified these permits including additional requirements, as appropriate, to ensure these permits comply with the Section 404(b)(1) Guidelines and State requirements including but not limited to the State's Environmental Resource Program permits, water quality standards, protection of listed species, and compliance with the State's Coastal Zone Management Plan. These general permits were available for comment as part of the program package approval and EPA has reviewed them as part of the program request. (See Section 3.2.1 of the State 404 Program Applicant's Handbook).

- The Seminole Tribe has a longstanding relationship with the South Florida WMD related to the Water Rights Compact Among the Seminole Tribe of Florida, the State of Florida, and the South Florida Water Management District. The Seminole Tribe has spent the last several years and numerous resources developing relationships with FDEP as it takes on more state permitting activities that impact Tribal lands and as part of the State's development of the 404 Program. The Seminole Tribe is pleased that FDEP is pursuing a Tribal Coordinator to foster this relationship further. There remains a concern however that shortly after assumption FDEP may seek to delegate the 404 Program to the five State WMDs. Nothing in state or federal law prevents FDEP from pursuing this option. Currently the 404 Program is set up so that a significant part of the 404 review is conducted by WMD staff during the review of ERP applications. The Seminole Tribe is concerned that delegation to the WMDs would cause significant coordination burdens for the Seminole Tribe. Instead of coordinating with one agency's staff on all the facets of the program the Seminole Tribe would be forced to coordinate and educate all the WMDs on the unique rights regarding implementation of the 404 program as it relates to Indian Country, Tribal waters, cultural resources and species/habitat concerns. Advance notice and an opportunity for consultation and comment should be provided before EPA authorizes delegation in the future by the State. EPA notes that WMDs are not authorized to administer the Section 404 permitting program under Florida's current program structure. WMDs may administer components of the ERP program under state law, and as such, FDEP may coordinate with the WMDs when administering the Section 404 program.

- The Seminole Tribe of Florida is interested in having the ability to comment on a proposed project as a downstream affected jurisdiction. Federal regulations at 40 CFR 233.31 require the following: "If a proposed discharge may affect the biological, chemical, or physical integrity of the water of any State(s) other than the State in which the discharge occurs, the Director shall provide an opportunity for such State(s) to submit written comments within the public comment period and to suggest permit conditions. If these recommendations are not accepted by the Director, he shall notify the affected State and the Regional Administrator prior to permit issuance in writing of his failure to accept these recommendations, together with his reasons for so doing. The Regional Administrator shall then have the time provided for in section 233.50(d) to comment upon, object to, or make recommendations."



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET, SW
ATLANTA, GEORGIA  30303-3104

December 16, 2020

The Honorable Noah Valenstein, Secretary
Florida Department of Environmental Protection
Marjory Stoneman Douglas Building
3900 Commonwealth Boulevard
Tallahassee, Florida  32399

Subject:    EPA Response to Comments Received During Consultation Under the National Historic
            Preservation Act Regarding the State of Florida's Request to Assume Administration of a
            Clean Water Act Section 404 Program

Dear Secretary Valenstein:

On September 2, 2020, the U.S. Environmental Protection Agency invited the Florida Department of
Environmental Protection (FDEP) to consult under Section 106 of the National Historic Preservation
Act (NHPA) of 1966, as amended, regarding the request from the State of Florida to assume
administration of a Clean Water Act Section 404 program. On September 15, 2020, your office
responded by email and accepted EPA's invitation to consult. EPA and FDEP's continued
communication during the consultation process is summarized in Enclosure A.

Provided in Enclosure B is a responsiveness summary that includes EPA's responses to comments
received from FDEP and the other consulting parties during the consultation process. We are providing
the complete responsiveness summary per the request of the Advisory Council on Historic Preservation
(ACHP) and agreement of the consulting tribes during a December 14, 2020 meeting. EPA intends to
execute a Programmatic Agreement (PA) pursuant to Section 106 of the NHPA with the ACHP, the
Florida State Historic Preservation Officer, and FDEP prior to acting on the State of Florida's request
and will send the FDEP a copy of the PA once executed.

We appreciate your engagement throughout the consultation process and your important feedback and input on the PA. If you have any questions regarding this matter, please contact me at (404) 562-9345, or have a member of your staff contact Mr. Kelly Laycock at (404) 562-9132 or laycock.kelly@epa.gov.

Sincerely,

JEANEANNE GETTLE

Digitally signed by JEANEANNE GETTLE
Date: 2020.12.16 09:41:53 -05'00'

Jeaneanne M. Gettle, Director
Water Division

Enclosures:
    A.  Summary of Communication Between EPA and the Florida Department of Environmental Protection During Consultation Under Section 106 of the National Historic Preservation Act with Respect to the State of Florida's Request to Assume Administration of a Clean Water Act Section 404 Program
    B.  Responses to Comments from the NHPA Consulting Parties

cc:    John Truitt, Deputy Secretary for Regulatory Programs, Florida Department of Environmental Protection

**Enclosure A:**

Summary of Communication Between EPA and Florida Department of Environmental Protection (FDEP) During Consultation Under Section 106 of the National Historic Preservation Act with Respect to the State of Florida's Request to Assume Administration of a Clean Water Act Section 404 program

- 9/2/20:  EPA letter issued to the State inviting them to consult under the National Historic Preservation Act (NHPA) Section 106.
- 9/4/20:  FDEP email to EPA providing points of contact regarding NHPA consultation.
- 11/25/20:  EPA email to consulting parties transmitting draft Programmatic Agreement for review and comment.
- 12/1/20:  EPA call with the Florida State Historic Preservation Officer and the State to discuss draft PA.
- 12/2/20:  EPA hosted call with consulting parties to discuss draft PA.
- 12/10/20:  EPA email to consulting parties transmitting revised PA.
- 12/14/20:  EPA hosted call with consulting parties to discuss revisions to PA.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

DEC 13 2019

OFFICE OF WATER

Rear Admiral Timothy Gallaudet
Assistant Secretary of Commerce for Oceans and Atmosphere
U.S. Department of Commerce
1401 Constitution Avenue, NW, Room 51030
Washington, D.C. 20230

Rob Wallace
Assistant Secretary for Fish and Wildlife and Parks
Department of the Interior
1849 C Street, NW, MS-3160MIB
Washington, D.C. 20240

~~RADM~~ Tim Gallaudet and ~~Mr.~~ Rob Wallace:

Earlier this week, I met with your representatives regarding the Florida Department of Environmental Protection's (FDEP) request to assume administration of the Clean Water Act Section 404 permitting program. I very much appreciate the support of your agencies on this effort. For your information, the Environmental Protection Agency's Region 4 Regional Administrator has designated FDEP as the non-Federal representative to conduct informal consultation for this effort, pursuant to 50 CFR § 402.08. The Regional Administrator's letter to FDEP is enclosed for your awareness.

Sincerely,

DRoss

David P. Ross
Assistant Administrator

cc: Noah Valenstein, Secretary, Florida Department of Environmental Protection

Enclosure

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

December 12, 2019

The Honorable Noah Valenstein
Secretary
Florida Department of Environmental Protection
Marjory Stoneman Douglas Building
3900 Commonwealth Boulevard
Tallahassee, Florida 32399-3000

Dear Secretary Valenstein:

This letter responds to the Florida Department of Environmental Protection's (FDEP) requests that the
U.S. Environmental Protection Agency initiate an informal Endangered Species Act (ESA) Section 7
consultation with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service (the
Services), and designate FDEP as a non-Federal representative for informal ESA consultation. In an
email to the EPA dated July 17, 2019, FDEP suggested that the EPA designate Florida as the non-
Federal representative for informal ESA Section 7 consultation to prepare a biological assessment on
FDEP's anticipated request to assume administration of a Clean Water Act (CWA) Section 404 program
in the State. In addition, during a call held between your staff and members of my staff on November 5,
2019, FDEP specifically requested that the EPA designate FDEP as the non-Federal representative for
this informal consultation.

The EPA has previously taken the position that EPA approval of a state's request to assume
administration of a CWA Section 404 program is nondiscretionary and consultation is not required; the
Agency is currently giving further consideration to that position. In the meantime, the EPA has decided
to voluntarily engage in informal consultation with the Services under ESA Section 7 and, pursuant to
50 CFR §402.08, designate FDEP as the non-Federal representative to conduct informal consultation to
prepare a biological assessment for this effort.

We appreciate Florida's interest in working with the EPA on these issues. If you have any further
questions, please feel free to contact me, or have a member of your staff contact Jeaneanne Gettle,
Director of the Water Division, at (404) 562-8979 or gettle.jeaneanne@epa.gov.

Sincerely,

Mary S. Walker
Regional Administrator

cc: Dr. Roy E. Crabtree, Regional Administrator
   NOAA Marine Fisheries Service, Southeast Regional Office

   Mr. Leopoldo Miranda, Regional Director
   U.S. Fish and Wildlife Service, Southeast Region

# PROGRAMMATIC AGREEMENT AMONG THE U.S. ENVIRONMENTAL PROTECTION AGENCY, THE ADVISORY COUNCIL ON HISTORIC PRESERVATION, THE FLORIDA DIVISION OF HISTORICAL RESOURCES-STATE HISTORIC PRESERVATION OFFICER, AND THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION REGARDING THE SECTION 106 PROCESS FOR THE EPA's APPROVAL OF THE STATE OF FLORIDA'S REQUEST TO ASSUME A CLEAN WATER ACT (CWA) SECTION 404 PERMITTING PROGRAM

---

WHEREAS, the U.S. Environmental Protection Agency (EPA) is the federal agency responsible for administering compliance with, and enforcement of, the CWA (33 U.S.C. §§ 1251 et seq.); and

WHEREAS, 33 U.S.C. § 1344(g) and 40 C.F.R. Part 233 provide for a state or an Indian tribe, as defined in 40 C.F.R. § 233.2, to administer its own permit program for the discharge of dredged or fill material into waters of the United States, other than those waters that the CWA reserves as subject to U.S. Army Corps of Engineers jurisdiction; and

WHEREAS, the Florida Department of Environmental Protection (FDEP) has submitted to the EPA a complete request to administer a permit program for discharges of dredged or fill material into waters of the United States assumed by the state pursuant to CWA Section 404(g)(1), not including discharges to waters in Indian country as defined at 18 U.S.C. Section 1151; and

WHEREAS, EPA initiated consultation in accordance with Section 106 of the National Historic Preservation Act (NHPA) of 1966, as amended, and its implementing regulations at 36 C.F.R. Part 800 regarding EPA's decision on Florida's request to assume the CWA Section 404 program in waters within the state pursuant to Section 404(g)(1); and

WHEREAS, a programmatic agreement is appropriate pursuant to 36 C.F.R. § 800.14(b)(1)(ii) because effects on historic properties cannot be fully determined prior to approval of Florida's assumption of the CWA 404 permitting program; and

WHEREAS, this Programmatic Agreement (hereinafter the "PA") serves as a tool which sets forth a process to assure compliance with Section 106 of the NHPA in connection with the EPA's program assumption decision, enhances coordination on the consideration of potential impacts on historic properties, seeks value-added outcomes from the Section 106 process, and provides a comprehensive process for resolution of disputes concerning effects determinations or resolution of adverse effects associated with state 404 permits by utilizing the EPA's existing permit review framework under 40 C.F.R. § 233.50; and

WHEREAS, the role of a State Historic Preservation Officer (SHPO) under Section 106 of the NHPA and 36 C.F.R. Part 800 is to advise, assist, review and consult with federal agencies as they carry out their historic preservation responsibilities and respond to requests within a specified period of time; and the Florida SHPO reflects the interests of Florida and its citizens in the preservation of the state's cultural heritage; and

WHEREAS, the Florida SHPO will advise and assist the FDEP with carrying out its historic preservation responsibilities under the Florida Historical Resources Act; and

WHEREAS, the State of Florida created a regulatory framework, to be codified in Chapter 62-331, Florida Administrative Code (F.A.C.), for ensuring that impacts to cultural and historic resources will be considered during the processing of state 404 permits by promulgating regulations that will adopt and incorporate the Archaeological Resources Protection Act (ARPA) and Native American Graves Protection and Repatriation Act (NAGPRA); will require no significant impact to historical resources; will include permit conditions that require permittees of individual and general permits to cease work immediately and begin consultation in the event of an unanticipated discovery of historic resources, effects to historic resources, or the identification of unmarked human remains; and will adopt the federally mandated notice and comment period where interested tribes and members of the public may provide comments and recommendations on all state 404 permit applications; and

WHEREAS, to effect a proper and comprehensive review of the effects of state 404 permit actions on historic properties, on August 6, 2020, FDEP and the Florida SHPO entered into an "Operating Agreement between the Florida Department of Environmental Protection and the Florida Division of Historical Resources – State Historic Preservation Officer regarding the State 404 Program" (hereinafter "August 6, 2020 OA") (the August 6, 2020 OA is attached to this PA as Appendix A); and

WHEREAS, FDEP, through the terms of the August 6, 2020 OA, committed to direct engagement with the SHPO and interested Indian tribes early in the application review process, including opportunities to inform FDEP's requests for additional information, provide effects determinations, and make recommendations for the resolution of adverse effects; and

WHEREAS, the Florida SHPO has Secretary of the Interior (SOI)-qualified personnel who will conduct reviews of historic properties pursuant to the August 6, 2020 OA; and

WHEREAS, FDEP has SOI-qualified personnel who will assist FDEP with its obligations under the PA and August 6, 2020 OA; and

WHEREAS, the EPA, by public notice published in the Federal Register on September 16, 2020, stated that "Tribal and State Historic Preservation Offices as well as members of the public with knowledge of or interest in the identification (and location) of historic properties in the State of Florida, the effects of discharges from dredged or fill activities into waters of the United States on these historic properties, or ways to mitigate or avoid adverse effects of such discharges may

be interested in commenting on EPA's consultation on this action under section 106 of the NHPA," 85 Fed. Reg. 57,853; and

WHEREAS, the August 6, 2020 OA was made available for public viewing and comment as part of the FDEP application materials (*see* 85 Fed. Reg. 57,853); and

WHEREAS, the EPA consulted with the Advisory Council on Historic Preservation (ACHP) pursuant to 36 C.F.R. § 800.14(b), and the ACHP is a signatory to this PA; and

WHEREAS, the EPA consulted with FDEP and the Florida SHPO pursuant to 36 C.F.R. § 800.14, and FDEP and the Florida SHPO are signatories to this PA; and

WHEREAS, as stated in Section I.A.2.b.i of the August 6, 2020 OA, Indian tribes possess special expertise in assessing the eligibility of cultural resources or historic properties that may possess religious and cultural significance to the Indian tribe; and

WHEREAS, in coordination with the ACHP, the EPA identified and invited the following eight federally recognized Indian tribes to consult as part of EPA's consideration of the FDEP's request to assume the CWA Section 404 program: the Alabama-Coushatta Tribe of Texas; the Choctaw Nation of Oklahoma; the Coushatta Tribe of Louisiana; the Miccosukee Tribe of Indians of Florida; the Mississippi Band of Choctaw Indians; the Muscogee (Creek) Nation; the Poarch Band of Creek Indians; and the Seminole Tribe of Indians of Florida; and

WHEREAS, based on the responses received from the eight Indian tribes that the EPA contacted, the EPA consulted with the Choctaw Nation of Oklahoma; the Miccosukee Tribe of Indians of Florida; the Muscogee (Creek) Nation, the Poarch Band of Creek Indians; and the Seminole Tribe of Florida (collectively, "Consulting Tribes") pursuant to 36 C.F.R. § 800.14, and invited the Consulting Tribes to provide comments on the draft PA; and

WHEREAS, the EPA has sought comment from the public regarding the identification and protection of historic properties and has taken any comments received into account; and

WHEREAS, nothing in this PA absolves the EPA or FDEP from the requirements for federal review of individual permit applications and draft general permits pursuant to Section 404 of the CWA, 40 C.F.R. Part 233, and the July 31, 2020 Memorandum of Agreement Between the Florida Department of Environmental Protection and the United States Environmental Protection Agency (FDEP-EPA MOA).

**NOW, THEREFORE**, the EPA, the ACHP, the Florida SHPO, and FDEP mutually agree that the EPA, consistent with the provisions of this PA below, will meet its responsibilities under the NHPA through this PA as provided for in 36 C.F.R. § 800.14(b), rather than following the procedure set forth in 36 C.F.R. §§ 800.3 through 800.7.

**STIPULATIONS**

The EPA and FDEP, in coordination with the Florida SHPO, shall ensure that the following stipulations are carried out:

I. DEFINITIONS

a. All the definitions in 36 C.F.R. Part 800, Subpart B – The Section 106 Process – are applicable and incorporated herein.

b. All the definitions in 36 C.F.R. Part 800, Subpart C – Program Alternatives – are applicable and incorporated herein.

c. All the definitions in 40 C.F.R. Part 233 are applicable and incorporated herein.

d. Additional definitions and terms that are defined in the August 6, 2020 OA found in Appendix A are applicable and incorporated herein.

II. RELEVANT ENTITIES

a. Parties to the PA

(1) U.S. Environmental Protection Agency. The EPA is the federal agency responsible for administering compliance with, and enforcement of, the CWA. The EPA is responsible for ensuring that the EPA's program assumption decision made pursuant to Section 404(g)(1) of the CWA complies with Section 106 of the NHPA, and its implementing regulations at 36 C.F.R. Part 800.

The EPA has oversight authority over the state CWA 404 program and may review state 404 individual permit applications and draft general permits. Pursuant to Section 404(j) of the CWA and 40 C.F.R. § 233.50, the EPA may in its discretion comment upon, object to, make recommendations, or take no action with respect to a state 404 individual permit application, draft general permit, or a state's failure to accept the recommendations of another state or Indian tribe whose waters may be affected by the issuance of a permit. Any such objection shall be based on the EPA's determination that the proposed permit is: (1) the subject of an interstate dispute under 40 C.F.R. § 233.31(a); and/or (2) outside the requirements of the CWA, the regulations at 40 C.F.R. Part 233, or the CWA Section 404(b)(1) Guidelines, which also address impacts to historic properties.

(2) State Historic Preservation Officer. The Florida SHPO reflects the interests of the state of Florida and its citizens in the preservation of the state's cultural heritage. The Florida SHPO will advise and assist the FDEP with carrying out its historic preservation responsibilities. The SHPO has advised and assisted the EPA in developing this PA to carry out its responsibilities to comply with Section 106 of the NHPA.

(3) Advisory Council on Historic Preservation. The ACHP promotes the preservation, enhancement, and sustainable use of our nation's diverse historic resources, and advises the President and the Congress on national historic preservation policy. The ACHP advised and assisted the EPA with carrying out its historic preservation responsibilities pursuant to Section 106 of the NHPA and its implementing regulations at 36 C.F.R. Part 800.

(4) Florida Department of Environmental Protection. FDEP is the state agency responsible for administering the state CWA 404 program in state assumed waters, which includes the authority to grant or deny applications for state CWA 404 program permits.

b. Other Entities that Participated in Consultation

(1) Indian tribes. Indian tribes mean an Indian tribe, band, nation, or other organized group or community including a Native village, Regional Corporation or Village Corporations, as those terms are defined in section 3 of the Alaska Native Claims Settlement Act (43 U.S.C. 1602), that is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians. (54 U.S.C. 300309). The state 404 assumption does not include waters in Indian country, as that term is defined in 18 U.S.C. § 1151.

(2) Public. The views of the public are beneficial to informed decision-making in the historic properties review. The EPA sought and considered the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on historic properties, the likely interest of the public in the effects on historic properties, and confidentiality concerns of private individuals and businesses.

III. NHPA IMPLEMENTATION AND ADOPTION OF THE AUGUST 6, 2020 OA

FDEP and the Florida SHPO established in the August 6, 2020 OA procedures for the review of proposed permits under the state 404 program to determine whether the proposed projects are likely to have an adverse effect on properties listed, or eligible for listing, on the National Register of Historic Places. The August 6, 2020 OA provides a detailed description of the historic properties review process, including but not limited to: 1) the duties and responsibilities of FDEP and the Florida SHPO; 2) procedures for direct consultation with interested Indian tribes at multiple stages of the review of applications; 3) procedures for public notice and comment; 4) the effects determination and resolution of adverse effects; 5) federal review; 6) unanticipated discovery procedures; and 7) training requirements. This PA adopts the August 6, 2020 OA and its procedures and incorporates them herein. FDEP and the Florida SHPO will consult with the other signatories to this PA prior to amending or terminating the August 6, 2020 OA. Amendments or termination of the August 6, 2020 OA shall be in accordance with sections VII and VIII of Appendix A. If necessary, the PA shall be amended or terminated pursuant to the terms set forth below.

IV. IDENTIFICATION AND TREATMENT OF HUMAN REMAINS

In the event that human remains are identified prior to, during, or after permitting, FDEP shall follow the provisions of II.C.4 of the August 6, 2020 OA. FDEP shall notify the EPA of the discovery on the same day that it notifies the SHPO, and the Tribal Historic Preservation Officer (THPO)/Indian tribes of the discovery. The signatory parties will comply with any applicable provisions of ARPA and NAGPRA. Activity authorized under the permit shall not resume without written authorization from FDEP, SHPO, the EPA, and THPO/Indian tribes.

V. EPA REVIEW

a. Section III.C. of the August 6, 2020 OA provides for EPA review of permit applications in the following circumstances, which are consistent with EPA's state 404 permit review authorities under Section 404(j) of the CWA and 40 C.F.R. § 233.50, and with FDEP's discretion to request EPA review of specific projects that would otherwise not require EPA oversight pursuant to Section II(B) of the FDEP-EPA MOA. The circumstances are as follows:

    (1) FDEP shall send a copy of the public notice described in Section II.B. of the August 6, 2020 OA to the EPA in accordance with subsection 62-331.052(2), F.A.C., for those projects that are subject to federal review. Included in the list are projects within critical areas established under state or federal law, including sites identified or proposed under the NHPA;

    (2) FDEP agrees to request, in accordance with section 5.2.5 of the State 404 Program Applicant's Handbook, EPA review of an application under 40 C.F.R. § 233.50 where the parties consulting under the August 6, 2020 OA cannot agree on the effect determination for a proposed activity or where FDEP does not accept the recommendations of one of the parties consulting under the August 6, 2020 OA for the resolution of adverse effects; and

    (3) FDEP shall, in accordance with subsection 62-331.052(3)(b), F.A.C., notify the EPA if FDEP does not accept the effect determination for a proposed activity or recommendations for the resolution of adverse effects of a THPO/Indian tribe, together with FDEP's reason for its decision.

b. The EPA may in its discretion review documentation submitted pursuant to subsection V(a) of this PA, consult with Indian tribes, where appropriate, and develop any comments, objections, or recommendations with respect to permit applications submitted pursuant to subsection V(a)(1) that have the potential to impact historic properties or permit applications that are the subject of a dispute submitted pursuant to subsections V(a)(2) or (3). The EPA will submit to the ACHP a copy of the proposed comments, objections, or recommendations and other pertinent documentation. The EPA will also notify the state pursuant to 40 C.F.R. § 233.50(d) that it is reserving its right to comment. The ACHP, within 30 days of receipt of the

EPA's proposed comments, objections, or recommendations and other pertinent documentation, may provide an advisory opinion regarding the proposed comments, objections, or recommendations. The EPA will consider, but need not follow, the ACHP's advisory opinion in finalizing its comments, objections, or recommendations with respect to the permit application. If the ACHP does not submit an advisory opinion within 30 days of receipt of the EPA's proposed comments, objections, or recommendations, and other pertinent documentation, the EPA will exercise its discretion to finalize its comments, objections, or recommendations, or determine not to finalize such comments, objections, or recommendations. The EPA will transmit any final comments, objections, or recommendations to FDEP for resolution in accordance with 40 C.F.R. § 233.50. The EPA will also transmit any final comments, objections, or recommendations to ACHP, the Florida SHPO, and the Indian tribes, where appropriate.

VI. CONFIDENTIALITY

All signatory parties to this PA acknowledge that information about Historic Properties, potential Historic Properties, or properties considered historic for purposes of the PA are or may be subject to the provisions of Section 304 of the NHPA. Having so acknowledged, all signatory parties to this PA will ensure that all actions and documentation prescribed by this PA are, where necessary, consistent with the requirements of Section 304 of the NHPA. The signatory parties shall maintain confidentiality in accordance with all applicable laws. FDEP and Florida SHPO shall also maintain confidentiality in accordance with the terms of the August 6, 2020 OA.

VII. REPORTING AND MONITORING

FDEP shall provide the signatory parties and the Consulting Tribes with an annual report for each state fiscal year ending June 30th by September 30th of each year that the PA is in effect. This annual report will summarize the actions taken to implement the terms of this PA and provide data about the historic properties review process under the August 6, 2020 OA, and, if necessary, recommend any actions or revisions to be considered, including amendments to the PA.

The EPA will schedule a meeting to discuss issues identified in the annual report related to the PA and August 6, 2020 OA if any signatory or Consulting Tribe requests one.

VIII. AMENDMENT

a. Any signatory party to this PA may at any time propose amendments to the PA, whereupon all signatory parties shall consult to consider such an amendment for no more than 90 days. This PA may be amended only upon written concurrence of all signatory parties. The amended PA, if any, will be filed with the ACHP. If the EPA determines that a modification of Florida's CWA Section 404 program is warranted based on its review of annual reports submitted by FDEP pursuant to 40 C.F.R. §

233.52, or other lawful basis, the EPA will consider whether the PA needs to be amended at that time and may propose such amendments to the signatory parties. Amendments to this PA that may alter any aspect of Florida's approved program are not part of Florida's approved program unless and until approved pursuant to 40 C.F.R. § 233.16.

b. Within 30 days of the execution of this PA, the EPA will engage in and complete further discussions with the Florida SHPO, FDEP, the ACHP, and the Consulting Tribes, to consider potential amendments to this PA regarding continuing tribal engagement and EPA oversight of the State's administration of its 404 program. Any amendment adopted pursuant to this clause must comply with subsection VIII(a) of this PA.

IX. TERMINATION

a. Any signatory party to this PA may terminate this PA for good cause by providing 90 days' notice to the other signatory parties, provided that the signatory parties will meet during the period prior to termination to seek agreement on amendments or other actions that would avoid termination. If this PA is terminated, the EPA will either execute another programmatic agreement or seek, consider, and respond to the ACHP comments, which the ACHP shall transmit to the EPA within 45 days of request. The termination of this PA does not modify or alter the legal status of the assumed state program.

b. This PA shall remain in effect unless and until program responsibilities are transferred by FDEP to the U.S. Army Corps of Engineers pursuant to 40 C.F.R. § 233.53, program approval is withdrawn pursuant to 40 C.F.R. § 233.53, or the PA is terminated as set forth above.

X. EFFECTIVE DATE

This PA shall become effective upon execution. Execution is defined as signature of all the signatory parties.

XI. SIGNATURE

This PA may be signed in counterparts. A certificate-based digital signature is acceptable.

**PROGRAMMATIC AGREEMENT AMONG THE U.S. ENVIRONMENTAL PROTECTION AGENCY, THE ADVISORY COUNCIL ON HISTORIC PRESERVATION, THE FLORIDA DIVISION OF HISTORICAL RESOURCES-STATE HISTORIC PRESERVATION OFFICER, AND THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION REGARDING THE SECTION 106 PROCESS FOR THE EPA's APPROVAL OF THE STATE OF FLORIDA'S REQUEST TO ASSUME A CLEAN WATER ACT (CWA) SECTION 404 PERMITTING PROGRAM**

**SIGNATORY PARTY**

MARY WALKER Digitally signed by MARY WALKER
Date: 2020.12.16 09:36:55 -05'00'

**By: Mary S. Walker (DATE)**
**Administrator, EPA Region 4**

**PROGRAMMATIC AGREEMENT AMONG THE U.S. ENVIRONMENTAL PROTECTION AGENCY, THE ADVISORY COUNCIL ON HISTORIC PRESERVATION, THE FLORIDA DIVISION OF HISTORICAL RESOURCES-STATE HISTORIC PRESERVATION OFFICER, AND THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION REGARDING THE SECTION 106 PROCESS FOR THE EPA's APPROVAL OF THE STATE OF FLORIDA'S REQUEST TO ASSUME A CLEAN WATER ACT (CWA) SECTION 404 PERMITTING PROGRAM**

**SIGNATORY PARTY**

Aimee Jorjani 12/16/2020

**By: Aimee K. Jorjani (DATE)**
**Chairman, Advisory Council on Historic Preservation**

**PROGRAMMATIC AGREEMENT AMONG THE U.S. ENVIRONMENTAL PROTECTION AGENCY, THE ADVISORY COUNCIL ON HISTORIC PRESERVATION, THE FLORIDA DIVISION OF HISTORICAL RESOURCES-STATE HISTORIC PRESERVATION OFFICER, AND THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION REGARDING THE SECTION 106 PROCESS FOR THE EPA's APPROVAL OF THE STATE OF FLORIDA'S REQUEST TO ASSUME A CLEAN WATER ACT (CWA) SECTION 404 PERMITTING PROGRAM**

**SIGNATORY PARTY**

Timothy Parsons

Digitally signed by Timothy Parsons
DN: cn=Timothy Parsons, o=Florida Department of State, ou=Division of Hsitorical Resources, email=timothy.parsons@dos.myflorida.com, c=US
Date: 2020.12.16 16:43:28 -05'00'

**By: Dr. Timothy Parsons (DATE)**
**Director and State Historic Preservation Officer**

**PROGRAMMATIC AGREEMENT AMONG THE U.S. ENVIRONMENTAL PROTECTION AGENCY, THE ADVISORY COUNCIL ON HISTORIC PRESERVATION, THE FLORIDA DIVISION OF HISTORICAL RESOURCES-STATE HISTORIC PRESERVATION OFFICER, AND THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION REGARDING THE SECTION 106 PROCESS FOR THE EPA's APPROVAL OF THE STATE OF FLORIDA'S REQUEST TO ASSUME A CLEAN WATER ACT (CWA) SECTION 404 PERMITTING PROGRAM**

**SIGNATORY PARTY**

Noah Valenstein Digitally signed by Noah Valenstein Date: 2020.12.16 11:40:39 -05'00' 12/16/2020

**By: Noah Valenstein (DATE)**
**Secretary, Florida Department of Environmental Protection**



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET, SW
ATLANTA, GEORGIA 30303-3104

AUG 2 8 2020

Office of Governor Ron DeSantis
State of Florida
The Capitol
400 South Monroe St.
Tallahassee, Florida 32399-0001

Re: Completeness Determination for State of Florida's Request to Assume Administration of a CWA Section 404 Program

Dear Governor DeSantis:

The Environmental Protection Agency Region 4 has concluded a completeness review of your request for the State of Florida to assume administration of a Clean Water Act (CWA) Section 404 program. The EPA received your request on August 20, 2020. All the program submission elements required by 40 C.F.R. § 233.10 were included as follows:

- Governor's Letter
- Program Description
- Statement from Justin G. Wolfe, General Counsel for the Florida Department of Environmental Protection (FDEP)
- Memorandum of Agreement with the EPA Region 4 Administrator
- Memorandum of Agreement with the Secretary of the Army
- Applicable State Statutes and Regulations

Our review indicates that the program submission is complete. The EPA has 120 days from receipt of the complete program submission to approve or disapprove the program based on whether Florida's program fulfills the requirements of the CWA, including its implementing regulations at 40 C.F.R. Part 233, taking into consideration all comments received. Please be advised that this program submission completeness determination does not constitute an evaluation of the merits of the submission. If we find that additional information is necessary to evaluate the submission, we will request the information.

