# Exhibit 3



March 31, 2021
*Via Certified Mail*

| | |
|---|---|
| Michael Regan<br>Administrator<br>U.S. Environmental Protection Agency<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460<br>regan.michael@epa.gov | Leopoldo Miranda-Castro<br>Regional Director<br>U.S. Fish and Wildlife Service<br>1875 Century Boulevard, Ste 400<br>Atlanta, GA 30345 |
| John Blevins<br>Acting Administrator, Region 4<br>U.S. Environmental Protection Agency<br>Sam Nunn Atlanta Federal Center<br>61 Forsyth Street, SW<br>Atlanta, GA 30303-8960<br>blevins.john@epa.gov | Gina Raimondo<br>Secretary<br>Department of Commerce<br>1401 Constitution Avenue, N.W., Rm 50003<br>Washington, D.C. 20230<br>secyraimondo@doc.gov |
| Deb Haaland<br>Secretary<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C. 20240 | Paul Doremus<br>Assistant Administrator<br>NOAA, Fisheries Directorate<br>1315 East-West Highway, 14th Floor<br>Silver Spring, MD 20910<br>paul.n.doremus@noaa.gov |
| Martha Williams<br>Principal Deputy Director<br>U.S. Fish and Wildlife Service<br>Main Interior<br>1849 C Street NW, Rm 3331<br>Washington, D.C. 20240-0001 | Noah Valenstein<br>Secretary<br>FL Department of Environmental Protection<br>3900 Commonwealth Blvd., M.S. 49<br>Tallahassee, FL 32399<br>noah.valenstein@dep.state.fl.us |

> **RE:** **60-Day Notice of Intent to Sue for Violations of the Endangered Species Act in Connection with EPA's Approval of Florida's Assumption of CWA 404 Permitting**

This letter serves as a 60-day notice of the Center for Biological Diversity's, Defenders of Wildlife's, Sierra Club's, Conservancy of Southwest Florida's, Florida Wildlife Federation's, Miami Waterkeeper's, and St. Johns Riverkeeper's intent to sue the Environmental Protection Agency ("EPA") for violation of the Endangered Species Act ("ESA") in connection with its approval of the Florida Department of Environmental Protection's ("FDEP") assumption of the administration of the dredge and fill permitting program under section 404 of the Clean Water Act. EPA's violations arise from its failure to comply with the substantive and procedural

requirements of section 7 of the ESA, as well as the prohibition on "take" of listed species in section 9, in approving the assumption. 16 U.S.C. §§ 1536, 1538. This letter constitutes notice required by the ESA, 16 U.S.C. § 1540(g)(2)(A)(i), prior to commencement of legal action.

I.  THE ENDANGERED SPECIES ACT

Congress enacted the ESA in 1973 to provide for the conservation of endangered and threatened fish, wildlife, plants, and their natural habitats. 16 U.S.C. § 1531.[1] The ESA imposes substantive and procedural obligations on all federal agencies with regard to species that are listed or proposed for listing under the Act, as well as their critical habitats. *See id*. §§ 1536(a)(1), (a)(2), (a)(4), 1538(a); 50 C.F.R. § 402.01.

Section 7 of the ESA and its implementing regulations require each federal agency, in consultation with the appropriate wildlife agency—the U.S. Fish and Wildlife Service ("FWS") and/or National Marine Fisheries Service ("NMFS")—to insure that any action authorized, funded, or carried out by the agency is not likely to (1) jeopardize the continued existence of any threatened or endangered species or (2) result in the destruction or adverse modification of the critical habitat of such species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). "Action" is defined broadly to encompass "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02. "Jeopardize the continued existence of" is defined by regulation as engaging in an action that "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. The obligation to "insure" against a likelihood of jeopardy or adverse modification requires agencies to give the benefit of the doubt to endangered species and to place the burden of risk and uncertainty on the proposed management action. *See Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987) (citing *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 174-184 (1978)). The substantive duty imposed by section 7(a)(2) is constant, relieved only by an exemption from the Endangered Species Committee. 16 U.S.C. § 1536(h).

For each federal action, the federal action agency—here, EPA—must request from the wildlife agencies a list of any species listed or proposed for listing under the ESA that may be present in the area of the agency action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. "Action area" is defined by regulation to be broader than simply the project area: it means "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02.

---

[1] Congress defined "conservation" as "the use of *all* methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the Act] are no longer necessary." *Id*. § 1532(3) (emphasis added).

2

Section 7 requires an action agency to engage in formal or informal consultation when it determines that its proposed action "may affect" listed species or critical habitat. *Id.* §§ 402.13, 402.14. "The minimum threshold for an agency action to trigger consultation with [the wildlife agencies] is low . . . ." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011). "*Any possible* effect, whether *beneficial*, benign, adverse or of an undetermined character, triggers the formal consultation requirement . . . ." 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) (emphases added); *see also* U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook*, at xvi (1998) ("May affect [is] the appropriate conclusion when a proposed action may pose *any* effects on listed species or designated critical habitat."). Effects determinations must be based on the sum of *all* effects caused by the action. 50 C.F.R. § 402.02 (defining "effects of the action."). An action agency is not obligated to consult with the wildlife agencies *only* if the action agency properly determines that its proposed action will have no effect on listed species or critical habitats. *Id.* § 402.14. Both the action agency and the wildlife agency must "use the best scientific and commercial data available" in evaluating the action's effects. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d), (g)(8).

