**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | **Civil Action No.** 1:21-cv-119 (RDM) |

**PLAINTIFFS' PROPOSED SUR-REPLY IN RESPONSE TO
DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
AND INTERVENORS' CROSS-MOTION TO DISMISS**

Plaintiffs respectfully submit this proposed sur-reply in accordance with the Court's March 1, 2022, minute order.

**ARGUMENT**

**I.   EPA's novel argument that a single decision-making process constitutes both an adjudication and a rulemaking fails.**

In its cross-motion, the U.S. Environmental Protection Agency ("EPA") argued that its approval of a state 404 program was solely an adjudication, that it did not view its approvals of state 404 programs as rules, and that it viewed state 404 program codifications as "merely memorializing an adjudicatory decision." Dkt. 34 at 29 & n.8. For the first time on reply, however, EPA suggests that its approval of a state 404 program constitutes *both* an adjudicatory order and a rule. Dkt. 45 at 16. EPA appears to contend that the agency engaged in adjudication when evaluating the state program submission, including taking public comments, receiving comments from other federal agencies, holding a public hearing, engaging in consultation under the Endangered Species Act and National Historic Preservation Act, and ultimately deciding

1

whether to approve the state program application. But, the agency suggests, EPA would have engaged in a separate rulemaking process to codify the program. EPA's argument is wrong.

First, the decision-making process for approving a state 404 program is one holistic process, not a piecemeal one where the decision to approve the program is made and effectuated separately. Indeed, EPA reviewed, approved, and effectuated the 404 programs for Michigan and New Jersey in one holistic process. As part of the process, EPA had to amend existing provisions of the Code of Federal Regulations that otherwise regulated the dredging and filling of waters of the United States in those states, see, e.g., 40 C.F.R. pts. 227–32 (EPA's regulations); 33 C.F.R. pts. 323–24, 30 (Corps' regulations). And an agency may not avoid rulemaking requirements "by merely adopting a de facto amendment to its regulation through adjudication." Marseilles Land & Water Co. v. Fed. Energy Reg. Comm'n, 345 F.3d 916, 920 (D.C. Cir. 2003) (alteration removed).[1] Accord Montgomery Ward & Co. v. Fed. Trade Comm'n, 691 F.2d 1322, 1329 (9th Cir. 1982); Dkt. 43 at 58.

EPA's argument on reply conflicts with the previous positions taken with regard to Florida's application and in this litigation. In its cross-motion, EPA contended that state 404 program codifications were "merely memorializing" prior decisions to approve state programs; i.e., they were not independent decision-making processes. Dkt. 34 at 29 & n.8. Similarly, in the public notice inviting comments on EPA's review of the Florida 404 program, EPA described codification as part of the process for approval of Florida's program, Dkt. 51 at 3, and that is exactly how EPA treated the approvals for both New Jersey and Michigan. U.S. Env't Prot. Agency, 49 Fed. Reg. 38,947-01 (Oct. 2, 1984) (codified at 40 C.F.R. § 233.70) (treating

---

[1] EPA has also taken the position elsewhere that its review of 404 programs is a rulemaking. See Dkt. 31 at 26; Dkt. 34 at 32 n.9; Dkt. 43 at 21; Dkt. 65 at 1–3; Dkt. 65-1 at 32; Dkt. 68 at 1–3.

codification as part of the program approval for Michigan); U.S. Env't Prot. Agency, 59 Fed. Reg. 9,933-01 (Mar. 2, 1994) (codified at 40 C.F.R. § 233.71) (same for New Jersey). Additionally, in the (still pending) pre-publication notice that would codify Florida's 404 program, EPA claims it is not engaging in any new decision-making process, but merely codifying the adjudicatory decision it has already made.[2]  U.S. Env't Prot. Agency, Pre-Publication Notice: Codifying EPA's Adjudicatory Decision of Florida's Clean Water Act Section 404 Program Request (Jan. 14, 2021), at 1–2.[3]  In fact, there, EPA characterizes its codification of the state program as a "voluntary amendment" of the Code of Federal Regulations to merely "reflect" the decision EPA had already made—rather than a separate decision-making process proceeding via rulemaking—and states the codification is merely to "enhance public awareness of the approved program" and to be "consistent with [EPA's] past practice." Id. at 2–3.  Nowhere in the pre-publication notice does EPA suggest it is making a new decision separate and apart from its approval.

