IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | CASE NO. 1:21-cv-00119 (RDM) |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

**PLAINTIFFS' SUPPLEMENTAL FILING**

Plaintiffs, by and through undersigned counsel, hereby submit this supplemental filing in support of Plaintiffs' Motion for Partial Summary Judgment, Dkt. 31, in accordance with the Court's March 15, 2022, Minute Entry.

**I.    Agency Codification of State Programs**

As to the Court's question of whether agencies typically codify state programs they approve, Plaintiffs believe that the appropriate comparator is how the U.S. Environmental Protection Agency ("EPA") treats other state-approved environmental programs.  As Plaintiffs pointed out in their reply brief, Dkt. 43 at 23, EPA's practice is to codify approved state programs.  See, e.g., 40 C.F.R. pt. 52 (approving and codifying state implementation plans under the Clean Air Act's National Ambient Air Quality Standards program); 40 C.F.R. pt. 62 (same for the Clean Water Act's Section 111(d) and 129); 40 C.F.R. pt. 147 (same for the Safe Drinking Water Act); 40 C.F.R. pt. 272 (same for the Resource Conservation and Recovery Act)).  And until December 2020, it was also EPA's practice to codify approved state 404

1

programs. 40 C.F.R. pt. 233, subpt. H. For the Court's convenience, these codifications are attached as composite Exhibit A.

Against this backdrop, EPA's practice of *not* codifying approved state 402 programs appears to be the exception rather than the rule, and therefore the Court ruling in Plaintiffs' favor would be consistent with EPA's practice of codifying most approved state programs. More importantly, as to Plaintiffs' Claim 9, Plaintiffs submit that the dispositive question is whether EPA was required to amend existing 404 regulations to give legal effect to a different legal regime (that of Florida's). The answer to that question—both for purposes of effectuating this change in the law and notice of what the applicable law is—is yes.

## II.     Comparison of Information Available to Plaintiffs Under NEPA and ESA with Information Produced by the State 404 Program

Plaintiffs next address the Court's request for a comparison of the information the state 404 program provides to the public versus the information to which Plaintiffs would have access under the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA") were the 404 program still (or once again) administered by the U.S. Army Corps of Engineers ("Corps"). As outlined in briefing, Plaintiffs' organizational injuries from the immediate unlawful transfer of 404 authority to the state include diversion of resources due to the loss of the opportunity to participate in the NEPA process, the loss of NEPA review of 404 permit applications, and the loss of information provided through NEPA and the ESA on which Plaintiffs have relied to serve their missions. See, e.g., Dkt. 31 at 45–46; Dkt. 43 at 45–46, 67, 70–71, 73. Plaintiffs address NEPA and the ESA in turn.

### A.     The National Environmental Policy Act

NEPA, at its core, is a statute designed to ensure that decision makers, and the public, have access to a broad array of information before major federal actions are taken that have the

potential to have a significant impact on the human environment.  See 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.1(m) ("Human environment means comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment.").  NEPA review is required for individual 404 permits administered by the Corps. 40 C.F.R. § 1508.1(q)(3)(iv) ("Major federal actions" include "actions approved by permit"). The breadth of information that NEPA review requires is above and beyond the information involved in permit review under the Clean Water Act and the ESA.  And there is no statute comparable to NEPA under Florida law.

Before the Corps can issue an individual permit, "it must conduct a case-specific review of each application, including preparation of an [environmental assessment ("EA")] or [environmental impact statement ("EIS")] pursuant to NEPA."  Sierra Club v. U.S. Army Corps of Eng'rs, 990 F. Supp. 2d 9, 19 (D.D.C. 2013), aff'd, 803 F. 3d 31, 36 (D.C. Cir. 2015).  An EA requires "a 'comprehensive assessment of the expected effects of a proposed action' in order to determine if that action is 'significant.'"  Found. on Econ. Trends v. Weinberger, 610 F. Supp. 829, 837, 841 (D.D.C. 1985) (finding the agency's EA insufficient because it failed to include a discussion of the geographical characteristics of the area, the controversial nature of the action, the extent of possible effects to the human environment, the long-term and short-term effects on the local region and society as a whole, the degree the action would impact protected species, and the possibility the action could violate other federal, state, or local laws).

