# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*<br><br>    Defendants. | Case No. 1:21-cv-0119 (RDM) |

## DEFENDANTS' RESPONSE TO THE COURT'S REQUEST FOR SUPPLEMENTAL INFORMATION

The United States Environmental Protection Agency ("EPA") submits this filing in response to the Court's request for supplemental information following the hearing that took place on March 15, 2022.

## BACKGROUND

Section 404 of the Clean Water Act ("CWA") creates a permitting program that can be administered by the United States Army Corps of Engineers ("the Corps"), or by EPA-approved states and tribes. 33 U.S.C. § 1344(a), (g). A state that wishes to issue section 404 permits can submit to EPA a request explaining how the state proposes to do so under state law. *Id.* § 1344(g)(1). EPA reviews the program submission using criteria set forth in statute and regulation. *Id.* § 1344(h)(1)(A) & (B). Upon receipt of a complete program submission, EPA has 120 days to do one of three things: (1) deny the request, in which case the federally-administered program remains in place; (2) approve the request, in which case the Corps will

1

transfer primary permitting authority to the state; or (3) take no action, in which case the state's request is deemed approved by operation of law.  *Id.* § 1344(h)(1), (3).

If EPA approves a state's assumption request, it must "publish notice in the Federal Register."  40 C.F.R. § 233.15(h).   "Transfer of the program to the State shall not be considered effective until such notice appears in the Federal Register. The Secretary [of the Army] shall suspend the issuance by the Corps of section 404 permits in State regulated waters on such effective date."  *Id.*  In this case, EPA approved Florida's application by issuing an approval notice that became effective on the date that it was published in the Federal Register.

## SUPPLEMENTAL INFORMATION

EPA's use of informal adjudication in the section 404 context is consistent with EPA's approach under similar statutory provisions, and with comparable actions by other federal agencies in very different statutory contexts.[1]  Examples are provided below.  While they vary, all examples have at least two things in common, which we believe makes them responsive to the Court's request for additional information.  In every example:

- A federal agency can administer a program, or it can approve a state's request to administer a comparable program pursuant to state law, if the state can establish that its program satisfies certain criteria; and

- The federal agency acts on state requests through informal adjudication.

None of the informal adjudications described below are codified in the Code of Federal Regulations.  The list in this filing reflects only the information that could be gathered in the limited time allotted under the Court's March 15, 2022 Order and thus may not be exhaustive.

---

[1] "[I]nformal adjudication," means "agency action that is neither the product of formal adjudication or a rulemaking."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001)

1.      **Implementation of Health Benefits Exchanges**

The Patient Protection and Affordable Care Act authorizes the Department of Health and

Human Services ("HHS"), or an HHS-approved state, to administer Health Benefits Exchanges

("Exchanges") to facilitate the purchase of health insurance.  *See* 42 U.S.C. § 18041(a), (b); 45

C.F.R. § 155.100–.110.  HHS sets standards for "the establishment and operation of Exchanges,"

*id.* § 18041(a), which are codified at 45 C.F.R. Part 155, Subparts C, D, E, F, G, H, and K.  If a

state elects to operate its own Exchange, it must "adopt and have in effect" either HHS's federal

standards, or "a State law or regulation that the Secretary determines implements the standards

within the State."  *Id.* § 18041(b); *see also* 45 C.F.R. § 155.105 (b) ("State Exchange approval

standards").  If a state "does not have an approved or conditionally approved Exchange," HHS

"must (directly or through agreement with a not-for-profit entity) establish and operate such

Exchange within the State."  45 C.F.R. § 155.105(f)(1).

HHS approves State Exchanges based primarily on a state's "Exchange Blueprint," a

document in which the state must describe how its Exchange will implement federal standards

for the establishment and operation of the Exchange.  *See* 45 C.F.R. § 155.105(c).  HHS

approves State Exchanges by issuing letters.

At present, 18 states operate approved State Exchanges and three more operate

Exchanges that rely in part on HHS to perform certain Exchange functions.  A list of approved

states and the conditional approval letters issued by HHS are available here:

https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/state-marketplaces

2.      **Review of health insurance premium increases**

The Public Health Services Act, as amended by the Patient Protection and Affordable

Care Act, requires HHS, "in conjunction with States," to "establish a process for the annual

review . . . of unreasonable increases in premiums for health insurance coverage." 42 U.S.C.

