IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ET AL.<br><br>Plaintiffs,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.<br><br>Defendants. | CASE NO. 1:21-cv-00119 (RDM) |

_____

**FLORIDA INTERVENORS' SUPPLEMENTAL FILING
CONCERNING AVAILABILITY OF ENVIRONMENTAL INFORMATION**
_____

Florida Intervenors respectfully submit this supplemental filing in response to the Court's request at the March 15, 2022 motions hearing.

**I.     Background**

In prior briefing, Florida Intervenors demonstrated that Plaintiffs lack standing based on *substantive* injuries as to all claims. *See* Dkt. 37 at 44-66; Dkt. 46 at 21-29. No concrete injury arises from the transfer of primary permitting authority from the U.S. Army Corps of Engineers ("Corps") to the State of Florida where EPA maintains oversight on a permit-by-permit basis. Dkt. 37 at 44-50; Dkt. 46 at 21-22. As a fallback position, Plaintiffs assert procedural injuries based on a *deprivation* of information otherwise made available to them under the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA"), *see* Dkt. 43 at 67, and Florida Intervenors previously explained that this purported harm is an inadequate basis for standing. *See*

Dkt. 37 at 56-57; Dkt. 46 at 23-25.[1] NEPA does not apply to EPA approvals of state 404 programs, 33 U.S.C. § 1371(c)(1), and state agencies are not subject to NEPA. 42 U.S.C. § 4332 ("[A]ll agencies of the Federal Government shall..."). Nor does ESA Section 7 consultation requirements apply to state agency actions. 16 U.S.C. § 1536(a)(2) ("Each Federal agency shall...").

At the March 15, 2022 motions hearing, the Court requested, for purposes of evaluating Plaintiffs' assertion of informational injury, a "side-by-side" comparison of environmental information available to the public based on whether the Corps or Florida administers the Section 404 program in Florida. In other words, what specific environmental information was available to Plaintiffs by virtue of NEPA review and ESA consultation when the Corps led the Section 404 program that is not available to them now under the Florida-led program?

The requested side-by-side comparison is provided in Exhibit A ("Side-by-Side Comparison of Environmental Information Available to Public under Corps-led 404 Program and Florida-led 404 Program"). Although Plaintiffs claimed at the motions hearing that the information produced by the two programs is "simply not comparable," all major categories of environmental information available to Plaintiffs under the Corps-led program are also available to them in a comparable manner after Florida's assumption of the Section 404 program. This includes the essential contents of a NEPA Environmental Impact Statement ("EIS") and/or Environmental Assessment ("EA"): purpose and need for a project, alternatives to the project, information about the affected environment, environmental impacts (including cumulative effects, secondary effects, etc.), mitigation measures, socioeconomic information, historic/cultural/tribal information, species

---

[1] Plaintiffs' purported informational injury related to NEPA/ESA-type information is not a basis for standing to assert Claims 8 and 9. The alleged lack of codification bears no nexus to this purported informational injury, and no Florida 404 permits were processed during the purportedly applicable 30-day waiting period.

and habitat information, coastal zone impacts, and a wide range of public interest information.[2] Plaintiffs still have access to the environmental information that they had before. This is reinforced by the fact that the Corps rarely prepares an EIS for Section 404 permitting actions, as shown below, and EAs are, by law, only "brief" and "concise" documents that are not required to address the multitude of issues covered by an EIS. Moreover, Plaintiffs have *greater access* to environmental permitting information under Florida's program than under the Corps-led program. To the extent there is any difference in environmental information made available to the public, that difference here to Plaintiffs is hypothetical, hardly concrete and particularized, and certainly not to the extent necessary to support Article III standing.

## II.  Standing for Informational Injuries

In *Spokeo, Inc. v. Robins*, the Supreme Court recently emphasized that all three elements for standing – injury, causation, and redressability – must be met in an informational injury context, including the existence of a "particularized" injury that "must affect the plaintiff in a personal and individual way." 136 S. Ct. 1540, 1549 (2016). The informational injury "must actually exist" and be "concrete." *Id.*  A "plaintiff must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *Florida Audubon Society v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996). The D.C. Circuit has explained, in a NEPA context, that courts must be careful to not open the floodgates to speculative claims of informational injury. *Foundation on Economic Trends v. Lyng*, 943 F.2d 79, 84-85 (D.C. Cir. 1991).

