**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

    Plaintiffs,

    v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

    Defendants.

**CASE NO.** 1:21-cv-119 (RDM)

## PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF SUPPLEMENTAL BRIEF ON REDRESSABILITY

At oral argument, EPA acknowledged it could consider Plaintiffs' Section 705 stay request if the Court found that the transfer of 404 authority to Florida should not have been effective during the 30-day period following publication of EPA's final rule approving the state program. Dkt. 73 at 37. The Court subsequently held that Section 705 conferred a procedural right on Plaintiffs to seek a stay of the rule pending judicial review, and that EPA's refusal to consider Plaintiffs' timely stay request constituted a cognizable harm. Id. at 37–41, 42–44. EPA does not dispute the Court's authority to craft the remedy Plaintiffs seek. Dkt. 82 at 2. Instead, EPA avers that if it were to consider Plaintiffs' stay request, the agency would be "obliged" to deny it as a matter of law. Id. But, for the reasons explained below, EPA is wrong on the law. The agency should therefore consider the stay request on the merits. As EPA has not opined on (or yet considered) the merits of Plaintiffs' stay request, there remains "some possibility" that the agency would grant relief. Dkt. 73 at 25, 45, 48; Massachusetts v. EPA, 549 U.S. 497, 518 (2007); Nat'l Council for Adoption v. Blinken, 4 F.4th 106, 113 (D.C. Cir. 2021) (possibility that agency would reconsider is enough). Plaintiffs' injury is therefore redressable.

1

Contrary to the briefs in opposition, Plaintiffs' requested remedy is drawn directly from the text of the Administrative Procedure Act, 5 U.S.C. § 706(2), which instructs courts to "set aside" unlawful agency action—in this case, an unlawful immediate effective date premised on the theory that EPA's approval of Florida's program was an "adjudication" rather than a rulemaking.[1]  Under Prows v. U.S. Dep't of Just., 938 F.2d 274, 276 (D.C. Cir. 1991), "a violation of Section 553(d) requires a remedy that makes 'whole' 'those who are affected by agency action taken [or refused] during the 30-day waiting period.'"  Dkt. 73 at 31.

A Court order granting this relief for a period of 30 days would restore the status quo ante so as to allow EPA to consider Plaintiffs' stay request.  At that time, EPA would be tasked with deciding whether to postpone a now lawful effective date (and so maintain the status quo ante) or to allow resumption of Florida's 404 program pending judicial review, after weighing all relevant considerations in favor and against.  The Court has the authority to grant this relief, and once the relief is granted, the agency would have the authority to consider Plaintiffs' request. Whatever effect maintaining the Corps' 404 authority pending judicial review might have on federal agencies, the state, and developers is a matter for *EPA* to take into account as it weighs the equities of a stay—along with the strength of Plaintiffs' claims and the equities that weigh in favor of a stay, including the state's abysmal administration of Section 404[2] and the need to protect vast wetlands and threatened and endangered species in one of the most biodiverse states

---

[1] The opposing parties mischaracterize the requested relief as seeking to vacate EPA's approval of the state 404 program.  Dkt. 82 at 2; Dkt. 84 at 3.  But the approval decision is not yet at issue. The question before the Court is whether Plaintiffs should the opportunity to have their agency stay request considered pending judicial review of EPA's approval decision.

[2] EPA recently articulated a number of concerns with Florida's implementation of the 404 program, including that the state continues to apply a narrow, vacated definition of the waters of the United States subject to protection under the Clean Water Act.  Letter from Frederick Thompson, Acting Reg'l Adm'r, EPA, Region 4, to Emile Hamilton, Sec'y, Fla. Dep't of Env't Prot. (May 23, 2022), Exh. 1 at 2–3.  See also Dkt. 59.

in the nation.  Neither the passage of time nor equitable considerations that may weigh against

the agency granting a stay form a basis for the Court to deny Plaintiffs the chance to be heard.

### I.   A Court Order Setting Aside EPA's Unlawful Effective Date Would Restore the Status Quo Ante and EPA's Ability to Consider Plaintiffs' Stay Request.

EPA claims that it lacks legal authority to grant a Section 705 stay, because 705 agency

stays are intended to preserve the status quo, and here the status quo has changed with the

passage of time.[3]  Dkt. 82 at 2, 6 (arguing that no remedy is available because of the limited

scope of EPA authority under Section 705).  But EPA's argument completely sidesteps the

agency's legal violation that allowed the status quo to change without consideration of Plaintiffs'

stay request, in violation of Plaintiffs' right to seek a 705 agency stay.  And EPA precluded

Plaintiffs' ability to seek an agency stay in two ways: first by classifying its action as an

"adjudicatory order" rather than a rule, and then by giving that action immediate effect (rather

than a delayed effective date of at least 30 days after publication as required for rules).  EPA's

entire discussion of its 705 authority fails to acknowledge that EPA unlawfully gave the 404

transfer immediate legal effect in such a way so as to deprive Plaintiffs of their right to seek an

agency stay pending review.  It cannot be the answer to say, as EPA does, that Section 705 itself

precludes any remedy for EPA's deprivation of Plaintiffs' right under Section 705.[4]

Moreover, EPA's argument puts the cart before the horse.  The remedy Plaintiffs ask *of*

*the Court*—holding unlawful and setting aside the rule's immediate effective date—would

---

[3] As discussed further below, Plaintiffs acted swiftly to litigate this claim.  It was EPA and Florida who sought to delay its resolution, thereby contributing to the "passage of time" on which they now rely to deny Plaintiffs relief.  Other pressing matters have likely also required the Court's time, see, e.g., Saxton v. McDonough, 2022 WL 136796, at *4 n.2 (D.D.C. Jan. 14, 2022), but the passage of time should not be a basis to deny Plaintiffs relief.

