IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,
                                        Civil Action
            Plaintiffs,                 No. 1:21-cv-0119

        vs.                             Washington, DC
                                        March 15, 2022
ANDREW WHEELER, et al.,
                                        3:05 p.m.
            Defendants.
_____/


            TRANSCRIPT OF VIDEO MOTION HEARING
        BEFORE THE HONORABLE RANDOLPH D. MOSS
              UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:     TANIA GALLONI
                        CHRISTINA REICHERT
                          Earthjustice
                          4500 Biscayne Boulevard, Suite 201
                          Miami, FL 33137

                        BONNIE MALLOY
                          Earthjustice
                          11 S. Martin Luther King Jr. Blvd
                          Tallahassee, FL 32301

For the Federal         ANDREW COGHLAN
Defendants:             ALISON FINNEGAN
                          U.S. Department of Justice - ENRD
                          150 M Street, NE
                          Washington, DC 20002


For the Movants:        MOHAMMAD JAZIL
                          Holtzman, Vogel, Baran,
                          Torchinsky & Josefiak, PLLC
                          119 S. Monroe Street, Suite 500
                          Tallahassee, FL 32301

1    **APPEARANCES CONT.**

2    For the Intervenors:        **JEFFREY WOOD**
                                 Baker Botts, LLP
3                                700 K Street, NW
                                 Washington, DC 20001

4
                                 **LILLY CHINN**
5                                Baker Botts, LLP
                                 101 California Street, Suite 3200
6                                San Francisco, CA 94111

7
     Court Reporter:            **JEFF M. HOOK**
8                                Official Court Reporter
                                 U.S. District & Bankruptcy Courts
9                                333 Constitution Avenue, NW
                                 Room 4700-C
10                               Washington, DC 20001

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>P R O C E E D I N G S</u>

2          **DEPUTY CLERK:**  This is civil action 21-119, Center

3    for Biological Diversity, et al., vs. Andrew Wheeler, et al.

4    Will the parties please identify themselves for the record,

5    starting with plaintiff, followed by defendants, and then

6    intervenors and movant.

7          **MS. MALLOY:**  Hi, this is Bonnie Malloy for

8    plaintiffs.

9          **THE COURT:**  Are you it for the plaintiffs,

10   Ms. Malloy?

11         **MS. MALLOY:**  Yes, I'm representing the plaintiffs.

12         **THE COURT:**  No, so are you the only person

13   appearing today for them?

14         **MS. MALLOY:**  No, we also have Ms. Reichert and

15   Ms. Galloni.

16         **MS. GALLONI:**  Good afternoon, Your Honor.  This is

17   Tania Galloni, also representing the plaintiffs.  We're

18   having some technical difficulties on our end, we apologize.

19         **THE COURT:**  Okay.  Ms. Reichert?

20         **MS. REICHERT:**  Yes, Your Honor.

21         **THE COURT:**  Who's speaking today on behalf of

22   plaintiffs?

23         **MS. GALLONI:**  Tania Galloni, Your Honor.

24         **THE COURT:**  Ms. Galloni, is there any way that you

25   can get your video on?

1    **MS. GALLONI:**  We have tried.  I'm going to stay on

2    audio, Your Honor, while Ms. Reichert keeps wrangling with

3    our Zoom to see if she can get that to work.

4         **THE COURT:**  If you log off and then log back on,

5    that might help.

6         **MS. GALLONI:**  Okay.  She will work on that, but

7    I'm here available by audio.  I don't want to delay

8    anything.

9         **THE COURT:**  Okay.  So then let's hear from the

10   defendants.

11        **MR. COGHLAN:**  Good afternoon, Your Honor.  Andrew

12   Coghlan for federal defendants.

13        **MS. FINNEGAN:**  Good afternoon, Your Honor.  Alison

14   Finnegan for the federal defendants.

15        **THE COURT:**  Okay.  Who's speaking today on behalf

16   of the federal defendants?

17        **MR. COGHLAN:**  Your Honor, I anticipate doing most

18   of the talking.  If there are any questions that come up

19   about Endangered Species Act issues, Ms. Finnegan may handle

20   those.

21        **THE COURT:**  Okay.

22        **MR. WOOD:**  Good afternoon, Your Honor.  Jeff Wood

23   on behalf of Florida intervenors.

24        **THE COURT:**  And Mr. Wood, do you have the lead for

25   the intervenors?

1    **MR. WOOD:**  Yes, Your Honor.  I'm joined by Lilly

2    Chinn as well.

3    **THE COURT:**  Great, thank you.

4    **MS. CHINN:**  Good afternoon, Your Honor.

5    **THE COURT:**  Good afternoon.

6    **MR. JAZIL:**  And Mohammad Jazil for the movants,

7    Your Honor.

8    **THE COURT:**  And good afternoon to you.

9    **MR. JAZIL:**  Good afternoon.

10    **THE COURT:**  So we're here today on the motions and

11    cross-motions and motion to dismiss in the Center for

12    Biological Diversity versus I guess what is now Regan.  I

13    guess I'd be inclined to start with Ms. Galloni, but I don't

14    know where things stand with her technical issues.

15    **MS. GALLONI:**  I am still here on audio, Your

16    Honor, not yet available for video.

17    **THE COURT:**  Well, it's up to you, do you want to

18    go ahead and just start on audio?  It's not as ideal as

19    having the video, but you're welcome to do that if that's

20    what you want to do.

21    **MS. GALLONI:**  It's your preference, Your Honor.

22    Obviously I would rather be on video, but I don't want to

23    interfere with the proceeding in that way.

24    **THE COURT:**  Well, has someone been able to try and

25    log back on, just logging out entirely and coming back in?

1    **MS. GALLONI:**  They're working on it right now.  Do

2    you mean logging out of the computer entirely or logging out

3    of Zoom?

4        **THE COURT:**  Well, maybe you need to close the

5    browser entirely and then at least reopen the browser.

6        **MS. GALLONI:**  If you could give me one minute,

7    I'll send that tip over and then I'll be ready to start.

8        **THE COURT:**  Okay.

9        **MS. GALLONI:**  I will say, Your Honor, for some

10    reason we're encountering this in both our Miami and

11    Tallahassee offices, so it's very strange.  But I'm ready to

12    proceed if you'd like to, and if we're able to get video I

13    will switch.

14        **THE COURT:**  Okay, that's fine.  So why don't you

15    go ahead and start.

16        **MS. GALLONI:**  Okay, great.  So you had mentioned

17    the motion to dismiss, but would you like me to start with

18    the motion for partial summary judgment?

19        **THE COURT:**  Yes, since that's your motion, why

20    don't you start with that one.

21        **MS. GALLONI:**  Sure.  Thank you, Your Honor.  In

22    2020, EPA engaged in rulemaking to approve Florida's 404

23    program.  And we know that one of the central issues in the

24    case today is whether that was a rulemaking or an

25    adjudication.  But we know it was a rulemaking for a lot of

1    reasons, and one of them is that EPA told us so.  In it's

2    September 2020 notice inviting public comment, the agency

3    invited comments to its rulemaking docket.  EPA told us it

4    would place those comments and a transcript of its public

5    hearings in that rulemaking docket.  EPA also told us that

6    it would decide on Florida's application in December 2020,

7    and that if approved, Florida's program would be codified,

8    an action that only applies to rules.

9           Now, if I may, Your Honor, it looks like Christina

10   has gotten the video working.  If you could hang on for one

11   minute, I will jump to that office.

12          THE COURT:  That's fine.

13          MS. GALLONI:  Thanks.

14     (Brief interruption)

15          MS. GALLONI:  Can you see me?

16          THE COURT:  There you go, I see you now.  Thank

17   you.  I'm glad you fixed that.  While there's a pause here,

18   let me ask you a question about something you've already

19   said.

20          MS. GALLONI:  Yes.

21          THE COURT:  Which is you said to me that we know

22   that it was a rulemaking because the docket said it was a

23   rulemaking.

24          MS. GALLONI:  Yes.

25          THE COURT:  And the Government, in its opposition

1    and cross-motion, says that if you actually click on the

2    docket entry, it says this is the nonrulemaking docket.  And

3    I actually did that, and at least as of today, if you click

4    on it, it says nonrulemaking docket.

5         So I guess do you know what it said back then?

6    Contemporaneously did it say that, and if so, were you on

7    notice at that point in time that the agency didn't think

8    this was a rulemaking?

9         **MS. GALLONI:**  I don't know what it said at that

10   time.  It surprised us when it was in the Government's

11   filing.  We did the same thing, we clicked on it.  It sounds

12   like an electronic filing issue.  I don't know that there

13   can be much weight given to that when the notice itself says

14   rulemaking, rulemaking docket, rulemaking docket, rulemaking

15   docket.  And when we approve this program, we will codify

16   it, which is something only applicable to rules.

17        But I went through the same thing you did, I

18   checked it out and thought well, that's strange.  I had

19   certainly not ever noticed that before.  I don't know if the

20   file has always lived there or not.

21        **THE COURT:**  It doesn't quite say rulemaking

22   docket, does it?  I mean, it refers to www.regulations.gov.

23        **MS. GALLONI:**  The notice itself says rulemaking

24   docket two or three times.  Let me see if I can point you to

25   that.

1          **THE COURT:**  That would be helpful.  I see, yes, it

2     does say through the Federal eRulemaking Portal.  Is that

3     what you're referring to?

4          **MS. GALLONI:**  It says that too, and then it says

5     the rulemaking docket specifically two or three times.  I'll

6     find it.

7          **THE COURT:**  Well, I can find that easily enough.

8          **MS. GALLONI:**  Okay, sure.  And it's in the

9     September 16th, 2020 notice.  And it says in section C:

10    "EPA recommends that commenters submit the text of their

11    oral comments as written comments to the rulemaking docket."

12    The end of that section says:  "Verbatim transcripts of the

13    sessions will be included in the rulemaking docket."  And

14    then it says the eRulemaking portal, and as I mentioned, if

15    EPA approves the program it will codify it.

16         **THE COURT:**  Are you talking about section 1C, is

17    that where you were reading from?

18         **MS. GALLONI:**  Let me pull it up again.  Section

19    1C, yes, about the fifth paragraph that starts with oral

20    comments, but it's the second sentence.

21         **THE COURT:**  Yes, I see it.  Thank you.

22         **MS. GALLONI:**  And then again -- and then next

23    paragraph at the end, another reference to the transcripts

24    will be in the rulemaking docket.

25         **THE COURT:**  Yes, I see it.  Thank you.

1          **MS. GALLONI:**  So that was September 2020.  And

2    then in November 2020, an election happened.  And so when

3    December came, the administration changed course.  So on

4    December 22nd, 2020, that's when they published the approval

5    of Florida's program as an adjudicatory order instead of a

6    rule, and made it applicable immediately.  They didn't wait

7    for the time consuming process of codification.  And I think

8    in our filings we have done the math about this.  To get

9    something through the Office of the Federal Register takes

10   time, 20 working days or so, to prepare everything that

11   needs to be put together for submission, especially amending

12   existing regulations, which this would do.  But they didn't

13   have that kind of time, because they had a different

14   administration coming in in January.

15          So on the basis of this adjudicatory order, this

16   approval, EPA transferred authority over the 404 program

17   from the Army Corps to the state.  And that authorized an

18   entirely new legal regime in the state of Florida.  So in

19   other words, before this action, there are 404 regulations

20   by EPA, 404 regulations by the Corps, and that's what

21   applies in all of the states unless the C.F.R. are amended

22   to say that there's a different regime in a particular

23   state, as they've done in Michigan and New Jersey.  But on

24   the basis of this December 2020 notice alone, they

25   transferred authority immediately to the state.  That then

1    authorized an entirely new legal regime: new rules, new

2    regulations, new forms, new processes, new decision makers,

3    an entirely new regime.

4        **THE COURT:**  So Ms. Galloni, can I ask you, in

5    general, agencies have a fair amount of discretion to decide

6    whether to proceed by rulemaking or by adjudication.  Is it

7    your position here that as a matter of statute they're

8    required to proceed by rulemaking; that as a matter of

9    regulation, they're required to proceed by rulemaking; or

10   simply that that's what they did here and they could have

11   changed course midstream?

12       **MS. GALLONI:**  Well, I suppose both.  But

13   fundamentally as a matter of the statute, as a matter of the

14   APA, this was a rulemaking.  It was --

15       **THE COURT:**  And is that because it actually has

16   the effect not only -- I mean, it affects third parties

17   because it affects the legal regime that applies to anybody

18   who is applying for a permit or who wants to participate in

19   that process and it has future recurring legal effect; and

20   because it also requires an amendment to the C.F.R., because

21   otherwise the rules that are in place in the C.F.R. would

22   govern, and someone would have to go to the Army Corps to

23   get a permit otherwise; and so since they're changing that

24   rule they need to proceed by rulemaking?

25       **MS. GALLONI:**  Exactly, because a rule can only be

1    amended with a rule, and the regulations are in place absent

2    a rule, a rule change.

3         **THE COURT:**  Does that mean, if you're right about

4    that, that the agency has just been proceeding incorrectly

5    under 402?  Because my understanding is under 402, they have

6    been proceeding by adjudication.  So is it your view

7    that (inaudible)?

8         **MS. GALLONI:**  I would say that -- I would say that

9    in the vast majority of the programs -- and I think we cite

10   most of those in our briefs, the state programs get

11   codified.  So 402 seems to be maybe the exception.  The

12   statute is different than 404, so I don't know if I can say

13   that they are proceeding incorrectly.  But in terms of 404,

14   both based on past practice and the practical effect of what

15   the rulemaking does, that they had to proceed by rulemaking.

16        **THE COURT:**  And then one thing that I've been sort

17   of mulling over related to this is the argument that the

18   federal defendants refer to and that the state intervenors

19   develop more fully, which is that we're dealing with a

20   statute here where if the agency doesn't act within 120

21   days, that as a matter of statute, as opposed to a matter of

22   regulation, that the authority is divested to the states --

23   or to the state applicant.

24        And -- well, I guess one question I had about that

25   is the statute itself may have a typo in it, if I'm looking

1    at this right.  Because the 120 days, as I understand it,

2    under H1 starts to run from the receipt by the administrator

3    of a program and statements submitted by any state under

4    paragraph one of this subsection.  And the typo I assume --

5    and I'm interested in the parties' views on this, I assume

6    it should say under G1 and that there's just a scrivener's

7    error here.  Because saying under paragraph one, I mean,

8    it's referring to itself there.

9         And if it's referring to G1, then I take it your

10    position is that -- in response to the federal and state

11    defendants, is that the 120 days doesn't start to run until

12    there is a submission that complies with G1.  And one of the

13    arguments that you want -- that you made, but you would like

14    to make through a motion for reconsideration, is that there

15    was never an application that was sufficient under G1 to

16    start the 120 days.  And therefore, the fact that the

17    default would be the authority divested to the states

18    doesn't get triggered in these circumstances or at least

19    even already have a chance to be heard on that question.  Is

20    that right?

21         MS. GALLONI:  Yes.  And to be clear, it's not just

22    about a motion to reconsider for the completeness

23    determination.  That's a standalone claim in our complaint

24    that they did not meet that standard, and so the 120-day

25    clock was not actually triggered.

1          **THE COURT:**  Right, so that question is not yet --

2    I mean, it may be raised somewhat indirectly by the state

3    intervenor's motion to dismiss, but you're not relying on

4    that at this point.  And the reason that I'm raising that

5    now is, in thinking about your standing, it may mean that

6    the standing with respect to the two claims that you've

7    raised under -- I think claims eight and nine, is fairly

8    narrow at this point in that -- and I'll talk about this in

9    a minute.  I'm not at all convinced that there's standing

10   with respect to the publication issue or codification issue,

11   but I want to hear from you on that.

12          But with respect to the reconsideration issue, it

13   might be that what you have standing then to do is to -- is

14   for me to order that you be provided an opportunity -- if I

15   conclude that there is a rulemaking, that you have standing

16   then to file a petition -- or for me to order that you would

17   be entitled to file a petition for reconsideration with the

18   EPA, but only to the extent that your contention that the

19   petition -- or the request from the state was incomplete is

20   front and center to such a request for reconsideration.  And

21   if it's not, I guess I'm not sure whether you would have

22   standing necessarily to raise other issues or for me to

23   order that you would have leave to file other issues in a

24   petition for reconsideration if the need to establish that

25   the petition was -- that the request was incomplete is a

1    predicate.  And I'll finish this very long question and then

2    let me let you elucidate things.

3              But the other thought that has passed through my

4    mind in thinking about this is, to the extent that I do

5    think that that is some necessary element of this, would it

6    be appropriate for me to wait to decide that issue with

7    respect to whether you've adequately established for me the

8    incompleteness of the request before I take any action on

9    count eight, or whether I should leave that in the first

10   instance to the agency to decide on reconsideration before

11   deciding it myself?

12             **MS. GALLONI:**  Well, Your Honor, you started on

13   Florida's motion to dismiss and the deemed approved

14   language.  Our starting point on the deemed approved

15   language is that it simply doesn't apply here because the

16   EPA acted.  The cases that Florida cite are situations where

17   the agency did not act, and that's not the scenario that

18   we're in here.  EPA did act, and because EPA acted, there is

19   no consequence -- what they've argued is if you vacate EPA's

20   action, that it gets deemed approved anyway.  We're not

21   living in that world, because EPA did act and so their

22   action is reviewable for starters.

23             **THE COURT:**  Are there cases on that, Ms. Galloni,

24   where -- I mean, I know there are because I've had other

25   cases myself with this.  There are other deemed approved

**1**    rules out there.  Are there cases out there where there's a

**2**    deemed approved rule, the agency acts nonetheless -- and I

**3**    did notice that I think the cases that Florida cites are

**4**    ones where the agency didn't act.  But are there cases where

**5**    the agency acted and where there's judicial review that sets

**6**    the decision aside, notwithstanding the fact that a

**7**    nonaction would result in an approval?

**8**        **MS. GALLONI:**  No, if I'm following the question.

**9**    So we haven't come across any case where the agency acted,

**10**    the court invalidated the action and then the submission was

**11**    deemed approved.  We've not seen a case like that.

**12**        **THE COURT:**  One way or the other I take it, right?

**13**        **MS. GALLONI:**  Well, the only cases that we've seen

**14**    are the ones where the agency did not act.  And I believe

**15**    there's one of those cases, even with the deemed approved

**16**    language, where the court still reviewed it even though it

**17**    was by operation of law.  So there's nothing even close to

**18**    our scenario, which is the agency did in fact act, and

**19**    therefore that's an action that you can review.  And that

**20**    your vacatur -- I mean, it would be a lot for Congress to go

**21**    through this whole process of all the things that must

**22**    happen for EPA to approve a state application, and then at

**23**    the end of that, if it's found to be unlawful, the program's

**24**    unlawful by a court's decision, that then Congress says oh,

**25**    but it's deemed approved anyway.  I mean, that would be

1    great lengths to go to.  You might as well not have a

2    statute, if that's the outcome.

3         **THE COURT:**  That may be right, although the irony

4    here is I suppose if the Trump administration really wanted

5    to get this done in 120 days and didn't want to provide any

6    opportunity for the Biden administration to hold up or

7    reconsider the rule, they could have just done nothing.

8         **MS. GALLONI:**  Right, and I'm sure there's some who

9    wish they had gone that route.  But they didn't, EPA acted.

10   And I'll also point out, there was a challenge in Idaho

11   Conservation League vs. EPA -- it's a Ninth Circuit petition

12   for review, where the court found the state program -- that

13   EPA's approval was an abuse of discretion or arbitrary

14   because the criminal intent standard wasn't stringent

15   enough.  And there, there was no issue of, well, it's going

16   to be deemed approved anyway.  So I don't know that the

17   issue came up, but certainly the court didn't say, well,

18   there's nothing I can do because this would be deemed

19   approved.

20        **THE COURT:**  Okay.

21        **MS. GALLONI:**  The second point --

22        **THE COURT:**  It sounds like that would be making

23   new law on that question, because no judge has said anything

24   one way or the other on that question?

25        **MS. GALLONI:**  Yes.  I will also add that on claims

1     eight and nine, the ones that we are here before you on

2     summary judgment, those don't turn on this deemed approved.

3     Those claims do not turn on EPA's approval of the state

4     program.  They don't -- the substance of the rest of the

5     complaint does.  But these claims turn on whether the

6     transfer of authority was lawful, whether EPA's

7     December 2020 notice -- adjudicatory order was legally

8     sufficient to transfer the authority immediately without

9     giving us the 30 days that Rule 553(d) provides so that we

10    could petition for a stay pending judicial review, so that

11    we could petition for reconsideration.

12          That's fundamental, to petition to stop the

13    program.  And it's not about the completeness determination,

14    it's about could we have petitioned to postpone the

15    effective date, and could we have petitioned for

16    reconsideration of the approval.

17          THE COURT:  It seems to me you're on somewhat

18    firmer ground on the petitioning for reconsideration than

19    you are on the petitioning for a stay under section 705,

20    because the 705 standard is so discretionary for an agency.

21          MS. GALLONI:  The decisional standard -- excuse

22    me.

23          THE COURT:  No, you go ahead.

24          MS. GALLONI:  The decisional standard is

25    discretionary, but the right to ask -- the right to make the

1    ask is the point of having that provision in there.  So the

2    right, we're still deprived of it.  Whether it gets granted

3    or denied by the agency, that's within the agency's

4    discretion.  But they have to weigh the equities, they have

5    to consider the factors that normally go into it, the

6    likelihood of success, pending judicial review.  So I don't

7    think the fact that the evaluation is discretionary changes

8    the fact that we've lost a procedural right in not having --

9              **THE COURT:**  So with respect to all of those, then,

10   what is the remedy that you would seek at this point?  Would

11   you want the opportunity to file a 705 petition to seek

12   reconsideration?

13             **MS. GALLONI:**  Yes, and to seek --

14             **THE COURT:**  Tell me what the remedy is -- say

15   again.

16             **MS. GALLONI:**  So the remedy would be to set aside

17   the transfer of authority, the December 22nd transfer of

18   authority, unless and until EPA promulgates a rule, a

19   codified rule, that actually amends the Code of Federal

20   Regulations with a 30-day delay in effective date.  And in

21   that way --

22             **THE COURT:**  Well, but doesn't Prowes say that you

23   don't get that?  I mean, Prowes says I can't invalidate the

24   rule on the grounds of failure to comply with a 30-day stay

25   requirement -- or delayed effective date, and that the only

1    remedy I can provide with respect to that is something that

2    flows from the failure to provide the 30 days.

3            **MS. GALLONI:** Yes and no. Prowes says you can't

4    invalidate the rule, absolutely. And the comparison in our

5    case is you can't invalidate the approval. And we're not

6    asking for validation of the approval decision. What Prowes

7    says is that you -- what Prowes says is that if the harm

8    continues past the 30 days, based on a violation -- or at

9    least this is implied in the decision. Based on a violation

10    that occurred within the 30 days, if there is ongoing harm,

11    that there should be a remedy for that. Because twice in

12    the decision the court in Prowes says: "I'm going to extend

13    the effective date by 30 days. That will make this

14    plaintiff whole without disturbing later action that is not

15    the product of the violation."

16            But in this case, we have later action that is the

17    product of the violation: The continuing operation of a

18    state program that was done contrary to law because we were

19    deprived of these opportunities -- not just the 705 stay,

20    petition for reconsideration, but also, frankly, an

21    automatic benefit from the Klain memo when the new

22    administration came in. Because had the Government followed

23    the steps, they make the approval decision, they decide what

24    aspects of law need to be incorporated into the C.F.R., they

25    send it to the office of Federal Register. That becomes

1    what we've seen as that prepublication notice -- that, by

2    the way, is still pending; EPA has not published that

3    prepublication notice for over a year.  If all of those

4    steps had been taken by the time the new administration

5    takes office, that's a rule that has not been published, and

6    it would have been automatically stayed under the Klain

7    memo.

8           So what we're saying is under Prowes, because the

9    harm continues past the 30 days from those initial

10   violations, there is still a remedy available to us.

11          **THE COURT:**  Is the Klain memo, though -- does it

12   create any legal rights?  I mean, I understand that the

13   administration, as does every new administration, for

14   purposes of its own organizational purposes, and for

15   purposes of doing its own work, has said put a pause on

16   things so we can take a look at this.  I don't think it's

17   ever intended in those circumstances to say we're conferring

18   rights on third parties.  It's we're a bunch of new people

19   who just took office here, slow down for a second, we want

20   to take a look at this and see what's happened here.

21          So does the Klain memo really create any rights

22   that are enforceable in any respect by private parties?

23   I've never heard of a case where a private party has invoked

24   and relied upon one of those memoranda.

25          **MS. GALLONI:**  We're not relying on that memo as an

1    enforceable right, we're relying on it as further evidence

2    of harm and why the appropriate remedy is the one that we're

3    asking for.  The rights are the right to seek a stay pending

4    judicial review and the right to seek reconsideration.  But

5    the Klain memo is further evidence that things would have

6    been different had our rights been respected, and should be

7    a consideration when you're crafting the remedy.

8            The other point I wanted to make on the remedy --

9    sorry.

10            **THE COURT:**  I had a question about remedy before

11    you move on to that, which is if you're right about all of

12    that, under Allied Signal, would it be appropriate for me,

13    if I agreed with you -- with at least most of what you're

14    saying, would it be appropriate under Allied Signal for me

15    to grant you less than the relief you're asking for here,

16    and to actually leave the permitting authority with the

17    state of Florida; but nonetheless remand to the agency with

18    a determination and a declaration that the action that the

19    agency took was in fact a rulemaking, triggering whatever

20    rights you may have under 553 and 705 and let the agency

21    deal with that?

22            Because it does strike me -- and I don't mean to

23    signal that I've reached a view on the merits, because I

24    haven't, it's a hard case.  But it does strike me that it

25    would invite some chaos in the permitting process for me to

1    say wait a second, put everything on hold.  It's not clear

2    to me at that point in time whether the Army Corps is acting

3    on permit applications, whether Florida's acting on permit

4    applications.  There are permit applications that have been

5    in the works for long periods of time.  There's a lot of

6    expectations that private parties have with respect to their

7    interests where there could be many millions of dollars that

8    they've invested, and someone is on the verge of getting a

9    permit to go forward with the project and all of a sudden it

10   gets yanked out from them.

11        So I suppose the question for you is even if I

12   agreed with you about all -- or most of what you've said

13   thus far, under Allied Signal, would it be appropriate for

14   me to leave the rule in place nonetheless -- and I guess

15   you're not even suggesting I vacate the rule, but that I

16   leave the assumption of authority in place with Florida

17   while the agency decides how it wants to proceed?

18        **MS. GALLONI:**  Let me start first with the

19   practical aspect of this.  When the assumption happened,

20   permits that were well underway with the Corps, where people

21   were close to getting their permits, where things were

22   humming along over there, they were disrupted when the

23   permits got transferred to Florida.  If the -- if a pause is

24   put on Florida's program, those permits go back to the

25   Corps.  So it is a back and forth, but it's not a back and

1   forth that would be brand new.

2      **THE COURT:** Although some of the Allied Signal

3   cases are just that type of scenario you're talking about of

4   like flipping that switch on and off in some way that drives

5   regulated parties crazy, because they're not sure where

6   they're supposed to be, and everything sort of grinds to a

7   halt.

8      **MS. GALLONI:** Right.

9      **THE COURT:** Because even if I agree with you

10   that -- about all the procedural issues that you've raised,

11   you would go to the new administration or go to the current

12   EPA leadership, and the EPA leadership would say we decline

13   your request for a stay under 705, we decline your request

14   for reconsideration, and we're not going to exercise any

15   authority under the Klain memorandum because that's our

16   business and we don't want to do it; and we actually want

17   this to go forward, and we're back where we were again.  So

18   you flip the switch back down again in ways in which it

19   creates a lot of unnecessary chaos while the agency is

20   sorting through that.

21      **MS. GALLONI:** Right.  I will say two things.  One

22   is that it's not possible to keep the rule in effect and

23   restore our rights, because the agency cannot postpone the

24   rule pending judicial review when the rule is already in

25   effect.  So if the rule, which allows the transfer of

1    authority to the state, remains in effect, then we still

2    can't petition for a 705 stay because that has to be while

3    the rule is not yet in effect.  So we would not be made

4    whole by that kind of a remedy.  The agency wouldn't be able

5    to entertain our 705 stay request.

6         I will also point out that for reasons we

7    predicted in our complaint, Florida's roll out of the

8    program has been extremely dysfunctional and clunky.  In the

9    over a year that this thing has been in operation, they have

10   issued fewer than 50 individual permits.  There has been a

11   lot of consternation among the development community and

12   concern.  We've raised the issues of funding and staffing

13   and expertise, being prepared.  DEP wasn't any more prepared

14   to handle this program when the transfer was made immediate,

15   and the plaintiffs worked to counteract it with what they

16   needed to do.

17        But it's important, I think, to consider that we

18   need a remedy that would be meaningful.  And if the rule

19   remains in effect, we can't ask for that 705 stay.

20        **THE COURT:**  Well, you could, though, ask for

21   reconsideration still.

22        **MS. GALLONI:**  We could ask for reconsideration,

23   but it's not the same thing.  A petition for a stay pending

24   judicial review says let's put a hold on this until we get

25   to the merits.  Because the whole reason we're here is

1      because we believe Florida's program is, on the merits,

2      unlawful.  And so those are the questions that should leave

3      the developer community in limbo until those issues are

4      resolved.  And if we can resolve the case on the merits,

5      then everybody will have their answer.

6              THE COURT:  Are there cases that say that under

7      705, the moment the rule takes effect the Court can't -- or

8      the agency can't grant relief under 705?

9              MS. GALLONI:  Yes.

10             THE COURT:  And I know that you did request

11     reconsideration.  What's the status of that?

12             MS. GALLONI:  Request reconsideration of?

13             THE COURT:  From the EPA, I think you did.

14             MS. GALLONI:  We did, we did.  We did two things.

15     During the pendency of the rulemaking, we requested

16     reconsideration of the completeness determination, got no

17     answer.  On January 20th, we did a petition asking for

18     the -- for EPA to recognize that their action was a rule,

19     not an adjudication, so that they could entertain our

20     request for a stay pending judicial review.  But our ask was

21     clunky, because since the rule had already gone into effect,

22     they couldn't grant our stay.  And since they weren't even

23     considering it a rule, they couldn't grant our stay, because

24     you don't get access to 705 unless it's a rule.  So while

25     they adhered to this adjudicatory order position, they

1    couldn't consider our request.  So we've had no response to

2    it.

3              The other thing I will mention is that --

4         **THE COURT:**  I'm sorry, just to back up, I want to

5    make sure I -- did you never seek reconsideration under 553

6    after the final determination from the agency?

7         **MS. GALLONI:**  Oh, a petition for reconsideration,

8    no.  We were trying -- we sought a stay pending judicial

9    review.

10        **THE COURT:**  Okay.

11        **MS. GALLONI:**  The other thing I'd like to mention

12   is that on the day this approval notice came out and was

13   published on December 22nd, we sent a letter to EPA that

14   same day to say what you've done is a rulemaking, it's a

15   rule, it's not lawful to transfer authority in this way.  We

16   put them on notice from day one that this was an unlawful

17   transfer of authority, and that we were being deprived of

18   our rights.  EPA and DEP assumed risks when they decided to

19   proceed anyway by adhering to this position that it's simply

20   an adjudicatory order.

21             The other issue I'd like to raise before you, Your

22   Honor --

23        **THE COURT:**  Although, I have to say, with respect

24   to that risk issue, I'm less concerned about creating chaos

25   for the agencies than I am for the public.  In one of your

1    arguments -- in your most persuasive arguments for why this

2    is a rule and not an order is it's not just between the EPA

3    and the state of Florida, and that this involves large

4    swaths of the public and the rules that apply to them.  And

5    they're not -- I know that the Chamber of Commerce has filed

6    an amicus brief here, but I don't have everyone who could be

7    affected by this rule in front of me for those purposes

8    where I can say well, that's just tough, it's your fault,

9    you went forward with this.

10          **MS. GALLONI:**  But there's also been tremendous

11   consequences for the plaintiffs.  So all of these processes

12   that the plaintiffs have relied on to serve their missions,

13   to protect the environment, to protect waterways and

14   wetlands and wildlife, they've lost access to NEPA review;

15   they've lost access to section 7 consultations under the

16   Endangered Species Act; they've lost access to being able to

17   challenge actions in court the way they could.  So the chaos

18   is not just affecting the development community, there has

19   been chaos wreaked on the plaintiffs that is ongoing that

20   also needs a remedy.

21          The one other point I'd like to make on

22   reconsideration is that that is challenging, because we

23   filed suit here to challenge the merits of EPA's action in

24   addition to the way the transfer was effectuated.  If we

25   petition for reconsideration, it makes the judicial -- I'm

1    sorry, it makes the agency action non final, and that would

2    affect our ability to litigate this case.

3          **THE COURT:**  But you're the one who moved for

4    partial summary judgment, and that's one of the grounds that

5    you've moved for partial summary judgment on.

6          **MS. GALLONI:**  It's one of the rights that we were

7    deprived of.

8          **THE COURT:**  Right, I know, but procedurally -- I

9    guess maybe I'm a little confused as to what you're asking

10   me to do, because I could wait and adjudicate the case as a

11   whole and not do it claim by claim.  But I thought you were

12   the one who wanted me to decide now whether in fact the

13   agency erred in treating the rule -- or the decision as an

14   order instead of a rule, thus depriving you of your right to

15   seek reconsideration.  If I were to agree with you, I assume

16   that I would enter partial judgment telling them that they

17   had to do that which would have the effect perhaps that

18   you're talking about, and then the rest of the case would

19   have to be on hold pending that decision.  So I just need to

20   know what you think procedurally the right way to proceed

21   is.

