**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | **CASE NO.** 1:21-cv-00119 (RDM) |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

LEGAL FRAMEWORK ......................................................................................................... 3

    I.    The Clean Water Act. ....................................................................................... 3

    II.   The Endangered Species Act. ........................................................................... 5

    III.  The Rivers and Harbors Act. ............................................................................ 7

STATEMENT OF FACTS ...................................................................................................... 8

    I.    Florida's Vast Waterways. ................................................................................ 8

    II.   Florida's Abysmal Environmental Record. ..................................................... 10

    III.  Florida's Pursuit of 404 Assumption. ............................................................. 10

    IV.  The Corps' Retained Waters List. .................................................................... 12

    V.   Endangered Species Act Consultation. ............................................................ 15

    VI.  EPA's Approval of the State's Application. ..................................................... 20

PROCEDURAL BACKGROUND ....................................................................................... 21

STANDARD OF REVIEW .................................................................................................. 22

ARGUMENT ........................................................................................................................ 23

    I.    USFWS Violated the ESA by Substituting a Non-Statutory Technical Assistance Process for the ESA's Statutory Framework. .................................. 24

          A.   USFWS Abdicated Its Duties to Abide by the ESA's Requirements. ................. 25

          B.   USFWS' ITS Unlawfully Extended Take Liability Exemptions Without Creating ESA-Mandated Guardrails. ............................................................. 30

          C.   USFWS Unlawfully Relied on a Novel Technical Assistance Process to Avoid the Mandates of Section 7 Consultation. ....................................................... 33

    II.   EPA Unlawfully Relied on USFWS' Arbitrary and Capricious BiOp and ITS. ........... 39

    III.  EPA Arbitrarily and Capriciously Determined "No Effect" to NMFS Species. ........... 40

    IV.  EPA Unlawfully Approved a State Program that is Less Stringent Than Federal Law. ................................................................................................................. 43

          A.   EPA Approved a State Program That Failed to Meet Minimum Enforcement Standards Required to Abate Violations of a Permit or the Permit Program. ...... 44

          B.   EPA Approved a State Program That Relied on Applicants' "Assurances" In Lieu of the Federal 404(b)(1) Guidelines' Requirement that the Permitting Authority Independently Make Factual Determinations. ...................................... 49

i

C.    EPA Approved a State Program with a Narrow View of Water Quality Effects Determinations Contrary to the Federal 404(b)(1) Guidelines. ............................ 52

D.    EPA Approved a State Program That Failed to Comply with 404(b)(1) Guideline to Ensure No Jeopardy from State Permits. ........................................ 54

E.    EPA Approved a State Program That Failed to Demonstrate That Assumable Waters Would be Regulated and Transferred Authority over Non-Assumable Waters to the State. ...................................................................................... 55

V.    The Corps Unlawfully Relinquished 404 Jurisdiction Over Certain Waters................ 58

VI.    EPA Arbitrarily and Capriciously Determined the State's Inadequate Application Was Complete. .................................................................................................... 60

STANDING ............................................................................................................ 63

CONCLUSION ........................................................................................................ 69

# TABLE OF AUTHORITIES

**Cases**                                       **Page(s)**

*Akiak Native Cmty. v. EPA*,
   625 F.3d 1162 (9th Cir. 2010) .................................................................48

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
   937 F.3d 559 (D.C. Cir. 2019), *cert. denied sub nom. Valero Energy Corp. v. EPA*,
   140 S. Ct. 2792 (2020)............................................................................43

\*   *Am. Rivers v. FERC*,
   895 F.3d 32 (D.C. Cir. 2018).................................................22, 29, 39, 42

\*   *Am. Rivers v. U.S. Army Corps of Eng'rs*,
   271 F. Supp. 2d 230 (D.D.C. 2003)..........................................................33

*Appalachian Voices v. U.S. Dep't of Interior*,
   25 F.4th 259 (4th Cir. 2022) ....................................................................29

*Arizona Cattle Growers' Ass'n v. USFWS*,
   273 F.3d 1229 (9th Cir. 2001) ..............................................................7, 32

\*   *Bennett v. Spear*,
   520 U.S. 154 (1997)............................................................................58, 59

\*   *Chesapeake Bay Found. v. Bethlehem Steel Corp.*,
   608 F. Supp. 440 (D. Md. 1985) ..............................................................49

\*   *City of Tacoma v. FERC*,
   460 F.3d 53 (D.C. Cir. 2006).............................................................39, 42

*In re Clean Water Act Rulemaking*,
   568 F. Supp. 3d 1013 (N.D. Cal. 2021) .....................................................3

\*   *Conner v. Burford*,
   848 F.2d 1441 (9th Cir. 1988) ............................................................30, 34

*Cooling Water Intake Structure Coal. v. EPA*,
   905 F.3d 49 (2d Cir. 2018)................................................................37, 38

*Ctr. for Biological Diversity v. EPA*,
   56 F.4th 55 (D.C. Cir. 2022)....................................................................65

\*   *Ctr. for Biological Diversity v. EPA*,
   861 F.3d 174 (D.C. Cir. 2017)..................................................................68

\*   *Ctr. for Biological Diversity v. Regan*,
   597 F. Supp. 3d 173 (D.D.C. 2022)....................................................58, 63

*Ctr. for Biological Diversity v. Rumsfeld*,
198 F. Supp. 2d 1139 (D. Ariz. 2002) ................................................................34

*Ctr. for Biological Diversity v. Salazar*,
695 F.3d 893 (9th Cir. 2012) ................................................................................7

\* *Ctr. for Biological Diversity v. Zinke*,
369 F. Supp. 3d 164 (D.D.C. 2019), *aff'd sub nom. Friends of Animals v. Bernhardt*,
961 F.3d 1197 (D.C. Cir. 2020) ..........................................................................65

*Defs. of Crooked Lake, Inc., v. FDEP*,
2018 WL 3387900 (Fla. Div. Admin. Hearings May 7, 2018) ............................51

\* *Defs. of Wildlife v. Babbitt*,
130 F. Supp. 2d 121 (D.D.C. 2001) ...................................................27, 28, 41

*Defs. of Wildlife v. U.S. Dep't of Interior*,
931 F.3d 339 (4th Cir. 2019) .............................................................................27

*Env't Def. v. U.S. Army Corps of Eng'rs*,
515 F. Supp. 2d 69 (D.D.C. 2007) .....................................................................52

*EPA v. California*,
426 U.S. 200 (1976).............................................................................................3

*Fisher v. Pension Benefit Guar. Corp.*,
468 F. Supp. 3d 7 (D.D.C. 2020) .......................................................................22

\* *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
726 F. Supp. 2d 1195 (D. Mont. 2010)..........................................................28, 34

\* *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)..........................................................................................45, 64

*Gerber v. Norton*,
294 F.3d 173 (D.C. Cir. 2002)............................................................................35

*Gifford Pinchot Task Force v. USFWS*,
378 F.3d 1059 (9th Cir. 2004) ...........................................................................34

\* *Growth Energy v. EPA*,
5 F.4th 1 (D.C. Cir. 2021)..............................................................................42, 43

*Hawaii Longline Ass'n. v. NMFS*,
281 F. Supp. 2d 1 (D.D.C. 2003), *on reconsideration in part sub nom. Hawaii
Longline Ass'n v. NMFS*, 281 F. Supp. 2d 1 (D.D.C. 2003)..............................39

\*  *Idaho Conservation League v. EPA*,
820 F. App'x 627 (9th Cir. 2020) ...............................................................22, 46

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
681 F.3d 1006 (9th Cir. 2012) ....................................................................29, 43

\*  *Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).............................................................................................66

*Massachusetts v. EPA*,
549 U.S. 497 (2007)............................................................................................65

\*  *Mayo v. Jarvis*,
177 F. Supp. 3d 91 (D.D.C. 2016)..................................................................40

\*  *Menominee Indian Tribe v. EPA*,
947 F.3d 1065 (7th Cir. 2020) .........................................................................58

\*  *N. Slope Borough v. Andrus*,
642 F.2d 589 (D.C. Cir. 1980)........................................................................34

*Nat. Res. Def. Council, Inc. v. EPA*,
859 F.2d 156 (D.C. Cir. 1988)........................................................................48

*Nat'l Ass'n of Clean Air Agencies v. EPA*,
489 F.3d 1221 (D.C. Cir. 2007)......................................................................22

*Nat'l Wildlife Fed'n v. Brownlee*,
402 F. Supp. 2d 1 (D.D.C. 2005)...................................................................34

\*  *Nat'l Wildlife Fed'n v. Norton*,
332 F. Supp. 2d 170 (D.D.C. 2004)...........................................................29, 40

*Native Ecosystems Council v. Dombeck*,
304 F.3d 886 (9th Cir. 2002) ..........................................................................42

\*  *Nw. Immigrant Rights Project v. U.S. Citizenship & Immigr. Servs.*,
496 F. Supp. 3d 31 (D.D.C. 2020), *appeal dismissed*, No. 20-5369, 2021 WL
161666 (D.C. Cir. Jan. 12, 2021)...........................................................64, 65, 66

\*  *Oceana, Inc. v. Pritzker*,
125 F. Supp. 3d 232 (D.D.C. 2015) ..............................................................67

\*  *Oceana, Inc. v. Ross*,
No. CV 15-0555 (PLF), 2020 WL 5995125 (D.D.C. Oct. 9, 2020) ...........27, 28, 31

*Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*,
144 F. Supp. 3d 35 (D.D.C. 2015) .................................................................64

\*     *Pasqua Yaqui Tribe v. EPA*,
    557 F. Supp. 3d 949 (D. Ariz. 2021) ......................................................56

*PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*,
    511 U.S. 700 (1994) ................................................................................3

*Res. Ltd., Inc. v. Robertson*,
    35 F.3d 1300 (9th Cir. 1993) ...............................................................40

\*     *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
    992 F.3d 1071 (D.C. Cir. 2021) ...........................................................39

*Sierra Club v. Chevron U.S.A., Inc.*,
    834 F.2d 1517 (9th Cir. 1987) .............................................................49

\*     *Sierra Club v. Jewell*,
    764 F.3d 1 (D.C. Cir. 2014) .................................................................66

\*     *Sierra Club v. U.S. Dep't of the Interior*,
    899 F.3d 260 (4th Cir. 2018) ...............................................................31

\*     *Small Refiner Lead Phase-Down Task Force v. EPA*,
    705 F.2d 506 (D.C. Cir. 1983) ........................................................62, 65

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001) ................................................................................4

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ..............................................................................64

\*     *State v. Greene*,
    348 So. 2d 3 (Fla. 1977) .......................................................................46

\*     *State v. Hamilton*,
    388 So. 2d 561 (Fla. 1980) ...................................................................46

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ..............................................................................65

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ............................................................................5, 6

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*,
    967 F.2d 598 (D.C. Cir. 1992) .............................................................34

*United States v. Earth Sciences, Inc.*,
    599 F.2d 368 (10th Cir. 1978) .............................................................45

\*    *United States v. Hanousek,*
     176 F.3d 1116 (9th Cir. 1999) ...................................................................46, 47

\*    *United States v. Maury,*
     695 F.3d 227 (3d Cir. 2012)...............................................................................45

\*    *United States v. Ortiz,*
     427 F.3d 1278 (10th Cir. 2005) .........................................................................45

\*    *United States v. Pruett,*
     681 F.3d 232 (5th Cir. 2012) .............................................................................45

\*    *United States v. Ursitti,*
     543 F. Supp. 2d 971 (C.D. Ill. 2008) ................................................................48

     *Wild Fish Conservancy v. Salazar,*
     628 F.3d 513 (9th Cir. 2010) .............................................................................26

\*    *WildEarth Guardians v. Jewell,*
     738 F.3d 298 (D.C. Cir. 2013) ..........................................................................66

     *WildEarth Guardians v. Salazar,*
     741 F. Supp. 2d 89 (D.D.C. 2010) ....................................................................22

**Federal Statutes**

5 U.S.C. § 553...............................................................................................20, 62, 65

5 U.S.C. § 704.........................................................................................................58

5 U.S.C. § 706....................................................................................................22, 51

16 U.S.C. § 1531.......................................................................................................5

16 U.S.C. § 1532....................................................................................................5, 9

16 U.S.C. § 1536............................................................................................... *passim*

16 U.S.C. § 1538.......................................................................................................5

16 U.S.C. § 1539....................................................................................................5, 7

16 U.S.C. § 1540.......................................................................................................5

18 U.S.C. § 3282.....................................................................................................48

33 U.S.C. § 401.....................................................................................................8, 59

33 U.S.C. § 403.....................................................................................................8, 59

33 U.S.C. § 407 .................................................................................................................8

33 U.S.C. § 1251 ............................................................................................................3, 4

33 U.S.C. § 1311 ...............................................................................................................3

33 U.S.C. § 1319 ...............................................................................................24, 45, 48

33 U.S.C. § 1344 ........................................................................................................ *passim*

33 U.S.C. § 1362 ...............................................................................................................3

**Federal Regulations**

33 C.F.R. § 230.4 ..............................................................................................................8

33 C.F.R. § 328.3 .......................................................................................................15, 59

33 C.F.R. § 328.3 (2020) .................................................................................................59

33 C.F.R. § 329.4 ..........................................................................................................8, 59

33 C.F.R. § 329.15 ...........................................................................................................59

33 C.F.R. § 329.16 ...........................................................................................................59

40 C.F.R. pt. 230 .........................................................................................................4, 44

40 C.F.R. pt. 233 .........................................................................................................4, 44

40 C.F.R. § 125.94 ...........................................................................................................38

40 C.F.R. § 230.1 ...............................................................................................................4

40 C.F.R. § 230.3 (2015) ..................................................................................................8

40 C.F.R. § 230.3 .............................................................................................................53

40 C.F.R. § 230.10 ................................................................................................50, 54, 60

40 C.F.R. § 230.11 ...........................................................................................................50

40 C.F.R. § 230.20 ...........................................................................................................50

40 C.F.R. § 230.21 ...........................................................................................................50

40 C.F.R. § 230.22 .......................................................................................................50, 53

40 C.F.R. § 230.23 ...........................................................................................................50

40 C.F.R. § 230.24 ........................................................................................................50

40 C.F.R. § 230.25 ........................................................................................................50

40 C.F.R. § 230.30 ........................................................................................................50

40 C.F.R. § 230.31 ........................................................................................................50

40 C.F.R. § 230.32 ........................................................................................................50

40 C.F.R § 230.40 .........................................................................................................50

40 C.F.R § 230.41 .........................................................................................................50

40 C.F.R § 230.42 .........................................................................................................50

40 C.F.R § 230.43 .........................................................................................................50

40 C.F.R § 230.44 .........................................................................................................50

40 C.F.R § 230.45 .........................................................................................................50

40 C.F.R. § 230.50 ........................................................................................................50

40 C.F.R. § 230.51 ........................................................................................................50

40 C.F.R. § 230.52 ........................................................................................................50

40 C.F.R. § 230.53 ........................................................................................................50

40 C.F.R. § 230.54 ........................................................................................................50

40 C.F.R. § 230.60 ........................................................................................................53

40 C.F.R. § 230.61 ........................................................................................................53

40 C.F.R. § 232.2 ..........................................................................................................55

40 C.F.R. § 233.1 ....................................................................................................45, 55

40 C.F.R. § 233.10 ........................................................................................................60

40 C.F.R. § 233.12 ........................................................................................................60

40 C.F.R. § 233.15 .................................................................................................. *passim*

40 C.F.R. § 233.20 ........................................................................................................55

40 C.F.R. § 233.30 ........................................................................................................55

40 C.F.R. § 233.34 ..................................................................................................54

40 C.F.R. § 233.40 ..................................................................................................55

40 C.F.R. § 233.41 ..................................................................................45, 46, 49

50 C.F.R. § 17.22 ......................................................................................................7

50 C.F.R. § 17.31 ......................................................................................................5

50 C.F.R. § 402.02 ........................................................................................ *passim*

50 C.F.R. § 402.13 ..............................................................................................6, 41

50 C.F.R. § 402.14 ........................................................................................ *passim*

50 C.F.R. § 402.16 ..............................................................................................7, 31

45 Fed. Reg. 85,336 (Dec. 24, 1980) .....................................................................51

84 Fed. Reg. 44,976 (Aug. 27, 2019) ......................................................................33

85 Fed. Reg. 57,853 (Sept. 16, 2020) .....................................................................60

**State Statutes**

Fla. Stat. § 373.430 ............................................................................................46, 48

Fla. Stat. § 373.4146 ..........................................................................................50, 55

Fla. Stat. § 775.15 ...................................................................................................48

**State Regulations**

Fla. Admin. Code R. 62-330.301 .......................................................................50, 53

Fla. Admin. Code R. 62-331.051 .............................................................................61

Fla. Admin. Code R. 62-331.053 .......................................................................51, 62

**Other Authorities**

EPA & Corps, *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in* Rapanos v. United States *&* Carabell v. United States (Dec. 2, 2008) ...................................................................................................................59

State Assumption of Federal Section 404 Dredge and Fill Permitting Authority, S.B. 1402, 2017 Leg. (2018 Fla. Laws 2018-88).................................................10

USFWS, *Habitat Conservation Planning and Incidental Take Permit Processing Handbook* (Dec. 16, 2016)........................................................................................7

USFWS & NMFS, *Endangered Species Consultation Handbook* (1998)...................................35

## PRELIMINARY STATEMENT

Plaintiff conservation organizations bring this action to protect our Nation's waters and the endangered species that rely on them. During the Trump Administration, Florida worked hand in glove with developers to achieve developers' "holy grail":[1] state assumption over Section 404 of the Clean Water Act—which governs dredging and filling of many sensitive wetlands—in one of the most biodiverse states in the country. Between 2017 and 2020, the State and the U.S. Environmental Protection Agency ("EPA"), U.S. Fish and Wildlife Service ("USFWS"), and the U.S. Army Corps of Engineers ("Corps"), worked to make this dream a reality. The Defendants' actions, however, violated multiple federal laws and must be set aside.

