**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

Plaintiffs,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

**DECLARATION OF AMBER CROOKS**

I, Amber Crooks, make the following declaration:

1. I am a resident of Naples, Florida.

2. I am competent to make this declaration. I provide this declaration based upon my personal knowledge. I would testify to the facts in this declaration under oath if called upon to do so.

3. I am a member of the Conservancy of Southwest Florida ("Conservancy"), and I am also employed by Conservancy as the Environmental Policy Manager.

4. Conservancy is a 501(c)(3) nonprofit that focuses on environmental conservation in Southwest Florida. Our water policy work addresses issues at local, statewide, and federal levels. Conservancy was founded in 1964 and has grown in membership to approximately over 3,600 dues-paying members, and approximately over 2,000 additional donors and supporters. The mission of Conservancy is to protect the natural environment, species, and habitats of Southwest Florida, summed up in our motto: "Our Water, Land, Wildlife, Future." We do this

through four main program areas: 1) Science and Research, 2) Policy and Advocacy, 3) Wildlife Rehabilitation, and 4) Environmental Education.

5.      Conservancy's Policy and Advocacy program focuses on protecting water, wildlife, and land.  In protecting wetlands and waterways, we work to promote better water management and resource protection by working with stakeholders and decision-makers to ensure that stringent water management tools, regulations, and best practices are in place and utilized.  In protecting wildlife and endangered species, we work to prevent harm by preserving species' habitats from environmental changes, conserving landscape corridors and critical habitat, and ensuring that protections are strong to recover imperiled species populations.  We perform this work at the local, state, and federal levels.

6.      Conservancy's Wildlife Rehabilitation program operates the von Arx Wildlife Hospital, which treats approximately 4,200 injured, sick, or orphaned native animals on an annual basis.  These native species include small mammals, birds (including migratory and protected birds), turtles, gopher tortoises, and many others.

7.      Protection of water resources such as wetlands and conservation of native species are core programmatic areas for Conservancy's policy work.

8.      I have a deep personal commitment to the protection and recovery of Florida's protected species, and I engage in both professional and personal activities to further this commitment.

9.      I have an aesthetic and scientific appreciation of the Florida panther in the wild, and travel to panther habitats in hopes of viewing and photographing the elusive panther.  I enjoy recreating in panther habitat areas, including hiking, camping, wildlife viewing, and nature photography.

10.     I graduated with a B.A. in political science from Stetson University in 2003, and I received a Masters of Public Administration in Environmental Policy and Planning from Florida Gulf Coast University in 2011.

11.     Through my work at Conservancy and through my formal education, I have studied endangered species policy issues, including critical habitat designation, Habitat Conservation Plans, and the Florida panther, among other topics.  As the environmental policy manager at Conservancy, I specialize in wildlife policy and am the organization's listed (endangered and threatened) species expert.  Endangered species that my work focuses on include, but are not limited to, Florida panthers, bonneted bats, and smalltooth sawfish.  My job duties also include overseeing policy staff members' technical analysis of issues related to state and federal permitting processes.

12.     Southwest Florida, as a region, has many endangered and threatened species that receive regulatory review by federal agencies as required under the Endangered Species Act ("ESA").  One such species is the Florida panther, one of the most endangered species on the planet, with only 120 to 230 adults remaining in the wild.  According to the U.S. Environmental Protection Agency's ("EPA") Biological Evaluation in this case, this region had the highest concentration of ESA consultations in all of Florida from 2014-2018.  *See* Dkt. No. 031-1, at 30-32 (Exhibit A, Excerpt from ESA Evaluation for Clean Water Act Section 404 Assumption by the State of Florida).

13.     One of the main tools Conservancy uses to protect species, their habitats, and waters is the public commenting process.  When there is a proposed agency action, we review the applications and documents; determine the scope and effect it would have on the wildlife and waters we seek to protect; utilize geographic information system (GIS) analysis, a data mapping

tool that allows us to visually understand the affected geographic environment; review wetland impacts and potential means to avoid, minimize, and mitigate those impacts; review applicable rules and laws; and submit comment letters.  As with this case, we also engage in litigation when needed to carry out our organization's goals.

**Conservancy's Engagement on Florida Assumption of Section 404**

14.     Conservancy has dedicated considerable resources to opposing Florida's assumption of the Clean Water Act's Section 404 program, in light of the State's poor permitting track record in environmental protection and the State's failure to demonstrate that it would provide the same level of protection, rights and remedies available under federal law, and that its program meets the requirements of federal law.

15.     Between 2017 and 2020, I advocated on behalf of Conservancy, against efforts to pursue assumption on Section 404 in Florida.  Among other things, I testified before the State legislature, participated in the State's rulemaking process (via comments and hearings), regularly raised concerns directly with the Secretary of Department of Environmental Protection and his staff, and helped engage our membership in advocacy against the proposed program at the state and federal levels.

16.     In 2018, we launched a campaign to urge Governor Rick Scott to veto a quickly passed bill that authorized the Department of Environmental Protection to pursue seeking approval from EPA to administer Section 404.  This included our supporters sending more than 700 emails in opposition, online advertisements that reached more than 70,000 viewers, and advertisements and opinion pieces published in local newspapers.  We submitted comments to the U.S. Army Corps of Engineers ("Corps") as it was considering modification to the list of waters that could be assumed by the State under Section 404.  In our comments, we submitted a

comparison of the 2014 and 2017 navigable waters lists, urged the Corps to use its 2017 list as the starting point for a retained waters list, and identified dozens of waterways in Florida counties that should be considered for navigability in addition to the those listed by the Corps. In 2019, we sent an action alert to our members and supporters asking them to contact the new Governor, Ron DeSantis, to urge him to reverse course on 404 assumption, as he had made promises about protecting our water quality.

17. From 2018 to 2020, we participated in the State's rulemaking process, the final steps of which were conducted at the height of uncertainty around the coronavirus pandemic (February to April 2020), urging the State not to rush the process when the community was facing a public health emergency involving stay at home orders, closed schools and scarce household supplies, and requiring families to focus on protecting their health, livelihood, and well-being.

18. After the State submitted its 404 application to EPA in August 2020, and EPA initiated a public comment period in September 2020, Conservancy, along with other Plaintiffs in this action, objected to the incompleteness of the application in October 2020, and in November 2020 submitted comprehensive comments objecting to Florida's proposed program as grossly inadequate and unlawful under federal law. *See* Dkt. No. 031-1, at 33, 43 (Exhibits B and C).

19. After EPA published its notice approving Florida's program and gave it immediate legal effect on December 22, 2020, Conservancy's counsel notified EPA and the other federal defendants, as well as the State, that EPA's transfer of authority was unlawful. *See* Dkt. No. 031-1, at 99-101 (Exhibit D). On December 28, 2020, EPA responded by claiming for the first time that the agency's December 22, 2020, action did not have to meet the 30-day

requirement or codify the State program because it was an informal adjudicatory order, rather than a rule. *See* Dkt. No. 031-1, at 102-104 (Exhibit E).

20. On January 14, 2021, Conservancy joined with the other Plaintiffs in this action to filed the present suit.

21. Conservancy was harmed, and continues to be harmed, by EPA's decision to approve the State-assumed 404 program, and the other agency actions related to that decision which are also challenged in this case. Florida's implementation of the unlawful 404 program harms Conservancy's ability to carry out its organizational mission of protecting the environment and wildlife, and harms members' aesthetic, recreational, and other interests.

**Organizational Harms from the State Program**

22. EPA's approval of the State's 404 program causes Conservancy to divert resources, threatens wetlands and wildlife, and undermines Conservancy's ability to fully realize its mission by depriving the organization of information, rights, and remedies available when Section 404 is administered by the Corps as it has been for decades.

23. To begin, Conservancy was harmed by Florida's incomplete assumption application. The application relied on a "technical assistance" process in a "forthcoming" biological opinion that was not produced until weeks after the public comment period ended. This prevented Conservancy from fully commenting on this vital component of Florida's program. This harmed Conservancy's ability to achieve one of its core missions—to protect listed species and their habitat—by providing EPA with its comment on the inadequacy of such an approach and the more protective options available and required. Moreover, since the "technical assistance" process in the biological opinion was not produced until November 2020,

the 120-day review clock would have run through March 2021, well into the next Presidential administration where many bad environmental decisions were stalled, reversed, or revised.

24. Once Florida was allowed to assume the 404 program, it restarted the review process for all applications received from the Corps. This meant Conservancy was forced to re-engage in our advocacy on pending 404 permits of concern to us, but now all at once. In addition to ensuring that our existing comments were forwarded to the State, we also had to submit new comments to the State for each 404 project impacting our mission, tailored to the specifics of the new program. Since then, because applications for many projects Conservancy has been engaged on for years were submitted or transferred at around the same time, those projects landed on a similar review schedule for the expedited state process, requiring us to monitor developments on the permit applications all at once, rather than if the permits had remained on their own natural timeline under the Corps' jurisdiction. As a result, we are continuing to divert staff time from other important local and state matters affecting species and water quality to keep up with the state 404 process. This includes reassigning a substantial amount of several employees' job duties.

25. In addition to troubling projects progressing along the same state timeframe, applications are being processed more quickly than under the Corps' 404 program. The State's expressed goal in assuming 404 authority was to streamline and expedite permitting. The quicker processing times means the Conservancy has less time to try to obtain project information, review and analyze the information, and voice concerns. For instance, over the course of several years, Conservancy opposed several projects in eastern Lee County and eastern Collier County, including those that at the time were part of the proposed Eastern Collier Multiple Species Habitat Conservation Plan (HCP) that was being considered by the U.S. Fish

and Wildlife. Projects that comprised the HCP were transferred or submitted to the State upon 404 assumption, as well as major projects across the county border in eastern Lee County. Under the State's program, these projects are being processed at a much quicker pace that makes the Conservancy question whether the impacts are adequately being considered as compared to our experiences under the federal program.

26. In this shorter period of time, Conservancy also has to divert considerable staff time in order to monitor and obtain information about projects as compared to under the Corps' 404 program. First, as explained more fully below, Conservancy no longer has the analyses available under NEPA and ESA while the State implements the program. In addition, it is incredibly difficult to obtain project information under the State's program. The State's main database for collecting project information, Oculus, is incredibly difficult to navigate and often has little information available, especially as to a project's impacts to species. Therefore, Conservancy has dedicated a significant amount of resources to tracking the State's "Oculus" search engine to figure out where and how to access 404 application documents. Even when records are available, frequently it is unclear what each document is for, who the author is, or even whether a particular document is a final or a draft. This requires the Conservancy also to have to contact the State via phone and email to ascertain what various documents found in Oculus mean.

27. Under the State's program, Conservancy's ability to comment on a permit application is also significantly hindered. Despite the State's recent draft annual report applauding its online public commenting system as encouraging comments, in reality the system's design has had the opposite effect. As a core part of Conservancy's work, Conservancy has expertise and designed strategies for submitting public comments on its behalf and on behalf

of its members. DEP's system is burdensome because it requires members of the public to register for an account through a multi-step registration process, as opposed to simply accepting public comment sent via email or a one-click online docket. In our experience, the longer and more cumbersome a process is, the less likely members of the public are to complete the process and post a comment. And because of Florida's system, Conservancy has had to expend still more time and divert more resources to develop new strategies to comment in an accessible way and to encourage its members and try to facilitate their ability to comment in a meaningful way.

28. To make matters worse, under the State program public notices are often issued without much, if any, detail on the impacts to listed species, a primary concern of Conservancy's. In its MOA with FWS and EPA, the State said that it would complete its species review, the "technical assistance" process, prior to issuing public notices to ensure the public would have this information to comment on. But this has not been the case. In the public notices on projects of concern to Conservancy, not one has contained the proposed required permit conditions needed to protect federally-listed species. Nor has Conservancy been able to obtain this information typically through Oculus. Where Conservancy has been able to obtain information on the impacts to federally-listed species, this has typically been only after the close of the public comment period. Again, with the lack of information provided, Conservancy must not only re-allocate staff time toward trying to obtain it or expend resources on experts to develop it, but must do so in time to attempt to comment on project applications. Sadly, since the proposed permit conditions revealed through the technical assistance process has not been available before public notices are issued, Conservancy is greatly hindered in its mission to advocate for proper species protections. This increase in work and required resources has

redirected Conservancy's resources and staff capacity that were dedicated to other aspects of the organization's core planned conservation programs.

29.     In addition to not having species related project information before public notice issuance, the State's "technical assistance" process overall has been a black box. Whether checking Oculus or asking the State and federal agencies directly for information, there is rarely much analysis documented or publicly shared on projects pending with the State. Without the benefit of the ESA's analyses, Conservancy is again left having to redirect staff and resources from other core work to try to assess the impact of projects on species.

30.     While attempting to obtain this information from the agencies, Conservancy has also been met with confusion by State and Federal staff who seem unclear as to their agency's duties under the "technical assistance" process. On several occasions on different projects, Conservancy was told by Florida Fish and Wildlife Conservation Commission (FWC) that any analysis for federally-listed species would be conducted by USFWS. USFWS, which has historically been the expert on federally-listed species, has claimed the opposite, indicating that at best they could only provide non-regulatory recommendations to the State on these species. This has left an obvious void on who, if anyone, is actually looking at impacts to federally-listed species. Conservancy has expended and diverted staff time in order to pressure and stay on top of both agencies to ensure one of them will consider federally-listed species. For instance, for the Troyer mine project discussed below, Conservancy urged USFWS to review impacts to federally-listed species especially given the large scale of the mining operation and its location in the panther's last remaining habitat. USFWS at first seemed unsure of the project's status, but later confirmed it would plan to comment, and that it would need to request additional time in order to do so.

31. Conservancy also has concerns with the State's compliance with the requirements laid out in the "technical assistance" process. On at least one occasion, the State failed to include a permit condition required by USFWS to protect species on a project of concern to the Conservancy. Namely, in its permit for a large residential development called Fleischmann Parcel (AKA Isles of Collier Preserve), the State failed to include a USFWS required condition for the eastern indigo snake. In other instances, the State's permit conditions are vague and subject to interpretations that could lead to insufficient protection of listed species.

32. One example of the State's concerning technical assistance process involved Babcock Property Holdings, LLC's, 404 permit application to expand its nearly 18,000-acre property development with an 8,711-acre project area located in the Tidal Caloosahatchee River Watershed. *See* Dkt. No. 031-1, at 19-20 (describing project and concerns). During the application process, the Conservancy voiced concerns over the potential harms to the caracara and the Florida bonneted bat. This project was permitted on November 19, 2021. Prior to and again after permit issuance, Conservancy voiced its concerns regarding the technical assistance process. First, FWC's final proposed permit conditions for listed species were only available a few days prior to permit issuance and well after the close of the public notice window. Further, Conservancy could not locate any information—not in the permit, not in FWC comments, and not in the public record—that assured us USFWS had conducted a proper analysis of jeopardy/adverse modification of critical habitat for this project, or a proper analysis of whether or not take would occur, or if they adequately assessed take associated with this project. This is particularly of concern, as there are significant nesting resources for the threatened crested caracara that can be affected in the project area. The permit condition requiring the applicant to follow conservation measures to protect the caracara is only triggered "if nesting is observed"

even though there were documented nests within the impact area, the caracara is a non-migratory bird, and it uses its territory year-round.  The permit acknowledges an estimated take of up to five different pairs of caracara, but stops short of setting a take limit from this project.

33.     Similarly, there is also Florida bonneted bat presence that will likely be impacted by the activities for this project.  The USFWS had acknowledged that there is likely to be take of the bonneted bat as well.  *See* Attachment A (Jan. 2022 Conservancy Comments).  However, again, the permit does not assess take to Florida bonneted bat or provide a take limit associated with this project.  The State's wholly inadequate technical assistance process harms Conservancy's ability to carry out its organizational mission of protecting the environment and wildlife, and harms members' aesthetic, recreational, and other interests.

34.     Conservancy is also harmed by the loss of environmental review of projects under NEPA.  This statute not only provides more scrutiny for water resources, species, and their habitat, but also provides the Conservancy with vital information to vet the impacts of a proposed project and additional opportunities for public comment.  In order to carry out our mission of protecting species and wetlands, we are now obligated to hire our own experts or divert significant staff time to engage in alternatives analyses, again draining our resources that would go elsewhere.

35.     The NEPA review process provides Conservancy with an opportunity to engage in the Corps decision-making, which can lead to better environmental decisions, opportunities that are lost now while Florida is allowed to continue administering this 404 program.  For example, four proposed large-scale projects in Lee and Collier counties were previously subject to NEPA, under which an environmental impact statement ("EIS") was determined to be required.  As a result of this decision, two of the applications – which would have impacted over

9,000 acres – were either suspended or withdrawn.  These projects are now under consideration by FDEP for State 404 permit without the benefit of a NEPA EIS review; Old Corkscrew Plantation (Kingston), Troyer Mine, and FFD were three of the four project areas considered in the former Army Corps determination.  *See* Dkt. No. 031-1, at 235 (Exhibit P, correspondence between permit applicants and the Corps documenting the EIS as the reason for withdrawal/suspension).

36.    The loss of critical information and procedural safeguards afforded by NEPA has significantly set back our established methods of advocating for and protecting water resources, species and their habitats, and as the pending 404 project applications discussed above demonstrate, these losses will continue to occur while Florida administers the 404 program.

37.    Furthermore, Conservancy has challenged 404 permits in federal court as one of our advocacy tools to further our mission, and we are harmed by the loss of federal court as a venue when permits are issued by the State.  Litigating in federal court provides us with the necessary access to protect the interests of our organizational mission and our members.  We do not have the same access to state courts because of the significantly higher costs of state court litigation and the anticipated drain on our resources to litigate at the state level.

38.    With assumption, there is now an entirely different legal scheme to challenge wetlands permitting in Florida, through the Division of Administrating Hearings ("DOAH").  Because legal proceedings in front of DOAH are conducted from scratch and are not treated as administrative record review cases, Conservancy would have to incur considerable expense to hire expert witnesses to bring a legal challenge.  Expert witnesses cost upwards of thousands of dollars to retain on a case, which is thousands of dollars Conservancy would have to divert from

other programmatic goals in order to litigate in state court.  This also means that Conservancy

may be restricted from challenging 404 permits.

39.     Conservancy also certainly will not be able to utilize the same tools as it had

under the federal regime.  In state administrative proceedings, we do not have the benefit of

environmental analyses and administrative records around which we can build our cases that

federal NEPA and ESA processes affords.  Rather, in state court, we have to build our cases from

the ground up, conducting our own investigations and hiring our own expert witnesses.  A case

before Florida's Division of Administrative Hearings ("DOAH") can easily run upwards of

several hundreds of thousands of dollars, factoring in expert witnesses, attorneys' fees, and

time.  With our limited budget, one permit challenge in state court could eat up a significant

portion of the policy department's budget.  In order to engage in such costly litigation we would

have to 1) raise additional money to fund these challenges, 2) pull funds from other areas within

our existing operating budget, or 3) forego certain litigation, as funding is not included in our

budget.  All three options would damage our ability to carry out our mission.

40.     It is my understanding that Conservancy would also risk exposure to a mandatory

"fee-shifting" provision in which we risk being liable for the costs and fees to engage in

litigation, costs, and fees that we would not automatically be subject to if we retained the ability

to litigate in federal court.  Such a fee-shifting provision further diminishes our ability to engage

in litigation, because we are required to weigh this financial risk in addition to the above costs,

regardless of how strong our claim might be.

41.     It is also my understanding that it would be significantly harder for Conservancy

to even bring a permit-specific lawsuit for environmental harms on behalf of our members,

because we would be required to show harm to a significant number of our members under Florida law, rather than to just one member under federal law.

42. The lack of procedural safeguards, and in turn, a weaker system for evaluating and testing the environmental impacts of permitting, also significantly increase the risk of harms to Florida's water resources, species, and their habitats, environmental harms that are felt personally by me as a member of Conservancy and a long-time resident of Naples. I regularly partake in outdoor activities such as hiking, camping, observing wildlife, and nature photography. Some of the areas that I like to visit include, but are not limited to, Big Cypress National Preserve, Fakahatchee Strand Preserve State Park, Picayune Strand State Forest, Collier Seminole State Park, Florida Panther National Wildlife Refuge, Corkscrew Regional Ecosystem Watershed's Corkscrew Marsh, Bird Rookery Swamp and Flint Pen Strand, Corkscrew Swamp Sanctuary, Stormwater Treatment Area 5, Babcock Ranch Preserve, Fisheating Creek, Okaloacoochee Slough State Forest and Spirit of the Wild Wildlife Management Area, and county owned conservation properties such as those in Collier and Lee counties.

43. If Florida is allowed to continue operating this unlawful 404 program, Conservancy would be irreparably harmed in its ability to carry out its mission of protecting native and endangered species, their habitats, and waters.

**Organizational and Membership Harms From Pending Project Application**

44. The Conservancy is particularly concerned about certain permit applications before the State[1] for major projects.

[1] https://depedms.dep.state.fl.us/Oculus/servlet/login and https://prodenv.dep.state.fl.us/DepNexus/public/searchPortal.

45. **Troyer Mine.** According to DEP's online search portal, the Corps transferred a 404 permit application by Troyer Brothers Florida, LLC, for construction and operation of a lime rock and fill dirt mine, to the State, in state application number 0292013007. The proposed project includes the extraction of approximately 256,000 cubic yards of crushed lime rock from the project site.[2] The project was withdrawn March 1, 2022 and later resubmitted March 31, 2022 with the state application number of 0292013008.

46. Troyer Mine would cover 1,803.51 acres and would affect waters that are part of the Big Cypress Swamp Watershed. The project site is within the consultation areas for several endangered and threatened species, including the Florida panther, bonneted bat, red cockaded woodpecker, Audubon's crested caracara, the Florida grasshopper sparrow, the Everglade snail kite, and the Florida scrub jay. Additionally, the site has suitable habitat for the threatened eastern indigo snake and wood stork. Other listed species observed on the site include the bald eagle, Florida sandhill crane, roseate spoonbill, limpkin, little blue heron, snowy egret, tricolored heron, white ibis, American alligator, and Big Cypress fox squirrel. The project is also within three wood stork colony Core Foraging Areas. *See* Dkt. No. 031-1, at 130-153 (Exhibit G, Public Notice, Permit Application No. SAJ-2008-03793).

47. While the application for Troyer Mine was pending before the Corps, Conservancy submitted public comments opposing the project. *See* Dkt. No. 031-1, at 154-66 (Exhibit H). Ninety percent of the project site is in Florida panther Primary Zone habitat, meaning it is habitat essential for the continued survival and recovery of the species. This project site is about 90% Primary Zone and Adult Breeding Habitat for the Florida panther. Due

[2] State 404 File for Troyer Mine: https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_292013/gis-facility!search.

to the proposed placement of the mine between two public lands and important panther habitat, linkages will be fragmented. Expert review prepared for the FDEP Public Notice by Dr. Robert Frakes in August 2022 identified that Troyer Mine is the major current link for panthers to access habitat east of the mine, which includes large segments of panther habitat. Cumulatively with other proposed projects currently being reviewed by the state of Florida, about 7,400 acres (~30 square kilometers) of Adult Breeding Habitat will be lost.

48.     Vehicular collisions are the leading cause of known deaths for the Florida panther. Troyer Brother's proposed project would result in at least 1,160 daily truck trips to or from the site, adding heavy traffic to already deadly roadways for panthers.

49.     Troyer Mine would also likely destroy 172 acres of wetland that are part of regional flowways, or connected strands of water that comprise a wetland ecosystem within the Density Reduction Groundwater Resource Area of Lee County, a large area of protected wetlands, agricultural lands, and conservation lands. This area includes preserved lands of Imperial Marsh Preserve, Corkscrew Regional Mitigation Bank, and Southwest Florida International Airport mitigation lands. Wetlands in this area are critical to preserving aquifers and water supply for Lee County and surrounding areas; for example, water from rain runoff naturally flow to and re-charge the aquifers. These wetlands also provide panther habitat. As explained in our attached Comments (*See* Dkt. No. 031-1, at 154-66 (Exhibit H)), the mining project would likely impact evaporation rates of water supply due to seepage from wetlands into the mines, resulting in a lower water table, with the potential for adjacent wetlands to be drained as a result.

50.     For the state 404 program, within 10 days of a completeness determination, DEP must provide public notice of the proposed application, which opens a 30-day comment period

for most permits that is extended to the close of any public meeting, if one is held.  If EPA does

not comment or signal it may comment or object, FDEP generally has 60 days from the close of

the comment period (or its determination that the application is technically complete) to make a

final permit decision.  If a request for additional information is issued, applicants have 90 days to

respond, though, they may respond sooner.

51.    Troyer Mine went to public notice twice (on November 5, 2021, after the

application was first before the State, and on July 8, 2022, after the application was resubmitted).

At neither junction were proposed permit conditions to address federally-listed species made

available either in Oculus or in the Public Notice.

52.    Despite the potential impacts to listed species, including the Florida panther, the

July 2022 Public Notice stated that "The Department has requested review from the Florida Fish

and Wildlife Conservation Commission (FWC) and the US Fish and Wildlife Service (USFWS).

FWC and USFWS contacted the Department to notify us that they did not have any comments

regarding the ST404_292013-008 application."  In July, Conservancy reached out to FDEP,

EPA, and USFWS with concerns about the apparent lack of technical assistance.  At first,

USFWS was uncertain as to their review status and the status of the project.  Later, USFWS staff

stated that (contrary to the public notice) their technical assistance was not yet complete, and that

the agency would request more time to review this large project.  The USFWS stated that they

had started to work on terms and conditions, but that these were never sent to the State.  We are

concerned that this important project may well have slipped through the cracks if not for our

advocacy.

53.    If the Troyer Mine permit is granted, Conservancy's ability to challenge the

permit and harms that result from the project will be severely constrained by inadequate and

costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law. Conservancy will also be harmed from not having had access to information about the project's impacts that would have been generated through NEPA review and Section 7 of the ESA.

54. In addition to harming Conservancy's organizational interests, the Troyer Mine project would be located approximately three and a half miles away from the public lands I enjoy, namely, the Corkscrew Regional Ecosystem Watershed lands where I regularly hike, camp, and observe the wildlife listed above. Panthers require huge swaths of territory for roaming, foraging, and breeding, can have ranges over 200 square miles, and can travel 12 or more miles a day. I visit Corkscrew for a near-annual camping trip with friends, and I plan to return here as often as possible. Environmental harms from Troyer Mine, including harms to essential species habitat, would negatively impact my ability to enjoy these lands and observe wildlife.

55. **Rural Lands West.** According to FDEP's online search portal, the 404 permit application for Rural Lands West was transferred to the State, in state application number 0396966001.[3] Interestingly, Corps personnel advised Conservancy that this 404 application was transferred to the State as of December 21, 2020, a day before EPA published notice of its approval of the state program.

[3] State 404 File for Rural Lands West: https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396966/gis-facility!search.

