IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | **CASE NO.** 1:21-cv-00119 (RDM) |

### DECLARATION OF ANDREW CARTER

I, Andrew Carter, make the following declaration:

1. I am competent to make this declaration. I provide this declaration based upon my personal knowledge. I would testify to the facts in this declaration under oath if called upon to do so.

2. I have a Ph.D. in Environmental Science and Policy from the Abess Center for Ecosystem Science and Policy at the University of Miami, a J.D. from the University of Miami School of Law, an M.A. in Marine Conservation and Policy from Stony Brook University, and a B.A. in Anthropology and Geography from Hunter College.

3. I am Director, Conservation Policy at the Center for Conservation Innovation at Defenders of Wildlife ("Defenders") and work in Defenders' national headquarters in Washington, D.C.

4. At Defenders' Center for Conservation Innovation I research and analyze conservation governance strategies and emerging policy issues to preserve biodiversity and promote habitat and species protection, and lead analysts carrying out that work. The scope of

1

my work is nationwide, rather than being trained on one particular region. I have been at Defenders since 2019.

5. Founded in 1947, Defenders is a 501(c)(3) nonprofit membership organization with six regional offices throughout the country.

6. Defenders' mission is to protect species and the habitats upon which they depend. In doing so, we focus on preserving the health of our nation's rich biological heritage (biodiversity).

7. Defenders works to achieve its mission by various means such as policy development, litigation, research, education, and engagement with federal, state, and local governments.

8. Habitat and biodiversity loss are disrupting ecosystems and breaking down the natural barriers that help reduce disease transfer and provide critical ecosystem services such as pollination, water filtration and carbon sequestration. With these services at risk, protecting our wildlife and their habitats is now more important than ever.

9. More than one-third of our country's threatened and endangered species live exclusively in wetlands, and almost half of these imperiled species use wetlands at some point during their lives. Unfortunately, the United States has lost over half of the wetlands in the lower 48 states.

10. Preventing or minimizing water pollution is critically important to protecting marine and aquatic species, as well as species like many birds that rely on healthy wetlands for food and shelter.

11. To that end, Defenders engages in advocacy, including litigation, to protect imperiled marine/aquatic and other species, and their habitats, including wetlands.

12. On a national scale, every species Defenders works to protect is an important species in the web of life. Wildlife has the greatest chance of being secure and thriving if it is supported by a transnational network of conserved public and private lands, rivers and coastal waters, core natural areas, and working landscapes.

13. We approach our work at Defenders with the understanding that local actions have national consequences. For instance, in 2020 I coauthored a paper with two coworkers addressing the need for a monitoring policy framework for the United States Endangered Species Act ("ESA"). Megan Evansen et al., *A Monitoring Policy Framework for the United States Endangered Species Act* (2020). The U.S. Fish and Wildlife Service ("USFWS") is in dire need of a comprehensive national monitoring policy in large part because many listed species have ranges spanning multiple states. Individual state decisions affecting these species in their respective states will affect the likelihood of a species' future existence as a whole. A standardized national monitoring policy is necessary to prevent siloed policymaking and enhance the species' likelihood of survival overall.

14. Defenders has joined other conservationists to achieve our goal "30 by 30," which aims protect at least 30% of the planet by 2030. Integral to that goal is ensuring species and habitat conservation in Florida. In 2021, President Biden signed an executive order setting that goal for the federal government.

15. To address the larger issue of biodiversity loss, we at Defenders also engage with communities across the country to protect public lands, restore habitat, limit negative interactions between humans and wildlife, and advocate for protections for imperiled species. Engaging in Florida-based issues is a part of our national strategy because it is a critical piece in the nationwide puzzle of biodiversity preservation.

16. Florida has a large number of species designated as threatened or endangered under the ESA. According to Service data, approximately 132 threatened or endangered species are found in Florida, with about 70% of those species found only in Florida, such as the endangered Florida panther, Florida bonneted bat, and Florida key deer.





Florida Panther. Photo courtesy of NPS / Rodney Cammauf
Florida Bonneted bat. Photo courtesy of Gary Morse
Florida Key Deer. Photo courtesy of NWF

17. Florida habitat is also home to populations of imperiled species whose ranges span beyond Florida. For instance, many threatened red knots use Florida as their midpoint to land and refuel during their migration to their Arctic breeding grounds from as far south as Argentina.



Red knot. Photo courtesy of FWS/Anne Marie Morrison

18. Some threatened West Indian manatees are known to migrate north to Georgia, South Carolina, and North Carolina or west into Alabama and Louisiana.



