IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>　　Plaintiffs,<br><br>　　v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>　　Defendants. | CASE NO. 1:21-cv-00119 (RDM) |

## DECLARATION OF BRETT HARTL

I, Brett Hartl, make the following declaration:

1. I am a resident of Prescott, AZ.

2. I am competent to make this declaration. I provide this declaration based upon my personal knowledge. I would testify to the facts in this declaration under oath if called upon to do so.

3. I am the Government Affairs Director at the Center for Biological Diversity ("Center"), and I work out of both the Center's Washington, D.C., and Arizona offices. I have been with the Center since 2013.

4. I am also a member of the Center and have been a member of the Center since 2013. As a member, I rely on the Center to represent my interests in conserving native species and their habitats.

5. I hold a bachelor's degree from Prescott College in conservation biology, and a law degree from Lewis and Clark Law School. Prior to law school, I spent five years as a field

1

biologist working with endangered species in the northwest Hawaiian Islands, Kauai, and Southern California. I also worked in the House of Representatives Natural Resources Committee for Democratic staff, and I was a senior policy fellow at the Society for Conservation Biology.

6. The Center is a member organization incorporated under the laws of the State of California. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code. The Center has 84,324 active members across the country, including more than 4,092 members in Florida. The Center is based in Tucson, AZ, and works throughout the entire United States. Our other major offices are in Washington, D.C.; San Francisco, CA; and Portland, OR.

7. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and water, and public health through science, policy, and environmental law. Based on an understanding that the health and welfare of human societies are closely linked to the condition of the natural environment, the Center works to protect natural resources like air, water, and land and to secure a future for animals and plants hovering on the brink of extinction. We work to protect the ecosystems they need to survive, for the species and for the people that interact with, depend on, and cherish these natural resources.

8. In my professional capacity as the Government Affairs Director at the Center, I monitor national policy issues that impact endangered species, wildlife, clean water, and environmental protection broadly. This includes agency rulemaking and their policy consequences throughout the country. I coordinate the Center's response and engagement, meet with agency officials, and work with outside stakeholders. I oversee or am involved with

Freedom of Information Act ("FOIA") requests, formal commenting, advocacy, lobbying, and litigation.

9. Protection of endangered and threatened species is a core organizational focus of the Center. Whether large or small, we believe all species have an intrinsic right to live. The United States and the world at large are currently in the midst of a biodiversity crisis: the diversity of life that sustains ecological systems and human cultures around the world are collapsing. As a result, the Center works tirelessly to protect endangered and threatened species through advocacy, litigation, education campaigns, conservation of critical habitats for species, and holding federal agencies accountable to their duties to protect species as directed by Congress.

10. Many of the species we work to protect throughout the country rely on healthy, intact wetlands to survive—whether directly or indirectly. Wetlands are therefore vital to our endangered species work. To that end, the Center has longstanding programs to protect freshwater and protected species in the Southeast, which is a hotspot of extinction nationally.

11. One such program is the Southeast Freshwater Extinction Campaign, which seeks to protect the unique and vast aquatic biodiversity of the Southeastern United States. The Southeastern United States has some of the richest aquatic fauna of any temperate area in the world, including globally significant diversity of freshwater mussels, freshwater fish and other species. The Southeast contains two-thirds of North America's species and subspecies of crayfishes and contains more amphibians and aquatic reptiles than any other region. It is also home to the largest number of listed species and extinct species in the lower 48 states. For example, nearly 70% of all freshwater mussel species in North America are either protected under the Act or already extinct, and most of the remaining species are declining and will need

protection under the Endangered Species Act in the future. Loss of these aquatic species in this region represents not only a loss to the nation as a whole but to the entire global biodiversity of freshwater systems.

12. Within the Southeastern United States, Florida has irreplaceable ecosystems not found anywhere else in the country, made up of semi-tropical environments, marine estuary systems, and springs. These include iconic ecosystems such as the Everglades and the Pine Rockland ecosystems. Florida is also home to unique protected species, including but not limited to the Florida panther, West Indian manatee, frosted flatwoods salamander, wood stork, eastern indigo snake, various species of turtles, smalltooth sawfish, and freshwater mussels. Florida is also home to some of the largest populations of protected sea turtles nationally. Any loss of biodiversity in Florida represents a loss to the nation at large. The uniqueness of these species and ecosystems means these losses cannot be replaced.

