**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

## DECLARATION OF RACHEL SILVERSTEIN IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Rachel Silverstein, Ph.D., make the following declaration:

1.     I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

2.     I am a resident of Coral Gables, Florida.

3.     I am the Executive Director and Waterkeeper of Miami Waterkeeper, one of the Plaintiffs in this case.  I am also a member of Miami Waterkeeper.  I have been a member of Miami Waterkeeper since 2014.

4.     As Executive Director and Waterkeeper, I lead and oversee all of Miami Waterkeeper's programs and initiatives, utilizing my expertise in marine biology and deep working knowledge of South Florida's waterways, wetlands, and ecosystems.  I hold a Ph.D. in Marine Biology and Fisheries from the University of Miami and a B.S. degree in Ecology, Evolution, and Environmental Biology from Columbia University.

1

DocuSign Envelope ID: 9A44C8F8-1C99-4906-8265-E2880DFB3BAD

5. Miami Waterkeeper is a 501(c)(3) nonprofit whose mission in South Florida is to ensure swimmable, drinkable, fishable water for all; protect marine ecosystems and habitats; and to ensure resiliency and preparedness for sea-level rise. We accomplish these goals through legal advocacy, community outreach, and education and scientific research. Collectively, our organization's work focuses primarily on water quality and aquatic habitat protection, such as marine and wetland ecosystems. Founded in 2010, Miami Waterkeeper has paying members as well social media followers.

6. Miami Waterkeeper's clean water initiatives are specifically grounded on the bedrock protections of the federal Clean Water Act ("CWA").[1] We work to keep South Florida's waters clean by (1) training the public to document and report pollution through our 1000 Eyes on the Water program; (2) litigating against polluters who violate environmental laws; (3) referring matters to the authorities for investigation and prosecution; (4) reporting stormwater runoff violations to regulatory agencies for possible enforcement action; (5) preventing algae blooms by working to reduce fertilizer use, stormwater runoff, septic tanks, and sewage spills; (6) protecting against contamination from Miami's aging nuclear power plant; (7) fighting against proposed rules that would allow more toxic and cancer-causing chemicals in Florida's water; (8) training the next generation of environmental leaders and clean water advocates through our Junior Ambassador program; (9) testing popular recreation beaches and waterways for bacteria on a weekly basis; (10) reporting the latest water quality data to the public on theswimguide.org; and (11) working to stop unnecessary application of herbicides like glyphosate into our waterways.

---

[1] Miami Waterkeeper, About Us, Our Focus Areas, Clean Water: https://www.miamiwaterkeeper.org/clean_water ("Swimmable, drinkable, and fishable water is a right granted to all of us under the Clean Water Act").

DocuSign Envelope ID: 9A44C8F8-1C99-4906-826E-E2980DFB3BAD

7.    Miami Waterkeeper's ecosystem and habitat protection initiatives focus on protecting freshwater wetlands, coral reefs, saltwater and mangrove wetlands, and seagrasses. The coral reefs that we work to protect are protected under the Magnuson-Stevens Fisheries Management Act; and specific corals and their critical habitats in our local reefs are protected under the Endangered Species Act.  Along with the aforementioned initiatives, additional ways we accomplish this mission include (1) protecting coral reefs from dredging and supporting coral restoration and research; (2) litigating to stop illegal destruction of our natural areas; (3) litigating to enforce the Endangered Species Act ("ESA") and the National Environmental Protection Act ("NEPA"); (4) advocating to improve water quality in Biscayne Bay and surrounding waters; (5) producing economic studies that value ecosystem services; (6) supporting efforts to get more fresh water to Biscayne Bay, like the Biscayne Bay Coastal Wetlands project; and (7) conducting key scientific research to inform policy decisions.

8.    Miami Waterkeeper reviews proposed agency actions, and when we determine it is necessary to engage to protect South Florida's waters and marine habitats, the main tools we employ include (1) thorough review of said agency action under NEPA and the ESA; (2) engaging in the comment process; (3) organizing public participation in the comment process[2]; (4) litigation; and (5) public education, i.e. a blog, social media, and/or newsletter posts to our members and followers relying on environmental assessments, environmental impact statements, and biological opinions.

---

[2] As an example, see our Port Everglades Action Alert page: https://www.miamiwaterkeeper.org/port_everglades_action_alert, which documents how we organized over 10,000 comments and circulated a petition that was sent to the U.S. Army Corps of Engineers for stronger protections of coral reefs in response to the Corps' dredging project at Port Everglades in Fort Lauderdale, FL.

9.      Our legal challenge to the Port Everglades dredging project, beginning in 2016 and ongoing, is an example of how Miami Waterkeeper harnesses the protections of NEPA and ESA to protect ESA-listed coral.  To protect the reefs near Port Everglades from the devastation to coral that occurred in a similar dredging project in Miami (in which we also took legal action), we filed a NEPA and ESA lawsuit against the Army Corps and the National Oceanic Atmospheric Administration ("NOAA").  We argued that by ignoring the unexpected harm that occurred to the reef at Port Miami, the Corps failed to use "best available science" in their Port Everglades environmental analyses.  In response, the Corps agreed to conduct new environmental studies before starting its planned dredging project to expand Port Everglades.

10.     As discussed in this declaration and for the reasons stated in Plaintiffs' complaint, Miami Waterkeeper is opposed to Florida's assumption of the 404 permitting program because state 404 permits are not subject to NEPA review and analysis, ESA consultation, nor federal CWA processes and guidelines, on which we rely when reviewing, commenting, and challenging permits; and it will make it more challenging, if not impossible, to bring permit challenges in court.  The proposed state 404 projects that would be within Miami Waterkeeper's purview to challenge, as discussed at paragraphs 27–44 below, demonstrate the harms that are and will occur as Florida continues to operate the program, harms that impact Miami Waterkeeper's organizational mission and my and our members' recreational and aesthetic interests.

