DocuSign Envelope ID: EA3B8104-BD13-4B5A-A937-97FAF29F3E84

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL
DIVISION, et al.,

     Plaintiffs,

     v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

     Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

## <u>DECLARATION OF PRESTON T. ROBERTSON</u>

I, Preston T. Robertson, make the following declaration:

1.     I am a resident of Tallahassee, Florida.

2.     I am competent to make this declaration. I provide this declaration based upon my personal knowledge. I would testify to the facts in this declaration under oath if called upon to do so.

3.     I am the former President and Chief Executive Officer of Florida Wildlife Federation, Inc. ("FWF"), one of the Plaintiffs in this case, and a lifetime member. I worked for FWF for over 17 years and was President and Chief Executive Officer from February 2019 until December 2022.

4.     FWF is a 501(c)(3) nonprofit that solely focuses on conserving Florida's wildlife, habitat, and natural resources. FWF was founded in 1936 and has grown in membership to over 9,000 members and approximately 60,000 supporters throughout Florida. The mission of FWF is to ensure that wildlife and Florida's fragile environment have a voice, which is echoed in our

DocuSign Envelope ID: EA3B8104-BD13-4B5A-A937-97EAE29F3E84

motto: "Wildlife is our Middle Name."  FWF does this through three main outreach areas: 1) Environmental Education, 2) Policy and Advocacy, 3) and Science-based Stewardship.

5.    FWF's Environmental Education program focuses on educating the public on the importance of protecting Florida's environment.  FWF accomplishes this through a distribution of various media focusing on wildlife issues.  FWF's media includes books, videos, and a newsletter aiming to educate the public on the importance of protecting the environment.  Additionally, FWF supports wildlife research and environmental preservation.

6.    FWF program areas focus on wildlife, land conservation, water, and climate change through our educational materials, policy and advocacy.  FWF advocates for the protection of species like the Florida panther and other listed species through connection of existing conservation lands along with road crossings in Southwest Florida.  FWF has been a leader in statewide land conservation and advocates for more funding for the Florida Forever program and other similar programs.  FWF promotes Everglades restoration, strengthening the environmental resiliency of our rivers and bays, and coastal protection for sea turtles and birds.  Lastly, FWF pushes for action on the state and federal level to counter climate change with activities such as successfully promoting a ban of oil and gas drilling in Florida's coastal waters.

7.    A majority of FWF's core advocacy work is dedicated to wildlife protection and land conservation.

8.    As former President and Chief Executive Officer at FWF, I specialized in advocating for the protection of Florida's wildlife and lands.  I have over 31 years of experience as an environmental attorney in Florida advocating for the protection of Florida' environment.

9.    EPA's approval of Florida's application to assume control of section 404 permitting undermines FWF's mission.  Among other failings, Florida has not committed

sufficient financial resources to the program, it relies upon an unlawful technical assistance process regarding its duty to ensure that listed species are adequately protected, and analyses of section 404 permit applications issued by Florida no longer include review under the National Environmental Policy Act ("NEPA") and consultation under section 7 of the Endangered Species Act ("ESA"), as they would if 404 authority remained with the U.S. Army Corps of Engineers ("Corps").

10.    Because section 404 permit applications processed by Florida do not undergo a NEPA analysis or site-specific ESA section 7 consultation, these projects are subject to a far less rigorous environmental review, which increases risk of harm to listed species and their habitats.

11.    The state's administration of the section 404 program prevents FWF from being able to monitor and engage in proposed permits to the same degree that the federal program afforded us.  As an organization, FWF is heavily reliant upon federal review and analysis of projects that affect wildlife, land conservation, climate and water.  We review applications that go to the Corps, and we act on them as needed depending on the impacts of the proposed project. We have relied on information generated through NEPA and the ESA to assess the harms posed by proposed projects.  These critical federal analyses provide a baseline for the natural environment and protected species and analysis of impacts and alternatives from which we can assess proposed agency actions and resultant environmental impacts.

12.    While Florida maintains 404 jurisdiction over assumable waters, we are losing the information, analysis, and protections that these federal laws provide.  We are also losing the opportunity to participate in the NEPA process for major projects.  This reduces our ability to advocate for wildlife by greatly reducing the information we have available to evaluate the impact of proposed projects, and our ability to identify those projects where it is most imperative

DocuSign Envelope ID: EA3B8104-BD13-4B5A-A937-97FAF29F3F84

that we focus our limited resources.  FWF does not have the ability to take on every advocacy with regard to every 404 project that will adversely affect wildlife, so we have for years relied on information generated by the Corps, the U.S. Fish and Wildlife Service, and the National Marine Fisheries Service to evaluate projects for our members and Florida's environment, and decide where to best focus our efforts.

