**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | CASE NO. 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

<u>**DECLARATION OF DIANA UMPIERRE**</u>

I, Diana Umpierre, make the following declaration:

1.      I submit this declaration in support of the Sierra Club in the above-captioned action.

2.      I live in Pembroke Pines, Broward County, Florida, near the Everglades and the associated Water Conservation Areas, and have lived here since 2000.  I spend a considerable amount of time enjoying and trying to help protect the natural environment and wildlife in South Florida.  I believe our unique ecosystem and wildlife are very important to the communities here and for biodiversity in general.

3.      Accordingly, I became an active member of the Sierra Club in 2014 to help protect and conserve endangered species and natural ecosystems in South Florida.

4.      I became an employee of the Sierra Club in June 2016 and since then have been serving as an Organizing Representative for the Sierra Club's Everglades Restoration Campaign.

5.      Prior to joining Sierra Club, my experience included working as a geoscientist for environmental consulting firms in New Jersey and Florida where I provided geographic data analysis of impacts to ecologically sensitive habitats and water quality from planned transportation and water/wastewater projects as part of NEPA environmental assessments. My experience also includes working as a geographer for the South Florida Water Management District where I supported regional water supply long-range planning for 16 counties in South Florida, including analysis of geographic data on water resources and of land cover over time to determine wetland impacts.  I assisted the Southeast Florida Regional Climate Change Compact by coordinating with government and academic partners in analyzing, mapping, and communicating sea level rise vulnerability for four counties in Southeast Florida, including Miami-Dade.  I earned my Bachelor of Science degree in Geological Sciences from Cornell University in 1990.

6.      The Sierra Club is a national non-profit grassroots environmental organization with over 700,000 members across the United States dedicated to practicing and promoting the responsible use of the earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives.  Sierra Club's interests encompass a wide range of environmental issues, including wildlife conservation, wilderness preservation, public lands and waters protection, and the protection of clean air and water resources.  These activities support Sierra Club's mission to explore, enjoy, and protect the wild places of the earth.

7.     The Sierra Club headquarters is in Oakland, California.  Sierra Club has chapters across the nation, including Florida, with members interested in wildlife and wildlife habitats.  Most of the Sierra Club chapters include all-volunteer groups, whose members work to preserve and protect their area's natural resources.  Sierra Club's Florida Chapter has nearly 5,000 members and focuses on protecting Florida's unique natural wonders, including its springs, wetlands, and endangered wildlife like the Florida panther and the Florida bonneted bat.

8.     One of the Sierra Club's main national initiatives, the Our Wild America campaign, which includes Everglades restoration efforts, tackles pressing environmental problems including global warming and threats to wildlife.  Sierra Club has long advocated for protections for species under the ESA, and has brought litigation to ensure that Federal agencies meet their ESA obligations.

9.     My work involves supporting and expanding volunteer-based grassroots efforts to promote the restoration of the Greater Everglades ecosystem and the protection of its remaining natural wildlife habitats from threats such as water mismanagement, development, and sea level rise.

10.     As an active member, I have advocated for Everglades restoration, the protection of native habitat, and the restoration of natural and clean water flows, which are important for healthy wildlife.  I also spend time educating people about the importance of protecting Florida panther and Florida bonneted bat habitat.  I plan to continue participating in these activities in the future.

11.     I am also an active member of the International Dark Sky Association and have advocated for the protection of the natural nocturnal environment, which is important for wildlife, including nocturnal species like fireflies, the Florida panther, and the Florida bonneted bat.  In 2016, I helped Big Cypress National Preserve become the first National Park Service unit east of Colorado to achieve an International Dark Sky Place designation, in part because this protection is important for the Florida panther and other nocturnal species.  I have also been actively engaged in advocating for similar Dark Sky Place designations and stronger nocturnal environment protections for other parts of the Greater Everglades, including Miami-Dade County, Florida Panther National Wildlife Refuge, and Everglades National Park.  Therefore, protecting the natural night sky and the nocturnal environment of these conservation areas is very important to me.

12.     EPA's approval of Florida's application to assume control of section 404 permitting undermines Sierra Club's mission.  Among other failings, Florida has no lawful plans to ensure that listed species are adequately protected and analyses of section 404 permit applications issued by Florida will no longer include review under the National Environmental Policy Act ("NEPA") and consultation under section 7 of the ESA, as they would if 404 authority remained with the U.S. Army Corps of Engineers ("Corps") instead.

13.     Because section 404 permit applications processed by Florida do not undergo a NEPA analysis or site-specific ESA section 7 consultation, these projects are subject to a far less rigorous environmental review, which increases the risk of harm to listed species and their habitat and harms Sierra Club's mission.

14.     Florida claimed this permitting program would be easily streamlined with their current state environmental resource permitting ("ERP") program which has significant differences and is required for projects that impact surface waters.  Florida also stated throughout the assumption process that it will process permits faster than the Corps has in the past.  The harms from this transfer of authority are detailed in an article written by Craig Pittman wherein he describes how lobbyists for the developers called this handover "the Holy Grail."  *See* Attachment A.  The bottom line is that "super-fast permit approvals" prioritize development over our precious wetlands in Florida.

**Organizational and Membership Harms From Particular Projects**

15.     The state's 404 program undermines Sierra Club's ability to realize its mission by depriving the organization of information, rights, and remedies available when Section 404 is administered by the Corps, as it has been for decades.  As a result of EPA's unlawful transfer of 404 authority to the state, the state will continue to issue 404 permits on major projects that will harm Sierra Club's organizational interests and my interests as a member.

16.     A project we are particularly concerned about is the Bellmar development project (state 404 application number 0396364-001) in Southwest Florida.  Collier Enterprises Management, Inc., applied on December 16, 2020, to build the Bellmar project in eastern Collier County, Florida, which would encompass over 5,000 acres and affect approximately 132 acres of wetlands. The project is located approximately one mile from the Florida Panther National Wildlife Refuge, which protects the core habitat of the endangered Florida panther. Telemetry data also shows the presence of the Florida

panthers on the project site. The proposed development would also impact habitat of the endangered Florida bonneted bat and crested caracara. On September 15, 2022, Sierra Club submitted public comments to Director Martha Williams of the U.S. Fish and Wildlife Service on the threats the development would pose to the Florida Panther. *See* Attachment B.

17.     Two additional project proposals that we are particularly concerned about are oil drilling projects in Big Cypress National Preserve that, if approved, would pave the way for oil drilling and production in the preserve for the next 30 years.

18.     Spanning over 700,000 acres, Big Cypress National Preserve is the nation's first national preserve.  It is a continuous freshwater ecosystem comprised of five habitats that are connected by the water that flows through them, and it is replenished entirely by rainwater.  The water flows from the hardwood hammocks to the pinelands, across the prairies, into the cypress swamps, and then into the estuaries that flow to the Gulf of Mexico.  The freshwaters of Big Cypress are crucial to the health of the neighboring Everglades and critical to the wildlife that inhabits it.  Big Cypress provides habitat for various listed species and has the largest contiguous acreage of habitat for the endangered Florida panther in south Florida.

19.     For the first proposed Big Cypress project I am concerned about, the Nobles Grade Prospect (previous state 404 application number 323836-004), Burnett Oil Co., Inc., applied on January 21, 2021, to construct an oil drilling pad for three vertical wells and an access road in Big Cypress National Preserve for the purposes of oil

drilling.[1]  On February 22, 2022, the applicant withdrew this proposal for this project but stated it would resubmit its application pending further project development.  The project as originally proposed would cover 21.21 acres and would result in the filling of 85,000 cubic yards of wetlands in Big Cypress.  The proposed area is located approximately three miles southwest of the rest stop at Interstate 75 mile marker 63.  This rest stop serves as an access point to hiking trails that go directly into the backcountry of Big Cypress.[2]

20.    Big Cypress National Preserve provides habitat for threatened and endangered species.  Endangered Species Act-listed species observed or potentially occurring within or near the Nobles Grade proposed project area include the following: the American alligator, eastern indigo snake, Everglade snail kite, wood stork, red-cockaded woodpecker, crested caracara, and the Florida panther.

21.    For the second proposed Big Cypress project I am concerned about, the Tamiami Prospect (previous state 404 application number 397879-002), Burnett Oil Co., Inc., applied on January 21, 2021, to construct an oil drilling pad and an access road in Big Cypress National Preserve at the eastern boundary of the Preserve for the purposes of oil drilling.  On February 22, 2022, the applicant withdrew this proposal as well, and again stated it would resubmit its application pending further project development.  The

---

[1] Burnett Oil's ERP / State 404 Application for Nobles Grade Prospect, available at https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_323836/gis-facility!search .

[2] National Park Service, Big Cypress, I-75 Mile Marker 63, *see* https://www.nps.gov/bicy/planyourvisit/i-75-mm-63.htm .

area would cover 10.99 acres and would result in the filling of 46,000 cubic yards of wetlands in Big Cypress.

22.     Endangered Species Act-listed species observed or potentially occurring within or near the Tamiami proposed project area include: the American alligator, eastern indigo snake, Everglade snail kite, wood stork, red-cockaded woodpecker, crested caracara, Florida bonneted bat, and the Florida panther.

23.     On February 3, 2021, several conservation groups sent a letter to the Florida Department of Environmental Protection ("FDEP") raising concerns about the impacts of the proposed projects.  I have reviewed this letter and incorporate it in this declaration, *see* Attachment C, because I share the same concerns regarding these oil projects.

24.     For example, not included and fully analyzed in Burnett Oil's applications are the scope of activities attendant to oil development and drilling and their impacts such as development activities associated with access roads, staging areas and seismic operations, and construction of gathering, transmission, and distribution pipelines.

25.     Because Big Cypress National Preserve is a continuous ecosystem connected by the flow of freshwater, any disruption to this flow from the oil projects would lead to still or stagnant water directly north and south of the site, altering and disturbing the natural environment on which plant and animal species depend.  Similarly, pollution at one location in Big Cypress will affect the remaining habitats to which that water flows, thereby threatening water quality downstream and in turn, threatening the species that rely on this habitat.

26.     Aside from disruptions to the flow of water and the threat of pollution/water quality degradation, the construction and operation of oil drilling infrastructure will negatively impact the species within the vicinity of the projects. Birds and other wildlife will be forced to flee as a result of the noise, artificial light at night, ground vibration, the presence of machinery, vehicles, and humans, and other attendant circumstances.  Animals that cannot get away risk injury from construction and operation activities.

27.     Burnett Oil's proposed projects are particularly concerning in light of the harmful impacts from previous seismic exploration activities in Big Cypress National Preserve in 2017 and 2018, when Burnett Oil utilized Vibroseis (seismic vibration technology) to send signals into the earth to locate subsurface oil and natural gas deposits within Big Cypress.  This seismic exploration took place over approximately 110 square miles of the Preserve and resulted in significant environmental damage that is still present today.  The damage included severely altered and rutted wetland soils; removal of dwarf cypress trees, which provide roosting sites for birds and other wildlife above high water levels; significantly diminished vegetation groundcover; the presence of dwarf pond cypress tree stumps that are not re-sprouting and the absence of seedlings for these trees; and uneven ground elevations as a result of the company's reclamation attempts, among other harms.

28.     Big Cypress is not suitable for any oil exploration or drilling because of ecological importance and sensitivity, as well as the damage already caused by those activities to this preserve and the protected species that rely on it.  So even if the projects

are modified, similar activities will harm our organizational and my membership interests.

29.     Another concerning project is the State Road 836 (Dolphin Expressway) Extension (state 404 application number 13-396515-001-SFI).  On March 26, 2019, the Miami-Dade Expressway Authority submitted its initial 404 permit application to the Corps (SAJ-2018-01778 (SP-MLC)).  That 404 permit application was transferred from the Corps to the state (FDEP) on or about December 28, 2020, a few days after state assumption became effective. On August 20, 2021, the applicant withdrew this proposal for this project stating as reason that  "the State 404 authorization cannot be issued until the [Environmental Resource Permit] has been issued," suggesting that the 404 application would be resubmitted once the applicant completed a "pre-permit application process with the FDEP."   *See* Attachment D.

30.     While the application was under Corps jurisdiction, on May 22, 2019, the Corps issued a Public Notice "soliciting comments from the public; Federal, State, and local agencies and officials; Indian Tribes; and other Interested parties in order to consider and evaluate the impacts of this proposed activity."[3]

31.     On July 26, 2019, the Everglades Coalition, comprised of over 60 organizations committed to the health and protection of America's Everglades, including Sierra Club, submitted comments to the Corps opposing the proposed 404 permit, *see* Attachment E.

---

[3] U.S. Army Corps of Engineers public notice SAJ-2018-01778(SP-MLC), available at https://www.saj.usace.army.mil/Missions/Regulatory/Public-Notices/Article/1855244/saj-2018-01778sp-mlc/ .

32.     Furthermore, in a letter sent to Governor DeSantis on June 24, 2020, the

Everglades Coalition asked him to uphold a recent ruling by Florida Administrative Law

Judge Suzanne Van Wyk, which held that the Miami-Dade County Comprehensive Plan

Amendment adopted by Miami-Dade County via Ordinance 2018-109 on September 27,

2018, that would allow for the proposed highway extension, demonstrated inconsistency

with Everglades restoration efforts, with Miami-Dade County's Comprehensive

Development Master Plan, and with state law.  *See* Attachment F.

33.     This project's purpose is to construct a 14-mile toll road extending the

current Dolphin Expressway.[4]  The project will consist of a six-lane toll road extending

State Road (SR) 836 through jurisdictional wetlands within the Comprehensive

Everglades Restoration Plan's (CERP) footprint.  The project would result in the filling

of 360 acres of wetlands and secondary impacts to almost 100 acres of wetlands located

in the Bird Drive and North Trail Wetland Basins which are adjacent to the Everglades

National Park.  These basins have been set aside as a water quality, water seepage, and

habitat buffer for the Park.  Freshwater wetlands are essential to the region for water

quality and wildlife benefits.

34.     Everglades National Park spans 1.5 million acres that stretch over the

southern part of Florida and is home to a vast diversity of plants and wildlife across

different ecosystems: freshwater sloughs, marl prairies, tropical hammocks, pinelands,

cypress, mangrove, coastal lowlands, marine, and estuarine.  The State Road 836

---

[4] Miami-Dade Expressway Authority State 404 related documents are available at
https://prodenv.dep.state.fl.us/DepNexus/public/electronic-
documents/ST404_396515/gis-facility!search .

Extension project would impact the progress made and on-going efforts to restore water flows and quality, fragile ecosystems, and natural resources within the Everglades National Park.

35.     In an August 23, 2019 letter to the Corps, the EPA voiced concerns and stated that the road extension project "may have substantial and unacceptable adverse secondary impacts to the Greater Everglades wetland ecosystem and direct impacts to 350 acres of freshwater wetlands located in the Bird Drive Basin and within Congressionally authorized CERP project boundaries that are an ARNI [aquatic resource of national importance]."[5]  In a subsequent letter on September 16, 2019, the EPA once again expressed its concerns and that it had "received no additional information from the Corps to address these concerns" and that "the EPA finds that the proposed project will have a substantial and unacceptable impact on aquatic resources of national importance."

36.     According to the Corps' May 2019 public notice, there are several listed species that may use the wetlands that would be affected if the SR 836 extension 404 permit is granted, including the wood stork, the Eastern indigo snake, and the Florida bonneted bat.

37.     I am personally and professionally very worried about the federally endangered Florida bonneted bat, the largest bat in Florida.  On June 10, 2020, the U.S. Fish and Wildlife Service proposed critical habitat that includes part of the footprint of

---

[5] U.S. Environmental Protection Agency letter to Army Corps of Engineers, August 23, 2019, available at https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396515/gis-facility!search .

the proposed highway project.[6]  I am very concerned that SR 836 extension will induce more traffic that would affect the wetlands and water quality, and invite more development.  All of which will cause harm to the listed species in this area impeding Sierra Club's mission and my personal use and enjoyment of this area.  Several likely consequences include increased bird and snake road fatalities as this area is very close to a water conservation area and wildlife management area within the Everglades Protection Area.  I am also very concerned about a substantial increase of light pollution in nearby conservation areas that may come from new artificial lighting on the highway and associated infrastructure, including exit interchanges and parking areas.  Increased noise will likely also affect listed species that may be present in this area.

38.     All of these projects are particularly concerning to me, because I love and enjoy visiting the Everglades Protection Area, Everglades National Park, and Big Cypress National Preserve.  Over the years I have visited many preserves, but Big Cypress National Preserve is still my most beloved and I visit about four times a year.  I also thoroughly enjoy visiting Everglades National Park, which I visit about two to four times a year.  During my visits, I typically hike, observe the flora and fauna, stargaze, and take photographs.  I enjoy recreating in nature to keep myself healthy, and to observe wildlife.  I enjoy getting outdoors to experience the unique environment and native wildlife, including opportunities to see or hear the Florida panther and Florida bonneted

---

[6] Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Florida Bonneted Bat, 50 C.F.R. § 17 (2020), available at https://www.govinfo.gov/content/pkg/FR-2020-06-10/pdf/2020-10840.pdf#page=1 .

DocuSign Envelope ID: D73B0293-BD78-402F-B268-84F251B9E5CE

bat, of South Florida.  I have plans to continue regularly visiting Big Cypress National Preserve and Everglades National Park as well.

39.     I also attend night education events hosted by park rangers at Big Cypress National Preserve.  I always look for panthers and fireflies when I am out at night.  I plan to continue these activities in the future.

40.     It is important to me to see the natural environment of South Florida preserved in a way that will maintain the integrity of the ecosystem.  My personal enjoyment of the ecosystem and natural areas in which I recreate will diminish significantly if the ecosystem and species like the panther are harmed.  For example, panthers are critical to supporting and maintaining the health of the South Florida ecosystem.  Without the panther, or with fewer panthers in the wild, there will be a domino effect on the ecosystem and its biodiversity.  This substantial alteration of the native ecosystem will fundamentally change the character and way of life in and around South Florida, adversely affecting my use and enjoyment.

**Organizational Harms from Waters Excluded from the Retained Waters List**

41.     Members of the Sierra Club reside in nearly every corner of the state and our members enjoy, explore, and do everything they can to protect the water bodies in their local regions.

42.     On April 16, 2018, Sierra Club sent a letter to then-District Commander Jason A. Kirk of the Jacksonville District Corps of Engineers, demanding that "the Corps completely rectify its inventory of Florida's navigable waters before any actions take place concerning the assumption of delegation of Section 404 dredge and fill permitting

DocuSign Envelope ID: D73B0293-BD78-402F-B266-84F2E1B9E5CE

authority by Florida's Department of Environmental Protection." Our well-founded concern was then, and is now, that many of the water bodies left off the current Retained Waters List will be further imperiled by FDEP's failure to provide them protection under an adequate 404 permitting system.

43.    The following water bodies are a sample of water bodies that are ecologically and/or recreationally significant to our members, and which were excluded from the Corps' 2020 Retained Waters List but had been present in the 2017 version of the same list:

44.    The Alapaha River (Hamilton County), is a tributary of the Suwannee River that is impacted by the Hamilton phosphate mining district. Near Jennings, Florida, the Alapaha drains into a sinkhole into the Floridan Aquifer. That aquifer supplies drinking water to more than 90 percent of people in northeast and east-central Florida. This aquifer system underlies an area of about 100,000 square miles in southern Alabama, eastern and southern Georgia, southeastern Mississippi, southern South Carolina, and all of Florida. The Alapaha River and its water trail,[7] like the Suwannee River, is a treasured, popular spot for recreation (fishing, paddling, outings, and camping) for our members.

45.    Several other waterways are imperiled by industry activity and are at further risk with 404 permitting in the hands of the state. Deep Creek (Duval and Baker counties), near U.S. Route 301, runs behind and receives runoff from the Chemours mine

---

[7] Georgia River Network, *Alapaha River Water Trail*, https://garivers.org/alapaha-river-water-trail/.

dump. Water Oak Creek (Bradford County) is also a repository for wastewater from the Chemours mine.  Our members have experienced and witnessed skin burns from contact with the water in Water Oak Creek that feeds into Lake Rowell and Lake Sampson via Alligator Creek (see below).

46.     Deep Creek (Suwannee County) receives phosphate waste from the Nutrien White Springs Phosphate plant and flows into the Suwannee River.

47.     Swift Creek (Hamilton and Suwannee counties) receives phosphate waste from the Nutrien Swift Creek processing plant.

48.     Turkey Creek (Baker County) receives mining discharge from the Chemours mine and the City of McClenny sewage treatment system.

49.     Horse Creek (Hardee and DeSoto counties) is surrounded in Hardee County by existing phosphate mines and is threatened by a new phosphate mine proposal from Mosaic in DeSoto County.[8]  Horse Creek in Hardee County flows within and south of phosphate mines.  Horse Creek is the largest tributary of the Peace River and begins at the "Four Corners," where the counties of Hillsborough, Manatee, Polk and Hardee meet in the heart of phosphate mining territory.

50.     Peace River (Polk, Hardee, DeSoto, and Charlotte counties) is vital to maintain the delicate salinity of Charlotte Harbor, which hosts several endangered species including the smalltooth sawfish.  Phosphate strip mining and fertilizer processing

---

[8] The Mosaic Company, *DeSoto County Project*, https://mosaicfloridaphosphate.com/communities/desoto-county/desoto-project/.

continue to threaten this river.  DeSoto County is under the threat of phosphate mining by Mosaic, the nation's largest producer of fertilizer.

51.     Peacock Slough (Suwannee County) is in Wes Skiles Peacock Springs State Park, which has two major springs, a spring run, and six sinkholes.  Many of our members recreate at this site (hiking, swimming, cave diving, and picnicking).

52.     Ichetucknee River (Columbia County) flows through the Ichetucknee Springs State Park – an area of high ecological and recreational value to our members (paddling, tubing, etc.). The Ichetucknee is imperiled by nutrient pollution that fuels the harmful algae that now chokes its once-pristine waters, in addition to the over-pumping of groundwater.

53.     Santa Fe River (Columbia, Suwannee, Bradford, Baker, Union, Gilchrist, and Alachua counties) flows underground in O'Leno State Park through an intricate cave system, emerges in River Rise Preserve State Park, and empties into the Suwannee River; this river sink/river rise system in O'Leno is the largest swallet-to-resurgence system in Florida.  Gilchrist Blue, Ginnie, Hornsby, Lily, Poe, and Rum Island springs are some of the 36 named springs and numerous smaller springs along the banks of or submerged by the river.  The headwaters of the river are Lake Santa Fe, near Keystone Heights.

54.     The Santa Fe River, its springs, and its tributaries, play a major role in the recreational (spring hopping, paddling, camping, and fishing) lives of our members.  The Santa Fe is also threatened by development in its sizable watershed.  The following Santa Fe River tributaries are also missing from the retained waters list: New River (Union and Bradford counties), the largest of the Santa Fe River tributaries, is near significant

phosphate deposits and was threatened by the HPS II phosphate mining project proposal, which would have mined over 7,400 acres across Union and Bradford counties. We expect that additional mining proposals will arise because Julian Hazen, who worked for the Florida Industrial and Phosphate Research Institute, is quoted in media as stating that because the United States is low on phosphate rock "[s]omeday, this deposit will be mined. . . [w]hether it's 5 years from now or 20 years from now."[9]

55.     Alligator Creek (Bradford County) receives discharges from the Chemours mine, and it feeds several local waterways. It was once a beautiful paddling spot that has become a polluted drainage ditch. Braggs Branch (Bradford County), just south of Brooker, is also impacted by mining. New River is part of the Santa Fe River Basin that spans nine counties including parts of Alachua, Gilchrist, Suwannee, Columbia, Union, Bradford, Baker, Clay, and Putnam. This watershed is an important recharge area for the Floridan Aquifer; Olustee Creek (Washington County) and Sampson River (Bradford County) are also tributaries of the Santa Fe River.

