**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

    Plaintiffs,

        v.                                                    Case No. 1:21-cv-0119 (RDM)

U.S. ENVIRONMENTAL PROTECTION
AGENCY, *et al*.

    Defendants.

**DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

GLOSSARY ..................................................................................................................... xiv

INTRODUCTION ................................................................................................................ 1

LEGAL FRAMEWORK ...................................................................................................... 2

    I.    The Clean Water Act ............................................................................................. 2

    II.   The Endangered Species Act ................................................................................ 6

    III.    The Rivers and Harbors Act ............................................................................... 9

FACTUAL BACKGROUND .............................................................................................. 10

    I.    Florida's Section 404 Assumption Request ...................................................... 10

    II.   Development of the Corps' Retained Waters List ............................................. 12

    III.    Consideration of Endangered and Threatened Species and Critical Habitat ................. 14

STANDARD OF REVIEW ................................................................................................ 18

ARGUMENT .................................................................................................................... 19

    I.    EPA Reasonably Concluded That Florida's Submission Was Complete. ......................... 23

        A.   The BiOp was not a required element of Florida's assumption request. ...................... 23

        B.   Plaintiffs had sufficient notice and opportunity to comment. .......................................... 25

    II.   EPA Reasonably Concluded That Florida's Regulations Were Consistent with and No Less Stringent Than the 404(b)(1) Guidelines. ................................................................. 30

        A.   FDEP must make written determinations, which are subject to judicial review........... 31

        B.   FDEP must consider effects on water quality generally. ................................................. 33

        C.   EPA reasonably concluded that FWS's review of state permit applications would safeguard species and habitat. ........................................................................................... 34

    III.    EPA Reasonably Concluded That Florida's Enforcement Authority Satisfied Statutory and Regulatory Requirements. .......................................................................... 35

        A.   The CWA does not preclude Section 404 assumption in states with a gross negligence culpability standard or a statute of limitations of less than five years. ................................. 35

        B.   EPA's regulations do not establish simple negligence as a precondition for state assumption. ...................................................................................................................... 39

    IV.    EPA Reasonably Did Not Demand that Florida Affirm or Incorporate the Federal Definition of "Waters of the United States" in State Regulations. .................................... 42

    V.   The Corps Reasonably Defined Retained Waters. .............................................. 43

    VI.   The BiOp Complies with the ESA. ................................................................... 47

    VII.   The Technical Assistance Process Complies with the ESA. ............................. 55

VIII.  The Incidental Take Statement Complies with the ESA and Is Reasonable.................. 61

IX.    EPA Rationally Relied on FWS's BiOp. ...................................................... 67

X.    EPA's No-Effect Determination For NMFS Species Was Reasonable............................ 68

CONCLUSION......................................................................................................... 70

# TABLE OF AUTHORITIES

## Cases

*1902 Atl. Ltd. v. Hudson*,
   574 F. Supp. 1381 (E.D. Va. 1983) ....................................................................... 46

*Air Transp. Ass'n of Am. v. FAA*,
   169 F.3d 1 (D.C. Cir. 1999) ................................................................... 26, 27, 28

*Akiak Native Cmty. v. EPA*,
   625 F.3d 1162 (9th Cir. 2010) ............................................................................ 37

*Ali v. Fed. Bureau of Prisons*,
   552 U.S. 214 (2008) ............................................................................................ 41

*Am. Bioscience, Inc. v. Thompson*,
   269 F.3d 1077 (D.C. Cir. 2001) .......................................................................... 19

*Am. Coke & Coal Chemicals v. EPA*,
   452 F.3d 930 (D.C. Cir. 2006) ............................................................................ 30

*Appalachian Power Co. v. EPA*,
   135 F.3d 791 (D.C. Cir. 1998) ............................................................................ 54

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*,
   Serv., 273 F.3d 1229 (9th Cir. 2001) .................................................................. 61

*Arkansas v. Oklahoma*,
   503 U.S. 91 (1992) .............................................................................................. 20

*Balt. Gas & Elec. Co. v. NRDC*,
   462 U.S. 87 (1983) .............................................................................................. 19

*Cabinet Mountains Wilderness v. Peterson*,
   685 F.2d 678 (D.C. Cir.1982) ............................................................................. 19

*Citizens to Pres. Overton Park v. Volpe*,
   401 U.S. 402 (1971) ............................................................................................ 19

*City of Olmsted Falls v. FAA*,
   292 F.3d 261 (D.C. Cir. 2002) ............................................................................ 19

*City of Tacoma v. FERC*,
   460 F.3d 53 (D.C. Cir. 2006) ........................................................................ 67, 68

*City of Waukesha v. EPA,*
    320 F.3d 228 (D.C. Cir. 2003) ................................................................. 29, 30

*Conner v. Burford,*
    848 F.2d 1441 (9th Cir. 1988) ................................................................. 63

*Cooling Water Intake Structure Coal. v. EPA,*
    905 F.3d 49 (2d Cir. 2018) ................................................................. passim

*Crutchfield v. Cnty. of Hanover,*
    325 F.3d 211 (4th Cir. 2003) ................................................................. 32

*CSX Transp. Inc. v. Surface Trans. Bd.,*
    584 F.3d 1076 (D.C. Cir. 2009) ................................................................. 28

*Ctr. For Biological Diversity v. U.S. Dep't of Interior,*
    563 F.3d 466 (D.C. Cir. 2009) ................................................................. 8

*CTS Corp. v. EPA,*
    759 F.3d 52 (D.C. Cir. 2014) ................................................................. 43

*Defs. of Wildlife v. Babbitt,*
    130 F. Supp. 2d 121 (D.D.C. 2011) ................................................................. 54

*Defs. of Crooked Lake, Inc. v. FDEP,*
    Nos. 17-5328, 17-0972, 2018 WL 3387900 (Fla. Div. Admin. Hrgs., May 7, 2018) ............. 33

*Defs. of Wildlife v. U.S. Dep't of Interior,*
    931 F.3d 339 (4th Cir. 2019) ................................................................. 54

*Duval Util. Co. v. Fla. Pub. Serv. Comm'n,*
    380 So. 2d 1028 (Fla. 1980) ................................................................. 33

*Edmond v. United States,*
    117 S. Ct. 1573 (1997) ................................................................. 41

*Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.,*
    726 F. Supp. 2d 1195 (D. Mont. 2010) ................................................................. 50

*Friends of the Earth v. Hintz,*
    800 F.2d 822 (9th Cir.1986) ................................................................. 32

*Hardy Salt Co. v. S. Pac. Trans. Co.,*
    501 F.2d 1156 (10th Cir. 1974) ................................................................. 46

iv

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*,
    452 U.S. 264 (1981) ........................................................................................ 20

*Hoosier Env't Council v. U.S. Army Corps of Eng'rs*,
    722 F.3d 1053 (7th Cir. 2013) ...................................................................... 32

*Idaho Conservation League v. EPA*,
    820 F. App'x 627 (9th Cir. 2020) ................................................................. 41

*Innovator Enters., Inc. v. Jones*,
    28 F. Supp. 3d 14 (D.D.C. 2014) .................................................................. 19

*Jama v. Immigr. & Customs Enf't*,
    543 U.S. 335 (2005) ........................................................................................ 36

*Louisiana v. Salazar*,
    170 F. Supp. 3d 75 (D.D.C. 2016) ............................................................... 19

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ........................................................................................ 19

*Marx v. Gen. Revenue Corps.*,
    568 U.S. 371 ...................................................................................................... 41

*Mia. Valley Conservancy Dist. v. Alexander*,
    692 F.2d 447 (6th Cir. 1982) ......................................................................... 10

*Miccosukee Tribe of Indians v. United States*,
    556 F.3d 1257 (11th Cir. 2009) ....................................................................... 7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .......................................................................................... 19

*NRDC v. EPA*,
    859 F.2d 156 (D.C. Cir. 1988) ......................................................... 36, 37, 45

*NRDC v. Houston*,
    146 F.3d 1118 (9th Cir. 1998) ....................................................................... 69

*Nat'l Ass'n of Home Builders v. Defs. Of Wildlife*,
    551 U.S. 644 ............................................................................................... 26, 52

*New York v. United States*,
    505 U.S. 144 (1992) ........................................................................................ 20

*N. Slope Borough v. Andrus*,
   642 F.2d 589 (D.C Cir. 1980) ........................................................................ 58, 59

*Oceana v. Pritzker*,
   75 F. Supp. 3d 469 (D.D.C. 2014) ....................................................................... 61

*Oceana, Inc. v. Ross*,
   No. 15-0555, 2020 WL 5995125 (D.D.C. Oct. 9, 2020) ..................................... 54, 64

*Or. Nat. Res. Council v. Allen*,
   476 F.3d 1031 (9th Cir. 2007) ............................................................................. 66

*Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*,
   144 F. Supp. 35 (D.D.C. 2015) ........................................................................... 55

*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*,
   538 F. Supp. 2d 242 (D.D.C. 2008) ..................................................................... 61

*Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*,
   898 F.2d 1410 (9th Cir. 1990) ............................................................................. 67

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ............................................................................... 48

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
   992 F.3d 1071 (D.C. Cir. 2021) ...................................................................... 67, 68

*Solite Corp. v. EPA*,
   952 F.2d 473 (D.C. Cir. 1991) ............................................................................ 28

*United States v. Hanousek*,
   176 F.3d 1116 (9th Cir. 1999) .......................................................................... 3, 38

*United States v. Ortiz*,
   427 F.3d 1278 (10th Cir. 2005) ............................................................................ 3

*United States v. Pruett*,
   681 F.3d 232 (5th Cir. 2012) ................................................................................ 3

*Wildearth Guardians v. Salazar*,
   880 F. Supp. 2d 77 (D.D.C. 2012) ...................................................................... 69

*Wyandotte Transp. Co. v. United States*,
   389 U.S. 191 (1967) ............................................................................................. 9

**Statutes**

5 U.S.C. § 706(2)(A) .......................................................................................................... 19

16 U.S.C. § 1531(b) ............................................................................................................... 6

16 U.S.C. § 1532(3) ............................................................................................................... 6

16 U.S.C. § 1532(7) ............................................................................................................... 7

16 U.S.C. § 1532(13) ............................................................................................................. 7

16 U.S.C. § 1532(15) ............................................................................................................. 6

16 U.S.C. § 1532(19) ............................................................................................................. 6

16 U.S.C. § 1533(b)(4) ......................................................................................................... 26

16 U.S.C. § 1533(b)(5) ......................................................................................................... 26

16 U.S.C. § 1536(a)(2) ............................................................................................... 7, 52, 54

16 U.S.C. § 1536(a)(3) ......................................................................................................... 26

16 U.S.C. § 1536(b) ............................................................................................................. 26

16 U.S.C. § 1536(b)(3)(A) ..................................................................................................... 9

16 U.S.C. § 1536(b)(4) ........................................................................................................... 9

16 U.S.C. § 1536(b)(4)(A) ..................................................................................................... 9

16 U.S.C. § 1536(b)(4)(C)(i) ............................................................................................... 61

16 U.S.C. § 1536(b)(4)(C)(ii) .............................................................................................. 65

16 U.S.C. § 1536(b)(4)(C)(iv) ....................................................................................... 65, 66

16 U.S.C. § 1536(o)(2) ........................................................................................................... 9

16 U.S.C. § 1538(a)(1)(B) ..................................................................................................... 7

16 U.S.C. § 1538(a)(1)(G) ..................................................................................................... 7

16 U.S.C. § 1539(a)(1)(B) ..................................................................................................... 7

16 U.S.C. § 1540(e)(6) ......................................................................................................... 57

16 U.S.C. § 1540(g) ............................................................................................... 57

18 U.S.C. § 3282 ............................................................................................ 35, 36

33 U.S.C. § 1251(a) ................................................................................................. 2

33 U.S.C. § 1251(b) ...................................................................................... passim

33 U.S.C. § 1251(b)(1) ..................................................................................... 3, 37

33 U.S.C. § 1311(a) ................................................................................................. 1

33 U.S.C. § 1319 ........................................................................................... passim

33 U.S.C. § 1319(c)(1) ........................................................................................... 3

33 U.S.C. § 1342 ..................................................................................................... 3

33 U.S.C. § 1342(b) ............................................................................................... 3

33 U.S.C. § 1342(b)(7) ......................................................................................... 36

33 U.S.C. § 1344(a) ............................................................................................... 3

33 U.S.C. § 1344(g)-(l) ....................................................................................... 52

33 U.S.C. § 1344(g) ......................................................................................... 3, 24

33 U.S.C. § 1344(g)(1) ................................................................................. passim

33 U.S.C. § 1344(h) ....................................................................................... 20, 24

33 U.S.C. § 1344(h)(1)(A)(i) ..................................................................... 5, 20, 36

33 U.S.C. § 1344(h)(1)(B) ................................................................................... 36

33 U.S.C. § 1344(h)(1)(G) .............................................................................. 5, 36

33 U.S.C. § 1344(h)(2)(A) .............................................................................. 5, 21

33 U.S.C. § 1344(h)(3) ........................................................................................... 5

33 U.S.C. § 1344(h)(4) ........................................................................................... 6

33 U.S.C. § 1344(i) ................................................................................................. 6

33 U.S.C. §§ 1344(j)-(*l*) ................................................................................................ 6

33 U.S.C. § 1344(n) ................................................................................................... 6, 39

33 U.S.C. § 1362(6) ........................................................................................................ 2

33 U.S.C. § 1362(7) ........................................................................................................ 2

33 U.S.C. § 1362(12)(A) ................................................................................................ 2

33 U.S.C. § 1377(e) ........................................................................................................ 3

**Legislative Materials**

H.R. Rep. No. 95–830 (1977) ......................................................................................... 3

H.R. Rep. No. 97-567, reprinted in 1982 U.S.C.C.A.N. 2807 .................................... 61

Model Penal Code § 2.02(d) ......................................................................................... 38

**State Statutes**

Fla. Stat. § 373.4146(2) ................................................................................................ 11

Fla. Stat. § 120.68(7)(b) ............................................................................................... 33

**State Administrative Code**

F.A.C. 62-331.051(4) .................................................................................................... 24

F.A.C. 62-331.052(1)(a) ............................................................................................... 24

F.A.C. 62-331.052(1)(c) ............................................................................................... 24

F.A.C. 62-331.053(1) .................................................................................................... 31

F.A.C. 62-331.053(3)(a)1-3 ......................................................................................... 33

F.A.C. 62-331.053(3)(a)1-4 ......................................................................................... 31

F.A.C. 62-331.053(3)(a)4 ............................................................................................. 24

F.A.C. 62-331.053(3)(a)6 ............................................................................................. 31

F.A.C. 62-331.053(3)(a)6.i-iv ...................................................................................... 31

F.A.C. 62-331.053(3)(a)6.i ................................................................................... 34

F.A.C. 62-331.053(3)(a)6.ii .................................................................................. 34

F.A.C. 62-331.053(3)(a)6.iii ................................................................................. 34

F.A.C. 62-331.053(3)(a)6.iv ................................................................................. 34

F.A.C. 62-33.053(3)(b) ........................................................................................ 34

**Code of Federal Regulations**

33 C.F.R. pt. 328 .................................................................................................. 2

33 C.F.R. § 329.4 ........................................................................................... 10, 45

33 C.F.R. § 329.14(b) ......................................................................................... 10

33 C.F.R. § 329.16(a) ......................................................................................... 10

33 C.F.R. § 329.16(b) .................................................................................. 10, 44

33 C.F.R. § 329.16(c) .................................................................................. 10, 44

40 C.F.R. pt. 120 .................................................................................................. 2

40 C.F.R. § 120.2(a)(1)(i) .................................................................................... 2

40 C.F.R. § 127.27(b)(2) .................................................................................... 41

40 C.F.R. pt. 230 .................................................................................................. 5

40 C.F.R. § 230.10(a) ......................................................................................... 31

40 C.F.R. § 230.10(b)(1)-(4) ............................................................................. 31

40 C.F.R. § 230.10(b)(1)-(2) ............................................................................. 33

40 C.F.R. § 230.10(b)(3) ...................................................................................... 5

40 C.F.R. § 230.10(c) ......................................................................................... 31

40 C.F.R. § 230.10(c)(1)-(4) ............................................................................. 31

40 C.F.R. § 230.10(c)(1) ..................................................................................... 34

40 C.F.R. § 230.10(c)(2) ..................................................................................... 34

40 C.F.R. § 230.10(c)(3) ................................................................................................ 34

40 C.F.R. § 230.10(d) .................................................................................................... 34

40 C.F.R. pt. 233 ..................................................................................................... 11, 67

40 C.F.R. § 233.2 ............................................................................................................. 4

40 C.F.R. § 233.10–.14 ............................................................................................ 11, 24

40 C.F.R. § 233.11(a)-(b) .............................................................................................. 24

40 C.F.R. § 233.11(h) .................................................................................................... 42

40 C.F.R. § 233.11–.12 .................................................................................................... 4

40 C.F.R. § 233.12(a) .................................................................................................... 24

40 C.F.R. § 233.14 ........................................................................................................ 22

40 C.F.R. § 233.14(b)(1) .......................................................................................... 4, 44

40 C.F.R. § 233.15(a) ...................................................................................................... 5

40 C.F.R. § 233.15(e)(1) .................................................................................................. 5

40 C.F.R. § 233.15(e)(2) .................................................................................................. 5

40 C.F.R. § 233.15(g) ...................................................................................................... 5

40 C.F.R. § 233.41 ............................................................................................. 39, 41, 42

40 C.F.R. § 233.41(a)(3)(i)-(iii) .................................................................................... 40

40 C.F.R. § 233.41(b)(2) .......................................................................................... 40, 42

40 C.F.R. § 233.50 ........................................................................................................ 67

50 C.F.R. § 17.11 ............................................................................................................. 6

50 C.F.R. § 402 ............................................................................................................. 16

50 C.F.R. § 402.01(b) ...................................................................................................... 6

50 C.F.R. § 402.02 ................................................................................................. 7, 9, 53

