**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ET AL. | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL. | |
| Defendants, | |
| STATE OF FLORIDA, ET AL. | |
| Intervenors. | |

———————————————

**STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL
PROTECTION'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

———————————————

# TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................................1

I.    Legal & Factual Background ............................................................... 4

    A.    Florida's Comprehensive Approach to Environmental Protection and Conservation of Water Resources ..........................................................5

    B.    FDEP's Early Efforts to Prepare its Proposed Section 404 Program ..........7

    C.    Florida's 404 Handbook is a Binding Rule that Helpfully Summarizes the Key Aspects of the Program...........................................10

    D.    FDEP's Close Coordination with Federal & State Wildlife Agencies..................................................................................................11

    E.    Public Access to Environmental Information in Florida ..........................15

    F.    Florida's Authority to Enforce Section 404...........................................18

    G.    Plaintiffs' Ability to Impact FDEP Permit Actions and to Challenge FDEP 404 Permits under Florida Law.....................................19

    H.    EPA Oversight of FDEP Permit Decisions................................................23

STANDARD OF REVIEW ...........................................................................................26

ARGUMENT ................................................................................................................27

I.    Plaintiffs' Claims Are Not Subject to Judicial Review Due to Lack of Standing, Lack of Final Agency Action, or Lack of Ripeness. .......................... 27

    A.    Plaintiffs Lack Standing For All Claims Based on Purported Informational Injuries. ..............................................................................27

    B.    Plaintiffs Cannot Challenge EPA's Completeness Determination (Claim 1). .....................................................................................................32

    C.    Plaintiffs Suffer No Injuries from State Assumption of *Primary* Permitting Responsibility, Especially Where EPA Maintains Program-Level and Permit-by-Permit Oversight and Independent Enforcement Authority (Claim 2). ..............................................................34

        1.    Plaintiffs Lack Standing to Challenge State 404 Assumption Generally. ..................................................................34

        2.    Plaintiffs Lack Standing to Challenge EPA's Approval Based on Concerns with Criminal Negligence & Statute of Limitations. ...................................................................................39

D.      Many of Plaintiffs' Attacks Are Not Ripe For Review (Claims 3 to 5, 7, 11-12)..................................................................41

        1.      Plaintiffs' Claim That FWS "Unlawfully Extended Take Liability Exemptions" Is Not Ripe For Review (Claims 3 and 4). .........................................................................43

        2.      Plaintiffs' Challenge to the Corps' List Of "Retained Waters" Is Neither Ripe Nor Based on "Final Agency Action" (Claim 7). ..........................................................45

        3.      Plaintiffs' Claims Based on NMFS Species Are Unripe and Likely Moot (Claims 5, 11, and 12)................................49

CONCLUSION.....................................................................................................50

# TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Gardner,*
  387 U.S. 136 (1967)........................................................................................................41, 42

*Agrico Chem. Co. v. Dep't of Env't Regul.,*
  406 So. 2d 478 (Fla. 2d DCA 1981) ..................................................................................20

*Agrico Chem. Co. v. Dep't of Env't Regul.,*
  No. 83-2708, 1984 WL 54261 (Fla. Div. of Admin. Hr'g, June 27, 1984) ..........................36

*Am. Oversight v. U.S. Dep't of Veterans Affairs,*
  498 F. Supp. 3d 145 (D.D.C. 2020) (Moss, J.) ..................................................................41

*Am. Petroleum Inst. v. EPA,*
  683 F.3d 382 (D.C. Cir. 2012) ...........................................................................................42

*Am. Tunaboat Ass'n v. Ross,*
  391 F. Supp. 3d 98 (D.D.C. 2019) .....................................................................................44

*Ass'n of Am. Physicians & Surgeons v. Sebelius,*
  901 F. Supp. 2d 19 (D.D.C. 2012) .....................................................................................29

*Bennett v. Spear,*
  520 U.S. 154 (1997)...........................................................................................................33

*Capeletti Bros. v. Dep't of Gen. Servs.,*
  432 So.2d 1359 (Fla. 1st DCA 1983) .................................................................................21

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013)...........................................................................................................35

*Coal. to Save Menominee River Inc. v. U.S. Env't. Prot. Agency,*
  423 F. Supp. 3d 560 (E.D. Wis. 2019)...............................................................................47

*Cooling Water Intake Structure Coal. v. EPA,*
  905 F.3d 49 (2d Cir. 2018).............................................................................15, 31, 43

*Crow Creek Sioux Tribe v. Brownlee,*
  331 F.3d 912 (D.C. Cir. 2003) .......................................................................................2, 38

*Ctr. for Biological Diversity v. Regan,*
  597 F. Supp. 3d 173 (D.D.C. 2022)...................................................1, 27, 34, 40, 48

*Ctr. for Biological Diversity v. Zinke,*
  369 F. Supp. 3d 164 (D.D.C. 2019) .............................................................................29, 34

*Defs. of Wildlife v. Dep't of Navy*,
   733 F.3d 1106 (11th Cir. 2013) .................................................................15

*Devia v. NRC*,
   492 F.3d 421 (D.C. Cir. 2007) ..................................................................41

*Ecological Rights Found. v. EPA*,
   No. CV 19-2181, 2022 WL 4130818 (D.D.C. Sept.12, 2022) ................29

*Elec. Priv. Info. Ctr. v. FAA*,
   892 F.3d 1249 (D.C. Cir. 2018) ................................................................34

*Env't Integrity Project v. McCarthy*,
   139 F. Supp. 3d 25 (D.D.C. 2015) ............................................................34

*Fed. Trade Comm'n v. Standard Oil Co.*,
   449 U.S. 232 (1980) ..................................................................................33

*Fla. Home Builders Ass'n v. Dep't of Labor and Emp't Sec.*,
   412 So. 2d 351 (Fla. 1982) .......................................................................20

*Friends of Animals v. Jewell*,
   828 F.3d 989 (D.C. Cir. 2016) ..................................................................29

*Hamilton Cnty. Bd. of Cnty. Comm'rs v. Fla. Dep't of Env't Regul.*,
   587 So.2d 1378 (Fla. 1st DCA 1991) .......................................................21

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ..................................................................................40

*Hous. Study Grp. v. Kemp*,
   736 F. Supp. 321 (D.D.C. 1990) ..............................................................33

*Lake Hickory Nut Homeowners' Ass'n v. Schofield Corp.*,
   No. 91-8088, 1992 WL 322912 (Fla. Div. of Admin. Hr'g, July 23, 1984) ...........................36

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................26, 27, 40, 46

*McCray v. Biden*,
   574 F. Supp. 3d 1 (D.D.C. 2021) (Moss, J.) .....................................41, 46

*Menominee Indian Tribe of Wis. v. Env't. Prot. Agency*,
   947 F.3d 1065 (7th Cir. 2020) ..........................................................24, 36, 48

*NAACP, Inc. v. Fla. Bd. of Regents*,
   863 So. 2d 294 (Fla. 2003) .......................................................................22

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007)................................................................................31

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003)................................................................................42

*Oceana, Inc. v. Evans*,
    384 F. Supp. 2d 203 (D.D.C. 2005) ..............................................42, 46

*Palm Beach Cnty. Env't Coal. v. Fla. Dep't of Env't Prot.*,
    14 So.3d 1076 (Fla. 4th DCA 2009) ....................................................22

*Pub. Citizen Health Rsch. Grp. v. FDA*,
    740 F.2d 21 (D.C. Cir. 1984) ...............................................................42

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002)........................................................26, 27

*Small Refiner Lead Phase-Down Task Force v. EPA*,
    705 F.2d 506 (D.C. Cir. 1983) .............................................................34

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2015)..............................................................................26

*Suburban Trails, Inc. v. New Jersey Transit Corp.*,
    800 F.2d 361 (3d Cir. 1986).................................................................44

*Swanson Grp. Mfg. LLC v. Jewell*,
    790 F.3d 235 (D.C. Cir. 2015) .............................................................27

*Texas v. United States*,
    523 U.S. 295 (1998)..............................................................................41

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)....................................................................26, 28

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016)........................................................................33, 47

*Waterkeeper All., Inc. v. Regan*,
    41 F.4th 654 (D.C. Cir. 2022)................................................................2

*Wyo. Outdoor Council v. Dombeck*,
    148 F. Supp. 2d 1 (D.D.C. 2001) .........................................................43

**Federal Statutes**

5 U.S.C. § 551(6) ............................................................................................11

5 U.S.C. § 551(8) ...................................................................................................................11

5 U.S.C. § 704.........................................................................................................................47

16 U.S.C. § 1531(a)(5)...........................................................................................................12

16 U.S.C. § 1536(a)(2)...........................................................................................................28

16 U.S.C. § 1540(g)................................................................................................................43

33 U.S.C. § 1251(b)..................................................................................................................4

33 U.S.C. § 1319...............................................................................................................38, 41

33 U.S.C. § 1341.....................................................................................................................26

33 U.S.C. § 1342......................................................................................................................4

33 U.S.C. § 1344.....................................................................................................................35

33 U.S.C. § 1344(a)................................................................................................................26

33 U.S.C. § 1344(g).........................................................................................................3, 4, 38

33 U.S.C. § 1344(g)(1)...........................................................................................................49

33 U.S.C. § 1344(h)...........................................................................................................23, 39

33 U.S.C. § 1344(h)(1)(F)......................................................................................................24

33 U.S.C. § 1344(h)(1)(G).....................................................................................................39

33 U.S.C. § 1344(i)...........................................................................................................23, 25

33 U.S.C. § 1344(j)...........................................................................................................13, 23

33 U.S.C. § 1344(k)................................................................................................................13

33 U.S.C. § 1344(l).................................................................................................................13

33 U.S.C. § 1344(m)...............................................................................................................24

33 U.S.C. § 1344(n)...........................................................................................................38, 40

**Florida Statues**

Fla. Stat. § 119.07(1)(a).........................................................................................................16

Fla. Stat. § 119.011(12)..........................................................................................................16

Fla. Stat. § 120.56(1)(a) ...........................................................................................22

Fla. Stat. § 120.56(3) ...............................................................................................22

Fla. Stat. § 120.57 .............................................................................................21, 22

Fla. Stat. § 120.57(1)(b) ...........................................................................20, 21, 36

Fla. Stat. § 120.68 .............................................................................................22, 23

Fla. Stat. § 120.68(6)(a) ...................................................................................22, 23

Fla. Stat. § 120.569 ...........................................................................................21, 22

Fla. Stat. § 373.129(7) ...............................................................................................18

Fla. Stat. § 373.430 ...................................................................................................18

Fla. Stat. § 373.430(1)(b) .........................................................................................19

Fla. Stat. § 373.430(1)(c) .........................................................................................19

Fla. Stat. § 373.430(4) ...............................................................................................19

Fla. Stat. § 373.430(5) ...............................................................................................19

Fla. Stat. § 373.4146(2) ........................................................................................7, 8

Fla. Stat. § 403.021(2) .................................................................................................5

Fla. Stat. § 403.121(1) ...............................................................................................18

Fla. Stat. § 403.161 ...................................................................................................18

Fla. Stat. § 403.412(6) ...............................................................................................20

Fla. Stat. § 403.412(7) ........................................................................................20, 37

**Cod of Federal Regulations**

40 C.F.R. § 147.500 .....................................................................................................6

40 C.F.R. § 233 ...........................................................................................................13

40 C.F.R. § 233.10 .......................................................................................................8

40 C.F.R. § 233.11 .......................................................................................................8

40 C.F.R. § 233.12 .......................................................................................................8

40 C.F.R. § 233.13 .........................................................................................................8, 24

40 C.F.R. § 233.14 .............................................................................................................8

40 C.F.R. § 233.15(d) .......................................................................................................24

40 C.F.R. § 233.15(g) .......................................................................................................24

40 C.F.R. § 233.15(h) .......................................................................................................11

40 C.F.R. § 233.16(d) .......................................................................................................47

40 C.F.R. § 233.41 ...........................................................................................................18

40 C.F.R. § 233.41(a)(3) ..................................................................................................19

40 C.F.R. § 233.41(b)(2) ..................................................................................................19

40 C.F.R. § 233.50(j) ........................................................................................................13

40 C.F.R. § 233.53(b) .......................................................................................................25

40 C.F.R. § 233.53(c) .......................................................................................................25

50 C.F.R. § 402.02 ...........................................................................................................15

50 C.F.R. § 402.12 ...........................................................................................................31

**Federal Register**

85 Fed. Reg. 57,853 (Sept. 16, 2020) ...............................................................................9

85 Fed. Reg. 83,553 (Dec. 22, 2020) ..............................................................................11

**State Executive Order**

Executive Order No. 23-06 (Fla. Jan. 10, 2023) ...............................................................5

**State Constitutional Provisions**

Fla. Const. Art. I, § 24 ....................................................................................................16

Fla. Const. Art. II, § 7(a) ...................................................................................................5

Fla. Const. Art. V, § 21 ...................................................................................................23

**Other Authorities**

Congressional Research Service, *Federal Land Ownership: Overview and Data*
    (Feb. 21, 2020) ............................................................................................................30

NOAA, *Coastal Zone Management Programs,*
   https://coast.noaa.gov/czm/mystate/ .......................................................................6

Fla. Dep't Env't Prot, *Source & Drinking Water Program,*
   https://floridadep.gov/water/source-drinking-water ...............................................6

U.S. Army Corps of Eng'rs, Jurisdictional Determinations & Permit Decisions
   https://permits.ops.usace.army.mil/orm-public#.....................................................17

ECOS, *Resolution 08-3: State Assumption of Clean Water Act Section 404 Permit
   Program,* https://www.ecos.org/documents/resolution-08-3-state-delegation-
   of-clean-water-act-section-404-permit-program/ ...................................................4

Fla. Dep't of State, *404 Handbook*
   https://www.flrules.org/gateway/reference.asp?No=Ref-12064 .............................9

*EPA, NPDES State Program Authorization Information,*
   https://www.epa.gov/npdes/npdes-state-program-authorization-information ..........6

EPA, *Clean Air Act Permitting in Florida,*  https://www.epa.gov/caa-
   permitting/clean-air-act-permitting-florida ............................................................6

NOAA, *Species Directory,* https://www.fisheries.noaa.gov/species-
   directory/threatened-endangered..........................................................................49

EPA, *State Authorization under the Resource Conservation and Recovery Act,*
   https://www.epa.gov/rcra/state-authorization-under-resource-conservation-
   and-recovery-act-rcra...........................................................................................6

## INTRODUCTION

For many years, the State of Florida has administered most federal environmental programs that are subject to state delegation or assumption. In 2020, after enacting new state legislation, adopting state regulations, and expending substantial resources over the course of several years to develop a new comprehensive permit program, Florida sought and obtained federal approval – the first such state to do so in almost thirty years – to administer the Clean Water Act (CWA) Section 404 dredge-and-fill permit program. This effort was part and parcel of Florida's longstanding commitment – based in the Florida Constitution – to environmental conservation. Here, Plaintiffs challenge Florida's right to administer this permit program.

