## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

     Plaintiffs,

     v.

U.S. ENVIRONMENTAL
PROTECTION AGENCY, et al.,

     Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

## PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' AND INTERVENORS' CROSS-MOTIONS FOR SUMMARY JUDGMENT

i

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................ v

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

ARGUMENT .................................................................................................................... 3

   I.   USFWS Violated the ESA by Failing to Assess the Impacts of EPA's Action. .................. 4

      A.  USFWS Failed to Conduct the Analysis Required by the ESA. ..................................... 6

         1.   USFWS Failed to Assess the Full Scope of EPA's Action. ...................................... 7

         2.   USFWS Failed to Evaluate the Baseline Status of Protected Species. ........................ 9

         3.   USFWS Ignored the Wealth of Information at Its Disposal on Which Its Impacts Analysis Could and Should Have Been Based............................................... 11

      B.  USFWS Failed to Limit Incidental Take of Protected Species. ..................................... 14

         1.   The ITS Exempted an Unlimited Amount of Incidental Take from Liability............ 14

         2.   The ITS Failed to Include a Trigger for Reinitiation.................................................. 15

         3.   The ITS Included No Meaningful Terms and Conditions to Minimize Incidental Take........................................................................................................... 17

      C.  The Non-Statutory, Permit-Level Technical Assistance Process Cannot and Does Not Substitute for the Programmatic Consultation ESA Requires................................. 20

         1.   USFWS Was Required to Conduct the ESA-Mandated Analyses at the Programmatic Level.............................................................................................. 20

         2.   The Non-Statutory Technical Assistance Process Was Not an Adequate Substitute for the Robust Analysis Required by Section 7. ........................................ 26

      D.  The Defendants' Reliance on *Cooling Water* Fails Because That Case is an Outlier That is Distinguishable, Poorly Reasoned, and Wrongly Decided. ................................ 30

   II.   EPA's Reliance Was Unlawful.......................................................................................... 33

   III.   EPA Arbitrarily Determined "No Effect" to NMFS Species. ............................................ 35

   IV.   EPA Unlawfully Approved Florida's Program. .................................................................. 37

      A.  Florida's Program Failed to Meet Minimum Enforcement Standards. ............................ 38

         1.   Florida's Mens Rea Conflicts with the Clean Water Act. ......................................... 38

         2.   Florida's Statute of Limitations is Contrary to the Clean Water Act. ....................... 49

      B.  The State Program's Consideration of Water Quality Impacts and Contamination is Less Stringent. .............................................................................................................. 50

C. The State Program Unlawfully Does Not Require the State to Independently Assess and Evaluate the Impacts of an Individual Permit. ........................................................ 53

D. The State Program Did Not Demonstrate that No Permit Would Be Issued that Would Jeopardize Species or Adversely Modify or Destroy Critical Habitat. ............... 57

E. EPA Approved a State Program That Failed to Demonstrate That Only Assumable Waters Would be Regulated and Transferred Authority over Non-Assumable Waters to the State. ................................................................................ 58

1. Under the Clean Water Act, the Corps Retains Exclusive Jurisdiction Over Traditionally Navigable Waters ("TNWs"). ............................................... 58

2. The Corps Unlawfully Excluded "Historic Use" RHA Section 10 Waters from the "Retained Waters" List. ..................................................................... 62

3. It was Unreasonable for the Corps to Base its Retained Waters List on An Admittedly Outdated RHA Section 10 List. ............................................... 64

4. EPA's Approval of Florida's Program Based on the Corps' Retained Waters List Was Unreasonable. ............................................................................... 69

5. Florida Unlawfully Failed to Incorporate the Federal Definition of WOTUS. .......... 70

V. EPA's Determination that Florida's Application was Complete was Unlawful and Therefore not Reasonable. ......................................................................................... 71

STANDING AND JUSTICIABILITY ........................................................................... 74

I. Plaintiffs Have Standing to Challenge EPA's Approval of Florida's Program and the Underlying Deficiencies on Which the Approval Is Based (Claim Two). ....................... 74

A. EPA's Decision to Transfer 404 Authority to the State Harms Plaintiff Organizations. ............................................................................................................ 74

1. Plaintiffs are Harmed by the Loss of Information Developed Through NEPA Review and ESA Consultation. ................................................................. 74

2. Plaintiffs are Harmed Because of Florida's Restrictive Access to Courts. ................ 79

B. EPA's Decision to Transfer 404 Authority to the State Threatens the Aesthetic and Recreational Interests of Plaintiffs' Members. ................................................... 83

C. Plaintiffs Need Not Independently Show Harm from the State's Less Stringent Enforcement Program, But They Have Done So. ....................................................... 85

II. Plaintiffs Have Standing to Challenge EPA's Arbitrary and Capricious Completeness Determination (Claim One). ................................................................................. 90

III. Plaintiffs' Claims Are Ripe for Review. ..................................................................... 91

A. Plaintiffs' Challenge to USFWS' Unlawful ITS is Ripe. ............................................ 92

B. The Corps' Unlawful Retained Waters List, and EPA's Reliance on It to Approve Florida's Program, is Ripe for Review. ................................................................... 96

C.  EPA's Unlawful Determinations on NMFS-listed Species Are Ripe for Review. ......... 98

CONCLUSION................................................................................................................... 99

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Air Transp. Ass'n of Am. v. FAA*,
    169 F.3d 1 (D.C. Cir. 1999) ........................................................................72

*Akiak Native Cmty. v. EPA*,
    625 F.3d 1162 (9th Cir. 2010) ...................................................................42

*Ali v. Fed. Bureau of Prisons*,
    552 U.S. 214 (2008)....................................................................................46

*Am. Fed'n of Gov't Emps., AFL-CIO v. Pierce*,
    697 F.2d 303 (D.C. Cir. 1982)...................................................................84

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
    937 F.3d 559 (D.C. Cir. 2019)...................................................................90

*Am. Oversight v. U.S. Dep't of Veterans Affairs*,
    498 F. Supp. 3d 145 (D.D.C. 2020) ..........................................................92

*Am. Petroleum Inst. v. EPA*,
    683 F.3d 382 (D.C. Cir. 2012) ............................................................92, 94

\* *Am. Rivers v. FERC*,
    895 F.3d 32 (D.C. Cir. 2018) ....................................................................84

*Am. Tel. & Tel. Co. v. FCC*,
    974 F.2d 1351 (D.C. Cir. 1992).................................................................54

*Am. Wild Horse Campaign v. Bernhardt*,
    442 F. Supp. 3d 127 (D.D.C. 2020) ..........................................................98

*Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*,
    282 F.3d 818 (D.C. Cir. 2002)...................................................................70

*Appalachian Power Co. v. EPA*,
    135 F.3d 791 (D.C. Cir. 1998)...................................................................10

*Appalachian Voices v. U.S. Dep't of Interior*,
    25 F.4th 259 (4th Cir. 2022) ......................................................................12

*Ariz. Cattle Growers' Ass'n v. USFWS*,
    273 F.3d 1229 (9th Cir. 2001) ...................................................................14

*Ass'n of American Physicians & Surgeons, Inc. v. Sebelius*,
    901 F. Supp 2d 19 (D.D.C. 2012)..............................................................75

\* *Bennett v. Spear*,
 520 U.S. 154 (1997)..................................................................................................91, 93

\* *Burlington Truck Lines, Inc. v. United States*,
 371 U.S. 156 (1962)..................................................................................................45, 53

 *Camp v. Pitts*,
 411 U.S. 138 (1973)..........................................................................................................53

 *Chevron v. Nat. Res. Def. Council, Inc.*,
 467 U.S. 837 (1984)..................................................................................................46, 49

 *Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*,
 316 F. Supp. 3d 349 (D.D.C. 2018)................................................................................63

 *Citizens to Preserve Overton Park, Inc. v. Volpe*,
 401 U.S. 402 (1971)..........................................................................................................28

 *City of Dania Beach v. FAA*,
 485 F.3d 1181 (D.C. Cir. 2007)......................................................................................90

\* *City of Tacoma v. FERC*,
 460 F.3d 53 (D.C. Cir. 2006).....................................................................................33, 35

 *City of Waukesha v. EPA*,
 320 F.3d 228 (D.C. Cir. 2003).........................................................................................73

 *Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013)..................................................................................................84, 85

 *Clean Wis. v. EPA*,
 964 F.3d 1145 (D.C. Cir. 2020).......................................................................................11

\* *Coal. to Save the Menominee River Inc. v. EPA*,
 423 F. Supp. 3d 560 (E.D. Wis. 2019)............................................................................97

 *Conn. Nat. Bank v. Germain*,
 503 U.S. 249 (1992)..........................................................................................................21

\* *Conner v. Burford*,
 848 F.2d 1441 (9th Cir. 1988) .................................................................................*passim*

 *Cooling Water Intake Structure Coal. v. EPA*,
 905 F.3d 49 (2d Cir. 2018)......................................................................................*passim*

 *Council of Parent Att'ys & Advocs., Inc. v. DeVos*,
 365 F. Supp. 3d 28 (D.D.C. 2019)..................................................................................61

*Crow Creek Sioux Tribe v. Brownlee*,
　331 F.3d 912 (D.C. Cir. 2003) .......................................................................87, 88

*Crutchfield v. Cnty. of Hanover*,
　325 F.3d 211 (4th Cir 2003) .................................................................................55

*CSX Transp., Inc. v. Surface Transp. Bd.*,
　584 F.3d 1076 (D.C. Cir. 2009) ...........................................................................73

*Ctr. for Biological Diversity v. EPA*,
　316 F. Supp. 3d 1156 (N.D. Cal. 2018) ................................................................36

*Ctr. for Biological Diversity v. NMFS*,
　No. CV 21-930 (BAH), 2022 WL 4235013 (D.D.C. Sept. 14, 2022) ....................60

*Ctr. for Biological Diversity v. Regan*,
　539 F. Supp. 3d 136 (D.D.C. 2021) ......................................................................79

\* *Ctr. for Biological Diversity v. Regan*,
　597 F. Supp. 3d 174 (D.D.C. 2022) ............................................................. *passim*

*Ctr. for Biological Diversity v. Salazar*,
　804 F. Supp. 2d 987 (D. Ariz. 2011) .......................................................18, 24, 28

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
　698 F.3d 1101 (9th Cir. 2012) ..............................................................................14

*Ctr. for Biological Diversity v. USFWS*,
　450 F.3d 930 (9th Cir. 2006) ................................................................................95

*Ctr. for Biological Diversity v. USFWS*,
　807 F.3d 1031 (9th Cir. 2015) ..............................................................12, 24, 31

*Ctr. for Biological Diversity v. Zinke*,
　369 F. Supp. 3d 164 (D.C. Cir. 2020) ...................................................................76

*Defs. of Crooked Lake, Inc. v. Fla. Dep't of Env't Prot.*,
　No. 17-5328, 2018 WL 3387900 (Fla. Div. Admin. Hrgs., May 7, 2018) .......56, 57, 80

*Defs. of Wildlife v. U.S. Dep't of Interior*,
　931 F.3d 339 (4th Cir. 2019) .................................................................................9

*Devia v. NRC*,
　492 F.3d 421 (D.C. Cir. 2007).......................................................................92, 94

*Duval Utility Co. v. Fla. Public Serv. Comm'n*,
　380 So. 2d 1028 (Fla. 1980)..................................................................................56

vii

*Env't Def. v. U.S. Army Corps of Eng'rs*,
  515 F. Supp. 2d 69 (D.D.C. 2007) ...................................................................80

*Env't Health Tr. v. FCC*,
  9 F.4th 893 (D.C. Cir. 2021) ...........................................................................35

*Ergon-W. Va., Inc. v. EPA*,
  980 F.3d 403 (4th Cir. 2020) ..........................................................................70

\* *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
  726 F. Supp. 2d 1195 (D. Mont. 2010) ..................................................... *passim*

*Friends of Animals v. Bernhardt*,
  961 F.3d 1197 (D.C. Cir. 2020) .......................................................................76

*Friends of Animals v. Jewell*,
  828 F.3d 989 (D.C. Cir. 2016) .........................................................................76

*Friends of the Earth v. Hintz*,
  800 F.2d 822 (9th Cir. 1986) ...........................................................................55

*Gerber v. Norton*,
  294 F.3d 173 (D.C. Cir. 2002) .........................................................................10

*In re Grand Jury Investigation*,
  315 F. Supp. 3d 602 (D.D.C. 2018) ....................................................22, 37, 51

*Greenpeace v. NMFS*,
  80 F. Supp. 2d 1137 (W.D. Wash. 2000) ........................................................24

\* *Growth Energy v. EPA*,
  5 F.4th 1 (D.C. Cir. 2021) ...............................................................................92

*Hawai'i Orchid Growers Ass'n v. U.S. Dep't of Ag.*,
  436 F. Supp. 2d 45 (D.D.C. 2006) ...................................................................24

*Hunton & Williams LLP v. EPA*,
  346 F. Supp. 3d 61 (D.D.C. 2018) ...................................................................65

\* *Idaho Conservation League v. EPA*,
  820 F. App'x 627 (9th Cir. 2020) ............................................................ *passim*

*Jama v. U.S. Immigr. & Customs Enf't*,
  543 U.S. 335 (2005) .........................................................................................39

*Judulang v. Holder*,
  565 U.S. 42 (2011) ...........................................................................................54

viii

*Kadi v. Geithner*,
42 F. Supp. 3d 1 (D.D.C. 2012) ..........................................................................84

*Legal Env't Assistance Found. v. Fla. Dep't of Env't Prot.*,
702 So.2d 1352 (Fla. 1st Dist. Ct. App. 1997) ....................................................82

*Leocal v. Ashcroft*,
543 U.S. 1 (2004) ................................................................................................40

\*      *Lone Mountain Processing, Inc. v. U.S. Sec'y of Labor*,
709 F.3d 1161 (D.C. Cir. 2013) .....................................................................60, 61

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ............................................................................................78

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ............................................................................................90

*Mcclash v. Manasota-88, Inc.*,
No. 14-4735, 2015 WL 3966050 (Fla. Div. Admin. Hearings June 25, 2015) ....82

*McCray v. Biden*,
574 F. Supp. 3d 1 (D.D.C. 2021) ........................................................................92

\*      *Menominee Indian Tribe of Wis. v. EPA*,
947 F.3d 1065 (7th Cir. 2020) ..................................................................... *passim*

\*      *Miccosukee Tribe of Indians of Fla. v. United States*,
566 F.3d 1257 (11th Cir. 2009) .....................................................................12, 14

\*      *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ..............................................................................................13

\*      *Mozilla Corp. v. FCC*,
940 F.3d 1 (D.C. Cir. 2019) ................................................................................86

\*      *N. Slope Borough v. Andrus*,
642 F.2d 589 (D.C. Cir. 1980) ............................................................................22

*Nat. Res. Def. Council, Inc. v. Evans*,
279 F. Supp. 2d 1129 (N.D. Cal. 2003) ....................................................... *passim*

*Nat. Res. Def. Council v. EPA*,
859 F.2d 156 (D.C. Cir. 1988) ..............................................................41, 42, 45

\*      *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*,
752 F.3d 999 (D.C. Cir. 2014) ............................................................................63

ix

*Nat'l Park Hosp. Ass'n v. U.S. Dep't of Interior*,
538 U.S. 803 (2003)............................................................................70, 92

\* *Nat'l Wildlife Fed'n v. Brownlee*,
402 F. Supp. 2d 1 (D.D.C. 2005)..........................................................23, 27, 91

\* *Native Ecosystems Council v. Dombeck*,
304 F.3d 886 (9th Cir. 2002) ....................................................................36

*New Hanover Township v. U.S. Army Corps of Eng'rs*,
992 F.2d 470 (3d Cir. 1993)....................................................................94, 95

\* *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*,
496 F. Supp. 3d 31 (D.D.C. 2020) ................................................................79

*Oceana Inc. v. Evans*,
384 F. Supp. 2d 203 (D.D.C. 2005)................................................................92

*Oceana, Inc. v. Pritzker*,
75 F. Supp. 3d 469 (D.D.C. 2014) ................................................................15

\* *Oceana, Inc. v. Ross*,
No. 15-055, 2020 WL 5995125 (D.D.C. Oct. 9, 2020) ................................10, 15, 16

*Oceana, Inc. v. Ross*,
No. CV 12-0041 (PLF), 2020 WL 5834832 (D.D.C. Oct. 1, 2020) ..............................37

\* *Or. Nat. Res. Council v. Allen*,
476 F.3d 1031 (9th Cir. 2007) ....................................................................14

*Otay Mesa Prop. L.P v. U.S. Dep't of Interior*,
144 F. Supp. 3d 35 (D.D.C. 2015)................................................................28

*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*,
538 F. Supp. 2d 242 (D.D.C. 2008)................................................................15

*Patel v. Garland*,
142 S.Ct. 1614 (2022)............................................................................60

\* *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
797 F.3d 1087 (D.C. Cir. 2015)..................................................................79

*Pharm. Rsch. & Mfrs. of Am. v. U.S. Dep't of Health & Hum. Servs.*,
43 F. Supp. 3d 28 (D.D.C. 2014)..................................................................65

*Pub. Citizen Health Resch. Grp. v. FDA*,
740 F.2d 21 (D.C. Cir. 1984)....................................................................92, 94

x

*PUD No. 1, of Jefferson County v. Wash. Dep't of Ecology*,
    511 U.S. 700 (1994)...................................................................................41

*Sackett v. EPA*,
    598 U.S. ___, 2023 WL 3632751 (2023)......................................38, 59, 70

\*   *San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) .........................................................8, 12, 25

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947).......................................................................................8

\*   *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
    992 F.3d 1071 (D.C. Cir. 2021) ..............................................................33, 34

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017)..................................................................87

*Sierra Club v. U.S. Dep't of the Interior*,
    899 F.3d 260 (4th Cir. 2018) .....................................................................15

\*   *Sierra Club v. W. Va. Dep't of Env't Prot.*,
    64 F.4th 487 (4th Cir. 2023) ...............................................................55, 57

*Strahan v. Roughead*,
    910 F. Supp. 2d 358 (D. Mass. 2012) .......................................................12

*Suburban Trails, Inc. v. N.J. Transit Corp.*,
    800 F.2d 361 (3d Cir. 1986).................................................................95, 96

*Sw. Ctr. for Biological Diversity v. Babbitt*,
    215 F.3d 58 (D.C. Cir. 2000) ....................................................................12

*Texas v. United States*,
    523 U.S. 296 (1998)...............................................................................92, 94

*TransUnion LLC v. Ramirez*,
    141 S.Ct. 2190, 2207 (2021).......................................................................78

*U.S. Dep't of Com. v. New York*,
    139 S.Ct. 2551 (2019)...........................................................................71, 76

*United States v. Atl. States Cast Iron Pipe Co.*,
    No. 03-852 (MLC), 2007 WL 2282514 (D.N.J. Aug. 2, 2007)...............48

*United States v. Doe*,
    701 F.2d 819 (9th Cir. 1983) .....................................................................46

*United States v. Maes*,
  546 F.3d 1066 (9th Cir. 2008) ..............................................................................46

*United Techs. Corp. v. U.S. Dep't of Def.*,
  601 F.3d 557 (D.C. Cir. 2010) ........................................................................10, 11

*W. Watersheds Project v. Kraayenbrink*,
  538 F. Supp. 2d 1302 (D. Idaho 2008) ................................................................21

*Waterkeeper Alliance v. Regan*,
  41 F.4th 654 (D.C. Cir. 2022) ..............................................................................88

*White v. U.S. Army Corps of Eng'rs*,
  No. 22-CV-06143-JSC, 2023 WL 2347379 (N.D. Cal. Mar. 3, 2023) ................36

*Wild Fish Conservancy v. Salazar*,
  628 F.3d 513 (9th Cir. 2010) ..................................................................................7

\*    *WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013) ........................................................................85, 86

*WildEarth Guardians v. U.S. Army Corps of Eng'rs*,
  429 F. Supp. 3d 1224 (D.N.M. 2019) ......................................................15, 18, 24

*Wyo. Outdoor Council v. Dombeck*,
  148 F. Supp. 2d 1 (D.D.C. 2001) ..........................................................................94

**Federal Statutes**

5 U.S.C. § 706(2)(A) ................................................................................................46, 49

16 U.S.C. § 1536 ............................................................................................................21

16 U.S.C. § 1536(a)(2) .............................................................................................11, 21

16 U.S.C. § 1536(b)(1)(A) .............................................................................................21

16 U.S.C. § 1536(b)(3)(A) .................................................................................7, 21, 28

16 U.S.C. § 1536(b)(4) ...................................................................................................14

16 U.S.C. § 1536(b)(4)(iv) .......................................................................................17, 18

16 U.S.C. § 1536(c)(2) ...................................................................................................10

16 U.S.C. § 1536(o) ...............................................................................17, 19, 26, 30

16 U.S.C. § 1536(o)(2) ...................................................................................................17

33 U.S.C. § 401 ....................................................................................................................63

33 U.S.C. § 403 ....................................................................................................................63

33 U.S.C. § 407 ....................................................................................................................63

33 U.S.C. § 1311(b)(1)(C) ...................................................................................................40

33 U.S.C. § 1313(d) .............................................................................................................52

33 U.S.C. § 1313(d)(4)(B) ...................................................................................................52

33 U.S.C. § 1319 ..................................................................................................................40

33 U.S.C. § 1319(a)(1) .........................................................................................................39

33 U.S.C. § 1319(c)(1) ....................................................................................................38, 48

33 U.S.C. § 1319(c)(1)(A) ...................................................................................................39

33 U.S.C. § 1319(g)(1) .........................................................................................................39

33 U.S.C. § 1344 ..................................................................................................................41

33 U.S.C. § 1344(g)(1) .............................................................................................59, 63, 71

33 U.S.C. § 1344(h)(1) .............................................................................................37, 49, 87

33 U.S.C. § 1344(h)(1)(A)(i) ...................................................................................37, 40, 50

33 U.S.C. § 1344(h)(1)(B) ...................................................................................................40

33 U.S.C. § 1344(h)(1)(G) .............................................................................................37, 39

33 U.S.C. § 1344(h)(2) .........................................................................................................87

33 U.S.C. § 1344(h)(2)(A) ...............................................................................................37, 50

33 U.S.C. § 1344(s) ..............................................................................................................40

33 U.S.C. § 1365(a) ..............................................................................................................82

33 U.S.C. § 1365(g) ..............................................................................................................82

**Legislative Materials**

H.R. Rep. No. 97-567, pt. 1 (1982) ......................................................................................18

S. Rep. No. 97-418 (1982) ...................................................................................................18

## Code of Federal Regulations

33 C.F.R. § 328.3(a)(1) (2020) ...................................................................................63

33 C.F.R. § 329.4 ...............................................................................................63, 65

33 C.F.R. § 329.16(a) .........................................................................................64, 65

40 C.F.R. pt. 230 ...................................................................................................37

40 C.F.R. pt. 233 ...................................................................................................37

40 C.F.R. § 131.12 .................................................................................................50

40 C.F.R. § 230.3(d) ..............................................................................................52

40 C.F.R. § 230.10(c) .............................................................................................56

40 C.F.R. § 230.11 .............................................................................................52, 56

40 C.F.R. § 230.11(d) ............................................................................................52

40 C.F.R. § 230.20–54 ...........................................................................................56

40 C.F.R. § 230.22 .................................................................................................52

40 C.F.R. § 233.1 ...............................................................................................43, 49

40 C.F.R. § 233.1(c) ..............................................................................................45

40 C.F.R. § 233.1(d) ..............................................................................................37

40 C.F.R. § 233.41(a)(3) .........................................................................................45

40 C.F.R. § 233.41(a)(3)(i) .....................................................................................45

40 C.F.R. § 233.41(a)(3)(ii) .................................................................................44, 45

40 C.F.R. § 233.41(a)(3)(iii) ...................................................................................46

40 C.F.R. § 233.41(b)(2) .................................................................................42, 43, 44

40 C.F.R. § 233.41(d) ............................................................................................47

40 C.F.R. § 233.41(d)(1) ........................................................................................42

50 C.F.R. § 402.02 .................................................................................................22

50 C.F.R. § 402.12(a) .............................................................................................10

50 C.F.R. § 402.12(k) ...................................................................................................10

50 C.F.R. § 402.14 .........................................................................................................7

50 C.F.R. § 402.14(a) ...................................................................................................22

50 C.F.R. § 402.14(c)(4) ...............................................................................................21

50 C.F.R. § 402.14(d) ..............................................................................................11, 28

50 C.F.R. § 402.14(g) ......................................................................................10, 22, 28

50 C.F.R. § 402.14(h) ..............................................................................................22, 28

50 C.F.R. § 402.14(i) ...............................................................................................22, 28

50 C.F.R. § 402.14(i)(1)(i) ............................................................................................14

50 C.F.R. § 402.16(a)(1) ...............................................................................................16

50 C.F.R. § 402.16(a)(2) ...............................................................................................16

50 C.F.R. § 402.16(a)(4) ...............................................................................................16

**Federal Register**

44 Fed. Reg. 34,244 (June 14, 1979) ...........................................................................43

45 Fed. Reg. 85,336 (Dec. 24, 1980) .................................................................51, 55, 84

45 Fed. Reg. 85,343 (Dec. 24, 1980) .............................................................................55

53 Fed. Reg. 20,764 (June 6, 1988) ...........................................................43, 45, 47, 48, 50

80 Fed. Reg. 51,020 (Aug. 21, 2015)......................................................................50, 52

85 Fed. Reg. 83,533 (Dec. 22, 2020) .............................................................................54

**State Statutes**

Fla. Stat. § 120.57 .......................................................................................................82

Fla. Stat. § 120.569 .....................................................................................................82

Fla. Stat. § 373.4146 ...................................................................................................56

Fla. Stat. § 403.412 ................................................................................................81, 82

Fla. Stat. § 403.412(2)(a) ........................................................................................81, 82

Fla. Stat. § 403.412(5) ........................................................................................81, 82

Fla. Stat. § 403.412(6) ..............................................................................................82

Fla. Stat. § 403.412(7) ........................................................................................81, 82

**State Administrative Code**

Fla. Admin. Code R. 62-330.301 .................................................................................56

Fla. Admin. Code R. 62-330.301(1)(e) .......................................................................52

Fla. Admin. Code R. 62-330.302 .................................................................................56

Fla. Admin. Code R. 62-331.053(3)(a)(6) ...................................................................56

Fla. Admin. Code R. 62-331.210–248 ...........................................................................8

**Other Authorities**

Complaint, Miccosukee Tribe of Indians of Fla. v. EPA, No. 22-CV-22459-KMM
    (S.D. Fla. Aug. 4, 2022) .......................................................................................3

EPA, *NPDES State Program Authority*, https://www.epa.gov/npdes/npdes-state-
    program-authority (last accessed June 3, 2023) ..................................................31

Letter from Roy E. Crabtree, NMFS, to Donald W. Kinard, Corps, (Nov. 20, 2017)
    http://cdm16021.contentdm.oclc.org/utils/getfile/collection/p16021coll3/id/577 ...............25

NMFS, Biological Opinion on the Federally Regulated Oil and Gas Program Activities
    in the Gulf of Mexico (2020), https://repository.library.noaa.gov/view/noaa/23738 ..............25

NOAA, NOAA Institutional Repository,
    https://repository.library.noaa.gov/gsearch?collection=noaa%3A5&terms=Bio
    logical+opinion (last visited May 19, 2023) .......................................................77

U.S. Army Corps of Eng'rs, *Supplement to the Jacksonville District Navigable Waters Lists*
    (October 5, 2017),
    https://www.saj.usace.army.mil/Portals/44/docs/regulatory/sourcebook/other_permitting_f
    actors/20171005SupplementToJacksonvilleDistrictSection10Waters.pdf?ver=2017-10-05-
    123156-363 (last accessed June 4, 2023) ...........................................................64

USFWS & NMFS, ESA Section 7 Consultation Handbook (1998) ........................................12, 21

USFWS, Environmental Conservation Online System (ECOS),
    https://ecos.fws.gov/ecp/report/biological-opinion (last visited May 19, 2023) ....................77

**INTRODUCTION**

The Defendants and Florida rely heavily on "cooperative federalism" to justify EPA's end-run around statutory requirements to approve Florida's 404 program.  But Congress did not authorize the approval of state programs that circumvent federal requirements in the name of "cooperation."  Congress intended that states administer Clean Water Act Section 404 programs *only* insofar as states are willing and able to establish programs that meet federal requirements. In the years since state assumption has been authorized, Congress has seen no need to amend these statutes so as to "facilitate" more states' assumption of Section 404.

