## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

### SUPPLEMENTAL DECLARATION OF AMBER CROOKS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Amber Crooks, make the following declaration:

1.      I am a resident of Naples, Florida.

2.      I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

3.      I submitted a declaration in support of Plaintiffs' Motion for Partial Summary Judgment on March 5, 2021, Dkt. 031-1, and a second declaration in support thereof on May 24, 2021, Dkt. 043-1.  I submitted another declaration in support of Plaintiffs' Motion for Summary Judgment on February 28, 2023.  Dkt. 98-1.  I am providing this supplemental declaration to provide updates on events that have transpired since my last declaration regarding particular projects and in response to factual matters raised by Florida, including in the Declaration by Justin Wolfe, Dkt. 102 and 102-1.

DocuSign Envelope ID: B572E0DA-7FAF-46DB-9B55-D4D09F31A3FC

4.      **Available Information**:  I have been an environmental advocate in Florida for over 15 years.  As I previously stated, it is incredibly difficult to obtain meaningful project information under the State's 404 program.  While there are several *access methods* available online to try to obtain public documents regarding pending 404 applications (Oculus, Information Portal, Permitting Information Database and ARCGIS Mapping Tool), all of these lead to the same pot of information.  And that pot of information is lacking.  The available information contains primarily submittals by the applicant.  I rarely, if ever, see agency factual determinations on whether the permit complies with the regulations' requirements, permit conditions negotiated with the applicant, or agency assessments of the applicant's alternatives analysis (and whether it is reliable).

5.      This is of specific concern for our work, because obtaining the types of information we need to understand the impacts of projects on listed species and their habitat is central to our mission.  That information would include state or federal agency analysis of impacts to species, determinations of necessary conditions and conservation measures based on the analyses, assessments of take and jeopardy, and discussion of take triggers.  Dkt. 98-1, at 9-10 (discussing that this information is missing from the publicly available files, that technical assistance is not completed in a transparent way, and that when this information may be obtained it is typically after the close of the public comment period harming our ability to advocate for necessary protections).  In other words, I do not usually find anything in the files that tells me what the Florida Department of Environmental Protection ("DEP") and the wildlife agencies are doing with that information to make *their* decisions or any analysis of the applicant-submitted information.  For instance, the applicant submits a biological assessment, but I cannot find information on how the agencies use it to form their own decisions.  Or, the applicant submits

DocuSign Envelope ID: B572E0DA-7EAF-46DB-9B55-D4D09F31A3EC

information on an alternatives analysis and cumulative impacts, and there are no documents to indicate what DEP does with those documents (analysis, reliance, etc.).  In addition, for the projects I monitor, I have yet to find agency documents containing environmental information comparable to what an environmental impact statement or environmental assessment would contain under NEPA.

6.      Though biological opinions are not produced for every 404 permit, most of the projects the Conservancy monitors and has concerns over typically trigger Section 7 consultation under the Endangered Species Act, when those types of projects are processed under the Corps' program because of their impacts to imperiled species.  For instance, the following projects discussed in my prior declaration were subject to or would be subject to receiving a biological opinion: Troyer Mine, Rural Lands West development, Bellmar development, Immokalee Road Rural Village development, Old Corkscrew Plantation (AKA Kingston) development, Hogan West development, and FFD development, *see* Dkt. 98-1, at 16-28.  This is unsurprising considering it is typically the larger scale developments that pose the most threats to listed species and their habitats and are therefore of most concern to Conservancy and to me.

7.      I recently reviewed the same database (Environmental Conservation Online System) to review issued biological opinions that Justin Wolfe discusses in his declaration.  Dkt. 102-1, at 9-10.  In addition to missing opinions from 2022 and 2023 as he mentions, depending on which dropdown choices you select (like selecting the Florida Field Office), the query function may not always include the Florida panther.  Therefore, many biological opinions for the Florida panther (e.g. WildBlue development, Argo Manatee development, Corkscrew Farms/the Place development, with which I am familiar because the Conservancy tracked these major developments) appear to be missing from Enclosure C provided by Mr. Wolfe.  That may

mean that he underestimated the amount of Biological Opinions occurring in assumed waters.

The EPA's Biological Evaluation acknowledged that a small number of species make up a

majority of the consultations.  Notably, the Florida panther and Florida bonneted bat (another

species that occurs in assumed waters here in southwest Florida) make up a large number of

these reviews.  The Biological Evaluation depicts Southwest Florida as a hotspot for ESA

consultations.  Finally, the database that Mr. Wolfe relies on in his declaration would also not

reflect several biological opinions that had been under consideration by the Corps (such as for

transferred projects) but were never completed.  Those opinions collectively covered thousands

of non-coastal acres that would have received biological opinion-level analysis.

8.      **Take of Listed Species**.  Since Florida's implementation of the 404 program, the

Conservancy has been unable to track take that is occurring in Southwest Florida from Florida's

program cumulatively as a whole because no biological opinions are being produced for projects

in assumed waters.  For the projects of interest to the Conservancy, we have not seen details of

take analysis or take authorization, even when take seems likely.  The Conservancy is especially

concerned with tracking take for the listed crested caracara, Florida panther, smalltooth sawfish,

and Florida bonneted bat.  More importantly, because the programmatic biological opinion's

incidental take statement does not identify the amount or extent of incidental take that is

authorized for these species for Florida's implementation of the program, the Conservancy can

also not determine if or when the authorized amount of take has been exceeded for these species

or ensure the agencies reinitiate programmatic consultation when it is exceeded.  This means the

Conservancy's mission to advocate on behalf of and seek protections for these species is gravely

impaired.  Given the lack of information about the technical assistance process and vagueness of

the reasonable and prudent measures and implementing terms and conditions in the ITS, the

4

Conservancy cannot monitor compliance with these processes and conditions.  This likewise harms the Conservancy's mission and members who seek to protect listed species in Southwest Florida.

9.      **Access to Courts**.  I previously referred to the fee shifting provision whereby attorney's fees are required to be assessed against the non-prevailing party in state court.  The potential risk of being responsible for paying an opposing party's fees, including not only the agency being sued, but also any third parties that have intervened, is a serious consideration for organizations contemplating a legal challenge, including the Conservancy.  As an example of some of the monetary considerations associated with suits where fee shifting applies, the Conservancy need look no further than our litigation against Collier County and Collier Enterprises Management over the Rivergrass Development Order (Conservancy of Southwest Florida, Inc., Plaintiff, v. Collier County, Florida and Collier Enterprises Management, Inc., Defendants.  Case No:  11-2020-CA-000780-0001-XX).  While no party has yet prevailed in this litigation, the trial court has determined amounts of fees previously incurred that, if the Conservancy were to lose, the Conservancy would have to pay Defendants.  The Conservancy disputes the constitutionality of the fee shifting provision to which that specific case is subject.  And the Conservancy has not lost the case, which has been remanded to Collier County Circuit Court for additional proceedings.  Therefore, these numbers are provided only to demonstrate the *potential* significant financial risks associated with challenges that require losing parties to pay prevailing party fees.  Specifically, the trial court found that Defendant Collier County would be entitled to fees of $118,142.45 and that Defendant Collier Enterprises Management would be entitled to fees of $2,381,436.88.  This is illustrative of the financial risk that *could* be associated with losing under a fee shifting provision.

10. **Current Status of DEP's 404 Program**. Upon reviewing the Declaration by Justin Wolfe, Dkt. 102-1, at 2-3, I noticed that in his description of Florida's program activities since implementation there were several important updates not provided. This includes three separate letters from EPA raising concerns about Florida's implementation, which I have reviewed and attached here. Exhibit A Combined RAI Letters; Exhibit B Annual Report Letter. In addition, as to the denied applications he mentions, Dkt. 102-1, at 3, based on my review of data from Oculus, all permit denials were because of non-responsiveness to a request for further information and the applicant was instructed that they could resubmit their application without prejudice. As to no permit required requests, almost exclusively, DEP denied the requests for non-responsiveness to DEP's request for additional information or due to a lack of information sufficient to determine no permit is required.

11. **Bellmar Development.** On or around May 9, 2023, Conservancy saw correspondence from U.S. Fish and Wildlife Service that their final comments would be provided to DEP by the end of May for this mixed-use community that would cover about 1,700 acres within the Big Cypress Drainage Basin. DEP also stated they plan to hold a public hearing once this information is obtained. After that, we fear the permit will be issued, as there appears to be no other outstanding issues before the State. As explained in my prior declaration, this project is of particular concern and would have unacceptable direct, indirect, and cumulative impacts on endangered and threatened species, wetlands, and other natural resources. This includes jeopardizing the Florida panther and resulting in take of this species and others.

