**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:21-cv-0119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

**DEFENDANTS' REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION .................................................................................................................. 1

ARGUMENT ......................................................................................................................... 1

    I.    EPA's Completeness Determination Was Reasonable. ........................................................ 1

    II.    EPA Reasonably Concluded That Florida's Regulations Were Consistent with and No Less Stringent Than the 404(b)(1) Guidelines. ............................................................. 2

        A.    References to "water quality standards" do not exempt discharges from regulation....... 2

        B.    Like the Corps, Florida may rely on applicant-submitted data. ...................................... 4

    III.    EPA Reasonably Concluded That Florida's Enforcement Authority Satisfied Statutory and Regulatory Requirements. ............................................................................. 8

    IV.    The Corps' Retained Waters List Was Reasonable. ................................................... 13

        A.    "Historic use" Section 10 waters are not retained waters. .......................................... 14

        B.    TNWs include, but are not limited to, retained waters........................................... 15

        C.    The Corps reasonably based the Retained Waters List on the 2014 Section 10 List..... 18

    V.    *Cooling Water Intake Structures* Is Persuasive Authority. ................................................. 19

    VI.    The BiOp and Its Analysis Comply with the ESA................................................... 22

        A.    The BiOp's programmatic approach was proper. ...................................................... 22

        B.    FWS properly relied on the BE to assess the environmental baseline. ......................... 25

        C.    The BiOp did not ignore information regarding prior consultations. ........................... 27

    VII.    The Court Should Reject Plaintiffs' Arguments Regarding the ITS............................. 28

        A.    The BiOp and ITS reasonably explained the absence of a take limit. .......................... 29

        B.    The ITS contains a reasonable reinitiation trigger. ................................................... 30

        C.    The ITS contained appropriate terms and conditions.................................................. 32

    VIII.    The Technical Assistance Process Complies with the Law. ......................................... 34

        A.    Plaintiffs' attacks on the technical assistance process regurgitate their attacks on the programmatic approach. ........................................................................................ 34

        B.    The binding technical assistance process incorporates the ESA's standards................. 37

    IX.    EPA's Reliance on the BiOp Was Reasonable. ........................................................ 38

    X.    EPA Made a Reasonable "No Effect" Determination for NMFS-listed Species............... 39

CONCLUSION ....................................................................................................................... 40

# TABLE OF AUTHORITIES

## CASES

*Appalachian Power Co. v. EPA*,
  135 F.3d 791 (D.C. Cir. 1998) ................................................................................26

*Butler v. Enterprise Integration Corp.*,
  459 F. Supp. 3d 78 (D.D.C. 2020) ..........................................................................20

*City of Tacoma v. FERC*,
  460 F.3d 53 (D.C. Cir. 2006) ..........................................................................38, 39

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988) .........................................................................34, 35

*Cooling Water Intake Structures v. EPA*,
  905 F.3d 49 (2d Cir. 2018)......................................................................... *passim*

*Crutchfield v. Cnty. of Hanover*,
  325 F.3d 211 (4th Cir. 2003) ..................................................................................7

*Crutchfield v. U.S. Army Corps of Engineers*,
  214 F. Supp. 2d 593 (E.D. Va. 2002) .....................................................................6

*Ctr. for Biological Diversity v. FWS*,
  807 F.3d 1031 (9th Cir. 2015) ...............................................................................31

*Ctr. for Biological Diversity v. Salazar*,
  804 F. Supp. 987 (D. Ariz. 2011) ..........................................................................35

*CTS Corp. v. EPA*,
  759 F.3d 52 (D.C. Cir. 2014)...................................................................................5

*Defs. of Crooked Lake v. FDEP*,
  Nos. 17-5328, 17-0972, 2018 WL 3387900 (Fla. Div. Admin. Hrgs., May 7, 2018) ................7, 8

*Defs. of Wildlife v. Dep't of the Navy*,
  733 F.3d 1106 (11th Cir. 2013) ..............................................................................35

*Defs. of Wildlife v. Zinke*,
  849 F.3d 1077 (D.C. Cir. 2017)..............................................................................31

*Friends of the Earth v. Hintz*,
  800 F.2d 822 (9th Cir. 1986) ...................................................................................6

*Gerber v. Norton*,
   294 F.3d 173 (D.C. Cir. 2002) ...........................................................................25

*Greenpeace v. NMFS*,
   80 F. Supp. 2d 1137 (W.D. Wash. 2000) ...........................................................35

*Hardy Salt Co. v. S. Pac. Transp. Co.*,
   501 F.2d 1156 (10th Cir. 1974) ...........................................................................16

*In re: Operation of Missouri River System Litigation*,
   421 F.3d 618 (8th Cir. 2005) ...............................................................................31

*Minnehaha Creek Watershed Dist. v. Hoffman*,
   597 F.2d 617 (8th Cir. 1979) ...............................................................................16

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..............................................................................................7

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
   551 U.S. 644 (2007) ...........................................................................24, 25, 36

*Nat'l Family Farm Coal. v. EPA*,
   966 F.3d 893 (9th Cir. 2020) ...............................................................................40

*Nat'l Wildlife Fed'n v. Brownlee*,
   402 F. Supp. 2d 1 (D.D.C. 2005) ........................................................................34

*Nielsen v. Preap*,
   139 S. Ct. 954 (2019) ..........................................................................................12

*Niz-Chavez v. Garland*,
   141 S. Ct. 1474 (2021) ........................................................................................12

*North Slope Borough v. Andrus*,
   642 F.2d 589 (D.C. Cir. 1980) ...........................................................................35

*NRDC v. EPA*,
   859 F.2d 156 (D.C. Cir. 1988) .....................................................................10, 11

*NRDC v. Houston*,
   146 F.3d 1118 (9th Cir. 1998) .............................................................................39

*Oceana, Inc. v. Pritzker*,
   75 F. Supp. 3d 469 (D.D.C. 2014) ......................................................................29

*Oceana v. Ross*,
   No. 15-055, 2020 WL 5995125 (D.D.C. Oct. 9, 2020) ...........................................26

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Servs.*,
   482 F. Supp. 2d 1248 (W.D. Wash. 2007)..........................................................36

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ............................................................................25

*San Luis & Delta-Mendota Water Auth. v. Salazar*,
   666 F. Supp. 2d 1137 (E.D. Cal. 2009) .............................................................25

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
   992 F.3d 1071 (D.C. Cir. 2021).........................................................................39

*The Daniel Ball*,
   77 U.S. 557 (1870).............................................................................................16

*Tundidor v. Miami-Dade Cnty.*,
   831 F.3d 1328 (11th Cir. 2016) .........................................................................15

*Utah v. United States*,
   403 U.S. 9 (1971)...............................................................................................16

*WildEarth Guardians v. U.S. Army Corps of Engineers*,
   429 F. Supp. 3d 1224 (D.N.M. 2019) ...............................................................30

## FEDERAL STATUTES

16 U.S.C. § 1536(b)(4)(C)(ii) ...............................................................................32

16 U.S.C. § 1536(b)(4)(C)(iv) ..........................................................................32, 33

33 U.S.C. § 401.......................................................................................................14

33 U.S.C. § 401-467o..............................................................................................14

33 U.S.C. § 1251(b) ................................................................................................18

33 U.S.C. § 1319(c) ..................................................................................................8

33 U.S.C. § 1319(c)(1) ..............................................................................................9

33 U.S.C. § 1319(c)(1)(A) .........................................................................................9

33 U.S.C. § 1344(g) ................................................................................................16

33 U.S.C. § 1344(g)(1) ....................................................................................13, 14

33 U.S.C. § 1344(h)(1) ...........................................................................................10

33 U.S.C. § 1344(h)(1)(A)(i) ..................................................................................10

33 U.S.C. § 1344(h)(1)(B) ......................................................................................10

33 U.S.C. § 1344(h)(1)(G) ......................................................................................10

33 U.S.C. § 1344(h)(2)(A) ......................................................................................10

33 U.S.C. § 1344(n) ..................................................................................................9

43 U.S.C. § 1331 .....................................................................................................37

**CODE OF FEDERAL REGULATIONS**

33 C.F.R. § 328.3(a)(1)(i) .......................................................................................16

33 C.F.R. pt. 329 ................................................................................................14, 18

33 C.F.R. § 329.4 ..............................................................................................14, 15

40 C.F.R. pt. 230 ......................................................................................................6

40 C.F.R. § 230.3(d) .................................................................................................4

40 C.F.R. § 230.11(d) ...............................................................................................4

40 C.F.R. § 233.16(d) .............................................................................................19

40 C.F.R. § 233.41 ............................................................................................11, 13

40 C.F.R. § 233.41(a) .............................................................................................12

40 C.F.R. § 233.41(a)(3) ...................................................................................11, 12

40 C.F.R. § 233.41(a)(3)(i) .....................................................................................12

40 C.F.R. § 233.41(a)(3)(ii) ....................................................................................12

40 C.F.R. § 233.41(b) .............................................................................................12

40 C.F.R. § 233.41(b)(2) ...................................................................................11, 12

40 C.F.R. § 233.41(c) .................................................................................................12

40 C.F.R. § 233.41(d) .................................................................................................12

50 C.F.R. § 402.14(i)(1)(iv) ........................................................................................33

50 C.F.R. § 402.14(i)(2) ..............................................................................................39

50 C.F.R. § 402.14(i)(3) ..............................................................................................33

**FEDERAL REGISTER**

37 Fed. Reg. 18289 (Sept. 9, 1972) ............................................................................15

40 Fed. Reg. 31320 (July 25, 1975) ...........................................................................15

44 Fed. Reg. 34244 (June 14, 1979) ..........................................................................13

45 Fed. Reg. 33290 (May 19, 1980) ..........................................................................13

45 Fed. Reg. 85336 (Dec. 24, 1980) ............................................................................6

51 Fed. Reg. 19926 (June 3, 1986) ............................................................................39

53 Fed. Reg. 20764 (June 6, 1988) ............................................................................13

**STATE STATUTES**

Ariz. Rev. Stat. § 13-105(d) .......................................................................................13

Fla. Stat. § 373.430(1)(b) .............................................................................................9

Fla. Stat. § 373.430(2) ..................................................................................................9

**FLORIDA ADMINISTRATIVE CODE**

62-302.200(42), F.A.C. .................................................................................................2

62-302.530(1)–(72), F.A.C. ..........................................................................................4

62-302.530(62), F.A.C. .................................................................................................4

62-330.301(e)(2), F.A.C. ..............................................................................................3

62-331.053(1), F.A.C. ...................................................................................................3

62-331.053(3)(a)6.i–iv, F.A.C. .................................................................................3

62-331.053(3)(b), F.A.C. ..........................................................................................3

## OTHER AUTHORITIES

Black's Law Dictionary (11th ed. 2019).........................................................................13

Waters that Qualify as "Traditional Navigable Waters" Under Section (a)(1)
   of the Agencies' Regulations……………………………………………………….. 16

**INTRODUCTION**

The U.S. Environmental Protection Agency ("EPA" or "the Agency") reasonably concluded that Florida's Section 404 assumption request satisfied the requirements of the Clean Water Act ("CWA" or "the Act") and its implementing regulations at the time of approval. The U.S. Army Corps of Engineers ("the Corps") reasonably described the scope of retained waters in Florida. The U.S. Fish & Wildlife Service ("FWS") reasonably opined that EPA's approval action, and Florida's subsequent administration of its state Section 404 program, would not likely jeopardize the continued existence of Endangered Species Act ("ESA")-listed species or destroy or adversely modify designated critical habitat within FWS's jurisdiction. And EPA reasonably determined that a Florida-administered Section 404 program would have no effect on ESA-listed species and critical habitat within the jurisdiction of the National Marine Fisheries Service ("NMFS"). Plaintiffs' arguments to the contrary misstate the record, misstate the law, or misstate both. The Court should enter summary judgment for Federal Defendants on all remaining counts.

