**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ET AL. | |
| Plaintiffs, | |
| v. | CASE NO. 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL. | |
| Defendants, | |
| STATE OF FLORIDA, ET AL. | |
| Intervenors. | |

———————————————

**STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL
PROTECTION'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY
JUDGMENT**

———————————————

## TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................................................1

ARGUMENT ......................................................................................................................5

    I.     Plaintiffs' Claims Are Not Justiciable. ................................................... 5

          A.     Informational Injury Does Not Provide Standing Here. ............................6

          B.     Plaintiffs Lack Standing to Challenge EPA's Early Finding that Florida's Application Was "Complete."....................................................12

          C.     Plaintiffs' Attempt to Show Standing Based on "Restrictive Access" to Florida Courts Fails. ............................................................12

          D.     Standing Based on "Aesthetic and Recreational Interests" Also Fails....................................................................................................16

          E.     Plaintiffs Lack Standing to Challenge Florida's Program on the Basis of Criminal Enforcement or Statute of Limitations. ........................17

    II.    Several of Plaintiffs' Claims Are Not Ripe. ......................................... 20

          A.     Take Liability Claims Are Not Ripe For Review (Claims 3 and 4). .........20

          B.     Plaintiffs Challenge to the "Retained Waters" List Is Not Ripe (Claim 7). ..............................................................................................23

          C.     Plaintiffs' NMFS-Based Claims Are Not Ripe (Claims 5, 11, and 12). ..........................................................................................25

CONCLUSION...................................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs v. Gardner*,
   387 U.S. 136 (1967)..................................................................................................20

*Am. Legion v. Am. Humanist Ass'n*,
   139 S. Ct. 2067 (2019)...............................................................................................5

*Association of American Physicians & Surgeons, Inc. v. Sebelius*,
   901 F. Supp. 2d 19 (D.D.C. 2012) ..........................................................................10

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971), *abrogated on other grounds*,*Califano v. Sanders*,
   430 U.S. 99 (1977)................................................................................................2, 17

*Cooling Waters v. EPA*,
   905 F.3d 49 (2d Cir. 2018)........................................................................................21

*Clapper v. Amnesty International USA*,
   568 U.S. 398 (2013)...................................................................................................16

*Clean Wisconsin v. EPA*,
   964 F.3d 1145 (D.C. Cir.), *judgment entered*, 812 F. App'x 4 (D.C. Cir. 2020) .....................4

*Coal. to Save Menominee River Inc. v. EPA*,
   423 F. Supp. 3d 560 (E.D. Wis. 2019)......................................................................24

*Crow Creek Sioux Tribe v. Brownlee*,
   331 F.3d 912 (D.C. Cir. 2003) ..................................................................................17

*Ctr. for Biological Diversity v. Zinke*,
   369 F. Supp. 3d 164 (D.D.C. 2019).......................................................................6, 10

*Dallas Safari Club v. Bernhardt*,
   518 F. Supp. 3d 535 (D.D.C. 2021) ..........................................................................14

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008)....................................................................................................5

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA*,
   785 F.3d 1 (D.C. Cir. 2015) ........................................................................................4

*Gen. Elec. Co. v. EPA*,
   360 F.3d 188 (D.C. Cir. 2004) ..................................................................................14

*Lake Brooklyn Civic Ass'n, Inc. v. St. John's River Water Mgmt. Dist.*,
  1993 WL 943540 (Fla. Div. Admin. Hrgs. 1993) ................................................... 14

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................... 5

*McCray v. Biden*,
  574 F. Supp. 3d 1 (D.D.C. 2021) ......................................................................... 20

*Menominee Indian Tribe of Wis. v. EPA*,
  947 F.2d 1065 (7th Cir. 2020) ............................................................................. 24

*Mississippi v. EPA*,
  744 F.3d 1334 (D.C. Cir. 2013) ........................................................................... 13

*Mozilla Corp. v. FCC*,
  940 F.3d 1 (D.C. Cir. 2019) ................................................................................. 19

*Nat'l Ass'n of Clean Air Agencies v. EPA*,
  489 F.3d 1221 (D.C. Cir. 2007) ........................................................................... 14

*Nat'l Ass'n of Clean Water Agencies v. EPA*,
  734 F.3d 1115 (D.C. Cir. 2013) ........................................................................... 13

*New Hanover Twp. v U.S. Army Corps of Eng'rs*,
  992 F.2d 470 (3d Cir. 1993) ................................................................................. 22

*Oceana, Inc. v. Evans*,
  384 F. Supp. 2d 203 (D.D.C. 2005) ..................................................................... 24

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998) ........................................................................................ 20, 24

*Paul Still v. New River Solid Waste Ass'n & FDEP*,
  2001 WL 1917255 (Fla. Div. Admin. Hrgs. 2001) ............................................... 14

*Rapanos v. United States*,
  547 U.S. 715 (2006) ............................................................................................... 1

*Sackett v. EPA*,
  598 U.S. 590 (2023) ........................................................................................... 1, 11

*Sierra Club v. EPA*,
  292 F.3d 895 (D.C. Cir. 2002) ............................................................................ 3, 5

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ............................................................................................... 5

*Sugar Cane Growers Cooperative of Fla. v. Veneman*,
　289 F.3d 89 (D.C. Cir. 2002) ................................................. 12

*Texas v. United States*,
　523 U.S. 295 (1998) ............................................................ 20

*TransUnion LLC v. Ramirez*,
　141 S. Ct. 2190 (2021) ................................................. 5, 7, 8, 10

*Waterkeeper Alliance, Inc. v. Regan*,
　41 F.4th 654 (D.C. Cir. 2022) ........................................... 6, 7, 8

*WildEarth Guardians v. Jewell*,
　783 F.3d 298 (D.C. Cir. 2013) ............................................... 19

*Wyoming Outdoor Council v. Dombeck*,
　148 F. Supp. 2d 1 (D.D.C. 2001) ....................................... 21, 22

## Statutes & Codes

16 U.S.C. § 1540(g) ............................................................... 23

33 U.S.C. § 1319 .................................................................... 18

33 U.S.C. § 1344(k) ............................................................... 18

33 U.S.C. § 1344(n) ............................................................... 18

Public Law No. 118-5, 137 Stat. 10, 41 (2023) ............................ 11

Fla. Stat. § 379.2291 ................................................................ 2

Fla. Stat. § 403.412(2)(f) ........................................................ 14

Fla.Stat. § 403.412(7) ............................................................ 15

## Other Authorities

A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17
　Suffolk U. L. Rev. 881, 882 (1983) .......................................... 5

Dep't of Justice, *Justice Manual*, available at https://www.justice.gov/jm/jm-5-12000-
　environmental-enforcement-section#5-12.523 (last visited July 7, 2023) .............. 19

Fla. Const. Art. V, § 21 ........................................................... 13

## INTRODUCTION

The State of Florida and the Florida Department of Environmental Protection (FDEP) (collectively, "Florida Intervenors") concur with Federal Defendants that Plaintiffs' challenge lacks merit. Consistent with Section 404 of the Clean Water Act (CWA) and its cooperative federalism design, the U.S. Environmental Protection Agency (EPA) properly approved Florida's Section 404 Program almost three years ago. Today, FDEP has primary responsibility for administering the Section 404 Program in assumable waters within Florida, with EPA consistently reviewing FDEP's program as well as reviewing individual permits. In the implementation of the program, FDEP, the State's five water management districts, and the Florida Fish and Wildlife Conservation Commission (FWC) cooperate and coordinate with EPA, the U.S. Army Corps of Engineers (Corps), and the U.S. Fish and Wildlife Service (FWS) to ensure that state-assumed waters in Florida and all listed species are protected in the manner required by Section 404 of the CWA and the Endangered Species Act (ESA), respectively.

