IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ET AL.<br><br>          Plaintiffs,<br><br>          v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.<br><br>          Defendants. | CASE NO. 1:21-cv-00119 (RDM) |

### SUPPLEMENTAL DECLARATION OF JUSTIN WOLFE

1. My name is Justin Wolfe. I declare under penalty of perjury under the laws of the United States of America and the State of Florida that the following statements are true and correct to the best of my knowledge and belief.

2. I serve as General Counsel to the Florida Department of Environmental Protection ("FDEP"). FDEP is the state agency in Florida authorized by law to "control and prohibit pollution of air and water…." Fla. Stat. § 403.061.[1]

3. Pursuant to Section 20.255(c), Florida Statutes, as General Counsel, I am responsible for all legal matters of FDEP. I have held this position for approximately four years. Before serving as the General Counsel for FDEP, I served as the Deputy General Counsel for the Water, Air, and State Lands Section of FDEP's Office of General Counsel.

---

[1] At this time, I am also temporarily serving in the role of Acting Deputy Secretary of FDEP.

1

4. I am authorized by the Office of the Governor of the State of Florida, the Office of Attorney General of the State of Florida, and the Secretary of the FDEP to provide this declaration to this Court.

5. I am aware that a coalition of environmental organizations ("Plaintiffs") filed a Complaint in the U.S. District Court for the District of Columbia seeking, among other things, to invalidate and enjoin EPA's approval of Florida's Section 404 Program.

6. I am aware that Plaintiffs submitted several sworn declarations in support of standing to bring their lawsuit, including new declarations filed with this Court on June 9, 2023. Previously, I signed a declaration in support of FDEP's standing to intervene, which was filed in this proceeding on January 19, 2021 (Dkt. 4-2), along with another declaration (Dkt. 102-1) in support of Florida's Cross-Motion for Summary Judgment, which was filed with this Court on May 10, 2023, and both of which I hereby re-affirm and incorporate by reference, subject to any additional information or clarifications provided herein.

7. I am providing this supplemental declaration to provide sworn facts to this Court in response to certain statements in Plaintiffs' new declarations on particular points that I believe are relevant to evaluating whether Plaintiffs have standing, i.e., whether they are injured by EPA's approval of Florida's Section 404 Program or otherwise have standing for the claims brought in this case.

***Florida's Environmental Record***

8. Plaintiffs wrongly assert that Florida has an "abysmal environmental record" and that Florida's operation of "most federal environmental programs…has been a failure..." *See* Dkt. 105 at 18. This accusation, for which Plaintiffs provide no meaningful support, is baseless. FDEP administers various federally-delegated programs as explained in my prior declaration, and FDEP

continues to administer those programs consistent with law and subject to EPA oversight and review. As stated in FDEP's Mission and Values, FDEP seeks to "advance Florida's position as a world leader in protecting natural resources while growing the state's economy." And Florida continues to make substantial investments in conservation of our environment. In June of 2023, the Legislature approved and the Governor signed a budget for FDEP that provides more than $3.8 billion in state funding to support Florida's environment by enhancing key protections, ensuring the health of Florida's environment, and supporting Florida's economy. This includes over $1.6 billion for Everglades restoration and water quality projects, as well as more than $976 million for conservation and recreational land acquisitions that focus on protecting our water resources and advancing the Florida Wildlife Corridor. In fact, since 2019, the State has secured over $1.25 billion in state funding for land acquisition through the Florida Forever Program, including $850 million specifically for the Florida Wildlife Corridor, and acquired nearly 192,000 acres, which is almost four times more than that of the previous four years. Approximately 90% of these acres are within the Wildlife Corridor.

