**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

       Plaintiffs,

       v.

U.S. ENVIRONMENTAL
PROTECTION AGENCY, et al.,

       Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

<u>**SUPPLEMENTAL JOINT APPENDIX**</u>

**VOLUME 2**

*Nov. 2, 2020 Comment Letter to the U.S. Environmental Protection Agency from Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper re: Florida's Request To Assume Administration of a Clean Water Act Program [EPA-HQ-OW-2018-0640-0001]*

# EXHIBIT 67

**EPA Approval of State Assumption of Clean Water Act Section 404 Program**

**Streamlined Approach to Address Endangered Species Act
Incidental Take Coverage**

States and the federal agencies charged with administering Section 404 of the Clean Water Act ("CWA")—the U.S. Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers ("Corps")—have expressed growing interest in promoting state assumption of the program. As an important part of the cooperative federalism structure of the CWA, state assumption can streamline and speed permitting processes, reduce duplication of effort and overall expenditures by state and federal authorities, and can better align the Section 404 program with other CWA programs for which states have authority. Virtually all states have delegated authority to administer the national pollution discharge elimination system ("NPDES") permitting program under CWA Section 402, as well as permitting programs under the Clean Air Act and other major environmental statutes. Only two states, however, have assumed authority for the CWA Section 404 program: Michigan in 1984 and New Jersey in 1994.

While many states have considered Section 404 assumption, there is a significant unresolved obstacle cited by those states: how to address potential liability under the Endangered Species Act ("ESA")—both for the state permitting authority and for permittees—for any incidental take of threatened or endangered species resulting from a Section 404 permit issued by the state. Where the Corps administers the Section 404 program, a streamlined process under Section 7 of the ESA allows for incidental take of listed species. However, thus far, where a state administers the Section 404 program, permittees themselves must avoid entirely adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10 separate and apart from the Section 404 permit process, which can take years to complete in contrast to the Section 7 process and is more burdensome for all involved—the applicant and the agencies. As other states have found, the ESA incidental take dynamic has created a serious hurdle to establishing an effective and efficient Section 404 program in Florida, where 135 ESA-listed species occur (the third most of any state).[1] It is estimated that approximately ten percent of Section 404 permits issued in Florida require some form of incidental take coverage. This includes many large real estate, mining, agriculture, and utility industry projects with significant economic benefits to the State of Florida and its citizens.

The most efficient and streamlined approach to resolving this issue is a ***one-time* ESA Section 7 *programmatic consultation* in connection with EPA's initial review of a state application to assume the Section 404 program.** Section 7 consultation is available in the Section 404 assumption context because of the unique statutory text and legislative history found in Section 404, which differs in critical respects from other state delegation programs administered by EPA where Section 7 does not apply. Under this approach, EPA would consult with the U.S. Fish and Wildlife Service ("USFWS") and the National Marine Fisheries Service ("NMFS") (collectively, the "Services") with regard to EPA's decision whether to approve state

---

[1] *See* U.S. Fish and Wildlife Service, *Listed species believed to or known to occur in each State*, available at https://ecos.fws.gov/ecp0/reports/species-listed-by-state-totals-report (last visited June 5, 2019).

assumption of the Section 404 program. This would allow the Services to issue a programmatic Biological Opinion ("BiOp") and a programmatic incidental take statement ("ITS"), which would identify procedural requirements for state permitting under Section 404 needed to support the Services determination that assumption would not result in jeopardy to any listed species. Provided these requirements are followed, the programmatic ITS would bring state Section 404 permits within the Section 7(o)(2) exemption from take liability.

While EPA originally recognized that Section 7 consultation applied to New Jersey's assumption of the Section 404 program, a legally flawed memorandum issued by EPA in 2010 in the Obama Administration essentially reversed that position. EPA's 2010 memorandum resulted from a rushed review, ignored the actual text and legislative history of Section 404, and misapplied Supreme Court precedent. Additionally, because of the unique provisions of Section 404(g) and (h), EPA will not open other program areas to ESA Section 7 by engaging in consultation here. For the reasons explained in this analysis, we believe EPA should return to its original view that approval of state assumptions under Section 404 triggers Section 7 consultation, which will provide substantial benefits to states like Florida with hopes of assuming the Section 404 program. No court has ruled if Section 404 assumption triggers consultation, providing EPA the opportunity to shape this issue in a way that benefits state authority and permitting efficiency.

## I.    PROGRAMMATIC CONSULTATION AND INCIDENTAL TAKE STATEMENT IN CONNECTION WITH EPA APPROVAL OF ASSUMPTION

### A.    Conceptual Outline and Benefits of Programmatic Consultation

Because Section 7(a)(2) is framed as a consultation process between *federal* agencies, it does not expressly provide a mechanism for a *state* permitting authority to consult directly with the Services and avail itself of the Section 7(o)(2) exemption from incidental take liability based on an ITS issued through a Section 7(a)(2) consultation process. Instead, as noted above, under current practice, where a state has assumed the Section 404 program, permittees cannot obtain incidental take protection directly from the permitting agency; rather, to gain such protection the permittee must obtain an incidental take permit from the relevant Service under ESA Section 10—a time-consuming and resource-intensive process that, especially in states where listed species are prevalent, render the state program more burdensome than the existing federal program. This loss of Section 7-based incidental take protection is being raised by other states as a hurdle to assuming the Section 404 program in the first place. [2] A programmatic consultation consistent with the Section 7 regulations on the Section 404 assumption decision would efficiently resolve this issue for all parties concerned. [3]

_____

[2] EPA's decision whether to approve assumption is not subject to review under the National Environmental Policy Act ("NEPA"), regardless of whether EPA consults with the Services in connection with its decision. *See* 33 U.S.C. § 1371(c)(1).

[3] 50 C.F.R. § 402.02 (defining "framework programmatic action" and "mixed programmatic action"); *id.* § 402.14(i)(6) (defining incidental take statement requirements for framework programmatic actions and mixed programmatic actions). *See also* Endangered and Threatened

There is precedent for this type of programmatic consultation and ITS with regard to a state-administered permitting program, such as EPA's Cooling Water Intake Structure Rule.  In each case, the Services issued a programmatic "no jeopardy" BiOp and ITS providing incidental take coverage to subsequent state permitting decisions under the relevant program, provided the state agency complied with certain procedural requirements to ensure protection of listed species and designated critical habitat.

**B.      EPA Approval of Section 404 Assumption May Be Considered a Discretionary Federal Action for ESA Purposes and is Distinguishable from Other Program Delegation Decisions**

In 2010, under the Obama Administration, EPA's then-Assistant Administrator for the Office of Water, Peter Silva, issued a two-page memorandum concluding that EPA's decision whether to approve a state application to assume the Section 404 program is not a discretionary federal action and accordingly is not subject to consultation under Section 7.[4]  The Silva memo was apparently the result of a brief review, as it was issued on December 27, 2010 in response to a request for clarification from the Environmental Council of States ("ECOS") dated December 6, 2010. Insofar as it is an obstacle to upfront consultation through which a state can obtain a programmatic ITS, the Silva memo has the effect—likely unintended—of hindering state efforts to obtain Section 404 assumption. The Silva memo's conclusion was contrary to EPA's prior agreement to consult informally with the USFWS in connection with New Jersey's application to assume the program, which EPA approved in 1993.[5]  More important, while the 2010 Silva memorandum purported to be based on the Supreme Court's decision in *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), which involved delegation under Section 402 of the CWA, the 2010 memorandum did not meaningfully analyze the relevant statutory text and legislative history, nor did the memo grapple with the unique characteristics of Section 404 and the implications of its determination on state assumptions.

As explained below, those unique characteristics make clear that Section 404 *does* give EPA discretion to consider the protection of listed species in the context of rendering a decision whether to approve a state's application to assume the Section 404 program.  This materially distinguishes Section 404 from the CWA Section 402(b) decision at issue in *National*

---

Wildlife and Plants; Revision of Regulations for Interagency Cooperation, 83 Fed. Reg. 35,178 (July 25, 2018).  Consistent with the discussion in the 2015 rule, the proposed definition states that "[p]rogrammatic consultations allow the Services to consult on the effects of programmatic actions such as . . . [a] proposed program, plan, policy or regulation providing a framework for future proposed actions."  *Id.* at 35,191-92.

[4] Letter from Peter S. Silva to R. Steven Brown and Jeanne Christie (Dec. 27, 2010), available at https://www.aswm.org/pdf_lib/silva_reply_on_esa_consultation_12272010.pdf.

[5] After informal consultation and based on the memorandum of agreement ("MOA") completed between EPA, the USFWS, and the New Jersey Department of Environmental Protection and Energy, the USFWS concurred that New Jersey's assumption of the Section 404 program is not likely to adversely affect federally-listed species.  *See* Letter from U.S. Fish and Wildlife Service to EPA Acting Regional Administrator William J. Muszynski, dated Dec. 22, 1993, available at https://www.fws.gov/northeast/njfieldoffice/pdf/MOAUSFWS.pdf.

*Association of Home Builders*, as well as the delegation provisions in each of the other major environmental statutes.

1.     **ESA Section 7 and** *National Association of Home Builders v. Defenders of Wildlife*

*National Association of Home Builders* involved a challenge—in part for alleged failure to comply with ESA Section 7—to EPA's decision approving transfer of authority to administer the CWA Section 402 national pollution discharge elimination system ("NPDES") permitting program to Arizona within the state.  The case turned on the U.S. Department of Interior's regulation, at 50 C.F.R. § 402.03, which provided that ESA "Section 7 and the requirements of this part [*i.e.*, 50 C.F.R. part 402, governing Section 7 consultation] apply to all actions in which there is discretionary Federal involvement or control."  The Supreme Court held that (1) 50 C.F.R. § 402.03 was a reasonable interpretation of ESA Section 7 and accordingly entitled to deference; and (2) Section 402(b)—governing EPA decisions on delegation of NPDES permitting authority—did not involve "discretionary Federal involvement or control" and, thus, ESA Section 7 was not implicated.

The Court's holding was predicated on the specific requirements of Section 402(b), which *required* EPA to approve delegation provided the agency determined that the state's permitting program met nine statutorily specified criteria.[6]  All of the statutory criteria focused on the sufficiency of the state's authority to implement the program, and none addressed protection of threatened or endangered species.  The Court emphasized that, although EPA may exercise some judgment in determining whether a state has authority to carry out the enumerated statutory criteria, Section 402(b) "clearly does not grant [EPA] discretion to add another entirely separate prerequisite.  Nothing in the text of section 402(b) authorizes the EPA to *consider the protection of threatened or endangered species as an end in itself when evaluating a transfer application.*"  *Id.* at 671 (emphasis added).  Because EPA was *required* to approve transfer if the statutory criteria were met, and because none of the criteria authorized EPA to "consider the protection of threatened or endangered species as an end in itself," *id.*, EPA lacked discretion to "insure" the protection of threatened or endangered species and Section 7 did not apply. The Court's opinion was focused only on Section 402(b) transfers and made no comment whatsoever about any other state-delegated or state-assumed programs.

2.     **Unlike Delegation Under CWA Section 402(b), CWA Section 404 Approval May Be Considered a Discretionary Federal Action for ESA Consultation Purposes**

As a preliminary matter, EPA's approval or disapproval of state assumption of the Section 404 program is an "action" for purposes of ESA Section 7(a)(2).  The Services' regulations governing ESA consultations expressly define "action" to include "the promulgation of regulations," 50 C.F.R. § 402.02, and EPA's approval of state assumption is undertaken

---

[6] Section 402(b) provides: "The Administrator shall approve each submitted program unless he determines that adequate authority does not exist" with regard to nine specified criteria.  33 U.S.C. § 1342(b).  For the full text of the provision, *see* Appendix A.

through rulemaking.[7] Delegation of authority to states under CWA Section 402 and other similar authorities are also accomplished via rulemaking; but the key issue for ESA Section 7 purposes is, as explained in *National Association of Home Builders*, whether the action is "discretionary" with the agency. Where the action does carry some degree of discretionary federal involvement or control, Section 7 consultation can be triggered.

Specifically, to trigger Section 7 consultation, the statute must give the agency authority to "*consider the protection of threatened or endangered species as an end in itself*" in making the relevant decision. *National Association of Home Builders*, 551 U.S. at 671 (emphasis added). The Supreme Court explained that "Agency discretion presumes that an agency can exercise 'judgment' in connection with a particular action," 551 U.S. at 668, and that "the ESA's requirements would come into play only when an action results from the exercise of agency discretion. This interpretation harmonizes the statutes by giving effect to the ESA's no-jeopardy mandate whenever an agency has discretion to do so, but not when the agency is forbidden from considering such extrastatutory factors," 551 U.S. at 665.

While delegation under Section 402(b) was found to be non-discretionary because EPA "is required by statute to [approve delegation] once certain specified triggering events have occurred," *id.* at 679-80, the analysis under Section 404(g) and (h) reaches an entirely different conclusion. This is clear for several reasons.

First, in stark contrast to Section 402(b), Section 404(g)(2) and (3) expressly require that, when a state applies for assumption, EPA must provide "the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service" an opportunity to comment on a state application for assumption of the 404 program. Relatedly, Section 404(h)(1) expressly requires EPA, in making a determination of whether to approve the state program, to "tak[e] into account any comments submitted by … the Secretary of the Interior, acting through the Director of [USFWS]" under Section 404(g). The USFWS is, of course, responsible for the implementation of the ESA and its consultation requirements. Thus, Section 404(g) expressly requires EPA to receive and consider input specifically focused on the protection of threatened and endangered species. This statutory requirement would be unnecessary (mere surplusage) if EPA were not authorized to consider those comments and thus "consider the protection of threatened or endangered species as an end in itself," *National Association of Home Builders*, 551 U.S. at 671, in determining whether to approve or disapprove assumption. Importantly, CWA Section 402(b) does not include any analogous comment or consideration requirement.

Second, and even more important, Section 404(h)(1) expressly requires EPA, in deciding whether to approve state assumption of the Section 404 program, to determine whether the state has authority "[t]o issue permits which, …apply, and assure compliance with, any applicable

---

[7] *See* Michigan Department of Natural Resources Section 404 Permit Program Approval, 49 Fed. Reg. 38,947 (Oct. 2, 1984) (referring to approval as a "rule" and modifying the Code of Federal Regulations to add 40 C.F.R. § 233.42 codifying Michigan's assumption of the program); New Jersey Department of Environmental Protection and Energy Section 404 Permit Program Approval, 59 Fed. Reg. 9933 (Mar. 2, 1994) (referring to approval as a "rule" and modifying the Code of Federal Regulations to add 40 C.F.R. § 233.71 codifying New Jersey's assumption of the program).

requirement of this section, including, but not limited to, the guidelines established under section (b)(1) of this section…."  The Section 404(b)(1) Guidelines, codified at 40 C.F.R. Part 230, expressly provide that: "No discharge of dredged or fill material shall be permitted if it … *Jeopardizes the continued existence of species listed as endangered or threatened under the Endangered Species Act* of 1973, as amended, or results in likelihood of the destruction or adverse modification of [critical] habitat." 40 C.F.R. § 230.10(b)(3)(emphasis added).  Of critical importance, this express requirement of the 404(b)(1) Guidelines—to insure that the state program is not likely to jeopardize the continued existence of any listed species or likely result in the destruction or adverse modification of critical habitat – is the same requirement, almost word-for-word, found in Section 7(a)(2) of the ESA.

Accordingly, by requiring EPA to take into account the views of the Services and by incorporating consideration of "jeopardy" to species and "adverse modification" of critical habitat via the Section 404(b)(1) Guidelines, Section 404(g) and (h) expressly require EPA to determine whether the state has adequate authority to apply and assure compliance with substantive requirements of the ESA.  Neither requirement is part of EPA's Section 402(b) delegation decision. Accordingly—unlike under Section 402(b)—EPA has discretion under Sections 404(g) and (h) to "consider the protection of threatened and endangered species as an end in itself," *National Association of Home Builders*, 551 U.S. at 671, in determining whether to approve a state's application to assume the Section 404 program.

This view is also firmly supported by the legislative history behind Section 404 state assumption. Yet surprisingly, the 2010 Silva memorandum states that the legislative history of Section 404 supports the view that EPA's approve/disapprove decision is nondiscretionary, but does not offer any language or citation in support of that assertion.  In fact, the legislative history confirms precisely the opposite.  Section 404(g) and (h) were enacted as part of the 1977 amendments to the CWA[8] and these provisions have not been amended since.  Specifically, the drafters of these provisions explained that the required consultation between EPA and USFWS with regard to a state application for assumption "*preserves the Administrator's discretion in addressing the concerns of [USFWS], yet affords them reasonable and early participation which can both strengthen the State program and avoid delays in implementation.*"[9]

This statement is from the Senate Report for the 1977 amendments, which explained the rationale for the consultation requirement in Section 404(g) and (h) as follows:

The Administrator *shall* consult with the Secretary of the Army and the Director of the Fish and Wildlife Service prior to his approval of a State permit program for control of discharges of dredge and fill material (sec. [402(*l*)(2)]).[10] The committee amendments

---

[8] Pub. L. 95–217, § 67(b) ("Clean Water Act of 1977," Dec. 27, 1977, 91 Stat. 1600), added subsections (g) and (h) to CWA Section 404.

[9] S. Rep. 95-370, at 78 (1977) (emphasis added).

[10] The precise citation in the report is to "Section 402 (1) (2)," but it clearly appears intended to refer to Section 402(*l*)(2), which would have been added by the Senate bill discussed in the Senate Report.  Section 402(*l*) of the Senate bill includes language addressing state assumption of Section 404 that was adapted and later enacted as Section 404(g) and (h).

relating to the Fish and Wildlife Service are designed to (1) recognize the particular expertise of that agency and the relationship between its goals for fish and wildlife protection and the goals of the Water Act, and (2) encourage the exercise of its capabilities in the early stages of planning. *By soliciting the views of the principal Federal agencies involved in the review of these programs at an early stage, objections can be resolved that might otherwise surface later and impede the operation of a State program approved by the Administrator. This consultation preserves the Administrator's discretion in addressing the concerns of these agencies, yet affords them reasonable and early participation which can both strengthen the State program and avoid delays in implementation.* That is, early participation in the development and design of programs, guidelines, and regulations should serve to reduce the emphasis now placed on the review by the Fish and Wildlife Service of individual applications for permits under the Water Act.[11]

In other words, just as the statutory text discussed above makes clear, the consultation requirement included in Section 404(g) and (h) was intended to ensure that EPA receive and use its discretion to address issues related to protection of fish and wildlife under a state-assumed Section 404 program. Further, the drafters endorsed the notion that the Section 404(g) assumption approval process should be used to strengthen state programs and resolve fish and wildlife-related issues on the front end, to avoid delays in implementation of state programs.[12]

Several other lower court cases have addressed the question whether certain federal actions involve "discretionary Federal involvement or control" (within the meaning of 50 C.F.R. § 402.03) for purposes of determining whether Section 7 applies. These decisions turn on the specific requirements of each statute and whether the agency's interpretation of those requirements (e.g., whether the federal agency has discretionary involvement or control) is entitled to deference. For example, the Eleventh Circuit, quoting directly from *National Association of Home Builders*, has underscored that the test is "whether [the agency] has discretion in administering the [statute] to *consider the protection of endangered or threatened species as an end*." *Florida Key Deer v. Paulison*, 522 F.3d 1133, 1141 (11th Cir. 2008) (emphasis added). In *Florida Key Deer*, the Eleventh Circuit held that test was met where the statute required the Federal Emergency Management Agency to determine whether to make flood insurance available based on whether local governments had adequate land use and control measures, employing criteria the agency developed. *Id.*[13]

---

[11] S. Rep. 95-370, at 78 (1977) (emphasis added).

[12] "[I]t is intended that the Agency bear in mind the potential cost to individual companies, entire industries, and the economy at large to result if the act is not administered as intended by the Congress. As reflected by the conference report on H.R. 3199, these concerns are prominent among those motivating this legislation." 123 Cong. Rec. 38,975 (1977) (statement by Rep. Clausen); *see also* H.R. Rep. No. 95-830 (Conf. Rep.), at 101 (1977).

[13] *See also Natural Resources Defense Council v. Jewell*, 749 F.3d. 776, 784 (9th Cir. 2014) ("Whether an agency must consult does not turn on the *degree* of discretion that the agency exercises regarding the action in question, but on whether the agency has *any* discretion to act in a manner beneficial to a protected species or its habitat." (emphasis added)); *Karuk Tribe v. U.S.*

Similarly, under Section 404(g) and (h), EPA must determine the adequacy of a state's authority to administer the Section 404 program based on the Section 404(b)(1) guidelines developed by EPA—including the requirement to assure compliance with the exact same requirements relevant to Section 7 consultation.  EPA therefore appears to have discretion to consider the protection of listed species in determining whether to approve state assumption, and that—in anticipation of a state application for assumption—EPA can influence the state's development and implementation of its program to ensure that it provides adequate protections for listed species, including through technical assistance.[14]  In all these respects, contrary to the cursory analysis in the Obama Administration's 2010 Silva memorandum (which notably fails entirely to address the specific text of Sections 404(g) or 404(h)), Section 404 is materially different from Section 402(b) with regard to the potential application of Section 7 consultation.[15]

### 3.    Section 404 Approval is Distinguishable from Section 402 Delegation and Other Delegation Decisions

Section 404 is also distinguishable from the state delegation or primacy provisions (and implementing regulations) for each of the other major environmental statutes administered by EPA, and as a result, a decision by EPA to engage in Section 7 consultation when approving/disapproving state assumption applications under CWA Section 404 will have no adverse precedential effect for other program areas.

At a minimum, this is true with respect to Clean Air Act Sections 111 and 112; Safe Drinking Water Act Sections 1413 (state primacy with regard to regulation of public water

---

*Forest Service*, 681 F.3d 1006, 1024-25 (9th Cir. 2012) ("The relevant question is whether the agency could influence [third-party] activity to benefit a listed species, not whether it must do so").  The D.C. Circuit does not appear to have issued any decisions addressing the question raised by *National Association of Home Builders*.

[14] *See* H.R. Rep. No. 97-830 (Conference Report), at 101 (1977) ("If, with respect to a State program submitted under subsection (g) of section 404, the Administrator determines that the State has the requisite authority to carry out the program he shall approve the program and notify the Secretary who shall suspend the issuance of permits under subsections (a) and (e) of that section for activities covered by the State Program. If the Administrator determines that the State does not have the requisite authority to administer the program, he must so notify the State which notification is to include any revisions or modifications necessary so that the State can resubmit the program for a new determination by the Administrator.").  *See also* EPA, Basic Information about Assumption under CWA Section 404 ("States or tribes should work with their respective EPA Regional Office 'early and often' during the preparation of the Section 404 assumption package to ensure it is complete…. [S]tates or tribes are encouraged to coordinate with all parties during the development of the package before official submission."), at https://www.epa.gov/cwa404g/basic-information-about-assumption-under-cwa-section-404 (visited June 2, 2019).

[15] Additionally, we note that under Section 7(a)(1), all federal agencies, including EPA "shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species and threatened species. . . .".  16 U.S.C. § 1536(a)(1).

systems) and 1425 (state primacy with regard to implementation of the Underground Injection Control program); Section 3006(b) of the Resource Conservation and Recovery Act; and Section 26 of the Federal Insecticide, Fungicide, and Rodenticide Act.[16]  Each of these statutes includes provisions identifying criteria for EPA approval of state primacy or delegation to states of defined regulatory authorities.  Importantly, however, none of these provisions requires EPA to consult with the Secretary of the Interior or the Director of USFWS.  Similarly, none predicates EPA's decision with regard to state delegation or primary on meeting substantive criteria analogous to the CWA Section 401(b) guidelines.  Unlike Section 404, therefore, these other statutory provisions do not authorize EPA to consider protection of listed species as an end in itself in making a delegation or primacy decision, and—under 50 C.F.R. § 402.03—Section 7 accordingly would not apply.

Additionally, as discussed in Section I.E.3. below, by adopting this approach, EPA is entirely free to not engage in consultation with respect to EPA's review of state-issued 404 permits.

## C.    EPA Could Take This Approach as a Permissible Interpretation of CWA Section 404

While Section 404 of the CWA *clearly* gives EPA discretion to consider ESA impacts, EPA could find that Section 404 is *at least ambiguous* with regard to whether EPA has that discretion. In light of such ambiguity, EPA would be free to adopt a permissible interpretation of Section 404(g) and (h) to the effect that, based on its reading of the statute in light of the text, legislative history and various policy considerations, such discretion does exist and allows for EPA to engage in Section 7 consultation when approving state assumptions. To the extent the courts agree that the statute is ambiguous, EPA's view would likely receive deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).[17]

## D.    Key Precedent: Cooling Water Intake Structure Rule

There are precedents for the type of programmatic consultation and ITS described above; one we highlight here is the EPA's Cooling Water Intake Structure Rule, promulgated under CWA Section 316(b) in 2014, 79 Fed. Reg. 48300 (Aug. 15, 2014) ("316(b) Rule").[18]  The 316(b) Rule establishes federal technology-based standards for cooling water intake structures ("CWIS"), intended to address impacts to aquatic life from entrainment or impingement of fish and shellfish.  In virtually all states, state permitting authorities implement the rule's requirements through state-issued permits.  The rule requires permit applicants to provide

---

[16] *See* Appendix A.

[17] This is different than the argument, discussed in the *National Association of Homebuilders* case, that the Services' interpretation of the regulation found at 50 C.F.R. § 402.03 is entitled to deference as a permissible interpretation of Section 7 of the ESA.

[18] Section 316(b) provides: "Any standard established pursuant to section 1311 of this title or section 1316 of this title and applicable to a point source shall require that the location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing adverse environmental impact."  33 U.S.C. § 1326(b).

information regarding potential impacts on listed species and authorizes permit authorities to establish additional requirements to protect such species.  Further, it establishes procedural requirements for permitting authorities to transmit permit applications to the Services and to provide an opportunity for the Services to review and comment on such applications—including recommended measures to address impacts to listed species.  In addition, the rule's preamble emphasized the importance of a preexisting memorandum of agreement between EPA and the Services, which provides that "EPA will use the full extent of its CWA authority to object to a permit where EPA finds that issuance of the permit is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of designated critical habitat."  79 Fed. Reg. at 48,382.  In other words, EPA through the memorandum of agreement effectively committed itself in advance to exercise its objection authority (informed, of course, by input from the Services) to ensure that state-issued permits under Section 316(b) would adequately protect listed species and designated critical habitat.

Under ESA Section 7(a)(2), EPA consulted with the Services with regard to the 316(b) Rule.[19]  The Services determined that the proposed action was likely to adversely affect listed species, and issued a "no jeopardy" Programmatic BiOp as well as a programmatic ITS covering implementation of the rule.[20]  The ITS provides, in relevant part:

> Incidental take exemption will be afforded to EPA when the Rule, including its implementation process, is carried out as described in this Opinion. In addition, any take incidental to the operation of a CWIS permitted under the Rule through the implementation process described in this Opinion will be exempt from Section 9 and Section 4(d) prohibitions if the owner/operator implements enforceable control measures, monitoring, and reporting as agreed upon by the owner/operator and the Services, and as reflected in the permit.[21]

The BiOp describes the "technical assistance" process for the 316(b) Rule as follows:

---

[19] Section 316(b) requires EPA to establish standards reflecting the "best technology available for minimizing adverse environmental impact."  33 U.S.C. § 1326(b).  It is undisputed that this provision (unlike Section 402(b), discussed below, for example) provides EPA with discretion to address impacts to listed species and designated critical habitat.  EPA sought informal consultation with the Services with regard to the Section 316(b) rulemaking, but was unable to obtain their concurrence on EPA's "not likely to adversely affect" finding.  Accordingly, EPA requested formal consultation.

[20] Endangered Species Act Section 7 Consultation, Programmatic Biological Opinion on the U.S. Environmental Protection Agency's Issuance and Implementation of the Final Regulations, Section 316(b) of the Clean Water Act (May 19, 2014), available at https://www.epa.gov/sites/production/files/2015-04/documents/final_316b_bo_and_appendices_5_19_2014.pdf.

[21] *Id.* at 76.

- ESA-listed species and/or critical habitat that occurs in the action area for a facility and impacted by CWIS will be identified by the owner or operator and provided to the Services for verification;

- The [State Permit] Directors are required to send all permit application information to the Services and provide the Services with 60 days to review the information. If the Services provide control measures, monitoring or reporting requirements to reduce impacts associated with CWIS to the Director, the Director may include those in the permit;

- If the Director does not include the control measures, monitoring or reporting requirements recommended by the Services and the Services have concerns that a permit will have more than minor detrimental effects on federally-listed species or critical habitat and contact EPA with their concerns:

    i. EPA will coordinate with the State or Tribe to ensure that the permit will comply with all applicable CWA requirements and will discuss appropriate measures protective of federally-listed species and critical habitat;

    ii. EPA will work with the State or Tribe to reduce or remove the detrimental impacts of the permit, including, in appropriate circumstances, by objecting to and federalizing the permit where consistent with EPA's CWA authority; and

    iii. EPA will exercise the full extent of its CWA authority, to object to a permit proposed by a State where EPA finds (giving deference to the views of the Services) that a State or Tribal permit is likely to jeopardize the continued existence of such species or result in the destruction or adverse modification of such critical habitat.

- Based on correspondence received from EPA on April 8, 2014, EPA will give deference to the views of the Services with regard to effects on federally-listed fish and wildlife resources.[22]

Environmental organizations challenged the 316(b) Rule, Biological Opinion, and ITS in the U.S. Court of Appeals for the Second Circuit.  The Second Circuit rejected these challenges and upheld the rule, the BiOp, and the ITS.[23]  Notably, the court held (1) that, given the

---

[22] *Id.* at 56.  Notably, the assumption regulations require coordination with the Services, including provision of each public notice for an individual permit and each general permit for review and comment, including on consistency with the Section 404(b)(1) Guidelines, along with other information the Regional Administrator may require in developing comments or an objection on the permit as part of the EPA oversight process.  40 C.F.R. § 233.50.  Coordination between the Services and the state in advance of this process will significantly minimize the potential for conflict and delay in the permitting process, and also facilitate oversight.

[23] *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 76-77 (2d Cir. 2018).  Notably, the Second Circuit brief for EPA and the Services specifically explained how the Programmatic ITS

agencies' explanation of the paucity of available information and their commitment to the technical assistance process, the ITS was valid despite its failure to numerically quantify the impacts of the rule on take; and (2) that the ITS's requirement that EPA follow the technical assistance process set forth in the rule, and exercise its related oversight authority to address impacts on listed species, was adequate.[24]

## E.    Implementing Programmatic Consultation and Streamlining the Process

### 1.    Procedures for Programmatic Consultation Regarding Approval of State Assumption of the Section 404 Program

The Services' existing consultation regulations—and proposed changes to those regulations expected to be finalized shortly—expressly authorize the Services to conduct programmatic consultation.

Procedurally, EPA would be required to submit to the Services a biological assessment supporting its request for consultation on the assumption decision, but to facilitate the process, the state could develop this assessment on EPA's behalf or in cooperation with EPA,[25] for development of a BiOp (and potentially a memorandum of understanding) that relies on technical assistance from the Services to ensure that any authorized take is consistent with the programmatic BiOp. Section 404(h) requires EPA to approve or disapprove a state assumption application within 120 days; if EPA fails to affirmatively approve or disapprove the application, it is deemed approved. However, EPA's assumption regulations expressly provide that EPA and the state can extend this and related deadlines by agreement. 40 C.F.R. § 233.15(c). Regardless,

---

is intended to function: "[T]here is powerful incentive for permit applicants to implement the control measures, monitoring, and reporting requirements developed through the technical assistance process and specified in the permit, in order to receive an exemption from the prohibition against take. SPA 211, 213 (BiOp at 64, 66). While a facility could also obtain a take exemption pursuant to ESA §10, that process would require the facility to develop a habitat conservation plan that specifies the anticipated effects of the proposed taking, how those impacts will be minimized or mitigated, and explanation of the rejected alternatives considered by the applicant. 79 Fed. Reg. at 48,380 (summarizing Section 10 permit requirements). Here, facilities have an incentive to comply with the technical assistance process and recommendations in order to obtain incidental take exemptions as part of their compliance with the NPDES permit process instead of going through a separate, additional process under ESA §10." The court also noted that a consultation on individual permits would not be required for state-issued permits. *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d at n. 14 ("The "agency action" subject to consultation here was the EPA's promulgation of the Rule, not the subsequent implementation of the Rule by State Directors.").

[24] *Id*.

[25] A Federal agency may designate a "non-Federal representative" to conduct informal consultation or prepare a biological assessment by giving written notice to the Services of such designation. 50 C.F.R. § 402.08; *see also* 50 C.F.R. § 402.02 ("designated non-Federal representative" refers to the entity designated by the Federal action agency as its representative to conduct informal consultation and/or to prepare any biological assessment.").

to ensure expeditious approval of assumption and issuance of the accompanying BiOp and ITS, it would be important that the state seeking assumption work closely with EPA and the Services to prepare the biological evaluation or assessment supporting consultation in advance of submitting its application for assumption.

### 2. State Section 404 Regulations: Safeguards for Listed Species

From a substantive perspective, Florida's draft proposed Section 404 regulations incorporate requirements—as required by the CWA Section 401(b) guidelines and therefore by CWA Section 404(h)—that "insure" that a state-assumed Section 404 program is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat." For example, the draft regulations include the following provisions:

- A requirement that no individual permit shall be issued where the project is inconsistent with the CWA, including the Section 401(b) guidelines codified at 40 C.F.R. part 230 (which includes the listed species and critical habitat protection discussed above).[26]

- Requirements that no individual or general permit shall be issued that jeopardizes the continued existence of listed species or critical habitat.[27]

- A requirement that no individual permit shall be issued that causes or contributes to significant degradation of jurisdictional waters, including significant adverse effects on life stages or aquatic life and other wildlife dependent on aquatic ecosystems.[28]

- A provision stating that no activity is authorized under any general permit that "may affect" a listed species or critical habitat, unless the state has consulted with federal and/or state wildlife agencies and appropriate measures to address the effects of the proposed activity have been implemented or are required as a specific condition to the general permit.[29]

These and related requirements, which would be enforceable through judicial review under state law, ensure that the state has both the authority and the obligation to ensure that state-issued permits issued after assumption will adequately protect listed species.

---

[26] F.A.C. § 62.331.053(3) (May 10, 2018 Draft).

[27] *Id.*; F.A.C. § 62.331.201(k) (May 10, 2018 Draft).

[28] F.A.C. § 62.331.053(3) (May 10, 2018 Draft).

[29] F.A.C. § 62.331.201(k) (May 10, 2018 Draft).

3. **EPA Oversight of State Permitting Decisions: Federal Backstop Authority**

In addition to the substantive requirements of the state's regulations for Section 404 permits, EPA's residual authority to oversee *individual state permitting decisions* (possibly supplemented by a new memorandum of understanding) provide a *federal backstop mechanism* to ensure that listed species are adequately protected in state permitting decisions. An advantage to this Option is that it will help ensure that EPA seldom (or perhaps never) needs to reject a state-issued 404 permit on ESA grounds.

Specifically, Section 404(j) and EPA's regulations provide that the state is required to present to EPA copies of all permit applications submitted to the state for approval and EPA must provide copies of those application to the USFWS for review and an opportunity to comment. 33 U.S.C. § 1344(j); 40 C.F.R. § 233.50(b). EPA cannot waive review of permits for "discharges with a reasonable potential for affecting listed species as determined by [USFWS]." 40 C.F.R. § 233.51(b)(2). EPA must notify the state of any comments, objections, or recommendations, and the reasons for such, and the actions the state must take in order to eliminate any objections. EPA may object to the proposed permit on the grounds that it does not comply with the requirements of the Clean Water Act and/or the Section 404(b)(1) guidelines, which, again, include the listed species protections discussed above. 40 C.F.R. § 233.50(e). When a state has received an EPA objection or requirement for a permit condition to the proposed permit, the state cannot issue the proposed permit unless it takes the steps required by EPA to eliminate the objection or EPA withdraws the objection. 40 C.F.R. § 233.50(f), 233.50(h).

Importantly, EPA oversight of state permit applications under the Part 233 regulations does not itself require consultation under ESA Section 7. First, EPA's comments, objections and recommendation on Section 404 permit application submitted to an assumed state program do not constitute final agency action for purposes of the Administrative Procedure Act—because they do not mark the consummation of a decision-making process and do not determine legal rights or obligations of the applicant.[30] Accordingly, there is a strong argument that such comments, objections, and recommendations do not constitute agency "actions" within the meaning of ESA Section 7.[31] Further, the Section 7 consultation obligation would already have been met by virtue of the initial consultation regarding approval of assumption—and any further Section 7 consultation with regard to a subsequent state permit application would be

---

[30] *See Marquette City. Rd. Comm'n v. EPA*, 188 F. Supp. 3d 641, 647-53 (W.D. Mich. 2016), *aff'd* 726 Fed. Appx. 461 (6th Cir. 2018); *see also Bennett v. Spear*, 520 U.S. 154 (1997).

[31] Certainly, EPA's *failure* to object to a proposed state permit does not constitute agency "action" within the meaning of Section 7. *See e.g.*, *Western Watersheds Project v. Matejko,* 468 F.3d 1099, 1108 (9th Cir. 2005) ("Section 7(a)(2) consultation stems only from affirmative actions" and "inaction is not "action" for Section 7(a)(2) purposes"); *District of Columbia v. Schramm*, 631 F.2d. 854, 862 (D.C. Cir. 1980) (EPA's failure to object to state NPDES permit is not a federal action, much less a "major" federal action for purposes of NEPA).

unnecessarily duplicative of the technical assistance process involving the Services that (as discussed further below) would be adopted as part of assumption.

**Appendix A: Key Statutory Provisions Governing Delegation, Primacy, and Assumption**

**Clean Water Act Sections 404(g) and (h) (33 U.S.C. § 1344(g) and (h))**

"**(g) State administration**

(1) The Governor of any State desiring to administer its own individual and general permit program for the discharge of dredged or fill material into the navigable waters (other than those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto) within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program.

(2) Not later than the tenth day after the date of the receipt of the program and statement submitted by any State under paragraph (1) of this subsection, the Administrator shall provide copies of such program and statement to the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service.

(3) Not later than the ninetieth day after the date of the receipt by the Administrator of the program and statement submitted by any State, under paragraph (1) of this subsection, the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, shall submit any comments with respect to such program and statement to the Administrator in writing.

**(h) Determination of State's authority to issue permits under State program; approval; notification; transfers to State program**

(1) Not later than the one-hundred-twentieth day after the date of the receipt by the Administrator of a program and statement submitted by any State under paragraph (1) of this subsection, the Administrator shall determine, taking into account any comments submitted by the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, pursuant to subsection (g) of this section, whether such State has the following authority with respect to the issuance of permits pursuant to such program:

(A) To issue permits which--

(i) apply, and assure compliance with, any applicable requirements of this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section, and sections 1317 and 1343 of this title;

16

(ii) are for fixed terms not exceeding five years; and

(iii) can be terminated or modified for cause including, but not limited to, the following:

(I) violation of any condition of the permit;

(II) obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

(III) change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge.

(B) To issue permits which apply, and assure compliance with, all applicable requirements of section 1318 of this title, or to inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title.

(C) To assure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application.

(D) To assure that the Administrator receives notice of each application (including a copy thereof) for a permit.

(E) To assure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing.

(F) To assure that no permit will be issued if, in the judgment of the Secretary, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby.

(G) To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement.

(H) To assure continued coordination with Federal and Federal-State water-related planning and review processes.

(2) If, with respect to a State program submitted under subsection (g)(1) of this section, the Administrator determines that such State--

(A) has the authority set forth in paragraph (1) of this subsection, the Administrator shall approve the program and so notify (i) such State and (ii) the

Secretary, who upon subsequent notification from such State that it is administering such program, shall suspend the issuance of permits under subsections (a) and (e) of this section for activities with respect to which a permit may be issued pursuant to such State program; or

(B) does not have the authority set forth in paragraph (1) of this subsection, the Administrator shall so notify such State, which notification shall also describe the revisions or modifications necessary so that such State may resubmit such program for a determination by the Administrator under this subsection.

(3) If the Administrator fails to make a determination with respect to any program submitted by a State under subsection (g)(1) of this section within one-hundred-twenty days after the date of the receipt of such program, such program shall be deemed approved pursuant to paragraph (2)(A) of this subsection and the Administrator shall so notify such State and the Secretary who, upon subsequent notification from such State that it is administering such program, shall suspend the issuance of permits under subsection (a) and (e) of this section for activities with respect to which a permit may be issued by such State.

(4) After the Secretary receives notification from the Administrator under paragraph (2) or (3) of this subsection that a State permit program has been approved, the Secretary shall transfer any applications for permits pending before the Secretary for activities with respect to which a permit may be issued pursuant to such State program to such State for appropriate action.

(5) Upon notification from a State with a permit program approved under this subsection that such State intends to administer and enforce the terms and conditions of a general permit issued by the Secretary under subsection (e) of this section with respect to activities in such State to which such general permit applies, the Secretary shall suspend the administration and enforcement of such general permit with respect to such activities.

## Clean Water Act Section 402(b) (33 U.S.C. § 1342(b))

"**(b) State permit programs**

At any time after the promulgation of the guidelines required by subsection (i)(2) of section 1314 of this title, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. **The Administrator shall approve each submitted program unless he determines that adequate authority does not exist:**

(1) To issue permits which--

(A) apply, and insure compliance with, any applicable requirements of sections 1311, 1312, 1316, 1317, and 1343 of this title;

(B) are for fixed terms not exceeding five years; and

(C) can be terminated or modified for cause including, but not limited to, the following:

(i) violation of any condition of the permit;

(ii) obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

(iii) change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;

(D) control the disposal of pollutants into wells;

(2)(A) To issue permits which apply, and insure compliance with, all applicable requirements of section 1318 of this title; or

(B) To inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title;

(3) To insure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application;

(4) To insure that the Administrator receives notice of each application (including a copy thereof) for a permit;

(5) To insure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing;

(6) To insure that no permit will be issued if, in the judgment of the Secretary of the Army acting through the Chief of Engineers, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby;

(7) To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement;

19

(8) To insure that any permit for a discharge from a publicly owned treatment works includes conditions to require the identification in terms of character and volume of pollutants of any significant source introducing pollutants subject to pretreatment standards under section 1317(b) of this title into such works and a program to assure compliance with such pretreatment standards by each such source, in addition to adequate notice to the permitting agency of (A) new introductions into such works of pollutants from any source which would be a new source as defined in section 1316 of this title if such source were discharging pollutants, (B) new introductions of pollutants into such works from a source which would be subject to section 1311 of this title if it were discharging such pollutants, or (C) a substantial change in volume or character of pollutants being introduced into such works by a source introducing pollutants into such works at the time of issuance of the permit. Such notice shall include information on the quality and quantity of effluent to be introduced into such treatment works and any anticipated impact of such change in the quantity or quality of effluent to be discharged from such publicly owned treatment works; and

(9) To insure that any industrial user of any publicly owned treatment works will comply with sections 1284(b), 1317, and 1318 of this title.

## Clean Air Act Sections 111 and 112

Section 111 (42 U.S.C. § 7411(c)):

"**(c) State implementation and enforcement of standards of performance**

(1) Each State may develop and submit to the Administrator a procedure for implementing and enforcing standards of performance for new sources located in such State. **If the Administrator finds the State procedure is adequate, he shall delegate to such State any authority he has under this chapter to implement and enforce such standards.**

(2) Nothing in this subsection shall prohibit the Administrator from enforcing any applicable standard of performance under this section."

Section 112 (42 U.S.C. § 7412(l))

"(1) In general

Each State may develop and submit to the Administrator for approval a program for the implementation and enforcement (including a review of enforcement delegations previously granted) of emission standards and other requirements for air pollutants subject to this section or requirements for the prevention and mitigation of accidental releases pursuant to subsection (r) of this section. A program submitted by a State under this subsection may provide for partial or complete delegation of the Administrator's authorities and responsibilities to implement and enforce emissions standards and

prevention requirements but shall not include authority to set standards less stringent than those promulgated by the Administrator under this chapter.

. . . .

(5) Approval or disapproval

Not later than 180 days after receiving a program submitted by a State, and after notice and opportunity for public comment, the Administrator shall either approve or disapprove such program. **The Administrator shall disapprove any program submitted by a State, if the Administrator determines that—**

> (A) the authorities contained in the program are not adequate to assure compliance by all sources within the State with each applicable standard, regulation or requirement established by the Administrator under this section;
>
> (B) adequate authority does not exist, or adequate resources are not available, to implement the program;
>
> (C) the schedule for implementing the program and assuring compliance by affected sources is not sufficiently expeditious; or
>
> (D) the program is otherwise not in compliance with the guidance issued by the Administrator under paragraph (2) or is not likely to satisfy, in whole or in part, the objectives of this chapter.

. . . ."


**Safe Drinking Water Act Sections 1413 and 1425**

Section 1413 (42 U.S.C. § 300g-2(a)) (Regulation of Public Water Systems):

"(a) In general

For purposes of this subchapter, a State has primary enforcement responsibility for public water systems during any period for which the Administrator determines (pursuant to regulations prescribed under subsection (b)) that such State--

> (1) has adopted drinking water regulations that are no less stringent than the national primary drinking water regulations promulgated by the Administrator under subsections (a) and (b) of section 300g-1 of this title not later than 2 years after the date on which the regulations are promulgated by the Administrator, except that the Administrator may provide for an extension of not more than 2 years if, after submission and review of appropriate, adequate documentation from the State, the Administrator determines that the extension is necessary and justified;

21

(2) has adopted and is implementing adequate procedures for the enforcement of such State regulations, including conducting such monitoring and making such inspections as the Administrator may require by regulation;

(3) will keep such records and make such reports with respect to its activities under paragraphs (1) and (2) as the Administrator may require by regulation;

(4) if it permits variances or exemptions, or both, from the requirements of its drinking water regulations which meet the requirements of paragraph (1), permits such variances and exemptions under conditions and in a manner which is not less stringent than the conditions under, and the manner in which variances and exemptions may be granted under sections 300g-4 and 300g-5 of this title;

(5) has adopted and can implement an adequate plan for the provision of safe drinking water under emergency circumstances including earthquakes, floods, hurricanes, and other natural disasters, as appropriate;

(6) has adopted and is implementing procedures for requiring public water systems to assess options for consolidation or transfer of ownership or other actions in accordance with the regulations issued by the Administrator under section 300g-3(h)(6) of this title; and

(7) has adopted authority for administrative penalties (unless the constitution of the State prohibits the adoption of the authority) in a maximum amount--

> (A) in the case of a system serving a population of more than 10,000, that is not less than $1,000 per day per violation; and

> (B) in the case of any other system, that is adequate to ensure compliance (as determined by the State);

except that a State may establish a maximum limitation on the total amount of administrative penalties that may be imposed on a public water system per violation.

Section 1425 (42 U.S.C. § 300h-1(b)) (Underground Injection Control Programs):

"**(b) State applications; notice to Administrator of compliance with revised or added requirements; approval or disapproval by Administrator; duration of State primary enforcement responsibility; public hearing**

(1)(A) Each State listed under subsection (a) shall within 270 days after the date of promulgation of any regulation under section 300h of this title (or, if later, within 270 days after such State is first listed under subsection (a)) **submit to the Administrator an application which contains a showing satisfactory to the Administrator that the State—**

(i) has adopted after reasonable notice and public hearings, and will implement, an underground injection control program which meets the requirements of regulations in effect under section 300h of this title; and

(ii) will keep such records and make such reports with respect to its activities under its underground injection control program as the Administrator may require by regulation.

The Administrator may, for good cause, extend the date for submission of an application by any State under this subparagraph for a period not to exceed an additional 270 days.

(B) Within 270 days of any amendment of a regulation under section 300h of this title revising or adding any requirement respecting State underground injection control programs, each State listed under subsection (a) shall submit (in such form and manner as the Administrator may require) a notice to the Administrator containing a showing satisfactory to him that the State underground injection control program meets the revised or added requirement.

(2) Within ninety days after the State's application under paragraph (1)(A) or notice under paragraph (1)(B) and after reasonable opportunity for presentation of views, the Administrator shall by rule either approve, disapprove, or approve in part and disapprove in part, the State's underground injection control program.

(3) **If the Administrator approves the State's program under paragraph (2), the State shall have primary enforcement responsibility for underground water sources until such time as the Administrator determines, by rule, that such State no longer meets the requirements of clause (i) or (ii) of paragraph (1)(A) of this subsection.**

(4) Before promulgating any rule under paragraph (2) or (3) of this subsection, the Administrator shall provide opportunity for public hearing respecting such rule."

**Resource Conservation and Recovery Act Hazardous Waste Provision Section 3006(b) (42 U.S.C. § 6926)**

"**(b) Authorization of State program**

Any State which seeks to administer and enforce a hazardous waste program pursuant to this subchapter may develop and, after notice and opportunity for public hearing, submit to the Administrator an application, in such form as he shall require, for authorization of such program. Within ninety days following submission of an application under this subsection, **the Administrator shall issue a notice as to whether or not he expects such program to be authorized, and within ninety days following such notice (and after opportunity for public hearing) he shall publish his findings as to whether or not the conditions listed in items (1), (2), and (3) below have been met.** Such State is authorized to carry out such program in lieu of the Federal program under this subchapter in such State and to issue and enforce permits for the storage, treatment, or disposal of

23

hazardous waste (and to enforce permits deemed to have been issued under section 6935(d)(1) of this title) unless, within ninety days following submission of the application the Administrator notifies such State that such program may not be authorized and, within ninety days following such notice and after opportunity for public hearing, he finds that (1) such State program is not equivalent to the Federal program under this subchapter, (2) such program is not consistent with the Federal or State programs applicable in other States, or (3) such program does not provide adequate enforcement of compliance with the requirements of this subchapter. In authorizing a State program, the Administrator may base his findings on the Federal program in effect one year prior to submission of a State's application or in effect on January 26, 1983, whichever is later."

**Federal Insecticide, Fungicide, and Rodenticide Act Section 26 (7 U.S.C. § 136w-1(a))**

"**(a) In general**

For the purposes of this subchapter, **a State shall have primary enforcement responsibility for pesticide use violations during any period for which the Administrator determines that such State**—

> (1) has adopted adequate pesticide use laws and regulations, except that the Administrator may not require a State to have pesticide use laws that are more stringent than this subchapter;

> (2) has adopted and is implementing adequate procedures for the enforcement of such State laws and regulations; and

> (3) will keep such records and make such reports showing compliance with paragraphs (1) and (2) of this subsection as the Administrator may require by regulation."

*Nov. 2, 2020 Comment Letter to the U.S. Environmental Protection Agency from Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper re: Florida's Request To Assume Administration of a Clean Water Act Program [EPA-HQ-OW-2018-0640-0001]*

# EXHIBIT 69

**U.S. Fish and Wildlife Service**

# Florida Panther

# Recovery Plan



Photo by Mark Lotz, Florida Fish and Wildlife Conservation Commission

## 3rd Revision

# FLORIDA PANTHER RECOVERY PLAN

## (*Puma concolor coryi*)

### THIRD REVISION

Original Approval:  December 17, 1981
First Revision Approved:  June 22, 1987
Second Revision Approved:  March 13, 1995

Prepared by

The Florida Panther Recovery Team

and

South Florida Ecological Services Office
U.S. Fish and Wildlife Service

for

U.S. Fish and Wildlife Service
Southeast Region
Atlanta, Georgia

Approved: _____

Regional Director, U.S. Fish and Wildlife Service

Date: _____

**DISCLAIMER**

Recovery plans delineate actions which the best available science indicates are required to recover and protect listed species. Plans are published by the U.S. Fish and Wildlife Service (FWS), sometimes prepared with the assistance of recovery teams, contractors, State agencies, and others. Objectives will be attained and any necessary funds made available subject to budgetary and other constraints affecting the parties involved, as well as the need to address other priorities. Nothing in this plan should be construed as a commitment or requirement that any Federal agency obligate or pay funds in contravention of the Anti-Deficiency Act, 31 U.S.C. 1341, or any other law or regulation. Recovery plans do not necessarily represent the views or the official positions or approval of any individuals or agencies involved in the plan formulation, other than the FWS. They represent the official position of the FWS only after they have been signed by the Regional Director. Approved recovery plans are subject to modification as dictated by new findings, changes in species status, and the completion of recovery actions.

LITERATURE CITATION SHOULD READ AS FOLLOWS:

U.S. Fish and Wildlife Service. 2008. Florida Panther Recovery Plan (*Puma concolor coryi*), Third Revision. U.S. Fish and Wildlife Service. Atlanta, Georgia. 217pp.

ADDITIONAL COPIES MAY BE OBTAINED FROM:

U.S. Fish and Wildlife Service
1339 20th Street
Vero Beach, FL 32960
772-562-3909

Recovery plans can be downloaded from http://www.fws.gov/endangered  or
http://www.fws.gov/verobeach

**RECOVERY TEAM MEMBERS**

| | |
|---|---|
| Buddy Baker | South Carolina Department of Natural Resources |
| Sonny Bass | National Park Service/Everglades National Park |
| Chris Belden[*] | U.S. Fish and Wildlife Service |
| Skip Bergmann | U.S. Army Corps of Engineers |
| Debbie Blanco* | Sarasota County Natural Resources |
| Dana Bryan* | Florida Department of Environmental Protection |
| Mary Bryant | The Nature Conservancy |
| Jimmy Bullock | International Paper Company |
| Barbara Cintron | U.S. Army Corps of Engineers |
| Joe Clark* | U.S. Geological Survey, Biological Resources Division |
| Mark Cunningham* | Florida Fish and Wildlife Conservation Commission |
| Don Cuozzo | National Association of Home Builders |
| Kipp Frohlich* | Florida Fish and Wildlife Conservation Commission |
| Skip Griep* | U.S. Forest Service |
| Karen Gustin | National Park Service/Big Cypress National Preserve |
| Dennis Hardin* | Florida Division of Forestry |
| Deborah Jansen* | National Park Service/Big Cypress National Preserve |
| Tom Jones | Barron Collier Partnership |
| F. K. Jones | Miccosukee Tribe of Indians of Florida |
| Nick Kapustin* | Jacksonville Zoo |
| Robert Lacy | Chicago Zoological Society |

[*] Current members, alternates, and U.S. Fish and Wildlife Service participants who actively contributed by attending meetings.

| | |
|---|---|
| Darrell Land* | Florida Fish and Wildlife Conservation Commission |
| Dwight LeBlanc | U.S. Department of Agriculture, APHIS, Wildlife Services |
| Gary Lester | Louisiana Department of Wildlife and Fisheries |
| Laurie Macdonald* | Defenders of Wildlife |
| Dave Maehr | University of Kentucky |
| Frank Mazzotti | University of Florida |
| Roy McBride* | Livestock Protection Company |
| Brian Murphy | Quality Deer Management Association |
| Erin Myers* | Natural Resources Conservation Service |
| Stephen O'Brien | National Cancer Institute |
| Tim O'Meara* | Florida Fish and Wildlife Conservation Commission |
| Jim Ozier | Georgia Wildlife Resources Division |
| Pedro Ramos | National Park Service/Big Cypress National Preserve |
| Richard Rummel | Mississippi Department of Wildlife, Fisheries & Parks |
| Mark Sasser | Alabama Division of Wildlife and Freshwater Fisheries |
| David Shindle* | Conservancy of Southwest Florida |
| Mel Sunquist | University of Florida |
| David Thompson | White Oak Conservation Center |
| Steve Williams* | Florida Panther Society |
| Ed Woods* | Seminole Tribe of Florida |
| Wesley Woolf* | National Wildlife Federation |

Recovery Team Member Alternates:

Phillip Brouse*               Sarasota County Natural Resources

Monika Dey*                  U.S. Army Corps of Engineers

Elizabeth Fleming*           Defenders of Wildlife

Margaret Trani (Griep)*      U.S. Forest Service

Sarah Grubs*                 Seminole Tribe of Florida

Laura Hartt*                 National Wildlife Federation

Karen Hill*                  Florida Panther Society

Jon Moulding*                U.S. Army Corps of Engineers

Cynthia Ovdenk*              U.S. Army Corps of Engineers

Mike Owen                    Florida Department of Environmental Protection

Nancy Payton                 Florida Wildlife Federation


U.S. Fish and Wildlife Service Participants:

Paula Halupa*                South Florida Ecological Services Field Office

Layne Hamilton               Florida Panther National Wildlife Refuge

Larry Richardson*            Florida Panther National Wildlife Refuge

Cindy Schulz*                South Florida Ecological Services Field Office

Paul Souza*                  South Florida Ecological Services Field Office


Meeting Facilitators – Florida Conflict Resolution Consortium:

Chris Pedersen               Orlando

Tom Taylor                   Tallahassee

Previous Recovery Team members that attended meetings were Lincoln Bormann (The Nature Conservancy), Pete David (South Florida Water Management District), Thomas Eason (Florida Fish and Wildlife Conservation Commission), John Kasbohm (U.S. Fish and Wildlife Service), Jeff Norment (Natural Resources Conservation Service), and Jora Young (The Nature Conservancy).

**ACKNOWLEDGMENTS**

The initial work (2001 - 2004) on this third revision of the Florida Panther Recovery Plan was led by John Kasbohm with the assistance of Dawn Jennings (U.S. Fish and Wildlife Service). Jora Young guided the Team through the threats analysis process and produced the Threats Analysis tables. Building upon that early work, Chris Belden and Cindy Schulz led the team through to completion of this revision.

Many people contributed to this revision, and some spent countless hours working on specific sections. The Overview and much of the Background Sections were initially written by John Kasbohm. Parts of the Background Section were updated and added to by Chris Belden, Mark Cunningham, Elizabeth Fleming, Paula Halupa, Laura Hartt, Karen Hill, Nick Kapustin, Darrell Land, Laurie Macdonald, Roy McBride, Tim O'Meara, Cindy Schulz, and Wes Woolf. The Recovery Strategy was drafted by Laura Hartt and Karen Hill with assistance from Larry Richardson, Wes Woolf, and Steve Williams. The Recovery Action Outline and Narrative Section and Implementation Schedule were a Team effort, but specific parts were provided by Kipp Frohlich, Margaret Trani (Griep), Tim O'Meara, and Karen Hill. Karen Hill provided the majority of the Public Awareness and Education parts of these sections.

The major editing for this revision was done by Cindy Schulz, Chris Belden, and Paula Halupa. Editorial suggestions were also provided by Laura Hartt, Deborah Jansen, Elizabeth Fleming, Karen Hill, Tim O'Meara, Joe Clark, Dana Bryan, Laurie Macdonald, and Mark Cunningham. We want to thank Chris Pederson and Tom Taylor for keeping us focused by facilitating our meetings.

## EXECUTIVE SUMMARY

### Current Species Status

The Florida panther is the last subspecies of *Puma* still surviving in the eastern United States. Historically occurring throughout the southeastern United States, today the panther is restricted to less than 5% of its historic range in one breeding population located in south Florida. The panther population has increased from an estimated 12-20 (excluding kittens) in the early 1970s to an estimated 100 - 120 in 2007. However, the panther continues to face numerous threats due to an increasing human population and development in panther habitat negatively impacts recovery. The panther is federally listed as endangered (see Appendix A for definitions) under the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*) and is on the State endangered lists for Florida, Georgia, Louisiana, and Mississippi. The panther has a recovery priority number of 6c.

### Habitat Requirements and Limiting Factors

Panthers are wide ranging, secretive, and occur at low densities. They require large contiguous areas to meet their social, reproductive, and energetic needs. Panther habitat selection is related to prey availability (i.e., habitats that make prey vulnerable to stalking and capturing are selected). Dense understory vegetation provides some of the most important feeding, resting, and denning cover for panthers. Telemetry monitoring and ground tracking indicate that panthers select forested habitat types interspersed with other habitat types that are used in proportion to their availability.

Limiting factors for the Florida panther are habitat availability, prey availability, and lack of human tolerance.  Habitat loss, degradation, and fragmentation is the greatest threat to panther survival, while lack of human tolerance threatens panther recovery.  Panther mortality due to collisions with vehicles threatens potential population expansion.  Potential panther habitat throughout the Southeast continues to be affected by urbanization, residential development, road construction, conversion to agriculture, mining and mineral exploration, and lack of land use planning that recognizes panther needs.  Public support is critical to attainment of recovery goals and reintroduction efforts.  Political and social issues will be the most difficult aspects of panther recovery and must be addressed before reintroduction efforts are initiated.

**Recovery Strategy**

The recovery strategy for the Florida panther is to maintain, restore, and expand the panther population and its habitat in south Florida, expand this population into south-central Florida, reintroduce at least two additional viable populations within the historic range outside of south and south-central Florida, and facilitate panther recovery through public awareness and education.  The panther depends upon habitat of sufficient quantity, quality, and spatial configuration for long-term persistence, therefore the plan is built upon habitat conservation and reducing habitat-related threats.  Range expansion and reintroduction of additional populations are recognized as essential for recovery.  Similarly, fostering greater public understanding and support is necessary to achieve panther conservation and recovery.

**Recovery Goal**

The goal of this recovery plan is to achieve long-term viability of the Florida panther to a point where it can be reclassified from endangered to threatened, and then removed from the Federal List of endangered and threatened species.

**Recovery Objectives**

1.  To maintain, restore, and expand the panther population and its habitat in south Florida and expand the breeding portion of the population in south Florida to areas north of the Caloosahatchee River.

2.  To identify, secure, maintain, and restore panther habitat in potential reintroduction areas within the historic range, and to establish viable populations of the panther outside south and south-central Florida.

3.  To facilitate panther recovery through public awareness and education.

**Recovery Criteria**

Reclassification will be considered when:

1.  Two viable populations of at least 240 individuals (adults and subadults) each have been established and subsequently maintained for a minimum of twelve years (two panther generations; one panther generation is six years [Seal and Lacy 1989]).

2.  Sufficient habitat quality, quantity, and spatial configuration to support these populations is retained / protected or secured for the long-term.

A viable population, for purposes of Florida panther recovery, has been defined as one in which there is a 95% probability of persistence for 100 years.  This population may be distributed in a metapopulation structure composed of subpopulations that total 240 individuals.  There must be exchange of individuals and gene flow among subpopulations.  For reclassification, exchange of individuals and gene flow can be either natural or through management.  If managed, a commitment to such management must be formally documented and funded.  Habitat should be in relatively unfragmented blocks that provide for food, shelter, and characteristic movements (e.g., hunting, breeding, dispersal, and territorial behavior) and support each metapopulation at a minimum density of 2 to 5 animals per 100 square miles (259 square kilometers) (Seidensticker et al. 1973, Logan et al. 1986, Maehr et al. 1991a, Ross and Jalkotzy 1992, Spreadbury et al. 1996, Logan and Sweanor 2001, Kautz et al. 2006), resulting in a minimum of 4,800 – 12,000 square miles (12,432 – 31,080 square kilometers) per metapopulation of 240 panthers.  The amount of area needed to support each metapopulation will depend upon the quality of available habitat and the density of panthers it can support.

Delisting will be considered when:

1.  Three viable, self-sustaining populations of at least 240 individuals (adults and subadults) each have been established and subsequently maintained for a minimum of twelve years.

2.  Sufficient habitat quality, quantity, and spatial configuration to support these populations is
    retained / protected or secured for the long-term.

For delisting, exchange of individuals and gene flow among subpopulations must be natural (i.e.,
not manipulated or managed).

Interim Recovery Goal

Due to the challenging nature of attaining the recovery criteria, an interim recovery goal has been
established to assist in determining progress towards the ultimate goals of reclassification and
delisting.

This interim goal is to achieve and maintain a minimum of 80 individuals (adults and subadults)
in each of two reintroduction areas within the historic range and to maintain, restore, and expand
the south / south-central Florida subpopulation.

The interim goal will be met when:

1.  The south / south-central Florida panther subpopulation has been maintained, restored, and
    expanded beyond 80 to 100 individuals (adults and subadults).

2.  Two subpopulations with a minimum of 80 individuals each have been established and
    maintained within the historic range.

3.  Sufficient habitat quality, quantity, and spatial configuration to support these three
    subpopulations is retained / protected or secured for the long-term.

There must be exchange of individuals and gene flow among these subpopulations.  This exchange of individuals and gene flow can be either natural or through management.

**Actions Needed**

1.  Maintain, restore, and expand the panther population and its habitat in south Florida.

2.  Expand the breeding portion of the population in south Florida to areas north of the Caloosahatchee River.

3.  Identify potential reintroduction areas within the historic range of the panther.

4.  Reestablish viable panther populations outside of south and south-central Florida within the historic range.

5.  Secure, maintain, and restore habitat in reintroduction areas.

6.  Facilitate panther conservation and recovery through public awareness and education.

**Total Estimated Cost of Recovery**

Cost estimates reflect costs for specific actions needed to achieve Florida panther recovery. Estimates do not include costs that agencies or other entities normally incur as part of their

mission or normal operating expenses.  The following table provides cost estimates for five years
for recovery actions listed in the Implementation Schedule of this document.  These costs reflect
an estimate of funding that could come from FWS and / or its many partners listed in the
Implementation Schedule.  Costs for some recovery actions were not determinable; therefore, the
total cost for recovery during this period is higher than this estimate.

**Estimated Cost of Recovery for Five Years by Recovery Action Priority (Dollars x 1,000):**

| Year | Priority 1 Action | Priority 2 Actions | Priority 3 Actions | Total |
|------|------|------|------|------|
| 1 | 875 | 1,981 | 1,713.5 | 4,569.5 |
| 2 | 875 | 1,696 | 1,506.5 | 4,077.5 |
| 3 | 835 | 1,561 | 1,231.5 | 3,627.5 |
| 4 | 835 | 921 | 981.5 | 2,737.5 |
| 5 | 835 | 921 | 981.5 | 2,737.5 |
| Total | 4,255 | 7,080 | 6,414.5 | 17,750 |

**Date of Recovery**

If all actions are fully funded and implemented as outlined, including full cooperation of all
partners needed to achieve recovery, criteria for reclassification from endangered to threatened
could be accomplished within 30 years; criteria for delisting could be accomplished within 45
years following reclassification.  However, due to the challenging nature of panther recovery
these are estimates that will be reevaluated as recovery actions are implemented.

# TABLE OF CONTENTS

*DISCLAIMER*..................................................................................................*ii*

*RECOVERY TEAM MEMBERS*...............................................................*iii*

*ACKNOWLEDGMENTS*............................................................................*vi*

*EXECUTIVE SUMMARY*..........................................................................*viii*

   **Current Species Status** ..............................................................................viii

   **Habitat Requirements and Limiting Factors**...........................................viii

   **Recovery Strategy**......................................................................................ix

   **Recovery Goal** ............................................................................................x

   **Recovery Objectives** ...................................................................................x

   **Recovery Criteria** .......................................................................................x

   **Actions Needed** ........................................................................................xiii

   **Total Estimated Cost of Recovery**...........................................................xiii

   **Date of Recovery** .....................................................................................xiv

*I. BACKGROUND* .....................................................................................*1*

   **A. Overview** .................................................................................................3

   **B. Description** .............................................................................................5

   **C. Taxonomy** ..............................................................................................7

   **D. Population Trends and Distribution** ...................................................12

   **E. Life History / Ecology** .........................................................................16

   **F. Habitat Characteristics / Ecosystem** ..................................................26

   **G. Habitat and Prey Management** ...........................................................31

   **H. Response to Management Activities** ...................................................33

   **I. Reasons for Listing / Threats Assessment** ..........................................34

   **J. Past and Current Conservation Efforts** ..............................................58

   **K. Population Viability Analysis** ..............................................................77

*II. RECOVERY STRATEGY*......................................................................*87*

*III. RECOVERY GOAL, OBJECTIVES, AND CRITERIA* ........................*95*

   **Recovery Goal** ..........................................................................................95

   **Recovery Objectives** .................................................................................95

   **Recovery Criteria** .....................................................................................96
     A. Reclassification to Threatened .............................................................97
     B. Delisting ..............................................................................................99
     C. Interim ................................................................................................99

*IV. RECOVERY ACTION OUTLINE AND NARRATIVE* ....................................................... *101*

**Existing Population** ....................................................................................................**101**
    **South Florida** ....................................................................................................101
    **Expansion into South-Central Florida** ............................................................114

**Reintroduction** .........................................................................................................**115**
    **Select Reintroduction Sites** .............................................................................115
    **Reintroduce Panthers into Suitable Sites** ......................................................117
    **Actions Once Populations Are Established** .....................................................119

**Public Awareness and Education** ..............................................................................**119**
    **Design and Develop Materials and Programs** ................................................120
    **Provide Materials and Programs** ...................................................................123
    **Evaluation** ........................................................................................................125

*V. IMPLEMENTATION SCHEDULE* ......................................................................... *127*

*VI. LITERATURE CITED* ........................................................................................... *156*

*FIGURES* ............................................................................................................... *175*

*APPENDIX A.  DEFINITIONS* ................................................................................... *181*

*APPENDIX B.  THREATS ANALYSIS USING THE FIVE LISTING FACTORS* ............. *183*

*APPENDIX C.  Summary of Comments Received* ..................................................... *202*

*APPENDIX D.  List of Peer Reviewers* ..................................................................... *216*

## I. BACKGROUND

The Florida panther (*Puma concolor coryi*) was listed as endangered throughout its range in 1967 (32 FR 4001) and received Federal protection under the passage of the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*) (ESA). Because it is listed pursuant to the ESA, the panther and its habitat are protected by the ESA.

The ESA establishes policies and procedures for identifying, listing, and protecting species of plants, fish, and wildlife that are endangered or threatened with extinction. The purposes of the ESA are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species…." The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." A "threatened species" is defined as any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Under the definition of "species" in the ESA, the U.S. Fish and Wildlife Service (FWS) can apply the protections of the ESA to any species or subspecies of fish, wildlife, or plants, or any distinct population segment of any species of vertebrate fish or wildlife that meets the definition of endangered or threatened.

The Secretary of the Department of the Interior is responsible for administering the ESA's provisions as they apply to the Florida panther. Day-to-day management authority for endangered and threatened species under the Department's jurisdiction has been delegated to the U.S. Fish and Wildlife Service (FWS). To help identify and guide species recovery needs,

section 4(f) of the ESA directs the Secretary to develop and implement recovery plans for listed

species.  Such plans are to include: (1) a description of site-specific management actions

necessary to conserve the species; (2) objective, measurable criteria which, when met, will allow

the species or populations to be removed from the endangered and threatened species list; and (3)

estimates of the time and funding required to achieve the plan's goals and intermediate steps.

Section 4 of the ESA and regulations (50 CFR Part 424) promulgated to implement its listing

provisions also set forth the procedures for reclassifying and delisting species on the Federal

lists.  A species can be delisted if the Secretary of the Interior determines that the species no

longer meets the endangered or threatened status based upon the five factors listed in section

4(a)(1) of the ESA:  (1) the present or threatened destruction, modification, or curtailment of its

habitat or range; (2) overutilization for commercial, recreational, scientific, or educational

purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; and (5)

other natural or manmade factors affecting its continued existence.

Further, a species may be delisted, according to 50 CFR Part 424.11(d), if the best scientific and

commercial data available substantiate that the species or population is neither endangered nor

threatened for one of the following reasons: (1) extinction, (2) recovery, or (3) original data for

classification of the species were in error.

The FWS has lead responsibility for recovery of the Florida panther, and all Federal agencies

including FWS are responsible for contributing to panther conservation pursuant to section

7(a)(1) of the ESA.  In 1981, FWS issued the initial recovery plan, and the plan was revisited in

the mid-1980s culminating in the first major revision in 1987.  A minor revision to incorporate a

task to address genetic restoration and management was approved in 1995.  In 1999, the FWS

approved the South Florida Multi-species Recovery Plan (MSRP) (FWS 1999) that identified

recovery needs of 68 threatened and endangered species in south Florida.  The MSRP included

recovery actions for the panther, but only for the portion of its range in south Florida. The FWS

acknowledges that portions of the MSRP are now outdated and the habitat descriptions need to

be clarified to more accurately describe panther habitat.

In 2001, the FWS initiated the process to revise the overall recovery plan for a third time.  A new

Florida Panther Recovery Team, consisting of representatives of the public, agencies, and groups

that have an interest in panther recovery and / or could be affected by proposed actions, was

established to assist with this revision.

Since approval of the original recovery plan in 1981 (FWS 1981), significant research has been

conducted and important conservation and recovery activities have been accomplished primarily

by the Florida Game and Freshwater Fish Commission (now the Florida Fish and Wildlife

Conservation Commission [FWC]).  This third revision of the recovery plan reflects many of

those accomplishments, addresses current threats and needs, addresses the planning requirements

of the ESA, and supersedes previous recovery plans including the Florida panther component of

the MSRP.

## A.  Overview

The Florida panther, is the last subspecies of *Puma* (also known as mountain lion, cougar, puma,

painter, or catamount) still surviving in the eastern U.S (throughout this document the Florida

panther will be referred to as "panther" and "puma" will be used for all other subspecies). Historically occurring throughout the southeastern U.S., today the remaining 100 - 120 panthers are restricted to less than 5% of their historic range (Figure 1).  The breeding component of this population is located on approximately 3,548 square miles ($mi^2$) (9,189 square kilometers [$km^2$]) (Kautz et al. 2006) south of the Caloosahatchee River in southern Florida.  The population density ranges from approximately 2.0 to 2.8 animals per 100 $mi^2$ (0.8 to 1.1 per 100 $km^2$) (Maehr et al. 1991a; Kautz et al. 2006; R. McBride, Livestock Protection Company, pers. comm. 2006)

Attempts to eradicate panthers in the past and prey decline resulted in a population threatened with extinction.  Prior to 1949, panthers could be killed in Florida at any time of the year.  In 1950, FWC declared the panther a regulated game species due to concerns over declining numbers.  The FWC removed panthers from the game animal list in 1958 and gave them complete legal protection.  On March 11, 1967, the FWS listed the panther as endangered (32 FR 4001) throughout its historic range.  The Florida Panther Act (State Statute 372.671), a 1978 Florida State law, made killing a panther a felony.  The States of Florida, Georgia, Louisiana, and Mississippi list the Florida panther as endangered.

FWS uses recovery priority numbers, ranging from a high of 1C to a low of 18, to assign recovery priorities to listed species.  The criteria on which the recovery priority number is based are degree of threat, recovery potential, taxonomic distinctiveness, and presence of an actual or imminent conflict between the species and development activities.  The FWS has assigned the panther a recovery priority number of 6C.  This priority number identifies the panther as a

subspecies with a high degree of threat of extinction, but low recovery potential because recovery is in conflict with construction, other development projects, or other forms of economic activity (48 FR 43098).

Habitat loss and fragmentation continue to threaten the panther's existence.   Survival and recovery of the Florida panther are dependent upon maintaining, restoring, and expanding the panther population and its habitat in south Florida and facilitating panther conservation and recovery through public awareness and education.  In addition, recovery requires expanding the breeding portion of the population into south-central Florida (Figure 2), identifying potential reintroduction areas within the historic range, and establishing and maintaining at least two additional viable populations with associated habitats outside of south and south-central Florida.

## B.  Description

An adult Florida panther is unspotted and typically rusty reddish-brown on the back, tawny on the sides, and pale gray underneath.  There has never been a melanistic (black) puma documented in North America (Tinsley 1970, 1987).  Adult males can reach a length of seven feet (ft) (2.1 meters [m]) from their nose to the tip of their tail and may exceed 161 pounds (lbs) (73 kilograms [kg]) in weight; but, typically adult males average around 116 lbs (52.6 kg) and stand approximately 24 - 28 inches (in) (60 - 70 centimeters [cm]) at the shoulder (Roelke 1990). Female panthers are smaller with an average weight of 75 lbs (34 kg) and length of 6 ft (1.8 m) (Roelke 1990).  The skull of the Florida panther is unique in that it has a broad, flat, frontal region, and broad, high-arched or upward-expanded nasal bones (Young and Goldman 1946).

Florida panther kittens are gray with dark brown or blackish spots and five bands around the tail. The spots gradually fade as the kittens grow older and are almost unnoticeable by the time they are six months old.  At this age, their bright blue eyes slowly turn to the light-brown straw color of the adult (Belden 1988).

Three external characters—a right angle crook at the terminal end of the tail, a whorl of hair or cowlick in the middle of the back, and irregular, white flecking on the head, nape, and shoulders—not found in combination in other subspecies of *Puma* (Belden 1986), were commonly observed in Florida panthers through the mid-1990s.  The kinked tail and cowlicks were considered manifestations of inbreeding (Seal 1994a), whereas the white flecking was thought to be a result of scarring from tick bites (Maehr 1992, Wilkins et al. 1997).  Four other abnormalities prevalent in the panther population prior to the mid-1990s included cryptorchidism (one or two undescended testicles), low sperm quality, atrial septal defects (the opening between two atria fails to close normally during fetal development), and immune deficiencies and were also suspected to be the result of low genetic variability (Roelke et al. 1993a).

A plan for genetic restoration and management of the Florida panther was developed in September 1994 (Seal 1994a) and eight non-pregnant adult female Texas pumas (*Puma concolor stanleyana*) were released in five areas of south Florida from March to July 1995.  Since this introgression, rates of genetic defects, including crooked tails and cowlicks, have dramatically decreased (Land et al. 2004).  In addition, to date neither atrial septal defects nor cryptorchidism have been found in introgressed panthers (M. Cunningham, FWC, pers. comm. 2005).  The effects of genetic restoration on color and cranial and dental measures have not been evaluated.

**C. Taxonomy**

Since the first classification of felids by Linnaeus (1758), there have been a number of reclassifications.  A brief review of cat species classification history is presented by Werdelin (1996) and shows a record of extremes in both "splitting" and "lumping" (Nowell and Jackson (1996).  The most recent evaluation of the felid family is Wozencraft's (1993) classification (Werdelin 1996).  A considerable amount of work is still required before consensus can be reached regarding felid systematics and the consensus must involve both morphological and molecular work (Werdelin 1996).  A consensus molecular, morphological, and ethological classification scheme would provide a framework for conservation programs and will become increasingly important as wild populations become smaller and increasingly isolated (O'Brien 1996a).

Although there is general agreement among felid taxonomists regarding recognition of cat species, there is considerable confusion with regards to subspecies, debate on subspecies definition, and debate on whether or not the traditional taxonomic concept is valid in the light of contemporary knowledge of population biology and genetics (Nowell and Jackson 1996).  There is general agreement that too many subspecies of cats have been described in the past on the basis of slim evidence (Nowell and Jackson 1996).  Mayr (1940, 1963, 1970) defined a subspecies as "a geographically defined aggregate of local populations which differ taxonomically from other subdivisions of the species" (cited in O'Brien 1996b).  O'Brien and Mayr (1991) and O'Brien (1996b) provide criteria for subspecies classification.  Following their criteria, a subspecies includes members that share a unique geographic range or habitat, a group

7

of phylogenetically concordant phenotypic characters, and a unique natural history relative to other subdivisions of the species.

The Florida panther was first described by Charles B. Cory in 1896 as *Felis concolor floridana* (Cory 1896). The type specimen was collected in Sebastian, Florida. Bangs (1899) believed that the Florida panther was restricted to peninsular Florida and could not intergrade with other *Felis* spp. Therefore, he assigned it full specific status and named it *Felis coryi* since *Felis floridana* had been used previously for the bobcat (*Lynx rufus*).

The taxonomic classification of the *Felis concolor* group was revised and described by Nelson and Goldman (1929) and Young and Goldman (1946). These authors differentiated 30 subspecies using geographic and morphometric (measurement of forms) criteria and reassigned the Florida panther to subspecific status as *Felis concolor coryi*. This designation also incorporated *F. arundivaga* which had been classified by Hollister (1911) from specimens collected in Louisiana into *F. c. coryi*.

The puma was originally named *Felis concolor* by Linneaus in 1771, but in 1834 Jardine renamed the genus *Puma* (Wozencraft 1993). Later taxonomists lumped most of the smaller cat species, including the puma, into subgenera under the genus *Felis* (Nowak and Paradiso 1983). Wozencraft (1993) promoted the subgenera of the old genus *Felis* to full generic status and placed a number of former *Felis* species, including the puma, in monotypic genera (Nowell and Jackson 1996). The taxonomic classification of the puma is now considered to be *Puma concolor* (Wozencraft 1993), making the accepted name for the Florida panther *P. c. coryi*.

A comprehensive molecular genetic analysis of pumas in southern Florida using mitochondrial DNA and nuclear markers reported by O'Brien et al. (1990) indicated the existence of two distinct genetic stocks with concordant morphological phenotypes. The close phylogenetic proximity of the southwest Florida population segment with representatives of other North American subspecies indicated this population segment was descended from historic *P. c. coryi*. The population segment in southeastern Florida, however, appeared to have evolved in South or Central America. This was accounted for by the release of seven captive animals (including three females) into Everglades National Park (ENP) between 1957 and 1967 (unpublished archives, ENP, National Park Service [NPS], Washington, D.C., cited in O'Brien et al. 1990). The subpopulation in ENP became effectively extirpated with the death of three resident females in June and July 1991 (Bass and Maehr 1991).

As people exterminated puma in eastern North America, the only population that remained was in peninsular Florida and they became isolated from other puma populations, eliminating gene flow. As the Florida panther was reduced to a small breeding population in southern Florida, the lack of gene flow and small population size fostered a high rate of inbreeding as seen in reduced allozyme variation relative to other puma subspecies (Roelke et al. 1993a) and eight fixed loci (Culver et al. 2000). The inbreeding condition and reduction of genetic diversity appeared to have occurred during the 20th century as Culver et al. (2000) found museum samples from the Florida population dating to the turn of the 19th century that had higher heterozygosity levels. The consequences of inbreeding included spermatozoal defects, cryptorchidism, cardiac abnormalities, and reduced immunity to infectious diseases (Roelke et al. 1993a).

Through the late 1980s and early 1990s, the frequency of individuals exhibiting physiological abnormalities increased.  Approximately 90% of males born after 1990 had one or both testicles undescended (Pimm et al. 2006a).  The FWS (1994a) became concerned that the overall genetic health of the Florida panther was at a point where the panther's continued existence was doubtful without a proactive genetic restoration program.  A plan for genetic restoration and management was developed (Seal 1994a).  The level of introgression required to reverse the effects of inbreeding and genetic loss required the release of eight Texas puma into areas occupied by Florida panther (Seal 1994a).  These eight female Texas puma were released in 1995, five of which produced a total of 20 offspring (Land et al. 2004).  The desired 20% introgression level was achieved (Land and Lacy 2000) and the genetic rescue of the Florida panther was determined to be successful (Pimm et al. 2006a).  Three times as many introgressed kittens appear to reach adulthood as do uncrossed Florida panthers and introgressed adult females have lower mortality rates (Pimm et al. 2006a).

Subspecies can interbreed as a natural process whenever they are in contact (O'Brien and Mayr 1991) and this was the basis for choosing Texas pumas (the closest extant adjacent subspecies) for genetic restoration of the Florida panther (FWS 1994a).  Prior to making the decision to conduct genetic augmentation to facilitate the recovery of the Florida panther, FWS made the determination that any resulting offspring would receive the full protections of the ESA.  This determination was the result of a rigorous policy and legal review at the highest levels of the agency (FWS 1994b).

Culver et al. (2000) speculated that the moderate level of genetic variability found in North American puma was due to their extirpation during Pleistocene glaciations and then recolonization some 10,000 years ago.  Modern puma eventually covered practically the entire North American continent (excluding the most northern latitudes) and had the largest range of any native mammal species in the Western Hemisphere (Hall and Kelson 1959).  Within this extensive range, geographic variation was present and involved subtle differences in body measurements, pelage characteristics, and skeletal features.  When puma subspecies were first described, it was this geographic variation that was used to delineate each subspecies.  Characters previously used to describe *P. c. coryi* were quantified and re-evaluated using statistical methods by Wilkins et al. (1997).  All historic and recent specimens from the southeastern U.S. (n = 79) were examined for pelage color, cranial profile and proportions, and other morphological traits.  These specimens were compared to a sample of North and South American specimens.  The characters measured provide a basis from which to describe the Florida population and discriminate between it and other populations (Wilkins et al. 1997).

Recent molecular genetic analyses have found that pumas in North America are very similar to each other (Culver et al. 2000, Sinclair et al. 2001, Anderson et al. 2004).  Culver et al. (2000) examined subspecies of puma by using three mitochondrial genes and ten microsatellite loci in biological samples collected from 315 pumas from throughout their range.  They could not confirm the previous classification of 32 subspecies and, based on the subspecific criteria suggested by O'Brien and Mayr (1991), could only recognize six subspecies of *Puma*.  Culver et al. (2000) suggested all North American pumas be reclassified as a single subspecies (*P. c. couguar*) due to lack of genetic structure.  However, Culver et al. (2000) determined that the

Florida panther was one of several smaller populations that had unique features, the number of polymorphic microsatellite loci and amount of variation were lower, and it was highly inbred (eight fixed loci).

The degree to which the scientific community has accepted the use of genetics in puma taxonomy is not resolved at this time. The existing Florida panther population represents the last remaining population of *Puma* in the eastern United States, and is therefore important to the genetic representation of pumas in North America. Additional research is needed to understand genetic and morphological similarities and differences of puma across North America. The Florida panther is listed under the ESA and any change in its listing status based on best available science would require completing the formal rulemaking process pursuant to the ESA. The panther and its habitat continue to receive ESA protections.

## D. Population Trends and Distribution

The Florida panther once ranged throughout the southeastern U.S. from Arkansas and Louisiana eastward across Mississippi, Alabama, Georgia, Florida, and parts of South Carolina and Tennessee (Young and Goldman 1946) (Figure 1). Historically, the panther intergraded to the north with *P. c. cougar*, to the west with *P. c. stanleyana*, and to the northwest with *P. c. hippolestes* (Young and Goldman 1946).

Although generally considered unreliable, sightings of panthers regularly occur throughout the Southeast. However, no reproducing populations of panthers have been found outside of south Florida for at least 30 years despite intensive searches to document them (Belden et al. 1991, McBride et al. 1993, Clark et al. 2002). Survey reports and more than 70,000 locations of radio-collared panthers recorded between 1981 and 2004 clearly define the panther's current breeding range (Figure 1). Reproduction is known only in the Big Cypress Swamp / Everglades physiographic region in Collier, Lee, Hendry, Miami-Dade, and Monroe Counties south of the Caloosahatchee River (Belden et al. 1991). Although confirmed panther sign, male radio-collared panthers, and uncollared males killed by vehicles have been recorded outside of south Florida, no female panthers have been documented north of the Caloosahatchee River since 1973 (Nowak and McBride 1974, Belden et al. 1991, Land and Taylor 1998, Land et al. 1999, Shindle et al. 2000, McBride 2002, Belden and McBride 2006).

Puma are wide ranging, secretive, and occur at low densities. However, their tracks, urine markers, and scats are readily found by trained observers, and resident populations are easily located. Van Dyke et al. (1986a) determined that all resident puma, 78% of transient puma, and 57% of kittens could be detected by track searches in Utah. During two month-long investigations – one late in 1972 / early 1973 and another in 1974 – funded by the World Wildlife Fund to determine if panthers still existed in Florida, McBride searched for signs of panthers in portions of south Florida. In 1972, McBride authenticated a road-killed male panther in Glades County and a female captured and released from a bobcat trap in Collier County (R. McBride, pers. comm. 2005). In 1973, McBride captured one female in Glades County (Nowak and McBride 1974). Based on this preliminary evidence, Nowak and McBride (1974) estimated

the "population from the Lake Okeechobee area southward to be about 20 or 30 individuals." In 1974, McBride found evidence of two additional panthers in the Fakahatchee Strand and suggested that there could be as few as ten panthers in the area around Lake Okeechobee and southward in the state (Nowak and McBride 1975). This initial survey documented that panthers still existed in Florida and delineated areas where a more exhaustive search was warranted. After this initial investigation, comprehensive surveys on both public and private lands were completed (Reeves 1978; Belden and McBride 1983a, b; Belden et al. 1991). Thirty panthers were identified during a wide-ranging survey in 1985 in south Florida (McBride 1985).

Maehr et al. (1991a) provides the only published estimate of population density based on a substantial body of field data (Beier et al. 2003). Maehr et al. (1991a) estimated a density of 1 panther / 43 mi$^2$ (110 (km$^2$) based on 17 concurrently radiocollared and four uncollared panthers. They extrapolated this density to the area occupied (1,946 mi$^2$ [5,040 km$^2$]) by radio-collared panthers during the period 1985 - 1990 to achieve a population estimate of 46 adult panthers for southwest Florida (excluding ENP, eastern Big Cypress National Preserve [BCNP], and Glades and Highlands Counties). Beier et al. (2003), however, argued that this estimate of density, although "reasonably rigorous," could not be extrapolated to other areas because it was not known whether densities were comparable in those areas.

McBride (2000, 2001, 2002, 2003) documented panther counts (i.e., number known alive) based on panthers treed with hounds, physical evidence (e.g., tracks where radio-collared panthers were not known to occur), documentation by trail-camera photos, and sightings of uncollared panthers by a biologist or pilot from a monitoring plane or via ground telemetry. He counted 62, 78, 80,

and 87 panthers (which include adult and subadult panthers but not kittens at the den) in 2000, 2001, 2002, and 2003, respectively. The number of documented panthers was 78, 82, and 97 in 2004, 2005, and 2006 (R. McBride, pers. comm. 2007).

McBride (pers. comm. 2007) documented an increase in the number of uncollared panthers captured each year between 2000 and 2006 relative to 1981 through 1999, while FWC (2006) reported data showing an apparent increase in the number of panthers killed by vehicles and number of known den sites since 1999. These data, along with an increase in the number of male panthers dispersing north of the Caloosahatchee River (Belden and McBride 2006), indicate an increasing trend in the panther population.

Although the breeding segment of the panther population occurs in south Florida, panthers were documented north of the Caloosahatchee River over 125 times between February 1972 and May 2004. This has been confirmed through field sign (e.g., tracks, scrapes, scats), camera-trap photographs, seven highway mortalities, four radio-collared animals, two captured animals (one of which was radiocollared), and one skeleton. From 1972 through 2004, panthers have been confirmed in 11 counties (Flagler, Glades, Highlands, Hillsborough, Indian River, Okeechobee, Orange, Osceola, Polk, Sarasota, Volusia) north of the river (Belden et al. 1991, Belden and McBride 2006). However, no evidence of a female or reproduction has been documented north of the Caloosahatchee River in over 30 years (Belden and McBride 2006).

**E. Life History / Ecology**

**Reproduction**--Male Florida panthers are polygynous, maintaining large, overlapping home ranges containing several adult females and their dependent offspring. The first sexual encounters for males normally occur at about three years based on 26 radio-collared panthers of both sexes (Maehr et al. 1991a). Based on genetics work, some males may become breeders as early as 17 months (W. Johnson, National Cancer Institute, pers. comm. 2005). Breeding activity peaks from December to March (Shindle et al. 2003). Litters (n = 82) are produced throughout the year, with 56 - 60% of births occurring between March and June (Jansen et al. 2005, Lotz et al. 2005). The greatest number of births occurs in May and June (Jansen et al. 2005, Lotz et al. 2005). Female panthers have bred as young as 18 months (Maehr et al. 1989a) and successful reproduction has occurred up to 11 years old. Mean age of denning females is 4.6 ± 2.1 (standard deviation [sd]) years (Lotz et al. 2005). Age at first reproduction for 19 known-aged female panthers averaged 2.2 ± 0.246 (sd) years and ranged from 1.8 - 3.2 years. Average litter size is 2.4 ± 0.91 (sd) kittens. Seventy percent of litters are comprised of either two or three kittens. Mean birth intervals (elapsed time between successive litters) are 19.8 ± 9.0 (sd) months for female panthers (n = 56) (range 4.1 - 36.5 months) (Lotz et al. 2005). Females that lose their litters generally produce another more quickly; five of seven females whose kittens were brought into captivity (see Captive Breeding section of F. Conservation Efforts) successfully produced another litter an average of 10.4 months after the removal of the initial litter (Land 1994).

Den sites are usually located in dense, understory vegetation, typically saw palmetto (*Serenoa repens*) (Maehr 1990a, Shindle et al. 2003). Den sites are used for up to two months by female

panthers and their litters from birth to weaning.  Independence and dispersal of young typically occurs at 18 months, but may occur as early as one year (Maehr 1992).

**Survivorship and Causes of Mortality--**Intraspecific aggression accounts for 42% of all mortalities among radio-collared panthers (Jansen et al. 2005, Lotz et al. 2005).  Unknown causes and collisions with vehicles account for 24 and 19% of mortalities, respectively.  From 1990 to 2004, mean annual survivorship of radio-collared adult panthers was greater for females (0.894 ± 0.099 sd) than males (0.779 ± 0.125 sd) (Lotz et al. 2005).   Most intraspecific aggression occurs between male panthers; but, aggressive encounters between males and females, resulting in the death of the female, have occurred.  Defense of kittens and / or a kill is suspected in half (5 of 10) of the known instances through 2003 (Shindle et al. 2003).

Female panthers are considered adult residents if they are older than 18 months, have established home ranges, and bred (Maehr et al. 1991a).  Land et al. (2004) reported that all 24 female panthers radiocollared when still dependent juveniles greater than six months of age survived to become residents and 19 (79.2%) produced litters.  Male panthers are considered adult residents if they are older than three years and have established a home range that overlaps with females. Thirty-one male panthers were captured as kittens and 12 (38.7%) of these cats survived to become residents (Jansen et al. 2005, Lotz et al. 2005).  "Successful male recruitment appears to depend on the death or home-range shift of a resident adult male" (Maehr et al. 1991a). Turnover in the breeding population is low with documented mortality in radio-collared panthers being greatest in subadults and non-resident males (Maehr et al. 1991a, Shindle et al. 2003).

One hundred thirty-two female panther den sites have been documented since 1985 (FWC 2006).
For 38 of these litters, Land et al. (2004) estimated Florida and introgressed panther kitten
survival to six months to be 52 and 72%, respectively.  Pimm et al. (2006a, 2006b) reported a
better than twofold advantage for introgressed kitten survival (P = 0.01).  Survival of kittens
greater than six months old was determined by following the fates of 55 radio-collared
dependent-aged kittens, including 17 introgressed panthers from 1985 - 2004.  Only one of these
55 kittens died before reaching independence, resulting in a 98.2% survival rate (Land et al.
2004).  The FWC and NPS are continuing to compile and analyze existing reproductive and
kitten data.

**Dispersal--**Panther dispersal begins after a juvenile becomes independent from its mother and
continues until it establishes a home range.  Dispersal distances are greater for males (n = 18)
than females (n = 9) (42.5 mi [68.4 km] vs. 12.6 mi [20.3 km], respectively) and the maximum
dispersal distance recorded for a young male Florida panther was 139.2 mi (224.1 km) over a
seven-month period followed by a secondary dispersal of 145 mi (233 km) (Maehr et al. 2002a).
Male Florida panthers disperse an average distance of 25 mi (40 km); females typically remain in
or disperse short distances from their natal ranges (Comiskey et al. 2002).  Female dispersers are
considered philopatric because they usually establish home ranges less than one average home
range width from their natal range (Maehr et al. 2002a).  Maehr et al. (2002a) reported that all
female dispersers (n = 9) were successful at establishing a home range whereas only 63% of
males (n = 18) were successful.  Young panthers become independent at 14 months on average
for both sexes, but male dispersals are longer in duration than for females (9.6 months and 7.0
months, respectively) (Maehr et al. 2002a).  Dispersing males usually go through a period as

transient (non-resident) subadults, moving through the fringes of the resident population and often occupying suboptimal habitat until an established range becomes vacant (Maehr 1997a).

Most panther dispersal occurs south of the Caloosahatchee River with only four radio-collared panthers crossing the river and continuing north since 1981 (Land and Taylor 1998, Land et al. 1999, Shindle et al. 2000, Maehr et al. 2002a, Belden and McBride 2006).  Western subspecies of *Puma* have been documented crossing wide, swift-flowing rivers up to a mile in width (Seidensticker et al. 1973, Anderson 1983).  The Caloosahatchee River, a narrow (295 - 328 ft [90 - 100 m]), channelized river, probably is not a significant barrier to panther movements, but the combination of the river, State Route (SR) 80, and land uses along the river seems to have restricted panther dispersal northward (Maehr et al. 2002a).  Documented physical evidence of at least 15 uncollared male panthers have been confirmed north of the river since 1972, but no female panthers nor reproduction have been documented in this area since 1973 (Belden and McBride 2006).

**Home Range Dynamics and Movements--**Panthers require large areas to meet their needs. Numerous factors influence panther home range size including habitat quality, prey density, and landscape configuration (Belden 1988, Comiskey et al. 2002).  Home range sizes of 26 radio-collared panthers monitored between 1985 and 1990 averaged 200 mi$^2$ (519 km$^2$) for resident adult males and 75 mi$^2$ (193 km$^2$) for resident adult females; transient males had a home range of 240 mi$^2$ (623 km$^2$) (Maehr et al. 1991a).  Comiskey et al. (2002) examined the home range size for 50 adult panthers (residents greater than 1.5 years old) monitored in south Florida from 1981 - 2000 and found resident males had a mean home range of 251 mi$^2$ (650 km$^2$) and females had a

mean home range of 153 mi$^2$ (396 km$^2$).  Beier et al. (2003) found home range size estimates for panthers reported by Maehr et al. (1991a) and Comiskey et al. (2002) to be reliable.

Annual minimum convex polygon home range sizes of 52 adult radio-collared panthers monitored between 1998 and 2002 ranged from 24 - 459 mi$^2$ (63 - 1,188 km$^2$), averaging 140 mi$^2$ (362 km$^2$) for 20 resident adult males and 69 mi$^2$ (179 km$^2$) for 32 resident adult females (Land et al. 1999; Shindle et al. 2000, 2001; Land et al. 2002).  Home ranges of resident adults tend to be stable unless influenced by the death of other residents; however, several males have shown significant home range shifts that may be related to aging (D. Jansen, NPS, pers. comm. 2005). Home-range overlap is extensive among resident females and limited among resident males (Maehr et al. 1991a).

Activity levels for Florida panthers are greatest at night with peaks around sunrise and after sunset (Maehr et al. 1990a).  The lowest activity levels occur during the middle of the day. Female panthers at natal dens follow a similar pattern with less difference between high and low activity periods.

Telemetry data indicate that panthers typically do not return to the same resting site day after day, with the exception of females with dens or panthers remaining near kill sites for several days.  The presence of physical evidence such as tracks, scats, and urine markers confirm that panthers move extensively within home ranges, visiting all parts of the range regularly in the course of hunting, breeding, and other activities (Maehr 1997a, Comiskey et al. 2002).  Males travel widely throughout their home ranges to maintain exclusive breeding rights to females.

Females without kittens also move extensively within their ranges (Maehr 1997a). Panthers are capable of moving large distances in short periods of time. Nightly panther movements of 12 mi (20 km) are not uncommon (Maehr et al. 1990a).

**Intraspecific Interactions--**Interactions between panthers occur indirectly through urine markers or directly through contact. Urine markers are made by piling ground litter using a backwards-pushing motion with the hind feet. This pile is then scent-marked with urine and occasionally feces. Both sexes make urine markers, apparently males use them as a way to mark their territory and announce presence while females advertise their reproductive condition.

Adult females and their kittens interact more frequently than any other group of panthers. Interactions between adult male and female panthers last from one to seven days and usually result in pregnancy (Maehr et al. 1991a). Aggressive interactions between males often result in serious injury or death. Independent subadult males have been known to associate with each other for several days and these interactions do not appear to be aggressive in nature. Aggression between males is the most common cause of male mortality and an important determinant of male spatial and recruitment patterns based on radio-collared panthers (Maehr et al. 1991a, Shindle et al. 2003). Aggressive encounters between radio-collared males and females also have been documented (Shindle et al. 2003, Jansen et al. 2005).

**Food Habits--**Primary panther prey are white-tailed deer (*Odocoileus virginianus*) and feral hog (*Sus scrofa*) (Maehr et al. 1990b, Dalrymple and Bass 1996). Generally, feral hogs constitute the greatest biomass consumed by panthers north of the Alligator Alley section of Interstate 75 (I-

75) while white-tailed deer are the greatest biomass consumed to the south (Maehr et al. 1990b).
Secondary prey includes raccoons (*Procyon lotor*), nine-banded armadillos (*Dasypus novemcinctus*), marsh rabbits (*Sylvilagus palustris*) (Maehr et al. 1990b) and alligators (*Alligator mississippiensis*) (Dalrymple and Bass 1996). No seasonal variation in diet has been detected. A resident adult male puma generally consumes one deer-sized prey every 8 - 11 days; this frequency is 14 - 17 days for a resident female; and 3.3 days for a female with three 13-month-old kittens (Ackerman et al. 1986). Maehr et al. (1990b) documented domestic livestock infrequently in scats or kills, although cattle were readily available on their study area.

**Infectious Diseases, Parasites, and Environmental Contaminants**--

 *Viral Diseases*--Feline leukemia virus (FeLV) is common in domestic cats (*Felis catus*), but is quite rare in non-domestic felids. Routine testing for FeLV antigen (indicating active infection) in captured and necropsied panthers had been negative since testing began in 1978. However, between November 2002 and February 2003, two panthers tested FeLV antigen positive (Cunningham 2005). The following year, three more cases were diagnosed. All infected panthers had overlapping home ranges in the Okaloacoochee Slough ecosystem. Three of the panthers died due to suspected FeLV-related diseases (opportunistic bacterial infections and anemia) and the two others died from intraspecific aggression. Testing of serum samples collected from 1990 - 2005 for antibodies (indicating exposure) to FeLV indicated increasing exposure to FeLV beginning in the late 1990s and concentrated north of I-75. There was apparently minimal exposure to FeLV during this period south of I-75. Positive antibody titers in different areas at different times may indicate that multiple introductions of the virus into the panther population may have occurred. These smaller epizootics were apparently self-limiting

and did not result in any known mortalities.  Positive antibody titers, in the absence of an active

infection (antigen positive), indicate that panthers can be exposed and overcome the infection

(Cunningham 2005).  Management of the disease includes vaccination as well as removal of

infected panthers to captivity for quarantine and supportive care.  As of June 1, 2005,

approximately one-third of the population had received at least one vaccination against FeLV

(FWC and NPS, unpublished data).  No new positive cases have been diagnosed since July 2004.

Pseudorabies virus (PRV) (Aujeszky's disease) causes respiratory and reproductive disorders in

adult hogs and mortality in neonates, but is a rapidly fatal neurologic disease in carnivores.  At

least one panther died from PRV infection presumably through consumption of an infected feral

hog (Glass et al. 1994).  At least one panther has also died of rabies (Taylor et al. 2002).  This

panther was radiocollared but not vaccinated against the disease.

Feline immunodeficiency virus (FIV) is a retrovirus of felids that is endemic in the panther

population.  Approximately 28% of panthers were positive for antibodies to the puma lentivirus

strain of FIV (Olmstead et al. 1992); however, the prevalence may be increasing.  Between

November 2004 and April 2005, 13 of 17 (76%) were positive (M. Cunningham, FWC,

unpublished data).  The cause of this increase is unknown but warrants continued monitoring and

investigation.  There is also evidence of exposure to Feline panleukopenia virus (PLV) in adult

panthers (Roelke et al. 1993b) although no PLV-related mortalities are known to have occurred.

Serological evidence of other viral diseases in the panther population includes feline calicivirus,

feline herpes virus, and West Nile virus (WNV).  However these diseases are not believed to

cause significant morbidity or mortality in the population.  All panthers found dead due to unknown causes are tested for alphaviruses, flaviviruses (including WNV), and canine distemper virus.  These viruses have not been detected in panthers by viral culture or polymerase chain reaction (FWC, unpublished data).

*Other Infectious Diseases*--Bacteria have played a role in free-ranging panther morbidity and mortality as opportunistic pathogens, taking advantage of pre-existing trauma or FeLV infections (FWC, unpublished data).  Dermatophytosis (ringworm infection) has been diagnosed in several panthers and resulted in severe generalized infection in at least one (Rotstein et al. 1999).  Severe infections may reflect an underlying immunocompromise, possibly resulting from inbreeding depression or immunosuppressive viral infections.

*Parasites*--The hookworm, *Ancylostoma pluridentatum,* is highly prevalent in the panther population.  Hookworm infections in domestic kittens can cause significant morbidity and mortality resulting from blood loss.  Hookworm infection in one panther kitten taken into captivity was believed to have resulted in anemia and poor body condition; improvement in hematological parameters and condition followed anthelmintic treatment (Dunbar et al. 1994). The impact of this parasite on panther kittens in the wild is unknown.

Other parasites identified from live-captured or necropsied panthers include eight arthropod species, eight nematode species, three cestode species, two trematode species, and three protozoa species (Forrester et al. 1985, Forrester 1992, Wehinger et al. 1995, Rotstein et al. 1999, Land et

al. 2002).  Of these, only an arthropod (*Notoedres felis)* caused significant morbidity in at least

one panther (Maehr et al. 1995).

*Environmental Contaminants*--Overall, mercury in south Florida biota has decreased over the

last several years (Frederick et al. 2002).  However, high mercury concentrations are still found

in some panthers.  At least one panther is thought to have died of mercury toxicosis and mercury

has been implicated in the death of two other panthers in ENP (Roelke 1991).  One individual

panther had concentrations of 150 parts per million (ppm) mercury in its hair (Land et al. 2004).

Elevated levels of p, p'– DDE (a breakdown product of DDT, an organochlorine pesticide) and

polychlorinated biphenyls were also detected in fat from that panther.  The role of mercury and /

or p, p'– DDE in this panther's death is unknown and cause of death was undetermined despite

extensive diagnostic testing.  Elevated mercury concentrations have also been found in panthers

from Florida Panther National Wildlife Refuge (FPNWR).  Two sibling neonatal kittens from

this area had hair mercury concentrations of 35 and 40 ppm and did not survive to leave their

natal den.  Although other factors were believed to have been responsible for the kitten

mortalities, neonates may be more susceptible to the toxic effects of mercury (Berglund and

Berlin 1969).  Consistently high hair mercury values in ENP and FPNWR and the finding of

elevated values in some portions of BCNP warrant continued monitoring (Land et al. 2004).

Other environmental contaminants found in panthers include polychlorinated biphenyls (e.g.,

Aroclor 1260) (Dunbar 1995, Land et al. 2004).

## F.  Habitat Characteristics / Ecosystem

**Landscape Composition--**Noss and Cooperrider (1994) considered the landscape implications of maintaining viable panther populations.  Assuming a male home range size of 215 mi$^2$ (558 km$^2$) (Maehr 1990a), an adult sex ratio of 50:50 (Anderson 1983), and some margin of safety, they determined that a reserve network as large as 15,625 – 23,438 mi$^2$ (40,469 - 60,703 km$^2$) would be needed to support an effective population size of 50 individuals (equating to an actual adult population of 100 - 200 panthers [Ballou et al. 1989]).  However, to provide for long-term persistence based on an effective population size of 500 individuals (equating to 1,000 - 2,000 adult panthers [Ballou et al. 1989]), could require as much as 156,251 - 234,376 mi$^2$ (404,687 - 607,031 km$^2$).  This latter acreage corresponds to roughly 60 - 70% of the Florida panther's historical range.  Although it is uncertain whether this much land is needed for panther recovery, it does provide some qualitative insight into the importance of habitat conservation across large landscapes for achieving a viable panther population (Noss and Cooperrider 1994).

The FWS created the Multi-species/Ecosystem Recovery Implementation Team (MERIT) to assist with implementation of the MSRP after it was signed in 1999.  The Florida Panther Subteam of MERIT developed a landscape-level strategy for the conservation of the panther population in south Florida, which was not finalized.  Many of the Panther Subteam members refined the methodology, further analyzed the data, and better defined the results of this landscape-level strategy (Kautz et al. 2006).  Data from radio-collared panthers collected from 1981 through 2000 were used to delineate home ranges, which were geo-referenced with land cover and other relevant data.

Compositional analysis was performed to evaluate the relative frequency of occurrence of various land cover types within panther habitat.  A spatially-explicit raster model that identified forest patches potentially suitable for use by panthers as cover was used to refine the outer boundaries of the occupied zone, represented as overlapping minimum convex polygons of panther home ranges, and as a first step to identifying zones of potential use elsewhere. Cover components were combined with a least cost path analysis to delineate a dispersal zone connecting occupied habitat in southern Florida to the Caloosahatchee River.

Three priority zones were identified as important for panther habitat conservation:  (1) Primary Zone – lands essential to the long-term viability and persistence of the panther in the wild; (2) Secondary Zone - lands contiguous with the Primary Zone, currently used by few panthers, but which could accommodate expansion of the panther population south of the Caloosahatchee River; and (3) Dispersal Zone - the area which may facilitate future panther expansion north of the Caloosahatchee River (Kautz et al. 2006), (Figure 3).  The Primary Zone is currently occupied and supports the breeding population of panthers.  Although panthers move through the Secondary and Dispersal Zones, they are not currently occupied by resident panthers.  Some areas of the Secondary Zone would require restoration to support panthers.

These zones vary in size, ownership, and land cover composition.  The Primary Zone is 3,548 $mi^2$ (9,189 $km^2$) in size, 73% of which is publicly owned, and includes portions of the BCNP, ENP, Fakahatchee Strand Preserve State Park (FSPSP), FPNWR, Okaloacoochee Slough State Forest (OSSF), and Picayune Strand State Forest (PSSF).  This zone's composition is 45%

forest, 41% freshwater marsh, 7.6% agriculture lands, 2.6% prairie and shrub lands, and 0.52% urban lands (Kautz et al. 2006).

The Secondary Zone is 1,269 mi$^2$ (3,287 km$^2$) in size, 38% of which is public land.  This zone's composition is 43% freshwater marsh, 36% agriculture, 11% forest, 6.1% prairie and shrub lands, and 2.3% low-density residential areas and open urban lands (Kautz et al. 2006).

The Dispersal Zone is 44 mi$^2$ (113 km$^2$) in size, all of which is privately owned.  This zone's composition is 49% agriculture (primarily improved pasture and citrus groves), 29% forest (wetland and upland), 8.8% prairie and shrub land, 7.5% freshwater marsh, and 5.1% barren and urban lands (Kautz et al. 2006).

**Habitat Use--**Between 1981 and 2007, more than 80,000 locations on more than 148 VHF radio-collared panthers have been collected.  The majority of data from VHF radio-collars have been collected during daytime hours (generally 0700 - 1100) for logistical and safety reasons, even though panthers are most active during crepuscular and night time hours.  However, recent developments in Global Positioning System (GPS) radio-collar technology is beginning to provide a more thorough analysis of panther habitat use (Land et al. in press).

Radio-collar data and ground tracking indicate that panthers use the mosaic of habitats available to them.  Forested cover types, particularly cypress swamp, pinelands, hardwood swamp, and upland hardwood forests are the habitat types most selected by panthers (Belden 1986, Belden et al. 1988, Maehr 1990a, Maehr et al. 1991a, Maehr 1992, Smith and Bass 1994, Kerkhoff et al.

2000, Comiskey et al. 2002, Cox et al. 2006).  Compositional analyses by Kautz et al. (2006) showed that forest patches comprise an important component of panther habitat in south Florida, and that other natural and disturbed cover types are also present.  GPS data has shown that panthers (n = 12) use all habitats contained within their home ranges by selecting for forested habitat types and using all others in proportion to availability (Land et al. in press).

Kautz et al. (2006) found that the smallest class of forest patches (i.e., 9 - 26 ac [3.6 - 10.4 ha]) were the highest ranked forest patch sizes within panther home ranges.  The diverse woody flora of forest edges probably provides cover suitable for stalking and ambushing prey (Belden et al. 1988, Cox et al. 2006).  Also, dense understory vegetation comprised of saw palmetto provides some of the most important resting and denning cover for panthers (Maehr 1990a).  Shindle et al. (2003) found that 73% of panther dens were in palmetto thickets.

**Prey Habitat Use--**Panther habitat selection is related to prey availability (Janis and Clark 1999, Dees et al. 2001) and, consequently, prey habitat use.  Duever et al. (1986) calculated a deer population of 1,760 in BCNP, based on Harlow's (1959) deer density estimates of 1 / 210 ac (85 ha) in pine forest, 1 / 299 ac (121 ha) in swamps, 1 / 1,280 ac (518 ha) in prairie, 1 / 250 ac (101 ha) in marshes, and 1 / 111 ac (45 ha) in hammocks.  Schortemeyer et al. (1991) estimated deer densities at 1 / 49 - 247 ac (20 - 100 ha) in three management units of BCNP based on track counts and aerial surveys.  Labisky et al. (1995) reported 1 / 49 ac (20 ha) in southeastern BCNP. Using track counts alone, McCown (1994) estimated 1 / 183 - 225 ac (74 - 91 ha) on the FPNWR and 1 / 133 - 200 ac (54 - 81 ha) in the FSPSP.

Hardwood hammocks and other forest cover types are important habitat for white-tailed deer and other panther prey (Harlow and Jones 1965, Belden et al. 1988, Maehr 1990a, Maehr et al. 1991a, Maehr 1992, Comiskey et al. 1994, Dees et al. 2001).  Periodic understory brushfires (Dees et al. 2001) as well as increased amounts of edge (Miller 1993) may enhance deer use of hardwood hammocks, pine, and other forest cover types.  Open marshes, dry-prairie/grasslands, and other vegetation types can also support high deer densities.  However, the importance of these habitat types to panthers is dependent upon the availability of stalking and ambush cover.

**Travel and Dispersal Corridors--**In the absence of direct field observations / measurements, Harrison (1992) suggested that landscape corridors for wide-ranging predators should be half the width of an average home range size.  Following Harrison's (1992) suggestion, corridor widths for Florida panthers would range 6.1 - 10.9 mi (9.8 - 17.6 km) depending on whether the target animal was an adult female or a transient male.  Beier (1995) suggested that corridor widths for transient male puma in California could be as small as 30% of the average home range size of an adult.  For Florida panthers, this would translate to a corridor width of 5.5 mi (8.8 km).  Without supporting empirical evidence, Noss (1992) suggests that regional corridors connecting larger hubs of habitat should be at least 1.0 mi (1.6 km) wide.  Beier (1995) makes specific recommendations for very narrow corridor widths based on short corridor lengths in a California setting of wild lands completely surrounded by urban areas; he recommended that corridors with a length less than 0.5 mi (0.8 km) should be more than 328 ft (100 m) wide, and corridors extending 0.6 - 4 mi (1 - 7 km) should be more than 1,312 ft (400 m) wide.  The Dispersal Zone encompasses 44 mi$^2$ (113 km$^2$) with a mean width of 3.4 mi (5.4 km).  Although it is not

adequate to support even one panther, the Dispersal Zone is strategically located and expected to function as a critical landscape linkage to south-central Florida (Kautz et al. 2006). Transient male panthers currently utilize this zone as they disperse northward into south-central Florida. Within south-central Florida, corridors have been identified to connect potential panther habitat patches (Thatcher et al. 2006a).

**G. Habitat and Prey Management**

Land management agencies in south Florida are implementing fire programs that attempt to mimic a natural fire regime through the suppression of human-caused wildfires and the application of prescribed natural fires. Periodic understory brushfires (Dees et al. 2001) as well as increased amounts of edge (Miller 1993) may enhance deer use of hardwood hammocks, pine, and other forest cover types. However, winter fires may increase the probability of endangering neonates (Land 1994).

Eight public land areas within the Primary Zone are managed by five Federal or State agencies and one non-governmental organization (NGO). The annual prescribed fire goals of these public land areas total 166 mi$^2$ (430 km$^2$). Two-to-five year fire rotations and burn compartments less than 10 mi$^2$ (25 km$^2$) are recommended to increase habitat heterogeneity (Schortemeyer et al. 1991). However, fire prescriptions vary based on fuel conditions, weather conditions, and historic fire frequency. Compartment size will vary based on site conditions, including the use of existing fire breaks or reluctance to establish new fire breaks that would reduce native habitats, fragment native habitats, and serve as vectors for the spread of invasive plants. For example, FPNWR, the only area managed specifically for panthers, uses existing swamp buggy

trails and highways as burn compartment boundaries. FPNWR is divided into 54 burn compartments that range in size from 0.47 – 1.72 mi$^2$ (1.22 – 4.45 km$^2$). A range of 8 - 12 mi$^2$ (20 - 32 km$^2$) is burned annually depending on weather conditions. The fire program at BCNP averages 47 - 62 mi$^2$ (121 - 162 km$^2$) burned annually (4 - 5% of the total area) as many habitats are adapted to long fire intervals.

Chemical, biological, and mechanical control of invasive plants is also conducted to maintain and restore native habitat types. Invasive non-native vegetation has the capacity to replace native plant communities and drastically change the landscape both visually and ecologically. The invasive plants of most concern in south Florida are melaleuca (*Melaleuca quinquenervia*), Brazilian pepper (*Schinus terebinthifolius*), old-world climbing fern (*Lygodium microphyllum*), cogongrass (*Imperata cylindrica*), and downy rose-myrtle (*Rhodomytrus tomentosus*). The effect of invasive plants on panther habitat utilization is unknown. However these species may reduce the panther's prey base by disrupting natural processes such as water flow and fire and by significantly reducing available forage. All public lands in south Florida have active invasive plant treatment programs. As of 2002, over 243 mi$^2$ (630 km$^2$) of invasive plants had been treated, with an estimated 579 mi$^2$ (1,500 km$^2$) yet untreated. No studies have been conducted to determine the effects of invasive plant management on panthers.

Management for panther prey consists of a variety of approaches such as habitat management and regulation of hunting and off-road vehicle (ORV) use. Prey management has been accomplished by regulating harvest using a variety of strategies. ENP, FSPSP, and FPNWR are closed to hunting. Corkscrew Regional Ecosystem Watershed, PSSF, OSSF, and BCNP allow

hunting.  Only BCNP allows ORV use by hunters.  It also has the longest deer and hog hunting

season (95 days), whereas the other three areas allow hunting for 35 days or less annually.  A

combination of hunter and vehicle use quotas, restrictions on hunting methods, and harvest limits

are used in BCNP to regulate impacts on the panthers' prey base.  Over the past 25 years, the

annual deer and hog harvest reported at check stations has averaged 210 and 127, respectively,

representing a sample of deer and hogs actually harvested.  Hunter pressure during that time

period has averaged 15,809 "hunter-days" annually (Adams and Bozzo 2002).


## H.  Response to Management Activities

Few studies have examined the response of panthers to various land / habitat management

activities.  Dees et al. (2001) investigated panther habitat use in response to prescribed fire and

found that panther use of pine habitats was greatest for the first year after the area had been

burned and declined thereafter.  Prescribed burning is believed to be important to panthers

because prey species (e.g., deer and hogs) are attracted to burned habitats to take advantage of

changes in vegetation structure and composition, including exploiting hard mast that is exposed

and increased quality or quantity of forage (Dees et al. 2001).  Responses of puma to logging

activities (Van Dyke et al. 1986b) indicate that they generally avoid areas within their home

range with intensification of disturbance.


There is the potential for disturbance to panthers from recreational uses on public lands.  Maehr

(1990a) reported that indirect human disturbance of panthers may include activities associated

with hunting and that panther use of Bear Island (part of BCNP) is significantly less during the

hunting season.  Schortemeyer et al. (1991) examined the effects of deer hunting on panthers at

BCNP between 1983 and 1990.  They concluded that, based on telemetry data, panthers may be altering their use patterns as a result of hunting.

Janis and Clark (2002) compared the behavior of panthers before, during, and after the recreational deer and hog hunting season (October through December) on areas open (BCNP) and closed (FPNWR, FSPSP) to hunting.  Variables examined were:  (1) activity rates, (2) movement rates, (3) predation success, (4) home range size, (5) home range shifts, (6) proximity to ORV trails, (7) use of areas with concentrated human activity, and (8) habitat selection. Responses to hunting for variables most directly related to panther energy intake or expenditure (i.e., activity rates, movement rates, predation success of females) were not detected.  However, panthers reduced their use of Bear Island, an area of concentrated human activity, and were found farther from ORV trails during the hunting season, indicative of a reaction to human disturbance.  Whereas the reaction to trails was probably minor and could be related to prey behavior, decreased use of Bear Island most likely reflects a direct reaction to human activity and resulted in increased use of adjacent private lands.

## I.  Reasons for Listing / Threats Assessment

The Florida panther was listed as endangered throughout its range in 1967 (32 FR 4001), pursuant to the Endangered Species Preservation Act, and received Federal protection under the passage of the ESA 1973.  The 1967 document did not address the five factor threats analysis. However, we address these factors in the summary below.

**Threats Assessment--**A detailed threats assessment for the panther was conducted by the Florida Panther Recovery Team using The Nature Conservancy's (TNC) planning approach (TNC 2000) (Appendix B).  Using this approach, the stresses (the types of degradation and impairment) for each factor were identified and evaluated in terms of severity and scope; sources of stresses were evaluated in terms of contribution and irreversibility.  Separate analyses were conducted for the panther population in south Florida and for reintroduction in the Southeast.

*Factor A:  The present or threatened destruction, modification, or curtailment of its habitat or range*--The panther's current occupied range is significantly reduced from its historic range from Louisiana and Arkansas east to South Carolina and southward through Florida.  The breeding portion of the panther population occurs only in south Florida, less than 5% of its historic range (Figure 1).  Because of their wide-ranging movements and extensive spatial requirements, panthers are sensitive to habitat fragmentation (Harris 1984).

<u>*Land Use Changes in Southeastern States*</u>--Based on the current trends of urbanization across the Southeast, it is likely that forested habitats will continue to be permanently altered, and the amount of available forest habitat will decrease in some areas (Wear and Greis 2002).  Compared to earlier periods, land use in the Southeast has been fairly stable since 1945, with the most notable exception of Florida, where developed land uses have expanded substantially (Wear and Greis 2002).  Two dominant forces strongly influenced recent land use changes:  (1) urbanization driven by population and general economic growth and (2) changing economic returns from agriculture relative to timber production; both of these influences are expected to continue (Wear and Greis 2002).  As a result of anticipated population and economic growth, rural land will be

converted to urban uses. Forecasts of land uses indicate that the Southeast could experience a net loss of from 12,500 - 18,750 mi$^2$ (32,375 - 48,562 km$^2$) of forest land (roughly 5 - 8%) between 1992 and 2020 (Wear and Greis 2002).

Potential panther habitat throughout the Southeast continues to be affected by urbanization, residential development, conversion to agriculture, mining and mineral exploration, lack of land use planning, and other sources of stress (Appendix B). With human population growth and increased human disturbance, the extent of potentially suitable habitat remaining in the Southeast is expected to decrease. Habitat loss, fragmentation, degradation, and disturbance from human activity throughout the Southeast are expected to remain among the greatest threats to reintroduced panther populations. As development pressure and population growth continue, the opportunity for panther reintroduction in the Southeast diminishes.

_Land Use Changes in Florida_--Habitat loss, fragmentation, and degradation, and associated human disturbance are the greatest threats to panther survival and among the greatest threats to its recovery. These threats are expected to continue in Florida and throughout the Southeast. Throughout Florida, between 1936 and 1987, cropland and rangeland increased 6,609 mi$^2$ (17,118 km$^2$) or 30%, urban areas increased by 6,172 mi$^2$ (15,985 km$^2$) or 538%, while herbaceous wetlands declined by 6,063 mi$^2$ (15,702 km$^2$) or 56% and forests declined by 6,719 mi$^2$ (17,402 km$^2$) or 21% (Kautz et al. 1993, Kautz 1994). Assuming that all of the forest lost was panther habitat, Kautz (1994) estimated that the 21% loss of forests was the equivalent of 35 - 70 male panther home ranges and 100 - 200 female panther home ranges. Between 1985 – 1989 and 2003 an additional 5,019 mi$^2$ (13,000 km$^2$) (13%) of natural and semi-natural lands

(including panther habitat) in the state were converted to urban / developed and agricultural uses (Kautz et al. 2007).

Continued expansion of urban areas on the coasts and the spread of agricultural and urban development in the interior of Florida continue to replace, degrade, and fragment panther habitat, placing the panther at greater risk. Over 83% of the 2,500 mi$^2$ (6,475 km$^2$) of agricultural land in southwest Florida has been categorized as rangeland. In southwest Florida between 1986 and 1990, row crop acreage increased by 14 mi$^2$ (36 km$^2$) or 21%; sugarcane increased by 25 mi$^2$ (65 km$^2$) or 21%; citrus increased by 84 mi$^2$ (219 km$^2$) or 75%; and rangeland, much of it suitable for panther occupation, decreased by 250 mi$^2$ (647 km$^2$) or 10% (Townsend 1991). Rangeland losses were about evenly divided between agricultural and urban development (Townsend 1991).

The extent of land use conversions for southwest Florida (Collier, Lee, Hendry, Charlotte, and Glades Counties) between 1986 and 1996 was estimated using a change detection analysis performed by Beth Stys (FWC, unpublished data). The area of disturbed lands increased 31% in these five counties between 1986 and 1996, with the greatest increases in disturbed lands occurring in Hendry and Glades Counties. Most (66%) of the land use change over the 10-year period was due to conversion to agricultural uses. Forest cover types accounted for 42% of land use conversions, dry prairies accounted for 37%, freshwater marsh accounted for 9%, and shrub and brush lands accounted for 8%. Randy Kautz (FWC, pers. comm. 2003) estimated panther habitat loss to be 0.8% per year between 1986 and 1996 using a composite of three different methodologies. These included: (1) review of U.S. Forest Service forest data between 1936 and 1995 using loss of forest as an index of the rate of panther habitat loss, (2) analysis to detect

changes in land cover in five south Florida counties (Charlotte, Collier, Glades, Hendry, Lee) between 1986 and 1996 using classified Landsat imagery, and (3) using the Cox et al. (1994) panther habitat model, and based on 1986 Landsat data, 1996 Landsat landcover data was overlaid and then areas originally mapped as panther habitat and subsequently converted to other uses over the 10-year period were tabulated. Randy Kautz (Breedlove, Dennis, and Associates, pers. comm. 2005) believes the estimated annual habitat loss since 1996 may be 2 to 3 times higher than that calculated for the previous period.

More recently, Stys calculated the extent of semi-natural and natural lands that have been converted to agricultural and urban / developed in Florida between 1985 - 1989 and 2003 (B. Stys, FWC, pers. comm. 2005). Based upon this analysis, approximately 570 mi$^2$ (1,476 km$^2$) of natural and semi-natural lands in Glades, Hendry, Lee, Collier, Broward, Monroe, and Miami-Dade Counties were converted during this time period (FWC, unpublished data). Of these, approximately 340 mi$^2$ (880 km$^2$) were conversions to agricultural uses and 230 mi$^2$ (596 km$^2$) to urban uses.

Rapid development in southwest Florida has compromised the ability of landscapes to support a self-sustaining panther population (Maehr 1990b, 1992). Maehr (1990b) reported that there were approximately 3,401 mi$^2$ (8,810 km$^2$) of occupied panther range in south Florida and that approximately 50% is comprised of landscapes under private ownership. In 2005, Kautz found that approximately 22% of the land in the Primary Zone, 60% of the land in the Secondary Zone, and 100% of the land in the Dispersal Zone is in private ownership (R. Kautz, pers. comm. 2005). Maehr (1990b) indicated that development of private lands may limit panther habitat to

landscapes under public stewardship.  Given the panther's reliance on public land, the rising cost of land is an impediment to habitat protection and therefore panther recovery.

Highways in wildlife habitat are known to result in loss and fragmentation of habitat, traffic related mortality, and avoidance of associated human development.  As a result, small populations may become isolated, subjecting them to demographic and stochastic factors that reduce their chances for survival and recovery.  Two-lane 108 ft (33 m) and four-lane 328 ft (100 m) cleared rights-of-way, respectively, occupy 2.0 and 6.2% of each 640 ac (259 ha) of land through which they pass (Ruediger 1998).  Highways can also stimulate land development as far away as 2 mi (3.2 km) on either side (Wolf 1981).  Thus, for each 1 mi (1.6 km) a highway is extended, 2,500 ac (1,012 ha) are potentially opened to new development (Wolf 1981).

Belden and Hagedorn (1993) observed that Texas pumas introduced into northern Florida established home ranges in an area with one-half the road density of the region in general, and tended to avoid crossing heavily traveled roads.  Female Florida panthers rarely establish home ranges in areas bisected by highways (Maehr 1997b).  Because home ranges of resident males typically encompass the ranges of multiple female panthers, males are less likely than females to find sufficiently large areas devoid of major roads.  Males tend to cross highways more frequently than females and suffer more vehicle-related injuries and mortalities (see Factor E).

In addition to a direct loss and fragmentation of habitat, constructing new and expanding existing highways may increase traffic volume and impede panther movement within and between frequently used habitat blocks throughout the landscape (Swanson et al. 2005).   Increases in

39

traffic volume, increasing size of highways (lanes), and habitat alterations adjacent to key road segments may limit the panther's ability to cross highways and may ultimately isolate some areas of panther habitat (Swanson et al. 2005).

Past land use activity, hydrologic alterations, and lack of fire management (Dees et al. 1999) have also affected the quality and quantity of panther habitat.  The effect of invasive plants on panther habitat utilization is unknown.  As the remaining forested uplands are lost, sloughs containing cypress, marsh, and shrub wetlands comprise a greater percentage of the remaining habitat available relative to habitat historically available to panthers.

*Human Population Growth*--Insight can be gained into expected rates of habitat loss in the future by reviewing human population growth projections for the south Florida region.  Smith and Nogle (2001) developed low, medium, and high population growth projections for all Florida counties from 2000 through 2030.  Using their medium projections, which they believe provide the most accurate forecasts, Smith and Nogle (2001) estimate that the human population of the 10 counties in south Florida will increase from 6.09 to 9.52 million residents by 2030, an increase of 56%.

Human population in the southeastern U.S. has increased 10-fold since 1850, expanding from 4.7 million to over 48 million in 2000 (Swanson et al. 2005).  In Florida, the population increased from 87,000 to over 17 million (Swanson et al. 2005, U.S. Census Bureau 2004).  From 1990 - 2004, the population in Collier County increased from 152,099 to 296,678 (U.S. Census Bureau 2002, 2004).  During the same time period, the population in Lee County increased from 335,113

40

to 514,295 (U.S. Census Bureau 2002, 2004).  The population of southwest Florida, particularly

Collier and Lee Counties, is projected to increase 21% by 2010 (Swanson et al. 2005).

*Factor B:  Overutilization for Commercial, Recreational, Scientific, or Educational Purposes—*
There are no commercial or recreational uses of panthers.  In rare cases where a panther is unable

to survive in the wild, it may be captured and used for conservation education purposes.

Panthers are routinely captured and monitored for scientific purposes.  Risks are associated with

capture and monitoring, but the overall threat to the panther is considered low (Appendix B).

Capturing and radiocollaring panthers and handling neonate kittens at dens may result in

unintentional take relative to three factors.

First, mortality or injury may result from the capture event because of capture-induced trauma or

an adverse reaction to immobilizing chemicals.  Routine capture activities include the use of

trained hounds to pursue and tree panthers and the subsequent anesthetization with remotely-

injected immobilizing drugs.  These activities may result in hyperthermia, hypothermia, dog bite

wounds, drowning, fractures, lacerations, seizures, head and spinal trauma, penetration of the

abdomen or thorax with dart, vomiting, aspiration, pneumothorax, respiratory depression or

arrest, shock, cardiac arrest, or complications associated with treatment of the above conditions.

However, the incidence of these injuries, especially serious injuries and mortalities, has been low

over the last 25 years of panther capture work in part because of stringent capture and handling

protocols developed and implemented by FWC, NPS, and FWS.  Since 1981, the FWC has

captured and immobilized 133 panthers over 296 times with only one fatality, two panthers

suffering broken legs that resulted in their temporary removal to captivity for rehabilitation and the successful return to the wild, and the holding of one other panther for 24 hours to treat an injury involving a needle embedded in bone (D. Land, FWC, pers. comm. 2004). NPS staff in BCNP have been capturing adult panthers and handling kittens at dens since 2003. Between 2003 and 2005, the NPS handled 19 adult or dependent juvenile panthers with no injury or mortality (Jansen et al. 2005).

Second, capture and handling events can result in abandonment of kittens, other disruptions of family structure, or injury to a kitten that requires its removal from the wild for rehabilitation. Further, the injury or death of an adult female with dependent-aged kittens (those less than 1 year of age) could result in the death of the kittens or the need to raise them in captivity. Neonate kittens are handled at den sites when the kittens are older than 2 weeks of age and when the mother is not present. These activities do not require anesthesia of the kittens. Handling activities could result in injury or death to the kitten or the abandonment of one or more of the kittens. From 1986 - 2004, the FWC has captured and radiocollared 59 dependent-aged kittens ranging in age from 4 - 18 months (D. Land, pers. comm. 2004). These captures resulted in the abandonment of two kittens. One was subsequently reared in captivity and released. The other died of an infection in captivity shortly after its capture. Early break-up of family groups may have occurred on a few other occasions. For this reason, dependent-aged kittens less than one year are no longer captured. Between 1992 and 2005, FWS and NPS handled 195 kittens at 82 dens with no injury, mortality, or den abandonment (Jansen et al. 2005, Lotz et al. 2005).

Third, the loss of contact with or access to young radio-collared panthers whose collars need to be resized to accommodate growth may result in the collar becoming embedded in the panther's neck.  If the panther cannot be recaptured to remove (e.g., if a radiocollar prematurely fails) or resize the collar, infection and eventual death could occur.  In September 2001, the FWC and NPS began fitting young panthers with break-away radiocollars.  This change in protocol has greatly reduced the risks associated with radiocollaring young panthers (D. Land, pers. comm. 2004).

If stringent capture and handling protocols continue to be followed and refined, injury levels are expected to remain low and are not expected to significantly affect important demographic parameters at the population level, including mortality and reproductive rates or recruitment of juveniles.  Handling panthers is important for research, management, and monitoring of the population, and overall the risks are low.

*Factor C:  Disease or Predation*--The Florida panther is susceptible to a number of infectious diseases and parasites some of which are of population significance while others are important only to the individual.  Some diseases have not been diagnosed in panthers but remain a potential threat.  As a single contiguous population, there is potential for an infectious disease to have a catastrophic impact on the panther.

Although FeLV is common in domestic cats, it is quite rare in non-domestic felids.  The recent outbreak of this disease in the panther population shows the potential of this disease to be of population significance.  Another viral disease potentially of population significance is PRV. PRV causes respiratory and reproductive disorders in adult hogs and mortality in neonates, but is

a rapidly fatal neurologic disease in carnivores.  Approximately 35% of feral hogs are

seropositive for PRV in Florida (van der Leek et al. 1993).  The virus is actively shed by only a

small percentage of infected hogs at any given time; however, stress can increase the percentage

that shed the virus (Murphy et al. 1999).  Feral hogs are an important prey species for panthers

(Maehr et al. 1990b), and there is potential for significant mortality in panthers due to PRV.

Raccoons are a common prey item for panthers (Maehr et al. 1990b) and are the most important

reservoir for rabies in the Southeast (Burridge et al. 1986).  As panthers are now vaccinated

against rabies at capture, only uncollared panthers are at significant risk.

PLV causes significant mortality in domestic kittens.  The virus is also carried by raccoons and is

quite stable in the environment.  However, kittens are at greatest risk of infection and causes of

mortality in this cohort are largely unknown.  An epizootic of PLV caused significant mortality

among radio-collared bobcats in the late 1970s in south-central Florida (Wassmer et al. 1988),

suggesting that the panther population may also be at risk.

Hookworm infections in domestic kittens can cause significant morbidity and mortality resulting

from blood loss.  The impact of this parasite on panther kittens in the wild is unknown.

Some individual panthers have been shown to be at risk from exposure to mercury in the food

chain (Newman et al. 2004).  Mercury bioaccumulates through the aquatic food chain reaching

high concentrations in higher trophic level carnivores such as raccoons and alligators.  Panthers

preying on these species are at risk for accumulating high tissue mercury concentrations. Neonates may be more susceptible to the toxic effects of mercury (Berglund and Berlin 1969).

Disease and parasites have not been documented to be a major mortality factor in the panther population (Maehr et al. 1991b, Taylor et al. 2002).  However, this observation is largely based on the captured and vaccinated sample of the population.  Disease expression and mortality events for the unmarked and unvaccinated segment of the population, including kittens, may be higher, especially for those diseases included in the vaccination regimen.  Further, as the panther population density increases there is an increased risk of diseases transmitted by direct contact. The FeLV outbreak demonstrated the potential impact of infectious diseases on the population. Should a virulent pathogen enter the population, there is no absolute barrier in south Florida that could prevent such a disease from impacting the entire population (Beier et al. 2003). Consequently, until additional populations of panthers can be established elsewhere in their historic range, infectious diseases and parasites remain a threat.  Finally, infectious diseases, parasites, and environmental contaminants, even of low pathogenicity, may work synergistically to reduce panther fitness and reproduction.

*Factor D:  The Inadequacy of Existing Regulatory Mechanisms*--The panther is federally listed as endangered and is on the State endangered lists for Florida, Georgia, Louisiana, and Mississippi.  The protection provided by Federal (ESA, Clean Water Act [62 Stat. 1155, as amended; 33 U.S.C. 1251-1376] [CWA], National Environmental Policy Act of 1969 [83 Stat. 852, as amended; 42 U.S.C. 4321-4347] [NEPA], Fish and Wildlife Coordination Act [48 Stat.

45

401, as amended; 16 U.S.C. 661 et seq.] [FWCA]) and State (Florida protective provisions specified in Rules 68A-27.0011 and 68A-27.003) laws help conserve the panther and its habitat.

Section 7(a)(2) of the ESA requires that all Federal agencies consult with FWS to ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of critical habitat. If a project will not jeopardize the continued existence of a species but may result in incidental take of the species, FWS works with the action agency and any applicants to find ways to minimize the effects of the take. Section 7(a)(1) requires all Federal agencies to utilize their authorities in furtherance of the ESA by carrying out programs for the conservation of listed species. Section 4(a)(3) requires the designation of critical habitat for listed species to the maximum extent prudent and determinable. Section 9 prohibits unlawful acts, including unauthorized take.

As discussed in Factor A, development pressure in southwest Florida has been high; for example, data for Collier, Lee, and Hendry Counties, a stronghold for the panther population, indicate that from 1985 through 2003 more than 223 mi$^2$ (578 km$^2$) of natural and semi-natural lands were converted to agriculture (FWC, unpublished data). In addition, more than 145 mi$^2$ (375 km$^2$) of semi-natural and natural lands in this three-county area have also been lost to development (FWC, unpublished data) (see Factor A). While not all of these habitat losses and conversions involved panther habitat, many projects involved wetland impacts, requiring permit review by the U.S. Army Corps of Engineers (COE) pursuant to section 404 of the CWA and / or coordination among regulatory agencies pursuant to the FWCA. For projects with a Federal

nexus, consultation pursuant to section 7 of the ESA was needed for actions that may affect the panther. Through compensation for some of these projects, FWS helped secure conservation of 62 mi$^2$ (161 km$^2$) in the Primary, Secondary, and Dispersal Zones from September 2003 to June 2008.

Section 10(a)(1) allows for the issuance of permits for scientific or enhancement of survival purposes, provided that certain terms and conditions are met. Section 10(a)(2) allows for the issuance of permits, provided that the taking will be incidental to an otherwise lawful action, adequately minimized and mitigated, appropriately funded, and will not appreciably reduce the likelihood of survival and recovery of the species in the wild. Through 2007, no Habitat Conservation Plans (HCP) have been finalized under section 10(a)(2) of the ESA and no incidental take permits have been issued for the panther. Section 10, however, provides opportunities for large-scale and regional approaches to panther habitat conservation, and can be a valuable tool at the county or regional level.

Florida Statute 373.414 requires that activities permitted in wetlands and surface waters of the state are not contrary to the public interest. If it is determined that an activity will adversely affect panthers or panther habitat, the governing board (Water Management District [WMD]) or the Florida Department of Environmental Protection (FDEP) can consider measures (e.g., on-site mitigation, off-site mitigation, purchase of credits from mitigation banks) that will mitigate the effects of the regulated activity.

In addition to the impacts of individual projects, the FDEP and WMD shall take into account cumulative impacts on water resources (Section 373.414(8), F.S.). Cumulative impacts can be

considered unacceptable when they provide unacceptable impacts to functions of wetlands, including the utilization of the wetlands by wildlife species (Sections 4.2.8 through 4.2.8.2 of the South Florida Water Management District Basis of Review).  In practice, evaluating cumulative impacts of development in southwest Florida on panthers has not been sufficient to prevent significant loss of panther habitat.  Since the majority of panther habitat in southwest Florida has significant wetland components, provisions of 373.414 are usually a part of the review of proposed development.  The State wetlands permitting authorities can also assess whether a regulated activity will cause adverse secondary impacts to aquatic or wetland dependent species, such as panthers, including where the site does not have a wetland component (Section 4.2.7 of the South Florida Water Management District Basis of Review).

The FWC may exercise the regulatory and executive powers of the State with respect to wild animals, including panthers.  The FWC has responsibility for conserving and managing these species and their habitat; however the FWC does not provide regulatory protection for listed species habitat.  The FWC provides comments regarding potential impacts to panther habitat to FDEP and WMDs under the authority of Chapter 20.331 Florida Statutes.

Because of the project-specific focus of regulatory programs, statutorily set processing time frames, and other constraints such as high workloads, local, State, and Federal regulatory agencies sometimes find it difficult to complete the cross-government review that would be ideal to thoroughly review and effectively assess all potential impacts to panthers.  In addition, local, State, and Federal agencies sometimes have difficulty monitoring permit compliance and tracking the precise impact on species and habitat from authorized actions, as well as tracking the

impact from unauthorized actions.  Assessing current baseline conditions and accurately predicting future impacts are also challenging because the panther is a wide-ranging species that uses a wide array of habitat types.  Furthermore, baseline conditions for the panther are continually changing (e.g., impacts from development, conservation actions).  Rigorous assessments and close coordination and scrutiny of project impacts by local, State, and Federal agencies during the planning phase could help maximize conservation benefits for the panther.

*Factor E:  Other Natural or Manmade Factors Affecting its Continued Existence*--
*Mortality, Trauma, and Disturbance*--Florida panthers were hunted for bounty during the 1800s and for sport until the 1950s.  Nine illegal shootings were documented in south Florida between 1978 and 2005, three of which were not fatal.  Education, self-policing among hunters, and regulation are the tools by which shootings are minimized.  All free-ranging puma in Florida are treated as Endangered because they closely resemble the Florida panther and are therefore protected by a "similarity of appearance" provision pursuant to the ESA.

Records on documented mortality of uncollared panthers have been kept since February 13, 1972.  Records on mortality of radio-collared panthers have been kept since February 10, 1981.  Eighty-four radio-collared panthers have died since 1981, and intraspecific aggression was the leading cause, accounting for 42% of these mortalities (Lotz et al. 2005).  Unknown causes and collisions with vehicles accounted for 24% and 19% of mortalities, respectively.  Other factors (7%), infections (5%), and diseases (4%) caused the remaining mortalities (Land et al. 2004).

One-hundred fifty-three panther mortalities were documented from February 1972 through June 2004, with at least 58 (41%) of known deaths occurring in the last four-year period (Land et al. 2004). Overall, documented mortality (n = 105) of radiocollared and uncollared panthers averaged 3.4 per year through June 2001. However, from July 2001 through June 2004, documented mortality (n = 48) increased with an average of 16.0 per year (Land et al. 2004). This increase in panther mortality (e.g., intraspecific aggression, collisions with vehicles) corresponds with increases in the panther population observed in recent years.

From February 1972 through June 2004, 36 documented panther mortalities were the result of intraspecific aggression (Land et al. 2004). Although most of these encounters are male-male, from July 2001 through June 2004, at least nine females were killed in encounters with males (Land et al. 2004). Defense of kittens and / or a kill is suspected in five of these instances that occurred through 2003 (Shindle et al. 2003).

From February 1972 through June 2004, 27 documented panther mortalities were from unknown causes (Land et al. 2004). While a couple of deaths from unknown causes occur each year, five deaths occurred in various areas in 2000 and six deaths occurred in Seminole game and safari pens in 2003 (Land et al. 2004).

Eighty-six panther-vehicle collisions were documented between 1972 and 2005 of which 80 (52%) resulted in panther deaths (Lotz et al. 2005). Panther-vehicle collisions were identified as the third most important source of mortality among radiocollared panthers (19%) (Land et al. 2004). Fifty-six percent (48) of panther-vehicle collisions have occurred since 2000 with all but

two being fatal to the panther (Lotz et al. 2005). Approximately 53% of documented panther-vehicle collisions have occurred within the Primary Zone through 2004 (Swanson et al. 2005). Panther-vehicle collisions are a significant source of mortality and pose an on-going threat. In addition, new and existing roads, expansion of highways, and increases in traffic volume and speed contribute to loss of panther habitat and impede movement within and between high use habitat blocks throughout the landscape (Swanson et al. 2005) (see Factor A). New and expanded highways could to increase the threat of panther mortality and injuries due to collisions if they are not accompanied by adequate fencing and crossings.

Wildlife crossings and continuous fencing were required during the conversion of two-lane SR 84 (Alligator Alley) into four-lane I-75. Until August 12, 2007, no panther mortalities had been documented in these protected areas since completion of I-75 in 1992. Similarly, six wildlife crossings and some fencing were required along SR 29 as a prerequisite to the SR 29 / I-75 interchange. All six of these crossings are now complete; however panther-vehicle collisions occur both where the fencing ends and when panthers enter the fenced area and become trapped. In addition, two crossings were required on County Road 858 (Oil Well Road) to offset projected traffic increases from development. In the absence of crossings and fencing, the remaining stretches of SR 29 and I-75 as well as several other roads continue to pose a serious mortality risk to panthers, including U.S. 41 (Tamiami Trail), SR 82, and County Roads 850 (Corkscrew Road), 858, 846 (Immokalee Road), 832, and 833. Through May 2007, 85 of 107 mortalities or injuries from panther-vehicle collisions occurred along these unsecured roads (Swanson et al. 2005, FWC unpublished data).

Florida's human population has been steadily growing and as a result, urban / suburban areas now interface with panther habitat. Extensive developments planned in Collier County, such as the Ave Maria University and associated town, will expand local road networks and extend the human / panther interface into primary panther habitat (Swanson et al. 2005).

In recent years, there has been an increase in human-panther interactions and hobby livestock depredations that have resulted in management responses. For example, in 2004, aversive conditioning was used on panthers observed near areas of human habitation in the Pinecrest area within BCNP, and a juvenile dependent male panther was subsequently relocated to OSSF. If human-panther interactions and livestock depredations increase, the potential for complaints from the public and, in some cases, the need for subsequent management responses could result in take of panthers in the form of harassment through aversive conditioning in an attempt to teach individuals to avoid humans. However, if the panther's location presents a possible threat to public safety (e.g., a dispersing male panther wanders into an urban neighborhood and can not find its way out) or there is a threat to the survival of the panther (e.g., a panther wanders into an area that contains numerous physical hazards), depending on specific circumstances, the panther may be captured and relocated, or removed to an approved captive facility. If a panther's behavior indicates a threat to human safety, it will be permanently removed from the wild. In extreme circumstances, euthanasia may be necessary. Currently, the FWS, FWC, and NPS are working on a document titled *Interagency Florida Panther Response Plan*. This plan will provide guidance on methods for minimizing the potential for human-panther interactions and help ensure consistency in use of potential management responses.

There is the potential for disturbance to panthers from recreational uses on public lands. Maehr (1990a) and Schortemeyer et al. (1991) reported that panthers may be altering their use patterns as a result of hunting.  Janis and Clark (2002) compared the behavior of panthers before, during, and after the recreational deer and hog hunting season on areas open and closed to hunting. Responses to hunting for variables most directly related to panther energy intake or expenditure were not detected (Janis and Clark 2002).  However, panthers reduced their use of an area of concentrated human activity, and were found farther from ORV trails during the hunting season, indicative of a reaction to human disturbance (Janis and Clark 2002).  Whereas the reaction to ORVs was probably minor and could indirectly be related to prey behavior, decreased panther use of high human activity areas and increased use of adjacent private lands most likely reflects a direct reaction.  Additional habitat loss on those private lands could exacerbate the negative consequences of this pattern of use (Janis and Clark 2002).

_Loss of Genetic Diversity_--Natural genetic exchange with other panther populations ceased when the Florida panther became geographically isolated over a century ago (Seal 1994a).  Isolation, habitat loss, reduced population size, and associated inbreeding resulted in loss of genetic variability and diminished health.  Data on polymorphism and heterozygosity, along with records of multiple physiological abnormalities, suggest that the panther population has experienced inbreeding depression (Roelke et al. 1993a, Barone et al. 1994).  Measured heterozygosity levels indicate that the Florida panther had lost about 60 - 90% of its genetic diversity (Culver et al. 2000).  Genetic problems in the Florida panther included heart murmurs, a high rate of unilateral cryptorchidism, low testicular and semen volumes, diminished sperm motility, and a high percentage of morphologically abnormal sperm.

To address these threats, a genetic management program was implemented with the release of Texas pumas into south Florida in 1995 (see Conservation Efforts Section).  The results of genetic restoration have been successful as indicated by an increasing population, signs of increased genetic health, recolonization of areas in BCNP and ENP recently unoccupied, and increased dispersal (McBride 2000, 2001, 2002; Maehr et al. 2002a).  To date, neither atrial septal defects nor cryptorchidism have been found in introgressed panthers (M. Cunningham, pers. comm. 2005).  Semen examination of two introgressed panthers indicated that sperm volume, motility, and count were higher than for an uncrossed Florida panther.   A preliminary assessment of genetic restoration suggested that the desired 20% introgression level had been achieved, but the contributions were primarily from two of the released females (Land and Lacy 2000).  Genetic introgression is also reducing the occurrence of kinked tails and cowlicks in intercross progeny (Land et al. 2004).

_Human Dimension_--Human intolerance has the potential to be a major challenge to panther recovery.  Recently, human-panther interactions have been on the rise in southwest Florida along the interface of urban and wild lands.  From December 2003 through June 2007 there was one area of repeated sightings (Pinecrest area within BCNP), two encounters (an unexpected direct meeting between a human and a panther in which the panther displayed a lack of wariness to humans and did not approach, or show signs of curiosity, but retreated), a threat (this was the result of repeated depredations and significant behavioral changes by one panther that was ultimately removed from the wild), and 16 depredations (domestic livestock or pets being attacked or killed by a panther).

Previous recovery plans have called for the establishment of additional populations within the historic range of the panther (FWS 1981, 1987, 1995). The FWC studied the possibility of establishing additional populations within the historic range (Belden and Hagedorn 1993, Belden and McCown 1996). Between 1988 and 1995, 26 Texas pumas were released near Okefenokee NWR and Osceola National Forest. Study animals, monitored by radiocollars at least three days per week, established large home ranges, killed large prey at expected frequencies, and generally adapted well to their new environment (Belden and McCown 1996). When these studies were terminated, the remaining panthers were captured and removed from the wild.

Experimental releases of Texas pumas indicated that habitat and prey availability in northern Florida and southern Georgia were sufficient to support a panther population (Belden and McCown 1996). However, although there appeared to be support for reintroduction among the general public in Florida, local landowners tended to oppose having panthers on their property. Political and social issues will be the most difficult aspect of panther reintroduction and must be addressed (Belden and Hagedorn 1993, Belden and McCown 1996).

Habitat assessment studies have been conducted to identify potential sites for reintroduction of the panther in the Southeast (Thatcher et al. 2006b). The purpose of these studies was to identify prospective sites for panther reintroduction within the historic range based on quantitative landscape assessments. Nine potential reintroduction sites of sufficient size to support a panther population were identified including: Ozark National Forest region, Ouachita National Forest region, southwest Arkansas, and Felsenthal NWR region in Arkansas; Kisatchie National Forest

region in Louisiana; Homochitto National Forest region in Mississippi; southwest Alabama;

Apalachicola National Forest region in Florida; and Okefenokee NWR region in Georgia

(Thatcher et al. 2006b).

Sociopolitical obstacles to large carnivore reintroduction are often more daunting than biological

ones (Clark et al. 2002). A lack of public support and tolerance could prevent the reintroduction

of panthers anywhere outside of Florida. Public support is critical to reintroduction efforts and

attainment of recovery goals.

*Contaminants*--Because the panther is a top carnivore, bioaccumulation of environmental

contaminants remains a concern (Dunbar 1995, Newman et al. 2004), with the threat of mercury

toxicity considered medium (see Appendix B). However, mercury in the Everglades ecosystem

has decreased over the last several years (Frederick et al. 2002). Other environmental

contaminants found in panthers include polychlorinated biphenyls (Aroclor 1260) and

organochlorines (Dunbar 1995, Land et al. 2004). Continued monitoring for contaminants,

especially mercury and organochlorines, in panthers, their prey, and sentinel species is warranted

(see E. Life History / Ecology).

*Prey availability*--The size, distribution, and abundance of available prey species are critical

factors to the persistence of panthers in south Florida and often determine the extent of panther

use of an area. A resident adult male puma generally consumes one deer-sized prey every 8 - 11

days; this frequency is 14 - 17 days for a resident female; and 3.3 days for a female with three

13-month-old kittens (Ackerman et al. 1986).

Historically, hunting in the Big Cypress physiographic region has been a major traditional activity with many hunt camps throughout the region.  With establishment of national and state parks, the numbers of hunt camps were decreased and additional hunting regulations that reduced hunting pressure on deer were implemented.  Although deer densities are difficult to determine, the deer population appears to have steadily increased.

Using aerial surveys, Schemnitz (1974) estimated the deer population in the 3,438 $mi^2$ (8,903 $km^2$) area south of the Caloosahatchee River and Lake Okeechobee at 20,000 in 1972, and stated that the deer population had decreased in the Water Conservation Areas (WCA) due to deeper water levels and submersion of tree islands.  Fleming et al. (1994) compared deer density estimates in WCA 2 and 3 in the 1950s with those from 1985 - 1988 and found a 67% reduction in the deer herd. They surmised that this reduction was due to habitat degradation from impoundment and associated water management.  ENP and portions of the WCAs are within the Primary Zone.  Smith and Bass (1994), however, stated that fire and water, which drive the Everglades system, appear to have little effect on the long-term dynamics of the ENP deer population.

Few studies have been done on the hog component of the panthers' prey base (e.g., Maehr et al 1989b).  However, the mean checked hog harvest of 29 in BCNP for 2003 - 2005 has fallen well below the previous 22-year average of 144, probably due to a combination of factors, including high water events and predation by panthers (D. Jansen, pers. comm. 2005).

Although the exact status of prey in different portions of the panther's occupied range is not known at this time, assessment of overall panther health and their success in raising young indicate that the prey base is adequate to support the current panther population. Adequate prey elsewhere within the historic range would be needed to establish populations in other areas.

### J. Past and Current Conservation Efforts

**Habitat Conservation and Protection--**Habitat protection has been identified as being one of the most important elements to achieving panther recovery. While substantial efforts have been made to secure a sufficient habitat base (Figure 4), continued action is needed to obtain additions to and inholdings for public lands, assure linkages are maintained, restore degraded and fragmented habitat, and obtain the support of private landowners for maintaining property in a manner that is compatible with panther use. Conservation lands used by panthers are held and managed by a variety of entities including FWS, NPS, Seminole Tribe of Florida, Miccosukee Tribe of Indians of Florida, FWC, FDEP, Florida Division of Forestry (FDOF), WMDs, NGOs, counties, and private landowners.

*Public Lands*--Public lands in south Florida that benefit the panther are listed below and shown in Figure 4:

- In 1947, ENP was established with 2,356 mi$^2$ (6,102 km$^2$) and in 1989 was expanded with the addition of 163 mi$^2$ (421 km$^2$).

- In 1974, Congress approved the purchase and formation of BCNP, protecting 891 mi$^2$ (2,307 km$^2$); later 228 mi$^2$ (591 km$^2$) were added.

- In 1974, the State of Florida began acquiring land for the FSPSP, which encompasses over 125 mi$^2$ (324 km$^2$).  Efforts are underway to acquire approximately 26 mi$^2$ (68 km$^2$).

- In 1985, acquisition of PSSF and Wildlife Management Area (WMA) began with the complex Golden Gate Estates subdivision buyouts and now comprises over 119 mi$^2$ (308 km$^2$).  The Southern Golden Gate Estates buyout through State and Federal funds is complete.  The South Belle Meade portion of Picayune Strand is about 90% purchased and although the State is no longer purchasing in South Belle Meade, Collier County's Transfer of Development Rights program is helping to secure the inholdings.

- In 1989, FWS' FPNWR was established and now protects 41 mi$^2$ (107 km$^2$).

- In 1989, the Corkscrew Regional Ecosystem Watershed Land and Water Trust, a public / private partnership, was established and to date has coordinated the purchase of 42 mi$^2$ (109 km$^2$).

- In 1996, the South Florida WMD, purchased the 50 mi$^2$ (130 km$^2$) OSSF.

- In 2002 Spirit of the Wild WMA, consisting of over 11 mi$^2$ (28 km$^2$), was taken into public ownership by the State of Florida and is managed by FDOF.

- In 2003, Dinner Island Ranch WMA consisting of 34 mi$^2$ (88 km$^2$) in southern Hendry County was taken into public ownership by the State of Florida and is managed by FWC.

*Tribal Lands*--Lands of the Seminole Tribe of Florida and Miccosukee Tribe of Indians of Florida encompass over 547 mi$^2$ (1,416 km$^2$) in south Florida.  Of these, 181 mi$^2$ (469 km$^2$) are used by panthers, and comprise 5% of the Primary Zone (R. Kautz, pers. comm. 2005).  These lands are not specifically managed for the panther and are largely in cultivation.

*Private Lands*--A variety of Federal, State, and private incentives programs are available to assist private landowners and other individuals to protect and manage wildlife habitat.  Voluntary agreements, estate planning, conservation easements, land exchanges, and mitigation banks are methods that hold untapped potential for conserving private lands.  In 1954, the National Audubon Society established the nearly 17 mi$^2$ (45 km$^2$) Corkscrew Swamp Sanctuary. However, little additional private land has been protected south of the Caloosahatchee River for panther conservation.  A number of properties identified by the State Acquisition and Restoration Council (ARC) for purchase by the Florida Forever Program are used by panthers (e.g., Devil's Garden, Half Circle F Ranch, Pal Mal, Panther Glades).  North of the Caloosahatchee River, Fisheating Creek Conservation Easement, 65 mi$^2$ (168 km$^2$) in Glades County is a private holding used by panthers.

*Habitat Protection Plans***--**

*The Florida Panther Habitat Preservation Plan, South Florida Population*--Released in 1993 by the Florida Panther Interagency Committee (Logan et al. 1993) and drafted to guide habitat acquisition, this document contains useful baseline information about lands that constitute important panther habitat.

*FWS MSRP*--Released by the FWS in 1999, the panther portion of the MSRP outlines how south Florida contributes to the rangewide recovery objective, but does not replace the approved 1995 recovery plan for the panther.  While it provides a comprehensive, general overview of panther biology in south Florida, parts that have become outdated will be replaced by this recovery plan.

*Florida Panther Subteam*-- The FWS created MERIT to assist with implementation of the MSRP after it was signed in 1999.  In 2000, the FWS formed the Florida Panther Subteam of MERIT to develop a landscape level conservation strategy for the panther in south Florida that could be applied in the planning and regulatory context.  The Subteam produced a draft report, "Landscape Conservation Strategy for the Florida Panther in South Florida" (Landscape Conservation Strategy) in December 2002.  The document includes a panther habitat map of Primary, Secondary, and Dispersal Zones, and outlines recommendations for protection of these areas.  Some portions of the science and findings in the Landscape Conservation Strategy have been challenged.  As of 2005, the FWS no longer distributes the document as a result of a Data Quality Act (Section 515 of Public Law 106-554) challenge.  Many of the Panther Subteam members refined the methodology, further analyzed the data, better defined, and published the results of the Landscape Conservation Strategy (Kautz et al. 2006).

*Regulatory Tools*--

*COE Panther Key*--In 2000, FWS issued to the COE its final interim Standard Local Operating Procedures for Endangered Species (SLOPES) for conducting consultations between the FWS and the COE for permit applications that may affect panthers.  The COE and FWS also co-developed a number of conservation measures that may, where appropriate and on a case-by-case basis, be incorporated into project designs to facilitate compliance with the requirements of the ESA.  The COE and FWS revised the key in 2007.  The COE and FWS plan to revise the SLOPES and other related documentation as needed and appropriate to incorporate new science developed in the future to conserve the panther.

*FWS Panther Habitat Methodology*--In 2002, FWS developed a draft Panther Habitat Assessment methodology to help guide the agency in evaluating permit applications for projects that could affect panthers and their habitat. This draft methodology was a way to assess the level of impacts to panthers expected from a given project, and to evaluate the effect of any proposed compensation offered by the project applicant. The draft methodology evolved over time to incorporate new information, and will continue to evolve in the future as new information is attained. FWS did not finalize an assessment methodology document but instead describes the methodology used to evaluate each project in detail in biological opinions. The habitat framework serves one important role in broader conservation efforts to maintain a panther population, and is complemented by activities such as fee-title acquisition, easements, and other local, State, and Federal conservation tools. The benefits from each of these conservation tools can be enhanced through coordination. For example, local, State, and Federal land conservation programs could identify and protect areas adjacent to parcels preserved through regulatory review, thereby increasing the size of connected, high-quality habitat for the panther.

*Federal and State Project Planning*--Under section 7(a)(2) of the ESA, FWS consults with Federal agencies proposing actions that may affect the panther. In addition, FWC provides comments regarding potential impacts to panther habitat to FDEP and WMDs under the authority of Chapter 20.331 Florida Statutes. Many of the impacts from development have been compensated through habitat protection in recent years. Using the evolving panther habitat methodology described above, FWS helped secure 62 mi$^2$ (161 km$^2$) in the Primary, Secondary, and Dispersal Zones from September 2003 to June 2008. In addition to habitat conservation, regulatory review allows other important compensation strategies to be considered and

implemented.  For example, new roads can be configured to direct traffic away from panther

habitat.  In addition, to help offset impacts from increases in traffic within panther habitat,

project sponsors can construct crossings that allow panthers to pass safely from one side of a

road to another, thereby minimizing the likelihood of vehicular collisions.  New advances in

science such as FWC's report entitled "Use of Least Cost Pathways to Identify Key Highway

Segments for Panther Conservation" (Swanson et al. 2005) help identify optimal locations for

crossings by depicting where vehicular collisions have occurred in the past.  This allows

agencies to set priorities and guide project sponsors to offset their impacts by providing crossings

in areas with a history of problems.


_FWS Panther Conservation Banks_--FWS has initiated a conservation banking program in south

Florida to address the impact of habitat loss on the Florida panther.  Banks are expected to play a

role in filling gaps in the current conservation lands network.  By selecting optimum sites among

willing participants the banking program provides opportunities to maintain traditional land uses,

such as ranching, that are compatible with panther conservation while realizing value from

protecting lands from future development.

When a development project has an adverse impact to panther habitat, compensation can be put

forward to offset this impact.  For small projects, land acquisition and restoration is typically

difficult to accomplish, and not economically feasible.  In addition, small pieces of compensation

tend to fragment the conservation landscape making it of less value to the panther.  Conservation

banks are assigned a number of credits based on the location in the landscape and the habitat

value to the panther.  This bank of credit can be drawn upon by projects impacting panther

habitat through payment to the banker.  There is cost certainty in the banking credit value that

allows potential development projects to evaluate the cost before making expensive development decisions while directing the compensation toward the best available lands for the panther.  By protecting the land in perpetuity and restoring ecological function where feasible, the banks allow consolidation of numerous small impacts into more unified and connected conservation lands that provide to best ecological value to the panther.

**Advisory Councils and Committees--**

*Florida Panther Technical Advisory Council*--Chapter 38-172, Laws of Florida, established the Florida Panther Technical Advisory Council in 1983.  The Council members represent State and Federal agencies and private and professional resource organizations.  The Council serves in an advisory capacity to FWC on technical matters of relevance to the panther program, provides a forum for technical review and discussion of the status and development of the panther program, and provides a communications liaison between the technical agencies and organizations represented on the Council.

*Florida Panther Interagency Committee (FPIC)*--FWS, FWC, NPS, and FDEP established FPIC in May 1986.  The FPIC was comprised of the Executive Directors of FWC and FDEP and the Regional Directors of FWS and NPS.  The purpose of FPIC was to provide guidance and coordination on panther research and management activities.  A Technical Subcommittee, composed of mid-level administrators, was appointed by FPIC to provide proposals and other information to be acted upon.  FPIC and the Technical Subcommittee are no longer active.

**Transportation Planning and Improvements--**

*Regional, Landscape Level Transportation Plans*--Recent least-cost pathways analyses (e.g., Swanson et al. 2005) that identify highway segments crossed by panthers have compiled information that can be used to help avoid and reduce injury and mortality to panthers from collisions with vehicles.

The Florida Department of Transportation (FDOT) is developing a method of early proposal review through the Efficient Transportation Decision Making (ETDM) process that can help assure landscape level protection is addressed, maintain habitat and population connectivity, and protect wildlife and human safety.  The State's Strategic Intermodal System Plan and Florida Transportation Plan 2025 focus on mobility and economic development yet include strengthened habitat and wildlife protection provisions.  Federal, State, and local agency coordination, as well as public involvement, is needed in regional transportation planning so that expansions, extensions, or new roads; mass transit; and ports minimize fragmentation and degradation of panther habitat.

*Reducing Vehicle Mortality*--

<u>*Wildlife Crossings, Underpasses*</u>--FDOT's installation of underpasses and accompanying fencing in 1993 along the section of I-75 (Alligator Alley) successfully eliminated panther-vehicle collisions in that area.  Incidents of panther-vehicle collisions have also been minimized in four additional areas where crossings and fencing have been installed on SR 29 (two north and two south of I-75).  FDOT completed two additional underpasses along SR 29 in 2007.

Wildlife crossings increase initial road costs and require permanent conservation designation of the lands on both sides of the structure.  However, the burgeoning human population with accompanying increases in personal and commercial vehicles necessitates many more road improvements to reduce the number of panther-vehicle collisions, as well as to help achieve greater human safety.

_Reduced Speed Limits_--Reduced nighttime speed zones have been in effect along many roads since July 1985 to minimize the likelihood of panther-vehicle collisions, however, compliance is a continuing problem.  In addition, panther-vehicle collisions have occurred despite drivers following the legal speed limit.  An evaluation of the effectiveness of these zones in reducing such collisions could help determine if further adjustments to the speed limits are warranted.

**Research, Monitoring, and Management--**

_Research and Monitoring_--The FWC began research on the panther with the development of a Florida Panther Record Clearinghouse in 1976.  This was the first step in identifying whether or not this species existed in Florida and where it occurred.  A total of 4,620 observations were reported to the Clearinghouse, but only 91 of these were confirmed to be a panther (Belden et al. 1991).  The majority of the confirmations came from Collier, Hendry, and Miami-Dade Counties.

Capture and radio-collaring work by FWC began in 1981 and by NPS in 2001.  Monitoring of radio-collared panthers has been done by NPS in ENP and BCNP since 1986 and 1988, respectively.  The objectives of research and monitoring have been directed toward

understanding the basic biology and habitat needs of the species. This research included movements, home range size and habitat use, morphological descriptions, food habits, mortality causes, and reproduction. Panther prey studies, including population dynamics, deer herd health and reproduction, and deer mortality have also been accomplished.

Concurrent with these studies, genetics work was being conducted by Dr. Stephen O'Brien of the National Cancer Institute, and collaborations with the Conservation Breeding Specialists Group were begun. Consultations with these experts on small population dynamics and inbreeding depression yielded a strategy to manage the panther population via genetic restoration. A genetic restoration plan was written in 1994 (Seal 1994a) and implemented in 1995 with the goal of improving the genetic health of the panther population. From 1995 through 2003, most panther capture and monitoring activities were directed towards evaluating genetic restoration. In addition, the goals of the BCNP research and monitoring work include determining the area's potential to support panthers, evaluating the effects of restoration projects and management strategies on the panther population within BCNP, and the extent of connectivity with the panthers in ENP.

Capture, handling, and biomedical sample collection by FWC and NPS follow established protocols to ensure safety and thoroughness. Radio-collared panthers are typically monitored by fixed-wing aircraft three times per week to determine location, habitat use, movements, interactions, births, and deaths. Several types of GPS collars are being field-tested by both FWC and NPS in order to obtain data on nocturnal movements and habitat use by panthers (Land et al. in press).

Since 1990, Florida panther research by FWC has been funded through the Florida Panther Research and Management Trust Fund, which receives its monies from the purchase of Florida panther specialty license plates. Through 2004, nearly 1.4 million panther license plates have been issued, generating nearly $40 million. Eighty-five percent of the proceeds from the extra $25.00 per license plate collected annually go into this trust fund. To obtain the money, FWC must submit a budget request each year to the Florida Legislature for approval. The NPS in ENP and BCNP supports its panther work within its annual budgets or special funding requests.

*Captive Breeding*--In 1984, John Lukas, Director of Conservation and Curator of Gilman Paper Company's White Oak Plantation, expressed an interest in breeding Florida panthers in captivity. At the time, a male Florida panther was convalescing at the FWC Wildlife Research Laboratory from injuries sustained when he was hit by a vehicle. These events led to the formalization of a plan to captive-breed panthers with the eventual goal of reestablishing them in unoccupied portions of their historic range.

In May 1985, FWC and Gilman Paper Company signed an agreement to breed panthers in captivity and to make suitable animals available for reintroduction. The captive-breeding facilities were constructed at White Oak in 1985 and 1986. The convalescing male panther was the first animal moved to these facilities. Three wild-caught female Texas pumas were brought to Florida in 1986 to be used as surrogates for Florida panthers.

The Florida Panther Viability Analysis and Species Survival Plan Workshop held in 1989 further defined the need to establish a captive Florida panther population as security against extinction and for the long-term preservation of the remaining gene pool (Seal and Lacy 1989). Establishment of a captive population with minimal impacts on the wild population and maximum genetic representation included the removal of selected kittens and adults from the wild over a three- to six-year period, not to exceed six kittens and two adults per year. The goal was to achieve a total panther population of 500 breeding adults (combination of all wild and captive populations) to retain 90% of the current genetic diversity for 100 years or longer (Seal and Lacy 1989).

After an extensive environmental review process, FWS determined that removal of these animals from the wild was not a major Federal action significantly affecting the quality of the human environment as defined under provisions of NEPA. However, The Fund for Animals, Inc., and Holly Jensen filed a lawsuit against FWS requesting a court injunction to prevent issuance of the subpermits needed to capture and remove panthers from the wild. An out-of-court settlement reached on February 6, 1991, identified a number of specific elements to be addressed in a Supplemental Environmental Assessment (EA). These elements were to explore and evaluate a genetic enrichment (augmentation) alternative; compare environmental, legal, and regulatory impacts of the proposed action and the genetic enrichment (augmentation) alternative; provide a thorough, expanded analysis on the issue of the feasibility and impact of reintroduction of captive-bred Florida panthers to the wild; and provide a thorough, expanded analysis of the impacts posed to the remaining wild population from the removal of Florida panthers (Jordan 1991).

Once the Supplemental EA had been developed and subpermits issued, six Florida panther kittens were brought into captivity in the spring of 1991 for use in the captive breeding program. Four additional kittens were removed from the wild in 1992. Two of these were taken to Lowry Park Zoological Garden in Tampa and two to Jacksonville Zoological Gardens. The plan was to pair these panthers for maintaining maximum genetic variability and viability when they matured. However, kitten removal from the wild ceased in 1992. The genetic health of the Florida panther population had deteriorated to a point where continued survival was questionable, even with selective breeding within a captive population, and plans were being formulated for genetic restoration by simulating natural gene flow by introducing animals from western puma populations (Seal 1994b). Therefore, captive breeding was not initiated and the captive animals were maintained for conservation education.

*Genetic Restoration*--A plan for genetic restoration and management of the panther was developed in September 1994 (Seal 1994a). The level of introgression required to reverse the effects of inbreeding and genetic loss required the release of eight female Texas pumas into areas occupied by Florida panthers (Seal 1994a). These eight female Texas pumas were released in 1995, five of which produced a total of 20 offspring (Land et al. 2004). None of the original eight Texas pumas remain in the population today (Land et al. 2004). A preliminary assessment of genetic restoration suggested that the desired 20% introgression level had been achieved, but the contributions were primarily from two of the released females (Land and Lacy 2000). The genetic restoration program appears to have been successful as determined by increased kitten

and adult female survival, an increasing population, and an expansion in occupied range (Pimm et al. 2006a).

**Reestablishment of panther populations in the southeastern U.S.--**

*Reintroduction Feasibility Studies in North Florida*--FWC conducted two studies, from 1988 - 1989 (Belden and Hagedorn 1993) and from 1993 - 1995 (Belden and McCown 1996), to evaluate feasibility of reintroducing panthers into unoccupied areas of their historic range. The studies also identified the need to address social issues surrounding reintroduction.

In 1988, seven pumas captured in west Texas were released in north Florida as surrogates for evaluating the feasibility of translocating Florida panthers. The pumas included three adult males, three adult females, and one yearling female. They were monitored from 1988 - 1989. The pumas established overlapping home ranges, killed large prey at predicted frequencies, and settled into routine movement and feeding patterns before the hunting season. Three pumas died during the study, the cause of death was unknown for one found floating in the Suwannee River, and shooting was suspected or documented for the other two deaths. Results indicated methods for reducing puma-human interactions, such as placing release pens as far as possible from humans and livestock, which occurred most frequently during the immediate post-release period and during subsequent excursions from home ranges (Belden and Hagedorn 1993). Belden and Hagedorn (1993) recommended additional research on the feasibility of panther translocation with a larger initial stocking rate of 10 - 20 pumas to ensure that a social structure can be established if some of the animals do not survive.

In 1993, 19 pumas were released into north Florida, including 11 females and eight vasectomized males. Six of the pumas were born and raised in captivity, 10 were captured in the wild in western Texas and translocated to Florida, and three were captured in the wild in western Texas and held in captivity in Florida for two to eight years prior to release. The study concluded that reintroduction is biologically feasible, that is, pumas can successfully establish territories and sustain themselves when reintroduced. This study showed that home ranges for females in north Florida were approximately half the size of home ranges for female panthers in south Florida, likely due to more productive habitat in north Florida and southern Georgia (Belden and McCown 1996). The Belden and McCown (1996) study also highlights the need for an effective and comprehensive public education and outreach program that occurs well ahead of releasing panthers into reintroduction sites.

*Habitat Assessment to Identify Potential Reintroduction Sites in the Southeastern U.S.*--Jordan (1994) evaluated 24 sites in the southeastern U.S. based on biological and anthropogenic criteria and concluded that 14 sites should be evaluated further as potential panther reintroduction sites. These were assessed and ranked based on four criteria (area size, forest area, human population density, road density). Jordan (1994) indicated that additional analyses would be needed.

Thatcher et al. (2006b) identified and ranked nine potential reintroduction sites based on models that utilized three landscape and four human-influence variables on the landscape. These variables included 1) percentage of natural land cover, 2) spatial aggregation of natural land-cover patches, 3) habitat patch density, 4) human population density, 5) minor road density, 6) major road density, and 7) percentage of urban land cover. Thatcher et al. (2006b) recommended

that the top three sites identified should be considered for further evaluation as potential reintroduction sites.  They recommend field surveys of local habitat conditions (e.g., assessment of localized prey densities and the availability of understory vegetation or varied topography for stalking and denning cover) and evaluation of sociopolitical information such as public attitudes towards carnivore reintroduction in the chosen reintroduction sites.

**Education and Outreach--**

*Panther Net Website*--A multidisciplinary interactive website (www.panther.state.fl.us) was launched and funded by FWC in 1999 with proceeds of the Florida panther license plate.  The site includes information for adults and school children on the natural history of the panther, its habitat, threats to its survival, research, management, and conservation efforts.

*Northeast Florida Panther Education Program (Cramer 1995)*--From September 1994 to November 1995 during the Florida Panther Reintroduction Feasibility Study, FWC sponsored this program that reached approximately 1,000 northeast Florida residents through a pamphlet, slide presentations, a county fair display, and a telephone survey.  Results revealed a large base of support (75%) for reintroduction of panthers into the Osceola National Forest region.  Results also identified specific community concerns, and made suggestions for addressing these through education and outreach.  The results from the program can be applied to develop an effective communications program to address community concerns well in advance of subsequent reintroduction efforts.

*Statewide Survey (Duda and Young 1995)*--FWC sponsored a 1995 statewide attitudinal survey about Florida panthers.  The survey revealed that 83% of Floridians surveyed support panther reintroduction efforts.

*Public Workshops and Acceptability of Florida Panther Reintroduction*--Three years after the 1993 - 1995 Florida Panther Reintroduction Feasibility Study ended, FWC sponsored a series of workshops in 1998 to address *Public Acceptability of Florida Panther Reintroduction* (Taylor and Pederson 1998).  The study focused on residents in Columbia County because of their experience with earlier reintroduction feasibility studies.  The goal was to engage residents in an exploration of concerns and possible ways to address them.  However, while the working group was intended to represent a variety of interests, it consisted mostly of local opposition to reintroduction and consensus was not reached.  The results demonstrated the need to engage a wider variety of interests in the process.

*Recent Panther Outreach Initiatives*--A variety of panther outreach initiatives have been undertaken in recent years to assist residents in southwest Florida learn to live safely and responsibly with the Florida panther and other wildlife.  FWS coordinates a panther outreach team that collaborates to produce informational materials and hold outreach events about living and recreating safely in panther habitat.  FWS, NPS, and FWC have led "Living with Panther" town hall meetings in communities experiencing human-panther interactions.  Many members of the outreach team participated in the construction of predator-proof enclosures for livestock and pets to demonstrate proper husbandry for domestic animals while avoiding attracting predators. In recent years, a number of celebrations, field trips, educational talks, and other events have

been held each March in southwest Florida to coincide with Save the Florida Panther Day (Florida Statute 683.18 designates the third Saturday of March of each year as "Save the Florida Panther Day."

*Conservation Organizations*--A number of conservation organizations are working to conserve and recover the panther through education, outreach, and advocacy.  These include Defenders of Wildlife (www.defenders.org, www.biodiversitypartners.org), Florida Panther Society (www.panthersociety.org), Friends of the FPNWR (www.floridapanther.org), National Wildlife Federation (www.nwf.org), its state affiliate the Florida Wildlife Federation (www.fwfonline.org), and The Nature Conservancy (www.natureconservancy.org).  Programs encompass public education and awareness initiatives, habitat conservation, transportation and land-use planning, compensation for livestock depredation, landowner incentive initiatives, and projects aimed at fostering human-panther coexistence.

*Interagency Florida Panther Response Plan*--FWC, FWS, and NPS established a Florida Panther Interagency Response Team in June 2004 to manage human-panther interactions while promoting human safety and assuring the continued existence and recovery of the panther.  This team, comprised of panther experts and agency representatives, was tasked with developing a panther response plan to provide guidance for the agencies so that human / panther interactions would be dealt with consistently and quickly while addressing the primary objective of public safety and balancing the needs of recovering an endangered species.  Additionally, the plan needed to address public education and outreach concerning panther interactions.  The draft plan is being finalized.

**Scientific Reviews--**

*Analysis of Scientific Literature Related to the Florida Panther and Panther Habitat--*In 2002, FWC and FWS commissioned an independent Scientific Review Team (SRT) to complete an analysis of scientific literature related to the panther.  Completed in 2003, the SRT report (Beier et al. 2003) found that a quarter-century of research strongly supported many published conclusions, including that forests are important as daytime rest sites of panthers, that white-tailed deer and feral hogs are the most important panther prey, that the most important threats to panther persistence include limited habitat area and continued habitat loss and fragmentation, and that recovery of the panther depends most critically on establishing additional populations outside of south Florida.  Beier et al. (2003) also found poorly supported inferences regarding panther use of large forest patches, the quality of habitat in ENP and BCNP, and some vital rates used in inflexible population viability analysis (PVA) software.

*Information Quality Act Challenge--*The scientific process by design continually advances our collective understanding of the species and its needs for recovery.  In 2004, an Information Quality Act challenge identified certain inconsistencies and shortcomings in some panther science.  In response, FWS completed a series of tasks to clarify the record and collect, incorporate, and clearly describe new scientific information in its analyses.  FWS remains committed to maximizing the quality, objectivity, utility, and integrity of the information it disseminates to the public.  Furthermore, FWS welcomes input from colleagues to improve the quality of scientific information and optimize the conservation benefits achieved through the agency's programs.

## K.  Population Viability Analysis

**Introduction--**

PVA estimates the risk of extinction for a given population over a given time period (Shaffer 1981, Gilpin and Soulé 1986, Beissinger and Westphal 1998).  In general, PVA models are relatively simple and rarely reflect the exact dynamics of a real population (Fieberg and Ellner 2000).  PVA models are dependent upon quality input data (Doak et al. 1994) and how effectively the model itself reflects the life history of the species being modeled.  However, PVA models used in conjunction with genetic and other benchmarks may help determine minimum population sizes (Shaffer 1981, Shaffer and Sampson 1985, Morris and Doak 2002) as well as metapopulation structure necessary to offset habitat fragmentation, catastrophes, and other threats (Pulliam et al. 1992, Hanski 2002).

A population is "viable" when it has the "capacity to maintain itself without significant demographic or genetic manipulation for the foreseeable ecological future—usually centuries—with a certain, agreed on, degree of certitude" (Soulé 1987).  Shaffer (1981) first defined the "minimum viable population" for a given species in a given habitat as "the smallest isolated population having a 99% chance of remaining extant for 1000 years despite the foreseeable effects of demographic, environmental and genetic stochasticity and natural catastrophes."  As Shaffer, Soulé, and others note, the choice of both the time horizon and the threshold is in fact arbitrary (Shaffer 1981, Soulé 1987, Boyce 1992, Grimm and Wissel 2004).  Nonetheless, a literature review of empirically derived PVAs suggests that thresholds set at a 95 or a 99% chance of persistence (corresponding to a 5 or 1% chance of true extinction) over a 100-year

time horizon are often used (Hamilton and Moller 1995, Horino and Miura 2000, Kelly and Durant 2000, Parysow and Tazik 2002, Kohlmann et al. 2005).

Even populations that persist beyond the stipulated time period may experience a reduction in population size or genetic variation rendering such populations vulnerable to inbreeding depression and / or genetic drift in subsequent generations.  Thus, to offset declining mean population fitness as a result of inbreeding depression, Franklin (1980) and Soulé (1980) recommended effective population sizes ($N_e$) of 50 or more individuals, and Soulé et al. (1986) argued for a genetic threshold of no more than a 10% loss of heterozygosity over 200 years.  To offset the erosion of genetic variability due to genetic drift, however, Franklin (1980) and Soulé (1980) recommended an effective population size of at least 500 individuals (see also Lande and Barrowclough 1987, Ewens 1990, Franklin and Frankham 1998).  Based on empirical observations that detrimental mutations outnumbered beneficial and neutral ones, Lande (1995) argued for even larger effective population sizes on the order of 5,000 (but see Franklin and Frankham 1998).  Finally, effective population sizes of between 10,000 and 100,000 may be necessary to maintain particularly beneficial traits (e.g., single-locus disease resistance factors) (Lande and Barrowclough 1987, Lande 1988).  These varied estimates highlight the species-specific nature of the question.

The effective population size is substantially lower than the actual population size because of spatial structure, variance in family size, unequal sex ratios, and temporal fluctuations in population size (Wright 1969, Falconer 1989, Frankham 1995, Waples 2002).  "However, one fairly well-substantiated generality is that for many birds and mammals $N_e$ / N ≈ one-half to two-

thirds, where N is the total population size of *reproductive adults* (Nunney 1993, Nunney and Elam 1994), arguing for a quasi-extinction threshold of at least 100 breeding adults" (Morris and Doak 2002). As Morris and Doak (2002) note, however, "this approach still basically ignores inbreeding problems and will always result in somewhat optimistic answers about population viability." Furthermore, metapopulation substructure is important because the total effective population size is not equal to the sum of the subpopulations and is most likely to be much higher than the sum (Wright 1943, Waples 2002).

**Previous Florida Panther PVAs**--

There have been at least six PVAs for the Florida panther (Seal and Lacy 1989, Seal and Lacy 1992, Cox et al. 1994, Ellis et al. 1999, Kautz and Cox 2001, Maehr et al. 2002b, Root 2004). The earliest of these, Seal and Lacy (1989) and Seal and Lacy (1992), used the VORTEX program to perform the PVA. The 1989 version predicted that "wholly isolated populations of less than 50 adult panthers (about 80 total adults, subadults, and juveniles) are not demographically stable even if the mean population growth rate, r, is positive." Even assuming that inbreeding has no deleterious effects on viability and reproduction, the predicted probability of extinction within 100 years was more than 14% (Seal and Lacy 1989). If inbreeding depression is assumed, the predicted probability of extinction within 50 years was "virtually certain" (Seal and Lacy 1989). Largely based on this PVA, the International Union for the Conservation of Nature and Natural Resources Captive Breeding Specialist Group recommended a vigorous captive breeding program.

In 1992, Seal and Lacy revised the VORTEX panther PVA, based on newer data for mortality and reproduction.  Like the 1989 version, the 1992 version predicted the panther had a significant chance of extinction in 100 years and reduced genetic viability.  For example, simulations of a population of 50 adult panthers with a positive mean population growth rate showed up to a 15% chance of extinction within 100 years in the absence of inbreeding and as much as a 35% chance with inbreeding (Seal and Lacy 1992).

Cox et al. (1994) and Kautz and Cox (2001) performed PVAs for 11 wildlife species, including the panther.  Their models built on the earlier work of Shaffer (1987) by including catastrophic events.  The Cox et al. (1994) PVA followed adult females only and incorporated a range of fecundity and survival values to simulate "favorable," "moderate," and "harsh" environmental conditions over 200 years.  Under the "favorable" environment scenario (high survival and fecundity), 63 panthers had a 90% chance of persistence for 200 years.  Under the "moderate" scenario (medium levels of survival and fecundity) 76 panthers and under the "harsh" scenario (low survival and fecundity) 84 panthers had the same chance of persistence.

Kautz and Cox (2001) added a genetic component to the Cox et al. (1994) PVA by using the technique described in Reed et al. (1988).  Kautz and Cox estimated the size of a total population needed to obtain an effective population size of 50.  The authors acknowledged that effective populations on the order of 100 - 1,000 times greater than 50 may be needed to ensure genetic variability over the long term; nonetheless, Kautz and Cox (2001) focused on the smallest population sizes likely to persist in the short term.  By comparison, Reed et al. (2003) performed PVAs in VORTEX for 102 vertebrate species, including the panther, to estimate minimum viable

populations (MVPs). Based on a subset (n = 38) of these species, Reed et al. (2003) determined that 5,800 adult animals were needed for a 95% chance of persistence over 40 generations, 4,700 for a 90% chance of persistence, and 550 for a 50% chance of persistence. Ultimately, Reed et al. (2003) concluded that management programs should conserve habitat capable of supporting approximately 7,000 adult vertebrates to ensure long-term persistence. This number was larger than other MVP estimates cited therein (Franklin 1980 [4,500], Newmark 1987 [greater than 3,250], Thomas 1990 [5,500], Schultz and Lynch 1997 [~2,000], Reed and Bryant 2000 [greater than 2,000], Whitlock 2000 [~2,000]).

Kautz and Cox (2001) assumed that as long as the effective population size does not drop below 50, opportunities will arise later for achieving larger populations and avoiding genetics problems through patch recolonization, translocation of individuals, or removal of environmental constraints on a population through management. Based on these assumptions, Kautz and Cox (2001) estimated that a census population of panthers in the range of 100 - 200 individuals is needed to achieve an effective population size of 50. However, this conclusion is based in part upon equating total metapopulation size with effective population size (see Wright 1943, Waples 2002).

Maehr et al. (2002b) used a "consensus" model, whereby five coauthors each provided initial conditions and parameter values for separate runs in VORTEX. These five "wildly divergent models produced divergent estimates of extinction risk" (Beier et al. 2003). If "discrepancies were more than slight, each author was asked to justify the variable in question" (Maehr et al. 2002b). The "agreement among 4 of 5 estimates of extinction risk was due to drastically

differing, but fortuitously offsetting, assumptions between modelers" (Beier et al. 2003). If "a single view did not prevail, compromise was sought by averaging the five versions of the contentious variable" (Maehr et al. 2002b). This consensus model suggested a 98% chance of persistence for 100 years (Maehr et al. 2002b). According to Beier et al. (2003), this more "optimistic" outcome was due to some combination of 4 factors: (1) kitten mortality was simulated at 20% compared to 50% in earlier PVAs; (2) initial population size was set as 60 compared to 50 in earlier PVAs; (3) they assumed no loss of habitat compared to 1% annually in earlier PVAs; and (4) they assumed population augmentation in the form of two females per decade compared to none in earlier PVAs.

Ellis et al. (1999) reviewed the Seal and Lacy (1989), Seal and Lacy (1992), and Maehr et al. (2002b)[1] PVA models. Their review included a comparison of the parameter inputs for the three models as well as additional sensitivity analyses to explore expansion prospects and the effects of habitat loss on the south Florida population (Ellis et al. 1999). In general, their analysis demonstrated that these PVA models are fairly sensitive to changes in first-year mortality (i.e., kitten survival) (Ellis et al. 1999). For example, with low carrying capacity (100 - 200 individuals) and low first-year mortality (20 - 40%), the PVA models showed positive population growth, low probabilities of extinction (0 - 3%), and moderate losses of genetic diversity (15 - 27%) (Ellis et al. 1999). However, when first-year mortality is increased (50 - 60%), the probability of extinction rises dramatically (48 - 100%), and loss of genetic diversity is further accelerated (28 - 50%, 100% for the extinction scenario) (Ellis et al. 1999).

---

[1] Although Maehr et al. (2002b) was published in 2002, the actual PVA model was first presented in 1999. See Ellis et al. (1999).

Ellis et al. (1999) also determined that in some circumstances, the south Florida population could remain viable given low levels of emigration from the current population (i.e., 1% per year). However, viable expansion required members of the newly established population immigrating back into the current population as well as low first-year mortality (Ellis et al. 1999).  Finally, simulations incorporating cumulative habitat losses of 25% and 50% over 25 years yielded significant probabilities of extinction for all but the lowest value of first-year mortality, ranging from 10% (assuming 30% first-year mortality and 25% habitat loss) to 98% (assuming 50% first-year mortality and 50% habitat loss) (Ellis et al. 1999).

Beier et al. (2003) recommended against the use of "canned programs" (e.g., VORTEX, RAMAS) and urged that future models take into account uncertainty in model parameters and functional relationships via sensitivity analyses.  With the exception of Cox et al. (1994) and Kautz and Cox (2001), all of the panther PVA models were based on these canned programs. The PVA by Maehr et al. (2002b) did not include a sensitivity analysis.  As Beier et al. (2006) note, understanding the sensitivity of PVA models to parameter changes may be more important than a precise estimate of extinction risk.  Beier et al. (2003) also recommended that rigorous estimates of reproduction rates, survival rates, and variation in these rates, be incorporated into future PVAs.  Finally, Beier et al. (2003) discouraged against "consensus" approaches (e.g., Maehr et al. 2002b) for inputting values because they lead to a "false sense of reliability."

**Recent Florida Panther PVA** --

In 2002, Root constructed a PVA model to determine the minimum population size necessary for long-term persistence (100 years).  Root's PVA model was constructed using RAMAS GIS,

a spatially-explicit PVA software program.  Relying on less optimistic fecundity and survival values from Seal and Lacy (1989), Root's PVA model determined that there was no feasible number of panthers that would produce persistence probabilities greater than 75%, even if the initial population size was more than 1,000 females (or 2,000 total panthers, assuming a sex ratio of 1:1).  Using more optimistic fecundity and survival values from Seal and Lacy (1989) corresponding to values needed to produce finite population growth rates much greater than 1.05, Root's PVA model determined that 25 females (50 total panthers) would provide a 95% probability of persistence for the next 100 years.  Using input parameter estimates needed to produce finite growth rates near 1.05, the population size needed for long-term persistence increased to 51 females (102 total panthers).  When the input parameter estimates were modified to reduce the finite growth rate still further to 1.03, Root's PVA model revealed that a panther population comprised of at least 120 females (240 total panthers) was required for long-term persistence.

Some of the PVA work done by Root in 2002 is now published (Root 2004), but the publication does not discuss specific target population sizes necessary for long-term persistence or include a sensitivity analysis.  Similar to Cox et al. (1994) and Kautz and Cox (2001), Root's model only followed females and examined three basic sets of parameters.  For the latter, Root (2004) used parameter values similar to those in Seal and Lacy (1989), Seal and Lacy (1992), and Maehr et al. (2002b).  Root (2004) ran several variations of each set of parameters, including "different density dependence or none, various levels of habitat loss, intermittent catastrophes or epidemics, or scheduled translocations or reintroductions."  In particular, Root (2004) calculated the potential impact on the panther population of a loss of 25% of habitat (1% per year for 25

years), or roughly the amount of private land within the Primary Zone.  After 100 years under a moderate scenario with this habitat loss assumption, Root (2004) estimated a decrease in mean final abundance of 26%, and a 1% increase in the likelihood of extinction.  However, even under the optimistic scenario she found the 25% habitat loss variation noted above greatly decreased mean final abundance.

Root (2004) also explored emigration (i.e., annual dispersal of female panthers to empty patches north of the Caloosahatchee River), finding that under the Seal and Lacy (1992) set of parameters, the probability of extinction actually increases over what it would have been without emigration.  These preliminary results suggest the importance of carefully considering metapopulation structure not only in terms of subpopulation size, but also in terms of dispersal rates, prior to deriving MVPs (see also Sweanor et al. 2000, Frank 2005, Hellgren et al. 2005, McCarthy et al. 2005).

The FWS believes that Root (2004) represents the most current, reliable, and objective PVA model available today.  We recognize that any model is only as good as the data / parameters estimates used.  We are also aware of the deficiencies of this model (e.g., use of a "canned program", lack of sensitivity analysis) and realize that while the model included a variation for habitat loss approximating all private lands in the Primary Zone, several of the assumptions in the basic model (e.g., no change in amount, quality, or configuration of habitat; no difficulty finding mates; no catastrophies; no additional human-induced mortality) may be unrealistic. Recognizing these limitations, we believe the PVA analysis by Root (2004) represents the best available science at this time.  Therefore, the Root (2004) PVA was used by the Recovery Team

and FWS to aid in developing the population numbers for the reclassification and delisting criteria.

**Implications**--

There is insufficient habitat in south Florida to sustain a viable panther population and population expansion into south-central Florida will be difficult. Therefore, to achieve a viable population of 240 and to reclassify or delist the species, additional populations will have to be reintroduced into other areas within the panther's historical range. Unfortunately, the distances from the occupied range to potential reintroduction sites (Thatcher et al. 2006b) may far exceed the species' capability for demographic and genetic interchange. In the absence of migration between populations, each panther population will remain isolated and therefore vulnerable to environmental, demographic, and genetic stochasticity as well as catastrophic events (Gilpin and Soulé 1986). These isolated populations will be vulnerable to extinction in the short-term. However, the long-term persistence of the panther will depend on multiple populations that are spatially discrete and able to fluctuate independently from one another in response to catastrophic or other environmental perturbations. If each of these reestablished populations had a moderately low probability of extinction, localized environmental perturbations, and population fluctuations remained asynchronous, all other things being equal, it is highly improbable that the extinction of the panther would result from a simultaneous extinction of all populations (Seal and Lacy 1989, Carlson and Edenhamn 2000, Kendall et al. 2000, Reed 2004, Li et al. 2005).

In some cases, managed translocation among separate populations may be a cost-effective means of achieving multiple, viable populations (Goodman 1987, Lubow 1996). However, biological concerns such as landscape connectivity (Noss 1987, Root 1998, Beier 1993, Swart and Lawes 1996, Carroll et al. 2004, Kramer-Schadt et al. 2005), disease outbreaks (Hedrick et al. 2003), migration rates among populations (Brown and Kodric-Brown 1977, Mills and Allendorf 1996), demographic impacts on the donor populations (Saenz et al. 2002, Root 2004), population bottlenecks (Ralls and Ballou 2004), Allee effects (Mooring et al. 2004), inbreeding depression (Swinnerton et al. 2004), and random genetic drift (Gautschi et al. 2003) must be carefully considered prior to reintroduction. Furthermore, financial (Margan et al. 1998, van Heezik and Ostrowski 2001, Lindsey et al. 2005), socio-political (Musiani and Paquet 2004) and / or other factors may impose additional constraints on the efficacy of reintroducing multiple populations.

## II. RECOVERY STRATEGY

The biological constraints that have to be taken into consideration when planning Florida panther conservation and management actions include the need for large, contiguous landscapes, the need for large prey for successful reproduction, very low population density, and low reproductive and colonization rates. The fact that the panther is a large predator requires human social considerations in its conservation and management.

Panthers are large, solitary carnivores and require large ranges to obtain the necessary prey (white-tailed deer and feral hogs) to meet energy needs required for health and reproduction. Their social and reproductive behavior requires access to large contiguous areas of suitable habitat to maintain viable breeding populations. Social intolerance (mutual avoidance), prey

abundance, and specific habitat features are thought to regulate panther density.  Females normally have a litter of kittens every other year.  When the kittens are 14 - 24 months of age, the family bond is broken and the kittens leave their mother.  Subadult males generally disperse and become somewhat nomadic, whereas subadult females generally set up home ranges very close to their natal ranges.  For this reason, it can take a considerable amount of time for a population to colonize new areas.

Panthers are sometimes thought of as a wilderness indicator species, not because they require wilderness to live or cannot live in proximity to people, but because people will not usually tolerate panthers living in close proximity to them.  People have historically been fearful of panthers due to concern for their livestock as well as their own lives.  As humans encroach in panther habitat the likelihood of human-panther interactions increases.  People's perceptions and attitudes about panthers will be a major determining factor in the success of panther recovery.

The recovery strategy for the Florida panther is to maintain, restore, and expand the panther population and its habitat in south Florida, expand this population into south-central Florida, reintroduce at least two additional viable populations within the historic range outside of south and south-central Florida, and facilitate panther recovery through public awareness and education.  The panther depends upon habitat of sufficient quantity, quality, and spatial configuration for long-term persistence, therefore the plan is built upon habitat conservation and reducing habitat-related threats, but also addresses other key issues such as genetic viability. Range expansion and reintroduction of additional populations are recognized as essential for

panther recovery.  Similarly, fostering greater public understanding and support is necessary to achieve panther recovery.

**Maintain, restore, and expand the panther population and its habitat in south Florida**

Before delisting can occur, sufficient habitat quality, quantity, and spatial configuration must be maintained and protected in the long-term to support multiple viable populations.  Consequently, habitat conservation will be necessary for recovery.  Leading sources of panther mortality (vehicular collisions and intra-specific aggression), impediments to population expansion and subsequent gene flow, and biological constraints on population growth and other life history traits also are habitat-related.  Therefore, those actions that maintain, restore, and expand panther habitat generally are critical for conservation and recovery.

The Primary Zone supports the only breeding panther population.  To prevent further loss of population viability, habitat conservation efforts should focus on maintaining the total available area, quality, and spatial extent of habitat within the Primary Zone.  The continued loss of habitat functionality through fragmentation and loss of spatial extent pose serious threats to the conservation and recovery of the panther.  Therefore, conserving lands within the Primary Zone and securing biological corridors are necessary to help alleviate these threats.

The Secondary Zone consists of lands that have the potential to support an expanding panther population.  However, these lands contain lower quality habitat comprised of high intensity agriculture, a patchwork of residential subdivisions, and golf course communities.  Restoration would need to occur to allow this area to contribute meaningfully to panther recovery.  Because

these lands require extensive restoration in some areas and may not contribute to panther recovery for some time, their conservation is considered a lower priority than conservation of the Primary and Dispersal Zones (Kautz et al. 2006).

Roads are a significant source of panther mortality and habitat fragmentation in south Florida. Therefore, necessary actions include the identification and prioritization of locations needing crossing and fencing installation, as well as collaborative efforts by transportation agencies, landowners, and local communities to ensure that future roads and road expansion projects are designed and constructed with regard to panther conservation.  Several highway segments are particularly problematic for panthers because the adjacent lands are privately owned.  Installation of highway crossings and fencing along sensitive highway segments will require cooperation with private landowners.

Approximately one-fourth of the Primary Zone, two-thirds of the Secondary Zone, and nearly all of the Dispersal Zone are in private ownership (R. Kautz, pers. comm. 2005).  Therefore, conservation and restoration of Primary, Secondary, and Dispersal Zone habitat will require cooperation with private landowners not only as willing sellers, but also as willing participants in conservation easements or other habitat management programs for the panther.  Actions that emphasize cooperative efforts and landowner incentives, particularly those designed to discourage conversion of land to less suitable habitat are important.

The majority of the Primary Zone is on public lands, and panther survival will depend upon public land managers to ensure that panthers and their prey are considered in management

efforts.  Important tools for success will include development and implementation of best
management practices for panther habitat; formalizing a network of south Florida public land
managers; preparation, review, and implementation of State and Federal habitat management
plans for public lands; and a tracking system to determine the effects of habitat loss and
conversion on panthers.

Although the genetic restoration program initiated in 1995 was successful (Pimm et al. 2006a),
the existing population size is not sufficient to offset genetic drift in the long-term.  At current
population levels, the loss of donor individuals to future expansion and / or reintroduction efforts
may pose an added risk to the existing population (Root 2004).  Therefore, developing and
implementing a genetics management program to determine appropriate protocols for
translocating or removing panthers as well as gauging the progress of the restoration effort is
important.  Related to this effort is the need to continue monitoring physical and physiological
characteristics correlated with inbreeding and loss of genetic variability.  A PVA model is being
developed by FWC that should assist in ensuring that these management actions do not impair
the long-term persistence of existing and future panther populations.

The small size and high degree of isolation of the existing panther population also makes it
vulnerable to catastrophic events such as disease or parasite outbreaks.  Actions that support
continued monitoring and determination of the presence, infection rate, mortality rate, and
consequences of known and unknown diseases and parasites are important.

**Provide for the expansion of the breeding population into south-central Florida**

Dispersing male panthers from the south Florida population have immigrated into south-central Florida, but an absence of females has inhibited expansion of the breeding population into this area (Belden and McBride 2006). The primary considerations to expanding the breeding population of panthers into south-central Florida are to determine whether suitable habitat exists, whether people there will accept panthers, if there are sufficient panther numbers in the age and sex classes necessary for expansion, and methods of expanding the population. Studies by Belden and McBride (2006) and Thatcher et al. (2006a) evaluated habitats in south-central Florida and identified areas that might provide favorable habitat conditions (Figure 5). Even though some suitable panther habitat remains in this region, it occurs in widely scattered and relatively small patches that are fragmented by major highways and agricultural and urban development. It is estimated that these areas could support 20 to 40 panthers (Belden and McBride 2006, Thatcher et al. 2006a). Development pressure and human population growth will decrease the opportunity for panther expansion north of the Caloosahatchee River.

The Dispersal Zone requires protection from development to provide a corridor to facilitate dispersal from south Florida to potentially suitable habitat north of the Caloosahatchee River. Maintaining connectivity is important not only to facilitate dispersal, but to enhance population exchange once female panthers have been reestablished in south-central Florida.

Given the limited dispersal rates of female panthers and the present lack of suitable habitat conditions in the Dispersal Zone, it is likely that human intervention will be required to establish females north of the Caloosahatchee River (Thatcher et al. 2006a). In this case, the feasibility of panther translocation will need to be evaluated, including an EA or Environmental Impact

Statements (EIS) under the NEPA process if necessary, and a translocation plan developed. This plan should include an evaluation of public acceptance, consideration of the effects on potential reintroductions elsewhere in the historic range, and consideration of the effects on the south Florida breeding population. Any expansion plan should include education and outreach to increase public understanding of panther behavior and recovery needs prior to, during, and after the translocation of panthers.

**Establish viable populations of the panther in potential reintroduction areas**

The panther has been restricted to less than 5% of its historic range and the current panther population is not considered viable. Recovery will require reintroduction to establish viable populations in other parts of its historic range. The strategy is to utilize existing studies and computer models along with field surveys to confirm potential reintroduction sites. These potential reintroduction sites will be further refined in coordination with agencies and the public in other southeastern states. This will include conducting preliminary public scoping, conducting field surveys, and using the NEPA process to develop and refine the appropriate reintroduction alternatives. Once a site is chosen, protocols will need to be developed to determine the number of panthers from each age and sex class that are needed and which individuals are the best candidates for release, methods of release, and monitoring. Education and outreach efforts will be needed to address social concerns before and after panthers are released.

**Identify, secure, maintain, and restore habitat in potential reintroduction areas**

The strategy for conserving habitat in potential reintroduction areas will need to mirror that for conserving habitat in the currently occupied range. The ability of potential reintroduction sites to support panthers will depend on land managers to ensure that the needs of both panther and prey are adequately considered. It will be important to develop and implement best management practices for panther habitat; formalize local networks of land managers; prepare, review, and implement habitat management plans; and develop a tracking system to determine the effects of habitat management on panthers. Those actions that prevent habitat loss, degradation, and fragmentation as well as maximize connectivity and spatial extent in reintroduction areas are important for reintroduction. Actions that involve identification and prioritization of areas for road crossing and fencing installation are essential. Similarly, collaborative transportation planning efforts that ensure future roads and road expansion projects are designed and constructed with regard to panther conservation are high priorities.

**Facilitate panther recovery through public awareness and education**

Public awareness and support are essential for panther conservation and management activities, as well as for reintroduction efforts. Previous social surveys and biological field research related to panther recovery efforts have identified the importance of public education and outreach programs, including development of a media plan. The strategy is to build support through education and outreach programs that increase public understanding of panther behavior and recovery needs. Social science research will identify public opinion and knowledge levels which are important in developing materials and programs; these will be provided to local planning organizations, decision makers and elected officials, the public, major landowners, residents living in and adjacent to panther habitat, the realtor community, and other audiences. Education

and outreach efforts will be evaluated, especially to assess human attitude and behavior changes toward panthers.

## III.  RECOVERY GOAL, OBJECTIVES, AND CRITERIA

### Recovery Goal

The goal of this recovery plan is to achieve long-term viability of the Florida panther to a point where it can be reclassified from endangered to threatened, and then removed from the Federal List of endangered and threatened species.

### Recovery Objectives

1.  To maintain, restore, and expand the panther population and its habitat in south Florida and expand the breeding portion of the population in south Florida to areas north of the Caloosahatchee River.

2.  To identify, secure, maintain, and restore panther habitat in potential reintroduction areas within the historic range, and to establish viable populations of the panther outside south and south-central Florida.

3.  To facilitate panther recovery through public awareness and education.

**Recovery Criteria**

The quantitative criteria for the interim goal, reclassification, and delisting are based upon threats to the panther, PVAs, and the need to address representation, resiliency, and redundancy (Shaffer and Stein 2000 cited in National Marine Fisheries Service 2004).  Representation is conserving the breadth of the genetic makeup of the species to conserve its adaptive capabilities.  Resiliency is ensuring that each population is sufficiently large to withstand stochastic events.  Redundancy is ensuring a sufficient number of populations to provide a margin of safety for the species to withstand catastrophic events.

Kautz et al. (2006) developed population guidelines based on the results of the previous Florida panther PVA (i.e., Root 2004).  Following these guidelines, populations of greater than 240 have a high probability of persistence, low probability of extinction over 100 years, are able to retain 90% of their heterozygosity (representation), and can tolerate some habitat loss or mild catastrophes.  Populations within the 80 to 100 range are likely stable with a low probability of extinction for 100 years, have slowly declining heterozygosity, and are vulnerable to habitat loss or catastrophes.  According to Root (2004), these models indicate that unless we are able to safeguard the current condition, amount, and configuration of the occupied panther habitat, the long-term viability of the panther is not secure.  In addition, Kautz et al. (2006) suggests that unavoidable losses in the Primary Zone should be offset by habitat restoration or enhancement of habitat elsewhere in the Primary Zone, thereby increasing the functional value and carrying capacity of the remaining habitat.  As a result, it is clear that conservation strategies should be used to maximize protection and restoration, if needed, in the Primary Zone.  The south Florida panther population, which documented panther counts suggest is roughly 100 - 120 individuals,

is obviously the foundation for all efforts to expand and/or reintroduce panthers into other parts of the species' historic range.  We have seen the panther population increase since the genetic restoration effort, and protecting and maintaining habitat in the appropriate configuration to support a stable population is a necessary component of recovery efforts in the future.

PVA models are no better than the data upon which they are based, and it cannot be overemphasized that the Root (2004) basic models assume no difficulties in finding mates, no additional human-induced mortality, and no intermittent catastrophic events.  In addition, aside from the 25% habitat loss variation that approximates the loss of all privately owned land in the Primary Zone, the Root (2004) models assume that there was no change in amount, quality, or configuration of habitat during 100 years of simulation.  Since many of these unrealistic assumptions represent a significant departure from conditions in south Florida and the Southeast, recovery criteria need to include more than one population (resiliency and redundancy) to safeguard against habitat loss (a major threat) and stochastic catastrophic events (e.g., disease outbreaks or major hurricanes).  It is difficult to predict the extent to which future catastrophic events will impact the panther.  However, two viable populations would be sufficient for reclassification and three viable populations would provide an adequate margin of safety for full recovery.  Meeting these criteria would indicate that threats are ameliorated, the panther is sufficiently genetically represented, and its security is achieved through resiliency and redundancy.

**A.  Reclassification to Threatened**

Reclassification will be considered when:

1. Two viable populations of at least 240 individuals (adults and subadults) each have been established and subsequently maintained for a minimum of twelve years (two panther generations; one panther generation is six years [Seal and Lacy 1989])..

2. Sufficient habitat quality, quantity, and spatial configuration to support these populations is retained / protected or secured for the long-term.

A viable population, for purposes of Florida panther recovery, has been defined as one in which there is a 95% probability of persistence for 100 years.  This population may be distributed in a metapopulation structure composed of subpopulations that total 240 individuals.  There must be exchange of individuals and gene flow among subpopulations.  For reclassification, exchange of individuals and gene flow can be either natural or through management.  If managed, a commitment to such management must be formally documented and funded.  Habitat should be in relatively unfragmented blocks that provide for food, shelter, and characteristic movements (e.g., hunting, breeding, dispersal, and territorial behavior) and support each metapopulation at a minimum density of 2 to 5 animals per 100 square miles (259 square kilometers) (Seidensticker et al. 1973, Logan et al. 1986, Maehr et al. 1991a, Ross and Jalkotzy 1992, Spreadbury et al. 1996, Logan and Sweanor 2001, Kautz et al. 2006), resulting in a minimum of 4,800 – 12,000 square miles (12,432 – 31,080 square kilometers) per metapopulation of 240 panthers.  The amount of area needed to support each metapopulation will depend upon the quality of available habitat and the density of panthers it can support.

**B. Delisting**

Delisting will be considered when:

1. Three viable, self-sustaining populations of at least 240 individuals (adults and subadults) each have been established and subsequently maintained for a minimum of twelve years.

2. Sufficient habitat quality, quantity, and spatial configuration to support these populations is retained / protected or secured for the long-term.

For delisting, exchange of individuals and gene flow among subpopulations must be natural (i.e., not manipulated or managed).

**C. Interim**

Due to the challenging nature of attaining the recovery criteria, an interim recovery goal has been established to assist in determining progress towards the ultimate goals of reclassification and delisting.

This interim goal is to achieve and maintain a minimum of 80 individuals (adults and subadults) in each of two reintroduction areas within the historic range and to maintain, restore, and expand the south / south-central Florida subpopulation.

The interim goal will be met when:

1. The south / south-central Florida panther subpopulation has been maintained, restored, and expanded beyond 80 to 100 individuals (adults and subadults).

2.  Two subpopulations with a minimum of 80 individuals each have been established and maintained within the historic range.

3.  Sufficient habitat quality, quantity, and spatial configuration to support these three subpopulations is retained / protected or secured for the long-term.

There must be exchange of individuals and gene flow among these subpopulations.  This exchange of individuals and gene flow can be either natural or through management.

## IV.  RECOVERY ACTION OUTLINE AND NARRATIVE

**Existing Population**

1.  **To maintain, restore, and expand the panther population and its habitat in south Florida and expand the breeding portion of the population in south Florida to areas north of the Caloosahatchee River to maximize the probability of the long-term persistence of this metapopulation.**

    **South Florida**

    1.1.  **Maintain, restore, and expand the panther population and its habitat in south Florida.**

      *South Florida Habitat*

      1.1.1.  **Maintain the ability of the Primary, Secondary, and Dispersal Zones, as identified in Kautz et al. (2006), to contribute to a viable population.** Maintain the quantity and quality of habitat in the Primary Zone, maintain the quantity and improve the quality in the Secondary Zone, and increase the quantity of protected acres and enhance the quality of the Dispersal Zone.  The Dispersal Zone needs to provide the connection between south and south-central Florida and provide for expansion of the population.  This indicates the need for an accounting of habitat in Primary, Secondary, and Dispersal Zones, tracking acres lost and restored over time.  This leads to a need for a mechanism to mitigate impacts.

      *Non-Regulatory Incentive Programs*

      1.1.1.1.  **Use and coordinate all non-regulatory incentive programs to maintain and secure habitat on private lands.**

        1.1.1.1.1.  **Develop Safe Harbor Agreements** with willing landowners.

        1.1.1.1.2.  **Focus available incentive programs to restore and enhance habitat.**  Coordinate implementation of existing programs (e.g., Farm Bill, Partners for Fish and Wildlife Program, Landowner Incentive Program, Rural Land Stewardship Program, Stewardship America Program) within and among agencies.

        1.1.1.1.3.  **Explore the creation of new panther conservation incentive programs** that compensate, pay, or otherwise provide economic incentives for landowners to provide for panthers and panther habitat on their lands.

1.1.1.1.4. **Continue to secure lands**, both fee simple and conservation easements, through existing and / or new land acquisition programs including Federal, State, county, and non-governmental organization programs.  Ensure terms of conservation easements address panther needs and are consistent among agencies.

    1.1.1.1.4.1. **Revise and implement the preliminary project proposal developed for expansion of FPNWR** incorporating the landscape conservation strategy maps (Kautz et al. 2006) and the results of Collier County's land use planning efforts.

    1.1.1.1.4.2. **Modify existing land appraisal procedures** to allow government agencies to offer more than the appraised value for private lands that support panthers.  Higher acquisition costs may be justifiable based on quality habitat because of greater long-term costs of both purchase and restoration of degraded habitat.

    1.1.1.1.4.3. **Conduct an annual review of Florida Forever projects and rate them with respect to panther conservation values.**  This report should be sent to the Governor and Cabinet of the State of Florida.

1.1.1.1.5. **Identify and support local initiatives to protect habitat and purchase development rights.**  Encourage, assist, and provide resources to local governments to develop and implement land use plans that complement and advance panther recovery.

*Regulatory Programs*

1.1.1.2. **Appropriately use local, State, and Federal regulatory programs to maximize their ability to maintain the overall quality, quantity, and functionality of habitat.**

1.1.1.2.1. **Create a Federal / State working group to coordinate permit review and consultation.**  The purpose of this group would be to ensure coordination and cooperation between Federal and State programs that provide biological opinions and recommendations to permitting authorities.

1.1.1.2.2. **Track permits, especially incidental take and compensation received, issued through Federal and State regulatory programs** to determine the impacts on panthers of landscape and land use changes.

1.1.1.2.3. **Develop and implement regulatory procedures and guidance that avoid habitat loss, degradation, and / or fragmentation as a result of federally funded or authorized projects and actions.**  If

incompatible development, conversion of natural habitat types, and / or land use intensification cannot be avoided then such procedures and guidance should ensure that equivalent habitat protection and restoration are provided, especially within the Primary Zone, to compensate for both the quantity and functional value of the lost habitat.

**1.1.1.2.3.1. Ensure that panther conservation and protection of habitat is included in the State Clearinghouse (SAI) reviews of Federal activities** and identify any actions that would be inconsistent with the Federal Coastal Zone Management Plan and NEPA.

**1.1.1.2.3.2. Ensure that the section 7 consultation process is utilized and that the best available science is used in development of biological opinions.**

**1.1.1.2.3.3. Avoid adverse effects to habitat (including prey) attributable to CERP and other water management projects.** Identify and monitor effects of water management projects; adverse effects should be avoided. If that is not possible, they should be minimized and appropriate compensation provided.

**1.1.1.2.4. Develop and implement regulatory procedures and guidance that avoid habitat loss, degradation, and / or fragmentation as a result of State or locally authorized projects that are not a part of a Federal review process.**

**1.1.1.2.4.1. Provide review and recommendations to FDEP, Department of Community Affairs, WMDs, and other State agencies on permit applications that can potentially impact habitat.**

**1.1.1.2.4.2. Work with counties and municipalities to modify and amend Comprehensive Plans to include the goal of no net loss of quantity, quality, or functionality of habitat in Primary, Secondary, and Dispersal Zones.**

**1.1.1.2.4.3. Develop a mechanism for providing compensation for projects that affect small acreages (e.g., single family residences) of habitat.** An effective mechanism will address loss of habitat and also cumulative degradation of habitat and could include panther conservation banks and / or regional off-site mitigation banks.

**1.1.1.2.4.4. Initiate and encourage landscape level HCPs where proposed non-Federal actions or projects will impact panthers or their habitat.** Explore partnering with counties through their growth

management plans to develop HCPs. Priority for conservation should be directed towards the Primary Zone.

*Habitat Fragmentation, Connectivity, and Spatial Extent*

**1.1.1.3.  Prevent habitat fragmentation, promote connectivity, and maintain spatial extent within panther habitat.**

**1.1.1.3.1.  Identify, restore, maintain, and enhance habitat corridors** to facilitate movements by resident panthers, promote dispersal, and prevent peripheral areas from becoming further isolated from habitat in the Primary Zone.

**1.1.1.3.1.1.  Quantitatively assess factors that define dispersal corridors and use least-cost pathways analysis to identify potential habitat corridors.**

**1.1.1.3.1.2.  Restore habitat in potential corridors identified by least-cost pathways analysis.**

**1.1.1.3.1.3.  Maintain and enhance existing habitat corridors.**

**1.1.1.3.1.3.1.  Secure the Dispersal Zone** through fee simple acquisition, compensation, or conservation easements.

**1.1.1.3.1.3.2.  Secure Camp Keais Strand** to maintain connectivity from FPNWR to Corkscrew Regional Ecosystem Watershed.

**1.1.1.3.1.3.3.  Secure a corridor between BCNP and Okaloacoochee Slough** to assure this pathway is not degraded or severed.

**1.1.1.3.1.3.4.  Consider maintenance of habitat corridors for panthers during Everglades restoration to avoid isolation of the ENP subpopulation.** High water levels in Shark River Slough may prevent panthers from moving in and out of ENP, thus separating them from the rest of the population.

**1.1.1.3.2.  Maintain spatial extent and arrangement of habitat.** Areas currently used by panthers and habitat conditions within the Primary Zone should be maintained. According to Root (2004), "Unless the current condition, amount, and configuration of the currently occupied panther habitat are safeguarded, the long-term viability of the panther is not secure." In addition, Kautz et al. (2006) suggests that unavoidable losses in the Primary Zone should be offset by habitat restoration or enhancement of habitat elsewhere in the Primary Zone, thereby increasing the functional value and carrying capacity of the

remaining habitat.  Restoration of the Secondary Zone will help maintain spatial extent.

*Negative Impacts of Roads on Panther Habitat – South Florida*

**1.1.1.4.  Prevent and minimize the negative impacts of roads to panther habitat.** Least cost path analysis, individual based models, and other modeling tools may be used to predict highway stretches that panthers are likely to cross (Carroll et al. 2004, Wikramanayake et al. 2004, Kramer-Schadt et al. 2005, Swanson et al. 2005).  These same models may characterize habitat use adjacent to dangerous stretches of highway.  This information should then be combined with field observations, home range data, and panther-vehicle collision data to identify and prioritize locations for wildlife crossings, to cluster habitat restoration and mitigation adjacent to these crossing areas, to identify other adjacent habitat used by panthers that needs added protection, and to connect the crossing areas and adjacent habitat with corridors to safer habitat.

**1.1.1.4.1.  Ensure that panther habitat needs are incorporated in the planning of new roads and road expansion projects.**  Examine future land use projections to assess expected effects of habitat fragmentation from roads.  Utilize the ETDM process.  Ensure early and continued coordination among agencies and local governments for all road projects in panther habitat.  Develop Memorandums of Understanding (MOU) and / or refine pre-coordination procedures with State Department of Transportation and local governments for proactive assessment and pre-planning of road projects.

**1.1.1.4.2.  Identify current and planned roads that could affect panthers, eliminate roads where possible, and retrofit priority areas with crossings and fencing as appropriate to promote connectivity and dispersal.**  Develop and distribute recommendations on improvements needed for specific road segments.

**1.1.1.4.3.  Secure habitat adjacent or contiguous to areas of high risk for panther-vehicle collisions.**

**1.1.1.4.4.  Determine the impacts of roads on range expansion and dispersal.**

*Habitat Restoration in Primary, Secondary, and Dispersal Zones*

**1.1.2.  Restore habitat in the Primary, Secondary, and Dispersal Zones.**

**1.1.2.1.  Identify and prioritize tracts suitable for restoration.**

**1.1.2.2.  Provide incentives and mechanisms for restoration of agricultural and range lands.**

**1.1.2.3.  Develop / expand funding mechanisms and other incentives for habitat restoration.**

**1.1.2.4.  Develop and disseminate information on cost-effective restoration techniques.**

**1.1.2.4.1.  Facilitate and conduct habitat restoration research**.

**1.1.2.4.2.  Monitor and evaluate restoration projects** and report the reasons for successes and failures.

*Habitat Management – South Florida*

**1.1.3.  Encourage habitat management that provides for the needs of panthers and their prey.**

**1.1.3.1.  Develop, disseminate, and implement best management practices for managing habitat.**  Develop in coordination with Federal, State, local and private entities.

*Public Land Management – South Florida*

**1.1.3.2.  Ensure that panthers and their prey are adequately considered and provided for in management of public lands.**  Management of public lands should include, but is not limited to, restoration and maintenance of natural habitat through prescribed fire, invasive plant control, regulation of ORV use as appropriate, restoration and maintenance of hydrologic quality and quantity, and regulation of recreational hunting to ensure that it does not negatively impact the panthers' prey base.

**1.1.3.2.1.  Formalize a network of south Florida public land managers** to encourage exchange of panther information and facilitate the development and implementation of effective land management actions. This group should consider the need for interagency panther habitat management strike teams to capitalize on and share existing resources to implement habitat management priorities on the various public lands in south Florida (e.g., cooperative efforts for prescribed burning and invasive plant control).

**1.1.3.2.2.  Prepare, review, and implement habitat management plans for public lands** to ensure that panthers and their prey are adequately considered and provided for.  Plans should include active, state-of-the-art management tools including prescribed fire where appropriate.

**1.1.3.2.3. Track habitat management activities and their effects on panthers** by developing and distributing annual reports that summarize land management accomplishments and effects.

*Private Land Management – South Florida*

**1.1.3.3. Encourage habitat management on private lands to adequately provide for panthers and their prey.**

**1.1.3.3.1. Provide incentives and assistance to willing landowners** (see 1.1.1.1.2 and 1.1.1.1.3) to manage their lands for panthers and their prey using tools such as prescribed fire and invasive plant control. Focus and coordinate existing incentive programs within panther habitat.

**1.1.3.3.2. Provide incentives and work with landowners to encourage them not to convert their lands to less suitable habitat.**

**1.1.3.3.3. Review and comment on county stewardship plans.**

*Monitoring Habitat – South Florida*

**1.1.4. Monitor habitat quantity and quality, land use changes, and response of the population** to these changes (e.g., distribution, density, dispersal, reproductive success, mortality). Track land protection and habitat restoration with an emphasis on identifying where habitat is lost and restored.

**1.1.4.1. Quantify 24-hour habitat use and movement patterns**. More data are needed during hours of peak activity. Obtain and analyze data on nocturnal locations of panthers throughout their range to get a complete picture of panther habitat use.

**1.1.4.2. Update Kautz et al. (2006) maps every five years** to assess trends in habitat quantity and spatial configuration.

*South Florida Population*

**1.1.5. Achieve and maintain the largest possible healthy panther population in south Florida using management practices that are consistent with ecosystem conservation.** In addition to habitat conservation measures referenced in other sections of the plan the following measures are appropriate.

*Demographics*

**1.1.5.1. Continue to monitor population viability.**

107

**1.1.5.1.1.  Convene a group of agency and independent experts to conduct an appropriate PVA** (existing or customized) and corresponding sensitivity analysis.  Obtain independent peer-review.

**1.1.5.1.2.  Continue to determine and monitor demographic variables** including age- and sex-specific reproduction and survival rates, litter size, recruitment, age at first reproduction, birth interval, proportion of individuals breeding, age and sex specific causes of mortality (including intraspecific aggression), dispersal, density, and minimum documented population size.  Identify, evaluate, and use the least intrusive monitoring techniques or indices as appropriate (e.g., hair / genetics sampling, scats, cameras).

**1.1.5.1.3.  Develop and implement annual capture and monitoring work plans**

*Genetic Diversity*

**1.1.5.2.  Maintain and enhance genetic diversity.**

**1.1.5.2.1.  Continue to monitor physical and physiological characteristics correlated with inbreeding and depletion of genetic variability** including kinked tails, cowlicks, cryptorchidism, sperm morphology, heart defects, immune function, and reproductive success.

**1.1.5.2.2.  Develop and implement a genetics management plan.**  Convene a working group of geneticists, reproductive physiologists, veterinarians, and population biologists to develop a genetics management plan.  Use field observations, existing data, and results from the genetic restoration and management project initiated in 1995.  The plan might include protocols and triggers (e.g., specific alleles, physical attributes, percent representation, studbook) for translocating, adding, or removing animals; a protocol for managing / preventing overrepresentation by specific lineages; the disposition of animals that may need to be removed; and specific monitoring needs.

**1.1.5.2.3.  Develop a population model to predict future genetic consequences of management proposals and actions.**

*Harassment, Injury, and Mortality*

**1.1.5.3.  Monitor and take action to prevent harassment, injury, and mortality.**

*Harassment*

**1.1.5.3.1.    Reduce and eliminate illegal harassment and implement management strategies to prevent future harassment stemming from human activity**.   Harass is defined by the FWS as intentional or negligent actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns, which include, but are not limited to, breeding, feeding, or sheltering. Harassment is considered a form of "take" as defined in the ESA.  This does not include activities permitted by the FWS for panther management.  Such permits may be issued by FWS to other Federal land management agencies or State conservation agencies.

**1.1.5.3.1.1.    Identify harassment activities.**  These could include, but are not limited to, illegal stalking of panthers, chasing panthers with dogs, pursuing panthers with ORVs, destruction of denning sites in an effort to relocate an animal, intentionally drawing a panther into an area (whether by baiting with live prey, illegal feeding, or other means) for photography or other purpose, and excessive noise-making activities.

**1.1.5.3.1.2.    Implement active management measures designed to inhibit and / or cease illegal harassment activities on public lands.**  Active management measures that can be implemented on public lands may include:

**1.1.5.3.1.2.1.    Manage public access to minimize harassment opportunities.**

**1.1.5.3.1.2.2.    Develop ORV management plans where ORVs are allowed.**  Plans should contain actions that minimize impacts to panthers.

**1.1.5.3.1.2.3.    Enforce regulations and statutes regarding discharge of firearms, explosive devices, or other loud noise sources.**

**1.1.5.3.1.3.    Increase compliance with existing Federal and State laws and regulations prohibiting harassment.**

**1.1.5.3.1.3.1.    Post and maintain regulatory and informational signs.**  The effective use of on-site regulatory and informational signs is essential in providing the public with information on prohibited harassment activities (including the legal consequences and fines).  This may contribute to better compliance.

**1.1.5.3.1.3.2.    Enforce existing laws and regulations to prohibit harassment.**

*Illegal Killing*

**1.1.5.3.2.  Enforce existing Federal and State laws and regulations to minimize and prevent illegal killing.**

*Road Mortalities*

**1.1.5.3.3.  Minimize and prevent injuries and mortalities by modifying conditions on existing roads and implement appropriate actions to protect panthers during the planning, permitting, and construction of new roads and highway expansion projects**.

**1.1.5.3.3.1.  Identify and address existing and potential panther-vehicle collision areas** to develop recommendations on improvements needed for specific road segments.

**1.1.5.3.3.1.1.  Convene a working group to prioritize and address actions needed in panther-vehicle collision areas.**

**1.1.5.3.3.1.2.  Secure funding for and install wildlife crossings and fencing in high risk areas.**

**1.1.5.3.3.1.3.  Evaluate and implement other mechanisms to prevent mortalities on roads** including installing signs, creating wider shoulders, slower speed limits and speed zones, changing road elevations, and reducing traffic volume with no truck zones or adjusting tolls to encourage alternative routes (e.g., removing tolls on I-75 to reduce traffic on U.S. 41).

**1.1.5.3.3.2.  Build mechanisms into permits for road projects to provide for adaptive management for panther mortality and / or other unforeseen problems.**  These could include conditions for when the FWS will reinitiate consultation pursuant to section 7 of the ESA or require additional project alterations to avoid impacts.

**1.1.5.3.3.3.  Develop new strategies to prevent road mortalities or injuries** including alternative technologies and new fencing designs that might be more aesthetically acceptable.

**1.1.5.3.3.4.  Enforce existing speed zones, monitor effectiveness, and modify as needed.**

*Research Caused Injuries and Mortality*

**1.1.5.3.4.** **Minimize harassment, injury, and mortality that could result from research, management, and monitoring programs.** Ensure that research, management, and monitoring are directed at achieving priority needs of the recovery program and are conducted using the least intrusive and risky methods necessary to meet the objectives of the plan. Allow only highly trained and experienced individuals to capture panthers.

**1.1.5.3.4.1.** **Provide adequate resources and facilities for rehabilitation of panthers that might be injured or orphaned during capture and monitoring efforts.**

**1.1.5.3.4.2.** **Develop, implement, review, and revise protocols (i.e., research, monitoring, capture, handling) as needed to minimize risks to panthers.**

*Diseases and Parasites*

**1.1.5.4.** **Monitor diseases and parasites and develop and implement appropriate management strategies.**

**1.1.5.4.1.** **Devise appropriate biomedical strategies to limit population level disease threats.**

**1.1.5.4.1.1.** **Continuously evaluate the value of specific vaccinations and review all vaccination protocols annually.**

**1.1.5.4.1.2.** **Revise vaccination protocols as appropriate considering new disease threats as they arise.**

**1.1.5.4.2.** **Determine and monitor the presence, infection rate, mortality rates, and consequences of diseases and parasites in the population.**

**1.1.5.4.2.1.** **Collect appropriate tissue and blood samples from all panthers handled, both live and dead, and analyze them for the presence of priority diseases and parasites,** summarize and report results annually.

**1.1.5.4.2.2.** **Evaluate the disease threats presented by other species including bobcats and domestic cats and identify any needed management intervention.**

**1.1.5.4.2.3.** **Implement appropriate management strategies for disease and parasite monitoring and control.**

*Environmental Contaminants*

**1.1.5.5.  Identify and minimize the detrimental effects of environmental contaminants.**

    **1.1.5.5.1.  Produce a summary report and database of contaminants in panthers and their environment in south Florida.**  Identify contaminants and sources of concern and determine management implications.

    **1.1.5.5.2.  Continue to monitor contaminants, especially mercury and endocrine disruptors, in panthers and their prey** by collecting and analyzing appropriate tissue samples, summarize and report results.

    **1.1.5.5.3.  Implement actions necessary to remediate contaminants in high risk areas.**

*Prey Base*

**1.1.5.6.  Ensure an ample, healthy, and diverse prey base.**  Work with managers of public, private, and Tribal lands.

    *Deer*

    **1.1.5.6.1.  Continue active management of white-tailed deer populations.**

        **1.1.5.6.1.1.  Assess and monitor the status of deer populations in panther habitat.**

        **1.1.5.6.1.2.  Develop deer harvest regulations that do not compromise the panther prey base and take into consideration food requirements of the panther.**

        **1.1.5.6.1.3.  Continue to monitor the impacts on panthers of hunting on public and private lands in panther habitat** including BCNP and State lands in south Florida.

    *Hogs*

    **1.1.5.6.2.  Encourage management / control of feral hog populations that does not threaten the panther.**  Develop a long-term strategy for hog management on public lands given potentially conflicting needs of the panther and agency policy to eradicate exotic species.  Continue to assess the role of hogs in the panther prey base as this strategy is implemented.

*Prey Diseases*

**1.1.5.6.3.  Monitor prey diseases and attempt to prevent possible spread into south Florida.**

    **1.1.5.6.3.1.  Continue statewide monitoring for chronic wasting disease and other emerging wildlife and domestic animal diseases and implement available eradication or control methods.**

    **1.1.5.6.3.2.  Identify, map, and appropriately monitor and regulate exotic animal operations that could serve as a source of infection for wild populations.**

    **1.1.5.6.3.3.  Coordinate with the southeastern States to review protocols and regulations that require imported ungulates to be disease-free.**

*Captive Management*

**1.1.5.7.  Address issues related to captive panthers and their potential for positively impacting the wild population.**

**1.1.5.7.1.  Develop guidance for the removal of panthers from the wild.**  This guidance will address removal of individuals for disease containment and survival (e.g., orphaned or abandoned kittens, injured individuals). Appropriate protocols will be generated for the specific reason for removal (e.g., hand-rearing protocols for kittens).

**1.1.5.7.2.  Evaluate the need for and establish, if necessary, a captive breeding program.**  This program would be for the maintenance of a captive population (if indicated) and / or for individuals for reintroduction (see 2.2.1.3.).

**1.1.5.7.3.  Evaluate the role of alternative breeding strategies** including artificial insemination and surrogate mothers that could provide a source of panthers to increase numbers or distribution**.**

**1.1.5.7.4.  Develop and implement a captive management plan for panthers held in captivity.**

    **1.1.5.7.4.1.  Form a captive management working group.**  This working group should consist of one representative from each institution maintaining or likely to maintain Florida panthers, the panther project veterinarian, and a representative of the FWS, FWC, and

NPS.  Institutional representatives will consist of veterinarians, curators, or other staff involved in panther husbandry.

**1.1.5.7.4.2.  Develop a captive management plan.**  The captive management team should develop a plan as a guide for the placement and maintenance of panthers held in captivity.  This plan should include preventative health, husbandry, reproduction, and captive population management.

**1.1.5.7.4.3.  Implement the captive management plan.**  Participating institutions will be signators of a MOU relative to adherence to this plan.

**1.1.5.7.5.  Establish research priorities for captive panthers which can be applied to management of the free-ranging population.**  Investigations could include such topics as vaccination protocols, baseline reproductive physiology, assisted reproduction technologies, and appropriate diseases.

**1.1.5.7.6.  Incorporate interpretative education at public facilities where captive panthers are held and prepare public information materials.**  See 3.1.3.6. and 3.2.7.

**Expansion into South-Central Florida**

**1.2.  Provide for the expansion of the breeding population of panthers in south Florida into south-central Florida.**  The potential for the persistence of the existing population in south Florida can be enhanced by its expansion into south-central Florida.

*Feasibility and Habitat Identification*

**1.2.1.  Continue to evaluate the potential for habitat in south-central Florida to support a breeding population.**  Evaluate the quantity and quality of existing panther habitat; likely future habitat trends with respect to human population growth; and patterns of public land ownership, highway expansions, and changing land use practices.

*Facilitating Natural Population Expansion*

**1.2.2.  If there is potential for habitat in south-central Florida to support a breeding population, determine if there are management steps that can be taken to facilitate natural expansion of female panthers into south-central Florida.**

*Translocation*

**1.2.3.  If natural expansion of female panthers into south-central Florida is not likely, evaluate the feasibility of translocation to establish a breeding population, including an EA or EIS under the NEPA process if necessary.**

**1.2.4.  If natural expansion is not likely, develop an expansion plan to guide translocation into south-central Florida.**  The plan should include education and outreach (implement actions in Section 3), consider the effects of translocations into south-central Florida on potential reintroductions elsewhere in the historic range, and consider the effects of translocations on the south Florida population.

*Suitable Habitat*

**1.2.5.  Secure, maintain, and restore suitable habitat for panthers that are dispersing into south-central Florida** to support continued dispersal and settlement.

   **1.2.5.1.  Secure a dispersal area north of Caloosahatchee River that maintains connection with habitat south of river.**

   **1.2.5.2.  Conserve lands buffering the Caloosahatchee River** by fostering compatible land uses and riparian habitat protection directly along the river in order to maintain enough characteristics of panther habitat to allow dispersal northward and genetic exchange should female panthers be successfully established north of the river.

   **1.2.5.3.  If establishment of a breeding population in south-central Florida is feasible, provide for the conservation and enhancement of other lands necessary for persistence of a population in south-central Florida.**

**1.2.6.  Implement appropriate actions in Section 2.**

   **1.2.6.1.  If the population is expanded into south-central Florida, implement appropriate actions in Section 1.1.**

**Reintroduction**

**2.  Within the historic range, identify, secure, maintain, and restore habitat in potential reintroduction areas and reestablish viable populations of the panther outside of south and south-central Florida.**

**Select Reintroduction Sites**

**2.1.  Select reintroduction areas in cooperation / coordination with the southeastern States within the historic range of the panther.**  Use top three sites identified by Thatcher et al. (2006b) as a starting point.

**2.1.1.  In cooperation / coordination with the southeastern States select potential reintroduction areas to be evaluated.**

**2.1.2.  Develop and conduct preliminary public scoping to allow effective preplanning of the NEPA process.**  This could include the use of focus / stakeholder meetings and opinion and attitude surveys in the Southeast and will build on knowledge gained from previous feasibility studies.

**2.1.3.  Identify State and Federal laws, regulations, or policies that could conflict with reintroduction and resolve any potential conflicts** such as predator control policies that conflict with reintroduction.

**2.1.4.  Conduct field surveys of selected reintroduction areas.**  These evaluations should address habitat quality variables including prey density, available habitat types, distribution, connectivity, topography and understory vegetation for stalking and denning cover, hydroperiods and potential for inundation, future trends in land use, accessibility to humans, and recreational uses.

**2.1.5.  Determine if puma are present in selected reintroduction areas** in the Southeast in order to understand any possible conflicts with reintroduction goals. This will be done by checking for sign of existing puma, identifying potential conflicts related to captive puma, and collecting and analyzing genetic samples from suspected wild puma encountered to determine their point-of-origin, if needed.

**2.1.6.  Evaluate possible disease and parasite problems in selected reintroduction areas prior to releasing panthers.**  Implement actions under 1.1.5.4.

**2.1.7.  Consider contaminant issues when evaluating selected reintroduction areas.** Implement actions under 1.1.5.5.

**2.1.8.  Use the NEPA process to develop and refine the appropriate reintroduction alternatives and recommend the preferred alternative (e.g., number of sites)**.

    **2.1.8.1.  Coordinate with the southeastern States, stakeholders, and the public for reintroduction site selection.**

    **2.1.8.2.  Collect, compare, and analyze sociopolitical data** (including public attitudes / opinions regarding panthers, predators, risks, and support) for identified potential reintroduction areas to help formulate and choose among alternatives.

    **2.1.8.3. Using the information obtained in 2.1.8.1 and 2.1.8.2. use the NEPA process to develop and refine appropriate reintroduction alternatives and recommend the preferred alternative**.

**Reintroduce Panthers into Suitable Sites**

**2.2.  Reestablish viable populations outside of south and south-central Florida within the historic range when a suitable reintroduction site is selected.**

*Source of Panthers for Reintroduction*

**2.2.1.  Determine the number of panthers from each age and sex class that are needed for a reintroduction program.**

**2.2.2.  Evaluate removal of panthers from the wild.**

**2.2.2.1.  Select individual panthers that could be removed for reintroduction without negatively affecting the persistence of the existing population.** Removal of individuals cannot jeopardize the panther pursuant to section 7 of the ESA.  Create a mechanism to expedite genetic analysis of all panthers genetically sampled to provide data for prudent and timely decision-making. Review of this data should occur annually relative to reintroduction decisions.  Use a PVA model to evaluate the affect of translocation on the existing population.

**2.2.2.2.  Develop a protocol for translocation of panthers from the wild.**

**2.2.3.  Evaluate the need for and establish, if necessary, a captive breeding program.**  This program would be to produce individuals for reintroduction.

**2.2.4.  Evaluate the role of alternative breeding strategies and / or source populations,** including artificial insemination and surrogate mothers or puma outside of Florida that could provide a source of panthers.

*Reintroduction Incentives*

**2.2.5.  Identify and provide incentives and remove disincentives to Federal, State, and local governments and agencies to participate in reintroduction.**

**2.2.5.1.  Identify and provide incentives to Federal, State, and local governments and agencies to participate in reintroduction.**

**2.2.5.2.  Address the legal liability issues for State participation in a reintroduction program.**  Identify the existing State laws and immunities and obtain a state solicitor's opinion regarding liability, if needed.

**2.2.5.3.  Provide resources to assist with reintroduction.**

117

*Human Dimensions of Reintroduction*

**2.2.6. Address human dimensions of reintroduction (including conflicts between stakeholders and panthers) with education, incentives, compensation, and regulatory mechanisms.** Social issues include landowner rights, safety for pets and livestock, effects on deer populations, and human safety. Implement actions under Section 3.

**2.2.6.1. Develop and implement a protocol and response plan for handling human-panther interactions.** Use existing protocols, including the draft Interagency Florida Panther Response Plan being prepared by FWC, NPS, and FWS.

**2.2.6.2. Evaluate the need for and, if appropriate, designate experimental populations.** Under section 10(j) of the ESA, FWS can designate reintroduced populations established outside the species' current range but within its historical range as "experimental." Designation of a population as experimental increases flexibility and discretion in managing reintroduced listed species.

**2.2.6.3. Develop a compensation program for the depredation of livestock in reintroduction areas.** An effective compensation program should have two components: proactive measures to prevent or reduce conflict between livestock and panthers, and a method for compensating livestock owners after a confirmed depredation by a panther. Programs established by other States and entities, such as Defenders of Wildlife, could be referenced for guidelines.

**2.2.6.3.1. Develop and distribute a landowner, land manager, and lessees panther handbook.** The handbook should include recommendations designed to minimize potential problems.

**2.2.6.3.2. Provide assistance to landowners, land managers, and lessees to identify and address potential conflicts on their property.**

**2.2.6.3.3. Develop and implement a compensation program.** Minimize procedural requirements for compensation when payment is warranted (once depredation by a panther has been determined and landowner protective efforts have been demonstrated). Partner with stakeholders to determine who receives compensation. Ensure that all individuals are adequately trained in confirming panther depredation.

**2.2.6.4. Address concerns of hunters in reintroduction areas.**

**2.2.6.4.1. Understand hunting pressure and methods in potential reintroduction areas to identify possible conflicts, including a real or perceived decline in deer populations.**

**2.2.6.4.2. Partner with hunters and hunting lease holders, including timber companies, to address panther, hunter, and prey issues.**

*Release of Panthers*

**2.2.7. Develop a protocol and release panthers into selected reintroduction sites.**

*Monitoring Reintroduced Panthers*

**2.2.8. Develop and implement monitoring plans for the selected reintroduction areas.**

**2.2.9. Minimize and monitor illegal killing.**

**2.2.9.1. Enforce existing Federal and State laws and regulations regarding illegal killing.**

**2.2.9.2. Extend ESA "similarity of appearance" protection to puma in applicable portions of the historic range prior to reintroduction.** Section 4(e) of the ESA and implementing regulations (50 CFR 17.50–17.52), authorize the treatment of an unlisted species as endangered or threatened if the species so closely resembles in appearance a listed endangered or threatened species that law enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species.

**2.2.9.3. Implement a toll free telephone tip number in reintroduction areas** as reintroduction is attempted and provide rewards to those that report illegal killing of panthers. Coordinate with existing State programs to avoid duplication.

**Actions Once Populations Are Established**

**2.3. As additional populations are established, implement appropriate actions in Section 1.**

**Public Awareness and Education**

**3. Facilitate panther conservation and recovery through public awareness and education.** Build support for the recovery effort through education and outreach programs that increase public understanding of panther behavior and recovery needs.

119

**Design and Develop Materials and Programs**

**3.1.   Design and develop education and outreach materials and programs.**

*Education Working Group*

**3.1.1.   Form a working group to design and develop education and outreach materials and programs.**  The group should include social scientists, environmental educators, university academics, conservation organizations, county extension agents, agencies involved in panther recovery, other local groups and community leaders.  Organizations can link together in various ways to bring unified, educational, public relations messages to groups of people concerned with panther conservation and recovery.

*Social Science Research*

**3.1.2.   Conduct social science research to identify public attitudes, knowledge levels, and concerns about panthers and panther recovery efforts.**  Draw on expertise of university academics, environmental educators, and social scientists.

**3.1.2.1.   Identify target audiences, content, strategic messages, and methods of getting the message out using social science research.**  Existing social science research on panthers and other carnivores such as wolves and bears can also be used.  Audiences can include hunt clubs, hunters, outdoor enthusiasts, area landowners, livestock organizations, area leaders, and groups that attract women and minorities (Cramer 1995).

*Production of Materials and Programs*

**3.1.3.   Produce necessary materials and programs for public awareness and education.**

*Natural History, Recovery, and Reduction of Threats to Panthers*

**3.1.3.1.   Produce information on natural history, place in the ecosystem, panther facts, benefits of recovery, and ways to reduce threats to panthers and their habitat.**  These materials should be produced in English and Spanish**.**  This can include concepts such as umbrella species, predator-prey relationships, food web dynamics, cultural importance, only population of pumas remaining in the eastern U.S., historic and current range, attempts at eradication that led to original population declines, timeline of events in panther history, and biology and behavior.

*Habitat Conservation and Management*

**3.1.3.2.   Produce materials and programs regarding panther habitat conservation and management.**

    **3.1.3.2.1.   Compile information and produce materials and programs on landowner incentives.**  See Action 1.1.1.1. for information on incentives and ways to increase economic revenue for private lands.

    **3.1.3.2.2.   Identify ecotourism values and economic incentives related to panthers and develop materials for ecotourism programs.**

    **3.1.3.2.3.   Compile information on land management techniques.**

    **3.1.3.2.4.   Develop a panther habitat management handbook for public and private land managers based on the best management practices** produced under Action 1.1.3.1.  Evaluate whether separate handbooks are needed for public and private land managers.

*South Florida Population*

**3.1.3.3.   Produce materials and programs regarding the south Florida population and its management.**

    **3.1.3.3.1.   Develop materials to inform the public and decision makers about methods for reducing panther-vehicle collisions,** including the success of wildlife crossings, crossing design standards, road placement, and speed and volume of traffic. Use existing materials and programs, such as those produced by conservation organizations, wherever appropriate.

*Human / Panther Interactions*

**3.1.3.4.   Produce materials and programs regarding human / panther interactions.**

    **3.1.3.4.1.   Develop educational material to address human social issues related to panther conservation and recovery.**  These could include: human safety, safety for pets and livestock, landowner rights, and effects on deer populations. Identify appropriate individuals to distribute information.  This can be a mass media campaign including TV, billboards, mailings, and presentations to homeowner groups similar to the FWC Bear Aware education and outreach program.

    **3.1.3.4.2.   Develop a Living With Panthers outreach program.**  Inform stakeholders about panthers and ways to reduce potential conflicts. Implement this program statewide, especially where panthers live and disperse.  Use the media, hunting license sales, pamphlets, signs, and

other outlets.  Model programs on other successful "living with wildlife" efforts such as the FWC Bear Aware program.  Address topics such as biology and behavior of panthers, human-panther interactions, factors that affect interactions, how to reduce the likelihood of interactions, protecting pets and livestock, tips for recreation in panther country, and what to do if you encounter a panther.

**3.1.3.4.3.   Develop materials and programs to address hunting concerns, such as a real or perceived decline in the deer population.** Draw on organizations experienced with hunting issues, such as the Quality Deer Management Association.

**3.1.3.4.4.   Include panther conservation issues in ORV educational materials**.  Materials should include regulations and reasons for staying on designated trails.  Utilize U.S. Forest Service education and outreach program for ORV use in National Forests.

*Population Expansion and Reintroduction*

**3.1.3.5.   Produce materials and programs regarding population expansion and reintroduction.**

**3.1.3.5.1.   Examine sociological information, such as public attitudes in and around reintroduction sites.**

**3.1.3.5.2.   Develop a media plan**. This process calls for oversight of logistical, public affairs, and biological aspects of a situation.  Public affairs staff will be able to predict what would happen with  reintroduction and plan public affairs events, coordinate logistics with other team members, and hold practice sessions of media relations activities.  The process also includes regular briefings of staff on key topics and incorporates an assessment of the information needs of mass media news organizations and a media plan for release of panthers (for example see Jacobson 1999:301).

*Displays and Programs in Public Environmental Education Centers*

**3.1.3.6.   Design education displays and programs for public environmental education centers, such as zoos and natural history museums.** Partners can also include the AZA and other affiliated organizations.  Use existing programs such as the Panther Glades exhibit at Caribbean Gardens in Naples, Florida, as an example.

*Programs and Materials for School Children*

**3.1.3.7. Develop education programs and materials for school children.** This can include curriculum, participation in panther education and recovery actions, and panther awareness events.

**3.1.3.8. Develop materials to promote Florida Panther Day.**

**Provide Materials and Programs**

**3.2. Provide materials and programs.** Provide information to local planning organizations, decision makers and elected officials, the public, major landowners living in and adjacent to panther habitat, potential new residents and the realtor community, and other audiences as identified by social science research. Include positive proactive programs to keep people interested, involved, and a part of conservation and recovery programs. Programs can be also geared toward achieving voluntary behavior changes as an alternative to restrictions.

*Communications Teams*

**3.2.1. Form communication teams to give presentations to audiences in and adjacent to panther habitat and in selected reintroduction sites.**

*Media / Public Relations Training for Agency Personnel*

**3.2.2. Provide media / public relations training for agency personnel who will be on-the-ground and interfacing with the public (including private landowners) and media.** This includes staff and law enforcement officers. This can be provided in a workshop and a 5 - 10 page manual.

*Distribute Materials and Provide Programs*

**3.2.3. Distribute materials and information to the public, landowners, and stakeholders.**

**3.2.3.1. Distribute information on landowner incentives.**

**3.2.3.2. Provide existing ecotourism facilities and the Visit Florida tourism promotion program with updated information on panthers** that they can include in their programs. Ecotourism facilities in south Florida include boat tours, swamp buggy rides, and minibus tours.

**3.2.3.3. Distribute information on land management techniques and provide technical assistance to public and private land managers regarding techniques to maintain and increase the value of habitat to panthers and their prey.**

**3.2.3.4. Inform the public, landowners, and decision makers about the needs and benefits of invasive species control / management and prescribed fire.** Identify and work with existing programs that address invasive species control / management and the value of prescribed fire to panthers and their prey.

**3.2.3.5. Distribute information on prey management techniques (including exotic game) on public and private lands.**

**3.2.3.6. Distribute materials to promote Florida Panther Day.** This could include the media, schools, environmental education facilities, and others.

*South Florida Population*

**3.2.4. Provide materials and programs regarding the south Florida panther population and its management.**

**3.2.4.1. Provide information on genetic restoration.** This should be directed at clearing up misinformation about genetic restoration as well as informing the public about the benefits and potential needs for genetic restoration. Include historical information on *Puma* subspecies, how the plan was formulated and implemented, and results of the program.

**3.2.4.2. Provide information on panther conservation issues in ORV educational materials**.

**3.2.4.3. Educate sportsmen groups and the public about the legal consequences of illegal harassment.** This includes the need for recognizing harassment activities, the detrimental effects that may result from harassment (physical injury, physiological stress, reduced litter size, morbidity), and the importance of preventing actions that constitute harassment.

**3.2.4.4. Provide information on panther management, including monitoring.**

*Human / Panther Interactions*

**3.2.5. Provide materials and programs regarding human / panther interactions.**

**3.2.5.1. Provide education and outreach to residents living in and adjacent to panther habitat.** Include the realtor community. Include tips for living in panther habitat.

**3.2.5.2. Provide tips for recreating in panther habitat.**

**3.2.5.3. Provide information on protecting livestock and pets.** Outreach efforts need to reassure livestock owners that the chance of their livestock being

taken by a panther can be minimized, and if it does happen, they may be compensated through a depredation fund.

**3.2.5.4. Provide outreach materials to address hunting concerns.** Include information regarding the effects of panthers on hunted prey species and hunting success. Provide information to hunters and hunt clubs. Use results from social science research.

*Population Expansion and Reintroduction*

**3.2.6. Provide materials and programs regarding population expansion and reintroduction.**

**3.2.6.1. Engage and provide materials to landowners and the public in south-central Florida to build support for restoring and maintaining habitat and for expansion and reintroduction.**

**3.2.6.2. Target education at reintroduction sites to address social issues in advance of releasing panthers.** Opinion surveys and conservation education should be the cornerstone of reintroduction.

**3.2.6.3. Continue education and outreach efforts after panthers are released into a reintroduction site.** Include regular contacts with area residents / landowners about the program. Continually reinforce and address panther conservation messages, especially as problems arise.

**3.2.6.4. Identify existing ecotourism facilities and State ecotourism boards in or near selected reintroduction sites and provide them with updated panther information.** Information can be provided on an on-going basis in a format that is simple for the facilities to include in their programs.

*Displays and Programs in Public Environmental Education Centers*

**3.2.7. Identify and work with existing environmental education facilities to provide or enhance panther education displays and programs.** This includes Jacksonville Zoo, Lowry Park Zoo, the Tallahassee Museum, Caribbean Gardens, and Busch Gardens.

*Programs and Materials for School Children*

**3.2.8. Distribute education programs and materials to school children.**

**Evaluation**

**3.3. Evaluate outreach and educational materials and programs.** Monitor the programs as they are implemented. Evaluate education and outreach efforts, especially to assess

changes in human behavior and attitude.  A good example of program evaluation is the FWC Bear Aware *Black Bear Public Education Program.*  Evaluation data should be compared to preliminary social science research (pre-program measurement) to provide a post-program measurement.

**3.4.  Revise materials where evaluation indicates a need.**

## V.  IMPLEMENTATION SCHEDULE

The Implementation Schedule that follows outlines actions and estimated costs for the recovery program for the Florida panther, as set forth in this recovery plan.  It is a guide for meeting the recovery goal and criteria outlined in this plan.  This schedule indicates action priorities, action numbers, action descriptions, duration of actions, the parties potentially responsible for actions (either funding or carrying out), and estimated costs.  Parties believed to have authority or responsibility for implementing a specific recovery action are identified in the Implementation Schedule.  When more than one party has been identified, the proposed lead party is indicated by an asterisk (*).  The listing of a party in the Implementation Schedule does not require the identified party to implement the action(s) or to secure funding for implementing the action(s).

**Priority Number**

Priority 1 - An action that must be taken to prevent extinction or to prevent the species from declining irreversibly in the foreseeable future.

Priority 2 - An action that must be taken to prevent a significant decline in species population, habitat quality, or some other significant negative impact short of extinction.

Priority 3 - All other actions necessary to provide for full recovery of the species.

Work on or completion of priority 1, 2, or 3 actions may take place concurrently.

**Participants and Other Parties Referenced in the Implementation Schedule**

| | |
|---|---|
| COE | U.S. Army Corps of Engineers |
| counties | South Florida counties |
| DCA | Department of Community Affairs |
| EPA | Environmental Protection Agency |
| FDACS | Florida Department of Agriculture and Consumer Services |
| FDEP | Florida Department of Environmental Protection |
| FDOF | Florida Division of Forestry |
| FDOT | Florida Department of Transportation |
| FHP | Florida Highway Patrol |
| FHwA | Federal Highway Administration |
| FNAI | Florida Natural Areas Inventory |
| FWC | Florida Fish and Wildlife Conservation Commission |
| FWS | U.S. Fish and Wildlife Service |
| IFAS | Institute of Food and Agricultural Science |
| local governments | City and county agencies |
| NGO | Non-governmental organization |
| NPS | National Park Service |
| NRCS | Natural Resources Conservation Service |
| private | Private industry, landowners, etc. |
| State agencies | State natural resource agencies |
| Tribes | Miccosukee Tribe of Indians of Florida and Seminole Tribe of Florida |
| universities | Public and private universities |
| USDA | U.S. Department of Agriculture |
| USFS | U.S. Forest Service |
| USGS | U.S. Geological Survey |
| WMD | Water Management Districts located in south Florida |

| | | | | | Estimated Fiscal Year Costs ($000s) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | FY1 | FY2 | FY3 | FY4 | FY5 | Comments |

**Florida Panther Recovery Plan Implementation Schedule**

**Existing Population**

*South Florida Habitat*

*Non-Regulatory Incentive Programs*

| Priority | Action Number | Recovery Action Description | Action Duration | Participants | FY1 | FY2 | FY3 | FY4 | FY5 | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 1.1.1.1.1. | Develop Safe Harbor Agreements | Continuous | FWS*, private | | | | | | Cost included in standard operating budget of Federal agency. |
| 3 | 1.1.1.1.2. | Focus available incentive programs to restore and enhance habitat | Continuous | FWS*, FWC*, NRCS, NGO, FDOF, IFAS, counties, private | 60 | 60 | 60 | 60 | 60 | Cost included in standard operating budgets of agencies. |
| 3 | 1.1.1.1.3. | Explore the creation of new panther conservation incentive programs | 3 years | FDEP, FWC, FWS, NRCS, counties, local governments, NGO, private | 10 | 10 | 10 | | | |
| 1 | 1.1.1.1.4.1. | Revise and implement the preliminary project proposal developed for expansion of FPNWR | 10 years | FWS* | | | | | | Cost dependent upon land prices. |
| 3 | 1.1.1.1.4.2. | Modify existing land appraisal procedures | 5 years | Local governments | 10 | 10 | 10 | 10 | 10 | |
| 3 | 1.1.1.1.4.3. | Conduct an annual review of Florida Forever projects and rate them with respect to panther conservation values | Continuous | FWC*, FWS, NPS, NGO | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | |
| 1 | 1.1.1.1.5. | Identify and support local initiatives to protect habitat and purchase development rights | Continuous | FWS, FWC, counties, local governments | 10 | 10 | 10 | 10 | 10 | |

*Regulatory Programs*

| Priority | Action Number | Recovery Action Description | Action Duration | Participants | FY1 | FY2 | FY3 | FY4 | FY5 | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 1.1.1.2.1. | Create a Federal / State working group to | < 1 year | FWS, FWC, FDEP, COE, | | | | | | Cost included in standard operating budgets of |

| Florida Panther Recovery Plan Implementation Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| | | coordinate permit review and consultation | | EPA, NRCS, FDOF, WMD, NPS, FDOT, FHwA, USFS, local governments | | | | | | agencies. |
| 2 | 1.1.1.2.2. | Track permits, especially incidental take and compensation received, issued through Federal and State regulatory programs | Continuous | FWS*, FWC, FDEP, COE, EPA, NRCS, FDOF, WMD, NPS, FDOT, FHwA, USFS | 5 | 5 | 5 | 5 | 5 | Cost included in standard operating budgets of agencies.<br><br>Much of the information is available, but needs interagency coordination. |
| 2 | 1.1.1.2.3.1. | Ensure that panther conservation and protection of habitat is included in the State Clearinghouse (SAI) reviews of Federal activities | Continuous | FWC*, FDEP | | | | | | Cost included in standard operating budgets of agencies. |
| 1 | 1.1.1.2.3.2. | Ensure that the section 7 consultation process is utilized and that the best available science is used in development of biological opinions | Continuous | FWS*, COE, EPA, NPS, FHwA, NRCS, USFS | | | | | | Cost included in standard operating budgets of agencies. |
| 2 | 1.1.1.2.3.3. | Avoid adverse effects to habitat (including prey) attributable to CERP and other water management projects | 10 years | FWS*, COE, FDEP, FWC, NPS, WMD, FDOF | 200 | 200 | 200 | 200 | 200 | Cost for identifying effects is included in standard operating budgets of agencies.<br><br>Additional funds are needed for monitoring. |
| 2 | 1.1.1.2.4.1. | Provide review and recommendations to FDEP, | Continuous | FWC*, FDEP, WMD | | | | | | Cost included in standard operating budgets of |

| | | | | | Estimated Fiscal Year Costs ($000s) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | FY1 | FY2 | FY3 | FY4 | FY5 | Comments |
| | | Department of Community Affairs, WMDs, and other State agencies on permit applications that can potentially impact habitat | | | | | | | | agencies. |
| 2 | 1.1.1.2.4.2. | Work with counties and municipalities to modify and amend Comprehensive Plans to include the goal of no net loss of quantity, quality, or functionality of habitat in Primary, Secondary, and Dispersal Zones | Continuous | FWC*, FDEP, counties, local governments | | | | | | Cost included in standard operating budgets of agencies. |
| 1 | 1.1.1.2.4.3. | Develop a mechanism for providing compensation for projects that affect small acreages (e.g., single family residences) of habitat | 2 years | FWS*, FWC, COE, local governments | 10 | 10 | | | | |
| 2 | 1.1.1.2.4.4. | Initiate and encourage landscape level HCPs where proposed non-Federal actions or projects will impact panthers or their habitat | Continuous | FWS*, FWC, counties, private, local governments, NGO | | | | | | Cost included in standard operating budgets of agencies. |
| | | *Habitat Fragmentation, Connectivity, and Spatial Extent* | | | | | | | | |
| 1 | 1.1.1.3.1.1. | Quantitatively assess factors that define dispersal corridors and use least-cost pathways analysis to identify potential habitat corridors | 2-3 years | FWC*, NPS, FWS, USGS, universities | 30 | 30 | 30 | | | |
| 1 | 1.1.1.3.1.2. | Restore habitat in potential corridors identified by | Continuous | FWC*, FWS*, FDEP*, NGO, | | | | | | Cost dependent upon number of willing |

| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| | | least-cost pathways analysis | | private, FDOF, WMD, local government | | | | | | landowners. |
| 1 | 1.1.1.3.1.3.1. | Secure the Dispersal Zone | Continuous | FWC*, FWS, FDEP*, NGO, private, FDOF, WMD, local government | | | | | | Cost dependent upon number of willing landowners and land prices. |
| 1 | 1.1.1.3.1.3.2. | Secure Camp Keais Strand | Continuous | FWC*, FWS, FDEP*, NGO, private, FDOF, WMD, local government | | | | | | Cost dependent upon number of willing landowners and land prices. |
| 1 | 1.1.1.3.1.3.3. | Secure a corridor between BCNP and Okaloacoochee Slough | Continuous | FWC*, FWS*, FDEP*, NPS, NGO, private, FDOF, WMD, local government | | | | | | Cost dependent upon number of willing landowners and land prices. |
| 2 | 1.1.1.3.1.3.4. | Consider maintenance of habitat corridors for panthers during Everglades restoration to avoid isolation of the ENP subpopulation | 30 years | FWS*, COE, FDEP, FWC, NPS, WMD | 5 | 5 | 5 | 5 | 5 | |
| 1 | 1.1.1.3.2. | Maintain spatial extent and arrangement | Continuous | FWC*, FWS, NPS, NGO, NRCS, FDEP*, FDOF, WMD, private, counties, local governments | | | | | | Cost dependent upon land prices. |
| | | *Negative Impacts of Roads on Panther Habitat – South Florida* | | | | | | | | |
| 2 | 1.1.1.4.1. | Ensure that panther habitat | Continuous | FWS, FWC, | 10 | 10 | 10 | 10 | 10 | |

The table is titled **Florida Panther Recovery Plan Implementation Schedule**

132

| Florida Panther Recovery Plan Implementation Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| | | needs are incorporated in the planning of new roads and road expansion projects. | | FDOT, FHwA, counties, local government, NGO, COE, FDEP, DCA | | | | | | |
| 1 | 1.1.1.4.2. | Identify current and planned roads that could affect panthers, eliminate roads where possible, and retrofit priority areas with crossings and fencing as appropriate to promote connectivity and dispersal | Continuous | FWS*, FWC, NPS, FDOT, FHwA, counties, local government, NGO, COE, FDEP, DCA | 15 | 15 | 15 | 15 | 15 | Cost to retrofit priority areas will be site-specific. |
| 1 | 1.1.1.4.3. | Secure habitat adjacent or contiguous to areas of high risk for panther-vehicle collisions | Continuous | FDEP*, FWS, FWC*, NPS, FDOT, FHwA, counties, local government, NGO, COE, DCA | | | | | | Cost will be site-specific. |
| 3 | 1.1.1.4.4. | Determine the impacts of roads on range expansion and dispersal | 3 years | FWC*, NPS, FWS, universities, USGS | 50 | 50 | 50 | | | |
| Habitat Restoration in Primary, Secondary, and Dispersal Zones | | | | | | | | | | |
| 3 | 1.1.2.1. | Identify and prioritize tracts suitable for restoration | 3 years | FWC*, NRCS, USGS, FNAI, universities, FWS | 50 | 50 | 50 | | | |
| 2 | 1.1.2.2. | Provide incentives and mechanisms for restoration of agricultural and range lands | Continuous | NRCS, FWC, FWS, FDEP, FDACS | 30 | 30 | 30 | | | Costs to be determined for remaining years. |
| 2 | 1.1.2.3. | Develop / expand funding | Continuous | NRCS, FWC, | 30 | 30 | 10 | 10 | 10 | |

| Florida Panther Recovery Plan Implementation Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| | | mechanisms and other incentives for habitat restoration | | FWS, FDEP, NGO, private | | | | | | |
| 3 | 1.1.2.4.1. | Facilitate and conduct habitat restoration research | 10 years | FWC*, NRCS, USGS, FWS, universities, NGO | 200 | 200 | 200 | 200 | 200 | |
| 3 | 1.1.2.4.2. | Monitor and evaluate restoration projects | Continuous | FWC, NRCS, USGS, FWS, universities, NGO | 30 | 30 | 30 | 30 | 30 | |
| *Habitat Management – South Florida* | | | | | | | | | | |
| 2 | 1.1.3.1. | Develop, disseminate, and implement best management practices for managing habitat | 2 years | FWS, FWC, NPS, NRCS, FDEP, FDOF, counties, local governments | 25 | 25 | | | | Much of the information needed is available but needs interagency coordination. |
| *Public Land Management – South Florida* | | | | | | | | | | |
| 2 | 1.1.3.2.1. | Formalize a network of south Florida public land managers | < 1 year | FWS*, FWC, NPS, FDEP, FDOF, WMD, counties, local governments | | | | | | Cost included in standard operating budgets of agencies. |
| 2 | 1.1.3.2.2. | Prepare, review, and implement habitat management plans for public lands | Continuous | FWS, FWC, NPS, FDEP, FDOF, WMD, counties, local governments | 100 | 100 | 100 | 100 | 100 | |
| 2 | 1.1.3.2.3. | Track habitat management activities and their effects on panthers | Continuous | FWC*, FWS, NPS, FDEP, FDOF, FNAI, WMD, counties, local governments | 30 | 30 | 30 | 30 | 30 | |

| Florida Panther Recovery Plan Implementation Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| *Private Land Management – South Florida* | | | | | | | | | | |
| 2 | 1.1.3.3.1. | Provide incentives and assistance to willing landowners | Continuous | FWS, FWC, NRCS, FDOF, IFAS, counties, private, NGO | 60 | 60 | 60 | 60 | 60 | |
| 1 | 1.1.3.3.2. | Provide incentives and work with landowners to encourage them not to convert their lands to less suitable habitat | Continuous | FWS, FWC, NRCS, IFAS, FDOF, counties, private, NGO | | | | | | Costs will be site-specific. |
| 3 | 1.1.3.3.3. | Review and comment on county stewardship plans | Periodic | FWS*, FWC, NRCS, FDEP counties, private, NGO | | | | | | Cost included in standard operating budgets of agencies. |
| *Monitoring Habitat – South Florida* | | | | | | | | | | |
| 2 | 1.1.4.1. | Quantify 24-hour habitat use and movement patterns | 3 years | FWC*, NPS | 450 | 450 | 450 | | | |
| 2 | 1.1.4.2. | Update Kautz et al. (2006) maps every five years | Periodic | FWS, FWC, USGS, universities | 60 | | | | | |
| *South Florida Population* | | | | | | | | | | |
| *Demographics* | | | | | | | | | | |
| 2 | 1.1.5.1.1. | Convene a group of agency and independent experts to conduct an appropriate PVA | 2 years | FWS*, FWC, NPS, USGS, universities | 30 | 30 | | | | |
| 1 | 1.1.5.1.2. | Continue to determine and monitor demographic variables | Continuous | FWC*, NPS, FWS | 750 | 750 | 750 | 750 | 750 | |
| 2 | 1.1.5.1.3. | Develop and implement annual capture and monitoring work plans | Continuous | FWC*, NPS, FWS | | | | | | Costs included in item 1.1.6.1.2. |

| Florida Panther Recovery Plan Implementation Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| *Genetic Diversity* | | | | | | | | | | |
| 1 | 1.1.5.2.1. | Continue to monitor physical and physiological characteristics correlated with inbreeding and depletion of genetic variability | Continuous | FWC*, NPS, FWS | | | | | | Costs included in item 1.1.6.1.2. |
| 1 | 1.1.5.2.2. | Develop and implement a genetics management plan | Continuous | FWS*, FWC, NPS, universities, private | 30 | 30 | | | | Costs for remaining years to be determined. |
| 2 | 1.1.5.2.3. | Develop a population model to predict future genetic consequences of management proposals and actions | 3 years | FWS, FWC, NPS, USGS, universities | 50 | 50 | 50 | | | |
| *Harassment, Injury, and Mortality* | | | | | | | | | | |
| 2 | 1.1.5.3.1.1. | Identify harassment activities | Continuous | FWS, FWC, NPS | 10 | 10 | 10 | 10 | 10 | |
| 2 | 1.1.5.3.1.2.1. | Manage public access to minimize harassment opportunities | Continuous | FWS, FWC, NPS, FDEP, WMD, FDOF, counties, local governments | 1 | 1 | 1 | 1 | 1 | |
| 3 | 1.1.5.3.1.2.2. | Develop ORV management plans where ORVs are allowed | Periodic | FWS, FWC, NPS, FDEP, WMD, FDOF, counties, local governments | 10 | 10 | 10 | 10 | 10 | |
| 3 | 1.1.5.3.1.2.3. | Enforce regulations and statutes regarding discharge of firearms, explosive devices, or other loud noise sources | Continuous | FWS, FWC, NPS, FDEP, WMD, FDOF, counties, local governments | 1 | 1 | 1 | 1 | 1 | Cost included in standard operating budgets of agencies. |

| Florida Panther Recovery Plan Implementation Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| 3 | 1.1.5.3.1.3.1. | Post and maintain regulatory and informational signs | Continuous | FWS, FWC, NPS, FDEP, WMD, FDOF, counties, local governments | 15 | 15 | 15 | 15 | 15 | |
| 2 | 1.1.5.3.1.3.2. | Enforce existing laws and regulations | Continuous | FWS, FWC, NPS, FDEP, WMD, FDOF, counties, local governments | | | | | | Cost included in standard operating budgets of agencies. |
| 2 | 1.1.5.3.2. | Enforce existing Federal and State laws and regulations to minimize and prevent illegal killing | Continuous | FWS, FWC, NPS, FDEP, WMD, FDOF | | | | | | Cost included in standard operating budgets of agencies. |
| 2 | 1.1.5.3.3.1.1. | Convene a working group to prioritize and address actions needed in panther-vehicle collision areas | 2-3 years | FWS, FWC, NPS, FDOT, counties, NGO, private | | | | | | Cost included in standard operating budgets of agencies and groups. |
| 2 | 1.1.5.3.3.1.2. | Secure funding for and install wildlife crossings and fencing in high risk areas | Continuous | FDOT*, FWS, FWC, NPS, counties, NGO, FHwA, private | | | | | | Costs will be site-specific. |
| 2 | 1.1.5.3.3.1.3. | Evaluate and implement other mechanisms to prevent mortalities on roads | Continuous | FWC*, FDOT, FWS, NPS, FHwA, counties, NGO, private | | | | | | Cost depends on mechanism and site. |
| 2 | 1.1.5.3.3.2. | Build mechanisms into permits for road projects to provide for adaptive management for panther mortality and / or other unforeseen problems | Continuous | FWC*, FWS, FDOT, COE, FHwA | | | | | | Cost included in standard operating budgets of agencies. |
| 2 | 1.1.5.3.3.3. | Develop new strategies to | Continuous | FDOT, FWS, | | | | | | Cost depends upon |

| Florida Panther Recovery Plan Implementation Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| | | prevent road mortalities or injuries | | FWC, NPS, counties, NGO, private | | | | | | technology. |
| 3 | 1.1.5.3.3.4. | Enforce existing speed zones, monitor effectiveness, and modify as needed | Continuous | FHP, counties, FWC, FWS, NPS | | | | | | Cost included in standard operating budgets of agencies. |
| 3 | 1.1.5.3.4.1. | Provide adequate resources and facilities for rehabilitation of panthers that might be injured or orphaned during capture and monitoring efforts | Continuous | FWS, FWC, NPS, NGO, private | | | | | | Cost depends in part upon individual operating costs for each facility. |
| 3 | 1.1.5.3.4.2. | Develop, implement, review, and revise protocols (i.e., research, monitoring, capture, handling) as needed to minimize risks to panthers | Continuous | FWC*, NPS, FWS | | | | | | Cost included in standard operating budgets of agencies. |
| *Diseases and Parasites* | | | | | | | | | | |
| 3 | 1.1.5.4.1.1. | Continuously evaluate the value of specific vaccinations and review all vaccination protocols annually | Continuous | FWC*, NPS, FWS | | | | | | Cost included in standard operating budgets of agencies. |
| 1 | 1.1.5.4.1.2. | Revise vaccination protocols as appropriate considering new disease threats as they arise | As needed | FWC*, NPS, FWS | | | | | | Cost depends on threat, included in standard operating budgets of agencies. |
| 1 | 1.1.5.4.2.1. | Collect appropriate tissue and blood samples from all panthers handled, both live and dead, and analyze them for the presence of priority | Continuous | FWC*, NPS, FWS | 60 | 60 | 60 | 60 | 60 | |

| | | | | | Estimated Fiscal Year Costs ($000s) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Priority** | **Action Number** | **Recovery Action Description** | **Action Duration** | **Participants** | **FY1** | **FY2** | **FY3** | **FY4** | **FY5** | **Comments** |
| | | diseases and parasites | | | | | | | | |
| 2 | 1.1.5.4.2.2. | Evaluate the disease threats presented by other species including bobcats and domestic cats and identify any needed management intervention | 3 years | FWC, NPS, FWS, USGS, universities | 60 | 60 | 60 | | | |
| 1 | 1.1.5.4.2.3. | Implement appropriate management strategies for disease and parasite monitoring and control | As needed | FWC, NPS, FWS | | | | | | Case-specific costs. |
| | *Environmental Contaminants* | | | | | | | | | |
| 3 | 1.1.5.5.1. | Produce a summary report and database of contaminants in panthers and their environment in south Florida | 2 years | FWS, FWC, EPA, FDEP, universities | 30 | 30 | | | | |
| 2 | 1.1.5.5.2. | Continue to monitor contaminants, especially mercury and endocrine disruptors, in panthers and their prey | Continuous | FWC, NPS, FWS | | | | | | Cost included in standard operating budgets of agencies. |
| 2 | 1.1.5.5.3. | Implement actions necessary to remediate contaminants in high risk areas | As needed | EPA, FDEP, FWS, NPS, COE, FWC, FDACS, FDOF, FDOT, counties, local governments | | | | | | Cost will be site-specific. |
| | *Prey Base* | | | | | | | | | |
| 2 | 1.1.5.6.1.1. | Assess and monitor the status of deer populations in panther habitat | Continuous | FWC, FWS, NPS, FWS, Tribes, FDOF, FDEP, WMD | 70 | 70 | 70 | 70 | 70 | |

The table title: **Florida Panther Recovery Plan Implementation Schedule**

| Florida Panther Recovery Plan Implementation Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| 3 | 1.1.5.6.1.2. | Develop deer harvest regulations that do not compromise the panther prey base and take into consideration food requirements of the panther | Continuous | FWC, NPS, FWS, Tribes, FDOF, FDEP, WMD | 5 | 5 | 5 | 5 | 5 | |
| 2 | 1.1.5.6.1.3. | Continue to monitor the impacts on panthers of hunting on public and private lands in panther habitat | Continuous | FWC*, NPS, FWS, Tribes, FDOF, FDEP, WMD | 5 | 5 | 5 | 5 | 5 | |
| 2 | 1.1.5.6.2. | Encourage management / control of feral hog populations that does not threaten the panther | Continuous | FWC, NPS, FWS, Tribes, FDOF, WMD | 20 | 20 | 20 | | | Costs to be determined for remaining years. |
| 3 | 1.1.5.6.3.1. | Continue statewide monitoring for chronic wasting disease and other emerging wildlife and domestic animal diseases and implement available eradication or control methods | Continuous | FWC, FWS, NPS, USDA, FDACS | 117 | 117 | 117 | 117 | 117 | |
| 3 | 1.1.5.6.3.2. | Identify, map, and appropriately monitor and regulate exotic animal operations that could serve as a source of infection for wild populations | Continuous | FWC, USDA, FDACS, FWS | 75 | 75 | 75 | 75 | 75 | |
| 3 | 1.1.5.6.3.3. | Coordinate with the southeastern States to review protocols and regulations that require imported ungulates to be | Continuous | FWS, USDA, State agencies | 2 | 2 | 2 | 2 | 2 | |

| Priority | Action Number | Recovery Action Description | Action Duration | Participants | FY1 | FY2 | FY3 | FY4 | FY5 | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| **Florida Panther Recovery Plan Implementation Schedule** |||||||||||
| | | | | | \multicolumn{5}{}{**Estimated Fiscal Year Costs ($000s)**} || | |
| | | disease-free | | | | | | | | |
| *Captive Management* |||||||||||
| 2 | 1.1.5.7.1. | Develop guidance for the removal of panthers from the wild | 1-2 years | FWC, FWS, NPS, NGO, universities | 10 | 10 | | | | |
| 3 | 1.1.5.7.2. | Evaluate the need for and establish, if necessary, a captive breeding program | As needed / Continuous | FWS, FWC, NPS, private | | | | | | Costs to be determined. |
| 3 | 1.1.5.7.3. | Evaluate the role of alternative breeding strategies | As needed / Continuous | FWS, FWC, NPS, private | | | | | | Cost included in item 1.1.7.7.4.2. |
| 3 | 1.1.5.7.4.1. | Form a captive management working group | < 1 yr | FWS, FWC, NPS, private | | | | | | Cost included in standard operating budgets of agencies. |
| 3 | 1.1.5.7.4.2. | Develop a captive management plan | 1-2 years | FWS, FWC, NPS, private | 10 | 10 | | | | |
| 3 | 1.1.5.7.4.3. | Implement the captive management plan | As needed / Continuous | FWS, FWC, NPS, private | | | | | | Costs to be determined. |
| 3 | 1.1.5.7.5. | Establish research priorities for captive panthers which can be applied to management of the free-ranging population | 1 year | FWS, FWC, NPS, private | | | | | | Cost included in item 1.1.7.7.4.2. |
| 3 | 1.1.5.7.6. | Incorporate interpretative education at public facilities where captive panthers are held and prepare public information materials | 2 years | NGO*, Private, FWS, FWC, NPS, universities | 30 | 30 | | | | |
| *Expansion into South-Central Florida* |||||||||||
| *Feasibility and Habitat Identification* |||||||||||
| 2 | 1.2.1. | Continue to evaluate the potential for habitat in south-central Florida to | 1 year | FWS, USGS, universities | 50 | | | | | |

| Florida Panther Recovery Plan Implementation Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| | | support a breeding population | | | | | | | | |
| *Facilitating Natural Population Expansion* | | | | | | | | | | |
| 2 | 1.2.2. | If there is potential for habitat in south-central Florida to support a breeding population, determine if there are management steps that can be taken to facilitate natural expansion of female panthers into south-central Florida | 1 year | FWC, FWS | | | | | | Cost included in standard operating budgets of agencies. |
| *Translocation* | | | | | | | | | | |
| 3 | 1.2.3. | If natural expansion of female panthers into south-central Florida is not likely, evaluate the feasibility of translocation to establish a breeding population, including an EA or EIS under the NEPA process if necessary | 3-5 years | FWS, FWC, NPS | | | | | | Cost included in standard operating budgets of agencies. |
| 3 | 1.2.4. | If natural expansion is not likely, develop an expansion plan to guide translocation into south-central Florida | 1 year | FWS, FWC, NPS | | | | | | Cost included in standard operating budgets of agencies. |
| *Suitable Habitat* | | | | | | | | | | |
| 2 | 1.2.5.1. | Secure a dispersal area north of Caloosahatchee River that maintains connection with habitat south of river | 5 years | FWS, FWC, WMD, FDEP, FDOF, counties, private | | | | | | Costs will be site-specific. |

| | | | | | Estimated Fiscal Year Costs ($000s) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **Florida Panther Recovery Plan Implementation Schedule** | | | | | | | | |
| **Priority** | **Action Number** | **Recovery Action Description** | **Action Duration** | **Participants** | **FY1** | **FY2** | **FY3** | **FY4** | **FY5** | **Comments** |
| 3 | 1.2.5.2. | Conserve lands buffering the Caloosahatchee River | Continuous | FWS, FWC, WMD, FDEP, FDOF, NGO, counties, private | | | | | | Cost included in standard operating budgets of agencies. |
| 3 | 1.2.5.3. | If establishment of a breeding population in south-central Florida is feasible, provide for the conservation and enhancement of other lands necessary for persistence of a population in south-central Florida | Continuous | FWS, FWC, WMD, FDEP, FDOF, NGO, counties, private | | | | | | Costs will be site-specific. |
| 3 | 1.2.6.1. | If the population is expanded into south-central Florida, implement appropriate actions in Section 1.1 | Continuous | FWS, FWC, WMD, FDEP, FDOF, counties, private | | | | | | Costs dependent upon actions needed. |
| **Reintroduction** | | | | | | | | | | |
| *Select Reintroduction Sites* | | | | | | | | | | |
| 2 | 2.1.1. | In cooperation / coordination with the southeastern States select potential reintroduction areas to be evaluated | 1-2 years | FWS, State agencies, USFS | | | | | | Cost included in standard operating budgets of agencies. |
| 2 | 2.1.2. | Develop and conduct preliminary public scoping to allow effective preplanning of the NEPA process | 1-2 years | FWS, State agencies, USGS, USFS, universities | 50 | 50 | | | | |
| 3 | 2.1.3. | Identify State and Federal laws, regulations, or policies that could conflict | 1-2 years | FWS*, State agencies, USGS, USFS, | | | | | | Cost included in standard operating budgets of agencies. |

| Florida Panther Recovery Plan Implementation Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| | | with reintroduction and resolve any potential conflicts | | universities | | | | | | |
| 3 | 2.1.4. | Conduct field surveys of selected reintroduction areas | 3 years | FWS*, State agencies, USGS, USFS, universities | 100 | 100 | 100 | | | |
| 3 | 2.1.5. | Determine if puma are present in selected reintroduction areas | 1-2 years | FWS*, State agencies, USGS, USFS, universities | 40 | 40 | | | | |
| 3 | 2.1.6. | Evaluate possible disease and parasite problems in selected reintroduction areas prior to releasing panthers | 1-2 years | FWS*, State agencies, USGS, USFS, universities | 30 | 30 | | | | |
| 3 | 2.1.7. | Consider contaminant issues when evaluating selected reintroduction areas | 1-2 years | FWS*, State agencies, USGS, USFS universities, EPA | 30 | 30 | | | | |
| 2 | 2.1.8.1. | Coordinate with the southeastern States, stakeholders, and the public for reintroduction site selection | 2 years | FWS*, state agencies and local governments, USDA, USFS, universities, private, NGO | | | | | | Cost included in standard operating budgets of agencies. |
| 3 | 2.1.8.2. | Collect, compare, and analyze sociopolitical data | 2 years | FWS*, State agencies and local governments, USGS, USFS, universities, | 50 | 50 | | | | |

| Florida Panther Recovery Plan Implementation Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| | | | | NGO | | | | | | |
| 3 | 2.1.8.3. | Using the information obtained in 2.1.8.1 and 2.1.8.2. use the NEPA process to develop and refine appropriate reintroduction alternatives and recommend the preferred alternative | 1-2 years | FWS*, State agencies, USFS, NGO | | | | | | Cost included in standard operating budgets of agencies. |
| *Reintroduce Panthers into Suitable Sites* | | | | | | | | | | |
| | *Source of Panthers for Reintroduction* | | | | | | | | | |
| 2 | 2.2.1. | Determine the number of panthers from each age and sex class that are needed for a reintroduction program | 1 year | FWS*, FWC, State agencies and local governments, USGS, NPS universities | 30 | | | | | |
| 2 | 2.2.2.1. | Select individual panthers that could be removed for reintroduction without negatively affecting the persistence of the existing population | 1 year | FWS, FWC, NPS, USGS, universities | | | | | | Cost included in standard operating budgets of agencies. |
| 3 | 2.2.2.2. | Develop a protocol for translocation of panthers from the wild | 1 year | FWS*, FWC, NPS, USGS, universities | | | | | | Cost included in standard operating budgets of agencies. |
| 3 | 2.2.3. | Evaluate the need for and establish, if necessary, a captive breeding program | 1-2 years | FWS, FWC, NPS, private | | | | | | Cost for evaluation included in standard operating budgets of agencies. Costs for establishment to be determined. |
| 3 | 2.2.4. | Evaluate the role of | 1 year | FWS, FWC, | | | | | | Cost included in standard |

| Florida Panther Recovery Plan Implementation Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| | | alternative breeding strategies and / or source populations | | NPS, private | | | | | | operating budgets of agencies. |
| *Reintroduction Incentives* | | | | | | | | | | |
| 2 | 2.2.5.1. | Identify and provide incentives to Federal, State, and local governments   and agencies to participate in reintroduction | 1-2 years | FWS, State agencies, local governments, county, USFS | | | | | | Cost included in standard operating budgets of agencies. |
| 3 | 2.2.5.2. | Address the legal liability issues for State participation in a reintroduction program | 1 year | FWS, State agencies | | | | | | Cost dependent on solution. |
| 3 | 2.2.5.3. | Provide resources to assist with reintroduction | Continuous | FWS,  State agencies, NGO, private | | | | | | State / site-specific costs. |
| *Human Dimensions of Reintroduction* | | | | | | | | | | |
| 3 | 2.2.6.1. | Develop and implement a protocol and response plan for handling human-panther interactions | Continuous | FWS,  State agencies, NGO, USFS, NPS | 7 | 7 | 7 | 7 | 7 | |
| 3 | 2.2.6.2. | Evaluate the need for and, if appropriate, designate experimental nonessential populations | 1-2 years | FWS | | | | | | Cost included in standard operating budget of agency. |
| 3 | 2.2.6.3.1. | Develop and distribute a landowner, land manager, and lessees panther handbook | 2 years | FWS, State agencies, NGO, USDA, private, USFS, NPS | 10 | 20 | | | | |
| 3 | 2.2.6.3.2. | Provide assistance to landowners, land managers, and lessees to identify and address potential conflicts on their property | Continuous | FWS, State agencies, NGO, NRCS, private | | | | | | Cost included in standard operating budgets of agencies. |

| | | | | | Florida Panther Recovery Plan Implementation Schedule | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| 3 | 2.2.6.3.3. | Develop, fund, and implement a compensation program | Continuous | FWS, State agencies, NGO, USDA, private | | | | | | State / site-specific costs. |
| 3 | 2.2.6.4.1. | Understand hunting pressure and methods in potential reintroduction areas to identify possible conflicts, including a real or perceived decline in deer populations | 2 years | FWS, State agencies, NGO, private | 5 | 5 | | | | |
| 3 | 2.2.6.4.2. | Partner with hunters and hunting lease holders, including timber companies, to address panther, hunter, and prey issues | Continuous | FWS, State agencies, NGO, USDA, private | | | | | | State / site-specific costs. |
| | *Release of Panthers* | | | | | | | | | |
| 1 | 2.2.7. | Develop a protocol and release panthers into selected reintroduction sites | Continuous / As needed | FWS, State agencies, NGO, private, USGS, universities | | | | | | State / site-specific costs. |
| | *Monitoring Reintroduced Panthers* | | | | | | | | | |
| 3 | 2.2.8. | Develop and implement monitoring plans for the selected reintroduction areas | Continuous | FWS, State agencies, USGS, USFS universities | 100 | 100 | 100 | 100 | 100 | |
| 3 | 2.2.9.1. | Enforce existing Federal and State laws and regulations regarding illegal killing | Continuous | FWS, State agencies, USFS | | | | | | Cost included in standard operating budgets of agencies. |
| 3 | 2.2.9.2. | Extend ESA "similarity of appearance" protection to puma in applicable portions of the historic range prior to | 2 years | FWS | | | | | | Cost included in standard operating budget of agency. |

| Florida Panther Recovery Plan Implementation Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| | | reintroduction | | | | | | | | |
| 3 | 2.2.9.3. | Implement a toll free telephone tip number in reintroduction areas | Continuous | FWS, State agencies | 2 | 2 | 2 | 2 | 2 | |
| *Actions Once Populations Are Established* | | | | | | | | | | |
| 3 | 2.3. | As additional populations are established, implement appropriate actions in Section 1 | As needed | | | | | | | Duration, participants, and costs depend on actions as well as State / site selection. |
| **Public Awareness and Education** | | | | | | | | | | |
| *Design and Develop Materials and Programs* | | | | | | | | | | |
| *Education Working Group* | | | | | | | | | | |
| 2 | 3.1.1. | Form a working group to design and develop education and outreach materials and programs | Continuous | FWS*, FWC, NPS, USDA, NRCS, FDEP, FDOF, WMD, State agencies, NGO | 10 | 10 | 10 | 10 | 10 | |
| *Social Science Research* | | | | | | | | | | |
| 2 | 3.1.2.1. | Identify target audiences, content, strategic messages, and methods of getting the message out using social science research | 1 year | FWS, FWC, NPS, USFS, NRCS, FDOF, WMD, State agencies, NGO | 30 | | | | | |
| *Production of Materials and Programs* | | | | | | | | | | |
| *Natural History, Recovery, and Reduction of Threats to Panthers* | | | | | | | | | | |
| 3 | 3.1.3.1. | Produce information on natural history, place in the ecosystem, panther facts, benefits of recovery, and ways to reduce threats to panthers and their habitat | Continuous | FWS, FWC, FDEP, NPS, NRCS, FDOF, USFS, WMD, NGO, State agencies, counties, local governments, | 50 | 50 | 50 | 50 | 50 | |

| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| **Florida Panther Recovery Plan Implementation Schedule** | | | | | | | | | | |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| | | | | universities, private | | | | | | |
| *Habitat Conservation and Management* | | | | | | | | | | |
| 3 | 3.1.3.2.1. | Compile information and produce materials and programs on landowner incentives | Continuous | FWS, FWC, FDEP, NPS, NRCS, FDOF, USFS, WMD, NGO, State agencies, counties, local governments, universities, private | 10 | 10 | 10 | 10 | 10 | |
| 3 | 3.1.3.2.2. | Identify ecotourism values and economic incentives related to panthers and develop materials for ecotourism programs | 1-2 years | FWS, State agencies, NGO, private, universities | 25 | | | | | |
| 3 | 3.1.3.2.3. | Compile information on land management techniques | 1-2 years | FWS, FWC, NRCS, FDEP, FDOF, WMD, NGO | 30 | 30 | | | | |
| 3 | 3.1.3.2.4. | Develop a panther habitat management handbook for public and private land managers based on the best management practices | 1-2 years | FWS, FWC, NRCS, FDEP, FDOF, WMD, NGO | | | | | | Costs included in 3.1.3.2.3. |
| *South Florida Population* | | | | | | | | | | |
| 3 | 3.1.3.3.1. | Develop materials to inform the public and decision makers about methods for reducing panther-vehicle collisions | Continuous | FWS, FWC, NPS, USDA, NRCS, FDOF, WMD, State agencies, NGO | | | | | | Costs included in 3.1.3.1. |
| *Human / Panther Interactions* | | | | | | | | | | |

| | | | | | Estimated Fiscal Year Costs ($000s) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | FY1 | FY2 | FY3 | FY4 | FY5 | Comments |
| 3 | 3.1.3.4.1. | Develop educational material to address human social issues related to panther conservation and recovery | Continuous | FWS, FWC, FDEP, NPS, NRCS, FDOF, USFS, WMD, NGO, State agencies, counties, local governments, universities, private | 20 | 20 | 20 | 20 | 20 | |
| 2 | 3.1.3.4.2. | Develop a Living With Panthers outreach program | 1 year | FWS, FWC, NPS, Tribes, NRCS, NGO, State agencies | 15 | | | | | |
| 3 | 3.1.3.4.3. | Develop materials and programs to address hunting concerns, such as a real or perceived decline in the deer population | 2-3 years | FWS, FWC, NPS, USGS, universities, State agencies, NGO | 10 | 10 | 10 | | | |
| 3 | 3.1.3.4.4. | Include panther conservation issues in ORV educational materials | Continuous | FWS, FWC, NPS, USFS, NRCS, FDOF, WMD, State agencies, NGO | 1 | 1 | 1 | 1 | 1 | |
| | | *Population Expansion and Reintroduction* | | | | | | | | |
| 2 | 3.1.3.5.1. | Examine sociological information, such as public attitudes in and around reintroduction sites | 2-3 years | FWS, USGS, universities, State agencies, NGO | 30 | 30 | 30 | | | |
| 2 | 3.1.3.5.2. | Develop a media plan | 1 year | FWS, FWC, NPS, Tribes, NGO, State agencies | 100 | | | | | |
| | | *Displays and Programs in Public Environmental Education Centers* | | | | | | | | |

The title row above reads: **Florida Panther Recovery Plan Implementation Schedule**

| | | | | | Estimated Fiscal Year Costs ($000s) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Priority** | **Action Number** | **Recovery Action Description** | **Action Duration** | **Participants** | **FY1** | **FY2** | **FY3** | **FY4** | **FY5** | **Comments** |

**Florida Panther Recovery Plan Implementation Schedule**

| Priority | Action Number | Recovery Action Description | Action Duration | Participants | FY1 | FY2 | FY3 | FY4 | FY5 | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 3.1.3.6. | Design education displays and programs for public environmental education centers, such as zoos and natural history museums | Continuous | FWS, FWC, NPS, Tribes, NGO, State agencies, private | 50 | 5 | 5 | 5 | 5 | |
| | | *Programs and Materials for School Children* | | | | | | | | |
| 3 | 3.1.3.7. | Develop education programs and materials for school children | 1 year | FWS, FWC, NPS, Tribes, NGO, State agencies, private | 100 | | | | | |
| 3 | 3.1.3.8. | Develop materials to promote Florida Panther Day | 1 year | FWC*, NPS, FWS, NGO, State agencies, private | 30 | | | | | |
| *Provide Materials and Programs* | | | | | | | | | | |
| | *Communications Teams* | | | | | | | | | |
| 3 | 3.2.1. | Form communication teams to give presentations to audiences in and adjacent to panther habitat and in selected reintroduction sites | Continuous | FWS, FWC, NPS, USFS, NRCS, FDEP, FDOF, WMD, State agencies, NGO | 5 | 5 | 5 | 5 | 5 | |
| | *Media / Public Relations Training for Agency Personnel* | | | | | | | | | |
| 2 | 3.2.2. | Provide media / public relations training for agency personnel who will be on-the-ground and interfacing with the public (including private landowners) and media | Continuous | NRCS, FWS, FWC, NPS, NRCS, Tribes, NGO, State agencies, private | 5 | 5 | 5 | 5 | 5 | |
| | *Distribute Materials and Provide Programs* | | | | | | | | | |
| 3 | 3.2.3.1. | Distribute information on landowner incentives | Continuous | FWS, FWC, FDEP, NPS, | | | | | | Costs included in 3.2.3.3. |

| Florida Panther Recovery Plan Implementation Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| | | | | NRCS, FDOF, USFS, WMD, NGO, State agencies, counties, local governments, universities, private | | | | | | |
| 3 | 3.2.3.2. | Provide existing ecotourism facilities and the Visit Florida tourism promotion program with updated information on panthers | Continuous | NPS, FWS, FWC, Tribes, private, NGO | 7 | 5 | 5 | 5 | 5 | |
| 2 | 3.2.3.3. | Distribute information on land management techniques and provide technical assistance to public and private land managers regarding techniques to maintain and increase the value of habitat to panthers and their prey | Continuous | FWS, FWC, NRCS, FDEP, FDOF, WMD, NGO | 300 | 300 | 300 | 300 | 300 | |
| 3 | 3.2.3.4. | Inform the public, landowners, and decision makers about the needs and benefits of invasive species control / management and prescribed fire | Continuous | FWS, FWC, NPS, USDA, NRCS, FDEP, counties, NGO, DCA, IFAS, USFS | | | | | | Costs included in standard operating budgets of agencies. |
| 3 | 3.2.3.5. | Distribute information on prey management techniques (including exotic game) on public and private lands | Continuous | FWS, FWC, NPS, USDA, NRCS, FDEP, FDOF, WMD, State agencies, counties, local | | | | | | Costs included in standard operating budgets of agencies.\n\nCosts included in 3.2.3.3. |

| Florida Panther Recovery Plan Implementation Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Priority** | **Action Number** | **Recovery Action Description** | **Action Duration** | **Participants** | **Estimated Fiscal Year Costs ($000s)** | | | | | **Comments** |
| | | | | | **FY1** | **FY2** | **FY3** | **FY4** | **FY5** | |
| | | | | governments, NGO | | | | | | |
| 3 | 3.2.3.6. | Distribute materials to promote Florida Panther Day | Continuous | FWC*, NPS, FWS, NGO, State agencies | 10 | 10 | 10 | 10 | 10 | |
| | *South Florida Population* | | | | | | | | | |
| 3 | 3.2.4.1. | Provide information on genetic restoration | Continuous | FWS, FWC, NPS, NGO, private | | | | | | Costs included in 3.1.3.1. |
| 3 | 3.2.4.2. | Provide information on panther conservation issues in ORV educational materials | Continuous | FWS, FWC, NPS, USFS, NRCS, FDOF, WMD, State agencies, NGO | | | | | | Costs included in 3.1.3.1. |
| 3 | 3.2.4.3. | Educate sportsmen groups and the public about the legal consequences of illegal harassment | Continuous | FWS, FWC, NPS, USDA, NRCS, FDOF, WMD, State agencies, NGO | | | | | | Costs included in 3.1.3.1. |
| 3 | 3.2.4.4. | Provide information on panther management, including monitoring | Continuous | FWC, FWS, NPS, USDA, NRCS, FDOF, State agencies, NGO | | | | | | Costs included in 3.1.3.1. |
| | *Human / Panther Interactions* | | | | | | | | | |
| 2 | 3.2.5.1. | Provide education and outreach to residents living in and adjacent to panther habitat | Continuous | FWS, FWC, NPS, USDA, NRCS, FDOF, WMD, State agencies, NGO | 50 | 50 | 50 | 50 | 50 | |
| 3 | 3.2.5.2. | Provide tips for recreating in panther habitat | Continuous | FWS, FWC, NPS, USFS, NRCS, FDEP, FDOF, WMD, | | | | | | Cost included in 3.2.5.1. |

| Florida Panther Recovery Plan Implementation Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Priority | Action Number | Recovery Action Description | Action Duration | Participants | Estimated Fiscal Year Costs ($000s) | | | | | Comments |
| | | | | | FY1 | FY2 | FY3 | FY4 | FY5 | |
| | | | | State agencies, NGO | | | | | | |
| 3 | 3.2.5.3. | Provide information on protecting livestock and pets | Continuous | FWS, FWC, NPS, USFS, NRCS, FDOF, WMD, State agencies, NGO | | | | | | Cost included in 3.2.5.1. |
| 3 | 3.2.5.4. | Provide outreach materials to address hunting concerns | Continuous | FWS, FWC, NPS, USDA, NRCS, FDOF, WMD, State agencies, NGO | | | | | | Cost included in 3.2.5.1. |
| *Population Expansion and Reintroduction* | | | | | | | | | | |
| 2 | 3.2.6.1. | Engage and provide materials to landowners and the public in south-central Florida to build support for restoring and maintaining habitat and for expansion and reintroductions | Continuous | FWS, FWC, NRCS, FDOF, WMD, counties, NGO | | | | | | Costs included in 3.2.3.3. |
| 2 | 3.2.6.2. | Target education at reintroduction sites to address social issues in advance of releasing panthers | Continuous | FWS, State agencies, NRCS, USFS, NGO, private | 50 | 50 | 50 | 50 | 50 | |
| 3 | 3.2.6.3. | Continue education and outreach efforts after panthers are released into a reintroduction site | Continuous | FWS, State agencies, NRCS, USFS, NGO, private | | | | | | Cost included in 3.2.6.2. |
| 3 | 3.2.6.4. | Identify existing ecotourism facilities and State ecotourism boards in or near selected reintroduction sites and provide them with | Continuous | FWS, State agencies, private, NGO | | | | | | Costs included in 3.2.3.2. |

| | | | | | Estimated Fiscal Year Costs ($000s) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Priority** | **Action Number** | **Recovery Action Description** | **Action Duration** | **Participants** | **FY1** | **FY2** | **FY3** | **FY4** | **FY5** | **Comments** |
| | | updated panther information | | | | | | | | |
| | | *Displays and Programs in Public Environmental Education Centers* | | | | | | | | |
| 3 | 3.2.7. | Identify and work with existing environmental education facilities to provide or enhance panther education displays and programs | Continuous | NPS, FWS, FWC, FDEP, Tribes, private, NGO | 50 | 50 | 50 | 50 | 50 | |
| | | *Programs and Materials for School Children* | | | | | | | | |
| 3 | 3.2.8. | Distribute education programs and materials to school children | Continuous | FWS, FWC, NPS, Tribes, NGO, State agencies, private | 20 | 20 | 20 | 20 | 20 | |
| *Evaluation* | | | | | | | | | | |
| 3 | 3.3. | Evaluate outreach and educational materials and programs | Continuous | FWS, FWC, NPS, Tribes, NGO, State agencies | 15 | 15 | 15 | 15 | 15 | |
| 3 | 3.4 | Revise materials where evaluation indicates a need | Continuous | FWS, FWC, NPS, Tribes, NGO, State agencies | 150 | 150 | 150 | 150 | 150 | |

Table title: **Florida Panther Recovery Plan Implementation Schedule**

## VI.  LITERATURE CITED

Ackerman, B. B., F. G. Lindzey, and T. P. Hemker.  1986.  Predictive energetics model for cougars.  Pages 333-352 *in* S. D. Miller and D. D. Everett (eds).  Cats of the world: biology, conservation, and management.  National Wildlife Federation and Caesar Kleberg Wildlife Research Institute, Washington, D. C. and Kingsville, TX.

Adams, B., and J. A. Bozzo.  2002.  Big Cypress National Preserve deer and hog annual report 2001 – 2002.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Anderson, A. E.  1983.  A critical review of literature on puma (*Felis concolor*).  Special Report No. 54. Colorado Division of Wildlife, Fort Collins, CO.

Anderson, C. R. Jr., F. G. Lindzey, D. B. McDonald.  2004.  Genetic structure of cougar populations across the Wyoming Basin: metapopulation or megapopulation.  Journal of Mammalogy 85:1207-1214.

Ballou, J. D., T. J. Foose, R. C. Lacy, and U. S. Seal.  1989.  Florida panther (*Felis concolor coryi*) population viability analysis and recommendations.  Captive Breeding Specialist Group, Species Survival Commission, IUCN, Apple Valley, MN.

Bangs, O.  1899.  The Florida puma.  Proceedings of the Biological Society of Washington 13:15-17.

Barone, M. A., M. E. Roelke, J. Howard, J. L. Brown, A. E. Anderson, and D. E. Wildt.  1994.  Reproductive characteristics of male Florida panthers: comparative studies from Florida, Texas, Colorado, Latin America, and North American Zoos.  Journal of Mammalogy 75:150-162.

Bass, O. L., and D. S. Maehr.  1991.  Do recent panther deaths in Everglades National Park suggest and ephemeral population?  Research & Exploration 7:426-427.

Beier, P.  1993.  Determining minimum habitat areas and habitat corridors for cougars.  Conservation Biology 7:94-108.

Beier, P.  1995.  Dispersal of juvenile cougars in fragmented habitat.  Journal of Wildlife Management 59:228-237.

Beier P., M. R. Vaughan, M. J. Conroy, and H. Quigley.  2003.  An analysis of scientific literature related to the Florida panther.  Final report, Project NG01-105, Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Beier P., M. R. Vaughan, M. J. Conroy, and H. Quigley.  2006.  Evaluating scientific inferences about the Florida panther.  Journal of Wildlife Management 70:236-245.

Beissinger, S., and M. I. Westphal. 1998. On the use of demographic models of population viability in endangered species management. Journal of Wildlife Management 62:821-841.

Belden, R. C. 1986. Florida panther recovery plan implementation - a 1983 progress report. Pages 159-172 *in* S. D. Miller and D. D. Everett (eds). Cats of the world: biology, conservation, and management. National Wildlife Federation and Caesar Kleberg Wildlife Research Institute, Washington, D.C. and Kingsville, TX.

Belden, R. C. 1988. The Florida panther. Pages 515-532 *in* Audubon Wildlife Report 1988/1989. National Audubon Society, New York, NY.

Belden, R. C., and B. W. Hagedorn. 1993. Feasibility of translocating panthers into northern Florida. Journal of Wildlife Management 57:388-397.

Belden, R. C., and R. T. McBride. 1983a. Florida panther surveys – Big Cypress National Preserve. Final report to Hughes and Hughes Oil and Gas Company, Wichita Falls, TX.

Belden, R. C., and R. T. McBride. 1983b. Florida panther surveys – South Florida Indian Reservations. Final report to Natural Resources Management Corporation, Eureka, CA.

Belden, R. C., and R. T. McBride. 2006. Florida panther peripheral areas survey final report 1998-2004. Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Belden, R. C., and J. W. McCown. 1996. Florida panther reintroduction feasibility study. Final Report 7507. Florida Game and Fresh Water Fish Commission, Tallahassee, FL.

Belden, R. C., W. B. Frankenberger, R. T. McBride, and S. T. Schwikert. 1988. Panther habitat use in southern Florida. Journal of Wildlife Management 52:660-663.

Belden, R. C., W. B. Frankenberger, and J. C. Roof. 1991. Florida panther distribution. Final Report 7501, E-1 II-E-1. Florida Game and Fresh Water Fish Commission, Tallahassee, FL.

Berglund, F., and M. Berlin. 1969. Risk of methylmercury cumulation in man and mammals and the relation between body burden of methylmercury and toxic effects. *In* M. W. Miller and G. G. Berg (eds). Chemical fallout. Charles C. Thomas, Springfield, IL.

Boyce, M. S. 1992. Population viability analysis. Annual Review of Ecology and Systematics 23:481-506.

Brown, J. H., and A. Kodric-Brown. 1977. Turnover rates in insular biogeography: effect of immigration on extinction. Ecology 58:445-449.

Burridge, M. J., L. A. Sawyer, and W. J. Bigler. 1986. Rabies in Florida. Florida Department of Health and Rehabilitative Services, Tallahassee, FL.

Carlson, A., and P. Edenhamn.  2000.  Extinction dynamics and the regional persistence of a tree frog metapopulation.  Proceedings for the Royal Society of London Series B-Biological Sciences 267:1311-1313.

Carroll, C., R. F. Noss, P. C. Paquet, and N. H. Schumaker.  2004.  Extinction debt of protected areas in developing landscapes.  Conservation Biology 18:1110-1120.

Clark J. D., D. Huber, and C. Servheen.  2002.  Bear reintroductions:  lessons and challenges.  Ursus 13:335-345.

Comiskey, E. J., L. J. Gross, D. M. Fleming, M. A. Huston, O. L. Bass, Jr., H. Luh, and Y. Wu.  1994.  A spatially-explicit individual-based simulation model for Florida panther and white-tailed deer in the Everglades and Big Cypress landscapes.  Pages 494-503 *in* D. Jordan (ed).  Proceedings of the Florida Panther Conference.  U.S. Fish and Wildlife Service, Gainesville, FL.

Comiskey, E. J., O. L. Bass, Jr., L. J. Gross, R. T. McBride, and R. Salinas.  2002.  Panthers and forests in south Florida: an ecological perspective.  Conservation Ecology 6:18.

Cory, C. B.  1896.  Hunting and fishing in Florida.  Estes and Lauriat, Boston, MA.

Cox, J., R. Kautz, M. MacLaughlin, and T. Gilbert.  1994.  Closing the gaps in Florida's wildlife habitat conservation system.  Florida Game and Fresh Water Fish Commission, Tallahassee, FL.

Cox, J. J., D. S. Maehr, and J. L. Larkin.  2006.  Florida panther habitat use:  New approach to an old problem.  Journal of Wildlife Management 70:1778-1785.

Cramer P. 1995.  The northeast Florida panther education program.  Final report to Florida Advisory Council on Environmental Education.  University of Florida, Gainesville, FL.

Culver, M., W. E. Johnson, J. Pecon-Slattery, and S. J. O'Brien.  2000.  Genomic ancestry of the American puma (*Puma concolor*).  Journal of Heredity 91:186-197.

Cunningham, M. W.  2005.  Epizootiology of feline leukemia virus in the Florida panther.  M.S. Thesis.  University of Florida, Gainesville, FL.

Dalrymple, G. H., and O. L. Bass.  1996.  The diet of the Florida panther in Everglades National Park, Florida.  Bulletin of the Florida Museum of Natural History 39:173-193.

Dees, C. S., J. D. Clark, and F. T. van Manen.  1999.  Florida panther habitat use in response to prescribed fire at Florida Panther National Wildlife Refuge and Big Cypress National Preserve.  Final report to Florida Panther National Wildlife Refuge.  University of Tennessee, Knoxville, TN.

Dees, C. S., J. D. Clark, and F. T. Van Manen. 2001. Florida panther habitat use in response to prescribed fire. Journal of Wildlife Management 65:141-147.

Doak, D. F., P. Kareiva, and B. Klepetka. 1994. Modeling population viability for the desert tortoise in the Western Mojave Desert. Ecological Applications 4:446-460.

Duda, M., and K. Young. 1995. Floridian's knowledge, opinions, and attitudes toward panther habitat and panther-related issues. Florida Advisory Council on Environmental Education, Tallahassee, FL.

Duever, M. J., J. E. Carlson, J. F. Meeder, L. C. Duever, L. H. Gunderson, L. A. Riopelle, T. R. Alexander, R. L. Myers, and D. P. Spangler. 1986. The Big Cypress National Preserve. Research Report 8. National Audubon Society, New York, NY.

Dunbar, M. R. 1995. Florida panther biomedical investigations. Annual performance report. Florida Game and Fresh Water Fish Commission, Tallahassee, FL.

Dunbar, M. R., G. S. McLaughin, D. M. Murphy, and M. W. Cunningham. 1994. Pathogenicity of the hookworm, *Ancylostoma pluridentatum*, in a Florida panther (*Felis concolor coryi*) kitten. Journal of Wildlife Diseases 30:548-551.

Ellis, S., R. C. Lacy, S. Kennedy-Stoskopf, D. E. Wildt, J. Shillcox, O. Byers, and U. S. Seal (eds). 1999. Florida panther population and habitat viability assessment and genetics workshop report. IUCN/SSC Conservation Breeding Specialist Group, Apple Valley, MN.

Ewens, W. J. 1990. The minimum viable population size as a genetic and demographic concept. Pages 307-316 *in* J. Adams, D. A. Lam, A. I. Hermalin, and P. E. Smouse (eds). Convergent issues in genetics and demography. Oxford University Press, New York, NY.

Falconer, D. S. 1989. Introduction to quantitative genetics. Third edition. Longman, NY.

Fieberg, J., and S. P. Ellner. 2000. When is it meaningful to estimate an extinction probability? Ecology 81:2040-2047.

Fleming, M., J. Schortemeyer, and J. Ault. 1994. Distribution, abundance, and demography of white-tailed deer in the Everglades. Pages 247-274 *in* D. Jordan (ed). Proceedings of the Florida Panther Conference. U.S. Fish and Wildlife Service, Gainesville, FL.

Florida Fish and Wildlife Conservation Commission. 2006. Annual report on the research and management of Florida panthers: 2005-2006. Fish and Wildlife Research Institute and Division of Habitat and Species Conservation, Naples, FL.

Forrester, D. J. 1992. Parasites and diseases of wild mammals in Florida. University Press of Florida, Gainesville, FL.

Forrester, D. J., J. A. Conti, and R. C. Belden.  1985.  Parasites of the Florida panther (*Felis concolor coryi*).  Proceedings of the Helminthological Society of Washington 52:95-97.

Frank, K.  2005.  Metapopulation persistence in heterogeneous landscapes:  lessons about the effect of stochasticity.  American Naturalist 165:374-388.

Frankham, R.  1995.  Effective population size / adult population size ratios in wildlife:  a review.  Genetical Research 66:95-107.

Franklin, I. R.  1980.  Evolutionary change in small populations.  Pages 135-149 *in* M. E. Soulé and B. A. Wilcox (eds).  Conservation biology:  an evolutionary-ecological perspective.  Sinauer Associates, Sunderland, MA.

Franklin, I. R., and R. Frankham.  1998.  How large must populations be to retain evolutionary potential?  Animal Conservation 1:69-70.

Frederick, P. C., M. G. Spalding, and R. Dusek.  2002.  Wading birds as bioindicators of mercury contamination in Florida, USA; annual and geographic variation.  Environmental Toxicology and Chemistry 21:163-167.

Gautschi, B., J. P. Muller, B. Schmid, and J. A. Shykoff.  2003.  Effective number of breeders and maintenance of genetic diversity in the captive bearded vulture population.  Heredity 91:9-16.

Gilpin, M. E., and M. E. Soulé.  1986.  Minimum viable populations: Processes of species extinction.  Pages 19-34 *in* M. E. Soulé (ed).  Conservation Biology:  The Science of Scarcity and Diversity.  Sinauer Associates, Inc., Sunderland, MA.

Glass, C. M., R. G. McLean, J. B. Katz, D. S. Maehr, C. B. Cropp, L. J. Kirk, A. J. McKeirnan, and J. F. Evermann.  1994.  Isolation of pseudorabies (Aujeszky's disease) virus from a Florida panther.  Journal of Wildlife Diseases 30:180-184.

Goodman, D.  1987.  Consideration of stochastic demography in the design and management of biological reserves.  Natural Resources Modeling 1:205-234.

Grimm, V., and C. Wissel.  2004.  The intrinsic mean time to extinction:  a unifying approach to analyzing persistence and viability of populations.  Oikos 105:501-511.

Hall, E. R., and K. R. Kelson.  1959.  The mammals of North America.  2 vols.  Ronald Press, New York, NY.

Hamilton, S., and H. Moller.  1995.  Can PVA models using computer packages offer useful conservation advice?  Sooty shearwaters *Puffinus griseus* in New Zealand as a case study.  Biological Conservation 73:107-117.

Hanski, I.  2002.  Metapopulations of animals in highly fragmented landscapes and population viability analysis.  Pages 86-108 *in* S. R. Beissinger and D. R. McCullough (eds). Population Viability Analysis.  University of Chicago Press, Chicago, IL.

Harlow, R. F. 1959.  An evaluation of white-tailed deer habitat in Florida.  Florida Game and Fresh Water Fish Commission Technical Bulletin 5, Tallahassee, FL.

Harlow, R. F., and F. K. Jones.  1965.  The white-tailed deer in Florida. Florida Game and Fresh Water Fish Commission Technical Bulletin 9, Tallahassee, FL.

Harris, L. D.  1984.  The fragmented forest: island biogeography theory and the preservation of biotic diversity.  University of Chicago Press, Chicago, IL.

Harrison, R. L.  1992.  Toward a theory of inter-refuge corridor design.  Conservation Biology 6:293-295.

Hedrick, P. W., R. N. Lee, and C. Buchanan.  2003.  Canine parvovirus enteritis, canine distemper, and major histocompatibility complex genetic variation in Mexican wolves. Journal of Wildlife Diseases 39:909-913.

Hellgren, E. C., D. P. Onorato, and J. R. Skiles.  2005.  Dynamics of a black bear population within a desert metapopulation.  Biological Conservation 122:131-140.

Hollister, N.  1911.  The Louisiana puma.  Proceedings of the Biological Society of Washington 24:175-178.

Horino, S., and S. Miura.  2000.  Population viability analysis of a Japanese black bear population.  Population Ecology 42:37-44.

Jacobson, S. K.  1999.  Case study of public communications for the gray wolf reintroduction to Yellowstone National Park.  Appendix *in* Communication Skills for Conservation Professionals.  Island Press, Washington, DC.

Janis, M. W., and J. D. Clark.  1999.  The effects of recreational deer and hog hunting on the behavior of Florida panthers.  Final report to Big Cypress National Preserve, National Park Service, Ochopee, FL.

Janis, M. W., and J. D. Clark.  2002.  Responses of Florida panthers to recreational deer and hog hunting.  Journal of Wildlife Management 66:839-848.

Jansen, D. K., S. R. Schulze, and A. T. Johnson.  2005.  Florida panther (*Puma concolor coryi*) research and monitoring in Big Cypress National Preserve.  Annual report 2004-2005. National Park Service, Ochopee, FL.

Jordan, D. B.  1991.  Final Supplemental Environmental Assessment – A proposal to establish a captive breeding population of Florida panthers.  U.S. Fish and Wildlife Service, Atlanta, GA.

Jordan, D. B.  1994.  Identification and evaluation of candidate Florida panther population reestablishment sites.  Pages 106-153 *in* D. B. Jordan (ed)  Proceedings of the Florida Panther Conference.  U.S. Fish and Wildlife Service, Gainesville, FL.

Kautz, R. S.  1994.  Historical trends within the range of the Florida panther.  Pages 285-296 *in* D. B. Jordan (ed)  Proceedings of the Florida panther conference.  U.S. Fish and Wildlife Service, Gainesville, FL.

Kautz, R. S., and J. A. Cox.  2001.  Strategic habitats for biodiversity conservation in Florida.  Conservation Biology 15:55-77.

Kautz, R. S., D. T. Gilbert, and G. M. Mauldin.  1993.  Vegetative cover in Florida based on 1985-1989 Landsat Thematic Mapper imagery.  Florida Scientist 56:135-154.

Kautz, R., R. Kawula, T. Hoctor, J. Comiskey, D. Jansen, D. Jennings, J. Kasbohm, F. Mazzotti, R. McBride, L. Richardson, and K. Root.  2006.  How much is enough? Landscape-scale conservation for the Florida panther.  Biological Conservation 130:118-133.

Kautz, R., B. Stys, and R. Kawula.  2007.  Florida vegetation 2003 and land use change between 1985-89 and 2003.  Florida Scientist 70:12-23.

Kelly, M. J., and S. M. Durant.  2000.  Viability of the Serengeti cheetah population.  Conservation Biology 14:786-797.

Kendall, B. E., O. N. Bjornstad, J. Bascompte, T. H. Keitt, and W. F. Fagan.  2000.  Dispersal, environmental correlation, and spatial synchrony in population dynamics.  American Naturalist 155:628-636.

Kerkhoff, A. J., B. T. Milne, and D. S. Maehr.  2000.  Toward a panther-centered view of the forests of south Florida.  Conservation Ecology 4:1.

Kohlmann, S. G., G. A. Schmidt, D. K. Garcelon.  2005.  A population viability analysis for the Island Fox on Santa Catalina Island, California.  Ecological Modelling 183:77-94.

Kramer-Schadt S., E. Revilla, and T. Wiegand.  2005.  Lynx reintroductions in fragmented landscapes of Germany:  projects with a future or misunderstood wildlife conservation?  Biological Conservation 125:169-182.

Labisky, R. F., M. C. Boulay, K. E. Miller, R. A. Sargent, Jr., and J. M. Zultowskil.  1995.  Population ecology of white-tailed deer in Big Cypress National Preserve and Everglades National Park.  Final report to National Park Service, Ochopee, FL.

Land, E. D.  1994.  Response of the wild Florida panther population to removals for captive breeding.  Final Report 7571.  Florida Game and Fresh Water Fish Commission, Tallahassee, FL.

Land, E. D., and R. C. Lacy.  2000.  Introgression level achieved through Florida panther genetic restoration.  Endangered Species Update 17:99-103.

Land, D., and S. K. Taylor.  1998.  Florida panther genetic restoration and management annual report 1997-98.  Florida Game and Fresh Water Fish Commission, Tallahassee, FL.

Land, D., B. Shindle, D. Singler, and S. K. Taylor.  1999.  Florida panther genetic restoration annual report 1998-99.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Land, D., M. Cunningham, R. McBride, D. Shindle, and M. Lotz.  2002.  Florida panther genetic restoration and management annual report 2001-02.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Land, D., D. Shindle, M. Cunningham, M. Lotz, and B. Ferree.  2004.  Florida panther genetic restoration and management annual report 2003-04.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Land, E. D., D. B. Shindle, R. J. Kawula, J. F. Benson, M. A. Lotz, and D. P. Onorato.  In press.  Florida panther habitat selection analysis of concurrent GPS and VHF telemetry data.  Journal of Wildlife Management.

Lande, R.  1988.  Genetics and demography in biological conservation.  Science 241:1455-1460.

Lande, R.  1995.  Mutation and conservation.  Conservation Biology 9:782-791.

Lande, R., and G. F. Barrowclough.  1987.  Effective population size, genetic variation, and their use in population management.  Pages 87-124 *in* M.E. Soulé (ed).  Viable populations for conservation.  Cambridge University Press, MA.

Li, Z., M. Gao, C. Hui, X. Han, and H. Shi.  2005.  Impact of predator pursuit and prey invasion on synchrony and spatial patterns in metapopulation.  Ecological Modelling 185:245-254.

Lindsey, P. A., R. Alexander, J. T. Du Toit, and M. G. L. Mills.  2005.  The cost efficiency of wild dog conservation in South Africa.  Conservation Biology 19:1205-1214.

Linnaeus, C.  1758.  Systema Naturae,  10th edition.  Stockholm, Sweden.

Logan, K. A., L. L. Irwin, and R. Skinner.  1986.  Characteristics of a hunted mountain lion population in Wyoming.  Journal of Wildlife Management 50:648-654.

Logan, K. A., and L. L. Sweanor.  2001.  Desert puma: evolutionary ecology and conservation of an enduring carnivore.  Island Press, Washington.

Logan, T., A. C. Eller, Jr., R. Morrell, D. Ruffner, and J. Sewell.  1993.  Florida panther habitat preservation plan: south Florida population.  Florida Panther Interagency Committee, U.S. Fish and Wildlife Service, Gainesville, FL.

Lotz, M., D. Land, M. Cunningham, and B. Ferree.  2005.  Florida panther annual report 2004-05.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Lubow, B. C.  1996.  Optimal translocation strategies for enhancing stochastic metapopulation viability.  Ecological Applications 6:1268-1280.

Maehr, D. S.  1990a.  Florida panther movements, social organization, and habitat utilization. Final Performance Report 7502.  Florida Game and Fresh Water Fish Commission, Tallahassee, FL.

Maehr, D. S.  1990b.  The Florida panther and private lands.  Conservation Biology 4:167-170.

Maehr, D. S.  1992.  Florida panther.  Pages 176-189 *in* S.R. Humphrey (ed).  Rare and endangered biota of Florida. Volume I: mammals.  University Press of Florida, Gainesville, FL.

Maehr, D. S.  1997a.  The comparative ecology of bobcat, black bear, and Florida panther in south Florida.  Bulletin of the Florida Museum of Natural History 40:1-176.

Maehr, D. S.  1997b.  The Florida panther:  Life and death of a vanishing carnivore.  Island Press, Washington, D.C.

Maehr, D. S., J. C. Roof, E. D. Land, and J. W. McCown.  1989a.  First reproduction of a panther (*Felis concolor coryi*) in southwestern Florida, U.S.A.  Mammalia 53: 129-131.

Maehr, D. S., J. C. Roof, E. D. Land, J. W. McCown, R. C. Belden, and W. B. Frankenberger. 1989b.  Fates of wild hogs released into occupied Florida panther home ranges.  Florida Field Naturalist 17:42-43.

Maehr, D. S., E. D. Land, J. C. Roof, and J. W. McCown.  1990a.  Day beds, natal dens, and activity of Florida panthers.  Proceedings of Annual Conference of Southeastern Fish and Wildlife Agencies 44:310-318.

Maehr, D. S., R. C. Belden, E. D. Land, and L. Wilkins.  1990b.  Food habits of panthers in southwest Florida.  Journal of Wildlife Management 54:420-423.

Maehr, D. S., E. D. Land, and J. C. Roof.  1991a.  Social ecology of Florida panthers.  National Geographic Research & Exploration 7:414-431.

Maehr, D. S., E. D. Land, and M. E. Roelke.  1991b.  Mortality patterns of panthers in southwest Florida.  Proceedings of Annual Conference of Southeastern Fish and Wildlife Agencies 45:201-207.

Maehr, D. S., E. C. Greiner, J. E. Lanier, and D. Murphy.  1995.  Notoedric mange in the Florida panther (*Felis concolor coryi*).  Journal of Wildlife Diseases 31:251-254.

Maehr, D. S., E. D. Land, D. B. Shindle, O. L. Bass, and T. S. Hoctor.  2002a.  Florida panther dispersal and conservation.  Biological Conservation 106:187-197.

Maehr, D. S., R. C. Lacy, E. D. Land, O. L. Bass, Jr., and T. S. Hoctor.  2002b.  Evolution of population viability assessments for the Florida panther:  a multi-perspective approach.  Pages 284-311 *in* S. R. Beissinger and D. R. McCullough (eds).  Population Viability Analysis.  University of Chicago Press, Chicago, IL.

Margan, S. H., R. K. Nurthen, M. E. Montgomery, L. M. Woodworth, E. H. Lowe, D. A. Briscoe, and R. Frankham.  1998.  Single large or several small? Population fragmentation in the captive management of endangered species.  Zoo Biology 17:467-480.

McBride, R. T.  1985.  Population status of the Florida panther in Everglades National Park and Big Cypress National Preserve.  Report to National Park Service in fulfillment of Contract #RFP 5280-84 04, Homestead, FL.

McBride, R. T.  2000.  Current panther distribution and habitat use: a review of field notes, fall 1999-winter 2000.  Report to Florida Panther Subteam of MERIT, U.S. Fish and Wildlife Service, Vero Beach, FL.

McBride, R. T.  2001.  Current panther distribution, population trends, and habitat use: report of field work: fall 2000-winter 2001.  Report to Florida Panther Subteam of MERIT, U.S. Fish and Wildlife Service, Vero Beach, FL.

McBride, R. T.  2002.  Current panther distribution and conservation implications -- highlights of field work:  fall 2001 -- winter 2002.  Report to Florida Panther Subteam of MERIT, U.S. Fish and Wildlife Service, Vero Beach, FL.

McBride, R. T.  2003.  The documented panther population (DPP) and its current distribution from July 1, 2002 to June 30, 2003.  Appendix IV *in* D. Shindle, M. Cunningham, D. Land, R. McBride, M. Lotz, and B. Ferree.  Florida panther genetic restoration and management.  Annual report 93112503002.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

McBride, R. T., R. M. McBride, J. L. Cashman, and D. S. Maehr.  1993.  Do mountain lions exist in Arkansas?  Proceedings Annual Conference Southeastern Fish and Wildlife Agencies 47:394-402.

McCarthy, M. A., C. J. Thompson, and H. P. Possingham.  2005.  Theory for designing nature reserves for single species.  American Naturalist 165:250-257.

McCown, J. W.  1994.  Big Cypress deer/panther relationships: deer herd health and reproduction.  Pages 197-217 *in* D. B. Jordan (ed).  Proceedings of the Florida Panther Conference. U.S. Fish and Wildlife Service, Gainesville, FL.

Miller, K. E.  1993.  Habitat use by white-tailed deer in the Everglades: tree islands in a seasonally flooded landscape.  M.S. Thesis.  University of Florida, Gainesville, FL.

Mills, L. S., and F. W. Allendorf.  1996.  The one-migrant-per-generation rule in conservation and management.  Conservation Biology 10:1509-1518.

Mooring, M. S., T. A. Fitzpatrick, T. T. Nishihira, and D. D. Reisig.  2004.  Vigilance, predation risk, and the Allee effect in desert bighorn sheep.  Journal of Wildlife Management 68:519-532.

Morris, W. F., and D. F. Doak.  2002.  Quantitative conservation biology:  Theory and practice of population viability analysis.  Sinauer Associates, Sunderland, MA.

Murphy, F. A., E. P. J. Gibbs, M. C. Horzinek, and M. J. Studdert.  1999.  Veterinary virology. Academic Press, New York, NY.

Musiani, M., and P. C. Paquet.  2004.  The practice of wolf persecution, protection, and restoration in Canada and the United States.  BioScience 54:50-60.

National Marine Fisheries Service.  2004.  Interim endangered and threatened species recovery planning guidance.  Silver Springs, MD.

Nelson, E. W., and E. A. Goldman.  1929.  List of the pumas with three described as new. Journal of Mammalogy 10:345-350.

Newman, J., E. Zillioux, E. Rich, L. Liang, and C. Newman.  2004.  Historical and other patterns of monomethyl and inorganic mercury in the Florida panther (*Puma concolor coryi*). Archives of Environmental Contaminants and Toxicology 48:75-80.

Newmark, W. D.  1987.  A land-bridge island perspective on mammalian extinctions in western North American parks.  Nature 325:430-432.

Noss, R. F.  1987.  Corridors in real landscapes:  a reply to Simberloff and Cox.  Conservation Biology 1:159-164.

Noss, R. F.  1992.  The wildlands project land conservation strategy.  Wild Earth (Special Issue):10-25.

Noss, R. F., and A.Y. Cooperrider.  1994.  Saving Nature's Legacy:  Protecting and Restoring Biodiversity.  Island Press, Washington, D.C.

Nowak, R. M., and R. T. McBride.  1974.  Status survey of the Florida panther.  Project 973. World Wildlife Fund Yearbook 1973-74:237-242.

Nowak, R. M., and R. T. McBride.  1975.  Status of the Florida panther.  Project 973.  World Wildlife Fund Yearbook 1974-75:245-46.

Nowak, R. M., and J. L. Paradiso.  1983.  Walker's mammals of the world, Volume II.  John Hopkins University Press, Baltimore, MD.

Nowell, K., and P. Jackson.  1996.  Status survey and conservation action plan:  Wild cats. International Union for Conservation of Nature and Natural Resources. Burlington Press, Cambridge, U.K.

Nunney, L.  1993.  The influence of mating system and overlapping generations on effective population size.  Evolution 47:1329-1341.

Nunney, L., and D. R. Elam.  1994.  Estimating the effective population size of conserved populations.  Conservation Biology 8:175-184.

O'Brien, S. J.  1996a.  Molecular genetics and phylogenetics of the Felidae.  Pages xxiii-xxiv in K. Nowell and P. Jackson.  Status survey and conservation action plan:  Wild cats. International Union for Conservation of Nature and Natural Resources.  Burlington Press, Cambridge, U.K.

O'Brien, S. J.  1996b.  Subspecies identification incorporating molecular genetics.  Pages 210-211 in K. Nowell and P. Jackson.  Status survey and conservation action plan:  Wild cats. International Union for Conservation of Nature and Natural Resources.  Burlington Press, Cambridge, U.K.

O'Brien, S. J., and E. Mayr.  1991.  Bureaucratic mischief:  Recognizing endangered species and subspecies.  Science 251:1187-1188.

O'Brien, S. J., M. E. Roelke, N. Yuhki, K. W. Richards, W. E. Johnson, W. L. Franklin, A. E. Anderson, O. L. Bass, R. C. Belden, and J. S. Martin.  1990.  Genetic introgression within the Florida panther *Felis concolor coryi*.  National Geographic Research 6:485-494.

Olmstead, R. A., R. Langley, M. E. Roelke, R. M. Goeken, D. Adger-Johnson, J. P. Goff, J. P. Albert, C. Packer, M. K. Laurenson, T. M. Caro, L. Scheepers, D. E. Wildt, M. Bush, J. S. Martenson, and S. J. O'Brien.  1992.  Worldwide prevalence of lentivirus infection in wild feline species: epidemiologic and phylogenetic aspects.  Journal of Virology 66:6008-6018.

Parysow, P., and D. J. Tazik.  2002.  Assessing the effect of estimation error on population viability analysis:  an example using the black-capped vireo.  Ecological Modelling 155:217-229.

Pimm, S. L., L. Dollar, and O. L. Bass Jr.  2006a.  The genetic rescue of the Florida panther. Animal Conservation 9:115-122.

Pimm, S. L., O. L. Bass Jr., and L. Dollar.  2006b  Ockham and Garp.  Reply to Maehr et al.'s (2006) response to Pimm et al. (2006).  Animal Conservation 9:133-134.

Pulliam, H. R., J. B. Dunning, and J. Liu.  1992.  Population dynamics in complex landscapes:  a case study.  Ecological Applications 2:165-177.

Ralls, K., and J. D. Ballou.  2004.  Genetic status and management of California condors. Condor 106:215-228.

Reed, D. H.  2004.  Extinction risk in fragmented habitats.  Animal Conservation 7:181-191.

Reed, D. H., and E. H. Bryant.  2000.  Experimental tests of minimum viable population size. Animal Conservation 3:7-14.

Reed, D. H., J. J. O'Grady, B. W. Brook, J. D. Ballou, and R. Frankham.  2003.  Estimates of minimum viable population sizes for vertebrates and factors influencing those estimates. Biological Conservation 113:23-34.

Reed, J. M., P. D. Doerr, and J. R. Walters.  1988.  Minimum viable population size of the red-cockaded woodpecker.  Journal of Wildlife Management 50:239-247.

Reeves, K. A.  1978.  Preliminary investigation of the Florida panther in Big Cypress Swamp. Unpublished report.  Everglades National Park, Homestead, FL.

Roelke, M. E.  1990.  Florida panther biomedical investigation.  Final Performance Report 7506. Florida Game and Fresh Water Fish Commission, Tallahassee, FL.

Roelke, M. E.  1991.  Florida panther biomedical investigation.  Annual performance report, Study no. 7506.  Florida Game and Fresh Water Fish Commission, Tallahassee, FL.

Roelke, M. E., J. S. Martenson, and S. J. O'Brien.  1993a.  The consequences of demographic reduction and genetic depletion in the endangered Florida panther.  Current Biology 3:340-350.

Roelke, M. E., D. J. Forrester, E. R. Jacobsen, G. V. Kollias, F. W. Scott, M. C. Barr, J. F. Evermann, and E. C. Pirtle.  1993b.  Seroprevalence of infectious disease agents in free-ranging Florida panthers (*Felis concolor coryi*).  Journal of Wildlife Diseases 29:36-49.

Root, K. 1998. Evaluating effects of habitat quality, connectivity, and catastrophes on a threatened species. Ecological Applications 8:854-865.

Root, K. 2004. Florida panther (*Puma concolor coryi*): Using models to guide recovery efforts. Pages 491-504 *in* H. R. Akcakaya, M. Burgman, O. Kindvall, C. C. Wood, P. Sjogren-Gulve, J. Hatfield, and M. McCarthy (eds). Species Conservation and Management, Case Studies. Oxford University Press, New York, NY.

Ross, P. I., and M. G. Jalkotzy. 1992. Characteristics of a hunted population of cougars in southwestern Alberta. Journal of Wildlife Management 56:417-426.

Rotstein, D. S., R. Thomas, K. Helmick, S. B. Citino, S. K. Taylor, and M. R. Dunbar. 1999. Dermatophyte infections in free-ranging Florida panthers (*Felis concolor coryi*). Journal of Zoo and Wildlife Medicine 30:281-284.

Ruediger, B. 1998. Rare carnivores and highways moving into the 21st century. Pages 10-16 *in* Evink, G. L., P. Garrett, and J. Berry (eds). Proceedings of the international conference on wildlife ecology and transportation. FL-ER-69-98, Florida Department of Transportation, Tallahassee, FL.

Saenz D., K. A. Baum, R. N. Conner, D. C. Rudolph, and R. Costa. 2002. Large-scale translocation strategies for reintroducing red-cockaded woodpeckers. Journal of Wildlife Management 66:212-221.

Schemnitz, S. D. 1974. Populations of bear, panther, alligator, and deer in the Florida Everglades. Florida Scientist 37:157-167.

Schortemeyer, J. L., D. S. Maehr, J. W. McCown, E. D. Land, and P. D. Manor. 1991. Prey management for the Florida panther: a unique role for wildlife managers. Transactions of the North American Wildlife and Natural Resources Conference 56:512-526.

Schultz, S. T., and M. Lynch. 1997. Mutation and extinction: the role of variable mutational effects, synergistic epistasis, beneficial mutations, and degree of outcrossing. Evolution 51:1363-1371.

Seal, U. S. (ed). 1994a. A plan for genetic restoration and management of the Florida panther (*Felis concolor coryi*). Report to the Florida Game and Fresh Water Fish Commission, by the Conservation Breeding Specialist Group, Species Survival Commission, IUCN, Apple Valley, MN.

Seal, U. S. 1994b. Florida panther population viability analysis. Pages 434-439 *in* D. Jordan (ed). Proceedings of the Florida Panther Conference (Fort Myers, Florida, USA). U.S. Fish and Wildlife Service, Gainesville, FL.

Seal, U. S., and R. C. Lacy (eds). 1989. Florida panther (*Felis concolor coryi*) viability analysis and species survival plan. Report to the U. S. Fish and Wildlife Service, by the Captive Breeding Specialist Group, Species Survival Commission, IUCN, Apple Valley, MN.

Seal, U. S., and R. C. Lacy (eds).  1992.  Genetic management strategies and population viability of the Florida panther (*Felis concolor coryi*).  Report to the U. S. Fish and Wildlife Service, by the Captive Breeding Specialist Group, Species Survival Commission, IUCN, Apple Valley, MN.

Seidensticker, J. C., IV, M. G. Hornocker, W. V. Wiles, and J. P. Messick.  1973.  Mountain lion social organization in the Idaho primitive area.  Wildlife Monographs 35:1-60.

Shaffer, M. L.  1981.  Minimum population sizes for species conservation.  BioScience 31:131-134.

Shaffer, M. L.  1987.  Minimum viable populations:  coping with uncertainty.  Pages 69-86 *in* M. E. Soulé (ed).  Viable populations for conservation.  Cambridge University Press, New York, NY.

Shaffer M. L., and F. B. Sampson.  1985.  Population size and extinction:  a note on determining critical population size.  American Naturalist 125:144-152.

Shindle, D., D. Land, K. Charlton, and R. McBride.  2000.  Florida panther genetic restoration and management. Annual Report 7500.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Shindle, D., D. Land, M. Cunningham, and M. Lotz.  2001.  Florida panther genetic restoration and management. Annual Report 7500.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Shindle D., M. Cunningham, D. Land, R. McBride, M. Lotz, and B. Ferree.  2003.  Florida panther genetic restoration and management.  Annual Report 93112503002.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Sinclair, E. A., E. L. Swenson, M. L. Wolfe, D. C. Choate, B. Gates, and K. A. Cranall.  2001.  Gene flow estimates in Utah's cougars imply management beyond Utah.  Animal Conservation 4:257-264.

Smith, T. R., and O. L. Bass, Jr.  1994.  Landscape, white-tailed deer, and the distribution of Florida panthers in the Everglades.  Pages 693-708 *in* S. M. Davis and J. C. Ogden (eds).  Everglades:  the ecosystem and its restoration.  Delray Beach, FL.

Smith, S. K., and J. M. Nogle.  2001.  Projections of Florida population by county, 2000-2030.  Florida Population Studies Bulletin 128.  Bureau of Economic and Business Research, University of Florida, Gainesville, FL.

Soulé, M. E.  1980.  Thresholds for survival:  maintaining fitness and evolutionary potential.  Pages 151-160 *in* M. E. Soulé and B. A. Wilcox (eds).  Conservation biology:  an evolutionary-ecological perspective.  Sinauer Associates, Sunderland, MA.

Soulé, M. E.  1987.  Introduction.  Pages 1-10 *in* M. E.  Soulé (ed).  Viable populations for conservation.  Cambridge University Press, New York, NY.

Soulé, M. E., M. Gilpin, W. Conway, and T. Foose.  1986.  The Millennium Ark:  How long a voyage, how many staterooms, how many passengers?  Zoo Biology 5:101-113.

Spreadbury, B. R., K. Musil, J. Musil, C. Kaisner, and J. Kovak.  1996.  Cougar population characteristics in southeastern British Columbia.  Journal of Wildlife Management 60:962-969.

Swanson, K., D. Land, R. Kautz, and R. Kawula.  2005.  Use of least cost pathways to identify key highway segments for panther conservation.  Pages 191-200 *in* R. A. Beausoleil and D. A. Martorello (eds.).  Proceedings of the Eighth Mountain Lion Workshop, Olympia, WA.

Swart, J., and M. J. Lawes.  1996.  The effect of habitat patch connectivity on samango monkey (*Cercopithecus mitis*) metapopulation persistence.  Ecological Modelling 93:15-74.

Sweanor, L. L., K. A. Logan, and M. G. Hornocker.  2000.  Cougar dispersal patterns, metapopulation dynamics, and conservation.  Conservation Biology 14:798-808.

Swinnerton, K. J., J. J. Groombridge, C. G. Jones, R. W. Burns, and Y. Mungroo.  2004.  Inbreeding depression and founder diversity among captive and free-living populations of the endangered pink pigeon *Columba mayeri*.  Animal Conservation 7:353-364.

Taylor, T. A., and C. Pedersen. 1998.  Public acceptability of Florida panther reintroduction, final report based on input from community workshops in Columbia County.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Taylor, S. K., C. D. Buergelt, M. E. Roelke-Parker, B. L. Homer, and D. S. Rotstein.  2002.  Causes of mortality of free-ranging Florida panthers.  Journal of Wildlife Diseases 38:107-114.

Thatcher, C. A., F. T. van Manen, and J. D. Clark.  2006a.  An assessment of habitat north of the Caloosahatchee River for Florida panthers.  University of Tennessee and U.S. Geological Survey, Knoxville, TN.  Final report to U.S. Fish and Wildlife Service, Vero Beach, FL.

Thatcher, C. A., F. T. van Manen, and J. D. Clark.  2006b.  Identifying suitable sites for Florida panther reintroduction.  Journal of Wildlife Management 70:752-763

The Nature Conservancy.  2000.  The five-s framework for site conservation:  a practitioner's handbook for site conservation planning and measuring conservation success.  Volume I, Second Edition.  Arlington, VA.

Thomas, C. D.  1990.  What do real population dynamics tell us about minimum viable population sizes?  Conservation Biology 4:324-327.

Tinsley, J. B. 1970.  The Florida panther.  Great Outdoors Publishing Company, St. Petersburg, FL.

Tinsley, J. B.  1987.  The puma:  legendary lion of the Americas.  Texas Western Press, University of Texas, El Paso, TX.

Townsend, D.  1991.  An economic overview of the agricultural expansion in southwest Florida.  Unpublished report.  Hendry County Extension Office, LaBelle, FL.

U.S. Census Bureau.  2002.  Table CO-EST2001-12-12 – time series of Florida intercensal population estimates by county:  April 1, 1990 to April 1, 2000.  Washington, D.C.

U.S. Census Bureau.  2004.  Population estimates, census 2002, 1990 census.  Washington, D.C.

U.S. Fish and Wildlife Service.  1981.  Florida panther recovery plan.  Atlanta, GA.

U.S. Fish and Wildlife Service.  1987.  Florida panther (*Felis concolor coryi*) recovery plan.  Atlanta, GA.

U.S. Fish and Wildlife Service.  1994a.  Final environmental assessment: genetic restoration of the Florida panther.  Gainesville, FL.

U.S. Fish and Wildlife Service.  1994b.  Proposed genetic restoration program for the Florida panther.  Memorandum dated June 13, 1994, from Director Beattie (Washington, D.C.) to the Regional Director (Atlanta, GA).

U.S. Fish and Wildlife Service.  1995.  Second revision Florida panther recovery plan.  Atlanta, GA.

U.S. Fish and Wildlife Service.  1999.  South Florida multi-species recovery plan.  Atlanta, GA.

van der Leek, M. L., H. N. Becker, E. C. Pirtle, P. Humphrey, C. L. Adams, B. P. All, G. A. Erickson, R. C. Belden, W. B. Frankenberger, and E. P. J. Gibbs.  1993.  Prevalence of pseudorabies (Aujeszky's disease) virus antibodies in feral swine in Florida.  Journal Wildlife Diseases 29:403-409.

Van Dyke, F. G., R. H. Brocke, and H. G. Shaw.  1986a.  Use of road track counts as indices of mountain lion presence.  Journal Wildlife Management 50:102-109.

Van Dyke, F. G., R. H. Brocke, H. G. Shaw, B. B. Ackerman, T. P. Hemker, and F. G. Lindzey.  1986b.  Reactions of mountain lions to logging and human activity.  Journal of Wildlife Management 50:95-102.

van Heezik, Y., and S. Ostrowski.  2001.  Conservation breeding for reintroductions:  assessing survival in a captive flock of houbara bustards.  Animal Conservation 4:195-201.

Waples, R.  2002.  Definition and estimation of effective population size in the conservation of endangered species.  Pages 147-168 *in* S. R. Beissinger and D. R. McCullough (eds).  Population viability analysis.  University of Chicago Press, Chicago, IL.

Wassmer, D. A., D. D. Guenther, and J. N. Layne.  1988.  Ecology of the bobcat in south-central Florida.  Bulletin of the Florida Museum of Natural History 33:159-228.

Wear, D. N., and J. G. Greis (eds).  2002.  Southern forest resources assessment.  General Technical Report SRS-53.  U.S. Department of Agriculture, Forest Service, Southern Research Station, Asheville, NC.

Wehinger, K. A., M. E. Roelke, and E. C. Greiner.  1995.  Ixodid ticks from Florida panthers and bobcats in Florida.  Journal of Wildlife Diseases 31:480-485.

Werdelin, L.  1996.  The history of Felid Classification.  Pages xviii-xxiii *in* K. Nowell and P. Jackson.  Status survey and conservation action plan:  Wild cats.  International Union for Conservation of Nature and Natural Resources.  Burlington Press, Cambridge, U.K.

Whitlock, M. C.  2000.  Fixation of new alleles and the extinction of small populations:  drift load, beneficial alleles, and sexual selection.  Evolution 54:1855-1861.

Wikramanayake, E., M. McKnight, E. Dinerstein, A. Joshi, B. Gurung, and D. Smith.  2004.  Designing a conservation landscape for tigers in human-dominated environments.  Conservation Biology 18:839-844.

Wilkins, L., J. M. Arias-Reveron, B. Stith, M. E. Roelke, and R. C. Belden.  1997.  The Florida panther (*Puma concolor coryi*):  a morphological investigation of the subspecies with a comparison to other North and South American cougars.  Bulletin of the Florida Museum of Natural History 40:221-269.

Wolf, P.  1981.  Land in America:  its value, use and control.  Pantheon Books, New York, NY.

Wozencraft, W. C.  1993.  Order Carnivora.  Pages 286-346 *in* D. E. Wilson and D. M. Reeder, (eds.).  Mammal species of the world, 2nd edition.  Smithsonian, Washington, D.C.

Wright, S.  1943.  Isolation by distance.  Genetics 28:114-138.

Wright, S.  1969.  The theory of gene frequencies.  Vol.2, Experimental results and evolutionary deductions.  University of Chicago Press, Chicago, IL.

Young, S. P., and E. A. Goldman.  1946.  The puma-mysterious American cat.  American
      Wildlife Institute, Washington, D.C.

**FIGURES**



Figure 1. Historic and current range of the Florida panther.



Figure 2.  Delineation between south and south-central Florida.



Figure 3.  Florida panther zones in south Florida (Kautz et al. 2006).



Figure 4. Conservation areas of south and south-central Florida.



Figure 5.  Potential panther habitat patches identified by Thatcher et al. (2006a).

## APPENDIX A.  DEFINITIONS

ALLEE EFFECTS – Inverse density dependence; for smaller populations, the reproduction and survival of individuals decrease; reproduction, finding a mate in particular, may be increasingly difficult as the population density decreases.

EFFECTIVE POPULATION SIZE ($N_e$) – A theoretical population with a 1:1 sex ratio that would result in the same amount of inbreeding or genetic drift as the actual population.  Denoted as $N_e$, the effective population size is usually less than the actual population size.

ENDANGERED – Any species which is in danger of extinction throughout all or a significant portion of its range.

HABITAT – The physical space within which an animal lives.  The various factors commonly recognized as components of habitat – cover, food, water, and such – are contained within this area.  Panther habitat includes all areas required for the panther to live out its full life-cycle, including areas providing food and shelter and supporting characteristic movement such as hunting, breeding, dispersal, and territorial behavior.

INBREEDING (individual) – The mating of related individuals (e.g., brother-sister, father-daughter, mother-son).

INBREEDING (population) – A population in which matings occur between relatives at a frequency greater than expected by chance.

INBREEDING DEPRESSION – Reduction in reproduction, survival, or other fitness characters due to inbreeding.

INTROGRESSION – The incorporation of genes of one subspecies into the gene pool of another.

LEAST-COST PATHWAYS ANALYSES – a modeling method to measure effective distance between habitat patches and connectivity between existing or potential reserves.  Maps routes of least resistance or travel cost between habitat patches.

METAPOPULATION – Two or more partially isolated populations, called subpopulations, which are linked by dispersal events.

PHILOPATRY – The tendency of an individual to return to or stay in its home area.  Female panthers tend to be more philopatric than males.

POLYGYNOUS – A pattern of mating in which a male has more than one female partner.

POPULATION – A group of interbreeding individuals living in the same geographic area at the same time and sharing a common gene pool.

SELF-SUSTAINING POPULATION – A population that is able to sustain itself independently.

SPATIAL CONFIGURATION – Refers to how patches of habitat are arranged on the landscape with respect to one another as well as their degree of connectivity and relative land cover composition.  An extensive arrangement of contiguous tracts of land that incorporates connectivity to support panther life history needs (e.g., appropriate cover, spatial extent, landscape configuration, prey densities, mating access, dispersal routes, minimizing human disturbance).

SPECIES (ESA definition) – includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species or vertebrate fish or wildlife which interbreeds when mature.

SUBPOPULATION – Each distinct population in a metapopulation.

THREATENED – Any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

VIABLE – A viable species is one that can reasonably be expected to avoid extinction over a long period of time.  Viability is the ability of a population or species to persist over time.  A viable panther population is considered to have a 95% probability of persistence for 100 years.

# APPENDIX B.  THREATS ANALYSIS USING THE FIVE LISTING FACTORS

## SOUTH FLORIDA

**Factor A: The present or threatened destruction, modification, or curtailment of the Florida panther's habitat or range.**

| | Stress | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Loss of ability for natural expansion of range | | | Habitat destruction | | | Habitat fragmentation | | | Population isolation & lack of connectivity | | | Habitat degradation | | | |
| | Severity | Scope | Stress rank | Severity | Scope | Stress rank | Severity | Scope | Stress rank | Severity | Scope | Stress rank | Severity | Scope | Stress rank | |
| | V | V | Very high | V | H | High | V | H | High | H | H | High | H | M | Medium | |
| Source of stress | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Factor A overall threat rank |
| Transportation projects | H | H | H | Very high | L | V | M | Medium | V | V | V | High | M | V | H | High | - | - | - | - | Very high |
| Lack of suitable habitat | V | H | V | Very high | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | Very high |
| Water management & conversion to water (includes CERP) | - | - | - | - | M | H | M | Medium | M | V | H | High | M | V | H | High | L | M | L | Low | High |
| Residential development | - | - | - | - | V | V | V | High | H | V | H | High | - | - | - | - | - | - | - | - | High |
| Inadequate habitat patch size | - | - | - | - | - | - | - | - | - | - | - | - | M | V | H | High | - | - | - | - | High |
| Mining and mineral exploration | - | - | - | - | L | V | M | Medium | L | V | M | Medium | - | - | - | - | L | L | L | Low | Medium |
| Conversion of habitat to agriculture | - | - | - | - | L | H | M | Medium | L | L | L | Low | - | - | - | - | M | H | M | Low | Medium |

**Factor A continued**

| Source of stress | Loss of ability for natural expansion of range — Severity V, Scope V — Stress rank Very high | | | | Habitat destruction — Severity V, Scope H — Stress rank High | | | | Habitat fragmentation — Severity V, Scope H — Stress rank High | | | | Population isolation & lack of connectivity — Severity H, Scope H — Stress rank High | | | | Habitat degradation — Severity H, Scope M — Stress rank Medium | | | | Factor A overall threat rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | |
| Major ditches | - | - | - | - | - | - | - | - | L | V | M | Medium | - | - | - | - | - | - | - | - | Medium |
| Caloosahatchee River as a barrier | L | M | L | Medium | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | Medium |
| Intensification of agricultural uses | - | - | - | - | - | - | - | - | L | M | L | Low | - | - | - | - | L | H | M | Low | Low |
| Invasive exotic plant species | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | M | M | M | Low | Low |
| Lack of or poor habitat management | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | M | M | M | Low | Low |

**SOUTH FLORIDA**

**Factor B: Overutilization for commercial, recreational, scientific, or education purposes.**

| Source of stress | Stress | | | | Factor B overall threat rank |
|---|---|---|---|---|---|
| | Overutilization for scientific purposes | | | | |
| | Severity | Scope | Stress rank | | |
| | L | L | Low | | |
| | Contribution | Irreversibility | Rank | Threat rank | |
| Impacts of capture and monitoring | L | L | L | Low | Low |

**SOUTH FLORIDA**

**Factor C: Disease and predation.**

| Source of stress | Stress | | | | Factor C overall threat rank |
|---|---|---|---|---|---|
| | Disease | | | | |
| | Severity | Scope | **Stress rank** | | |
| | L | L | Low | | |
| | Contribution | Irreversibility | Rank | **Threat rank** | |
| Feline leukemia | M | L | M | Medium | Medium |
| All diseases | L | M | L | Low | Low |

**SOUTH FLORIDA**

**Factor D: The inadequacy of existing regulatory mechanisms.**

The Recovery Team believed regulatory mechanisms were more appropriately considered as strategies underlying the other stresses and sources.  Therefore, they chose not to evaluate Factor D.

**SOUTH FLORIDA**

**Factor E: Other natural or manmade factors affecting the Florida panther's continued existence.**

| Source of stress | Panther mortality |  |  |  | Loss of genetic diversity |  |  |  | Decline of prey base |  |  |  | Genetic swamping |  |  |  | Loss/lack of support for panther conservation |  |  |  | Factor E overall threat rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Severity | Scope | Stress rank |  | Severity | Scope | Stress rank |  | Severity | Scope | Stress rank |  | Severity | Scope | Stress rank |  | Severity | Scope | Stress rank |  |  |
|  | H | H | High |  | M | H | Medium |  | M | M | Medium |  | L | V | Low |  | L | V | Low |  |  |
|  | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank |  |
| Intraspecific aggression | H | V | H | High | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | High |
| Mercury toxicity | L | V | M | Medium | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | Medium |
| Road kills | H | M | M | Medium | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | Medium |
| Illegal kills | L | H | M | Medium | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | Medium |
| Disease | L | H | M | Medium | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | Medium |
| Effect of small population size | - | - | - | - | V | M | H | Medium | - | - | - | - | - | - | - | - | - | - | - | - | Medium |
| Lack of suitable habitat | - | - | - | - | V | V | V | Medium | - | - | - | - | - | - | - | - | - | - | - | - | Medium |
| Lack of corridors for dispersal | - | - | - | - | M | H | M | Low | - | - | - | - | - | - | - | - | - | - | - | - | Low |
| Escape of captive pumas | - | - | - | - | - | - | - | - | - | - | - | - | L | H | M | Low | - | - | - | - | Low |
| Managed releases of pumas | - | - | - | - | - | - | - | - | - | - | - | - | M | M | M | Low | - | - | - | - | Low |
| Ungulate disease | - | - | - | - | - | - | - | - | L | H | M | Low | - | - | - | - | - | - | - | - | Low |

188

**Factor E continued**

| Source of stress | Stress: Panther mortality (Severity H, Scope H, Stress rank High) | | | | Loss of genetic diversity (Severity M, Scope H, Stress rank Medium) | | | | Decline of prey base (Severity M, Scope M, Stress rank Medium) | | | | Genetic swamping (Severity L, Scope V, Stress rank Low) | | | | Loss/lack of support for panther conservation (Severity L, Scope V, Stress rank Low) | | | | Factor E overall threat rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | |
| Water management or conversion to water | - | - | - | - | - | - | - | - | M | M | M | Low | - | - | - | - | - | - | - | - | Low |
| Natural climate or environmental change | - | - | - | - | - | - | - | - | L | V | M | Low | - | - | - | - | - | - | - | - | Low |
| Lack of or poor prey management (e.g, over hunting) | - | - | - | - | - | - | | - | L | L | L | Low | - | - | - | - | - | - | - | - | Low |
| Prey habitat loss / degradation | - | - | - | - | - | - | - | - | M | H | M | Low | - | - | - | - | - | - | - | - | Low |
| Exotic prey management | - | - | - | - | - | - | - | - | L | L | L | Low | - | - | - | - | - | - | - | - | Low |
| Change in the legal description | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | V | H | V | Low | Low |

**Factor E continued**

| Source of stress | Panther mortality | | | | | | | Loss of genetic diversity | | | | | | | Decline of prey base | | | | | | | Genetic swamping | | | | | | | Loss/lack of support for panther conservation | | | | | | | Factor E overall threat rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Severity | Scope | Stress rank | | | | | Severity | Scope | Stress rank | | | | | Severity | Scope | Stress rank | | | | | Severity | Scope | Stress rank | | | | | Severity | Scope | Stress rank | | | | | |
| | H | H | High | | | | | M | H | Medium | | | | | M | M | Medium | | | | | L | V | Low | | | | | L | V | Low | | | | | |
| | Contribution | Irreversibility | Rank | Threat rank | | | | Contribution | Irreversibility | Rank | Threat rank | | | | Contribution | Irreversibility | Rank | Threat rank | | | | Contribution | Irreversibility | Rank | Threat rank | | | | Contribution | Irreversibility | Rank | Threat rank | | | | |
| Public fear of panthers | - | - | - | - | | | | - | - | - | - | | | | - | - | - | - | | | | - | - | - | - | | | | L | M | L | Low | | | | Low |
| Landowner fear of regulation, lost property rights, and negative economic consequences | - | - | - | - | | | | - | - | - | - | | | | - | - | - | - | | | | - | - | - | - | | | | H | M | M | Low | | | | Low |

# REINTRODUCTION

**Factor A: The present or threatened destruction, modification, or curtailment of the Florida panther's habitat or range.**

| Source of stress | Unidentified potential habitat Contribution | Irreversibility | Rank | Threat rank | Habitat fragmentation Contribution | Irreversibility | Rank | Threat rank | Habitat destruction Contribution | Irreversibility | Rank | Threat rank | Incompatible management of private lands Contribution | Irreversibility | Rank | Threat rank | Incompatible management of public lands Contribution | Irreversibility | Rank | Threat rank | Factor A overall threat rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Severity, Scope, Stress rank)* | V | V | Very high | | V | V | Very high | | H | H | High | | M | M | Medium | | L | M | Low | | |
| Urbanization | - | - | - | - | M | V | H | Very high | M | V | H | High | - | - | - | - | - | - | - | - | Very high |
| Transportation projects | - | - | - | - | V | V | V | Very high | H | H | H | High | - | - | - | - | - | - | - | - | Very high |
| Low density residential development | - | - | - | - | V | H | V | Very high | V | H | V | High | - | - | - | - | - | - | - | - | Very high |
| Lack of land use planning | - | - | - | - | H | V | H | Very high | - | - | - | - | - | - | - | - | - | - | - | - | Very high |
| Inadequate evaluation of potential habitat in historic range | V | L | H | Very high | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | Very high |
| Lack of prioritization system among areas | V | L | H | Very high | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | Very high |
| Conversion of habitat to agriculture | - | - | - | - | M | M | M | High | M | M | M | Medium | - | - | - | - | - | - | - | - | High |
| Human recreational uses in panther habitat | - | - | - | - | M | M | M | High | M | M | M | Medium | - | - | - | - | M | M | M | Low | High |
| Invasive exotic plant species | - | - | - | - | L | H | M | High | L | H | M | Medium | - | - | - | - | - | - | - | - | High |
| Large public works projects (e.g, dams) | - | - | - | - | L | V | M | High | L | V | M | Medium | - | - | - | - | - | - | - | - | High |

**Factor A continued**

| | Stress | | | | | | | | | | | | | | | | | | | | Factor A overall threat rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Unidentified potential habitat | | | | Habitat fragmentation | | | | Habitat destruction | | | | Incompatible management of private lands | | | | Incompatible management of public lands | | | | |
| | Severity | Scope | Stress rank | | Severity | Scope | Stress rank | | Severity | Scope | Stress rank | | Severity | Scope | Stress rank | | Severity | Scope | Stress rank | | |
| | V | V | Very high | | V | V | Very high | | H | H | High | | M | M | Medium | | L | M | Low | | |
| Source of stress | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | |
| Lack of incentives to maintain / restore panther habitat | - | - | - | | H | M | M | High | H | M | M | Medium | H | M | M | Low | - | - | - | - | High |
| Lack of complete data in historical range | M | M | M | High | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | High |
| Right of ways | - | - | - | - | L | V | M | High | - | - | - | - | - | - | - | - | - | - | - | - | High |
| Conversion of habitat to silviculture | - | - | - | - | L | L | L | Medium | L | L | L | Low | - | - | - | - | - | - | - | - | Medium |
| Mining and mineral exploration | - | - | - | - | L | M | L | Medium | L | M | L | Low | - | - | - | - | - | - | - | - | Medium |
| Conflicting mandates | - | - | - | - | - | - | - | - | - | - | - | - | H | H | H | Medium | L | H | M | Low | Medium |
| Conflicting management of other species | - | - | - | - | - | - | - | - | - | - | - | - | L | L | L | Low | L | L | L | Low | Low |
| Lack of implementation of management plans | - | - | - | - | - | - | - | - | - | - | - | - | H | M | M | Low | L | M | L | Low | Low |

**REINTRODUCTION**

**Factor B: Overutilization for commercial, recreational, scientific, or education purposes.**

| Source of stress | Stress | | | | Factor B overall threat rank |
|---|---|---|---|---|---|
| | Overutilization for scientific purposes | | | | |
| | Severity | Scope | Stress rank | | |
| | L | H | Low | | |
| | Contribution | Irreversibility | Rank | Threat rank | |
| Impacts of capture and monitoring | L | L | L | Low | Low |
| Impacts of removals for reintroductions to donor populations | L | L | L | Low | Low |

**REINTRODUCTION**

**Factor C: Disease and predation.**

| | Stress | | | | | | | | | | | |
| | Disease | | | Parasites | | | Predation | | | | | |
| Source of stress | Severity L | Scope H | Stress rank Low | Severity L | Scope H | Stress rank Low | Severity L | Scope L | Stress rank Low | | | Factor C overall threat rank |
| | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Feline leukemia | M | L | M | Medium | - | - | - | - | - | - | - | - | Medium |
| Rabies | M | M | M | Low | - | - | - | - | - | - | - | - | Low |
| Pseudorabies | H | M | M | Low | - | - | - | - | - | - | - | - | Low |
| Hookworm | - | - | - | - | H | M | M | Low | - | - | - | - | Low |
| Manges | - | - | - | - | H | M | M | Low | - | - | - | - | Low |
| Unknown / other | L | L | L | Low | L | L | L | Low | - | - | - | - | Low |
| All sources of predation | - | - | - | - | - | - | - | - | V | M | H | Low | Low |

REINTRODUCTION

**Factor D: The inadequacy of existing regulatory mechanisms.**

| Source of stress | Stress | | | | | | | | | | | | Factor D overall threat rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Inadequate land use planning or regulation | | | | Lack of agency coordination | | | | Inconsistent state regulation or protection | | | | |
| | Severity | Scope | Stress rank | | Severity | Scope | Stress rank | | Severity | Scope | Stress rank | | |
| | V | V | Very high | | H | V | High | | H | L | Low | | |
| | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | |
| Inadequate development, implementation, and enforcement of comprehensive plans and zoning | V | H | V | Very high | - | - | - | - | - | - | - | - | Very high |
| Inadequate growth management planning and implementation | V | H | V | Very high | - | - | - | - | - | - | - | - | Very high |
| Little or no protection of upland habitats | H | H | H | Very high | - | - | - | - | - | - | - | - | Very high |
| Inadequate development, and implementation of corridor / greenway planning | V | H | V | Very high | - | - | - | - | - | - | - | - | Very high |
| Lack of cumulative impacts evaluation | H | H | H | Very high | - | - | - | - | - | - | - | - | Very high |
| Inadequate land conservation of acquisition programs | H | H | H | Very high | - | - | - | - | - | - | - | - | Very high |

**Factor D continued**

| Source of stress | Inadequate land use planning or regulation | | | | Lack of agency coordination | | | | Inconsistent state regulation or protection | | | | Factor D overall threat rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Severity: V, Scope: V, Stress rank: Very high | | | | Severity: H, Scope: V, Stress rank: High | | | | Severity: H, Scope: L, Stress rank: Low | | | | |
| | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | |
| Lack of public awareness of environmental issues and needs | H | H | H | Very high | - | - | - | - | - | - | - | - | Very high |
| Conflicting laws, regulations, mandates, or policies | M | M | M | High | - | - | - | - | H | M | M | Low | High |
| No mechanism for agency communication or coordination | - | - | - | - | H | L | M | Medium | H | L | M | Low | Medium |
| Lack of a mutually defined common goal | - | - | - | - | H | L | M | Medium | H | L | M | Low | Medium |
| Interagency distrust and lack of relationships and partnerships | - | - | - | - | M | M | M | Medium | - | - | - | - | Medium |

196

# REINTRODUCTION

## Factor E: Other natural or manmade factors affecting the Florida panther's continued existence.

| Source of stress | Public / landowner resistance to reintroduction — Severity V, Scope V, Stress rank Very high | | | | Political and agency resistance to reintroduction — Severity V, Scope V, Stress rank Very high | | | | Human / panther interactions — Severity H, Scope V, Stress rank High | | | | Panther mortality — Severity H, Scope V, Stress rank High | | | | Genetic viability and population connectivity — Severity M, Scope H, Stress rank Medium | | | | Conflicting prey management — Severity M, Scope H, Stress rank Medium | | | | Conflicts with escaped pumas — Severity L, Scope M, Stress rank Low | | | | Competition with other species — Severity L, Scope H, Stress rank Low | | | | Factor E overall threat rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | |
| Public perception, misconception, and lack of knowledge | V | M | H | Very high | - | - | - | | V | M | H | High | - | - | - | - | - | - | - | - | H | M | M | Low | - | - | - | - | - | - | - | - | Very high |
| Conflicts with livestock (attacks on) | V | M | H | Very high | V | M | H | Very high | M | M | M | Medium | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | Very high |
| Public fear of panthers (including fear of attacks / mortality) | V | H | V | Very high | V | H | V | Very high | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | Very high |
| Distrust of government agencies | H | H | H | Very high | H | H | H | Very high | | | | | | | | | | | | | | | | | | | | | | | | | Very high |
| Agency funding and resource constraints | - | - | - | - | V | M | H | Very high | | | | | | | | | | | | | | | | | | | | | | | | | Very high |
| Lack of incentives for states | - | - | - | - | H | H | H | Very high | | | | | | | | | | | | | | | | | | | | | | | | | Very high |

197

**Factor E continued**

| Source of stress | Public / landowner resistance to reintroduction (Severity V, Scope V, Stress rank Very high) | | | | Political and agency resistance to reintroduction (Severity V, Scope V, Stress rank Very high) | | | | Human / panther interactions (Severity H, Scope V, Stress rank High) | | | | Panther mortality (Severity H, Scope V, Stress rank High) | | | | Genetic viability and population connectivity (Severity M, Scope H, Stress rank Medium) | | | | Conflicting prey management (Severity M, Scope H, Stress rank Medium) | | | | Conflicts with escaped pumas (Severity L, Scope M, Stress rank Low) | | | | Competition with other species (Severity L, Scope H, Stress rank Low) | | | | Factor E overall threat rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | |
| Agency's fear of liability (political, financial, and professional) | - | - | - | | V | M | H | Very high | - | - | - | | - | - | - | | - | - | - | | - | - | - | | - | - | - | | - | - | - | | Very high |
| Public official's fear of losing constituent's support | - | - | - | | H | H | H | Very high | - | - | - | | - | - | - | | - | - | - | | - | - | - | | - | - | - | | - | - | - | | Very high |
| Influence of opposing special interest groups on public officials | - | - | - | | V | V | V | Very high | - | - | - | | - | - | - | | - | - | - | | - | - | - | | - | - | - | | - | - | - | | Very high |
| Conflicts with hunters and hunting | H | M | M | High | H | M | M | High | H | M | M | Medium | - | - | - | | - | - | - | | - | - | - | | H | M | M | Low | - | - | - | | High |
| Landowner fear of regulation, lost property rights, and negative economic consequences | H | M | M | High | H | M | M | High | - | - | - | | - | - | - | | - | - | - | | - | - | - | | - | - | - | | - | - | - | | High |

# Factor E continued

| Source of stress | Public / landowner resistance to reintroduction (Severity V, Scope V, Stress rank Very high) | | | | Political and agency resistance to reintroduction (Severity V, Scope V, Stress rank Very high) | | | | Human / panther interactions (Severity H, Scope V, Stress rank High) | | | | Panther mortality (Severity H, Scope V, Stress rank High) | | | | Genetic viability and population connectivity (Severity M, Scope H, Stress rank Medium) | | | | Conflicting prey management (Severity M, Scope H, Stress rank Medium) | | | | Conflicts with escaped pumas (Severity L, Scope M, Stress rank Low) | | | | Competition with other species (Severity L, Scope H, Stress rank Low) | | | | Factor E overall threat rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | |
| Media sensationalism and panther myths | M | M | M | High | M | M | M | High | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | High |
| Relationships among potential supporting landowners and their neighbors | M | M | M | High | M | M | M | High | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | High |
| Lack of panther information dissemination to public officials and agencies | - | - | - | - | H | L | M | High | - | - | - | - | - | - | - | - | - | - | - | - | M | L | L | Low | - | - | - | - | - | - | - | - | High |
| Road kills | - | - | - | - | - | - | - | - | - | - | - | - | H | H | H | High | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | High |
| Illegal kill | - | - | - | - | - | - | - | - | - | - | - | - | H | M | M | Medium | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | Medium |
| Accidental death (including contaminants) | - | - | - | - | - | - | - | - | - | - | - | - | L | H | M | Medium | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | Medium |

**Factor E continued**

Stress

Stress group rankings (Severity / Scope / Stress rank):
- Public / landowner resistance to reintroduction: V / V / Very high
- Political and agency resistance to reintroduction: V / V / Very high
- Human / panther interactions: H / V / High
- Panther mortality: H / V / High
- Genetic viability and population connectivity: M / H / Medium
- Conflicting prey management: M / H / Medium
- Conflicts with escaped pumas: L / M / Low
- Competition with other species: L / H / Low

| Source of stress | Public / landowner resistance to reintroduction | | | | Political and agency resistance to reintroduction | | | | Human / panther interactions | | | | Panther mortality | | | | Genetic viability and population connectivity | | | | Conflicting prey management | | | | Conflicts with escaped pumas | | | | Competition with other species | | | | Factor E overall threat rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | |
| Natural catastrophes | - | - | - | | - | - | - | | - | - | - | | L | V | M | Medium | - | - | - | | - | - | - | | - | - | - | | - | - | - | | Medium |
| Small number of founder panthers available | - | - | - | | - | - | - | | - | - | - | | - | - | - | | V | M | H | Medium | - | - | - | | - | - | - | | - | - | - | | Medium |
| Unidentified or secured pathways for dispersal | - | - | - | | - | - | - | | - | - | - | | - | - | - | | H | H | H | Medium | - | - | - | | - | - | - | | - | - | - | | Medium |
| Deer management | - | - | - | | - | - | - | | - | - | - | | - | - | - | | - | - | - | | V | M | H | Medium | - | - | - | | - | - | - | | Medium |
| Intraspecific aggression or predation | - | - | - | | - | - | - | | - | - | - | | L | M | L | Low | - | - | - | | - | - | - | | - | - | - | | L | M | L | Low | Low |
| Removal of panthers for management purposes | - | - | - | | - | - | - | | - | - | - | | L | M | L | Low | - | - | - | | - | - | - | | - | - | - | | - | - | - | | Low |

**Factor E continued**

| Source of stress | Stress | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | Factor E overall threat rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Public / landowner resistance to reintroduction | | | | Political and agency resistance to reintroduction | | | | Human / panther interactions | | | | Panther mortality | | | | Genetic viability and population connectivity | | | | Conflicting prey management | | | | Conflicts with escaped pumas | | | | Competition with other species | | | | |
| | Severity | Scope | Stress rank | | Severity | Scope | Stress rank | | Severity | Scope | Stress rank | | Severity | Scope | Stress rank | | Severity | Scope | Stress rank | | Severity | Scope | Stress rank | | Severity | Scope | Stress rank | | Severity | Scope | Stress rank | | |
| | V | V | Very high | | V | V | Very high | | H | V | High | | H | V | High | | M | H | Medium | | M | H | Medium | | L | M | Low | | L | H | Low | | |
| | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | Contribution | Irreversibility | Rank | Threat rank | |
| Panther visibility to local public | - | - | - | - | - | - | - | - | M | L | L | Low | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | Low |
| Inadequate regulation or understanding of distribution and occurrence of pet puma | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | H | M | M | Low | - | - | - | - | Low |
| Competition with other large predators | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | L | L | L | Low | Low |
| Feral hog management | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | H | M | M | Low | - | - | - | - | - | - | - | - | Low |

# APPENDIX C.  Summary of Comments Received

The FWS received comments on the Technical / Agency Draft from 33,739 individuals / organizations.  Of these, 33,676 individuals commented through the Defenders of Wildlife website.  These comments were faxed to the FWS South Florida Field Office in Vero Beach, Florida.  With few exceptions, these comments were identical and followed the suggested wording on the website.  The remaining 63 individuals / organizations offered 299 comments.

**Support for the Recovery Plan and suggested edits to text**

Ten commenters stated that they were supportive of the Recovery Plan and offered no changes.  One-hundred twenty-two comments regarded suggested edits to the text.

**FWS Response**

The FWS considered all suggested edits and incorporated those that were appropriate.

**Criteria and need for interim goals and supporting actions**

Seven commenters offered 11 comments concerning the recovery criteria and the need of interim goals.  These commenters believed that the recovery criteria have little or no chance of being realized.  It was suggested that achievable goals or benchmarks be set that would reduce the risk

of extinction to acceptable levels and suggested a target of establishing 3 separate populations of approximately 80 animals (a total of 240).

**FWS Response**

The population size of 240 for a viable Florida panther population was derived from the most recent PVA. The Recovery Team believes that 3 populations are needed for redundancy and resiliency. FWS agreed that an interim goal of 3 subpopulations of 80 animals each was needed to show that progress towards the recovery criteria is being achieved. This interim goal and associated criteria were added.

**Panther Range and Taxonomy**

Five commenters offered 10 comments questioning the accuracy of Young and Goldman's 1946 range map for the Florida panther in regards to taxonomic status. Commenters further stated that given the arbitrary nature of the estimated historic range and new information regarding genetic ancestry and the current state of the science, the plan appears to rest on a rather weak foundation.

**FWS Response**

The map in Young and Goldman (1946) is the most current and best available historic range map for the Florida panther.  The degree to which the scientific community has accepted the use of genetics in puma taxonomy is not resolved at this time.  Additional research is needed to understand genetic and morphological similarities and differences of puma across North America.

**Panther Habitat**

Development / Habitat Protection--The majority of the 36 comments received from 24 commenters concerning panther habitat had little to do with the Recovery Plan and were directed at the FWS's regulatory process.  It was suggested that FWS place primary emphasis on protecting and restoring panther habitat in Florida by not permitting development in panther habitat.  They felt that too often developers have been permitted to build developments that directly impact the survival of the panther.

**FWS Response**

Through section 7 of the ESA, as amended, the FWS works with Federal agencies to ensure that any action that is federally funded, authorized, or carried out that may affect the Florida panther does not jeopardize the continued existence of the panther.  The FWS works with Federal agencies to emphasize the identification of potential conflicts in the early stages of project

planning and advises the agencies and applicants on means to avoid adverse impacts.  In addition to habitat conservation, important compensation strategies include the configuration of new roads to direct traffic away from panther habitat and the construction of wildlife crossings aimed primarily at allowing panthers to pass safely from one side of a road to another.  The section 7 process can be complemented by activities such as fee-title acquisition, easements, and other local, State, and Federal conservation tools to achieve maximum benefits.

Critical Habitat--Four commenters suggested the need to designate critical habitat for the Florida panther.

**FWS Response**

When the panther became a listed species pursuant to the ESA in 1973, critical habitat was not designated.  Designation of critical habitat for a species could occur only through a rulemaking process that would include opportunity for public comment.  Because it is listed as endangered pursuant to the ESA, the panther and its habitat receive protection whether or not they are in an area designated as critical habitat.

**Panther Management and Research**

<u>Annual counts or other census techniques</u>--One commenter stated that the Recovery Plan should explicitly commit the three agencies to coordinate efforts to conduct annual verified counts or other appropriate census techniques to track progress made towards achieving a self-sustaining, viable population. A second commenter stated that the Population Trends and Distribution section would benefit from a description of the extensive annual field surveys conducted since 1981 by McBride for the FWC.

**FWS Response**

An FWS recovery plan does not commit other agencies to conduct specific tasks; it does however recommend which agencies / organizations would be best suited to accomplish certain tasks. Since 1981, an annual count of documented panthers has been conducted. Roy McBride drafted the Population Trends and Distribution section for the Recovery Plan and more details about annual field surveys discussed therein can be found in the literature.

<u>Provide crossing points on the Caloosahatchee River and create a panther corridor to North Florida and South Georgia</u>--28 comments were received from 17 commenters suggesting that the Recovery Plan address providing panther crossing points along the Caloosahatchee River to facilitate movement to the north and create a panther corridor that would connect habitat in south Florida with habitat in north Florida and Georgia by linking the Ocala National Forest and Okeefenokee National Wildlife Refuge.

**FWS Response**

As described in the Recovery Plan, the Dispersal Zone encompasses 44 mi$^2$ (113 km$^2$) with a mean width of 3.4 mi (5.4 km).  The Dispersal Zone is strategically located and expected to function as a critical landscape linkage to south-central Florida (Kautz et al. 2006).  Transient male panthers currently utilize this zone as they disperse northward into south-central Florida.  Within south-central Florida, corridors have been identified to connect potential panther habitat patches (Thatcher et al. 2006a).  The Florida Ecological Greenways Network (Hoctor 2004) identifies and prioritizes landscape corridors that would also serve as panther travelways.

Growing transportation threats--Sixteen commenters offered 19 comments concerning panthers and highways.  Some felt that the Recovery Plan trivializes the impact that transportation has had and continues to have on the current population.  Suggestions were made to "Prohibit road development in panther habitat and retrofit existing highways that experience panther mortality with crossing underpasses similar to I-75."  Others, however, felt that too much emphasis was placed on highway underpasses and that "…it would be misleading to infer that crossings can adequately substitute for sound transportation and land use planning that realistically assess the harm suffered by wildlife and for landscape level habitat protection."

**FWS Response**

FWS agrees that roads are one of the major sources of mortality for the panther population as well as limiting their ability to disperse and travel across the landscape. We believe that the potential impact of roads to the conservation and recovery of the panther is adequately addressed in the Recovery Plan and we are working closely with public and private entities to help minimize these impacts.

<u>Genetics management plan</u>--One comment was received encouraging the continued monitoring of physical and physiological characteristics correlated with inbreeding and depletion of genetic variability along with the development and implementation of a genetics management plan that would detect levels of heterozygosity that may trigger future introgressions of genetic material into the southern Florida population.

**FWS Response**

FWC continues to monitor panther physical and physiological characteristics correlated with inbreeding and depletion of genetic variability. The genetics data collected over the past two decades is being analyzed and published and will be used to help map future panther management actions.

Captive breeding program--One commenter suggested that a limited captive breeding program be considered as a hedge against sudden extinction.

**FWS Response**

The history of Florida panther captive breeding is presented in the Recovery Plan. The captive breeding program for panthers was discontinued in the early 1990s due to the fact that the genetic health of the Florida panther population had deteriorated to a point where continued survival was questionable, even with selective breeding within a captive population. Genetic restoration by simulating natural gene flow through introducing animals from western puma populations has proven to be more successful. This plan does consider the establishment of a captive breeding program to address other issues, however.

Monitor prey densities--Two commenters made 2 comments to the effect that prey animals should be monitored along with panthers as part of the recovery program.

**FWS Response**

FWS agrees that prey animals should be monitored along with panthers, and one of the actions in the Recovery Plan is to assess and monitor the status of deer populations in panther habitat.

PVA--One individual commented that the continued focus on panther demographics is strongly warranted and that the key vital rates for data collection should be kitten survival and adult female survival. However, they were not sure that convening another group of experts to conduct a PVA with existing data would be worthwhile unless solid new data are obtained on vital rates and variation in those rates. Also, they were uncertain whether Root's PVA was based on the Florida panther population only or on a hypothetical metapopulation of *Puma* as would be meaningful for the entire southeast region.

**FWS Response**

FWS and FWC are cooperatively funding a new PVA project that is analyzing new as well as reanalyzing old data. This PVA project should be completed by the end of 2008. The Root model was based on the Florida panther population as well as a hypothetical metapopulation and would be meaningful for the entire southeast region.

Independent scientific review of recovery program--One individual recommended that the Recovery Plan "provide for an independent scientific review panel of the recovery program that would issue annual reports on panther recovery."

**FWS Response**

There is no requirement for FWS to provide for an independent scientific review panel. FWC, NPS, and FWS prepare scientifically based annual updates on the status of panther recovery; however, these updates are not reviewed by an independent scientific panel.

Add research questions that need to be addressed--One individual commented that "the paper by Janis and Clark (2002) on the effects of ORV use and hunting on panthers is exemplary for its experimental design. This Plan should recommend more such studies about other subjects. The plan is particularly weak in its lack of attention to the identification of important questions that could be addressed with experimental management approaches."

**FWS Response**

Almost any recovery action mentioned in this plan could be addressed with experimental management approaches. The purpose of this plan is to outline the actions necessary to recover the panther to the extent that it can be reclassified and eventually delisted.

**Panther Translocation / Reintroduction**

Opposed / supports translocation / reintroduction--Ten comments were received from 8 commenters that were opposed to reintroduction into Arkansas (3), into Arkansas as it affects Missouri (2), Okefenokee National Wildlife Refuge (1), and Georgia (1). Seven comments by 4

commenters were supportive of the need to expand the breeding portion of the Florida panther population into south-central Florida and to establish viable populations in two areas in the southeastern U.S. outside of Florida.

**FWS Response**

The numbers of panthers required to obtain reclassification and delisting thresholds will require expansion of the existing population as well as the reintroduction of additional populations. Prior to any translocation / reintroduction efforts extensive cooperation / coordination will occur.

<u>Clarify the relative priorities and the process for translocation of panthers into central Florida versus other portions of the historic range</u>--Because the pool of individuals available for translocation into central Florida and other portions of the panther's historic range is limited, one individual felt that any decision to physically move cats out of the currently occupied range must be made in light of the competing goals involving range expansion and establishment of additional populations. They felt that the best available science indicates that translocation of panthers into central Florida would not only impede recovery but also would jeopardize panther survival. Two other commenters made 3 comments suggesting that any translocation of panthers would be considered a population "augmentation" versus a "reintroduction."

**FWS Response**

FWS will proceed cautiously by preparing an EIS that explores a reasonable range of

translocation scenarios into central Florida and other portions of the historic range, and

adequately presents the scientific information concerning habitat suitability for these areas and

the biological limitations of the south Florida source population.

Panthers and habitat suitability north of the Caloosahatchee River-- Two commenters were

concerned about a lack of activity by FWS in exploring the possible existence of a small but

viable population of panthers in south-central Florida, especially in the western portion of this

region.  They suggested that an immediate systematic survey be conducted.  Another commenter

requested that additional information be provided about the land uses, potential conflicts, and

size and connectivity of blocks of potential panther habitat in south-central Florida.

**FWS Response**

FWC conducted a systematic survey from July 1998 to June 2004 to determine the occurrence

and status of panthers in south-central Florida and to evaluate the area's potential for expansion

of the breeding population from south Florida (Belden and McBride 2006).  No evidence of a

breeding population of panthers was found.  Dispersing males from the southern Florida

population have immigrated into south-central Florida, but an absence of females has inhibited

expansion of a breeding population into this area.  This study suggested that three segments of

remaining habitat possibly could support small numbers of panthers.  A model to identify

potential panther habitat in south-central Florida was also developed by Thatcher et al. (2006b).

**Panther Effects on Humans**

<u>Increased potential for adverse human-panther encounters</u>--One individual commented that they

were uncertain about the socio-political feasibility of the Recovery Plan.  Two other commenters

recommended that due to the rapidly escalating significance of people-panther interactions, that

the Human Dimensions discussion be expanded beyond the north Florida reintroduction research

to include a brief synopsis of south Florida issues and the extant population.  Another individual

commented that FWS needs to clarify what is meant both by 'extreme' and 'permanent.'

**FWS Response**

FWS agreed and this section of the Recovery Plan was updated.

<u>Recovery Plan threatens hunting / public access</u>--Thirty-two comments were received from four

commenters suggesting that more panthers would result in a loss in outdoor recreation to near

zero, particularly hunting and use of ORVs.  They believed that the Recovery Plan was

intentionally focused upon doing away with the traditional cultural community associated with

the Gladesman folk culture of southern Florida.

**FWS Response**

The majority of outdoor recreational activities are compatible with panther recovery if they are conducted in a manner consistent with existing local, state, and Federal laws and regulations. The Recovery Plan is not aimed at any culture or traditional cultural practices.  Our mandate was to write a plan that outlined actions necessary to recover the panther to the extent that it can be reclassified and eventually delisted.

# APPENDIX D.  List of Peer Reviewers

Dr. Eric Hellgren
Cooperative Wildlife Research Lab
Mailcode 6504, Department of Zoology
Southern Illinois University
Carbondale, IL  62901

Dr. Fran James
Department of Biological Sciences
Florida State University
Tallahassee, FL  32306

Dr. Robert A. Kluson
University of Florida – Sarasota County Extension
Twin Lakes Park
6700 Clark Rd.
Sarasota, FL  34241

Dr. Kenny Logan
Colorado Division of Wildlife
2300 South Townsend Avenue
Montrose, Colorado  81401

Dr. Clay Nielsen
Cooperative Wildlife Research Lab
Mailcode 6504, Department of Zoology
Southern Illinois University
Carbondale, IL  62901

Linda Sweanor
Colorado Division of Wildlife
2300 South Townsend Avenue
Montrose, Colorado  81401

*Nov. 2, 2020 Comment Letter to the U.S. Environmental Protection Agency from Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper re: Florida's Request To Assume Administration of a Clean Water Act Program [EPA-HQ-OW-2018-0640-0001]*

# EXHIBIT 70

**Florida Panther**
***(Puma concolor coryi)***

**5-Year Review:**
**Summary and Evaluation**



**U.S. Fish and Wildlife Service**
**Southeast Region**
**South Florida Ecological Services Office**
**Vero Beach, Florida**

# 5-YEAR REVIEW
## Florida panther / *Puma concolor coryi*

I.    **GENERAL INFORMATION**

A.    **Methodology used to complete the review:**  This review is based on monitoring reports, surveys, and other scientific and management information, augmented by conversations and comments from biologists familiar with the species.  The review was conducted by the Service's Florida Panther Coordinator  located at the South Florida Ecological Services Office and is based primarily on the Third Revision of the Florida Panther Recovery Plan.  All recommendations resulting from this review are a result of thoroughly reviewing the best available information on the Florida panther.  Comments and suggestions regarding the review were received from peer reviews from outside the Service (see Appendix A).  No part of the review was contracted to an outside party.  Comments were evaluated and incorporated as appropriate.

B.    **Reviewers**

   **Lead Regional Office:**  Southeast Region, Kelly Bibb, 404-679-7132

   **Lead Field Office:**  South Florida Ecological Services Office, Chris Belden, 772-562-3909 x 237

C.    **Background**

   1.    **FR Notice citation announcing initiation of this review:**  June 21, 2005.  70 FR 35689.

   2.    **Species status:**  Declining; 2008 Recovery Data Call.

   3.    **Recovery achieved:**  1 (0 to 25 percent)

   4.    **Listing history**
      Original Listing
      FR notice:  32 FR 4001
      Date listed:  March 11, 1967
      Entity listed:  Subspecies
      Classification:  Endangered

   5.    **Associated rulemakings:**  All other free-living *Puma concolor* to be threatened due to similarity of appearance wherever they may occur in Florida (56 FR 40265).

   6.    **Review History:**
      Final Recovery Plan – December 18, 2008.

Recovery Data Call – 2008, 2007, 2006, 2005, 2004, 2003, 2002, 2001, 2000, 1999, and 1998.

November 6, 1991 (56 FR 56882) 5-year review of listed species

July 22, 1985 (50 FR 29901) 5-year review for species listed before 1976 and in 1979 and 1980

May 21, 1979 (44 FR 29566) Review of species listed prior to 1975

No changes were recommended to the status of the panther in these 5-year reviews.

7.  **Species' Recovery Priority Number at start of review (48 FR 43098):** 6c. This designation indicates that the subspecies is subject to a high degree of threat, has a low recovery potential, and its protection may conflict with development or some other economic interest.

8.  **Recovery Plan or Outline:**
Name of plan: Florida Panther Recovery Plan, Third Revision
Date issued: December 18, 2008
Dates of previous revisions:
    Second Revision – March 13, 1995
    First Revision – June 22, 1987
    Original Plan – December 17, 1981

## II.    REVIEW ANALYSIS

A.    **Application of the 1996 Distinct Population Segment (DPS) policy**

1.    **Is the species under review listed as a DPS?**  No

2.    **Is there relevant new information that would lead you to consider listing this species as a DPS in accordance with the 1996 policy?**    No

B.  **Recovery Criteria**

1.    **Does the species have a final, approved recovery plan containing objective, measurable criteria?**  Yes

2.    **Adequacy of recovery criteria.**

        **a. Do the recovery criteria reflect the best available and most up-to-date information on the biology of the species and its habitat?**  Yes

3

> **b. Are all of the 5 listing factors that are relevant to the species addressed in the recovery criteria?** Yes

3. **List the recovery criteria as they appear in the recovery plan, and discuss how each criterion has or has not been met, citing information.**

> Reclassification will be considered when:
> 1. Two viable populations of at least 240 individuals (adults and subadults) each have been established and subsequently maintained for a minimum of twelve years (two panther generations; one panther generation is six years [Seal and Lacy 1989]).
>
> 2. Sufficient habitat quality, quantity, and spatial configuration to support these populations is retained / protected or secured for the long-term.
>
> A viable population, for purposes of Florida panther recovery, has been defined as one in which there is a 95 percent probability of persistence for 100 years. This population may be distributed in a metapopulation structure composed of subpopulations that total 240 individuals. There must be exchange of individuals and gene flow among subpopulations. For reclassification, exchange of individuals and gene flow can be either natural or through management. If managed, a commitment to such management must be formally documented and funded. Habitat should be in relatively unfragmented blocks that provide for food, shelter, and characteristic movements (e.g., hunting, breeding, dispersal, and territorial behavior) and support each metapopulation at a minimum density of 2 to 5 animals per 100 square miles (259 square kilometers) (Seidensticker et al. 1973, Logan et al. 1986, Maehr et al. 1991a, Ross and Jalkotzy 1992, Spreadbury et al. 1996, Logan and Sweanor 2001, Kautz et al. 2006), resulting in a minimum of 4,800 – 12,000 square miles (12,432 – 31,080 square kilometers) per metapopulation of 240 panthers. The amount of area needed to support each metapopulation will depend upon the quality of available habitat and the density of panthers it can support.
>
> The panther population has increased from an estimated 12 to 20 (excluding kittens) in the early 1970s to an estimated 100 to 120 in 2007. However, the panther continues to face numerous threats. The Florida panther has not met criteria to be considered for reclassification to threatened status. For further detail on recovery criteria, please see the recently released recovery plan at http://www.fws.gov/verobeach.

C. **Updated Information and Current Species Status**

1. **Biology and Habitat**

**a. Abundance, population trends (e.g. increasing, decreasing, stable), demographic features (e.g., age structure, sex ratio, family size, birth rate, age at mortality, mortality rate, etc.), or demographic trends:**
The panther population appears to be increasing or stable in the short-term. McBride (2000, 2001, 2002, 2003) reported documented panther counts (i.e., number known alive) based on panthers treed with hounds; physical evidence (e.g., tracks where radio-collared panthers were not known to occur); documentation by trail-camera photos; and sightings of uncollared panthers by a biologist or pilot from a monitoring plane or via ground telemetry. He counted 62, 78, 80, and 87 panthers (which includes adult and subadult panthers but not kittens at the den) in 2000, 2001, 2002, and 2003, respectively. The number of documented panthers were 78, 82, 97, 117, and 104 in 2004, 2005, 2006, 2007, and 2008, respectively (R. McBride, pers. comm. 2009). McBride (pers. comm. 2007) documented an increase in the number of uncollared panthers captured each year between 2000 and 2006 relative to 1981 through 1999, while Florida Fish and Wildlife Commission (FWC) (2006) reported data showing an apparent increase in the number of panthers killed by vehicles and number of known den sites since 1999. These data, along with an increase in the number of male panthers dispersing north of the Caloosahatchee River (Belden and McBride 2006), indicate an increasing trend in the panther population. In the long term, continued habitat loss and fragmentation could eventually lead to decline.

Male Florida panthers are polygynous, maintaining large, overlapping home ranges containing several adult females and their dependent offspring. The first sexual encounters for males normally occur at about three years based on 26 radio-collared panthers of both sexes (Maehr et al. 1991a). Based on genetics work, some males may become breeders as early as 17 months (W. Johnson, National Cancer Institute, pers. comm. 2005). Breeding activity peaks from December to March (Shindle 2003). Litters (n = 82) are produced throughout the year, with 56 – 60 percent of births occurring between March and June (Jansen et al. 2005, Lotz et al. 2005). The greatest number of births occurs in May and June (Jansen et al. 2005, Lotz et al. 2005). Female panthers have bred as young as 18 months (Maehr et al. 1989) and successful reproduction has occurred up to 11 years old. Mean age of denning females is $4.6 \pm 2.1$ (standard deviation [sd]) years (Lotz et al. 2005). Age at first reproduction for 19 known-aged female panthers averaged $2.2 \pm 0.246$ (sd) years and ranged from 1.8 to 3.2 years. Average litter size is $2.4 \pm 0.91$ (sd) kittens. Seventy percent of litters are comprised of either two or three kittens. Mean birth intervals (elapsed time between successive litters) are $19.8 \pm 9.0$ (sd) months for female panthers (n = 56) (range 4.1 to 36.5 months) (Lotz et al. 2005). Females that lose their litters generally produce another more quickly; five of seven females whose kittens were brought into

5

captivity successfully produced another litter an average of 10.4 months after the removal of the initial litter (Land 1994).

Intraspecific aggression accounts for 42 percent of all mortalities among radio-collared panthers (Jansen et al. 2005, Lotz et al. 2005). Unknown causes and collisions with vehicles account for 24 and 19 percent of mortalities, respectively. From 1990 to 2004, mean annual survivorship of radio-collared adult panthers was greater for females ($0.894 \pm 0.099$ sd) than males ($0.779 \pm 0.125$ sd) (Lotz et al. 2005). Most intraspecific aggression occurs between male panthers; but, aggressive encounters between males and females, resulting in the death of the female, have occurred. Defense of kittens and / or a kill is suspected in half (5 of 10) of the known instances through 2003 (Shindle et al. 2003).

Female panthers are considered adult residents if they are older than 18 months, have established home ranges and bred (Maehr et al. 1991a). Land et al. (2004) reported that all 24 female panthers first captured as kittens survived to become residents and 19 (79.2 percent) produced litters. Male panthers are considered adult residents if they are older than three years and have established a home range that overlaps with females. Thirty-one male panthers were captured as kittens and 12 (38.7 percent) of these cats survived to become residents (Jansen et al. 2005, Lotz et al. 2005). "Successful male recruitment appears to depend on the death or home-range shift of a resident adult male" (Maehr et al. 1991b). Turnover in the breeding population is low with documented mortality in radio-collared panthers being greatest in subadults and non-resident males (Maehr et al. 1991b, Shindle et al. 2003).

**b. Genetics, genetic variation, or trends in genetic variation (e.g., loss of genetic variation, genetic drift, inbreeding, etc.):** Three external characters—a right angle crook at the terminal end of the tail, a whorl of hair or cowlick in the middle of the back, and irregular, white flecking on the head, nape, and shoulders—not found in combination in other subspecies of *Puma* (Belden 1986), were commonly observed in Florida panthers through the mid-1990s. The kinked tail and cowlicks were considered manifestations of inbreeding (Seal 1994), whereas the white flecking was thought to be a result of scarring from tick bites (Maehr 1992, Wilkins et al. 1997). Four other abnormalities prevalent in the panther population prior to the mid-1990s included cryptorchidism (one or two undescended testicles), low sperm quality, atrial septal defects (the opening between two atria of the heart fails to close normally during fetal development), and immune deficiencies. These four abnormalities were also suspected to be the result of low genetic variability (Roelke et al. 1993).

6

Natural genetic exchange with other panther populations ceased when the Florida panther became geographically isolated over a century ago (Seal 1994). Isolation, reduced population size, and inbreeding resulted in loss of genetic variability and diminished health. Data on polymorphism and heterozygosity, along with records of multiple physiological abnormalities, suggest that the panther population had experienced inbreeding depression (Roelke et al. 1993, Barone et al. 1994). Measured heterozygosity levels indicate that the Florida panther had lost about 60 – 90 percent of its genetic diversity (Culver et al. 2000). Genetic problems in the Florida panther included heart murmurs, a high rate of unilateral cryptorchidism, low testicular and semen volumes, diminished sperm motility, and a high percentage of morphologically abnormal sperm.

A plan for genetic restoration and management of the Florida panther was developed in September 1994 (Seal 1994) and eight non-pregnant adult female Texas puma (*Puma concolor stanleyana*) were released in five areas of south Florida from March to July 1995. Since this introgression, rates of genetic defects, including crooked tails and cowlicks, have dramatically decreased (Land et al. 2004). In addition, to date neither atrial septal defects nor cryptorchidism have been found in introgressed panthers (M. Cunningham, FWC, pers. comm. 2005). Semen examination of two introgressed panthers indicated that sperm volume, motility, and count were higher than for an uncrossed Florida panther. A preliminary assessment of genetic restoration suggested that the desired 20 percent introgression level had been achieved, but the contributions were primarily from two of the released females (Land and Lacy 2000). Genetic introgression is also reducing the occurrence of kinked tails and cowlicks in intercross progeny (Land et al. 2004). The effects of genetic restoration on color and cranial and dental measures have not been evaluated.

**c. Taxonomic classification or changes in nomenclature:**  Since the first classification of felids by Linnaeus (1758), there have been a number of reclassifications. A brief review of cat species classification history is presented by Werdelin (1996) and shows a record of extremes in both "splitting" and "lumping" (Nowell and Jackson 1996). The most recent evaluation of the felid family is Wozencraft's (1993) classification (Werdelin 1996). A considerable amount of work is still required before consensus can be reached regarding felid systematics and the consensus must involve both morphological and molecular work (Werdelin 1996). A consensus molecular, morphological, and ethological classification scheme would provide a framework for conservation programs and will become increasingly important as wild populations become smaller and increasingly isolated (O'Brien 1996a).

Although there is more agreement among felid taxonomists regarding recognition of cat species, there is considerable confusion with regards to

subspecies, debate on subspecies definition, and debate on whether or not the traditional taxonomic concept is even valid in the light of contemporary knowledge of population biology and genetics (Nowell and Jackson 1996). There is general agreement that too many subspecies of cats have been described in the past on the basis of slim evidence (Nowell and Jackson 1996). Mayr (1940, 1963, 1970) defined a subspecies as "a geographically defined aggregate of local populations which differ taxonomically from other subdivisions of the species" (cited in O'Brien 1996b). O'Brien and Mayr (1991) and O'Brien (1996b) provide criteria for subspecies classification. Following their criteria, a subspecies includes members that share a unique geographic range or habitat, a group of phylogenetically concordant phenotypic characters, and a unique natural history relative to other subdivisions of the species.

The Florida panther was first described by Charles B. Cory in 1896 as *Felis concolor floridana* (Cory 1896). The type specimen was collected in Sebastian, Florida. Bangs (1899) believed that the Florida panther was restricted to peninsular Florida and could not intergrade with other *Felis* spp. Therefore, he assigned it full specific status and named it *Felis coryi* since *Felis floridana* had been used previously for a bobcat (*Lynx rufus*).

The taxonomic classification of the *Felis concolor* group was revised and described by Nelson and Goldman (1929) and Young and Goldman (1946). These authors differentiated 30 subspecies using geographic and morphometric (measurement of forms) criteria and reassigned the Florida panther to subspecific status as *Felis concolor coryi*. This designation also incorporated *F. arundivaga* which had been classified by Hollister (1911) from specimens collected in Louisiana into *F. c. coryi*.

The puma was originally named *Felis concolor* by Linneaus in 1771, but in 1834 Jardine renamed the genus *Puma* (Wozencraft 1993). Later taxonomists lumped most of the smaller cat species, including the puma, into subgenera under the genus *Felis* (Nowak and Paradiso 1983). Wozencraft (1993) promoted the subgenera of the old genus *Felis* to full generic status and placed a number of former *Felis* species, including the puma, in monotypic genera (Nowell and Jackson 1996). The taxonomic classification of the puma is now considered to be *Puma concolor* (Wozencraft 1993), making the accepted name for the Florida panther *P. c. coryi*.

A comprehensive molecular genetic analysis of pumas in southern Florida using mitochondrial DNA and nuclear markers reported by O'Brien et al. (1990) indicated the existence of two distinct genetic stocks with concordant morphological phenotypes. The close phylogenetic proximity of the southwest Florida population segment with representatives of other North American subspecies indicated this population segment was

descended from historic *P. c. coryi*.  The population segment in southeastern Florida, however, appeared to have evolved in South or Central America.  This was accounted for by the release of seven captive animals (including three females) into Everglades National Park (ENP) between 1957 and 1967 (unpublished archives, ENP, National Park Service [NPS], Washington, D.C., cited in O'Brien et al. 1990).  The subpopulation in ENP became effectively extirpated with the death of three resident females in June and July 1991 (Bass and Maehr 1991).

As people exterminated puma in eastern North America, the only population that remained was in peninsular Florida and they became isolated from other puma populations, eliminating gene flow.  As the Florida panther was reduced to a small breeding population in southern Florida, the lack of gene flow and small population size fostered a higher rate of inbreeding as seen in reduced allozyme variation relative to other puma subspecies (Roelke et al. 1993a) and eight fixed loci (Culver et al. 2000).  The inbreeding condition and reduction of genetic diversity appeared to have occurred during the 20th century as Culver et al. (2000) found museum samples from the Florida population dating to the turn of the 19th century to have much higher heterozygosity levels.  The consequences of inbreeding included spermatozoal defects, cryptorchidism, cardiac abnormalities, and reduced immunity to infectious diseases (Roelke et al. 1993a).

Through the late 1980s and early 1990s, the frequency of individuals exhibiting physiological abnormalities increased.  Approximately 90 percent of males born after 1990 had one or both testicles undescended (Pimm et al. 2006a).  The Service (1994a) became concerned that the overall genetic health of the Florida panther was at a point where the panther's continued existence was doubtful without a proactive genetic restoration program.  A plan for genetic restoration and management was developed (Seal 1994a).  The level of introgression required to reverse the effects of inbreeding and genetic loss required the release of eight Texas puma into areas occupied by Florida panther (Seal 1994).  These eight female Texas puma were released in 1995, five of which produced a total of 20 offspring (Land et al. 2004).  The desired 20 percent introgression level was achieved (Land and Lacy 2000) and the genetic rescue of the Florida panther was determined to be successful (Pimm et al. 2006a).  Three times as many introgressed kittens appear to reach adulthood as do uncrossed Florida panthers and introgressed adult females have lower mortality rates (Pimm et al. 2006a).

Subspecies can interbreed as a natural process whenever they are in contact (O'Brien and Mayr 1991) and this was the basis for choosing Texas puma (the closest extant adjacent subspecies) for genetic restoration of the Florida panther (Service 1994a).  Prior to making the decision to

conduct genetic augmentation to facilitate the recovery of the Florida panther, the Service made the determination that any resulting offspring would receive the full protections of the Endangered Species Act (ESA). This determination was the product of a rigorous policy and legal review at the highest levels of the agency (Service 1994b).

Culver et al. (2000) speculated that the moderate level of genetic variability found in North American puma was due to their extirpation during Pleistocene glaciations and then recolonization some 10,000 years ago. Modern puma eventually covered practically the entire North American continent (excluding the most northern latitudes) and had the largest range of any native mammal species in the Western Hemisphere (Hall and Kelson 1959). Within this extensive range, geographic variation was present and involved subtle differences in body measurements, pelage characteristics, and skeletal features. When puma subspecies were first described, it was this geographic variation that was used to delineate each subspecies. Characters previously used to describe *P. c. coryi* were quantified and re-evaluated using statistical methods by Wilkins et al. (1997). All historic and recent specimens from the southeastern U.S. (n = 79) were examined for pelage color, cranial profile and proportions, and other morphological traits. These specimens were compared to a sample of North and South American specimens. The characters measured provide a basis on which to describe the Florida population and discriminate between it and other populations (Wilkins et al. 1997).

Recent molecular genetic analyses have found that pumas in North America are very similar to each other (Culver et al. 2000, Sinclair et al. 2001, and Anderson et al. 2004). Culver et al. (2000) examined subspecies of puma by using three mitochondrial genes and ten microsatellite loci in biological samples collected from 315 pumas from throughout their range. They could not confirm the previous classification of 32 subspecies and, based on the subspecific criteria suggested by O'Brien and Mayr (1991), could only recognize six subspecies of *Puma*. Culver et al. (2000) suggested all North American pumas be reclassified as a single subspecies (*P. c. couguar*) due to lack of genetic structure. However, Culver et al. (2000) determined that the Florida panther was one of several smaller populations that had unique features, the number of polymorphic microsatellite loci and amount of variation were lower, and it was highly inbred (eight fixed loci).

The degree to which the scientific community has accepted the use of genetics in puma taxonomy is not resolved at this time. The existing Florida panther population represents the last remaining population of *Puma* in the eastern United States, and is therefore important to the genetic representation for pumas in North America. Additional research is needed to understand genetic and morphological similarities and

differences of puma across North America.  The Florida panther is listed under the ESA and any change in its listing status based on best available science would require completing the formal rulemaking process pursuant to the ESA.  The panther and its habitat continue to receive ESA protections.

**d. Spatial distribution, trends in spatial distribution (e.g. increasingly fragmented, increased numbers of corridors, etc.), or historic range:**
The Florida panther is the last subspecies of *Puma* still surviving in the eastern U.S.  The panther once ranged throughout the southeastern U.S. from Arkansas and Louisiana eastward across Mississippi, Alabama, Georgia, Florida, and parts of South Carolina and Tennessee.  Today the panther is restricted to less than 5 percent of its historic range in one isolated breeding population located in southern Florida.

Although generally considered unreliable, sightings of panthers regularly occur throughout the Southeast.  However, no reproducing populations of panthers have been found outside of south Florida for at least 30 years despite intensive searches to document them (Belden et al. 1991, McBride et al. 1993, Clark et al. 2002).  Survey reports and more than 70,000 locations of radio-collared panthers recorded between 1981 and 2004 clearly define the panther's current breeding range (see recovery plan at http://www.fws.gov/verobeach for relevant figures and maps). Reproduction is known only in the Big Cypress Swamp / Everglades physiographic region in Collier, Lee, Hendry, Miami-Dade, and Monroe Counties south of the Caloosahatchee River (Belden et al. 1991). Although confirmed panther sign, male radio-collared panthers, and uncollared males killed by vehicles have been recorded outside of south Florida in recent years, no female panthers have been documented north of the Caloosahatchee River since 1973 (Nowak and McBride 1974, Belden et al. 1991, Land and Taylor 1998, Land et al. 1999, Shindle et al. 2000, McBride 2002, Belden and McBride 2006).

**e. Habitat or ecosystem conditions (e.g., amount, distribution, and suitability of the habitat or ecosystem):**  Data from radio-collared panthers collected from 1981 through 2000 were used to delineate home ranges, which were geo-referenced with land cover and other relevant data.  Compositional analysis was performed to evaluate the relative frequency of occurrence of various land cover types within panther habitat.  A spatially-explicit raster model that identified forest patches potentially suitable for use by panthers as cover was used to refine the outer boundaries of the occupied zone, represented as overlapping minimum convex polygons of panther home ranges, and as a first step to identifying zones of potential use elsewhere.  Cover components were combined with a least cost path analysis to delineate a dispersal zone

connecting occupied habitat in southern Florida to the Caloosahatchee River.

Three priority zones were identified as important for panther habitat conservation: (1) Primary Zone – lands essential to the long-term viability and persistence of the panther in the wild; (2) Secondary Zone - lands contiguous with the Primary Zone, currently used by few panthers, but which could accommodate expansion of the panther population south of the Caloosahatchee River; and (3) Dispersal Zone - the area which may facilitate future panther expansion north of the Caloosahatchee River (Kautz et al. 2006), (Figure 3 in the recovery plan). The Primary Zone is currently occupied and supports the breeding population of panthers. Although panthers move through the Secondary and Dispersal Zones, they are not currently occupied by resident panthers. Some areas of the Secondary Zone would require restoration to support panthers.

These zones vary in size, ownership, and land cover composition. The Primary Zone is 3,548 mi$^2$ (9,189 km$^2$) in size, 73 percent of which is publicly owned, and includes portions of the Big Cypress National Preserve (BCNP), ENP, Fakahatchee Strand Preserve State Park (FSPSP), Florida Panther National Wildlife Refuge (FPNWR), Okaloacoochee Slough State Forest (OSSF), and Picayune Strand State Forest (PSSF). This zone's composition is 45 percent forest, 41 percent freshwater marsh, 7.6 percent agriculture lands, 2.6 percent prairie and shrub lands, and 0.52 percent urban lands (Kautz et al. 2006).

The Secondary Zone is 1,269 mi$^2$ (3,287 km$^2$) in size, 38 percent of which is public land. This zone's composition is 43 percent freshwater marsh, 36 percent agriculture, 11 percent forest, 6.1 percent prairie and shrub lands, and 2.3 percent low-density residential areas and open urban lands (Kautz et al. 2006).

The Dispersal Zone is 44 mi$^2$ (113 km$^2$) in size, all of which is privately owned. This zone's composition is 49 percent agriculture (primarily improved pasture and citrus groves), 29 percent forest (wetland and upland), 8.8 percent prairie and shrub land, 7.5 percent freshwater marsh, and 5.1 percent barren and urban lands (Kautz et al. 2006).

2.    **Five-Factor Analysis (threats, conservation measures, and regulatory mechanisms)**

   a. **Present or threatened destruction, modification or curtailment of its habitat or range:** Habitat loss, fragmentation, and degradation, and associated human disturbance are the greatest threats to panther survival and among the greatest threats to its recovery. These threats are expected to continue in Florida and throughout the Southeast. Throughout Florida,

between 1936 and 1987, cropland and rangeland increased 6,609 mi$^2$ (17,118 km$^2$) or 30 percent, urban areas increased by 6,172 mi$^2$ (15,985 km$^2$) or 538 percent, while herbaceous wetlands declined by 6,063 mi$^2$ (15,702 km$^2$) or 56 percent and forests declined by 6,719 mi$^2$ (17,402 km$^2$) or 21 percent (Kautz et al. 1993, Kautz 1994). Assuming that all of the forest lost was panther habitat, Kautz (1994) estimated that the 21 percent loss of forests was the equivalent of 35 to 70 male panther home ranges and 100 to 200 female panther home ranges. Between 1985 to 2003 an additional 5,019 mi$^2$ (13,000 km$^2$) (13 percent) of natural and semi-natural lands (including panther habitat) in the state were converted to urban / developed and agricultural uses (Kautz et al. 2006).

Expansion of urban areas on the coasts and the spread of agricultural and urban development in the interior of Florida continue to replace, degrade, and fragment panther habitat, placing the panther at greater risk. Over 83 percent of the 2,500 mi$^2$ (6,475 km$^2$) of agricultural land in southwest Florida has been categorized as rangeland. In Southwest Florida between 1986 and 1990, row crop acreage increased by 14 mi$^2$ (36 km$^2$) or 21 percent; sugarcane increased by 25 mi$^2$ (65 km$^2$) or 21 percent; citrus increased by 84 mi$^2$ (219 km$^2$) or 75 percent; and rangeland, much of it suitable for panther occupation, decreased by 250 mi$^2$ (647 km$^2$) or 10 percent (Townsend 1991). Rangeland losses were about evenly divided between agricultural and urban development (Townsend 1991).

The extent of land use conversions for southwest Florida (Collier, Lee, Hendry, Charlotte, and Glades Counties) between 1986 and 1996 was estimated using a change detection analysis performed by Beth Stys (FWC, unpublished data). The area of disturbed lands increased 31 percent in these five counties between 1986 and 1996, with the greatest increases in disturbed lands occurring in Hendry and Glades Counties. Most (66 percent) of the land use change over the 10-year period was due to conversion to agricultural uses. Forest cover types accounted for 42 percent of land use conversions, dry prairies accounted for 37 percent, freshwater marsh accounted for 9 percent, and shrub and brush lands accounted for 8 percent. Randy Kautz (FWC, pers. comm. 2003) estimated panther habitat loss to be 0.8 percent per year between 1986 and 1996 using a composite of three different methodologies. These included a review of U.S. Forest Service forest data between 1936 and 1995 using loss of forest as an index of the rate of panther habitat loss and an analysis to detect changes in land cover in five south Florida counties (Charlotte, Collier, Glades, Hendry, Lee) between 1986 and 1996 using classified Landsat imagery. The third methodology used the Cox et al. (1994) panther habitat model, where based on 1986 Landsat data, 1996 Landsat landcover data was overlaid and then areas originally mapped as panther habitat were subsequently converted to other uses over the 10-year period were tabulated. Kautz (Breedlove, Dennis, and Associates, pers. comm.

2005) believes the estimated annual habitat loss since 1996 may be 2 to 3 times higher than that calculated for the previous period.

More recently, Stys calculated the extent of semi-natural and natural lands that have been converted to agricultural and urban / developed in Florida between 1985 to 1989 and 2003 (B. Stys, FWC, pers. comm. 2005). Based upon this analysis, approximately 570 mi$^2$ (1,476 km$^2$) of natural and semi-natural lands in Glades, Hendry, Lee, Collier, Broward, Monroe, and Miami-Dade Counties were converted during this time period (FWC, unpublished data). Of these, approximately 340 mi$^2$ (880 km$^2$) were conversions to agricultural uses and 230 mi$^2$ (596 km$^2$) to urban uses.

Rapid development in southwest Florida has compromised the ability of landscapes to support a self-sustaining panther population (Maehr 1990, 1992). Maehr (1990) reported that there were approximately 3,401 mi$^2$ (8,810 km$^2$) of occupied panther range in south Florida and that approximately 50 percent is comprised of landscapes under private ownership. Kautz et al. (2006) found that approximately 27 percent of the land in the Primary Zone, 60 percent of the land in the Secondary Zone, and 100 percent of the land in the Dispersal Zone is in private ownership. Maehr (1990) indicated that development of private lands may limit panther habitat to landscapes under public stewardship. Given the panther's reliance on public land, the rising cost of land is an impediment to habitat protection and therefore panther conservation and recovery.

Highways in wildlife habitat are known to result in loss and fragmentation of habitat, traffic related mortality, and avoidance of associated human development. As a result, small populations may become isolated, subjecting them to demographic and stochastic factors that reduce their chances for survival and recovery. Two-lane 108 ft (33 m) and four-lane 328 ft (100 m) cleared rights-of-way, respectively, occupy 2.0 and 6.2 percent of each 640 ac (259 ha) of land through which they pass (Ruediger 1998). Highways can also stimulate land development as far away as 2 mi (3.2 km) on either side (Wolf 1981). Thus, for each 1 mi (1.6 km) a highway is extended, 2,500 ac (1,012 ha) are potentially opened to new development (Wolf 1981).

In addition to direct loss and fragmentation of habitat, constructing new and expanding existing highways may increase traffic volume and impede panther movement within and between frequently used habitat blocks throughout the landscape (Swanson et al. 2005). Increases in traffic volume, increasing size of highways (lanes), and habitat alterations adjacent to key road segments may limit the panther's ability to cross highways and may ultimately isolate some areas of panther habitat (Swanson et al. 2005). The addition of wildlife crossings and fencing has ameliorated this threat in the immediate vicinity of these structures. The

addition of more wildlife crossings, especially in areas with a history of collisions and where traffic is projected to increase, can help address this significant threat.

Past land use activity, hydrologic alterations, and lack of fire management (Dees et al. 1999) have also affected the quality and quantity of panther habitat. The effect of invasive plants on panther habitat utilization, particularly melaleuca, is unknown. As the remaining forested uplands are lost, sloughs containing cypress, marsh, and shrub wetlands comprise a greater percentage of the remaining habitat available to panthers, relative to habitat historically available to the species.

Insight can be gained into expected rates of habitat loss in the future by reviewing human population growth projections for the south Florida region. Smith and Nogle (2001) developed low, medium, and high population growth projections for all Florida counties from 2000 through 2030. Using their medium projections, which they believe provide the most accurate forecasts, Smith and Nogle (2001) estimate that the human population of the 10 counties in south Florida will increase from 6.09 to 9.52 million residents by 2030, an increase of 56 percent.

Human population in the southeastern U.S. has increased 10-fold since 1850, expanding from 4.7 million to over 48 million in 2000 (cited in Swanson et al. 2005). In Florida, the population increased from 87,000 to over 18 million (cited in Swanson et al. 2005, U.S. Census Bureau 2008). From 1990 to 2004, the population in Collier County increased from 152,099 to 296,678 (U.S. Census Bureau 2002, 2004). During the same time period, the population in Lee County increased from 335,113 to 514,295 (U.S. Census Bureau 2002, 2004). The population of southwest Florida, particularly Collier and Lee Counties, is projected to increase 21 percent by 2010 (cited in Swanson et al. 2005).

Potential panther habitat throughout the Southeast continues to be affected by urbanization, residential development, conversion to agriculture and silviculture, mining and mineral exploration, lack of land use planning, and other sources of stress. With human population growth and increased human disturbance, the extent of potentially suitable habitat remaining in the Southeast is expected to decrease. Habitat loss, fragmentation, degradation, and disturbance from human activity throughout the Southeast are expected to remain among the greatest threats to the potential for reintroducing panther populations.

**b. Overutilization for commercial, recreational, scientific, or educational purposes:** There are no commercial or recreational uses of panthers. In rare cases where a panther is unable to survive in the wild, it may be captured and used for educational purposes. However, panthers

are routinely captured and monitored for scientific purposes. Risks are associated with capture and monitoring, but the overall threat to the panther is considered low.

**c. Disease or predation:** Disease and parasites have not been documented to be a major mortality factor in the panther population (Maehr et al. 1991b, Taylor et al. 2002). However, this observation is largely based on the captured and vaccinated sample of the population. Disease expression and mortality events for the unmarked and unvaccinated segment of the population, including kittens, may be higher, especially for those diseases included in the vaccination regimen. Further, as the panther population density increases there is an increased risk of diseases transmitted by direct contact. A recent outbreak of Feline Leukemia Virus (FeLV) demonstrated the potential impact of infectious diseases on the population. Should a virulent pathogen enter the population, such as occurred with FeLV, there is no absolute barrier in south Florida that could prevent such a disease from impacting the entire population (Beier et al. 2003). Consequently, until additional populations of panthers can be established elsewhere in their historic range, infectious diseases and parasites remain a threat to the Florida panther.

**d. Inadequacy of existing regulatory mechanisms:** Development pressure in southwest Florida has been high; for example, data for Collier, Lee, and Hendry Counties, a stronghold for the panther population, indicate that from 1985 through 2003 more than 223 mi$^2$ (578 km$^2$) of natural and semi-natural lands were converted to agriculture (FWC, unpublished data). In addition, more than 145 mi$^2$ (375 km$^2$) of semi-natural and natural lands in this three-county area have also been lost to development (FWC, unpublished data). While not all of these habitat losses and conversions involved panther habitat, many projects involved wetland impacts, requiring permit review by the U.S. Army Corps of Engineers (COE) pursuant to section 404 of the Clean Water Act and / or coordination among regulatory agencies pursuant to the Fish and Wildlife Coordination Act. For projects with a Federal nexus, consultation pursuant to section 7 of the ESA was needed for actions that may affect the panther. Through compensation for some of these projects, the Service helped secure conservation of 62 mi$^2$ (161 km$^2$) in the Primary, Secondary, and Dispersal Zones from September 2003 to June 2008.

Florida Statute 373.414 requires that activities permitted in wetlands and surface waters of the state are not contrary to the public interest. If it is determined that an activity will adversely effect panthers or panther habitat, the governing board (Water Management District [WMD]) or the Florida Department of Environmental Protection (FDEP) can consider measures (e.g., on-site mitigation, off-site mitigation, purchase of credits

16

from mitigation banks) that will mitigate the effects of the regulated activity.

In addition to the impacts of individual projects, the FDEP and WMD shall take into account cumulative impacts on water resources and manage those resources in a manner to ensure their sustainability (Chapter 373.016(2) F.S.). Cumulative impacts can be considered unacceptable when they provide significant impacts to functions of wetlands, including the utilization of the wetlands by wildlife species. In practice, evaluating cumulative impacts of development in southwest Florida on panthers has not been sufficient to prevent significant loss of panther habitat. Since the majority of panther habitat in southwest Florida has significant wetland components, provisions of 373.414 are usually a part of the review of proposed development. However, the state wetlands permitting authorities currently lack comparable regulatory mechanisms to assess impacts to panthers or panther habitat on project sites that do not have a wetland component.

Because of the project-specific focus of regulatory programs and other constraints such as high workloads, local, State, and Federal regulatory agencies sometimes find it difficult to complete the cross-government review that would be ideal to thoroughly review and effectively assess all potential impacts to panthers. In addition, local, State, and Federal agencies sometimes have difficulty monitoring permit compliance and tracking the precise impact on species and habitat from authorized actions, as well as tracking the impact from unauthorized actions. Assessing current baseline conditions and accurately predicting future impacts are also challenging because the panther is a wide-ranging species that uses a wide array of habitat types. Furthermore, baseline conditions for the panther are continually changing (e.g., impacts from development, conservation actions).

**e. Other natural or manmade factors affecting its continued existence:**
*Mortality, Trauma, and Disturbance*--One-hundred fifty-three panther mortalities have been documented from February 1972 through June 2004, with at least 58 (41 percent) of known deaths occurring in the latest four-year period (Land et al. 2004). Overall, documented mortality (n = 105) of radiocollared and uncollared panthers averaged 3.4 per year through June 2001. However, from July 2001 through June 2004, documented mortality (n = 48) increased with an average of 16.0 per year during these years (Land et al. 2004).

From February 1972 through June 2004, 36 panthers were documented to have died from intraspecific aggression (Land et al. 2004). Although most of these encounters are male-male, from July 2001 through June 2004, at least nine females have been killed in encounters with males (Land et al.

2004). Defense of kittens and / or a kill is suspected in five of these instances that occurred through 2003 (Shindle et al. 2003).

Eighty-six panther-vehicle collisions were documented between 1972 and 2005 of which 80 (52 percent) resulted in panther deaths (Lotz et al. 2005). However, panther-vehicle collisions were identified as the third most important source of mortality among radiocollared panthers (19 percent), a less biased sample (Land et al. 2004). Fifty-six percent (48) of panther-vehicle collisions have occurred since 2000 with all but two being fatal (Lotz et al. 2005). Approximately 53 percent of documented panther roadkills have occurred within the Primary Zone through 2004 (Swanson et al. 2005). Panther-vehicle collisions are a significant source of mortality and pose a serious on-going threat to the species. In addition, new and existing roads, expansion of highways, and increases in traffic volume and speed contribute to a loss of panther habitat and impede movement within and between high use habitat blocks throughout the landscape (Swanson et al. 2005). New and expanded highways are likely to increase the threat of panther mortality and injuries due to collisions.

Florida's human population has been steadily growing and as a result, urban / suburban areas now interface with panther habitat. If human-panther interactions increase, the potential for complaints from the public and, in some cases, the need for subsequent management responses could result in take of panthers in the form of harassment through aversive conditioning in an attempt to teach individuals to avoid humans. In extreme cases, permanent removal from the wild is possible.

*Loss of Genetic Diversity*--Natural genetic exchange with other panther populations ceased when the Florida panther became geographically isolated over a century ago (Seal 1994). Isolation, habitat loss, reduced population size, and associated inbreeding resulted in loss of genetic variability and diminished health. Data on polymorphism and heterozygosity, along with records of multiple physiological abnormalities, suggest that the panther population has experienced inbreeding depression (Roelke et al. 1993, Barone et al. 1994). Measured heterozygosity levels indicate that the Florida panther has lost about 60 to 90 percent of its genetic diversity (Culver et al. 2000). Genetic problems in the Florida panther included heart murmurs, a high rate of unilateral cryptorchidism, low testicular and semen volumes, diminished sperm motility, and a high percentage of morphologically abnormal sperm.

To address these threats, a genetic management program was implemented with the release of Texas puma into south Florida in 1995. The results of genetic restoration have been successful (Pimm et al. 2006), with an increasing population, signs of increased genetic health, recolonization of areas in BCNP and ENP recently unoccupied, and increased dispersal

(McBride 2000, 2001, 2002; Maehr et al. 2002). To date, neither atrial septal defects nor cryptorchidism have been found in introgressed panthers (M. Cunningham, pers. comm. 2005). Semen examination of a couple of introgressed panthers indicated that sperm volume, motility, and count were higher than for an uncrossed Florida panther. A preliminary assessment of genetic restoration suggested that the desired 20 percent introgression level had been achieved, but the contributions were primarily from two of the released females (Land and Lacy 2000). Genetic introgression is also reducing the occurrence of kinked tails and cowlicks in intercross progeny (Land et al. 2004).

_Human Dimension_--Sociopolitical obstacles to large carnivore management are often more daunting than biological ones (Clark et al. 2002). As more people have moved into panther habitat in recent years, there has been an increase in potential for human-panther interactions and disturbance associated with management responses to panthers that have interacted with humans. As human-panther interactions increase, the potential for complaints from the public and, in some cases, the need for subsequent management responses could result in take of panthers in the form of harassment through aversive conditioning in an attempt to teach individuals to avoid humans. Also, a lack of public support and tolerance could prevent the reintroduction of panthers outside of Florida. Public opinion and government apprehension about public opposition are the most critical impediments to reintroduction efforts and attainment of recovery goals.

_Contaminants_--Because the panther is a top carnivore, bioaccumulation of environmental contaminants, particularly mercury, remains a concern (Dunbar 1995, Newman et al. 2004). However, mercury in the Everglades ecosystem has decreased over the last several years (Frederick et al. 2002).

**D.    Synthesis**

Historically occurring throughout the southeastern United States, today the panther is restricted to less than 5 percent of its historic range in one population located in south Florida. The panther population has increased from an estimated 12 to 20 (excluding kittens) in the early 1970s to an estimated 100 to 120 in 2007. The panther continues to face numerous threats due to an increasing human population and habitat development. Isolation, reduced population size, and inbreeding have resulted in loss of genetic variability, and because the panther occurs as a single, isolated population, a catastrophic event such as a disease outbreak could be devastating. Consequently, until further recovery actions can be implemented and additional populations can be established elsewhere in their historic range, the Florida panther remains in danger of extinction throughout all or a significant portion of its range.

**III.    RESULTS**

    **A.    Recommended Classification:**

        __X_  **No change is needed**

**IV.    RECOMMENDATIONS FOR FUTURE ACTIONS**

The panther depends upon habitat of sufficient quantity, quality, and spatial configuration for long-term persistence, therefore the primary actions over the next 5 years should be aimed at habitat conservation and reducing habitat-related threats.  Range expansion and reintroduction of additional populations are essential for panther recovery as is fostering greater public understanding and support.  Therefore, actions aimed at expanding the existing breeding population into south-central Florida, reintroducing at least two additional viable populations within the historic range outside of south and south-central Florida, and facilitating panther recovery through public awareness, understanding, and support will also be important.

*South Florida Habitat*
- Maintain the quantity and quality of habitat in the Primary Zone, maintain habitat quantity and improve the quality in the Secondary Zone, and increase the quantity of protected acres and enhance the quality of the Dispersal Zone.  The Dispersal Zone needs to provide the connection between south and south-central Florida and provide for expansion of the population.  This indicates the need for an accounting of habitat in Primary, Secondary, and Dispersal Zones, tracking acres lost and restored over time.

- Continue population viability and sensitivity analyses as improved demographic data become available.

- Use and coordinate all non-regulatory incentive programs to maintain and secure habitat on private lands.

- Continue to secure lands, both fee simple and conservation easements, through existing and / or new land acquisition programs including Federal, State, county, and non-governmental organization programs.  Ensure terms of conservation easements address panther needs and are consistent among agencies.

- Develop a land acquisition plan for FPNWR that will identify corridors, buffer zones, and adjacent primary habitat that need to be secured through fee title acquisition, management agreements and / or conservation easements.

- Identify and support local initiatives to protect panther habitat and purchase development rights.  Encourage, assist, and provide resources to local governments to develop and implement land use plans that complement and advance panther recovery.

- Appropriately use local, State, and Federal regulatory programs to maximize their ability to maintain the overall quality, quantity, and functionality of panther habitat.

- Continue to improve regulatory procedures and guidance that avoid habitat loss, degradation, and / or fragmentation and increases in traffic volume as a result of federally funded or authorized projects and actions.  If development, conversion of natural habitat types, and / or land use intensification cannot be avoided then such procedures and guidance should ensure that equivalent habitat protection and restoration are provided, especially within the Primary Zone, to compensate for both the quantity and functional value of the lost habitat.

- Continue to work with partners to improve regulatory procedures and guidance that avoid habitat loss, degradation, and / or fragmentation as a result of State or locally authorized projects that are not a part of a Federal review process.

- Develop a mechanism to compensate for projects that affect small acreages (e.g., single family residences) of panther habitat in south Florida.  An effective mechanism will address loss of habitat and also cumulative degradation of habitat and could include panther conservation banks and / or regional off-site mitigation banks.

- Identify, maintain, enhance, and restore habitat corridors at multiple spatial scales to facilitate movements by resident panthers, promote dispersal, and prevent peripheral areas from becoming further isolated from habitat in the Primary Zone.

- Secure the Dispersal Zone through fee simple acquisition, compensation, or appropriate conservation easements.

- Secure Camp Keais Strand to maintain connectivity from FPNWR to Corkscrew Regional Ecosystem Watershed.

- Secure a corridor between BCNP and Okaloacoochee Slough to assure this pathway is not degraded or severed.

- Maintain existing panther home ranges and habitat conditions within the Primary Zone.

- Identify current and planned roads that could affect panthers, eliminate roads where possible, and retrofit priority areas with crossings and fencing as appropriate to promote connectivity and dispersal.  Develop and distribute recommendations on improvements needed for specific road segments.  In order to be effective, road-related mitigation must be specified and implemented before major developments are approved and permitted.

- Secure habitat adjacent or contiguous to areas of high risk for panther-vehicle collisions.

- Restore habitat in the Primary, Secondary, and Dispersal Zones.

- Ensure that panthers and their prey are adequately considered and provided for in management of public lands.

- Encourage habitat management on private lands to adequately provide for panthers and their prey.

- Provide incentives and work with landowners to encourage them not to convert their lands to less suitable habitat.

- Monitor panther habitat quantity and quality, land use changes, and response of the panther population to these changes (e.g., distribution, density, dispersal, reproductive success, mortality).  Track land protection and habitat restoration with an emphasis on identifying where habitat is lost and restored.

*South Florida Population*

- Continue to determine and monitor demographic variables including age- and sex-specific reproduction and survival rates, litter size, recruitment, age at first reproduction, birth interval, proportion of individuals breeding, age and sex specific causes of mortality (including intraspecific aggression), dispersal, density, and minimum documented population size.  Identify, evaluate, and use the least intrusive monitoring techniques or indices as appropriate (e.g., hair / genetics sampling, scats, cameras).

- Maintain and enhance genetic diversity.

- Continue to monitor physical and physiological characteristics correlated with inbreeding and depletion of genetic variability including kinked tails, cowlicks, cryptorchidism, sperm morphology, heart defects, immune function, and reproductive success.

- Develop and implement a genetics management plan.  Convene a working group of appropriate geneticists, reproductive physiologists, veterinarians, and population biologists to develop a genetics management plan.  Use field observations, existing data, and results from the genetic restoration and management project initiated in 1995.

- Monitor panther diseases and parasites and develop and implement appropriate management strategies.

- Revise vaccination protocols as appropriate considering new disease threats as they arise.

- Determine and monitor the presence, infection rate, mortality rates, and consequences of diseases and parasites in the panther population.

- Collect appropriate tissue and blood samples from all panthers handled, both live and dead, and analyze them for the presence of priority diseases and parasites, summarize and report results annually.

- Implement appropriate management strategies for diseases and parasites.

*Expansion into South-Central Florida and Reintroduction*

- Select reintroduction areas in coordination with the southeastern States within the historic range of the panther.

- Develop and conduct preliminary public scoping to allow effective preplanning of the NEPA process.  This could include the use of focus / stakeholder meetings and opinion and attitude surveys in the Southeast.

*Public Awareness and Education*
- Build support for the recovery effort through education and outreach programs that increase public understanding of panther behavior and recovery needs.

- Conduct social science research to identify public attitudes, knowledge levels, and concerns about panthers and panther recovery efforts.

- Identify target audiences, content, strategic messages, and methods of getting the message out using social science research.

- Distribute materials and information to the public, landowners, and stakeholders.

- Provide materials and programs regarding human / panther interactions.

- Provide education and outreach to residents living in and adjacent to panther habitat. Include the realtor community. Include tips for living in panther habitat.


## V.    REFERENCES

Anderson, C. R. Jr., F. G. Lindzey, D. B. McDonald.  2004.  Genetic structure of cougar populations across the Wyoming Basin: metapopulation or megapopulation.  Journal of Mammalogy 85:1207-1214.

Bangs, O. 1899.  The Florida puma.  Proceedings of the Biological Society of Washington 13:15-17.

Barone, M. A., M. E. Roelke, J. Howard, J. L. Brown, A. E. Anderson, and D. E. Wildt.  1994.  Reproductive characteristics of male Florida panthers: comparative studies from Florida, Texas, Colorado, Latin America, and North American Zoos.  Journal of Mammalogy 75:150-162.

Bass, O. L., and D. S. Maehr.  1991.  Do recent panther deaths in Everglades National Park suggest and ephemeral population?  Research & Exploration 7:426-427.

Beier P., M. R. Vaughan, M. J. Conroy, and H. Quigley.  2003.  An analysis of scientific literature related to the Florida panther.  Final report, Project NG01-105, Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Belden, R. C.  1986.  Florida panther recovery plan implementation - a 1983 progress report.  Pages 159-172 *in* S. D. Miller and D. D. Everett (eds)  Cats of the world: biology, conservation, and management.  National Wildlife Federation and Caesar Kleberg Wildlife Research Institute, Washington, D.C. and Kingsville, TX.

Belden, R. C., and R. T. McBride.  2006.  Florida panther peripheral areas survey final report 1998-2004.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Belden, R. C., W. B. Frankenberger, and J. C. Roof.  1991.  Florida panther distribution.  Final Report 7501, E-1 II-E-1.  Florida Game and Fresh Water Fish Commission, Tallahassee, FL.

Clark J. D., D. Huber, and C. Servheen.  2002.  Bear reintroductions:  lessons and challenges.  Ursus 13:335-345.

Conroy, M. J., P. Beier, H. Quigley, and M. R. Vaughan.  2006.  Improving the use of science in conservation: lessons from the Florida panther.  Journal of Wildlife Management 70(1):

Cory, C. B.  1896.  Hunting and fishing in Florida.  Estes and Lauriat, Boston, MA.

Cox J., R. Kautz, M. MacLaughlin, and T. Gilbert.  1994.  Closing the gaps in Florida's wildlife habitat conservation system.  Florida Game and Fresh Water Fish Commission, Tallahassee, FL.

Culver, M., W. E. Johnson, J. Pecon-Slattery, and S. J. O'Brien.  2000.  Genomic ancestry of the American puma (*Puma concolor*).  Journal of Heredity 91:186-197.

Dees, C. S., J. D. Clark, and F. T. van Manen.  1999.  Florida panther habitat use in response to prescribed fire at Florida Panther National Wildlife Refuge and Big Cypress National Preserve.  Final report to Florida Panther National Wildlife Refuge.  University of Tennessee, Knoxville, TN.

Dunbar, M. R.  1995.  Florida panther biomedical investigations.  Annual performance report.  Florida Game and Fresh Water Fish Commission, Tallahassee, FL.

Frederick, P. C., M. G. Spalding, and R. Dusek.  2002.  Wading birds as bioindicators of mercury contamination in Florida, USA; annual and geographic variation.  Environmental Toxicology and Chemistry 21:163-167.

Hall, E. R., and K. R. Kelson.  1959.  The mammals of North America.  2 vols.  Ronald Press, New York, NY.

Hollister, N.  1911.  The Louisiana puma.  Proceedings of the Biological Society of Washington 24:175-178.

Jansen, D. K., S. R. Schulze, and A. T. Johnson.  2005.  Florida panther (*Puma concolor coryi*) research and monitoring in Big Cypress National Preserve.  Annual report 2004-2005.  National Park Service, Ochopee, FL.

Kautz, R. S.  1994.  Historical trends within the range of the Florida panther.  Pages 285-296 *in* D. B. Jordan (ed).  Proceedings of the Florida panther conference.  U.S. Fish and Wildlife Service, Gainesville, FL.

Kautz, R. S., D. T. Gilbert, and G. M. Mauldin.  1993.  Vegetative cover in Florida based on 1985-1989 Landsat Thematic Mapper imagery.  Florida Scientist 56:135-154.

Kautz, R., R. Kawula, T. Hoctor, J. Comiskey, D. Jansen, D. Jennings, J. Kasbohm, F. Mazzotti, R. McBride, L. Richardson, and K. Root.  2006.  How much is enough? Landscape-scale conservation for the Florida panther.  Biological Conservation 130:118-133.

Land, E. D.  1994.  Response of the wild Florida panther population to removals for captive breeding.  Final Report 7571.  Florida Game and Fresh Water Fish Commission, Tallahassee, FL.

Land, E. D., and R. C. Lacy.  2000.  Introgression level achieved through Florida panther genetic restoration.  Endangered Species Update 17:99-103.

Land, D., and S. K. Taylor.  1998.  Florida panther genetic restoration and management annual report 1997-98.  Florida Game and Fresh Water Fish Commission, Tallahassee, FL.

Land, D., B. Shindle, D. Singler, and S. K. Taylor.  1999.  Florida panther genetic restoration annual report 1998-99.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Land, D., D. Shindle, M. Cunningham, M. Lotz, and B. Ferree.  2004.  Florida panther genetic restoration and management annual report 2003-04.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Linnaeus, C.  1758.  Systema Naturae,  10th edition.  Stockholm, Sweden.

Lotz, M., D. Land, M. Cunningham, and B. Ferree. 2005. Florida panther annual report 2004-05. Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Maehr, D. S. 1990. The Florida panther and private lands. Conservation Biology 4:167-170.

Maehr, D. S. 1992. Florida panther. Pages 176-189 *in* S.R. Humphrey (ed). Rare and endangered biota of Florida. Volume I: mammals. University Press of Florida, Gainesville, FL.

Maehr, D. S., J. C. Roof, E. D. Land, and J. W. McCown. 1989. First reproduction of a panther (*Felis concolor coryi*) in southwestern Florida, U.S.A. Mammalia 53: 129-131.

Maehr, D. S., E. D. Land, and J. C. Roof. 1991a. Social ecology of Florida panthers. National Geographic Research & Exploration 7:414-431.

Maehr, D. S., E. D. Land, and M. E. Roelke. 1991b. Mortality patterns of panthers in southwest Florida. Proceedings of Annual Conference of Southeastern Fish and Wildlife Agencies 45:201-207.

Maehr, D. S., E. D. Land, D. B. Shindle, O. L. Bass, and T. S. Hoctor. 2002. Florida panther dispersal and conservation. Biological Conservation 106:187-197.

McBride, R. T. 2000. Current panther distribution and habitat use: a review of field notes, fall 1999-winter 2000. Report to Florida Panther Subteam of MERIT, U.S. Fish and Wildlife Service, Vero Beach, FL.

McBride, R. T. 2001. Current panther distribution, population trends, and habitat use: report of field work: fall 2000-winter 2001. Report to Florida Panther Subteam of MERIT, U.S. Fish and Wildlife Service, Vero Beach, FL.

McBride, R. T. 2002. Current panther distribution and conservation implications -- highlights of field work: fall 2001 -- winter 2002. Report to Florida Panther Subteam of MERIT, U.S. Fish and Wildlife Service, Vero Beach, FL.

McBride, R. T. 2003. The documented panther population (DPP) and its current distribution from July 1, 2002 to June 30, 2003. Appendix IV *in* D. Shindle, M. Cunningham, D. Land, R. McBride, M. Lotz, and B. Ferree. Florida panther genetic restoration and management. Annual report 93112503002. Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

McBride, R. T., R. M. McBride, J. L. Cashman, and D. S. Maehr. 1993. Do mountain lions exist in Arkansas? Proceedings Annual Conference Southeastern Fish and Wildlife Agencies 47:394-402.

Nelson, E. W., and E. A. Goldman. 1929. List of the pumas with three described as new. Journal of Mammalogy 10:345-350.

Newman, J., E. Zillioux, E. Rich, L. Liang, and C. Newman.  2004.  Historical and other patterns of monomethyl and inorganic mercury in the Florida panther (*Puma concolor coryi*). Archives of Environmental Contaminants and Toxicology 48:75-80.

Nowak, R. M., and R. T. McBride.  1974.  Status survey of the Florida panther.  Project 973. World Wildlife Fund Yearbook 1973-74:237-242.

Nowak, R. M., and J. L. Paradiso.  1983.  Walker's mammals of the world, Volume II.  John Hopkins University Press, Baltimore, MD.

Nowell, K., and P. Jackson.  1996.  Status survey and conservation action plan:  Wild cats. International Union for Conservation of Nature and Natural Resources. Burlington Press, Cambridge, U.K.

O'Brien, S. J.  1996a.  Molecular genetics and phylogenetics of the Felidae.  Pages xxiii-xxiv in K. Nowell and P. Jackson.  Status survey and conservation action plan:  Wild cats. International Union for Conservation of Nature and Natural Resources.  Burlington Press, Cambridge, U.K.

O'Brien, S. J.  1996b.  Subspecies identification incorporating molecular genetics.  Pages 210-211 *in* K. Nowell and P. Jackson.  Status survey and conservation action plan:  Wild cats. International Union for Conservation of Nature and Natural Resources.  Burlington Press, Cambridge, U.K.

O'Brien, S. J., and E. Mayr.  1991.  Bureaucratic mischief:  Recognizing endangered species and subspecies.  Science 251:1187-1188.

O'Brien, S. J., M. E. Roelke, N. Yuhki, K. W. Richards, W. E. Johnson, W. L. Franklin, A. E. Anderson, O. L. Bass, R. C. Belden, and J. S. Martin.  1990.  Genetic introgression within the Florida panther *Felis concolor coryi*.  National Geographic Research 6:485-494.

Pimm, S. L., L. Dollar, and O. L. Bass Jr.  2006.  The genetic rescue of the Florida panther. Animal Conservation 9:115-122.

Roelke, M. E., J. S. Martenson, and S. J. O'Brien.  1993.  The consequences of demographic reduction and genetic depletion in the endangered Florida panther.  Current Biology 3:340-350.

Seal, U. S. (ed.)  1994.  A plan for genetic restoration and management of the Florida panther (*Felis concolor coryi*).  Report to the Florida Game and Fresh Water Fish Commission, by the Conservation Breeding Specialist Group, Species Survival Commission, IUCN, Apple Valley, MN.

Shindle, D., D. Land, K. Charlton, and R. McBride.  2000.  Florida panther genetic restoration and management. Annual Report 7500.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Shindle D., M. Cunningham, D. Land, R. McBride, M. Lotz, and B. Ferree.  2003.  Florida panther genetic restoration and management.  Annual Report 93112503002.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Sinclair, E. A., E. L. Swenson, M. L. Wolfe, D. C. Choate, B. Gates, and K. A. Cranall.  2001.  Gene flow estimates in Utah's cougars imply management beyond Utah.  Animal Conservation 4:257-264.

Smith, S. K., and J. M. Nogle.  2001.  Projections of Florida population by county, 2000-2030.  Florida Population Studies Bulletin 128.  Bureau of Economic and Business Research, University of Florida, Gainesville, FL.

Swanson, K., D. Land, R. Kautz, and R. Kawula.  2005.  Use of least cost pathways to identify key highway segments for panther conservation.  Pages 191-200 *in* R. A. Beausoleil and D. A. Martorello (eds.).  Proceedings of the Eighth Mountain Lion Workshop, Olympia, WA.

Taylor, S. K., C. D. Buergelt, M. E. Roelke-Parker, B. L. Homer, and D. S. Rotstein.  2002.  Causes of mortality of free-ranging Florida panthers.  Journal of Wildlife Diseases 38:107-114.

Townsend, D.  1991.  An economic overview of the agricultural expansion in southwest Florida.  Unpublished report.  Hendry County Extension Office, LaBelle, FL.

U.S. Census Bureau.  2002.  Table CO-EST2001-12-12 – time series of Florida intercensal population estimates by county:  April 1, 1990 to April 1, 2000.

U.S. Census Bureau.  2004.  Population estimates, census 2002, 1990 census.

U.S. Census Bureau.  2008.  State and County QuickFacts.  Population estimates, census 2006.

U.S. Fish and Wildlife Service.  1994a.  Final environmental assessment: genetic restoration of the Florida panther.  Gainesville, FL.

U.S. Fish and Wildlife Service.  1994b.  Proposed genetic restoration program for the Florida panther.  Memorandum dated June 13, 1994, from Director Beattie (Washington, D.C.) to the Regional Director (Atlanta, GA).

Werdelin, L.  1996.  The history of Felid Classification.  Pages xviii-xxiii *in* K. Nowell and P. Jackson.  Status survey and conservation action plan:  Wild cats.  International Union for Conservation of Nature and Natural Resources.  Burlington Press, Cambridge, U.K.

Wilkins, L., J. M. Arias-Reveron, B. Stith, M. E. Roelke, and R. C. Belden.  1997.  The Florida panther (*Puma concolor coryi*):  a morphological investigation of the subspecies with a comparison to other North and South American cougars.  Bulletin of the Florida Museum of Natural History 40:221-269.

Wozencraft, W. C.  1993.  Order Carnivora.  Pages 286-346 *in* D. E. Wilson and D. M. Reeder, (eds.).  Mammal species of the world, 2nd edition.  Smithsonian, Washington, D.C.

Young, S. P., and E. A. Goldman.  1946.  The puma-mysterious American cat.  American Wildlife Institute, Washington, D.C.

**U.S. FISH AND WILDLIFE SERVICE**
**5-YEAR REVIEW of the Florida Panther**

Current Classification  _Endangered_
Recommendation resulting from the 5-Year Review

　　　 _X_  **No change is needed**

Review Conducted By _____ Chris Belden _____

**APPROVALS**

FIELD OFFICE APPROVAL:

Field Supervisor, Fish and Wildlife Service

Approve _____ Date 3/27/09

*The lead Field Office must ensure that other offices within the range of the species have been provided adequate opportunity to review and comment prior to the review's completion. The lead field office should document this coordination in the agency record.*

REGIONAL OFFICE APPROVAL:

*The Regional Director or the Assistant Regional Director, if authority has been delegated to the Assistant Regional Director, must sign all 5-year reviews.*

**Regional Director, Fish and Wildlife Service**

Approve _____ Date 4-28-09
　　　 Acting RD

**APPENDIX A**

**Summary of peer review for the 5-year review of the Florida panther (*Puma concolor coryi*)**

**A. Peer Review Method:**  Recommendations for peer reviewers were solicited from Florida Department of Environmental Protection, Florida Fish and Wildlife Conservation Commission, Sarasota County Department of Natural Resources, and the Seminole Tribe of Florida. Additionally, two peer reviewers were selected by the Service.  Eight peer reviewers participated in this review.  Individual responses were requested and received from each peer reviewer.

**B. Peer Review Charge:**  See attached guidance.

**C. Summary of Peer Review Comments** – Peer review comments involved primarily minor edits.  Other concerns covered a variety of topics including existing knowledge of demographic data, along with uncertainties and limitations, as related to PVA modeling and the direct and indirect effects of human development on panther population persistence; road related impacts, particularly traffic volume as an indirect effect of development projects; the identification and protection of corridors at multiple spatial scales; the need to move female panthers north of the Caloosahatchee River to expand the breeding population in southern Florida; local opposition in potential reintroduction areas; the manpower necessary to carry out the recommendations; and the findings of the Scientific Review Team (Beier et al. 2006, Conroy et al. 2006).

**D. Response to Peer Review** – The Service was in agreement with all comments and concerns received from peer reviewers.  Comments were incorporated into the 5-year review form as appropriate.

# Guidance for Peer Reviewers of Five-Year Status Reviews

U.S. Fish and Wildlife Service, South Florida Ecological Services Office

June 7, 2006

As a peer reviewer, you are asked to adhere to the following guidance to ensure your review complies with Service policy.

Peer reviewers should:

1. Review all materials provided by the Service.

2. Identify, review, and provide other relevant data apparently not used by the Service.

3. Not provide recommendations on the Endangered Species Act (ESA) classification (e.g., endangered, threatened) of the species.

4. Provide written comments on:
   - Validity of any models, data, or analyses used or relied on in the review.
   - Adequacy of the data (e.g., are the data sufficient to support the biological conclusions reached. If data are inadequate, identify additional data or studies that are needed to adequately justify biological conclusions.
   - Oversights, omissions, and inconsistencies.
   - Reasonableness of judgments made from the scientific evidence.
   - Scientific uncertainties by ensuring that they are clearly identified and characterized, and that potential implications of uncertainties for the technical conclusions drawn are clear.
   - Strengths and limitation of the overall product.

5. Keep in mind the requirement that we must use the best available scientific data in determining the species' status. This does not mean we must have statistically significant data on population trends or data from all known populations.

All peer reviews and comments will be public documents, and portions may be incorporated verbatim into our final decision document with appropriate credit given to the author of the review.

Questions regarding this guidance, the peer review process, or other aspects of the Service's recovery planning process should be referred to Cindy Schulz, Endangered Species Supervisor, South Florida Ecological Services Office, at 772-562-3909, extension 305, email: Cindy_Schulz@fws.gov.

*Nov. 2, 2020 Comment Letter to the U.S. Environmental Protection Agency from Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper re: Florida's Request To Assume Administration of a Clean Water Act Program [EPA-HQ-OW-2018-0640-0001]*

# EXHIBIT 46



ALASKA   CALIFORNIA   FLORIDA   MID-PACIFIC   NORTHEAST   NORTHERN ROCKIES

NORTHWEST   ROCKY MOUNTAIN   WASHINGTON, D.C.   INTERNATIONAL

April 30, 2020

Florida Department of Environmental Protection
2600 Blair Stone Road
Tallahassee, FL  32399

Att'n: Heather Mason
Via Email: Heather.Mason@FloridaDEP.gov

> <u>Re:</u>     **Public Comments in Opposition to Proposed State 404 Program; Proposed Amendments to Chapter 62-330, F.A.C., Creation of Chapter 62-331, F.A.C.**

Dear Ms. Mason:

We write on behalf of the Florida Wildlife Federation, Conservancy of Southwest Florida, Center for Biological Diversity, Miami Waterkeeper and St. Johns Riverkeeper to voice strong opposition to the Department's proposal to pursue assumption of jurisdiction over wetlands permitting under Section 404 of the Clean Water Act of 1972 ("CWA"), 33 U.S.C. § 1344, in waters of the United States.

This letter incorporates by reference our prior submissions to the Department on 404 assumption, including, but not limited to, our: July 9, 2018 letter on rule development; March 11, 2020 comments on the proposed rules, request for publication and request for hearing; March 19, 2020 request to postpone rulemaking during the pendency of the COVID-19 statewide emergency; and all comments and questions raised during the April 2020 webinars and phone conferences hosted by the Department in lieu of public hearings.

As we have stated before, the Department's attempt to assume jurisdiction over federal wetlands permitting is a misguided effort that would only result in further degradation of Florida's precious natural resources.  The State is not equipped, prepared or staffed to adequately operate such an important program.  Particularly in recent years—with dramatic cuts to staffing, reductions in expertise and inadequate enforcement of existing environmental mandates—the Department has demonstrated the inability or unwillingness to adequately protect Florida's wetlands.  Floridians cannot afford for the Department to administer the Section 404 program.

**The Department Should Suspend Rulemaking on 404 Assumption During the COVID-19 Crisis to Allow for Meaningful Public Participation Given Statewide Interest and Considerable Public Opposition**

Florida Statutes Section 373.4146 authorizes, but does not require, the Department to pursue assumption of the dredge and fill permitting program established in Section 404 of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, and rules promulgated thereunder.  Just as pursuing assumption is not required, neither is proceeding with rulemaking, particularly at this time.



ALASKA   CALIFORNIA   FLORIDA   MID-PACIFIC   NORTHEAST   NORTHERN ROCKIES
NORTHWEST   ROCKY MOUNTAIN   WASHINGTON, D.C.   INTERNATIONAL

The Department's insistence on conducting the public portion of the rulemaking process at the peak of a pandemic demonstrates the agency's failure to appreciate the importance of public participation in environmental protection. It does not bode well for how the agency would handle public participation under an assumed Section 404 program.

On March 1, 2020, Governor DeSantis directed the declaration of a public health emergency. *See* Exec. Order No. 20-51 (Mar. 1, 2020), https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-51.pdf. On March 9, 2020, the Governor declared a state of emergency, finding that COVID-19 poses a risk to the entire state of Florida. *See* Exec. Order No. 20-52 (Mar. 9, 2020), https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-52.pdf.

The Governor subsequently ordered the closure of schools, businesses and other establishments. *See* Jeffrey Schweers, *Coronavirus: Florida Gov. Ron DeSantis Suspends School Testing, Orders Bars and Nightclubs Closed*, Tallahassee Democrat (Mar. 17, 2020).

On April 1, 2020, Governor DeSantis issued a statewide stay at home order—one that is not set to expire until today, the same day as the Department's deadline for comments. *See* Exec. Order No. 20-91 (Apr. 1, 2020), https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-91-compressed.pdf. More than two weeks later, the Governor ordered that schools stay closed for the remainder of the school year. *See* Kelli Kennedy, *DeSantis Orders Schools Closed Rest of Academic Year*, Lakeland Ledger (Apr. 18, 2020).

Throughout this period, Floridians have been under tremendous strain. They are struggling to protect the health and safety of their families, care for children home from day cares and schools, save their jobs and businesses and get food on the table.

As of this morning, there were 33,690 confirmed cases of COVID-19 in Florida. To date, there have been more than 5,500 hospitalizations, and 1,268 Floridians have died. More than half of the State's COVID-19 cases are concentrated in South Florida, with more than 12,000 confirmed cases in Miami-Dade County and nearly 5,000 confirmed cases in Broward County. *See Current Situation in Florida*, Fla. Health, https://floridahealthcovid19.gov/#latest-stats (last updated Apr. 30, 2020, 10:44:19 AM) (Exhibit 1).

Across the State, nearly one million Floridians have had to apply for unemployment benefits, overwhelming the State's safety net and leaving the majority of unemployed Florida residents without any income. *See* Tony Romm and Heather Long, *Out of Work—and Cash—Millions of Americans are Still Waiting for their First Unemployment Check*, Washington Post (Apr. 23, 2020) ("The growing national backlog, analyzed by The Post, has proved particularly problematic in Florida—where fewer than 7 percent of applicants have received aid.") (Exhibit



ALASKA   CALIFORNIA   FLORIDA   MID-PACIFIC   NORTHEAST   NORTHERN ROCKIES
NORTHWEST   ROCKY MOUNTAIN   WASHINGTON, D.C.   INTERNATIONAL

2); *Florida Ranks Among Lowest of States Providing Unemployment Benefits*, WJHG NBC Newschannel 7 (Apr. 29, 2020) (Exhibit 3).[1]

For reasons difficult to discern or comprehend, it is precisely during this incredibly difficult time that the Department has chosen to begin and end the "public participation" component of its Section 404 rulemaking.  Rather than hold off until it is safe to conduct public hearings, the Department elected to hold webinars and phone conferences in April 2020.  Rather than wait for a return to normalcy for Floridians enduring the hardships from this public health crisis, the Department chose to set the deadline for public comment for April 30, 2020.

In so doing, the Department has not only demonstrated an indifference toward ensuring meaningful public participation on an issue of great statewide importance.  It has also rejected repeated requests on behalf of tens of thousands of Floridians not to proceed with this rulemaking at the peak of a pandemic.[2]

As the Department is well aware, there is strong public opposition to its plan to assume the Clean Water Act's Section 404 program.  The Department should not steamroll past this opposition to serve special interests; it should engage with the public in meaningful dialogue to proceed in a way that is in the best interests of the State.  The Department's failure to do so reflects poorly on the agency and undermines public confidence in its ability to properly administer Section 404.

**The Department Failed to Adequately Respond to Questions and Provide All Information Necessary to Allow for Public Input**

Floridians who have been able to participate in the April 2020 webinars and phone conferences have raised a number of questions and concerns that the Department failed to adequately address, including by withholding information and thereby insulating itself from public scrutiny.

---

[1] Florida reports that in the last six weeks, more than two million claims have been submitted, including 916,000 confirmed unique claims, most of which still have not been paid.  *Reemployment Assistance Claim Workflow March 15, 2020–April 29, 2020*, Fla. Dep't of Economic Opportunity (last visited Apr. 30, 2020) (Exhibit 4).

[2] *See* Letter from Tania Galloni, Earthjustice, to Fla. Dep't Envtl. Prot., Mar. 19, 2020 (requesting that the Department postpone rulemaking during the pendency of the COVID-19 statewide emergency) (Exhibit 5); Letter from Bob Graham & Lee Constantine, Florida Conservation Coalition, to Secretary Noah Valenstein, Fla. Dep't Entl. Prot., Mar. 30, 2020 (same) (Exhibit 6); Letter from Mark Perry & Marisa Carrozzo, Everglades Coalition, to Heather Mason, Fla. Dep't Envtl. Prot., Mar. 31, 2020 (same) (Exhibit 7); Email from Jeanine Bennett, Miccosukee Tribe of Indians of Florida, to Heather Mason, Fla. Dep't Envt. Prot., Apr. 7, 2020 (stating that postponing the comment deadline would be appropriate given Floridians' focus on keeping themselves and their families healthy) (Exhibit 8); Letter from Lisa Rinaman, Waterkeepers Florida, to Heather Mason, Fla. Dep't Envtl. Prot., Apr. 20, 2020 (requesting that the Department postpone rulemaking to allow meaningful public participation) (Exhibit 9).



ALASKA   CALIFORNIA   FLORIDA   MID-PACIFIC   NORTHEAST   NORTHERN ROCKIES

NORTHWEST   ROCKY MOUNTAIN   WASHINGTON, D.C.   INTERNATIONAL

From the start, the Department has claimed that it would require no additional resources to adopt, implement, operate and enforce a state Section 404 program.  Indeed, it was with this assurance that the Legislature even approved legislation enabling the Department to pursue assumption.

The Department has long stated that it would staff the program by filling vacancies—positions which apparently, and without explanation, the Department expects the Legislature will continue to approve even though the agency has not filled them to meet the Department's existing duties and despite the inevitable budget reallocations and cuts Florida will face to cope with the impacts of COVID-19 on state finances and the economy.

During the public comment period, the Department retreated further into a lack of candor.  The agency began to decline to answer resources questions, claiming more than once that these were "outside the scope" of public hearings on the State's plan to assume Section 404.  The Department also declined to provide any information on how or whether it had determined resources needs.  The Department also declined to provide any information regarding the additional staffing that its proposal would require for the Fish and Wildlife Commission given the planned increase in that agency's workload.

Without transparency on the resources the Department would need and use, the public is prevented from commenting on the impacts and feasibility of the proposed rule's requirements and how/if it will be properly implemented and enforced.  Instead, the Department shielded itself from public comment on these issues, defeating the very purpose of holding public hearings.

Members of the public also raised concerns about the Department's failure to meet its existing obligations, including on wetlands protection, mitigations measures, and adequate enforcement of programs already under its purview.  The Department did not respond to these concerns either.

Indeed, there were scores of public concerns raised that the Department failed to adequately address.  These included, but were not limited to: (1) the Department's decision to remove references to memoranda of agreement (MOAs) with federal agencies from the proposed rules, and not to disclose the content of those MOAs so as to allow for public comment before the State submits an application to the U.S. Environmental Protection Agency (EPA); (2) a lack of clarity around the definition of waters of the United States, retained waters and assumed waters; (3) the failure to properly define administrative boundaries; (4) the risk to Tribes of loss of consultation rights and protections for impacts to adjacent lands; (5) differences between state and federal wetlands delineation methodologies, and the impacts of those differences; (6) the failure to adopt all Section  404(b)(1) Guidelines; (7) questions around the role of water management districts and the Department's intentions regarding further delegation; (8) the rationale for proposing the less protective 300 foot buffer, and its lack of basis in science; (9) inadequate consideration of secondary and cumulative impacts; (10) the failure to assess the impacts of proposed general permits and provide those analyses for public input; and (11) the failure to articulate how endangered species would be protected.



In response to some of the concerns raised, the Department indicated that important issues were not yet resolved (such as those relating to endangered species protection, which the public was told was part of an MOA process "still in its infancy"), that certain key topics such as staffing and resources were "outside the scope" of the public comment opportunity, and that the public should direct their concerns to EPA rather than to their state agency crafting the plan. These responses were not adequate and, again, undermine the public's confidence in the agency. Excluding relevant information from public review and avoiding public input fails to provide the public with proper notice and a reasonable opportunity to comment on the proposed regulations.

**Conclusion**

Protection of Florida's remaining wetlands is a vital state interest that affects the millions of Floridians who rely on them for clean water, biodiversity and resilience to devastating storms. The Department has already demonstrated that it is not equipped to adequately protect the wetlands already under its purview. Now is not the time for the State to claim it can do more, with less.

That the Department would limit public participation in the Section 404 rulemaking process and then further confine it to the very time period when Floridians are focused on their health, jobs and families as a result of statewide public health emergency is a disservice to the State. It undermines public confidence in the agency, and further demonstrates that the Department should not be entrusted with administering the federal Clean Water Act Section 404 program.

Sincerely,

Tania Galloni
Managing Attorney

Enc.

# Exhibit 1

# Florida's COVID-19 Data and Surveillance Dashboard

Florida Department of Health, Division of Disease Control and Health Protection

☑ Select a County  None

## Recent Data for Florida Residents (Last 30 Days):

### New Cases by Day (Last 30 Days)



### Deaths by Day (Last 30 Days)



University of South Florida, FDEP, Esri, HE...

Data is updated every day at or about 11 A.M. Eastern Daylight Savings Time (UTC-4).

Showing 1

**CASE DATA FOR MIAMI-DADE**

Total Cases: 12,063
Residents: 11,930
Residents Not in Florida: 1
Non-Residents: 132

Conditions and Care
Deaths: 352
Hospitalizations*
Residents: 1,509
Non-Residents: 13

**Demographics of Cases**

Age:
Age Range: 0 to 105

## Total Cases

# 33,690

Cumulative Data for Florida Residents:

## Positive Residents

# 32,801

### Deaths

# 1,268

Hospitalizations

# 5,589

Florida Cases | Florida Testing | Cases by County | Cases by Zip Code | Health Metrics | USA and World

# Exhibit 2

# The Washington Post

*Democracy Dies in Darkness*

**Coronavirus**       Live updates       U.S. map       World map       FAQs       Flattening the curve       Newsletter

# Out of work — and cash — millions of Americans are still waiting for their first unemployment check

The growing national backlog, analyzed by The Post, has proved particularly problematic in Florida — where fewer than 7 percent of applicants have received aid

By **Tony Romm** and **Heather Long**

April 23, 2020 at 2:51 p.m. EDT

Holly Strout is a 47-year-old event planner in Volusia County, Fla., not far from Orlando, where she was born and raised. There's just one problem: The state where she has lived her entire life didn't seem to know that.

For days, Strout had been trying to file for unemployment benefits, joining millions of Americans unexpectedly out of a job because of the deadly coronavirus. Try as she might, though, Florida's beleaguered system would not verify her identity. So she emailed. She faxed. She made "116 calls a day," she said. It wasn't until early April, nearly three weeks after applying, that she learned the verdict.

"I was told I was ineligible," Strout said. "They told me to reapply."

**Access The Post's coronavirus coverage for free through our newsletter.**

Out of work, out of cash and running out of patience, Strout is among more than 26 million workers nationwide seeking unemployment benefits, many of whom are still waiting for approval. The economic carnage wrought by the coronavirus has resulted in a national backlog of at least 3 million unpaid jobless claims, according to a new analysis by The Washington Post, threatening Americans around the country with even more financial hardship than they anticipated.

The figure reflects claims made by April 4. The true backlog is probably far greater, following the release of new federal data Thursday showing an additional 4 million people who filed for unemployment last week. Meanwhile, an untold number of self-employed Americans, including Strout, still can't even apply for aid. The $2 trillion aid package adopted by Congress last month extended jobless benefits to these laborers, a broad category that includes freelancers, Uber and Lyft drivers and Grubhub deliverers. But only 10 states are paying this support, according to the Labor Department, leaving millions of families in financial limbo.

Florida appears to be among the many states still struggling to process applications from such gig workers, contributing to its sky-high unemployment backlog. Roughly 1.7 million residents have sought jobless aid there since the outbreak began, and fewer than 120,000 have actually received money, according to state data last updated Thursday.

AD

"You've received no wages, and you have to put food on the table, pay for your car payment, pay for your auto insurance, pay for your health insurance," Strout said, "because if you don't pay, you're screwed."

Strout said she had been doing well. She had saved for years. "Financially, I'm worried," she said. "I don't want to lose my home."

No state could have prepared fully for such a surge in applications, economists say, but the delays have been exacerbated by low staffing levels and outdated computer systems at many of the offices that process claims. Federal watchdogs affirmed those concerns in a new report this week, finding the shortcomings are "particularly evident in prior periods of increased stress on the unemployment program."

AD

More than 17 million Americans submitted new jobless claims in the critical four-week period when the pandemic escalated from March 8 through April 4, federal data shows. So far, fewer than 14.2 million of those applications have been successfully processed, according to the latest Labor Department data on "insured" claims. The rate has been even slower than economists predicted, according to a Goldman Sachs note to clients Thursday.

Such delays inflict hardship on millions of families in Florida and nationwide. But the backlog is also harming the broader U.S. economy, as families awaiting aid aren't able to pay bills or, in some cases, buy food.

"This should not have been a surprise to anyone. We've been screaming about it for years," said Julia Lane, an economist and professor at the New York University Wagner Graduate School of Public Service. "The states haven't had the investments in modern IT and workforce training that could have mitigated it, and now we're paying the price for shortsighted budget cuts."

AD

In Florida, the state's phone lines are jammed and its website repeatedly crashes, creating delays that Gerlinde Harrison of Cape Coral knows all too well. Harrison, who lost her job as a cook at an Italian restaurant, applied for unemployment aid in Florida on March 22. A month later, she has received no money and her application still says "pending."

"No one I work with has been able to get unemployment yet," she said.

Harrison, 53, lives with her husband in a house they rent for $1,450 each month. If they don't get help soon, they won't have money for May rent. Harrison said she has called Florida's unemployment hotline 50 times and never got through. She went online Thursday, after Gov. Ron DeSantis (R) vowed that the state had added more servers and the website would not crash. After she answered all of the questions about how she became unemployed, the system kicked her off without a confirmation.

AD

"I try to log in every day at 7:30 a.m., and it's just error message after error message," she said. "We are waiting for the unemployment money and the stimulus check, and so far we didn't get anything."

The Sunshine State's litany of problems came to light about a decade ago under the leadership of then-Gov. Rick Scott (R), who slashed unemployment benefits in the name of austerity. In doing so, local officials put in place a $77 million computer system to process applications that auditors since have said repeatedly suffers from serious deficiencies, including errors that have wrongly denied people benefits.

Aides to Scott, now a U.S. senator, defended his tenure. "Some politicians always try to find a scapegoat instead of taking responsibility for their own actions," spokeswoman Sarah Schwirian said in a statement, pointing out that the troubles predated his election as governor.

AD

Years of repeated warnings, apparently unheeded by state officials, later contributed to the immense backlog Florida now faces in the midst of an economic crisis, local leaders say. "It was routinely ignored, and that's where we find ourselves now," said state Sen. Randolph Bracy (D). "It's been years of neglect."

The backlog is so unwieldy that Florida officials at one point recommended out-of-work residents apply through paper applications. Hundreds queued in line outside one state office in South Florida in early April, sparking widespread criticism that the state's missteps had forced people to put themselves in public danger just to get the benefits they need to afford groceries and pay their mortgages.

To speed up benefit payments, DeSantis this month announced a wave of additional changes. He essentially sidelined the leader of Florida's unemployment agency, tapping a new "czar" to oversee the system, and sought to fix tech glitches and staff up the state's call centers. Florida also unveiled a second website to apply for benefits, hoping to ease congestion on its error-plagued $77 million portal.

AD

"While we've made some progress in recent days, it's not nearly enough," DeSantis said at a news conference last week.

Those efforts have not always helped.

DeSantis, for example, waived a requirement that people actively seek work to qualify for unemployment. But his announcement last month made little difference to some jobless residents there, who have reported seeing prompts on their online applications to document their job-search progress in April anyway, according to state Rep. Anna Eskamani (D), who said constituents have flooded her office with questions. Others are being prompted online to recertify their claims to receive checks, she said, even though Florida no longer requires it.

AD

"It's been waived, but it's not been operationalized," Eskamani said. The department "is not penalizing anyone in the sense money is withheld from you. But they're being penalized, because the broken system has let them down."

A spokeswoman for DeSantis did not respond to requests for comment. The state's Department of Economic Opportunity, which oversees unemployment, declined to comment. Many residents have reported that the unemployment website has been down in recent days.

The digital deficiencies threaten to harm self-employed workers most. The $2 trillion Cares Act allows contract laborers and gig-economy drivers to collect weekly checks, including the extra $600 boost that lawmakers made available to former full-time employees. Florida has not yet paid these benefits or indicated when it will start, sparking confusion and panic among many self-employed workers who are not sure whether to apply.

Florida had not yet ordered residents to stay at home when Lee Hansen decided to stop driving for Uber in early March. The 66-year-old retiree in Sanford, a half-hour from Orlando, had been doing gig-economy work to supplement his Social Security income, working "a little more than part time to survive," he said. But he has lung disease, a major risk factor in contracting the coronavirus, forcing him off the road.

"I couldn't take that chance. I'm really high-risk," Hansen said.

His wife, Diane, similarly had been self-employed, helping proctor health exams for restaurant workers. But many cooks are not on the job now, and neither was she, so the pair filed for unemployment — only to run into the same glitches, delays and uncertainties troubling so many in their state.

Diane did the work, assembling the applications. Her claim took a week to submit, because of errors, before she was ultimately denied; Lee's went through, but it is listed as pending. "She calls 20, 30, 40 times a day, every day, and she's never gotten to the point of talking to a person," Lee said. Meanwhile, the bills are mounting. Only one of them has received the stimulus payment promised by the U.S. government, and they are putting a lot on credit cards as a result.

"We are better off than some people because we have Social Security, but that doesn't pay the rent," Diane said.

"It's a waiting game," she added, "and it's hard to sit around and wait."

# Coronavirus: What you need to read

The Washington Post is providing some coronavirus coverage free, including:

Updated April 29, 2020

**Live updates:** The latest in the U.S. and abroad

**More stories today:** What you need to know about going back to work | 'Frostbite' toes and other peculiar rashes may be signs of coronavirus

**Mapping the spread:** Cases and deaths in the U.S. | Map of cases worldwide

**What you need to know:** Stay-at-home orders and reopening by state | Your life at home | Personal finance guide | Make your own fabric mask | Follow all of our coronavirus coverage and sign up for our daily newsletter.

**How to help:** Your community | Seniors | Restaurants | Keep at-risk people in mind

**Remembering the victims:** Stories of Americans who have died | A memorial for those lost to covid-19

**Tony Romm**

Tony Romm is a technology policy reporter at The Washington Post. He has spent nearly ten years covering the ways that tech companies like Apple, Facebook and Google navigate the corridors of government – and the regulations that sometimes result. Follow 🐦

**Heather Long**

Heather Long is an economics correspondent. Before joining The Washington Post, she was a senior economics reporter at CNN and a columnist and deputy editor at the Patriot-News in Harrisburg, Pa. She also worked at an investment firm in London. Follow 🐦

# Exhibit 3

# Florida ranks among lowest of states providing unemployment benefits



*By Olivia Michael* | Posted: Wed 7:01 PM, Apr 29, 2020  | Updated: Wed 8:48 PM, Apr 29, 2020

**BAY COUNTY, Fla. (WJHG/WECP) -** A new Pew Research Center study shows that Florida is at the bottom of the list of states that actually provide unemployment benefits.

In the last five weeks, more than a million Floridians have filed for unemployment benefits, but that study shows many of them won't ever receive them. The author tells us many of these systems are facing unprecedented numbers of claims that they're just not geared for.

In March Marvin Randall was one of many who lost his job in the service industry. "The first time that I applied for the unemployment it literally took me about three days to get everything done. The website would crash, I would get one page done, advance to the next page- it would crash," said Randall.

He said the phone lines aren't helpful either.

"When I logged on I saw that I was ineligible and I have no idea why. There's nothing on the account itself that specified why I was not eligible," said Randall.

According to the Pew study, only about 8% of Floridians who filed for unemployment benefits in mid-March were actually approved.

"This country, we don't have a single, national unemployment insurance system. We have 53 separate unemployment insurance systems," said Drew DeSilver, senior writer at Pew Research Center.

He said that could be why in March only about 8% of unemployed Floridians actually received benefits but, by comparison, 66%



A new Pew study shows Florida ranks low on the list of states that actually provide unemployment benefits. Florida also ranks low on weekly unemployment amounts. (MGN)

of unemployed people from Massachusetts received them.

DeSilver said that number could have something to do with the difficulties many Floridians are having with the application process. "It very well could. I'm not an expert on Florida- I've heard it's one of the states where there has been just tremendous difficulty," he said.

Tuesday, Florida's Department of Economic Opportunity unveiled the Pandemic Unemployment Assistance program, which could make more people eligible for benefits.

As for Randall, he said he will keep refiling in the meantime.

The D.E.O. sent us a statement saying:

"Yesterday, we announced that Pandemic Unemployment Assistance (PUA) is now available to all eligible Floridians. Many of the individuals that were deemed ineligible this weekend may be eligible for federal benefits through the Pandemic Unemployment Assistance program.

We have streamlined the claims process for all applicants in a one-stop-shop, on our website at www.floridajobs.org. Floridians can click, file a claim and answer a few short questions that will lead them to the application for federal or state benefits. They may also call 1-833-FL-Apply (1-833-352-7759) for any questions they may have. Please review our latest press release here.

Pandemic Unemployment Assistance Program:
Again, many of the individuals that were deemed ineligible this weekend may be eligible for federal benefits through the Pandemic Unemployment Assistance program.

Applicants should utilize the following criteria when applying for PUA:
- Individuals who applied for the state's Reemployment Assistance benefits on or after April 5, 2020, and were deemed ineligible for state reemployment assistance benefits will receive additional application information from the Department. They can also visit www.floridajobs.org/cares-act for more information regarding these programs. Please advise these Floridians to monitor their accounts and email for additional information from the Department.
- Those who are self-employed, contract employees, gig workers, or others who applied for the state's Reemployment

Assistance benefits on or before April 4, 2020, should apply at www.Floridajobs.org and select "file a claim" to request PUA.
- Unemployed Floridians who have not yet applied for any benefit should apply at www.FloridaJobs.org and will be considered for all existing programs, including PUA.



Updates for Walton County School District

READ MORE »

State Reemployment Assistance Eligibility:
Many of your viewers have had questions regarding state reemployment assistance eligibility, there are numerous reasons someone could be deemed ineligible for state Reemployment Assistance benefits, including wage base period issues, lack of wage history, multiple claims in one year, separation circumstances, incomplete applications, among others. Each person deemed ineligible for state Reemployment Assistance receives a notification regarding their eligibility."

Copyright 2020 WJHG. All rights reserved.

Get the latest updates from wjhg.com delivered to your browser

**SUBSCRIBE TO PUSH NOTIFICATIONS**

# Exhibit 4



## Reemployment Assistance Claim Workflow
## March 15, 2020 - April 29, 2020

Workflow Details >>

Total Claims Submitted*
**2,030,958**

Confirmed Unique Claims Submitted
**916,002**

Claim Verification Queue
**231,345**
25.3% of Confirmed Unique Claims Submitted

Claims Processed
**684,657**
74.7% of Confirmed Unique Claims Submitted

Claimants Paid
**416,683**
45.5% of Confirmed Unique Claims Submitted

**$579,530,328**
**Paid to Claimants**

*Individuals may have submitted an application through multiple methods. The Total Claims Submitted may include duplicate or triplicate claim counts. These numbers may fluctuate as duplicates are identified.

# Exhibit 5



ALASKA  CALIFORNIA  FLORIDA  MID-PACIFIC  NORTHEAST  NORTHERN ROCKIES
NORTHWEST  ROCKY MOUNTAIN  WASHINGTON, D.C.  INTERNATIONAL

March 19, 2020

Florida Department of Environmental Protection
2600 Blair Stone Road
Tallahassee, FL  32399

Att'n: Heather Mason
Via Email: Heather.Mason@FloridaDEP.gov

**Re:    Request to Reschedule April 2, 2020 Public Hearing on 404 Assumption**

Dear Ms. Mason:

We write on behalf of the Florida Wildlife Federation, The Conservancy of Southwest Florida,
the Center for Biological Diversity, Miami Waterkeeper and St. Johns Waterkeeper to request
that the Department reschedule the April 2, 2020 Public Hearing on the proposed State 404
Program in light of the state emergency related to the COVID-19 pandemic.

On February 19, 2020, the Department published a Proposed Rule to create Chapter 62-331, for
the purpose of seeking jurisdiction over wetlands permitting under Section 404 of the Clean
Water Act of 1972 ("CWA"), 33 U.S.C. § 1344, in waters of the United States.  In response to
the notice, many affected persons requested that the Department hold a public hearing, in
accordance with Florida law.  *See* Fla. Stat. § 120.54(3)(c)1.

On March 1, 2020, Governor Ron DeSantis issued an executive order directing the declaration of
a public health emergency in the state arising from the novel coronavirus, COVID-19.  *See* Exec.
Order No. 20-51, https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-51.pdf.  On
March 9, 2020, the Governor declared a state of emergency, finding that COVID-19 poses a risk
to the entire state of Florida.  *See* Exec. Order No. 20-52, https://www.flgov.com/wp-
content/uploads/orders/ 2020/EO_20-52.pdf.

On March 11, 2020, the Department noticed a public hearing for its proposed State 404 Program
to be held on April 2, 2020, in Tallahassee and via webinar.

On March 17, 2020, Governor DeSantis announced that all schools would remain closed until
April 15, 2020.  *See* Florida coronavirus update for Tuesday: Three field hospitals slated to open;
K-12 schools to close through April 15; state announces 7th death, 216 positive tests, Orlando
Sentinel (Mar. 18, 2020).  Governor DeSantis also imposed drastic restrictions on certain service
industries, including restaurants and bars, to reduce the spread of the virus.  *See* Exec. Order No.
20-68, https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-68.pdf.

These emergency conditions have resulted in tremendous hardships for families and small
businesses throughout the state of Florida.  *See, e.g.*, Philip Valys, While shoppers hoard, South



ALASKA   CALIFORNIA   FLORIDA   MID-PACIFIC   NORTHEAST   NORTHERN ROCKIES
NORTHWEST   ROCKY MOUNTAIN   WASHINGTON, D.C.   INTERNATIONAL

Florida grocery stores scramble to keep up, South Florida Sun-Sentinel (Mar. 16, 2020); Max Chesnes, 'Why are they out of toilet paper?' Coronavirus concerns have cleaning supplies, food flying off the shelves), TC Palm (Mar. 13, 2020); Dan DeLuca, Coronavirus Naples: Here's what is closed or has changed along amid COVID-19 concerns, Naples Daily News (Mar. 16, 2020); Rene Rodriguez, 'This is apocalypse now': Miami bars and restaurants brace for closure impacts, Miami Herald (Mar. 16, 2020); Michelle Marchante, Disney World, Universal to close hotels, parks, restaurants to prevent coronavirus spread, Miami Herald (Mar. 16, 2020); Zac Anderson, Coronavirus in Florida: State ramps up containment efforts, Tallahassee Democrat (Mar. 17, 2020); Jane Musgrave, Coronavirus in Florida: State adds 98 cases overnight; Palm Beach County to 19, including 6-year-old boy, Palm Beach Post (Mar. 18, 2020).

As of today, Florida's Department of Health is reporting that there are more than 350 confirmed cases of COVID-19 in the state, a total of 390 Florida residents infected, and nearly 1,000 additional persons in Florida being monitored. *See* https://floridahealthCOVID19.gov/; https://experience.arcgis.com/experience/96dd742462124fa0b38ddedb9b25e429 (last accessed March 19, 2020, 11:24 AM). Positive cases have now been confirmed in 31 Florida counties.

Families across the state are struggling not only to protect themselves from contracting COVID-19, but also to ensure that their most vulnerable loved ones are safe and cared for. Families are also under considerable stress as they struggle to ensure that their homes are adequately stocked with food, medicines and other necessities in the face of dramatically increased demand for goods and resulting supply shortages. Parents are tasked with caring for their children at home during a prolonged closure of schools and daycare centers that coincides with guidance promoting social distancing from others, often while trying to maintain their own employment. Many who work in service industries are finding their income reduced or eliminated as social distancing increases and some stores and businesses are forced to close.

**In this exceptionally challenging environment, it would be extremely difficult, if not impossible, for the public to meaningfully prepare for and participate in the Department's Public Hearing currently scheduled for April 2, 2020, on the proposed State 404 Program.**

Given the significant public concern and opposition to the state's proposal, the high stakes of ensuring the highest level of protection for Florida's irreplaceable wetlands, and these extraordinary times, we respectfully request that the Department's Public Hearing be postponed during the pendency of this statewide emergency or, at a minimum, be rescheduled to no earlier than May 15, 2020.

Sincerely,

Tania Galloni
Managing Attorney

# Exhibit 6



Chairman

**Bob Graham**

Vice Chairman

**Lee Constantine**

Organizations

**CONSERVANCY OF
SOUTHWEST
FLORIDA**

**DEFENDERS OF
WILDLIFE**

**FLORIDA WILDLIFE
FEDERATION**

**LEAGUE OF
WOMEN VOTERS**

**1000 FRIENDS OF
FLORIDA**

**SIERRA CLUB
FLORIDA**

**ST. JOHNS
RIVERKEEPER**

Individuals

**Craig Diamond**

**Ryan Smart**

**Victoria Tschinkel**

**Estus Whitfield**

March 30, 2020

Secretary Noah Valenstein
Florida Department of Environmental Protection
2600 Blair Stone Road
Tallahassee, Florida 32399
Noah.valenstein@dep.state.fl.us

**Re: State 404 Program Public Hearing, Request for Postponement**

Dear Secretary Valenstein,

The Florida Conservation Coalition is an alliance of over 80 conservation organizations dedicated to protecting Florida's lands, water, and wildlife. We have repeatedly expressed opposition to the state's plan to assume jurisdiction over the federal Clean Water Act Section 404 dredge and fill permitting program. We are now concerned that the Department intends to conduct public comment on its State 404 Program proposal in the midst of the growing COVID-19 pandemic, and to hold no public hearings on this issue of critical importance to the state.

By way of background, on February 19, 2020, the Department published proposed rules to create the State 404 Program, making public comments due March 11, 2020. On March 1, 2020, Governor Ron DeSantis issued an executive order directing the declaration of a public health emergency in the state arising from the novel coronavirus, COVID-19. *See* Exec. Order No. 20-51, https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-51.pdf. On March 9, 2020, the Governor declared a state of emergency, finding that COVID-19 poses a risk to the entire state of Florida. *See* Exec. Order No. 20-52, https://www.flgov.com/wp-content/uploads/orders/ 2020/EO_20-52.pdf.

On March 11, 2020, the Florida Conservation Coalition requested that the Department heed the considerable public opposition to assumption and

maintain the current system of state and federal authority over wetlands permitting, including review under the National Environmental Policy Act and the Endangered Species Act in waters of the United States.  We also requested that, at a minimum, the Department hold public hearings around the state to permit stakeholders to express their views on this issue of exceptional importance.  That same day, the Department noticed a single public hearing to be held in Tallahassee on April 2, 2020, *in conjunction with* a webinar.

In the intervening weeks, the COVID-19 pandemic has grown exponentially throughout the country and in Florida.  As of March 30, 2020, Florida's Department of Health is reporting that there are more than 4,700 confirmed cases of COVID-19 in the state, with another 1,000 people being monitored.  *See* https://floridahealthcovid19.gov/#latest-stats (last accessed March 30, 2020, 10:00 AM).  Positive cases have now been confirmed in 51 Florida counties.  The pandemic has resulted in school closures, supply shortages, business restrictions, a steep rise in unemployment, and strains on our economy and health care system.  On March 17, 2020, Governor DeSantis announced that all schools would remain closed until April 15, 2020.  *See* Florida coronavirus update for Tuesday: Three field hospitals slated to open; K-12 schools to close through April 15; state announces 7th death, 216 positive tests, Orlando Sentinel (Mar. 18, 2020).

On March 23, 2020, the Department announced that in light of federal social distancing guidance in response to the COVID-19 pandemic, it would hold no public hearings.  The Department stated instead that it would offer three webinars on April 2, 2020, April 6, 2020 and April 10, 2020, and extend the comment period to April 17, 2020.

In light of current conditions, the Florida Conservation Coalition strenuously objects to the Department's intention to proceed with public comment at a time when the public in Florida cannot meaningfully participate.  Communities across the state are struggling to protect themselves and their loved ones from contracting a deadly virus.  At the same time, they are struggling with the burdens of reduced services (school closures), loss of income and economic stability, short supplies of basic household necessities and caring for their families.  There is too much uncertainty surrounding these threats for the state to ensure that it would even be physically possible for most members of the public to submit public comments.  Proceeding with public comment on the State 404 Program during this time of crisis for Florida communities would preclude meaningful public participation.

Moreover, while the Florida Conservation Coalition supports the Department's observance of federal social distancing guidance, webinars are no substitute for public hearings.  Webinars may be helpful when paired with public hearings, providing access to those unable to travel, but are not equivalent to public hearings for a variety of obvious reasons.  Many affected stakeholders may not have the technological capabilities or know-how to participate by webinar.  In addition, not all Floridians have access to reliable internet and many public facilities providing access like coffee shops and libraries have closed as a result of the current pandemic.

Members of the public should be afforded the opportunity to participate meaningfully in hearings in person with the Department.  And since 404 assumption is a statewide issue, the public should be afforded the opportunity to participate in hearings where they live.  Because that is not possible at this time, the Department should postpone the public comment and hearings until those can proceed with adequate opportunity for public participation.

The Department's proposed rulemaking for a State 404 program is discretionary. It is not an essential government function or statutorily mandated. It is not necessary to protect the public or the environment. To the contrary, it only places additional strains on state government resources during a time of crisis, to deal with a non-exigent matter of great public importance at a time when the public is struggling and cannot meaningfully participate.

We therefore respectfully request that the Department postpone the public comment period on the proposed State 404 Program during the pendency of this statewide public health emergency. We further request that the Department schedule in-person public hearings, *in conjunction* with webinars, on the matter once the public health emergency has subsided.

Sincerely,


Bob Graham
Chairman
Florida Conservation Coalition


Lee Constantine
Vice Chairman
Florida Conservation Coalition


CC: Administrator Heather Mason

# Exhibit 7



# Everglades Coalition

1000 Friends of Florida
Angler Action Foundation
Audubon Florida
Audubon of Southwest Florida
Audubon of the Western Everglades
Audubon Society of the Everglades
Backcountry Fly Fishers of Naples
Calusa Waterkeeper
Cape Coral Friends of Wildlife
Center for Biological Diversity
Conservancy of Southwest Florida
Defenders of Wildlife
"Ding" Darling Wildlife Society
Earthjustice
Environment Florida
Everglades Foundation
Everglades Law Center
Everglades Trust
Florida Bay Forever
Florida Conservation Voters Education Fund
Florida Defenders of the Environment
Florida Keys Environmental Fund
Florida Native Plant Society
Florida Oceanographic Society
Friends of the Arthur R. Marshall
Loxahatchee National Wildlife Refuge
Friends of the Everglades
Hendry-Glades Audubon Society
International Dark-Sky Association,
FL Chapter
Izaak Walton League of America
Izaak Walton League Florida Division
Izaak Walton League Florida Keys Chapter
Izaak Walton League Mangrove Chapter
Lake Worth Waterkeeper
Last Stand
League of Women Voters of Florida
Martin County Conservation Alliance
Miami Pine Rocklands Coalition
Miami Waterkeeper
National Audubon Society
National Parks Conservation Association
National Wildlife Refuge Association
Natural Resources Defense Council
North Carolina Outward Bound School
Ocean Research & Conservation Association
Peace River Audubon Society
Reef Relief
Sanibel-Captiva Conservation Foundation
Sierra Club
Sierra Club Florida Chapter
Sierra Club Broward Group
Sierra Club Calusa Group
Sierra Club Central Florida Group
Sierra Club Loxahatchee Group
Sierra Club Miami Group
South Florida Audubon Society
Southern Alliance for Clean Energy
The Florida Wildlife Federation
The Institute for Regional Conservation
The National Wildlife Federation
Theodore Roosevelt Conservation
Partnership
Tropical Audubon Society

March 31, 2020

Heather Mason
Environmental Administrator
Florida Department of Environmental Protection
2600 Blair Stone Road
Tallahassee, Florida 32399
Heather.Mason@FloridaDEP.gov

**Re: State 404 Program Public Hearing, Request for Postponement**

Dear Ms. Mason:

The Everglades Coalition has over 60 member organizations committed to the protection and restoration of America's Everglades. We have repeatedly expressed opposition to the state's plan to assume jurisdiction over the federal Clean Water Act Section 404 dredge and fill permitting program. We are now concerned that the Department intends to conduct public comment on its State 404 Program proposal in the midst of the growing COVID-19 pandemic, and to hold no public hearings on this issue of critical importance to the state.

By way of background, on February 19, 2020, the Department published proposed rules to create the State 404 Program, making public comments due March 11, 2020. On March 1, 2020, Governor Ron DeSantis issued an executive order directing the declaration of a public health emergency in the state arising from the novel coronavirus, COVID-19. *See* Exec. Order No. 20-51, https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-51.pdf. On March 9, 2020, the Governor declared a state of emergency, finding that COVID-19 poses a risk to the entire state of Florida. *See* Exec. Order No. 20-52, https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-52.pdf.

On March 9, 2020, the Everglades Coalition requested that the Department heed the considerable public opposition to assumption and maintain the current system of state and federal authority over wetlands permitting, including review under the National Environmental Policy Act (NEPA) in waters of the United States. We also requested that, at a minimum, the Department hold public hearings around the state to permit stakeholders to express their views on this issue of exceptional importance. On March 11, the Department noticed a single public hearing to be held in Tallahassee on April 2, 2020, in conjunction with a webinar.

In the intervening weeks, the COVID-19 pandemic has grown exponentially throughout the country and in Florida. As of March 23, 2020, Florida's Department of Health is reporting that there are more than 1,100 confirmed cases of COVID-19 in the state, with another 1,000 people being monitored. *See* https://experience.arcgis.com/experience/96dd742462124fa0b38 ddedb9b25e429 (last accessed March 23, 2020, 2:00 PM). Positive cases have now been confirmed in 47 Florida counties. The pandemic has resulted in school closures, supply shortages, business restrictions, a steep rise in unemployment, and strains on our economy and health care system. On March 17, 2020, Governor DeSantis announced that all schools would remain closed until April 15, 2020. *See* Florida coronavirus update for Tuesday: Three field hospitals slated to open; K-12 schools to close through April 15; state announces 7th death, 216 positive tests, Orlando Sentinel (Mar. 18, 2020).

On March 23, 2020, the Department announced that in light of federal social distancing guidance in response to the COVID-19 pandemic, it would hold no public hearings. The Department stated instead that it would offer three webinars on April 2, 2020, April 6, 2020 and April 10, 2020, and extend the comment period to April 17, 2020.

In light of current conditions, the Everglades Coalition strenuously objects to the Department's intention to proceed with public comment at a time when the public in Florida cannot meaningfully participate. Communities across the state are struggling to protect themselves and their loved ones from contracting a deadly virus. At the same time, they are struggling with the burdens of reduced services (school closures), loss of income and economic stability, short supplies of basic household necessities and caring for their families. Proceeding with public comment on the State 404 Program during this time of crisis for Florida communities would preclude meaningfully public participation.

Moreover, while the Everglades Coalition supports the Department's observance of federal social distancing guidance, webinars are no substitute for public hearings. Webinars may be helpful when paired with public hearings, providing access to those unable to travel, but are not equivalent to public hearings for a variety of reasons. Many affected stakeholders may not have the technological capabilities or know-how to participate by webinar. In addition, not all Floridians have access to reliable internet and many public facilities providing access like coffee shops and libraries have closed as a result of the current pandemic.

Members of the public should be afforded the opportunity to participate meaningfully in hearings in person with the Department. And since 404 assumption is a statewide issue, the public should be afforded the opportunity to participate in hearings where they live. Because that is not possible at this time, the Department should postpone the public comment and hearings until those can proceed with adequate opportunity for public participation.

The Department's proposed rulemaking for a State 404 program is discretionary. It is not an essential government function or statutorily mandated. It is not necessary to protect the public or the environment. To the contrary, it only places additional strains on state government resources during a time of crisis, to deal with a non-exigent matter of great public importance at a time when the public is struggling and cannot meaningfully participate.

We therefore respectfully request that the Department postpone the public comment period on the proposed State 404 Program during the pendency of this statewide public health emergency. We further request that the Department schedule in-person public hearings on the matter once the public health emergency has subsided.

Sincerely,


Mark Perry                                          Marisa Carrozzo
Co-Chair                                            Co-Chair


cc: Noah Valenstein

# Exhibit 8

**From:** Jeanine Bennett
**Sent:** Tuesday, April 07, 2020 10:40 AM
**To:** 'Mason, Heather' <Heather.Mason@FloridaDEP.gov>; Gene Duncan <GeneD@miccosukeetribe.com>
**Subject:** RE: State 404 Program Notice of Proposed Rule published

Thanks for the information Heather. This is good news. Looks like we will all be hunkered down well into May if not June.

Jeanine



**Miccosukee Tribe of Indians of Florida**
General Counsel, In-House
jeanineb@miccosukeetribe.com
**O:** 305.223.8380 **Ext:** 5211 **F:** 305.894.5212

**From:** Mason, Heather <Heather.Mason@FloridaDEP.gov>
**Sent:** Tuesday, April 07, 2020 10:27 AM
**To:** Jeanine Bennett <JeanineB@miccosukeetribe.com>; Gene Duncan <GeneD@miccosukeetribe.com>
**Subject:** RE: State 404 Program Notice of Proposed Rule published

Hi Jeanine,

We do plan on extending the comment period beyond the currently extended date of April 17 and having at least one additional public meeting because of COVID-19. We are still working on picking a date for the extension/meeting(s), but plan to have one soon. I will let you know as soon as we have a new date.

Thank you,



**Heather Mason, PWS**
Environmental Administrator
Florida Department of Environmental Protection
Submerged Lands and Environmental Resources Coordination
Heather.Mason@FloridaDEP.gov
2600 Blair Stone Road, MS 2500
Tallahassee, FL 32399-2400
Office: (850) 245-8480

**From:** Jeanine Bennett <JeanineB@miccosukeetribe.com>
**Sent:** Tuesday, April 7, 2020 10:03 AM

**To:** Mason, Heather <Heather.Mason@FloridaDEP.gov>; Gene Duncan <GeneD@miccosukeetribe.com>
**Subject:** RE: State 404 Program Notice of Proposed Rule published

Heather,

I am told that due to the confines imposed on people and businesses the deadline for written comments on the 404 Program Proposed Rule has been changed. Can you please provide an update to that new date? Considering the fact that the entire state's concerns are placed on reducing the spread of COVID-19, I think it is appropriate to postpone this deadline to allow people to focus on keeping themselves and their families healthy.

Thank you,

Jeanine



*Jeanine Bennett, Esq.*
**Miccosukee Tribe of Indians of Florida**
General Counsel, In-House
jeanineb@miccosukeetribe.com
**O:** 305.223.8380 **Ext:** 5211  **F:** 305.894.5212

**From:** Mason, Heather <Heather.Mason@FloridaDEP.gov>
**Sent:** Wednesday, February 19, 2020 10:39 AM
**To:** Jeanine Bennett <JeanineB@miccosukeetribe.com>; Gene Duncan <GeneD@miccosukeetribe.com>
**Subject:** State 404 Program Notice of Proposed Rule published

Hi Jeanine and Gene,

Our Notices of Proposed Rule were published today. The information is below. Please let me know if you have any questions,

The Department has published Notices of Proposed Rule for the State 404 Program. This rule is just one step in the process for the State to assume authority to administer the dredge and fill permitting program under Section 404 of the Clean Water Act. Rulemaking will not give the Department authority to administer the 404 program. The rules will be submitted as part of the assumption application package to the Environmental Protection Agency (EPA) once finalized.

This rulemaking includes the addition of minor changes in the state's Environmental Resource Permitting (ERP) rule, Chapter 62-330, F.A.C., to provide for consistency between programs, and the creation of a new rule, Chapter 62-331, F.A.C. to implement the State 404 Program and to include federal regulations that are not currently covered under the ERP program. These rules will become effective some time after approval of the assumption application package by EPA.

The Notices can be viewed via the following:

- [62-330 Notice](#)
- [62-331 Notice](#)

The draft forms and handbooks can be viewed on the [Division of Water Resource Management's rule development website](#).



**Heather Mason**
Environmental Administrator
Florida Department of Environmental Protection
Submerged Lands and Environmental Resources Coordination
[Heather.Mason@FloridaDEP.gov](mailto:Heather.Mason@FloridaDEP.gov)
2600 Blair Stone Road, MS 2500
Tallahassee, FL 32399-2400
Office: (850) 245-8480



# Exhibit 9



April 20, 2020

Florida Department of Environmental Protection
2600 Blair Stone Road
Tallahassee, FL  32399

Attn.: Heather Mason
Via Email: Heather.Mason@FloridaDEP.gov

**RE: Proposed Rules Related to State Assumption of the Clean Water Act Section 404 Program: Public Comment Deadline Suspension Request**

Ms. Mason,

On behalf of our respective organizations and our thousands of members, we are writing to express our concerns regard the Florida Department of Environmental Protection's ("FDEP or the Department") proposal to assume jurisdiction under Section 404(a) of the Clean Water Act, 33 U.S.C. § 1344, for wetland permitting in waters of the United States. This letter speaks specifically to the proposed revisions to Chapter 62-330, the proposed promulgation of Chapter 62-331, the Draft 404 Handbook, and the Department's Statement of Estimated Regulatory Costs ("SERC") all of which were published on February 19, 2020.

Each signatory below is an independent organization, member of Waterkeepers Florida, and a member of Waterkeeper Alliance, a global movement of on-the-water advocates who patrol and protect over 100,000 miles of rivers, streams, and coastlines. More than 350 Waterkeeper Organizations worldwide combine firsthand knowledge of their waterways with an unwavering commitment to the rights of their communities and to the rule of law.

On March 23, 2020, the Department issued a notice which superseded the March 11, 2020 Notice of Hearing for the State 404 Program Rulemaking. In the March 23 notice, FDEP announced that the public hearing related to this rulemaking would take place via three separate video conferences in order to remain "[c]onsistent with COVID-19 social distancing guidance from the U.S. Center for Disease Control and Prevention[.]" These video conferences were scheduled for April 2, 6, and 10th and the public comment period for the rulemaking was extended until midnight on April 17, 2020.

On April 17, 2020, the Department again notified interested parties that "due to these extenuating circumstances" related to COVID-19, FDEP would hold two additional telephonic hearings on April 24 and April 27, 2020. The Department also extended the public comment period for this rulemaking to midnight on April 30, 2020.

It is the position of Waterkeepers Florida that moving forward with this rulemaking is deeply inappropriate at this time. At the drafting of this letter, there have been more than 26,000 COVID-19 cases in the state of Florida, more than 3,800 hospitalizations as a result of the virus, and more than 780 deaths (*see* https://floridahealthcovid19.gov/#latest-stats). Additionally, more than 450,000 people in the State of Florida have filed for unemployment in the last month as a result of the pandemic. Moreover, K-12 schools across the state will remain closed through the end of the school year, forcing many parents to juggle childcare responsibilities. Finally, on April 1, 2020 Governor DeSantis issued a state-wide stay home order, instructing Floridians to stay home but for essential activities.

Given this body of evidence, we ask: is FDEP's rulemaking an essential activity at this time? We believe the answer to be a resounding "no."

Waterkeepers Florida is deeply committed to ensure public involvement in this rulemaking process. In fact, public involvement is the hallmark of our collective mission. We do not feel that these rulemaking proceedings have been adequately inclusive for all members of the public. Not only is it our position that this rulemaking and its motivations are deeply flawed to begin with, but the Department's attempts to fast track these decisions while the public is preoccupied with a global pandemic is unsettling at best.

We formally request that FDEP suspend Clean Water Act Section 404 rulemaking until, at a minimum, Governor DeSantis has lifted his stay at home order. We also request that FDEP schedule in-person public hearings at that time.

Respectfully,

Lisa Rinaman
St. Johns Riverkeeper
Board Chair of Waterkeepers Florida





Jen Lomberk
Matanzas Riverkeeper
Jen@MatanzasRiverkeeper.org
(904) 471-9878



Georgia Ackerman
Apalachicola Riverkeeper
Georgia@ApalachicolaRiverkeeper.org
(850) 653-8936



John Cassani
Calusa Waterkeeper
Cassani@CalusaWaterkeeper.org
(239) 444-8584



Colleen Gill
Collier County Waterkeeper
colleen@colliercountywaterkeeper.org
(609) 731-1362



Laurie Murphy
Emerald Coastkeeper
Laurie@EmeraldCoastkeeper.org
(850) 712-9566



Mike Conner
Indian Riverkeeper
keeper@theindianriverkeeper.org
(772) 521-1882



Reinaldo Diaz
Lake Worth Waterkeeper
Reinaldo@LakeWorthWaterkeeper.org
(561) 707-2897



Rachel Silverstein
Miami Waterkeeper
Rachel@MiamiWaterkeeper.org
(305) 905-0856



Anna Laws
St. Marys Riverkeeper
StMarysRiverkeeper@Gmail.com
(404) 909-0667



Andy Mele
Suncoast Waterkeeper
AndyMele@Mac.com
(914) 204-0030



John Quarterman
Suwannee Riverkeeper
wwalswatershed@gmail.com
(850) 290-2350



Justin Bloom
Tampa Bay Waterkeeper
bloomesq1@gmail.com

*Nov. 2, 2020 Comment Letter to the U.S. Environmental Protection Agency from Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, the Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper re: Florida's Request To Assume Administration of a Clean Water Act Program [EPA-HQ-OW-2018-0640-0001]*

# EXHIBIT 19

# Commentary: Florida's treasured wetlands on the eve of destruction — we cannot allow it



The city of Winter Park has acquired 55 acres of sloshy land off Howell Branch Road it long coveted. (Red Huber / Orlando Sentinel)

By **Victoria Tschinkel**
Guest Columnist

MARCH 9, 2018, 6:45 PM

L eave wetlands protection up to chance?

No way.

But in Tallahassee, it's the order of the day. Legislators have tripped over themselves in a stampede to pass House Bill 7043 at the behest of the very folks who want fast and simple permitting to destroy our most fragile natural heritage — our wetlands. Now this terrible legislation is on its way to Gov. Rick Scott. Florida has already lost half its wetlands, with great negative effects on water quality, fish nurseries, wildlife habitat and flood control. The legislation would allow the state of Florida to "take over" most Clean Water Act federal reviews and permitting, and poses a great risk to our wetlands.

Mind you, right now the state of Florida has authority to regulate potential destruction of wetlands under state law enacted in 1984. That authority remains untouched. But here's the sleight of hand: If and when Florida

adds federal permitting to its portfolio, significant protections available only under federal law will disappear because state law does not contain those protections. The entire Environmental Impact Statement process could disappear.

An EIS is a comprehensive review of all the effects a proposed project will have on the landscape: long-term productivity, irreversible and irretrievable commitment of resources, and unavoidable adverse impacts. Most importantly, an EIS considers alternate ways to achieve the goals of a project while protecting the greatest amount of wetlands.

The EIS is not all that's at stake; so is the Federal Endangered Species act (think manatees, sea turtles and Everglades snail kites).

The state's position is that all this will be magically covered by "agreements" and "memoranda of understanding" with a plethora of agencies, and that somehow, the state will follow "federal case law" (a verbal promise only). How can this happen without specific changes in Florida legislative authority? It can't, and no such changes are contained in the current legislation.

Michigan and New Jersey are the only states to have assumed delegation. Michigan's environmental community filed a complaint with EPA in 1997 that the state's performance and statutes were inconsistent with federal requirements, and as of 2016, deficiencies were still uncorrected. The feds never took back their proper role in protecting the state's wetlands. Florida does not need a deficient wetlands program or legal battles lasting decades.

The Federal Permitting Program started in 1975. Florida has consistently rejected responsibility for the program because of the decrease in wetland protection and lack of funding for the additional work. The environmental organizations comprising the Florida Conservation Coalition oppose accepting it now. Some members would have been willing to reconsider their opposition if the Legislature were required to review and ratify the mysterious packet of agreements during next year's session. At least legislators would know what they were voting for. But the Legislature declined this opportunity.

In 1994, the Florida Legislature passed a law requiring legislative ratification of each detail of DEP's method of determining exactly what qualifies as a wetland — down to the approval of every single wetland plant. This provided the development community with comfort. Yet now the Legislature is allowing the entire system for protecting Florida's wetlands to be weakened without a second thought. I guess the people of Florida don't deserve the same level of comfort as developers.

Why the rush? What is the emergency? The only credible answer is that the development industry (expected to thrive in the coming years), the mining industry and big agriculture all know this is a golden opportunity for them to get what they want: easier access to Florida's treasured wetlands.

Scott should veto HB 7043 when it lands on his desk.

*Victoria Tschinkel is former secretary of the Florida Department of Environmental Regulation.*

*Nov. 2, 2020 Comment Letter to the U.S. Environmental Protection Agency from Earthjustice on behalf of Florida Wildlife Federation, The Conservancy of Southwest Florida, Center for Biological Diversity, Miami Waterkeeper, and St. Johns Riverkeeper re: Florida's Request To Assume Administration of a Clean Water Act Program [EPA-HQ-OW-2018-0640-0001]*

# EXHIBIT 20



**RICK SCOTT**
GOVERNOR

March 23, 2018

Secretary Kenneth W. Detzner
Secretary of State
R.A. Gray Building
500 South Bronough Street
Tallahassee, FL 32399

Dear Secretary Detzner:

By the authority vested in me as Governor of the State of Florida, under the provisions of Article III, Section 8, of the Constitution of Florida, I do hereby approve House Bill 7043, enacted during the 120th Session of the Legislature of Florida, during the Regular Session of 2018 and entitled:

An act relating to State Assumption of Federal Section 404 Dredge and Fill Permitting Authority…

The Florida Department of Environmental Protection is absolutely dedicated to ensuring the wellbeing and protection of Florida's environment. A large part of their duties is to also eliminate duplicity in permitting while upholding and improving our stringent environmental protection standards. This often requires a review of processes with the federal government to ensure that taxpayers are being served properly while our environment is protected. Having two levels of government issue permits for the same activity is often burdensome and can create confusion and uncertainty while doing nothing more to protect our pristine environment.

Currently, with regards to wetlands permitting, there are two processes – an Environmental Resource Permit administered by the state and a Section 404 permit administered by the federal government. This bill gives the Department of Environmental Protection the authority to undertake rulemaking to explore whether the state should issue 404 permits, as is the case in New Jersey and Michigan. The signing of this bill makes no changes to the permitting process that is currently in place. HB 7043, which passed overwhelmingly with bipartisan support in both chambers of the Legislature, simply begins a public evaluation to identify ways we can continue to protect our environment while improving the Department of Environmental Protection's permitting process.

THE CAPITOL
TALLAHASSEE, FLORIDA 32399 • (850) 717-9249

Secretary Kenneth W. Detzner
March 23, 2018
Page Two


     The Department of Environmental Protection's rulemaking process is done with public input and scrutiny. Also, the Department of Environmental Protection must demonstrate that their permitting program's standards are just as stringent, if not more stringent, than what is in place currently with the federal government.

                                       Sincerely,

                                       Rick Scott
                                       Governor



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET, SW
ATLANTA, GEORGIA 30303-3104

## MEMORANDUM

**SUBJECT:**  State of Florida's Request to Assume a Clean Water Act Section 404 Program -
**ACTION MEMORANDUM**

**FROM:**  Jeaneanne M. Gettle    JEANEANNE GETTLE  Digitally signed by JEANEANNE GETTLE
Director, Water Division                                              Date: 2020.12.16 16:35:51 -05'00'

**TO:**  Mary S. Walker
Regional Administrator

## DISCUSSION:

### Background

The Clean Water Act (CWA) Section 404 authorizes the Secretary of the Army, acting through the Chief of Engineers of the Corps, to issue permits for the discharge of dredged or fill material into waters of the United States. CWA Section 404(g) allows a state or tribe to submit to EPA a request to assume administration of a Section 404 program in certain waters within the state's or tribe's jurisdiction.

On August 20, 2020, EPA received from the Governor of the State of Florida a program submission for regulating discharges of dredged or fill material into certain waters within the jurisdiction of the State in accordance with CWA Section 404(g-*l*). Receipt of the submission initiated a 120-day review of the proposed State program. During that period, EPA determined that the program submission was complete and subsequently solicited comments from members of the public as well as from the U.S. Army Corps of Engineers (Corps), the U.S. Fish and Wildlife Service (USFWS), and the National Marine Fisheries Service (NMFS). EPA also initiated and completed consultation with the Seminole Tribe of Florida, the Miccosukee Tribe of Indians of Florida, and the Poarch Band of Creek Indians in accordance with the EPA Policy on Consultation and Coordination with Indian Tribes[1] and the EPA Policy on Consultation and Coordination with Indian Tribes: Guidance for Discussing Tribal Treaty Rights[2] (collectively, EPA Tribal Policies). Concurrent with its actions on the program submittal, EPA consulted under Section 7 of the Endangered Species Act (ESA) with the USFWS, and under Section 106 of the National Historic Preservation Act (NHPA) with a number of parties[3] on its decision whether to approve Florida's request to assume a CWA Section 404 program.

### Public Participation and Responsiveness Summary

On September 16, 2020, EPA published a Federal Register notice regarding Florida's request for assumption of a Section 404 program. The Federal Register notice informed the public of EPA's receipt of a complete program request submission (85 FR 57853), opened a 47-day public

---

[1] https://www.epa.gov/tribal/forms/consultation-and-coordination-tribes
[2] https://www.epa.gov/tribal/epa-policy-consultation-and-coordination-indian-tribes-guidance-discussing-tribal-treaty
[3] Advisory Council on Historic Preservation, Choctaw Nation of Oklahoma, Florida Department of Environmental Protection, Florida State Historic Preservation Officer, Miccosukee Tribe of Indians of Florida, Muscogee (Creek) Nation, Poarch Band of Creek Indians, and Seminole Tribe of Florida

comment period, and scheduled virtual public hearings. EPA published notice of the State's submission in enough of the largest newspapers in Florida to attract statewide attention (Miami Herald, Orlando Sentinel, Palm Beach Post, Tallahassee Democrat, Tampa Bay Times). EPA also mailed notice to persons known to be interested in such matters. Existing mailing lists from the State of Florida, the Corps, USFWS, and NMFS, as well as EPA's own mailing lists were used as a basis for this mailing. EPA held virtual public hearings on October 21, 2020, and October 27, 2020, and received comments submitted to Docket ID No. EPA-HQ-OW-2018-0640 until November 2, 2020. EPA received and reviewed over 3,000 comments. Comments indicated both support for and opposition to EPA's potential approval of Florida's request to assume a CWA Section 404 program. Commenters supporting the State's assumption of a Section 404 program stated that Florida has run a successful Environmental Resource Program, a previously existing permitting program, which positions it well to assume the Section 404 program, that state-level control likely will improve environmental protections, and that streamlining these two programs would make permitting processes more efficient. Commenters opposing the State's assumption of a Section 404 program expressed several concerns including that Florida lacks sufficient staffing and funding resources, provides inadequate opportunities for public input, and would not provide sufficient protections for threatened and endangered species. After reviewing Florida's program submission and comments received, EPA has concluded that Florida and its Department of Environmental Protection (FDEP) have the necessary authority to assume and operate a program in accordance with the requirements found in CWA Section 404 and 40 C.F.R. Part 233. A summary of the public comments received and the Agency's responses can be found in the December 16, 2020, EPA Response to Comments document.

**Tribal Consultation**

EPA consulted with three tribes on Florida's CWA Section 404 program submission in accordance with the EPA Tribal Policies (the Miccosukee Tribe of Indians of Florida, the Poarch Band of Creek Indians, and the Seminole Tribe of Florida). EPA also consulted with five tribes under Section 106 of the NHPA (Choctaw Nation of Oklahoma, Miccosukee Tribe of Indians of Florida, Muscogee (Creek) Nation, Poarch Band of Creek Indians, and Seminole Tribe of Florida). EPA also invited three additional tribes (the Alabama-Coushatta Tribe of Texas, the Coushatta Tribe of Louisiana, and the Mississippi Band of Choctaw Indians) to consult under NHPA Section 106, but those three tribes did not engage in consultation, as confirmed in letters dated October 19, 2020. As part of these consultation processes, EPA met individually with each tribe, discussed questions and comments they provided, and reviewed and responded to written comments from each tribe. EPA sent letters to each tribe that respectively described how each of their comments submitted during the NHPA Section 106 consultation process were considered. The letters issued to the Miccosukee Tribe of Indians of Florida, the Poarch Band of Creek Indians, and the Seminole Tribe of Florida also described how each of their comments submitted in accordance with the Tribal Consultation Policies were considered.

**BASIS FOR DECISION:**

**Summary of EPA review and analysis**

Upon receipt of Florida's August 20, 2020, request to administer a Section 404 program, EPA reviewed the submission for inclusion of the required elements, as set forth in 40 C.F.R. § 233.10: (a) a letter from the Governor of the state requesting program approval; (b) a complete program description as set forth in 40 C.F.R. § 233.11; (c) an Attorney General's statement or a statement from the attorney for those state or interstate agencies which have independent legal counsel, as set forth in 40 C.F.R. § 233.12; (d) a Memorandum of Agreement with the EPA Regional Administrator, as set forth in 40 C.F.R. § 233.13; (e) a Memorandum of Agreement

with the Secretary of the Army, as set forth in 40 C.F.R. § 233.14; and (f) copies of all applicable state statutes and regulations, including those governing applicable state administrative procedures. Consistent with 40 C.F.R. § 233.15, EPA determined that Florida's submission was a complete request for State program approval that met the submittal requirements of 40 C.F.R. § 233.10, and so notified Florida by letter dated August 28, 2020. EPA Region 4 Water Division, EPA Region 4 Office of Regional Counsel, the Office of General Counsel, the Office of Water, and the Office of Enforcement and Compliance Assurance have conducted a thorough review of the submission from Florida in accordance with Section 404(g-*l*) and have determined that the State's program meets the requirements of the Clean Water Act and implementing regulations. The Agency also considered comments received in writing and at two public hearings, and consulted with tribes pursuant to the EPA Tribal Policies, where required, and Section 106 of the NHPA and its implementing regulations.

**Consultations and Consistency Determinations on this Agency Action**
EPA determined that approval of Florida's CWA 404 program has the potential to affect federally listed threatened or endangered species or critical habitat and thus consulted with USFWS under Section 7 of the Endangered Species Act. The USFWS provided a Biological Opinion with Incidental Take Statement stating that EPA approval of Florida's assumption of a CWA 404 program in assumable waters is not likely to jeopardize the continued existence of proposed or listed species or destroy or adversely modify designated or proposed critical habitat.

In its April 15, 2020, letter to FDEP, NMFS concluded that ESA-listed species under NMFS' jurisdiction do not occur in waters that are assumable by the State based on the ESA-listed species that were identified at that time as part of this proposed assumption. In a letter to NMFS dated September 2, 2020, EPA confirmed that the list of NMFS species had not changed. In email dated September 3, 2020, NMFS confirmed EPA's determination that approval of Florida's program has no effect on endangered and threatened species under NMFS' jurisdiction.

EPA has determined that approval of Florida's request to assume a CWA Section 404 program is an undertaking and thus consulted under Section 106 of the NHPA with the Advisory Council on Historic Preservation (ACHP), the Florida State Historic Preservation Office (SHPO), FDEP, and five Tribes (Choctaw Nation of Oklahoma, Miccosukee Tribe of Indians of Florida, Muscogee (Creek) Nation, Poarch Band of Creek Indians, and Seminole Tribe of Florida) regarding any potential effects of such approval on historic properties. On December 16, 2020, EPA entered into a programmatic agreement with the ACHP, FDEP, and the Florida SHPO, which, consistent with applicable NHPA regulations, evidences compliance with EPA's responsibilities under Section 106 of the NHPA and its implementing regulations. EPA held a consultation meeting on December 14, 2020, and responded to many of the comments received during the consultation period. On December 16, 2020, EPA responded to all comments received from the consulting parties.

EPA has determined that Florida's CWA Section 404 program will comply with the State's Coastal Zone Management Plan (CZMP) and therefore will not adversely affect the coastal zone, as documented in a Memorandum for the Record (December 16, 2020). Similarly, EPA has determined that its approval of Florida's CWA Section 404 program will have "No Adverse Effects" on Essential Fish Habitat (EFH) pursuant to Section 305(b) of the Magnuson-Stevens Act, as documented in a Memorandum for the Record (December 16, 2020). EPA's determination is based on a comparison of the scope of assumed waters and EFH, as well as an October 30, 2020, letter from the NMFS confirming that EFH consultation was not required.

**Federal Agency Comments**
EPA provided the Corps, NMFS, and USFWS a copy of Florida's program submission in accordance with 40 C.F.R. § 233.15(d). None of the agencies provided substantive comments on Florida's submission. The Corps provided a letter on November 24, 2020, stating it had no comments on the State program, that it had been working with the State since 2017, that since at least early 2020 it had worked to develop and finalize a Memorandum of Agreement with FDEP, and that it continues to work with FDEP to ensure an efficient transition of permitting responsibilities to FDEP. The NMFS sent a letter on October 30, 2020, indicating it reviewed the submission, cited to the September 3, 2020, concurrence on EPA's determination that approval of Florida's program has no effect on endangered and threatened species under NMFS' jurisdiction, and opined that no consultation under Section 305(b)(4)(A) of the Magnuson-Stevens Act is required if EPA makes a determination that approval of the program will not have adverse impacts on EFH. In a letter dated November 19, 2020, the USFWS stated it had no comments on the State's program and transmitted two signed documents: (1) a signed Biological Opinion concluding consultation pursuant to Section 7 of the ESA on EPA's Action to potentially approve Florida's request to assume a CWA Section 404 program and (2) a signed MOU among Florida Fish and Wildlife Conservation Commission, USFWS, and the FDEP outlining coordination on potential permit impacts on threatened and endangered species and critical habitat.

**RECOMMENDATION TO APPROVE:** I recommend, with the concurrence of the Acting General Counsel David Fotouhi, Assistant Administrator for the Office of Water David Ross, and Assistant Administrator for the Office of Enforcement and Compliance Assurance Susan Bodine, that you approve the State of Florida's request to assume a CWA Section 404 program.

**DISPOSITION:** A letter to the Governor of Florida and a letter to the Assistant Secretary of the Army for Civil Works (both with copies to the Secretary of the FDEP, the District Commander of the Corps Jacksonville District, and the EPA Administrator) have been prepared and uploaded to CMS for the signature of the Regional Administrator (see attachments). Please sign the attached Federal Register Notice of Decision. Please return signed copies of this Action Memorandum and the signed Federal Register Notice of Decision to me to be added to the record.

**DEADLINE:** A decision to approve or deny Florida's request to assume and operate a CWA Section 404 program is statutorily required by December 17, 2020. Therefore, letters giving notice of the decision should be signed and sent to the State of Florida and Corps on or before December 17, 2020.

**SUPPORTING DOCUMENTS:**
- The State of Florida's Program Application Submission to Assume the Clean Water Act Section 404 Permitting Program; August 20, 2020
  Made available to the public online through Docket No. EPA-HQ-OW-2018-0640 in the EPA's Docket Center, available at https://www.regulations.gov
    - Letters from the Governor of the State of Florida and the Secretary of the Florida Department of Environmental Protection requesting program approval
    - A complete program description, as set forth in 40 C.F.R. § 233.11
    - A General Counsel's statement, as set forth in 40 C.F.R. § 233.12
    - A Memorandum of Agreement with the Regional Administrator, as set forth in 40 C.F.R. § 233.13
    - A Memorandum of Agreement with the Secretary, as set forth in 40 C.F.R. § 233.14

- o  Copies of all applicable State statutes and regulations, including those governing applicable State administrative procedures
- EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program, December 16, 2020
- Tribal consultation letters
  - o  Letter to Alabama-Coushatta Tribe of Texas; October 19, 2020
  - o  Letter to Coushatta Tribe of Louisiana; October 19, 2020
  - o  Letter to Miccosukee Tribe of Indians of Florida; December 17, 2020
  - o  Letter to Mississippi Band of Choctaw Indians; October 19, 2020
  - o  Letter to Poarch Band of Creek Indians; December 17, 2020
  - o  Letter to Seminole Tribe of Florida; December 17, 2020
- Response to comment letters to tribes
  - o  Letter to Choctaw Nation of Oklahoma; December 16, 2020
  - o  Letter to Miccosukee Tribe of Indians of Florida; December 16, 2020
  - o  Letter to Muscogee (Creek) Nation; December 16, 2020
  - o  Letter to Poarch Band of Creek Indians; December 16, 2020
  - o  Letter to Seminole Tribe of Florida; December 16, 2020
- Programmatic Biological Opinion for U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program under Section 404 of the Clean Water Act; U.S. Fish & Wildlife Service; FWS Log #: 04E00000-2021-F-0001; 04E00000-2021-B-0001; November 17, 2020 ("Biological Opinion")
- NMFS letter to FDEP concerning NMFS' ESA jurisdiction; April 15, 2020
- EPA letter to NMFS concerning NMFS' ESA jurisdiction; September 2, 2020
- NMFS email to EPA concerning NMFS' ESA jurisdiction; September 3, 2020
- NHPA Programmatic Agreement; December 16, 2020
- NHPA consultation response letters
  - o  Letter to ACHP; December 16, 2020
  - o  Letter to FDEP; December 16, 2020
  - o  Letter to SHPO; December 16, 2020
- EPA Memorandum for the Record regarding Coastal Zone Management Act consistency; December 16, 2020
- EPA Memorandum for the Record regarding Magnuson-Stevens Act consistency; December 16, 2020
- Department of the Army letter to EPA concerning EPA's request for comments on the State of Florida's program submission; November 24, 2020
- NMFS letter to EPA concerning EPA's request for comments on the State of Florida's program submission and concerning Essential Fish Habitat consultation requirements of the Magnuson-Stevens Act; October 30, 2020
- USFWS letter to EPA concerning EPA's request for comments on the State of Florida's program submission and transmitting USFWS Biological Opinion (listed above); November 19, 2020
  - o  Appended to Biological Opinion: Memorandum of Understanding Between the Florida Fish and Wildlife Conservation Commission, the United States Fish and Wildlife Service, and the Florida Department of Environmental Protection; August 5, 2020

**CONCURRENCES:**

**Acting General Counsel:**
Concur: DAVID FOTOUHI  Digitally signed by DAVID FOTOUHI
Date: 2020.12.16 17:23:26 -05'00'

Disapprove: _____

Date: _____

**Assistant Administrator,**
**Office of Water:**
Concur: DAVID ROSS  Digitally signed by DAVID ROSS
Date: 2020.12.16 17:07:25 -05'00'

Disapprove: _____

Date: _____

**Assistant Administrator, Office of**
**Enforcement and Compliance Assurance:**
Concur: SUSAN BODINE  Digitally signed by SUSAN BODINE
Date: 2020.12.16 17:14:18 -05'00'

Disapprove: _____

Date: _____

## DECISION

That the request from the State of Florida for assumption its State 404 program be approved pursuant
to CWA Sections 404 (g) and (h) and as laid out at 40 C.F.R. Part 233.

**Regional Administrator**

Mary S. Walker

Date: _Dec. 17, 2020._

**COPIES:**
Andrew R. Wheeler,
Administrator



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET, SW
ATLANTA, GEORGIA  30303-3104
**August 28, 2020**

Ms. Aurelia Skipwith
Director
U.S. Fish and Wildlife Service
Main Interior
1849 C Street NW, Room 3331
Washington, DC  20240-0001

Mr. Larry Williams
State Supervisor Ecological Services
U. S. Fish & Wildlife Service
1339 20th Street
Vero Beach, Florida  32960

Mr. Leopoldo Miranda
Regional Director
1875 Century Blvd, Suite 400
U.S. Fish and Wildlife Service
Southeast Regional Office
Atlanta, GA  30345-3319

Subject:    Notice of Receipt of a Complete Package from the State of Florida Requesting to Assume
Administration of a CWA Section 404 Program

Dear Ms. Skipwith, Mr. Miranda, and Mr. Williams:

The U.S. Environmental Protection Agency (EPA) is hereby providing notice that on August 20, 2020,
we received a complete package from the State of Florida requesting to assume administration of a
Clean Water Act (CWA) Section 404 program. With this letter, we are including a copy of the State's
submission for your review and invite your comments on Florida's proposed program's consistency with
the Act.

The CWA established the Section 404 program, under which the U.S. Army Corps of Engineers (Corps)
may issue permits for the discharge of dredged or fill material into "waters of the United States" as
identified in the CWA. Section 404(g)(1) of the CWA provides states and tribes the option of submitting
to the EPA a request to assume administration of a CWA Section 404 program in certain waters within
state or tribal jurisdiction.

To assume a Section 404 program, a state or tribe must have authority to administer a permit program that regulates discharges of dredged or fill material consistent with the requirements of the CWA and its implementing regulations at 40 C.F.R. Part 233, and submit to the EPA a request to assume the program. In addition, a state or tribe's program must: (1) be at least as stringent as required by the CWA and its implementing regulations; (2) provide for sufficient public participation; (3) ensure compliance with the *Section 404(b)(l) Guidelines* (40 C.F.R. Part 230), which provide environmental criteria for permit decisions and; (4) have adequate enforcement authority.

Any state that seeks to administer a Section 404 program under 40 C.F.R. Part 233 shall submit to the EPA Regional Administrator: (a) a letter from the Governor of the state requesting program approval; (b) a complete program description, as set forth in 40 C.F.R. § 233.11; (c) an Attorney General's statement, or a statement from the attorney for those state or interstate agencies which have independent legal counsel, as set forth in 40 C.F.R. § 233.12; (d) a Memorandum of Agreement with the EPA Regional Administrator, as set forth in 40 C.F.R. § 233.13; (e) a Memorandum of Agreement with the Secretary of the Army, as set forth in 40 C.F.R. § 233.14 and; (f) copies of all applicable state statutes and regulations, including those governing applicable state administrative procedures.

The EPA's receipt of the request by the State of Florida triggered the EPA's statutory review. The EPA has reviewed the State of Florida's submission and consistent with 40 C.F.R. §233.15 has determined that it is a complete request that meets the submittal requirements of 40 C.F.R. § 233.10. The EPA will approve or disapprove the program on or before December 17, 2020. The EPA is also publishing notice of Florida's submission in the Federal Register.

With this letter, the EPA is inviting your comments on Florida's program. The link https://usepa.sharepoint.com/:f:/r/sites/R4/r4_wetlands_stream_regulatory_section/Shared%20Documents/Florida%20Assumption%20EPA%20Internal/Shared%20Package%20Folder?csf=1&web=1 provides a copy of Florida's submittal, which includes the following components: a letter from Florida Governor Ron DeSantis requesting program approval; a complete program description; Florida DEP General Counsel Justin G. Wolfe's statement; a Memorandum of Agreement with the EPA Regional Administrator; a Memorandum of Agreement with the Secretary of the Army; and copies of all applicable Florida statutes and regulations, including those governing applicable Florida administrative procedures. In case of any technical difficulties, please let us know and we will provide the documents via an alternative mechanism. The regulations at 40 C.F.R. § 233.15(f) provide for the submission of written agency comments from the Corps, the U.S. Fish and Wildlife Service, and the National Marine Fisheries Service to the EPA within 90 days of the EPA's receipt of a complete program submission. Accordingly, we request that you submit your comments no later than November 17, 2020.

If you have any questions regarding this matter, please do not hesitate to call me at (404) 562-9345 or have a member of your staff contact Mr. Kelly Laycock of my staff at (404) 562-9262 or 404Assumption-FL@epa.gov.

Sincerely,

JEANEANNE GETTLE  Digitally signed by JEANEANNE GETTLE
Date: 2020.08.28 14:51:51 -04'00'

Jeaneanne M. Gettle, Director
Water Division



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET, SW
ATLANTA, GEORGIA  30303-3104
**September 2, 2020**

Dr. Roy E. Crabtree, Regional Administrator
Directorate Office
NOAA Fisheries Service
Southeast Regional Office
263 13th Avenue South
St. Petersburg, Florida  33701

Subject:  Consultation on the EPA's Action on the State of Florida's Request to Assume Administration
          of a Clean Water Act Section 404 Program

In the 1977 amendments to the Clean Water Act (CWA), Congress provided states the option of
assuming the Section 404 program for discharges of dredged or fill material in certain waters. On
August 20, 2020, the U.S. Environmental Protection Agency, Region 4 (EPA) received a complete
package from Governor DeSantis of Florida requesting to assume administration of a CWA Section 404
program. Pursuant to the CWA Section 404 and its implementing regulations (40 C.F.R. Part 233), the
EPA is the federal agency charged with approving or denying Florida's request. The EPA has 120 days
within which to complete this action (i.e., by December 17, 2020).

In its December 13, 2019, letter to the U.S. Department of Commerce and the Department of the
Interior, the EPA committed to voluntarily engage in informal consultation with the United States Fish
and Wildlife Service (USFWS) and the National Marine Fisheries Service (NMFS) under Section 7 of
the Endangered Species Act (ESA) and identified the Florida Department of Environmental Protection
(FDEP) as a non-federal representative for purposes of consultation. In its April 15, 2020, letter to
FDEP, NMFS concluded that ESA-listed species under NMFS' jurisdiction do not occur in waters that
are assumable by the state based on the ESA-listed species that were identified at that time as part of this
proposed assumption. The EPA has confirmed that this list has not changed. Based on NMFS'
determination, the EPA concludes that our decision to approve or disapprove FDEP's assumption of the
Section 404 program has no effect on NMFS' jurisdictional species. This should conclude consultation
on this action with NMFS.

If you have any questions regarding this matter, please do not hesitate to call me at (404) 562-9345 or
have a member of your staff contact Mr. Kelly Laycock of my staff at (404) 562-9262 or
404Assumption-FL@epa.gov.

Sincerely,

JEANEANNE GETTLE
Digitally signed by JEANEANNE
GETTLE
Date: 2020.09.02 15:00:06 -04'00'

Jeaneanne M. Gettle, Director
Water Division

**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
**NATIONAL MARINE FISHERIES SERVICE**
Southeast Regional Office
263 13th Avenue South
St. Petersburg, Florida 33701-5505
https://www.fisheries.noaa.gov/region/southeast

October 30, 2020                        F/SER4:DD

Jeaneanne M. Gettle, Director
Environmental Protection Agency
Region 4 – Water Division
61 Forsyth Street SW
Atlanta, GA 30303-3104

Sent via: 404Assumption-FL@epa.gov

Dear Ms. Gettle,

Staff of the Florida Department of Environmental Protection (FDEP) and the Environmental Protection Agency (EPA) met with National Marine Fisheries Service (NMFS) on several occasions over the past few years regarding the State of Florida pursuing assumption of the Clean Water Act Section 404 program. Discussions with NMFS included staff from our Protected Resources Division and Habitat Conservation Division regarding consultations required by Section 7 of the Endangered Species Act and the essential fish habitat (EFH) consultation requirements of Section 305(b)(2) of the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act), respectively.

By letter dated September 2, 2020, the EPA notified the NMFS Southeast Regional Administrator of their determination FDEP's assumption of the Section 404 program has no effect on endangered and threatened species under NMFS jurisdiction. On September 3, 2020, Mr. David Bernhart, the Assistant Regional Administrator for Protected Resources, provided a courtesy concurrence of this determination.

We note EPA did not make an effects determination regarding EFH and recognize consultation is not required if a federal agency determines their action will not have adverse impacts on EFH. Due to the significance of the action, and in accordance with Section 305(b)(4)(A) of the Magnuson-Stevens Act and 50 CFR 600.925(b), the Habitat Conservation Division reviewed the State of Florida's application and we are not requesting EPA initiate EFH consultation nor are we offering conservation recommendations.

Further EFH consultation on this action is not necessary unless future modifications are proposed and you believe the resulting action may result in adverse impacts to EFH. Please contact Mr. David Dale, the Southeast Region's EFH Coordinator, at 727-551-5736 or david.dale@noaa.gov if you have any questions or wish to discuss this finding.

Sincerely,

FAY.VIRGINIA.M.
1365817320

Digitally signed by
FAY.VIRGINIA.M.1365817320
Date: 2020.10.30 15:36:36
-04'00'

Virginia M. Fay
Assistant Regional Administrator
Habitat Conservation Division



cc: (via email)
EPA – Laycock
F/OHC – Stedman, Lundgren
F/SER4 – Swafford, Wilber
F/SER3 – Bernhart

**MEMORANDUM OF UNDERSTANDING
BETWEEN THE
FLORIDA FISH AND WILDLIFE CONSERVATION COMMISSION,
THE UNITED STATES FISH AND WILDLIFE SERVICE AND
THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION
AUGUST 5, 2020**

This Memorandum of Understanding ("Understanding", or "MOU") is entered into by and between the Florida Fish and Wildlife Conservation Commission ("FWC"), the United States Fish and Wildlife Service ("USFWS"), and the Florida Department of Environmental Protection ("FDEP"), to formally memorialize existing coordination and collaborative efforts and to establish future processes and procedures that will ensure that the State of Florida's assumption of the CWA 404 program, as well as other permitting programs executed under FDEP's authority, will 1) fulfill state rule requirements regarding fish and wildlife under Part IV of Chapter 373 Florida Statutes (F.S.), including Chapters 62-330, F.A.C., and 62-331, F.A.C., 2) be compliant with the State of Florida requirements under Article IV, Section 9 of the Florida Constitution, Chapter 253, F.S., Chapter 379, F.S., and Rules Relating to Threatened and Endangered Species under Chapter 68A-27, F.A.C., and 3) comply with the Endangered Species Act (ESA; 16 U.S.C. § 1531 et seq) and the Marine Mammal Protection Act (MMPA; 16 U.S.C. § 1361 et seq.).

I.   PURPOSE

The purpose of this MOU between the FWC, the USFWS, and FDEP is to formalize the existing coordination between these agencies and establish additional coordination processes to ensure the conservation of Florida's federally and State-listed wildlife and their habitats. This MOU is to ensure that FDEP's permitting and lease programs under Part IV of Chapter 373, F.S., and Chapter 253, F.S., are consistent with all applicable requirements of the ESA, the MMPA, 16 U.S.C. § 1531-43, and are in keeping with the State of Florida requirements under Article IV, Section 9 of the Florida Constitution, Chapter 379, F.S., and Chapter 68A-27, F.A.C..

This MOU is focused on FDEP's implementation of the State of Florida's permitting programs under Part IV of Chapter 373, F.S. These programs include the Environmental Resource Permitting program (ERP Program), 62-330, F.A.C., and the anticipated State 404 Permitting Program (State 404 Program), 62-331, F.A.C., contingent upon the Environmental Protection Agency (EPA) approval of Florida's request for State assumption of Section 404 of the Clean Water Act (CWA) under 40 C.F.R. Part 233.

These permitting programs authorize FDEP to regulate proposed activities in surface waters and wetlands.  Alteration of wetlands and other surface waters may have a detrimental impact on the environment. Wetlands produce the basic food material used by many fish and other aquatic life and some also serve as nursery grounds for fish and rookery areas for birds. Many wildlife species, some of which are threatened or endangered, depend on wetlands to complete all or part of their life cycle. Dredging and filling can degrade water quality during and after construction and can impact aquatic invertebrates, fish, and wildlife in that area. It has been estimated that as much as 80 percent of our recreationally and commercially important fish species are dependent

upon wetlands for at least some portion of their life cycle.

The purpose of this MOU is to:

- Improve the existing framework and develop new processes as needed for meeting responsibilities under the ERP Program, State 404 Program, Chapter 68A-27, F.A.C., Florida's Constitution, MMPA, and the ESA.
- Create a State and Federal Endangered and Threatened Species Technical Team to better assist FDEP's district, regional, and field offices to conserve and protect Florida's aquatic and terrestrial species and their habitats, natural resources and ecosystems through the State permitting processes.
- Develop a coordination process for the State 404 Program that will maximize efficiencies and consistency in order to successfully balance the permitting workload, while minimizing administrative processing for all involved parties. See Attachment 1 for a species coordination process flowchart.
- Develop a coordination plan that will include guidance on how to elevate any conflicts or disagreements between agencies.
- Ensure consistent internal coordination processes between regional offices of the USFWS, FWC, and FDEP Districts.
- Ensure the state permitting processes implemented by FDEP meet the requirements of the rules and statutes governing protection of state imperiled species.

    A.  Authorities

      1.  Environmental Resource Permitting

The State of Florida's ERP Program regulates activities involving the alteration of surface flows, including new activities in uplands that generate stormwater runoff, as well as dredging and filling in wetlands and other surface waters. Dredging and filling in the surface waters of Florida has been regulated since the early 1970s. Established under Chapter 403, F.S., the "dredge and fill permit" program protected surface waters from degradation caused by the loss of wetlands, and from pollution caused by construction activities.  This program was phased out in 1995, and replaced by the new environmental resource permit program under Part IV of Chapter 373, F.S. The ERP program provides a mechanism for protection for all fish and wildlife and their habitats, particularly federally and State-listed wildlife and plant species, and can provide protection measures in perpetuity.

The FWC is Florida's state wildlife agency established in the State Constitution to exercise the regulatory and executive powers of the state with respect to wild animal life and fresh water aquatic life.  The FWC has permitting authority over species identified in Chapter 68A-27, F.A.C., which include the species identified within FDEP's ERP program.  Permits issued by FDEP cannot authorize impacts, specifically take, of species identified in Chapter 68A-27, F.A.C. As such, the FDEP has historically coordinated protection and conservation of aquatic and terrestrial fish and wildlife species with the FWC.  FWC's permit commenting authority was codified upon the agency's creation in Section 20.331(10), F.S. The FWC provides a list of

potentially affected federally and State-listed species to FDEP during ERP application review. It also evaluates potential impacts to State-listed fish and wildlife for ERP Program project applications that are expected to affect species and habitat, and provides recommendations for permit conditions to the FDEP.

 2.  State Lands

The state of Florida acquired title to sovereignty submerged lands on March 3, 1845, by virtue of statehood. Sovereignty submerged lands include all submerged lands, title to which is held by the Board of Trustees (Governor and Cabinet) of the Internal Improvement Trust Fund.  FDEP is Florida's lead agency for environmental management and stewardship, serving as staff to the Board of Trustees. As such, the FDEP's role includes acquiring lands for protection, and providing oversight for the management of activities on more than 12 million acres of public lands including lakes, rivers and islands. These public lands include sovereignty submerged lands, which include, but are not limited to, tidal lands, islands, sandbars, shallow banks, lands waterward of the ordinary or mean high water line, and those beneath navigable fresh water or beneath tidally influenced waters. These publicly owned lands are managed under Chapter 253, F.S., and the rules promulgated thereunder, to provide for areas of natural resource-based recreation, to ensure the survival of plant and animal species, and the conservation of finite and renewable natural resources. Section 18-21.004(2)(i), F.A.C. states: "Activities on sovereignty lands shall be designed to minimize or eliminate adverse impacts on fish and wildlife habitat, and other natural or cultural resources. Special attention and consideration shall be given to endangered and threatened species habitat.

 3.  Section 404 of the Clean Water Act

The United States Army Corps of Engineers (USACE) currently regulates proposed activities through a federal permit review process, administering Section 404 of the CWA.  The USACE permitting program regulates the discharge of dredged or fill material into waters of the United States, including wetlands. Activities in waters of the United States regulated under this program include fill for development, water resource projects (such as dams and levees), infrastructure development (such as highways and airports), and mining projects. Section 404 requires a permit before dredged or fill material may be discharged into waters of the United States, unless the activity is exempt from Section 404 regulation (e.g., certain farming and forestry activities).  An individual permit is required for potentially significant impacts. Individual permit applications under USACE review are evaluated for public interest, as well as the environmental criteria set forth in the CWA Section 404(b)(1).

The USACE consults with the USFWS, the federal agency charged with wildlife protection, to ensure protection of federally listed fish, wildlife and plants. The USFWS evaluates impacts on federally listed fish, wildlife, and plant species for all federal projects and federally permitted projects expected to affect species and their critical habitat, including projects subject to the requirements of Section 404.

The State of Florida, through FDEP, is requesting assumption of this permitting authority.  If approved, this program will be referred to as the State 404 Program.

4. Section 6 of the Endangered Species Act

Section 6(a) of the ESA directs the USFWS to "cooperate to the maximum extent practicable with the States" to further the conservation of federally threatened and endangered species. The purpose, processes, and procedures described in this MOU are consistent with this mandate. This MOU does not conflict with or limit the longstanding section 6(c) cooperative agreement between the USFWS and FWC, which has been annually renewed since its establishment in 1976.

B. Background

In 2020, FDEP will be submitting its application to the EPA seeking to assume authority to administer Section 404 of the CWA for certain waters of the United States (assumption). If approved, the State 404 Program will be a separate permitting program from the ERP Program, with separate authorizations. Assumption of the permitting program is limited to "state-assumed" waters, which is not defined in the CWA but is described as all waters of the United States that are not under the jurisdiction remaining with the USACE (retained waters, such as those waters subject to section 10 of the Rivers and Harbors Act). Retained waters are defined in the State 404 Program Applicant's Handbook, as:

"Retained Waters" means those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The Corps will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the Corps is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the Corps will retain jurisdiction to the landward boundary of the project for the purposes of that project only."

Based on a comparison of the last five years of USACE and FDEP reviewed applications, it is anticipated that the majority of future projects will require both a State 404 and an ERP authorization. It is the intent of FDEP to establish a State 404 Program coordination process for protection of federally listed species and designated critical habitat that is similar, and as protective as, the ESA's Section 7 interagency consultation process that currently exists between the USACE and the USFWS for federal Section 404 permits.  As part of the State of Florida's assumption of Section 404, FDEP will continue to utilize FWC's biologists and species

specialists that are already involved in the review of both 404 applications and ERP applications. Currently, FWC already provides a list of federally and State-listed species to FDEP and the USACE as part of their review. FWC also provides comments and recommendations on State-listed species, provides technical assistance on federally listed species, and currently provides comments and recommendations on aquatic species such as manatees and sea turtles under the Florida Manatee Sanctuary Act and Florida's Marine Turtle Protection Act. FWC also regulates intentional and incidental take of State-listed species under Chapter 68A-27, F.A.C. exclusive of the ERP Program and the State 404 Program. Nothing in this MOU, the ERP Program, nor the State 404 Program supersede nor otherwise affect FWC's permitting programs or authorities. For State 404 Program application reviews, FWC proposes to provide preliminary effect assessments for federally listed species and their critical habitat, as well as provide preliminary impact avoidance and minimization measures that will become permit conditions during the FDEP review of project applications. These project-specific preliminary lists of affected federally listed species, assessment determinations, and proposed impact avoidance and minimization measures may be coordinated with the USFWS during technical assistance review and/or as part of the Public Notice process for concurrence. This will be in addition to FWC's role in reviewing the ERP Program applications for state listed species impacts, which will remain unchanged. The benefits of this MOU, and FWC's involvement with Part IV of Chapter 373, F.S. concern the authorizations as outlined in Section V of this MOU.

II.  COORDINATION FRAMEWORK

    A.  The Permit Application Review Process Framework

The current ERP species coordination process includes FWC's involvement upon initial receipt of the application, allowing FWC's review to begin early in the process and proceed during the ERP Request for Additional Information and Completeness phases. State 404 permit applications are proposed to be processed in a similar manner, where FWC and USFWS will receive applications from FDEP as soon as possible after receipt. Upon assumption of the Section 404 Program, coordination between the USFWS and FDEP related to the proposed action's effects on species will occur through the technical assistance process, which is anticipated to be outlined in the USFWS's biological opinion based on information included in the biological assessment submitted by EPA. FWC and FDEP will jointly decide which agency will be the species coordination lead to coordinate the federally listed species review with the USFWS for each application. The State species coordination lead is responsible for making a preliminary determination for affected federally listed species, affected action area and critical habitats, and assessing whether, and what type of, adverse impacts to federally endangered or threatened species and their critical habitats is expected. The FDEP and FWC reviewers will work as a team. This coordination between reviewers will ensure that the preliminary information and impact/effect determinations for federally listed species that is to be sent to the USFWS represents all needed aspects of the State review. The designated State species lead will always include the other State agency's reviewer on all correspondence with the USFWS. Disagreements between agencies will be handled in accordance with Section IV of this MOU. Upon receipt of a permit application, the State species lead will coordinate with the USFWS and provide to DEP the preliminary assessment and additional information request within 20 days, so that FDEP may comply with its requirement to submit its request for additional information

within 30 days of receipt of a permit application (Rule 62-331.052, F.A.C)

After FDEP/FWC has all the necessary information needed in order to review the permit application, the State species lead for that project can provide preliminary effect determinations and protective measures to USFWS for review and comment. Comments from the USFWS will be incorporated into FDEP's review of the permit application, including the effects discussion and incorporation of draft permit conditions. Or, in the case where no species will be affected, this information will be officially documented, and the species coordination review will be considered completed. This technical assistance with the USFWS will be accomplished prior to the Public Notice, when possible. The Public Notice will include the types of anticipated impacts to endangered and threatened species as well as their critical habitat, and the proposed protection measures to offset those impacts. After the Public Notice, the State species lead will review any additional information and public concerns that were received and coordinate with the USFWS to address them as appropriate. If there are no additional concerns or modifications that would affect the species review, the conclusions and permit conditions by USFWS will be drafted as final correspondence for the file and recommended conditions incorporated into the permit.

During EPA's review of Florida's application for assumption, FDEP's Submerged Lands and Environmental Resources Coordination Program (SLERC) staff, with assistance from FWC and USFWS, if possible, will provide training to FDEP permit review staff on the species coordination process and performing assessments of effects that different types of projects pose to federally listed species. This will include the use of information and approaches found in section 7 consultation keys, Standard Local Operating Procedures for Endangered Species (SLOPES) and other species effects evaluation tools. These tools will be provided to FWC and FDEP in advance of these trainings and any discrepancies in the species information or use of these tools will be resolved. In addition, information and approaches for how to analyze species-specific data and assess potential effects to species that do not have such tools would be discussed. Additional tools will be adopted as they are developed by the USFWS.

The parties anticipate that FWC's species expertise and current engagement in the ERP review will create efficiencies during the transition from a Federal 404 program to the State 404 permit program, while also providing continuous protection to Florida's fish, wildlife, and plant species and their habitats. The FWC and USFWS staff will be providing expertise to FDEP staff regarding species issues, and the species coordination process will be a joint effort for each application. Over time, FDEP, FWC, and USFWS will become more proficient and knowledgeable about effects determinations for federally listed species during the State 404 Program permitting process.

B. Agency Roles and Responsibilities

This MOU anticipates the following roles and responsibilities for each agency. However, after 404 assumption, a technical team (described in Section III below) should convene and formalize the details of coordination.

FWC
• Attend Technical Team meetings.

• Participate in training efforts with FDEP and USFWS.
• Provide oversight during the permitting review process, when needed.
• Provide a list of potentially affected species and habitat during the review of permit applications, preliminary determinations of the project's potential effect on federally and State-listed species and habitat (particularly critical habitat) and provide preliminary recommendations for impact avoidance and minimization measures.
• Determine if the project meets any specified criteria identified in any pre-existing biological opinions, USFWS-approved species effect determination keys, or USFWS-issued incidental take permits for federally and State-listed species.
• In coordination with USFWS, develop appropriate, site specific habitat conservation or species conservation measures to be incorporated as permit conditions. When appropriate, the USFWS-approved species lists, and recommended impact avoidance and minimization measures may be finalized by FWC as official correspondence to FDEP.
• Participate in project-specific meetings, teleconferences and email conversations regarding wildlife and habitat reviews. This will provide support for the review of wildlife and habitat impacts when needed.
• Take the lead in resolution of issues regarding State-listed species, including State-listed species that are also designated federally as "at-risk", "candidate" or "proposed" species, as appropriate.
• Work directly with the applicant to resolve issues regarding permitting for take of State-listed species in accordance with FWC's Rules Relating to Threatened and Endangered Species.

USFWS
• Attend Technical Team meetings, when appropriate.
• Participate in training efforts with FDEP and FWC.
• Provide technical assistance during the permitting review process, where there may be effects to federally listed species, proposed species, petitioned species, or candidate species.
• Coordinate compliance with FWC to meet ESA requirements for relevant federally threatened and endangered ("T/E") species.
• Provide section 7 consultation keys, Standard Local Operating Procedures for Endangered Species (SLOPES) and other species effects evaluation tools used to evaluate effect determinations
• Provide technical assistance regarding effects on federally threatened or endangered species and measures to avoid or minimize adverse effects.
• In coordination with FWC, develop appropriate, site-specific habitat conservation or species management opportunities.
• Participate in project-specific meetings, teleconferences and email conversations regarding wildlife and habitat reviews upon request as related to ESA-listed species, proposed species, petitioned species, or candidate species. This will provide support for the review of wildlife and habitat impacts when needed.
• Take the lead in resolution of issues related to federally listed species.
• Incidental take for federally listed species will be handled in accordance with the Biological Assessment and Biological Opinion developed for this assumption.

FDEP

• Attend Technical Team meetings when appropriate.
• Participate in training efforts with FWC and USFWS.
• Provide oversight during the permitting review process, when needed.
• Provide State 404 Program and ERP program related permit applications as soon as possible for review upon submittal.
• Provide any additional information that may assist in the review, including activity-specific information to FWC and USFWS. Incorporate any additional information requested by FWC and USFWS into the FDEP requests for additional information or completeness requests to the applicant.
• Participate in project-specific meetings, teleconferences and email conversations regarding wildlife and habitat reviews. This provides support for the review of species and habitat impacts when needed.
• Provide notification to FWC regarding timelines for the submittal of FWC questions and comments during the review of submitted applications.  When FWC is actively reviewing a permit, FDEP will not issue the permit without resolution of FWC's review.

## III. ENDANGERED AND THREATENED SPECIES TECHNICAL TEAM

This MOU's framework, processes, and procedures may be reviewed periodically after initiating an Endangered and Threatened Species Technical Team (Technical Team) comprised of FWC, USFWS and FDEP agency staff members. This Technical Team will meet to review the effectiveness of the coordination processes, procedures, training resources, and other areas related to State of Florida permitting under Part IV of Chapter 373 F.S. to ensure compliance with the ESA and State of Florida Rules Relating to Threatened and Endangered Species. Team members would include staff from FWC's Office of Conservation Planning Services (CPS), USFWS's Florida's Ecological Services Office, and FDEP's SLERC. FDEP SLERC's office will take the lead in setting up Technical Team meetings and training meetings. The Technical Team will also act as technical support to FDEP District offices during the permitting process should any issues arise regarding state or federally listed species or habitat conservation measures. Frequent and informal contact between agencies is encouraged regarding the general process, project-specific issues, or emerging issues.

    A.  Guidance/Training

FDEP, FWC and USFWS will hold cross-training sessions, and joint training sessions with district, regional and field staff of all agencies to facilitate mutual understanding and implementation of the MOU. Initially, the goal is completion of basic training to all relevant permit review personnel prior to the approval of assumption, with additional training resources and sessions to continue periodically as needed. The agencies may issue guidance individually or jointly to assist in carrying out this MOU.

    B.  Oversight Review

The Technical Team provides oversight and coordination for all aspects of this MOU. Its functions include, but are not limited to:

(1) Developing, maintaining, and updating training guidance;
(2) Addressing issues about process implementation to ensure compliance with ESA;
(3) Identifying and addressing workload issues;
(4) Incorporating/identifying improvements and revisions into the process;
(5) Convening interagency scientific/technical reviews, as appropriate;
(6) Reviewing and evaluating, at least on an annual basis, the MOU and its
    implementation;
(7) Facilitating reaching consensus on particular issues at any level upon requests by
    personnel at that level.

## IV. INTERAGENCY ELEVATION PROCESS

FDEP, FWC and USFWS intend to work cooperatively to achieve their mutually shared
objectives of protecting the quality of waters of the United States and the species that depend on
those waters. Collaboration among Technical Team members, agency district, regional, and field
staff when resolving any potential conflicts or disagreements should be performed through a
structured, time-sensitive process at the lowest possible level. During the review of State 404
permit applications and these elevation procedures, the following regulations will be followed:
40 CFR § 233.20; 40 CFR § 233.50; the 404(b)(1) Guidelines in 40 CFR § 230; 40 CFR §
230.10(b)(3) and 40 CFR § 230.30(c). The agencies will follow the procedures below to elevate
any conflict or disagreement.

Any contentious issues, disagreements or conflicts between agencies, or between agencies and
applicants, will be discussed with an attempt to resolve them at the lowest levels within the
agencies without elevation (reviewers and their supervisors). If issues cannot be resolved at this
level, reviewers and their supervisors will reach out to the Technical Team for assistance (Level
1). If there is no consensus resolution at that level, or if it is deemed prudent, the issues will be
elevated to Level 2, which would include the USFWS State Supervisor, FDEP State 404 program
Supervisor, FWC Conservation Planning Services Director, and EPA Florida State 404 program
Supervisor). While anticipated to be very rare, issues can be elevated to Level 3 if needed, which
would include the USFWS Regional Director, Atlanta; EPA Regional Administrator, Atlanta;
FWC Executive Director and FDEP Secretary. The supervisory level staff may differ for each
agency and may differ depending upon the issue in dispute or conflict that needs resolution. All
agencies will be included in resolution discussions, even if the issue only involves two of the
three partner agencies.

While decisions by all levels, including decisions to elevate, will be made by consensus to the
greatest extent practicable, any one agency can initiate the elevation process or elevate to the
next supervisor level. Agencies will jointly prepare a summary document that will contain a
statement of facts and succinctly state each agency's position and recommendations for
resolution. This summary document will be developed and shared when elevated to Level 2 or
Level 3.  If needed, the summary documents may be updated when elevated to Level 3. The
overall goal is to jointly develop implementable actions to avoid and/or minimize adverse
impacts to listed species to ensure the impacts of any given project are not likely to result in take,
or likely to jeopardize the continued existence of any species or adversely modify its critical
habitat. With regard to conclusions about the potential effects of a project on ESA-listed species

or the effectiveness of proposed protection measures, the final USFWS position is determinative. With regard to conclusions about the potential effects of a project on State listed species or the effectiveness of proposed protection measures, the final FWC position is determinative.

Elevation should be initiated so that all applicable deadlines will be met, considering subsequent levels of review. If FDEP is aware of a dispute, they will resolve the dispute prior to taking final action. This is to ensure consistency with applicable legal deadlines, and to allow the issue to be resolved through the elevation process When determined to be appropriate (e.g., where the results of the elevation would provide useful guidance to agency staff or transparency to the public), the decision on the elevation should be memorialized in writing, placed in the application's official file, and circulated among Agency staff to serve as guidance for future decisions.

## V.  BENEFITS OF THIS MEMORANDUM OF UNDERSTANDING

While there is statutory permit commenting authority for FWC in the ERP Program, no specific, written coordination procedures or agreements have been initiated between FWC and FDEP for the ERP Program. This MOU will improve communication and provide a mechanism to improve ERP processes, resolve emerging issues, and likely increase efficiency and consistency in the ERP Program review for endangered and threatened species.

Once assumed, the implementation of the State 404 Program will result in FWC reviewing potentially affected federally and State-listed species concurrently.  Since similar guilds of species have similar habitat needs or life-history traits, FWC's preliminary determinations of a project's potential adverse effects to species will be more holistic and more efficient than the current process. There is also some limited jurisdictional overlap between FWC and USFWS with some species, such as species that are State-listed and federally designated as "at risk", "candidate", and "proposed".  This MOU provides a mechanism for FWC and USFWS to more closely coordinate the review of potential adverse impacts to these types of species during State permit review.  In addition, on rare occasions there can be conflicting conservation needs of species located within the same action area of a project.  This MOU provides a mechanism for FDEP, FWC and USFWS to better resolve such issues.

This MOU formally memorializes partnerships that are mutually beneficial to all parties:

- Benefit to FDEP: The FWC and USFWS partnerships and involvement in both permitting processes ensures fulfillment of the ERP Program, State 404 Program, Chapter 253 F.S. and all other laws requiring protection of federally and State-listed species and their habitats. The FDEP/FWC partnership will ease the transition of the State 404 Program, providing faster and more accurate project reviews and effect determinations as compared to FDEP staff alone.

- Benefit to FWC: The FDEP partnership provides a mechanism for fulfillment of the requirements of Article IV, Section 9 of the Florida Constitution, and FWC's Chapter

68A-27 of the Florida Administrative Code (F.A.C.).

- <u>Benefit to USFWS:</u> The FWC and FDEP partnerships increase collaboration on development projects that previously may have been reviewed and permitted separately but will now be reviewed by one permitting agency (FDEP) and one wildlife agency (FWC). FDEP and FWC may assist USFWS during the technical assistance process by providing preliminary reviews when possible, in order to ensure the fulfillment of ESA requirements.

## VI. OBLIGATION OF FUNDS, COMMITMENT OF RESOURCES

Nothing in this MOU shall be construed as obligating any of the parties to the expenditure of funds in excess of appropriations already authorized by law, or otherwise commit any of the agencies to actions for which it lacks authority. It is understood that the level of resources to be expended under this MOU will be consistent with the level of resources available to the agencies to support such efforts.

## VII.  NATURE OF THE MEMORANDUM OF UNDERSTANDING

This Memorandum is intended only to improve the interagency coordination between FWC, USFWS and FDEP. It is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the State of Florida or the United States, its agencies or instrumentalities, its officers or employees, or any other person. FWC, USFWS, and the FDEP may jointly revise this document. No party to this MOU waives any administrative claims, positions, or interpretations it may have with respect to the applicability or the enforceability of the ESA or the CWA.

(1)   Nothing in this MOU shall be construed to restrict in any way EPA's authority to fulfill its oversight and enforcement responsibilities under the CWA, nor shall it restrict the enforcement responsibilities of FDEP and FWC under Florida law or USFWS under Federal law.

(2)   This MOU, and procedures established in conformance with it, shall be reviewed periodically by FDEP, FWC, and USFWS. Any party may request in writing an amendment or modification to the MOU.

(3)   This MOU, and any amendments and modifications, shall remain in effect until the State 404 Program authorization is modified in a manner that would affect this MOU.

## VIII. EFFECTIVE DATE; TERMINATION

This Memorandum will become effective upon signature by each of the parties.  If the State 404 Program is not yet approved, this Memorandum will only become effective for the ERP program and requirements under Chapter 253, F.S.. Once the application for assumption is approved by EPA, this Memorandum will become effective for both the ERP program and the State 404 Program. Any of the parties may withdraw from this MOU upon 60 days written notice to the other parties, provided that any coordination covered by the terms of this MOU that are pending at the time notice of withdrawal is identified by the parties, and those activities covered by this

MOU that begin the process prior to and within the 60-day notice period, will continue to be covered by the terms of this MOU.

IX.  SIGNATURES

**Florida Department of Environmental Protection**

Date: 08/07/2020 _____    By: _____ _____
                                        Noah Valenstein, Secretary

**Florida Fish and Wildlife Conservation Commission**

Date: 8/5/2020 _____    By: _____
                                        Eric Sutton, Executive Director

**United States Fish and Wildlife Service**

Date: 11/16/2020 _____    By: _____
                                        Leopoldo Miranda-Castro, Regional Director

Attachment 1: Species Coordination Process Flowchart



requirements, interventions, protests, service, and qualifying facilities filings can be found at: *http://www.ferc.gov/ docs-filing/efiling/filing-req.pdf*. For other information, call (866) 208–3676 (toll free). For TTY, call (202) 502–8659.

Dated: May 15, 2020.

**Nathaniel J. Davis, Sr.,**

*Deputy Secretary.*

[FR Doc. 2020–10970 Filed 5–20–20; 8:45 am]

**BILLING CODE 6717–01–P**

## ENVIRONMENTAL PROTECTION AGENCY

[EPA–HQ–OW–2020–0008; FRL–10008–96–OW]

### Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program Is Non-Discretionary for Purposes of Endangered Species Act Section 7 Consultation

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice and request for comment.

**SUMMARY:** The Environmental Protection Agency (EPA) requests comment on whether the EPA should reconsider its current position that consultation under Endangered Species Act (ESA) section 7 is not required when the EPA approves a state or tribe's request to assume the Clean Water Act (CWA) section 404 dredged and fill permit program under the CWA. Comments in response to this document will be considered as the EPA reviews this position. If the EPA changes its current position, then the EPA would take the position that the Agency's decision as to whether to approve or disapprove a state's or tribe's request to assume the CWA section 404 permit program involves an exercise of discretion warranting consultation under ESA section 7. Section 7 consultation under the ESA would consequently apply to state and tribal requests to assume the CWA section 404 program and potentially subsequent program revisions, and the EPA would consult on its actions with the U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) (hereafter referred to as "the Services") under the ESA as appropriate.

**DATES:** Comments may be submitted on or before July 6, 2020.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–HQ–OW–OW–2020–0008. All documents in the docket are listed on the *https://www.regulations.gov*

website. Although listed in the index, some information may not be publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, may not be placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available electronically through *https:// www.regulations.gov*.

*Instructions:* All submissions received must include the Docket ID No. for this document. Comments received may be posted without change to *https:// www.regulations.gov/,* including any personal information provided. Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room was closed to public visitors on March 31, 2020, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. We encourage the public to submit comments via *https:// www.regulations.gov* or email, as there is a temporary suspension of mail delivery to the EPA, and no hand deliveries are currently accepted. For further information on the EPA Docket Center services and the current status, please visit us online at *https:// www.epa.gov/dockets*.

**FOR FURTHER INFORMATION CONTACT:** Kathy Hurld, Oceans, Wetlands, and Communities Division, Office of Water (4504–T), Environmental Protection Agency, 1200 Pennsylvania Avenue NW, Washington, DC 20460; telephone number: 202–564–5700; email address: *404gESAconsultation@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. General Information
　A. Does this action apply to me?
　B. What should I consider as I prepare my comments?
II. Background
　A. CWA Section 404 Dredged and Fill Material Permit Program
　B. State and Tribal Assumption of CWA Section 404
　C. Consultation Under the ESA and State and Tribal Assumption Under CWA Section 404
III. Request for Comment

### I. General Information

*A. Does this action apply to me?*

States and tribes that have assumed or are considering assuming the administration of the CWA section 404 dredged or fill permitting program, as well as regulated entities and members of the public may be interested in

providing input on the issue described in this document.

*B. What should I consider as I prepare my comments?*

Submit your comments, identified by Docket ID No. EPA–HQ–OW–2020–0008, at *https://www.regulations.gov* (our preferred method), or the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. The EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be CBI or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*e.g.,* on the web, cloud, or other file sharing system). For additional submission methods, the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *https://www.epa.gov/dockets/ commenting-epa-dockets*.

The EPA is temporarily suspending its Docket Center and Reading Room for public visitors to reduce the risk of transmitting COVID–19. Written comments submitted by mail are temporarily suspended and no hand deliveries will be accepted. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. We encourage the public to submit comments via *https:// www.regulations.gov*. For further information and updates on EPA Docket Center services, please visit us online at *https://www.epa.gov/dockets*.

The EPA continues to carefully and continuously monitor information from the Centers for Disease Control and Prevention (CDC), local area health departments, and our federal partners so that we can respond rapidly as conditions change regarding COVID–19.

### II. Background

*A. CWA Section 404 Dredged and Fill Material Permit Program*

Section 404 of the CWA establishes a program to regulate the discharge of dredged or fill material into waters of the United States, which includes wetlands. Activities in waters of the United States regulated under this program include, for example, fill for

development, water resource projects (such as dams and levees), infrastructure development (such as highways and airports), natural resource extraction projects, and wetland restoration efforts. CWA section 404 requires a permit before dredged or fill material may be discharged into waters of the United States, unless the activity is exempt from regulation under CWA 404(f). The substantive and procedural requirements applicable to CWA section 404 are detailed in the EPA's regulations at 40 CFR parts 230 through 233 and the regulations of the U.S. Army Corps of Engineers at 33 CFR parts 323 through 338. Proposed discharges are regulated through a permit process implemented by the U.S. Army Corps of Engineers or authorized states and tribes.

## B. State and Tribal Assumption of CWA Section 404

In amendments to the CWA in 1977 and 1987, Congress gave states and tribes the ability to assume responsibility for part of the CWA section 404 permit program. The amendments require the EPA to approve or deny a state's or tribe's request to assume the permit program in lieu of the U.S. Army Corps of Engineers, to oversee operation of the assumed program, and to coordinate federal review of state or tribal permit actions. 33 U.S.C. 1344(g)–(i). To assume the CWA section 404 program, states or tribes must develop a dredged and fill material discharge permit program consistent with the requirements of the CWA and implementing regulations at 40 CFR part 233 and submit a request to assume the program to the EPA. States or tribes must have a program that is consistent with and no less stringent than the requirements of the CWA and implementing regulations. 40 CFR 233.1(d). The assumed program must include, but is not limited to, the following provisions laid out in the statute and program regulations: Regulation of discharges into all assumed waters within the state or tribe's jurisdiction; regulation of at least the same scope of activities as the CWA section 404 program; permitting procedures; permit issuance consistent with the environmental review criteria known as the CWA section 404(b)(1) Guidelines, applicable CWA section 303 water quality standards, and applicable CWA section 307 effluent standards and prohibitions; administrative and judicial review procedures; public notice and participation requirements; compliance and enforcement authorities as specified in the regulations; information collection requirements; and coordination procedures with Federal

agencies and adjacent states and tribes. 40 CFR part 233, subparts C through F; see 33 U.S.C. 1344(h).

Section 404(h)(2) of the CWA states that if the Administrator of the EPA determines that a state or tribe that has submitted a program under section 404(g)(1) has the authority set forth in section 404(h)(1) of the CWA, then the Administrator ''shall approve'' the state or tribe's program request to transfer the section 404 permitting program. Under CWA section 404(h)(3), if the Administrator fails to make a determination with respect to any program request submitted by a state or tribe within 120 days after date of receipt of the request, the program shall be deemed approved.

## C. Consultation Under the ESA and State and Tribal Assumption Under CWA Section 404

The ESA section 7 directs each Federal agency to ensure, in consultation with the Services, that ''any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of'' listed species or result in the destruction or adverse modification of designated critical habitat. 16 U.S.C. 1536(a)(2). If the Federal agency determines that an action will not affect listed species or designated critical habitat, ESA section 7 consultation is not required. In addition, the ESA regulations at 50 CFR 402.03 state that section 7 applies to ''all actions in which there is discretionary Federal involvement or control.''

In *National Association of Home Builders* v. *Defenders of Wildlife,* 551 U.S. 644 (2007), the United States Supreme Court held that because the transfer of CWA National Pollutant Discharge Elimination System (NPDES) permitting authority to a state ''is not discretionary, but rather is mandated once a State has met the criteria set forth in section 402(b) of the CWA, it follows that a transfer of NPDES permitting authority does not trigger section 7(a)(2)'s consultation and no-jeopardy requirements.'' 551 U.S. at 673. The Supreme Court held that ''[w]hile the EPA may exercise some judgment in determining whether a State has demonstrated that it has the authority to carry out section 402(b)'s enumerated statutory criteria, the statute clearly does not grant it the discretion to add an entirely separate prerequisite to the list. Nothing in the text of section 402(b) authorizes the EPA to consider the protection of threatened or endangered species as an end in itself when evaluating a transfer application.'' *Id.* at 671.

The EPA has previously taken the position that the Supreme Court's rationale in *National Association of Home Builders* applies to approval of a state's or tribe's dredged and fill permit programs under section 404(h) of the CWA. On December 6, 2010, the Environmental Council of the States (ECOS) and the Association of State Wetland Managers, Inc. (ASWM), sent a letter to the EPA asking whether the EPA must conduct an ESA section 7 consultation prior to approving or disapproving a state or tribe's section 404 program request. *See* Docket ID No. EPA–HQ–OW–2020–0008. The Agency responded to ECOS and ASWM in a December 27, 2010 letter (''Letter to ECOS and ASWM''), *see* Docket ID No. EPA–HQ–OW–2020–0008, stating that, as in the CWA section 402(b) context, when considering a state or tribal CWA section 404 program request, the EPA is only permitted to evaluate the specified criteria in CWA section 404(h) and does not have discretion to add requirements to the list in CWA section 404(h), including considerations of endangered and threatened species through ESA section 7 consultation with the Services.

The EPA stated in the 2010 letter that although there are some differences between CWA sections 402 and 404, the EPA's position was that the Supreme Court's reasoning in the *National Association of Home Builders* case applies to the EPA's approval of a CWA section 404(g) permitting program. Section 404(h)(2) of the CWA states that if the Administrator determines that a state program submitted under CWA section 404(g)(1) has the authority set forth in section 404(h)(1) of the CWA, then the Administrator ''shall approve'' the state's application to transfer the CWA section 404 permitting program. The 2010 letter thus concluded that this action is non-discretionary and ESA consultation is not required. The EPA further noted that although ESA section 7 consultation is not required, a number of important safeguards exist in the CWA and the EPA's regulations which work to ensure that concerns about listed species and designated critical habitat are addressed in approved CWA section 404(g) programs. State and tribal programs must issue permits that comply with the CWA section 404(b)(1) Guidelines (40 CFR 233.20(a)) which include the requirement that a permit may not be issued that ''[j]eopardizes the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of . . . critical habitat . . . .'' 40 CFR

**Federal Register**/Vol. 85, No. 99/Thursday, May 21, 2020/Notices **30955**

230.10(b)(3). Additionally, permits which have "[d]ischarges with reasonable potential for affecting endangered or threatened species as determined by the Fish and Wildlife Service'' must be sent to the EPA for review. The EPA shares these permits with the U.S. Army Corps of Engineers and the Services during this review.

In July 2019, the EPA received a request from the Florida Department of Environmental Protection (FDEP) asking the EPA to engage in an ESA section 7 consultation with the Services in connection with the EPA's initial review of a Florida's request to assume the CWA section 404 program. FDEP provided a white paper contending that ESA section 7 consultation is required in the CWA section 404 assumption context because of the unique statutory text and legislative history found in CWA section 404, which, in the FDEP's view, differ in critical respects from other state delegation programs administered by the EPA where ESA section 7 does not apply.

FDEP made a number of points in its white paper. *See* Docket ID No. EPA–HQ–OW–2020–0008. FDEP noted that, as a preliminary matter, the EPA's approval or disapproval of state assumption of the CWA section 404 program is an "action" for purposes of ESA section 7(a)(2). The Services' regulations governing ESA consultations expressly define "action" to include "the promulgation of regulations," 50 CFR 402.02, and the EPA's approval of state assumption is undertaken through rulemaking. FDEP then emphasized that the key question for ESA section 7 purposes is, as explained in *National Association of Home Builders,* whether the action is "discretionary" with the agency. To trigger Section 7 consultation, the statute must give the agency authority to "consider the protection of threatened or endangered species as an end in itself" in making the relevant decision. *National Association of Home Builders,* 551 U.S. at 671. In contrast to CWA section 402(b), FDEP noted that CWA sections 404(g)(2) and (3) expressly require that, when a state or tribe applies for assumption, the EPA must provide "the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service" an opportunity to comment on a state application for assumption of the CWA section 404 program. Relatedly, CWA section 404(h)(1) requires the EPA, in making a determination of whether to approve the state or tribal program, to "tak[e] into account any comments submitted by . . . the Secretary of the Interior, acting through the Director of [FWS]" under

CWA section 404(g). The FWS is responsible for the implementation of the ESA and its consultation requirements. Thus, FDEP concluded that CWA section 404(g) requires the EPA to receive and consider input specifically focused on the protection of threatened and endangered species.

Second, FDEP noted that CWA section 404(h)(1) requires the EPA, in deciding whether to approve state or tribal assumption of the CWA section 404 program, to determine whether the state has authority "[t]o issue permits which, . . . apply, and assure compliance with, any applicable requirement of this section, including, but not limited to, the guidelines established under section (b)(1) of this section . . . ." The CWA section 404(b)(1) Guidelines, codified at 40 CFR part 230, provide that: "No discharge of dredged or fill material shall be permitted if it . . . [j]eopardizes the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of [critical] habitat." 40 CFR 230.10(b)(3) (emphasis added). By requiring the EPA to take into account the views of the Services and by incorporating consideration of "jeopardy" to species and "adverse modification" of critical habitat via the CWA section 404(b)(1) Guidelines, FDEP concluded that CWA sections 404(g) and (h) expressly require the EPA to determine whether the state or tribe has adequate authority to apply and assure compliance with the substantive requirements of the ESA. FDEP pointed out that neither requirement is part of the EPA's CWA section 402(b) delegation decision.

Unlike under CWA section 402(b), FDEP viewed the EPA as possessing discretion under CWA sections 404(g) and (h) to "consider the protection of threatened and endangered species as an end in itself," *National Association of Home Builders,* 551 U.S. at 671, in determining whether to approve a state's application to assume the CWA section 404 program. FDEP in its white paper cited excerpts from the legislative history and case law that it viewed as supporting its position that the EPA's decision as to whether to approve or disapprove state CWA section 404 programs is "discretionary" within the meaning of 40 CFR part 402.

## III. Request for Comment

The EPA is seeking public comment regarding whether to reconsider its position that it lacks discretionary involvement or control within the meaning of 50 CFR 402.03 when acting

on a state or tribal application to administer the CWA section 404 program to trigger the requirements of section 7 of the ESA, based on the positions articulated in the FDEP white paper, as well as any other considerations that may be relevant to this issue, and consequently whether the EPA can and should engage in one-time ESA section 7 consultation with the Services in connection with the EPA's initial review of a state or tribal request to assume the CWA section 404 program.

To aid in its consideration of this issue, the EPA is taking comment as to whether, and on what basis, the EPA's approval of a state or tribe's program under CWA section 404(h) is a discretionary agency action for the purpose of ESA compliance. Specifically, the EPA seeks comment on whether the EPA should reconsider the position articulated in its 2010 Letter to ECOS and ASWM that in deciding whether to approve or disapprove a state's or tribe's CWA section 404 program, the EPA lacks discretion to consider the protection of threatened or endangered species, and therefore that this decision does not trigger ESA section 7 consultation. The EPA seeks comment on the question as to whether the Agency should, alternatively, adopt the position articulated in the FDEP white paper that the EPA's decision as to whether to approve or disapprove a state or tribe's CWA section 404 program provides the EPA with discretion warranting consultation under ESA section 7. The EPA requests commenters' views as to the legal viability of this potential interpretation as well as the programmatic implications of this interpretation, including its implications for existing state CWA section 404 programs and for permit applicants and permittees.

The EPA's docket for this document includes a number of background documents, including the 2010 Letter to ECOS and ASWM, the FDEP white paper, excerpts from the legislative history of CWA sections 404(g) and (h), and other documents to assist commenters as they consider the EPA's request for comment.

**David P. Ross,**

*Assistant Administrator, Office of Water.*

[FR Doc. 2020–10913 Filed 5–20–20; 8:45 am]

**BILLING CODE 6560–50–P**

**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
Silver Spring, MD 20910

April 15, 2020

Heather Mason, PWS
Environmental Administrator
Florida Department of Environmental Protection
Submerged Lands and Environmental Resources Coordination
2600 Blair Stone Road, MS 2500
Tallahassee, FL 32399-2400

RE:    National Marine Fisheries Service in the Clean Water Act Section 404 Assumption by the
       State of Florida

Dear Ms. Mason:

On November 22, 2019, the National Marine Fisheries Service (NMFS) received your request
for input on a draft species list for Florida's assumption of Clean Water Act Section 404
permitting from the U.S. Army Corps of Engineers (USACE). Through subsequent
communications with you and your staff, a review of state mapping products, NMFS'own
mapping analysis, and a review of state-provided documents about the assumption, we conclude
that Endangered Species Act (ESA)-listed species under NMFS' jurisdiction do not occur in
waters that are assumable by the state.

We specifically analyzed the possible spatial overlap of the assumption with waters used by
shortnose sturgeon, Atlantic sturgeon, smalltooth sawfish, and Gulf sturgeon. Based on that
analysis, shortnose sturgeon and Atlantic sturgeon occur in the St. Marys and St. Johns Rivers,
which are included on the USACE retained waters list. Smalltooth sawfish occur in waters
"subject to the ebb and flow of the tide" which will also remain under the USACE's jurisdiction,
per the draft State 404 Program Applicant's Handbook definition of "Retained Waters."
Therefore, the USACE will retain ESA Section 7 responsibility for proposed Section 404 actions
in the waterways where NMFS's trust resources are most likely to occur.

For Gulf sturgeon, which has shared jurisdiction between NMFS and the U.S. Fish and Wildlife
Service, the U.S. Fish and Wildlife Service is responsible for all consultations regarding Gulf
sturgeon and critical habitat in riverine habitat units (final rule designating critical habitat for the
Gulf sturgeon – 68 FR 13370). Rivers in Florida that include riverine critical habitat units (i.e.,
Escambia, Yellow, Choctawhatchee, Apalachicola, and Suwannee rivers) and river areas where
Gulf sturgeon are known to occur (e.g., lower Ochlockonee River) are all listed by the USACE
as retained waters.

Based on this determination we also assume that the Environmental Protection Agency will
make a "no effect" determination for NMFS' ESA-listed species that were originally identified
as part of this proposed assumption.



We appreciate all the information and assistance you provided in making this determination. If you have any questions, please contact Dr. Pat Shaw-Allen at (301) 427-8473, or by e-mail at pat.shaw-allen@noaa.gov or me at (301) 427-8495 or by e-mail at cathy.tortorici@noaa.gov.

Sincerely,

TORTORICI.CAT
HRYN.E.136582
6850

Digitally signed by
TORTORICI.CATHRYN.E.13
65826850
Date: 2020.04.15 13:25:25
-04'00'

Cathryn E. Tortorici
Chief, ESA Interagency Cooperation Division
Office of Protected Resources

cc:    Karen Myers, US Fish and Wildlife Service
       Robert Tawes, US Fish and Wildlife Service
       David Bernhart, NMFS, Southeast Regional Office