We appreciate the significant effort by the Florida Department of Environmental Protection in developing this programmatic submission and its coordination with the Secretary of the Army and Region 4 in developing the Memorandums of Agreement that were enclosed with your letter.

If you have any questions, please do not hesitate to call me at (404) 562-8357 or have a member of your staff contact Ms. Jeaneanne M. Gettle, Director of the Water Division at (404) 562-9345.

Sincerely,

Mary S. Walker
Regional Administrator

cc:  The Honorable Noah Valenstein, Secretary, FDEP

     Mr. John Truitt, Deputy Secretary for Regulatory Programs, FDEP

**Programmatic Biological Opinion for**

**U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program under Section 404 of the Clean Water Act**

FWS Log #: 04E00000-2021-F-0001; 04E00000-2021-B-0001

Prepared by:

U.S. Fish and Wildlife Service
South-Atlantic Gulf and Mississippi Basin Interior Regions
1875 Century Blvd
Atlanta, GA 30345

11/17/2020

Leopoldo Miranda-Castro, Regional Director — Date

## TABLE OF CONTENTS

**ACRONYMS (**adopted from EPA BE, p. ix - x) ........ **ii**
**GLOSSARY** (adopted from EPA BE p. xi – xv) ........ **iv**
**CONSULTATION HISTORY** ........ **1**
**INTRODUCTION** ........ **3**
**DESCRIPTION OF THE PROPOSED ACTION** ........ **7**
**ACTION AREA** ........ **37**
**APPROACH TO THE ASSESSMENT** ........ **43**
**STATUS OF SPECIES** ........ **45**
**ENVIRONMENTAL BASELINE** ........ **45**
**EFFECTS OF THE ACTION** ........ **54**
**CUMULATIVE EFFECTS** ........ **65**
**INTEGRATION AND ANALYSIS OF EFFECTS** ........ **66**
**CONCLUSION** ........ **68**
**INCIDENTAL TAKE STATEMENT** ........ **69**
**REINITIATION NOTICE** ........ **73**
**LITERATURE CITED** ........ **73**

**ACRONYMS** (adopted from EPA BE, p. ix - x)

| | |
|---|---|
| **Assumption** | Assumption of Section 404 of CWA by the State of Florida |
| **BA** | Biological Assessment |
| **BE** | Biological Evaluation |
| **BMP** | Best Management Practices |
| **BiOp** | Biological Opinion |
| **C&SF** | Central and Southern Florida |
| **CERP** | Comprehensive Everglades Restoration Plan |
| **CFR** | Code of Federal Regulations |
| **CWA** | Clean Water Act |
| **EIS** | Environmental Impact Statement |
| **ECOS** | Environmental Conservation Online System |
| **EPA** | United States Environmental Protection Agency |
| **ERP** | Environmental Resource Permit |
| **ESA** | Endangered Species Act |
| **F.A.C.** | Florida Administrative Code |
| **FDEP** | Florida Department of Environmental Protection |
| **FEMA** | Federal Emergency Management Agency |
| **FLCCS** | Florida Land Cover Classification System |
| **FNAI** | Florida Natural Areas Inventory |
| **F.S.** | Florida Statutes |
| **FWC** | Florida Fish and Wildlife Conservation Commission |
| **GIS** | Geographic Information Systems |
| **HCP** | Habitat Conservation Plan |
| **IPaC** | Information for Planning and Consultation |
| **ITS** | Incidental Take Statement |
| **MOA** | Memorandum of Agreement |
| **NMFS** | National Marine Fisheries Service |
| **NOAA** | National Oceanic and Atmospheric Administration |

| | |
|---|---|
| **NWP** | Nationwide Permit |
| **PEM** | Palustrine Emergent |
| **PFO** | Palustrine Forested |
| **PSS** | Palustrine Shrub Scrub |
| **RAI** | Request for Additional Information |
| **SFWMD** | South Florida Water Management District |
| **SLOPES** | Standard Local Operating Procedures for Endangered Species |
| **USACE** | United States Army Corps of Engineers |
| **USC** | United States Code |
| **USFWS** | United States Fish and Wildlife Service |
| **Wildlife Plan** | Florida's State Wildlife Action Plan (FWC) |
| **WMDs** | Water Management Districts |
| **WOTUS** | Waters of the United States |

**GLOSSARY** (adopted from EPA BE p. xi – xv)

**Action** means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by federal agencies in the United States or upon high seas (50 CFR § 402.02). For the purposes of this document, the proposed action is the EPA's potential approval of the State of Florida's request for the assumption of the administration and permitting of a CWA Section 404 program.

**Action Area** means all areas to be affected directly or indirectly by the Federal action, and not merely the immediate area involved in the action (50 CFR § 402.02).

**Activity** for the purposes of the State 404 program only, means "discharge of dredged material" and/or "discharge of fill material" as those terms are defined in 40 CFR § 232.2 (Rule 62-331.030, F.A.C.).

**Administratively complete** means an application that contains all the items required under the public noticing requirements of Rule 62-331.060, F.A.C.

**Affect/effect** as a verb, to "affect" means is to bring about a change. The "effect" (usually a noun) is the result of a change. "Affect" appears in Section 7 of the ESA (16 USC § 1536) and "Effect" appears throughout ESA Section 7 regulations (50 CFR § 402 *et seq*) and guidance documents (ESA Section 7 Consultation Handbook).

**Assumed waters** (or **State-assumed waters)** State-assumed waters are all waters of the United States that are not retained waters (as identified in Chapter 62-331, F.A.C., and FDEP's State 404 Handbook).

**Avoidance** means mitigating a resource impact by selecting the least-damaging project type, spatial location and extent compatible with achieving the purpose of the project. Avoidance is achieved through an analysis of appropriate and practicable alternatives and a consideration of impact footprint.

**Assumption** means a state has requested and the EPA has approved a state dredge and fill permitting program to be administered in lieu of the Section 404 program administered by the USACE for discharges into assumed waters.

**Best available data** means data to assure the quality of the science used to establish official positions, decisions, and actions taken by the State of Florida during the review of State 404 program permit applications, the quality of the biological, ecological, technical, and other relevant information that is used will only be that which is reliable, credible and represents the best data available. Under Section 7(a)(2) of the ESA, the USFWS is required to use the best available science. In the context of the ESA, the USFWS and NMFS have a policy statement that further describes best available data (see Notice of Interagency Cooperative Policy on Information Standards Under the Endangered Species Act 1994).

**Biological opinion (BiOp)** means a document which includes 1) the opinion of the US Fish and Wildlife Service or the National Marine Fisheries Service as to whether or not a federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of designated critical habitat; 2) a summary of information on which the opinion is

based; and 3) a detailed discussion of the effects of the action on listed species or designated critical habitat (50 CFR § 402.02, 50 CFR § 402.14(h)).

**Candidate species** means plant and animal taxa considered for possible addition to the list of Endangered and Threatened Species. These are taxa for which USFWS has on file sufficient information on biological vulnerability and threat(s) to support issuance of a proposal to list, but issuance of a proposed rule is currently precluded by higher priority listing actions (See 50 CFR § 424.02, ESA Section 7 Consultation Handbook).

**Conservation** means to use all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which protective measures are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking (ESA 16 U.S.C. § 1532(3)).

**Critical habitat** for a threatened or endangered species means 1) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of Section 1533, on which are found those physical or biological features essential to the conservation of the species and which may require special management considerations or protection; and 2) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of Section 1533, upon a determination by the Secretary of the Interior or the Secretary of Commerce that such areas are essential for the conservation of the species (ESA 16 U.S.C. § 1532(5)).

**Cumulative effects** are those effects of future State or private activities, not involving federal activities that are reasonably certain to occur within the action area of the action subject to coordination. For the purposes of this document, this definition only applies to ESA Section 7 analyses (50 CFR § 402.02).

**CWA** means the Clean Water Act (also known as the Federal Water Pollution Control Act or FWPCA) Pub. L. 92–500, as amended by Pub. L. 95–217, 33 USC 1251, et seq. (Rule 62-331.030, F.A.C., FDEP's State 404 Handbook section 2.0(b)1).

**Destruction or adverse modification of critical habitat** means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species (50 CFR § 402.02).

**Effects of the action** are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action (50 CFR § 402.02).

**Endangered species** means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of Class Insecta determined by the Secretary to

constitute a pest whose protection under the provisions of the ESA would present an overwhelming and overriding risk to man (ESA 16 U.S.C. § 1532(6)).

**Endangered or threatened species** in this document refers to those animal species that are identified as federally endangered or threatened by the USFWS or NMFS, and those animal species that are identified as State-listed by the FWC; it also means plant species identified as endangered or threatened by the USFWS or by the Florida Department of Agriculture and Consumer Services when such plants are located in a wetland or other surface water (Rule 62-330.021, F.A.C.).

**Environmental baseline** refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed federal projects in the action area that have already undergone formal or early ESA Section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline (50 CFR § 402.02).

**ESA-species of concern** refers to species that are either listed, proposed, petitioned, or considered candidates for listing under the Endangered Species Act.

**Fish or wildlife** means any member of the animal kingdom, including without limitation any mammal, fish, bird (including any migratory, nonmigratory, or endangered bird for which protection is also afforded by treaty or other international agreement), amphibian, reptile, mollusk, crustacean, arthropod or other invertebrate, and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof. (ESA 16 U.S.C. § 1532(8)).

**Incidental take** refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by a federal agency or applicant (50 CFR § 402.02).

**Jeopardize the continued existence of** means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species (50 CFR § 404.02).

**Listed species** refers to any species of fish, wildlife or plant which has been determined to be endangered or threatened under Section 4 of the ESA or under Chapter 68A-27, F.A.C.

**May affect** is the appropriate conclusion made by a federal action agency in the context of the ESA or by the State in the context of the State 404 program when a proposed activity is reasonably certain to affect any ESA-listed species or designated critical habitat.

**Minimization** means mitigating an aquatic resource impact by managing the severity of a project's impact on resources at the selected site. Minimization is achieved through the incorporation of appropriate and practicable design and risk avoidance measures.

**No effect** is the appropriate conclusion when the action agency determines its action will not

affect a listed species or designated critical habitat per the ESA.

**Other Activities** are program and discharge activities that are caused or authorized by the proposed action. If other activities cause consequences to listed species or critical habitat, the consequences of these other activities would be considered as effects of the proposed action, pursuant to 50 CFR 402.02.

**Practicable** means available and capable of being done after taking into consideration cost, existing technology, and logistics considering overall project purposes (Rule 62-331.030, F.A.C.).

**Programmatic consultation** (under ESA implementing regulations 50 CFR § 402.02) is a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the USFWS to consult on the effects of programmatic actions such as:
(1) Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and
(2) A proposed program, plan, policy, or regulation providing a framework for future proposed actions.

**Project area** or **Project site** means that a portion of the State-assumed waters where specific dredging or filling activities are permitted and consist of a bottom surface area, any overlying volume of water, and any mixing zones. In the case of wetlands on which surface water is not present, the project area consists of the wetland surface area (Rule 62-331.030, F.A.C.). In the context of the review of State 404 permit applications for endangered and threatened species, also includes those areas outside the immediate area of activity which may affect listed species using those areas.

**Protection measures** means those avoidance and minimization measures to address adverse impacts to listed species and critical habitat under the State 404 program. Protection measures recommended by the USFWS are incorporated as conditions to the State 404 permit. Examples of protection measures include, but are not limited to, project design changes and operational restrictions for the protection of species (i.e., seasonal restrictions for construction work as used in Chapter 62-331, F.A.C.).

**Proposed species** means any species of fish, wildlife or plant that is proposed in the Federal Register to be listed under Section 4 of the Endangered Species Act (50 CFR § 402.02).

**Reasonable potential to affect** for the purposes of this document and for the State of Florida's 404 program, refers to a project that has a reasonable potential for affecting endangered or threatened species (40 CFR § 233.51(b)(2)) where it has been determined during the species coordination process that the project may affect federally listed species or their critical habitat.

**Retained Waters** means those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The USACE will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A of the FDEP's State 404 Handbook), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high

water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only (Rule 62-331.030, F.A.C.). The USACE will also retain responsibility for permitting for the discharge of dredged or fill material in Indian Country, as defined in 18 U.S.C. § 1151.

**Section 7 consultation** refers to Section 7(a)(2) of the ESA that requires federal agencies to use their authorities to further the conservation of listed species, including the requirement to consult with the USFWS to ensure that they are not undertaking, funding, permitting or authorizing actions likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat.

**Section 404** is a section of the federal CWA that establishes a program to regulate the discharge of dredged and fill material into the WOTUS.

**Services(s)** describes the USFWS and/or the NMFS.

**Species coordination** is a process to address potential adverse effects to threatened or endangered species, ensuring compliance with Florida Chapter 62-331, F.A.C., and the ESA. This process includes coordination between the FDEP, FWC, and the USFWS during the review of submitted State 404 permit applications. Recommendations for avoiding and minimizing the effects of a project to federally listed species and their critical habitat is provided by technical assistance from the USFWS.

**Species coordination lead or State species lead** is the designated FDEP or FWC staff person who coordinates with the USFWS and is the point of contact for all ESA species issues during the review of a specific State 404 application. FDEP and FWC staff will decide on a project by project basis which agency will act as the State's species lead on the project when coordinating with the USFWS. Factors that will be considered in this decision include the complexity of the coordination and relative workloads.

**State 404 program** is the FDEP program (Chapter 62-331, F.A.C.) that fulfills the requirements of Section 404 of the CWA and its implementing regulations, if approved by EPA.

**Stream** means any river, creek, slough, or natural watercourse in which water usually flows in a defined bed or channel. It is not essential that the flowing be uniform or uninterrupted. The fact that some part of the bed or channel shall have been dredged or improved does not prevent the watercourse from being a stream (§ 373.019(20), F.S.).

**Stressors** are any physical, chemical, or biological alteration of resources (i.e., increase, decrease, or introduction) that can induce an adverse organism response. Stressors can act directly on an individual, or indirectly through impacts to resources.

**Surface water** means water upon the surface of the earth, whether contained in bounds created naturally or artificially or diffused. Water from natural springs shall be classified as surface water

when it exits from the spring onto the earth's surface (§ 373.019(21), F.S.).

**Take** means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect or attempt to engage in any such conduct. (ESA 16 U.S.C. § 1532(19)) **Harass** is further defined as actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include but are not limited to, breeding, feeding, or sheltering. **Harm** is further defined to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns such as breeding, feeding, or sheltering (ESA implementing regulations 50 CFR § 17.3).

**Technical assistance** refers to a type of coordination process described in the ESA Section 7 Consultation Handbook (1998) that outlines a variety of ways in which the USFWS provides expertise and guidance on an individual project basis. In the context of FDEP's 404 permit application reviews, the USFWS will provide technical assistance to the State of Florida by providing information, reviews, and recommendations on effect determinations and protective measures to ensure compliance with the ESA, CWA, and Chapter 62-331, F.A.C.

**Technically complete** means a State 404 application where each application item is adequate to allow the FDEP to determine if the proposed project complies with Chapter 62-331, F.A.C. If a project requires both an ERP and a State 404 program authorization, the State 404 program review shall not be considered complete until the ERP review is complete. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met (Rule 62-331.030, F.A.C.).

**Threatened species** means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range (ESA 16 U.S.C. § 1532(20)).

**Uplands** means areas that are not wetlands or other surface waters, as delineated pursuant to Rules 62-340.100 through 62-340.550, F.A.C., as ratified by § 373.4211, F.S.

**USACE 404 program** refers to the administration and permitting responsibilities by the USACE for Section 404 of the CWA, prior to any assumption by the State of Florida.

**Waters of the State** are as defined in § 403.031(13), F.S.

**Waters of the United States (WOTUS)** means those waters defined in the regulations under 40 CFR § 120.2.

**Wetland** means areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas (40 CFR § 120.2).

**Works** means all artificial structures, including, but not limited to, ditches, canals, conduits, channels, culverts, pipes, and other construction that connects to, draws water from, drains water into, or is placed in or across the waters in the State [§ 373.403(5), F.S.] and includes all types of dredging and filling to create, remove, or locate structures in, on, or over wetlands or other surface waters (Rule 62-330.021, F.A.C.).

CONSULTATION HISTORY

This section lists key events and correspondence during the course of this consultation. A complete administrative record of this consultation is on file in the Service's South-Atlantic Gulf and Mississippi Basin Interior Regions, 1875 Century Blvd, Atlanta, GA 30345.

On March 23, 2018, the Governor signed into law Rule 2018-88, Laws of Florida, which created section 373.4146, Florida Statutes (F.S.), granting Florida Department of Environmental Protection (FDEP) with the power and authority to adopt rules to assume and implement the Section 404 dredge and fill program of the Clean Water Act (CWA).

In 2018 FDEP began coordinating with both the U.S. Environmental Protection Agency (EPA) and the U.S. Army Corps of Engineers (USACE) to draft separate memorandums of agreement that describe the commitments and responsibilities of each agency, should the Assumption be approved by the EPA. FDEP also began assembly of other required components that would constitute a complete Assumption request package per 40 CFR 233.10-14(b).

In May 2018, FDEP published a Notice of Rule Development to implement the State 404 program and held three rulemaking workshops to collect public comment on the draft rule, Chapter 62-331, Florida Administrative Code (F.A.C.). FDEP developed its rule to include federal requirements that are not currently covered under the Environmental Resource Permitting (ERP) program.

On July 17, 2019, the FDEP sent a request to EPA that sought designation, pursuant to 50 CFR 402.08, to serve as a non-Federal representative for informal ESA section 7 consultation to prepare a biological assessment (BA).

On September 18, 2019, EPA, FDEP, United States Department of Interior (DOI), U.S. Fish and Wildlife Service (USFWS), and USACE members attended a meeting to discuss Florida's proposal to use programmatic consultation for ESA purposes under the Section 404 Assumption.

On November 22, 2019, FDEP sent a request to USFWS and National Marine Fisheries Service (NMFS) to review a preliminary list of affected species for a BA.

On December 12, 2019, the FDEP Secretary received a response from the EPA Region IV Administrator approving the requested non-federal representative designation, allowing FDEP to move forward with the development of a BA. The EPA response indicated that EPA would voluntarily engage in informal consultation with the Services on its action on Florida's request to assume administration of a Section 404 program.

In February 2020, FDEP published a Notice of Proposed Rule to implement the State 404 program and in April, held five rulemaking hearings to collect public comment on the draft rule, Chapter 62-331, F.A.C.

In February 2020, FDEP, FWC and USFWS began work to draft a Memorandum of Understanding (MOU) to describe commitments, roles and responsibilities in the State 404

program's species coordination process to ensure species protection, should the Assumption be approved by the EPA.

On February 25, 2020, FDEP submitted first draft of BA to USFWS for review and comment. On March 24, 2020, USFWS submitted comments on draft BA to FDEP.

In March and April 2020, additional public hearings were held regarding rulemaking for Chapter 62-331, F.A.C.

On April 15, 2020, NMFS responded to FDEP's November 22, 2019 letter with the conclusion that ESA-Listed species under NMFS' jurisdiction do not occur in waters that are assumable by the State.

On April 28, 2020, FDEP submitted a revised draft BA (draft BA 2.0) to USFWS for review and comment.

On May 21, 2020, EPA published a notice in the federal register requesting comment on whether EPA's approval of a Clean Water Act Section 404 program is nondiscretionary for purposes of Endangered Species Act section 7 consultation.

On May 28, 2020, USFWS submitted comments on the second draft of the BA to FDEP.

On June 8, 2020, the Final Notice of Proposed Rule Change for Chapter 62-331, F.A.C. was published.

On June 18, 2020, FDEP submitted its third draft of the BA (draft BA 3.0) to USFWS

On July 1, 2020, USFWS submitted comments on draft BA 3.0 to FDEP.

On July 24, 2020, FDEP sent EPA and USFWS a final draft BA (20200724_FDEP Final BA.docx)

On August 20, 2020, EPA received FDEP's application package requesting EPA's approval of the State's assumption of the administration of the CWA 404 program for assumable waters in Florida.

On August 28, 2020, EPA indicated its approval of a state 404 program was a discretionary action subject to compliance with the ESA. EPA also determined that the FDEP's application package was complete.

On September 2, 2020, EPA submitted its "ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida" (BE) to USFWS and initiated formal consultation.

On October 2, 2020, USFWS sent its draft biological opinion (BiOp) addressing EPA's proposed action to the EPA

On October 29, 2020, EPA submitted comments on the draft BiOp.

**INTRODUCTION**

Section 7(a)(2) of the Endangered Species Act of 1973, as amended, (ESA; 16 United States Code [U.S.C] 1531 *et seq.*) requires every Federal agency, in consultation with and with the assistance of the Secretary, to insure that any action it authorizes, funds, or carries out, in the United States or upon the high seas, is not likely to jeopardize the continued existence of any federally listed species or results in the destruction or adverse modification of designated critical habitat. The ESA's section 7 implementing regulations stipulate, "Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control," (50 Code of Federal Regulations [CFR] 402.03) and that under certain conditions reinitiation of section 7 consultation may be required where discretionary Federal involvement or control over the action has been retained or is authorized by law (50 CFR 402.16). The USFWS and NMFS have been delegated the authority to administer the ESA.

Congress enacted the Clean Water Act (CWA; 33 U.S.C. 1251 et seq.) to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters". The CWA (33 U.S.C 1344) establishes the basic structure for regulating discharges of pollutants into the waters of the United States and regulating quality standards for surface waters. With respect to discharges of dredged or fill material, Congress assigned certain authorities and responsibilities to the EPA and the U.S. Army Corps of Engineers (USACE), and authorizes the USFWS opportunity to provide comment on requests to assume the program and on certain draft permits or permit applications. In its regulations at 40 CFR 233, EPA has extended this opportunity to comment on certain state-issued permits and on program assumption requests to the NMFS. The roles and responsibilities for implementing the Act differ in scope among the involved Federal agencies, as well as between Federal agencies and states or tribes administering the Section 404 program.

For example, some of the respective roles include:

USACE

- Administers day-to-day 404 program in non-assumed waters, including individual and general permit decisions;
- Conducts or verifies jurisdictional determinations;
- Develops USACE policy and guidance; and
- Enforces USACE Section 404 permit provisions.

EPA

- Develops and interprets policy, guidance, and environmental criteria used in evaluating permit applications;
- Determines scope of geographic jurisdiction and applicability of exemptions;
- Approves and oversees State and Tribal assumption (33 U.S.C. 1344(g)-(l);
- Reviews and has opportunity to comment on non-waived permit applications;
- Has authority to prohibit, deny, or restrict the use of any defined area as a disposal site

(Section 404(c));
- Can elevate specific cases (Section 404(q));
- Enforces Section 404 provisions.

USFWS and NMFS
- Evaluate impacts on fish and wildlife of all new Federal projects and Federally permitted projects, including projects subject to the requirements of CWA's Section 404 (pursuant to the Fish and Wildlife Coordination Act);
- Elevate specific cases or policy issues pursuant to Section 404(q); and
- Address requests to consult under section 7 of the ESA on program assumption requests ; (EPA 2020, https://www.epa.gov/cwa404g/consultation-cwa-section-404-program-requests-endangered-species-act-and-national-historic, accessed August 8, 2020)
- Have opportunity to provide comment on proposed state 404 permits pursuant to procedures laid out in 40 CFR 233.50.

As noted above, EPA administers sections 404(g)-(*l*) (33 U.S.C. 1344(g)-(*l*)) of the CWA in accordance with its implementing regulations (40 CFR 233). Sections 404(g)-(*l*) provide States and Tribes the opportunity to request assumption of the administration of the CWA 404 program for assumable waters in lieu of the U.S. Army Corps of Engineers (USACE) 404 program. It is important to note that some waters of the U.S. are not assumable by a State or Tribe and are retained under the USACE 404 permitting program (referred to hereafter as "retained waters"). The EPA is required to follow procedures specified in 40 CFR 233 when evaluating, approving, reviewing, and withdrawing its approval of a State or Tribal 404 program, and when coordinating Federal review of State or Tribal 404 permit actions.

EPA has determined that its potential approval of any State or Tribe's request to assume the CWA 404 permit program is a discretionary action for purposes of consultation under section 7 of the ESA (Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals dated 8/27/2020). If EPA approves the Assumption, upon EPA's publication of its final approval of a State or Tribal assumption, the USACE would suspend its issuance of section 404 permits in assumed waters and the USACE would no longer receive CWA 404 permit applications from the regulated community in assumed waters. Finally, EPA will commence its  oversight of the administration of the State or Tribe's 404 program and coordinate Federal review of State or Tribal permit actions, in accordance with 33 U.S.C. 1344(g)-(l) of the Clean Water Act (CWA) and its implementing regulations (40 CFR 233). If EPA determines a state program no longer complies with the requirements of 40 CFR 233, EPA may initiate withdrawal proceedings pursuant to the procedures at 40 CFR 233.53.

On August 20, 2020, EPA received a package from the State of Florida requesting assumption of the administration of the dredge and fill permitting program under Section 404(g)-(l) of the CWA.

On September 2, 2020, EPA requested formal consultation with the USFWS and provided the USFWS with a complete section 7 consultation package that included a biological evaluation

(BE) and other information concerning the potential effects of its potential approval of Florida's assumption on ESA-listed species, pursuant to section 7 of the ESA (50 CFR 402).

The Federal action agency is the EPA and the applicant is the Florida Department of Environmental Protection (FDEP). The Federal action (action) that we are considering is EPA's potential approval of FDEP's request to assume the CWA 404 permit program in waters of the U.S. that will not be retained by the USACE 404 permitting program.

Approval of the action would change the permitting authority under section 404 of the CWA in State-assumed waters in Florida. The EPA's BE considers the effects of the state-issued permits on ESA-species of concern. Consistent with this biological opinion (BiOp) and a Memorandum of Understanding between USFWS, FDEP, and FWC, we will provide technical assistance to FDEP to insure that no State 404 permit action jeopardizes the continued existence of ESA-listed species or adversely modifies or destroys critical habitat, pursuant to 40 CFR 233.20(a).

Other activities (program activities) that would occur if EPA approved the State's 404 assumption request include the State's implementation of its section 404 program, EPA's oversight of the State 404 program, EPA's coordination of Federal review of State permit actions, and the execution of State-permitted activities by permit holders. The consequences of the potential approval of the State's assumption (including those related to any program activities caused by the potential approval) on ESA-listed species and critical habitat are considered as effects of the action, pursuant to 50 CFR 402.

Given the programmatic nature of the action, USFWS conducted a programmatic consultation, which is defined in 50 CFR 402.02 as: "a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the Services to consult on the effects of programmatic actions such as:

(1) Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and

(2) A proposed program, plan, policy, or regulation providing a framework for future proposed actions."

In conducting section 7 consultation, the USFWS must follow procedures described in the ESA (U.S.C. 1531 *et seq*) and its implementing regulations (50 CFR 402). Some of these requirements are noted below.

The USFWS must:
- "…use the best scientific and commercial data available," (16 U.S.C. 1536(a)(2).
- "…formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat," (50 CFR 402.14(g)(4).
- "Formulate a statement concerning incidental take, if such take is reasonably certain to occur," (50 CFR 402.14(g)(7).

- Where "resultant incidental take of listed species will not violate section 7(a)(2)…, the Service will provide with the biological opinion a statement concerning incidental take…" (50 CFR 402.14(i)(1).

The USFWS has provided technical assistance to FDEP and EPA throughout the development of FDEP's BA that FDEP submitted to EPA as supplementary information in its assumption application package. EPA utilized FDEP's BA to develop its BE.

In addition, USFWS reviewed and commented on draft portions of Florida's 404 program rule (62-331, Florida Administrative Code [F.A.C.]; Florida's Environmental Resource Permit rule 62-330, F.A.C.; the Rules' associated Applicant Handbooks; and a Memorandum of Understanding (MOU) between FDEP, Florida Fish and Wildlife Conservation Commission (FWC), and USFWS concerning protected species coordination. The MOU provides a structured framework for coordinating review of State 404 permits to assess potential effects on State-listed and ESA-listed species and to insure that no State 404 permit action jeopardizes the continued existence of an ESA-listed species, or adversely modifies or destroys designated critical habitat.

The USFWS reviewed the EPA's section 7 consultation initiation package and found it complete. Information provided by EPA and FDEP is summarized below. This information was carefully considered by USFWS in formulating this BiOp:

- EPA's letter requesting formal consultation, pursuant to 50 CFR 402.14
- EPA's Biological Evaluation (BE): "ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida" (dated July 2020, received September 2, 2020)
- EPA CWA 404 Regulations (40 CFR 230 and 233)
- USFWS ESA-listed Species Databases (e.g. ECOS)
- The State 404 Assumption Package submitted to EPA
    - Florida's State Statutes: Chapters: 120 – Florida Administrative Procedures Act; 373 – Water Resources; 403 – Environmental Control; Florida House of Representatives Bill 1091; Florida Senate Bill 712
    - Florida's Administrative Code (FAC) of regulations: 62-4 – Permits, 62-110 – Exceptions to the Uniform Rules of Procedure, 62-330 – Environmental Resource Permitting Rule, 62-331 – State 404 Permitting Rule, and 62-340 - Delineation of the Extent of Wetlands and Surface Waters.
    - Applicant's Handbooks that are incorporated into FAC: State 404 Program Applicant's Handbook, Environmental Resource Permit Applicant's Handbook
    - Florida General Counsel's Statement (dated July 31, 2020)
    - The FDEP-USACE Memorandum of Agreement (MOA)
    - The FDEP-EPA MOA
    - The FDEP-FWC-USFWS MOU for Protected Species Coordination

Pursuant to 50 CFR 402.14(h) (3), this BiOp formally adopts the EPA BE (Appendix I) and the FDEP, FWC, USFWS MOU (Appendix II), as part of this BiOp. For example, significant portions of the EPA BE and MOU will be used to describe the action (which includes program activities), and its potential effects on ESA-considered species and any designated critical

habitat, and proposed critical habitat. Note that ESA-considered species include ESA-listed species, ESA Candidate species, species proposed for listing, and petitioned species.

Although the USFWS has adopted and adapted various portions of the EPA's ESA consultation initiation package and the MOU in the BiOp, the USFWS has conducted its own analysis of the best scientific and commercial data available (which includes all the information noted above) and has given appropriate consideration to any beneficial actions as proposed or taken by the EPA and FDEP, including any actions taken prior to the initiation of consultation. Measures included in the proposed action (action) that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action and do not require any additional demonstration of binding plans. (50 CFR 402.14(g)(8)).

This USFWS BiOp will examine whether and to what degree FDEP's program, regulations, processes, and procedures insure that EPA's approval and FDEP's subsequent assumption and implementation of the 404 program is not likely to jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of critical habitat.


## DESCRIPTION OF THE PROPOSED ACTION

An action, pursuant to 50 CFR 402.02, means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:

(a) actions intended to conserve listed species or their habitat;
(b) the promulgation of regulations;
(c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or
(d) actions directly or indirectly causing modifications to the land, water, or air.

With respect to the action's indirect modifications (or effects) to the land, water, or air, such modifications are considered as effects of the action and include consequences caused by other activities that are, themselves, caused by the action (effects of the action are defined in 50 CFR 402.02, 402.17).

The action that this BiOp is analyzing is the EPA's potential approval of the State of Florida's request to assume the administration of section 404 of the CWA for the permitting of discharges of dredged or fill material into those waters under the jurisdiction of the State 404 program ("assumed waters"). The processes and procedures for approving State 404 programs are described in 40 CFR 233 Subpart B. If the assumption is approved by EPA, it will be effective on the date EPA publishes its approval in the Federal Register.