If an action may affect a listed species or critical habitat, the action agency must either engage in formal consultation or obtain the wildlife agency's written concurrence that the action is not likely to adversely affect listed species or critical habitat. 50 C.F.R. §§ 402.13(a), 402.14. Formal consultation concludes in the issuance of a biological opinion that determines whether the action is likely to jeopardize the continued existence of the listed species and/or adversely modify or destroy critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h). Jeopardy exists if an action reasonably would be expected, directly or indirectly, to appreciably reduce the likelihood of the survival or recovery of a listed species in the wild. 50 C.F.R. § 402.02. "[D]estruction or adverse modification of critical habitat" is any "direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

The action agency also has a mandatory duty to confer with wildlife agencies on any actions that are "likely to jeopardize the continued existence of any proposed species or result in the destruction or adverse modification of proposed critical habitat." *Id.* § 402.10(a). The conference process "is designed to assist the Federal agency and any applicant in identifying and resolving potential conflicts at an early stage in the planning process." *Id.*

Section 7 of the ESA requires that a biological opinion "detail[] how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(h)(1)(ii), (iii). The wildlife agency must, in the biological opinion: 1) evaluate the current status and environmental baseline of affected species and critical habitats, 2) assess the effects of the action and cumulative effects on those species and habitats, and 3) analyze whether the effects of the action, when added to the environmental baseline together with any cumulative effects, is likely to jeopardize the continued existence of the species or adversely modify their critical habitats. 50 C.F.R. § 402.14(g). If the wildlife agency concludes that the proposed action is likely to jeopardize the species, it must specify reasonable and prudent

3

alternatives that would avoid the likelihood of jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

The ESA requires the wildlife agency to provide an incidental take statement with the biological opinion when the agency anticipates that incidental taking of a threatened or endangered species will occur. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).[2] This requirement applies even if take of the species is not prohibited by statute or regulation. *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 910–11 (9th Cir. 2012). The statement must specify the permissible level of taking. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i). Where the agency establishes that it cannot numerically quantify take, the statement may employ a "surrogate" to express the amount of take, but the surrogate must include "a clear standard for determining when the level of anticipated take has been exceeded." 50 C.F.R. § 402.14(i)(1)(i).

An incidental take statement serves as a check on the biological opinion's assumptions and conclusions, and provides for monitoring. 50 C.F.R. § 402.14(i)(3); *see also Salazar*, 695 F.3d at 911 (explaining purpose of ITS is to "serve[] as a check on the agency's original decision that the incidental take of listed species resulting from the proposed action will not [jeopardize the continued existence of the species]" (second alteration in original) (citation omitted)). The amount of take set out in the incidental take statement acts as a trigger that, if exceeded, invalidates the safe harbor, and requires the agencies to immediately reinitiate consultation. 50 C.F.R. § 402.14(i)(4). In addition, the incidental take statement must specify reasonable and prudent measures that the wildlife agency considers necessary or appropriate to minimize the effects of take, as well as reporting requirements and other terms and conditions with which the action agency must comply in order to implement the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4)(B); 50 C.F.R. § 402.14(i)(1).

Once the action agency has initiated consultation, section 7(d) prohibits it from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" which would avoid violating ESA section 7(a)(2). 16 U.S.C. § 1536(d); 50 C.F.R. § 402.09. This prohibition is not an exception to the requirements of section 7(a)(2); it is in addition to the requirements of section 7(a)(2) and ensures that section 7(a)(2)'s substantive mandate is met. *See, e.g., Pac. Rivers*, 30 F.3d at 1056–57 & n.14; *Defs. of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 113 (D.D.C. 2011). This prohibition remains in effect until the procedural requirements of section 7(a)(2) are satisfied. 50 C.F.R. § 402.09.

---

[2] Section 9 of the ESA prohibits "take" of endangered species by any person, which includes federal agencies. 16 U.S.C. § 1538(a)(1). "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." *Id.* § 1532(19). FWS and NMFS have extended take prohibitions by regulation to most threatened species under their respective jurisdictions. *See* 50 C.F.R. § 17.31(a).

4

Congress established the section 7 consultation process explicitly "to ensure compliance with the [ESA's] substantive provisions." *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985) ("The ESA's procedural requirements call for a systematic determination of the effects of a federal project on endangered species. If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result."); *see also Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2005) ("The purpose of the consultation process . . . is to prevent later substantive violations of the ESA."); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1056–57 (9th Cir. 1994) ("Only after the [agency] complies with § 7(a)(2) can any activity that may affect the protected [species] go forward."). Therefore, until EPA completes the necessary consultation(s), it is out of compliance with both its procedural and substantive section 7(a)(2) obligations.

Even after the procedural requirements of a consultation are complete, however, the ultimate duty to ensure that an activity does not jeopardize a listed species lies with the action agency. An action agency's reliance on an inadequate, incomplete, or flawed biological opinion to satisfy its duty to avoid jeopardy is arbitrary and capricious. *See, e.g.*, *Pyramid Lake Tribe of Indians v. U.S. Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990); *Stop H-3 Ass'n. v. Dole*, 740 F.2d 1442, 1460 (9th Cir. 1984). Compliance with the biological opinion and its incidental take statement protects federal agencies, and others acting under the biological opinion, from enforcement action under section 9's prohibition against take;[3] however, take not in compliance with a biological opinion or absent a valid take statement is in violation of section 9 of the ESA. Thus, the substantive duty not to jeopardize listed species (or adversely modify critical habitat) remains in effect regardless of the status of the consultation.