EPA contends that Plaintiffs' argument on withdrawal procedures acknowledges that a single agency decision-making process can be both an adjudication and rulemaking, Dkt. 45 at 16, but that mischaracterizes Plaintiffs' argument.  To the contrary, Plaintiffs explained that withdrawal is an adversarial process whereby a state is adjudged as either complying with federal law or not before a neutral arbiter based on adjudicative facts regarding the state's operation and enforcement of its state 404 program.  Dkt. 43 at 23 n.4, 29.  This process may result in an adjudicatory order defining the ways that a state is falling short in operating and enforcing the

---

[2] This argument is plainly wrong since the Code of Federal Regulations is reserved solely for rules, and not adjudicatory orders.  Dkt. 43 at 21–22.
[3] https://www.epa.gov/sites/production/files/2021-01/documents/pre-publication_frn-_fl_404_codification_final_rule_.pdf.

3

state program, along with corrective actions the state must take to come into compliance. Id. As Plaintiffs explained, it is only after a state fails to comply with that adjudicatory order that EPA acts to withdraw the state program through a separate and distinct rulemaking. Id. That argument does not conflict with the fact that EPA's review, approval, and codification of a state 404 program constitutes a single rulemaking process.

Second, the suggestion that an agency decision-making process could constitute *both* an adjudication and a rulemaking is contradicted by the plain language of the Administrative Procedure Act ("APA") and administrative law cases. The APA defines rulemaking and adjudication as two distinct processes, 5 U.S.C. § 551(5), (7), subject to distinct requirements, 5 U.S.C. §§ 553–554, that result in different types of decisions, 5 U.S.C. § 551(4), (6). And longstanding administrative law cases demonstrate that agency actions are made through rulemaking or through adjudication, but not both. See, e.g., Nat'l Lab. Rel. Bd. v. Wyman-Gordon Co., 394 U.S. 759, 764 (1969) (distinguishing between adjudication and rulemaking); Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 417 F.3d 1272, 1284–85 (D.C. Cir. 2005) (same); Safari Club Int'l v. Zinke, 878 F.3d 316, 332–33 (D.C. Cir. 2017) (same); Cities of Anaheim et al. v. Fed. Energy Regul. Comm'n, 723 F.2d 656, 659 (9th Cir. 1984) (identifying adjudication and rulemaking as separate processes while explaining an agency cannot use adjudication to circumvent the APA's rulemaking procedures). EPA provides no authority to support its argument to the contrary. Dkt. 45 at 16.

## II. Florida's argument that Plaintiffs lack standing on Claim 9 (Failure to Codify) because of actual notice of state program components fails.

Florida's argument on reply that Plaintiffs do not have standing to pursue Claim 9—the failure to codify—because they have actual notice of all the components of the state program, including the "technical assistance process" purported to ensure no jeopardy to federally

protected species, is flatly wrong. Dkt. 46 at 17–20. To this day, the content of the "technical assistance process" that is applicable as a matter of law in Florida remains unclear. Dkt. 43 at 59. It is *not* delineated in the state's application, the state's 404 regulations, EPA's request for comments, or the Code of Federal Regulations' generic outline of state application submittal requirements, as Florida claims. Indeed, the state's application (which is purported to constitute the EPA-approved program) explicitly stated that a then-anticipated biological opinion would contain the "technical assistance process."[4] While a "technical assistance process" *is* described in the biological opinion, the biological opinion was not part of any of the items on which Florida relies and did not come into existence until after the public comment period on Florida's application closed.

References to portions of the technical assistance process within the application are preliminary, scattered, and incomplete.[5] Dkt. 43 at 59. The unambiguous intent of the Federal Register Act, however, is to provide the public with notice of what the law is—the properly promulgated federal regulations—not vague references or summations of what the law may contain. Dkt. 43 at 57–59. See also 44 U.S.C. § 1507 (purpose of publishing documents with

---

[4] Dkt. 55-1 at 12, 124 (technical assistance process "is anticipated to be outlined in the [U.S. Fish and Wildlife Service's ("USFWS")] biological opinion").

[5] Indeed, there are inconsistencies between the USFWS memorandum of understanding ("MOU") and the subsequent biological opinion on which the state application relies. These relate to whether USFWS is required or only permitted to provide technical assistance and whether USFWS will have primary responsibility to resolve conflicts related to federally listed species and draft permit conditions or is only to participate on a "voluntary" basis. Compare Dkt. 55-1 at 125–26 with Dkt. 56-1 at 704, 715, 722, 723. Moreover, the biological opinion itself fails to provide Plaintiffs with actual notice because it is internally inconsistent as to what actions are mandatory or voluntary on the part of USFWS. Compare Dkt. 56-1 at 763 (providing that USFWS will participate in the technical team overseeing the technical assistance process) with id. at 704, 715, 722, 723 (describing USFWS' participation as voluntary).

general applicability and legal effect is to give "notice of the contents of the document to a person subject to or affected by it").