When an agency prepares an EIS under NEPA, it must detail (1) the environmental impact of the proposed action; (2) any adverse environmental effects which cannot be avoided should the proposal be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-

3

term productivity; and (5) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.  42 U.S.C. § 4332(c).  Although the Trump Administration made substantial changes to longstanding NEPA regulations, the revised regulations still require a broad scope of detailed information to be provided to the public in an EIS and still require that agencies inform the public when completing EISs.[1]  40 CFR pt. 1502–03.  That information includes: (1) a description of the affected environment, including "reasonably foreseeable environmental trends and planned actions in the area," id. § 1502.15; (2) a detailed analysis of alternatives, including a "no action" alternative and a discussion of whether the proposed action and alternatives may or may not achieve NEPA requirements, id. §§ 1502.02(d), 1502.14; (3) an environmental consequences section that "forms the scientific and analytic basis" for the alternatives analysis,[2] id. §§ 1502.16, 1508.1(g); and (4) any cost-benefit analysis undertaken by the agency, id. § 1502.22.

The agency must also integrate into an EIS other analyses required by federal law, including those under the Fish and Wildlife Coordination Act, the National Historic Preservation Act, and the Endangered Species Act.  Id. § 1502.24(a).  Additionally, as a result of Presidential Executive Orders, NEPA also requires consideration of special topics, such as environmental justice.  Vecinos para el Bienestar de la Comunidad Costera v. Fed. Energy Reg. Comm'n, 6 F.

---

[1] The Biden Administration, in turn, has begun the process to revise the regulations to "better effectuate NEPA's statutory requirements and purposes."  Council on Env't Quality, 86 Fed. Reg. 55,757, 55,759 (proposed Oct. 7, 2021).

[2] The environmental consequences section requires discussion of a wide array of information, including any possible conflicts between the proposed action and other land use plans, policies, and controls created by states, regions, or tribes; energy requirements and conservation potential of alternatives and mitigation measures; the natural and depletable resource requirements and conservation potential of alternatives and mitigation measures; the urban quality, historic and cultural resources, and design of the built environment of alternatives and mitigation measures; the means to mitigate adverse impacts; and economic and technical considerations.  40 C.F.R. §§ 1502.16, 1508.1(g).

4

4th 1321, 1327–31 (D.C. Cir. 2021) (observing that notwithstanding new NEPA regulations, agency remained obligated to consider environmental justice because of Executive Orders).

Further, the quality of this information is required to be of the highest caliber. An EIS must "provide *full and fair* discussion of significant environmental impacts and shall inform decision makers *and the public* of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1 (emphasis added). The EIS must be the product of an interdisciplinary approach that ensures "the integrated use of the natural and social sciences and the environmental design arts" and must ensure the "scientific integrity" of the discussions and analysis contained within. Id. §§ 1502.02, 1502.06, 1502.14, 1502.23. Where there are gaps in available information, and the costs of obtaining missing information is not unreasonable, agencies must obtain and include that missing information in the EIS as well. Id. § 1502.21(b).

In addition to detailing the scope of information agencies must consider and incorporate into an EIS, NEPA and its implementing regulations specifically require that this extensive information be accessible to the public, not only in substance but also in form. See 42 U.S.C. § 4332(C). Agencies must use "plain language," "appropriate graphics," and "should employ writers of clear prose" so that "decision makers *and the public* can readily understand" an agency's EIS. 40 C.F.R. § 1502.8 (emphasis added).

None of these requirements have a comparator under Florida law.