§ 300gg-94. HHS regulations implementing this provision are codified at 45 C.F.R. Part 154.

The Center for Medicare & Medicaid Services ("CMS"), a part of HHS, "review[s] rate

increase[s] subject to review to determine whether [they are] unreasonable." 45 C.F.R.

§ 154.210(a). CMS conducts its review according to procedures codified at 45 C.F.R.

§ 154.205(b)–(d). But if CMS determines that a state has "an Effective Rate Review Program,"

and if that state provides to CMS a "final determination of whether a rate increase is

unreasonable" along with certain supporting information, then "CMS will adopt [the] State's

determination" instead. *Id.* § 154.210(b)(1)–(2).

CMS "determine[s] whether a State has an Effective Rate Review Program . . . based on

information available to CMS that a rate review program meets the criteria described in" 45

C.F.R. § 154.301(a) and (b). *Id.* § 154.301(c). CMS then notifies states of its determinations by

letter. To date, CMS has determined that 47 states have effective rate review programs. A list of

those states is available here: https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-

FAQs/rate_review_fact_sheet.

3. **Enforcement of housing anti-discrimination laws**

Under the Fair Housing Act, "an aggrieved person may . . . file a complaint with" the

Department of Housing and Urban Development ("HUD") alleging discriminatory housing

practices. 42 U.S.C. § 3610(a)(1)(A)(i). HUD will then investigate the complaint and take

enforcement action if reasonable cause exists to believe discrimination occurred. *Id.*

§§ 3610, 3612. But if a complaint alleges discrimination "within the jurisdiction of a State or

local public agency" that "has been certified by the Secretary pursuant to this subsection," HUD

"shall refer such complaint to that certified agency" for action under local or state law. *Id.* § 3610(f); *accord* 24 C.F.R. § 115.207.

HUD certifies agencies based on its determination that applicable state and local fair housing laws offer substantive rights, agency procedures, remedies, and availability of judicial review that "are substantially equivalent to those created by [the Fair Housing Act.]" 42 U.S.C. § 3610(f)(3)(A). HUD also "take[s] into account the current practices and past performance, if any, of such agency." *Id.* § 3610(f)(3)(B); *see also* 24 C.F.R. § 115.201 (phases of substantial equivalency determination); *id.* § 115.204 (further defining "[c]riteria for adequacy of law" determinations).

When HUD decides to certify a state or local agency as substantially equivalent under 42 U.S.C. § 3610(f), it enters a Memorandum of Understanding with that agency. 24 C.F.R. § 115.205 ("Certification procedures"); *see also id.* § 115.203 ("Interim certification procedures").

A recent list of state and local agencies with substantial equivalence certifications can be found on pages 65 through 67 of HUD's Fiscal Year 2020 annual report, which is available here: https://www.hud.gov/sites/dfiles/FHEO/documents/FHEO-Annual-Report-FY2020.pdf. At the time of that report, there were 76 such agencies.

## 4.      Regulation of pollutants in certain waters

The discharge of pollutants other than dredge or fill material to waters of the United States is regulated under CWA section 402's National Pollutant Discharge Elimination System ("NPDES") program. 33 U.S.C. § 1342(a). NPDES permits may be issued by EPA or EPA-approved states or tribes. *Id.* § 1342(b). States apply for EPA approval to administer NPDES programs and EPA must act on complete applications within 90 days. *Id.* § 1342(b), (c). As

with CWA section 404, EPA "shall approve" state applications that satisfy statutory conditions. *Id.* § 1342(b).

EPA's application review and approval procedures are at codified at 40 C.F.R. Part 123. If EPA "approves the State's program" it must "notify the State and publish notice in the Federal Register.  The Regional Administrator shall suspend the issuance of permits by EPA as of the date of program approval."  40 C.F.R. § 123.61(c).  EPA has consistently maintained that its "determination to approve or deny" a section 402 authorization request "constitute[s] an adjudication," a position that traces back to a 1978 opinion from EPA's Office of General Counsel.  66 Fed. Reg. 12791, 12795 (Feb. 28, 2001).

EPA has approved requests from 47 states to administer a NPDES program.  A list of approved states is available here:  https://www.epa.gov/sites/default/files/2021-02/documents/authorized_states_2021.pdf.