Plaintiffs must show that (1) they have been "deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) [they]

---

[2] At the motions hearing, counsel for Plaintiffs incorrectly argued that Florida's program does not provide information on cumulative impacts or alternatives.

3

suffer[], by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).[3] Courts consider "whether the particular procedural violations alleged in this case entail a degree of risk sufficient to meet the concreteness requirement." *Spokeo*, 136 S. Ct. at 1550. Plaintiffs must also show that any purportedly missing information renders "essential" organizational activities to be "infeasible." *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 502 (D.C.Cir.1994) ("[I]nformational injury is justiciable where the information sought is 'essential to the injured organization's activities ... [and] lack of the information will render those activities infeasible"); *see also Chesapeake Climate Action Network v. Exp.-Imp. Bank of the United States*, 78 F. Supp. 3d 208, 237 (D.D.C. 2015) (finding that plaintiffs failed to allege specific facts that would support informational injury where lack of information did not "render its activities infeasible").

### III. Corps NEPA & ESA Procedures

NEPA requires federal agencies to include in "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C).  NEPA's "twin aims" are to obligate federal agencies to "consider every significant aspect of the environmental impact of a proposed action," and to "ensure[] that the agency will inform the public that it," *i.e.*, the federal agency, "has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983). The White House Council on Environmental Quality ("CEQ") promulgated regulations implementing NEPA, which are

---

[3] Here, Plaintiffs cannot show that they suffer "the type of harm Congress sought to prevent" when Congress expressly wrote into law that the kinds of NEPA and ESA procedures they seek are not required for state 404 permitting actions.

currently codified at 40 CFR Parts 1500 through 1508. *See* 85 Fed. Reg. 43,363 (July 16, 2020) (final rule adopting the most recent changes to the CEQ NEPA regulations).[4] Additionally, the Corps has adopted NEPA implementing regulations found at 33 C.F.R. Part 230.

Though Plaintiffs seem to base their informational injury on the availability of voluminous EISs, the Corps' NEPA regulations provide that "[m]ost permits will normally require only an EA," that is, an "Environmental Assessment" and not an EIS. 33 C.F.R. § 230.7(a). The Corps' NEPA regulations further provide that an "EA is a *brief document* which provides sufficient information to the district commander on potential environmental effects of the proposed action and, if appropriate, its alternatives, for determining whether to prepare an EIS or a FONSI." *Id.* at § 230.10(a) (emphasis added). "[N]o special format is required." *Id*. at § 230.10(b). The EA "should include a brief discussion of [1] the need for the proposed action, [2] or appropriate alternatives if there are unresolved conflicts concerning alternative uses of available resources, [3] of the environmental impacts of the proposed action and [4] alternatives and [5] a list of the agencies, interested groups and the public consulted. The document is to be concise for meaningful review and decision." *Id*. The Corps' requirements for an EIS, where required, refer back to the CEQ NEPA regulations. *Id*. at § 230.13.

In reality, few EISs are issued in Florida by the Corps for Section 404 individual permitting purposes alone. According to a report by the Government Accountability Office (GAO), "CEQ estimates that about 95 percent of NEPA analyses are [categorical exclusions, which do not provide the information Plaintiffs seek], less than 5 percent are EAs, and less than 1 percent are EISs." GAO, NEPA: Little Information Exists on NEPA Analyses, GAO-14-369, at 7 (April 2014), available at https://www.gao.gov/assets/gao-14-369.pdf. GAO reported that the U.S. Forest

---

[4] Though CEQ recently proposed new changes to its NEPA regulations, *see* 86 Fed. Reg. 55,757 (Oct. 7, 2021), those changes are not yet final or in effect.