[4] Florida similarly argues that the 553(d) violation itself precludes any remedy because the rule already took effect, Dkt. 83 at 1, even if the rule took effect unlawfully and deprived Plaintiffs of a cognizable right.

restore the status quo ante, at least long enough for EPA to consider the merits of Plaintiffs' stay request.  This is the specific remedy that the APA calls for (setting aside unlawful agency action), the only remedy that would allow EPA to consider Plaintiffs' stay request (to postpone a *lawful* effective date), and the necessary remedy to satisfy <u>Prows</u>' mandate that Plaintiffs be made "whole" for a 553(d) violation.  938 F.2d at 276.  It is an imperfect remedy (because it would not undo the destruction of wetlands and other ecological harms already caused by the state program over the past year), but it would come closest to restoring Plaintiffs to the position they would have had but for EPA's legal violation.

Only once the Court acts would the matter turn to EPA to determine whether to grant a Section 705 stay (thus maintaining the status quo with the Corps administering 404) or deny it (allowing the state program to resume), after considering Plaintiffs' legal claims, irreparable harms, a weighing of the equities, and the public interest.  EPA's and Florida's assertions regarding the potential impact of an agency stay on the regulated community are premature *here*, because those matters go to the equities the agency must weigh *once the stay request is before it*.  EPA's recent assessment of deficiencies in the state program would also have to be taken into account,[5] as would the additional equities that weigh in Plaintiffs' favor with regard to the destruction of wetlands and harms to protected species and the ecosystems on which they rely.  Dkt. 31-1, Exh. F; Dkt. 31-1 to 31-7.

There is nothing novel about recognizing the status quo ante as the legally relevant "status quo" for purposes of remedying a legal violation.  In the context of injunctions, it is the

---

[5] These concerns include the state's continued application of a vacated definition of waters of the United States, inadequate documentation supporting determinations that "no permit is required," insufficient documentation of coordination with federal wildlife agencies to ensure protection of listed species, and issuance of after-the-fact permits for unauthorized discharges prior to resolution of enforcement matters.  Exh. 1 at 2–3, 6–7.

status quo that preceded the contested act that must be considered.  Huisha-Huisha v. Mayorkas, 27 F.4th 718, 733 (D.C. Cir. 2022) (injunctions are intended to preserve the last uncontested status); Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am., 412 F.2d 165, 168 (D.C. Cir. 1969).  This principle applies equally to a Section 705 stay, including one granted after a rule has gone into effect.  Centro Legal de la Raza v. Exec. Off. for Immigr. Rev., 524 F. Supp. 3d 919, 950–51 (N.D. Cal. 2021) (treating legally relevant status quo for granting Section 705 stay after rule has gone into effect as the status quo ante); Thatikonda v. U.S. Citizen & Immigr. Servs., 2020 WL 2126716 at *6 (D.D.C. 2020) (court's retroactive 705 stay of effective date of work visa denial restored plaintiff's lawful work status).  And, as this Court has recognized, Section 705 grants courts *and* agencies "the same 'equitable' authority to 'maintain the status quo.'"  Bauer v. Devos, 325 F. Supp. 3d 74, 105–106 (D.D.C. 2018).  Here, it would be the Court to restore the status quo ante as a remedy to an APA violation, and then the agency to decide whether to maintain that status quo in light of Plaintiffs' request for a 705 stay.

EPA's reliance on California v. U.S. Bureau of Land Mgmt., 277 F. Supp. 3d 1106, 1125 (N.D. Cal. 2017), is misplaced.  Dkt. 82 at 3.  In that case, the Bureau of Land Management ("Bureau") promulgated a final rule.  Five months after the rule lawfully took effect, the Bureau invoked Section 705 to issue a notice postponing the rule's compliance dates.  But the rule's effective date was not unlawful, and there had not been any deprivation of a party's right to seek an agency stay before the rule took effect.  Here, the matter is quite different.  The Court has before it an APA violation which deprived Plaintiffs of the right to seek an agency stay before the rule took effect (thereby changing the status quo).  The rule's unlawful effective date resulted in the deprivation of a right.  The APA instructs the Court to set aside the unlawful agency action, and Prows calls on the Court to make the Plaintiffs whole.  Once the Court sets aside the

unlawful effective date, restoring the status quo ante, EPA can consider Plaintiffs' stay request and then determine whether to postpone a—now lawful—effective date.[6]

EPA argues that if it were to restore 404 authority to the Corps, this would be tantamount to a rulemaking in the same way that transferring authority to the state was a rulemaking, and that rulemaking exceeds the scope of the agency's Section 705 authority.  Dkt. 82 at 4; see also Dkt. 84 at 2.  But this argument too ignores that the question arises not in the abstract, but in the context of affording a remedy for EPA's legal violation that deprived Plaintiffs of a cognizable right.  And again, it is the Court that would be restoring 404 authority to the Corps (the status quo ante), not EPA.  EPA would then be in the position to decide whether to maintain the Corps' 404 authority, or whether to allow the rule to resume pending judicial review.  EPA refuses to grapple with the fact that the state's "up and running" program took effect *unlawfully* through an immediate effective date that deprived Plaintiffs of a right to seek an agency stay before the program took effect.  But for that violation, Florida's program might never have gotten off the ground either by agency action through the Klain memo[7] or by the granting of Plaintiffs' request for an agency stay.  See, e.g., 86 Fed. Reg. 6,847 (Jan. 25, 2021) (delaying for 60 days, via notice issued on January 21, 2021, the effective date of a rule published on December 23, 2020, with an effective date of January 22, 2021).  In this instance, if EPA were to grant the stay, the agency

---

[6] Becerra v. U.S. Dep't of the Interior, 276 F. Supp. 3d 953, 964 (N.D. Cal. 2017), also cited by EPA, Dkt. 82 at 3, merely stands for the proposition that an agency may only postpone a rule's effective date (rather than its compliance dates) with a 705 stay.
[7] 86 Fed. Reg. 7,424 (Jan. 20, 2021) (Memo from Ronald A. Klain, Assistant to the President and Chief of Staff).

would not be engaging in rulemaking because it would be preserving the status quo ante, a status

quo that should not have been disturbed as a matter of law.[8]

EPA argues that a Court order cannot restore the status quo ante.  Dkt. 82 at 4–5.  But this

is plainly wrong as a matter of law.  See, e.g., California v. Bernhardt, 472 F. Supp. 3d 573, 587

(N.D. Cal. 2020) (vacatur of postponement notice restored status quo ante).  The Court enjoys

both statutory and broad equitable authority to remedy an APA violation.  Restoring the status

quo ante by setting aside an unlawful effective date is not only well within the Court's powers, it

is also the standard remedy for a violation of the APA.[9]  Allina Health Servs. v. Sebelius, 746

F.3d 1102, 1110 (D.C. Cir. 2014) (describing vacatur as "the normal remedy" for APA

violation).[10]  The Court also has broad equitable authority to craft relief that "ensure[s] the

vindication of plaintiffs' rights."  Cobell v. Norton, 240 F.3d 1081, 1108 (D.C. Cir. 2001)

(affirming equitable remedy where agencies had delayed performance of their legal obligations).