22         **MS. GALLONI:**  Yes.  So I want to make sure that

23   I'm clear:  Our principal objective is, and would have been,

24   to seek a 705 stay pending judicial review.  And that could

25   also be in the form of reconsider the immediate effective

1    date.  So it is not for the purpose of interfering with our

2    ability to litigate the case.  But what we're asking for

3    here is not just the right to go back and ask for

4    reconsideration.  What we're asking for is the ability to

5    ask for an agency stay pending judicial review so that the

6    plaintiffs have their rights restored of all the federal

7    protections and processes that they have enjoyed for years

8    before this very quickie assumption took place, and

9    authority to resolve permits is restored with the Corps

10   under a regime that is familiar and known to all.

11            I will point out, also, that we made a filing in

12   October to let the Court know that Florida was applying the

13   now vacated Trump era definition of waters of the United

14   States.  The entire United States has recognized that the

15   rule is vacated by a court, that it's illegal, the Trump era

16   definition of which waterways are covered.  But Florida

17   defied that.  Florida said we're going to keep applying the

18   Trump era rule.  So as long as Florida has the program, you

19   also have that level of chaos.  EPA has told them you can't

20   do that, you have to go back to the regulatory regime that

21   lived before the Trump era rule.  And EPA has been in

22   defiance, and they've had this correspondence in December

23   and January.  I suppose we'll know later what the current

24   status of that is.

25            **THE COURT:**  I suppose that means that if that's

1    the case, that you could file a petition under 1344(h), is

2    it?

3              MS. GALLONI:  A withdrawal petition?

4              THE COURT:  Yes, the withdrawal petition.  Maybe

5    it's (j), let's see, or (i).  But you could file a petition

6    with the EPA saying that there should be withdrawal, right?

7              MS. GALLONI:  Yes.  That is a lengthy process that

8    turns on how the state is administering the program, so not

9    the claims we've made.  And yes, we could file a withdrawal

10   petition for their using the wrong standard on defining

11   which waterways.  That would not be a quick process, it's a

12   prolonged, pretty comprehensive adjudicatory process.

13             THE COURT:  I'm just raising it with you to the

14   extent you're raising with me now arguments that the state

15   is not properly administering it, that I think the remedy

16   for that is to probably to file a withdrawal petition.

17             MS. GALLONI:  I see.  I meant to raise it in the

18   context of harm, that so long as the program is administered

19   by the state, it is a further harm that the plaintiffs are

20   suffering because Florida's not even exercising jurisdiction

21   over waters that are jurisdictional under the Clean Water

22   Act.  Whereas if you grant the relief that we're seeking,

23   the authority would be restored to the Corps which is

24   applying the correct legal definition of waters of the

25   United States.

1          **THE COURT:**  I want to make sure that I understand

2     what your position is, because frankly I didn't gather this

3     from the papers.  But if I disagree with you about 705, at

4     that point in time, is your preference that I then simply

5     deny your motion and we proceed to the merits with respect

6     to the rest of the case; or is it your preference that I

7     then reach the question about whether under 553 you were

8     deprived of your right to petition for reconsideration and

9     potentially grant you that relief, but then as you note,

10    would -- could render non final the determinations that

11    you're challenging?

12         Quite frankly, I'm not quite sure I know the

13    answer to whether the filing of the petition for

14    reconsideration would render it non final, because that

15    varies from statute to statute of when that happens.  I'm

16    not, as I sit here now, convinced that a filing for

17    reconsideration would render it otherwise non final.  It

18    might be if the agency reopened things itself.  I'm not sure

19    that just the filing of the petition itself would render it

20    non final.

21         **MS. GALLONI:**  That's our understanding, but our

22    preference, just as a general matter, would be a ruling on

23    our motion that the action the agency took was a rulemaking

24    that resulted in a rule that needs to be codified and follow

25    the 30-day delay.  And for us, that is both right to

1    petition for reconsideration and/or to petition for a stay

2    pending judicial review.

3         **THE COURT:**  Well, I guess I'm still not entirely

4    certain as to what your position is and what you're asking

5    me to do here.  Because with respect to the 30 days, and as

6    Prowes teaches, I need to find something that flows or some

7    violation that occurred during that 30-day period of time.

8    And one thing that I could conclude that occurred during

9    that period of time was the denial of your right to seek

10   reconsideration.  The other thing I could find that flowed

11   during that period of time was your right to file a 705

12   petition.

13         Those are in different postures, and I don't know

14   the answer to this yet, I'm thinking hard about it.  But the

15   state argues and says -- and maybe the federal defendants

16   maybe say the same thing, which is 705 is such a

17   discretionary form of relief that you can't -- there's no

18   such thing as a deprivation of your right to seek relief

19   under 705, because it's so uniquely discretionary with an

20   agency whether to proceed on that or not.

21         **MS. GALLONI:**  Your Honor, the only court that has

22   decided this was just in January of 2021, the Environmental

23   Defense Fund vs. EPA case, where the court found that

24   section 705 does in fact guarantee a right; and that a

25   violation of the 30 days creates a procedural injury by

1    depriving plaintiffs of the opportunity, the right to seek a

2    705 agency stay.

3            THE COURT:  Well, so -- and what court is that

4    from?

5            MS. GALLONI:  That's the District of Montana.

6            THE COURT:  So all I can say is -- and as I said,

7    I don't know the answer to this, and I'll have to think hard

8    about it; this is not an easy case.  But the language of 705

9    is very different from 553.  So 553 says that you are

10   entitled to petition for reconsideration.  705 doesn't say

11   anything at all about the rights of third parties.  It says:

12   "When an agency finds that justice so requires, it may

13   postpone the effective date of action taken by it."  And

14   that, on its face, seems to confer a right on the agency.

15           So it's not clear to me that losing the

16   opportunity to ask an agency to do that would be a

17   deprivation of a right of a party in litigation.  It might

18   be -- and I'll read the case from Montana and think about

19   that, I saw that you had cited that.  But it's -- that's a

20   more challenging question that you're raising than

21   reconsideration.  And the reason I'm asking you about this

22   is because I can imagine a universe in which I might

23   conclude, yes, you have limited standing with respect to

24   civil cases; yes, you're right, this is best viewed as a

25   rulemaking and not an adjudication, and you're entitled to

1    some form of relief.  But it might be that based on standing

2    principles and what your rights are, that I might conclude

3    that the relief you're entitled to is to file a petition for

4    reconsideration which --

5            **MS. GALLONI:**  May I say, Your Honor --

6            **THE COURT:**  -- may or may not raise the issues

7    you've suggested.

8            **MS. GALLONI:**  Right.  And on the 705 language, I

9    would just like to point out a couple of things.  One is

10   it's for a state pending judicial review which presupposes

11   that somebody is not happy with this rule and wants it

12   stayed pending judicial review.  If you look at the

13   legislative history, it's all about somebody making a proper

14   showing to the agency to warrant this kind of relief.  It

15   presupposes that somebody's asking for that.  EPA talks

16   about the agency's right to grant a stay.  You only grant a

17   stay if someone requests a stay.  And the legislative

18   history makes clear that it contemplated that people would

19   have the right to seek this form of relief.

20           I also think that if --

21           **THE COURT:**  I mean, you may be right about it, but

22   it also may be that an agency knows something is going to be

23   challenged, and it says:  I don't want to have the yo-yo

24   effect here.  We're going to stay the effective date while

25   this challenge proceeds so that we're not regulating,

1    unregulating, regulating, unregulating.  Let's hold the

2    status quo for some period of time while we resolve these

3    issues.

4           **MS. GALLONI:**  It's also that the agencies -- EPA

5    specifically, has a standard for when it considers these

6    stays, and the balancing of the equities and what kind of

7    showing the party requesting the stay has to make.  So they

8    have created that standard that a party has to meet for

9    getting this stay.

10          **THE COURT:**  Is there a regulation you can point me

11   to that says that?

12          **MS. GALLONI:**  I don't know if it's a regulation,

13   but I'll take a look.

14          **THE COURT:**  Okay.  If it's a regulation, maybe one

15   of your colleagues can look for it while I'm hearing from

16   others.  I mean, I can look for it myself, but it would be

17   helpful to know.

18          **MS. GALLONI:**  It's for sure laid out in the case

19   law.  We'll double check on the regulation, but it's for

20   sure laid out in the case law.  Also, because parties

21   challenge when EPA or another agency grants a stay, that can

22   also be subject to challenge.

23          The last point I wanted to make on that is that I

24   also think the 705 --

25          **THE COURT:**  Do you have any idea, by the way,

1    whether the administration would be likely to grant a 705

2    stay?  In some sense, it's all a little bit pointless to go

3    through this if EPA has said to you already:  Look, we're

4    not staying this, we're fighting this litigation.  We're not

5    granting a stay here.  We think we ought to have this

6    authority, and we're sticking by it.

7         And so it all may be a little bit academic if you

8    have reason to think they're not going to grant a stay

9    anyway.

10        Uh-oh, Ms. Galloni froze.  Ms. Reichert, can you

11   hear me?  Well, give her a moment to log back in.

12        **MS. GALLONI:**  Sorry, I'm back.

13        **THE COURT:**  Good.  Did you hear my question before

14   you froze?

15        **MS. GALLONI:**  What I heard was do we have any

16   indication of what EPA would say.

17        **THE COURT:**  I guess I was just raising the

18   question of whether it's all fairly academic if you have a

19   pretty high degree of certainty that the EPA is not inclined

20   to grant a 705.

21        **MS. GALLONI:**  We don't have an indication that

22   they would not.  We don't have an indication that they do.

23   We do know that a lot has changed, especially in recent

24   months, with the way Florida has behaved in terms of defying

25   federal law and defying EPA's directives on the definition

1    of WOTUS.  Maybe that has evolved.  But as late as January,

2    Florida was thumbing its nose at EPA on what rule applied in

3    terms of defining waters of the U.S.  I think that the

4    fundamental question is whether the plaintiffs have a right

5    to try and to make the case to EPA as to why a stay would be

6    appropriate.

7            THE COURT:  And I take it that one of the

8    arguments that you were making on the merits is that one of

9    the significant completeness problems is that the failure of

10   the state to have adequately defined the waterways that were

11   at issue?

12           MS. GALLONI:  Yes, yes.  And that's not a WOTUS

13   issue, that is about how the Army Corps defined which waters

14   it would retain jurisdiction over and which waters it would

15   leave to the state.  It is a separate claim about the

16   waters, but it's not about this recent vacatur of the Trump

17   definition of WOTUS.

18           THE COURT:  No, but all I was saying is I thought

19   that one of your completeness -- or incompleteness arguments

20   was that the waterways were not adequately defined.

21           MS. GALLONI:  That is correct, that is correct.

22   The other point -- sorry, just really quickly on the 705

23   stay, I also want to mention that I think it needs to be

24   read in harmony with 553 and all of the rights that the

25   public has, and the purpose of the APA, which is to increase

1    public engagement and opportunity to effect agency

2    decisions.  But especially on 553, changing an effective

3    date of a rule has been considered, in some cases, an

4    amendment of the rule.

5            So insofar as 553 authorizes and expressly grants

6    the right to petition for amendment, I think you can read

7    that together with 705 if the effect is to postpone the

8    effective date -- it is a form of amendment, and find that

9    it is a right in that way as well.

10   **THE COURT:**  So if Prowes says that I can't vacate

11   the rule, and you tell me I have to vacate the rule before

12   the government can rely on 705, how do I navigate that?

13   **MS. GALLONI:**  The rule can't be in effect.  It's

14   two different things.  Prowes says the 30-day violation

15   doesn't invalidate the rule, and we are not saying to

16   invalidate the approval -- which is the first part of this.

17   The second part -- sorry, I lost my train of thought.  We're

18   not asking you to invalidate the rule, we're asking you to

19   invalidate the transfer of authority that was done without

20   observing the procedures required by law.

21   **THE COURT:**  That comes pretty close to saying

22   you're challenging the rule, right?

23   **MS. GALLONI:**  Well, it gives it back to the agency

24   in this administration, restores what they could have done

25   in January 2021, which is look at it, decide is this what we

1    want to go through, and then publish it in the C.F.R. as a

2    rule, transfer accomplished and it all gets done.  But this

3    time, plaintiffs' rights have been respected, we're given

4    the 30 days so we can make our shot on procedural stay

5    pending judicial review, and then the agency decides.  And

6    they could decide to send it right back to Florida, they

7    could decide not to.

8        **THE COURT:**  Well, so can I then, if I grant you

9    the relief you're seeking, not vacate the rule or the

10   determination that was made and simply hold that the agency

11   erred in making the rule effective immediately; set aside

12   the determination to make it effective immediately, and hold

13   that it shall not be effective for 30 days or something to

14   that effect -- in other words, creating a 30-day window at

15   this point for you to then go back to the agency and say to

16   the agency:  We want a stay from you under 705 and

17   reconsideration.  And if the agency says no to you, then it

18   becomes effective after the 30 days.  So there's simply at

19   most a 30-day -- unless the agency has a different view, it

20   creates just a 30-day window or hiatus.

21       **MS. GALLONI:**  Yes, that is one possibility.  But

22   if you also rule in our favor in claim nine, it would

23   require the agency to also promulgate this and codify it in

24   the C.F.R -- which could be the same effect.  They go

25   through that so that it actually appears as law with binding

1     effect as amending the existing 404 regulations, and it goes

2     back.  It may be longer than 30 days, but it could be 60

3     days if they decide they want to keep moving forward with

4     it.

5          **THE COURT:**  I have a problem understanding what

6     injury any of the plaintiffs in this case have sustained as

7     a result of a failure to codify the rule.  Because the

8     purposes of codification generally are for purposes of

9     public notice, and you all were perfectly aware of this.

10         So what injury flows from the failure to codify?

11         **MS. GALLONI:**  There are two, and I'll get to

12    notice second.  The first one is -- and the fundamental

13    right is you have a right to know what the law is.  Right

14    now, if you look at the books, what the law is is a federal

15    program governing 404 in Florida.  That's what the law says

16    that is on the books, right.  And that cannot be changed

17    unless somebody amends the Code of Federal Regulations, the

18    way they did with Michigan and New Jersey, to reflect that a

19    different legal regime applies in Florida.  Plaintiffs had a

20    right --

21         **THE COURT:**  But you're not --

22         **MS. GALLONI:**  No, no, no, but I'm saying

23    plaintiffs have a right to operate under that federal

24    regime, because the Florida regime is not in the law.  It

25    should not have a lawful binding effect because it is not in

1    fact in the law.  On the notice point --

2              **THE COURT:**  But the -- I mean, the statute doesn't

3    require codification, so it's just the regulation that

4    requires codification.  So your argument -- maybe it's a

5    combination of that as well as the fact that rules need to

6    be codified.  But I suspect, though, there are probably

7    plenty of times in which rules take effect before their

8    codification, and no one can come in and say, well, I don't

9    have to follow that rule because it's not codified yet.

10             **MS. GALLONI:**  Well, there are cases actually where

11   if a part of a rule wasn't codified it has no legal effect,

12   and we cite those in our cases.  So because it wasn't

13   codified, it's not part of the rule, it doesn't have legal

14   effect.  And in this particular case, because there are

15   rules in effect -- the 404 regulations, the federal 404

16   regulations are in effect, it has to be amended in order for

17   something else to be the law in Florida.

18             But I do want to get to your notice point --

19             **THE COURT:**  So your argument is that as a result

20   of the codification requirement in the Federal Records Act

21   statute -- or the Federal Register statute, in light of that

22   as well as the EPA regulation, your position then is that in

23   fact the delegation or assumption of responsibility by

24   Florida is a nullity; and that therefore, to the extent that

25   your clients have to live under that regime, that they have

1    a right to a declaratory judgment that it's a nullity in

2    essence because it's not codified.  And therefore, any

3    injury that's sustained by that regime, including the

4    unavailability of NEPA or ESA review, is an injury that

5    you're sustaining.  And it's not really even a procedural

6    injury argument at that point, you're just arguing that it's

7    a nullity.  In fact, it's almost as though they didn't --

8    not so much like Prowes, but it's more like not engaging in

9    notice and comment rulemaking.  If they did it was flawed,

10   and therefore they never actually properly promulgated the

11   rule, and it's a nullity as a result of that.

12        MS. GALLONI:  Right.  And it's particularly the

13   case here, because without that codification, there is a set

14   of regulations that are in place to tell you what -- how

15   dredging and filling gets done in Florida.  There is a set

16   of regulations, so right.  It's a nullity because that --

17   what EPA did is a nullity because it hasn't amended the

18   existing regulations.

19        THE COURT:  I haven't gone to look at this, but I

20   would be surprised if there weren't cases or circumstances

21   in which there is at least some gap in time before

22   something's codified when it still has legal binding effect

23   prior to the time it shows up in the Federal Register -- in

24   the C.F.R.  I mean, the C.F.R. is only issued periodically,

25   for example.

1          **MS. GALLONI:**  Right.  But when agencies are

2     finalizing rules, they're publishing the amendatory

3     language.  So it may not be codified in the sense that it's

4     showing up in a book.  But in the Federal Register, they're

5     publishing -- just as this prepublication notice that's been

6     sitting out there for a year tells you what's going to be

7     codified and incorporates what needs to be incorporated, the

8     Federal Register amends the C.F.R., the regulations tell us,

9     daily.  So as long as they're publishing --

10          **THE COURT:**  Have they not done that here?  They

11     haven't even done what the language would look like at this

12     point?

13          **MS. GALLONI:**  It's in the prepublication notice

14     which is posted to EPA's website.  But that's right, they

15     haven't.

16          **THE COURT:**  So why isn't that the same then as the

17     circumstance, and they've actually told you what the

18     language is?  It may not be in the C.F.R. yet, but they've

19     told you this is the amended rule, here it is; anyone who

20     wants to look at it can look at it.

21          **MS. GALLONI:**  Right.  So that gets to the notice

22     question.  And the notice part that is most concerning to

23     our clients is how are threatened and endangered species

24     going to be protected, right, because of their missions.

25     And so the different items that Florida and EPA point us to

1    don't answer that question.  There is a technical assistance

2    process -- so in lieu of the Endangered Species Act, in lieu

3    of the section 7 consultation, state application says

4    there's going to be a technical assistance process.  We'll

5    let you know what it is in a forthcoming memorandum, a

6    biological opinion.  And there's an MOU in the application

7    between Florida and EPA that says yep, there's going to be a

8    technical assistance process, read about it more in the

9    biological opinion.

10    And then after the notice comment closes on

11    Florida's application, two weeks after that, they put out

12    this biological opinion.  And it's got a technical

13    assistance process for how species are supposed to be

14    handled.  Now, that document is not consistent with the

15    other document.  And Florida and EPA are both telling us

16    that that ultimate document that all these other documents

17    refer to is not part of the state approved program,

18    including in that prepublication notice.  It's not part of

19    the state approved program.  So plaintiffs, who are trying

20    to protect endangered species in Florida, how are they to

21    know what the law is on that issue if these documents all

22    point to each other saying different things, and the

23    document that's supposed to be the ultimate document is not

24    considered part of the state approved program.

25    The fundamental right under the Federal Register

1    Act is to know what the law is so that it can be applied, so

2    that there can be advocacy around it and so it can be

3    enforced.  We don't know --

4         THE COURT:  So I'm looking, for example, at the

5    1994 notice for New Jersey.  And that contains in it at the

6    end a portion that says:  "For the reasons set forth in the

7    preamble, Chapter One, Title 40 of the Code of Federal

8    Regulations is amended as follows:  Part 233-404, state

9    program regulations."  And then it's got language that is

10   C.F.R.-like language.

11        Is this prepublication notice -- I'm sure it's in

12   the materials I have and I just haven't looked at it yet, is

13   that in the same form, does it look like that?

14        MS. GALLONI:  It does look like that.

15        THE COURT:  And so why isn't that sufficient?  If

16   you know what's going to be in the C.F.R. and it's just the

17   C.F.R. hasn't published it yet, why isn't that sufficient?

18        MS. GALLONI:  It has not been published in the

19   Federal Register.  It's not even pre-published in the

20   Federal Register, it's on EPA's website.  But it also

21   doesn't give any notice on -- one of the elements of the

22   Clean Water Act 404 state program is that it can -- is that

23   there will not be jeopardy to threatened or listed species.

24   It doesn't tell us what the law is on that specific point.

25   That's the point I was emphasizing just now.

1          **THE COURT:**  I guess -- I mean, I understand

2     there's confusion -- that your position is there's confusion

3     in the law here, but I'm not quite sure how the codification

4     relates to that if all the codification would be is what's

5     already on the EPA website and you don't think that resolves

6     the problem.

7          **MS. GALLONI:**  Right.  It doesn't solve the

8     problem, because it doesn't tell us what the law is on that

9     point.  It says we are codifying this adjudicatory order --

10    we are codifying an adjudicatory order, we're going to

11    incorporate by reference these different things, but it

12    doesn't tell us what the law is.  On the one hand, EPA in

13    Florida tells us:  We're applying what's in this biological

14    opinion as to endangered and threatened species, but that's

15    not part of the state program.  But this is supposed to tell

16    us what the law is, and it doesn't include that.  This

17    hasn't been published to the Federal Register, so how --

18    what is the law.

19          **THE COURT:**  Is someone telling you in Florida or

20    elsewhere that they're not bound by the proposed

21    codification because it hasn't been published in the Federal

22    Register yet, is that what you're saying?  So when you go to

23    them, you say we need to know what the law is, and they're

24    saying well, we're not bound by that because it's not in the

25    Federal Register yet, it's just a prepublication notice; is

1    that the problem?

2         **MS. GALLONI:**  No, the problem is not knowing what

3    the enforceable law is as to endangered and threatened

4    species.  It's not in the prepublication notice, and it's

5    not in what the state --

6         **THE COURT:**  But isn't that a different challenge,

7    then?  You're just saying that the notice is defective in

8    some way.  I'm just -- I apologize, I'm just confused here,

9    I'm not following you.

10        **MS. GALLONI:**  Backing up, our right is to know

11   what the law is.

12        **THE COURT:**  Okay, fair enough.

13        **MS. GALLONI:**  We would know what the law is if EPA

14   codified the provisions of the program that are considered

15   to be the law.  There is a piece missing, so we don't know

16   what the law is.  So we're not saying that codifying the

17   prepublication notice is the remedy, we're saying that

18   having a right to know what the law is on this issue is the

19   remedy.  And this administration, I believe, would -- they

20   have -- that prepublication thing has been sitting out there

21   for over a year.  My guess is it might be done differently

22   if looked at by this administration.

23        **THE COURT:**  So is the document that's there now

24   signed or is it just almost like a proposed?

25        **MS. GALLONI:**  It's proposed.  It's on EPA's

1    website, it hasn't been sent to our knowledge to the Federal

2    Register's, the office of the Federal Register.  It's not

3    even proposed, it's a pre-prepublication posted on EPA's

4    website.

5            **THE COURT:**  So your point, at least in part, is

6    that it's not simply a matter of the fact that it hasn't

7    been published yet, it hasn't been finalized yet is what

8    you're telling me?

9            **MS. GALLONI:**  Right.

10            **THE COURT:**  So would this claim be mooted if the

11    EPA were in fact to publish the prepublication notice?

12            **MS. GALLONI:**  No, it would be -- the existing one,

13    no, because the existing prepublication notice says that

14    it's codifying an adjudicatory order -- which we don't

15    believe is a thing, that it's codifying an adjudicatory

16    order of an action that has already taken effect.  So

17    codifying the actual approved program with all of its

18    components is what would cure the claim.

19            **THE COURT:**  Well, I mean, strike the words

20    adjudication there, I'm not sure they need to say that in

21    the document as well.  But if they were tomorrow to go ahead

22    and publish the prepublication notice in the Federal

23    Register and take the words out that are commentary, or are

24    not necessary in any event, saying that this is adjudicatory

25    or not based on a rule, would that moot -- you might have a

1    different claim, but would that moot count nine?

2              MS. GALLONI:  It would moot count nine if it

3    contained all of the components of the approved program.

4              THE COURT:  But isn't that a different argument?

5    Because I think count nine is simply that -- as I understand

6    it, is not that -- is not a challenge saying you're missing

7    some of the elements.  Count nine is that because you

8    treated this as an adjudication instead of a rule -- or put

9    that aside.  Count nine, as I understand it, is simply that

10   you had to publish this in the Federal Register and codify

11   it.  You haven't codified it, and therefore that's a

12   procedural flaw.

13             And you might have another argument separate, and

14   maybe it's an amended complaint or something saying well, we

15   need to codify this.  But my understanding, at least of the

16   current count nine, is that it's not picking at missing

17   elements, it's picking at the fact that it hasn't been

18   codified, period.

19             MS. GALLONI:  Yes.  And the missing elements goes

20   to the actual notice point.  But yes, the fundamental

21   violation is we have a set of regulations, federal

22   regulations that we should have the benefit of with all the

23   processes that that entails -- NEPA, ESA, the Corps.  And

24   because the Florida program hasn't been codified, we should

25   have the benefit of those.  If they were to codify the

1    components of the program, yes, that would take care of

2    claim nine.

3            THE COURT:  Right.  But even if they were to

4    publish what they've done now, I think it would deal with

5    count nine.  You might have a different count or amended

6    complaint saying well, now what you've published is

7    deficient because you're missing elements two, three and

8    four, but that would just be a different claim.

9            You're nodding, so do you agree with that?

10           MS. GALLONI:  I'm thinking about it.

11           THE COURT:  Fair enough.

12           MS. GALLONI:  I think that's right.  But again,

13   we're entitled to notice -- if what's contained in the

14   biological opinion -- and I hate to call it the biological

15   opinion, because this isn't really about a biological

16   opinion, but about the technical assistance process that was

17   stuck into that document.  If it's being used as law but has

18   not been codified as law, then we don't have notice of what

19   the law is.  So it's being applied as though it's law, it's

20   not in -- it's not codified.  I understand what you're

21   saying, that that might be a somewhat different claim.

22           THE COURT:  Fair enough.  Anything else you want

23   to add before I hear from the others?  I'll give you a

24   chance to response.

25           MS. GALLONI:  No, thank you.

1              **THE COURT:** Mr. Coghlan, do you want to go next?

2              **MR. COGHLAN:** Thank you, Your Honor. Maybe I'll

3       just start by responding to a couple of the points that came

4       up in your exchange with Ms. Galloni. The first point I

5       just wanted to note is with respect to a section 705 stay,

6       that's a provision that authorizes that agencies and courts

7       to issue stays. The fact of the matter is if plaintiffs

8       think that they're entitled to a stay, they could move the

9       Court today for a 705 stay, and it would be within the

10      judicial authority to grant a stay that --

11             **THE COURT:** I'm sorry, Mr. Coghlan, I'm not sure

12      that's correct. They could file a motion for a preliminary

13      injunction or a TRO. I'm not sure they could file a motion

14      for a 705 stay, because Ms. Galloni, I think correctly,

15      observes that 705 applies before a rule has taken effect.

16      Their view is that this is a rule and it's already taken

17      effect.

18             **MR. COGHLAN:** I think, Your Honor, the D.C.

19      Circuit opinion that issued that holding that an agency

20      doesn't have the power to issue a 705 stay after it's taken

21      effect relied on the general rule that an agency, once it

22      issues a rule, doesn't have the power to undo that rule

23      except by rulemaking. So it was based on an agency's

24      limited scope of authority under the Administrative

25      Procedure Act. I don't think that reasoning applies in any

1      way to the Judicial Branch in its power of equitable

2      authority to --

3                THE COURT:  Although, I have to say, I'm not sure

4      that -- I'm not sure I agree with you with respect to the

5      705.  I don't think it matters a whole lot whether it's

6      captioned -- for me, if they filed it with me, whether it

7      was captioned as a motion for a preliminary injunction or a

8      motion for a 705 stay.  I'm not sure that substantively

9      makes a difference.  I think the standards for courts'

10     perspectives are the same.

11               But I think that what Ms. Galloni is saying -- and

12     I think there's some merit to this, is that there's a

13     benefit to having two bites at the apple, and that they

14     ought to be entitled to have an opportunity to convince the

15     EPA whether there should be a stay.  And if they're

16     unsuccessful at that, then maybe they come to the Court and

17     try to convince the Court that there's an independent right

18     to ask the agency to do it.

19               MR. COGHLAN:  Yeah, I think, you know, maybe.  I

20     would just note that the standard that guides the agency's

21     exercise of its equitable discretion under section 705 is

22     going to be the same one the Court applies.  So if it's two

23     bites at the apple, it's really two bites at the same part

24     of the apple.  There's not really a greater advantage to

25     getting a crack at asking the agency for a stay, which is

1    itself subject to judicial review under the --

2          THE COURT:  Although I'm not sure that's -- maybe

3    it's the same, although the agency certainly has a different

4    perspective on it than a court has on it, on the issue, in

5    that an agency, for example, in balancing the public

6    interest factors is going -- or would likely have a

7    different take on those issues than a court would; and that

8    agencies have their own views, and they should have their

9    own views, with respect to what's in the public interest.

10         MR. COGHLAN:  Yeah, maybe.  There might be some

11   marginal difference between an agency's decision making in

12   the state context and the courts.  The point is it's not as

13   if they're entirely without recourse to tomorrow seek

14   federal relief they say they can surmise by virtue of this

15   rulemaking going into effect -- or at least something pretty

16   close to it.  That's just the observation on it.

17         THE COURT:  You should feel free to decline to

18   answer this question if you'd like, but if you're

19   comfortable answering it, it might be helpful.  Do you know

20   whether in fact this is a pointless exercise, whether the

21   agency has a view or not with respect to whether it thinks a

22   stay is appropriate here, or is that something the agency

23   just hasn't considered because it hasn't been presented with

24   the issue?

25         MR. COGHLAN:  I don't want to get over my feet.

1    The agency hasn't taken --

2         THE COURT:  Yep, that's fair enough.  Let me ask

3    you another question, though, about -- that may be not quite

4    as over your skis, which I think is perhaps a little fairer

5    question than the last one was.  Why hasn't the agency

6    codified the determination here?  It's been a year.  It

7    seems a little strange under the circumstances.  And if it

8    would potentially moot the claim, why hasn't the agency just

9    done it?

10        MR. COGHLAN:  Well, I think that the agency is not

11   required to codify in the --

12        THE COURT:  I thought the regulations did require

13   codification?

14        MR. COGHLAN:  No, I don't think so.

15        THE COURT:  Oh, is it just publication?

16        MR. COGHLAN:  Well, I think EPA's regulations

17   require it to issue a notice of approval, and provide that

18   the notice be becomes effective as of the date of

19   publication.  As I understand it, that's publication in the

20   Federal Register.

21        THE COURT:  No, you're right.  But still, maybe

22   the problem here is that this is tied up in the merits of

23   the case.  But in the prior two cases where EPA has

24   delegated authority to a state, it has gone ahead and

25   codified.  And here it said it was going to codify.  I have

1      to say, the takeaway from -- the impression that leaves the

2      Court with is that the reason that the agency's not

3      codifying here is because it thinks that the process of

4      codification implies that this is a rule, and therefore it

5      loses on the merits.  Because if it's codifying it, it's

6      treating it like a regulation, and therefore you're holding

7      off in doing it while the litigation is pending.  But given

8      the fact that it's happened in the last two, and that the

9      agency said it was going to codify here, it doesn't advance

10     the ball a lot for the agency just to hold off on its

11     codification.

12            **MR. COGHLAN:**  Well, I think part of the reason the

13     agency is reluctant is because there is this pending claim

14     on this issue of whether it had to codify, and it doesn't

15     want to suggest that it had to act.  And it does state that

16     it was within its discretion to codify or not in this

17     instance.  But the other reason that I would point to is the

18     exchange that you just had with Ms. Galloni.

19            I mean, this is active litigation and somewhat of

20     a game of whack-a-mole.  And so if they codify it, then

21     maybe there's an amended complaint based on some

22     incomplete -- or allegation of incompleteness.  So easier in

23     some respects for us to let sleeping dogs lie and resolve

24     these claims which have been pending before the Court.  And

25     then depending on what the Court says, codification

1   thereafter at some point perhaps.  But I think it's bound up

2   in this litigation, and it's just not something the

3   agency...

4           THE COURT:  So my understanding is that the

5   plaintiffs did seek a stay from the agency after the rule or

6   determination issued.  What is the status of that?

7           MR. COGHLAN:  I believe plaintiffs filed something

8   that was -- I believe it was on January 20th, they can

9   correct me if I'm wrong, that's the filing that I'm familiar

10  with.  And it was, I believe, sort of a combination of a

11  request for a stay and here are all of the things that are

12  wrong with this program.  I think the EPA's position is this

13  was an order.  A 705 stay doesn't apply here because the

14  thing has become effective.  So the agency hasn't taken any

15  action on it to --

16          THE COURT:  If I conclude that this was a

17  rulemaking and not an order, what follows from that?

18          MR. COGHLAN:  Well, it's a difficult issue to

19  think of in terms of remedy.  I mean, I think if we're going

20  to lose on the merits, that these claims very much welcome

21  the opportunity to brief the issue of remedy and develop

22  this a little bit further.  But the Court, in its equitable

23  discretion, might be able to afford them relief where it has

24  an opportunity -- plaintiffs have an opportunity to ask the

25  agency for the stay that they say they would have been able

1    to ask for but for the immediate effective date.  The agency

2    would have an opportunity to consider that request and grant

3    it or not, which would then be reviewable by this Court.