EPA's approval of Florida's 404 program is based upon multiple legal errors. First, EPA failed to ensure that the state program is as stringent as, and equivalent to, federal law. Second, EPA relied on USFWS' inadequate biological opinion ("BiOp") to determine the state program would not jeopardize threatened and endangered species, even though the BiOp unlawfully replaced the statutory framework and analyses Congress required in the Endangered Species Act ("ESA") with a non-statutory technical assistance process lacking those guardrails. USFWS then unlawfully extended broad liability coverage for harm to protected species from administration of the state program to EPA, the State, and state permittees, for the life of the program. Third, EPA allowed the State to assume authority over waters required by law to remain under the Corps' exclusive jurisdiction. Defendants' actions threaten to open the floodgates for other states to seek assumption without complying with federal standards, further imperiling our Nation's waters and the ESA-listed species that rely on them.

---

[1] *See* Ex. 10 at 5 (Umpierre Dec. ¶ 14).

The improper delegation of a core Clean Water Act program poses a significant threat in Florida, a state whose waters are a national treasure and economic mainstay; a state that is home to more than 130 threatened and endangered species; and a state where these assets and resources face intense ecological pressure as a result of mining, development, and other industry projects. The epicenter of this crisis may well be Southwest Florida, a richly biodiverse corner of the world that also provides the last remaining habitat for the critically endangered Florida panther. Panthers are one of the most endangered species on the planet, with only 120 to 230 adults remaining in the wild.

The State is currently considering Section 404 permits for several projects that threaten to destroy habitat and breeding ground essential to the Florida panther. These include Troyer Mine (a lime rock and fill dirt mine), Bellmar Development (a mixed-use community covering 1,500 acres), and Immokalee Road Rural Village (a mixed-use residential and commercial development over 2,780 acres). These projects also threaten harm to other listed species, including Audubon's crested caracara, the Everglade snail kite, and the Florida scrub jay. Many other projects that pose major threats to listed species are in the same pipeline.

Congress enacted the ESA to ensure that federal actions would not jeopardize the continued existence of threatened and endangered species, like the Florida panther, and mandated specific processes for federal wildlife agencies to fulfill this promise. But EPA's unlawful transfer of authority to Florida gave away the keys to kingdom, putting the panther—and the more than 130 other listed species in Florida—in peril.

The Federal Defendants' actions are unlawful and must be set aside.  Given the severity of the violations and the harms to Plaintiffs, EPA's approval of Florida's program should be vacated, restoring 404 authority over assumable waters in Florida to the Corps.[2]

## LEGAL FRAMEWORK

### I.    The Clean Water Act.

Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" after states had failed to control water pollution as evidenced by disasters like the Cuyahoga River catching on fire and the Hudson River filling with raw sewage and toxic waste.  33 U.S.C. § 1251; *In re Clean Water Act Rulemaking*, 568 F. Supp. 3d 1013, 1018 (N.D. Cal. 2021).  *See also EPA v. California*, 426 U.S. 200, 202–09 (1976).  Congress thus strengthened the laws protecting the Nation's waters because previously, it only provided assistance to states, seeking to incentivize them to protect and clean up the water.  *Id*.  That state-dependent system had failed, necessitating more thorough measures.  *Id.*

Based upon this history and Congress' direction, a fundamental tenet of the Clean Water Act is that the Act is a *floor*, a minimum baseline in all respects for protection of the Nation's waters.  States retain only the flexibility to be more, but never less, protective than the Clean Water Act's foundational protections.  *See* 33 U.S.C. § 1311(b)(1)(C); *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 705–07 (1994).

At its heart, the Clean Water Act prohibits the unpermitted discharge of pollution (defined broadly to include dredge and fill material) into waters of the United States.  33 U.S.C. §§ 1311(a), 1362(6), (12), (19).[3]  It is thus a vital tool to meet the Clean Water Act's goals.  *See*

---

[2] Plaintiffs respectfully request the opportunity to brief the appropriate remedy following the Court's ruling on summary judgment.

[3] The Clean Water Act defines limited circumstances where a permit would not be required.  33 U.S.C. § 1344(f).

*id.* § 1251.  Waters of the United States are defined to include wetlands, *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 167 (2001), and the Clean Water Act recognizes that the degradation and destruction of wetlands is "among the most severe environmental impacts."  40 C.F.R. § 230.1(a).

Section 404 authorizes the Corps to issue permits regulating the discharge of dredge or fill materials into waters of the United States, including wetlands, 33 U.S.C. § 1344(a).  The Clean Water Act allows states to administer their own dredge and fill permit program, excepting "those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto."  *Id.* § 1344(g)(1).  The Corps retains 404 jurisdiction over waters not assumable by the State.  *Id.* § 1344(h)(3)–(4); 40 C.F.R. § 233.15(h).

The Clean Water Act requires that any state 404 program be at least as stringent as the federal program.  33 U.S.C. § 1344(h)(1).  EPA must determine that a state has authority to, among other things:  (1) issue permits "which apply, and assure compliance with" all Section 404 requirements, including the Section 404(b)(1) Guidelines, 40 C.F.R. pt. 230; and (2) "abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement."  33 U.S.C. § 1344(h)(1)(A)(i), (1)(C), (1)(G); 40 C.F.R. pt. 233.  EPA may only approve a state program if it meets these criteria.  33 U.S.C. § 1344(h)(2)(A).  EPA's approval requires the Corps to suspend issuance of 404 permits for activities covered by the state program.  *Id.* § 1344(h)(2)(A), (4)–(5).

## II.    The Endangered Species Act.

Almost fifty years ago, Congress enacted the ESA to provide for the conservation of threatened and endangered species and their habitats.  16 U.S.C. § 1531.  Congress created this regime in response to increasing concerns about how many "species of fish, wildlife, and plants" had been rendered extinct "as a consequence of economic growth and development untempered by adequate concern and conservation."  *Id.* § 1531(a)(1).  With this legislation, Congress made a "conscious decision ... to give endangered species priority over the 'primary missions' of federal agencies."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).  Indeed, an "examination of the language, history, and structure [of the ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities."  *Id.* at 174.

Section 9 of the ESA prohibits any person, including private parties, states, and federal agencies, from "taking" a protected species.  16 U.S.C. § 1538(a)(1)(B).[4]  "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect."  *Id.* § 1532(19).  Congress established civil and criminal penalties for illegal take and authorized the public to bring civil suits to ensure compliance with the Act.  *Id.* § 1540(a)–(b), (g).

Recognizing that take may still occur as a result of otherwise lawful activities, Congress created two distinct paths to ensure that this "incidental take" would not jeopardize protected species or adversely modify or destroy critical habitat:  (1) Section 7, which applies to federal agency actions, *id.* § 1536; and (2) Section 10, which applies to non-federal actions, *id.* § 1539.  These mechanisms exempt liability for incidental take only so long as the wildlife agencies and consulting agencies abide by the specific measures and standards developed by Congress.

---

[4] USFWS and NMFS have extended take prohibitions by regulation to most threatened species under their respective jurisdictions.  *See* 50 C.F.R. § 17.31(a).

Whenever a federal agency action may affect protected species or critical habitat, the action agency must consult with wildlife agencies—USFWS and National Marine Fisheries Service ("NMFS")—pursuant to Section 7.  *Id.* § 1536; 50 C.F.R. §§ 402.13, 402.14.  Section 7 creates affirmative duties for both the action agency and wildlife agencies.  The Act prescribes the analysis that the wildlife agencies must undertake during consultation, which includes a requirement that the wildlife agencies provide a BiOp detailing how the agency action affects protected species and critical habitat.  16 U.S.C. § 1536(b)(3)(A).  *Accord* 50 C.F.R. § 402.14(g), (h).  Section 7 requires that the wildlife agencies and action agency employ the "best scientific and commercial data available" during consultation.  16 U.S.C. § 1536(a)(2).  It sets the standard for the wildlife agencies' ultimate opinion, determining whether the action would (1) jeopardize protected species or (2) destroy or adversely modify critical habitat.  *Id.* § 1536(a)(2).  And Section 7 mandates that action agencies, through consultation, must ensure their actions are not likely to jeopardize protected species or adversely modify or destroy critical habitat.  *Id.*  The obligation to ensure against a likelihood of jeopardy or adverse modification requires agencies to give the benefit of the doubt to protected species.  *See Tenn. Valley Auth.*, 437 U.S. at 174–84.

Additionally, Section 7 creates guidelines and requirements whenever the wildlife agencies intend to extend incidental take liability exemption.  16 U.S.C. § 1536(b)(4).  If the wildlife agencies determine that incidental take is reasonably certain to occur, they must formulate an incidental take statement ("ITS") that specifies (1) the amount or extent of incidental take; (2) reasonable and prudent measures required to minimize take impacts; and (3) implementing terms and conditions with which the action agency must comply.  *Id.  Accord* 50 C.F.R. § 402.14(g)(7), (i).  "The [ITS] functions as a safe harbor provision immunizing persons from Section 9 liability and penalties for takings committed during activities that are

otherwise lawful and in compliance with its terms and conditions." *Arizona Cattle Growers'*

*Ass'n v. USFWS*, 273 F.3d 1229, 1239 (9th Cir. 2001) (citing 16 U.S.C. § 1536(o)).  And an ITS

serves as a check on the BiOp, acting as a "trigger" by denoting when an unacceptable level of

take has occurred, which then invalidates the safe harbor provision and requires the action

agency to (1)  reinitiate consultation to reevaluate the action; (2) determine if the action may now

jeopardize protected species or critical habitat; and (3) determine what additional protective

measures may be required to reduce impacts from the action.  50 C.F.R. §§ 402.14(i)(3), (4),

402.16(a); *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 910–11 (9th Cir. 2012).

As it did for Section 7 consultation, Congress mandated robust analyses and standards for

wildlife agencies when they extend incidental take liability exemption to a non-federal entity

pursuant to Section 10 of the ESA.  16 U.S.C. § 1539(a).[5]  The Act creates binding requirements

on a non-federal applicant to submit an application along with enumerated analyses, protective

measures, and a demonstration of funding to implement required protective measures.  *Id.*

§ 1539(a)(2)(A).[6]  And Section 10 establishes the standard for the wildlife agencies to issue an

incidental take permit, including the requirement that the taking will not appreciably reduce the

likelihood of the survival and recovery of protected species.  *Id.* § 1539(a)(2)(B).

## III.    The Rivers and Harbors Act.

The Rivers and Harbors Act ("RHA") grants the Corps exclusive jurisdiction over certain

waterways.  Section 10 prohibits the excavation or fill of any canal, lake, harbor, "or inclosure

---

[5] *See also* 50 C.F.R. § 17.22 (detailing the robust analysis and process for obtaining a Section 10 incidental take permit).

[6] *See* USFWS, *Habitat Conservation Planning and Incidental Take Permit Processing Handbook* at 7-1, 14-8 (Dec. 16, 2016), https://www.fws.gov/media/habitat-conservation-planning-and-incidental-take-permit-processing-handbook ("robust" analysis must be more than a mere "tally" of take and often requires biological studies, species population surveys, species distribution information, and/or habitat modeling and distribution to obtain the "thorough, up-to-date biological information" required).

within the limits of any breakwater, or of the channel of any navigable water" without the consent of the Corps. 33 U.S.C. § 403. Section 9 grants the Corps jurisdiction over construction in navigable waters, except for "waters that are not subject to the ebb and flow of the tide and that are not used and are not susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce." *Id.* § 401. And Section 13 prohibits the discharge of any refuse into navigable waters. *Id.* § 407. Although the Corps' authority under the Clean Water Act is broader than under the RHA, the Corps defines navigable waters under the RHA and traditionally navigable waters under the Clean Water Act the same.[7]

## STATEMENT OF FACTS

Florida's vast waterways, and the endangered and threatened species that rely on them, have long depended on the protections of federal law. But as the record shows, the EPA, USFWS, and the Corps skirted those laws to allow an unlawful state 404 program to take effect.[8]

### I.     Florida's Vast Waterways.

Water is one of Florida's most prominent features, with almost 1,200 miles of coastline, more than 7,500 major lakes, thirty-three first magnitude springs, and approximately 27,500 linear miles of rivers and streams. EPA-HQ-OW-2018-0640-0386-A2, at 49 (*Florida Waters: A*

---

[7] *Compare* 33 C.F.R. § 329.4 (defining RHA navigable waters as "those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce") *with id.* § 328.3(a)(1) (2020) (defining traditionally navigable waters under Clean Water Act as "waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide.").

[8] In this motion, EPA records are identified by their document ID on the administrative record index. *See* Dkt. 95-2 (*e.g.*, EPA-HQ-OW-2018-0640-0001). Because EPA documents are not bates-stamped, Plaintiffs cite page numbers corresponding to the PDF page number of each document. Corps and USFWS records are identified by the beginning bates number as indicated on the index, *see* Dkt. 94-2 (*e.g.*, CORPS000001), 93-2 (*e.g.*, FWS-000001), followed by a pin cite to the corresponding bates number within the document. Administrative record cites are followed by a title or brief description of the document when necessary for context.

*Water Resources Manual*).  Countless valuable wetlands are widely distributed throughout the

State, including the renowned Everglades and the Big Cypress Swamp.  EPA-HQ-OW-2018-

0640-0386-A3, at 20–21 (*Geology of Florida*).  With approximately eleven million acres of

wetlands, Florida has more wetlands than any of the other lower forty-eight states.  EPA-HQ-

OW-2018-0640-0386-A4, at 11 (USFWS, *Florida's Wetlands: An Update on Status and Trends

1985–1996* (document continues to EPA-HQ-OW-2018-0640-0386-A5)).

      Florida's waters help sustain some of the world's most renowned biodiversity.  Florida

lies within the North American Coastal Plan, the World's Thirty-Sixth Biodiversity Hotspot, and

is considered the richest area biologically for endemic species.  EPA-HQ-OW-2018-0640-0386-

A6 (*Florida Declared a Global Biodiversity Hotspot*).  Freshwater resources in Florida provide

nesting, foraging, wintering, and migrating habitats for numerous species of fish and wildlife.

EPA-HQ-OW-2018-0640-0386-A1, at 4 (citing *Florida's Freshwater Priority Resources: A

Guide for Future Management* at 1, EPA-HQ-OW-2018-0640-0386-A7).

      And these waters support the more than 130 ESA-listed species in Florida, as well as

another 96 under consideration for listing.  *See* FWS-005610, at FWS-005647 (EPA Biological

Evaluation [hereinafter "BE"]).  These include the critically endangered Florida panther, as well

as the West Indian manatee, Key deer, Everglade snail kite, Audubon's crested caracara,

bonneted bat, and smalltooth sawfish.  *Id.* at FWS-005734, FWS-005737, FWS-005741, FWS-

005742, FWS-005748–50, FWS-005761–62.  USFWS has also designated "critical habitat"[9] for

more than thirty ESA-listed species in Florida.  *See id.* at FWS-005648–60 (chart of ESA-listed

species also indicating those with designated critical habitat).  With one of the highest rates of

---

[9] Critical habitat means areas containing the features essential to conservation of species which
may require special management considerations as identified based on wildlife agencies'
decision that such areas are essential to the conservation of the species.  16 U.S.C. § 1532(5)(A).

habitat loss, Florida's water resources and the species that depend on them are some of the most threatened. *See* EPA-HQ-OW-2018-0640-0386-A8 (*Threats to Florida's Biodiversity*).

## II.    Florida's Abysmal Environmental Record.

Despite the importance of environmental protection to the State's biodiversity and waters, leading up to Florida's request to assume 404 permitting authority, the State slashed staff and funding for its Department of Environmental Protection ("FDEP"), including in its wetlands division. EPA-HQ-OW-2018-0640-0386-A1, at 5 (Plaintiffs' Comments). Florida's leading paper called FDEP's recent record "an environmental disaster" because of reduced budgets, rushed permitting, weakened enforcement, and widespread layoffs of experts who were replaced with political appointees focused on advancing business interests. EPA-HQ-OW-2018-0640-0385-A1 (*The Rick Scott Record: An Environmental Disaster*).

A 2016 Public Employees for Environmental Responsibility ("PEER") analysis found that FDEP had opened 81% fewer enforcement cases, collected the lowest number of fines in twenty-eight years, and assessed no penalties in a third of cases. EPA-HQ-OW-2018-0640-0385-A2 (*Scott's Undeclared Polluters' Holiday Stains Florida*); EPA-HQ-OW-2018-0640-0385-A3 (*Report on Enforcement Efforts by the Florida Department of Environmental Protection Calendar Year 2015*); EPA-HQ-OW-2018-0640-0385-A4 (*State Failing to Protect Our Waterways*) (collecting articles describing the State's environmental record).

## III.    Florida's Pursuit of 404 Assumption.

It was against this backdrop that in late 2017, the Florida legislature quietly introduced a bill to authorize FDEP to pursue assumption over Section 404 assumable waters. State Assumption of Federal Section 404 Dredge and Fill Permitting Authority, S.B. 1402, 2017 Leg. (2018 Fla. Laws 2018-88), https://www.flsenate.gov/Session/Bill/2018/1402.

The legislature considered but rejected a similar effort in 2005, after FDEP concluded that for assumption in Florida to be feasible, several changes to state and federal statutes would be required. EPA-HQ-OW-2018-0640-0385-A6, at 4–6 (FDEP, *Consolidation of State and Federal Wetland Permitting Programs Implementation of House Bill 759*). In 2005, FDEP also recognized that assumption would require "substantial staff resources" for the State to be able to take on the additional responsibilities and workload required under federal law. *Id.* at 4–5.