56. Collier Enterprises Management, Inc., seeks this permit to develop approximately 4,000 acres in the Big Cypress Drainage Basin. This drainage basin includes critical wetland ecosystems such as Shaggy Cypress, Camp Keais Strand flowway, Picayune Strand, and Fakahatchee Strand, which are proximate or downstream to this proposed project. Rural Lands West is a project to clear, grade, excavate, dredge, and fill to construct and maintain a mixed-used development consisting of two golf courses; a commercial town center; an elementary, middle, and high school; and residential neighborhoods with roads, driveways, parking areas, lakes, drainage management systems and other associated infrastructure. The project would discharge 196,217 cubic yards of fill into 98.25 acres of jurisdictional wetlands and 1,360 cubic yards of materials into 0.68 acre of isolated wetlands in the watershed for the Big Cypress Drainage Basin. Approximately 27,820 cubic yards of materials would be discharged into 13.90 acres of remnant farm-field ditches. The project also would dredge/excavate approximately 2,951,250 cubic yards of native materials from 197.45 acres of jurisdictional wetlands and 16,500 cubic yards of material from 1.1 acre of isolated wetlands. *See* Dkt. No. 031-1, at 167-173 (Exhibit I, Public Notice).

57. While the Rural Lands West application was pending before the Corps, Conservancy submitted comments in opposition to the project. *See* Dkt. No. 031-1, at 174-204 (Exhibits J and K). Conservancy owns 1.4 acres of land for conservation purposes that are approximately 1.5 miles away from Rural Lands West, and another 26 acres of land within 3 miles of the project.

58. The project would result in approximately 10,000 new residents arriving to the area and would impact over 300 acres of wetlands. The project falls within important regional flowways and ecosystems.

59. Regarding water resources, we additionally raised concerns that Rural Lands West would be in an impaired water body that does not meet water quality standards, particularly for nutrients or where nutrients are the pollutant. Conservancy asked federal agencies for better hydrological analysis of the impacts of this project on downstream and adjacent wetlands.

60. As stated in the comments Conservancy submitted to the Corps in opposition to this project, there would be 4,000 acres of impacts to panther habitat, with 75% of the project in the Primary Zone habitat. A substantial amount of the project is also in panther Adult Breeding Habitat. The Rural Lands West project was part of the proposed Eastern Collier Multiple Species Habitat Conservation Plan that was being considered by the USFWS from 2010-2022 for which the Conservancy opposed, in part, due to loss of panther habitat from projects like Rural Lands West. A draft Biological Opinion showed a statistically significant reduction in panther population viability if Rural Lands West and the other development envisioned in the HCP, such as Bellmar and Hogan West (AKA Brightshore), were approved.

61. The Conservancy obtained expert review by Dr. Robert Frakes, who conducted an analysis of Rural Lands West in September 2022. He found that Rural Lands West, in combination with Bellmar, would result in direct and indirect destruction of 5,680 acres (23 square kilometers) of Adult Breeding Habitat.

62. In April 2022, Conservancy submitted comments asking the State to elevate this application as a project with a significant degree of public interest to hopefully ensure a public hearing would be provided, given the size, potential effect ton environment or public, controversial nature, and the location within the panther's primary zone habitat, bonneted bat's critical habitat, and wood stork's Core Foraging Areas. *See* Attachment B.

63. If the Rural Lands West permit is granted, Conservancy's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law. Conservancy will also be harmed from not having had access to information about the project's impacts that would have been generated through NEPA review and Section 7 of the ESA.

64. I would also be personally harmed by the Rural Lands West development. I regularly hike the public trails at the Florida Panther National Wildlife Refuge. The Refuge boundary is about four miles from the project site, and I plan to return as often as possible. Environmental harms from the Rural Lands West development project threaten my ability to enjoy these natural areas, hike, and observe wildlife.

65. **Bellmar Development.** Collier Enterprises Management, Inc., applied to develop a mixed-use community that would cover about 1,700 acres within the Big Cypress Drainage Basin.[4] This drainage basin includes critical wetland ecosystems such as the Camp Keais Strand flowway, Picayune Strand, and Fakahatchee Strand which are proximate or downstream to this proposed project. The project would impact about 130 acres of wetlands.

66. In October 2021 and September 2022, Conservancy submitted comments discussing the shortcomings of the alternative and cumulative impact analyses for Bellmar. *See* Attachment C (September 2022 Comments). Conservancy explained that the project would have

[4] 404 File for Bellmar Development: https://prodenv.depStatel.us/DepNexus/public/electronic-documents/ST404_396364/gis-facility!search.

unacceptable direct, indirect, and cumulative impacts on endangered and threatened species, wetlands, and other natural resources.  As it is located within a flowway and key wildlife corridor, it would directly impact over 1,700 acres, and is only approximately one mile away from the Florida Panther National Wildlife Refuge (FPNWR).  It is also apparent that this project will cause jeopardy to listed species due to habitat loss, infringement of wildlife corridors, indirect impacts on adjacent preserves, and impacts of traffic and transportation needs resulting from the Bellmar project, particularly in concert with cumulative impacts that are reasonably foreseeable.

67.     The Bellmar project is proposed completely within 100% Primary Zone habitat for the Florida panther, and about 80% of the site is Adult Breeding Habitat for the panther as well.  The Bellmar project was part of the proposed Eastern Collier Multiple Species Habitat Conservation Plan (HCP) that was being considered by the US Fish and Wildlife Service from 2010-2022 for which the Conservancy opposed, in part, due to loss of panther habitat from projects like Bellmar.  A draft Biological Opinion showed a statistically significant reduction in panther population viability if Bellmar and the other development envisioned in the HCP, such as Rural Lands West and Hogan West (AKA Brightshore), were approved.  *See* Attachment C (Conservancy Comments).

68.     The Conservancy hired an expert, Dr. Robert Frakes, to conduct an analysis of Bellmar and, in combination with Rural Lands West in response to the FDEP Public Notice.  He found that these two projects would result in direct and indirect destruction of 5,680 acres (23 square kilometers) of Adult Breeding Habitat.

69. The project would likely impact lands that are part of the Florida Panther National Wildlife Refuge, where I love to regularly visit and recreate and plan to continue regularly visiting. Conservancy also owns property about 3 miles from the proposed project site.

70. Bellmar went to public notice on August 16, 2022. As common in the State's public notices, there were no proposed permit conditions for listed species despite the findings that the project "may affect" and was "likely to adversely affect" the panther, bonneted bat, and eastern indigo snake. In fact, the notice merely says that the agencies would "work with" the applicant to determine "any necessary permit conditions." *See* Attachment D (Public Notice).

71. On November 9, 2022, EPA stated they had no comments on the project.

72. In 2021 and throughout 2022 and in its comments, Conservancy raised its concerns the need for traffic analyses for this project which were necessary for proper review. The State issued the Public Notice for Bellmar despite the USFWS asking in a RAI for the traffic information to be submitted, but the applicant did not provide the requested specific information. The State eventually informed Conservancy that they would request this information and that it would also hold a public hearing after receipt of the information as a last step before granting or denying the permit.

73. In January 2023, the applicant's proposed permit conditions were submitted for review.

74. The State has informed Conservancy that a public hearing will be set within the next couple of months. There appears to be no further outstanding issues regarding this application before the State and a permit could issue shortly after such public hearing.

75. Conservancy's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and costly State procedures (including

restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law. Conservancy will also lose access to information about the project that would have been provided under NEPA and Section 7 of the ESA.

76.     **Immokalee Road Rural Village (IRRV)**. 27th/Pico Boulevard Limited Partnership seeks to construct a mixed-use residential and commercial development over 2,780 acres in Collier County (application #396348-001), which would approximately result in the discharge of 159,091 cubic yards of fill material into 32.87 acres of wetlands and 1,942,195 cubic yards of fill material into 200.64 acres of other surface waters. The project would also involve the excavation of approximately 179,241 cubic yards of material from over 11 acres of wetlands. The site is within the USFWS designated Focus Area for the Florida panther and is within the USFWS designated consultation area for the crested caracara. Conservancy sent a letter seeking consideration and action on the severe panther roadkill hotspot adjacent to this project.

77.     The IRRV project is situated near the conservation lands of Bird Rookery Swamp. The project is located within the consultation area for the Everglade snail kite, Florida scrub-jay, Florida bonneted bat, red cockaded woodpecker, eastern indigo snake, wood stork, Audubon's crested caracara, and the Florida panther; there are a number of state-listed species also in the area. The applicant's field survey documented at least 110 gopher tortoise burrows on site, and bonneted bat calls on the site.

78.     In April 2022, Conservancy submitted comments flagging this project to the State given the size, potential effects on environment or public, controversial nature, and the location

within the panther's primary zone habitat (675 acres within primary zone and 344 acres within adult breeding habitat) and wood stork's Core Foraging Areas.  *See* Attachment B.

79.     In October 2022, Conservancy again submitted comments voicing concerns over the project in response to materials submitted by the applicant.  *See* Attachment E.

80.     If the Immokalee Road development permit is granted, Conservancy's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law.

81.     I would also be personally harmed by the Immokalee Road development.  I like to hike at Corkscrew Swamp Sanctuary and Corkscrew Regional Ecosystem Watershed Bird Rookery Swamp.  The Sanctuary is about two miles from the project site, and Bird Rookery even closer, essentially across the street from IRRV. I plan to return as often as possible. Environmental harms from this development project threaten my ability to enjoy these natural areas, hike, and observe wildlife.  Conservancy will also lose access to information about the project that would have been provided under NEPA and Section 7 of the ESA.

82.     **Old Corkscrew Plantation Mine (AKA Kingston)**.  Cameratta Companies is pursuing this large-scale development project that would span over 6,671 acres.  It had an active 404 permit application in 2011, which was withdrawn after the Army Corps determined an EIS under NEPA was necessary, and now is being considered under application #0423130-001.  The project already received its ERP for mining from FDEP in 2011, and now is being considered by the State for a new ERP consistent with this application.  Much of the project is panther habitat,

including Adult Breeding Habitat, and the project also contains Florida panther Primary Zone habitat. The applicant would add 95,000 additional trips per day. Expert review by Dr. Robert Frakes in August 2022 identified that Old Corkscrew (AKA Kingston) would have a substantial impact cumulatively with other proposed projects Troyer Mine and FFD; about 7,400 acres (~30 square kilometers) of Adult Breeding Habitat will be lost directly and indirectly with these three projects.

83.     The following species have been previously documented on site, including crested caracara, Everglades snail kite, wood stork, Florida panther, Florida sandhill crane, little blue heron, roseate spoonbill, Big Cypress Fox squirrel, and Florida black bear. The project also contains Core Foraging Area for four wood stork colonies. This project would also be approximately one and a half miles away from the public lands I enjoy, namely, the Corkscrew Regional Ecosystem Watershed lands where I regularly hike, camp, and observe wildlife.

84.     Further demonstrating the harms discussed above and below, here are additional applications before the State that Conservancy has been monitoring and has already engaged in:

a.    **Hogan West (AKA Brightshore)**. Barron Collier is seeking a permit (application #0405559-001-NPR, 0405559-002-SFI) for this project that would convert habitat to approximately 2,300 homes and commercial development. Of the 640-acre site, about 210 of those acres are Primary Zone panther habitat and the remainder is Secondary Zone panther habitat. A draft Biological Opinion showed a statistically significant reduction in panther population viability if Hogan West and the other development envisioned in the HCP, such as Rural Lands West and Bellmar, were approved. The project sits within the Corkscrew Swamp wetland ecosystem and adjacent to the Poggie Strand. In October 2021, we notified the State and the federal agencies that the applicant was attempting to receive a

verification of a no permit required (NPR) determination.  We did not receive a response.

However, sometime thereafter, the project was resubmitted as an Individual Permit.  I am

concerned that the NPR may have been granted if not for our advocacy.  Conservancy will

continue to monitor this project due to its potential impacts to the panther.

b. **FFD (AKA Orchid)**.  FFD Land Co., Inc. is seeking a State 404 permit for a

large scale development in Lee County (application #0291030-004-SFI).  The application

would result in over 550 acres of impact to Primary Zone panther habitat and 1,370 acres of

Adult Breeding Habitat directly.  Expert review by Dr. Robert Frakes in August 2022

identified that with FFD, cumulatively with other proposed projects currently being reviewed

by the state of Florida for Troyer Mine and Old Corkscrew Plantation (Kingston), about

7,400 acres (~30 square kilometers) of Adult Breeding Habitat will be lost.  *See* Attachment

F (June 2022 Conservancy Comments).

85.    Conservancy has also identified and has been monitoring project developments

that will likely need a 404 permit in the future:

a. **State Road 29.**   This is a project to widen State Road 29 in Collier County, and it

is already beyond the beginning stages of the planning process with the Florida Department

of Transportation.  The State Road 29 project encompasses Florida roadkill hotspots that

threaten panthers, and it is adjacent to the public lands of Big Cypress National Preserve and

the Florida Panther National Wildlife Refuge.  This project would be located directly

adjacent to these key public lands, where I enjoy hiking and other outdoor activities.

b. **Wilson-Benfield Road.**  This is a project to extend a major roadway in Collier

County, and it would be within or adjacent to the Picayune Strand State Forest.  The

Picayune Strand provides habitat for numerous species, including the wood stork, red

cockaded woodpecker, Florida black bear, Florida panther, and others. This roadway may impact important downstream resources, fragment wildlife habitat, and alter hydrological connections. This project is likely to go forward, as it has already been listed on the Collier County Metropolitan Planning Organization (MPO) 2045 Long Range Transportation Plan, which is the federally mandated planning mechanism for local governments to receive federal funding for transportation projects. Collier County is currently engaged in the alignment selection process. I live about 1.5 miles way from this project area, and enjoy recreation, such as hiking and wildlife observation, in the Picayune Strand State Forest and plan to continue doing so as often as I can.

c. **I-75 Interchange near Everglades Blvd**. This is a project to construct a new interchange on I-75 in Alligator Alley. An interchange in this area would increase development in Golden Gate Estates and the Rural Lands Stewardship Areas. These areas provide habitat for wildlife such as Florida black bears and Florida panthers, among other species. This project is likely to go forward, as it has already been listed on the Collier County Metropolitan Planning Organization (MPO) 2045 Long Range Transportation Plan, which is the federally mandated planning mechanism for local governments to receive federal funding for transportation projects.

d. **Eden Oak Development**. This is a project to develop a 55-home community on 306 acres along the Caloosahatchee River. The project was previously pending with the Corps starting in 2012, it would have impacted at least 35 acres of mangrove and salt marsh, and it was within smalltooth sawfish critical habitat and Florida manatee critical habitat. The wetlands within this site were recognized by agencies as Aquatic Resources of National Importance. The developer has an active application for development at the local level. We

do not know definitely yet, as no 404 application has been submitted, if this project would be in solely assumed waters that would be processed by FDEP or if the project would be retained by the Army Corps.

86.     A ruling in Plaintiffs' favor invalidating EPA's approval of Florida's program would redress Conservancy's harms by restoring 404 authority over assumable waters to the Corps, restoring Section 7 and NEPA review to projects, and ensuring that all requirements of federal law are met and can be enforced in federal court.  A ruling in Plaintiffs' favor on our ESA claims would redress Conservancy's harms by requiring EPA to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the effects of Florida's application on listed species and critical habitat; require the wildlife agencies to produce legally sufficient biological opinions that properly analyze the impact to listed species and critical habitat, set limits on incidental take, and impose reasonably prudent measures and triggers for reinitiation that are protective under the ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24 day of February, 2023.

DocuSigned by:

50496CAE7D21435...

Amber Crooks
Environmental Policy Manager
Conservancy of Southwest Florida
1495 Smith Preserve Way
Naples, Florida 34102

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F9-CCD24385A1FE

# ATTACHMENT A

DocuSign Envelope ID: A49EDFD1-91B9-4E45-88F9-CCD24385A1FE Case 1:21-cv-00119-RDM Document 98-1 Filed 02/28/23 Page 32 of 123

CONSERVANCY
of Southwest Florida
OUR WATER, LAND, WILDLIFE, FUTURE.

*Protecting Southwest Florida's unique natural environment and quality of life ... now and forever.*

January 10, 2022 sent via email

John Truitt, Deputy Secretary for Regulatory Programs
Florida Department of Environment Protection
3900 Commonwealth Boulevard MS 15
Tallahassee, FL 32399
john.truitt@dep.state.fl.us

Jose Rivera, Supervisory Biologist
U.S. Fish and Wildlife Service
1339 20th St. Vero Beach, FL 32960
Jose_rivera@fws.gov

Jason Hight, Director
Office of Conservation Planning Services
Florida Fish and Wildlife Conservation Commission
620 S. Meridian St.
Tallahassee, FL 32399
Jason.Hight@myfwc.com

Dear Mr. Truitt, Mr. Rivera, and Mr. Hight,

On behalf of the Conservancy of Southwest Florida and our more than 6,400 supporting families, we are providing comment on Babcock development, permit #0396574-001, issued on November 19, 2021, which appears to incorporate Florida Fish and Wildlife Conservation Commission (FWC) comments, recommendations, and permit conditions from a letter dated October 25, 2021.

**Listed Species Coordination**

Throughout their letter, the Florida Fish and Wildlife Conservation Commission states that they "have provided avoidance conditions" for a number of federally and state listed species.[1] We have some questions that we hope can be clarified. The unclear and ambiguous language was incorporated into the November 19, 2021 permit.

Further, the FWC letter states that the US Fish and Wildlife Service (USFWS) coordinated on the comments; however, questions remain about how impacts to federally-listed species were considered. Neither the letter, nor the permit, illuminates the coordination between FWC and the

[1] Letter from Jason Hight to Curtis Hardman dated October 25, 2021 re: Babcock Ranch Community, Florida Department of Environmental Protection, State 404 Permit Application (396574-001-SFI), Lee and Charlotte Counties, pp. 3-6

CHARITY NAVIGATOR
Four Star Charity

Conservancy of Southwest Florida has been awarded Charity Navigator's prestigious 4-Star top rating for good governance, sound fiscal management and commitment to accountability and transparency. Charity Navigator is America's largest and most respected independent evaluator of charities.

1495 Smith Preserve Way I Naples, Florida 34102 I 239.262.0304 I Fax 239.262.0672 I www.conservancy.org

USFWS, both in terms of timing of coordination and substance of the agencies' analysis and conclusions.

The state 404 program Memorandum of Agreement (MOA) stipulates that "technical assistance with the USFWS will be accomplished prior to the Public Notice, when possible. The Public Notice will include…the proposed protection measures to offset those impacts."[2] (emphasis added) We outlined our concerns about the timing of the wildlife review in comparison to the public notice in our last comments dated September 15, 2021; the FWC letter with proposed permit conditions was only available for a matter of days before the permit was issued, and was only available well after the close of the public notice window.

Further, as illustrated below, the provided technical assistance from FWC, in coordination with USFWS, does not appear to meet the expectations presented in the USFWS Biological Opinion for the state assumed program. We do not see any information in the permit, FWC letter, or public record that assures us if and how the USFWS conducted an analysis of jeopardy/adverse modification of critical habitat for this project, or how the agency analyzed whether or not take would occur, or if they concluded that there would be take associated with this proposed project.[3]

This is particularly of concern, as demonstrated below, as there are significant nesting resources for the threatened crested caracara, as well as proposed critical habitat for the Florida bonneted bat that will be impacted by the proposed activities. Additionally, the USFWS has already acknowledged that there is likely to be take from this project (see Attachment A).

The agencies are to monitor and track the amount of anticipated take[4] but it is not clear to the public if there has been assessed take associated with this project; none is mentioned in the FWC letter or the permit. Instead these documents appear to further bifurcating assessment of take for the crested caracara until a later date, despite acknowledgement of 5 different pairs in active nests currently within the development footprint.[5] The USFWS 404 program Biological Opinion states that "if it is determined, though technical assistance on permit review with the State that take of ESA-listed species is still expected to occur after implementation of recommended minimization measures, the amount or extent of incidental take will be quantified."[6]

Critically, the 404 program Biological Opinion does not quantify take for *any* of the species it is intending to provide incidental take coverage for. It appears to us that unless the applicant modifies

---

[2] Memorandum of Understanding Between the Florida Fish and Wildlife Conservation Commission, The United States Fish and Wildlife Service, and the Florida Department of Environmental Protection, 2020. August 5, 2020. P. 6.
[3] US Fish and Wildlife Service, 2020. Programmatic Biological Opinion for US Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program under Section 404 of the Clean Water Act. P. 19-20. "This process of USFWS coordination and technical assistance operates similarly to a section 7 consultation because it has a similar objectives of 1) ensuring a State 404 permit action is not likely to jeopardize or adversely modify or destroy critical habitat, and 2) minimizing and tracking the amount of incidental take if take is reasonably certain to occur."
[4] *Ibid.*
[5] FDEP, 2021. Babcock Ranch Community Phases 1 and 2, Permit No. 36574-001, November 19, 2021, P. 13. "…potential take, which is estimated to be up to five different pairs… If evidence of caracara nesting is observed….".
[6] US Fish and Wildlife Service, 2020. Programmatic Biological Opinion for US Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program under Section 404 of the Clean Water Act. P.70.

this permit to completely avoid listed species impacts, especially the crested caracara nests, that take will occur. Thus, it would become necessary for EPA to reinitiate consultation about the entirety of the 404 program since "the amount of extent of incidental take is exceeded."[7]

**Audubon's Crested Caracara**

Our last comment letter provides relevant background on the caracara as well as the likely impacts to caracara on the project site. We have some questions and concerns about the conditions set forth in the FWC letter dated October 25, 2021, which were incorporated into the November 19, 2021 permit.

*Condition 23.a*

This condition begins by requiring inspections of palm trees and oaks between January and April in the undeveloped portions of the BRC property.[8] What is considered the undeveloped portions of the BRC property? The mitigation areas? The phased development areas that haven't been cleared? Both? Is the applicant required to do this every year until the caracaras are either harassed into abandoning their nests or forcibly have their nests moved to allow development?

As the condition reads, up to five pairs of caracara could potentially be taken.[9] This is a lot, and appears to be based on the BRC habitat model (dated July 2020) provided to FWC and USFWS during the 404 permit review.[10] Is this document available to the public? It does not appear to be under that name (or a related name) in Oculus. We would like to review this model, and it should be part of the public record.

*Condition 23.b*

Condition 23.b states "if" caracara nesting is observed on the property, conservation measure "shall be implemented…to the extent feasible".[11] It seems clear from condition 23.a (and the map of nests produced by the applicant (Attachment B) and photos included in the Babcock Ranch Community 2020 Crested Caracara Survey (Attachments C, D, and E)) that caracara nesting is occurring on the project site. What does FWC and/or USFWS consider feasible? What does FDEP consider feasible? Is the agencies definition of feasible the same as the applicant? It seems feasible to us to change the layout of the mitigation areas to protect at least some of the caracara nests, which were requests that we made in our prior comments, provided previous to the permit being awarded.

---

[7] *Ibid.* P. 73.
[8] Permit No. 396574-001, Babcock Property Holdings LLC and Babcock Ranch Community Independent Special District, p. 12
[9] *Ibid.*
[10] *Ibid.*
[11] *Ibid.*

*Condition 23.c*

Condition 23.c states "if" nesting is discovered to contact the USFWS and FWC. Nesting is on the site. What does this condition mean? Shouldn't the technical assistance[12] referred to in the condition be happening now?

*Condition 23.d*

Condition 23.d appears to allow for take of nests. Is this an accurate reading of this condition? If this is allowing for take, why is the word 'take' not in this condition or acknowledged anywhere in the permit or in the wildlife agency's documents?

*Condition 23.h*

Please provide the rationale as to why the GPS tagging of caracara constitutes "mitigation." Typically, mitigation relates to alleviating impacts. Trapping, tagging and monitoring two adult caracaras prior to destroying their nests does not appear to fall into the typical definition of mitigation. Also, pursuant to condition 23.a, there are up to 5 pairs that could be taken. Are these one from each of two specific pairs of caracaras? If so, which ones?

**Florida Bonneted Bat**

On January 21, 2021, the USFWS noted there would be take of Florida bonneted bat (see Attachment A). The applicant's Florida bonneted bat survey found onsite locations recorded 9+ calls overnight, and noted the potential for onsite roost(s).

The agencies should consider the impact of Babcock's proposed activities on roosting, as well as foraging bats. Bailey et al 2017[13] states that bonneted bats utilize agricultural lands for a significant part of their daily life needs - foraging. That study found that bonneted bat occupancy was positively correlated with the amount of crop-based agriculture.

Because Florida bonneted bats and their proposed critical habitat were not previously considered in prior Babcock Biological Opinions, we are very concerned that the current programmatic biological opinion and technical assistance process will result in less protection and analysis for this endangered species.

*Condition 22.c*

Condition 22.c states "[i]f evidence of use by any bat species is observed during pre-construction survey, removal efforts shall be discontinued".[14] However, the last sentence of this condition indicates that after consultation with USFWS and FWC, removal of a roost tree can happen "outside of maternity season".[15] Does this mean that the take of roosts is not permitted, or just not

---

[12] *Ibid.*
[13] Bailey et al., 2017. Impact of Land Use and Climate on the Distribution of the Endangered Florida Bonneted Bat. Journal of Mammology, 98(6): 1586-1593.
[14] Permit No. 396574-001, Babcock Property Holdings LLC and Babcock Ranch Community Independent Special District, p. 11
[15] *Ibid.*

permitted during maternity season? What does the service define as maternity season? Pursuant to FWC's website:

> Florida bonneted bats are thought to have a low reproductive capacity, only giving birth to one offspring per breeding season. However, the female has the capability of going into heat many times during the year (polyestrous). This species may have two breeding seasons each year. Reproduction has been documented during the summer and also during January and February.[16]

Is maternity season January, February, June, July, and August? The permit condition is too vague.

*Conditions 22 g & h*

Condition 22.g states that "widespread application of insecticides…shall be minimized to the extent feasible".[17] Condition 22.h states "[m]ature trees and snags within the preserve areas shall be maintained to the maximum extent feasible".[18] What do FWC and/or USFWS consider feasible? Is the agencies definition of feasible the same as the applicant? When would maintaining a tree in a preserve area not be feasible? There are no safeguards in the technical assistance process for the environmental community or public to understand what triggers will be required of the applicant as this project goes forward.

**Florida panther**

The Babcock area has long been established as an important area for panthers, particularly for northern expansion and most recently as supporting the first documented breeding north of the Caloosahatchee River since 1973.[19] Thatcher et al., 2009,[20] established that the Babcock area, including what appears to be portions of the subject property, as an important habitat patch. Similarly, the recent study Frakes & Knight, 2021, also appears to indicate this as a panther habitat suitability area.[21]

Was this new information utilized to inform agency review of the application to ensure that breeding in this area will not be diminished by Babcock's proposed activities? Did the USFWS determine that the Biological Opinion conditions that were contemplated years ago are adequate given this new information? If so, could this analysis be made public and placed on Oculus? If not, what was the basis for agency determination that breeding in this area will not be diminished by Babcock's proposed activities?

---

16 https://myfwc.com/wildlifehabitats/profiles/mammals/land/florida-bonneted-bat/
17 Permit No. 396574-001, Babcock Property Holdings LLC and Babcock Ranch Community Independent Special District, p. 11
18 *Ibid.*
19 Florida Fish and Wildlife Conservation Commission, 2020. Assessment of the Distribution of Florida Panther North of the Caloosahatchee River. Written by Brian Kelly and Dave Onorato. August 18, 2020.
20 Thatcher et al., 2009. Journal of Mammalogy, 90(4): 918-925.
21 Frakes & Knight, 2021. Location and Extent of Unoccupied Panther Habitat in Florida: Opportunities for Recovery. Global Ecology and Conservation, 26, e01516.