West Indian Manatee. Photo courtesy of NOAA

4

19. Several species of ESA-listed sea turtles, too, can be found in Florida in addition to coastal areas of other states. For example, the threatened Northwest Atlantic Ocean Distinct Population Segment of the loggerhead sea turtle nests primarily along the Atlantic coast of Florida, South Carolina, Georgia, and North Carolina, and along the Florida and Alabama coasts in the Gulf of Mexico. Endangered hawksbill sea turtles occur in states along the Gulf of Mexico, especially in Texas, and in the United States, their nesting is limited to the southeast coast of Florida and the Florida Keys.




Loggerhead sea turtle. Photo courtesy of Wexor Tmg

Hawksbill sea turtle. Photo courtesy of Kris Mikael Krister

20. Given Florida's importance to achieving Defenders' national mission, projects of mine that are national in scale can require me to work on issues that occur in Florida, such as by reviewing ESA section 7 consultation documents and ESA section 10 habitat conservation plans.

21. EPA's approval of Florida's application to assume control of section 404 permitting undermines Defenders' mission. Among other failings, EPA approved the program with Florida not committing any new financial resources to administer it; it has no lawful plans to ensure that listed species are adequately protected, and analyses of section 404 permit applications issued by Florida will no longer include review under the National Environmental Policy Act ("NEPA") or consultation under section 7 of the ESA, as they would if 404 authority remained with the U.S. Army Corps of Engineers instead.

22. Many listed species are likely to be adversely affected by projects permitted through Florida's section 404 program. For example, these projects can cause habitat destruction and fragmentation for endangered Florida bonneted bats, red-cockaded woodpeckers, Florida panthers, and Florida salt marsh voles, as well as threatened American crocodiles and Eastern indigo snakes. Florida's program does not adequately protect against these harms, in part because it does not require consultation under Section 7 or a habitat conservation plan under Section 10 of the ESA.



Red-cockaded woodpecker. Photo courtesy of Martjan Lammertink. Florida salt marsh vole. Photo courtesy of USFWS/Michael Mitchell. American Crocodile. Photo courtesy of NPS. Eastern Indigo snake. Photo courtesy of Todd Pierson.

23. Because section 404 permit applications processed by Florida will not undergo a NEPA analysis or site-specific ESA section 7 consultation, nor will they be subject to Section 10 habitat conservation plans, these projects will likely be subject to a far less rigorous environmental review, which increases risk of harm to listed species and their habitat.

24. The state's administration of this unlawful section 404 program will also prevent Defenders from being able to monitor and engage in proposed permits to the same degree that the federal program afforded us. Without a NEPA analysis or biological opinions by federal wildlife agencies, we will not have access to the same level of information regarding a project's environmental impacts as we would for projects reviewed by the Corps.

25. The state's unlawful assumption will interfere with our ability to litigate over illegal section 404 permitting actions, when necessary. It is my understanding that there is a higher bar to establish organizational standing in Florida state court because we would be required to show that a *substantial* number of our members will be affected by the challenged action, while in federal court we are only required to show that a single member is adversely affected. As an organization with nationwide membership, it would be impracticable to make such a showing in most cases. It is also my understanding that Defenders would risk exposure to mandatory fee-shifting for certain types of permit litigation, which creates the risk of liability for the opposing parties' costs and fees to engage in litigation. We are not exposed to this same risk in federal court, where the Corps is the section 404 permitting agency. The risk of incurring these substantial costs and fees could result in our inability to bring certain types of litigation in Florida that would cause serious harm to threatened and endangered species, even if our claims are strong.

26. Defenders was harmed by Florida's incomplete application, which failed to include a biological opinion assessing the risk to species from the program, and incidental take statement authorizing incidental harm of listed species resulting from the state program and state-issued permits. These documents were not provided during the public comment period and were completed only after the public comment period closed. Florida's application referred to a

"technical assistance" process that it said would be described in "an anticipated biological opinion"; however, the biological opinion containing that information was not part of the application, frustrating Defenders' ability to analyze and comment on the process. Florida relied on this missing information when asserting that it complied with the Clean Water Act's Section 404(b)(1) Guidelines to protect listed species and make a finding of no jeopardy. Without being able to review these documents, it was impossible for me to determine whether the state program met that criteria. This also deprived Defenders of the opportunity to comment on, and object to, the adequacy of the "technical assistance" process articulated in the biological opinion.

27. EPA's ultimate approval of Florida's 404 program, which does not require rigorous section 7 consultation with wildlife agencies for permits that may adversely affect protected species, and instead provides a broad exemption from incidental take liability for harm to species, imperils protected species. USFWS' "technical assistance" process, which puts the state in the driver's seat and does not require USFWS to follow the requirements of Section 7, is not as protective as the ESA.