13. Florida's wetlands provide key migratory stopover habitats for numerous species of birds that migrate between the United States and Central America, the Caribbean, and South America. Examples of listed species that are migratory and rely on Florida's wetlands include the Red Knot, which migrate from South America to Canada and back each year and the Black Rail, which winters in Florida and migrates to the east coast to breed. Other listed species of birds like the Everglades Snail Kite and Audubon's Caracara rely on Florida's wetland ecosystems year-round.

14. The federal section 404 wetlands permitting program provides a vital check on actions that would otherwise destroy wetlands, and it ensures vital information is gathered to understand how an action impacts wetlands and the species who rely on them. It provides

federally mandated minimum levels of protections that have been instrumental in conservation of protected species.

15. Assumption by the states that is not in strict compliance with federal law is extremely problematic, because it will not provide the same level of transparency and substantive protections that the federal program provides.

16. Unlawful state assumption of 404 programs would harm the Center's ability to protect wildlife, in Florida and around the country.

17. Just as the Center is engaged in litigation in this case to challenge EPA's approval of Florida's program and related federal agency actions, the Center has also been monitoring other states that have expressed an interest in assuming the CWA 404 program. For example, one state we are monitoring closely is Arizona, which since 2018 has been considering changes to its wetlands regulation program that may ultimately include the State applying to assume the 404 program. Wetland and riparian areas in desert environments are particularly critical to wildlife. Nearly 80 percent of all wildlife species, including numerous listed species like the Yellow-billed Cuckoo, SW Willow Flycatcher and narrow-headed gartersnake, are found close to riparian and wetland ecosystems.

18. Since 2020, Alaska has also apparently indicated to the EPA that it might be interested in assumption of the state's 404 program. The Center has submitted several Freedom of Information Act requests to learn more about the status of these efforts. If states such as Alaska or Arizona or others were to assume 404 permitting without sufficient safeguards, many of endangered species could be harmed across the country.

19. It is my understanding that former U.S. Environmental Protection Agency Administrator Andrew Wheeler, at the press conference announcing EPA's approval of Florida's

404 program, encouraged other states to follow Florida's example as a model. If EPA's approval of Florida's 404 program is upheld, it would set a dangerous precedent of state 404 programs that are inadequate to protect listed species and wetlands.

20. The Center is particularly concerned with how EPA's approval of Florida's 404 program will likely result in increased negative impacts to wildlife and water quality, as follows:

21. I understand that DEP has stated that its intention is to approve permits faster.

22. I also understand that DEP has and continues to apply the 2020 Navigable Water Protection Rule, which has been invalidated and vacated by two federal courts. DEP's application of this unlawful rule significantly reduces and the number of waterways, and wetlands in particular, that are protected under the Clean Water Act.

23. I believe that with the Florida dredge-and-fill permitting program, the wetlands that are impacted by development projects do not receive the same level of environmental review that they would otherwise under the dredge-and-fill permitting program administered by the U.S. Army Corps of Engineers and consulting federal agencies like the USFWS and National Marine Fisheries Service. While Florida is permitted to continue administering the 404 program, the Center is prevented from fully assessing and publicly engaging on specific project applications and is forced to expend significant resources in the process to discover or develop information that would otherwise be afforded by NEPA and the ESA.

24. In fact, the Center has already had significant difficulty fully assessing and publicly engaging on projects going through the state-administered 404 program. For example, I understand that Center staff are tracking the application and impacts of the Bellmar development (permit application no. 396364-001) because of its potential to adversely affect the Florida panther, Florida bonneted bat, and eastern indigo snake, among other species.

25. I understand the system for submitting public comments is also more burdensome and inconvenient than the federal public commenting process. I understand that DEP accepts electronically submitted comments through its business portal, which requires registration and is difficult to navigate. Records relating to applications are posted on another DEP portal, which is also very difficult and time-consuming to navigate. Furthermore, I understand that DEP is failing to make records relating to 404 permits that it has in its possession available to the public in a timely manner. I also understand that the documents generated by DEP's 404 process are far less informative and useful than the documentation produced during the federal 404 process. All of these impediments make it more difficult and time-consuming for the Center to advocate for species and their habitat, and they likely deter participation from the general public, who do not have the time and resources to figure out the portals.