**Miami Waterkeeper and Its Members are Harmed by Florida's Assumption of the 404 Permitting Program**

11.     Miami Waterkeeper and its members are harmed, and will continue to be harmed, by Florida's assumption of the state 404 permitting program.

12.     Miami Waterkeeper almost exclusively litigates in federal court.  We typically do not litigate state court claims because of the significantly high costs and drain on our resources to

4

do so.  Permit challenges in state court are not administrative review cases, as they are in federal court.  Therefore, we do not have the benefit of environmental analyses and administrative records around which we can build our cases that federal NEPA and ESA litigation affords.  Rather, in state court, we would have to build our cases from the ground up, conducting our own investigations and hiring our own expert witnesses.  A case like this before Florida's Division of Administrative Hearings can easily run upwards of several hundreds of thousands of dollars, factoring in expert witnesses, attorneys' fees, and time.

13.    A state permit challenge would significantly cut into our operating budget, requiring us to divert resources that would otherwise be dedicated to our programmatic work.  We would have to (1) raise additional money to fund these challenges; (2) use funds from our existing operating budget; or (3) no longer engage in litigation as an advocacy tool.  Under the first option—raise additional money to fund these challenges—the time spent fundraising would prevent us from carrying out our other programmatic work, and it is unknown whether we would even be successful in raising funds to cover legal costs.  Under the second option—use funds from our existing budget—factoring in our other operating and overhead costs, we would not be able to carry out as much of our other robust programmatic work.  Under the third option— abandoning litigation as an advocacy tool—we would no longer have this powerful tool of seeking legal remedies to carry out our organization's mission of protecting South Florida's waters, wetlands, and species' habitats.  All three options would damage our operations, with the first two resulting in a depletion of our time, resources, and money away from our existing program work to the detriment of our ability to actually carry out other work.  The third option would drastically impede our ability to carry out our organization's mission by eliminating one of the main advocacy tools we use to accomplish our mission, namely, litigation.

14.     On top of the aforementioned irreparable harms, Miami Waterkeeper would be further harmed by the mandatory fee-shifting provision for permit enforcement and 404 unpermitted discharge litigation, which we would not be subject to in federal court.  This further financial risk on top of the above-listed costs of litigating in state court means we would effectively have to choose between bringing these challenges in state court or carrying out our other existing programs and initiatives.

15.     Furthermore, even if we somehow were able to raise enough funds to cover state court litigation, we would still face potentially insurmountable hurdles to getting into court, since Florida law requires harm to a significant portion of our members to pursue litigation on their behalf, whereas federal law would only require us to show harm to at least one member.

16.     Miami Waterkeeper also engages in monitoring of pollution, violations of environmental laws, and permit violations.  For cases that we do not litigate ourselves, we refer to the appropriate authorities for investigation and criminal prosecution, for which we provide any necessary assistance.

17.     There have already been gaps in Florida Department of Environmental Protection's ("FDEP") enforcement of environmental laws.  For example, Miami Waterkeeper took an inventory of NPDES permits along the Miami River and discovered that many of the permits were outdated or that discharges were occurring without a permit.  Miami Waterkeeper went through the painstaking process of researching each permit in FDEP's Oculus search engine. We also had to work with graduate students and law students to assist with the inventory, which further resulted in a diversion of resources to manage the students.  Among the violations we discovered, four were particularly egregious.  This process culminated in a letter to FDEP

urging them to enforce the NPDES permit program.  Miami Waterkeeper letter to FDEP (Borja Crane Amores), 30 March 2018.

18.      Another example of FDEP's enforcement limitations concerns the Municipal Separate Storm Sewer (MS4) permittees.  FDEP, as the MS4 program administrator, has the oversight responsibility to provide support, assist with compliance, and ultimately enforce the permit terms and conditions.  Miami Waterkeeper reviewed the compliance and practices of 35 Phase I MS4 operators in Miami-Dade County to ascertain the Permittee's compliance with their MS4 permits.  We found that none of the 35 MS4 permit holders were 100% compliant with their permit requirements, and the average compliance score was below a C-, based on our rubric.  We consulted Oculus for compliance records and examined the five lowest-performing municipalities. We found that enforcement actions, where they were started or attempted, were ineffectual at gaining full compliance. For a full review of our findings, please see: *An Audit of Miami-Dade County Stormwater Permit Compliance: 2022 Report Card and Recommendations*, Miami Waterkeeper & Everglades Law Center, July 8, 2022, https://www.miamiwaterkeeper.org/stormwater.

19.      Aside from litigation and enforcement, the loss of NEPA, ESA, and CWA review, analyses, and public notice and comment requirements that have resulted from Florida's assumption of the 404 program will also harm our organizational mission.  Without these required evaluations and analyses, we will lose access to information that allows us to assess projects and understand the impacts of those projects on waters, wetlands, and species.  This information is necessary to determine how to advocate effectively and to inform our members and followers of the crucial developments that could impact them.  As a result, we will either be unable to carry out a major aspect of our organizational mission, or we will be required to

expend significant resources hiring experts to provide us with this information we otherwise would have access to.  Either option will cause great harm to Miami Waterkeeper's ability to protect local waters, species, and their habitats.