13.     FWF is significantly harmed without these federal analyses because the organization would have to hire cost-prohibitive experts to obtain comparable information to assess and understand the impacts of the proposed projects.  Experts such as these can cost thousands of dollars per case, well beyond our budget.  And as a small organization with limited staff, without this information we are unable to review and act on proposals or projects at the rate we normally did.  Therefore, the loss of information from these analyses results in additional staff time to triage permits to identify harms to the listed species and their habitats and requires additional costs in hiring experts.  Therefore, our core program work focused on conservation is significantly hindered.

14.     A primary tool FWF uses to protect species and their habitats is the public commenting process.  When there is a proposed agency action, FWF reviews the applications and any available federal analyses, determines the scope and effect it would have on wildlife and their habitats that we seek to protect, review applicable rules and laws, and submits comment letters.  Without the information generated when the Corps has jurisdiction, FWF is greatly hindered from obtaining information necessary to weigh in on the impact of proposed projects.

15.     For example, under the state 404 program, there is no ESA Section 7 consultation for individual projects, and no requirement that applicants pursue an ESA Section 10 habitat conservation plan process to obtain incidental take protection.  Section 7 and Section 10 reviews

DocuSign Envelope ID: EA3B8104-BD13-4B5A-A937-97EAF29F3E84

are robust and comprehensive as required under the ESA. We often rely on these processes to understand, comment, and engage on these projects.

16. The resulting federal analyses from these processes help us evaluate the impacts on Florida's wildlife and land conservation. Many endangered and threatened species are in Florida and are subject to regulatory review by the agencies, including but not limited to Florida panthers, bonneted bats, nesting turtles, sturgeon, and smalltooth sawfish. These species are important to FWF, and to me as a member of FWF, for their ecological value. In addition, land conservation protects our watersheds and our native species.

17. Many listed species are likely to be adversely affected by projects permitted through Florida's section 404 program. For example, these projects can cause habitat destruction and fragmentation. Florida's program does not adequately protect against these harms, in part because it does not require consultation under Section 7 or a habitat conservation plan under Section 10 of the ESA, and because projects are not subject to scrutiny under NEPA.

18. In addition to interfering with our ability to understand and therefore comment on projects, the state's unlawful assumption hinders our ability to enforce the law by challenging illegal section 404 permitting actions, when necessary. It is my understanding that, as compared to federal court, there is a higher bar to establish standing in Florida state court because FWF would be required to show that a substantial number of its members will be affected by the challenged action, while in federal court FWF is only required to show that a single member is adversely affected. It is also my understanding that FWF would risk exposure to mandatory "fee-shifting" in certain types of actions which creates the risk of liability for the opposing parties' costs and fees to engage in litigation. FWF is not exposed to this same risk in federal court, the forum for challenges to actions by federal agencies. The risk of incurring these

substantial costs and fees could hinder FWF's ability to challenge illegal permit authorizations in Florida that would cause serious harm to threatened and endangered species even if the claims are strong.

19.     FWF was also harmed by Florida's incomplete application, which failed to include a biological opinion assessing the risk to species from the program, and an incidental take statement authorizing incidental harm of listed species resulting from the state program and state-issued permits.  These documents were not provided during the public comment period and were completed only after the public comment period closed.  In doing so, the application did not address how endangered species review would occur, how a no-jeopardy determination would be made, or relevant and important information about the take of listed species.  While Florida's application referred to a "technical assistance" process that it said would be described in "an anticipated biological opinion," the biological opinion containing that information was not part of the application, frustrating FWF's ability to analyze and comment on the process.  Florida relied on this missing information when asserting that it complied with the Clean Water Act's Section 404(b)(1) Guidelines to protect listed species and make a finding of no jeopardy. Without being able to review these documents, it was impossible for FWF to comment on whether the state's plan would in fact protect listed species.

20.     EPA's ultimate approval of Florida's 404 program, which does not require rigorous section 7 consultation with U.S. Fish and Wildlife Service for permits that may adversely affect protected species, and instead provides a broad exemption from incidental take liability for harm to species, imperils protected species.

21.     As a plaintiff to this case and for the reasons stated in this declaration, it is FWF's position that Florida's 404 program is unlawful and will result in harm to the environment and

DocuSign Envelope ID: EA3B8104-BD13-4B5A-A937-97EAF29F3F84

wildlife that our organization strives to protect.  This was reflected in FWF advocacy during the state's 404 application process, during which I was engaged in FWF's review of Florida's proposal during EPA's public comment period and participated in the development of our comments in opposition to the program.

22.     Absent Florida's unlawful assumption, FWF would continue to enjoy rights and protections guaranteed by federal law, including participation in the lawful 404 program administered by the U.S. Army Corps of Engineers for more than 40 years.  FWF would also benefit from the public participation process afforded by NEPA, the protections afforded to species through Section 7 or Section 10 of the ESA whenever a project may affect a listed species, and the ability to enforce all these rights in federal court, where FWF can meet standing requirements and afford to litigate based on an administrative record, unlike the barriers that litigation in state court present.