56.     Silver River (Marion County) is a seven-mile run from the outflow from Silver Springs State Park to a confluence with the Ocklawaha River. While it still provides a breathtaking scenic experience for those in canoes or kayaks, and is a popular and beloved destination for our members, it is now choked with algae. The iconic glass-bottomed boats on the river show a vastly different river bottom from that of 50 years ago. The Silver River is further threatened by the River Creek RV Resort project (State

---

[9] Molly Minta, WUFT News, *What's Mine Is Yours*, available at https://projects.wuft.org/peakflorida/whats-mine-is-yours/

404 Program Permits: 671124).  The River Creek RV Resort is a proposed 385 Site

Recreation Vehicle Resort on 160.76 Acres located near the confluence of the Silver and

Ocklawaha rivers.

57.     Hendry Creek (Lee County) is located within Caloosahatchee River Basin

and was designated as impaired in FDEP's implementation of its Impaired Waters

Rule.  It runs through the Hendry Creek neighborhood in South Ft. Myers.

58.     Hickey Creek (Lee County) runs through the Hickey Creek Mitigation

Park,  a popular hiking, paddling, and birding location for our members. The creek's

ecosystem supports the threatened Florida Scrub-Jay and gopher tortoises.

59.     Powell Creek (Lee County), a tributary of the Caloosahatchee River, runs

through Powell Creek Preserve and is a popular recreation spot for our members and their

families for walking, biking, and viewing wildlife, including pileated woodpeckers and

gopher tortoises.  The endangered gopher tortoise is a keystone species; it shares its

burrows with more than 350 other species.

**Organizational Harms from the State Program**

60.     The state's administration of this unlawful section 404 program prevents

Sierra Club from being able to monitor and engage in proposed permits to the same

degree that the federal program afforded us.

61.     To start, we do not have the same access to basic information about 404

applications open for public comment under the state program that we were readily able

to obtain from the Corps.  As a staff member, I would regularly review 404 public notices

from the Corps and forward those to Sierra Club groups located throughout the state.

Those groups would then use the information to identify projects of concern, help set their advocacy priorities, and prepare members to engage in advocacy, particularly during the comment period.  Sierra Club used this information also to monitor development pressures and trends so that we could tailor our advocacy around those.

62.      The state program, however, does not provide this information in an accessible manner.  The state has an email subscription service, called Permit Application Subscription Service (PASS), that provides a periodic email that lists different permit applications they received for processing. However, that service does not email public notices of 404 permits applications open for public comment.  This unduly burdens Sierra Club's ability to get prompt information about 404 permits open for public comment, which I do get by email from USACE for any 404 individual permit application open for public comment to the Corps from anywhere in Florida. Prompt access is important because 404 permits typically only have a 30-day public comment period and a limited timeframe for Sierra Club and any member of the public to request a public hearing. We cannot do this promptly or effectively to advocate against harmful 404 projects.  We are required to divert resources to try to find the pertinent information, and to do so in time to notify local Sierra Club groups that may be most concerned, and to ensure they have the opportunity to review the application and engage in advocacy before it is too late.  Each of the six FDEP local district posts its 404 public notices on their own separate district web pages. There is no easy means to subscribe to a single email distribution list that automatically informs me when a 404 permit application is open for public comment. It is onerously burdensome, and often not possible, to check six different FDEP district web

pages, every single day, to see if there any 404 permit applications that might be of

concern to our Sierra local groups. That is just one example of how the State's

assumption of 404 permit is hurting our ability to protect our waters.

63.     Without being able to receive public notices in a timely, orderly manner as

we had before, we are unable to forward that information in a timely way to Sierra Club

groups, and they and we as a result are hindered in our ability to track trends in

development that may collectively require coordinated advocacy.  This harms our ability

to execute our mission.

64.     As an organization, we also heavily rely on federal review and analyses of

projects that affect wildlife, land conservation, climate, and water.  We act on them as

needed depending on the impacts of the proposed project.  We utilize information

required under NEPA, the ESA, and the Clean Water Act to review permit applications.

These federal analyses also provide a common baseline for issues, from which we can

assess proposed agency actions and their environmental impacts.

65.     Because the state program is in place, we are losing all of the protections

that the federal law allows.  This means that there will be no federal analysis or comment

process on state 404 projects and permits.  As an organization, we do not have the ability

to take on every advocacy effort so we rely on that federal review to evaluate those

projects for our members and Florida's environment.

66.     Our organization is significantly harmed without these federal analyses

because we must hire our own experts in an attempt to assess and understand the impacts

of agency actions.  Experts cost thousands of dollars per case, we are longer able to

review and act on proposals or projects at the rate we normally do. The loss of information from these analyses results in additional staff time to triage permits to identify harms to the listed species and their habitats and additional costs in hiring experts. As a result, our conservation advocacy work is significantly hindered.

67.     One of the main tools Sierra Club uses to protect species, their habitats, and waters is the public commenting process. When there is a proposed agency action, we review the applications and documents; determine the scope and effect it would have on the wildlife and waters we seek to protect; review the geographic information and maps that allow us to visually understand the affected geographic environment; review wetland impacts and potential means to avoid, minimize, and mitigate those impacts; review applicable rules and laws; and submit comment letters.

68.     Under the Florida's 404 program, however, this public commenting process has become significantly more difficult, harming the advocacy of our members and volunteers. First, the state provides far less information about projects than the federal process does. Second, FDEP has moved the online public commenting process to the FDEP Nexus Business Portal, which requires commenters to provide their personal information including address and phone number to register for an account before allowing them to submit public comments. This onerous system discourages public comments in Sierra Club's grassroots campaigns, to the detriment of our organizational mission and to members concerned with harmful projects.

69.     The loss of critical information and procedural safeguards afforded by NEPA and the ESA significantly sets back our ability to advocate for and protecting

water resources, species and their habitats. As the pending 404 project applications

discussed above demonstrate, these losses are caused by Florida's assumption of the 404

program.  Furthermore, for any of the projects which Sierra Club would challenge

through litigation, a tool employed by our organization, it is guaranteed that Sierra Club

will either have to divert significant resources to engage in state court litigation, or forego

litigation completely, damaging our organizational mission.

70.     The state's unlawful assumption also hinders in other ways our ability to

litigate over illegal section 404 permitting actions, when necessary.  Sierra Club

challenges 404 permits in federal court as one of our advocacy tools to further our

mission, and we are harmed by the loss of federal court as a venue as a result of Florida

assuming the 404 program because it is much more difficult and expensive to bring these

challenges in Florida's state courts.

71.     It is my understanding that there is a higher bar to establish standing in

Florida state court because we are required to show that a substantial number of our

members will be affected by the challenged action, while in federal court we are only

required to show that a single member is adversely affected.  It is also my understanding

that Sierra Club risks exposure to mandatory "fee-shifting" which creates the risk of

liability for the opposing parties' costs and fees to engage in litigation.  We are not

exposed to this same risk in federal court, where the Corps is the section 404 permitting

agency.  The risk of incurring these substantial costs and fees results in our inability to

challenge illegal permit authorizations in Florida that would cause serious harm to

threatened and endangered species, even if our claims are strong.

72.     With assumption, there is now an entirely different legal scheme to challenge wetlands permitting in Florida, through the Division of Administrating Hearings ("DOAH").  Because legal proceedings in front of DOAH are conducted from scratch and are not treated as administrative record review cases, Sierra Club will have to incur considerable expense to hire expert witnesses to bring a legal challenge.  Expert witnesses cost upwards of thousands of dollars to retain on a case, which is thousands of dollars Sierra Club would have to divert from other programmatic goals if we did not have to litigate in state court.  In state court, we also would not have the benefit of environmental analyses and administrative records around which we can build our cases that federal NEPA and ESA processes afford.  Rather, in state court, we would have to build our cases from the ground up, conducting our own investigations and hiring our own expert witnesses.  A case before DOAH can easily run upwards of several hundreds of thousands of dollars, factoring in expert witnesses, attorneys' fees, and time.  As an organization, we do not have the ability to take on every advocacy effort so we rely on that federal review to evaluate those projects for our members and Florida's environment.

73.     The lack of procedural safeguards, and in turn, a weaker system for evaluating and testing the environmental impacts of permitting, also significantly increase the risk of harms to Florida's water resources, species, and their habitats, environmental harms that are felt personally by me as a member of Sierra Club.  I regularly partake in outdoor activities such as hiking, camping, observing wildlife, stargazing, and nature photography.  Some of the areas that I like to visit include, but are not limited to, Everglades National Park, Big Cypress National Preserve, Fakahatchee

Strand Preserve State Park, Florida Panther National Wildlife Refuge, Corkscrew Swamp

Sanctuary, Fisheating Creek, Okaloacoochee Slough State Forest and Spirit of the Wild

Wildlife Management Area, and several state, county and municipal-owned natural areas

in South Florida.

74.     Sierra Club is and will continue to be irreparably harmed in its ability to

carry out its mission of protecting native and endangered species, their habitats, and

waters if Florida is allowed to continue operating this unlawful 404 program.

**Redressability**

75.     A ruling in Plaintiffs' favor in this litigation would redress Sierra Club's

and my harms.  A ruling on our Clean Water Act claims invalidating EPA's approval of

Florida's program would restore 404 authority over assumable waters to the Corps,

restoring ESA Section 7 and NEPA review to projects (and the essential information and

analyses that those processes generate), and ensuring that all requirements of federal law

are met and can be enforced in federal court.

76.     A ruling in Plaintiffs' favor on our ESA claims would redress Sierra

Club's and my harms by invaliding EPA's approval of the state program; requiring EPA

to reinitiate consultation with USFWS (and to consult with NMFS) to fully consider the

effects of Florida's application on listed species and critical habitat; require the wildlife

agencies to produce legally sufficient biological opinions that properly analyze the

impact to listed species and critical habitat, set limits on incidental take, and impose

reasonable and prudent measures and triggers for reinitiation that are protective under the

DocuSign Envelope ID: D73B0293-BD78-402F-B269-84F2F1B9F5CF

ESA; and prohibit EPA, the state, and state permittees from receiving incidental take coverage from an unlawful "technical assistance" process.

77. A ruling in Plaintiffs' favor on the Retained Waters List would invalidate EPA's approval of the state program, set aside the Corps' inadequate retained waters list, prevent state 404 permitting on waters required to remain under the Corps' jurisdiction, require EPA to ensure that no non-assumable waters are placed under state 404 authority, and require re-evaluation of the Corps' list to comply with federal law..

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ____27____ day of February 2023, at Pembroke Pines, Florida.
.

DocuSigned by:

*Diana Umpierre*

A1CFBA93B2C3410...

Diana Umpierre

# Attachment A

Case 1:21-cv-00119-RDM Document 98-10 Filed 02/28/23 Page 28 of 101

# Handing federal wetlands permitting to FL DEP is an idea that's all wet

By Craig Pittman - September 17, 2020



*Roseate spoonbills are pictured at the Blackpoint Drive Wildlife Refuge on Merritt Island. Credit Michael Seeley via Wikimedia Commons*

Florida is best known for its gorgeous beaches, but we also have a lot of wetlands. Bogs, swamps, marshes, you name it, we've got 'em — more than any other state besides Alaska.

Some are famous — everyone's heard of the Everglades — but most are just anonymous soggy spots that help recharge our underground aquifer, filter pollution, soak up floodwaters, and provide valuable habitat for a whole lot of species.

Not everyone is a fan, of course. When John James Audubon visited Florida in 1832, he was blown away by the flocks of roseate spoonbills and other wading birds he found, but he couldn't deal with how wet our landscape was.

"The general wildness, the eternal labyrinth of waters and marshes, interlocked and apparently never ending, the whole surrounded by interminable swamps — all these things had a tendency to depress my spirits," he wrote in a letter to his editor.

If the swamp-hating Audubon were around today, he would no doubt be delighted to hear that the job of protecting our wetlands is on the verge of being handed over entirely to the state Department of Environmental Protection.

Right now, under the Clean Water Act, two federal agencies are in charge of preserving wetlands: the U.S. Army Corps of Engineers, which issues permits for dumping fill in them, and the Environmental Protection Agency, which can veto those permits. But now both are considering handing the job of federal wetlands permitting in Florida over to the state DEP, according to a Federal Register notice published on Sept. 4 seeking public comment over the next 45 days.

Florida's developers have been pushing for this handover to the state for a couple of decades. In 2005, a lobbyist for Florida developers said that a state takeover of federal wetlands permitting would be "the Holy Grail."

Why? Because they are convinced the state would grant them super-fast permit approvals, no matter how many acres of wetlands they were going to pave over, and because the state doesn't protect as many different types of wetlands as the feds do.

In 2006, the Florida DEP, which already issues state wetland permits, looked into taking over the federal permitting program, something only two other states had done. State officials quickly dropped the idea for one very simple reason: Florida builders were requesting so many permits already that taking over the feds' workload would overwhelm the agency. The state wouldn't have enough people to issue permits, much less follow up to make sure all the permit conditions were being followed.

### Scott the slasher



*Former governor and current Republican U.S. Sen. Rick Scott of Florida. Official Senate portrait; U.S. Senate website.*

That was under then-Gov. Jeb Bush. In 2011, after Rick Scott became governor, he slashed the size of the DEP by more than 600 employees.

Many of those who were ousted had been in place for decades and were considered experts in their fields. He also cut funding for the state's water management districts, which issue some wetland permits.

Under Bush, a pro-business governor, the DEP spent an average of 45 days considering permits before granting them. That was too slow for Scott, who urged the agency to crank them out faster. In 2014, he stood in front of a room full of DEP employees to praise them for cutting the amount of time to get permits to an average of just two days. That means they were processing those permits with all the care and consideration of a batting cage pitching machine shooting out fast balls.

Scott's administration is the one that began pursuing the Holy Grail of a state takeover of federal wetlands permitting. However, Scott's people insisted they could do it without hiring any new people to accommodate the huge increase in workload.



*Republican Gov. Ron DeSantis of Florida. Photo by Joe Raedle/Getty Images*

His staff persuaded the Legislature to pass a bill approving the changeover, and now Gov. Ron DeSantis — who pledged to be more environmentally friendly than Scott — is ready to carry Scott's plan to its fruition.

When I asked DEP press secretary Weesam Khoury if the agency expected the staff to take on this new challenge without hiring any additional workers, she said that the agency "will enhance the protection of Florida's wetlands by having the same statewide team of environmental experts who are already administering Florida's robust wetlands protection program also administer the similar federal … program."

(In other words, no.)

When I asked if that would overwhelm the staff, she said, "The state has more than 400 staff" working on environmental permitting, and "DEP is confident that these knowledgeable staff would be able to work together to handle this slight workload increase."

Putting the DEP in charge of the federal permits "would provide a streamlined permitting procedure," she said. Usually, when state officials say some regulatory function is being "streamlined" that means

"we're going to hand out permits like they're beads being tossed to the crowd from a Gasparilla float."

To Eric Hughes, this seems particularly worrisome for the future of Florida's valuable wetlands. Hughes spent 37 years at the EPA, most of them dealing with wetland permits in Florida, retiring at the end of 2016. Far from a "slight workload increase," he said, the number of federal wetland permit applications per year tends to fall between 1,500 and 2,000 in Florida.

**'Directly controlled by the governor'**

Not only would DEP permit reviewers face an overwhelming boost in their workload, he said, but the state agency is more likely to face serious political interference in its permitting decisions than the Corps or EPA do.

"These people [at DEP] are directly controlled by the governor," Hughes told me.

Lest you think he's exaggerating, let me point you to the case of the Highlands Ranch Mitigation Bank, a Jacksonville-area project that in 2012 got negative reviews from two water district employees who subsequently found themselves unemployed because they didn't give the politically connected owners what they wanted.

Then, when the DEP's top wetlands expert, Connie Bersok, balked at issuing the permit, she wound up being suspended then removed from reviewing that permit. She had refused an order from the deputy secretary of the DEP to bend the rules to cater to the wishes the applicants. A judge later ruled that she was right about everything.

Bersok retired in 2017 after 30 years, so I called her up to ask what she thought about her former co-workers taking over issuing federal wetlands permits. She called it "a terrible plan."

She also said Khoury's claim of having 400 DEP employees working on wetlands permitting sounded, shall we say, "inflated." The only way to get to 400 is to count every single state employee involved in every kind of permitting, including issuing permits for air pollution and other things that have nothing to do with wetlands.

"We've always been shorthanded," she told me.

A lot of DEP's permitting has been handed off to the state's five water management districts and even to some of the counties, she said. According to Hughes, if the DEP does that with federal wetlands permits, that would be even worse for the wetlands than if DEP handled them alone.

Florida's water boards tend to be run by well-connected gubernatorial appointees from the development and agricultural industries. In 2015, the developer who was chairman of the Southwest Florida Water Management District board pushed through approval of a wetlands permit for a friend and former business partner, then insisted he had no conflict of interest.

Last year, the chairman of the St. Johns River Water Management District faced ethics complaints because he tried hiding conflicts of interest involving permits for clients of his environmental consulting business. One of DeSantis' first actions as governor was to demand the resignations of all nine members of the South Florida water board because they kowtowed to Big Sugar.

**More than just the Everglades**

I asked Khoury if the DEP plans to dump its new federal permitting duties on the water management districts. Instead of saying "no," she replied, "Any consideration for the delegation of the program to the

water management districts would be considered after the program is implemented."

To me that sounds like, "Yes, but we don't want to say anything about that yet."

The funny thing, Bersok said, is that legally the builders and developers aren't getting what they really want. Even if state employees are the ones reviewing federal wetland permits, those permits would not be subject to state deadlines, she explained.

In other words, if the DEP handled the permits the way it should under the Clean Water Act, then the federal wetland permits would not be issued any faster — unless, of course, the permits are just going to be rubber-stamped, especially those involving a developer with major political connections.

Of course, given who's in charge of the federal government right now, that sort of arrangement would not be a considered a deterrent to the feds handing over permitting to the state.

The bottom line, then, is this: A lot of politicians say they're in favor of saving the Everglades. In Florida, it's become the equivalent of supporting motherhood and apple pie.

It's nice to see that one wetland get so much love. But the other wetlands deserve some love too, especially for those of us who like our water clean, our property flood-free, and our spoonbills abundant — no matter what old Mr. Audubon might say.

---

### Craig Pittman

Craig Pittman is a native Floridian. In 30 years at the Tampa Bay Times, he won numerous state and national awards for his environmental reporting. He is the author of five books, including the New York Times bestseller Oh, Florida! How America's Weirdest State Influences the Rest of the Country, which won a gold medal from the Florida Book Awards. His latest, published in January, is Cat Tale: The Wild, Weird Battle to Save the Florida Panther. The Florida Heritage Book Festival recently named him a Florida Literary Legend. He lives in St. Petersburg with his wife and children.



# Attachment B

  

September 15, 2022                                                                 *sent via email*

Director Martha Williams
U.S. Fish and Wildlife Service
1849 C. St. NW
Washington DC, 20240

State Supervisor Larry Williams
U.S. Fish and Wildlife Service
1339 20th Street
Vero Beach, FL 32960

Regional Administrator Daniel Blackman
U.S. Environmental Protection Agency
61 Forsyth Street SW
Atlanta, GA 30303

Secretary Shawn Hamilton
Florida Department of Environmental Protection
3900 Commonwealth Blvd. MS 49
Tallahassee, FL 32399

Director Eric Sutton
Florida Fish and Wildlife Conservation Commission
620 S. Meridian St.
Tallahassee, FL 32399

Re: Bellmar Development Application (Collier County) and Public Notice, #396364-001

Dear Director Williams, State Supervisor Williams, Regional Administrator Blackman, Secretary
Hamilton, and Director Sutton:

On behalf of our respective organizations and our members, the Center for Biological Diversity,
Conservancy of Southwest Florida, and Sierra Club are providing comment on the Bellmar
project proposal that is being sought under the Florida Department of Environmental Protection
(FDEP) state assumed 404 program (application #396364-001). This letter supplements our prior

correspondence on both the Bellmar project, as well as our comments provided regarding the Eastern Collier Multiple Species Habitat Conservation Plan (ECMSHCP). Please consider this letter as a request that FDEP hold a public meeting,[1] as well as a request that the US Environmental Protection Agency also hold a public meeting.[2]

We oppose authorization of this project and are asking you to deny the request for a section 404 permit because it will have unacceptable direct, indirect, and cumulative impacts on endangered and threatened species, wetlands, and other natural resources. This controversial project is within a flowway and key wildlife corridor, would directly impact over 1,700 acres, and is only approximately one mile away from the Florida Panther National Wildlife Refuge (FPNWR).

Further, it is apparent that the project will not meet the "no jeopardy" requirement of the Endangered Species Act and the state 404 permitting program, not only due to habitat loss, infringement of wildlife corridors, and indirect impacts on adjacent preserves, but also due to the impacts of traffic and transportation needs resulting from the Bellmar project, particularly in concert with cumulative impacts that are reasonably foreseeable.

Not only does Bellmar fail to meet the criteria for permit issuance under rule 62-331 F.A.C. and other requirements of Florida's state assumed 404 program, but it also would be inconsistent with the Endangered Species Act (ESA).

I.      **Bellmar Cannot Be Authorized Absent an Affirmative Demonstration that the Effects of the Authorization, Considered with Regard to Cumulative Effects, Are Not Likely to Jeopardize the Florida Panther**

ESA Section 7 requires that "[e]ach Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species."[3] When EPA decided to allow FDEP to take over the 404 permitting, it relied on a programmatic Biological Opinion to purportedly satisfy its duties under ESA Section 7 to ensure against jeopardy.[4] Rather than analyze the impacts to species from EPA's decision, which included the effects of the permitting that would occur under the State 404 Program, that programmatic Biological Opinion relied on a structured process for technical assistance whereby the analysis would occur at the State program permitting stage instead, and would comply with the terms in the programmatic Biological Opinion, deferring the actual analysis of jeopardy. To comply with the programmatic Biological Opinion**,** the agencies must now consider all the indirect, direct, and cumulative effects of Bellmar and other reasonably foreseeable development to ensure the project will not jeopardize listed species, including the Florida panther. As outlined below, because these effects, when added to the environmental baseline, are likely to jeopardize the Florida panther, the agencies cannot authorize Bellmar.

---

[1] 62-331.060, Florida Administrative Code.
[2] 62-331.052, Florida Administrative Code.
[3] 16 U.S.C. § 1536(a)(2).
[4] CSWF, CBD, Sierra Club and others are currently challenging the lawfulness of that approach in court, and in no manner waive the claims, issues, or arguments raised in that litigation.