50 C.F.R. § 402.03 .................................................................................................... 7

50 C.F.R. § 402.12(b) ............................................................................................... 8

50 C.F.R. § 402.12(j) ................................................................................................ 8

50 C.F.R. § 402.12(k) ............................................................................................... 8

50 C.F.R. § 402.13 .................................................................................................... 8

50 C.F.R. § 402.13(a) ............................................................................................... 8

50 C.F.R. §§ 402.14(a)-(b) ...................................................................................... 8

50 C.F.R. § 402.14 .................................................................................................... 8

50 C.F.R. § 402.14(b)(1) .......................................................................................... 8

50 C.F.R. § 402.14(c)(4) ......................................................................................... 57

50 C.F.R. § 402.14(d) ............................................................................................. 57

50 C.F.R. § 402.14(g) ......................................................................................... 8, 53

50 C.F.R. § 402.14(g)(4) .......................................................................................... 9

50 C.F.R. § 402.14(g)(8) .......................................................................................... 9

50 C.F.R. § 402.14(i)(I)(iv) ................................................................................... 66

50 C.F.R. § 402.14(i)(2) ......................................................................................... 65

50 C.F.R. § 402.14(i)(3) ......................................................................................... 66

50 C.F.R. § 402.16 .................................................................................................. 64

**Federal Register**

51 Fed. Reg. 19,926 (June 3, 1986) ................................................................. 26, 69

85 Fed. Reg. 30,953 (May 21, 2020) ............................................................... 15, 29

85 Fed. Reg. 57,853 (Sept. 16, 2020) ......................................................... 11, 12, 29

85 Fed. Reg. 80,713 (Dec. 14, 2020) ................................................................... 42

85 Fed. Reg. 83,553 (Dec. 22, 2020) ............................................................................. 12

88 Fed. Reg. 3004 (Jan. 18, 2023) ................................................................................. 2

**GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BA | Biological Assessment |
| BE | Biological Evaluation |
| BiOp | Biological Opinion |
| CWA | Clean Water Act |
| ESA | Endangered Species Act |
| FDEP | Florida Department of Environmental Protection |
| FWC | Florida Fish and Wildlife Conservation Commission |
| FWS | U.S. Fish and Wildlife Commission |
| ITS | Incidental Take Statement |
| MOU | Memorandum of Understanding |
| NMFS | National Marine Fisheries Service |
| NPDES | National Pollutant Discharge Elimination System |
| RHA | Rivers and Harbors Act |
| RTC | Response to Comments |
| TNWs | Traditionally Navigable Waters |

# INTRODUCTION

The Clean Water Act ("CWA" or "the Act") establishes permitting programs that govern the discharge of pollutants to waters of the United States, and the Act authorizes the federal government to administer those programs. But Congress wished to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution," 33 U.S.C. § 1251(b), and so the CWA also authorizes states deemed qualified by the U.S. Environmental Protection Agency ("EPA") to administer CWA permitting programs under state law. Starting in 2018, Florida enacted statutes and regulations to implement a state law CWA permitting program and, in summer 2020, the State requested EPA's approval to issue permits for discharges of dredge or fill material into certain waters within its borders. EPA granted that request after concluding, based on the information then before it, that Florida' proposed program satisfied statutory and regulatory requirements. Plaintiffs challenge EPA's approval and a related action by the U.S. Army Corps of Engineers ("the Corps"). But both actions are consistent with governing law and are supported by the administrative record. Plaintiffs' CWA-related challenges thus fail.

Before approving Florida's request to assume CWA permitting authority, EPA consulted with the U.S. Fish and Wildlife Service ("FWS") to determine whether a Florida-administered permitting program would likely to jeopardize the continued existence of species listed under the Endangered Species Act ("ESA") or would destroy or adversely modify designated critical habitat. FWS found that it would not, a conclusion that it explained in a programmatic Biological Opinion ("BiOp"). In the BiOp, FWS examined Florida's permit review procedures, and EPA's procedures for overseeing Florida's implementation of its program, and it found that so long as those procedures were followed, permits issued by Florida would comply with the ESA. That finding was reasonable, EPA's reliance on the BiOp was reasonable, and EPA also reasonably determined

1

that its approval of Florida's permitting program would have no effect on ESA-listed species under the jurisdiction of the National Marine Fisheries Service ("NMFS"). Plaintiffs' challenges under the ESA also fail.

Accordingly, the Court should enter summary judgment for EPA, FWS, and the Corps (collectively, "Federal Defendants") on all remaining claims.

## LEGAL FRAMEWORK

### I.    The Clean Water Act

Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), while also "recogniz[ing], preserv[ing], and protect[ing] the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution," *id.* § 1251(b). The CWA prohibits the unauthorized "discharge of any pollutant." *Id.* § 1311(a). "Discharge" includes "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12)(A). The term "pollutant" includes "dredged spoil" and fill material, such as "rock" and "sand." *Id.* § 1362(6). And "navigable waters" is broadly defined as "the waters of the United States, including the territorial seas." *Id.* § 1362(7). EPA and the Corps have issued regulations interpreting the phrase "waters of the United States." 40 C.F.R. Part 120 (EPA) and 33 C.F.R. Part 328 (Corps). As relevant here, those regulations have consistently defined "waters of the United States" to include waters which "are [c]urrently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide." 40 C.F.R. § 120.2(a)(1)(i).[1]  Waters in this category are known as "TNWs" (short for "traditionally navigable waters").

---

[1] On January 18, 2023, EPA and the Department of the Army issued a revised definition of "waters of the United States," which took effect on March 20, 2023. 88 Fed. Reg. 3004. The 2023 rule is the latest in a series of changing regulatory definitions dating back to 2015.  In light

The CWA establishes two permitting programs for authorizing discharges. Under Section 404, the Corps may issue a permit "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). Under Section 402, EPA may issue a "National Pollutant Discharge Elimination System," or "NPDES," permit for the discharge of other pollutants, such as chemical waste or sewage. *Id.* § 1342.

CWA Section 309, 33 U.S.C. § 1319 authorizes certain administrative, civil, and criminal penalties for discharges without, or in violation of, a permit. Penalties include fines of up to $25,000 per day of violation, or up to one year of prison, for anyone who "negligently" violates a Section 404 or NPDES permit, or negligently violates the Act's prohibition on unauthorized discharges. 33 U.S.C. § 1319(c)(1). All courts of appeals to consider the issue have held that Section 309 requires only a showing of "simple" negligence to establish criminal liability.[2]

While the CWA authorizes federal implementation of the Section 404 and NPDES permitting programs, it "is the policy of Congress that the States . . . implement" those programs. 33 U.S.C. § 1251(b). To that end, the Act allows states and tribes to assume primary responsibility for NPDES and Section 404 permitting programs for waters within their jurisdictions. *Id.* §§ 1342(b), 1344(g), 1377(e). The transfer of CWA permitting authority from the federal government to states or tribes "is not a delegation of Federal authority." H.R. Rep. No. 95–830 at

---

of court orders preliminarily enjoining the 2023 rule, EPA and the Corps are currently interpreting "waters of the United States" consistent with the pre-2015 regulatory regime in 27 States, including Florida. The differences between the 2023 rule and the pre-2015 regulatory regime are minor and are not relevant to the Court's assessment of EPA's approval action.

[2]  *See United States v. Hanousek*, 176 F.3d 1116, 1121 (9th Cir. 1999); *United States v. Ortiz*, 427 F.3d 1278, 1282 (10th Cir. 2005); *United States v. Pruett*, 681 F.3d 232, 242 (5th Cir. 2012).

104 (1977). Rather, states "establish[] programs under State law," which "function[] in lieu of the Federal program." *Id.* In the Section 404 context, this is known as state or tribal "assumption."[3]

States may not assume Section 404 permitting authority for all waters of the United States within their borders. The Corps continues to administer the Section 404 program in "waters which are presently used, or are susceptible to use . . . as a means to transport interstate or foreign commerce," in "waters which are subject to the ebb and flow of the tide," or in "wetlands adjacent thereto." *Id.* § 1344(g)(1). Waters over which the Corps continues to exercise Section 404 permitting authority following assumption are known as "retained waters," while waters under state jurisdiction are known as "assumed waters."

A state seeking to assume Section 404 permitting authority must submit an assumption request to EPA. That submission must include "a full and complete description of the program" that the state "proposes to establish and administer under State law" and "a statement from the attorney general (or the attorney for those State agencies which have independent legal counsel), . . . that the laws of such State . . . provide adequate authority to carry out the described program." 33 U.S.C. § 1344(g)(1). EPA regulations elaborate on those general statutory requirements, prescribing, for example, eight required elements of a "full and complete" program description, and four required elements of the "attorney general's statement." 40 C.F.R. § 233.11–.12. EPA regulations also require states to submit a "Memorandum of Agreement with the Secretary [of the Army]" that includes a "description of waters of the United States within the State over which the Secretary retains jurisdiction, as identified by the Secretary." *Id.* § 233.14(b)(1). That description typically includes a list of Corps-retained waters, known as a "retained waters list."

---

[3] The CWA refers to "State" assumption of the Section 404 program. EPA's regulations define "State" to include Indian Tribes meeting certain requirements. 40 C.F.R. § 233.2. The references to "States" in the statute and regulations are therefore to be interpreted to include Tribes.

Once EPA receives a Section 404 assumption request, it has 30 days to "determine whether the submission is complete." 40 C.F.R. § 233.15(a). If so, the Agency will publish a notice to that effect in the Federal Register and must solicit comments from members of the public and federal agencies and hold a public hearing. *Id.* § 233.15(e)(1), (2). Within 120 days of receipt of a complete application, EPA must "approve or disapprove" the State's Section 404 assumption request, unless the State agrees to an extension. 40 C.F.R. § 233.15(g). If EPA fails to act within that period, and a state does not agree to an extension, then the state's assumption request is "deemed approved" by operation of law. 33 U.S.C. § 1344(h)(3).

EPA "shall approve" a state assumption request if, based on the materials submitted and comments received, it determines that the state's program meets the eight criteria at CWA Section 404(h)(1). *Id.* § 1344(h)(2)(A). These criteria define the minimum standards that a state Section 404 program must satisfy. For instance, Section 404(h)(1)(G) requires that a state have the authority to "abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement." *Id.* § 1344(h)(1)(G). While Section 404(h)(1)(A)(i) requires EPA to determine if state-issued permits would "apply, and assure compliance with, any applicable requirements of this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section, and sections 1317 and 1343 of this title [referring, respectively to toxic pollutant standards and ocean discharge criteria]" *Id.* § 1344(h)(1)(A)(i). The "guidelines established under subsection (b)(1)" refer to regulations codified at 40 C.F.R. Part 230, which are known as the "404(b)(1) Guidelines." Among other things, the 404(b)(1) Guidelines bar Section 404 permits for discharges that "[j]eopardize[] the continued existence" of ESA listed-species or "result[] in likelihood of the destruction or adverse modification" of critical habitat. 40 C.F.R. § 230.10(b)(3).

Following EPA approval (or deemed approval through inaction), the Corps suspends its Section 404 permitting activity in waters subject to the state's authority. 33 U.S.C. § 1344(h)(4). EPA then exercises oversight of the state-administered Section 404 program, including by reviewing and, if warranted, objecting to permits. *Id.* § 1344(j)–(*l*). If EPA objects to a permit and the state does not address its objection, then authority to issue that permit reverts to the Corps. *Id.* EPA also retains its enforcement authority even after state assumption, which in no way "limit[s] the authority of the Administrator to take action" under 33 U.S.C. § 1319. 33 U.S.C. § 1344(n). Finally, if the Agency determines that a state "is not administering" its Section 404 program "in accordance with" the requirements of the CWA, then it may withdraw its approval and return the program to the Corps. *Id.* § 1344(i).

## II.    The Endangered Species Act

Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and to bring such species "to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. §§ 1531(b), 1532(3). The Secretary of the Interior is generally responsible for listed terrestrial and inland fish species and administers the ESA through FWS, while the Secretary of Commerce is generally responsible for listed marine species and administers the ESA through NMFS (jointly, "the Services"). *Id.* at § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b). Once a species is listed, it receives the protections afforded by the ESA.

ESA Section 9 prohibits the "take" of endangered species within the United States, as well as those threatened species to which the Services have extended the protections.[4] 16 U.S.C.

---

[4] The ESA term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

6

§ 1538(a)(1)(B) and (G). This prohibition applies to any "person," including corporations, States and their instrumentalities, and the United States and its agencies. *Id.* § 1532(13). Take that is "incidental" [5] to an otherwise lawful activity may be exempted pursuant to the procedures set forth in ESA Sections 7 or 10. ESA Section 10 sets forth a permit process through which private actors with no Federal nexus may obtain an incidental take permit. *Id.* § 1539(a)(1)(B).

ESA Section 7 addresses the obligations of Federal agencies. Section 7(a)(2) directs each federal agency, in consultation with FWS or NMFS (the "consulting agency"), to "insure that any action authorized, funded, or carried out by such agency. . . is not likely to jeopardize the continued existence of" any listed species or destroy or adversely modify critical habitat that has been designated for such species. *Id.* § 1536(a)(2). [6] "Federal agency" is defined as "any department, agency, or instrumentality of the United States." *Id.* § 1532(7). Neither States nor State agencies come within this definition thus, ESA Section 7(a)(2)'s requirements do not extend to State actions. ESA Section 7(a)(2)'s obligations are triggered only by those Federal actions over which the agency has discretionary involvement or control. 50 C.F.R. § 402.03.

The Services have issued implementing regulations governing the ESA consultation process. [7] Consultation is required if the agency proposing action ("action agency") determines that

---

[5] "Incidental take" is defined as "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02.

[6] The regulations further define the statutory phrase "[j]eopardize the continued existence of" to mean "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

[7] The Services also have jointly issued a "Consultation Handbook" that "provides internal guidance and establishes national policy for conducting consultation" pursuant to ESA Section 7. https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf (last visited Apr. 26, 2023); *see* EPA-HQ-OW-2018-0640-0387_attachment_10. The Services' views in the Consultation Handbook are entitled to deference. *Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1273 (11th Cir. 2009).

the action "may affect" listed species or critical habitat. 50 C.F.R. §§ 402.13, 402.14. If the action

will have no effect on a listed species, the consultation requirement is not triggered. *See Ctr. for*

*Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 475 (D.C. Cir. 2009).

If the action agency determines that its action "may affect" listed species, it must pursue

either informal or formal consultation as appropriate. Informal consultation is an optional process

comprised of all discussions and correspondence between the resource agency and the action

agency in order to determine whether formal consultation is necessary. 50 C.F.R. § 402.13(a). The

action agency may prepare a "biological assessment" ("BA," sometimes called a "biological

evaluation" or "BE," as here) to assist in determining whether formal consultation is required. *Id.*

§ 402.12(b) (pointing out that any person "may" but is not required to prepare a BA for Federal

actions that are not "major construction activities."). If the action agency determines, with the

written concurrence of the Service(s), that the action "is not likely to adversely affect" the listed

species or critical habitat, the consultation process is terminated and formal consultation is not

necessary. 50 C.F.R. §§ 402.12(j), (k), 402.13, 402.14(b)(1).

If either the action agency or the Service(s) determines that the proposed action is "likely

to adversely affect" listed species or designated critical habitat, the agencies must engage in formal

consultation. 50 C.F.R. §§ 402.13(a), 402.14(a)–(b). During formal consultation, the Service

evaluates the agency's proposed action in the context of the current status of the species or critical

habitat, the environmental baseline, the effects of the action, and the cumulative effects. 50 C.F.R.

§ 402.14(g). Effects of the action

> are all consequences to listed species or critical habitat that are caused by the
> proposed action, including the consequences of other activities that are caused by
> the proposed action. A consequence is caused by the proposed action if it would
> not occur but for the proposed action and it is reasonably certain to occur. Effects
> of the action may occur later in time and may include consequences occurring
> outside the immediate area involved in the action.

8

*Id*. § 402.02. At the conclusion of formal consultation, the Service issues its biological opinion as to whether the proposed action is likely to "jeopardize the continued existence of" any listed species or destroy or adversely modify critical habitat. *Id*. § 402.14(g)(4); 16 U.S.C. § 1536(b)(3)(A). If the action is likely to jeopardize the continued existence of a listed species or adversely modify critical habitat, the biological opinion will set forth a reasonable and prudent alternative to the action, if any is available. 50 C.F.R. § 402.14(g)(8).

If the Service determines at the conclusion of the consultation that the action is not likely to jeopardize the species, but "incidental take" of individuals of the species caused by the action is reasonably certain to occur, it will issue a written "incidental take statement" ("ITS") that specifies the impact of the incidental taking on the species, those "reasonable and prudent measures" necessary or appropriate to minimize such impact, measures necessary to comply with any take authorizations issued under the Marine Mammal Protection Act, as relevant, and any terms and conditions required to implement these measures. 16 U.S.C. § 1536(b)(4)(A). Any taking that is in compliance with the terms and conditions specified in the ITS is not considered to be a prohibited taking of the species. *Id*. § 1536(o)(2). This exemption may extend to private applicants covered by the Federal action. *Id*. § 1536(b)(4).

## III.    The Rivers and Harbors Act

Congress enacted the Rivers and Harbors Act of 1899 ("RHA") "to prevent obstructions in the Nation's waterways." *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967). RHA Section 10 makes it illegal to, among other things, "excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of . . . the channel of any navigable water of the United States" except as authorized by the Corps of Engineers. "Navigable waters of the United States" subject to Corps RHA Section 10 jurisdiction—"Section 10 waters"—are "those waters

9

that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce." 33 C.F.R. § 329.4. As indicated by the phrase "or have been used in the past," Section 10 waters include "historic use" waters that are not, and cannot be, used to transport interstate commerce, but were used for that purpose. *See Mia. Valley Conservancy Dist. v. Alexander*, 692 F.2d 447, 450 (6th Cir. 1982).