Florida fully agrees with Federal Defendants on the merits. Plaintiffs ignore Congress' clear objective that CWA Section 404 programs should be administered through a system of cooperative federalism, with states holding the primary role in processing permits subject to ongoing federal oversight. Likewise, Plaintiffs' 13-count complaint contravenes this clear intent by mounting a broad attack on virtually all aspects of the Federal Defendants' review and approval of Florida's program. Two procedural claims (Claims 8 and 9) were taken up separately by this Court. The remaining eleven claims are all entirely without merit for the reasons Federal Defendants provide.

Yet this Court need not reach the merits of these eleven claims because Plaintiffs do not meet their burden to prove that each claim is justiciable.[1] Plaintiffs are uninjured in any legally cognizable manner by Florida administering a program under federal standards where EPA has

---

[1] At the motion to dismiss stage, this Court decided to "defer ruling on this particular flavor of Florida's standing-related arguments [i.e., that Plaintiffs lack standing to challenge the mere transfer of permit authority where EPA oversight ensures a compliant program] until Plaintiffs press the merits of their claims as to the substance of the EPA's decision." *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 190 (D.D.C. 2022) (Dkt. 73 at 21).

continuous oversight and enforcement responsibility on a program level and permit-by-permit. The D.C. Circuit has been skeptical of standing in contexts involving transfers of federal roles or responsibilities to states where federal standards remained applicable and/or the federal agency had oversight and enforcement authority. *See Waterkeeper All., Inc. v. Regan*, 41 F.4th 654, 661 (D.C. Cir. 2022) (dismissing *sua sponte* an environmental group's challenge to EPA's approval of Oklahoma's state coal ash program for lack of standing); *Crow Creek Sioux Tribe v. Brownlee,* 331 F.3d 912, 917 (D.C. Cir. 2003) (holding that Indian tribe lacked standing to challenge transfer of federal lands to state government where the federal land transfer statute ensured continued enforcement of cultural protection requirements).

Many of Plaintiffs' other individual claims also should not be entertained by this Court. Plaintiffs clearly lack standing to challenge the adequacy of criminal enforcement – a function solely within the unreviewable discretion of the Executive Branch at both the federal and state levels. They are also uninjured by a loss of environmental information, as coextensive information is either readily available via Florida's program or is information that Congress, by statute, has decided is not required for a state program. Florida previously filed a supplemental brief addressing environmental informational standing (Dkt. 72)[2], and as part of this motion, Florida provides an additional declaration showing that, among other things, Plaintiffs' assertions of "losses" of environmental information do not hold water. *See* Declaration of Justin Wolfe, Florida Department of Environmental Protection (FDEP) General Counsel (Wolfe Dec.) attached as Exhibit A.

And certain other claims – such as Plaintiffs' challenge to the incidental take statement – are based on speculations of harm that may never arise (e.g., that Florida will issue a 404 permit for a project that causes an unlawful take of species without interdiction by the federal oversight

---

[2] For citations to filings in this case, Florida cites to the docket number and the relevant PDF page number.

agencies). Such claims are not ripe for review at this early point in the implementation of Florida's program, though Plaintiffs are certainly free to bring a legal challenge to a specific permit action down the road that actually involves claims of unlawful take of species.

Likewise, whether particular waterbodies should be added or removed from the list of "retained waters" is not an issue that this Court can or should take up here. Florida is home to thousands of waterbodies. As part of the assumption process, the Corps of Engineers (Corps) provided an initial list of over 500 rivers, lakes, streams, and creeks in Florida that, based on available information, reasonably constituted waters that could not be assumed by the State under CWA Section 404(g). But this list was not meant to be the final word. Some waters, like the St. John's River and Lake Okeechobee, are easy to classify as "retained waters," but many others require an intensive analysis as to, for example, whether the waterbodies are "presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce..." 33 U.S.C. § 1344(g). In fact, the list (and its related Memorandum of Agreement (MOA)) expressly include all other waters found to be non-assumable waters (even if not listed), and the Corps and Florida agreed to a process for regularly updating the list to ensure that waters are properly classified. Thus, the retained waters list is not "final agency action," but even if it were, Plaintiffs' concerns that certain waters are classified incorrectly can and should wait for an as-applied challenge to a particular permit involving a particular waterbody.

Similar ripeness concerns (and ongoing activity that is likely to trigger mootness) support dismissal of the claims based on protection of marine and coastal species under the jurisdiction of the National Marine Fisheries Service (NMFS).

For these reasons, and for the reasons set forth in the Federal Defendants' summary judgment brief, Florida respectfully requests that the Court deny Plaintiffs' motion for summary

judgment and enter judgment for the Federal Defendants and Florida Intervenors on all claims. [3]

## I.       Legal & Factual Background

Built on cooperative federalism, the CWA shares stewardship responsibilities for water resources among the States and Federal government. 33 U.S.C. § 1251(b). Congress created two CWA permit programs: one program under Section 402 to control point-source pollution to surface waters (known as the National Pollutant Discharge Elimination System, or NPDES, program) and another under Section 404 to regulate the dredge or fill of surface waters (including wetlands) constituting "waters of the United States." *Id.* §§ 1342, 1344.

**"It is the policy of Congress that the States . . . implement the permit programs under sections [402] and [404]."** *Id*. § 1251(b). To that end, Sections 402 and 404 invite States to seek EPA's approval to administer State-level permit programs in place of the federal permit programs. *Id*. §§ 1342(b), 1344(g). Over 40 States have obtained approval to administer State NPDES programs under Section 402, while just three States—Michigan, New Jersey, and Florida—have assumed responsibility for administering their own Section 404 programs. [4] The Federal Defendants' brief provides a thorough explanation of Section 404 and the regulations governing 404 assumption (40 C.F.R. Part 233). In this brief, Florida provides further details about Florida's statutes, regulations, policies, and other relevant background legal principles, while also sharing additional factual details about Florida's Section 404 program.

---

[3] Florida Intervenors are filing a *consolidated* opposition brief and cross-motion for summary judgment, total combined length not to exceed 50 pages consistent with this Court's order of January 31, 2023. *See* Dkt. 33.

[4] The Environmental Council of the States (ECOS), which is the nonpartisan association comprised of environmental agency leaders from *all 50 states*, recently adopted a resolution supporting state assumption of CWA 404 programs. The resolution is available at https://www.ecos.org/documents/resolution-08-3-state-delegation-of-clean-water-act-section-404-permit-program/ (last visited May 10, 2023).

A. **Florida's Comprehensive Approach to Environmental Protection and Conservation of Water Resources[5]**

The Florida Constitution establishes the "policy of the state to conserve and protect its natural resources and scenic beauty," with "[a]dequate provision" for the "conservation and protection of natural resources." Fla. Const. Art. II, Sec. 7(a). The "public policy of [Florida] [is] to conserve the waters of the state," Fla. Stat. § 403.021(2), and "to provide for the management of water and related land resources," *id*. § 373.016(3)(a). On this basis, Florida takes a comprehensive approach to protecting wetlands and other water resources. Those efforts have accelerated in recent years, with Florida dedicating an unprecedented amount of state funding to the restoration and protection of the Florida Everglades (over $3.3 billion since 2019), increasing investment in state environmental permitting programs, and completing efforts to obtain federal approval to administer the Section 404 permit program.[6] Uniquely, for water resource management purposes, Florida has divided the State into five "Water Management Districts," or "WMDs," each with technical staff trained to supplement the work of the Florida Department of Environmental Protection (FDEP) in conserving water resources in Florida.

Even before obtaining authority to administer the CWA Section 404 program, Florida had already spent many years (in some cases, decades) administering most other major federal environmental programs capable of state delegation/assumption, including:

- CWA Section 402 National Pollutant Discharge Elimination System (NPDES) Program;
- Clean Air Act (CAA) permit program including construction permits for minor sources,

---

[5] While Florida provides additional context in its background section, Federal Defendants' brief helpfully summarizes key aspects of Florida's Section 404 program. *See, e.g.,* Dkt. 99 at 45-46 (describing provisions of Florida's program that satisfy the 404(b)(1) requirements); Dkt. 99 at 46-48 (describing provisions of Florida law requiring FDEP to give written determinations that are subject to judicial review); Dkt. 99 at 48-50 (describing provisions of Florida's program addressing impacts to water quality from proposed 404 projects).

[6] *See* Executive Order No. 23-06 Signed by Governor Ron DeSantis (Jan. 10, 2023), available at https://www.flgov.com/wp-content/uploads/2023/01/EO-23-06.pdf (last visited May 10, 2023).

major source PSD and nonattainment permitting and Title V operating permits;

- Resource Conservation Recovery Act (RCRA) Subtitle C Program (Hazardous Waste);
- Coastal Zone Management Act (CZMA) Program (approved by the National Oceanic and Atmospheric Administration);
- Safe Drinking Water Act (SDWA) Program for regulating public water systems in Florida; and
- Underground Injection Control (UIC) Program.[7]

On top of these federally-approved programs, FDEP has administered various other state-specific environmental programs. For decades, FDEP has administered the State Environmental Resource Permit (ERP) Program, which is broader in scope than the federal Section 404 program because, among other things, ERP regulates dredging or filling of *all waters* in the State, not merely the narrower category of "waters of the United States" regulated under Section 404. EPA-HQ-OW-2018-0640-0007-A1 at 5-6; EPA-HQ-OW-2018-0640-0016-A-3 at App. J-3, ERP Comparison with Federal Requirements"; EPA-HQ-OW-2018-0017 at 3.

At the same time, Florida and its citizens experienced significant permit delays and other challenges with the Corps of Engineers' administration of the CWA Section 404 program within the State.[8] Florida believed that, consistent with the cooperative federalism framework of the CWA, FDEP and its staff would be better suited to administer the Section 404 program,

---

[7] *See* EPA, *NPDES State Program Authorization Information*, available at https://www.epa.gov/npdes/npdes-state-program-authorization-information (last visited May 10, 2023); EPA, *Clean Air Act Permitting in Florida*, available at https://www.epa.gov/caa-permitting/clean-air-act-permitting-florida (last visited May 10, 2023); *see* EPA, *State Authorization under the Resource Conservation and Recovery Act (RCRA)*, available at https://www.epa.gov/rcra/state-authorization-under-resource-conservation-and-recovery-act-rcra (last visited May 10, 2023); *see* NOAA, *Coastal Zone Management Programs*, available https://coast.noaa.gov/czm/mystate/ (last visited May 10, 2023); FDEP SDWA approval available at https://floridadep.gov/water/source-drinking-water (last visited May 10, 2023); EPA UIC program approval issued via regulation at 40 C.F.R. § 147.500.

[8] *See, e.g.,* Letter from Rep. Diaz-Balart (R-FL) and Rep. Alcee Hastings (D-FL) (Nov. 2, 2020). EPA-HQ-OW-2018-0640-0416-A2 (explaining that Everglades restoration projects have been "plagued by design, permitting, and construction delays under the U.S. Army Corps of Engineers").

particularly in light of FDEP's longstanding implementation of the ERP program, localized knowledge and experience, a larger number of FDEP offices and staff spread throughout the State, and the availability of Florida's five Water Management Districts. Florida also hoped to benefit from the improved economic climate that comes from more efficient government permit programs of any kind. In 2017, FDEP started efforts to obtain approval for its own Section 404 program. EPA-HQ-OW-2018-0640-0006 at 2; EPA-HQ-OW-2018-0640-0007-A1 at 5-6.

**B.      FDEP's Early Efforts to Prepare its Proposed Section 404 Program**

For many years, the State of Florida considered the possibility of assuming the federal 404 program. *See, e.g.*, Chapter 2016-195, Law of Florida (legislation in 2016 authorizing FDEP to pursue assumption). In March 2018, the Governor of Florida signed into law a new statute again authorizing FDEP to establish a Section 404 Program. *See* Chapter 2018-88, Laws of Florida (codified at Fla. Stat. § 373.4146). This new state law, which expanded upon previous state laws allowing for the pursuit of assumption, sought to "enable the [FDEP] to assume and implement the federal section 404 dredge and fill permitting program in conjunction with the environmental resource permitting program.…" Fla. Stat. § 373.4146(2).