The Defendants argue their actions were "reasonable" because 404 assumption is hard. But if it is hard, there is good reason.  The Clean Water Act recognizes the potential for environmental devastation from dredging and filling waters of the United States, including wetlands, and, along with the Rivers and Harbors Act ("RHA"), ensures federal control over the Nation's navigable, and traditionally navigable, waters.  The Endangered Species Act recognizes that protecting biodiversity must be given the highest of priorities.  That few states have been able or willing to meet federal standards does not empower federal agencies to override federal statutes.

Moreover, the record shows that the Defendants could have complied with federal law but chose not to.  They argue that USFWS could not possibly have projected the impacts to species from future 404 projects even though they had complete information about prior 404 projects because USFWS had performed those consultations itself.  They do not dispute that they had other options available to them, including federalizing permits likely to adversely affect listed species, that would have complied with the ESA and allowed assumption to occur.  And EPA argues that it was good enough for the state program to be close enough, even where the

1

state program failed to meet minimum federal standards.  They argue that the Corps could not have performed the assessment of Florida's waterways that the Corps itself began before abruptly changing course, because it would have been "time-consuming."  Ensuring compliance with federal law may have taken more time than the Defendants were willing to expend, but expedience does not trump federal law.

Congress' enactments mean that the Defendants were not writing on a blank slate.  The agencies were required to follow federal law; they were not entitled to choose their own adventure to find a path for state approval outside of what Congress has authorized.  Cooperative federalism is not a magic erase pen for the laws Congress has written.

## STATEMENT OF FACTS

Neither the Defendants nor Florida contests Plaintiffs' Statement of Facts.  Florida, for example, offers no record evidence to rebut Plaintiffs' factual assertions on the State's abysmal environmental record.  *Compare* Dkt. 98 at 22 *with* Dkt. 102 at 15–17.  Indeed, the Florida experience of "already operating most federal environmental programs," Dkt. 102 at 15, has been a failure, especially in the realm of the Clean Water Act.  *See, e.g.*, Dkt. 98 at 22; EPA-HQ-OW-2018-0640-0386-A1, at 5 (Plaintiffs' Comments to EPA).

Florida also makes a series of disputed claims, many of which cite no evidence at all, much less anything found in the administrative record.  For example, Florida boasts of all its purported investments in environmental protection, Dkt. 102 at 15, while neglecting to mention that its application to EPA claimed it could (and would) administer the Section 404 program without an additional cent in funding.  Florida touts its February–June 2020 state rulemaking process, *id.* at 17, without acknowledging the disruptions to the public caused by the unfolding of the novel coronavirus pandemic and multiple requests to postpone rulemaking to allow adequate

2

participation.  And the State touts its engagement with Florida's tribes, *id.* at 19, without

acknowledging that one of them is suing EPA for approving Florida's program, in a case in

which Florida has intervened.  *See* Complaint, Miccosukee Tribe of Indians of Fla. v. EPA, No.

22-CV-22459-KMM (S.D. Fla. Aug. 4, 2022).

Florida relies on a May 10, 2023, declaration by the Florida Department of

Environmental Protection's ("FDEP's") general counsel to offer a rosy picture of its

administration of the 404 program.  But this declaration fails even to acknowledge EPA's April

6, 2023, correspondence to FDEP expressing the federal agency's "continued concerns with

FDEP's implementation" of the program, including (1) its continued disregard for EPA's

directive as to the State applying a vacated, illegal federal regulation; (2) inadequacies with the

FDEP's jurisdictional determinations; (3) incomplete or missing information and documentation

from FDEP's database; (4) issues with FDEP's coordination with the Corps; and (5) problems

with retaining staff in its 404 program, which leads to a drain of expertise.  Ex. 1 at 6, 29–38

(Crooks Dec. ¶ 10, Ex. B).[1]  The Court should also reject the remainder of Florida's unreliable

assertions, which Plaintiffs address below to the extent they relate to particular claims.

## ARGUMENT

Plaintiffs have demonstrated that EPA's approval of Florida's 404 program, and the

agency actions underlying that decision, failed to comply with the Clean Water Act, the ESA,

and the RHA.  As shown below, the Defendants' theory that cooperative federalism authorized

the agencies to circumvent Congressional requirements for state assumption is contrary to law.

---

[1] Nor does the declaration acknowledge that the purported "denials" of individual permit
applications make clear that the applicant can resubmit another application without prejudice and
were based solely on the applicant's non-responsiveness.  Ex. 1 at 6 (Crooks Dec. ¶ 10).

Florida's justiciability arguments also lack merit.  Plaintiffs therefore respectfully request that their Motion for Summary Judgment be granted, that the Defendants' and Florida's Cross-Motions for Summary Judgment be denied, and that the Defendants' actions be vacated.

I.     **USFWS Violated the ESA by Failing to Assess the Impacts of EPA's Action.**

Before EPA could approve Florida's program, the agency was required to engage in ESA Section 7 programmatic consultation with federal wildlife agencies to determine whether EPA's approval of Florida's program, and its implementation as a whole, threatened to jeopardize ESA-listed species and/or adversely modify or destroy their critical habitat.[2]  If, after performing the analyses required by Section 7 of the ESA, the wildlife agencies found that EPA's action was not likely to have impermissible effects but would likely lead to incidental take of protected species, the wildlife agencies were required to issue an incidental take statement ("ITS") articulating limits on that take, which, if exceeded, would trigger reinitiation of programmatic consultation.  But USFWS failed at these tasks, and this alone is a sufficient basis for the Court to find that EPA's approval of Florida's program was unlawful and must be set aside.

Plaintiffs have shown that USFWS violated the ESA in three ways.  First, in the programmatic biological opinion ("BiOp"), USFWS refused to consider impacts to threatened and endangered species that would result from EPA's transfer of 404 authority to the State and the resulting implementation of the State 404 program.  Dkt. 98 at 37–41.  This refusal violated the ESA's requirement that any BiOp—including a programmatic BiOp—use the best available science to analyze the impacts to species from the agency action under review.  *Id.*  Second,

---

[2] Plaintiffs agree that EPA's approval of a state 404 program is a discretionary action requiring the agency to consult with USFWS and NMFS on the impact of that action on ESA-listed species.  *Cf.* Dkt. 73 at 11 (characterizing Count Five as challenging decision that EPA approval of 404 assumption program is discretionary action triggering ESA consultation).

despite its refusal to assess species impacts, USFWS must have determined that take of species was likely (a predicate to issuing an ITS) yet failed to project the amount or extent of anticipated take, also in violation of the ESA.  *Id.* at 42–43.  Third, without setting any limit on the anticipated take, USFWS issued an ITS that granted the State and all future state permittees an exemption from all incidental take liability for permits issued by the State, so long as permittees complied with permit conditions.  *Id.* at 42–45.

USFWS' attempt to defend this BiOp based on the non-statutory technical assistance process fails because the ESA does not authorize proxies for meeting the procedural and substantive requirements of Section 7.  Dkt. 99 at 62.  Further, Plaintiffs have shown that (1) the technical assistance process, too, lacks key ESA guardrails—including the requirement to use the best available science to determine impacts to species; and (2) USFWS failed to bind itself to performing any analysis or making any recommendations for individual permits, meaning that state 404 permits may issue without USFWS providing any input at all.  Dkt. 98 at 45–49.  If allowed to stand, USFWS' approach would allow the agency to avoid the ESA's rigorous procedural and substantive requirements at both the programmatic and the permit level.

The Defendants have no viable response to these points.  They deflect as to their programmatic duties by claiming that it would be too difficult to "predict" future impacts, Dkt. 99 at 72, ignoring the fact that USFWS had complete historical information of 404 consultations in Florida on which it could (and should) have based this analysis and made projections, as wildlife agencies routinely do in programmatic BiOps as shown below.  Dkt. 98 at 42.

As to the ITS, the Defendants admit that they did not specify any limit on incidental take, again on the theory this would be too difficult to predict, Dkt. 99 at 76–78, even though take limits are not intended as predictions but rather as safeguards to require reinitiation for an agency

to reconsider its assumptions and the adequacy of its protective measures should the anticipated take be exceeded.  USFWS also deflects when it points to the possibility of reinitiating consultation on individual permits, *id.* at 79–80, because that reinitiation by definition can only relate to an individual permit, not the exceedance of take at a programmatic level which would require reinitiation of consultation at the programmatic level.  There is also no way to tell when or whether USFWS' take assumptions prove inaccurate at the programmatic level because USFWS failed to analyze the impacts from EPA's action on species and failed to project expected levels of take.  This leaves only USFWS' closed-door, subjective judgment.

The Defendants ask the Court to ignore all these ESA violations because the BiOp and ITS were modeled on a similar approach approved by the Second Circuit in *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49 (2d Cir. 2018).  Dkt. 99 at 56–61.  Although Plaintiffs submit that *Cooling Water* was wrongly decided, as discussed later, the Court need not reach that issue because the circumstances in that case were materially different from those presented here, most notably because the agency in that case had no information at its disposal on which to base the analyses required by the ESA.  Dkt. 98 at 49–51, 49 n.21.

**A.  USFWS Failed to Conduct the Analysis Required by the ESA.**

In determining that EPA's approval of Florida's program would not jeopardize protected species, USFWS failed to conduct an adequate programmatic consultation, believing it could defer any analysis to the technical assistance process for individual permits.[3]  Dkt. 98 at 37–38. As a result, the programmatic BiOp failed to include the analysis and information required to

---

[3] "Individual permits" are required for dredge and fill projects that do not qualify for a State 404 general permit and are not otherwise exempt from Section 404 requirements.  EPA-HQ-OW-2018-0640-0002-A20, at 14 (404 Handbook).

determine whether EPA's action (as opposed to any individual permit) would jeopardize protected species or adversely modify or destroy critical habitat. *Id.* at 38–41.

But Congress clearly defined the required contents of a BiOp which must include the information on which the jeopardy opinion is based, stating the BiOp must "detail[] how the agency action affects the species or its critical habitat."  16 U.S.C. § 1536(b)(3)(A).  *Accord* 50 C.F.R. § 402.14.  Thus, the BiOp here is unlawful because it failed to (1) analyze the full scope of EPA's action; (2) use the best available science to analyze the effects of that action; (3) analyze the baseline status of the species; and (4) add the effects to the baseline to determine whether EPA's action would jeopardize species or adversely modify or destroy critical habitat.

Unable to point to anywhere in the BiOp for the programmatic analyses required by the ESA (because there are none), the Defendants cobble together references to state laws and regulations (which contain no analysis) and rely on EPA's vacuous biological evaluation ("BE"). At most, USFWS relied on the BE as providing an analysis of the baseline status of the species. The Defendants do not dispute that USFWS failed to consider the effects of EPA's action on Florida's threatened and endangered species, and do not attempt to defend USFWS' BiOp as having performed an adequate effects analysis on the merits.

### 1.   USFWS Failed to Assess the Full Scope of EPA's Action.

USFWS' myopic focus on Florida's individual permit process failed to account for and to consider the impacts to species from EPA's entire action as required by the ESA.  The agency action included not only individual permit decisions, but also the State's administration of existing general permits, its "no permit required" decisions, its compliance and enforcement activities, and the loss of NEPA analysis and ESA consultation.  Dkt. 98 at 38.  *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 521 (9th Cir. 2010) ("agency action" is defined broadly).

7

The Defendants fail to point to any evidence that USFWS analyzed the impacts of these components of EPA's decision to transfer authority over the 404 program to the State. They cite no explanation in the BiOp as to the impacts of those aspects of the program, how those program components factored into USFWS' jeopardy determination, or whether those program components would likely result in incidental take. The Defendants' claim that Florida had not issued any general permits, Dkt. 99 at 66, is belied by the thirty-eight general permits promulgated in the state program, Fla. Admin. Code R. 62-331.210–248, and only underscores the fact that USFWS failed to consider the impacts of general permits to be issued by the State.

The Defendants argue that USFWS could ignore "no permit required decisions" because Florida has no discretionary control over projects that do not require permits, Dkt. 99 at 67 & n.18, but USFWS itself did not assert this as a basis for declining to consider the impact of those decisions. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (reviewing court "must judge the propriety" of an agency's action "solely by the grounds invoked by the agency"). Moreover, *San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581 (9th Cir. 2014), explains that even non-discretionary components of an agency action must be considered as part of the agency action analyzed. *Id.* at 639–40. And, in any event, the State *does* exercise discretion when deciding to issue a "no permit required" decision.[4]

As to NEPA and the ESA, the Defendants concede that these processes would no longer apply but argue that USFWS was authorized to ignore them for that reason. Dkt. 99 at 67 n.19. They cite no authority, however, for the proposition that an agency can ignore the impact of the

---

[4] The Defendants attempt to draw parallels to the Corps' jurisdictional determinations to argue "no permit required" decisions are non-discretionary, but EPA itself has said that they are different. Ex. 1 at 38 (Crooks Dec. Ex. B).

loss of protections, when the ESA mandates that all impacts to species be considered, even if those impacts flow from actions that are otherwise lawful.[5]

And as to monitoring and enforcement, the Defendants point to the BiOp's conclusory statement that the technical assistance process will ensure that compliance is monitored and enforced for individual state 404 permits.  Dkt. 99 at 66–67.  The technical assistance process, however, operates only at the individual permit-by-permit level.  The Defendants' argument, thus, does not demonstrate that USFWS considered the impact to species of Florida's monitoring and enforcement at the programmatic level.  Nor do the Defendants' citations to state laws, Dkt. 99 at 66–67 & n.20, show that USFWS considered the impacts of those laws.  *See Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 353 (4th Cir. 2019) (short, perfunctory statements do not suffice for analysis of effects).

### 2.  USFWS Failed to Evaluate the Baseline Status of Protected Species.

As Plaintiffs have shown, the baseline section of the BiOp includes only generic descriptions of wetlands losses without articulating the connection between those wetlands losses and any particular species or critical habitat area.  Dkt. 98 at 38–39.  The Defendants are unable to point to any baseline analysis of species performed by USFWS relying instead on the mirror-image section in EPA's BE, Dkt. 99 at 68–69; *compare* FWS-006028, at FWS-006083–92 (BiOp) *with* FWS-005610, at FWS-005662–80 (BE), which is a near carbon copy of Florida's BA, *compare* EPA-HQ-OW-2018-0640-0387-A8 (BA) *with* FWS-005610–5906 (BE), and which suffers the same flaws as the BiOp.[6]

---

[5] Even if the loss of NEPA and the ESA was an intended result of 404 assumption, that does not mean it is not an "effect" that USFWS was required to analyze.

[6] USFWS' incorporation of the BE's discussion of Corps permitting data does not show any USFWS analysis.  Dkt. 99 at 69 n.23.  And neither the BA or BE contain the ESA-mandated analyses, and so USFWS could not rely on them to claim the analysis has been done.

But the Defendants identify nothing in the BiOp or the record to show any independent

analysis by USFWS in adopting the BE, and their conclusory statement that the BE was the best

available information deserves no deference, Dkt. 99 at 68–69.  *See United Techs. Corp. v. U.S.*

*Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) ("[Courts] do not defer to [an] agency's

conclusory or unsupported suppositions."); *Oceana, Inc. v. Ross*, No. 15-055, 2020 WL 5995125

at *23 (D.D.C. Oct. 9, 2020) (rejecting NMFS' attempt to "list and describe data that it purported

to incorporate into its jeopardy analysis—without indicating how that data actually factors into

the analysis").  USFWS has an independent duty to evaluate the baseline status of species, 50

C.F.R. § 402.14(g), which cannot be met by adopting, without discussion or analysis, the action

agency's BE, which is intended only "to identify any endangered or threatened species which is

likely to be affected" by the proposed action, 16 U.S.C. § 1536(c)(2); *see also* 50 C.F.R.

§ 402.12(a), (k).  USFWS cannot hang its hat on the self-interested submission provided by the

State and EPA.  *See Gerber v. Norton*, 294 F.3d 173, 184–85 (D.C. Cir. 2002) (USFWS

unlawfully allowed regulated entity to make findings USFWS was required to make).

The Defendants curiously suggest that Plaintiffs failed to identify any actions that were

omitted from the baseline, Dkt. 99 at 68 n.21, but Plaintiffs have pointed precisely to what

USFWS failed to consider in its baseline analysis: species and critical habitat, Dkt. 98 at 38–39.

Contrary to the Defendants' argument, *Appalachian Power Co. v. EPA* does not justify

granting USFWS deference here.  Dkt. 99 at 69.  In *Appalachian Power*, plaintiffs challenged

EPA's use of computer models to analyze technological improvements needed to reduce nitrogen

oxides emissions.  135 F.3d 791, 801 (D.C. Cir. 1998).  EPA conducted its own analyses, and

plaintiffs raised factual challenges regarding the data used.  *Id.*  Here, by contrast, USFWS does

not show it conducted any analyses that would warrant deference.  "[Courts] do not defer to [an]

10

agency's conclusory or unsupported suppositions." *United Techs. Corp.*, 601 F.3d at 562.  *See Clean Wis. v. EPA*, 964 F.3d 1145, 1161–64 (D.C. Cir. 2020) (denying deference when nothing in the record justified or explained agency's decision).  USFWS' conclusory, unsupported statements warrant no deference.

> **3.   USFWS Ignored the Wealth of Information at Its Disposal on Which Its Impacts Analysis Could and Should Have Been Based.**

As Plaintiffs have shown, USFWS possessed decades of data on consultations for Section 404 permits issued by the Corps which the agency could, and should, have analyzed to determine the impact of EPA's decision to transfer the 404 program to the State on protected species.  Dkt. 98 at 42.  Assessing the roughly seventy consultations per year from 2014–2018, FWS-006028, at FWS-006091 (BiOp), would have allowed USFWS to analyze the impacts on species based on (1) development trends in Florida regions (e.g., Southwest Florida, which has the last remaining habitat for the critically endangered Florida panther); (2) the types of projects that regularly obtain Section 404 permits in Florida (e.g., road and housing projects); (3) the types and seriousness of impacts of 404 projects (e.g., vehicle strikes for panthers, which is one of the leading causes of panther deaths); (4) the manner and volume of potential incidental take from 404 projects, which would allow them to project the allowable level of take for species (e.g., assessing the take that could occur for panthers, which has an existing wild population of only 120 to 230 adults).  USFWS' decision to ignore this wealth of data was impermissible, and its vague listing of potential impacts at the taxa level was insufficient.  Dkt. 98 at 39–41.  *See* FWS-006028, at FWS-006097–98 (e.g., mammals may occupy waters of the United States; dredge and fill activities may affect habitat in terms of water quality or habitat fragmentation).

The ESA requires USFWS to use "the best scientific and commercial data available" in its analysis.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).  "[T]he 'best scientific ... data

available,' does not mean 'the best scientific data possible.'"  *San Luis*, 747 F.3d at 602 (citing

*Building Indus. Ass'n Superior Cal. v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001)).  *Accord*

*Nat. Res. Def. Council, Inc. v. Evans* ("NRDC"), 279 F. Supp. 2d 1129, 1180 (N.D. Cal. 2003);

*Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000).  Under the ESA

"an agency cannot abdicate its responsibility to evaluate the impacts of an action on a species by

labeling available information '*uncertain*,' because doing so violates Congress' intent that

agencies 'give the benefit of the doubt to the species.'"  *Miccosukee Tribe of Indians of Fla. v.*

*United States* ("*Miccosukee Tribe I*"), 566 F.3d 1257, 1267 (11th Cir. 2009) (emphasis added).

*Accord* USFWS & NMFS, ESA Section 7 Consultation Handbook at 1-7 (1998) [hereinafter

"Consultation Handbook"] (if there are gaps in information, provide the benefit of the doubt to

the species).  "These are not passive directives; rather, [USFWS] 'must seek out and consider all

existing scientific data relevant to the decision it is tasked with making.'"  *Appalachian Voices v.*

*U.S. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022).  USFWS thus cannot "ignore available

biological information."  *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988).

Here, USFWS ignored the wealth of data at its disposal, and then claimed that it would

have been too difficult to project potential impacts to species from EPA's transfer of 404

authority to the State.  But federal wildlife agencies regularly use historical consultation

information to project future impacts and take.  *See, e.g.*, *Ctr. for Biological Diversity v. USFWS*,

807 F.3d 1031, 1048, 1050 (9th Cir. 2015) (programmatic BiOp using projections and modeling

to evaluate impacts and take); *Strahan v. Roughead*, 910 F. Supp. 2d 358, 381–82 (D. Mass.

2012) (programmatic BiOp using historical data on ship strikes to project impacts); *San Luis*,

747 F.3d at 600–01, 612, 615 (conducting multiple analyses and modeling future impacts; using

historical take data to project future potential take).  And where the wildlife agencies ignore

available data, courts have found that decision arbitrary and capricious.  *See Conner*, 848 F.2d at

1453–54 (rejecting USFWS' argument that it could not assess impacts at the programmatic level

because agency did not know the precise location of the future site-specific activities, where

USFWS had extensive information about species in the broad areas covered by lease sales).

In light of the foregoing, the Defendants' claim that historical data are only relevant as to

past projects, Dkt. 99 at 77–78, falls flat.  It cannot be squared with the fact that in this case, both

USFWS and EPA used the same historical data to determine that EPA's approval decision may

affect protected species, thus requiring formal consultation.  FWS-006028, at FWS-006089

(BiOp); FWS-005610, at FWS-005681 (BE); Dkt 99 at 78 n.26 (acknowledging USFWS' own

use of this data to approximate "number and types of permitting activities that could occur over

the next five years").  USFWS must have also relied on that information to determine that take of

protected species was likely, a required predicate finding before the agency could issue an ITS

(as it did).  There was no reasoned or adequate basis for USFWS to disregard this wealth of

information to assess the anticipated impacts of EPA's proposed action.  *See Motor Vehicle Mfrs.*

*Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Defendants' response to Plaintiffs' claim that USFWS failed to consider impacts to

Florida's nesting sea turtles is particularly telling.  Several species of protected sea turtles nest

along the beaches in Florida, with more than 90% of all sea turtle nesting in the continental U.S.

occurring in Florida.  Dkt. 98-2 at 5 (Carter Dec. ¶ 19); Dkt. 98-3 at 9–10 (Fleming Dec. ¶ 27).

Baby sea turtles can become confused and head in the wrong direction due to artificial light from

nearby development, which would require state 404 permits.  Dkt. 98-3 at 5–7 (Fleming Dec.

¶¶ 17, 21).  Light can also disorient female sea turtles when they come ashore to nest.  *Id.* at 5–6,

13 (Fleming Dec. ¶¶ 17, 36).  And yet the record contains no mention of nesting sea turtles.  The

Defendants ask the Court to merely take them at their word that USFWS considered "all ESA-listed species and their critical habitat." Dkt. 99 at 70.[7] But the law requires more.

**B. USFWS Failed to Limit Incidental Take of Protected Species.**

After failing to analyze the baseline status of the species, and the impacts to any species, USFWS granted unlimited take liability exemption to EPA, the State, and all future state permittees, in perpetuity. Dkt. 98 at 42. The ITS fails to comply with ESA requirements because it does not limit incidental take, provide adequate triggers for reinitiation, or establish meaningful guardrails with which these parties must abide to be exempt from liability.

**1. The ITS Exempted an Unlimited Amount of Incidental Take from Liability.**

USFWS failed to establish any take limit for EPA's action, and so failed to create a safeguard the ESA requires. *Id.* Both the ESA and its implementing regulations explicitly require USFWS to create an incidental take limit—as either a numerical limit or a surrogate[8]—when it exempts incidental take from liability. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i). *Accord NRDC*, 279 F. Supp. 2d at 1184–85 (rejecting a programmatic BiOp that failed to set take limits and instead sought to defer that decision to later review of specific actions); *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1037–38 (9th Cir. 2007) (explaining that a programmatic ITS must limit take as to each species, preferably with a numerical take limit, but if not possible, a surrogate that "performs the functions of a numerical limitation" may be permitted as to the species); *Miccosukee I*, 566 F.3d at 1275 (same for a project-specific BiOp); *Ariz. Cattle Growers' Ass'n v. USFWS*, 273 F.3d 1229, 1250 (9th Cir. 2001) (same); *Ctr. for*

---

[7] The Defendants' only qualm appears to be with the length of Plaintiffs' argument, Dkt. 99 at 70, but it does not take much to say, "there is nothing there."