12. **Troyer Mine.** Based on documents that are available through DEP's publicly assessable databases, there has been no request for additional information (RAI) from DEP since April 29, 2022. On June 3, 2022, Troyer provided a response document. Under DEP's rules,

applicants have 90 days to respond to an RAI.  There has been no request for extension by the

applicant nor a subsequent RAI from DEP that I have been able to locate on Oculus.  The

Declaration of Justin Wolfe however indicates that DEP is still waiting on a response to an RAI.

Dkt. 102-1, at 9-10.

13.    **Eden Oak Development**.  Conservancy has been monitoring this project because

it will likely need a 404 permit in the future.  Given a recent zoning denial at the local Lee

County level, the applicant cannot submit the same or similar project for at least one year.  We

will continue monitoring any future development proposals on this parcel.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this

24 day of May, 2023.

DocuSigned by:

*Amber Crooks*

50496CAE7D21435...

Amber Crooks
Environmental Policy Manager
Conservancy of Southwest Florida
1495 Smith Preserve Way
Naples, Florida 34102

# Exhibit A



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET, SW
ATLANTA, GEORGIA 30303-3104

November 12, 2021

Secretary Emile D. Hamilton
Florida Department of Environmental Protection
Marjory Stoneman Douglas Building
3900 Commonwealth Boulevard
Tallahassee, Florida 32399

Dear Secretary Hamilton:

Thank you for your agency's transmission of the draft annual report evaluating the Florida Department of Environmental Protection's (FDEP) administration of its Clean Water Act (CWA) section 404 program, pursuant to the Memorandum of Agreement (MOA) between FDEP and the EPA, Section IV.A, and 40 CFR 233.52. We have reviewed the draft report closely and on October 14 and 21, 2021, transmitted to FDEP requests for additional information on a number of topics. For your reference, the requests for information that we transmitted are enclosed. We look forward to receiving FDEP's response.

We would like to ensure that FDEP has the time it needs to adequately respond to the EPA's questions, and that the EPA has the ability to fully evaluate the information that FDEP provides. The EPA's regulations and the MOA provide that FDEP will finalize the annual report within 30 days of receipt of the EPA's comments. MOA at IV.B.6; 40 CFR 233.52(e). We are writing to confirm that we do not view the EPA's initial requests for additional information as having begun this 30 day period for finalization of the annual report. Rather, we view the EPA and FDEP as engaging in a productive process for exchanging information and feedback, consistent with the intent of the program reporting requirements. The EPA will promptly assess all of the information, once FDEP submits it in response to EPA's requests. The 30-day period for finalizing the report would not begin until the EPA submits final comments, questions, or requests for additional information.

The EPA is committed to assisting and supporting FDEP's efforts to comply with the CWA section 404 state program reporting requirements and we look forward to engaging with FDEP in the completion of a robust annual report. If you have any questions or wish to discuss this matter, please contact me, or have a member of your staff contact Ms. Rosemary Calli at 404-562-9846.

Sincerely,

CAROL MONELL
Digitally signed by
CAROL MONELL
Date: 2021.11.12
09:36:50 -05'00'

John Blevins
Acting Regional Administrator
EPA Region 4

Enclosures (2)

1. October 14, 2021 transmittal of request for additional information

2. October 21, 2021 transmittal of request for additional information

| | |
|---|---|
| **From:** | Calli, Rosemary |
| **To:** | Mason, Heather |
| **Cc:** | Laycock, Kelly; Mcgill, Thomas |
| **Subject:** | EPA request for additional evaluation and information |
| **Date:** | Thursday, October 14, 2021 4:23:47 PM |
| **Attachments:** | FI404-AnnualReview-Planning2021_Transmittal20211014.docx |

Hello, Heather – As part of EPA's review of FDEP's program reporting per 40 CFR Part 233.52, we have compiled the attached questions as an initial request for additional evaluation and information. Please feel free to reach out if we can provide any clarification.

Best regards,
Rosemary

Request for additional evaluation and information                              October 14, 2021
Supporting EPA review of program reporting

**Public participation**
-   Please describe the public participation opportunities, including types of participatory forums, formats, frequency, and outreach to EJ communities and tribal groups.
-   Do all public notices contain the information specified at 40 CFR 233.32(d)?
-   Has the Department heard from the public concerns that information shared with public notices is insufficient? If so, what measures is FDEP taking to address these concerns?
-   Are there criteria a potential commenter must demonstrate in order to participate, e.g. residency, impact on economic interest, etc?
-   As part of its public notice process, does FDEP include supporting documentation, or a link to where supporting documentation can be found, for the items listed in 62-331.060(1)(a)-(i)?
-   Does FDEP upload all information submitted by an applicant as part of the initial application or in response to FDEP's requests for information onto the OCULUS platform? If not, what factors does FDEP consider in whether to include information on OCULUS? How soon after receiving this information does FDEP upload it to OCULUS?
-   What species review information does FDEP include with the public notice?
-   Does FDEP upload ESA technical assistance communications between FDEP, FFWCC, U.S. FWS, and/or NMFS onto OCULUS? How soon after receiving this information does FDEP upload it to OCULUS?
-   How many requests has the Department received for comment period extension, and how many of these requests have been granted?
-   Have any permitting decisions been appealed and what was the outcome?

**Delineations/Waters Determinations**
-   Under the Navigable Waters Protection Rule (NWPR), EPA and the U.S. Army Corps of Engineers (Corps) Corps Districts, including the Jacksonville District, coordinated on approved jurisdictional determinations where a negative jurisdictional decision was made based solely on a finding that a non-jurisdictional feature (e.g., ephemeral stream) or artificial structure (e.g., dam, spillway) did not convey surface water flow to a downstream jurisdictional water in a typical year and thus severed jurisdiction of the subject water and potentially implicated upstream aquatic resources. EPA is interested in learning if FDEP made similar determinations under the NWPR, where waters were not jurisdictional based solely on the finding described above. Please provide the number of these determinations made and the relevant information to support the determinations.
-   Under the NWPR, EPA and the Corps Districts, including the Jacksonville District, coordinated on approved jurisdictional determinations where affirmative jurisdictional decisions were based solely on a finding that a particular wetland, lake, pond, or impoundment of a jurisdictional water was inundated by flooding from a jurisdictional water in a typical year. EPA is interested in learning if FDEP made similar determinations under the NWPR, where waters were jurisdictional based on the finding described above. Please provide the number of these determinations made and the relevant information to support the determinations.
-   EPA is aware that FDEP has an approved wetland delineation methodology for assumed waters (outlined in Chapter 62-340, F.A.C. and 62-340 F.A.C. Data Form) whereas the Corps follows federal delineation methodologies for retained waters, including those for federal mitigation banks (outlined in the Corps 1987 Wetlands Delineation Manual and Regional Supplement to

Request for additional evaluation and information                                      October 14, 2021
Supporting EPA review of program reporting

the Corps Wetland Delineation Manual for the Atlantic and Gulf Coastal Plain Region, as well as the associated Wetland Determination Data Form). EPA is aware of instances where discrepancies between the two methodologies have been identified. Please provide the number of discrepancies that FDEP is aware of, including relevant documentation illustrating how the discrepancies were resolved.

- Certified Wetland Evaluators (CWEs) must verify the delineation of wetlands and other surface waters made by FDEP and Water Management District (WMD) staff for 404-permitting purposes. Has FDEP identified projects where CWEs have not been able to field verify the delineation of waters for 404-permitting purposes? If so, please provide the number of projects where FDEP was not able to perform the necessary field verification for 404-permitting purposes and the steps that FDEP has taken to resolve this oversight role discrepancy.

**Expedited Review/Long-Term Conceptual Planning**

- Has FDEP reviewed any applications under the expedited permit review process? If so, how many?
- For purposes of determining whether there has been a "material permit modification" or "material changes in the scope of the project," how does FDEP determine whether there has been a significant increase in the total project environmental impact, including but not limited to wildlife impacts, or a significant increase in the impact to state-assumed or retained waters?
- Has FDEP received any applications with long-term planning documents? If so, how many?
- Has FDEP received any permit applications with existing long-term planning documents issued under the ERP program? How is the state working with applicants to ensure state 404 permits comply with the statute and regulatory limitation of 5-year permits?
- Did the long-term planning documents include all of the elements required in Section 5.3.2 of the State 404 Program Applicant's Handbook?
- Have the long-term planning documents been included with the public notice?
- How does FDEP determine whether applications are unique or part of the same larger project?
- How does FDEP account for cumulative impacts associated with multiple applications that are part of the same larger project?
- Have any NPRs been issued as part of the expedited permit review process?