**ARGUMENT**

**I.      EPA's Completeness Determination Was Reasonable.**

Plaintiffs argue that Florida's Section 404 Program application was incomplete without FWS's biological opinion ("the BiOp") because the BiOp alone details how Florida would safeguard ESA-listed species and critical habitat through a process known as "technical assistance." Dkt. 104 at 87. But as the BiOp notes, "[t]echnical [a]ssistance" simply refers to the "coordination process" by which FWS provides Florida with "information, reviews, and recommendations on effect determinations and protective measures." FWS-006038. And as EPA explained previously, the essential elements of that coordination process—"the participants, timing, subject matter, dispute resolution mechanisms, and binding effect"—are contained in the

1

materials that Florida submitted to EPA and on which Plaintiffs commented. Dkt. 99 at 42; *see also id.* at 39–40.

Plaintiffs dismiss those details as an "empty outline" or a "black box." Dkt. 104 at 87, 89. Yet they identify nothing essential to their understanding of "technical assistance" that was present in the BiOp but missing from the regulations, memoranda, and procedural handbooks included in Florida's assumption application. Their failure to do so is fatal to their completeness argument. Plaintiffs have no free-standing right to comment on the BiOp under the ESA or the Administrative Procedure Act. Dkt. 99 at 40–42. Nor is the BiOp, in and of itself, a required element of a state Section 404 assumption application. *Id.* at 38–40. Having failed to show how the BiOp's summary of "technical assistance" deviated in any way from the coordination process outlined in materials on which they commented, Plaintiffs have no leg to stand on. The Court should enter summary judgment for Federal Defendants on Claim 1.

## II. EPA Reasonably Concluded That Florida's Regulations Were Consistent with and No Less Stringent Than the 404(b)(1) Guidelines.

### A. References to "water quality standards" do not exempt discharges from regulation.

Plaintiffs cite two sentences in Florida's Section 404 program regulations that reference state water quality standards,[1] and they argue that because of those references, the State can ignore the environmental consequences of discharges so long as those discharges do not violate water quality standards. Dkt. 104 at 68. Not so. To authorize discharges of dredged or fill material into any water of the United States—"pristine" or otherwise, *id.*—Florida must first determine that the proposed discharge would not have significant adverse effects on "human health or welfare," the

---

[1] Under Florida law, "water quality standards" include "numerical and narrative" limitations on various pollutants and other indicators of water quality, which are applied to waters based on their "designated present and future most beneficial uses." 62-302.200(42), F.A.C.

"life stages of aquatic life and other wildlife dependent on aquatic ecosystems," and "recreational, aesthetic, and economic values," among other things. 62-331.053(3)(a)6.i–iv, F.A.C.; *see also* Dkt. 99 at 45–46 (discussing Florida's regulatory requirements). The State must also review practicable alternatives to the proposed project and conclude that none of those alternatives would "have less adverse impact on the aquatic ecosystem." 62-331.053(1), F.A.C. And it must find that the permit applicant took "appropriate and practicable steps" to "minimize potential adverse impacts of the activity on the aquatic ecosystem." 62-331.053(3)(b), F.A.C. To do any of that, Florida must "evaluate water quality impacts or contamination" associated with the proposed discharge. Dkt. 104 at 68. To point this out is not to "deflect" or "redirect[] the Court's attention," *id.* at 66, but rather to note that by narrowly focusing on 62-330.301(e)(2), F.A.C., *id.* at 68, Plaintiffs ignore provisions of state law that cut against their sweeping claims.

Plaintiffs misread the provisions of state law that they do acknowledge. Section 8.2(g) of the State 404 Handbook requires Florida to "evaluate the material to be dredged or used as fill to determine *the possibility of the presence* of contaminants that may violate state water quality standards." EPA-HQ-OW-2018-0640-0002-A20, at 32 (emphasis added). The touchstone of review under that provision is not whether a discharge will violate a water quality standard, as Plaintiffs claim, but whether the material to be discharged might contain a contaminant referenced in the state's water quality standards. Section 8(h) reinforces that conclusion. It compels permit applicants to conduct additional "sediment, elutriate, and/or water quality tests" based only on a determination by the Florida Department of Environmental Protection ("FDEP") that there is "a reasonable probability that contaminants are *present*" in dredged or fill material. *Id.* (emphasis added). Those prophylactic mandates are not reasonably read as a license to ignore contamination risks until waterways are "so polluted that they violate water quality standards." Dkt. 104 at 68.

Florida's water quality standards contain narrative or numeric limitations for more than 130 contaminants and other water quality parameters, such as turbidity or dissolved oxygen content. *See, e.g.*, 62-302.530(1)–(72), F.A.C. And as with the 404(b)(1) Guidelines, the contaminants listed in the state water quality standards include both specific chemicals of concern and broad categories of pollutants. *See, e.g.*, 62-302.530(62), F.A.C. (contaminants include "[s]ubstances in concentrations which injure, are chronically toxic to, or produce adverse physiological or behavioral response in humans, plants, or animals"); *cf.* 40 C.F.R. § 230.3(d) (contaminants include "a chemical or biological substance in a form that can be incorporated into, onto or be ingested by and that harms aquatic organisms, consumers of aquatic organisms, or users of the aquatic environment"). By determining if dredged or fill material *might contain* one of those contaminants, FDEP necessarily determines whether that material "will introduce, relocate, or increase" the contaminant in question. 40 C.F.R. § 230.11(d). That is no different than the Corps' obligation under the 404(b)(1) Guidelines. Plaintiffs' argument therefore fails.

B.  Like the Corps, Florida may rely on applicant-submitted data.

In their opening brief, Plaintiffs argued that Florida's regulations are less stringent than the 404(b)(1) Guidelines because the State is not obliged to "evaluate" or "make written factual determinations" about a proposed "project's effects," or the "adequacy" of applicant-supplied "reasonable assurances." Dkt. 98 at 63. That is untrue for the reasons noted in EPA's brief. Dkt. 99 at 46–48. No matter, Plaintiffs now say, because EPA did not sufficiently "analyze the impact" of "reasonable assurances" in its response to Plaintiffs' comment letter and so cannot now rebut Plaintiffs arguments without offering "post-hoc rationalizations." Dkt. 104 at 69–70. Alternatively, Plaintiffs claim that the 404(b)(1) Guidelines are more stringent than Florida's regulations because

4

they require the Corps to base permitting decisions on its own independent analyses rather than on information supplied by permit applicants. *Id.* at 72. Both arguments fail.

Plaintiffs' "post-hoc" accusations distort the record and obscure the extent to which Plaintiffs' arguments about "reasonable assurances" expanded and evolved from their comment letter to their opening brief. That comment letter was more than 24,140 words long. EPA-HQ-OW-2018-0640-0386. Fewer than 250 of those words addressed "reasonable assurances," and Plaintiffs claimed only that "state regulations do not require [FDEP] to make the factual determinations laid out in" the 404(b)(1) guidelines. *Id.* at 23. EPA's response on that issue was proportional. *Cf. CTS Corp. v. EPA*, 759 F.3d 52, 65 (D.C. Cir. 2014) ("the dialogue between administrative agencies and the public is a two-way street") (internal quotation marks omitted). The Agency explained that it had "carefully evaluated the State's requirements," that it had "determined that" those requirements "are consistent with and no less stringent than the Section 404(b)(1) Guidelines," and that it "disagree[d] with the commenter who asserted that Florida's inclusion of 'reasonable assurance' language in the Environmental Resource Permit Applicant's Handbook means that the State program is not consistent with federal requirements." EPA-HQ-OW-2018-0640-0568, at 27–28.

In their opening brief, Plaintiffs spun the handful of sentences in their comment letter into three full pages. Dkt. 98 at 61–64.  To do so, they embellished the arguments in their letter, claiming that anything could constitute a "reasonable assurance," and that the safeguards of judicial review "do not exist" for Florida's Section 404 program because of the State's reliance on applicant-supplied information.  *Compare* Dkt. 98 at 63–64 *with* EPA-HQ-OW-2018-0640-0386 at 23. They also discussed legal authorities cited nowhere in their letter. EPA was thus well within its rights when it responded by: (1) pointing out the "State's requirements" that belied Plaintiffs'

assertions; (2) rebutting the claims that Plaintiffs raised for the first time in their brief; and (3) marshalling cases to support its own position. Dkt. 99 at 46–48. Plaintiffs' complaints about "post-hoc rationalizations" are therefore unavailing.

Plaintiffs fare no better when they engage on the merits. Florida law requires FDEP to "[c]omplete a Technical Staff Report to document how the project addresses the requirements of" Florida regulations that are materially identical to the 404(b)(1) Guidelines, and to "[m]ake and document a finding of either compliance or noncompliance" with applicable Florida law. *See* EPA-HQ-OW-2018-0640-0002-A20, at 32 (State 404 Handbook § 8.2(j)-(*l*)); *see also* Dkt. 99 at 45–47. Plaintiffs now say that this is insufficient because FDEP may base its assessment on applicant-supplied information, while the 404(b)(1) Guidelines require the Corps to "independently make factual determinations based on its own independent analysis." Dkt. 104 at 72.

But nowhere do the 404(b)(1) Guidelines mention the Corps' supposed obligation to conduct "independent investigation[s]." Indeed, nowhere do the Guidelines even use the word "independent," on which the entire weight of Plaintiffs' argument appears to rest. *See* 40 C.F.R. pt. 230. And nothing in those guidelines suggests that the Corps cannot base the requisite findings and determinations on applicant-supplied information.[2]  In fact, the Corps routinely does just that, as courts have long recognized. *Friends of the Earth v. Hintz*, 800 F.2d 822, 834–36 (9th Cir. 1986) (The Corps may base its analysis "entirely upon information supplied by the applicant"). Plaintiffs cite no judicial decision suggesting that this practice is impermissible. We are aware of just one: *Crutchfield v. U.S. Army Corps of Engineers*, 214 F. Supp. 2d 593, 654 (E.D. Va. 2002), where a district judge held, along the lines urged by Plaintiffs, that the Corps erred because it "did not

---

[2] The preamble to the 404(b)(1) Guidelines does not mention, let alone impose, a requirement that the Corps develop factual records through its own studies. *See* 45 Fed. Reg. 85336 (Dec. 24, 1980).

independently assess" applicant-submitted information on which it relied. But that decision was vacated on appeal, and the Fourth Circuit rightly held that "to require the Corps to do such independent studies rather than reasonably relying on extensive studies given to them by applicants would place unreasonable and unsuitable responsibilities on the Corps." *Crutchfield v. Cnty. of Hanover*, 325 F.3d 211, 223–24 (4th Cir. 2003) (internal quotation marks omitted). What mattered, the court noted, was not whether the Corps made its own "independent calculations" to support its conclusions but that "the administrative record . . . include[d] the figures on which those conclusions were based." *Id.* at 224 n.5.