With regard to water resources protection, Florida's Section 404 program regulates dredge and fill activities impacting the "waters of the United States" (WOTUS) for which the State has assumed primary authority, while Florida also administers a separate state wetlands program – the "Environmental Resource Permit (ERP) Program" – that provides regulatory protection for *all waters* in the State irrespective of whether they fall within the narrower (and often disputed[1]) WOTUS category. Likewise, with regard to species protection, Florida adopted its own state

---

[1] *See Sackett v. EPA*, 598 U.S. 590, 603 (2023) (recounting long track record of confusion over the proper understanding of "waters of the United States," rejecting definitions built on the notion of "significant nexus," and adopting Justice Scalia's definition from *Rapanos v. United States*, 547 U.S. 715 (2006) (plurality)).

endangered species protection law decades ago to avoid and minimize impacts to listed species.[2]

In furtherance of its own federal ESA Section 7 obligations, FWS issued a Biological Opinion (BiOp) with an Incidental Take Statement (ITS) in conjunction with EPA's review and approval of Florida's Section 404 Program. This BiOp/ITS provides reasonable assurance that no permitted action under Florida's Section 404 program would jeopardize listed species or adversely modify critical habitat, so long as the protective measures adopted in the BiOp/ITS are followed by the agencies.[3] This includes a "technical assistance process" that ensures an effective and lawful coordination mechanism for federal and state agencies to cooperate in the protection and conservation of listed species. Dkt. 99 at 70-76; Dkt. 106 at 42-46. The administrative record in this case strongly supports EPA's decision to approve Florida's Section 404 Program and also strongly supports the BiOp/ITS issued in conjunction with that approval. Accordingly, for the reasons set forth in Federal Defendants' briefs (Dkt. 99; Dkt. 106), this Court should enter judgment in favor of Federal Defendants and Florida Intervenors as to all claims in this case.

Yet, as Florida Intervenors have also demonstrated, this Court need not (and should not) reach the merits of most, if not all, of Plaintiffs' claims. Plaintiffs do not suffer cognizable harm sufficient for standing by the mere transfer of primary permitting responsibility from the Corps to FDEP, especially where EPA maintains continuous oversight at both a program level and on a permit-by-permit basis. Across the waterfront of Plaintiffs' broad-based challenge to virtually all aspects of Florida's program, they have identified no claims for which they suffer cognizable harm.

---

[2] The Florida Endangered and Threatened Species Act is codified at Fla. Stat. § 379.2291 and adopts the "policy of [Florida] to conserve and wisely manage these resources, with particular attention to those species defined by the Fish and Wildlife Conservation Commission, the Department of Environmental Protection, or the United States Department of Interior, or successor agencies, as being endangered or threatened."

[3] Agencies are entitled to a presumption of regularity. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977).

The baseline against which to measure harm is the Corps' administration of the program, and here, Plaintiffs have not shown a single situation where the Corps would decide a permit differently than Florida in a way that presents a unique cognizable injury. Subtle purported differences in criminal enforcement cannot be the basis of that harm, nor can contrived gaps in "environmental information" since Florida's program provides the same or similar environmental information to the public (and actually more information is available on a real-time basis than in the federal permitting system). Many other claims are simply not ripe for review. Therefore, Plaintiffs have not met their burden of demonstrating that each separate claim is justiciable now.

Florida Intervenors' opening brief (Dkt. 102) enclosed a Declaration of Justin Wolfe, FDEP General Counsel, addressing Plaintiffs' factual assertions related to standing. *See* Dkt. 102-1 ("Wolfe Dec."). In their reply, Plaintiffs try to rehabilitate their standing arguments through various legally and factually flawed arguments but the bulk of their standing arguments in the reply brief are based upon a new set of declarations asserting new facts and contesting aspects of Mr. Wolfe's declaration. Dkt. 105 at 90-106. Many assertions in Plaintiffs' new declarations are incorrect.[4]

But more importantly, Plaintiffs' new declarations submitted at the reply brief stage should not be considered by this Court. *See Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). As previously noted, Plaintiffs were obliged to include *in their opening briefs* sufficient evidence to demonstrate standing (where it is not self-evident) in order to meet their burden of proof. Dkt. 102 at 36-37. "Absent good cause shown," Plaintiffs should not expect this Court to allow them to submit new evidence of standing in a reply brief. *Sierra Club,* 292 F.3d at 900-01. Here, Plaintiffs have not provided good cause to be allowed to supplement their standing declarations on reply, so

---

[4] Florida Intervenors concur with Federal Defendants that Plaintiffs' arguments "misstate the record, misstate the law, or misstate both." Dkt. 106 at 9.

those new declarations should be ignored. While "*Sierra Club* is not a gotcha trap,"[5] Plaintiffs knew standing was a key hurdle in this case ever since Florida filed its cross-motion to dismiss over two years ago.  See Dkt. 36-37.  Thus, Plaintiffs should not be permitted to rehabilitate their standing declarations at this late stage.

To the extent this Court considers Plaintiffs' new declarations, Florida Intervenors respectfully request consideration of the Supplemental Declaration of Justin Wolfe ("Wolfe Supp. Dec.") which, among other things, addresses Plaintiffs' new assertions concerning Florida's record of environmental protection generally; Florida's implementation of the Section 404 Program; availability of environmental information; coordination between the Corps and FDEP related to Section 404 program issues; Florida administrative law and avenues for judicial review in state courts; and other topics.[6]

While the merits strongly support Federal Defendants' actions here, this case should be resolved on justiciability grounds. Under that scenario, Plaintiffs would remain free to pursue legal challenges as to any particular projects where they have an adequate interest and can demonstrate that the coordinated efforts of the federal and state agencies failed to follow the law.

---

[5] See *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1159 (D.C. Cir.), *judgment entered*, 812 F. App'x 4 (D.C. Cir. 2020) (explaining that a court retains "discretion to look beyond the opening brief and consider material submitted later if the petitioner reasonably believed its standing was self-evident" (quoting *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 8 (D.C. Cir. 2015)).