*Environmental Information*

9. Plaintiffs also argue that there is "incomplete or missing information and documentation from FDEP's database." *See* Dkt. 105 at 19. In particular, Plaintiffs claim that they "rarely, if ever, see agency factual determination on whether the permit complies with the regulations' requirements, permit conditions negotiated with the applicant, or agency assessments of the applicant's alternatives analysis (and whether it is reliable)." Crooks Dec., Dkt. 105-1 at 2. Plaintiffs also complain that FDEP's online "permit files include no documents containing the State's analysis of applicant submitted information, the State's findings as to impacts, incidental take, required permit conditions, and alternatives, nor the State's rationale for those decisions…"

3

Dkt. 105 at 93. And they complain that "the files contain no analytical information from USFWS as to impacts on species." *Id*.

10. FDEP's databases, including Oculus, provide real-time access to permit records. FDEP staff evaluate whether project applicants have provided adequate information before proceeding with the permit process. Where additional information is necessary, as is often the case, FDEP staff send a "Request for Additional Information" (RAI) to the applicant. In many instances, multiple rounds of RAIs are sent to the applicant, all of which are available on the FDEP databases (along with any responses received from the applicants). The final permit decision is made publicly available immediately upon issuance along with any permit terms and conditions.

11. Plaintiffs say that "Mr. Wolfe also mistakenly claims that BiOps [biological opinions] are not publicly provided," and they then refer this Court to the federal agencies' Environmental Conservation Online System available through the USFWS. *See* Dkt. 105-2 at 93 n. 59. This is precisely the same information that I referenced in my declaration (at paragraph 27, Dkt. 102-1 at 9). And Plaintiffs do not acknowledge that this database only provides copies of BiOps long after a permit proceeding is completed (e.g., at the time of my May 2023 declaration, this federal database did not contain *any* BiOps for Corps projects from 2022 and 2023).

12. Plaintiffs also reference the NOAA Institutional Repository, which contains a database with, among other things, copies of BiOps prepared by NMFS. This database can be searched based on NOAA regions and states. A search of this database identified 79 BiOps issued by NMFS for *any program or project* (not just Section 404 permits) in Florida since 2016 for *all agencies* (not just the Corps). I have reviewed this list of 79 BiOps, and to the extent some of them involved Section 404 projects, many, if not most, of those BiOps appear to involve projects that would not require Section 404 permits *from FDEP* because they occur in retained waters as would

be expected (e.g., shoreline stabilization projects; marina construction projects; certain pier replacement projects; etc.).

13. Plaintiffs argue that the following projects "would be subject to receiving a biological opinion" if Florida did not administer the Section 404 program: "Troyer Mine, Rural Lands West Development, Bellmar Development, Immokalee Road Rural Village Development, Old Corkscrew Plantation (AKA Kingston) development, Hogan West development, and FFD Development." Crooks Dec., Dkt. 105-1 at 3. Significant information about each of these projects is readily available to Plaintiffs in the Oculus database. All of these projects remain under review.

14. Plaintiffs say that, "when the Troyer Mine project was before the Corps, it was determined that an EIS would be required." Dkt. 105 at 93. That is not supported. Dkt. 31-1, at 240 – "Based on the reduced cumulative impact, the Corps is willing to conduct a review of your project by means of an [Environmental Assessment]."). It is unlikely that an EIS would be triggered for the currently proposed version of the Troyer Mine project. My previous declaration (Dkt. 102-1, at 7-8 ¶ 22) provides links to the entire permit file for the Troyer Mine project. The updated project, as reflected in the FDEP's November 5, 2021 public notice, shows that the Troyer Mine proposes approximately 104 acres of wetlands impacts (approximately 25% of the impacts in the original pre-2011 proposal referenced by the Corps in the 2011 letter cited by Plaintiffs). Given the substantial reduction in impacted wetlands acres and the changes in cumulative impact concerns, it seems unlikely that an EIS would be required by the Corps for the project in its present form, if the Corps was still administering the program for assumable waters in Florida.

15. Plaintiffs complain that information about "take" of protected species is no longer available because FDEP is administering the 404 program. Crooks Dec., Dkt. 105-1 at 4. This is incorrect. The FDEP permit files provide significant species-related information, including

5

incidental take information where available. The Technical Assistance Process is designed to avoid and minimize take of species.