EPA Requirements for a State's Assumption of CWA 404 Program

Pursuant to 40 CFR 233.10, Florida submitted an application package to the EPA Region IV Administrator that included:

1. Letter from the Governor of Florida requesting program approval;

2. Complete program description in accordance with 40 CFR 233.11;

3. Attorney General's statement, in accordance with 40 CFR 233.12;

4. Memorandum of Agreement (MOA) with the EPA Regional Administrator, in accordance with Section 40 CFR 233.13;

5. MOA with the Secretary of the Army, in accordance with 40 CFR 233.14; and

6. Copies of all applicable state statutes and regulations, including those governing applicable state administrative procedures.

Attached to the program description, FDEP sent EPA a copy of the FDEP-FWC-FWS MOU that describes how the State and USFWS would coordinate in evaluating State 404 permit applications. The action (EPA's approval of the State 404 program) would change the regulatory structure for approval of program activities. action These program activities consist of a number of activities related to the processing of State 404 permits, and importantly, as discussed briefly above and in more detail later, include a process by which the USFWS will receive and review all State 404 permit applications and provide technical assistance to the State, as needed, to insure State 404 permit actions are not likely to jeopardize a species or adversely modify or destroy critical habitat.

The following summarizes program activities (Fig. 1) that are reasonably certain to occur only because of the action:

1. CWA's requirement for EPA to coordinate federal review of State permit actions, and in accordance with 40 CFR 233.50 and 233.51
2. CWA's requirement to oversee the operation of the State's 404 program, and in accordance with 40 CFR 233.50 and 233.51.
3. FDEP's requirement to administer the State 404 program in accordance with:
   a. All applicable Federal regulations specified in 40 CFR 233
   b. The FDEP-USACE MOA
   c. The FDEP-EPA MOA
   d. The FDEP-FWC-USFWS MOU for Endangered Species Coordination
   e. Florida's Environmental Resource Permitting Rule (62-330, F.A.C.)
   f. Florida's 404 Permitting Rule (62-331, F.A.C.)
   g. Processes and procedures specified in the State 404 Program Applicant's Handbook and the ERP Program's Applicant's Handbook
4. A State Permittee's requirement to follow the State 404 program requirements when applying for a State 404 permit and to conduct permitted activities in accordance with the conditions in the State 404 permit.



Figure 1. The proposed action (EPA's approval of the State 404 program) and program activities that it will cause. Program activities will be subjected to coordination with USFWS to insure any State 404 permit action is not likely to jeopardize a species or adversely modify or destroy critical habitat.

**Program activities that will only occur but for EPA approving the State's Assumption**

If the State of Florida's assumption is approved, FDEP would assume regulatory responsibility over all dredging and filling activities in WOTUS within Florida not retained by USACE. The implementation of the State's program in evaluating permit applications, issuing or denying permits, compliance and enforcement of permit conditions, and all the ensuing execution of permitted activities by permittees are considered program activities emanating from the action and have been considered under this programmatic consultation and BiOp. EPA will retain oversight of the State 404 program and coordinate review by USACE, USFWS, and NMFS of State permit actions that are not subject to being waived from EPA review.

The USFWS considers future State permit actions as program activities that are caused by the proposed action. For example, when the EPA approves the State 404 program, a State 404 permit issuance would be the only legal means for dredge and fill actions to occur in assumed waters and for those actions to potentially affect ESA-listed species or their designated critical habitats.

**State Processes for administering the State 404 program**

If Florida's program is approved by EPA in accordance with 40 CFR 233, the Secretary of FDEP will be the State official charged with administering the State 404 program when the program is approved and has authority to issue permits pursuant to Part IV of section 373 of the Florida Statutes (F.S.). In accordance with section 373.4146, F.S., FDEP has the power and authority to issue permits for regulated activities conducted in assumed waters following procedures stipulated in the State 404 Program Rule (62-331, F.A.C) and State Environmental Resource Permitting Rule (62-330, F.A.C.) and each Rule's respective Applicant's Handbook.

Florida's 404 Program Rule includes requirements of federal law that are not addressed in the existing state regulations for dredge and fill permitting (such as noticing provisions, alternatives analysis, and the federal mitigation hierarchy, etc.). The State 404 Rule, Chapter 62-331, F.A.C., also includes definitions, procedures for review of and agency action on exemption requests, processes for individual permits, public notice requirements, procedures regarding mitigation banking, and procedures and descriptions for general permits created to correspond to the USACE Nationwide Permits and appropriate regional general permits as granted by the USACE.

In describing the State's processes for administering the State 404 Program, this BiOp and information contained in EPA's consultation package focuses on describing activities that affect ESA-listed species, designated and proposed critical habitat, and ESA-considered species, as opposed to other resource issues such as insuring compliance with regulations specific to protection of cultural resources or water quality. Provisions and considerations for those other resource issues are detailed in Federal regulations (40 CFR 233) and State rules (62-330; 62-331, F.A.C.).

It is important to note the BE describes the relationship between FDEP and the State's water management districts (WMDs) and certain local governments whom have been delegated by FDEP to jointly implement Florida's Environmental Resource Permitting (ERP) program. The

agencies' various responsibilities are divided according to the Operating and Delegation Agreement (operating agreements) and the geographic regions of the WMDs.

The current State 404 Rule (62-331, F.A.C.) limits the administration and implementation of the State 404 Program to FDEP, but contains a provision that may allow the State 404 Program to be delegated to the WMDs by FDEP in the future. CWA regulations (40 CFR 233) would require this type of change to the State 404 Program to be approved by EPA prior to implementation.

Another important State agency that will be involved in the State 404 Program is the Florida Fish and Wildlife Conservation Commission (FWC). FWC has historically worked closely with FDEP in its implementation of the State's ERP program, which regulates discharge of fill into waters of the State. FWC has permitting authority over species identified in Chapter 68A-27, F.A.C., which include the species identified within FDEP's ERP program.

FDEP cannot authorize impacts, specifically incidental take, of State-listed species identified in Chapter 68A-27, F.A.C. Therefore, FDEP has historically coordinated protection and conservation of aquatic and terrestrial fish and wildlife species with the FWC. FWC's permit commenting authority was codified upon the agency's creation of Section 20.331(10), Fla. Stat. The FWC provides a list of potentially affected federally and State-listed species to FDEP during ERP application review. It also evaluates potential impacts to State-listed fish and wildlife for ERP Program project applications that are expected to affect species and habitat, and provides recommendations for permit conditions to the FDEP to minimize such effects. As described in the BE (Appendix A), FWC will continue to comment on ERP permits and will be commenting on State 404 permits should EPA approve FDEP's assumption of the 404 program, per the State 404 Program Rule (62-331, F.A.C.), the State ERP Rule (62-330, F.A.C), and the FDEP-FWC-USFWS MOU.

**Consideration of ESA-listed Species when processing State 404 permit applications**

The following is a summary description of how potential effects to ESA-listed species will be assessed and minimized when the State processes State 404 permit applications.

FDEP will review all submitted applications for administrative and technical completeness and forward submitted applications to FWC and USFWS. If FDEP, FWC, or USFWS require additional information, FDEP will request that the applicant supply any additional required information prior to publishing a public notice pursuant to Rule 62-331.060, F.A.C. (administrative completeness), and to determining if the proposed activity meets the conditions for issuance in Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. (technical completeness).

The provisions described in the Applicant's Handbook (Volume I, sections 5.5.3.5 through 5.5.3.7, which govern an applicant's timeframes to respond to requests for additional information) apply to applications for State 404 permits. Once FDEP has determined that an application is administratively complete, FDEP will provide public notice as described in Subsection 62-331.060(2), F.A.C.

Permit applications will not be considered technically complete until the ERP review, if required, is complete. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met. (See Rule 62-331.070, F.A.C.,

and section 5 of the State 404 Handbook). FDEP may request additional information as necessary during its review of any information it receives during the public comment period, at a public meeting, or during Federal review. Importantly, Federal regulations (40 CFR 233.20) prohibit the issuance of a State 404 permit that is not in compliance with 40 CFR 230, or a permit that EPA has objected to under 40 CFR 233.50, or if discharges would occur in an area otherwise protected by 404(C), or in which anchorage or navigation in navigable waters would be substantially impaired.

**State 404 permit application timelines**

Pursuant to Rule 62-331.052, F.A.C., FDEP will review the application within 30 days of receipt of an application for a permit, or receipt of any additional information provided by the applicant in response to FDEP's request for additional information, for: 1) administrative and technical completeness; 2) request any additional information required to publish the public notice; and 3) determine if the proposed activity meets the requirements for issuance. The applicant may voluntarily submit a written waiver of the above 30-day deadline to allow more time for FDEP to determine if additional information is required.

Within 10 days of FDEP determining that an application is administratively complete pursuant to subsection 62-331.060(1), F.A.C., FDEP will provide public notice as described in subsection 62-331.060(2), F.A.C. In addition, FDEP will send a copy of the public notice to EPA for those projects that EPA reviews, in accordance with section 5.2.5 of the State 404 Applicants' Handbook, the FDEP-EPA MOA, and Federal regulations (40 CFR 233.50 - .51). EPA review timelines and potential public meetings are discussed in section 7.4.2 of the BE.

FDEP issues public notices concerning the following FDEP actions: 1) a determination that an application for an individual permit or major modification is administratively complete; 2) notification to a permittee of revocation or suspension of a permit; and 3) issuance of an emergency field authorization.

From date of publication, interested parties may express their views concerning the permit application, modification, revocation, or suspension for a period of 30 days, or 15 days for the projects listed in 62-331.060(b)(3)(b).

The USFWS will receive all permit applications and public notices directly from FDEP in accordance with the FDEP-FWC-FWS MOU and 62-331, F.A.C. USFWS will also receive species effect assessments from FWC or FDEP. USFWS will review all permit applications and effects assessments received from FDEP and FWC. USFWS will submit questions, information and comments or measures necessary to minimize effects to ESA-listed species as needed. FDEP, in coordination with FWC, will receive, review, and incorporate any impact minimization measures received from USFWS into its permit actions pursuant to the FDEP, FWC, USFWS MOU and FDEP's State 404 program rule (62-331, F.A.C.).

In accordance with the FDEP-EPA MOA and governing federal regulations (40 CFR 233), EPA will retain federal oversight authority on the issuance of State 404 permits, with the ability to review applications, comment on, object to or make recommendations with respect to the permit including avoidance, minimization and compensation measures..

In some scenarios and situations, EPA can waive Federal review of State 404 permit applications pursuant to 40 CFR 233.51(b)(2). Applications for discharges with reasonable potential for affecting ESA-listed or ESA-proposed species or critical habitat, however, are not waived. For the discharges subject to EPA review, FDEP will send a copy of the public notice to EPA, in accordance with section 5.2.5 of the State 404 Handbook (also 40 CFR 233.50(a)(1)). Under the State 404 program, projects with reasonable potential for affecting ESA-listed or ESA-proposed species or critical habitat are defined as projects that have been determined by FDEP and FWC, in coordination with USFWS, to affect listed species and their critical habitats, whether effects are beneficial or adverse. Details regarding the types and magnitude of effects to species and their critical habitats, as well as proposed protection measures are to be included in the public notice.

As detailed in 40 CFR 233.50(b), if review is not waived, EPA will provide a copy of each public notice, each draft general permit, and other information needed for review of the application to the USACE, USFWS, and NMFS, within 10 days of receipt. These agencies will notify the EPA within 15 days of their receipt if they wish to comment on the public notice or draft general permit. Such agencies shall submit any comments to EPA within 50 days of such receipt. The final decision to comment, object, or to require permit conditions will be made by EPA

Within 30 days of receipt of notice, EPA will notify FDEP whether it intends to comment upon, object to, or make recommendations with respect to 1) a permit application, or 2) a draft general permit. Within this time period, EPA may also request additional information from FDEP if the previously provided information is inadequate for determining whether the permit application or draft permit meets the requirements of the CWA, 40 CFR 233.50, and the 404(b)(1) Guidelines. EPA may notify FDEP of its intention to not comment but that it reserves the right to object within 90 days of receipt, based on any new information brought out by the public during the comment period or at a hearing.

If EPA has given notice to FDEP of the intent to comment, those comments shall be submitted within 90 days of the receipt of the public notice, draft general permit, or FDEP's failure to accept the recommendations of an affected State. . Within 90 days, the EPA will provide a written statement with comments, objections, or recommendations; and the actions that must be taken by FDEP in order to eliminate any objections (see 40 CFR 233.50(e) for more details). FDEP shall not issue a permit until steps required by EPA to eliminate an objection or incorporate a requirement for a permit condition to a permit application or draft general permit. Within 90 days of FDEP receipt of EPA's comments, FDEP or an interested party may request EPA may hold a public hearing on the objection or requirement (see 40 CFR 233.50(g) and (h) for more details).

If no public hearing is held, FDEP shall either issue the permit revised to satisfy EPA's objections, notify EPA of its intent to deny the permit, or notify EPA that it will not resolve the objection or deny the permit. In the event FDEP neither satisfies EPA's objections, requirement for a permit condition, nor denies the permit, EPA shall transfer the permit application to the USACE for processing.

**Estimated Species Review Timelines for State 404 Application Reviews**

All days are counted from the day of DEP's receipt of application
or receipt of additional information unless stated otherwise

FDEP receives permit application

**Within 5 days**

DEP sends request for comment to FWC and USFWS with application materials

**Within 20 days**

Subprocess 1: FWC responds to DEP

**Within 30 days**

DEP Responds

Subprocess 2: FWC and USFWS review of information

Is the file Administratively complete?

No

Applicant Responds

**Within 5 days**

DEP sends request for comment to FWC and USFWS with response

**Within 20 days**

Yes

After FWC has stated that information is complete for wildlife issues and DEP has determined file completeness, Applicant is notified by DEP that file is administratively complete

**Within 10 days** deemed complete

Public Notice (provided to EPA and USFWS)

Public comment period is 15 days or 30 days, depending upon project

Neither EPA or USFWS provide comment; Most likely to occur if proposed permit conditions already coordinated with the USFWS are included in the public notice

USFWS provides comments directly within the public comment period

EPA provides comment

EPA requests comments from USFWS and USACE

USFWS has **15 days** to notify EPA it intends to comment and **50 days** from receipt of public notice to send comments to EPA

Subprocess 3: FWC and USFWS review of information

EPA has **90 total days** from receipt of public notice to send decision to comment, object, or require permit conditions

DEP issues or denies permit, or DEP notifies EPA it does not plan to issue or deny

Figure 2. Processes and timelines for processing State 404 permit applications. Subprocess 1-3 described on following page.



Subprocess 1: FWC responds to DEP with additional questions or requested information
Subprocess 1:
Request for Additional Information
Must be completed within 20 days
Process is repeated until information is complete
Response will include federally listed and state listed questions or request for more information
FWC and USFWS receive information from DEP
FWC drafts questions and/ or requests for missing information
FWC contacts USFWS with draft and requests review
FWC adds any USFWS additional questions and information to draft
FWC responds to DEP and copies USFWS
Subprocess 2: FWC and USFWS review of information
Subprocess 2:
Species Coordination Process prior to Public Notice
Completed during the Additional Information request period
Public Notice must include effect determinations, including "No Effects". If available, proposed permit conditions should also be included.
FWC and USFWS review information concurrently as it is received from DEP
FWC drafts preliminary determinations for: Project area, Affected species list and Anticipated effects to species and habitat
FWC coordinates with USFWS on determinations
FWC drafts response to DEP incorporating any USFWS suggestions and includes correspondence from USFWS
Effect determinations are included in Public Notice
Subprocess 3: FWC and USFWS review of information
Subprocess 3:
Species Coordination Process during or after the Public Notice
Completed during the public comment period or during EPA's comment review period
FWC and DEP review information provided by USFWS as it is received from USFWS or EPA
Did the public notice include protective measures to be incorporated as permit conditions?
No
Was the effect determination for the project "No Effect"?
No
Yes
FWC coordinates with USFWS on determinations
FWC drafts response to DEP incorporating any USFWS suggestions and includes correspondence from USFWS
If needed, additional permit conditions are included in the proposed permit, or modifications to the project design are made

**Required information and agency review of State 404 permits**

Applicants submitting a State 404 permit application will be required to submit information that allows the State of Florida (FDEP and FWC) to sufficiently assess potential adverse impacts of the proposed project on listed species and their designated critical habitats and allow the USFWS to review and provide technical assistance as needed (62-331.051, F.A.C.). To that end, the following information will be required as part of the State 404 application:

- Description of the proposed activity (including all activities reasonably related to the same project, timing and duration of project and related information as required in application)
- Description of the specific areas affected by the activity (e.g., site map)
- Description of listed species/critical habitat that are present in the area affected by the activity
- Description on the manner in which species may be affected by the activity
- Analysis of any cumulative effects, which are the effects of future State or private activities that are reasonably certain to occur within the project area
- Relevant information (e.g., species surveys, etc.)
- When needed, proposed project designs and proposed conservation measures that would avoid and minimize the expected impacts to listed species and their habitats.

If incomplete, additional information will be requested during the information gathering and review processes and forwarded by FDEP to the FWC and USFWS in accordance with the FDEP-FWC-USFWS MOU.

As part of the State-listed and ESA-listed species coordination process, FDEP will provide copies of all State 404 permit applications to the FWC and USFWS. At the time each application is submitted to USFWS (or within a short period after submittal), FDEP or FWC will submit a preliminary determination to the USFWS as to whether ESA-listed species or their critical habitats are expected to be present and whether they are likely to be affected adversely or beneficially by the proposed State permit action. In some cases, FDEP or FWC may provide the USFWS with a list of preliminary protective measures to minimize impacts to ESA-listed species and critical habitats. The USFWS will review and may suggest modifications or recommend additional protective measures, as needed.

The State's lead for species coordination may be FWC staff, or the permit processor with FDEP, depending on the complexity of the request and the workload. Regardless of the designated staff to be the point person for coordinating with the USFWS, both State agencies will work together as a team for all projects with listed species issues. For each State 404 permit application review, staff with FWC and FDEP will determine who will take the lead to coordinate with the USFWS and will copy the other reviewer on all correspondence. The State species lead will provide, and/or validate the applicant's submittal of a preliminary list of species anticipated to be affected, identification of project areas, preliminary impact/effect determinations, and preliminary proposed impact avoidance and minimization measures (protection measures) for federally listed and State-listed endangered or threatened species (and species proposed to be listed) and their critical habitats. Upon coordination with the USFWS on appropriate protection measures for federally listed species and their critical habitats, FDEP will incorporate the USFWS-recommended measures as permit conditions, or will issue a Notice of Intent to Deny the permit.

**Review of estimated species coordination timeframes**

As presented in the flow chart (Fig. 2) and the BE (pp. 76-77), State regulations dictate the process and general timeframes, however, there are transitional periods between these timeframes, and these are summarized in the steps below (see *Application Timelines* under 7.4 of the BE).

1) FDEP receives a permit application.

2) Within approximately 3-5 days, FDEP will send a copy to USFWS and FWC. Within approximately 1 or 2 days of receiving the permit application, FWC will send a preliminary affected species list and type of effects determination to USFWS.

3) Within approximately 15 days of receipt, USFWS may send to FDEP any comments or questions it has about missing information, or potential affects to listed species or critical habitat, or protective measures to avoid or minimize effects.

4) Within 30 days from receipt, FDEP must either request additional information (RAI) from applicant or deem the application complete.

5) After FDEP receives additional info, FDEP has 30 days to review the response and:

    a) Request clarification of answers to the questions; or

    b) Notify applicant their application is complete.

6) Preferably before the application is deemed complete or before a public notice is issued, FWC and USFWS may determine whether there is reasonable potential to affect listed species, or critical habitats, and if so, the types of effects, and any appropriate potential protective measures. These determinations are forwarded to FDEP.

7) After the application is deemed complete, FDEP has 10 days to issue a public notice for applications for individual permits.

8) If the EPA has waived review, then after the public comment period closes, FDEP has either 60 or 90 days to issue or deny the permit.

9) If EPA reviews the public notice, then Federal regulations (40 CFR 233.50) will govern the process of State 404 permit review by EPA.

    a) EPA has 10 days to send a copy of the public notice to USFWS.

    b) USFWS has 15 days to notify EPA it intends to comment

    c) USFWS has 50 days from receipt of public notice from EPA to send comments to EPA

    d) EPA has 90 days to send comments or objection to FDEP. The final decision to comment, object, or to require permit conditions will be made by EPA.

After considering the timeframes identified in the State regulations and the transitional periods described in the BE, we estimate the total time that USFWS will have to review and comment on a permit application that had all the necessary information at the start and where review has been waived by EPA, would be approximately 55-70 days, depending on whether the public comment period was 15 days or 30 days. However, if additional information was required before FDEP considered the application to be

complete, the maximum amount of time USFWS would have to review and comment would be increased accordingly.

**Identifying applications that may pose adverse impacts**

The FDEP/FWC species coordination and technical assistance with the USFWS will begin before the application's public notice is posted. The USFWS will receive the application prior to FDEP posting a public notice and USFWS may submit information and questions to FDEP prior to FDEP posting a public notice. The public notice will also go to the USFWS, and provides details regarding the type of effects/impacts to species and their critical habitat and any proposed protection measures recommended by USFWS. The technical assistance process between the USFWS, FDEP, and FWC will not be considered complete until any modifications are incorporated as a result of the public notice. If needed, technical assistance with the USFWS may continue during and after the public notice period.

Upon receiving an application, FDEP and FWC will review the submittal by the applicant and preliminarily identify the affected species, affected project area, and critical habitats. The species lead is responsible for making a preliminary determination for affected species, affected project area and critical habitats, and assess whether, and what type of, adverse impacts to endangered or threatened species and their critical habitats is expected. FDEP will forward the application to FWC and the USFWS within three-five days of receipt. The species lead will contact the USFWS and send their preliminary assessments to the USFWS as soon as possible. USFWS may submit questions regarding missing information FDEP, but must do so within 20 days of receiving the permit application.

For example, if FDEP received an application on June 1st and forwarded it to USFWS on June 5th, any questions USFWS wishes to convey to the applicant must be relayed through the species coordinator by June 25th. If USFWS has no questions, technical assistance simply continues. All comment deadlines for USFWS's response will be included in FDEP/FWC initial submission of the permit application to USFWS.

- If FDEP/FWC does not get a response from the USFWS by the deadline for questions or comments, the lack of a response will be considered a "no comment" and no further information from the USFWS is needed. USFWS has internal processes in place to ensure that all applications are received and reviewed. As a fail-safe, USFWS may submit its questions during the public notice period for the State 404 application should USFWS not respond during the early phase of FDEP-USFWS coordination. If the State species coordinator believes that effects may be significant and the lack of response may be in error, they will contact the USFWS to confirm. In addition, the USFWS will receive a copy of all public notices and may provide comments to EPA and/or FDEP at that time, as needed.

- For the determination of potential affected species, project area or impact/effect on the species, if FDEP/FWC receives a response from USFWS with additional information to consider, the information will be re-evaluated and resubmitted to USFWS, if needed.

- Once it has been determined by FDEP/FWC that an application will have no adverse impacts or adverse effects to federally listed endangered or threatened species (or species proposed to be listed) or their critical habitats, and the USFWS has not submitted information or questions that would lead the State to reconsider its determination, the species review concludes for that application. If the applicant modifies the project activities or increases the project area as the application is continued to be reviewed, FDEP/FWC/USFWS may re-evaluate the application

with this information, if warranted (e.g., if the new project area would include additional listed species or critical habitats not considered in the previous review).

- Once it has been determined by FDEP/FWC that an application may cause an adverse impact or adverse effect to federally listed endangered or threatened species (or species proposed to be listed) or their critical habitats, technical assistance with USFWS continues in order to determine if, and how, the impacts and effects can be addressed with protection measures.

*Coordination of protective measures with the USFWS*

- For applications determined to have an adverse impact to federally listed species or species proposed to be listed or their critical habitats, the species coordination lead will forward all available information to the USFWS with a request for additional technical assistance.
- The FDEP/FWC species coordination lead will compile additional information or questions needed to complete the review, including information or questions from the USFWS, to forward to FDEP. These questions and requested information will be incorporated into the FDEP's RAI to the applicant.
- The species coordination lead will coordinate with the USFWS regarding potential protection measures that may avoid or minimize the anticipated adverse impacts. In some cases, depending upon the project, the USFWS may submit recommendations to FDEP/FWC. In other cases, the species coordination lead will compile a package that presents the proposed protection measures and transmit the package to USFWS for their review and comment.
- After USFWS provides/agrees with recommended protection measures appropriate to avoid or minimize the expected adverse impacts associated with the proposed project, the protection measures are incorporated into the public notice as proposed permit conditions.
  - If modifications are made during the public comment period that may change the original determination or anticipated effects to species or their critical habitats, FDEP reviewers will forward this information to FWC and USFWS for further review and comment.
  - If no modifications are made, or if the modifications during the public notice process can be addressed by FDEP/FWC/USFWS, protective measures are incorporated into the permit as special conditions and the species review concludes for that application.
- If the review by FDEP, FWC, and USFWS concludes that adverse impacts are likely to jeopardize the continued existence of a species, or will destroy, or adversely modify critical habitat, either of the following alternatives may occur, depending upon the project:
  - Additional protection measures that will satisfy the requirements of the ESA and avoid jeopardy or adverse modification are developed in coordination with or as recommended by USFWS, and FDEP incorporates those measures as permit conditions and processes the permit; or
  - The FDEP issues an "Intent to Deny" the application for a permit.

**Summary of USFWS commitments triggered by approval of the action**

If EPA approves FDEP's assumption of the 404 program, the State 404 program rule (62-331, F.A.C.), State ERP rule (62-330, F.A.C.), Federal oversight and coordination regulations (40 CFR 233), and the FDEP-FWC-FWS MOU will be activated and implemented. As a result of their activation and implementation, the USFWS will:

1. Receive all the 404 permit applications sent by FDEP.
2. Review all the 404 permit applications sent by FDEP.
3. Determine whether the permit application has the required information needed to assess:
   a. Whether or not issuing the permit is likely to jeopardize an ESA-listed or proposed species of fish, wildlife, or plant species or cause adverse modification to proposed or designated critical habitat of such species; and
   b. whether or not take, as defined by the ESA and it implementing regulations (50 CFR 402.02; 50 CFR 17.3) is reasonably certain to occur as a result of issuing the permit after taking into account all the protection measures that the FDEP and/or the applicant propose to implement.
4. If there is missing information necessary to complete the USFWS review, the USFWS will promptly notify FDEP.
5. If all the necessary information is provided to complete step 3, USFWS may provide FDEP with technical information regarding species biology, types and likelihoods of potential effects of the proposed permit on the species, and recommended measures that would avoid or minimize effects, as appropriate with the understanding that final FWS conclusions regarding effects to species are determinative. The USFWS evaluation of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA.
6. If USFWS has information that would disconfirm the State's effect determination, the USFWS will provide that information. Otherwise, the USFWS response may indicate the application had been received and reviewed by USFWS and USFWS has no comments.
7. Monitor and track the amount of anticipated take on a project by project basis in order to inform future species status assessments and future effects assessments.
8. Document all the above as events under the State 404 programmatic BiOp official file.

USFWS will be conducting the actions described above through the technical assistance process, and not through section 7 or section 10 of the ESA. To clarify that USFWS coordination through a technical assistance process, USFWS will not "concur" with any effect determinations made by the State of Florida, but rather may provide comments and conditions that must be implemented in order for the permit to be issued. This process of USFWS coordination and technical assistance operates similarly to a section 7 consultation because it has a similar objectives of 1) ensuring a State 404 permit action is not likely to jeopardize a species or adversely modify or destroy critical habitat, and 2) minimizing and tracking the amount of incidental take if take is reasonably certain to occur.

**Assessing potential effects of a State permit application**

The following description adopted from the BE presents the structure of the species coordination process and how potential impacts of regulated activities will be evaluated to insure compliance with Federal regulations (40 CFR 233; 50 CFR 402) and State rules (62-330; 62-331, F.A.C.).

*Identifying the Project Area and Affected Species*

The BE states the first step in assessing potential adverse impacts to listed species or those proposed to be listed as endangered or threatened, as well as their critical habitats, is to define the project area (similar to the "action area" during a federal section 7 consultation). The project area can be larger than the immediate area of activity, since it is an identification of all areas that may affect listed species and their critical habitats directly or indirectly by the project's activities.

For species within the USFWS's jurisdiction, the USFWS's Information for Planning and Consultation (IPaC) website (https://ecos.fws.gov/ipac/) allows for the user to draw a polygon to represent the project area. The project area must include the proposed project's potential impacts to the affected species and their habitats, and critical habitats, even those traditionally considered as offsite, if the impacts would occur as a result of approval of the project. By creating a polygon that is geographically referenced, the system will produce a preliminary list of resources for the area chosen. This list of species and critical habitats will be considered preliminary, because all potential adverse effects need to be determined (and some species may need to be confirmed by on-site surveys) and verified during the State and Federal species reviews. The result of this online search will also include critical habitats that overlap with the project area. While critical habitat is a special designation under the ESA, during project reviews all occupied habitat within the species range that may be adversely affected will be considered if the project's activity may affect listed species, even that which is not designated as critical habitat under the ESA.

**Available Federal decision tools**

Once there is a proposed affected species list, the State's species coordination lead determines (preliminarily or concurrently with the USFWS) whether adverse effects/impacts are likely to occur. The types of impacts that may occur could be beneficial to species and their critical habitat or could adversely impact or adversely affect them. Adverse impacts to species include the potential for harm to members of the species, such as injury, death, or those that occur by loss of feeding, breeding, or sheltering resources due to a project's activities affecting habitat where members of the species exist. Adverse impacts also include the potential for jeopardizing the continued existence of a species, or adversely modifying critical habitat. Adverse effects/impacts to one or more individuals, can result directly from dredging and filling activities involved with construction or demolition proposed by the project, as well as secondary impacts caused by the ongoing operations of the project once constructed. Assessment of adverse cumulative impacts must be considered during the review of State 404 permit applications; the assessment of expected impacts to species that may be caused from a particular project must be considered along with the impacts that may have been caused from past authorized projects, as well as those future projects that are reasonably certain to occur. Adverse impacts to habitats, particularly critical habitats, include alteration or destruction of the physical and biological characteristics of that habitat. These characteristics are important to the listed species using the area, and harm to species may occur temporarily during construction or permanently during operation or by alteration of the habitat.

For some species, the IPaC system provides Federal species guidelines. These guidelines include General Project Design Guidelines, Habitat Assessment Guidelines, Species Survey Guidelines, Effects Determination (consultation and/or dichotomous) Keys, conservation measures, guidance for determining whether a species 'may be present', proactive management suggestions, Species Assessment Guides (SAGs) or Standard Local Operating Procedures for Endangered Species (SLOPES).

Programmatic consultations, when available, are anticipated to be used to help identify where impacts/effects will occur and whether technical assistance with the USFWS is needed. Some programmatic consultations do not exempt take; rather, they attempt to avoid take through setting project-specific criteria that either determines a project is "not likely to adversely affect" a listed species or critical habitat, or sets avoidance and minimization measures that allow a "not likely to adversely affect" determination to be made. Because these consultation keys and programmatic biological opinions cover many of the species which are most often the subject of ESA section 7 consultations in

Florida, they include many useful measures to identify, avoid, or minimize adverse effects to ESA-listed species.

The objectives of developing and using effect determination decision assistance tools, particularly SLOPES, are to:

- Increase the effect determinations' accuracy and consistency;
- Improve completeness and efficiency in the documentation of the administrative record;
- Decrease the amount of staff and time needed to complete certain types of consultation or species coordination; and
- Improve ESA-listed species conservation and the regulated community's compliance with the ESA.