II.     BACKGROUND

   A.     EPA'S Approval of Florida's Assumption of CWA 404 Permitting

On August 20, 2020, EPA received an application from Florida requesting to assume the administration of the Clean Water Act's dredge and fill permitting program. Under the assumption, the Florida Department of Environmental Protection ("FDEP") would be responsible for permitting dredge and fill activities in all Waters of the United States ("WOTUS") in the State that are not retained by the U.S. Army Corps of Engineers. The Corps would retain permitting authority in tidal waters and adjacent wetlands within a 300-foot administrative boundary.

Dredging and filling in rivers, lakes, wetlands, and other WOTUS affects the environment and species not only in the immediate area, but also in upland and downstream areas. EPA accordingly recognized that it has a duty to complete ESA section 7 consultation on the effects that the 404 permitting program may have on protected species and critical habitats.[4]

---

[3] 16 U.S.C. §§ 1536(o)(2); 1538(a); 50 C.F.R. § 17.31(a).

[4] *See, e.g.*, U.S. Envtl. Prot. Agency, *ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida* (Aug. 2020) [hereinafter BE].

On November 22, 2019, FDEP sent a request to FWS and NMFS for input on a draft species list for Florida's assumption of the 404 Program. NMFS sent FDEP a response on April 15, 2020, stating that ESA-listed species under NMFS' jurisdiction "do not occur *in* waters that are assumable by the state."[5] On September 2, 2020, based on NMFS' April 15 jurisdictional determination, EPA determined that Florida's assumption of the 404 Program would have no effect on listed species under NMFS' jurisdiction. On September 3, 2020, NMFS concurred with EPA's determination—still premised on NMFS' jurisdictional determination.

EPA submitted its biological evaluation ("BE") to FWS and initiated formal consultation on September 2, 2020. EPA's BE found that Florida's assumption is "likely to adversely affect" 164 species under FWS' jurisdiction, is "not likely to adversely affect" 9 species (red wolf, gray bat, little brown bat, Indiana bat, Key Largo cotton mouse, whooping crane, Georgia blind salamander, bigcheek cave crayfish, and Ocala vetch), and would have "no effect" on 60 species.[6] Notably, EPA found the action would have "no effect" on shortnose sturgeon, Gulf sturgeon, or Atlantic sturgeon[7]— despite EPA's own comment that "the action could result in a [likely to adversely affect] determination" for shortnose sturgeon,[8] and NMFS' statement that all three species occur in Florida's rivers (and that critical habitat for Gulf sturgeon is designated in several Florida rivers).[9] EPA noted that critical habitat is designated for nearly 40 potentially affected species,[10] but did not map where critical habitat may exist within the action area or make any effects determinations for critical habitats.[11]

Just one month after EPA initiated formal consultation, FWS sent EPA its draft biological opinion on the proposed action. FWS issued a final biological opinion ("BiOp") shortly thereafter, on November 17, 2020. The BiOp purports to address the 235 species that EPA identified as being potentially affected in its BE.[12] FWS makes a cursory statement, with no analysis, that it "concurs with and adopts" EPA's list of species and "respective effect

---

[5] Letter from Cathryn E. Tortorici, Chief, ESA Interagency Cooperation Division, Office of Protected Resources, NMFS to Heather Mason, PWS, Environmental Administrator, Submerged Lands and Environmental Resources Coordination, FDEP (Apr. 15, 2020) [hereinafter NMFS letter].

[6] BE at 252–177 (Table C.1.b). Due to an apparent error in page numbering in the BE's footer, all BE citations in this letter are to the PDF page number.

[7] *Id.* at 260.

[8] *Id.*

[9] NMFS letter.

[10] BE at 39–51 (Table 3-1).

[11] *Id.* at 52.

[12] BiOp at 45. Table C.1.b in the BE only lists 233 species, however.

determinations."[13] FWS claims it is "not possible" to detail the effects of the action, so only "briefly summarizes major categories of impacts"—*i.e.*, biotic stressors, physical stressors, and physiochemical water quality stressors.[14] FWS also claims "it is not feasible, nor is it required, to conduct a meaningful . . . species-specific effects analysis in this BiOp."[15] FWS accordingly refers to a generic table of potential effects on listed species and offers a vague summary of effects that could occur to taxonomic groups (not to individual species).[16]

FWS concludes the approval of the proposed assumption "is not likely to jeopardize the continued existence of ESA-listed species [] identified in this BiOp and is not likely to destroy or adversely modify designated critical habitat identified in this BiOp."[17] This conclusion is based not on any analysis of effects to species, but rather on FWS' assumption that the technical assistance process detailed in the BiOp, and authorized by a Memorandum of Understanding ("MOU") between state and federal agencies, will provide a process to avoid jeopardy and adverse modification from individual fill and dredge permits in the future.[18] The MOU however does not require FWS to review, more less comment on, any permit and instead defers all meaningful analysis to the state.[19] Moreover, FWS' consideration of the likelihood of jeopardy or adverse modification from the issuance of individual permits does not assess the likelihood of jeopardy or adverse modification from the entire action under consultation—assumed authority for *all* dredge and fill permits.

The BiOp also includes an Incidental Take Statement ("ITS") that fails to quantify likely incidental take or specify the impacts such taking will have on affected species.[20] Rather, FWS asserts the information in the BE "did not allow [FWS] to . . . estimate the number of individuals that might be affected by the permitted activities."[21] FWS claims that will be provided information later, after the conclusion of this consultation, which may allow it in coordination with the state agencies to estimate incidental take on a project-specific basis.[22] FWS does not state that such information would allow it to estimate the *total* incidental take from EPA's action. FWS notes that it will "track the levels of take estimated through the technical assistance

---

[13] *Id.* Although 235 species are listed as "potentially affected species" in EPA's BE Table 3-1, only 233 species were included in EPA's determination list in Table C.1.b (Effects of the Action on ESA-listed Species).