To try and circumvent these facts, Florida now argues that Plaintiffs were not entitled to know the contents of the biological opinion (which was relied on in Florida's application as containing the applicable, forthcoming technical assistance process) during the notice and comment period. Dkt. 46 at 19–20. For this proposition, Florida first relies on the general principle that there is no independent right to comment on a biological opinion under the ESA. Dkt. 46 at 19–20. This principle is not applicable here since Claim 9 does not raise a claim under the ESA.

Florida next argues that information within a biological opinion is not required to be disclosed during a substantive rulemaking. Florida's argument, however, conflates the issue of notice for purposes of notice and comment with the issue of notice under the Federal Register Act. In Cooling Water, the court rejected the argument that EPA violated the APA by failing to provide adequate notice and opportunity to comment on a biological opinion, its data, and a final rule's provisions detailing a technical assistance process for complying with the ESA. Cooling Water Intake Structure Coal. v. U.S. Env't Prot. Agency, 905 F.3d 49, 78–79 (2d Cir. 2018). In rejecting the claims, the court found that there is not an independent right to notice and comment under the ESA for a biological opinion and that adequate notice had been provided during the rulemaking so disclosure of the biological opinion itself and other items was not necessary for purposes of satisfying the APA's notice and comment requirements. Id.[6]

---

[6] Cooling Water is also readily distinguishable because the party was seeking a biological opinion's underlying data and analysis, which they thought was necessary for adequate notice and the opportunity to comment on the impacts of a proposed rule. 905 F.3d at 78–79. In Claim 9, Plaintiffs are challenging the failure to codify a final rule.

For purposes of Claim 9, the question is not whether there is an abstract right to comment on a biological opinion or whether sufficient notice of the proposed rule's contents were provided during the rulemaking. The issue is the failure to codify a rule that articulates what the applicable law as to protected species is, and the harm is the failure to notify Plaintiffs of what that law is so that it can be applied and enforced.

Florida's position then is that Plaintiffs have actual notice of the technical assistance process by virtue of summary references in the application (which points to a forthcoming biological opinion) and the state regulations (which merely refer to a technical assistance process) included in the application. But Florida at the same time argues that the biological opinion was not part of the state application, and on that reasoning therefore cannot be part of the EPA-approved program. Florida's argument demonstrates just how Plaintiffs have been deprived of the right to know what the law on this point is. Dkt. 43 at 57–59.

### III. Florida's claim that EPA's completeness determination is not reviewable fails.

In the context of claiming that Plaintiffs' entire case is futile because Florida's 404 program would be "deemed approved" if the Court were to vacate EPA's approval as unlawful, the state asserts for the first time that Plaintiffs' claim regarding the completeness of the application is not reviewable because it is not a final agency action and is committed to agency discretion by law. Dkt. 46 at 28. Florida's argument has no merit.

An agency action is final if it marks the consummation of an agency's decision-making process and gives rise to legal consequences. Spirit Airlines, Inc. v. U.S. Dep't of Transp., No. 19-1248, 2021 WL 2021621, at *3 (D.C. Cir. May 21, 2021). The first prong asks "whether the action is 'informal, or only the ruling of a subordinate official, or tentative.'" Am. Wild Horse Campaign v. Bernhardt, 442 F. Supp. 3d 127, 147 (D.D.C. 2020) (citation omitted). The process "set out in an agency's governing statutes and regulations are key to determining whether an

7

action ... represents the culmination of that agency's consideration of an issue." Id. (alteration in original) (internal quotations and citation omitted). Here, EPA formally concluded a completeness review of the state's submission and decided that the application was complete. See Dkt. 51 at 3 ("EPA has reviewed the State of Florida's program submission and consistent with 40 CFR 233.15 has determined that it is a complete request for State program approval that meets the submittal requirements of 40 CFR 233.10."). This was not a preliminary or tentative determination, but the culmination of EPA's decision-making on completeness.

The second prong asks "whether 'legal consequences will flow' from an agency action." Am. Wild Horse Campaign, 442 F. Supp. 3d at 149 (citation omitted). This "pragmatic" and "flexible" inquiry looks to "'the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it.'" Id. (citation omitted). This prong is satisfied even if the legal consequences affect only the agency itself. Id. Here, EPA's completeness determination led to concrete legal consequences because it imposed a 120-day clock for EPA to act on the application or have the program be "deemed approved" by operation of law. 33 U.S.C. § 1344(g)(1), (h)(1); 40 C.F.R. § 233.15(a).