**B.    The Endangered Species Act**

As with the loss of NEPA information, Plaintiffs have lost valuable information generated through ESA Section 7 formal consultations, which also only occur when the Corps rather than the state administers the 404 program. The results and analyses from ESA

consultations are closely tied to NEPA because the ESA's implementing regulations require that biological opinions be incorporated into NEPA analyses. Dkt. 43 at 69 (citing 50 C.F.R. § 402.06(b); U.S. Fish & Wildlife Serv., ESA Section 7 Consultation Handbook 88.42). This linkage means that the analytic document generated through NEPA takes into account, and will incorporate, the information from any biological opinion generated through ESA consultation.

Florida's 404 program does not require any agency to produce a document containing the analysis, conclusions, and requirements that a biological opinion under the ESA requires.[3] Nor does Florida have a statute comparable to the ESA.[4] Plaintiffs attach a table enumerating the ESA biological opinion components as compared to the state 404 program. Exhibit B. At most, Florida's program describes information to be exchanged between state agencies and the U.S. Fish and Wildlife Service ("USFWS") during a "technical assistance" process. See, e.g., Dkt. 55-1 at 124–25 (Memorandum of Understanding Between the Florida Fish and Wildlife Conservation Commission, the U.S. Fish and Wildlife Service, and the Florida Department of Environmental Protection at 5–6, Aug. 5, 2020, A.R. 0016-A2) (USFWS "comments" will be documented in final file correspondence and recommended conditions incorporated into final

---

[3] ESA consultation is required whenever a federal action "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a)–(b)(1). Formal consultation, which results in a biological opinion, is required unless a project is "not likely to adversely affect" any listed species or critical habitat. Id.

[4] Florida's "Endangered and Threatened Species Act" bears no resemblance to the federal statute. Fla. Stat. § 379.2291(5). The only report it requires is an annual plan for management and conservation of endangered and threatened species, including criteria for research and management priorities; a description of an educational program; statewide policies pertaining to protection of endangered and threatened species; additional legislation which may be required; and the recommended level of funding for the following year, along with a progress report and budget request. Id. The remainder of the statute discusses only legislative policy, interagency coordination for research and management, and measurable biological goals for manatee recovery.

permits).[5]  As Exhibit B shows, there is no equivalent, or even comparable, final agency document created as a result of this process that is available to Plaintiffs.  Under Florida's program, Plaintiffs would have to incur the burden and costs to collect any useful information generated through the state program and/or secure its own costly experts to obtain the analysis to which they would otherwise have access under the ESA.

Dated: March 18, 2022

                        Respectfully submitted,

                        /s/ Tania Galloni
                        TANIA GALLONI*
                        Fla. Bar No. 619221
                        CHRISTINA I. REICHERT*
                        Fla. Bar No. 0114257
                        Earthjustice
                        4500 Biscayne Blvd., Ste 201
                        Miami, FL 33137
                        T: 305-440-5432
                        F: 850-681-0020
                        tgalloni@earthjustice.org
                        creichert@earthjustice.org

                        /s/ Bonnie Malloy
                        BONNIE MALLOY*
                        Fla. Bar No. 86109
                        Earthjustice
                        111 S. Martin Luther King Jr. Blvd
                        Tallahassee, FL 32301
                        T: 850-681-0031
                        F: 850-681-0020

---

[5] Additional information is discussed in the "technical assistance" process described in USFWS' programmatic biological opinion for the state 404 program.  Dkt. 56-1 at 686–773 (U.S. Fish & Wildlife Serv., Programmatic Biological Opinion for U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program Under Section 404 of the Clean Water Act at 19, 27, 35, Nov. 17, 2020, A.R. 0642).  However, Florida and EPA continue to take the position that this programmatic biological opinion is not part of the approved state program, and EPA has not included the programmatic biological opinion as among the components it would codify as part of the program.  See, e.g., Dkt. 34 at 21, Dkt. 45 at 9, n. 2.  As a result it is unclear whether the steps described in the programmatic biological opinion are required as a matter of law under the state program.

bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

\* Appearing *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of March 2022, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org