## 5.     Regulation of activities related to lead-based paint

The Toxic Substances Control Act ("TSCA") authorizes EPA or an EPA-approved state or tribe to "administer and enforce standards, regulations, or other requirements" regarding the identification and abatement of lead-based paint, and the publication and subsequent revision of a "[l]ead hazard information pamphlet."  15 U.S.C. §§ 2682, 2684(a), 2686(a).  States may submit an application to EPA and "certify to the Administrator . . . that the State program" is: (1) "at least as protective of human health and the environment as the Federal program;" and (2) "provides adequate enforcement."  *Id.* §§ 2684(a), (b).  EPA must approve or disapprove an application within 180 days.  *Id.* § 2684(b)(2).  If EPA does not act on the application, the state program is deemed to be authorized unless EPA withdraws the authorization.  *Id.* § 2684(a).

EPA's regulations governing applications are codified at 40 C.F.R. § 745.324.  EPA acts on those applications by "notify[ing] in writing the State or Indian Tribe of the Administrator's decision to authorize the State or Tribal program or disapprove the State's or Indian Tribe's application."  40 C.F.R. § 745.324(e)(3).  Historically, EPA has then published notice of its decision in the Federal Register following the decision's effective date.  As EPA stated when it published notice of its decision approving Oregon's application, EPA understands its "actions on State or Tribal lead-based paint activities program applications [to be] informal adjudications, not rules."  63 Fed. Reg. 70127, 70128 (Dec. 18, 1998).

EPA has approved 45 state lead-based paint activities programs.  A list of approved programs is available here:  https://www.epa.gov/lead/lead-based-paint-abatement-and-evaluation-program-overview.

6.      **Enforcement of drinking water standards for public water systems**

Under the Safe Drinking Water Act, a state or tribe will have "primary enforcement responsibility for [its] public water systems during any period for which [EPA] determines," *inter alia*, that the state or tribe "has adopted drinking water regulations that are no less stringent than" EPA's "national primary drinking water regulations."  42 U.S.C. § 300g-2(a)(1).  States may apply to EPA for a determination by following procedures set forth at 40 C.F.R. § 142.11, and EPA must approve or deny that application "within 90 days," 42 U.S.C. § 300g-2(b).  EPA acts as the primary enforcement authority in states where it has not approved such an application. *Id.* § 300g-3.

The regulations governing EPA's actions on applications for primary enforcement responsibility are codified at 40 C.F.R. §§ 142.11–.13.  Under those regulations, EPA's approval of a state application is effective 30 days after the publication in the Federal

Register of an initial determination, or, if a hearing is held following publication of such

a notice, approval is finalized by an immediately effective order.  40 C.F.R. § 142.13(f),

(g).

As EPA stated when it approved the Navajo Nation's application for primary

enforcement authority:  "Based on the language of [42 U.S.C. § 300g-2], EPA has long

implemented the determination to approve a state [or tribal] application for primary

enforcement responsibility for public water systems as an 'adjudication' rather than a

'rulemaking.'"  65 Fed. Reg. 66541 (Nov. 6, 2000).

EPA has approved 49 states, all territories, and the Navajo Nation as having primary

enforcement authority for their public water systems.  *See*

https://www.epa.gov/dwreginfo/public-water-system-supervision-pwss-grant-program.

|  | Respectfully submitted, |
|---|---|
| Dated: March 18, 2022 | TODD KIM<br>Assistant Attorney General<br>Environment & Natural Resources Division<br>United States Department of Justice |
|  | /s/ Andrew S. Coghlan<br>ANDREW S. COGHLAN (CA Bar 313332)<br>Environmental Defense Section<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Tel: (202) 514-2191<br>Fax: (202) 514-8865<br>Email: andrew.coghlan@usdoj.gov |
|  | ALISON FINNEGAN (PA Bar 88519)<br>Wildlife & Marine Resources Section<br>P.O. Box 7611<br>Washington, DC 20044-7611<br>Tel: 202-305-0500<br>Email: alison.c.finnegan@usdoj.gov |
|  | *Attorneys for Defendant* |

**Certificate of Service**

I certify that on March 18, 2022, I filed the foregoing with the Court's CM/ECF system, which will notify each party.

/s/ Andrew S. Coghlan
ANDREW S. COGHLAN