Service, the U.S. Bureau of Land Management, the Federal Highway Authority, and the Corps of Engineers "are generally the most frequent producers" of EISs, though the GAO data showed that the Corps only issued between 33 and 43 EISs *annually for the entire Corps mission across the entire nation* from 2008 to 2012. *Id*. at 9-10 (Table 2). Section 404 permits are a fraction of the nationwide work conducted by the Corps that might trigger NEPA obligations. Situations requiring a Corps EIS often include actions involving coastal ports and waterways (a central part of the Corps' mission) that would still require Corps' review and approval (as well as separate Corps permits under various other statutes, such as Section 10 of the Rivers and Harbors Act, which has not been delegated to Florida). Section 404 permits for coastal projects have been retained by the Corps (as non-assumable waters).

While the Corps has stated that most Section 404 permits do not require an EIS and only require an EA, many projects that do, in fact, trigger the need for an EIS tend to be large-scale projects, such as major energy development projects, large highway construction projects, and other similar activities. In those contexts, project proponents usually need a variety of federal approvals, not just a Section 404 permit. A project that now requires a Florida-issued Section 404 permit *that also triggers another federal approval requirement* would still result in a federal NEPA review, notwithstanding Florida's 404 program approval. Plaintiffs ignore this reality. For example, federal funding for a large project independently triggers NEPA obligations irrespective of Section 404 procedures. Likewise, projects that involve federal lands may require federal easements, rights-of-way, or other federal approvals, thereby triggering NEPA reviews independent of Section 404 permitting. A review of the projects referenced by Plaintiffs in their complaint and supporting declarations illustrate why this point is important for analyzing standing here. For instance, the two Burnett Oil projects referenced by Plaintiffs (Nobles Grade and Tamiami Prospect) are subject to

NEPA review for reasons independent of Section 404 permitting (namely, proposed energy production on federal lands).[5] Likewise, the Northern District Wastewater Treatment Plant in Miami-Dade County, which Plaintiffs raised as a basis for their standing in this case, *see* Dkt. 31 at 31-32, was awarded over $400 million in federal loan guarantees under the "WIFIA" program, which separately triggers NEPA obligations independent of Section 404 permitting.[6] NEPA review occurs for these projects (and other projects that require a Section 404 permit and some other kind of federal approval) regardless of Florida's Section 404 program.

Plaintiffs assume whether an EIS is published for Section 404 projects is directly related to whether Florida or the Corps administers the Section 404 program. That is incorrect. CEQ provides access to an EPA-managed database of all EIS documents issued by federal agencies since 1987. https://ceq.doe.gov/get-involved/eis_filings.html. To provide an indication of the kinds of projects that triggered an EIS requirement pre- and post-assumption, counsel for Florida Intervenors ran a search of this database for EIS notices issued for the Corps of Engineers between January 1, 2019 to March 18, 2022 (the final two years of the Corps-led 404 program in Florida and the 15 months since Florida's assumption). The results of that search are provided in Exhibit B, which shows 11 distinct projects with Corps' EISs in that timeframe – *none* of which would be exempt from NEPA

---

[5] Adding to the speculative nature of Plaintiffs' assertion here, both of these permit applications were withdrawn by the permit applicants. Of the 7 projects raised by Plaintiffs as supporting their standing in this case, 4 projects were withdrawn by the project applicants after Florida requested additional information and other concerns were raised. Another small project, referred to by Plaintiffs as the Port 1850 project, involves approximately 5 acres of wetlands impacts, remains a pending application with Florida DEP, and under either a Corps-led or Florida-led 404 program, would not be expected to trigger obligations under NEPA, again reinforcing the speculative nature of Plaintiffs' informational injury claims.