Where, as here, the public interest is involved, "equitable powers assume an even broader and

more flexible character than when only a private controversy is at stake."  Porter v. Warner

Holding Co., 328 U.S. 395, 398 (1946); see also United States v. Price, 688 F.2d 204, 211 (3d

Cir. 1982) ("A court of equity has traditionally had the power to fashion any remedy deemed

---

[8] Despite articulating these as concerns, EPA also takes the position that the Court should not require notice and comment for the agency to consider Plaintiffs' stay request.  Dkt. 82 at 2 n.2.  Plaintiffs agree that 705 stay requests do not require notice and comment, and in any event, the regulated industry has had notice of these proceedings and would have an opportunity to advocate its position to EPA should the Court grant relief.  EPA's citation to Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 543 (1978), Dkt. 82 at 2 n.2, simply stands for the proposition that courts should not dictate agencies' rules of procedure.
[9] It is difficult to square EPA and Florida's argument that the Court lacks the authority to grant the limited relief Plaintiffs have requested here (which would temporarily restore the status quo ante so that EPA can consider Plaintiffs' stay request), while acknowledging that the Court has authority to stay the program itself, which would restore the status quo ante throughout the remainder of this litigation.
[10] Here, any "vacatur" would be a temporary suspension of an unlawful effective date.

necessary and appropriate to do justice in the particular case.") (citing <u>Hecht Co. v. Bowles</u>, 321 U.S. 321, 329, (1944)).

EPA's references to regulations governing scenarios outside the litigation context (such as when a state voluntarily relinquishes its program or EPA withdraws approval of a state program) and to the months it took Florida to issue its first permit, Dkt. 82 at 5, have no bearing on the Court's authority to remedy a statutory violation that has resulted in the deprivation of a cognizable right. At most, EPA suggests that it might take time for the Corps to fully resume some operations, and that this could only be completed if the agency grants a stay. But EPA's argument has no bearing on the legal effect of a Court order restoring the status quo ante, just as EPA's immediate effective date transferring authority to the state had immediate legal consequences even if it took the state months to even issue a permit. Moreover, EPA refers only to a potential temporary pause in "permitting activity." <u>Id.</u> EPA's myopic view ignores other critical aspects of Section 404 which the Corps could undertake swiftly, such as jurisdictional determinations and enforcement against the unpermitted dredging and filling of wetlands in Florida, including those ignored by the state because they are not covered by the vacated Navigable Waters Protection Rule, which the state continues to apply in defiance of federal law.

## II.  The "Consequences" of an Agency Stay are Factors for Agency to Consider with Plaintiffs' Stay Request, not a Basis to Deny Chance to be Heard.

EPA asks the Court to consider "the consequences" of an agency stay. Dkt. 82 at 3. But it is the agency's job, not the Court's, to consider those factors (among other equities) when it considers a stay request. Moreover, these so-called "consequences" are nothing more than maintaining the very same processes that were in place in Florida for more than 40 years before EPA precipitously (and unlawfully) transferred that authority to the state—processes that are well familiar to everyone with an interest in Section 404 given their longstanding operation in

the state.  Without apparent irony, the same EPA that once transferred 404 authority "immediately" to an ill-equipped, under-staffed, and un-funded state agency now laments that if it were to grant an agency stay, the Corps—which has administered 404 for decades and continues to do so for 47 other states—would have "little-to-no-opportunity to prepare."[11]

EPA's "consequences" include that the Corps' administration of 404 would once again require the dredging and filling of wetlands to comply with additional federal laws intended to protect the environment.  Dkt. 82 at 3.  Plaintiffs submit these are factors that weigh in *favor* of granting a stay.  But regardless, the point is that they are factors that go toward whether a stay should be granted by the agency, not whether Plaintiffs' claim is redressable by the Court.  And there are other factors the agency would have to consider as well: the likelihood that Plaintiffs will succeed on the merits of their claims that the state program is unlawful, harms caused by the state's administration of the program, and the public interest.  EPA would also have to consider the deficiencies the agency has identified in the state's administration of the program over the past year.  Perhaps EPA would prefer to avoid this reckoning—either for administrative, political, or other reasons—but it cannot do so by punting a subset of equity concerns to the Court in the hopes of avoiding having to comply with the law and render a decision on Plaintiffs' stay request.

---

[11] Florida claims that the Corps "transferred thousands of permit files" to the state upon transfer of 404 authority.  Dkt. 83 at 2.  But the state's own website says there were only 591 applications transferred, and that about 200 of those were for jurisdictional determinations.  Fla. Dep't of Env't Prot., State 404 Program Frequently Asked Questions (FAQ) and Answers, https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/state-404-program-frequently (last visited June 30, 2022).  Plaintiffs are not surprised if the number of applications has since increased as developers rush to take advantage of a less protective scheme to secure permit approvals and "no permit required" determinations.  The state's touting of its comprehensive regulatory program, Dkt. 83 at 2, is belied by EPA's recent comments regarding deficiencies with the program.