4            But I think, zooming out a little bit, and also

5    sort of going back to something that was said at the

6    beginning, just a couple of clarifications.  The

7    non-rulemaking docket on regulations.gov was ultimately the

8    non-rulemaking.  That was not something that changed over

9    the course of this.  And I also want to note that there's a

10   lot of agency action that gets filed in what's called a

11   rulemaking docket.  That's just a matter of course when

12   you're doing things through the Federal Register.  And I

13   would just caution against relying on the sort of

14   superficial indicia of whether something was a rule or an

15   order.  And there is some D.C. Circuit case law --

16           **THE COURT:**  Fair enough, but that is -- it's more

17   here, though, than just a type of superficial designation,

18   because it's confirming what might otherwise appear to be

19   the case.  On March 2nd, 1994, in the New Jersey

20   determination, the agency labels its determination final

21   rule.  That's the agency speaking.  I went back and looked

22   at the brief that was filed in the Seventh Circuit case, and

23   the agency said that 553(e) applied.  So the agency -- I

24   mean, there's certainly evidence that the agency

25   historically has considered these to be rules.

1          And then you look at the case law in

2    distinguishing a rule between an adjudication, and I have to

3    say, I'm not terribly persuaded by the argument that this is

4    just a licensing type of matter between the federal

5    government and the state of Florida.  The presence of amici

6    here confirms that there are a lot of other people who are

7    interested in this, and it affects the regulatory regime.

8    It's amending the regulations, and it's saying in the past

9    you had to go to the Army Corps of Engineers to get a

10   permit, now here's someone else you go to.  There's a whole

11   new set of rules that apply.  It sure looks like a rule in

12   that sense, and certainly doesn't look like just a private

13   resolution of an issue between a limited universe of

14   individuals.  And the agency itself said it was going to

15   codify it, which is indicative of it being a rule.

16          So there's a lot more that points towards the

17   notion this is a rule.  And quite frankly, it looks a little

18   bit like what happened here is that someone got to the end

19   of the process here, and just when you look at the calendar

20   and say wait a second, if we treat this as a rule and we

21   wait 30 days, then there's going to be a new administration.

22   And the new administration is going to -- the Klain memo is

23   going to kick in.  Ron Klain was not the first chief of

24   staff to invent that, it's happened I think in every

25   administration in my memory that they do that.  And perhaps

1    someone on the way out of office said to themselves we

2    better treat this as an adjudication, because we don't want

3    to have to live with the 30-day rule.  And that seems

4    improper to me, if that's what was going on here.  Because

5    you can't change courses halfway through the process, even

6    if agencies do have a lot of discretion in deciding whether

7    to treat something as a regulation or an order or

8    adjudication in the first place.

9         MR. COGHLAN:  Let me just respond to that issue of

10   whether or not this was sort of by nature a rulemaking

11   rather than adjudication, because I think that's really the

12   dispositive issue in this case.  And I think -- I mean, I

13   would concede that this is not an archetypal adjudication.

14   But I would also note that this is not an archetypal

15   rulemaking either.  I mean, EPA's approval of Florida's

16   action was a fact intensive, case specific inquiry with

17   immediate legal consequences for a specific entity.  And I

18   think --

19        THE COURT:  I'm sorry, let me pause you for a

20   second there.  I mean, I agree that this is somewhat

21   unusual.  One of the things that worries me in thinking this

22   through is about the vast array of other programs out there

23   in the federal government like this one, and I want to think

24   that through.  If you can point me to other analogies -- I

25   know the plaintiffs have pointed me to some, and you've all

1    pointed me to some as well under at least the 402 program.

2    But I don't think it's really fair to say this is just a

3    really fact intensive, case specific matter involving

4    specific parties here.

5            Because you can also say, you know, in Chevron

6    when the EPA was deciding what a source was, it was this

7    intensive, fact specific inquiry regarding pollutants and

8    how they're emitted in different types of facilities.  We

9    had scientists working on this.  It was incredibly fact

10   intensive here, and it just dealt with this one narrow

11   issue.  That's classically obviously a rulemaking.  And

12   here, it's true that it doesn't apply across the entire

13   nation, it only applies in Florida.  But it is an issue, as

14   this case exemplifies by the fact that we have, I think,

15   seven plaintiffs here and amici here -- and there probably

16   are lots of other folks out there that care deeply about

17   this case.  This is not a case that's simply about granting

18   a license to the state of Florida to engage in some activity

19   the state wants to get into.  It's amending the Code of

20   Federal Regulations to take what was a responsibility of the

21   Army Corps, and a process in which people had to go to the

22   Army Corps and get a permit following particular regulations

23   and procedures, and saying all those regulations and

24   procedures that used to apply for getting a permit under 404

25   don't apply anymore.  Here's a whole new set of regulations

1    and rules that apply.

2              It was true that it could be done by another party

3    if the state of Florida is going to be doing it.  But I

4    think it's not a fair characterization to treat this as

5    though it's a narrow, private licensing type of issue

6    involving the state of Florida.  It's an issue that may only

7    apply to one of the 50 states, but it is a question of what

8    regulatory rules apply as a matter of federal law in that

9    jurisdiction.

10             **MR. COGHLAN:**  Your Honor -- I'm sorry.

11             **THE COURT:**  No, go ahead.

12             **MR. COGHLAN:**  I think an important distinction

13   between this instance and something like Chevron where

14   you're dealing with sources and how to define them is that

15   this is not EPA sort of sitting down and saying, you know,

16   based on the exercise of our quasi legislative authority,

17   what's the best system; what's the most practicable system

18   for Florida to administer; what's the best section 404

19   program Florida could administer here.  Florida submitted an

20   application to EPA with a state program that Florida

21   defined.  And the EPA's role in that process is actually

22   fairly narrow.  It's to look at that application, and decide

23   whether the application lines up against predefined

24   statutory and regulatory criteria, check the boxes that it

25   needs to check.  And that's the application of existing law

1    to unique facts.

2            They understand that there are effects of that

3    decision that make this seem more like a rulemaking.  But if

4    you look at what EPA's doing here, what kind of authority

5    EPA's exercising, they're actually fairly narrow, and it is

6    I think a fair analogy to look to licensing programs.

7    Because it's not a very different exercise of agency

8    authority to look at the application and ask whether it

9    meets the criteria that Congress defined.  And then, again,

10   it's the judgment of Congress that, should the application

11   satisfy those criteria, that that will become the law in

12   that state, that EPA will transfer the programming over

13   to --

14           **THE COURT:**  Mr. Coghlan, can you say to me that at

15   the time this process began, that the EPA regarded it to be

16   an adjudication; and when the acting general counsel issued

17   his letter after the process was complete, that he was

18   simply confirming something that was decided all along?

19   Because certainly with respect to what happened in 1994, and

20   perhaps with Michigan as well -- and the position that the

21   United States Government, the Justice Department took in

22   briefing, they've all treated these things as though they're

23   rulemakings.

24           So you would have thought that if the agency said

25   this time let's not do a rulemaking, let's do an

1    adjudication, that someone would have said in the notice by

2    the way, this is an adjudication, it's not a rulemaking, as

3    has happened in the 402 context.

4         MR. COGHLAN:   I'm not aware of EPA ever having

5    changed its position about what regulatory process it would

6    use, nor can I confirm for you that it ever did.   I don't

7    have sort of definitive proof on that point.   But I would

8    say that as to the historical evidence, I think for a lot of

9    the reasons that we noted in our brief, there's ambiguity in

10   the historical record, and there's aspects of the historical

11   record that really cut both ways here.   I mean, there were

12   immediate effective dates for at least one of the prior

13   section 404 approvals with no reference to any kind of

14   exception from the 30-day requirement.   And the other

15   section 404 approval was effective 15 days after notice was

16   published.

17        With one of those Federal Register notices,

18   there's a description that the approval action that says an

19   approval action -- which would not be a rulemaking, and then

20   a final rule, two discrete actions:   One being approval, one

21   being the codification program, which is how EPA views

22   approval and codification in this instance.   So I think

23   there's no clear evidence in the past practice that EPA has

24   always consistently referred to these as rules.   You

25   mentioned the brief filed by the Justice Department in the

1    (inaudible) case.  I think we noted in our response to

2    plaintiffs' supplemental authority the issue of whether

3    these things were rules or orders is really besides the

4    point, because the argument was there was a requirement to

5    consider a comment that was submitted.  The comment was not

6    relevant.  So whether it was a rule or an order, it didn't

7    matter, EPA didn't have to apply to it.  So the Justice

8    Department attorneys who were briefing it chose not to

9    litigate a non-dispositive issue, they just said it's a

10    rule, it doesn't matter.

11        **THE COURT:**  Well, they didn't quite say that.

12    They didn't say well, we're not addressing whether it's a

13    rule or not.  They said they treated it as though 553(e)

14    applied.  They may have assumed it themselves, but it's not

15    like they simply said to the court even assuming that it is,

16    that's not what they said in the brief.  They acted as

17    though it was.  And it may be -- you know, I don't know

18    whether there's such as a thing as dicta in a brief or not,

19    maybe it was dicta for the brief writers.  But that was

20    their impression looking at it.

21        **MR. COGHLAN:**  I think that's a far cry from a

22    concession that it was in fact a rulemaking, that's the

23    first point.  The second point is if you go back and look at

24    the Federal Register notice for that, I mean, it was

25    described as an agency action.  It was not described as a

1    final rule.  There was an immediate effective date.  And EPA

2    often describes these things in ways that very much make

3    them seem as if they were non-rulemaking actions.

4         THE COURT:  What, other than the effective date --

5    and the effective date, you know, the plaintiffs I think say

6    that there's language in the determination that actually is

7    consistent with their view that it's a rule, and that the

8    agency is actually explaining why it was immediately

9    effective -- notwithstanding the requirements of 553.  But

10   even put that aside, maybe the agency violated 553.  It

11   doesn't mean that it wasn't a rule, even if they violated

12   553 in the process.

13        MR. COGHLAN:  Possibility, but I think it also

14   shows there's not a clear pattern here of always treating

15   these things as clear rulemakings with 30-day on-ramps until

16   effectiveness.  That was not -- whether these things were

17   rules or orders, the immediate effective date is very much

18   not a new feature of this.  I think that sort of undercuts

19   the argument that there was some nefarious effort to short

20   circuit the change in administration and get this on the

21   books immediately.

22        THE COURT:  So let me ask you, it seems to me that

23   the Justice Department's position here -- which I think is a

24   little tough, is that well, maybe these were hybrid

25   adjudications and rulemakings, and that the decision itself

1   was an adjudication, but the codification of that decision

2   was a rulemaking -- which, I have to say, I think is kind of

3   a dangerous position.  Because if agencies can do that, it

4   threatens to completely undermine the APA.  Because anytime

5   an agency would then have discretion to do something by

6   adjudication and have to live with less demanding standards,

7   it's an adjudication all the way up until the point when we

8   have to codify it, and we're just going to do the

9   codification by rulemaking.  That seems to me to really risk

10  undermining the APA more generally.

11          But put that aside for a second.  Here, the agency

12  has said I think that the codification would be a

13  rulemaking.  It said it's going to do a codification, and so

14  where is that.  I don't think the agency can say it's going

15  to do a codification and then just not do it without then

16  issuing some further notice, and perhaps an opportunity for

17  comment, saying we decided not to engage in that rulemaking

18  we told you we were going to engage in.  I think once you've

19  begun a rulemaking, you can't just abandon a rulemaking

20  without providing notice and comment for an opportunity to

21  abandon the rulemaking, which you haven't done -- which the

22  agency hasn't done here.

23          And if they did do that, abandon that rulemaking,

24  then the plaintiffs would have an opportunity to challenge

25  that decision as final agency action abandoning a

1    rulemaking, if that's what the agency is doing here.

2            MR. COGHLAN:  Just to clarify the agency's

3    position and what I think it intended to do through

4    codification -- and I'm not sure this speaks to the first

5    point you raised, but --

6            THE COURT:  I'm sorry, say that again.

7            MR. COGHLAN:  I'm sorry, I'm not sure this speaks

8    to the broader point you raised about the APA, but just to

9    clarify how EPA understood the requirements for publication

10   in the Federal Register.  The intention was to use a

11   rulemaking to codify it, because rulemaking is the process

12   by which you get things into the Federal Register.  That's

13   just the administrative process.  It was not intending to go

14   through notice and comment rulemaking in order to codify it,

15   it was going to be an immediately effective rule with

16   553(e)'s exception from the 30-day requirement.  So EPA --

17           THE COURT:  That strikes me as even more dangerous

18   then, is saying we're going to actually engage in

19   codifications.  Codifications have to be done by rulemaking.

20   We're going to do the whole thing by adjudication.  Then

21   we're going to get up to the last bit and we're going to do

22   it by rulemaking, and we're not going to provide an

23   opportunity for notice and comment because the decision's

24   already been made.

25           MR. COGHLAN:  Well, I think EPA's position is that

1    it doesn't have to codify here, it could just not codify

2    this at all as it does in many other areas.  The

3    adjudication would still be final, Florida's program would

4    be up and running, and --

5         THE COURT:  How could it not codify it if someone

6    picks up the C.F.R. and shows up at the Army Corps of

7    Engineers' offices and says here's the law, I'm here for my

8    permit?  These are what the regulations say, it says I come

9    here to apply for it.  No, no, no, there's this other thing

10   that's not in the law, it's out in there, but we didn't put

11   it in the Code of Federal Regulations.

12        MR. COGHLAN:  I think it would be the same

13   situation as if they had filed the amendatory language here.

14   You know, if they're going to file a Federal Register notice

15   that says here's the language that we're planning to include

16   in the Federal Register, that person still doesn't have

17   (inaudible) when he walks into the Corps' office.  It's not

18   a situation that's any different from the status quo, if I

19   understand the question correctly.  I mean, EPA published

20   notice of its approval of Florida's program, so that's in

21   the Federal Register.  That was effective on December 22nd

22   or whenever the publication date was.  That's the action

23   that EPA used to transfer the authority.

24        THE COURT:  I guess my point is that to the extent

25   the Code of Federal Regulations sets forth what the legal

1    regime is and what the rules are, if someone goes and reads
2    that, they're going to go show up at the Army Corps of
3    Engineer's offices unless there's something published saying
4    you don't do that.

5         MR. COGHLAN:  Well, I think if they don't know
6    what the law is because they don't have notice through the
7    Code of Federal Regulations, maybe there's a claim there
8    based on failure to codify.  But we think that's a pretty
9    different situation than what we're dealing with here, on
10   claim nine at least.

11        THE COURT:  But isn't anything, though -- I mean,
12   isn't that kind of the point of codification, though, that
13   anything that actually changes generally applicable rules of
14   law needs to be in the Code of Federal Regulations, and
15   that's the reason there's the codification requirement?  The
16   idea is that if it actually changes the rules, it ought to
17   be codified.  And this is changing the rules.  It's saying
18   if you're in Florida, you don't go to the Army Corps
19   anymore, now you go to the state of Florida.  And by the
20   way, if you're in Michigan or New Jersey, you look at the
21   Code of Federal Regulations and it says no, you go to
22   Michigan or to New Jersey now, and it doesn't say that with
23   respect to Florida.

24        MR. COGHLAN:  (Inaudible) EPA has approved
25   Michigan and New Jersey's programs.  I think it's approved

1    Florida's program too.  It doesn't say that in the Code of

2    Federal Regulations.  I mean, I take the point, I don't

3    think that -- I'm looking at the C.F.R. now.

4         **THE COURT:**  I'm looking at the notice for New

5    Jersey, and it's a heck of a lot more extensive than simply

6    saying go to New Jersey now.

7         **MR. COGHLAN:**  If you look at what's actually in

8    the C.F.R., it supports what EPA understood itself to be

9    doing when it published a prepublication notice, and what it

10   understood that it would be doing if they codified here,

11   which is essentially to memorialize some already taken

12   agency action rather than amending the Code of Federal

13   Regulations in some way that would be binding in the future.

14   A lot of what was said here is we're not even incorporating

15   this by reference, this is just a heads up.  There are other

16   documents here that are part of the program:  A memorandum

17   of understanding -- memorandum of agreement, excuse me;

18   statement of legal authority.  These things are just

19   memorializing decisions that have already been taken,

20   they're not themselves legally binding.

21        You would never sue somebody under 33 C.F.R.

22   233.71(e).  That's just a marker in the Code of Federal

23   Regulations that memorializes a decision that had been made

24   previously.  I think that's how EPA understood the C.F.R. to

25   work in this instance, to be a source of information for

1    people to go to, but not to have sort of legal effect.

2    Florida's program is going to be the program that they go to

3    that governs, and the laws of Florida are published and

4    available to the public, and the notice that you need to

5    know what the law is.

6            I'm sorry, what was that Your Honor?

7            **THE COURT:**  I said fine, I'm happy to move on to

8    anything else you want to raise.

9            **MR. COGHLAN:**  I do want to talk about standing

10   while we're here, if we can.  And I think there's some

11   serious standing problems with claim nine.  I think your

12   exchange with Ms. Galloni teased this out.  Their harm here

13   is not from a failure to codify, their harm is from the

14   administration of Florida's program -- the alleged harm is

15   from the administration of Florida's program, the

16   implementation of Florida's program.  I don't think you get

17   to point to an alleged procedural defect and say that that

18   renders null and void everything about the agency action

19   that followed that procedural defect.

20           We know this -- we cite the Diamond case in our

21   brief.  The problem there is you just don't really have any

22   sort of causal connection here.  If EPA didn't codify, that

23   didn't cause their harm.  Their harm is from administration

24   of the program.  That might give them standing to bring

25   substantive challenges to the program, but they can't tie

1  the failure to codify to any of their specific terms here.

2          THE COURT:  I need to think hard about that

3  question.

4          MR. COGHLAN:  The other point I'd note on standing

5  on claim eight, I mean, I think that they've got a pretty

6  narrow path to walk here to get standing.  I think to

7  injuries that occurred during the 30-day period when they

8  said this rule should not have gone into effect, maybe

9  there's some cognizable injury for standing purposes.  But

10  they can't reach outside that 30-day period, because you

11  can't make the rule ineffective after that 30-day clock has

12  run.

13          So if they have standing here, it's based on the

14  injuries they alleged for the time they spent trying to

15  figure out where permits were in the 30-day period between

16  the approval date and -- well, plus 30 days would be

17  January 21st.  That's got to be where their standing rises

18  or falls.  That's the only other point I'd note on standing.

19          THE COURT:  Going back to claim nine, I hear you

20  with respect to notice.  If the plaintiffs' argument,

21  though, is that the relief you're seeking with respect to

22  count nine is a declaratory judgment that absent

23  codification there's been no change in the law, and the

24  reason for that is because the agency can only proceed by

25  rulemaking, it cannot proceed by adjudication, therefore it

1    must have been a rulemaking and not an adjudication.  And

2    that the law is not ultimately effective until it's

3    codified, therefore it's a nullity.  I don't know whether

4    they're right or wrong about that on the merits, but don't

5    they have standing to raise that argument?

6         And maybe they lose on the merits for the reasons

7    you've stated, but don't they have standing to say look,

8    we're bound by these rules, this really affects what we do

9    enormously.  It affects our access to NEPA and the

10   Endangered Species Act.  It has a profound effect on us.

11   And we actually want a declaratory judgment that what you

12   did is a nullity, because you haven't codified it.

13        And as I said, I don't know whether they're right

14   or wrong about that.  But it does seem to me that maybe they

15   have standing at least to raise that argument if that is

16   what their claim is.

17        **MR. COGHLAN:**  I don't think they do have standing,

18   Your Honor.  I think that their claims did -- their alleged

19   harms might be redressable if they got the relief they were

20   requesting.  I don't think we would contest that an order

21   vacating programs would provide them with relief from the

22   harms that they say they've suffered as a result of the

23   program's implementation.  But I think for purposes of the

24   standing analysis, you need to establish causation between

25   each alleged violation of law and the harm that you say

1    you're suffering.

2            And here, that causal link is just lacking,

3    because they didn't suffer a harm for a lack of notice -- or

4    at least not something they pointed to.  Running

5    counter-factual, EPA codified on January 16th after it made

6    available its prepublication notice.  It really doesn't cure

7    any of the harms that they say they suffered from the

8    implementation of Florida's program.  And I think that

9    that's really a fatal flaw.  I mean, there's sort of two

10   ways you can get at standing in that situation.  You could

11   show that there's a harm suffered as a result of the

12   violation of law -- alleged violation of law, which they

13   haven't done, or you can say well, we've been deprived some

14   procedural right here.  But what the D.C. Circuit said is

15   that in that procedural right standing context, you still

16   have to show causation.  The way you show causation is the

17   procedural right that you didn't get could have affected the

18   substantive decision that ultimately harmed you.  And here,

19   there's just a chronology problem.  You can't say that the

20   failure to codify would have -- or that EPA's codification

21   would have resulted in a different decision on the approval

22   action.  Those things are just in the wrong chronological

23   order, so there's no way you could say that having codified

24   would have affected the substantive decision.

25            THE COURT:  I mean, I'm not thinking of this --

1    maybe it's partially a procedural issue, but I guess I'm

2    thinking of this as analogous to a situation in which they

3    came in here and they said, you know, we looked at the final

4    rule, Judge Moss, and it turns out that the administrator's

5    four-year-old son signed the rule.  And that doesn't --

6    that's not a final rule.  You can't have legal effect when a

7    four-year-old, who is not a government official, signs a

8    rule.  And therefore, this is a nullity.  And they have

9    would have standing to come in and say this thing that you

10   point to be a rule is a nullity because it was signed by a

11   four-year-old who's not a government official.  And they can

12   do that, and they'd have standing to make that argument.

13          I suppose the question I'm raising is, if you put

14   the notice issue aside, as I understood Ms. Galloni's

15   argument to be now, is aren't they making an argument that's

16   somewhat analogous to that saying it's not law until it's in

17   the -- until it's been codified; and we want a declaration

18   that this is not law; and that in fact everyone should be

19   going to the Army Corps for their permits now because it

20   hasn't been codified?  I think that -- and I'm just saying

21   to raise that argument, they may have standing to raise

22   that, whether they're right or wrong on the merits.

23          MR. COGHLAN:  I don't think they would have

24   standing to raise that, Your Honor, and I think that Diamond

25   case, which we cited in our briefs, is on all fours here.

1    It really addresses an analogous situation where a

2    plaintiff, who has substantive claims to a law, said that he

3    was injured in many ways because of the law's

4    implementation.  He also said that the law was null ab

5    initio, because the legislative body that approved it didn't

6    go through the required procedures before they cast their

7    votes.  And he, like the plaintiffs here, said well, I was

8    injured by the downstream consequences of the law, therefore

9    I have standing to bring a challenge to their failure to

10   follow the procedural requirements.

11           But the D.C. Circuit said well, yeah, sure you

12   have standing to bring the substantive claims, but don't

13   have any standing to bring a challenge as to that procedural

14   claim.  Even if you say that everything happened afterwards,

15   everything about this law harmed you, there's no clear

16   connection, there's no traceability, there's no causation

17   between the failure to follow that procedure and the harm.

18   So the law went into effect, you're harmed by that.  Feel

19   free to challenge the law.  But you don't get to challenge

20   for failure to follow the specific procedure.

21           THE COURT:  I'll take a look at that.  I guess I

22   think maybe we'll just -- there's a difference, I think,

23   between the procedures that may end up in a final rule.  I'm

24   saying the argument, as I understand it, is analogous to it

25   turns out the president never signed the bill from Congress,

1    and someone goes out and starts enforcing the law.  And

2    someone brings a declaratory judgment action saying that's

3    not a law, the president never signed it and it wasn't

4    subject to a pocket veto or a veto, and therefore it's not

5    law.  I would think someone would have standing to make that

6    argument; whether they win or lose on it is a different

7    matter.  I understand Ms. Galloni's argument to be that it's

8    just not law because it wasn't codified.  As I said, I don't

9    know the merits of it, but on the standing, it seems to me

10    as though there's not a reason you wouldn't have standing to

11    raise that argument.

12           MR. COGHLAN:  I think we laid out the argument in

13    our brief, so I don't want to belabor the point.

14           THE COURT:  I'll look at the case.

15           MR. COGHLAN:  You know, I do want to make a bigger

16    picture point here, Your Honor, just about some of the

17    stakes here.  I think that -- you know, I conceded earlier

18    that this is not sort of an archetypal adjudication.  I

19    think zooming out a little bit, most agency action doesn't

20    entail the exercise of exclusively adjudicative or

21    executive -- or legislative authority.  Pretty much

22    everything an agency does falls somewhere between two poles,

23    a legislative action and an adjudicative action.

24           Going back 75 years, the courts have said under

25    the circumstances where you're acting as an agency sort of

1    between those two poles, we're just not going to elevate

2    form and cap the agency action by trying to draw precise

3    lines between adjudications and rulemakings.  So if you

4    apply that framework in this case, sure, there are some

5    elements of this that make this look somewhat like a rule.

6    But there's also a lot of this that looks a lot like an

7    adjudication.  I think under those circumstances, it's fair

8    for the agency to exercise its discretion in choosing which

9    mechanism it's going to employ.

10             Now, I would also say that even if --

11             **THE COURT:**  Shouldn't it make that decision at the

12   beginning rather than at the end of the process?

13             **MR. COGHLAN:**  Well, I'm not entirely clear that

14   EPA in any way locked itself into acting through rulemaking

15   here.  And I'm not sure that EPA does typically at the

16   outset sort of state in the beginning of a preamble for an

17   action, you know, we are doing this as an adjudication.

18   Perhaps it does.  But it's not as if they acted through

19   issuing a notice of proposed rulemaking and then said oh, by

20   the way, this is going to be an adjudication.  It did this

21   process in a compressed timeframe pursuant to the regs and

22   statutes, and I don't think they ever said this is going to

23   be a rule.  And I don't think --

24             **THE COURT:**  You know, Mr. Coghlan, we need to take

25   a break in just a second, but I did want to say you make the

1    point that it's not like they said this was a notice post

2    rulemaking, but it's action, notice and request for

3    comments.  I guarantee you you could find several hundred

4    rulemakings in the Federal Register that say exactly that,

5    and that's the language that's used, and the D.C. Circuit in

6    fact, and perhaps the Supreme Court as well, has said that

7    when a statute refers to notice and comments, that that's

8    referring to notice and comment rulemaking.  And that's

9    the -- those are the magic words that most of us understand

10   to mean rulemaking.

11        **MR. COGHLAN:**  Well, if I could just push back a

12   little on that, Your Honor.  I mean, I think there's nothing

13   in the statute here that requires a notice and comment

14   process.  EPA regs provides for a notice and comment

15   process.  But the D.C. Circuit's recognized that agencies

16   are always within their rights to use notice and comment

17   processes in actions that are not rulemakings.  And in fact,

18   it has said in several of the cases that we cite the fact

19   that an agency went through some kind of notice and comment

20   process doesn't transform that action into a rulemaking.

21        So just to quibble a little bit with the assertion

22   there that a notice and comment is some kind of magic words

23   here, because it's not.  And EPA in fact engages --

24        **THE COURT:**  I think you were the one -- I was

25   coming back at what you said.  I think you were the one who

1    said Judge, it's not like they said this was a notice and

2    comment rulemaking; and I said well, they do say it's notice

3    and comment.

4         MR. COGHLAN:  I think my point there was just to

5    say it's not like they clearly went down a rulemaking path

6    by issuing a notice of proposed rulemaking, and then between

7    NPRM and final rule changed their minds to adjudication.  I

8    think with extreme facts like that, I could see an agency

9    perhaps being locked into the course it chose.  But I don't

10   think it did anything here to say this is going to be a rule

11   at the end of this process.  At the start, that would have

12   sort of worked an injustice to plaintiffs who are

13   participating in this process.

14        THE COURT:  Although one thing they did do was

15   they said we're going to codify it, which I think you would

16   concede requires a rulemaking.  So that's some indication

17   that that's what they contemplated.

18        MR. COGHLAN:  Yes.

19        THE COURT:  So let me ask you, Mr. Coghlan, I want

20   to take a break, give the court reporter a minute because

21   it's been a long time.  How much more time do you think you

22   need?  If you had another two minutes, I would say let's

23   finish up with you and take the break.  But if you think you

24   need another 10, I think we should take the break now.

25        MR. COGHLAN:  Well, Your Honor, I'm happy to

1    answer any of the Court's questions.  I think there are no

2    points right now that jump out to me that we didn't touch on

3    in our exchange.  But if there's some opportunity just to

4    respond at the end to other issues that come up very

5    briefly, I'd appreciate that opportunity.

6            THE COURT:  That's fair.  So it's just almost 5:00

7    o'clock now.  Why don't we take a 15-minute break, come back

8    at 5:15, and I'll hear from the intervenors and amici if

9    they want to address the Court as well.

10        (Recess taken at 4:59 p.m.)

11        (Back on the record at 5:17 p.m.)

12           THE COURT:  I had a couple of follow up questions

13   I wanted to ask.  Ms. Galloni, you indicated that you did

14   file a request for a stay under 705, right?

15           MS. GALLONI:  Yes, although we framed it as first

16   recognize this as a rule, not an adjudication so that you

17   can consider our request for a stay, yes.

18           THE COURT:  And did you do that within 30 days of

19   the decision?

20           MS. GALLONI:  Yes.

21           THE COURT:  So under -- I'm thinking through the

22   Prowes decision.  In light of that, if I were to conclude

23   that you were right on standing and conclude that you were

24   right on the merits, that I could hold that you're entitled

25   to relief for any injury sustained during the 30-day period

1    when you say that the rule should not have been effective;

2    and that because you filed your request during that period

3    of time, that the agency should consider under 705 whether

4    to issue a stay.

5            Does that make sense to you?

6        MS. GALLONI:  I think so, yes.

7        THE COURT:  And then with respect to your request

8    that the agency entertain a request for reconsideration, you

9    didn't make that request.  But there's not the same rule

10   that applies in the 705 context that you have to do that

11   before the rule takes effect, and so I could also then

12   indicate the agency should also consider reconsideration as

13   well.

14       MS. GALLONI:  Right.

15       THE COURT:  Mr. Coghlan, what are your answers to

16   those two same questions?

17       MR. COGHLAN:  I think, if I understood the

18   question, Your Honor, it was did they file a stay request

19   within the 30 days, and therefore could they be entitled to

20   relief to under Prowes to have the agency consider that stay

21   request?

22       THE COURT:  Right, during that period of time,

23   because there was an injury arguably sustained during that

24   period of time.

25       MR. COGHLAN:  I think if the Court concludes that

1    the nonconsideration of the stay request was an injury, then

2    under Prowes that is something that would be remedial

3    because it occurred within the 30-day period.  I would agree

4    with that.  And I'm sorry, what was the second question?

5        THE COURT:  The second question was with respect

6    to the plaintiffs' desire to seek reconsideration; that

7    there, there's not the same limitation that applies in 705

8    that it has to be during -- before the rule takes effect.

9    And therefore, again, under Prowes, that the Court could --

10   again, assuming I conclude that they're right on everything

11   else, order that the agency entertain a request for

12   reconsideration?

13       MR. COGHLAN:  Yes.

14       THE COURT:  And then another follow up question

15   was I know that one of the objections from the plaintiffs

16   was that the state's submission did not indicate what waters

17   are covered.  Has that issue been resolved or is there still

18   uncertainty with respect to which waters are covered?

19       MS. GALLONI:  It has not been resolved.

20       THE COURT:  And then this may be a question for

21   the state, but I'm getting ready to move to the state in any

22   event.  The question I have is whether any permits have

23   issued, how many permits have issued and so forth.  It would

24   be helpful to have an update on that.

25           Mr. Wood, I guess it's your turn in any event.  So

1    sometime in your argument, if you could respond to that

2    question.

3            **MR. WOOD:**  Good afternoon, Your Honor.  Thank you.

4    I can start there, if you'd like.

5            **THE COURT:**  Okay, great.

6            **MR. WOOD:**  Ms. Galloni mentioned the statistics, I

7    would like to correct the record there.  Florida's program

8    is off to a very strong start we think.  Over 4,500 permit

9    applications have been received, Your Honor.  Over 1,500 of

10   those applications were eventually withdrawn after Florida

11   asked additional questions and other processes unfolded.  So

12   just to show you how that works out, so far she mentioned 50

13   permits -- actually the number is 116, individual permits

14   for a wide array of projects of various types have been

15   issued.  And then in addition, over 150 non-individual

16   permits have been issued.  Around 50 permit applications

17   have been denied by Florida.

18           The process with EPA, Your Honor, is working well.

19   Florida and EPA are working cooperatively to ensure that

20   permits issued in Florida are compliant with applicable law.

21   As Your Honor knows, under the process set forth in section

22   404, EPA receives every draft permit.  If the EPA has a

23   concern, they make that concern known.  They also receive

24   feedback from the U.S. Fish and Wildlife Service, from the

25   Army Corps of Engineers, from the National Marine Fishery

1       Service.  And EPA can assert any sort of federal equity or

2       issue they would like in that process.  And if Florida were

3       not to accommodate or adjust the permitting process that

4       they're involved in on a permit-by-permit basis to account

5       for those concerns raised at the federal law, EPA has the

6       authority to federalize the permit and take it over -- which

7       really goes to the core of why we think there's no standing

8       for any claim here, Your Honor.

9               This is not a program that goes into effect on a

10      blank slate.  This is a program that provides for

11      Florida-led 404 permitting in place of Army Corps-led 404

12      permitting.  But it does not remove the federal overlay, the

13      federal statutory requirements.  And it doesn't remove the

14      opportunity for federal agencies to step in on a

15      permit-by-permit basis if there's a concern.  So we don't

16      see harm or injury arising to these plaintiffs or other

17      plaintiffs.