An analysis of the 2017 bill also recognized that assumption would generate costs. EPA-HQ-OW-2018-0640-0385-A7, at 3, 14, 17 (*Bill Analysis and Fiscal Impact Statement: S.B. 1402*). FDEP claimed, however, that it did "not anticipate" an increase in expenditures with assumption, and that it believed administration and enforcement of the 404 program could be "absorbed without an increase in staffing or administrative costs." *Id.* at 17. FDEP sought no funding and advised that it would charge no fees. *Id.*

There was great public outcry. Waterkeepers across Florida urged legislators to reject the proposed legislation, citing concerns about FDEP taking on an additional program without additional resources and its woefully inadequate regulation of another delegated Clean Water Act program. EPA-HQ-OW-2018-0640-0385-A8 (Letter from Miami Waterkeeper). On behalf of its more than sixty member organizations, the Everglades Coalition issued a resolution opposing the legislation, identifying concerns regarding state assumption and the risk to Florida's remaining wetlands, which are critical to cleansing water, recharging groundwater, providing fish and wildlife habitat, and storm resiliency. EPA-HQ-OW-2018-0640-0385-A10 (Everglades Coal., *Resolution Opposing SB1402 and HB7043*).

And former FDEP Secretary Victoria Tschinkel urged the Governor to veto the bill, which she observed had been pushed for "fast and simple permitting" rather than being in the

best interests of the State. EPA-HQ-OW-2018-0640-0392-A2 (*Florida's Treasured Wetlands on the Eve of Destruction—We Cannot Allow It*). Former Secretary Tschinkel noted, among other things, that "Florida has already lost half its wetlands, with great negative effects on water quality, fish nurseries, wildlife habitat and flood control." *Id. See also* EPA-HQ-OW-2018-0640-0385-A9 (*Don't Let Florida Take Over Wetlands Permitting*) (raising concerns about FDEP's workforce and funding; "There is no reason to have confidence that the state agency is prepared to take on this obligation ... The wetlands are too important to Florida's economy and to public safety in a coastal state to put the interests of developers ahead of the general good.").

Over these objections and concerns, on March 23, 2018, Governor Rick Scott signed the bill authorizing FDEP "to explore whether the state should issue 404 permits." EPA-HQ-OW-2018-0640-0392-A3. In 2019, Ron DeSantis became governor and continued these efforts.

## IV.    The Corps' Retained Waters List.

As the State began pursuing 404 program assumption, the Corps began to evaluate the Florida waters over which it would retain jurisdiction upon assumption. On March 19, 2018, the Corps initiated a thirty-day comment period to identify navigable waters in the State, including "those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities." CORPS003213, at CORPS003214 (Public Notice). The Corps sought to determine "which waters are subject to permitting authority under Section 10" of the RHA and which "would be retained" after state assumption. *Id.*

By March 20, 2018, the Corps had provided FDEP with two lists of navigable waters in Florida. CORPS003215, at CORPS3215, CORPS003217 (Corps email) (map). The first was dated 2014 and identified more than 480 navigable rivers, creeks, and lakes. CORPS002987, at CORPS002987 (Jacksonville District Navigable Waters Lists). The second was dated 2017 and

identified more than 1,700 navigable rivers, creeks, and lakes in Florida.  CORPS003117, at CORPS003117 (Supplement to the Jacksonville District Navigable Waters Lists).

In response to the Corps' public notice, members of the public began submitting information on Florida's navigable waters.  CORPS003227, at CORPS00327 (Seminole Tribe of Florida email) (historic use of Florida waterways for canoe travel and trade); CORPS003617, at CORPS3617–708 (same) (navigability in the Florida Everglades for sugar cane production); CORPS003230, at CORPS003230–616 (same) (canoe exploration through, and navigability of, the Everglades); CORPS003709, at CORPS003709 (Florida Division of Recreation and Parks) (updated paddling trails information).

Unbeknownst to the public, however, FDEP's Secretary asked the Corps to stop the navigability studies, and the Corps acquiesced.  CORPS003714, at CORPS003714 (April 9, 2018, Email) (stating that, per their discussion FDEP would send written request that the Corps "cease the navigation studies").  Corps leadership quickly responded to this "clear guidance," stated they would "direct [their] team to execute as directed," and directed that the Corps "CEASE WORK on all actions related to the NAVIGABLE WATERS STUDIES to support ASSUMABLE WATERS STUDY leading to assumption of 404 permit authorities by the STATE of FLORIDA."  *Id.* at CORPS003714 (capitalization in original).

The next day, the Corps issued a public notice summarily terminating the comment period.  CORPS003717, at CORPS003717 (Updated Public Notice) (terminating comment period "until further notice").  The public, undeterred, continued to submit comments through the original deadline of April 20, 2018.  CORPS003724, at CORPS003725–29 (Sierra Club) (asking that the Corps ensure a complete inventory of navigable waters in Florida prior to assumption); CORPS003843, at CORPS003844 (Audubon Florida); CORPS003846, at CORPS003846

(Center for Biological Diversity); CORPS003850, at CORPS003892–99 (Conservancy of Southwest Florida) (identifying dozens of additional waterways in Florida counties that should be reviewed for navigability); CORPS003900, at CORPS003900–4064 (Earthjustice); CORPS004065, at CORPS004067–68 (Florida Conservation Coalition) (former U.S. Senator and Florida Governor Bob Graham, urging the Corps to recognize the vast network of navigable waterways in Florida over which the Corps would have to retain jurisdiction); CORPS004069, at CORPS004069–74 (Florida Keys Environmental Fund); CORPS004085, at CORPS004085–87 (Waterkeepers Florida).[10]

On June 18, 2018, Corps leadership directed staff to "suspend its efforts relating to a navigability study of waters" in response to Florida's proposal to assume 404 authority. CORPS004093, at CORPS004094–95 (Corps email).  The Corps acknowledged that it had "initiated a navigability study" to identify retained waters but now cited a forthcoming rulemaking to revise the definition for "waters of the United States" as justification to "suspend the current navigability studies."  *Id.*

Then, on July 30, 2018, the Corps issued a memorandum on "non-assumable waters." CORPS004096, at CORPS004097–98 (Corps Memorandum).  The Corps asserted it would use existing RHA Section 10 lists as a "starting point" for 404 retained waters lists, subject to amendments by the Corps.  *Id.*, at CORPS004098.  The memo, however, also directed that the Corps would not retain 404 jurisdiction over Section 10 waters that "qualify as 'navigable' solely because they were 'used in the past' to transport interstate or foreign commerce."  *Id.* at CORPS004097–98.  This reversed the position the Corps had taken while participating on an

---

[10] The comments submitted by Conservancy of Southwest Florida and by Earthjustice (on behalf of some of the Plaintiffs) were also copied to EPA at the time.

EPA Assumable Waters Subcommittee based on its own regulations and guidance.[11]  The Corps'

memorandum also stated that while EPA intended to address assumable waters in a rule, it was

not necessary to wait for "any such rulemaking."  *Id.*, at CORPS004096–97.

In 2019, the Corps provided FDEP with a four-page "Retained Waters List" that the State

included in its draft "State 404 Program Handbook" which it adopted through state rulemaking

for the purpose of its 404 application to EPA.  EPA-HQ-OW-2018-0640-0002-A20, at 43–46.

The Corps' Retained Waters List was based on the 2014 (and not 2017) navigable waters list,

CORPS004149, at CORPS004149, and "remove[d] … Historic Navigation Segments" from the

list.  CORPS004238, at CORPS004238–4264.  On August 5, 2020, the Corps executed a

memorandum of agreement ("MOA") with FDEP, which attached the final Retained Waters List

(now dated August 5, 2020).  CORPS004322, at CORPS004322–34.

## V.    Endangered Species Act Consultation.

When it came to protected species issues, EPA and USFWS also changed course

expressly at Florida's request and for the purpose of its assumption aspirations.  Since at least

2010, EPA had taken the position that its approval of a state 404 program was a non-

discretionary decision, and that therefore consultation under Section 7 of the Endangered Species

Act ("ESA") for the review of an assumption application was not required.  EPA-HQ-OW-2018-

0640-0690, at 1–2 (EPA ESA Consultation Position Memo).

---

[11] According to the Subcommittee Report, EPA formed the subcommittee to "clarify" which
waters could be assumed under Section 404 under 33 U.S.C. 1344(g)(1).  The majority proposed
that the Corps not retain jurisdiction over "historic use" waters, CORPS002999, at CORPS
003017–21, while the Corps recommended that it retain jurisdiction over all Traditional
Navigable Waters (TNWs) under the Clean Water Act in accordance with 33 C.F.R.
§ 328.3(a)(1) and the agency's *Rapanos* guidance.  CORPS002999, at CORPS003015–16,
CORPS003021–22.

15

But in its quest to ensure a "streamlined" approach for state 404 permittees to receive liability coverage for incidental take, Florida asked EPA to change course on whether Section 7 consultation was required when it approved state 404 programs. EPA-HQ-OW-2018-0640-0670 (email from Florida to EPA attaching "Florida's First White Paper"); EPA-HQ-OW-2018-0640-0670-A5 (Florida White Paper I). As later outlined in another of Florida's white papers, Florida proposed that EPA engage in a "one-time" programmatic consultation that would result in a programmatic ITS extending take liability coverage to EPA, the State, and state permittees following a "technical assistance" process. EPA-HQ-OW-2018-0640-0388-A7, at 2 (FDEP White Paper II).

Florida complained that currently, "where a state administers the Section 404 program, permittees themselves must avoid entirely adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10." *Id.* Florida sought an out from this "dynamic" precisely because there are so many ESA-listed species in the State. *Id.* Florida estimated that about 10% of 404 permits in Florida required some form of incidental take coverage, including for "many large real estate, mining, agriculture, and utility industry projects[.]" *Id.*

Other options were available to protect permittees from incidental take liability while also complying with the ESA. EPA acknowledged that state programs can (1) entirely avoid impacts to protected species; (2) federalize state 404 permits when they may impact species (passing those permits to the Corps);[12] or (3) require state permittees to engage in ESA Section 10 review,

---

[12] This was the approach taken by New Jersey in its state program. FWS-006144, at FWS-006149–50 (NJ MOU).

the process Congress designed to extend incidental take liability exemption to non-federal actors. EPA-HQ-OW-2018-0640-0686, at 1–2 (EPA response to comments).[13]

On December 12, 2019, EPA designated FDEP as the non-federal representative for "informal" consultation with USFWS.  FWS-000001, at FWS-000001–02 (EPA letter).  EPA stated that it was voluntarily initiating informal consultation while it gave "further consideration" to its position on whether consultation was required for approving a state 404 program.  *Id.*

But as early as November 2019, FDEP was already telling the Corps that the State had hired a contractor to prepare a biological assessment ("BA"), and that EPA would treat its review of the State's application as a "discretionary" federal action, thereby requiring Section 7 consultation at the program level.  CORPS004318, at CORPS004318 (Corps email).  In December 2019, FDEP further advised the Corps that EPA would use the BA to request consultation and produce a programmatic BiOp.  CORPS004319, at CORPS004320–21 (Corps email) (sending meeting notes).  And on April 1, 2020, USFWS staff also made explicit to FDEP the plan that was already in the works:

> After assumption, [USFWS] will not be issuing any project-by-project incidental take statements for State 404 permits because the State 404 BiOp will have a programmatic [ITS] that will cover any incidental take for any state 404 permit. [USFWS] will merely be providing technical assistance on the project by project reviews to [FDEP], [the Florida Fish and Wildlife Conservation Commission ("FWC")], and/or permit applicants and tracking on a project-by-project basis any incidental take that is anticipated to occur as the result of [FDEP] issuing any particular 404 permit.

FWS-000749–751, at FWS-000749 (USFWS email).

---

[13] As Florida itself acknowledged, there was a fourth approach available where EPA would consult with USFWS on individual state 404 permits based on its oversight of state permits that have the reasonable potential to affect protected species.  EPA-HQ-OW-2018-0640-0670-A3, at 1–2 (ESA Compromise).

Still, on May 21, 2020, EPA invited public comment on whether EPA's approval of a Section 404 program is nondiscretionary for purposes of ESA Section 7 consultation, representing to the public that this was still an open question on which they could be heard.[14] EPA-HQ-OW-2018-0640-0637 (85 Fed. Reg. 30,953).

In the meantime, on July 24, 2020, Florida sent EPA its BA.  EPA-HQ-OW-2018-0640-0387-A8 (BA).  And the State worked with USFWS to draft a Memorandum of Understanding ("MOU") that claimed the State would ensure permits would not jeopardize species based on a "technical assistance" process that it predicted would be articulated in an "anticipated" BiOp. EPA-HQ-OW-2018-0640-0016-A2, at 5 (Application MOU) (unexecuted).

On August 27, 2020, EPA announced the reversal of its longstanding position for purposes of considering the state's application, so that EPA could use Section 7 consultation to deliver broad protection to the State and its permittees for incidental take.  EPA-HQ-OW-2018-0640-0660-A1, at 1 (ESA Consultation Memo).  But EPA did not stop there.  Instead, the agency also articulated exactly how the wildlife agencies would perform their consultation duties.  EPA explained that it had been persuaded by Florida's advocacy for a one-time ESA Section 7 programmatic consultation in conjunction with EPA's initial review "as an efficient and legally-defensible approach to resolving the lack of incidental take coverage for permittees and permitting agencies" by providing a programmatic ITS, preferable to the status quo of requiring permittees to "avoid adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10."  *Id.* at 3.

---

[14] Several Plaintiffs agreed that EPA's action was discretionary, thereby requiring Section 7 consultation, but opposed the use of Section 7 to follow the path advocated by Florida (and on which EPA also sought comment) as unlawful under the ESA.  EPA-HQ-OW-2018-0640-0388-A2 (Conservation Groups' comment letter).

Just four business days later, on September 2, 2020, EPA submitted a biological evaluation ("BE") to USFWS to initiate formal consultation on Florida's application. FWS-005608, at FWS-005608–09 (submittal letter); FWS-005610, at FWS005610–906 (BE). EPA's BE was largely a cut and paste of the State's BA, which was not independently assessed by EPA. *Compare* EPA-HQ-OW-2018-0640-0387-A8 (BA) *with* FWS-005610–5906 (BE).

Also, on September 2, 2020, EPA sent a letter to NMFS summarily concluding that approval of the state program would have "no effect" on NMFS' jurisdictional marine and anadromous species. EPA-HQ-OW-2018-0640-0617 (EPA letter). EPA's conclusion was solely based on an April 15, 2020, letter by NMFS to Florida, stating that no species in NMFS' exclusive jurisdiction would be present "in assumable waters." EPA-HQ-OW-2018-0640-0638 (NMFS letter). *See also* EPA-HQ-OW-2018-0640-0649 at 52 (BE) (EPA explaining basis for no effect determination). NMFS' letter, however, did not consider the entire action area, including areas indirectly affected by the federal action, as required by law. 50 C.F.R. § 402.02. On September 3, 2020, NMFS concurred with EPA's determination. *See* EPA-HQ-OW-2018-0640-0618 (NMFS letter).

On November 17, 2020, USFWS produced a programmatic BiOp and ITS for EPA's approval of Florida's application. FWS-006028 (BiOp). The BiOp did not conduct species-specific analyses of the baseline status of species or impacts of EPA's action. *See id.* at FWS-006092, FWS-006094–95 (stating USFWS would not and was not "required" to analyze species-specific effects). Instead, the BiOp devoted nearly half its length describing the technical assistance process by which the State would take the lead in considering and addressing impacts to listed species and critical habitat for individual permit decisions. *Id.* at FWS-006045–75. USFWS would have "opportunities" to engage in this process but would only be required to

receive and review permit applications.  USFWS then granted broad incidental take exemption to EPA for its approval and oversight of the state program, to the State for its role as the "applicant," and to state permittees for any take of listed species incidental to state-permitted activities, without specifying the extent of that incidental take, adequate monitoring of take, or terms and conditions that would meaningfully limit incidental take.[15]

## VI.    EPA's Approval of the State's Application.

On August 20, 2020, the State submitted its application to EPA.  *See* EPA-HQ-OW-2018-0640-0001, at 1 (Federal Register notice).  The application relied on a technical assistance process that would be outlined in a later programmatic BiOp, failed to adopt Section 404(b)(1) Guidelines, failed to adequately identify waters to be assumed, and relied on lesser enforcement standards.  Ensuring a decision would be made before any change in administration, on August 28, 2020, EPA determined that Florida's application was "complete" as of the submission date. EPA-HQ-OW-2018-0640-0641, at 1–2 (Completeness Determination).  EPA's "completeness" determination triggered a 120-day deadline to approve or deny the application by December 18, 2020, unless EPA and Florida agreed to extend the timeline.  *See* 33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.15(a), (c).  And on September 16, 2020, EPA initiated a public comment period on Florida's assumption application that would conclude on November 2, 2020.  EPA-HQ-OW-2018-0640-0001, at 1 (Federal Register notice).  *See* 40 C.F.R. § 233.15(e); 5 U.S.C. § 553.

In an October 23, 2020, letter, Plaintiffs' counsel urged EPA to reverse its completeness determination considering critical omissions in Florida's application and requested suspension of the public comment period until the deficiencies were cured, including as to the treatment of

---

[15] Although USFWS stated that permittees would be required to comply with species-related permit conditions, USFWS extended take liability coverage without any terms and conditions requiring that permittees do so.  *See* 16 U.S.C. § 1536(o).

ESA-listed species.  EPA-HQ-OW-2018-0640-0051, at 1–9 (Completeness Letter).  *See* 40 C.F.R. § 233.15(a) (review period begins only if EPA finds state application complete).

On November 2, 2020, Plaintiffs and many other members of the public submitted comments opposing the state program, citing, among other things, the absence of required components which prejudiced the opportunity for public comment, and the proposal's failure to meet the requirements for a state-assumed program, particularly as relates to the protection of listed species, the failure to adopt the federal 404(b)(1) Guidelines, and enforcement.  *See, e.g.*, EPA-HQ-OW-2018-0640-0386-A1 (Plaintiffs' Comments). 33 U.S.C. § 1344(g)–(h).

On December 17, 2020, EPA approved Florida's application.  EPA-HQ-OW-2018-0640-0566 (Approval Letter).  On December 22, 2020, EPA published its approval with an immediate effective date, in violation of 553(d), ensuring the transfer of authority would occur before the next administration took office.  EPA-HQ-OW-2018-0640-0564 (85 Fed. Reg. 83,553).