**Conclusion**

While we understand that the Babcock permit has already been issued, the questions raised in this letter are still timely, relevant, and in need of clarification, particularly as many of our questions would persist throughout the life of this permit. Further, we are concerned that the problems illustrated in this letter about the technical assistance and wildlife review process could unfortunately be replicated for other major permits under FDEP and wildlife agencies' review.

We ask for your agencies' responsiveness in providing these much needed answers. We were concerned when the state assumed section 404 permitting that protection of listed species would be compromised. This permit reinforces our concerns.

Please note that this letter does not constitute support for the state-assumed section 404 permitting program, which we believe is unlawful.

Please add this letter to the permit file for this project.

Sincerely,

/s/

Julianne Thomas
Senior Environmental Planning Specialist
(239) 262-0304 x 252
juliannet@conservancy.org

/s/

Amber Crooks
Environmental Policy Manager
(239) 776-5601
amberc@conservancy.org

cc:
Curtis Hardman, FDEP
Cindy Owens, FDEP
Jon Iglehart, FDEP
Larry Williams, USFWS
Connie Cassler, USFWS
Bryan Phillips, FWC
Laura DiGruttolo, FWC
Josh Cucinella, FWC
Jeaneanne Gettle, US EPA
Kathy Hurld, US EPA
Megan Mills, FDEP

*Attachment A*

Fit to page Page view Read aloud Add notes

**Subject:** Fw: [EXTERNAL] State 404 Permit No.: 396574-001 SFI Individual Lee County/ Babcock Ranch Community
**Date:** Friday, January 15, 2021 2:53:13 PM
**Attachments:** Project Map.pdf

To Whom it May Concern,

The Service plans on providing some comments in the future based on conversations we had with the Applicants when the project was with the Corps. I tried to use the link in the DEP email to look at the permit application. When I did that, the website told me "There are no documents that meet your criteria." Can you please send a working link so I can look at the permit application?

Will the website also tell me who the FWC reviewer is? If not, can you please let me know who that is?

We know there will be take of Florida bonneted bats. Also, we are waiting on a 2021 caracara survey from the applicants. We will have additional comments later in the process.

Connie

Constance L. Cassler, Ph.D.
Supervisory Fish and Wildlife Biologist
U.S. Fish and Wildlife Service
1339 20th Street
Vero Beach, Florida 32960
office: 772-469-4243
Fax: 772-562-4288
email: constance_cassler@fws.gov

Follow us on Twitter @USFWSVERO
Follow us on Facebook@USFWSSouthFlorida
Follow us on InstaGram @usfws_south_florida
Visit our website at www.fws.gov/verobeach/

Note: All email correspondence and attachments received from or sent to me are subject to the Freedon of Information Act (FOIA) and may be disclosed to third parties.

*Attachment B*



*Attachment C*

SITE 4

Adult feeding fledgling near nest tree in Site 4 on January 29, 2020.

Fledgling perched near nest tree in Site 4 on January 30, 2020.

*Attachment D*

Received Electronically
Jan 11, 2021
South District

SITE 6

Fledgling perched in nest tree in Site 6 on February 25, 2020.

Two fledglings foraging on the ground in Site 6 on March 10, 2020.

*Attachment E*

Received
Electronically
Jan 11, 2021
South District

**SITE 8**

Adult on nest in Site 8 on April 13, 2020.

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F9-CCD24385A1FE Case 1:21-cv-00119-RDM Document 98-1 Filed 02/28/23 Page 43 of 123

# ATTACHMENT B



DocuSign Envelope ID: A49EDFD1-91B9-4E45-88F9-CCD24385A1FE Case 1:21-cv-00119-RDM Document 98-1 Filed 02/28/23 Page 44 of 123

CONSERVANCY
of Southwest Florida
OUR WATER, LAND, WILDLIFE, FUTURE.

*Protecting Southwest Florida's unique natural environment and quality of life ... now and forever.*

April 8, 2022 sent via email

Jennifer Smith, Chief of Staff
South Florida Water Management District
3301 Gun Club Road
West Palm Beach, FL 33406
Jsmith@sfwmd.gov

Megan Mills, Permitting Administrator
Florida Department of Environmental Protection South District
PO Box 2549
Fort Myers, FL 33902-2549
Megan.Mills@FloridaDEP.gov

Dear Ms. Smith and Ms. Mills,

On behalf of the Conservancy of Southwest Florida and our more than 6,400 supporting families, we are writing to identify projects we believe deserve elevation by the Florida Department of Environmental Protection (FDEP) and/or South Florida Water Management District (SFWMD) to projects of heightened public concern and warranting expanded public opportunities to comment.

The Conservancy believes that these projects merit being elevated as each of them will have substantial and severe impacts to the environment, if approved.

Both FDEP and SFWMD (under the Environmental Resource Permit process), and FDEP (with the 404 program), allow for projects to be flagged for public meetings if there is public interest in the proposed project. The ERP handbook states that projects of large size, potential effects on the environment or public, a controversial nature, and/or impact on the conservation of wildlife and their habitats can result in a project being flagged as of "heightened public concern."[1]

Further, the ERP handbook also lays out the criteria for the public interest test.[2] Of particular note is Section 10.1.1.a.2, which states that an applicant must provide reasonable assurance that the proposed activity will not adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats. We contend that destruction and/or fragmentation of species habitat is an adverse impact from the projects detailed herein, thereby not only failing the public interest test (and perhaps other permit criterion regarding impact to listed species and wildlife), but also qualifying as a project of heightened public concern.

[1] FDEP, Environmental Resource Permit Applicant's Handbook, Vol. 1, Section 5.5.2.3.
[2] FDEP, Environmental Resource Permit Applicant's Handbook, Vol. 1, Section 10.1.1. (As referenced in rule 62-330.302, F.A.C.).

★★★★
CHARITY NAVIGATOR
Four Star Charity

Conservancy of Southwest Florida has been awarded Charity Navigator's prestigious 4-Star top rating for good governance, sound fiscal management and commitment to accountability and transparency. Charity Navigator is America's largest and most respected independent evaluator of charities.

1495 Smith Preserve Way I Naples, Florida 34102 I 239.262.0304 I Fax 239.262.0672 I www.conservancy.org

For FDEP, there is a webpage titled "Projects of Heightened Public Concern" in which "Selected Environmental Resource Permit Application and/or Agency Action" are listed.[3] The following projects with FDEP ERP or state 404 applications should be added to this webpage.

For pending ERP projects before the SFWMD, we ask that you reinstate your regular regulatory meetings.[4] These meetings began as a result of 2009 changes to the Florida Statutes to provide continuing public engagement in the permitting process, but meetings were suspended in 2020. At these meetings, projects of heightened public concern were a standing agenda item for which members of the public could provide comments.

The projects below meet the criteria listed on the webpage and in the rules based on their size, potential effect on the environment or the public, potential controversial nature, and the location of the activities. They should be elevated to project of heightened public concern, be reviewed for compliance with the public interest test and other permit issuance criterion regarding impacts to endangered species and wildlife habitats. We ask that a public meeting be made available for citizens to share their concerns prior to the agency permitting these projects.

Inclusion on these lists will allow for additional public engagement by making it easier for the public to track and learn about these projects. We believe that input from the public and concerned parties should be a priority for FDEP and SFWMD. After all, these projects, as seen in Figure 1, will change the landscape and future of the area –the trajectory of species survival and recovery- if approved. The Conservancy requests the agencies elevate the below identified applications[5].

- Bellmar, Collier County – 404 Application #396364-001 (& any future ERP construction/operation permit application)
    - Bellmar will destroy 1,700+ acres located entirely in Primary Zone panther habitat.
    - Over 130 acres of wetlands would also be destroyed.
    - The location is only about 1 mile away from the Florida Panther National Wildlife Refuge (FPNWR). Refuge manager shared concerns about the development's secondary and cumulative impacts on the Refuge.
    - The project proposes to impact caracara nest in the center of the parcel.
    - More than 650 letters expressing concern about this project have been submitted to FDEP from citizens and organizations.
    - Bellmar is located in proposed critical habitat for the Florida bonneted bat.

- Rural Lands West, Collier County – 404 Application #396966-001 (& any current or future ERP construction/operation permit applications such as ERP application #220107-32645)
    - Rural Lands West would impact about 4,500 acres, and a majority of the site is Primary Zone panther habitat.
    - Over 300 acres of wetlands would be destroyed.

---

[3] Accessed at <https://floridadep.gov/south/sd-permitting/content/projects-heightened-public-concerns>.
[4] Accessed at <https://www.sfwmd.gov/doing-business-with-us/rules.>
[5] ERP and state 404 applications by Burnett Oil for new projects at Nobles Grade and Tamiami Prospect within the Big Cypress National Preserve are projects of concern and when they resubmit, we ask that their application be elevated.

- The southern end of the development impact footprint is located in proposed critical habitat for the Florida bonneted bat.
- Rural Lands West is also within 5 wood stork colony's Core Foraging Areas.
- Concerns about impacts from Rural Lands West have been expressed by FPNWR.
- The project is adjacent to and within the Camp Keais Strand flowway that feeds the FPNWR and other public/mitigation lands.

- Troyer Mine, Lee County – 404 Application #292013-008
    - Troyer Mine is nearly 2,000 acres with a proposed mine pit of nearly 800 acres.
    - The location is adjacent to conservation lands on the east and west sides of the project.
    - EPA objected to the methodology/definition used by the applicant to calculate WOTUS wetland impacts in December 2021.
    - More than 15 letters of objection asking for a public hearing were submitted from citizens, organizations, and businesses, including Sakata Seed, the adjacent landowner who will be negatively impacted by this project.
    - Miccosukee Tribe concerns do not appear to be resolved based on public information available on FDEP Oculus webpage.
    - The site was previously identified by Army Corps of Engineers in 2010 for NEPA Environmental Impact Statement (EIS) due to cumulative impacts in eastern Lee County. The Determination Letter by the ACOE stated concerns for public drinking water resources, infrastructure and traffic safety, conservation lands and mitigation lands adjacent or nearby the mine, as well as impacts to water resources, hydrology, flowways, and wildlife habitat.
    - Troyer Mine will impact 3 wood stork Core Foraging Areas.

- FFD, Lee County – ERP Application #211005-7746 and 404 Application #291030-004
    - FFD would impact more 2,500+ acres.
    - The project is bounded on three sides by conservation and mitigation lands that could be negatively impacted by development.
    - The proposed impact area is in Primary and Secondary Zone panther habitat.
    - The site was previously identified by the Army Corps of Engineers in 2010 for an Environmental Impact Statement due to cumulative impacts in eastern Lee County.

- Immokalee Road Rural Village, Collier County – ERP Application #211201-32383 and 404 Application #396348-001
    - The project is nearly 3,000 acres, with over 1,000 acres slated for impacts.
    - Immokalee Road Rural Village would impact over 240 acres of wetlands and other surface waters.
    - There are 675 acres of panther Primary Zone & 344 acres of Adult Breeding Habitat on site.
    - Immokalee Road, adjacent to the project, is a panther-vehicle collision hot spot with 8 recorded deaths, along with several black bear deaths.

- There are 113 gopher tortoise burrows on site and the threatened eastern indigo snake is a potential commensal species.
- The project will impact 5 wood stork colonies Core Foraging Area.

While there are many other projects we are tracking, these projects are the ones that we presently believe should have heightened awareness and be brought to the attention of the public.

Please let us know if you would like additional information about these projects as you consider our request.

Sincerely,

Julianne Thomas
Senior Environmental Planning Specialist
(239) 262-0304 x 252
julliannet@conservancy.org

Amber Crooks
Environmental Policy Manager
(239) 776-5601
amberc@conservancy.org

cc:
Shawn Hamilton, FDEP
Melissa Roberts, SFWMD
Laura Layman, SFWMD

DocuSign Envelope ID: A49EDFD1-91B9-4E45-8859-CCD24385A1FE
Conservancy of Southwest Florida
Projects of Heightened Concern
Page **5** of **5**

*Figure 1*

Date: 2/1/2022
Legend
FFD
Troyer Bros Mine
Immokalee Road Rural Village
Rural Lands West
Bellmar
0 0.75 1.5 3 4.5 6
Miles

CONSERVANCY
of Southwest Florida
OUR WATER, LAND, WILDLIFE, FUTURE.

**From:** Mills, Megan
**To:** SD-ERPcomments
**Subject:** FW: Projects of Heightened Public Concern
**Date:** Monday, April 11, 2022 8:06:40 AM
**Attachments:** CSWFLProjects of Heightened Public Concern.pdf

---

Please insert to Oculus under DEP Files:
ST404 Program Catalog
396364
396966
291030
396348

Note the Troyer Mine project is not our 404 and will be handled by Mining and Mitigation.

Sincerely,
Megan

---

**From:** Julianne Thomas <JulianneT@conservancy.org>
**Sent:** Friday, April 8, 2022 5:38 PM
**To:** Smith, Jennifer <jsmith@sfwmd.gov>; Mills, Megan <Megan.Mills@dep.state.fl.us>; Laura Layman <llayman@sfwmd.gov>; Melissa Roberts <mroberts@sfwmd.gov>; Hamilton, Shawn <Shawn.Hamilton@FloridaDEP.gov>
**Cc:** nicole johnson <nicolej@conservancy.org>; Amber Crooks <amberc@conservancy.org>
**Subject:** Projects of Heightened Public Concern

**EXTERNAL MESSAGE**
This email originated outside of DEP. Please use caution when opening attachments, clicking links, or responding to this email.

Please find attached the Conservancy of Southwest Florida's letter which identifies projects we believe deserve elevation by the Florida Department of Environmental Protection (FDEP) and/or South Florida Water Management District (SFWMD) to projects of heightened public concern and warrant expanded public opportunities to comment.

Please let me know if you have any questions or need additional information.

Julianne Thomas
Senior Environmental Planning Specialist
Conservancy of Southwest Florida

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F9-CCD24385A1FE Case 1:21-cv-00119-RDM Document 98-1 Filed 02/28/23 Page 50 of 123

# ATTACHMENT C

  

September 15, 2022                                                 *sent via email*

Director Martha Williams
U.S. Fish and Wildlife Service
1849 C. St. NW
Washington DC, 20240

State Supervisor Larry Williams
U.S. Fish and Wildlife Service
1339 20th Street
Vero Beach, FL 32960

Regional Administrator Daniel Blackman
U.S. Environmental Protection Agency
61 Forsyth Street SW
Atlanta, GA 30303

Secretary Shawn Hamilton
Florida Department of Environmental Protection
3900 Commonwealth Blvd. MS 49
Tallahassee, FL 32399

Director Eric Sutton
Florida Fish and Wildlife Conservation Commission
620 S. Meridian St.
Tallahassee, FL 32399

Re: Bellmar Development Application (Collier County) and Public Notice, #396364-001

Dear Director Williams, State Supervisor Williams, Regional Administrator Blackman, Secretary
Hamilton, and Director Sutton:

On behalf of our respective organizations and our members, the Center for Biological Diversity,
Conservancy of Southwest Florida, and Sierra Club are providing comment on the Bellmar
project proposal that is being sought under the Florida Department of Environmental Protection
(FDEP) state assumed 404 program (application #396364-001). This letter supplements our prior

correspondence on both the Bellmar project, as well as our comments provided regarding the Eastern Collier Multiple Species Habitat Conservation Plan (ECMSHCP). Please consider this letter as a request that FDEP hold a public meeting,[1] as well as a request that the US Environmental Protection Agency also hold a public meeting.[2]

We oppose authorization of this project and are asking you to deny the request for a section 404 permit because it will have unacceptable direct, indirect, and cumulative impacts on endangered and threatened species, wetlands, and other natural resources. This controversial project is within a flowway and key wildlife corridor, would directly impact over 1,700 acres, and is only approximately one mile away from the Florida Panther National Wildlife Refuge (FPNWR).

Further, it is apparent that the project will not meet the "no jeopardy" requirement of the Endangered Species Act and the state 404 permitting program, not only due to habitat loss, infringement of wildlife corridors, and indirect impacts on adjacent preserves, but also due to the impacts of traffic and transportation needs resulting from the Bellmar project, particularly in concert with cumulative impacts that are reasonably foreseeable.

Not only does Bellmar fail to meet the criteria for permit issuance under rule 62-331 F.A.C. and other requirements of Florida's state assumed 404 program, but it also would be inconsistent with the Endangered Species Act (ESA).

## I. Bellmar Cannot Be Authorized Absent an Affirmative Demonstration that the Effects of the Authorization, Considered with Regard to Cumulative Effects, Are Not Likely to Jeopardize the Florida Panther

ESA Section 7 requires that "[e]ach Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species."[3] When EPA decided to allow FDEP to take over the 404 permitting, it relied on a programmatic Biological Opinion to purportedly satisfy its duties under ESA Section 7 to ensure against jeopardy.[4] Rather than analyze the impacts to species from EPA's decision, which included the effects of the permitting that would occur under the State 404 Program, that programmatic Biological Opinion relied on a structured process for technical assistance whereby the analysis would occur at the State program permitting stage instead, and would comply with the terms in the programmatic Biological Opinion, deferring the actual analysis of jeopardy. To comply with the programmatic Biological Opinion, the agencies must now consider all the indirect, direct, and cumulative effects of Bellmar and other reasonably foreseeable development to ensure the project will not jeopardize listed species, including the Florida panther. As outlined below, because these effects, when added to the environmental baseline, are likely to jeopardize the Florida panther, the agencies cannot authorize Bellmar.

[1] 62-331.060, Florida Administrative Code.
[2] 62-331.052, Florida Administrative Code.
[3] 16 U.S.C. § 1536(a)(2).
[4] CSWF, CBD, Sierra Club and others are currently challenging the lawfulness of that approach in court, and in no manner waive the claims, issues, or arguments raised in that litigation.

**A. The agencies must consider the impact of the Bellmar project with the cumulative effects of other reasonably foreseeable development that will be authorized under the State 404 program and will affect ESA-listed species and habitats in the areas affected by the Bellmar project.**

The "no jeopardy" conclusion in the Biological Opinion for EPA's approval of the Florida State 404 program (404 Programmatic BiOp) relies on the "structured process" established pursuant to the Memorandum of Understanding (MOU) between FDEP, the Florida Fish and Wildlife Conservation Commission (FWC), and the U.S. Fish and Wildlife Service (FWS) to avoid jeopardy,[5] which characterizes that structured process as being "as protective" as ESA section 7 consultation.[6] For that to be the case, the jeopardy determination for any given permit would have to consider the effects of the permitted activity cumulatively with other reasonably foreseeable non-federal actions, which here would necessarily include other reasonably foreseeable State 404 permits affecting the same area affected by the permit at issue.

An ESA section 7 analysis of effects would require consideration of cumulative effects. ESA regulations state, "Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."[7] "Action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action."[8] Effects include "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action."[9] "A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action."[10]

With regard to how cumulative effects will be considered in making the effects determinations pursuant to the "structured process," the 404 Programmatic BiOp states: "The USFWS evaluation of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA."[11] The BiOp states that State 404 permit applications must include: "Analysis of any cumulative effects, which are the effects of future State or private activities that are reasonably

[5] U.S. Fish and Wildlife Service, Programmatic Biological Opinion for U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program under Section 404 of the Clean Water Act (hereafter "404 Programmatic BiOp"), at 68–69.
[6] 404 Programmatic BiOp at 56.
[7] 50 C.F.R § 402.02.
[8] 50 C.F.R § 402.02.
[9] 50 C.F.R § 402.02.
[10] 50 C.F.R § 402.02.
[11] 404 Programmatic BiOp at 20. *See also id*. at 25 ("The USFWS evaluation of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA.").

certain to occur within the project area."[12] It defines "project area" to mean: "a portion of the State-assumed waters where specific dredging or filling activities are permitted and consist of a bottom surface area, any overlying volume of water, and any mixing zones," but specifies that, "In the context of the review of State 404 permit applications for endangered and threatened species, also includes those areas outside the immediate area of activity which may affect listed species using those areas."[13]

With regard to how jeopardy will be evaluated as part of the "structured process," the 404 Programmatic BiOp states that, "the USFWS's project-specific, species-specific, review of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA."[14] "Assessment of adverse cumulative impacts must be considered during the review of State 404 permit applications; the assessment of expected impacts to species that may be caused from a particular project must be considered along with the impacts that may have been caused from past authorized projects, as well as those future projects that are reasonably certain to occur."[15]

Reasonably foreseeable activities requiring authorization under the State 404 Program seemingly are non-federal actions, and therefore in making jeopardy determinations for each State 404 Program permit, their effects in the area affected by the permit application at issue must be considered as cumulative effects and added on top of the baseline when considering whether the effects of the permit are likely to cause jeopardy.

The cumulative impacts proposed by this applicant and others, which are pending or otherwise reasonably foreseeable, are extreme. These impacts include, but are not limited to, the 45,000 total acres of mining and development that were pursued under the ECMSHCP for over twelve years.

As of the date of this letter, Rural Lands West (about 4,000 acres), Bellmar (about 1,790 acres), and Hogan West (640 acres)[16]—approximately 6,430 acres of the remaining 39,973 acres unpermitted but previously considered under the ECMSHCP—are now pending before the FDEP state 404 program. Additionally, the Barron Collier Rod and Gun Club, an approximately 895-acre project that proposes impacts within the ECMSHCP development and "preserve" area, including golf courses, shooting ranges, and residential estates within a panther corridor, was recently active with FDEP for verification that no state 404 permit was needed.[17] In their withdrawal letter, the applicants state that they soon intend to apply for the FDEP state 404 permit.

---

[12] 404 Programmatic BiOp at 16.

[13] 404 Programmatic BiOp at vii.

[14] 404 Programmatic BiOp at 66 (discussing cumulative effects of EPA assumption decision).

[15] 404 Programmatic BiOp at 21.

[16] Of Rural Lands West's impact acres, 3100 acres are with Primary Zone panther habitat. All of Bellmar is within the Primary Zone. Of Hogan West's (AKA Brightshore) impact acres, 211 of these acres within Primary Zone. The remainder of these projects are within Secondary Zone panther habitat.

[17] Barron Collier withdrew its request for FDEP's action on May 20, 2022, stating that "we intend to apply for a SFWMD ERP and FDEP 404 permit later in the summer."

Therefore, projects put forth in the ECMSHCP are reasonably foreseeable and thus must be considered by FDEP under the cumulative impacts analysis. It is clear, by advancing the Rural Lands West and Bellmar projects with the U.S. Army Corps of Engineers' 404 program and now the state-assumed 404 program, that the landowners intend to pursue their developments regardless of whether the ECMSHCP is completed. Moreover, since the 404 Programmatic BiOp purports to provide authorization for incidental take to State 404 permittees, it is reasonably foreseeable that the other developments under the Covered Activities will proceed via the State 404 program.

Additional developments, not covered by the now-withdrawn ECMSHCP but located within the same critical panther areas, are also under consideration by FDEP. The Immokalee Road Rural Village is adjacent to Hogan West and the ECMSHCP boundary. The project is 2,780 acres, with 676 acres that are Primary Zone panther habitat and the remainder Secondary Zone panther habitat. It is situated between the 7,000+ acre Bird Rookery Swamp and the Collier County Panther Walk Preserve, as well as the state protected lands of the Corkscrew Regional Ecosystem Watershed (CREW). The wetland ecosystems constitute travel ways for large mammals, and the project site is adjacent to one of the deadliest areas for Florida panthers. The proposed project includes the construction of a rural village on a 2,787-acre site within the Rural Fringe Mixed Use area of Collier County. Per the applicant's 404 permit application, the proposal includes a mixed-use development consisting of residential, commercial uses, and civic/institutional, with associated infrastructure, amenities, and stormwater management system. The applicant proposes to construct over 4,000 residential units: 2,842 single family residential homes and up to 1,200 multi-family residential units.

Eastern Lee County, adjacent to the ECMSHCP boundary, has also experienced extreme development pressure. The projects known as FFD, Troyer Mine, and Kingston (FKA Old Corkscrew Plantation) would directly destroy 2,573 acres of Primary Zone panther habitat, and directly and indirectly impact about 7,400 acres of Adult Breeding Habitat for panthers.[18]

| **Project[19]** | **Homes** | **Residents** | **Panther habitat** | **Primary Zone** | **Wetland direct** |
|---|---|---|---|---|---|
| Rural Lands West | 5,100 | 10,496 | 4,000 ac | 3,100 ac | 311 ac |
| Bellmar | 4,132 | 8,683 | 1,790 ac | 1,790 ac | 135 ac |
| Collier Rod and Gun Club | 225 | 583 | 895 ac | 895 ac | TBD |
| Hogan West | 2,000 | 4,893 | 640 ac | 211 ac | 21 ac |
| Immokalee Road Rural Village | 4,042 | 9,874 | 2,780 | 676 ac | 244 ac |
| Troyer Mine | 0 | 0 | 907 ac | 841 ac | 214 ac |
| Kingston | 10,000 | 25,800 | 6,676 ac | 1,177 ac | 12 ac |
| FFD | 5,208 | 13,436 | 2,596 ac | 555 ac | 79 ac |
| **Totals** | **30,707** | **73,7652** | **20,284 ac** | **9,245 ac** | **1,016 ac** |

[18] Conservancy of Southwest Florida, August 2, 2022. Letter to FDEP, FWC, and USFWS regarding Troyer Mine state 404 permit, citing modeling analysis by Dr. Robert Frakes.
[19] Selection of state 404 applications. Estimates based on best available information at time of drafting of this letter.



Additionally, Florida Power and Light Beautyberry Solar Energy Center is a proposed approximately 2,200-acre project located in Primary Zone panther habitat in Hendry County.[20] A proposed widening of State Road 82 would widen SR 82 for 23 miles to expand the road from two lanes to four lanes (and ultimately, to six lanes) through Lee, Hendry and Collier Counties. The segment between the Collier County line and Gator Slough is under review by FDEP for a proposed state 404 permit. The continuous flow intersection at the center of the first of seven parts of this project is expected to average about 2,700 cars per hour, more than a conventional intersection can handle. The road runs north of and adjacent to important public lands and panther habitat such as the Wild Turkey Preserve, Corkscrew Mitigation Bank, and Pepper Ranch Preserve.[21] Daniel's Parkway South is a proposed mixed-use development in the DR/GR area of Lee County requesting 1,600 residences and 350,000 sq ft of commercial development on 1,233 acres. Of those 1,233 acres, 944.5 acres are primary panther habitat. There is also a proposal to widen 18 miles of SR 29 from Collier County to Hendry County from the existing two lanes to four lanes. Traffic volumes on SR 29 are projected to increase from 6,200 vehicles per day to 23,800 vehicles per day by the year 2035. The road widening project is adjacent to or

[20] FDEP Oculus file for application #419224-002.