28. Had EPA not deemed Florida's application complete before the "technical assistance" process was articulated in the biological opinion dated November 17, 2020, the clock to render a decision on Florida's application would have continued until at least March 17, 2021, well into the Biden administration, which very well make have taken a different view on the application as a matter of law and/or policy.

29. The loss of procedural rights Defenders has sustained as a result of EPA's and USFWS' actions has resulted in immediate and ongoing harm while the state's unlawful program operates. The state's inadequate 404 program causes Defenders to divert resources, threatens wetlands and wildlife, and undermines Defenders' ability to realize its mission by depriving the

8

organization of information, rights and remedies available when Section 404 is administered by the Corps as it has been for decades.

30. Additionally, as a result of EPA's transfer of 404 authority to the state, Defenders has been harmed because its work on the proposed Eastern Collier County Habitat Conservation Plan ("Eastern Collier HCP") has not gone forward due to permit applicants withdrawing the proposed HCP. The ESA Section 10 HCP process can require rigorous planning that must account for minimizing and mitigating impacts to protected species, among other requirements, and depending on the complexity of the plan, can include requirements such as long-term monitoring to ensure the plan's effectiveness.

31. The proposed Eastern Collier HCP was to cover approximately 152,000 acres of rural, agricultural, and wild lands in the southwest part of Florida that connect the Florida Panther National Wildlife Refuge and the Big Cypress National Preserve with other protected areas in the region. Defenders was deeply involved in working on the Eastern Collier HCP, which represents a significant focus of its Florida conservation work, with the goal of protecting species in one of the most biodiverse regions of the country. The species at issue for this HCP included 11 federally listed or candidate species, such as the Florida panther, Florida scrub jay, and Florida bonneted bat.

32. Defenders believes that Florida's unlawful 404 permitting program, which offers incidental take coverage through a "technical assistance" process, created less of an incentive for private developers to engage in the HCP process. Indeed, it came to Defenders staff members' attention that landowners who were parties to the Eastern Collier HCP had been considering withdrawing from the HCP in the wake of a state 404 assumption program with much lower bars

to meet to obtain incidental take authorization and which does not meaningfully account for landscape-scale conservation. In August 2022, the landowners did withdraw from the HCP.

33. This represents the loss of an entire body of Defenders' work in Florida to protect endangered and threatened species in this region. It means that Defenders has to redouble our efforts advocating for the gains that have been lost since the landowners involved in the HCP walked away. State 404 permits will not offer the same protection to listed species as the HCP would have.

34. The lack of NEPA and ESA site-specific consultation with Florida's 404 program and the hurdles and roadblocks to litigating in state court, as described above, would be detrimental to our ability to carry out our organizational mission of protecting wildlife.

35. Due to my work regarding environmental governance at the national level, I am particularly concerned about state-specific actions that could have broader impacts across the country. Allowing an unlawful 404 assumption program could spur other states to apply for and receive authority under section 404 of the Clean Water Act to administer programs that do not comply with federal law. For example, to my knowledge Alaska has begun the process of pursuing 404 assumption. Alaska has more wetland area than the rest of the United States combined, placing a significant portion of the country's biodiversity at risk.

36. Many states, like Florida, do not appear to devote sufficient resources to assume permitting authority over dredge-and-fill operations, and should they receive that authority, wetlands degradation and its corresponding impact on threatened and endangered species could accelerate across the country.

37. It is my understanding that several other states have taken steps to submit their own section 404 assumption applications. Defenders will monitor these developments as they

occur and engage in advocacy efforts, as necessary, to oppose unlawful state programs that pose a threat to our mission.

38.  If Florida is allowed to continue unlawfully operating the dredge-and-fill permitting program, Defenders and its members would be irreparably harmed in their ability to protect wetlands, imperiled species, and their habitat.

39.  A ruling in Plaintiffs' favor invalidating EPA's approval of Florida's program would redress Defenders' harms by restoring 404 authority over assumable waters to the Corps, restoring Section 7 and NEPA review to projects, and ensuring that all requirements of federal law are met and can be enforced in federal court. A ruling in Plaintiffs' favor on our ESA claims would redress Defenders' harms by requiring EPA to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the effects of Florida's application on listed species and critical habitat; require the wildlife agencies to produce legally sufficient biological opinions that properly analyze the impact to listed species and critical habitat, set limits on incidental take, and impose reasonable and prudent measures and triggers for reinitiation that are protective under the ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25 day of February 2023, in Washington, D.C.

DocuSigned by:

Andrew Carter
Director, Conservation Policy
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036