26. Additionally, EPA's approval of Florida's assumption program harms the Center's ability to litigate on behalf of wetland habitats and the species that rely on them. Because legal challenges to state permits have to be filed in state administrative court, rather than proceed as administrative record cases litigated in federal court, it is my understanding that the Center would be required to spend significant monetary resources to hire expert witnesses to successfully bring legal challenges—monetary resources that would otherwise be put toward other important organizational initiatives and goals. The significant expense involved in bringing expert-driven challenges in state court means that the Center may have to forego challenging permits it would and could otherwise have challenged in federal court.

27. It is also my understanding that it is significantly more difficult to establish standing in state court when compared to federal court. For example, in Florida state court, an organization like the Center is required to show that a *substantial number* of its members will be

affected by the challenged action, while in federal court organizations can establish standing based on harms suffered by an individual member. With a national membership, it would be exceedingly difficult, if not impossible, for the Center to establish standing to challenge individual permits under such a state standard.

28.    It is also my understanding that, in state court, the Center would be exposed to liability for legal fees and costs under mandatory fee-shifting state law provisions for certain types of permit challenges that it would not be exposed to in federal court. This can hamper the Center's ability to participate in vigorous advocacy for species and habitat because the Center would be required to weigh that significant financial risk—even if the Center had strong legal claims.

29.    With Florida's assumption of the 404 program, the lack of project-by-project consultation with USFWS under Section 7 or Section 10 of the ESA, and the blanket exemption from incidental take liability extended to the state and state permittees, imperils protected species that the Center's mission is to protect.

30.    Moreover, without the information that is made available under the ESA consultation process and NEPA review process—including a robust alternatives analysis—the Center is denied important information about environmental and species impacts, forcing the Center to hire scientific experts to carry out the analysis. This will cost the Center significant financial resources that could have been put toward other organizational priorities and can reduce the number of potentially harmful and concerning projects on which the Center could engage. As a result, the Center and its members do not have access to important information about the effects of wetland destruction on species, nor do we have a clear process to advocate on behalf of endangered and threatened species at the administrative level. This, in turn, harms the Center's

interest in meaningfully evaluating how wetland destruction harms endangered and threatened species, and advocating on their behalf. It also requires the Center to hire its own scientific experts to analyze the species effects, which requires the Center to use financial resources it could have put toward other organizational missions.

31. The loss of procedural rights the Center has sustained as a result of EPA's transfer of authority to the state, has resulted in immediate and ongoing organizational and membership harms while the state's unlawful program operates. The state's 404 program causes the Center to divert resources, threatens wetlands and wildlife, and undermines the Center's ability to realize its mission by depriving the organization of information, rights and remedies available when Section 404 is administered by the Corps as it has been for decades.

32. The state is poised to issue 404 permits on major projects that will harm the Center's organizational interests the interests of its members.

33. Of particular concern to the Center are several proposed developments in southwest Florida that would adversely affect many endangered and threatened species.

34. For example, DEP is considering a permit application for the Bellmar development (permit application no. 396364-001), which is likely to adversely affect the Florida panther, Florida bonneted bat, and eastern indigo snake, among other species. The Center is particularly concerned about adverse effects on the Florida panther because the proposed development is located within the core breeding range for the only remaining population of Florida panthers. The proposed development is also about a mile away from Florida Panther National Wildlife Refuge and would stand between the panther and its ability to expand north through its historic range—a necessary prerequisite for the species' recovery. Bellmar would

also induce the construction of more roads and more vehicle trips, which will, in turn, increase the number of panther deaths from vehicle strikes, the leading cause of death for the species.

35.     The Center is concerned about the direct, indirect, and cumulative effects of Bellmar, particularly on the endangered Florida panther.  I understand that the Center has received public records from U.S. Fish and Wildlife Service relating to a now-withdrawn Endangered Species Act Section 10 permitting application for massive planned development in eastern Collier County that indicate Bellmar and other reasonably foreseeable developments in the county are likely to jeopardize the survival and recovery of the panther through habitat destruction, infringement of wildlife corridors, indirect impacts on adjacent preserves, and increased vehicle-caused panther mortality driven by increased traffic and transportation needs.