20.    Overdevelopment, and the resulting environmental harms to South Florida's freshwater and marine ecosystems, are also more likely to occur with this assumption because of the state's lack of federal guidelines and reviews as well as public notice and comment required by the Clean Water Act, NEPA, and the ESA.  Dense urban development increases contaminated stormwater runoff.  It also leads to increased pressure on the aging sewage infrastructure or an increased number of septic tanks.  Both sewage leaks and septic tanks increase nutrient runoff and bacteria levels, leading to algae blooms and/or public health and recreation implications. Additionally, without the natural filtration system wetlands provide for stormwater runoff, nutrient runoff to lakes, ponds, ocean, and surrounding bays would increase, leading to increased turbidity and algae blooms that are harmful to marine species and renders waters unsafe for humans.  Nutrient-loading and harmful algal blooms are well-documented problems in Florida, as was seen earlier this year with algal bloom and nutrient loading that caused a massive fish die-off and made parts of Biscayne Bay a temporary dead zone.[3] Last, development authorizations that fail to incorporate credible endangered species review imperil the biodiversity of our area of responsibility, Miami-Dade and Broward counties.

---

[3] For further information on this event, see Miami Waterkeeper's coverage: https://www.miamiwaterkeeper.org/fish_kill.

**Organizational and Membership Harms from Particular Projects**

21.     Because the state is presently administering the 404 program, the state is poised to issue 404 permits on major projects that will impact Miami Waterkeeper's organizational interests and my interests as a member.

22.     **Port 1850**.  A project that would have been in our purview to challenge is Port 1850 LLC's application to place 44,107 cubic yards of fill within 4.21 acres of mangrove wetlands for the construction of a new commercial warehouse in Fort Lauderdale.  See Army Corps of Engineers public notice for this project, Dkt. 31-1, at 29–39.  This project was transferred to the state of Florida on December 28, 2020.[4]

23.     Mangroves and other estuarine environments provide critical habitat for protected species in southeast Florida including the eastern brown pelican, wood stork, manatee, and common snook.  Mangrove forests provide habitat for adult fish and also act as nurseries for juvenile species.  They stabilize shorelines, protecting coastal areas from storm surge and providing erosion control.  South Florida is particularly vulnerable to sea level rise, so this protective buffer area is of critical importance.  Mangroves trap sediments and maintain water quality by absorbing nutrients and other pollutants from the water.  See U.S. Fish and Wildlife Service's informational report on mangroves:

https://www.fws.gov/verobeach/msrppdfs/mangroves.pdf.   Mangroves also absorb carbon dioxide and other greenhouse gasses from the atmosphere and store those gasses—an important ecosystem service to combat climate change.  Mangrove forests have declined across the state due to overdevelopment.  *See* FDEP's informational page on mangroves:

---

[4] State 404 File for Port 1850 Project: https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396518/gis-facility!search.

https://floridadep.gov/rcp/rcp/content/floridas-mangroves. For these reasons, mangrove species

have been protected by law in the state of Florida.  *See* Florida's Mangrove Trimming and

Preservation Act: https://floridadep.gov/sites/default/files/mtpa96_0.pdf.

24.     The smalltooth sawfish is one such species, see Dkt. 31-3, at 40–55, listed as

endangered under the Endangered Species Act by the National Marine Fisheries Service.

Destruction of mangroves will have a direct, negative impact on this species which uses

mangroves for nursery habitat.  This area of South Florida where the project is located is part of

the historic range for smalltooth sawfish.

25.      Destruction of mangroves releases large amounts of sediment, carbon, and

nutrients, which can be fatal to seagrasses by causing shading, suffocation or eutrophication,

which can lead to algae blooms.  Other federally listed species depend on seagrass in South

Florida; these include the West Indian manatee, American crocodile, loggerhead sea turtle,

hawksbill sea turtle, leatherback sea turtle, Kemp's ridley sea turtle, roseate tern, wood stork, and

bald eagle.  *See id.* at 122 (describing species that depend on seagrass); *id.* at 124

(describing the ecological function of seagrass).  Furthermore, the coastal area of South Florida

is home to one of the world's largest loggerhead rookeries and increasing green turtle and

leatherback breeding populations.  *See id.* at 144–158, Bovery, Wyneken, *Seasonal Variation in*

*Sea Turtle Density and Abundance in Southeast Florida Current and Surrounding Waters*, at 9.

This area of Fort Lauderdale is also home to the West Indian manatee.

26.     Preservation of these endangered and threatened species are critical to Miami

Waterkeeper's mission, and to the recreational and aesthetic interests of Miami Waterkeeper's

members.  Miami Waterkeeper has members in Broward County who regularly recreate on the

water canals and intercoastal waterway area downstream of the project area, which will be

negatively impacted by the destruction of the mangroves. This project site is also approximately

two miles west of Eula Johnson State Park, where Miami Waterkeeper has led beach clean-ups

with members and the general public and has given lectures and presentations on South Florida

marine ecology, habitats, and species.  We have also held a diving "Bioblitz" event and coral

identification trainings just offshore of Port Everglades.  Harms to habitat and species are very

likely to occur here if this project is allowed to go forward, negatively impacting Miami

Waterkeeper's members and Miami Waterkeeper itself in its mission to protect and study marine

species and access natural areas to carry out program activities.

27.    Miami Waterkeeper's ability to challenge this project's permit and harms that

result from the project will be severely constrained by inadequate and costly state procedures

(including restrictive standing requirements, costly litigation requirements because of the need to

retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that

are not comparable to the processes or remedies available under federal law.  The state program

also lacks enforcement capacity and measures required under federal law, reducing the incentive

to comply with permit requirements, further increasing the risk to wetlands and species.

28.    Harms to the waters and species would also affect me personally as a member of

Miami Waterkeeper.  I go boating and diving at the mouth of Port Everglades, which is

approximately two miles north of the above-cited warehouse project.  When I go boating and

diving, I enjoy observing listed coral and other marine wildlife, and I look out for and try to

observe species such as manatees, herons, egrets, ibises, ospreys, sea turtles, and dolphins.  My

ability to enjoy these waters and wildlife are dependent on there being clean, safe waters.  The

approval of this project and likely resulting harms would negatively impact my ability to recreate

in this area, due to harms to the waters and wildlife.