23.     EPA's approval of Florida's unlawful 404 permitting program, which has faster processing times and less stringent permitting requirements, also increases the likelihood that ESA section 10 Habitat Conservation Plan ("HCP") processes will no longer be utilized.  As an alternative to section 7 project-by-project consultation, the ESA section 10 incidental take permit ("ITP") application process for private developers requires an HCP that minimizes and mitigates impacts to protected species.  Unlike Florida's 404 application process, which is designed to be completed in a matter of months, development of an HCP is a complex process that can take years to complete in order to ensure that species receive the level of protection Congress intended.  It requires landowners and developers to come together to initiate the process.  The beauty of an HCP is that it allows various stakeholders—including environmental conservationists—to work together and create a framework to ensure that environmental interests

are considered in the development of the plan; and it can set aside land in perpetuity for wildlife and water resources. All too often, individual development and transportation projects move forward in a piecemeal fashion, which results in a "checkerboard" of habitat destruction and fragmentation across the landscape, to the severe detriment of species dependent on continuous and connected habitat. The HCP process is intended to prevent this.

24.     The HCP process is more stringent than Florida's 404 permitting program in that it requires NEPA analysis and a biological opinion under section 7 of the ESA, among other statutory requirements. The section 10 HCP process also requires long-term monitoring for compliance, including periodic accountings of take, surveys to determine species status in project areas or mitigation habitats, and progress reports on fulfillment of mitigation requirements. The HCP process would naturally result in greater species and environmental protections than Florida's 404 permitting process because it requires more stringent and detailed standards of review, both before and after the ITP is approved. From the perspective of developers, however, the HCP process is arguably more costly and time-consuming because it contemplates various development projects, has more stringent standards that must be met for approval, and as a result, is a much lengthier process than the 404 permit program. The HCP process is also much more expensive. The state 404 program creates a disincentive for developers to go the HCP route because it gives them an easy shot at incidental take protection through a simpler, cheaper "technical assistance" process not contemplated or authorized by Congress. This creates additional risk of loss of environmental and species protection from overdevelopment in the unique and biodiverse state of Florida.

25.     To further FWF's organization goals, FWF has actively engaged on habitat conservation plans in order to obtain protections for listed species and conserve habitat for their

survival and recovery.  For instance, for years FWF worked on the Eastern Collier County HCP

("Eastern Collier HCP") in Southwest Florida, which represented a significant focus of its

Florida conservation work because of its importance to protecting species in one of the most

biodiverse regions of the country.  The proposed Eastern Collier HCP covered approximately

152,000 acres of rural, agricultural, and wild lands in the southwest part of Florida that connect

the Florida Panther National Wildlife Refuge and the Big Cypress National Preserve with other

protected areas in the region.  This HCP would have kept 70% of the area as either conservation

or agricultural lands, with the other 30% set aside for residential and commercial development.

26.     In August 2022, however, the landowners who are party to the Eastern Collier

HCP withdrew their HCP application.  Now the development projects proposed to be covered by

the HCP will only undergo the State's species review process associated with their state

processed 404 permit, which is not as stringent as ESA's Section 7 or Section 10 review.

27.     As with the loss of use of habitat conservation plans in general, it is detrimental to

FWF's mission that the landowners abandoned the HCP in favor of the state 404 assumption

program which has a much lower bar to meet to obtain a permit and which does not have the

same long-term monitoring requirements.  The loss of the Eastern Collier HCP and/or the

decrease in protections it contemplated represents the loss of an entire body of FWF's work in

Florida to protect endangered and threatened species in this region for the past decade.  It also

means that FWF has had to start from scratch in working to protect endangered species in this

area, particularly the highly endangered Florida panther.  Instead of ensuring species protection

through one HCP for numerous development projects, FWF now has to review and challenge

problematic developments on a project-by-project basis in state court.

28.    The lack of NEPA and ESA site-specific consultation with Florida's 404 program and the hurdles and roadblocks to litigating in state court, as described above, harms FWF's ability to carry out the organizational mission of protecting wildlife.

29.    While Florida is allowed to implement the state 404 program, FWF will continue to be harmed in its ability to carry out its mission of protecting native and endangered species, their habitats, and waters.

30.    A favorable ruling from this Court would return Section 404 authority to the Corps and restore the federal protections afforded under NEPA and the ESA.  In addition, a favorable ruling would allow FWF to pursue remedies in federal court in order to vindicate rights under the CWA, NEPA, and ESA.  A decision favorable to the Plaintiffs will prevent the issuance of permits authorized by the state program and the associated harms to FWF as outlined above.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 5th day of February, 2023.

DocuSigned by:

*Preston Robertson*

9C75928929AF45D...

Preston T. Robertson

14241 Buckhorn Road

Tallahassee, FL 32312