**A. The agencies must consider the impact of the Bellmar project with the cumulative effects of other reasonably foreseeable development that will be authorized under the State 404 program and will affect ESA-listed species and habitats in the areas affected by the Bellmar project.**

The "no jeopardy" conclusion in the Biological Opinion for EPA's approval of the Florida State 404 program (404 Programmatic BiOp) relies on the "structured process" established pursuant to the Memorandum of Understanding (MOU) between FDEP, the Florida Fish and Wildlife Conservation Commission (FWC), and the U.S. Fish and Wildlife Service (FWS) to avoid jeopardy,[5] which characterizes that structured process as being "as protective" as ESA section 7 consultation.[6] For that to be the case, the jeopardy determination for any given permit would have to consider the effects of the permitted activity cumulatively with other reasonably foreseeable non-federal actions, which here would necessarily include other reasonably foreseeable State 404 permits affecting the same area affected by the permit at issue.

An ESA section 7 analysis of effects would require consideration of cumulative effects. ESA regulations state, "Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."[7] "Action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action."[8] Effects include "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action."[9] "A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action."[10]

With regard to how cumulative effects will be considered in making the effects determinations pursuant to the "structured process," the 404 Programmatic BiOp states: "The USFWS evaluation of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA."[11] The BiOp states that State 404 permit applications must include: "Analysis of any cumulative effects, which are the effects of future State or private activities that are reasonably

---

[5] U.S. Fish and Wildlife Service, Programmatic Biological Opinion for U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program under Section 404 of the Clean Water Act (hereafter "404 Programmatic BiOp"), at 68–69.

[6] 404 Programmatic BiOp at 56.

[7] 50 C.F.R § 402.02.

[8] 50 C.F.R § 402.02.

[9] 50 C.F.R § 402.02.

[10] 50 C.F.R § 402.02.

[11] 404 Programmatic BiOp at 20. *See also id*. at 25 ("The USFWS evaluation of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA.").

certain to occur within the project area."[12] It defines "project area" to mean: "a portion of the State-assumed waters where specific dredging or filling activities are permitted and consist of a bottom surface area, any overlying volume of water, and any mixing zones," but specifies that, "In the context of the review of State 404 permit applications for endangered and threatened species, also includes those areas outside the immediate area of activity which may affect listed species using those areas."[13]

With regard to how jeopardy will be evaluated as part of the "structured process," the 404 Programmatic BiOp states that, "the USFWS's project-specific, species-specific, review of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA."[14] "Assessment of adverse cumulative impacts must be considered during the review of State 404 permit applications; the assessment of expected impacts to species that may be caused from a particular project must be considered along with the impacts that may have been caused from past authorized projects, as well as those future projects that are reasonably certain to occur."[15]

Reasonably foreseeable activities requiring authorization under the State 404 Program seemingly are non-federal actions, and therefore in making jeopardy determinations for each State 404 Program permit, their effects in the area affected by the permit application at issue must be considered as cumulative effects and added on top of the baseline when considering whether the effects of the permit are likely to cause jeopardy.

The cumulative impacts proposed by this applicant and others, which are pending or otherwise reasonably foreseeable, are extreme. These impacts include, but are not limited to, the 45,000 total acres of mining and development that were pursued under the ECMSHCP for over twelve years.

As of the date of this letter, Rural Lands West (about 4,000 acres), Bellmar (about 1,790 acres), and Hogan West (640 acres)[16]—approximately 6,430 acres of the remaining 39,973 acres unpermitted but previously considered under the ECMSHCP—are now pending before the FDEP state 404 program. Additionally, the Barron Collier Rod and Gun Club, an approximately 895-acre project that proposes impacts within the ECMSHCP development and "preserve" area, including golf courses, shooting ranges, and residential estates within a panther corridor, was recently active with FDEP for verification that no state 404 permit was needed.[17] In their withdrawal letter, the applicants state that they soon intend to apply for the FDEP state 404 permit.

---

[12] 404 Programmatic BiOp at 16.

[13] 404 Programmatic BiOp at vii.

[14] 404 Programmatic BiOp at 66 (discussing cumulative effects of EPA assumption decision).

[15] 404 Programmatic BiOp at 21.

[16] Of Rural Lands West's impact acres, 3100 acres are with Primary Zone panther habitat. All of Bellmar is within the Primary Zone. Of Hogan West's (AKA Brightshore) impact acres, 211 of these acres within Primary Zone. The remainder of these projects are within Secondary Zone panther habitat.

[17] Barron Collier withdrew its request for FDEP's action on May 20, 2022, stating that "we intend to apply for a SFWMD ERP and FDEP 404 permit later in the summer."

Therefore, projects put forth in the ECMSHCP are reasonably foreseeable and thus must be considered by FDEP under the cumulative impacts analysis. It is clear, by advancing the Rural Lands West and Bellmar projects with the U.S. Army Corps of Engineers' 404 program and now the state-assumed 404 program, that the landowners intend to pursue their developments regardless of whether the ECMSHCP is completed. Moreover, since the 404 Programmatic BiOp purports to provide authorization for incidental take to State 404 permittees, it is reasonably foreseeable that the other developments under the Covered Activities will proceed via the State 404 program.

Additional developments, not covered by the now-withdrawn ECMSHCP but located within the same critical panther areas, are also under consideration by FDEP. The Immokalee Road Rural Village is adjacent to Hogan West and the ECMSHCP boundary. The project is 2,780 acres, with 676 acres that are Primary Zone panther habitat and the remainder Secondary Zone panther habitat. It is situated between the 7,000+ acre Bird Rookery Swamp and the Collier County Panther Walk Preserve, as well as the state protected lands of the Corkscrew Regional Ecosystem Watershed (CREW). The wetland ecosystems constitute travel ways for large mammals, and the project site is adjacent to one of the deadliest areas for Florida panthers. The proposed project includes the construction of a rural village on a 2,787-acre site within the Rural Fringe Mixed Use area of Collier County. Per the applicant's 404 permit application, the proposal includes a mixed-use development consisting of residential, commercial uses, and civic/institutional, with associated infrastructure, amenities, and stormwater management system. The applicant proposes to construct over 4,000 residential units: 2,842 single family residential homes and up to 1,200 multi-family residential units.

Eastern Lee County, adjacent to the ECMSHCP boundary, has also experienced extreme development pressure. The projects known as FFD, Troyer Mine, and Kingston (FKA Old Corkscrew Plantation) would directly destroy 2,573 acres of Primary Zone panther habitat, and directly and indirectly impact about 7,400 acres of Adult Breeding Habitat for panthers.[18]

| Project[19] | Homes | Residents | Panther habitat | Primary Zone | Wetland direct |
|---|---|---|---|---|---|
| Rural Lands West | 5,100 | 10,496 | 4,000 ac | 3,100 ac | 311 ac |
| Bellmar | 4,132 | 8,683 | 1,790 ac | 1,790 ac | 135 ac |
| Collier Rod and Gun Club | 225 | 583 | 895 ac | 895 ac | TBD |
| Hogan West | 2,000 | 4,893 | 640 ac | 211 ac | 21 ac |
| Immokalee Road Rural Village | 4,042 | 9,874 | 2,780 | 676 ac | 244 ac |
| Troyer Mine | 0 | 0 | 907 ac | 841 ac | 214 ac |
| Kingston | 10,000 | 25,800 | 6,676 ac | 1,177 ac | 12 ac |
| FFD | 5,208 | 13,436 | 2,596 ac | 555 ac | 79 ac |
| **Totals** | **30,707** | **73,7652** | **20,284 ac** | **9,245 ac** | **1,016 ac** |

[18] Conservancy of Southwest Florida, August 2, 2022. Letter to FDEP, FWC, and USFWS regarding Troyer Mine state 404 permit, citing modeling analysis by Dr. Robert Frakes.
[19] Selection of state 404 applications. Estimates based on best available information at time of drafting of this letter.



Additionally, Florida Power and Light Beautyberry Solar Energy Center is a proposed approximately 2,200-acre project located in Primary Zone panther habitat in Hendry County.[20] A proposed widening of State Road 82 would widen SR 82 for 23 miles to expand the road from two lanes to four lanes (and ultimately, to six lanes) through Lee, Hendry and Collier Counties. The segment between the Collier County line and Gator Slough is under review by FDEP for a proposed state 404 permit. The continuous flow intersection at the center of the first of seven parts of this project is expected to average about 2,700 cars per hour, more than a conventional intersection can handle. The road runs north of and adjacent to important public lands and panther habitat such as the Wild Turkey Preserve, Corkscrew Mitigation Bank, and Pepper Ranch Preserve.[21] Daniel's Parkway South is a proposed mixed-use development in the DR/GR area of Lee County requesting 1,600 residences and 350,000 sq ft of commercial development on 1,233 acres. Of those 1,233 acres, 944.5 acres are primary panther habitat. There is also a proposal to widen 18 miles of SR 29 from Collier County to Hendry County from the existing two lanes to four lanes. Traffic volumes on SR 29 are projected to increase from 6,200 vehicles per day to 23,800 vehicles per day by the year 2035. The road widening project is adjacent to or

---

[20] FDEP Oculus file for application #419224-002.

[21] WFTX Digital Team, New Continuous Flow Intersection now open in Lehigh Acres (Jul. 9, 2019 6:37 AM), https://www.fox4now.com/news/local-news/continuous-flow-intersection-now-open-in-lee-county; Florida Department of Transportation, State Road (SR) 82 from Hendry County Line to Gator Slough Lane, Collier County Resurface/Add Lanes Financial Project No. 430848-1-51-01(last visited Jul. 15, 2021), http://www.swflroads.com/sr82/hendrytogatorslough/; No. 9 - S.R. 82 From Lee Boulevard to 40th Street, Roads & Bridges (last visited July 15, 2021), https://www.roadsbridges.com/no-9-sr-82-lee-boulevard-40th-street; FDOT, Project description, Project ID 425841-3, http://www.sr82design1.com/ (last visited Jul. 15, 2021).

near major public lands and habitat.[22] Additionally, a proposed widening of Snake Road in Hendry County would involve approximately eight miles that cross an important wildlife corridor connecting the Big Cypress National Preserve to public and private lands in southeast Hendry County and the southwest corner of Palm Beach County.[23]

Notably, lands within the action area of the Bellmar project have already been eaten away by development over recent years, particularly in eastern Lee County. Though we highlight just a handful of projects here, the habitat losses have been substantial. Wildblue Residential Development (2015), Corkscrew Crossing (2018), The Place (FKA Corkscrew Farms) (2016), Verdana Village (2020), and Hyde Park (2020), have resulted in 11,600 acres of panther habitat loss.[24] The agencies must consider the impacts of the current proposal and reasonably foreseeable development combined with the impacts of these developments.



---

[22] Florida Department of Transportation, SR 29 - SR 82 to County Line (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/sr82tocountyline/; FDOT, SR 29 from North of New Market Road North to SR 82 (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/newmarkettosr82/; FDOT, SR 29 from CR 846 E to North of New Market Road N (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/cr846tonewmarket/; FDOT, SR 29 Design from South of Agriculture Way to CR 846 E (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/agriculturetocr846/; FDOT, SR 29 from Sunniland Nursery Road to South of Agriculture Way (last visited Jul. 15, 2021), http://www.swflroads.com/sr29/sunnilandnurserytoagriculture/; Tony Sherrard (FDOT), S.R. 29 PD&E Study From North of S.R. 82 to South of C.R. 80A (last visited Jul. 15, 2021), http://swflroads.com/sr29/northof82/Images/Hearing%20Handout.pdf
[23] Tara Backhouse, Snake Road Construction!, Seminole Tribe of Florida Ah-Tah-Thi-Ki Museum Blog (Feb. 6, 2011), https://ahtahthiki.wordpress.com/2011/02/16/snake-road-construction/.
[24] Date of US Fish and Wildlife Service Biological Opinion for each project provided.

**B. The agencies must address FWS's prior analysis showing that the combined effects of the Bellmar project and other planned development in eastern collier county will cause jeopardy to the Florida panther.**

FWS has previously made draft determinations indicating that the effects of authorizing the Bellmar project in combination with other development in Eastern Collier County, and other reasonably foreseeable impacts, will jeopardize the Florida panther. The Bellmar project was one of multiple proposed developments from the Eastern Collier Property Owners ("ECPO") seeking an ESA section 10 Incidental Take Permit ("ITP") in reliance on their proposed Eastern Collier Multi-Species Habitat Conservation Plan ("ECPO HCP"). According to a recent statement by FWS:

> The first full draft of the HCP was received on April 22, 2015. Modifications to the original HCP were received by the Service on October 14, 2017, April 6, 2018, April 23, 2018, August 22, 2018, March 8, 2019, March 25, 2019, and September 17, 2019 (HCP Addendum). Also, a modification to the original ITP application was received on September 9, 2019.[25]

According to FWS, the ECPO applicants submitted a letter to FWS to withdraw their ITP applications on July 28, 2022.[26] While the letter indicates the ECPO applicants wish to withdraw their ITP application, it confirms that the applicants will "move forward case-by-case on [their] individual projects" within the HCP area through "project-specific reviews," with some already in that process and others "fast approaching."[27] While not explicitly stated in the letter, the project-specific reviews the ECPO applicants are referring to apparently are state-assumed Clean Water Act Section 404 permitting and associated reviews through the technical assistance process, not ESA section 7 consultations. Following the ECPO applicants' withdrawal, FWS stated that, "[a]t the time of withdrawal, the Service had not made a final determination regarding jeopardy or non-jeopardy for any of the covered species."[28] Nonetheless, FWS's analyses in publicly available draft Biological Opinions for the proposed ITPs under the proposed ECPO HCP indicate that the combined effect of the proposed ECPO developments would cause jeopardy to the Florida panther. FWS has publicly released two draft Biological Opinions dated from December 2020 and December 2021, respectively.[29] The December 2020 draft BiOp indicates that it is based on an iteration of the HCP from January 28, 2020, whereas the December 2021 draft BiOp indicates that it is based on that version of the HCP "plus subsequent addenda."[30]

---

[25] U.S. Fish & Wildlife Service, East Collier Multi-Species ITP/HCP Withdrawal, (posted Sept. 1, 2022) https://www.fws.gov/library/collections/east-collier-multi-species-itphcp-withdrawal (last accessed Sept. 9, 2022).
[26] *See id. See also* Eastern Collier Property Owners Letter to USFWS dated 07/28/2022 Withdrawing their Incidental Take Permit applications, *available at* https://www.fws.gov/media/eastern-collier-property-owners-letter-usfws-dated-07282022-withdrawing-their-incidental-take.
[27] *Id.* at 2–3.
[28] U.S. Fish & Wildlife Service, East Collier Multi-Species ITP/HCP Withdrawal, (posted Sept. 1, 2022) https://www.fws.gov/library/collections/east-collier-multi-species-itphcp-withdrawal (last accessed Sept. 9, 2022).
[29] It is our understanding that there is a 2022 draft of the BiOp, but we do not currently have public access to a copy.
[30] *Compare* Biological Opinion and Conference Opinion, Eastern Collier Multi-Species Habitat Conservation Plan (filename "20201229_draft BO-CO-ECMHCP_for ECPO.pdf") (hereafter "2020 draft HCP BiOp") at 1 [submitted with these comments for inclusion in the administrative record] *to* Biological Opinion and Conference Opinion

A February 24, 2021 letter from the ECPO ITP applicants to FWS regarding the December 2020 draft Biological Opinion ("BiOp") makes clear their understanding that the draft BiOp concluded that absent additional commitments from the ITP applicants to "fund public roadway improvement projects (wildlife crossings and fencing) and 'capture' traffic within future community developments," the additional panther mortality from vehicle collisions due to increased traffic induced by the proposed developments "would cause jeopardy."[31]

Indeed, the December 2020 draft HCP BiOp makes clear that, even taking into account the proposed mitigation measures under the draft ECPO HCP, the proposed ECPO developments would result in a statistically significant increase in the risk of extinction for the Florida panther, with a net loss of 12 panthers per year at full build-out.[32] The December 2020 draft HCP BiOp found that the risk of extinction with the HCP increased to 5.7%, compared to an extinction risk of approximately 1.1% or 1.38% without it.[33] The December 2020 draft HCP BiOp then explained that to sufficiently reduce the increased risk of extinction so that it was no longer a statistically significant increase, additional mitigation measures and/or changes to the proposed developments to increase internal capture rates for traffic or otherwise reduce impacts would be required.[34] The 2020 draft HCP BiOp stated:

> If the Applicants are able to achieve a greater than 50 percent community (internal) capture rate, further reduce the effects of their action, or mitigate them through use of the Marinelli Fund for habitat restoration to the extent that the net effect is a loss of no more than 10 adult panthers (4 female adult panthers)/year above present (from all causes) our analysis finds the probability of extinction falls from 5.7 percent to 1.4 percent. This probability of extinction is within the 95 percent C.I. [confidence interval] of scenarios where no additional panthers are taken above present (i.e., not significantly different from baseline).[35]

The next paragraph in the December 2020 draft HCP BiOp indicates that a "no jeopardy" conclusion is contingent on finding that a "further net reduction of effects to *fewer than* 10 panthers per year at full build-out" will "be accomplished through the maintenance of high community (internal) trip capture, adaptive management, and the mitigative effects of actions

---

Eastern Collier Multi-Species Habitat Conservation Plan (filename DRAFT-USFWS-ECPO-full-Biological-Opinion-December-2021.pdf) (hereafter "2021 draft HCP BiOp") at 1 [submitted with these comments for inclusion in the administrative record].

[31] "ECPO's High-Level Comments on Draft BO" at 12, transmitted to Robert Tawes

Chief, Environmental Review Division, U.S. Fish and Wildlife Service, Southeast Region by Bruce Johnson, Principal, Senior Scientist , Stantec Consulting Services, as attachment to letter dated February 24, 2021. (Obtained from FWS via FOIA) [submitted with these comments for inclusion in the administrative record]; *see also* Email from Leopoldo Miranda, Regional Director, FWS, to Jack Arnold, Acting Assistant Regional Director, FWS, regarding a Revised ECPO Information Memorandum (June 5, 2019) (quoting a draft information memorandum stating, "We have also begun frank discussions with ECPO, most recently May 10 and 14, based on the Service's preliminary, internal analyses of traffic volume effects on the continued survival or recovery of the Florida panther.") [submitted with these comments for inclusion in the administrative record].

[32] Biological and Conference Opinion, Eastern Collier Multi-Species Habitat Conservation Plan (filename "20201229_draft BO-CO-ECMHCP_for ECPO.pdf") (hereafter "2020 draft HCP BiOp") at 158–159.

[33] *Id*. at 158–159.

[34] *See id*. at 159.

[35] *Id*. at 159.

facilitated by the Marinelli Fund."[36] In short, the December 2020 draft HCP BiOp shows that the combined impacts of the proposed ECPO developments would cause jeopardy to the Florida panther absent additional changes to the design or additional mitigation measures to reduce the anticipated number of annual panther losses caused by implementing the proposed covered activities.

The December 2021 draft HCP BiOp similarly states:

> [O]ur PVA [population viability analysis] predicts the implementation of the HCP, in the absence of further actions to reduce the impact of the action to the panthers, could reduce the abundance of panthers across their range such that the probability of extinction is predicted to increase from 1 percent (95 percent C.I. 0.2 to 1.8 percent) to 5.7 percent (95 Percent C.I. 2.2 to 9.2 percent). When cumulative effects are added to the effects of the HCP the probability of extinction further increases to 6.6 percent (95 percent C.I. 2.3 to 10.9 percent). The probability of extinction after implementation of the HCP is statistically significantly different than baseline conditions. If the Applicants are able to achieve a greater than 50 percent community (internal) traffic capture rate, further reduce the effects of their action, or mitigate them through use of the Marinelli Fund for habitat restoration to the extent that the net effect is a loss of no more than 10 adult panthers (4 female adult panthers)/year above present (from all causes) our analysis finds the probability of extinction falls from 5.7 percent to 1.4 percent. This probability of extinction is within the 95 percent C.I. of scenarios where no additional panthers are taken above present (i.e., not significantly different from baseline).[37]

Notably, whereas the draft HCP BiOps both state that additional panther losses must be limited to "no more than 10" per year over present levels, other portions of the draft HCP BiOps indicate that the number actually must be *fewer than* 10 over present levels to avoid a statistically significant increase in extinction risk.[38]

Just like the 2020 draft HCP BiOp, the modeling in the 2021 draft HCP BiOp finds that, even with 8 wildlife crossings *and* assuming a 50% internal capture rate for traffic, implementation of the HCP will cause a total of 12 additional panther deaths per year, 8 from vehicle collisions resulting from increased traffic induced by the HCP developments, and 4 from habitat loss and

---

[36] 2020 draft HCP BiOp at 159 (emphasis added).

[37] 2021 draft HCP BiOp at 148.

[38] *See* 2020 draft HCP BiOp at 146 ("Internal population viability analysis contingency modelling, and statistical comparison of possible thresholds found that the probability of extinction 100 years after ITP expiration of BSLR, BSLR + HCP, and BSLR + HCP + CE scenarios do not differ significantly (1.38 percent Prext versus the 1.1±0.8 percent Prext estimated for BSLR) *if fewer than* 10 adult panthers (4 female panthers) total are taken annually, above present.") (emphasis added); 2021 draft HCP BiOp at 133–134 ("Our analysis of these PVAs found that though there was still a difference in final abundances, the probability of extinction 100 years after ITP expiration does not differ significantly from Baseline + Sea Level Rise (1.38 percent Prext versus the 1.1±0.8 percent Prext estimated for BSLR) *if fewer than* 10 adult panthers (4 female panthers) total are lost annually, above present, from any cause (*e.g.,* habitat loss, roadway mortality, etc.).") (emphasis added).

degradation.[39] And both the 2020 and 2021 BiOps find that the cumulative effects of traffic induced by other non-HCP, non-federally authorized actions will cause an additional 2 panther deaths per year, even after accounting for the mitigation provided by 8 wildlife crossings.[40] In sum, both versions conclude that the additional panther deaths associated with implementation of the HCP will be 12 per year, and that such panther losses must be limited to fewer than 10 per year to avoid a statistically significant increase in the risk of extinction (i.e. jeopardy). Both versions indicate that additional changes to the proposed HCP, such as commitments to achieve internal capture of traffic greater than 50% and/or additional commitments for mitigation, would be necessary to conclude that the panther losses will be reduced to 10 or fewer.

Based on the available records, there appears to be no indication that the HCP applicants further modified their project designs or mitigation commitments to achieve the necessary reductions in the number of additional panther losses per year.[41] Consequently, the Service's draft analyses appear to indicate that, absent additional changes to the project designs to increase internal capture above 50% or commitments for additional avoidance or mitigation of impacts, the combined impacts of the Bellmar project and the other projects formerly part of the proposed HCP, will result in total panther losses that are likely to cause jeopardy to the Florida panther.

This result is especially concerning because the 2020 and 2021 draft HCP BiOps reflect multiple assumptions that result in underestimating the risk of extinction, as detailed below in section **I.C**.

C. **The 2020 and 2021 draft HCP BiOps underestimate the risk of extinction for Florida Panthers and the impacts of the HCP Covered Activities, which include the Bellmar project, on that risk.**

Although FWS's analyses in the 2020 and 2021 draft HCP BiOps raise legitimate concerns that the cumulative effects of the Bellmar project and other proposed projects will jeopardize the Florida panther, even these analyses underestimate the harm to the species and the extent of projected jeopardy by relying on unsupported assumptions. To accurately and lawfully consider the direct, indirect, and cumulative effects of Bellmar on the panther and other listed species, the agencies must first address these problematic assumptions.