Determinations of "whether a waterbody is a navigable water of the United States will be made by the division engineer," based on a "report of findings" prepared "by the district engineer, accompanied by an opinion of the district counsel." 33 C.F.R. § 329.14(b).[8] These reports are known as "navigability studies." Each district maintains "[t]abulated lists of final determinations of navigability," to be updated "by court decisions, jurisdictional inquiries, or other changed conditions." *Id.* § 329.16(a). These lists are known as "Section 10 lists." Section 10 lists are not presumed to be exhaustive and a waterbody's "absence from" such a list "should not be taken as an indication that the waterbody is not navigable." *Id.* § 329.16(b). A "change in status of a waterbody from navigable to non-navigable" is "not considered final until a determination has been made by the division engineer." *Id.* § 329.16(c).

## FACTUAL BACKGROUND

### I.    Florida's Section 404 Assumption Request

More than 40 years after Congress enacted Section 404(g)(1), just two states—New Jersey (1994) and Michigan (1984)—had assumed Section 404 permitting authority. Then, in 2018, Florida's Legislature passed a law conferring on the Florida Department of Environmental Protection ("FDEP") "the power and authority to assume, in accordance with 40 C.F.R. part 233,

---

[8] The Corps is divided into "divisions" and its divisions are sub-divided by "district." *See* https://www.usace.army.mil/Missions/Locations/ (last visited Apr. 25, 2023).

the dredge and fill permitting program established in s. 404 of the Clean Water Act." Fla. Stat. § 373.4146(2). Over the ensuing years, FDEP enacted new regulations, modified existing regulations, and developed other elements of its Section 404 program.

On August 20, 2020, Florida submitted to EPA a formal assumption request. 85 Fed. Reg. 57,853 (Sept. 16, 2020). The State's submittal, comprising over 100 documents, was organized by reference to EPA's assumption regulations (40 C.F.R. § 233.10–.14) and included materials responsive to each of the required elements in those regulations. *See* Dkt. 95-2 at 1–5 (EPA Record Index listing submission documents); *see also* EPA-HQ-OW-2018-0640-0003 (table of contents). Among many other things, it included hundreds of pages of existing and newly enacted sections of the Florida Administrative Code, and a new State 404 Program Applicant's Handbook outlining various guidelines and procedures that are incorporated by reference in state regulations. EPA-HQ-OW-2018-0640-A20 ("State 404 Handbook"). It also included a 155-page table showing how those state regulations compare to analogous provisions of the 404(b)(1) Guidelines. EPA-HQ-OW-2018-0640-0016-A3, at 55–155. And it included a Memorandum of Understanding ("MOU") among FDEP, FWS, and the Florida Fish and Wildlife Conservation Commission ("FWC") detailing procedures for coordinated interagency review and assessment of potential species and habitat impacts from state-issued Section 404 permits. EPA-HQ-OW-2018-0640-0016-A2.[9]

Because Florida's submission included every element required by EPA's Section 404 assumption regulations, the Agency declared the submission complete as of the date of submission. EPA-HQ-OW-2018-0640-0641. EPA posted Florida's complete submission on a public non-

---

[9] The FWS-FDEP-FWS MOU included in Florida's submission was signed by FDEP's Secretary and FWC's Executive Director. EPA-HQ-OW-2018-0640-0016-A2, at 12. An otherwise identical version of the same MOU that was also signed by FWS's Regional Director is included in FWS's record at FWS-006015.

11

rulemaking docket, and on September 16, it published a Federal Register notice of its receipt of a complete assumption request package and opened a 45-day public comment period during which it scheduled two virtual public hearings. 85 Fed. Reg. at 57,853.

EPA received and reviewed over 3,000 comments submitted during the comment period and public hearings. EPA-HQ-OW-2018-0640-0568, at 1. In the roughly six weeks allotted under the statute, the Agency summarized and responded to significant comments in a 113-page Response to Comments ("RTC"). *Id.* at 1–113. Based on its review of Florida's submission and the comments received, the Agency concluded that the State had "the necessary authority to operate a program in accordance with the requirements in CWA Section 404 and 40 C.F.R. part 233," and on December 22, 2020, it published notice of its approval. 85 Fed. Reg. 83,553.

## II.   Development of the Corps' Retained Waters List

As part of its years-long effort to develop a state Section 404 program, in 2017 FDEP reached out to the Corps' Jacksonville District to identify the scope of assumable and retained waters in Florida. *See* CORPS003115–16. In response, the District sought to augment its Section 10 list, which was last updated in 2014 ("2014 Section 10 List"). *See* CORPS003115. On October 3, 2017, a manager in the Jacksonville District directed a staff member to add to that list "whatever additional waterbodies, tributaries we think might be remotely section 10 OR TNWs. Whether there is an approved navigability study or not, put it on the website." *Id.* The resulting list—dated October 5, 2017, and titled "Supplement to the Jacksonville District Navigable Waters Lists" ("2017 Supplement")—described itself as a "first preliminary increment of an effort to update" the 2014 Section 10 List. CORPS003117.

Florida's interest in Section 404 assumption also prompted the Jacksonville District to plan new navigability studies and to issue a public notice in March 2018 seeking information in support

of its "analysis of waterways in the state of Florida to determine the extent of navigability." CORPS003213. A few weeks later, however, the Corps' leadership directed the Jacksonville District to suspend work on its pre-assumption navigability studies, CORPS003714, and the District retracted its call for public comment, CORPS003717.

Then, in July 2018, the Assistant Secretary of the Army for Civil Works issued a guidance document stating that the Corps would henceforth "use existing RHA Section 10 lists of waters" to develop retained waters lists when approached by a state seeking to pursue Section 404 assumption. In so doing, the Assistant Secretary endorsed the findings and recommendations of the Assumable Waters Subcommittee, a group that EPA convened in 2015 after several states complained that "uncertainty over the scope of assumable waters" had hindered their efforts to pursue assumption, CORPS002997, because their discussions with Corps district offices had "broken down or stopped due to lack of clarity, uncertainty, or disagreement over the scope of retained waters or wetlands," CORPS003005. The Subcommittee's charge was to recommend a way in which EPA could clarify which waters are assumable. CORPS003053. In May 2017, 21 of the subcommittee's 22-members—all but the Corps' representative—recommended, among other things: (1) that retained waters comprise only Section 10 waters, but not those Section 10 waters deemed navigable based solely on historic use; and (2) that the Corps base its retained waters lists on existing Section 10 lists, rather than on a more open-ended inquiry into the scope of retained waters. CORPS003013–22. In the majority's view, that more streamlined approach was both necessary to facilitate state assumption, and consistent with the text and legislative history of Section 404(g)(1). *Id.* The Assistant Secretary agreed on both counts and noted in his guidance memorandum that he had "personally heard from state officials who—but for . . . uncertainty [about the scope of retained waters]—would pursue Section 404(g) assumption." CORPS004096.

Following the Assistant Secretary's guidance, the Jacksonville District stated in an August 2018 memorandum that it would use the 2014 Section 10 List as "the basis of the list of retained waters" in Florida. CORPS004149. The District refined that list over the course of 2018 and 2019, removing duplicate listings and waters deemed navigable based solely on historic use. *See, e.g.*, CORPS004238–64; CORPS004265–4312.

The final version of the Retained Waters List was appended to a Memorandum of Agreement between FDEP and the Corps dated August 5, 2020. CORPS004322–34. That Memorandum explained that the Corps would "retain responsibility" for Section 404 permitting "in those waters identified in the Retained Waters List . . . , as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary," and in waters of the United States within " 'Indian Country,' as that term is defined at 18 U.S.C. § 1151." CORPS004323. FDEP would assume permitting responsibility in "[a]ll waters of the United States not retained by the Corps." *Id.* And the Corps would update the Retained Waters List based on new navigability determinations or by agreement of FDEP and the Corps that a proposed project lay "within the Corps' jurisdiction," as defined in 33 U.S.C. § 1344(g), "but is not within the Retained Waters List." CORPS004324.

## III.    Consideration of Endangered and Threatened Species and Critical Habitat

In a 2010 guidance letter, EPA took the position that Section 7 consultation was not required before approving a Section 404 assumption request. EPA-HQ-OW-2018-0640-0689-A3. But Florida urged EPA to reconsider that position, and on May 21, 2020, EPA published a request for comment on whether its approval of a CWA Section 404 Program is discretionary for the purposes of ESA consultation. 85 Fed. Reg. 30,953. While EPA was reconsidering its policy

14

position, FDEP developed a draft BA. FWS-006040; *see* EPA-HQ-OW-2018-040-617. Following several rounds of comments from FWS, FDEP submitted a final BA to EPA and FWS on July 24, 2020. *Id.*

On August 27, 2020, EPA issued a memorandum announcing that it had reconsidered its prior position on consultation and, "[f]or Florida and other states and tribes seeking to assume the CWA Section 404 program," EPA intended "to engage in a one-time ESA Section 7 programmatic consultation with the Services in connection with the initial review of an assumption request if a decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or designated critical habitat."[10]    EPA-HQ-OW-2018-0640-0660-A1 at 6–7. This process, EPA explained, would allow the Services "to issue a programmatic biological opinion and programmatic incidental take statement" for a state Section 404 program based on "procedural requirements and permitting conditions or measures" to safeguard listed species and critical habitat. *Id.* at 7. EPA concluded that approval of Florida's assumption request may affect species listed as threatened or endangered under the ESA or designated critical habitat under the jurisdiction of FWS, but made a "no effect" determination with respect to species under the jurisdiction of NMFS. Thus, EPA prepared a BE based on FDEP's BA, which it transmitted to FWS on September 2, 2020, with a request to initiate a programmatic consultation on the possible effects of EPA's potential approval of Florida's assumption request on federally listed species, proposed species, designated critical habitat, and proposed critical habitat under FWS's jurisdiction. FWS-005608-09; FWS-005610-5906.

---

[10]  A programmatic consultation addresses an agency's multiple actions on a program, region, or other basis. FWS-006043. Programmatic consultations allow the Services to consult on the effects of programmatic actions, such as multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas, and a proposed program, plan, policy, or regulation providing a framework for future proposed actions. FWS-006035.

Consultation concluded on November 17, 2020, when FWS issued a programmatic Biological Opinion in which it determined that EPA's action would not jeopardize listed species under its jurisdiction. FWS-006108–6115. The BiOp analyzed the change in Section 404 permitting authority in assumed waters in Florida, including the effect of the state-issued permits on ESA-considered species[11] and critical habitat. FWS-006043. Based on the information available, the BiOp assessed other program activities that would occur if EPA approved the State's assumption request, including the State's implementation of its Section 404 program, EPA's oversight of the State's program, EPA's coordination of federal review of state permit actions, and the execution of state-permitted activities by permit holders. FWS-006043-45; FWS-006048. FWS considered the consequences of the potential approval of the State's assumption (including those related to any program activities caused by the potential approval) on ESA-considered species and critical habitat to be effects of the action, pursuant to 50 C.F.R. § 402. FWS-006043; FWS-006048.

As described in the BiOp, FWS will receive and review all State Section 404 permit applications when submitted, including those that FDEP or FWC has preliminarily determined as "no effect/no impact." FWS-006067. FWS will provide technical assistance to the State to ensure that State 404 permit actions are not likely to jeopardize a species or destroy or adversely modify critical habitat. FWS-006046; FWS-006047 (flow chart identifying FWS's role in the State's permitting program); FWS-006106. FDEP committed that its processes and procedures to review State Section 404 applications "will be similar to and will utilize [FWS]-approved permitting guidance that currently is used by the [Corps], to ensure consistency with CWA and ESA requirements." FWS-006105; *see also* FWS-006048 (describing Florida's 404 Program Rule at

---

[11]    The BiOp used the term "ESA-considered species" to "include ESA-listed species [i.e., those listed as threatened or endangered], ESA Candidate species, species proposed for listing, and petitioned species." FWS-006045. We use that term for purposes of consistency with the BiOp.

16

62-331, F.A.C.).[12] FDEP, FWC, and FWS will participate in a State Section 404 program species coordination technical team to oversee the species coordination process, including assisting in the transition of 404 permitting by participating in training efforts; providing a process to elevate questions and decisionmaking to a group with technical expertise, and assist in refining coordination processes, procedures, and future improvements, as needed, related to the State's permitting. FWS-006105. State permit review staff will be trained in the new State Section 404 program species coordination procedures and processes, and FDEP, FWC, and FWS will collaborate on the development of training material. *Id*. Most importantly, FDEP will incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by FWS to avoid jeopardizing listed or proposed species and/or adversely modifying designated or proposed critical habitat and EPA will maintain oversight authority over the program. FWS-006057; FWS-006066; FWS-006106; *see also* FWS-006050 ("FDEP, in coordination with FWC, will receive, review, and incorporate any impact minimization measures received from [FWS] into its permit actions pursuant to the FDEP, FWC, USFWS MOU and FDEP's State 404 program rule (62-331, F.A.C.)").

In FWS's opinion, the proposed action, including the associated subsequent program activities, had a sufficiently structured process to ensure that the State's Section 404 program is not likely to cause an appreciable reduction in the likelihood of both the survival and recovery of any listed species by reducing the reproduction, numbers, or distribution of that species. FWS-006106–07. FWS also opined that the proposed action had a sufficiently structured process to ensure the State's Section 404 program was not likely to result in destruction or adverse

---

[12] Record documents cite to the Florida Administrative Code as "[section number], F.A.C." For consistency, this brief employs the same citation format.

modification of critical habitat. FWS-006107. The BiOp included an Incidental Take Statement ("ITS"), which stated that the amount and extent of incidental take anticipated from these proposed activities in which the State has permitting authority will be quantified and evaluated on a project-specific basis through the technical assistance process between FWS and the State. FWS-006107. The BiOp also found that through implementation of Florida's Section 404 program, and EPA's oversight of the program and coordination of Federal review of state permit actions, project-specific information would be provided to FWS through its receipt of all State 404 permit applications. FWS-006107–08. Through the technical assistance process, FWS would provide input so that the State can adjust an action that may result in the take of ESA-listed species, and identify appropriate measures to minimize incidental take and detrimental effects associated with activities regulated by the State Section 404 program. FWS-006108. If it is determined during the technical assistance process that take of ESA-listed species still is expected to occur after implementation of recommended minimization measures, FWS would quantify the amount or extent of incidental take in coordination with FDEP. FWS-006108. Levels of take would be reported and tracked through the technical assistance process and exempted by the ITS. *See id*. As set forth in the terms and conditions, if new information shows that the magnitude of impacts to ESA-considered species is greater than anticipated or the amount of incidental take originally anticipated is exceeded, FDEP will re-open the permit to determine if any additional impacts are likely to jeopardize species and if additional minimization measures, reporting, or monitoring are required. FWS-006110.

## STANDARD OF REVIEW

"[W]hen a party seeks review of agency action under the" Administrative Procedure Act ("APA"), "the district judge sits as an appellate tribunal" and the " 'entire case' on review is a

question of law." *Am. Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083 (D.C. Cir. 2001). "Summary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 20 (D.D.C. 2014). But the ordinary Rule 56 standard does not apply. *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016). Instead, the APA provides the governing standard. *Id.*; *see also Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982) (judicial review of ESA claims governed by APA standard of review).

Under that deferential standard, agency action can be overturned only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review" is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Where, as here, an agency's technical expertise is involved, the reviewing court should be particularly zealous in guarding the agency's discretion. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376-77 (1989); *accord Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983). Agency action "is entitled to a presumption of regularity," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977), and so the "party challenging an agency's action . . . bears the burden of proof," *City of Olmsted Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002) (internal quotation marks omitted).

## ARGUMENT

The Court should grant summary judgment to Federal Defendants on all claims.[13]

---

[13] Plaintiffs have "request[ed] the opportunity to brief the appropriate remedy following the Court's ruling on summary judgment." Dkt. 98 at 15 n.2. Federal Defendants join Plaintiffs' request for supplemental briefing on remedy should the Court be inclined to grant them any relief.

Section 404 assumption is not a delegation of federal authority; rather, it is one way that Congress "recognize[s], preserve[s], and protect[s] the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution" within the framework of a federal statutory scheme. 33 U.S.C. § 1251(b); *cf. Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (The CWA "anticipates a partnership between the States and the Federal Government"); *New York v. United States*, 505 U.S. 144, 167 (1992) (describing the CWA as an example of "cooperative federalism"). In such "a program of cooperative federalism," states, "within limits established by federal minimum standards," can "enact and administer their own regulatory programs, structured to meet their own particular needs." *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 289 (1981).

Congress called on EPA to determine whether a state's Section 404 program satisfies the Act's minimum standards. 33 U.S.C. § 1344(h). Those standards are broad and, in some cases, defined by reference to complex federal statutory and regulatory regimes, such as the 404(b)(1) Guidelines. *See id.* § 1344(h)(1)(A)(i). To apply those standards, EPA must decide whether the state laws that make up a state's Section 404 program would be consistent with and no less stringent than non-identical federal laws. That is no simple task. In carrying it out, the Agency must make discretionary judgments that balance the CWA's competing policy aims of respecting state autonomy and ensuring the minimum thresholds set by the federal standards are met.

At the same time, however, Congress made clear that EPA "shall approve" a state's assumption request if the state's Section 404 program satisfies statutory and regulatory criteria. *Id.* § 1344(h)(2)(A). Conversely, then, EPA cannot deny a request based on its noncompliance with an unwritten rule. *See id.* And for good reason. As Florida's experience demonstrates, preparing a state Section 404 program requires years of regulatory and legislative groundwork. *See supra* pp. 10–12. In undertaking that effort, states necessarily rely on statutory and regulatory criteria to

20

shape an approvable program. EPA cannot undercut that reliance by denying an assumption request by reading into the statute and regulations preconditions that are not there.