In early 2018, FDEP began to discuss 404 assumption with the Jacksonville District of the Corps of Engineers as well as EPA (CORPS003213, at 1-2; EPA-HQ-OW-2018-0640-0649 at 20-21, providing a timeline of key events). In February 2020, after almost two full years of work by FDEP staff, FDEP initially proposed Section 404 regulations at the state level. EPA-HQ-OW-2018-0640-0006 at 2-3. An extensive state-level public notice and comment process ensued. *Id.* at 3. This included multiple public workshops and public meetings in April 2020. *Id.*  In response to the public notice process, FDEP modified the proposed regulations in various respects and ultimately finalized the State 404 regulations in June 2020. *Id.* at 3-4. The state regulations were adopted into the Florida Administrative Code (F.A.C.) but, by express statutory provision, were

not effective unless and until EPA approved Florida's program. *See* Fla. Stat. § 373.4146(2) ("…Any rule, standard, or other requirement adopted pursuant to the authority granted in this subsection for purposes of obtaining assumption may not become effective or otherwise enforceable until [EPA] has approved the state's assumption application."). FDEP's regulations creating the State 404 Program are now codified primarily at Chapter 62-331 of the Florida Administrative Code. EPA-HQ-OW-2018-0640-0006 at 3; EPA-HQ-OW-2018-0640-0002-A48.[9]

On August 20, 2020, Florida filed a complete application with EPA to administer a Section 404 Program. *See* EPA-HQ-OW-2018-0640-0002 through EPA-HQ-OW-2018-0640-0020 (including attachments). Florida's application contained all of the required elements of a State 404 program as set forth in 40 C.F.R. § 233.10. This included (among other things): (a) a letter from Florida's Governor requesting program approval; (b) a complete program description as set forth in 40 C.F.R. § 233.11; (c) a State legal opinion as set forth in 40 C.F.R. § 233.12; (d) a MOA with the EPA Regional Administrator as set forth in 40 C.F.R. § 233.13; (e) a MOA with the Corps of Engineers as set forth in 40 C.F.R. § 233.14; and (f) copies of all applicable State statutes and regulations, including those governing applicable State administrative procedures. Florida's application was available for public review via FDEP's website, EPA's website, and the Federal government's regulatory docket website.

The application documents comprehensively described and delineated Florida's 404 program. To help the public "understand the rules, procedures, standards, and criteria that apply to the State 404 Program," FDEP developed the "State 404 Program Applicant's Handbook." EPA-

---

[9] Plaintiffs in this action filed comments in the state rulemaking process opposing FDEP's assumption rules, but they did not seek further administrative or judicial review of the final State regulations. *See, e.g.,* EPA-HQ-OW-2018-0640-0391-A6.

HQ-OW-2018-0640-0002-A20 at 4. [10] More than mere guidance, the 404 Handbook is "incorporated by reference" into FDEP's regulations (*see* F.A.C. 62-331.010(5)), and "therefore operates as a rule of the Agencies." *Id.* As such, the Handbook was itself subject to public review and comment before adoption and serves as an authoritative compendium for reference by this Court (and for others seeking to understand how the State 404 Program is administered in Florida). This Handbook was included in the State's 404 application and was at all times available to the public, along with the other application materials.

On August 28, 2020, EPA acknowledged receipt of Florida's complete application (EPA-HQ-OW-2018-0640-0641), and promptly opened a public comment period and scheduled public hearings. 85 Fed. Reg. 57,853 (Sept. 16, 2020). Over 3,000 comments were submitted. EPA-HQ-OW-2018-0640-0568 at 1, 10-13. EPA held public hearings on Florida's Section 404 Program application on October 21 and October 27, 2020, via virtual platforms that allowed remote participation by any member of the public. EPA-HQ-OW-2018-0640-0429, 0430, 0574, 0575, 0589 and 0604. The State of Florida and FDEP consulted with the Seminole Tribe of Florida, Miccosukee Tribe of Indians of Florida, and other Indian tribes concerning Florida's assumption of the Section 404 Program. *See*, *e.g.*, EPA-HQ-OW-2018-0640-0223 at 6 (discussing Florida's cooperative engagement with tribes). FDEP entered into an Operating Agreement whereby FDEP committed to direct engagement with the Florida State Historic Preservation Officer (Florida SHPO) and interested Indian tribes early in the permit application review process. EPA-HQ-OW-2018-0640-0016-A1. FDEP also entered a Programmatic Agreement with EPA, the Advisory Council on Historic Preservation, and the Florida SHPO for purposes of Section 106 of the

---

[10] The currently applicable "404 Handbook" is available on the State of Florida administrative regulation website found at https://www.flrules.org/gateway/reference.asp?No=Ref-12064 (last visited May 10, 2023).

National Historic Preservation Act. EPA-HQ-OW-2018-0640-0595, 0630, and 0639.

Furthermore, Florida invested significant time and resources in preparing to assume authority to establish and implement the CWA Section 404 program. For example, in addition to obtaining statutory authority from the State legislature, adopting State regulations via the State of Florida's administrative rulemaking process, preparing all requisite application materials, and complying with extensive federal regulatory requirements, FDEP held more than a dozen staff training sessions beginning in August 2020 covering all aspects of the Section 404 program, as well as many meetings and interactions with outside stakeholders concerning the establishment and implementation of a Section 404 Program in Florida. EPA-HQ-OW-2018-0640-0006 at 3; *see also* Dkt. 4-2 at 6. The State of Florida and FDEP also ensured that the program would have the necessary resources. EPA-HQ-OW-2018-0640-0223 at 6-7.

Since assumption of the Section 404 program in December 2020, FDEP has received over 7,700 applications. *See* Wolfe Decl. ¶ 10. Currently, over 1,780 applications are pending review and determination by FDEP. *Id.* ¶ 11. To date, FDEP has issued 460 individual permits (including permit modifications) under the Section 404 program. FDEP has denied 168 applications (including individual permits, regional and general permit requests, and NPR requests). *Id.* ¶ 12. Approximately 2,900 applications have been withdrawn by permit applicants (in many instances, applications are withdrawn after FDEP staff submit requests for additional information or flag concerns with project proposals). *Id.* ¶ 13.

### C.    Florida's 404 Handbook is a Binding Rule that Helpfully Summarizes the Key Aspects of the Program.

As explained in the 404 Handbook, ERP permits are required for projects impacting any surface water in the State of Florida, while 404 permits are required for projects discharging dredged or fill material into "waters of the United States." EPA-HQ-OW-2018-0640-0002-A20 at

4-5. Any surface water in the State is, for 404 permitting purposes, "considered Waters of the United States" and FDEP "will treat them as if they are, *unless the applicant clearly demonstrates otherwise*." *Id.* at 5 (emphasis added). In other words, the presumption is that any project requiring an ERP will also require a Section 404 permit. And "[a]ctivities that require both an ERP and a State 404 permit shall not commence before both permits are issued." *Id.* As explained in further detail below, the Handbook and other Florida 404 Program-related materials specifically address how impacts to species and habitat are considered and addressed.

On December 17, 2020, EPA issued a notice determining that the State of Florida "has the necessary authority to operate a CWA Section 404 program in accordance with the requirements found in CWA section 404(g-l) and EPA's implementing regulations," and therefore approved Florida's assumption of the program. *See* EPA-HQ-OW-2018-0640-0566; *see also* 85 Fed. Reg. 83,553-54 (Dec. 22, 2020) at EPA-HQ-OW-2018-0640-0564.[11] The approval notice was sent from the EPA Regional Administrator to the Governor of Florida on December 17, 2020. EPA-HQ-OW-2018-0640-0566. Approval of the program became effective upon publication in the Federal Register on December 22, 2020, *see* 85 Fed. Reg. at 83,553, as provided under 40 C.F.R. § 233.15(h).

FDEP now administers two separate (yet overlapping) wetlands protection programs: the State's 404 Program and the State's ERP program. Projects within State-assumed waters require both an ERP and a State 404 Program authorization.

### D.    FDEP's Close Coordination with Federal & State Wildlife Agencies

Section 2(a)(5) of the Endangered Species Act (ESA) provides: "Federal agencies shall cooperate with [s]tate and local agencies to resolve water resource issues in concert with

---

[11] The parties dispute whether this "notice" constitutes an "order" under the APA. *See* 5 U.S.C. § 551(6), (8) (defining "order" and "license," respectively).

conservation of endangered species." 16 U.S.C. § 1531(a)(5). At Florida's request, EPA engaged in Section 7 consultation because EPA's review of Florida's Section 404 program application requires considering impacts to listed species and habitat.  Dkt. 99 at 29-30. EPA designated FDEP as the non-Federal representative for purposes of engaging in consultation with the U.S. Fish & Wildlife Service (FWS). EPA-HQ-OW-2018-0640-0635, -0636. FDEP submitted a Biological Assessment (BA) to EPA concerning the impact of Florida's Section 404 Program on federally listed species and critical habitat. FWS-006040. In turn, EPA prepared a Biological Evaluation (BE) and submitted it to EPA. EPA-HQ-OW-2018-0640-0649; FWS-005610.[12]

On November 17, 2020, FWS issued a Biological Opinion (BiOp) to accompany EPA's determination concerning Florida's 404 assumption request. EPA-HQ-OW-2018-0640-0642 at 12-14; FWS-006028. As is appropriate for programmatic consultations, the FWS BiOp with Incidental Take Statement (ITS) established procedures, terms, and conditions governing the review of state 404 permit applications with regard to impacts to federally-listed species and habitat. EPA-HQ-OW-2018-0640-0642. This included adoption of a "technical assistance process" - modeled after other programmatic consultation processes used by EPA - that brings together all relevant federal and state agencies to review projects for potential impacts to species and habitat. *Id.* at 31-35, 66-67, 80-83.

The "BiOp/ITS" explains that the Biological Evaluation "provided a detailed analysis of

---

[12] Based on information from the National Marine Fisheries Service (NMFS), which has jurisdiction over coastal and marine species, EPA reached the reasonable conclusion that federal approval of Florida's 404 permit program for assumable waters (i.e., not coastal or marine waters) would not be expected to have adverse impacts to species under NMFS jurisdiction. EPA-HQ-OW-2018-0640-0638; EPA-HQ-OW-2018-0640-0663; EPA-HQ-OW-2018-0640-0617; EPA-HQ-OW-2018-0640-0572. Section 3.2 of the Biological Evaluation discusses NMFS species, noting: "While ESA-listed species under NMFS jurisdiction are anticipated to occur only in retained waters, they are included in the BE as part of the comprehensive review of all Florida's imperiled species." EPA-HQ-OW-2018-0640-0649 at 52.

typical impacts related to stressors to ESA-listed species," while also explaining that the programmatic nature of the consultation does not allow for an actual estimate of the number of species individuals that might be affected by permitted activities. EPA-HQ-OW-2018-0640-0642 at 80. Instead, the BiOp/ITS explains: "through implementation of the State 404 program (62-331, F.A.C.) and EPA's oversight of the State 404 program and coordination of Federal review of state permit actions (40 C.F.R. § 233), this project-specific information will be provided to the USFWS because USFWS will receive all State 404 permit applications." *Id.* at 80-81.

The BiOp/ITS (and the technical assistance process that it utilizes) is well explained in the Federal Defendants' brief, with which Florida fully concurs. Dkt. 99 at 22-24. The main upshot, of course, is that, in all respects related to impacts to federally-protected species or habitat, the position of the federal agencies always controls: "With regard to conclusions about the potential effects of a project on ESA-listed species, their critical habitats, or the effectiveness of proposed protection measures, the final USFWS position is determinative." EPA-HQ-OW-2018-0640-0642, at 41. The BiOp/ITS repeats this point to make it abundantly clear. EPA-HQ-OW-2018-0640-0642, at 31 ("...final FWS conclusions regarding effects to species are determinative"); *id.* at 40 ("USFWS conclusions regarding potential impacts and necessary measures to address impacts are determinative"). The Memorandum of Understanding between FDEP, Florida Fish & Wildlife Conservation Commission (FWC), and FWS also expressly states that "the final FWS position" is "determinative" for purposes of "potential effects on ESA-listed species or the effectiveness of proposed mitigation measures." EPA-HQ-OW-2018-0640-0016-A2, at 10. As such, FDEP administers the 404 program fully committed to the requirement that any such determinations by FWS are binding. In the event FDEP did not accept or adopt any such requirement, EPA would be authorized to transfer the permit to the Corps. 33 U.S.C. § 1344(j)-(*l*); 40 C.F.R. § 233.50(j).

This reality is also made abundantly plain in the Florida 404 Handbook, which addresses reviews associated with protected species and habitat. Specifically, the Handbook explains that "[c]ompliance shall be required, as applicable, with any requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission (FWC), the US Fish & Wildlife Service, and the National Marine Fisheries Service (NMFS) for permits reviewed under the State 404 Program." EPA-HQ-OW-2018-0640-0002-A20 at 6. FDEP provides FWS, NMFS, and FWC with the opportunity to review all applications for projects "with reasonable potential for affecting endangered or threatened species." *Id.* at 23. FDEP is required to consult with or obtain technical assistance from these three agencies whenever FDEP "determines that the project may have the potential to affect listed species." *Id.* FDEP "shall incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by FWC, FWS, or NMFS under their respective authorities, to avoid jeopardizing listed species or adversely modifying designated or proposed critical habitat." *Id.* Importantly, "[i]f the FWC, FWS, or NMFS concludes that a permit application is likely to jeopardize or adversely modify designated critical habitat and no protection measures are available to reduce the risk to an acceptable level, [FDEP] shall deny the permit or shall take no action and notify EPA and the applicant of the decision in accordance with sub-subparagraph 62-331.052(3)(b)6.b., F.A.C." *Id.*

Programmatic consultation, as used here, is firmly engrained in the existing regulatory landscape as a means to streamline ESA consultation and improve conservation outcomes. As defined in the ESA regulations, "programmatic consultation" means "a consultation addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the Services to consult on the effects of programmatic actions such as: (1) Multiple similar,

14

frequently occurring, or routine actions expected to be implemented in particular geographic areas; and (2) A proposed program, plan, policy, or regulation providing a framework for future proposed actions." 50 C.F.R. § 402.02.