[8] To use a surrogate in lieu of a numerical take limit, USFWS must meet the regulatory requirements. 50 C.F.R. § 402.14(i)(1)(i). In any event, the Defendants do not claim that they used a surrogate nor that they conducted the required analysis to do so.

*Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1126–27 (9th Cir. 2012) (same); *Oceana, Inc., v. Ross*, 2020 WL 5995125, at *11–13 (same).  There must always be some limit on take when USFWS grants liability exemptions for that take.  *Contra* Dkt. 99 at 76–77.  The Defendants do not contest that the ITS failed to establish a take limit at the programmatic level for any imperiled species in Florida.  *Id.* at 33, 77–78.

As already explained, USFWS had a wealth of information from which it could assess what incidental take had occurred in prior projects and project potential future incidental take based on project types and development trends.  This is what wildlife agencies do.  *See WildEarth Guardians v. U.S. Army Corps of Eng'rs*, 429 F. Supp. 3d 1224, 1261–62, 1266–67 (D.N.M. 2019) (upholding programmatic BiOp that had designated numerical take limits for both direct take and habitat loss).  The Defendants' suggestion that they lacked sufficient information to project potential incidental take therefore rings hollow.  Dkt. 99 at 77–78.

The cases cited by the Defendants do not support USFWS' decision to create *no* take limit.  Dkt. 99 at 76.  *See Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 538 F. Supp. 2d 242, 256–57 (D.D.C. 2008) (explaining USFWS must identify a numerical limit or use a surrogate); *Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 494–97 (D.D.C. 2014) (same).

### 2.  The ITS Failed to Include a Trigger for Reinitiation.

Having failed to limit take, the ITS also failed to include an adequate trigger for reinitiation.  Dkt. 98 at 42–43.  Reinitiation cannot "be left to 'the unfettered discretion of [USFWS], leaving no method by which the applicant or the action agency can gauge their performance.'"  *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 272 (4th Cir. 2018) (requiring "a clear standard for determining when the level of anticipated take has been

15

exceeded" that cannot be based on "vague and undetectable criteria"). "This lack of a clear standard also creates a transparency problem," because now, USFWS "makes the decision about whether to reinitiate consultation behind closed doors and without a record." *Oceana*, 2020 WL 5995125, at *14. *Accord NRDC*, 279 F. Supp. 2d at 1182 (applying same "trigger" requirements for a programmatic BiOp); *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195, 1231–32 (D. Mont. 2010) (same).

By not creating a take limit, USFWS failed to articulate any measurable standard by which one can determine when an authorized amount of take has been exceeded at the programmatic level so as to require reinitiation of programmatic consultation to re-evaluate the adequacy of USFWS' analyses and protective measures. 50 C.F.R. § 402.16(a)(1).[9]  Reinitiation of the technical assistance process on an individual permit is no substitute for USFWS' duties at the programmatic level. *Contra* FWS-006028, at FWS-006111 (BiOp).[10]

Further, because USFWS also failed to analyze the impacts to species in the BiOp or ITS, it is also impossible to know when "new information" as to those impacts would require reinitiation of programmatic consultation because USFWS' assumptions as to the impacts on species have proven untrue. 50 C.F.R. § 402.16(a)(2). *Contra* Dkt. 99 at 79.

Lastly, and contrary to its own regulatory requirements, USFWS avers that it would not reinitiate consultation on EPA's action even when a new species is listed. *Compare* 50 C.F.R. § 402.16(a)(4) *with* FWS-006028, at FWS-006111 (BiOp). The Defendants' argument that

---

[9] The Defendants have no response to Plaintiffs' argument that the ITS did not establish adequate monitoring and reporting requirements for incidental take at the permit level. Dkt. 98 at 43.
[10] The Defendants misleadingly cite this same language to suggest that USFWS would reinitiate consultation for the programmatic BiOp, Dkt. 99 at 33, 79 (citing FWS-006028, at FWS-006081, FWS-006093, FWS-006110), but that argument is contrary to what the ITS says, which is that reinitiation would occur as to an individual permit.

newly listed species would be handled through the technical assistance process, Dkt. 99 at 79, fails because, again, that process operates only at the *individual permit* level, and not the *programmatic* level.  It is illustrative, however, of USFWS' approach here: that it failed to consider the impact of EPA's action on any species.

### 3. The ITS Included No Meaningful Terms and Conditions to Minimize Incidental Take.

Having failed to set any limit for incidental take so as to trigger reinitiation of programmatic consultation, USFWS also failed to establish any meaningful reasonable and prudent measures or implementing terms and conditions.  Dkt. 98 at 44.[11]  Instead, the ITS simply requires that EPA abide by its own, pre-existing obligations under the Clean Water Act and that the State engage in the technical assistance process.  *Id.*

The Defendants' claim that only reporting is required as a term and condition, Dkt. 99 at 80–81, is contrary to law.  An ITS (including a programmatic ITS) must include "terms and conditions (*including, but not limited to*, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both."  16 U.S.C. § 1536(b)(4)(iv) (emphasis added). Reporting is therefore a necessary, but not solely sufficient, component of an ITS.

This language must also be read in conjunction with Section 1536(o), which extends take liability exemption only for "taking that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iv)."  *Id.* § 1536(o)(2).  Terms and conditions therefore serve as the basis for the ITS' exemption of incidental take.

---

[11] The Defendants have no response to Plaintiffs' argument that the ITS' reliance on compliance from the EPA, USFWS, the State, and all future permittees was unreasonable.  Dkt. 98 at 44–45 (citing *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 253–54 (D.D.C. 2003)).

Legislative history confirms that when Congress amended the ESA to create liability

exemption pursuant to Section 7, it did so with the intention of USFWS creating "mandatory and

enforceable controls on the means and level of incidental takings that may be allowed with

respect to agency action."  S. Rep. No. 97-418, at 24 (1982).  *Accord* H.R. Rep. No. 97-567, pt.

1, at 26 (1982) ("The Committee intends that such incidental takings be allowed provided that

the terms and conditions specified by the Secretary to minimize the impact of the taking are

complied with.").  Congress did not intend to weaken "one of the most effective tools for

conserving endangered wildlife," namely Section 9's take prohibition.  S. Rep. No. 97-418, at

25.  And it did "not intend[] to provide a liberal exemption from the taking prohibitions of the

Act for a large class of activities."  *Id.* at 24.  Only a "narrow set of activities that are conducted

in compliance with the specified reasonable and prudent measures shall be exempt."  *Id.*[12]

This interpretation is consistent with case law requiring that protective measures

established in an ITS be reasonably specific, certain to occur, and more than merely advisory.

*See Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 1001–02 (D. Ariz. 2011)

(rejecting conservation measures that were not reasonably specific nor certain to occur);

*Forest Serv. Emps.*, 726 F. Supp. 2d at 1228 (reasonable and prudent measures cannot merely be

"advisory"); *cf. WildEarth*, 429 F. Supp. 3d at 1272 (describing programmatic BiOp terms and

conditions, including one that prohibits construction during cuckoo breeding period).

The Defendants' reliance on EPA's Clean Water Act oversight does not save the ITS'

inadequate terms and conditions.  Dkt. 99 at 80.  Fundamentally, EPA oversight is baked into

state assumption by law; it is not an additional requirement USFWS created for the purpose of

---

[12] Those "reasonable and prudent measures" are implemented as "terms and conditions."  16
U.S.C. § 1536(b)(4)(iv).

minimizing impacts to species, but part of the underlying agency action.  The Defendants cite no authority for the proposition that directing compliance with existing law constitutes a "term and condition" imposed by the agency to minimize impacts to species as required by the ESA.  Nor is EPA's oversight of individual permits established under the Clean Water Act a lawful substitute for USFWS' separate, independent duty under the ESA to impose terms and conditions to minimize impacts to species.[13]  Importantly, compliance with the terms and conditions of an ITS serves as a guardrail, where the failure to comply removes any incidental take liability exemption USFWS has otherwise extended under the ESA.  16 U.S.C. § 1536(o).  EPA's oversight pursuant to a different statute, the Clean Water Act, serves a different function, and does not determine when and whether incidental take liability exemption is available under the ESA.

Nor does the Defendants' reliance on the State's engagement in the non-statutory technical assistance process constitute an adequate term and condition, Dkt. 99 at 80–81, particularly where, as here, the Defendants contend that process is also part of the underlying agency action.  The ESA requires USFWS to impose terms and conditions to minimize the impact *of the action under review*.  It cannot be sufficient for USFWS to rely on the same action to claim it has imposed the necessary terms and conditions to minimize the effects of that action. This circular reasoning is part and parcel of USFWS' failure to comply with the ESA twice, by

---

[13] Further, EPA reviews only certain individual permit decisions as the State is processing them, allowing EPA to object or federalize those permits.  FWS-002888, at FWS-002892–93 (EPA MOU).  It does not have input on the issuance of already promulgated state general permits or the State's no permit required decisions.  *Id.*  Moreover, although EPA will review individual permits that have a "reasonable potential for affecting endangered or threatened species as determined by USFWS," *id.* at FWS-002892, USFWS' determination is only as to which species are "endangered or threatened," FWS-006639, at FWS-006639 (USFWS email), whereas the effects of the proposed individual permit are determined "by [the State], in coordination with USFWS," which is not required to provide input.  FWS-006028, at FWS-006051 (BiOp).

avoiding its obligations at the programmatic level and then claiming they will be addressed at the permit level, which also does not follow the strictures of the ESA.

### C. The Non-Statutory, Permit-Level Technical Assistance Process Cannot and Does Not Substitute for the Programmatic Consultation ESA Requires.

To justify these ESA violations, USFWS relied on a non-statutory technical assistance process that (1) lacks key ESA guardrails, such as the requirement to use the best available science; (2) only deals with individual permits and new general permits; and (3) does not require USFWS' input on individual permit applications after preliminary species determinations.  Dkt. 98 at 45–49.  Under USFWS' approach, the agency would be allowed to avoid complying with ESA Section 7's rigorous procedures and substantive standards altogether.  But USFWS cannot have it both ways: the agency cannot forego full and detailed compliance with the ESA's protective Section 7 analytical requirements at the programmatic level by deferring that analysis until the downstream permitting stage, when the downstream permitting stage too will not apply the full scope of the ESA's protective Section 7 analytical requirements.  The Court should reject this attempt to create a vast loophole in the ESA's clear and rigorous protection of species.[14]

#### 1. USFWS Was Required to Conduct the ESA-Mandated Analyses at the Programmatic Level.

The ESA required USFWS to complete an adequate programmatic consultation using the ample information USFWS has at its disposal to consider how EPA's decision and its implementation would impact protected species and critical habitat in Florida.  Dkt. 98 at 45–46. The plain language of the ESA, its implementing regulations, decades of case law, and the

---

[14] Counts 6 and 13 challenge USFWS' technical assistance process, and the extension of incidental take liability coverage through that process. Dkt. 77 at 44–45 ¶¶ 213–221, at 44–45 ¶¶ 213–221; Cf. Dkt. 73 at 11 (characterizing Count 6 as challenging only that USFWS circumvented Section 10 of the ESA).

wildlife agencies' own practice demonstrate that the ESA required USFWS to analyze the impact of EPA's action and its implementation at the programmatic level.[15]

First, as Plaintiffs demonstrated in their motion, *id.*, "the ESA's consultation requirements apply with equal strength, to site-specific and programmatic actions." *W. Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302, 1324 (D. Idaho 2008), *aff'd in part, vacated in part, remanded*, 620 F.3d 1187 (9th Cir. 2010), *and aff'd in part, vacated in part, remanded*, 632 F.3d 472 (9th Cir. 2011). The terms "programmatic" and "site-specific" appear nowhere in the statute. *See* 16 U.S.C. § 1536. Rather, Congress wrote the ESA to apply equally to "any action" taken by a federal agency. *Id.* § 1536(a)(2), (b)(1)(A). Thus, for "any action," USFWS must issue a "written statement setting forth [USFWS'] opinion, and a summary of the information on which the opinion is based detailing how the agency action affects … species or … critical habitat." *Id.* § 1536(b)(3)(A). Congress "says in a statute what it means and means in a statute what it says there." *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992). To hold otherwise would re-write the ESA, something neither the Defendants nor the Court are authorized to do.

Second, the ESA's singular approach to consultations is confirmed by USFWS' own implementing regulations, which also treat programmatic and site-specific consultation the same. The regulations *explicitly* state that the availability of programmatic consultation "does not relieve the Federal agency of the requirements for considering the effects of the action or actions as a whole." 50 C.F.R. § 402.14(c)(4). *Accord* Consultation Handbook, at E-17. Nor do the

---

[15] Plaintiffs do not contest, as the Defendants claim, the availability of programmatic consultation, Dkt. 99 at 37, 62, but rather address the legal shortcomings of *this* programmatic consultation. Nor have Plaintiffs argued that programmatic consultation requires USFWS to foretell the exact locations and impacts of future state 404 permits. *Cf. id.*

regulations create different standards for site-specific and programmatic consultations. Formal consultation is required for "any action" that "may affect listed species or critical habitat." 50 C.F.R. § 402.14(a), (g)–(i). "Action" is defined broadly to include "all activities or programs of any kind," including "the promulgation of regulations." *Id.* § 402.02. "When a regulation's 'language is plain, [a court] must enforce it according to its terms.'" *In re Grand Jury Investigation*, 315 F. Supp. 3d 602, 633 (D.D.C. 2018), *aff'd*, 916 F.3d 1047 (D.C. Cir. 2019).

Third, the overwhelming weight of authority requires that any programmatic consultation include the ESA's mandated analyses. In the germinal case *Conner v. Burford*, 848 F.2d 1441, the Ninth Circuit rejected USFWS' argument that the ESA permitted an incremental consultation approach where the agency would consult on a lease sale considering only the impacts of the lease sale, and not subsequent oil and gas activities, because the agency could consider those site-specific impacts in later consultations. *Id.* at 1452–53. The court held that USFWS must prepare a "comprehensive" BiOp that assessed all aspects of the agency action "as a whole," based on the best available science. *Id.* at 1453, 1455–56. "To hold otherwise would eviscerate Congress' intent to 'give the benefit of the doubt to the species.'" *Id.* at 1454.

The court in *Conner* also found support in the D.C. Circuit's opinion in *North Slope Borough v. Andrus*, 642 F.2d 589, 608 (D.C. Cir. 1980), because that case also recognized "that incremental-step consultation does not vitiate the ESA requirement that [USFWS] prepare a comprehensive [BiOp]." *Conner*, 848 F.2d at 1455. Rather, the court in *North Slope* recognized a discrete exception for leasing decisions under the Outer-Continental Shelf Lands Act ("OCSLA"), because OCSLA required Section 7 consultation at all future stages and had a system of "checks and balances" that ensured all ESA consultation requirements would be carried out at each stage. *Id.* at 1455–56. *Conner* rejected USFWS' attempt to read a similar

22

exception into the Mineral Leasing Act ("MLA") because the MLA did not include the same system of "checks and balances" as OCSLA nor require consultation at each stage, thus there was no justification to obviate the ESA's congressional mandate. *Id.* at 1456.[16]

Another court in the D.C. Circuit has similarly rejected an attempt to avoid adequate programmatic consultation by relying on future permitting actions. In *National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d 1 (D.D.C. 2005), the Corps sought to avoid programmatic consultation on a nationwide Section 404 permit because the agency planned to evaluate each future site-specific dredge-and-fill activity that may affect the critically endangered Florida panther. *Id.* at 10. The court rejected this argument because the future consideration of species-specific impacts at the permit level did not relieve the agency of its obligation to consider the action "as a whole" at the programmatic level. *Id.* (citing 50 C.F.R. § 402.14(c)). The court recognized that comprehensive consultation was necessary to "avoid piece-meal destruction of panther habitat through [the Corps' and USFWS'] failure to make a cumulative analysis of the program as a whole." *Id.*

These holdings are consistent with the overwhelming body of case law.[17] *See, e.g.*, *Forest Serv. Emps.*, 726 F. Supp. 2d at 1224–25 (rejecting a programmatic BiOp with a superficial analysis of the effects of the action and use of a coarse filter analysis that ignored

---

[16] The Defendants ask the Court to read a similar exception into ESA consultations for the Clean Water Act, Dkt. 99 at 74–75. The Clean Water Act does not contain the same "checks and balances" as OCSLA. *See id.* at 74.

[17] As discussed in detail below, *Cooling Water* is an outlier in this body of law.

critical habitat impacts);[18] *Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1144–45, 1150 (W.D.

Wash. 2000) (rejecting a programmatic BiOp for a fishery management plan because it did not

consider the action as a whole, including all the activities involved in fishing); *Ctr. for Biological*

*Diversity v. Salazar*, 804 F. Supp. 2d 987, 1005–10 (D. Ariz. 2011) (same and rejecting

agencies' impacts analysis that failed to address all aspects of the action and was not supported

by the best available science); *Hawai'i Orchid Growers Ass'n v. U.S. Dep't of Ag.*, 436 F. Supp.

2d 45, 54–55 (D.D.C. 2006), *aff'd sub nom. Hawai'i Orchid Growers Ass'n v. Johanns*, 249 F.

App'x 204 (D.C. Cir. 2007) (upholding a programmatic BiOp because the administrative record

was "replete with discussion" demonstrating that the impacts of the entire action were

thoroughly considered); *Ctr. for Biological Diversity v. USFWS*, 807 F.3d at 1048, 1050

(upholding a programmatic BiOp because USFWS used the best available science to analyze the

effects of the action, including extensive projections and modeling of the effects on species);

*WildEarth*, 429 F. Supp. 3d at 1264, 1266–67, 1270–72 (upholding a programmatic BiOp that

considered impacts of the action "as a whole").

Fourth, the wildlife agencies are fully capable of producing programmatic BiOps that

address the required criteria.  *See, e.g.*, Biological Opinion on the Federally Regulated Oil and

Gas Program Activities in the Gulf of Mexico, Mar. 13, 2020 (programmatic BiOp including

discussion of the baseline status and impacts on marine species and critical habitat, partially

---

[18] The Defendants' attempt to distinguish *Forest Service Employees* fails.  Dkt. 99 at 64–65.  In *Forest Service Employees* and here, USFWS relied on future consideration of site-specific, species-specific impacts that would take place through a process that fell short of full Section 7 consultation (emergency consultation, 726 F. Supp. 2d at 1228, and the technical assistance process).  And in both *Forest Service Employees* and here, USFWS' actions were driven by the political winds: there, the Washington Office advised USFWS that a measure limiting aerial fire retardant on parts of the forests was "not an option," *id.*, and here EPA/USFWS took this approach at the behest of Florida, a fact the Defendants do not dispute, Dkt. 98 at 27–30.

specifying numerical take limits, and outlining specific terms and conditions for partially

mitigating harm to species).[19]

USFWS was not "free to choose" whether to abide by the ESA's clear mandates.  Dkt. 99

at 62–63.  And *San Luis*, 747 F.3d 581, does not counsel for such a blank check to disregard the

ESA's plain language.  That case stands for the long-understood principle that the ESA requires

USFWS to use the best information available—even if uncertain or imperfect—to conservatively

evaluate the impacts of federal actions as a whole on species while giving the benefit of the

doubt to imperiled species.  *Id.* at 607–10.  In *San Luis*, the court reviewed a "more than 400-

page [BiOp]—described by [USFWS] as the most complex [BiOp] ever prepared" dealing with

"an extremely complicated and technical subject matter covering multiple federal and state

agencies and affecting millions of acres of land and tens of millions of people."  *Id.* at 591–92,

605.  And there, USFWS conducted a thorough analysis of species and proposed a surrogate take

limit based on its analysis of historical data.  *Id.* at 598–600, 615.

Nor are Defendants correct that the action "as a whole" consisted only of EPA's approval

of the state program, Dkt. 99 at 66, and not the State's implementation of that decision, meaning

that all analysis could be deferred to the permit level.   USFWS' own description of the agency

action in the BiOp included both EPA's approval and the State's implementation of the program,

FWS-006028, at FWS-006045, FWS-006048 (BiOp).  And the ITS extends incidental take

---

[19] *Available at* https://repository.library.noaa.gov/view/noaa/23738.  *See also* Letter from Roy E.
Crabtree, NMFS, to Donald W. Kinard, Corps, (Nov. 20, 2017)
http://cdm16021.contentdm.oclc.org/utils/getfile/collection/p16021coll3/id/577 (programmatic
BiOp for dredge and fill activities in Florida and Caribbean analyzing baseline status and impacts
on species and critical habitat, using historical consultations to project impacts from future
actions, creating criteria to mitigate harm, and authorizing no incidental take).

liability exemption to the State in implementing the 404 program and to all future state

permittees, *id.* at FWS-006108.  USFWS defined the agency action broadly, because an ITS can

exempt incidental take for liability only if those actions are contemplated by the BiOp.  16

U.S.C. § 1536(o).  USFWS thus had the duty to perform the requisite analyses at the

programmatic level, taking the agency action "as a whole" into account.

### 2. The Non-Statutory Technical Assistance Process Was Not an Adequate Substitute for the Robust Analysis Required by Section 7.

To justify its failure to conduct an adequate programmatic consultation, USFWS sought

to rely on an inadequate, state-driven technical assistance process that contemplates only

individual permits and new general permits.  Dkt. 98 at 45–49.  But this technical assistance

process cannot, and does not, serve as an adequate proxy for legally mandated programmatic

consultation.  The Defendants themselves do not argue that the technical assistance process is

equivalent to Section 7 consultation.  Dkt. 99 at 74.  It has no basis in law, does not mandate

compliance with ESA guardrails like the requirement to use the best available science, and

allows the State to issue permits without any input from USFWS.  Dkt. 98 at 45–49.

But USFWS cannot have its take and eat it too.  USFWS must conduct Section 7

consultation *somewhere*, either at the programmatic level—which it refused to do—or at the site-

specific level—which it admits it does not do, instead relying on the technical assistance process

that also fails to comply with the ESA.  If USFWS had complied with its obligations to produce

an adequate programmatic BiOp that rigorously evaluates the impacts of EPA's action on species

in the State, and imposed the requisite take limits and guardrails on incidental take (such as

design characteristics for particular classes of projects, seasonal prohibitions in sensitive nesting

sites, or even no-fill zones for endemic species with limited habitat areas), then it is conceivable

that the agency could have relied on *a* technical assistance process to ensure that its assumptions

26

from the programmatic consultation proved true and to ensure that the guardrails it established were being observed.  Dkt. 98 at 28–29 & n.13 (identifying other options that would have allowed assumption while also complying with the ESA).  But what USFWS cannot do is use *this* technical assistance process, which itself does not conform to the requirements of Section 7 of the ESA, to avoid its duties at the programmatic level to comply with Section 7 of the ESA.

The Defendants point to nothing in the ESA that authorizes USFWS' attempt to circumvent the requirements for programmatic consultation by relying on a non-statutory, state-driven technical assistance process at the site-specific level.  Nor do the Defendants show USFWS' role in this process is anything more than voluntary in nature, unbound from the requirements, standards, and procedures mandated by the ESA.  Therefore, the Defendants' arguments do not support the Court "carv[ing] out a judicial exception to ESA's clear mandate that a comprehensive [BiOp] … be completed before initiation of the agency action."  *See Conner*, 848 F.2d at 1455 (finding a stipulation that allegedly ensured environmental review for site-specific actions did not substitute for comprehensive programmatic consultation); *accord Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d at 10 (future site-specific consultations do not replace comprehensive programmatic consultation).

The Defendants' suggestion that the technical assistance process's use of the term "jeopardy" somehow incorporates the rigorous processes and standards required for Section 7 consultation, Dkt. 99 at 71, is contradicted by their own concession that they do not argue the technical assistance process is equivalent to Section 7 consultation, *id.*  Moreover, "jeopardy" is not a term that exists in isolation in the ESA.  Rather the ESA specifically directs how wildlife agencies, including USFWS, are to make determinations regarding jeopardy.  The Defendants incorrectly suggest that it is sufficient under the ESA for USFWS to focus on the finish line

27

(jeopardy), without having to take the road established by Congress to get there (use best available science, perform baseline analysis of species, analyze impacts of action, determine whether take is likely, establish take limits, impose terms and conditions).  That position is contrary to law.  *See* 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(d), (g)–(i).

Contrary to the Defendants' argument, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) does not suggest that non-statutory technical assistance provisions in which a state may issue permits that affect species without USFWS' input somehow become lawful and binding because of the "presumption of regularity."  In *Overton Park*, the Court merely alluded to the presumption of regularity in lieu of applying de novo review or requiring the agency to meet a substantial evidence test.  *Id.* at 415.  The Court itself stated that the presumption did not "shield [the agency's] action from a thorough, probing, in-depth review."  *Id.  Accord Otay Mesa Prop. L.P v. U.S. Dep't of Interior*, 144 F. Supp. 3d 35, 54 (D.D.C. 2015) (same).  Moreover, even if that presumption required the Court to presume USFWS could create a non-statutory, voluntary technical assistance process in lieu of abiding by clear congressional mandates, Plaintiffs have overcome that presumption given the irregularity of the entire assumption process in this case.  Dkt. 98 at 22–33.

USFWS' role in the technical assistance process here is vague and voluntary.  *See Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d at 1001–02 (rejecting programmatic BiOp where conservation measures were not reasonably specific nor certain to occur); *Forest Serv. Emps.*, 726 F. Supp. 2d at 1228 (rejecting BiOp where protective measures were merely advisory).  Other than receiving and reviewing permits or providing information in response to the State's preliminary determination as to impacts on species, USFWS is not required to do

anything at all.[20]   USFWS *may* provide "technical assistance," but is not required to.   USFWS

"may" provide comments but is not required to.   And whatever that technical assistance might

entail, or the comments might address, is not specified at all, nor is any process by which

USFWS might arrive at the technical assistance or comments that it *may* offer.   Nothing guides

or defines USFWS' participation in the process.

And most fundamentally, the State can issue permits without any input from USFWS.