**Compensatory mitigation**

- How much in-kind vs. out-of-kind mitigation has been provided?
- Please explain the ratios of impact to compensation required in permits.
- Are credits available within the watershed where the impacts have occurred? How often have permittees proposed or needed to purchase mitigation credits from outside the watershed?
- For projects where compensatory mitigation was not required, please explain why not in the context of mitigation sequencing to avoid, minimize, and compensate for any impacts (e.g., were impacts requiring mitigation reduced through avoidance?).
- What are the overall cumulative losses and/or benefits provided through Florida's 404 permitting program? How are these accounted for and tracked?

Request for additional evaluation and information                                        October 14, 2021
Supporting EPA review of program reporting

**Staffing levels of program**
- What is the staffing vacancy rate? How has it ranged since the State 404 Program became effective?
- How have FTE numbers and allocations for the 404 program changed since the program went into effect? What functions are new staff being hired for, and at what expertise level?
- Have any FTE been shifted from other programs into the 404 program, and if so, how many?
- How many staff have had Corps wetland delineation training?
- How many staff are Certified Wetland Evaluators?
- What other training has been provided staff for the State 404 Program?
- How many permits on average is each staff member assigned? How has this changed pre- and post-Assumption?
- EPA understands that as part of workload management, FDEP is piloting dual employment of WMD staff as FDEP employees. How does FDEP envision WMD staff's roles in audits of jurisdictional decisions (e.g., FDs)? If fully implemented, how would this change the permitting process and structure of the approved program?

**Assumed vs. Retained Waters**
- Have there been discussions with the Corps about potential updates and/or activities that may lead to updates to the Retained Waters List or Retained Waters List GIS Layer pursuant to Section III.B. of the Corps-FDEP MOA, or otherwise? If so, what is the status of these discussions and any anticipated upcoming activities and/or decisions?
- Have applicants or members of the public questioned the accuracy of the Retained Waters List GIS Layer and, if so, what has been FDEP's response?

**Enforcement**
The EPA/FDEP MOA states in Section III.B that FDEP will take timely and appropriate enforcement action against persons in violation of permit conditions of permits issued pursuant to the State 404 permit program. The Program Description states that "all potential violations of the State 404 Program reported to the Department will be entered into a statewide database and tracked until resolution." The Program Description also states that "FDEP will investigate and provide written responses to all citizen complaints."
- Since audits were designed to ensure consistent implementation of delineation methodology and would likely be separate from compliance monitoring, how are sites selected and is there a target number?

The EPA/FDEP MOA in Section III.E (Unauthorized Activity) states that FDEP is to inform EPA of the status of the file *as enforcement actions are taken* including any decision to accept an ATF application.
- The annual report will identify the number of actions taken for unauthorized activities and the status and/or nature of the actions taken. How is FDEP planning to meet the requirement for status of enforcement actions as they occur?
- The EPA is willing to participate in periodic meetings to discuss enforcement topics but wants to avoid ad-hoc and time-limited requests for input and/or review of specific case related material(s).

Request for additional evaluation and information                                    October 14, 2021
Supporting EPA review of program reporting

- The Draft Report indicates that no permit compliance inspections were completed, citing four occurrences that would trigger an inspection, none of which have occurred during the reporting period: 1) a permittee submits Form 62-330.350(1), "Construction Commencement Notice," (for individual permits); 2) a permittee submits Form 62-331.200(1) – "Certification of Compliance with a State 404 Program General Permit"; 3) at least one year has passed since permit issuance; or 4) a complaint is received. The program description outlines annual compliance monitoring requirements and in the first year requires 100% of individual permits and 25% of general permits are to be inspected (regardless of the triggering conditions outlined above). How does FDEP track these submittals/occurrences? For individual permits, how soon after receipt of a "Construction Commencement Notice" would an inspection be scheduled? For general permits, how are sites selected for inspection? How does FDEP plan to meet the Minimum Inspection Responsibilities for the first year or even the minimum annual inspection rates of 20% of the individual permits and 10% of the general permits found in the Program Description?
- What is the database of record for permit compliance inspections? Is data uploaded to ICIS?
- For suspected unauthorized activities, how are sites selected and/or identified? What is the nature of the response action?
- How is the state maintaining its "program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with permit conditions," as required by 40 CFR 233.40(a)? Has the state inspected and monitored activities subject to regulation?
- Are all potential violations (from citizen complaints/tips, compliance monitoring activities, referrals from other agencies, targeting, etc.), confirmed violations, and resolution being entered into a statewide database? If yes, can EPA access this data? If no, is a program being developed and what is the expected timeline for implementation?
- The Draft Report lists 801 suspected unauthorized activities, with 191 confirmed violations. Of the 191 confirmed violations, 82 were offered compliance assistance and 22 were issued warning letters, leaving 87 confirmed violations with no known status related to enforcement activities. How were the violations confirmed (field verification/inspection)? What is the status of the remaining (87) confirmed violations? What is the status of the remaining (610) suspected unauthorized activities?
- What types of violations warranted compliance assistance? What types of compliance assistance were offered? How is resolution documented?
- For Warning Letters, what types of violations warranted a warning letter and what follow-up activity is conducted to ensure resolution?
- How is the state maintaining its "program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with permit conditions," as required by 40 CFR 233.40(a)?

**EPA/federal oversight process**
- What technical assistance provided by EPA has been helpful? What additional support does FDEP need?
- What areas of concern has FDEP identified as needing to be addressed to effectively administer the program? How is FDEP planning on addressing these? What support can EPA provide?
- What implementation issues has FDEP encountered, how were they identified and what steps has FDEP taken to address these and avoid similar future implementation challenges?

Request for additional evaluation and information                                    October 14, 2021
Supporting EPA review of program reporting

**ESA**
- On what percentage of permit reviews has there been ESA early coordination engagement?
- Have there been any instances where FDEP and/or the Florida Fish and Wildlife Conservation Commission (FWC) were not able to fully implement the provisions of the 8/5/2020 Memorandum of Understanding (MOU) between FDEP, FWC and the U.S. Fish and Wildlife Service (USFWS)? If so, please explain and share any relevant supporting documentation.
- Please discuss whether and how often the Endangered and Threatened Species Technical Team has convened and what, if any, challenges the Team has identified with respect to implementing the MOU.
- Please discuss the process by which FWC and FDEP determine which agency is the species coordination lead to coordinate the federally listed species review with USFWS for each permit application?

**NHPA Programmatic Agreement (PA) Implementation**
- Please provide a summary of the following actions taken to implement the terms of the PA:
  - Advance Notice to commenting agencies and interested Tribes on an individual permit application.
    - Number of instances when DEP issued such Advance Notice, including a breakdown for the commenting agencies/interested parties.
    - Number of instances when DEP received an initial determination of effect, requested additional information, or suggested permit conditions.
  - Public Notice process where FDEP specifically solicited comments on potential effects to historic/cultural resources, and recommendations received by SHPO/THPO/Indian Tribes during FDEP's initial review of the application.
    - Number of instances where DEP solicited such comments.
      - Number of instances where DEP received specific comments.
      - Were there any instances where DEP did not accept the recommendations and/or determination from a commenting agency or Tribe?
  - Resolving Adverse Effects
    - Number of instances where a consulting party determined that an undertaking will adversely affect historic or cultural resources.
  - Human Remains
    - Number of instances when human remains were discovered.
- Does FDEP upload all information generated during the Advance Notice and Public Notice processes onto the OCULUS platform? If not, what factors does FDEP consider in whether to include information on OCULUS?
- Does FDEP recommend any actions or revisions to the FDEP-SHPO Operating Agreement or the PA?

**Tribal engagement outside of the implementation of the NHPA Programmatic Agreement**
- For any public notices for which FDEP did not solicit comments on the potential effects to historic/cultural resources, how many sets of comments were received from tribal representatives?