The Fourth Circuit's analysis is consistent with basic principles of administrative law. In Section 404 permitting decisions, as in most other administrative settings, the Corps must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). If it does that, and if the information in the record reasonably supports the agency's conclusions, then those conclusions should be upheld. The Corps does not have to take the additional step of proving that it generated "the relevant data" itself, or that it drew facts only from the four corners of its own studies. Thus, nothing about Florida's reliance on applicant-submitted information meaningfully differentiates the state's Section 404 program from the program prescribed under the 404(b)(1) Guidelines, as implemented by the Corps.

Because neither Florida nor the Corps must "perform[] [their] own independent analysis," Dkt. 104 at 73, it is unsurprising that courts do not assess whether those agencies have done so. Plaintiffs' reliance on the lack of any such assessment in *Defenders of Crooked Lake v. FDEP*, Nos. 17-5328, 17-0972, 2018 WL 3387900 (Fla. Div. Admin. Hrgs., May 7, 2018), an

administrative challenge to an FDEP-issued permit, is therefore misplaced. Plaintiffs' summary of that proceeding is also misleading. They claim that the presiding ALJ based his findings of fact only on applicant-submitted information. Dkt. 104 at 72–73 & n.43. In fact, every one of the ALJ's substantive findings of fact rested solely on documents submitted by, or testimony from, FDEP. *See* 2018 WL 3387900, at *3–5 (listing statements of fact based on "DEP Exhibits" and testimony of Michael Brandon Miller, Environmental Specialist at FDEP); *see also id.* at *5 (noting Miller's testimony that FDEP had "evaluated the project for consistency with all of the applicable criteria, including potential degradation to ambient water quality standards, primary impacts, secondary impacts, cumulative impacts, and appropriate water depth, and that all of this criteria was [sic.] likewise met"). Before making those factual findings, moreover, the ALJ considered new evidence submitted by the parties *challenging* the permit. And Plaintiffs offer no reason to believe that the availability of a de novo administrative proceeding to contest FDEP's permitting decisions renders Florida's program less stringent than the federal Section 404 program.[3]

## III.    EPA Reasonably Concluded That Florida's Enforcement Authority Satisfied Statutory and Regulatory Requirements.

In its opening brief, EPA explained why neither the CWA's text, nor its implementing regulations, preclude Section 404 assumption in states that require a showing of gross negligence to establish criminal liability, instead of the simple negligence required for federal prosecution under CWA Section 309(c), 33 U.S.C. § 1319(c). Dkt. 99 at 50–57. In response, Plaintiffs accuse

---

[3] Plaintiffs also contend that Florida's regulations are less stringent than the 404(b)(1) guidelines because the State failed to show how it would prevent discharges that jeopardize the continued existence of ESA-listed species or result in likelihood of the destruction or adverse modification of critical habitat. Dkt. 104 at 73. In doing so, Plaintiffs simply cross-reference their arguments about the supposed incompleteness of Florida's application, and the supposed inadequacies of "technical assistance."  Those arguments fail for the reasons noted in Federal Defendants' opening brief and in pages 1–2 and 34–38 in this brief.

EPA of "conflat[ing] the question of what *constitutes* a violation under the" CWA "with the flexibility as to *how* a state may abate those violations." Dkt. 104 at 54. They argue that Section 309(c) defines violations. *Id.* at 56. And they claim that allowing Section 404 assumption in states with a more-than-simple negligence culpability standard would "legalize activity that is patently unlawful under" the Act. *Id.* at 55.

Plaintiffs' argument fails. The language in Section 309(c) on which they rely does not so much define violations as establish criminal liability and set "penalties" for certain violations defined elsewhere in the Act. 33 U.S.C. § 1319(c)(1). These include, as relevant here, violations of "section 1311," which prohibits the unauthorized discharge of any pollutant, and violations of a "condition or limitation" in "a permit issued under section 1344." *Id.* § 1319(c)(1)(A). To Plaintiffs' point, such violations under federal law are violations under Florida law too. *See* Fla. Stat. § 373.430(1)(b) ("It shall be a violation of this part . . . for any person" to "fail to obtain any permit required by this part . . . or to violate or fail to comply with any . . . permit adopted or issued . . . under this part."). The State's negligence standard affects only whether the violation is punishable by a civil or criminal fine.[4]  And Florida's and EPA's legal authority to seek criminal fines differs only in cases that would be prosecuted under a simple negligence culpability standard, but not under Florida's heightened negligence standard of "gross careless disregard." The universe of such cases is likely to be vanishingly small, for the reasons noted in EPA's opening brief. Dkt. 99 at 53–54. Should any arise, moreover, EPA remains free to bring them, since the Agency's prosecutorial authority under Section 309 is unaffected by state assumption. 33 U.S.C. § 1344(n). For these reasons, EPA could reasonably conclude, as it has previously, that the authority to seek

---

[4] Like EPA, Florida employs a strict liability standard for civil enforcement actions. Fla. Stat. § 373.430(2).

criminal fines of at least $10,000 per violation per day for certain violations committed with some form of negligence is consistent with authority sufficient "[t]o abate violations." 33 U.S.C. § 1344(h)(1)(G).

EPA's longstanding view is entirely consistent with Section 404(h)(1), 33 U.S.C. § 1344(h)(1), which governs state assumption. That provision requires state Section 404 programs to "apply, and assure compliance with, any applicable requirements" of: (1) "this section" (i.e., Section 404), *id.* § 1344(h)(1)(A)(i); (2) "sections 1317 and 1343 of this title", *id.*; and (3) "section 1318 of this title," *id.* § 1344(h)(1)(B). Section 309 is conspicuously absent from that list, though it would have been simple enough for Congress to include. Drawing the obvious inference—that Congress did not wish to foreclose assumption in states that do meet or exceed all requirements of Section 309—does not "render Section 3[0]9 meaningless." Dkt. 104 at 56 n.28. It simply avoids imputing to Section 309 a meaning that does not follow from the text.

Plaintiffs resist this straightforward reading of the CWA, arguing that state Section 404 programs must be as stringent as, or more stringent than, "each and every Clean Water Act requirement," not just the requirements "expressly referenced in Section 404 assumption provisions." Dkt. 104 at 57. Congress said otherwise. If a state "has the authority set forth in" Section 404(h)(1), then EPA "*shall* approve the program." 33 U.S.C. § 1344(h)(2)(A) (emphasis added). There is no free-floating stringency test, unmoored from "the Section 404 assumption provisions," as Plaintiffs insist.[5]

The D.C. Circuit reached a similar conclusion in *NRDC v. EPA*, 859 F.2d 156 (D.C. Cir. 1988), and while Plaintiffs argue otherwise, the court's reasoning is on point. At issue in *NRDC*

---

[5] The lack of a generally applicable stringency requirement dooms Plaintiffs' claim about the supposed inadequacy of Florida's statute of limitations, which they admit lacks any basis in the CWA generally, let alone Section 404(h)(1). *See* Dkt. 104 at 65.

were EPA regulations authorizing states to assume CWA permitting authority even if they lacked authority to assess criminal fines up to the federal maximums set forth in Section 309(c). 859 F.2d at 178. Like Plaintiffs, the petitioners in *NRDC* argued that EPA's regulations were insufficiently "stringent." *Id.* at 179–80. The court rejected those arguments, though not, as Plaintiffs suggest, because the petitioners lacked any statutory support for their position. Dkt. 104 at 57. In fact, the *NRDC* petitioners grounded their arguments in various provisions of the Act, including Section 309(c)(1). 859 F.2d at 179–80. But the problem, according to the court, was that the provisions on which petitioners relied did not explicitly require states to meet or exceed federal maximum criminal penalties. *Id.* at 180. Given Congress's stated desire to respect state autonomy, the court required more before concluding that EPA lacked discretion to approve state programs that were marginally less punitive than the federal regime. *Id.* at 180–81. So too here.

Like the CWA itself, EPA's regulations accommodate Section 404 assumption in states like Florida that employ a gross negligence standard rather than the simple negligence standard applicable in federal prosecutions. EPA explained why that conclusion follows from the application of ordinary tools of construction to 40 C.F.R. § 233.41, in particular subparagraphs (a)(3) and (b)(2). Dkt. 99 at 54–57.[6] In response, Plaintiffs insist that subparagraphs (a)(3) and (b)(2) impose unrelated and independent requirements and that there "is no reason to conclude" that either provision "somehow supplements, clarifies, or otherwise affects" the other. Dkt. 104 at 61–62. The regulatory text suggests the opposite. Subsection (b)(2) directly references

---

[6] Responding to comments, EPA explained that it construed Florida's "gross careless disregard or reckless indifference" culpability standard "to constitute a negligence standard" and therefore found "that Florida satisfied the federal requirements to allow for prosecution of negligent permitting violations." EPA-HQ-OW-2018-0640-0568, at 74–75. Those "federal requirements" are in 40 C.F.R. § 233.41. In explaining why that provision accommodates heightened negligence standards, like Florida's, EPA does not rely on a post-hoc rationalization, as Plaintiffs suggest in passing. Dkt. 104 at 61 n.32. Rather, it defends its action on the basis articulated in the record.

11

subsection (a)(3). *See* 40 C.F.R. § 233.41(b)(2) (describing the "burden of proof and degree of knowledge or intent required under State law for establishing violations under paragraph (a)(3) of this section"). And the distinction that Plaintiffs attempt to draw between what they call subparagraph (a)'s "penalty provisions," Dkt. 104 at 61, and the rest of § 233.41, is illusory since § 233.41(a), (b), (c), and (d) all deal explicitly with state authority to abate violations by recovering penalties. There is thus no good reason to read subparagraphs (a)(3) and (b)(2) in isolation, as Plaintiffs suggest. Instead, the text of § 233.41, like any other law, should be read in context, its various provisions should be harmonized, and its every term given effect.