[6] Florida Intervenors have submitted a supplemental declaration for purposes of contesting Plaintiffs' standing, not on the merits. As Federal Defendants have correctly explained, the merits of this case are governed strictly by the administrative record. Dkt. 99 at 33-34. Further, "[i]nformation concerning Florida's implementation of its Section 404 program is not part of the administrative record. And Plaintiffs do not even attempt to justify the inclusion of post-decision extra-record evidence under one of the 'narrow and rarely invoked' exceptions to record review. Florida's implementation track record is simply not at issue here." *Id.* at 58 (citation omitted).

4

# ARGUMENT

## I.     Plaintiffs' Claims Are Not Justiciable.

Plaintiffs lack standing across the board. They raise nothing more than speculative, non-concrete injuries based on a fundamental misunderstanding of the relevant legal framework. "As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207-08 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek. . . ." *Id.* at 2208. Standing is evaluated based on whether cognizable injury existed at the time of filing of the complaint, not at some distant point in the future. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

"Under Article III, a federal court may resolve only 'a real controversy with real impact on real persons.' … The plaintiff's injury in fact [must] be 'concrete'—that is, 'real, and not abstract.'" *TransUnion*, 141 S. Ct. at 2203-04 (citing, among other cases, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) and *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2103 (2019)). Here, Plaintiffs "must be able to sufficiently answer the question: What's it to you," if Florida – instead of the Corps – has the primary role in administering the Section 404 Program for assumable waters in Florida where EPA retains oversight responsibility? *Id.* at 2203 (quoting A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)). And while Plaintiffs need not prove the merits of their case to demonstrate standing, they must show a "substantial probability" that their cognizable interests will be "adversely affected" by the agency action. *See Sierra Club,* 292 F.3d at 898 ("The organization need not prove the merits of its case — '*i.e.*, that localized harm has in fact resulted from a federal rulemaking' — in order to establish its standing, but it 'must demonstrate that there is a `substantial probability' that

local conditions will be adversely affected' and thereby injure a member of the organization."
(citation omitted)).

With regard to standing for environmental plaintiffs to challenge EPA's approval of a state
environmental program, the most relevant recent D.C. Circuit opinion is *Waterkeeper Alliance,
Inc. v. Regan*, where environmental plaintiffs claimed that EPA's approval of a state coal ash
program was unlawful because EPA had not yet adopted "public-participation guidelines for state
programs" and the state program gave "inadequate public-participation opportunities." 41 F.4th
654, 659, 662 (D.C. Cir. 2022). Though no party raised justiciability concerns, the D.C. Circuit
found *sua sponte* that these claims were not sufficient to support standing. *Id.* at 662. (finding that
"they fail to show that their requested relief would redress their injuries"). With regard to plaintiffs'
claim that the state program allowed for "lifetime permits," which plaintiffs said were not
adequately protective, the D.C. Circuit found that they "fail[ed] to demonstrate imminent injury in
connection with [that claim]." *Id.* at 663.

When evaluating standing based on a "procedural right afforded to them by statute," federal
courts "relax—while not wholly eliminating—the issues of imminence and redressability, but not
the issues of injury in fact or causation." *Ctr. for Biological Diversity v. Zinke*, 369 F. Supp. 3d
164, 176-77 (D.D.C. 2019) (citation omitted). Plaintiffs have not shown standing as to their
substantive claims, nor have they carried their burden of proving standing for procedural claims
built on theories of informational injury.

### A.    Informational Injury Does Not Provide Standing Here.

In their reply brief, Plaintiffs contend that they have standing for "Claims Two, Seven, and
Ten" because "EPA's action threatens harm to ... Plaintiff organizations' access to information
provided through NEPA review and ESA consultation..." Dkt. 105 at 90, 94. They simply claim,
without further explanation, that they "clearly tied their informational harms to Claims Two,

Seven, and Ten."[7] Yet their opening brief only attempted to tie this flavor of environmental informational standing to Claim Two, not Claims Seven or Ten. Dkt. 98 at 78-79. For this kind of informational standing, Plaintiffs' opening brief vaguely refers to Claims One, Two, and Seven in reference to "the harms sustained as a result of EPA's unlawful approval of the state program, as shown above…" Dkt. 98 at 81. This is not enough. Florida Intervenors previously explained why this "environmental information" standing argument fails. Dkt. 102 at 37-42. In their reply, Plaintiffs make several flawed arguments to try to rehabilitate their standing argument.

First, Plaintiffs argue incorrectly that this Court must find informational injury standing for Claim Two simply because this Court found informational standing for Claim Nine. Dkt. 105 at 90-91 and n. 57. In its March 30, 2022 order (Dkt. 73), this Court evaluated standing for purposes of Claim Nine at an early stage addressing a narrow procedural claim. Now, at this stage, Florida Intervenors have sought summary judgment as to all remaining claims and have challenged Plaintiffs' specious claims of informational injury by submitting a factual declaration showing that Plaintiffs do not suffer actual informational harms by virtue of Florida's administration of the Section 404 program. While this Court did find standing for Claim Nine based on the assumption that Plaintiffs' allegations of injury were true, *see* Dkt. 73 at 13, the Court is not bound to apply the same analysis and to reach the same conclusions at this stage particularly given the evidence before the Court regarding the inaccuracies in Plaintiffs' standing declarations.[8] *Waterkeeper*

---

[7] Plaintiffs still make no viable effort – whether in the complaint, the briefs, or the declarations – to tether their alleged informational injuries to specifically numbered claims in their complaint. It is simply inadequate to generally reference a loss of some kinds of information as a basis for any and all claims. *TransUnion*, 141 S. Ct. at 2208 ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek . . . .").

[8] In any event, this Court is always free to reconsider its previous standing analysis in the context of separate claims at separate stages and with the benefit of additional briefing and declarations. In this respect, Florida Intervenors note that this Court's March 31, 2022 opinion did not address

*Alliance*, 41 F.4th at 659-61 (stating that "[courts] have an independent obligation to assure ourselves of our jurisdiction" and finding, where "neither EPA nor Intervenors contest[ed] plaintiffs' standing," that plaintiffs lacked standing to challenge EPA's approval of Oklahoma's coal ash program).

Second, Plaintiffs fail to show at this stage that they have suffered an actual loss of environmental information to the degree required to support Article III standing. While "disclosure of *private* information" may constitute the kind of "intangible harms" that can be sufficiently "concrete" to show standing, *Transunion*, 141 S. Ct at 2204 (emphasis added), this case involves a different kind of *general* environmental information that is part of the public record and not specific to Plaintiffs. In that context, Plaintiffs must do more than assert a vague kind of informational harm; they must show deprivation of specific information as well as show how that deprivation causes them injury. Dkt. 72 at 3-4. Here, however, they do not identify any concrete, non-speculative injury arising from a loss of environmental information to which they are entitled. Florida Intervenors' declarations show that, under Florida's Section 404 program, Plaintiffs may access the same kinds of environmental information (and in fact even get more environmental information more quickly than under the federal program). Dkt. 102-1, at 3-11 ¶¶ 16-30 (Wolfe Dec.); Wolfe Supp. Dec. ¶¶ 9-15.