***Coordination with the Corps of Engineers***

16. Plaintiffs further contend that there are "issues with FDEP's coordination with the Corps." *See* Dkt. 105-2 at 19. FDEP continues to work cooperatively with the Corps of Engineers on all aspects of the Section 404 Program. FDEP holds monthly meetings with the Corps. We have established working groups to address issues that arise, and FDEP and Corps staff routinely review and determine questions related to assumed versus retained waters.

***FDEP Staffing Levels***

17. Plaintiffs argue that there are "problems with retaining staff in [Florida's] 404 program, which leads to a drain of expertise." *See* Dkt. 105-2 at 19. This is not correct. As of the end of June 2023, there were 138 certified wetlands evaluators (CWEs) employed by FDEP alone. When taking into account those employed by Florida's five Water Management Districts, the total number is 186 CWEs. FDEP has adequate staffing to administer the Section 404 program.

***FDEP Permitting Process***

18. Plaintiffs complain that my declaration does not "acknowledge that the purported 'denials' of individual permit applications make clear that the applicant can resubmit another application without prejudice and were based solely on the applicant's non-responsiveness." *See* Dkt. 105-2 at 19 n. 1. Plaintiffs also claim, incorrectly, that FDEP "has not denied a single individual 404 permit for purposes of protecting the environment…" *See* Dkt. 105 at 100. FDEP has denied 230 permit applications (including 39 individual permits). A large number of permits remain under review currently (many have pending requests for additional information). Usually, a permit application is denied when the applicant does not provide adequate information to ensure

that the project meets the criteria for issuance of a Section 404 permit. FDEP only issues permits if the applicant meets the criteria for receiving a Section 404 permit, which is the way that FDEP ensures environmental protection. Consistent with standard agency practices generally, permit applicants are allowed to resubmit permit applications with new or additional information. Commonly, permit applicants make changes to their projects before resubmitting them for review by FDEP.

***Florida Water Quality Standards***

19.     Plaintiffs make certain unfounded claims about FDEP's protection of water quality standards and lack of compliance with the 404(b)(1) Guidelines. Dkt. 105 at 67-69; Silverstein Dec., Dkt. 105-2 at 4.  EPA correctly found that FDEP's Section 404 Program complies with the 404(b)(1) Guidelines. *See* Dkt. 99 at 45-49. FDEP staff review permit applications to determine whether discharges will impair water quality. Projects are reviewed for consistency with state water quality standards. Additionally, FDEP's ERP review, which applies to every project that requires a Section 404 permit in Florida, ensures that the project satisfies the requirements for a state water quality certification.

20.     Plaintiffs raise concerns about water quality in Biscayne Bay. Silverstein Dec., Dkt. 105-2 at 5. This is not directly relevant to Florida's Section 404 Program as Biscayne Bay is classified as Retained Waters under the regulatory purview for Section 404 purposes of the Corps of Engineers. More generally, FDEP is keenly aware of the water quality issues impacting Biscayne Bay and other parts of South Florida, and has been taking proactive steps to improve conditions. FDEP administers various environmental programs aimed at improving water quality in Biscayne Bay. On June 3, 2021, Governor DeSantis signed legislation creating the Biscayne Bay Commission, which through a deliberative and transparent process, provides input to support

key funding and restoration initiatives and guide regulatory changes that are needed to improve water quality. Since 2019, Florida has dedicated $72 million into Biscayne Bay water quality and protection projects. Under the leadership of Governor DeSantis, the State of Florida has invested a record $5 billion to protect natural water resources and Everglades restoration (more than doubling the amount of funding from the previous four year period), with significant additional funding called for in Executive Order 23-06.

***Florida Administrative Procedures & State Judicial Review***

21. Plaintiffs claim that the Florida administrative law and judicial review processes place them at a disadvantage relative to the federal system. *See* Dkt. 105 at 96-98. This is not correct.