For example, effect determinations for wide-ranging species such as the Wood Stork determination key has been used extensively and has had some success. As stated in chapter 4.2.2. of the BE, the Eastern Indigo Snake and Wood Stork accounted for 56.6% of all species-level consultations in Florida between 2014 and 2018 (BE, p. 47). Species guidelines, or decision guidance tools, are also available independently from the IPaC system on the USFWS website.

These types of tools are available to project proponents and permit reviewers and provide consistent criteria to reach impact/effect determinations. The State's species coordination lead to facilitate the USFWS's review. The review process for species with these types of decision tools will likely be slightly different and simplified compared to those species that do not have these tools. In the early stages of reviewing a State 404 permit application, the State's species lead will use these decision tools to arrive at impact/effect determinations and potential protection measures. This preliminary review will be submitted to the USFWS with a request for technical assistance, allowing the USFWS to ask questions or provide additional information that may change the conclusions. After the species review outcome is finalized, technical assistance from the USFWS ends for those species and the protection measures are incorporated as conditions to any State 404 permit that is issued.

**Project-by-project assessments when tools are not available**

The BE states for those species or activities that do not have federal species guidelines or decision tools, a case by case assessment must be performed. A preliminary assessment will be performed by the applicant and verified or expanded upon by the FDEP/FWC species coordination lead. Applicants will need to provide all of the information necessary to perform an assessment of potential impacts to listed species and their habitats, as well as submitting proposed protection measures to avoid and minimize the anticipated impacts.

The BE states the following factors will be considered when evaluating the impacts/effects of the activity:

- Proximity of the activity to the species and/or designated critical habitat;
- Location and extent of the area of disturbance;
- Timing (with regards to sensitive periods of a species lifecycle);
- Duration of the activity or impact;

- Disturbance frequency, and

- Nature of the effect (elements of a lifecycle, population size, variability, or distribution, physical and biological features of habitat, etc.).

Federal species guidelines, information on IPaC, USFWS specific species webpages, the results of species surveys, (see Table 7.2 of the BE for guidance), relevant scientific literature, species accounts in Appendix B of the BE, stressors and effects in Appendix C of the BE with discussion in Chapter 5 of the BE, and other available sources of information are reviewed to develop preliminary conclusions of impact/effect as well as develop any potential protection measures.

Physical or biological features essential to the conservation of the species as identified in the final rules designating critical habitat for specific listed species should be considered to determine whether there may be adverse modification of critical habitat.

The BE states the species coordination lead will use the information from the applicant and assess all the data available to them to determine if there will be impacts to any listed species and the severity of adverse impacts to each species and habitats present in the project area. For projects with large amounts of acreage or that are intensive in the amount of activities proposed, or with multiple species and critical habitats, a written assessment determining preliminary anticipated adverse impacts and protection measures to avoid and minimize those impacts would be developed. This preliminary review will be submitted to the USFWS with a request for technical assistance or would be developed in coordination with the USFWS. The USFWS may comment, provide recommended protection measures, or provide additional information that may change the conclusions and protective measures. Once the species coordination review and technical assistance with the USFWS is completed, the species coordination process with the USFWS ends for those species and the protection measures are incorporated as conditions to any State 404 permit that is issued. At any time during the review of State 404 permit applications, if modifications to the project are proposed after the species coordination process, the species review will be revisited with the USFWS. If modification occurs after the application is granted, and the modification causes effects not previously considered by USFWS, the applicant may not be in compliance with this BiOp and may any incidental take that occurs may not be exempt from being considered as prohibited undersection 9 of the ESA.

**Impact/effect determinations and protective measures**

The BE states the word "impact" used in Chapters 62-330 and 62-331, F.A.C. describes effects similar to "may affect" and "adverse effects" under ESA. Throughout this document, these terms are used interchangeably. The State 404 program has two standards of review regarding the protection of listed species: the species protections required under CWA and ESA, and the species protections required under State Chapters 62-330, and 62-331, F.A.C. Under State rules, the requirements of CWA and ESA are incorporated into the species review process for adverse impacts to listed species and their habitats. The State rules are broad; the ERP rule and State 404 program rule protect not only federally listed and State-listed species, but all fish and wildlife in Florida.

While the State 404 program has been developed to meet the requirements of CWA and ESA, it also relies on the requirements of the existing State ERP program. The ERP program requires the applicant to provide reasonable assurances that the proposed activities will not damage or harm the water resources of the State nor reduce the value of wetland functions including functions provided to fish, wildlife and listed species. A state or federally listed species' ability to nest or den cannot be interrupted by negative

impacts to the uplands or wetlands a listed species uses. Subsection 62-330.301(1)(d), F.A.C. requires an applicant provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment "will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters" to obtain approval for a permit. This review also includes consideration for secondary and cumulative impacts.

The BE states the protection measures are defined as those avoidance and minimization measures to address adverse impacts to listed species and critical habitat. Protection measures, in the form of avoidance and minimization measures recommended by the USFWS, are incorporated as conditions to the State 404 permit. Examples of protection measures include but are not limited to project design changes and operational restrictions for the protection of species (i.e., seasonal restrictions for construction work).

**Determining impacts and effects to ESA-listed species when decision assistance tools are not available**

The BE states when decision tools are not available, the determination of whether a project's activities will affect endangered or threatened species is preliminarily made by FDEP and FWC, and coordinated with USFWS during the technical assistance process. Information about a species should be cross-referenced with knowledge of the project's activities and the project area to help predict whether and how the species at any life stage will respond when exposed to the effects of the activities. Based on best available data, if any of the following occurs it will be determined that the project will adversely impact/effect the species and technical assistance with the USFWS to determine possible protective measures is required. The following is to be used as guidance for making a "may adversely impact" determination:

- Data indicate the species may be exposed to the elements of the activity and respond deleteriously upon exposure to elements of the activity or to stressors produced by the activity; or

- Data indicate the proposed activity will cause changes to the physical and biological features of critical habitat and produces exposure or stressor to species.

As the species coordination process progresses during the review of a State 404 permit application, proposed activities will be assessed for potential effects to species. The USFWS will review and may provide additional information on whether adverse impacts are anticipated to occur, and how significantly the impacts are expected to affect the species or critical habitats. These determinations can be categorized as follows:

- No Effect/No Impact

- Not Likely to Adversely Affect/Impact

- Likely to Adversely Affect/Impact

- Jeopardizes the Continued Existence of the Species, and/or Destroys or Adversely Modifies Critical Habitat

***No Effect/No Impact***

If physical or biological features essential to the conservation of the species are not present or are present but will not be affected in the project area, then no further review of effects/impacts to critical habitats is required. In addition, a determination of "No Effect/No Impact" would be made if listed or proposed species or critical habitats do not occur and do not have the potential to occur on a site. If neither the species nor the critical habitat will respond in any manner, no further review of adverse impacts to species is required and technical assistance with the USFWS is concluded.

***Not Likely to Adversely Affect/Impact***

This determination is reached when there is reasonable certainty that a proposed activity may affect a species or designated critical habitat, but the effect is not anticipated to cause harm to a member of the species, nor cause adverse impacts to critical habitat that would result in harm to a listed species dependent on that habitat. The impact expected may not require protective measures (if discountable, or insignificant) or it may be deemed as not likely to adversely affect via required protective measures to avoid and minimize the effects.

***Likely to Adversely Affect/Impact***

This determination is reached when there is reasonable certainty that a proposed activity may adversely affect a species or designated critical habitat, and the effect is anticipated to cause harm to a member of the species and/or cause adverse impacts to critical habitat that would result in harm to a listed species dependent on that habitat. Harm to an individual(s) means injury or death. The level of harm, however, may not result in jeopardizing the continued existence of the species or destroying or adversely modifying critical habitat. The adverse impact expected is likely to require protective measures to avoid and minimize the effects.

***Jeopardizes the Continued Existing of the Species and/or Destroys or Adversely Modifies Critical Habitat***

The State 404 program rule includes stipulations (Rules 62-331.053(3)(a)4, 62-331.201(3)(k), and 62-331-248(3)(k) F.A.C.) that prohibit issuance of a permit that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by USFWS. The USFWS evaluation of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA.

Through technical assistance with the USFWS, the FDEP and FWC will be informed of when a proposed project and its activities is anticipated to jeopardize the continued existence of the species, or if critical habitat is destroyed, or adversely modified. Under these circumstances, the FDEP, FWC, USFWS and the applicant will discuss to determine what, if any, protective measures may be appropriate.

The BE lists anticipated stressors in Table C.1. of Appendix C and notes anticipated effect determinations in Table C.1.b of Appendix C. During future reviews of State 404 permit applications, however, all potential impacts and effects to species and their habitat will be assessed and addressed during project by project permit application reviews.

**State 404 process for developing and ensuring implementation of protective measures**

The BE states after the determination of "may adversely affect/impact" and the level of adverse impact, the species coordination process continues between the State species coordination lead and the USFWS during the review of a State 404 permit application. In order to move towards authorization of an activity, the project's adverse effects/impacts to species and habitat that have been identified must be avoided and minimized by implementing protective measures. Those protective measures may likely either modify the project design, modify the project operation, or follow species-specific protective measures. Early in the review process, the species lead will draft and compile the applicant's information as well as their own assessment and forward to the USFWS for review. The assessment may also be done in coordination with the USFWS, depending upon the project. The USFWS may or may not comment on the proposed preliminary impact review and proposed protection measures, and the finalized assessment and recommendations may be provided to the applicant in the form of comments and draft permit conditions. The USFWS may also recommend additional avoidance and minimization measures, provide recommendations for appropriate permit conditions if none were proposed in the informational package sent to them, or state that the proposed measures are not adequate to avoid or minimize effects to species and their critical habitats.

Some of the Federal species guidelines discussed in the previous subsection of this chapter provide minimization measures that are considered standard conditions for adverse effects associated with common, minor activities. For other species, there are typical minimization measures for common activities that are frequently incorporated into permits as standard conditions that may not be associated with programmatic guidance but can be found in biological opinions. Some projects, particularly those with a greater level of adverse impacts or multiple activities and/or multiple species that may be affected, have a need for a more comprehensive assessment and intensive coordination with USFWS.

In addition to species-specific protective measures, thorough assessments of adverse impacts to habitat must be performed in order to ensure alterations to habitat do not adversely affect listed species. There are various methods for avoiding and minimizing effects of dredge and fill activities within wetlands. Some impacts can be avoided or minimized through BMPs (e.g., silt fences, turbidity curtains, containing dredge materials during dewatering, transfer and storage), while others require administrative restrictions or permit conditions (e.g., contractor education, not refueling equipment within 100 feet of wetlands) to protect wetlands, waters, or "at-risk" species. A major administrative control that compensates for wetland destruction is wetland mitigation. Wetland mitigation includes the enhancement, restoration, establishment, and/or preservation of wetlands that serve to offset unavoidable impacts on wetlands (FDEP 2019b). Governments and agencies have used this policy across North America with notable levels of success (NAWCCC 2000). The species coordination process will avoid and minimize adverse impacts to habitat when practicable.

In addition, FDEP intends to incorporate adaptive management into the State 404 process as needed, particularly as it pertains to wetland compensatory mitigation projects. Per the FDEP's State 404 Applicants' Handbook, wetland compensatory mitigation projects that cannot be constructed in accordance with the approved mitigation plans will require FDEP approval prior to any significant modifications. Wetland compensatory mitigation projects not progressing toward meeting their performance standards will be evaluated for measures to address deficiencies and a determination as to whether these modifications will result in the project meeting its original ecological objectives.

These modifications/measures may include but are not limited to site modifications, design changes, revisions to maintenance requirements, and revised monitoring requirements. The measures shall be designed to ensure that the modified compensatory mitigation project provides aquatic resource functions comparable to those described in the mitigation plan objectives. Performance standards will be revised to address deficiencies in wetland compensatory mitigation projects and to reflect changes in management strategies and objectives if the new standards provide for ecological benefits that are comparable or superior to the approved compensatory mitigation project. No other revisions to performance standards shall be allowed except in the case of natural disasters.

**Best management practices for wetland protection**

BMPs, including schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of WOTUS from discharges of dredged or fill material, will be implemented for all projects under the State 404 program. BMPs include methods, measures, practices, or design and performance standards which facilitate compliance with the Section 404(b)(1) Guidelines (40 CFR 230), effluent limitations or prohibitions under Section 307(a), and applicable water quality standards.

Wetland mitigation measures included in a Section 404 application may also offset effects or result in longer-term beneficial effects to ESA-listed species; however, they are part of the wetland protection process of the State 404 and ERP processes and not a requirement of the ESA coordination.

**Protective measures for plants and animals**

In Florida, fifty-four (54) plant species are on the Federal list of endangered species and 14 are on the Federal list of threatened species. The ESA (16 USC section 1531) provides protection to both endangered and threatened plants and animals. The ESA, however, does not prohibit the destruction, damage or transplantation of protected plants unless such activities involve an endangered species on Federal land or if the activities occur in violation of state laws. If a person wishes to develop private land, with no Federal jurisdiction involved, and if the proposal is in accordance with state law, then the potential destruction, damage, or movement of endangered or threatened plants does not violate ESA. Further, a section 10 ESA incidental take permit is only needed in situations where a non-federal project is likely to result in "take" of a listed species of fish or wildlife; there is no such process for plants.

But while incidental take does not apply to plants, an assessment of jeopardy and adverse modification to critical habitat under section 7(a)(2) applies to plants. For the State 404 program, 40 CFR 233.51(2), and 40 CFR 233.20(a) would prohibit issuance of a State 404 permit that will jeopardize a plant species or adversely modify its critical habitat. FDEP will incorporate any reasonable and prudent measures and terms and conditions provided by the USFWS into permit conditions for a State 404 permit for such a project.

Endangered, threatened and commercially exploited plant species in Florida are regulated by the Florida Department of Agriculture and Consumer Services, by their Division of Plant Industry. Florida's State ERP program under Chapter 62-330, F.A.C. and the State 404 program under Chapter 62-331, F.A.C. include plants in the definition of endangered and threatened species, which requires consideration of adverse impacts resulting from activities authorized under these programs. During the permit review process for each type of permit, FDEP will evaluate potential impacts and effects to State and ESA-listed plant species. Similar to animal species, USFWS will provide recommendations as needed to avoid and reduce anticipated impacts. For those types of projects where jeopardy is not expected to

occur and no adverse modification to critical habitat is expected, some projects may still need protective measures incorporated as permit conditions in order to adequately conserve endangered and threatened plant species.

The State 404 program, the State ERP program, and the ESA provide protection to both endangered and threatened plants and animals. As with animals, there could be a situation in which a federally listed plant is located in the upland portion of the project area that is adjacent to assumable waters and would be affected by the permit. The State 404 program is required to consider adverse impacts in uplands that would not occur except for the authorization of the proposed activity. In addition, while the State 404 program does not have jurisdiction in isolated wetlands, the ERP program does have jurisdiction and can address adverse impacts to animal and plant species dependent on these wetlands.

**Ensuring protection for ESA-listed species in Florida**

The State of Florida is required to incorporate all USFWS recommendations for protection measures as State 404 program permit conditions (Subsection 62-331.054(1), F.A.C.). The existing working relationship and coordination during the review of projects would continue between the FDEP and the USACE. The FDEP will add fields in their permitting tracking database that will continue the collection of data done by the USACE for past Section 404 permits. This data will continue the monitoring of adverse effects on listed species and critical habitat, facilitating the State's ability to conduct its compliance obligations.

In the current ERP program, FWC provides recommendations to FDEP and the WMDs for State-listed species and some federally listed species that are also protected by Florida Statutes, such as manatees and sea turtles. FWC has committed to assist FDEP in the State 404 program review for impacts to ESA- listed species, and the current collaboration between FDEP and FWC will be enhanced by the State's Assumption of the 404 program if EPA approves it. FWC and the USFWS have a long-standing partnership and a current ESA section 6 Cooperative Agreement for conserving Florida's federally endangered and threatened wildlife. The BE anticipates the relationship between FWC and USFWS will bring an existing high level of cooperation, knowledge, and expertise to the State 404 program. In addition, FDEP, FWC and USFWS have entered into a Memorandum of Understanding to identify commitments, roles and responsibilities regarding species coordination for the State 404 program as well as the ERP program (Appendix II).

The BE and MOU indicate the State 404 program species coordination process involves the applicant, FDEP, FWC and USFWS, and encourages compliance by the applicant to avoid and minimize adverse effects, reducing the expected impacts to listed species and their critical habitats. The interactions between agencies and the applicant will inform applicants of the importance of this process in order to be eligible for authorization of their proposed activities and in order to ensure compliance with the ESA.

Finally, if the applicant for a State 404 permit is the holder of a pre-existing valid and active biological opinion with an incidental take statement, or a Habitat Conservation Plan with an Incidental Take Permit (HCP/ITP) that was issued by the USFWS and the species and activities described in the State 404 permit application are covered by that particular biological opinion, or HCP/ITP, then FDEP may stipulate as a permit condition that the applicant must comply with that biological opinion or ITP. FDEP will confirm the validity and applicability of the applicant's pre-existing biological opinion or HCP/ITP with the USFWS before taking any final action on the State 404 permit application.

**State 404 process regarding statements of adverse impact in public notices**

The BE states while many adverse effects can be avoided and minimized during the species coordination review process, impacts that are likely to adversely affect a species (e.g. likely to cause incidental take or jeopardy) or critical habitat (e.g. destroy or adversely modify critical habitat) must be recorded, monitored, provided to the USFWS for tracking and species conservation purposes. These types of projects will receive the most stringent review and be documented in the Public Notice as well as the FDEP database and project file.

The public notice, required by Rule 62-331.060, F.A.C., will include an effect determination statement and include the proposed protection measures, if known at the time of publication. The effect determinations statements for species and critical habitats would include one of the following: "No Effect/Impact", "May Affect, Not Likely to Adversely Affect/Impact", or "May Affect, Likely to Adversely Affect/Impact".

The USFWS will receive copies of all applications when submitted, including those FDEP/FWC has preliminarily determined as "No Effect/No Impact". If the USFWS elected to not respond to these types of applications upon first submittal, they will still receive public notices for these applications and may elect to comment at that time. Receiving public notices for all applications also provides an opportunity for the USFWS to re-review all of the effect determinations made by the State and provide oversight of the species coordination process. Along with the public notice, the USFWS will receive copies of all applications and supplemental information submitted for applications required to be publicly noticed, with all stated effect or no effect determinations.

With the public notice, EPA will receive copies of all applications with a determination other than "No Effect/Impact". This provides an opportunity for the EPA to monitor the effectiveness of the species coordination process and to provide oversight of State permit actions and State 404 program operations, including ESA compliance.

**Description of dispute resolution between FDEP and USFWS; and USFWS-EPA coordination**

As stated in the BE, State 404 permits (as with USACE 404 permits) must comply with Section 404(b)(1) guidelines which include a stipulation that prohibits the discharge of dredged or fill material if it jeopardizes the continued existence of listed species or results in the likelihood of the destruction or adverse modification of designated critical habitat. 40 CFR 230.10(b)(3). Similarly, State 404 Chapter 62-331.053(3)(a)(4), 331.201(3)(k) and the State 404 Applicants' Handbook (sections 1.3.3, 5.2.3) include provisions that prohibit issuance of State 404 permits that are likely to jeopardize ESA-listed species and recognize USFWS conclusions regarding potential impacts and necessary measures to address impacts are determinative.

For permits that would result in injury or harm to individuals of a listed species but whose impacts would not jeopardize the continued existence of the species or cause adverse modifications to critical habitat, FDEP shall incorporate USFWS-recommended protection measures as permit conditions to fulfill compliance with the anticipated Program assumption BiOp and for any subsequent anticipated incidental take to be exempted from prohibition under section 9 of the ESA.

The BE and the FDEP-FWC-FWS MOU regarding species coordination states the following steps would guide the resolution process in the event FDEP questions or disagrees with a local USFWS office about the necessity of project-specific, species-specific USFWS-recommended protection measures as being added as permit conditions for the purpose of either 1) avoiding jeopardy to a ESA-listed or

proposed species or adverse modification of critical habitat; or 2) minimizing incidental take to fish and wildlife..

***Interagency Elevation Process*** **(excerpt from the FDEP, FWC, USFWS MOU, Appendix II, pp. 9-10)**

"FDEP, FWC and USFWS intend to work cooperatively to achieve their mutually shared objectives of protecting the quality of waters of the United States and the species that depend on those waters. Collaboration among Technical Team members, agency district, regional, and field staff when resolving any potential conflicts or disagreements should be performed through a structured, time-sensitive process at the lowest possible level. During the review of State 404 permit applications and these elevation procedures, the following regulations will be followed: 40 CFR § 233.20; 40 CFR § 233.50; the 404(b)(1) Guidelines in 40 CFR § 230; and 40 CFR § 230.10(b)(3). The agencies will follow the procedures below to elevate any conflict or disagreement.

Any contentious issues, disagreements or conflicts between agencies, or between agencies and applicants, will be discussed with an attempt to resolve them at the lowest levels within the agencies without elevation (reviewers and their supervisors). If issues cannot be resolved at this level, reviewers and their supervisors will reach out to the Technical Team for assistance (Level 1). If there is no consensus resolution at that level, or if it is deemed prudent, the issues will be elevated to Level 2, which would include the USFWS State Supervisor, FDEP State 404 program Supervisor, FWC Conservation Planning Services Director, and EPA Florida State 404 program Supervisor. While anticipated to be very rare, issues can be elevated to Level 3 if needed, which would include the USFWS Regional Director, Atlanta; EPA Regional Administrator, Atlanta; FWC Executive Director and FDEP Secretary. The supervisory level staff may differ for each agency and may differ depending upon the issue in dispute or conflict that needs resolution. All agencies will be included in resolution discussions, even if the issue only involves two of the three partner agencies.

While decisions at all levels, including decisions to elevate, will be made by consensus to the greatest extent practicable, any one agency can initiate the elevation process or elevate to the next supervisor level. Agencies will jointly prepare a summary document that will contain a statement of facts and succinctly state each agency's position and recommendations for resolution. This summary document will be developed and shared when elevated to Level 2 or Level 3. If needed, the summary documents may be updated when elevated to Level 3. The overall goal is to jointly develop implementable actions to avoid and/or minimize adverse impacts to listed species to ensure the impacts of any given project are not likely to result in take, or likely to jeopardize the continued existence of any species or adversely modify its critical habitat. With regard to conclusions about the potential effects of a project on ESA-listed species, their critical habitats, or the effectiveness of proposed protection measures, the final USFWS position is determinative. With regard to conclusions about the potential effects of a project on State listed species or the effectiveness of proposed protection measures, the final FWC position is determinative.

Elevation should be initiated so that all applicable deadlines will be met, considering subsequent levels of review. If FDEP is aware of a dispute, they will resolve the dispute prior to taking final action. This is to ensure consistency with applicable legal deadlines, and to allow the issue to be resolved through the elevation process. When determined to be appropriate (e.g., where the results of the elevation would provide useful guidance to agency staff or transparency to the public), the decision on the elevation should be memorialized in writing, placed in the application's official file, and circulated among Agency staff to serve as guidance for future decisions."

**Dredge or fill material discharge activities regulated by the State 404 program**

After FDEP completes its permit evaluation process and issues a State 404 permit to a permittee, the permittee will be authorized to discharge dredge or fill material into assumed waters. The BE (Appendix A) describes the different types of actions that cause the discharge of dredge or fill material in assumed waters. The list of anticipated actions was derived from the USACE project information database. All the activities in the BE's Appendix E list, however, may not be applicable to the State 404 program.

Dredging and filling actions include but are not limited to:

- Discharge of fill material
- Dredging
- Ecological restoration
- Discharge of dredged material
- Excavation associated with the discharge of dredged or fill material
- Other (Aquaculture, Work, Aerial o Submarine cable crossings)
- Conversion of waters type (forested wetland to emergent wetland, strean to lake)
- Commercial developments
- Residential developments
- Single-family residence
- Agriculture
- Utilities
- Roadways
- Airports
- Marinas
- Docks
- Piers
- Boat Ramps
- Dams
- Levees
- Mining activities
- Mitigation
- Restoration

**Proposed dredge material discharge or fill activities authorized or exempt under the State 404 Program**

The BE (Appendix A) describes the types of actions the State 404 program will regulate include all dredge and fill activities within the assumed waters. The proposed activities and exemptions below are excerpts from 40 CFR 232 and select definitions from 40 CFR 232.2, also summarized in Appendix B of the State 404 Handbook:

*Discharge of dredged material.*

(1) Except as provided below in paragraph (2), the term "discharge of dredged material" means any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the waters of the United States. The term includes, but is not limited to, the following:
  (i) The addition of dredged material to a specified discharge site located in waters of the United States;
  (ii) The runoff or overflow, associated with a dredging operation, from a contained land or water disposal area; and

(iii) Any addition, including redeposit other than incidental fallback, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized land clearing, ditching, channelization, or other excavation.

(2) The term discharge of dredged material does not include the following:
  (i) Discharges of pollutants into waters of the United States resulting from the onshore subsequent processing of dredged material that is extracted for any commercial use (other than fill). These discharges are subject to Section 402 of the Clean Water Act even though the extraction and deposit of such material may require a permit from the Corps or applicable state.
  (ii) Activities that involve only the cutting or removing of vegetation above the ground (e.g., mowing, rotary cutting, and chain sawing) where the activity neither substantially disturbs the root system nor involves mechanized pushing, dragging, or other similar activities that redeposit excavated soil material.
  (iii) Incidental fallback.

(3) Section 404 authorization is not required for the following:

  (i) Any incidental addition, including redeposit, of dredged material associated with any activity that does not have or would not have the effect of destroying or degrading an area of waters of the U.S. as defined in paragraphs (4) and (5) of this definition; however, this exception does not apply to any person preparing to undertake mechanized land clearing, ditching, channelization and other excavation activity in a water of the United States, which would result in a redeposit of dredged material, unless the person demonstrates to the satisfaction of the Corps, or EPA as appropriate, prior to commencing the activity involving the discharge, that the activity would not have the effect of destroying or degrading any area of waters of the United States, as defined in paragraphs (4) and (5) of this definition. The person proposing to undertake mechanized land clearing, ditching, channelization or other excavation activity bears the burden of demonstrating that such activity would not destroy or degrade any area of waters of the United States.
  (ii) Incidental movement of dredged material occurring during normal dredging operations, defined as dredging for navigation in navigable waters of the United States, as that term is defined in 33 CFR part 329, with proper authorization from the Congress or the Corps pursuant to 33 CFR part 322; however, this exception is not applicable to dredging activities in wetlands, as that term is defined at section232.2(r) of this chapter.
  (iii) Certain discharges, such as those associated with normal farming, silviculture, and ranching activities, are not prohibited by or otherwise subject to regulation under Section 404. See 40 CFR 232.3 for discharges that do not require permits.

(4) For purposes of this section, an activity associated with a discharge of dredged material destroys an area of waters of the United States if it alters the area in such a way that it would no longer be a water of the United States.

Note: Unauthorized discharges into waters of the United States do not eliminate Clean Water Act jurisdiction, even where such unauthorized discharges have the effect of destroying waters of the United States.

(5) For purposes of this section, an activity associated with a discharge of dredged material degrades an area of waters of the United States if it has more than a de minimis (i.e., inconsequential) effect on the area by causing an identifiable individual or cumulative adverse effect on any aquatic function.

*Discharge of fill material.*

(1) The term "discharge of fill material" means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills; placement of overburden, slurry, or tailings or similar mining-related materials;" after the words "utility lines; and artificial reefs.

(2) In addition, placement of pilings in waters of the United States constitutes a discharge of fill material and requires a Section 404 permit when such placement has or would have the effect of a discharge of fill material. Examples of such activities that have the effect of a discharge of fill material include, but are not limited to, the following: Projects where the pilings are so closely spaced that sedimentation rates would be increased; projects in which the pilings themselves effectively would replace the bottom of a waterbody; projects involving the placement of pilings that would reduce the reach or impair the flow or circulation of waters of the United States; and projects involving the placement of pilings which would result in the adverse alteration or elimination of aquatic functions.

   (i) Placement of pilings in waters of the United States that does not have or would not have the effect of a discharge of fill material shall not require a Section 404 permit. Placement of pilings for linear projects, such as bridges, elevated walkways, and powerline structures, generally does not have the effect of a discharge of fill material. Furthermore, placement of pilings in waters of the United States for piers, wharves, and an individual house on stilts generally does not have the effect of a discharge of fill material. All pilings, however, placed in the navigable waters of the United States, as that term is defined in 33 CFR part 329, require authorization under section 10 of the Rivers and Harbors Act of 1899 (see 33 CFR part 322).

*40 CFR 232.3 Activities not requiring permits.*

Except as specified in paragraphs (a) and (b) of this section, any discharge of dredged or fill material that may result from any of the activities described in paragraph (c) of this section is not prohibited by or otherwise subject to regulation under this part.

(a) If any discharge of dredged or fill material resulting from the activities listed in paragraph (c) of this section contains any toxic pollutant listed under section 307 of the Act, such discharge shall be

subject to any applicable toxic effluent standard or prohibition and shall require a Section 404 permit.

(b) Any discharge of dredged or fill material into waters of the United States incidental to any of the activities identified in paragraph (c) of this section must have a permit if it is part of an activity whose purpose is to convert an area of the waters of the United States into a use to which it was not previously subject, where the flow or circulation of waters of the United States may be impaired or the reach of such waters reduced. Where the proposed discharge will result in significant discernable alterations to flow or circulation, the presumption is that flow or circulation may be impaired by such alteration.

Note: For example, a permit will be required for the conversion of a cypress swamp to some other use or the conversion of a wetland from silvicultural to agricultural use when there is a discharge of dredged or fill material into waters of the United States in conjunction with construction of dikes, drainage ditches or other works or structures used to affect such conversion. A conversion of Section 404 wetland to a non-wetland is a change in use of an area of waters of the U.S. A discharge which elevates the bottom of waters of the United States without converting it to dry land does not thereby reduce the reach of, but may alter the flow or circulation of, waters of the United States.

(c) The following activities are exempt from Section 404 permit requirements, except as specified in paragraphs (a) and (b) of this section:

(1)(i) Normal farming, silviculture and ranching activities such as plowing, seeding, cultivating, minor drainage, and harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices, as defined in paragraph (d) of this section.

(ii) (A) To fall under this exemption, the activities specified in paragraph (c)(1) of this section must be part of an established (i.e., ongoing) farming, silviculture, or ranching operation, and must be in accordance with definitions in paragraph (d) of this section. Activities on areas lying fallow as part of a conventional rotational cycle are part of an established operation.

(B) Activities which bring an area into farming, silviculture or ranching use are not part of an established operation. An operation ceases to be established when the area in which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operation. If an activity takes place outside the waters of the United States, or if it does not involve a discharge, it does not need a Section 404 permit whether or not it was part of an established farming, silviculture or ranching operation.

(2) Maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, bridge abutments or approaches, and transportation structures. Maintenance does not include any modification that changes the character, scope, or size of the original fill design. Emergency reconstruction must occur within a reasonable period of time after damage occurs in order to qualify for this exemption.

(3)  Construction or maintenance of farm or stock ponds or irrigation ditches or the maintenance (but not construction) of drainage ditches. Discharge associated with siphons, pumps, headgates, wingwalls, weirs, diversion structures, and such other facilities as are appurtenant and functionally related to irrigation ditches are included in this exemption.

(4)  Construction of temporary sedimentation basins on a construction site which does not include placement of fill material into waters of the United States. The term "construction site" refers to any site involving the erection of buildings, roads, and other discrete structures and the installation of support facilities necessary for construction and utilization of such structures. The term also includes any other land areas which involve land-disturbing excavation activities, including quarrying or other mining activities, where an increase in the runoff of sediment is controlled through the use of temporary sedimentation basins.