[14] *Id.* at 57–58.

[15] *Id.* at 54.

[16] *Id.* at 57–65.

[17] *Id.* at 68.

[18] *Id.* at 68–69

[19] Memorandum of Understanding between Fla. Fish & Wildlife Conservation Comm'n, U.S. Fish & Wildlife Servs., & the Fla. Dep't of Env't Prot., Nov. 16, 2020.

[20] *Id.* at 69–73.

[21] *Id.* at 69; *see also id.* at 70 (asserting FWS cannot "accurately estimate the specific amount of incidental take at this time that is anticipated to occur as a result of the action.").

[22] *Id.* at 70.

7

process" on an ongoing basis, but does not explain how it will estimate take numbers (or surrogates), how it will analyze cumulative effects, how it will analyze whether projects jeopardize species or destroy critical habitat, or indicate what it will do with that information.[23] The ITS includes no incidental take limit that would trigger reinitiation of consultation if exceeded.[24] Yet FWS states that "[i]ncidental take exemption will be afforded to EPA when its approval of the State's assumption [of 404 permitting] is carried out"—*before* FWS even receives information on project-specific incidental take.[25]

### B.    Listed Species and Designated Critical Habitats

EPA's approval of Florida's assumption may affect hundreds of terrestrial, aquatic, and avian species and critical habitats protected under the ESA. Dredge and fill of the assumed waters can affect and cause harm to species and habitats under FWS' jurisdiction, as well as marine and coastal species and habitats under NMFS' jurisdiction.

EPA's BE identifies 235 potentially affected species under FWS' jurisdiction, and notes that critical habitat has been designated for 40 of those species. However, neither the BE nor BiOp includes nesting sea turtles, which fall under FWS' jurisdiction. FWS explains that dredge and fill activities in assumed waters can have direct and indirect effects on species that inhabit Florida's beaches.[26] Those activities can similarly affect sea turtles that nest on those beaches (loggerhead, green, leatherback, hawksbill, and Kemp's ridley sea turtles), most considerably by causing coastal development that eliminates nesting habitat and disrupts nesting behavior through lighting and other disturbances.[27]

Dredge and fill activities also may affect sturgeon while they are in freshwater (when they are under FWS' jurisdiction), as well as Atlantic sturgeon critical habitat in the St. Marys River. Despite EPA's determination that the action will have "no effect" on the Florida's three ESA-listed sturgeon species, FWS acknowledges that "sedimentation, water quality degradation, and to a lesser extent direct habitat loss are potential effects."[28]

---

[23] *Id.*

[24] *See id.* at 73 (referring to 50 C.F.R. § 402.16 take exceedance reinitiation requirement in context of individual permits).

[25] *Id.* at 70.

[26] *Id.* at 60.

[27] *See id.* at 59 ("Dredge and fill activities are also frequently associated with coastal development.").

[28] *Id.* at 63.

Moreover, the effects of the approval are not limited to only the assumed waters. The action area also includes indirectly affected habitats.[29] In particular, dredge and fill in assumed waters can affect downstream estuarine, marine, and tidal waters and the species that inhabit them.[30] For example, these activities can increase sedimentation and turbidity, change water temperature, resuspend and transport pollutants, alter water flows (temporally, spatially, and by magnitude), and increase or change nutrient runoff.[31] As a result, marine and coastal habitats may experience more frequent and/or widespread red tide events, changes to salinity or bathymetry, loss of seagrass and other aquatic vegetation, changes in nutrient deposition, and higher contaminant loads. Dredge and fill activities in upstream habitats can also alter food webs that provide prey for marine and coastal species.

Dozens of ESA-protected species and critical habitats (under NMFS' jurisdiction) are found in Florida's bays, lagoons, inlets, and other intertidal, neritic, and nearshore oceanic environments and may be affected by impacts from dredge and fill in assumed waters. These include the threatened loggerhead sea turtle, the threatened green sea turtle, the endangered Kemp's ridley sea turtle, the endangered leatherback sea turtle, the endangered hawksbill sea turtle, the threatened giant manta ray, the threatened Nassau grouper, the endangered smalltooth sawfish, the endangered shortnose sturgeon, the endangered Atlantic sturgeon, and the threatened Gulf sturgeon. Dredge and fill activities can also affect the ESA-protected Johnson's seagrass and elkhorn, staghorn, boulder star, mountainous star, lobed star, rough cactus, and pillar corals in Florida's waters. Critical habitat along the Florida coast for the loggerhead sea turtle, smalltooth sawfish, elkhorn coral, staghorn coral, and Johnson's seagrass also may be affected by dredge and fill activities in assumed waters. Yet the BE does not address effects to these species or critical habitats.

III.     NOTICE OF VIOLATION OF ESA SECTION 7, 16 U.S.C. § 1536(A)(2)

EPA's approval of FDEP's assumption of CWA 404 permitting authority violates the agency's procedural and substantive obligations under ESA section 7(a)(2) and its implementing regulations. 16 U.S.C. § 1536(a)(2). EPA's approval is an "action" under ESA section 7. *See* 50 C.F.R. § 402.02. ESA section 7 requires EPA to complete consultation if its action "may affect" listed species or critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.02,

---

[29] *Cf. id.* at 38 ("The action area consists of, and is limited to, the State-assumed waters (assumed waters) *and areas affected directly or indirectly* by the action, including affected upland, terrestrial areas. (emphasis added).