In addition, EPA's completeness determination circumscribed Plaintiffs' right to notice and a meaningful opportunity to comment on the state application before EPA transferred authority. Dkt. 1 at 25–27 (Complaint at ¶¶ 108–117). Florida's application was not complete, in part because the application explicitly relied on forthcoming information as to a "technical assistance process" that was not yet in existence, and which related to the duty not to jeopardize protected species. Id. at 25–26 (Complaint at ¶¶ 108–09). See also Dkt. 31 at 9–12. Plaintiffs were thus foreclosed from a fair and meaningful opportunity to test the sufficiency of the state's proposed "technical assistance process" and develop evidence in the record for judicial review.

8

5 U.S.C. § 553; 40 C.F.R. § 233.15(e)(1)–(2); Small Refiner Lead Phase-Down Task Force v. U.S. Envtl. Prot. Agency, 705 F.2d 506, 547 (D.C. Cir. 1983).

Florida's reliance on Federal Trade Commission is misplaced because that case involved a challenge to the Commission's statement when initiating an enforcement action that it had "reason to believe" that the plaintiff was violating federal law. Fed. Trade Comm'n v. Standard Oil Co., 449 U.S. 232, 234–35 (1980). The Court ruled this statement was not a final agency action because it was an initial belief which initiated a proceeding but had no legal or practical effect on the plaintiff. Id. at 241–43.

Here, by contrast, EPA's decision was not the first step of an inquiry regarding the completeness of the state's application; it was the conclusion of that inquiry. And the completeness determination gave rise to the legal consequences described above.[7] That this determination "did not mark the end" of EPA's analysis of whether the state 404 application should be *approved* does not "vitiate the finality" of its analysis as to whether the application was *complete*. See Am. Wild Horse Campaign, 442 F. Supp. 3d at 148. "[C]ourts have repeatedly recognized that agency action can be final as to one issue" (here, the completeness of Florida's application) "even if other issues" (such as whether Florida's submission is as stringent as federal law requires for approval) "remain open for later resolution." Id. (citation omitted).

Even if EPA's completeness determination were not a final agency action susceptible of direct judicial review, it would at a minimum constitute "[a] preliminary, procedural, or intermediate agency action" that "is subject to review on the review of the final agency action."

---

[7] For these same reasons, Housing Study Group has no bearing on this case. Dkt. 46 at 28 (citing Hous. Stud. Grp. v. Kemp, 736 F. Supp. 321 (D.D.C. 1990)). There, the court dismissed as premature a challenge to an agency's announcement of intent to terminate a federal program, where that decision would not be final (and therefore would not give rise to legal consequences) until after rulemaking was completed. 736 F. Supp. at 331–32.

9

5 U.S.C. § 704.  Accord Accrediting Council for Indep. Coll. & Sch. v. DeVos, 303 F. Supp. 3d 77, 116 (D.D.C. 2018).  Here, there is no dispute that Plaintiffs' challenge of EPA's approval of the state 404 program arises from a final agency action.

Florida's passing reference to 5 U.S.C. § 701(a)(2), Dkt. 46 at 28, which provides that agency action committed to agency discretion by law is not reviewable, fares no better.  Bauer v. DeVos, 325 F. Supp. 3d 74, 102 (D.D.C. 2018) (explaining the APA carries a presumption of judicial review and exceptions must be treated as very narrow and applied only in rare circumstances).  Florida makes no showing that EPA's completeness determination was committed to agency discretion by law.  Nor does Florida show that the Court would have "no meaningful standard" to apply in reviewing the lawfulness of EPA's action.  Id. at 101.  To the contrary, federal regulations contain the standards by which the lawfulness of that action may be reviewed.  40 C.F.R. § 233.15 (process, timing, and effect of completeness determination); id. §§ 233.10–14 (detailing elements necessary to establish complete state program submission).[8]

Dated: March 4, 2022

                                      Respectfully submitted,

                                      /s/ Tania Galloni
                                      TANIA GALLONI*
                                      Fla. Bar No. 619221
                                      CHRISTINA I. REICHERT*
                                      Fla. Bar No. 0114257
                                      Earthjustice
                                      4500 Biscayne Blvd., Ste 201
                                      Miami, FL 33137
                                      T: 305-440-5432
                                      F: 850-681-0020
                                      tgalloni@earthjustice.org
                                      creichert@earthjustice.org

---

[8] Plaintiffs withdraw the request to respond to Florida's arguments on reply as to the merits of Claims 8 and 9, which have been addressed.  Dkt. 43 at 22–23 (Clean Water Act 402 and 404 programs); id. at 33–34 (codification); id. at 39–43 (harmless error).

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

* Appearing under LCvR 83.2(c)(1))

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of March 2022, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org