[6] https://www.miamidade.gov/releases/2021-11-04-wasd-wifia-loan-announcement.asp. EPA's WIFIA Federal Compliance Requirements provide that a "proposed WIFIA project must be assessed for its impact on the environment under the guidelines set forth by NEPA." *See* EPA, *WIFIA Federal Compliance Requirements*, available at https://www.epa.gov/wifia/wifia-federal-compliance-requirements.

review now that Florida administers the 404 program: the Lake Okeechobee Water Restoration Project; the Port Everglades Harbor Project; the Florida Keys Coastal Storm Risk Study; Coastal Storm Risk Management Feasibility Studies (for Collier County and Miami-Dade County); the Combined Operational Plan (for Everglades National Park); Loxahatchee River Watershed Restoration Project; Central and Southern Florida Everglades Agricultural Area Project; Gulf Coast Parkway Project (new 30-mile highway crossing the Gulf Intracoastal Waterway); East Lake Tohopekaliga Drawndown Project (water control manual for reservoir classified as retained waters that remains subject to Corps 404 regulatory purview); and Eagle LNG Partners Jacksonville Project (FERC process). Setting aside that Plaintiffs have not even relied on these particular projects for standing, each triggers NEPA review independent of Florida 404 assumption. In other words, NEPA review for these projects would be unaffected by Florida's assumption of the Section 404 Program. The same is true for a host of other projects.

Likewise, under Section 7 of the ESA, the Corps consults with the USFWS and NMFS concerning impacts to listed species and their designated critical habitat. 16 U.S.C. § 1536(a)(2). Section 7 consultation, which only applies to federal actions, requires the Corps to "insure that any action authorized, funded, or carried out by [the Corps] is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated critical] habitat…" *Id.* As part of this process, *if a particular project is likely to adversely affect listed species or designated critical habitat* and the project is otherwise moving forward through the process (*i.e.*, the project is not rejected for other reasons or otherwise withdrawn or modified), the Corps engages in consultation under ESA Section 7, including preparation of a biological assessment, and in turn, the U.S. Fish and Wildlife Service and/or the

8

National Marine Fisheries Service[7] prepare a biological opinion. These ESA-based procedures, depending upon the nature of a particular project, provide the public with information about a project's potential impacts to listed species and habitat, including the possibility of incidental take of such species/habitat and any reasonable and prudent measures that may be necessary or appropriate to minimize such impacts. *See* 16 U.S.C. § 1536(a)-(c).

## IV.  Environmental Information Available to Plaintiffs under the Florida-led 404 Program

Plaintiffs (and others in the public) receive the same or similar kinds of environmental information with approval of the Florida Section 404 Program, and they can benefit from even *greater access* to permitting records and environmental information under the Florida-led program. The side-by-side comparison in Exhibit A illustrates these points in detail. Significant environmental information is made available to the public under the combined Florida Environmental Resource Permitting (ERP) Program and the Florida Section 404 Program, along with other state laws and regulations triggered by Florida's review of wetlands permits.[8] This is shown by a review of the relevant Florida Statutes, Florida Administrative Code provisions, the Florida ERP Handbook, the Florida 404 Handbook, the Memoranda of Agreement involving the State of Florida, EPA, the Corps, and other federal and state agencies, and various other

---

[7] Because the Corps retained jurisdiction over coastal waters in Florida, projects with impacts to marine species are retained by the Corps for review and processing. It is conjecture on the part of Plaintiffs to assume that particular projects that impact them would involve marine species for which the Corps would not be involved to process the permit. In any event, the species' reviews conducted under the Florida-led Section 404 program fairly match (or even exceed) the scope of reviews provided under the Corps-led program.

[8] Florida's 404 program now employs over 130 certified wetlands evaluators to process Section 404 permits.

programmatic materials published by the State of Florida.[9] Likewise, under the Florida Endangered Species Act, the terms of the Memorandum of Agreement between Florida and the U.S. Fish & Wildlife Service and Florida Fish & Wildlife Conservation Commission, as well as the Programmatic Biological Opinion issued in conjunction with EPA's approval of Florida's 404 program (including the Technical Assistance Process utilized by Florida DEP, USFWS, FWC, and NMFS), the same information related to species reviews and impacts are prepared and made available to the public.