### III.    Administration of Section 404 is Not a Scrambled Egg.

Florida's egg argument has no applicability in the particular circumstances here, because restoring authority to the Corps to administer an ongoing federal program *is* an "apparent way to restore the status quo ante." Cf. Dkt. 83 at 2, 7.  Unlike the cases on which Florida relies, granting relief here would not require un-plowing for a sugar crop season gone by, recouping specific agricultural disbursements, or the recalculation of shipping invoices four years after the fact. Cf. Sugar Cane Growers Co-op. of Fla. v. Veneman, 289 F.3d 89, 97 (D.C. Cir. 2002); Milk Train, Inc. v. Veneman, 310 F.3d 747, 756 (D.C. Cir. 2002); Am. Great Lakes Ports Ass'n v. Schultz, 962 F.3d 510, 519 (D.C. Cir. 2020).  Also unlike in Sugar Cane Growers, Milk Train, and Am. Great Lakes Ports Ass'n, the harms here from administration of the state program are repeated and ongoing; because the state program is inadequate under federal law, a harm occurs every time the state issues a permit, deems that a permit "is not required," fails to exercise jurisdiction over waters that should be protected by federal law, and fails to enforce compliance with federal law.  No remedy in life can go back in time, but the Court can and should restore the legal status quo ante (restoring jurisdiction to the Corps for a brief period of time) for the purpose of allowing EPA to consider Plaintiffs' stay request.[12]

Nor is this case like Defs. of Wildlife v. Jackson, 791 F. Supp. 2d 96 (D.D.C. 2011), also cited by Florida.  Dkt. 83 at 7.  In that case, vacatur of a particular pesticide's registration would

---

[12] Florida claims that the remedy Plaintiffs request of the Court is "drastic," Dkt. 83 at 8 n.4, yet in actuality it is tailored to allow a remedy for the violation.  The real concern underlying Florida's brief is what would happen if EPA *granted* Plaintiffs' stay request.  While Florida claims it is clear this would never happen (and so therefore the Court should not even give Plaintiffs a chance), Florida's concerns about the fate of its program only make sense in the context of the agency actually granting the stay pending judicial review.

have created chaos in an industry where the pesticide was already sold and in use by farmers in various states to control prairie dog populations, and the manufacturer had voluntarily cancelled its local use registrations in reliance on EPA's registration of the product.  Defs. of Wildlife, 791 F. Supp. 2d at 119.  Here there would be no such disruptive effect.  Plaintiffs do not request the vacatur of any particular permit, the matter is one of restoring jurisdiction over a permitting (and, when properly administered, enforcement) program to the federal government long enough to allow consideration of Plaintiffs' stay request.

## IV.     The Court Should Reject the Invitation to Afford Plaintiffs No Remedy.

EPA dismisses Plaintiffs' argument that there must be a remedy for the agency's APA violation because failure to grant one would invite future violations (and that this presupposes bad faith).[13]  Dkt. 82 at 5.  And yet that precise concern has motivated this court before.  In Ngou v. Schweiker, 535 F. Supp. 1214, 1215 (D.D.C. 1982), plaintiffs faced harms (loss of medical and financial benefits) that began during the 30-day period after a rule's promulgation and would continue thereafter.  The court enjoined the rule's effective date for a reasonable period following the court's ruling that plaintiffs were likely to prevail on their claim that the agency violated Section 553(d).  Id. at 1217–18.  In rejecting the agency's argument that the only available remedy was a retroactive 30-day extension of the rule's effective date, the court opined that such a remedy would only "invite[] violations of section 553(d)."  Id. at 1217 (citing cf. N.J. Dep't of Env't Prot. v. EPA, 626 F.2d 1038, 1049 (D.C. Cir. 1980)).

---

[13] It is worth observing that EPA has never advanced an explanation for why the agency did *not* follow its ordinary practice of codifying state 404 programs, which indisputably would have delayed the effective date of the rule here into the new administration.  Dkt. 78 at 4.  The only reasonable inference is that the prior administration sought to tie the incoming administration's hands while depriving the public of any recourse.  (Contrary to Florida's characterization of this section of their brief, Dkt. 83 at 10–11, Plaintiffs' accounting was intended to demonstrate EPA's departure from its ordinary practice.)

Indeed, the risk of future violation is heightened here, since EPA continues to adhere to the position that authorizing Florida's 404 program was an adjudication rather than a rulemaking, in which case 553(d) would not even apply.  If the Court were to find Plaintiffs' claims not redressable here, it would also not reach the merits of Plaintiffs' claim.  EPA would then be free to continue treating 404 transfers of authority (with entirely different regulatory regimes, processes, and rules) as adjudications with immediate effect, again depriving the public of any opportunity to seek an agency stay before the rule takes effect.

Without citing legal authority to support the proposition, EPA, Florida, and Amici argue that Plaintiffs should be deprived a remedy because they did not seek and obtain emergency relief from the Court, presumably between December 22, 2020, and January 21, 2021.  Dkt. 82 at 6; Dkt. 83 at 1–2; Dkt. 84 at 2.  Not only is this argument irrelevant as a matter of law, but Plaintiffs did not sit on their rights.  On December 22, 2020, they immediately notified EPA (and the state) of the violation, promptly filed suit on January 14, 2021, timely submitted an expedited petition for the agency to acknowledge its action was a rule and consider Plaintiffs' stay request on January 20, 2021, and then sought leave from the Court to move early for summary judgment on this claim by January 29, 2021.

But Defendants opposed Plaintiffs' request for early summary judgment on Claim 8. EPA argued it was not "appropriate" for Plaintiffs to move so quickly given that the government should have sixty days to respond to the complaint.  Dkt. 22 at 1.  EPA urged the Court that Plaintiffs' claims did not require "immediate" resolution and argued that Plaintiffs would not be able to establish standing "because Florida's section 404 program is barely a month old, and, as of this writing, the state has not yet issued a single permit."  Id. at 1-2.