18              Your Honor, I also think it's worth noting that of

19      the seven projects that are referred to in the plaintiffs'

20      documents -- including their standing declarations, Your

21      Honor, that they say will -- you know, would harm them,

22      three of those were withdrawn, Your Honor.  One of those was

23      granted with changes in August, and they didn't file any

24      challenge under the state administrative process.  And so

25      there is highly -- there's a lot of speculation here on the

1    part of plaintiffs that they would ever be injured by any

2    decision.  But it's not just injury alone.  They actually

3    have to show that they would be injured in a way that's

4    different than when the Army Corps led this program.  And

5    the fact of the matter is they weren't happy when the Corps

6    led the program either.  They filed lawsuits challenging

7    Corps permits, because they didn't think the Corps followed

8    the right processes either.  And so we don't think that they

9    can bring this broad scale programmatic challenge here and

10   demonstrate standing globally the way they have.

11          Now, Your Honor has asked a lot of questions about

12   the adjudication versus rulemaking issue.  And from the

13   state of Florida's perspective, the Florida legislature

14   enacted statutes that authorized the governor of the state

15   to submit an application to EPA.  And every other state that

16   has filed an application -- 45 times, Your Honor, this has

17   happened under the Clean Water Act; 42 times under section

18   402; now three times under 404, those programs are approved

19   and then they are effective immediately.  And not once have

20   they been effective in 30 days, it's never happened.

21          THE COURT:  So Mr. Wood, can I ask you a question

22   about that.  My understanding is that under 402, the

23   determination is non-discretionary, but under 404 it is

24   discretionary with the EPA?

25          MR. WOOD:  Actually, Your Honor, the plaintiffs

1    raised that point, and that confuses an issue under the

2    Endangered Species Act versus an issue under the Clean Water

3    Act.  So both 402 and 404 are actually non-discretionary.

4    The administrator shall approve if they meet the criteria.

5    There is discretion within the criteria, however, under 404.

6    Because 404 says that the administrator has to consider

7    impacts to listed species.  That is not in 402.

8         So in 402, you have to approve it irrespective of

9    any impacted species.  Under 404, there is an opportunity

10   for discussions with the Fish and Wildlife Service and

11   consideration of the 404(b)(1) guidelines, which themselves

12   take into account ESA issues.  And for that reason, in this

13   case, Florida asked EPA to engage in consultation under

14   section 7, because there are potential impacts to species

15   associated with this.  And that's what triggered the need to

16   do a biological opinion -- which happened separate from EPA

17   approval, but comes in contemporaneous with the final

18   approval.  And that's when the technical assistance process

19   is described.  It's described in a biological opinion under

20   section 7 of the Endangered Species Act.  It's described in

21   general in the application materials.  But again, that's not

22   a requirement of the Clean Water Act, that's a function of

23   section 7 of ESA.  So the fact that it's not described in

24   the level of detail that they would like it to be in the

25   application is not an indication of incompleteness, as you

1    heard earlier, Your Honor.

2            But to the point of adjudication versus rule,

3    Florida, the governor, submitted an application.  And the

4    statute itself does not say state petition for rulemaking,

5    the statute says they submit an application.  That's a full

6    and complete description of the program.  If it meets the

7    criteria, the statute says EPA approves it.  If it doesn't

8    meet the criteria, the statute says EPA disapproves it.  And

9    if EPA takes no action whatsoever, as Your Honor

10   acknowledged earlier -- which would have been an option

11   available to them, if they took no action whatsoever, it's

12   deemed approved.  Well, approved, disapproved is

13   adjudicatory language.  There's not a requirement to

14   petition for rulemaking.  There's not a requirement to do

15   any sort of rulemaking process associated with the

16   application before EPA.  And then on the back end, Your

17   Honor --

18           **THE COURT:**  I'm sorry to interrupt for a second.

19   Is it your position then that under the statute, an

20   adjudication is the only alternative and that the agency

21   doesn't have discretion to do it by rulemaking?

22           **MR. WOOD:**  Your Honor, we don't disagree with the

23   United States' position that historically they've taken a

24   look and have had discretion under the D.C. Circuit case law

25   to evaluate whether it's a rule or an adjudication.  We

1    would note for you, Your Honor, that when a program is

2    undone, if it's withdrawn, that is certainly by an

3    adjudicatory process -- which we think reinforces it.  And

4    we also think the bigger point here is that the agency has

5    simply treated these as notices of approval or notices of

6    disapproval.  Every time it comes up, they issue a notice

7    with regard to whether the program -- the state program is

8    approved.  And when asked specifically, they have said it's

9    an adjudication.

10    So in the example of -- and we have these in our

11    brief, document 37 in the docket, pages eight through nine,

12    they described Maine's Clean Water Act program that, quote,

13    EPA has long considered a determination to approve or deny a

14    state NPDES program submission to constitute an

15    adjudication.

16    **THE COURT:**  You're talking about 402, though.

17    **MR. WOOD:**  But it's the same thing, Your Honor.

18    I'm just saying it's a rule or an adjudication.  402, 404,

19    the process can be the same.  In the case of --

20    **THE COURT:**  I don't doubt that it can be the same,

21    but I think what you're pointing to -- and it may be a

22    little bit of a two-edged sword.  The fact that the agency

23    has specifically said that 402 was an adjudication might

24    support the argument you make.  But it also might support

25    the argument in saying but they didn't say the same thing

1    for 404.  They could have and they didn't, so maybe that's

2    some indication that they really intended it to be a

3    rulemaking.

4           MR. WOOD:  Well, Your Honor, they've been

5    consistent, both with 402 and 404, that these are notices of

6    approval that are effective immediately in pretty much every

7    single case, and never effective in 30 days as they

8    suggested.  General counsel opinion from EPA in 1978:  "Long

9    considered a determination to approve or deny a state NPDES

10   program submission to constitute an adjudication."  Now when

11   they did Michigan and New Jersey -- which you have referred

12   to, Your Honor, they don't say expressly that it's a

13   rulemaking.  But they do say it's an approval that simply

14   ratifies state regulations and requirements already in

15   effect under state law.  That's the same thing that's true

16   with Florida's situation.  Therefore, EPA is publishing this

17   approval effective immediately.  They used exactly the same

18   language in 1994, and the same language in --

19          THE COURT:  Are the 402 determinations codified,

20   do you know?

21          MR. WOOD:  Your Honor, I think in EPA's

22   regulations they have a subpart where they list by state

23   those that are approved.  And we can get that citation for

24   you if you'd like.

25          THE COURT:  Mr. Coghlan is shaking his head no to

1    the question about whether they're codified.

2            MR. COGHLAN:  402 programs are not codified, Your

3    Honor.

4            THE COURT:  Okay, thank you.  Mr. Wood, you can

5    continue.

6            MR. WOOD:  Thank you.  So Your Honor, we do want

7    to draw your attention to -- in addition, to the

8    codification question.  And I think we've covered the issue

9    that you raised about Allied Signal with regard to the

10   disruptive effects.  I think the statistics we've provided

11   to you would demonstrate the highly disruptive effects of

12   any kind of stay or block or change in the status of

13   Florida's program.  We don't think that would be justified.

14   We also think it would run contrary --

15           THE COURT:  I'm sorry, Mr. Wood, can I ask you

16   just to slow down a little bit for the sake of the court

17   reporter.

18           MR. WOOD:  Yes, sir.  My apologies.  So under the

19   Clean Water Act program, Florida has engaged in a year's

20   worth of effort of standing up a program.  We've hired

21   hundreds of state employees, not just in Tallahassee, the

22   state capital, but across the state in the five water

23   management districts.  So there would be highly disruptive

24   effects, Your Honor.  We think that would run contrary to

25   what the Clean Water Act requires with regard to transfer of

1    programs to the states.  It's clear under the statute that

2    states have primary responsibility to manage these programs.

3    And it's also clear that the legislative history was a clear

4    intent by Congress that states take these on, which is why

5    we have a 120-day deemed approved requirement; that Congress

6    assumed more states would take this on than have in fact

7    done so.  So we think it would be contrary to congressional

8    intent, contrary to the statute and highly disruptive to

9    grant the kind of relief that they're requesting here.

10           But again, Your Honor, more generally, I mean, I

11    think our view is that the mere transfer of a permit program

12    from this sort of Corps-led mechanism to a state-led

13    mechanism creates no cognizable injury, especially where EPA

14    retains permit-by-permit oversight, and where the Corps and

15    U.S. Fish and Wildlife and National Marine Fishery Services

16    have the opportunity to weigh in on Clean Water Act issues

17    as well as ESA issues.

18           **THE COURT:**  Mr. Wood, am I right, though, that

19    it's not simply a question of who's making the decisions,

20    but the rules are different so that NEPA doesn't apply, and

21    the ESA doesn't apply in the same way when it's -- when the

22    transfer decision is made.  There certainly are plenty of

23    cases out there where the availability or unavailability of

24    NEPA has been held sufficient to establish standing as long

25    as the plaintiff can then demonstrate that if there were,

1      that there was some reasonable possibility that they would

2      have gotten a different disposition.

3              **MR. WOOD:**  Your Honor, NEPA doesn't apply here,

4      and not because of EPA's approval of Florida's program.

5      NEPA doesn't apply because the Clean Water Act itself at 33

6      U.S.C. section 1371 says NEPA does not apply.  And NEPA

7      doesn't also apply to non federal actions, so that's a

8      function of the statute that Congress has put in place

9      and not --

10             **THE COURT:**  Maybe that's a little bit cute, if I'm

11     understanding what you're saying, Mr. Wood.  I guess I want

12     to hear from plaintiffs about your point that under the

13     statute NEPA doesn't apply.  But saying that NEPA doesn't

14     apply because it only applies to federal action is not a

15     terribly satisfying response, if the reason that this

16     doesn't apply here is because the federal government has

17     transferred authority from the federal government to the

18     state.

19             **MR. WOOD:**  That's right.  But the Clean Water Act

20     is clear that NEPA does not apply to these kinds of

21     decisions and these programs being run by the state.  But I

22     would, Your Honor, recognize that Florida has its own robust

23     Environmental Protection Act.  Florida has its own

24     environmental resource permitting program that applies to

25     all state waters, not just waters of the United States.

1    Plaintiffs raised this issue of the waters of the U.S.

2    question being an area of difference.  That's an issue

3    that's being worked through through a cooperative

4    relationship between EPA and the state of Florida.

5          It's also an issue that, Your Honor, happens to be

6    in front of the U.S. Supreme Court right now:  What is

7    meaning of waters of the United States.  If somebody here on

8    this call could define that clearly for any of us, I think

9    they would be gainfully employed for the rest of their life.

10   It's a question that's escaped and evaded clarity for a very

11   long time, and Florida and EPA are working through that.  I

12   think the Supreme Court's analysis on that question will be

13   helpful later this year on what that actually means.

14         But whether the ESA applies is, again, a question

15   of statute.  So the ESA applies here insofar as EPA had to

16   consult under section 7A with the Fish and Wildlife Service

17   for approval of the program.  Because the program

18   requires -- it has discretion for EPA to consider impacts to

19   species as part of the program.  So EPA went to Fish and

20   Wildlife Service and received a biological opinion.  And

21   that process does ensure that the requirements of the ESA

22   are abided by.  On top of that, Florida has its own

23   Endangered Species Act under state law where Florida

24   consults with the Florida Fish and Wildlife Commission to

25   make sure that state listed species are protected as well.

1            But I think this brings us back to the ultimate

2      question, which is where is the injury here to plaintiffs

3      arising from Florida's management of the program when you

4      have this overlay and backstop of federal authority.  And I

5      would point Your Honor to a case out of the D.C. Circuit,

6      which we discuss in our briefs, called Crow Creek Sioux

7      Tribe vs. Brownlee.  We've highlighted this case.  We think

8      it's important, because it's a case involving a transfer

9      from federal to state control.  And in that case, a tribe

10     challenged the Corps of Engineers' transfer of lands to the

11     state of South Dakota.  And the tribe argued that the

12     transfer would reduce the role of the federal government in

13     enforcing cultural resource protection laws under federal

14     law.  And the transfer of laws in that case was expressly

15     subject to continued application of the cultural protection

16     statutes, just as here where the requirements of the Clean

17     Water Act and other federal laws continue to apply and be

18     overseen by federal agencies.

19            Also in that case, the federal agencies retained

20     authorities under federal law and under a state-federal MOU

21     to protect those cultural resources, just as here where EPA,

22     the Corps, Fish and Wildlife Service maintain key roles in

23     the process.  And because of this joint federal-state

24     arrangement where the requirements of federal law continue

25     to apply with federal oversight and enforcement, the D.C.

1    Circuit said that it, quote, did not need to delve into the

2    tribe's myriad constitutional and statutory claims, because

3    the tribe lacks Article III standing.  There's no standing

4    where the transfer effects no legal change that would lessen

5    the protection of the tribe's cultural heritage."  That was

6    the court's point.  Here, there's no lessening of protection

7    for the plaintiffs.  There's no lessening of protection for

8    wildlife resources.  Florida is required by regulation to

9    make sure that it does not run its program in any way less

10   stringent than the federal requirements.  And there's a host

11   of federal agencies and officials there to raise concerns,

12   if there ever are any.  And if Florida were to ever get in

13   its mind that it would issue a permit without the support of

14   EPA, EPA retains the right to federalize it -- which we

15   think, again, gets back to the core issue of no standing.

16           Your Honor, we also raised a separate issue that

17   you've asked about, and it's the deemed approved issue.

18   This is not, as plaintiffs would like to surmise, defeated

19   by the idea that the application was not complete.  While

20   plaintiffs get the benefit of reasonable inferences at this

21   stage, the Court does not need to accept factual inferences

22   that are not supported by facts alleged in the complaint.

23   And if you just look at page one through six of the

24   administrative record here, it shows over a hundred

25   entries -- a hundred line entries of the index, each with a

1  separate document comprising the application that Florida

2  submitted.  There's a description of the program.  There's a

3  long list of the new state statutes and regulations.

4  There's copies of the statutes and regulations.  There's a

5  404 -- a set of 404 application forms that EPA would review

6  for Florida to use.  There are letters from all the relevant

7  state officials certifying to Florida's legal authority to

8  administer the program.  There's memoranda of agreement with

9  the EPA and the Corps.  There's budget and staffing

10  information.  There's enforcement information.

11        So we think it's beyond question that a complete

12  description, as this statute calls for, was filed.  And if

13  that's the case, then by virtue of congressional statute,

14  the program is deemed approved within 120 days, if there's

15  no approval in effect.  And so if plaintiffs' request here

16  is to defeat EPA's approval of Florida's program, the

17  logical implication of that, Your Honor, is that it is

18  deemed approved by congressional action, not agency action,

19  which would render is not justiciable.

20        And this is not something that's foreign to the

21  D.C. Circuit, this has come up four times in the D.C.

22  Circuit, Your Honor:  The Sprint-Nextel case, the AT&T case,

23  the Public Citizen case, and then Amador County.  In the

24  first three cases, all unreviewable agency action where

25  deemed granted or deemed approved or cease to apply language

1    was in effect, the only time where the D.C. Circuit said it

2    was reviewable was in the case of the Indian Gaming

3    Regulatory Act where the compact is considered to have been

4    approved by the secretary if it's not ruled upon in a

5    certain number of days.

6          THE COURT:  Mr. Wood, are there any -- do you have

7    any cases -- I think I asked Ms. Galloni this question as

8    well.  But do you have any cases in which the agency acted

9    before the deemed approved time ran in which the court then

10   said well, we don't have to reach the merits of a challenge

11   to the agency action, because if the agency had done

12   nothing --

13         MR. WOOD:  We've looked, Your Honor, at every

14   deemed approved, deemed granted case we could find, and

15   these are the ones that we identified.  I think the

16   timelines in those statutes tend to be fairly limited, and

17   don't necessarily allow for early decisions.  There is a

18   three-year period to make a decision in the AT&T case.  The

19   provision said that the particular provisions of law would

20   cease to apply unless the FCC extended the three-year period

21   by rule or order.  And where they didn't do it in three

22   years, it was automatically applied, and that was deemed to

23   be congressional action not subject to review.  But I'm not

24   aware of any cases that raise the specific point you're

25   asking about.

1          **THE COURT:**  Okay, thank you.

2          **MR. WOOD:**  Your Honor, we also want to -- and I

3     think I've covered the technical assistance issue.  I've

4     covered the issue with regard to Florida's approval and its

5     expectations that there would be a highly disruptive effect

6     if the Court were to disrupt that.  But I would be open to

7     answering any other questions you have.

8          I did want to address the Florida administrative

9     law program that plaintiffs have raised concerns about, if

10    you would like me to.

11         **THE COURT:**  That's up to you.  If you have

12    something you'd like to raise, I'd be happy to hear it.  But

13    otherwise, I don't think I need to.

14         **MR. WOOD:**  Well, plaintiffs have suggested that

15    they don't have an opportunity under Florida law to

16    effectively challenge decisions, that they've said that that

17    somehow injures them.  And we make it clear that under D.C.

18    Circuit law, there must be a substantial risk of injury to

19    plaintiffs from this change in regulatory status.  And we

20    don't think they have that.  Environmental groups in Florida

21    routinely have standing in Florida administrative

22    proceedings and in Florida courts to challenge permits

23    issued by Florida DEP.  The Florida APA, chapter 120 of

24    Florida statutes, provides standards and procedures for

25    this.  There's case law in Florida called Agrico which uses

1    the substantial interest test for establishing standing.

2    And that under Supreme Court case law, substantial interest

3    includes showing an injury in fact which is of sufficient

4    immediacy to entitle them to a hearing.  So we think it's

5    roughly comparable to federal standing.

6            In addition, Your Honor, there are a host of other

7    provisions of Florida law that benefit them.  They get a de

8    novo hearing if they challenge a Florida DEP permit.  You

9    don't get that if you challenge a federal Army Corps permit.

10   And in addition, they get an automatic stay.  If a permit is

11   issued by Florida DEP and they file an administrative

12   challenge, that does not become a final action until the

13   administrative process runs its course and it becomes a

14   final order thereafter.  And then they have the opportunity

15   to file for judicial review in Florida state courts.  So we

16   just wanted to highlight that, again, this reinforces the

17   view that the mere transfer of primary authority to Florida

18   does not create a unique cognizable injury to plaintiffs.

19           And with that, Your Honor, we'll entertain any

20   other questions you might have.

21           **THE COURT:**  All right, thank you.

22           Mr. Jazil, is there anything you wanted to add?

23           **MR. JAZIL:**  No, Your Honor.  We join in Mr. Wood's

24   argument.  Thank you.

25           **THE COURT:**  Okay, thank you.

1          Ms. Galloni, any response?  I guess I'm

2   particularly interested in your views on that NEPA point.

3          **MS. GALLONI:**  Which NEPA point, Your Honor?

4          **THE COURT:**  Well, Mr. Wood said that NEPA doesn't

5   apply to the Clean Water Act in any event.

6          **MS. GALLONI:**  Right, right.  I think what he means

7   is that NEPA didn't apply when EPA was considering Florida's

8   application.  Of course, NEPA applies when the Corps is

9   administering section 404.  And so major permits that the

10  Corps is considering will be subject to NEPA review.  And

11  once this program is transferred to the state, NEPA does not

12  apply, because it doesn't apply to state actors as you

13  pointed out.  So all of those 404 permits from the state

14  don't get any NEPA review, and that's been one of our

15  sources of loss.

16         **THE COURT:**  Is there an equivalent of NEPA review

17  under Florida law, do they have their own form of NEPA?

18         **MS. GALLONI:**  There is no mini NEPA.  Florida is

19  not a state with a mini NEPA.

20         **THE COURT:**  Mr. Wood, do you want to add anything

21  with respect to that point?

22         **MR. WOOD:**  Well, Your Honor, NEPA by its own terms

23  applies to major federal actions significantly affecting the

24  human environment.  Most actions taken by government

25  agencies don't actually trigger NEPA obligations.  The major

1    ones would.  But again, Congress made the decision in NEPA

2    to only apply that to major federal actions.  And I'll point

3    to 33 U.S.C. 1371 and the Clean Water Act:  "No action of

4    the administrator taken pursuant to this chapter shall be

5    deemed a major federal action significantly affecting the

6    quality of the human environment within the meaning of

7    NEPA."  So Congress decided that when EPA was reviewing and

8    approving and taking actions with regard to 404 applications

9    like Florida's, there was no NEPA triggered there.  And by

10   virtue of NEPA's terms itself, it's not triggered when the

11   state takes action on a permit.

12        However, it's important to note that there are a

13   host of other permits that I'm sure plaintiffs will want to

14   challenge or raise concerns about that would trigger NEPA,

15   because they require some additional federal approval.  So

16   if it requires an easement on federal land, if it requires a

17   permit from the Department of Interior, like an oil and gas

18   project or something like that, that would trigger NEPA.

19   And I think that reinforces the idea that there's a highly

20   speculative nature to their claim that they're somehow

21   injured by the loss of a NEPA process.  But again, that NEPA

22   loss that they claim is not caused by EPA's approval, it's

23   caused by the way Congress has written the statutes.

24        THE COURT:  Well, fair enough.  But if the agency

25   erred in its decision to transfer the authority to the state

1    of Florida, then the agency, by doing that, indirectly

2    deprived improperly the plaintiffs of their ability to

3    obtain NEPA review.  I understand that Congress didn't

4    require NEPA review for the transfer decision itself.  But

5    that is a procedural loss to the determination, assuming

6    that there are significant projects that would be covered by

7    them.  And maybe that's a question back for Ms. Galloni, how

8    often the types of permits we're talking about do result in

9    NEPA review if it's the federal government that's issuing

10   the permits.

11          MR. WOOD:  On that, to the extent there are -- I'm

12   sorry, Your Honor, may I address that?

13          THE COURT:  Sure, go ahead.

14          MR. WOOD:  To the extent this is a procedural

15   informational injury kind of argument that's being made --

16   which sounds like it is, that they're not getting

17   information about the environment, there is so much

18   information evaluated as part of the review of these

19   applications, it's hard to imagine the kind of information

20   that they think they're missing.  And the D.C. Circuit

21   case -- it's called the Epic case, we cited it in our brief,

22   D.C. Circuit 2017, the plaintiffs must show that they've

23   been deprived of information that a statute requires them to

24   be provided.

25          So if there's -- the statute does not require them

1    to be provided information if it's become a state action.

2    That's the basic language out of NEPA.  It's a major federal

3    action impacting the environment.  And so they can't

4    manufacture, we think, standing based on a procedural injury

5    for lack of information where that comes from clear intent

6    by Congress as embodied in statute.

7         THE COURT:  Ms. Galloni.

8         MS. GALLONI:  Again, Your Honor, this goes back to

9    whether the authority was properly and lawfully transferred

10   to the state.  The types of projects, as you'll see from the

11   declarations of the plaintiffs and their members, discuss

12   the type of projects that they tend to engage on are those

13   major types of actions that do trigger NEPA review.  And

14   that is a major information loss.  NEPA is designed for the

15   purpose of providing the public with information, making

16   sure that agencies take a hard look before they leap in

17   making decisions.  It's all about public engagement and

18   education, and so that is fundamental.

19        Also, though, there's a division of views.

20   Mr. Wood relies on Epic, which is about an informational

21   injury.  And there's a different line of cases under PETA in

22   this circuit which is about organizational injury that comes

23   from the loss of information.  The plaintiffs have relied

24   for years on the information generated through NEPA and

25   through the ESA.  And they are in Florida, so they've not

1    been relying as much on the information from Florida.  But

2    they have been relying on the information from NEPA and the

3    ESA for their advocacy to prioritize the work that they do,

4    to educate the public about the impacts of proposed actions

5    and to inform their advocacies.  So those are major

6    informational losses that, again, are contingent on whether

7    the transfer was lawfully effectuated, and when we get to

8    the merits of the rest of the claims, whether the approval

9    was appropriate.

10          I do have some other --

11          **THE COURT:**  What do you say to Mr. Wood's point

12   that the same information, if not more, is generated by the

13   state of Florida and I assume made available.  And so even

14   though you may not get it under NEPA or the Endangered

15   Species Act, that you'll still get the same information.

16          **MS. GALLONI:**  It's simply not true.  It's not

17   true, and you can do a comparison statute by statute.  For

18   instance, information that comes to the ESA for a biological

19   opinion that ultimately becomes part of the NEPA process.

20   If you look at what a biological opinion is required to

21   entail, and you look at what is coming out of this process

22   right now out of the state of Florida, there is no

23   comparison.

24          **THE COURT:**  Is there something that I can look to,

25   either cited in the briefing or in the administrative

1    record, that will let me do that type of comparison that

2    you're talking about?

3          **MS. GALLONI:**  I don't know if we have cited the

4    specific provisions.  We'd be happy to supplement with

5    something that goes to that point.  I will also add --

6          **THE COURT:**  The question for me I guess is what

7    Florida provides.

8          **MS. GALLONI:**  Right.  I don't think Florida has

9    put anything in the record about the information that is

10   provided.  But they don't ask the same questions.  So just

11   as a matter of law, they don't ask the same questions.  NEPA

12   asks what's the environmental baseline, what are the

13   cumulative impacts, what are the rigorous study of

14   alternatives, all sorts of information that just isn't part

15   of the state process.  The same thing with the Endangered

16   Species Act section 7 consultation.  So they're asking

17   different questions, they're zooming out for a broader view

18   and that's why the information is not comparable.

19         **THE COURT:**  Well, if you want to provide me a

20   side-by-side analysis -- and Mr. Wood, if you want to do the

21   same, and Mr. Coghlan, you're welcome to as well.  It would

22   be helpful for the Court to have that, just to look over

23   that comparison.  Today is Tuesday.

24         Would it be asking too much to have it by Friday,

25   Ms. Galloni?

1        **MS. GALLONI:**  I think that's fine.

2        **THE COURT:**  So I'll provide that the parties can

3    have until Friday to provide that information.

4        **MS. GALLONI:**  Thank you.  And I'll add, Your

5    Honor, that for purposes of standing, this is about

6    different information that the plaintiffs are entitled to.

7    So for purposes of standing, I think it's important to keep

8    that in mind.  But it will be, I think, quite obvious once

9    we put that together for you.

10        **THE COURT:**  Okay, thank you.

11        **MS. GALLONI:**  There are a few other points.

12        **THE COURT:**  Yeah, go ahead.

13        **MS. GALLONI:**  I wanted to mention that I think

14    Mr. Wood tried to characterize this as it's simply one state

15    administering the program instead of the federal government.

16    And as you have seen, it is not, it's the creation of a

17    whole new system of statutes and regulations.  One of our

18    main issues is that Florida didn't adopt the 404(b)(1)

19    guidelines, which is so essential to the way the Corps

20    administers the 404 program.  Florida did not just say we

21    will administer the 404 program, they created a whole new

22    system, forms and applications.

23        EPA does not look at every permit in this

24    collaborative effort.  EPA entered into an MOU with the

25    state where they waived whole categories of permits that

1    they would not look at.  And so they don't have the

2    opportunity to inject in every one.  Also, the state -- and

3    especially right now we're very concerned about it, the

4    state has issued over a hundred no permit required

5    determinations.  That means that the folks who get those

6    determinations can dredge and fill wetlands without a

7    permit.  And the reason we're worried about it is because

8    they're applying the Trump era definition of waters of the

9    United States.  That is another action that is not provided

10   for in the MOU for EPA to review.  So all of this sense that

11   there is this massive oversight by EPA is not quite in

12   alignment with how this is working out.

13          A lot of the points that Mr. Wood made I think go

14   to the merits and not to a motion to dismiss on the basis of

15   standing, so I wanted to point that out.  On the Crow Creek

16   Sioux Tribe vs. Brownlee case where Mr. Wood said this was

17   about a transfer to a state, the difference in that case is

18   that the Corps retained jurisdiction.  Here, Florida is the

19   lead on jurisdiction.  That's not the case in the Crow Creek

20   Sioux Tribe case.  The Corps retained undiluted enforcement

21   power in that case.  That's not the case here.  The Corps

22   does not have primary enforcement power.  In fact, they

23   don't have any power other than over the retained waters,

24   which is the opposite of the waters that Florida has

25   jurisdiction over.  So that case has really no bearing here.

1            On whether Florida was just -- on whether EPA was

2    just checking the boxes on Florida's application, it's clear

3    that EPA had discretion in whether to approve Florida's

4    program.  In fact, they had to find that they had that

5    discretion in order to come up with this consultation with

6    the wildlife agencies to get the programmatic biological

7    opinion that then allows them to give all this cover to

8    developers through their permits for incidental tape.

9            When the Supreme Court considered this issue on

10   404, they said there was no discretion in the approval of

11   the program.  EPA of Florida have gone out of their way now

12   to say that there is discretion.  They just can't have it

13   both ways on that point.  It's clear the Clean Water Act

14   requires EPA to consider comments from the other federal

15   agencies.  The regulations require notice and comment from

16   the public on a state application.  So all of these are just

17   more factors -- and I realize I'm jumping around a little

18   bit, but all of these are just more factors to the fact that

19   it was a rulemaking that EPA engaged in.

20           On the number of permits, I will just say Mr. Wood

21   said over a hundred permits -- individual permits have been

22   granted.  The state database does not reflect that.  And

23   this is the same state database that we, as the public and

24   the plaintiffs, are required to rely on to collect

25   information on what the state is up to with this program.

1    So if they've approved twice as many permits as we're able

2    to locate in the state database, that raises further

3    concerns for us.  There are -- well, I want to stop there.

4    I'm sure if you have any questions, it would be more helpful

5    for me to hear them than for me to babble on.

6         **THE COURT:**  I don't think I have any other

7    questions, so I'm happy to hear anything else you have to

8    say, and I'm happy also to give Mr. Coghlan the final word

9    as well.

10        **MS. GALLONI:**  Just one last point I'd like to

11   make, which is Mr. Wood -- and maybe also Mr. Coghlan,

12   mentioned the withdrawal process.  I just want to point

13   out -- and I think we've acknowledged this, the withdrawal

14   process is about whether the state is performing properly

15   under the approved program, and whether there should be an

16   adjudication that is about how the facts of what is actually

17   happening as a result.  So it's very different than the

18   approval process.  Thank you, Your Honor.

19        **THE COURT:**  No, I understood that, and I think the

20   criteria -- I picked that up as well.

21        **MS. GALLONI:**  Thank you.

22        **THE COURT:**  Mr. Coghlan, do you want to have the

23   final word?

24        **MR. COGHLAN:**  Yeah, I'll be brief, Your Honor.  I

25   think the point I want to stress here is that, again, EPA

1    acted here by applying existing law, existing regulations to

2    the unique application submitted by Florida.  It was an

3    immediately effective action.  I think that puts it within

4    the scope of an adjudicatory action that courts have

5    recognized that agencies can carry out by order, which it

6    did here.  I think that the suggestion that this was somehow

7    a reversal of course doesn't I think answer the question

8    here, doesn't decide this case.  Even if EPA had approved

9    these things, the section 404 permit applications, by rule

10   in the past -- which I don't think they did, they wouldn't

11   be unable to do so by order at this time.  And nothing in

12   the administrative record here clearly signaled some intent

13   to do this by rule such that they would have had to provide

14   a rationale for reversing course before they issued this by

15   order.  And I think that's underscored by the fact that

16   there are in fact 47 402 programs that EPA has approved by

17   immediately effective order, none of which are codified.

18          And I just wanted to stress here that if this had

19   to be done by rulemaking, there's a lot of water over the

20   dam, a lot of lot of administrative agency action that could

21   be affected by the line drawing exercise in this case.  And

22   we would just urge caution on the Court's behalf to draw

23   those lines narrowly in a way to not create unintended

24   consequences.

25          **THE COURT:**  Well, that's a fair point.  Do you

1    know -- I mean, I understand that EPA has decided to and is

2    determined to do the 402 authorizations as adjudications.  I

3    know there are a host of other programs out there, not just

4    EPA, but H.H.S., various other agencies that have authority

5    to grant limited enforcement roles to the states.

6            Do you know if -- apropos of your comment about

7    not writing anything that could have unintended

8    consequences, do you know what those others are?  Are there

9    others out there that I should be aware of as I'm thinking

10   about this case?

11           **MR. COGHLAN:**  Your Honor, the only that I'm aware

12   of right now are the 47 approved 402 programs.  I don't know

13   about the other EPA programs, and certainly not other

14   administrative agencies.

15           **THE COURT:**  Well, again, since I'm allowing

16   everyone to file something a little bit further on Friday,

17   if anyone wants to bring to my attention programs going one

18   way or the other from other agencies even by Friday as well

19   at the same time, I'd appreciate knowing that.  Because I do

20   want to make sure that whatever I do is cognisant of the

21   range of types of programs that are out there.

22           Well, anything else from anyone?  This was very

23   helpful to the Court, so thank you all.  This was excellent

24   arguments all around.  The briefing has been, of course,

25   great from everyone in this case, and so I'm appreciative.

1    It's an interesting and difficult case, and I will get you a

2    decision as soon as I can.  Thank you all, take care.

3           (Proceedings adjourned at 6:00 p.m.)

1          **C E R T I F I C A T E**

2

3               I, **Jeff Hook, Official Court Reporter**,

4    certify that the foregoing is a true and correct transcript

5    of the remotely reported proceedings in the above-entitled

6    matter.

7                    **PLEASE NOTE:**  This hearing occurred during

8    the COVID-19 pandemic and is therefore subject to the

9    technological limitations of court reporting remotely.