## PROCEDURAL BACKGROUND

Plaintiffs filed this action on January 14, 2021, alleging that the Federal Defendants violated the Clean Water Act, ESA, RHA, and Administrative Procedure Act ("APA").  Dkt. 1. On February 1, 2021, the Court granted the Motion to Intervene by the State of Florida and FDEP ("Florida" or "Intervenors").  Minute Order.

On March 5, 2021, Plaintiffs filed a Motion for Partial Summary Judgment on Claims Eight and Nine.  Dkt. 31.  On April 26, 2021, Defendant EPA cross-moved, Dkt. 34, and Intervenors filed a Cross-Motion to Dismiss, Dkt. 36.  On March 30, 2022, the Court entered summary judgment in favor of EPA on Claim Nine, reserved ruling on Claim Eight pending further briefing on redressability, and denied Florida's Motion to Dismiss on all claims.  Dkt. 73. On April 19, 2022, Plaintiffs filed an Amended Complaint asserting additional claims against EPA and USFWS.  Dkt. 77.

On November 1, 2022, the Federal Defendants each filed a Certified Index to their respective Revised Administrative Record.  Dkt. 93, 94, and 95.  On November 15, 2022, the parties filed a status report requesting to propose a case management order following the Court's decision on Claim Eight.  Dkt. 96.  On January 30, 2023, the parties filed a Joint Motion for a Summary Judgment Scheduling Order, Dkt. 97, which the Court granted.  Jan. 31, 2023, Minute Order.  This motion is filed in accordance with that Order.

## STANDARD OF REVIEW

In an APA case, summary judgment "serves as a 'mechanism for deciding, as a matter of law, whether the agency action is ... consistent with the APA standard of review.'"  *Fisher v. Pension Benefit Guar. Corp.*, 468 F. Supp. 3d 7, 18 (D.D.C. 2020) (quoting *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 9 (D.D.C. 2019)).  The APA provides that a court shall "hold unlawful and set aside agency action" that is (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," (2) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or (3) "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C)–(D).  *See also WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 97 (D.D.C. 2010) (citing *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *Idaho Conservation League v. EPA*, 820 F. App'x 627, 628 (9th Cir. 2020) (EPA abused its discretion approving a state-delegated Clean Water Act program that was less stringent than federal law).  Courts apply the same APA standard for ESA citizen suit claims.  *Am. Rivers v. FERC*, 895 F.3d 32, 44–45 (D.C. Cir. 2018).  Questions of statutory interpretation are reviewed de novo.  *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007).

## ARGUMENT

From 2017 to 2020, the Federal Defendants created unlawful regulatory shortcuts to allow Florida to assume Section 404 authority without meeting the standards of federal law. The agencies' actions violated not only the Clean Water Act, but also the ESA, RHA, and APA. These unlawful agency actions harmed Plaintiffs' interests, and those of the tens of thousands of members they represent.

First, USFWS—the entity Congress directed to administer the ESA—produced a shallow programmatic BiOp that relied on a state-driven, non-statutory technical assistance process that itself does not require the same rigorous analyses Congress established in the ESA. Based on this unlawful BiOp, USFWS then granted broad take liability exemption to EPA, the State, and all future state permittees for the life of the state program.

Second, once Florida's application was submitted, EPA moved at breakneck speed to approve the program before a change in administration. EPA ignored Plaintiffs' request to reverse its "completeness" determination as to Florida's application, which triggered a 120-day decision clock, even though the State had failed to demonstrate authority to ensure against jeopardy of protected species and modification or destruction of critical habitat and had failed to adequately describe the waters over which it would assume jurisdiction. EPA closed the public comment period more than two weeks before USFWS produced the BiOp that would contain the technical assistance process on which Florida (and EPA) relied to support the program's adequacy as to protected species. And EPA did not complete consultation with NMFS, relying on an unlawful "no effects" determination as to species under that agency's jurisdiction.

EPA failed to require Florida's program to come into compliance with federal law even after Plaintiffs notified the agency of its inadequacies, including a criminal intent standard already found by a U.S. Court of Appeals to have constituted an abuse of discretion in EPA's

approval of another state's Clean Water Act program.  In December 2020, EPA approved the application "effective immediately," depriving Plaintiffs of the right to seek an agency stay pending judicial review as a new administration was taking office.

Third, the Corps unlawfully washed its hands of exclusive jurisdiction over certain navigable waters by failing to perform navigability studies to determine the scope of its authority post-assumption and arbitrarily creating a "Retained Waters List" that rendered hundreds of those waterways assumable by the State.  EPA abused its discretion by failing to ensure that the state program only assumed authority over assumable waters.  In approving Florida's program, EPA unlawfully delivered non-assumable waterways to state 404 jurisdiction and away from further federal protection under NEPA and the ESA.

While Congress preserved important roles for states under the Clean Water Act, including the ability to administer permit programs when certain criteria are met, any state program authorized under the Clean Water Act must be as stringent as federal law.  33 U.S.C. § 1344(h)(1).  Congress made plain that the Clean Water Act set the minimum standards to address previous shortcomings in state clean water efforts.  *See id.* §§ 1319, 1344.

The Federal Defendants' actions were unlawful.  While Congress created a path for states to assume 404 jurisdiction, federal agencies are not authorized to disregard federal law to grease the skids.  The Federal Defendants' actions must therefore be vacated and set aside.

I.    **USFWS Violated the ESA by Substituting a Non-Statutory Technical Assistance Process for the ESA's Statutory Framework.**

USFWS violated the ESA by substituting an inadequate, non-statutory technical assistance process for the statutory framework established by Congress in Sections 7 and 10 of the ESA.  USFWS's non-statutory approach abandoned key protections for threatened and endangered species that would be afforded to them if the statutory process were followed.  There

were other options for the State to obtain take liability exemption for state permittees—such as federalizing permits that would impact species, thereby triggering Section 7 consultation, or obtaining Section 10 authorization—which would include statutory safeguards at the permit level to minimize and mitigate take and use the best scientific and commercial data available.

USFWS' approach here, however, discarded both statutory avenues to rely on a novel procedure for state 404 permits to issue without the key statutory protections congressionally mandated by the ESA. First, at the programmatic level, USFWS produced a programmatic BiOp that was devoid of the analyses and rigor required under Section 7 of the ESA, and without regard to the quantity, location, scope, methods, species, and habitat impacts, or any other details about these future wetland-filling projects. Second, USFWS extended broad take liability exemption to all parties involved, in perpetuity, relying on a technical assistance process that lacks the statutory guardrails that specify the extent of take permitted, require the monitoring of take, and establish meaningful terms and conditions to implement the ITS. Third, USFWS wrongly claimed that the technical assistance process would provide the same level of species and habitat protection as the Section 7 consultation process would have provided had the Corps retained 404 permitting authority. At both the programmatic and permit level, USFWS gave away the keys to the kingdom in violation of the ESA and APA (Claims 3, 4, 6, 12, and 13).

A.    **USFWS Abdicated Its Duties to Abide by the ESA's Requirements.**

By adopting the State's approach, USFWS did not abide by the standards and procedures laid out in Section 7. It failed to analyze the full extent of the agency action, failed to evaluate the baseline status of the species affected, and failed to assess the effect of EPA's action on protected species. USFWS then arbitrarily and capriciously opined that EPA's action would not jeopardize protected species or adversely modify or destroy critical habitat. USFWS' actions violated the direct mandates of the ESA and its implementing regulations and must be vacated.

First, a core flaw in USFWS' BiOp was its evaluation of only the process the State would undertake when issuing individual Section 404 permits and authorizing new general 404 permits, rather than the State's program as a whole.  FWS-006028, at FWS-006043, FWS-006045–69 (BiOp).  Agency action is defined broadly, because "caution can only be exercised if the agency takes a look at all the possible ramifications of the agency action."  *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 521 (9th Cir. 2010).  USFWS' narrow view excluded the impact on species that would occur through the State's (1) application of existing general permits across the State; (2) decisions on when permits would not be required, including those based on the State's evaluation of whether the wetlands at issue are assumed "waters of the United States;" and (3) compliance and enforcement activities.  Nor did USFWS consider the impacts to species that result from the loss of NEPA review and ESA Section 7 consultations at the site-specific level.

Second, USFWS failed to evaluate the baseline status of protected species and critical habitat.  *Contra* 50 C.F.R §§ 402.14(g)(2), 402.02.  USFWS vaguely listed information devoid of any analysis or connection to protected species, critical habitat, or the past, present, and anticipated impacts on protected species and critical habitat.  The "Environmental Baseline" section contained only (1) an introductory section that includes the unremarkable premise that species are affected when their habitats are affected and then adopts, without explanation or independent analysis, sections of the BE, FWS-006028, at FWS-006083–84 (BiOp); (2) a "procedural baseline" section describing the regulatory structure in place before assumption by the State, *id.* at FWS-006084–88; (3) an "ecological baseline" section that generally describes the existing acreage of different types of wetlands without mentioning or connecting those wetlands to a single protected species or critical habitat area, *id.* at FWS-006089–91; and (4) a generic description from EPA's BE of estimates about a subset of Corps permitting data focused

on the number and type of ESA consultations conducted, not species impacts, *id.* at FWS-006091.  Of the 139 protected species at risk, *id.* at FWS-006083, only two species were named in this section, *id.* at FWS-006091.  And even there, USFWS made no mention of the information required in a baseline analysis.  *Id.*

USFWS thus failed to "evaluate the current status and environmental baseline of affected species or critical habitats."  50 C.F.R. §§ 402.14(g), 402.02.  *See Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 128 (D.D.C. 2001) (requiring USFWS to conduct an "analysis of the status of the environmental baseline given the listed impacts, not simply a recitation of the activities of the agency"); *Oceana, Inc. v. Ross*, No. CV 15-0555 (PLF), 2020 WL 5995125, at *11 (D.D.C. Oct. 9, 2020) (USFWS cannot just "list and describe data that it purported to incorporate into its jeopardy analysis—without indicating how that data actually factors into the analysis"); *Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 353 (4th Cir. 2019) (short, perfunctory statements do not suffice).

Third, rather than evaluating and analyzing the impact of EPA's action on protected species and critical habitat, USFWS stated that it was "not feasible, *nor is it required*" to detail or analyze any "species-specific effects."  FWS-006028, at FWS-006092, FWS-006094–95 (BiOp) (emphasis added).  But evaluating the individual and cumulative effects on protected species is exactly what the ESA demanded.  16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. § 402.14(g)(3).  Rather than conduct the analyses required by law, however, USFWS (1) relied on sections of EPA's BE that it incorporated without analysis or explanation, including the assessment of general "stressors" and summary table, FWS-006028, at FWS-006092, FWS-006094–96 (BiOp); (2) made unfounded and unsupported assumptions that failed to evaluate the effects of the action, *id.* at FWS-006093; and (3) provided a generic, 30,000-foot view of

stressors, *id.* at FWS-006095–96 (*e.g.*, "Biotic Stressors" are harms to organisms from other organisms; "Physical Stressors" are physical changes that have biological impacts); and (4) taxa-level impacts that provided nothing more than general information without meaningful connection to the proposed action, *see, e.g.*, *id.* at FWS-006097–98 (mammals may occupy waters of the United States; dredge and fill activities may affect habitat in terms of water quality or habitat fragmentation).[16]  And nowhere does USFWS evaluate cumulative impacts.

Even where the BiOp named particular species, it fell far short of considering the most concerning impacts that result from 404 permits.  For example, the BiOp mentioned panthers, *id.* at FWS-006097, but omitted the leading cause of death for panthers: vehicle strikes, which often increase as a result of development or road projects that must clear wetlands and obtain Section 404 permits.  *See* EPA-HQ-OW-2018-0640-0388-A9, at 35–41, 87–94 (Panther Recovery Plan); EPA-HQ-OW-2018-0640-0388-A10, at 12–15, 16–17 (Panther Five-Year Review).

The BiOp's vague listing of potential impacts at the taxa level was insufficient.  *See Defs. of Wildlife*, 130 F. Supp. 2d at 127–28 (requiring analysis of effects, not mere listing, and analysis of effects cannot simply address the impacts of the particular agency action in isolation); *Oceana*, 2020 WL 5995125, at *20 (listing without connecting information to analysis is insufficient); *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195, 1224 (D. Mont. 2010) (rejecting a programmatic BiOp that failed "to explain how a discussion of

---

[16] *Accord id.* at FWS-006098–99 (BiOp) (dredge and fill may disturb birds, alter water quality, and affect their habitats); *id.* at FWS-006099–100 (reptiles may be affected by impacts to their habitats); *id.* at FWS-006100–01 (amphibians may be affected by fill of wetlands, hydrology alteration, habitat fragmentation); *id.* at FWS-0060101 (fish may be affected by sedimentation, water quality degradation, and habitat loss); *id.* at FWS-006101–02 (insects may be affected by habitat impacts); *id.* at FWS-006102 (crustaceans may be affected "via direct mortality" or habitat alteration and water quality changes); *id.* at FWS-006102 (mollusks are likely to be impacted by dredge and fill activities); *id.* at FWS-006103 (plants may be affected by direct mortality, habitat loss, water quality).

the effects on an entire taxonomic group can support a finding as to the effects on the value for recovery of specific designated critical habitat for a specific species"); *Am. Rivers*, 895 F.3d at 47 (USFWS must "analyze the effects" of the proposed action, not merely list some effects and omit others); *Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170, 176–77 (D.D.C. 2004) (rejecting BiOp that failed to evaluate reasonably likely impacts).

Moreover, USFWS ignored how Section 404 permitting actions that occur in state-assumed waters may affect nesting sea turtles, e.g., from light pollution or sedimentation. By this omission, USFWS violated its obligations under the ESA. EPA violated its independent duty to consult, 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a), by omitting nesting sea turtles from its BE and relying on an insufficient BiOp, *see Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (agency must consult when action may affect species).

Fourth, after failing to undertake ESA-mandated analyses, USFWS made a blanket "no jeopardy" determination for over a hundred protected species in one fell swoop. FWS-006028, at FWS-006106–07 (BiOp). USFWS did not attempt to conduct the mandated jeopardy analysis, nor could it given its refusal to assess species-specific effects. *Cf.* 50 C.F.R. § 402.14(g)(4) (requiring USFWS to "[a]dd the effects of the action and cumulative effects to the environmental baseline and in light of this information, formulate its opinion as to whether the action is likely to jeopardize the continued existence of a protected species or result in the destruction or adverse modification of critical habitat"). USFWS' blanket jeopardy determination failed to employ the best available science or otherwise comply with the ESA. 16 U.S.C. § 1536(a)(2), (b). *See Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022) ("These are not passive directives; rather, [USFWS] 'must seek out and consider all existing scientific data relevant to the decision it is tasked with making.'").

**B.    USFWS' ITS Unlawfully Extended Take Liability Exemptions Without Creating ESA-Mandated Guardrails.**

Next, despite not having performed the required statutory analyses, USFWS then

extended broad take liability exemption to EPA, the State, and all future state 404 permittees, in

perpetuity, without the ESA-mandated guardrails, which include: (1) identifying the amount or

extent of take that serves as an adequate trigger for reinitiation; (2) requiring adequate take

monitoring; and (3) creating adequate terms and conditions to limit take and justify the broad

safe harbor it created for EPA, the State, and state permittees.

First, the ITS failed to specify the amount or extent of incidental take and instead merely

asserted, without explanation, that the information provided by EPA and Florida "did not allow

[USFWS] to ... estimate the number of individuals that might be affected by the permitted

activities." FWS-006028, at FWS-006107 (BiOp). *Contra* 16 U.S.C. § 1536(b)(4); 50 C.F.R.

§ 402.14(i)(1)(i). But USFWS itself was a hub of data on Section 7 consultations for Section

404 permits in Florida given its decades of consulting with the Corps on those permits. Despite

the wealth of information at its fingertips, USFWS baldly asserted it lacked the information

necessary to comply with the ESA's mandate. *See Conner v. Burford*, 848 F.2d 1441, 1453 (9th

Cir. 1988) (rejecting USFWS' position that there was insufficient information on site-specific

activities, because although the "precise location and extent" of such activities may be "unknown

at the time, extensive information about the behavior and habitat of the species in the areas

covered by" potential site-specific activities "was available"). Nor did USFWS identify or

justify the use of a surrogate. *Contra* 50 C.F.R. § 402.14(i)(1)(i).

One of the consequences of the ITS' failure to specify the amount of take is that the ITS

contained no adequate "trigger" for reinitiation. Without specifying the amount or extent of take,

there is no way to say when it has been exceeded such that reinitiation of consultation would be

required.  50 C.F.R. § 402.16(a)(1).  The ITS provided no other clear reinitiation triggers either.

For example, although "new" information requires reinitiation, given USFWS' failure to

evaluate the information at its disposal, it is unclear what new information would trigger

reinitiation.  *Id.* § 402.16(a)(2).  Moreover, USFWS' "reinitiation notice" stated that (1) any

exceedance of take anticipated in a Section 404 permit would not require reinitiation, but rather

the reopening of only that permit, FWS-006028, at FWS-006111 (BiOp); and that (2) the listing

of a new species—a condition for reinitiation under ESA regulations, 50 C.F.R. § 402.16(a)(4)—

would *not* require reinitiation either, *id.*  But reinitiation cannot "be left to 'the unfettered

discretion of [USFWS], leaving no method by which the applicant or the action agency can

gauge their performance.'"  *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 272 (4th Cir.

2018) (requiring USFWS to set "a clear standard for determining when the level of anticipated

take has been exceeded" that will "adequately trigger reinitiation of consultation" and cannot be

based on "vague and undetectable criteria").  "This lack of a clear standard also create[d] a

transparency problem," because now, "the agency makes the decision about whether to reinitiate

consultation behind closed doors and without a record."  *Oceana*, 2020 WL 5995125, at *13.

Second, after failing to identify any incidental take limit, the ITS then failed to require

adequate monitoring or reporting of incidental take at the permit level.  An ITS must establish an

adequate monitoring mechanism.  *Id.* at *15.  The ITS noted only that USFWS would track take

levels through the technical assistance process.  It did not explain how those take numbers would

be estimated, how it would determine if a specific project's anticipated take individually and

cumulatively fell below USFWS' "anticipated take limit" at the programmatic level, or what it

would do with that information (e.g., would the public have access to it to ensure the ITS is

working and enforced).