[21] WFTX Digital Team, New Continuous Flow Intersection now open in Lehigh Acres (Jul. 9, 2019 6:37 AM), https://www.fox4now.com/news/local-news/continuous-flow-intersection-now-open-in-lee-county; Florida Department of Transportation, State Road (SR) 82 from Hendry County Line to Gator Slough Lane, Collier County Resurface/Add Lanes Financial Project No. 430848-1-51-01(last visited Jul. 15, 2021), http://www.swflroads.com/sr82/hendrytogatorslough/; No. 9 - S.R. 82 From Lee Boulevard to 40th Street, Roads & Bridges (last visited July 15, 2021), https://www.roadsbridges.com/no-9-sr-82-lee-boulevard-40th-street; FDOT, Project description, Project ID 425841-3, http://www.sr82design1.com/ (last visited Jul. 15, 2021).

near major public lands and habitat.[22] Additionally, a proposed widening of Snake Road in Hendry County would involve approximately eight miles that cross an important wildlife corridor connecting the Big Cypress National Preserve to public and private lands in southeast Hendry County and the southwest corner of Palm Beach County.[23]

Notably, lands within the action area of the Bellmar project have already been eaten away by development over recent years, particularly in eastern Lee County. Though we highlight just a handful of projects here, the habitat losses have been substantial. Wildblue Residential Development (2015), Corkscrew Crossing (2018), The Place (FKA Corkscrew Farms) (2016), Verdana Village (2020), and Hyde Park (2020), have resulted in 11,600 acres of panther habitat loss.[24] The agencies must consider the impacts of the current proposal and reasonably foreseeable development combined with the impacts of these developments.

[22] Florida Department of Transportation, SR 29 - SR 82 to County Line (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/sr82tocountyline/; FDOT, SR 29 from North of New Market Road North to SR 82 (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/newmarkettosr82/; FDOT, SR 29 from CR 846 E to North of New Market Road N (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/cr846tonewmarket/; FDOT, SR 29 Design from South of Agriculture Way to CR 846 E (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/agriculturetocr846/; FDOT, SR 29 from Sunniland Nursery Road to South of Agriculture Way (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/sunnilandnurserytoagriculture/; Tony Sherrard (FDOT), S.R. 29 PD&E Study From North of S.R. 82 to South of C.R. 80A (last visited Jul. 15, 2021), http://swflroads.com/sr29/northof82/Images/Hearing%20Handout.pdf
[23]Tara Backhouse, Snake Road Construction!, Seminole Tribe of Florida Ah-Tah-Thi-Ki Museum Blog (Feb. 6, 2011), https://ahtahthiki.wordpress.com/2011/02/16/snake-road-construction/.
[24] Date of US Fish and Wildlife Service Biological Opinion for each project provided.

**B. The agencies must address FWS's prior analysis showing that the combined effects of the Bellmar project and other planned development in eastern collier county will cause jeopardy to the Florida panther.**

FWS has previously made draft determinations indicating that the effects of authorizing the Bellmar project in combination with other development in Eastern Collier County, and other reasonably foreseeable impacts, will jeopardize the Florida panther. The Bellmar project was one of multiple proposed developments from the Eastern Collier Property Owners ("ECPO") seeking an ESA section 10 Incidental Take Permit ("ITP") in reliance on their proposed Eastern Collier Multi-Species Habitat Conservation Plan ("ECPO HCP"). According to a recent statement by FWS:

> The first full draft of the HCP was received on April 22, 2015. Modifications to the original HCP were received by the Service on October 14, 2017, April 6, 2018, April 23, 2018, August 22, 2018, March 8, 2019, March 25, 2019, and September 17, 2019 (HCP Addendum). Also, a modification to the original ITP application was received on September 9, 2019.[25]

According to FWS, the ECPO applicants submitted a letter to FWS to withdraw their ITP applications on July 28, 2022.[26] While the letter indicates the ECPO applicants wish to withdraw their ITP application, it confirms that the applicants will "move forward case-by-case on [their] individual projects" within the HCP area through "project-specific reviews," with some already in that process and others "fast approaching."[27] While not explicitly stated in the letter, the project-specific reviews the ECPO applicants are referring to apparently are state-assumed Clean Water Act Section 404 permitting and associated reviews through the technical assistance process, not ESA section 7 consultations. Following the ECPO applicants' withdrawal, FWS stated that, "[a]t the time of withdrawal, the Service had not made a final determination regarding jeopardy or non-jeopardy for any of the covered species."[28] Nonetheless, FWS's analyses in publicly available draft Biological Opinions for the proposed ITPs under the proposed ECPO HCP indicate that the combined effect of the proposed ECPO developments would cause jeopardy to the Florida panther. FWS has publicly released two draft Biological Opinions dated from December 2020 and December 2021, respectively.[29] The December 2020 draft BiOp indicates that it is based on an iteration of the HCP from January 28, 2020, whereas the December 2021 draft BiOp indicates that it is based on that version of the HCP "plus subsequent addenda."[30]

---

[25] U.S. Fish & Wildlife Service, East Collier Multi-Species ITP/HCP Withdrawal, (posted Sept. 1, 2022) https://www.fws.gov/library/collections/east-collier-multi-species-itphcp-withdrawal (last accessed Sept. 9, 2022).
[26] *See id*. *See also* Eastern Collier Property Owners Letter to USFWS dated 07/28/2022 Withdrawing their Incidental Take Permit applications, *available at* https://www.fws.gov/media/eastern-collier-property-owners-letter-usfws-dated-07282022-withdrawing-their-incidental-take.
[27] *Id.* at 2–3.
[28] U.S. Fish & Wildlife Service, East Collier Multi-Species ITP/HCP Withdrawal, (posted Sept. 1, 2022) https://www.fws.gov/library/collections/east-collier-multi-species-itphcp-withdrawal (last accessed Sept. 9, 2022).
[29] It is our understanding that there is a 2022 draft of the BiOp, but we do not currently have public access to a copy.
[30] *Compare* Biological Opinion and Conference Opinion, Eastern Collier Multi-Species Habitat Conservation Plan (filename "20201229_draft BO-CO-ECMHCP_for ECPO.pdf") (hereafter "2020 draft HCP BiOp") at 1 [submitted with these comments for inclusion in the administrative record] *to* Biological Opinion and Conference Opinion

A February 24, 2021 letter from the ECPO ITP applicants to FWS regarding the December 2020 draft Biological Opinion ("BiOp") makes clear their understanding that the draft BiOp concluded that absent additional commitments from the ITP applicants to "fund public roadway improvement projects (wildlife crossings and fencing) and 'capture' traffic within future community developments," the additional panther mortality from vehicle collisions due to increased traffic induced by the proposed developments "would cause jeopardy."[31]

Indeed, the December 2020 draft HCP BiOp makes clear that, even taking into account the proposed mitigation measures under the draft ECPO HCP, the proposed ECPO developments would result in a statistically significant increase in the risk of extinction for the Florida panther, with a net loss of 12 panthers per year at full build-out.[32] The December 2020 draft HCP BiOp found that the risk of extinction with the HCP increased to 5.7%, compared to an extinction risk of approximately 1.1% or 1.38% without it.[33] The December 2020 draft HCP BiOp then explained that to sufficiently reduce the increased risk of extinction so that it was no longer a statistically significant increase, additional mitigation measures and/or changes to the proposed developments to increase internal capture rates for traffic or otherwise reduce impacts would be required.[34] The 2020 draft HCP BiOp stated:

> If the Applicants are able to achieve a greater than 50 percent community (internal) capture rate, further reduce the effects of their action, or mitigate them through use of the Marinelli Fund for habitat restoration to the extent that the net effect is a loss of no more than 10 adult panthers (4 female adult panthers)/year above present (from all causes) our analysis finds the probability of extinction falls from 5.7 percent to 1.4 percent. This probability of extinction is within the 95 percent C.I. [confidence interval] of scenarios where no additional panthers are taken above present (i.e., not significantly different from baseline).[35]

The next paragraph in the December 2020 draft HCP BiOp indicates that a "no jeopardy" conclusion is contingent on finding that a "further net reduction of effects to *fewer than* 10 panthers per year at full build-out" will "be accomplished through the maintenance of high community (internal) trip capture, adaptive management, and the mitigative effects of actions

---

Eastern Collier Multi-Species Habitat Conservation Plan (filename DRAFT-USFWS-ECPO-full-Biological-Opinion-December-2021.pdf) (hereafter "2021 draft HCP BiOp") at 1 [submitted with these comments for inclusion in the administrative record].

31 "ECPO's High-Level Comments on Draft BO" at 12, transmitted to Robert Tawes Chief, Environmental Review Division, U.S. Fish and Wildlife Service, Southeast Region by Bruce Johnson, Principal, Senior Scientist , Stantec Consulting Services, as attachment to letter dated February 24, 2021. (Obtained from FWS via FOIA) [submitted with these comments for inclusion in the administrative record]; *see also* Email from Leopoldo Miranda, Regional Director, FWS, to Jack Arnold, Acting Assistant Regional Director, FWS, regarding a Revised ECPO Information Memorandum (June 5, 2019) (quoting a draft information memorandum stating, "We have also begun frank discussions with ECPO, most recently May 10 and 14, based on the Service's preliminary, internal analyses of traffic volume effects on the continued survival or recovery of the Florida panther.") [submitted with these comments for inclusion in the administrative record].

32 Biological Opinion and Conference Opinion, Eastern Collier Multi-Species Habitat Conservation Plan (filename "20201229_draft BO-CO-ECMHCP_for ECPO.pdf") (hereafter "2020 draft HCP BiOp") at 158–159.

33 *Id*. at 158–159.

34 *See id*. at 159.

35 *Id*. at 159.

facilitated by the Marinelli Fund."[36] In short, the December 2020 draft HCP BiOp shows that the combined impacts of the proposed ECPO developments would cause jeopardy to the Florida panther absent additional changes to the design or additional mitigation measures to reduce the anticipated number of annual panther losses caused by implementing the proposed covered activities.

The December 2021 draft HCP BiOp similarly states:

> [O]ur PVA [population viability analysis] predicts the implementation of the HCP, in the absence of further actions to reduce the impact of the action to the panthers, could reduce the abundance of panthers across their range such that the probability of extinction is predicted to increase from 1 percent (95 percent C.I. 0.2 to 1.8 percent) to 5.7 percent (95 Percent C.I. 2.2 to 9.2 percent). When cumulative effects are added to the effects of the HCP the probability of extinction further increases to 6.6 percent (95 percent C.I. 2.3 to 10.9 percent). The probability of extinction after implementation of the HCP is statistically significantly different than baseline conditions. If the Applicants are able to achieve a greater than 50 percent community (internal) traffic capture rate, further reduce the effects of their action, or mitigate them through use of the Marinelli Fund for habitat restoration to the extent that the net effect is a loss of no more than 10 adult panthers (4 female adult panthers)/year above present (from all causes) our analysis finds the probability of extinction falls from 5.7 percent to 1.4 percent. This probability of extinction is within the 95 percent C.I. of scenarios where no additional panthers are taken above present (i.e., not significantly different from baseline).[37]

Notably, whereas the draft HCP BiOps both state that additional panther losses must be limited to "no more than 10" per year over present levels, other portions of the draft HCP BiOps indicate that the number actually must be *fewer than* 10 over present levels to avoid a statistically significant increase in extinction risk.[38]

Just like the 2020 draft HCP BiOp, the modeling in the 2021 draft HCP BiOp finds that, even with 8 wildlife crossings *and* assuming a 50% internal capture rate for traffic, implementation of the HCP will cause a total of 12 additional panther deaths per year, 8 from vehicle collisions resulting from increased traffic induced by the HCP developments, and 4 from habitat loss and

---

[36] 2020 draft HCP BiOp at 159 (emphasis added).
[37] 2021 draft HCP BiOp at 148.
[38] *See* 2020 draft HCP BiOp at 146 ("Internal population viability analysis contingency modelling, and statistical comparison of possible thresholds found that the probability of extinction 100 years after ITP expiration of BSLR, BSLR + HCP, and BSLR + HCP + CE scenarios do not differ significantly (1.38 percent Prext versus the 1.1±0.8 percent Prext estimated for BSLR) *if fewer than* 10 adult panthers (4 female panthers) total are taken annually, above present.") (emphasis added); 2021 draft HCP BiOp at 133–134 ("Our analysis of these PVAs found that though there was still a difference in final abundances, the probability of extinction 100 years after ITP expiration does not differ significantly from Baseline + Sea Level Rise (1.38 percent Prext versus the 1.1±0.8 percent Prext estimated for BSLR) *if fewer than* 10 adult panthers (4 female panthers) total are lost annually, above present, from any cause (*e.g.,* habitat loss, roadway mortality, etc.).") (emphasis added).

degradation.[39] And both the 2020 and 2021 BiOps find that the cumulative effects of traffic induced by other non-HCP, non-federally authorized actions will cause an additional 2 panther deaths per year, even after accounting for the mitigation provided by 8 wildlife crossings.[40] In sum, both versions conclude that the additional panther deaths associated with implementation of the HCP will be 12 per year, and that such panther losses must be limited to fewer than 10 per year to avoid a statistically significant increase in the risk of extinction (i.e. jeopardy). Both versions indicate that additional changes to the proposed HCP, such as commitments to achieve internal capture of traffic greater than 50% and/or additional commitments for mitigation, would be necessary to conclude that the panther losses will be reduced to 10 or fewer.

Based on the available records, there appears to be no indication that the HCP applicants further modified their project designs or mitigation commitments to achieve the necessary reductions in the number of additional panther losses per year.[41] Consequently, the Service's draft analyses appear to indicate that, absent additional changes to the project designs to increase internal capture above 50% or commitments for additional avoidance or mitigation of impacts, the combined impacts of the Bellmar project and the other projects formerly part of the proposed HCP, will result in total panther losses that are likely to cause jeopardy to the Florida panther.

This result is especially concerning because the 2020 and 2021 draft HCP BiOps reflect multiple assumptions that result in underestimating the risk of extinction, as detailed below in section **I.C**.

### C. The 2020 and 2021 draft HCP BiOps underestimate the risk of extinction for Florida Panthers and the impacts of the HCP Covered Activities, which include the Bellmar project, on that risk.

Although FWS's analyses in the 2020 and 2021 draft HCP BiOps raise legitimate concerns that the cumulative effects of the Bellmar project and other proposed projects will jeopardize the Florida panther, even these analyses underestimate the harm to the species and the extent of projected jeopardy by relying on unsupported assumptions. To accurately and lawfully consider the direct, indirect, and cumulative effects of Bellmar on the panther and other listed species, the agencies must first address these problematic assumptions.

---

[39] *See* 2020 draft HCP BiOp at 153, lines 5444-5447; 2021 draft HCP BiOp at 142, lines 5055-5057.

[40] *See* 2020 draft HCP BiOp at 153; 2021 draft HCP BiOp at 142.

[41] In contrast to the Florida panther opinion section from the 2020 draft HCP BiOp, the 2021 draft HCP BiOp omits a paragraph indicating that a no jeopardy conclusion hinged on additional changes such as assuring greater internal capture of traffic or committing to additional impact reductions or mitigation. In its place is a paragraph indicating that instead of actually specifying the changes to the HCP necessary to ensure greater internal capture rates above 50%, or to ensure commitments to undertake specific additional avoidance or mitigation measures, the Service may have intended to rely on "adaptive management measures" added to the conditions in yet unidentified permit terms to somehow provide an avenue for additional impact reduction post-permit issuance. *Compare* 2021 draft HCP BiOp at 148 *to* 2020 draft HCP BiOp at 159. Notably, in ESA contexts, courts have found that the Service unlawfully relied on "adaptive management" in lieu of specific measures or specific criteria to ensure satisfaction of ESA standards. *See, e.g.*, *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1025–28 (9th Cir. 2011) (reliance on "adaptive management" to justify delisting grizzlies in the face of substantial uncertainty about extent of impacts on population from harmful factor was unlawful given lack of specific criteria to address that factor).

1. **In estimating extinction risk resulting from implementation of the HCP, the draft HCP BiOps assume that the developments under the HCP's Covered Activities will result in 50% internal capture, despite evidence indicating actual internal capture rates as low as 2% for proposed projects.**

In estimating the impacts to panthers from increased traffic that would be induced by implementation of the HCP, the modeling in both the 2020 and 2021 draft HCP BiOps *assumes* that the developments under the Covered Activities will have a 50% internal capture rate. That assumption was based on the assertion that "future developments proposed in the HCP would have daily internal trip capture rates similar to the community of Ave Maria" which FWS asserted "approaches 50 percent."[42] Despite adopting that assumption in the modeling, the 2020 draft HCP BiOp conceded that:

> [R]ecent proposals for residential communities submitted by the Applicants to Collier County in the Plan Area indicate some communities being planned *will achieve an internal capture rate of 2 percent* as indicated by the Applicants' planning documents. If developments that don't achieve the internal capture rate of Ave Maria are constructed, it is likely the traffic model will underestimate future traffic volume generated by development proposed in the HCP, and thus the total impact the proposed developments may have on panthers. If the Applicants build communities with a lower internal capture rate, but still use the $12.5 million to construct crossings (*e.g.,* 8 crossings are constructed), we would nonetheless expect higher panther mortality due to greater traffic on existing roads (Tables 13a and 13b in Appendix I).[43]

In other words, the 2020 draft HCP BiOp conceded that, even if 8 wildlife crossings were built, its model would underestimate the actual impacts to panthers if the proposed developments under the HCP's Covered Activities did not actually achieve 50% internal capture. When paired with the reality that at least some of those proposed developments would apparently achieve a mere 2% internal capture rate, FWS clearly underestimated projected impacts for the panther. The 2021 draft BiOp similarly states:

> One of the more important assumptions made when the traffic model was produced was that future developments proposed in the HCP would have daily internal trip capture rates similar to the community of Ave Maria, which approaches 50 percent. *However, recent proposals for residential communities submitted by the Applicants to Collier County in the Plan Area indicate some communities being planned will achieve an internal capture rate of 2 percent as indicated by the Applicants' planning documents.* If developments that don't achieve the internal capture rate of Ave Maria are constructed, it is likely the traffic model will underestimate future traffic volume generated by development

---

[42] 2020 draft HCP BiOp at 129; *see also* 2021 draft BiOp at 42 ("Specifically, we assumed such metrics as future housing density, number of people per dwelling, employment, and daily vehicle trips per household would be similar to what is currently exists in the Town of Ave Maria.").
[43] 2020 draft HCP BiOp at 129–130 (emphasis added).

> proposed in the HCP, and thus the total impact the proposed developments may have on panthers.[44]

And the 2021 draft HCP BiOp further states:

> [I]t is possible future developments will have a lesser internal traffic capture rate, higher dwelling unit density, and higher number of residents per dwelling unit than the Town of Ave Maria, which was a template for future development proposed in the HCP when we estimated how much traffic would likely be generated on existing roadways. If this were to occur, we would expect to see greater traffic volume and effects to panthers than we have estimated in this BO.[45]

Nonetheless, neither BiOp indicated that FWS intended to provide any binding requirement that would actually ensure internal capture of at least 50%. Nor does either BiOp assert that the HCP itself provides plan components that would result in at least 50% internal capture. Instead, maintaining at least 50% internal capture is merely suggested as a conservation *recommendation*.[46] Thus, the BiOp's estimates that implementation of the HCP would result in 12 panther deaths per year, with 8 of those deaths resulting from increased traffic, are based on an assumption about internal capture that was not supported by actual internal capture rates, nor assured by any binding requirement, nor incorporated as a fixed feature of the proposed action.[47] And the PVA modeling used to reach conclusions about extinction risk from implementation of the HCP were based on the similarly assumed 12 panther deaths per year from the HCP, with 8 from increased traffic, based on the internal capture rate of 50% and 8 crossings.

Importantly, both of the draft HCP BiOps do contain analyses showing how lower internal capture rates increase the number of panther fatalities per year that would result from the HCP

---

[44] 2021 draft HCP BiOp Appendix H (Analysis of Panther Motor Vehicle Mortality) at 7 (emphasis added).

[45] 2021 draft HCP BiOp at 136.

[46] *See* 2021 draft HCP BiOp at 310 (suggesting maintaining internal capture of at least 50% as a conservation recommendation); 2020 draft HCP BiOp at 320 (same); 2020 draft HCP BiOp at 130 ("…the HCP *does not identify explicit targets for internal trip capture*, a maximum number of crossings, where they will be located, or what measures they are likely to take to maximize their effectiveness. Thus, our analysis remains confined to the assumption of 50% internal trip capture in newly constructed communities and the construction of a minimum of 8 wildlife crossings.") (emphasis added).

[47] Consequently, reliance on that assumption of 50% internal capture to reach a no jeopardy conclusion would violate the ESA because achievement of that rate was not reasonably certain to occur based on the record before FWS, and apparently was not assured by any binding requirement or component of the plan. *See, e.g., Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 524 F.3d 917, 935–36 (9th Cir. 2008) (requiring measures relied on to reach no jeopardy conclusion be set forth in specific and binding plans). The ESA's express requirement to "insure" that agency actions are not likely to cause jeopardy, 16 U.S.C. § 1536(a)(2), plainly requires that the Services cannot reach a no jeopardy conclusion that relies on mitigation offsetting harm unless there is reasonable certainty that the mitigation will actually render jeopardy unlikely. As the Supreme Court has recognized in construing section 7(a)(2), "To 'insure' something…means '[t]o make certain, to secure, to guarantee (some thing, event, etc.).'" *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 667 (2007) (quoting appellate court, in turn quoting Oxford English Dictionary 1059 (2d ed.1989)). The plain text of the Act therefore requires that the Service cannot issue a no jeopardy conclusion unless the action agency has indeed made it certain, secured, or guaranteed that mitigation relied upon to avoid jeopardy will actually occur.

developments at a given number of wildlife crossings.[48] That analysis indicates, for example, that assuming 8 wildlife crossings added by the HCP, an internal capture rate of 30% would add approximately three more panther deaths per year than an internal capture rate of 50%.[49] That analysis also shows how the total number of panther fatalities from the HCP and cumulative effects would change with lower internal capture rates.[50]

However, the BiOps do not include any modeling to estimate the extinction risk from the HCP associated with internal capture rates under 50%. This is critical where, to the extent the applicants are working to increase the internal capture rate by merging Bellmar into the larger Rural Lands West project, there is no data to suggest it would reach the 50% threshold set forth in the draft HCP BiOps.

Consequently, in evaluating whether the Bellmar project, considered with the cumulative effects of other reasonably foreseeable state and private actions (such as the other former HCP projects and the cumulative effects in the draft HCP BiOps), will likely cause jeopardy to the Florida panther, the agencies must consider what the actual internal capture rates of the projects will be, and how those capture rates will affect the total additional panther mortalities that will foreseeably result from the developments.

**2. The draft HCP BiOps underestimate the impacts on panthers by underestimating the amount of traffic induced by the developments covered under the draft HCP.**

In the 2021 draft HCP BiOp Appendix B.1 "Description of the Traffic Model," the Service attempts to estimate a density for proposed development to estimate a likely population in the eastern Collier area. The Service estimates that the Town of Ave Maria is 1.4 units per acre and uses that as the basis to assume "a comparable residential unit density on the remaining 39,973 acres proposed for development."[51] The resulting population estimate is approximately 152,000 people. However, the Bellmar project, and the other locally approved projects, have an average density of 2.6 development units per acre and an average of 2.5 people per household.[52] With a

[48] *See* 2020 draft HCP BiOp Appendix I at Table 2a [2020 draft HCP BiOp Appendices submitted with these comments for inclusion in the administrative record]; 2021 draft HCP BiOp Appendix H at Table AH2a [2021 draft HCP BiOp submitted with these comments for inclusion in the administrative record].
[49] *See* 2020 draft HCP BiOp Appendix I at Table 2a; 2021 draft HCP BiOp Appendix H at Table AH2a.
[50] *See* 2020 draft HCP BiOp Appendix I at Table 13b; 2021 draft HCP BiOp Appendix H at Table AH2b.
[51] 2021 draft BiOp at Appendix B.1.
[52] Average density for the components of Rural Lands West is 2.6 development units per acre (per Approved Town Agreement between Collier County Board of County Commissioners and Collier Land Holding, LLC/CDC Land Investments, LLC, dated June 8, 2021. And respective Village approvals, Collier County Resolution 2021-119, Collier County Resolution 2020-24). Density for Bellmar Village (a portion of state 404 footprint) is 2.75 development units per acre (per Collier County Resolution 2021-120). Other projects such as Hogan West (AKA Brightshore Village) have a projected density of 2.9 development units per acre (per Brightshore Village SRA Development Document for Collier County SRA Application, June 29, 2022). Of the seven Stewardship Receiving Areas (SRA) approved and pending in eastern Collier County, the average density is 2.6 development units per acre. The average persons per household in Collier County is 2.54 based on Census information accessed at https://www.census.gov/quickfacts/fact/table/colliercountyflorida,US/HCN010217.

more realistic density, the projected estimate for the 'new' population within the 45,000 acres of the eastern Collier area would be closer to 300,000+ people.[53]

This underestimation of human population -and the number of cars on roadways- within Bellmar and other reasonably foreseeable development can also be found when looking at the Economic Assessments provided to Collier County. The assessments for Rural Lands Wests, Bellmar, Hogan West, and others have averaged around 6.7 people per acre, which again estimates the population for the eastern Collier developments at around 300,000 people.[54]

**3. The draft 2021 HCP BiOp underestimates cumulative effects by failing to update the analysis in light of Florida's assumption of Clean Water Act 404 permitting.**

Both the 2020 and 2021 draft HCP BiOps use the same assumptions about future non-HCP, non-federal actions in their modeling of cumulative effects. Both draft HCP BiOps assume that 25.3% of future, non-HCP developments will occur without a federal permitting nexus to trigger federal action, and therefore warrant inclusion in the assessment of cumulative effects as defined per 50 C.F.R § 402.02.[55] Both draft HCP BiOps only consider the traffic impacts of that 25.3% of future development in modeling the cumulative effects, and the increased extinction risk resulting from the HCP plus cumulative effects. Yet by December 2021, Florida DEP had assumed Clean Water Act Section 404 permitting pursuant to EPA's decision on the State 404 Program, a decision that drastically altered whether future projects would require a federally issued permit to fill wetlands. Though 404 permits for wetlands fills now frequently will be issued by the state rather than the U.S. Army Corps of Engineers, the 2021 draft HCP BiOp does not appear to engage in any re-evaluation of whether it is still true that only 25.3% of future, non-HCP developments will entail no federal action subject to ESA section 7 consultation. Consequently, it is plain that the analysis in the BiOps fails to address the reality that a much larger proportion of non-HCP traffic induced in the action area will be from future projects that will not be subject to ESA section 7 consultation due to the State 404 permitting scheme, and therefore should have been evaluated as sources of cumulative effects.

As the Service recognizes in the draft 2021 HCP BiOp documents, a jeopardy determination must be based on whether the action, either individually *or taken together with cumulative effects*, will appreciably diminish the likelihood of survival or recovery for the species.[56] By

---

[53] Any mining within the eastern Collier HCP area is likely to become lake-front development once mining uses are complete. The estimate of over 300,000 people does not include the addition of one home per five-acre ranchettes.
[54] Based on information provided in DPFG Town of Big Cypress Economic SRA Assessment, Revised June 28, 2022, p. 42; DPFG Bellmar Village SRA Economic Assessment, Revised January 8, 2021, p. 36; DPFG Longwater Village SRA Economic Assessment, Revised January 8, 2021; DPFG Rivergrass Village SRA Economic Assessment, Revised September 3, 2019, p. 38. DPFG Brightshore Village (AKA Hogan West) SRA Economic Assessment, Revised August 26, 2022, p. 31; DPFG Hyde Park Village (aka Skysail) Economic Assessment, Revised November 13, 2019, p. 35.
[55] *Compare* 2021 draft HCP BiOp Appendix H at 5–6; 2021 draft HCP BiOp Appendix J at 1, 2-3 *to* 2020 draft HCP BiOp Appendix H at 4 of 8; 2020 draft HCP BiOp Appendix J at 1.
[56] *See* 2021 draft HCP BiOp Appendix L at 10 ("Under section 7 of the ESA, we compare the future with the project scenario ($B_{SLR}$ + HCP) to the Baseline condition ($B_{SLR}$) to help us determine whether the effects of the action are likely to result in an appreciable decrease or increase in the probability of survival and recovery over time. In addition, under section 7 of the ESA, we consider the cumulative effects, and compare the future with the project

failing to evaluate the impacts of all of the reasonably foreseeable non-HCP future development that will not entail federal action subject to ESA consultation requirements, the draft HCP BiOps underestimate the increased risk of extinction that will result from the HCP projects and other reasonably foreseeable non-HCP development in the action area.