36.     The state-assumed 404 permitting process and USFWS's technical assistance fall short of the Endangered Species Act's requirements for analyses, study, and evaluation to ensure against jeopardy for the panther.  For example, as described above, DEP provided public notice for an incomplete file that omitted key traffic information.  This falls far short of the Endangered Species Act's mandate that jeopardy determinations be based on the best scientific and commercial data available.  Furthermore, if USFWS misses a time-limited opportunity to comment, it appears that there is no mechanism for USFWS to stop the issuance of a permit— even if it determines that issuing the permit may jeopardize an endangered or threatened species or adversely modify critical habitat.  Not only would this violate the Service's ESA-mandated duty to ensure against jeopardy but it would have real and dire consequences for species like the Florida panther, particularly in view of USFWS analyses that indicate the cumulative impact of Bellmar and reasonably foreseeable projects nearby, which will likely also be permitted under the state 404-permit process, are likely to jeopardize the panther.  Under Section 7 consultation,

by contrast, no permit could issue unless and until USFWS makes a "no jeopardy" determination.

37. If DEP were to approve Bellmar and other projects in southwest Florida, it would harm the Center's interest in preventing the decline and extinction of endangered and threatened species in Florida. In particular, it would harm the Center's interest in securing the survival and recovery of the Florida panther and the Florida bonneted bat, species whose protection we have advocated for years. The approval of Bellmar and nearby developments would harm those interests, setting the species' recovery back and putting them at greater risk of extinction.

38. It's also my understanding that DEP has failed to provide the public with the information it needs to meaningfully weigh in on the permit application for Bellmar. For example, at the time DEP issued its public notice on Bellmar's state 404-permit application, USFWS indicated that it needed more information that was missing from the applicant's biological assessment; namely, an estimate of panther mortality due to traffic volume increases upon completion of the development. Without this key information, the public and the Center were unable to fully and meaningfully participate during the open comment period. While in this instance, DEP has stated they will hold another public hearing after submittal of traffic analyses by the applicant, it is still not clear if the public will have USFWS' comments or proposed permit conditions for consideration.

39. Additionally, the Center is concerned about the proposed Burnett Oil drilling projects, whose 404 applications are expected to be re-submitted to the state, that would pave the way for oil drilling in Big Cypress National Preserve for the next 30 years. Dkt. 031-4 (Declaration of Ann Wiley in Support of Plaintiffs' Partial Motion for Summary Judgment, dated March 3, 2021). Not only will the Center experience the aforementioned harms to its mission of

protecting species and the natural environment as these permits are being processed and if approved, the Center's members will be harmed by these projects to develop in our nation's first national preserve. The freshwaters of Big Cypress are vital to the health of the neighboring Everglades and to the wildlife that inhabit it—waters and wildlife that the Center strives to protect and that our members enjoy.

40. If Florida is allowed to continue administering an unlawful dredge-and-fill permitting program, the Center and its members will be harmed in their ability to protect wetlands, imperiled species, and their habitat.

41. The Center's harms would be redressed by a ruling that invalidates EPA's approval of Florida's program. This ruling would restore 404 authority over assumable waters to the Corps, restore Section 7 and NEPA review for projects, and ensure that all requirements of federal law are met and can be enforced in federal court. In addition, a ruling in Plaintiffs' favor on the agencies' ESA violations would redress the Center's harms by requiring EPA to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the effects of Florida's application on listed species and critical habitat; require a legally sufficient biological opinion that properly analyzes the impact to listed species and critical habitat, sets limits on incidental take, and imposes reasonably prudent measures and triggers for reinitiation that are protective under the ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23 day of February 2023, in Prescott, AZ.

DocuSigned by:

Brett Hartl
17B8BD37BB374A7...

Brett Hartl
Government Affairs Director

DocuSign Envelope ID: 9102E847-213F-417C-AC5A-71A9DF8DF600

Center for Biological Diversity
1411 K Street, NW, Ste. 1300
Washington, D.C. 20005