29.     In 2021, Miami Waterkeeper began a water quality sampling contract with the
City of Fort Lauderdale, which will include routine monitoring of multiple sites within a few
miles of project SAJ-2020-01739.  *See* Dkt. 31-3 at 159–60, Miami Waterkeeper's Water
Monitoring Map.  Members of the community and followers of Miami Waterkeeper depend on
our weekly water quality updates on our mobile platform to gather information about water
quality at these sites where they recreate.  These activities include paddle-boarding, kayaking, jet-
skiing, and swimming, among others.  Increased development under an unlawful state-assumed
program and the aforementioned environmental harms from project SAJ-2020-01739 would
impede community members and Waterkeeper followers from engaging in these recreational
activities and may negatively impact water quality.

30.     **CPN West, LLC.**  Based on the permit file,[5] this project would impact wetlands
and should have required a state 404 permit, but FDEP applied the vacated Navigable Waters
Protection Rule ("NWPR") to issue a "No Permit Required" decision on October 6, 2021, over a
month after the rule was vacated on August 31, 2021.  *Pasqua Yaqui Tribe, et al. v. U.S. Env't
Prot. Agency, et al.*, No. CV-20-00266-TUC-RM, 2021 WL 3855977 (D. Ariz. Aug. 30, 2021).
Miami Waterkeeper's attorneys notified the state and EPA about Florida's need to stop using

---

[5] State 404 File for CPN West LLC, https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_402032/facility!search.

NWPR on multiple occasions.[6]  EPA notified the state that it must apply the pre-2015 regulatory regime rather than NWPR.[7]  But Florida has continued to apply NWPR regardless.[8]

31.    A tree survey included with application documents suggests that this is a palustrine, forested wetland with cypress, maples, and palms.  Pictures included in the file show trees exhibiting morphological adaptations: cypress knees and buttressed bases—these indicate the site floods.  A soil survey derived from the National Resources Conservation Service classifies the soil in this location as "Sanibel muck," a hydric soil.  This property's mature wetland canopy and its position in the landscape make it a unique, relict natural area in the urban landscape surrounding it.

32.    This project, involving the placement of fill for several buildings and access roads, impacts recreational and aesthetic interests by removing mature, scenic wetlands, and by adding fill to an area that drains into the Cypress Creek canal, which is tributary to Lake Santa Barbara and the intracoastal waterway, which is in the geographic area that my organization protects and defends.

---

[6] Letter from Tania Galloni, Earthjustice, to Shawn Hamilton, Fla. Dep't Env't. Prot., Sept. 1, 2021 (Attachment A); Letter from Tania Galloni, Earthjustice, to Mark Wilson & Lance Pierce, Developers, Feb. 16, 2022 (Attachment B) (copying EPA and FL); Letter from Christina I. Reichert, Earthjustice, to Radhika Fox, EPA, Jan. 30, 2022 (Attachment C).

[7] Letter from Daniel Blackman, U.S. Env't Prot. Agency, to Emile Hamilton, Fla. Dep't Env't Prot., Dec. 9, 2021(Attachment D); Letter from Jeaneanne Gettle, U.S. Env't Prot. Agency, to John Truitt, Fla. Dep't Env't Prot., Jan. 31, 2022 (Attachment E).

[8] *See* Final NPR (granted Feb. 16, 2023), *in State 404 File for Int of Moccasin Wallow Rd & Carter Rd, ST404_417551,* https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_417551/facility!search; Final NPR (granted Feb. 14, 2023), *in State 404 File for East Daytona North — Phase 2 Paving, ST404_428112,* https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_428112/facility!search.

33.    A portion of the site is also within the 300-foot buffer retained by the Corps. Because a portion is within this 300-foot buffer, the 404 application files should have contained a determination as to which agency would review under 404 purview.

34.    Moreover, the NPR letter states that the site "current[ly] connect[s] through a drainage ditch that runs to the Cypress Creek Canal." Therefore, the project contains a direct surface-water connection to seagrasses, mangroves, and corals that I and other Miami Waterkeeper members enjoy and seek to protect.

35.    If the state were not operating the 404 program in assumed waters, this permit would have required a Section 404 permit from the Corps, including application of the Corps' compensatory mitigation rule at 33 CFR Part 332, and Executive Order 11990, "no Net Loss of Wetlands."  Moreover, the Corps permit would have been subject to NEPA review, ESA Section 7 consultation, and the rigors of the federal Clean Water Act program more generally.

36.    If Florida is allowed to continue operating this unlawful 404 program, Miami Waterkeeper will be harmed in its ability to carry out its mission of protecting South Florida's waters, wetlands, species, and their habitats.  Additionally, the recreational and aesthetic interests of Miami Waterkeeper's members, including myself, will continue to be harmed by the state processing section 404 permits.

37.    A ruling in Plaintiffs' favor invalidating EPA's approval of Florida's program would redress Miami Waterkeeper's harms by restoring 404 authority over assumable waters to the Corps, restoring Section 7 consultation and NEPA review to projects, and ensuring that all requirements of federal law are met and can be enforced in federal court.  A ruling in Plaintiffs' favor on our ESA claims would redress Miami Waterkeeper's harms by requiring EPA to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the effects of

Florida's application on listed species and critical habitat; require the wildlife agencies to produce legally sufficient biological opinions that properly analyze the impact to listed species and critical habitat, set limits on incidental take, and impose reasonably prudent measures and triggers for reinitiation that are protective under the ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27 day of February, 2023.