---

[39] *See* 2020 draft HCP BiOp at 153, lines 5444-5447; 2021 draft HCP BiOp at 142, lines 5055-5057.

[40] *See* 2020 draft HCP BiOp at 153; 2021 draft HCP BiOp at 142.

[41] In contrast to the Florida panther opinion section from the 2020 draft HCP BiOp, the 2021 draft HCP BiOp omits a paragraph indicating that a no jeopardy conclusion hinged on additional changes such as assuring greater internal capture of traffic or committing to additional impact reductions or mitigation. In its place is a paragraph indicating that instead of actually specifying the changes to the HCP necessary to ensure greater internal capture rates above 50%, or to ensure commitments to undertake specific additional avoidance or mitigation measures, the Service may have intended to rely on "adaptive management measures" added to the conditions in yet unidentified permit terms to somehow provide an avenue for additional impact reduction post-permit issuance. *Compare* 2021 draft HCP BiOp at 148 *to* 2020 draft HCP BiOp at 159. Notably, in ESA contexts, courts have found that the Service unlawfully relied on "adaptive management" in lieu of specific measures or specific criteria to ensure satisfaction of ESA standards. *See, e.g.*, *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1025–28 (9th Cir. 2011) (reliance on "adaptive management" to justify delisting grizzlies in the face of substantial uncertainty about extent of impacts on population from harmful factor was unlawful given lack of specific criteria to address that factor).

1. **In estimating extinction risk resulting from implementation of the HCP, the draft HCP BiOps assume that the developments under the HCP's Covered Activities will result in 50% internal capture, despite evidence indicating actual internal capture rates as low as 2% for proposed projects.**

In estimating the impacts to panthers from increased traffic that would be induced by implementation of the HCP, the modeling in both the 2020 and 2021 draft HCP BiOps *assumes* that the developments under the Covered Activities will have a 50% internal capture rate. That assumption was based on the assertion that "future developments proposed in the HCP would have daily internal trip capture rates similar to the community of Ave Maria" which FWS asserted "approaches 50 percent."[42] Despite adopting that assumption in the modeling, the 2020 draft HCP BiOp conceded that:

> [R]ecent proposals for residential communities submitted by the Applicants to Collier County in the Plan Area indicate some communities being planned *will achieve an internal capture rate of 2 percent* as indicated by the Applicants' planning documents. If developments that don't achieve the internal capture rate of Ave Maria are constructed, it is likely the traffic model will underestimate future traffic volume generated by development proposed in the HCP, and thus the total impact the proposed developments may have on panthers. If the Applicants build communities with a lower internal capture rate, but still use the $12.5 million to construct crossings (*e.g.,* 8 crossings are constructed), we would nonetheless expect higher panther mortality due to greater traffic on existing roads (Tables 13a and 13b in Appendix I).[43]

In other words, the 2020 draft HCP BiOp conceded that, even if 8 wildlife crossings were built, its model would underestimate the actual impacts to panthers if the proposed developments under the HCP's Covered Activities did not actually achieve 50% internal capture. When paired with the reality that at least some of those proposed developments would apparently achieve a mere 2% internal capture rate, FWS clearly underestimated projected impacts for the panther. The 2021 draft BiOp similarly states:

> One of the more important assumptions made when the traffic model was produced was that future developments proposed in the HCP would have daily internal trip capture rates similar to the community of Ave Maria, which approaches 50 percent. *However, recent proposals for residential communities submitted by the Applicants to Collier County in the Plan Area indicate some communities being planned will achieve an internal capture rate of 2 percent as indicated by the Applicants' planning documents.* If developments that don't achieve the internal capture rate of Ave Maria are constructed, it is likely the traffic model will underestimate future traffic volume generated by development

---

[42] 2020 draft HCP BiOp at 129; *see also* 2021 draft BiOp at 42 ("Specifically, we assumed such metrics as future housing density, number of people per dwelling, employment, and daily vehicle trips per household would be similar to what is currently exists in the Town of Ave Maria.").
[43] 2020 draft HCP BiOp at 129–130 (emphasis added).

proposed in the HCP, and thus the total impact the proposed developments may have on panthers.[44]

And the 2021 draft HCP BiOp further states:

> [I]t is possible future developments will have a lesser internal traffic capture rate, higher dwelling unit density, and higher number of residents per dwelling unit than the Town of Ave Maria, which was a template for future development proposed in the HCP when we estimated how much traffic would likely be generated on existing roadways. If this were to occur, we would expect to see greater traffic volume and effects to panthers than we have estimated in this BO.[45]

Nonetheless, neither BiOp indicated that FWS intended to provide any binding requirement that would actually ensure internal capture of at least 50%. Nor does either BiOp assert that the HCP itself provides plan components that would result in at least 50% internal capture. Instead, maintaining at least 50% internal capture is merely suggested as a conservation *recommendation*.[46] Thus, the BiOp's estimates that implementation of the HCP would result in 12 panther deaths per year, with 8 of those deaths resulting from increased traffic, are based on an assumption about internal capture that was not supported by actual internal capture rates, nor assured by any binding requirement, nor incorporated as a fixed feature of the proposed action.[47] And the PVA modeling used to reach conclusions about extinction risk from implementation of the HCP were based on the similarly assumed 12 panther deaths per year from the HCP, with 8 from increased traffic, based on the internal capture rate of 50% and 8 crossings.

Importantly, both of the draft HCP BiOps do contain analyses showing how lower internal capture rates increase the number of panther fatalities per year that would result from the HCP

---

[44] 2021 draft HCP BiOp Appendix H (Analysis of Panther Motor Vehicle Mortality) at 7 (emphasis added).

[45] 2021 draft HCP BiOp at 136.

[46] *See* 2021 draft HCP BiOp at 310 (suggesting maintaining internal capture of at least 50% as a conservation recommendation); 2020 draft HCP BiOp at 320 (same); 2020 draft HCP BiOp at 130 ("…the HCP *does not identify explicit targets for internal trip capture*, a maximum number of crossings, where they will be located, or what measures they are likely to take to maximize their effectiveness. Thus, our analysis remains confined to the assumption of 50% internal trip capture in newly constructed communities and the construction of a minimum of 8 wildlife crossings.") (emphasis added).

[47] Consequently, reliance on that assumption of 50% internal capture to reach a no jeopardy conclusion would violate the ESA because achievement of that rate was not reasonably certain to occur based on the record before FWS, and apparently was not assured by any binding requirement or component of the plan. *See, e.g., Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935–36 (9th Cir. 2008) (requiring measures relied on to reach no jeopardy conclusion be set forth in specific and binding plans). The ESA's express requirement to "insure" that agency actions are not likely to cause jeopardy, 16 U.S.C. § 1536(a)(2), plainly requires that the Services cannot reach a no jeopardy conclusion that relies on mitigation offsetting harm unless there is reasonable certainty that the mitigation will actually render jeopardy unlikely. As the Supreme Court has recognized in construing section 7(a)(2), "To 'insure' something…means '[t]o make certain, to secure, to guarantee (some thing, event, etc.).'" *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 667 (2007) (quoting appellate court, in turn quoting Oxford English Dictionary 1059 (2d ed.1989)). The plain text of the Act therefore requires that the Service cannot issue a no jeopardy conclusion unless the action agency has indeed made it certain, secured, or guaranteed that mitigation relied upon to avoid jeopardy will actually occur.

developments at a given number of wildlife crossings.[48] That analysis indicates, for example, that assuming 8 wildlife crossings added by the HCP, an internal capture rate of 30% would add approximately three more panther deaths per year than an internal capture rate of 50%.[49] That analysis also shows how the total number of panther fatalities from the HCP and cumulative effects would change with lower internal capture rates.[50]

However, the BiOps do not include any modeling to estimate the extinction risk from the HCP associated with internal capture rates under 50%. This is critical where, to the extent the applicants are working to increase the internal capture rate by merging Bellmar into the larger Rural Lands West project, there is no data to suggest it would reach the 50% threshold set forth in the draft HCP BiOps.

Consequently, in evaluating whether the Bellmar project, considered with the cumulative effects of other reasonably foreseeable state and private actions (such as the other former HCP projects and the cumulative effects in the draft HCP BiOps), will likely cause jeopardy to the Florida panther, the agencies must consider what the actual internal capture rates of the projects will be, and how those capture rates will affect the total additional panther mortalities that will foreseeably result from the developments.

2. **The draft HCP BiOps underestimate the impacts on panthers by underestimating the amount of traffic induced by the developments covered under the draft HCP.**

In the 2021 draft HCP BiOp Appendix B.1 "Description of the Traffic Model," the Service attempts to estimate a density for proposed development to estimate a likely population in the eastern Collier area. The Service estimates that the Town of Ave Maria is 1.4 units per acre and uses that as the basis to assume "a comparable residential unit density on the remaining 39,973 acres proposed for development."[51] The resulting population estimate is approximately 152,000 people. However, the Bellmar project, and the other locally approved projects, have an average density of 2.6 development units per acre and an average of 2.5 people per household.[52] With a

---

[48] *See* 2020 draft HCP BiOp Appendix I at Table 2a [2020 draft HCP BiOp Appendices submitted with these comments for inclusion in the administrative record]; 2021 draft HCP BiOp Appendix H at Table AH2a [2021 draft HCP BiOp submitted with these comments for inclusion in the administrative record].

[49] *See* 2020 draft HCP BiOp Appendix I at Table 2a; 2021 draft HCP BiOp Appendix H at Table AH2a.

[50] *See* 2020 draft HCP BiOp Appendix I at Table 13b; 2021 draft HCP BiOp Appendix H at Table AH2b.

[51] 2021 draft BiOp at Appendix B.1.

[52] Average density for the components of Rural Lands West is 2.6 development units per acre (per Approved Town Agreement between Collier County Board of County Commissioners and Collier Land Holding, LLC/CDC Land Investments, LLC, dated June 8, 2021. And respective Village approvals, Collier County Resolution 2021-119, Collier County Resolution 2020-24). Density for Bellmar Village (a portion of state 404 footprint) is 2.75 development units per acre (per Collier County Resolution 2021-120). Other projects such as Hogan West (AKA Brightshore Village) have a projected density of 2.9 development units per acre (per Brightshore Village SRA Development Document for Collier County SRA Application, June 29, 2022). Of the seven Stewardship Receiving Areas (SRA) approved and pending in eastern Collier County, the average density is 2.6 development units per acre. The average persons per household in Collier County is 2.54 based on Census information accessed at https://www.census.gov/quickfacts/fact/table/colliercountyflorida,US/HCN010217.

more realistic density, the projected estimate for the 'new' population within the 45,000 acres of the eastern Collier area would be closer to 300,000+ people.[53]

This underestimation of human population -and the number of cars on roadways- within Bellmar and other reasonably foreseeable development can also be found when looking at the Economic Assessments provided to Collier County. The assessments for Rural Lands Wests, Bellmar, Hogan West, and others have averaged around 6.7 people per acre, which again estimates the population for the eastern Collier developments at around 300,000 people.[54]

### 3. The draft 2021 HCP BiOp underestimates cumulative effects by failing to update the analysis in light of Florida's assumption of Clean Water Act 404 permitting.

Both the 2020 and 2021 draft HCP BiOps use the same assumptions about future non-HCP, non-federal actions in their modeling of cumulative effects. Both draft HCP BiOps assume that 25.3% of future, non-HCP developments will occur without a federal permitting nexus to trigger federal action, and therefore warrant inclusion in the assessment of cumulative effects as defined per 50 C.F.R § 402.02.[55] Both draft HCP BiOps only consider the traffic impacts of that 25.3% of future development in modeling the cumulative effects, and the increased extinction risk resulting from the HCP plus cumulative effects. Yet by December 2021, Florida DEP had assumed Clean Water Act Section 404 permitting pursuant to EPA's decision on the State 404 Program, a decision that drastically altered whether future projects would require a federally issued permit to fill wetlands. Though 404 permits for wetlands fills now frequently will be issued by the state rather than the U.S. Army Corps of Engineers, the 2021 draft HCP BiOp does not appear to engage in any re-evaluation of whether it is still true that only 25.3% of future, non-HCP developments will entail no federal action subject to ESA section 7 consultation. Consequently, it is plain that the analysis in the BiOps fails to address the reality that a much larger proportion of non-HCP traffic induced in the action area will be from future projects that will not be subject to ESA section 7 consultation due to the State 404 permitting scheme, and therefore should have been evaluated as sources of cumulative effects.

As the Service recognizes in the draft 2021 HCP BiOp documents, a jeopardy determination must be based on whether the action, either individually *or taken together with cumulative effects*, will appreciably diminish the likelihood of survival or recovery for the species.[56] By

---

[53] Any mining within the eastern Collier HCP area is likely to become lake-front development once mining uses are complete. The estimate of over 300,000 people does not include the addition of one home per five-acre ranchettes.

[54] Based on information provided in DPFG Town of Big Cypress Economic SRA Assessment, Revised June 28, 2022, p. 42; DPFG Bellmar Village SRA Economic Assessment, Revised January 8, 2021, p. 36; DPFG Longwater Village SRA Economic Assessment, Revised January 8, 2021; DPFG Rivergrass Village SRA Economic Assessment, Revised September 3, 2019, p. 38. DPFG Brightshore Village (AKA Hogan West) SRA Economic Assessment, Revised August 26, 2022, p. 31; DPFG Hyde Park Village (aka Skysail) Economic Assessment, Revised November 13, 2019, p. 35.

[55] *Compare* 2021 draft HCP BiOp Appendix H at 5–6; 2021 draft HCP BiOp Appendix J at 1, 2-3 *to* 2020 draft HCP BiOp Appendix H at 4 of 8; 2020 draft HCP BiOp Appendix J at 1.

[56] *See* 2021 draft HCP BiOp Appendix L at 10 ("Under section 7 of the ESA, we compare the future with the project scenario ($B_{SLR}$ + HCP) to the Baseline condition ($B_{SLR}$) to help us determine whether the effects of the action are likely to result in an appreciable decrease or increase in the probability of survival and recovery over time. In addition, under section 7 of the ESA, we consider the cumulative effects, and compare the future with the project

failing to evaluate the impacts of all of the reasonably foreseeable non-HCP future development that will not entail federal action subject to ESA consultation requirements, the draft HCP BiOps underestimate the increased risk of extinction that will result from the HCP projects and other reasonably foreseeable non-HCP development in the action area.

4. **The 2021 draft HCP BiOp's PVA modeling underestimates baseline risk of extinction because it assumes artificial introgressions to maintain genetic health will be conducted, even though there are no plans to conduct those introgressions.**

The 2021 draft HCP BiOp makes clear that a key assumption of the PVA modeling it used to estimate the risk of extinction is that: "The Service will maintain the genetic health of the population through translocation when necessary, and in a manner consistent with the recommendations of van de Kerk et al. (2019)."[57] The Service explains that:

> If recommendations of introducing 5-10 individuals from other Puma populations every 20-40 years aren't adopted, van de Kerk et al (2019) predicted probability of quasi-extinction would increase to 13 percent (0–99) at 100 years and 23 percent (0–100) at 200 years (Minimum Population Count Scenario) or to 10 percent (0–99) at 100 years and 12 percent (0–99) at 200 years (Motor Vehicle Mortality Scenario). If the van de Kerk et al. (2019) recommendations aren't adopted, it would mean our estimates of extinction probability and abundance would change similarly.[58]

Although the risk modeling in the BiOp is therefore based on the assumption that the Service will undertake those actions to supplement the panther population, the draft 2021 HCP BiOp concedes that the Service in fact has no actual plans to conduct those actions; the draft 2021 HCP BiOp states, "It is not known if efforts to translocate panthers or apply some other measure to increase genetic variability in the panther population may occur in the future."[59] Consequently, it is arbitrary and capricious for the Service to base its analyses of extinction risks, and jeopardy, on the assumption that these actions will take place when the Service concedes that it is in fact unknown whether those actions will occur or not. There is no indication that the Service even attempted to evaluate how changing that assumption would alter its analysis of total extinction risk with the HCP, or the total extinction risk with the HCP and cumulative effects. So while the 2021 draft HCP BiOp does acknowledge that the baseline extinction risk would be substantially higher absent these management activities to supplement the population, it fails to evaluate the compounding effect of the HCP and cumulative impacts against a baseline scenario of substantially increased risk. When considering the direct, indirect,

---

and cumulative effects scenario ($B_{SLR}$+HCP+CE) to the Baseline condition ($B_{SLR}$) to help us determine whether the effects of the action along with other actions that are reasonably certain to occur in the future without consultation with the Service are likely to result in an appreciable decrease or increase in the probability of survival and recovery over time. We consider both of these comparisons when we make our jeopardy determination.").

[57] 2021 draft HCP BiOp Appendix L at 1.
[58] 2021 draft HCP BiOp Appendix L at 12.
[59] 2021 draft HCP BiOp at 141.

and cumulative effects of the Bellmar project, the agencies must correct this unsupported assumption.

### 5. The draft HCP BiOps conceal the true risk of extinction by using speculation about carrying capacity to mask the impacts of habitat loss from sea level rise.

The PVA modeling results in both draft HCP BiOps conceal the true baseline risk of extinction by averaging together the results from model runs based on three different assumptions about whether the population is currently at carrying capacity for the remaining habitat. Although past PVAs assumed that the population reflected either 100% of the carrying capacity of the existing habitat, or 80% of the carrying capacity, the draft HCP BiOps, with little explanation or justification, also assume that the current population may reflect only 60% of the carrying capacity of the existing habitat.[60]

First, the assumption that the current population reflects only 60% of the carrying capacity of the panther's remaining habitat appears to be based on speculation rather than the best available scientific information. The 2021 draft BiOp states:

> The present Florida panther population is at or near average annual carrying capacity ($K$) of habitat south of the Caloosahatchee River. However, *it is possible* future habitat management may increase carrying capacity to range-wide effect. It is also *possible* present assumptions about maximum attainable panther densities are wrong. Thus, we assume the true $K$ could actually be up to 40 percent higher than the present population size.[61]

This makes plain that FWS has based its analysis on mere "possibility" and conjecture rather than on what conditions are likely based on the best available scientific information, in violation of ESA requirements. It is also plainly irrational, as FWS elsewhere concedes, that "the true carrying capacity is unknown but *Service and FWC biologists infer the population may be at or near carrying capacity (K)*" but then proceeds to state that it nonetheless "assumed it is possible $N_0$ (the current population size) represents 100 percent, 80 percent, and 60 percent of carrying capacity."[62] There is no explanation of how 60% of carrying capacity is somehow rationally consistent with evidence suggesting the population is "at or near" 100% of carrying capacity. Most people would not consider a glass that is 60% full to be "at or near" being 100% full. This assertion is especially egregious given that the Service's peer reviewer pointed out that the studies cited by FWS regarding population trends could not be relied on to rule out that the population may already be either stable or in decline, rather than growing.[63] Moreover, the most

---

[60] *See* 2021 draft HCP BiOp Appendix L at 4 (Table AL1 n.2) ("Our past PVA only utilized $N_0 = K_0$ and $N_0 = 80$ percent of $K_0$. Our current PVA incorporates scenarios where $N_0$ may equal 60, 80, and 100 percent of $K_0$.").
[61] 2021 draft HCP BiOp Appendix L at 2 (emphasis added).
[62] 2021 draft HCP BiOp Appendix L at 7 (emphasis added).
[63] *See* 2021 draft HCP BiOp Appendix M at 3 of 166 ("In the report Dr. Martin noted that recent efforts to estimate the Florida panther population over time contained a great deal of uncertainty. Particularly, he noted that though the central tendency of these estimates indicates a growing population, the confidence intervals surrounding these estimates were so wide that the possibility of an unchanging population or population in decline couldn't be rejected. Dr. Martin also indicated concern that were the panther population to be declining, rather than growing, future catastrophes, such as disease outbreaks of more serious diseases than seen to date, could have a greater affect [sic] on population viability than had been estimated in previous PVAs. Based on Dr. Martin's advice, the Service

recent population estimates indicate that the population is no longer increasing. As the 2020 SSA acknowledges, the most recent population trend data indicate the population did not grow between 2016 and 2018, and began to decline from 2017 to 2018.[64]

Second, rather than separately presenting the results of models based on the assumption of the population being at 100%, 80%, and 60% of the carrying capacity of the habitat, the draft HCP BiOps only present the results showing the *averaging* of model runs reflecting these three very different carrying capacity assumptions. Thus, the draft HCP BiOps conceal the extinction risk associated with the impacts of habitat loss given the more realistic assumption that the population is already at 100% of carrying capacity. Notably, in the BiOp's PVA analysis, FWS models sea level rise by 2070 as resulting in an 18% habitat loss for the Florida panther.[65] Yet its model shows little impact on the projected future population from that enormous amount of habitat loss, and indeed, shows the same result as a prior model *that totally failed to address the impacts of sea level rise (SLR)-related habitat loss at all*.[66] Without ever contemplating whether that might indicate that there is something wrong with the BiOp's modeling of SLR impacts, FWS instead asserts that "SLR as we modeled it here does not influence probability of extinction as much as small population size and genetic variation might."[67] FWS totally fails to consider that the reason that there is little impact from this enormous amount of habitat loss is because the assumption that the current population is only at 60% of carrying capacity would mean that the population could still *grow* by about 20% even with a 20% habitat loss. And the assumption that the current population is at 80% of carrying capacity similarly would mean that the population can stay the same, even with a 20% habitat loss. Averaging these results together with the scenario where the population is already at 100% of carrying capacity, and therefore would likely drop by about 20% in response to a 20% habitat loss would unsurprisingly mask the substantial population drop under the K = 100% scenario by averaging it out against the increase under the K= 60% scenario. Indeed, it is almost as if the modeling, and the otherwise arbitrary choice of the K=60% scenario was selected specifically to ensure this result, and mask the impacts of SLR on the baseline extinction risk.

Notably, the 2020 draft HCP BiOp acknowledges that the choice of carrying capacity explained a substantial portion of the variance in the projected abundances, but otherwise fails to examine how the treatment of carrying capacity in the modeling irrationally and unreasonably masked the impacts of SLR.[68] This error taints both the representations about the baseline extinction risk, and the impact of the HCP and cumulative effects in compounding the baseline extinction risk, with the upshot being that the analysis in the HCP BiOps underestimates the extinction risk

---

amended portions of the Biological Opinion that treated 'rapid growth of the panther population' as fact to reflect this was but one possibility for the true population trend but that others, like population decline, could also be true.").

[64] *See* U.S. Fish and Wildlife Serv. 2020. Species Status Assessment for the Florida Panther. Version 1.0. September 2020. Vero Beach, Florida ["SSA"] at 88, 90, Figure 6.8.

[65] 2021 draft HCP BiOp Appendix L at 8.

[66] *See* 2021 draft HCP BiOp Appendix L at 12 ("Our results were also similar to van de Kerk et al.'s (2019) despite the fact their model did not consider the impact of sea level rise, while ours did.").

[67] 2021 draft HCP BiOp Appendix L at 12.

[68] *See* 2020 draft HCP BiOp at 145 (stating that the choice of carrying capacity explained 17.8% of the variance in final abundance whereas scenario explained 38.15%, and initial population 33.09%).

resulting from the impacts of the HCP and cumulative effects exacerbating the disastrous habitat loss from SLR.