In approving Florida's Section 404 program in 2020, EPA acted reasonably within the circumscribed scope of its authority based on the applicable regulatory criteria. Plaintiffs disagree and point to differences between Florida's program and the federal Section 404 program. But the very point of state assumption—or any exercise in cooperative federalism—is to allow for some degree of variation subject to minimum federal standards. And EPA permissibly concluded that the differences in Florida's program did not fall outside the boundaries set by statute and regulation. Plaintiffs also point to problems with Florida's implementation of its Section 404 program. But those problems post-date the approval action challenged here and so lie outside the administrative record and beyond the scope of this litigation. EPA need not, and does not, defend Florida's post-decisional implementation of its Section 404 program. For present purposes, what matters is that the Agency's approval of that program was reasonable based on information available at the time of its decision. Plaintiffs fail to show otherwise and so their CWA-based claims against EPA (Claims 1 and 2) fail.

Plaintiffs' claim against the Corps (Claim 7) betrays a similar misapprehension of state assumption generally, and the Corps' limited role in the state assumption process. Congress wanted the Corps to permanently retain Section 404 authority in a subset of the waterbodies subject to the Corps' Section 10 permitting authority, "and in wetlands adjacent thereto." 33 U.S.C. § 1344(g)(1). So, before a state can assume Section 404 permitting authority, the Corps must first identify retained waters. 40 C.F.R. § 233.14. According to Plaintiffs, this meant that the Corps had to conduct a statewide Section 10 navigability determination to support the Retained Waters List. But experience strongly suggests that this kind of comprehensive investigation would have

substantially hindered, or effectively defeated, Florida's assumption bid. *See supra* p. 13. The Corps rightly refused to let the retained waters tail wag the state assumption dog. Instead, it developed the Retained Waters List using the information on Section 10 waters already in its possession. That decision gave effect to Section 404(g)(1)'s parenthetical definition of retained waters without also undermining Section 404(g)'s broader aim of facilitating state assumption. Claim 7 therefore fails.

Plaintiffs' ESA-related claims fare no better. FWS prepared a programmatic biological opinion that reasonably assessed whether, and to what degree, FDEP structured its regulatory program and EPA structured its oversight program to ensure that approval and implementation of the State 404 program is not likely to jeopardize the continued existence of proposed or listed species, or to destroy or adversely modify designated critical habitat. This programmatic approach was appropriate, and properly tailored to address information available and uncertainties regarding the location, timing, frequency, and intensity of future State Section 404 permit actions. As the BiOp explained, FWS will evaluate permits on a site- and species-specific basis through a defined technical assistance process during which FWS's position on the potential effects of a project on ESA-listed species or the effectiveness of proposed mitigation measures is determinative. That process is not optional, as Plaintiffs suggest; it is part of the action and binding on FWS.

Nor is there any merit to Plaintiffs' attacks on the ITS. As FWS explained, it is not feasible at this time to anticipate the location of all future State 404 permit activities; thus, take will be determined, calculated, and tracked through the technical assistance process. The ITS has an appropriate reinitiation trigger and contained both reasonable and prudent measures and terms and conditions. Notably, this very programmatic approach and the technical assistance process were approved by the U.S. Court of Appeals for the Second Circuit in a 2018 case, involving another

22

EPA CWA action. The Court should follow the reasoning in that decision and reject Plaintiffs' challenges to the BiOp, the ITS, and the technical assistance process in Claims 3, 4, 6, 12, and 13.

Similarly, there is no merit to Plaintiffs' argument that EPA improperly relied on the BiOp. EPA acted reasonably in doing so and Plaintiffs have not identified any new, contrary information that FWS did not take into account. Claim 10 therefore fails.

Finally, EPA's determination that approval of Florida's assumption request would have no effect on ESA-listed species under NMFS's jurisdiction was reasonable, and does not violate the CWA, the APA, nor the ESA. Nonetheless, while not required to do so, after Plaintiffs notified EPA of their intent to sue regarding the determination, EPA has initiated a process to address the issue of potential effects downstream of assumed waters. EPA is evaluating the effects of its approval on species under NMFS's jurisdiction and preparing a biological evaluation that ultimately should resolve the matter. Claims 5 and 11 also fail.

## I.    EPA Reasonably Concluded That Florida's Submission Was Complete.

Claim 1 of the Complaint disputes EPA's threshold determination that Florida submitted a complete assumption request. Plaintiffs note that Florida's submission did not include FWS's BiOp, and on that basis, they argue that Florida's submission was incomplete and, relatedly, deprived them of their right to provide comment on the process of interagency permit review outlined in the BiOp. Dkt. 98 at 72–75. Neither claim succeeds.

### A.    The BiOp was not a required element of Florida's assumption request.

Neither the CWA nor EPA's assumption regulations require states to include a biological opinion as part of their assumption request. *See* 33 U.S.C. §§ 1344(g), (h); 40 C.F.R. §§ 233.10–.14. Thus, as EPA explained in response to comments, Florida's submission was not incomplete simply because it did not include the BiOp. EPA-HQ-OW-2018-0640-0568, at 13 (RTC).

What EPA's regulations did require is a "description" of the "coordination" activities, "permit review criteria," "procedures," and enforceable "statutes and administrative regulations" that Florida would implement to satisfy the substantive requirements of the 404(b)(1) Guidelines, including the prohibition on discharges that jeopardize the continued existence of ESA-listed species or result in likelihood of the destruction or adverse modification of critical habitat. 40 C.F.R. § 233.11(a)–(b); *id.* § 233.12(a). Florida's submission satisfied that requirement by detailing, at length, how FDEP would safeguard listed species and critical habitat, including by working with FWS to review individual permits.

As the regulations contained in that submission make clear, FDEP may not issue any permit that "[j]eopardizes the continued existence of endangered or threatened species, or results in the likelihood of the destruction or adverse modification of . . . critical habitat." 62-331.053(3)(a)4, F.A.C. Thus, all permit applicants must provide any "data and information necessary for purposes of reviewing impacts to state and federal listed species," *id.* 62-331.051(4), including any additional information sought by FDEP within a 30-day window, *id.* 62-331.052(1)(a), (c). And state regulators must determine—based on a review of "scientific literature, species keys, . . . habitat maps, or" observations during a site visit—whether a proposed project "may" affect listed species. EPA-HQ-OW-2018-0640-A20 at 23 (State 404 Handbook § 5.2.3.). If so, FDEP must "seek consultation with or technical assistance by" FWS. *Id.* And if, through that process, FWS identifies measures necessary "to avoid jeopardizing listed species or adversely modifying designated or proposed critical habitat," then FDEP "shall incorporate as permit conditions all" such "recommended impact avoidance and minimization measures." *Id.* But if FWS finds that "no protection measures are available to reduce the risk" of jeopardy or adverse habitat modification "to an acceptable level," then FDEP "shall deny the permit or shall take no action." *Id.* at 23–24.

24

The MOU among FWC, FWS, and FDEP, which was also included in Florida's submission, provides additional details on the contemplated inter-agency permit review process. As the MOU explains, FDEP would send all permit applications to FWS and FWC "as soon as possible after receipt" and FWS and FWC would make requests for additional information within 20 days so that FDEP could relay the request to the applicant within the 30 days allotted under state regulations. EPA-HQ-OW-2018-0640-0016-A2, at 5. A state regulator's initial assessment of species or habitat impacts would be "preliminary" and subject to review by FWS. *Id.* at 5–6. The public would have an opportunity to comment on "the types of anticipated impacts to endangered and threatened species as well as their critical habitat, and the proposed protection measures to offset those impacts." *Id.* at 6. And while interagency disputes could be elevated within each agency, "the final FWS position [would be] determinative" as to "the potential effects of a project on ESA-listed species or the effectiveness of proposed mitigation measures." *Id.* at 10.

EPA reviewed all of this and concluded that "Florida's rules, Program Description, and other documents provide sufficient details for the public to assess how the state plans to handle listed species issues." EPA-HQ-OW-2018-0640-0568, at 20 (RTC). EPA's regulations demanded nothing more for a threshold showing of completeness, and so EPA reasonably concluded that Florida's application was complete.

B.  Plaintiffs had sufficient notice and opportunity to comment.

Approaching the same issue from a different angle, Plaintiffs also claim that they were denied their right to comment on information contained in the BiOp. But neither the ESA nor the APA confers such a right.

The ESA requires notice and comment for proposed rules that list species and designate critical habitat, 16 U.S.C. § 1533(b)(4) & (5), but Section 7 consultation has no parallel notice and

25

comment requirement, *see id.* §1536(a)(3), (b); *see also* 51 Fed. Reg. 19,926, 19,928 (June 3, 1986) ("Nothing in section 7 authorizes or requires the Service to provide for public involvement (other than that of an applicant) in the 'interagency' consultation process."). Indeed, Section 7 consultation is routinely conducted without public notice and comment. And courts have repeatedly upheld that practice in the face of procedural arguments like those that Plaintiffs raise here. *See, e.g.*, *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 78 (2d Cir. 2018) (holding that "no procedural infirmity arises in failing to provide notice of or an opportunity to comment on the biological opinion or other determinations by the Services"); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 660 n.6 (2007) (holding that there is no "independent right to public comment with regard to consultations conducted under § 7(a)(2)").

Nor did the APA's rulemaking procedures entitle Plaintiffs to comment on the BiOp. Only "the most critical factual material that is used to support the agency's position" must be submitted for public comment during the administrative proceeding. *Air Transp. Ass'n of Am. v. F.A.A.*, 169 F.3d 1, 7 (D.C. Cir. 1999). And the focus in rulemaking cases "is primarily on whether the final rule changes critically from the proposed rule rather than on whether the agency relies on supporting material not published for comment." *Id.* In *Air Transportation Association of America*, the D.C. Circuit applied this legal framework to a fact pattern like the one here. That case, like this one, involved an agency's review and approval of an application following notice and comment. *Id.* at 3–4. And there, as here, parties objected to the agency's consideration of documents that were not included with the application on which comment was sought. *Id.* at 4. In this context, the D.C. Circuit reasoned that "the application itself . . . is the analogy to the proposed rule," and the "the question . . . is whether" the extra-application material "critically deviated from" anything in the "application itself." *Id.* at 7.

By that logic—and assuming without conceding that EPA's approval action was a rulemaking—then EPA's posting of Florida's submission on its public docket "is analogous to a notice of proposed rulemaking." *See id.* at 6. And the question is whether the BiOp's discussion of interagency permit review "critically deviated" from the process of interagency permit review described in the submission materials, *see id.* at 7.

It did not. The essential elements of interagency permit review—the participants, timing, subject matter, dispute resolution mechanisms, and binding effect—are all set forth in Florida's assumption request. *See supra* pp.24–25. In describing how FWS would provide "technical assistance," the BiOp simply summarizes that submission's interagency framework while filling in certain technical details. For instance, while noting that "State regulations dictate the process and general timeframes" for permit review, the BiOp estimates the duration of certain gap-filling interim steps between regulatory milestones. *See* FWS-006055–56 (noting, for example, that FDEP would provide permits to FWS within "3–5 days" of receipt). Similarly, while the Florida Administrative Code requires state regulators to make an initial determination of whether a proposed project might affect ESA-listed species, the BiOp lists existing "Federal decision tools" that can aid the State in making that determination and aid FWS's review of the State's findings, *see* FWS-006058–60 (discussing, among other things, FWS's "Information for Planning and Consultation (IpaC) website," which allows users to draw a "geographically referenced" polygon representing a project area). And while the FWS-FWC-FDEP MOU makes clear that FWS will review all permits shortly after they are submitted, the BiOp notes that FWS may also "submit its questions during the public notice period for the State 404 application should [it] not respond during the early phase of FDEP-USFWS coordination," FWS-006056.

These statements in the BiOp and others like them, "expand[] on and confirm[]" what Florida submitted in its application, but in no way depart from that application's discussion of interagency permit review. *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991). Agencies need not solicit comment on such "supplementary" information during a rulemaking proceeding. *Air Transp. Ass'n of Am.*, 169 F.3d at 7.

Plaintiffs do not demonstrate otherwise by insisting that EPA "relied on the BiOp." Dkt. 98 at 74. A biological opinion is, by definition, the consulting agency's opinion "as to whether or not a federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of designated critical habitat." FWS-006032. EPA of course relied on the BiOp, but so too does virtually every action agency that issues a rule following a no-jeopardy determination by one of the consulting agencies. Yet Plaintiffs cite no case—and we are aware of none—in which a court has grafted the APA's notice and comment requirements onto ESA Section 7 consultation by declaring a biological opinion to be "critical factual material" on which public comment must be sought.

The Court should not do so here. The APA's notice and comment requirements are satisfied when an agency asks the public "for comments on a particular issue or otherwise ma[kes] clear that" it is "contemplating" a course of action. *CSX Transp. Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009). Plaintiffs knew how Florida and FWS would handle permit review because Florida's submission described those interagency coordination procedures in detail. And Plaintiffs "should have anticipated" that the BiOp would consider those permit review procedures because EPA twice gave notice that this would likely be the case. *City of Waukesha v. EPA*, 320 F.3d 228, 245 (D.C. Cir. 2003).

First, in May 2020, when EPA sought comment on whether it should reconsider its prior position on ESA consultation (85 Fed. Reg. 30,953), it posted on its public docket an FDEP-authored white paper advocating the issuance of "a programmatic Biological Opinion . . . and a programmatic incidental take statement" that "identif[ied] procedural requirements for state permitting under Section 404." EPA-HQ-OW-2018-0640-0388-A7, at 1–2. A few months later, when EPA solicited comments on Florida's Section 404 application, it also explained its intent to seek Section 7 consultation, identified its August 27, 2020 memorandum as a source of "more information regarding EPA's position on ESA Section 7 consultation under CWA Section 404(g)," and provided a link to the memo. 85 Fed. Reg. at 57,856.

Plaintiffs responded to both notices with comment letters in which they supported the agencies' ESA Section 7 consultation process but opposed incidental take protection based on permit-by-permit interagency review. *See* EPA-HQ-OW-2018-0640-0388-A2 (July 6, 2020 letter); EPA-HQ-OW-2018-0640-0386-A1, at 35–42. The arguments that Plaintiffs raised in those comment letters mirror the arguments in their summary judgment brief, down to the cases cited. *Compare* EPA-HQ-OW-2018-0640-0386-A1, at 35–41 *with* Dkt. 98 at 45–51. That symmetry underscores the extent to which the BiOp's outline of "technical assistance" tracks the description of interagency permit review contained in the materials on which Plaintiffs commented. Under these circumstances, Plaintiffs cannot now claim undue surprise at the BiOp's discussion of interagency permit review. *See Cooling Water Intake Structure.,* 905 F.3d at 78 (finding under similar circumstances that EPA's proposed rule fairly apprised interested persons of the subjects and issues of its rulemaking). Claim 1 therefore fails.

Even if Plaintiffs *could* demonstrate a lack of proper notice, they could not show prejudice. *See Am. Coke & Coal Chemicals v. EPA*, 452 F.3d 930, 939 (D.C. Cir. 2006) (showing of prejudice

required in procedural challenges to adequacy of notice). Plaintiffs raised objections to interagency permit review in their comment letters, which EPA considered and rejected. EPA-HQ-OW-2018-0640-0568, at 90–103 (RTC). After reviewing the BiOp, Plaintiffs raise essentially the same arguments in their brief. Thus, they have not shown that but for the purported lack of notice regarding the BiOp, they "would have submitted additional, different comments that could have invalidated the rationale" for EPA's approval action. *City of Waukesha*, 320 F.3d at 246. Any claim of prejudice therefore fails, and with it Claim 1 fails as well.

## II. EPA Reasonably Concluded That Florida's Regulations Were Consistent with and No Less Stringent Than the 404(b)(1) Guidelines.

On the merits, Plaintiffs repeatedly fault EPA for approving a program that did not "adopt[] the federal 404(b)(1) Guidelines." Dkt. 98 at 61; *see also id.* at 61–64. But Congress did not require verbatim incorporation of the 404(b)(1) Guidelines as a precondition of assumption. Instead, it allowed states leeway to adopt their own programs, and left it to EPA to determine whether those state programs will ensure compliance the 404(b)(1) Guidelines' requirements. EPA reasonably concluded that Florida's regulations and procedures, as drafted, would meet that standard.

Although Florida did not (and was not required to) adopt the Section 404(b)(1) Guidelines into state law, the State's regulations overlap considerably with their federal analogs. For instance, both Florida's regulations and the 404(b)(1) Guidelines prohibit any discharge of dredge or fill material that "causes or contributes to violations of" an applicable water quality standard, "violates any applicable toxic effluent standard," "jeopardizes" listed species, and threatens "critical habitat." 62-331.053(3)(a)1–4, F.A.C.; *accord* 40 C.F.R. § 230.10(b)(1)–(4). Both the federal and state regulations also bar any discharge that "[c]auses or contributes to significant degradation of wetlands or other surface waters." 62-331.053(3)(a)6, F.A.C.; *accord* 40 C.F.R. § 230.10(c). Both sets of regulations define "significant degradation" by reference to the same criteria. 62-

331.053(3)(a)6.i–iv, F.A.C.; *accord* 40 C.F.R. § 230.10(c)(1)–(4). And both bar any discharge if there is "a practicable alternative to the proposed activity" that would "have less adverse impact on the aquatic ecosystem." 62-331.053(1), F.A.C.; *accord* 40 C.F.R. § 230.10(a). Based on these and other parallels, EPA concluded that the State's Section 404 regulations, as submitted, satisfied the requirements of the 404(b)(1) Guidelines. EPA-HQ-OW-2018-0640-0568, at 27 (RTC).

Plaintiffs fail to acknowledge the substantial similarities between Florida's regulations and the 404(b)(1) Guidelines and focus instead on what they claim are two differences that render the federal and state regulations "non-equivalent." Dkt. 98 at 62. First, Plaintiffs claim that while the Corps must make written determinations and findings of fact, FDEP bases its permit decisions solely on permit applicants' "reasonable assurances." *Id.* at 61–64. Second, Plaintiffs insist that while federal law "focuse[s] on water quality generally," under Florida's program, discharges of dredge and fill material "only matter if and when" they "would violate water quality standards or toxic effluent limitations." *Id.* at 64–66. Plaintiffs also rehash their argument about the completeness of Florida's application, again contending that Florida's submission did not demonstrate compliance with the 404(b)(1) Guidelines because it did not include the BiOp. *Id.* at 66. None of these arguments withstand scrutiny.