The programmatic approach used here was built upon and supported by the approach discussed in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49, 76-77 (2d Cir. 2018), where the Second Circuit upheld the use of programmatic consultation for an EPA water quality permit program that applied to state and EPA permitting actions, covered the entire country, and provided an incidental take statement that, using a technical assistance process, did not set a numerical cap on take but used a process for evaluating and limiting take on a permit-by-permit basis as the program was being implemented. Federal Defendants have fully explained why *Cooling Water* gives a solid basis for the kind of approach used here. Dkt. 99 at 75-76, 78-82.[13]

### E.    Public Access to Environmental Information in Florida

Florida's 404 program provides extensive, readily available, real-time information to interested members of the public, as well as a robust opportunity for involvement in the permit process. *See* Wolfe Dec. at ¶¶ 16-33. The 404 Handbook fully describes the public notice and comment process for FDEP 404 permits. EPA-HQ-OW-2018-0640-0002-A20 at 26-27. The

---

[13] The programmatic approach here is also supported by the Eleventh Circuit's decision in *Defs. of Wildlife v. Dep't of Navy*, 733 F.3d 1106, 1112-13 (11th Cir. 2013), which the Second Circuit relied upon. There, the Eleventh Circuit considered an ESA challenge to the Navy's undersea warfare training range off the coast of Florida. Environmental plaintiffs contended that a BiOp issued by NMFS failed to "meaningfully analyze" the "entire action" that was "proposed by the Navy," including the "the installation and the operation phases" of the training range. 733 F.3d at 1118. The Eleventh Circuit denied this challenge, rejecting the notion that BiOps "must be coextensive in scope with the 'entire action'." *Id*. at 1121. "It is for the agencies to determine how best to structure consultation to fulfill Section 7(a)(2)'s mandate." *Id*. (explaining that NMFS' decision was "due deference" as "there is no statutory basis for ordering that the consultation be carried out in some other manner"). The Eleventh Circuit was persuaded that, by leaving room for subsequent consultation activities to address future undersea training range operations, NMFS would "ensure that any adverse impacts to listed species will be considered closer in time to when operations will actually commence." *Id*. at 1122.

Handbook also describes the information that is developed as part of the permit review process, which includes, among other things, an analysis of project alternatives that would avoid impacts to wetlands; an analysis of environmental impacts (including cumulative and secondary effects, where appropriate); a review of impacts on state water quality; and written documentation on each application outlining the permitting decision and the rationale for the decision. All of this, and more, is made publicly available. Wolfe Dec. ¶¶ 18-23. In addition, Florida's Sunshine Laws (found at Chapter 119, Florida Statutes) provide very broad access to governmental records and information. Access to state records is a state constitutional right and Florida's Sunshine laws are broader than the federal corollary statute, the Freedom of Information Act, 5 U.S.C. § 552.[14]

Likewise, Florida provides *real-time access* to state permit records related to Section 404 permit applications via publicly accessible DEP websites. Written communications to or from state officials (including permitting staff) regarding state business are available to the public. Wolfe Dec. ¶ 20. Records and information are readily available at no cost via any one of four FDEP's online resources that contain detailed information about (1) areas classified as "assumable waters" (FDEP 404 permitting) versus "retained waters" (Corps 404 permitting); and (2) provides site-specific information about permit applications (including those that have been withdrawn, remain pending, etc.) and links to download the permit file. *Id.* These online resources are Florida's "Oculus" System, DEP Information Portal, FDEP Permitting Information

---

[14] See Fla. Const. Art. I, § 24 (establishing constitutional right of access to public records in Florida); Fla. Stat. § 119.07(1)(a) ("Every person who has custody of a public record shall permit the record to be inspected and copied by any person desiring to do so, at any reasonable time, under reasonable conditions, and under supervision by the custodian of the public records."); Fla. Stat. § 119.011(12) (broadly defining a "public record").

Database and FDEP ARCGIS Mapping Tool.[15] *Id.*

For example, a member of the public can go to a project location on the FDEP mapping tool (such as the "Troyer Mine" located in Lee County, which is cited in Plaintiffs' standing declarations), and, from there, access substantial information about the project. *Id.* ¶ 22. The public databases for this project provide extensive materials, including thousands of pages of permit application records, environmental reports, biological assessments, correspondence between federal and state agencies, public notice information, requests for additional information, and a host of other points of information. *Id.* For example, Troyer Mine project remains in "pending" status as FDEP is awaiting a response to its request for additional information. *Id.*

All major categories of environmental information available to the public under the Corps-led 404 program are also available to the public in a comparable manner after Florida's assumption of the Section 404 program.[16] *Id.* ¶¶ 24-30 and Enclosure D. This includes the essential contents of a NEPA Environmental Impact Statement (EIS) and/or Environmental Assessment, such as purpose and need for a project, alternatives to the project, information about the affected environment, environmental impacts (including cumulative effects, secondary effects, etc.), mitigation measures, socioeconomic information, historic/cultural/tribal information, species and habitat information, coastal zone impacts, and a wide range of "public interest" information. *Id.* ¶ 28 and Enclosure D.

---

[15] These databases provide more information on a real-time basis than is available from the Corps, which has an on-line permit database searching system available at https://permits.ops.usace.army.mil/orm-public# (last visited May 10, 2023).

[16] In response to this Court's request at the March 15, 2022 motions hearing, Florida Intervenors submitted a supplemental brief providing a "side-by-side" comparison of the environmental information available to the public that was available to Plaintiffs by virtue of NEPA review and ESA consultation when the Corps led the Section 404 program versus what is available now under the Florida-led program. *See* Dkt. 72.

F.      Florida's Authority to Enforce Section 404

As part of its application, FDEP had to satisfy federal requirements related to the State's authority to enforce the Section 404 program. Section 373.129(7), Fla. Stat., authorizes enforcement of the State 404 Program in the same manner and to the same extent as provided in other relevant parts of Florida's environmental laws. This includes reference to Sections 373.430 (criminal remedies water resources), 403.121(1) and (2) (civil and administrative remedies), 403.131 (injunctive relief), 403.141 (civil liability), and 403.161 (criminal remedies pollution control). EPA-HQ-OW-2018-0640-0013 at 6.

As in the federal system, enforcement in Florida can take the form of administrative, civil and/or criminal proceedings. Fla. Stat. § 403.121(1) (administrative, civil); Fla. Stat. § 403.161 and Fla. Stat. § 373.430 (criminal). Enforcement of the State 404 Program is implemented through FDEP's six regulatory district offices with the Office of General Counsel or the Office of the State Attorney providing legal support depending on the type of enforcement initiated. EPA-HQ-OW-2018-0640-0013 at 2, 6; Wolfe Dec. ¶ 34.

As required by 40 C.F.R § 233.41, FDEP is empowered to restrain unauthorized activity, (§§ 373.129(1) and 373.430(1)); to enjoin and abate violations of statutes, rules, and orders adopted pursuant to Chapter 373 (§ 373.129(2)); and to recover civil penalties up to $15,000 per violation (§ 373.129(5)). EPA-HQ-OW-2018-0640-0017 at 10; EPA-HQ-OW-2018-0640-0002-A51 at 50; EPA-HQ-OW-2018-0640-0002-A53 at 8. FDEP is also authorized to seek criminal remedies against someone who:

- with criminal negligence (reckless indifference or gross careless disregard) discharges dredged or fill material without the required permit or in violation of any permit condition in the amount up to $10,000 (§ 373.430(4));

- willfully discharges dredged or fill material without the required permit or in violation of any permit condition in the amount up to $10,000 (§ 373.430(5)); or

18

- knowingly makes false statements, representation or certification in any application, record, report, plan, or other document filed or required to be maintained part IV, Chapter 373, or falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required to be maintained under the permit in an amount of $10,000. (§ 373.430(1)(c) & (5)).[17]

*See also* EPA-HQ-OW-2018-0640-0017 at 10; EPA-HQ-OW-2018-0640-0002-A51 at 140; EPA-HQ-OW-2018-0640-0002-A53 at 10.

Additionally, EPA may file its own enforcement actions, even where there is a state program in place, pursuant to EPA's authority under Section 309 and 404(n) of the CWA. In other words, though rarely exercised in most state program contexts, EPA may initiate independent or parallel enforcement actions to any Florida enforcement action involving the Section 404 program. EPA-HQ-OW-2018-0640-0017 at 10; *see also* EPA-HQ-OW-2018-0640-0018 at 10; EPA-HQ-OW-2018-0640-0568 at 72.

### G. Plaintiffs' Ability to Impact FDEP Permit Actions and to Challenge FDEP 404 Permits under Florida Law

As Federal Defendants correctly observed (Dkt. 99 at 47-48), Florida's program includes a system of administrative checks that allow the public to hold the State accountable if it errs in granting or denying a permit. Likewise, Florida's program gives many opportunities for public engagement throughout the permitting process as well as ample opportunities to bring permit

---

[17] In relevant part, 40 C.F.R. § 233.41(a)(3) requires a state agency to have authority to "seek criminal fines against any person who *willfully* or with *criminal negligence* discharges dredged or fill material without a required permit or violates any permit condition issued under section 404." Emphasis added. Further, 40 C.F.R. § 233.41(b)(2) requires "[t]he *burden of proof* and *degree of knowledge or intent required under State law* for establishing violations under paragraph (a)(3) of this section, shall be *no greater* than the burden of proof or degree of knowledge or intent EPA must bear when it brings an action under the Act." Emphasis added. Florida statutes §§ 373.430(1)(b), (1)(c), (4) & (5) as summarized in the text above comply with this requirement. The requirements in 40 C.F.R. § 233.41(b)(2) related to the degree of knowledge or intent are only applicable to crimes requiring willfulness or knowledge and not criminal negligence, which does not require intent or knowledge by definition.

challenges under the Florida APA (Fla. Stat. Ch. 120) and the Florida Environmental Protection

Act (Fla. Stat. § 403.412). In fact, just as environmental groups have a right to broader information

under Florida's Sunshine laws, Florida administrative law also gives them greater opportunities to

use that information to advance their interests in permit challenges. Consistent with the federal

process, an environmental group (or other person) may submit any information that they would

like during the public notice and comment process. *See* F.A.C. § 62-331.060 (describing public

notice and comment procedures).

Florida law also provides for a *de novo* permit hearing before a Florida 404 permit becomes

effective, which provides affected parties with an additional opportunity to obtain and submit even

more information (including via depositions and interrogatories) and to ensure consideration of

that additional information in the hearing record. *See* Fla. Stat. § 120.57(1)(b). Environmental

groups have at least three avenues for establishing standing to challenge state 404 permit actions

under Florida law. But most importantly for this case, Florida law expressly provides that, "[i]n a

matter pertaining to a federally delegated or approved program," like Florida's Section 404

program, "a citizen of the state may initiate an administrative proceeding under this subsection *if

the citizen meets the standing requirements for judicial review of a case or controversy pursuant

to Article III of the United States Constitution*."[18] Fla. Stat. § 403.412(7) (emphasis added). In

---

[18] In addition, environmental groups can also establish standing under state law in several other ways. First, under the seminal case in Florida known as *Agrico Chem. Co. v. Dep't of Env't Regul.*, 406 So. 2d 478 (Fla. 2d DCA 1981), plaintiffs have standing to challenge permitting actions if they can demonstrate that their "substantial interests" are determined or affected by the action and their interests fall within the zone of interests of the relevant program. Under the *Agrico* framework, associations have standing if a "substantial number of its members, although not necessarily a majority, are substantially affected'...." *Fla. Home Builders Ass'n v. Dep't of Labor and Emp't Sec.*, 412 So. 2d 351, 353-54 (Fla. 1982). This is the traditional avenue for environmental plaintiffs to obtain standing in Florida. Second, under separate statutory authority, environmental groups in Florida with "at least 25 current members residing within the county where the activity is proposed" have *automatic standing* to challenge a permitting action. *See* Fla. Stat. § 403.412(6).

other words, if Plaintiffs seek to challenge a permitting decision by FDEP under Florida's Section 404 Program, Florida law will simply require them to satisfy Federal standing doctrine. *Id.*

Environmental groups can build the administrative record in a *de novo* hearing, with testimony, presentation of experts, and questions directed toward state environmental officials and permit writers, something that is not available to them under federal procedures. Of course, nothing prevents them from using the same information that they provided during the public comment process during an administrative hearing.

Likewise, FDEP's issuance of a permit is not final agency action if an administrative challenge is timely filed (meaning that the permit is automatically stayed pending resolution of the administrative challenge). *See* Fla. Stat. § 120.569, § 120.57. In Florida, the "administrative hearing process is designed to formulate agency action" so FDEP's "final action may be different from the proposed agency action and may result in the issuance of a permit as requested by the applicant or as modified in the course of the [administrative] proceeding or by settlement." F.A.C. § 62-110.106(7)(e)(2). Since permit challenges in Florida are *de novo* proceedings, FDEP's initial determination receives *no deference* and all of the parties—*including any environmental challengers*—have the "opportunity to respond, to present evidence and argument on all issues involved, [and] to conduct cross-examination and submit rebuttal evidence. . . ." *Id.* § 120.57(1)(b); *see*, *e.g.*, *Hamilton Cnty. Bd. of Cnty. Comm'rs v. Fla. Dep't of Env't Regul.*, 587 So.2d 1378, 1387-88 (Fla. 1st DCA 1991). In other words, these *de novo* administrative proceedings are designed to give aggrieved "parties an opportunity to change the agency's mind." *Capeletti Bros. v. Dep't of Gen. Servs.*, 432 So.2d 1359, 1363 (Fla. 1st DCA 1983). If the administrative process results in a final order issuing the permit, Florida law provides for a right to seek judicial review.