Dkt. 98 at 47–49.   These are facts the Defendants cannot dispute, because they are plain on the

face of the BiOp itself: "Once it has been determined by [the State] that an application will have

no adverse impacts or adverse effects to federally listed endangered or threatened species (or

species proposed to be listed) or their critical habitats, and the USFWS has not submitted

information or questions that would lead the State to reconsider its determination, the species

review concludes for that application."  FWS-006028, at FWS-006056.   The Defendants'

references to the *State's* obligations, Dkt. 99 at 31–32, 71–72, not only have no bearing on

*USFWS'* role, they also confirm that USFWS' role is voluntary.   FWS-006028, at FWS-006046,

FWS-006056 (USFWS "may" submit questions within twenty-days or have their silence deemed

"no comment]");  FWS-006028, at FWS-006057 (USFWS "may submit recommendations to

[the State]" for protective measures).   That the State has committed to incorporate any measures

USFWS proposes into permit conditions, Dkt. 99 at 32, 71, presupposes that USFWS will have

---

[20] The fact that USFWS will receive and review individual 404 permits, Dkt. 99 at 31, 72, is
insufficient because it does not require USFWS to then use the best available science to
rigorously examine the baseline of affected species and potential impacts from the project, nor
create take limits.   Nor would receiving and reviewing individual 404 permits be a sufficient
substitute for evaluating EPA's action at the *programmatic* level.   The Defendants' citations, *id.*
at 31, show only that USFWS (1) "may" provide technical assistance "as needed," FWS-006028,
at FWS-006046, (2) "may" submit comments, FWS-006028, at FWS-006047; and (3) will be
"provide[d] an opportunity" to provide technical assistance, FWS-006028, at FWS-006106.

proposed protective measures, something USFWS is not required to do, because the technical

assistance process does not require USFWS to make any determinations at all.

Finally, the ESA's Section 9 prohibition of take would not solve the problems with the

technical assistance process, Dkt. 99 at 72 n.25, because USFWS' ITS exempts incidental take

from liability for the State in operating the 404 program as well as all future state permittees as

long as they comply with their individual 404 permits.  FWS-006028, at FWS-006108; 16 U.S.C.

§ 1536(o).  In other words, when take occurs pursuant to Section 404 permitted actions, that take

is exempt from Section 9 liability as long as the permittee complies with their permit; that is true

even when the State issues the permit without any input from USFWS.

### D.  The Defendants' Reliance on *Cooling Water* Fails Because That Case is an Outlier That is Distinguishable, Poorly Reasoned, and Wrongly Decided.

To defend USFWS' abdication of its Section 7 duties at the programmatic level, and its

wholesale reliance on the individual permit-by-permit technical assistance process as a proxy for

Section 7 compliance, the Defendants put all their eggs in the *Cooling Water* basket.[21]  Dkt. 99 at

64–65, 70–71, 72 n.25, 74–76, 78, 80–82.  But *Cooling Water* is contrary to law.  As relates to

the issue presented here, *Cooling Water* is an outlier that goes against the current in a vast sea of

case law on programmatic BiOps.  It was poorly reasoned and was wrongly decided for all the

reasons why USFWS' actions here are unlawful.  However, the Court need not reach that issue

because *Cooling Water* is also distinguishable on its facts.

First, in *Cooling Water*, USFWS did not have extensive prior consultation data on which

it could base an analysis of the impacts of NPDES programs that regulate cooling water intake

---

[21] *Cooling Water* is an out of circuit case that does not bind this Court, and, because the decision
conflicts the ESA, it does not constitute persuasive authority either.  Contrary to the Defendants'
claim, Dkt. 99 at 76, Plaintiffs argue *Cooling Water* was wrongly decided, Dkt. 98 at 49 n.21.

systems, because those programs had long ago been delegated to the States.[22]  *Cooling Water*, 905 F.3d at 59 & n.2.  Moreover, there were no pre-existing Section 316(b) regulations that had been implemented in federal NPDES permitting processes, and therefore no prior consultations on those activities.  *Id*. at 61–62.  Here, by contrast, USFWS had extensive, on-point data from its own consultations on Corps 404 permits, specifically in Florida, that it could and should have used to develop its analyses and projections.

Second, unlike in *Cooling Water*, the technical assistance process laid out in the BiOp here was not part of the agency action being reviewed by USFWS.  Dkt. 98 at 50–51.  The Defendants mischaracterize our argument and suggest that Plaintiffs take issue solely with EPA not codifying its approval of the state 404 program.  Dkt. 99 at 76.  Not so.  Whether the technical assistance process was part of the agency action under review affects its legal effect.  Only measures consulted upon as part of the underlying agency action are legally enforceable under the ESA.  *Ctr. for Biological Diversity v. USFWS*, 807 F.3d at 1046 & n.12.  If, as in *Cooling Water*, the technical assistance process had been promulgated as part of the rule that USFWS consulted upon, that process would be enforceable under the ESA.  905 F.3d at 72.  However, here, the Memorandum of Agreement explicitly said that the technical assistance process "would be outlined in the USFWS' [BiOp]," and EPA has consistently maintained that the BiOp was not part of the program.[23]  FWS-006028, at FWS-006045–68 (BiOp).

---

[22] *See NPDES State Program Authority*, EPA, https://www.epa.gov/npdes/npdes-state-program-authority (last accessed June 3, 2023).

[23] The Defendants did not dispute Plaintiffs' argument that the agency action did not include the technical assistance process, Dkt. 98 at 73 & 73 n.36, and instead merely cited the BiOp's outline of the technical assistance process.  *See, e.g.*, Dkt. 99 at 31–33, 42, 44, 70–72, 77, 79, 81.

Third, the scope of the action in *Cooling Water* is distinct from EPA's action here. Dkt. 98 at 49–50. Although the Defendants focus on the geographic scope (Florida's program being statewide whereas the 316(b) regulations are national), that does not address the more relevant difference in *regulatory* scope. In *Cooling Water*, EPA promulgated a technical standard to reduce take for cooling water intake structures that would be implemented in individual NPDES permits under already delegated state programs (akin to EPA establishing a maximum level of allowable discharges for a pollutant), 905 F.3d at 65–70; whereas here, EPA transferred a dredge and fill program to the State, which would be implemented through permits (individual and general), no permit required decisions, and compliance and enforcement measures, Dkt. 98 at 49–50. Unlike a dredge and fill program, the agency action in *Cooling Water* was protective, aiming to reduce harm to aquatic species from cooling water intake structures, and would result in a *net reduction* of incidental take. Dkt. 98 at 50. The Defendants have no response to these differences, and instead focus only on the purpose of the *Section 7 consultations* for both actions, rather than the purpose of agency actions being reviewed. Dkt. 99 at 75.

At bottom, the technical assistance process in *Cooling Water* served as an extra check on a rule that, by design, would reduce incidental take of protected species and would be implemented through permits for a discrete universe of existing facilities.[24] Here, by contrast, the State 404 program, by design, would result in incidental take from habitat destruction and the associated construction of, e.g., roads, housing developments, and mines that harm species through, e.g., increased pollution and risks of vehicle strikes. So, here, the means by which species are protected at a programmatic level must be rigorous and thorough as required by the

---

[24] The court issued its decision after several prior attempts to regulate this harm to species, and the agency's ultimate solution was opposed by both environmental groups and advocates.

ESA and not left entirely to a technical assistance process that applies only at the individual permit level and that allows the State to issue a permit without USFWS' input.

## II.   EPA's Reliance Was Unlawful.

To contest its unlawful reliance on the BiOp, EPA erroneously treats *City of Tacoma* as establishing a single bright-line rule—that a plaintiff must always point to new information that challenges the BiOp's conclusions to show that an action agency's reliance on that BiOp was unlawful.  Dkt. 99 at 82–83.  However, as recognized in *City of Tacoma* and then later applied in *Shafer*, an action agency's reliance on a *facially* flawed BiOp is arbitrary and capricious regardless of new information.  *City of Tacoma v. FERC*, 460 F.3d 53, 75–76 (D.C. Cir. 2006); *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1096 (D.C. Cir. 2021).  EPA fails to acknowledge this standard and the cases Plaintiffs cited from within this Circuit and elsewhere that have followed it.  *See* Dkt. 98 at 51–52.

The Defendants mischaracterize Plaintiffs' position as arguing that *Shafer* rejected the "new information" standard.  Dkt. 99 at 82–83 & n.27.  Rather, Plaintiffs relied on *Shafer* (and other cases) because the court did not apply the "new information" standard to find an agency's reliance arbitrary when the court was confronted with a BiOp's *inadequate* analysis.[25]  *See* Dkt. 98 at 51–52.  The courts' not requiring plaintiffs in those cases to identify "new information" supports the Plaintiffs' argument that, when a BiOp is facially inadequate, a challenger need not point to "new information" that undermines the BiOp's conclusions.

---

[25] While the court in *Shafer* separately applied the "new information" standard when analyzing a BiOp's evidence-based plan for river flow management, it first found that the analysis was "reasoned and thorough" and then found reliance on it was also reasonable absent a showing the action agency overlooked new information or evidence in the record.  *Shafer*, 992 F.3d at 1092–1093.  Similarly, in *City of Tacoma*, the court did not find inadequacies on the face of the BiOp. 460 F.3d at 76–78.

33

Like in *Shafer*, here the BiOp fails to address several important issues that are apparent on its face.  Indeed, the Defendants admit that they did not complete the effects analyses, claiming that they did not have to.  FWS-006028, at FWS-006092, FWS-006094–95 (BiOp). Also, like in *Shafer*, these inadequacies raise questions of law, including whether the BiOp is missing analysis that is required to be undertaken at the programmatic level as opposed to only permit by permit analyses to be conducted at a later time by state agencies.  While EPA attempts to distinguish *Shafer* on the facts, the missing analysis in *Shafer* also raised a question of law— whether a reasonable and prudent measure constituted a minor change in compliance with ESA regulations.  The court did not rely on whether the action agency was made aware of the minor change requirement or whether there was new information.  The facial flaw of failing to address a legal requirement alone made reliance by the action agency arbitrary.

Where, as here, a BiOp is facially unlawful, it would make no sense to require the Plaintiffs to identify "new information," because what Plaintiffs challenge is USFWS' theory that it can avoid programmatic analyses in favor of a permit-level technical assistance process that also does not abide by ESA requirements.  In other words, the debate is not over factual issues USFWS took into consideration, or any analytical conclusion that USFWS may have reached, because USFWS did not analyze information for the purpose of reaching any analytical conclusion required by the ESA.

EPA's reliance on *Cooling Water* fails for the same reasons that *Cooling Water* should not be extended to the circumstances of this case, as argued above.  Plaintiffs do not argue that EPA had to undertake its own independent analysis as insinuated by the Defendants, but that it is EPA's ultimate burden to satisfy the ESA by ensuring that the BiOp the agency relies on is

lawful.  *See City of Tacoma*, 460 F.3d at 76 (citing 16 U.S.C. § 1536(a)(1)–(2)).  Accordingly, if

USFWS did not comply with the ESA, then EPA also failed to meet its duty.

Indeed, the Defendants fail to cite a case that finds reliance on a facially invalid BiOp to

have been lawful.  *City of Tacoma* did not hold that flaws in a BiOp are irrelevant to the reliance

analysis, only that the focus of the inquiry is on the action agency's reliance.  *City of Tacoma*,

460 F.3d at 75–76.  Here, the action agency (EPA) actually set forth the unsound approach

followed by the expert agency (USFWS).  *See* EPA-HQ-OW-2018-0640-0660-A1, at 3, 7 (ESA

Consultation Memo) (EPA adopting process-based proxy approach for 404 assumption).  This is

therefore not a situation where the action agency blindly relied on the expert's advice, and where

fairness would dictate that the action agency be put on notice of legal errors sometime thereafter.

*City of Tacoma*, 460 F.3d at 75–76 (rationale for "new information" standard is to give action

agency a basis for doubting the expert conclusions).

The Defendants' argument that Plaintiffs' concern is about USFWS' failure to estimate

the number of each ESA-listed species that would be affected for purposes of estimating take

misses the point.  Plaintiffs' argument is that EPA failed to provide all relevant data to the expert

agency, which also makes EPA's reliance arbitrary.  Dkt. 98 at 52.

Finally, the Defendants' position would lead to absurd results, allowing two wrongs to

make a right.  "One agency's unexplained adoption of an unreasoned analysis just compounds

rather than vitiates the analytical void.  Said another way, two wrongs do not make a

right." *Env't Health Tr. v. FCC*, 9 F.4th 893, 910–11 (D.C. Cir. 2021).

### III.    EPA Arbitrarily Determined "No Effect" to NMFS Species.

The Defendants do not dispute that EPA's "no effect" determination relied solely on

NMFS' conclusion that NMFS-listed species do not occur *in* assumable waters.  Dkt. 99 at 84.

And the Defendants do not dispute that the proper "action area" for EPA's "no effect" determination includes areas that would be indirectly impacted, including downstream from assumable waters where NMFS-listed species are found. Dkt. 98 at 53. Nor do the Defendants dispute the evidence in the record illustrating potential impacts to NMFS-listed species and habitats within the action area. Dkt. 98 at 54–55. Indeed, once Plaintiffs notified EPA of their intent to sue on this claim, EPA indicated that the agency would pursue a BE to consider these impacts. Dkt. 99 at 85. The Defendants argue that EPA's claim that NMFS species are not within assumed waters is reasonable but fail to provide any explanation to back that up. Given that EPA failed to analyze the legally required "action area" and failed to provide a rational connection between its conclusion and evidence in the record, EPA's "no effect" determination was arbitrary. *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002). EPA's decision not to consult based on this unduly narrow definition of the action area and its approval of Florida's program without having conducted that consultation were also arbitrary.[26]

Contrary to Florida's unsupported contention, Dkt. 102 at 60, these claims are not "likely" mooted by EPA's two-years-too-late initiation of a BE on NMFS species because there is still meaningful relief that the Court can grant.[27] *See, e.g.*, *Ctr. for Biological Diversity v. EPA*, 316 F. Supp. 3d 1156, 1174–75 (N.D. Cal. 2018) (claim of failure to consult not mooted by reinitiation because relief is available in injunctions and vacatur); *White v. U.S. Army Corps of*

---

[26] EPA's complaint that consultation is not required if an action agency makes a "no effect" determination is irrelevant when that determination is improper.

[27] Though EPA initially claimed it would initiate consultation "as appropriate" within ninety days of its response to Plaintiffs' notice of intent to sue, it has been almost two years since EPA began its BE for NMFS-listed species. EPA-HQ-OW-2018-0640-0664, at 1 (EPA Response to NOI). EPA now claims they anticipate completion of this preliminary step roughly a week *after briefing in this case is scheduled to end*. Dkt. 99 at 85.

*Eng'rs*, No. 22-CV-06143-JSC, 2023 WL 2347379, at *5 (N.D. Cal. Mar. 3, 2023) (challenge on failure to abide by ITS not moot because relief available in injunction of underlying action while BiOp is completed).  Plaintiffs seek a declaratory judgment as to EPA's failure to consult and vacatur of EPA's ultimate action—approval of Florida's program.  Neither of these remedies is mooted by EPA's belated development of a BE.  Because EPA has not issued a superseding effects determination or BiOp addressing NMFS-listed species, Plaintiffs' claims are also not moot on those grounds.  *Oceana, Inc. v. Ross*, No. CV 12-0041 (PLF), 2020 WL 5834832, at *4 (D.D.C. Oct. 1, 2020) (reinitiation alone does not moot claims against BiOp).

### IV.     EPA Unlawfully Approved Florida's Program.

In addition to failing to comply with the ESA, EPA's approval also failed to comply with the Clean Water Act.  The Defendants aver that Plaintiffs only qualm is with the State not adopting the federal 404(b)(1) Guidelines, Dkt. 99 at 45, but that is not the case.

Under the Clean Water Act, any state 404 program must be at least as stringent as the federal program.  33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.1(d).  EPA may only approve a state program when the state has authority to, among other things: (1) issue permits "which apply, and assure compliance with" all Section 404 requirements, including the Section 404(b)(1) Guidelines, 40 C.F.R. pt. 230; and (2) "abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement."  33 U.S.C. § 1344(h)(1)(A)(i), (1)(G), (2)(A); 40 C.F.R. pt. 233.

To defend EPA's approval, the Defendants point to areas where the federal and state program are consistent.  Dkt. 99 at 45–46.  But they fail to account for the places where the state program is not as stringent as federal law requires.  Dkt. 98 at 55–70.  *See In re Grand Jury*, 315 F. Supp. 3d at 633 (requiring all regulatory provisions to be given effect).

By failing to: (1) recognize criminal liability for negligent violations or adopt the federal statute of limitations; (2) either adopt *or* demonstrate it would assure compliance with all 404(b)(1) Guidelines, including as to factual determinations, water quality, and protection of species; and (3) properly define assumable and retained waters, Florida's program failed to meet Clean Water Act criteria and EPA's approval of the program was therefore unlawful.

### A.  Florida's Program Failed to Meet Minimum Enforcement Standards.

The Defendants' argument that Florida's less stringent mens rea and statute of limitations are sufficient under the "flexibility" afforded by the Clean Water Act conflicts with the statute's plain meaning and EPA's unambiguous regulations.  Dkt. 99 at 50–57.

### 1.  Florida's Mens Rea Conflicts with the Clean Water Act.

The Clean Water Act unambiguously criminalizes negligent violations both for state and federal permitting programs.  EPA's approval of a state program that contains a less stringent mens rea is an abuse of discretion.  *See Idaho Conservation League v. EPA*, 820 F. App'x 627, 628 (9th Cir. 2020).  In defending Florida's failure to adopt the same mens rea established by Congress, the Defendants conflate the question of what *constitutes* a violation under the Clean Water Act with the flexibility as to *how* a state may abate those violations.

### a.  The Clean Water Act Criminalizes Negligent Violations.

As four Circuit Courts of Appeal have held, Congress unambiguously established simple negligence as a category of violations for all 404 permits, including state permits.  33 U.S.C. § 1319(c)(1).  Dkt. 98 at 56–58.  *See Sackett v. EPA*, 598 U.S. ___, 2023 WL 3632751, at *9–10, 15 (2023) (recognizing criminalization of negligent violations under CWA).  Nothing in the statute authorizes states to employ a different criminal intent standard when issuing 404 permits.

While the Defendants seek to minimize the importance of Congress' criminalization of negligent violations by claiming that these make up a small percentage of criminal prosecutions, Dkt. 99 at 53–54, that argument rings hollow given the lengths to which the Government has gone to repeatedly litigate their right to prosecute negligent violations, *see* Dkt. 98 at 56–58 (discussing cases).  Because Congress directed that negligent violations of the law constitute criminal violations (whether permits are issued by the Corps or a state), it set the minimum standard for EPA approval of state programs as well, which must recognize that negligent violations of the law constitute criminal violations to be as stringent as federal law.

In addition to establishing what constitutes a violation, Congress separately required state programs to have authority to "abate violations" of the Act.  33 U.S.C. § 1344(h)(1)(G).  Contrary to the Defendants' contention, Dkt. 99 at 50–52, there is nothing in the Clean Water Act that authorizes a state program to decline to recognize an entire class of criminal violations.  To permit the Defendants' interpretation would allow a state 404 program to legalize activity that is patently unlawful under the Clean Water Act.  More importantly, there is no language in the statute allowing "flexibility" as to what constitutes a violation for state-assumed programs.

As further evidence, Congress did not limit negligent criminal violations of the Clean Water Act to only federal prosecution.  33 U.S.C. § 1319(c)(1)(A) (establishing criminal violation for negligent violations of 404 permits issued by federal agency or a state); *id.* § 1319(a)(1) (referring to state enforcement of Section 404).  Where Congress intended to dictate only how federal agencies handled a matter, Congress did so *explicitly*.  *See id*. § 1319(g)(1) (establishing administrative penalties that EPA or the Corps may impose).  The Defendants' position that states may exclude negligent violations from criminal liability would impermissibly rewrite the act.  *See Jama v. U.S. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do

39

not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

The Defendants' argument that state programs need only mirror certain requirements, Dkt. 99 at 51, misses the point. The issue is one of stringency, not exactness. The provisions the Defendants cite merely illustrate that Congress set the floor, the minimum requirements state programs must meet. Section 1344(h)(1)(A)(i) requires that state programs "apply, and assure compliance with, *any* applicable requirements of this section, *including, but not limited to,* the guidelines established under subsection (b)(1) of this section, and sections 1317 and 1343 of this title." 33 U.S.C. § 1344(h)(1)(A)(i) (emphasis added). One of those requirements is the ability to enforce violations of the Clean Water Act, which are defined by statute. *Id.* § 1319. Section 1344(h)(1)(B) further requires state programs to demonstrate they have authority "[t]o issue permits which apply, and assure compliance with, all applicable requirements of section 1318 of this title, or to inspect, monitor, enter, and require reports *to at least the same extent* as required in section 1318 of this title." *Id.* § 1344(h)(1)(B) (emphasis added).[28]

This is hardly surprising. Congress made plain that the Clean Water Act is a floor in all respects because it was intended to protect the Nation's waters. State programs cannot be less protective because that would defeat the purpose of the Act. *See* 33 U.S.C. § 1311(b)(1)(C);

---

[28] Although the Defendants also rely on the fact Section 404(h) does not refer to Section 319(c) in describing the violations, Dkt. 99 at 51, it was unnecessary as they were already laid out. The use of the term "violation" elsewhere in the statute likewise does not typically refer to Section 319, including provisions in the same section regarding how the Corps shall bring enforcement actions for violation of permits. 33 U.S.C. § 1344(s). The Defendants' interpretation would render Section 319 meaningless in all of these instances. *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004) ("[Courts] must give effect to every word . . . wherever possible.").

*PUD No. 1, of Jefferson County v. Wash. Dep't of Ecology*, 511 U.S. 700, 705–707 (1994).  The Defendants' view of "flexibility" would allow state programs to be less stringent for each and every Clean Water Act requirement not expressly referenced in Section 404 assumption provisions, thereby allowing assumed programs with standards below the floor set by Congress. 33 U.S.C. § 1344.  Congress may have intended for cooperation, but not evisceration of minimum standards, including for the protection and deterrent effect they provide.

The Defendants' reliance on *Natural Resources Defense Council ("NRDC") v. EPA* is also to no avail.  Dkt. 99 at 51–52.  What constitutes a violation of the Clean Water Act was not at issue in *NRDC*, instead the court was confronted with *how* violations would be abated in a state program (specifically, the *penalties* that a state program might impose *after* finding a violation).  859 F.2d 156, 180 (D.C. Cir. 1988).  There, plaintiffs argued that the regulations had to set maximum criminal penalties for state programs, not just a minimum.  *Id.* at 174.  In reaching its decision, the court relied on statutory text instructing EPA to "promulgate guidelines establishing the *minimum* procedural and other elements of any State program," explicitly including "enforcement provisions."  *Id.* at 173 n.15 (citing 33 U.S.C. § 1314(i)(2) (emphasis added).  Again, enforcement relates to how a state responds to a violation.  It does not establish what constitutes a violation.  There was also no statutory text the court found to support plaintiffs' position.  *Id.* at 178–79.  And, despite discussion on state roles and flexibility on which EPA relies, the court recognized that while EPA regulations establish "a floor for . . . state enforcement authority," Congress made its intent clear that state-assumed Clean Water Act programs must be administered to "provide a much more effective program than that which would result from control in the regional offices of [EPA]."  *Id*. at 174.

41

Unlike the penalties issue in *NRDC*, here the Clean Water Act unambiguously criminalizes negligent violations both for state and federal permitting.  Dkt. 98 at 57–58.  EPA has no discretion to create an exemption from the statutory requirements.  Nor does *NRDC* provide any support to the contrary.[29]  Rather, implicit in *NRDC* is that a state program that is less effective than a federally administered program runs counter to the Act and defeats its very purpose.  The explicit minimum protections of the statute, not uniformity, are at issue here.

The same is true of *Akiak Native Community v. EPA*, on which EPA also relied, Dkt. 99 at 52 n.14.  625 F.3d 1162, 1171–72 (9th Cir. 2010) (declining to find inadequate enforcement authority where a state lacked authority to impose administrative penalties available to the EPA).  Like *NRDC*, *Akiak* did not involve criminal liability, but a challenge to how Alaska abated violations—its inability to assess civil penalties administratively as compared to the federal NPDES program.  *Id*.  The court relied on the statute's silence on state imposition of administrative penalties and EPA's regulations, which provide EPA flexibility in approving a state program's civil penalties, 40 C.F.R. § 233.41(d)(1).  625 F.3d at 1171–72.  Here, the statute is not silent, and EPA's regulations confirm that a state must have the same minimum criminal intent standard as the federal program.  40 C.F.R. § 233.41(b)(2).

---

[29] Indeed, unlike EPA's approval here of a less stringent program, in *NRDC* the minimum penalties EPA required for state programs were higher than the minimum penalties in the Clean Water Act.  859 F.2d at 178–79.  This is, of course, consistent with the overall policy and goal of Congress to make the Clean Water Act the minimum baseline protections for our water resources.  EPA's reasoning in promulgating the minimum penalty baseline regulation was "to ensure effective State enforcement programs" so that EPA would not "be forced to take its own enforcement action in approved States" because of an inadequate state program.  *Id.* at 181.  The same policy, goal, and reasoning dictates against EPA's interpretation here.

**b. Florida's 404 Program Excludes Simple Negligence Criminal Violations and Therefore is Less Stringent Than Federal Law**

As shown above, the Clean Water Act criminalizes negligent violations of Section 404, regardless of whether permitting is performed by state or federal agencies. The Defendants' argument that EPA could approve Florida's program notwithstanding its heightened criminal intent standard is contrary to law. Dkt. 99 at 50–54. *See Idaho*, 820 F. App'x at 628.

The Defendants' argument that state programs need not criminalize negligent violations is also contrary to EPA's regulation, which plainly requires the mens rea for state 404 enforcement programs to be "no greater" than that under federal law. 40 C.F.R. § 233.41(b)(2). EPA's regulations also explicitly embody the Clean Water Act's central tenet that the federal program sets the floor for state programs, which "may not impose any less stringent requirements for *any purpose*." *Id.* § 233.1 (emphasis added). *See also* 44 Fed. Reg. 34,244, 34,258 (June 14, 1979) (state satisfies requirement if its burden of proof for "criminal negligence" is equivalent to "negligence" in federal criminal prosecution); 53 Fed. Reg. 20,764, 20,770 (June 6, 1988) (a state program component that is not as stringent as the Clean Water Act cannot be compensated for by another state component that is more stringent; state program "must be at least as stringent and extensive").