**From:** Calli, Rosemary
**Sent:** Thursday, October 21, 2021 4:28 PM
**To:** Mason, Heather <Heather.Mason@FloridaDEP.gov>; Gray, Stephanie A
<Stephanie.A.Gray@FloridaDEP.gov>
**Cc:** Kelly Laycock <laycock.kelly@epa.gov>
**Subject:** EPA request 2 (additional questions) for additional evaluation and information

Hello, Heather, Stephanie –
As part of EPA's review of FDEP's program reporting per 40 CFR Part 233.52, we have compiled the additional (shorter) list of questions below as part of our request for additional evaluation and information. Please feel free to reach out if we can provide any clarification.

Best regards,
Rosemary

- FDEP indicates a higher number of permits than expected has required additional hiring and training. Please provide information regarding what hiring has occurred and what is planned as well as information regarding the additional training.
- FDEP also indicates that the higher number of permits than expected has led to a decision that the Department would not perform stand-alone Waters of the United States (WOTUS) determinations (determinations performed on a property without a planned project and project drawings). To get a WOTUS determination under the State 404 Program, applicants are required to do one of three things: (1) apply for a permit and request a WOTUS determination during review; (2) apply for a formal determination under Chapter 62-340, Florida Administrative Code (F.A.C.) and request a WOTUS determination in conjunction with the formal determination; or (3) request a "No Permit Required" letter for a project where the applicant plans to avoid impacts to WOTUS (project drawings required). Has the Department experienced a change in the volume of requests for determinations in these three categories that it attributes to the decision to not perform stand-along determinations? Please provide a description of any resulting changes to the Department's workload.
- A large percentage of individual and general permits were withdrawn (6 issued individual permits vs 167 withdrawn, 66 general permits issued vs 152 withdrawn. FDEP indicates the reasons for these withdrawals are not readily available. EPA requests information regarding the withdrawals and a proposed solution so that the information is readily available in the future.
- What were the reasons for the 17 General Permit denials?
- Please provide information regarding No Permit Required (NPR) and exemption requests that have been processed. Were any NPR decisions due to jurisdictional determinations? If so, for what sites?
- The FDEP Program Description Section (e) – Workload Analysis, page 15 outlines that "subject matter experts in the Department's Submerged Lands and Environmental Resources Coordination (SLERC) program will audit a percentage of State 404 Program permits and compliance actions and associated wetland delineations. All formal jurisdictional determinations will be audited. Other estimated audit numbers are shown for the first year for purposes of this workload analysis and reflect the minimum percentage of actions that will be audited [see Tables (e)-22 through (e)-29, below]." Tables (e)-22 through (e)-27 outline the percentage of specific permit actions that will undergo both desktop and/or field delineation audits. Please provide information that details the status as outlined in tables (e)-22 through (e)-27.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET, SW
ATLANTA, GEORGIA  30303-3104

November 15, 2022

Mr. Michael Lynch
Director
Division of Water Resource Management
Florida Department of Environmental Protection
2600 Blair Stone Road
Mail Station 3500
Tallahassee, Florida  32399

Dear Mr. Lynch:

Thank you for your agency's transmission of the draft annual report evaluating the Florida Department of Environmental Protection's (FDEP) administration of its Clean Water Act (CWA) section 404 program, pursuant to the Memorandum of Agreement (MOA) between FDEP and the EPA, Section IV.A, and 40 CFR 233.52. We reviewed the draft report closely and on October 27, 2022, transmitted to FDEP a request for additional information on several topics. For your reference, the request for information that we transmitted is enclosed. We look forward to receiving FDEP's response and request that FDEP provide the additional information within 30 days from receipt of this letter.

We would like to ensure that FDEP has the time it needs to adequately respond to the EPA's questions, and that the EPA has the ability to fully evaluate the information that FDEP provides. The EPA's regulations and the MOA provide that FDEP will finalize the annual report within 30 days of receipt of the EPA's comments. MOA at IV.B.6; 40 CFR 233.52(e). We are writing to confirm that we do not view the EPA's initial request for additional information as having begun this 30-day period for finalization of the annual report. Rather, we view the EPA and FDEP as engaging in a productive process for exchanging information and feedback, consistent with the intent of the program reporting requirements. The EPA will promptly assess all the information, once FDEP submits it in response to the EPA's request. The 30-day period for finalizing the report would not begin until the EPA submits final comments, questions, or requests for additional information.

The EPA is committed to assisting and supporting FDEP's efforts to comply with the CWA section 404 state program reporting requirements and we look forward to engaging with FDEP in the completion of a robust annual report.

If you have any questions or wish to discuss this matter, please contact me at 404-562-9345, or have a member of your staff contact Ms. Rosemary Calli at 404-562-9846.

Sincerely,

CHRISTOPHER
THOMAS

Digitally signed by CHRISTOPHER
THOMAS
Date: 2022.11.15 09:19:05 -05'00'

Denisse D. Diaz, Acting Director
Water Division

Enclosure (1)

1. October 27, 2022, Request for Additional Information

October 27, 2022

Request For Additional Information

| | |
|---|---|
| **From:** | Calli, Rosemary |
| **To:** | Timothy Rach; Minick, Allyson |
| **Cc:** | Mcgill, Thomas; Laycock, Kelly |
| **Subject:** | EPA questions, information request for annual report |
| **Date:** | Thursday, October 27, 2022 4:23:00 PM |
| **Attachments:** | FDEP-FY22AR_EPACQuestions.docx |

Tim, Allyson -

As I just said in voicemail for each of you, EPA is transmitting the attached questions and requests for information to support our review of Florida's FY2023 annual report on its Section 404 program. We would appreciate receiving responses as soon as practicable so that we can continue our review with the requested clarifications and additional information. Responses by topic as they are ready would be very helpful to facilitate EPA continuing its review. Also, we would appreciate sharing of any information presented in table form in a raw format such as Excel (i.e., not PDF) to facilitate analysis.

Please let us know if you have any questions or would like to discuss,
Rosemary


**Rosemary (Hall) Calli**
**Section Chief, Wetlands & Streams Regulatory Section**
Aquatic Ecotoxicologist
U.S. Environmental Protection Agency, Region IV

404.562.9846
Calli.Rosemary@epa.gov
she/her

EPA questions re: FDEP FY22 annual report on state 404 program: clarifications & information ask
27 October 2022

Public participation

| Report ref. | Request for Additional Information |
|---|---|
| p. 7 | Q: What information is located in OCULUS that would not be located within the Information Portal, and vice versa? |
| p.7 | It was mentioned that DEP does not collect information about requests for extension of comment periods on individual projects and whether they are granted. It was also mentioned that DEP is not aware of any instance where a member of the public stated that the information contained within the public notices is insufficient.<br>Q: What kind of public comment information is tracked, and how are public comments considered? |
| p. 8 | Q: DEP uploads confidential information to restricted files that are accessible to the public in redacted form if requested. However, EPA is not aware of a separate folder filled with restricted files. Is the existence of a restricted file visible to the public? Are restricted files sufficiently named so as to determine the general contents? If not, how would EPA or the public know that this information exists and how to ask for it in redacted form? |
| p. 9 | Q: In the previous annual report, it was stated that "[a]s of June 30, 2021, no permitting decisions had been petitioned". Have any permitting decisions been appealed in this reporting period, and what was the outcome? |
| p. 12 | Q: Are public comments submitted through the FDEP Nexus Business Portal collected and uploaded to OCULUS and/or the Information Portal? |

Number of violations identified, and number and nature of action taken

| Report ref. | Request for Additional Information |
|---|---|
| p. 20 | Were penalties assessed for all six settlement agreements executed or a portion thereof? The total penalties assessed is $24,525; penalties collected are lower. |

An estimate of extent of activities regulated by general permits

| Report ref. | Request for Additional Information |
|---|---|
| | 62-331.215 General Permit for Utility Line Activities has a threshold of ½ acre, yet 64 permits led to 56.1 acres of impacts. Please explain how impacts above the threshold were permitted. |

EPA questions re: FDEP FY22 annual report on state 404 program: clarifications & information ask
27 October 2022