Among § 233.41's terms is "criminal negligence," which Black's Law Dictionary and more than two-dozen state criminal codes define as heightened negligence beyond a mere deviation from the standard of ordinary care. *See* Dkt. 99 at 55; Dkt. 99-1 at 2–6. Courts "are entitled to assume" that this term bears its "ordinary meaning," "until and unless someone" demonstrates otherwise. *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1481–82 (2021). Plaintiffs try and fail to do that here. They argue that the phrase "criminal negligence," in subparagraph (a)(3)(ii) "simply distinguishes" (a)(3)(ii) from (a)(3)(i), "which relates to enforcement for civil, rather than criminal, offenses." Dkt. 104 at 61–62. But (a)(3)(ii) uses "criminal" twice: "The [state] agency shall have the authority to seek *criminal* fines against any person who . . . with *criminal* negligence discharges" without a permit or in violation of permit condition. Plaintiffs plausibly read the first use of "criminal" to distinguish (a)(3)(i) from (a)(3)(ii). But under Plaintiffs' reading, the second use of "criminal," which appears in the very same sentence as the first, is an awkward superfluity. *See Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (no term or provision "should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence") (internal quotation marks omitted). Better to construe "criminal negligence" as "criminal negligence."

The history of what is now 40 C.F.R. § 233.41 supports that conclusion. It is true, as Plaintiffs note, that in the Notice of Proposed Rulemaking for § 233.41's precursor, EPA stated that "if the burden of proof for establishing 'criminal negligence' in State court is equivalent to that for establishing 'negligence' in a criminal proceeding in Federal court, such State authority satisfies the requirements of this section." 44 Fed. Reg. 34244, 34258 (June 14, 1979). But that was the preamble for a proposed rule. And when EPA published the final version of that rule, it added a "Note" to what is now § 233.41(b)(2), explaining that "States which provide criminal remedies based on 'criminal negligence,' 'gross negligence' or strict liability satisfy the requirement of paragraph (a)(3)(iii)"—now § 233.41(a)(3)(ii)—"of this section." 45 Fed. Reg. 33290, 33462 (May 19, 1980). In 1988, when EPA overhauled its Section 404 assumption regulations, it deleted the cross-referential "Note," but inserted the words "criminal negligence" directly into (a)(3)(ii). *See* 53 Fed. Reg. 20764, 20783 (June 6, 1988). Though EPA struck the phrase "gross negligence" from the regulatory text, it explained that it intended only to "retain[]" the previous regulatory requirements, *id.* at 20771, a statement entirely consistent with an understanding of "criminal negligence" as a form of "[g]ross negligence," NEGLIGENCE, Black's Law Dictionary (11th ed. 2019), or "a gross deviation from the standard of care," *see, e.g.*, Ariz. Rev. Stat. § 13-105-10(d).

## IV.    The Corps' Retained Waters List Was Reasonable.

In CWA Section 404(g) Congress described waters over which the Corps would retain primary Section 404 permitting authority following state assumption (i.e., retained waters) as:

> waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce . . . , including all waters which are subject to the ebb and flow of the tide . . . , including wetlands adjacent thereto.

33 U.S.C. § 1344(g)(1). Plaintiffs would have the Corps expand that description to include "historic use [Rivers and Harbors Act ('RHA')] Section 10 waters" and certain "traditionally navigable waters ('TNWs')" that do not meet the criteria that Congress specified. In support of this position, they note that neither the phrase "navigable waters of the United States" (as used in the RHA), nor the phrase "navigable waters" (as used in the CWA), explicitly references "historic use waters," and yet the Corps' regulatory interpretations of both statutory phrases do. So, Plaintiffs argue, the Corps must interpret Section 404(g)'s definition of retained waters to include historic use waters as well. Dkt. 104 at 78–79. Plaintiffs also claim that TNWs and retained waters are coextensive and that the Corps had a prior position to that effect, which it arbitrarily reversed. *Id.* at 74–77. Finally, Plaintiffs maintain that the Jacksonville District erred by producing the Retained Waters List using its current Section 10 list. *Id.* at 80–85. These arguments are meritless.

A. "Historic use" Section 10 waters are not retained waters.

The RHA establishes the Corps' jurisdiction over "navigable waters of the United States" (also known as "Section 10 waters") but does not define that term. 33 U.S.C. §§ 401–467o. The Corps' regulations, codified at 33 C.F.R. pt. 329, fill the definitional gap. Under those regulations, "Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, *or have been used in the past*, or may be susceptible for use to transport interstate or foreign commerce." 33 C.F.R. § 329.4 (emphasis added).[7]  That definition, the Corps explained, incorporates "doctrines established by the Federal courts," 37 Fed. Reg.

---

[7] The RHA provision that Plaintiffs quote in their brief (Dkt. 104 at 79 (table)) does not define "navigable waters of the United States." Rather, it describes certain waters—those "not subject to the ebb and flow of the tide and that are not used and are not susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce"— over which bridges or causeways may be constructed without securing from the Coast Guard "the approval required by this section." 33 U.S.C. § 401. That text appears only in RHA Section 9, not, as Plaintiffs suggest, RHA Sections 10 and 13.

18289 (Sept. 9, 1972), which have long viewed historic use as a determinant of "navigability" under the RHA and in certain other legal contexts, *see, e.g.*, *Tundidor v. Miami-Dade Cnty.*, 831 F.3d 1328, 1332–1333 (11th Cir. 2016) (collecting cases). Hence the Corps' inclusion in § 329.4 of waters "used in the past." When the Corps issued regulations defining "navigable waters" under the CWA, it used its existing regulatory definition of "navigable waters of the United States" as a starting point, incorporating "historic use" waters into that definition as well. *See* 40 Fed. Reg. 31320 (July 25, 1975).

Against this backdrop, had Congress used the phrase "navigable waters of the United States" to define retained waters, then waters "used in the past to transport interstate or foreign commerce" might be reasonably construed as retained. But Congress instead defined retained waters by listing in CWA Section 404(g) the waters described in 33 C.F.R. § 329.4 *except* for waters "used in the past" to transport interstate commerce. *Cf.* Dkt. 104 at 78 (discussing "apples and oranges"). Because of that omission, "historic use" waters are not "retained waters."

B. <u>TNWs include, but are not limited to, retained waters.</u>

Plaintiffs' TNW arguments fail as well. The regulatory category of "traditional navigable waters" and the statutory category of retained waters overlap but are not co-extensive. Certain TNWs do not qualify as retained waters and Plaintiffs are thus wrong to insist that TNWs and retained waters are interchangeable.

The Corps and EPA use "TNWs" to refer to waters that are "[c]urrently used, *or were used in the past*, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide." 33 C.F.R. § 328.3(a)(1)(i) (emphasis added). On its face, that definition includes "historic use" waters, which, for the reasons noted above, are not retained waters. The categories of retained waters and TNWs also diverge because under

longstanding agency guidance, EPA and the Corps interpret TNWs to "include all of the 'navigable waters of the United States,' defined in 33 C.F.R. Part 329" (a subset of which are retained waters, *see supra* pp.14–15), "plus" additional "navigable-in-fact" waters not meeting that definition but "'over which trade and travel are or may be conducted in the customary modes of trade and travel on water.'" *Waters that Qualify as "Traditional Navigable Waters" Under Section (a)(1) of the Agencies' Regulations*, available at https://www.epa.gov/wotus/waters-qualify-traditional-navigable-waters-under-section-a1-agencies-regulations ("TNW Guidance"), at 1 (quoting *The Daniel Ball*, 77 U.S. 557, 563 (1870)).[8] In other words, all retained waters are TNWs, but not all TNWs are retained waters. Section 404(g) authorizes qualifying states to assume primary CWA permitting authority over those TNWs that are not also retained waters. *See* 33 U.S.C. § 1344(g) (authorizing state assumption in "navigable waters," "except" retained waters). Plaintiffs offer no statutory or regulatory basis to conclude otherwise.

Instead, they argue that the Jacksonville District could not follow the law without first acknowledging its departure from what Plaintiffs say was a longstanding Corps policy of treating all TNWs as retained waters. But Plaintiffs' only evidence of this alleged prior position comes from a selectively quoted sentence in the Assumable Waters Subcommittee Report, which reads: "The [Corps] has maintained *this position* since at least the 2008 post-*Rapanos* guidance was issued and it is not a 'new' position created by the agency for purposes of this subcommittee." CORPS003021 (emphasis added). Plaintiffs say that "this position" refers to the position

---

[8] Case law illustrates the difference between waters that are "navigable-in-fact" and "navigable waters of the United States." *Compare Utah v. United States*, 403 U.S. 9 (1971) (Great Salt Lake is navigable-in-fact based on limited history of waterborne commercial traffic) *with Hardy Salt Co. v. S. Pac. Transp. Co.*, 501 F.2d 1156, 1168–69 (10th Cir. 1974) (parties failed to prove that Great Salt Lake was a "navigable water of the United States"); *see also, e.g.*, *Minnehaha Creek Watershed Dist. v. Hoffman*, 597 F.2d 617, 622–23 (8th Cir. 1979) (Lake Minnetonka is navigable-in-fact but is not a "navigable water of the United States" under the RHA).

advocated by the Corps' representative to the Subcommittee, who recommended that retained waters be defined to include TNWs, a recommendation that the Report calls "Alternative C."[9] Context demonstrates otherwise.

The Assumable Waters Subcommittee was formed precisely because there was *no guidance* on the scope of retained and assumable waters, CORPS003003 & n.6, leaving Corps Districts "to determine the extent of waters to be retained" on an ad hoc basis, CORPS003005. In fact, the Subcommittee included in its report a status quo alternative ("Alternative A") in which "neither EPA nor the [Corps] provide further guidance or clarification on criteria to be used to help define the scope of retained vs. assumed waters." CORPS003014. No members of the Subcommittee favored Alternative A. And the Corps' representative proposed Alternative C— treating TNWs as retained waters—to address the absence of any policy guidance, not to maintain an existing policy. Plaintiffs' argument cannot be squared with this broader context.

Nor can Plaintiffs' reading of "this position" be squared with the Report's immediately preceding sentence:

> The [Corps] believes TNWs reflect the concept of "navigability" appropriate to ensure the objective of the CWA to restore and maintain the chemical, physical, and biological integrity of the Nation's waters (see "Appendix D: Legal Definition of 'Traditional Navigable Waters'"). The [Corps] has maintained *this position* since at least the 2008 post-Rapanos guidance was issued and it is not a "new" position created by the agency for purposes of this subcommittee."

CORPS003021 (emphasis added). Viewed in context, rather than in isolation, "this position" refers not to Alternative C, but to the Corps' policy on the "Legal Definition of 'Traditional Navigable Waters,'" as reflected in the TNW Guidance. That guidance says *nothing* about Section 404(g)

---

[9] No other committee member supported Alternative C. CORPS003017. Nor did the Assistant Secretary of the Army for Civil Works, who, after reviewing the Subcommittee's report, issued guidance adopting the recommendation of the other 21 members, all of whom agreed that retained waters were Section 10 waters, less historic use waters. CORPS004096.

and certainly nothing about the scope of retained and assumed waters. Plaintiffs thus fail to conjure a "longstanding" Corps position from a single, cherry-picked sentence.