Third, Plaintiffs' reference to certain pending projects in Florida does not help their standing argument. To support their speculative NEPA-based standing argument, Plaintiffs rely heavily on a comparison between the Corps' 404 permit process for the Troyer Mine project (a proposed limestone mine) and the current FDEP 404 permit process, arguing that, "when the Troyer Mine project was before the Corps, it was determined that an EIS would be required." Dkt.

_____

or discuss the supplemental briefs on informational standing filed by the parties in response to the Court's request days before the opinion was issued. Dkt. 70, 71 and 72.

105 at 93. Plaintiffs' sole support for this comparison is found in one of their declarations (Dkt. 98-1 at 12-13 ¶ 35), which in turn relies on a decade-old letter from the Corps dated July 18, 2011 (Dkt. 31-1, at 240-42).

Contrary to Plaintiffs' claim, however, the Corps' July 18, 2011 letter does not actually say that an "EIS would be required." Instead, the Corps recognizes that, due to changes in the project, the Corps was willing to proceed with an Environmental Assessment (EA). Dkt. 31-1, at 240. Specifically, the Corps recognized that a pre-2011 iteration of the Troyer Mine proposed project triggered an EIS because, in combination with "three projects proposed near regional wetland preserves," the project "cumulatively propos[ed] 418 acres of direct wetland impacts." *Id*. The Corps explained that, since the other three projects were no longer "active" proposals, it was re-evaluating whether an EIS was required. *Id.* ("Based on the reduced cumulative impact, the Corps is willing to conduct a review of your project by means of an [Environmental Assessment]."). Even now, more than a decade later, an EIS is unlikely to be triggered for the currently proposed version of the Troyer Mine project. Wolfe Supp. Dec. ¶ 14. The updated project, as reflected in the FDEP November 5, 2021 public notice, shows that this project proposes approximately 104 acres of wetlands impacts (approximately 25% of the impacts in the original pre-2011 proposal). *Id.*[9] Given the substantial reduction in impacted wetlands acres and the changes in cumulative impact concerns, it seems unlikely that an EIS would be required by the Corps for the project in its present form, if the Corps was still administering the program for assumable waters in Florida. Wolfe Supp. Dec. ¶ 14. Nevertheless, as with the other projects flagged by Plaintiffs as part of their informational injury argument, even a cursory review of the FDEP database shows many hundreds,

---

[9] Another Corps' public notice for the Troyer Mine project dated May 30, 2019 (and available via the database shown in the Wolfe Declaration) explains that the revised project proposes approximately 203 acres of permanent wetland impacts and 11 acres of temporary wetland impacts but does not state whether an EIS or EA would be required.

if not thousands, of pages of environmental information related to the project. These facts further undercut Plaintiffs' speculative assumption that they would be deprived of specific information in legally cognizable respects.

Ultimately, it was Congress – not EPA – which decided that state agencies are not required to prepare an EIS or a Biological Opinion. Dkt. 102 at 38-39. *Association of American Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 42-44 (D.D.C. 2012), is not "inapposite," as Plaintiffs suggest. In that case, a group of physicians challenged an agency action requiring non-Medicare providers to comply with certain "opt-out" procedures before obtaining Medicare reimbursement. 901 F. Supp. 2d at 42-43.[10] But since the Medicare statute already required compliance with opt-out procedures, the court found plaintiffs had no standing, explaining that injuries caused by pre-existing statutes and regulations present a "causation problem" for standing. *Id.* at 42. Plaintiffs are also wrong to evade *Center for Biological Diversity v. Zinke*, 369 F. Supp. 3d 164, 181 (D.D.C. 2019), on the sole basis that it did not involve "informational harm." Dkt. 105 at 92. While the court noted that it did not involve claims of informational injury, the court did, however, highlight a key requirement for such cases; namely, that the plaintiff "identify [a] statute entitling them to any information deprived under the [agency action]." 369 F. Supp. 3d at 181 n.5. NEPA and the ESA expressly provide that they only apply to federal agencies, not state agencies. When deciding whether harm is concrete enough, "[c]ourts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant…" *Transunion*, 141 S. Ct at 2204.

---

[10] In that case, the court looked first to the complaint to see if the alleged injury was referenced there. *Id.* at 42. Of course, here, Plaintiffs' complaint says nothing about NEPA-based injuries arising from EPA's approval of Florida's program. Dkt. 102 at 27-32.

Indeed, recent statutory amendments further undercut Plaintiffs' claims of informational harm. On June 3, 2023, the President signed into law the "Fiscal Responsibility Act of 2023," which raised the federal government's debt ceiling and, relevant here, amended NEPA by capping page limits for EISs at 150 pages and EAs at 75 pages (both limits exclusive of appendices). *See* Public Law No. 118-5, 137 Stat. 10, 41 (2023). Only for proposed actions of "extraordinary complexity" is a larger page limit allowed. *Id.* at 42. In addition, these newly-enacted NEPA reforms expressly prescribe procedures for permittees to prepare an EIS or EA and for the lead agency to then "independently evaluate" and "take responsibility for" the document. 137 Stat. at 42. This further undercuts Plaintiffs' assertion of a cognizable, legally-enforceable injury from the loss of an agency's *independently-prepared* NEPA document. *Cf.* Dkt. 105 at 93-94. Plaintiffs' claim of informational harm cannot be based on the lack of *any environmental information*; to the contrary, Plaintiffs can only try to say that they lack access to *certain kinds of environmental information*. But these new statutory changes further call into question the validity of Plaintiffs' assertion of a "loss" of legally-required environmental information.

Just as recent legislation curbs Plaintiffs' claims, recent Supreme Court action does as well. In *Sackett v. EPA*, issued in May 2023, the Supreme Court clarified the proper scope of "waters of the United States." 598 U.S. at 603. Under the *Sackett* test, the scope of CWA jurisdiction over the "waters of the United States" is narrower than has been employed in the past by EPA, the Corps, or FDEP. Wolfe Supp. Dec. ¶¶ 28-29. A narrower scope of Section 404 jurisdiction means fewer permits require Section 404 permit coverage, and similarly, fewer projects that require NEPA and/or ESA procedures. Wolfe Supp. Dec. ¶¶ 28-29.

### B.    Plaintiffs Lack Standing to Challenge EPA's Early Finding that Florida's Application Was "Complete."

Florida Intervenors agree with Federal Defendants that EPA did not err when finding Florida's application to be complete. Dkt. 106 at 9-10. But, again, this Court need not reach that issue as an agency's finding that an application is "complete" is not final agency action subject to judicial review. Federal courts review final agency actions, not every step in the long process that leads to a final decision. Nor do Plaintiffs experience cognizable injuries sufficient to support standing to assert such a novel claim.