22. First, Plaintiffs present an incorrect picture of Florida's *de novo* approach to permit appeals. Under Florida law, there is no presumption of "correctness" in an administrative hearing challenging an FDEP permit. Administrative law judges (ALJs) hear permit challenges *de novo* at the Florida Division of Administrative Hearings (DOAH). No deference of any kind is given to FDEP's permit decision. After the hearing, the ALJ issues a Recommended Order and FDEP makes a final decision (final order), but FDEP is not empowered to overturn any of the ALJ's finding of facts *unless they are not supported by any competent substantial evidence*. If the final order gets appealed, the Florida District Courts of Appeal give no deference to FDEP's final order. In other words, FDEP's preliminary decision to issue a Section 404 permit is not entitled to any presumption of correctness nor is FDEP entitled to any deference. The standard of proof in permit challenges is a simple preponderance of the evidence. If a judicial appeal is filed, a Florida reviewing court looks not just at FDEP's findings of fact but also the ALJ findings. The administrative record on review includes the FDEP decision with the ALJ determinations and the

ultimate agency outcome. In that setting, the Florida appellate court considers the entire record established during the DOAH process (including any pleadings, motions, transcripts, etc.), not just the FDEP permit record. Contrary to their claims, Plaintiffs are not *required* to incur "substantial cost" to "present an affirmative case by hiring experts and conducting independent investigations." They are certainly free to rely on their written comments, but they also have the opportunity, in a de novo setting, to have their arguments – factual, legal, scientific, and policy – heard by an ALJ *before* FDEP renders a final decision on the permit. In that setting, Plaintiffs are free to introduce a wide array of information and arguments in any form that they choose.

23.     Second, Plaintiffs are incorrect about "fee shifting" under Florida law. Crooks Dec., Dkt. 105-1 at 5. FDEP is not aware of any case where an environmental organization was required to pay attorney's fees to the State of Florida for not prevailing in an environmental permit challenge. The only situation cited by Plaintiffs in their brief (Dkt. 105 at 97) involves a *potential* scenario in a case that does not even involve FDEP.

24.     Third, Plaintiffs incorrectly describe Florida law concerning standing to challenge FDEP permits. Florida Intervenors have previously explained (Dkt. 102 at 30-31) that environmental groups have at least three avenues to establish standing to challenge permits under Florida law: (1) the test set forth in *Agrico Chem. Co. v. Dep't of Envt'l Regulation*, 406 So. 2d 478 (Fla. 2d DCA 1981); (2) the path under Fla. Stat. § 403.412(6) whereby environmental groups in Florida with "at least 25 current members residing within the county where the activity is proposed" have *automatic standing* to challenge a permitting action; and (3) the path under Fla. Stat. § 403.412(7) where, "[i]n a matter pertaining to a federally delegated or approved program," like Florida's Section 404 program, "a citizen of the state may initiate an administrative proceeding

9

under this subsection if the citizen meets the standing requirements for judicial review of a case or controversy pursuant to Article III of the United States Constitution."

25. Plaintiffs raise concerns, in particular, with the third path for standing, contending that Florida Statutes Section 403.412(7) "is unclear as to which proceedings it applies." Dkt. 105 at 98. They argue that the "clearest reading" is that Section 403.412(7) "appl[ies] Article III standing for injunctive suits regarding delegated programs," and nothing else. Dkt. 105 at 98. To the contrary, FDEP reads this provision to apply to "administrative proceedings" in a "matter pertaining to a federally delegated or approved program," and thus, FDEP views this provision as applying to environmental challenges to FDEP 404 permits, which is consistent with how Florida administrative hearings have been handled.

26. Additionally, Plaintiffs argue that Florida's approach to standing harms Plaintiffs because the statutory avenues are limited to "citizens of the state." To the contrary, the first and most traditional path for standing, under the *Agrico* test, remains available irrespective of state citizenship. The *Agrico* test and Florida Statutes Chapter 120 do not contain a citizenship requirement.