(5)  Any activity with respect to which a State has an approved program under section 208(b)(4) of the Act which meets the requirements of section 208(b)(4)(B) and (C).

(6)  Construction or maintenance of farm roads, forest roads, or temporary roads for moving mining equipment, where such roads are constructed and maintained in accordance with best management practices (BMPs) to assure that flow and circulation patterns and chemical and biological characteristics of waters of the United States are not impaired, that the reach of the waters of the United States is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized. The BMPs which must be applied to satisfy this provision include the following baseline provisions:

(i)  Permanent roads (for farming or forestry activities), temporary access roads (for mining, forestry, or farm purposes) and skid trails (for logging) in waters of the United States shall be held to the minimum feasible number, width, and total length consistent with the purpose of specific farming, silvicultural or mining operations, and local topographic and climatic conditions;

(ii)  All roads, temporary or permanent, shall be located sufficiently far from streams or other water bodies (except for portions of such roads which must cross water bodies) to minimize discharges of dredged or fill material into waters of the United States;

(iii)  The road fill shall be bridged, culverted, or otherwise designed to prevent the restriction of expected flood flows;

(iv)  The fill shall be properly stabilized and maintained to prevent erosion during and following construction;

(v)  Discharges of dredged or fill material into waters of the United States to construct a road fill shall be made in a manner that minimizes the encroachment of trucks, tractors, bulldozers, or other heavy equipment within the waters of the United States (including adjacent wetlands) that lie outside the lateral boundaries of the fill itself;

(vi)  In designing, constructing, and maintaining roads, vegetative disturbance in the waters of the United States shall be kept to a minimum;

(vii)  The design, construction and maintenance of the road crossing shall not disrupt the migration or other movement of those species of aquatic life inhabiting the water body;

(viii) Borrow material shall be taken from upland sources whenever feasible;

(ix) The discharge shall not take, or jeopardize the continued existence of, a threatened or endangered species as defined under the Endangered Species Act, or adversely modify or destroy the critical habitat of such species;
(x) Discharges into breeding and nesting areas for migratory waterfowl, spawning areas, and wetlands shall be avoided if practical alternatives exist;
(xi) The discharge shall not be located in the proximity of a public water supply intake;
(xii) The discharge shall not occur in areas of concentrated shellfish production;
(xiii) The discharge shall not occur in a component of the National Wild and Scenic Rivers System;
(xiv) The discharge of material shall consist of suitable material free from toxic pollutants in toxic amounts; and
(xv) All temporary fills shall be removed in their entirety and the area restored to its original elevation.

(d) For purpose of paragraph (c)(1) of this section, cultivating, harvesting, minor drainage, plowing, and seeding are defined as follows:

(1) Cultivating means physical methods of soil treatment employed within established farming, ranching
and silviculture lands on farm, ranch, or forest crops to aid and improve their growth, quality, or yield.
(2) Harvesting means physical measures employed directly upon farm, forest, or ranch crops within established agricultural and silvicultural lands to bring about their removal from farm, forest, or ranch land, but does not include the construction of farm, forest, or ranch roads.
(3)(i) Minor drainage means:
(A) The discharge of dredged or fill material incidental to connecting upland drainage facilities to waters of the United States, adequate to effect the removal of excess soil moisture from upland croplands. Construction and maintenance of upland (dryland) facilities, such as ditching and tiling, incidental to the planting, cultivating, protecting, or harvesting of crops, involve no discharge of dredged or fill material into waters of the United States, and as such never require a Section 404 permit;
(B) The discharge of dredged or fill material for the purpose of installing ditching or other water control facilities incidental to planting, cultivating, protecting, or harvesting of rice, cranberries or other wetland crop species, where these activities and the discharge occur in waters of the United States which are in established use for such agricultural and silvicultural wetland crop production;
(C) The discharge of dredged or fill material for the purpose of manipulating the water levels of, or regulating the flow or distribution of water within, existing impoundments which have been constructed in accordance with applicable requirements of the Act, and which are in established use for the production or rice, cranberries, or other wetland crop species.
Note: The provisions of paragraphs (d)(3)(i) (B) and (C) of this section apply to areas that are in established use exclusively for wetland crop production as well as areas in established use for conventional wetland/non-wetland crop rotation (e.g., the rotations of rice and soybeans) where such rotation results in the cyclical or intermittent temporary dewatering of such areas.
(D) The discharge of dredged or fill material incidental to the emergency removal of sandbars, gravel bars, or other similar blockages which are formed during flood flows or other events, where

such blockages close or constrict previously existing drainageways and, if not promptly removed, would result in damage to or loss of existing crops or would impair or prevent the plowing, seeding, harvesting or cultivating of crops on land in established use for crop production. Such removal does not include enlarging or extending the dimensions of, or changing the bottom elevations of, the affected drainageway as it existed prior to the formation of the blockage. Removal must be accomplished within one year after such blockages are discovered in order to be eligible for exemption.

(ii) Minor drainage in waters of the United States is limited to drainage within areas that are part of an established farming or silviculture operation. It does not include drainage associated with the immediate or gradual conversion of a wetland to a non-wetland (e.g., wetland species to upland species not typically adequate to life in saturated soil conditions), or conversion from one wetland use to another (for example, silviculture to farming).

In addition, minor drainage does not include the construction of any canal, ditch, dike or other waterway or structure which drains or otherwise significantly modifies a stream, lake, swamp, bog or any other wetland or aquatic area constituting waters of the United States. Any discharge of dredged or fill material into the waters of the United States incidental to the construction of any such structure or waterway requires a permit.

(4) Plowing means all forms of primary tillage, including moldboard, chisel, or wide-blade plowing, disking, harrowing, and similar physical means used on farm, forest or ranch land for the breaking up, cutting, turning over, or stirring of soil to prepare it for the planting of crops. Plowing does not include the redistribution of soil, rock, sand, or other surficial materials in a manner which changes any area of the waters of the United States to dryland. For example, the redistribution of surface materials by blading, grading, or other means to fill in wetland areas is not plowing. Rock crushing activities which result in the loss of natural drainage characteristics, the reduction of water storage and recharge capabilities, or the overburden of natural water filtration capacities do not constitute plowing. Plowing, as described above, will never involve a discharge of dredged or fill material.

(5) Seeding means the sowing of seed and placement of seedlings to produce farm, ranch, or forest crops and includes the placement of soil beds for seeds or seedlings on established farm and forest lands.

(e) Federal projects which qualify under the criteria contained in Section 404(r) of the Act are exempt from Section 404 permit requirements but may be subject to other State or Federal requirements.

**ACTION AREA**

The action area is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action" (50 CFR402.02). Delineating the action area is necessary for the Federal action agency to obtain a list of species and critical habitats that may occur in that area, which necessarily precedes any subsequent analyses of the effects of the action to particular species or critical habitats.

The action area determines any overlap with critical habitat and the physical or biological features therein that we defined as essential to the species' conservation in the final rule designating its critical habitat. For species, the action area establishes the bounds for an analysis of individuals' exposure to action-caused changes, but the subsequent consequences of such exposure to those individuals are not necessarily limited to the action area.

For the review of this action, the action area encompasses the geographic extent of the FDEP Assumption of Section 404 permitting within the entire State of Florida. The action area consists of, and is limited to, the State-assumed waters (assumed waters) and areas affected directly or indirectly by the action, including affected upland, terrestrial areas.

The State 404 Handbook section 1.1 states, "The CWA does not define State-assumed waters; rather, it describes waters that a state cannot assume and for which jurisdiction remains with the Corps (retained waters). State-assumed waters then are all waters of the United States that are not retained waters. Retained waters are defined in section 2.0 of this Handbook and listed in Appendix A. Activities within retained waters will generally still require a state ERP authorization and a separate federal authorization from the Corps. To provide certainty, streamlining, and efficiency, the State will consider that any wetlands or other surface waters delineated in accordance with Chapter 62-340, F.A.C. that are regulated under Part IV of Chapter 373, F.S. could be considered Waters of the United States, and will treat them as if they are, unless the applicant clearly demonstrates otherwise."

The BE indicates Florida's request to assume the administration of the CWA Section 404 permitting includes those Waters of the United States (WOTUS) not retained by the USACE; referred to as assumed waters. The USACE will retain permitting responsibility for the discharge of dredged or fill material in those waters defined as "retained waters". This definition can be found in the State 404 Handbook in Chapter 2.0 and the process to determine whether a project is located in retained, or assumed waters, is described in Chapter 4.1 of the State 404 Applicants' Handbook. In addition, Appendix A of the 404 Handbook includes the Retained Waters List maintained by the USACE. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only.

The USACE also retains permitting authority for projects within "Indian country" as that term is defined at 18 USC section 1151 (provided below):

> "Except as otherwise provided in Sections 1154 and 1156 of this title, the term "Indian country," as used in this chapter, means
>
> a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,
>
> b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and
>
> c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

> A list of "Indian country" can be found online in the USACE Jacksonville District Regulatory Division Sourcebook.
>
> The boundary of a mitigation bank, excluding the service area, shall be considered the project boundary, even if only a portion of the bank requires a dredge and fill permit under Section 404 of the CWA."

The BE also notes Federal and state-approved dredge and fill activities may occur in isolation or adjacent to one another. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only (BE's Figure 2-1 noted below). Projects that fall entirely outside of the 300-foot buffer of the retained waters will be permitted by the State 404 program (Project 3 in Figure 2-2 of the BE). Linear projects that have some portion of dredge and fill activities in retained waters will be entirely authorized and permitted by the USACE, even if dredge and fill activities occur in wetlands landward of the 300-foot buffer (Figure 2-3 of the BE).



Excerpt from BE's Figure 0-1. Example of activities authorized by the USACE 404 program



Excerpt from BE's Figure 0-2. Example of activities authorized by USACE and FDEP

Projects 1, 2, and 3 show the difference between retained and assumed waters responsibilities. Project 3 would be authorized by FDEP.



Excerpt from BE's Figure 0-3. Example of a linear project

Linear projects may sometimes be miles long, but if there are dredge or fill activities waterward of the 300-foot guideline within the project boundary, the project is considered within retained waters and will be processed by the USACE.

Section 2.4 of the BE (Appendix A) describes in detail the physical attributes of action area. A summary of this description is provided below.

Florida's freshwater ecosystem includes 7,800 freshwater lakes, 700 springs, 11 million acres of wetlands, more than 1,700 rivers and streams, and numerous underground aquifers (Fernald and Purdum 1998 as cited in the BE). It is through these systems that freshwater eventually makes its way to the nearly 2,000 miles of Florida coastline and marine ecosystem.

Although terrestrial habitats are not regulated under the CWA, many ESA-listed species that occupy assumed waters also require or utilize adjacent uplands. Upland portions of permitted activities are also subject to ESA consultation as part of permit review.

As summarized in BE, "Florida's terrestrial ecosystem includes approximately 3.7 million acres of natural habitats that are essential breeding, foraging, and refuge areas for many species. Florida has very little topographic relief, with the highest point at 328 feet above sea level. Slight changes in elevation result in habitat changes, with some upland communities at an only slightly greater elevation than adjacent wetlands. Diverse terrestrial ecosystems provide important habitat for a large variety of wildlife, including the Florida Panther, Gopher Tortoise, salamanders and frogs breeding in inclusions of ephemeral wetlands, and bats and crayfish living in caves (FWC 2019). Though uphill terrestrial habitats help to filter rainwater to lower elevations connected to freshwater habitats, only select ecosystems from the Wildlife Plan are discussed herein due to their relation to the action area."

## APPROACH TO THE ASSESSMENT

Section 7(a)(2) of the ESA requires every Federal agency, in consultation with and with the assistance of the Services (U.S. Fish and Wildlife Service and National Marine Fisheries Service), to insure that any action it authorizes, funds, or carries out is not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of designated critical habitat. "'Jeopardize the continued existence of'" means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." (50 C.F.R. § 402.02) "'Destruction or adverse modification'" means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." (50 C.F.R. § 402.02).

Because we are consulting on EPA's approval of FDEP's request to assume the CWA 404 program in Florida's assumable waters, in which FDEP would regulate a broad array of activities conducted over several geographic areas and long periods of time, there is substantial uncertainty about the number, location, timing, frequency, and intensity of regulated activities. Therefore, we developed a programmatic consultation approach to determine whether and to what degree FDEP has structured their regulatory program and EPA has structured its oversight program to ensure approval and implementation of the State 404 program is not likely to jeopardize the continued existence of proposed or listed species or result in the destruction or adverse modification of proposed or designated critical habitat by assessing whether the following criteria are fulfilled: (1) understand the scope of its action; (2) reliably estimate the physical, chemical, or biotic stressors that are likely to be produced as a direct or indirect result of their action; (3) minimize adverse effects of such activities on ESA-listed species and designated critical habitat; (4) identify, inform, encourage, and screen applicants for potential eligibility under or participation in the permitted activity; (5) continuously monitor and evaluate likely adverse effects on listed species and critical habitat; (6) monitor and enforce permit compliance; and (7) modify its action if new information (including inadequate protection for species or low levels of compliance) becomes available.

This approach also recognizes that site- and species-specific considerations would be addressed with the USFWS in subsequent technical assistance efforts with the State of Florida through the FDEP, FWC, USFWS MOU, the State 404 rule (62-331, F.C.A), and EPA's oversight regulations (40 CFR 233).

**Jeopardy Determination**

The jeopardy analysis in this BiOp relies on four components: (1) the Status of the Species, which describes the range-wide condition of the species, the factors responsible for that condition, and its survival and recovery needs; (2) the Environmental Baseline, which analyzes the condition of the listed species in the action area, without the consequences to the listed species caused by the proposed action; (3) the Effects of the Action, which includes all consequences to listed species that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action; and (4) the Cumulative Effects, which evaluates the effects of future, non-Federal activities in the action area on the species.

For purposes of making the jeopardy determination, the Service: (1) reviews all the relevant information, (2) evaluates the current status of the species and environmental baseline, (3) evaluates the effects of the Action and cumulative effects, (4) add the effects of the action and cumulative effects to the environmental baseline, and, in light of the status of the species, determines if the action is likely to jeopardize listed species.

We evaluated the effects of the action on guilds of ESA-proposed and -listed species and designated and proposed critical habitat. Assigning species to guilds based on life-history similarities allows for a thorough review of expected responses of similar species to stressors without redundantly discussing key impacts for each individual species. Analysis of effects using a guild approach is more appropriate at the programmatic level. Species-specific and site-specific analyses will occur during the technical assistance process conducted between the USFWS and FDEP, and whenever EPA coordinates with USFWS on State permit actions.

**Adverse Modification Determination**

The destruction or adverse modification analysis in this BiOp relies on four components: (1) the status of critical habitat, which describes the range-wide condition of the critical habitat in terms of the key components (i.e., essential habitat features, physical and biological features, or primary constituent elements) that provide for the conservation of the listed species, the factors responsible for that condition, and the intended value of the critical habitat overall for the conservation/recovery of the listed species; (2) the environmental baseline, which analyzes the condition of the designated critical habitat in the action area, without the consequences to the designated critical habitat caused by the proposed action; (3) the effects of the action, which includes all consequences to the critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action; and (4) cumulative effects, which evaluate the effects of future non-Federal activities that are reasonably certain to occur in the action area on the key components of critical habitat that provide for the conservation of the listed species and how those impacts are likely to influence the conservation value of the affected critical habitat.

For purposes of making the destruction or adverse modification determination, the USFWS: (1) reviews all relevant information, (2) evaluates the current status of the critical habitat and environmental baseline, (3) evaluates the effects of the proposed action and cumulative effects, (4) add the effects of the action and cumulative effects to the environmental baseline, and, in light of the status of the critical habitat, determines if the proposed action is likely to result in the destruction or adverse modification of critical habitat.

Past designations of critical habitat have used the terms “primary constituent elements” (PCEs), “physical or biological features” (PBFs) or "essential features" to characterize the key components of

critical habitat that provide for the conservation of the listed species. Recent critical habitat regulations (50 C.F.R. § 402.02) discontinue use of the terms PCEs or essential features, and rely exclusively on use of the term PBFs for that purpose because that term is contained in the statute. However, the shift in terminology does not change the approach used in conducting a ''destruction or adverse modification'' analysis, which is the same regardless of whether the original designation identified PCEs, PBFs or essential features. For those reasons, in this USFWS, we use the term PBFs to characterize the key components of critical habitat that provide for the conservation of the listed species.

## STATUS OF SPECIES

In the BE, EPA identified 235 species that occur in the action area and may be affected by the action and program activities that occur because of the proposed action (Table 3-1 of BE, p. 22). Of the 235, 139 are listed as threatened or endangered under the ESA and the remainder are species which have been proposed for listing, petitioned for listing, are candidates for listing, and/or have reasonable potential to be considered for ESA listing in the future. This BiOp concurs with and adopts the BE's list of ESA-listed and ESA-considered species that occur in the action area and respective effect determinations regarding the effects of the action.

For more information regarding the ESA-listed individual species and critical habitats and the factors affecting their conservation status, please refer to proposed and final listing determinations, critical habitat designations, recovery plans, and five-year reviews available at: http://ecos.fws.gov/ecos/indexPublic.do.

In regard to future listing actions that result in new species being added to the ESA list, the proposed State 404 program's species coordination framework requires that when a State 404 application is received a current list of ESA-listed species must be used at the time a State 404 application is received in determining potential effects to ESA-listed species. Therefore, the State 404 review process is capable of maintaining compliance with the ESA by adapting to future changes to the list of species classified as threatened or endangered under the ESA.

## ENVIRONMENTAL BASELINE

Environmental baseline refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the action (which includes consequences caused by program activities). The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline (50 CFR 402.02).

All of the endangered and threatened species and designated critical habitat considered in this BiOp depend on the health of aquatic and terrestrial ecosystems for their survival. These species were listed as endangered or threatened, at least in part, because of the consequences of human activities on the aquatic and terrestrial ecosystems to include estuaries, rivers, lakes, streams, and associated wetlands, floodplains, riparian, and terrestrial ecosystems of Florida. The status and trends of those aquatic and

terrestrial ecosystems determines the status and trends of these species and the critical habitat that has been designated for them.

The BE (Appendix A: section 4, pp. 36-54) includes a description of the baseline for 404 permitting in Florida and its past and ongoing effects on ESA-listed and considered species. This BiOp adopts the BE's detailed description of the environmental baseline, which addresses the baseline of 1) the listed species and 2) their habitats, and 3) the baseline procedures and processes related to the issuance of permits that allow for activities that affect waters of the U.S., adjacent uplands, and the ESA-listed and considered species that reside therein.

The programmatic nature of the action would trigger a change in the framework and processes that affect the implementation of permitted actions that affect the physical environment and potentially affect ESA-listed species and their critical habitats. The BE considers the USACE 404 program and State ERP program as part of the procedural processing (regulatory) baseline.

For example, when EPA publishes its approval of FDEP's assumption of the 404 program in the Federal Register, the USACE will cease to directly administer 404 permits in assumed waters and FDEP would immediately assume administration of 404 permits in assumed waters and modifications to the administration of its ERP program to align it with the State 404 program will be effective.

**Procedural Baseline: past and current regulation of discharge of dredged and fill material in Florida**

**Federal Regulations**

The BE states that Section 404 of the CWA (33 USC section 1344) establishes a program to regulate the discharge of dredged or fill material into WOTUS, inclusive of wetlands. The Administrator of the EPA, in conjunction with the Secretary of the Army, acting through the Chief of Engineers, established guidelines for regulating such discharges under Section 404(b)(1) of the CWA (40 CFR 230). The EPA and the USACE jointly implement the regulation and permitting of such proposed activities. In Florida, the USACE Jacksonville District acts as the regulatory agency that issues Section 404 dredge and fill permits.

*Individual Permits*

To receive a dredge and fill permit authorization from the USACE, an applicant must demonstrate the following under 40 CFR 230.10:

- No practicable alternative to the proposed activity exists that would have less adverse impact on the aquatic ecosystem;
- The proposed activity will not:
    - violate State water quality standards,
    - violate any applicable toxic effluent standard or prohibition,
    - jeopardize the continued existence of Endangered and Threatened species, or result in the likelihood of destruction or adverse modification of critical habitat
    - violate any requirement imposed to protect a marine sanctuary;

- The proposed activity will not cause or contribute to significant degradation of WOTUS; and

- The applicant has taken appropriate and practicable steps that will minimize potential adverse impacts of the discharge on the aquatic ecosystem.

The USACE will request any additional information required to deem an application complete, typically within 15 days of receipt of the application. Once the agency deems the application to be complete, the USACE publishes a public notice within 15 days to receive comments from interested and/or affected parties on the proposed action.

Following receipt of an application and evaluation as to the completeness of the application, the USACE is charged with evaluating the effects of the proposed action on ESA-listed species or designated critical habitat. Where a proposed action may affect a listed species or critical habitat, USACE coordinates and/or consults with the Services prior to issuing any permit. If the USACE determines the proposed activity may affect any endangered or threatened species or their critical habitat, beneficially or adversely, the USACE District Engineer will initiate consultation with the Services. If the USACE District Engineer makes a determination from the submitted application that the proposed activity would not affect ESA-listed species or their critical habitat, the public notice will contain a statement attesting to such and consultation with the Services is not required.

The comment period is typically 30 days; upon receipt of comments, the USACE evaluates the comments received, provides them to the applicant, and determines whether a public hearing is required. Following the comment period (and a public hearing if conducted), the USACE makes a determination as to whether the Section 404 permit should be issued. This determination is based on applicable regulations governing the activity as well as comments received as part of the record. The USACE District Engineer will either prepare a Statement of Findings or – where an Environmental Impact Statement (EIS) has been prepared – a Record of Decision on all permit decisions. The final action of the USACE is either the signature of the issuing official on the authorizing document (a USACE Permit) or a signature on a letter notifying the application of the denial of the permit. An issued permit will contain conditions to follow in execution of the work; a denial will contain written documentation of the reason(s) for the denial.

*General Permits*

A general permit is issued for structures, work, or discharges that will result in only minimal adverse effects. General permits are issued on a nationwide, regional, or state basis for particular categories of activities. There are three types of general permits – Nationwide Permits, Regional General Permits, and Programmatic General Permits. General permits (which are reviewed by the Services) are usually valid for five years and may be re-authorized by the USACE (the Services will review the proposed reauthorizations).

*Nationwide Permits*

On a five-year basis, the USACE issues Nationwide Permits (NWPs) pursuant to Section 404(e) of the CWA (33 USC section 1344) and Section 10 of the Rivers and Harbors Act of 1899 (33 USC section 401 et seq.). As of January 6, 2017, there were a total of 52 NWPs. The NWPs streamline the requirements of the CWA and are informed by extensive feedback from the public and other key stakeholders. NWPs provide expedited review of projects that have minimal impact on the aquatic environment. Categories of activities that may be covered under the NWPs include linear transportation

projects, bank stabilization activities, aquatic habitat restoration, residential development, commercial and industrial developments, aids to navigation, and certain maintenance activities.

In 2017, the USACE added two new NWPs in addition to the 50 that were in place in 2012. One addition provides a mechanism for an efficient authorization process for the removal of low-head dams to restore streams and enhance public safety; the second addition covers the construction and maintenance of living shorelines to control erosion in coastal areas (adapted from USACE news release dated January 6, 2017) (https://www.usace.army.mil/Media/News-Releases/News-Release-Article-View/Article/1043614/army-corps-of-engineers-revises-and-renews-nationwide-permits/; accessed January 30, 2020).

*Regional General Permits*

As of February 2020, the USACE Jacksonville District has issued 18 general permits. Each regional general permit has specific terms and conditions, all of which must be met for project-specific actions to be verified as compliant with and covered by the respective general permit.

*Programmatic General Permits*

Programmatic General Permits are based on an existing state, local, or other federal program and designed to avoid duplication of that program. The USACE Jacksonville District lists 12 programmatic general permits - one of which is only applicable to Puerto Rico (https://www.usace.army.mil/Missions/Civil-Works/Regulatory-Program-and-Permits/Obtain-a-Permit/; accessed January 30, 2020).

**Florida regulations**

Part IV of section 373, F.S. regulates dredging and filling in wetlands and other surface waters, such as: the construction, alteration, operation, maintenance, abandonment, and removal of stormwater management systems, dams, impoundments, reservoirs, works (including, but not limited to, ditches, canals, conduits, channels, culverts, pipes, and other artificial structures), and appurtenant works (artificial improvements to a dam).

This statute authorizes FDEP and the five water management districts (WMDs) in the state to jointly implement Florida’s ERP program. The responsibilities of the agencies are divided according to Operating Agreements between FDEP and the particular WMD. Provisions in the statute allow for FDEP to approve local government programs to implement the ERP program on behalf of the FDEP and the WMDs. As of January 2020, full delegation has been given to Broward County and minor works delegated to the Environmental Protection Commission for Hillsborough County.

The ERP program operates in addition to the USACE Section 404 program that regulates activities in WOTUS. All state, local, and regional governments in Florida delineate wetlands in accordance with state methodology (Chapter 62-340, F.A.C.) instead of the federal wetland delineation method (Section 404 of the CWA and the Federal Manual for Identifying and Delineating Jurisdictional Wetlands). While the ERP application is issued, withdrawn, or denied in accordance with state statutory and rule criteria (briefly summarized below), agency action on the ERP application also constitutes any needed water quality certification (waiver thereto) under Section 401 of the CWA, and coastal zone consistency concurrence statements with Florida‘s federally-approved Coastal Zone Management program under section 307 (Coastal Zone Management Act). These State ERP reviews and approvals by FDEP, WMD, or delegated local governments are not connected to, dependent upon, nor do they influence the USACE

permit review processes under Section 404 of the CWA. Therefore, the USACE must take separate action to issue or deny any needed federal permit under Section 404 of the CWA and/or section 10 of the Rivers and Harbors Act of 1899, and the USACE decision to issue a permit may or may not be consistent with the State's decision to issue an ERP permit.

To receive an ERP, an applicant must demonstrate that the proposed activity will not be harmful to the water resources of the state and will not be inconsistent with the overall objectives of Florida rules and statutes. The applicant must provide reasonable assurance that the activity will not violate the applicable state water quality standards and that the activity is not contrary to the public interest for all waters that are not designated as Aquatic Preservers or Outstanding Florida Waters. For activities in those designated waters, the applicant must provide reasonable assurance that the proposed activity will be clearly in the public interest. Surface water quality standards are published in Chapter 62-302, F.A.C. In addition, FDEP provides policy guidance on anti-degradation in Rule 62-4.242, F.A.C., and in Rule 62-302.300, F.A.C, which allows for the protection of water quality above the minimum required for classification. Further, FDEP administers the Impaired Waters Rule (Chapter 62-303, F.A.C.), and has established Total Maximum Daily Load criteria (Chapter 62-304, F.A.C.) (FDEP 2020b). It is the intent of FDEP and the WMDs that these criteria are implemented in a manner that achieves a programmatic goal and a project-permitting goal of no net loss in wetlands or other surface water functions.

To determine whether an activity is not contrary to the public interest or is clearly in the public interest, the FDEP must consider and balance the following criteria:

- Whether the activity will adversely affect the public health, safety, or welfare or the property of others;
- Whether the activity will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;
- Whether the activity will adversely affect navigation or the flow of water or cause harmful erosion or shoaling;
- Whether the activity will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity;
- Whether the activity will be of a temporary or permanent nature;
- Whether the activity will adversely affect or will enhance significant historical and archaeological resources; and
- The current condition and relative value of functions being performed by areas affected by the proposed activity.

FDEP provides a copy of all notices of ERP applications for individual permits that propose regulated activities in, on, or over wetlands or other surface waters to the FWC for review and comment. The FDEP and FWC frequently work together on non-regulatory issues as well as regulatory. Examples of the many collaboration efforts include habitat restoration projects, management of State Parks and management of species on other State-owned easements and property.

In accordance with the provisions of section 373.4141, F.S., the FDEP shall review the ERP application to determine if it is complete. If the application is incomplete, FDEP must request additional information (RAI) within 30 days. The applicant must respond to such requests within 90 days. Within 30 days after receipt of such additional information, FDEP must review the submitted material for completeness. The

WMD processing procedures for ERP vary somewhat to accommodate the requirements of their specific Governing Boards.

In accordance with section 120, F.S., FDEP must decide whether it should issue or deny an ERP within 60 days after receipt of the original application, the last item of timely requested additional material, or the applicant's written request to begin processing the permit application. Application completeness is determined by whether the applicant has submitted all materials required for review as specified by rule and statute. The WMDs also are subject to this requirement, but their ERP processing procedures vary by each district to accommodate the requirements of their different Governing Boards. Pursuant to section 120.60(1), F.S., any application that FDEP or the WMD does not approve or deny within 60 days is considered approved by default.

Once issued, ERP permits are valid for the life of the system (which includes all structures and works authorized for construction or land alteration). The ERP permit does not automatically expire after the construction phase (typically five years) of a project but continues to cover operation (use) of the system in perpetuity.

Under current regulations for permit issuance, an applicant proposing any activity that is expected to result in impacts to both federal and state jurisdictional wetlands or other surface waters must obtain both a Section 404 permit from the USACE and an ERP permit from FDEP or the WMDs. There is the potential for duplication of effort to obtain what, in some cases, results in nearly identical permits for anticipated impacts to the same extent of wetlands and other surface waters. The timelines for review and issuance of a federal Section 404 Permit and a State ERP permit can vary substantially. The State of Florida has an interest in assuming the federal permitting responsibility for Section 404 and will preserve the environmental protections afforded by federal law; the result should increase efficiency and consistency in the application review and issuance process while ensuring a framework that will maintain protections for listed species and their critical habitats.

**Ecological Baseline**

*Wetlands*

In 1845, the State of Florida contained an estimated 20.3 million acres of wetlands (Dahl 2005). By 1996, the BE notes only about half of the original wetlands remained (USFWS 1996). From the mid-1950s through the mid-1970s, prior to the CWA, the rate of wetland loss has been estimated at 72,000 acres per year (Hefner 1986). In the following decade, wetland loss decreased to an estimated 23,700 acres per year (Hefner et al. 1994).

As of 1996, an estimated 11.4 million acres of wetlands covered about 29 percent of the surface area of Florida, more than any other state in America at that time. Of these wetlands, 90 percent or about 10.2 million acres were freshwater wetlands. The average annual net loss of wetlands from 1985 through 1996 was 4,740 acres, and freshwater forested wetlands exhibited a net gain. During the 1985-1996 interval, 72 percent of wetland loss was attributed to development and 28 percent to agriculture (Dahl 2005).

*Central and Southern Florida Project*

The Central and Southern Florida (CS&F) Project for flood control and other purposes was authorized by the Flood Control Act of 1948 as an improvement plan for flood control, drainage, and other purposes over an 18,000-square-mile area of central and south Florida. This project authorized the

diversion of water to the Atlantic Ocean and the Gulf of Mexico through canals and the diversion of water southwest through the Everglades. The project provided benefits for human populations that were able to build, grow, and develop these new lands. The Everglades Agricultural Area was developed for the production of food, and areas further east became densely populated cities, including Miami, Ft. Lauderdale, and West Palm Beach. Unfortunately, the project also resulted in the modification and loss of 2,400 square miles of freshwater wetlands, including the Everglades (USACE 2019a). See Figure 4-1 of the BE for a comparison of historic freshwater flows compared to water flows today.