[30] *See, e.g.*, BiOp at 42 (explaining how "freshwater eventually makes its way to the nearly 2,000 miles of Florida coastline and marine ecosystem"); BE at 58 (Fig. 4-1 – Historic freshwater flows compared to freshwater flows after C&SF Project), 256 (describing adverse impacts to coastal and marine birds).

[31] *See, e.g.,* BiOp at 61 ("Permitted activities may also result in changes to hydrologic regimes and water quality in coastal areas."); BE at 256 (stating action could cause "[i]mpacts to habitat, hydrology, and water quality" affecting birds in coastal and marine habitats).

402.13, 402.14.  EPA is not in compliance with this duty until the required consultation has been *completed*, and a legally valid biological opinion has been produced.  *See* 16 U.S.C. § 1536(b); *Pac. Rivers Council*, 30 F.3d at 1056–57; *Stop H-3*, 740 F.2d at 1460.

EPA's approval may affect several species and critical habitats on which EPA failed to consult.  And EPA has failed to satisfy its section 7 duties for the species on which it did consult because the BiOp on which EPA relies is arbitrary and capricious and contrary to law.  In addition, EPA's reliance on the MOU between FDEP, FWCC, and FWS constitutes an unlawful delegation of EPA's section 7 duties, in violation of the ESA.  The BiOp states that the FWS' actions in reviewing and prescribing protective measures is not an action subject to the ESA.  However, since avoiding jeopardy and adverse modification of critical habitat hinges entirely on the content of those measures, FWS' actions are federal actions and must comport with the ESA consultation and substantive requirements.  In taking these actions, EPA is also violating section 7(d) of the ESA.

> A. <u>Unlawful No Effect Determination on Species and Critical Habitats under NMFS' Jurisdiction</u>

EPA failed to lawfully consider the effects the approval may have on ESA-protected species and critical habitats under NMFS' jurisdiction and arbitrarily assumed the approval would have "no effect" on such species in violation of its obligations under ESA section 7.[32]

EPA's no effect determination appears to be based on finding that "ESA-listed species under NMFS' jurisdiction do not occur *in* waters that are assumable by the state" (emphasis added) as stated in NMFS' April 15, 2020 letter.[33]  However, the ESA places an independent duty on EPA to ensure that its action will not jeopardize species or adversely modify critical habitat, wherever the species or habitat may be located.

ESA section 7(a)(2) consultation must occur for species and critical habitat that are in the "action area" and "action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action."  50 C.F.R. 402.02(d).

NMFS' April letter however was solely based on an action area that consisted of "assumed" waters.  To the contrary, the "action area" is not limited to the assumed waters; it also includes areas that would be indirectly impacted by the Federal action, like waters downstream of assumed waters.  EPA therefore failed to consider, much less analyze, all areas that would be affected directly or indirectly, as required under federal law.  See 16 U.S.C. 1536(a)(2); 50 C.F.R. § 402.02(d).

---

[32] BE at 35.
[33] NMFS letter.

There is ample evidence that the approval may affect NMFS jurisdictional species and habitats, as explained above.[34] The undersigned and other members of the public also submitted comments on the proposed approval identifying EPA's duty to consult on species under NMFS' jurisdiction and setting forth facts on effects to protected species that could result from the proposed approval.[35]

EPA is required by ESA section 7(a)(2) to initiate and complete consultation with NMFS to insure the state's assumption will not jeopardize the continued existence of ESA-listed loggerhead sea turtles, green sea turtles, Kemp's ridley sea turtles, leatherback sea turtles, hawksbill sea turtles, giant manta rays, Nassau grouper, smalltooth sawfish, shortnose sturgeon, Atlantic sturgeon, Gulf sturgeon, Johnson's seagrass, elkhorn coral, staghorn coral, boulder star coral, mountainous star coral, lobed star coral, rough cactus coral, or pillar coral, or adversely modify or destroy designated critical habitat for the loggerhead sea turtle, smalltooth sawfish, elkhorn coral, staghorn coral, or Johnson's seagrass. EPA has not done so, therefore is in violation of the ESA and its implementing regulations.

B.  Failure to Properly Consult on Certain Species under FWS' Jurisdiction

EPA did not consider or make an effects determination for ESA-listed sea turtles that nest on Florida's beaches, and accordingly did not consult with FWS on the effects the approval may have on those sea turtles. In addition, EPA made arbitrary "no effect" determinations that are not based on the best available science for several other species under FWS' jurisdiction, so failed to consult on those species. EPA also failed to obtain FWS' written concurrence for most of its determinations that the action is not likely to adversely affect certain species. Finally, EPA did not make effects determinations or complete consultation on critical habitats under FWS' jurisdiction that may be affected by the approval. EPA's failure to complete consultation on these FWS jurisdictional species and habitats violates EPA's procedural and substantive obligations under ESA section 7.

As described above, dredge and fill activities in assumed waters may affect nesting sea turtles in various ways. EPA therefore was required to consult with FWS on those effects, but did not.