Plaintiffs repeatedly oversimplify and mischaracterize the role of the Programmatic Biological Opinion [10] and related documents prepared in conjunction with EPA's approval of Florida's program. The Biological Opinion, along with the agreements between the federal and state agencies that are incorporated into the Biological Opinion, establishes a framework for coordinating species and habitat reviews under the Florida 404 program in a manner that aligns with existing Section 7 consultation processes. The USFWS-FDEP-Florida FWC Memorandum of Understanding (MOU) [11] is incorporated into the Biological Opinion and describes how this federal-state cooperative process will ensure comprehensive reviews of potential impacts to species and habitat. Notably, with regard to public information, the MOU expressly states that this "technical assistance with the USFWS will be accomplished *prior to the Public Notice*, when possible. The Public Notice

---

[9] The Administrative Record for this case includes copies of these documents. The Court also may be aided by reviewing the 155-page spreadsheet in the Administrative Record showing how the Florida ERP and Florida 404 Programs compare with federal requirements. *See* EPA-HQ-OW-2018-0640-0016-A3, available online at https://downloads.regulations.gov/EPA-HQ-OW-2018-0640-0016/attachment_3.pdf.

[10] The Biological Opinion is available in the Administrative Record (EPA-HQ-OW-2018-0640-00642), and is available on-line at https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0642.

[11] The Memorandum of Understanding is available in the Administrative Record at EPA-HQ-OW-2018-0640-0623 (also available on-line at https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0640-0623).

will include the types of anticipated impacts to endangered and threatened species as well as their critical habitat, and the proposed protection measures to offset those impacts." *See* MOU at pages 5-6. The MOU further explains that, after public notice, additional information and public concerns will be reviewed and addressed and made part of the file and "recommended conditions" will be "incorporated into the [state 404] permit." *Id.*

Taken together, even where the State of Florida administers the Section 404 Program, Plaintiffs are not deprived of relevant NEPA/ESA-type information concerning the following (at a minimum):

- purpose and need for a project,
- alternatives to the project,
- affected environment,
- environmental impacts (including cumulative effects),
- mitigation measures,
- socioeconomic information,
- historic/cultural/tribal information,
- comprehensive review of species and habitat information and impacts,
- coastal zone impacts, and
- public interest factors.

Plaintiffs still have access to the same environmental information that they had before, and in some instances, even more information.

## V. Florida's "Sunshine" Laws & Publicly-Accessible Permitting Databases

When evaluating Plaintiffs' claims of injury based on a *deprivation* of information, this Court should also consider Plaintiffs' *right of access* to environmental information as well. Importantly, Florida's Sunshine Laws (found at Chapter 119, Florida Statutes) provide broader access to governmental records and information than the federal corollary statute, the Freedom of Information Act, 5 U.S.C. § 552. *See* Fla. Const. Article I, § 24 (establishing constitutional right of access to public records in Florida); Fla. Stat. 119.07(1)(a) ("Every person who has custody of a public record shall permit the record to be inspected and copied by any person desiring to do so, at

11

any reasonable time, under reasonable conditions, and under supervision by the custodian of the public records."); Fla. Stat. § 119.011(12) (broadly defining a "public record"). This is not a hypothetical distinction in the ESA context, as the U.S. Supreme Court ruled just last year in a case brought by environmental organizations seeking federal endangered species information that federal FOIA blocks disclosure of deliberative process materials, including draft biological opinions. *See U.S. Fish & Wildlife Service v. Sierra Club*, 141 S. Ct. 777, 782 (2021) (holding that "[t]he deliberative process privilege protects from disclosure under [federal] FOIA in-house draft biological opinions that are both predecisional and deliberative, even if the drafts reflect the agencies' last views about a proposal"). Florida's Sunshine laws do not impose the same limitations on public access to information.

Likewise, Florida provides *real-time access* to state permit records related to Section 404 permit applications via publicly accessible DEP websites. Written communications to or from state officials (including permitting staff) regarding state business are available to the public. Records and information is readily available at no cost via one of DEP's online resources, including:

- Florida's "Oculus" System, which is a web-based electronic document management system providing access to public records associated with DEP permitted facilities and activities. Documents in Oculus are filed under a specific DEP program and facility. The public can access this system and search for all records under the Florida 404 Program, ERP Program, and various other Florida environmental programs. https://depedms.dep.state.fl.us/Oculus/servlet/login
- DEP Information Portal, which provides extensive information about projects, including permit application materials, public comments, agency correspondence, and all other associated records.