Florida similarly asked the Court to deny Plaintiffs the ability to move early for partial summary judgment, urging that "the proper and well-trod path here is for the Court to deny Plaintiffs' request and set a schedule for motions to dismiss, compilation of the administrative record, and cross-motions for summary judgment." Dkt. 23 at 2. Florida further argued that Plaintiffs had suffered no harm and that in any event the passage of time (*then* 45-50 days) had already rendered Plaintiffs' claims moot. Id. at 6. At the pre-filing hearing, Florida also insisted for the right to cross-move to dismiss on all claims, thereby multiplying the proceedings and requiring more of the Court's time. Dkt. 37. Having prolonged the resolution of Plaintiffs' claim, Defendants and Intervenors should not now be rewarded with a finding that relief is not available because now it is "too late."[14]

As the court observed in Ngou, "the 30-day notice requirement, like the notice and comment procedures prescribed in Sections 553(b) and (c), is designed to ensure adequate public participation in the rule-making process." 535 F. Supp. at 1216. And the "primary purpose" of section 553(d)'s delayed effective date is to afford persons affected a reasonable time to prepare for the effective date of a rule, and to take any other action which the issuance may prompt—including exercising the right to petition the agency to postpone the rule's effective date. Nance v. U.S. Env't Prot. Agency, 645 F.2d 701, 708–09 (9th Cir. 1981); Rowell v. Andrus, 631 F.2d 699, 703 (10th Cir. 1980). Imposing a requirement that the public, harmed by unlawful agency action, seek and secure relief on an emergency basis would render violations of 553(d) virtually

---

[14] It would also be unduly burdensome to require those harmed by federal agency violations, which often includes parties with limited resources, to obtain emergency relief in federal court in order to be able to vindicate this right. Ngou v. Schweiker, 535 F. Supp. 1214 (D.D.C. 1982). In this case, it may be worth remembering that this particular 30-day period occurred at a time of holidays, a pre-vaccine pandemic, an insurrection, and a change in presidential administrations.

unenforceable.  See N.J. Dep't of Envt'l Prot., 626 F.2d at 1049 (in context of notice and comment violation, rejecting remedy that would render requirement "virtually unenforceable").

Florida argues that there is no ruling the Court can fashion to remedy the violation.  Dkt. 83 at 3.[15]  But for this argument, Florida relies on the wrong legal standard: that for preliminary injunctions.  Dkt. 83 at 3 (citing Nken v. Holder, 556 U.S. 418, 434 (2009)).  This issue is before the Court on summary judgment.  Plaintiffs do not seek a preliminary relief, they seek final judgment.  Plaintiffs are not relying on the Court's equitable powers to grant preliminary relief through the exercise of discretion, they are relying on the remedy for violations of the APA.  The standard for preliminary relief is heightened because there, the Court is granting relief "before the legality of [the challenged action] has been conclusively determined."  Nken, 556 U.S. at 428.  Here, the Court has made all the determinations as to the legality of EPA's immediate effective date, Dkt. 78 at 6–7; the only issue the Court has left to resolve is redressability.  As Plaintiffs have shown, the Court has the authority to grant the relief Plaintiffs seek.

## V.    Plaintiffs Have Met the Redressability Standard for a Procedural Violation.

Florida argues that EPA's statement that it would be "obliged" to deny Plaintiffs' stay request is fatal to the redressability of Plaintiffs' claim.  Dkt. 83 at 5.  But as shown above, EPA's position is based on an error of law.  EPA has expressed no view (and claims it has always lacked the authority to consider) the merits of Plaintiffs' request.  It therefore remains possible that EPA could grant the request.  See Dkt. 73 at 25, 45, 48.

---

[15] Florida takes the position that the violation itself renders a remedy impossible.  Dkt. 83 at 1 (arguing tautologically that even if Claim 8 has merit—meaning that the rule took immediate effect unlawfully and Plaintiffs were thus deprived of the right to seek an agency stay—EPA could not consider stay request because the rule already went into effect).

Relying on a recent Circuit panel decision, <u>Marino v. Nat. Oceanic & Atmos. Admin.</u>, 33 F.4th 593, 597–98 (D.C. Cir. 2022), Florida argues that it is not sufficient for Plaintiffs to show "some possibility" that EPA would grant their stay request, <u>cf.</u> Dkt. 73 at 45, but rather that they must demonstrate this relief is likely.  Dkt. 83 at 5.  But as several prior panel decisions demonstrate, Florida's argument fails.

A plaintiff asserting procedural injury "never has to prove that if he had received the procedure the substantive result would have been altered."  <u>City of Dania Beach, Fla. v. Fed. Aviation Admin.</u>, 485 F.3d 1181, 1186 (D.C. Cir. 2007) (quoting <u>Sugar Cane Growers</u>, 289 F.3d at 94); Dkt. 31 at 26; Dkt. 43 at 51–52.  <u>See also</u> <u>Nat'l Council for Adoption</u>, 4 F.4th at 113 (possibility that agency would reconsider is enough); <u>Am. Fuel & Petrochemical Mfrs. v. EPA</u>, 937 F.3d 559, 595 (D.C. Cir. 2019) (finding redressability where there "remains at least the possibility" that EPA would have promulgated different standards had it complied with obligations); <u>Idaho v. Interstate Com. Comm'n</u>, 35 F.3d 585, 591 (D.C. Cir. 1994) ("neither the causation requirement nor the redressability requirement for constitutional standing should hinder enforcement of 'procedural rights'").  A panel of the Circuit Court cannot abrogate or overrule this controlling body of case law absent circumstances not present here.  <u>LaShawn A. v. Barry</u>, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (under law of the Circuit doctrine, a three-judge panel "does not have the authority to overrule another three-judge panel of the court").[16]

Moreover, the panel holding in <u>Marino</u> was driven by the specific facts presented there. In <u>Marino</u>, the plaintiffs sought medical and necropsy information related to the deaths of

---

[16] Although the panel in <u>Marino</u> opined that the "some possibility" standard applies only to sovereign plaintiffs such as states, when the Supreme Court articulated that standard in <u>Massachusetts v. EPA</u>, 549 U.S. at 517–18, the Court relied on <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555 (1992), and this Circuit's precedent in <u>Sugar Cane Growers</u>, which both involved private plaintiffs.