10

11

12

13     __July 14, 2022__                _____

14          **DATE**                        **Jeff M. Hook**

15

16

17

18

19

20

21

22

23

24

25

**'**

**'s [1]**   68/16

**0**

**0119 [1]**   1/4

**1**

**1,500 [1]**   85/9
**10 [1]**   81/24
**101 [1]**   2/5
**11 [1]**   1/17
**116 [1]**   85/13
**119 [2]**   1/24 3/2
**120 [7]**   12/20 13/1
13/11 13/16 17/5
98/14 100/23
**120-day [2]**   13/24
93/5
**1344 [1]**   31/1
**1371 [2]**   94/6 103/3
**15 [2]**   1/6 64/15
**15-minute [1]**   82/7
**150 [2]**   1/21 85/15
**16th [2]**   9/9 75/5
**19 [1]**   115/8
**1978 [1]**   91/8
**1994 [4]**   46/5 58/19
63/19 91/18
**1:21-cv-0119 [1]**
1/4
**1C [2]**   9/16 9/19

**2**

**20 [1]**   10/10
**20001 [2]**   2/3 2/10
**20002 [1]**   1/21
**201 [1]**   1/15
**2017 [1]**   104/22
**2020 [9]**   6/22 7/2
7/6 9/9 10/1 10/2
10/4 10/24 18/7
**2021 [2]**   33/22
39/25
**2022 [1]**   1/6
**20th [2]**   26/17 57/8
**21-119 [1]**   3/2
**21st [1]**   73/17
**22nd [4]**   10/4 19/17
27/13 69/21
**233-404 [1]**   46/8
**233.71 [1]**   71/22
**2nd [1]**   58/19

**3**

**30 [18]**   18/9 20/2
20/8 20/10 20/13
21/9 33/5 33/25
40/4 40/13 40/18
41/2 59/21 73/16
82/18 83/19 87/20
91/7
**30-day [18]**   19/20
19/24 32/25 33/7
39/14 40/14 40/19
40/20 60/3 64/14
66/15 68/16 73/7
73/10 73/11 73/15
82/25 84/3
**3200 [1]**   2/5

**32301 [2]**   1/18 1/25
**33 [3]**   71/21 94/5
103/3
**33137 [1]**   1/15
**333 [1]**   2/9
**37 [1]**   90/11
**3:05 [1]**   1/7

**4**

**4,500 [1]**   85/8
**40 [1]**   46/7
**402 [19]**   12/5 12/5
12/11 61/1 64/3
87/18 87/22 88/3
88/7 88/8 90/16
90/18 90/23 91/5
91/19 92/2 112/16
113/2 113/12
**404 [39]**   6/22 10/16
10/19 10/20 12/12
12/13 41/1 41/15
42/15 42/15 46/8
46/22 61/24 62/18
64/13 64/15 85/22
86/11 86/11 87/18
87/23 88/3 88/5
88/6 88/9 88/11
90/18 91/1 91/5
98/5 98/5 102/9
102/13 103/8 108/18
108/20 108/21
110/10 112/9
**42 [1]**   87/17
**45 [1]**   87/16
**4500 [1]**   1/15
**47 [2]**   112/16
113/12
**4700-C [1]**   2/9
**4:59 p.m [1]**   82/10

**5**

**50 [4]**   25/10 62/7
85/12 85/16
**500 [1]**   1/24
**553 [15]**   18/9 22/20
27/5 32/7 34/9 34/9
38/24 39/2 39/5
58/23 65/13 66/9
66/10 66/12 68/16
**5:00 [1]**   82/6
**5:15 [1]**   82/8
**5:17 p.m [1]**   82/11

**6**

**60 [1]**   41/2
**6:00 p.m [1]**   114/3

**7**

**7 of [2]**   88/20
88/23
**700 [1]**   2/3
**705 [42]**   18/19
18/20 19/11 20/19
22/20 24/13 25/2
25/5 25/19 26/7
26/8 26/24 29/24
32/3 33/11 33/16
33/19 33/24 34/2
34/8 34/10 35/8
36/24 37/1 37/20

**38/22 39/7 39/12
40/16 52/5 52/9
52/14 52/15 52/20
53/5 53/8 53/21
57/13 82/14 83/3
83/10 84/7
**75 [1]**   78/24
**7A [1]**   95/16

**9**

**94111 [1]**   2/6

**A**

**ab [1]**   77/4
**abandon [3]**   67/19
67/21 67/23
**abandoning [1]**
67/25
**abided [1]**   95/22
**ability [4]**   29/2
30/2 30/4 104/2
**able [7]**   5/24 6/12
25/4 28/16 57/23
57/25 111/1
**above [1]**   115/5
**above-entitled [1]**
115/5
**absent [2]**   12/1
73/22
**absolutely [1]**   20/4
**abuse [1]**   17/13
**academic [2]**   37/7
37/18
**accept [1]**   97/21
**access [5]**   26/24
28/14 28/15 28/16
74/9
**accommodate [1]**
86/3
**accomplished [1]**
40/2
**account [2]**   86/4
88/12
**acknowledged [2]**
89/10 111/13
**across [3]**   16/9
61/12 92/22
**act [37]**   4/19 12/20
15/17 15/18 15/21
16/4 16/14 16/18
28/16 31/22 42/20
45/2 46/1 46/22
52/25 56/15 74/10
87/17 88/2 88/3
88/20 88/22 90/12
92/19 92/25 93/16
94/5 94/19 94/23
95/23 96/17 99/3
102/5 103/3 106/15
107/16 110/13
**acted [9]**   15/16
15/18 16/5 16/9
17/9 65/16 79/18
99/8 112/1
**acting [5]**   23/2
23/3 63/16 78/25
79/14
**action [55]**   1/4 3/2
7/8 10/19 15/8
15/20 15/22 16/10

**16/19 20/14 20/16
22/18 26/18 28/23
29/1 32/23 34/13
49/16 57/15 58/10
60/16 64/18 64/19
65/25 67/25 69/22
71/12 72/18 75/22
78/2 78/19 78/23
78/23 79/2 79/17
80/2 80/20 89/9
89/11 94/14 98/18
98/18 98/24 99/11
99/23 101/12 103/3
103/5 103/11 105/1
105/3 109/9 112/3
112/4 112/20
**actions [11]**   28/17
64/20 66/3 80/17
94/7 102/23 102/24
103/2 103/8 105/13
106/4
**active [1]**   56/19
**activity [1]**   61/18
**actors [1]**   102/12
**acts [1]**   16/2
**actual [2]**   49/17
50/20
**actually [27]**   8/1
8/3 11/15 13/25
19/19 22/16 24/16
40/25 42/10 43/10
44/17 62/21 63/5
66/6 66/8 68/18
70/13 70/16 71/7
74/11 85/13 87/2
87/25 88/3 95/13
102/25 111/16
**add [6]**   17/25 51/23
101/22 102/20 107/5
108/4
**addition [5]**   28/24
85/15 92/7 101/6
101/10
**additional [2]**
85/11 103/15
**address [3]**   82/9
100/8 104/12
**addresses [1]**   77/1
**addressing [1]**
65/12
**adequately [3]**   15/7
38/10 38/20
**adhered [1]**   26/25
**adhering [1]**   27/19
**adjourned [1]**   114/3
**adjudicate [1]**
29/10
**adjudication [38]**
6/25 11/6 12/6
26/19 34/25 49/20
50/8 59/2 60/2 60/8
60/11 60/13 63/16
64/1 64/2 67/1 67/6
67/7 68/20 69/3
73/25 74/1 78/18
79/7 79/17 79/20
81/7 82/16 87/12
89/2 89/20 89/25
90/9 90/15 90/18
90/23 91/10 111/16

**A**

**adjudications [3]**
66/25 79/3 113/2
**adjudicative [2]**
78/20 78/23
**adjudicatory [14]**
10/5 10/15 18/7
26/25 27/20 31/12
47/9 47/10 49/14
49/15 49/24 89/13
90/3 112/4
**adjust [1]** 86/3
**administer [4]**
62/18 62/19 98/8
108/21
**administered [1]**
31/18
**administering [4]**
31/8 31/15 102/9
108/15
**administers [1]**
108/20
**administration [20]**
10/3 10/14 17/4
17/6 20/22 21/4
21/13 21/13 24/11
37/1 39/24 48/19
48/22 59/21 59/22
59/25 66/20 72/14
72/15 72/23
**administrative [12]**
52/24 68/13 86/24
97/24 100/8 100/21
101/11 101/13
106/25 112/12
112/20 113/14
**administrator [4]**
13/2 88/4 88/6
103/4
**administrator's [1]**
76/4
**adopt [1]** 108/18
**advance [1]** 56/9
**advantage [1]** 53/24
**advocacies [1]**
106/5
**advocacy [2]** 46/2
106/3
**affect [1]** 29/2
**affected [4]** 28/7
75/17 75/24 112/21
**affecting [3]** 28/18
102/23 103/5
**affects [5]** 11/16
11/17 59/7 74/8
74/9
**afford [1]** 57/23
**afternoon [9]** 3/16
4/11 4/13 4/22 5/4
5/5 5/8 5/9 85/3
**afterwards [1]**
77/14
**again [21]** 9/18
9/22 19/15 24/17
24/18 51/12 63/9
68/6 84/9 84/10
88/21 93/10 95/14
97/15 101/16 103/1
103/21 105/8 106/6

111/25 113/15
**against [2]** 58/13
62/23
**agencies [21]** 11/5
27/25 36/4 44/1
52/6 54/8 60/6 67/3
80/15 86/14 96/18
96/19 97/11 102/25
105/16 110/6 110/15
112/5 113/4 113/14
113/18
**agency [109]** 7/2
8/7 12/4 12/20
15/10 15/17 16/2
16/4 16/5 16/9
16/14 16/18 18/20
19/3 22/17 22/19
22/20 23/17 24/19
24/23 25/4 26/8
27/6 29/1 29/13
30/5 32/18 32/23
33/20 34/2 34/12
34/14 34/16 35/14
35/22 36/21 39/1
39/23 40/5 40/10
40/15 40/16 40/17
40/19 40/23 52/19
52/21 53/18 53/25
54/3 54/5 54/21
54/22 55/1 55/5
55/8 55/10 56/9
56/10 56/13 57/3
57/5 57/14 57/25
58/1 58/10 58/20
58/21 58/23 58/23
58/24 59/14 63/7
63/24 65/25 66/8
66/10 67/5 67/11
67/14 67/22 67/25
68/1 71/12 72/18
73/24 78/19 78/22
78/25 79/2 79/8
80/19 81/8 83/3
83/8 83/12 83/20
84/11 89/20 90/4
90/22 98/18 98/24
99/8 99/11 99/11
103/24 104/1 112/20
**agency's [7]** 19/3
35/16 52/23 53/20
54/11 56/2 68/2
**agree [6]** 24/9
29/15 51/9 53/4
60/20 84/3
**agreed [2]** 22/13
23/12
**agreement [2]** 71/17
98/8
**Agrico [1]** 100/25
**ahead [8]** 5/18 6/15
18/23 49/21 55/24
62/11 104/13 108/12
**al [4]** 1/3 1/6 3/3
3/3
**alignment [1]**
109/12
**ALISON [2]** 1/20
4/13
**allegation [1]**
56/22

**alleged [7]** 72/14
72/17 73/14 74/18
74/25 75/12 97/22
**Allied [5]** 22/12
22/14 23/13 24/2
92/9
**allow [1]** 99/17
**allowing [1]** 113/15
**allows [2]** 24/25
110/7
**almost [3]** 43/7
48/24 82/6
**alone [2]** 10/24
87/2
**along [2]** 23/22
63/18
**alternative [1]**
89/20
**alternatives [1]**
107/14
**although [8]** 17/3
24/2 27/23 53/3
54/2 54/3 81/14
82/15
**always [4]** 8/20
64/24 66/14 80/16
**Amador [1]** 98/23
**ambiguity [1]** 64/9
**amendatory [2]** 44/2
69/13
**amended [9]** 10/21
12/1 42/16 43/17
44/19 46/8 50/14
51/5 56/21
**amending [5]** 10/11
41/1 59/8 61/19
71/12
**amendment [4]** 11/20
39/4 39/6 39/8
**amends [3]** 19/19
41/17 44/8
**amici [3]** 59/5
61/15 82/8
**amicus [1]** 28/6
**among [1]** 25/11
**amount [1]** 11/5
**analogies [1]** 60/24
**analogous [4]** 76/2
76/16 77/1 77/24
**analogy [1]** 63/6
**analysis [3]** 74/24
95/12 107/20
**and not [1]** 94/9
**and/or [1]** 33/1
**ANDREW [4]** 1/6 1/19
3/3 4/11
**anticipate [1]** 4/17
**anymore [2]** 61/25
70/19
**APA [6]** 11/14 38/25
67/4 67/10 68/8
100/23
**apologies [1]** 92/18
**apologize [2]** 3/18
48/8
**appear [1]** 58/18
**APPEARANCES [2]**
1/12 2/1
**appearing [1]** 3/13
**appears [1]** 40/25

**apple [3]** 53/13
53/23 53/24
**applicable [4]** 8/16
10/6 70/13 85/20
**applicant [1]** 12/23
**application [27]**
7/6 13/15 16/22
45/3 45/6 45/11
62/20 62/22 62/23
62/25 63/8 63/10
87/15 87/16 88/21
88/25 89/3 89/5
89/16 96/15 97/19
98/1 98/5 102/8
110/2 110/16 112/2
**applications [10]**
23/3 23/4 23/4 85/9
85/10 85/16 103/8
104/19 108/22 112/9
**applied [6]** 38/2
46/1 51/19 58/23
65/14 99/22
**applies [16]** 7/8
10/21 11/17 41/19
52/15 52/25 53/22
61/13 83/10 84/7
94/14 94/24 95/14
95/15 102/8 102/23
**apply [32]** 15/15
28/4 57/13 59/11
61/12 61/24 61/25
62/1 62/7 62/8 65/7
69/9 79/4 93/20
93/21 94/3 94/5
94/6 94/7 94/13
94/14 94/16 94/20
96/17 96/25 98/25
99/20 102/5 102/7
102/12 102/12 103/2
**applying [7]** 11/18
30/12 30/17 31/24
47/13 109/8 112/1
**appreciate [2]** 82/5
113/19
**appreciative [1]**
113/25
**appropriate [8]**
15/6 22/2 22/12
22/14 23/13 38/6
54/22 106/9
**approval [37]** 10/4
10/16 16/7 17/13
18/3 18/16 20/5
20/6 20/23 27/12
39/16 55/17 60/15
64/15 64/18 64/19
64/20 64/22 69/20
73/16 75/21 88/17
88/18 90/5 91/6
91/13 91/17 94/4
95/17 98/15 98/16
100/4 103/15 103/22
106/8 110/10 111/18
**approvals [1]** 64/13
**approve [8]** 6/22
8/15 16/22 88/4
88/8 90/13 91/9
110/3
**approved [38]** 7/7
15/13 15/14 15/20

**A**

approved... **[34]**
15/25 16/2 16/11
16/15 16/25 17/16
17/19 18/2 45/17
45/19 45/24 49/17
50/3 70/24 70/25
77/5 87/18 89/12
89/12 90/8 91/23
93/5 97/17 98/14
98/18 98/25 99/4
99/9 99/14 111/1
111/15 112/8 112/16
113/12
approves **[2]**   9/15
89/7
approving **[1]**   103/8
apropos **[1]**   113/6
arbitrary **[1]**   17/13
archetypal **[3]**
60/13 60/14 78/18
area **[1]**   95/2
areas **[1]**   69/2
arguably **[1]**   83/23
argued **[2]**   15/19
96/11
argues **[1]**   33/15
arguing **[1]**   43/6
argument **[26]**   12/17
42/4 42/19 43/6
50/4 50/13 59/3
65/4 66/19 73/20
74/5 74/15 76/12
76/15 76/15 76/21
77/24 78/6 78/7
78/11 78/12 85/1
90/24 90/25 101/24
104/15
arguments **[7]**   13/13
28/1 28/1 31/14
38/8 38/19 113/24
arising **[2]**   86/16
96/3
Army **[15]**   10/17
11/22 23/2 38/13
59/9 61/21 61/22
69/6 70/2 70/18
76/19 85/25 86/11
87/4 101/9
around **[4]**   46/2
85/16 110/17 113/24
arrangement **[1]**
96/24
array **[2]**   60/22
85/14
Article **[1]**   97/3
aside **[7]**   16/6
19/16 40/11 50/9
66/10 67/11 76/14
aspect **[1]**   23/19
aspects **[2]**   20/24
64/10
assert **[1]**   86/1
assertion **[1]**   80/21
assistance **[7]**   45/1
45/4 45/8 45/13
51/16 88/18 100/3
associated **[2]**
88/15 89/15

assume **[4]**   13/4
13/5 29/15 106/13
assumed **[3]**   27/18
65/14 93/6
assuming **[1]**   65/15
84/10 104/5
assumption **[4]**
23/16 23/19 30/8
42/23
attention **[2]**   92/7
113/17
attorneys **[1]**   65/8
audio **[4]**   4/2 4/7
5/15 5/18
August **[1]**   86/23
authorities **[1]**
96/20
authority **[37]**
10/16 10/25 12/22
13/17 18/6 18/8
19/17 19/18 22/16
23/16 24/15 25/1
27/15 27/17 30/9
31/23 37/6 39/19
52/10 52/24 53/2
55/24 62/16 63/4
63/8 65/2 69/23
71/18 78/21 86/6
94/17 96/4 98/7
101/17 103/25 105/9
113/4
authorizations **[1]**
113/2
authorized **[3]**
10/17 11/1 87/14
authorizes **[2]**   39/5
52/6
automatic **[2]**   20/21
101/10
automatically **[2]**
21/6 99/22
availability **[1]**
93/23
available **[7]**   4/7
5/16 21/10 72/4
75/6 89/11 106/13
Avenue **[1]**   2/9
aware **[5]**   41/9 64/4
99/24 113/9 113/11

**B**

babble **[1]**   111/5
back **[32]**   4/4 5/25
5/25 8/5 23/24
23/25 23/25 24/17
24/18 27/4 30/3
30/20 37/11 37/12
39/23 40/6 40/15
41/2 58/5 58/21
65/23 73/19 78/24
80/11 80/25 82/7
82/11 89/16 96/1
97/15 104/7 105/8
Backing **[1]**   48/10
backstop **[1]**   96/4
Baker **[2]**   2/2 2/5
balancing **[2]**   36/6
54/5
ball **[1]**   56/10
Bankruptcy **[1]**   2/8

Baran **[1]**   1/23
based **[11]**   12/14
20/8 20/9 35/1
49/25 52/23 56/21
62/16 70/8 73/13
105/4
baseline **[1]**   107/12
basic **[1]**   105/2
basis **[5]**   10/15
10/24 86/4 86/15
109/14
bearing **[1]**   109/25
because that **[1]**
43/16
become **[4]**   57/14
63/11 101/12 105/1
becomes **[5]**   20/25
40/18 55/18 101/13
106/19
before you **[1]**
27/21
began **[1]**   63/15
beginning **[3]**   58/6
79/12 79/16
begun **[1]**   67/19
behalf **[4]**   3/21
4/15 4/23 112/22
behaved **[1]**   37/24
belabor **[1]**   78/13
benefit **[6]**   20/21
50/22 50/25 53/13
97/20 101/7
besides **[1]**   65/3
best **[3]**   34/24
62/17 62/18
better **[1]**   60/2
beyond **[1]**   98/11
Biden **[1]**   17/6
bigger **[2]**   78/15
90/4
bill **[1]**   77/25
binding **[5]**   40/25
41/25 43/22 71/13
71/20
biological **[16]**   1/3
3/3 5/12 45/6 45/9
45/12 47/13 51/14
51/14 51/15 88/16
88/19 95/20 106/18
106/20 110/6
Biscayne **[1]**   1/15
bit **[13]**   37/2 37/7
57/22 58/4 59/18
68/21 78/19 80/21
90/22 92/16 94/10
110/18 113/16
bites **[3]**   53/13
53/23 53/23
blank **[1]**   86/10
block **[1]**   92/12
Blvd **[1]**   1/17
body **[1]**   77/5
BONNIE **[2]**   1/16 3/7
book **[1]**   44/4
books **[3]**   41/14
41/16 66/21
both **[9]**   6/10 11/12
12/14 32/25 45/15
64/11 88/3 91/5
110/13

Botts **[2]**   2/2 2/5
Boulevard **[1]**   1/15
bound **[4]**   47/20
47/24 57/1 74/8
boxes **[2]**   62/24
110/2
Branch **[1]**   53/1
brand **[1]**   24/1
break **[5]**   79/25
81/20 81/23 81/24
82/7
brief **[14]**   7/14
28/6 57/21 58/22
64/9 64/25 65/16
65/18 65/19 72/21
78/13 90/11 104/21
111/24
briefing **[4]**   63/22
65/8 106/25 113/24
briefly **[1]**   82/5
briefs **[3]**   12/10
76/25 96/6
bring **[6]**   72/24
77/9 77/12 77/13
87/9 113/17
brings **[2]**   78/2
96/1
broad **[1]**   87/9
broader **[2]**   68/8
107/17
Brownlee **[2]**   96/7
109/16
browser **[2]**   6/5 6/5
budget **[1]**   98/9
bunch **[1]**   21/18
business **[1]**   24/16

**C**

C.F.R **[17]**   10/21
11/20 11/21 20/24
40/1 40/24 43/24
43/24 44/8 44/18
46/16 46/17 69/6
71/3 71/8 71/21
71/24
C.F.R. **[1]**   46/10
C.F.R.-like **[1]**
46/10
CA **[1]**   2/6
calendar **[1]**   59/19
California **[1]**   2/5
call **[2]**   51/14 95/8
called **[4]**   58/10
96/6 100/25 104/21
calls **[1]**   98/12
came **[6]**   10/3 17/17
20/22 27/12 52/3
76/3
can **[62]**   3/25 4/3
7/15 8/13 8/24 9/7
11/4 11/25 12/12
16/19 17/18 20/1
21/16 26/4 28/8
34/6 34/22 36/10
36/15 36/16 36/21
37/10 39/6 39/12
40/4 40/8 42/8
44/20 46/1 46/2
46/2 46/22 54/14
57/8 60/24 61/5

**C**

can... [26]   63/14
64/6 67/3 67/14
72/10 73/24 75/10
75/13 76/11 82/17
85/4 86/1 87/9
87/21 90/19 90/20
91/23 92/4 92/15
93/25 106/17 106/24
108/2 109/6 112/5
114/2
cap [1]   79/2
capital [1]   92/22
captioned [2]   53/6
53/7
care [3]   51/1 61/16
114/2
carry [1]   112/5
case [72]   6/24 16/9
16/11 20/5 20/16
21/23 22/24 26/4
29/2 29/10 29/18
30/2 31/1 32/6
33/23 34/8 34/18
36/18 36/20 38/5
41/6 42/14 43/13
55/23 58/15 58/19
58/22 59/1 60/12
60/16 61/3 61/14
61/17 61/17 65/1
72/20 76/25 78/14
79/4 88/13 89/24
90/19 91/7 96/5
96/7 96/8 96/9
96/14 96/19 98/13
98/22 98/22 98/23
99/2 99/14 99/18
100/25 101/2 104/21
104/21 109/16
109/17 109/19
109/20 109/21
109/21 109/25 112/8
112/21 113/10
113/25 114/1
cases [23]   15/16
15/23 15/25 16/1
16/3 16/4 16/13
16/15 24/3 26/6
34/24 39/3 42/10
42/12 43/20 55/23
80/18 93/23 98/24
99/7 99/8 99/24
105/21
cast [1]   77/6
categories [1]
108/25
causal [2]   72/22
75/2
causation [4]   74/24
75/16 75/16 77/16
cause [1]   72/23
caused [2]   103/22
103/23
caution [2]   58/13
112/22
cease [2]   98/25
99/20
center [4]   1/3 3/2
5/11 14/20

central [1]   6/23
certain [2]   33/4
99/5
certainly [9]   8/19
17/17 54/3 58/24
59/12 63/19 90/2
93/22 113/13
certainty [1]   37/19
certify [1]   115/4
certifying [1]   98/7
challenge [22]
17/10 28/17 28/23
35/25 36/21 36/22
48/6 50/6 67/24
77/9 77/13 77/19
77/19 86/24 87/9
99/10 100/16 100/22
101/8 101/9 101/12
103/14
challenged [2]
35/23 96/10
challenges [1]
72/25
challenging [5]
28/22 32/11 34/20
39/22 87/6
Chamber [1]   28/5
chance [2]   13/19
51/24
change [7]   12/2
60/5 66/20 73/23
92/12 97/4 100/19
changed [7]   10/3
11/11 37/23 41/16
58/8 64/5 81/7
changes [4]   19/7
70/13 70/16 86/23
changing [3]   11/23
39/2 70/17
chaos [6]   22/25
24/19 27/24 28/17
28/19 30/19
chapter [3]   46/7
100/23 103/4
characterization [1]
62/4
characterize [1]
108/14
check [3]   36/19
62/24 62/25
checked [1]   8/18
checking [1]   110/2
Chevron [2]   61/5
62/13
chief [1]   59/23
CHINN [2]   2/4 5/2
choosing [1]   79/8
chose [2]   65/8 81/9
CHRISTINA [2]   1/14
7/9
chronological [1]
75/22
chronology [1]
75/19
circuit [18]   17/11
52/19 58/15 58/22
66/20 75/14 77/11
80/5 89/24 96/5
97/1 98/21 98/22
99/1 100/18 104/20

104/22 105/22
Circuit's [1]   80/15
circumstance [1]
44/17
circumstances [6]
13/18 21/17 43/20
55/7 78/25 79/7
citation [1]   91/23
cite [5]   12/9 15/16
42/12 72/20 80/18
cited [5]   34/19
76/25 104/21 106/25
107/3
cites [1]   16/3
Citizen [1]   98/23
civil [3]   1/4 3/2
34/24
claim [23]   13/23
29/11 29/11 38/15
40/22 49/10 49/18
50/1 51/2 51/8
51/21 55/8 56/13
70/7 70/10 72/11
73/5 73/19 74/16
77/14 86/8 103/20
103/22
claims [13]   14/6
14/7 17/25 18/3
18/5 31/9 56/24
57/20 74/18 77/2
77/12 97/2 106/8
clarifications [1]
58/6
clarify [2]   68/2
68/9
clarity [1]   95/10
classically [1]
61/11
Clean [15]   31/21
46/22 87/17 88/2
88/22 90/12 92/19
92/25 93/16 94/5
94/19 96/16 102/5
103/3 110/13
clear [18]   13/21
23/1 29/23 34/15
35/18 64/23 66/14
66/15 77/15 79/13
93/1 93/3 93/3
94/20 100/17 105/5
110/2 110/13
clearly [3]   81/5
95/8 112/12
click [2]   8/1 8/3
clicked [1]   8/11
clients [2]   42/25
44/23
clock [2]   13/25
73/11
close [5]   6/4 16/17
23/21 39/21 54/16
closes [1]   45/10
clunky [2]   25/8
26/21
Code [12]   19/19
41/17 46/7 61/19
69/11 69/25 70/7
70/14 70/21 71/1
71/12 71/22
codification [28]

10/7 14/10 41/8
42/3 42/4 42/8
42/20 43/13 47/3
47/4 47/21 55/13
56/4 56/11 56/25
64/21 64/22 67/1
67/9 67/12 67/13
67/15 68/4 70/12
70/15 73/23 75/20
92/8
codifications [2]
68/19 68/19
codified [33]   7/7
12/11 19/19 32/24
42/6 42/9 42/11
42/13 43/2 43/22
44/3 44/7 48/14
50/11 50/18 50/24
51/18 51/20 55/6
55/25 70/17 71/10
74/3 74/12 75/5
75/23 76/17 76/20
78/8 91/19 92/1
92/2 112/17
codify [27]   8/15
9/15 40/23 41/7
41/10 50/10 50/15
50/25 55/11 55/25
56/9 56/14 56/16
56/20 59/15 67/8
68/11 68/14 69/1
69/1 69/5 70/8
72/13 72/22 73/1
75/20 81/15
codifying [8]   47/9
47/10 48/16 49/14
49/15 49/17 56/3
56/5
COGHLAN [13]   1/19
4/12 52/1 52/11
63/14 79/24 81/19
83/15 91/25 107/21
111/8 111/11 111/22
cognisant [1]
113/20
cognizable [3]   73/9
93/13 101/18
collaborative [1]
108/24
colleagues [1]
36/15
collect [1]   110/24
COLUMBIA [1]   1/1
combination [2]
42/5 57/10
comfortable [1]
54/19
coming [4]   5/25
10/14 80/25 106/21
comment [19]   7/2
43/9 45/10 65/5
65/5 67/17 67/20
68/14 68/23 80/8
80/13 80/14 80/16
80/19 80/22 81/2
81/3 110/15 113/6
commentary [1]
49/23
commenters [1]   9/10
comments [8]   7/3

**C**

comments... [7]  7/4
9/11 9/11 9/20 80/3
80/7 110/14
Commerce [1]  28/5
Commission [1]
95/24
community [3]  25/11
26/3 28/18
compact [1]  99/3
comparable [2]
101/5 107/18
comparison [5]  20/4
106/17 106/23 107/1
107/23
complaint [7]  13/23
18/5 25/7 50/14
51/6 56/21 97/22
complete [4]  63/17
89/6 97/19 98/11
completely [1]  67/4
completeness [5]
13/22 18/13 26/16
38/9 38/19
compliant [1]  85/20
complies [1]  13/12
comply [1]  19/24
components [3]
49/18 50/3 51/1
comprehensive [1]
31/12
compressed [1]
79/21
comprising [1]  98/1
computer [1]  6/2
concede [2]  60/13
81/16
conceded [1]  78/17
concern [4]  25/12
85/23 85/23 86/15
concerned [2]  27/24
109/3
concerning [1]
44/22
concerns [5]  86/5
97/11 100/9 103/14
111/3
concession [1]
65/22
conclude [8]  14/15
33/8 34/23 35/2
57/16 82/22 82/23
84/10
concludes [1]  83/25
confer [1]  34/14
conferring [1]
21/17
confirm [1]  64/6
confirming [2]
58/18 63/18
confirms [1]  59/6
confused [2]  29/9
48/8
confuses [1]  88/1
confusion [2]  47/2
47/2
Congress [13]  16/20
16/24 63/9 63/10
77/25 93/4 93/5

94/8 103/1 103/7
103/23 104/3 105/6
congressional [4]
93/7 98/13 98/18
99/23
connection [2]
72/22 77/16
consequence [1]
15/19
consequences [5]
28/11 60/17 77/8
112/24 113/8
Conservation [1]
17/11
consider [12]  19/5
25/17 27/1 58/2
65/5 82/17 83/3
83/12 83/20 88/6
95/18 110/14
consideration [2]
22/7 88/11
considered [9]  39/3
45/24 48/14 54/23
58/25 90/13 91/9
99/3 110/9
considering [3]
26/23 102/7 102/10
considers [1]  36/5
consistent [3]
45/14 66/7 91/5
consistently [1]
64/24
consternation [1]
25/11
constitute [2]
90/14 91/10
Constitution [1]
2/9
constitutional [1]
97/2
consult [1]  95/16
consultation [4]
45/3 88/13 107/16
110/5
consultations [1]
28/15
consults [1]  95/24
consuming [1]  10/7
CONT [1]  2/1
contained [2]  50/3
51/13
contains [1]  46/5
contemplated [1]
35/18 81/17
contemporaneous [1]
88/17
Contemporaneously [1]
8/6
contention [1]
14/18
contest [1]  74/20
context [5]  31/18
54/12 64/3 75/15
83/10
contingent [1]
106/6
continue [3]  92/5
96/17 96/24
continued [1]  96/15
continues [2]  20/8

21/9
continuing [1]
20/17
contrary [5]  20/4
92/14 92/24 93/7
93/8
control [1]  96/9
convince [2]  53/14
53/17
convinced [2]  14/9
32/16
cooperative [1]
95/3
cooperatively [1]
85/19
copies [1]  98/4
core [2]  86/7 97/15
Corps [35]  10/17
10/20 11/22 23/2
23/20 23/25 30/9
31/23 38/13 50/23
59/9 61/21 61/22
69/6 70/2 70/18
76/19 85/25 86/11
87/4 87/5 87/7 87/7
93/12 93/14 96/10
96/22 98/9 101/9
102/8 102/10 108/19
109/18 109/20
109/21
Corps' [1]  69/17
Corps-led [2]  86/11
93/12
correctly [2]  52/14
69/19
correspondence [1]
30/22
counsel [2]  63/16
91/8
count [10]  15/9
50/1 50/2 50/5 50/7
50/9 50/16 51/5
51/5 73/22
counter [1]  75/5
counter-factual [1]
75/5
counteract [1]
25/15
County [1]  98/23
couple [4]  35/9
52/3 58/6 82/12
course [10]  10/3
11/11 58/9 58/11
81/9 101/13 102/8
112/7 112/14 113/24
courses [1]  60/5
court [43]  1/1 2/7
2/8 16/10 16/16
17/12 17/17 20/12
26/7 28/17 30/12
30/15 33/21 33/23
34/3 52/9 53/16
53/17 53/22 54/4
54/7 56/2 56/24
56/25 57/22 58/3
65/15 80/6 81/20
82/9 83/25 84/9
92/16 95/6 97/21
99/9 100/6 101/2
107/22 110/9 113/23

115/3 115/9
Court could [1]
84/9
court's [5]  16/24
82/1 95/12 97/6
112/22
courts [7]  2/8 52/6
54/12 78/24 100/22
101/15 112/4
courts' [1]  53/9
cover [1]  110/7
covered [7]  30/16
84/17 84/18 92/8
100/3 100/4 104/6
COVID [1]  115/8
COVID-19 [1]  115/8
crack [1]  53/25
crafting [1]  22/7
crazy [1]  24/5
create [4]  21/12
21/21 101/18 112/23
created [2]  36/8
108/21
creates [4]  24/19
33/25 40/20 93/13
creating [2]  27/24
40/14
creation [1]  108/16
Creek [3]  96/6
109/15 109/19
criminal [1]  17/14
criteria [8]  62/24
63/9 63/11 88/4
88/5 89/7 89/8
111/20
cross [2]  5/11 8/1
cross-motion [1]
8/1
cross-motions [1]
5/11
Crow [3]  96/6
109/15 109/19
cry [1]  65/21
cultural [4]  96/13
96/15 96/21 97/5
cumulative [1]
107/13
cure [2]  49/18 75/6
current [3]  24/11
30/23 50/16
cut [1]  64/11
cute [1]  94/10
cv [1]  1/4