Third, and most fundamentally, the ITS established no meaningful reasonable and prudent measures nor implementing terms and conditions that the parties must abide by to stay within the safe harbor of the ITS.  16 U.S.C. § 1536(o).  Under the ESA, USFWS must include specific terms and conditions and articulate a rational connection between these terms and conditions and the taking of species.  *Arizona Cattle Growers'*, 273 F.3d at 1251.  Rather than abiding by the ESA's mandates, 16 U.S.C. § 1536(b)(4)(ii), (iv), the BiOp merely required EPA to take actions already required by law and required only that the State (1) follow the technical assistance process described in the BiOp; (2) provide training on that process; (3) provide an annual summary report; and (4) inform permittees to notify USFWS of dead or injured protected species.  FWS-006028, at FWS-006109–10 (BiOp).  In other words, the ITS created no new or additional requirements on EPA and no meaningful conditions for the State.  As for USFWS, no terms and conditions required the agency to engage in the technical assistance process laid out in the BiOp, participate robustly in that process, or take all "opportunities" that are available under the process.  *Id.*  Nor were any terms and conditions that apply to future 404 permittees, such as requiring compliance with state 404 permit terms and conditions.  *Id.*  Such vague, empty promises were insufficient to satisfy the law.  *See* 16 U.S.C. § 1536(b)(4)(C)(ii), (iv).

USFWS' BiOp and ITS also relied on wholesale compliance by EPA (oversight), compliance by Florida (minimizing impacts and abiding by its role in the "technical assistance" process), compliance by USFWS (in taking all "opportunities" to engage in the "technical assistance" process), compliance by all future permittees, and (presumably) compliance by all others who would dredge and fill wetlands in Florida so that they obtain all necessary Section 404 permits before dredging and filling wetlands in WOTUS.  *See* FWS-006028, at FWS-006093 (BiOp).  But because the terms and conditions did nothing to guarantee this compliance,

at any level or across the board, these assumptions on "purely speculative actions" could not

support a no jeopardy determinations. *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d

230, 253–54 (D.D.C. 2003) (rejecting a BiOp dependent on the Corps' "purely speculative"

compliance with USFWS' terms and conditions).

### C. USFWS Unlawfully Relied on a Novel Technical Assistance Process to Avoid the Mandates of Section 7 Consultation.

Having failed to produce an adequate BiOp at the programmatic level, USFWS could not

then rely on an inadequate "technical assistance" process at the permit-level.  USFWS had a

mandatory duty to comply with the ESA, and it failed twice.  To grant the State's wish and

extend broad take liability coverage to state permittees without requiring the robust analysis of

Section 10, USFWS produced a Section 7 programmatic BiOp but then claimed it could rely on a

non-statutory technical assistance process as a substitute for its Section 7 duties.  This approach

was in direct conflict with the ESA and undermined the specific requirements Congress put in

place before allowing incidental take liability exemptions.  USFWS' programmatic BiOp must

therefore be set aside.

First, USFWS was required to conduct the ESA-mandated analyses at the programmatic

level and failed to do so as described above.  Congress did not distinguish between consultation

that is programmatic in nature as opposed to site-specific, but mandated that the processes,

standards, and findings required by statute apply to consultation, period.  16 U.S.C. § 1536.  And

although the ESA regulations contemplate programmatic BiOps, those rules still bind USFWS to

conduct an analysis based on the "best scientific and commercial data available," considering the

effects of a proposed federal action "*as a whole*."  50 C.F.R. § 402.14(c)(4), (d) (emphasis

added).  *See* 84 Fed. Reg. 44,976, 44,996 (Aug. 27, 2019) (codified at 50 C.F.R. § 402.02)

(describing the added definition of "programmatic consultation" as consultation used to "assess the effects of a program, plan, or set of activities *as a whole*" (emphasis added)).

And as courts have explained, it is permissible to tier site-specific BiOps to programmatic BiOps only where (1) USFWS evaluates the federal agency action *as a whole* at the programmatic level—which USFWS did not do here; and (2) the action agency engages in site-specific consultation to produce site-specific BiOps and ITSs—which USFWS claimed it would do through the insufficient technical assistance process. *See N. Slope Borough v. Andrus*, 642 F.2d 589, 608 (D.C. Cir. 1980) (multi-stage actions do not excuse failure to consider effects at the earliest stage).[17] Step two is critical for USFWS to comply with its continuing duty to ensure all effects are properly considered as required by the ESA. *See* 50 C.F.R. § 402.14(k).

Second, the non-statutory technical assistance process was not an adequate stand in for the robust analysis required by Section 7 consultation because it is not subject to the requirements and mandates in the ESA. No regulation or statutory provision affirmatively authorizes a "technical assistance" process for ESA consultations.[18] Nor are there any statutory or regulatory standards that applied to USFWS' approach here, such as Section 7's requirement to consider the best available scientific and commercial information. The most authoritative legal source that discusses "technical assistance" is an agency guidance document, which merely

---

[17] *See, e.g.*, *Conner*, 848 F.2d at 1453–54 (ESA Section 7 "on its face requires the FWS in this case to consider all phases of the agency action, which includes post-leasing activities, in its biological opinion."); *Gifford Pinchot Task Force v. USFWS*, 378 F.3d 1059, 1063 (9th Cir. 2004), *amended*, 387 F.3d 968 (9th Cir. 2004) (tiering site-specific BiOp to programmatic BiOp); *Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 10–11 (D.D.C. 2005) (future analyses considering species effects would "not relieve the Federal agency of the requirements for considering the effects of the action as a whole"); *Forest Serv. Emps.*, 726 F. Supp. 2d at 1229–32 (programmatic BiOp can tier only with full BiOps); *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1156 (D. Ariz. 2002) (staged analysis not allowed by ESA).
[18] USFWS' actions are thus also ultra vires and must be set aside. *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992). (Claim 13).

shows it was created for an entirely different use: as a preliminary step available during *informal* consultation with *federal* agencies to allow USFWS to assist agencies in that process, not as an alternative to the ESA-mandated procedures and standards pursuant to Section 7 (for federal actions) or Section 10 (for non-federal actions). USFWS & NMFS, *Endangered Species Consultation Handbook* (1998), https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf.

And in fact, there are no statutory or regulatory guidelines to bind the process or manner of USFWS' engagement in the technical assistance process here. USFWS is not required to evaluate the baseline status of protected species that may be affected by state permits. The agency need not evaluate the effects of the permit on protected species and critical habitat. There is no requirement that USFWS evaluate jeopardy or the potential to adversely modify or destroy critical habitat. And the agency need not apply the best available science in its assessment, if any, of state 404 permits. There are therefore no guardrails for how USFWS would make determinations for state 404 permits.

Third, the technical assistance process that USFWS created is State led, with only "opportunities" for USFWS to be involved. "When a statute requires an agency to make a finding as a prerequisite to action, it must do so." *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) (USFWS violated ESA by allowing regulated entity to make findings USFWS was required to make under Section 10 of the ESA). Here, the State (not USFWS) determines whether a permit application will have adverse impacts on protected species or critical habitat and may stick to that determination even if USFWS provides information contrary to that conclusion. FWS-006028, at FWS-006056, FWS-006058 (BiOp). If the State concludes there

will be no adverse impacts, the technical assistance process concludes.[19]  *Id.* at FWS-006056.  If the State finds there will be an adverse impact, it will send information to USFWS requesting technical assistance.  *Id.* at FWS-006057.  The State then coordinates with USFWS on potential protective measures, which the State may propose to USFWS; it is voluntary for USFWS to respond.  *Id.* at FWS-006057–58.  Where a permit is likely to jeopardize protected species or destroy or adversely modify critical habitat, the State need only "coordinate" with USFWS to develop measures that must be incorporated into the permit (meaning the State may be the one to develop those measures), but there is no obligation on USFWS' part to engage and no parameters for USFWS to follow if it does engage.  *Id.* at FWS-006057.

As for USFWS' role under the technical assistance process, its only mandatory duty is to receive and review complete permit applications.  *Id.* at FWS-006049.  USFWS may, but is not required to, request additional information to ensure the applicant provides the information necessary to assess the species impacts of the proposed permit.  *Id.*  USFWS' review of permit applications, *id.* at FWS-006050, is bereft of any enumerated process or standards.  USFWS is not required to follow and abide by any of the guardrails the ESA requires (such as baseline, effects analyses, best available science, and cumulative effects) to inform USFWS' opinions and recommended protective measures.  USFWS has the "opportunity" to provide comments during the public comment period but is not required to do so.  *Id.* at FWS-006057.  USFWS "may" suggest measures to protect species, "as needed," but is not required to do so.  *Id.* at FWS-006054.  *Accord id.* at FWS-006055, FWS-006058.[20]  Even if a permit will lead to incidental

---

[19] While the BiOp asserted USFWS' determinations as to species effects are "determinative," that only applies if and when the State has already made the determination that a state permit will affect species, and it assumes that USFWS will weigh in.  FWS-006028, at FWS-006058 (BiOp).
[20] Although not required to do so, if USFWS does decide to recommend protective measures, the State must incorporate them or deny the permit.  FWS-006028, at FWS-006054 (BiOp).

take, the BiOp stated USFWS will establish take limits "in coordination with" the State, without USFWS meeting any of the underlying ESA requirements to quantify take and set take limits that would trigger reinitiation. *Id.* at FWS-006108. Even in the BiOp, USFWS explicitly relied on its own "assumption" that it would later develop appropriate measures to minimize take, but nothing in the BiOp, the technical assistance process, or the law committed the agency to do so. And nothing in the process requires USFWS to follow the ESA when it does. *Id.*

USFWS modeled their approach on its programmatic BiOp assessing EPA's 316(b) regulations, which codified a technical assistance process in very different circumstances. *See* FWS-000113, at FWS-000113–16 (USFWS email); FWS-000129, at FWS-000129 (same); FWS-006523, at FWS-006523 (same). That programmatic BiOp was upheld in *Cooling Water*, but the circumstances and case are inapposite for three key reasons. *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 63, 72 (2d Cir. 2018).[21]

First, the federal action at issue was much narrower in scope. *Cooling Water* involved regulations EPA promulgated to create a technology standard aimed at reducing impacts to aquatic species from the operation of cooling water intake structures at select existing facilities that operate in similar ways (e.g., power plants) with similar effects. *Id.* at 59–60. That standard would then be implemented as a permit condition in a facility's National Pollutant Discharge Elimination System permit. *Id.* at 59. *Cooling Water* was thus similar to other programmatic BiOps that address the same type of action across different locations (e.g., the same technology operating in the same way at multiple facilities). Here, by contrast, Section 404 dredge and fill

---

[21] Plaintiffs also submit that *Cooling Water* was an outlier that was wrongly decided and is inconsistent with the ESA and the weight of authority, for the reasons articulated above. But the Court need not reach that issue because the case is also distinguishable.

activities cover a broad spectrum (ranging from building a house to large-scale residential, commercial, or industrial developments and road projects) which impact species in distinct ways.

Second, the 316(b) regulations served a very different purpose: they codified prescriptive measures designed to *reduce* impacts to aquatic species, *see* 40 C.F.R. § 125.94(c), and would cause a *net reduction* in incidental take, *Cooling Water*, 905 F.3d at 81. The 404 program, however, will necessarily harm species because it authorizes dredge and fill activities that destroy wetlands (habitat) and replace them with roads, developments, industrial facilities, etc. (causing secondary impacts like vehicle strikes, habitat segmentation, and pollution). *See* FWS-006028, at FWS-006096–103 (BiOp) (generally listing the potential effects from Section 404 permits); EPA-HQ-OW-2018-0640-0388-A9, at 35–41, 87–94 (Panther Recovery Plan); EPA-HQ-OW-2018-0640-0388-A10, at 12–15, 16–17 (Panther Five-Year Review).

Third, the 316(b) technical assistance process was codified as part of the 316(b) rulemaking, creating legally binding responsibilities for all parties. *Cooling Water*, 905 F.3d at 72. And the court explicitly upheld the 316(b) BiOp's programmatic approach because the 316(b) rules "*require[d]* [USFWS'] participation in the technical assistance process." *Id.* (emphasis in original).[22] Here, the technical assistance process was both created in, and relied upon by, the programmatic BiOp. There is no regulatory framework binding the parties' actions as in *Cooling Water*.[23] Further, as demonstrated above, the technical assistance process here does not require USFWS' participation, unlike in *Cooling Water*. The circumstances in *Cooling*

---

[22] USFWS also verified this commitment to the court. *Cooling Water*, 905 F.3d at 72.
[23] The USFWS MOU contemplated a technical assistance process being created but explained that the process would be outlined in the BiOp. EPA-HQ-OW-2018-0640-0016-A2, at 5 (Application MOU).

*Water* are too far afield from 404 permitting to support the breathtaking approach the Federal Defendants adopted here.  Defendants' actions thus violated the ESA.

## II.    EPA Unlawfully Relied on USFWS' Arbitrary and Capricious BiOp and ITS.

Because the BiOp was facially flawed, it was arbitrary and capricious for EPA to rely on it.  As detailed above, Section 7 of the ESA required EPA to ensure that the State's assumption, and implementation of the program, would not jeopardize the survival and recovery of listed species or adversely modify or destroy critical habitat.  16 U.S.C. § 1536(a)(2).  *See City of Tacoma v. FERC*, 460 F.3d 53, 75–76 (D.C. Cir. 2006);[24] *Am. Rivers*, 895 F.3d at 55 (reliance on legally flawed BiOp in NEPA document was arbitrary because it incorporated opinion's inadequate consideration of cumulative impacts); *Hawaii Longline Ass'n. v. NMFS*, 281 F. Supp. 2d 1, 27 (D.D.C. 2003), *on reconsideration in part sub nom. Hawaii Longline Ass'n v. NMFS*, 288 F. Supp. 2d 7 (D.D.C. 2003) (reliance on vacated, procedurally invalid BiOp as legal basis for continued application of regulations was arbitrary).

As the action agency, EPA bore the "ultimate responsibility for compliance with the ESA." *City of Tacoma*, 460 F.3d at 76 (citing 16 U.S.C. § 1536(a)(1)–(2)).  But EPA blindly adopted the pre-ordained (and unsupported) conclusions of USFWS.  *Contra id.* (agency must not blindly adopt consultant agency's conclusions).  Here, EPA failed to assess the impacts of its actions, because it relied entirely on USFWS' wholly inadequate BiOp which in turn unlawfully sought to punt its ESA duties to a non-statutory technical assistance process that itself was inadequate.  It was unreasonable for EPA to rely on the BiOp to conclude that its actions would

---

[24] While in that case the court found that reliance was lawful where the plaintiffs could point to no "new" information the action agency should have considered, this standard has not been applied when a BiOp is facially invalid because of missing analysis or incorporation of inadequate analysis, as is the case here. *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1096 (D.C. Cir. 2021); *Am. Rivers*, 895 F.3d at 55.

avoid jeopardy or to satisfy its procedural duties under the ESA.  *Id.  See also Mayo v. Jarvis*, 177 F. Supp. 3d 91, 146 (D.D.C. 2016) (reliance on facially flawed addendum to BiOp was arbitrary where addendum failed to explicitly discuss all effects); *Nat'l Wildlife Fed'n*, 332 F. Supp. 2d at 182 (BiOp was unlawful for failing to provide proper analysis of cumulative impacts and make rational connection between facts and no jeopardy finding, therefore reliance on it for NEPA assessment was arbitrary).

Moreover, the BiOp asserted that the information EPA and Florida provided did not allow USFWS to "estimate the number of individuals that might be affected by the permitted activities."  FWS-006028, at FWS-006107 (BiOp).  This too rendered EPA's reliance on the BiOp arbitrary.  *See Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1305 (9th Cir. 1993) (reliance on BiOp arbitrary because of action agency's failure to give expert agency all relevant data and information).  EPA's reliance was therefore unlawful and must be set aside (Claim 10).

### III.    EPA Arbitrarily and Capriciously Determined "No Effect" to NMFS Species.

EPA also made an unlawful "no effect" determination for protected species that are under NMFS jurisdiction, omitting potential indirect effects by relying on an improperly narrow definition of the "action area."  Both EPA and NMFS ignored the fact that, while no NMFS-protected species may be found in the waters over which Florida would assume jurisdiction, such species may nonetheless be impacted by the 404 assumption because they are found in waters that are fed by state-assumed waters.  The ESA prohibits making a "no effect" determination— and thus bypassing further consultation—when an action has even the potential for such indirect effects on protected species.  Because of this unlawful "no effect" determination, EPA failed to properly consult with NMFS and its actions must be vacated (Claims 5 and 11).

EPA had a duty under the ESA to consult with NMFS and ensure its action—approval of Florida's program—would not jeopardize the survival and recovery of protected species or

adversely modify or destroy their critical habitat *in the area of the proposed action*.  16 U.S.C. § 1536(a)(2), (c)(1); 50 C.F.R. §§ 402.13(a), 402.14(a).  "Action area" is defined to be broader than simply the project area: it means "all areas to be affected directly *or indirectly* by the Federal action and not merely the immediate area involved in the action."  50 C.F.R. § 402.02 (emphasis added).  *Accord Defs. of Wildlife*, 130 F. Supp. 2d at 128–29 ("action area" more than the "immediate area").

EPA based its "no effect" determination solely on NMFS' April 15, 2020, letter stating that ESA-listed species under NMFS' jurisdiction "do not occur *in* waters that are assumable by the state."  EPA-HQ-OW-2018-0640-0617 (EPA Letter) (emphasis added).  *See also* EPA-HQ-OW-2018-0640-0649, at 52 (BE).  EPA's determination was arbitrary and capricious given that NMFS' statement ignored areas that would be *indirectly* impacted by the federal action, including retained waters where NMFS species are present.  *See* 50 C.F.R. § 402.02.  As a matter of law, the relevant action area was not only "assumed" waters, or even just the "immediate area" of assumed waters.  *See Defs. of Wildlife*, 130 F. Supp. 2d at 128–29.  The "action area" included areas that would be *indirectly* impacted by the federal action, like waters downstream of assumed waters, where species under NMFS jurisdiction are found.