4. **The 2021 draft HCP BiOp's PVA modeling underestimates baseline risk of extinction because it assumes artificial introgressions to maintain genetic health will be conducted, even though there are no plans to conduct those introgressions.**

The 2021 draft HCP BiOp makes clear that a key assumption of the PVA modeling it used to estimate the risk of extinction is that: "The Service will maintain the genetic health of the population through translocation when necessary, and in a manner consistent with the recommendations of van de Kerk et al. (2019)."[57] The Service explains that:

> If recommendations of introducing 5-10 individuals from other Puma populations every 20-40 years aren't adopted, van de Kerk et al (2019) predicted probability of quasi-extinction would increase to 13 percent (0–99) at 100 years and 23 percent (0–100) at 200 years (Minimum Population Count Scenario) or to 10 percent (0–99) at 100 years and 12 percent (0–99) at 200 years (Motor Vehicle Mortality Scenario). If the van de Kerk et al. (2019) recommendations aren't adopted, it would mean our estimates of extinction probability and abundance would change similarly.[58]

Although the risk modeling in the BiOp is therefore based on the assumption that the Service will undertake those actions to supplement the panther population, the draft 2021 HCP BiOp concedes that the Service in fact has no actual plans to conduct those actions; the draft 2021 HCP BiOp states, "It is not known if efforts to translocate panthers or apply some other measure to increase genetic variability in the panther population may occur in the future."[59] Consequently, it is arbitrary and capricious for the Service to base its analyses of extinction risks, and jeopardy, on the assumption that these actions will take place when the Service concedes that it is in fact unknown whether those actions will occur or not. There is no indication that the Service even attempted to evaluate how changing that assumption would alter its analysis of total extinction risk with the HCP, or the total extinction risk with the HCP and cumulative effects. So while the 2021 draft HCP BiOp does acknowledge that the baseline extinction risk would be substantially higher absent these management activities to supplement the population, it fails to evaluate the compounding effect of the HCP and cumulative impacts against a baseline scenario of substantially increased risk. When considering the direct, indirect,

---

and cumulative effects scenario ($B_{SLR}$+HCP+CE) to the Baseline condition ($B_{SLR}$) to help us determine whether the effects of the action along with other actions that are reasonably certain to occur in the future without consultation with the Service are likely to result in an appreciable decrease or increase in the probability of survival and recovery over time. We consider both of these comparisons when we make our jeopardy determination.").

[57] 2021 draft HCP BiOp Appendix L at 1.

[58] 2021 draft HCP BiOp Appendix L at 12.

[59] 2021 draft HCP BiOp at 141.

and cumulative effects of the Bellmar project, the agencies must correct this unsupported assumption.

**5. The draft HCP BiOps conceal the true risk of extinction by using speculation about carrying capacity to mask the impacts of habitat loss from sea level rise.**

The PVA modeling results in both draft HCP BiOps conceal the true baseline risk of extinction by averaging together the results from model runs based on three different assumptions about whether the population is currently at carrying capacity for the remaining habitat. Although past PVAs assumed that the population reflected either 100% of the carrying capacity of the existing habitat, or 80% of the carrying capacity, the draft HCP BiOps, with little explanation or justification, also assume that the current population may reflect only 60% of the carrying capacity of the existing habitat.[60]

First, the assumption that the current population reflects only 60% of the carrying capacity of the panther's remaining habitat appears to be based on speculation rather than the best available scientific information. The 2021 draft BiOp states:

> The present Florida panther population is at or near average annual carrying capacity (*K*) of habitat south of the Caloosahatchee River. However, *it is possible* future habitat management may increase carrying capacity to range-wide effect. It is also *possible* present assumptions about maximum attainable panther densities are wrong. Thus, we assume the true *K* could actually be up to 40 percent higher than the present population size.[61]

This makes plain that FWS has based its analysis on mere "possibility" and conjecture rather than on what conditions are likely based on the best available scientific information, in violation of ESA requirements. It is also plainly irrational, as FWS elsewhere concedes, that "the true carrying capacity is unknown but *Service and FWC biologists infer the population may be at or near carrying capacity (K)*" but then proceeds to state that it nonetheless "assumed it is possible $N_0$ (the current population size) represents 100 percent, 80 percent, and 60 percent of carrying capacity."[62] There is no explanation of how 60% of carrying capacity is somehow rationally consistent with evidence suggesting the population is "at or near" 100% of carrying capacity. Most people would not consider a glass that is 60% full to be "at or near" being 100% full. This assertion is especially egregious given that the Service's peer reviewer pointed out that the studies cited by FWS regarding population trends could not be relied on to rule out that the population may already be either stable or in decline, rather than growing.[63] Moreover, the most

---

[60] *See* 2021 draft HCP BiOp Appendix L at 4 (Table AL1 n.2) ("Our past PVA only utilized $N_0 = K_0$ and $N_0 = 80$ percent of $K_0$. Our current PVA incorporates scenarios where $N_0$ may equal 60, 80, and 100 percent of $K_0$.").

[61] 2021 draft HCP BiOp Appendix L at 2 (emphasis added).

[62] 2021 draft HCP BiOp Appendix L at 7 (emphasis added).

[63] *See* 2021 draft HCP BiOp Appendix M at 3 of 166 ("In the report Dr. Martin noted that recent efforts to estimate the Florida panther population over time contained a great deal of uncertainty. Particularly, he noted that though the central tendency of these estimates indicates a growing population, the confidence intervals surrounding these estimates were so wide that the possibility of an unchanging population or population in decline couldn't be rejected. Dr. Martin also indicated concern that were the panther population to be declining, rather than growing, future catastrophes, such as disease outbreaks of more serious diseases than seen to date, could have a greater affect [sic] on population viability than had been estimated in previous PVAs. Based on Dr. Martin's advice, the Service

recent population estimates indicate that the population is no longer increasing. As the 2020 SSA acknowledges, the most recent population trend data indicate the population did not grow between 2016 and 2018, and began to decline from 2017 to 2018.[64]

Second, rather than separately presenting the results of models based on the assumption of the population being at 100%, 80%, and 60% of the carrying capacity of the habitat, the draft HCP BiOps only present the results showing the *averaging* of model runs reflecting these three very different carrying capacity assumptions. Thus, the draft HCP BiOps conceal the extinction risk associated with the impacts of habitat loss given the more realistic assumption that the population is already at 100% of carrying capacity. Notably, in the BiOp's PVA analysis, FWS models sea level rise by 2070 as resulting in an 18% habitat loss for the Florida panther.[65] Yet its model shows little impact on the projected future population from that enormous amount of habitat loss, and indeed, shows the same result as a prior model *that totally failed to address the impacts of sea level rise (SLR)-related habitat loss at all*.[66] Without ever contemplating whether that might indicate that there is something wrong with the BiOp's modeling of SLR impacts, FWS instead asserts that "SLR as we modeled it here does not influence probability of extinction as much as small population size and genetic variation might."[67] FWS totally fails to consider that the reason that there is little impact from this enormous amount of habitat loss is because the assumption that the current population is only at 60% of carrying capacity would mean that the population could still *grow* by about 20% even with a 20% habitat loss. And the assumption that the current population is at 80% of carrying capacity similarly would mean that the population can stay the same, even with a 20% habitat loss. Averaging these results together with the scenario where the population is already at 100% of carrying capacity, and therefore would likely drop by about 20% in response to a 20% habitat loss would unsurprisingly mask the substantial population drop under the K = 100% scenario by averaging it out against the increase under the K= 60% scenario. Indeed, it is almost as if the modeling, and the otherwise arbitrary choice of the K=60% scenario was selected specifically to ensure this result, and mask the impacts of SLR on the baseline extinction risk.

Notably, the 2020 draft HCP BiOp acknowledges that the choice of carrying capacity explained a substantial portion of the variance in the projected abundances, but otherwise fails to examine how the treatment of carrying capacity in the modeling irrationally and unreasonably masked the impacts of SLR.[68] This error taints both the representations about the baseline extinction risk, and the impact of the HCP and cumulative effects in compounding the baseline extinction risk, with the upshot being that the analysis in the HCP BiOps underestimates the extinction risk

---

amended portions of the Biological Opinion that treated 'rapid growth of the panther population' as fact to reflect this was but one possibility for the true population trend but that others, like population decline, could also be true.").

[64] *See* U.S. Fish and Wildlife Serv. 2020. Species Status Assessment for the Florida Panther. Version 1.0. September 2020. Vero Beach, Florida ["SSA"] at 88, 90, Figure 6.8.

[65] 2021 draft HCP BiOp Appendix L at 8.

[66] *See* 2021 draft HCP BiOp Appendix L at 12 ("Our results were also similar to van de Kerk et al.'s (2019) despite the fact their model did not consider the impact of sea level rise, while ours did.").

[67] 2021 draft HCP BiOp Appendix L at 12.

[68] *See* 2020 draft HCP BiOp at 145 (stating that the choice of carrying capacity explained 17.8% of the variance in final abundance whereas scenario explained 38.15%, and initial population 33.09%).

resulting from the impacts of the HCP and cumulative effects exacerbating the disastrous habitat loss from SLR.

### 6. The PVA modeling underestimates extinction risk by failing to account for the impacts of additional habitat loss from SLR between 2070 and 2170.

The PVA modeling relied on in the draft HCP BiOps to estimate extinction risk evaluates what the Florida panther population will be 100 years after the end of the proposed 50-year period for the proposed Incidental Take Permits in 2070.[69] FWS explains that its PVA model accounted for habitat loss due to sea level rise by "treat[ing] Sea Level Rise up to 2070 as an effect in the baseline portion of [the] assessment[.][70] FWS acknowledged that SLR "will have range-wide effects on demographic parameters and habitat availability for panthers within the proposed permit duration of the HCP."[71] FWS estimated that by 2070, 1 meter of SLR would cause the loss of 18% of the Florida panther's habitat.[72] "To input SLR in the PVA [FWS] assumed SLR would accumulate linearly and only to 1 m by 2070, and divided the acreage by 50 years with 0 acres lost to SLR being equivalent to a proportion of individuals represented by a given $N_0$ … and to 18 percent of habitat loss to SLR being equivalent to 18 percent of $N_0$."[73] FWS explicitly states that the PVA modeling relies on the assumption that "Sea Level Rise of 1m will occur by 2070 but will not take additional Florida panther habitat beyond that time."[74] Thus, FWS apparently only modeled habitat loss due to SLR up until 2070, but did not account for additional habitat loss that would occur as sea levels continue to rise after 2070. FWS's modeling purports to assess the population 100 years after 2070 but ignores the impacts on that population of continued habitat loss from SLR between 2070 and 2170, even though SLR projections are available through at least 2100. Indeed, in the 2020 Species Status Assessment for the Florida Panther, FWS used sea level rise models of up to two meters to estimate possible loss of panther habitat through 2100.[75] And, in 2017, NOAA estimated that global mean sea level rise in 2100 would be nearly double that in 2070 under the Intermediate through High scenarios.[76] By failing to account for continued sea level rise related habitat loss after 2070, the PVA modeling likely overestimates panther abundance in 2170 and underestimates the extinction risk. Revised

---

69 *See* 2021 HCP BiOp Appendix L at 10 ("For each of the three scenarios above, we simulated a 150-year population trajectory (50-year build-out plus 100 years beyond) and compared the predicted change in population viability for the panther."); 14, Table AL3 ("The probability of extinction and predicted population size of the Florida panther under Baseline with Future Sea Level Rise (BSLR), BSLR plus HCP Development Effects (BSLR+HCP), and BSLR+HCP plus Cumulative Effects (BSLR+HCP+CE) scenarios given three different beginning female panther population sizes. BSLR = Baseline (Current conditions + 1m SLR by 2070) and the end time is 100 years after HCP full build-out in 2070.").

70 2021 draft HCP BiOp at 132.

71 2021 draft HCP BiOp at 132.

72 2021 draft HCP BiOp Appendix L at 8.

73 2021 draft HCP BiOp Appendix L at 8.

74 2021 draft HCP BiOp Appendix L at 2.

75 U.S. Fish and Wildlife Serv. 2020. Species Status Assessment for the Florida Panther. Version 1.0. September 2020. Vero Beach, Florida ["SSA"] at vii, 189; *see also* SSA at 230–32.

76 *See* Sweet, W. V., R. E. Kopp, C. P. Weaver, J. Obeysekera, R. M. Horton, E. R. Thieler, and C. 12769 Zervas. 2017. Global and regional sea level rise scenarios for the United States. NOAA 12770 Technical Report NOS CO-OPS 083. National Oceanic and Atmospheric Administration, 12771 Silver Spring, MD, at 23 (Table 5), *available at* https://tidesandcurrents.noaa.gov/publications/techrpt83_Global_and_Regional_SLR_Scenarios_for_the_US_final.pdf (showing GMSL in 2070 of 0.57 m, 0.79 m, and 1.0 m for the Intermediate, Intermediate-High, and High scenarios, and GMSEL in 2100 of 1.0 m, 1.5 m, and 2.0 m for those same scenarios, respectively).

analysis to correct this problem is necessary, and should utilize the best available scientific information available, such as NOAA's most recent sea level rise projections.[77]

**D. The agencies cannot rely on proposed mitigation for species impacts in the ECMSHCP because the applicant has withdrawn its associated permit application and thus the ECMSHCP provides no assurances the mitigation will occur.**

The Bellmar applicant and other landowners have been seeking incidental take coverage through the ECMSHCP for development of 45,000 acres since 2010. In a letter submitted to the U.S. Fish and Wildlife Service (FWS) in July 2022, the landowners formally withdrew their application for an incidental take permit.[78] However, to-date we have not seen any documentation indicating that the applicant has informed FDEP that the ECMSHCP application has been withdrawn or that the applicant has updated its application materials to reflect this significant change. As the ECMSHCP has been withdrawn by the applicant, any promises from the applicant to adhere to the tenets of the ECMSHCP are toothless unless incorporated as conditions in the FDEP permit, if awarded.

Moreover, fatal flaws in the ECMSHCP have not evaporated; our letters regarding the proposal and the review by experts are enclosed. We do not consider any intent to work towards the tenets of the ECMSHCP[79] adequate to meet the requirements of the state 404 program nor the Endangered Species Act.

**E. The applicant has failed to provide necessary information for the agencies to estimate Bellmar's effects on the Florida panther.**

On August 31, 2022, FWS corresponded with FDEP to request additional time to prepare appropriate conservation recommendations for the Bellmar project, taking into account the project's size, location, and anticipated effects to federally protected species.[80] FWS further indicated the need for information currently missing from the applicant's biological assessment:

---

[77] *See, e.g.*, Sweet, W.V., B.D. Hamlington, R.E. Kopp, C.P. Weaver, P.L. Barnard, D. Bekaert, W. Brooks, M. Craghan, G. Dusek, T. Frederikse, G. Garner, A.S. Genz, J.P. Krasting, E. Larour, D. Marcy, J.J. Marra, J. Obeysekera, M. Osler, M. Pendleton, D. Roman, L. Schmied, W. Veatch, K.D. White, and C. Zuzak, 2022: Global and Regional Sea Level Rise Scenarios for the United States: Updated Mean Projections and Extreme Water Level Probabilities Along U.S. Coastlines. NOAA Technical Report NOS 01. National Oceanic and Atmospheric Administration, National Ocean Service, Silver Spring, MD, 111 pp., at 23, https://oceanservice.noaa.gov/hazards/sealevelrise/noaa-nostechrpt01-global-regional-SLR-scenarios-US.pdf (projecting relative sea level rise in 2100 in the eastern Gulf of Mexico will be 1.2, 1.7, and 2.2. meters under intermediate, intermediate-high, and high scenarios, respectively)

[78] U.S. Fish & Wildlife Service, East Collier Multi-Species ITP/HCP Withdrawal, (posted Sept. 1, 2022) https://www.fws.gov/library/collections/east-collier-multi-species-itphcp-withdrawal (last accessed Sept. 9, 2022).USFWS response to HCP withdrawal, provided by email on September 1, 2022, and enclosed

[79] Eastern Collier Property Owners Letter to USFWS dated 07/28/2022 Withdrawing their Incidental Take Permit applications, available at https://www.fws.gov/media/eastern-collier-property-owners-letter-usfws-dated-07282022-withdrawing-their-incidental-take.Letter dated July 28, 2022, from ECPO re: Withdrawal of ECPO Incidental Take Permit Applications

[80] Email from Charles Kelso, U.S. Fish and Wildlife Service, to Toby Schwetje, Florida Department of Environmental Protection regarding U.S. Fish and Wildlife Service's initial comments regarding the Bellmar proposal (Aug. 31, 2022).

> Because our recommendations are based on anticipated effects of the action, the Service will require an estimate of the project's future effects to the Florida panther. Therefore, we recommend updating Applicant's July 2021 Biological Assessment to include an estimate of panther mortality due to traffic volume increases upon project completion.[81]

The agencies had already requested in a prior Request for Additional Information (RAI) for the applicant to "provide a traffic analysis specific to the Bellmar project. The traffic analysis should include an estimation of daily trips generated by village residents, employees, and municipal services and identify the roads these trips will most likely take place on."[82] However, this information was not provided and yet FDEP still advanced the Bellmar project to Public Notice.

The applicant has obscured the amount of traffic attributable to the Bellmar 404 project, and, as illustrated above, this information is vital to avoiding jeopardy to the Florida panther. The applicant has requested "that the USFWS include a proportional level of coverage for the incidental take expected as a result of the Project in the incidental take statement for this action" should FDEP complete their review before an ITP is issued.[83] However, critical information in which the agencies would need to ensure roadkill mortalities are adequately considered and avoided is not provided.

We are aware that in materials submitted to Collier County (Attachment A), the applicant's traffic engineer calculated that total traffic created by the 1,000 acre Bellmar Village would be 26,232 trips per day.[84] Please note that this estimate is for only part of the state 404 project area—there are more than 700 acres, 1,000 additional residential units, and commercial development not included in this estimate that, if developed, will generate thousands of additional trips to this total.

The table below summarizes the information available through the Collier County materials in regard to the Bellmar 404 application and a portion of the Rural Lands West state 404 project.[85] This 404 application is fairly equivalent to the village of Bellmar and most of the town connector as seen in the table below.

---

[81] *Id.*
[82] FDEP, 2021. Request for Additional Information, Bellmar. August 20, 2021.
[83] Letter from Applicant to FDEP dated April 14, 2022, page 14
[84] Traffic Impact Statement for Bellmar Stewardship Receiving Area (SRA) by Treblicock Engineering for Collier Enterprises dated August 19,2020, p. 7, Table 2. The project footprint for the Bellmar SRA is at least 700 acres less than the state 404 project that is the subject of this letter.
[85] Traffic Impact Statement for the Town of Big Cypress SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, June 2022,Page 7. The Town of Big Cypress SRA, as known at the Collier County level, includes the state 404 Bellmar project, and a portion of the Rural Lands West state 404 project. There would be about an additional 1,000 acres of development added to these figures as part of the Rural Lands West state 404 project footprint.

| TOWN OF BIG CYPRESS | |
|---|---|
| | Estimated daily trips generated |
| Rivergrass[86] | 23,929 |
| Longwater[87] | 24,919 |
| Bellmar[88] | 26,232 |
| Town Connector | 64,125 |
| | |
| Total [89] | 139,205*<br><br>*Does not include a portion of the state 404 Rural Lands West project |
| | |
| Bellmar state 404 application | 90,357 |

We emphasize that the application trips are the best estimate the public currently has access to, given that the applicant has failed to provide the required traffic and transportation information. The total daily trips generated are likely to be more than what we show here. The agencies should not proceed with decisionmaking on the Bellmar permit until the applicant provides this necessary information. To determine species effects, mitigation, or make a jeopardy determination without this information would violate the ESA's core requirement to use the best available science,[90] as well as the technical assistance process's requirement that applicants provide sufficient information to review potential adverse impacts to listed species and critical habitat.[91]

## II. Bellmar Is Inconsistent with the State 404 Program, 62-331, F.A.C.

### A. The alternatives analysis is inadequate.

The project identifies an approximately 1,790-acre footprint in eastern Collier County that is proposed for construction of a master-planned community. We note for the record that there is no

[86] Traffic Impact Statement for Rivergrass SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, August 2019, Page 7.
[87] Traffic Impact Statement for Longwater SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, March 2020, Page 7.
[88] Traffic Impact Statement for the Bellmar SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, August 2020, Page 7.
[89] Traffic Impact Statement for the Town of Big Cypress SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, June 2022, Page 7.
[90] 16 U.S.C. § 1536(a)(2); 404 Programmatic BiOp at 5.
[91] 404 Programmatic BiOp at 16 ("Applicants submitting a State 404 permit application will be required to submit information that allows the State of Florida (FDEP and FWC) to sufficiently assess potential adverse impacts of the proposed project on listed species and their designated critical habitats and allow the USFWS to review and provide technical assistance as needed (62-331.051, F.A.C.).").

public benefit of the project, and rather, the public's resources and interests are threatened by the Bellmar project.

The state rules governing section 404 permitting state that FDEP shall not grant a permit "if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem."[92] We disagree with the applicant that there is "no less environmentally damaging practicable alternative."[93]

The general project purpose of providing a master-planned community can be achieved while avoiding and minimizing impacts to wetlands and listed species habitats, such as Florida panther Primary Zone habitat and crested caracara primary nest buffer, when considering other site alternatives, as required.[94]

The applicant improperly restricts the alternatives they are considering to areas that are 2,000 acres or greater, within eastern Collier, within the Collier County Rural Lands Stewardship Program, and ECMSHCP. There may be lands with less impact to natural resources that are of a different size and outside of these boundaries that should have been considered as an alternative. We note the ECMHCP is withdrawn as of July 28, 2022, and cannot be relied on by the applicant to ignore all alternatives. This change requires the applicant to redo and resubmit a new alternatives analysis including non ECMSHCP properties.

The applicant offers no evidence, that 2,000 acres is required for a master-planned community.[95] In fact, we contend that approving this type of sprawling development is damaging to the future of Florida as it erodes the urban rural boundary and removes important agricultural lands from production. There are many examples both in and out of Florida using smart growth design that provide the desired number residences as well as commercial development on sites significantly smaller than 2,000 acres.

Sustainable, compact development – which the proposed project is not – would also appeal to "ecologically minded consumers"[96], and truly ecologically minded consumers would not support destroying important panther habitat needed for survival and recovery of the Florida panther.

Further, the applicant failed to consider other sites, even those not owned by the applicant, which can serve the general residential and commercial uses proposed by this project in an area closer to existing development, outside of primary panther habitat, and not adjacent to a wildlife refuge.[97] The applicant does not fully consider lands directly north of the Bellmar parcel as alternatives. The alternative analysis speaks to "Parcel 5" as containing lands that would meet

---

[92] 62-331.053, Florida Administrative Code.
[93] Bellmar Alternatives Analysis, April 2022, page 1.
[94] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook. Effective December 22, 2020; 62-331, Florida Administrative Code.
[95] Bellmar Alternatives Analysis, April 2022, page 1.
[96] Bellmar Alternatives Analysis, April 2022, page 1.
[97] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook. Effective December 22, 2020, Appendix C, p. 57 states If it is otherwise a practicable alternative, an area not presently owned by the applicant that could reasonably be obtained, utilized, expanded, or managed in order to fulfill the overall purpose of the proposed activity can still be considered a practicable alternative. In other words, if an applicant does not own an alternative parcel, that does not rule that parcel out as a practicable alternative.

the applicant's constrained restrictions, but it does not go on to fully consider these areas as alternatives.

Within Parcel 5, there are more than 20,000 acres, many of which are owned by the applicant (not a limiting factor), and others recently sold to Gargiulo (who also owns part of this pending Bellmar project area) (see Attachment B).

The applicant appears to not consider lands to the north because of the also-proposed Rural Lands West state 404 application, which is not a justifiable reason to exclude from the analysis.

Importantly, there are also lands to the north of both Bellmar and Rural Lands West that should be considered as an alternative. There are lands north of Oil Well Road that are also contemplated for future development, as evidenced by the ECMSHCP. The Conservancy of Southwest Florida has recommended Collier Enterprises move its developments to this area since the area would result in little to no Primary Zone panther habitat to be impacted. In fact, the Service asked the applicant to consider this northern area as an alternative to avoid and minimize listed species impacts, when the Rural Lands West project was seeking a permit from the U.S. Army Corps of Engineers.[98]

Instead of providing an Alternatives Analysis that would satisfy the state 404 program requirements, the applicant vies for developing the entirety of Parcel 5, with this Bellmar application and several other proposals.

To make matters worse, the applicant provided no scenario that considered a smaller footprint, or any footprint that would avoid the primary zone for the active caracara nest on the site or redesign stormwater lakes to avoid wetland impacts. Most of the wetland impacts are coming from the choice to place stormwater lakes into wetlands. With a project size of over 1,700 acres there is no excuse to use the adjacent wetlands to dredge stormwater lakes; such development uses could be contained within uplands.

The applicant did not adequately analyze "alternative on-site configurations" or "extensively redesign the Project to avoid and minimize impacts."[99] If that were true, the applicant would have made a small adjustment to the footprint to avoid impacts to the primary zone of the caracara nest in the center of the property. Avoiding this caracara primary zone would require an alteration and avoidance of approximately 52 acres. This has never been done, and it undermines the applicant's genuine interest in avoiding and minimizing impacts. It is particularly egregious for the applicant to state that their "development should be designed to incorporate protection and preservation of habitat and natural resources"[100] in light of their refusal to avoid the primary zone of this existing caracara nest.

---

[98] Letter from U.S. Fish and Wildlife Service to Army Corps of Engineers regarding Collier Enterprises Management, Inc. project Town of Big Cypress dated November 18, 2008. "The Service recommends the alternatives analysis includes alternative project sites and configurations that avoid and minimize the impacts to wetlands and open waters, as well as minimize impacts to endangered species. Specifically, other applicant-owned lands north of Oil Well Road may be more suited to a development of this sort."
[99] Bellmar Alternatives Analysis, April 2022, page 1.
[100] Bellmar Alternative Analysis, April 2022, page 7.

In sum, the applicant has failed to provide an adequate analysis of less damaging alternatives. Furthermore, FDEP should consider a "no action alternative."[101] The impacts of the proposed project are contrary to the public interest.