Rachel Silverstein, Ph.D.
Executive Director and Waterkeeper
Miami Waterkeeper
P.O. Box 141596
Coral Gables, FL 33114-1596
(305) 905 0856

# ATTACHMENT A



September 1, 2021
Via Email shawn.hamilton@floridadep.gov

Shawn Hamilton, Interim Secretary
Florida Department of Environmental Protection
3900 Commonwealth Boulevard M.S. 49
Tallahassee, FL 32399

<u>Re:</u>    **Impact of Court Ruling Vacating WOTUS Rule on Florida 404 Program**

Dear Secretary Hamilton:

As you know, we are challenging EPA's approval of Florida's 404 Program as unlawful under
federal law.  We write to ensure you are also aware of the recent ruling in <u>Pasqua Yaqui Tribe, et
al. v. United States Env't Prot. Agency, et al.</u>, No. CV-20-00266-TUC-RM, 2021 WL 3855977
(D. Ariz. Aug. 30, 2021), vacating "The Navigable Waters Protection Rule: Definition of
'Waters of the United States'" (Apr. 1, 2020) ("NWPR") on which Florida's Section 404
program is based.  Enclosed please find a copy of that decision for your convenience.

Florida assumed jurisdiction over the dredging and filling of "waters of the United States" under
Section 404 of the Clean Water Act on or about December 22, 2020.  Since that time, the state
has proceeded under the 2020 NWPR definition of "waters of the United States" to determine the
scope of its jurisdiction.  The Court's vacatur of the NWPR as unlawful requires that DEP
immediately re-assess the scope of waterways in Florida covered by Section 404.

As the Court observed, the NWPR substantially reduced the number of waterways, including
wetlands, protected under the Clean Water Act as compared to prior rules and practices.  <u>Pasqua
Yaqui Tribe</u>, 2021 WL 3855977, at *5.  Vacatur of the rule restores broader coverage of
waterways under the Clean Water Act as existed in years past.  This will have considerable
impacts in Florida and on the state's duties under federal law.  It is therefore critical that DEP act
immediately to ensure protection of all waterways covered by the Clean Water Act.

Among other things, DEP must immediately: (1) ensure that the regulated community is notified
of the Court's action; (2) ensure against the unlawful (unpermitted) dredging and filling of
additional covered waterways; (3) re-visit its "no permit required" and other jurisdictional
determinations made while the unlawful NWPR was in effect; (4) defer issuance of any permit to
re-assess the scope of the state's jurisdiction and obligations relative to the permit application;
and (5) ensure adequate staffing and training to make correct jurisdictional determinations.

Sincerely,

Tania Galloni
Managing Attorney

Bonnie Malloy
Senior Attorney

Christina Reichert
Associate Attorney

Enc.

cc w/enc.:    Justin George Wolfe, General Counsel
              Florida Department of Environmental Protection
              justin.g.wolfe@dep.state.fl.us

# ATTACHMENT B



February 16, 2022

Mark Wilson
President and Chief Executive Officer
Florida Chamber of Commerce
36 S. Bronough Street
Tallahassee, Florida 32301
mwilson@flchamber.com

Lance Pierce
Executive Director
Association of Florida Community Developers
310 W College Avenue
Tallahassee, FL 32301
lance.pierce@afcd.com

**Re:    Liability Risk for Entities Relying on State 404 Determinations**

Dear Mr. Wilson and Mr. Pierce:

As you know, Florida assumed jurisdiction over the Clean Water Act's Section 404 dredge and fill permitting program on or about December 22, 2020.  Since that time, the state has applied the 2020 Navigable Waters Protection Rule ("NWPR") definition of "waters of the United States" to determine the scope of its 404 jurisdiction.  On August 30, 2021, however, a federal court vacated the NWPR as unlawful at the time of its adoption.  Pasqua Yaqui Tribe, et al. v. U.S. Env't Prot. Agency, et al., No. CV-20-00266-TUC-RM, 2021 WL 3855977 (D. Ariz. Aug. 30, 2021).  Accord Navajo Nation v. Regan, No. 2:20-CV-00602, 2021 WL 4430466 (D.N.M. Sept. 27, 2021).  As the Court observed, the NWPR substantially reduced the number of waterways, including wetlands, protected under the Clean Water Act as compared to prior rules and practices.  Pasqua Yaqui Tribe, 2021 WL 3855977, at *5.

In September 2021, the U.S. Army Corps of Engineers ("Corps") and U.S. Environmental Protection Agency ("EPA") halted implementation of the NWPR nationwide and returned to the pre-2015 regulatory regime to define waters of the United States.  Current Implementation of Waters of the United States, U.S. Env't Prot. Agency, https://www.epa.gov/wotus/current-implementation-waters-united-states (updated Dec. 20, 2021) (Attachment 1).  The return to the pre-2015 regulatory regime restores broader coverage of waterways under the Clean Water Act as existed in years past.

On September 1, 2021, we notified the Florida Department of Environmental Protection ("DEP") of its obligation to abide by the vacatur of the NWPR and asked that DEP notify the regulated community regarding this change in the law.  Letter from Tania Galloni, Earthjustice, to Shawn Hamilton, Fla. Dep't Env't. Prot., Sept. 1, 2021 (Attachment 2).  As we explained, it was critical that Florida act immediately to ensure protection of all waterways covered by the Clean Water Act.  However, at risk to itself and the development community, Florida has

continued to apply the unlawful, vacated NWPR to its 404 actions, including determinations that no permit is required and the issuance of individual and general permits.

By letter to DEP dated December 9, 2021, EPA confirmed that the CWA and its implementing regulations require Florida to administer its 404 program consistent with the current definition of "waters of the United States." Letter from Daniel Blackman, U.S. Env't Prot. Agency, to Emile Hamilton, Fla. Dep't Env't Prot., Dec. 9, 2021(Attachment 3). As EPA explained, "The Clean Water Act and its implementing regulations, as well as Florida's statute and regulations, require Florida to implement its program consistent with the definition of 'waters of the United States,'" which is "the pre-2015 Rule regulatory regime." Id.