### 6. The PVA modeling underestimates extinction risk by failing to account for the impacts of additional habitat loss from SLR between 2070 and 2170.

The PVA modeling relied on in the draft HCP BiOps to estimate extinction risk evaluates what the Florida panther population will be 100 years after the end of the proposed 50-year period for the proposed Incidental Take Permits in 2070.[69] FWS explains that its PVA model accounted for habitat loss due to sea level rise by "treat[ing] Sea Level Rise up to 2070 as an effect in the baseline portion of [the] assessment[.]"[70] FWS acknowledged that SLR "will have range-wide effects on demographic parameters and habitat availability for panthers within the proposed permit duration of the HCP."[71] FWS estimated that by 2070, 1 meter of SLR would cause the loss of 18% of the Florida panther's habitat.[72] "To input SLR in the PVA [FWS] assumed SLR would accumulate linearly and only to 1 m by 2070, and divided the acreage by 50 years with 0 acres lost to SLR being equivalent to a proportion of individuals represented by a given $N_0$ … and to 18 percent of habitat loss to SLR being equivalent to 18 percent of $N_0$."[73] FWS explicitly states that the PVA modeling relies on the assumption that "Sea Level Rise of 1m will occur by 2070 but will not take additional Florida panther habitat beyond that time."[74] Thus, FWS apparently only modeled habitat loss due to SLR up until 2070, but did not account for additional habitat loss that would occur as sea levels continue to rise after 2070. FWS's modeling purports to assess the population 100 years after 2070 but ignores the impacts on that population of continued habitat loss from SLR between 2070 and 2170, even though SLR projections are available through at least 2100. Indeed, in the 2020 Species Status Assessment for the Florida Panther, FWS used sea level rise models of up to two meters to estimate possible loss of panther habitat through 2100.[75] And, in 2017, NOAA estimated that global mean sea level rise in 2100 would be nearly double that in 2070 under the Intermediate through High scenarios.[76] By failing to account for continued sea level rise related habitat loss after 2070, the PVA modeling likely overestimates panther abundance in 2170 and underestimates the extinction risk. Revised

---

[69] *See* 2021 HCP BiOp Appendix L at 10 ("For each of the three scenarios above, we simulated a 150-year population trajectory (50-year build-out plus 100 years beyond) and compared the predicted change in population viability for the panther."); 14, Table AL3 ("The probability of extinction and predicted population size of the Florida panther under Baseline with Future Sea Level Rise (BSLR), BSLR plus HCP Development Effects (BSLR+HCP), and BSLR+HCP plus Cumulative Effects (BSLR+HCP+CE) scenarios given three different beginning female panther population sizes. BSLR = Baseline (Current conditions + 1m SLR by 2070) and the end time is 100 years after HCP full build-out in 2070.").

[70] 2021 draft HCP BiOp at 132.

[71] 2021 draft HCP BiOp at 132.

[72] 2021 draft HCP BiOp Appendix L at 8.

[73] 2021 draft HCP BiOp Appendix L at 8.

[74] 2021 draft HCP BiOp Appendix L at 2.

[75] U.S. Fish and Wildlife Serv. 2020. Species Status Assessment for the Florida Panther. Version 1.0. September 2020. Vero Beach, Florida ["SSA"] at vii, 189; *see also* SSA at 230–32.

[76] *See* Sweet, W. V., R. E. Kopp, C. P. Weaver, J. Obeysekera, R. M. Horton, E. R. Thieler, and C. 12769 Zervas. 2017. Global and regional sea level rise scenarios for the United States. NOAA 12770 Technical Report NOS CO-OPS 083. National Oceanic and Atmospheric Administration, 12771 Silver Spring, MD, at 23 (Table 5), *available at* https://tidesandcurrents.noaa.gov/publications/techrpt83_Global_and_Regional_SLR_Scenarios_for_the_US_final.pdf (showing GMSL in 2070 of 0.57 m, 0.79 m, and 1.0 m for the Intermediate, Intermediate-High, and High scenarios, and GMSEL in 2100 of 1.0 m, 1.5 m, and 2.0 m for those same scenarios, respectively).

analysis to correct this problem is necessary, and should utilize the best available scientific information available, such as NOAA's most recent sea level rise projections.[77]

**D. The agencies cannot rely on proposed mitigation for species impacts in the ECMSHCP because the applicant has withdrawn its associated permit application and thus the ECMSHCP provides no assurances the mitigation will occur.**

The Bellmar applicant and other landowners have been seeking incidental take coverage through the ECMSHCP for development of 45,000 acres since 2010. In a letter submitted to the U.S. Fish and Wildlife Service (FWS) in July 2022, the landowners formally withdrew their application for an incidental take permit.[78] However, to-date we have not seen any documentation indicating that the applicant has informed FDEP that the ECMSHCP application has been withdrawn or that the applicant has updated its application materials to reflect this significant change. As the ECMSHCP has been withdrawn by the applicant, any promises from the applicant to adhere to the tenets of the ECMSHCP are toothless unless incorporated as conditions in the FDEP permit, if awarded.

Moreover, fatal flaws in the ECMSHCP have not evaporated; our letters regarding the proposal and the review by experts are enclosed. We do not consider any intent to work towards the tenets of the ECMSHCP[79] adequate to meet the requirements of the state 404 program nor the Endangered Species Act.

**E. The applicant has failed to provide necessary information for the agencies to estimate Bellmar's effects on the Florida panther.**

On August 31, 2022, FWS corresponded with FDEP to request additional time to prepare appropriate conservation recommendations for the Bellmar project, taking into account the project's size, location, and anticipated effects to federally protected species.[80] FWS further indicated the need for information currently missing from the applicant's biological assessment:

---

[77] *See, e.g.*, Sweet, W.V., B.D. Hamlington, R.E. Kopp, C.P. Weaver, P.L. Barnard, D. Bekaert, W. Brooks, M. Craghan, G. Dusek, T. Frederikse, G. Garner, A.S. Genz, J.P. Krasting, E. Larour, D. Marcy, J.J. Marra, J. Obeysekera, M. Osler, M. Pendleton, D. Roman, L. Schmied, W. Veatch, K.D. White, and C. Zuzak, 2022: Global and Regional Sea Level Rise Scenarios for the United States: Updated Mean Projections and Extreme Water Level Probabilities Along U.S. Coastlines. NOAA Technical Report NOS 01. National Oceanic and Atmospheric Administration, National Ocean Service, Silver Spring, MD, 111 pp., at 23, https://oceanservice.noaa.gov/hazards/sealevelrise/noaa-nostechrpt01-global-regional-SLR-scenarios-US.pdf (projecting relative sea level rise in 2100 in the eastern Gulf of Mexico will be 1.2, 1.7, and 2.2. meters under intermediate, intermediate-high, and high scenarios, respectively)

[78] U.S. Fish & Wildlife Service, East Collier Multi-Species ITP/HCP Withdrawal, (posted Sept. 1, 2022) https://www.fws.gov/library/collections/east-collier-multi-species-itphcp-withdrawal (last accessed Sept. 9, 2022).USFWS response to HCP withdrawal, provided by email on September 1, 2022, and enclosed

[79] Eastern Collier Property Owners Letter to USFWS dated 07/28/2022 Withdrawing their Incidental Take Permit applications, available at https://www.fws.gov/media/eastern-collier-property-owners-letter-usfws-dated-07282022-withdrawing-their-incidental-take.Letter dated July 28, 2022, from ECPO re: Withdrawal of ECPO Incidental Take Permit Applications

[80] Email from Charles Kelso, U.S. Fish and Wildlife Service, to Toby Schwetje, Florida Department of Environmental Protection regarding U.S. Fish and Wildlife Service's initial comments regarding the Bellmar proposal (Aug. 31, 2022).

> Because our recommendations are based on anticipated effects of the action, the
> Service will require an estimate of the project's future effects to the Florida
> panther. Therefore, we recommend updating Applicant's July 2021 Biological
> Assessment to include an estimate of panther mortality due to traffic volume
> increases upon project completion.[81]

The agencies had already requested in a prior Request for Additional Information (RAI) for the
applicant to "provide a traffic analysis specific to the Bellmar project. The traffic analysis should
include an estimation of daily trips generated by village residents, employees, and municipal
services and identify the roads these trips will most likely take place on."[82] However, this
information was not provided and yet FDEP still advanced the Bellmar project to Public Notice.

The applicant has obscured the amount of traffic attributable to the Bellmar 404 project, and, as
illustrated above, this information is vital to avoiding jeopardy to the Florida panther. The
applicant has requested "that the USFWS include a proportional level of coverage for the
incidental take expected as a result of the Project in the incidental take statement for this action"
should FDEP complete their review before an ITP is issued.[83] However, critical information in
which the agencies would need to ensure roadkill mortalities are adequately considered and
avoided is not provided.

We are aware that in materials submitted to Collier County (Attachment A), the applicant's
traffic engineer calculated that total traffic created by the 1,000 acre Bellmar Village would be
26,232 trips per day.[84] Please note that this estimate is for only part of the state 404 project
area—there are more than 700 acres, 1,000 additional residential units, and commercial
development not included in this estimate that, if developed, will generate thousands of
additional trips to this total.

The table below summarizes the information available through the Collier County materials in
regard to the Bellmar 404 application and a portion of the Rural Lands West state 404 project.[85]
This 404 application is fairly equivalent to the village of Bellmar and most of the town connector
as seen in the table below.

---

[81] *Id.*
[82] FDEP, 2021. Request for Additional Information, Bellmar. August 20, 2021.
[83] Letter from Applicant to FDEP dated April 14, 2022, page 14
[84] Traffic Impact Statement for Bellmar Stewardship Receiving Area (SRA) by Treblicock Engineering for Collier
Enterprises dated August 19,2020, p. 7, Table 2. The project footprint for the Bellmar SRA is at least 700 acres less
than the state 404 project that is the subject of this letter.
[85] Traffic Impact Statement for the Town of Big Cypress SRA, Section 1, Road Segment Analysis, Trebilcock
Consulting Solutions, June 2022,Page 7. The Town of Big Cypress SRA, as known at the Collier County level,
includes the state 404 Bellmar project, and a portion of the Rural Lands West state 404 project. There would be
about an additional 1,000 acres of development added to these figures as part of the Rural Lands West state 404
project footprint.

| TOWN OF BIG CYPRESS | |
|---|---|
| | Estimated daily trips generated |
| Rivergrass[86] | 23,929 |
| Longwater[87] | 24,919 |
| Bellmar[88] | 26,232 |
| Town Connector | 64,125 |
| | |
| Total [89] | 139,205*<br><br>*Does not include a portion of the state 404 Rural Lands West project |
| | |
| Bellmar state 404 application | 90,357 |

We emphasize that the application trips are the best estimate the public currently has access to, given that the applicant has failed to provide the required traffic and transportation information. The total daily trips generated are likely to be more than what we show here. The agencies should not proceed with decisionmaking on the Bellmar permit until the applicant provides this necessary information. To determine species effects, mitigation, or make a jeopardy determination without this information would violate the ESA's core requirement to use the best available science,[90] as well as the technical assistance process's requirement that applicants provide sufficient information to review potential adverse impacts to listed species and critical habitat.[91]

## II.    Bellmar Is Inconsistent with the State 404 Program, 62-331, F.A.C.

### A.  The alternatives analysis is inadequate.

The project identifies an approximately 1,790-acre footprint in eastern Collier County that is proposed for construction of a master-planned community. We note for the record that there is no

---

[86] Traffic Impact Statement for Rivergrass SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, August 2019, Page 7.

[87] Traffic Impact Statement for Longwater SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, March 2020, Page 7.

[88] Traffic Impact Statement for the Bellmar SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, August 2020, Page 7.

[89] Traffic Impact Statement for the Town of Big Cypress SRA, Section 1, Road Segment Analysis, Trebilcock Consulting Solutions, June 2022, Page 7.

[90] 16 U.S.C. § 1536(a)(2); 404 Programmatic BiOp at 5.

[91] 404 Programmatic BiOp at 16 ("Applicants submitting a State 404 permit application will be required to submit information that allows the State of Florida (FDEP and FWC) to sufficiently assess potential adverse impacts of the proposed project on listed species and their designated critical habitats and allow the USFWS to review and provide technical assistance as needed (62-331.051, F.A.C.).").

public benefit of the project, and rather, the public's resources and interests are threatened by the Bellmar project.

The state rules governing section 404 permitting state that FDEP shall not grant a permit "if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem."[92] We disagree with the applicant that there is "no less environmentally damaging practicable alternative."[93]

The general project purpose of providing a master-planned community can be achieved while avoiding and minimizing impacts to wetlands and listed species habitats, such as Florida panther Primary Zone habitat and crested caracara primary nest buffer, when considering other site alternatives, as required.[94]

The applicant improperly restricts the alternatives they are considering to areas that are 2,000 acres or greater, within eastern Collier, within the Collier County Rural Lands Stewardship Program, and ECMSHCP. There may be lands with less impact to natural resources that are of a different size and outside of these boundaries that should have been considered as an alternative. We note the ECMHCP is withdrawn as of July 28, 2022, and cannot be relied on by the applicant to ignore all alternatives. This change requires the applicant to redo and resubmit a new alternatives analysis including non ECMSHCP properties.

The applicant offers no evidence, that 2,000 acres is required for a master-planned community.[95] In fact, we contend that approving this type of sprawling development is damaging to the future of Florida as it erodes the urban rural boundary and removes important agricultural lands from production. There are many examples both in and out of Florida using smart growth design that provide the desired number residences as well as commercial development on sites significantly smaller than 2,000 acres.

Sustainable, compact development – which the proposed project is not – would also appeal to "ecologically minded consumers"[96], and truly ecologically minded consumers would not support destroying important panther habitat needed for survival and recovery of the Florida panther.

Further, the applicant failed to consider other sites, even those not owned by the applicant, which can serve the general residential and commercial uses proposed by this project in an area closer to existing development, outside of primary panther habitat, and not adjacent to a wildlife refuge.[97] The applicant does not fully consider lands directly north of the Bellmar parcel as alternatives. The alternative analysis speaks to "Parcel 5" as containing lands that would meet

---

[92] 62-331.053, Florida Administrative Code.
[93] Bellmar Alternatives Analysis, April 2022, page 1.
[94] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook. Effective December 22, 2020; 62-331, Florida Administrative Code.
[95] Bellmar Alternatives Analysis, April 2022, page 1.
[96] Bellmar Alternatives Analysis, April 2022, page 1.
[97] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook. Effective December 22, 2020, Appendix C, p. 57 states If it is otherwise a practicable alternative, an area not presently owned by the applicant that could reasonably be obtained, utilized, expanded, or managed in order to fulfill the overall purpose of the proposed activity can still be considered a practicable alternative. In other words, if an applicant does not own an alternative parcel, that does not rule that parcel out as a practicable alternative.

the applicant's constrained restrictions, but it does not go on to fully consider these areas as alternatives.

Within Parcel 5, there are more than 20,000 acres, many of which are owned by the applicant (not a limiting factor), and others recently sold to Gargiulo (who also owns part of this pending Bellmar project area) (see Attachment B).

The applicant appears to not consider lands to the north because of the also-proposed Rural Lands West state 404 application, which is not a justifiable reason to exclude from the analysis.

Importantly, there are also lands to the north of both Bellmar and Rural Lands West that should be considered as an alternative. There are lands north of Oil Well Road that are also contemplated for future development, as evidenced by the ECMSHCP. The Conservancy of Southwest Florida has recommended Collier Enterprises move its developments to this area since the area would result in little to no Primary Zone panther habitat to be impacted. In fact, the Service asked the applicant to consider this northern area as an alternative to avoid and minimize listed species impacts, when the Rural Lands West project was seeking a permit from the U.S. Army Corps of Engineers.[98]

Instead of providing an Alternatives Analysis that would satisfy the state 404 program requirements, the applicant vies for developing the entirety of Parcel 5, with this Bellmar application and several other proposals.

To make matters worse, the applicant provided no scenario that considered a smaller footprint, or any footprint that would avoid the primary zone for the active caracara nest on the site or redesign stormwater lakes to avoid wetland impacts. Most of the wetland impacts are coming from the choice to place stormwater lakes into wetlands. With a project size of over 1,700 acres there is no excuse to use the adjacent wetlands to dredge stormwater lakes; such development uses could be contained within uplands.

The applicant did not adequately analyze "alternative on-site configurations" or "extensively redesign the Project to avoid and minimize impacts."[99] If that were true, the applicant would have made a small adjustment to the footprint to avoid impacts to the primary zone of the caracara nest in the center of the property. Avoiding this caracara primary zone would require an alteration and avoidance of approximately 52 acres. This has never been done, and it undermines the applicant's genuine interest in avoiding and minimizing impacts. It is particularly egregious for the applicant to state that their "development should be designed to incorporate protection and preservation of habitat and natural resources"[100] in light of their refusal to avoid the primary zone of this existing caracara nest.

---

[98] Letter from U.S. Fish and Wildlife Service to Army Corps of Engineers regarding Collier Enterprises Management, Inc. project Town of Big Cypress dated November 18, 2008. "The Service recommends the alternatives analysis includes alternative project sites and configurations that avoid and minimize the impacts to wetlands and open waters, as well as minimize impacts to endangered species. Specifically, other applicant-owned lands north of Oil Well Road may be more suited to a development of this sort."
[99] Bellmar Alternatives Analysis, April 2022, page 1.
[100] Bellmar Alternative Analysis, April 2022, page 7.

In sum, the applicant has failed to provide an adequate analysis of less damaging alternatives. Furthermore, FDEP should consider a "no action alternative."[101] The impacts of the proposed project are contrary to the public interest.

### B. The application fails to adequately analyze secondary effects.

The Bellmar project also fails to meet the requirements to adequately consider secondary impacts. FDEP must consider secondary effects from proposed activities, particularly on sanctuaries and refuges.[102] These areas, as the FDEP Handbook states, are "managed principally for the preservation and use of fish and wildlife resources," and dredge and fill activities may "result in the establishment of undesirable competitive species of plants and animals," or "change the balance of water and land areas needed to provide cover, food, and other fish and wildlife habitat requirements in a way that modifies sanctuary or refuge management practices."[103]

We note that Collier Enterprises Management Inc. discusses its "long tradition of environmental stewardship," land transfers, and sales in its response to the request for additional information.[104] But that generalized historical narrative does nothing to address the harmful impacts of the applicant's proposal on the Florida panther and other natural resources through this project. The Bellmar project will destroy more than 1,700 acres of the most important and critical category of delineated panther habitat, will infringe on and fragment a landscape corridor, and cause additional panther and other species mortalities due to habitat loss and vehicle collisions, while adding more than 8,600 new residents in an area heavily utilized by wildlife. In fact, the applicant's proposed project threatens the future integrity of the Florida Panther National Wildlife Refuge, one of the lands they mention in their history. As they note, the Refuge was founded with the purpose of protecting Florida panthers and their habitat.[105] However, the Bellmar project is a direct affront to this publicly held sanctuary.

The FPNWR has informally and formally shared concerns regarding both the Rural Lands West and Bellmar projects since 2006.[106] Major concerns of the FPNWR managers even then was the impact of these developments on hydrology and prescribed fire use. Staff wrote "building a community adjacent to the west side of the refuge would severely limit or prohibit prescribed burning to nearly half of the refuge fire units due to smoke management limitations…. Staff is concerned that the new developments will cause more water to either be stored in retention ponds, thereby reducing water flow into the refuge or developments will increase runoff into Camp Keais Strand, which flows into the refuge."[107] Already-altered hydrology has shifted the land cover on the FPNWR to dense cabbage palm, and the Refuge expends considerable effort in

---

[101] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook Effective December 22, 2020, Section 8.3.1.
[102] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook Effective December 22, 2020, Section 8.3.6.
[103] Florida Department of Environmental Protection, 2020. State 404 Program Applicant's Handbook Effective December 22, 2020, Section 8.3.6.
[104] Passarella & Associates, Inc., 2021. Bellmar Biological Assessment. July 2021, p. 1.
[105] *Id.* at 2-4.
[106] Meeting notes and staff summaries regarding Rural Lands West and Bellmar projects impacts to listed species and impacts to FPNWR, dated 2006. Received through Freedom of Information Act request.
[107] *Id.*

vegetation management and prescribed fire to maintain the publicly-held refuge as suitable habitat for the Florida panther and its prey.

These same concerns about degradation to the 26,400 acres of the FPNWR were echoed repeatedly, in the Refuge staff comments on the ECMSHCP and in a letter to Collier County when the local authorizations for Bellmar were sought.[108]

In a 2016 letter from FPNWR, the Panther Review Team (PRT) configuration alternative was recommended. This alternative would "protect critical linkages and buffer areas."[109] The PRT alternative would mean the Bellmar property would not be intensified above existing agriculture and would not be developed (Attachment C).

Both the 2016 and 2021 letters shared concerns that development contemplated in the ECMSHCP would encroach upon conservation areas like the FPNWR. Because of the Refuge's position against roadways I-75 and State Road 29, prescribed burn can only direct smoke in the direction of Bellmar and Rural Lands West.

While we understand that efforts were made to provide smoke easement language, future Florida Forest Service authorizations for burning are not assured, once these massive developments are built. If Rural Lands West and Bellmar are built, they would place about 19,170 people -a population about the size of the City of Naples[110]- in direct conflict with management of the Refuge. The FPNWR currently is the most densely occupied Florida panther habitat[111] and any degradation or encroachment of the adjacent-proposed development would be an unacceptable secondary impact and could also contribute to jeopardy for the Florida panther.

### C. FDEP must analyze all cumulative effects.

Under the state 404 program, FDEP must also consider the impact of cumulative effects. As in the sections above, there are a number of projects both pending before the agency or otherwise reasonably foreseeable, that contribute to unacceptable cumulative impacts.

From just seven state 404 applications, there would be over 1,000 acres of wetlands lost.[112] Further, FDEP is also currently considering additional proposed state 404 actions. There are 259 activities reviewed or under review as part of the state 404 program within 5 miles of Bellmar, and 785 within 25 miles of Bellmar (Attachment D and Attachment E).[113] Though these actions

---

[108] Letter from Florida Panther National Wildlife Refuge to U.S. Fish and Wildlife Service Ecological Services Re: Public Comment Eastern Collier Multispecies Habitat Conservation Plan and EIS, August 25, 2016; Letter from Florida Panther National Wildlife Refuge to Collier County Planning Commission Re: Longwater and Bellmar Village SRA Resolutions, March 1, 2021.

[109] Letter from Florida Panther National Wildlife Refuge to U.S. Fish and Wildlife Service Ecological Services Re: Public Comment Eastern Collier Multispecies Habitat Conservation Plan and EIS, August 25, 2016.

[110] City of Naples census population, as of 2020.

[111] Dorazio & Onorato, 2015. Estimating the Density of Florida Panthers Using Camera Trapsand Telemetry - Report for Phase I of the Project, final report.

[112] Bellmar, Rural Lands West, Hogan West, Immokalee Road Rural Village, FFD, Troyer Mine, Kingston.

[113] Based on ArcGIS analysis. Feature Layer from Florida Department of Environmental Protection, Managed by FDEPOpenDataPortal.

may be small or large projects, the total cumulative impacts on wetlands and aquatic resources must be considered.