A.  FDEP must make written determinations, which are subject to judicial review.

Plaintiffs mischaracterize the record when they claim that Florida's program does not require FDEP to "evaluate [a proposed] project's effects," or "make written factual determinations" or "findings of its own." *Id.* at 63. In fact, upon receipt of a permit application, FDEP must: (1) "Complete a Technical Staff Report to document how the project addresses the requirements of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C.," which include the state law analogs the 404(b)(1) Guidelines, described above; (2) "Make and document a finding of either compliance or noncompliance with the requirements of Rules 62-330.301, 62-330.302, and 62-

31

331.053, F.A.C."; and (3) "Prepare a written determination on each application outlining the permitting decision and the rationale for the decision," which it must "include[] in the official record prior to final action on the application," along with its "Technical Staff Report." EPA-HQ-OW-2018-0640-A20 at 32 (State 404 Handbook § 8.2(j)-(*l*)).

That FDEP bases its written findings on information submitted by the project applicant does nothing to distinguish Florida's Section 404 program from the federal program. By necessity, the Corps also relies on applicant-supplied information in making its permit determinations. *See, e.g.*, *Crutchfield v. Cnty. of Hanover*, 325 F.3d 211, 223–24 (4th Cir. 2003) (The Corps "receives thousands of [Section 404] permit applications per year" and so "reasonably rel[ies]" on "studies given to them by applicants"); *Friends of the Earth v. Hintz*, 800 F.2d 822, 834–36 (9th Cir. 1986) ("The Corps is not a business consulting firm" and may therefore base its analysis "entirely upon information supplied by the applicant."). Of course, the Corps may not rely "uncritically" on applicant's supporting documentation. *Hoosier Env't Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1061 (7th Cir. 2013). But then neither may FDEP, which must "determine whether the information provided by the applicant is sufficient to provide reasonable assurance that the applicable provisions of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C., will be met." EPA-HQ-OW-2018-0640-A20 at 32 (State 404 Handbook § 8.2(f)).

And while Plaintiffs say otherwise, Dkt. 98 at 63–64, FDEP's determinations *are* subject to judicial review. An FDEP-issued permit can be "set aside" if, among other things, it "depends on any finding of fact that is not supported by competent, substantial evidence." Fl. St. § 120.68(7)(b). "Competent substantial evidence is such evidence as will establish a substantial basis of fact from which the fact at issue can reasonably be inferred or such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Duval Util. Co. v. Fl. Pub.*

*Serv. Comm'n*, 380 So. 2d 1028, 1031 (Fla. 1980) (cleaned up). It is not, in other words, "evidence which is incredible, mere speculation, or unreliable." *Defs. Of Crooked Lake, Inc. v. FDEP*, Nos. 17-5328, 17-0972, 2018 WL 3387900, at *7 (Fla. Div. Admin. Hrgs., May 7, 2018). Plaintiffs are thus wrong to suggest that any "subjective, vague" promise by a "self-interested applicant" will rise to the level of a "reasonable assurance." Dkt. 98 at 64. And EPA was right to conclude that Florida's "'reasonable assurance' language" did not render the State's program "[in]consistent with federal requirements." EPA-HQ-OW-2018-0640-0568, at 27 (RTC).

B.  FDEP must consider effects on water quality generally.

Plaintiffs also argue that Florida's Section 404 program is less stringent than the federal program because, they assert, it is concerned only with discharges that violate water quality standards or toxic effluent limitations. Dkt. 98 at 64–66. That assertion is belied by the record.

Just like the 404(b)(1) Guidelines, Florida's regulations prohibit any discharge that "causes or contributes to" violations of state water quality standards or that violates toxic effluent limitations. 62-331.053(3)(a)1–3, F.A.C.; *accord* 40 C.F.R. § 230.10(b)(1)–(2). So, like the Corps, FDEP must determine a proposed project's effect on water quality by reference to those standards and limitations. But that is not FDEP's sole focus, as Plaintiffs suggest. Dkt. 98 at 65. Rather, just like the Corps, FDEP must also assess a proposed project's impact on water quality based on its:

- "effects on human health or welfare, including but not limited to, effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites," 62-331.053(3)(a)6.i, F.A.C.; *accord* 40 C.F.R. § 230.10(c)(1);

- "effects on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their by-products outside of

33

the project site through biological, physical, and chemical processes," 62-331.053(3)(a)6.ii, F.A.C.; *accord* 40 C.F.R. § 230.10(c)(2);

- "effects on aquatic ecosystem diversity, productivity, and stability," including "loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy," 62-331.053(3)(a)6.iii, F.A.C.; *accord* 40 C.F.R. § 230.10(c)(3); and

- "effects on recreational, aesthetic, and economic values," 62-331.053(3)(a)6.iv, F.A.C.; *accord* 40 C.F.R. § 230.10(c)(4).

In other words, just like the 404(b)(1) Guidelines, Florida's regulations demand an examination of a proposed project's effect "on water quality generally." Dkt. 98 at 65.

And just like the 404(b)(1) Guidelines, Florida's regulations bar discharges unless the permit applicant takes "appropriate and practicable steps" to "minimize potential adverse impacts of the activity on the aquatic ecosystem." 62-331.053(3)(b), F.A.C.; *accord* 40 C.F.R. § 230.10(d). There is thus no reason to assume, based on the text of Florida's regulations, that "negative impacts on water quality" that "must be mitigated" under the federal program would somehow escape regulation under Florida's program. Dkt. 98 at 65.

C. EPA reasonably concluded that FWS's review of state permit applications would safeguard species and habitat.

Briefly reprising their argument about completeness, Plaintiffs again argue that because Florida's assumption request did not include the BiOp, the State failed to demonstrate how it would avoid issuing permits that jeopardize the continued existence of ESA-listed species or result in likelihood of the destruction or adverse modification of critical habitat, as required by the 404(b)(1) Guidelines, *Id.* at 66. That argument rests on a flawed premise. As explained above, while Florida's submission did not include the BiOp, it did explain how FDEP, FWC, and FWS would jointly review permits. *Supra* pp.24–25. Based on that process of interagency coordination—one in which

34

FWS would have the last word on species and habitat impacts—EPA reasonably concluded that Florida-issued permits would neither jeopardize listed species, nor harm critical habitat.

## III.    EPA Reasonably Concluded That Florida's Enforcement Authority Satisfied Statutory and Regulatory Requirements.

Plaintiffs next argue that EPA erred in approving Florida's assumption request because the State's criminal enforcement authority differs from federal enforcement authority in two respects. Dkt. 98 at 56–61. First, Florida, has a graduated one-to-three-year statute of limitations applicable to environmental crimes, while 18 U.S.C. § 3282 creates a default five-year statute of limitations for non-capital federal crimes. Second, criminal convictions in Florida generally require a minimum showing of "gross or culpable (criminal) negligence," Dkt. 98 at 58, while 33 U.S.C. § 1319, authorizes criminal convictions on a showing of simple negligence. Plaintiffs contend that these differences preclude state assumption. In so doing they raise statutory and regulatory arguments; both fail.

### A.    The CWA does not preclude Section 404 assumption in states with a gross negligence culpability standard or a statute of limitations of less than five years.

Plaintiffs' statutory argument—that the CWA itself precludes Section 404 assumption in states with a less-than-five-year statute of limitations or a gross negligence culpability standard— is unsupported by the text and purpose of the Act, and at odds with Circuit precedent.

Under CWA Section 404(h)(1), a state need only demonstrate authority necessary to "abate violations of" its permitting program, "including civil and criminal penalties and other ways and means of enforcement." 33 U.S.C. § 1344(h)(1)(G). That broad language suggests that states have some flexibility in devising criminal enforcement regimes, and, relatedly, that EPA has discretion to approve state programs that deviate in at least some respects from the federal enforcement model. *See* EPA-HQ-OW-2018-0640-0568, at 75 (RTC).

35

Considerations of statutory context bolster those inferences. Where Congress demanded equivalence between state and federal law, it made plain its intent. *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."). Elsewhere in Section 404(h)(1), Congress required that state-issued permits "assure compliance with any applicable requirements" of "sections 1317 and 1343 of this title." 33 U.S.C. § 1344(h)(1)(A)(i). Congress also required that state-issued permits include inspection, monitoring, entry, and reporting requirements "to at least the same extent as required in section 1318 of this title." *Id.* § 1344(h)(1)(B). The lack of any reference to 33 U.S.C. § 1319 or 18 U.S.C. § 3282 is good reason not to read the CWA to foreclose assumption in states with less-than-five-year statutes of limitations or culpability standards higher than simple negligence.

This reading of the statute is entirely consistent with the D.C. Circuit's decision in *NRDC v. EPA*, 859 F.2d 156 (D.C. Cir. 1988). That case involved CWA Section 402(b)(7), which, like Section 404(h)(1)(G), requires states seeking to assume NPDES permitting authority to demonstrate "adequate authority" to "abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement." 33 U.S.C. § 1342(b)(7). Acting under Section 402(b)(7), EPA established minimum criminal penalties for state NPDES programs at levels below the federal penalties authorized under 33 U.S.C. § 1319. The petitioners in *NRDC* challenged those regulations, arguing (much like Plaintiffs) that state criminal penalties needed to mirror federal penalties to effectively abate violations.

The D.C. Circuit disagreed. While acknowledging that "[u]niformity is indeed a recurrent theme in the Act," the court stressed that Congress's "quest for homogeneity is in tension with its

36

independent emphasis on state autonomy, which is repeated throughout the legislative history of the Act, is enshrined in the Act as the basic policy to 'recognize, preserve, and protect the primary responsibilities and rights of States,' and is the very foundation of the [state-assumed] permit program." 859 F.2d at 175 (quoting 33 U.S.C. § 1251(b)(1)). Noting that criminal penalties "are traditionally under control of the individual states," and that the statute affords EPA "broad[] discretion to respect state autonomy in the criminal sector," the court declined to infer "an unexpressed congressional intent that state requirements must mirror the federal ones." *Id.* at 180.[14]

The statute-based reasoning in *NRDC* applies with equal force here. The CWA makes no mention of statutes of limitations or state culpability standards. So, EPA may exercise its "broad discretion" to allow Section 404 assumption in states that depart from the federal simple negligence standard or five-year statute of limitations. Indeed, in keeping with its long-held view that the CWA "does not require total uniformity between federal and state enforcement authorities," EPA-HQ-OW-2018-0640-0568, at 76 (RTC), the Agency has never in 50 years denied a state Section 404 assumption request or NPDES program application because the state provided for criminal prosecution based on a standard more demanding than simple negligence or employed a less-than-five-year statute of limitations.

That is not for want of opportunity. For instance, three states that assumed NPDES permitting authority relatively recently—Idaho (2018), Arizona (2002), and Maine (2001)—do not authorize prosecutions based on simple negligence. *See* Exhibit A at 1–3. Neither does New Jersey

---

[14] For similar reasons, the Ninth Circuit rejected a challenge to EPA's approval of Alaska's state NPDES program in *Akiak Native Community v. EPA*, 625 F.3d 1162, 1171–72 (9th Cir. 2010). The petitioners there argued that Alaska lacked adequate enforcement authority because—unlike EPA—the State could not assess administrative penalties and could recover penalties only by initiating a court proceeding. *Id.* at 1171. But the court noted that "[t]here is no requirement in the CWA . . . that state officials have the authority to impose an administrative penalty," and so it found no "reason to conclude" that EPA's approval violated the Act. *Id.* at 1171–72.

(1994), the last state before Florida to assume Section 404 permitting authority. *See id.* at 4. And of those four states, three have statutes of limitations of less than five years for at least some environmental crimes. *See id.* at 6.

This is unsurprising. The definition of "negligence" sufficient to give rise to criminal penalties varies significantly by jurisdiction. "Simple" or "ordinary" negligence is the rule in federal prosecutions of certain misdemeanor offenses under the CWA. *Hanousek*, 176 F.3d at 1121; 33 U.S.C. § 1319. But at least 25 states, including Florida, require a heightened showing of "gross" or "culpable" negligence to establish criminal liability. *See* Exhibit A at 1–5. So too does the Model Penal Code, which defines "negligently" as follows:

> A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves *a gross deviation from the standard of care* that a reasonable person would observe in the actor's situation.

Model Penal Code § 2.02(d) (emphasis added). Similarly, 38 states have a statute of limitations of less than five years for at least some environmental crimes. *See* Exhibit A at 6–7. EPA has declined to treat those deviations from federal enforcement authority as insuperable boundaries to state NPDES or Section 404 assumption, and it reasonably declined to do so here.

Plaintiffs' counter arguments exaggerate the legal and practical effects of Florida's criminal negligence standard on CWA enforcement. Dkt. 98 at 56–59. While states must assume primary enforcement responsibility over their Section 404 programs, state assumption does not "limit the authority of the Administrator to take action pursuant to" 33 U.S.C. § 1319, with its simple negligence standard. 33 U.S.C. § 1344(n). Plaintiffs are thus wrong to insist that Florida's definition of negligence removes "an entire class of violators from criminal liability." Dkt. 98 at 56–57. Moreover, any theoretical gap between gross or culpable negligence and simple negligence

narrows considerably in practice. A study of federal criminal enforcement of the CWA, cited in a law review article in the record, found that over a six-year period, just 3.9% of prosecutions—12 out of 307—were brought solely for simple negligence, without any aggravating factors like knowing violations, deceptive conduct, or substantial harm. EPA-HQ-OW-2018-0640-0668-A2, at 9.[15]  There is thus good reason to doubt Plaintiffs' suggestion that Florida's negligence standard would, by itself, vastly erode the scope of Section 404 enforcement.

In sum, EPA's longstanding approach of extending some measure of deference to states in matters of criminal enforcement is entirely consistent with the relevant statutory text and with the federal-state partnership that Congress envisioned. Plaintiffs' inflexible reading of the CWA is not. Their statutory argument fails.

> **B.** EPA's regulations do not establish simple negligence as a precondition for state assumption.

Plaintiffs' regulatory argument fares no better. They contend that EPA violated 40 C.F.R. § 233.41 by approving Florida's assumption request despite the state's "gross or culpable (criminal) negligence" standard. Dkt. 98 at 57–58. But that contention rests on a selective reading of the regulatory text.

Section 233.41 sets out the "[r]equirements for enforcement authority" necessary to satisfy Section 404(h)(1)(G). Two of its subparagraphs, (a)(3) and (b)(2), are relevant here. Subparagraph (a)(3) requires that states have the authority to: (i) seek civil fines of at least $5,000 per day against anyone who illegally discharges or violates a discharge permit condition; (ii) seek criminal fines of at least $10,000 per day against anyone who illegally discharges or violates a permit condition,

---

[15] As the Principal Deputy Solicitor General explained during argument last October, under the CWA, it is "very unusual for simple negligence to give rise to criminal liability," and federal "criminal prosecutions are brought only when there's some sort of serious aggravating conduct." Transcript of Oral Argument at 114, *Sackett v. EPA*, 21-454.

if they do so with "*criminal negligence*"; and (iii) seek criminal fines of at least $5,000 per day against anyone who engages in certain deceptive conduct, if they do so "knowingly." 40 C.F.R. § 233.41(a)(3)(i)–(iii) (emphasis added). Subparagraph (b)(2) then requires that the "burden of proof and degree of knowledge or intent required under State law for establishing violations under paragraph (a)(3) of this section, shall be no greater than the burden of proof or degree of knowledge or intent EPA must bear when it brings an action under the Act." *Id.* § 233.41(b)(2).

Plaintiffs focus only on sub-paragraph (b)(2), which they read to bar Section 404 assumption in any state that fails to conform its criminal code to the "mens rea," or "level of culpability," applicable under 33 U.S.C. § 1319. Dkt. 98 at 56–57. Thus, according to Plaintiffs, because that provision authorizes EPA to seek criminal penalties from anyone who, acting with ordinary negligence, discharges without a permit or violates a permit condition, states must be able to prosecute the same misconduct based only on a showing of simple negligence. But that argument runs headlong into sub-paragraph (a)(3)(ii), which demands only that states seek criminal fines from those who illegally discharge or violate permit conditions "with criminal negligence."

Black's defines "criminal negligence" as "[g]ross negligence so extreme that it is punishable as a crime," or (referencing the Model Penal Code) as the "objectively assessed mental state of an actor" who engages in prohibited conduct despite "a substantial and unjustifiable risk that the social harm that the law is designed to prevent will occur." NEGLIGENCE, Black's Law Dictionary (11th ed. 2019). Under Plaintiffs' reading of Section 233.41, a state could satisfy the express terms of (a)(3)(ii) by providing for prosecution of "criminal negligence," as that term is widely understood, and *in so doing*, violate the requirements of (b)(2). That cannot be right.

"Ordinarily, where a specific provision conflicts with a general one, the specific governs." *Edmond v. United States*, 520 U.S. 651, 657 (1997). That interpretive principle resolves any

40

superficial inconsistency within Section 233.41. The general language in sub-paragraph (b)(2) should be read to complement rather than contradict the more specific text of sub-paragraph (a)(3). To illustrate, where sub-paragraph (a)(3)(i) requires authority to seek civil fines but establishes no culpability standard, (b)(2) clarifies that those penalties must be assessable consistent with the federal standard of strict liability. Similarly, where sub-paragraph (a)(3)(iii) requires authority to seek criminal fines for certain "knowing[]" violations, (b)(2) clarifies that, as in the federal context, "knowingly" means something less than "intentionally." But where (a)(3)(ii) requires authority to bring prosecutions based on a showing of "criminal negligence," (b)(2) should not be read to strike the word "criminal" from the regulation. Rather, any form of negligence will suffice.

This understanding of Section 233.41 gives effect to every word in that provision. *See Marx v. Gen. Revenue Corps.*, 568 U.S. 371, 386 (2013) ("the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme"). It also ensures that Section 233.41 coheres. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008) (laws "must, to the extent possible," be construed to "ensure that the statutory scheme is coherent and consistent"). Neither of these things can be said of Plaintiffs' reading of Section 233.41.