*See* Fla. Stat. § 120.68.[19]

In Florida, the "reviewing court's decision may be mandatory, prohibitory, or declaratory in form, and it shall provide whatever relief is appropriate irrespective of the original form of the petition." Fla. Stat. § 120.68(6)(a). Florida courts may, among other things, "[o]rder agency action required by law; order agency exercise of discretion when required by law; set aside agency action; remand the case for further agency proceedings; or decide the rights, privileges, obligations, requirements, or procedures at issue between the parties; and [o]rder such ancillary relief as the court finds necessary to redress the effects of official action wrongfully taken or withheld." *Id.* If the "court sets aside agency action or remands the case to the agency for further proceedings, it may make such interlocutory order as the court finds necessary to preserve the interests of any party and the public pending further proceedings or agency action." *Id.* § 120.68(6)(b). And as Federal Defendants also noted, the court shall remand a case to the agency for further proceedings consistent with the court's decision or set aside agency action, as appropriate, when it finds the "agency's action depends on any finding of fact that is not supported by competent, substantial evidence in the record of a hearing conducted pursuant to §§ 120.569 and 120.57; however, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact." *Id.* § 120.68(7)(b).

Likewise, if the "fairness of the proceedings or correctness of the action may have been impaired by a material error in procedure or a failure to follow prescribed procedure," the court

---

[19] Under Florida law, any person "substantially affected" by an FDEP rule or proposed rule may seek an administrative determination that the rule is invalid. *See* Fla. Stat. § 120.56(1)(a); § 120.569(1). Florida courts have interpreted Chapter 120 liberally to achieve the statutory purpose of increasing public participation in agency decisions. *NAACP, Inc. v. Fla. Bd. of Regents*, 863 So. 2d 294, 298 (Fla. 2003); *Palm Beach Cnty. Env't Coal. v. Fla. Dep't of Env't Prot.*, 14 So.3d 1076 (Fla. 4th DCA 2009). This includes the opportunity to challenge the validity of an existing rule "at any time during which the rule is in effect." Fla. Stat. § 120.56(3).

may set it aside. *Id*. And the same is true if the "agency has erroneously interpreted a provision of

law and a correct interpretation compels a particular action…" *Id*. The same is true if the "agency's

exercise of discretion was," among other things, "[o]utside the range of discretion delegated to the

agency by law" or "inconsistent with agency rule," such as FDEP's Section 404 program rules or

handbook. Id. § 120.68(8). And under Florida law, unlike federal law, agencies do not receive any

deference to their interpretations. Fla. Const. Art. V, § 21 ("In interpreting a state statute or rule, a

state court or an officer hearing an administrative action pursuant to general law may not defer to

an administrative agency's interpretation of such statute or rule, and must instead interpret such

statute or rule de novo.").

### H.     EPA Oversight of FDEP Permit Decisions

After approving a State program, EPA maintains an active role to ensure compliance with

the requirements of Federal law. *Id*. § 1344(i)-(j). First, EPA oversees the State permitting process

– both on a program level as well as permit-by-permit basis – to ensure continued compliance with

Federal requirements. *Id*. § 1344(h); 40 C.F.R. § 233, Subpart F (Federal Oversight). For example,

unless a kind of activity is exempted by EPA under Section 404(k)(1), a State must provide EPA

with a "copy of each permit application received by such State and provide notice to [EPA] of

every action related to the consideration of such permit application, including each permit

proposed to be issued by such State," along with a "copy of each proposed general permit which

such State intends to issue." *Id*. § 1344(j). EPA may provide comments or otherwise "object" to

the issuance of any permit by the State. *Id*. And EPA may hold a public hearing on its objection.

*Id*. Ultimately, if the State rejects EPA's comments or changes, the State must deny the permit or

that particular permit must be federalized (*i.e.*, the Corps takes over issuance of that particular

permit).[20] *Id.*; *see also* Mem. of Agreement between FDEP and EPA (July 31, 2020) at EPA-HQ-OW-2018-0640-0018 at 7-9; F.A.C. § 331.052(3)(b) at EPA-HQ-OW-2018-0640-0002-A48 at 8-9. Besides EPA and the Corps, other Federal agencies also have significant opportunities for involvement in State 404 permits. *See, e.g.*, 33 U.S.C. §§ 1344(h)(1)(F) (U.S. Coast Guard); 1344(m) (FWS); *see also* 40 C.F.R. § 233.15(d) (requiring EPA to submit copies of the State's submission to the Corps, FWS, and NMFS); 40 C.F.R. § 233.15(g) (requiring EPA to respond to comments from those agencies).

Second, EPA remains actively involved in the administration of the State program as a whole. Any State seeking to administer its own Section 404 program must enter a memorandum of agreement with EPA that, among other things, requires submission of regular "reports, documents and other information" to EPA along with an "annual report" documenting the State's administration of its program. 40 C.F.R. § 233.13. States are also required to "allow EPA routinely to review State records, reports and files relevant to the administration and enforcement of the approved program." *Id.* § 233.13(b)(2); *see also id.* § 233.52 ("Program reporting"). As part of this oversight function, Florida provides EPA with copies of No Permit Required (NPR) letters for review as requested (although all NPR information is publicly accessible on FDEP's website).[21] Wolfe Dec. ¶¶ 41, 45. An applicant may apply for a State 404 NPR verification when the activity

---

[20] Since program approval, EPA has raised objections to some of Florida's proposed decisions on Section 404 permits. In just three instances, however, EPA has determined that Florida had not, in EPA's view, adequately addressed EPA's concerns, and thus, EPA transferred processing of the permit to the Corps (i.e., federalized the permit application). Wolfe Dec. ¶ 31. While Florida disagreed with EPA's decision in those instances, this is how the oversight mechanism in the CWA Section 404 program is designed to work. *Menominee Indian Tribe of Wis. v. Env't. Prot. Agency*, 947 F.3d 1065, 1071 (7th Cir. 2020) ("where Section 404 permitting authority has been delegated to a state, the EPA retains an oversight role… The EPA reviews, and can object to, proposed permits…If the agency lodges objections, the state cannot issue a permit without revising and resubmitting it for approval…").

[21] *See* https://fldep.dep.state.fl.us/parep/pa_query_pa_data.asp (last visited May 10, 2023)

has avoided all impacts to wetland or surface waters delineated using 62-340, F.A.C., or when the activity has been designed to only impact wetlands or surface waters that are excluded from jurisdiction as waters of the United States. *Id.* ¶ 43. NPR verifications are voluntary, non-binding advisory letters designed to assist the regulated community and help to promote overall compliance with the law. *Id.* ¶ 42.

Third, where a State program does not comply with Federal standards, EPA may seek to withdraw the program. 33 U.S.C. § 1344(i). EPA regulations set forth the withdrawal process, which includes an opportunity for the State to "take corrective action"; an "informal review" to determine whether "cause exists" to commence formal proceedings; a formal hearing on the record that is announced in the Federal Register; completion of proceedings in general conformance with EPA's Consolidated Rules of Practice found at 40 C.F.R. Part 22 (with opportunities for interested parties to intervene as parties or participate as *amici curiae*); a recommended decision by a hearing officer with compilation of a full hearing record; and ultimately a determination by the Administrator of EPA with a "list" of "deficiencies in the program" (if any) and "providing the State a reasonable time, not to exceed 90 days, to take such appropriate corrective action as the Administrator determines necessary." 40 C.F.R. § 233.53(b)-(c). If the State fails to correct the deficiencies, EPA "shall issue a supplementary order withdrawing approval of the State program," and such order "shall constitute final Agency action" subject to judicial review under the Administrative Procedure Act. *Id.* § 233.53(c)(8)(vi)-(vii). Withdrawal proceedings can be initiated by EPA "or in response to a petition from an interested person alleging failure of the State to comply" with Federal requirements. 40 C.F.R. § 233.53(c). Thus, the Section 404 assumption process ensures expedited admission of States into the program, with ongoing federal oversight and a careful, deliberate process for correcting or withdrawing deficient State programs.

Where a State has not assumed responsibility for its own Section 404 program or has its program withdrawn, the Corps retains responsibility to issue permits authorizing the "discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). In that context, where the federal-state roles are reversed from Congress' preferred alignment, States play a supplementary role in the Federal 404 permitting process, including, for example, through the process of certifying that Corps permitting actions comply with State water quality standards pursuant to CWA Section 401, 33 U.S.C. § 1341, and state concurrence review under the Coastal Zone Management Act, 16 U.S.C. §§ 1451, et seq.

Taken together, Florida administrative and environmental law-including Florida's new Section 404 program combined with the federal overlay arising from EPA oversight of Florida's Section 404 Program-ensures that Florida's water resources are conserved and protected consistent with federal standards.

## STANDARD OF REVIEW

Standing is an "essential and unchanging" requirement for judicial review in any case, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). And "standing is not dispensed in gross." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021). It must be "demonstrate[d] for each claim" and "for each form of relief that [Plaintiffs] seek." *Id.* at 2208. The "irreducible constitutional minimum of standing" requires that Plaintiffs demonstrate, for each claim, that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2015) (citing *Lujan*, 504 U.S. at 560).

Plaintiffs bear the burden of establishing that a court has jurisdiction to hear each of their claims. *See Sierra Club v. EPA,* 292 F.3d 895, 899 (D.C. Cir. 2002). In the D.C. Circuit, Plaintiffs must include in their opening briefs sufficient evidence to demonstrate their standing where it is

not self-evident. *Id.* at 900. Moreover "[a]bsent good cause shown," Plaintiffs should not expect the court to allow them to submit evidence of standing for the first time in their reply brief or after oral argument. *Id.*

Plaintiffs must satisfy each element of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan,* 504 U.S. at 561. While general factual allegations of harm may suffice at the pleading stage, such "mere allegations" are insufficient to support standing at the summary judgment stage. *See id.* Instead, a plaintiff "must provide affidavits or other evidence to demonstrate the specific facts necessary to support standing," *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 188 (D.D.C. 2022) (citing *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015)).

Florida adopts and incorporates by reference the Standard of Review for summary judgment as set forth in the Federal Defendants' brief. *See* Dkt. 99 at 33-34.

## ARGUMENT

**I.    Plaintiffs' Claims Are Not Subject to Judicial Review Due to Lack of Standing, Lack of Final Agency Action, or Lack of Ripeness.**

### A.    Plaintiffs Lack Standing For All Claims Based on Purported Informational Injuries.

Plaintiffs seem to suggest that certain alleged informational losses provide standing to support all of their claims in gross. Dkt. 98 n.39 at 76. They make no effort to expressly connect their alleged informational losses to specifically numbered claims in the Amended Complaint, but it appears that they want this Court to assume that their "loss" of environmental information creates standing to challenge essentially everything: EPA's approval of Florida's program in totality, the programmatic consultation approach, and the Corps' approach to assumable waters (i.e., all claims

except Claims 1, 8, 9). However, by alleging informational injury for *all of these claims*, Plaintiffs have made no direct showing of harm for *any specific claim. TransUnion,* 141 S. Ct. at 2207. Since standing is not dispensed in gross, this Court must find that, as alleged, Plaintiffs' informational losses do not support standing here.

To the extent the Court considers the informational standing arguments further, they should be rejected as to each claim. Contrary to Plaintiffs' assertions, their purported informational injuries do not support standing for any claims asserted here. Indeed, there is no actual loss of meaningful information for which Plaintiffs experience cognizable injuries. To support standing for informational injury, Plaintiffs assert a loss of information in two respects: first, the "loss of ESA Section 7 consultation on 404 permits in assumed waters"; and second, "the loss of NEPA analysis..." Dkt. 98 at 75. Neither works.

Florida Intervenors have previously briefed this question in significant detail and re-adopt those points here. *See* Dkt. 37 at 56-57; Dkt. 46 at 23-25; Dkt. 72 (Florida's supplemental brief concerning availability of environmental information). These "losses" of information are not cognizable grounds for asserting standing because Congress, not EPA, decided that state programs are not subject to the NEPA provisions that may trigger environmental impact statements. Nor are they subject to ESA Section 7's provisions that may result in biological assessments and the ensuing BiOps. 16 U.S.C. § 1536(a)(2) ("Each Federal agency shall … insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any [listed] species…") and 16 U.S.C. § 1536(a)(2) ("…Each Federal agency shall…conduct a biological assessment…"). Thus, EPA did not cause any purported loss of information; Congress did. Dkt. 99 at 67 n.19 (explaining that "Congress decided that neither NEPA review nor ESA consultation is required" for state permits). The "levels of environmental

review," which Plaintiffs believe are missing are only missing, if at all, by congressional design. *See Ass'n of Am. Physicians & Surgeons v. Sebelius*, 901 F. Supp. 2d 19, 42 (D.D.C. 2012) (holding that injuries "caused by statutes and regulations that pre-date the agency actions plaintiffs' challenge" suffered from "a causation problem" and the harms were "not redressable"); *Ecological Rights Found. v. EPA*, No. CV 19-2181, 2022 WL 4130818 , at *14 (D.D.C. Sept.12, 2022) (finding no injury where "EPA followed Congress's instructions to the letter" and authority for the decision being challenged was bestowed by Congress); *see also Ctr. for Biological Diversity v. Zinke*, 369 F. Supp. 3d 164, 181 n.5 (D.D.C. 2019) ("Although the federal defendants mention informational standing in their motion to dismiss, . . . plaintiffs put forth no argument for informational standing in their opposition and fail to identify any statute entitling them to any information deprived under the Service's new policy); *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (stating that in order to claim informational standing, a plaintiff must allege: "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.").