The Defendants' argument here is strikingly similar to the argument EPA raised and lost before the Ninth Circuit. *Idaho*, 820 F. App'x at 628. In *Idaho,* a unanimous panel relied on the plain language of the statute and the almost identical mens rea regulation under the 402 NPDES program to conclude that EPA abused its discretion when it approved a state program with a criminal intent higher than simple negligence. *Contra* Dkt. 99 at 56. The court held that EPA abused its discretion in approving the state program because the Clean Water Act criminalizes simple negligence and EPA's 402 regulation, like the 404 regulation here, requires the mens rea

43

for state enforcement programs be "no greater" than that under federal law.  *Idaho*, 820 F. App'x at 628.  The court rejected EPA's argument that broad language in the mens rea regulation was inconsistent with more specific language in a provision regarding penalty assessments.  *Id.*  The court also noted that while state programs need not "mirror" the federal program as to mens rea, they must include criminal liability for simple negligence.  *Id.*  The same is true here.

Similarly, here, EPA's approval of Florida's program was an abuse of discretion because Florida's program excludes from criminal liability an entire class of criminal violations under the Clean Water Act.  And, as in *Idaho*, the Defendants advance a similarly faulty interpretation that conflicts with the plain meaning of the statute and its own regulation.  Dkt. 99 at 50–54.

Here, the Defendants' argument that the mens rea regulation's "general" language should be governed by more specific language in a different provision that relates to penalties fails here for the same reasons it did in *Idaho*.  Dkt. 99 at 55–56; *Compare* 40 C.F.R. § 233.41(b)(2) *with id.* § 233.41(a)(3)(ii).  The mens rea provision could not be clearer.  It plainly provides that states may not impose a higher mens rea than that required of EPA to establish a violation.  The penalty provision, by contrast, relates to *the consequences* for committing a violation.  That EPA may not have prescribed a minimum monetary penalty for simple negligence criminal violations at most means that states retain full flexibility as to the monetary penalty for those violations.[30]

---

[30] Contrary to the Defendants' argument, Dkt. 99 at 55, EPA's penalty provision does not ban or limit a state's ability to impose criminal penalties for negligent violations; at most, that provision simply declines to set a *minimum* monetary penalty for negligent violations.  In addition, sanctions other than financial penalties are available for criminal violations, and there are advantages to prosecuting criminal violations other than recouping fines, including the deterrent effect.  *See* EPA-HQ-OW-2018-0640-0668-A1 at 5, 9 n.125 (criminal prosecution of corporations can cause loss of "lucrative government contracts," damage to their public and commercial images, payment of criminal fines, probation, and other sanctions; criminal prosecution of corporate officials, as opposed to corporation, may provide even greater deterrence as they would face possible incarceration).

Indeed, EPA has recognized that the criminal intent and penalty provisions are different in kind, and, consistent with the Clean Water Act, has expressly afforded flexibility only to the latter. *See* 53 Fed. Reg. at 20,771 (specifically retaining the mens rea provision while amending the penalty provision to provide states with flexibility as to enforcement).  As explained in the regulation's preamble, the penalty provision simply sets the minimum *penalty* scheme for certain criminal violations in a state program.  *Id*. at 20,770 ("These regulations establish monetary penalties for which the State must have the authority to assess; they need not be assessed by the State for every violation.").  It does not authorize state programs to have different (and harder to prove) standards for criminal intent.[31]

The Defendants' theory that the "general" mens rea regulation "supplements" the three penalty provisions is incongruous and fails.[32]  Dkt. 99 at 56.  The first penalty provision says nothing about criminal intent, and simply requires states to have authority to "assess and recover civil penalties" for unpermitted discharges or permit violations.  40 C.F.R. § 233.41(a)(3)(i).  The second penalty provision requires states to have authority to "seek criminal fines against any person who willfully or with criminal negligence" causes unpermitted discharges or permit violations.  *Id.* § 233.41(a)(3)(ii).  The use of the word "criminal" in this provision simply

---

[31] EPA's regulation reasonably ensures that more egregious violations receive more punitive treatment by setting a minimum monetary penalty for the more serious violations.  This would help relieve EPA from having to "step-in" like the agency wanted to avoid in *NRDC*. 859 F.2d at 181.  Nothing in the regulation precludes states from seeking criminal remedies from simple negligence.  *See* 40 C.F.R. § 233.1(c).  Also, given that the provision addresses both civil and criminal penalties, it makes sense that placing "criminal" before negligence was intended to distinguish criminal from civil penalties.  *See Id.* § 233.41(a)(3) ("recover civil penalties and to seek criminal remedies").

[32] The Court should also reject this rationale because EPA did not rely on it, and the Defendants advance it for the first time in this litigation.  *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) (agency action must "be upheld, if at all, on the same basis articulated in the order by the agency itself.").

distinguishes it from the prior provision, which relates to enforcement for civil, rather than criminal, offenses.  And the third provision requires states to have authority to "seek criminal fines against any person who knowingly makes false statements" and other acts.  *Id.* § 233.41(a)(3)(iii).  There is no reason to conclude, as the Defendants claim, that the mens rea regulation somehow supplements, clarifies, or otherwise affects these penalty provisions.

Inserting an "any negligence" standard, as the Defendants urge, would impermissibly rewrite the Clean Water Act, which plainly criminalizes simple negligence for permits, whether issued by federal agencies or a state.[33]  Agencies cannot override Congress's plain direction, either explicitly or in the manner the agency interprets and applies its rule.  *See United States v. Maes*, 546 F.3d 1066, 1068 (9th Cir. 2008) ("[A] regulation does not trump an otherwise applicable statute unless the regulation's enabling statute so provides.").  *United States v. Doe*, 701 F.2d 819, 823 (9th Cir. 1983) ("Where an administrative regulation conflicts with a statute, the statute controls.").  Because Congress has spoken directly to the standard of negligence required for a violation of section 402 and 404 permits issued by the Corps or a state, EPA is not authorized to construe a regulation otherwise.[34]  *See* 5 U.S.C. § 706(2)(A); *Chevron v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

---

[33] It also fails to abide by the statutory scheme to ensure state programs provide the minimum standards of the Clean Water Act.  *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008) (laws "must, to the extent possible," be construed to "ensure that the statutory scheme is coherent and consistent").

[34] Accordingly, there is no reason to resort to Black's Law Dictionary, as the Defendants do. Dkt. 99 at 55.  The Defendants rely on the definition for "criminal negligence;" however, the Clean Water Act uses just "negligence," and all courts to have interpreted this provision have relied on the ordinary negligence meaning and definitions.  Dkt. 98 at 57–58.  Certainly, dictionary definitions do not trump federal court rulings.

The history of EPA's mens rea regulation is also telling.  When EPA revised its Clean Water Act regulations in 1987, the agency expressly retained the "requirement that the burden of proof for State enforcement cases shall be no greater than the burden of proof required of EPA." 53 Fed. Reg. at 20,771.  In contrast, EPA overhauled its penalty scheme in response to comments requesting the agency provide as much flexibility as possible to states to set their own penalty scheme.  *Id.*  This is why the regulation allows states to use an alternative enforcement mechanism when they lack specific monetary penalty authority.  40 C.F.R. § 233.41(d).  So, while EPA provided states more flexibility as to penalties, it did not (because it cannot) provide flexibility as to the mens rea requirement.

The Defendants' reliance on EPA's decades-old approvals of other state programs (primarily NPDES), Dkt. 99 at 52–53, is unavailing.[35]  First, most of EPA's past Sections 402 (NPDES) and 404 state program approvals occurred in the 1970s and 1980s, years before the Circuit Courts held that the Clean Water Act criminalizes simple negligence.  Second, past approvals of state programs lacking the required criminal intent standard are not probative of the lawfulness of that practice, particularly where those approvals were not challenged on this basis. Third, the Defendants' argument is inconsistent with EPA's own instructions to Idaho, during the Obama Administration, that it would have to adopt a simple negligence standard for its Clean Water Act Section 402 program to be approved.  *See* Dkt. 98 at 59 (discussing EPA's recognition of Florida's heightened mens rea and EPA's instruction to Idaho to enact authority to prosecute simple negligence to obtain program approval before the agency changed course).

---

[35] Likewise, EPA's decision to approve Michigan's and New Jersey's 404 programs without engaging in formal consultation under the ESA is not dispositive of whether such consultation was required, something EPA has since acknowledged.  Plaintiffs assume, without conceding, that other states have Clean Water Act programs that fail to criminalize simple negligence.

The Defendants' reliance on the Model Penal Code is likewise unavailing.  Dkt. 99 at 53.

Model instructions are not binding on any court or agency, cannot invalidate past court decisions,

and cannot trump statutory mandates.  *See United States v. Atl. States Cast Iron Pipe Co.*, No.

03-852 (MLC), 2007 WL 2282514, *13–14 (D.N.J. Aug. 2, 2007) (declining to use Model Penal

Code's "heightened" negligence standard for section 1319(c)(1) jury instructions).

Finally, EPA's oversight responsibilities for state assumed programs cannot cure state

program inadequacies, nor is there a de minimis exception for program failures.  Dkt. 99 at 53–

54.  Oversight is intended to ensure a program is operating as approved, not to remedy a

program's failure to comply with federal law.  EPA cites no authority to suggest otherwise.  That

negligent violations may constitute a small percentage of criminal prosecutions does not

authorize EPA to act contrary to congressional direction.  Even infrequent prosecutions can be a

meaningful component of Clean Water Act enforcement.[36]

Allowing EPA's interpretation would also be contrary to the Clean Water Act by

allowing significant inconsistency between state and federal administration of Clean Water Act

programs (and between states themselves).  Such inconsistency would be contrary to EPA's own

policy and objectives regarding assumption of permitting programs.  *See* 53 Fed. Reg. at 20,771

("We are concerned about national consistency in administration and effectiveness of State

---

[36] *See, e.g.*, EPA-HQ-OW-2018-0640-0668-A3, at 4 (*The Criminalization of Negligence under the Clean Water Act*) (discussing prosecution for negligence involving CITGO's petroleum refinery operations that resulted in discharge of about 53,000 barrels into two rivers; CITGO received a thirteen million dollar fine that was at the time "the largest [fine] ever for a criminal misdemeanor violation of the Clean Water Act" and was required to implement a compliance plan.  "CITGO stands as yet another stark reminder that misdemeanors can result in significant monetary fines and should not be underestimated or belittled.").

programs.")  And it would fly in the fact of Congress' intent: to provide a minimum baseline of water protection across the Nation.  33 U.S.C. § 1344(h)(1).

Like all Courts of Appeal that considered this issue have found, the Clean Water Act unambiguously criminalizes negligent violations.  Dkt. 98 at 57–58.  That criminal intent standard applies to 404 permits, whether issued by federal agencies or a state and whether prosecuted by federal agencies or a state.  Like the court found in *Idaho*, EPA's nearly identical mens rea regulation here is unambiguous and consistent with the penalty assessment provisions. *Idaho*, 820 F. App'x at 628.  Since the statute is clear that EPA employs a simple negligence standard (indeed, EPA does not contest this)—states must as well.  The only flexibility afforded by the Clean Water Act is a one-way ratchet, allowing states to be *more*, not less, protective.[37]

### 2.  Florida's Statute of Limitations is Contrary to the Clean Water Act.

While the Clean Water Act is silent as to the statute of limitations, state programs that employ a shorter statute of limitations create the same problem as those with a higher mens rea— a reduced ability for a state to prosecute Clean Water Act violations—and they thereby provide for less stringency than a program administered by the federal agencies.  Dkt. 98 at 60–61. Again, the purpose and scope of EPA's own regulations state that "[a]ny approved State Program shall, at all times, be conducted in accordance with the requirements of the Act and of this part. While States may impose more stringent requirements, *they may not impose any less stringent requirements for any purpose*."  40 C.F.R. § 233.1 (emphasis added).  Allowing a shorter statute of limitations in a state program allows a state to have a weaker, less protective program.  This is

---

[37] While EPA points to a rulemaking specific to this mens rea standard, Dkt. 99 at 57 n.16, that proposal has been sitting dormant for almost three years.  In any event, any future rule must abide by Congress' express standard for negligence.  *See* 5 U.S.C. § 706(2)(A); *Chevron*, 467 U.S. at 844.

not what Congress intended or instructed.  Nor what EPA itself has recognized in promulgating

its 404 assumption regulations.

### B. The State Program's Consideration of Water Quality Impacts and Contamination is Less Stringent.

Plaintiffs have shown that the state program significantly limits its analysis of water

quality impacts and potential contamination from dredge and fill material, because the state

program myopically focuses only on violations of water quality standards or toxic effluent

limitations, whereas the federal program considers all potential water quality impacts and

contamination from a project.  Dkt. 98 at 64–66.  The federal program's lens is necessary to

achieve the Clean Water Act's principal objective: "to maintain the 'chemical, physical and

biological integrity of the Nation's waters.'"  80 Fed. Reg. 51,020, 51,021, 51,024, 51,029 (Aug.

21, 2015) (describing purpose of Clean Water Act and its water quality standards, and the need

for the antidegradation policy that aims to maintain high quality waters); 40 C.F.R. § 131.12.

The Defendants do not contest these limitations in the State's analysis nor the fact that

this creates a difference between federal and State administration of the 404 program.  Instead,

the Defendants deflect, redirecting the Court's attention away from the portions of Florida's

program that fail to meet the stringency levels applied by the federal program by urging the

Court to focus instead on a handful of other federal provisions that are paralleled in the state

program.  Dkt. 99 at 48–49.  The Court should reject such attempts at distraction.

The Clean Water Act requires a state program to comply with *all* of the 404(b)(1)

Guidelines.  33 U.S.C. § 1344(h)(1)(A)(i), (2)(A).  *Accord* 53 Fed. Reg. at 20,770 ("Any State

environmental review criteria must be at least equivalent to the 404(b)(1) Guidelines for an

approvable program.").  EPA drafted the Guidelines as more than "simply advisory," stating that,

*together*, they constitute the "substantive criteria for dredged and fill material discharges under the Clean Water Act."  45 Fed. Reg. 85,336, 85,336–37 (Dec. 24, 1980).  EPA also specifically "eliminate[d] duplicative material" from the Guidelines, so no provision can stand in the shoes of another.  *Id.* at 85,338.  Nothing in the 404(b)(1) Guidelines suggests that a state may pick and choose which ones to follow.  Therefore, whatever provisions in Florida's program that parallel the federal program cannot also stand in for parts of the 404(b)(1) Guidelines that the state program completely lacks.  Each part of the federal program must either be replaced by the State with an equally stringent requirement, or the State must demonstrate how its program provides each and all of the same protections as the federal program.  It is not sufficient to say, as the Defendants do, that "some" provisions are parallel, and that this is close enough.

The Defendants' reading of EPA's regulations is thus at odds with one of the most basic interpretive canons: "a regulation 'should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'"  *In re Grand Jury*, 315 F. Supp. 3d at 633 (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).  The Defendants' reading would violate this principle, by treating two of the 404(b)(1) Guidelines as void.

As illustrated below, federal law requires consideration of water quality impacts and an analysis of potential contamination from dredge and fill activities at the time of permit issuance; that consideration is not limited only to those impacts that rise to the level of violating water quality standards.[38]  By contrast, Florida's program limits the State's analysis of water quality impacts to situations where water quality or toxic effluent standards will actually be violated.

---

[38] The Defendants do not dispute that these considerations are required.

| Federal 404(b)(1) Guidelines | Florida Program |
|---|---|
| "The permitting authority shall determine in writing the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment in light of" Subpart C, which includes a broad array of water quality impacts.  40 C.F.R. §§ 230.11, 230.22. | "[A]n applicant must provide reasonable assurance that" their project "[w]ill not adversely affect the quality of receiving waters *such that the state water quality standards … will be violated*."  Fla. Admin. Code R. 62-330.301(1)(e) (emphasis added).  *Accord* EPA-HQ-OW-2018-0640-0002-A1, at 93 (ERP Handbook 10.2.4). |
| The permitting authority shall "[d]etermine the degree to which the material proposed for discharge will introduce, relocate, or increase contaminants."  40 C.F.R. § 230.11(d); *id.* § 230.3(d) (defining "contaminant" broadly as "a chemical or biological substance in a form that can be incorporated into, onto or be ingested by and that harms aquatic organisms, consumers of aquatic organisms, or users of the aquatic environment, and includes but is not limited to the [toxic pollutants]"). | The State must "[e]valuate the material to be dredged or used as fill to determine the possibility of the presence of contaminants, including chemical contamination, *that may violate state water quality standards …, or any toxic effluent standard or prohibition*."  EPA-HQ-OW-2018-0640-0002-A20, at 32 (404 Handbook 8.2(g)) (emphasis added). |

This difference is significant because under the state program, no contamination or water quality impacts or degradation of waters from dredge and fill activities need be considered unless and until they reach the high bar of violating water quality standards or toxic effluent standards, at which point the water is now polluted and requires cleanup.  *See* 33 U.S.C. § 1313(d).  The point of permitting and antidegradation requirements in the law, however, is to *avoid* this outcome.  *Id.* § 1313(d)(4)(B); 80 Fed. Reg. at 51,029–30.  The Clean Water Act was enacted to restore and maintain the quality of the Nation's waters, not to wait to act until they are so polluted that they violate water quality standards.

As an illustration, under the state program, when there is potential for a discharge into a pristine waterway that has low levels of pollution, the State would not have to evaluate water quality impacts or contamination unless that discharge would release large enough volumes of

52

pollution to risk a violation. The State would not have to consider water quality impacts from discharges until this same pristine waterway was so polluted that it was on the brink of not meeting water quality standards. By contrast, the Corps must consider how *any* increase in pollution or contamination might affect the natural landscape in that waterway—which is supported by the Clean Water Act's general prohibition on discharges of any amount and the Clean Water Act's antidegradation policy—and act proactively to prevent waterways from becoming so polluted that they are violating water quality standards.

### C. The State Program Unlawfully Does Not Require the State to Independently Assess and Evaluate the Impacts of an Individual Permit.

Under the state program, the State need not engage in an independent assessment of representations by a permit applicant regarding the potential impacts of a project. Rather, the State need only assess whether the applicant provided "reasonable assurances" regarding the impacts of their project to water quantity, flood risk, species, and water quality standards. This is significantly less stringent than the federal program, which requires the Corps to independently assess and make explicit factual determinations regarding the enumerated impacts listed for analysis in the 404(b)(1) Guidelines. Dkt. 98 at 61–64.

The Defendants present post-hoc rationales to defend EPA's arbitrary and capricious decision. But an agency cannot rely on post-hoc rationalizations to justify inadequacies in the agency's original decision, and an agency cannot support the decision it has already made with additional explanation added after-the-fact and in response to legal challenge. An agency's decision, instead, must "be upheld, if at all, on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc.*, 371 U.S. at 168–69; *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973) (agency cannot rely on post hoc rationalizations to defend its earlier decisions).

Nowhere in the record did EPA analyze the impact of the State's use of "reasonable assurances," nor does the record allude to the Defendants' arguments presented here, something it was required to do for those arguments to be considered.  *See Judulang v. Holder*, 565 U.S. 42, 45 (2011) ("When an administrative agency sets policy, it must provide a reasoned explanation for its action. That is not a high bar, but it is an unwavering one."); *Am. Tel. & Tel. Co. v. FCC*, 974 F.2d 1351, 1354 (D.C. Cir. 1992) ("[W]e will not uphold an agency's action where it has failed to offer a reasoned explanation that is supported by the record.").  EPA's response to comments included only conclusory statements that "EPA has reviewed Florida's environmental review criteria and found them to be consistent with the Section 404(b)(1) Guidelines" and that EPA "disagrees" that the framing of the state program around an applicant's reasonable assurances rendered it "inconsistent with the federal program."  EPA-HQ-OW-20188-0640-0568, at 25, 27–28 (Response to Comments).  Nor did EPA explain its rationale in its ultimate decision.  85 Fed. Reg. 83,533 (Dec. 22, 2020); EPA-HQ-OW-20188-0640-0566, at 1–2 (Approval Letter).  The Court should therefore reject the Defendants' post-hoc arguments.

The Defendants then mischaracterize the issues raised by Plaintiffs to allow themselves an easier response.  The issues here are not whether the State must write down findings, Dkt. 99 at 46–47, nor whether a state permit can be challenged in court, *id.* at 47–48.  Rather, the issue is that under the program EPA approved, the State is not required to independently assess and evaluate information submitted by an applicant as is required by the federal program.  Because it does not, the program is significantly less stringent in its protections, and EPA's unlawful approval of the state program must be vacated.

Under the federal program, when a self-interested applicant gives reasonable assurances, even ones that appear reasonable on their face, about impacts to species, wetlands, and water

54

quality, the Corps must independently assess that application, make factual findings regarding the impacts enumerated in the 404(b)(1) Guidelines, and use its own analysis, expertise, and application of its own guidelines and the law to decide whether to issue a permit and what mitigation and conditions must be included in that permit.  The State, however, only asks itself whether an applicant "reasonably assured" the State about the project's impacts on water quantity, flood risk, species, and water quality standards.  No independent investigation or analysis is required, no apparent guidelines for the State to apply, and no factual determinations the State is required to make.[39]

The import of this difference is demonstrated in *Sierra Club v. West Virginia Department of Environmental Protection ("WVDEP")*, 64 F.4th 487 (4th Cir. 2023).  That case involved a state's water quality certification for a federal 404 permit.  *Id.* at 498–99.  The plaintiffs argued that the state had an affirmative duty to verify whether the applicant's proposal complied with state best management practices.  *Id.* at 507 (citing *Friends of the Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir. 1986)).[40]  But the court distinguished *Hintz*, explaining that the Corps' rules "conferred an independent duty on the [Corps] to verify the information supplied" by an applicant.  *Id.*[41]  The state regulation, however, "does not impose any affirmative duties on the

---

[39] Notably, neither the State's regulations nor handbooks define what qualifies as a "reasonable assurance."

[40] *Hintz* holds that the Corps "has an obligation to independently verify the information supplied to it" including "evaluation of the environmental issues."  800 F.2d at 835.  *Accord Crutchfield v. Cnty. of Hanover*, 325 F.3d 211, 214 (4th Cir 2003) (processing individual permits requires extensive, research, documentation, and formal analysis).  It is precisely this independent review and analysis that is absent from the state program.

[41] The Defendants concede that the Corps must critically review an applicant's documentation. Dkt. 99 at 47.  Nor do they dispute EPA's intent behind the 404(b)(1) Guidelines at issue or demonstrate the state program would similarly satisfy this intent.  Dkt. 98 at 63 (citing 45 Fed. Reg. 85,336, 85,343 (Dec. 24, 1980)).

[state agency]" because it "speaks only to requirements of an application." *Id.* (citing West Virginia Code § 47-5A-4.2).

The same distinction appears here. The federal 404(b)(1) Guidelines impose an independent duty on the permitting agency, 40 C.F.R. §§ 230.10(c), 230.11, 230.20–54, while the state program only requires the agency to determine whether an "[a]pplicant provide[d] reasonable assurances" about the potential adverse impacts of their project, Fla. Stat. § 373.4146; Fla. Admin. Code R. 62-330.301–02; EPA-HQ-OW-2018-0640-0002-A1, at 64, 81 (ERP Handbook 5.5.4.1 and 8.1).[42]  It matters not that the State must document—i.e., take notes on— how the permit applicant complied with the requirement to provide reasonable assurances. Dkt. 99 at 46–47. The fact of the matter is that nothing requires the State to independently make factual determinations based on its own independent analysis.

Similarly, state court review of state permits does not inquire into whether the State independently assessed and verified information provided by an applicant to decide whether to issue a permit. Dkt. 99 at 47–48. Neither case cited by the Defendants holds otherwise. *Duval Utility Co. v. Florida Public Service Commission*, 380 So. 2d 1028, 1031 (Fla. 1980), is irrelevant as it involved a challenge to the Public Service Commission regarding the Commission's satisfaction of its own independent duty to "set just and reasonable charges and conditions for service availability" pursuant to Florida Statute Section 367.101. *Id.*  By contrast, *Defenders of Crooked Lake, Inc. v. FDEP*, No. 17-5328, 2018 WL 3387900 (Fla. Div. Admin. Hrgs., May 7, 2018), underlines exactly the issues raised by Plaintiffs:  in considering an

---

[42] Although Fla. Admin. Code R. 62-331.053(3)(a)(6) does not include the term "reasonable assurances," the agency's determinations as to the impacts of a permit are all based on the requirements and findings from Fla. Admin. Code R. 62-330.301–02, which are couched in an applicant's reasonable assurances.

individual permit challenge, the state administrative law judge ("ALJ") (1) assessed whether "an Applicant provided reasonable assurances," *id.* at *3, 5, 8; (2) asked whether the applicant had used the proper criteria to evaluate her own project, *id.* at *5; and (3) applied a presumption "that reasonable assurances were provided as to all applicable regulatory criteria" that would only be rebutted by a preponderance of the evidence presented by the petitioner, *id.* at *8. Absent from the ALJ's analysis was any indication that the State performed its own independent analysis, findings, and determinations. *Accord Sierra Club v. WVDEP*, 64 F.4th at 507.[43]

### D. The State Program Did Not Demonstrate that No Permit Would Be Issued that Would Jeopardize Species or Adversely Modify or Destroy Critical Habitat.

Further, as Plaintiffs have shown, the state program did not demonstrate that no permit will issue that would jeopardize species or adversely modify or destroy critical habitat because (1) EPA has adhered to the position that the programmatic BiOp, which contains the technical assistance process, was not part of the program submission and thus cannot be considered or relied on as part of the state program, Dkt. 99 at 38–40; and (2) even if it were, as demonstrated above, the technical assistance process is a non-statutory, state driven process that cannot and does not ensure that no permit will issue that would jeopardize species or adversely modify or destroy critical habitat because it does not require USFWS to weigh in. EPA's approval of the state program was thus arbitrary, capricious, and an abuse of discretion. It must be vacated.