Delineations/WOTUS determinations (including NPRs)

| Report ref. | |
|---|---|
| p.12, App 3 | Q: As previously noted by EPA after FDEP's first reporting period, "a large percentage of individual and general permits were withdrawn." EPA formerly asked the reasons for these withdrawals, but a limited response was provided. For this reporting period, EPA again notes the large number of permits withdrawn. FDEP provides a list of withdrawn applications in Appendix 3, including the application #, the project name, the permit type and the withdrawal date. However, the reasons for the application withdrawals are not provided. If a reason for an application withdrawal was provided to FDEP, please provide the reason in an additional column in Appendix 3. Also, EPA has had some challenges finding the referenced application information in Appendix 3. Please confirm that the information in Appendix 3 is accurate and if not, please provide the correct information. In addition, since the specific permit types are abbreviated, please provide a legend or table footnote defining the permit types in Appendix 3.<br>EPA would appreciate sharing of any information in table form in a raw format such as Excel (i.e., not PDF). |
| p.6 of Appendix 1 | Regarding the statement in Appendix 1, "Notably, NPRs are similar to Preliminary Jurisdictional Determinations issued routinely by the Corps of Engineers to aid the regulated community."<br>Q: Please clarify why FDEP likens Corps PJDs to FDEP NPR letters. This clarification will help EPA more clearly understand FDEP's use and application of NPR letters.<br><br>Regarding the statement, "Like Preliminary JDs, NPRs are entirely voluntary and non-binding, and provided only as a courtesy."<br>Q: Please clarify how FDEP interprets the purpose and resiliency of NPR letters. For example, does FDEP consider NPR letters only as preliminary advice and not final agency actions? FDEP (like the Corps) can reconsider and reissue, but that's not the same as non-binding or not representing a final agency action. If the NPR letters are not binding and not final agency actions, please clarify FDEP's perspective on the role of NPR letters.<br><br>Q: Is the version of the NPR Guidance attached to the July 28, 2022, letter the most up-to-date version? If not, please provide the most recent version for EPA to review/consider. |
| | Q: Per EPA's request on April 7, 2022, FDEP provided a table with NPR letter information for the period between February 1, 2022, and March 31, 2022. EPA is now requesting the same information that FDEP provided in a similarly formatted table, for the time frame between April 1, 2022, and June 30, 2022. |
| p.6, p.14, p. 18, App 4 (p.194) | Out of 352 total NPRs issued (AR error notes 353) for State-assumed waters, 268 were issued based on the NWPR and 84 were based on use of the 62.340 F.A.C. approach.<br>Q: EPA has had some challenges finding the referenced application information in Appendix 4. Please confirm that the information in Appendix 4 is accurate and if not, please provide the correct information. EPA would appreciate sharing of any information in table form in a raw format such as Excel (i.e., not PDF). |

EPA questions re: FDEP FY22 annual report on state 404 program: clarifications & information ask
27 October 2022

| p.33-p.36, App 2, Section 7 Applicant's Handbook Vol 1, various state statutes | Q: EPA requests that FDEP more clearly state in the AR and consistently throughout the AR, that formal jurisdictional determinations performed previously for ERP purposes that are not in compliance with the 62.340 method, will not be used for 404 permitting purposes. Further, EPA requests information regarding the methodology used for any determinations made during the reporting period and for any currently in process (91 according to pg 18 of the annual report). (Page 18 of the AR lists "wetland determinations" as a separate category from IPs, GPs, NPRs, etc.) This will address contradicting language in the AR, and in other resources cited (*e.g.*, procedures in Section 7 of the Applicant's Handbook Vol I, state statutes). As the AR currently reads, it appears to contradict this requirement in some places. |
|---|---|
| p.10 | Q: In terms of field staff verification of wetland delineations and those for other surface waters (on page 10), what does 'review' mean (*e.g.*, a desktop verification or a field verification)? Does FDEP have additional information to facilitate EPA's understanding as to whether FDEP has confirmed field verification of all the delineations of wetlands and other surface waters made by FDEP and WMD staff for 404-permitting purposes? |
| p.19, Appendix 1, 404 Handbook Appendix B, Discharge of fill material, page 48-49 (2)-(2)(i), FDEP's July 28, 2022, letter, NPR Draft Guidance, and EPA's Q&A document addressing utility poles and pilings. | Q: There are various statements about pilings in several FDEP documents. EPA encourages FDEP to be clearer, more transparent, and more consistent when discussing how pilings may or may not be regulated as discharges of fill. This will ensure that FDEP staff and the regulated community are very clear on the requirements. For example, the placement of pilings for linear projects, such as bridges, may or may not be regulated as discharges of fill according to the case-specific circumstances as outlined in the 404 Handbook Appendix B, Discharge of fill material section, pages 48-49, in both sections (2)-(2)(i). Section (2) of Appendix B should be clearly explained when discussing the regulatory approach to pilings. |

EPA questions re: FDEP FY22 annual report on state 404 program: clarifications & information ask
27 October 2022

| p. 15, p.33-36, p.37 | Q: It's unclear who specifically performs the FDEP audits. Please clarify who is referenced as 'staff' (on page 33) and 'SLERC' (on page 35). What specific qualifications do these 'staff' have to perform the audits and evaluate the audited information?<br><br>*(Formal Determinations).* The AR states that the formal determination audit focused on data forms submitted with FD applications.<br>Q: Is FDEP aware of other circumstances where data forms would be necessary and used as part of the permitting process, that were not evaluated as part of the audit? If so, please describe.<br><br>Q: Based on the audit, the AR states that SLERC identified potential topics for discussion and lists four general areas that were identified that need improvement (pages 35-36). Can FDEP quantify the findings (*e.g.*, how many FDs, IPs and GPs lacked adequate descriptions and photographs of indicators, how may renewal and reissuance of FDs did not use the data form)?<br><br>"SLERC conducted an audit of all sixty-three Formal Determinations (FDs) issued during the auditing period to evaluate implementation of the CWE and 62-340 data form requirements, determine consistency in documentation standards, and identify future training needs..." The AR states that for findings related to "Renewal and Reissuance: SLERC will reiterate to staff the data form is also required for the renewal and reissuance of FD authorizations."<br>Q: Please list the number of FDs found as part of the audit process that didn't have the required data form discussed in the AR as part of the 'renewal and reissuance' of FD authorizations. Were FDs previously issued for ERP-permitting purposes (not using the 62.340 method) part of the audited 'renewal and reissuance' dataset? Please clarify how SLERC identified/audited FDs previously issued for ERP-permitting purposes that didn't use the 62.340 method (*e.g.*, based on a certified survey, approximate delineation), that were administratively extended and used for 404-permitting purposes.<br><br>Q: Please clarify the number of staff members with CWE certifications as of June 30, 2022, and if they are: a) serving as official CWEs for FDEP, b) serving as full-time CWEs for FDEP or if they have other duties, and c) how many these CWEs are dual employees, working as CWEs for both the WMDs and for FDEP? |
| --- | --- |

EPA questions re: FDEP FY22 annual report on state 404 program: clarifications & information ask
27 October 2022

Expedited review/long-term conceptual planning

| Report ref. | Request for Additional Information |
|---|---|
| p.14 | The second annual report says that "[t]he Department issued one individual permit with a long-term plan during this reporting period [The Chemours Company, TT, LLC, for the Florida Mine Trial Ridge West Levee, file number 137482-022-SFI]. Three other long-term planning projects remain under review during this reporting period and are included in Table 2 below." But the first annual report says that 12 long term projects were under review during the first reporting period. Q: Please explain what happened to the 12 long term projects that were under review from the first reporting period, none of which were permitted or are currently under review during the second review period. |
| p.14 | Q: Please explain why "[n]o subsequent phases [of long-term planning projects] were reviewed under the expedited permit review process outlined in Rule 62-331.060(8), F.A.C. for long term projects. |

Compensatory mitigation

| Report ref. | Request for Additional Information |
|---|---|
| p. 10, Appendix 2, pp. 103-132 | Q: DEP has indicated that compensatory mitigation sometimes was considered for impacts outside of the mapped service area on a case-by-case basis. Please identify these projects, providing rationale for why the selected compensatory mitigation was determined to be the most environmentally preferable option (e.g., credit and/or in-kind resource availability). Please also provide explanation for how credits were determined, such as whether a proximity ratio was applied. Please indicate whether MBI signatories and the IRT had an opportunity to comment in each instance. |
| Appendix 2, pp. 49-102 | Q: For individual and general permits where no mitigation was required, please identify the projects that provided environmental benefit, indicating the amount of functional gain, if possible. If it is not possible to determine functional gain for such projects, please explain how it was determined that there was no functional loss. For instance, 0375475-004 had >40 acres of impacts but no functional loss is indicated. |
| Appendix 2, pp. 49-102 | Q: For the projects that were determined to have insignificant impacts, please indicate why these were determined to be insignificant. For example, there does not appear to be a threshold for significance, since some projects required mitigation with a functional loss of 0.001 (e.g., 0409386-001 SFG), while others did not require mitigation for greater functional loss (e.g., 0396423-001, 0403414-001, 0396501-001 SFI, 0410615-001 SFG, 0394692-001 SFRP, and others). |
| Appendix 2, pp. 127-132 | Q: How many permittee-responsible mitigation activities occurred off-site or were out-of-kind? For each permittee-responsible mitigation project, did FDEP require a mitigation plan that complied with 40 C.F.R. Section 230.91? For example, did each permittee-responsible mitigation project submit detailed plans that included performance standards, monitoring requirements, financial assurances, and other relevant documentation listed in the 2008 Compensatory Mitigation Rule? |