C.   The Corps reasonably based the Retained Waters List on the 2014 Section 10 List.

The Corps has administered the RHA for more than 120 years. In that time, it has identified waters within the state of Florida that it understands to be "navigable waters of the United States" under 33 C.F.R. pt. 329. All those waters appear on the 2014 Section 10 list, which was and is the Jacksonville District's best estimate of the scope of its RHA jurisdiction.[10] The Jacksonville District thus acted reasonably when it used the 2014 Section 10 List to estimate the scope of retained waters.

Plaintiffs make two related but distinct counterarguments. Their first is, essentially, that an *estimated* scope of retained waters is never sufficient because the Corps must definitively disprove the Section 10 status of every water within a state before that state can assume Section 404 permitting responsibility. This position is not compelled by any explicit command in statute or regulation. But its practical consequences are clear enough: to demand perfect information on retained waters as a precondition for state assumption is to frustrate state assumption. That might accord with Plaintiffs' policy preferences, but not Congress's. *See* 33 U.S.C. § 1251(b). And the Corps cannot be faulted for declining to construe Section 404(g)(1) in a way that defeats the provision's broader aim.

Plaintiffs' second argument is that the Retained Waters list unreasonably omitted waters that appeared on the 2017 Supplement. But the 2017 Supplement was not a list of waters that the

---

[10] The 2014 Section 10 list is the Section 10 list posted on the Jacksonville District's website: https://www.saj.usace.army.mil/Missions/Regulatory/Source-Book/ (list contained in the drop-down menu beneath the heading "Other Permitting Factor"). The link for the 2017 Supplement, that Plaintiffs cite, Dkt. 104 at 80 n.48, does not appear anywhere on the District's public website.

Jacksonville District believed to be Section 10 waters; it was a list of waters that the District thought "*might be remotely* section 10 OR TNWs." CORPS003115 (emphasis added). That waters on the 2017 Supplement did not make the Retained Waters list is hardly surprising. And it was not, as Plaintiffs suggest, because the Corps "never looked at the 2017 [S]upplement again," or "ignored all public comment on the topic." Dkt. 104 at 80, 83. In fact, in developing the Retained Waters List, the Corps reviewed both the 2017 Supplement and the public comments it received "regarding the use of waters within the State of Florida for navigation," CORPS003213, which is why those materials appear in the Corps' certified record, Dkt. 94-2 at 1–2 (listing documents). If Plaintiffs believe that those materials, or any other record documents, show that a waterway belongs on, but is missing from, the Retained Waters List, then they have had every opportunity to make their case. Yet nowhere in their 300-paragraph Complaint, or their 175 pages of briefing have they done so.[11] Instead, they speculate that further study will yield additional navigable waters and thus increase the scope of retained waters. If that proves to be the case, then the Corps will update the Retained Waters List and the boundaries of Florida's Section 404 permitting jurisdiction will shift. CORPS004324; 40 C.F.R. § 233.16(d).[12] But the Corps acted reasonably in refusing to hold up state assumption until it ruled out that possibility.

## V.   *Cooling Water Intake Structures* **Is Persuasive Authority.**

At the end of their arguments regarding the BiOp, Plaintiffs attack the Second Circuit's opinion in *Cooling Water Intake Structures v. EPA,* 905 F.3d 49 (2d Cir. 2018), as "contrary to

---

[11] Because Plaintiffs have not identified any flaws in the Retained Waters List, their claim that EPA unreasonably relied on the Retained Waters List in approving Florida's assumption request is baseless. Dkt. 104 at 85–86.

[12] The Corps will also update the Retained Waters List if court decisions or congressional determination require alterations to its Section 10 list, or if the Corps and FDEP determine that the Retained Waters list should be augmented. CORPS004324.

law," "poorly reasoned," and "wrongly decided." Dkt. 104 at 46. We start here to dispel the notion that *Cooling Water Intake Structures* is anything other than directly on point with this case. The biological opinion before the Second Circuit in *Cooling Water Intake Structures* and the BiOp there utilized similar approaches for similar one-time EPA actions that set requirements for a wide array of subsequent implementation actions where impacts were unknown at the time of consultation. There is no significant difference between the arguments the plaintiffs asserted in *Cooling Water Intake Structures* and Plaintiffs' arguments here. In fact, two of the plaintiffs in *Cooling Water Intake Structures*, Center for Biological Diversity and Sierra Club, are Plaintiffs in this case. While Plaintiffs contend that the decision is "contrary to law" (among other criticisms), the ruling has stood for five years. The petitioners, including the Center and Sierra Club, did not seek a writ of certiorari, which was their opportunity to argue that the case was wrongly decided. While this Court is not bound by the Second Circuit's decision, Plaintiffs offer no convincing reason why it is not persuasive authority. *Butler v. Enter. Integration Corp.*, 459 F. Supp. 3d 78, 106 (D.D.C. 2020) (this Court can look to opinions from other circuits as persuasive authority).

Plaintiffs' other arguments about *Cooling Water Intake Structures* remain unconvincing. Federal Defendants previously explained why there is no merit to Plaintiffs' efforts to distinguish the facts in *Cooling Water Intake Structures* on the grounds that the CWA Section 316(b) regulations were narrower in scope than EPA's approval of Florida's assumption request. Dkt. 99 at 75. Thus, Plaintiffs' statement that the action in *Cooling Water Intake Structures* was "protective" of species, Dkt. 104 at 48, stands in stark contrast to how the Second Circuit described the petitioners' arguments regarding the biological opinion at issue in that case. 905 F.3d at 76. Indeed, although the panel rejected the arguments, the Second Circuit stated that the petitioners "fault[ed] the Services for reaching a no-jeopardy conclusion for several species that are currently

or nearly in jeopardy" and contended that they failed to consider recovery; neither of these descriptions are consistent with Plaintiffs' characterization of the action and technical assistance process at issue in *Cooling Water Intake Structures* as "protective." *See id*.

Plaintiffs also argue that *Cooling Water Intake Structures* does not apply because the technical assistance process was not part of the agency action reviewed by FWS here and, therefore, not enforceable. Dkt. 104 at 47. Federal Defendants fully addressed this issue in their opening brief. Dkt. 99 at 75–76; *see* Section I, *supra*. To be clear, the incidental take coverage described in the BiOp is conditioned on EPA's continued oversight of Florida's implementation of the Section 404 program and its coordination of federal review of State Section 404 permit actions. FWS-006109. Florida's incidental take coverage is conditioned on its compliance with an extensive list of terms and conditions. FWS-006109–10. Plaintiffs' characterization of the technical assistance process as not legally enforceable is plainly incorrect.

Finally, Plaintiffs recycle their argument about FWS's use of prior consultation data, now arguing that information about prior consultations provides a reason for this Court to decline to apply the Second Circuit's reasoning in *Cooling Water Intake Structures*. Dkt. 104 at 46–47. According to Plaintiffs, there was no prior data available in the consultation at issue in *Cooling Water Intake Structures*, thus the availability of such data in this case is a distinguishing factor that precludes this Court from following the Second Circuit's holding. *See id*. Federal Defendants have explained at length how FWS considered information from prior consultations and why FWS determined that there was no best available data regarding future permits, just as in *Cooling Water Intake Structures*. Dkt. 99 at 77–78; *see* Section VI.C, *infra*. Further, just as the federal agencies did in *Cooling Water Intake Structures*, EPA, Florida, and FWS have committed to the technical assistance process in this case, through which "appropriate measures to minimize incidental take

and detrimental effects associated with activities regulated by the State 404 program will be developed by [FWS], and these measures will ensure that each permit will minimize adverse effects and therefore avoid jeopardy to ESA-considered species or destruction or adverse modification to critical habitat." FWS-006108. This Court should rely on the Second Circuit's holding as persuasive authority and reject Plaintiffs' challenges to the BiOp.

## VI.     The BiOp and Its Analysis Comply with the ESA.

Plaintiffs reiterate three challenges to the BiOp regarding FWS's programmatic approach and its analysis. Dkt. 104 at 22–30. As previously explained, these arguments have no merit. Dkt. 99 at 62–70. We further address these arguments below.

### A.     The BiOp's programmatic approach was proper.

Plaintiffs argue that FWS failed to consider the impacts to species from "EPA's entire action," relying on the general proposition that an "agency action" should be defined broadly. Dkt. 104 at 23. Federal Defendants already have addressed this argument at length. Dkt. 99 at 64–67. Here, FWS properly construed the action under review as EPA's approval of Florida's request to assume Section 404 permitting at the state level, including the process-based protections and conditions directed at ESA-considered species. FWS-006081; *see* Dkt. 99 at 33 n.11 (explaining how BiOp used the term "ESA-considered species"). As previously explained, FWS "examine[d] whether and to what degree FDEP's program, regulations, processes, and procedures insure that EPA's approval and FDEP's subsequent assumption and implementation of the 404 program is not likely to jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of critical habitat." FWS-006045. Analysis of specific projects (and impacts of those projects on specific species) will be addressed in the technical assistance process. FWS-006081–82.

Characterizing FWS's approach as "myopic," Plaintiffs contend that FWS should have analyzed existing general permits, the State's "no permit required" decisions, compliance and enforcement activities, and loss of National Environmental Policy Act ("NEPA") analysis and ESA consultation. *Id*. As to general permits,[13] it is unclear whether Plaintiffs are referring to general permits issued before or after EPA approved Florida's assumption request. Dkt. 104 at 24. If they are referring to general permits issued *before* December 2020, Florida's application provided information about the number of general permits prior to EPA's approval of Florida's assumption request, but those were not issued pursuant to CWA Section 404. FWS-003303–04; FWS-003308–09; FWS-006045-46. If Plaintiffs are referring to general permits issued *after* December 2020, Federal Defendants already have explained that the BiOp evaluated the process for issuing general permits and EPA's oversight of that process. Dkt. 99 at 66–67. As Plaintiffs acknowledge, general permits will be assessed as part of the technical assistance process. Dkt. 104 at 36.

Plaintiffs accuse Federal Defendants of attempting to "draw parallels" between "no permit required" decisions and the Corps' jurisdictional determinations to argue that "no permit required" decisions are non-discretionary. Dkt. 104 at 24, n.4. But the phrase "jurisdictional determination" appears nowhere in Federal Defendants' opening brief. *See generally* Dkt. 99. Rather, Federal Defendants explained that if Florida finds that a project does not require a Section 404 permit, then the project is beyond the regulatory reach of the State's Section 404 permitting authority. *See* Dkt. 99 at 67, n.18. Plaintiffs cite no legal authority for their argument that the State exercises discretion when issuing a "no permit required" decision. Dkt. 104 at 24; *see Nat'l Ass'n of Home Builders v.*

---

[13] General permits authorize activities that will cause only minimal individual and cumulative adverse effects. FWS-003303.