Plaintiffs provide no valid arguments to support standing for this purpose and still cite no cases where a court found that a completeness determination was reviewable. Plaintiffs assume that, "[h]ad EPA determined the application was not complete until the BiOp was produced, there is a possibility that the agency would have reached a different decision and/or granted an agency stay pending review." Dkt. 105 at 106. Yet this argument fails as a matter of law since there is no such legal obligation to complete the BiOp before deciding whether a CWA Section 404 assumption application is complete. *See* Dkt. 106 at 10. Whether there is such a "possibility" is beyond even mere speculation. There is simply no showing that this "procedural step was connected to the substantive result." *Sugar Cane Growers Cooperative of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002).

### C.    Plaintiffs' Attempt to Show Standing Based on "Restrictive Access" to Florida Courts Fails.

Plaintiffs conjure highly speculative and legally dubious reasons to argue that the Florida Section 404 program "subjects Plaintiffs to a restrictive state court system …" Dkt. 105 at 95. They are incorrect. Florida's judicial system provides a fair and appropriate process that allows Plaintiffs to seek to vindicate their concerns if FDEP issues a permit that they believe is improper in any way. This Court should not accept Plaintiffs' invitation to demean the judicial system of the

State of Florida. The Constitution and the Laws of the State of Florida provide a fair, just, and reasonable system for reviewing agency actions. In many ways, Plaintiffs are better off challenging agency actions in Florida courts than in federal courts. Wolfe Supp. Dec. ¶¶ 19-26.

First, Plaintiffs are not harmed by Florida's *de novo* approach to permit appeals, as explained in the Supplemental Wolfe Declaration. Wolfe Supp. Dec. ¶ 22. Indeed, they benefit. Under Florida law, there is no presumption of "correctness" in an administrative hearing challenging an FDEP permit; administrative law judges (ALJs) hear permit challenges *de novo* at the Florida Division of Administrative Hearings (DOAH); and no deference is given to FDEP's permit decision. Wolfe Supp. Dec. ¶ 22.[11] Nor are Plaintiffs *required* to incur "substantial cost" to "present an affirmative case by hiring experts and conducting independent investigations." Wolfe Supp. Dec. ¶ 22. They may rely on their written comments, but they also have the opportunity, in a *de novo* setting, to have their arguments – factual, legal, scientific, and policy – heard by an impartial administrative law judge *before* FDEP renders a "final" decision on the permit. Wolfe Supp. Dec. ¶ 22.

For those challenging permits, this system is preferable to the federal approach where the permitting agency receives deference, both as to legal interpretations and on technical issues. *Mississippi v. EPA,* 744 F.3d 1334, 1349 (D.C. Cir. 2013); *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1155 (D.C. Cir. 2013) ("Because we owe significant deference to EPA in areas of its technical expertise, we reject Sierra Club's challenge to EPA's method of addressing non-detect data."). And permit challengers are not entitled to develop the record in an adversarial setting; to the contrary, they must rely on the submittal of comment letters with supporting exhibits

---

[11] *See also* Fla. Const. Art. V, § 21 ("In interpreting a state statute or rule, a state court or an officer hearing an administrative action pursuant to general law may not defer to an administrative agency's interpretation of such statute or rule, and must instead interpret such statute or rule de novo.").

and materials (and in some cases, oral comments at a public meeting). *Gen. Elec. Co. v. EPA*, 360 F.3d 188, 189 (D.C. Cir. 2004). There is a strong presumption that the agency acted properly. *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007). To overcome this highly deferential standard of review under the APA, Plaintiffs must typically expend resources to submit comprehensive and compelling comments supported by expert testimony, without the benefit of obtaining any testimony from agency officials or others involved in the process. *Dallas Safari Club v. Bernhardt*, 518 F. Supp. 3d 535, 537 (D.D.C. 2021).

Plaintiffs' attempt to conjure standing based on these differences is wholly inadequate. Plaintiffs obviously already hire experts to generate comments and to provide supporting information. Those are funds that they are spending already when projects of concern are under consideration. Their declarations do not address how much more they are spending *over current expenditures* – and any such effort would be inherently speculative and case specific.

Second, Plaintiffs are not likely to be injured by fee-shifting provisions in the context of Florida's Section 404 program. As Florida has already explained, the fee shifting provision at Section 403.412(2)(f) "applies only to circuit court actions for injunctive relief," not administrative actions. Dkt. 102 at 46.[12] Here, Plaintiffs are making a meritless argument; i.e., that somehow they will face a situation one day where FDEP will change its view of the relevant statute and seek to obtain fees for an appeal brought by Plaintiffs that is rejected on the merits. The only situation

---

[12] *See, e.g., Lake Brooklyn Civic Ass'n, Inc. v. St. John's River Water Mgmt. Dist.*, 1993 WL 943540, at *19 (Fla. Div. Admin. Hrgs. 1993) (["Section 403.412(2)[f]] only applies to suits to maintain an action for injunctive relief in circuit court, and not to an administrative action such as this."); *Paul Still v. New River Solid Waste Ass'n & FDEP*, 2001 WL 1917255, at *2 (Fla. Div. Admin. Hrgs. 2001) (adopting ALJ's recommendation that association was not entitled to attorney's fees and costs from petitioner under Fla. Stat. § 403.412(2)(f) because these statutory provisions do not apply to administrative actions brought under subsection 403.412(5)).

cited by Plaintiffs in their brief (Dkt. 105 at 97) involves a *potential* scenario in a case that does not even involve FDEP. Plaintiffs' fears are unfounded. Wolfe Supp. Dec. ¶ 23.

Third, Plaintiffs are wrong to suggest that Florida law concerning standing to challenge permits will harm them. Florida Intervenors have previously explained that environmental groups have at least three avenues to establish standing to challenge permits under Florida law. Dkt. 102 at 30-31. Their new spin on this point has been refuted. Wolfe Supp. Dec. ¶¶ 24-26.  Plaintiffs argue that one of the three paths for standing, under Florida Statutes Section 403.412(7), "is unclear as to which proceedings it applies." Dkt. 105 at 98. They argue that the "clearest reading" is that Section 403.412(7) "appl[ies] Article III standing for injunctive suits regarding delegated programs," and nothing else. Dkt. 105 at 98. But Plaintiffs cite no case or other authority for this exceedingly narrow and (temporarily) self-serving construction. And they ignore the plain language of Section 403.412(7), which says it applies to "administrative proceedings" (not injunctive cases in civil court) in a "matter pertaining to a federally delegated or approved program." As such, this statutory avenue applies to environmental permit challenges. Additionally, Plaintiffs argue that Florida's approach to standing harms Plaintiffs because the statutory avenues are limited to "citizens of the state." This argument is misleading. The first and most traditional path for standing, under the *Agrico* test, remains available irrespective of state citizenship. Wolfe Supp. Dec. ¶ 26.  But even if an environmental petitioner looked to the other avenues for standing, Plaintiffs cite no authority for their premise that state citizenship in this context is a basis for legally cognizable injury.[13]

---

[13] Last, Plaintiffs lack standing on these grounds for reasons similar to those encountered by the Florida businesses that sought intervention. Dkt. 102 at 37.