***EPA Oversight***

27. Plaintiffs try to suggest that FDEP is not working cooperatively with EPA. *See* Crooks Dec., Dkt. 105-1 at 6. FDEP is continuing to work with EPA on addressing any issues with program implementation. In that regard, EPA continues to exercise oversight of FDEP's program and, where appropriate, adjustments in the program are made.

28. A key issue of discussion with EPA has involved implementation of the proper definition of "Waters of the United States" in the midst of ongoing changes in definitions at the federal level (as a matter of both regulatory change and judicial cases). As explained in the State

404 Program Applicant's Handbook, Florida's 404 Permitting Program considers "any wetlands or other surface waters delineated in accordance with Chapter 62-340, F.A.C." to be Waters of the United States and "will treat them as if they are, unless the applicant clearly demonstrates otherwise." *See* Section 1.1 State 404 Program Applicants Handbook.  FDEP has been utilizing the federal definition of "waters of the United States" which was in effect at the time of EPA's approval of Florida's State 404 Permitting Program. While EPA adopted a broader definition in January 2023 based upon the "significant nexus" test for wetlands jurisdiction, that new definition was enjoined by a federal court from going into effect in Florida. On May 25, 2023, the U.S. Supreme Court issued an opinion in *Sackett v. EPA*, which addresses the proper scope of the "Waters of the United States." In *Sackett*, the Court clarified that the "significant nexus" test does not apply and adopted an interpretation of "waters of the United States" that is *narrower* than the definition currently utilized by FDEP.  At this time, FDEP staff are interpreting the phrase "waters of the United States" consistent with the Supreme Court's decision in *Sackett*.

29. Because *Sackett* narrows the scope of "waters of the United States," it is reasonable to expect that fewer projects will now require permits as part of the Section 404 Program. FDEP is committed to administering the Section 404 Program in full compliance with law.

*Enforcement*

30. Plaintiffs also contend that Florida has "limited [Plaintiffs'] ability to enforce" Section 404 violations. *See* Dkt. 105 at 105. However, Florida has taken no steps to block Plaintiffs or their members from bringing citizen suits. To the best of my knowledge, Plaintiffs and their members have not brought any citizen suit enforcement actions in Florida (since FDEP assumed the 404 program) involving alleged violations of the Section 404 requirements for projects that are otherwise subject to FDEP 404 permitting.

31. FDEP and Florida Water Management District staff continue to effectively and diligently enforce the Section 404 program requirements in Florida.

32. Plaintiffs argue that FDEP's enforcement of the Municipal Separate Storm Sewer (MS4) program has "shortcomings." Silverstein Dec., Dkt. 105-2 at 2. They cite anecdotal information gathered by Miami Riverkeeper regarding compliance by MS4 permit holders in Florida, including a statement that 15 of 35 permit holders lacked a stormwater management program. *Id.* at 2-3. FDEP strongly disagrees with Plaintiffs' mischaracterizations. First, MS4 compliance is entirely separate and distinct from Section 404 enforcement and involves an entirely different set of circumstances. In the context of MS4 compliance, FDEP must work with local governments to ensure that their stormwater management programs are effectively prohibiting and limiting pollutants from a variety of courses within their respective jurisdictional areas. Where MS4 non-compliance persists, FDEP is taking proper enforcement and other actions to address MS4 non-compliance

*NMFS Review*

33. FDEP has been informed that EPA continues to prepare a Biological Evaluation (BE) regarding EPA's approval of FDEP's CWA 404 program in coordination with the National Marine Fisheries Service (NMFS). EPA has communicated with FDEP throughout this process. It is our understanding that EPA still plans to complete and issue the BE for NMFS species in the near future. FDEP continues to actively support efforts by EPA and NMFS to complete consultation.

Executed on the 7th day of July, 2023.

                                          */s/ Justin Wolfe*
                                          Justin Wolfe
                                          General Counsel
                                          Florida Department of Environmental Protection
                                          3900 Commonwealth Blvd M.S. 35
                                          Tallahassee, FL 32399