*Everglades Restoration*

Florida's everglades are twice the size of New Jersey, comprised of a mixture of dense forests and open prairies, sunny croplands and shady swamps, rural areas and cities. The South Florida Ecosystem Restoration Program, a partnership between the federal government and the State of Florida, consists of a suite of projects that focus on the C&SF system.  In 2000, congressional authorization created the Comprehensive Everglades Restoration Plan (CERP), which is the single largest of the program's efforts. CERP is a 50/50 partnership between the federal government and the State of Florida. It is a program to restore, protect, and preserve water resources in central and southern Florida, including the Everglades. The USACE is the lead federal agency, and the South Florida Water Management District (SFWMD) is the lead State agency in this effort.

For 20 years, the CERP program has been designing, planning, and constructing multiple components of the South Florida Ecosystem Restoration Program. The goal of these efforts is to eventually improve 2.4 million acres of south Florida's wetlands ecosystems (including Everglades National Park), by reducing high volume discharges from Lake Okeechobee to the estuaries and improve water delivery to the Florida and Biscayne Bays, as well as enhance the freshwater supply (USACE 2019b). See Figure 4-2 of the BE for a depiction of the Everglades restoration project and the associated improvements to future ecosystem conditions.

**Historical Federal Permitting: Habitat**

WOTUS, as defined under currently applicable regulations and guidance, are regulated by the USACE under Section 404 of the CWA, and by FDEP and the WMDs. The following discussion is based on data provided by the USACE and characterizes Section 404 permits issued from 2014 through 2018. The habitat types are from Wildlife Plan and Guide to the Natural Communities of Florida (FNAI 2010), and each includes multiple subtypes. The BE cross walked with Cowardin types used for USACE reporting; while similar, definitions may not match entirely.

A single 404 permit may authorize activities that affect multiple wetlands or surface waters areas within the project area. So, the total number of areas will be larger than the total number of permits issued.

Please note that this data contained in the BE was used to analyze and depict general data trends for this BiOp to use, and not serve as a source for definitive quantitative data. The data summarized from the BE likely overestimate the number of projects that will be in assumed waters but is considered by USFWS to be the best available information.

The BE assessed the impact of the various types of wetlands. These impacts are summarized below.

Freshwater Non-forested Wetlands

Freshwater non-forested wetlands (assumed to be roughly equivalent to combined PEM and PSS Cowardin Types) are associated with a considerable number of the permitted activities in Florida from FY 2014 through 2018; the number of WOTUS areas authorized ranged from 263 to 542, and the acreage ranged from 320 to 2,069 annually. Although freshwater non-forested wetlands are among the most extensive in Florida (about 5.4 million acres) (FWC 2019), Table 4-1 of the BE suggests that Section 404 permitted fill activities disproportionately affected this habitat type.

*Freshwater Forested Wetlands*

Freshwater forested wetlands (to be roughly equivalent to Palustrine Forested (PFO) Cowardin Types) accounted for an even greater number of permitted fill activities from FY 2014 through 2018; the number of WOTUS areas authorized ranged from 354 to 622, and the acreage ranged from 727 to 1,980.

Freshwater forested wetlands include about 4.2 million acres or about 10 percent of Florida's land area. Table 4-1 of the BE suggests that Section 404 permitted fill activities disproportionately affected this habitat type.

*Lakes*

Lakes (assumed to be roughly equivalent to lacustrine Cowardin Types) accounted for a relatively small proportion of permitted activities: 24 to 32 WOTUS areas authorized from FY 2014 through 2018, and nine to 48 acres. Lakes cover almost 1.3 million acres in Florida, with much of the surface area in public ownership.

*Rivers and Streams*

Rivers and streams (assumed to be roughly equivalent to riverine Cowardin Types) accounted for 124 to 238 WOTUS areas authorized from FY 2014 through 2018, and 79 to 432 acres with considerable year to year variation. Estuarine Cowardin Type wetlands may also fall in this category, with a small area included in assumed waters; 22 to 112 WOTUS areas associated with permits were issued for estuarine wetlands, including three to 17 acres of impacts.

*Marine*

Relatively small areas of marine habitat (assumed to be equivalent to marine Cowardin Types) are within assumed waters; WOTUS areas authorized ranged from two to 15 per year, including less than one to about 10 acres of impacts per year.

*Uplands*

While uplands are not regulated under state wetland regulations, under the CWA and ESA, if uplands include listed species which can be adversely affected as a result of the action, those impacts/effects must be addressed. ESA-listed species could be affected by actions on uplands that are associated with wetlands permits such as construction of access roads or staging areas, and many species utilize both wetland and upland habitat. Thus, such features are often included as part of the species coordination process for a State 404 permit application review.

*Inventories and Surveys for Habitat Types and Quantities*

The most current information on Florida habitat types is summarized in the Wildlife Plan and is also available as GIS layers from the FNAI. While this information is in some cases based on site-specific inventories or surveys, it is presented at the statewide level. A statewide approach is believed to be

appropriate for the statewide Programmatic BE. Available GIS layers can be used to map specific wetlands, at a scale that can be presented in a statewide view or mapped on a finer scale when needed.

Historical ESA Consultations Triggered by Federal Wetland Permitting

The BE used the USACE permit database provided by the Regulatory Division of the USACE Jacksonville District, to examine consultations from fiscal years 2014 through 2018. This database includes all temporary and permanent permitted wetland impacts by Cowardin code, permit authorization type, dredge or fill acreage approved, and a project site coordinate. The database also includes all ESA consultations by type, agency, closure method, ESA-listed species potentially affected, and a corresponding object identification number that links the ESA consultations with the permitted wetland impacts.

The BE estimates that out of those past Section 404 permit applications reviewed, 7% of reviews were reasonably certain to result in incidental take (n=~368 permit reviews out of 5,195). This percentage was calculated using the USACE Jacksonville District permitting database's "Formal" choice in the "Consultation Type" field, since most of the formal consultations can be assumed to be associated with activities that may cause incidental take. Approximately 14% resulted in "Informal" type consultations. Approximately 79% of consultations from 2014-2018 were covered by existing programmatic consultations or effect decision tools.

For the USACE permit data collected during the years 2014-2018, a small proportion of the total number of ESA-listed species accounted for the majority of consultations. During this time, many of the species subject to frequent consultation had existing decisions tools such as consultation keys or programmatic biological opinions. For those species, such decision tools can help guide future consultations and assist FDEP when assessing potential effects of proposed actions.

Of the 139 listed and two (2) proposed species in the action area, 84 have been the subject of ESA consultations in the past five years. Two species (Eastern Indigo Snake and Wood Stork) accounted for 56.6% of species-level consultations, and just 15 species accounted for 93.3 percent of all species-level consultations. Recent consultations are not distributed evenly within the action area and can be especially dense in areas of rapid growth and development.

Excerpt from the BE (Table 0-1a).    Consultation Types for Federal actions Totals, FY 2014 – 2018

| ESA Determination | Total # (2014-2018) | % of Total |
|---|---|---|
| Formal | 368 | 7.08 |
| Informal | 710 | 13.67 |
| Programmatic | 4117 | 79.25 |
| Total | 5195 | 100 |

Source: USACE Jacksonville District



Excerpt from BE (Figure 0-1). Locations of ESA Consultations in actionarea, 2014 – 2018

## EFFECTS OF THE ACTION

Effects of the action are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action. (See 50 C.F.R. § 402.17).

### Programmatic Approach

As noted above, the scope of EPA's approval of FDEP's request to administer the CWA 404 program in assumable waters is essentially statewide, covering an array of operations that may affect a wide variety of ESA-proposed and -listed species and proposed and designated critical habitat. Because this is a consultation on a programmatic action, it is not feasible, nor is it required, to conduct a meaningful site-specific and species-specific effects analysis in this BiOp. Therefore, the USFWS determined that a programmatic consultation is appropriate in determining whether FDEP's 404 program and EPA's oversight of FDEP's 404 program is structured to insure that no permit will be issued that is likely to jeopardize threatened and endangered species and destroy or adversely modify critical habitat. For future permits issued under the State 404 program, site-specific and species-specific information will be

available and assessed through the technical assistance process with the State and/or through coordination with the EPA, when EPA has not waived its review of the State permit action.

**Key Assumptions for the Effects Analysis**

In developing this analysis, we made a number of key assumptions due to the lack of information and uncertainties surrounding the location, timing, frequency, and intensity of State 404 permit actions. If these assumptions prove incorrect or warrant changes during implementation of the State 404 Program, it could affect the validity of this analysis and trigger re-initiation of ESA section 7 consultation if it results in effects that were not considered herein pursuant to 50 CFR 402.16.

As stated in the BE and the MOU, FDEP will provide USFWS with copies of all permit applications for review and comment, and to include in the record for the draft permit any species protection measures that the FWS recommends.

USFWS views this exchange of information and any resulting coordination as falling within the broad scope of "technical assistance" as described in the USFWS section 7 Consultation Handbook.

Key Assumptions of this BiOp in determining whether the proposed Federal action complies with section 7(a)(2) of the ESA.

1. USFWS will receive all State 404 permit applications upon receipt by the FDEP and all public notices issued by FDEP in accordance with timelines established by State and Federal regulations.
2. Where necessary, FDEP will incorporate the species protection measures, monitoring, and reporting recommendations provided by the USFWS through technical assistance facilitated by the exchange of information between the State (FDEP and FWC) and the USFWS
3. The species protection measures, monitoring, and reporting developed by FDEP, FWC, and/or recommended by USFWS and implemented by FDEP and the permittee will minimize the adverse effects to levels that will avoid jeopardy to species and/or destruction and adverse modification of critical habitat
4. For any existing 404 permit applications that are transferred from the Corps to FDEP upon assumption, FDEP may adopt any conditions that USFWS previously provided to the Corps in order to fulfill compliance with this PBO or may coordinate with USFWS to modify or amend the earlier conditions recommended by USFWS. The USFWS assumes this process will resolve any concerns regarding adverse effects to ESA-listed species and designated critical habitat that weren't previously considered on the original section 7 with the Corps.
5. FDEP and EPA will use their respective authorities to minimize adverse effects of State permit actions and ensure compliance with all permit conditions and/or conservation measures that are included as part of the State 404 permit action.

**Evaluation of the Programmatic Consultation Criteria**

We use a programmatic approach to determine whether and to what degree the FDEP 404 program and the EPA oversight of the FDEP 404 program have the structures needed to insure the issuance of State 404 permits is not likely to jeopardize the continued existence of proposed or listed species or result in the destruction or adverse modification of proposed or designated critical habitat. In this evaluation, we

assess whether the State 404 program, as implemented by FDEP and overseen by EPA, fulfills the following criteria: (1) understand the scope of its action; (2) reliably estimate the physical, chemical, or biotic stressors that are likely to be produced as a direct or indirect result of their action; (3) minimize adverse effects of such activities on ESA-listed species and designated critical habitat; (4) identify, inform, encourage, and screen applicants for potential eligibility under or participation in the permitting activity; (5) continuously monitor and evaluate likely adverse effects on listed species and critical habitat; (6) monitor and enforce permit compliance; and (7) modify its action if new information (including inadequate protection for species or low levels of compliance) becomes available. While we recognize that site-specific activities would be addressed on a permit-specific basis during the technical assistance process with the State and coordination with EPA (when EPA has not waived review of the state permit action), this 7- question approach allows us to consider how the overall implementation of EPA's proposed action (which would include these site-specific processes) avoids jeopardy and adverse modification. We discuss each criterion and its applicability to the proposed action in the following paragraphs.

**Description of effects of the action**

The BE states the action studied in the BE is EPA's approval of the State's Assumption of the dredge and fill permitting program under Section 404 of the CWA for waters assumable by the State. Inherent with the action is that the USACE would no longer accept 404 permit applications from the regulated community in assumed waters. The 404 program activities caused by the EPA approving the States 404 Program are: 1) FDEP would begin processing 404 permits in assumed waters, 2) FDEP would be required to coordinate with USFWS in reviewing permit applications in order to avoid or minimize effects to ESA-listed species and insure FDEP permit actions are not likely to jeopardize a species or adversely modify its critical habitat, and 3) the consequence of FDEP issuing 404 permits would be the placement of dredged or fill material into waters of the United States, which in turn would alter the environment where ESA-considered species may exist or designated critical habitat may exist.

The USFWS has determined that the endangered species coordination processes required in the State's operation of the State 404 program (as detailed in this BiOp's Description of the action and in the BE) are as protective as the section 7 interagency consultation processes that occur in the operation of the USACE 404 Program (as detailed in this BiOp's description of the environmental baseline).

The EPA action is not expected to increase or decrease the future number of CWA section 404 regulated activities. It is reasonable to expect that the permitting history presented in the BE for the years 2014-2018 approximates the number and types of permitting activities that could occur over the next five years. See Chapter 4.2.1 of the BE regarding the limitations of the data used in the analyses of the BE, regarding the interpretations of the USACE database and shapefile.

Because the precise number and locations of future State section 404 permit applications are unknown, the exact effects to ESA-species cannot be accurately determined. However, this BiOp and the BE examined the history of section 7 consultations related to CWA 404 applications and the data indicates 404 permits tend to cluster in rapidly developing regions of Florida.

Using the best available information on recent (2014 - 2018) permitting activities as a baseline (see Chapter 4 of the BE), and the information included in the species accounts in Appendix B of the BE, a qualitative assessment of the potential effects of the action on listed and proposed species and designated and proposed critical habitat was presented in the BE. The BE did not distinguish direct and

indirect effects based on 2019 revisions to the ESA's section 7 implementing regulations (50 CFR 402); however, both immediate impacts and impacts that are reasonably certain to occur later in time were considered.

Table C.1 in Appendix C of the BE summarizes the potential impacts of dredge and fill activities on ESA-listed and proposed to be listed species. This stressor table is intended to identify potential effects and facilitate analysis of which effects are reasonably certain to occur if EPA approves Florida's assumption of the CWA section 404 Program in assumed waters. A detailed analysis of potential effects in the future is not possible, because, as stated above, the exact locations, amounts, and types of impacts are not yet known. The BE briefly summarizes major categories of impacts and those are presented below, followed by a discussion of potential effects on major taxa.

**Types of Effects**

The following discussion is presented in the BE. This description of effects is not exhaustive but includes some of the more common influencing factors and consequences to species that may result from activities associated with the placement of dredge and fill material in waters of the U.S. There is a spectrum of effects to consider, including beneficial effects. For example, there is a level of disturbance without a detectable sign of effect (e.g. a wood stork flushed off a nest but returns before the eggs are harmed). There is also disturbance with a detectable sign of effect (e.g. a wood stork is flushed off a nest and the eggs overheat and die). Heightened levels of effect include injury that is observable or detectable, such as a failure to reproduce because of physiological or ecological effects of the action, or the death of one or more individuals.

There is also a theoretical spectrum of likelihoods regarding the probability that a given event or consequence might occur. These levels of likelihood that a consequence will occur include potential, unlikely, possible, likely, more than likely, and reasonably certain. With respect to a potential consequence meeting the definition of an Effect of the action, the consequence must be reasonably certain to occur which requires clear and substantial information to support that conclusion (50 CFR 402.02, 402.17). Potential stressors or effects to the species and to the essential physical and biological features of any critical habitat are discussed below and summarized in Appendix C, and we note that these same factors are evaluated during the review of State 404 permit applications and actions.

**Biotic Stressors**

Biotic stress is stress that occurs as a result of damage done to an organism by other living organisms, such as bacteria, viruses, fungi, parasites, beneficial and harmful insects, weeds, and cultivated or native plants. Dredge and fill activities can alter competitive balances, change predator/prey relationships, or encourage the establishment of invasive plants or animals, which can alter habitat structure. Loss or decrease, or colonization or increase, of a species can cascade through multiple trophic levels and, in some cases, even contribute to habitat alteration (monotypic stands of invasive plants).

**Physical Stressors**

Physical stressors should be assessed individually and cumulatively, when assessing potential biological impacts. An example of a physical stressor could be the physical diversion of a stream to another location, which may adversely impact the habitat for the flora and fauna using the original location of the stream. Other examples include the construction of new, improvements to, and even the removal of dams, weirs, and culverts, the removal of wetlands and surface waters by filling with materials, and the

creation of surface waters by dredging and excavation. Physical stressors include direct mortality (burying or trapping of individual animals by fill or equipment placing fill), especially for smaller, less mobile species; it can also result in loss of habitat and displacement of more mobile species able to escape the immediate effect. Fill of part of a wetland can contribute to loss of function even if most of the wetland remains intact.

Dredging can result in temporary to permanent loss of aquatic bottom communities, and sedimentation can reduce visibility, clog gills of aquatic species, and bury immobile organisms. Recovery from dredge effects may require hours to years, depending on the habitat, substrate type, and the extent of the disturbance.

Fragmentation can affect species that migrate seasonally between habitat types (pond breeding salamanders which spend the summer in uplands up to hundreds of feet away) or which have large home ranges and frequently move among resource types (Eastern Indigo Snake or Florida Panther). It can also disrupt metapopulations, especially for short-lived invertebrates dependent on stochastic environments, reducing the frequency of recolonization of otherwise suitable habitat.

Changes to hydrologic regime may include lowering of groundwater levels, increased runoff, or altered hydroperiod. Changes that result in early drying of ponds or wetlands may result in mortality to pond breeding amphibian larvae or small fish, while conversion of a seasonal wetland to a permanent pond may allow colonization by large predators, including stocking of game fish.

Some construction activities (e.g., pile driving or dredging) can result in air or underwater noise and vibration effects. Analysis of and attempting to reduce these effects has become more common in recent years. Construction activities such as noise, vibration, as well as visual disturbance, may alter the behavior of ESA-listed species.

Even measures intended to reduce effects can sometimes have unintended consequences. Some projects have relocated ESA-listed species, but little follow-up monitoring has been done to document success or failure of the translocations.

**Physicochemical Water Quality Stressors**

Physicochemical stress results from environmental factors such as food/nutrition, toxins, metabolic disorders, infections, and inflammation. Water Quality changes are commonly associated with dredge and fill activities, although these are not always easy to describe. Effects can include changes in water temperature, gas or oil dripping from construction equipment or generators to fill of a wetland, eliminating or reducing natural filtration of sediment and pollutants and resulting in degradation of downstream habitat. Dredging may also re-suspend environmental contaminants in sediment (common in industrial areas). Changes to nutrient cycling or exchange are even less obvious and may result from new activities occurring on or adjacent to the filled areas.

**Potential Effects**

The following discussion is grouped by major taxa and discusses potential effects of the action by future activities that may be authorized, should the State 404 program be approved, within guilds of species with similar habitat needs or life-history traits. These effects are similar to the effects of the current USACE Section 404 process for granting or denying permits, only will be performed by the State 404 program process as a consequence of the action, if approved. It is assumed that overall, the future number and/or any rate of increase for State 404 applications and the general types of activities and

overall dredge or fill quantities will be similar to those permitted in similar jurisdictional waters as past requests for permits by the USACE, and would not change due to an approval of the State's request for Assumption.

**Mammals**

Twenty-four mammalian species/subspecies are included in Appendix C, Table C.1. Two of these mammals are extirpated from the state and are therefore excluded from further consideration in this BE. General habitat preferences in Florida can group the remaining twenty mammals into the following broad categories: wetland/marsh (six mammals), forests/grasslands/swamps (two mammals), tropical hardwood hammock/mangrove (three mammals), caves (four mammals), pine rockland (one mammal), beach/scrub dune (five mammals), and aquatic (one mammal). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is presented in Table C.1.

In general, all mammalian species under consideration in this BE that occupy or frequent WOTUS or adjacent habitats during any stage of their life histories and behaviors may be disturbed by activities during periods when authorized activity-related noise and vibration exceed baseline levels. Such activities may also disturb the natural behavior of ESA-considered species due to visual disturbance during construction activities.

ESA-considered mammals that occupy wetlands and marshes in Florida include voles, rabbits, and rats. These species/subspecies may occupy or use wetland/marsh habitat during all or a portion of their life history (e.g., for breeding, foraging, or shelter). Marsh and wetland species are likely to be directly affected by impacts to their habitat from future authorized dredge and fill activities, which may also result in habitat fragmentation. Changes in existing hydrological regimes and water quality associated with future authorized activities could also degrade the quality of wetland/marsh habitat and vegetation (e.g., allow for invasion of non-native vegetation). Dredge and fill activities are also frequently associated with coastal development. Development of marshes/wetlands may create suitable conditions for non-native predators (e.g., cats and dogs) and competitors (e.g., *Rattus rattus*), which would also impact these ESA-considered species via increased ecological pressures.

Carnivores with large home ranges (e.g., Florida Panther and Red Wolf) occupy a diverse range of habitats, such as forests, grasslands, and swamps in Florida (as well as pine rocklands). Due to the restricted range of the Red Wolf on protected land in Florida (limited to St. Vincent Island, a USFWS National Wildlife Refuge), future activities authorized by the State 404 program are not likely to adversely affect the species. However, future permitted activities may impact the Florida Panther through direct impacts to habitat (dredge and fill), habitat fragmentation, and changes to existing hydrological regimes/water quality. Habitat fragmentation is one of the primary threats to this subspecies and a limit to its recovery.

Tropical hardwood hammock/mangrove ESA-considered mammal species (bats, rats, and mice) are likely to be impacted by future permitted activities via habitat fragmentation from fill or impacts to hydrology/water quality. Several species require fresh sources of drinking water, and their prey items are also dependent on these landscape features. In addition, impacts to habitat, including fragmentation, may create opportunities for non-native predators (e.g., cats) to colonize/thrive. The extent of tropical hardwood hammock and mangrove, particularly in south Florida, has declined significantly over the last several decades as a result of development, and further fragmentation could have significant impacts on ESA-considered species (USFWS 1999).

Several ESA-considered bat species/subspecies occur in limestone karst cave regions of the Florida Panhandle. Most of these bats are rare/unlikely to occur in the state, and future permitted activities are unlikely to adversely affect them. However, the Tricolored Bat is a permanent resident throughout Florida and occupies caves as well as woodland habitat and urban landscapes. Water features are also important to the species as foraging habitat. Direct impacts on the species' habitat (fill) as well as an increase in habitat fragmentation or impacts to hydrological regimes/water quality, may adversely affect the species.

The Key Deer (as well as the Florida Panther) inhabits pine rocklands. Pine rockland (as well as hammock) contains a substantial portion of the deer's forage plants, freshwater, and cover, which is especially important for fawning. Ongoing threats to the species include urbanization. Through direct impacts to habitat via fill, as well as habitat fragmentation and impacts to water quality, future permitted activities could have an impact on the subspecies.

Several ESA-considered beach mice occupy dune systems vegetated by sea oats and adjacent scrub (dominated by oaks and sand pine or palmetto) in coastal Florida. The predominant factors of decline for these mice are habitat loss due to alteration or conversion of dunes (from human development and use) as well as predation by non-native predators. Direct impacts to habitat via fill, dredging, and habitat fragmentation (which may make habitat for hospitable for non-native predators) could affect these species.

The West Indian Manatee is the only ESA-listed aquatic marine mammal considered in this BE. Florida manatees occur in freshwater, brackish, and marine environments, including coastal river estuaries, sloughs, canals, creeks, and lagoons. The species requires a source of freshwater for drinking. Threats to the species include human-caused mortality (watercraft collisions), interactions with commercial fishing gear, pollution, exposure to cold/loss of warm-water refugia, red tides, and impacts to habitat. Future activities authorized by the State 404 program could affect this species from dredge and fill activities, increases in vessel storage and operation, and impacts on habitat, including changes in hydrologic regimes, water quality, water control structures, and habitat fragmentation.

**Birds**

Nineteen avian species/subspecies are included in Appendix C, Table C.1. Five of these birds are extirpated from the state and are therefore excluded from further impact analysis in this BE. The remaining 14 birds can be grouped by general habitat preferences in Florida into the following broad categories: marsh/wetland birds (five birds), upland scrub birds (one bird), coastal tidal/marine birds (four birds), grassland birds (two birds), pine savanna birds (one bird), and forest/forested wetlands birds (one bird). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is also presented in Appendix C, Table C.1.

In general, all avian species under consideration in this BE that occupy or frequent WOTUS or adjacent habitats during any stage of their life histories may be disturbed by future permitted activities during periods project noise and vibration exceed baseline levels. In addition, these activities may also alter the natural behavior of ESA-considered via visual disturbance during construction activities.

Marsh/wetland avian species may be affected by any direct impacts to their habitat (nesting, foraging, roosting, overwintering, or stop-over site habitat). Physical impacts to their habitat associated with future State 404 permits may include fill, dredging, and habitat fragmentation. In addition, fill of

marsh/wetland habitat may result in a change to existing hydrologic regimes that could impact prey availability, via providing better conditions for invasive/competing prey species or reducing habitat for prey). Changes in hydrology also have the potential to flood habitat and nesting areas (resulting in nest failure), allow aquatic or terrestrial predators easier access to nests (during flooding vs. receding water conditions), and change the existing nutrient cycle. Changes in hydrology may result in high nitrogen levels in marshes/wetlands. The habitat then may become choked by an overabundance of emergent vegetation. Future permitted activities may also result in changes to water quality that could impact existing marsh/wetland vegetation and prey items (reducing habitat suitability for the species).

The only upland scrub avian species under evaluation is the Florida Scrub-jay. Florida Scrub-jays occupy early successional xeric scrub and scrub flatwood habitat in relict sand dunes in north and central Florida. This xeric habitat is well-drained but may be interspersed with swale marshes. Direct impacts associated with permitted activities that could affect the species include placement of fill, alteration of hydrologic regimes, and habitat fragmentation (a major issue that hampers the recovery of this species).

Direct impacts of future permitted activities on coastal tidal/marine avian species may include fill, dredging, and habitat fragmentation of nesting and foraging habitat (beaches, mudflats, intertidal areas, and inlets). Shoreline stabilization efforts, in particular, threaten several coastal avian species (i.e., fortification by riprap and other hardscape reduces available habitat). Permitted activities may also result in changes to hydrologic regimes and water quality in coastal areas.

Grassland (or dry prairie) avian species may be impacted if authorized dredge or fill activities result in diminished habitat quality via habitat fragmentation or changes to existing hydrologic regimes. Throughout Florida, grassland habitat is declining and highly fragmented. This habitat may also be mismanaged by suppression of natural fire regimes (USFWS 1999). Additional habitat loss and fragmentation may impact grassland species. Many grassland species also nest on or close to the ground and are highly susceptible to nest flooding (could occur with altered hydrological conditions in the grassland).

The only pine savanna avian species under evaluation is the Red-cockaded Woodpecker. Pine savanna ecosystems (or “high pine”) are characterized by widely spaced pine trees and extensive ground cover. Wetlands may be interspersed in low-lying areas. This habitat is almost extinct and highly fragmented in Florida. Also, the quality of existing high pine forests may be hampered by fire suppression (USFWS 1999). Pine savanna avian species may be impacted if authorized dredge or fill activities result in diminished habitat quality via habitat fragmentation or changes to existing hydrologic regimes.

Forest/forested wetlands avian species may be impacted if future authorized dredge or fill activities result in diminished habitat quality via habitat fragmentation or changes to existing hydrologic regimes and water quality. Many of the forest/forested wetland obligate species under evaluation are extirpated from the State of Florida. Habitat fragmentation may expose the remaining forest/forested wetland avian species to increased predation risk and nest failure (Stephens et al. 2004). Altered hydrology and water quality may impact prey availability as well.

**Reptiles**

Nineteen reptiles are included in Appendix C, Table C.1 of the BE. These reptiles can be grouped by general habitat preferences in Florida into the following broad categories: wetland/marsh/freshwater (seven reptiles), swamp/saltwater (one reptile), pine flatwoods (two reptiles), pine rocklands (two reptiles), and sandhill/scrub flatwood (seven reptiles). These groups are intentionally broad for this

macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is presented in Appendix C, Table C.1.

Wetland/marsh/freshwater reptile species in Florida may be affected by any direct impacts to their habitat (foraging, breeding, loafing, etc.). Dredge and fill activities in wetlands, marshes, and freshwater (ponds, rivers, streams), including ditching, diking, and impoundments, may result in habitat fragmentation and potentially impact both prey and predator populations (both native and invasive species). In addition, species that spend a large portion of their lives in water are likely to be impacted by changes in hydrological regimes, water quality, and vegetation composition (e.g., increased levels of sedimentation, impacts to burrowing mud substrate, and changes in emergent/submergent vegetation). Impacts are anticipated to be similar for species that inhabit swamps/forested wetlands and saltwater mangroves.

Pine flatwoods serve as a mesic successional stage between hardwood hammock and wet flatwoods (USFWS 1999). This habitat is threatened by conversion or loss and degradation from fire suppression. Species restricted to pine flatwoods are unlikely to be adversely affected by future State 404 permits. However, species that range between pine flatwoods and other habitat types such as wet flatwoods may be affected by direct impacts to habitat and habitat fragmentation.

In Florida, large areas of pine rockland habitats are protected on federal lands. However, particularly around Miami and the Keys, this habitat is on private land and under threat from development, conversion to agriculture, fire suppression, and invasive species (USFWS 1999). Pine rocklands are interspersed with areas of freshwater wetlands. Species associated with these wetland features may be affected by direct impacts to habitat as well as habitat fragmentation.

Sandhill/scrub flatwoods are xeric, well-drained areas of prairie, hammock, and scrub. These habitats are threatened by conversion, degradation, and fragmentation. The species that are found in sandhill/scrub flatwoods are not typically associated with wetlands/WOTUS during their life histories. The future permits under the State 404 program are not likely to adversely affect species that occupy these habitats.

**Amphibians**

Five amphibians are included in Appendix C, Table C.1 of the BE. These include species that utilize seasonal wetlands to breed and then disperse into surrounding upland habitat (three amphibians); species restricted to aquatic caves (one amphibian); and subspecies that primarily utilize perennial wetlands but which always had a restricted distribution and may now be extirpated (one amphibian).

Pond breeding species are easily affected by direct fill of wetlands and by hydrology alteration, especially shortening of pond hydroperiod, which may strand aquatic larvae prior to metamorphosis. As these species move between upland and wetland habitat, fragmentation is a concern. In other parts of the United States, the USFWS sometimes explicitly considers fragmentation in making effects determinations and making conservation recommendations for pond-breeding ESA-listed amphibians (R. Henry pers. comm.). Fire suppression is believed to be a concern for some species in some habitat types. Pond breeding amphibians are also at risk because they utilize seasonal isolated wetlands, which often are not subject to CWA jurisdiction. For cave-dwelling amphibians, water quality degradation, and both chemical and from sedimentation, could have adverse effects. Hydrology alteration is also a concern.

Most ESA-considered amphibians in Florida have relatively small distributions. Fully implemented safeguards, such as careful review to identify occurrences associated with future permitting and with adequate avoidance and minimization measures including minimization of fragmentation near utilized wetlands, would ensure that effects would remain at or below baseline conditions.

**Fish**

Six species/subspecies of fish are included in Appendix C, Table C.1 including three types of sturgeon associated with larger rivers and estuaries, two other coastal species, and one species associated with smaller streams. The stream species (Okaloosa Darter) is especially at risk of fragmentation or direct habitat loss because of a restricted range and very limited mobility; however, most populations are currently managed, and the species is considered to be stable at present. The estuarine and coastal species are less likely to be affected by small amounts of dredge or fill because they tend to occur in larger and more contiguous habitats, although sedimentation, water quality degradation, and to a lesser extent direct habitat loss are potential effects. As fish are, by definition, fully aquatic, they are frequently affected by CWA activities. Should these species be found in State-assumed waters, coordination with the Services and important safeguards may need to be identified during permit review, such as implementation of Best Management Practices (BMPs), and avoidance and minimization measures.