There is also ample evidence that dredge and fill activities in assumed waters may affect listed sturgeon that are found in Florida rivers. EPA appears to acknowledge the effects in its BE, but irrationally determined the proposed action would have "no effect" on shortnose sturgeon, Atlantic sturgeon, or Gulf sturgeon. EPA's "no effect" determination for smalltooth sawfish similarly disregards "[i]mpacts to aquatic habitat, hydrology, and water quality" that

---

[34] *See also* BE at 255–58 (finding action is likely to adversely affect several species that inhabit the same coastal waters as NMFS jurisdictional species).

[35] Letter from Tania Galloni et. al, to Kelly Laylock, EPA, Nov. 2, 2020.

11

dredge and fill activities may cause.[36] The possible effects on these species (as well as Atlantic sturgeon critical habitat in the St. Marys River) make EPA's "no effect" determinations arbitrary and capricious, and require EPA to complete consultation with FWS. EPA failed to do so.

For the same reasons that EPA's approval may affect marine and coastal species under NMFS' jurisdiction (as described above), it may affect the black-capped petrel. EPA notes the species is found "in relatively shallow waters near shore,"[37] where indirect effects are likely. EPA's determination that its approval will have "no effect" on the species is thus arbitrary and capricious. EPA is required to complete consultation with FWS on the petrel, but has not done so.

EPA failed to obtain FWS' written concurrence for its "not likely to adversely affect" determinations for eight species: the gray bat, little brown bat, Indiana bat, Key Largo cotton mouse, whooping crane, Georgia blind salamander, bigcheek cave crayfish, and Ocala vetch. While FWS expressly concurred with EPA's not likely to adversely affect determination for the red wolf,[38] it issued no similar concurrences for the other species.[39] Rather, the BiOp indicates that several of these species *are* likely to be adversely affected. For example, it states that mice in tropical hardwood hammock/mangrove habitats (where the Key Largo cotton mouse is found) are "likely to be impacted."[40] FWS also states that "water quality degradation, and both chemical and from sedimentation [*sic*], could have adverse effects" on cave-dwelling amphibians[41]—*e.g.*, the Georgia blind salamander. And it lists adverse effects likely to occur to crustaceans in caves, wells, or sinkhole habitats[42]—*e.g.*, bigcheek cave crayfish. Without FWS' proper written concurrence, EPA's "not likely to adversely affect" determinations for these species are not final and cannot satisfy its section 7 consultation duties. EPA therefore has failed to complete consultation as required for these eight species.

Finally, the BE notes that critical habitat has been designated for 40 potentially affected species. Dredge and fill activities in assumed waters may affect these critical habitats, including but not limited to critical habitat for the Everglades snail kite, smalltooth sawfish, and Florida manatee and proposed critical habitat for the Florida bonneted bat. EPA therefore is required to consult with FWS on the effects the approval may have on critical habitats for these species. Yet

---

[36] BE at 260.

[37] *Id.* at 257.

[38] *See* BiOp at 59.

[39] The BiOp contains a statement that some bats that occur in limestone karst caves are unlikely to be adversely affected because they "are rare/unlikely to occur in the state." *Id.* at 60. But it is unclear to which species this statement refers. The BE indicates that the gray bat does occur in the Panhandle, and that the little brown bat is "occasionally detected" in Florida, so the BiOp's statement is inapplicable to at least those two species. BE at 252–53.

[40] BiOp at 59.

[41] *Id.* at 62; *see also id.* at 64 (listing adverse impacts to crustaceans cave-dwelling).

[42] *Id.* at 64.

EPA apparently did not make effect determinations for or consult with FWS on these critical habitats.

EPA is required by ESA section 7(a)(2) to initiate and complete consultation with FWS to insure the Assumption will not jeopardize the continued existence of ESA-listed loggerhead sea turtles, green sea turtles, Kemp's ridley sea turtles, leatherback sea turtles, hawksbill sea turtles, shortnose sturgeon, Atlantic sturgeon, or Gulf sturgeon, or adversely modify or destroy designated critical habitat for Atlantic sturgeon, Florida manatees, or other species identified in BE Table 3-1. EPA has not done so, therefore is in violation of the ESA and its implementing regulations.

        C.      <u>Reliance on Inadequate and Legally Flawed Biological Opinion</u>

EPA has failed to comply with its duty to insure against jeopardy or adverse modification for the species and critical habitats covered by FWS' BiOp because the BiOp is arbitrary and capricious and contrary to law. FWS concluded in the BiOp that FDEP's assumption of CWA section 404 permitting would not jeopardize the survival or recovery of 235 species identified in Appendix C of EPA's BE. The BiOp is arbitrary, capricious, and contrary to law for several reasons.

First, FWS did not adequately describe or analyze the effects of action, as required by the ESA and its implementing regulations. Section 7 of the ESA requires that a biological opinion "detail[] how the agency action affects the species or its critical habitat."[43] The ESA's implementing regulations specify that a biological opinion must include: "A detailed discussion of the environmental baseline of the listed species and critical habitat [and] [a] detailed discussion of the effects of the action on listed species or critical habitat."[44] The BiOp provides only vague information on the environmental baseline and the proposed action's effects on the more than 200 species it purports to assess—it does not come close to providing the detail required by law. In the BiOp's effects section, FWS simply cites a table from EPA's BE that contains cursory acknowledgements that the proposed action is likely to adversely affect 163 species.[45] Nowhere in the BiOp or BE does FWS or EPA, respectively, provide any detail on the type or magnitude of effects the action may have on any particular species. Rather, FWS states it cannot and will not detail or analyze "species-specific effects."[46] That fails to satisfy the ESA's mandate to detail how the agency action affects species.