https://prodenv.dep.state.fl.us/DepNexus/public/searchPortal

In most respects, these databases provide more information on a real-time basis than is available from the Corps.[12]

Additionally, just as environmental groups gain access to broader information under Florida's Sunshine laws, Florida administrative law gives them greater opportunities to use that information to advance their interests in permit challenges. Florida law provides for a de novo permit hearing *before* a Florida 404 permit becomes effective, which provides affected parties with an opportunity to gain additional information (including via depositions and interrogatories) and to ensure consideration of that information in the hearing record. *See* Fla. Stat. § 120.57(1)(b). In that regard, environmental groups can build the administrative record in a de novo hearing, with testimony, presentation of experts, and questions directed toward state environmental officials and permit writers, something that is not available to them under federal procedures.

## VI.    Plaintiffs Lack Standing Based on Deprivation of Environmental Information

In light of this informational comparison, Plaintiffs clearly lack standing. The D.C. Circuit recently reiterated the proper framework for evaluating standing based on informational injury. *See Center for Biological Diversity v. Haaland*, 849 Fed. Appx. 2, *3 (D.C. Cir. 2021) (quoting *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017)). A "procedural injury ... must be tethered to some concrete interest adversely affected by the procedural deprivation." *Id.* (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)). The D.C. Circuit also cautioned against allowing litigants to "simply reframe" injuries in terms of "informational loss," as that tactic "could make 'an end run around the Supreme Court's procedural injury doctrine…'" *Id.* (quoting *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1260 (9th

---

[12] The Corps has an on-line permit database searching system available at https://permits.ops.usace.army.mil/orm-public#.

Cir. 2010)). A plaintiff has the obligation to give an "explanation *pinpointing* what information it has lost…" *Id.* at *4 (finding that plaintiff failed to show that it suffered informational injury) (emphasis added). Plaintiffs have not done so here. Generalized claims of "missing" information are not enough.

Plaintiffs have not even asserted a NEPA violation in their complaint and have brought no direct NEPA-based challenge here. This further distinguishes the current case from others where the deprivation of information justified standing. For example, in *Spokeo*, 136 S. Ct. at 1549-50, the Supreme Court cited two other informational injury cases where the Court found standing: *Federal Election Comm'n v. Akins*, 524 U.S. 11, 20–25 (1998), concerning access by voters to FEC data, and *Public Citizen v. Department of Justice*, 491 U.S. 440, 449 (1989), concerning access to information under the Federal Advisory Committee Act. Unlike those cases, which involved direct deprivations of information based on the statutory requirement directly at issue in the case, none of Plaintiffs' claims here assert a violation of NEPA as such; to the contrary, Plaintiffs assert a kind of indirect deprivation of information – not from the statutory program at issue in the direct challenge (Section 404 of the Clean Water Act), but from other statutory programs (particularly, NEPA), which Congress has already expressly deemed inapplicable to state-administered 404 programs.

Finally, Plaintiffs' purported informational injury is not redressable. Even if the Court *could* grant a vacatur of the program (which Florida Intervenors respectfully suggest it cannot, *see* Dkt. 46 at 25-29), the purported informational injury from a lack of NEPA review and ESA consultation is not redressable where federal statutes do not impose those obligations.

CONCLUSION

Plaintiffs are not deprived of specific meaningful environmental information in a way that satisfies the Supreme Court's test for informational standing. Plaintiffs' lawsuit should be dismissed for lack of standing.

Dated: March 18, 2022

Respectfully submitted,
BAKER BOTTS L.L.P.

/s/ Jeffrey H. Wood
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

Lily N. Chinn (DC Bar No. 979919)
101 California Street
San Francisco, CA 94111
Phone: (415) 291-6200
lily.chinn@bakerbotts.com

Aaron M. Streett (TX Bar No. 24037561)
Harrison Reback (TX Bar No. 24012897)
(*pro hac vice*)
910 Louisiana Street
Houston, TX 77002-4995
Phone: (713) 229-1234
aaron.streett@bakerbotts.com
harrison.reback@bakerbotts.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of March 2022, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

<u>/s/ Jeffrey H. Wood</u>
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com