publicly displayed marine mammals (such as for Tillikum, one of the orcas that recently died at SeaWorld in Florida).  33 F.4th at 595.  Plaintiffs sought to have the National Marine Fisheries Service (NMFS) enforce a common condition for permits to publicly display certain marine mammals, which required that the medical and necropsy information of publicly displayed marine mammals be sent to NMFS when one of them dies.  Id.  NMFS declined to enforce the permit condition, claiming that an amendment to the Marine Mammal Protection Act had shifted this responsibility to a different agency more than 20 years ago.  Id. at 595–596.  On a motion to dismiss, the district court found plaintiffs lacked standing.  Id. at 596.  The Court of Appeals affirmed, finding that plaintiffs had made "no allegation addressing the likely effect of a favorable ruling" on NMFS' behavior.  Id. at 597.  The Court noted that whether to enforce permit conditions was entirely permissive and subject to prosecutorial discretion, and that plaintiffs had not alleged "any reason to believe" the agency would choose to enforce the permit conditions if plaintiffs prevailed.  Id.[17]

Even if a heightened standard applied (and it does not), several factors point to a likelihood that EPA would grant Plaintiffs' stay request here.  First, EPA's approval of Florida's program could not have lawfully taken effect until the day after the inauguration of a new administration.  And, on day one the Biden administration issued a directive that all agencies consider postponing the effective date of rules that had not yet taken effect to allow the President's leadership to review them.  Dkt. 73 at 26 n.5.  In addition to stays, the Klain memo specifically directed agencies to consider pending petitions for reconsideration of rules not yet in effect.  The same day, President Biden issued his Executive Order on Protecting Public Health

---

[17] The Court further found no allegation that the third-party private actors would provide the required information if plaintiffs prevailed.  Marino, 33 F.4th at 598–99.

and the Environment, demonstrating the new administration's particular interest in environmental issues, including clean water. [18]   Florida's 404 program was only the third state program in the long history of the Clean Water Act and relied on new "mechanisms" to facilitate state administration of Section 404 (the workarounds challenged in this action).   It is therefore likely that this action would have been stayed for review by the new administration had it not been given immediate effect 29 days before inauguration.

In addition, EPA has had Plaintiffs' stay request before it since January 20, 2021.   In all this time, EPA has not denied the request, and, even after multiple inquiries from this Court, EPA has never said it *would* deny the request on the merits.   EPA has only said that it believes it lacks the authority to grant the request.   To this day, EPA has not promulgated the "final rule" that would codify the state 404 program consistent with its past practice.   The January 14, 2021, Pre-Publication Notice of that action has never moved forward.[19]   And even if codification is not required by law, as this Court has found, the hesitation to put this administration's imprimatur on Florida's program is palpable.

EPA has objected to the state's lawless insistence to continue applying the vacated Navigable Waters Protection Rule, which dramatically limited the scope of waters protected under Section 404 of the Clean Water Act, and has identified additional deficiencies in Florida's administration of the program which would weigh in favor of the agency staying the program pending judicial review.   Exh. 1.   And in the most recent briefing to this Court, EPA specifically

---

[18] Exec. Order No. 13,990, 86 Fed. Reg. 7037 (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-protecting-public-health-and-environment-and-restoring-science-to-tackle-climate-crisis/.

[19] Env't Prot. Agency, Pre-publication Notice: Codifying EPA's Adjudicatory Decision on Florida's Clean Water Act Section 404 Program Request (Jan. 14, 2021), https://www.epa.gov/cwa404g/pre-publication-notice-codifying-epas-adjudicatory-decision-floridas-clean-water-act.

disavowed the suggestion "that it could not or will not initiate withdrawal proceedings," which would initiate termination of Florida's approval altogether.  Dkt. 82 at 6 n.4.  The opposition's lengthy exposition of the potential impacts an agency stay could have on federal agencies, the state, and developers suggests a concern that EPA may very well grant the request.

Moreover, unlike the prosecutorial discretion involved in Marino, an agency is not free to disregard a stay request and the deprivation of the right "at least to be heard" on a stay request constitutes a cognizable harm.  Dkt. 73 at 38–40.  The agency's consideration of a Section 705 stay request also is not unbridled.  The agency typically applies the 4-factor test similar to that for preliminary injunctions, it must comply with the Administrative Procedure Act (i.e., its decision cannot be arbitrary and capricious), and its decision constitutes final agency action subject to judicial review.  Bauer v. Devos, 325 F. Supp. 3d 74, 103–106 (D.D.C. 2018).

Plaintiffs have therefore established reason to believe that EPA would grant Plaintiffs' stay request were the Court to hold it has authority to consider it.  To the extent Florida complains that Plaintiffs did not adequately plead this matter in the amended complaint, Dkt. 82 at 4–5, Plaintiffs point out that the Court's focus on pleading in the Marino decision was because that case arose in the context of a motion to dismiss and the Court limited its review to the pleadings.  In litigating this motion, Plaintiffs have amply and repeatedly made the claim that there is a possibility EPA would grant their stay request, and were there now a pleading requirement to that effect (there is not), Plaintiffs should be permitted to cure through amendment to conform to the evidence.  Fed. R. Civ. P. 15(b)(1).

## VI.    Plaintiffs Are Entitled to a Remedy Under the APA and Prows.

Rather than grapple with Prows' mandate that plaintiffs be made "whole," Florida next argues against relief by relying on the standards for vacating a rule and for issuing an injunction,

Dkt. 83 at 5–6, neither of which Plaintiffs request of this Court as relief for Claim 8.  The test contained in Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n, 988 F.2d 146, 150–51 (D.C. Cir. 1993), is inapposite because the relief Plaintiffs seek in the instant matter is not vacatur of EPA's approval of Florida's program, it is rather the setting aside of the effective date of that approval long enough for EPA to consider Plaintiffs' request for a stay pending judicial review.[20]

The Supreme Court's ruling in Weinberger v. Romero-Barcelo, 456 U.S. 305, 312–13, 314 (1982), stands for the unremarkable proposition that district courts are not limited only and always to granting injunctive relief to remedy violations of the Clean Water Act because injunctions are not the only means to ensure compliance with the statute.  But even while Florida cites Weinberger as illuminating a relevant standard, the state does not offer any other way that EPA's compliance with the APA could be assured beyond that which Plaintiffs have requested.[21]