**D**

D.C [15]  52/18
58/15 75/14 77/11
80/5 80/15 89/24
96/5 96/25 98/21
98/21 99/1 100/17
104/20 104/22
daily [1]  44/9
Dakota [1]  96/11
dam [1]  112/20
dangerous [2]  67/3
68/17
database [3]  110/22
110/23 111/2
date [18]  18/15
19/20 19/25 20/13

**D**

date... **[14]**   30/1 34/13 35/24 39/3 39/8 55/18 58/1 66/1 66/4 66/5 66/17 69/22 73/16 115/14
date and **[1]**   73/16
dates **[1]**   64/12
day **[23]**   13/24 19/20 19/24 27/12 27/14 27/16 32/25 33/7 39/14 40/14 40/19 40/20 60/3 64/14 66/15 68/16 73/7 73/10 73/11 73/15 82/25 84/3 93/5
days **[28]**   10/10 12/21 13/1 13/11 13/16 17/5 18/9 20/2 20/8 20/10 20/13 21/9 33/5 33/25 40/4 40/13 40/18 41/2 41/3 59/21 64/15 73/16 82/18 83/19 87/20 91/7 98/14 99/5
DC **[4]**   1/5 1/21 2/3 2/10
de **[1]**   101/7
deal **[2]**   22/21 51/4
dealing **[3]**   12/19 62/14 70/9
dealt **[1]**   61/10
December **[9]**   7/6 10/3 10/4 10/24 18/7 19/17 27/13 30/22 69/21
December 2020 **[3]**   7/6 10/24 18/7
December 22nd **[4]**   10/4 19/17 27/13 69/21
decide **[12]**   7/6 11/5 15/6 15/10 20/23 29/12 39/25 40/6 40/7 41/3 62/22 112/8
decided **[6]**   27/18 33/22 63/18 67/17 103/7 113/1
decides **[2]**   23/17 40/5
deciding **[3]**   15/11 60/6 61/6
decision **[28]**   11/2 16/6 16/24 20/6 20/9 20/12 20/23 29/13 29/19 54/11 63/3 66/25 67/1 67/25 71/23 75/18 75/21 75/24 79/11 82/19 82/22 87/2 93/22 99/18 103/1 103/25 104/4 114/2
decision's **[1]**   68/23
decisional **[2]**

18/21 18/24
decisions **[7]**   39/2 71/19 93/19 94/21 99/17 100/16 105/17
declaration **[2]**   22/18 76/17
declarations **[2]**   86/20 105/11
declaratory **[4]**   43/1 73/22 74/11 78/2
decline **[3]**   24/12 24/13 54/17
deemed **[23]**   15/13 15/14 15/20 15/25 16/2 16/11 16/15 16/25 17/16 17/18 18/2 89/12 93/5 97/17 98/14 98/18 98/25 98/25 99/9 99/14 99/14 99/22 103/5
deeply **[1]**   61/16
default **[1]**   13/17
defeat **[1]**   98/16
defeated **[1]**   97/18
defect **[2]**   72/17 72/19
defective **[1]**   48/7
defendants **[10]**   1/7 1/20 3/5 4/10 4/12 4/14 4/16 12/18 13/11 33/15
Defense **[1]**   33/23
defiance **[1]**   30/22
deficient **[1]**   51/7
defied **[1]**   30/17
define **[2]**   62/14 95/8
defined **[5]**   38/10 38/13 38/20 62/21 63/9
defining **[2]**   31/10 38/3
definition **[6]**   30/13 30/16 31/24 37/25 38/17 109/8
definitive **[1]**   64/7
defying **[2]**   37/24 37/25
degree **[1]**   37/19
delay **[3]**   4/7 19/20 32/25
delayed **[1]**   19/25
delegated **[1]**   55/24
delegation **[1]**   42/23
delve **[1]**   97/1
demanding **[1]**   67/6
demonstrate **[3]**   87/10 92/11 93/25
denial **[1]**   33/9
denied **[2]**   19/3 85/17
deny **[3]**   32/5 90/13 91/9
DEP **[5]**   25/13 27/18 100/23 101/8 101/11
Department **[5]**   1/20 63/21 64/25 65/8

103/17
Department's **[1]**   66/23
depending **[1]**   56/25
deprivation **[2]**   33/18 34/17
deprived **[8]**   19/2 20/19 27/17 29/7 32/8 75/13 104/2 104/23
depriving **[2]**   29/14 34/1
described **[7]**   65/25 65/25 88/19 88/19 88/20 88/23 90/12
describes **[1]**   66/2
description **[4]**   64/18 89/6 98/2 98/12
designation **[1]**   58/17
designed **[1]**   105/14
desire **[1]**   84/6
detail **[1]**   88/24
determination **[16]**   13/23 18/13 22/18 26/16 27/6 40/10 40/12 55/6 57/6 58/20 58/20 66/6 87/23 90/13 91/9 104/5
determinations **[4]**   32/10 91/19 109/5 109/6
determined **[1]**   113/2
develop **[2]**   12/19 57/21
developer **[1]**   26/3
developers **[1]**   110/8
development **[2]**   25/11 28/18
Diamond **[2]**   72/20 76/24
dicta **[2]**   65/18 65/19
difference **[5]**   53/9 54/11 77/22 95/2 109/17
different **[33]**   10/13 10/22 12/12 22/6 33/13 34/9 39/14 40/19 41/19 44/25 45/22 47/11 48/6 50/1 50/4 51/5 51/8 51/21 54/3 54/7 61/8 63/7 69/18 70/9 75/21 78/6 87/4 93/20 94/2 105/21 107/17 108/6 111/17
differently **[1]**   48/21
difficult **[2]**   57/18 114/1
difficulties **[1]**   3/18
directives **[1]**   37/25

disagree **[2]**   32/3 89/22
disapproval **[1]**   90/6
disapproved **[1]**   89/12
disapproves **[1]**   89/8
discrete **[1]**   64/20
discretion **[17]**   11/5 17/13 19/4 53/21 56/16 57/23 60/6 67/5 79/8 88/5 89/21 89/24 95/18 110/3 110/5 110/10 110/12
discretionary **[8]**   18/20 18/25 19/7 33/17 33/19 87/23 87/24 88/3
discuss **[2]**   96/6 105/11
discussions **[1]**   88/10
dismiss **[5]**   5/11 6/17 14/3 15/13 109/14
disposition **[1]**   94/2
dispositive **[2]**   60/12 65/9
disrupt **[1]**   100/6
disrupted **[1]**   23/22
disruptive **[5]**   92/10 92/11 92/23 93/8 100/5
distinction **[1]**   62/12
distinguishing **[1]**   59/2
DISTRICT **[5]**   1/1 1/1 1/11 2/8 34/5
districts **[1]**   92/23
disturbing **[1]**   20/14
DIVERSITY **[3]**   1/3 3/3 5/12
divested **[2]**   12/22 13/17
division **[1]**   105/19
docket **[18]**   7/3 7/5 7/22 8/2 8/2 8/4 8/14 8/14 8/15 8/22 8/24 9/5 9/11 9/13 9/24 58/7 58/11 90/11
document **[10]**   45/14 45/15 45/16 45/23 45/23 48/23 49/21 51/17 90/11 98/1
documents **[4]**   45/16 45/21 71/16 86/20
dogs **[1]**   56/23
dollars **[1]**   23/7
done **[23]**   10/8 10/23 17/5 17/7 20/18 27/14 39/19 39/24 40/2 43/15 44/10 44/11 48/21 51/4 55/9 62/2

**D**

done... [7]  67/21
67/22 68/19 75/13
93/7 99/11 112/19
double [1]  36/19
doubt [1]  90/20
down [5]  21/19
24/18 62/15 81/5
92/16
downstream [1]  77/8
draft [1]  85/22
draw [3]  79/2 92/7
112/22
drawing [1]  112/21
dredge [1]  109/6
dredging [1]  43/15
drives [1]  24/4
during [11]  26/15
33/7 33/8 33/11
73/7 82/25 83/2
83/22 83/23 84/8
115/7
dysfunctional [1]
25/8

**E**

earlier [3]  78/17
89/1 89/10
early [1]  99/17
Earthjustice [2]
1/14 1/17
easement [1]  103/16
easier [1]  56/22
easily [1]  9/7
easy [1]  34/8
edged [1]  90/22
educate [1]  106/4
education [1]
105/18
effect [42]  11/16
11/19 12/14 24/22
24/25 25/1 25/3
25/19 26/7 26/21
29/17 35/24 39/1
39/7 39/13 40/14
40/24 41/1 41/25
42/7 42/11 42/14
42/15 42/16 43/22
49/16 52/15 52/17
52/21 54/15 72/1
73/8 74/10 76/6
77/18 83/11 84/8
86/9 91/15 98/15
99/1 100/5
effective [34]
18/15 19/20 19/25
20/13 29/25 34/13
35/24 39/2 39/8
40/11 40/12 40/13
40/18 55/18 57/14
58/1 64/12 64/15
66/1 66/4 66/5 66/9
66/17 68/15 69/21
74/2 83/1 87/19
87/20 91/6 91/7
91/17 112/3 112/17
effectively [1]
100/16
effectiveness [1]

66/16
effects [5]  63/2
92/10 92/11 92/24
97/4
effectuated [2]
28/24 106/7
effort [3]  66/19
92/20 108/24
eight [5]  14/7 15/9
18/1 73/5 90/11
either [4]  60/15
87/6 87/8 106/25
election [1]  10/2
electronic [1]  8/12
element [1]  15/5
elements [6]  46/21
50/7 50/17 50/19
51/7 79/5
elevate [1]  79/1
else [7]  42/17
51/22 59/10 72/8
84/11 111/7 113/22
elsewhere [1]  47/20
elucidate [1]  15/2
embodied [1]  105/6
emitted [1]  61/8
emphasizing [1]
46/25
employ [1]  79/9
employed [1]  95/9
employees [1]  92/21
enacted [1]  87/14
encountering [1]
6/10
end [11]  3/18 9/12
9/23 16/23 46/6
59/18 77/23 79/12
81/11 82/4 89/16
endangered [13]
4/19 28/16 44/23
45/2 45/20 47/14
48/3 74/10 88/2
88/20 95/23 106/14
107/15
enforceable [3]
21/22 22/1 48/3
enforced [1]  46/3
enforcement [5]
96/25 98/10 109/20
109/22 113/5
enforcing [2]  78/1
96/13
engage [6]  61/18
67/17 67/18 68/18
88/13 105/12
engaged [3]  6/22
92/19 110/19
engagement [2]  39/1
105/17
engages [1]  80/23
engaging [1]  43/8
Engineer's [1]  70/3
Engineers [2]  59/9
85/25
Engineers' [2]  69/7
96/10
enjoyed [1]  30/7
enormously [1]  74/9
enough [8]  9/7
17/15 48/12 51/11

51/22 55/2 58/16
103/24
ENRD [1]  1/20
ensure [2]  85/19
95/21
entail [2]  78/20
106/21
entails [1]  50/23
enter [1]  29/16
entered [1]  108/24
entertain [5]  25/5
26/19 83/8 84/11
101/19
entire [2]  30/14
61/12
entirely [9]  5/25
6/2 6/5 10/18 11/1
11/3 33/3 54/13
79/13
entitle [1]  101/4
entitled [11]  14/17
34/10 34/25 35/3
51/13 52/8 53/14
82/24 83/19 108/6
115/5
entity [1]  60/17
entries [2]  97/25
97/25
entry [1]  8/2
environment [5]
28/13 102/24 103/6
104/17 105/3
environmental [5]
33/22 94/23 94/24
100/20 107/12
EPA [116]
EPA's [22]  15/19
17/13 18/3 18/6
28/23 37/25 44/14
46/20 48/25 49/3
55/16 57/12 60/15
62/21 63/4 63/5
68/25 75/20 91/21
94/4 98/16 103/22
Epic [2]  104/21
105/20
equitable [3]  53/1
53/21 57/22
equities [2]  19/4
36/6
equity [1]  86/1
equivalent [1]
102/16
era [5]  30/13 30/15
30/18 30/21 109/8
erred [3]  29/13
40/11 103/25
error [1]  13/7
eRulemaking [2]  9/2
9/14
ESA [12]  43/4 50/23
88/12 88/23 93/17
93/21 95/14 95/15
95/21 105/25 106/3
106/18
escaped [1]  95/10
especially [5]
10/11 37/23 39/2
93/13 109/3
essence [1]  43/2

essential [1]
108/19
essentially [1]
71/11
establish [3]  14/24
74/24 93/24
established [1]
15/7
establishing [1]
101/1
et [4]  1/3 1/6 3/3
3/3
evaded [1]  95/10
evaluate [1]  89/25
evaluated [1]
104/18
evaluation [1]  19/7
even [25]  13/19
16/15 16/16 16/17
23/11 23/15 24/9
26/22 31/20 43/5
44/11 46/19 49/3
51/3 60/5 65/15
66/10 66/11 68/17
71/14 77/14 79/10
106/13 112/8 113/18
event [4]  49/24
84/22 84/25 102/5
eventually [1]
85/10
everybody [1]  26/5
everyone [4]  28/6
76/18 113/16 113/25
evidence [5]  22/1
22/5 58/24 64/8
64/23
evolved [1]  38/1
exactly [3]  11/25
80/4 91/17
example [4]  43/25
46/4 54/5 90/10
excellent [1]
113/23
except [1]  52/23
exception [3]  12/11
64/14 68/16
exchange [4]  52/4
56/18 72/12 82/3
exclusively [1]
78/20
excuse [2]  18/21
71/17
executive [1]  78/21
exemplifies [1]
61/14
exercise [8]  24/14
53/21 54/20 62/16
63/7 78/20 79/8
112/21
exercising [2]
31/20 63/5
existing [8]  10/12
41/1 43/18 49/12
49/13 62/25 112/1
112/1
expectations [2]
23/6 100/5
expertise [1]  25/13
explaining [1]  66/8
expressly [3]  39/5

**E**

expressly... [2]
  91/12 96/14
extend [1]   20/12
extended [1]   99/20
extensive [1]   71/5
extent [7]   14/18
  15/4 31/14 42/24
  69/24 104/11 104/14
extreme [1]   81/8
extremely [1]   25/8

**F**

face [1]   34/14
facilities [1]   61/8
fact [39]   13/16
  16/6 16/18 19/7
  19/8 22/19 29/12
  33/24 42/1 42/5
  42/23 43/7 49/6
  49/11 50/17 52/7
  54/20 56/8 60/16
  61/3 61/7 61/9
  61/14 65/22 76/18
  80/6 80/17 80/18
  80/23 87/5 88/23
  90/22 93/6 101/3
  109/22 110/4 110/18
  112/15 112/16
fact engages [1]
  80/23
factors [4]   19/5
  54/6 110/17 110/18
facts [4]   63/1 81/8
  97/22 111/16
factual [2]   75/5
  97/21
failure [12]   19/24
  20/2 38/9 41/7
  41/10 70/8 72/13
  73/1 75/20 77/9
  77/17 77/20
fair [13]   11/5
  48/12 51/11 51/22
  55/2 58/16 61/2
  62/4 63/6 79/7 82/6
  103/24 112/25
fairer [1]   55/4
fairly [5]   14/7
  37/18 62/22 63/5
  99/16
falls [2]   73/18
  78/22
familiar [2]   30/10
  57/9
far [3]   23/13 65/21
  85/12
fatal [1]   75/9
fault [1]   28/8
favor [1]   40/22
FCC [1]   99/20
feature [1]   66/18
federal [91]   1/19
  4/12 4/14 4/16 9/2
  10/9 12/18 13/10
  19/19 20/25 30/6
  33/15 37/25 41/14
  41/17 41/23 42/15
  42/20 42/21 43/23

44/4 44/8 45/25
  46/7 46/19 46/20
  47/17 47/21 47/25
  49/1 49/2 49/22
  50/10 50/21 54/14
  55/20 58/12 59/4
  60/23 61/20 62/8
  64/17 65/24 68/10
  68/12 69/11 69/14
  69/16 69/21 69/25
  70/7 70/14 70/21
  71/2 71/12 71/22
  80/4 86/1 86/5
  86/12 86/13 86/14
  94/7 94/14 94/16
  94/17 96/4 96/9
  96/12 96/13 96/17
  96/18 96/19 96/20
  96/20 96/23 96/24
  96/25 97/10 97/11
  101/5 101/9 102/23
  103/2 103/5 103/15
  103/16 104/9 105/2
  108/15 110/14
federal-state [1]
  96/23
federalize [2]   86/6
  97/14
feedback [1]   85/24
feel [2]   54/17
  77/18
feet [1]   54/25
few [1]   108/11
fewer [1]   25/10
fifth [1]   9/19
fighting [1]   37/4
figure [1]   73/15
file [20]   8/20
  14/16 14/17 14/23
  19/11 31/1 31/5
  31/9 31/16 33/11
  35/3 52/12 52/13
  69/14 82/14 83/18
  86/23 101/11 101/15
  113/16
filed [12]   28/5
  28/23 53/6 57/7
  58/10 58/22 64/25
  69/13 83/2 87/6
  87/16 98/12
filing [7]   8/11
  8/12 30/11 32/13
  32/16 32/19 57/9
filings [1]   10/8
fill [1]   109/6
filling [1]   43/15
final [20]   27/6
  29/1 32/10 32/14
  32/17 32/20 58/20
  64/20 66/1 67/25
  69/3 76/3 76/6
  77/23 81/7 88/17
  101/12 101/14 111/8
  111/23
finalized [1]   49/7
finalizing [1]   44/2
find [8]   9/6 9/7
  33/6 33/10 39/8
  80/3 99/14 110/4
finds [1]   34/12

fine [4]   6/14 7/12
  72/7 108/1
finish [2]   15/1
  81/23
FINNEGAN [3]   1/20
  4/14 4/19
firmer [1]   18/18
first [11]   15/9
  23/18 39/16 41/12
  52/4 59/23 60/8
  65/23 68/4 82/15
  98/24
Fish [7]   85/24
  88/10 93/15 95/16
  95/19 95/24 96/22
Fishery [2]   85/25
  93/15
five [1]   92/22
fixed [1]   7/17
FL [3]   1/15 1/18
  1/25
flaw [2]   50/12 75/9
flawed [1]   43/9
flip [1]   24/18
flipping [1]   24/4
Florida [92]   4/23
  10/18 15/16 16/3
  22/17 23/16 23/23
  28/3 30/12 30/16
  30/17 30/18 37/24
  38/2 40/6 41/15
  41/19 41/24 42/17
  42/24 43/15 44/25
  45/7 45/15 45/20
  47/13 47/19 50/24
  59/5 61/13 61/18
  62/3 62/6 62/18
  62/19 62/19 62/20
  70/18 70/19 70/23
  72/3 85/10 85/17
  85/19 85/20 86/2
  86/11 87/13 88/13
  89/3 92/19 94/22
  94/23 95/4 95/11
  95/22 95/23 95/24
  97/8 97/12 98/1
  98/6 100/8 100/15
  100/20 100/21
  100/22 100/23
  100/23 100/24
  100/25 101/7 101/8
  101/11 101/15
  101/17 102/17
  102/18 104/1 105/25
  106/1 106/13 106/22
  107/7 107/8 108/18
  108/20 109/18
  109/24 110/1 110/11
  112/2
Florida's [33]   6/22
  7/6 7/7 10/5 15/13
  23/3 23/24 25/7
  26/1 31/20 45/11
  60/15 69/3 69/20
  71/1 72/2 72/14
  72/15 72/16 75/8
  85/7 87/13 91/16
  92/13 94/4 96/3
  98/7 98/16 100/4
  102/7 103/9 110/2

110/3
Florida-led [1]
  86/11
flowed [1]   33/10
flows [3]   20/2 33/6
  41/10
folks [2]   61/16
  109/5
follow [7]   32/24
  42/9 77/10 77/17
  77/20 82/12 84/14
followed [4]   3/5
  20/22 72/19 87/7
following [3]   16/8
  48/9 61/22
follows [2]   46/8
  57/17
For the Federal [1]
  1/19
foregoing [1]   115/4
foreign [1]   98/20
form [8]   29/25
  33/17 35/1 35/19
  39/8 46/13 79/2
  102/17
forms [3]   11/2 98/5
  108/22
forth [6]   23/25
  24/1 46/6 69/25
  84/23 85/21
forthcoming [1]
  45/5
forward [4]   23/9
  24/17 28/9 41/3
found [3]   16/23
  17/12 33/23
four [5]   51/8 76/5
  76/7 76/11 98/21
four-year-old [3]
  76/5 76/7 76/11
fours [1]   76/25
framed [1]   82/15
framework [1]   79/4
Francisco [1]   2/6
frankly [4]   20/20
  32/2 32/12 59/17
free [2]   54/17
  77/19
Friday [4]   107/24
  108/3 113/16 113/18
front [3]   14/20
  28/7 95/6
froze [2]   37/10
  37/14
full [1]   89/5
fully [1]   12/19
function [2]   88/22
  94/8
Fund [1]   33/23
fundamental [6]
  18/12 38/4 41/12
  45/25 50/20 105/18
fundamentally [1]
  11/13
funding [1]   25/12
further [7]   22/1
  22/5 31/19 57/22
  67/16 111/2 113/16
future [2]   11/19
  71/13

**G**

**G1 [4]**  13/6 13/9
13/12 13/15
**gainfully [1]**  95/9
**GALLONI [21]**  1/13
3/15 3/17 3/23 3/24
5/13 11/4 15/23
37/10 52/4 52/14
53/11 56/18 72/12
82/13 85/6 99/7
102/1 104/7 105/7
107/25
**Galloni's [2]**  76/14
78/7
**game [1]**  56/20
**Gaming [1]**  99/2
**gap [1]**  43/21
**gas [1]**  103/17
**gather [1]**  32/2
**general [6]**  11/5
32/22 52/21 63/16
88/21 91/8
**generally [4]**  41/8
67/10 70/13 93/10
**generated [2]**
105/24 106/12
**gets [8]**  15/20 19/2
23/10 40/2 43/15
44/21 58/10 97/15
**given [3]**  8/13 40/3
56/7
**gives [1]**  39/23
**giving [1]**  18/9
**glad [1]**  7/17
**globally [1]**  87/10
**goes [8]**  41/1 50/19
70/1 78/1 86/7 86/9
105/8 107/5
**good [10]**  3/16 4/11
4/13 4/22 5/4 5/5
5/8 5/9 37/13 85/3
**govern [1]**  11/22
**governing [1]**  41/15
**government [14]**
7/25 20/22 39/12
59/5 60/23 63/21
76/7 76/11 94/16
94/17 96/12 102/24
104/9 108/15
**Government's [1]**
8/10
**governor [2]**  87/14
89/3
**governs [1]**  72/3
**grant [16]**  22/15
26/8 26/22 26/23
31/22 32/9 35/16
35/16 37/1 37/8
37/20 40/8 52/10
58/2 93/9 113/5
**granted [5]**  19/2
86/23 98/25 99/14
110/22
**granting [2]**  37/5
61/17
**grants [2]**  36/21
39/5
**great [5]**  5/3 6/16
17/1 85/5 113/25

**greater [1]**  53/24
**grinds [1]**  24/6
**ground [1]**  18/18
**grounds [2]**  19/24
29/4
**groups [1]**  100/20
**guarantee [2]**  33/24
80/3
**guess [18]**  5/12
5/13 8/5 12/24
14/21 23/14 29/9
33/3 37/17 47/1
48/21 69/24 76/1
77/21 84/25 94/11
102/1 107/6
**guidelines [2]**
88/11 108/19
**guides [1]**  53/20

**H**

**H.H.S [1]**  113/4
**H1 [1]**  13/2
**halfway [1]**  60/5
**halt [1]**  24/7
**hand [1]**  47/12
**handle [2]**  4/19
25/14
**handled [1]**  45/14
**hang [1]**  7/10
**happen [1]**  16/22
**happened [12]**  10/2
21/20 23/19 56/8
59/18 59/24 63/19
64/3 77/14 87/17
87/20 88/16
**happening [1]**
111/17
**happens [2]**  32/15
95/5
**happy [8]**  35/11
72/7 81/25 87/5
100/12 107/4 111/7
111/8
**hard [6]**  22/24
33/14 34/7 73/2
104/19 105/16
**harm [17]**  20/7
20/10 21/9 22/2
31/18 31/19 72/12
72/13 72/14 72/23
72/23 74/25 75/3
75/11 77/17 86/16
86/21
**harmed [3]**  75/18
77/15 77/18
**harmony [1]**  38/24
**harms [3]**  74/19
74/22 75/7
**hate [1]**  51/14
**head [1]**  91/25
**heads [1]**  71/15
**hear [11]**  4/9 14/11
37/11 37/13 51/23
73/19 82/8 94/12
100/12 111/5 111/7
**heard [4]**  13/19
21/23 37/15 89/1
**hearing [5]**  1/10
36/15 101/4 101/8
115/7

**hearings [1]**  7/5
**heck [1]**  71/5
**held [1]**  93/24
**help [1]**  4/5
**helpful [8]**  9/1
36/17 54/19 84/24
95/13 107/22 111/4
113/23
**here's [4]**  59/10
61/25 69/7 69/15
**heritage [1]**  97/5
**Hi [1]**  3/7
**hiatus [1]**  40/20
**high [1]**  37/19
**highlight [1]**
101/16
**highlighted [1]**
96/7
**highly [6]**  86/25
92/11 92/23 93/8
100/5 103/19
**hired [1]**  92/20
**historical [3]**  64/8
64/10 64/10
**historically [2]**
58/25 89/23
**history [3]**  35/13
35/18 93/3
**hold [9]**  17/6 23/1
25/24 29/19 36/1
40/10 40/12 56/10
82/24
**holding [2]**  52/19
56/6
**Holtzman [1]**  1/23
**Honor [74]**  3/16
3/20 3/23 4/2 4/11
4/13 4/17 4/22 5/1
5/4 5/7 5/16 5/21
6/9 6/21 7/9 15/12
27/22 33/21 35/5
52/2 52/18 62/10
72/6 74/18 76/24
78/16 80/12 81/25
83/18 85/3 85/9
85/18 85/21 86/8
86/18 86/21 86/22
87/11 87/16 87/25
89/1 89/9 89/17
89/22 90/1 90/17
91/4 91/12 91/21
92/3 92/6 92/24
93/10 94/3 94/22
95/5 96/5 97/16
98/17 98/22 99/13
100/2 101/6 101/19
101/23 102/3 102/22
104/12 105/8 108/5
111/18 111/24
113/11
**HONORABLE [1]**  1/10
**HOOK [3]**  2/7 115/3
115/14
**host [4]**  97/10
101/6 103/13 113/3
**human [2]**  102/24
103/6
**humming [1]**  23/22
**hundred [5]**  80/3
97/24 97/25 109/4

110/21
**hundreds [1]**  92/21
**hybrid [1]**  66/24

**I**

**I then [1]**  40/8
**Idaho [1]**  17/10
**idea [4]**  36/25
70/16 97/19 103/19
**ideal [1]**  5/18
**identified [1]**
99/15
**identify [1]**  3/4
**III [1]**  97/3
**illegal [1]**  30/15
**imagine [2]**  34/22
104/19
**immediacy [1]**  101/4
**immediate [7]**  25/14
29/25 58/1 60/17
64/12 66/1 66/17
**immediately [13]**
10/6 10/25 18/8
40/11 40/12 66/8
66/21 68/15 87/19
91/6 91/17 112/3
112/17
**impacted [1]**  88/9
**impacting [1]**  105/3
**impacts [5]**  88/7
88/14 95/18 106/4
107/13
**implementation [4]**
72/16 74/23 75/8
77/4
**implication [1]**
98/17
**implied [1]**  20/9
**implies [1]**  56/4
**important [5]**  25/17
62/12 96/8 103/12
108/7
**impression [2]**  56/1
65/20
**improper [1]**  60/4
**improperly [1]**
104/2
**in not [1]**  19/8
**inaudible [4]**  12/7
65/1 69/17 70/24
**incidental [1]**
110/8
**inclined [2]**  5/13
37/19
**include [2]**  47/16
69/15
**included [1]**  9/13
**includes [1]**  101/3
**including [3]**  43/3
45/18 86/20
**incomplete [3]**
14/19 14/25 56/22
**incompleteness [4]**
15/8 38/19 56/22
88/25
**incorporate [1]**
47/11
**incorporated [2]**
20/24 44/7
**incorporates [1]**

**I**

incorporates... [1] 44/7
incorporating [1] 71/14
incorrectly [2] 12/4 12/13
increase [1] 38/25
incredibly [1] 61/9
independent [1] 53/17
index [1] 97/25
Indian [1] 99/2
indicate [2] 83/12 84/16
indicated [1] 82/13
indication [6] 37/16 37/21 37/22 81/16 88/25 91/2
indicative [1] 59/15
indicia [1] 58/14
indirectly [2] 14/2 104/1
individual [4] 25/10 85/13 85/15 110/21
individuals [1] 59/14
ineffective [1] 73/11
inferences [2] 97/20 97/21
inform [1] 106/5
information [24] 71/25 98/10 98/10 104/17 104/18 104/19 104/23 105/1 105/5 105/14 105/15 105/23 105/24 106/1 106/2 106/12 106/15 106/18 107/9 107/14 107/18 108/3 108/6 110/25
informational [3] 104/15 105/20 106/6
initial [1] 21/9
initio [1] 77/5
inject [1] 109/2
injunction [2] 52/13 53/7
injured [5] 77/3 77/8 87/1 87/3 103/21
injures [1] 100/7
injuries [2] 73/7 73/14
injury [21] 33/25 41/6 41/10 43/3 43/4 43/6 73/9 82/25 83/23 84/1 86/16 87/2 93/13 96/2 100/18 101/3 101/18 104/15 105/4 105/21 105/22
injustice [1] 81/12
inquiry [2] 60/16 61/7
insofar [2] 39/5
95/15
instance [6] 15/10 56/17 62/13 64/22 71/25 106/18
instead [4] 10/5 29/14 50/8 108/15
intended [3] 21/17 68/3 91/2
intending [1] 68/13
intensive [4] 60/16 61/3 61/7 61/10
intent [5] 17/14 93/4 93/8 105/5 112/12
intention [1] 68/10
interest [4] 54/6 54/9 101/1 101/2
interested [3] 13/5 59/7 102/2
interesting [1] 114/1
interests [1] 23/7
interfere [1] 5/23
interfering [1] 30/1
Interior [1] 103/17
interrupt [1] 89/18
interruption [1] 7/14
intervenor's [1] 14/3
intervenors [6] 2/2 3/6 4/23 4/25 12/18 82/8
into [17] 19/5 20/24 26/21 51/17 54/15 61/19 68/12 69/17 73/8 77/18 79/14 80/20 81/9 86/9 88/12 97/1 108/24
invalidate [7] 19/23 20/4 20/5 39/15 39/16 39/18 39/19
invalidated [1] 16/10
invent [1] 59/24
invested [1] 23/8
invite [1] 22/25
invited [1] 7/3
inviting [1] 7/2
invoked [1] 21/23
involved [1] 86/4
involves [1] 28/3
involving [3] 61/3 62/6 96/8
irony [1] 17/3
irrespective [1] 88/8
issue [50] 8/12 14/10 14/10 14/12 15/6 17/15 17/17 27/21 27/24 38/11 38/13 45/21 48/18 52/7 52/20 54/4 54/24 55/17 56/14 57/18 57/21 59/13 60/9 60/12 61/11 61/13 62/5 62/6
65/2 65/9 76/1 76/14 83/4 84/17 86/2 87/12 88/1 88/2 90/6 92/8 95/1 95/2 95/5 97/13 97/15 97/16 97/17 100/3 100/4 110/9
issued [14] 25/10 43/24 52/19 57/6 63/16 84/23 84/23 85/15 85/16 85/20 100/23 101/11 109/4 112/14
issues [17] 4/19 5/14 6/23 14/22 14/23 24/10 25/12 26/3 35/6 36/3 52/22 54/7 82/4 88/12 93/16 93/17 108/18
issuing [4] 67/16 79/19 81/6 104/9
items [1] 44/25

**J**

January [9] 10/14 26/17 30/23 33/22 38/1 39/25 57/8 73/17 75/5
January 16th [1] 75/5
January 2021 [1] 39/25
January 20th [2] 26/17 57/8
January 21st [1] 73/17
JAZIL [3] 1/23 5/6 101/22
JEFF [4] 2/7 4/22 115/3 115/14
JEFFREY [1] 2/2
jeopardy [1] 46/23
Jersey [9] 10/23 41/18 46/5 58/19 70/20 70/22 71/5 71/6 91/11
Jersey's [1] 70/25
join [1] 101/23
joined [1] 5/1
joint [1] 96/23
Josefiak [1] 1/24
Jr [1] 1/17
judge [4] 1/11 17/23 76/4 81/1
judgment [10] 6/18 18/2 29/4 29/5 29/16 43/1 63/10 73/22 74/11 78/2
judicial [19] 16/5 18/10 19/6 22/4 24/24 25/24 26/20 27/8 28/25 29/24 30/5 33/2 35/10 35/12 40/5 52/10 53/1 54/1 101/15
jump [2] 7/11 82/2
jumping [1] 110/17
jurisdiction [6] 31/20 38/14 62/9
109/18 109/19 109/25
jurisdictional [1] 31/21
justice [6] 1/20 34/12 63/21 64/25 65/7 66/23
justiciable [1] 98/19
justified [1] 92/13