On its face, NMFS' determination that was limited to "assumed waters" failed to consider, much less analyze, all areas that would be indirectly affected by Florida's program. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02.  In relying solely on NMFS' jurisdictional determination, EPA also failed in its independent duty to consider, much less analyze, the proper action area—and the listed species that live there—as required under federal law.  *See* 16 U.S.C.

§ 1536(a)(2); 50 C.F.R. § 402.02(d).[25]  And EPA failed to provide a rational basis for its

determination.  *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002)

(agency must justify no effect determination with methodology, facts, or rational connections).

Moreover, EPA had ample evidence of the connections linking the action's potential

impacts to NMFS jurisdictional species and habitats within the action area.[26]  *See, e.g.*, EPA-

HQ-OW-2018-0640-0649, at 255–58 (BE) (finding action was likely to adversely affect several

species that inhabit the same coastal waters as NMFS jurisdictional species); *id.* at 151–153

(discussing certain NMFS jurisdictional species that exist in Florida waters).  In particular,

dredge and fill in assumed waters can affect downstream estuarine, marine, and tidal waters and

the species that inhabit them.  *See, e.g.*, EPA-HQ-OW-2018-0640-0642, at 42 (BiOp) (explaining

how "freshwater eventually makes its way to the nearly 2,000 miles of Florida coastline and

marine ecosystem"); EPA-HQ-OW-2018-0640-0649, at 58 (BE) (Fig. 4-1) (Historic freshwater

flows compared to freshwater flows after C&SF Project); *id.* at 256 (describing adverse impacts

to coastal and marine birds).  For example, these activities impact habitat (including critical

habitat), hydrology, and water quality in coastal areas where NMFS species, such as smalltooth

sawfish and sea turtles, dwell.  *See, e.g.*, EPA-HQ-OW-2018-0640-0642, at 61 (BiOp)

("Permitted activities may also result in changes to hydrologic regimes and water quality in

---

[25] Just as EPA could not blindly rely on the BiOp, it could not rely on NMFS' facially invalid
jurisdictional determination to issue a "no effects" determination and avoid consultation with
NMFS.  An action agency (here, EPA) acts arbitrarily and capriciously when it relies on a
"facially flawed BiOp" or when "blindly adopt[ing]" the faulty conclusions of the consulting
agency (here, NMFS).  *See City of Tacoma*, 460 F.3d at 75–76; *Am. Rivers*, 895 F.3d at 55.
[26] "'May affect' sets a low bar: 'Any possible effect, whether beneficial, benign, adverse or of an
undetermined character, triggers the formal consultation requirement.  Thus, actions that have
any chance of affecting listed species or critical habitat—even if it is later determined that the
actions are 'not likely' to do so—require at least some consultation under the ESA.'"  *Growth
Energy v. EPA*, 5 F.4th 1, 30 (D.C. Cir. 2021) (internal citations omitted).

coastal areas."); EPA-HQ-OW-2018-0640-0649, at 256 (BE) (stating action could impact "habitat, hydrology, and water quality" affecting birds in coastal and marine habitats).

Despite this evidence of potential impacts to NMFS-regulated species, EPA failed to explain how it could reach the conclusion that its action would have "no effect" on NMFS species. EPA's determination was therefore arbitrary and must be set aside. *See Growth Energy*, 5 F.4th at 31–33; *see also Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 598 (D.C. Cir. 2019), *cert. denied sub nom. Valero Energy Corp. v. EPA*, 140 S. Ct. 2792 (2020) (EPA should have consulted; not "attribut[ing]" harm "with reasonable certainty" is not the same "no effect").

Because of EPA's unlawful "no effect" determination, the agency failed to properly consult with NMFS, in violation of the ESA. *Karuk Tribe*, 681 F.3d at 1027 ("[A]ctions that have any chance of affecting listed species or critical habitat—even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA.").

## IV. EPA Unlawfully Approved a State Program that is Less Stringent Than Federal Law.

In addition to the ESA violations, EPA's approval of Florida's program was arbitrary, capricious, an abuse of discretion, and not in accordance with the law, because it authorized a state program that is not as stringent as federal law requires, in violation of the Clean Water Act and APA (Claim 2).[27]

---

[27] Plaintiffs submitted comments to EPA raising these issues. EPA's administrative record divided Plaintiffs' comments and exhibits into multiple non-sequential parts. In order, the comments appear as follows: EPA-HQ-OW-2018-0640-0386 [Part 1] (Comment Letter and Exhibits 1-8); EPA-HQ-OW-2018-0640-0385 [Part 2] (Exhibits 9-18); EPA-HQ-OW-2018-0640-0392 [Part 3] (Exhibits 19-30); EPA-HQ-OW-2018-0640-0393 [Part 4] (Exhibits 31-40); EPA-HQ-OW-2018-0640-0391 [Part 5] (Exhibits 41-50); EPA-HQ-OW-2018-0640-0387 [Part 6] (Exhibits 51-60); EPA-HQ-OW-2018-0640-0388 [Part 7] (Exhibits 61-70); EPA-HQ-OW-2018-0640-0389 [Part 8] (Exhibits 71-80); EPA-HQ-OW-2018-0640-0394 [Part 9] (Exhibits 81-99); EPA-HQ-OW-2018-0640-0390 [Part 10] (Exhibits 100-103).

Any state 404 program must be at least as stringent as the federal program.  33 U.S.C. § 1344(h)(1).  EPA must determine that a state has authority to, among other things: (1) issue permits "which apply, and assure compliance with" all Section 404 requirements, including the Section 404(b)(1) Guidelines, 40 C.F.R. pt. 230; and (2) "abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement."  33 U.S.C. § 1344(h)(1)(A)(i), (1)(C), (1)(G); 40 C.F.R. pt. 233.  EPA may only approve a state program if it meets these criteria.  33 U.S.C. § 1344(h)(2)(A).

Yet, here, EPA unlawfully approved the State's application, because the program failed to: (1) provide for enforcement as stringent as federal law to abate violations of a permit or the permit program; (2) adopt the Section 404(b)(1) Guidelines or create equivalent standards requiring the permitting authority to conduct the evaluations and factual determinations required by federal law; (3) determine water quality impacts other than those that would violate water quality standards or toxic effluent guidelines, contrary to the 404(b)(1) Guidelines; (4) ensure that state permits would not jeopardize protected species or adversely modify or destroy critical habitat, as required by the Section 404(b)(1) Guidelines; and (5) properly define the scope of its jurisdiction over assumable waters of the United States.  EPA's action was thus arbitrary, capricious, an abuse of discretion, not in accordance with the law, and otherwise in violation of the Clean Water Act and APA.

### A.    EPA Approved a State Program That Failed to Meet Minimum Enforcement Standards Required to Abate Violations of a Permit or the Permit Program.

First, although federal law criminalizes negligent violations of the Clean Water Act, Florida's 404 program does not.  Instead, Florida law requires a higher level of culpability to establish a criminal 404 violation.  Florida's enforcement scheme thus excludes an entire class of

violators from criminal liability, rendering its program less stringent than the federal program and undermining the deterrent effect of the Clean Water Act's enforcement mechanisms.

Enforcement serves as a critical safeguard and deterrent to violations of the Clean Water Act.  *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000); *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir. 1978) ("The [Clean Water] Act would be severely weakened if only intentional acts were proscribed.  We will not interpret it that narrowly, particularly when the legislative history is clear Congress intended strong regulatory enforcement.").

EPA regulations require that "the burden of proof and degree of knowledge or intent required under State law for establishing violations under … this section shall be no greater than the burden of proof or degree of knowledge or intent EPA must bear when it brings an action under the Act."  40 C.F.R. § 233.41(b)(2).  *See also id.* § 233.1(d) (state 404 program "may not impose any less stringent requirements for any purpose").

In Section 309(c)(1), Congress spoke directly and unambiguously to the mens rea requirement for Clean Water Act violations.  Section 309(c)(1) states: "[a]ny person who ... negligently violates ... any requirement imposed ... in a permit issued under [sections 402 or 404] of this title by the Secretary of the Army or by a State ... shall be punished[.]"  33 U.S.C. § 1319(c)(1).  Every federal circuit court to have considered this language has held that its plain meaning establishes liability for simple or ordinary negligence for Clean Water Act violations, rather than a higher criminal negligence standard, such as gross negligence.  *See United States v. Maury*, 695 F.3d 227, 259 (3d Cir. 2012) (plain language of "negligence" means ordinary negligence); *United States v. Pruett*, 681 F.3d 232, 243 (5th Cir. 2012) (same); *United States v.*

45

*Ortiz*, 427 F.3d 1278, 1283 (10th Cir. 2005) (same); *United States v. Hanousek*, 176 F.3d 1116, 1120 (9th Cir. 1999) (same).  No other court has interpreted this statutory provision otherwise.

The intent standard under Florida law, on the other hand, is gross or culpable (criminal) negligence.  *See* Fla. Stat. § 373.430(1)(a), (3)–(4) (requiring willfulness, reckless indifference, or gross careless disregard to establish criminal liability for a pollution offense); *id.* § 373.430(1)(b)–(c), (5) (requiring willfulness to establish criminal liability for permit violations and false statements).[28]  Indeed, under Florida law it is unconstitutional to criminally penalize "mere negligent conduct."  *State v. Hamilton*, 388 So. 2d 561, 563–64 (Fla. 1980).  In Florida, culpable negligence is "reckless indifference or grossly caress disregard of the safety of others." *State v. Greene*, 348 So. 2d 3, 4 (Fla. 1977).  It has also been defined as "a gross and flagrant character, evincing reckless disregard for human life or of the safety of persons exposed to its dangerous effects;" or "the entire want of care which would raise the presumption of indifference to consequences;" or "reckless indifference to the rights of others, which is equivalent to an intentional violation of them."  *Id.*

Florida law therefore is not as stringent as to criminal enforcement as is the Clean Water Act.  It excludes from criminal liability an entire class of permit violations that are subject to criminal penalty under federal law.  EPA therefore abused its discretion in approving Florida's program.  *See Idaho Conservation League*, 820 F. App'x 627 (EPA abused its discretion in

---

[28] Under 40 C.F.R. § 233.41(a)(3)(ii), for example, a state agency must show it has authority to "seek criminal fines against any person who willfully or with criminal negligence discharges dredged or fill material without a required permit or violates any permit condition issued under section 404[.]"  But Florida law requires more than simple negligence to establish a criminal permit violation subject to punishment.  *See* Fla. Stat. § 373.430(1)(b) (making permit violations unlawful); *id.* § 373.430(4) (providing that (1)(b) violation with reckless indifference or gross careless disregard is misdemeanor in the second degree); *id.* § 373.430(5) (providing that willful Section 373.430(1)(b) violation is misdemeanor in the first degree).

approving a state delegated program with a mens rea standard greater than the burden of proof required under the Clean Water Act); EPA-HQ-OW-2018-0640-0681 (copy of decision).

Moreover, EPA's action undermined the deterrent effect that Congress sought by prohibiting negligent violations of Section 404 and the incentives to ensure full compliance with the 404 program.  Ordinary negligence is the lowest form of criminal mens rea aside from strict liability.  It is the failure to use care that a reasonably prudent and careful person would under similar circumstances. *Hanousek*, 176 F.3d at 1120.  This mens rea standard allows robust criminal enforcement of permit violations—and therefore greater environmental protections— because it sets a lower bar the government must meet to bring and prevail in an enforcement action and promotes compliance through deterrence.

EPA was aware of this deficiency in Florida law and willfully disregarded it in approving Florida's program. *See* EPA-HQ-OW-2018-0640-0665, at 1 (EPA email) ("[EPA's] criminal folks view 'reckless indifference' or 'gross careless disregard' as a different standard than simple or ordinary criminal negligence."); EPA-HQ-OW-2018-0640-0666, at 2 (EPA email) ("[G]iven [Florida case law] ... it does seem like there is a real question in FL as to whether a statute can constitutionally provide criminal penalties for simply negligent conduct."); EPA-HQ-OW-2018-0640-0667 & EPA-HQ-OW-2018-0640-0667-A1, at 1 ("EPA has concluded that Idaho must revise the statutory language for the criminal intent standard in order for the EPA to approve the IPDES program.").[29]  The deficiency was also brought to EPA's attention during public comment on Florida's application.  EPA-HQ-OW-2018-0640-0386-A1, at 32–34.

---

[29] As noted above, EPA went on to approve Idaho's program anyway, something the Ninth Circuit Court of Appeals subsequently held to be an abuse of discretion.  Still, EPA was undeterred and willfully abused its discretion again in approving Florida's program.

In its response to comments, EPA-HQ-OW-2018-0640-0568, at 75–76, EPA relied on inapposite cases that posed the question whether states might impose different *penalties* for certain violations, not whether state could impose a higher criminal intent before a violation could be established in the first place.  *See, e.g.*, *Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 180 (D.C. Cir. 1988) (penalties); *Akiak Native Cmty. v. EPA*, 625 F.3d 1162, 1171–72 (9th Cir. 2010) (civil administrative penalties).  EPA dismissed the Ninth Circuit's decision which found the agency had *abused its discretion in identical circumstances* as merely "unpublished and non-binding."  EPA-HQ-OW-2018-0640-0568, at 76.  And then, by approving Florida's program anyway, EPA abused its discretion again.

In addition, Florida law is not as stringent as federal law because it provides a shorter statutes of limitation for enforcement of environmental crimes.  Under federal law, criminal enforcement actions brought under 33 U.S.C. § 1319(c) are generally subject to a five-year statute of limitations.  *See United States v. Ursitti*, 543 F. Supp. 2d 971, 974 (C.D. Ill. 2008) (case involving Clean Water Act criminal violation, citing to 18 U.S.C. § 3282(a) and stating "[t]here is a five-year statute of limitations for criminal offenses, which is applicable to the offenses charged in this case"); *see also* Joseph J. Lisa, *Negligence-Based Environmental Crimes: Failing to Exercise Due Care Can Be Criminal*, 18 Vill. Env't L.J. 1, 43 n.109 (2007) (citing 18 U.S.C. § 3282(a) as statute of limitations for Section 1319(c) enforcement actions).

The statutes of limitation applicable to violations under state law, however, are between one and three years depending on the severity of the offense.  Fla. Stat. § 373.430(1)(a)–(c) (identifying crimes relating to pollution, failure to comply with permit requirements, and fraud); *id.* § 373.430(3)–(5) (setting degree of offense depending on the crime); *id.* § 775.15 (setting for statute of limitations depending on the severity of the offense).  State law regarding criminal

enforcement is therefore deficient also in this regard, making its program less stringent than

federal law. *Chesapeake Bay Found. v. Bethlehem Steel Corp.*, 608 F. Supp. 440, 447–48 (D.

Md. 1985) (recognizing in the citizen suit context that shorter state statutes of limitations under

Clean Water Act would "frustrate several policies" of the Clean Water Act, including a lack of

uniformity from state to state and that shorter statutes of limitation would be "very hospitable to

industries that violate the Act" and could make violators nearly immune); *see also Sierra Club v.

Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522–23 (9th Cir. 1987) (same; applying shorter state

statutes of limitations would "diminish the effective enforcement" of the Clean Water Act).

Although 40 C.F.R. § 233.41(d)(1) authorizes EPA to approve a state program that has

less stringent *penalties* than federal law provides,[30] the Clean Water Act does not authorize

approval of a state program with a less stringent enforcement scheme in terms of criminal

culpability and statutes of limitations.  To the contrary, these failures rendered the program non-

approvable, and it was an abuse of discretion for EPA to approve the program anyway.

**B.    EPA Approved a State Program That Relied on Applicants' "Assurances" In Lieu of the Federal 404(b)(1) Guidelines' Requirement that the Permitting Authority Independently Make Factual Determinations.**

Further, rather than adopting the federal 404(b)(1) Guidelines, which create duties and

obligations for the permitting authority to evaluate the potential impacts of a Section 404 permit

and to make factual determinations about those effects, Florida chose to rely on an existing state

regulatory program, which merely asks the applicant to provide the permitting authority with the

applicant's "reasonable assurances."

The federal 404(b)(1) Guidelines require that the permitting authority "determine in

writing the potential short-term or long-term effects of a proposed discharge of dredged or fill

---

[30] Note that the State has claimed that this regulatory provision was "not applicable" to the State's application.  EPA-HQ-OW-2018-0640-0016-A3, at 54.

material on the physical, chemical, and biological components of the aquatic environment in light of subparts C through F."  40 C.F.R. § 230.11.  Subparts C through F deal with a detailed list of the ways that dredge and fill activities may affect (1) physical and chemical characteristics (including substrate and salinity levels), *id.* §§ 230.20–230.25; (2) biological characteristics (including protected species, fish and other aquatic species, and other wildlife), *id.* §§ 230.30–230.32; (3) special aquatic sites (including wetlands), *id.* §§ 230.40–230.45; and (4) human use (including municipal water supplies, fisheries, recreation, aesthetics, and parks), *id.* §§ 230.50–230.54.  The permitting authority's factual determinations and evaluations of those effects then form the basis for the agency's decision about whether a discharge of dredge and fill material will cause or contribute to significant degradation of the waters of the United States.  *Id.* § 230.10(c).  If the answer is yes, the Guidelines prohibit the issuance of the permit.  *Id.*

    The State, however, did not adopt the federal 404(b)(1) Guidelines.  Instead, the state program incorporated non-equivalent provisions from its existing state Environmental Resource Program, which only require that an "[a]pplicant provide reasonable assurance" about the potential adverse impacts of their project.  *See, e.g.*, Fla. Stat. § 373.4146; Fla. Admin. Code R. 62-330.301.  Under state law, the agency's job is merely to determine whether the reasonable assurances required have been provided.  EPA-HQ-OW-2018-0640-0002-A1, at 64 (ERP Handbook 5.5.4.1) ("The decision to issue or deny a permit will be based on a determination of whether the reasonable assurances required in the above rules and the Handbook have been provided.").  *Accord id.* at 81 (ERP Handbook 8.1) ("The staff recommendation to approve any individual or conceptual approval permit will be based upon a determination of whether reasonable assurance has been provided that the activity meets the criteria for evaluation, and whether the applicable permit fee has been submitted.").  Although the State does prohibit

permits that cause or contribute to significant degradation of wetlands, Fla. Admin. Code R. 62-331.053(3)(a)(6), that determination is based on an applicant's "reasonable assurances."