**B. The application fails to adequately analyze secondary effects.**

The Bellmar project also fails to meet the requirements to adequately consider secondary impacts. FDEP must consider secondary effects from proposed activities, particularly on sanctuaries and refuges.[102] These areas, as the FDEP Handbook states, are "managed principally for the preservation and use of fish and wildlife resources," and dredge and fill activities may "result in the establishment of undesirable competitive species of plants and animals," or "change the balance of water and land areas needed to provide cover, food, and other fish and wildlife habitat requirements in a way that modifies sanctuary or refuge management practices."[103]

We note that Collier Enterprises Management Inc. discusses its "long tradition of environmental stewardship," land transfers, and sales in its response to the request for additional information.[104] But that generalized historical narrative does nothing to address the harmful impacts of the applicant's proposal on the Florida panther and other natural resources through this project. The Bellmar project will destroy more than 1,700 acres of the most important and critical category of delineated panther habitat, will infringe on and fragment a landscape corridor, and cause additional panther and other species mortalities due to habitat loss and vehicle collisions, while adding more than 8,600 new residents in an area heavily utilized by wildlife. In fact, the applicant's proposed project threatens the future integrity of the Florida Panther National Wildlife Refuge, one of the lands they mention in their history. As they note, the Refuge was founded with the purpose of protecting Florida panthers and their habitat.[105] However, the Bellmar project is a direct affront to this publicly held sanctuary.

The FPNWR has informally and formally shared concerns regarding both the Rural Lands West and Bellmar projects since 2006.[106] Major concerns of the FPNWR managers even then was the impact of these developments on hydrology and prescribed fire use. Staff wrote "building a community adjacent to the west side of the refuge would severely limit or prohibit prescribed burning to nearly half of the refuge fire units due to smoke management limitations…. Staff is concerned that the new developments will cause more water to either be stored in retention ponds, thereby reducing water flow into the refuge or developments will increase runoff into Camp Keais Strand, which flows into the refuge."[107] Already-altered hydrology has shifted the land cover on the FPNWR to dense cabbage palm, and the Refuge expends considerable effort in

---

[101] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook Effective December 22, 2020, Section 8.3.1.
[102] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook Effective December 22, 2020, Section 8.3.6.
[103] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook Effective December 22, 2020, Section 8.3.6.
[104] Passarella & Associates, Inc., 2021. Bellmar Biological Assessment. July 2021, p. 1.
[105] *Id.* at 2-4.
[106] Meeting notes and staff summaries regarding Rural Lands West and Bellmar projects impacts to listed species and impacts to FPNWR, dated 2006. Received through Freedom of Information Act request.
[107] *Id.*

vegetation management and prescribed fire to maintain the publicly-held refuge as suitable habitat for the Florida panther and its prey.

These same concerns about degradation to the 26,400 acres of the FPNWR were echoed repeatedly, in the Refuge staff comments on the ECMSHCP and in a letter to Collier County when the local authorizations for Bellmar were sought.[108]

In a 2016 letter from FPNWR, the Panther Review Team (PRT) configuration alternative was recommended. This alternative would "protect critical linkages and buffer areas."[109] The PRT alternative would mean the Bellmar property would not be intensified above existing agriculture and would not be developed (Attachment C).

Both the 2016 and 2021 letters shared concerns that development contemplated in the ECMSHCP would encroach upon conservation areas like the FPNWR. Because of the Refuge's position against roadways I-75 and State Road 29, prescribed burn can only direct smoke in the direction of Bellmar and Rural Lands West.

While we understand that efforts were made to provide smoke easement language, future Florida Forest Service authorizations for burning are not assured, once these massive developments are built. If Rural Lands West and Bellmar are built, they would place about 19,170 people -a population about the size of the City of Naples[110]- in direct conflict with management of the Refuge. The FPNWR currently is the most densely occupied Florida panther habitat[111] and any degradation or encroachment of the adjacent-proposed development would be an unacceptable secondary impact and could also contribute to jeopardy for the Florida panther.

**C. FDEP must analyze all cumulative effects.**

Under the state 404 program, FDEP must also consider the impact of cumulative effects. As in the sections above, there are a number of projects both pending before the agency or otherwise reasonably foreseeable, that contribute to unacceptable cumulative impacts.

From just seven state 404 applications, there would be over 1,000 acres of wetlands lost.[112] Further, FDEP is also currently considering additional proposed state 404 actions. There are 259 activities reviewed or under review as part of the state 404 program within 5 miles of Bellmar, and 785 within 25 miles of Bellmar (Attachment D and Attachment E).[113] Though these actions

---

[108] Letter from Florida Panther National Wildlife Refuge to U.S. Fish and Wildlife Service Ecological Services Re: Public Comment Eastern Collier Multispecies Habitat Conservation Plan and EIS, August 25, 2016; Letter from Florida Panther National Wildlife Refuge to Collier County Planning Commission Re: Longwater and Bellmar Village SRA Resolutions, March 1, 2021.

[109] Letter from Florida Panther National Wildlife Refuge to U.S. Fish and Wildlife Service Ecological Services Re: Public Comment Eastern Collier Multispecies Habitat Conservation Plan and EIS, August 25, 2016.

[110] City of Naples census population, as of 2020.

[111] Dorazio & Onorato, 2015. Estimating the Density of Florida Panthers Using Camera Trapsand Telemetry - Report for Phase I of the Project, final report.

[112] Bellmar, Rural Lands West, Hogan West, Immokalee Road Rural Village, FFD, Troyer Mine, Kingston.

[113] Based on ArcGIS analysis. Feature Layer from Florida Department of Environmental Protection, Managed by FDEPOpenDataPortal.

may be small or large projects, the total cumulative impacts on wetlands and aquatic resources must be considered.

**D. Bellmar will have adverse effects on aquatic ecosystems, including listed species and their habitats.**

The state's 404 program stipulates that no permits can be granted for projects that would cause or contribute to significant degradation of wetlands, which can include adverse effects on wetland-dependent species, ecosystem diversity, and fish and wildlife habitat.[114] Wildlife surveys provided by the applicant show how valuable this area is for a multitude of state and federally listed species. We address quite a bit of this in our prior letters on Bellmar, however, we provide the new or updated information as below, including an analysis by panther habitat modeling expert, Dr. Robert Frakes. Bellmar's impacts to fish and wildlife and their habitats is significant and unacceptable, and thus the permit should be denied.

**1. Bellmar will have unacceptable impacts on the Florida panther.**

The Bellmar project site is an important area for the endangered and wetland-dependent Florida panther. There have been 112,065 telemetry points collected from Florida panthers since 1981 through 2022, from at least 267 panthers.[115] Looking at just a 5-mile area around the Bellmar site, 8.3% of all documented telemetry points and 29.2% of all collared panthers fall within this area.

The Bellmar project is completely comprised of Primary Zone habitat and nearly all Adult Breeding Habitat area – two models depicting the most critical lands to the survival and recovery of the Florida panther. It is situated close to the FPNWR and a critical linkage called Camp Keais Strand is within and adjacent to the project.

The 2020 draft HCP BiOp described a range of impacts to the Florida panther from development in Eastern Collier:

- Increased mortality from intra-specific aggression among panthers displaced by proposed development and human activity;
- Increased mortality and decreased individual fitness caused by intensification of intra and inter- specific competition;
- Increased predation of panther kittens from other predators when preferred prey populations decline;
- Effects to individuals from habitat loss, degradation, and fragmentation because of new roads connecting new areas of development to one another and the existing road network;
- Increased injury and mortality from collisions with traffic on new roads;
- Management removal because of depredation and human/panther interactions;
- Increased exposure to disease; and
- Increased exposure to toxins.[116]

[114] 62-331.053, Florida Administrative Code.
[115] https://geodata.myfwc.com/datasets/myfwc::florida-panther-telemetry/about
[116] 2020 draft HCP BiOp at 125.

To review the impacts to Adult Breeding Habitat, panther habitat modeling expert Dr. Robert Frakes utilized a landscape-scale panther habitat model that was described in Frakes, et al, 2015.[117] The model analyzes forest land cover and forest edge, human density, and road density, amongst other factors to determine suitable breeding habitat for the panther.

Using this published model with updates, Dr. Frakes compared the existing conditions to post-project scenario for Bellmar alone as well as Bellmar and RLW together. There is one set of maps to show the raw results and one set to show in an interpolated model that "smooths" the cells.

Frakes et al., 2015 acknowledges that "protection of the remaining breeding habitat in south Florida is essential to the survival and recovery of the subspecies and should receive the highest priority by regulatory agencies."[118] Yet, adult breeding habitat maps show that Bellmar alone will cause the loss of 10 km2 (2,471 acres) of breeding habitat.

When Bellmar is combined with RLW, it would cause a combined loss of 23 $km^2$ (5,683 acres). The interpolated maps show a significant narrowing of the Camp Keais Strand dispersal corridor, especially when Bellmar and RLW are considered together.

Allowing Bellmar to move forward will have unacceptable direct and indirect impacts on panther habitat and corridor connections.

[117] Frakes, R.A., Belden, R.C., Wood, B.E. & James, F.E. (2015). Landscape analysis of adult Florida panther habitat. PLoS One 10, e0133044.
[118] *Id.* at 15-16.

DocuSign Envelope ID: A49EDFD1-91B9-4E45-88F9-CCD24385A1FE Case 1:21-cv-00119-RDM Document 98-1 Filed 02/28/23 Page 79 of 123
Bellmar 404 Application 396364-001
Page **29** of **42**

Panther Habitat Suitability (P)
Before Development
High : 0.99486
Low : 0.00384327
Bellmar Impact Area
Bellmar

Panther Habitat Suitability (P)
After Development
High : 0.99486
Low : 0.00384327
Bellmar Impact Area
New Roads
Stormwater Lakes
Bellmar

Rural Lands West
Bellmar
Before Development
Adult Panther Habitat P>0.338 (Frakes et al. 2015)
Project Impact Areas

Rural Lands West
Bellmar
After Development
Adult Panther Habitat P>0.338 (Frakes et al. 2015)
Project Impact Areas
Agriculture
Residential
Water
New Roads

29











We note for the record that in addition to the direct impacts to areas with development, the Public Notice states that "[m]anagement objectives to the preserves adjacent to development will the implemented to limit prey and foraging conditions that otherwise may attract panther and bears".[119] We need clarification on what this means and assurance that if permitted, the applicant will not be seeking or be given Panther Habitat Unit (PHU) credits for lands that are actively being managed to deter panthers. The PN states that the proposed project will need 1,793.4 acres and the estimated PHU credits needed are 16,844.[120] The PN then states that the conservation areas of the project exceed this amount by providing 18,648 PHUs.[121] However, without a map detailing the areas being considered, there is no way to ensure that the applicant is considering preserves being managed to deter panthers as impacted and that these preserves are not being used for compensation.

Further, in the 2020 draft HCP BiOp, the FWS recommended more than 25 different actions to minimize impacts on the Florida panther, including the following:

- Maintain internal traffic capture of each development at or above 50 percent.

[119] State 404 Program Public Notice for Permit Application No. 396364-001 dated August 16,2022, at 3.
[120] State 404 Program Public Notice for Permit Application No. 396364-001 dated August 16,2022, at 5.
[121] State 404 Program Public Notice for Permit Application No. 396364-001 dated August 16,2022, at 5.

- Prohibit residents from keeping domestic animals (chickens, goats, etc.) that attract panthers and other predators.
- Require full vaccination of all pets in new developments from diseases that can be acquired by panthers.
- Require pets be kept indoors, leashed, or maintained in fenced enclosures at all times. Encourage residents to feed pets indoors and to not leave pet food dishes outside.
- Encourage residents to clean grills and store them indoors when not in use.
- Minimize the use of bird feeders and supplemental feeding stations for deer and other game species.
- Require residents to deer proof gardens.
- Restore agricultural lands to native habitats that are more beneficial to the panther, especially forested habitats, and maintain in perpetuity. [122]

We have no indication from the applicant whether they are going to follow or incorporate this advice into the proposed development. These draft recommendations should inform the evaluation of whether the project should be authorized absent any commitment by the applicant to implement them, for example, by informing whether the proposal is in the public interest or meets requirements to minimize impacts. The agencies should also consider whether these recommendations should be incorporated as binding permit terms to ensure that impacts are minimized.

**2. Bellmar will have unacceptable impacts on the Florida bonneted bat.**

The applicant's Florida bonneted bat (FBB) survey, dated July 2021, found that calls were recorded "within the time frame considered by USFWS that roosting is likely nearby (Attachment F)."[123] Thus, the agencies need to look closely at not only how Bellmar would impact proposed critical habitat, but also foraging and roosting within the project. If the Bellmar project will impact a roost(s), there is an increased likelihood that Bellmar would also pose jeopardy to the bonneted bat. Based on our review, the applicant has not adequately addressed this issue.

We also note that this project is in FBB Proposed Critical Habitat (PCH), specifically Unit 3 of the PCH (Attachment G).

**E. Ownership and other information must be addressed.**

**1. Ownership within the Project Boundary**

It appears that the applicant does not, in fact, own all of the property contained in the application (Attachment H). About 503.57 acres were sold in June 2019 to Gargulio, Inc. This is 9.8% of the 5,105.49 acres. We note that Gargulio does not appear to be indicated as or listed as an adjacent property owner and is not part of the permit notice. To our knowledge, Gargulio is also not an applicant. While it appears that the Gargulio property is not designated as development or conservation, it does call into question the appropriateness of including this property in the

---

[122] 2020 draft HCP BiOp at 320.
[123] Passarella & Associates, Inc., 2021. Bellmar Florida Bonneted Bat Acoustic Survey Report. Prepared for Collier Enterprises Management, Inc. July 2021.

Bellmar 404 boundary without the documented acknowledgement of the property owner. The agencies should determine why land not owned by the applicant is included in the boundary of the application.

| Parcel ID | Acres |
|---|---|
| **354930004** | 96.88 |
| **354960207** | 9.03 |
| **354520100** | 225.97 |
| **354480606** | 171.69 |
| | |
| TOTAL | 503.57 |

This information was found on the Collier County Property Appraiser on October 15, 2021, confirmed on August 30, 2022.

**2. The applicants have yet to comply fully with all requests for additional information.**

In addition to the other RAI request that was not addressed, as discussed above, the following RAI comments from the August 20, 2021 RAI letter have not been addressed in part or in full:

Excerpt from the Agency RAI:

*25. Page 34 of the BA addresses incidental take of the project by referring to the HCP. The ITP has not been issued yet. Therefore, please provide a stand-alone analysis of incidental take for each species that will have take (as defined by the ESA) associated with the Bellmar project. In order to remain within the State 404 process, a project must not cause jeopardy. Please provide an analysis supporting that the Bellmar project is not likely to cause jeopardy to the panther.*

The applicant's response to this request is not adequate because the ECMSHCP has been withdrawn. To date, we have not seen any new information submitted to FDEP and FWC informing them that the ECMSHCP has been withdrawn.

Excerpt from the Agency RAI:

*34. The provided plans do not seem to provide any indication of the proposed lot size. What is the approximate site of each residential lot? How many residences are proposed or anticipated?*

The applicant refers to the Town Connector as intended for commercial uses, however at least 1,000 residential units – both affordable and market rate – are also proposed along with the commercial uses. The applicant should be required to answer this question completely and in adequate detail to ensure that the impacts of its proposal, in particular the traffic-inducing impacts, are assessed accurately.

Excerpt from the Agency RAI:

*48. What are the potential effects of the project on the Florida panther, including the direct, indirect, interrelated, and interdependent effects? What is the extent of habitat loss that would result from the proposed project?*

The applicant avoids answering these questions. The applicant must address these issues and answer these questions fully and directly.

Excerpt from the Agency RAI:

*50. How would the proposed mitigation offset the proposed impacts to the panther?*

*The assessment includes a traffic analysis section but does not specifically address the extent of the proposed traffic increases that would result from the implementation of the project. What is the specific anticipated increase in traffic (volume, location, etc.) and how would that increase impact the panther?*

The applicant has refused to answer these questions. Particularly, in light of the analysis in the 2020 draft HCP BiOp and 2021 draft HCP BiOp, the applicant must address these issues and answer these questions fully and directly.

## III. Conclusion

Thank you for considering our comments. We ask that you deny the Bellmar project because it would pose unacceptable direct, indirect, and cumulative impacts, and would seal the fate of the Florida panther. Bellmar, and other reasonably foreseeable projects, would not only remove habitat, but also would cause increased roadkill, increase human-wildlife interaction, and pose threats to trust resources and properties in conservation. Furthermore, Bellmar is inconsistent with the requirements of the State 404 Program.

Please note that this letter does not constitute support for the state-assumed section 404 permitting program, which we believe is unlawful.

Sincerely,

Julianne Thomas
Senior Environmental Planning Specialist
(239) 262-0304 x 252
juliannet@conservancy.org

Amber Crooks
Environmental Policy Manager
(239) 776- 5601
amberc@conservancy.org

Karimah Schoenhut
Staff Attorney
Sierra Club
Sierra Club Environmental Law Program
50 F Street NW, 8th Floor
Washington DC 20001
Phone: 202-548-4584
karimah.schoenhut@sierraclub.org

Elise Pautler Bennett
Florida Director & Senior Attorney
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, Florida 33703
(727) 755-6950
ebennett@biologicaldiversity.org

Cc:
Shannon Estenoz, Assistant Secretary for Fish and Wildlife and Parks, Department of Interior
Bob Carey, Environmental Review Branch Manager, USFWS
Jose Rivera, Environmental Review Supervisor, USFWS
John Truitt, Deputy Secretary, FDEP
Jon Iglehart, South District Director, FDEP
Megan Mills, Permitting Administrator, FDEP
Toby Schwetje, Environmental Specialist III, FDEP
Jason Hight, Director Office of Conservation Planning Services, FWC
Jeaneanne Gettle, Director of Water Division, EPA
Rosemary Calli, Section Chief Wetlands & Streams, EPA
FWC records FWCConservationPlanningServices@myfwc.com
FDEP records SD-ERPcomments@floridadep.gov

Attachment A

**Table 2**
**Project Specific Trip Generation – Build-out Conditions – Average Weekday**

| ITE LUC | Daily Two-Way Volume | AM Peak Hour | | | PM Peak Hour | | |
|---|---|---|---|---|---|---|---|
| | | Enter | Exit | Total | Enter | Exit | Total |
| **Single Family Detached** | **13,250** | 284 | 850 | **1,134** | 911 | 535 | **1,446** |
| **Multifamily Housing (Low-Rise)** | **8,729** | 112 | 377 | **489** | 329 | 194 | **523** |
| **Office Park** | **424** | 36 | 4 | **40** | 2 | 27 | **29** |
| **Shopping Center** | **5,383** | 120 | 74 | **194** | 231 | 251 | **482** |
| **Total Traffic** | **27,786** | 552 | 1,305 | **1,857** | 1,473 | 1,007 | **2,480** |
| **Internal Capture** | **806** | 24 | 24 | **48** | 97 | 97 | **194** |
| **External Traffic** | **26,980** | 528 | 1,281 | **1,809** | 1,376 | 910 | **2,286** |
| **Pass-by Traffic** | **748** | 26 | 17 | **43** | 51 | 46 | **97** |
| **Net External Traffic** | **26,232** | 502 | 1,264 | **1,766** | 1,325 | 864 | **2,189** |

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F9-CCD24385A1FE
Bellmar 404 Application 396364-001
Page **36** of **42**

Attachment B

CONSERVANCY
of Southwest Florida
OUR WATER, LAND, WILDLIFE, FUTURE.
Collier Enterprises owns approx. 15,919 acres or 72% of the Big Cypress Stewardship District
Legend
Name
BARRON COLLIER
COLLIER ENTERPRISES
GARGIULO
PACIFIC LAND TRUST
0 0.5 1 2 3 4
Miles

36



Attachment C[124]

[124] Florida Panther Protection Program Technical Review Team, 2009. Technical Review of the Florida panther Protection program Proposed for the Rural Lands Stewardship Area of Collier County, Florida. Final Report. Note that the PRT did not analyze the Big Cypress DRI (AKA Rural Lands West) but did find that the Bellmar state 404 area should be retained in no more intense than current agricultural uses.

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F9-CCD24385A1FE
Bellmar 404 Application 396364-001
Page **38** of **42**

Attachment D

Date: 9/13/2022
Legend
5 mile buffer
State 404 Program Permits
Bellmar 404 Impact Area
Source: Esri, DigitalGlobe, GeoEye, Earthstar Geographics, CNES/Airbus DS, USDA, USGS, AeroGRID, IGN, and the GIS User Community
0 0.5 1 2 3 4
Miles

CONSERVANCY of Southwest Florida
OUR WATER, LAND, WILDLIFE, FUTURE.

There are 259 404 permits within 5 miles of the Bellmar 404 impact area

38

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F9-CCD24385A1FE
Bellmar 404 Application 396364-001
Page **39** of **42**

Attachment E

Date: 9/13/2022
Legend
State 404 Program Permits
Bellmar 404 Impact Area
25 mile buffer
Source: Esri, DigitalGlobe, GeoEye, Earthstar Geographics, CNES/Airbus DS, USDA, USGS, AeroGRID, IGN, and the GIS User Community
0 2 4 8 12 16
Miles
CONSERVANCY of Southwest Florida
OUR WATER, LAND, WILDLIFE, FUTURE.
There are 785 404 permits within 25 miles of the Bellmar 404 impact area

39

DocuSign Envelope ID: A49EDFD1-91B9-4E45-88F9-CCD24385A1FE
Bellmar 404 Application 396364-001
Page **40** of **42**

Attachment F[125]

PROJECT LOCATION
AS-1
AS-2
AS-3
AS-4
AS-5
AS-6
AS-7
AS-8
AS-9
AS-10
AS-11
AS-12
AS-13
AS-14
AS-15
AS-16
AS-17
AS-18
AS-19
AS-20
AS-21
AS-22
AS-24
AS-25
AS-26
AS-27
AS-28
AS-29
AS-30
LEGEND
N
S
W
E
0 900 1,800
Feet
PASSARELLA & ASSOCIATES
BELLMAR
AERIAL WITH ACOUSTIC STATION LOCATIONS

[125] Calls indicating roost nearby at stations #1, 16, 18, 20, 26, 28.

40

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F9-CCD24385A1FE
Bellmar 404 Application 396364-001
Page **41** of **42**

Attachment G

Bellmar & Florida Bonneted Bat Critical Habitat
Legend
Bellmar Project
Florida Bonneted Bat Critial Habitat (Proposed)
Proposed Development Area

41

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F9-CCD24385A1FE
Bellmar 404 Application 396364-001
Page **42** of **42**

Attachment H

Date: 9/14/2022
FLORIDA PANTHER NATIONAL WILDLIFE REFUGE
Legend
Florida Panther National Wildlife Refuge
Bellmar 404 Boundary
ONAME
BARRON COLLIER PARTNERSHIP LLP
COLLIER ENTERPRISES
GARGIULO
PACIFIC LAND LTD
CONSERVANCY of Southwest Florida
OUR WATER, LAND, WILDLIFE, FUTURE.
0 0.2 0.4 0.8 1.2 1.6
Miles

42



DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F9-CCD24385A1FE

# ATTACHMENT D



# FLORIDA DEPARTMENT OF Environmental Protection

South District
PO Box 2549
Fort Myers FL 33902-2549
SouthDistrict@FloridaDEP.gov

Ron DeSantis
Governor

Jeanette Nuñez
Lt. Governor

Shawn Hamilton
Secretary

**August 16, 2022**

## STATE 404 PROGRAM
## PUBLIC NOTICE

Permit Application No. 396364-001

TO WHOM IT MAY CONCERN: The Department of Environmental Protection has received an application for a State 404 Program permit pursuant to 62-331, Florida Administrative Code, as described below:

APPLICANT: Collier Enterprises Management Inc.
999 Vanderbilt Beach Road, Suite 507
Naples, Florida 34108
(239) 261-4455

LOCATION: The Project site is located in Section 34, Township 48 South, Range 28 East; and Sections 1, 2, 3, 10, 11, 12, 15, and 22; Township 49 South; Range 28 East; Collier County. More specifically, the Project is located east of Golden Gate Estates and is approximately 2.29 miles south of Oil Well Road (CR 858).

APPROXIMATE CENTRAL COORDINATES:
Latitude 26.219790° Longitude -81.492157°

PROJECT PURPOSE: The overall project purpose is to construct a master-planned mixed-use community east of Golden Gatge Estates in Collier County.

PROPOSED WORK: The applicant seeks authorization to discharge dredge or fill material into "waters of the United States" (WOTUS). The authorized discharges would total approximately 144 acres, and would occur in connection with construction of a master-planned mixed-use community, including roads, utility features, pedestrian trail crossings, graded slopes along stormwater management and development areas, and commercial areas.

The site of the village and town center is a 5,105 acre area. Planned features within that area include an approximately 1,000 acre village, a 350 acre commercial town center, 750 acres of continued

agriculture activities, 400 acres of water management features and other ancillary components, and over 2,500 acres of conservation lands.

Of the 144.23± acres of wetland impacts, 132.23± acres are associated with direct wetland impacts and 12.00± acres are associated with secondary wetland impacts. Structures to be erected on fills include road, utility, and pedetrain trail crossings, commercial areas, and graded slopes along the perimeters of development areas and stormwater management lakes. Excavations primarily consist of the construction of stormwater management lakes, which are primarily located along the perimeters of the existing agricultural fields. **All wetlands and surface waters delineated using Chapter 62-340, F.A.C. and regulated under Part IV of Chapter 373, F.S. were determined to be waters of the United States.**

The Project will be constructed in three phases that each correspond with three proposed surface water management basins. In accordance with Section 5.3.2 of the State 404 Applicant's Handbook, the applicant has provided a Long-Term Planning Document that addresses the phasing of the Project. Per the plan, of the Project's 144.23± acres of WOTUS impacts, 17.65± acres are associated with Basin 1; 79.07± acres are associated with Basin 2; and 47.51± acres are associated with Basin 3.

EXISTING CONDITIONS: The Project area contains a variety of land cover types, including a mix of previously-disturbed areas used for large-scale row crop production and other agricultural purposes as well as native habitats. A total of 69 vegetative associations and land uses, as defined by the Florida Land Use, Cover and Forms Classification System (FLUCFCS) codes, were identified on the property. The description and locations of these land uses can been seen on the plan drawings. The dominant land use on the property is agricultural. The land use types Cropland and Pastureland (FLUCFCS Code 210), Row Crops (FLUCFCS Code 214), Rural Open Land (FLUCFCS Code 260), Fallow Cropland, Hydric (FLUCFCS Code 2611), and Low Pasture, Hydric (FLUCFCS Code 262) comprise approximately 43.7 percent (2,231.21± acres) of the site.

The native areas on-site are dominated by Cypress, Disturbed (FLUCFCS Code 6219) which comprises approximately 23.8 percent (1,214.40± acres) of the Project site and Wetland Mixed Hardwood Conifer, Disturbed (FLUCFCS Code 6309) which comprises approximately 9.2 percent (470.38± acres) of the Project site.

Wetlands deemed to be jurisdictional WOTUS constitute a total of 2,283.22± acres or approximately 44.7 percent of the Project site. The wetlands are generally forested and are dominated by cypress with areas of cypress/pine, hydric pine, mixed wetland hardwood, and freshwater marsh habitats. The wetlands contain varying degrees of exotic infestation including the exotic species Brazilian pepper (*Schinus terbinthifolia*), primrose willow (*Ludwigia* sp.), torpedograss (*Panicum repens*), paragrass (*Urochola mutica*), and trompetilla (*Hymenachne amplexcaulis*). Exotic vegetation is most dense where wetlands border agricultural fields. The hydrology of the landscape within and surrounding the Project area has been historically affected by roadways, ditches, and permitted agricultural activities. The wetlands that would be impacted by the project are primarily limited to lower quality wetlands which are part of the historical agricultural operations.