EPA further confirmed that those in noncompliance since August 30, 2021, are liable for violations of federal law and at risk for enforcement actions. Id. "[A]ny discharges of pollutants into waters protected under the pre-2015 Rule regulatory regime, including **discharges into waters outside the scope of the vacated NWPR**, **which do not have a permit** or are not otherwise exempted from permitting requirements under that regime (e.g., under section 404(f)), violate the Act and **are subject to citizen suits as well as state and federal enforcement**." Id. (emphasis added).[1]

Notwithstanding the foregoing, Florida continues to apply the unlawful, vacated NWPR in its review of individual and general permits[2] and "no permit required" determinations. Please be advised that those taking action based on permits and other determinations applying NWPR's definition of WOTUS have been, remain, and will continue to be at risk of liability and enforcement action.

Sincerely,

Tania Galloni
Managing Attorney

Bonnie Malloy
Senior Attorney

Christina I. Reichert
Senior Associate Attorney

Enc.

---

[1] EPA reiterated Florida's obligation to apply the pre-2015 regulatory regime in its more recent letter from January 31, 2022. Letter from Jeaneanne Gettle, U.S. Env't Prot. Agency, to John Truitt, Fla. Dep't Env't Prot., Jan. 31, 2022 (Attachment 4).

[2] EPA has now begun objecting to individual state 404 permits on this basis. See, e.g., Letter from Jeaneanne Gettle, U.S. Env't Prot. Agency, to Benjamin M. Melnick, Fla. Dep't Env't Prot., Dec. 17, 2021 (Attachment 5).

cc w/enc.:

Shawn Hamilton, Secretary, Florida Department of Environmental Protection,
shawn.hamilton@floridadep.gov

Justin George Wolfe, General Counsel, Florida Department of Environmental Protection,
justin.g.wolfe@dep.state.fl.us

Radhika Fox, Director, Office of Water, EPA, fox.radhika@epa.gov

John Goodin, Director, Office of Wetlands, Oceans and Watersheds, EPA, goodin.john@epa.gov

Macara Lousberg, Director, Water Policy Staff, EPA, lousberg.macara@epa.gov

Patrick Utter, Chair, Association of Florida Community Developers, patrick.utter@afcd.com

TJ Thornberry, President, Florida Homebuilders Association, tthornberry@fhba.com

Kevin J. Thibeault, Secretary, Florida Department of Transportation,
kevin.thibeault@dot.state.fl.us

Ovelio A. Ruiz, President, Florida Chapter of the American Public Works Association,
truiz@miamigardens-fl.gov

Ryan Goldman, President, Florida Association of Environmental Professionals,
rgoldman@broward.org

# ATTACHMENT C



*Via Email*

January 30, 2022

Director Radhika Fox
Office of Water
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460
fox.radhika@epa.gov

> **Re:**    **Florida's Unlawful Application of the Navigable Waters Protection
> Rule to Determine Waters of the United States in State-Assumed Clean
> Water Act 404 Program**

Dear Director Fox:

After more than a year ignoring federal law, it is time for EPA to require Florida to stop applying the long-vacated 2020 Navigable Waters Protection Rule ("NWPR"). Florida's refusal to comply with federal law threatens national waters and wetlands, as well as the wildlife and communities that depend on them.

As you know, Florida assumed jurisdiction over the Clean Water Act's Section 404 dredge and fill permitting program on or about December 22, 2020. Since that time, the state has applied the NWPR definition of "waters of the United States" to determine the scope of its 404 jurisdiction. On August 30, 2021, a federal court vacated the NWPR as unlawful at the time of its adoption. *Pasqua Yaqui Tribe, et al. v. U.S. Env't Prot. Agency, et al.*, No. CV-20-00266-TUC-RM, 2021 WL 3855977 (D. Ariz. Aug. 30, 2021). *Accord Navajo Nation v. Regan*, No. 2:20-CV-00602, 2021 WL 4430466 (D.N.M. Sept. 27, 2021). As the Court observed, the NWPR substantially reduced the number of waterways, including wetlands, protected under the Clean Water Act as compared to prior rules and practices. *Pasqua Yaqui Tribe*, 2021 WL 3855977, at *5.

On September 1, 2021, we notified the Florida Department of Environmental Protection ("DEP") of its obligation to abide by the vacatur of the NWPR. Letter from Tania Galloni, Earthjustice, to Shawn Hamilton, Fla. Dep't Env't. Prot., Sept. 1, 2021 (Attachment 1). As we explained, it was critical that Florida act immediately to ensure protection of all waterways covered by the Clean Water Act. DEP did not respond.

Also in September 2021, the U.S. Army Corps of Engineers ("Corps") and U.S. Environmental Protection Agency ("EPA") announced that they had halted implementation of the NWPR nationwide and returned to the pre-2015 regulatory regime to define waters of the United States. *Current Implementation of Waters of the United States*, U.S. Env't Prot. Agency, https://www.epa.gov/wotus/current-implementation-waters-united-states (updated Dec. 20, 2021) (Attachment 2). But still DEP continued to apply NWPR.

By letter to DEP dated December 9, 2021, EPA affirmed that the Clean Water Act and its implementing regulations require Florida to administer its 404 program consistent with the definition of "waters of the United States" under the pre-2015 regulatory regime. Letter from Daniel Blackman, U.S. Env't Prot. Agency, to Emile Hamilton, Fla. Dep't Env't Prot., Dec. 9, 2021(Attachment 3). EPA then reiterated Florida's obligation to apply the pre-2015 regulatory regime in its January 31, 2022, letter. Letter from Jeaneanne Gettle, U.S. Env't Prot. Agency, to John Truitt, Fla. Dep't Env't Prot., Jan. 31, 2022 (Attachment 4). Still, DEP refused to conform to the law.