### D. Bellmar will have adverse effects on aquatic ecosystems, including listed species and their habitats.

The state's 404 program stipulates that no permits can be granted for projects that would cause or contribute to significant degradation of wetlands, which can include adverse effects on wetland-dependent species, ecosystem diversity, and fish and wildlife habitat.[114] Wildlife surveys provided by the applicant show how valuable this area is for a multitude of state and federally listed species. We address quite a bit of this in our prior letters on Bellmar, however, we provide the new or updated information as below, including an analysis by panther habitat modeling expert, Dr. Robert Frakes. Bellmar's impacts to fish and wildlife and their habitats is significant and unacceptable, and thus the permit should be denied.

#### 1. Bellmar will have unacceptable impacts on the Florida panther.

The Bellmar project site is an important area for the endangered and wetland-dependent Florida panther. There have been 112,065 telemetry points collected from Florida panthers since 1981 through 2022, from at least 267 panthers.[115] Looking at just a 5-mile area around the Bellmar site, 8.3% of all documented telemetry points and 29.2% of all collared panthers fall within this area.

The Bellmar project is completely comprised of Primary Zone habitat and nearly all Adult Breeding Habitat area – two models depicting the most critical lands to the survival and recovery of the Florida panther. It is situated close to the FPNWR and a critical linkage called Camp Keais Strand is within and adjacent to the project.

The 2020 draft HCP BiOp described a range of impacts to the Florida panther from development in Eastern Collier:

- Increased mortality from intra-specific aggression among panthers displaced by proposed development and human activity;
- Increased mortality and decreased individual fitness caused by intensification of intra and inter- specific competition;
- Increased predation of panther kittens from other predators when preferred prey populations decline;
- Effects to individuals from habitat loss, degradation, and fragmentation because of new roads connecting new areas of development to one another and the existing road network;
- Increased injury and mortality from collisions with traffic on new roads;
- Management removal because of depredation and human/panther interactions;
- Increased exposure to disease; and
- Increased exposure to toxins.[116]

---

[114] 62-331.053, Florida Administrative Code.
[115] https://geodata.myfwc.com/datasets/myfwc::florida-panther-telemetry/about
[116] 2020 draft HCP BiOp at 125.

To review the impacts to Adult Breeding Habitat, panther habitat modeling expert Dr. Robert Frakes utilized a landscape-scale panther habitat model that was described in Frakes, et al, 2015.[117] The model analyzes forest land cover and forest edge, human density, and road density, amongst other factors to determine suitable breeding habitat for the panther.

Using this published model with updates, Dr. Frakes compared the existing conditions to post-project scenario for Bellmar alone as well as Bellmar and RLW together. There is one set of maps to show the raw results and one set to show in an interpolated model that "smooths" the cells.

Frakes et al., 2015 acknowledges that "protection of the remaining breeding habitat in south Florida is essential to the survival and recovery of the subspecies and should receive the highest priority by regulatory agencies."[118] Yet, adult breeding habitat maps show that Bellmar alone will cause the loss of 10 km2 (2,471 acres) of breeding habitat.

When Bellmar is combined with RLW, it would cause a combined loss of 23 km$^2$ (5,683 acres). The interpolated maps show a significant narrowing of the Camp Keais Strand dispersal corridor, especially when Bellmar and RLW are considered together.

Allowing Bellmar to move forward will have unacceptable direct and indirect impacts on panther habitat and corridor connections.



---

[117] Frakes, R.A., Belden, R.C., Wood, B.E. & James, F.E. (2015). Landscape analysis of adult Florida panther habitat. PLoS One 10, e0133044.
[118] *Id.* at 15-16.











We note for the record that in addition to the direct impacts to areas with development, the Public Notice states that "[m]anagement objectives to the preserves adjacent to development will the implemented to limit prey and foraging conditions that otherwise may attract panther and bears".[119] We need clarification on what this means and assurance that if permitted, the applicant will not be seeking or be given Panther Habitat Unit (PHU) credits for lands that are actively being managed to deter panthers. The PN states that the proposed project will need 1,793.4 acres and the estimated PHU credits needed are 16,844.[120] The PN then states that the conservation areas of the project exceed this amount by providing 18,648 PHUs.[121] However, without a map detailing the areas being considered, there is no way to ensure that the applicant is considering preserves being managed to deter panthers as impacted and that these preserves are not being used for compensation.

Further, in the 2020 draft HCP BiOp, the FWS recommended more than 25 different actions to minimize impacts on the Florida panther, including the following:

- Maintain internal traffic capture of each development at or above 50 percent.

---

[119] State 404 Program Public Notice for Permit Application No. 396364-001 dated August 16,2022, at 3.
[120] State 404 Program Public Notice for Permit Application No. 396364-001 dated August 16,2022, at 5.
[121] State 404 Program Public Notice for Permit Application No. 396364-001 dated August 16,2022, at 5.

- Prohibit residents from keeping domestic animals (chickens, goats, etc.) that attract panthers and other predators.
- Require full vaccination of all pets in new developments from diseases that can be acquired by panthers.
- Require pets be kept indoors, leashed, or maintained in fenced enclosures at all times. Encourage residents to feed pets indoors and to not leave pet food dishes outside.
- Encourage residents to clean grills and store them indoors when not in use.
- Minimize the use of bird feeders and supplemental feeding stations for deer and other game species.
- Require residents to deer proof gardens.
- Restore agricultural lands to native habitats that are more beneficial to the panther, especially forested habitats, and maintain in perpetuity. [122]

We have no indication from the applicant whether they are going to follow or incorporate this advice into the proposed development. These draft recommendations should inform the evaluation of whether the project should be authorized absent any commitment by the applicant to implement them, for example, by informing whether the proposal is in the public interest or meets requirements to minimize impacts. The agencies should also consider whether these recommendations should be incorporated as binding permit terms to ensure that impacts are minimized.

## 2. Bellmar will have unacceptable impacts on the Florida bonneted bat.

The applicant's Florida bonneted bat (FBB) survey, dated July 2021, found that calls were recorded "within the time frame considered by USFWS that roosting is likely nearby (Attachment F)."[123] Thus, the agencies need to look closely at not only how Bellmar would impact proposed critical habitat, but also foraging and roosting within the project. If the Bellmar project will impact a roost(s), there is an increased likelihood that Bellmar would also pose jeopardy to the bonneted bat. Based on our review, the applicant has not adequately addressed this issue.

We also note that this project is in FBB Proposed Critical Habitat (PCH), specifically Unit 3 of the PCH (Attachment G).

## E. Ownership and other information must be addressed.

## 1. Ownership within the Project Boundary

It appears that the applicant does not, in fact, own all of the property contained in the application (Attachment H). About 503.57 acres were sold in June 2019 to Gargulio, Inc. This is 9.8% of the 5,105.49 acres. We note that Gargulio does not appear to be indicated as or listed as an adjacent property owner and is not part of the permit notice. To our knowledge, Gargulio is also not an applicant. While it appears that the Gargulio property is not designated as development or conservation, it does call into question the appropriateness of including this property in the

---

[122] 2020 draft HCP BiOp at 320.
[123] Passarella & Associates, Inc., 2021. Bellmar Florida Bonneted Bat Acoustic Survey Report. Prepared for Collier Enterprises Management, Inc. July 2021.

Bellmar 404 boundary without the documented acknowledgement of the property owner. The agencies should determine why land not owned by the applicant is included in the boundary of the application.

| Parcel ID | Acres |
|---|---|
| **354930004** | 96.88 |
| **354960207** | 9.03 |
| **354520100** | 225.97 |
| **354480606** | 171.69 |
| | |
| TOTAL | 503.57 |

This information was found on the Collier County Property Appraiser on October 15, 2021, confirmed on August 30, 2022.

### 2.  The applicants have yet to comply fully with all requests for additional information.

In addition to the other RAI request that was not addressed, as discussed above, the following RAI comments from the August 20, 2021 RAI letter have not been addressed in part or in full:

Excerpt from the Agency RAI:

*25. Page 34 of the BA addresses incidental take of the project by referring to the HCP. The ITP has not been issued yet. Therefore, please provide a stand-alone analysis of incidental take for each species that will have take (as defined by the ESA) associated with the Bellmar project. In order to remain within the State 404 process, a project must not cause jeopardy. Please provide an analysis supporting that the Bellmar project is not likely to cause jeopardy to the panther.*

The applicant's response to this request is not adequate because the ECMSHCP has been withdrawn. To date, we have not seen any new information submitted to FDEP and FWC informing them that the ECMSHCP has been withdrawn.

Excerpt from the Agency RAI:

*34. The provided plans do not seem to provide any indication of the proposed lot size. What is the approximate site of each residential lot? How many residences are proposed or anticipated?*

The applicant refers to the Town Connector as intended for commercial uses, however at least 1,000 residential units – both affordable and market rate – are also proposed along with the commercial uses. The applicant should be required to answer this question completely and in adequate detail to ensure that the impacts of its proposal, in particular the traffic-inducing impacts, are assessed accurately.

Excerpt from the Agency RAI:

*48. What are the potential effects of the project on the Florida panther, including the direct, indirect, interrelated, and interdependent effects? What is the extent of habitat loss that would result from the proposed project?*

The applicant avoids answering these questions. The applicant must address these issues and answer these questions fully and directly.

Excerpt from the Agency RAI:

*50. How would the proposed mitigation offset the proposed impacts to the panther?*

*The assessment includes a traffic analysis section but does not specifically address the extent of the proposed traffic increases that would result from the implementation of the project. What is the specific anticipated increase in traffic (volume, location, etc.) and how would that increase impact the panther?*

The applicant has refused to answer these questions. Particularly, in light of the analysis in the 2020 draft HCP BiOp and 2021 draft HCP BiOp, the applicant must address these issues and answer these questions fully and directly.

## III.   Conclusion

Thank you for considering our comments. We ask that you deny the Bellmar project because it would pose unacceptable direct, indirect, and cumulative impacts, and would seal the fate of the Florida panther. Bellmar, and other reasonably foreseeable projects, would not only remove habitat, but also would cause increased roadkill, increase human-wildlife interaction, and pose threats to trust resources and properties in conservation. Furthermore, Bellmar is inconsistent with the requirements of the State 404 Program.

Please note that this letter does not constitute support for the state-assumed section 404 permitting program, which we believe is unlawful.

Sincerely,

Julianne Thomas
Senior Environmental Planning Specialist
(239) 262-0304 x 252
 juliannet@conservancy.org

Amber Crooks
Environmental Policy Manager
(239) 776- 5601
amberc@conservancy.org


Karimah Schoenhut
Staff Attorney
Sierra Club
Sierra Club Environmental Law Program
50 F Street NW, 8th Floor
Washington DC 20001
Phone: 202-548-4584
karimah.schoenhut@sierraclub.org


Elise Pautler Bennett
Florida Director & Senior Attorney
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, Florida 33703
(727) 755-6950
ebennett@biologicaldiversity.org

Cc:
Shannon Estenoz, Assistant Secretary for Fish and Wildlife and Parks, Department of Interior
Bob Carey, Environmental Review Branch Manager, USFWS
Jose Rivera, Environmental Review Supervisor, USFWS
John Truitt, Deputy Secretary, FDEP
Jon Iglehart, South District Director, FDEP
Megan Mills, Permitting Administrator, FDEP
Toby Schwetje, Environmental Specialist III, FDEP
Jason Hight, Director Office of Conservation Planning Services, FWC
Jeaneanne Gettle, Director of Water Division, EPA
Rosemary Calli, Section Chief Wetlands & Streams, EPA
FWC records FWCConservationPlanningServices@myfwc.com
FDEP records SD-ERPcomments@floridadep.gov

Attachment A

**Table 2**
**Project Specific Trip Generation – Build-out Conditions – Average Weekday**

| ITE LUC | Daily Two-Way Volume | AM Peak Hour | | | PM Peak Hour | | |
|---|---|---|---|---|---|---|---|
| | | Enter | Exit | Total | Enter | Exit | Total |
| **Single Family Detached** | 13,250 | 284 | 850 | **1,134** | 911 | 535 | **1,446** |
| **Multifamily Housing (Low-Rise)** | 8,729 | 112 | 377 | **489** | 329 | 194 | **523** |
| **Office Park** | 424 | 36 | 4 | **40** | 2 | 27 | **29** |
| **Shopping Center** | 5,383 | 120 | 74 | **194** | 231 | 251 | **482** |
| **Total Traffic** | 27,786 | 552 | 1,305 | **1,857** | 1,473 | 1,007 | **2,480** |
| **Internal Capture** | 806 | 24 | 24 | **48** | 97 | 97 | **194** |
| **External Traffic** | 26,980 | 528 | 1,281 | **1,809** | 1,376 | 910 | **2,286** |
| **Pass-by Traffic** | 748 | 26 | 17 | **43** | 51 | 46 | **97** |
| **Net External Traffic** | 26,232 | 502 | 1,264 | **1,766** | 1,325 | 864 | **2,189** |

Attachment B



Attachment C[124]



---

[124] Florida Panther Protection Program Technical Review Team, 2009. Technical Review of the Florida panther Protection program Proposed for the Rural Lands Stewardship Area of Collier County, Florida. Final Report. Note that the PRT did not analyze the Big Cypress DRI (AKA Rural Lands West) but did find that the Bellmar state 404 area should be retained in no more intense than current agricultural uses.

Attachment D

Date: 9/13/2022





There are 259 404 permits within 5 miles of the Bellmar 404 impact area

Attachment E

Date: 9/13/2022



There are 785 404 permits within 25 miles of the Bellmar 404 impact area

Attachment F[125]



---

[125] Calls indicating roost nearby at stations #1, 16, 18, 20, 26, 28.

Attachment G



Attachment H

Date: 9/14/2022



**Legend**

- Florida Panther National Wildlife Refuge
- Bellmar 404 Boundary

**ONAME**
- BARRON COLLIER PARTNERSHIP LLP
- COLLIER ENTERPRISES
- GARGIULO
- PACIFIC LAND LTD

0  0.2 0.4    0.8    1.2    1.6 Miles

# Attachment C

**Natural Resources Defense Council • Conservancy of Southwest Florida • National Parks
Conservation Association • Center for Biological Diversity**

February 3, 2021

Noah Valenstein, Secretary
Florida Department of Environmental Protection
*Via electronic mail to*: noah.valenstein@dep.state.fl.us

**RE: Burnett Oil Company, Inc.'s Section 404 Clean Water Act/Environmental Resource
Permit application nos. 323836-004 and 397879-002 to facilitate new oil drilling in the Big
Cypress National Preserve and public records request under Chapter 119, Florida Statutes**

Dear Secretary Valenstein,

The undersigned organizations have repeatedly written to the Department and the National Park
Service, most recently on December 16, 2020, regarding our opposition to Phase I geophysical oil
exploration for the Nobles Grade 3-D Geophysical Seismic Survey in the Big Cypress National
Preserve (Preserve) by the Burnett Oil Company, and its failure to adhere to existing permit
conditions and fully reclaim and properly monitor the related damage. We now write to express
our opposition to the Department's issuance of permits under Section 404 of the Clean Water Act
and Part IV of Chapter 373, Florida Statutes, or any other permits, that would authorize or facilitate
new oil exploration or drilling in the Preserve.

On December 22, 2020, the Environmental Protection Agency (EPA) published in the Federal
Register notice of its approval of the state of Florida's application to assume jurisdiction over the
Clean Water Act's Section 404 permitting program.[1] Conservation organizations are challenging
the EPA's actions in *Center for Biological Diversity v. U.S. Environmental Protection Agency*,
Case No.: 21-cv-119 (D.D.C. January 14, 2021). Public comments submitted in opposition to the
Department's request to assume this program highlighted concerns regarding the unlawfulness of
the proposed program and the lack of analyses, consultation, and public disclosures that would
normally occur under federal law, including the Clean Water Act (CWA), National Environmental
Policy Act (NEPA), Endangered Species Act (ESA), and National Historic Preservation Act
(NHPA).

We recently became aware of state 404 application nos. 323836-004 and 397879-002, submitted
on January 22, 2021, by the Burnett Oil Company to the Department, for Section 404 Clean Water
Act and Environmental Resource Permit authorization to construct oil well pads and access roads
in wetlands in two new locations in the Big Cypress National Preserve. The undersigned
organizations did not receive notice of any permit applications from the Department despite
repeatedly requesting such notice in prior correspondence. We became aware of these permit
applications as a result of an exploratory search of the Department's new Section 404 permit

---

[1] 85 Fed. Reg. 83,553 (Dec. 22, 2020).

1

program database. The website itself lists no public notices regarding any Section 404 permit.  This lack of transparency is concerning and serves as an example of inadequate public notice under the state Section 404 permit program.

It is also unclear whether Burnett Oil has applied for a permit under Chapter 377, Florida Statutes, and we request clarity from the Department on this, as well as the status of obligations under the Endangered Species Act regarding the effects these activities will have on endangered and threatened species, including the Florida panther and Florida bonneted bat, and their critical habitats in the Preserve.

*Existing Damage Caused by Oil Exploration in the Preserve Remains*

As stated most recently in our December 16, 2020 letter, and, in other prior correspondence, we continue to have concerns about the success of the reclamation Burnett Oil has attempted thus far to reclaim the wetland damage caused by its seismic activities in the Preserve in 2017 and 2018, and the lack of compensatory mitigation for the loss of wetland function and endangered Florida panther habitat. Specifically, numerous issues remain with the oil company's monitoring of and reporting on the reclamation, and compensatory mitigation remains incomplete as of the date of this letter. We have shared numerous reports[2] written by our environmental consultants at Quest Ecology, Inc. Most recently, Quest Ecology reviewed the 2020 Reclamation Monitoring Report (dated October 2020) prepared by Turrell, Hall and Associates, Inc. on behalf of Burnett Oil and Quest Ecology continues to identify issues with the reclamation monitoring. To date, we have not received a response regarding the issues with Burnett Oil Company's monitoring raised by Quest Ecology.

The following is a summary of the damage to the Preserve caused by Burnett Oil Company's Phase I seismic survey, as documented by Quest Ecology:[3]

- Wetland soils were severely altered due to rutting and compaction caused by vibroseis and other off-road vehicles driving over them and then re-disturbed by subsequent reclamation attempts. The 33-ton vibroseis vehicles compacted and deeply rutted soils due to their sheer weight. The soils ruts created were almost 2-feet deep and up to 15-feet wide in places;

---

[2] *See* Quest Ecology, *Comments on Turrell, Hall and Associates, Inc.'s 2020 Reclamation Monitoring Report – October 20th, 2020 Burnett Oil Company's Nobles Grade 3-D Seismic Oil and Gas Exploration in the Big Cypress National Preserve* (December 15, 2020), available at: https://www.nrdc.org/sites/default/files/quest-comments-monitoring-report-20201215.pdf; Quest Ecology, *Summary of March 6, 2020 Site Assessment within Burnett Oil Company's Nobles Grade 3-D Seismic Oil and Gas Exploration area, Big Cypress National Preserve, Collier County, Florida* (March 15, 2020), available at: https://www.nrdc.org/sites/default/files/final-quest-ecology-memorandum-20200306.pdf; Quest Ecology, *Comments on Turrell, Hall & Associates, Inc.'s 2019 Reclamation Monitoring Report – August 30th, 2019 Burnett Oil Company's Nobles Grade 3-D Seismic Oil and Gas Exploration in the Big Cypress National Preserve* (January 3, 2020), available at: https://www.nrdc.org/sites/default/files/quest-ecology-memorandum-2019-reclamation-monitoring-report-01032020.pdf; Quest Ecology, *Seismic Survey Inspection Report, Big Cypress National Preserve* (June 2019), available at: https://www.nrdc.org/sites/default/files/seismic-survey-inspection-report-20190615.pdf; Quest Ecology, *Phase I Seismic Survey Inspection Report, Big Cypress National Preserve* (May 2018), available at: https://assets.nrdc.org/sites/default/files/seismic-survey-inspection-big-cypress-20180531.pdf?_ga=2.61695279.2044034844.1586532000-1336211018.1533580820.
[3] *Id.*

- Despite their small size, dwarf cypress trees can range in age from 31 to 2,500 years. These trees provide important roosting sites and refuge from high water levels for birds and other wildlife. Nonetheless, dwarf cypress trees were cut or run over to make way for the vibroseis vehicles. Plant species and abundance within the representative seismic line inspected is significantly different from adjacent habitats not directly impacted by seismic survey activities—for example, dwarf cypress trees were observed in less than 1% of the seismic line, whereas these trees make up 50% of the plant cover in adjacent undisturbed habitats;
- Average total groundcover was around 5-10% within the seismic line inspected, as opposed to 40-60% in adjacent undisturbed habitats;
- Trees, shrubs, herbaceous species, and epiphytes (primarily consisting of Florida butterfly orchids and State-listed bromeliad species) were conspicuously absent within the seismic survey line observed compared to adjacent undisturbed habitats;[4]
- Dwarf pond cypress tree stumps that were cut with chainsaws by oil company crews— many exceeding two feet in diameter—were abundantly observed in the seismic line inspected and were not re-sprouting;
- Desiccation (drying out) of bromeliads and Florida butterfly orchids on the edges of the seismic lines due to removal of the adjacent dwarf cypress tree canopy important for maintaining temperature and moisture levels;
- Dwarf pond cypress tree seedlings were rarely observed in the seismic line inspected, although they were frequently observed in adjacent undisturbed habitats;
- The extent of torpedograss, a Category I invasive plant species in Florida, appear to have increased since the seismic survey activities began;
- Two native, but potentially nuisance plant species with the potential to spread once established—common reed and Carolina willow—were observed within the seismic survey line observed, suggesting that conditions are favorable for their continued growth and spread into other parts of the Preserve;
- Periphyton cover was significantly reduced within the seismic line observed compared to adjacent undisturbed habitats—periphyton is a critical component of the food web because it provides the primary food source for small consumers such as fish and invertebrates; and
- The oil company's initial reclamation attempts of ground elevations impacted by vibroseis vehicles resulted in a difference of up to seven inches in some locations—the differences in ground elevations will have adverse effects on the natural recruitment of desirable native plants.

Despite Burnett Oil Company's initial reclamation attempts, damage remains. Further, Quest Ecology identified problems with the representations made in the oil company's initial monitoring report, many of which still remain, according to a second monitoring report, including:[5]

---

[4] Notably, "reclamation" requirements include re-grading the soil ruts, but not the replanting of cypress trees or other destroyed or damaged vegetation. Vegetation is supposed to naturally recruit on its own.

[5] Quest Ecology, *Comments on Turrell, Hall & Associates, Inc.'s 2019 Reclamation Monitoring Report – August 30th, 2019 Burnett Oil Company's Nobles Grade 3-D Seismic Oil and Gas Exploration in the Big Cypress National Preserve* (January 3, 2020), available at: https://www.nrdc.org/sites/default/files/quest-ecology-memorandum-2019-reclamation-monitoring-report-01032020.pdf.