That reading finds little support in *Idaho Conservation League v. EPA*, 820 F. App'x 627 (9th Cir. 2020). There, the Ninth Circuit summarily held that under 40 C.F.R. § 127.27(b)(2), a state must have a simple negligence culpability standard to implement a state NPDES program. But that decision is thinly reasoned and thus unpersuasive. And while Plaintiffs' reading of 40 C.F.R. § 233.41 may be consistent with an unpublished out-of-circuit decision, EPA's conclusion that Florida's "culpable negligence" standard satisfied the requirements of 40 C.F.R. § 233.41 is consistent with the CWA's text and purpose, with EPA's past practice of approving state NPDES

and Section 404 programs that employ a gross negligence standard, and with the better reading of

the regulatory text. Plaintiffs' regulatory argument therefore fails.[16]

## IV.    EPA Reasonably Did Not Demand that Florida Affirm or Incorporate the Federal Definition of "Waters of the United States" in State Regulations.

Plaintiffs next contend that EPA erred in approving Florida's assumption request because

Florida neither "affirm[ed]" in its regulations "that 'waters of the United States' are those waters

as defined by federal law," nor did it "incorporate the federal definition" of "waters of the United

States" into state law. Dkt. 98 at 68. This argument is meritless.

Florida made clear that it would assume Section 404 permitting authority in all " 'waters

of the United (WOTUS) as defined at 40 C.F.R. Part 120,' " other than those waters over which

the Corps would retain Section 404 permitting authority. EPA-HQ-OW-2018-0640-0568, at 65

(RTC quoting FDEP's Program Description); *accord* CORPS004323. Neither the CWA nor EPA's

Section 404 assumption regulations demanded anything more. *See generally* 33 U.S.C.

§ 1344(g)(1); 40 C.F.R. § 233.11(h). They certainly did not require Florida to define the phrase

"waters of the United States." That definition is a matter of federal law. Florida's assumption in

no way altered it. State assumption only shifted "responsibility for administering the Section 404

program for certain waters of the United States." EPA-HQ-OW-2018-0640-0568, at 67 (RTC).

The federal definition thus remains binding in Florida regardless of whether the State "affirm[s]"

or "incorporate[s]" it. And EPA reasonably declined to treat Florida's affirmation or incorporation

of an already applicable federal standard as a precondition for assumption.

---

[16] EPA proposed amending 40 C.F.R. § 233.41(b)(2) to clarify that "any form or type of negligence" is sufficient for state Section 404 assumption. 85 Fed. Reg. 80,713, 80,718 (Dec. 14, 2020). It is currently preparing to propose updated changes to its Section 404 assumption regulations. *See* https://www.reginfo.gov/public/do/eoDetails?rrid=300864 (last visited Apr. 25, 2023). EPA will keep the parties and the Court apprised of any developments.

Plaintiffs do nothing to advance their argument by noting that, in some instances, Florida has continued to rely on a regulatory definition of "waters of the United States" that was vacated in 2021. Dkt. 98 at 68. The outdated regulatory definition, known as the Navigable Waters Protection Rule, was operative at the time that Florida requested assumption. EPA-HQ-OW-2018-0640-0568, at 67 (RTC). And the problem is not that Florida failed to "affirm" or "incorporate" that outdated definition in state law (which would have only compounded the concern Plaintiffs raise), but rather that Florida fails to acknowledge intervening changes in binding federal law.

EPA believes that Florida's continued reliance on the Navigable Waters Protection Rule is problematic. But it is a problem that arose after EPA's approval and one that EPA is addressing through its oversight authority. Most importantly for present purposes, it is a problem that is beyond the scope of this litigation. As a matter of "black-letter administrative law," the reviewing court in APA cases like this one "should have before it neither more nor less information than did the agency when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (cleaned up). Information concerning Florida's implementation of its Section 404 program is not part of the administrative record. And Plaintiffs do not even attempt to justify the inclusion of post-decision extra-record evidence under one of the "narrow and rarely invoked" exceptions to record review. *Id.* Florida's implementation track record is simply not at issue here.

## V.    The Corps Reasonably Defined Retained Waters.

Plaintiffs attack the Corps' Retained Waters List. Dkt. 98 at 67–72. The crux of their complaint is that the list was based on less-than-perfect information about which of Florida's "7,500 major lakes, thirty-three first magnitude springs, and approximately 27,500 linear miles of rivers and streams" are in fact Section 10 waters. *Id.* at 20. But experience and commonsense both

suggest that the pursuit of an exhaustive retained waters list will come at the expense of state assumption, and so the Corps reasonably opted for a different approach here.[17]

Rather than undertaking the state-wide navigability study that Plaintiffs demand, the Jacksonville District used the 2014 Section 10 List to develop the Retained Waters List. CORPS004149. The 2014 Section 10 List drew on navigability determinations, was familiar to the regulated community, and reflected the District's informed judgments about the Section 10 status of many waters within Florida. It was, in short, the best currently available information on the scope of Section 10 waters. The 2014 Section 10 List thus served as a reasonable basis for developing the "description of" retained waters required for state assumption. 40 C.F.R. § 233.14(b)(1).

That list was not exhaustive, nor was it intended to be static. *See* 33 C.F.R. § 329.16(b) (noting that a waterbody's "absence from" from a Section 10 list "should not be taken as an indication that the waterbody is not navigable"); *see id.* § 329.16(c) (procedures for updating Section 10 lists). Rather, it was the product of an iterative approach to identifying Section 10 waters. The Corps developed that approach through its long experience implementing the RHA and it reasonably employed a similar approach to identifying retained waters in Florida. While using the 2014 Section 10 List as an off-the-shelf starting point for the Retained Waters List, the Memorandum of Agreement among FDEP and the Corps provides mechanisms for updating the Retained Waters List as new information comes to light. CORPS004324.

The record of state assumption (or the lack thereof) supports the pragmatic approach that the Corps employed here. As noted in the Assumable Waters Subcommittee Report, the Corps'

---

[17] Plaintiffs contend that the Corps' development of the Retained Waters List was a final agency action. Dkt. 98 at 70–71. Assuming without conceding that it was, the Corps' action was reasonable for the reasons discussed in the text.

prior, open-ended inquiries into the scope of retained waters had effectively, if inadvertently, discouraged states from pursuing assumption. CORPS003001, CORPS003005. When the Assistant Secretary of the Army for Civil Works adopted the report's majority recommendations, he referenced that past experience, noting that he had "personally heard from state officials who—but for . . . uncertainty [about the scope of the Corps' retained waters]—would pursue Section 404(g) assumption on behalf of their state." CORPS004096. The Assistant Secretary sought to address this problem by directing the Corps to use existing Section 10 lists (here the 2014 Section 10 List) as the basis for retained waters lists. That decision struck a balance between Congress's twin goals of maintaining federal oversight in channels of interstate or foreign commerce and facilitating Section 404 assumption. The Court should "not disturb this reasonable accommodation of manifestly competing interests." *NRDC*, 859 F.2d at 181 (internal quotation marks omitted).

Though Plaintiffs argue otherwise, Dkt. 98 at 72, the Corps properly excluded "historic use" Section 10 waters from the Retained Waters List. Section 404(g)(1), which defines the scope of retained waters, reflects Congress's concern with channels of current or future—not historic—interstate and foreign commerce. That provision retains the Corps' jurisdiction over "waters which *are presently* used, or *are susceptible to use* in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce . . . and wetlands adjacent thereto." 33 U.S.C. § 1344(g)(1) (emphasis added). Unlike the definition of RHA Section 10 "navigable waters of the United States" that it otherwise closely tracks, Section 404(g) makes no mention of waters that "have been used in the past" to "transport interstate or foreign commerce." 33 C.F.R. § 329.4. The statutory text is thus clear: Congress did not want the Corps to retain CWA jurisdiction over waters deemed navigable based solely on historic practice. The Corps gave effect

45

to that clear congressional intent when it declined to include on its retained waters list " 'historic use' navigable waters." Dkt. 98 at 72.

The Corps also reasonably declined to include on the Retained Waters List every water that appeared on the 2017 Supplement. Unlike the 2014 Section 10 List, the 2017 Supplement was avowedly a draft—the "first preliminary increment of an effort" to update the District's list of Section 10 waters. CORPS003117. And the 2017 Supplement's deliberately over-inclusive scope—"whatever" waters the Jacksonville District thought "might be remotely . . . *TNWs*," CORPS003115 (emphasis added)—far exceeded that of any retained waters list.

Section 10 waters and TNWs are not co-extensive. "The term 'navigable waters of the United States' as used in the [RHA] has a substantially different, and more limited, meaning than" navigable waters under the CWA. *1902 Atl. Ltd. v. Hudson*, 574 F.Supp. 1381, 1392 (E.D. Va. 1983). The RHA "contemplat[es] . . . a body of water forming a continued highway over which commerce is or may be carried on with other states or foreign countries, by water." *Hardy Salt Co. v. S. Pac. Transp. Co.*, 501 F.2d 1156, 1169 (10th Cir. 1974). But under longstanding agency guidance, a TNW need only be "navigable-in-fact." *Waters that Qualify as "Traditional Navigable Waters" Under Section (a)(1) of the Agencies' Regulations*, available at https://www.epa.gov/wotus/waters-qualify-traditional-navigable-waters-under-section-a1-agencies-regulations; *see also id.* (noting that TNWs "include but are not limited to," Section 10 waters). Thus, as the Assumable Waters Subcommittee Report noted, "there are more . . . TNW waters" than Section 10 waters. CORPS003021. Unsurprisingly, the Jacksonville District more-than-doubled the number of waterbodies named on the 2014 Section 10 List by including on the 2017 Supplement everything that "might . . . remotely" be a TNW. Sorting retained waters from a

46

list of speculative TNWs would have been time-consuming and, likely, contentious. The Corps relied instead on the 2014 Section 10 List. That decision was reasonable; Claim 7 therefore fails.

Because the Corps' Retained Waters list was reasonable, EPA acted reasonably in approving Florida's assumption request based in part on the Retained Waters list, and Plaintiffs' argument to contrary, Dkt. 98 at 69–70, fails as well.

## VI.   The BiOp Complies with the ESA.

Plaintiffs take issue with the BiOp's programmatic approach, which evaluated whether and to what degree FDEP and EPA structured their regulatory and oversight programs, respectively to ensure that approval and implementation of Florida's Section 404 program is not likely to jeopardize the continued existence of ESA-considered species (as the BiOp defined that term (FWS-006045)) or destroy or adversely modify designated critical habitat. *See also* n.11, *supra*. As explained below, the BiOp outlined the technical assistance process in which FWS will engage with FDEP to evaluate permits on a site-specific and species-specific basis. Plaintiffs accuse FWS of unlawfully abdicating its duties, and argue that every future permit issued by FDEP is required to either undergo ESA Section 7 consultation or obtain a permit under ESA Section 10. Dkt. 98 at 36–50. These arguments lack merit.

At the threshold, Plaintiffs' overriding criticism of the BiOp rests on their belief that neither EPA nor FWS can satisfy ESA Section 7 by relying on a programmatic or process-based approach. Instead, in their view, the only valid approach would be to undertake an analysis encompassing individualized, site-specific impacts for every permit Florida will issue after assumption of the program. But the ESA does not prohibit use of a programmatic approach. EPA is free to choose how to structure its action to meet its obligations under ESA Section 7(a)(2). In turn, FWS's sole responsibility is to determine whether the agency action as structured satisfies Section 7(a)(2)'s

command. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 624 (9th Cir. 2014) (FWS does not need to pick an approach that may more effectively protect a species from jeopardy; FWS need only find that the final action complies with the jeopardy standard) (citation omitted). Here, the action presented for consultation was EPA's approval of FDEP's request to assume the Section 404 program in all assumable waters, which included process-based protections and conditions directed at ESA considered species. FWS-006081. FWS properly concluded that this action is not likely to cause jeopardy or adverse modification. That is all that is required.

As explained in the BiOp, approval of Florida's request would result in FDEP regulating a broad array of activities conducted over several geographic areas and for long periods of time. *Id*. The BiOp specifically acknowledged that, as a result, there was substantial uncertainty about the number, location, timing, frequency, and intensity of regulated activities. *Id*. In lieu of site-specific or species-specific analyses, FWS determined that a programmatic or process-based approach to EPA's potential approval of FDEP's request was appropriate. Accordingly, FWS "examin[ed] whether and to what degree FDEP's program, regulations, processes, and procedures insure that EPA's approval and FDEP's subsequent assumption and implementation of the 404 program is not likely to jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of critical habitat." FWS-006045. With this programmatic approach, species-specific analyses were deferred, to be assessed on a permit-by-permit basis through the technical assistance process. FWS-006081. As the BiOp explained at length, that process requires all permit applications to be forwarded to FWS for review and provides a structured framework for coordinating review of State 404 permits to assess potential effects on ESA-considered species to ensure that no Section 404 permit action jeopardizes the continued existence of listed species or adversely destroys or modifies critical habitat. FWS-006049–58.

48

FWS previously utilized a similar programmatic approach for a one-time EPA nationwide action that would result in a wide array of subsequent implementation actions where impacts similarly were unknown at the time of consultation. When FWS's approach was challenged in court, the Second Circuit held both that approach and the determinations set forth in that biological opinion were reasonable. In that case, environmental petitioners brought nearly identical complaints, alleging that the consulting agencies' (FWS and NMFS) use of a structured and programmatic approach that deferred species-specific analysis until a later time was unlawful. *Cooling Water Intake Structure*, 905 F.3d at 73-74. The Second Circuit rejected those arguments and held that the lack of available data and uncertainties as to how and where the rule would be implemented did not allow for a meaningful assessment of impacts on a national scale. Therefore, it was reasonable for the consulting agencies to defer consideration of those impacts to the site-specific permitting process. *See id*. Here too, FWS determined that it was not feasible to conduct a meaningful site-specific and species-specific effects analysis in the BiOp nor was it required to do so. FWS-006092. To the contrary, the scope of EPA's approval of FDEP's request to administer the Section 404 program in assumable waters was statewide, covering an array of operations that may affect a wide variety of ESA-considered species and proposed and designated critical habitat depending on the site-specific action, making it an appropriate action for consideration at the programmatic level. *Id*. Thus, FWS properly assessed whether FDEP had structured its regulatory program and EPA structured its oversight program to ensure that approval and implementation of the State 404 program satisfied ESA Section 7. FWS-006081; FWS-006093; FWS-006104. Like the Second Circuit, this Court should uphold that approach.

Plaintiffs assert at least seven different specific arguments in support of their claim that the BiOp failed to comply with the ESA; none of them has merit. First, despite Plaintiffs' efforts to

draw similarities between this programmatic consultation and the one in *Forest Service Employees for Environmental Ethics v. U.S. Forest Service*, 726 F. Supp. 2d 1195 (D. Mont. 2010), the two cases are plainly different. Dkt. 98 at 40–41. There, both consulting agencies envisioned that take would be authorized through emergency consultation on a case-by-case basis. 726 F. Supp. 2d at 1203, 1205. In analyzing the reasonable and prudent alternative challenged by the plaintiffs, the court held that FWS had deferred improperly to the action agency on whether to impose restrictions for the benefit of listed species, and that unwarranted deference suggested that FWS would not impose meaningful restrictions during future emergency consultations. *Id*. at 1228. Here, FWS has reserved to itself the final say on protective measures; there simply is no deference to FDEP. *See* FWS-006050; FWS-006057; FWS-006066; FWS-006106; (requiring FDEP to incorporate all recommended protection measures as permit conditions). The circumstances are inapposite.

Second, for the same reasons, Plaintiffs' contention that FWS unlawfully made a "no jeopardy" determination is flawed. Dkt. 98 at 41. The proposed programmatic action and its related activities provided FWS with enough information to analyze effects at the programmatic level, while analysis of specific projects (and impacts of those projects on specific species) will be addressed in the technical assistance process. FWS-006081. As explained, there was substantial uncertainty about the number, location, timing, frequency, and intensity of regulated activities. *Id*. While Plaintiffs characterize this approach as a "refusal to assess species-specific affects," Dkt. 98 at 41, FWS exercised its expertise and discretion and made a determination using the information that it had about Florida's proposed program and EPA's intended oversight of that program under the CWA. FWS-006081. The Second Circuit rejected similar arguments in *Cooling Water Intake Structure*, holding that "[n]othing in the ESA requires that the Services assess every future 'phase' of an agency action on a site-specific or species-specific basis." 905 F.3d at 73. Instead, the Second

Circuit held that it was proper to construe the agency action as promulgation of standards under Section 316(b) of the CWA, rather than a phased action consisting of both the promulgation of standards and the states' later implementation of those standards. Having properly defined the scope of the action at issue, the Court held that the consulting agencies' biological opinions discharged their duty to assess the effects of the action as a whole. *Id*. So too here, where FWS properly construed the agency action as EPA's approval of Florida's request to assume Section 404 permitting at the state level and assessed the entirety of the effects of that action.

Third, Plaintiffs argue FWS failed to analyze the full extent of the action because it did not consider potential impacts to species from existing general permits, decisions on when permits would not be required, and compliance and enforcement activities. Dkt. 98 at 38. Yet Plaintiffs overlook that Florida had issued no Section 404 general permits prior to EPA's approval of Florida's assumption request. Thus, an assessment of impacts from "existing" state general permits was not possible. The BiOp did, however, contemplate the proposed issuance of permits as described in the State's Section 404 program rule, which allows special conditions to be attached to such permits if needed. FWS-003408-09 (Florida rules 62-4.070 and 62-4.080); *see also* FWS-006110 (BiOp's terms and conditions, referencing 62-331.080, F.A.C., which allows FDEP to reevaluate the circumstances and conditions of a permit at any time for sufficient cause); FWS-005631–32. The State 404 Handbook also described how projects that apply for general permits will be evaluated for consistency with those proposed general permits and how proposed general permits would be processed and their effects reviewed by FWS. FWS-005631–32; FWS-006048; FWS-006051; FWS-006085–86. Moreover, FWS determined that permit compliance would be monitored and enforced through the species coordination process. FWS-006105. As explained in the BiOp, FWS assessed monitoring and enforcement compliance actions, including EPA's receipt

of all applications with a determination other than no effect/impact, which allows EPA to monitor the effectiveness of the species coordination process and oversee State permit actions and program operations. FWS-006067; FWS-006081. As part of the overall action, FWS reasonably evaluated the process for issuing general permits and EPA's oversight of that process.