But even if that was not determinative here, Florida Intervenors have shown how Plaintiffs do not actually suffer the loss of information they claim. Dkt. 72. With this brief, Florida Intervenors have provided a declaration by the General Counsel of FDEP addressing, among other things, the alleged loss of environmental information and access to permit records. Wolfe Dec. ¶¶ 24-30.

First, Plaintiffs contend that EPA's approval of Florida's program "removed Plaintiffs' access to critical environmental analyses that Plaintiffs use to educate the public, engage in advocacy, and seek redress for environmental harm." Dkt. 98 at 76. But Plaintiffs receive the same

kinds of environmental information under the Florida-led program as they did under the Corps-led program, and in many respects, they receive *more information more quickly*. Wolfe Dec. ¶¶ 25, 28. The side-by-side comparison demonstrates Florida's point here. *Id.* at Enclosure D.

Moreover, in asserting informational injuries, Plaintiffs vastly overstate the extent to which an EIS or biological opinion is prepared for Corps-led 404 permits. In fact, relatively few permit applications under the Corps-led program in Florida resulted in preparation of a BiOp and/or EIS. Wolfe Dec. ¶¶ 26-27. And for that narrow category of projects, many (if not most) would still generate the exact same federal BiOp and EIS *after assumption* because of some other federal nexus. Wolfe Dec. ¶ 27; Dkt. 72 at 5-8. That is because Section 404 permitting is usually *not* the only federal nexus for the kinds of major projects that result in a BiOp and/or EIS. Projects that involve use of federal lands (4.5 million acres of federal lands in Florida),[22] use of federal funds (such as major transportation projects), or other federal "hooks" will likely continue to require the same BiOp or EIS that they required pre-assumption. Some projects that Plaintiffs listed in their brief and/or standing declarations, such as the withdrawn application for an oil development project (Nobles Grade/Burnett Oil) in South Florida, would be located on federal lands within the Big Cypress National Preserve and, thus, would likely require NEPA and ESA compliance on that basis (independent of a Section 404 permit).

And while Plaintiffs make much in their briefs on the lack of NEPA review, that point is glaringly omitted from their Amended Complaint, which only contains one minor reference to NEPA – and that reference is in relation to the already resolved Claim 8. Dkt. 77 at 47 (Amended Complaint) (listing removal of citizen's NEPA rights as a substantive legal effect of EPA's giving

---

[22] Congressional Research Service, *Federal Land Ownership: Overview and Data*, at 7 (Feb. 21, 2020) (showing approximately 12.9% of the surface area of Florida as owned or managed by federal agencies) (https://sgp.fas.org/crs/misc/R42346.pdf (lasted visited May 10, 2023)).

its approval an immediate effective date when published in the Federal Register).

Likewise, nothing in the ESA provides any right of access to review and comment on BiOps. Dkt. 99 at 38-40. Under ESA Section 7 and its regulations, formal consultation is between the action agency (here, EPA) and the consulting agency (here, FWS), and there is no requirement for public notice and comment or public access to the action agency's biological assessment or the consulting agency's BiOp during the consultation process. *See* 50 C.F.R. § 402.12 (setting forth procedures for biological assessments and not requiring publication or public notice and comment); *id.* § 402.14(g)(5) ("The applicant may request a copy of the draft opinion from the Federal agency. All comments on the draft BiOp must be submitted to the Service through the Federal agency, although the applicant may send a copy of its comments directly to the Service."). Thus, for purposes of consultation under the Corps-led 404 program, while the project applicant may be involved, there is no *right* of notice and comment for the public within the Section 7 consultation process. *Cooling Water Intake Structure Coal.*, 898 F.3d 173, amended, 905 F.3d 49, 78 (2nd Cir. 2018) ("[T]here is no independent right to public comment with regard to consultations conducted under §7(a)(2) of the ESA…So no procedural infirmity arises in failing to provide notice of or an opportunity to comment on the biological opinion or other determinations by the Services."); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 660 n.6 (2007) (explaining that there is not an "independent right to public comment with regard to consultations conducted under § 7(a)(2)" of the ESA).

In their declarations, Plaintiffs now point to a long list of specific projects that they claim as a basis for injury. The Wolfe Declaration provides an update on the status of each of those projects with pending applications. Wolfe Dec. ¶ 17 and Enclosure A. Plaintiffs referenced several proposed projects for which a Section 404 application has *not* been submitted. Various other

projects referenced in Plaintiffs' declarations have been *withdrawn* by the permit applicant and are no longer pending (*e.g.*, Nobles Grade/Burnett Oil; Tamiami Prospect; State Road 836, Port 1850). Plaintiffs also referenced the CPN West LLC project, a commercial development that met the requirements for a No Permit Required letter. None of these projects can supply the basis for standing. Each of the active applications seeking Section 404 permits, as referenced by Plaintiffs for standing, are described in Enclosure A of the Wolfe Declaration, with a link to the relevant FDEP online permit files, which clearly demonstrate that each of these projects are in the midst of a pending review process with direct involvement by state and federal agencies, including FWS and FWC. Those agencies are actively involved in evaluating projects and providing the technical assistance contemplated by the BiOp/ITS. As just one example (among several described in Enclosure A), the permit file for the FFD (Orchid) project, with FDEP Permit No. 0291030-004-SFI, contains an applicant-prepared Biological Assessment (with over 1,100 pages of documentation) as well as an environmental site assessment of more than 200 pages (completed at the request of FWS). As a careful review of FDEP's publicly-available permitting records show, FWS and FWC are clearly engaged in reviewing and evaluating the projects, and the same kinds of information that Plaintiffs decry as lacking are available for them to review, or will be through the completion of the permit process.

## B.   Plaintiffs Cannot Challenge EPA's Completeness Determination (Claim 1).

Plaintiffs also challenge EPA's finding that Florida's application was "complete" for purposes of allowing EPA to begin the process of evaluating whether to approve or disapprove the program. Dkt. 99 at 38-45. Florida Intervenors concur with Federal Defendants' argument that Florida's application was complete, and certainly EPA's decision to find it complete was not arbitrary. But before reaching the merits of this issue, the Court should carefully weigh whether such claims are even properly subject to judicial review. Here, Florida suggests at least two

grounds for finding this claim non-justiciable.

One, the finding by an agency of an application's completeness lacks the hallmarks of "final agency action" for purposes of the Administrative Procedure Act (APA). Agency actions are "final" under the APA if, first, it "marks the consummation of the agency's decisionmaking process—*it must not be of a merely tentative or interlocutory nature*," and second, it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 592 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)) (emphasis added).

Taking those two elements in turn, the first is not met here as the "completeness" determination is not the "consummation of the agency's decisionmaking process." It is just the beginning of the process - the very first step in EPA's process for reaching a final determination. *See Fed. Trade Comm'n v. Standard Oil Co.*, 449 U.S. 232, 241 (1980) (explaining that a "threshold determination that further inquiry is warranted" is not a "definitive statement of position," thus it is not final agency action); *Hous. Study Grp. v. Kemp*, 736 F. Supp. 321, 331 (D.D.C. 1990) ("Agency action which merely initiates proceedings has no legal force, is not a definitive statement of position, and therefore is not final agency action ripe for review.").

But even on the second step, though consequences may flow from a completeness determination – namely, the triggering of a 120-day clock for EPA to make a final decision - that is it. And that 120-day clock was created by congressional design to protect the interests of the State applicants, not the public. Dkt. 37 at 15-16. There are no consequences *impactful to Plaintiffs* that would give rise to standing here. The completeness determination merely gets folded into the final approval determination, which becomes the final agency action subject to review. Plaintiffs cite no cases recognizing that an agency's finding of completeness is reviewable.

<u>Two</u>, even if the "completeness" finding is final agency action, Plaintiffs fail to show how *they* suffer any cognizable injury related to EPA's completeness determination. Indeed, Plaintiffs have not cited, and Florida Intervenors have not located, any case law standing for the proposition that a non-applicant would have standing to challenge an agency's finding that an application is complete.[23] The absence of precedent is telling here.

### C. Plaintiffs Suffer No Injuries from State Assumption of *Primary* Permitting Responsibility, Especially Where EPA Maintains Program-Level and Permit-by-Permit Oversight and Independent Enforcement Authority (Claim 2).

#### 1. Plaintiffs Lack Standing to Challenge State 404 Assumption Generally.

Plaintiffs assert both organizational and associational standing "to challenge EPA's unlawful approval of Florida's 404 program (Claim 2)" based on alleged informational injuries from the transfer of the primary permitting authority to the State.[24] Dkt. 98 at 78. However, as shown in Argument Section I.A above, there is no actual loss of meaningful information for which Plaintiffs experience cognizable standing injuries.

Plaintiffs also allege that their members have standing for Claim 2 because "as a result of EPA's action, the State is considering (and approving) permit applications that substantially risk

---

[23] In its argument concerning standing to challenge the completeness of the application, Plaintiffs cite two cases, Dkt. 98 at 77-78, none of which address standing to challenge the completeness of an application. Neither *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983), nor *Center for Biological Diversity v. Zinke*, 369 F. Supp. 3d 164, 179 (D.D.C. 2019), involved a challenge to the completeness of an application.

[24] To establish organizational standing a party "must show that it suffers or will imminently suffer 'a concrete and demonstrable injury to its activities, distinct from a mere setback to the organization's abstract social interests [and] the presence of a direct conflict between the defendant's conduct and the organization's mission.'" *Ctr. for Biological Diversity*, 597 F. Supp. 3d at 194 (quoting *Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d 1249, 1255 (D.C. Cir. 2018) (cleaned up). "To establish associational standing, an organization must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Dkt. 30 at 2 (quoting *Env't Integrity Project v. McCarthy*, 139 F. Supp. 3d 25, 38 (D.D.C. 2015)).

harm to their members' aesthetic, recreational, and other interests by authorizing developers to fill precious wetland habitat for projects that will harm threatened and endangered species." *Id.* In truth, Florida's expanded role causes no increased risk of injury relative to the pre-assumption 404 program, especially because EPA maintains oversight on a permit-by-permit basis.[25] To be sure, if Florida approved a proposed project without appropriate mitigation, that could result in harm to Plaintiffs' aesthetic, recreational, and other interests in wetlands or protected species. But that would be equally true if the Corps approved such a proposed project before assumption. Thus, any such harm is not specific to the State issuing the permit instead of the federal government, and thus is not an injury fairly traceable to EPA's approval of Florida's 404 Program.

On that relevant metric, Plaintiffs have not established any proof that state permitting will be less rigorous than pre-assumption federal permitting--especially given that the EPA retains permit-level review and oversight more generally over Florida's actions. Mere speculation of future harm cannot support standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (a "threatened injury must be certainly impending to constitute injury in fact, and that [a]llegations of possible future injury are not sufficient") (internal quotations and citations omitted). Because Plaintiffs have proffered no evidence of any concrete, particularized harms caused by Florida making a Section 404 permitting decision instead of the federal government, they have failed to meet their burden of proof on standing.

Next, Plaintiffs' standing declarations assert injury from EPA's approval of Florida's 404 Program because now any challenge to 404 permitting decisions must be filed in state court rather

---

[25] Though Florida does not rehash the argument here, Florida preserves and incorporates by reference its previously-made argument that Plaintiffs' claims are not redressable because of the "deemed approved" provision found in 33 U.S.C. § 1344. Dkt. 37 at 59-64.

than federal court, which allegedly has a different standard of review,[26] fee shifting provisions, and more restrictive standing requirements.[27] Plaintiffs aversion to state courts and preference for federal courts is baseless. *Menominee Indian Tribe*, 947 F.3d at 1071 ("It is not the unique province of the federal courts to adjudicate administrative law challenges related to the Clean Water Act…Nothing has been brought to our attention to suggest that the Tribe cannot receive full and fair review in a Michigan court."). Plaintiffs do not identify any pending or planned state court litigation, much less explain how these supposed differences constitute a cognizable Article III injury. In fact, as discussed above, the fee shifting provision at Section 403.412(2)(f) "applies only to circuit court actions for injunctive relief," not administrative actions,[28] and there is no difference in standing because Florida law expressly provides that, "[i]n a matter pertaining to a federally delegated or approved program," like Florida's Section 404 program, "a citizen of the state may initiate an

---

[26] Plaintiffs provide no actual evidence beyond general speculation that the *de novo* standard of review in state court would negatively impact unidentified future litigation involving state issued 404 permits. First, as explained above, Plaintiffs are free to submit comments, including technical information, to FDEP during the administrative review of the permit application, similar to the federal process, which will be part of the administrative record of the agency. If Plaintiffs chose to challenge the FDEP's permit decision, they have the option in a *de novo* proceeding to supplement the administrative record if they wish. But this is not a requirement and Plaintiffs can rely on documents submitted in the notice and comment process to litigate their claim. Second, under the *de novo* standard, FDEP's initial determination receives *no deference* and all of the parties—*including any environmental challengers*—have the "opportunity to respond, to present evidence and argument on all issues involved, [and] to conduct cross-examination and submit rebuttal evidence....". F.S § 120.57(1)(b). This is an advantage for Plaintiffs seeking to challenge FDEP 404 permits, not an injury.