---

[43] Although the state ALJ made findings of fact regarding the showing made by the applicant, there was no discussion of any such findings by the agency to issue the permit. To rely on the courts to satisfy the Clean Water Act's mandate would require the public to challenge every state 404 permit to obtain review equivalent to that provided under federal law. Given the barriers to permit challenges, including cost, evidentiary requirements, and standing restrictions, it cannot be sufficient to stand in for the agency having an independent obligation to evaluate that information when issuing permits. Moreover, EPA did not rely on this court review to justify the adequacy of Florida's program and cannot do so *post hoc* here.

### E. EPA Approved a State Program That Failed to Demonstrate That Only Assumable Waters Would be Regulated and Transferred Authority over Non-Assumable Waters to the State.

The Defendants implausibly argue that the Corps acted reasonably in creating a retained waters list for Florida that is completely contrary to statutory requirements.  They further argue that EPA acted reasonably when it approved Florida's application based on the Corps' retained waters list, even though there is no evidence EPA made *any* determination to ensure it was transferring authority to the State over only assumable waters.  The Defendants' arguments fail.

The Corps acted arbitrarily when it:  (1) excluded traditionally navigable waters ("TNWs") from the retained waters list; (2) excluded "historic use" RHA Section 10 waters from the retained waters list; and (3) relied on an admittedly out-of-date RHA Section 10 list to create the 404 retained waters list.  These actions were contrary to the RHA, the Clean Water Act, and applicable regulations.  EPA then acted unreasonably when it relied on that list to approve Florida's program, unlawfully transferring authority to the State over non-assumable waters. That complying with the law may have been "time-consuming," as the Defendants complain, does not excuse these unlawful actions.  Dkt. 99 at 62.

### 1. Under the Clean Water Act, the Corps Retains Exclusive Jurisdiction Over Traditionally Navigable Waters ("TNWs").

The Defendants' argument that TNWs were properly excluded from the Corps' retained waters list conflicts with the plain meaning of the Clean Water Act.  Subject to EPA approval, the Clean Water Act authorizes states to assume 404 authority over waters of the United States,

> except as to those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto.

33 U.S.C. § 1344(g)(1).  Because the "except as to" waters cannot be assumed by the State, they are the waters over which the Corps retains exclusive jurisdiction after state assumption; in other words, the "retained waters."[44]  It was therefore unlawful for the Corps to omit TNWs from the retained waters list and for EPA to approve Florida's program based on that list.

The Corps itself recognized that TNWs under the Clean Water Act were *not* assumable when the Corps served on EPA's Assumable Waters Subcommittee, a fact the Defendants completely fail to mention.  CORPS002993, at CORPS002999 (Subcommittee Report).  Indeed, as stated in the *Assumable Waters Subcommittee Report*, the Corps had taken that position for at least a decade, before abruptly changing course at Florida's behest.  *See id.* at CORPS003021 (Corps has "maintained this position since at least the 2008 post-*Rapanos* guidance was issued and it is not a 'new' position created by the agency for purposes of this subcommittee.").[45]

The Defendants' reliance on the Corps' 2018 Memorandum ultimately adopting the subcommittee's majority recommendation (Dkt. 99 at 60) is wholly misplaced.  As shown above, the majority position (that TNWs are assumable by states) is contrary to the Clean Water Act.

---

[44] The Supreme Court's recent *Sackett* decision appears to align with Plaintiffs' view, although Section 404(g)(1) was not at issue in the case.  *Sackett*, 2023 WL 3632751, at *12 ("[S]tate permitting programs may regulate discharges into (1) any waters of the United States, (2) except for traditional navigable waters, (3) including wetlands adjacent thereto.").

[45] The Corps correctly recognized that "there should not be a distinction between different uses of the term 'navigable waters' under different sections of the statute" and that retained waters include *both* TNWs under the Clean Water Act *and* Section 10 waters under the RHA.  *See* CORPS002993, at CORPS002999 (Subcommittee Report).  The Corps also recognized that this position serves Congress' intent.  *Id.* at CORPS003021 ("TNWs reflect the concept of 'navigability' appropriate to ensure the objective of the CWA to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.").  Plaintiffs agree with the Defendants that RHA Section 10 waters and Clean Water Act TNWs are not co-extensive.  But that argument serves them no better because neither are assumable by the State.

The Corps could not lawfully have adopted a policy position that conflicts with the plain language of a statute.  *Patel v. Garland*, 142 S.Ct. 1614, 1627 (2022).

Even if the statute were not plain, the Court could not defer to the Corps' new position because it was based on a policy reversal that the Corps failed to acknowledge, much less adequately justify.  *Lone Mountain Processing, Inc. v. U.S. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) (agency reversal of position must be supported by "reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored"); *Ctr. for Biological Diversity v. NMFS*, No. CV 21-930 (BAH), 2022 WL 4235013, at *13 (D.D.C. Sept. 14, 2022) (affording deference to agency that "pointedly acknowledge[d]" a change in position and then elaborated on the reasons for it).

In its 2018 Memorandum, the Corps did not pointedly acknowledge that it was reversing course on whether TNWs were assumable waters.  To the contrary, the memorandum disingenuously claimed in a footnote that the Corps "ha[d] not previously taken any formal position on the recommendations contained in [the Assumable Waters Subcommittee] report." CORPS004096, at CORPS004096 (Corps Memorandum).[46]

Having failed even to acknowledge (and in fact, preposterously denying) its prior position, the Corps obviously did not provide a reasoned explanation for the reversal.  But to be afforded deference, an agency must not only acknowledge the change, but also "show that there are good reasons for the new policy."  *Ctr. for Biological Diversity v. NMFS*, 2022 WL 4235013,

---

[46] The memo also sought to deflect attention away from the Corps' prior position by making only an oblique reference to the Corps' participation in the Subcommittee.  CORPS004096, at CORPS004097 (Corps Memorandum) (describing the subcommittee's majority as all members except for "a Corps technical representative").  The *Report*, however, makes clear that the Corps' representative was not a mere "technical" member, but was rather conveying the agency's longstanding position.

at *12 (finding change in agency position adequately explained where agency listed and elaborated on several reasons for change).

Indeed, neither the Corps nor EPA has provided a reasoned explanation based on the administrative record to justify this reversal of position, nor could they provide a lawful basis to disregard the express language of the Clean Water Act.  The agencies' actions were therefore arbitrary and capricious.  *Lone Mountain Processing*, 709 F.3d at 1164 ("Failing to supply such analysis renders the agency's action arbitrary and capricious.").

The only "new" information the Defendants specifically cite is an unsupported hearsay statement that the Assistant Secretary had "personally heard" from unidentified state officials that they would pursue assumption if the Corps changed its position on whether TNWs are assumable waters. Dkt. 99 at 60. The Defendants, however, cite no case where personal entreaties have been found sufficient to warrant an administrative about-face, and protecting against arbitrary favors of this nature is precisely why administrative law requires agencies to acknowledge, explain, and justify changes in position.  Further, the same rationales on which the majority relied to exclude TNWs were considered and rejected by the Corps when it served on the Subcommittee and therefore were inadequate to justify a change in position.  *Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 51 (D.D.C. 2019) (data that "proves nothing new" was inadequate to justify a change in agency position).

The Corps' admitted exclusion of Clean Water Act TNWs from its retained waters list, and EPA's approval of Florida's program as based on that list, transferred authority to the State over non-assumable waters in violation of the Clean Water Act and must be set aside.

## 2. The Corps Unlawfully Excluded "Historic Use" RHA Section 10 Waters from the "Retained Waters" List.

In addition to unlawfully excluding Clean Water Act TNWs, the Corps also unlawfully excluded "historic use" RHA Section 10 waters from the retained waters list. The Defendants do not dispute that the Corps has exclusive RHA jurisdiction over "historic use" waters, Dkt. 99 at 25, but claim that the State can somehow still assume Clean Water Act 404 jurisdiction over them. This position flies in the face of the common meaning of "exclusive" jurisdiction.

The Defendants defend this suspect proposition by claiming that Section 404(g)(1) of the Clean Water Act does not refer to "historic" use waters (as among waters to be retained by the Corps), whereas RHA regulations defining the Corps' jurisdiction do. Dkt. 99 at 61. That might be a persuasive argument if the Defendants were comparing apples to apples and oranges to oranges. But they are not. They are comparing apples (statutory language) to oranges (regulatory language). And it is here where the Defendants' theory falls apart.

As demonstrated in the chart below, an apples to apples and oranges to oranges comparison shows that *neither* the Clean Water Act nor the RHA expressly refers to historic use waters, but that the Corps' interpretation of *both* statutes *does*. Thus, the Clean Water Act prohibits the transfer of authority over "historic use" waters, which must remain under the Corps' exclusive jurisdiction, and it was unlawful for the Corps to remove these from its retained water list for Florida.

| Definition | Clean Water Act | Rivers and Harbors Act |
|---|---|---|
| Statute | Clean Water Act authorizes states to assume 404 authority, except as to "those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto."<br><br>33 U.S.C. § 1344(g)(1). | The RHA grants the Corps exclusive jurisdiction over construction in navigable waters, except for "waters that are not subject to the ebb and flow of the tide and that are not used and are not susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce."<br><br>The RHA further prohibits excavation or fill of, or discharge of refuse into, any navigable water, without the consent of the Corps.<br><br>33 U.S.C. §§ 401, 403, 407. |
| Regulation | CWA traditionally navigable waters are "waters which are currently used, **were used in the past,** or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide."<br><br>33 C.F.R. § 328.3(a)(1) (2020) | RHA navigable waters are "those waters that are subject to the ebb and flow of the tide and/or are presently used, or **have been used in the past,** or may be susceptible for use to transport interstate or foreign commerce."<br><br>33 C.F.R. § 329.4 |

The Defendants cite no authority for the proposition that they are free to disregard their own interpretation of nearly identical statutory language. *Cf. Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (axiomatic that agencies are not free to disregard their own regulations). And they offer no rationale for why their interpretation should be disregarded. *See Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, 316 F. Supp. 3d 349, 382–83 (D.D.C. 2018), *aff'd*, 971 F.3d 340 (D.C. Cir. 2020) (in analogous context based on textual comparison of statutory requirement with language in regulation, rejecting agency interpretation "which stands virtually barren of any substantive explanation that would provide a

rationale for the difference").  It was therefore not reasonable or lawful for the Corps to exclude

RHA "historic" use waters from the retained waters list.[47]

### 3.  It was Unreasonable for the Corps to Base its Retained Waters List on An Admittedly Outdated RHA Section 10 List.

Consistent with the Corps' RHA' regulations, in 2017 the Corps initiated a process to

update its 2014 Navigable Waters List.  *See* CORPS003115, at CORPS003115 (Corps internal

email stating it was "absolutely imperative" to update the 2014 list and to remind Florida that the

2014 List "is not inclusive of all Section 10 waters nor necessarily informed by navigability

studies."); 33 C.F.R. § 329.16(a) (requiring Corps to update Section 10 lists "as necessitated by

court decisions, jurisdictional inquiries, or other changed conditions.").

As a first step, the Corps produced a 2017 Supplement to the Navigable Waters List,

identifying additional waters in Florida subject to the Corps' exclusive jurisdiction.  The Corps

published the 2017 Supplement to its website.  *See* CORPS003724, at CORPS003727, 29

(identifying at "Appendix F" the link where Corps posted supplement).[48]  In 2018, the Corps

invited public comment on a navigability assessment for Florida waters.  CORPS003213, at

CORPS003213 (Corps' Public Notice).

But at Florida's request, the Corps abruptly terminated that process, without explanation,

and never looked at the 2017 supplement again.  The Defendants argue that the Corps reasonably

---

[47] Although in the *Assumable Waters Subcommittee Report* the Corps acquiesced in the view that retained waters excluded "historic" use Section 10 waters, CORPS002993 at CORPS002999, the Corps provided no rationale to square that view with its position that "navigable waters" should not be defined differently in different parts of the Clean Water Act and that TNWs (which also define navigable waters with regard to historic use) are retained waters.

[48] The 2017 Supplement remains posted to the Corps' website.  *See* https://www.saj.usace.army.mil/Portals/44/docs/regulatory/sourcebook/other_permitting_factors/ 20171005SupplementToJacksonvilleDistrictSection10Waters.pdf?ver=2017-10-05-123156-363 (last accessed June 4, 2023).

"declined to include ... every water" from its 2017 Supplement.  Dkt. 99 at 61.  But there is no evidence that the Corps considered the 2017 Supplement at all.  To the contrary, the Defendants admit the Corps used the 2014 list, only, as a "starting point" for its retained waters list.  *Id.* at 29.  By disregarding updates to the 2014 list, the Corps violated its own regulations, which require the Corps to update its navigable waters lists when jurisdictional questions arise.  33 C.F.R. § 329.16(a).  The Corps then removed "historic use" waters from the list, further in violation of the regulation that holds that once a navigability determination has been made it cannot be extinguished by later actions that "impede or destroy" navigability.  *Id.* § 329.4.

The Defendants now claim that the 2017 supplement was only "a draft."  Dkt. 99 at 61. But the 2017 list was not marked as a draft, and its publication on the Corps' official website suggests it was not a draft.[49]  Agencies do not typically publish draft documents, but rather guard them zealously against any public disclosure.  *See, e.g.*, *Hunton & Williams LLP v. EPA*, 346 F. Supp. 3d 61, 85 (D.D.C. 2018) (Corps properly withheld draft documents pursuant to deliberative process privilege).  Indeed, information posted on an official agency website is so reliable that courts often take judicial notice of it.  *Pharm. Rsch. & Manufacturers of Am. v. U.S. Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies.").

That the 2017 list stated it was part of a "first preliminary increment of an effort to update the Jacksonville District Navigable Waters List" also does not indicate that the document was a

---

[49] Having been published to the Corps' official website, the 2017 Supplement was therefore also familiar to the regulated community, belying the Defendants' justification for using the admittedly outdated 2014 list due to familiarity.

draft, but simply (as it says) that the supplement was the start of an update.  The 2014 list contained similar caveats, including that it reflected only waters over which the Corps "currently" exercised regulatory authority, that "[t]he absence of a water on these lists does not mean it or a portion of it is not a navigable water," and that "[t]he District makes no claim that [the 2014 list is] complete or completely accurate."  CORPS002987, at CORPS002987.

The Defendants rely on an internal Corps email to argue that the 2017 list was "deliberatively over-inclusive."  Dkt. 99 at 61.  But the same email made clear that the 2014 list was *under*-inclusive, and therefore using it as the starting point for the retained waters list meant unlawfully transferring authority to the State over non-assumable waters.  Given the availability of the 2017 Supplement, and the Corps' inchoate navigability assessment, the Defendants' argument that the 2014 list was the "best" information available falls flat.

Without citing anything in the record, the Defendants lament that "[s]orting retained waters from a list of speculative TNWs would have been time-consuming and, likely, contentious" and on this basis claim it was reasonable not to bother considering the 2017 list. Dkt. 99 at 61–62.  But as shown above, TNWs *are* retained (i.e., non-assumable) waters and including them on the retained waters list was therefore required by law.  The same is true for the "retained waters" the Defendants admit the Corps did not bother "sorting" from the 2017 list.

The Defendants cite no authority for the proposition that the Corps was free to take these shortcuts because compliance with the law might be "time-consuming" or potentially "contentious."  Dkt. 99 at 62.  They cite no time constraints that forced their hand (and indeed completed the list in August 2019, a full year before Florida even submitted its application to EPA in August 2020).  And they cite no rationale for why avoiding "contention" justified their

approach.  It was not reasonable for the Defendants to favor expedience at the expense of a lawful process to ensure against the transfer of non-assumable waters to the State.

The Defendants do not dispute that the Corps (1) initiated a statewide navigability assessment to determine the scope of retained waters in Florida; (2) summarily terminated the public comment period for that assessment without explanation; and (3) ignored all public comment on the topic.  Dkt. 99 at 58–62.  But the Defendants claim that these actions were reasonable because doing anything more than what the Corps ultimately did would have come "at the expense of state assumption."  *Id.* at 58.  In other words, the Corps' goal was not to identify which waters could lawfully be assumed under federal law, *but rather to ensure state assumption*.  *That* is the tail wagging the dog.

The Defendants oddly decry the undertaking of a statewide navigability study as a "demand" by the Plaintiffs, *Id.* at 59, when it was *the Corps* that initiated that study precisely for the purpose of Florida's application before putting an abrupt end to a reasoned administrative process.  The Defendants argue that the Corps' about-face was justified because "prior, open-ended inquiries" into retained waters had discouraged states from pursuing assumption.  *Id.* at 60.  But even if prior actions by the Corps had had the effect of discouraging state assumption,[50] nothing about *completing* a navigability assessment is "open-ended."

The Defendants claim that because Congress intended for states to assume the 404 program under the Clean Water Act, the Corps must adopt a "pragmatic" approach to reconcile that intent with congressional intent under the RHA.[51]  *Id.* at 59–60.  But this overlooks that

---

[50] Importantly, if states decide not to pursue assumption because of the requirements put in place by Congress, it is not for agencies to second guess Congress' judgment and "fix" this.

[51] Of course, there are many other reasons why states may decline to pursue 404 assumption, including perhaps most importantly, the cost.

Congress also intended to limit the waters over which states could assume jurisdiction *under the Clean Water Act*. Nothing in the statute reflects a congressional intent to expand the scope of assumable waters to make assumption more palatable to states. Congress intended that states assume the program, but only under the terms Congress prescribed.

The Defendants blame "uncertainty" over the scope of retained waters for few states pursuing assumption. *Id.* at 60. But excluding Clean Water Act TNWs and historic RHA Section 10 waters from retained waters lists does not eliminate uncertainty. What it eliminates is hundreds of waterways from the additional protections that federal law affords when the Corps administers the 404 program. Certainty is served when a retained waters list is consistent with federal law, by identifying the waterways that Congress required remain under the Corps' 404 authority. A process that properly identifies those waters Congress will certainly yield more retained waters. But it also provides certainty. And it is what the law requires.

The Defendants argue that the Corps' approach was reasonable because the retained waters list is "not exhaustive" or "static." *Id.* at 90. But the list was exhaustive (though inaccurate) because the MOA that incorporates it provides that the State assumes 404 authority over "*all* waters of the United States [in Florida]" other than those that are tidally influenced or appear on the list. CORPS004322, at CORPS004323. Modifications to the list that affect jurisdiction require EPA approval. *Id.* at CORPS004324. Nothing in the list provides any gray area: a water is either retained because it is tidally influenced or on the retained waters list, or it is assumed by the State and subject to the State's 404 jurisdiction.

And the list is also static. There is no process for correction whereby the State may transfer authority over an assumed waterway to the Corps or whereby the Corps may transfer authority over a retained water to the State. The MOA's "joint procedures" only require Florida

68

to notify the Corps of an application that relates to retained waters and the Corps to notify Florida if it receives an application that relates to assumed waters; whether a water is assumed or retained is already determined by the retained waters list.  *Id.* at CORPS004324.[52]

Unlike the Corps' determinations *under the RHA*, on which the Defendants rely, retained waters lists under the Clean Water Act cannot unilaterally be amended or revised by the Corps. To the contrary, a 404 retained waters list can only be changed with the approval of EPA through rulemaking.  *Menominee Indian Tribe of Wis. v. EPA*, 947 F.3d 1065, 1070 (7th Cir. 2020).  And unless and until such modifications are made through rulemaking, the allocation of authority remains as stated in the approved program.

That the list may theoretically be modified after the fact does not address the Defendants' failure to ensure that only assumable waters were transferred to the State's authority when EPA approved the program.  It is particularly cold comfort to suggest that "new information" will easily yield new determinations given that when the Corps *was* provided with new information (both by its own preliminary update to the list and through public comment), the Corps did exactly nothing with that information.  The EPA was aware of all this information as well, Dkt. 98 at 26 n.10, and did not do anything with it either.

### 4. EPA's Approval of Florida's Program Based on the Corps' Retained Waters List Was Unreasonable.

The Defendants do not contest that EPA had the ultimate duty under the Clean Water Act to ensure that its approval of Florida's program did not transfer Section 404 authority to the State over waters required to remain in the Corps' exclusive jurisdiction, and that EPA failed to take

---

[52] While Section II.A. of the MOA includes the statutory language of 404(g)(1), it also clearly states that the Corps retains jurisdiction only over those waters on the retained waters list and any tidal waters.  CORPS004322, at CORPS004323.

any independent action or conduct any independent analysis to comply with this duty.  Dkt. 98 at 69.  EPA's action therefore was not reasonable.  *See Ergon-W. Va., Inc. v. EPA*, 980 F.3d 403, 422 (4th Cir. 2020).  The Defendants cite no authority for their conclusory assertion that "because the Corps' Retained Waters list was reasonable, EPA acted reasonably in approving Florida's assumption request" based on that list.  Dkt. 99 at 62.  No matter.  Since the Corps' action was not reasonable, neither was EPA's reliance on it.

### 5.    Florida Unlawfully Failed to Incorporate the Federal Definition of WOTUS.

Lastly, EPA erred in approving Florida's program, which failed to incorporate the federal definition of WOTUS or commit to applying the federal definition.  The Defendants claim that the problem was not the program, but rather Florida's "fail[ure] to acknowledge intervening changes in binding federal law."  Dkt. 99 at 58.  But that is precisely the problem: the State did not "bind" itself to the federal definition, and so does not consider it "binding."  Dkt. 98 at 67–69.  That Florida has continued to ignore the scope of waters covered by the Clean Water Act even with EPA's oversight demonstrates the limits of that oversight.  EPA's failure to require the State to incorporate the federal definition into its program (and not only its program *description*) has allowed it to flout federal law, to the detriment of the Nation's waters.[53]

---

[53] The Defendants do not dispute that Florida has flouted federal law but argue that the Court should not consider the relevant evidence because it is not part of the administrative record.  Dkt. 99 at 58.  Yet Plaintiffs are required to demonstrate harms resulting from the Defendants' unlawful actions, and that requirement necessarily entails submitting extra-record evidence. *Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 282 F.3d 818, 830 (D.C. Cir. 2002), *vacated in part on other grounds sub nom. Nat'l Park Hosp. Ass'n v. U.S. Dep't of Interior*, 538 U.S. 803 (2003). Plaintiffs were therefore not required to invoke an exception to record review, as the Defendants complain (and themselves failed to do when citing their oral argument in *Sackett* or attaching an extra-record chart to their filing).  Plaintiffs recognize that the Supreme Court's decision in *Sackett* has narrowed the scope of wetlands covered by the Clean Water Act and understand that the Corps and EPA are reviewing the decision.

V.   **EPA's Determination that Florida's Application was Complete was Unlawful and Therefore not Reasonable.**

Plaintiffs' completeness claim arises under the Clean Water Act, 33 U.S.C. § 1344(g)(1), which required the State to submit a "full and complete" program submission before it could be deemed "complete" for purposes of triggering the notice and comment period and the one-hundred-and-twenty-day decision clock.  To demonstrate (and determine) that Florida's program complied with the Clean Water Act 404(b)(1) Guideline that prohibits issuing permits that may jeopardize species or adversely modify or destroy critical habitat, Florida (and EPA) expressly relied on the technical assistance process as outlined in the BiOp.  *See* Dkt. 98 at 73–74 & n.37. The BiOp was thus a necessary component of Florida's submission, and therefore the application was not "full and complete" without it.  *See U.S. Dep't of Com. v. New York*, 139 S.Ct. 2551 (2019) ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record.").

The Defendants' focus on *other* information in Florida's application fails because it either simply restates the law or describes only the beginning and the end of the technical assistance process (with USFWS receiving and reviewing permits on the front end and potentially making recommendations at the back end).  Dkt. 99 at 39–40.  The state regulations and MOU fail to articulate what the "consultation" or "technical assistance"—the process USFWS later claimed would ensure against jeopardy of species or adverse modification or destruction of critical habitat—entails.  *See* Dkt. 98 at 73.  The process remains a black box.  The Defendants' reliance on EPA's Response to Comments fares no better, Dkt. 99 at 40, as it relied on the Program Description, which relied on the MOU, which relied on the BiOp.  All roads lead to the BiOp.

71

The Defendants' reliance on cases that stand for the proposition that there is no independent right *under the ESA* to comment on BiOp, *id.* at 40–41, is neither here nor there, as Plaintiffs' claim arises under the Clean Water Act, which provided the right to comment on Florida's full and complete program submission.[54]  That Florida and EPA decided those procedures should be articulated in a BiOp (which EPA separately relies on to claim it has met its Section 7 obligations under the ESA) does not eviscerate this right, nor have Florida and EPA pointed to any authority to support that claim.  The Defendants' claim that "EPA of course relied on the BiOp," Dkt. 99 at 43, pursuant to its Section 7 obligations *under the ESA* similarly sidesteps this point, that EPA relied on the technical assistance process in the BiOp to approve Florida's program *under the Clean Water Act*.

Florida's application did not put Plaintiffs on notice of how the State intended to ensure no jeopardy to threatened and endangered species.  For example, Florida's BA stated that "[b]ecause of the terms and conditions anticipated in the [programmatic] BiOp and its [ITS], the State 404 program would not issue a permit that would jeopardize the continued existence of a species or adversely modify designated critical habitats."  EPA-HQ-OW-2018-0640-0386-A1, at 36 (Plaintiffs' Comments to EPA); EPA-HQ-OW-2018-0640-0387-A8, at 7 (BA).  The "terms and conditions" and ITS, however, were not known until USFWS produced the BiOp, which contained them.[55]  *See Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999) (extra-application material sufficiently deviated from application requiring notice and comment).

---

[54] The Second Circuit's decision in *Cooling Water*, 905 F.3d at 78, expressly relied on Section 7 of the ESA and did not address the claim presented here, which is based on the Clean Water Act.
[55] The "completeness" of Florida's application did not rest on merely identifying "the participants, timing, subject matter, dispute resolution mechanisms, and binding effect" of an undefined process.  *Cf.* Dkt. 99 at 42.  It rested on demonstrating *how* its permits would ensure protection of federally listed species.

Although EPA's final decision was not a "complete turnaround" on how Florida might demonstrate compliance with the Clean Water Act, *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1082 (D.C. Cir. 2009), it was not enough to give notice that *a* technical assistance process (or some "terms and conditions") would be used to ensure Plaintiffs could comment on *the* process EPA ultimately approved.