EPA questions re: FDEP FY22 annual report on state 404 program: clarifications & information ask
27 October 2022

| p.9-10 | The description indicates that CWEs 'verify' all assessment methodology scores submitted by applicants to ensure that the scores reflect a reasonably accurate accounting of loss and compensation, and that the compensation is adequate to fully mitigate impacts. |
| --- | --- |
| | Q: What does 'verify' mean (desktop review only)? If so, how does the CWE confirm that the assessment 'accurately reflects site conditions?' |

Staffing levels/training

| Report ref. | Request for Additional Information |
| --- | --- |
| NPR guidance | Q: In the supplied NPR guidance, it stated that "[o]nly a FDEP CWE is able to evaluate a WOTUS determination (not dual employed WMD CWE's)." Is this the only distinction, or are there other roles performed by FDEP CWEs that differ from dual employed WMD CWEs? |
| pp. 34, 36 | Q: By June 30, 2022, 159 staff members had received CWE certification. If there are currently 69 staff members directly responsible for working on State 404 permits, how many of these are CWE certified (e.g., are all permit processors also CWEs)? How many staff are dual employees, working as CWEs for both the WMDs and for DEP? |
| p. 36 | Q: In the previous annual report, it was stated that "[p]rior to assumption, the average workload per permit processor was 11.7 applications. As of June 30, 2021, the average workload per permit processor had increased to 30.2 applications." In this report, there appears to be the same number of staff as stated in the previous report, indicating that workload may not have changed since the program was assumed. Please address whether workload has changed for this reporting period and provide rationale for the lack of increased staffing in this reporting period. With 33 new employees, how is workload expected to change? |
| p. 22 | Q: Each processing office is assigned a Division Mentor. How many years of experience is required to become a Division Mentor? How many staff, on average, does each Division Mentor oversee? |
| pp. 22-25 | Q: DEP has indicated that multiple field and virtual trainings have taken place, with high participation rates among staff. Are virtual trainings and other documents available for new staff? |
| pp. 34, 36 | Q: What steps has DEP taken to improve retention, aside from hiring? |

Enforcement

| Report ref. | Request for Additional Information |
| --- | --- |
| Table 8, p.19 | Q: Have the minimum number of inspections for IPs and GPs been conducted? Table 8 also now shows violations (31 reported). |
| | Q: Are these permit violations? Were they referred to enforcement? If so, what was the enforcement response? If not, how were these violations rectified? |

EPA questions re: FDEP FY22 annual report on state 404 program: clarifications & information ask
27 October 2022

| | |
|---|---|
| Table 9, p. 20 | Report states that Table 9 shows the total number of suspected unauthorized activities during the current reporting period, which is 1074. The total for confirmed violations (191) is the same as the previous reporting period. The total still under investigation (103) is also the same as the previous reporting period. Assuming that FDEP received 1074 (191 confirmed) new complaints/referrals for the current reporting period along with the 971 (191 confirmed) from the previous reporting period and considering the 31 violations that were identified through Permit Compliance Inspections – it appears that there are at least 413 confirmed violations, but only 46 formal responses (of which only 6 were consent orders) to these violations were reported.<br>Q: What is the total number of confirmed violations for the current reporting period? What is the total number of confirmed violations for both reporting periods? |
| p. 36 | AR states that the State 404 Program Compliance and Enforcement team consists of 54 persons.<br>Q: Of these positions, how many are dedicated to conducting inspections of unauthorized activities? How many of the suspected unauthorized activities are targeted for inspection? |
| Table 10, p.20 | Q: Why is the penalties assessed amount greater than the penalties collected?<br>Q: There were 6 reported consent orders issued, how many included penalties? For those consent orders that did not assess penalties, if any, what justification was used? |

EPA oversight process

| Report ref. | Request for Additional Information |
|---|---|
| NA | Q: What is the status of the Scrub Oaks enforcement matter? |

| Report ref. | Request for Additional Information |
|---|---|
| p. 26 | Q: The report describes engagement with two tribes; has DEP received comments or recommendations from any other tribe that may have historical or cultural ties to Florida (e.g., The Mississippi Band of Choctaw Indians, The Muscogee (Creek) Nation, The Poarch Band of Creek Indians, or The Seminole Nation of Oklahoma)? |

NHPA programmatic agreement implementation

| Report ref. | Request for Additional Information |
|---|---|
| p.26 | Q: Which of the SHPO's and Tribes' requests for additional information, effects determinations, and recommendations were provided in response to advance notice under the Operating Agreement or in response to a public notice? |

# Exhibit B



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 4**
**SAM NUNN ATLANTA FEDERAL CENTER**
**61 FORSYTH STREET, SW**
**ATLANTA, GEORGIA 30303-8960**

April 6, 2023

Secretary Emile D. Hamilton
Florida Department of Environmental Protection
Marjory Stoneman Douglas Building
3900 Commonwealth Boulevard
Tallahassee, Florida 32399

Dear Secretary Hamilton:

Thank you for the draft annual report and supplemental information your office provided regarding the
Florida Department of Environmental Protection's (FDEP) administration of its Clean Water Act
(CWA) Section 404 program for the reporting period, July 1, 2021, through June 30, 2022. The
Environmental Protection Agency (EPA) received the draft report on September 30, 2022 and
supplemental information on January 6, 2023, in response to the EPA's request for additional information
on October 27, 2022. The FDEP's submission of the draft annual report and the EPA's comments,
questions, and requests for additional information are pursuant to the program reporting requirements set
forth at 40 CFR 233.52, as well as described in the Memorandum of Agreement between our two
agencies regarding FDEP's CWA Section 404 program.

The EPA's comments regarding the draft annual report are enclosed. In accordance with the
requirements set forth in 40 CFR 233.52(e), FDEP must finalize the annual report, incorporating and/or
responding to the EPA's comments, and transmit the final report to the EPA within 30 days of receipt of
this letter.

In addition to identifying issues and additional information needs related to the draft annual report, the
EPA is taking this opportunity to express our continued concerns with FDEP's implementation of its
CWA Section 404 program. The concerns identified in this letter reflect the EPA's review of FDEP's
program as of the date of this letter, and any additional concerns that may arise from the EPA's
continued oversight of FDEP's implementation and enforcement of the program will be communicated
to FDEP under separate cover. The EPA requests a meeting with FDEP to discuss the following issues at
its earliest convenience.

- **FDEP's Continued Use of the Vacated Navigable Waters Protection Rule.**
  FDEP continues to use the vacated Navigable Waters Protection Rule (NWPR) for interpreting
  "waters of the United States" (WOTUS) in the implementation of its CWA Section 404 program. As
  outlined in numerous EPA letters provided to FDEP since December 9, 2021, the CWA and its
  implementing regulations require FDEP to implement its program consistent with the current
  definition of WOTUS, which the EPA and the U.S. Army Corps of Engineers (Corps) interpreted to
  be the pre-2015 regulatory regime following vacatur of the NWPR and up until the effective date of
  the recently published final "Revised Definition of 'Waters of the United States.'" The rule went into

effect in Florida on March 20, 2023 (see
https://www.federalregister.gov/documents/2023/01/18/2022-28595/revised-definition-of-waters-of-the-united-states). To date, the EPA has objected to 33 permits proposed by FDEP on the basis that the information provided was insufficient to determine the extent to which the FDEP considered discharges into all WOTUS and therefore did not demonstrate consistency with the CWA or the regulations at 40 CFR Part 233. As described in the enclosure to this letter, we have concerns that FDEP issued 183 No Permit Required (NPR) determinations that used the vacated NWPR for jurisdictional assessments which may result in unauthorized discharges to WOTUS.