*Defs. of Wildlife*, 551 U.S. 644, 671–72 (2007) (limited discretion to determine whether statutory criteria is satisfied is not the same as a statute giving discretion to take additional action); *see also* n.27, *infra* (discussing ESA Section 9's prohibition on take). Nor does the extra-record evidence that Plaintiffs (improperly) cite for the proposition that "EPA itself has said [that jurisdictional determinations and "no permit required" decisions] are different," Dkt. 104 at 24 n.4, appear in the cited text. On these weak facts, the Court should reject this argument.

Plaintiffs insist that the BiOp failed to consider how compliance and enforcement would be monitored. Dkt. 104 at 25. As previously explained, FWS determined that permit compliance would be monitored and enforced through the species coordination process. Dkt. 99 at 66–67 (citing FWS-006051; FWS-006067; FWS-006081). FWS considered the program rule and the State 404 Handbook, both of which explain FDEP's ability to attach conditions to permits as well as EPA's continued oversight of the State Section 404 process. *See id*. FWS clearly considered these issues and discussed its reasoning in the BiOp.

Finally, Plaintiffs argue that the loss of ESA and NEPA review itself is an impact to species that should have been reviewed. Dkt. 104 at 23–25. The action, however, included the process by which FDEP would determine whether a Section 404 permit is required for a project. FWS-006086–88. If a Section 404 permit is required, the BiOp considered the process for evaluating the effects to federally listed species and designated critical habitat, including what conditions would be imposed to ensure against jeopardy and the destruction or adverse modification of critical habitat. FWS-006105–06. Thus, the BiOp considered the processes that would be in place for the protection of ESA-considered species and designated critical habitat for issuance of Section 404 permits upon approving Florida's assumption request. Moreover, the CWA authorizes states to apply to assume the Section 404 permitting process, and Congress decided that neither NEPA

24

review nor ESA consultation is required in such circumstances. *Home Builders*, 551 U.S. at 653 n.4; *see* Dkt. 99 at 67 n.19; Section VIII.A, *infra*.

B.   FWS properly relied on the BE to assess the environmental baseline.

Repeating their prior arguments, Plaintiffs contend that FWS improperly adopted the discussion and evaluation of the environmental baseline in EPA's Biological Evaluation ("BE"), thus violating FWS's alleged "independent duty" to evaluate listed species and critical habitat. Dkt. 104 at 25–27. As previously stated, FWS explained in the BiOp that it adopted and adapted various portions of EPA's consultation package, which FWS considered the best available scientific and commercial data. Dkt. 99 at 69; *see* FWS-006044–45. The BiOp adopted the BE's list of ESA-considered species that occur in the action area and respective determinations regarding the effects of the action. *Id*. The BiOp further explained that FWS conducted its own analysis of the best scientific and commercial data available as required by the ESA. FWS-006044–45. This discussion shows that FWS reviewed, analyzed, and adopted the information in the BE, and its reasoning is evident. *See San Luis & Delta-Mendota Water Auth. v. Salazar*, 666 F. Supp. 2d 1137, 1158–59 (E.D. Cal. 2009) (agency's action may be upheld if its reasoning can be discerned on the basis of the entire record); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 604–06 (9th Cir. 2014) (upholding BiOp where the overall conclusion was "adequately supported by the record" and court could "discern the agency's reasoning").

Relying on *Gerber v. Norton*, 294 F.3d 173, 184–85 (D.C. Cir. 2002), Plaintiffs insist that more analysis was required because the BE was a "self-interested submission." Dkt. 104 at 26. But the consulting agency in *Gerber* requested a modification to a project that would reduce impacts to a listed species. 294 F.3d at 184. The developer refused, and the consulting agency issued an incidental take permit anyway, without making a finding of impracticability. *See id*. No such

improper deference to an applicant occurred in this case. Plaintiffs fail to identify any information that FWS believed should have been included in the environmental baseline, but was not, and for that reason, *Gerber* does not apply.[14]  Plaintiffs' demand for "more" has no legal basis.

Next, when Federal Defendants previously pointed out that Plaintiffs did not appear to identify any action or activities that were not included in the environmental baseline, Dkt. 99 at 68 n.21, Plaintiffs countered by stating that FWS failed to consider species and critical habitat, Dkt. 104 at 26. But, as explained above, the BiOp incorporated the BE's discussion of the status of ESA-considered plant and animal species in the action area. FWS-005613; FWS-006083. The BiOp also adopted the BE's description of the environmental baseline, which discussed past and current wetland fill activities and consultations on a species-by-species basis, based on the best available information, which informed FWS as to the condition of the species in the action area. FWS-005666; FWS-005670–80; FWS-006083–84.[15] The sole basis for Plaintiffs' attack on the BiOp's analysis of the environmental baseline is that it relied on the BE as a source. That is not sufficient to displace FWS's determination that the BE provided the best available scientific information, and its decision is entitled to deference. *Cooling Water Intake Structures*, 905 F.3d at 74; *Appalachian Power Co. v. EPA*, 135 F.3d 791, 802 (D.C. Cir. 1998) (courts defer to an agency "when reviewing a scientific analysis within its area of expertise").

---

[14] We have previously explained why the cases that Plaintiffs rely on, including *Oceana, Inc. v. Ross*, No. 15-0555, 2020 WL 5995125 (D.D.C. Oct. 9, 2020), are inapposite. Dkt. 99 at 69, n.22.

[15] Moreover, as part of the technical assistance process, FWS will consider the condition of all species that exist in the action area upon receipt of a State 404 permit application and evaluate whether issuance of the permit is likely to jeopardize the species. FWS-006104–05. This includes an evaluation of the species' condition in the action area at that time (i.e., the environmental baseline) and its condition across the range of the species at that time (i.e., the status of the species).

C.   The BiOp did not ignore information regarding prior consultations.

Although Plaintiffs previously argued that prior projects should have been considered for the purposes of setting a take limit, Dkt. 98 at 42, they now expand that argument to say that FWS should have considered this information in analyzing the impacts on species. Dkt. 104 at 27. Yet they offer no explanation for how that information would allow FWS to predict take with reasonable certainty or set a meaningful trigger for reinitiation. The technical assistance process, however, allows for a meaningful review of specific projects. Regardless of how Plaintiffs frame the issue, FWS considered information presented in EPA's BE about ESA consultations triggered by federal wetlands permitting between 2014 and 2018 and incorporated it into the BiOp. FWS-006091; FWS-006094. Thus, FWS did not ignore the information; it just did not utilize it in the way that Plaintiffs now demand.

Here, the agencies recognized that prior consultations provided information about the types of impacts from specific past projects and were used to approximate the number and type of permitting activities that could occur over the next five years. Dkt. 99 at 77, 78 n.26. But, as explained in the BiOp, FWS determined that it did not have the information to allow it to predict *future* Section 404 permit applications, including the nature of the proposed activities, their locations, or their potential overlap with listed species or designated critical habitat. FWS-006093. As the Second Circuit explained, an agency is authorized to determine that there is no best data available and defer consideration of impacts to the site-specific permitting process. *See Cooling Water Intake Structures*, 905 F.3d at 73–74. This BiOp used this exact approach, and FWS is entitled to deference on this point.

Finally, Plaintiffs allege in Claim 12 that EPA failed to consult on ESA-listed sea turtles and their designated critical habitats under FWS's jurisdiction. Dkt. 77 (Am. Compl. ¶¶ 288–294).

Plaintiffs' opening brief contained limited argument on this point and their reply brief does not improve the matter. First, Plaintiffs state, without support, that nesting sea turtles will be disturbed by development that occurs as a result of the issuance of State 404 permits. Dkt. 104 at 29-30. But Plaintiffs have not identified any habitat that would be in or near assumed waters, which is the basis of the action area under review. FWS-006076 (the action area consists of, and is limited to, State-assumed waters and areas affected directly or indirectly by the action). In short, Plaintiffs' argument is purely speculative. Further, while Plaintiffs' most recent submission accuses *FWS* of failing to consider impacts to sea turtles, Claim 12 is asserted against *EPA*, alleging that the agency failed to consult as to nesting sea turtles. *Compare* Dkt. 104 at 29–30 *with* Dkt. 77 (Am. Compl. ¶¶ 288–94).[16] Having failed to make any cognizable argument on Claim 12 or convincing arguments on Claim 3, the Court should enter judgment for Federal Defendants.

## VII. The Court Should Reject Plaintiffs' Arguments Regarding the ITS.

Plaintiffs assert three arguments against the Incidental Take Statement ("ITS"). As explained below, none of them provides any reason to depart from the sound analysis outlined in *Cooling Water Intake Structures*, which rejected many of the same arguments that Plaintiffs make here and held that a similar approach to take was legally permissible. This Court should reject Plaintiffs' efforts to obtain a different result.

---

[16] Plaintiffs misquote Federal Defendants as saying that FWS considered "all ESA-*listed* species and their critical habitat." Dkt. 104 at 30. Federal Defendants actually stated that the BiOp includes "all ESA-*considered* species and their critical habitat." Dkt. 99 at 70 (emphasis added). Federal Defendants previously explained that they were using "ESA-considered species" as the BiOp defined that phrase. *Id*. at 31 n.11. The BiOp in turn used the term as it was defined in the BE, which was limited to such species within the action area. FWS-005647. Nevertheless, the Memorandum of Understanding ("MOU") and the BiOp require FWS to review a project's impact on any ESA-listed species during the technical assistance process' species coordination review, which applies to all listed species or designated critical habitat that may be present in the project area. FWS-006015; FWS-006067; *see also* FWS-006083 (requiring current list of ESA-listed species to be used when reviewing permit application).

A.  The BiOp and ITS reasonably explained the absence of a take limit.

As previously explained, an ITS that has no numerical cap is considered adequate if it explains why it was impracticable to express a numerical measure of take. *See* Dkt. 99 at 76–77; *cf. Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 498–99 (D.D.C. 2014). FWS explained in the BiOp that it was unable to anticipate the locations of future state Section 404 permit applications, thus, it could not conduct a site-specific or species-specific analysis to estimate the number of individuals that may be affected by the permitted activities. FWS-006081; FWS-006107. Project-specific information will be provided to FWS in the future because Florida must provide all State Section 404 permit applications to FWS. FWS-006107–08. This will afford FWS the opportunity to appropriately evaluate project effects on a project-specific and species-specific basis. FWS-006108. The Second Circuit held in *Cooling Water Intake Structures* that this approach complied with the law, given the paucity of information and the agencies' commitment to the technical assistance process. 905 F.3d at 77; *see also* Dkt. 99 at 78. Considering this persuasive authority, Plaintiffs overstate their contention that there is no support for an agency's decision not to set a take limit. *See* Dkt. 104 at 30–31.