**D.      Standing Based on "Aesthetic and Recreational Interests" Also Fails.**

Plaintiffs also continue to assert standing on the basis of general aesthetic and recreational interests. But they make no showing as to why Corps permits do not also cause the same kind of harms that Plaintiffs claim arise from FDEP permits, nor have they made any showing that Florida permitting will be any less rigorous than Corps-led permitting, especially given EPA's oversight function. In other words, the mere issuance of Section 404 permits cannot form the basis of standing; there must be some non-speculative showing that Florida 404 permits will harm Plaintiffs' aesthetic and recreational interests in a way that Corps 404 permits would not.

Florida Intervenors relied on *Clapper v. Amnesty International USA*, where the Supreme Court reiterated that a "threatened injury must be certainly impending to constitute injury in fact, and that [a]llegations of possible future injury are not sufficient." 568 U.S. 398, 409 (2013) (internal quotations omitted). Plaintiffs seek to avoid *Clapper* by suggesting that their claims of harm do not depend upon a "series of events." Dkt. 105 at 100. But as they acknowledge, no harm would arise to their purported aesthetic and recreational interests unless a long series of events transpires. Dkt. 105 at 101.

In truth, the series of events is even longer than they suggest. No harm to Plaintiffs' aesthetic and recreational interests would arise, if at all, *unless and until* (1) FDEP proposes to issue a permit that harms them in some manner; (2) EPA fails to convince FDEP to address the issue and EPA neither objects to nor federalizes the permit; (3) FDEP proceeds to issue the permit without correcting the concerns submitted in the public comment process; (4) Plaintiffs file an administrative challenge and the Florida administrative and judicial review processes result in no changes to the project[14]; and (5) the permitted project proceeds in a manner that actually harms

---

[14] If an administrative challenge is filed, FDEP's permit decision is not final agency action until the completion of the hearing process and the issuance of a final order. Dkt. 102 at 31.

Plaintiffs' aesthetic and recreational interests. This is the kind of chain of events that cannot support standing. Plaintiffs admit that at least three independent actions need to occur to make harm likely, Dkt. 105 at 101, and they give no evidence whatsoever that these three actions are imminent with respect to any project that will actually cause harm to their protected interests.

Here, the pivotal break in the chain of events is EPA's continued oversight of the state program on both a program level and permit-by-permit. Plaintiffs erroneously contend that "EPA's oversight does not supplant an adequate state program nor remove this risk of harm." While Florida's program clearly meets the requirements of the CWA, EPA's role is to ensure that no unlawful permits are issued by the states. Agencies are entitled to a presumption of regularity, not illegality. *Citizens to Pres. Overton Park*, 401 U.S. at 415.

**E.      Plaintiffs Lack Standing to Challenge Florida's Program on the Basis of Criminal Enforcement or Statute of Limitations.**

In its opening brief, Florida cited to binding D.C. Circuit precedent, *Crow Creek Sioux Tribe v. Brownlee,* 331 F.3d 912 (D.C. Cir. 2003), to show that, "[w]here a statute provides that the federal government 'will have an ongoing and undiluted enforcement role,' concerns about reduced enforcement were simply 'unsupported conjecture' that do not constitute an injury for Article III standing purposes." Dkt. 102 at 48 (citing to *Crow Creek*). Therefore, Plaintiffs lack standing for Claim Two to the extent their alleged injury is based on a heightened mens rea for criminal negligence or shorter statute of limitations under state law or even allegations of insufficient future state enforcement.

Despite their attempts, Plaintiffs' reply brief has failed to meaningfully distinguish *Crow Creek* from the facts of this case. While Plaintiffs argue that the role of EPA and the Corps will be

different under state assumption regarding certain aspects of the 404 program,[15] they do not dispute

that Section 404(n) of the Clean Water Act states "[n]othing in this section shall be construed to

limit the authority of the Administrator to take action pursuant to section 1319 of this title." 33

U.S.C. § 1344(n). Nor do Plaintiffs dispute that Section 309 sets forth the scope of the EPA's

enforcement authority, including for violations of permits issued under a state assumed 404

programs. *See* 33 U.S.C. § 1319. Moreover, the federal government's ongoing and undiluted CWA

enforcement authority is further reinforced by Section III.G of the EPA-FDEP Memorandum of

Agreement which plainly states that "EPA may initiate independent or parallel enforcement

actions in accordance with Sections 309 and 404(n) of the CWA." EPA-HQ-OW-2018-0640-0018

at 10.

It is also reinforced by Section 5-12.523 ("Coordination with State Programs") of the

Justice Manual (formerly known as the U.S. Attorney's Manual), which provides more detail on

how the federal government exercises its enforcement discretion in this context. It explains:

"Frequently, an unauthorized activity constitutes a violation of both federal and state law. United

States Attorneys should remain advised of pending state environmental enforcement actions. If it

appears that all federal interests in the case will be vindicated in the state court proceeding, action

in federal court may be an unnecessary duplication of effort. **On the other hand, if federal**

---

[15] For example, Plaintiffs' argument that the Corps will not have primary enforcement authority in assumed waters, Dkt. 105 at 103, is a red herring given that EPA retains independent enforcement authority. Similarly, Plaintiffs' argument that EPA has waived review of certain 404 permit categories is unavailing. *Id.* While EPA has agreed to waive initial review of certain categories of state issued 404 permits under the Memorandum of Agreement (MOA) with FDEP (as Congress intended pursuant to Section 404(k), 33 U.S.C. § 1344(k)), it has not relinquished its oversight over waived categories as Section II.B.(3) and II.D.(4).a of the MOA requires FDEP to provide EPA with permit applications, related public notices and supplemental materials for waived permit categories upon request and Section II.B.(2) provides EPA with unilateral authority to terminate waiver of any of the categories identified in the MOA pursuant to EPA regulations. EPA-HQ-OW-2018-0640-0018 at 6-8. Further under the MOA, EPA retains the right to review any of FDEP's compliance and enforcement records upon request. *Id.* at 9.

**interests will not be protected completely in state court, federal proceedings may be warranted.** Where legal action in federal court appears warranted, the United States Attorney should continue to consult and, as appropriate, coordinate with relevant state authorities..." Dep't of Justice, *Justice Manual*, at 5-12.523 available at https://www.justice.gov/jm/jm-5-12000-environmental-enforcement-section#5-12.523 (last visited July 7, 2023) (emphasis added).