**Insects**

Twenty-five species/subspecies of insects are included in Appendix C, Table C.1 including 11 butterflies, five caddisflies, five dragonflies, two bees, and two beetles. Two of these insects, the American Burying Beetle and the Three-toothed Long-horned Caddisfly, are extirpated from the state and therefore excluded from further consideration in this BE. The majority of these ESA-considered insects are threatened by the use of pesticides for agricultural purposes (e.g., Monarch Butterfly's loss of milkweed host plant) and biocides/insecticides for mosquito control.

All of the caddisfly and dragonfly species face similar threats associated with spring, stream, river, and lake modifications. They may be directly affected by impacts to their habitat from future authorized dredge and fill activities, which may also result in habitat fragmentation. Given that both groups spend the larval stage of their life cycles in an aquatic habitat, they are especially vulnerable to changes in water quality conditions (e.g., siltation, pollution, and eutrophication) and changes to existing hydrological regimes. Thus, changes in existing hydrological regimes and water quality could also degrade the quality of aquatic habitat and vegetation (e.g., allow for invasion of non-native vegetation).

ESA-considered insects that occupy wetlands, marshes, and swamps in Florida include the Palatka Skipper and Duke's Skipper butterflies and the Calvert's Emerald Dragonfly. These species are likely to be directly affected by impacts to their habitat from future authorized dredge and fill activities, which may also result in habitat fragmentation. Changes in existing hydrological regimes and water quality could also degrade the quality of wetland/marsh habitat and vegetation (e.g., allow for invasion of non-native vegetation). Dredge and fill activities are also frequently associated with coastal development and, in turn, habitat fragmentation.

Species that occupy forests, woodlands, pine barrens, pine rocklands, and/or grasslands in Florida (e.g., Monarch Butterfly, Florida Leafwing, Frosted Elfin Butterfly, Ceraunus Blue Butterfly, Cassius Blue Butterfly, Bartram's Scrub-hairstreak, and Miami Tiger Beetle) do not use wetlands or WOTUS during any stage of their life history. Future permits under the State 404 program are not likely to adversely affect species that occupy these habitats.

Coastal or tropical hardwood hammocks, dunes, sand pine, and/or scrub obligate insect species (e.g., Gulf Coast Solitary Bee, Nickerbean Blue Butterfly, Miami Blue Butterfly, and Blue Calamintha Bee) may be impacted by habitat fragmentation from fill. These impacts may occur where waters/wetland habitat is interspersed with or border these habitat types. As insects are declining on a global scale, impacts to habitat and other resources that factor into species' life history could affect ESA-considered species recovery.

**Crustaceans**

Nineteen crustacean species/subspecies are included in Appendix C, Table C.1. These species can be grouped by general habitat preferences in Florida into the following broad categories: pond/river/stream species (four crustaceans) and cave/well/sinkhole species (15 crustaceans). These groups are intentionally broad for this macro analysis. Impact analysis on the species level (that takes into consideration species'/subspecies' microhabitat preferences) is presented in Appendix C, Table C.1.

Future authorizations under the State 404 program may impact pond/river/stream crustaceans (crayfish) via direct mortality or physical alteration of habitat through dredge and fill activities. Dredge and fill activities may also fragment habitat, change existing hydrological regimes, and affect water quality. All of the crayfish species under consideration in the action area are highly sensitive to and already threatened by impacts to both surface and groundwater quality (e.g., changes in temperature, flow, and siltation levels, etc.). Changes in water quality (e.g., an increase in nitrogen levels) may also create favorable conditions for invasive aquatic vegetation or change existing levels and/or species composition of native vegetation. This could decrease the quality of the existing crayfish habitat.

Crustaceans (crayfish and amphipods) that inhabit caves, wells, sinkholes, and other subterranean water features may also experience indirect mortality and/or impacts to habitat as a result of dredge and fill activities in or adjacent to occupied areas. Many cave/well obligates are extremely restricted in range (some species are only known from one or two localities). Any changes in habitat conditions could potentially result in species extirpation. Cave/subterranean crustaceans are also highly threatened by changes in hydrology. Any future activities that would deplete groundwater/aquifers results in changes in flow and, in turn, impacts availability of detrital food items or burrowing habitat. Water quality impacts (increase in nitrogen or sediment levels) may also affect the species. In addition, many cave-dwelling species are dependent on cave-roosting bats, specifically their guano, as a food source. Impacts on cave-roosting bat populations may also affect these crustaceans by reducing food availability.

**Mollusks**

As freshwater mussels are, by definition, fully aquatic, they are likely to be impacted by dredge and fill activities. Twenty-one species of mollusks are included in Appendix C, Table C.1, including 18 types of freshwater mussels that are associated with varying sizes of springs, creeks, and rivers, two freshwater snails, and one tree snail. The freshwater mussel species all face similar threats associated with habitat modification. These include direct habitat modifications such as impoundments, dredging/channelization, stream bed destabilization, and streamflow depletion (e.g., water extraction). They are especially vulnerable to changes in water quality conditions (e.g., excessive sedimentation, environmental contaminants, and eutrophication) and changes to existing hydrological regimes. Similarly, as filter feeders, they are vulnerable to changes in nutrient cycling. Given the reliance all freshwater mussels have on host fish during the larval period of their life cycle, impoundments or other effects influencing host fish species may affect these species. Additionally, mollusk species may be threatened by the invasive species (e.g., Asiatic Clam (*Corbicula fluminea*)), which could be spread by

dredge and fill activities. Tree Snails are less likely to be affected as they occur in terrestrial, arboreal environments; nonetheless, direct habitat fragmentation is possible.

**Plants**

Ninety-nine plants are included in Appendix C, Table C.1. These species/subspecies/varieties can be grouped by guild into the following categories: lichens, graminoids, annual forbs, perennial forbs, sub-shrubs, shrubs, cacti, and trees. These groups are intentionally broad for this macro analysis. Impact analysis on the species/subspecies/varietal level (that takes into consideration microhabitat preferences) is presented in Appendix C, Table C.1.

Nine annual forbs are included in this analysis. Five of these forbs occur primarily in wetland habitats, including non-forested wetlands such as prairies, as well as ponds and lakes, ditches, and road shoulders. Fifty-five perennial forbs are included, and roughly half of these occur in wetland habitats. They occur in a variety of specific habitats within freshwater non-forested and freshwater forested wetlands, including wet prairies, cypress swamps, bogs, fens, and seeps. Some occur in pond or lake habitats, and others occur in floodplains or along the banks of rivers or streams. Two epiphytic orchids in this category grow on trees in forested wetlands. One grass and one sedge species included in this analysis may be affected as well.

Four sub-shrubs, six shrubs, and two tree species considered in the analysis occur in wetland habitats, or in habitats which may border wetlands, and which may be affected by future activities that may be permitted under the State 404 program. These species occur in both freshwater non-forested and freshwater-forested wetlands. The sole lichen species and the four cacti species occur in upland habitats that are not likely to be affected.

Many of the species analyzed in this document have experienced substantial habitat loss and range restrictions due to a number of factors, including development and land conversion, alteration of fire regimes and fire suppression, threats from invasive species, and changes to hydrologic regimes. Some have been impacted by forestry practices or horticultural collection. Direct impacts to several of the plants may occur from future authorized fill or dredging activities (which could result in direct mortality or direct impact on wetland habitats). Indirect impacts from wetland dredge or fill activities may affect not only hydrophytes but also some upland species occurring in habitats that border wetlands, from the building of access roads or staging areas. Other indirect impacts include changes in hydrology, water quality, nutrient alteration, and competitive pressure that may arise from shifts in species composition.

## CUMULATIVE EFFECTS

This BiOp must evaluate the consequences to species caused by future non-Federal activities within the action area, *i.e.,* cumulative effects. “Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation” (50 CFR 402.02). Additional regulations at 50 CFR 402.17(a) identify factors to consider when determining whether activities are reasonably certain to occur. These factors include, but are not limited to: existing plans for the activity; and any remaining economic, administrative, and legal requirements necessary for the activity to go forward. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the ESA.

Within the action area (the assumed waters and their adjacent uplands in Florida), declines in the abundance or range of many federally-threatened, endangered, and other special status species are attributable to various human activities on Federal, State, and private lands, such as human population expansion and associated infrastructure development; construction and operation of dams along major waterways; water retention, diversion, or dewatering of springs, wetlands, or streams; recreation, including off-road vehicle activity; expansion of agricultural or grazing activities, including alteration or clearing of native habitats for domestic animals or crops; and introductions of non-native plant, wildlife, or fish or other aquatic species, which can alter native habitats or out-compete or prey upon native species. Many of these activities are expected to continue within the range of various federally protected wildlife, fish, and plant species, and could contribute to cumulative effects to the species within the action area. Species with small population sizes, endemic locations, or slow reproductive rates will generally be more susceptible to cumulative effects.

The BE (Appendix A) has a section that describes the effects of non-Federal activities that are reasonably certain to occur in the action area. The BE states as compared to the regulatory baseline, the action does not authorize any new activities or increased discharge of pollutants that would significantly increase the magnitude of adverse cumulative environmental impacts to ESA-listed species, and the implementation of the State 404 program by FDEP will ensure effects on ESA-listed species will be evaluated and addressed at project-level. Lastly, as noted in this BiOp's Description of the action, the USFWS's project-specific, species-specific, review of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA.

## INTEGRATION AND ANALYSIS OF EFFECTS

The action this BiOp is evaluating is the EPA's potential approval of Florida's request to assume administration of the CWA 404 program in assumed waters, defined as waters not retained by the USACE 404 program. The action will occur throughout Florida in assumed waters and may affect them and their adjacent uplands, which is considered the action area. The action is likely to adversely affect the species and critical habitats listed in this BiOp and the BE. This section of the BiOp integrates information presented in this BiOp to summarize stressors and the likely consequences of exposing ESA-listed species to these stressors.

This programmatic BiOp's effects analysis assesses whether, and to what degree, FDEP has structured its 404 program to establish processes that provide EPA , FWC, USFWS, and the 404 permit applicant to collectively implement the provisions of section 404(g)-(l) of the CWA and the State's 404 Program Rule (62-331 F.A.C.), and the FDEP-FWC-FWS Endangered Species Coordination Memorandum of Understanding in a manner that addresses adverse effects to listed species and their critical habitats, and ensures the regulated activities that require State 404 permits are not likely to jeopardize the continued existence of endangered or threatened species or destroy or adversely modify designated critical habitat.

As described in the BE, the State 404 Program requires the analysis for whether effects to listed species and their critical habitats have "reasonable potential" to occur (62-331, F.A.C.; 40 CFR 233.51), and if so, to further determine whether those effects are "likely to be an adverse effect", or "not likely to be an adverse effect". If adverse effects/impacts may occur, conditions or measures to avoid and minimize the impacts would be included as permit conditions and implemented by the permittee. The State 404

program species assessment is modeled after the Federal processes for determining, avoiding, and minimizing effects to listed species and ensures compliance with the ESA and the CWA during State 404 permit application review and permit issuance.

This BiOp confirms the resulting species coordination processes fulfill the following criteria when reviewing future State 404 permit applications:

1. The scope of the action is adequately described;
2. The physical, chemical, or biotic stressors to species that are likely to be produced as a result of the action is estimated;
3. The adverse effects of such activities on ESA-listed species and designated critical habitat is minimized;
4. The applicants participating in permitted activities are informed, encouraged, and screened for potential incidental take exemption eligibility as required by permit issuance;
5. Likely adverse effects on listed species and critical habitat are monitored and evaluated;
6. Permit compliance is monitored and enforced; and
7. If new information becomes available (including inadequate protection for species or low levels of compliance), the action is re-evaluated and modified if warranted.

The FWC will assist FDEP with the coordination of ESA- listed species reviews, which would take place concurrently with their review of impacts to State-listed species (per Chapters 62-330, F.A.C. and 68A-27, F.A.C.) for the State 404 and ERP programs. The FWC may assist FDEP as the State's species coordination lead to be the point of contact for coordination with the USFWS. FWC may provide information and other preliminary assessment assistance to USFWS as USFWS reviews State 404 permit applications and develops recommendations for FDEP/FWC to avoid and minimize adverse impacts to listed species and their habitats.

**Key commitments by FDEP, FWC, FWS that ensure ESA-listed species coordination and conservation**

The species coordination process includes a USFWS review of all State 404 permit applications for consistency with the ESA and an EPA review (including consideration of USACE, USFWS, and NMFS comments provided to EPA) of applications with a reasonable potential to affect ESA-listed species. Key commitments between FDEP, FWC, and the USFWS to ensure a successful species coordination and conservation related to State 404 permit reviews include:

1) FDEP's processes and procedures to review State 404 applications will be similar to and will utilize the USFWS-approved permitting guidance that is currently used by the USACE, to ensure consistency with CWA and ESA requirements.

2) FDEP, FWC, and USFWS will participate in a State 404 program species coordination technical team. This technical team will oversee the species coordination process, including but not limited to: assisting in the transition of 404 permitting by participating in training efforts; providing a process to elevate questions and decision-making to a group with technical expertise, as needed; assist in refining coordination processes, procedures, and future improvements, as needed, related to State of Florida permitting under Chapter 62-331, F.A.C.

3) Prior to assuming 404 permitting, FDEP and FWC permit review staff will be trained in the new State 404 program species coordination procedures and processes. The FDEP, FWC and the USFWS will collaborate on developing the training materials, and the FWC and the USFWS will be invited to participate in the in-person and/or virtual training meetings for FDEP permit review staff.

4) All State 404 applications will be forwarded to USFWS for review, the majority of which will include FDEP or FWC preliminary determinations for effects to ESA-listed species or species proposed to be listed within a few days of the application provided to the USFWS. These preliminary determinations may include possible effects for species found onsite, potential impacts to critical habitat, and potential protective measures that may address the effects and impacts.

5) Technical assistance in individual project-by-project reviews from the USFWS may be accomplished by individual USFWS staff or by USFWS-approved effect determination tools, as described below.

6) FDEP will incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the USFWS to avoid jeopardizing listed or proposed species and/or adversely modifying designated or proposed critical habitat.  In addition, if:

a) the applicant for a State 404 permit is the holder of a valid and active biological opinion, or Habitat Conservation Plan Incidental Take Permit (HCP/ITP), or a similar binding agreement that is issued by the USFWS and

b) the species and activities described in the State 404 permit application are covered in the Program assumption BiOp, HCP/ITP (or similar agreement), then no additional avoidance and minimization measures would be required. FDEP would provide the documentation in order for USFWS review the project. If the USFWS concludes that a permit application is likely to jeopardize or adversely modify designated critical habitat and no protection measures are available to reduce the risk to an acceptable level, FDEP will issue a Notice of Intent to Deny the permit.

**CONCLUSION**

After reviewing the current status of the species, the environmental baseline for the action area, the effects of the potential action, and the cumulative effects, it is the USFWS's biological opinion that EPA's action, as proposed, is not likely to jeopardize the continued existence of ESA-listed species listed identified in this BiOp and is not likely to destroy or adversely modify designated critical habitat identified in this BiOp.

As described in the BE and this BiOp, activities regulated by section 404 of the CWA can have significant adverse effects on ESA-listed species and their critical habitats. EPA's approval of the State's 404 program activates the FDEP-FWC-USFWS MOU which establishes a process whereby the USFWS will be provided an opportunity to review all State 404 permit applications, and analyze impacts to ESA-listed species and designated critical habitat that may result from activities permitted by the State 404 program and provide technical assistance to FDEP with respect to avoiding and minimizing effects on .ESA-listed species and their critical habitats During this review, the USFWS will have an opportunity to provide additional information concerning potential effects to ESA-listed species, recommend measures to minimize effects, and provide monitoring and reporting recommendations on a project-specific and species-specific basis.

Our opinion is that the proposed action (including the subsequent program activities it will cause) has built in a sufficiently structured process to insure that the State's administration of section 404 of the CWA in assumed waters is not likely to cause an appreciable reduction in the likelihood of both the survival and recovery of any listed species by reducing the reproduction, numbers or distribution of that

species. It is also our opinion that the proposed action has built in a sufficiently structured process to insure State's administration of section 404 of the CWA in assumed waters is not likely to result in destruction or adverse modification of critical habitat.

**INCIDENTAL TAKE STATEMENT**

Section 9 of the ESA and Federal regulations pursuant to section 4(d) of the ESA prohibit the "take" of endangered and threatened species, respectively, without special exemption. "Take" is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. Harm is further defined by the USFWS as an act which actually kills or injures wildlife, which may include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering. Harass is defined by the USFWS as actions that create the likelihood of injury to listed species by annoying them to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of sections 7(b)(4) and 7(o)(2), taking that is incidental and not intended as part of the agency action is not considered to be prohibited taking under the ESA provided that such taking is in compliance with the terms and conditions of this Incidental Take Statement.

Section 7(b)(4) and 7(o)(2) of the ESA generally do not apply to listed plant species. However, protection of listed plants from take is provided to the extent that the ESA prohibits the removal and reduction to possession of Federally listed endangered plants or the malicious damage of such plants on areas under Federal jurisdiction, or the destruction of endangered plants on non-Federal areas in violation of State law or regulation or in the course of any violation of a State criminal trespass law.

For species proposed for listing under the ESA, the prohibitions against taking endangered species under section 9 of the ESA or under a Section 4(d) rule for threatened species do not apply until the species is listed. If the conference opinion is adopted as a biological opinion following a listing or designation under section 4 of the ESA, the Reasonable and Prudent Measures, with their implementing Terms and Conditions, will be nondiscretionary. Terms and Conditions must be undertaken, for the exemption in section 7(o)(2) to apply.

For proposed activities in which the State has permitting authority and for which incidental take of ESA-listed species is reasonably certain to occur, the amount and extent of incidental take anticipated from these proposed activities will be quantified and evaluated on a project-specific basis through the technical assistance process conducted between the USFWS and the State.

**Amount or Extent of Take Anticipated**

While the BE provided a detailed analysis of typical impacts related to stressors to ESA-listed species, inability to anticipate the locations of future State 404 permit applications did not allow the Service to conduct site- and species-specific analyses to estimate the number of individuals that might be affected by the permitted activities. .

However, through implementation of the State 404 program (62-331, F.A.C.) and EPA's oversight of the State 404 program and coordination of Federal review of state permit actions (40 CFR 233), this

project-specific information will be provided to the USFWS because USFWS will receive all State 404 permit applications.

This affords the USFWS the opportunity to appropriately evaluate project effects on a project-specific and species-specific basis. This review will allow the USFWS to provide technical assistance to the State to adjust an action that may result in the take of ESA-listed species. As described in our conclusion, we assume that through technical assistance with the State, appropriate measures to minimize incidental take and detrimental effects associated with activities regulated by the State 404 program will be developed by the USFWS, and that these measures will ensure that each permit will minimize adverse effects and thereby avoid jeopardy to ESA-listed species and avoid destruction or adverse modification of critical habitat.

If it is determined, through technical assistance on permit reviews with State that take of ESA-listed species is still expected to occur after implementation of recommended minimization measures, the amount or extent of incidental take will be quantified, at that time by the appropriate Field Office of the USFWS, in coordination with FDEP/FWC. FDEP/FWC and USFWS will review reports and track the levels of take estimated through the technical assistance process and exempted by this Incidental Take Statement.

Incidental take exemption will be afforded to EPA when its approval of the State's assumption of the administration of section 404 of the CWA, including its implementation process, is carried out as described in this BiOp. In addition, any take incidental to the execution of activities permitted by a State 404 permit issued through the implementation process described in this BiOp will be exempt from Section 9 and Section 4(d) prohibitions if the permittee implements all permit conditions such as effect minimization measures, monitoring, and reporting as agreed upon by the State, and the USFWS.

If FDEP chooses not to follow, or is unable to comply with the Reasonable and Prudent Measures and associated Terms and Conditions of this Incidental Take Statement, they may seek protections from the take prohibitions of the ESA by obtaining take authorization pursuant to section 10(a)(1)(A) and 10(a)(1)(B) of the ESA or exemption through a separate ESA Section 7(a)(2) consultation if another Federal nexus exists.

In summary, because of the large scale and broad scope of the proposed action, the best scientific and commercial data available are not sufficient to enable the USFWS to accurately estimate the specific amount of incidental take at this time that is anticipated to occur as a result of the action. However, the amount or extent of incidental take of listed species will be quantified during the technical assistance process that is required in accordance with the State 404 program rule (62-331, F.A.C.), the FDEP, FWC, USFWS MOU, and EPA oversight regulations (40 CFR 233). This Incidental Take Statement does not apply in the absence of any take prohibited under Section 9 or Section 4(d) of the ESA.

**Reasonable and Prudent Measures**

The following reasonable and prudent measures are necessary and appropriate to minimize impacts of incidental take to species identified in this BiOp.

1. EPA (the action Agency) will use its authorities under the CWA to minimize impacts to listed

species pursuant to its oversight of the State's 404 Program.

2. The State of Florida (the Applicant) will use its authorities under the State of Florida 404 Program Rule (62-331) and other authorities pertaining to the protection of fish, wildlife, and plants to minimize impacts to ESA-listed species pursuant to its administration of the State's 404 Program.

3. The parties (FDEP, FWC, and USFWS) will implement the FDEP, FWC, USFWS MOU.

**Terms and Conditions**

In order to be exempt from the prohibitions of section 9 of the ESA, the Action Agency (EPA) and the Applicant (FDEP) must comply with the following terms and conditions, which implement the reasonable and prudent measure described above and outline required reporting/monitoring requirements. In accordance with 50 CFR 402.14(i)(1)(iv), these terms and conditions are non-discretionary and must be complied with by EPA or FDEP, as indicated below.

Terms and Conditions the EPA must comply with:

1. EPA shall oversee the operation of the State 404 program to ensure the State 404 program operates in accordance with the requirements stipulated in 40 CFR 233.

2. EPA shall coordinate Federal review of State 404 permit actions in accordance with the requirements stipulated in 40 CFR 233.50.

Terms and Conditions the FDEP must comply with:

1. FDEP shall participate in a State 404 program species coordination technical team with FWC and USFWS per the FDEP-FWC-USFWS MOU. This technical team will oversee the species coordination process, including but not limited to: assisting in the transition of 404 permitting by participating in training efforts; providing a process to elevate questions and decision-making to a group with technical expertise, as needed; assist in refining coordination processes, procedures, and future improvements, as needed, related to State of Florida permitting under Chapter 62-331, F.A.C.

2. FDEP shall implement a training program to familiarize FDEP and FWC permit review staff with the State 404 program species coordination procedures and processes. FDEP shall collaborate with FWC and USFWS on developing the training materials, and shall invite FWC and USFWS to participate in the in-person and/or virtual training meetings for FDEP permit review staff.

3. FDEP shall forward all State 404 applications to USFWS for review, in accordance with the timeframes and processes described in the BE and this BiOp's description of the proposed Action.

4. FDEP shall accept technical assistance in individual project-by-project reviews from the USFWS via individual USFWS staff coordination or by USFWS-approved effect determination tools.

5. FDEP shall incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided to FDEP by the USFWS to avoid jeopardizing listed species and/or adversely modifying designated or proposed critical habitat.

6. If the applicant for a State 404 permit is the holder of a pre-existing valid and active biological opinion with an incidental take statement, or a Habitat Conservation Plan with an Incidental Take Permit (HCP/ITP) that was issued by the USFWS and the species and activities described

in the State 404 permit application are covered by that particular biological opinion, or HCP/ITP, then FDEP may stipulate as a permit condition that the applicant must comply with that biological opinion or ITP. FDEP will confirm the validity and applicability of the applicant's pre-existing biological opinion or HCP/ITP with the USFWS before taking any final action on the State 404 permit application.

7. FDEP will issue a Notice of Intent to Deny the permit if the USFWS concludes that a permit application is likely to jeopardize or adversely modify designated critical habitat and no protection measures are available to reduce the risk to an acceptable level.

8. FDEP will provide an annual report to the USFWS that:
   a. Summarizes the number and types of State 404 permits issued or denied, including data on impacts to ESA-listed species or critical habitat.
   b. Includes a table that identifies all ESA-listed species taken by State 404 permitted activities along with the amount or extent of such take.
   c. Identifies any permits that were elevated in accordance with the FDEP-FWC-USFWS MOU and how those elevations were resolved.

9. If prior to the completion of a permitted activity, new information (e.g. listing of new species, new critical habitat, or modifications to permitted activity) shows that the magnitude of impacts to listed species is greater than originally anticipated by USFWS, or that the amount of incidental take originally anticipated by USFWS is exceeded, FDEP, in accordance with its authority under 62-331.080, F.A.C., will reopen the permit and coordinate with the USFWS to: 1) determine if the additional impacts are likely to jeopardize any species; and 2) determine if additional minimization measures, reporting, or monitoring are required as deemed necessary by USFWS.

10. FDEP will inform 404 permittees that if a permittee locates dead or injured ESA-listed species, immediate notification must be made to the appropriate Field Office of the USFWS. Pertinent information including the date, time, location, and possible cause of injury or mortality (e.g. impingement or entrainment) of each species shall be recorded and provided to the USFWS. Instructions for proper care, handling, transport, and disposition of such specimens will be issued by the Services. Care must be taken in handling sick or injured animals to ensure effective treatment and in handling dead specimens to preserve biological material in the best possible state.

**Conservation Recommendations**

Section 7(a)(1) of the ESA directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information. We recommend that EPA, FDEP, and State 404 permit applicants implement the following actions:

1. In consultation with the Service, develop a conservation program for threatened and endangered species and develop conservation plans that specifically addresses threats to listed species and how implementation of CWA programs can ameliorate those threats;

2. EPA and FDEP may further aid the recovery of ESA-listed species by sponsoring additional research and development that improves the wildlife value of activities regulated by the CWA 404 program (e.g., creation of shallow-water littoral shelves in stormwater retention ponds for the benefit of wading birds).

In order for the Service to be kept informed of actions minimizing or avoiding adverse effects or

benefitting listed species or their habitats, the Service requests notification of the implementation of any conservation recommendations.

## REINITIATION NOTICE

This concludes formal consultation on the action. As described in 50 CFR §402.16, reinitiation of consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; (3) the agency action is subsequently modified in a manner that causes an effect to the listed species or critical habitat not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action. For the purposes of this programmatic consultation, any exceedance of take for a State 404 permit action that has not been completed will be addressed as described in FDEP's term and condition number 9. Additionally, the listing of a new species or critical habitat shall not trigger reinitiation of consultation on this action (approval of Florida's assumption of the CWA 404 program). Since the State would administer the CWA 404 program, the USFWS has no obligation to conduct section 7 consultation on individual permits because the issuance of such a permit is not a Federal action. However, the State's regulations require that the State comply with the technical assistance process with USFWS for ESA listed species and critical habitat. Accordingly, any effects to newly listed species or their critical habitat would be sufficiently considered and addressed.

## LITERATURE CITED

16 United States Code (USC) Chapter 35, Sections 1531, 1532, and 1536. The Endangered Species Act of 1973.

18 United States Code (USC) Chapter 53, Section 1151. Indian Country Defined.

33 Code of Federal Regulations (CFR) Part 322. Permits for Structures or Work in or Affecting Navigable Waters of the United States.

40 Code of Federal Regulations (CFR) Part 232 and 233. 404 State Program Regulations.

50 Code of Federal Regulations (CFR) Part 402. Interagency Cooperation-Endangered Species Act of 1973, As Amended.

1000 Friends of Florida, University of Florida Geoplan Center, and Florida Department of Agriculture and Consumer Services. 2017. A Special Report – What is Your Vision for Florida's Future? Florida 2070 and Water 2070 Joint Project. https://1000friendsofflorida.org/florida2070/ (01/15/2020).

Abiy, A. Z., A. M. Melesse, W. Abtew, and D. Whitman. 2019. Rainfall trend and variability in Southeast Florida: Implications for freshwater availability in the Everglades. *PLOS ONE* **14**(2): e0212008.

Baumberger, R. E. 2008. The impacts of harmful algal blooms on a Florida reef fish community.

Master's thesis. Florida Atlantic University, Boca Raton, Florida, USA. https://fau.digital.flvc.org/islandora/object/fau%3A2853/datastream/OBJ/view/impacts_of_harmful_al g al_blooms_on_a_Florida_reef_fish_community.pdf.

Benscoter, A. M., J. S. Reece, R. F. Noss, L.A. Brandt, F. J. Mazzotti, et al. 2013. Threatened and endangered subspecies with vulnerable ecological traits also have high susceptibility to sea level rise and habitat fragmentation. *PLOS ONE* **8**(8): e70647.

Dahl, T. E. 2005. Status and trends of wetland sin the conterminous United States 1998 to 2004. U.S. Fish and Wildlife Service, Fisheries and habitat Conservation, Washington, District of Columbia, USA.

Dahl, T. E. 2011. Status and trends of wetlands in the conterminous United States 2004-2009. U.S. Department of the Interior, Fish and Wildlife Service, Washington, District of Columbia, USA.

Fernald, E. A., and E. D. Purdum. 1998. *Water resources atlas of Florida*. Institute of Science and Public Affairs, Florida State University, Tallahassee, Florida, USA.

Florida Administrative Code (FAC) Chapter 62-330. Environmental Resource Permitting.

Florida Administrative Code (FAC) Chapter 62-331. State 404 program.

Florida Administrative Code (FAC) Chapter 68A-27. Rules Relating to Endangered or Threatened Species.

Florida Department of Environmental Protection (FDEP). 2019b. Wetlands Mitigation. Available online at: https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/mitigation. Accessed January 27, 2020.

Florida Department of Environmental Protection (FDEP). 2020a. State 404 program applicant's handbook. FDEP. Version 02/11/2020. https://floridadep.gov/water/water/content/water-resource-management- rules-development. (02/24/2020).

Florida Department of Environmental Protection (FDEP). 2020b. Water Quality Standards. FDEP. floridadep.gov/DEAR/Water-Quality-Standards. (02/16/2020).

Florida Fish and Wildlife Conservation Commission (FWS). 2016. Florida's Imperiled Species Management Plan. November 2016, with amendments incorporated December 2018. Tallahassee.

Florida Fish and Wildlife Conservation Commission (FWC). 2018. Florida's endangered and threatened species. Updated December 2018. FWC, Tallahassee, Florida, USA.

Florida Fish and Wildlife Conservation Commission (FWC). 2019. Florida's Wildlife Legacy Initiative: Florida's State Wildlife action Plan. Tallahassee, Florida, USA.

Florida Natural Areas Inventory (FNAI). 2010. Guide to the natural communities of Florida. 2010 edition. Tallahassee, Florida, USA. http://fnai.org/PDF/FNAI-Natural-Community-ClassificationGuide- 2010_20150218.pdf. (02/24/2020).

Florida Statutes (F.S.) Chapter 373. Water Resources.

Hefner, J. M. 1986. Wetlands of Florida, 1950s to 1970s. Pp. 23-31 *in:* E. D. Estevez, J. Miller, J. Morris, and R. Hamman (eds.), *Managing Cumulative Effects in Florida Wetlands*. New College Environmental Studies program Publication No. 37. Omnipress, Madison, Wisconsin, USA.

Hefner, J. M., B. O. Wilen, T. E. Dahl, and W. E. Frayer. 1994. Southeast wetlands; status and trends, mid- 1970's to mid-1980's. Department of Interior, Fish and Wildlife Service, Atlanta, Georgia, USA.

Holt, L. 2005. Avoiding a water crisis in Florida: how should water resources be managed in response to growth? *Florida Water Resources Journal* (October):16-22.

Makepeace, D. K., D. W. Smith, and S. J. Stanley. 1995. Urban stormwater quality: summary of contaminant data. *Critical Reviews in Environmental Science and Technology* **25**:93-139.