Second, and relatedly, FWS made a blanket "no jeopardy" determination for hundreds of species in one fell swoop, without offering any species-specific support or rationale.[47] FWS

---

[43] 16 U.S.C. § 1536(b)(3)(A).

[44] 50 C.F.R. § 402.14(h)(1)(ii), (iii).

[45] BiOp at 45.

[46] *Id.* at 54, 57–58.

[47] BiOp at 68.

13

did not attempt to conduct any jeopardy analysis for any given species, nor could it given its refusal to assess the species-specific effects of the action. FWS' hollow, blanket jeopardy "analysis" fails employ the best available science or otherwise comply with the ESA.[48]

Third, FWS' reliance on the technical assistance process laid out in the BiOp and MOU in making its no jeopardy determination violates the ESA's consultation requirements. In addition to unlawfully delegating ESA duties from the action agency, as described below, the MOU authorizes a process that does not allow the agencies to assess whether the federal action—EPA's approval of FDEP's CWA section 404 assumption—may jeopardize listed species or adversely modify critical habitat. Both the MOU and BiOp set the scale of the jeopardy analysis at the individual 404 permit-level, *not* the federal action level. Assessing jeopardy in such a piecemeal, segmented way unlawfully prevents an assessment of whether the entire federal action may jeopardize listed species or adversely modify critical habitat. There is no indication that FWS or EPA will at any point in the future consider whether the cumulative effects of all individual permits issued under the MOU (the effect of the agency action) may jeopardize any species or adversely modify critical habitat. Even if they did, that would be inadequate to satisfy the requirement to insure against jeopardy *before* the federal agency acts.[49] By relying on the MOU, FWS' no jeopardy determination is arbitrary and capricious and contrary to law.

Fourth, the ITS in the BiOp is arbitrary and capricious and contrary to law. The ITS must quantify likely incidental take and specify the impacts such taking will have on affected species.[50] It must include a rational take trigger and this trigger cannot be an amount of take that causes jeopardy.[51] The amount of take authorized may not be coextensive with the scope of the agency action because such a take limit will not serve as a check on the assumptions underlying the no-jeopardy conclusion or a trigger for reinitiation of consultation.[52] FWS expressly declines to quantify any amount of expected incidental take or specify the impacts of such taking on any species.[53] It does not attempt to set a surrogate to measure or limit take. It thus establishes no limit on the allowable amount of take that the delegation will cause. And it fails to set any rational take trigger for reinitiating consultation.[54]

FWS' apparent reliance on the MOU process (which is not a section 7 consultation) to quantify take in the future is likewise unlawful.[55] FWS' regulations detailing consultation on programmatic action explain that an ITS is not required at the programmatic level because any

---

[48] 16 U.S.C. § 1536(a)(2), (b).

[49] *See Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1056–57 (9th Cir. 1994).

[50] 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i).

[51] 50 C.F.R. § 402.14(i)(4); *Salazar*, 695 F.3d at 911.

[52] *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1038–41 (9th Cir. 2007).

[53] BiOp at 70.

[54] *See id.* at 73.

[55] *See* 50 C.F.R. § 402.14(i)(6) (permitting deferral of ITS requirements *only* if those requirements "will be addressed in subsequent section 7 consultation").

incidental take resulting from any subsequent action under that program "will be addressed in subsequent section 7 *consultation*."[56] According to EPA, the subsequent actions under the program, i.e. assumption, will explicitly not be addressed in subsequent consultation, but instead will go through a "coordination process . . . that is similar" to section 7 consultation.[57] Therefore, FWS is not following its own regulations regarding programmatic consultation.

The ITS also must include adequate measures to minimize take and must compel federal agencies and applicants to implement such measures.[58] The ITS, however, relies on a *future* process to minimize take, which lacks sideboards to ensure that the take will not cause jeopardy or be at odds with the biological opinion's assumptions and conclusions. It provides EPA take coverage once the CWA delegation is approved without requiring EPA to implement ESA take minimization measures. It also appears to provide permittees conditional take coverage if they comply with all permit conditions that minimize take. The nature and adequacy of such conditions is not yet known, however, so FWS lacks a reasoned basis for determining the permits and permittee actions in compliance with them will not result in an unacceptable amount of take. Accordingly, the ITS fails to specify or require the reasonable and prudent measures necessary to minimize take, or ensure that such measures are adequate. The ITS fails to comply with the requirements of the ESA and its implementing regulations, and, accordingly, the BiOp is invalid because it lacks a valid ITS.[59]

The substantive goal of consultation under ESA section 7(a)(2) is to ensure that federal actions do not jeopardize the continued existence of listed species or adversely modify critical habitat. Federal agencies may not take action that could harm a listed species until they have completed the ESA section 7(a)(2) consultation process and have received a *valid* biological opinion. The BiOp is not valid for the reasons described above, so EPA may not rely on this document to conclude that its actions will avoid jeopardy or to satisfy its procedural duties under the ESA. Under these circumstances, the ESA requires that EPA avoid any action that causes harm to listed species or designated critical habitat pending compliance with the procedural requirements of section 7(a)(2). By approving FDEP's assumption request, EPA is in violation of section 7(a)(2).