Instead, Florida raises the specter of various administrative questions, Dkt. 83 at 6, of what would happen to "x" in the 30 days the Court would allow EPA to consider Plaintiffs' stay request as bases for the Court to allow EPA to escape any consequence at all for its deprivation of Plaintiffs' right to seek a stay of the program pending judicial review.  And the answer to those questions is straightforward: Much as jurisdiction was transferred to the state on December

---

[20] Amici also mischaracterize the relief sought as vacatur of the entire rule for a period of time. Dkt. 84 at 3.  But setting aside an unlawful effective date is not the same as vacatur of a rule, since the rule can take effect following a lawful effective date.  Vacatur is the remedy after the court finds the rule to be unlawful.  The merits of EPA's rule are not at issue in this claim.
[21] Florida argues that other "meaningful and adequate means of vindicating" Plaintiffs' right exist, but then either points to *other* rights (the right to seek reconsideration, the right to petition for withdrawal of program approval) or the ability to have sought interim rather than final relief on this claim. Dkt. 83 at 9.  But none of these purported alternatives are remedies for the violation Plaintiffs have sustained.  None would assure EPA's compliance with the 30-day requirement or vindicate Plaintiffs' right to seek an agency stay.

22, 2020, jurisdiction would be transferred back to the Corps on the date of the Court's order.[22] Pending applications could be granted by the Corps but not the state, and the Corps (not the state) would have primary enforcement responsibility during that time.[23]  Florida cites WildEarth Guardians v. Haaland, 2021 WL 4502054 at *7 (D.D.C. Sep. 30, 2021), for the proposition that such an order would be impossible for "the judiciary to administer" or the agency "to perform." Dkt. 83 at 6.  But there would be no "administration" required of the judiciary, and not even EPA has claimed it would be "impossible" to comply with the Court's order.

Florida's view that EPA's "alleged violation" is not "serious enough to support vacatur or suspension of a rule already in effect," Dkt. 83 at 5, is also that EPA's violation is not "serious enough" to support any remedy at all.  In Florida's view, deprivation of the right to seek an agency stay of a federal action that threatens the nation's wetlands and federally protected species; limits access to the courts for violations; eliminates NEPA review, tribal consultation, and access to information generated under NEPA and the ESA, deserves no remedy at all.  But if it is to mean anything, the rule of law demands remedies for violations of law.

---

[22] Florida's staff would continue to administer its state wetlands permitting program, which the state claims involves an 85% overlap with Section 404. Fla. Dep't of Env't Prot., State 404 Program, https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/state-404-program (last visited June 30, 2022) ("approximately 85% of review requirements overlap between programs, eliminating duplicative review").  And since Florida's 404 program does not charge processing fees, there is no reason to fret over the fate of those mythical funds during this short period of time.  Id. See also Fla. Dep't of Env't Prot., State 404 Applicant Handbook Section 4.4. Dkt. 52 at 82–143, 101 ("There shall be no processing fees for State 404 Program verifications, notices, applications, or permits.")  The final 404 Handbook with this language is available at https://www.swfwmd.state.fl.us/sites/default/files/404_Handbook_FINAL%20-%2012.30.20.pdf (last visited June 30, 2022).

[23] When 404 is administered by the federal government it is the Corps that primarily handles enforcement, not EPA.  Cf. Dkt. 83 at 6.

Florida's argument that the violation itself effectively makes the remedy unavailable, Dkt. 83 at 8, is repugnant to the interests of justice.  Once EPA gave its transfer of authority "immediate" effect (as an adjudicatory order for which the 30-day delayed effective date minimum does not apply), there was no window of time for Plaintiffs to make a stay request, yet both EPA and Florida have argued that EPA lost the authority to grant a stay request once the rule took effect (that is, immediately).  Under this theory, it would have been futile for Plaintiffs to make any stay request unless and until the Court ruled that EPA's action in fact constituted a rule, not an adjudication, that the 30-day delay in effective was therefore required, and that EPA therefore would have had the authority to consider such a request.[24]  EPA has not, and would not, have considered it.  EPA has since conceded that because Plaintiffs did make a stay request within 30 days of the rule's immediate effective date, the request was timely and the agency could consider it should the Court rule in Plaintiffs' favor.

But Florida now argues that Plaintiffs should be denied a remedy because their stay request came so late that EPA could not have "meaningfully considered" it.  Dkt. 83 at 10.  Given the agency's legal position, it is difficult to fathom what purpose could have been served by presenting the stay request earlier.  Plaintiffs did what any reasonable litigant might do: they immediately urged EPA to recognize its action as a rule that could not take effect for 30 days, filed suit two weeks after EPA adhered to its position, and submitted a stay request a week after that.  Indeed, Plaintiffs' "stay request" was first a request for expedited action—for the agency to

---

[24] At the time, Plaintiffs' position was that the transfer had not lawfully been effectuated because while EPA's approval of the state program had been published, the program had not been codified, and codification was necessary to give the program legal effect, as had occurred with every prior approval of a state 404 program.  EPA had posted a pre-publication notice of its intent to codify the approval dated January 14, 2021, but that rule had not been submitted to the Federal Register, and indeed has never been promulgated.  The Court has since denied the codification claim on the merits.  Dkt. 73 at 60–61.

recognize that the APA's delayed effective date and the Federal Register Act's codification requirements applied—and then a request for the agency to postpone a lawful effective date.[25]

Florida argues that a 30-day remedy would be overly broad in duration because Plaintiffs submitted their request only hours before midnight of the day the rule could have lawfully taken effect. Dkt. 83 at 10. But the deprivation was of the right to be heard. And the violation was failing to provide a 30-day delay in effective date to allow the exercise of that right. The remedy must address the violation and allow Plaintiffs' stay request to be heard. A 30-day remedy is therefore reasonable. The cases Florida cites, id., do not compel or support a different result. See Califano v. Yamasaki, 442 U.S. 682, 702 (1979) (affirming courts' authority to certify nationwide class actions); Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs., 435 F.3d 326, 329 (D.C. Cir. 2006) (reversing injunction that awarded relief broader than that sought in the complaint). That no other stay may have been granted on January 20, 2021, is neither here nor there. Of more interest is Florida's citation to a December 23, 2020, rule that the Biden administration *did* stay by notice dated January 21, 2021, Dkt. 83 at 10–11, where that agency properly delayed the effective date. It is clear that given the opportunity the administration could have, and very well may have, delayed the effective date here as well.