**K**

keep [4] 24/22 30/17 41/3 108/7
keeps [1] 4/2
key [1] 96/22
kick [1] 59/23
kind [14] 10/13 25/4 35/14 36/6 63/4 64/13 67/2 70/12 80/19 80/22 92/12 93/9 104/15 104/19
kinds [1] 94/20
King [1] 1/17
Klain [8] 20/21 21/6 21/11 21/21 22/5 24/15 59/22 59/23
knowing [2] 48/2 113/19
knowledge [1] 49/1
known [2] 30/10 85/23
knows [2] 35/22 85/21

**L**

labels [1] 58/20
lack [2] 75/3 105/5
lacking [1] 75/2
lacks [1] 97/3
laid [3] 36/18 36/20 78/12
land [1] 103/16
lands [1] 96/10
language [19] 15/14 15/15 16/16 34/8 35/8 44/3 44/11 44/18 46/9 46/10 66/6 69/13 69/15 80/5 89/13 91/18 91/18 98/25 105/2
large [1] 28/3
last [5] 36/23 55/5 56/8 68/21 111/10
late [1] 38/1
later [4] 20/14 20/16 30/23 95/13
law [79] 16/17 17/23 20/18 20/24 36/19 36/20 37/25 39/20 40/25 41/13 41/14 41/15 41/24 42/1 42/17 45/21 46/1 46/24 47/3 47/8 47/12 47/16 47/18 47/23 48/3 48/11 48/13 48/15 48/16 48/18 51/17

**L**

law... [48]   51/18
51/19 51/19 58/15
59/1 62/8 62/25
63/11 69/7 69/10
70/6 70/14 72/5
73/23 74/2 74/25
75/12 75/12 76/16
76/18 77/2 77/4
77/8 77/15 77/18
77/19 78/1 78/3
78/5 78/8 85/20
86/5 89/24 91/15
95/23 96/14 96/20
96/24 99/19 100/9
100/15 100/18
100/25 101/2 101/7
102/17 107/11 112/1
law's [1]   77/3
lawful [3]   18/6
27/15 41/25
lawfully [2]   105/9
106/7
laws [4]   72/3 96/13
96/14 96/17
lawsuits [1]   87/6
lead [2]   4/24
109/19
leadership [2]
24/12 24/12
League [1]   17/11
leap [1]   105/16
least [14]   6/5 8/3
13/18 20/9 22/13
43/21 49/5 50/15
54/15 61/1 64/12
70/10 74/15 75/4
leave [7]   14/23
15/9 22/16 23/14
23/16 26/2 38/15
leaves [1]   56/1
led [6]   86/11 86/11
87/4 87/6 93/12
93/12
legal [17]   10/18
11/1 11/17 11/19
21/12 31/24 41/19
42/11 42/13 43/22
60/17 69/25 71/18
72/1 76/6 97/4 98/7
legally [2]   18/7
71/20
legislative [7]
35/13 35/17 62/16
77/5 78/21 78/23
93/3
legislature [1]
87/13
lengths [1]   17/1
lengthy [1]   31/7
less [4]   22/15
27/24 67/6 97/9
lessen [1]   97/4
lessening [2]   97/6
97/7
letter [2]   27/13
63/17
letters [1]   98/6
level [2]   30/19

88/24
license [1]   61/18
licensing [3]   59/4
62/5 63/6
lie [1]   56/23
lieu [2]   45/2 45/2
life [1]   95/9
light [2]   42/21
82/22
likelihood [1]   19/6
likely [2]   37/1
54/6
LILLY [2]   2/4 5/1
limbo [1]   26/3
limitation [1]   84/7
limitations [1]
115/9
limited [5]   34/23
52/24 59/13 99/16
113/5
line [3]   97/25
105/21 112/21
lines [3]   62/23
79/3 112/23
link [1]   75/2
list [2]   91/22 98/3
listed [3]   46/23
88/7 95/25
litigate [3]   29/2
30/2 65/9
litigation [5]
34/17 37/4 56/7
56/19 57/2
little [17]   29/9
37/2 37/7 55/4 55/7
57/22 58/4 59/17
66/24 78/19 80/12
80/21 90/22 92/16
94/10 110/17 113/16
live [3]   42/25 60/3
67/6
lived [2]   8/20
30/21
living [1]   15/21
LLP [2]   2/2 2/5
locate [1]   111/2
locked [2]   79/14
81/9
log [4]   4/4 4/4
5/25 37/11
logging [3]   5/25
6/2 6/2
logical [1]   98/17
long [11]   15/1 23/5
30/18 31/18 44/9
81/21 90/13 91/8
93/24 95/11 98/3
longer [1]   41/2
look [38]   21/16
21/20 35/12 36/13
36/15 36/16 37/3
39/25 41/14 43/19
44/11 44/20 44/20
46/13 46/14 59/1
59/12 59/19 62/22
63/4 63/6 63/8
65/23 70/20 71/7
74/7 77/21 78/14
79/5 89/24 97/23
105/16 106/20

106/21 106/24
107/22 108/23 109/1
looked [5]   46/12
48/22 58/21 76/3
99/13
looking [5]   12/25
46/4 65/20 71/3
71/4
looks [4]   7/9 59/11
59/17 79/6
lose [3]   57/20 74/6
78/6
loses [1]   56/5
losing [1]   34/15
loss [6]   102/15
103/21 103/22 104/5
105/14 105/23
losses [1]   106/6
lost [5]   19/8 28/14
28/15 28/16 39/17
lot [23]   6/25 16/20
23/5 24/19 25/11
37/23 53/5 56/10
58/10 59/6 59/16
60/6 64/8 71/5
71/14 79/6 79/6
86/25 87/11 109/13
112/19 112/20
112/20
lots [1]   61/16
Luther [1]   1/17

**M**

magic [2]   80/9
80/22
main [1]   108/18
Maine's [1]   90/12
maintain [1]   96/22
major [9]   102/9
102/23 102/25 103/2
103/5 105/2 105/13
105/14 106/5
majority [1]   12/9
makers [1]   11/2
makes [4]   28/25
29/1 35/18 53/9
making [9]   17/22
35/13 38/8 40/11
54/11 76/15 93/19
105/15 105/17
MALLOY [1]   1/16 3/7
3/10
manage [1]   93/2
management [2]
92/23 96/3
manufacture [1]
105/4
many [5]   23/7 69/2
77/3 84/23 111/1
March [2]   1/6 58/19
March 2nd [1]   58/19
marginal [1]   54/11
Marine [2]   85/25
93/15
marker [1]   71/22
Martin [1]   1/17
massive [1]   109/11
materials [2]   46/12
88/21
math [1]   10/8

matter [19]   11/7
11/8 11/13 11/13
12/21 12/21 32/22
49/6 52/7 58/11
59/4 61/3 62/8 65/7
65/10 78/7 87/5
107/11 115/6
matters [1]   53/5
may [27]   4/19 7/9
12/25 14/2 14/5
17/3 22/20 34/12
35/5 35/6 35/6
35/21 35/22 37/7
41/2 44/3 44/18
55/3 62/6 65/14
65/17 76/21 77/23
84/20 90/21 104/12
106/14
maybe [30]   6/4
12/11 29/9 31/4
33/15 33/16 36/14
38/1 42/4 50/14
52/2 53/16 53/19
54/2 54/10 55/21
56/21 65/19 66/10
66/24 70/7 73/8
74/6 74/14 76/1
77/22 91/1 94/10
104/7 111/11
mean [38]   6/2 8/22
11/16 12/3 13/7
14/2 14/5 15/24
16/20 16/25 19/23
21/12 22/22 35/21
36/16 42/2 43/24
47/1 49/19 56/19
57/19 58/24 60/12
60/15 60/20 64/11
65/24 66/11 69/19
70/11 71/2 73/5
75/9 75/25 80/10
80/12 93/10 113/1
meaning [2]   95/7
103/6
meaningful [1]
25/18
means [4]   30/25
95/13 102/6 109/5
meant [1]   31/17
mechanism [3]   79/9
93/12 93/13
meet [4]   13/24 36/8
88/4 89/8
meets [2]   63/9 89/6
members [1]   105/11
memo [7]   20/21 21/7
21/11 21/21 21/25
22/5 59/22
memoranda [2]   21/24
98/8
memorandum [4]
24/15 45/5 71/16
71/17
memorialize [1]
71/11
memorializes [1]
71/23
memorializing [1]
71/19
memory [1]   59/25

**M**

mention [4]   27/3
27/11 38/23 108/13
mention is [1]   27/3
mentioned [6]   6/16
9/14 64/25 85/6
85/12 111/12
mere [2]   93/11
101/17
merit [1]   53/12
merits [18]   22/23
25/25 26/1 26/4
28/23 32/5 38/8
55/22 56/5 57/20
74/4 74/6 76/22
78/9 82/24 99/10
106/8 109/14
Miami [2]   1/15 6/10
Michigan [7]   10/23
41/18 63/20 70/20
70/22 70/25 91/11
midstream [1]   11/11
might [22]   4/5
14/13 17/1 32/18
34/17 34/22 35/1
35/2 48/21 49/25
50/13 51/5 51/21
54/10 54/19 57/23
58/18 72/24 74/19
90/23 90/24 101/20
millions [1]   23/7
mind [3]   15/4 97/13
108/8
minds [1]   81/7
mini [2]   102/18
102/19
minute [5]   6/6 7/11
14/9 81/20 82/7
minutes [1]   81/22
missing [6]   48/15
50/6 50/16 50/19
51/7 104/20
missions [2]   28/12
44/24
MOHAMMAD [2]   1/23
5/6
mole [1]   56/20
moment [2]   26/7
37/11
Monroe [1]   1/24
Montana [2]   34/5
34/18
months [1]   37/24
moot [4]   49/25 50/1
50/2 55/8
mooted [1]   49/10
more [18]   12/19
25/13 34/20 43/8
45/8 58/16 59/16
63/3 67/10 68/17
71/5 81/21 93/6
93/10 106/12 110/17
110/18 111/4
MOSS [2]   1/10 76/4
most [11]   4/17
12/10 22/13 23/12
28/1 40/19 44/22
62/17 78/19 80/9
102/24

motion [17]   1/10
5/11 6/17 6/18 6/19
8/1 13/14 13/22
14/3 15/13 32/5
32/23 52/12 52/13
53/7 53/8 109/14
motions [2]   5/10
5/11
MOU [4]   45/6 96/20
108/24 109/10
movant [1]   3/6
movants [2]   1/23
5/6
move [4]   22/11 52/8
72/7 84/21
moved [2]   29/3 29/5
moving [1]   41/3
Mr. [26]   4/24 52/1
52/11 63/14 79/24
81/19 83/15 84/25
87/21 91/25 92/4
92/15 93/18 94/11
99/6 101/22 101/23
102/4 102/20 105/20
106/11 107/20
107/21 108/14 111/8
111/22
Mr. Coghlan [10]
52/1 52/11 63/14
79/24 81/19 83/15
91/25 107/21 111/8
111/22
Mr. Jazil [1]
101/22
Mr. Wood [13]   4/24
84/25 87/21 92/4
92/15 93/18 94/11
99/6 102/4 102/20
105/20 107/20
108/14
Mr. Wood's [2]
101/23 106/11
Ms. [26]   3/10 3/14
3/15 3/19 3/24 4/2
4/19 5/13 11/4
15/23 37/10 37/10
52/4 52/14 53/11
56/18 72/12 76/14
78/7 82/13 85/6
99/7 102/1 104/7
105/7 107/25
Ms. Finnegan [1]
4/19
Ms. Galloni [18]
3/15 3/24 5/13 11/4
15/23 37/10 52/4
52/14 53/11 56/18
72/12 82/13 85/6
99/7 102/1 104/7
105/7 107/25
Ms. Galloni's [2]
76/14 78/7
Ms. Malloy [1]   3/10
Ms. Reichert [4]
3/14 3/19 4/2 37/10
much [11]   8/13 43/8
57/20 66/2 66/17
78/21 81/21 91/6
104/7 106/1 107/24
mulling [1]   12/17

must [4]   16/21 74/1
100/18 104/22
myriad [1]   97/2
myself [3]   15/11
15/25 36/16

**N**

narrow [6]   14/8
61/10 62/5 62/22
63/5 73/6
narrowly [1]   112/23
nation [1]   61/13
National [2]   85/25
93/15
nature [2]   60/10
103/20
navigate [1]   39/12
NE [1]   1/21
necessarily [2]
14/22 99/17
necessary [2]   15/5
49/24
need [21]   6/4 11/24
14/24 20/24 25/18
29/19 33/6 42/5
47/23 49/20 50/15
72/4 73/2 74/24
79/24 81/22 81/24
88/15 97/1 97/21
100/13
needed [1]   25/16
needs [7]   10/11
28/20 32/24 38/23
44/7 62/25 70/14
nefarious [1]   66/19
NEPA [45]   28/14
43/4 50/23 74/9
93/20 93/24 94/3
94/5 94/6 94/6
94/13 94/13 94/20
102/2 102/3 102/4
102/7 102/8 102/10
102/11 102/14
102/16 102/17
102/18 102/19
102/22 102/25 103/1
103/7 103/9 103/14
103/18 103/21
103/21 104/3 104/4
104/9 105/2 105/13
105/14 105/24 106/2
106/14 106/19
107/11
NEPA's [1]   103/10
new [33]   10/18
10/23 11/1 11/1
11/1 11/2 11/2 11/2
11/3 17/23 20/21
21/4 21/13 21/18
24/1 24/11 41/18
46/5 58/19 59/11
59/21 59/22 61/25
66/18 70/20 70/22
70/25 71/4 71/6
91/11 98/3 108/17
108/21
next [2]   9/22 52/1
Nextel [1]   98/22
nine [16]   14/7 18/1
40/22 50/1 50/2

50/5 50/7 50/9
50/16 51/2 51/5
70/10 72/11 73/19
73/22 90/11
Ninth [1]   17/11
nodding [1]   51/9
non [13]   29/1 32/10
32/14 32/17 32/20
58/7 58/8 65/9 66/3
85/15 87/23 88/3
94/7
non-discretionary [2]
87/23 88/3
non-dispositive [1]
65/9
non-individual [1]
85/15
non-rulemaking [3]
58/7 58/8 66/3
nonaction [1]   16/7
nonconsideration [1]
84/1
none [1]   112/17
nonetheless [3]
16/2 22/17 23/14
nonrulemaking [2]
8/2 8/4
nor [1]   64/6
normally [1]   19/5
nose [1]   38/2
not in [1]   48/5
note [10]   32/9 52/5
53/20 58/9 60/14
73/4 73/18 90/1
103/12 115/7
noted [2]   64/9 65/1
notice [70]   7/2 8/7
8/13 8/23 9/9 10/24
16/3 18/7 21/1 21/3
27/12 27/16 41/9
41/12 42/1 42/18
43/9 44/5 44/13
44/21 44/22 45/10
45/18 46/5 46/11
46/21 47/25 48/4
48/7 48/17 49/11
49/13 49/22 50/20
51/13 51/18 55/17
55/18 64/1 64/15
65/24 67/16 67/20
68/14 68/23 69/14
69/20 70/6 71/4
71/9 72/4 73/20
75/3 75/6 76/14
79/19 80/1 80/2
80/7 80/8 80/13
80/14 80/16 80/19
80/22 81/1 81/2
81/6 90/6 110/15
notice on [1]   46/21
noticed [1]   8/19
notices [4]   64/17
90/5 90/5 91/5
noting [1]   86/18
notion [1]   59/17
notwithstanding [2]
16/6 66/9
November [1]   10/2
November 2020 [1]
10/2

**N**

novo [1]   101/8
NPDES [2]   90/14
91/9
NPRM [1]   81/7
null [2]   72/18 77/4
nullity [10]   42/24
43/1 43/7 43/11
43/16 43/17 74/3
74/12 76/8 76/10
number [3]   85/13
99/5 110/20
NW [2]   2/3 2/9

**O**

o'clock [1]   82/7
objections [1]
84/15
objective [1]   29/23
obligations [1]
102/25
observation [1]
54/16
observes [1]   52/15
observing [1]   39/20
obtain [1]   104/3
obvious [1]   108/8
obviously [2]   5/22
61/11
occurred [6]   20/10
33/7 33/8 73/7 84/3
115/7
October [1]   30/12
off [5]   4/4 24/4
56/7 56/10 85/8
office [8]   7/11
10/9 20/25 21/5
21/19 49/2 60/1
69/17
offices [3]   6/11
69/7 70/3
official [4]   2/8
76/7 76/11 115/3
officials [2]   97/11
98/7
often [2]   66/2
104/8
oil [1]   103/17
old [3]   76/5 76/7
76/11
on-ramps [1]   66/15
once [5]   52/21
67/18 87/19 102/11
108/8
one [58]   6/6 6/20
6/23 7/1 7/10 12/16
12/24 13/4 13/7
13/12 16/12 16/15
17/24 21/24 22/2
24/21 27/16 27/25
28/21 29/3 29/4
29/6 29/12 33/8
35/9 36/14 38/7
38/8 38/19 40/21
41/12 42/8 46/7
46/21 47/12 49/12
53/22 55/5 60/21
60/23 61/10 62/7
64/12 64/17 64/20

64/20 80/24 80/25
81/14 84/15 86/22
97/23 102/14 108/14
108/17 109/2 111/10
113/17
one is [1]   41/12
ones [5]   16/4 16/14
18/1 99/15 103/1
ongoing [2]   20/10
28/19
only [20]   3/12 7/8
8/16 11/16 11/25
14/18 16/13 19/25
33/21 35/16 43/24
61/13 62/6 73/18
73/24 89/20 94/14
99/1 103/2 113/11
open [1]   100/6
operate [1]   41/23
operation [3]   16/17
20/17 25/9
opinion [15]   45/6
45/9 45/12 47/14
51/14 51/15 51/16
52/19 88/16 88/19
91/8 95/20 106/19
106/20 110/7
opportunities [1]
20/19
opportunity [23]
14/14 17/6 19/11
34/1 34/16 39/1
53/14 57/21 57/24
57/24 58/2 67/16
67/20 67/24 68/23
82/3 82/5 86/14
88/9 93/16 100/15
101/14 109/2
opposed [1]   12/21
opposite [1]   109/24
opposition [1]   7/25
option [1]   89/10
oral [2]   9/11 9/19
order [31]   10/5
10/15 14/14 14/16
14/23 18/7 26/25
27/20 28/2 29/14
42/16 47/9 47/10
49/14 49/16 57/13
57/17 58/15 60/7
65/6 68/14 74/20
75/23 84/11 99/21
101/14 110/5 112/5
112/11 112/15
112/17
orders [2]   65/3
66/17
organizational [2]
21/14 105/22
other analogies [1]
60/24
others [4]   36/16
51/23 113/8 113/9
otherwise [5]   11/21
11/23 32/17 58/18
100/13
ought [3]   37/5
53/14 70/16
out [48]   5/25 6/2
6/2 8/18 16/1 16/1

17/10 23/10 25/6
25/7 27/12 30/11
35/9 36/18 36/20
44/6 45/11 48/20
49/23 58/4 60/1
60/22 61/16 69/10
72/12 73/15 76/4
77/25 78/1 78/12
78/19 82/2 85/12
93/23 96/5 102/13
105/2 106/21 106/22
107/17 109/12
109/15 110/11
111/13 112/5 113/3
113/9 113/21
outcome [1]   17/2
outset [1]   79/16
outside [1]   73/10
over [24]   6/7 10/16
12/17 21/3 23/22
25/9 31/21 38/14
48/21 54/25 55/4
58/8 63/12 85/8
85/9 85/15 86/6
97/24 107/22 109/4
109/23 109/25
110/21 112/19
over my [1]   54/25
overlay [2]   86/12
96/4
overseen [1]   96/18
oversight [3]   93/14
96/25 109/11
own [9]   21/14 21/15
54/8 54/9 94/22
94/23 95/22 102/17
102/22

**P**

p.m [4]   1/7 82/10
82/11 114/3
page [1]   97/23
pages [1]   90/11
pandemic [1]   115/8
papers [1]   32/3
paragraph [4]   9/19
9/23 13/4 13/7
part [19]   39/16
39/17 42/11 42/13
44/22 45/17 45/18
45/24 46/8 47/15
49/5 53/23 56/12
71/16 87/1 95/19
104/18 106/19
107/14
partial [4]   6/18
29/4 29/5 29/16
partially [1]   76/1
participate [1]
11/18
participating [1]
81/13
particular [4]
10/22 42/14 61/22
99/19
particularly [2]
43/12 102/2
parties [10]   3/4
11/16 21/18 21/22
23/6 24/5 34/11

36/20 61/4 108/2
parties' [1]   13/5
party [5]   21/23
34/17 36/7 36/8
62/2
passed [1]   15/3
past [6]   12/14 20/8
21/9 59/8 64/23
112/10
path [2]   73/6 81/5
pattern [1]   66/14
pause [4]   7/17
21/15 23/23 60/19
pendency [1]   26/15
pending [18]   18/10
19/6 21/2 22/3
24/24 25/23 26/20
27/8 29/19 29/24
30/5 33/2 35/10
35/12 40/5 56/7
56/13 56/24
people [6]   21/18
23/20 35/18 59/6
61/21 72/1
perfectly [1]   41/9
performing [1]
111/14
perhaps [9]   29/17
55/4 57/1 59/25
63/20 67/16 79/18
80/6 81/9
period [15]   33/7
33/9 33/11 36/2
50/18 73/7 73/10
73/15 82/25 83/2
83/22 83/24 84/3
99/18 99/20
periodically [1]
43/24
periods [1]   23/5
permit [31]   11/18
11/23 23/3 23/3
23/4 23/9 59/10
61/22 61/24 69/8
85/8 85/16 85/22
86/4 86/4 86/6
86/15 86/15 93/11
93/14 93/14 97/13
101/8 101/9 101/10
103/11 103/17
108/23 109/4 109/7
112/9
permit-by-permit [3]
86/4 86/15 93/14
permits [27]   23/20
23/21 23/23 23/24
25/10 30/9 73/15
76/19 84/22 84/23
85/13 85/13 85/16
85/20 87/7 100/22
102/9 102/13 103/13
104/8 104/10 108/25
110/8 110/20 110/21
110/21 111/1
permitting [6]
22/16 22/25 86/3
86/11 86/12 94/24
person [2]   3/12
69/16
perspective [2]

**P**

perspective... [2]  54/4 87/13
perspectives [1]  53/10
persuaded [1]  59/3
persuasive [1]  28/1
PETA [1]  105/21
petition [33]  14/16 14/17 14/19 14/24 14/25 17/11 18/10 18/11 18/12 19/11 20/20 25/2 25/23 26/17 27/7 28/25 31/1 31/3 31/4 31/5 31/10 31/16 32/8 32/13 32/19 33/1 33/1 33/12 34/10 35/3 39/6 89/4 89/14
petitioned [2]  18/14 18/15
petitioning [2]  18/18 18/19
picked [1]  111/20
picking [2]  50/16 50/17
picks [1]  69/6
picture [1]  78/16
piece [1]  48/15
place [10]  7/4 11/21 12/1 23/14 23/16 30/8 43/14 60/8 86/11 94/8
plaintiff [4]  3/5 20/14 77/2 93/25
plaintiffs [51]  1/4 1/13 3/8 3/9 3/11 3/17 3/22 25/15 28/11 28/12 28/19 30/6 31/19 34/1 38/4 41/6 41/19 41/23 45/19 52/7 57/5 57/7 57/24 60/25 61/15 66/5 67/24 77/7 81/12 84/15 86/16 86/17 87/1 87/25 94/12 95/1 96/2 97/7 97/18 97/20 100/9 100/14 100/19 101/18 103/13 104/2 104/22 105/11 105/23 108/6 110/24
plaintiffs' [6]  40/3 65/2 73/20 84/6 86/19 98/15
planning [1]  69/15
please [2]  3/4 115/7
plenty [2]  42/7 93/22
PLLC [1]  1/24
plus [1]  73/16
pocket [1]  78/4
point [73]  8/7 8/24 14/4 14/8 15/14 17/10 17/21 19/1 19/10 22/8 23/2

25/6 28/21 30/11 32/4 35/9 36/10 36/23 38/22 40/15 42/1 42/18 43/6 44/12 44/25 45/22 46/24 46/25 47/9 49/5 50/20 52/4 54/12 56/17 57/1 60/24 64/7 65/4 65/23 65/23 67/7 68/5 68/8 69/24 70/12 71/2 72/17 73/4 73/18 76/10 78/13 78/16 80/1 81/4 88/1 89/2 90/4 94/12 96/5 97/6 99/24 102/2 102/3 102/21 103/2 106/11 107/5 109/15 110/13 111/10 111/12 111/25 112/25
pointed [4]  60/25 61/1 75/4 102/13
pointing [1]  90/21
pointless [2]  37/2 54/20
points [5]  52/3 59/16 82/2 108/11 109/13
poles [2]  78/22 79/1
pollutants [1]  61/7
portal [2]  9/2 9/14
portion [1]  46/6
position [17]  11/7 13/10 26/25 27/19 32/2 33/4 42/22 47/2 57/12 63/20 64/5 66/23 67/3 68/3 68/25 89/19 89/23
possibility [3]  40/21 66/13 94/1
possible [1]  24/22
post [1]  80/1
posted [2]  44/14 49/3
postpone [4]  18/14 24/23 34/13 39/7
postures [1]  33/13
potential [1]  88/14
potentially [2]  32/9 55/8
power [6]  52/20 52/22 53/1 109/21 109/22 109/23
practicable [1]  62/17
practical [2]  12/14 23/19
practice [2]  12/14 64/23
pre [2]  46/19 49/3
pre-prepublication [1]  49/3
pre-published [1]  46/19
preamble [2]  46/7 79/16
precise [1]  79/2

predefined [1]  62/23
predicate [1]  15/1
predicted [1]  25/7
preference [4]  5/21 32/4 32/6 32/22
preliminary [2]  52/12 53/7
prepare [1]  10/10
prepared [2]  25/13 25/13
prepublication [16]  21/1 21/3 44/5 44/13 45/18 46/11 47/25 48/4 48/17 48/20 49/3 49/11 49/13 49/22 71/9 75/6
presence [1]  59/5
presented [1]  54/23
president [2]  77/25 78/3
presupposes [2]  35/10 35/15
pretty [8]  31/12 37/19 39/21 54/15 70/8 73/5 78/21 91/6
previously [1]  71/24
primary [3]  93/2 101/17 109/22
principal [1]  29/23
principles [1]  35/2
prior [3]  43/23 55/23 64/12
prioritize [1]  106/3
private [5]  21/22 21/23 23/6 59/12 62/5
probably [3]  31/16 42/6 61/15
problem [8]  41/5 47/6 47/8 48/1 48/2 55/22 72/21 75/19
problems [2]  38/9 72/11
procedural [17]  19/8 24/10 33/25 40/4 43/5 50/12 72/17 72/19 75/14 75/15 75/17 76/1 77/10 77/13 104/5 104/14 105/4
procedurally [2]  29/8 29/20
procedure [3]  52/25 77/17 77/20
procedures [6]  39/20 61/23 61/24 77/6 77/23 100/24
proceed [13]  6/12 11/6 11/8 11/9 11/24 12/15 23/17 27/19 29/20 32/5 33/20 73/24 73/25
proceeding [4]  5/23 12/4 12/6 12/13
proceedings [3]

100/22 114/3 115/5
proceeds [1]  35/25
process [49]  10/7 11/19 16/21 22/25 31/7 31/11 31/12 45/2 45/4 45/8 45/13 51/16 56/3 59/19 60/5 61/21 62/21 63/15 63/17 64/5 66/12 68/11 68/13 79/12 79/21 80/14 80/15 80/20 81/11 81/13 85/18 85/21 86/2 86/3 86/24 88/18 89/15 90/3 90/19 95/21 96/23 101/13 103/21 106/19 106/21 107/15 111/12 111/14 111/18
processes [7]  11/2 28/11 30/7 50/23 80/17 85/11 87/8
product [2]  20/15 20/17
profound [1]  74/10
program [83]  6/23 7/7 8/15 9/15 10/5 10/16 13/3 17/12 18/4 18/13 20/18 23/24 25/8 25/14 26/1 30/18 31/8 31/18 41/15 45/17 45/19 45/24 46/9 46/22 47/15 48/14 49/17 50/3 50/24 51/1 57/12 61/1 62/19 62/20 64/21 69/3 69/20 71/1 71/16 72/2 72/2 72/14 72/15 72/16 72/24 72/25 75/8 85/7 86/9 86/10 87/4 87/6 89/6 90/1 90/7 90/7 90/12 90/14 91/10 92/13 92/19 92/20 93/11 94/4 94/24 95/17 95/17 95/19 96/3 97/9 98/2 98/8 98/14 98/16 100/9 102/11 108/15 108/20 108/21 110/4 110/11 110/25 111/15
program's [2]  16/23 74/23
programmatic [2]  87/9 110/6
programming [1]  63/12
programs [17]  12/9 12/10 60/22 63/6 70/25 74/21 87/18 92/2 93/1 93/2 94/21 112/16 113/3 113/12 113/13 113/17 113/21
project [2]  23/9 103/18

**P**

projects [5]   85/14
86/19 104/6 105/10
105/12
prolonged [1]   31/12
promulgate [1]
40/23
promulgated [1]
43/10
promulgates [1]
19/18
proof [1]   64/7
proper [1]   35/13
properly [4]   31/15
43/10 105/9 111/14
proposed [7]   47/20
48/24 48/25 49/3
79/19 81/6 106/4
protect [4]   28/13
28/13 45/20 96/21
protected [2]   44/24
95/25
protection [6]
94/23 96/13 96/15
97/5 97/6 97/7
protections [1]
30/7
provide [10]   17/5
20/1 20/2 55/17
68/22 74/21 107/19
108/2 108/3 112/13
provided [6]   14/14
92/10 104/24 105/1
107/10 109/9
provides [5]   18/9
80/14 86/10 100/24
107/7
providing [2]   67/20
105/15
provision [3]   19/1
52/6 99/19
provisions [4]
48/14 99/19 101/7
107/4
Prowes [15]   19/22
19/23 20/3 20/6
20/7 20/12 21/8
33/6 39/10 39/14
43/8 82/22 83/20
84/2 84/9
public [16]   7/2 7/4
27/25 28/4 38/25
39/1 41/9 54/5 54/9
72/4 98/23 105/15
105/17 106/4 110/16
110/23
publication [6]
14/10 55/15 55/19
55/19 68/9 69/22
publish [5]   40/1
49/11 49/22 50/10
51/4
published [16]   10/4
21/2 21/5 27/13
46/17 46/18 46/19
47/17 47/21 49/7
51/6 64/16 69/19
70/3 71/9 72/3
publishing [4]   44/2

44/5 44/9 91/16
pull [1]   9/18
purpose [3]   30/1
38/25 105/15
purposes [10]   21/14
21/14 21/15 28/7
41/8 41/8 73/9
74/23 108/5 108/7
pursuant [2]   79/21
103/4
push [1]   80/11
put [15]   10/11
21/15 23/1 23/24
25/24 27/16 45/11
50/8 66/10 67/11
69/10 76/13 94/8
107/9 108/9
puts [1]   112/3

**Q**

quality [1]   103/6
quasi [1]   62/16
quibble [1]   80/21
quick [1]   31/11
quickie [1]   30/8
quickly [1]   38/22
quite [9]   8/21
32/12 32/12 47/3
55/3 59/17 65/11
108/8 109/11
quo [2]   36/2 69/18
quote [2]   90/12
97/1

**R**

raise [15]   14/22
27/21 31/17 35/6
72/8 74/5 74/15
76/21 76/21 76/24
78/11 97/11 99/24
100/12 103/14
raised [12]   14/2
14/7 24/10 25/12
68/5 68/8 86/5 88/1
92/9 95/1 97/16
100/9
raises [1]   111/2
raising [6]   14/4
31/13 31/14 34/20
37/17 76/13
ramps [1]   66/15
ran [1]   99/9
RANDOLPH [1]   1/10
range [1]   113/21
rather [4]   5/22
60/11 71/12 79/12
ratifies [1]   91/14
rationale [1]
112/14
reach [3]   32/7
73/10 99/10
reached [1]   22/23
read [4]   34/18
38/24 39/6 45/8
reading [1]   9/17
reads [1]   70/1
ready [3]   6/7 6/11
84/21
realize [1]   110/17
really [21]   17/4