The state program thus does not require FDEP to make findings of its own or even to independently evaluate and make findings as to the applicant's reasonable assurances. *See, e.g.*, *Defs. of Crooked Lake, Inc., v. FDEP*, 2018 WL 3387900, at *3 (Fla. Div. Admin. Hearings May 7, 2018) (asking only whether evidence showed the applicant provided reasonable assurances). There is no legally binding requirement that *the permitting authority* evaluate the project's effects or even the adequacy of the applicant's reasonable assurances. Nor is there a requirement that *the permitting authority* make written factual determinations about either.

As EPA explained when issuing the 404(b)(1) Guidelines, it purposefully placed the duty on the permitting authority because "[s]pecific documentation is important to ensure an understanding of the basis for each decision to allow, condition, or prohibit a discharge through application of the Guidelines." 45 Fed. Reg. 85,336, 85,343 (Dec. 24, 1980). EPA explained that this documentation "provides a record of actions taken that can be evaluated for adequacy and accuracy and ensures consideration of all important impacts in the evaluation of a proposed discharge of dredge or fill material." *Id.* Without FDEP making the 404(b)(1) Guidelines' factual determinations, the public cannot ensure an understanding of FDEP's decisions, and are hamstrung in evaluating the adequacy and accuracy of FDEP's permitting decisions. And FDEP cannot ensure that all important impacts have been considered.

Further, when a duty falls on a federal agency, the public can ensure that the agency undertake reasoned actions that comply with the agency's legal authority and the APA. *See* 5 U.S.C. § 706. This proves to be a strong incentive for federal agencies to follow the law. And it provides an opportunity for the public to step in when a federal agency fails at that duty. *See*

*Env't Def. v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 77–79 (D.D.C. 2007) (Corps'

factual determinations arbitrary and capricious).  Because the only obligations under the state

program fall with the *applicant*, those incentives and enforcement opportunities do not exist.

Additionally, unlike the clear, prescriptive requirements in the federal program, the state

program's use of the term "reasonable assurance" leaves space for interpretation.  A reasonable

assurance by a self-interested applicant that there will not be significant adverse effects is not the

same as the rigorous evaluations and determinations that must be made by an independent

agency as required under the Section 404(b)(1) Guidelines.

This subjective, vague, and applicant-driven process is thus not equivalent to the federal

program's prescriptive and clear requirements.  EPA's approval was thus arbitrary, capricious,

and an abuse of discretion.

**C.    EPA Approved a State Program with a Narrow View of Water Quality
        Effects Determinations Contrary to the Federal 404(b)(1) Guidelines.**

Another stringency issue with the state program is that it limits consideration of water

quality impacts to situations where the high bar of water quality standards or toxic effluent limits

will be violated.  Federal law prohibits the introduction of any pollutant without a permit.  But in

the state program, the water quality impacts that result from dredge and filled material into

waterways only matter if and when that introduction would violate water quality standards or

toxic effluent limitations.  Such a narrow view is less stringent than what federal law requires.

The federal 404(b)(1) Guidelines rightly focus on the introduction of pollutants—defined

broadly—into waters of the United States, recognizing the threat of harm that this poses.  The

Guidelines do not limit that concern only to situations where specific water quality standards or

toxic effluent limitations are or may be violated.  That would be overly narrow for the purpose

and intent of the Clean Water Act as a whole.  Yet that is exactly the narrowing effect of the state

program, rendering EPA's decision to approve it arbitrary, capricious, and an abuse of discretion.

While the federal 404(b)(1) Guidelines include many provisions focused on water quality

generally, many of the state program's "parallels" limit those considerations to situations where

specific water quality standards or toxic effluent limitations may or will be violated.  For

example, the federal 404(b)(1) Guidelines require that the permitting authority evaluate and

determine the potential impacts on water, generally.  40 C.F.R. § 230.22.  The state program,

however, focuses instead on adverse effects to receiving waters "such that the state water quality

standards … and any special standards … will be violated."  Fla. Admin. Code R. 62-

330.301(1)(e); EPA-HQ-OW-2018-0640-0002-A1, at 93 (ERP Handbook 10.2.4).  This means

that the same dredge and fill activity that the federal program would deem as having negative

impacts on water quality, which must be mitigated, would not necessarily receive the same

treatment under the state program.  And this allows dredge and fill activities under the state

program that under the federal program would either not be permitted or would require

measures, mitigation, or controls.

As another illustration, the federal 404(b)(1) Guidelines require the permitting authority

to evaluate the material to be discharged to "determine the possibility of chemical contamination

or physical incompatibility," generally.  40 C.F.R. § 230.60.  *See id.* § 230.61(b)(1) (explaining

that the evaluation required by Section 230.60 concerns the "potential effects on the water

column and on communities of aquatic organisms" with no mention of water quality standard or

toxic effluent limitation violations); *id.* § 230.3(d) (defining "contaminant" broadly as "a

chemical or biological substance in a form that can be incorporated into, onto or be ingested by

and that harms aquatic organisms, consumers of aquatic organisms, or users of the aquatic

environment, and includes but is not limited to the [toxic pollutants]").  The state program, by contrast, requires evaluation of material to be dredged or filled for chemical contamination "that may violate state water quality standards…, or any toxic effluent standards or prohibition." EPA-HQ-OW-2018-0640-0002-A20, at 32 (404 Handbook 8.2(g)).  Again, this means that the same fill material may be considered as creating the possibility of chemical contamination under the federal program but not under the state program.  And again, that contaminated fill material may require additional controls, cleanup, or even prohibitions for use under federal law which would not be required under the state program.

By limiting its assessment of water quality impacts to situations where water quality standards or toxic effluent limitations may be violated, the state program is more narrow, and thus less stringent, than federal law requires.  EPA's decision to approve it in spite of these differences was arbitrary, capricious, and an abuse of discretion that must be vacated.

### D.    EPA Approved a State Program That Failed to Comply with 404(b)(1) Guideline to Ensure No Jeopardy from State Permits.

Next, EPA abused its discretion in approving Florida's program because the State's application failed to show the authority on which it would rely to claim that the state program would ensure no jeopardy to protected species and critical habitat.  EPA may only approve a state program if it determines that no state permit will issue that would jeopardize the continued existence of protected species or adversely modify or destroy critical habitat.  40 C.F.R. §§ 230.10(b)(3), 233.34(a).  The State, however, relied on a technical assistance process to be laid out in the anticipated, future programmatic BiOp that was not part of the program application, as discussed below.  Further, the technical assistance process established by the BiOp was insufficient to ensure no jeopardy, as described above.

**E.    EPA Approved a State Program That Failed to Demonstrate That Assumable Waters Would be Regulated and Transferred Authority over Non-Assumable Waters to the State.**

Finally, EPA's approval of the state program violated the Clean Water Act because the State failed to demonstrate that it would regulate all assumable waters of the United States, and only those waters.  EPA can only approve a state program if the state demonstrates it has authority to regulate the proper scope of waters.  33 U.S.C. § 1344(g)(1), (h)(1)(A)(i), (h)(1)(G); 40 C.F.R. §§ 233.20(a), 233.30(a), 233.40(a).  A state program must regulate *all* assumable waters of the United States as defined in Section 404(g)(1).  *See* 40 C.F.R. § 233.1(b) (partial programs are not approvable).  And a state 404 program can only regulate assumable waters. Section 404 authority "cannot be transferred for those waters" required by law to remain under the Corps' exclusive jurisdiction.  *See* 40 C.F.R. § 232.2 (defining waters that can be state regulated).  Yet, here, the state program failed to demonstrate it would regulate all assumable waters.  Further, EPA's approval of the program also transferred authority over non-assumable waters to the State.

First, Florida's program did not demonstrate authority to regulate all assumable waters of the United States.  As a result, the State has failed to exercise jurisdiction over assumable waters, leaving those waters unregulated.  The state program claimed it would assume jurisdiction over "state-assumed waters," which it described as "all waters of the United States that are not retained waters."  EPA-HQ-OW-2018-0640-0002-A20, at 4–5 (404 Handbook 1.1).  *Accord* Fla. Stat. § 373.4146(1) (defining "state-assumed waters" as "waters of the United States that the state assumes permitting authority over pursuant to s. 404 of the Clean Water Act … and rules promulgated thereunder").  However, the state program did not define "waters of the United States."  *See* EPA-HQ-OW-2018-0640-0016-A3, at 11 (Comparison Table) ("No state

definition" for "waters of the United States").[31]  The State therefore did not demonstrate what waters constituted "waters of the United States" for purposes of its application.  Although state regulations could have affirmed that "waters of the United States" are those waters as defined by federal law, or incorporated the federal definition, the State did neither.

As Plaintiffs feared, the State has exploited this gap and abrogated its authority over assumable waters by failing to require permits for discharges in all assumable waters.  Indeed, the State has continued applying the Trump-era definition—which substantially reduced waters covered by the Clean Water Act—after it was vacated by a federal court as unlawful.  *Pasqua Yaqui Tribe v. EPA*, 557 F. Supp. 3d 949, 955 (D. Ariz. 2021); Ex. 7 at 12–13 (Silverstein Dec. ¶ 30).  The State continued to do so even after EPA (repeatedly) told the State that the State was required to cease applying the vacated Trump definition and that it was required to apply the controlling federal definition of waters of the United States (the pre-2015 regulatory regime). Ex. 7 at 12–13 (Silverstein Dec. ¶ 30).  *See also* Dkt. 59.

Despite the federal agency's directives, the State has continued making "no permit required" decisions for discharges into assumable waters when those waters are excluded pursuant to the vacated, Trump-era definition of "waters of the United States."  Ex. 7 at 12–13 (Silverstein Dec. ¶ 30).  By claiming these waters are not under its jurisdiction, based on the vacated definition, the State is also abdicating its duty to enforce against unpermitted discharges in all assumable waters because the State does not consider those discharges to be in violation of Section 404.

---

[31] Although the State application claimed the program would use the federal definition, nothing in the program incorporates, adopts, or ensures the State will follow the federal definition.

EPA's approval of a state program that failed to demonstrate it would adhere to the federal definition of waters of the United States violated the Clean Water Act. EPA thus unlawfully approved a partial 404 program and left assumable waters in Florida unregulated.[32]

Second, EPA was not authorized to transfer Section 404 authority to the State over waters that federal law requires remain under the Corps' exclusive jurisdiction. Specifically, the Clean Water Act prohibited EPA from allowing the State to administer Section 404 over "those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto." 33 U.S.C. § 1344(g)(1).

Yet, EPA failed to ensure that its approval of Florida's program met this requirement of the Clean Water Act. There is no record evidence that EPA undertook any independent action to ensure its approval of Florida's application complied with its duty under Section 404(g)(1). To the contrary, EPA took no action when the Corps summarily and arbitrarily terminated its 2018 navigability studies to determine the extent of non-assumable waters in Florida. EPA also was copied on public comments to the Corps identifying the need for these navigability assessments but ignored them. EPA determined Florida's 404 application was "complete" even (1) though the Corps' navigability assessments were never completed; (2) Florida's application relied on a truncated "Retained Waters List" that omitted navigable waterways listed by the Corps as recently as 2017; (3) the public identified numerous waterways that should be deemed non-

---

[32] Because the Corps cannot regulate assumable waters once a State has assumed the Section 404 program, the Corps too is not exercising jurisdiction over those waters. EPA's unlawful action means no one is regulating those waters while Florida administers its 404 program.

assumable; and (4) substantial questions remained over which waters the State would regulate.

EPA-HQ-OW-2018-0640-0051, at 4–6 (Completeness Letter).  EPA abused its discretion by

approving Florida's application based solely on the Corps' unlawful "Retained Waters List."

EPA's failure to undertake any inquiry to ensure compliance with Section 404(g)(1) and

its unreasonable reliance on arbitrary and capricious actions by the Corps were unlawful.  EPA's

action had the legal effect of transferring 404 authority from the Corps to the State, cementing

the allocation of authority between those two entities.[33]  EPA's action also affected which

projects would continue to be subject to additional environmental protections, including Section

7 of the ESA and NEPA review.  EPA had a duty to independently determine that only

assumable waters were transferred to State authority, including by evaluating Florida's reliance

on the Corps' "Retained Waters List" on its own and in light of the concerns raised by others.

EPA's approval of Florida's program thus unlawfully transferred 404 authority from the Corps to

the State over "non-assumable" waters in violation of the Clean Water Act.

## V.    The Corps Unlawfully Relinquished 404 Jurisdiction Over Certain Waters.

Further, the Corps' "Retained Waters List" constituted a final agency action which, when

adopted by EPA, unlawfully rendered certain waters "assumable" by the State, contrary to the

RHA, CWA, and APA (Claim 7).  *See* 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177–78

(1997).  It marked the consummation of the agency's decision-making (as to which waters would

be retained for purposes of Florida's 404 assumption application) and was an action by which

"rights or obligations have been determined" or from which "legal consequences will flow"

(because it set forth the scope of retained waters, i.e., it altered the legal status of those waters,

---

[33] Indeed, EPA has argued that after assumption, changes to the list require modification of the program (which only EPA can approve).  *Menominee Indian Tribe v. EPA*, 947 F.3d 1065, 1074–75 (7th Cir. 2020) (Hamilton, J. concurring) (cited by *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 212 n.9 (D.D.C. 2022)); EPA-HQ-OW-2018-0640-0568, at 66.

rendering others assumable). *See Bennett*, 520 U.S. at 177–78. Once EPA approved Florida's program, the State assumed 404 jurisdiction over waters not retained. That change also had legal consequences for the public, who are subject to different rules and legal regimes depending on whether the Corps or the State has jurisdiction over a particular waterway.

Under Section 404(g)(1) the Clean Water Act, the Corps must retain exclusive jurisdiction over navigable waters related to commerce. The Clean Water Act also provides for more expansive authority by requiring the Corps also to retain 404 jurisdiction over dredge and fill in adjacent wetlands. *See id.* § 1344(g)(1).

The RHA similarly provides for the Corps' exclusive jurisdiction over construction and fill in navigable waters amenable to commerce. 33 U.S.C. § 401 (Section 9, construction); *id.* § 403 (Section 10, fill); *id.* § 407 (Section 13, discharges). Under the RHA, the Corps has a duty to maintain lists of Section 10 navigable waters, not to remove waterbodies from its lists without following a procedure absent here, and to make findings and determinations "whenever a question arises regarding the navigability of a waterbody." 33 C.F.R. §§ 329.15(a), 329.16(a), 329.16(c). Finally, the Corps' regulations under both the Clean Water Act and the RHA define navigable waters under its exclusive jurisdiction as including "historic use" waters. *Compare id.* § 328.3(a)(1) (2015)[34] *with id.* § 329.4.[35]

---

[34] The Trump Administration's definition did not materially alter this part of the definition. *See* 33 C.F.R. § 328.3(a)(1) (2020) ("The territorial seas, and waters which are currently used, or *were used in the past*, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." (emphasis added)).

[35] *See also Subcommittee Report*, CORPS002993, at CORPS002999, CORPS003015–16, CORPS003021–22 (citing 33 C.F.R. § 328.3(a)(1) and *Rapanos* guidance). *See also* EPA & Corps, *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in* Rapanos v. United States & Carabell v. United States (Dec. 2, 2008), https://www.epa.gov/sites/default/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf (waters are considered "traditional navigable waters" if they are subject to Section 9 or Section 10 of the RHA).

The Corps violated the Clean Water Act, RHA, and APA by arbitrarily and capriciously (1) failing to complete navigability assessments necessary to ascertain the scope of its 404 jurisdiction post-assumption; (2) relying on an outdated and incomplete RHA Section 10 list from 2014 as the basis for its Clean Water Act "Retained Waters List;" (3) omitting waterways identified on the 2017 list without justification; and (4) removing "historic use" navigable waters from the list.  The "Retained Waters List" should therefore be set aside.

## VI.    EPA Arbitrarily and Capriciously Determined the State's Inadequate Application Was Complete.

EPA also acted arbitrarily and capriciously by deeming Florida's application complete when submitted (Claim 1).  Eight days after receiving Florida's application, EPA deemed the application complete as of the date of submission, EPA-HQ-OW-2018-0640-0608, thereby triggering a statutory 120-day deadline to approve or deny the application unless EPA and the State agreed to extend the timeline.  *See* 33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.15(a).  On September 16, 2020, EPA issued a notice and request for comment on the application with the opportunity to comment closing on November 2, 2020.  85 Fed. Reg. 57,853 (Sept. 16, 2020).

But the public was deprived of an adequate opportunity to comment on the application because the application was not, in fact, complete at the time of submission.  The elements required for a state submission included "a complete program description" and a statement from the Attorney General showing that the State had "adequate authority to carry out the program and meet the applicable requirements of this part."  40 C.F.R. §§ 233.10(b)–(c), 233.12(a).  An integral part of any 404 program is demonstrating that state-issued permits will result in no jeopardy to listed species.  33 U.S.C. § 1344(h)(1)(A)(i) (state must show it has authority to comply with 404(b)(1) Guidelines); 40 C.F.R. § 230.10(b)(3) (404(b)(1) Guideline requiring that no permit jeopardizes a listed species or destroys or adversely modifies critical habitat).

Florida's submission, however, did not demonstrate this authority.  The application included an unexecuted MOU between state and federal agencies stating that USFWS would give "technical assistance" to state agencies for purposes of ensuring no jeopardy to listed species.[36]  EPA-HQ-OW-2018-0640-0016-A2, at 12 (Application MOU) (unexecuted).  What this process would entail, however, was not defined.  Instead, the MOU stated that "the technical assistance" process was "anticipated to be outlined in the USFWS' BiOp based on information included in the [BA] submitted by EPA."  *Id.* at 5.  And so it would be, but not until November 17, 2020, two weeks after public comment closed.