AVOIDANCE AND MINIMIZATION INFORMATION: The applicant proposes to conform to the Collier County's Rural Land Stewardship Program, which is designed by Collier County to preserve lands with the highest natural resource values and identifies certain lands with relatively low natural resource values (such as cleared agricultural fields) for development of new communities.

The applicant proposes to utilize existing agricultural fields for the planned development to the extent possible and avoid and minimize direct impacts to the natural wetland habitats on-site. The planned discharges to jurisdictional wetlands are primarily for infrastructure construction such as road crossings and surface water management facilities.

The proposed Project would avoid impacts to the majority of the existing native habitats. For example, the proposed Project would avoid impacts to the Camp Keais Strand located on the Project's eastern boundary. The proposed site plan has been designed to minimize impacts to listed species by utilizing agriculture fields for development and preserving the majority of the natural wetland and upland habitats on-site. Approximately 94.2 percent (2,156.97± acres) of the wetlands on-site will be preserved. The proposal would establish 2,570.66± acres of Conservation Area. Priority has been given to preserving higher quality native vegetation that provides habitat for listed species.

To avoid and minimize impacts to protected species, the Conservation Area will be managed as habitat for the listed species documented on the Project site, in accordance with a Listed Species Management and Human-Wildlife Coexistence Plan. Management objectives for the preserves adjacent to development will be implemented to limit prey and foraging conditions that otherwise may attract panthers and bears; therefore, discouraging these species from accessing areas within the development. Preserves internal to the Project site will be managed to limit panther prey species such as white-tailed deer (*Odocoileus virginianus*) and feral hogs (*Sus scrofa*). The Project site design includes a lake buffer between the proposed development areas and Camp Keais Strand. The goal of this buffer is to limit potential access to development areas by large mammals. Where construction of a lake buffer is not feasible, wildlife fencing will be constructed to deter access by these species. Since the majority of the Project is currently an active agricultural operation, the proposed on-site preservation, enhancement, and restoration activities (described in more detail below) are anticipated to result in a net benefit to the conservation of fish, wildlife, listed species, and their habitats.

COMPENSATORY MITIGATION: The proposed compensatory mitigation plan for the Project has been designed in accordance with Section 8.5.2 of the 404 Applicant's Handbook to compensate for unavoidable impacts to jurisdictional waters. The proposed Conservation Area consists of 2,570.66± acres, of which approximately 2,100.17± acres will be utilized as compensatory mitigation for impacts to jurisdictional wetlands. The proposed mitigation for wetland impacts includes wetland preservation and enhancement. Exotic vegetation will be hand removed from 1,871.99± acres of wetlands. Mechanical removal of exotics and supplemental planting will be conducted in 228.18± acres of wetlands. In addition to the compensatory mitigation, the mitigation plan also includes the enhancement and preservation of 429.55± acres of existing upland habitat important to the life cycle of wetland-dependent wildlife species. These

429.55± acres are included in the mitigation plan, but are not used to offset functional loss associated with impacts to wetlands.

The proposed compensatory mitigation is located within the same watershed as the impact site and in a location where it is most likely to successfully replace lost functions and services. The compensatory mitigation for the Project is located within a regional flow-way and wildlife corridor and includes high-value habitat targeted by the Florida Forever Program within Camp Keais Strand. The South Florida Water Management District has also identified the Camp Keais Strand as a valuable resource for restoration and protection because it would provides attenuation of flood peaks, water quality improvements, and long-term protection of core wetland ecosystems.

A Uniform Mitigation Assessment Methodology (UMAM) functional analysis was prepared and provided with the application for the Project. The UMAM analysis indicates that the functional loss associated with wetland impacts for the Project totals 70.85 functional units. The functional gain associated with the proposed compensatory mitigation totals 128.57 functional units. Therefore, the UMAM analysis demonstrates that the proposed compensatory mitigation will more then offset the functional loss associated with the Project and yield a net gain of 57.72 functional units.

The proposed mitigation would occur in three phases.  Each of the three Mitigation Areas corresponds to the basin number it offsets. Mitigation Area 1 is comprised of 645.04± acres and results in a functional gain of 23.89 units. Mitigation Area 2 is comprised of 1,011.61± acres and results in a functional gain of 60.21 units. Mitigation Area 3 is comprised of 873.07± acres and results in a functional gain of 42.76 units. Therefore, each Mitigation Area generates more than enough functional gain to offset the functional loss associated with each corresponding basin or phase of construction.

CULTURAL RESOURCES: An archaeological and historical survey was conducted by Archaeological Consultant's, Inc. (ACI) in July 2006 for the Big Cypress Stewardship District, which encompasses the project site. No archaeological or historic sites were documented during the survey. The Florida Department of State, Division of Historical Resources (DHR) issued a letter dated August 29, 2007 indicating concurrency with ACI's determination. The DHR letter states that the development of the Project site will have no effect on any historic properties eligible for listing in the National Register of Historic Places, or otherwise of historical or archaeological value.

The Department has requested review from the State Historic Preservation Officer (SHPO) and those federally recognized Tribes with concerns in Florida and the permit area. No comments have been received.

FEDERALLY AND STATE-LISTED SPECIES: The Department has requested review from the Florida Fish and Wildlife Conservation Commission (FWC) and the US Fish and Wildlife Service (USFWS), and the below comments have been received.

FEDERALLY AND STATE-LISTED SPECIES:  The project is located within the U.S. Fish and Wildlife Service (USFWS) Consultation Areas for the Audubon's crested caracara (*Polyborus plancus audubonii*, Federally Threatened [FT]), Everglade snail kite (*Rostrhamus*

*sociabilis plumbeus*, Federally Endangered [FE]), Florida scrub-jay (*Aphelocoma coerulescens*, FT), Florida panther (*Felis concolor coryi*, FE), red-cockaded woodpecker (*Picoides borealis*, FE), Florida bonneted bat (*Eumops floridanus*, FE), and Core Foraging Areas (CFA) for the wood stork (*Mycteria americana*, FT). The project site may also provide habitat for the eastern indigo snake (*Drymarchon corais couperi,* FT), gopher tortoise (*Gopherus polyphemus*, State Threatened [ST]), Florida pine snake (*Pituophis melanoleucus mugitis*, ST), southeastern American kestrel (*Falco sparverius paulus*, ST), Florida sandhill crane (*Antigone canadensis pratensis*, ST), little blue heron (*Egretta caerulea*, ST), roseate spoonbill (*Platalea ajaja*, ST), tricolored heron (*Egretta tricolor*, ST), Everglades mink (*Neovison vison evergladensis*, ST), and Big Cypress fox squirrel (*Sciurus niger avicennia*, ST).

Florida Fish and Wildlife Conservation Commission (FWC) staff determined the proposed project will have **no effect** on the Florida scrub-jay and red-cockaded woodpecker; and **may affect but is not likely to adversely affect** the wood stork, Everglade snail kite, and Audubon's crested caracara. The project **may affect and is likely to adversely affect** the Florida panther, Florida bonneted bat, and eastern indigo snake.

Florida Panther: The entire project site is located with the Panther Focus Area Primary Zone. Use of the USFWS *Panther Effect Determination Key,* resulted in the following sequential determination: A > C = "may affect" the Florida panther. Florida panthers have been documented utilizing the forested uplands and forested wetland areas on the project site based on radio-collar telemetry points. According to the applicant's environmental representative, Passarella and Associates Inc. (PAI), the proposed project would result in impacts to 1,793.4 acres. The estimated number of Panther Habitat Unit (PHU) credits needed is 16,844 based on PAI's use of USFWS's Panther Compensation Calculator. The applicant has proposed to offset potential impacts to the Florida panther through a combination of onsite preservation and enhancement consisting of 2,391.6 acres. According to information provided by PAI, the project would provide compensation totaling 18,648 PHUs, which is a net increase of 1804 PHUs. The applicant has indicated a willingness to evaluate and implement avoidance, minimization, and compensation measures needed to offset potential adverse impacted to Florida panthers associated with any roadway improvements needed to accommodate future increases in traffic. Based on this information, the proposed project "may affect, and is likely to adversely affect" the Florida panther. FWC staff will work with USFWS staff, Florida Department of Environmental Protection (FDEP) staff, and the applicant to determine any necessary permit conditions for the State 404 permit based on this information.

Florida Bonneted Bat: The Florida bonneted bat roosts in a variety of habitats including tropical hardwoods, pinelands, and mangroves that include tall, mature trees or other areas in which suitable structural features for breeding and sheltering are present. Foraging habitat is comprised of relatively open areas including open fresh water, permanent or seasonal freshwater wetlands, within and above wetland and upland forests, agricultural lands, and man-made habitats such as golf courses and parks. The project site is located within proposed Critical Habitat for the Florida bonneted bat and PAI has noted that the site contains physical and biological habitat features for bonneted bat. According to PAI, the project would result in an impact to approximately 1,550 acres of potential foraging and/or roosting habitat, but approximately 821 acres is currently in active row crop production and provides limited foraging and roosting

habitat.  An acoustic survey for the Florida bonneted bat was performed at 30 stations located on the property.  A total of 153 Florida bonneted bat calls were recorded at 6 survey stations, with 12 identified as near the time of roosting.

The applicant has proposed to implement several Best Management Practices from the Consultation Key.  PAI indicates that the proposed project would preserve and enhance approximately 2,571 acres of foraging and roosting habitat, resulting in an overall net increase in permanently protected habitat, so that the impacts would not result in an overall loss of available critical habitat for Florida bonneted bat.  Based on this information, use of the USFWS *Florida Bonneted Bat Consultation Guidelines* key resulted in the following sequential determination:  1a
> 2a > 3b > 6a > 7a > 8b, "likely to adversely affect."  FWC staff will work with USFWS staff, FDEP staff, and the applicant to determine any necessary permit conditions for the State 404 permit based on this information.  The potential impacts to the Florida bonneted bat were evaluated using the.  and further coordination with USFWS staff is required.

Eastern Indigo Snake:  Over most of its range, the eastern indigo snake inhabits pine flatwoods, scrubby flatwoods, high pine, dry prairie, tropical hardwood hammocks, edges of freshwater marshes, agricultural fields, coastal dunes, and human-altered habitats.  Eastern indigo snakes appear to need a mosaic of habitats to complete their life cycle.  Wherever the eastern indigo snake occurs in xeric habitat, it is closely associated with the gopher tortoise.  No gopher tortoise burrows were observed during the 2019-2020 surveys of the site.  The project site includes approximately 2,724 acres of habitat that could potentially be used by the eastern indigo snake. According to information provided by PAI, eastern indigo snakes were documented on the site during surveys conducted in 2007 and 2009.  The potential impacts to the eastern indigo snake were evaluated using the USFWS *Eastern Indigo Snake Programmatic Effect Determination Key*.  Use of the key resulted in the following sequential determination:  A > B > C, "may affect" since the project will result in impacts to more than 25 acres of potential habitat for the eastern indigo snake.  The applicant has committed to following the USFWS-approved *Standard Protection Measures for the Eastern Indigo Snake* during the clearing and construction phases of the project.  Based on the available information, the proposed project "may affect, and is likely to adversely affect" the eastern indigo snake.  FWC staff will work with USFWS staff, FDEP staff, and the applicant to determine any necessary permit conditions for the State 404 permit based on this information.

Wood Stork:  The project lies within the 18.6-mile buffer of the 619141, 619018 (Corkscrew), 619316, and 619161 (North Catherine Island II) colonies and wood storks have been observed

foraging on the property. The project site is located approximately 1.7 miles from the North Catherine Island II nesting location. The proposed project would potentially affect suitable foraging habitat and impacts are unavoidable. The applicant is proposing to provide on-site mitigation which is within the appropriate CFA and of matching hydroperiod of the proposed impacts, and the project is not contrary to the Habitat Management Guidelines for the Wood Stork in the Southeast Region. Use of the USFWS *South Florida Ecological Services Office Effect Determination Key,* resulted in the following sequential determination: A > B > C > E, "not likely to adversely affect" provided the permit is conditioned on the applicant complying with approved wetland mitigation and monitoring requirements. FWC staff will work with USFWS staff, FDEP staff, and the applicant to determine any necessary permit conditions for the State 404 permit based on this information.

Audubon's Crested Caracara: The Audubon's crested caracara prefers habitats that contain largely short-stature vegetation with a low density of trees, including dry or wet prairie and improved and unimproved pasture containing scattered cabbage palms, their preferred nesting tree. They may also be found in lightly wooded areas with scattered saw palmetto, scrub oaks, and cypress. Seasonal freshwater marsh wetlands of less than 2.47 acres may increase habitat attractiveness. Audubon's crested caracaras have been observed foraging on site and a nest was documented on-site during 2020. PAI conducted bi-weekly observations and documented that the young fledged. PAI conducted surveys in 2021 and no nesting activity was observed on the property. Potential nesting habitat is present on the property. The applicant intends to conduct additional surveys and will avoid any nests during the nesting season. Based on this information, FWC staff determined that the proposed project "may affect but is not likely to adversely affect" Audubon's crested caracara. FWC staff will work with USFWS staff, FDEP staff, and the applicant to determine any necessary permit conditions for the State 404 permit based on this information.

Everglade Snail Kite: Everglade snail kite foraging habitat consists of relatively shallow wetland vegetation, either within extensive marsh systems, or in lake littoral zones. This species nests in a variety of vegetation types, usually over open water and almost always in areas with good foraging habitat nearby. Its preferred habitat is lowland freshwater marshes mostly in the Everglades, Lake Okeechobee, Lake Kissimmee, and upper St. Johns River watersheds. Most of the wetlands on the property are forested, but the property does contain approximately 78 acres of potential habitat. According to information provided by PAI, an adult Everglade snail kite was observed flying on the property during 2019-2020 surveys, and piles of apple snail shells have been observed on the property. No nesting has been observed on the site. Based on this information, FWC staff determined that the proposed project "may affect but is not likely to adversely affect" the Everglade snail kite. FWC staff will work with USFWS staff, FDEP staff, and the applicant to determine any necessary permit conditions for the State 404 permit based on this information.

Florida Scrub-Jay: The Florida scrub-jay is endemic to peninsular Florida's ancient dune ecosystems of oak-dominated scrub, or xeric oak scrub habitat, which occur on well-drained to excessively well-drained sandy soils. Optimal habitat for scrub-jays is dominated by low growing oaks (sand live oak [*Quercus geminata*], Chapman oak [*Q. chapmanii*], myrtle oak [*Q. myrtifolia*], scrub oak [*Q. inopina*]), which are 1 to 3 meters high, interspersed with 10 to 50

percent unvegetated, sandy openings for foraging and acorn-caching space, and a sand pine (*Pinus clausa*) canopy of less than 20 percent.  The project lies within the consultation area for Florida scrub-jay, but suitable habitat for this species is not present on the site based on existing site conditions.  Based on this information, FWC staff has determined that the project would have "no effect" on the Florida scrub-jay and no State 404 permit conditions are necessary for this species.

Red-Cockaded Woodpecker:  The red-cockaded woodpecker lives and forages in mature pine forests, specifically those with longleaf pines averaging 80 to 120 years old and loblolly pines averaging 70 to 100 years old.  Red-cockaded woodpeckers live in groups with a breeding pair and as many as four helpers, usually male offspring from the previous year.  Each group needs about 200 acres of old pine forest to support its foraging and nesting needs.  The applicant's environmental representative, PAI, conducted surveys during 2020 and 2021 and no potential nesting cavities were observed on the property.  No red-cockaded woodpeckers have been observed foraging on the property.  Based on this information, FWC staff has determined that the proposed project would have "no effect" on the red-cockaded woodpecker and no State 404 permit conditions are necessary for this species.

Gopher Tortoise:  Gopher tortoises are found in dry, sandy soils in habitats such as sandhills, xeric oak, and dry pine flatwoods.  The onsite uplands represent potentially suitable habitat for the gopher tortoise.  In their *Biological Assessment*, PAI indicated that no gopher tortoise burrows were observed onsite during surveys performed in 2019-2020.  FWC's Gopher Tortoise Permitting Guidelines found at http://www.myfwc.com/license/wildlife/gopher-tortoise-permits/ can be referenced for survey methodology, measures for avoiding impacts, as well as options and state requirements for minimizing, mitigating, and permitting. FWC staff will work with FDEP staff and the applicant to establish appropriate avoidance measures prior to issuance of the State 404 permit that will be included as permit conditions.

Southeastern American Kestrel:  The project site may provide suitable habitat for the southeastern American kestrel, including the open field habitat present on-site.  PAI conducted surveys in March and April 2020 and observed kestrels on site but was not able to determine if the kestrels were non-migratory.  The *Species Conservation Measures and Permitting Guidelines for Southeastern American Kestrel* found at https://myfwc.com/wildlifehabitats/wildlife/species-guidelines/ can be referenced for biological information, survey methodology, measures for avoiding impacts, and recommended conservation practices.  If nesting is identified on the project site, avoidance measures include maintaining a 490-feet (150-meter) buffer around the nest cavity location.  FWC staff will work with FDEP staff and the applicant to establish appropriate avoidance measures prior to issuance of the State 404 permit that will be included as permit conditions.

State-Listed Wading Birds:  The forested wetlands present onsite may provide potential habitat for wading birds, including the little blue heron, roseate spoonbill, and tricolor heron which have been observed foraging on-site.  No nesting was observed during surveys conducted in 2019-2020.  The *Species Conservation Measures and Permitting Guidelines for Little Blue Heron, Reddish Egret, Roseate Spoonbill, Tricolored Heron* found at https://myfwc.com/wildlifehabitats/wildlife/species-guidelines/ can be referenced for biological

information, survey methodology, measures for avoiding impacts, and recommended conservation practices. If nesting is discovered after site activities have begun, the applicant will need contact the FWC to discuss potential avoidance measures, which include maintaining a 330-feet (100-meter) buffer around the nesting area, or other alternatives. FWC staff will work with FDEP staff and the applicant to establish appropriate avoidance measures prior to issuance of the State 404 permit that will be included as permit conditions.

Florida Sandhill Crane: The open marsh on the project site may provide suitable foraging and nesting habitat for the Florida sandhill crane. Florida sandhill cranes have been observed foraging on-site and a potential nesting area was documented on the property. The *Species Conservation Measures and Permitting Guidelines for Florida Sandhill Crane* found at https://myfwc.com/wildlifehabitats/wildlife/species-guidelines/ can be referenced for biological information, survey methodology, measures for avoiding impacts, and recommended conservation practices. If nesting is identified on the project site, avoidance measures include maintaining a 400-foot (122-meter) buffer around the nesting area. FWC staff will work with FDEP staff and the applicant to establish appropriate avoidance measures prior to issuance of the State 404 permit that will be included as permit conditions.

Big Cypress Fox Squirrel: The Big Cypress fox squirrel typically inhabit pine flatwoods, cypress swamps and hard wood hammocks with open to moderately dense understory and shrub cover. According to information provided by PAI, Big Cypress fox squirrels have been observed during on-site surveys conducted in 2007-2009, 2019-2020, and during other field work on the site. The *Species Conservation Measures and Permitting Guidelines for Big Cypress Fox Squirrel* (https://myfwc.com/media/11559/bigcypressfoxsquirrelguidelines-2018.pdf) can be referenced for biological information, survey methodology, measures for avoiding impacts, and recommended conservation practices. FWC staff will work with the applicant and FDEP staff to establish appropriate avoidance measures prior to issuance of the State 404 permit that will be included as permit conditions.

Everglades Mink: The project site is located within the range of the Everglades mink and the site contains potential habitat including ditches, freshwater marsh, and prairie. Everglades mink rely on multiple wetland habitat types, do not avoid human activity, and frequently utilize man- made structures such as canals and levees located near wetland habitat. Their dens, if present, may be located near canals and wetlands. In March and April 2020, PAI conducted a camera trap survey for Everglades mink, and none were observed or recorded. FWC staff will work with the applicant and FDEP staff to determine any necessary permit conditions for the State 404 permit based on this information.

OTHER INFORMATION:

Please note that, to advance the objectives of the RLSP, Collier County requested that the applicant file an amendment to the Longwater Village Stewardship Receiving Area (SRA) to create a town SRA. The footprint of the requested town SRA would overlap with the current Longwater Village footprint and with the northern tip of the footprint of the Project but would not change the footprint of either Longwater Village or the Project. The applicant agreed and filed the requested amendment with Collier County on January 27, 2022. The outcome of the request will not be known until the County takes final action on the potential amendment, which is not anticipated until fall of 2022 or later. Regardless of the

County's final action on the amendment under the RLSP, the footprint, overall timing of development and acreage of impacts (including WOTUS impacts) would not change as a result of the amendment.

COMMENTS regarding the potential authorization of the work proposed should be submitted in writing through the business portal (Public Comment | DEP Business Portal (fldepportal.com) or to Toby Schwetje at Florida Department of Environmental Protection, South District Office, PO Box 2549, Fort Myers, Florida 33902-2549 within 30 days from the date of this notice. Written comments will be made part of the record and should reference the above permit application number. Objections must be factual, specific, and fully describe the reasons upon which any objection is founded. Any comments received will be considered by the Department to determine whether to issue, modify, condition, or deny a permit for this proposal. Unless a written request is filed with the Department within the 30-day public comment period, the Department may decide on the application without a public meeting.

EVALUATION: The determination as to whether a permit will be issued, or a public meeting held, will be based on an evaluation of all relevant factors, including the public comments received and the effect of the proposed work on the public interest, including, but not limited to, fish, wildlife, historical resources, and pollution. The specific permit decision criteria can be found in Chapter 62-331, Florida Administrative Code.

The Department is soliciting comments from the public; federal, state, and local agencies and officials; Indian Tribes; and other interested parties in order to consider and evaluate the impacts of this proposed activity. To make this consideration, comments are used to assess impacts to endangered species, historic properties, water quality, general environmental effects, and other public interest factors. Comments are also used to determine the need for a public meeting and to determine the overall public interest of the proposed activity.

FOR FURTHER INFORMATION regarding this application, please visit the State 404 Permit File at https://depedms.dep.state.fl.us:443/Oculus/servlet/shell?command=hitlist&[freeText=]&[folderName=]&[profile=Permitting_Authorization]&[creator=]&[entityType=any]&[createdDateTo=]&[catalog=45]&[searchBy=Profile]&[sortBy=Facility Site+ID]&[createdDate=]&{County=_EQ_COLLIER}&{District=_EQ_SD}&{Facility-Site+ID=_EQ_ST404_396364}, or contact the project manager, Toby Schwetje, in writing at Florida Department of Environmental Protection, South District Office, PO Box 2549, Fort Myers, Florida 33902-2549; by electronic mail at Toby.Schwetje@floridadep.gov, or by telephone at (239)344-5631. Please include the permit application number referenced at the top of this page in any correspondence.

REQUEST FOR PUBLIC MEETING: Any person may request a public meeting. The request must be submitted to **SD-ERPcomments@floridadep.gov,** within the designated comment period of the notice and must state the specific reasons for requesting the public meeting.

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F9-CCD24385A1FE Case 1:21-cv-00119-RDM Document 98-1 Filed 02/28/23 Page 104 of 123

# ATTACHMENT E



DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F8-C6D24385A1FE Case 1:21-cv-00119-RDM Document 98-1 Filed 02/28/23 Page 105 of 123

CONSERVANCY
of Southwest Florida
OUR WATER, LAND, WILDLIFE, FUTURE.

*Protecting Southwest Florida's unique natural environment and quality of life ... now and forever.*

October 27, 2022

Megan Mills, Program Administrator Permitting and Engineering
Florida Department of Environmental Protection South District
PB Box 2549
Fort Myers, FL 33902
Megan.Mills@FloridaDEP.gov

Robert Carey, Environmental Review Branch Manager
U.S. Fish and Wildlife Service
1339 20th St.
Vero Beach, FL 32960
robert_carey@fws.gov

Jason Hight, Director
Office of Conservation Planning Services
Florida Fish and Wildlife Conservation Commission
620 S. Meridian St.
Tallahassee, FL 32399
Jason.Hight@myfwc.com

RE: Immokalee Road Rural Village 404 Permit Application No. 396348-001

Dear Ms. Mills, Mr. Carey, and Mr. Hight,

The Conservancy of Southwest Florida writes on behalf of our over 6,400 supporting families to provide additional comments on the Immokalee Road Rural Village (IRRV) state 404 permit application currently under review (application number 396348-001). Our previous comments addressed the original state 404 permit application that was transferred from the U.S. Army Corps of Engineers (USACE) for this proposed project in Collier County. We are now writing in response to the applicant's February 17, 2022 materials submitted in response to the Department's Request for Additional Information (RAI). To our knowledge, no further RAIs or response materials for the state 404 permit application have been exchanged since this date.

We continue to highlight our past concerns with this 2,787-acre project, including impacts to water resources and listed species, as well as the cumulative effects of this and other large-scale projects under review or permitted in the region. The habitat fragmentation, loss of wetlands, and related impacts to upland systems in this part of southwest Florida is of increasing concern,

CHARITY NAVIGATOR
Four Star Charity

Conservancy of Southwest Florida has been awarded Charity Navigator's prestigious 4-Star top rating for good governance, sound fiscal management and commitment to accountability and transparency. Charity Navigator is America's largest and most respected independent evaluator of charities.

1495 Smith Preserve Way | Naples, Florida 34102 | 239.262.0304 | Fax 239.262.0672 | www.conservancy.org

especially as this project is nearby the critically important greater Corkscrew ecosystem. We ask that the agencies thoroughly review all impacts posed by this proposed project and require the applicant to provide additional information as indicated in questions in our previous comments and this updated letter. The IRRV project poses a substantial risk to wetlands and listed species, both individually and cumulatively, and we ask that the agencies deny this project.

**Site plan and environmental impacts**

The updated application materials indicate that wetlands were reviewed by the Florida Department of Environmental Protection (FDEP) and the South Florida Water Management District (SFWMD) on May 21 and June 23 and 25, 2021.[1] We request that FDEP clarify which definition of "Waters of the U.S." (WOTUS) the Department utilized for this application. FDEP must ensure consistency with the current definition of WOTUS, which the USACE and the U.S. Environmental Protection Agency (US EPA) interpret to be the pre-2015 regulatory regime definition.[2] For this and other issues highlighted in this letter and our past comments, we ask that the US EPA reserve its right for federal review of this 404 permit application.[3]

It is evident that the site plan for the IRRV project has been updated since the original 404 permit application materials were transferred to FDEP, and includes changes to the proposed preserve areas, development footprint, roadways in and around IRRV, and water features on-site. As a result of these changes, there are additional environmental impacts on-site; thus, the site plan alterations and related impacts must be reconsidered by the permitting agencies. For example, the FWC provided their determinations on the impact of the proposed IRRV project in a letter dated March 15, 2022[4]; was this based on the original footprint or on the newer proposal submitted?