Now for more than a year, Florida has continued to apply the unlawful, vacated NWPR to 404 actions, including determinations that no permit is required, enforcement and compliance decisions, and the issuance of general permits. We understand that DEP has been continuing to use the vacated portions of the Code of Federal Regulations containing the NWPR's definition of waters of the United States for making jurisdictional determinations, and the agency is publicly directing the regulated community to the vacated definition. *WOTUS Determinations*, Fla. Dep't Env't Prot., https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/wotus-determinations (last visited January 17, 2022) (using the "waters of the United States" definition in 40 C.F.R. 120—NWPR at the time—in option three for performing jurisdictional determinations) (Attachment 5). Florida is flouting federal law, and EPA is failing to step in.

DEP has attempted to justify this flagrant violation in a number of ways, including saying the state was waiting for EPA's clarification, then that the state had a year to comply with the change in federal law, and finally that a new rule would add another one-year period for the state to come into compliance. *See, e.g.*, House Environment, Agriculture and Flooding Subcommittee Hearing, at 21:10–24:15, https://www.myfloridahouse.gov/ VideoPlayer. aspx?eventID=7473. None of those rationalizations hold water. Rather, they reveal that Florida's actions are nothing more than the willful failure to regulate waters of the United States in Florida.

EPA has allowed Florida to violate the law for too long. More than one year has passed since the court issued its decision in *Pasqua Yaqui Tribe*, and more than one year has passed since EPA notified DEP that it must apply the pre-2015 regulatory regime. And EPA has

codified a new definition of waters of the United States, which Florida will no doubt delay in implementing for as long as possible.  In the meantime, wetlands properly protected as waters of the United States are being destroyed across the state.

EPA must ensure that DEP comes into compliance and stops applying NWPR to the detriment of Florida's precious wetlands.  Continued inaction is a de facto acceptance of DEP's flagrant disregard of the law, and EPA cannot turn a blind eye while Florida's critical wetlands are degraded and developed.  We formally request a meeting with EPA to discuss this ongoing issue to ensure that DEP follows the law.

Sincerely,

Christina I. Reichert
Senior Associate Attorney

Tania Galloni
Managing Attorney

Bonnie Malloy
Senior Attorney

Enc.

cc w/enc.:

Michael S. Regan, Administrator, EPA, regan.michael@epa.gov

John Goodin, Director, Office of Wetlands, Oceans and Watersheds, EPA, goodin.john@epa.gov

Macara Lousberg, Director, Water Policy Staff, EPA, lousberg.macara@epa.gov

Navis Bermudez, Deputy Assistant Administrator, Office of Policy, EPA,
        bermudez.navis@epa.gov

Lawrence Starfield, Acting Assistant Administrator, Acting Assistant Administrator, Office of
        Enforcement and Compliance, EPA, starfield.lawrence@epa.gov

Shawn Hamilton, Secretary, Florida Department of Environmental Protection,
    shawn.hamilton@floridadep.gov

Justin George Wolfe, Interim Deputy Secretary for Regulation, Florida Department of
    Environmental Protection, justin.g.wolfe@dep.state.fl.us

Chad Stevens, Acting General Counsel, Florida Department of Environmental Protection,
    chad.r.stevens.@dep.state.fl.us

# ATTACHMENT D



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

December 9, 2021

Secretary Emile D. Hamilton
Florida Department of Environmental Protection
Marjory Stoneman Douglas Building
3900 Commonwealth Boulevard
Tallahassee, Florida  32399

Dear Secretary Hamilton:

As the new Regional Administrator for the Environmental Protection Agency, Region 4, I look forward to working with you and your office to continue the important work of ensuring the protection of human health and environment in Florida. My staff has briefed me on recent communications between our offices regarding the scope of waters subject to the Clean Water Act Section 404 program that Florida has assumed. In consideration of the significance of this matter, I am writing this letter as a follow up to those discussions.

I would like to confirm that the EPA and the U.S. Army Corps of Engineers (the agencies) interpret the current definition of "waters of the United States" subject to the Section 404 program to be the regulatory interpretation in place prior to promulgation of the 2015 Clean Water Rule. Florida's Section 404 permitting program must therefore regulate discharges of dredged or fill material into "waters of the United States" consistent with the pre-2015 Rule regulatory regime.

As background, the Clean Water Act generally prohibits the discharge of pollutants into "waters of the United States" unless authorized by a permit, including a permit issued pursuant to Section 404 of the Act. 33 USC §§ 1311(a); 502(7), (12). The Clean Water Act and the EPA's implementing regulations require that any state administering a Section 404 program regulate the discharge of dredged or fill material into all "waters of the United States" within its jurisdiction, aside from those retained by the Corps. 33 USC § 1344(g); 40 CFR § 233.1(b). The EPA's regulations further provide that a state program shall at all times be conducted in accordance with the Act. 40 CFR § 233.1(d). Florida's statute and regulations are consistent with this mandate. *See* Fl. Stat. 373.4146 (defining state-assumed waters as "waters of the United States that the state assumes permitting authority over pursuant to s. 404 of the Clean Water Act… and rules promulgated thereunder, for the purposes of permitting the discharge of dredge or fill material"); 62 Fla. Admin. Code Ann. 62-331.010 (providing that the "State 404 Program governs all dredging and filling in waters of the United States regulated by the State under Section 373.4146").

When EPA approved Florida's request to assume the Section 404 program, the term "waters of the United States" was defined by the 2020 Navigable Waters Protection Rule (NWPR). On August 30, 2021, the U.S. District Court for the District of Arizona vacated and remanded the NWPR. *Pascua Yaqui Tribe v. U.S. Environmental Protection Agency*, No. 20-00266 (D. Ariz. Aug. 30, 2021). On September 27, 2021, the U.S. District Court for the District of New Mexico also issued an order vacating and remanding the NWPR. *Navajo Nation v. Regan*, No. 2:20-cv-00602 (D.N.M. Sept. 27, 2021). Pursuant to these cases, the agencies interpret "waters of the United States" under the statute and implementing regulations to mean the pre-2015 regulatory regime.