- The oil company is re-grading soils within 3 inches of adjacent undisturbed areas in places, as opposed to re-grading soil ruts to match original grade, as required by federal and state permits. Meaning, the Preserve is not the same as it was prior to the seismic testing, despite the oil company's claims that there would be no long-term impacts;
- The number of monitoring stations within each designated reclamation area is not proportional to the length of the impacts caused by the oil exploration;
- The number and size of disturbed vegetation monitoring plots are insufficient to yield statistically significant results and do not include the full width of the seismic lines the oil company created;
- It's unclear whether state and federal agencies will base the "success of the reclamation" on individual reclamation areas or the 110-square mile Phase I seismic survey area in its entirety;
- The center of the seismic line is the least disturbed area because it was located between the vibroseis vehicle tires, yet the disturbed vegetation monitoring is taking place there;
- The method for comparing the topographic elevations of adjacent undisturbed areas to reclaimed areas is "biased and inconsistent" with the oil company's permits;
- Fundamental plant community attributes—such as species richness and diversity—between impacted and adjacent, undisturbed areas are not being disclosed; and
- Plant species are misidentified.

It is important for Burnett Oil Company to get the monitoring of the reclamation right from the start. Otherwise, subsequent years of monitoring will not be effective in identifying problems with the oil company's reclamation attempts so they can be promptly corrected. In short, despite the oil company's claims to the contrary, our scientific experts continue to conclude that long-term soil, hydrologic, and vegetation damage will persist as a result of Burnett Oil Company's seismic survey activities.[6]

*Impacts from Proposed Oil Development Must Not be Piecemealed*

In addition to exploration, oil development (drilling and related infrastructure) can have long-lasting impacts. However, it appears that Burnett Oil Company may be piecemealing its permit applications to avoid analyzing and disclosing to the public the secondary and cumulative impacts of the forthcoming oil development, including drilling and any well stimulation techniques, such as hydraulic fracturing or acidizing. It appears from a review of the Department's Section 404 permitting database that Burnett Oil Company is applying for authorization to fill wetlands to construct oil well pads and access roads at two new locations in the Preserve. However, we have not seen any related oil and gas permit applications submitted to the Department, or any federal access permits submitted to the National Park Service, to authorize oil drilling or other development, as of the date of this letter. Therefore, it appears that Burnett Oil Company is seeking authorization for direct wetland impacts associated with preemptive oil drilling activities (filling of wetlands to construct well pads and access roads), without disclosing the full impacts associated with oil development, including secondary and cumulative impacts. This approach thwarts

---

[6] Quest Ecology, *Comments on Turrell, Hall and Associates, Inc.'s 2020 Reclamation Monitoring Report –October 20th, 2020 Burnett Oil Company's Nobles Grade 3-D Seismic Oil and Gas Exploration in the Big Cypress National Preserve* (December 15, 2020), available at: https://www.nrdc.org/sites/default/files/quest-comments-monitoring-report-20201215.pdf.

informed and transparent environmental review and fails to provide the Department with the reasonable assurances required to issue permits for these activities. Impacts associated with oil development that can occur and must be analyzed here are as follows:[7]

### A. Upstream (Well) Development Activities

- Development activities, including those associated with access roads, staging areas, seismic operations, as well as geophysical exploration including surveying/staking, land/tree clearing, explosives use, boring and vehicle traffic.
- Well field development activities, including those associated with production wells, well pads, drilling rigs, pump/well heads, reserve pits, storage tanks, fuel tanks, water tanks, electric equipment, drilling pipe storage, water wells, waterlines, surface water intakes, disposal wells, water impoundments, borrow pits, reserve pits, electric distribution lines, communication towers.
- Construction activities associated with well pads and ancillary features and onsite components, including but not limited to surveying/staking, land/tree clearing, grading, stormwater and erosion and sediment control infrastructure, wetland, stream and sensitive area mitigation/protection, trenching/boring, surface water pumping, spoil/debris, vegetation piles, vehicle traffic, drilling/well pad development and completion activities, office, control, utility, storage and maintenance structures incidental to specific projects.
- Production and operations activities, including those related to access roads, production, gas flaring, vehicle traffic, post-construction stormwater management, maintenance of well pads and ancillary features and components (including supporting infrastructure installation, repair and replacement, equipment upgrades, inspections and repairs, workovers and recompletions, minor amounts of soil disturbance, vegetation maintenance, road maintenance, etc.).
- Decommissioning and reclamation activities, including those associated with vehicle traffic, land/tree clearing, land excavation/backfilling, vegetation restoration and well plugging.

### B. Midstream (Pipeline) Development Activities

- Construction of gathering, transmission and distribution pipelines and associated activities, including but not limited to access roads, staging areas, pipe storage/laydown areas, stream and water crossings, road borings, surveying/staking, land/tree clearing, stormwater and erosion and sediment controls, grading, trenching/boring, stockpiles, pipeline assembly, trench backfilling, vehicle traffic, revegetation and reclamation of surface impacts.
- Construction of surface features, including but not limited to access roads, staging areas and storage yards, booster, compressor and pump stations and related facilities, meter stations, mainline valves, pig launcher/receiver facilities, regular facilities, facilities to process, refine, stabilize and store natural gas and/or other hydrocarbons, communication towers, electric distribution lines, electric substations, capacitor stations, transformer

---

[7] See U.S. Fish and Wildlife Service, *Oil & Gas Coalition Multi-State Habitat Conservation Plan*, https://www.fws.gov/northeast/PDF/OG_HCP_EIS_FAQs.pdf.

stations, office/control/utility/storage/maintenance structures incidental to specific projects, parking areas, cathodic protection, storage tanks.

- Operation and maintenance of pipeline and surface facilities, including but not limited to vehicle traffic, equipment upgrades, inspections and repairs/replacements, leak detection, pigging, painting, minor amounts of soil disturbance, vegetation maintenance to preserve the ROW [right-of-way], road maintenance, and odorization.
- Installation of new culverts/ditches, gas flaring, blow downs, and hydrostatic testing and discharge.
- Decommissioning and reclamation of pipeline and surface facilities, including but not limited to vehicle traffic, land excavation/backfilling, and vegetative restoration.

For example, as the photograph below shows, existing oil pads and associated roads in Big Cypress National Preserve are clearly visible in the landscape.



An oil pad and road near Raccoon Point in the Big Cypress National Preserve (January 2019)
Photo credit: Jonathan Milne, LightHawk

C. *Greenhouse Gas Emissions from Oil Development, including Downstream Activities, and Climate Change*

- A large and growing body of scientific research demonstrates, with ever increasing confidence, that climate change is occurring and is caused by emissions of greenhouse gases (GHGs) from human activities, primarily the use of fossil fuels. The 2018 Intergovernmental Panel on Climate Change (IPCC) Special Report on Global Warming of 1.5°C found that human activities are estimated to have caused approximately 1.0°C of global warming above pre-industrial levels, and that warming is likely to reach 1.5°C between 2030 and 2052 if it continues to increase at the current rate.[8]

- The 2018 United States Fourth National Climate Assessment found (NCA4), "that the evidence of human-caused climate change is overwhelming and continues to strengthen, that the impacts of climate change are intensifying across the country, and that climate-related threats to Americans' physical, social, and economic well-being are rising."[9] Like the IPCC, the authors of NCA4 found that impacts are already occurring, concluding that "[t]he impacts of global climate change are already being felt in the United States and are projected to intensify in the future—but the severity of future impacts will depend largely on actions taken to reduce GHG emissions and to adapt to the changes that will occur."[10]

- Both the IPCC and National Climate Assessment, respectively, acknowledge the role of fossil fuels in driving climate change.[11][12]

- Research shows that fossil fuels produced from U.S. federal lands are already a significant source of GHG emissions and that together, coal, oil, and natural gas produced on federal lands account for approximately 25 percent of the total fossil fuels produced annually in the United States.[13]

- Federal lands are also a critical carbon sink. The U.S. Geological Survey (USGS) found that in 2014, federal lands of the conterminous United States stored an estimated 83,600 MMT CO2 Eq., in soils (63 percent), live vegetation (26 percent), and dead organic matter (10 percent).79 In addition, the USGS estimated that Federal lands "sequestered an average of 195 MMT CO2 Eq./yr between 2005 and 2014, offsetting approximately 15 percent of the CO2 emissions resulting from the extraction of fossil fuels on Federal lands and their end-use combustion."[14] Here, surface disturbing activities from the oil development will likely reduce the Preserve lands carbon sequestration ability.

---

[8] 2018 Intergovernmental Panel on Climate Change, *Summary for Policymakers*, *in* Global Warming of 1.5°C: An IPCC Special Report on the Impacts of Global Warming of 1.5°C Above Pre-industrial Levels and Related Global Greenhouse Gas Emission Pathways, in the Context of Strengthening the Global Response to the Threat of Climate Change, Sustainable Development, and Efforts to Eradicate Poverty 6 (Valérie Masson-Delmotte et al. eds., 2018) (attached) [hereinafter, *Summary of IPCC 1.5°C Report*].

[9] U.S. Global Change Research Program, Fourth National Climate Assessment: Volume II Impacts, Risks, and Adaptation in the United States 36 (David Reidmiller et al. eds. 2018)[hereinafter, *NCA4*].

[10] *Id*. at 32.

[11] 2014 Intergovernmental Panel on Climate Change, *Climate Change 2014 Synthesis Report: Contribution of Working Groups I, II, and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change* 46 (Rajendra K. Pachauri et al. eds. 2015) [hereinafter, *AR5*].

[12] *NCA4* at 76.

[13] Matthew D. Merrill, et al., Federal Lands Greenhouse Gas Emissions and Sequestration in the United States: Estimates for 2005-14: U.S. Geological Survey Scientific Investigations Report 2018-5131 6 (2018)[hereinafter, *USGS 2018 Report*].

[14] *Id*. at 1.

7

- The Biden-Harris Administration recently issued an executive order acknowledging the climate crisis and the potential climate and other impacts associated with oil and gas activities on public lands,[15] and a memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships.[16]
- The emissions associated with the production of fossil fuels from federal lands can be divided into two categories: (1) direct emissions associated with activities such as construction, drilling, completion, and well operation; and (2) indirect or "downstream" emissions associated with activities such as transportation, processing and end use of those fuels. Since direct emissions from production represent only a small proportion of the life cycle emissions from fossil fuels, agencies must analyze and disclose to the public both the direct and indirect effects for the entire supply chain. This includes emissions from exploration, development, drilling, completion (including hydraulic fracturing), production, gathering, boosting, processing, transportation, transmission, storage, distribution, refining, and end use.
- End uses of fossil fuels include combustion, which is the largest source of energy-related GHG emissions.[17] Other end uses may result in oil or gas being used as a feedstock to create other products rather than being combusted. The creation and use of such products may also result in GHG emissions, and those emissions could be greater or lesser than the GHG emissions caused by combustion.

All of the aforementioned impacts must be analyzed and disclosed together, rather than in a piecemeal fashion.

*Formal Government-to-Government Tribal Consultation is Required*

Additionally, we understand that the areas of the Preserve encompassed in Burnett Oil Company's new permit applications contain identified archaeological and culturally sensitive sites, and that the Miccosukee Tribe of Indians of Florida opposes these permit applications and have requested formal consultation. Formal consultation must also be initiated with the Seminole Tribe of Florida. We oppose any permit applications that adversely impact cultural and archaeological resources or impact the spiritual and cultural traditions of Native American tribes or interfere with sacred landscapes of indigenous peoples.

*Public Records Request under Chapter 119, Florida Statutes*

Finally, we found it difficult to locate and view all of Burnett Oil Company's permit application materials on the Department's state 404 permit MapViewer website and we could not locate any related documents through a project-specific search on the Department's Oculus database, even though the 404 web page directs the public that files are available there. The documents we were

---

[15] The White House, *Executive Order on Tackling the Climate Crisis at Home and Abroad* (January 27, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/.

[16] The White House, *Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships* (January 26, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/26/memorandum-on-tribal-consultation-and-strengthening-nation-to-nation-relationships/.

[17] *See* Bureau of Land Management, *Supplemental Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Utah, DOI-BLM-UT-0000-2021-0001-EA* (Oct. 2020) at 27.

able to locate thus far include the following: NPDES Discharge Control Plans and Details; Section A: General Information for All Activities; Tamiami Prospect; ERP/State 404 Environmental Supplement; and Stormwater Management System Engineering Supplemental Report. We request that the Department treat this as a public records request under Chapter 119, Florida Statutes, seeking any other records[18] related to Burnett Oil Company's Section 404 and Environmental Resource Permit applications, including any correspondence with the Department. If these documents are readily available online, please advise. Please also contact the undersigned before doing anything that would cause the related costs or fees to exceed $150.00.

*Conclusion and Formal Meeting and Notice Request*

Based on the foregoing, we fail to understand how Burnett Oil Company can demonstrate compliance with state and federal laws for issuance of the requested Section 404 Clean Water Act and Environmental Resource Permits. Therefore, we renew our request for a "time out" on further seismic, filling, drilling, or other related activities that the Department, in consultation with the National Park Service, U.S. Fish and Wildlife Service, and Tribal governments can: (1) fully assess the existing damage caused by Burnett Oil Company's seismic testing and require completion of scientifically-based reclamation, monitoring, and compensatory mitigation for the damage that has already occurred; (2) request additional information on the secondary and cumulative impacts associated with new oil development; (3) analyze and disclose this information to the public and Tribal governments; (4) ensure Endangered Species Act obligations will be met; (5) engage in consultation under the National Historic Preservation Act; and (6) engage in meaningful government-to-government Tribal consultation. This is necessary for the Department to evaluate the full picture of the environmental damage already caused by Burnett Oil Company, and to analyze and disclose to the public whether the company can provide scientifically supported reasonable assurances to meet all applicable permit criteria for its proposed oil development activities.

We will continue to attempt to work with state and federal agencies to protect America's first National Preserve, which provides immeasurable values to the Everglades, Tribal and other frontline communities, public water supplies, tourism, wildlife, and the economy.[19] To this end, we respectfully request a meeting with you to further discuss our grave concerns with the adverse impacts that have already occurred to Preserve resources as a result of oil exploration, and the additional adverse impacts that would likely occur if Section 404 and Environmental Resource Permits are issued allowing more oil development. We will also submit detailed comments once

---

[18] "Records" means anything denoted by the use of that word or its singular form in the text of the Freedom of Information Act and includes correspondence, minutes of meetings, memoranda, notes, emails, notices, facsimiles, charts, tables, electronic data, Geographic Information Systems (GIS) data and shape files, aerial imagery and photography, data contained within cell phone applications, video footage, presentations, orders, filings, and other writings (handwritten, typed, electronic, or otherwise produced, reproduced, or stored). This request seeks responsive records in the custody of any Department office.

[19] Frank Ackerman, Ph.D., Synapse Energy Economics, *Why Drill for Oil in Florida? Tiny Industry, Huge Risks* (2018), available at: https://www.nrdc.org/sites/default/files/why-drill-for-oil-in-florida-tiny-industry-huge-risks_2018-10-22.pdf.

we have had a chance to review all of Burnett Oil Company's permit application materials and any documents responsive to our public records request.[20]

Finally, we request Department notification of all activity on the pending permit applications and renew our requests for the Department to notify us of any public notices and/or notices of intent to issue any Department permits to Burnett Oil Company. Please do not hesitate to contact us if you have any questions. Thank you in advance for your consideration.

Sincerely,


Alison Kelly
Senior Attorney
Natural Resources Defense Council
1152 15th Street, NW
Suite 300
Washington, DC 20005
(202) 717-8297
akelly@nrdc.org

Melissa Abdo, Ph.D.
Sun Coast Regional Director
National Parks Conservation Association
777 6th Street, NW Suite 700
Washington, DC 20001
(954) 298-0819
mabdo@npca.org

Nicole Johnson, Director of Environmental Policy
Amber Crooks, Environmental Manager
Conservancy of Southwest Florida
1495 Smith Preserve Way
Naples, FL 34102
(239) 262-0304
nicolej@conservancy.org
amberc@conservancy.org

Jaclyn Lopez
Florida Director/Senior Attorney
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
(727) 490-9190
jlopez@biologicaldiversity.org

---

[20] NRDC also has three outstanding Freedom of Information Act Requests from 2017 and 2018 pending with the National Park Service that have not been fulfilled.

cc:

Scott de la Vega, Acting Secretary, U.S. Department of the Interior
Stan Austin, Southeast Regional Director, U.S. Department of the Interior
Shannon Estenoz, Principal Deputy Assistant Secretary, U.S. Department of the Interior
Pedro Ramos, Superintendent, Everglades and Dry Tortugas National Parks
Thomas Forsyth, Superintendent, Big Cypress National Preserve
Tony Pernas, Chief of Resource Management, Big Cypress National Preserve
Don Hargrove, Regional Minerals Manager, Big Cypress National Preserve
Jane Nishida, Acting Administrator, Environmental Protection Agency
John Blevins, Region IV Administrator, Environmental Protection Agency
Radhika Fox, Acting Assistant Administrator for Water, Environmental Protection Agency
Tom Wall, Director, Office of Wetlands, Oceans and Watersheds, Environmental Protection Agency
John A. Coates, Mining and Minerals Programs Director, Florida Department of Environmental Protection
Cindy Mulkey, Oil and Gas Program Administrator, Florida Department of Environmental Protection
Jon M. Iglehart, South District Director, Florida Department of Environmental Protection
Pierre Bruno, Florida Department of Environmental Protection
Larry Williams, State Supervisor, Florida, U.S. Fish and Wildlife Service
Colonel Andrew Kelly, Jacksonville District Commander, U.S. Army Corps of Engineers
John Policarpo, Chief, Fort Myers Section, U.S. Army Corps of Engineers

# Attachment D



MIAMI-DADE EXPRESSWAY AUTHORITY

3790 N.W. 21 St.  Miami, FL 33142  T 305.637.3277  F 305.637.3283

www.mdxway.com

August 20, 2021


David White
Environmental Specialist II
Florida Department of Environmental Protection
3300 PGA Boulevard, MSC 7210-1
West Palm Beach, FL 33406


Re: State 404 Permit Application No. 13-396515-001-SFI

Dear Mr. White:

The Miami-Dade Expressway Authority (MDX) submitted a 404-permit application to the United States Army Corps of Engineers (USACE) as part of the federal review process under Section 404 and the National Environmental Policy Act (NEPA). This permit application was transferred to the Florida Department of Environmental Protection (FDEP) under the recently approved State 404 Permit Program.

In correspondence with both the South Florida Water Management District (SFWMD) and the FDEP regarding the Environmental Resource Permit (ERP) and State 404 permit applications, both agencies have recommended that the process be pursued through joint agency collaboration. Due to the extent of the project and to ensure the ERP permit application submissions meet agency requirements, the MDX is engaging with the SFWMD through a pre-application process. A formal application has not yet been submitted to the SFWMD.

Since the State 404 authorization cannot be issued until the ERP has been issued (as per FAC 62-331.070), the MDX would like to respectfully withdraw the current State 404 permit application (application no. 13-396515-001-SFI) and continue the project review through a pre-permit application process with the FDEP.

The MDX would like to engage in this review of pre-permit application documents with the FDEP, initiated through a written agreement between the two agencies. In addition, we would like confirmation of the time frames for review of these pre-application documents, since the FDEP 404 Handbook does not provide for such.



MIAMI-DADE EXPRESSWAY AUTHORITY

3790 N.W. 21 St.  Miami, FL 33142   T 305.637.3277   F 305.637.3283

www.mdxway.com

If you have any questions or comments, please feel free to reach me at (305) 637-3277 ext. 2115 or jtoledo@mdxway.com.

Sincerely,


Juan Toledo, P.E.
Deputy Executive Director/Director of Engineering

Cc: Jeffery Meyer, Environmental Manager, ERP Permitting (FDEP)
    Norva Blandin, Program Administrator, Permitting & Waste Clean-up (FDEP)
    Claudio Diaferia, M.S., P.E., Assistant Director of Engineering (MDX)
    Kevin Brown, Program Director (MDX/HNTB)

# Attachment E



# Everglades Coalition

1000 Friends of Florida
Arthur R. Marshall Foundation
Audubon Florida
Audubon of Southwest Florida
Audubon of the Western Everglades
Audubon Society of the Everglades
Backcountry Fly Fishers of Naples
Calusa Waterkeeper
Cape Coral Friends of Wildlife
Center for Biological Diversity
Conservancy of Southwest Florida
Defenders of Wildlife
"Ding" Darling Wildlife Society
Earthjustice
Environment Florida
Everglades Foundation
Everglades Law Center
Everglades Trust
Florida Bay Forever
Florida Conservation Voters Education Fund
Florida Defenders of the Environment
Florida Keys Environmental Fund
Florida Native Plant Society
Florida Oceanographic Society
Friends of the Arthur R. Marshall
Loxahatchee National Wildlife Refuge
Friends of the Everglades
Hendry-Glades Audubon Society
International Dark-Sky Association,
FL Chapter
Izaak Walton League of America
Izaak Walton League Florida Division
Izaak Walton League Florida Keys Chapter
Izaak Walton League Mangrove Chapter
Lake Worth Waterkeeper
Last Stand
League of Women Voters of Florida
Martin County Conservation Alliance
Miami Pine Rocklands Coalition
Miami Waterkeeper
National Audubon Society
National Parks Conservation Association
National Wildlife Refuge Association
Natural Resources Defense Council
North Carolina Outward Bound School
Ocean Research & Conservation Association
Peace River Audubon Society
Reef Relief
Sanibel-Captiva Conservation Foundation
Sierra Club
Sierra Club Florida Chapter
Sierra Club Broward Group
Sierra Club Calusa Group
Sierra Club Central Florida Group
Sierra Club Loxahatchee Group
Sierra Club Miami Group
Snook and Gamefish Foundation
South Florida Audubon Society
Southern Alliance for Clean Energy
The Florida Wildlife Federation
The Institute for Regional Conservation
The National Wildlife Federation
The Urban Environment League of
Greater Miami
Theodore Roosevelt Conservation
Partnership
Tropical Audubon Society

July 26, 2019

Megan Clouser
Senior Project Manager
U.S. Army Corps of Engineers
9900 SW 107th Avenue, Suite 203
Miami, FL 33176

Re: Opposition to 404 Wetland Degradation Permit Application for 836 Extension Permit Application No. SAJ-2018-01778 (SP-MLC)

Dear Ms. Clouser:

The Everglades Coalition - comprised of 62 organizations committed to the health and protection of America's Everglades - opposes the proposed 404 Wetlands Degradation permit sought by the Miami Dade Expressway Authority (MDX) for the purpose of developing a six-lane toll road extending State Road (SR) 836 through jurisdictional wetlands within the Comprehensive Everglades Restoration Plan's (CERP) footprint. We ask that this permit be denied, and that MDX consider other existing hybrid alternatives that do not bisect the Bird Drive Basin and instead take advantage of existing infrastructure. The detrimental impacts to the CERP footprint are unnecessary and avoidable.

CERP was authorized by Congress to "restore, preserve, and protect the South Florida ecosystem while providing for other water-related needs of the region, including water supply and flood protection."[1] While we recognize CERP is not static and uses adaptive management to evolve, we also recognize that preserving the east coast buffer within the ecosystem will likely be more important than ever to improve water quality and eliminate harmful discharges to the east and west as we seek to increase the ability to send more water south to this very transmissive area for aquifer recharge. The proposed project has damaging impacts to CERP. Most notably, the project involves construction of a permanent fixture in a very low-lying area, which will require additional flood and groundwater protection measures. Further, the project's induced development will drive up the cost of land needed for acquisition, potentially eliminating willing sellers. These impacts undermine the goals and benefits of CERP and set a negative precedent.