Plaintiffs wrongly contend that FWS should have evaluated the impact on species from "decisions on when permits would not be required,"[18] and considered impacts that will result from "the loss of NEPA review and ESA Section 7 consultations."[19] Dkt. 98 at 38. The BiOp considered a programmatic action that included the process by which FDEP would determine if a project required a Section 404 permit. FWS-006086–88. If a project requires a Section 404 permit, the BiOp considered how that permit would be evaluated for effects to federally listed species and designated critical habitat, and what conditions would be imposed as outlined in coordination with FWS to insure that listed species would not be jeopardized and critical habitat would not be destroyed or adversely modified. FWS-006105-06. Conversely, if Florida finds that a project does not require a State Section 404 permit, then the project is beyond the regulatory reach of its Section 404 permitting program, and not part of the species' coordination process considered in the BiOp.[20]

---

[18] This argument is a red herring in any event. If an agency determines that no permit is required, then it never had discretionary control over a project in the first place and, therefore, cannot cause any effects to listed species in the first place. *See* 16 U.S.C. § 1536(a)(2). This is so when the Corps issued Section 404 permits and remains true now that FDEP is issuing Section 404 permits.

[19] Arguments as to "the loss of NEPA review and ESA Section 7 consultations at the site-specific level" fail to acknowledge that the CWA allows states to apply to assume the Section 404 permitting process at the state level. 33 U.S.C. § 1344(g)–(l). In such circumstances, Congress decided that neither NEPA review nor ESA Section 7 consultation is required. *Nat'l Ass'n of Home Builders*, 551 U.S. at 653 n.4 (the ESA's consultation requirement "does not apply to permitting decisions by state authorities").

[20] To the extent Plaintiffs are criticizing how Florida decides that a project does not require a permit, the BiOp considered the relevant portions of Florida's Administrative Code, FWS-006044, and found the FDEP's 404 program was structured to ensure that no permit will be issued that is likely to jeopardize listed species and adversely destroy or modify critical habitat. FWS-006092.

Nor is there any merit to Plaintiffs' additional argument that FWS failed to evaluate the environmental baseline. Dkt. 98 at 38–39. The environmental baseline includes "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that already have undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02. The BiOp properly considered the environmental baseline. *See* FWS-006044–45 (BiOp, explaining that it adopted and adapted various portions of the BE, which it considered to be the best scientific and commercial data available); FWS-006084; FWS-005662–80 (BE, devoting an entire chapter to the environmental baseline). The BiOp adopted the BE's detailed description of the environmental baseline, which addressed the baseline of listed species, their habitats, and the baseline procedures and processes related to the issuance of permits that allow for activities that affect waters of the United States, adjacent uplands, and the ESA-considered species that reside in them. FWS-006084. The BiOp specifically cited the BE's description of the baseline for Section 404 permitting in Florida and its past and ongoing effects on ESA-considered species. *Id*. FWS further separately addressed ecological aspects of the environmental baseline, including the Everglades Restoration, the Central and Southern Florida Project, and other historical ESA consultations triggered by federal wetlands permitting. FWS-006094.[21]  This thorough analysis was more than sufficient to satisfy the requirements of 50 C.F.R. § 402.14(g), particularly given the programmatic nature of

---

[21]  Plaintiffs do not appear to identify any actions or human activities that they believe were omitted improperly from the environmental baseline. Dkt. 98 at 38-39.

the BiOp and future consideration of projects for site-specific and species-specific impacts.[22] FWS-006086–87; FWS-006092–93.

Plaintiffs also contend that FWS improperly relied on EPA's BE and incorporated sections of it "without analysis or explanation." Dkt. 98 at 39.[23] As explained above, FWS explained in the BiOp that it adopted and adapted various portions of ESA's consultation package, which it considered the best available scientific and commercial data. FWS-006044–45. FWS also explained that it conducted its own analysis of the best scientific and commercial data available as required by the ESA, *id.*, thus Plaintiffs' assertion that FWS did no analysis is inaccurate. This fulfilled the ESA's mandate that FWS's opinion be based on the best available scientific and commercial data available, 16 U.S.C. § 1536(a)(2), and its determination is entitled to deference. *Appalachian Power Co. v. EPA*, 135 F.3d 791, 802 (D.C. Cir. 1998).

---

[22]    The cases cited by Plaintiffs are inapposite. None of them concerned programmatic consultations such as the one in this case, where FWS will conduct site-specific and species-specific analyses of each permit through the technical assistance process. To the contrary, the individual biological opinions at issue in *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 128 (D.D.C. 2001) addressed the effects of individual agency actions on a single species, which the Court held simply provided a "recitation of the activities of the agencies." This BiOp delved into the environmental baseline and, for that reason, is distinguishable on the facts. Nor does *Oceana, Inc. v. Ross*, No. 15-055, 2020 WL 5995125 (D.D.C. Oct. 9, 2020) apply. There, the Court found that the consulting agency listed and described data without indicating how it factored into its jeopardy analysis. But here, FWS discussed, for example, data on Section 404 permits issued from 2014 through 2018; stated its relevance to the action under review (namely, EPA's approval of Florida's assumption request) and that it likely approximates the number and types of permitting activities that could occur in the next five years. FWS-006081; FWS-006094. There is simply no basis to describe the BiOp's evaluation of the environmental baseline as short or perfunctory. *Cf.* Dkt. 98 at 39 (citing *Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339 (4th Cir. 2019)).

[23]    Plaintiffs also ignore those parts of the BiOp where FWS discussed data from the BE on Section 404 permits issued from 2014 through 2018 that the Corps provided and explained that the permitting history approximates permitting activities that could occur in the next five years, although the precise number and location of future permit applications are unknown. FWS-006089; FWS-006094.

Finally, Plaintiffs devote just three sentences of argument in their brief in support of Claim 12, in which they allege that EPA failed to consult on ESA-listed sea turtles and their designated critical habitats under FWS's jurisdiction. Dkt. 98 at 41; *see* Dkt. 77 (Am. Complaint ¶¶ 288–294). As explained at length above, the BiOp includes all ESA-considered species and their critical habitat; species-specific impacts will be addressed in the technical assistance process and on a permit-by-permit basis. Neither EPA nor FWS violated their obligation to comply with the ESA in this regard. The Court should enter judgment for Federal Defendants on Claims 3 and 12.

## VII.    The Technical Assistance Process Complies with the ESA.

Throughout their brief, Plaintiffs contend that the technical assistance process is merely voluntary, questioning whether it will be followed and whether FWS and the other agencies will participate in the process as outlined. *E.g.*, Dkt. 98 at 44, 48. Plaintiffs' arguments on this point are easily resolved in favor of Federal Defendants.

At the threshold, the agencies' commitments to the technical assistance process are entitled to a presumption of regularity, which Plaintiffs cannot overcome with mere speculation. *Overton Park,* 401 U.S. at 415; *Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*, 144 F. Supp. 3d 35, 54 (D.D.C. 2015). The plaintiffs made similar arguments in *Cooling Water Intake Structure*, claiming that the technical assistance process was "wholly voluntary" and "not designed to provide meaningful species protection." 905 F.3d at 76. The Second Circuit rejected those arguments, however, holding that the technical assistance process involved a binding commitment by the consulting agencies in that case. *Id*. Here, the BiOp's no jeopardy determination similarly was conditioned on compliance with specific procedures that are part of the description of the action, and the agencies' commitment to them. FWS-006106–07. The agency participants—EPA, FDEP, and FWS—must abide by the commitments made and considered in the BiOp. FWS-006104–05;

FWS-006106–07. Just as the Second Circuit held that the rule at issue in *Cooling Water Intake Structure* was interpreted to require participation in the technical assistance process, so too here that process was part of the action that was approved in this programmatic consultation. *See* 905 F.3d at 72. While Plaintiffs insist that FWS's involvement is simply optional, Dkt. 98 at 47–48, their suggestion that FWS is not committed to the process has no basis in fact. To the contrary, the BiOp contemplated that the express purpose of the technical assistance process was to allow FWS to determine if state-issued 404 permits are likely to jeopardize species or destroy or adversely modify critical habitat. FWS-006056–57. That is the standard that FWS will apply in its review of permits, as expressly stated in the BiOp, thus clearly incorporating the meaning of those terms from the ESA and its implementing regulations.[24] *See id*. Plaintiffs' statement that FWS "need not evaluate the effects of the permit on protected species and critical habitat" nor "evaluate jeopardy or the potential to adversely modify or destroy critical habitat," Dkt. 98 at 47, is pure speculation.

Nor is it true that FDEP "determines whether a permit application will have adverse impacts . . . and may stick to that determination even if USFWS provides information contrary to that conclusion." *Id.* at 47. To the contrary, Florida must comply with the technical assistance process, FWS-006109, and the BiOp explicitly stated that FWS's final conclusions regarding potential impacts and necessary measures to address impacts are "determinative," FWS-006056, FWS-006068, a provision to which the state agencies agreed. EPA-HQ-OW-2018-0640-0623, at 10 (MOU among FDEP, FWC, and FWS). FDEP must "incorporate any reasonable and prudent measures and terms and conditions provided by [FWS] into permit conditions for a State 404 permit" and "will incorporate as permit conditions all recommended impact avoidance and

---

[24]   In addition, both federal regulations and the State 404 applicant handbook state that issuance of a State 404 permit that is likely to jeopardize ESA-listed species is prohibited. FWS-006067.

minimization measures (protection measures)" provided by FWS to avoid jeopardy to species and/or adverse modification or destruction of critical habitat. FWS-006065; FWS-006106. This means that FWS, utilizing its expertise, has the final say.[25] Nor is it accurate for Plaintiffs to say that if the FDEP concludes there will be no adverse impacts, the technical assistance process automatically concludes. Dkt. 98 at 47–48. To the contrary, the BiOp contemplated that FWS "will receive copies of all applications when submitted, including those FDEP/FWC has preliminarily determined as 'No Effect/No Impact.' " FWS-006067; *see also* EPA-HQ-OW-2018-0640-0623, at 13 (MOU among FDEP, FWC, and FWS). If FWS does not respond to such applications upon first submittal, FWS "will still receive public notices for these applications and may elect to comment at that time." FWS-006067. As stated in the BiOp, receipt of public notices for "all applications also provides an opportunity for [FWS] <u>to re-review all of the effect determinations made by the State</u> and provide oversight of the species coordination process." *Id.* (emphasis added).

Plaintiffs' argument that FWS should have considered the effects of the action "as a whole," Dkt. 98 at 45 (citing 50 C.F.R. § 402.14(c)(4), (d)), is just another attack on FWS's programmatic approach. FWS did not have information to allow it to predict every future Section 404 permit application, its location, or its potential overlap with listed species or designated critical habitat. FWS properly recognized the inherent uncertainties and made a decision based on the best

---

[25]    To the extent that Plaintiffs are implying that unlawful take will be permitted to occur notwithstanding the extensive technical assistance process outlined in and committed to in the BiOp, Dkt. 98 at 49, nothing in EPA's approval of Florida's assumption request or the BiOp itself changes the ESA's prohibition of take of listed species. This prohibition operates independently of EPA's approval or the BiOp. If unauthorized take of ESA-listed species occurs, Congress authorized Plaintiffs, other citizens, or the United States to file an action directly against the person or entity responsible to enjoin such take. 16 U.S.C. §§ 1540(g), (e)(6); *see Cooling Water Intake Structure*, 905 F.3d at 75 n.16.

available information. FWS-006093. Accordingly, the action subject to consultation here is EPA's approval of Florida's request to assume its CWA 404 program, not the actual issuance of permits for dredging and filling activities in assumed waters. *See* FWS-006046–48. FWS properly analyzed the effect of that approval, namely Florida's assumption of permitting authority on ESA-species of concern, and that future state permit actions are program activities caused by the proposed action. FWS-006043; FWS-006048. The environmental baseline addressed the baseline of listed species and their habitats, and the baseline procedures and processes related to the issuance of permits that allow for activities that affect waters of the U.S., adjacent uplands, and the ESA-listed and considered species that reside there. FWS-006084. The analysis of effects assessed EPA's oversight authority and whether, and to what degree, FDEP structured its Section 404 program to establish processes that provide the federal and state agencies will implement CWA Section 404 provisions, the State Section 404 program rule, and the MOU among FDEP, FWC, and FWS in a manner that addresses adverse effects to listed species and their critical habitats to ensure that the regulated activities that require State Section 404 permits are not likely to jeopardize the continued existence of ESA-listed species or destroy or adversely modify designated critical habitat. FWS-006104. The ESA does not mandate an assessment of effects on a site-specific and species-specific basis where the specifics of future projects are uncertain.

In addition to contending that FWS must analyze a programmatic action "as a whole," Plaintiffs argue that FWS must engage in site-specific consultations and produce site-specific biological opinions. Dkt. 98 at 46 (citing *N. Slope Borough v. Andrus*, 642 F.2d 589, 608 (D.C Cir. 1980)) & n.17 (citing cases). But *North Slope* simply said that a biological opinion "may not deal exclusively with any one particular stage of an outer continental shelf project." 642 F.2d at 608. The "foresight" that the D.C. Circuit held is required by the ESA is built into the BiOp at issue in

this case, mandating processes and giving FWS final say on potential effects and proposed protective measures to elevate protection of listed species to the highest priority. While Plaintiffs also cite the Ninth Circuit's decision in *Conner v. Burford* and other cases for the proposition that a court must consider all phases of an agency action, Dkt. 98 at 46 n.17, the D.C. Circuit has held that ESA compliance must be assessed in the context of the applicable statutory scheme and future checks and balances and mitigating measures "adopted in pursuance thereof." *North Slope*, 642 F.2d at 609. That is precisely what the BiOp does here. Indeed, the Second Circuit rejected this same argument (and specifically declined to follow *Conner*) in *Cooling Water Intake Structure*, holding that "the rule that biological opinions must be coextensive in scope with the entire action or else violate the ESA is nowhere to be found in the language of the ESA." 905 F.3d at 73. Plaintiffs' arguments on this point lack legal support, and their claim that the technical assistance process is not "an adequate stand in for the robust analysis required by Section 7 consultation," Dkt. 98 at 46, misses the point. Federal Defendants do not claim that the technical assistance process equals Section 7 consultation, and the law is clear that absent any further federal permitting, no further Section 7 consultation is required. Under these circumstances, FWS properly treated and analyzed the future impacts of state-issued 404 permits as effects of the action.

Plaintiffs correctly state that the approach taken in this BiOp follows the programmatic approach taken in the *Cooling Water Intake Structure* case. Dkt. 98 at 49. To do so was reasonable, given the Second Circuit's rejection of the attacks on the biological opinion there. Plaintiffs assert three arguments in an effort to distinguish this BiOp from the consultation in that case, all of which fall flat. First, the federal action in *Cooling Water Intake Structure* was a nationwide consultation on EPA's promulgation of a final rule under CWA Section 316(b); the one at issue in this case is limited to approval of Florida's request to assume CWA Section 404 permitting in waters of the

59

United States within the State of Florida. On its face, the federal action in *Cooling Water Intake Structure* cannot seriously be characterized as "much narrower in scope." Dkt. 98 at 49.

Second, the Court should dismiss any suggestion that the CWA Section 316(b) regulations at issue in *Cooling Water Intake Structure* "served a very different purpose." *Id.* at 98 at 50. The measures in the 316(b) rule were codified to ensure that any NPDES permit issued by either the EPA or a state that had assumed NPDES permitting authority would not jeopardize listed species or adversely modify or destroy critical habitat, with the goal of reducing impacts of the ongoing operation of NPDES permitted facilities over time. *See* 905 F.3d at 71–72. The purpose of the BiOp in analyzing EPA's approval of Florida's assumption request is the same: to ensure that permitted activities do not jeopardize ESA-listed species or adversely modify or destroy critical habitat as a result of dredge or fill activities. *See* FWS-006103. Both agency actions arise under the CWA and both allow the permitting of otherwise prohibited discharges of pollutants under the CWA subject to certain conditions. Even if the two agency actions could be found to have differences, they are inconsequential considering their common goal as to listed species and designated critical habitat.

Finally, there is no merit to Plaintiffs' claim that the obligations in *Cooling Water Intake Structure* were "legally binding" only because they were codified in a rulemaking, whereas the obligations here are not because EPA did not codify its approval of Florida's assumption request. Dkt. 98 at 50-51. EPA's incidental take coverage is conditioned on the agency's continued oversight of Florida's implementation of the State 404 program, as well as its coordination of federal review of State Section 404 permit actions. *See* FWS-006109 (setting forth these requirements in Terms and Conditions and citing 40 C.F.R. Part 233). Florida's incidental take coverage is similarly conditioned on its compliance with an extensive list of terms and conditions

in the BiOp, FWS-006109–10, as well as use of its authorities in the State Section 404 program rule. FWS-006109. By attempting to distinguish the *Cooling Water Intake Structure* case, Plaintiffs implicitly concede that the holding would apply, absent the distinctions they try to draw. But any distinctions are easily dispensed with, and Plaintiffs' arguments have no merit. The Court should grant judgment in favor of FWS on Claims 6 and 13.

## VIII.   The Incidental Take Statement Complies with the ESA and Is Reasonable.

Much like their general attacks on the BiOp, *see* Section VI, *supra*, Plaintiffs disagree with the approach in FWS's ITS. These arguments also lack merit.