[27] *See* Carter Dec. ¶ 25; Crooks Dec. ¶¶ 37-40; Hartl Dec. ¶¶ 26, 28; Rinaman Dec. ¶¶ 21-22; Silverstein Dec. ¶¶ 12-14; Robertson Dec. ¶¶ 18, 27; and Umpierre Dec. ¶¶ 70-72 regarding higher costs of state court. See Carter Dec. ¶ 25; Crooks Dec. ¶ 41; Hartl Dec. ¶ 27; Rinaman Dec. ¶ 23; Silverstein Dec. ¶ 15; Robertson Dec. ¶ 18; and Umpierre Dec. ¶ 71 regarding standing in state court.

[28] *See Agrico Chem. Co. v. Dep't of Env't Regul.*, No. 83-2708, 1984 WL 54261, at *2 (Fla. Div. of Admin. Hr'g, June 27, 1984); *accord Lake Hickory Nut Homeowners' Ass'n v. Schofield Corp.*, No. 91-8088, 1992 WL 322912, at *13 (Fla. Div. of Admin. Hr'g, July 23, 1984); (explaining that Section 403.412(2)(f) only "relates to a civil injunction action and not to an administrative proceeding").

administrative proceeding under this subsection *if the citizen meets the standing requirements for judicial review of a case or controversy pursuant to Article III of the United States Constitution*." Fla. Stat. § 403.412(7) (emphasis added). Plaintiffs simply have not shown a reasonable prospect that they would bring a Florida state court action and lose that action even though they would have prevailed under federal standards.

Crucially, this Court held earlier in this case that an almost identical argument from the Florida Chamber of Commerce (Chamber) and the Association of Florida Community Developers (AFCD) was too speculative to support standing. In their renewed motion to intervene, the Chamber and AFCD argued that the loss of "the right to a de novo proceeding under the Florida APA, complete with discovery and fact-finding adduced through the presentation of evidence before an impartial administrative law judge" if EPA's approval was vacated constitutes a cognizable, Article III injury. Dkt. 32-1 at 12. In denying the motion for lack of standing, this court held that "Movants' members do not aver that they are currently bringing (or are likely soon to bring) proceedings under the Florida APA. . . .And the mere prospect that the Florida permitting authorities *might* rule against one of Movants' members in the future on an issue that the member *might* then raise under the Florida APA, where that member would be unable to raise a similar (or equally effective) challenge under the federal APA, is too speculative to support Article III jurisdiction." Dkt. 39 at 7-8 (emphasis in original). Applying this same logic to Plaintiffs' arguments necessitates dismissing Claim 2 for lack of standing as well.

Even if there were some theoretical differences between Florida and federal law, or Florida and federal enforcement practices,[29] Plaintiffs would still lack standing. That is because Congress

---

[29] *See e.g.,* Rinaman Dec. ¶¶ 26-27, Silverstein Dec. ¶¶ 17-18 (referencing FDEP enforcement related to stormwater permits issued under Section 402, which like the Section 404 program, has been assumed from EPA).

explicitly provided that EPA retains independent enforcement authority under CWA Section 309 and 404(n) when a state assumes a 404 program.[30] As a result, federal authorities review every permit that Florida proposes to issue as well as the validity of Florida's overall program on an ongoing basis, including issuance of No Permit Required verifications. EPA-HQ-OW-2018-0640-0018 at 4-9, 11-12; Wolfe Dec. ¶¶ 41, 45.

Binding precedent teaches that a transfer from federal to state authority cannot support standing where the federal government maintains the ability to apply federal law. *See Crow Creek Sioux Tribe,* 331 F.3d at 917. In *Crow Creek,* an Indian Tribe argued that the transfer of lands from U.S. Army Corps of Engineers to the State of South Dakota would impede or reduce the likelihood of enforcement of federal cultural protection statutes on the transferred lands by federal agencies, injuring the Tribe's rights under those statutes. *Id.* at 913. The D.C. Circuit found that the Tribe lacked standing because the statute that required the land to be transferred explicitly provided that the federal cultural protection statutes continue to apply on the transferred lands. *Id.* In addition, the court deemed "purely speculative" assertions that transfer of the land to the State would diminish enforcement because the federal government retained full legal enforcement authority. *Id.* at 917. Where a statute provides that the federal government "will have an ongoing and undiluted enforcement role," concerns about reduced enforcement were simply "unsupported conjecture" that do not constitute an injury for Article III standing purposes. *Id.* Accordingly, the D.C. Circuit dismissed the case. Likewise, this Court should dismiss Claim 2 for the same reason given EPA's independent enforcement authority pursuant to CWA Section 309 and 404(n).

---

[30] Section 404(g) sets forth the requirements for state assumption of 404 permitting. 33 U.S.C. § 1344(g). Section 404(n) states "[n]othing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title." 33 U.S.C. § 1344(n). Section 309 sets forth the scope of the Administrator's enforcement authority, including for violations of permits issued under state assumed 404 programs. *See* 33 U.S.C. § 1319.

### 2.   Plaintiffs Lack Standing to Challenge EPA's Approval Based on Concerns with Criminal Negligence & Statute of Limitations.

*Crow Creek* is particularly instructive here as Plaintiffs' challenge to EPA's approval of Florida's 404 program is based in part on the state's criminal enforcement standard and criminal statute of limitations, which Plaintiffs assert provides harm sufficient for standing. Specifically, Plaintiffs refer to criminal enforcement in a couple of sentences in two standing declarations— one by Lisa Rinaman, a member of St. Johns Riverkeeper, and another by Rachel Silverstein, a member of Miami Waterkeeper. *See* Dkt. 98 at 78. In relevant part, Ms. Rinaman declares

> The state's enforcement of its section 404 program also harms St. Johns Riverkeeper . . . When appropriate, we refer issues to the authorities for investigation and criminal prosecution, for which we provide any necessary assistance. The state program, however, does not include the same enforcement standards and requirements as federal law.

Dkt. 98-6 at 7 (Rinaman Decl. ¶ 26). And, in relevant part, Ms. Silverstein declares

> Miami Waterkeeper also engages in monitoring of pollution, violations of environmental laws, and permit violations. For cases that we do not litigate ourselves, we refer to the appropriate authorities for investigation and criminal prosecution, for which we provide any necessary assistance.

Dkt. 98-7 at 6 (Silverstein Decl. ¶ 16) (emphasis added).

First, neither declaration demonstrates (or even suggests) that the individuals or their respective organizations suffered (or will suffer) any actual, imminent, or concrete injuries that are remotely traceable to application of Florida's criminal enforcement regime instead of the federal enforcement regime to CWA Section 404 violations. At most, Ms. Rinaman's declaration simply states that the state program is not the "same" as the federal program. However, the CWA does not require that a state program be identical to the federal program. It simply requires that a state program "abate violations of the permit or the permit program including civil and criminal penalties and other ways and means of enforcement." 33 U.S.C. § 1344(h)(1)(G); *see also* Federal

Defendants' Brief, Dkt. 99 at 50-54.

Plaintiffs' broader, unsupported allegations concerning Florida's statute of limitations fare no better. Though Plaintiffs argue that "Florida law is not as stringent as federal law because it provides a shorter statute[] of limitation for enforcement of environmental crimes," Dkt. 98 at 48, none of the standing declarations assert any harm that can be traced to these "shorter statutes of limitation." Thus, Plaintiffs have also failed to meet their burden of proof for standing as to Claim 2 based on Florida's criminal statute of limitations. "Standing is not 'an ingenious academic exercise in the conceivable,' but . . . requires . . . a factual showing." *Lujan*, 504 U.S. at 566 (citation omitted); *Ctr. for Biological Diversity*, 597 F. Supp. 3d at 188 (explaining that a plaintiff "must provide affidavits or other evidence to demonstrate the specific facts necessary to support standing").

Second, neither Ms. Rinaman's nor Ms. Silverstein's declaration attempt to explain how the difference between the federal ordinary negligence and state gross negligence definitions, as applied to criminally negligent discharges in violation of the CWA, could result in a legally cognizable injury to them sufficient for standing purposes. This may be because under *Crow Creek,* Plaintiffs cannot suffer such an injury here as EPA retains independent federal criminal (and civil) enforcement authority relating to both unpermitted discharges and conditions or limitations in permits issued by a state under CWA Section 404. Thus, Ms. Rinaman and Ms. Silverstein can continue to refer criminal enforcement matters to EPA, and Congress has authorized EPA to bring a CWA enforcement action if it chooses based on the federal definition of negligence and the federal statute of limitations even after Florida's assumption of the 404 program regardless of

whether the state brings its own enforcement action under state law.[31] *See* 33 U.S.C. §§ 1319, 1344(n).

Because Plaintiffs' standing declarations are deficient on their face and fail to meet Plaintiffs' burden of proof, this Court does not have jurisdiction to determine the merits of Plaintiffs' challenge to EPA's approval of Florida's 404 program.

### D.   Many of Plaintiffs' Attacks Are Not Ripe For Review (Claims 3 to 5, 7, 11-12).

"Ripeness is a justiciability doctrine designed to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *McCray v. Biden*, 574 F. Supp. 3d 1, 11 (D.D.C. 2021) (Moss, J.) (internal quotations and citations omitted). Ripeness is assessed under the two-pronged test established by the Supreme Court in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967). "[A] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *McCray,* 574 F. Supp. 3d at 12 (quoting *Texas v. United States*, 523 U.S. 295, 300 (1998)) (internal quotations omitted). This test is based on "'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Am. Oversight v. U.S. Dep't of Veterans Affairs*, 498 F. Supp. 3d 145, 157 (D.D.C. 2020) (Moss, J.) (citing *Abbott Labs.*, 387 U.S. at 149) (internal quotation marks omitted).

First, the agency action must have a "sufficiently direct and immediate" impact on the party challenging the action. *Abbott Labs.*, 387 U.S. at 152. A "claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300 (internal quotation marks omitted). Second, the court must determine

---

[31] Of course, the federal government's decision as to whether to bring a civil or criminal enforcement action is not subject to judicial review under the APA. *See Heckler v. Chaney*, 470 U.S. 821, 832-33 (1985).

whether withholding judicial review would cause hardship to the parties. *Abbott Labs.*, 387 U.S. at 136. Any hardship caused by the deferral of adjudication must be "immediate and significant," to warrant judicial intervention. *Devia v. NRC,* 492 F.3d 421, 424 (D.C. Cir. 2007). However, the consideration of hardship "will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions." *Pub. Citizen Health Rsch. Grp. v. FDA,* 740 F.2d 21, 30 (D.C. Cir. 1984). An agency action that "does not require [plaintiff's] to engage in, or to refrain from, any conduct, and [where] plaintiff does not identify any other imminent harm" does not constitute sufficient hardship for the purposes of ripeness. *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 254-55 (D.D.C. 2005).

Part of the ripeness doctrine in both these factors is "subsumed into the Article III requirement of standing," whereby a petitioner must show injury-in-fact. *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012). However, "[e]ven if a case is 'constitutionally ripe,' though, there may also be 'prudential reasons for refusing to exercise jurisdiction.'" *Id.* (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803, 808 (2003)). Accordingly, the doctrine of prudential ripeness attempts to avoid inefficient and unnecessary "piecemeal review" and "ensures that Article III courts make decisions only when they have to, and then, only once." *Pub. Citizen,* 740 F.2d at 30; *Am. Petroleum Inst.*, 683 F.3d at 387. In challenges to agency action, the ripeness doctrine protects agencies from judicial interference until their decisions have been formalized and their effects have been felt in a concrete way. As the Supreme Court explained in *Abbott Laboratories*, ripeness helps to prevent premature judicial interference with agency decision-making, which could lead to "abstract disagreements over administrative policies." *Abbott Labs.*, 387 U.S. at 148. By promoting administrative efficiency and preventing unnecessary litigation, the ripeness doctrine helps to ensure that agencies can effectively carry out their

statutory duties.

Here, Plaintiffs have asserted several claims that are not presently ripe for review in this case, including (1) Plaintiffs' claim that FWS unlawfully extended "take liability" protection; (2) Plaintiffs' claim that the Corps' list of "retained waters" incorrectly omits certain waterbodies; and (3) Plaintiffs' claim related to consultation over impacts to species under NMFS jurisdiction. Each of these claims should be dismissed on ripeness grounds.

**1.** **Plaintiffs' Claim That FWS "Unlawfully Extended Take Liability Exemptions" Is Not Ripe For Review (Claims 3 and 4).**

Plaintiffs contend that FWS "extended broad take liability exemption to EPA, the State, and all future state 404 permittees" without including "ESA-mandated guardrails." Dkt. 98 at 42. Federal Defendants have fully explained why FWS' Incidental Take Statement complies with the ESA's requirements. Dkt. 99 at 76-82. Any challenge to the scope of incidental take coverage (including the terms and conditions that ensure that activities do not jeopardize federally-listed species or adversely modify designated critical habitat) should await an actual FDEP 404 permit issuance where, notwithstanding EPA and FWS involvement and oversight, take protections are claimed to be inadequate. Given the project-by-project involvement and oversight of EPA and FWS, *see supra* at 23-26, any such scenario is speculative at best and unripe for review at this stage. *See Cooling Water Intake Structure Coal.,* 905 F.3d at 79 n.19 (finding claim "unripe" where "EPA may still veto the permit" and "[i]f EPA fails to veto the permit, the affected parties can bring a particularized, as-applied challenge"); *see also Wyo. Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 9, 2001 (D.D.C. 2001) (finding environmental challenge, which was based on ESA Section 7 to agency approval of oil and gas leases on federal lands, unripe where leases had not yet been issued). Indeed, to the extent a particular permit application creates an unlawful risk of take, Plaintiffs would have at least two viable, as-applied legal options at their disposal: first, they

could challenge the FDEP 404 permit under Florida administrative and judicial review processes (*see supra* at 19-23); and (2) second, Plaintiffs could sue in federal court under the ESA's citizen suit provisions. 16 U.S.C. § 1540(g).