The Defendants' argument that it was sufficient for Plaintiffs to know that "permit review procedures" would be addressed in the BiOp effectively means that EPA could have approved any process at all, and Plaintiffs would have been deemed to have had adequate notice of it. *CSX Transp.*, 584 F.3d at 1982. When what is proposed is a black box, virtually anything could fit into it. Therefore, it is impossible to say that the process as laid out in the BiOp was "a logical outgrowth" of the empty outline that was proposed. Unlike in *City of Waukesha v. EPA*, where "the petitioners conceded that there were no additional comments or evidence they could have proffered for the record," 320 F.3d 228, 246 (D.C. Cir. 2003), here Plaintiffs would have commented on the unlawfulness of the technical assistance process and terms and conditions that were adopted, for the reasons argued above. The agency could have "learned from comments" to reach a different result in the final rule. *Cf. id.* at 245.

The Defendants unreasonably claim that Plaintiffs had adequate notice of this black box from the earlier ESA consultation rulemaking based on Florida's proposal there. But the *conclusion* of that rulemaking was EPA's August 27, 2020, decision, which on its face did not adopt Florida's proposal wholesale. EPA-HQ-OW-2018-0640-0660-A1, at 1–8 (ESA Consultation Memo). Instead, EPA concluded that ESA programmatic consultation at the approval stage would "help ensure *a process* is in place to consider potential adverse impacts to

73

species resulting from [state] permitting decisions" and that the BiOp may identify additional procedures and measures which may differ from state to state.  *Id*. at 3, 5, 6–7.[56]

## STANDING AND JUSTICIABILITY

While the Defendants challenge Plaintiffs' claims on the merits, Florida challenges Plaintiffs' standing to bring those claims.  These arguments fail.

**I.      Plaintiffs Have Standing to Challenge EPA's Approval of Florida's Program and the Underlying Deficiencies on Which the Approval Is Based (Claim Two).**

Plaintiffs have shown that EPA's decision to transfer the Section 404 program to Florida threatens their organizational and associational interests in protecting Florida's waterways, including the endangered and threatened species that rely on them.  Dkt. 98 at 75–79.  EPA's action threatens harm to (1) Plaintiff organizations' access to information provided through NEPA review and ESA consultation and access to courts to challenge inadequate environmental protection; and (2) Plaintiffs' members' aesthetic and recreational interests in wild Florida lands, wetlands, and waters where panthers roam and sea turtles nest.

**A.  EPA's Decision to Transfer 404 Authority to the State Harms Plaintiff Organizations.**

As Plaintiffs have shown, they have and continue to divert their resources to counteract the harms caused by EPA's unlawful transfer of the 404 program to the State.  *Id.* at 78–79.

**1.  Plaintiffs are Harmed by the Loss of Information Developed Through NEPA Review and ESA Consultation.**

This Court has already found that Plaintiffs informational harms qualified as a concrete and demonstrable injury despite Florida's same challenges to Plaintiffs' Motion for Partial

---

[56] The Defendants claim that EPA provided notice by referring to a white paper by FDEP.  Dkt. 99 at 44.  That argument fails for the same reasons; moreover, EPA did not adopt or incorporate that white paper by reference in its August 27, 2020, decision, or in its request for comment on Florida's application.

Summary Judgment.  *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 174, 202–03, 207

(D.D.C. 2022).[57]  Here, Florida seeks to relitigate this issue, raising the same arguments as it did

in response to Plaintiffs' Motion for Partial Summary Judgment, now supported by an

unconvincing affidavit.  Dkt. 102 at 11–14; Dkt. 102-1 (Wolfe Aff.).  Florida makes erroneous

arguments regarding the specificity of Plaintiffs' allegations of harm that are easily rebutted.

Dkt. 102 at 11–14.  Plaintiffs have thus established standing.

      First, Florida attempts to re-litigate arguments this Court already rejected regarding

Plaintiffs' informational harm.  *Id.* at 12, 39–41.  The State again argues that Plaintiffs have not

been harmed because (1) not all state 404 projects would have required an EIS and BiOp under

the federal program and that those that would are usually ones with a federal nexus; (2) state 404

permits do not require NEPA analysis or ESA consultation; (3) the ESA does not provide a right

of access to review and comment on BiOps.  *Compare* Dkt. 102 at 39–41 and Dkt. 102-1 at 4–

11, 23–54 (Wolfe Aff. ¶¶ 18–30, encl. B–D) *with* Dkt. 37 at 56–57, Dkt. 46 at 23–25, and Dkt.

72; *see* Dkt. 43 at 67–71; *see generally* Dkts. 70, 70-2.  The Court already considered and

rejected all of these arguments.  *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d at 190,

202–03, 207.

      Florida cites new cases to support its repeated arguments, Dkt. 102 at 39, but those are

unavailing.  The existing federal 404 program required NEPA review and ESA consultation,

which has now disappeared under the state program.  *Id.*  Thus, *Association of American

Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp 2d 19, 42–44 (D.D.C. 2012), is inapposite

---

[57] While the Court reached this decision in the context of Claim Nine, the same reasoning applies
to Claims Two, Seven, and Ten, where the harms to Plaintiffs similarly resulted from EPA's
transfer of 404 authority to the State.

because, there, plaintiffs were harmed by requirements in *existing* Medicare statute not the changes made in the *new* agency actions that were challenged.  Plaintiffs have specifically alleged informational harm from the loss of information from NEPA and the ESA, Dkt. 98 at 75–76, 78–79, and the Court has found those allegations sufficient.  *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d at 202–03.  Thus, Florida's use of *Center for Biological Diversity v. Zinke* is also unavailing because the plaintiffs there alleged no informational harm.  369 F. Supp. 3d 164, 181 & n.5 (D.D.C. 2019), *aff'd sub nom. Friends of Animals v. Bernhardt*, 961 F.3d 1197 (D.C. Cir. 2020).  Further, Plaintiffs have shown, and the Court has confirmed, that (1) they have lost access to information that must be disclosed; and (2) they suffer the type of harm Congress sought to prevent by requiring disclosure.  Dkt. 98 at 75–76, 78–79; *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d at 202–03.  They have satisfied the standard cited in *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).

The only new spin on Florida's argument is the introduction of an Affidavit by FDEP General Counsel Justin Wolfe.  Dkt. 102-1 (Wolfe Aff.).  But it too raises the same arguments already rejected by this Court.  In the Affidavit, Mr. Wolfe generally contends that Plaintiffs have access to readily available, real-time information developed through the permit review process.  *Id.* at 4–7 (Wolfe Aff. ¶¶ 18–21).  Mr. Wolfe claims that Plaintiffs can obtain "essentially all of the same kinds of information" of the "essential contents" of a NEPA analysis and BiOp through Florida's permitting databases, pointing to the same side-by-side comparison this Court considered when ruling that Plaintiffs had established information standing for Claim

Nine. *Id.* at 8–11, 44–54 (Wolfe Aff. ¶¶ 25, 28, encl. D).[58]  Further, Mr. Wolfe avers again that

some projects would not require EISs or BiOps but falls short of alleging or showing that the

projects of concern to Plaintiffs would not have required EAs, EISs, or BiOps.  Dkt. 102-1 at 9

(Wolfe Aff. ¶¶ 26–27).[59]  And in fact when the Troyer Mine project was before the Corps, it was

determined that an EIS would be required.  *See* Dkt. 98-1 at 12–13 (Crooks Dec. ¶ 35).  To

support the arguments this Court has already considered and rejected, Mr. Wolfe points to the

Troyer, Kingston, and FFD permit files as containing information provided by the *applicant* in

the form of application records and environmental reports.  Dkt. 102-1 at 7–8, 11 (Wolfe Aff.

¶¶ 22–23, 30).  On the technical assistance process in particular, Mr. Wolfe points to the FFD

and Kingston permit files.  *Id.* at 8, 11 (Wolfe Aff. ¶¶ 23, 29–30).

Unlike NEPA and the ESA, however, these permit files include no documents containing

the State's analysis of applicant submitted information, the State's findings as to impacts,

incidental take, required permit conditions, and alternatives, nor the State's rationale for those

decisions; and Mr. Wolfe points to none.  Similarly, the files contain no analytical information

from USFWS as to impacts on species.  Ex. 1 at 2–4 (Crooks Dec. ¶¶ 4–7).  That is the

information—i.e., contained in an EA, EIS, or BiOp—that Plaintiffs use to understand projects

and their impacts, and to educate their members and engage in advocacy necessary to further

---

[58] Mr. Wolfe spends much of his declaration pointing to ways that Plaintiffs can reach publicly available information, Dkt. 102-1 at 4–8, 23–33 (Wolfe Aff. ¶¶ 19–23, encl. B), which would only be useful to the extent that the information paralleled that generated pursuant to NEPA and the ESA.  Ex. 1 at 2–4 (Crooks Dec. ¶¶ 4–7).  However, as Plaintiffs have shown, it does not.
[59] Mr. Wolfe also mistakenly claims that BiOps are not publicly provided.  Dkt. 102-1 at 9–10, 34–43 (Wolfe Aff. ¶ 27, encl. C).  *Contra* Env't Conservation Online System, USFWS, https://ecos.fws.gov/ecp/report/biological-opinion (last visited May 19, 2023) (containing links to publicly available BiOps); NOAA Institutional Repository, NOAA, https://repository.library.noaa.gov/gsearch?collection=noaa%3A5&terms=Biological+opinion (last visited May 19, 2023) (same).

their goals.  Even if information submitted by an applicant could in some way be equivalent to an agency's independent analysis and findings, those submissions still fall short of providing the contents required by NEPA and the ESA.  *Id.*; Dkt. 70 at 2–7; Dkt. 70-2.  Mr. Wolfe does not truly contest this, because he merely avers that the permit files contain "essentially all" of what he deems to be the "essential" information.  Dkt. 102-1 at 8–11 (Wolfe Aff. ¶¶ 25, 28).

Second, Florida erroneously claims that Plaintiffs have not alleged informational harm as to any particular claim.  Dkt. 102 at 37–38 (citing *TransUnion*).  However, Plaintiffs clearly tied their informational harms to Claims Two, Seven, and Ten.  Dkt. 98 at 78–79, 80–81.  As such, Plaintiffs have satisfied *TransUnion LLC v. Ramirez*'s requirement that Plaintiffs demonstrate standing as to each of these claims.  141 S.Ct. 2190, 2207 (2021).

Third, Florida makes arguments regarding the sufficiency of Plaintiffs' Complaint and its allegations regarding informational harm.  Dkt. 102 at 40.  However, there is nothing in the pleading standard that requires such allegations, and Florida has not demonstrated otherwise. Florida had the opportunity to test the sufficiency of Plaintiffs' Complaint at the outset of this litigation but chose not to raise this argument then.  Florida has been on notice of Plaintiffs' informational harm at least since the briefing on Plaintiffs' Motion for Partial Summary Judgment.  Dkt. 31 at 40–49.  Moreover, now that this case is at summary judgment on the remaining claims, Plaintiffs have submitted additional declarations alleging specific facts and citing records to demonstrate standing.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Florida's argument based solely on Plaintiffs' Complaint therefore lacks merit in the face of the substantial evidence Plaintiffs have provided.

Finally, Amici cite the Court's denial of their motion to intervene to contend that Plaintiffs' organizational injuries are speculative.  Dkt. 103 at 5–6.  This Court, however, has

already ruled that Plaintiffs have established informational standing in its order on Claim Nine in

the face of similar arguments. *See Ctr. for Biological Diversity v. Regan*, 597 F. Supp. at 190,

203–04, 207; Dkt. 37 at 54–58. Regardless, Amici's arguments fail. The Court rejected Amici's

motion to intervene because they failed to identify any (1) likely proceedings under the Florida

APA; (2) likely prospect for seeking records from the State under the Florida FOIA; (3) evidence

to show that Florida will process permits faster than the Corps; nor (4) evidence that their

members will have Section 404 permits pending when the merits are decided. *Ctr. for Biological*

*Diversity v. Regan*, 539 F. Supp. 3d 136, 142–45 (D.D.C. 2021). Here, by contrast, Plaintiffs

have provided extensive evidence of (1) the differences in information generated by the NEPA

process and ESA consultation as opposed to the information available pursuant to Florida's

program; (2) the particular ways in which the state court system is more restrictive than the

federal court system; and (3) specific projects and permits where Plaintiffs are losing access to

this information and would be subjected to Florida's restrictive permit appeal and court system.

Dkt. 98 at 75–76, 76 n.39, 78–79; Dkt. 31 at 48–49; Dkt. 43 at 72–73.

### 2. Plaintiffs are Harmed Because of Florida's Restrictive Access to Courts.

Plaintiffs have also demonstrated that EPA's action subjects Plaintiffs to a restrictive

state court system when adversely affected by state-issued permits and unpermitted activities.

The state court system will either force Plaintiffs to divert significant resources from their

programs or forego challenging legal violations and inadequate permit decisions. Dkt. 31 at 22–

23, 47–48; Dkt. 43 at 73–74 nn.45–46. *See Nw. Immigrant Rts. Project v. U.S. Citizenship &*

*Immigr. Servs.*, 496 F. Supp. 3d 31, 45–50 (D.D.C. 2020), *appeal dismissed*, No. 20-5369, 2021

WL 161666 (D.C. Cir. Jan. 12, 2021) (finding organizational standing where agency action

restricted Plaintiffs' ability to litigate to protect immigrants); *People for the Ethical Treatment of*

*Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094–97 (D.C. Cir. 2015) (finding organizational standing when agency action precluded plaintiff from "its normal process" of submitting complaints).  Florida, however, raises arguments similar to those Plaintiffs addressed in briefing for the State's Motion to Dismiss and again contends that (1) de novo review in administrative court proceedings does not harm Plaintiffs; (2) the State's mandatory fee shifting provision would not apply; (3) standing in state court is the same as federal court; and (4) that Plaintiffs' allegations of harm are speculative.  *Compare* Dkt. 102 at 30–33, 45–47, *with* Dkt. 37 at 46–49, 57–58.[60]  These arguments fail.

First, Plaintiffs have specifically alleged the harm from the state administrative court's use of de novo review for state permitting actions: the substantial cost required to present an affirmative case by hiring experts and conducting independent investigations.  Dkt. 31 at 47–48 (citing declarations); Dkt. 43 at 72–73 nn.45–46 (same).  *Contra* Dkt. 102 at 46 n.26.  Rather than litigating the adequacy of an agency's independent analysis and decision-making, *Env't Def. v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 77–79 (D.D.C. 2007), parties challenging a state permit must rebut a presumption in favor of the permittee by presenting evidence, *Crooked Lake*, 2018 WL 3387900, at *8.  Because of this evidentiary burden, it is not enough for Plaintiffs to simply rely on public comments, *contra* Dkt. 102 at 31; Plaintiffs must present analyses to rebut those presented by the permit applicant, which requires costly independent investigations and expert testimony.[61]  This is particularly true in Florida because, as described

---

[60] Florida also erroneously relies on *Menominee*, 947 F.3d at 1070–71, Dkt. 102 at 46, even though there, the Tribe raised concerns about the substantive scope of their state court challenge as opposed to the federal court challenge and did not raise concerns about the state court's standard of review, fee-shifting provisions, or standing requirements.

[61] *See* Dkt. 98-1 at 13–14 (Crooks Dec. ¶¶ 38–39); Dkt. 98-4 at 7 (Hartl Dec. ¶ 26); Dkt. 98-7 at 4–5 (Silverstein Dec. ¶¶ 12–13); Dkt. 98-10 at 24 (Umpierre Dec. ¶ 72).

above, the State is not required to independently evaluate and provide written findings and analyses, and Plaintiffs no longer have the benefit of the analyses and information provided pursuant to NEPA and the ESA.  As Ms. Rinaman explained, because of this de novo review, a state administrative court challenge would "cost upwards of several hundreds of thousands of dollars, which represents 35% of [St. Johns Riverkeepers'] annual budget" because of the need to hire expert witnesses.  Dkt. 98-6 at 5–6 (Rinaman Dec. ¶ 21).

Second, Florida seeks to dispute Plaintiffs' harms from the State's mandatory fee shifting provision by arguing that it applies only to suits for enjoining environmental violations.  Dkt. 102 at 46.  But that is precisely the point.  For Plaintiffs to enforce Section 404 violations, they would be exposed to the State's mandatory fee shifting provision.[62]  Dkt. 98 at 79; Dkt. 31 at 23.  As Ms. Crooks has explained, Conservancy has faced the impact of this fee-shifting provision firsthand, because if they lose their case on remand to the Circuit Court, they could face a demand for fees of nearly $2.4 million.[63]  Ex. 1 at 5 (Crooks Dec. ¶ 9).

Third, Florida wrongly contends that Plaintiffs will not face a different burden to prove standing in state court.  Dkt. 102 at 46–47.  Although Florida relies heavily on Florida Statute Section 403.412, Dkt. 102 at 30, 46, that law authorizes only a "citizen of the state" to maintain an enforcement action and explains that only a "citizen of the state" will have standing to initiate an administrative permit challenge or intervene in any proceeding brought under this statute.  Fla. Stat. § 403.412(2)(a), (5), (7).  At least one Florida appellate court has found that a foreign

---

[62] Although Florida elsewhere contends that Plaintiffs could still bring enforcement suits in federal court, Florida does not cite any authority on that point in the Eleventh Circuit nor does Florida address the fact that defendants in those cases often seek remand to state court.
[63] Conservancy of Southwest Florida is challenging this demand for fees as Ms. Crooks further explains.  Ex. 1 at 5 (Crooks Dec. ¶ 9).

corporation would not quality as a citizen of the State, even when they hold a valid certificate of authority to operate in the State. *Legal Env't Assistance Found. v. FDEP*, 702 So.2d 1352, 1353 (Fla. 1st Dist. Ct. App. 1997). *See Mcclash v. Manasota-88, Inc.*, No. 14-4735, 2015 WL 3966050, at *8 (Fla. Div. Admin. Hearings June 25, 2015) ("Sierra Club is not a citizen of the state; it is a foreign nonprofit corporation."). Federal law, by contrast, authorizes citizen suits under the Clean Water Act by "any citizen" (i.e., "a person or persons having an interest which is or may be adversely affected"). 33 U.S.C. § 1365(a), (g).

Moreover, the language of Florida Statute Section 403.412(7) is unclear as to which proceedings it applies. It states, "In a matter pertaining to a federally delegated or approved program, a citizen of the state may initiate an administrative proceeding under this *subsection* if the citizen meets the standing requirements for judicial review of a case or controversy pursuant to Article III of the United States Constitution." Fla. Stat. § 403.412(7) (emphasis added). However, 403.412(7) is a subsection of Section 403.412, and "subsection" 403.412(7) does not authorize any administrative proceedings. *Id.* Assuming, arguendo, that the State legislature intended the term "subsection" to apply to all of "Section" 403.412, that still would not explain to which "administrative proceedings" this more liberal standing standard applies. Florida Statute Section 403.412 authorizes injunctive actions to enforce environmental laws, but it does not authorize administrative proceedings. *Id.* § 403.412(2)(a). The only other mentions of administrative proceedings in Section 403.412 discuss the standing requirements for administrative hearings initiated pursuant to Sections 120.569 and 120.57. *Id.* § 403.412(5), (6). But those provisions do not independently authorize administrative proceedings. The clearest reading of the statute would be for Florida Statute Section 403.412(7) to apply Article III standing for injunctive suits regarding delegated programs.

82

Fourth, Florida cites this Court's denial of Amici's intervention to argue that Plaintiffs have failed to identify any pending or planned state court litigation, and thus, their allegations of harm are speculative.  Dkt. 102 at 46–47.  However, unlike Amici, Plaintiffs have pointed to specific Section 404 permit applications that the State is considering as well as other decisions of concern to Plaintiffs.[64]  Plaintiffs have explained that litigation and permit challenges are tools they regularly use to further their missions of environmental protection.[65]  Thus, any of these permit decisions would implicate potential future state court challenges.  As Ms. Umpierre explained, due to EPA's action, "it is guaranteed that Sierra Club will either have to divert resources to engage in state court litigation, or forego litigation completely, damaging [the Club's] organizational mission."  Dkt. 98-10 at 22–23 (Umpierre Dec. ¶ 69).

## B. EPA's Decision to Transfer 404 Authority to the State Threatens the Aesthetic and Recreational Interests of Plaintiffs' Members.

Florida raises the same arguments that this Court has already rejected to claim that Plaintiffs' members will not be harmed by EPA's unlawful decision to approve the less stringent State (or that their harm is speculative) because Plaintiffs have not "proven" that the state program is less stringent than the federal program.  Dkt. 102 at 45.  Plaintiffs have already responded to this illogical argument, Dkt. 43 at 74–76, and this Court has already rejected it, *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d at 189.

---

[64] Dkt. 98-1 at 1–3, 16–29 (Crooks Dec. ¶¶ 1–3, 8–12, 15, 45–52, 54–62, 64–74, 76–83, 85(a)–(b)); Dkt. 98-3 at 2–13 (Fleming Dec. ¶¶ 6–36); Dkt. 98-4 at 9–11 (Hartl Dec. ¶¶ 32–37); Dkt. 98-5 at 3–18 (Schwartz Dec. ¶¶ 9–31, 33–54); Dkt. 98-6 at 1–2, 7–9 (Rinaman Dec. ¶¶ 3, 9, 26–29, 32); Dkt. 98-7 at 1, 4, 9–14 (Silverstein Dec. ¶¶ 3, 11, 21–26, 28, 30–36); Dkt. 98-10 at 1, 3–14, 24–25 (Umpierre Dec. ¶¶ 2–3, 10–11, 15–40, 73).

[65] Dkt. 98-1 at 13 (Crooks Dec. ¶ 37); Dkt. 98-2 at 2 (Carter Dec. ¶¶ 7, 11); Dkt. 98-4 at 3 (Hartl Dec. ¶ 9); Dkt. 98-5 at 6–7, 14 (Schwartz Dec. ¶¶ 16, 38); Dkt. 98-6 at 4 (Rinaman Dec. ¶ 18); Dkt. 98-7 at 2–4 (Silverstein Dec. ¶¶ 6–9); Dkt. 98-10 at 3, 23 (Umpierre Dec. ¶¶ 8, 70).

First, as the Court has explained, it must "take care 'not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *Id.  Accord Am. Rivers v. FERC,* 895 F.3d 32, 41–42 (D.C. Cir. 2018) (rejecting challenge to standing based on merits arguments); *Am. Fed'n of Gov't Emps., AFL-CIO v. Pierce*, 697 F.2d 303, 305 (D.C. Cir. 1982) ("For purposes of the standing issue, we accept as valid [plaintiff's] pleaded legal theory."); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 28 (D.D.C. 2012) (finding that the "issue of standing need not be conclusively resolved" where jurisdictional facts "are inextricably intertwined with the merits of the case").

Second, Plaintiffs' allegations regarding member harms are not speculative or vague. The State has issued, is considering, and will likely issue several specific Section 404 permits that will harm the aesthetic and recreational interests of Plaintiffs' members.  Dkt. 98 at 78. Contrary to Florida's suggestion otherwise, Dkt. 102 at 20; Dkt. 102-1 at 3 (Wolfe Aff. ¶ 12), the State has not denied a single individual 404 permit for purposes of protecting the environment; those denials have all been based on an applicants' delay in responding to requests for information, and the State has invited the re-submission of those applications once the applicant is ready.  Ex. 1 at 6 (Crooks Dec. ¶ 10).

Third, EPA's oversight does not supplant an adequate state program nor remove this risk of harm.  *Contra* Dkt. 102 at 45.  EPA itself has explained that its ability to block the issuance of a 404 permit does not "lessen" the need for the regulatory requirements embodied in the 404(b)(1) Guidelines.  45 Fed. Reg. at 85,337.

Fourth, as Plaintiffs have already explained, *Clapper v. Amnesty International USA* does not apply.  Dkt. 43 at 41–42.  In *Clapper*, the plaintiffs lacked standing because the harms would not occur absent a series of events, including decisions by multiple independent actors, none of

84

which were even alleged to have occurred.  568 U.S. 398, 415–18 (2013).  The same attenuated

chain of events is not present here.  To the contrary, (1) Florida will likely issue permits pursuant

to an unlawful 404 program, Ex. 1 at 6 (Crooks Dec. ¶ 10); (2) EPA will likely not object to or

federalize that permit, Dkt. 102-1 at 12 (Wolfe Aff. ¶ 31) (stating EPA has only objected to 8.5%

of permits and federalized less than 1% of permits); and (3) the permittee will likely clear

wetlands and waters that are vital to protected species and water quality.

### C.  Plaintiffs Need Not Independently Show Harm from the State's Less Stringent Enforcement Program, But They Have Done So.

Florida argues that Plaintiffs lack standing to challenge EPA's approval of Florida's

program (Claim Two) because they have not demonstrated injuries traceable to the State's higher

criminal intent standard and shorter statute of limitations.  Dkt. 102 at 49–51.  But Florida

misapprehends Plaintiffs' burden.

In *WildEarth Guardians v. Jewell*, which Plaintiffs cite, Dkt. 98 at 78, and neither the

Defendants nor Florida address, the plaintiffs challenged the adequacy of a Final Environmental

Impact Statement ("FEIS"), including for the failure to adequately consider "global climate

change caused by future mining, before authorizing the leasing of" certain lands, and alleged

harm from local pollution from mining activities that would follow.  738 F.3d 298, 304–08 (D.C.

Cir. 2013).  The district court ruled that the plaintiffs lacked standing to challenge the failure to

adequately address climate change because they could not demonstrate a link between their

members' local interests and "the diffuse and unpredictable effects of [greenhouse gas]

emissions."  *Id.* at 306–07 (alteration in original).  The Court of Appeals rejected that approach,

which would have required the plaintiffs to show "that the specific type of pollution causing the

Appellants' aesthetic injury—here, local pollution—[was] the same type that was inadequately

considered in the FEIS." *Id.* The appellate court found that the plaintiffs established standing

because: (1) their members would be injured by increased pollution resulting from the mining

activities; and (2) that pollution/injury followed inexorably from the decision to authorize leases

which rested on the FEIS. *Id.* The appellate court reasoned that the plaintiffs' aesthetic injuries

followed from the order that relied on the FEIS and would be redressed by vacatur of that order

"on the basis of any of the procedural defects identified in the FEIS" because the agency "could

change its mind about authorizing the lease offering" if "required to adequately consider each

environmental concern." *Id.* at 306, 308.