- **FDEP's Delineations and Determination of Waters.**
  The EPA has identified that many of FDEP's jurisdictional determinations are not in compliance with the required 62-340 F.A.C. delineation method. The EPA has concerns with the lack of consistent field verifications, and the lack of mandatory 62-340 F.A.C. Data Forms and incomplete or missing WOTUS Determination Forms. Accordingly, the EPA will conduct a detailed review of the FDEP's 404 Delineation Guidance and will offer comments and recommendations outside of the annual reporting process.

- **Majority of FDEP's NPR Determinations Lack Required Supporting Documentation.**
  According to FDEP's own Oculus database, a majority of the NPR determinations made during the reporting period do not include required supporting documentation. Specifically, the EPA's review of the 258 NPR determinations issued by FDEP revealed at least 170 of the assessments were incomplete and/or missing at least one necessary dataset. Please see the enclosure for additional details.

- **FDEP's Joint Coordination with the Corps.**
  FDEP's coordination with the Corps, pursuant to the joint coordination procedures set forth in Section III of the Memorandum of Agreement between FDEP and the Corps, has in some instances, led to errors regarding decisions about the appropriate permitting authority. The EPA has issued objections to two proposed permits based on such errors to date. We encourage FDEP to work with the Corps to improve how such joint coordination is conducted and are pleased to offer our participation and assistance in this process.

- **Support on the EPA's preparation of a Biological Evaluation.**
  Pursuant to the Endangered Species Act (ESA), the EPA continues to prepare a Biological Evaluation (BE) regarding FDEP's CWA 404 program in coordination with the National Marine Fisheries Service. The EPA has communicated with FDEP throughout this process, and we anticipate completing and issuing the BE in the near future.

- **Retention of Staff.**
  FDEP officials have made public statements during the past year about the challenge of retaining staff in the Department's CWA Section 404 program. Maintaining significant staff knowledge and expertise is required to effectively implement the program; developing staff expertise may warrant a year or more of training and experience, which would be undermined by a significant level of staff turnover. We are concerned that staff retention may be contributing to some of the issues identified in this letter. As stated in the enclosure, we request the final annual report describe what steps, if any, FDEP has taken to identify the primary causes of the challenges with staff retention in its CWA Section 404 program and any steps that FDEP is taking to improve staff retention.

If you have any questions or wish to discuss these matters, please contact me, or have a member of your staff contact Ms. Denisse Diaz, Acting Director of the Water Division, at Diaz.Denisse@epa.gov or 404-562-9248.

Sincerely,

JEANEANNE GETTLE
Digitally signed by JEANEANNE GETTLE
Date: 2023.04.06 13:09:06 -04'00'

Jeaneanne M. Gettle
Deputy Regional Administrator
*Performing the functions and duties of the Regional Administrator for this matter*

Enclosure

ENCLOSURE: Assessment of FDEP's 9/30/2022 Draft Annual Report

The comments that follow are organized under the same headings included in the Florida Department of Environmental Protection's (FDEP) draft annual report.

### *Program Administration*

Appeals of permitting decisions

In FDEP's reply dated January 6, 2023, to the EPA's request for additional information issued on October 27, 2022, FDEP indicated that no Clean Water Act (CWA) Section 404 program permitting decisions were appealed. Please include this information in the final annual report. In future annual reports, please provide information including the project name, number, short description of the appeal, and rationale behind the final decision.

Restricted files

For future annual reports, the EPA requests that FDEP include the number and type of permits with restricted files. We recommend including a table with this information, indicating the project name and number.

### *An Assessment of the Cumulative Impacts of the State's Permit Program on the Integrity of the State Regulated Waters*

Evaluation of compensatory mitigation and cumulative loss

The documentation provided in this section of the annual report and in Appendix 2 does not provide readily verifiable information needed for the EPA to evaluate questions about compensatory mitigation and cumulative loss. The EPA appreciates that FDEP has begun tracking requests for out-of-service-area mitigation for the next reporting period. In future annual reports, the EPA expects FDEP to include the following additional information: 1) the location of the impact site *(e.g.*, coordinates or the 8-digit HUC); 2) the name of the mitigation site used and its location, especially if it is outside of the service area; 3) whether credits applied as mitigation were in-kind or out-of-kind, with a brief rationale for out-of-kind; 4) if applicable, the proximity ratio that was applied; 5) the total functional loss; 6) any functional gains, especially those that do not propose mitigation or that proposes a combination of mitigation types (*e.g.*, PRM vs. TPM credit purchases, etc.); 7) if applicable, a short, one-sentence explanation as rationale for why mitigation was not required for a project with demonstrated functional losses; and 8) totals for all columns involving a numeric statistic.

Continued use of the vacated Navigable Waters Protection Rule

The annual report states that "Florida is working cooperatively with EPA to navigate the changing definitional regimes of [waters of the United States (WOTUS)] and is committed to administering its assumed CWA Section 404 program in accordance with the requirements of the CWA and regulations promulgated thereunder." FDEP continues to use the vacated Navigable Waters Protection Rule (NWPR) for interpreting WOTUS in the implementation of its CWA Section 404 program, which is inconsistent with the requirements of the CWA. The CWA and its implementing regulations require FDEP to implement its program consistent with the current

ENCLOSURE: Assessment of FDEP's 9/30/2022 Draft Annual Report

definition of WOTUS which the EPA and the U.S. Army Corps of Engineers (Corps) interpreted to be the pre-2015 regulatory regime following vacatur of the NWPR and up until the effective date (i.e., March 20, 2023) of the recently published final "Revised Definition of 'Waters of the United States'." FDEP's current interpretation of WOTUS creates a situation whereby FDEP's CWA Section 404 program is narrower in scope than contemplated under the CWA. To address this inconsistency with the CWA, the EPA is objecting to projects proposed by FDEP, requiring permit conditions to ensure consistency with the CWA, and requiring FDEP and the permit applicants to spend additional time and resources to address the objections. This leads to inefficiency and confusion, specifically, potential inconsistencies between federal and state actions, inefficiencies in FDEP's program implementation, confusion on the part of the regulated community and the public, and most importantly, insufficient protections for the quality of the nation's waters. If the FDEP does not enforce CWA Section 404 program requirements in waters not covered by the NWPR, the lack of enforcement could lead to suits brought by citizens or potential enforcement by the EPA.

FDEP's Delineations and Determination of Waters

Based on information FDEP provided, discussions between the EPA and FDEP staff, and the EPA's review of information in its Oculus database, the EPA has identified numerous concerns. The EPA is concerned, for example, that many of the jurisdictional determinations are not in compliance with the required 62-340 F.A.C delineation method. The EPA is concerned that field verifications are conducted inconsistently. The EPA is concerned about the lack of mandatory 62-340 F.A.C. Data Forms and incomplete or missing WOTUS Determination Forms.

In addition, based on the EPA's concerns about how FDEP performs delineations of waters, FDEP previously drafted "Delineations for Projects that May Require a State 404 Program Permit," (Delineation Guidance), dated October 27, 2021. In response to the EPA's request for additional information for this draft annual report (dated October 27, 2022), FDEP referenced the Delineation Guidance and stated that the document memorializes the requirement to always use the 62-340 F.A.C. delineation method. If FDEP is using the Delineation Guidance to direct staff to always require the use of the 62-340 F.A.C. delineation method, that should be clearly described in the final annual report and any relevant program documentation. The EPA plans to perform a detailed review of the Delineation Guidance under separate cover.

**_The Number and Nature of Individual and General Permits Issued, Modified, and Denied_**

No Permit Required (NPR) Letters

The EPA is providing comments regarding NPR determinations issued by FDEP. These comments are based on review of the draft annual report, including Appendix 4, FDEP's reply dated January 6, 2023, to the EPA's request for additional information issued on October 27, 2022, and FDEP's Oculus database.

- FDEP utilized the vacated NWPR, and therefore the incorrect definition of WOTUS, as the basis for issuing 183 of 258 NPR determinations. The available information does not include sufficient documentation to quantify the amount (*e.g.*, acreage, linear feet) of waters that met the current definition of WOTUS (*i.e.*, the pre-2015 regulatory regime for

the portion of the reporting period between August 30, 2021, and June 30, 2022) but were not considered in FDEP's NPR determinations. Accordingly, the EPA believes that the NPR determinations issued by FDEP may lead to unauthorized discharges to WOTUS. Based on the information reviewed, which for many projects does not include sufficient documentation as described below, the EPA cannot confirm the extent of WOTUS and potential scope of unauthorized discharges.