Plaintiffs continue to insist that FWS should have relied on information about past consultations on Section 404 permits to predict potential future incidental take, arguing only that FWS's explanation for its programmatic approach "rings hollow." Dkt. 104 at 31. Yet the BiOp explained that there was substantial uncertainty about the number, location, timing, frequency, and intensity of regulated activities. FWS-006081. Indeed, approval of Florida's request would result in FDEP regulating a broad array of activities conducted over several geographic areas and for long periods of time. *Id*. Prior consultations provide information about impacts from past projects, not projects that will be proposed and considered in the future. Plaintiffs' effort to force FWS to

make projections and estimates when FWS has determined that it does not have sufficient data has no legal support. *See Cooling Water Intake Structures*, 905 F.3d at 73–74. Plaintiffs' reliance on *WildEarth Guardians v. U.S. Army Corps of Engineers*, 429 F. Supp. 3d 1224 (D.N.M. 2019), to suggest that FWS should have done otherwise is misplaced. The programmatic biological opinion in that case designated numerical take limits for three species, but the parameters of the action under review (replacement of levees along 43 miles of the Rio Grande River) were known and defined, thus a numerical take calculation was possible. *Id*. at 1261–62.[17]

Thus, FWS's decision to defer decisionmaking on take limits to the technical assistance process was reasonable and supported by persuasive authority.

B. The ITS contains a reasonable reinitiation trigger.

As previously explained, FWS considered the extent to which there would be sufficient processes to monitor or evaluate adverse effects on ESA-considered species and critical habitat, and to monitor and enforce permit compliance. FWS-006081; *see* Dkt. 99 at 79. If FWS's assumptions about those processes prove incorrect or warrant changes to implementation of the State program, it could affect the validity of the analysis and trigger reinitiation of consultation if effects occur that were not considered. *See* FWS-006111 (reinitiation notice); FWS-006110 (Term and Condition 9, which is specifically incorporated by reference in the reinitiation notice). Notwithstanding Plaintiffs' arguments, on its face, this language provides a reasonable and appropriate reinitiation trigger.

---

[17] Importantly, the biological opinion in that case noted that there were uncertainties associated with a habitat loss estimate that would require future analysis. *WildEarth Guardians*, 429 F. Supp. 3d at 1267. The court rejected the plaintiffs' claims that FWS improperly segmented its analysis by including a term and condition that required the action agency to conduct ongoing monitoring, modeling and analysis to address that uncertainty, demonstrating that any parallels between this case and *WildEarth Guardians* run in favor of Federal Defendants, not Plaintiffs. *Id*. at 1267–68.

Plaintiffs' argument that there is no "measurable standard" for determining when an authorized amount of take has been exceeded at the programmatic level improperly implies that there are no measures in place for tracking take that may occur across all permits. Dkt. 104 at 32. But Term and Condition 8 requires FDEP to provide an annual report to FWS. FWS-006110. The annual report must summarize the number and types of State 404 permits issued or denied, including data on impacts to ESA-listed species or critical habitat. *Id*. The report must include a table that identifies all ESA-listed species taken by State 404 permitted activities along with the amount or extent of such take.[18] *Id*. This mandate works together with Term and Condition 9, which requires FDEP to reopen a permit and coordinate with FWS "[i]f prior to the completion of a permitted activity, new information (e.g. listing of new species, new critical habitat, or modifications to permitted activity) shows that the magnitude of impacts to listed species is greater than originally anticipated by USFWS, or that the amount of incidental take originally anticipated by USFWS is exceeded[.]" FWS-006110. Term and Condition 9 is incorporated by reference in the reinitiation notice. *See id*.[19] Clearly, these measures are intended to allow FWS to track take on an ongoing basis and more than satisfy the ESA's requirements. *Ctr. for Biological Diversity v. FWS*, 807 F.3d 1031, 1045–46 (9th Cir. 2015); *In re: Operation of Missouri River System Litigation*, 421 F.3d 618, 635 (8th Cir. 2005) (under jeopardy analysis, FWS is not required to guarantee success of the plan: it must simply have a rational basis to expect it to work); *see Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1084 (D.C. Cir. 2017) (the ESA does not demand certainty).

---

[18] Additional requirements are in place in the event that a permittee locates dead or injured ESA-listed species. *See* FWS-006110 (Term and Condition 10).

[19] Federal Defendants did not "misleadingly cite" the language of Term and Condition 9 "to suggest that USFWS would reinitiate consultation for the programmatic BiOp," even though the process outlined in that term and condition refers only to individual permits. Dkt. 104 at 32 n.10. Federal Defendants cited the language of Term and Condition 9 because the reinitiation notice incorporates it by reference. FWS-006111.

Finally, the reinitiation notice states that the listing of a new species or critical habitat shall not trigger reinitiation of consultation on approval of Florida's assumption of the Section 404 program. FWS-006111. This, of course, is because EPA transferred administration of the Section 404 program to Florida. FWS-006111. As previously explained, the State Section 404 program's species coordination framework requires a current list of ESA-listed species be used when a State Section 404 permit application is received. FWS-006083. Thus, any effects to newly listed species or their critical habitat will be considered and addressed through the technical assistance process. The use of a current list of threatened and endangered species will enable the State 404 review process to adapt to future changes to the list of species listed as threatened or endangered under the ESA. FWS-006111. Plaintiffs' criticisms of this approach are nothing more than re-hash of their general arguments against the BiOp's programmatic structure. The Court should reject them.

   C.   The ITS contained appropriate terms and conditions.

Plaintiffs continue to argue that the ITS's terms and conditions are not "meaningful." Dkt. 104 at 33. Notwithstanding Plaintiffs' characterizations, the ITS's terms and conditions comply with the law. As previously explained, the ESA does not mandate any particular form or content for "reasonable and prudent measures." Dkt. 99 at 80. The ESA directs only that a biological opinion authorizing incidental take specify the measures "that the Secretary considers necessary or appropriate" to minimize the impact of the incidental taking. 16 U.S.C. § 1536(b)(4)(C)(ii); *see Cooling Water Intake Structures*, 905 F.3d at 77. The ESA also vests FWS with broad discretion under the statutory phrase "terms and conditions," which are those necessary to comply with the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4)(C)(iv).[20]

---

[20] Here, Plaintiffs again mischaracterize Federal Defendants' prior arguments as stating that reporting is the only term and condition that must be included in an ITS. Dkt. 104 at 33. This is not what we said: Federal Defendants' opening brief stated that the only *example* of terms and

Further, the ITS's terms and conditions ensure that meaningful review and monitoring is required. The ITS requires EPA to use its authorities under the CWA to minimize impacts to listed species pursuant to its oversight of the State's 404 program. *See* Dkt. 99 at 80. While Plaintiffs complain that FWS did not fulfill its duty to impose terms and conditions because this requirement does nothing more than direct compliance with existing law,[21] Dkt. 104 at 35, these arguments mischaracterize the structured framework of the species coordination process in which FDEP, the Florida Fish and Wildlife Conservation Commission, and FWS will engage in the technical assistance process outlined in their Memorandum of Understanding. *See* Dkt. 99 at 80–81. In *Cooling Water Intake Structures*, the Second Circuit held that EPA's use of its authorities under the CWA to minimize impacts; various administrative conditions, including a detailed annual reporting requirement; and EPA's commitment to ask for permits to be reopened if the consulting agencies determined that a facility's operations may have more than minor detrimental effects on listed species were adequate terms and conditions. 905 F.3d at 77. Similarly, the court held that the consulting agencies' reliance on EPA's continued oversight authority under the CWA and the binding technical assistance process were meaningful attempts to minimize incidental takings

---

conditions given in the ESA and its implementing regulations is "reporting requirements." Dkt. 99 at 81 (citing 16 U.S.C. § 1536(b)(4)(C)(iv); 50 C.F.R. § 402.14(i)(1)(iv); *id*. § 402.14(i)(3)). Consistent with these authorities, the ITS's terms and conditions impose a detailed reporting requirement. *See id*.

[21] Plaintiffs vaguely state in a footnote that EPA "does not have input on the issuance of already promulgated state general permits or the State's no permit required decisions." Dkt. 104 at 35 n.13. But Florida's application included a program description of general permits issued before the State assumed its Section 404 program, *see generally* FWS-002916, and (as demonstrated by Plaintiffs' recent filing) EPA has requested information about "no permit required" decisions made after December 2020. *See* Dkt. 104-1 at Ex. A & B. Plaintiffs then appear to contradict themselves elsewhere, with their statement that the technical assistance process "only deals with individual permits and new general permits." Dkt. 104 at 36. Plaintiffs also continue to mischaracterize FWS's participation in the species coordination process as optional, *id*. at 35 n.13, even though Federal Defendants have explained why that argument is speculative. *See* Dkt. 99 at 71–72; Section VIII.B, *infra*.

associated with the project and, therefore, appropriate reasonable and prudent measures. *Id*. These principles apply with equal force here, and directly contradict Plaintiffs' argument that the terms and conditions were inadequate and that FWS failed to fulfill its statutory duty on this point.

## VIII.   The Technical Assistance Process Complies with the Law.

Plaintiffs reiterate their earlier arguments regarding the technical assistance process, contending that FWS should have addressed the action as a whole and attacking FWS's programmatic approach to the consultation. Federal Defendants already have addressed these arguments at length, Dkt. 99 at 70–76, but briefly address them again below.

A.   Plaintiffs' attacks on the technical assistance process regurgitate their attacks on the programmatic approach.

The BiOp explained that FWS did not have information to allow it to predict every future Section 404 permit application, its location, or its potential overlap with listed species or designated critical habitat. FWS-006092–93. Thus, FWS consulted with EPA on EPA's approval of Florida's request to assume its CWA 404 program, not the actual issuance of permits for dredge and fill activities in assumed waters. *See id*. Federal Defendants previously explained how the action was defined, how the BiOp addressed the environmental baseline, and how the analysis of effects assessed EPA's oversight authority and the structure of its Section 404 program. FWS-006043; FWS-006048; FWS-006084; FWS-006104–05. Contrary to Plaintiffs' insistence, the ESA does not mandate an assessment of effects on a site-specific and species-specific basis where crucial details of future projects are uncertain. *See* Dkt. 99 at 72–73.

Plaintiffs continue to push the Court to apply and adopt the approach taken in *Conner v. Burford*, 848 F.2d 1441, 1455 (9th Cir. 1988). Dkt. 104 at 38–39.[22] The holding set forth in *Conner*

---

[22] Plaintiffs also cite *National Wildlife Federation v Brownlee*, 402 F. Supp. 2d 1, 4, 10 (D.D.C. 2005), where the action agency elected not to initiate programmatic consultation before issuing several nationwide permits, but planned to consult with FWS as needed on a site-specific basis. In

is not universally accepted. *See Defs. of Wildlife v. Dep't of the Navy,* 733 F.3d 1106, 1121 (11th Cir. 2013) ("[T]he rule that biological opinions must be coextensive in scope with the 'entire action' or else violate the ESA is nowhere to be found in the language of the ESA and we decline to adopt that rule here." (citations omitted)). ESA Section 7(a)(2) "simply directs the federal agency to 'insure' in consultation with [the Services] that its actions are not likely to jeopardize the existence of listed species or their critical habitat . . . . It is for the agencies to determine how best to structure consultation to fulfill Section 7(a)(2)'s mandate." *Id.*[23]   The Second Circuit specifically adopted this reasoning in *Cooling Water Intake Structures. See* 905 F.3d at 73.