Simply put, EPA's approval of Florida's Section 404 program does not block the federal government from bringing civil or criminal enforcement actions under federal law, subject to federal statute of limitations, in federal court for violations of CWA Section 404 in state assumed waters, regardless of whether Florida, in its enforcement discretion, determines to pursue or decline enforcement in a particular context. Wolfe Supp. Dec. ¶¶ 30-32. Consequently, Plaintiffs have not been suffered a cognizable injury sufficient for Article III standing.

Plaintiffs' reliance on *WildEarth Guardians v. Jewell*, 783 F.3d 298 (D.C. Cir. 2013) and *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) in its reply are of no relevance either. Dkt. at 101-02. In relevant part, *WildEarth Guardians* involved standing related to a procedural injury under NEPA. 783 F.3d at 305-08. Here, Plaintiffs' allegations related to the state criminal intent standard or statute of limitations are not procedural injuries, so this case is simply not relevant to standing based on these alleged claims. Similarly, *Mozilla* is also inapposite. In that case, the petitioners challenged a portion of an FCC order that required "[a]ny person providing broadband Internet access service shall publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient to enable consumers to make informed choices." 940 F.3d at 46-47. The FCC asserted that petitioners did not have standing to challenge this portion of the rule based on lack of injury, but the court disagreed. *Id.* However, the petitioners in *Mozilla*, unlike the Plaintiffs

19

here, would have been required to affirmatively provide public disclosures if the rule being challenged was upheld, which the court recognized as a concrete injury directly tied to the rule itself. In contrast, EPA's approval of the Florida's 404 application, with its heightened mens rea and shorter statute of limitations, does not in itself require Plaintiffs to do anything. Nor does EPA's action result in any concrete injury to the Plaintiffs as EPA retains independent enforcement authority under federal law even under state assumption.

## II.      Several of Plaintiffs' Claims Are Not Ripe.

Plaintiffs either misstate or misunderstand this Court's ripeness doctrine as applied to EPA's approval of Florida's 404 program. Claims related to the FWS Incidental Take Statement (Claims Three and Four), the Corps' list of "retained waters" (Claim Seven), and National Marine Fisheries Service (NMFS) consultation (Claims Five, Eleven and Twelve) all rely on contingent future events that are too speculative to adjudicate at this time and are, therefore, unripe under the test set forth in *Abbott Labs v. Gardner*, 387 U.S. 136, 148-49 (1967). Generally, "a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *McCray*, 574 F. Supp. 3d at 12 (quoting *Texas v. United States*, 523 U.S. 295, 300 (1998)) (internal quotations omitted).[16]

### A.      Take Liability Claims Are Not Ripe For Review (Claims 3 and 4).

With regard to the ITS, Plaintiffs' reply brief only points to "creat[ing] an 'unlawful risk of take.'" Dkt. 105 at 108-09. However, Plaintiffs fail to address why challenging particular projects in an as-applied context would be insufficient to prevent any "unlawful risk of take." The

---

[16] *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998) (explaining ripeness test for challenging agency action as including "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development.").

Florida Section 404 Program, in combination with the BiOp/ITS, provides comprehensive regulatory guarantees concerning species impacts. Further, Plaintiffs do not demonstrate any scenarios under the Florida Section 404 program that actually create an "unlawful risk of take."

Plaintiffs' attempt to have it both ways with regards to the import of the Second Circuit's *Cooling Water* case. 905 F.3d 49 (2d Cir. 2018). While they cite it in support of ripeness, they separately criticize it as "poorly reasoned" and "wrongly decided" when attacking the Federal Defendants' reliance on it for the merits. Dkt. 105 at 46. Moreover, Plaintiffs inaccurately claim that "Florida misleadingly cites the case for having found a different claim to be unripe." Dkt. 105 at 109. But in its opening brief, Florida Intervenors directly quoted *Cooling Water*'s finding that a claim was "unripe" in a scenario where "EPA may still veto the permit" and, "[i]f EPA fails to veto the permit, the affected parties can bring a particularized, as-applied challenge." *See* Dkt. 102 at 53. Such a situation exists here.

Plaintiffs' reply also suggests that *Cooling Water* "implicitly" ruled on the ripeness of the biological opinion. No such implied ruling is present. In *Cooling Water*, ripeness is only discussed in the footnote previously cited by Florida Intervenors. Dkt. 102 at 53 (citing *Cooling Water*, 905 F.3d at 79 n. 19). The Court did not address ripeness in the context of the direct BiOp challenge and no inference should be drawn from an issue that was not contested or addressed in the case.

Without identifying authority that directly supports their position, Plaintiffs also attempt to distinguish other cases cited by Florida Intervenors but miss the target. For example, Plaintiffs ignore the similarities between the present case and *Wyoming Outdoor Council v. Dombeck*, where plaintiffs challenged EPA's ESA Section 7 procedure during its approval of an application for oil and gas leases. 148 F. Supp. 2d 1, 9 (D.D.C. 2001). The court in *Wyoming Outdoor* found the challenges to EPA's approval to be unripe where subsequent action would need to occur before

final approval occurred. *Id.*

Likewise, Plaintiffs attempt to distinguish the facts of this case from those in *Suburban Trails, Inc. v. New Jersey Transit Corp.,* by arguing that there was no final federal action in that case and no hardships to the plaintiff, just uncertainty. Dkt. 105 at 112. However, Plaintiffs do not address Florida's point that the challenge "was not ripe because a federal agency possessed veto power over the state agency's decision," Dkt. 102 at 54, which is the situation here.

Finally, Plaintiffs incorrectly argue in a footnote that "Florida cherry-picks ripeness language" from a series of cases. Dkt. 105 at 108. Plaintiffs mistake legal synthesis for cherry-picking. Florida provided a series of cases that support each factor of its ripeness argument. Each supports the premise they are cited for. Dkt. 102 at 51-52. Plaintiffs are wrong to argue that there are no "later agency actions that could supersede or undo the violation or remedy the harms wholesale." Dkt. 105 at 110. The ITS, including the required Technical Assistance Process, provide a litany of steps involving multiple federal and state agencies that work in tandem to avoid any of the speculative take concerns that Plaintiffs seem to fear. EPA's veto authority is also a "later agency action" that would be in place to prevent any future harm to the Plaintiffs under the ESA take provisions.

Plaintiffs' rebuttal concerning *New Hanover* is also ineffectual. In *New Hanover*, the challenge to the Corps' use of a nationwide permit to authorize a city landfill project was unripe where the necessary state water permits had not yet been granted because the "results of the [state water permitting] process cannot be predicted." 992 F.2d 470, 473-74 (3d Cir. 1993). Here, the outcome of the agencies' technical assistance process as well as EPA's Section 404 oversight role cannot be predicted and no harm will be caused to Plaintiffs' interest unless and until they show inadequate take protection will occur.