Mendelsohn, R., K. Emauel, S. Chonabayshi, and L. Bakkenshen. 2012. The impacts of climate change on global tropical cyclone damage. *Nature Climate Change* **2**: 205-209.

Nagy, R. C., B. G. Lockaby, L. Kalin, and C. Anderson. 2011. Effects of Urbanization on Stream Hydrology and Water Quality: the Florida Gulf Coast. *Hydrological Processes* **26**:2019-2030.

National Marine Fisheries Service (NMFS). 2009. Recovery plan for smalltooth sawfish (*Pristis pectinata*). Prepared by the smalltooth sawfish recovery team for the National Marine Fisheries Service, Silver Spring, Maryland, USA.

National Oceanic and Atmospheric Administration (NOAA) Fisheries. 2020. Smalltooth sawfish. Species directory. https://www.fisheries.noaa.gov/species/smalltooth-sawfish#overview. (01/07/2020).

NatureServe. 2020. NatureServe Explorer: An online encyclopedia of life [web application]. Version 7.1. NatureServe, Arlington, Virginia, USA. http://explorer.natureserve.org/. (01/15/2020).

North American Wetlands Conservation Council (Canada) (NAWCCC). 2000. Wetland Mitigation in Canada. A Framework for Application. No. 2000-1 Available online at: http://nawcc.wetlandnetwork.ca/Wetland%20Mitigation%202000-1.pdf. Accessed January 28, 2020.

Prinos, S. T. 2014. Origins and delineation of saltwater intrusion in the Biscayne Aquifer and changes in the distribution of saltwater in Miami-Dade County, Florida. *Scientific Investigations Report*. doi:10.3133/sir20145025.

U.S. Army Corps of Engineers (USACE). 2019a. Central and Southern Florida (C&SF) project – fact

sheet. USACE, Jacksonville District, Jacksonville, Florida, USA. https://www.saj.usace.army.mil/About/Congressional-Fact-Sheets-2019/C-SF-Project-C/. (02/24/2020).

U.S. Army Corps of Engineers (USACE). 2019b. Ecosystem restoration. USACE, Jacksonville District, Jacksonville, Florida, USA. https://www.saj.usace.army.mil/Missions/Environmental/Ecosystem- Restoration/. (02/24/2020).

U.S. Army Corps of Engineers (USACE) and South Florida Water Management District (SFWMD). 2007. Broward County Water Preserve Areas Comprehensive Everglades Restoration Plan (CERP) Final Project Implementation Report and EIS Briefing to the Civil Works Review Board. https://usace.contentdm.oclc.org/digital/collection/p16021coll7/id/5154. (01/27/2020).

U.S. Environmental Protection Agency (USEPA). 2020. Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals. https://www.epa.gov/sites/production/files/2020-08/documents/esa_consultation_policy_for_404g.pdf. (08/27/2020).

U. S. Fish and Wildlife Service. 1996. The South Florida ecosystem. South Florida Ecological Services Field Office, Vero Beach, Florida, USA.

U.S. Fish and Wildlife Service (USFWS). 1999. South Florida multi-species recovery plan. U.S. Department of the Interior, Fish and Wildlife Service, Southeast Regional Office, Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2001. Florida manatee recovery plan, (*Trichechus manatus latirostris*), Third Revision. U.S. Fish and Wildlife Service. Atlanta, Georgia, USA.

U.S. Fish and Wildlife Service (USFWS). 2019a. Consultation guidance - programmatic consultations. USFWS South Florida Ecological Services Field Office, Vero Beach, Florida, USA. https://www.fws.gov/verobeach/Programmatic%20Consultations.html. (02/24/2020).

Vose, R.S., D.R. Easterling, K.E. Kunkel, A.N. LeGrande, and M.F. Wehner, 2017: Temperature changes in the United States. In: *Climate Science Special Report: Fourth National Climate Assessment, Volume I* [Wuebbles, D.J., D.W. Fahey, K.A. Hibbard, D.J. Dokken, B.C. Stewart, and T.K. Maycock (eds.)].

U.S. Global Change Research Program, Washington, DC, USA, pp. 185-206, doi: 10.7930/J0N29V45



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460

OFFICE OF WATER

**MEMORANDUM**

**SUBJECT:** Consultation Requirements under the Endangered Species Act for State and Tribal Clean Water Act Section 404 Program Approvals

**FROM:** David P. Ross
Assistant Administrator

DAVID ROSS

Digitally signed by DAVID ROSS
Date: 2020.08.27 13:36:01 -05'00'

**TO:** Mary S. Walker
Region 4 Administrator

The Endangered Species Act (ESA) Section 7 directs each federal agency to ensure, in consultation with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service, that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" listed species or result in the destruction or adverse modification of designated critical habitat. 16 U.S.C. 1536(a)(2). The U.S. Environmental Protection Agency (EPA or Agency) views consultation under ESA Section 7 as required when EPA determines that approval of a state or tribe's request to assume administration of the Clean Water Act (CWA) Section 404 program may affect a listed species or designated critical habitat. EPA's position is set forth in the attached memorandum entitled "Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals." EPA has finalized its position following the consideration of comments received in response to the Agency's *Federal Register* notice "Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program Is Nondiscretionary for Purposes of Endangered Species Act Section 7 Consultation" (Docket ID No. EPA-HQ-OW-2020-0008). The attached memorandum will be posted on EPA's website at https://www.epa.gov/cwa404g.

Because we have determined that EPA's potential approval of the State of Florida's August 20, 2020 request to assume administration of the CWA Section 404 program may affect ESA-listed species or designated critical habitat, please initiate ESA Section 7 formal consultation with our federal partners as part of your review of Florida's application. I look forward to continuing to work with you and your staff on this important action.

Attachment (1):

1. Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460

OFFICE OF WATER

**Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals**

Pursuant to Section 404 of the Clean Water Act (CWA), 33 U.S.C. 1344, the U.S. Army Corps of Engineers (Corps) is authorized to permit the discharge of dredged or fill material into "waters of the United States." States and federally recognized tribes may assume authority to implement the CWA Section 404 permitting program within their respective jurisdictions from the Corps by submitting a request to the U.S. Environmental Protection Agency (EPA or Agency), as Congress authorized the EPA Administrator to approve program transfers from the Corps to the states and tribes. In the past, EPA has taken the position that such program transfer decisions do not involve an exercise of discretion warranting consultation under Section 7 of the Endangered Species Act (ESA), 16 U.S.C. 1536, meaning EPA would not need to consult with the U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) (hereafter referred to as "the Services") when acting on an assumption application from a state or tribe. EPA has reconsidered its prior position, articulated in 2010, that the decision to approve a state or tribal CWA Section 404 program does not trigger ESA Section 7 consultation. Going forward, EPA has determined that it should consult with the Services under Section 7 of the ESA if a decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or designated critical habitat.

## I. Background

To assume the CWA Section 404 permitting program, states and tribes must develop permit programs for discharges of dredged or fill material consistent with the requirements of the CWA and implementing regulations at 40 C.F.R. part 233 and submit a request to assume any such program to EPA. States and tribes must administer and implement programs that are consistent with and no less stringent than the requirements of the CWA and implementing regulations. 40 C.F.R. 233.1(d). The Administrator "shall approve" an assumption request if the state or tribal program satisfies the requirements of the CWA Section 404(h)(1). 33 U.S.C. 1344(h)(2)(A). If the Administrator fails to make a determination within 120 days of receiving the request, the program shall be deemed approved. 33 U.S.C. 1344(h)(3).

Section 7 of the ESA directs each federal agency to ensure, in consultation with one or both of the Services, as appropriate, that "any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence" of listed species or result in the destruction or adverse modification of designated critical habitat. 16 U.S.C. 1536(a)(2). ESA Section 7 consultation is not required if the agency determines that an action will not affect listed species or designated critical habitat. ESA Section 7 applies to "all actions in which there is discretionary Federal involvement or control." 50 C.F.R. 402.03.

In December 2010, EPA articulated its position that ESA Section 7 consultation is not applicable to CWA Section 404 program transfer decisions. EPA stated at that time that a 2007 U.S. Supreme Court decision from another context, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ("*NAHB*"), controlled the inquiry. In *NAHB*, the Supreme Court held that because the transfer of CWA National Pollutant Discharge Elimination System (NPDES) permitting authority to a state "is not discretionary, but rather is mandated once a State has met the criteria set forth in Section 402(b) of the CWA, it follows that a transfer of NPDES permitting authority does not trigger Section 7(a)(2)'s consultation and no-jeopardy requirements." 551 U.S. at 673. The Supreme Court held that "[w]hile EPA may exercise some judgment in determining whether a State has demonstrated that it has the authority to carry out Section 402(b)'s enumerated statutory criteria, the statute clearly does not grant it the discretion to add an entirely separate prerequisite to the list. Nothing in the text of Section 402(b) authorizes the EPA to consider the protection of threatened or endangered species as an end in itself when evaluating a transfer application." *Id.* at 671.

EPA evaluated this decision in response to a December 6, 2010 letter sent to the Agency by the Environmental Council of the States (ECOS) and the Association of State Wetland Managers (ASWM) asking whether EPA must conduct an ESA Section 7 consultation prior to approving or disapproving a Section 404 program request. The Agency responded to ECOS and ASWM in a December 27, 2010 letter ("2010 Letter"), see Docket ID No. EPA–HQ–OW–2020–0008, stating that, as in the CWA Section 402(b) context, when considering a CWA Section 404 program transfer request, EPA is only permitted to evaluate the specified criteria in CWA Section 404(h) and does not have discretion to add requirements to the list in CWA Section 404(h), including considerations of potential impacts to endangered and threatened species through ESA Section 7 consultation with the Services.

EPA stated in the 2010 Letter that although there are some differences between CWA Sections 402 and 404, the Supreme Court's reasoning in *NAHB* applies to EPA's approval of a CWA Section 404(g) permitting program. Section 404(h)(2) of the CWA states that if the Administrator determines that a state program submitted under CWA Section 404(g)(1) has the authority set forth in CWA Section 404(h)(1), then the Administrator "shall approve" the state's application to transfer the CWA Section 404 permitting program. The 2010 Letter acknowledged that "there are some differences between § 402(b) and § 404(h)," but concluded that those differences did not render EPA's action approving a state CWA Section 404 program a "discretionary federal action." The letter did not address the specific differences between the approval requirements of the CWA Section 402 and 404 programs that EPA now recognizes are relevant to the applicability of ESA Section 7. The 2010 Letter concluded that EPA's decision as to whether to approve a state CWA Section 404 program action is non-discretionary and ESA consultation is not required.

In July 2019, EPA received a request from the Florida Department of Environmental Protection (FDEP) asking EPA to engage in an ESA Section 7 consultation with the Services in connection with EPA's initial review of Florida's request to assume the CWA Section 404 program. FDEP provided a white paper asserting that ESA Section 7 consultation is required in the CWA Section 404 assumption context based on the unique statutory text of CWA Section 404 and its associated legislative history, which, in FDEP's view, differs in critical respects from other state delegation programs administered by EPA to which ESA Section 7 does not apply. FDEP stated that EPA's position was articulated in a two-page letter a few weeks after receiving the ECOS and ASWM letter and failed to acknowledge the critical distinctions between the statutory text of CWA Section 404 and the Section 402 program at issue in *NAHB*. FDEP also questioned the 2010 Letter's reliance on the legislative history of CWA Section 404

to support the non-discretionary nature of a state assumption decision, arguing that the legislative history supports the opposite conclusion.

The white paper explained that when a state or tribe administers the CWA Section 404 program, permittees must avoid adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10, which involves a burdensome process for both permit applicants and government agencies. The white paper characterized the lack of incidental take coverage in state- or tribe-assumed programs as a significant hurdle to establishing an effective and efficient CWA Section 404 program in Florida and estimated that approximately ten percent of CWA Section 404 permits issued in Florida require some form of incidental take coverage.

The white paper viewed a one-time ESA Section 7 programmatic consultation in connection with EPA's initial review of an assumption application as an efficient and legally-defensible approach to resolving the lack of incidental take coverage for permittees and permitting agencies. An ESA Section 7 consultation on EPA's potential approval of Florida's program would allow the Services to issue a programmatic biological opinion and a programmatic incidental take statement, which could identify procedural requirements for state permitting under CWA Section 404 needed to support the Services' determination that assumption would not result in jeopardy to any listed species. Subject to the Services' incidental take statement and provided these requirements are followed, FDEP stated that this process would bring state CWA Section 404 permits within the ESA Section 7(o)(2) exemption from take liability.

**II. Public Comment**

On May 21, 2020, EPA initiated a 45-day public comment period through an announcement in the Federal Register titled "Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program Is Nondiscretionary for Purposes of Endangered Species Act Section 7 Consultation" (Docket ID No. EPA-HQ-OW-2020-0008). EPA sought public comment regarding whether to reconsider its position that it lacks discretionary involvement or control within the meaning of 50 C.F.R. 402.03 when acting on a state or tribal application to administer the CWA Section 404 program sufficient to trigger ESA Section 7 consultation requirements. EPA identified the positions articulated in the FDEP white paper, as well as other considerations that may be relevant to this issue, and requested comment on whether EPA can and should engage in an ESA Section 7 consultation with the Services in connection with EPA's initial review of a state or tribal request to assume the CWA Section 404 program. The public comment period closed on July 6, 2020, and EPA received comments from a variety of stakeholders.

Several commenters stated that EPA's decision regarding a request to assume the CWA Section 404 permit program involves an exercise of discretion warranting consultation under ESA Section 7. These commenters recommended that EPA engage in a single ESA Section 7 programmatic consultation with the Services in connection with EPA's initial review of an assumption application. The commenters said that this process would enable the Services to issue a programmatic biological opinion and a programmatic incidental take statement, which could identify procedural requirements for state and tribal CWA Section 404 permits. They indicated that this approach could support a determination on the part of the Services that assumption would not result in jeopardy to any listed species and would ensure that activities authorized under state- or tribal CWA Section 404 permits would not be liable for incidental take as long as the terms and conditions of permitting are met.

Other commenters agreed that EPA's approval of a state or tribal CWA Section 404 permitting program is discretionary and thus triggers the requirements for consultation under Section 7 of the ESA. However, the commenters expressed concern about how states or tribes would ensure that the ESA's requirements are being applied at the project-specific level. These commenters said that EPA's consultation regarding whether to approve or disapprove an assumption request does not alleviate ESA liability concerns related to actions authorized by future state or tribal CWA Section 404 permits.

Certain commenters asserted that the Supreme Court's decision in *NAHB* applies to EPA's approval of CWA Section 404 programs, in addition to its approval of CWA Section 402 programs, and therefore EPA lacks discretion to consult under ESA Section 7 in approving state or tribal requests to assume permitting authority under CWA Section 404. These commenters argued that EPA's role under both the CWA Section 402 and 404 programs is limited to determining whether states and tribes have the legal authority Congress has specified; if the criteria are satisfied, EPA lacks the discretion to deny an application. The commenters also expressed concern that, as a practical matter, the agencies will spend significant time and resources collecting data and conducting analyses for a consultation but may not ultimately provide states and private landowners with incidental take protection under the ESA.

**III. ESA Section 7 Applies to CWA Section 404 Program Assumption Decisions**

Following the release of the May 2020 Federal Register Notice and its review of public comments, EPA has reconsidered the position articulated in the 2010 Letter to ECOS and ASWM. EPA concludes that the Agency's decision as to whether to approve a state or tribal request to assume the CWA Section 404 permit program involves an exercise of discretion warranting consultation under ESA Section 7 if EPA determines that such an approval action may affect a listed species or designated critical habitat. EPA's current view is that the *NAHB* decision, while informative, does not control in the CWA Section 404 program assumption context because Congress established a framework in which ESA concerns could be addressed when delegating authority to the Agency to transfer permitting responsibility from the Corps to individual states and tribes. That ability is absent in the list of factors Congress instructed EPA to consider when authorizing states to take on NPDES permitting authority.

For example, CWA Section 404(h)(1)(A) requires the Administrator to determine whether a state or tribe seeking CWA Section 404 program assumption has the authority to issue permits which apply and assure compliance with the CWA Section 404(b)(1) Guidelines. Those Guidelines include a provision that prohibits the permitting of a discharge if it jeopardizes the continued existence of endangered or threatened species or results in the likelihood of the destruction or adverse modification of designated critical habitat. 40 C.F.R. 230.10(b)(3). EPA's regulations state that in determining compliance with the CWA Section 404(b)(1) Guidelines, where ESA Section 7 consultation occurs, the Services' conclusions "concerning the impact of the discharge on threatened and endangered species and habitat shall be considered final." 40 C.F.R. 230.30(c). The CWA Section 404(b)(1) Guidelines were first promulgated in 1975, including the current prohibition on issuing permits jeopardizing threatened or endangered species, *before* Congress enacted CWA Section 404(g). 40 Fed. Reg. 41,292, 41,296 (Sept. 5, 1975). Thus, Congress was aware when requiring state or tribal program compliance with the CWA Section 404(b)(1) Guidelines that the no jeopardy mandate would apply to all permits issued by states and tribes.

Unlike the statutory construct governing EPA's delegation of NPDES program authority under CWA Section 402, EPA is required to seek and consider comments from the Services when deciding whether to approve a state or tribal request to assume the CWA Section 404 permitting program. Under CWA Section 404(g)(2), EPA must provide the Services with an opportunity to comment on a state or tribal

program submission. CWA Section 404(g)(2) provides that within ten days after receipt of a program assumption submission, EPA shall provide copies of the program application to the Corps and FWS. EPA extended that statutory direction to NMFS by regulation. 40 C.F.R. 233.15(d). CWA Section 404(h)(1) directs EPA to consider comments submitted by the Corps and FWS when determining whether a state or tribe has the requisite authority and meets the CWA statutory requirements with respect to implementing the CWA Section 404 program. EPA's regulations make clear that EPA should provide heightened attention to comments from the Services, providing that in issuing its approval or disapproval of a state or tribal program, EPA shall provide a responsiveness summary of significant comments received and its responses. EPA "shall respond individually to comments received from the Corps, FWS, and NMFS." 40 C.F.R. 233.15(g).

By requiring EPA to consider the Services' comments before deciding to approve an assumption request, and requiring states and tribes to comply with the CWA Section 404(b)(1) Guidelines when issuing permits under an assumed program, the CWA provides EPA with discretionary involvement and control that triggers the need for ESA Section 7 consultation when EPA's action may affect listed species. EPA has discretion regarding *the extent to which* it takes into account the Services' comments and can do so with an eye towards ensuring compliance with the CWA Section 404(b)(1) Guidelines. States and tribes are not required to consult on their individual permitting decisions, see 16 U.S.C. 1536(a)(2), so the program approval stage provides the most reasonable and efficient point in which to help ensure a process is in place to consider potential adverse impacts to species resulting from those permitting decisions. EPA has discretionary authority at that stage to shape program implementation to ensure compliance with the CWA Section 404(b)(1) Guidelines. This discretionary authority is unique to the transfer of CWA Section 404 permitting authority. There is no requirement in CWA Section 402 for EPA to take into consideration the views of the Services, and there is no corollary in the CWA Section 402 program to the CWA Section 404(b)(1) Guidelines. These provisions in CWA Section 404 provide discretion to EPA that is not present in the Section 402 context.

The legislative history of CWA Section 404 supports the argument for consultation. According to the Senate Report accompanying enactment of the assumption authority:

> The committee amendments relating to the Fish and Wildlife Service are designed to (1) recognize the particular expertise of that agency and the relationship between its goals for fish and wildlife protection and the goals of the Water Act, and (2) encourage the exercise of its capabilities in the early stages of planning. By soliciting the views of the principal Federal agencies involved in the review of these programs at an early stage, objections can be resolved that might otherwise surface later and impede the operation of a State program approved by the Administrator. This consultation preserves the Administrator's discretion in addressing the concerns of these agencies, yet affords them reasonable and early participation which can both strengthen the State program and avoid delays in implementation. That is, early participation in the development and design of programs, guidelines, and regulations should serve to reduce the emphasis now placed on the review by the Fish and Wildlife Service of individual applications for permits under the Water Act.

S. Rep. 95-370, at 78 (1977). The report expresses a preference for early engagement with FWS at the program approval stage with the goal of reducing engagement at the individual permitting stage while preventing comments at the permitting stage that might lead to a permit objection.

While the legislative history does not specifically mention ESA Section 7 consultation, Congress used the phrase "consultation" at the developmental stage of state programs while recognizing EPA's "discretion" in considering the FWS's comments and ensuring efficient and effective program implementation following approval. Ensuring that federal decisions contemplate, where appropriate, potential impacts to listed species at a stage where those impacts can be most efficiently addressed is one of the hallmarks of the ESA Section 7 consultation process. The legislative history therefore supports programmatic consultation more so than suggesting that formal consultation is not required.

In *NAHB*, the Supreme Court held that ESA Section 7 consultation on an NPDES program transfer could impose conditions beyond those found in Section 402(b). 551 U.S. at 663-664. The Court stated that "[w]hile EPA may exercise some judgment in determining whether a State has demonstrated that it has the authority to carry out Section 402(b)'s enumerated statutory criteria, the statute clearly does not grant it the discretion to add another entirely separate prerequisite to that list." *Id.* at 671. In the CWA Section 404 context, however, an ESA consultation will not impose an entirely separate condition. Instead, ESA consultation will fulfill Congress's statutory directive that the Services provide input on a state program prior to EPA's approval. By allowing for consideration of the views of the Services through their comments and incorporation of the no jeopardy requirement from the CWA Section 404(b)(1) Guidelines, the statute provides authority for EPA to consult and consider protection of listed species in the approval decision.

In *NAHB*, the Supreme Court found that the canon against implied repeals supports the interpretation that the transfer of CWA Section 402 programs was a non-discretionary agency action. This reasoning is not applicable in the CWA Section 404 assumption context. The Court stated: "An agency cannot simultaneously obey the differing mandates set forth in Section 7(a)(2) of the ESA and the Section 402(b) of the CWA, and consequently the statutory language – read in light of the canon against implied repeals – does not itself provide clear guidance as to which command must give way." 551 U.S. at 666. In the CWA Section 402 context, the Court found that approval of the state's permitting authority was non-discretionary and "comports with the canon against implied repeals because it stays Section 7(a)(2)'s mandate where it would effectively override otherwise mandatory statutory duties." *Id*. at 670. CWA Section 404 is distinguishable from CWA Section 402 because Congress required EPA to solicit comment from the FWS at the program approval stage and because the statute incorporates the jeopardy prohibition by reference to the CWA Section 404(b)(1) Guidelines. Here, ESA Section 7(a)(2)'s mandate does not override EPA's statutory duties but instead fits into the existing statutory structure.

**IV. Implementation**

On August 20, 2020, EPA received a request from the State of Florida to assume administration of the CWA Section 404 program. For Florida and other states and tribes seeking to assume the CWA Section 404 program, EPA intends to engage in a one-time ESA Section 7 programmatic consultation with the Services in connection with the initial review of an assumption request if a

decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or designated critical habitat. To initiate consultation, the Agency will submit a biological evaluation to the Services, which evaluates the potential effects of EPA's potential approval of an assumption request on ESA-listed species, proposed species, designated critical habitat, and proposed critical habitat (50 C.F.R. 402.12). A biological evaluation also considers whether EPA's approval of an assumption request is likely to adversely affect any species or habitat.

For Florida and other states and tribes seeking to assume administration of the CWA Section 404 permitting program, EPA's engagement in a one-time ESA Section 7 programmatic consultation with the Services in connection with the initial review of an assumption application would allow one or both of the Services, as appropriate, to issue a programmatic biological opinion and programmatic incidental take statement for the state or tribal permitting program. The biological opinion and incidental take statement could establish additional procedural requirements and permitting conditions or measures that help ensure the state or tribal permitting program and individual permits issued pursuant to that program, as well as EPA's approval of that program, do not result in jeopardy to any listed species. This process, assuming compliance with any applicable permit conditions or measures, would extend ESA Section 9 liability protections to individual permits issued pursuant to the state or tribal program and place state and tribal CWA Section 404 permitting on equal footing with the Corps' permitting program. This streamlined permitting process would reduce costs and duplication of effort by state or tribal and federal authorities and facilitate more effective and efficient state and tribal CWA Section 404 programs. This programmatic consultation approach will ensure that listed species are protected while avoiding additional ESA Section 10 processes to obtain similar liability protections.

EPA disagrees with the comments stating that EPA's consultation regarding whether to approve or disapprove a request to assume the CWA Section 404 program does not alleviate existing ESA liability related to actions authorized by future state or tribal CWA Section 404 permits. The Services are required, as part of formal consultation, to prepare an incidental take statement if such take is reasonably certain to occur and will not violate ESA Section 7(a)(2). 50 C.F.R. 402.14(g)-(i). If, pursuant to the ESA regulations, the Services provide an incidental take statement, then "any taking which is subject to a statement as specified in [50 C.F.R. 402.14(i)(1)] and which is in compliance with the terms and conditions of that statement is not a prohibited taking under the [ESA], and no other authorization or permit under the [ESA] is required." 50 C.F.R. 402.14(i)(5).

At the individual permit level, the CWA Section 404(b)(1) Guidelines prohibit discharges that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by the Services. See 40 C.F.R. 233.20; 40 C.F.R. 230.10(b)(3). EPA anticipates that states and tribes may develop different program structures and coordination mechanisms to meet these requirements and any conditions of a programmatic incidental take statement, depending on factors such as the structure and expertise of the state and tribal agencies, provisions of state and tribal law, previous coordination among state or tribal and federal agencies, the number of ESA-considered species and extent of critical habitat, and other factors. States and tribes maintain the existing flexibilities in developing their CWA Section 404 programs to meet these requirements.

EPA's determination that CWA Section 404 provides the requisite discretionary involvement or control for the ESA to apply to EPA's approval of a state or tribal CWA Section 404 program does not modify or alter the application of the ESA to other EPA actions not analyzed here, such as actions under the CWA (other than state assumption of CWA Section 404 programs), Safe Drinking Water Act, the



DEPARTMENT OF THE ARMY
OFFICE OF THE ASSISTANT SECRETARY
CIVIL WORKS
108 ARMY PENTAGON
WASHINGTON DC 20310-0108

30 JUL 2018

MEMORANDUM FOR COMMANDING GENERAL, U.S. ARMY CORPS OF ENGINEERS

SUBJECT: Clean Water Act Section 404(g) — Non-Assumable Waters

1. Congress enacted Section 404(g) of the Clean Water Act (CWA) to allow states and tribes to take an active role in the permitting of dredge and fill operations within their jurisdiction of governance, with one exception: the Corps must retain exclusive permitting authority over certain waters. The waters over which the Corps must retain permitting authority, referred to as non-assumable or "retained" waters, are "... those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto ..." 33 U.S.C. § 1344(g). The Corps provides to states and tribes that are seeking to administer a dredge and fill program under CWA Section 404 an identification of these waters over which the Corps would retain authority.

2. In 2015, the Environmental Protection Agency (EPA) established the Assumable Waters Subcommittee within the National Advisory Council for Environmental Policy and Technology (NACEPT) to provide advice and develop recommendations regarding the meaning of Section 404(g) and thus the scope of waters and adjacent wetlands that may be assumed by a state or tribe. The NACEPT Subcommittee issued a Final Report in May 2017.[1] Though many states have shown interest in assuming the Section 404 program, only two states have done so. The Subcommittee report cited a number of possible reasons why so few states have assumed the Section 404 program, one of which may be the difficulty in ascertaining those waters that are retained waters. The Subcommittee noted that this area of uncertainty has stifled the interests of several states in particular in recent years. Further, I have personally heard from state officials who – but for this uncertainty – would pursue Section 404(g) assumption on behalf of their state. While EPA intends to address the Subcommittee report and clarify the waters for which a state or tribe could assume responsibility as well as the procedures related to state assumption under Section 404(g) in a rulemaking process, assumption of the Section 404

---

[1] The Army has not previously taken any formal position on the recommendations contained in this report.

program by states and tribes is not dependent upon and need not await the completion of any such rulemaking..

3. The Subcommittee's majority – formed of all 21 members aside from a Corps technical representative – recommended a policy under which, when a state or tribe program is approved by EPA under Section 404(g), the waters retained within the Corps' permitting authority would be limited to waters regulated under Section 10 of the Rivers and Harbors Act of 1899 (RHA), less those waters that are jurisdictional under the RHA due solely to historical navigability and with the addition of wetlands adjacent to other retained waters.[2] For ease of implementation, the Subcommittee's majority recommended using existing RHA Section 10 lists of waters as a starting point, which could be amended by the Corps as appropriate following consideration of the RHA case law and relevant factors set forth in the RHA Section 10 regulations. The majority also recommended that the agencies clarify that the Corps would retain administrative authority over all wetlands adjacent to retained navigable waters landward to an administrative boundary agreed upon by the state or tribe and the Corps. The majority's discussion provides considerations that may be useful to the state or tribe and the Corps as they evaluate the appropriate administrative boundary suited to the particular circumstances of the state or tribe, including state or tribal regulatory authority, topography, and hydrology.

4. I have reviewed the Subcommittee's findings and recommendations and believe that the majority's recommendations reflect an appropriate apportionment of responsibility between the states and tribes and the Federal government for the regulation of waters under a program administered by a state or tribe pursuant to Section 404(g). In my view, implementing Section 404(g) in this manner adheres to the language of the statute and the intent of Congress when enacting this provision.

5. Therefore, subject to further proceedings by EPA and the Corps, it is appropriate for the Corps to retain the following categories of waters for permitting under Section 404(g) of the Clean Water Act:

a. waters that are jurisdictional under Section 10 of the Rivers and Harbors Act of 1899, *provided that* —

---

[2] The Assumable Waters Subcommittee report noted that the scope of retained waters defined by the parenthetical of Section 404(g)(1) is similar to the scope of Section 10 waters under the RHA, except for the deletion of historical-use-only waters and the addition of adjacent wetlands.

SUBJECT: Clean Water Act Section 404(g) — Non-Assumable Waters

- retained waters include tidal waters shoreward to their mean high water mark, or mean higher high water mark on the west coast, and

- retained waters do not include those waters that qualify as "navigable" solely because they were "used in the past" to transport interstate or foreign commerce; and

b. wetlands adjacent to waters retained under a. above, landward to an administrative boundary agreed upon by the state or tribe and the Corps.

For ease of implementation and to provide transparency to states, tribes and the public, the Corps will use existing RHA Section 10 lists of waters as a starting point, which could be amended by the Corps as appropriate consistent with applicable regulations and case law.

6. Nothing in this memorandum affects the scope of "waters of the United States" under the CWA, as this memorandum addresses only the division of responsibility between the Corps and a state or tribe that assumes the Section 404(g) program. Further, this memorandum is not intended to address future decisions to be made by EPA under Sections 404(g) or 404(h). Any final decisions pertaining to a specific application for state or tribe assumption under 404(g) will be made at a later time and may be made case-by-case to take into account context-specific information. No rights are created and no obligations are imposed through this guidance memorandum.

R. D. James
Assistant Secretary of the Army
(Civil Works)

Resource Conservation and Recovery Act, or other statutes implemented by EPA. For example, there are significant differences in how the CWA Section 402 and 404 programs operate, legally and procedurally, and nothing in this memorandum modifies established precedent and procedures for the NPDES permitting program. Likewise, EPA's determination that EPA has the discretion to consult on CWA Section 404 program approvals does not apply to actions by other federal agencies. EPA and other federal agencies must evaluate each federal activity considering the relevant implementing statute and the relevant factual situations to determine if the ESA consultation requirement attaches.

DAVID ROSS Digitally signed by DAVID ROSS Date: 2020.08.27 13:35:21 -05'00'

David P. Ross, Date
Assistant Administrator