    D.    <u>Unlawful Delegation of ESA Section 7 Obligations</u>

Section 7(a) of the ESA places the duty on EPA to determine what effects a state's assumption of the 404 program may have on listed species and their critical habitats and to ensure its action (approval of state assumption) will not jeopardize the continued existence of listed species.[60] The FDEP, USFWS and FWCC MOU lays out a process whereby the EPA will

---

[56] *Id.* (emphasis added).
[57] MOU at 4.
[58] *Id.* § 402.14(i)(1)(ii), (iv).
[59] 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).
[60] 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

15

rely on a then-future, abridged programmatic biological opinion that merely instructs FDEP and FWCC to determine at the project level if an activity may affect listed species or critical habitat, determine whether there will be jeopardy, and determine what conditions may be necessary to ensure no jeopardy. However, these determinations must be made by the federal action agency in consultation with the federal wildlife agencies.[61]

The MOU makes FWS' oversight of future permits only limited and discretionary. EPA's effective delegation of its section 7(a)(2) obligations to state agencies through the MOU is arbitrary and capricious and violates the ESA. Moreover, there is no factual basis to make a no jeopardy finding in light of Florida's track record regarding the protection of listed species.[62] Indeed, the approval of the MOU itself which memorializes FWS' action of creating a new technical assistance process intended to supplant section 7 consultation, is itself FWS agency action subject to consultation. It does not appear FWS has conducted the necessary intra-agency consultation on the MOU.

EPA's effective delegation of its section 7(a)(2) obligations to state agencies through the MOU is also arbitrary and capricious and violates the ESA.

Under this scheme, avoiding jeopardy and adverse modification of critical habitat will depend entirely on the content of FWS' review of projects and its proposed protective measures. Neither the delegation nor the BiOp establishes binding standards for such measures. The BiOp states that FWS' review and protective measures are not actions subject to section 7 of the ESA, which purports to divorce FWS' actions from the substantive jeopardy standard. Because FWS' review plays such a central role, which will greatly impact and even possibly determine the survival and recovery of listed species in Florida, it will result in actions subject to section 7 and the BiOp's attempt to exempt those actions from section 7 itself violates that section.

IV.     NOTICE OF VIOLATION OF ESA SECTION 7, 16 U.S.C. § 1536(d)

Section 7(d) of the ESA prevents federal agencies from making "any irreversible or irretrievable commitment of resources . . . which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures."[63] "This prohibition . . . continues until the requirements of section 7(a)(2) are satisfied."[64] The additional restrictions imposed by section 7(d) are in effect because EPA initiated the consultation process, but it has not completed the process lawfully with the issuance of a valid biological opinion. The prohibition against the irreversible and irretrievable commitment of resources applies to EPA's approval of FDEP's assumption, and adoption and implementation of FWS' BiOp.

---

[61] 16 U.S.C. § 1536(a)(2).
[62] Letter from Tania Galloni et. al, to Kelly Laylock, EPA, Nov. 2, 2020.
[63] 16 U.S.C. § 1536(d).
[64] 50 C.F.R. § 402.09.

16

EPA is violating this prohibition by taking actions that could potentially foreclose implementation of measures required to avoid jeopardy, including but not limited to approving FDEP's assumption of the CWA section 404 program and ability to immediately begin permitting dredge and fill activities in assumed waters. Such permitted activities may not be able to be reversed before EPA comes into compliance with section 7(a)(2). These and other actions that make irreversible or irretrievable commitments of resources violate ESA section 7(d).

V.      NOTICE OF VIOLATION OF ESA SECTION 9, 16 U.S.C. § 1538

Without a biological opinion from FWS and NMFS and accompanying ITS including reasonable and prudent measures and terms and conditions to minimize impacts and incidental take, the EPA and FDEP do not have incidental take authorization, and therefore any actions they authorize that result in take violate section 9 of the ESA.[65]

\*      \*      \*

If EPA fails to cure its violations within 60 days of receiving this letter, the Center for Biological Diversity, Defenders of Wildlife, Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper intend to file suit for declaratory and injunctive relief. *See* 5 U.S.C. § 706(2); 16 U.S.C. § 1540(g)(1)(A).

If you believe any of the foregoing is in error, have any questions, or would like to discuss this matter, please do not hesitate to contact us.

Sincerely,

| | | |
|---|---|---|
| Tania Galloni | Bonnie Malloy | Christina I. Reichert |
| Fla. Bar No. 619221 | Fla. Bar No. 86109 | Fla. Bar No. 0114257 |
| Earthjustice | Earthjustice | Earthjustice |
| 4500 Biscayne Blvd. | 111 S. Martin Luther King Jr. Blvd | 4500 Biscayne Blvd. |
| Ste 201 | Tallahassee, FL 32301 | Ste 201 |
| Miami, FL 33137 | T: 850-681-0031 | Miami, FL 33137 |
| T: 305-440-5432 | F: 850-681-0020 | T: 305-440-5432 |
| F: 850-681-0020 | bmalloy@earthjustice.org | F: 850-681-0020 |
| tgalloni@earthjustice.org | | creichert@earthjustice.org |

---

[65] 16 U.S.C. § 1536(b)(4); 16 U.S.C. § 1538.

n/a

cc: Radhika Fox, Radhika Fox, Acting Assistant Administrator Office of Water
U.S. Environmental Protection Agency
fox.radhika@epa.gov

Melissa Hoffer, Acting General Counsel
U.S. Environmental Protection Agency
hoffer.melissa@epa.gov

Lawrence Starfield, Acting Assistant Administrator of Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
starfield.lawrence@epa.gov

Lt. General Scott A. Spellmon, Chief of Engineers, U.S. Army Corps of Engineers
scott.a.spellmon.mil@mail.mil

Colonel Andrew Kelly, District Commander Jacksonville District
U.S. Army Corps of Engineers
Andrew.D.Kelly@usace.army.mil