Lastly, Florida and Amici attempt to distinguish several cases relied on by Plaintiffs to support the requested relief. Id. at 12–14; Dkt. 84 at 3–4. But this attempt fails. While each case certainly presents a unique set of facts, in each one of the cases the court granted the relief that made Plaintiffs whole.

---

[25] Plaintiffs' counsel received immediate confirmation that the addressees of their stay request at EPA had read the email within 11, 16, and 38 minutes of it being sent. Exh. 2.

In Lewis-Mota v. Sec'y of Labor, 469 F.2d 478 (2d Cir. 1972), a plaintiff class of aliens lost the priority status their applications for admission would have reached but for the immigration agency's unlawful application of a directive that was not published for over a year. The court held the immigration directive valid after 30 days from the date of publication.  But to provide a remedy for the harm to the class, the court also allowed plaintiffs "a reasonable time within which to apply for admission under the same circumstances as if their priority position on the visa approval list were reached," well beyond the expiration of the 30-day period.  Id. at 482. This is because the class would have reached their priority status within 30 days of publication of the directive.  The court rejected the notion that the case was mooted because the class was not admitted before publication of the directive, recognizing that this argument presupposed that had the agency published the directive before giving it effect the outcome would not have been different ("something we do not and cannot know").  Id.  The court's relief did not ensure that plaintiffs' applications for admission would be granted, but it did ensure that their applications would be properly considered.

Here, the same rationale applies.  Had the agency published the rule with a 30-day delay in effective date, Plaintiffs would have retained the right to have their stay request heard.  Had EPA considered the stay request, the agency may have stayed the final rule pending judicial review.[26]  In order to restore Plaintiffs to the position they would have had but for the violation, the Court must set aside the unlawful effective date of program and should allow 30 days for consideration of Plaintiffs' stay request.  Because of the nature of Plaintiffs' harm (the deprivation of the right to have their stay request heard before the rule took effect), the only

---

[26] Florida misses the boat by complaining that consideration of the stay request would not have affected the underlying decision to approval Florida's program. Dkt. 83 at 13.  The issue is that EPA's consideration of the stay request could have resulted in a stay pending judicial review.

remedy is to set aside the immediate effective date that caused this harm so that their stay request can be heard.

Florida next argues that United States v. Gavrilovic, 551 F.2d 1099 (8th Cir. 1977), is distinguishable because it is a criminal case in which the court does not fashion any equitable relief. Dkt. 83 at 13. But again, in Gavrilovic the court granted the very relief required to make those affected whole. 551 F.2d at 1106. In that case, because the defendants were charged for conduct that occurred during the 30-day period when the relevant rule should not have been in effect, their convictions (which occurred long after the 30-day period) could not stand. Id. That the matter arose in a criminal context does not diminish the relevance of the court's action. See Rowell, 631 F.2d at 703 (holding that the interpretation of the APA and review of legislative history in Gavrilovic "logically apply in both civil and criminal cases") (citing Chrysler Corp. v. Brown, 441 U.S. 281, 312 ("strict compliance with the APA" is required in a civil context)).

Florida finally argues Ngou v. Schweiker, 535 F. Supp. 1214 (D.D.C. 1982), is distinguishable because Ngou arose a decade before Prows, the court fashioned relief in the preliminary injunction context, any delay of the effective date would have triggered a 30 day delay under the rule, and the case presented "special circumstances" for certain refugees. Dkt. 83 at 13–14. Florida does not, however, explain how any of this detracts from the relief Plaintiffs request.[27] In Ngou, the district court considered a rule that would withdraw cash and medical benefits to refugees, but was to be given effect only 20 days from publication, rather than the required 30. 535 F. Supp. at 1215. The court rejected the agency's argument that the

---

[27] Prows did not reject or even discuss the reasoning in Ngou. And the special circumstances the Ngou district court alluded to were harms to the refugee class in Washington State because they would not have other state or federal financial benefits available to them once the rule took effect, a relevant factor for a preliminary injunction. 535 F. Supp. at 1217.

only available remedy was to give the rule effect after 30 days, as this "invites violations of section 553(d)" and would undermine the provision's purpose, to ensure adequate public participation in the rulemaking process.  Id. at 1217.  The court then enjoined the rule for a period of 30 days as to all refugees residing in the State of Washington.  Id. at 1217–18.

Here, Plaintiffs are requesting a final remedy at summary judgment on their 553(d) claim. If the Court can enjoin an effective date as preliminary relief for a potential 553(d) violation, it must certainly be able to set aside that effective date once the Court concludes it was in fact unlawful.  Amici try to distinguish the above cases on the basis that they do not involve a suspension of a rule in its entirety—just "exemption[s] to a litigant" who would have been subject to the rule in violation of 553(d).  Dkt. 84 at 3–4.  But in actuality, the relief granted was quite broad.  In Lewis-Mota, the court granted relief to a class of plaintiffs, and in Ngou relief was granted to all refugees residing in Washington State.  The ruling in Gavrilovic would apply to any similarly situated criminal defendants.

What the cases really show is that courts have fashioned the remedy that is required to make adversely affected plaintiffs (and in some cases, defendants) whole.  That the remedy required in this case is different, because the harm is different, does not affect this principle or the analysis.  Plaintiffs' harm, and the public interest in having agencies comply with the APA, call for a remedy.  Indeed, "[t]here is generally no public interest in the perpetuation of unlawful agency action." League of Women Voters of U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in 'having governmental agencies abide by the federal laws that govern their existence and operations.'" Id.

Dated: June 30, 2022

                              Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org
/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

* Appearing *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of June 2022 I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org