21/21 38/22 43/5
51/15 53/23 53/24
60/11 61/2 61/3
64/11 65/3 67/9
72/21 74/8 75/6
75/9 77/1 86/7 91/2
109/25
reason [14]   6/10
14/4 25/25 34/21
37/8 56/2 56/12
56/17 70/15 73/24
78/10 88/12 94/15
109/7
reasonable [2]   94/1
97/20
reasoning [1]   52/25
reasons [5]   7/1
25/6 46/6 64/9 74/6
receipt [1]   13/2
receive [1]   85/23
received [2]   85/9
95/20
receives [1]   85/22
recent [2]   37/23
38/16
Recess [1]   82/10
recognize [3]   26/18
82/16 94/22
recognized [3]
30/14 80/15 112/5
recommends [1]   9/10
reconsider [3]
13/22 17/7 29/25
reconsideration [37]
13/14 14/12 14/17
14/20 14/24 15/10
18/11 18/16 18/18
19/12 20/20 22/4
24/14 25/21 25/22
26/11 26/12 26/16
27/5 27/7 28/22
28/25 29/15 30/4
32/8 32/14 32/17
33/1 33/10 34/10
34/21 35/4 40/17
83/8 83/12 84/6
84/12
record [9]   3/4
64/10 64/11 82/11
85/7 97/24 107/1
107/9 112/12
Records [1]   42/20
recourse [1]   54/13
recurring [1]   11/19
redressable [1]
74/19
reduce [1]   96/12
refer [2]   12/18
45/17
reference [4]   9/23
47/11 64/13 71/15
referred [3]   64/24
86/19 91/11
referring [4]   9/3
13/8 13/9 80/8
refers [2]   8/22
80/7
reflect [2]   41/18
110/22
Regan [1]   5/12

regard [5]   90/7
92/9 92/25 100/4
103/8
regarded [1]   63/15
regarding [1]   61/7
regime [14]   10/18
10/22 11/1 11/3
11/17 30/10 30/20
41/19 41/24 41/24
42/25 43/3 59/7
70/1
Register [25]   10/9
20/25 42/21 43/23
44/4 44/8 45/25
46/19 46/20 47/17
47/22 47/25 49/2
49/23 50/10 55/20
58/12 64/17 65/24
68/10 68/12 69/14
69/16 69/21 80/4
Register's [1]   49/2
regs [2]   79/21
80/14
regulated [1]   24/5
regulating [2]
35/25 36/1
regulation [11]
11/9 12/22 36/10
36/12 36/14 36/19
42/3 42/22 56/6
60/7 97/8
regulations [41]
10/12 10/19 10/20
11/2 12/1 19/20
41/1 41/17 42/15
42/16 43/14 43/16
43/18 44/8 46/8
46/9 50/21 50/22
55/12 55/16 59/8
61/20 61/22 61/23
61/25 69/8 69/11
69/25 70/7 70/14
70/21 71/2 71/13
71/23 91/14 91/22
98/3 98/4 108/17
110/15 112/1
regulations.gov [1]
58/7
regulatory [7]
30/20 59/7 62/8
62/24 64/5 99/3
100/19
REICHERT [5]   1/14
3/14 3/19 4/2 37/10
reinforces [3]   90/3
101/16 103/19
related [1]   12/17
relates [1]   47/4
relationship [1]
95/4
relevant [2]   65/6
98/6
relied [4]   21/24
28/12 52/21 105/23
relief [19]   22/15
26/8 31/22 32/9
33/17 33/18 35/1
35/3 35/14 35/19
40/9 54/14 57/23
73/21 74/19 74/21

**R**

relief... [3]   82/25
83/20 93/9
relies [1]   105/20
reluctant [1]   56/13
rely [2]   39/12
110/24
relying [6]   14/3
21/25 22/1 58/13
106/1 106/2
remains [2]   25/1
25/19
remand [1]   22/17
remedial [1]   84/2
remedy [18]   19/10
19/14 19/16 20/1
20/11 21/10 22/2
22/7 22/8 22/10
25/4 25/18 28/20
31/15 48/17 48/19
57/19 57/21
remotely [2]   115/5
115/9
remove [2]   86/12
86/13
render [5]   32/10
32/14 32/17 32/19
98/19
renders [1]   72/18
reopen [1]   6/5
reopened [1]   32/18
reported [1]   115/5
reporter [5]   2/7
2/8 81/20 92/17
115/3
reporting [1]   115/9
representing [2]
3/11 3/17
request [25]   14/19
14/20 14/25 15/8
24/13 24/13 25/5
26/10 26/12 26/20
27/1 57/11 58/2
80/2 82/14 82/17
83/2 83/7 83/8 83/9
83/18 83/21 84/1
84/11 98/15
requested [1]   26/15
requesting [3]   36/7
74/20 93/9
requests [1]   35/17
require [8]   40/23
42/3 55/12 55/17
103/15 104/4 104/25
110/15
required [9]   11/8
11/9 39/20 55/11
77/6 97/8 106/20
109/4 110/24
requirement [10]
19/25 42/20 64/14
65/4 68/16 70/15
88/22 89/13 89/14
93/5
requirements [9]
66/9 68/9 77/10
86/13 91/14 95/21
96/16 96/24 97/10
requires [11]   11/20

34/12 42/4 80/13
81/16 92/25 95/18
103/16 103/16
104/23 110/14
resolution [1]
59/13
resolve [4]   26/4
30/9 36/2 56/23
resolved [3]   26/4
84/17 84/19
resolves [1]   47/5
resource [2]   94/24
96/13
resources [2]   96/21
97/8
respect [24]   14/6
14/10 14/12 15/7
19/9 20/1 21/22
23/6 27/23 32/5
33/5 34/23 52/5
53/4 54/9 54/21
63/19 70/23 73/20
73/21 83/7 84/5
84/18 102/21
respected [2]   22/6
40/3
respects [1]   56/23
respond [3]   60/9
82/4 85/1
responding [1]   52/3
response [6]   13/10
27/1 51/24 65/1
94/15 102/1
responsibility [3]
42/23 61/20 93/2
rest [5]   18/4 29/18
32/6 95/9 106/8
restore [1]   24/23
restored [3]   30/6
30/9 31/23
restores [1]   39/24
result [8]   16/7
41/7 42/19 43/11
74/22 75/11 104/8
111/17
resulted [2]   32/24
75/21
retain [1]   38/14
retained [4]   96/19
109/18 109/20
109/23
retains [2]   93/14
97/14
reversal [1]   112/7
reversing [1]
112/14
review [31]   16/5
16/19 17/12 18/10
19/6 22/4 24/24
25/24 26/20 27/9
28/14 29/24 30/5
33/2 35/10 35/12
40/5 43/4 54/1 98/5
99/23 101/15 102/10
102/14 102/16 104/3
104/4 104/9 104/18
105/13 109/10
reviewable [3]
15/22 58/3 99/2
reviewed [1]   16/16

reviewing [1]   103/7
right [89]   6/1 12/3
13/1 13/20 14/1
16/12 17/3 17/8
18/25 18/25 19/2
19/8 22/1 22/3 22/4
22/11 24/8 24/21
29/8 29/14 29/20
30/3 31/6 32/8
32/25 33/9 33/11
33/18 33/24 34/1
34/14 34/17 34/24
35/8 35/16 35/19
35/21 38/4 39/6
39/9 39/22 40/6
41/13 41/13 41/13
41/16 41/20 41/23
43/1 43/12 43/16
44/1 44/14 44/21
44/24 45/25 47/7
48/10 48/18 49/9
51/3 51/12 53/17
55/21 74/4 74/13
75/14 75/15 75/17
76/22 82/2 82/14
82/23 82/24 83/14
83/22 84/10 87/8
93/18 94/19 95/6
97/14 101/21 102/6
102/6 106/22 107/8
109/3 113/12
rights [15]   21/12
21/18 21/21 22/3
22/6 22/20 24/23
27/18 29/6 30/6
34/11 35/2 38/24
40/3 80/16
rigorous [1]   107/13
rises [1]   73/17
risk [3]   27/24 67/9
100/18
risks [1]   27/18
robust [1]   94/22
role [2]   62/21
96/12
roles [2]   96/22
113/5
roll [1]   25/7
Ron [1]   59/23
Room [1]   2/9
roughly [1]   101/5
route [1]   17/9
routinely [1]
100/21
rule [104]   10/6
11/24 11/25 12/1
12/2 12/2 16/2 17/7
18/9 19/18 19/19
19/24 20/4 21/5
23/14 23/15 24/22
24/24 24/24 24/25
25/3 25/18 26/7
26/18 26/21 26/23
26/24 27/15 28/2
28/7 29/13 29/14
30/15 30/18 30/21
32/24 35/11 38/2
39/3 39/4 39/11
39/11 39/13 39/15
39/18 39/22 40/2

40/9 40/11 40/22
41/7 42/9 42/11
42/13 43/11 44/19
49/25 50/8 52/15
52/16 52/21 52/22
52/22 56/4 57/5
58/14 58/21 59/2
59/11 59/15 59/17
59/20 60/3 64/20
65/6 65/10 65/13
66/1 66/7 66/11
68/15 73/8 73/11
76/4 76/5 76/6 76/8
76/10 77/23 79/5
79/23 81/7 81/10
82/16 83/1 83/9
83/11 84/8 89/2
89/25 90/18 99/21
112/9 112/13
ruled [1]   99/4
rulemaking [82]
6/22 6/24 6/25 7/3
7/5 7/22 7/23 8/8
8/14 8/14 8/14 8/14
8/21 8/23 9/5 9/11
9/13 9/24 11/6 11/8
11/9 11/14 11/24
12/15 12/15 14/15
22/19 26/15 27/14
32/23 34/25 43/9
52/23 54/15 57/17
58/7 58/8 58/11
60/10 60/15 61/11
63/3 63/25 64/2
64/19 65/22 66/3
67/2 67/9 67/13
67/17 67/19 67/19
67/21 67/23 68/1
68/11 68/11 68/14
68/19 68/22 73/25
74/1 79/14 79/19
80/2 80/8 80/10
80/20 81/2 81/5
81/6 81/16 87/12
89/4 89/14 89/15
89/21 91/3 91/13
110/19 112/19
rulemakings [6]
63/23 66/15 66/25
79/3 80/4 80/17
rules [23]   7/8 8/16
11/1 11/21 16/1
28/4 42/5 42/7
42/15 44/2 58/25
59/11 62/1 62/8
64/24 65/3 66/17
70/1 70/13 70/16
70/17 74/8 93/20
ruling [1]   32/22
run [7]   13/2 13/11
73/12 92/14 92/24
94/21 97/9
running [2]   69/4
75/4
runs [1]   101/13

**S**

sake [1]   92/16
same [32]   8/11 8/17
25/23 27/14 33/16

**S**

same... [27]  40/24
44/16 46/13 53/10
53/22 53/23 54/3
69/12 83/9 83/16
84/7 90/17 90/19
90/20 90/25 91/15
91/17 91/18 93/21
106/12 106/15
107/10 107/11
107/15 107/21
110/23 113/19
San [1]  2/6
satisfy [1]  63/11
satisfying [1]
94/15
saw [1]  34/19
say that [1]  79/10
saying [36]  13/7
21/8 22/14 31/6
38/18 39/15 39/21
41/22 45/22 47/22
47/24 48/7 48/16
48/17 49/24 50/6
50/14 51/6 51/21
53/11 59/8 61/23
62/15 67/17 68/18
70/3 70/17 71/6
76/16 76/20 77/24
78/2 90/18 90/25
94/11 94/13
scale [1]  87/9
scenario [3]  15/17
16/18 24/3
scientists [1]  61/9
scope [2]  52/24
112/4
scrivener's [1]
13/6
second [14]  9/20
17/21 21/19 23/1
39/17 41/12 59/20
60/20 65/23 67/11
79/25 84/4 84/5
89/18
secretary [1]  99/4
section [23]  9/9
9/12 9/16 9/18
18/19 28/15 33/24
45/3 52/5 53/21
62/18 64/13 64/15
85/21 87/17 88/14
88/20 88/23 94/6
95/16 102/9 107/16
112/9
seek [15]  19/10
19/11 19/13 22/3
22/4 27/5 29/15
29/24 33/9 33/18
34/1 35/19 54/13
57/5 84/6
seeking [3]  31/22
40/9 73/21
seem [3]  63/3 66/3
74/14
seems [8]  12/11
18/17 34/14 55/7
60/3 66/22 67/9
78/9

send [3]  6/7 20/25
40/6
sense [5]  37/2 44/3
59/12 83/5 109/10
sent [2]  27/13 49/1
sentence [1]  9/20
separate [5]  38/15
50/13 88/16 97/16
98/1
September [3]  7/2
9/9 10/1
September 16th [1]
9/9
September 2020 [2]
7/2 10/1
serious [1]  72/11
serve [1]  28/12
Service [6]  85/24
86/1 88/10 95/16
95/20 96/22
Services [1]  93/15
sessions [1]  9/13
set [10]  19/16
40/11 43/13 43/15
46/6 50/21 59/11
61/25 85/21 98/5
sets [2]  16/5 69/25
seven [2]  61/15
86/19
Seventh [1]  58/22
several [2]  80/3
80/18
shaking [1]  91/25
shall [3]  40/13
88/4 103/4
short [1]  66/19
shot [1]  40/4
show [7]  70/2 75/11
75/16 75/16 85/12
87/3 104/22
showing [4]  35/14
36/7 44/4 101/3
shows [4]  43/23
66/14 69/6 97/24
side [2]  107/20
107/20
side-by-side [1]
107/20
signal [6]  22/12
22/14 22/23 23/13
24/2 92/9
signaled [1]  112/12
signed [5]  48/24
76/5 76/10 77/25
78/3
significant [2]
38/9 104/6
significantly [2]
102/23 103/5
signs [1]  76/7
simply [18]  11/10
15/15 27/19 32/4
40/10 40/18 49/6
50/5 50/9 61/17
63/18 65/15 71/5
90/5 91/13 93/19
106/16 108/14
single [1]  91/7
Sioux [3]  96/6
109/16 109/20

sit [1]  32/16
sitting [3]  44/6
48/20 62/15
situation [7]  69/13
69/18 70/9 75/10
76/2 77/1 91/16
situations [1]
15/16
six [1]  97/23
skis [1]  55/4
slate [1]  86/10
sleeping [1]  56/23
slow [2]  21/19
92/16
solve [1]  47/7
somebody [5]  35/11
35/13 41/17 71/21
95/7
somebody's [1]
35/15
somehow [3]  100/17
103/20 112/6
someone [14]  5/24
11/22 23/8 35/17
47/19 59/10 59/18
60/1 64/1 69/5 70/1
78/1 78/2 78/5
something's [1]
43/22
sometime [1]  85/1
somewhat [7]  14/2
18/17 51/21 56/19
60/20 76/16 79/5
somewhere [1]  78/22
son [1]  76/5
soon [1]  114/2
sorry [16]  22/9
27/4 29/1 37/12
38/22 39/17 52/11
60/19 62/10 68/6
68/7 72/6 84/4
89/18 92/15 104/12
sort [19]  12/16
24/6 57/10 58/5
58/13 60/10 62/15
64/7 66/18 72/1
72/22 75/9 78/18
78/25 79/16 81/12
86/1 89/15 93/12
sorting [1]  24/20
sorts [1]  107/14
sought [1]  27/8
sounds [3]  8/11
17/22 104/16
source [2]  61/6
71/25
sources [2]  62/14
102/15
South [1]  96/11
speaking [3]  3/21
4/15 58/21
speaks [2]  68/4
68/7
species [20]  4/19
28/16 44/23 45/2
45/13 45/20 46/23
47/14 48/4 74/10
88/2 88/7 88/9
88/14 88/20 95/19
95/23 95/25 106/15

107/16
specific [10]  46/24
60/16 60/17 61/3
61/4 61/7 73/1
77/20 99/24 107/4
specifically [4]
9/5 36/5 90/8 90/23
speculation [1]
86/25
speculative [1]
103/20
spent [1]  73/14
Sprint [1]  98/22
Sprint-Nextel [1]
98/22
staff [1]  59/24
staffing [2]  25/12
98/9
stage [1]  97/21
stakes [1]  78/17
stand [1]  5/14
standalone [1]
13/23
standard [9]  13/24
17/14 18/20 18/21
18/24 31/10 36/5
36/8 53/20
standards [3]  53/9
67/6 100/24
standing [50]  14/5
14/6 14/9 14/13
14/15 14/22 34/23
35/1 72/9 72/11
72/24 73/4 73/6
73/9 73/13 73/17
73/18 74/5 74/7
74/15 74/17 74/24
75/10 75/15 76/9
76/12 76/21 76/24
77/9 77/12 77/13
78/5 78/9 78/10
82/23 86/7 86/20
87/10 92/20 93/24
97/3 97/3 97/15
100/21 101/1 101/5
105/4 108/5 108/7
109/15
start [13]  5/13
5/18 6/7 6/15 6/17
6/20 13/11 13/16
23/18 52/3 81/11
85/4 85/8
started [1]  15/12
starters [1]  15/22
starting [2]  3/5
15/14
starts [3]  9/19
13/2 78/1
state [97]  10/17
10/18 10/23 10/25
12/10 12/18 12/23
13/3 13/10 14/2
14/19 16/22 17/12
18/3 20/18 22/17
25/1 28/3 31/8
31/14 31/19 33/15
35/10 38/10 38/15
45/3 45/17 45/19
45/24 46/8 46/22
47/15 48/5 54/12

**S**

state... **[63]**   55/24
56/15 59/5 61/18
61/19 62/3 62/6
62/20 63/12 70/19
79/16 84/21 84/21
86/24 87/13 87/14
87/15 89/4 90/7
90/14 91/9 91/14
91/15 91/22 92/21
92/22 92/22 93/12
94/18 94/21 94/25
95/4 95/23 95/25
96/9 96/11 96/20
96/23 98/3 98/7
101/15 102/11
102/12 102/13
102/19 103/11
103/25 105/1 105/10
106/13 106/22
107/15 108/14
108/25 109/2 109/4
109/17 110/16
110/22 110/23
110/25 111/2 111/14
**state's [1]**   84/16
**state-federal [1]**
96/20
**state-led [1]**   93/12
**stated [1]**   74/7
**statement [1]**   71/18
**statements [1]**   13/3
**states [18]**   1/1
1/11 10/21 12/22
13/17 30/14 30/14
31/25 62/7 63/21
93/1 93/2 93/4 93/6
94/25 95/7 109/9
113/5
**States' [1]**   89/23
**statistics [2]**   85/6
92/10
**status [7]**   26/11
30/24 36/2 57/6
69/18 92/12 100/19
**statute [31]**   11/7
11/13 12/12 12/20
12/21 12/25 17/2
32/15 32/15 42/2
42/21 42/21 80/7
80/13 89/4 89/5
89/7 89/8 89/19
93/1 93/8 94/8
94/13 95/15 98/12
98/13 104/23 104/25
105/6 106/17 106/17
**statutes [9]**   79/22
87/14 96/16 98/3
98/4 99/16 100/24
103/23 108/17
**statutory [3]**   62/24
86/13 97/2
**stay [55]**   4/1 18/10
18/19 19/24 20/19
22/3 24/13 25/2
25/5 25/19 25/23
26/20 26/22 26/23
27/8 29/24 30/5
33/1 34/2 35/16

35/17 35/17 35/24
36/7 36/9 36/21
37/2 37/5 37/8 38/5
38/23 40/4 40/16
52/5 52/8 52/9
52/10 52/14 52/20
53/8 53/15 53/25
54/22 57/5 57/11
57/13 57/25 82/14
82/17 83/4 83/18
83/20 84/1 92/12
101/10
**stay that [1]**   52/10
**stayed [2]**   21/6
35/12
**staying [1]**   37/4
**stays [2]**   36/6 52/7
**step [1]**   86/14
**steps [2]**   20/23
21/4
**sticking [1]**   37/6
**still [15]**   5/15
16/16 19/2 21/2
21/10 25/1 25/21
33/3 43/22 55/21
69/3 69/16 75/15
84/17 106/15
**stop [2]**   18/12
111/3
**strange [3]**   6/11
8/18 55/7
**Street [4]**   1/21
1/24 2/3 2/5
**stress [2]**   111/25
112/18
**strike [3]**   22/22
22/24 49/19
**strikes [1]**   68/17
**stringent [2]**   17/14
97/10
**strong [1]**   85/8
**stuck [1]**   51/17
**study [1]**   107/13
**subject [7]**   36/22
54/1 78/4 96/15
99/23 102/10 115/8
**submission [6]**
10/11 13/12 16/10
84/16 90/14 91/10
**submit [3]**   9/10
87/15 89/5
**submitted [6]**   13/3
62/19 65/5 89/3
98/2 112/2
**subpart [1]**   91/22
**subsection [1]**   13/4
**substance [1]**   18/4
**substantial [3]**
100/18 101/1 101/2
**substantive [5]**
72/25 75/18 75/24
77/2 77/12
**substantively [1]**
53/8
**success [1]**   19/6
**sudden [1]**   23/9
**sue [1]**   71/21
**suffer [1]**   75/3
**suffered [3]**   74/22
75/7 75/11

**suffering [2]**   31/20
75/1
**sufficient [6]**
13/15 18/8 46/15
46/17 93/24 101/3
**suggest [1]**   56/15
**suggested [3]**   35/7
91/8 100/14
**suggesting [1]**
23/15
**suggestion [1]**
112/6
**suit [1]**   28/23
**Suite [3]**   1/15 1/24
2/5
**summary [4]**   6/18
18/2 29/4 29/5
**superficial [2]**
58/14 58/17
**supplement [1]**
107/4
**supplemental [1]**
65/2
**support [3]**   90/24
90/24 97/13
**supported [1]**   97/22
**supports [1]**   71/8
**suppose [6]**   11/12
17/4 23/11 30/23
30/25 76/13
**supposed [4]**   24/6
45/13 45/23 47/15
**Supreme [5]**   80/6
95/6 95/12 101/2
110/9
**sure [34]**   6/21 9/8
14/21 17/8 24/5
27/5 29/22 32/1
32/12 32/18 36/18
36/20 46/11 47/3
49/20 52/11 52/13
53/3 53/4 53/8 54/2
59/11 68/4 68/7
77/11 79/4 79/15
95/25 97/9 103/13
104/13 105/16 111/4
113/20
**surmise [2]**   54/14
97/18
**surprised [2]**   8/10
43/20
**suspect [1]**   42/6
**sustained [4]**   41/6
43/3 82/25 83/23
**sustaining [1]**   43/5
**swaths [1]**   28/4
**switch [3]**   6/13
24/4 24/18
**sword [1]**   90/22
**system [4]**   62/17
62/17 108/17 108/22

**T**

**takeaway [1]**   56/1
**takeaway from [1]**
56/1
**talk [2]**   14/8 72/9
**talking [7]**   4/18
9/16 24/3 29/18
90/16 104/8 107/2

**talks [1]**   35/15
**Tallahassee [4]**
1/18 1/25 6/11
92/21
**TANIA [3]**   1/13 3/17
3/23
**tape [1]**   110/8
**teaches [1]**   33/6
**teased [1]**   72/12
**technical [9]**   3/18
5/14 45/1 45/4 45/8
45/12 51/16 88/18
100/3
**technological [1]**
115/9
**telling [4]**   29/16
45/15 47/19 49/8
**tells [2]**   44/6
47/13
**tend [2]**   99/16
105/12
**terms [7]**   12/13
37/24 38/3 57/19
73/1 102/22 103/10
**terribly [2]**   59/3
94/15
**test [1]**   101/1
**Thanks [1]**   7/13
**that if [1]**   35/20
**thereafter [2]**   57/1
101/14
**therefore [17]**
13/16 16/19 42/24
43/2 43/10 50/11
56/4 56/6 73/25
74/3 76/8 77/8 78/4
83/19 84/9 91/16
115/8
**thinking [9]**   14/5
15/4 33/14 51/10
60/21 75/25 76/2
82/21 113/9
**third [3]**   11/16
21/18 34/11
**though [20]**   16/16
21/11 25/20 42/6
43/7 51/19 55/3
58/17 62/5 63/22
65/13 65/17 70/11
70/12 73/21 78/10
90/16 93/18 105/19
106/14
**thought [7]**   8/18
15/3 29/11 38/18
39/17 55/12 63/24
**threatened [4]**
44/23 46/23 47/14
48/3
**threatens [1]**   67/4
**three [9]**   8/24 9/5
51/7 86/22 87/18
98/24 99/18 99/20
99/21
**three-year [2]**
99/18 99/20
**thumbing [1]**   38/2
**thus [2]**   23/13
29/14
**tie [1]**   72/25
**tied [1]**   55/22

**T**

timeframe [1]   79/21
timelines [1]   99/16
times [7]   8/24 9/5
42/7 87/16 87/17
87/18 98/21
tip [1]   6/7
Title [1]   46/7
to seek [1]   19/13
today [8]   3/13 3/21
4/15 5/10 6/24 8/3
52/9 107/23
together [2]   10/11
39/7 108/9
told [7]   7/1 7/3
7/5 30/19 44/17
44/19 67/18
tomorrow [2]   49/21
54/13
took [6]   21/19
22/19 30/8 32/23
63/21 89/11
top [1]   95/22
Torchinsky [1]   1/24
touch [1]   82/2
tough [2]   28/8
66/24
towards [1]   59/16
traceability [1]
77/16
train [1]   39/17
transcript [3]   1/10
7/4 115/4
transcripts [2]
9/12 9/23
transfer [26]   18/6
18/8 19/17 19/17
24/25 25/14 27/15
27/17 28/24 39/19
40/2 63/12 69/23
92/25 93/11 93/22
96/8 96/10 96/12
96/14 97/4 101/17
103/25 104/4 106/7
109/17
transferred [6]
10/16 10/25 23/23
94/17 102/11 105/9
transform [1]   80/20
treat [4]   59/20
60/2 60/7 62/4
treated [4]   50/8
63/22 65/13 90/5
treating [3]   29/13
56/6 66/14
tremendous [1]
28/10
tribe [6]   96/7 96/9
96/11 97/3 109/16
109/20
tribe's [2]   97/2
97/5
tried [2]   4/1
108/14
trigger [4]   102/25
103/14 103/18
105/13
triggered [5]   13/18
13/25 88/15 103/9

103/10
triggering [1]
22/19
TRO [1]   52/13
true [6]   61/12 62/2
91/15 106/16 106/17
115/4
Trump [7]   17/4
30/13 30/15 30/18
30/21 38/16 109/8
try [3]   5/24 38/5
53/17
trying [4]   27/8
45/19 73/14 79/2
Tuesday [1]   107/23
turn [4]   18/2 18/3
18/5 84/25
turns [3]   31/8 76/4
77/25
twice [2]   20/11
111/1
two [21]   8/24 9/5
14/6 24/21 26/14
39/14 41/11 45/11
51/7 53/13 53/22
53/23 55/23 56/8
64/20 75/9 78/22
79/1 81/22 83/16
90/22
two-edged [1]   90/22
type [6]   24/3 58/17
59/4 62/5 105/12
107/1
types [6]   61/8
85/14 104/8 105/10
105/13 113/21
typically [1]   79/15
typo [2]   12/25 13/4

**U**

U.S [7]   1/20 2/8
38/3 85/24 93/15
95/1 95/6
U.S.C [2]   94/6
103/3
Uh [1]   37/10
Uh-oh [1]   37/10
ultimate [3]   45/16
45/23 96/1
ultimately [4]   58/7
74/2 75/18 106/19
unable [1]   112/11
unavailability [2]
43/4 93/23
uncertainty [1]
84/18
under [76]   12/5
12/5 13/2 13/3 13/6
13/7 13/15 14/7
18/19 21/6 21/8
22/12 22/14 22/20
23/13 24/13 24/15
26/6 26/8 27/5
28/15 30/10 31/1
31/21 32/7 33/19
40/16 41/23 42/25
45/25 52/24 53/21
54/1 55/7 61/1
61/24 71/21 78/24
79/7 82/14 82/21

83/3 83/20 84/2
84/9 85/21 86/24
87/17 87/17 87/18
87/22 87/23 88/1
88/2 88/5 88/9
88/13 88/19 89/19
89/24 91/15 92/18
93/1 94/12 95/16
95/23 96/13 96/20
96/20 100/15 100/17
101/2 102/17 105/21
106/14 111/15
under the [1]   54/1
undercuts [1]   66/18
undermine [1]   67/4
undermining [1]
67/10
underscored [1]
112/15
understood [7]   68/9
71/8 71/10 71/24
76/14 83/17 111/19
underway [1]   23/20
undiluted [1]
109/20
undo [1]   52/22
undone [1]   90/2
unfolded [1]   85/11
unintended [2]
112/23 113/7
unique [3]   63/1
101/18 112/2
uniquely [1]   33/19
UNITED [10]   1/1
1/11 30/13 30/14
31/25 63/21 89/23
94/25 95/7 109/9
universe [2]   34/22
59/13
unlawful [4]   16/23
16/24 26/2 27/16
unless [7]   10/21
19/18 26/24 40/19
41/17 70/3 99/20
unnecessary [1]
24/19
unregulating [2]
36/1 36/1
unreviewable [1]
98/24
unsuccessful [1]
53/16
unusual [1]   60/21
up [32]   4/18 5/17
9/18 17/6 17/17
27/4 43/23 44/4
48/10 52/4 55/22
57/1 62/23 67/7
68/21 69/4 69/6
69/6 70/2 71/15
77/23 81/23 82/4
82/12 84/14 90/6
92/20 98/21 100/11
110/5 110/25 111/20
update [1]   84/24
upon [2]   21/24 99/4
urge [1]   112/22
use [4]   64/6 68/10
80/16 98/6
used [5]   51/17

61/24 69/23 80/5
91/17
uses [1]   100/25
using [1]   31/10

**V**

vacate [5]   15/19
23/15 39/10 39/11
40/9
vacated [2]   30/13
30/15
vacating [1]   74/21
vacatur [2]   16/20
38/16
validation [1]   20/6
varies [1]   32/15
various [2]   85/14
113/4
vast [2]   12/9 60/22
Verbatim [1]   9/12
verge [1]   23/8
versus [4]   5/12
87/12 88/2 89/2
veto [2]   78/4 78/4
video [7]   1/10 3/25
5/16 5/19 5/22 6/12
7/10
view [9]   12/6 22/23
40/19 52/16 54/21
66/7 93/11 101/17
107/17
viewed [1]   34/24
views [6]   13/5 54/8
54/9 64/21 102/2
105/19
violated [2]   66/10
66/11
violation [11]   20/8
20/9 20/15 20/17
33/7 33/25 39/14
50/21 74/25 75/12
75/12
violations [1]
21/10
virtue [3]   54/14
98/13 103/10
Vogel [1]   1/23
void [2]   72/18
votes [1]   77/7

**W**

wait [6]   10/6 15/6
23/1 29/10 59/20
59/21
waived [1]   108/25
walk [1]   73/6
walks [1]   69/17
want to [1]   100/2
wants [6]   11/18
23/17 35/11 44/20
61/19 113/17
warrant [1]   35/14
Washington [4]   1/5
1/21 2/3 2/10
water [17]   31/21
46/22 87/17 88/2
88/22 90/12 92/19
92/22 92/25 93/16
94/5 94/19 96/17
102/5 103/3 110/13

**W**

water... [1]   112/19
waters [16]   30/13
 31/21 31/24 38/3
 38/13 38/14 38/16
 84/16 84/18 94/25
 94/25 95/1 95/7
 109/8 109/23 109/24
waterways [5]   28/13
 30/16 31/11 38/10
 38/20
way [35]   3/24 5/23
 16/12 17/24 19/21
 21/2 24/4 27/15
 28/17 28/24 29/20
 36/25 37/24 39/9
 41/18 48/8 53/1
 60/1 64/2 67/7
 70/20 71/13 75/16
 75/23 79/14 79/20
 87/3 87/10 93/21
 97/9 103/23 108/19
 110/11 112/23
 113/18
ways [6]   24/18
 64/11 66/2 75/10
 77/3 110/13
website [5]   44/14
 46/20 47/5 49/1
 49/4
weeks [1]   45/11
weigh [2]   19/4
 93/16
weight [1]   8/13
welcome [3]   5/19
 57/20 107/21
weren't [3]   26/22
 43/20 87/5
wetlands [2]   28/14
 109/6
whack [1]   56/20
whack-a-mole [1]
 56/20
what's [14]   21/20
 26/11 44/6 46/16
 47/4 47/13 51/13
 54/9 58/10 62/17
 62/17 62/18 71/7
 107/12
whatsoever [2]   89/9
 89/11
WHEELER [2]   1/6 3/3
whenever [1]   69/22
Whereas [1]   31/22
who's [4]   3/21 4/15
 76/11 93/19
whole [12]   16/21
 20/14 25/4 25/25
 29/11 53/5 59/10
 61/25 68/20 108/17
 108/21 108/25
wide [1]   85/14
wildlife [10]   28/14
 85/24 88/10 93/15
 95/16 95/20 95/24
 96/22 97/8 110/6
win [1]   78/6
window [2]   40/14
 40/20

wish [1]   17/9
withdrawal [7]   31/3
 31/4 31/6 31/9
 31/16 111/12 111/13
withdrawn [3]   85/10
 86/22 90/2
within [13]   12/20
 19/3 20/10 52/9
 56/16 80/16 82/18
 83/19 84/3 88/5
 98/14 103/6 112/3
without [9]   18/8
 20/14 39/19 43/13
 54/13 67/15 67/20
 97/13 109/6
WOOD [19]   2/2 4/22
 4/24 84/25 87/21
 92/4 92/15 93/18
 94/11 99/6 102/4
 102/20 105/20
 107/20 108/14
 109/13 109/16
 110/20 111/11
Wood's [2]   101/23
 106/11
word [2]   111/8
 111/23
words [6]   10/19
 40/14 49/19 49/23
 80/9 80/22
work [5]   4/3 4/6
 21/15 71/25 106/3
worked [3]   25/15
 81/12 95/3
working [8]   6/1
 7/10 10/10 61/9
 85/18 85/19 95/11
 109/12
works [2]   23/5
 85/12
world [1]   15/21
worried [1]   109/7
worries [1]   60/21
worth [2]   86/18
 92/20
WOTUS [3]   38/1
 38/12 38/17
would run [1]   92/14
wrangling [1]   4/2
wreaked [1]   28/19
writers [1]   65/19
writing [1]   113/7
written [2]   9/11
 103/23
wrong [7]   31/10
 57/9 57/12 74/4
 74/14 75/22 76/22
www.regulations.gov [1]
 8/22

**Y**

yanked [1]   23/10
year [11]   21/3 25/9
 44/6 48/21 55/6
 76/5 76/7 76/11
 95/13 99/18 99/20
year's [1]   92/19
years [4]   30/7
 78/24 99/22 105/24
yep [2]   45/7 55/2

yo [2]   35/23 35/23
yo-yo [1]   35/23

**Z**

zoom [2]   4/3 6/3
zooming [3]   58/4
 78/19 107/17