Florida's submission also included, and relied on, state-promulgated regulations.  But those too only referenced a "technical assistance" that would later be defined; they did not themselves define it.  *See* Fla. Admin. Code R. 62-331.051 (applicants for individual permits will be required to provide "data and information for purposes of reviewing impacts to state and federal listed species, including compliance with any applicable requirements resulting from consultation with, or technical assistance by," the state agencies and USFWS); *id.* 62-331.053(3)(a) (no permit shall be issued that causes jeopardy to listed species or results in adverse modification of critical habitat as determined by compliance with "any requirements resulting from consultation with, or technical assistance by" the state agencies and USFWS); *id.* 62-331.010(5) (incorporating State 404 Handbook); EPA-HQ-OW-2018-0640-0002-A20, at 6 (404 Handbook 1.3.33) (requiring compliance with requirements resulting from the "technical

---

[36] EPA dismissed the objection that the unexecuted MOU or absence of the BiOp rendered Florida's application incomplete on the basis that these are not required for a program submission.  EPA-HQ-OW-2018-0640-0568, at 19.  EPA's position, however, did not address the fact that *Florida* relied on the MOU to establish its authority for a component of the program, and that the MOU in turn relied on a "forthcoming" technical assistance process that it said would be produced in a later BiOp.

assistance" process); *id.* at 23 (404 Handbook 5.2.3) (referring to the "technical assistance" process)).  The Attorney General's statement only made general references to the 404(b)(1) Guidelines and to the state individual permit conditions rule, Fla. Admin. Code R. 62-331.053.  *See* EPA-HQ-OW-2018-0640-0017, at 7 (AG Statement).

EPA's reliance on Florida's program description failed too, since the program description itself relied on the unexecuted MOU, which relied on the then non-existent BiOp to define the technical assistance process.  EPA-HQ-OW-2018-0640-0568, at 19–20 (Response to Comments).  Moreover, EPA's view that these materials described how "reviews" would be "handled" itself fell short of claiming that they established the State's authority to ensure that there would be no jeopardy to listed species.  Indeed, in defending Florida's authority to protect listed species, EPA itself relied on the BiOp.[37]

By relying on processes that had not yet been articulated or produced, Florida's application could not demonstrate the State's authority to ensure protection of listed species, and so its application was not complete.  EPA's completeness determination was therefore arbitrary and capricious.  It deprived the public of the opportunity to comment on an integral component of Florida's program.  5 U.S.C. § 553; 40 C.F.R. § 233.15(e)(1); *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983).  And it unlawfully set in motion a

---

[37] EPA-HQ-OW-2018-0640-0568, at 95 (Response to Comments) (citing BiOp to describe state process for evaluating impacts to listed species and designated critical habitat); *id.* at 95–96 (citing BiOp for FDEP's duty to follow USFWS' recommended measures as permit conditions); *id.* at 97 (citing BiOp for conclusion "that the process developed by Florida in partnership with the USFWS and EPA is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat"); *id.* at 98 (citing BiOp for conclusion that state process is adequate to protect listed species); *id.* at 99 (citing BiOp in paragraph concluding that state process "is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat"); *id.* at 101 (citing BiOp to defend how State will comply with 404(b)(1) Guidelines); *id.* at 102 (stating that "as a result" of EPA's consultation and resulting BiOp state and federal agencies will coordinate on state permits to avoid jeopardy).

120-day clock ending December 17, 2020. Had EPA found the application complete when it received the programmatic BiOp containing the technical assistance process on which Florida's program relied (November 19, 2020), the public would have had at least until January 4, 2021, to comment (forty-five days), and the 120-day clock would not have run until Friday, March 19, 2021, well into the next Presidential administration.

Lastly, for the reasons demonstrated above, EPA's conclusion that Florida's application was complete as submitted was also unlawful based on the State's failure to demonstrate that it would assume authority over all assumable waters, and only assumable waters.

## STANDING

Plaintiffs have been injured by the Federal Defendants' actions and have standing to pursue their claims. As demonstrated in Plaintiffs' Motion for Partial Summary Judgment, EPA's transfer of 404 authority to Florida threatens Plaintiffs' organizational and associational interests in protecting Florida's valuable waterways, including the endangered and threatened species that rely on them. Dkt. 31 at 32–51. The loss of ESA Section 7 consultation on 404 permits in assumed waters and the loss of NEPA analysis have (1) eliminated levels of environmental review to which Plaintiffs would otherwise be entitled; (2) limited Plaintiffs' statutory avenues to advocate for robust environmental protection; (3) removed Plaintiffs' access to critical environmental analyses that Plaintiffs use to educate the public, engage in advocacy, and seek redress for environmental harm;[38] and (4) unduly restricted Plaintiffs' access to courts

---

[38] *See Ctr. for Biological Diversity*, 597 F. Supp. 3d at 190 (finding Florida's challenge to Plaintiffs' asserted informational injury unavailing).

to challenge inadequate environmental protection.[39]  Plaintiffs are also harmed by USFWS' and

EPA's failures to comply with the ESA, and the Corps' abdication of jurisdiction over certain

navigable waters.

To establish standing, Plaintiffs must show, "by a preponderance of the evidence," *Otay*

*Mesa Prop., L.P. v. U.S. Dep't of Interior*, 144 F. Supp. 3d 35, 56 (D.D.C. 2015), that they "have

(1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the

defendant; and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v.*

*Robins*, 578 U.S. 330, 338 (2016) (citation omitted).  An association may bring suit on its

members behalf when (1) "its members would otherwise have standing to sue in their own

right;" (2) "the interests at stake are germane to the organization's purpose;" and (3) "neither the

claim asserted nor the relief requested requires the participation of individual members in the

lawsuit."  *Friends of the Earth*, 528 U.S. at 181.

"'[T]o establish organizational standing a party must show that it suffers' or will

imminently suffer 'a concrete and demonstrable injury to its activities, distinct from a mere

setback to the organization's abstract social interests.'"  *Nw. Immigrant Rights Project v. U.S.*

*Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 46 (D.D.C. 2020), *appeal dismissed*, No. 20-

5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021) (quoting *Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d

1249, 1255 (D.C. Cir. 2018)) (alterations in original).  First, a plaintiff "must show a 'direct

conflict between the defendant's conduct and the organization's mission.'"  *Id.* (citation

---

[39] *See* Dkt. 31 at 35–48 (discussing harms resulting from EPA's transfer of authority in context
of Claims 8 and 9; same applies to other claims based on EPA's approval of Florida's program);
Dkt. 43 at 67–74 (discussing informational standing as to all claims).  Plaintiffs hereby adopt and
incorporate these showings as to all claims related to EPA's approval of Florida's program.

omitted).  Second, a "plaintiff must show that it has 'used its resources to counteract [the asserted] harm.'"  *Id.* (alterations in original) (citation omitted).

A person who has been accorded a procedural right to protect their concrete interests may "assert that right without meeting all the normal standards for redressability and immediacy." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (emphasis omitted) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992)).  A plaintiff has standing "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."  *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). "A plaintiff asserting procedural injury 'never has to prove that if he had received the procedure the substantive result would have been altered.'"  *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 68 (D.C. Cir. 2022).

Plaintiffs have standing to challenge EPA's interlocutory completeness determination as a procedural injury (Claim 1).  Among other things, to be deemed complete, Florida's application was required to demonstrate authority to ensure that its permit actions would not result in jeopardy to listed species or adverse modification to critical habitat.  But for this requirement, the application relied on a technical assistance process in a forthcoming BiOp that was not produced until more than two weeks after the public comment period concluded.  EPA's completeness determination initiated the public comment period while depriving Plaintiffs of the opportunity to comment on an integral component of Florida's program.  5 U.S.C. § 553; 40 C.F.R. § 233.15(e)(1); *Small Refiner Lead Phase-Down Task Force*, 705 F.2d at 547.  The inability to review and comment on Florida's claimed authority to ensure no jeopardy to listed species or adverse modification to critical habitat from its state permits created a demonstrable risk to Plaintiffs' aesthetic and recreational interests in listed species.  *Ctr. for Biological*

*Diversity v. Zinke*, 369 F. Supp. 3d 164, 179 (D.D.C. 2019), *aff'd sub nom. Friends of Animals v. Bernhardt*, 961 F.3d 1197 (D.C. Cir. 2020).  Ex. 1 at 6–7 (Crooks Dec. ¶ 23); Ex. 2 at 7–8 (Carter Dec. ¶¶ 26, 28); Ex. 6 at 6–7 (Rinaman Dec. ¶¶ 24–25); Ex. 8 at 6 (Robertson Dec. ¶ 19); Ex. 9 at 3 (Gledhill Dec. ¶ 8).

Plaintiffs have standing to challenge EPA's unlawful approval of Florida's 404 program (Claim 2) and the deficiencies underlying that approval.  *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 308 (D.C. Cir. 2013).  As a result of EPA's action, the State is considering (and approving) permit applications that substantially risk harm to their members' aesthetic, recreational, and other interests by authorizing developers to fill precious wetland habitat for projects that will harm threatened and endangered species.  *Lujan*, 504 U.S. at 562–63 ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."); *Sierra Club v. Jewell*, 764 F.3d 1, 6 (D.C. Cir. 2014) ("impairment of the affiant's ability to enjoy the 'natural vistas' of the nearby hills from her own home, regardless of the absence (or existence) of any legal right on her part to view or make an entry onto the nearby hills" is sufficiently concrete for injury-in-fact (citing *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 715 (D.C. Cir. 1988)).  Ex. 1 at 1–3, 16–29 (Crooks Dec. ¶¶ 1–3, 8–12, 15, 45–52, 54–62, 64–74, 76–83, 85(a)–(b)); Ex. 3 at 2–13 (Fleming Dec. ¶¶ 6–36); Ex. 4 at 9–11 (Hartl Dec. ¶¶32–37); Ex. 5 at 3–18 (Schwartz Dec. ¶¶ 9–31, 33–54); Ex. 6 at 1–2, 7–9 (Rinaman Dec. ¶¶ 3, 9, 26–29, 32); Ex. 7 at 1, 4, 9–14 (Silverstein Dec. ¶¶ 3, 11, 21–26, 28, 30–36); Ex. 10 at 1, 3–14, 24–25 (Umpierre Dec. ¶¶ 2–3, 10–11, 15–40, 73).

In addition, EPA's approval of Florida's program poses a direct conflict with Plaintiffs' organizational missions, and Plaintiffs have used their resources to counteract the resulting harm. *Nw. Immigrant Rights Project*, 496 F. Supp. 3d at 6.  Plaintiffs' missions, writ large, are to

ensure environmental protection, something they accomplish through citizen engagement, education, and outreach, scientific research, advocacy, and legal challenges. EPA's approval of Florida's program has impaired Plaintiffs' missions by (1) causing them to lose the benefit of federal requirements, rights, and remedies available under NEPA and Section 7 of the ESA; (2) causing a loss of access to information essential to accomplishing their missions; and (3) substantially limiting their ability to protect wetlands and species through litigation because of restrictive access to the courts. Plaintiffs have had to use and will continue to use their resources to counteract these harms and/or divert resources away from their core program work. Ex. 1 at 1–3, 6–30 (Crooks Dec. ¶¶ 4–12, 21–53, 55–63, 65–85); Ex. 2 at 2–11 (Carter Dec. ¶¶ 5–7, 11–17, 20–25, 27, 29–34, 38); Ex. 3 at 2, 10–11, 13 (Fleming Dec. ¶¶ 4–5, 30–33, 37); Ex. 4 at 2–9, 11 (Hartl Dec. ¶¶ 6–7, 9–16, 22–31, 38); Ex. 6 at 3–6, 9–10 (Rinaman Dec. ¶¶ 10–23, 31, 33–34); Ex. 7 at 1–14 (Silverstein Dec. ¶¶ 3–27, 29–36); Ex. 8 at 1–10 (Robertson Dec. ¶¶ 4–7, 9–18, 22–29); Ex. 9 at 2–3 (Gledhill Dec. ¶¶ 4–8); Ex. 10 at 1–5, 19–25 (Umpierre Dec. ¶¶ 1, 4, 6–9, 12–14, 60–74).

    Plaintiffs have standing to challenge USFWS' BiOp and ITS (Claims 3 and 4), as well as USFWS' attempt to use a non-statutory "technical assistance" process as a proxy for ESA consultation (Claims 6 and 13). *Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232, 241 (D.D.C. 2015). Plaintiffs' members have an interest in the enjoyment of listed species, and this interest is germane to Plaintiffs' organizational interests. USFWS' unlawful BiOp and ITS threatens Plaintiffs' interests by failing to (1) analyze the impact of Florida's program on listed species and critical habitat; (2) render a lawful jeopardy determination; and (3) set limits on incidental take. Vacating the BiOp and ITS would redress Plaintiffs' injuries by requiring reinitiation of consultation to assess the impacts to species and habitat and requiring EPA to reconsider its

assessment of Florida's program.  USFWS' unlawful "technical assistance" proxy threatens

Plaintiffs' interests by failing to ensure Florida's program would not jeopardize listed species or

adversely modify or destroy critical habitat and giving a blank check on incidental take.  Ex. 1 at

1–3, 16–29 (Crooks Dec. ¶¶ 1–3, 8–12, 15, 45–52, 54–62, 64–74, 76–83, 85(a)–(b)); Ex. 3 at 2–

13 (Fleming Dec. ¶¶ 6–36); Ex. 4 at 9–11 (Hartl Dec. ¶¶ 32–37); Ex. 5 at 3–18 (Schwartz Dec.

¶¶ 9–31, 33–54); Ex. 6 at 1–2, 7–9 (Rinaman Dec. ¶¶ 3, 9, 26–29, 32); Ex. 7 at 1, 4, 9–14

(Silverstein Dec. ¶¶ 3, 11, 21–26, 28, 30–36); Ex. 10 at 1–14 (Umpierre Dec. ¶¶ 2–3, 6–40).

Plaintiffs have standing to challenge EPA's reliance on that BiOp to approve Florida's

program (Claim 10), as EPA similarly harmed Plaintiffs' interests by failing to ensure that

Florida's program would not jeopardize listed species or adversely modify critical habitat.

Vacating EPA's reliance on the BiOp would redress Plaintiffs' injuries by invalidating EPA's

approval of Florida's program and requiring reinitiation of consultation.  Plaintiffs also have

standing on this claim for the same reasons as they have standing to challenge EPA's approval of

Florida's program (Claim 2).  Ex. 1 at 1–3, 16–29 (Crooks Dec. ¶¶ 1–3, 8–12, 15, 45–52, 54–62,

64–74, 76–83, 85(a)–(b)); Ex. 3 at 2–13 (Fleming Dec. ¶¶ 6–36); Ex. 4 at 9–11 (Hartl Dec. ¶¶

32–37); Ex. 5 at 3–18 (Schwartz Dec. ¶¶ 9–31, 33–54); Ex. 6 at 1–2, 7–9 (Rinaman Dec. ¶¶ 3, 9,

26–29, 32); Ex. 7 at 1, 4, 9–14 (Silverstein Dec. ¶¶ 3, 11, 21–26, 28, 30–36); Ex. 10 at 1–14

(Umpierre Dec. ¶¶ 2–3, 6–40).

Plaintiffs have standing to challenge EPA's "no effect" determination as to NMFS (Claim

5), failure to engage in adequate consultation with NMFS (Claim 11), and failure to consult with

USFWS on the agency action's impact on nesting sea turtles (Claim 12).  *Ctr. for Biological

Diversity v. EPA*, 861 F.3d 174, 182–84 (D.C. Cir. 2017) (failure to meet statutory consultation

obligations constitutes archetypal procedural injury; environmental organization has obvious

interest in failure to consult; neither action nor relief requested requires participation of individual members). Ex. 1 at 2–3, 29–30 (Crooks Dec. ¶¶ 8–12, 85(d)); Ex. 7 at 1, 4, 9–11 (Silverstein Dec. ¶¶ 3, 11, 21–26, 28); Ex. 3 at 1–3, 4–10, 13 (Fleming ¶¶ 1, 7–9, 14–29, 36).

Lastly, Plaintiffs have standing to challenge EPA's failure to ensure that all assumable waters, and only assumable waters, would be assumed by the State (Claims 2 and 7) and EPA's determination that the State's application was complete when the State had failed to adequately identify the waters over which it would assume jurisdiction (Claim 1). In addition to the harms sustained as a result of EPA's unlawful approval of the state program, as shown above, Plaintiffs' aesthetic and recreational interests are harmed by the Corps' "Retained Waters List" and EPA's reliance on it, which rendered assumable by the State scores of waterways that should have remained under the Corps' jurisdiction. As a result of the Corps' abdication of jurisdiction, Plaintiffs' interests in those waterways are at risk from the State's 404 permitting program, inadequate enforcement, and unlawful granting of "no permit required" determinations, all without access to Section 7 consultation or NEPA processes. Ex. 6 at 7 (Rinaman Dec. ¶ 25); Ex. 10 at 1–3, 14–19 (Umpierre Dec. ¶¶ 1, 4, 6–7, 41–59); Ex. 11 at 1–3 (Hamann Dec. ¶¶ 3–8); Ex. 12 at 1–3 (Hollenhorst Dec. ¶¶ 3–8); Ex. 13 at 1–3 (Knight Dec. ¶¶ 2–8).

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court grant summary judgment in their favor on their Claims One through Seven and Ten through Thirteen.[40]

Dated: February 28, 2023

---

[40] Plaintiffs also respectfully renew their motion for summary judgment as to Claim Eight, Dkt. 31, which the Court has taken under advisement, Minute Orders Apr. 19, 2022, Oct. 17, 2022; *see also* Dkt. 78, 82, 83, 87, and request that the Court grant that motion as well.

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

* Appearing *pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of February 2023, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,

<u>/s/ Tania Galloni</u>
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

71