Originally, the northern preserve area extended to the eastern edge of the project area, and as we suggested in our previous letter, the widening of this preserve area could better serve as a connector for large mammals. We remind the agencies that the wetland ecosystems in this part of southwest Florida constitute existing travel ways for large mammals, like the Florida panther. This is evidenced by the fact that CR846 Immokalee Road at the site of IRRV is one of the worst existing hotspots for Florida panther vehicle collisions; several Florida black bear have also been killed on this stretch.[5] Newly proposed alterations to the site plan now show a portion of the preserve removed from the northwest, a narrowing of the preserve area moving east, and the

---

[1] IRRV Wetland Map, prepared by Passarella & Associates, Inc., (Revised February 3, 2022).
[2] USEPA, Current Implementation of Waters of the United States, accessed from: https://www.epa.gov/wotus/current-implementation-waters-united-states
[3] State 404 Program Applicant's Handbook, section 5.2.5, and as described in Rule 62-331.052(3), F.A.C.
[4] Florida Fish and Wildlife Conservation Commission, 2022. FWC's Public Notice Response Immokalee Road Rural village Mixed-used Development. Posted on Oculus March 15, 2022.
[5] Southwest Florida Road Hot Spots, 2.0 Transportation SubTeam Report to Florida Panther Recovery Implementation Core Team. June 2020, and subsequent updates.

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F8-C6D24385A1FE Case 1:21-cv-00119-RDM Document 98-1 Filed 02/28/23 Page 107 of 123

Conservancy of Southwest Florida
IRRV Application 396348-001
3

northeastern portion now cut off before reaching the proposed connecting road.[6] It is unclear from the application materials if large mammal crossings have been proposed by the applicant either on CR846 or for the internal road.

The updated proposed uplands preserve is now only approximately 265 acres in the northwestern section and 100 acres in the southeastern section as a gopher tortoise preserve.[7] The previous site plan shows 484.84 acres of upland preserve.[8] In addition, the site plan now shows "passive recreational trails" in the conservation areas, including in what could be the gopher tortoise preserve area.[9] How will the applicant ensure minimized human-wildlife interactions, as well as provide for continued protection of these proposed preserves, wildlife, listed species, and compensatory mitigation areas?

The updated application materials indicate direct impacts to approximately 46 acres of wetlands and 216 acres of other surface waters on-site.[10] While this is 1.72 acres of additional impacts to wetlands, the most recent UMAM data submitted as part of the related ERP application indicates greater loss of wetland functional units. The applicant now proposes approximately 153 acres of wetland preservation and enhancement to offset these direct wetland impacts, as well as to offset the loss in prey biomass for the federally threatened wood stork. It appears that the Mitigation, Monitoring and Maintenance Plan included in the 404 application RAI response was updated in February 2022; however, this document no longer includes proposed acreage impacts and mitigation lift/gain numbers to support the narrative. Instead, the November 2021 OCULUS upload of the SFWMD ERP Environmental Supplement materials includes a UMAM analysis, which shows that the applicant's calculated net gain in wetland functional units would be 10.10 units (down from the estimated 13.93 units in the July 2020 UMAM analysis).[11] Further, the applicant's most recent UMAM analysis, submitted to SFWMD in August 2022, shows updated scoring, additional functional units lost, and even lower functional units gained after now utilizing the upland preservation and enhancement areas to supplement mitigation.[12] As a result, we ask: what supporting data are the permitting agencies reviewing? Are the agencies aware of the site plan alterations and the modifications to related impacts and proposed mitigation provided in updated materials in the related ERP application?

---

[6] IRRV Conservation Areas Map, Prepared by Passarella & Associates, Inc. (Revised February 3, 2022). The intended land uses for the portions of the preserve that are now removed are unclear.
[7] IRRV, Biological Assessment, prepared by Passarella & Associates, Inc., (Revised February 2022).
[8] IRRV Impact Map Dwg No. 99WAI374-15, (October 21, 2019), Received by FDEP on December 28, 2020.
[9] IRRV Wetland Mitigation and Monitoring Plan, (Revised February 3, 2022), prepared by Passarella and Associates Inc.; IRRV Preserve Area and Listed Species Management Plan, Exhibit 43A, (Revised February 7, 2022), prepared by Passarella & Associates, Inc.
[10] IRRV, Biological Assessment, (Revised February 2022). Prior application materials indicated approximately 44 acres of direct impacts to wetlands and 201 acres of impacts to other surface waters (see November 19, 2019 application materials from 404 permit application to US Army Corps of Engineers as transferred to FDEP).
[11] IRRV Environmental Supplement for SFWMD ERP, (November 2021), prepared by Passarella & Associates, Inc., received electronically by FDEP South District on December 15, 2021.
[12] IRRV UMAM Analysis, (Revised August 2022), submitted to SFWMD ERP application RAI response August 17, 2022. The applicant states that 3.74 functional units will be gained, though there appears to be errors in calculations as indicated in the SFWMD RAI letter dated September 16, 2022.

The applicant continues to suggest that the proposed restoration and enhancement would fully compensate for wetland functional loss; however, in the May 4, 2022 and September 16, 2022 RAI letters for the project's related ERP application, SFWMD indicated that the proposed mitigation is insufficient to offset the wetland impacts.[13] In light of the site plan alterations and impacts and mitigation changes, what less damaging alternatives[14] and "appropriate and practicable changes to the project plan to avoid or minimize the environmental impact of the activity"[15] have been considered and analyzed by the applicant? We also ask that FDEP require an updated and full accounting of the proposed compensatory mitigation be provided to support the applicant's proposed on-site mitigation, and that FDEP thoroughly review the proposed mitigation as required by the State 404 Program. As this proposed development relies on compensatory mitigation to offset impacts to wetlands and listed species, accurate and uniform data are crucial for a comprehensive review and assessment of whether the proposed mitigation fulfills the criteria established in the State 404 Applicant's Handbook.[16]

**Listed Species**

The updated Biological Assessment included in the RAI response shows that listed species surveys for the project site were conducted in 2018 and 2019.[17] The applicant reported that crested caracara nesting surveys were performed January through April 2020, and that this and past site surveys have observed caracara utilizing the site for foraging. Due to the presence of caracara, the applicant should perform updated caracara survey and also account for any nests that are off-site but where the project falls within the 1,500 meter protective buffer area, consistent with USFWS survey policy.[18] Florida Bonneted Bat acoustic and roost surveys were completed in 2020. The updated materials show red cockaded woodpecker (RCW) surveys from 2007.[19]

The entirety of the project site is within the Panther Primary and Secondary Zones. The updated Biological Assessment shows that the loss of Panther Habitat Units (PHUs) is now estimated at 6,227 (569 PHUs more than was previously estimated). In addition, as included in the updated materials, the applicant's panther vehicle mortality study, completed in October 2020, found that "based on existing and projected panther mortality for the roadway segments in the study area, vehicle-related panther deaths are projected to increase due to Project traffic."[20] Mortality from

---

[13] SFWMD, (May 4, 2022), Request for Additional Information ERP application number 211207-32383, item number 12; SFWMD (September 17, 2022), Request for Additional Information, item numbers 9 and 10.
[14] 62-331.053, F.A.C.
[15] State 404 Applicant's Handbook, Section 8.2 (i).
[16] State 404 Applicant's Handbook, Section 8.5.5 Use of Preservation as Compensatory Mitigation. Under the state 404 program, the applicant's compensatory mitigation plan must satisfy requirements of Rule 62-331.130, F.A.C.
[17] IRRV Biological Assessment, (revised February 2022), p. 3.
[18] USFWS, 2017. USFWS Crested Caracara Draft Survey Protocol, Additional Guidance.
[19] The USFWS October 2016 Endangered Species Act Consultation Checklist (Service Consultation Code 2020-TA-1186) asked the applicant to provide a previous survey report from 2015 for the RCW. We are unable to locate this in the application materials submitted with the February 17, 2022 RAI response.
[20] IRRV Biological Assessment, (revised February 2022), p. 19.

panther-vehicle collisions is a major threat to the species and population expansion, and as we previously indicated, the western border of the proposed IRRV development (Immokalee Road) is one of the top eight deadliest areas for panthers (and the site is also Primary Zone habitat and Adult Breeding Habitat). As recently as July 9, 2022, FWC announced that a four-year old female panther was struck and killed by a vehicle on Immokalee Road, directly next to the proposed development.[21] The potential for increase in panther mortality due to traffic from the proposed project needs to be fully considered by the permitting agencies and adequately avoided, minimized, and mitigated.

We remind the agencies that the Biological Assessment states that 113 gopher tortoise burrows were identified on site.[22] The applicant proposes to relocate gopher tortoises "to on-site preservation areas," which we understand could be the southeastern proposed preserve area.[23] Considering that this area is approximately 100 acres, this preserve might be able to accommodate less than half of the gopher tortoises potentially located on-site.[24] Further, this map includes species survey data from 2018, and without updated data it is unclear how many potentially occupied gopher tortoise burrows are currently on-site and how this would influence the avoidance and minimization needed to adequately protect this state-designated threatened species. Further, as we understand from FWC, there may only be approximately one year's worth of offsite gopher tortoise relocation site capacity left available statewide.[25] The continued permitting of gopher tortoises to be relocated offsite at levels seen in the past two years (approximately 19,000 tortoises in 2021 and over 11,000 tortoises in 2022, as of July) is not sustainable; the agencies must work with this applicant to ensure that the gopher tortoise preserves are appropriate and large enough to accommodate all gopher tortoises from the site, and that preservation of the existing burrows in place are maximized.

This project is also within the core foraging area of five wood stork colonies; the closest of which is less than two miles away at the historic Corkscrew Swamp Sanctuary. The analysis of the cumulative effects to the wood stork does not appear to have been updated, as the analysis references data from 2016 to 2019.[26] The updated Biological Assessment shows that the project would pose an even greater risk to wood stork prey biomass than what was proposed in the original application (now estimated at 1,040 kilograms of biomass loss versus 945.95 kg of biomass loss in the initial application). The Biological Assessment references calculations using

---

[21] FWC Panther Pulse, 2022 data, accessed from: https://myfwc.com/wildlifehabitats/wildlife/panther/pulse/.
[22] IRRV Biological Assessment, USFWS 2020-TA-1186, (Revised February 2022), Prepared by Passarella & Associates, Inc., p. 6.
[23] IRRV Preserve Area and Listed Species Management Plan, Exhibit 43A, (revised February 7, 2022).
[24] Figure 7, IRRV Aerial with Listed Species Locations, (July 12, 2019), in Exhibit 6, IRRV Updated Listed Plant and Wildlife Species Survey, Revised July 2019. As of this survey, it appears that the proposed preserve area in the southeastern portion has approximately 70 burrows alone.
[25] Preservation at Marco Island Summer School, July 2022. Estimate by FWC staff as about 15,000 spaces left in capacity for offsite relocation of gopher tortoises statewide. FWC staff stated that in 2021 there were 2,300 offsite relocation permits granted for about 19,000 tortoises, and in 2022 there had been over 1,440 offsite relocation permits for over 11,000 tortoises.
[26] Figure 7, IRRV Aerial with Listed Species Locations, (July 12, 2019), in Exhibit 6, IRRV Updated Listed Plant and Wildlife Species Survey, Revised July 2019, pp. 11-12.

the USFWS wood stork compensation calculator in Exhibit 39; however, we are unable to locate the updated calculations to support the changes described in the narrative.[27] In addition, the FWC Notice, dated March 15, 2022 on FDEP's Information Portal site, states the proposed project is "not likely to adversely affect" the wood stork due to the applicant "proposing to provide mitigation at an approved mitigation bank."[28] However, the application materials state that the applicant intends to mitigate for the loss of wood stork biomass through "on-site restoration and enhancement activities, particularly in the form of preserving and enhancing 152.85+/- acres of existing wetlands."[29] Is this the same area as that which is intended to provide compensatory mitigation for the direct impacts to wetlands? We would also appreciate clarification on the updated biomass loss calculations and information regarding the proposed mitigation included in the FWC Public Notice Response document and the application materials.

**Cumulative and secondary effects**

The cumulative and secondary effects to wildlife, wetlands, and other natural resources must be fully accounted for, analyzed by the applicant, and considered by the agencies during permit review. There are now over 540 state 404 permit applications within 10 miles of the IRRV site, including similar large development projects that would add over 15,000 new homes to this area (see Attachments A and B).[30] In terms of secondary effects, we remind the agencies that the proposed project would be located near the protected lands and wetland ecosystems of the Corkscrew Swamp Sanctuary and Corkscrew Regional Ecosystem Watershed (CREW). As such, a secondary effects analysis per the State 404 Applicant's Handbook, Section 8.3.6, should be required for this project. As FDEP and the Water Management Districts continue to receive more 404 and ERP applications than originally anticipated, the cumulative and secondary impact analyses for this project must be updated for an informed review of the considerable amount of development taking place in this part of southwest Florida.

**Conclusion**

We appreciate the opportunity to submit additional comments on this project and hope that this information will assist with a thorough review of the impacts of this project on water resources and listed species. Given its size, location, and impacts on natural resources and listed species both individually and cumulatively, we ask that you deny this project. Should this project move forward, we continue to request that FDEP hold a public meeting for this application and ask that

---

[27] For example, see "IRRV Wood Stork Foraging Habitat Analysis" (August 2020), p. 5; table in Appendix D Wood Stork Suitable Foraging Prey Base Loss; and Appendix E IRRV Wood Stork Compensation Calculator May 8, 2020.
[28] Florida Fish and Wildlife Conservation Commission's Public Notice Response, Immokalee Road Rural Village Mixed-used Development State 404 Permit App. No. 396348-001, Collier County, (dated March 15, 2022).
[29] IRRV Biological Assessment, (Revised February 2022), p. 21.
[30] Feature Layer from Florida Department of Environmental Protection, State 404 Program Permits, accessed from: https://geodata.dep.state.fl.us/, track State 404 Program facilities and sites which have applied for various environmental and/or regulatory permits, with additional fields added to allow better querying of data. Other proposed large development projects include Rural Lands West, Hogan West, and Bellmar.

the US EPA reserve its right to object to a permit application should additional information be uncovered during the public notice comment period. This comment letter does not constitute support for the state-assumed Section 404 permitting program, which we believe is unlawful. FDEP, the wildlife agencies, and US EPA should use every latitude in the framework to fully review this permit application.

Thank you again for your consideration of our comments and if you have any questions, please contact me at (239) 430-2467.

Sincerely,

Jessica P. Wilson, Ph.D.
Senior Water Policy Specialist
jessicaw@conservancy.org

cc:
Toby Schwetje, FDEP
Jennifer Carpenter, FDEP
John Truitt, FDEP
Jose Rivera, USFWS
Jeaneanne Gettle, US EPA
ConservationPlanningServices@MyFWC.com
SD-ERPcomments@floridadep.gov

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F9-C5D24385A1FE Case 1:21-cv-00119-RDM Document 98-1 Filed 02/28/23 Page 112 of 123

Conservancy of Southwest Florida
IRRV Application 396348-001
8

Attachment A

Date: 10/24/2022

Legend
Permits within 10 miles of IRRV
State 404 Program Permits
IRRV
0
1.5
3
6
9
12
Miles
543 permits within 10 miles of IRRV
CONSERVANCY
of Southwest Florida
OUR WATER, LAND, WILDLIFE, FUTURE.



DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F9-C5D24385A1FE Case 1:21-cv-00119-RDM Document 98-1 Filed 02/28/23 Page 113 of 123

Conservancy of Southwest Florida
IRRV Application 396348-001
9

Attachment B

Date: 9/9/2022
CONSERVANCY of Southwest Florida
OUR WATER, LAND, WILDLIFE, FUTURE.
0 1 2 4 6 8 Miles
0 1.5 3 6 9 12 Miles
Legend
The Place
Verdana Village
Ave Maria
Town of Big Cypress
IRRV
HoganWest
Collier_Rod_and_Gun
HCP Covered Activities
FFD
Troyer Bros Mine
OCP/Kingston

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F9-C6D24385A1FE Case 1:21-cv-00119-RDM Document 98-1 Filed 02/28/23 Page 114 of 123

# ATTACHMENT F



DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F9-C6D24385A1FE Case 1:21-cv-00119-RDM Document 98-1 Filed 02/28/23 Page 115 of 123

CONSERVANCY
of Southwest Florida
OUR WATER, LAND, WILDLIFE, FUTURE.

*Protecting Southwest Florida's unique natural environment and quality of life ... now and forever.*

June 7, 2022 *sent via email*

Laura Layman, Section Leader
South Florida Water Management District
2301 McGregor Boulevard
Fort Myers, Florida 33901
llayman@sfwmd.gov

Jason Hight, Acting Director
Office of Conservation Planning Services
Florida Fish and Wildlife Conservation Commission
620 S. Meridian St.
Tallahassee, FL 32399
Jason.Hight@myfwc.com

Re: FFD Corkscrew Road Property, #211005-7746

Dear Ms. Layman and Mr. Hight,

On behalf of our more than 6,400 supporting families, the Conservancy of Southwest Florida is providing comment on FFD Conceptual Environmental Resource Permit Application No. 211005-7746. We again request that this project be designated a Project of Heightened Public Concern and that the public be provided an opportunity to give verbal comment about this project at an upcoming Regulatory Meeting before the South Florida Water Management District (SFWMD) decides whether or not to grant this permit.

As the applicant has not addressed our concerns from November 2021, many of our issues remain the same and we refer you to our November letter for additional details.

**Listed Species Survey Too Old To Reliably Meet Issuance Criteria**

The Environmental Resource Permit (ERP) rule and handbooks stipulate that proposed activities cannot adversely impact fish and wildlife wetland habitat functions.[1] This includes impacts to the abundance and diversity of listed species, or the habitat of those species.

---

[1] Environmental Resource Permit, Applicant's Handbook, Vol. I, Section 10.1.1., Section 10.2.2.

CHARITY NAVIGATOR
Four Star Charity

Conservancy of Southwest Florida has been awarded Charity Navigator's prestigious 4-Star top rating for good governance, sound fiscal management and commitment to accountability and transparency. Charity Navigator is America's largest and most respected independent evaluator of charities.

1495 Smith Preserve Way I Naples, Florida 34102 I 239.262.0304 I Fax 239.262.0672 I www.conservancy.org

Further, to meet the additional conditions for issuance of individual permits, the SFWMD must know whether the proposed activities will adversely affect the conservation of fish and wildlife, including endangered and threatened species, or their habitats.[2]

It is not possible to provide these reasonable assurances as the applicant relies on listed species surveys conducted in 2007 and 2008. Data that is more than a decade old - some 15 years old - cannot meet the requirements of the SFWMD, and should not be deemed as adequate. The environmental supplement repeatedly refers to the protected species survey done in 2007 and 2008.[3] While there is publicly available data for some species (such as the Florida panther, Florida black bear, and wood stork), most listed species do not have this resource available and on-site surveys are necessary.

Comment 20 from the Request for Additional Information dated November 4, 2021 requires an updated wildlife survey, conducted within the past year. This request was ignored as all documents in the revised plans refer to the listed species surveys conducted in 2007 and 2008. Please reiterate your request for an updated wildlife survey, conducted within the past year.

**Impacts to Listed Species and Their Habitats**

Further, of the information we do know of this proposed project, it would have adverse impacts on listed species and their habitats, and would be contrary to the public interest, as considered in Applicant's Handbook Section 10.2.3.[4]

*Florida Panthers*
The applicant is proposing to impact 555.3 acres of primary panther habitat while there are 404 acres of secondary habitat outside of the impact footprint.[5] If the applicant were to slightly compress and modify their footprint, the development could avoid most – if not all – primary panther habitat.

Kautz et al. (2006)[6] is considered best available science and recognizes the habitat areas delineated in the study as crucial for Florida panther recovery.[7] The area defined as the Primary Zone is the minimum "space to support a population that is barely viable demographically as long as the habitat base remains stable" and therefore advocates for a "no net loss of landscape function or carrying capacity."[8] The delineated habitat zones are essential to long-term viability, survival, and recovery of the species, yet this project proposes to destroy more than a thousand of acres of panther habitat. We note that panther habitat is not mentioned in the provided survey dated 2008.

---

[2] 62-330.302, Additional Conditions for Issuance of Individual and Conceptual Approval Permits.
[3] FFD Corkscrew Road Property Listed Species Management and Human-Wildlife Coexistence Plan, April 2022.
[4] Environmental Resource Permit, Applicant's Handbook, Vol. I, Section 10.2.3.
[5] We acknowledge that there is an area designated as a wildlife corridor in the center of the impact area, however, as that area is not designed to facilitate movement of large mammals (or any animals, discussed below), we are including this area as part of the impact area.
[6] Kautz, R. et al, How much is enough? Landscape-scale conservation for the Florida panther, BIOLOGICAL CONSERVATION 130 (2006) 129
[7] US Fish and Wildlife Service, 2008. Florida Panther Recovery Plan, 3rd Revision.
[8] Kautz, R. et al, How much is enough? Landscape-scale conservation for the Florida panther, BIOLOGICAL CONSERVATION 130 (2006) 129

DocuSign Envelope ID: A49FDFD1-91B9-4E45-88F8-C5D24385A1FE Case 1:21-cv-00119-RDM Document 98-1 Filed 02/28/23 Page 117 of 123
Conservancy of Southwest Florida
FFD Conceptual Environmental Resource Permit Application No. 211005-7746
Page **3** of **4**

Lands within the FFD project site have also been designated as "Adult Breeding Habitat"[9]. Scientists modeled Adult Breeding Habitat for the species and have stated that protecting this remaining breeding habitat in south Florida is essential to the survival and recovery of the Florida panther.[10] Further loss of adult panther breeding habitat is likely to reduce the prospects for survival of the existing population, and decrease the probability of natural expansion of the population into south-central Florida.[11]

The proposed development area impacts 1,372.6 acres of Adult Breeding Habitat.

The applicant should consider an alternative that would reduce these proposed impacts through a more compact, walkable community that is built only on secondary panther habitat rather than impacting both primary and secondary panther habitat.

The Florida Panther Recovery Plan indicates that while loss and fragmentation of habitat is the leading threat to the survival of the species, panthers also "avoid areas within their home range with intensification of disturbance."[12] Frakes et al, 2015, also shows that panthers begin to avoid areas with increasing density of people and density of roadways.[13] Being directly adjacent to heavily utilized wildlife habitat, this intensification of use has the potential to seriously impact both the function and value of these areas for the Florida panther and wildlife in general.

*Audubon's Crested Caracara*

Caracara were observed on the site in 2007 and 2008.[14] Are caracara still using the property? We don't know. Is there a caracara nest on the property? We don't know. No listed species survey has been conducted in more than a decade.

*Red-Cockaded Woodpecker*

We note that evidence of several red-cockaded woodpecker (RCW) cavity trees were observed on site according to Table 1 of the environmental supplement.[15]

*Wood Storks*

The proposed FFD project is also within the Core Foraging Area (CFA) of 3 active wood stork colonies.

The applicant should address each of the foraging areas separately and cumulatively as to impacts, as the applicant needs to ensure each colony will have adequate foraging habitat. We also believe that impacts for other developments in each CFA must be looked at cumulatively.

---

[9] Frakes RA, Belden RC, Wood BE, James FE (2015) Landscape Analysis of Adult Florida Panther Habitat. PLoS ONE 10(7): e0133044. https://doi.org/10.1371/journal.pone.0133044

[10] *Ibid.*

[11] *Ibid.*

[12] US Fish and Wildlife Service, 2008. Florida Panther Recovery Plan. P. viii. P.33.

[13] Frakes RA, Belden RC, Wood BE, James FE (2015) Landscape Analysis of Adult Florida Panther Habitat. PLoS ONE 10(7): e0133044. https://doi.org/10.1371/journal.pone.0133044

[14] FFD Corkscrew Road Property Environmental Supplement for the South Florida Water Management District Environmental Resource Permit, October 2021, p.4.

[15] FFD Corkscrew Road Property Environmental Supplement for the South Florida Water Management District Environmental Resource Permit, October 2021. P.4.

**Cumulative and Secondary Impacts**

If a large development, such as proposed by FFD, is approved, it could have devastating secondary and cumulative impacts on critically-important landscapes in southeast Lee County and into Collier County. If FFD is approved, it has the potential to change water quality, water quantity, hydrology, increase invasive plants and animals, and contribute to light pollution.

The applicant must address the plethora of alternative sites already approved along Corkscrew Road for Master Planned Communities, and explain why building additional housing along Corkscrew Road is better/more efficient/less impactful than infill and redevelopment in more urbanized areas in Lee County. The applicant has failed to show why this development would not result in adverse direct, secondary, and cumulative environmental impacts.

**Conclusion**

Thank you for considering our comments and we hope that this will help assist in your evaluation of the impacts of the FFD Project on water resources and listed species. Eastern Lee and Collier counties natural resources are extremely threatened by continuing mining and development, and FFD in particular is located within an area heavily utilized by listed and wetland-dependent species, a regional corridor, and is adjacent to critical conserved lands.

Sincerely,

Julianne Thomas
Senior Environmental Planning Specialist
(239) 262-0304 x 252
juliannet@conservancy.org

Amber Crooks
Environmental Policy Manager
(239) 776-5601
amberc@conservancy.org

Cc:
Melissa Roberts, SFWMD mroberts@sfwmd.gov
Jennifer Smith, Chief of Staff, South Florida Water Management District, jsmith@sfwmd.gov

DocuSign

## Certificate Of Completion

Envelope Id: A49FDFD191B94E4588F9CCD24385A1FE
Status: Completed
Subject: Please Complete DocuSign, Case: FL 404 Assumption - 2023 02 24 Conservancy Final Com.pdf
Source Envelope:

| | | |
|---|---|---|
| Document Pages: 118 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Briana Kleiner |
| AutoNav: Enabled | | 50 California Street, Suite 500 |
| EnvelopeId Stamping: Enabled | | San Francisco, CA 94111 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | bkleiner@earthjustice.org |
| | | IP Address: 63.144.247.236 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>2/24/2023 11:09:08 AM | Holder: Briana Kleiner<br>bkleiner@earthjustice.org | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Amber Crooks<br>amberc@conservancy.org<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>50496CAE7D21435...<br>Signature Adoption: Drawn on Device<br>Using IP Address: 209.180.221.66 | Sent: 2/24/2023 11:14:16 AM<br>Viewed: 2/24/2023 11:17:17 AM<br>Signed: 2/24/2023 11:41:35 AM |

**Electronic Record and Signature Disclosure:**
Accepted: 2/24/2023 11:17:17 AM
ID: eb553d3b-3c08-4b43-941a-be30303dde8f

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Bonnie Malloy<br>bmalloy@earthjustice.org<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | COPIED | Sent: 2/24/2023 11:14:16 AM<br>Viewed: 2/26/2023 8:03:01 AM |
| Briana Kleiner<br>bkleiner@earthjustice.org<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | COPIED | Sent: 2/24/2023 11:14:16 AM<br>Resent: 2/24/2023 11:41:43 AM |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
| --- | --- | --- |
| Envelope Sent | Hashed/Encrypted | 2/24/2023 11:14:16 AM |
| Certified Delivered | Security Checked | 2/24/2023 11:17:17 AM |
| Signing Complete | Security Checked | 2/24/2023 11:41:35 AM |
| Completed | Security Checked | 2/24/2023 11:41:35 AM |

| Payment Events | Status | Timestamps |
| --- | --- | --- |

**Electronic Record and Signature Disclosure**

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Earth Justice (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Earth Justice:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: ndiamond@earthjustice.org

**To advise Earth Justice of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at ndiamond@earthjustice.org and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.
**To request paper copies from Earth Justice**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to ndiamond@earthjustice.org and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.
**To withdraw your consent with Earth Justice**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
ii. send us an e-mail to ndiamond@earthjustice.org and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| | |
|---|---|
| Operating Systems: | Windows2000? or WindowsXP? |
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**
To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.
By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Earth Justice as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Earth Justice during the course of my relationship with you.