The Clean Water Act and its implementing regulations, as well as Florida's statute and regulations, require Florida to implement its program consistent with the definition of "waters of the United States," which since August 30, 2021, has effectively been the pre-2015 Rule regulatory regime. Accordingly, any discharges of pollutants into waters protected under the pre-2015 Rule regulatory regime, including discharges into waters outside the scope of the vacated NWPR, which do not have a permit or are not otherwise exempted from permitting requirements under that regime (e.g., under section 404(f)), violate the Act and are subject to citizen suits as well as state and federal enforcement.

If you have any questions or wish to discuss this matter, please contact me, or have a member of your staff contact Ms. Jeaneanne Gettle, Director of the Water Division at gettle.jeaneanne@epa.gov or 404-562-8979.

Sincerely,

Daniel Blackman
Regional Administrator

# ATTACHMENT E



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET, SW
ATLANTA, GEORGIA  30303-3104

January 31, 2022

Deputy Secretary John Truitt
Florida Department of Environmental Protection
Marjory Stoneman Douglas Building
3900 Commonwealth Boulevard
Tallahassee, Florida  32399

Dear Deputy Secretary Truitt:

Thank you for your letter of December 17, 2021, seeking to better understand the Environmental Protection Agency's position that the current definition of "waters of the United States," applicable nationwide, is the regulatory interpretation in place prior to promulgation of the 2015 Clean Water Rule ("pre-2015 Rule regulatory regime") and that this definition currently applies to Florida's Clean Water Act (CWA) Section 404 program.

Your letter affirms Florida's commitment to administering the assumed CWA Section 404 program consistent with the requirements of the statute, and the EPA appreciates this commitment. However, you also suggest that there is "confusion" and a "complex and unusual legal situation" regarding the governing definition of "waters of the United States." In this matter, we disagree; the applicable standard is straightforward. As we stated in our letter of December 9, 2021, to Secretary Hamilton, two district courts have vacated the most recent regulation defining "waters of the United States," the Navigable Waters Protection Rule. *Pascua Yaqui Tribe v. U.S. Environmental Protection Agency*, No. 20-00266 (D. Ariz. Aug. 30, 2021) and *Navajo Nation v. Regan*, No. 2:20-cv-00602 (D.N.M. Sept. 27, 2021). Based on those court decisions and the vacaturs, the EPA and the U.S. Army Corps of Engineers (Corps) have been clear that the definition of "waters of the United States" currently in effect nationwide is the pre-2015 Rule regulatory regime. *See* EPA, Current Implementation of Waters of the United States, https://www.epa.gov/wotus/currentimplementation-waters-united-states.

The CWA and the EPA's implementing regulations require that any state administering a Section 404 program regulate the discharge of dredged or fill material into all "waters of the United States" within its jurisdiction, aside from those retained by the Corps. 33 USC § 1344(g); 40 CFR § 233.1(b). The EPA's regulations further provide that a state program shall at all times be conducted in accordance with the CWA. 40 CFR § 233.1(d). Pursuant to these requirements, Florida is required to implement the current applicable definition of "waters of the United States," consistent with the pre-2015 Rule regulatory regime.

Florida's statute and regulation governing its administration of the Section 404 program are consistent with these federal requirements, as they simply codify the term "waters of the United States." Florida's

statute authorizing assumption of the CWA Section 404 permitting program defines "state assumed waters" to mean "waters of the United States that the state assumes permitting authority over pursuant to s. 404 of the Clean Water Act…and rules promulgated thereunder, for the purposes of permitting the discharge of dredge or fill material." Fl. Stat. 373.4146. Florida's implementing regulations, in turn, provide that "[t]he State 404 Program governs all dredging and filling in waters of the United States regulated by the State under Section 373.4146." 62 Fla. Admin. Code Ann. 62-331.010. The EPA has not identified, and your letter did not reference, any Florida statute or regulation that would impede Florida's implementation of the currently applicable federal definition of "waters of the United States."

Your letter also refers to the EPA's regulation at 40 CFR 233.16(b), which allows states a period of time to implement certain changes to federal regulations when the federal change "requires revision" of state law. That regulation is inapplicable for the reasons discussed above.

Your letter includes other questions about, among other things, any deliberations the EPA or the Department of Justice may have had regarding the applicability of the vacaturs of the Navigable Waters Protection Rule, the EPA's past experience in overseeing state adoption of federal standards, and the EPA's schedule for rulemaking to redefine the scope of "waters of the United States." None of these questions are relevant to Florida's obligation, outlined above and in our letter of December 9, 2021, to implement the pre-2015 Rule regulatory regime defining "waters of the United States." We also recognize that the Supreme Court has recently granted certiorari in a case implicating the definition of "waters of the United States," *Sackett v. EPA* (21-454), but the Supreme Court's pending review of this case does not affect Florida's current obligations. We would be glad to discuss these issues or other questions you may have, other than internal federal government deliberations, by phone or video conference at your convenience.

The EPA appreciates the productive working relationship that our agencies have shared related to Florida's administration of the CWA Section 404 program. Please feel free to reach out to me if you would like to discuss this matter or have a member of your staff contact Ms. Rosemary Calli, Section Chief, Wetlands & Streams Regulatory Section, at Calli.Rosemary@epa.gov or 404-562-9846.

Sincerely,

JEANEANNE
GETTLE

Digitally signed by
JEANEANNE GETTLE
Date: 2022.01.31 19:02:59
-05'00'

Jeaneanne Gettle
Director, Water Division
US EPA Region 4