---

[1] Comprehensive Everglades Restoration Plan (CERP), National Park Service, https://www.nps.gov/ever/learn/nature/cerp.htm.

*Committed to full protection and restoration of America's Everglades*

MDX's current proposal poses a particular threat to the Bird Drive Recharge Area (BDRA) project within CERP. The goals of this project include reducing seepage from Everglades National Park to improve the hydrology of the park's ecosystem, recharge groundwater east of Krome Avenue to improve Miami-Dade County water supply, improve the spatial extent of wetlands, and improve water supply to the South Dade Conveyance System.[2] A fully-developed plan for the Bird Drive Basin (BDB) has not yet been identified. Until critical project components have been fully modeled and defined, a project like this six-lane tollway cutting through the project footprint is premature and threatens critical federal initiatives to protect and restore Everglades National Park.

The Everglades Coalition has opposed the expansion of the SR 836 into the sensitive and CERP-critical wetlands west of the Miami-Dade County Urban Development Boundary (UDB) since 2013. The Everglades Coalition passed a resolution in opposition to the project in May 2013, sent a letter to MDX stating our opposition to the current iteration of their plans in April 2015[3], and sent a letter to the South Florida Water Management District (SFWMD) detailing the impacts this project would have on CERP and the broader Everglades ecosystem in July 2018.[4] The negative impacts of this project on CERP necessitate the denial of the applicant's permit request.

**Impacts to CERP Bird Drive Recharge Area**

The physical presence of a major roadway would undermine CERP viability within the BRDA footprint because a central aspect of the project involves developing the ability to store surface water up to four feet, allowing for aquifer recharge. We are also concerned with how increased light pollution and noise in close proximity to Everglades National Park will not be compatible with wildlife and endangered species that use this area for foraging and nesting such as snail kites, panthers, bonneted bats, and woodstorks.

The BDRA is linked to both upstream CERP projects and the downstream South Dade Conveyance System (SDCS). The BDRA can provide water storage year-round and release water to the SDCS throughout the dry season. Modeling performed by Dr. Thomas Van Lent of the Everglades Foundation demonstrates that the successful implementation of the BDRA project is critical to prevent dry season water shortages in South Dade and to maintain a freshwater head that helps fight against saltwater intrusion at coastal structures.[5] With the full seepage barrier implementation, this recharge may be more important to this region than previously modeled, as the CERP model run only modeled for a seepage barrier that was partially engaged.

At their July 11, 2019 meeting, the South Florida Water Management District (SFWMD) Governing Board discussed the importance of BDRA project's north-south connectivity as a part of overall efforts to restore this critical area of the ecosystem. Specifically, the east coast buffer provided by the project and spatial extent of wetlands were discussed as critical CERP components needed to send clean water south. While the BDRA project was delayed for a restudy purpose in

---

[2] https://www.sfwmd.gov/sites/default/files/documents/bdrupdate_eb_12_14_11.pdf
[3] EVCO Ltr RE: 836/Dolphin Expressway Southwest Extension (Project 83618), 4/3/2015.
https://docs.wixstatic.com/ugd/599879_33911d71b9344705b62b72ed3730f649.pdf
[4] EVCO Ltr RE: Re: Kendall Parkway Comprehensive Plan Amendment, State Application Review, 7/31/2018,
https://docs.wixstatic.com/ugd/599879_fc6383a4af6c4817b2297aa1a083e666.pdf
[5] Analysis of the Potential for the State Road 836 Expansion to Affect the Comprehensive Everglades Restoration Plan, Thomas Van Lent, 6/18/2019

2008 and currently lacks a specific timeframe for construction and engineering, it is still on track for implementation.[6] The restudy called for a change of course and a "conveyance concept" project was presented to concentrate land acquisition on the western part of Bird Drive Basin, which was approved by the SFWMD in resolution No. 2012-511**:**

A RESOLUTION OF THE GOVERNING BOARD OF THE SOUTH FLORIDA WATER MANAGEMENT DISTRICT ACCEPTING THE FORMULATION FINDINGS AND RECOMMENDATION OF THE LEADERSHIP OF THE U.S. ARMY CORPS OF ENGINEERS JACKSONVILLE DISTRICT AND THE STAFF OF THE SOUTH FLORIDA WATER MANAGEMENT DISTRICT REGARDING THE BIRD DRIVE RECHARGE AREA PLAN; ACKNOWLEDGING THAT DISTRICT STAFF WILL COORDINATE WITH THE DEPARTMENT OF INTERIOR TO RECONCILE OBLIGATIONS UNDER LAND AND WATER CONSERVATION FUND GRANTS WITH RESPECT TO CERTAIN PARCELS WITHIN THE BIRD DRIVE BASIN AND SOLICIT IDEAS FOR POSSIBLE INTEGRATION OF DISTRICT OWNED LANDS INTO OTHER REGIONAL PROJECTS; DIRECTING DISTRICT STAFF TO COORDINATE WITH OTHER STAKEHOLDERS TO SOLICIT IDEAS FOR OTHER PROJECTS WITHIN THE REGION; PROVIDING AN EFFECTIVE DATE.

To our knowledge, no further action, including meeting all the benefits described in CERP or satisfying the above highlighted language above has been completed by the SFWMD. The development of this multi-lane highway would constitute a permanent decision that directly impacts up to 500 acres of wetlands and will only worsen our ability to expand the spatial extent of wetlands within the east coast buffer area. Many of these lands are encumbered by federal grant obligations for conservation and there is no mitigation elsewhere that would deliver the same benefits.

**Impacts to other CERP components and Everglades Projects**

This project would also impact the following CERP components as listed in the Yellow Book[7]:
V (L-31N Improvements for Seepage Management), FF (S-356 Structures), BB (Dade/Broward Levee/ Pennsuco Wetlands), S/EE (Central Lake Belt Storage Area), XX (North Lake Belt Storage Area), YY and ZZ. Component V involves the extension of the L-31 N canal along an altered course. The road would intercept the east west running portion of the L-31 N canal and either preclude its use or minimize its effectiveness. All of the other project components previously mentioned either rely in whole or in part on the successful implementation of component V.[8]

---

[6] SFWMD, Bird Drive Basin-Background and Current Status. April 30, 2012.
[7] "Final Integrated Feasibility Report and Programmatic Environmental Impact Statement (PEIS) for the Central and Southern Florida Project, Comprehensive Review Study" (Yellow Book), April 1999
[8] Potential Hydrological Effects of the Proposed 836 Extension on Everglades Restoration (CERP) and the Miami-Dade Consumptive Use Permit (CUP) for the M-D West Wellfield, Christopher McVoy, Ph.D.
June 19, 2019

*Committed to full protection and restoration of America's Everglades*

450 N. Park Road # 301, Hollywood FL 33021  |  www.evergladescoalition.org  |  info@evergladescoalition.org



Taken from: "Final Integrated Feasibility Report and Programmatic Environmental Impact Statement (PEIS) for the Central and Southern Florida Project, Comprehensive Review Study" (Yellow Book), April 1999, Appendix A4, Alternative D13R, Bird Drive Basin and L-31N Seepage Management, Component Map 7 (pg. A4-59)

The proposed road would also impose on the Pennsuco wetlands north of Tamiami Trail. The Pennsuco wetlands and the BDRA are important components of the East Coast Buffer. The wetlands of the East Coast Buffer provide a boundary between the wetlands of Everglades National Park and the urban core of Miami-Dade and Broward Counties. This buffer is critical to seepage management, groundwater recharge, and wetland protection.

The SFWMD has acquired land in the Pennsuco wetlands area using a myriad of state and federal funding sources, in addition to funding from developers seeking off-site mitigation. On October 25, 2017, the District acquired an additional 1,100 acres within the Pennsuco wetlands via Lake Belt Mitigation funds, bringing approximately 86% of the 12,732 acre Pennsuco wetlands into public ownership.

*Committed to full protection and restoration of America's Everglades*

**Alternatives**

Under 40 C.F.R. § 230.12(a)(3)(i-iv), 404 permits may not be issued if: (i) there is a practicable alternative which would have less adverse impact and does not have other significant adverse environmental consequences, (ii) the discharge will result in significant degradation, (iii) the discharge does not include all appropriate and practicable measures to minimize potential harm, or (iv) there is insufficient information to make a reasonable judgment as to whether the proposed discharge will comply with the Corp's Guidelines for permit issuance.[9]

Practical alternatives exist to this project, and the applicant has not adequately studied or reported these alternatives. The only alternatives explored by MDX were a limited number of alternative road corridors – twelve out of thirteen of which bisect the BDRA. The applicant has failed to sufficiently explore hybrid alternatives which use existing infrastructure in combination with improvements and transit. Only one alternative inside the UDB was evaluated and it was determined as being the most effective way to solve traffic congestion. However, MDX deemed it infeasible because of cost and displacement of existing infrastructure. MDX failed to review real public transit alternatives that would effectively service the existing built environment but has instead chosen an alternative that would incite urban sprawl next to a critical CERP project footprint. We feel that is because the applicant (MDX)'s primary focus is on building expressways and it relies on collecting toll revenues. Therefore, MDX did not adequately vet all transportation alternatives to solve the stated traffic problem. The only viable option is the no action alternative because it (1) does not interfere with a federally-funded project (CERP), (2) is not contrary to USACE guidelines, and (3) forces mass transit to become a priority in Miami-Dade County.

**No Action Alternative**

In a white paper written on behalf of the Transit Alliance Miami, Walter Kulash, a transit and development expert, concludes that **there is no demonstrated need for the SR 836 expansion.** According to The Corridor Evaluation Traffic Technical Memorandum prepared on behalf of MDX, of 112 segments of major arterial and collector streets examined in the traffic study area, only thirteen failed to meet Miami Dade County CDMP multi-mode level of service standards with a volume to capacity ratio of less than 1.20 in either the AM or PM periods. Overall, the Traffic Technical Memorandum failed to show a sufficient current or future need that justifies MDX's proposal for a new multi-lane toll highway.

MDX proposed highway project does not provide the right solution to traffic needs. Studies show that expanding highways creates more traffic over time, not less.[10,11,12,13]   The Kulash report estimates that ten years after the 836 extension opens, the daily vehicle count of induced traffic

[9] 40 C.F.R. § 230.12(a)(3)(i-iv).

[10] Goodwin, Phil. Empirical evidence on induced traffic. Transportation. February 1996, Volume 23, Issue 1, pp 35–54

[11] Milam et al., 'Closing the Induced Vehicle Travel Gap Between Research and Practice', Transportation Research Record: Journal of the Transportation Research Board, 2017, DOI 10.3141/2653-02

[12] Litman. Generated Traffic and Induced Travel Implications for Transport Planning. Victoria Transport Policy Institute, 2017

[13] Schwager, Diane. 'Consequences of the Development of the Interstate Highway System for Transit'. Transit Cooperative Research Program Sponsored by the Federal Transit Administration RESEARCH RESULTS DIGEST. August 1997. http://onlinepubs.trb.org/onlinepubs/tcrp/tcrp_rrd_21.pdf

will be four times greater than the reduction in traffic on the arterial streets that the extension was designed to alleviate. In other words, the induced traffic would be far greater than the intended traffic reduction.[14] As such, a 'No Action' alternative remains the best alternative not only for the health of the Everglades, but also for traffic conditions and congestion reduction on Miami-Dade County's roadways.

**Transit Alternative**

The Kulash report goes on to describe a plan for solving the traffic issues alluded to via major transit improvements along SW 137th Avenue, between SW 136th Street and NW 12th Street. This transit extension would constitute a reasonable extension of Miami Dade County's Strategic Miami Area Rapid Transit (SMART) plan. This plan would result in far greater reduction in vehicle miles traveled and improve traffic services in the area in question far more effectively than the road extension.[15]

In spite of the viability of this alternative – which achieves county traffic goals while protecting the federal investment in CERP – this alternative has not been fully vetted by the applicant. We believe it is premature to grant a 404 wetland fill permit on this project before other reasonable alternatives have been thoroughly considered.

**Road Alternatives**

The Miccosukee Tribe of Indians has consistently indicated that the proposed roadway would have a detrimental impact on adjacent tribal resources. As such, the Tribe has promoted a road expansion alternative that would not impact tribal land or resources and that may have lesser impacts on the Everglades system and ongoing Everglades restoration projects. This alternative would involve linking the SR-836 to the recently widened Krome Avenue via an elevated highway, which makes use of existing infrastructure. This alternative would facilitate vehicle traffic while minimizing wetland degradation and negative impacts to the BDRA.

**Insufficiency of the interlocal agreement**

Much of the supposed protections that MDX has offered for wetland resources are derived from an interlocal agreement, not actual Comprehensive Development Master Plan (CDMP) amendments. An interlocal agreement is a wholly inappropriate tool to use in order to ensure that obligations for ensuring there are no conflicts with CERP projects. At a minimum, these protections would need to be ensured within the four corners of the CDMP in order to be considered legitimate and enforceable. A simple majority of the Miami-Dade County Commission can change the details of the interlocal agreement very easily whereas a CDMP change would require a supermajority from the Commission.

---

[14] Selected Traffic and Transit Issues SR 836 Extension Dade County, Florida, Walter Kulash, Miami Transit Alliance, 12/24/2018
[15] Ibid.

**Conclusion**

The United States of America and the State of Florida have invested hundreds of millions of dollars to protect and restore Everglades National Park through implementation of CERP. Indeed, the U.S. Army Corps of Engineers is a close restoration partner facilitating the planning, construction, and operations of key restoration projects. The proposed SR 836 as offered by MDX represents a significant threat to the viability of CERP components that are essential to supplying clean water to the Everglades and protecting Miami-Dade County's water supply. The member organizations of the Everglades Coalition strongly urge you to deny this permit application on the virtue of its negative impacts on CERP – especially given that there are a number of viable alternatives that have not been fully vetted by the applicant which would eliminate the significant detrimental impacts of the current proposal.

Sincerely,

Mark Perry
Co-Chair

Marisa Carrozzo
Co-Chair

*Committed to full protection and restoration of America's Everglades*

# Attachment F



# Everglades Coalition

1000 Friends of Florida
Angler Action Foundation
Audubon Florida
Audubon of Southwest Florida
Audubon of the Western Everglades
Audubon Society of the Everglades
Backcountry Fly Fishers of Naples
Calusa Waterkeeper
Cape Coral Friends of Wildlife
Center for Biological Diversity
Conservancy of Southwest Florida
Defenders of Wildlife
"Ding" Darling Wildlife Society
Earthjustice
Environment Florida
Everglades Foundation
Everglades Law Center
Everglades Trust
Florida Bay Forever
Florida Conservation Voters Education Fund
Florida Defenders of the Environment
Florida Keys Environmental Fund
Florida Native Plant Society
Florida Oceanographic Society
Friends of the Arthur R. Marshall
Loxahatchee National Wildlife Refuge
Friends of the Everglades
Hendry-Glades Audubon Society
International Dark-Sky Association,
FL Chapter
Izaak Walton League of America
Izaak Walton League Florida Division
Izaak Walton League Florida Keys Chapter
Izaak Walton League Mangrove Chapter
Lake Worth Waterkeeper
Last Stand
League of Women Voters of Florida
Martin County Conservation Alliance
Miami Pine Rocklands Coalition
Miami Waterkeeper
National Audubon Society
National Parks Conservation Association
National Wildlife Refuge Association
Natural Resources Defense Council
North Carolina Outward Bound School
Ocean Research & Conservation Association
Peace River Audubon Society
Reef Relief
Sanibel-Captiva Conservation Foundation
Sierra Club
Sierra Club Florida Chapter
Sierra Club Broward Group
Sierra Club Calusa Group
Sierra Club Central Florida Group
Sierra Club Loxahatchee Group
Sierra Club Miami Group
South Florida Audubon Society
Southern Alliance for Clean Energy
The Florida Wildlife Federation
The Institute for Regional Conservation
The National Wildlife Federation
Theodore Roosevelt Conservation
Partnership
Tropical Audubon Society

*Sent Via Email*

June 24, 2020

Office of Governor Ron DeSantis
State of Florida
The Capitol
400 S. Monroe St.
Tallahassee, FL 32399-0001
governorron.desantis@eog.myflorida.com

**Re: Miami-Dade County SR-836 Extension Proposal Ruling**

Dear Governor DeSantis and members of the Florida Cabinet:

On behalf of the 61 member organizations of the Everglades Coalition[1] committed to the protection and restoration of America's Everglades, we write to you to ask you to uphold the recent ruling by Administrative Law Judge Suzanne Van Wyk, which held that the proposed expansion of Miami-Dade's SR-836 tollway demonstrated inconsistency with Everglades restoration efforts, is inconsistent with Miami-Dade County's Comprehensive Development Master Plan, and is inconsistent with state law. The proposed 6 lane toll road would snake 14 miles outside of Miami-Dade County's Urban Development Boundary. It would impact water quality and disrupt fragile ecosystems and natural resources on the Miami-Dade County periphery, which the State has invested significant resources toward protecting and preserving for the benefit of all Floridians. We urge you to uphold your record as champions of Florida's Everglades, protect the State's investments, and put an end to the ill-fated campaign that violates state planning law, threatens our Everglades, and would not provide meaningful benefits to Florida residents.

Judge Van Wyk arrived at two clear findings in her order: First, the project's planning did not adequately consider potential for negative impacts to Comprehensive Everglades Restoration Plan projects and goals; nor did the County receive an adequate determination by the South Florida Water Management District that the project would not compromise the goals of CERP. The failure of the county to obtain an adequate determination is particularly concerning in light of the South Florida Water Management District's ongoing plans to construct a CERP project component in the Bird Drive Basin, which the road bisects. Second, the billion-dollar project itself is not an appropriate reaction to transportation data, and would elicit only meager mobility improvements in the target area and virtually no improvement for commuters. Testimony from the county's own experts revealed that drivers would shave a mere 6 minutes off a two-hour commute as a result of this project's implementation[2]. The County CDMP requires that it shift the travel mode from single occupancy vehicle to mass transit[3], and yet no data or analysis proves that the mass transit option listed in the Plan Amendment would actually be used.

---

[1] Abstaining from the Everglades Coalition on this matter were Tropical Audubon Society and Friends of the Everglades.
[2] Trial Tr. *TAS et al v. Miami-Dade County*, Fla. DOAH Case No. 2018-5695GM. Vol. 12, 1881:11-1882:15, July 26, 2019
[3] Miami-Dade Comprehensive Development Master Plan, Policy MT-7C

*Committed to full protection and restoration of America's Everglades*

This project would exert an outsized negative impact on state investments[4], freshwater resources, ecological resources[5], and would negatively impact CERP[6]. The County fell far short of meeting its burden to prove that the tollway would be consistent with Everglades restoration; and it adopted the tollway amendment despite the South Florida Water Management District's claim that the County had not proved the amendment would not cause harm.

The project has also encountered significant criticism at the Federal level. The Federal Government is Florida's partner towards the shared goal of Everglades restoration under CERP, and has invested significant resources towards future projects in the area in question. The office of Florida Senator Marco Rubio has criticized the project on a number of occasions, and the U.S. Department of the Interior and the U.S. Environmental Protection Agency have both expressed their concerns with the proposed project. The U.S. EPA claims the tollway would "incur substantial and unacceptable consequences for the Everglades as a whole"[7].

The EPA went on to say that the area "plays a critical strategic role in the overall plan for restoration of the southern Everglades." As you are aware, South Florida's water-related dilemmas are playing out in real time for both its residents and its wildlife. The Judge found that the new tollway "creates a risk of contamination to the wellfield" and that the Plan Amendment violates the County's requirement to "protect and enhance" wellfields. The Plan Amendment is also inconsistent with the County's requirement to protect the Pennsucco wetlands, an area designated as critical habitat for the threatened and endangered species that is protected by the CDMP.

For all of the problems it creates, the tollway doesn't solve the problem for which it was created. The Judge found that "Not only [did] the data reveal that the improvements in West Kendall, congestion would be … 'meager,' …they provide no support for a finding that the Plan Amendment will … improve the commute time to downtown and other employment centers."[8]

The Judge's summation of the proposal was apt: "commuters will drive 13 miles, outside of the UDB, through active agricultural lands, through environmentally-sensitive lands, and through the West Wellfield, only to connect with the existing expressway operating at [a level of service] lower than it operates at today."[9] Placing this tollway outside of the UDB is inconsistent with the very intent of the UDB, and the proposed tollway, unfortunately, would harm rather than help the people, land, water, and wildlife it would literally and figuratively touch.

We need not convince you of the Everglades' paramount importance to the health and prosperity of Miami-Dade and our state as a whole, and the vital role it plays in so many of our state affairs, from public health to drinking water to tourism. Making the choice to move against this proposal is a straightforward, common-sense decision to protect Floridians from the echoing impacts of a poorly executed plan.

There is no ideal time to engage in a project that offers unproven benefits at the cost of proven harms. It is time to declare an end to this pursuit, and instead turn our attention to proven solutions. When Miami-Dade recovers from the struggles our entire country is facing, a host of alternative infrastructure improvements await, offering the prospect of faster, more convenient, more affordable commutes. We need not spend taxpayer dollars and years navigating thorny legal waters for what would garner a weak return on

[4] Department of the Interior Letter
[5] McVoy Dep. 31:21-31:20, June 24, 2019, *TAS et al v. Miami-Dade County*, DOAH Case No's 2018-5695GM, 2018-5696GM)
[6] McVoy Dep. 31:21-31:20, June 24, 2019, *TAS et al v. Miami-Dade County*, DOAH Case No's 2018-5695GM, 2018-5696GM)
[7] August 2019 Letter from EPA to USACE
[8] State of Florida DOAH Order Case No. 18-5695GM p. 56
[9] State of Florida DOAH Order Case No. 18-5695GM p. 44

*Committed to full protection and restoration of America's Everglades*

investment for Floridians. We urge you to recognize the illusory appeal of this proposal as just that—an idea initiated with good intentions, but ultimately not in Florida's best interest.

While the tollway's purported benefits reflect what Miami-Dade's residents rightfully desire—less time spent idling in standstill traffic—this proposal has ultimately painted a picture of a panacea that, sadly, is no more than a mirage. Miami-Dade invested considerable amounts of time and money into pursuing this project, and the truth remains: This road would have negative consequences for the Everglades, for Miami-Dade, and for the state of Florida.

We understand the appeal of the project, and believe that the County had the best interests of its community at heart. When one weighs the costs against the benefits, however, it is clear that this simply does not pan out as a solution to Miami-Dade's problems. We trust that each of you, as proven advocates for the Everglades and pragmatic decisionmakers, will choose to uphold the Judge's ruling and close this chapter, making way for new projects that will benefit and protect us all.

Sincerely,

Mark Perry
Co-Chair

Marisa Carrozzo
Co-Chair

CC:

**Shane Strum, Chief of Staff**
Shane.Strum@eog.myflorida.com

**Erin Sumpter, Director of Office of Cabinet Affairs**
Erin.Sumpter@myfloridalegal.com

**Ashley Moody, Attorney General of Florida**
ashley.moody@myfloridalegal.com

**Nicole "Nikki" Fried, Commissioner of Florida Department of Agriculture & Consumer Services**
Nikki.Fried@FDACS.gov

**Jimmy Patronis, Chief Financial Officer of Florida**
CFO.Patronis@myfloridacfo.com