Plaintiffs first argue that the ITS failed to specify the amount or extent of incidental take and seem to contend that FWS had sufficient information to allow FWS to estimate the number of individuals that might be affected by future permitted activities. Dkt. 98 at 42. This argument lacks legal and factual support. The ESA provides that an incidental take statement shall, among other things, specify the impact of incidental take on species. 16 U.S.C. § 1536(b)(4)(C)(i). Although Congress expressed a preference for quantifying take in the incidental take statement, it recognized that such specificity is not always possible. *See* Endangered Species Act of 1982, H.R. Rep. No. 97-567, at 27, reprinted in 1982 U.S.C.C.A.N. 2807, 2827; *see Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 538 F. Supp. 2d 242, 257 (D.D.C. 2008); *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1249 (9th Cir. 2001) ("We have never held that a numerical limit is required."). An ITS that has no numerical cap is considered adequate if it explains why it was impracticable to express a numerical measure of take. *Cf. Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 498-99 (D.D.C. 2014).

Consistent with these authorities, FWS explained in the BiOp that it was unable to anticipate the locations of future State Section 404 permit applications, thus it could not conduct a site-specific or species-specific analysis to estimate the number of individuals that may be affected

by the permitted activities. FWS-006081; FWS-006107. Project-specific information will be provided to FWS in the future because FWS will receive all State Section 404 permit applications. FWS-006107–08. This will afford FWS the opportunity to appropriately evaluate project effects on a project-specific and species-specific basis. FWS-006108. The ITS further stated: "we assume that through technical assistance with the State, appropriate measures to minimize incidental take and detrimental effects associated with activities regulated by the State 404 program will be developed by [FWS], and these measures will ensure that each permit will minimize adverse effects and therefore avoid jeopardy to ESA-considered species or destruction or adverse modification to critical habitat." *Id*. The ITS further explained that "[i]f it is determined, through technical assistance on permit reviews with State that take of ESA-listed species is still expected to occur after implementation of recommended minimization measures, the amount or extent of incidental take will be quantified, at that time by the appropriate Field Office of the USFWS, in coordination with FDEP/FWC. FDEP/FWC and USFWS will review reports and track the levels of take estimated through the technical assistance process and exempted by this Incidental Take Statement." FWS-006108; *see also id*. ("the amount or extent of incidental take of listed species will be quantified during the technical assistance process that is required" by Florida's 404 program rule, the MOU signed by FDEP, FWS and FWC, and EPA oversight regulations (40 C.F.R. § 233)). Through this process, take will be quantified and monitoring will track the levels of take estimated through the technical assistance process and exempted by the ITS. FWS-006108.

Plaintiffs nonetheless insist that prior consultations with the Corps on past Section 404 permit applications provided sufficient information to establish numeric take limits and/or identify a surrogate. Dkt. 98 at 42. But prior consultations could have provided only information about the types of impacts from specific <u>past</u> projects, not projects that will be proposed and considered in

the future.[26]    Plaintiffs' citation to *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988), does not change this result. There, the court held that there was sufficient information about behavior and habitat of species in areas covered by potential site-specific activities because the areas already had been leased; thus, the agencies knew the specific areas where future oil and gas activities were likely to occur. *See id.* at 1453–54. This fact-specific holding does not apply here, where there is no information to allow FWS to predict who will apply for permits, what activities will be the subject of permit applications, or the location of the proposed activities, which impairs FWS's ability to make a reasonable estimate of potential take. The Second Circuit rejected similar arguments in *Cooling Water Intake Structure*, 905 F.3d at 73, finding that it was reasonable for FWS and NMFS to defer consideration of how pollution would affect aquatic ecosystems. The court held that it was rational for the consulting agencies to engage in a technical assistance process carefully defined in a programmatic biological opinion, which would allow the agencies to more reliably estimate the stressors that are likely to be produced as a direct or indirect result of thermal discharge activities at individual facilities. *See id.* In so ruling, the Second Circuit rejected the plaintiffs' argument that FWS and NMFS had failed to seek out and consider existing scientific data, instead agreeing with the agencies that the exact nature of future impacts would be species-specific and require individual analyses. *Id.* This reasoning also applies here.

---

[26]    FWS considered information presented in EPA's BE about ESA consultations triggered by federal wetlands permitting between 2014 and 2018 and incorporated it in the BiOp. FWS-006091. As stated above, this information was not used to generate take limits. Rather, the analysis of former consultations (i.e., the percentage of permit applications that resulted in formal or informal consultations or were covered by existing programmatic consultations) provided information about long-term implementation of the Section 404 assumption process. *Id.* FWS properly relied on this information to determine that it approximates the number and types of permitting activities that could occur over the next five years, FWS-006094, and properly deferred setting take limits to the species-specific analysis that will occur on individual permit applications.

Plaintiffs' complaint that the ITS did not have an "adequate trigger for reinitiation," Dkt. 98 at 42, is similarly flawed. FWS considered the extent to which there would be sufficient processes to monitor and evaluate adverse effects on ESA-considered species and critical habitat and monitor and enforce permit compliance. FWS-006081. If assumptions about those processes prove incorrect or warrant changes during implementation of the State program, it could affect the validity of the analysis and trigger reinitiation of consultation if effects occur that were not considered. FWS-006093 (citing 50 C.F.R. § 402.16); *see* FWS-006110 (if new information shows that magnitude of impacts to species is greater than originally anticipated or amount of incidental take is exceeded, FDEP will re-open the permit and coordinate further with FWS). This is the sort of "new" information that could trigger reinitiation. *Cf.* Dkt. 98 at 43.

Nor was it unreasonable for FWS to determine that the listing of a new species alone would not require reinitiation of this programmatic consultation. FWS-006111. FWS evaluated the proposed State 404 program's species coordination framework, which requires that a current list of ESA-listed species be used when a State 404 permit application is received. FWS-006083. Thus, the State 404 review process can maintain compliance with the ESA by adapting to future changes to the list of species listed as threatened or endangered under the ESA, and reinitiation of consultation may not be required or necessary. *Id.* Furthermore, as explained in the BiOp, Florida's regulations require the State to comply with the technical assistance process for ESA-listed species and critical habitat, and any effects to newly listed species or their critical habitat would be sufficiently considered and addressed through the same technical assistance process. FWS-006111. The cases cited by Plaintiffs address biological opinions on individual agency actions, not programmatic biological opinions that include a site-specific and species-specific evaluation via a technical assistance process. *See* Dkt. 98 at 43 (citing, *e.g.*, *Oceana v. Ross*, 2020 WL 5995125, at

*13 (D.D.C. Oct. 9, 2020)). The events triggering reinitiation of consultation were announced clearly; nothing was done "behind closed doors" in this regard. *Cf.* Dkt. 98 at 43.

Plaintiffs next incorrectly contend that the ITS established "no meaningful reasonable and prudent measures nor implementing terms and conditions." Dkt. 98 at 44. The ESA does not mandate any particular form or content for "reasonable and prudent measures," directing only that a biological opinion authorizing incidental take specify the measures "that the Secretary considers necessary or appropriate" to minimize the impact of the incidental taking. 16 U.S.C. § 1536(b)(4)(C)(ii); *see Cooling Water Intake Structure*, 905 F.3d at 77. The ESA similarly vests FWS with broad discretion under the statutory phrase "terms and conditions," which are those necessary to comply with the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4)(C)(iv). The implementing regulations provide some additional substance by stating that both reasonable and prudent measures and terms and conditions "cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes." 50 C.F.R. § 402.14(i)(2).

Here, the ITS requires EPA to use its authorities under the CWA to minimize impacts to listed species pursuant to its oversight of the State's 404 Program, which in turn incorporates FWS's expertise in determining measures to eliminate or minimize take. FWS-006108-09. The ITS also requires FDEP "to participate in [the] State 404 program species coordination technical team" with FWC and FWS per their MOU, which provides a structured framework for coordinating review of State 404 permits to assess potential effects on ESA-considered species and critical habitat and to ensure that no State 404 permit action jeopardizes the continued existence of an ESA-listed species (as well as species listed under Florida's endangered species statute), or adversely modifies or destroys designated critical habitat. FWS-006109; *see* FWS-006110, FWS-006043–44. The ITS states that all protection measures recommended by FWS shall

be incorporated as permit conditions. FWS-006109. Plaintiffs' demand that "new or additional requirements" be imposed on EPA or FDEP has no basis in the ESA or its implementing regulations, particularly where FWS determined that the commitments made by state and federal agencies, and memorialized in the ITS, were sufficient. In *Cooling Water Intake Structure*, the Second Circuit held that a nearly identical reasonable and prudent measure regarding EPA's use of its oversight authority satisfied the ESA because "reliance on the binding technical assistance process was a 'meaningful attempt to minimize incidental takings associated with the project.'" 905 F.3d at 77 (quoting *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1039 n.7 (9th Cir. 2007)).

The ITS also contains terms and conditions prescribed to implement the reasonable and prudent measures, which more than satisfy the scarce guidance provided in the ESA and its implementing regulations. The only example of terms and conditions given in the statute and regulations is "reporting requirements." 16 U.S.C. § 1536(b)(4)(C)(iv); 50 C.F.R. § 402.14(i)(1)(iv). Similarly, the regulations require the action agency to "report the progress of the action and its impact on the species to the Service as specified in the incidental take statement." *Id.* § 402.14(i)(3). The terms and conditions proscribed here impose a detailed annual reporting requirement on FDEP, requiring a summary of the number and types of 404 permits issued or denied, including data on impacts to ESA-listed species or critical habitat. FWS-006110. The ITS further contains a lengthy list of additional terms and conditions for FDEP, including that it oversee the species coordination process; implement a training program; forward all applications to FWS for review according to the timeframes and processes in the BE and in the BiOp's description of the action; accept the technical assistance process; and incorporate as permit conditions all protection measures that FWS provides to FDEP. FWS-006109–10. If FWS concludes that a permit is likely to jeopardize a listed species or adversely destroy or modify critical habitat, then

FDEP must issue a notice of intent to deny the permit. FWS-006110. The terms and conditions contain other mandatory measures, namely that EPA oversee operation of Florida's 404 program to ensure that it operates in accordance with the requirements of 40 C.F.R. pt. 233 and coordinate federal review of State Section 404 permit actions pursuant to 40 C.F.R. § 233.50. FWS-006109. *In Cooling Water Intake Structure*, the Second Circuit held that "various administrative conditions, like a detailed annual reporting requirement, and several substantive implementing conditions" were sufficient to satisfy the "terms and conditions" requirement. *See* 905 F.3d at 77. The same conclusion should be applied in this case. For these reasons, the Court should reject Plaintiffs' claim that the ITS fails to comply with the ESA and enter judgment for FWS on Claim 4.

## IX.    EPA Rationally Relied on FWS's BiOp.

Under the ESA, EPA is fully entitled to rely on FWS's expert analysis and conclusions contained in a BiOp to ensure its compliance with the ESA. In reviewing EPA's approval of Florida's assumption request, "the critical question is whether the action agency's reliance was arbitrary and capricious, not whether [the BiOp] itself is somehow flawed." *City of Tacoma v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006). Even in situations where the consulting agency's opinion "is based on 'admittedly weak' information," an action agency satisfies its obligations under the ESA "if a challenging party can point to no 'new' information—i.e., information the [Service] did not take into account—which challenges the [biological] opinion's conclusions." *Id*. at 76 (citing *Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990)); *see Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1093 (D.C. Cir. 2021).[27]

---

[27]  Plaintiffs argue that this standard "has not been applied when a BiOp is facially invalid because of missing analysis or incorporation of inadequate analysis, as is the case here." Dkt, 98 at 51 n.24 (citing *Shafer & Freeman Lakes*, 992 F.3d at 1096). But the D.C. Circuit held in *Shafer & Freeman Lakes* that the plaintiffs failed to show that the action agency overlooked new information in the administrative record that had been unavailable to the consulting agency, therefore, the action

Plaintiffs fail to meet the relevant standard, which requires them to identify "new information" that FWS failed to consider in its BiOp. Here, EPA rationally relied on FWS's BiOp. Plaintiffs' claim that the BiOp arbitrarily and capriciously asserted that FWS could not estimate the number of individuals that might be affected by permitted activities, which in turn rendered EPA's reliance on the BiOp arbitrary, is a thinly disguised argument that the BiOp itself is flawed. This is not the proper focus in assessing whether EPA rationally relied on the BiOp. The law does not require EPA to "'undertake a separate, independent analysis' of the issues addressed in the BiOp." *City of Tacoma*, 460 F.3d at 75. Plaintiffs' "reargu[ment] of factual issues [that FWS] already took into consideration" is insufficient to show that EPA should have rejected the BiOp. *Id*. at 76. The Court should grant judgment for EPA on Claim 10.

**X.     EPA's No-Effect Determination For NMFS Species Was Reasonable.**

EPA determined that its approval of Florida's assumption request would have no effect on ESA-listed species that are under NMFS's jurisdiction. The allegations in Claim 5 that this no effect determination violates the CWA and APA, and in Claim 11 that this no effect determination violates the ESA, lack merit.

In a letter dated November 19, 2019, EPA requested that NMFS identify any species under its jurisdiction that existed in waters that are assumable by the state. EPA-HQ-OW-2018-0640-0638 (20200415 Ltr. from NMFS to EPA). After communications between the two agencies, a review of state mapping products, NMFS's own mapping analysis, and a review of state-provided

---

agency reasonably relied on the consulting agency's scientific judgments and properly granted a license. *Id*. at 1093. Contrary to Plaintiffs' contention, the Court did not reject the "no new information standard" or otherwise discuss it. The "missing analysis" cited by Plaintiffs in that case was the consulting agency's failure to analyze whether its proposal of a specific reasonable and prudent measure "satisfied its own governing regulation" that such measures "qualif[y] as only a minor change within the meaning of 50 C.F.R. § 402.14(i)(2)." *Id*. at 1095. This is a significantly different issue than the one presented here, where Plaintiffs allege that FWS failed to comply with ESA Section 7, even though it followed an approach specifically upheld by the Second Circuit.

documents about the assumption, NMFS concluded that ESA-listed species under NMFS's jurisdiction do not occur in waters that are assumable by the state. EPA-HQ-OW-2018-0640-0638 (20200415 Ltr. from NMFS to EPA); *see also* FWS-005931. In making this determination, NMFS stated that it specifically analyzed the possible spatial overlap of the assumption with waters used by certain sturgeon species that occur in waters that will remain under USACE's jurisdiction. *See id*. NMFS concluded by stating that it assumed that EPA would make a "no effect" determination for NMFS's ESA-listed species that were identified as part of the proposed assumption. *See id*. And EPA did so, ultimately deciding that its approval or disapproval of FDEP's assumption of the Section 404 program would have no effect on ESA-listed species under NMFS's jurisdiction. EPA-HQ-OW-2018-0640-0617 (Sept. 2, 2020 Ltr. from NMFS to EPA). NMFS acknowledged receipt of EPA's "no effect" determination, stating that such determinations do not require NMFS's concurrence nor does the agency provide concurrence on them. EPA-HQ-OW-2018-0640-0663. NMFS, however, did confirm that it had coordinated closely with FDEP on the potential for effects to endangered and threatened species under NMFS's jurisdiction. *See id*.

With its no effect determination, EPA fulfilled its procedural obligation to review its action and determine whether consultation with NMFS was required. *See* 51 Fed. Reg. at 19,945; *see also NRDC v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998) (before initiating any agency action in an area that contains threatened or endangered species or a critical habitat, the action agency must either "(1) make an independent determination of whether its action 'may affect' a protected species or habitat, or (2) initiate a formal consultation with the agency that has jurisdiction over the species"). If an action agency makes a "no effect" determination, there is no trigger for formal consultation. *Wildearth Guardians v. Salazar*, 880 F. Supp. 2d 77, 94 (D.D.C. 2012). EPA explained its decision, namely that ESA-listed species under NMFS's jurisdiction do not occur in

69

waters that are assumable by the State, and its determination that approval of FDEP's assumption request would have no effect on such species was reasonable. EPA-HQ-OW-2018-0640-617.

Nevertheless, recognizing that Plaintiffs raised issues about potential effects downstream of assumed waters, EPA has undertaken to address that issue. EPA-HQ-OW-2018-0640-664. In March 2021, Plaintiffs sent EPA (as well as several other agencies) a notice of intent to sue for alleged violations of the ESA, contending (among other things) that EPA's no effect determination was arbitrary and capricious. Out of an abundance of caution, EPA, in its response to this notice, stated that it had considered the issue further and would prepare a biological evaluation and effects determinations for NMFS-listed species and critical habitats within that evaluation. EPA-HQ-OW-2018-0640-664 (Dec. 20, 2021 Ltr. EPA to Plaintiffs). Once EPA has prepared the BE, it will initiate consultation with NMFS, as appropriate. *Id*. EPA further explained that it would consider issues raised in the notice of intent to sue, including potential impacts to listed marine species and their critical habitats downstream of assumed waters. *Id*. EPA's work on the biological evaluation is ongoing and includes coordination with NMFS. *See* Exhibit B (Declaration of D. Diaz at ¶ 6). EPA expects to complete its biological evaluation on or about July 14, 2023. *Id*. ¶ 7. Thus, while EPA's initial "no effect" determination was reasonable, should the Court determine otherwise, EPA's ongoing work should provide a more fulsome analysis and ultimately resolve the matter.

## CONCLUSION

For these reasons, the Court should enter summary judgment for Federal Defendants on Plaintiffs' Claims One through Seven and Ten through Thirteen.

Respectfully Submitted,

Dated: April 26, 2023

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

/s/Andrew S. Coghlan
Andrew S. Coghlan (CA Bar 313332)
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 514-9275
Fax: (202) 514-8865
Email: andrew.coghlan@usdoj.gov

Alison Finnegan (PA Bar 88519)
United States Department of Justice
Environment & Natural Resources
Division Wildlife & Marine Resources
Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: 202-305-0500
Email: Alison.C.Finnegan@usdoj.gov

*Attorneys for Federal Defendants*

**Certificate of Service**

I certify that on April 26, 2023, I filed the foregoing with the Court's CMS/ECF system, which will notify each party.

/s/Andrew S. Coghlan
ANDREW S. COGHLAN