This case resembles the Third Circuit's decision in *New Hanover Township v. U.S. Army Corps of Engineers.* There, the court dismissed as unripe a citizen group challenge to the Corps' use of a nationwide permit (under CWA Section 404) to authorize a city landfill project because a necessary state water quality certification (under CWA Section 401) had not yet been granted. 992 F.2d 470, 473-74 (3d Cir. 1993). The Third Circuit explained that the "results of the [state water quality certification] process cannot be predicted." *Id*. In that situation, "[b]ecause neither the [plaintiffs] nor anyone else will experience any effects from the Corps' decision [to approve use of the nationwide permit to authorize the project] unless and until Pennsylvania grants a water quality certificate, when fill work can begin, this case is not ripe." *Id*. The Third Circuit instructed that the citizen group in that case "should wait until Pennsylvania makes its decision [to approve or deny a water quality certificate] and then, assuming that injury is impending, file suit." *Id*. (relying upon *Suburban Trails, Inc. v. New Jersey Transit Corp.*, 800 F.2d 361, 367 (3d Cir. 1986), where the Third Circuit "ruled that a challenge to a state agency's decision regarding the allocation of new buses among transportation companies was not ripe *because a federal agency possessed veto power over the state agency's decision*" (emphasis added)).

The crucial point is that no harm to Plaintiffs from the Incidental Take Permit would arise unless and until FDEP takes a particular action that implicates take liability in the first instance.[32]

---

[32] In *Am. Tunaboat Ass'n v. Ross*, 391 F. Supp. 3d 98, 110 (D.D.C. 2019), a district court found that, in the context of ESA Section 7 consultation related to continuation of an approved tuna fishery, NMFS's refusal to treat a fishing industry association as an "applicant" in the consultation process was ripe for review. Of course, here, Plaintiffs do not claim to be an applicant in an ongoing consultation process.

That outcome is contingent upon how FWS and EPA exercise their oversight authority, which allows these federal agencies to impose requirements necessary to protect federally-listed species and habitat. In other words, any harm arising from the Incidental Take Statement is multiple steps away: at step one, it requires FDEP to propose to issue a new 404 permit that would cause take of species; at step two, it requires FWS to take inadequate action to protect federally-listed species and habitat; and at step three, it requires EPA to concur and also decline to impose protective measures in its oversight capacity. While Plaintiffs may eventually encounter a situation where they may want to challenge an FDEP 404 permit for allowing unacceptable adverse impacts to federally-listed species, no such situation is presented here. The Court should decline to review an abstract, unripe claim, when concrete, as-applied challenges will be available later.

### 2. Plaintiffs' Challenge to the Corps' List Of "Retained Waters" Is Neither Ripe Nor Based on "Final Agency Action" (Claim 7).

Plaintiffs contend that the Corps violated the law when it approved the list of "retained waters" in Florida.[33] Dkt. 98 at 70-72. In their view, the Corps should have completed "navigability assessments" or "studies" of every waterbody in the State of Florida to ensure that it correctly captured all "historic use" waters and any other waters that fall within the statutory definition for

---

[33] Plaintiffs separately argue in (Part IV.E) that "Florida's program did not demonstrate authority to regulate all assumable *waters of the United States*." Dkt. 98 at 67-70. This argument, however, is focused on the scope of "waters of the United States" under Florida's program, particularly on the impact of post-decisional litigation regarding the definition of this phrase. Federal Defendants have explained that these concerns are not relevant here. Dkt. 99 at 58. Florida's program requires permit coverage for "waters of the United States," and going beyond that, Florida requires Section 404 permits for *all waters*, unless the applicant "clearly demonstrates" that "waters of the United States" are not present. *See* Florida 404 Handbook at pages 4-5 (codified at F.A.C. 62-331.010(5); EPA-HQ-OW-2018-0640-0002-A20). While post-approval disagreements have arisen between Florida and EPA over the proper interpretation of "waters of the United States," particularly in light of various recent district court orders, these post-decisional issues are not relevant to the merits in this matter, nor do they provide Plaintiffs a basis for standing. For the Court's awareness, in October 2022, the Supreme Court heard argument in *Sackett v. EPA*, No. 21-454, which involves the proper interpretation of "waters of the United States," and a decision is expected by the end of the current term.

non-assumable waters. Again, Federal Defendants have fully and persuasively explained why this

claim lacks merit. Dkt. 99 at 43-47. But this is yet another issue that this Court need not reach,

because it is not ripe.

This is precisely the kind of issue that the *Abbott Labs'* ripeness test rules out. The Corps'

approval of the retained waters list does not have a "sufficiently direct and immediate" impact on

Plaintiffs unless and until they challenge a specific project involving a specific waterbody that they

believe is incorrectly excluded from the list. This "claim is not ripe for adjudication [because] it

rests upon contingent future events that may not occur as anticipated, or indeed may not occur at

all." *McCray*, 574 F. Supp. 3d at 12. Awaiting such a scenario would ensure that the "scope of the

controversy" and "factual components" are "fleshed out, by some concrete action applying the

regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Lujan*, 497

U.S. at 891 .

Even if the list were faulty in its current state, which Florida does not believe to be true, an

agency action that "does not require [plaintiffs] to engage in, or to refrain from, any conduct, and

plaintiff does not identify any other imminent harm" does not constitute sufficient hardship for the

purposes of ripeness. *Oceana*, 384 F. Supp. 2d at 255. Ruling now on the correctness of the

Retained Waters List, when a waterbody's inclusion on the list is an exceedingly fact-specific issue

involving analysis of historic and current navigation and other factors, would be a fruitless and

hypothetical exercise in the abstract. This is especially true where, as here, Florida's program

includes a process for updating the Retained Waters List, as needed and as warranted.

Separately, and contrary to Plaintiffs' assertion in their summary judgment motion (Dkt.

98 at 70-71), Plaintiffs are very likely challenging a list that does not actually constitute final

agency action under the APA.[34] The Retained Waters List is attached to the MOA between FDEP and the Corps (CORPS004322-CORPS004334). The list (which includes over 500 rivers, lakes, creeks, and streams – spread across the State of Florida – that are considered, for purposes of Section 404(g), to be "retained waters" (non-assumable waters)) expressly includes "all waters subject to the ebb and flow of the tide shoreward to their high water mark *that are not specifically listed* …, including wetlands adjacent thereto landward to the administrative boundary." CORPS004331. This same understanding is reflected in the MOA itself, CORPS004323, which also provides that the list will be updated when: "the Corps makes a navigability determination," "a Federal court makes a navigability determination," "Congress makes" such a determination, or "there are applicable rule changes." Additionally, the MOA explains that the list will be updated, as appropriate, through "Joint Coordination Procedures" between the Corps and FDEP. CORPS004324. And the MOA recognizes that modifications to the Retained Waters List are subject to EPA approval under 40 C.F.R. § 233.16(d). CORPS004324.

Whether this list meets the test for final agency action is suspect. *Hawkes*, 578 U.S. 590, 597 (2016) (applying *Bennett v. Spear's* two-part test to find that Corps' approved jurisdictional determinations, which are binding on the Corps and subject landowners to potential enforcement action, constitute final agency action subject to judicial review). "Even if final, an agency action is reviewable under the APA only if there are no adequate alternatives to APA review in court." *Id.* at 600 (citing 5 U.S.C. § 704). And here, any person (including Plaintiffs) may seek a modification to the list of retained waters in any circumstance.[35]

---

[34] *See* Dkt. 99 at 59 n.17 (Federal Defendants note that they have not conceded that the retained waters list was final agency action reviewable under the APA).

[35] In 2019, a district court in Wisconsin found that the retained waters list approved for the Michigan 404 program constituted final agency action. *See Coal. to Save Menominee River Inc. v. U.S. Env't. Prot. Agency*, 423 F. Supp. 3d 560, 568 (E.D. Wis. 2019) ("The final agency action,

Plaintiffs point out that "EPA has argued [in other cases] that after assumption, changes to the [retained waters] list require modification of the program (which only EPA can approve)." Dkt. 98 at 70 n.33 (citing *Menominee Indian Tribe,* 947 F.3d at 1074–75  (Hamilton, J. concurring) (cited by *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 212 n.9 (D.D.C. 2022))). That may have been true for the Michigan program, but the Florida 404 Program, as approved by EPA, allows the Corps and Florida to cooperatively resolve issues involving whether particular projects are inside or outside of "retained waters," as noted above. This is entirely logical as the exercise of identifying "retained versus assumable waters" in theory is easier than in actual project-specific situations, which inherently involve line-drawing based on a close review of individual projects' location and impacts. In Florida's program, the Corps and Florida are working collaboratively to address the status of waters when needed. Wolfe Dec. ¶ 48. Certainly, EPA can and should reassess the list of retained waters at a program level where warranted, but nothing in the statute or regulations preclude the Corps and Florida from collaborating to ensure that lines are properly drawn with regard to classification of specific projects. Here, where a project sits on both sides of the administrative line demarcating the divide between retained and assumable waters, the default rule under the MOA is that the permit application is processed by the Corps of Engineers. CORPS004323.

Whether as a matter of ripeness or lack of final agency action, the Corps' list of retained waters is not properly subject to judicial review at this juncture. Plaintiffs are free to bring a

here, is the EPA's 1984 decision allowing Michigan to assume permitting authority over Section 404 permits related to the Menominee River, and the statute of limitations period to challenge that action has long expired."). But that was in the context of an as-applied challenge to EPA's decision in 2018 to not object to a state 404 permit for a river that the plaintiff believed should have been classified as a retained water. There was also no discussion in that case as to whether the Michigan program defined the list of retained waters in the same manner (i.e., with a list of rivers, lakes, creeks, and streams along with a catch-all for any other water that meets the definition). The approach to retained waters lists has improved since 1984. Dkt. 99 at 59-62.

separate challenge later to a permit action involving a particular waterbody that they believe should be removed from the list. In fact, a plaintiff "may argue in state court that [the State] lacks permitting jurisdiction over [a specific] portion of [a] River under § 1344(g)(1)" and "a state court will need to decide it." *Id*. at 1075 (Hamilton, J., concurring) (noting that "Michigan courts have heard Clean Water Act challenges to state actions").

### 3. Plaintiffs' Claims Based on NMFS Species Are Unripe and Likely Moot (Claims 5, 11, and 12).

Plaintiffs assert several claims (Claims 5, 11, and 12) related to the decision by EPA and/or NMFS to not engage in formal consultation. These claims are specific to listed marine or coastal species in Florida under NMFS jurisdiction.[36] For the same reasons explained above, claims related to adverse impacts to NMFS species are not ripe for review here.

Florida's 404 program is limited to "assumable waters," which includes *no coastal or marine waters*. NMFS species would be anticipated to occur in marine waters, coastal waters, or other areas subject to the ebb and flow of the tide, which would all be classified as "retained waters" for these purposes (and thus, subject to Corps Section 404 permitting, not Florida 404 permitting). To the extent a proposed Florida 404 permit may eventually affect NMFS species, the federal agencies (EPA, FWS, and NMFS) and the state agencies (FDEP and FWC) would address those concerns at that time. Otherwise, such a decision would be subject to challenge at that time.

But again, a scenario where Florida approves a 404 permit that causes harm to marine or coastal species is unlikely to occur given the assignments of regulatory jurisdiction here among the federal and state agencies. Certainly, any such scenario would be highly species-specific,

---

[36] NMFS (also known as "NOAA Fisheries") currently has regulatory jurisdiction "over 163 endangered and threatened marine species (79 endangered; 84 threatened), including 65 foreign species (39 endangered; 26 threatened)." NMFS, *Species Directory*, available at https://www.fisheries.noaa.gov/species-directory/threatened-endangered.

project-specific, and location-specific. All federal agencies have a duty under ESA Section 7(a)(1) to exercise their authorities to ensure conservation of species. Nothing about Florida's Section 404 program triggers new or unique impacts to NMFS species. Moreover, these NMFS-based claims are likely moot due to EPA's decision to initiate consultation with NMFS at this time. Dkt. 99 at 85; Wolfe Dec. ¶ 50.

## CONCLUSION

For the foregoing reasons, Florida Intervenors are entitled to summary judgment on all claims and Plaintiffs' motion for summary judgment should be denied. With regard to the litany of extra-record, post-hoc arguments asserted by Plaintiffs in the context of merits arguments, this Court should ignore them. The record before the Court strongly supports the validity of EPA's approval of Florida's Section 404 Program and the related Programmatic BiOp, as well as the actions by the Corps. Though Plaintiffs are not entitled to any relief, if this Court is inclined to find in favor of Plaintiffs with respect to any particular claim, Florida Intervenors concur with the Federal Defendants that the Parties should be afforded an opportunity to brief remedy separately.

Dated: May 10, 2023

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

Lily N. Chinn (DC Bar No. 979919)
101 California Street
San Francisco, CA 94111
Phone: (415) 291-6200
lily.chinn@bakerbotts.com

Aaron M. Streett (TX Bar No. 24037561)
Harrison Reback (TX Bar No. 24012897)

(*pro hac vice*)
910 Louisiana Street
Houston, TX 77002-4995
Phone: (713) 229-1234
aaron.streett@bakerbotts.com
harrison.reback@bakerbotts.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of May 2023, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

_/s/ Jeffrey H. Wood_
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com