Similarly, in *Mozilla Corporation v. Federal Communications Commission*, the Court

held that "[w]hen a party alleges concrete injury from promulgation of an agency rule, it has

standing to challenge essential components of that rule, invoked by the agency to justify the

ultimate action, even if they are not directly linked to Petitioners' injuries; if Petitioners'

objections carry the day, the rule will be struck down and their injury redressed." 940 F.3d 1,

46–47 (D.C. Cir. 2019) (citing *Sierra Club v. FERC*, 867 F.3d 1357, 1366–67 (D.C. Cir. 2017)).

The same reasoning applies here. The state program's failure to meet minimum

enforcement standards required to abate violations of the 404 program is one of the several

deficiencies that renders EPA's approval of the program unlawful. Plaintiffs have demonstrated

that they are harmed by EPA's approval of the program, which resulted in the transfer of 404

authority to the State. They therefore have standing to challenge that approval and the legal

deficiencies that underlie it.[66]

---

[66] The Court has already determined that EPA's approval of Florida's program constituted a rule.
*Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d at 211–12. The essential components of
that rule are the criteria the State had to meet before EPA could lawfully approve the state

Florida's oblique citation to *Crow Creek Sioux Tribe v. Brownlee* is unavailing.  Dkt. 102

at 48.  In *Crow Creek*, a Tribe sued to enjoin the implementation of a federal water resources

management statute, which would use a memorandum of agreement to transfer federal lands

from the Corps to the State of South Dakota.  331 F.3d 912 (D.C. Cir. 2003).  The court held that

the Tribe lacked standing because "the transfer effect[ed] no legal change that would lessen the

protection of the Tribe's cultural heritage under federal law," including that the Corps would

retain all jurisdiction over cultural protection statutes that it held prior to the transfer and that the

Corps would have undiluted enforcement power.  *Id.* at 917.  The same is not true here.  Unlike

in *Crow Creek*, Florida will administer its program "in lieu of the permitting program

implemented by the Corps," and "[t]he Corps *will not be responsible* for enforcing against

unauthorized discharges of dredged or fill material in violation of the CWA which occur in State

assumed waters after the effective date of assumption."  EPA-HQ-OW-2018-0640-0019, at 1, 7.

EPA's action also changed EPA's role in protecting Florida's waters by waiving EPA's review

of numerous permit categories.  EPA-HQ-OW-2018-0640-0018, at 5–6.  And it rendered

assumable scores of waterbodies that should have remained under the Corps' jurisdiction.

Furthermore, unlike in *Crow Creek*, where the same substantive law was enforced before and

---

program, including as to criminal enforcement.  *See* 33 U.S.C. § 1344(h)(1)–(2).  EPA relied on
the State meeting those criteria to justify its ultimate action: approval of the state program.  EPA-
HQ-OW-2018-0640-0565, at 6 (approval pursuant to Section 404(g) and (h)); EPA-HQ-OW-
2018-0640-0566, at 1 (notifying Florida of approval based on EPA's determination "that
Florida's program has the necessary authority to operate a CWA Section 404 program in
accordance with the requirements found in CWA Sections 404(g-l) and EPA's implementing
regulations").  Vacatur of the approval would restore 404 authority to the Corps, thereby
redressing Plaintiffs' injuries.  Plaintiffs therefore have standing to object to any deficiency in
EPA's approval, even if they are not directly linked to Plaintiffs' injuries.  *See also Sierra Club
v. FERC*, 867 F.3d 1357, 1366–67 (D.C. Cir. 2017) (where agency action involving multiple
projects was treated as integrated whole, final order was not severable, and plaintiffs could
challenge it all even if not separately injured by each project).

after the transfer, Florida's assumption program is substantively different from—and less

protective than—the law that applied before the transfer, namely the federal 404 program.[67]  *See*

*Crow Creek*, 331 F.3d at 917.[68]

Lastly, even if Plaintiffs were required to establish harm from the State's lesser

enforcement scheme, they have done so.  *Contra* Dkt. 102 at 49–50.  Contrary to Florida's

contention, Plaintiffs' harms are not limited to just a couple of assertions.  Instead, Plaintiffs'

harms as to enforcement are comparable to those that were sufficient to establish plaintiffs'

standing in *Idaho*, 820 F. App'x at 628 (challenging EPA's approval of a state program with a

less stringent enforcement program), over objections that parallel Florida's contentions here.

As to organizational harm, Plaintiffs have alleged that (1) part of their organizational

missions and core work involves enforcement actions to ensure polluters comply with the law,

Dkt. 98-6 at 1–3, 7–8 (Rinaman Dec. ¶¶ 5, 11, 26–27); Dkt. 98-7 at 2–3, 6–7 (Silverstein Dec.

¶¶ 5–7, 16–18); (2) they accomplish this goal through investigations based on violations that are

discovered through patrolling the waters they protect, responding to members' inquiries, and

assessing public records, Dkt. 98-6 at 7–8 (Rinaman Dec. ¶ 26–27); Dkt. 98-7 at 2, 6–7

(Silverstein Dec. ¶¶ 5–6, 17–18); and (3) they report violations to the State to bring enforcement

---

[67] This includes aspects that make the state program less stringent, including the failure to cover all assumable waters, the State's inadequate enforcement authority, and the failure to comply with the ESA and 404(b)(1) Guidelines.

[68] Florida's vague reliance on *Waterkeeper Alliance, Inc. v. Regan*, Dkt. 102 at 12, is similarly misplaced.  In *Waterkeeper Alliance*, the plaintiffs failed to show that their harm from a state program's public participation opportunities would be remedied by EPA issuing federal guidelines for public participation, because there was no showing that EPA would withdraw approval of the state program or that the state would have to "cease its injurious conduct."  41 F.4th 654, 660–61 (D.C. Cir. 2022).  Here, Plaintiffs have shown that their harms stemming from the State's operation of the program would be remedied by the Court vacating EPA's decision to approve the state program.

actions and ensure compliance with the law as well as bringing their own enforcement actions, Dkt. 98-6 at 7–8 (Rinaman Dec. ¶ 26–27); Dkt. 98-7 at 2, 6–7 (Silverstein Dec. ¶¶ 5–6, 17–18).

As to their members' harm, Plaintiffs have explained that (1) their members use the Biscayne Bay, St. Johns River, their tributaries, and the lands adjacent to them to kayak, boat, swim, fish, bird-watch, hike, camp, and take photos with their families, Dkt. 98-6 at 2 (Rinaman Dec. ¶ 9); Dkt. 98-7 at 11 (Silverstein Dec. ¶ 28); (2) the water quality in these waterways is already degraded, Ex. 3 at 2 (Rinaman Dec. ¶¶ 5–6); Dkt. 98-7 at 8 (Silverstein Dec. ¶ 20); Ex. 2 at 4–5 (Silverstein Dec. ¶¶ 12–14); and (3) poor water quality affects their recreational and aesthetic interests, Dkt. 98-6 at 2 (Rinaman Dec. ¶ 9); Ex. 3 at 2 (Rinaman Dec. ¶ 7); Dkt. 98-7 at 11 (Silverstein Dec. ¶ 28); Ex. 2 at 5 (Silverstein Dec. ¶ 15).

Additionally, they have alleged that as a result of the State's less stringent enforcement program, there is less deterrence for violations of the Clean Water Act and the State has limited its ability to enforce those violations, Dkt. 98-6 at 7 (Rinaman Dec. ¶ 26); Ex. 3 at 2 (Rinaman Dec. ¶¶ 7–8); Dkt. 98-7 at 11 (Silverstein Dec. ¶ 27).

Therefore, Plaintiffs are harmed as organizations because Plaintiffs will be forced to divert resources more often to step in the shoes of the State and bring enforcement actions on their own, Ex. 2 at 5–6 (Silverstein Dec. ¶ 16); Ex. 3 at 2 (Rinaman Dec. ¶ 8). And Plaintiffs' members are harmed because water quality in the waters of concern will likely degrade even further, impairing their members' aesthetic and recreational use and enjoyment, Dkt. 98-6 at 3 (Rinaman Dec. ¶ 14); Ex. 3 at 2 (Rinaman Dec. ¶ 7); Dkt. 98-7 at 8, 11 (Silverstein Dec. ¶¶ 20, 27); Ex. 2 at 5 (Silverstein Dec. ¶ 15).

Aside from the sufficiency of Plaintiffs' declarations, Florida raises two main arguments to contest Plaintiffs' standing. First, Florida relies heavily on EPA's independent enforcement

authority to suggest it eliminates Plaintiffs' injuries. Dkt. 102 at 48 & n.30. However, Plaintiffs have already addressed the role of that oversight, and how it does not overcome the inadequacies of the state program.[69] EPA's oversight thus does not eliminate the harms Plaintiffs experience because of the State's less stringent enforcement program. Second, Florida raises an argument regarding the justiciability of an agency's exercise of enforcement discretion, Dkt. 102 at 51 n.31 (citing *Heckler v. Chaney*, 470 U.S. 821, 832–33 (1985)), which is equally unavailing. This case is not about Florida deciding not to exercise its enforcement authority. It is about the State's lack of authority to enforce Clean Water Act violations. There is no enforcement discretion at play.[70]

## II.   Plaintiffs Have Standing to Challenge EPA's Arbitrary and Capricious Completeness Determination (Claim One).

Florida's argument that Plaintiffs have failed to show harm for Claim One is belied by the inability to comment on a full and complete application, as shown above, and the triggering of the one-hundred-and-twenty-day decision clock that required EPA to render a decision on Florida's application on the eve of a change in administration. Had EPA determined the application was not complete until the BiOp was produced, there is a possibility that the agency would have reached a different decision and/or granted an agency stay pending review. *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *City of Dania Beach v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007); *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 595 (D.C. Cir. 2019).[71] Florida's claim that EPA's completeness determination was not a final agency action

---

[69] Further, contrary to Florida's averment, Dkt. 102 at 48, EPA does not review every permit the State proposes to issue. EPA-HQ-OW-2018-0640-0018, at 5–6.

[70] Florida also raises merits arguments to contest Plaintiffs' standing, alleging a state's enforcement authority need not be equivalent to the federal program. Dkt. 102 at 49. That argument is addressed in detail above.

[71] Plaintiffs adopt, and incorporate by reference, their prior briefing and evidence submitted in support of Plaintiffs' Motion for Partial Summary Judgment. *See* Dkts. 31, 43, 69.

has no merit.  Plaintiffs previously briefed this issue and adopt and incorporate the same arguments here.  *See* Dkt. 69 at 7–10.

## III.      Plaintiffs' Claims Are Ripe for Review.

Florida raises a host of ripeness claims, none of which have any merit.[72]  To the contrary, Plaintiffs' action presents facial challenges to several agency actions that have altered the legal regime for 404 permitting in Florida to the detriment of Plaintiffs.  Plaintiffs' claims are ripe because they challenge final agency actions[73] with determinative and coercive effect.  *See Bennett v. Spear*, 520 U.S. 154, 168–71 (1997) (finding standing for facial challenge to BiOp and ITS because they "alter[] the legal regime to which the action agency is subject;" later decisions by action agency does not eliminate injury produced by this coercive effect).

A challenge to EPA's approval of Florida's program, and the underlying programmatic agency action, could never be any riper as that approval has resulted in the transfer of 404 authority to the State, with consequences for Plaintiffs.  Contrary to Florida's suggestion, there is no later "as-applied" challenge that would allow Plaintiffs to challenge EPA's approval of Florida's program, and the agency actions that underlie that approval, as a whole.  Any as-applied challenge to a particular permit would not afford Plaintiffs the opportunity to challenge EPA's approval of the program, or any of the underlying agency actions as they relate to the approval of the program.  A case such as this is therefore ripe for review as a facial challenge. *See, e.g.*, *Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d at 8–10 (finding claims against agency's refusal to conduct programmatic BiOp on the action as a whole ripe despite agency's

---

[72] Specifically, Florida argues that Plaintiffs' challenges to USFWS' programmatic ITS (Claims Three and Four), the Corps' retained waters list (Claim Seven), and EPA's ESA violations with regard to NMFS species (Claims Five, Eleven, and Twelve) are not ripe.
[73] Florida only disputes finality as to the Corps' Retained Waters List.  *See* Dkt. 102 at 56–57.

plans to evaluate individual actions later at the permit level); *Cooling Water*, 905 F.3d at 76–78 (2d Cir. 2018) (deciding facial challenge to programmatic ITS on merits); *Menominee*, 947 F.3d at 1069–70 (suggesting that challenge to Michigan's authority over a particular waterbody should have been brought at the time of EPA's approval of that state's 404 program, not at the time of permit decision); *Growth Energy v. EPA*, 5 F.4th 1, 30–31 (D.C. Cir. 2021) (finding no effect determination in facial challenge arbitrary).[74]  Delay of judicial review would serve no just purpose, and only prejudice Plaintiffs.[75]

### A.  Plaintiffs' Challenge to USFWS' Unlawful ITS is Ripe.

Florida's argument that later permitting actions render Plaintiffs' challenge to the programmatic ITS (Claims Three and Four) unripe lacks any merit.  Dkt. 102 at 53–54.  That Plaintiffs may challenge individual take actions at the individual permit level also misses the point, as no individual permit challenge would afford Plaintiffs to bring a programmatic challenge to a programmatic agency action.  Plaintiffs are harmed by the programmatic ITS now

---

[74] *See* discussion of programmatic BiOp cases above.

[75] Florida cherry-picks ripeness language from a slate of cases that are materially different from the circumstances presented here.  *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (general policy statement that had no force of law and created no hardship to plaintiff besides uncertainty was not ripe); *Texas v. United States*, 523 U.S. 296, 300 (1998) (application of statute was not foreseeable or likely so claim not ripe); *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012) (regulation challenge not ripe because on-going agency action and proposed rule would eliminate exclusion sought); *Devia v. NRC*, 492 F.3d 421, 424 (D.C. Cir. 2007) (claim not ripe where other permit denials blocked project from occurring); *Pub. Citizen Health Resch. Grp. v. FDA*, 740 F.2d 21, 31 (D.C. Cir. 1984) (agencies' preliminary, tentative findings on drug impacts not ripe because not final and part of ongoing agency decision-making); *McCray v. Biden*, 574 F. Supp. 3d 1, 11 (D.D.C. 2021) (Moss, J.) (claim not ripe where injury was contingent on denial of exemption request, no evidence showed may be denied, there were ways to cure alleged reasons for denial, and no imminent harm); *Am. Oversight v. U.S. Dep't of Veterans Affairs*, 498 F. Supp. 3d 145, 156 (D.D.C. 2020) (Moss, J.) (deferring decision on ripeness until merits); *Oceana Inc. v. Evans*, 384 F. Supp. 2d 203, 254–55 (D.D.C. 2005) (claim not ripe where impossible to predict if future frameworks created pursuant to statute would exceed agency's authority and no hardship was shown).

because it creates an "unlawful risk of take" for Florida's program *as a whole* by failing to set limits on incidental take for the program *as a whole*, in contravention of the ESA.  Dkt. 98 at 42–45, 79–80.  Delaying judicial review would further burden Plaintiffs by allowing these harms to continue.  *Id.* at 75–81.  The ITS is a concrete application of the ESA that is ripe for review.

Tellingly, Florida fails to cite any case where a similar challenge to a programmatic ITS was found unripe.  And in *Cooling Water*, the court ruled on the merits of a similar challenge to a programmatic ITS without requiring the plaintiffs to pursue an "as-applied" challenge at the permit level instead.  905 F.3d at 76–78.  Florida misleadingly cites the case here for having found a *different* claim to be unripe and fails to acknowledge that the case found the claim that parallel's Plaintiffs' claim implicitly ripe for review.  *Id.* at 79–80.

Contrary to Florida's theory, EPA's oversight and Florida's technical assistance process are not the type of "later actions by independent third parties not before the court" that makes harm too speculative and claims unripe.  *See Bennett*, 520 U.S. at 168–71 (later decisions on water releases in long-term irrigation project by action agency pursuant to or in violation of ITS did not eliminate injury from ITS itself).  Neither affect the *programmatic* ITS' finality, determinative effect, or risk of harm from its unfettered extension of take exemption for the program as a whole.  The potential for later challenges to individual permits[76] or the possibility that EPA *may* veto an individual permit has no bearing.  Plaintiffs' programmatic challenge to the agency's programmatic actions can only be decided now.  Florida's theory would lead to an absurd result—precluding Plaintiffs' ability to challenge programmatic actions and allowing only challenges to individual permits.

---

[76] A permit challenge would also not provide further factual development necessary to decide whether the programmatic ITS is legal.

Also contrary to several of the cases on with Florida relies, this claim does not present a situation where a court is asked to step into the middle of an agency's decision-making or to speculate on future application of a *valid* statute.  *See, e.g.*, *Pub. Citizen*, 740 F.2d at 31 (not ripe because not final and ongoing decision-making); *Texas*, 523 U.S. at 300 (application of statute was not foreseeable or likely, so claim as to its inapplicability to a state code not ripe).  Nor are there later agency actions that could supersede or undo the violation or remedy the harm wholesale.  *See, e.g.*, *Am. Petroleum Inst. v. EPA*, 683 F.3d at 386 (regulation challenge not ripe because on-going agency action and proposed rule would eliminate exclusion sought); *Devia v. NRC*, 492 F.3d at 424, 426 (not ripe because project blocked from occurring by other permit denials); *Pub. Citizen*, 740 F.2d at 31 (D.C. Cir. 1984) (not ripe because not final and ongoing agency decision-making).

Florida's reliance on an oil and gas leasing case also fails.  Dkt. 102 at 53.  Given the multifaceted nature of the leasing process, there is a body of case law specific to oil and gas leasing that dictates when those claims are ripe based on the action agency's ability to continually fulfill their NEPA duties.  *Wyo. Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 9–10 (D.D.C. 2001).  As for the ESA, however, case law makes it quite clear that the initial BiOp must consider the agency action as a whole, and that its failure to do so is subject to judicial review.  *Conner*, 848 F.2d at 1455–56 (discussing differences between NEPA and ESA and analysis timing required).

Nor does reliance on *New Hanover Township v. U.S. Army Corps of Engineers*, 992 F.2d 470, 473–74 (3d Cir. 1993), help Florida.  Dkt. 102 at 54.  There the challenge was directly to an approved use of a general permit.  The court found the claim was unripe because the underlying project required other permits before it could move forward.  Here, the same concerns do not

94

apply because there are no subsequent steps or required approvals that will undo USFWS'

unlawful extension of take protection or the State's implementation of the illegal program.  And,

if Plaintiffs prevail, USFWS' BiOp and EPA's approval of the program would be vacated.

Similar to the reasons the Ninth Circuit declined to follow *New Hanover*, here we also argue that

no ITS should issue until the ESA's legal requirements are met and those legal inadequacies are

central to the case.  *Ctr. for Biological Diversity v. USFWS*, 450 F.3d 930, 941 (9th Cir. 2006)

(finding claim against BiOp ripe because if plaintiff prevailed, BiOp would be withdrawn until

mining project complied with other laws plaintiff argued the ESA required to be addressed

before an ITS could issue).

Unlike in *New Hanover*, the effects of the ITS have already been felt; they were essential

to EPA's approval of Florida's program, and indeed, as Florida admitted in the record, essential

to Florida's interest in assuming the 404 program.  Dkt. 98 at 27–32.  The transfer of authority

has since allowed the State to issue permits with incidental take coverage obtained through the

inadequate programmatic BiOp, which created a pass-through for the agencies to extend liability

coverage to state permittees who otherwise would have had to go through the rigorous processes

Congress established in Section 10 for non-federal actors.  Dkt. 98 at 75–81.  *See, e.g.*, Dkt. 98-1

at 11–12 (Crooks Dec. ¶¶ 31–33) (discussing failures to include required conditions, use of

vague conditions which could lead to insufficient protection, findings that take will occur, but no

take limits were set and insufficient conditions to ensure conservation measures would be taken).

*Suburban Trails, Inc. v. New Jersey Transit Corporation* is also inapposite.  Dkt. 102 at

54.  In *Suburban Trails*, the court held that federal preemption and antitrust claims were not ripe

because the state regulatory action was far from final and subject to modification by the federal

agency that would eventually fund the subsidies.  800 F.2d 361, 362 (3d Cir. 1986).[77]  Among

other things, the state had not made a final eligibility decision, plaintiffs were parties in a state

administrative proceeding that could affect their subsidy eligibility, plaintiffs also had a

complaint pending before the federal agency regarding the matter, and the federal agency (a

significant player) was not a party.  *Id.* at 362, 367.  Moreover, there was no hardship to the

plaintiff, just uncertainty.  *Id.* at 366–367.  Unlike in *Suburban Trails*, here we have a final

agency action—a programmatic ITS—and all the context necessary to determine a question of

law—whether it violates the ESA.  Potential future interaction between the agencies at the permit

level and EPA's oversight power will not disrupt these facts or its finality.  The administrative

decision-making is complete, and Plaintiffs are concretely affected.  Future decisions at the

permit level do not nullify the harms from the programmatic action.  Dkt. 98 at 75–81.

### B.  The Corps' Unlawful Retained Waters List, and EPA's Reliance on It to Approve Florida's Program, is Ripe for Review.

Again here, Florida's claim that as-applied challenges would be available fails to reckon

with the fact that Plaintiffs challenge the program as a whole:  (1) the Corps unlawfully produced

a retained waters list that allowed non-assumable waters to be assumed by the State; and

(2) EPA's approval of Florida's program, based on the Corps' flawed retained waters list,

unlawfully transferred authority over non-assumable waters to the State.  Dkt. 102 at 56.  Any

as-applied challenge would not reach these programmatic harms because it would necessarily

apply to each waterway at a time on a permit-by-permit basis.  Indeed, the only court to have

considered a similar claim (EPA's transfer of authority over the Menominee River to the state of

---

[77] While the court concluded that the federal modification power was "more significant[]" than the non-finality of the state action, the court's analysis relied heavily on the non-finality of the state's action and pending state and federal administrative proceedings.  *Id.* at 365–66.

Michigan) ruled that plaintiffs' as-applied challenge came too late.  That court held that instead, the plaintiffs were required to have challenged EPA's approval of the program that transferred authority over the river to Michigan.  *Menominee*, 947 F.3d at 1069–70 (affirming *Menominee Indian Tribe of Wis. v. EPA*, 360 F. Supp. 3d 847, 860 (E.D. Wis. 2018)).

Florida's bald assertion that Plaintiffs have suffered no harm, Dkt. 102 at 56, ignores evidence in the record, including harm from the State's administration of the 404 program.  Dkt. 98 at 81.  Florida misconstrues the relief Plaintiffs seek, Dkt. 102 at 56, which is simply for the Corps and EPA to engage in a lawful process to ensure that authority over non-assumable waters remains with the Corps as the Clean Water Act and RHA require.  EPA should then only approve Florida's program after assuring that its action too will only transfer authority over assumable waters to the State.  Dkt. 98 at 70–72.

Florida's argument that the Corps' retained waters list "likely" did not constitute a final agency action subject to challenge, Dkt. 102 at 56–57, also fails.[78]  *See* Dkt. 98 at 70–71.  *See also Coal. to Save the Menominee River Inc. v. EPA*, 423 F. Supp. 3d 560, 567 (E.D. Wis. 2019) (Corps' retained waters list for Michigan was final agency action because Corps' determination regarding assumable waters was binding on the Corps).  That Florida's list does not enumerate all waters subject to the ebb and flow of the tide does not render the list non-final.  The Corps' MOA with Florida explicitly states that the Corps retains jurisdiction over all waters identified in the retained waters list *and* all tidally influenced waters (whether listed or not), including adjacent wetlands.  CORPS004322, at CORPS004324.  All non-tidal waters that are not identified on the list are thus assumed by the State.

---

[78] The Defendants offer no argument on this point, but instead "assume, without conceding" that the retained waters list is a final agency action.  Dkt. 99 at 59 n.17.

Florida's argument that the list is not final because it can be updated in the future is similarly unavailing.  Dkt. 102 at 57.  *See Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 148 (D.D.C. 2020), *aff'd sub nom. W. Watersheds Project v. Haaland*, 850 F. App'x 14 (D.C. Cir. 2021) (agency's ability to amend its action "did not vitiate the finality" of its action). That this agency action, like any other, may be modified at some future date does not render a final agency action non-final.  Contrary to Florida's suggestion, there is no process in the MOA for Florida or the Corps to modify the retained waters list.  Rather, the MOA merely provides procedures for each entity to alert the other if it receives a permit in the other's jurisdiction.  The Corps may propose changes to the list, but those must be approved by EPA through rulemaking. *Menominee*, 947 F.3d at 1070.

### C.  EPA's Unlawful Determinations on NMFS-listed Species Are Ripe for Review.

Florida again erroneously argues that later permit decisions and future potential as-applied challenges to permits cause even EPA's unlawful NMFS determinations to be unripe. Dkt. 102 at 59–60.  But Florida ignores that EPA was required to consult with NMFS *before* approving Florida's program, and its unsupported "no effects" determination renders unlawful EPA's approval.  The potential for later, site-specific determinations as to certain NMFS' species affected by individual permits cannot cure those violations or remedy the harms to Plaintiffs.  It is indisputable that a project-specific analysis will not consider impacts from Florida's implementation of the *entire* program.  If Florida's implementation of the 404 program "may affect" NMFS species, as Florida admits, *see id.*, then EPA was obligated under Section 7 of the ESA to properly consider those impacts prior to approving Florida's program.  Dkt. 98 at 52–55. And Florida's reliance on the agencies' duty to "ensure conservation of species" is not an exemption from complying with Section 7 in the first place.  Dkt. 102 at 60.

Plaintiffs have demonstrated how this violation harms their mission and members.  Dkt. 98 at 80–81.  These harms continue to burden Plaintiffs in carrying out their missions and daily work.  *Id.*  Further factual development would not aid the Court with its determination either. The claims all rest on the same illegally narrow definition of the action area (which is not disputed by the Defendants or Florida).  *Id.* at 52–55.

## **CONCLUSION**

For these reasons, Plaintiffs respectfully request that the Court grant summary judgment in their favor on their Claims One through Seven and Ten through Thirteen.

Dated:  June 9, 2023

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

99

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

\* Appearing *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of June 2023, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.


Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org