- The available information, including FDEP's Oculus database, appears to indicate that a majority of the NPR determinations made during the reporting period do not include required supporting documentation. Specifically, the EPA's review of the 258 NPR determinations issued by FDEP, revealed at least 170 of the assessments were incomplete and/or missing at least one necessary dataset. For example,
    o 119 of 258 NPR determinations did not include complete documentation that field verifications were conducted. Specifically, 105 determinations were based on desktop only assessments, and of those that included onsite verification, 14 were missing 62-340 F.A.C. Data Forms.
    o 124 of 258 NPR determinations did not have complete WOTUS Determination Forms. In particular, 48 determinations did not include a WOTUS Determination Form, and the 76 determinations that included a WOTUS Determination Form did not include a signature from the Certified Wetland Evaluator (CWE).
  FDEP should ensure that all previously issued and future NPR determinations are fully supported and documented in the Oculus database, and in accordance with relevant program requirements.

- The reply issued by FDEP on January 6, 2023, in response to the EPA's request for additional information dated October 27, 2022, suggests that NPR determinations are similar to Preliminary Jurisdictional Determinations (PJDs) issued by the Corps, because they are both preliminary in nature. However, the language included in the FDEP's NPR letters states that FDEP has verified that the activity as proposed does not require a permit or other form of authorization and that the verification is valid for a period of five years unless new information warrants a revision to the verification. The EPA believes the characterization of NPR determinations as preliminary is not accurate and that comparisons to PJDs may lead to misunderstandings about the NPR process being similar to the process used by the Corps. Accordingly, we recommend the language describing NPR determinations/letters in the final annual report should not include comparisons to PJDs, nor should these claims be articulated in other correspondences with the EPA.

- The EPA appreciates the detailed tabular information regarding NPR determinations provided by FDEP on January 6, 2023. Please include this detailed information in the final annual report (*i.e.*, the application number and the name of the office that processed the action, relevant county, project name, agency action date, documentation of whether a WOTUS Determination Form was used and/or whether the CWE signature page was signed, documentation of whether a relevant 62-340 F.A.C. Data Form was completed, documentation of whether there was coordination with the Corps, the jurisdictional assessment method used, documentation of whether a site inspection or desktop assessment was performed, and the relevant link to the Oculus database). For future

ENCLOSURE: Assessment of FDEP's 9/30/2022 Draft Annual Report

annual reports, please provide a similar table that includes the same type of information along with additional information for each project that describes whether the disclaimer language was included on the CWE signature page of the WOTUS Determination Form, the types and amounts (*e.g.*, acreage, linear feet) of any waters that were excluded on the WOTUS Determination Form, and where applicable, any prior permit applications submitted and related withdrawal dates.

-   In the final annual report, FDEP should correct the number of NPR letters issued during the reporting period. The language on page 14 of the draft report indicates 353 NPR letters were issued during the reporting period; however, the EPA's review of the information provided by FDEP on January 6, 2023, indicates that 258 NPR letters were issued.

-   The EPA appreciates that FDEP shared NPR Guidance as an enclosure to the letter issued to the EPA on July 28, 2022. We wish to discuss the procedures used by FDEP to evaluate and document its NPR determinations, particularly in the context of the above comments and recommendations and will follow-up with your office under separate cover.

Long-Term Projects

FDEP's final annual report should address and resolve the following discrepancies between the draft annual report and the additional information shared by FDEP on January 6, 2023, regarding permits with long-term planning.

-   Page 14 of FDEP's draft annual report states that "[t]he Department issued one individual permit with a long-term plan during this reporting period [The Chemours Company, TT, LLC, for the Florida Mine Trail Ridge West Levee, file number 137482-022-SFI]. However, FDEP's response to the EPA's request for additional information dated October 27, 2022, indicates that two permits were issued with long-term planning during the second reporting period (396565-001; issued July 9, 2021, and 396574-001; issued November 19, 2021), neither of which match the Chemours/Trail Ridge West Levee permit which has a file number of 137482-002-SFI.

-   FDEP's response to the EPA's request for additional information dated October 27, 2022, says that three of the twelve permits for long-term projects that were under review during the previous annual reporting period are still actively being processed during the current reporting period (file numbers 400133-001, and 396364-001, 396966-001). However, these three file numbers do not match the file numbers in Table 2 (Long-Term Planning Projects Under Review as of June 30, 2022) on page 14 of the draft annual report.

We request that FDEP's final annual report also reconcile the discrepancy in the draft annual report regarding the status of the permitting action for the Chemours/Trail Ridge West Levee. The first full paragraph on page 14 indicates a permit was issued, whereas Table 2 suggests the project was still under review during the reporting period.

4

ENCLOSURE: Assessment of FDEP's 9/30/2022 Draft Annual Report

### *An Estimate of Extent of Activities Regulated by General Permits*

Based on the information included in the draft annual report and the FDEP's reply dated January 6, 2023, to the EPA's request for additional information on October 27, 2022, the EPA understands that authorizations issued under the 62-331.215 General Permit for Utility Line Activities (GP) during the reporting period exceed the allowable impact threshold specified by GP. Specifically, FDEP's draft annual report states that 64 activities were authorized by the GP that impacted a total of 56.1 acres, which indicates that the average impact of the authorized activities (*i.e.*, approximately 0.88 acres) exceeds the threshold of 0.5 acres for each activity set forth by the GP. Authorizing activities that exceed the GP's threshold is inconsistent with the approach articulated in the Program Description of Florida's Section 404 program, which indicates general permits are modeled after Nationwide Permits issued by the Corps. Regarding future permitting decisions, FDEP should ensure that each authorization under the GP does not exceed the 0.5-acre threshold for each activity.

### *Historical, Cultural, and Tribal Resources*

FDEP indicated in response to the EPA's request for additional information dated October 27, 2022, that it does not track at what point in the process (advance notice or public notice) a response from a State Historic Preservation Office (SHPO) or a Tribe is received. This information is useful to the EPA, and we believe the public would also find this information helpful. We also note that FDEP was able to track this information in the previous annual report (see pg. 28 "DEP received the following in response to advanced notices:…," and pg. 30 "There were 12 instances where DEP received specific comments during the public comment period on potential effects to historic/cultural resources, broken down as follows: Table 15 - Comments received during the notice and comment period."). Please include this information in the final annual report and in all future annual reports.

### *Program Auditing*

For future annual reports, the audit findings of FDEP's formal determinations (FDs) of the landward extent of wetlands and other surface waters should include: a quantification of the specific issues identified (*i.e.*, the number of FDs without the necessary 62-340 F.A.C. Data Forms, including those for renewal/reissuance purposes; the number of FDs that did not accurately apply the 62-340 F.A.C. delineation method, including those that lacked necessary photographs of indicator factors or narrative descriptions; the number of FDs with clerical errors, such as files referencing specific information that was not uploaded to the Oculus database; the number of FDs with issues regarding the site visit; the number of FDs that did not meet the requirements for the renewal/reissuance of an authorized FD; and the number of FDs with any other errors or issues regarding compliance with FDEP's CWA Section 404 Program).

FDEP's reply dated January 6, 2023, to the EPA's request for additional information issued on October 27, 2022, included a copy of FDEP's 404 Delineation Guidance (Guidance), which had previously been shared with the EPA, along with a statement that the Guidance memorializes the requirement for FDEP to use the 62-340 F.A.C. delineation method for CWA Section 404 permitting purposes, among other requirements. We request that FDEP include this requirement

ENCLOSURE: Assessment of FDEP's 9/30/2022 Draft Annual Report

in the final annual report. In consideration of the audit findings (described immediately above) and the records in FDEP's Oculus database regarding NPR determinations that did not include all of the required documentation (described on pp. 2-3 of this enclosure), the EPA will conduct a detailed review of the Guidance and will follow-up with FDEP outside of the annual reporting process to discuss and/or offer comments and any recommendations.

### *Other Information*

The EPA's request for additional information on October 27, 2022, asked about steps FDEP has taken to improve retention of its employees, aside from hiring. FDEP's response dated January 6, 2023, provided general information about hiring benefits that appear to be applicable to any state government employee and did not include any information specific to the CWA Section 404 program. Please include information in the final annual report that clarifies what steps, if any, have been taken to identify the primary cause(s) of the challenges with staff retention in its CWA Section 404 program (*e.g.*, conducting exit interviews) and any steps that FDEP is taking to improve staff retention. For future annual reports, the EPA requests that FDEP describe whether staff retention has improved, and any steps that have been taken or will be taken to identify the causes of turnover and improve staff retention.