Even if *Conner* were the applicable law, it is distinguishable.[24] First, *Conner* involved an action where the future phases of activity would be federal actions. That is not the case here, where the future actions are not EPA actions. Indeed, to accept Plaintiffs' arguments would require FWS to first predict, then quantify and provide a site-specific analysis of each permit expected for the duration of the State's Section 404 program—in other words, the equivalent of subsequent site-specific Section 7 consultations for every future permit for an unknown period. Such a feat would

---

other words, the action agency skipped the very step that EPA took when it initiated consultation on its action here. *Brownlee* can easily be distinguished, given the consultation and resulting BiOp here and the agencies' commitment to the technical assistance process.

[23] The other cases on which Plaintiffs rely (*Greenpeace v. NMFS,* 80 F. Supp. 2d 1137 (W.D. Wash. 2000), and *Center for Biological Diversity v. Salazar,* 804 F. Supp. 987 (D. Ariz. 2011)) also follow *Conner,* thus this Court should reject them for the same reasons expressed in *Defenders of Wildlife v. Dep't of the Navy,* 733 F.3d 1106, 1121 (11th Cir. 2013), and *Cooling Water Intake Structures.* In the remaining cases cited by Plaintiffs, the courts upheld various programmatic biological opinions on the grounds that they sufficiently considered the entire agency action and relied on the best available science. Dkt. 104 at 40. Federal Defendants have explained at length that FWS also identified the best available science (or lack thereof). *E.g.*, Dkt. 99 at 69, 72–73.

[24] Federal Defendants already addressed Plaintiffs' reliance on *North Slope Borough v. Andrus,* 642 F.2d 589 (D.C. Cir. 1980), and other cases cited by Plaintiffs, in our opening brief. Dkt. 99 at 73–74. Plaintiffs' most recent filing relies on *North Slope* in the same way as they did in their opening brief, Dkt. 99 at 46 and Dkt. 104 at 38, and so Federal Defendants rest on their prior discussion of that case.

be impossible since EPA, Florida, and FWS cannot predict every future Section 404 application, its location, and potential overlap with listed species or designated critical habitat. More importantly, that is not required here, where FWS reasonably established a programmatic analysis that evaluates the entire scope of EPA's action.

Importantly, what Plaintiffs believe should be part of the BiOp's analysis actually contravenes the Congressional design of the CWA. The very crux of the alleged adverse impacts at issue in the Supreme Court's decision in *Home Builders* was the loss of site-specific consultation on individual permits that would come with transfer of the National Pollutant Discharge Elimination System ("NPDES") program to Arizona. But, as FWS recognized in that biological opinion, "the absence of the section 7 process . . . reflects Congress' decision to grant States the right to administer these programs under state law." *Home Builders*, 551 U.S. at 654. For this reason alone, Plaintiffs' reliance on the segmentation/"entire agency action" cases is misplaced, because there is no future EPA action upon which consultation would be required. *See, e.g.*, *Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*, 482 F. Supp. 2d 1248, 1266, 1267 n.9 (W.D. Wash. 2007) (distinguishing *Home Builders* from the "phased biological opinion" case law because the transfer of the NPDES program to the State would have precluded further site-specific consultation).[25] Nor is Plaintiffs' reliance on examples of biological opinions issued for oil and gas activities on the Outer Continental Shelf helpful. *See* Dkt. 104 at 40–41. Even Plaintiffs acknowledge that such activities occur pursuant to a structured statutory scheme that dictates the phases of leasing, exploration, and development. *See* Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq.*; Dkt. 104 at 38–39. Thus, for reasons similar to those previously explained (Dkt.

---

[25]   The programmatic biological opinion for activities in Florida and the Caribbean cited by Plaintiffs appears to fall into this category as well.  *See* Dkt. 104 at 41 n.19.

99 at 78), the biological opinion cited by Plaintiffs is a poor comparative for the Section 404 permit applications at issue in this case, the number and location of which were unknown at the time the BiOp was prepared. Dkt. 104 at 41 n.19. In short, FWS's approach was reasonable and appropriate.

B. The binding technical assistance process incorporates the ESA's standards.

Plaintiffs have side-stepped Federal Defendants' prior arguments and continue to insist that FWS's involvement is optional and that it will not apply the ESA's "rigorous processes and standards." Dkt. 104 at 42–46. Yet, in repeating their inaccurate characterizations of the BiOp, Plaintiffs overlook its plain language and the legal authority that supports it.

First, as previously explained, the agencies' commitments to the technical assistance process are entitled to a presumption of regularity. Dkt. 99 at 70–71. The BiOp's no-jeopardy conclusion is conditioned on compliance with specific procedures that are part of the description of the action and the agencies' commitment to them. FWS-006106–07. The agencies must abide by the commitments made and considered in the BiOp. FWS-006104–05. In *Cooling Water Intake Structures*, the Second Circuit rejected the same arguments that Plaintiffs make here precisely because that biological opinion's no-jeopardy finding was conditioned on compliance with certain procedures. 905 F.3d at 72. Here, the technical assistance process is not voluntary for any of the agencies. It plainly binds the agencies and that should be the end of the matter.

Second, the purpose of the technical assistance process is to allow FWS to determine if State-issued 404 permits are likely to jeopardize species or destroy or adversely modify critical habitat. FWS-006056–57. Plaintiffs ignore this plain language when they argue that FWS's evaluation of permit applications is "unbound from the requirements [and] standards" set forth in the ESA. Dkt. 104 at 43. The standard that FWS will apply in its review of permits is expressly stated in the BiOp and clearly incorporates the meaning of the terms from the ESA and its

implementing regulations. *See* FWS-006056–57; FWS-006067 (federal regulations and State 404 applicant handbook prohibit issuance of a State 404 permit that is likely to jeopardize ESA-listed species). The Second Circuit rejected the same arguments that Plaintiffs make here, declining to find that the technical assistance process was "not designed to provide meaningful species protection." *See* 905 F.3d at 72, 76.[26]

Finally, Plaintiffs ignore key aspects of the technical assistance process and relegate FWS's role to "receiving and reviewing permits or providing information in response to the State's preliminary determination as to impacts on species." Dkt. 104 at 44–46. As previously explained, FWS's final conclusions regarding potential impacts and necessary measures to address impacts are "determinative." FWS-006058; FWS-006067–68. Similarly, Plaintiffs' contention that the species review process terminates upon the State's determination that an application will have no adverse impacts on ESA-considered species ignores that FWS has multiple opportunities throughout the process to insert itself for the benefit of such species. *See* Dkt. 99 at 71–72.

## IX.    EPA's Reliance on the BiOp Was Reasonable.

In their effort to argue that EPA's reliance on the BiOp was unreasonable, Plaintiffs overlook governing case law and urge this Court to apply an incorrect standard. Dkt. 104 at 49-51. "[T]he critical question is whether the action agency's reliance was arbitrary and capricious, not whether the BiOp itself is somehow flawed." *City of Tacoma v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006). Here, Plaintiffs characterize the BiOp as "facially invalid" and "facially unlawful," Dkt.

---

[26] Plaintiffs also argue that the availability of a citizen lawsuit to enforce ESA Section 9's take prohibition does not "solve the problems with the technical assistance process." Dkt. 104 at 46. The Second Circuit specifically held otherwise, stating that, if the agencies failed to honor the obligations of the technical assistance process in that case, environmental groups "may challenge individual permits pursuant to the ESA's citizen-suit provisions once those permits issue." *Cooling Water Intake Structures*, 905 F.3d at 72.

104 at 51, 50, but this faulty premise improperly frames the question around the BiOp, rather than EPA's reliance on it. Indeed, by criticizing Federal Defendants for "fail[ing] to cite a case that finds reliance on a facially invalid BiOp to have been lawful," Dkt. 104 at 51, Plaintiffs prove the point: they are stating the wrong test, and the "bright-line rule" that they would have the Court adopt, Dkt. 104 at 49, simply has no legal support.

In citing *Shafer & Freeman Lakes Environmental Conservation Corp. v. FERC*, 992 F.3d 1071, 1093 (D.C. Cir. 2021), Plaintiffs ask the Court to misapply the case. One need only review *Shafer* to see that Plaintiffs completely skip the portion of that decision that applies *City of Tacoma* and discusses the action agency's reasonable reliance on the biological opinion, *see Shafer*, 992 F.3d at 1093, and instead cite the discussion of whether there was sufficient explanation of whether a proposed reasonable and prudent measure qualified as a minor change under 50 C.F.R. § 402.14(i)(2). *See Shafer*, 992 F.3d at 1094–96; Dkt. 104 at 49 n.25 (citing *Shafer*, 992 F.3d at 1096)). The former is relevant; the latter is not. *City of Tacoma* supplies the governing standard: the law does not require EPA to "'undertake a separate, independent analysis' of the issues addressed in the BiOp." 460 F.3d at 75. Rather, it requires Plaintiffs to point to new information that the consulting agency did not consider, which they have failed to do. For these reasons and those previously stated, Dkt. 99 at 82–83, EPA rationally relied on the BiOp and the Court should grant judgment for EPA on Claim 10.

## X.   EPA Made a Reasonable "No Effect" Determination for NMFS-listed Species.

As previously argued, EPA made a "no effect" determination, thereby fulfilling its procedural obligation to review its action and determine whether consultation with NMFS was required. *See* 51 Fed. Reg. 19926, 19945 (June 3, 1986); *NRDC v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998) (describing action agency's obligations under the ESA before initiating any action

in an area that contains threatened or endangered species or critical habitat); *see also Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 923–24 (9th Cir. 2020) (upholding agency's "no effect" determination); Dkt. 99 at 82–85. EPA already has explained, both in correspondence to Plaintiffs and in Federal Defendants' earlier brief, that it is preparing a biological evaluation and effects determinations for NMFS-listed species and critical habitats within that determination. Dkt. 99 at 85. EPA's work is ongoing and includes coordination with NMFS. *See id*.; *see also* Dkt. 99, Ex. B. We rest on our earlier submission on this issue: should the Court determine that EPA's initial "no effect" determination was not reasonable, the agency's ongoing work should provide a more fulsome analysis and resolve the matter.

## CONCLUSION

For these reasons, the Court should enter summary judgment for Federal Defendants on Plaintiffs' Claims One through Seven and Ten through Thirteen.

Respectfully Submitted,

Dated: June 30, 2023                    TODD KIM

Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

/s/ Andrew S. Coghlan
Andrew S. Coghlan (CA Bar 313332)
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 514-9275
Fax: (202) 514-8865
Email: andrew.coghlan@usdoj.gov

Alison Finnegan (PA Bar 88519)
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section

P.O. Box 7611
Washington, DC 20044-7611
Tel: 202-305-0500
Email: Alison.C.Finnegan@usdoj.gov

*Attorneys for Federal Defendants*

**Certificate of Service**

I certify that on June 30, 2023, I filed the foregoing with the Court's CMS/ECF system, which will notify each party.

/s/Andrew S. Coghlan
ANDREW S. COGHLAN