Ultimately, Plaintiffs have not been harmed by the issuance of the ITS and cannot point to any FDEP 404 permits that have resulted in or will result in inadequate take provisions.[17] A comprehensive, coordinated process involving FDEP, EPA, FWS and FWC exists to ensure that no such scenario arises, but if it does, it will invariably entail an exceedingly fact-specific scenario with a developed administrative record for review. Thus, a challenge to the scope of incidental take coverage should await an actual FDEP 404 permit issuance where, notwithstanding EPA and FWS involvement and oversight, take protections are claimed to be inadequate.[18]

**B.    Plaintiffs Challenge to the "Retained Waters" List Is Not Ripe (Claim 7).**

Despite assertions to the contrary, Plaintiffs have not shown that the Retained Waters List has a "sufficiently direct and immediate" impact *on the Plaintiffs* such that *Abbott Lab'* ripeness test is met. A challenge to the Retained Waters List should await a specific as-applied challenge where FDEP permits dredge and fill activity at a particular waterbody excluded from the Retained Waters List but which Plaintiffs believe should be on the List. Of course, such a challenge would only be viable, if at all, where (1) FDEP and the Corps fail to properly follow their agreed-upon process under the Memorandum of Agreement (EPA-HQ-OW-2018-0640-0018 at 8) for evaluating, in the context of specific projects, whether particular waterbodies belong on or off the List; (2) Plaintiffs comment to FDEP that the project should be handled by the Corps based on impacts to waters that should be treated as Retained Waters; and (3) FDEP

---

[17] Plaintiffs have expressed concern about the "Eden Oak Development." An application for a Section 404 permit has not yet been submitted to FDEP for this potential project. Dkt. 102-1 at 22. Even Plaintiffs' declaration notes that the project did not receive local zoning approval, *see* Crooks Dec., Dkt. 105-1 at 7.

[18] If a situation arose with the potential for unlawful take, Plaintiffs would have at least two viable, as-applied legal options at their disposal: first, they could challenge the FDEP 404 permit under Florida administrative and judicial review processes; or second, Plaintiffs could sue in federal court under the ESA's citizen suit provisions (16 U.S.C. § 1540(g)).

and the Corps ignore or reject those comments and/or EPA takes no action in its oversight role.

An agency action, such as EPA's approval of Florida's program, that "does not require [plaintiffs]

to engage in, or to refrain from, any conduct" does not constitute sufficient hardship for the

purposes of ripeness. *Oceana*, 384 F. Supp. 2d at 254-55.[19]

   Plaintiffs' main point here seems to be that the ripeness doctrine does not apply to a

challenge of a "program as a whole." Dkt. 105 at 112. Yet they cite no case law for such a broad

carve-out from the ripeness doctrine. *Cf. Ohio Forestry*, 523 U.S. at 733-34 (finding

environmental group's challenge to forest management plan not ripe for review where

subsequent challenges could await actual logging projects). Instead, they point to litigation

involving the Michigan Section 404 Program, Dkt. 105 at 112-13 (discussing *Menominee*, 947

F.2d 1065, 1069-70 (7th Cir. 2020), but do not address possible differences between the Florida-

Corps MOA and any such process in the Michigan context, *see, e.g.*, Dkt. 102 at 57 n. 35).

Whether a particular waterbody is on or off the Retained Waters List is of no real consequence

to Plaintiffs, at least not yet.

   Nor have Plaintiffs demonstrated that the Retained Waters List constitutes "final agency

action." Plaintiffs predictably rely on *Coal. to Save Menominee River Inc. v. EPA,* 423 F. Supp.

3d 560, 568 (E.D. Wis. 2019), which Florida Intervenors previously cited to this Court (Dkt. 102

at 57 n. 35), to argue that the Corps' retained water list is final agency action. Plaintiffs ignore

the fact-specific distinctions between Florida's Retained Waters List (which, based on the record

here, lacks hallmarks of final agency action) and Michigan's Retained Waters List (which is not

before this Court and for which the Parties do not have the benefit of comparing the 1984 list and

---

[19] Contrary to Plaintiff's assertion, Dkt. 105 at 113, allegations of insufficient future state enforcement do not constitute harm for standing purposes, particularly where EPA retains independent enforcement authority under the CWA as addressed in previous section.

its accompanying MOA). On the record before this Court, the Florida 404 Program contains a process of routine refinement of the Retained Waters List as particular projects are reviewed. The Corps and FDEP have established "Joint Coordination Procedures" to ensure that the List is appropriately updated, as appropriate. Dkt. 102 at 57. This process is working well and is ensuring that, as stated in the MOA, the list includes "all other waters" that are not expressly listed if they meet the definition of non-assumable waters under 404(g). Dkt. 102-1 at 16-17. To challenge the list as a whole now would be to jump ahead of the process selected by the agencies for ensuring that particular projects are correctly permitted based on whether they are inside or outside the bounds of "retained waters."

      **C.**    **Plaintiffs' NMFS-Based Claims Are Not Ripe (Claims 5, 11, and 12).**

Plaintiffs contest EPA's decision to not engage in formal consultation with the National Marine Fisheries Service (NMFS). Florida has explained why these claims are not ripe for review; namely, marine species under NMFS' jurisdiction are unlikely to be found in any assumable waters because the Corps retains jurisdiction over "all waters subject to the ebb and flow of the tide...including wetlands adjacent thereto." Dkt. 102 at 59. Accordingly, it is highly unlikely that FDEP Section 404 permits in assumable waters (non-marine waters) will affect NMFS-listed species and, to the extent any such concerns arise, those would be addressed in the normal permitting procedures. A final permit action involving impacts to species under NMFS jurisdiction could be challenged at that time. No actual harm – and certainly none that is ripe for review at this stage – accrues to Plaintiffs from EPA's decision to defer NMFS consultation. Wolfe Supp. Dec. ¶ 33. In any event, ongoing coordination between EPA and NMFS should decisively cut-off these claims. Dkt. 106 at 48.

## CONCLUSION

For the foregoing reasons, Florida Intervenors respectfully request entry of summary judgment in favor of Defendants and Intervenors as to all claims.

Dated: July 7, 2023

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

Lily N. Chinn (DC Bar No. 979919)
101 California Street
San Francisco, CA 94111
Phone: (415) 291-6200
lily.chinn@bakerbotts.com

Aaron M. Streett (TX Bar No. 24037561)
Harrison Reback (TX Bar No. 24012897)
(*pro hac vice*)
910 Louisiana Street
Houston, TX 77002-4995
Phone: (713) 229-1234
aaron.streett@bakerbotts.com
harrison.reback@bakerbotts.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of July 2023, I electronically filed the foregoing document

using the CM/ECF system. Service was accomplished by the CM/ECF system.

<div style="margin-left: 50%;">

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

</div>