**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>Defendants. | **CASE NO.** 1:21-cv-00119 (RDM) |

**SUPPLEMENTAL JOINT APPENDIX**

**VOLUME 6**

**Jacksonville District Navigable Waters Lists**

In Florida, Puerto Rico, and the U.S. Virgin Islands, the U.S. Army Corps of Engineers, Jacksonville District, exercises section 10 (of the Rivers and Harbors Act of 1899) regulatory jurisdiction over the Atlantic Ocean, Gulf of Mexico, and Caribbean Sea. Additionally, all or portions of tributaries to the above waters may also be subject to section 10 authority. However, complete lists of all rivers, streams, creeks, ponds, and lakes subject to Corps section 10 authority are not available. Below are lists of waters over which the Jacksonville District currently exercises regulatory jurisdiction under the authority of both section 10 of the Rivers and Harbors Act of 1899 and section 404 of the Clean Water Act on all or a portion of the listed water. The absence of a water on these lists does not mean it or a portion of it is not a navigable water. Likewise, the inclusion of a water on these lists is not meant to imply that the water is subject to section 10 authority in its entirety. All waters subject to the ebb and flow of the tide (tidal action) are navigable waters of the US, and many of the waters listed below have some portion that is subject to the ebb and flow of the tide. Inquiries concerning Department of the Army Permit requirements on these and other tributary streams and lakes not listed below should be submitted on a case-by case basis to the Regulatory Division, Jacksonville District.

The section 10 waters lists (below) from the Jacksonville District were compiled from multiple approved and draft navigability studies conducted during the 1970s and 1980s, and from local knowledge of tidally influenced waters. The District makes no claim that these lists are complete or completely accurate. These lists are for regulatory reference purposes only. They are not a substitute for a jurisdictional determination (JD). It is imperative that you contact the appropriate Regulatory Permit Section for a determination on whether the Corps is able to ascertain if a particular project falls within or outside of section 10 authority.

## STATE OF FLORIDA

### Rivers and Creeks

Acosta Creek
Alafia River
Alapaha River
Alapahoochee River
Alaqua Creek
Alexander Springs Creek
Alligator Creek
Alligator Lake-Lake Gentry Canal
Amelia River
Anclote River
Apalachicola River
Arlington River
Aucilla River
Axle Creek
Banana River
Barrentine Creek
Barron River
Basin Creek
Bayou Marcus Creek
Bear Creek
Bear Creek (Bay County)
Belcher Canal
Bells River
Bessey Creek
Big Davis Creek
Big Fishweir Creek
Big Juniper Creek
Big Marco River
Big Mud Creek
Big Mulberry Branch
Billy Creek
Black Creek
Black Creek (Walton County)
Black Water Creek
Blackwater River
Blind Creek
Blockhouse Creek
Blounts Branch
Blue Creek
Blue Hole Creek
Blue Springs Run
Bluff Branch
Boathouse Creek
Bogey Branch
Boggy Creek
Bonnet Creek
Botts Creek
Bowlees Creek
Box Branch
Boynton Canal
Braden River
Bradley Creek
Bray Creek
Brick-Alligator Lake Canal
Britt Creek
Broad River
Brothers River
Broward Creek
Broward River
Browns Creek
Buck Creek
Buckhorn Creek
Bull Creek
Bulow Creek
Bumble Bee Creek
Burnt Mill Creek
Butcher Pen Creek
Butler Creek
C-15 Canal
C-17 Canal
C-18 Canal

C-23 Canal
C-24 Canal
C-51 Canal
Cabbage Creek
Callaway Creek
Caloosahatchee River
Camp Branch
Caney Branch
Canoe Creek
Capo Creek
Carpenters Creek
Carrabelle River
Casa Cola Creek
Cat Creek
Cedar Creek
Cedar Point Creek
Cedar River
Cemetery Creek
Chassahowitzka River
Chatham River
Chattahoochee River
Chicopit Bay
Chipola River
Choctawhatchee River
Christopher Creek
Clapboard Creek
Clark Creek
Clarkes Creek
Clear Creek -
Cocohatchee River
Coldwater Creek
Coon Lake-Lake Lizzie Canal
Coral Gables Waterway
Cormorant Creek
Cow Creek
Cowhead Creek
Cracker Branch
Cradle Creek
Craig Creek
Crane Creek
Crooked Creek
Crooked Creek (Martin County)
Crooked River
Crooked River (Franklin County)
Cross Creek
Cross Florida Barge Canal
Crystal River
Cunningham Creek
Cut Creek
Cypress Creek
Danforth Creek
Dania Cut-off canal
Days Creek
Dead River (Kissimmee River)
Dead River (Lake County, Florida)
Dead River (Wakulla County)
Dean Dead River
DeBlieu Creek
Deep Bottom Creek
Deep Creek
Deer Creek
Depot Creek
Dillaberry Branch
Doctors Lake
Dog Branch
Drummond Creek
Dunns Creek
Durbin Creek
East Bay River
East Creek
East River
Eau Gallie River
Econfina Creek
Econfina River
Econlockhatchee River
Egans Creek
Eight Mile Creek
Elbow Branch
Elbow Creek
Eleven Mile Creek
Eph Creek
Escambia River
Estero River
Etonia Creek
Fakahatchee River
Fenholloway River
Fish Creek
Fisheating Creek
Fishing Creek
Fitzpatrick Creek
Five Mile Creek
Flora Branch
Forked Creek
Fort George River
Fourmile Creek
Fox Cut
Frazier Creek
Garden Creek
Get Out Creek
Ginhouse Creek
Goodbys Creeks
Governor Creek
Graham Creek
Grog Branch
Guano River
Gulley Creek
Haines Creek
Half Creek
Halifax River
Hannah Mills Creek
Harney River
Harrison Creek
Harry's Creek
Hatchett Creek
Hatchineha Canal
Haulover Creek
Haw Creek
Haynes Creek
Henderson Creek
Highland Park Run
Hillsboro Canal
Hillsboro River
Hillsborough River
Hitchens Creek
Hog Creek
Hogan Creek
Hogpen Creek
Holiday Harbor
Holmes Creek
Holmes Creek (Jackson County)
Hominy Branch
Homosassa River
Honey Creek
Hontoon Dead River
Hopkins Creek
Horseshoe Creek
Hospital Creek
Howard Creek
Hudson Bayou
Hulett Branch
Huston River
Ichetucknee River
Imperial River
Inconstantion Creek
Indian Creek
Indian Creek
Indian River
Indian River North
Istokpoga Creek
Jackson Canal
Jackson Creek
Jackson River
Joe River
Johnson Creek
Johnson Creek (Gulf County)
Johnson Slough
Jolly River
Jones Creek
Jones Swamp Creek
Julington Creek
Juniper Creek
Karen Canal
Kendall Creek
Kentner Creek
Kentucky Branch
Kissimmee River
Krueger Creek
L-40 Canal
L-8 Canal
Lafayette Creek
Lake Ajay-Fells Cove Canal
Lake Apopka-Beauclerc Canal
Lake Ashby Canal
Lake Center-Coon Lake Canal
Lake Griffin-Yale Canal
Lake Hart-Ajay Canal
Lake Joel-Myrtle Canal
Lake Joel-Trout Canal
Lake Lizzie-Alligator Canal
Lake Marion Creek
Lake Mary Jane-Hart Canal
Lake Myrtle-Mary Jane Canal
Lake Okeechobee Rim Canal

Lake Okeechobee Waterway
Lake Preston-Myrtle Canal
Lake Worth Lagoon
Lanceford Creek
Lehigh Canal
Leitner Creek
Little Black Creek
Little Cedar Creek
Little Clapboard Creek
Little Double Creek
Little Econlockhatchee River
Little Fishweir Creek
Little Juniper Creek
Little Manatee River
Little Mud Creek
Little Pottsburg Creek
Little River (Biscayne Bay)
Little River (Ochlockonee River)
Little Rocky Creek
Little Saint Marys River
Little Trout River
Little Wekiva River
Little Withlacoochee River
Lofton Creek
Lolly Creek
Long Branch
Long Creek
Lopez River
Lostmans River
Lower Sister Creek
Loxahatchee River
Lumber Creek
Mainard Branch
Manatee Creek
Manatee River
Marshall Creek
Mason Branch
Matanzas River
McCoys Creek
McCullough Creek
McGirts Creek
McQueen Creek
Miami Canal
Miami River
Middle River
Middle River (South and North Fork)
Mill Branch
Mill Log Creek
Mills Creek
Moccasin Branch
Moccasin Slough
Moncrief Creek
Monroe Canal
Moore's Creek
Moore's Creek (Martin County)
Morris Dead River
Morrison Creek
Moses Creek
Moultrie Creek
Mud Creek
Murphy Creek
Myakka River
Myakkahatchee Creek
Nassau River
New Castle Creek
New River (Broward County)
New River (Collier County)
New River (Franklin County)
New River (Pasco County)
New River (Union/Bradford County)
New River Canal off LO
New Rose Creek
Nichols Creek
Ninemile Creek
NN Creek
Norris Dead River
North Fork St. Lucie River
North New River Canal
Ochlockonee River
Ocklawaha River
Old Channel
Oldfield Creek
Oleta River
Open Creek
Orange Creek
Orange Grove Branch
Orange River
Ortega River
Pablo Creek
Paines Branch
Palatlakaha River
Palm River
Payne Creek
Pea River
Peace River
Pecks Branch
Pellicer Creek
Perdido River
Peters Branch
Peters Creek
Phelps Creek
Philippi Creek
Pine Barren Creek -
Pine Log Creek
Pinhook River
Pithlachascotee River
Plummer Creek
Polly Creek
Poncho Creek
Pond Creek
Poppleton Creek
Porpoise Creek
Pottsburg Creek
Puckett Creek
Pumpkin Hill Creek
Rainbow River
Red House Branch
Reedy Creek
Ribault River
Rice Creek
Robinson Creek
Rock Springs Run
Rocky Creek
Rocky Creek (Okaloosa/Walton)
Rodgers River
Rosalie Creek
Rushing Branch
Saint Sebastian River
Salt Creek
Salt Creek (Dixie County)
Salt Run
Salt Springs Run
San Carlos Creek
San Julian Creek
San Sebastian River
Sand Beach Branch
Sandy Creek
Sandy Run
Santa Fe River
Saul Creek
Sawpit Creek
Scipio Creek
Scoggin Creek
Shad Creek
Shark River
Shell Creek
Shingle Creek
Shipyard Creek
Shired Creek
Shoal River
Short Canal
Silver Glenn Springs Run
Silversmith Creek
Simms Creek
Simpson Creek
Sink Creek
Sisters Creek
Six Mile Creek
Sixteen Mile Creek
Smith Creek (Flagler)
Smith Creek (St. Johns)
Snake Creek
Snell Creek
Soap Creek
Soldier Creek
Soldier Creek (Escambia County)
Sombrero Creek
Sopchoppy River
South Amelia River
South Fork Black Creek
South Fork St. Lucie River
South Port Canal
Spring Creek
Spring Garden Creek
Spring Warrior Creek
Spruce Creek
St Francis Dead River
St. Cloud Canal
St. Johns River
St. Lucie Canal
St. Lucie River
St. Marks River
St. Marys River

Steinhatchee River
Stokes Creek
Stranahan River
Strawberry Creek
Styles Creek
Summer Haven River
Suwannee River
Sweetwater Creek
Swimming Pen Creek
Tarpon River
Taylor Creek
Telogia Creek
Ten Mile Creek
Terrapin Creek
Thomas Creek
Thomas Mill Run
Three Otter Creek
Tiger Creek
Tocoi Creek
Tolomato River
Tomoka River
Trout -Coon Lake Canal
Trout Creek
Trout River
Turkey Creek
Turkey Creek (Okaloosa County)
Turner River
Upper Sister Creek
Waccasassa River
Wacissa River
Wakulla River
Walker creek
Wares Creek
Warf Creek
Warner Creek
Weeki Wachee River
Wekiva River
Weohyakapka Creek
West Branch
West Palm Beach Canal
West Run Cracker Branch
Wetappo Creek
Whitney River
Whittenhorse Creek
Williamson Creek
Willoughby Creek
Wills Branch
Withlacoochee River (central Florida)
Withlacoochee River (north Florida)
Woodruff Creek
Wrights Creek
Wrights Creek (Walton County)
Ximanies Creek
Yellow River
Ziegler Dead River

## Lakes

Adams Lake
Alligator Lake
Blue Cypress Lake
Blue Lagoon
Brick Lake
Cherry Lake
Clark Lake
Clear Lake
Coon Lake
Crescent Lake
Cypress Lake
Dead Lakes
Deer Point Lake
Doctors Lake
Dumfoundling Bay
East Lake Tohopekaliga
Fells Cove
Horseshoe Mud Lake
Kimball Lake
Lake Ajay
Lake Apopka
Lake Ashby
Lake Beauclair
Lake Beresford
Lake Carlton
Lake Center
Lake Cone
Lake Dexter
Lake Dora
Lake Emma
Lake Eustis
Lake Florence
Lake Gentry
Lake George
Lake Griffin
Lake Harney
Lake Harris
Lake Hart
Lake Hatchineha
Lake Hell 'n Blazes also called Lake Hellen Blazes or Lake Helen Blazes
Lake Ida
Lake Istokpoga
Lake Jackson
Lake Jessup
Lake Jesup
Lake Joel
Lake Kissimmee
Lake Lizzie
Lake Louisa
Lake Lucy
Lake Manatee
Lake Manatee (Manatee County)
Lake Mangonia
Lake Marion
Lake Mary Jane
Lake Minnehaha
Lake Minneola
Lake Monroe
Lake Myrtle
Lake Nellie
Lake Okeechobee
Lake Ola
Lake Osborne
Lake Poinsett
Lake Powell
Lake Preston
Lake Rosalie
Lake Rousseau
Lake Santa Fe
Lake Seminole (Gadsden, Jackson Counties)
Lake Seminole (Leon County)
Lake Seminole (Pinellas County)
Lake Susan
Lake Talquin
Lake Tarpon
Lake Thonotosassa
Lake Tohopekaliga
Lake Washington
Lake Weohyakapka
Lake Wimico
Lake Winder
Lake Woodruff
Lake Yale
Little Lake George
Little Lake Harris
Little Lake Santa Fe
Little Sawgrass Lake
Lochloosa Lake
Loughman Lake
Marco Lake
Maul Lake
Mud Lake
Orange Lake
Puzzle Lake
Rodman Reservoir
Ruth Lake
Salt Lake
Sawgrass Lake
Silver Lake
Spring Garden Lake
Stagger Mud Lake
Tick Island Mud Lake

Tiger Lake
Trout Lake
Tsala Apopka Lake
Ward Lake
Ward Lake (Manatee County)

## COMMONWEALTH OF PUERTO RICO

### Rivers, Streams, Creeks and Channels in Puerto Rico with tidal portions

Canal Blasina (Carolina/Loíza)
Canal Suarez (Carolina)
Caño Boca Chica (Juana Díaz)
Caño Boca Prieta (Humacao)
Caño Boquerón (Cabo Rojo)
Caño Boquilla (Mayaguez)
Caño Cabo Caribe (Vega Baja)
Caño Corazones (Mayaguez)
Caño de Martín Peña (San Juan)
Caño de Santi Ponce (Aguada)
Caño de Santiago (Yabucoa)
Caño García (Rincón)
Caño La Malaria (Cataño)
Caño La Puente (Añasco)
Caño Madre Vieja (Aguadilla)
Caño Matos (Barceloneta)
Caño Merle (Mayaguez)
Caño Tiburones (Arecibo)
Laguna Tortuguero Outlet Channel (Manatí)
Quebrada Branderí (Guayama)
Quebrada Ceiba (Ceiba)
Quebrada Corazón (Guayama)
Quebrada de Los Cedros (Isabela/Aguadilla)
Quebrada del Oro (Mayaguez)
Quebrada Grande de Calvache (Rincón)
Quebrada Icacos (Añasco)
Quebrada Piletas (Rincón)
Quebrada Ramos (Rincón)
Quebrada Salada (Arroyo/Guayama)
Río Antón Ruiz (Naguabo/Humacao)
Río Blanco (Naguabo)
Río Bucaná (Ponce)
Río Camuy (Camuy/Hatillo)
Río Candelero (Humacao)
Río Cañas (Juana Díaz)
Río Cayures (Santa Isabel)
Río Chico (Patillas)
Río Cibuco (Vega Baja)
Río Coamo (Santa Isabel)
Río Cocal (Dorado/Toa Baja)
Río Culebrinas (Aguadilla/Aguada)
Río Daguao (Naguabo/Ceiba)
Río de Bayamón (Toa Baja/Cataño)
Río de La Plata (Dorado)
Río Demajagua (Fajardo/Ceiba)
Río Descalabrado (Juana Díaz/Santa Isabel)
Río Espíritu Santo (Río Grande)
Río Fajardo (Fajardo)
Río Grande (Aguada/Rincón)
Río Grande de Añasco (Añasco/Mayaguez)
Río Grande de Arecibo
Río Grande de Loíza (Loíza)
Río Grande de Manati (Barceloneta/Manatí)
Río Grande de Patillas (Patillas)
Río Guajataca (Quebradillas/Isabela)
Río Guamaní (Guayama)
Río Guanajibo (Mayaguez)
Río Guayabo (Aguada)
Río Guayanés (Yabucoa)
Río Guayanilla (Guayanilla)
Río Herrera (Loíza/Río Grande)
Río Humacao (Humacao)
Río Inabón (Ponce)
Río Jacaboa (Patillas)
Río Jacaguas (Ponce/Juana Díaz)
Río Jueyes (Salinas/Santa Isabel)
Río Loco (Guánica)
Río Mameyes (Río Grande/Luquillo)
Río Matilde (Ponce)
Río Maunabo (Maunabo)
Río Nigua (Arroyo)
Río Nigua (Salinas)
Río Portugués (Ponce)
Río Puerto Nuevo (San Juan)
Río Sabana (Luquillo)
Río Santiago (Naguabo)
Río Tallaboa (Peñuelas)
Río Yaguez (Mayaguez)
Río Yauco (Yauco)

### Tidal lagoons and ponds

Laguna Aguas Prietas (Fajardo)
Laguna Algodones (Vieques)
Laguna Anones (Vieques)
Laguna Arenas (Vieques)
Laguna de las Salinas (Ponce)
Laguna de Levittown (Toa Baja)
Laguna de Piñones (Carolina/Loíza)
Laguna del Condado (San Juan)
Laguna del Flamenco (Culebra)
Laguna del Molino (Culebra (Culebrita))
Laguna El Pobre (Vieques)
Laguna Grande (Fajardo)
Laguna Guaniquilla (Cabo Rojo)
Laguna Joyuda (Cabo Rojo)

Laguna Kiani (Vieques)
Laguna La Plata (Vieques)
Laguna La Torrecilla (Carolina/Loíza)
Laguna Los Corozos (San Juan/Carolina)
Laguna Los Machos (Ceiba)
Laguna Monte Largo (Vieques)
Laguna Playa Grande (Vieques)
Laguna Puerto Diablo (Vieques)
Laguna San José (San Juan/Carolina)
Laguna Tortuguero (Manatí/Vega Baja)
Laguna Yanuel (Vieques)
Laguna Zoni (Culebra)

## TERRITORY OF THE U.S. VIRGIN ISLANDS

## Ponds and Guts in the U.S. Virgin Islands

### St. John

Brown Bay Pond
Chocolate Hole Pond
Drunk Bay Pond
Elk Bay Pond
Europa Bay Pond
Fish Bay Gut
Fish Bay Pond
Francis Bay Pond
Friis Bay Pond
Great Lameshur Pond
Grootpan Bay Pond
Guinea Gut
Hart Bay Pond
Kiddel Bay Pond
Lagoon Point Pond
Leinster Bay Pond
Mt. Pleasant Pond
Newfound Bay Pond
Privateer Bay Pond
Reef Bay Pond
Salt Pond
Southside Pond
Turner Point Pond

### St. Thomas

Benner Bay Pond
Bolongo Bay Pond
Bovoni Bay Pond
Cabrita Point Pond
Christmas Cove Pond
Coculus Bay Pond
East Gregerie Pond
Eva Point Pond
Fortuna Bay Pond
Frenchman Bay Pond
Great St. James Pond
Hassel Island Pond
Limestone Bay Pond
Little Coculus Bay Pond
Perseverance Bay Pond
Red Hook Pond
Saba Island Pond
Salt Cay Pond
Smith Bay Pond
Sprat Point Pond

### St. Croix

Altona Lagoon
Billy French Ponds
Buck Island Pond
Caledonia Gut
Coakley Bay Pond
Great Pond
Jolly Hill Gut
Krause Lagoon
Manning Bay Pond
River Gut
Robin Bay Pond
Southgate Pond
West End Saltpond



FINAL REPORT OF THE
Assumable Waters Subcommittee
May 2017
Columbia River
Willamette River
Kincaid River
Black 002993

Intentionally left blank

002994

CORPS002994

# Table of Contents

Executive Summary ..... iii
- Problem Statement ..... iii
- Underlying Assumptions ..... iv
- Subcommittee Activities ..... iv
- Subcommittee Findings and Recommendations ..... v
- Implementation and Process Recommendations ..... vi

1. Statement of the Problem ..... 1

2. Background ..... 2
   - What is Assumption? ..... 2
   - Tribal Considerations Regarding Assumption ..... 3
   - Overview of Assumption by Michigan and New Jersey ..... 3
   - No Further Assumption by States or Tribes Since the 1990s ..... 5
   - The Importance of Assumption to States and Tribes ..... 5
   - Establishment of the Subcommittee ..... 6
   - Operation of the Subcommittee ..... 7
   - About the Writing of this Report ..... 7

3. Origin and Purpose of Section 404(g) ..... 9
   - Organization of the Work Group ..... 9
   - Background on Navigable Waters to be Retained by the USACE as Defined in Section 404(g)(1) ..... 9
   - Background on Adjacent Wetlands to be Retained by the USACE ..... 11

4. Description of Alternatives for Identifying Waters (other than Wetlands) Assumable by a State or Tribe, and Waters that Must be Retained by the USACE ..... 13
   - Waters Alternative A ..... 14
   - Waters Alternative B ..... 14
   - Waters Alternative C ..... 15

5. Subcommittee Discussion and Recommendations for Identifying Retained Waters ............................ 17

Majority Recommendation ........................................ 17

USACE Recommendation ........................................ 21

6. Description of Alternatives for Identifying Adjacent Wetlands Assumable by a State or Tribe, and Adjacent Wetlands that Must be Retained by the USACE ............................. 23

Wetlands Alternative A ........................................ 24

Wetlands Alternative B ........................................ 25

Wetlands Alternative C ........................................ 25

7. Subcommittee Discussion and Recommendations on Identifying Adjacent Wetlands ........................ 29

Majority Recommendation ........................................ 29

USACE Recommendation ........................................ 34

8. Implementation and Process Recommendations ........................................ 35

Maintain Michigan and New Jersey 404 Assumed Programs ........................................ 35

Develop Guidance for the Field ........................................ 35

Provide Flexibility ........................................ 36

Incorporate National Principles and Considerations into Field Guidance ........................................ 36

Provide General Procedures for the Assumption Process ........................................ 37

Utilize Best Available Technology ........................................ 38

Appendix A: Tribal Findings, Issues, and Considerations during Assumption ........................................ 39

Appendix B: Michigan and New Jersey's Assumed Programs ........................................ 41

Appendix C: Letter from the Association of Clean Water Administrators, the Environmental Council of the States, and the Association of State Wetland Managers........................ 47

Appendix D: List of Subcommittee Members ........................................ 50

Appendix E: Subcommittee Charter........................................ 52

Appendix F: The Legislative History of Section 404(g)(1) of the Clean Water Act ........................................ 55



# Executive Summary

## PROBLEM STATEMENT

Section 404 of the Clean Water Act (CWA) authorizes the US Army Corps of Engineers (USACE) to issue permits for discharge of dredged or fill material in navigable waters. "Navigable waters" is defined under the CWA to mean "the waters of the United States and territorial seas." Section 404(g) of the CWA authorizes states,[1] with approval from the US Environmental Protection Agency (EPA), to assume authority to administer the 404 program in some, but not all, navigable waters and adjacent wetlands. Section 404(g)(1) describes the waters over which the USACE must retain administrative authority even after program assumption by a state or tribe.

Only two states, Michigan and New Jersey, have been approved to assume the Section 404 Program. Other states have explored assumption, but those efforts have not borne fruit in part due to uncertainty over the scope of assumable waters and wetlands. The EPA formed the Assumable Waters Subcommittee under the auspices of the National Advisory Council for Environmental Policy and Technology (NACEPT) to provide advice and develop recommendations for NACEPT on how the EPA can best clarify for which waters a state or tribe may assume CWA section 404 permit responsibilities, and for which waters the USACE retains CWA section 404 permit responsibility under an approved state or tribal program. The Subcommittee included 22 members representing states and tribes, federal agencies, and other stakeholders. This report represents the results of the Subcommittee's work from October 2015 to April 2017 and is being presented to NACEPT for its consideration.

[1] Tribes were not specifically called out in the 1977 CWA amendments but are able to assume as provided in Section 518(e) of the CWA.

## UNDERLYING ASSUMPTIONS

Recommendations to the NACEPT were developed against the background of the following assumptions.

- In accordance with the requirements of Section 404, a state or tribe may only be authorized to assume the Section 404 Program if it has authority over all assumable waters of the United States, and demonstrates that it will apply legal standards consistent with the Clean Water Act (CWA) requirements in operating a permitting program.
- Assumption by a state or tribe does not alter CWA jurisdiction over waters of the United States. Moreover, nothing in the report or recommendations of the subcommittee is intended to alter in any way the definition or scope of federal jurisdiction. Rather, this report speaks only to the administrative division of authority under Section 404 between the USACE and an approved state or tribe.
- In accordance with EPA's charge to the subcommittee, recommendations are intended to provide clarity, to be practical and readily implementable in the field, and to be consistent with the CWA, particularly Section 404(g)(1).
- Waters, such as rivers, lakes, and streams, and adjacent wetlands are clearly linked legally, in policy, and in hydrology, and in total are often referred to as "waters." However, for the purposes of developing recommendations and for usage in this report, the Subcommittee chose the use of two terms: "waters" and "adjacent wetlands."
- Since the EPA will be receiving formal advice from the NACEPT, the EPA participated actively in the discussion, formulation, and review of the alternatives and provided technical advice, but did not take a position regarding the specific recommendations made by the Subcommittee. The US FWS also participated in the discussions but did not take a position on the final recommendations. Members who took a position regarding the recommendations are referred to as "recommending members." These include all members, including the USACE, but not the US EPA and the US FWS.

## SUBCOMMITTEE ACTIVITIES

Subcommittee members met eight times and also worked independently from October 2015 through April 2017. Investigations and discussions were divided into three primary topics.

- The origins, legislative history, and processes of Section 404 state or tribal assumption. Subcommittee members, including attorneys and others, reviewed the language of Section 404(g), the legislative history, and other policy documents. The full findings of this group are included in *Appendix F*. The histories of the programs in Michigan and New Jersey are included in *Appendix B*.
- The extent of waters of the United States that may be assumed by an approved state or tribe, and the extent of waters where Section 404 authority must be retained by the USACE, even following state or tribal assumption. Findings and recommendations are discussed in detail in this report.
- The extent of wetlands that must also be retained by the USACE following state or tribal assumption. Findings and recommendations are discussed in detail in this report.

## SUBCOMMITTEE FINDINGS AND RECOMMENDATIONS

### *Waters (other than Wetlands) Assumable by a State or Tribe, and Waters that Must be Retained by the USACE*

MAJORITY RECOMMENDATION. All the recommending Subcommittee members (the majority) except the member representing the USACE recommend to NACEPT that the EPA develop guidance or regulations to clarify that when a state or tribe assumes the 404 program, the USACE must retain authority over waters included on lists of waters regulated under Section 10 of the Rivers and Harbors Act (RHA). These lists are compiled and maintained by the USACE district offices for every state except Hawaii, and the majority of the Subcommittee recommends the lists be used with two minor modifications: any waters that are on the Section 10 lists based solely on historic use (e.g. based solely on historic fur trading) are not to be retained (based on the Congressional record and statute), and waters that are assumable by a tribe (as defined in the report) may also be retained by the USACE when a state assumes the program. The majority recognizes that waters may be added to Section 10 lists after a state or tribe assumes the program, and recommends in that case, such waters may also be added to lists of USACE-retained waters at that time.

The majority believes that this option is clear and practical, can be implemented efficiently at the time a state or tribe seeks assumption as well as in the operation of an assumed program, and is consistent with Congress' intent that the USACE retain authority over RHA Section 10 waters and adjacent wetlands. This alternative also is based on relatively stable and predictable information.

All other waters of the United States (with the exception of adjacent wetlands as discussed below) are assumable by a state or tribe.

MINORITY RECOMMENDATION. The Subcommittee member representing the USACE recommends USACE retain authority over waters on the Section 10 lists, and also waters that have been identified as Traditional Navigable Waters (TNWs) under the CWA in accordance with USACE CWA regulations at 33 CFR 328.3(a)(1) and guidance issued by the USACE and the EPA to implement the Supreme Court's opinion in Rapanos, Appendix D.[2] Under this recommendation waters that are officially determined by a USACE district as Section 10 or stand-alone CWA (a)(1) TNW waters at the time a state or tribe assumes the program would be retained by the USACE. In addition, the District would evaluate all of its completed case-specific TNW determinations to determine whether addition of that water to the retained waters list is warranted under a stand-alone determination. Waters that are later identified and officially determined as a Section 10 or stand-alone CWA(a)(1) TNW after assumption occurs will also be added to the list of retained waters. The USACE believes there should not be a distinction between different uses of the term "navigable waters" under different sections of the statute, and believes this is consistent with the purposes of the CWA and Section 404(g). While the statutory language of the CWA Section 404(g) parenthetical waters slightly differs from the regulatory language of 328.3(a)(1), the USACE believes the interpretation of the term "navigable waters" is the same under 404(g) and 328.3(a)(1) (other than those waters considered navigable based solely on their historic use).

---

2 Appendix D of the 2007 "US Army Corps of Engineers Jurisdictional Determination Instructional Guidebook" available at: http://www.usace.army.mil/Portals/2/docs/civilworks/regulatory/cwa_guide/ app_d_traditional_navigable_waters.pdf. The Guidebook, of which Appendix D is part, was dated 1 June 2007 and signed by USACE and the US EPA on 5 June 2007.

### *Adjacent Wetlands Assumable by a State or Tribe, and Adjacent Wetlands that Must be Retained by the USACE*

MAJORITY RECOMMENDATION. All the recommending Subcommittee members (the majority) except for the USACE member recommend that the EPA adopt and implement a policy under which the USACE would retain administrative authority over all wetlands adjacent to retained navigable waters landward to an administrative boundary agreed upon by the state or tribe and the USACE. The USACE CWA regulatory definition of "adjacent" would be used to identify adjacent wetlands, and the USACE would retain administrative authority only over adjacent wetlands within the agreed-upon administrative boundary. This administrative line could be negotiated at the state or tribal level to take into account existing state regulations or natural features that would increase practicability or public understanding; if no change were negotiated, a 300-foot national administrative default line would be used.

The majority of the subcommittee understands that the purpose of retention by the USACE of wetlands adjacent to Section 10 waters is primarily to ensure that the USACE has authority over activities that may alter the physical structure of the navigational channel or otherwise interfere with navigation. Thus, it believes that the extent of USACE authority over adjacent wetlands under an assumed program is reasonably limited to wetlands that are likely to affect navigation.

MINORITY RECOMMENDATION. The representative of the USACE recommends that the USACE retain the entirety of wetlands that are "adjacent" to retained navigable waters, using the definition of adjacent wetlands currently being used by the USACE for regulatory actions under Section 404 (i.e. the wetlands defined as adjacent under 33 CFR 328.3, implemented through the 2008 Rapanos guidance). The USACE believes that this recommendation is consistent with CWA Section 404, provides clarity regarding the permitting authority, and is easily understood and implementable in the field.

## IMPLEMENTATION AND PROCESS RECOMMENDATIONS

This report also provides general recommendations regarding the potential content of new guidance or regulations on state or tribal assumable waters, and effective procedures for implementation.



# 1. Statement of the Problem

Section 404(a) of the Clean Water Act (CWA) authorizes the US Army Corps of Engineers (USACE) to issue CWA permits for the discharge of dredged or fill material into navigable waters. Section 404(g) authorizes states,[3] with approval from the US Environmental Protection Agency (EPA), to assume authority to administer the 404 program in some but not all navigable waters. The waters and wetlands that a state may not assume, and that the USACE must retain even after a state has assumed the program, are specified in a parenthetical phrase in section 404(g)(1) as:

> *"... those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto ..."*[4]

It was the intent of Congress for states to implement the permit program under Section 404 of the Federal Clean Water Act.[5] However, since the enactment of 404(g) in 1977, only two states and no tribes have assumed the 404 Program. While other states (most recently including Maryland, Oregon, Virginia, Montana, Florida, Arizona, and Alaska) and some tribes have explored assuming the program, their efforts have not resulted in actual assumption. States have indicated that this is due in part to confusion about the meaning of Section 404(g)(1). This report focuses on clarifying the meaning of Section 404(g)(1) and thus the scope of waters and adjacent wetlands that may be assumed by a state or tribe.

3 Tribes were not specifically called out in the 1977 CWA amendments but are able to assume as provided in statute in Section 518(e) of the CWA, 33 USC 1378(e), which authorizes the Administrator to treat an Indian Tribe as eligible to apply for numerous CWA programs, including the 404 permit program under section 404(g). The EPA has also issued regulations on this matter at 40 CFR Part 233g: 404 – Tribal Program Regulations.

4 §1344(g)(1)

5 33 USC § 1251(b)



# 2. Background

## WHAT IS ASSUMPTION?

"Assumption" of the CWA Section 404 program describes the process whereby a state or tribe obtains approval from the EPA to administer the 404 program within their borders and consequently begins administering the program.  To obtain EPA approval, the state or tribal program must be consistent with and no less stringent than that required by law of the federal agencies.  For example, a state or tribe must:

- have sufficient authority to regulate all waters of the US that may be assumed;

- regulate at least the same activities as listed in the Act and regulations;

- provide for sufficient public participation;

- ensure compliance with the Section 404(b)(1) guidelines, which provide environmental criteria for permit decisions;

- have adequate enforcement authority; and

- comply with other applicable regulations (33 USC part 1344(h); 40 CFR part 233).

In an assumed 404 program, the EPA retains the authority to review defined categories of permit applications and may request review of any application.  The EPA coordinates its review of a particular application with the USACE and requests comments from the US Fish and Wildlife Service, and, as appropriate, the National Marine Fisheries Service, with the EPA providing comments to the state or tribe.  In the event that the EPA objects to issuance of a 404 permit,

the state or tribe cannot issue the 404 permit unless the EPA's objection is resolved. If the objection is not resolved, the USACE takes responsibility for the permit, including the decision to issue or deny the permit. These provisions of federal law provide safeguards that ensure consideration of both state or tribal and federal requirements as well as national consistency.

Before assuming the program, the state or tribe must enter into and sign separate Memoranda of Agreement (MOAs) with both the EPA and USACE. The MOA with the USACE must describe which navigable waters and adjacent wetlands will be retained by the USACE. To date, there has been little guidance to USACE districts, EPA regions, or states and tribes on how to make that determination.[6]

## TRIBAL CONSIDERATIONS REGARDING ASSUMPTION[7]

Section 518 of the CWA, enacted as part of the 1987 amendments to the statute, authorizes the EPA to treat eligible Indian tribes in a manner similar to states ("treatment as a state" or TAS) for a variety of purposes, including administering each of the principal CWA regulatory programs and receiving grants under several CWA authorities (81 FR at 30183). This includes CWA Section 404. Tribal governments pursuing assumption of the 404 program will follow the same process as states, though it is expected that there will be some nuanced differences; for example, in addressing Tribal Indian Reservation boundaries.

In a state-assumed program, states will generally not assume authority for administering the 404 program within Indian country; instead, such authority will generally be retained by the USACE unless the tribe itself is approved by the EPA to assume the 404 program. Because Tribal Indian Reservation boundaries are not static and precise definitions and considerations vary from state to state, it is essential that waters to be retained by the USACE on tribal lands be specifically addressed in any MOA developed between the USACE and a state assuming the program.

Per Executive Order 13175 of November 6, 2000 – Consultation and Coordination With Indian Tribal Governments,[8] the federal government has an obligation to consult with federally-recognized tribes that may be affected during a state assumption effort.

## OVERVIEW OF ASSUMPTION BY MICHIGAN AND NEW JERSEY

Since Section 404(g) was enacted in 1977, two states have assumed the program: Michigan and New Jersey.

Michigan and EPA signed a MOA regarding assumption in 1983. In 1984, the state and the USACE signed a MOA describing waters over which the USACE retained administration. Prior to assumption, Michigan had enacted a number of statutes related to water protection, including the 1955 Great Lakes Submerged Lands Act, the 1972

[6] In 1980, the EPA produced a document entitled: "The State's Choice: 404 Permit Program" that provides some insight into the agency's thinking at that time (*US EPA, Office of Water Regulations and Standards Criteria and Standards Division, EPA 440/5-81-002, October 1980*). The EPA's implementing regulations also provide very general guidance. These regulations state that the MOA between the USACE and state or tribe will contain "A description of waters of the United States within the State over which the Secretary retains jurisdiction, as identified by the Secretary." 40 CFR Part 233: 404 State Program Regulations.

[7] *See Appendix A*, Tribal Findings, Issues, and Considerations during Assumption.

[8] Federal Register Vol. 65, No. 218, pages 67249-67252.

Inland Lakes and Streams Act, and the 1979 Wetland Protection Act. The Wetland Protection Act was passed to facilitate assumption of the 404 Program. In 1984, EPA formally approved Michigan's program.[9]

The waters and wetlands assumed by Michigan are described in the MOA between Michigan and the USACE. In this MOA, the USACE retains responsibility for waters that are on a Rivers and Harbors Act (RHA) Section 10 list maintained by the USACE district office. In addition, the USACE retains permitting authority over the Great Lakes, which although not on the list clearly qualify as Section 10 waters. This list is specific and results in well-defined boundaries and upstream limits for waters retained by the USACE. Most of these USACE-retained waters are within a narrow band of streams that flow into the Great Lakes. This list has been refined over time with the addition of some small tributaries and wetlands that are influenced by the water level of the Great Lakes. Michigan has assumed the remaining waters, which are the vast majority of the waters internal to the state.

The extent of adjacent wetlands over which the USACE retains authority is determined by the USACE on a case-by-case basis – generally including wetlands in close proximity to Section 10 waters, and having a direct surface water connection to and within the influence of the ordinary high water mark of those waters.

There are some waters over which Michigan and the USACE have joint authority. In these cases the two agencies work together on the permitting and compliance activities, and site inspections. Usually the state takes the lead on mitigation because the state has a robust mitigation program and can own property, hold conservation easements, and hold financial instruments, which the USACE cannot.

New Jersey assumed the program in 1994.[10] Prior to assumption, New Jersey passed its Wetlands Act in 1970, Coastal Zone Management Act in 1972, and the Freshwater Wetlands Protection Act in 1987. As part of the Freshwater Wetlands Protection Act, New Jersey undertook a mapping program to identify freshwater wetlands and waters. While the maps are not regulatory in nature, New Jersey's 404 program is keyed to these freshwater wetlands maps.

In the MOA between New Jersey and the USACE, the USACE retained regulatory authority over those wetlands that are: "... partially or entirely located within 1000 feet of the ordinary high water mark or mean high tide of the Delaware River, Greenwood Lake, and all water bodies which are subject to the ebb and flow of the tide."[11] State-administered waters in turn are generally determined by superimposing head of tide data on the state's freshwater wetlands quarter quadrangles that are at a scale of one inch equals 1000 feet. A line was established parallel to and 1000 feet from the ordinary high water mark or mean high tide of the waters described above. The USACE retains permitting authority over all wetlands that are waterward of, or intersected by, the administrative line described above. Because New Jersey regulates all wetlands/waters, it rarely has to determine whether a wetland is assumable or non-assumable. However, if there is any question or a reason that it makes a difference to an applicant, the state either adds a permit condition informing the applicant or contacts the USACE in advance to request the USACE determine whether they will or will not assert authority to regulate. See *Appendix B* for further elaboration of these two states' assumed programs.

---

[9] 49 FR 38948, Oct. 2, 1984. Redesignated at 53 FR 20776, June 6, 1988. Redesignated at 58 FR 8183, Feb. 11, 1993. Effective date, October 16, 1984.

[10] 59 FR 9933, Mar. 2, 1994.

[11] Ibid.

## NO FURTHER ASSUMPTION BY STATES OR TRIBES SINCE THE 1990s

The legislative history and statute indicate that Congress intended and expected that a number of states would choose to assume authority over the discharge of dredged or fill materials under the provisions of Section 404(g). However, no states or tribes have assumed the 404 Program since Michigan and New Jersey. There are many possible reasons for this, from the increasing complexity and cost of administering the program, to decades-long challenges about which waters should even be regulated under Section 404, to the fact that unlike several other EPA programs, Congress did not dedicate specific additional funding for states or tribes to cover the costs of administering a 404 program. Additionally, EPA and the USACE have not provided specific guidance that can be used to identify the waters (and wetlands) that must be retained by the USACE under 404(g). Without specific guidance, individual states or tribes and USACE districts have been left to interpret the meaning of 404(g)(1) to determine the extent of waters to be retained in each MOA negotiation. In turn, these negotiations have often broken down or stopped due to lack of clarity, uncertainty, or disagreement over the scope of retained waters and wetlands.

## THE IMPORTANCE OF ASSUMPTION TO STATES AND TRIBES

States and tribes play a significant role in many Clean Water Act programs (for example, point and nonpoint source management, waste management, wastewater permitting under Section 402, and development of water quality standards). In most CWA programs, states and tribes partner primarily with the EPA. Section 404 is unique in the sharing of regulatory responsibilities with the USACE in addition to EPA. For those states or tribes with mature, integrated water management programs that include the regulation of dredged or fill activities, 404 Program assumption allows a state or tribe to carry out a fully integrated and comprehensive water program addressing the full range of state, tribal, and CWA requirements. Despite the complexity of the program and potential administrative costs, states and tribes remain interested in pursuing assumption.

While not all states and tribes are qualified or positioned to assume Section 404 responsibility, or are willing to bear the additional cost of doing so, assumption may have significant benefits for some states and tribes, as well as the public. State or tribal assumption in accordance with Section 404(g) could reduce the overlap and duplication of state, tribal, and federal permitting programs, and be the best use of state, tribal, and federal program resources. This is, of course, dependent upon assurance that the state or tribal program is as stringent as is required by the federal statutes and regulations, an assurance required by the CWA and provided by initial EPA approval and by ongoing federal oversight. Assumption allows a state or tribe to meet state or tribal regulatory time constraints; to incorporate needed local requirements and permit conditions; and, to integrate review of applications for discharge of dredged or fill material with other applicable regulatory requirements. The public may be supportive of assumption and willing to accept the costs to a state or tribal government and the potentially higher permit fees given potentially significant streamlining of the permitting process for many projects.

## ESTABLISHMENT OF THE SUBCOMMITTEE

In 2014, the Association of Clean Water Administrators, the Environmental Council of the States, and the Association of State Wetland Managers asked EPA to clarify which waters are assumable under the statute (see *Appendix C* for a copy of the request from the state associations). In response, EPA convened a stakeholder group to provide advice on this matter. To form the stakeholder group, EPA drew on its authority under the Federal Advisory Committee Act (FACA), Public Law 92-463[12]. In 1988, EPA established the National Advisory Council for Environmental Policy and Technology (NACEPT), a body subject to FACA, to provide advice to the EPA Administrator on a broad range of environmental policy, management, and technology issues. In March 2015, the Agency published a Federal Register Notice announcing that NACEPT would be establishing the Subcommittee to address the issue raised by the states and national organizations, and that it was seeking nominations for membership. In June of that year, EPA announced the appointment of 22 members representing federal, state, and tribal governments, non-governmental organizations and the regulated public (see *Appendix D* for a list of members and their affiliations).

EPA directed the Subcommittee to focus on a narrow and specific task related to the waters for which a state or tribe may assume permitting responsibility (see the Subcommittee Charter in *Appendix E*). The Subcommittee was asked to provide advice and develop recommendations for NACEPT on how EPA can best clarify for which waters a state or tribe may assume CWA section 404 permit responsibilities, and for which waters the USACE retains CWA section 404 permit responsibility under an approved state or tribal program.

As set forth in the Charter's Charge to the Subcommittee: "this effort will address the States' request to provide clarity on this issue enabling them to assess and determine the geographic scope and costs and benefits associated with implementing an approved program." The Subcommittee has had a limited duration and narrow focus. Other aspects of state or tribal assumption were not within the scope of Subcommittee deliberations. *In particular, the Charge emphasized that "the subcommittee will not be deliberating on the merits of assumption, nor on any aspect of the larger question of which waters are 'waters of the US.'"*

EPA asked that the final Subcommittee report to NACEPT reflect consideration of the following assumptions:

- A CWA section 404 permit is required – meaning there is an activity regulated under section 404 that will result in a discharge of dredged or fill material into a water of the US;
- Any recommendation must be consistent with the CWA and in particular section 404(g); and
- Clarity regarding who is the permitting authority (the state or tribe or the USACE) should be easily understood and implementable in the field.

[12] 5 USC Appendix 2

## OPERATION OF THE SUBCOMMITTEE

With this direction in mind, the Subcommittee held its initial meeting October 6–7, 2015, followed by four additional multi-day meetings and three webinars.  The early meetings were spent clarifying and understanding the nature of the question being asked.  Subsequently, the Subcommittee formed four work groups to focus on assigned issues – specifically, Tribal Considerations, Origin and Purpose of Section 404(g), Waters, and Adjacent Wetlands.

The Tribal Considerations work group clarified issues that both states and tribes need to address from the earliest stages of consideration of assumption.  The work of the Origin and Purpose of Section 404(g) work group served as an underpinning not only for the entire Subcommittee's work but particularly for the work of the Waters and Adjacent Wetlands work groups.  Waters, such as rivers, lakes, and streams, and adjacent wetlands are clearly linked legally, in policy, and in hydrology, and in total are often referred to as "waters."  However, for the purposes of developing recommendations and for usage in this report, the Subcommittee chose the use of two terms:  "waters" and "adjacent wetlands."  The Subcommittee felt that the recommendation for which waters could be assumed vs. retained would relate directly to which adjacent wetlands would be assumed vs. retained:  only wetlands adjacent to waters retained by the USACE, for example, would be retained by the USACE, regardless of the nature of the recommendation for retained wetlands.

The work groups were tasked with studying the assigned topics, reporting their findings, and developing alternatives for consideration by the entire Subcommittee.  Typically, the work groups met during Subcommittee meetings at key points, and between meetings continued their work through conference calls and exchanges of emails.

It was immediately apparent to all participants that the Subcommittee should not deviate from the defined charge and should avoid addressing questions about the scope of CWA jurisdiction over "the waters of the United States."  Thus, consistent with EPA's Charge to the Subcommittee, the question for the Subcommittee was not which waters are "waters of the United States," but rather which of the "waters of the United States" will be *retained* by the USACE, and which "waters of the United States" may be *assumed* by a state or tribe.  All waters of the United States will continue to be regulated in accordance with Section 404 requirements regardless of whether a state or tribe assumes the program.  The Subcommittee stresses that this distinction between administrative responsibility and jurisdictional authority is essential to keep in mind in reading the findings and recommendations in this report.  The Subcommittee's focus has been on clarifying administrative responsibility.

## ABOUT THE WRITING OF THIS REPORT

This report is based on extensive written work completed by the Subcommittee's work groups and reviewed and discussed by the full Subcommittee.  A drafting work group assembled and edited the final report based on those work groups' products.

The work groups carried out extensive discussion, then one or two participants produced a draft working paper or brief that was in turn reviewed and edited by all work group members, and then further reviewed and edited by all Subcommittee members.  In the case of the Origin and Purpose of Section 404(g) section, the Subcommittee relied heavily on non-agency Subcommittee members who were attorneys with extensive experience in the CWA.

The reader may note that the following alternatives and recommendations sections for retained waters and adjacent wetlands vary somewhat in format and style. While the sections follow the same general approach (discussion, presentation of alternatives, and majority and minority recommendations), there are differences in the presentations. The Subcommittee has chosen to allow these differences to remain. These differences are in part due to the different work groups' writing style and formatting, and in part because the two issues have different legislative histories and treatments. The full Subcommittee agrees that the report accurately describes the Subcommittee's deliberations and majority and USACE minority recommendations.

While the US EPA provided comments along with all other Subcommittee members, drafting of this report was by non-EPA members of the subcommittee. Since the US EPA will be receiving formal advice from the NACEPT, the EPA participated actively in the discussion, formulation, and review of the alternatives and provided technical advice, but did not take a position regarding the specific recommendations made by the Subcommittee. The US FWS also participated in the discussions but did not take a position on the final recommendations. Members who took a position regarding the recommendations are referred to as "recommending members." These include all members, including the USACE, but not the US EPA and the US FWS.



# 3. Origin and Purpose of Section 404(g)

## ORGANIZATION OF THE WORK GROUP

In accordance with EPA's charge to the Subcommittee that "any recommendation must be consistent with the CWA and in particular 404(g)(1)," the Subcommittee established a work group to look into the meaning and history of Section 404(g)(1). The work group sought to provide clarification and understanding of the language of the statute by referring to the record of administrative developments, Congressional hearings, committee reports, and debates that led to the 1977 amendments to the CWA – which amendments resulted in, among other things, the adoption of section 404(g)(1). Memoranda of the work group's findings and conclusions are attached in *Appendix F* to this Report. Following is a brief summary of the work group's findings and conclusions. In the interest of brevity, citations to original sources are omitted from this summary, but they can be found in the Memoranda attached in *Appendix F*.

## BACKGROUND ON NAVIGABLE WATERS TO BE RETAINED BY THE USACE AS DEFINED IN SECTION 404(g)(1)

At the time Congress enacted the CWA in 1972, the USACE had been regulating "navigable waters of the United States" under the Rivers and Harbors Act (RHA) since the 19th century. The CWA went beyond the RHA to regulate "navigable waters," which it defined to mean "the waters of the United States." The strikingly similar language in the two statutes led to confusion, and the USACE's initial post-CWA regulations treated the two jurisdictional terms interchangeably. But the statutes had different purposes: the RHA focused primarily on navigable capacity; the CWA on water quality. In 1975 the District Court for the District of Columbia ordered the USACE to adopt new regulations in accordance with the broader water quality purposes of the CWA. In July 1975, the USACE issued new regulations announcing a phase-in schedule for expanding the 404 program as follows:

- *Phase I:* [effective immediately] discharges of dredged material or of fill material into coastal waters and coastal wetlands contiguous or adjacent thereto or into inland navigable waters of the United States and freshwater wetlands contiguous or adjacent thereto are subject to … regulation.
- *Phase II:* [effective July 1, 1976] discharges of dredged material or of fill material into primary tributaries, freshwater wetlands contiguous or adjacent to primary tributaries, and lakes are subject to … regulation.
- *Phase III:* [effective after July 1, 1977] discharges of dredged material or of fill material into any navigable water [including intrastate lakes, rivers and streams landward to their ordinary high water mark and up to the headwaters that are used in interstate commerce] are subject to … regulation.

Many in Congress were concerned about the expansion of the USACE's CWA dredge or fill regulatory program as addressed in their 1975 regulations quoted above, and in 1976 the House of Representatives passed HR 9560 which redefined the CWA term "navigable waters" specifically for the 404 program (but not the rest of the CWA) to:

> The term "navigable waters" as used in this section shall mean all waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark (mean higher high water mark on the west coast).

This House bill was not approved by the Senate and therefore it never became law. The Committee report accompanying the House bill explained that the new definition would be "the same as the definition of navigable waters of the United States as it has evolved over the years through court decisions ... with one exception. [It] omits the historical test of navigability." The Committee believed "that if a water is not susceptible of use for the transport of interstate or foreign commerce in its present condition or with reasonable improvement," then it should be excluded from the definition. "Activities addressed by section 404, to the extent they occur in waters other than navigable waters of the United States ... are more appropriately and more effectively subject to regulation by the States."

Although HR 9560 did not include wetlands in the definition of navigable waters, it protected wetlands by requiring 404 permits for dredged or fill activities in "coastal wetlands and ... those wetlands lying adjacent and contiguous to navigable streams."

The Senate declined to redefine "navigable waters" for purposes of the 404 program. But the Senate did pass a bill in August 1977 that allowed the states to assume 404 permitting authority, subject to EPA approval, in phase II and III waters (as defined in the USACE's 1975 regulations quoted above). Until the approval of a state program for Phase II and III waters, the USACE would administer section 404 in all navigable waters. After assumption, the USACE would retain 404 permitting authority in Phase I waters.

The final bill, HR 3199, referred to as the 1977 CWA Amendments, was a compromise. It did not change the definition of "navigable waters" for the 404 program. But it allowed the states to assume permitting authority in "phase II and III waters after the approval of a program by [EPA]."

To effectuate this intent, the final bill inserted the language from HR9560 that had limited the term "navigable waters" into a parenthetical phrase in section 404(g)(1) that defined the waters the USACE must retain. The parenthetical

tracked the language the House Committee had originally used to limit USACE jurisdiction, except that the Conference Committee added "wetlands adjacent thereto" to the parenthetical phrase that defined waters to be retained by the USACE, known as "retained waters."

The legislative history of 404(g) in both the House and the Senate evidences a Congressional expectation that most States would assume the 404 program, and therefore effectively limit USACE permitting authority to Phase I waters (except waters deemed navigable based solely on historical use, which are assumable by a state). The USACE defined Phase I waters as "navigable waters of the United States" and "wetlands contiguous or adjacent thereto." The preamble to the USACE's 1977 regulations described them as "waters already being regulated by the USACE," i.e., those waters subject to regulation by the USACE under section 10 of the RHA, plus adjacent wetlands.

Numerous judicial opinions over more than a century have factored into the meaning and scope of USACE jurisdiction under the RHA. As the USACE states in its 1977 section 10 regulations, "[p]recise definitions of 'navigable waters' or 'navigability' are ultimately dependent on judicial interpretation, and cannot be made conclusively by administrative agencies." Therefore, if and when questions arise in identifying the RHA waters to be retained according to the 404(g)(1) formula at the time a state or tribe assumes permitting authority, agency expertise will be necessary to interpret the RHA standard and apply it on the ground to determine whether a particular feature is assumable or must be retained by the USACE, all of which will be subject to judicial review.

## BACKGROUND ON ADJACENT WETLANDS TO BE RETAINED BY THE USACE

When a state or tribe assumes permitting authority, the USACE must retain those waters described above and "wetlands adjacent thereto."

The phrase "wetlands adjacent thereto" was first added to Section 404(g)(1) by the Conference Committee during the final run-up to enactment of the 1977 amendments, although there had been a reference to wetlands earlier, in HR 9560, which had been passed by the House in the summer of 1976. That bill did not include wetlands in the definition of "navigable waters" but it required permits for discharges to "wetlands lying adjacent and contiguous to navigable streams." However, neither the House nor the Conference Committee defined what they meant by the terms "adjacent," "contiguous" or "wetlands."

While actual definitions of adjacent and wetlands were not included, the terms "contiguous or adjacent wetlands" were used in the USACE's July 1975 regulations. In July 1977 the USACE for the first time promulgated definitions of "adjacent" and "wetlands" for purposes of its "waters of the United States" regulatory definitions under the CWA. The preamble to the 1977 rule explained that:

> "[s]ince 'contiguous' is only a subpart of the term 'adjacent,' we have eliminated the term 'contiguous.' At the same time, we have defined the term 'adjacent' to mean 'bordering, contiguous, or neighboring.' The term would include wetlands that directly connect to other waters of the United States, or that are in reasonable proximity to these waters but physically separated from them by man-made dikes or barriers, natural river berms, beach dunes, and similar obstructions."[13]

[13] 42 Fed. Reg. 37,122, 37,129 (July 19, 1977).

There are no references in the legislative history of section 404(g) to the USACE's 1977 definition of "adjacent," though the regulatory definition quoted above was in place when Congress debated the 1977 amendments. Mention of the meaning of the term "adjacent" came up only once during the final floor debate on the 1977 amendments. In response to questions raised by another Member, Congressman Don H. Clausen, the ranking minority member of the Subcommittee on Water Resources of the House Committee on Public Works and Transportation and one of the drafters of the 1977 CWA amendments, replied that the word "adjacent" as used in 404(g)(1) means "immediately contiguous to the waterway." Other than this colloquy, there is no significant discussion of what Congress intended by using the word "adjacent" for purposes of allocating permitting authority under 404(g)(1).

In sum, no definitive meaning of the term "adjacent" in 404(g)(1) emerges from a review of the legislative history. Therefore, the meaning of adjacency within 404(g)(1) is susceptible to various interpretations.



# 4. Description of Alternatives for Identifying Waters (other than Wetlands) Assumable by a State or Tribe, and Waters that Must be Retained by the USACE

The Subcommittee tasked the Waters work group with identifying a plausible, limited set of options that the federal agencies could use to clarify which waters (other than wetlands) are assumable by states or tribes and which need be retained by the USACE. These options were based on the experience in Michigan and New Jersey, a reading and understanding of the CWA and the legislative history of 404(g)(1), the input and experience of other states and tribes with a potential interest in assumption, and the experience of the USACE in administering the program in its entirety in all but two states since 1977. These options are listed below as ALTERNATIVES A, B, and C.

As a starting point, the waters work group noted that the following three regulations or statutes all use the term "navigable":

- RHA interpreted at 33 CFR 329.4, 1977,
- CWA jurisdictional definition of "(a)(1)" waters at 33 CFR 328.3(a)(1), and
- CWA Section 404(g)(1) parenthetical definition of waters to be retained by the USACE under a state- or tribe-assumed program.

However, the term "navigable" has different meanings in each of these passages, and the statutes and/or regulations that use "navigable" have different purposes. For example, the purpose of 328.3(a)(1) is to define the scope of jurisdiction under the CWA, while the purpose of 404(g) is to provide for an administrative division of permitting responsibilities between states or tribes and the USACE.

## WATERS ALTERNATIVE A: Case-by-case determination of USACE-retained and state- or tribal-assumable waters at the time of program assumption (the status quo).

At the time a state or tribe decides to pursue assumption, the USACE district and the state or tribe will work together to identify, utilizing existing information, which waters will be retained by the USACE and which will be assumed by the state or tribe. Under this alternative, neither EPA nor the USACE would provide further guidance or clarification on criteria to be used to help define the scope of retained vs. assumed waters, but states or tribes would retain their ability to seek assumption within existing processes and procedures. While the Subcommittee deemed it important to put forward this option as one of three, it should be noted that states and tribes have requested that EPA clarify the extent of assumable waters because uncertainty regarding the potential scope of state and tribal permitting authority under an assumed program has proven to be a barrier to full consideration of 404 Program assumption by the states and tribes. This option provides no further clarity due to historic differences and communications in different states, tribes, and districts.

## WATERS ALTERNATIVE B: Primary Dependence on RHA Section 10 Lists of Navigable Waters to Define USACE-Retained Waters

This alternative uses existing USACE lists of RHA Section 10 waters to define USACE-retained waters. USACE district offices maintain state-by-state lists of waters that are regulated by the USACE under Section 10 of the RHA for every state except Hawaii. These include waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce. This district-maintained list will be used as the basis for the list of USACE-retained waters (List of Retained Waters) for any state or tribe pursuing assumption.

Waters included on the Section 10 lists based solely on historical navigational use may be assumed by a state or tribe,[14] and thus would be deleted from a list of USACE-retained waters. All waters of the United States not included on the list of USACE-retained waters would be assumable by a state or tribe.

As discussed earlier in this report in *Section 2*, subsection on *Tribal Considerations Regarding Assumption* (*see page 3*), if a state (as opposed to a tribe) is seeking assumption, waters associated with lands held in trust for federally recognized Indian tribes – that is, that are subject to assumption by a tribe – could also be retained by the USACE unless and until the time of a tribal assumption.

Under ALTERNATIVE B, when a state or tribe initiates the assumption process, the USACE district will use the Section 10 list to develop a List of Retained Waters by (1) deleting waters included on the Section 10 list based on

[14] See *Appendix F* of this report regarding assumption of such waters.

historical use only (applying the relevant factors set forth in the RHA Section 10 regulations); (2) in the case of a state assumption, adding tribal waters, and (3) identifying and adding waters that appropriately belong on the Section 10 list and therefore on the List of Retained Waters.

If the USACE identifies waters that are eligible for but not included on the list of waters regulated under RHA Section 10, either at the time of assumption or following some future alteration in the physical condition of a water body, the USACE can add such waters following consideration of the RHA case law and relevant factors set forth in the RHA Section 10 regulations, including 33 CFR 329.8 (improved or natural conditions of the water body), 329.9(a) (past use), 329.9(b) (future or potential use), and 329.10 (existence of obstructions). Under ALTERNATIVE B, these waters would be retained by the USACE only if they are added to the Section 10 list, unless the determination is based solely on historical use. Once added, these waters would be included in the List of Retained Waters.

The Subcommittee discussed variations within this option at length, but all variations relied on the use of the existing Section 10 lists as the starting point. When a state or tribe seeks assumption, the state or tribe, the USACE, and the EPA would collaborate in review of the existing Section 10 list, clarify the scope of assumable waters, and resolve any waters that do not clearly meet the guidance described in the above paragraph. It is of note that while the state and federal agencies would collaborate in the development of the List of Retained Waters, the USACE would still have sole responsibility for maintaining and adding to the underlying Section 10 list. Inclusion of EPA in these discussions would further assure consideration of state or tribal assumption factors and concerns in devising the List of Retained Waters, including consideration of related issues (e.g., tribal waters). The EPA and the USACE would need to establish a clear dispute resolution procedure to be followed if the state or tribe and the USACE district were not able to complete the List of Retained Waters as part of their MOA development within a reasonable time frame.

## WATERS ALTERNATIVE C:
## Rivers and Harbors Act (RHA) Section 10 Waters plus CWA 33 CFR 328.3(a)(1) Waters as Retained Waters.

ALTERNATIVE C was proposed by the USACE representative on the Subcommittee and the following explanation of the Alternative has been written by the USACE.

Under this option, retained waters would be determined using both the RHA Section 10 lists, and additional waters determined by the USACE to be Traditional Navigable Waters (TNWs, or (a)(1) waters) under the CWA. In this option, the following process would be used[15].

[15] The USACE recognizes that there may be Section 10 and/or TNW waters that are not on the existing District lists under paragraphs (i) and (ii). If a state or tribal government asks the USACE for a list of Section 10 waters and TNWs that the USACE does not believe are subject to state CWA Section 404 assumption, the appropriate District office(s) will provide to the state or tribe the existing list of Section 10 waters (minus those based solely on historical use) and TNWs the USACE has available at that time. However, if and when assumption of the Section 404 program is being pursued by a state or tribe, at that time the USACE may be able to provide a more complete and updated list of retained waters, which might differ from the list given initially, and would include the waters resulting from completion of the process outlined in paragraphs (i) and (ii). The USACE recognizes that in many states some waters that have the legal status of Section 10 waters and/or TNWs have not yet been determined by the USACE to have such status. To the extent that available USACE resources allow, the USACE would try to update the list of retained waters for any particular state before the assumption process is finalized by the EPA. For purposes of clarity for the administrative process of state or tribal assumption and in recognition of limited USACE resources to identify all Section 10 and/or TNW waters with such legal status which have not yet been identified within a state, it is practical to limit the list of retained waters by the USACE at the time of final state assumption to those already identified as a Section 10 and/or TNW waters. Nothing in this part diminishes the statutory authorities over waters that may be Section 10 and/or TNWs but have not yet been formally determined as such.

- Include the RHA Section 10 "navigable waters of the US" identified on Section 10 lists developed by the USACE districts within their areas of responsibility. These include waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce. For purposes of state or tribal assumption, the list would exclude any waters or reaches of such waters based solely on use in the past.

- Include the Traditional Navigable Waters (TNWs).[16,17] For purposes of state or tribal assumption, the list of "navigable waters" that would be retained by the USACE would include any waters for which TNW stand-alone determinations or EPA TNW determinations have been previously made. In addition, case-specific TNW determinations are also made by USACE Districts but are only valid for the specific approved jurisdictional determination for which they are prepared. At the time a state or tribe begins assumption discussions with a USACE District, the District would evaluate all of their completed case-specific TNW determinations to determine whether addition of that water to the retained navigable waters list is warranted under a stand-alone determination. Any CWA (a)(1) TNW[18] determination can also serve as precedent for evaluation as a navigable water of the US to be added to the District Section 10 list.

- For purposes of the assumption process, only those waters in paragraphs (i) and (ii) would be retained by the USACE except for the rare exceptions described in paragraph iv below which may occur after a state or tribe has assumed the program under 404(g).

- Post-Assumption: There may be rare occasions when the USACE must make a new or revised Section 10 or TNW determination after it has provided its "retained navigable waters" list to a state or tribe (e.g., when a District independently makes changes to determinations per regulations at 33 CFR 329.14 or under TNW determination guidance, or when a Federal court has made a determination of "navigable waters of the US" or TNW, or when Congress makes a "non-navigable" determination under 33 USC Chapter 1, Subchapter II). In these cases, as with the above option, appropriate adjustments would be made to the retained navigable waters list to account for these revisions. Note that the state or tribe will primarily take on permitting and thereby jurisdictional determinations under their state or tribal programs post-assumption unless and otherwise triggered by these exceptions.

[16] See 33 CFR 328.3(a)(1) and Appendix D of the 2007 "US Army Corps of Engineers Jurisdictional Determination Instructional Guidebook" for a definition and guidance on identifying TNWs available at: http://www.usace.army.mil/Portals/2/docs/civilworks/regulatory/cwa_guide/app_d_traditional_navigable_waters.pdf

[17] TNWs in this paragraph are only based on the EPA determinations or determinations made under the USACE's approved jurisdictional determinations and do not include determinations made under a preliminary jurisdictional determination which only indicate which waters "may be" subject to USACE jurisdiction under the USACE's statutory authorities.

[18] The USACE proposes retaining waters that the USACE deems to be "traditional navigable waters" or TNWs under the CWA regulation defining 'the waters of the United States' at 33 CFR Section 328.3(a)(1). To avoid confusion with "navigable waters of the United States" regulated under the Rivers and Harbors Act, this report refers to these as "CWA (a)(1) TNWs."



# 5. Subcommittee Discussion and Recommendations for Identifying Retained Waters

## MAJORITY RECOMMENDATION: WATERS ALTERNATIVE B – Primary Dependence on RHA Section 10 Lists of Navigable Waters to Define USACE Retained Waters

After consideration of various options, all recommending subcommittee members with the exception of the USACE member recommend that EPA adopt and implement policy (guidance and/or regulations) consistent with ALTERNATIVE B to differentiate between assumable waters and those that must be retained by the USACE. The majority of the Subcommittee understands this option to have two primary advantages: clarity, and consistency with CWA Section 404(g)(1) as understood by the majority of Subcommittee members. The following discussion provides reasons for this recommendation as developed by the majority of the Subcommittee, referencing two of the criteria included in the charge to the Subcommittee and identifying a separate third criteria related to Congressional intent based on the legislative history of 404(g). These recommendations are made with the understanding that the Subcommittee is not making any recommendation that would affect the jurisdictional definition of waters of the United States.

*Note that none of the Subcommittee members endorsed ALTERNATIVE A – essentially a "no action" alternative – and thus the Subcommittee provides no further discussion of this alternative.*

*CRITERION 1. Does the recommendation provide clarity and is it easily understood and implementable in the field?*

ALTERNATIVE B – the use of Section 10 lists to define USACE retained waters – is practical at the field level, being based on currently available information. It is also reasonably predictable for both the agencies and the public.

The recommended alternative provides a clearly defined set of waters to be retained by the USACE based on an existing administrative tool: the RHA Section 10 lists. This reduces confusion, uncertainty, and prolonged negotiations between a state or tribe and the associated USACE district or districts. Thus, it meets the criterion set forth in the Charge to the Subcommittee.

Lists of RHA Section 10 navigable waters of the United States are maintained by the USACE for all states except Hawaii. Additionally, ALTERNATIVE B recognizes that some RHA Section 10 lists, while generally stable, may not include all Section 10 regulated waters, and that the status of a specific water may change over time (e.g., removal of a dam that renders a stream reach navigable under the RHA). If changes are necessary, agencies can rely on existing regulations to guide the process for modifying the list. This alternative acknowledges that as the USACE and RHA case law amends a state Section 10 list as needed, parallel revisions may be made to the list of USACE-retained waters.

It is not expected that the overall reach of these lists will be modified greatly in the future. Thus, states and tribes can predict with reasonable accuracy which waters would be retained by the USACE in considering whether to pursue an application for Section 404 assumption. Moreover, relying on pre-existing lists (which may be augmented based on existing regulations and RHA case law) will foster efficient assumption procedures and minimize disagreements.

Of equal importance, identification of USACE-retained waters on a list of retained waters in a manner that is generally consistent with RHA Section 10 lists will allow the public to readily determine which agency is responsible for Section 404 regulation at a specific location under a state or tribal assumed program. The Section 10 lists are well established, and can be relatively easily labeled on regional maps or GIS systems, and therefore the Lists of Retained Waters would similarly be easily labeled. As noted in the discussion of the alternatives, the one complexity in utilizing the RHA Section 10 list for state or tribal assumption is those RHA Section 10 listed waters that may be based solely on historical use and would not be retained by the USACE.

By contrast, ALTERNATIVE C could result in uncertainty at the statewide and field level regarding the scope of state- or tribal-assumable versus USACE-retained waters, both before and after state or tribal program assumption. Under ALTERNATIVE C, the USACE would retain both RHA Section 10 waters and CWA "traditional navigable waters" under the USACE's jurisdictional regulations at 33 CFR 328.3(a)(1). As compared to ALTERNATIVE B, which relies on the clear definition of RHA waters, ALTERNATIVE C depends on multiple regulations, guidance, and procedures, and ties the identification of retained waters to determining the extent of CWA (a)(1) TNWs – waters that are less clearly defined than Section 10 waters.

Whereas the majority of RHA Section 10 waters are identified on lists maintained by each USACE district, the location and extent of CWA (a)(1) TNWs that would be retained by the USACE in the case of assumption are identified through a number of different approaches. The USACE and EPA have made some "stand-alone" CWA (a)(1) TNW determinations, and the USACE districts have documented some of these. These stand-alone determinations would be included in the list of retained waters under ALTERNATIVE C. The USACE also issues approved jurisdictional

determinations when they are requested by landowners or other interested parties. Many of these case-by-case jurisdictional determinations issued after the Supreme Court decision in *Rapanos v. United States*, 547 US 715 (2006) identify the nearest CWA (a)(1) TNW, but these "case-by-case" determinations are not considered permanent.

Because most TNWs have not yet been identified as such and thus lists of stand-alone TNWs could increase, ALTERNATIVE B provides more clarity, certainty and predictability to states, tribes and the regulated community regarding the scope of the state or tribal program.

After state or tribal program assumption, the USACE proposes to cease routine jurisdictional determinations in assumed waters but ALTERNATIVE C notes that additional waters might still be identified as CWA (a)(1) TNW waters in association with various legal proceedings, including federal enforcement actions. These CWA (a)(1) TNWs identified after assumption would be added to the List of Retained Waters at the time they are identified.

*CRITERION 2. Is the recommendation consistent with the CWA, and with Section 404(g)?*

ALTERNATIVE B is consistent with CWA Section 404(g) based on the plain language of Section 404(g) and the legislative history. Congress clearly intended that states and tribes should play a significant role in the administration of Section 404 – as they do in other CWA programs – anticipating that many states would assume the Section 404 program.

Congress also recognized the long-standing role and expertise of the USACE in maintaining navigation under the RHA, and therefore specified that the USACE would retain the parallel 404 permitting authority in those RHA waters and adjacent wetlands even after a state or tribe assumed 404 permitting authority over remaining waters and wetlands. Congress relied on RHA Section 10 to identify USACE-retained waters, with one exception: waters that were deemed "navigable" for RHA purposes based solely on historical practices (e.g., waters capable of carrying canoes for fur-trading in the 18th century) are also assumable by states or tribes.

On the other hand, all Subcommittee members except the USACE member believe that ALTERNATIVE C – under which the USACE would retain both RHA Section 10 waters and CWA (a)(1) TNWs identified up to the date of assumption – is not consistent with CWA Section 404(g), based upon its plain language and the legislative history. Congress was specific about what it intended in 404(g):

> *"The Committee amendment does not redefine navigable waters. Instead the committee amendment intends to assure continued protection for all of the Nation's waters, but allows States to assume primary responsibility for protecting those lakes, rivers, streams, swamps, marshes and other portions of the navigable waters outside the USACE program in the so-called Phase I waters."*[19]

The USACE's 1977 regulations reinforced that understanding. The preamble characterized Phase I as covering "waters already being regulated by the USACE [i.e. RHA waters] plus all adjacent wetlands to these waters."

[19] Clean Water Act of 1977 Report of the Committee on Environment and Public Works, United States Senate, July 1977, pg. 75

The USACE definition of "navigable waters of the United States" under the RHA is similar to the definition of waters to be retained by the USACE under Section 404(g)(1) – except for the deletion of historically used waters and addition of adjacent wetlands.

> Section 10 regulations, 33 CFR section 329.4: *"Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible to use to transport interstate or foreign commerce."*
>
> Section 404(g)(1) description of waters to be retained by the USACE: " *... waters that are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate and foreign commerce ... including wetlands adjacent thereto.*"

This similarity leads the majority of Subcommittee members to again conclude that the "navigable waters" to be retained by the USACE were intended to be the same waters regulated by the RHA. Further, the USACE regulation indicates that, "*This definition does not apply to authorities under the Clean Water Act, which definitions are described at 33 CFR parts 323 and 328.*"[20]

Moreover, the majority of the Subcommittee also understands the USACE to have acknowledged during Subcommittee discussions that the USACE can and does distinguish between Section 10 waters and CWA (a)(1) waters for regulatory purposes, displaying maps showing the two different categories in two states where USACE districts have identified Section 10 and CWA TNW waters. The Nationwide Permits issued by the USACE on January 6, 2017 also repeatedly distinguish between RHA waters and CWA waters, suggesting that such a distinction is and can be made with relative ease. Therefore, the majority of the Subcommittee holds that distinguishing between Section 10 and CWA (a)(1) waters for the purpose of distinguishing between assumable and USACE-retained waters remains practical and appropriate in accordance with 404(g).

### *CRITERION 3. Does the Recommendation comport with Congressional intent that qualified states assume responsibility for the Section 404 regulatory program?*

The Subcommittee majority views that ALTERNATIVE B makes it easier for states and tribes to understand the costs associated with assumption and thus more readily weigh the costs and benefits of assuming the program, thereby encouraging state or tribal assumption, if desired, consistent with Congressional intent and with other CWA programs.

States and tribes may be willing to undertake Section 404 program assumption for the reasons discussed earlier in this report, but they do incur the cost of development and administration of a state or tribal 404 program. Assumption of all CWA waters except those on the RHA Section 10 list minus solely historical use – as has occurred in Michigan and New Jersey – would provide an economy of scale to the state and the public, which could make the development and ongoing fixed costs more acceptable for qualified states or tribes who wish to pursue this approach under the CWA.

ALTERNATIVE C would be an effective barrier to assumption for many if not most states and tribes. The impact of ALTERNATIVE C would vary geographically, but particularly in states with significant wetlands and other water resources, the USACE could retain a greater percentage of waters (and adjacent wetlands) under this option. As

[20] 33 CFR §329.1.

an example, during Subcommittee discussions the USACE representatives presented a graphic map prepared by the Kansas City District that compared CWA (a)(1) waters to RHA Section 10 waters in the district. RHA Section 10 waters in the district totaled 887 stream miles; the addition of CWA (a)(1) waters tripled this to 2476 stream miles. The extent of adjacent wetlands would be expected to increase proportionally.

Many waters identified as "TNWs" under CWA jurisdictional guidance[21], such as inland lakes, have an impact on interstate commerce resulting from tourism, but may have little to no impact on the *transport* of interstate or foreign commerce (as do RHA waters). Examples of determinations made under this jurisdictional federal guidance include Bah Lake (an isolated 70-acre water, maximum depth 10 feet) and Boyer Lake (300-acre 28-feet maximum depth) – both of which are defined as CWA (a)(1) TNWs. Such water bodies are common on the American landscape. While the scale might be different in different states it is clear that there are more CWA (a)(1) TNW waters, and more scattered across the landscape, than are RHA waters. The net effect is that the scope and location of CWA (a)(1) TNW waters are such that having the USACE retain these waters could undermine Congress's intent that the states assume authority over most of the waters within their borders.

Finally, it should be noted that states and tribes have operated for many years under the belief that if they develop a comprehensive wetland/dredge and fill permitting program consistent with federal statute and regulations, they will be eligible to assume that program for all but Section 10 waters (and adjacent wetlands). In order to protect state waters, many states have developed wetland assessment and monitoring programs, wetlands water quality standards, and regulatory processes that would eventually help to provide eligibility for full Section 404 assumption should they choose to pursue that option. ALTERNATIVE C could decrease the value of that investment.

## USACE RECOMMENDATION:
## WATERS ALTERNATIVE C – Section 10 waters plus CWA (a)(1) Waters as Retained Waters.

While the USACE is neutral with respect to state or tribal assumption of Section 404 of the CWA program, the USACE does believe there are valid considerations that must be factored into the determination of which waters must be retained (and ultimately which waters can be assumed by a state or tribe). The USACE believes there should not be a distinction between different uses of the term "navigable waters" under different sections of the statute, and believes this is consistent with the purposes of the CWA and Section 404(g). While the statutory language setting forth the CWA Section 404(g) parenthetical waters slightly differs from the regulatory language of 328.3(a)(1), the USACE believes the interpretation of the term "navigable waters" is the same under 404(g) and 328.3(a)(1) (other than those waters considered navigable based solely on their historic use). The USACE believes TNWs reflect the concept of "navigability" appropriate to ensure the objective of the CWA to restore and maintain the chemical, physical, and biological integrity of the Nation's waters (see "Appendix D: Legal Definition of 'Traditional Navigable Waters'"[22]). The USACE has maintained this position since at least the 2008 post-Rapanos guidance was issued and it is not a "new" position created by the agency for purposes of this subcommittee.

---

[21] Appendix D of the 2007 "US Army Corps of Engineers Jurisdictional Determination Instructional Guidebook" available at: http://www.usace.army.mil/Portals/2/docs/civilworks/regulatory/cwa_guide/app_d_traditional_navigable_waters.pdf

[22] Ibid.

A narrower reading of those waters retained by the USACE under the state assumption program would not take into consideration the evolution of the USACE Regulatory Program since 1977. The USACE must continue to modify its program to reflect changes in law, policy, science, and other considerations, including changes in what waters constitute waters of the US under the CWA.

Different definitions for the term "navigable waters" under different provisions of the same statute could also result in confusion that would not provide clarity for the regulated public. The states and tribes would know the Section 10 waters (as identified by the District lists) as well as the stand-alone TNW determinations made by the Districts. All approved jurisdictional determinations made by the USACE are posted on District websites and are publicly available. Thus, the case-specific TNW determinations that may be included on the retained waters list when the state initiates that process are also available. In conclusion, these lists and waters are known and publicly available and therefore provide clarity to the USACE, the state, and the regulated public.



# 6. Description of Alternatives for Identifying Adjacent Wetlands Assumable by a State or Tribe, and Adjacent Wetlands that Must be Retained by the USACE

The Adjacency work group was established by the Subcommittee to develop alternatives for the identification of wetlands adjacent to the navigable waters being retained by the USACE under an assumed CWA Section 404 permit program. The work group learned that unlike the background information regarding retained waters, there is no conclusive Congressional intent on the meaning of "wetlands adjacent thereto" – i.e., wetlands that must be retained by the USACE.

The work group's initial discussion on adjacent wetlands was influenced by the floor debate between Congressman Bauman and Congressman Clausen on the 1977 amendments to the CWA. During their debate, Congressman Bauman asked about the meaning and extent of adjacent wetlands in Section 404(g). In response, Congressman Clausen stated that he would "interpret the word 'adjacent' to mean immediately contiguous to the waterway." This is the only reference to the meaning of "adjacent" in the context of 404(g) in the entire legislative record.

The work group also considered the use of the word "adjacent" in the USACE's 1975[23] and 1977 regulations defining "waters of the United States." Although the word "adjacent" was being used in the USACE regulations defining

[23] 40 Fed. Reg. 31,320, 31,324, 31, 326 (July 25, 1975).

"waters of the United States" just prior to the 1977 CWA amendments, there are no references to the USACE regulations in the legislation or Committee reports. In addition, the regulatory definition of adjacency was established after the original statutory language, but before final passage, of the 1977 amendments. Because of the timing of the various actions, the Subcommittee could not assume that Congress was aware of the USACE regulatory definition when this section of the statute was written. For most subcommittee members, it is clear, however, that the word "adjacent" in 404(g) was referring to adjacency to RHA waters, which were being retained primarily to foster federal navigation interests. Therefore, while the meaning of adjacent in 404(g) is not certain, the majority of the Subcommittee believes the purpose of adjacent in 404(g) is different than the jurisdictional definition in the USACE "waters of the United States" regulations. "Adjacent" is used in Section 404(g) to allocate permitting responsibilities between the USACE and a state or tribe that is assuming the 404 program, whereas "adjacent" is used in the USACE "waters of the United States" regulations to define the scope of jurisdiction under the CWA. Agencies generally have discretion in making judgments on how to administer their programs, and thus should have some discretion in how they define what is adjacent for purposes of allocating administrative authority between states or tribes and the USACE.

## WETLANDS ALTERNATIVE A:<br>USACE Retains All Wetlands Whether Touching or Not Touching Retained Navigable Waters, Regardless of Furthest Reach

WETLANDS ALTERNATIVE A interprets the word "adjacent" in 404(g) to mean the same as the word "adjacent" in regulations[24] currently being used by the USACE to identify jurisdictional "adjacent" wetlands. Under WETLANDS ALTERNATIVE A, the USACE would retain permitting authority over all wetlands adjacent to retained navigable waters whether or not they are touching retained navigable waters and regardless of their extent (see *Figure 1: WETLANDS ALTERNATIVE A*).

**Figure 1. WETLANDS ALTERNATIVE A**

ALTERNATIVE A would require that the USACE retain expansive wetland systems that are touching a retained water, regardless of their extent. Thus, the specific extent of retained wetlands could not be determined at the time of program assumption and the majority of projects would require a case-by-case field inspection to determine whether the USACE would retain permitting authority.

[24] 33 CFR S328.3(c). ("The term adjacent means bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms beach dunes and the like are 'adjacent wetlands'."

## WETLANDS ALTERNATIVE B: USACE Retains Entirety of Wetlands Touching Retained Waters, Regardless of Furthest Reach

WETLANDS ALTERNATIVE B also relies on the current definition of "adjacent" in the regulations that define "waters of the United States," but under this alternative, the USACE would not retain all "adjacent" wetlands. Rather, it would only retain permitting authority over wetlands touching the waters being retained by the USACE.

Figure 2. WETLANDS ALTERNATIVE B

As discussed in the Origin and Purpose of Section 404(g) section of this report, above, Congress intended that in a case of state or tribal assumption the USACE would retain permitting authority over "Phase I waters" (except waters deemed navigable based solely on historical use, which would be assumable by a state or tribe). Phase I waters were defined in the USACE's 1975 regulations as coastal and inland "navigable waters of the United States" and wetlands "contiguous or adjacent thereto" – i.e., waters subject to regulation by the USACE under Section 10 of the RHA, plus adjacent wetlands. The RHA is designed to protect the navigable capacity of the "navigable waters of the US" and thus requires permits for work in "navigable waters of the US" and work outside "navigable waters of the US ... if these structures or work affect the course, location, or condition of the waterbody in such a manner as to impact on its navigable capacity." WETLANDS ALTERNATIVE B assumes that wetlands touching retained waters have the greatest ability to impact navigability under Section 10 of the RHA and that wetlands not affecting navigability can be assumed by a state or tribe for administrative purposes under the CWA. As a result, wetlands that are "not touching" retained waters could be assumed by a state or tribe (see *Figure 2: WETLANDS ALTERNATIVE B*).

Like WETLANDS ALTERNATIVE A, WETLANDS ALTERNATIVE B would require that the USACE retain expansive wetland systems that are touching a retained water, regardless of their extent. Also similar to WETLANDS ALTERNATIVE A, the specific extent of retained wetlands could not be determined at the time of program assumption and the majority of projects would require a case-by-case field inspection to determine whether the USACE would retain permitting authority.

## WETLANDS ALTERNATIVE C: Establishment of a National Administrative Boundary

WETLANDS ALTERNATIVE C requires the establishment of a national administrative boundary based on a fixed distance from USACE-retained navigable waters (e.g., 100, 300, or 1,000 feet). The boundary would depict the limits of federal program administration and the beginning of state or tribal program administration under an assumed CWA Section 404 permit program.

The establishment of a national administrative boundary to assign regulatory responsibility over adjacent wetlands should build on USACE authorities under the RHA. The RHA was enacted primarily to protect navigation and the

navigable capacity of the nation's waters. Section 10 of the RHA requires that the following regulated activities be approved or permitted by the USACE: placement and removal of structures; work involving dredging; disposal of dredged material; filling, excavation, or any other disturbance of soils or sediments; or modification of a navigable waterway. All of these activities have the potential to affect navigability, further underscoring that the RHA's primary purpose is to protect navigable capacity. Depicting adjacent wetlands retained by the USACE as an administrative distance from retained waters based on existing state-established setbacks, buffers, or a defined elevation as in the case of New Jersey, or other criteria, preserves the USACE's control over waters and wetlands necessary to protect these waters from activities that may adversely impact navigability.

In general, the activities taking place landward of the "ordinary high water mark" (inland) or "mean high water mark" (coastal) that potentially impact navigation and warrant continued regulation by the USACE under an assumed program are those that are likely to generate sediment and debris that reach channels and harbors and affect the navigable capacity of waters used to transport interstate or foreign commerce. Consequently, activities taking place in wetlands adjacent to navigable waters may warrant regulation by the USACE either under the CWA, the RHA, or both. Regulated activities that may impact navigable capacity, however, would likely occur in areas that are in close proximity to the waterways retained by the USACE. Riparian buffers and setbacks are established by many states to, among other purposes, help store floodwaters and prevent sediment transport, directly supporting and preserving navigation. Thus, such state-established boundaries can provide both a practical and a logical basis for the establishment of a national administrative boundary between wetlands retained by the USACE and wetlands assumed by a state or tribe.

The establishment of a national administrative boundary would resolve a number of adjacency issues. The use of an administrative line to assign regulatory responsibility for the implementation of the CWA ensures complete protection of water and wetland resources without confusion or unnecessary duplication, while preserving the USACE's responsibility to protect and maintain navigation under the RHA as required by Congress. Since the boundary defines the landward extent of the adjacent wetlands retained by the USACE, it eliminates the need to determine the extent and connectivity of large wetland systems to allocate administrative authority between the USACE and a state or tribe. The boundary would be established prior to program assumption and incorporated into GIS or other mapping methods to facilitate a state or tribe's assessment of the costs and benefits of assumption. Finally, because WETLANDS ALTERNATIVE C establishes a bright line boundary, the entirety of expansive wetland systems such as those in examples from Alaska, Minnesota, and the Fond du Lac Reservation would not be retained by the USACE. Thus, more wetlands would be assumable than would be the case under other alternatives.

Based on the above discussion, the Subcommittee agreed that a default distance of 300 feet from the retained navigable water would be fully adequate to protect federal navigation interests and could serve as a reasonable national administrative boundary. The Subcommittee identified several possible implementation strategies once this national administrative boundary is established, which are presented below.

### *WETLANDS ALTERNATIVE C1: USACE Retains All Wetlands Touching Retained Navigable Waters and Extending Landward to the National Administrative Boundary*

Under WETLANDS ALTERNATIVE C1, the USACE would retain permitting authority over all wetlands physically "touching" retained navigable waters and extending landward to the national administrative boundary. The state or tribe would assume those wetlands beyond the established boundary. Additionally, wetlands that are shoreward of

the administrative boundary but not "touching" a retained navigable water would be assumed by the state or tribe (see *Figure 3: WETLANDS ALTERNATIVE C1*).

While the administrative boundary would clearly define the extent of USACE retention for large or expansive wetlands, many projects would still require a case-by-case field inspection to determine whether the affected wetland is in fact touching the retained water. This alternative would likely result in the greatest amount of wetlands assumable by a state or tribe, but contains some implementation inefficiencies similar to WETLANDS ALTERNATIVES A and B due to the need for case-by-case field inspections on many projects. For instance, physical separations, such as river berms or beach dunes are dynamic, meaning that this alternative would result in an equally dynamic "sometimes in or sometimes out" scenario that is not conducive to predictability for the public.



Figure 3. WETLANDS ALTERNATIVE C1

*WETLANDS ALTERNATIVE C2: USACE Retains All Adjacent Wetlands Between Retained Waters and the National Administrative Boundary*

Under WETLANDS ALTERNATIVE C2, the USACE retains permitting authority over all wetlands adjacent to retained navigable waters up to the national administrative boundary. The state or tribe would only assume those wetlands beyond the national administrative boundary (see *Figure 4: WETLANDS ALTERNATIVE C2*).



Figure 4. WETLANDS ALTERNATIVE C2

Under this alternative, there is no need for case-by-case field investigations to determine the extent and connectivity of large or expansive wetland systems. The partitioning of administrative authority under Section 404 assumption would be completely separate from issues relating to determining Section 404 jurisdiction, and the farthest reach of all retained wetlands would be known prior to program assumption. WETLANDS ALTERNATIVE C2 provides substantial clarity and certainty for states, tribes, the USACE, and the regulated public.

*WETLANDS ALTERNATIVE C3: USACE Retains All Wetlands Landward to an Administrative Boundary Established During the Development of the Memorandum of Agreement with the USACE, with a 300-foot National Administrative Boundary as a Default*

WETLANDS ALTERNATIVE C3 establishes a 300-foot national administrative boundary up to which the USACE retains permitting authority over all wetlands regardless of whether they are touching retained navigable waters. However, under this alternative, that boundary could shift in accordance with negotiations between a state or tribe and the

USACE during the development of the required MOA with the USACE. The actual boundary could be established to account for the expertise and comprehensive programs of a state or tribe, planning and regulatory authorities, regional or geographic differences, and other local conditions that may affect or complement the CWA Section 404 Program. For example, the 300 foot National Administrative Boundary could be moved up to as close as 75 feet to match up with established building setback requirements, or as far away as 1,000 feet to match up with a broad state shoreland boundary. In the event that negotiations to establish an administrative boundary specific to that state or tribe are unsuccessful, the extent of USACE-retained wetlands default to the 300-foot National Administrative Boundary (see *Figure 5: WETLANDS ALTERNATIVE C3*).

**Figure 5. WETLANDS ALTERNATIVE C3**

This alternative retains the clarity and certainty of WETLANDS ALTERNATIVE C2 and continues to separate assumption from issues relating to determining Section 404 jurisdiction. However, WETLANDS ALTERNATIVE C3 also provides the added benefit of improving the consistency and effectiveness of an assumed program by allowing states or tribes to incorporate Section 404 requirements into existing programs and requirements established to address local resource needs and circumstances.

In formulating WETLANDS ALTERNATIVE C3, which establishes an administrative boundary measured from retained waters to define the limits of a federally-administered Section 404 program and the beginning of a state- or tribally-assumed program, the Subcommittee discussed state or tribal programs that could form the basis for establishing an administrative boundary. For example, a state or tribe may have statutes or regulations for riparian buffers or setbacks. The benefits associated with buffers or setbacks accrue from the existence of appropriate vegetation and their ability to reduce erosion and sedimentation, among other benefits, which benefits are directly linked to navigability. Finally, in addition to existing government programs, the consideration of natural features such as topography, hydrology, or other unique conditions may also influence the location of an administrative boundary and improve the effectiveness and efficiency of an assumed CWA Section 404 permit program.

Criteria for establishing a state or tribal-specific administrative boundary could be developed by the EPA in guidance or regulations, and allow for the recognition and integration of state or tribal-specific programs and circumstances as discussed above, provided the ability to keep nutrients, sediment, or debris from impacting the retained navigable water is maintained. The state or tribe and the USACE would address these criteria during the development of the MOA and, once negotiations were completed, document the rationale for the selected administrative boundary in the MOA.



# 7. Subcommittee Discussion and Recommendations on Identifying Adjacent Wetlands

## MAJORITY RECOMMENDATION: USACE Retains All Wetlands Landward to an Administrative Boundary Established During the Development of the Memorandum of Agreement with the USACE, with a 300-foot National Administrative Boundary as a Default.

After consideration of various options, all recommending Subcommittee members except the USACE representative recommend that the EPA adopt and implement a policy consistent with WETLANDS ALTERNATIVE C3 to differentiate between wetlands retained by the USACE and those assumed by a state or tribe under an assumed Section 404 Program. The majority's reasons for this recommendation include that WETLANDS ALTERNATIVE C3:

- is consistent with the Subcommittee's findings and conclusions about the origin and purpose of Section 404(g);
- establishes an administrative boundary that is consistent with many state and tribal boundaries already established for administrative ease;
- provides states and tribes with the flexibility to adjust the boundary based on their unique circumstances, including but not limited to regulatory authority, topography, and hydrology;

- assures that the USACE is able to maintain navigability as required by the Rivers and Harbors Act;
- allows for the identification and mapping of the administrative boundary prior to program assumption, providing clarity, understanding, and after assumption, ease of implementation;
- uses a process to determine the extent of retained wetlands that is easily distinguished from the process used to determine Section 404 jurisdiction, resulting in improved efficiency, regulatory certainty, and sufficient wetland resources for a state or tribe to assume;
- provides a clear, reasonable, and implementable separation of administrative authority by establishing a clearly demarcated boundary between USACE-retained and state or tribally-assumed wetland areas; and
- maximizes the efficiency and effectiveness of assumed programs by allowing them to be tailored to a state's or tribe's specific circumstances.

Discussion on the justification and rationale for WETLANDS ALTERNATIVE C3 follows, including comparisons to other alternatives when appropriate based on criteria developed by the Adjacency work group.

*CRITERION #1: WETLANDS ALTERNATIVE C3 is consistent with Section 404(g) of the CWA.*

Congress passed 404(g) with the expressed intention that states and tribes would play a significant role in the administration of the Section 404 program. The purpose of section 404(g)(1) is to identify those waters and wetlands that must be retained by the USACE. The legislative history also indicates that the purpose of retention by the USACE is related to RHA Section 10 authorities primarily to maintain navigability and related interests.

WETLANDS ALTERNATIVE C3 is consistent with Congressional intent because it provides clarity on the wetlands for a state or tribe may assume, thereby removing one of the current barriers to assumption. WETLANDS ALTERNATIVE C3 is also consistent with Congressional intent because it establishes an administrative boundary that will ensure that the USACE can protect and maintain navigability and water quality in retained waters.

The unique state-assumed section 404 program administered by New Jersey since 1994 has clearly demonstrated that a state-specific administrative boundary, different from a CWA jurisdictional boundary, is both implementable and consistent with Section 404(g)(1). WETLANDS ALTERNATIVE C3 allows for the establishment of other assumed programs with state-specific or tribal-specific administrative boundaries.

*CRITERION #2: WETLANDS ALTERNATIVE C3 provides a clear, reasonable, and implementable separation of administrative authority.*

The stated charge of the Assumable Waters Subcommittee is to provide advice and recommendations on how to best clarify which waters a state or tribe can assume under an EPA-approved CWA Section 404 program. WETLANDS ALTERNATIVE C3, by establishing a "bright line" administrative boundary, provides needed clarity. The public, states, tribes, and federal agencies can easily identify the appropriate permitting authority at the time an application is submitted.

WETLANDS ALTERNATIVE A (USACE Retains All Wetlands, Whether Touching or Not Touching Retained Navigable Waters, Regardless of Furthest Reach) and WETLANDS ALTERNATIVE B (USACE retains entirety of wetlands touching

retained waters, regardless of further reach) would result in four problem scenarios. First, large wetland complexes can extend tens or even hundreds of miles from the retained water. Examples provided by the states of Alaska and Minnesota demonstrate that using the regulatory CWA jurisdictional definition of adjacency to describe retained wetlands would result in expansive wetland systems being retained by the USACE, leaving fewer wetlands to be assumed by a state or tribe.

Second, wetlands often extend away from navigable waters in intricate and snakelike networks, which could result in a confusing pattern of USACE and state or tribal permitting authority across the landscape. For example, the St. Louis River (a tributary to Lake Superior) forms some of the boundaries of the Fond du Lac Indian Reservation in Minnesota where wetlands comprise 44% of the Reservation. Wetlands adjacent to the St. Louis River, which has been determined to be a navigable water, are interconnected with other wetlands that extend tens of miles away from the river, well beyond other wetlands that are not connected or adjacent to the river.

Third, wetlands adjacent to USACE-retained waters can extend beyond state-assumed waters. For example, the USACE retains a stream with the exception of the upstream portion of it that is beyond the point of navigability (or "head of navigation"), but wetlands adjacent to the retained portion of the stream continue to extend farther up the watershed (a common occurrence, particularly in upstream reaches). Absent some administrative demarcation of which adjacent wetlands would be retained, an awkward situation results where a state or tribe assumes an upstream section of a stream, but the USACE retains its adjacent wetlands.

Fourth, scenarios that require case-by-case field inspections to determine the appropriate regulating authority will reduce the efficiencies of an assumed program.

Prior to assumption, the problems associated with WETLANDS ALTERNATIVES A and B would make it difficult for states or tribes to accurately assess the feasibility and benefits of assumption because the extent of retained wetlands would be unknown or unclear. Lacking a known boundary for retained wetlands, it would require a significant upfront investment for a state or tribe to make an informed decision about pursuing assumption of the 404 program and accurately planning for its development. In the event that a state or tribe assumed the program without having ascertained the boundary, the problem scenarios discussed above would essentially make it more difficult for the state or tribe to deliver on the stakeholder efficiencies anticipated under an assumed Section 404 permit program such as ease of determining administrative control, speed of reaching a permit decision, and other customer service improvements. Use of WETLANDS ALTERNATIVE C3 would eliminate these problems by establishing a standard national boundary.

*CRITERION #3: WETLANDS ALTERNATIVE C3 establishes an administrative boundary that can be consistent with already established state or tribal program boundaries.*

Many states and tribes have already established various boundaries, lines, or demarcations in their state or tribal programs. For administrative ease, these established lines can be used to establish the administrative line for retained and assumable waters. Such an administrative boundary will assure that the USACE is able to maintain navigability as required by RHA waterward of the boundary, while the state or tribe assumes authority to protect wetlands and water quality as required by the CWA landward of the boundary.

*CRITERION #4: WETLANDS ALTERNATIVE C3 provides flexibility to maximize the efficiency and effectiveness of a State- or Tribally-assumed 404 program.*

In WETLANDS ALTERNATIVE C3, under prescriptive guidance or regulations that establish a default administrative boundary (i.e., 300 feet from retained navigable water), states and tribes can still further negotiate the location of the administrative boundary with the USACE during the establishment of the relevant MOA (for example, 75 or 1,000 feet). Unlike WETLANDS ALTERNATIVES C1 and C2, WETLAND ALTERNATIVE C3 allows the parties to establish a boundary taking into account other existing regulatory programs or requirements and the unique landscape characteristics of the state or tribal territory. This could lead to better environmental results, administrative efficiency, clarity for the public and regulators, and a strengthening of the aligned state or tribal program.

WETLANDS ALTERNATIVE C3 also provides states and tribes with the ability to tailor the line to features specific to the state or tribe. In such a large geographically and biologically diverse nation, there are significant differences in landscapes and the nature of our waters and wetlands among the states. WETLANDS ALTERNATIVE C3 allows USACE and the state or tribe to address these regional resource differences and provide an opportunity to utilize the best available information, tools, and procedures. For example, the distance used to establish the administrative boundary could vary based on unique floodplain characteristics of a given waterbody. Focusing on up-front mapping may even encourage the development of improved, more comprehensive inventories and cartography.

*CRITERION #5: Under WETLANDS ALTERNATIVE C3, the administrative boundary for retained wetlands can be identified and mapped prior to program assumption, providing clarity, understanding, and ease of implementation.*

In many cases, the state or tribe would assert continuous permitting authority over all waters and wetlands regardless of whether the USACE also regulates those waters and wetlands. In other cases, a state or tribe may choose to minimize or eliminate permitting duplication entirely and not require a permit for projects permitted by the USACE (i.e., exempt landowners from state or tribal permitting requirements). While in either case, the extent of retained waters and wetlands must be identified, in those instances where a state or tribe exempts federally regulated activities, it is even more important for landowners to know the permitting authority before submitting a permit application (i.e., know the boundary and extent of retained wetlands) because the application will go to either the state, tribe or the USACE. WETLANDS ALTERNATIVE C3 provides a relatively simple and consistent mechanism for identifying the clear boundary of retained wetlands.

The extent of the wetlands retained by the USACE under WETLANDS ALTERNATIVES A and B is not limited by distance. This could make identifying and mapping assumable waters extremely challenging. WETLANDS ALTERNATIVES A and B would often require a case-by-case analysis or the equivalent of a jurisdictional determination of proposed projects to determine the appropriate permitting authority(s).

*CRITERION #6: WETLANDS ALTERNATIVE C3 improves applicant confidence and program effectiveness.*

Absent a map or clearly identified boundary criteria, applicants may not know who the permitting authority is until after their application is submitted. This uncertainty would result in longer or inconsistent permitting timeframes. Regulatory uncertainty also tends to result in less effective regulation. A standardized boundary eliminates permitting barriers. Separating the administrative boundary from Section 404 jurisdiction issues and coupling it with other state and tribal

regulatory programs improves predictability for agencies and applicants. Improved consistency shortens permitting wait times.

### *CRITERION #7: WETLANDS ALTERNATIVE C3 improves decision-making abilities for States and Tribes*

Bounding the extent of retained wetlands allows states and tribes to better assess potential assumption and development of a 404 program. The WETLANDS ALTERNATIVES A and B do not support a consistent and clear basis for states or tribes to determine the extent and location of wetlands they would be assuming.

### *CRITERION #8: WETLANDS ALTERNATIVE C3 identifies retained and assumable wetlands independently of Section 404 jurisdiction*

WETLANDS ALTERNATIVES A and B use the same or similar criteria to determine retained wetlands as are used to determine Section 404 jurisdiction. These alternatives generate confusion between the administrative process of assumption and the CWA jurisdictional determinations of the regulatory program. WETLANDS ALTERNATIVE C3 provides a state or tribe with a well-understood and precise scope of assumable wetlands that should not be affected or confused by changes to CWA jurisdictional definitions. WETLANDS ALTERNATIVE C3 provides regulatory certainty about the agency responsible for 404 permitting, even while certainty may change over whether the activity will require a permit under federal law.

### *Summary of Majority Recommendation*

Congress passed section 404(g) of the CWA to enable a state or tribe to assume section 404 permitting authority over many, but not all, of the "waters of the United States." However, the legislative history relating to retained wetlands does not reveal a conclusive legislative intent about the meaning of "adjacent." What is certain is that the word "adjacent" in 404(g)(1) was focused on adjacency to Phase 1 waters, essentially Section 10 RHA waters. WETLANDS ALTERNATIVE C3 ensures the USACE's ability to maintain navigability as required by the RHA, while the state or tribe (under an assumed program) protects wetlands and water quality as required by the CWA.

It is also clear to the majority of the Subcommittee that the word "adjacent" is used in Section 404(g)(1) for a different purpose than it is used in the "waters of the United States" regulations published by the USACE in 1977. The USACE regulations define the wetlands that are subject to CWA regulation while Section 404(g)(1) describes which entity will exercise permitting authority over them. As a result, the EPA has substantial administrative discretion in allocating administrative authority between states, tribes, and the USACE pursuant to Section 404(g)(1). Since all jurisdictional wetlands will continue to be subject to 404 protections, it is reasonable to use that discretion to establish an administrative boundary that clearly identifies the division of regulatory authority.

WETLANDS ALTERNATIVE C3 is not only consistent with the CWA and legislative history, but it also addresses shortcomings of other alternatives. It provides clarity while still allowing individual states and tribes the ability to tailor the program to their administrative needs and align with other regulatory programs to improve the efficiency and effectiveness of the regulations. WETLANDS ALTERNATIVE C3 clearly separates administrative authority from jurisdiction, resulting in clear, predictable, and implementable administrative boundaries; a reasonable extent of assumable wetlands; and state or tribal programs that are insulated from challenges to 404 jurisdiction.

Under WETLANDS ALTERNATIVE C3, states and tribes will be able to accurately assess the feasibility and benefits of assumption because the extent of retained wetlands will be a known factor. States and tribes can make informed decisions about pursuing an assumed program and plan for its development. Finally, WETLANDS ALTERNATIVE C3 ensures that the regulated public, states, tribes, and federal agencies will know the permitting authority at the time an application is submitted.

## USACE RECOMMENDATION:
## WETLANDS ALTERNATIVE A – USACE Retains All Adjacent Regardless of Furthest Reach

The USACE representative on the Subcommittee proposed WETLANDS ALTERNATIVE A and has written the following section explaining the reasons the USACE favors this Alternative.

Under WETLANDS ALTERNATIVE A, the USACE would retain permitting authority over all wetlands adjacent to retained navigable waters. WETLANDS ALTERNATIVE A uses the definition of adjacent wetlands currently being used by the USACE for regulatory actions under Section 404. Adjacent wetlands are determined in accordance with current regulations and implementing guidance.

With respect to implementing which "wetlands adjacent thereto" should be retained by the USACE under state or tribal assumption, such wetlands would be identified by continuing to use the definition of adjacent wetlands which has not changed since it was originally published in USACE regulations in July 1977. This definition existed at the time Congress passed Section 404(g). It is reasonable to conclude that if Congress had desired to limit the wetlands that are to be retained by the USACE during a program assumption, more restrictive language would have been included in the statute rather than simply using the term "adjacent" which had already been defined and of which the Congress would have certainly been aware. The interpretation of "legislative intent" based on Congressional Committee Reports and floor debates has not provided rationale to support changes in interpretation of the term "adjacent". This alternative inherently satisfies the criterion in the charge to the subcommittee that the recommendation be consistent with the CWA and in particular section 404(g). The USACE has a defined process of determining whether particular wetlands are considered adjacent and USACE personnel are familiar with these procedures. In practice, if a discharge of dredged or fill material is proposed into a wetland that is determined to be adjacent to retained navigable waters, the USACE would be the permitting authority. If it is not, the state or tribe would be. The process of determining whether a particular wetland is adjacent to the retained navigable waters would be agreed upon during development of the MOA. This alternative meets the criterion of providing clarity regarding who is the permitting authority (the state or tribe or the USACE) and it is easily understood and implementable in the field.



# 8. Implementation and Process Recommendations

The Subcommittee also developed additional implementation and process recommendations. These recommendations apply no matter which substantive recommendations are followed. Note that the recommendations below sometimes refer to regulation changes, sometimes to field level guidance, and sometimes to memos. The important point is that the guidance is requested, while it is understood that the form the guidance takes may be different. All recommending members of the Subcommittee support these recommendations. The USACE supports these recommendations, except and unless they contradict their preferred alternatives as described earlier in this report.

## MAINTAIN MICHIGAN AND NEW JERSEY 404 ASSUMED PROGRAMS

Nothing in these recommendations or report is intended to require alterations or changes to the existing assumed programs in Michigan and New Jersey. The Subcommittee recognizes that these two long-standing programs were created through specific state-district negotiations and have established and functional track records.

## DEVELOP GUIDANCE FOR THE FIELD

The Subcommittee recommends that the federal agencies develop guidance or regulations on state and tribal 404 Program assumption. This guidance could be in the form of a memorandum to the field, and/or amendments to current EPA Section 404 State Program Regulations (40 CFR Part 233). The EPA and USACE should develop this guidance jointly, with input from states and tribes, for use by the EPA Regional Offices and USACE districts, as well as

by state and tribal governments. The guidance should enable states or tribes and the USACE districts to distinguish between state- or tribal-assumable waters and those waters where responsibility for 404 permitting is to be retained by the USACE following assumption. It is also important that the guidance carefully differentiate between the legal definition of jurisdictional waters (i.e. waters of the United States), and the assignment of administrative authority based on state- or tribally-assumed waters and USACE-retained waters. The Subcommittee did not determine whether the guidance should be implemented through policy or regulation.

## PROVIDE FLEXIBILITY

The distribution and concentration of waters of the United States, as well as the subset of those waters that may be administered under an assumed Section 404 program, differ greatly across the nation. For example, state or tribal territory can be comprised of coastal zones or arid western regions; they can support larger interstate rivers, or sustain numerous lakes, streams, and wetlands within their territorial boundaries. The extent of waters, the primary hydrologic patterns that dictate the flow and use of waters, and the overall ecology can also vary greatly, as can the type and extent of interstate and foreign commerce transported on the waters within state or tribal territory. This variability requires that the guidance called for above provide states and tribes sufficient flexibility to meet the geographically and programmatically diverse needs of the states and tribes while adhering to CWA section 404 (g)(1).

## INCORPORATE NATIONAL PRINCIPLES AND CONSIDERATIONS INTO FIELD GUIDANCE

Field guidance should incorporate general principles and considerations – arising from the language of Section 404(g), records reflecting Congressional intent, and subsequent federal regulations – that identify the extent of state or tribal assumable waters, and lead to relatively consistent decisions from state to state and tribe to tribe, and certainly within a particular state from the perspective of various agencies. The principles and considerations that should be incorporated into national guidance are listed below.

- Federal agencies should support state or tribal assumption, consistent with Congressional intent. Most Subcommittee members believe, based on the background leading up to the enactment of the 1977 CWA amendments, that Congress intended states and tribes to play a significant role in the administration of Section 404, as they do in other CWA programs, including assumption.
- Program assumption is a partnership between a state or tribe and federal agencies. This partnership enables a state or tribe to not only reduce duplication of state, tribal and federal permitting, but also take full advantage of state, tribal and federal expertise. Provisions of the program assumption regulations ensure an equivalent or greater level of resource protection meeting 404 criteria, provide for federal government oversight, and maintain USACE responsibilities in navigable waters, including adjacent wetlands
- The final list of retained waters prepared by the USACE in accordance with current federal law and regulations should also include input from the state or tribe and the appropriate federal agencies. The list should be available at the signing of the MOA between the state or tribe and the USACE.
- A national methodology should be developed to support the identification of retained waters. The methodology should be flexible and enable a state or tribe and USACE to use the best records, data, and procedures available.

- Tribal lands defined as Indian country, including lands within reservation boundaries, dependent Indian communities, and other lands held in trust for the tribes by the federal government, may be assumed by a tribe if approved by the EPA, but typically may not be assumed by a state.

## PROVIDE GENERAL PROCEDURES FOR THE ASSUMPTION PROCESS

Field level national guidance prepared by the EPA and USACE, with input from states and tribes, should include general procedures to be followed when a state or tribe proposes to assume the Section 404 permit program. The guidance would amend or supplement existing EPA regulations governing the state assumption process in 40 CFR Part 233 by providing a greater degree of specificity about negotiations between a state or tribe and the USACE.

- A state or tribe initiates the 404 Program assumption process with the EPA and the USACE.
- Upon request by a state or tribe that is considering assumption, the USACE District will provide a list and/or map of waters within state or tribal borders that would be retained by the USACE based upon national guidance or regulation.
- The terms used in 404(g)1 such as the “ordinary high water mark” (inland) or “mean high water mark” (coastal) or “mean higher high water mark” (West coast) may require further clarification or definition in the USACE District’s initial listing.
- The USACE list of retained waters provided by the USACE, EPA, and/or the tribe may include waters located on Indian reservation land (unless such waters have already been assumed by a tribe). In many cases, these waters will be retained by the USACE for CWA 404 administration because states will lack authority to regulate activities on Indian reservation lands. Engagement with tribes will be important to determine the extent of these lands.
- Where a tribe is proposing 404 Program assumption, the tribe will prepare a description (list, map) of Indian country lands over which the tribe would request Section 404 program authority. The tribe will coordinate with the EPA and state regulatory authorities and state and federal tribal coordinators in the review of lands that would be under tribal authority.
- The state or tribe will review the retained waters list, and may request additional information from the USACE regarding the basis for including particular waters, if needed. The USACE will make available to the state or tribe any written navigational determinations, court orders, or similar documentation. The state or tribe and the USACE may also agree to modify the list based on more accurate, currently available geographic information. The EPA should participate in this review, to ensure that the list of assumed waters is consistent with the CWA and acceptable at the time the EPA approves assumption.
- The state or tribe and the USACE will include the agreed-upon list of waters for which Section 404 administration must be retained by the USACE in an MOA regarding state or tribal assumption (see 40 CFR §233.14). The MOA will clarify that all other waters will be under the administration of the state or tribe in accordance with 404(g) upon approval of the state or tribal program by the EPA. Descriptions of waters

under state or tribal and federal authority may be based on any data that are available and useful to the public, including lists, maps, descriptions, digital geographic information, etc.

- The MOA between the state or tribe and the USACE should include provisions to amend the MOA and the attached lists of state or tribal and federal authority at such time as the status of a particular water is modified due to improvements, legal decisions, or other pertinent changes (such as natural events which significantly alter the condition of a waterway). If desired, a regular period for review may be established.
- The field guidance should establish a dispute resolution procedure to be followed if a state or tribe and the USACE district are not able to complete the list of retained waters as part of the MOA development within a reasonable amount of time. This dispute resolution process should be developed by the EPA and USACE.

## UTILIZE BEST AVAILABLE TECHNOLOGY

The Subcommittee recommends that retained waters and adjacent wetlands, to the greatest extent practicable, be identified on an appropriate map or geographic information system for administrative purposes. This will provide readily available information to regulatory agencies, as well as the general public, applicants and other interested parties. In support of this recommendation, the Subcommittee encourages states, tribes, and USACE districts to use the best available technologies, such as LiDAR (Light Detection and Ranging) remote sensing, drones, and other tools during the development of the MOA between a state or tribe and the USACE district.



# Appendix A: Tribal Findings, Issues, and Considerations during Assumption

Section 518 of the CWA, enacted as part of the 1987 amendments to the statute, authorizes the EPA to treat eligible Indian tribes in a manner similar to states ("treatment as a state" or TAS) for a variety of purposes, including administering each of the principal CWA regulatory programs and receiving grants under several CWA authorities (81 FR at 30183). This includes CWA Section 404.

The Subcommittee, with the leadership of its two tribal participants, identified a set of "Tribal Issues" that the EPA, USACE, states, tribes and other interested parties should be aware of when considering assumption under CWA Section 404(g)(1). It should be noted that there may be specific jurisdictional and other legal matters that are in dispute within specific states and with specific tribes. The EPA may need to consider these issues as it addresses any application for assumption of the program.

## USACE RETAINS INDIAN COUNTRY AQUATIC RESOURCES

The EPA-approved state assumed programs generally would not extend to waters and wetlands within Indian country. Instead, such areas would generally continue to be administered by USACE, at least until such time that a tribe is approved by the EPA to assume the 404 program itself.[25] This retention of administration by USACE should be outlined in any MOA between the USACE and the state when such state wishes to assume the 404 program.

[25] See 40 CFR 233.1(b).

## INDIAN RESERVATION BOUNDARIES

Tribal Indian Reservation boundaries are not necessarily static; for instance, additional lands can be added to reservations and new reservations can be created. As stated in the Indian Reorganization Act of 1934 "The Secretary of the Interior is hereby authorized to proclaim new Indian reservations on lands acquired pursuant to any authority conferred by this Act, or to add such lands to existing reservations: Provided, that lands added to existing reservations shall be designated for the exclusive use of Indians entitled by enrollment or by tribal membership to residence at such reservations," (25 US Code Section 467) and as provided by the Bureau of Indian Affairs regulations (25 CFR Section § 151.3, 151.10, and 151.11).

In addition, Indian Reservations can have varied land ownership patterns. Some Indian reservations consist solely of lands that are held in trust status with the United States. Other reservations may have mixed ownership of property within the reservation (including tribal, public and private ownership). Mixed ownership and trust status within reservations can occur for a variety of reasons including land inheritance, when and how the reservation was established, and treatment of the reservation by Congress as interpreted in court decisions. The EPA has interpreted CWA section 518 as including a delegation of authority by Congress to eligible Indian tribes to administer regulatory programs under the statute over their entire reservations, irrespective of who owns the land 81 FR 30183 (May 16, 2016).

## LANDS OUTSIDE OF THE RESERVATION

In CWA Section 518(e)(2), the phrase "…or otherwise within the borders of an Indian reservation." is interpreted to modify each category of land (*i.e.*, "…held by an Indian tribe, held by the United States in trust for Indians, held by a member of an Indian tribe if such property interest is subject to a trust restriction on alienation…").[26] Thus, any land that an Indian tribe wishes to regulate under the CWA – including under section 404 – must qualify as Indian reservation land as used in CWA 518. Such lands must therefore be located within the exterior boundaries of a formal Indian reservation, or qualify as an informal Indian reservation – *e.g.*, tribal trust lands located outside the boundaries of a formal reservation or Pueblos. Thus, privately owned reservation lands that are part of the reservation should generally be excluded from assumed state programs, and thus retained by USACE), or could generally be assumed by the relevant tribe.

Lands can be brought into trust at various times, before or after a state or tribe has assumed a 404 program, and trust lands can create a patchwork of assumed and retained waters. Thus, cooperative relationships and agreements should be developed between the federal agencies, states and tribes in order to appropriately administer the program. Therefore, the assumption MOAs between the states or tribes and the EPA and the USACE should contain language on how changes in the trust status of Indian land is going to be handled.

[26] See Preamble to the Clean Water Act Treatment As a State – TAS rules at 56 FR 64881 and 58 FR 8177). (See also CWA Section 518(e)(2).



# Appendix B:  Michigan and New Jersey's Assumed Programs

## CASE STUDY OF MICHIGAN PROGRAM

Michigan has a long history of leadership in environmental protection and management, beginning with passage of a state water pollution control statute in 1929.  So with passage of the Federal Water Pollution Control Act Amendments of 1972, Michigan began working to align state programs with the new federal regulations to enable Michigan to administer the CWA programs.  Michigan was delegated authority to administer the Section 402, National Pollution Discharge Elimination Program in 1973.  In 1972 Michigan also passed an inland lakes and streams statute that established dredged or fill regulations over inland waters.  Regulations over dredged or fill activities and bottomland occupations within the Great Lakes had been in place since 1955.

During the 1970's as the federal agencies were developing implementation guidelines and regulations, and Congress was considering amendments to the CWA, Michigan began development of a wetland program and was building a partnership with the USACE.  Michigan and the USACE signed an agreement in 1977 to use a joint permit application form for projects within all state and federally regulated waters, and to coordinate public hearings when required for those projects.  Over the next several years, the agencies continued to align the state and federal programs to improve efficiency and reduce duplication, including issuance of additional federal general permits and state statutory amendments.  Following passage of the 1977 CWA amendments that added Section 404(g)(1), Michigan passed a wetland statute in 1979 with the intention of assuming the Section 404 program.

In 1981 the agencies entered into two additional agreements to streamline the state and federal programs.  The first was an agreement to coordinate enforcement actions and after-the-fact permitting procedures.  The second was

an agreement to share staff resources; this agreement allowed the state to place staff in locations throughout the state to conduct site reviews for both state and federal permits, in exchange the USACE provided joint staff training, reimbursed state travel costs, and funded the development of public outreach materials.

This effort laid the groundwork for assumption of the 404 program. Michigan formally requested assumption in 1983 and the Environmental Protection Agency (EPA) approved the program the same year. With the signing of the USACE Memorandum of Agreement (MOA) in 1984, which identified the retained waters, Michigan became the first state to assume the 404 program[27].

### *The EPA and USACE Memoranda*

The 1983 MOA with the EPA provided the framework for Michigan's administration of the 404 program. The agreement specifies the state's responsibilities for permitting and enforcement, the federal oversight responsibilities including procedures for federal review of certain permit applications, and state program reporting requirements. The categories of permit applications which the EPA did not waive federal review under Section 404(j) are specifically defined; they include proposed state general permit categories and major discharges of dredged or fill material. Major discharges are further defined and include: discharges of toxic pollutants or hazardous substances; impacts to unique waters for a geographic region, commercial or recreational values of a significant area, or endangered or threatened species; and wetland fills, breakwater or seawall construction, or culvert enclosures of specified volumes and sizes.

Michigan's program agreement with the EPA was updated in 2011 after an extensive review of Michigan's program and nearly three decades of program changes at both the federal and state level. The updated agreement is substantially the same as the original agreement, with new language added to clarify responsibilities for coordination with other states and tribes, coordination with federal agencies for mitigation banks, and streamlining of reporting requirements.

The 1984 MOA with the USACE identifying retained waters is still in effect. In defining waters to be assumed by the state and the waters to be retained by the USACE the MOA simply states that all waters within the state are assumed other than waters identified by the language in 404(g)(1). The MOA quotes the 404(g)(1) language, and then states that those waters are identified on an attached list of "Navigable Waters of the United States in US Army Engineer District, Detroit, November 1981". The list of navigable waters of the United States identifies specific waterways by name and location, and identifies the head of navigation that is the upstream limit of the USACE's retained authority under the 404 program.

### *Current Status of Michigan's Program*

Michigan has been successfully implementing the 404 program for over 3 decades. But implementation requires continual coordination with the federal agencies. State staff screen each permit application to determine if the proposed project is located within assumed or retained waters. If the project is in a retained area, a copy of the application is forwarded to the USACE. Michigan still regulates all waters and wetlands throughout the state, so applications within retained waters are coordinated with the USACE. All application information is shared between

[27] 49 FR 38948, Oct. 2, 1984. Redesignated at 53 FR 20776, June 6, 1988. Redesignated at 58 FR 8183, Feb. 11, 1993. Effective date, October 16, 1984.

the agencies, site inspections are coordinated when appropriate, and permit conditions and mitigation requirements are coordinated to avoid conflicts and inconsistencies. Since Michigan has a robust wetland mitigation program and the state can own property, hold conservation easements, and hold financial instruments, state staff normally take the lead in negotiating and reviewing mitigation proposals. The state and USACE also coordinate compliance and enforcement actions within retained waters to reduce duplication and prevent conflicting compliance requirements.

Coordination with the United States Fish and Wildlife Service (US FWS) is also a necessary part of the program. State staff are responsible for screening applications for potential impacts to threatened and endangered species and coordinating with US FWS and state endangered species staff. State staff also work with US FWS to develop species specific screening criteria, permit conditions and best management practices.

State staff work continuously with the EPA staff to coordinate review of major discharge applications, new or revised general permit categories, major enforcement actions, and all statutory, rule or policy changes that affect the 404 program. The state has one staff person who is designated as the 404 program liaison to streamline communication between the agencies.

Annually Michigan processes approximately 3,000 to 4,000 permit applications under the 404 program in assumed waters. Normally 60 to 70 percent of those projects fall within the state's general permit categories. Typically, the EPA reviews one to two percent of the total applications because they fall within the major discharge categories described in the state's MOA with the EPA. In addition, state staff investigates and takes action on approximately 1000 to 1500 reports of non-compliance.

## CASE STUDY OF NEW JERSEY PROGRAM

New Jersey is the most densely populated state in the nation with a population of 8,958,013 in 8,721.3 square miles or 1,195.5 people per square mile (2015 Statistics from the US Census). As a result, New Jersey faces many environmental issues in advance of other states and has developed an active and vocal grass roots environmental movement.

As early as 1917, New Jersey enacted a Waterfront Development law to protect navigation and ensure adequate dockage for shipping along the coast. In 1929, the state began protecting streams under the Flood Hazard Area Control Act which regulated structures placed within the natural waterway of any stream. The New Jersey Department of Environmental Protection was created on the first Earth Day, April 22, 1970. That same year, New Jersey passed the Coastal Wetlands Act.

In response to passage of the 1972 Federal Coastal Zone Management Act, in 1973 New Jersey passed the Coastal Area Facility Review Act. In 1977, the state's Pinelands Preservation Act began protecting from development a unique area in the southern part of New Jersey. It also prohibited development in freshwater wetlands.

New Jersey does not have its own USACE District. The state is served by the New York District, located in New York City and serving New York state and the eastern portion of New Jersey; and the Philadelphia District, located in Philadelphia, Pennsylvania and serving Pennsylvania and the western part of New Jersey. In the 1980s, the USACE program included Nationwide permits which were self-regulating and that allowed up to 10 acres of impacts per

permit. New Jersey used its Water Quality Certificate authority to try to limit the impacts. However, a review by the US Fish and Wildlife Service of 40 wetland fill cases in northern New Jersey between 1980 and 1984 documented approximately 800 acres of wetland impacts resulting from illegal filling, Nationwide permits, and Individual permit activities.

In the mid-1980s, environmental groups in New Jersey united with the goal of obtaining a state freshwater wetlands protection law. On June 8, 1987, Governor Tom Kean enacted a building moratorium prohibiting all development in wetlands until passage of a wetland law. On July 1, 1987, New Jersey passed the Freshwater Wetlands Protection Act (FWPA), effective July 1, 1988.

The law contained a provision, directing the state to "take all appropriate action to secure the assumption of the permit jurisdiction exercise by the United States Army Corps of Engineers pursuant to the Federal Act." (NJSA 13:9B-27) To fulfill this mandate, the statute was structured to give the state the necessary authority to assume the Federal permitting program. In addition, the state legislature appropriated sufficient funds for the Department of Environmental Protection to staff and equip a statewide, freshwater wetlands regulatory program independent of the USACE.

New Jersey submitted an application for assumption to the EPA in 1993. The program was approved and New Jersey became the second state to implement an assumed Federal 404 program in 1994.

### *MOA with the EPA*

As required by the Federal Transfer Regulations[28], New Jersey signed a memorandum of agreement with the EPA. In addition to those projects that continue to require Federal review in accordance with the EPA transfer regulations, New Jersey agreed that the following project types would also continue to get Federal review under its assumed program:

- Filling of 5 or more acres of wetlands;
- Significant reduction in ecological, commercial or recreational value of 5 or more acres;
- Culverts longer than 100 feet;
- Channelization of more than 500 feet of river or stream.

### *MOA with the Army USACE*

As required by the Federal Transfer Regulations, the State of New Jersey signed a memorandum of agreement with the USACE[29]. The state and the USACE agreed to the following definition to distinguish assumed and non-assumed waters:

> "All waters of the United States, as defined at 40 CFR Section 232.2(q), within the State of New Jersey will be regulated by NJDEP as part of their state program, with the exception of those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to

[28] 40 CFR Part 233: 404 State Program Regulations

[29] 59 FR 9933, Mar. 2, 1994

transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. *For the purposes of this agreement, the USACE will retain regulatory authority over those wetlands that are partially or entirely located within 1,000 feet of the ordinary high water mark or mean high tide of the Delaware River, Greenwood Lake, and all water bodies which are subject to the ebb and flow of the tide.*"

The "1,000 feet" criterion had two sources. First, the USACE traditionally took jurisdiction to elevation 10 in coastal areas in New Jersey under the Rivers and Harbors Act. They consider any wetlands and/or waters located between the water and 10 feet above sea level to be navigable waters or "wetlands adjacent thereto." They estimated that on average, the distance from the Mean High Water Line landward to 10 feet above sea level is approximately 1,000 feet. In addition, the state's wetland maps were drawn at a scale where one inch equals 1,000 feet. Therefore, the state and the USACE agreed to use 1,000 feet from the ordinary high water mark or mean high tide as the division between waters to be retained (regulated by both agencies), and those to be assumed (regulated by the state alone).

### *MOU with the US Fish and Wildlife Service*

The US Fish and Wildlife Service (FWS) opposed assumption by the State of New Jersey. In order to assuage their concerns, the state voluntarily signed a memorandum of understanding (MOU) with both the EPA and FWS. The MOU requires the state to provide certain applications directly to the FWS for review if they are located within municipalities known to contain federally-listed threatened or endangered species.

### *Coordination with State Historic Preservation Office (SHPO)*

As part of its assumed program, the state also screens applications for referral to the SHPO to comply with Section 106 of the National Historic Preservation Act (16 USC Section 470(f)).

### *Current Status of Program*

The state of New Jersey reviews all incoming wetlands/waters permit applications regardless of whether they are in assumed or non-assumed waters. The state also conducts jurisdictional determinations throughout most of the state. The state prescreens incoming permit applications to identify projects constituting "major discharges," which are then sent to the EPA for Federal review. In addition, if a permit application falls within one of the identified municipalities with federally-listed threatened or endangered species, and constitutes one of the permit types of concern to the FWS, the state screens the application and sends a copy to the FWS. The FWS returns comments to DEP and the EPA for consideration. If the state cannot satisfy FWS concerns, the project begins a new review with the EPA through the "major discharge" process. The state cannot approve a Section 404 permit over the EPA objections.

In those cases where a project is in a non-assumed water, the state issues its state permit independently of the USACE. However, monthly coordination meetings with the USACE let the agencies compare information on projects under review by both agencies. In addition, the agencies coordinate required mitigation. New Jersey also reviews and approves mitigation banks independently in assumed areas. In non-assumed areas, the state is a member of both the New York and Philadelphia USACE Interagency Review Teams.

The state also conducts compliance and enforcement for violations in non-assumed waters.

Over the years, the state has made between 550 and 2,000 permit decisions annually. Of these, on average fewer than 10 applications per year require coordination with the EPA as "major discharges," approximately 80 per year required FWS review, and between 225 and 250 are coordinated with the State Historic Preservation Office.

In addition, the state's Enforcement Bureau has undertaken an average of 1,000 actions annually on reports of non-compliance.



# Appendix C: Letter from the Association of Clean Water Administrators, the Environmental Council of the States, and the Association of State Wetland Managers

  

April 30, 2014

Nancy K. Stoner
Acting Assistant Administrator for Water
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, NW (4101M)
Washington, DC 20460

Via email to: stoner.nancy@epa.gov

Dear Acting Assistant Administrator Stoner:

Re:  Assumable Waters under Clean Water Act Section 404

In the rule proposed by the U.S. Environmental Protection Agency (EPA) and the U.S. Army Corps of Engineers (Corps) regarding the scope of the definition of "waters of the United States," a statement in the preamble explains that the rule does not affect the scope of waters subject to state assumption in accordance with §404(g).  79 Fed. Reg. 22,188, p. 22,200 (April 21, 2014).  The undersigned organizations appreciate that such language was included in the proposed rule addressing this critical aspect of state §404 program assumption.

We agree with the preamble statement in the rule that "[c]larification of waters that are subject to assumption by states or tribes or retention by the Corps could be made through a separate process under section 404(g)" (ibid).  We recommend that steps to further clarify the scope of assumable and non-assumable waters be initiated in a timely manner.  We are concerned that states currently considering assumption are having difficulty making progress because of the current uncertainty.

We would appreciate the opportunity to actively engage in a discussion with EPA to address this issue.  Our organizations recognize that any steps toward clarification must be undertaken thoughtfully in accordance with the provisions of §404(g), and without altering the existing state 404 programs in Michigan and New Jersey.

Clear identification of assumable and non-assumable waters has been made more difficult by legal decisions that address terms such as "navigable" and "adjacent."  Nonetheless, Congress intended that states be able to assume regulatory responsibility for the majority of waters within their boundaries.  Clarification of assumable waters will help to facilitate state assumption where it is desired – providing benefits to the public, the resource, and the state and federal agencies.

Under §404 of the Clean Water Act – all waters regulated by the Corps or by a state/tribal program – are deemed "waters of the United States." We believe that "other waters," as well as some portion of both "navigable waters," and "adjacent wetlands" may be administered by a state or tribe in accordance with 404(g).  We look forward to discussions with EPA to explore this very important area of public policy.

Our goal is to work collaboratively to discern the criteria that will be used by a state/tribe, EPA, and the Corps to identify assumable/non-assumable waters pursuant to §404(g). We would also like to reach agreement on how to formalize these criteria (e.g., Memorandum of Understanding). Several steps may be needed to address both the immediate concerns of states pursuing assumption and the needs of those that may do so in the future.

Our organizations are committed to supporting state efforts to assume the Section 404 program by identifying issues and working with partners to resolve them. See, for example, ECOS Resolution #08-3 on State Delegation of the Clean Water Act Section 404 Permit Program – originally approved in 2008 – was on April 2, 2014 reaffirmed, with the addition of the following language: "[NOW, THEREFORE, BE IT RESOLVED THAT THE ENVIRONMENTAL COUNCIL OF THE STATES] Encourages U.S. EPA to work with states to bring clarity and certainty to the identification of assumable and non-assumable waters."

We look forward to a timely and productive discussion with you. Please contact Jeanne Christie of ASWM at 207-892-3399 or jeanne.christie@aswm.org, to discuss this request. Thank you again for your attention to this matter.

Sincerely,

Alexandra Dapolito Dunn
ECOS

Sean Rolland
ACWA

Jeanne Christie
ASWM

Cc: Ken Kopocis, EPA
Benita Best-Wong, EPA
Jim Pendergast, EPA
Bill Ryan, OR DSL
Ben White, AK
Eric Metz, OR DSL
Ginger Kopkash, NJ
Bill Creal, MI



# Appendix D: List of Subcommittee Members

COLLIS G. ADAMS, CWS, CPESC
Wetlands Bureau Administrator
New Hampshire Department of Environmental Services
Land Resources Management

VIRGINIA S. ALBRECHT
Special Counsel
National Association of Home Builders
Hunton & Williams LLP

CRAIG W. AUBREY
Chief, Division of Environmental Review
Ecological Services Program
US Fish and Wildlife Service Headquarters
Ecological Services, MS: ES

TREVOR BAGGIORE
Division Director, Water Quality
Arizona Department of Environmental Quality

LAUREEN MONICA BOLES
NACEPT Liaison

PEG BOSTWICK
Senior Policy Analyst
Association of State Wetland Managers
Great Lakes Office

DAVID L. DAVIS, CPWD, PWS
Director, Office of Wetlands & Stream Protection
Virginia Department of Environmental Quality

JAMES P. DENOMIE
Tribal Consultant
Tribal Member of Bad River Chippawa Tribe
of Lake Superior
Midwest Alliance of Sovereign Tribes

TOM DRISCOLL
Government Relations Representative
National Farmers Union

DAVID S. EVANS, DEPUTY DIRECTOR
Co-Chair of the Subcommittee
Office of Wetlands, Oceans, and Watersheds
USEPA OWOW *(resigned as of 12-9-2016 due to employment change)*

KIMBERLY FISH
Assistant Division Chief
Michigan Department of Environmental Quality
Water Resources Division

RICHARD D. GITAR
Water Regulatory Specialist/Tribal Inspector
Office of Water Protection
Fond du Lac Reservation

JAN GOLDMAN-CARTER
Director of Wetlands and Water Resources,
National Wildlife Federation
National Advocacy Center

MICHELLE HALE
Director, Division of Water
Alaska Department of Environmental Conservation

WILLIAM L. JAMES
US Army Corps of Engineers National Mining Expert

LES LEMM
Wetlands Section Manager
Minnesota Board of Water and Soil Resources

SUSAN D. LOCKWOOD
Environmental Specialist 4
New Jersey DEP Division of Land Use Regulation

ERIC D. METZ, P.W.S.
Planning and Policy Manager
Aquatic Resource Management Program
Oregon Department of State Lands

BARRY RABE, PH.D
Co-Chair of the Subcommittee
Director of the Center for Local, State, and Urban Policy
Gerald R. Ford School of Public Policy
University of Michigan

DAVE ROSS
Senior Assistant Attorney General
Wyoming Attorney General's Office
Water & Natural Resources Division *(resigned as of 5-16-2016 due to employment change)*

GARY T. SETZER
Policy Advisor, Office of the Secretary
Maryland Department of the Environment

MICHAEL J. SZERLOG, MANAGER
Aquatic Resources Unit
Office of Environmental Review and Assessment,
Environmental Protection Agency, EPA Region 10



# Appendix E:  Subcommittee Charter

## INTRODUCTION

Section 404(g) of the Clean Water Act (CWA) lays out the requirements for the assumption and implementation of state and tribal CWA section 404 permitting programs.  Congress, with the addition of CWA section 404(g), made clear that states and tribes wishing to assume administration of the dredge and fill permit program, could do so for certain waters.  This Subcommittee under the National Advisory Council for Environmental Policy and Technology (NACEPT) will focus on a very narrow and specific charge related to which waters a state or tribe assumes permitting responsibility for under an approved CWA section 404 program and for which waters the US Army Corps of Engineers (USACE) will retain CWA section 404 permitting authority.  To be known as the "Assumable Waters Subcommittee," (Subcommittee), the Subcommittee will be asked to provide advice and develop recommendations on how the US Environmental Protection Agency (EPA) can best clarify for which waters the state/tribe has CWA section 404 permit responsibilities, and for which waters the USACE retains CWA section 404 permit responsibility, under an approved state/tribal program.  This effort is part of the Administrator's priorities as it supports states and tribes seeking to assume the CWA section 404 program by providing clarity on the scope of waters for which they would be responsible for administering the CWA section 404 program.  Specifically, this effort will address the states' request to provide clarity on this issue enabling them to assess and determine the geographic scope and costs associated with implementing an approved program.

## BACKGROUND

The NACEPT is a Federal Advisory Committee chartered under the Federal Advisory Committee Act (FACA), Public Law 92–463.  The EPA established the NACEPT in 1988 to provide advice to the EPA Administrator on a broad

range of environmental policy, management, and technology issues. The EPA is now seeking to form a subcommittee under the NACEPT, to be known as the Assumable Waters Subcommittee (Subcommittee) to provide advice on how the EPA can best clarify the waters that a state or tribe may assume permitting responsibility for under an approved CWA dredge and fill permit program. Subcommittee members, like the parent NACEPT committee, serve as representatives from academia, industry, non-governmental organizations, and federal, state, tribal, and local governments.

The Subcommittee is being formed to provide advice and recommendations concerning a focused, but critical, aspect of implementing the CWA section 404 program for the discharge of dredge and fill materials. The USACE currently evaluates CWA section 404 permit applications for activities in the majority of the nation's waters subject to the CWA. Although states and tribes may assume the dredge and fill permit responsibilities pursuant to section 404(g) of the CWA, only two states (Michigan and New Jersey) and no tribes have assumed such responsibility to date. When a state or tribe considers assuming such responsibilities, among the first questions that needs to be answered is for which waters will the state or tribe assume permitting responsibility and for which waters will the USACE retain permitting authority. States have raised concerns to the EPA that section 404 of the CWA and its implementing regulations lack sufficient clarity to enable states and tribes to estimate the extent of waters for which they would assume program responsibility and thus calculate associated program implementation costs.[30] The lack of clarity on these questions has been identified by the states as a challenge to pursuing assumption as envisioned under the CWA.[31]

The Subcommittee will have a limited duration and narrow focus. Other aspects of state or tribal assumption will not be within the scope of the deliberations for this Subcommittee. For example, the Subcommittee will not be deliberating on the merits of assumption, nor on any aspect of the larger question of which waters are "waters of the US." It will focus on how the EPA can clarify the waters for which a state or tribe assumes CWA section 404 permitting responsibility and for which waters the USACE will retain this authority.

## CHARGE TO THE SUBCOMMITTEE

The final Subcommittee report to NACEPT should provide advice and recommendations to EPA on how to clarify for which waters states and tribes will assume CWA section 404 permitting responsibilities, and for which waters the USACE will retain permitting authority. The recommendations should reflect consideration of the following assumptions:

1. A CWA section 404 permit is required – meaning there is an activity regulated under section 404 that will result in a discharge of dredge or fill material to a Water of the US
2. Any recommendation must be consistent with the CWA and in particular section 404(g)
3. Clarity regarding who is the permitting authority (the state/tribe or the USACE) should be easily understood and implementable in the field

[30] Environmental Council of States, the Association of Clean Water Administrators, and the Association of State Wetland Managers letter. April 30, 2014. Letter can be found in the docket.

[31] Ibid

## PROPOSED SCHEDULE

The Subcommittee will meet approximately four to six times following initiation of the group for twelve to sixteen months face-to-face or via video/teleconference. Additionally, members may be asked to participate in ad hoc workgroups to develop potential policy recommendations and reports to address specific issues.

Tentative meeting schedule (subject to change):

- September 2015 – Meeting 1
- December 2015 – Meeting 2
- Late February 2016 – Meeting 3
- April 2016 – Meeting 4
- June 2016 – Meeting 5
- September 2016 – Meeting 6 (if needed) to finalize recommendations to NACEPT



# Appendix F: The Legislative History of Section 404(g)(1) of the Clean Water Act[32]

## INTRODUCTION

Section 404 of the Clean Water Act (CWA) authorizes the US Army Corps of Engineers (the USACE) to issue permits for the discharge of dredged or fill material into "navigable waters."[33] Pursuant to section 404(g)(1), States, with approval from the Environmental Protection Agency (EPA), may assume authority to administer the 404 permit program in some but not all navigable waters. The waters that a state may not assume, and which the USACE must retain even after a state has assumed the program, are defined in a parenthetical phrase in section 404(g)(1) as:

(… those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto) …[34]

This memorandum explores the meaning of this parenthetical language by reviewing the legislative history of the 1977 CWA amendments that led to section 404(g)(1). The legislative history summarized below includes the reports of the House Committee on Public Works and Transportation and the Senate Committee on Environment and Public Works, passages from earlier versions of both the House and Senate bills, and excerpts from the Conference

[32] Prepared by Virginia S. Albrecht, Jan Goldman-Carter, and Dave Ross

[33] 33 USC § 1344(a).

[34] 33 USC § 1344(g)(1).

Report regarding the final language of the amendments. After careful review of this material, it is clear that the waters Congress intended the USACE to retain after a state assumed 404 authority are: (1) the waters identified by the USACE as Phase I waters in its 1975 regulations, except for those navigable waters of the United States deemed navigable based solely on historic uses, and (2) wetlands adjacent to the retained Phase I waters.[35]

## HISTORY OF SECTION 404(g)(1)

*Responding to a court order, the USACE proposes to expand its definition of navigable waters for section 404.*

After the CWA was enacted in 1972, the USACE promulgated regulations defining the CWA term "navigable waters" synonymously with the RHA term "navigable waters of the United States." The National Wildlife Federation and the Natural Resources Defense Council challenged the USACE' CWA definition, and in March 1975 the District Court for the District of Columbia ordered the USACE to issue new regulations broadening the definition to accord with the broader water quality purposes of the CWA.[36] On July 25, 1975, in compliance with the court order, the USACE issued revised regulations creating a phased schedule for expanding the program, as follows:

- *Phase I:* [effective immediately] discharges of dredged material or of fill material into coastal waters and coastal wetlands contiguous or adjacent thereto or into inland navigable waters of the United States[37] and freshwater wetlands contiguous or adjacent thereto are subject to … regulation.
- *Phase II:* [effective July 1, 1976] discharges of dredged material or of fill material into primary tributaries, freshwater wetlands contiguous or adjacent to primary tributaries, and lakes are subject to … regulation.
- *Phase III:* [effective after July 1, 1977] discharges of dredged material or of fill material into any navigable water [including intrastate lakes, rivers and streams landward to their ordinary high water mark and up to the headwaters that are used in interstate commerce] are subject to … regulation.[38]

---

35 As described below, Phase I waters were understood to be "navigable waters of the United States" already regulated by the USACE under section 10 of the Rivers and Harbors Act (RHA), plus adjacent wetlands.

36 *Nat. Res. Def. Council, Inc. v. Callaway*, 392 F. Supp. 685 (D.D.C. 1975). The CWA defines the term "navigable waters" to mean "the waters of the United States." At the time the CWA was passed, the USACE had been regulating "navigable waters of the United States" under the Rivers and Harbors Act for more than 100 years. The strikingly similar language in the two statutes led to confusion. The USACE' initial post-CWA regulations treated the terms synonymously. 39 Fed. Reg. 12,115, 12,119 (Apr. 3, 1974). But the two statutes had different purposes – the RHA was focused on maintaining navigable capacity, the CWA on water quality. And the CWA Conference Report stated that the "term 'navigable waters' [should] be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes." S. Rep. No. 92-1236, at 144 (1972), *reprinted in* Comm. on Pub. Works, 93d Cong., 1 A Legislative History of the Water Pollution Control Act Amendments of 1972, at 281, 327 (Jan. 1973).

37 The term "navigable waters of the United States" is a term of art used to reference waters subject to the USACE jurisdiction under the RHA. The USACE defined the term in the 1975 regulations as "waters that have been used in the past, are now used, or are susceptible to use as a means to transport interstate commerce landward to their ordinary high water mark and up to the head of navigation as determined by the Chief of Engineers, and also waters that are subject to the ebb and flow of the tide shoreward to their mean high water mark…. See 33 CFR 209.260 … for a more definitive explanation of this term." 40 Fed. Reg. 31,320, 31,324 (July 25, 1975). The regulatory cross-reference included in this definition was to the USACE' then current RHA regulations. Those regulations emphasized that, "[p]recise definitions of 'navigable waters' or 'navigability' are ultimately dependent on judicial interpretation, and cannot be made conclusively by administrative agencies." 33 CFR § 209.260(b) (1973). Those regulations were later updated, and now read "[p]recise definitions of 'navigable waters of the United States' or 'navigability' are ultimately dependent on judicial interpretation and cannot be made conclusively by administrative agencies." 33 CFR § 329.3 (2015).

38 40 Fed. Reg. at 31,326.

*Responding to the USACE' regulations, the House Committee on Public Works writes a bill to limit 404 jurisdiction to Phase I waters.*

Reviewing the new USACE regulations, the House Committee on Public Works and Transportation expressed concern that "full implementation of this permit program under the new regulations would have a dramatic effect on the overall Corps of Engineers permit program."[39] The Committee Report noted that permits under the RHA numbered close to 11,000 per year and were expected to remain constant, but the new 404 regulations would increase 404 applications from 2,900 to 30,000 per year as Phases II and III became effective.[40] The Committee was concerned that the expanded 404 program "will prove impossible of effective administration and … discourage the States from exercising their present responsibilities in protecting water and wetland areas."[41] The Committee report stated that environmental protection should be a shared responsibility of the States and the Federal government. Noting that "[t]he Federal government has traditionally had the responsibility of protecting the navigable waters of the United States for public use and enjoyment," the Committee concluded that "activities addressed by section 404, to the extent they occur in waters other than navigable waters of the United States … are more appropriately and more effectively subject to regulation [by] the States."[42]

*The House bill tracks the RHA definition, except it omits "historic" navigable waters of the United States.*

To address the concerns identified in the Committee report, section 17 of the Committee bill, H.R. 9560, added a definition of "navigable waters" to be applied to the 404 program that is "the same as the definition of navigable waters of the United States as it has evolved over the years through court decisions with one exception. [It] omits the historical test of navigability."[43] The Committee noted that the historical test had been used "to classify as navigable … many bodies of water … [that] were not capable of supporting interstate commerce in their existing condition or with reasonable improvement,"[44] for example, waters that were used in the fur trade in the 1700's, "where traders would transport their furs by trail to the lake, across the lake by boat, and then again by trail into another State."[45] Similarly, "small lakes located entirely within one State, which were part of a highway of commerce in the 1800's by virtue of their proximity to a railway track which led into another State, [had] been classified as navigable."[46] Thus, the Committee intended to exclude "small intra-state lakes … which could not conceivably be used today or in the future for interstate commerce."[47] The Committee "fe[lt] strongly that if a water is not susceptible of use for the transport of interstate or foreign commerce in its present condition or with reasonable improvement, then it should not be considered a 'navigable water of the United States.'"[48]

---

[39] H.R. Rep. No. 94-1107, at 22 (1976).

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.* at 23.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.* at 23-24.

[48] *Id.* at 24

Reflecting these Congressional intentions, section 17 read as follows:

> The term "navigable waters" as used in this section shall mean all waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark (mean higher high water mark on the west coast).[49]

As discussed below, section 17 morphed during the legislative process, and the above language ended up in 404(g)(1) and was used to describe the navigable waters the USACE would retain in a case of state assumption. The language "wetlands adjacent thereto" was added to the final bill separately.

### *During debate in the House, the 404 permit requirement is extended to certain wetlands, and certain activities are exempted.*

Section 17 was debated vigorously on the House floor in 1976.[50] Many vehemently opposed restricting the USACE' jurisdiction, while proponents of section 17[51] feared the USACE's infringement on States' authorities and farmers' operations.[52] In a compromise, the final House bill included the Committee's definition of "navigable waters" (for 404 purposes), but protected wetlands by requiring 404 permits for dredge and fill activities in "coastal wetlands and … those wetlands lying adjacent and contiguous to navigable streams."[53] The bill did not include wetlands in the definition of navigable waters, however.

The bill also exempted from the permit program normal farming activities, ranching, and the construction or maintenance of farm or stock ponds and irrigation ditches.[54] Additionally, it created a process for States to administer the program themselves whenever the Secretary of the Army found that they have sufficient legal authority and capability to carry out such functions and that the delegation of authority would be within the public interest.[55] The House of Representatives passed H.R. 9560 and approved these amendments to the 404 program on June 3, 1976.[56]

### *The Senate bill creates a mechanism for States to assume the 404 program but does not modify the definition of navigable waters.*

The Senate took up the bill in the summer of 1977. Emphasizing the ambitious water quality goals of the 1972 Clean Water Act, the Senate Committee on Environment and Public Works declined to redefine "navigable waters" for purposes of the 404 program. Instead, the Senate bill, S. 1952, in section (l)(5), allowed States to assume the

---

[49] *Id.* at 63.

[50] *See* 122 Cong. Rec. 16,514-73 (June 3, 1976).

[51] Note: In the final bill, the definition of "navigable waters" appears in section 16. *Id.* at 16,572.

[52] *See id*. at 16,514-73.

[53] *Id.* at 16,553.

[54] *Id.* at 16,552.

[55] *Id.* at 16,572.

[56] *Id.* at 16,569.

primary responsibility for implementing the permit program "outside the USACE program in the so-called phase I waters."[57] The waters that would be retained by the USACE if a state assumed the program were the same waters the House bill had defined as "navigable waters" except section (l)(5) added adjacent wetlands:

> [A]ny coastal waters of the United States subject to the ebb and flow of the tide, including any adjacent marshes, shallows, swamps and mudflats, and any inland waters of the United States that are used, have been used or are susceptible to use for transport of interstate or foreign commerce, including any adjacent marshes, shallows, swamps and mudflats.[58]

S. 1952 would allow the States to assume authority over "phase 2 and phase 3 waters."[59] The assumption procedures were modeled on the 402 procedures for transfer of National Pollutant Discharge Elimination System ("NPDES") authority to the States in the hopes that the familiar process would expedite state adoption of the program.[60] The amendment also exempted activities similar to those exempted in the House bill and provided for general permits to eliminate delays and administrative burdens associated with the program.[61] The Senate concluded that until the approval of a state program for Phase II and Phase III waters, the USACE would administer section 404 in all navigable waters.62 The Senate passed S. 1952 on August 4, 1977.[63]

*The final bill does not change the definition of "navigable waters" but does provide for state assumption that would effectively limit USACE permitting authority in assumed States to Phase I waters.*

Ultimately, the final bill, H.R. 3199, referred to as the 1977 Clean Water Act Amendments, did not change the definition of navigable waters for the 404 program. Instead, the amendments were a combination of the House and Senate bills. While members of the House, and more specifically the House Committee on Public Works and Transportation, wanted to redefine "navigable waters" for the 404 program, others strongly opposed such restrictions. Both chambers agreed, however, that the States could properly assume authority for administering the 404 program in waters other than those called out in section 17 of the House bill and section (l)(5) of the Senate bill. Accordingly, the conferees agreed upon an amendment that would leave the definition of "navigable waters" unchanged, but would allow the States to assume the program in most waters.

Thus, under the 1977 amendments, the States can administer an individual and general permit program for the discharge of dredged or fill material into "phase 2 and 3 waters after the approval of a program by the Administrator."[64]

---

[57] S. Rep. No. 95-370, at 75 (1977) *reprinted in* Comm. on Env't & Publ. Works, 95th Cong., 4 A Legislative History of the Clean Water Act of 1977 ("Legis. History 1977"), at 635, 708 (Oct. 1978).

[58] 4 Legis. History 1977, at 830.

[59] *Id.* at 708.

[60] *Id.* at 710-11.

[61] *Id.* at 707.

[62] *Id.* at 708.

[63] 123 Cong. Rec. 26,775 (Aug. 4, 1977).

[64] H.R. Rep. No. 95-830, at 101 (1977) *reprinted in* 3 Legis. History 1977, at 185, 285.

If and when a state assumed the program, the C' permitting authority would be limited to "those waters defined as the phase I waters in the Corps … 1975 regulations, with the exception of waters considered navigable solely because of historical use."[65]

The final bill inserted the language that the House Committee had originally used to limit USACE jurisdiction, except that the Conference Committee added "wetlands adjacent thereto" to the parenthetical phrase defining the waters over which the USACE would always retain permitting authority.[66]

The legislative history in both the House and the Senate evidences a Congressional expectation that most States would assume the 404 program, and therefore effectively limit USACE permitting authority to Phase I waters.

> By using the established mechanism in section 402 …, the committee anticipates the authorization of state management of the [404] permit program will be substantially expedited. At least 28 state entities which have already obtained approval of the national pollutant discharge elimination system under the section should be able to assume the program quickly.[67]

Also, "the corps [conducted] … a study [in 1976] to determine the scope of state programs similar to or duplicative of corps regulations and to determine the interest of the States in accepting delegation of the 404 program."[68] Based on the preliminary responses of 52 states and territories, 34 indicated their intent, under certain conditions, such as federal funding, to assume the dredge and fill program.[69] Only 6 responded that they would not seek assumption of the program, and 12 were undecided.[70]

### *Summary of Key Points*

The language in the 404(g)(1) parenthetical phrase that defines the waters over which the USACE will retain jurisdiction in an assumed state is identical to the language used by the House Committee to narrow the definition of "navigable waters," except that it includes "wetlands adjacent thereto."

Congress intended that the parenthetical language be interpreted to mean the same waters as the USACE had defined as Phase I waters in its 1975 regulations, except those deemed navigable based solely on historical use. Thus, waters deemed navigable based on historical use only are assumable by a state.

The 1977 Congress anticipated that most states would assume the 404 program and therefore regulate dredge and fill activities in Phase II and III waters, leaving the USACE with authority over Phase I waters (including their adjacent wetlands but excluding historical use waters).

---

[65] 123 Cong. Rec. 38,969 (Dec. 15, 1977). The USACE's July 19, 1977 final regulations characterized Phase I as covering "waters already being regulated by the Corps[ ] plus all adjacent wetlands to these waters." 42 Fed. Reg. 37,122, 37,124 (July 19, 1977).

[66] H.R. Rep. No. 95-830, at 39, *reprinted in* 3 Legis. History 1977, at 285.

[67] S. Rep. No. 95-370, at 77-78, *reprinted in* 4 Legis. History 1977, at 710-11.

[68] H.R. Rep. No. 95-139, at 67, *reprinted in* 4 Legis. History 1977, at 1196, 1262.

[69] *Id.*

[70] *Id.*

The parenthetical waters identified by the USACE as Phase I waters in its 1975 regulations incorporated the description of "navigable waters of the United States" already regulated by the USACE under section 10 of the RHA, except the parenthetical excluded waters deemed navigable based solely on historical use, and included adjacent wetlands. The USACE's regulations at the time emphasized that "[p]recise definitions of 'navigable waters' or 'navigability' are ultimately dependent on judicial interpretation, and cannot be made conclusively by administrative agencies." 33 CFR § 209.260(b) (1973). The language changed later, and the current regulation now states "[p]recise definitions of 'navigable waters of the United States' or 'navigability' are ultimately dependent on judicial interpretation and cannot be made conclusively by administrative agencies." 33 CFR § 329.3 (2015).



003062



003063

CORPS003063



003064

**From:** White, Tori K CIV USARMY CESAJ (US)
**To:** BARRON, Robert B (Bob) CIV USARMY CESAJ (US)
**Cc:** Beter, Dale E CIV USARMY CESAJ (US)
**Subject:** RE: NavStudy: DEP today (1) asking when talk next week and (2) shared some of their work
**Date:** Tuesday, October 3, 2017 8:18:34 PM

---

Bob, thanks, per our conversation today it is absolutely imperative that you do the following:

1) Update our Section 10 list on the website by COB this Friday with whatever additional waterbodies, tributaries we think might be remotely section 10 OR TNWs. Whether there is an approved navigability study or not, put it on the website.
2) Be responsive to DEP. Schedule the call and remind them via email of the caveats on our web that the current section 10 list they have it not inclusive of all section 10 waters nor necessarily informed by navigability studies.
3) Work with Jim to finalize the C&SF navigability study by 31 Oct 2017 for submission to SAD.

I plan on utilizing Jon Griffin assistance for finalizing the 6 Draft navigability studies for submission to SAD by 31 Dec 2017. This includes Kissimmee, Nassau, St. Johns, St. Marks, St. Marys, and Waccasassa. Hopefully will be able to have this conversation with him and Clif tomorrow, for now keep close hold.

Let's discuss GIS efforts further tomorrow. ERDC is available. I'd like to know where Alana is with the efforts.
Thanks!

V/R
Tori White
Acting Chief, Real Estate Division
U.S. Army Corps of Engineers
701 San Marco Blvd
Jacksonville, FL 32207
(o) 904.232.1170
(c) 904.923.6626

-----Original Message-----
From: BARRON, Robert B (Bob) CIV USARMY CESAJ (US)
Sent: Tuesday, October 03, 2017 11:40 AM
To: White, Tori K CIV USARMY CESAJ (US) <Tori.White@usace.army.mil>
Cc: Beter, Dale E CIV USARMY CESAJ (US) <Dale.E.Beter@usace.army.mil>
Subject: NavStudy: DEP today (1) asking when talk next week and (2) shared some of their work

Tori,

re: call next week (email "RE: call"). I will see how far I get in my thinking I get today for overlay and also chat with Alana before setting a time for a call.

Re: shared work (email "Implementation"). I am soooo happy they have shared. They have a lot of waters on our list they are not sure where go on the map (cannot find or there are more than one river by the same name). I will quicly re-double-check Stu's emails to see if can find the Chief's submittals. However, I think we have an opening to collaborate on the list: The "approved" Alana has digitized + the "hunt for" that DEP had done + the overlay of

other data.

- Bob

Bob Barron
Project Manager, Regulatory Division
Ofc (904) 232-2203 Cell (904) 304-9572

**Supplement**

**to the**

**Jacksonville District Navigable Waters Lists**

**October 5, 2017**

The waters named below were those identified in the first preliminary increment of an effort to update the Jacksonville District Navigable Waters List (List). Some of the waters named below are duplicated on that List. Some of the waters below are in addition to that List. There may be additional waters not listed either below or on the List.

The District makes no claim that these lists are complete or completely accurate. These lists are for regulatory reference purposes only. They are not a substitute for a jurisdictional determination (JD). It is imperative that you contact the appropriate Regulatory Permit Section for a determination on whether the Corps is able to ascertain if a particular project falls within or outside of section 10 authority.

## STATE OF FLORIDA

## Rivers and Creeks

Acorn Lake Creek
Acosta Creek
Adams Mill Creek
Adams Spring Branch
Addison Creek
Africa Bayou
Airport Canal
Alafia River
Alapaha River
Alapahoochee River
Alaqua Creek
Alexander Springs Creek
Alice Creek
Allen Creek
Alligator Bayou
Alligator Branch
Alligator Creek
Amason Creek
Amberjack Cove
Amelia River
Ammonia River Sand Slough
Anclote River
Andrews Creek
Andrews Mill Creek
Angelfish Creek
Angelico Branch
Angelwing Creek
Apalachicola River
Arbor Bush Branch
Arbuckle Branch
Arbuckle Creek
Arch Creek
Archie Creek
Arlington River
Ash Slough
Ates Creek
Athena Warrior Creek
Attapulgus Creek
Aucilla River
Austin Bayou
Avocado Creek
Axle Creek
Back River
Back Slough
Baggett Creek
Bailey Branch
Bailey Mill Creek
Baird Creek
Baker Bayou
Baker Branch
Baker Creek
Banana Branch
Banana Creek
Banana River
Bannahassee River
Barbecue Branch
Barber Branch
Barnett Creek
Barnett Mill Creek
Barron River
Basin Bayou
Basin Creek
Bass Branch
Bass Brinks Creek
Bass Slough
Basset Branch
Battle Creek
Bauldree Branch
Bay Branch
Bay Head Branch
Bayou Canal
Bayou Creek
Bayou George Creek
Bayou Marcus
Bayou Texter
Bayview Creek
Beale Creek
Bear Bay Creek
Bear Branch
Bear Creek
Bearman Creek
Beasley Creek
Beatty Bayou
Beaver Branch
Beaver Creek
Beaverdam Creek
Bedman Creek
Bee Branch
Beech Branch
Beecher Run
Beetree Slough
Belcher Canal
Bell Bay Branch
Bell Branch
Bell Creek
Bells Leg
Bells River
Bellshead Branch
Bends Creek
Bennetts Creek
Bessy Creek
Bethel Creek
Bethel Spring Branch
Betsy Branch
Big Bayou

Big Bear Creek
Big Boggy Branch
Big Branch
Big Branch Beaver Creek
Big Coldwater Creek
Big Creek
Big Cypress Branch
Big Cypress Creek
Big Davis Creek
Big Ditch
Big Fishweir Creek
Big Flounder Creek
Big Fork
Big Head Branch
Big Horse Creek
Big Jones Creek
Big Juniper Creek
Big Lige Branch
Big Magnesia Creek
Big Mound Creek
Big Muddy Creek
Big Mulberry Branch
Big Rock Creek
Big Sable Creek
Big Slough
Big Spring Creek
Big Sweetwater Creek
Big Trout Creek
Big West Bayou
Billies Branch
Bills Arm
Billy Creek
Billys Branch
Bird Branch
Bird Creek
Bird Island Creek
Bishop Creek
Bivens Creek
Black Branch
Black Creek
Black Lake
Black Prong
Black Rock Creek
Black Water Creek
Blackburn Canal
Blackjack Creek
Blackwater Creek
Blackwater River
Blakeslee Creek
Blanket Bay Slough
Blind Creek
Blockhouse Creek
Blount Creek
Blount Mill Creek
Blounts Branch
Blue Creek
Blue Spring Creek
Bluff Branch
Bluff Creek
Boardhead Branch
Boat Creek
Boathouse Creek

Bogey Branch
Boggess Creek
Boggy Bayou
Boggy Branch
Boggy Creek
Boggy Jordan Bayou
Bogy Branch
Boiling Creek
Bone Creek
Bonnet Gully
Bonnet Pond
Booker Creek
Boone Creek
Bootheel Creek
Bostick Branch
Botheration Bayou
Botheration Creek
Bottle Branch
Botts Creek
Boutwell Branch
Bowen Branch
Bowlees Creek
Bowlegs Creek
Bowman Bayou
Box Branch
Braddock Creek
Braden River
Bradford Brook
Bradley Creek
Braggs Branch
Brandy Branch
Brandy Creek
Brannen Creek
Branning Branch
Bray Creek
Bray Mill Creek
Brickyard Creek
Brickyard Cut Off
Brickyard Slough
Bridge Branch
Bridge Creek
Britches Creek
Britt Branch
Britt Creek
Broad Creek
Broad River
Brock Mill Branch
Brooks Branch
Broomstraw Branch
Brothers River
Broward River
Brown Branch
Brown Creek
Broxson Branch
Bruce Creek
Brush Creek
Brushy Creek
Buck Bayou
Buck Branch
Buck Creek
Buck Head Branch
Buck Pelt Branch

Bucket Branch
Buckford Creek
Buckhannon Branch
Buckhead Slough
Buckhorn Creek
Buffalo Mill Creek
Bull Branch
Bull Creek
Bullfrog Creek
Bulow Creek
Bumblebee Creek
Bumpy Creek
Burgess Creek
Burkett Bayou
Burnt Grocery Creek
Burnt Mill Creek
Burton Creek
Butcher Pen Creek
Butler Creek
Buttermilk Slough
Cabbage Creek
Cabbage Drain
Cabbage Slough
Caesar Creek
Caldwell Branch
Calf Branch
California Creek
Callalisa Creek
Callaway Creek
Caloosahatchee Canal
Caloosahatchee River
Camp Branch
Camp Creek
Campbell Branch
Campbell Creek
Campbells Mill Creek
Canal C-41A
Canaveral Barge Canal
Caney Branch
Caney Creek
Cannon Creek
Canoe Creek
Capo Creek
Carlisle Lake
Carlton Branch
Carpenter Creek
Carr Branch
Carr Spring Branch
Carrabelle River
Carroll Creek
Carter Branch
Carter Creek
Casa Cola Creek
Cash Creek
Cat Creek
Catfish Branch
Catfish Creek
Catfish Slough
Catfish Waterway
Cebe Land Cutoff
Cedar Branch
Cedar Creek

Cedar Hammock Creek
Cedar Point Creek
Cedar River
Cedar Swamp Creek
Cemetery Creek
Chaires Creek
Chandler Hammock Slough
Chandler Slough
Chapel Branch
Charley Creek
Charlie Creek
Chassahowitzka River
Chatham River
Chattahoochee River
Cherry Branch
Chicken Head
Chicken Slough
Chickenhouse Branch
Chipley Creek
Chipola Cutoff
Chipola River
Chito Branch
Choctawhatchee River
Christopher Creek
Chub Creek
Chub Slough
Chula Vista Bayou
Church Creek
Churchhouse Branch
Clabber Creek
Clapboard Creek
Clark Branch
Clark Creek
Clarkes Creek
Clay Branch
Clay Creek
Clay Gully
Clear Branch
Clear Creek
Clearwater Creek
Cleve Hinton Creek
Cobb Branch
Cobb Creek
Cochran Slough
Cockroach Creek
Cocohatchee River
Coffee Branch
Colorinda Creek
Columbia Spring
Commander Creek
Compass Point Creek
Conecuh River
Cook Creek
Cooks Bayou
Coon Camp Branch
Coon Head
Coon Head Branch
Coons Bay Branch
Cooper Branch
Cooper Creek
Coot Creek
Coral Creek

Corbett Branch
Corbit Branch
Cork Slough
Corley Slough
Cormorant Branch
Cossiers Creek
Cosson Mill
Cotton Creek
Counterfeit Mill Creek
Covas Creek
Cow Creek
Cow House Creek
Cow Log Branch
Cowdevil Creek
Cowhead Creek
Cowpen Branch
Cox Creek
Coxes Branch
Crab Creek
Crabgrass Creek
Cracker Branch
Cradle Creek
Craig Creek
Crane Branch
Crane Creek
Crawford Creek
Creighton Bayou
Crooked Creek
Crooked River
Crooked Run
Cross Bayou Canal
Cross Branch
Cross Creek
Cross Cypress Branch
Cross Florida Barge Canal
Crossway Branch
Crystal River
Cunningham Creek
Cuno Creek
Curiosity Creek
Curlew Creek
Curry Creek
Cushion Creek
Cut Creek
Cut Off Creek
Cypress Branch
Cypress Creek
Cypress Pond Branch
Cypress River
Cypress Slough
Cypress Strand
Dallus Creek
Dan May Creek
Danforth Creek
Daughtrey Creek
Dave Branch
Davenport Creek
Davis Branch
Davis Mill Creek
Days Creek
Dead Boy Creek
Dead End Creek

Dead River
Deadfall Creek
Deadmans Branch
Dean Creek
Dean Dead River
DeBarry Creek
Deep Bottom Creek
Deep Branch
Deep Creek
Deep Creek Diversion Canal
Deer Creek
Deer Moss Creek
Deer Prairie Creek
Deer Prairie Slough
Deese Creek
Delaney Creek
Delaney River
Demory Creek
Denham Bayou
Dennis Creek
Depew Creek
Depot Creek
Devall Branch
Devils Den Creek
Devon Creek
Diamond Creek
Dick Creek
Dillaberry Branch
Dip Vat Branch
Dismal Creek
Dispatch Creek
Ditch Branch
Divedapper Creek
Dog Branch
Dolphin Creek
Doorshutter Creek
Dorset Creek
Double Barrel Creek
Double Branch
Double Branches
Double Hammock Creek
Double Head Branch
Double Run Creek
Douglas Slough
Dove Creek
Doyle Bayou
Doyle Creek
Dram Branch
Driver Branch
Drummond Creek
Dry Branch
Dry Creek
Dry Ford Branch
Dry Run
Duck Creek
Duck Pond Branch
Duck Slough
Duckwater Branch
Dug Creek
Dunham Branch
Dunn Creek
Dunns Creek

Durbin Creek
Dusenbury Creek
Duval Branch
Eagle Creek
Eagle Nest
Eagle Nest Bayou
Eaglenest Creek
Early Branch
Earnest Mill Creek
East Bay River
East Branch Coral Creek
East Branch Fourmile Creek
East Branch Mare Creek
East Branch Troublesome Creek
East Creek
East Cutoff
East Cutoff Creek
East Fork Big Coldwater Creek
East Fork Juniper Creek
East Fork Manatee River
East Fork Syfrett Creek
East Goose Creek
East Griffin Creek
East Pepper Creek
East Pittman Creek
East River
East River Cut Off
East Run Cracker Branch
Eaton Creek
Eau Gallie River
Econfina Creek
Econfina River
Econlockhatchee River
Edwards Creek
Egans Creek
Eightmile Creek
Eightmile Slough
Elbow Branch
Elbow Creek
Elevenmile Creek
Ellis Branch
Ellis Creek
Elwood Branch
English Branch
English Creek
Eph Creek
Equaloxic Creek
Ericson Creek
Escambia River
Estero River
Etonia Creek
Evans Creek
Evans Slough
Everett Slough
Faka Union River
Fakahatchee River
Falling Branch
Falling Creek
Fanning Branch
Farley Creek
Farm Creek
Farmdale Bayou
Fenholloway River
Ferguson River
Fern Creek
Ferrell Branch
Ferry Pass Bayou
Finns Slough
First Branch
First Puncheon Branch
Fish Branch
Fish Creek
Fish Pond Branch
Fish Slough
Fishbone Creek
Fisheating Creek
Fisher Branch
Fishing Creek
Fitzpatrick Creek
Fivemile Creek
Flag Creek
Flat Branch
Flat Creek
Fleming Creek
Fletcher Creek
Flint Creek
Flopbuck Creek
Flora Branch
Florida River
Forked Creek
Fort Crawford Creek
Fort Drum Creek
Fort Gadsden Creek
Fort George River
Fort Kirkland Branch
Fort Simmons Branch
Four Mile Branch
Four Mile Creek
Four Tree Cut Off
Fourmile Creek
Fowler Branch
Fox Branch
Fox Creek
Fox Cut
Fox Head Branch
Frazier Creek
Freeman Creek
Frenchman Creek
Frenchmans Creek
Frog Creek
Frye Canal
Fuller Creek
Fundy Bayou
G Creek
Gable Branch
Gamble Creek
Game Creek
Gander Creek
Gap Creek
Garden Creek
Gardner Creek
Gardner Run
Garnier Creek
Garrett Branch
Gaskin Branch
Gates Creek
Gator Branch
Gator Creek
Gator Slough
Gee Creek
Geiger Creek
Georgia Fruit Farm Creek
Get Out Creek
Ghost Creek
Giger Creek
Gilley Creek
Gilshey Branch
Ginhouse Branch
Ginhouse Creek
Glenn Branch
Goat Creek
Goddard Creek
Goldfish Creek
Gomez Creek
Goodbys Creek
Goodwin Creek
Goose Creek
Gopher Creek
Gopher Gully
Gopher River
Gordon River
Gore Branch
Goshum Branch
Gottfried Creek
Gourd Bay
Governors Bayou
Governors Creek
Graham Creek
Grand Canal
Grandaddy Branch
Grape Head Branch
Grassy Creek
Graves Creek
Graveyard Branch
Graveyard Creek
Grayson Slough
Green Branch
Greenfield Creek
Greenhead Branch
Greens Creek
Gregory Mill Creek
Griffin Branch
Grog Branch
Grooms Creek
Groover Branch
Grouper Creek
Guana River
Guardhouse Branch
Gude Branch
Guinea Creek
Gulf County Canal
Gulley Branch
Gully Branch
Gum Branch
Gum Creek
Gum Drift Slough

Gum River
Gum Slough
Gum Springs Branch
Gum Swamp Branch
Gun Branch
Gunn Creek
Half Creek
Halfway Creek
Halifax River
Hall Creek
Halls Branch
Halls River
Hammock Branch
Hammock Creek
Hampton Branch
Hancock Creek
Hannah Branch
Hannah Mills Creek
Hansford Branch
Happy Creek
Harden Creek
Harlow Branch
Harney River
Harris Creek
Harrison Creek
Harrys Creek
Hart Branch
Harvey Creek
Harvey Prong
Hathaway Mill Creek
Haulover Canal
Haulover Creek
Haw Creek
Hawthorne Creek
Hayes Creek
Heidelberg Branch
Helverson Creek
Henderson Branch
Henderson Creek
Henderson River
Henderson Slough
Hendry Creek
Henry Creek
Hewett Bayou
Hickey Branch
Hickey Creek
Hickory Branch
Hickory Creek
Hickory Slough
Hickory Tree Flat Slough
Hicks Creek
Hidden Johnson Creek
Higgenbotham Creek
High Bluff Creek
High Hill Creek
Highland Park Run
Hillsborough River
Hodges Branch
Hoffman Creek
Hog Branch
Hog Creek
Hog Island Creek

Hog Pen Branch
Hogan Creek
Hogpen Branch
Hogpen Creek
Hogtown Creek
Hole in the Wall
Holley Branch
Holliman Branch
Hollin Creek
Hollis Branch
Hollomans Branch
Holly Creek
Holman Branch
Holmes Creek
Holton Creek
Holy Creek
Hominy Branch
Homosassa River
Honey Creek
Honey Run
Hontoon Dead River
Hopkins Creek
Horns Creek
Horse Creek
Horse Island Creek
Horsehead Creek
Horsehead Run
Horseshoe Creek
Hosford Branch
Hospital Creek
Howard Creek
Howell Branch
Howell Creek
Hubbard Branch
Hubbert Branch
Huckaby Creek
Huckleberry Creek
Hudson Creek
Hughes Ditch
Hulett Branch
Hunter Branch
Hunter Creek
Hurddles Creek
Hurricane Branch
Hurricane Creek
Hurst Branch
Huston River
Hynote Branch
Ichetucknee River
Imperial River
Inconstantion Creek
Indian Bayou
Indian Branch
Indian Camp Creek
Indian Creek
Indian Mound Slough
Indian River
Ingram Creek
Inlet Creek
Intracoastal Waterway
Irvine Slough
Irwin Creek

Island Branch
Island Creek
Istokpoga Canal
Istokpoga Creek
Itchepackesassa Creek
Jack Branch
Jack Creek
Jacks Branch
Jacks Creek
Jackson Creek
Jackson River
Jacobs Creek
Jakes Bayou
Jane Green Creek
Jeffs Cowpen Creek
Jenkins Creek
Jerry Branch
Jewfish Creek
Jim Branch
Jim Creek
Jim Green Creek
Jim Lee Creek
Joe Lamb Branch
Joe River
Joel Branch
John Branch
Johns Creek
Johns Island Creek
Johnson Branch
Johnson Creek
Johnson Mill Branch
Johnson Slough
Johnsontown Bayou
Jolly River
Jones Creek
Jones Mill Creek
Jones Rice Mill Branch
Josephine Creek
Joshua Creek
Joyce Branch
Julian Mill Creek
Julington Creek
Jumper Creek
Jumping Gully
Jumping Gully Branch
Jumping Gully Creek
Juniper Branch
Juniper Creek
Juno Canal
Jupiter Canal
Karen Canal
Keen Branch
Kelley Branch
Kelly Branch
Kelly Creek
Kelly Spring Branch
Kendall Creek
Kennedy Creek
Kentucky Branch
Kestner Creek
Kettle Creek
Kid Creek

King Branch
King Creek
Kings Creek
Kingsley Creek
Kiser Branch
Kissimmee River
Kitchen Branch
Kitching Creek
Kohler Bayou
Krueger Creek
L Bowden Creek
Lafayette Creek
Laird Mill Creek
Lake Dale Branch
Lake Drain
Lake Marion Creek
Lanceford Creek
Langston Branch
Larkin Slough
Lawton Branch
Lee Branch
Left Hand Turner River
Leitner Creek
Lemkin Creek
Lemon Creek
Lettuce Creek
Lettuce Lake Cutoff
Lighter Knot Creek
Lightwood Knot Creek
Lilly Creek
Lily Miller Branch
Limestone Branch
Limestone Creek
Linderman Creek
Linton Spring Branch
Little Alaqua Creek
Little Alligator Creek
Little Angelfish Creek
Little Aucilla River
Little Basin Creek
Little Bear Creek
Little Black Branch
Little Black Creek
Little Boggy Creek
Little Branch Beaver Creek
Little Bullfrog Creek
Little Cedar Bayou
Little Cedar Creek
Little Chaires Creek
Little Charlie Creek
Little Cow Creek
Little Creek
Little Crooked Creek
Little Cypress Creek
Little Denham Bayou
Little Dispatch Creek
Little Dram Branch
Little Dunn Creek
Little Econlockhatchee River
Little Escambia Creek
Little Fishhawk Creek
Little Fishweir Creek

Little Flounder Creek
Little Fort Crawford Creek
Little Grooms Creek
Little Gum Creek
Little Harden Creek
Little Haw Creek
Little Horse Creek
Little Huckleberry Creek
Little Juniper Creek
Little Magnesia Creek
Little Manatee River
Little Moccasin Creek
Little Monteocha Creek
Little Mulberry Branch
Little Orange Creek
Little Payne Creek
Little Porpoise Creek
Little Pottsburg Creek
Little Pumpkin Creek
Little Redfish Creek
Little Reedy Branch
Little River
Little River Canal
Little Rocky Creek
Little Run
Little Sable Creek
Little Saint Marks River
Little Saint Marys River
Little Sandy Creek
Little Shark River
Little Simpson River
Little Sixmile Creek
Little Snake Creek
Little Spring Creek
Little Sweetwater Creek
Little Tide Creek
Little Tomoka River
Little Trout Creek
Little Trout River
Little Wekiva River
Little White River
Little Withlacoochee River
Little Wood River
Littles Bayou
Live Oak Creek
Live Oak Cutoff
Livingston Creek
Lochloosa Creek
Lock Creek
Lofton Creek
Log River
Lolly Creek
London Creek
Lone Cabbage Creek
Long Bayou
Long Branch
Long Branch Creek
Long Creek
Long Grassy Creek
Lost Creek
Lostmans Creek
Lostmans Creek Number Three

Lostmans River
Lower Sister Creek
Lows Creek
Loxahatchee River
Lucy Branch
Lukens Creek
Lumber Creek
MacDonald Creek
Machine Branch
Mack Bayou
Magee Branch
Magnolia Creek
Magnolia Slough
Main Canal
Mainard Branch
Malloy Branch
Malone Creek
Malone Hammock Branch
Manatee Creek
Manatee River
Manning Creek
Manuel Branch
Maple River
Mapps Creek
Mare Branch
Maria Branch
Marian Creek
Mars Canal
Marsh Branch
Marshall Creek
Mary Slough
Mason Branch
Mason Creek
Matanzas River
Mathison Creek
Max Branch
May Creek
May Mill Creek
Mayo Mill Branch
McBride Branch
McBride Slough
McCall Branch
McCollough Branch
McCormick Creek
McCostill Mill Creek
McCoy Branch
McCoy Creek
McCullough Creek
McDavid Creek
McDonald Branch
McGirts Creek
McIntyre Creek
McIver Branch
McKay Creek
McKinney Branch
McKinnon Branch
McMullen Creek
McNair Branch
McQuage Bayou
McQuage Branch
McQueen Creek
Medcalf Lake

Mensler Creek
Merrill Branch
Metts Creek
Miami Canal
Miami River
Middle Creek
Middle Haw Creek
Middle River
Middle Rocky Creek
Middle Warrior Creek
Midway Branch
Mile Branch
Mill Bayou
Mill Branch
Mill Creek
Mill Dam Branch
Mill Log Creek
Mill Pond Branch
Mill Seat Creek
Mill Slough
Miller Bayou
Miller Creek
Milligan Creek
Mills Branch
Mills Creek
Minerva Canal
Minge Branch
Mink Creek
Minnow Creek
Mitchell Branch
Mitchell Creek
Mitchell Mill Creek
Mitchell River
Mizelle Creek
Mobbly Bayou
Moccasin Branch
Moccasin Creek
Moccasin Slough
Molasses Branch
Moncrief Creek
Monden Creek
Money Bayou
Monkey Creek
Monroe Canal
Monroe Creek
Monteocha Creek
Montgomery Slough
Moody Branch
Moore Branch
Moore Creek
Moores Mill Creek
Morgan Creek
Moriah Creek
Morman Branch
Morrell Branch
Morrison Spring Run
Moses Creek
Mosquito Creek
Mossy Head Branch
Moultrie Creek
Mount Pleasant Creek
Mud Creek

Mud Flats Creek
Mud River
Muddy Branch
Mulatto Bayou
Mule Creek
Mullet Creek
Mullock Creek
Munson Slough
Murder Creek
Murray Creek
Mussett Bayou
Myakka River
Myrtle Creek
Myrtle Slough
Nancy Creek
Nancys Cutoff
Narrows Creek
Nassau River
Neat Creek
New River
New Rose Creek
Newcastle Creek
Newman Branch
Nichols Creek
Ninemile Branch
Ninemile Creek
Nomans River
Norris Dead River
North Branch Smith Creek
North Creek
North Double Barrel Creek
North Fork Alligator Creek
North Fork Black Creek
North Fork Loxahatchee River
North Fork Manatee River
North Fork Miami River
North Fork Middle River
North Fork Saint Lucie River
North Fork Taylor Creek
North Harney River
North Palm Beach Waterway
North Prong Alafia River
North Prong Alligator Creek
North Prong Otter Creek
North Prong Saint Sebastian
River
North River
North Sound Creek
Nubbin Slough
Oak Branch
Oak Creek
Oak Grove Branch
Oakie Creek
Ocheesee Creek
Ochlockonee River
Ocklawaha Creek
Ocklawaha River
Okefenokee Slough
Old Canal
Old River
Oldfield Creek
Oleta River

Olive Branch
Oliver Bayou
Olivers Creek
Olustee Creek
Open Creek
Orange Branch
Orange Creek
Orange Grove Branch
Orange Hammock Slough
Orange River
Ortega River
Osceola Creek
Otter Creek
Otter Slough
Outlet River
Outside Lake
Owens Branch
Owl Creek
Oyster Creek
Oyster Prong
Pablo Creek
Packingham Slough
Padgett Branch
Page Creek
Paines Branch
Painter Branch
Palatlakaha River
Palm River
Palmer Slough
Palmetto Branch
Pancho Creek
Panther Branch
Panther Creek
Pareners Branch
Parker Branch
Parrot Creek
Pate Branch
Patterson Branch
Pattillo Creek
Patty Wiggins Branch
Paul Branch
Payne Creek
Peace Creek
Peace Creek Drainage Canal
Peace River
Peach Creek
Peacock Slough
Pearl Creek
Pearly Island Creek
Pecks Branch
Peler Creek
Pelican Bayou
Pelleham Branch
Pellicer Creek
Pelt Creek
Pemberton Creek
Penasula Creek
Penny Creek
Perdido River
Peters Branch
Peters Creek
Petty Branch

Philippe Creek
Phyllis Branch
Piclalene Bayou
Picnic Island Creek
Pierce Branch
Pigeon Creek
Pimple Creek
Pine Barren Creek
Pine Creek
Pine Island Creek
Pine Log Creek
Piney Branch
Piney Creek
Piney Point Creek
Piney Reach Slough
Piney Woods Creek
Pinhook Cut-Off
Pinhook River
Pippin Mill Creek
Pithlachascotee River
Pitt Creek
Pittman Creek
Pitts Bayou
Pitts Creek
Pitts Mill Creek
Pitts River
Plate Creek
Platt Branch
Plummer Creek
Plunder Branch
Pochanee Branch
Polander Branch
Pole Branch
Poley Branch
Polk Creek
Polley Creek
Pollywog Creek
Ponce de Leon Cut
Pond Creek
Poorhouse Creek
Popash Creek
Popash Slough
Poplar Branch
Poplar Creek
Poplar Head Branch
Poppolton Creek
Porpoise Creek
Port Leon Creek
Porter Slough
Porters Bar Creek
Postun Bayou
Potter Creek
Pottsburg Creek
Poucher Branch
Pound Net Creek
Poverty Creek
Powell Creek
Powell Spring Branch
Prairie Creek
Pretty Branch
Price Creek
Priest Branch
Pringle Branch
Pritchell Mill Branch
Prodie Creek
Puckett Creek
Pump Branch
Pumpkin Creek
Pumpkin Hill Creek
Pumpkin River
Purify Creek
Quarry Creek
Quincy Creek
Rainbow River
Rainey Slough
Rake Creek
Ramsey Branch
Ramsey Creek
Ratliff Creek
Rattlesnake Bayou
Rattlesnake Branch
Rattlesnake Slough
Rattlesnake Spring Branch
Raulerson Creek
Rauslerson Branch
Raysor Creek
Reader Creek
Red Bay Branch
Red Bay Creek
Red Fish Creek
Red Head Branch
Red House Branch
Red Wash Branch
Redfish Bayou
Redfish Creek
Redland Canal
Reed Canal
Reedy Branch
Reedy Creek
Regular Creek
Revell Branch
Ribault River
Rice Creek
Richard Creek
Richlander Creek
Ridgeway Creek
Right Prong Stone Mill Creek
Rim Ditch
Ring Jaw Branch
Rio Barcelona Canal
Riomar Creek
River Styx
Roaring Creek
Roberts Creek
Roberts River
Roberts Slough
Robinson Branch
Robinson Creek
Rock Creek
Rock Springs Run
Rock Yard Creek
Rockedge Creek
Rockhouse Creek
Rocky Branch
Rocky Comfort Creek
Rocky Creek
Rocky Run
Rodgers Creek
Rodgers River
Roebuck Creek
Rookery Branch
Rosalie Creek
Rose Creek
Rowell Creek
Royal Palm Hammock Creek
Rum Still Branch
Rushing Branch
Rushing Cutoff
Rutland Creek
Rye Branch
Ryle Creek
Saddle Creek
Sailor Hammock Slough
Saint Francis Dead River
Saint Joe Canal
Saint Joes Creek
Saint Johns Creek
Saint Johns River
Saint Joseph Creek
Saint Lucie Canal
Saint Lucie River
Saint Marks River
Saint Marys River
Saint Sebastian River
Sal Marie Branch
Sal Taylor Creek
Salt Creek
Salt Island Creek
Salt Pan Creek
Salt Run
Salt Springs Run
Saltwater
Sam Knight Creek
Samples Creek
Sampson Creek
Sampson River
Sams Creek Cutoff
San Carlos Creek
San Julian Creek
San Sebastian River
Sand Beach Branch
Sand Branch
Sand Creek
Sand Gully
Sand Hill Creek
Sand Slough
Sandbank Creek
Sanders Branch
Sanders Creek
Sandfly Creek
Sandfly Gully
Sandy Branch
Sandy Creek
Sandy Gully
Sandy Mountain Branch
Sandy Point Bayou

Sandy Run
Santa Fe River
Sarah Ann Branch
Saul Creek
Saul Creek Cut Off
Saultsman Bayou
Saultsman Cutoff
Saunders Creek
Sawed Slough
Sawmill Slough
Sawpit Creek
Schoolhouse Branch
Scipio Creek
Scoggin Creek
Sconiers Mill Creek
Seabreeze Creek
Searcy Creek
Seaton Creek
Seminole Creek
Seven Pines Creek
Seven Runs
Sevenmile Creek
Sewell Branch
Seybold Canal
Shad Creek
Shady Brook
Shaky Joe Branch
Shark Cutoff
Shark River
Shaw Still Branch
Sheephead Creek
Shell Creek
Shepherd Spring Creek
Sherman Creek
Shine Creek
Shingle Branch
Shingle Creek
Shinney Creek
Shipyard Canal
Shipyard Creek
Shired Creek
Shirttail Branch
Shoal River
Short Creek
Shuler Branch
Sikes Creek
Silcox Branch
Silver Creek
Silver Glen Springs Run
Silver River
Silversmith Creek
Simms Creek
Simpson Creek
Simpson River
Sink Branch
Sink Creek
Sister Pond Creek
Sister River
Sisters Creek
Sixmile Creek
Sixteenmile Creek
Skipper Creek
Slave Canal
Sloman Branch
Smith Bayou
Smith Creek
Smith McCullah Creek
Smokehouse Creek
Smyrna Creek
Snake Bayou
Snake Creek
Snead Creek
Snipe Creek
Snowden Creek
Soap Creek
Soapstone Branch
Soldier Creek
Soldiers Creek
Sombrero Creek
Sopchoppy River
South Amelia River
South Branch Anclote River
South Broad Creek
South Canal
South Creek
South Double Barrel Creek
South Fork Bear Creek
South Fork Black Creek
South Fork Little Manatee River
South Fork Miami River
South Fork Middle River
South Fork Saint Lucie River
South Marsh Creek
South Mouth
South Prong Alafia River
South Prong Alligator Creek
South Prong Fort Godsden Creek
South Prong Saint Marys River
South Prong Saint Sebastian River
South Sound Creek
Southwest Fork Loxahatchee River
Spanish Creek
Spanish Mill Creek
Spiders Gut
Sponge Crawl Creek
Spots Branch
Spring Branch
Spring Creek
Spring Garden Creek
Spring Hammock Run
Spring Run
Spring Warrior Creek
Springhead Creek
Spruce Creek
Squawk Creek
Stag Branch
Stage Stand Branch
Stagger Creek
Stanton Creek
Stapleton Creek
Starrett Creek
Starvation Slough
Stave Branch
Steamboat Creek
Steep Head Branch
Steinhatchee River
Stevens Branch
Stevenson Creek
Steves Wash Branch
Still Creek
Stingray Creek
Stokes Branch
Stokes Creek
Stone Mill Creek
Stopper Creek
Straw Bay Branch
Strawberry Creek
Stroud Creek
Strouds Creek
Styles Creek
Sugar Creek
Sugar Mill Branch
Sugarhouse Creek
Sugarloaf Creek
Sulfur Creek
Sullivans Ditch
Sulphur Run
Sunday Rollaway Creek
Surveyor Creek
Suwannee River
Swamp Creek
Sweetwate Creek
Sweetwater Branch
Sweetwater Creek
Swift Creek
Swift Slough
Swimming Pen Creek
Syfrett Creek
Syrup Branch
Tan Branch
Tan Vat Branch
Tanyard Branch
Tarpon Creek
Tavernier Creek
Taylor Branch
Taylor Creek
Taylor River
Telegraph Creek
Telogia Creek
Tenmile Branch
Tenmile Creek
Terrapin Creek
Tetabar Creek
Thankyouma'am Creek
The Bayou
The Boggies
The Cutoff
Thirtymile Creek
Thomas Branch
Thomas Creek
Thomas Mill Run
Thompson Bayou
Thompson Branch

Thompson Cutoff
Thornton Branch
Thousandmile Creek
Three Brothers Creek
Three Otter Creek
Threemile Branch
Tick Island Creek
Tick Island Slough
Tide Creek
Tidwell Mill Creek
Tiger Branch
Tiger Creek
Tiger Ford Branch
Tiger Pond Creek
Tiller Branch
Timber Branch
Titi Branch
Titi Creek
Tocoi Creek
Todd Branch
Tolomato River
Tom Hahn Creek
Tom King Bayou
Tom Smith Branch
Tomoka River
Toms Creek
Tooke Creek
Toolchest Branch
Tootoosahatchee Creek
Town Branch
Tracy Branch
Trammel Creek
Trawick Creek
Tripod Creek
Troublesome Creek
Trout Bayou
Trout Creek
Trout River
Tubbys Creek
Tucker Bayou
Tucker Creek
Turket Creek
Turkey Creek
Turkey Gobbler Creek
Turkey Hen Creek
Turkey Slough
Turnbull Creek
Turner Creek
Turner River
Turners Creek
Turnpike Branch
Turtle Creek
Turtle Lake Branch
Twin Creek
Twomile Branch
Twomile Creek
Tyner Branch
Tyre Creek
Tyson Creek
Underhill Creek
Upper Sister Creek

Upper Sweetwater Creek
Van Horn Slough
Van Swearingen Creek
Vassey Creek
Vause Branch Ochlockonee
River
Virginia Cut
Vossinbury Creek
Waccasassa River
Wacissa River
Wade Canal
Wagner Creek
Wakulla River
Walker Bayou
Walker Branch
Walker Creek
Wall Creek
Ward Creek
Ward Mill Creek
Wards Creek
Wares Creek
Warner Creek
Wasteway Branch
Watch Chain Slough
Water Oak Creek
Watering Creek
Watson River
Weaver Creek
Weaver River
Weaver Warrior Creek
Webb Branch
Week Creek
Weeki Wachee River
Weeks Fisher Creek
Wekiva River
Weohyakapka Creek
West Bay Creek
West Branch Blockhouse Creek
West Branch Coral Creek
West Branch Lightwood Knot
Creek
West Branch Mare Creek
West Branch South Prong Alafia
River
West Creek
West Cutoff
West Fork Big Coldwater Creek
West Fork Juniper Creek
West Fork Syfrett Creek
West Goose Creek
West Griffin Creek
West Palm Run
West Pepper Creek
West Pittman Creek
West Run Cracker Branch
West Sandy Creek
Western Branch
Wetappo Creek
Whackup Creek
Wharf Creek
Wheeler Branch

Whidden Branch
Whidden Creek
Whiskey Creek
Whiskey George Creek
White Branch
White River
Whiteoak Bayou
Whites River
Whitewater Branch
Whitney River
Whittenhorse Creek
Wiggins Branch
Wigwam Creek
Wilburn Branch
Wildcat Branch
Wildcat Creek
Wilder Branch
Wilder Creek
Wilkinson Creek
Willacoochee Creek
Williams Branch
Williams Creek
Williams Lake
Williamson Creek
Willoughby Creek
Willow Cove Branch
Wills Branch
Wilson Branch
Windmill Branch
Winegourd Creek
Winkley Branch
Winters Creek
Winzy Creek
Wisher Creek
Withlacoochee River
Wolf Branch
Wolf Creek
Wolf Slough
Wolfe Creek
Wolftrap Branch
Womack Creek
Wood River
Woodbine Bayou
Woods Creek
Wrights Creek
Wynn Branch Creek
Ximanies Creek
Yates Creek
Yates Mill Creek
Yellow Bluff Creek
Yellow Creek
Yellow Fever Creek
Yellow River
Yellow Slough
Yellow Water Creek
Yent Bayou
Yoke Branch
Yucca Pen Creek
Zeigler Dead River

## Lakes

A A Hilton Pond
A J Spencer Pond
Abbott Lake
Acorn Lake
Adams Lake
Adams Pond
Ajay Lake
Albert Gordon Pond
Albritton Lake
Alford Arm
Alligator Lake
Alligator Pond
Alligator Ponds
Alva Davidson Pond
Amory Lake
Anderson Lake
Anderson Pond
Andover Lakes
Andrew Lake
Andrews Lake
Angeles Lake
Anglers Lake
Apshawa Lake
Argenta Lake
Ashton Dead River
Bachelor Lake
Bagget Lake
Bait Lake
Baker Pond
Banana Lake
Banner Lake
Baptizing Pond
Barbara Lake
Barnett Lake
Barpost Lake
Bass Lake
Bath Lake
Battle Pond
Bay Gall Ponds
Bay Horse Pond
Bay Lake
Bazzell Pond
Beakman Lake
Beany Pond
Bear Harbor Lake
Bear Lake
Bear Pond
Beaverdam Lake
Bee Gum Lake
Beer Can Pond
Beetree Pond
Belcher Hole
Bell Lake
Bell Pond
Bell Prairie
Bellamy Pond
Beltons Millpond
Bens Lake
Berchfield Lake
Berry Pond
Bert Brothers Pond
Bethea Lake
Big Blue Lake
Big Boy Lake
Big Island Lake
Big Lake
Big Lake Vienna
Big Lilly Lake
Big Morrell Lake
Big Redfish Lake
Big Trail Pond
Big Whirl
Billy Lake
Bimini Basin
Bird Lake
Bird Pond
Black Lake
Black Pond
Blackfish Lake
Blair Pond
Blanton Lake
Block Pond
Blossom Lake
Blue Lake
Blue Peter Lake
Blue Pond
Blue Sink
Blue Sink Pond
Boat Lake
Boat Pond
Bobcat Pond
Boggess Hole
Boggy Lake
Boiling Creek Lake
Boll Green Lake
Bolt Lake
Bone Bluff Lake
Bone Pond
Bonnet Lake
Bonnet Pond
Boram Lake
Bosse Lake
Bottonwood Pond
Brandt Pond
Brandy Beach Pond
Brickyard Lake
Brickyard Pond
Bright Lake
Brooks Lake
Brooks Pond
Brown Lake
Brown Pond
Brunner Pond
Bryant Pond
Buck Lake
Buck Pond
Buckhorn Creek
Buddy Pond
Buffalo Lake
Bull Slough
Bully Lake
Burke Pond
Burns Lake
Burnt Cypress Lake
Bush Pond
Butterfly Lake
Buttonwood Pond
C R Wise Pond
Cabbage Bay
Caldwells Pond
Calf Lake
Calf Pond
California Lake
Camp Creek Lake
Camp Pond
Campbell Pond
Campground Pond
Carl Pond
Carlney Lake
Carpenter Pond
Carter Pond
Carver Pond
Casa Linda Lake
Cascade Lake
Casson Pond
Casterline Lake
Castle Lake
Cat Island Lake
Cattail Lake
Cattail Lakes
Cedar Lake
Cemetery Lake
Chain O Lakes
Chapman Lake
Charley Pond
Charlotte Pond
Chason Pond
Chason Ponds
Cheney Pond
Chipley Lake
Chub Pond
Clair Pond
Clam Bayou
Clark Lake
Clay Hole Pond
Clay Lake
Clayhole Pond
Clear Basin

Clear Lake
Clear Pond
Clearview Lake
Clearwater Lake
Clyde Reese Pond
Coal Spring Lake
Coleman Pond
Como Lake
Complex Lake
Cooeg Pond
Cook Lake
Coon Pond
Cooney Pond
Coop Pond
Cooper Basin
Coot Bay Pond
Cooter Lake
Coral Cove
Corkins Lake
Cotton Lake
Coulter Basin
Cow Pen Pond
Cow Pond
Cowarts Lake
Cowpen Lake
Cox Lake
Crain Pond
Crane Lake
Crane Pond
Crane Ponds
Cravero Lake
Crawford Lake
Crescent Lake
Crest Lake
Crews Lake
Croft Pond
Crowder Holes
Crown Lake
Crystal Lake
Curry Lake
Cuthbert Lake
Cypress Creek
Cypress Lake
Cypress Pond
Daddy Hole
Dade Lake
Dallis Waterhole
Danley Lake
Danley Pond
Danny Hole
Darkwater Lake
Davenport Bayou
Davis Lake
Davis Pond
Deacon Lake
Deacon Pond
Dead Lake
Dead Lakes
Dead River Lake
Deep Hole
Deep Lake
Deer Lake

Deer Point Lake
Deer Pond
Dempsey Lake
Devils Elbow
Dicks Lake
Dillard Pond
Dinken Bayou
Dinners Pond
Dixon Lake
Dobes Hole
Doctors Lake
Doe Pond
Dog Hole
Dog Lake
Dollar Lake
Dollar Pond
Dolly Lakes
Dorman Pond
Dorset Lake
Dosson Lake
Double Bluff Lake
Double Branch Pond
Double Pond
Double Ponds
Dove Sound
Downing Lake
Dozier Lake
Draper Lake
Dream Pond
Dry Lake
Dry Pond
Duck Lake
Duck Pond
Dykes Mill Pond
Eagle Lake
Eagle Nest Pond
East Fox Lake
East Lake
East Lake Tohopekaliga
East River Pool
Eastern Lake
Echo Lake
Eden Lake
Egypt Lake
Eightmile Pond
Eleven Ponds
Elsie Lake
Emerald Lake
Emmons Bayou
Enchanted Lake
Endless Lake
English Lake
Equus Meadow Pond
Faircloth Lakes
Fairview Lake
Fairway Lake
Fannin Bayou
Fanny Lake
Farles Lake
Faye Lake
Ferguson Bay
Fish Lake

Fivemile Pond
Flora Lake
Flowers Pond
Forehand Pond
Fountain Lake
Four Prong Lake
Fox Lake
Fox Pond
Frank Taucher Reservoir
Freshwater Bayou
Freshwater Lake
Frierson Lakes
Frog Lake
Gainer Pond
Gar Pond
Garden Lake
Gator Hole
Gator Lake
George Ann Lake
Gibbs Pond
Gillis Pond
Gin House Lake
Glenvar Lake
Glisson Pond
Goggleye Lake
Golden Isles Lake
Golden Lake
Goose Pond
Grass Lake
Grass Pond
Grassy Lake
Grassy Pond
Graveyard Lake
Great Pocket
Green Lake
Green Pond
Greenback Lake
Greyknoll Lake
Grimes Lake
Grisset Pond
Guest Lake
Gum Pond
Gum Slough
Gyte Chester Pond
Half Moon Lake
Half Moon Pond
Halfmoon Lake
Halfway Lake
Halfway Pond
Ham Pond
Hamilton Lake
Hammock Lake
Hampton Lake
Handcock Lake
Hankley Lake
Harbor Lake
Hardesty Lake
Hardworking Bayou
Hardy Sink
Hare Lake
Harolds Pond
Harris Pond

Hart Pond
Harvest Lake
Hasenjaeger Lake
Hay Lake
Hay Pond
Headquarters Pond
Heath Pond
Henderson Pond
Hendrics Lake
Henry Dover Pond
Henry Lake
Henry Prescott Pond
Heron Lagoon
Hettie Pond
Hewitt Lakes
Hickory Hammock Lake
Hidden Hollow Lake
Hidden Lake
Higginbotham Lake
Highlog Lake
Hitchcock Lake
Hobart Lake
Hog Pond
Hokey Lake
Holden Lake
Hole in the Wall
Holley Ponds
Homer Lake
Honeymoon Lake
Horse Pond
Horselot Pond
Horseshoe Lake
Horseshoe Mud Lake
Howard Lake
Hubbard Pond
Hubert Bell Pond
Hudson Lake
Huguenot Lagoon
Hundred Acre Pond
Hungerford Lake
Hutson Pond
Hydrilla Lake
Indian Lake
Indian Pond
Inner Clam Bay
Inside Lake
Iola Lake
Island Lake
Island Pond
Ivy Stag Lake
J C Headley Pond
J R Alford Pond
Jacks Lake
James Lake
Jane Pond
Jeb Knight Pond
Jennings Lake
Jernigan Lake
Jernigans Pond
Jessamine Lake
Jewel Lake
Jim Long Lake

John C Pace Pond One
John Quiet Lakes
John Stafford Pond One
John Stafford Pond Two
Johns Pond
Johnson Bayou
Johnson Lake
Johnson Pond
Joiner Lake
Jones Lake
Jones Pond
Jordan Lake
Jug Lake
July Lake
Jungle Bay
Karick Lake
Keene Lake
Kelly Pond
Kemp Pond
Kendale Lake
Kendall Lake
Kentucky Lake
Key Pond
Kimball Lake
King Pond
Knight Lake
Konomac Lake
Ladyfinger Lake
Lago Lindo
Lago Maggiore
Lago Minore
Lago Monaco
Lake Alfred
Lake Alice
Lake All Bright
Lake Allen
Lake Altamaha
Lake Alto
Lake Ann
Lake Annette
Lake Annie
Lake Arcola
Lake Asbury
Lake Audrey
Lake Austin
Lake Avoca
Lake Azalea
Lake Barbara
Lake Beauty
Lake Bedford
Lake Belle
Lake Bellevue
Lake Belmar
Lake Beresford
Lake Bessiola
Lake Bethel
Lake Beulah
Lake Blue
Lake Boca Raton
Lake Bonita
Lake Bonnet
Lake Bonny

Lake Bracy
Lake Bright
Lake Brooker
Lake Brooklyn
Lake Buchanan
Lake Buckhorn
Lake Burbank
Lake Burns
Lake Buynak
Lake Byron
Lake Cannon
Lake Carol
Lake Caroline
Lake Carroll
Lake Cecile
Lake Chapin
Lake Charles
Lake Chasco
Lake Chautauqua
Lake Chelton
Lake Chipley
Lake Citrus
Lake Claire
Lake Clarke
Lake Claudette
Lake Clyde
Lake Coma
Lake Cone
Lake Cooley
Lake Cooper
Lake Crago
Lake Dan
Lake Daugharty
Lake Davis
Lake Deer
Lake Deon
Lake Destiny
Lake Dexter
Lake Diamond
Lake Dicie
Lake Disston
Lake Dixie
Lake Dot
Lake Downey
Lake Duval
Lake Earl
Lake Ebby
Lake Eckles
Lake Eden
Lake Edward
Lake Effie
Lake Elizabeth
Lake Ella
Lake Ellen
Lake Elsie
Lake Emerald
Lake Emily
Lake Emma
Lake Emporia
Lake Enola
Lake Erin
Lake Evergreen

Lake Fan
Lake Fanny
Lake Flamingo
Lake Florence
Lake Fox
Lake Frances
Lake Francis
Lake Galilee
Lake Gass
Lake Gem
Lake Geneva
Lake George
Lake Gibson
Lake Gleason
Lake Grace
Lake Green Sills
Lake Greenwood
Lake Griffin
Lake Harney
Lake Harris
Lake Harry
Lake Hartley
Lake Hartridge
Lake Harvey
Lake Hattie
Lake Henry
Lake Hermosa
Lake Hialeah
Lake Hiawatha
Lake Hicpochee
Lake Holden
Lake Holloway
Lake Hollywood
Lake Horney
Lake Howard
Lake Hugh
Lake Huntington
Lake Hutchinson
Lake Iamonia
Lake Ida
Lake Idlewild
Lake Idylwild
Lake Ingraham
Lake Irene
Lake Issue
Lake Ivanhoe
Lake Jane
Lake Jean
Lake Jennie
Lake Jessie
Lake Jesup
Lake Jewel
Lake John
Lake Juanita
Lake Julia
Lake Juno
Lake Kanapaha
Lake Karen
Lake Katherine
Lake Kersky
Lake Keuka
Lake L Rancho
Lake LaChard
Lake Lafayette
Lake Lagonda
Lake Lappin
Lake Laura
Lake Lee
Lake Lillie
Lake Lily
Lake Lincoln
Lake Lipsey
Lake Little Worth
Lake Loladero
Lake Lorraine
Lake Lotus
Lake Louisa
Lake Louise
Lake Lucas
Lake Lucille
Lake Lucy
Lake Lula
Lake Lulu
Lake Lure
Lake Madeline
Lake Magdalene
Lake Maggie
Lake Maggiore
Lake Mahar
Lake Manatee
Lake Mangonia
Lake Manning
Lake Marae
Lake Maria
Lake Marie
Lake Marietta
Lake Marion
Lake Martin
Lake Mary
Lake McBride
Lake McLeod
Lake Medora
Lake Miccosukee
Lake Midget
Lake Millbite
Lake Mirror
Lake Monarch
Lake Monroe
Lake Morton
Lake Myra
Lake Myrtle
Lake Nally
Lake Neptune
Lake Number 1
Lake Number 2
Lake Number 3
Lake Number 4
Lake Number Five
Lake Oakland
Lake of the Woods
Lake Okahumpka
Lake Olivia
Lake Omega
Lake Orange
Lake Osborne
Lake Overstreet
Lake Palm
Lake Palmer
Lake Palmerito
Lake Panasoffkee
Lake Pancoast
Lake Patient
Lake Patricia
Lake Pearl
Lake Phillips
Lake Placid
Lake Poinsett
Lake Pollock
Lake Ponte Vedra
Lake Reaves
Lake Rey
Lake Rhea
Lake Roberta
Lake Roberts
Lake Robin Hood
Lake Rogers
Lake Rousseau
Lake Roy
Lake Ruby
Lake Runnymede
Lake Ruth
Lake Sable
Lake Sanitary
Lake Sarah
Lake Sarasota
Lake Saratoga
Lake Seminole
Lake Senac
Lake Sentinel
Lake Serena
Lake Sharpe
Lake Shepherd
Lake Shippey
Lake Sidney
Lake Silver
Lake Simmons
Lake Somerset
Lake Sparkle
Lake Speer
Lake Spencer
Lake Sperry
Lake Stahl
Lake Stanley
Lake Steven
Lake Stone
Lake Surprise
Lake Susan
Lake Sylvia
Lake Terry
Lake Theresa
Lake Tilden
Lake Trowed
Lake Tuttle
Lake Tutuola
Lake Van
Lake Vedra

Lake Virginia
Lake Vivian
Lake Ward
Lake Ware
Lake Warren
Lake Wastena
Lake Wayman
Lake Weader
Lake Weston
Lake Whitcomb
Lake Wilbar
Lake Wimico
Lake Winston
Lake Wire
Lake Woodruff
Lake Worth
Lake Worth Creek
Lake Wyman
Lake Yarbo
Lake Yvette
Lake Yvonne
Lake Zephyr
Lamar Lake
Lamps Pond
Lands Lake
Landy Lake
Lane Pond
Lassiter Lake
Laura Lake
Lazy Lake
Leavins Lake
Lemon Lake
Leroy Ponds
Lettuce Lake
Lighthouse Pool
Lily Lake
Lily Pond
Little Banana Lake
Little Blue Pond
Little Brushy Pond
Little Deer Lake
Little Ellen Lake
Little Fox Lake
Little Gant Lake
Little Gar Lake
Little Halfmoon Lake
Little Henry Lake
Little Lake
Little Lake Barton
Little Lake Bryan
Little Lake Geneva
Little Lake George
Little Lake Green Sills
Little Lake Jackson
Little Lake Maule
Little Lost Lake
Little Morrell Lake
Little Porter Lake
Little Redfish Lake
Little Salt Spring
Little Sand Pond
Little Sawgrass Lake

Little Tucker Lake
Little Van Lake
Live Oak Pond
Lockey Lake
Log Creek Pond
Log Pond
Long Lake
Long Pond
Long Sun Lake
Long Swamp
Lorraine Lake
Lost Boy Pond
Lost Lake
Lovers Lake
Lower Lake Louise
Loxahatchee Slough
Mabel Porter Pond
Major Lake
Major Shear Pond
Manatee Pocket
Mango Lake
Mansfield Pond
Marco Lake
Maria Sanchez Lake
Mariner Lake
Marquis Basin
Martin Lakes
Martin Pond
Martins Mill Pond
Mary Lake
Mary Lou Lake
Maule Lake
Mayan Lake
Mays Pond
McCarthy Lake
McClendon Lake
McQuaig Lake
Mead Lake
Melvina Pond
Menge Pond
Meridian Lake
Metcalf Lake
Middle Fox Lake
Middle Lake
Mile Lake
Mill Pond
Miller Lake
Mills Smokehouse Pond
Milly Lake
Minom Sog
Mirror Lake
Monroe Lake
Moody Lake
Moore Pond
Moran Lake
Morgan Pond
Morris Lake
Morrison Lake
Moses Hole
Mosquito Lake
Moss Pond
Mound Lake

Mounds Pond
Mounds Pool
Mountain Lake
Mountain Sink
Mud Lake
Mud Lakes
Mud Pond
Mudd Lake
Muddy Lake
Mullet Lake
Mullet Pond
Muscogee Lake
Myrtle Lake
Nature Conservancy Bay
Ned Pond
Needmore Pond
Nelson Lake
Newman Bayou
Ninemile Pond
Noreast Lake
North Bear Lake
North Crystal Lake
North Lake
Norwood Lake
Oak Pond
O'Berry Lake
Ocala Pond
Ogden Lake
Ogden Pond
Old Blind Pass
Old Fern Pond
Old Lake
Old Pond
Oldfield Pond
Olsen Lake
Open Pond
Orange Lake
Otter Pond
Otter Ponds
Outlook Lake
Owens Pond
Ox Lake
Ox Pond
Oyster Lake
Oyster Pond
Pace Lake
Palatka Pond
Palm Lake
Palmer Lake
Palmetto Lake
Panama Lake
Paradise Lake
Park Lake
Pasadena Lake
Paul Pond
Payne Pond
Peace Pond
Peacock Lake
Peacock Pond
Pearl Bayou
Pearl Lake
Peck Lake

Pelican Lake
Pelican Pond
Penner Ponds
Perch Lake
Perch Pond
Perry Pond
Peter Gibson Pond
Phyllis Lake
Piclalene Bayou
Picnic Lake
Picnic Pond
Pigott Pond
Pillans Prairie
Pine Bluff Lake
Pine Lake
Pine Log Lake
Piney Z Lake
Pinhook Lake
Pioneer Lake
Pippin Lake
Pirate Cove
Plank Bridge Lake
Plantation Pond
Platt Lake
Playland Lake
Plaza Pool
Pleasant Point Lake
Plew Lake
Point Lake
Polk Lake
Port Leon Lake
Porter Lake
Potter Pond
Pouratis Pond
Powell Lake
Prairie Ponds
Pretty Lake
Pretty Pond
Princess Lake
Puddin Head Lake
Pump Pond
Puzzle Lake
Queen City Lake
R B Spires Pond
R B Squirls Pond
R B Underwood
Race Pond
Railroad Pond
Rainbow Lake
Rat Pond
Rattlesnake Lake
Raulerson Prairie
Rayner Pond
Reason Lakes
Red Bug Lake
Red Lake
Reedy Lake
Rees Lake
Reinheimer Lake
Renfro Lake
Republic Lake
Rexford Lake

Riverside Lake
Roberts Lake
Rock Lake
Rock Pond
Rose Apple Lake
Rosemary Pond
Round Lake
Round Pond
Royal Lake
Ruth Lake
Sabal Lake
Saddleback Lake
Saddlebag Lake
Saddlebags Lake
Saint Johns Lake
Salerno Lake
Salt Lake
Salters Lake
Sam Joe Pond
Sampson Lake
Sams Lake
Sanborn Lake
Sand Hill Pond
Sand Lake
Sand Pond
Sandy Pond
Sanibel Bayou
Santa Fe Lake
Sapp Lake
Sapphire Lake
Sawdust Lake
Sawgrass Lake
Schoolhouse Lake
Scoggin Lake
Sconiers Mill Pond
Sea Pond
Seaboard Pond
Sears Lake
Secret Lake
Sellers Lake
Seminole Lake
Seven Palm Lake
Sevenmile Lake
Sewell Lake
Shacklefoot Pond
Sharon Lake
Sharpes Lake
Sharpless Pond
Shaw Pond
Sheephead Bayou
Sheppard Lake
Sherman Cove
Sherman Inlet
Shirt Tail Lake
Sigler Lake
Silver Lake
Silver Pond
Simmon Pond
Sink Hole Ponds
Sister Pond
Sixmile Pond
Skim Lake

Skinner Lake
Sky Lake
Smokehouse Lake
Smokehouse Pond
Snag Lake
Snapper Creek Lake
South Bass Lake
South Bear Lake
South Bonnet Pond
South Crystal Lake
South Lake
South Lake Asbury
South Moon Lake
South Twin Lake
Southern Pond
Southwater
Sparkleberry Lake
Sparkling Water Lake
Sparling Lake
Spectacle Pond
Spring Head Pond
Spring Lake
Spring Lake Number Two
Spruce Lake
Square Lake
Squirrel Prairie Lake
Stagger Mud Lake
Stalworth Lake
Stanley Sog
Star Lake
Starks Prairie
Starvation Lake
Station Lake
Stealing Lake
Steer Pen Slough
Stergan Lake
Stevens Pond
Still Pond
Stokes Lake
Stony Bayou Pool
Story Lake
Strayhan Pond
Stubbs Lake
Sugarbowl Lake
Suggs Lake
Sunset Lake
Sunshine Lake
Surprise Lake
Swan Lake
Sweet Water Lake
Sweetwater Lake
Sylvia Lake
Tank Pond
Tanner Lake
Tarkiln Bayou
Tarpan Lake
Tarpon Creek
Tater Patch Pond
Taylor Lake
Taylor Slough
Tea Pond
Tee Lake

Tenmile Lake
The Basin
The Black Holes
The Cutoff
The Lungs
The Narrows
The Pond
Thirsting Lake
Thomas Lake
Thompson Lake
Thompson Pond
Thornhill Lake
Thrasher Nest Pond
Three Pond
Threemile Lake
Tick Island Mud Lake
Tiger Lake
Tiller Mill Lake
Tillmans Pond
Timber Lake
Tom Black Lake
Townsen Lake
Tractor Lake
Triple Lakes
Tropic Lagoon
Trout Lake
Trues Lake
Tucker Lake
Turf Pond
Turner Lake

Turnip Pond
Turtle Harbor
Tusset Pond
Twin Lake
Twin Lakes
Twomile Prairie Lake
Up and Down Lake
Upper Lake Louise
Varnes Lake
Vienna Lake
Waldon Lake
Waldorf Lake
Walton Pond
Ward Lake
Warner East Bayou
Warner West Bayou
Warren Bayou
Wash Pond
Waterview Lake
Watson Pond
Watson Prairie
Wee Lake
Weeks Lakes
Weeks Waterhole
Well Pond
West Arm of Dead Lakes
West Lake
Western Lake
Whidden Lake
Whirlwind Lake

White Flank Pond
White Lake
White Pond
Whitehead Lake
Whitmore Lake
Wicker Lakes
Wickers Pond
Williams Lake
Williams Pond
Wilma Lake
Wilson Lake
Wind Lake
Windsor Pond
Winston Lake
Wistaria Lake
Wolf Pond
Wood Lake
Woodbine Springs Lake
Woodbury Lake
Workman Lake
Workman Pond
Wright Lake
Wynn Lake
X L Lake
Yarber Pond
Yard Pond
Yearling Pond
Zephyr Lake



**DEPARTMENT OF THE ARMY**
**JACKSONVILLE DISTRICT CORPS OF ENGINEERS**
**POST OFFICE BOX 4970**
**JACKSONVILLE, FLORIDA 32232-0019**

REPLY TO
ATTENTION OF

March 19, 2018

Regulatory Division

# *PUBLIC NOTICE*

## *Determination of Navigable Waters*

TO WHOM IT MAY CONCERN: The Jacksonville District, U.S. Army Corps of Engineers (Corps), seeks input from the public regarding the use of waters within the State of Florida for navigation.

BACKGROUND: Pursuant to 33 C.F.R. § 329.4, navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce. A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity.

Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403) (Section 10) requires a Department of the Army (DA) permit for certain activities in, over, or under navigable waters of the United States. A determination whether a waterbody is a navigable water of the United States is made by the division engineer and is based on a report of findings prepared at the district level according to specific criteria (33 C.F.R. § 329.14(b)).

In an effort to provide clarity to the regulated public regarding which waters are subject to permitting authority under Section 10, the Corps is performing an analysis of waterways in the state of Florida to determine the extent of navigability and identify the limits of Section 10 jurisdiction.

These navigability studies are required by regulation to be conducted and updated whenever a question arises regarding the navigability of a waterbody. Where no determination has been made, a report of findings will be prepared and forwarded to the Division engineer for approval (33 C.F.R. § 329.15(a)). Tabulated lists of final determinations of navigability are to be maintained in each district office, and be updated as necessitated by court decisions, jurisdictional inquiries, or other changed conditions (33 C.F.R. § 329.16(a)).

Section 404(a) of the Clean Water Act of 1972 (CWA), 33 U.S.C. § 1344, authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue DA permits for

the discharge of dredged or fill material into waters of the United States (Section 404 Program). Pursuant to Section 404(g) of the CWA, the Florida Department of Environmental Protection (DEP) is pursuing approval from the United States Environmental Protection Agency (EPA) to assume the Section 404 Program and administer its own individual and general permit program. State assumption of the Section 404 Program would be limited to certain waters and does not include navigable waters of the United States. The navigability studies will also assist with determining the waters that would be retained by the Corps if the EPA approves the State's application for Section 404 Program assumption. The Regulations governing the assumption process can be found at 40 C.F.R. §233.

**To assist with completion of the navigability studies, the Corps is seeking comments from the public regarding use of waters in the state of Florida for navigation. This includes identification of those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities.**

COMMENTS: Comments should be submitted in writing to the District Engineer or sent via email to the below addresses within 30 days from the date of this notice. Please include mapping, figures, coordinates, etc. that clearly identify the reach of the associated waterbody and documentation relating to navigation, commerce, and recreation.

DEPARTMENT OF THE ARMY
JACKSONVILLE DISTRICT CORPS OF ENGINEERS
REGULATORY DIVISION
ATTN: DETERMINATION OF NAVIGABLE WATERS
P. O. BOX 4970
JACKSONVILLE, FLORIDA 32232-0019

Navigability_Determination@usace.army.mil

Tori K White

for

Donald W. Kinard
Chief, Regulatory Division

**From:** Ennis, Bradley
**To:** BARRON, Robert B (Bob) CIV USARMY CESAJ (US)
**Cc:** Mason, Heather; Lagos, Jorge
**Subject:** [Non-DoD Source] ACOE - FDEP Florida Navigable Waters Discussion
**Date:** Tuesday, March 20, 2018 1:04:48 PM
**Attachments:** FloridaNavigableWaters - Section 10.pdf
Database_Metadata.docx
Database_Design.pptx
Section_10_Waters_NO MATCH FOUND.xlsx

---

Bob,

Attached are the documents and mapping data that I have been working on for the Florida navigable waters classification. As previously discussed, since receiving the 'original' and 'supplemental' list from the Jacksonville District ACOE, the FDEP Water Resource Management (WRM) section has been trying to identify the hydrological features for future permitting purposes. Using a subset of the National Hydrography Dataset (NHD) 24:000K resolution features I have started to build a database to delineate Section 10 and 404 waters as specified by the ACOE.

An ArcGIS Map Package with the most recent data can be downloaded here:

ftp://ftp.dep.state.fl.us/pub/outgoing/Layers/

Using the NHD and geo-referencing sources the FDEP-WRM staff were able to join most of the names listed in the 'original' and 'supplemental' list. However, there are numerous broad names such as "Crooked Creek" that produced multiple hits in the NHD. We will need to have additional direction from ACOE in order to continue to refine the Section 10 list.

Please review the attached documents. I will give you a call today (3/20) at 1:00 ET.

-Brad

Bradley Ennis

Engineering Specialist IV

Division of Water Resource Management

Florida Department of Environmental Protection

850-245-8201

bradley.ennis@dep.state.fl.us <mailto:bradley.ennis@dep.state.fl.us>

<*(((>< <*(((>< <*(((><

<Blockedhttp://survey.dep.state.fl.us/?refemail=Bradley.Ennis@dep.state.fl.us>

# Florida's Section 10 Navigable Waters

This map depicts the hydrological features in the state of Florida that were identified as Section 10 waters by the U.S. Army Corps of Engineers in the 'Original' and 'Supplemental' Jacksonville District Navigable Water lists that were sent to the Florida Department of Environmental Protection. The map's hydrological features are a subset of the National Hydrography Dataset ver. 2017-12-15, at the 1: 24,000 resolution.

Florida Navigable Waters Database ver. 2018-03-20

## Flowlines

Subset of the 1:24,000 scale NHDFlowline features from the National Hydrography Dataset (NHD) ver. 2017-12-15. This FeatureClass only contains features found in the state of Florida with the 460 - 'StreamRiver' NHD subtype. This dataset represents the routes that make up the hydrological drainage network. Features may intersect other hydrological features.

The National Hydrography Dataset (NHD) is a feature-based database that interconnects and uniquely identifies the stream segments or reaches that make up the nation's surface water drainage system. The NHD contains reach codes for networked features, flow direction, names, and centerline representations for areal water bodies. A dissolve based on feature connectivity within a basin as defined by the ReachCode field was performed on this dataset to simplify reach components in a name search. The simplified layer was then related to the original feature components in a 1-M relationship.

The NHD also incorporates the National Spatial Data Infrastructure framework criteria established by the Federal Geographic Data Committee.

| Field Name | Type | Description |
|---|---|---|
| REACHCODE | Text | Unique identifier based on sub-basin code as defined by FIPS 103 |
| GNIS_ID | Text (Formatted Number) | Unique identifier assigned by Geographic Names Information System |
| GNIS_NAME | Text | Proper name or term by which a particular geographic entity is known |
| Section_10 | Integer (Boolean) | True/False - ACOE Section 10 reference is associated with feature |
| Section_10_Reference | Text (Formatted Number) | Reference number associated with ACOE Section 10 Lists |

## Flowlines_RC (Flowline Reach Components)

Dataset is used as a relational intermediate between the **Flowlines** FeatureClass and the **Flowlines Area** feature class.

Subset of the 1:24,000 scale NHDFlowline features from the National Hydrography Dataset (NHD) ver. 2017-12-15. This FeatureClass only contain features with the subtype 460 - 'StreamRiver' in the state of Florida. This dataset represents the routes that make up the hydrological drainage network. summarization or dissolves were used on this dataset to maintain congruency between the flowline features in the National Hydrological Database and the Florida Navigable Waters Database. Features may intersect other hydrological features.

| Field Name | Type | Description |
|---|---|---|
| REACHCODE | Text | Unique identifier based on sub-basin code as defined by FIPS 103 |
| GNIS_ID | Text (Formatted Number) | Unique identifier assigned by Geographic Names Information System |
| GNIS_NAME | Text | Proper name or term by which a particular geographic entity is known |
| PERMANENT_IDENTIFIER | Text | 40-char GUID value that uniquely identifies feature in NHD |
| FDATE | Date | Date of last feature modification |
| WBAREA_PERMANENT_ID | Text | Link relationship field between line features and associated areas |
| FTYPE | Integer | Three-digit integer value, unique subtype identifier of a feature |
| FCODE | Integer | Five-digit integer NHD value describing feature's characteristics |

## Flowlines_Areas

Subset of the 1:24,000 scale NHDArea features from the National Hydrography Dataset (NHD) ver. 2017-12-15. This FeatureClass only contains features found in the state of Florida with the 336 - 'CanalDitch' or 460 – 'StreamRiver' NHD subtype. This dataset represents the areal waterbody features associated with Flowlines. Features may intersect other hydrological features.

| Field Name | Type | Description |
|---|---|---|
| GNIS_ID | Text (Formatted Number) | Unique identifier assigned by Geographic Names Information System |
| GNIS_NAME | Text | Proper name or term by which a particular geographic entity is known |
| PERMANENT_IDENTIFIER | Text | 40-char GUID value that uniquely identifies feature in NHD |
| FDATE | Date | Date of last feature modification |
| FTYPE | Integer | Three-digit integer value, unique subtype identifier of a feature |
| FCODE | Integer | Five-digit integer NHD value describing feature's characteristics |
| Section_10 | Integer (Boolean) | True/False - ACOE Section 10 reference is associated with feature |

## Reservoirs

Subset of the 1:24,000 scale Waterbody features and NHDArea features from the National Hydrography Dataset (NHD) ver. 2017-12-15. This FeatureClass only contains features found in the state of Florida with the 390 - 'LakePond' or 436 – 'Reservoir' subtype from the NHD Waterbody features or the 445 – 'SeaOcean' subtype from the NHD Area feature. Note: No other NHD Waterbody subtypes classifications are present in Florida. This dataset represents the areal waterbody features that are either not connected to a flowline feature or represent a significant hydrological feature with different physical (i.e. presence of flow or distance between shorelines). Features may intersect other hydrological features.

| **Field Name** | **Type** | **Description** |
|---|---|---|
| REACHCODE | Text | Unique identifier based on sub-basin code as defined by FIPS 103 |
| GNIS_ID | Text (Formatted Number) | Unique identifier assigned by Geographic Names Information System |
| GNIS_NAME | Text | Proper name or term by which a particular geographic entity is known |
| PERMANENT_IDENTIFIER | Text | 40-char GUID value that uniquely identifies feature in NHD |
| FDATE | Date | Date of last feature modification |
| FTYPE | Integer | Three-digit integer value, unique subtype identifier of a feature |
| FCODE | Integer | Five-digit integer NHD value describing feature's characteristics |
| Section_10 | Integer (Boolean) | True/False - ACOE Section 10 reference is associated with feature |
| Section_10_Reference | Text (Formatted Number) | Reference number associated with ACOE Section 10 Lists |

## Hydro_Subsets

Subset of the 1:24,000 scale NHDArea features from the National Hydrography Dataset (NHD) ver. 2017-12-15. This FeatureClass only contains features found in the state of Florida with the 312 - 'BayInlet' NHD subtype. This dataset represents the sub-regions of the Reservoir and Flowline_Area FeatureClasses that have unique names and unique identifiers within the NHD.

| **Field Name** | **Type** | **Description** |
|---|---|---|
| GNIS_ID | Text (Formatted Number) | Unique identifier assigned by Geographic Names Information System |
| GNIS_NAME | Text | Proper name or term by which a particular geographic entity is known |
| PERMANENT_IDENTIFIER | Text | 40-char GUID value that uniquely identifies feature in NHD |
| FDATE | Date | Date of last feature modification |
| FTYPE | Integer | Three-digit integer value, unique subtype identifier of a feature |
| FCODE | Integer | Five-digit integer NHD value describing feature's characteristics |
| Section_10 | Integer (Boolean) | True/False - ACOE Section 10 reference is associated with feature |
| Section_10_Reference | Text (Formatted Number) | Reference number associated with ACOE Section 10 Lists |

## ACOE_Section10_Waters

Table summarizing all reference water bodies (Both rivers and lakes) from the ACOE Section 10 Waters Original and Supplemental documents that were linked to feature(s) within the NHD Database.

| **Field Name** | **Type** | **Description** |
|---|---|---|
| Name | Text | Name of ACOE Section 10 feature |
| Feature_Type | Text | River/Lake |
| Source | Text | List the reference came from (i.e. original or supplemental) |
| REFID | Integer | Unique reference number associated with ACOE Section 10 feature |



CORPS003220

| Name | Feature_Type |
|---|---|
| Lake Seminole (Leon County) | Lake |
| Crooked Creek (Martin County) | River |
| Moores Creek (Martin County) | River |
| Morris Dead River | River |
| NN Creek | River |
| Old Channel | River |
| Soldier Creek (Escambia County) | River |
| Summer Haven River | River |
| Wrights Creek (Walton County) | River |

| Source |
| --- |
| ACOE Jacksonville District Section 10 Waters - Original |
| ACOE Jacksonville District Section 10 Waters - Original |
| ACOE Jacksonville District Section 10 Waters - Original |
| ACOE Jacksonville District Section 10 Waters - Original |
| ACOE Jacksonville District Section 10 Waters - Original |
| ACOE Jacksonville District Section 10 Waters - Original |
| ACOE Jacksonville District Section 10 Waters - Original |
| ACOE Jacksonville District Section 10 Waters - Original |
| ACOE Jacksonville District Section 10 Waters - Original |

**From:** Palmer, John C CIV USARMY CESAJ (US)
**To:** Currie, Steven J CIV USARMY CESAJ (US)
**Subject:** FW: All Florida
**Date:** Thursday, March 22, 2018 10:18:40 AM

---

Steve,
See the below email chain from the Seminole Tribe in reference to the Nav waters PN.

John Palmer, Project Manager
U.S. Army Corps of Engineers
400 High Point Drive, Suite 600
Cocoa, FL 32926
321-504-3771 extension 10
321-504-3803 (fax)
john.palmer@usace.army.mil

Service
“The happiest people are those who do the most for others. The most miserable are those who do the least.” —
Booker T. Washington

“To give real service you must add something which cannot be bought or measured with money, and that is sincerity and integrity”. - Douglas Adams

-----Original Message-----
From: Bernard Howard [mailto:BernardHoward@semtribe.com]
Sent: Wednesday, March 21, 2018 3:54 PM
To: White, Tori K CIV USARMY CESAJ (US) <Tori.White@usace.army.mil>; Palmer, John C CIV USARMY CESAJ (US) <John.Palmer@usace.army.mil>
Cc: Moore, Robin E CIV USARMY CESAJ (US) <Robin.E.Moore@usace.army.mil>; Victoria Menchaca <VictoriaMenchaca@semtribe.com>
Subject: [Non-DoD Source] RE: All Florida

Good Afternoon,

Below is a short list of various sources that may be helpful with identifying historic canoe travel in Florida.

Aberg, F.A and C. Lewis
2000 The Rising Tide; Archaeology and Coastal Landscapes. Oxbow Books, Oxford, UK
Bailey, G.N.
1988 The Archaeology of Prehistoric Coastlines. Cambridge University Press, Cambridge, UK
Blanchard, C.
1999 Analogy and Aboriginal Canoe use in Southwest Florida. Maritime Archaeology of Lemon Bay, Florida. Col 14, edited by G.M. Luer , pg 23-42; Florida Anthropology Society Inc. Tampa, Florida
Catesby, Mark
1743 The Natural History of Carolina, Florid, and Bahama Islands. Vol. II London, UK
Luer, George M.
1989 Calusa Canals in Southwestern Florida: Routes of Trade and Exchange. The Florida Anthropologist 42(2)
MacCauley, Clay
1887 The Seminole Indians of Florida, Fifth Annual Report of the Bureau of Ethnology to the Secretary of the Smithsonian Institution. United States Government Printing Office, Washington, DC.
Newsom, Lee and Barbara Purdy
1990 Florida Canoes: A Maritime Heritage form the Past. The Florida Anthropologist 43(3) 164-180
Purdy, Barbara

1991 The Art and Archaeology of Florida's Wetlands. CRC Press, Boca Raton, FL
Sturtevent, William and Jessica R. Cattelino
2004 Florida Seminole and Miccosukee. Handbook of North American Indians 14, pg 429-449
Wheeler, R.J.
1996 Ancient Art of the Florida Peninsula: 500 BC to AD 1763. Unpublished Pd.D. dissertation, Department of Anthropology, University of Florida, Gainesville, FL
Wyman, J.
1870 From Explorations in Florida. Peabody Museum, Boston, MA.

Best Regards,

Bernard J. Howard MA, RPA
Project Coordinator
Tribal Historic Preservation Office
Seminole Tribe of Florida
Tel: (863) 983-6549 Ext. 12206
Fax: (863) 902-1117

-----Original Message-----
From: THPO Compliance
Sent: Wednesday, March 21, 2018 2:28 PM
To: Bernard Howard
Subject: FW: All Florida

Please send an email to John.Palmer@usace.army.mil and Tori.White@usace.army.mil with additional sources to check on canoe travel in Florida and copy Robin as well.

Thanks,
Victoria

-----Original Message-----
From: owner-ls-specialinterest-publicnotice@lst.usace.army.mil [mailto:owner-ls-specialinterest-publicnotice@lst.usace.army.mil] On Behalf Of Palmer, John C CIV USARMY CESAJ (US)
Sent: Tuesday, March 20, 2018 12:04 PM
To: ls-specialinterest-publicnotice@lst.usace.army.mil
Subject: USACE.Notice..Location: All Florida

A public notice for the action described below has been posted at Blockedhttp://www.saj.usace.army.mil/Missions/Regulatory/PublicNotices.aspx

TO WHOM IT MAY CONCERN: The Jacksonville District, U.S. Army Corps of Engineers (Corps), seeks input from the public regarding the use of waters within the State of Florida for navigation.

BACKGROUND: Pursuant to 33 C.F.R. § 329.4, navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce. A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity.

Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403) (Section 10) requires a Department of the Army (DA) permit for certain activities in, over, or under navigable waters of the United States. A determination whether a waterbody is a navigable water of the United States is made by the division engineer and is based on a report of findings prepared at the district level according to specific criteria (33 C.F.R. § 329.14(b)).

In an effort to provide clarity to the regulated public regarding which waters are subject to permitting authority

under Section 10, the Corps is performing an analysis of waterways in the state of Florida to determine the extent of navigability and identify the limits of Section 10 jurisdiction.

These navigability studies are required by regulation to be conducted and updated whenever a question arises regarding the navigability of a waterbody. Where no determination has been made, a report of findings will be prepared and forwarded to the Division engineer for approval (33 C.F.R. § 329.15(a)). Tabulated lists of final determinations of navigability are to be maintained in each district office, and be updated as necessitated by court decisions, jurisdictional inquiries, or other changed conditions (33 C.F.R. § 329.16(a)).

Section 404(a) of the Clean Water Act of 1972 (CWA), 33 U.S.C. § 1344, authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue DA permits for the discharge of dredged or fill material into waters of the United States (Section 404 Program). Pursuant to Section 404(g) of the CWA, the Florida Department of Environmental Protection (DEP) is pursuing approval from the United States Environmental Protection Agency (EPA) to assume the Section 404 Program and administer its own individual and general permit program. State assumption of the Section 404 Program would be limited to certain waters and does not include navigable waters of the United States. The navigability studies will also assist with determining the waters that would be retained by the Corps if the EPA approves the State's application for Section 404 Program assumption. The Regulations governing the assumption process can be found at 40 C.F.R. §233.

To assist with completion of the navigability studies, the Corps is seeking comments from the public regarding use of waters in the state of Florida for navigation. This includes identification of those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities.

COMMENTS: Comments should be submitted in writing to the District Engineer or sent via email to the below addresses within 30 days from the date of this notice. Please include mapping, figures, coordinates, etc. that clearly identify the reach of the associated waterbody and documentation relating to navigation, commerce, and recreation.

DEPARTMENT OF THE ARMY
JACKSONVILLE DISTRICT CORPS OF ENGINEERS  REGULATORY DIVISION
ATTN: DETERMINATION OF NAVIGABLE WATERS  P. O. BOX 4970  JACKSONVILLE, FLORIDA 32232-0019

Navigability_Determination@usace.army.mil

--- If you no longer wish to receive these notifications, please send an email to mailto:SAJ-RD-Webmaster@usace.army.mil
--- If you have comments regarding the permit application described above, please do not reply to this email.  Your response should be provided to the project manager as described in the text of the notice.

**From:** Palmer, John C CIV USARMY CESAJ (US)
**To:** Currie, Steven J CIV USARMY CESAJ (US)
**Subject:** FW: Sources for navigable waters of florida
**Date:** Thursday, March 22, 2018 10:24:17 AM
**Attachments:** acrosseverglades.pdf
EvergladesandsouthernFlorida1911.pdf

---

And this one too.....

John Palmer, Project Manager
U.S. Army Corps of Engineers
400 High Point Drive, Suite 600
Cocoa, FL 32926
321-504-3771 extension 10
321-504-3803 (fax)
john.palmer@usace.army.mil

Service
“The happiest people are those who do the most for others. The most miserable are those who do the least.” — Booker T. Washington

“To give real service you must add something which cannot be bought or measured with money, and that is sincerity and integrity”. - Douglas Adams

-----Original Message-----
From: Victoria Menchaca [mailto:VictoriaMenchaca@semtribe.com]
Sent: Wednesday, March 21, 2018 4:54 PM
To: Palmer, John C CIV USARMY CESAJ (US) <John.Palmer@usace.army.mil>
Cc: White, Tori K CIV USARMY CESAJ (US) <Tori.White@usace.army.mil>; Moore, Robin E CIV USARMY CESAJ (US) <Robin.E.Moore@usace.army.mil>
Subject: [Non-DoD Source] Sources for navigable waters of florida

Here are some additional sources that cover canoe travel in Florida.

Thanks,

Victoria Menchaca, M.A.

Compliance Review Specialist

Seminole Tribe of Florida

Tribal Historic Preservation Office

30290 Josie Billie Hwy, PMB 1004

Clewiston, FL 33440

Tel: 863-983-6549 Ext: 12216

Email: victoriamenchaca@semtribe.com

003220
CORPS003231



003221

# *Across the Everglades*

## A Canoe Journey of Exploration By Hugh L. Willoughby

Ex-Lieutenant Commanding Rhode Island Naval Reserve

Illustrated from Photographs Taken by the Author

Philadelphia
*J. B. Lippincott Company*
1898

TWO COPIES RECEIVED
8173*

LIBRARY OF CONGRESS
OFFICE OF
JAN 28 1898
Register of Copyrights.

F317
.E9W9

9314

Copyright, 1898
by
Hugh L. Willoughby



003224



81°
TO MYERS
FORT SHACKLEFORD
BIG CYPRESS SWAMP
EDGE OF EVERGLADES.
MAJOR A.P. WILLIAMS, EXPEDITION 1883.
J.E. INGRAHAM EXPEDITION 1892.
Compass variation from 0 to 1/8 point E.
26°
CAPE ROMANO.
MIAMI
LAT. 25' 46' 15" N
LON. 80 11 15 W.
LAT. 25' 45' 00" N
LON. 80 36 15
LIEUT. H.L.WILLOUGHBY EXPEDITION 1897.
WILLOUGHBY KEY
LAT. 25' 38' 30"
LON. 80 45 00
4 or 7
LONE PINE
EDGE OF EVERGLADES
BISCAYNE BAY.
TEN THOUSAND ISLAND ARCHIPELAGO.
LAT. 25' 29' 30" N
LON 80 56. 45 W.
HARNEY RIVER
SHARK RIVER
NAUTICAL MILES.
STATUTE MILES.
LINE
THROUGH THE EVERGLADES
BY
LIEUT. H.L.WILLOUGHBY.
WHITEWATER BAY
CAPE SABLE
50
40
30
20
10
80

0032255°

CORPS003236

# PREFACE

IF the reader has the patience and fortitude to follow me in my wanderings, he will perhaps find many preconceived and erroneous impressions of the character of the Everglades dissipated. I have elsewhere stated the purpose of my winter's work. It remains, then, only for me to thank those who have kindly aided me. I beg here to express my great indebtedness to my friend, Mr. H. M. Flagler, for the courtesies of his railroad and the special interest shown by him in the successful issue of my undertaking. I have also to thank Mr. J. I. Ingraham for loaning me the complete and interesting notes made by him during his own expedition. The vocabulary in this volume was greatly enriched by the use of that charming little book, "The Seminoles of Florida," by Minnie Moore Willson, enabling me to add much to my own stock of words.

## Preface

For the analysis of the water of the Everglades I am indebted to the Harrison Laboratory of the University of Pennsylvania. Many of my negatives of Indians having been over-exposed, I have substituted the portraits of Matlo, Dr. Tiger, and Miami Doctor's Boy, which are from the camera of Commodore Ralph Munroe.

HUGH L. WILLOUGHBY.

"THE CHALET," NEWPORT, R. I.,
September, 1897.

# Table of Contents

CHAPTER I

PAGE

Florida Geographically—The Everglades—The Seminole War—Characteristics of the Tribe—Previous Explorations . . . . . . . . . . . . . . . . 9

CHAPTER II

Preliminary Trip—Seminoles at Home—Details of Outfit . . . . . . . . . . . . . . . . . . . 35

CHAPTER III

Miami — Fowey Rocks Light-House — Florida Wreckers—Vaseline à la Seminole—Soldier Key —The Habitat of the Crocodilus Americanus—The North American Alligator . . . . . . . . . 59

CHAPTER IV

Land of the Big Snake—Florida Sponges—Crawfish —An Unlucky Dive—Amateur Surgery—Cape Sable—The Edge of the Everglades . . . . . . . 82

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

## Table of Contents

### CHAPTER V

PAGE

Fighting Saw-Grass—The Limpkin—Making Camps —Sweet Water—Long Key—A Meridian Altitude—Willoughby Key—The Cabbage-Palm . . 109

### CHAPTER VI

Baffled by Saw-Grass—Return to Willoughby Key —A Fresh Start—A Dead Snake by Moonlight—Mosquitoes—Supplies Running Low—The Palmetto as Food . . . . . . . . . . . . . . . 134

### CHAPTER VII

Canoeing over Two Inches of Water—Nearing the End — Welcome to Civilization — Analysis of Water—Seminole Vocabulary . . . . . . . . . . 155

Index . . . . . . . . . . . . . . . . . . . . 185

003229

CORPS003240

# List of Illustrations

PAGE

The Author . . . . . . . . . . . . . *Frontispiece.*
Map: Line through the Everglades . . . . . . . 9
De Soto's Map . . . . . . . . . . . . . . . 11
French Map of 1750 . . . . . . . . . . . . . 12
In the "Hammock" . . . . . . . . . . . . . 16
Dr. Tiger . . . . . . . . . . . . . . . . 25
Matlo . . . . . . . . . . . . . . . . . . 33
Billy Stewart and his Bride . . . . . . . . . . 43
Miami Doctor's Boy . . . . . . . . . . . . . 46
The Mouth of the Miami River . . . . . . . . . 57
Cocoanut Grove . . . . . . . . . . . . . . 60
Post-office at Cutler . . . . . . . . . . . . 65
Fowey Rocks Light-House . . . . . . . . . . . 66
Soldier Key . . . . . . . . . . . . . . . . 68
On Soldier Key . . . . . . . . . . . . . . 70
Crocodile Hunting . . . . . . . . . . . . . 73
The Haunt of the Crocodile . . . . . . . . . . 74
The Crocodile at Home . . . . . . . . . . . 77
Brewer on Key Largo . . . . . . . . . . . . 89
The Craw Fishermen . . . . . . . . . . . . 90
A Four-pound Crawfish . . . . . . . . . . . . 92
The Lookout forward . . . . . . . . . . . . 95
Cape Sable Beach . . . . . . . . . . . . . 97

# List of Illustrations

PAGE
Cocoanut-Trees near the Shore . . . . . . . . . . 98
On Cape Sable . . . . . . . . . . . . . . . . 100
Along the Coast . . . . . . . . . . . . . . . . 102
The "Cupid" in Harney River . . . . . . . . . 106
The Edge of the Everglades . . . . . . . . . . 109
The Noonday Rest . . . . . . . . . . . . . . 113
Outlook from Station 2 . . . . . . . . . . . . 114
Making Camp . . . . . . . . . . . . . . . . 120
Outlook from Station 3 . . . . . . . . . . . . 122
Filling the Camp Bucket . . . . . . . . . . . 125
A Meridian Altitude . . . . . . . . . . . . . 126
On Willoughby Key . . . . . . . . . . . . . . 131
A Good Camping Island . . . . . . . . . . . 135
In the Big Saw-Grass . . . . . . . . . . . . 137
A Good Water-Lead . . . . . . . . . . . . . 144
Station 8 . . . . . . . . . . . . . . . . . . 147
Slow Travelling . . . . . . . . . . . . . . . 148
Outlook from Station 9 . . . . . . . . . . . 150
Shoal Water over Rocky Bottom . . . . . . . . 152
Two Inches of Water over Rock . . . . . . . . 155
Outlook from Station 12 . . . . . . . . . . . 159
Looking for Land . . . . . . . . . . . . . . 160
Eastern Edge of the Everglades . . . . . . . . 162
The Rapids of the Miami River . . . . . . . . 164

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

# ACROSS THE EVERGLADES

## CHAPTER I

Florida Geographically—The Everglades—The Seminole War—Characteristics of the Tribe—Previous Explorations.

THIS journey was undertaken in order to explore that unknown portion of the Everglades into which the Seminole Indians were driven during the Indian War, and which was left untouched by the two previous expeditions; also to examine the fauna and flora of the region in the interests of the University of Pennsylvania. Its simple record may help to while away an idle hour for those who love an out-door life, and to whom the memories of the camp-fire are dear.

Florida was ceded to the United States by Spain, in the year 1821, in payment of damages done to our commerce by that country, which had been estimated at five million dollars.

003232

CORPS003243

Being our most southerly State, and touching a semitropical climate, it has naturally excited much interest from time to time from the settler, the seeker after health, the naturalist, and the sportsman who finds a variety of game in its thick, jungle-like hammocks, and a countless number of fish in its streams and around its sinuous coast. Every one is of course familiar with the general outline of the State; but many of us are surprised when we are told that Florida has twelve hundred miles of coast-line.

The warm water supplied by the Gulf of Mexico on the west and the Gulf Stream on the southeast (which at a few points almost laps the shore), in connection with the warm air in the southern portion of the State and the crystalline purity of the salt water in this latitude, make the conditions for the rapid propagation of marine life almost perfect.

It is a very interesting thing to trace through the various maps of many years ago the gradual evolution of the map we have to-day. From the very start, not only the interior has been incorrectly put down, but the coast has been from time to time changed by what was the guess-work alone of the geographers of the day, one copying the errors of the other, until it was



v-00119-RDM Document 112-6 Filed 07/19/23 Pag

Tascaluza
Altapaha
Aute
Utina
Saturiba
S. Agustino
Ocali
TEGESTA
Acuera
PROV.
Mucoso
Hirriga
C. Carlos
B. de Iuan Ponca
C. d'Aguada
B. d'Aguada
las Martyres
C. de Florida
C. de Canaveral
Canal de Bahama
Bahama
Bimini
Abacoa
Roques

DE SOTO'S MAP

003234

CORPS003245

difficult for our Department of the Interior to get reliable data with which to make its official map, and even this map cannot be relied upon very accurately in the extreme South. Our latest geodetic coast survey chart is really the only one to-day that we can look to to give the outline of the State as it exists, and the funds at the disposal of the Survey made it impossible to do any detailed work further than the outlying edge of regions like, for instance, the Ten Thousand Island Archipelago. The geographical knowledge of 1731 is very well shown in the accompanying reproduction of a map from "Histoire de la Conquête de la Floride," by Ferdinand de Soto, published in that year. Surely the coast-lines could not have changed so materially since that time.

The greatest error in this map seems to be in the width of the central portion of the State. Cape Canaveral could have afforded no shelter against a norther in those days, as it does to-day, unless there was a passage running back of the very large island, which is charted running east and west. The most interesting map, however, that in my search for early geography I have discovered, is one published in France in 1750. This map was accidentally found while on a



CARTE DE
LA LOUISIANE
ET DES
PAYS VOISINS
Dédiée à M. Rouillé Secrétaire d'Etat
ayant le Département de la Marine
ECHELLES
GEORGIE
FLORIDE
PRESQU'ISLE DE LA FLORIDE
CANAL DE BAHAMA
LES MARTYRS

003236

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

visit to his family in France two years ago by a French gentleman now living in South Florida, and through his kindness I have reproduced it.

According to this map Florida was wedge-shaped, and a wonderfully mountainous country, the high peaks extending almost to the extreme South. Now, very strange to say, until recently our knowledge of the interior of the southern part was about as limited as that of the early French explorers; for that portion is covered by the great Everglades, many parts of which the foot of a white man has never trod. Ever since the Indians were driven to the far South by the troops during the Seminole War, this land, or rather water, for there is certainly more water than land, has been deemed impenetrable. The very settlers along the edge of the east coast know absolutely nothing of what exists ten miles west of their farms.

It is without doubt the peculiar character of this great tract of country, which renders travel in it almost impossible, that has caused its geography to remain obscure. In one of the more recent maps the Everglades are represented as containing splendid rivers, fifty and sixty miles long, diverging from all kinds of imagi-

003237

CORPS003248

nary water-sheds. But on careful inspection it will be noticed that some of these rivers have their sources on land, and run up-hill, emptying into no other body of water. In another we notice the Miami River to be thirty miles long, and the Harney River about forty.

Probably as accurate a map as any we have to-day is that issued by the railroad company, and put up in its folders. This is not like the usual railroad publication, which straightens a very crooked road in order to deceive the public into taking what appears the shortest route, but is compiled mostly from the best data in possession of the Interior Department. It may seem strange, in our days of Arctic and African exploration, for the general public to learn that in our very midst, as it were, in one of our Atlantic coast States, we have a tract of land one hundred and thirty miles long and seventy miles wide that is as much unknown to the white man as the heart of Africa. This tract occupies the southern part of the State. It is bounded on the north by Lake Okeechobee, on the east by the pine-land about six miles wide facing the Atlantic, on the south by the mangrove swamps facing the Bay of Florida and the Gulf of Mexico, and on the west by the

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

Big Cypress Swamp which touches the land of the west coast.

Every one has heard of the Everglades; but I think that the general impression of what constitutes the Everglades is absolutely erroneous. If you seek information, you will probably be told that it is a vast tract of swamp in Florida, into which the Indians were driven during the Seminole War, and where "Uncle Sam" was unable to follow them. It will be my endeavor to show, as this account of my last winter's expedition progresses, that the word swamp, as we understand it, has no application whatever to the Everglades; that it is a country of pure water; that this water is moving in one direction or another, depending on the natural topography of the country; that the air is wholesome, pure, and free from disease-germs; that near the coast and the mangroves the mosquitoes thrive; but deep in the Everglades, in the winter time at least, you can sleep comfortably without a net. No stagnant pools exist for the larvæ to thrive in.

The winds blow gently over this almost level expanse most of the time from the southeast, though occasionally they come from the Gulf, and still more rarely sweep down from due

003239

CORPS003250

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

North, when the thermometer drops gradually to about 50°. During the last cold winter, a few years ago, the central and northern part of the State was made desolate, and thousands of people were financially ruined, by the terrible blow given to the orange culture. The northern half of Lake Okeechobee was covered with ice, and the cocoanut-trees were stripped of their leaves at Palm Beach, which is about their northern limit. On Biscayne Bay, however, the cold did no damage. Northers of such low temperature, fortunately, lose most of their cold before reaching South Florida, and the usual daily temperature of the Everglades in the winter is from 70° to 80°. The air has plenty of life in it at all times, and is full of what people call "ozone." Even the heat of 80° seems about the same as 70° in our mid-summer.

Since returning home I have frequently been asked, Did you not suffer from fever? Were you not made ill by your exposure in that terrible, malarious swamp? I reply that during the entire winter I did not have a single ache or pain, with the exception of an accident which befell me on the Florida Reefs, in which the bone of my nose was half cut through. This

003240

CORPS003251



v-00119-RDM Document 112-6 Filed 07/19/23 Pag

IN THE "HAMMOCK"

003241

CORPS003252

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

wound, a very bad one, occurred just before I started into the Glades, and healed in a most rapid manner, though exposed to the sun all day. The Indians bear witness to the healthfulness of this region. The men have fine, stalwart figures; the women are strong and in many instances beautiful; the children are fat and chubby. They suffer less from the diseases that Indians are apt to have, and are content in their simple wild life so long as the "lying" white man lets them alone in the one little spot which they have hoped might ever be inaccessible to him.

Over these watery wastes the Seminole still paddles his cypress dug-out canoe, hunts the deer and the otter, and observes the rites and ceremonies of his tribe, unmixed with and uncontaminated by the whites. The occasional visits which he makes to the trading-stations do him no good, as there he finds the "white man's fire-water," which he is tempted to imbibe too freely by those who think themselves of a superior race, but who, in reality, are far inferior to the "untutored Indian" in every moral trait.

The Everglades came into prominence during our war with the Indians, a war of which the United States government has not much to

003242

CORPS003253

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

boast. Costing so many lives and so many dollars, it was against a people which was willing to live in peace, but which naturally objected with all its force to the destruction of its homes and the theft of its hogs and cattle. They soon found that redress of their wrongs was impossible, and there was nothing left but to fight, and with such a place of retreat from which to make sorties they certainly did maintain that fight in a marvellous manner. The United States troops, during this war, at various times penetrated the more northerly portions of the Everglades, but, as a rule, the scouting parties were obliged to return, having accomplished little, through their lack of knowledge of the country and for want of food, while the Indians usually followed them back on their trail, knowing their every movement.

One party of soldiers discovered a stronghold of the Seminoles in the Big Cypress Swamp through treachery; the only instance on record of the Indians being taken by surprise, their knowledge of the country and their method of travel being so much better than that of their enemies. The case to which I refer was recently related to me in a conversation I had with William Mickler, of St. Augustine. A small detach-

003243

CORPS003254

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

ment of Major Loomis's command was on a scouting expedition a few miles directly south of Lake Okeechobee. William Mickler climbed a small tree growing on a wet island, and some three miles distant saw a very small column of smoke rising from a little clump of bushes, and knew that it was an Indian camp-fire.

With the greatest caution the command was divided, the main body forming the advance; a few picked men were given orders to move around them, and as soon as the advance should engage to come up and attack the rear. A cover in the way of small bushes greatly facilitated the movements of the surrounding party, and the time was so accurately calculated that at the first shout of the advance they rushed in, and the whole band was captured without loss on either side. The Indians were so unprepared for this attack that the few guns fired did no damage. Eighteen men and women were captured, Old Tommy being of the number. This was quite a bonanza for the soldiers, as previously the whites, exasperated by their want of success in dealing with these savages, had resorted to many cruelties, giving no quarter. The government, in order to check this inhuman warfare, had offered a reward of five hundred

003244

CORPS003255

dollars for warriors, three hundred dollars for women, and two hundred dollars for children, if captured alive. Old Tommy was sent to Fort Myers with his fourteen-year-old son, but the lad managed to escape. The imprisonment, and the easy way by which he was trapped, had so wrought upon the old man's feelings that he committed suicide by eating glass.

Many short scouting expeditions were made in the northern part of the Everglades, but when the troops got away from their base of supplies, the travel being slow and uncertain, they experienced terrible hunger and fatigue, and were glad to return to the coast. The Indians, with their knowledge of the country, always travelling rapidly, were not obliged to encumber themselves with many provisions, and easily evaded these parties. At last those who were not captured and sent to the Western Reservation retreated to the far South, and General Worth, finding the absolute impossibility of getting at them, came to a personal understanding that so long as they let the whites alone they should not be disturbed. This compact has been kept by the Indians to the letter, and is as sacred to them to-day as when made. They simply live in fear that the white man

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

will not keep to his part, and that they will be suddenly ordered to the Western Reservation, considering, as they do, that the name "white man" is a synonyme of "liar."

Search well the history of our dealings with this noble race, and judge for yourselves if they are wrong in this definition. I may overestimate their moral characteristics, but this I do know, that a Seminole would as soon cut his tongue out as lie. Whenever an Indian has stated something to be a fact, or has passed his word to me that he would do a certain thing, I have always been able to rely upon what he said to the very letter. When an Indian is found guilty of a malicious lie, his punishment by the council is always a very severe one. Although the Seminoles are to-day perfectly friendly to the whites, and have helped out many a lost white man, who but for timely aid would have starved to death before reaching the coast, nothing will induce them to divulge the secret of Everglade travel, which they alone possess. They may take you out, but never in. Very large sums of money have been offered them to act as guides at different times. One case that I know of was that of an engineer who wished to take his line well into the interior; but it was of no

003246

CORPS003257

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

avail; he was compelled to abandon his project and report to his chief that further carrying of the line was impossible.

The first attempt to make a lengthened journey through any part of the Everglades in the interest of geographical research was made by Major A. P. Williams in 1883, the expense of which was covered by a Southern newspaper. This was called the "Times Democrat Expedition." I regret very much that I have no detailed account of this line, as it must have been very interesting. I fear, however, that accurate surveying must have been abandoned at a very early stage, as I can find no map with any stations, the line being devoid of points from start to finish, and simply gives a general direction from the Harney River to Lake Okeechobee. I can imagine that the fight through the Big Saw Grass, which lies to the south of the lake, must have been a very severe one.

In 1892, Mr. J. E. Ingraham started on an exploring expedition with Mr. J. W. Newman as engineer and twenty men. Some of the details of this trip, taken from his private notes and those of another of his party, I am through his kindness enabled to present to my readers.

On the 15th of March, 1892, the party, con-

003247

CORPS003258

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

sisting of Mr. J. E. Ingraham, Mr. Newman (an engineer), with twenty men, two flat skiffs, and two canvas canoes, started from Fort Myers on the old government trail which leads to Fort Shackelford. The two flat-bottomed skiffs had previously been sent on by ox-cart. The party started with a single horse and wagon, a second team being procured to assist in the carrying. In four days of marching the old government causeway was crossed which passes over the Ocklacoochee Slough and Big Cypress Swamp, which was constructed about 1885. At this juncture a perceptible flow south was noticed in the stream of water comprising a portion of the slough. The prairie which they entered upon after crossing the slough above mentioned extends eastward about forty miles, and is from five to twenty-five miles wide. It is said to be the finest cattle range in the State. A number of different companies had fenced off large pastures, running a fence line from a point in the Big Cypress to the Everglades, a distance of twenty-seven miles. The fence was barbed wire.

Twenty miles was through water from five to six inches deep, at various points the rock appearing on the surface. Where there was rock the soil appeared very poor, being sparsely

003248

CORPS003259

covered with vegetation. At various points on the stock range the grass was high and thick, and said to be very nutritious and affording wholesome food for cattle, magnificent bodies of cypress timber extending southward along the line of what is known as the Big Cypress. The country appeared to have been cleaned out as far as game was concerned, and it is not surprising that the Indians should have apparently deserted a country so devoid of game. On March 19 an old Indian camp was passed that was occupied by a squaw called Nancy and three grandchildren of about two, four, and five years, two or three dogs, and a lot of chickens. She graciously received the party, and gave them such information as was possible to understand, her stock of English being quite limited. The children were noted for their dignity and reserve, and were fat and healthy. Nancy was asked the distance to Miami, and she replied one hundred miles, and that Indian could go from Shackelford to Miami in four days, and added, with a chuckle, that it would take white man ten days.

Nancy claimed to be the widow of Osceola, a son of the great chief of that name; she is the widow, also, of Billy Jumper, who was

003249

CORPS003260

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

drowned in the Miami River a short time ago. One of the hunting-parties found several Indian villages, in which were growing bananas, lemons, and two or three varieties of guavas. Mr. Ingraham received information from a man who accompanied the party, and who claimed to have been there, that the Harney River was forty-four miles long with good water.

On March 21, Fort Shackelford was reached, and one load was sent ahead to the edge of the Everglades, some four miles distance, by means of the ox-team, which was retained for that purpose. The entire party joining, a camp was made a mile and a quarter into the Everglades The surveyors began chaining and levelling from Fort Shackelford, and found a drop of two and three-tenths feet. An Indian named Billy Fiewel was met, and after much persuasion was induced to travel with them, but he very soon left the expedition and was never seen again. The soundings gave from three to five feet of mud overlying the limestone.

An island was passed of about an acre in extent, on which grew wild fig- and rubber-trees. Even in the saw-grass hard rock bottom could always be found with a five-foot pole. Fresh Indian signs were seen; the Glades here pre-

003250

CORPS003261



DR. TIGER

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

sented an endless sea of saw-grass. The secretary, while engaged in writing, was disturbed by a moccasin snake attempting to crawl up his left shoulder. The only thing in the way of fresh provisions that could be obtained were a few fresh-water turtle, marsh-hens, limpkins, and an occasional mallard duck. On March 25 very heavy saw-grass was encountered, and the fatigue of the men was so great that it was thought best to abandon the smallest of the wooden boats, and some of the impedimenta was thrown away. The level rock here was but twelve inches below the surface. A few small islands were passed, and occasionally one with a little more ground on it.

On March 26 an unfortunate accident occurred to the provisions. The corn meal was packed with bottles of syrup, which fermenting, drove out the corks and was soaked up by the meal; some, however, was used with bread, the flour having been all consumed. The work through the saw-grass was beginning to tell on the men, in the shape of severe pains, cuts, and bruises. When camps were made at night many moccasins were killed. Indian signs were again encountered, their poles sticking up at landing-places on the small islands, and the

003252

CORPS003263

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

ground well strewn with the shells of the Everglade terrapin which they had eaten. Before starting, in order to arrange about provisions, the average rate of travel had been placed at five miles; but as this was not realized, it became necessary to reduce the rations. The cook of the party was taken sick and had to be carried in the canoe.

The story of how a nice meal of venison was lost is well told by another member of the party. "As we had not seen any game in the Glades, the guns were usually kept in the boats. This morning, as we were strung out through the saw-grass, I heard, from those in front, shouts of, 'Get the gun! shoot him! kill him! catch him!' and an instant later a deer emerged from the grass in front and plunged heavily in the bog, not twenty yards from me. For an instant the frightened animal seemed stuck in the mud, but gathering himself with all his strength, made a supreme effort and disappeared in the grass just as several of us made a rush to catch him. And when the deer was gone, and there was no prospect of venison steaks for supper, every one of those fellows, who were so tired of hominy, went back to the boats, strapped on their guns, loaded themselves with

003253

CORPS003264

ammunition, and vowed the next time a deer came they would be ready for him, but I haven't seen a deer since, and I don't think they have either." The travel through the saw-grass became more and more difficult, and packing for any distance seemed impracticable. A few white heron were killed and eaten. A cold northeaster set in, which made a night in wet clothes very uncomfortable. One of the men had managed to boil some rice for supper, but it was only half-done; there was nothing that could be used for fuel excepting the dried saw-grass.

Mr. Newman, the engineer, estimated that it was from twenty-five to twenty-seven miles to Miami. There were but five days' provisions, and it was necessary to put all hands on allowance, their best rate of travel being three miles a day. Surveying became more and more difficult, the chainmen, having so much extra work, on so little to eat, began to give out from physical exhaustion, and for the time that work had to be suspended. For the next day's journey rather better channels were found, the current setting in swifter to the southeast, running about a mile an hour, but as the centre of the Glades was reached the surface became

broader and shallower, the water running somewhat slower. Seven Everglade terrapin, one marsh-hen, and three fish—the latter jumping into the boats—were caught or shot on this day. During the night two alligators were attracted by the provisions in one of the boats, and had not Mr. Ingraham been sleeping there the party might have been left with nothing to eat. The red bugs were something fearful, and the men were all so peppered over with them that their bodies seemed on fire.

A note was made on the growth of saw-grass, and it was found to be three-quarters of an inch for one night. Camp fifteen was made on a small wet island, on which were growing custard-apples. Large islands could be seen to the north and east; the water was increasing in depth, in places about two feet; Indian fires were sighted, but no Indians. Food was going rapidly, nothing left but hominy, and the game was scarce. Three blue heron and an alligator were taken, but the alligator was thrown away, as none of the party had the courage to eat it, though they were really in a famished condition by this time.

[As I have frequently eaten alligator when out of food, I think Mr. Ingraham made a

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

great mistake in not trying what effect careful cooking would have had in getting up a very palatable dish. It is, of course, rather difficult to overcome the prejudice most people have against it.—AUTHOR.]

Fish might possibly have been caught, but the time necessary could not be spared on the march, and when camp was reached the men were too exhausted, though there were lines and hooks in the outfit. The engineer, Mr. Newman, estimated the distance to Miami to be nineteen and a half miles. Hard travelling was again encountered, and no place to camp was found but the saw-grass, which was cut, and the water bridged over in the best way possible. The hardships were increased by many of the men, including Mr. Ingraham, being obliged to sleep in wet clothes. The rock below the surface was deeper here than at any point met with, it being from six to six and a half feet. Many statements were made by the men that they saw a high island, or an Indian, ahead, and they began to realize for the first time that the constant looking at the dead level of saw-grass had destroyed their ideas of height.

Wading along almost to the armpits in water,

003256

CORPS003267

bushes seemed to be trees, and a few of them clustered together appeared as a forest. Owing to the physical condition of the men, all surveying was abandoned. On April 2 a good open watercourse was found, and many of the men thought that another day at most would see them out of this terrible watery solitude; but they soon discovered their mistake. An object floated by, however, that filled them with hope. It was a very small, insignificant object; in fact, nothing but a piece of paper with a few printed words torn from a flour-sack. To them that water-borne waif spoke volumes; it meant that they were on the Indian trail to Miami. Heavy smoke was sighted to the east, some of the party thinking that it must have been lighted by a relief party coming after them. The narrow watercourses seemed to tend too much to the south, which caused them to make many tedious portages and drags.

The character of the growth was still changing, the brushes getting more plentiful and the saw-grass somewhat less and more resembling prairie. Islands were scarce, but the range of vision was very limited, even by standing as high as possible in the canoe. Some of the deepest mud was here struck; several more

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

things had to be abandoned to lighten the boat, and were cached on a very small island. The men became constantly bogged, and without the help of their comrades would have perished. The rock was about seven feet below the surface, the water in many places being two feet deep. Mr. Ingraham believes that the east side, if reclaimed, contains the largest volume of muck land. A few more fish jumped into the boats, and a few young water-fowl (rather fishy) were procured from their nests. All the men were showing plainly the effects of the hardships they had undergone, their faces being haggard and their eyes bloodshot. Two more of the men gave out entirely, and had to be carried in the boats, more things being thrown away to make room for them, A meal was omitted in order to try and reach an island where wood could be had to cook with and a dry place on which to sleep, if possible.

From the top of a young rubber-tree Mr. Ingraham saw what he took to be pine-timber, about five miles to the eastward, which was very encouraging to every one. At ten P.M. an Indian was seen approaching, who proved to be Billy Harney, a wiry-built man of sixty-five or seventy. An unsuccessful attempt was made

003258

CORPS003269

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

to get him to go to Miami with the party, but the most they could get out of him was, that he would get some one else to go, telling them Miami was twenty-five miles away, and pointing in a different direction from what was expected. This intelligence threw the party into the depths of despair, as it would take fully five days to get there, and only enough rations were left on half allowance for two days. Mr. Newman determined to go alone with Billy Harney, and see if he could not procure some provisions and boats and find, if possible, a route to Miami. In the middle of the day, Mr. Newman returned and told the party that he had gone to Harney's camp, but had found nothing but one woman and nothing to eat. The woman told him that he could go to Miami and back in twenty-four hours, if an Indian took him.

He persuaded Billy Harney to accompany him, Mr. Ingraham, and Mr. Moses, Mr. Newman leaving orders to take a certain course the next day and make fires in the saw-grass. The advance party camped on an island at sunset, and the next morning, after a very early start, reached the Miami River, under the Indian's guidance, about nine o'clock. The rapids in

003259

CORPS003270



MATLO

the Miami were shot, some of the party walking around through the pine-timber. The drop of the water seemed to be ten feet in three hundred yards. Miami was reached at noon, and the party was warmly welcomed by Mrs. Tuttle, who raised the American flag and fired a salute of dynamite cartridges in their honor. After a good meal and a night of rest from the terrible fatigue, Mr. Newman succeeded in persuading old Matlo and Billy Harney to return to the rescue of the party with provisions. The rescuing party reached the poor sufferers in due time, and every one seemed to get new life at the prospect of reaching the end of their painful journey next day.

After satisfying their hunger, they pushed rapidly on, and camped that night very near the Miami River, where another big meal was indulged in. The next day they joined the advance party at Miami. This finished an expedition that threw much light on what really existed in the way of land between Fort Shackelford and the coast, and the notes from time to time show pretty well the geological formation of the surface rock, the character of the grass, and the islands. The rich lands on which the Indians were supposed to have large,

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

profitable farms and splendid groves of orange-trees and limes certainly did not exist in this section. Were they still in the far south? Perhaps.

003262

CORPS003273

## CHAPTER II

Preliminary Trip—Seminoles at Home—Details of Outfit.

IT was after a conversation with Mr. Ingraham that I became interested in the southern part of the Everglades, which had as yet been unexplored. I then became possessed with the idea that I must go and find out for myself some of the mysteries of this *terra incognita*. From my early experiences in canoeing in the Adirondacks, the Maine woods, and Canada, I thought I could turn my back on my base of supplies, and with an exceedingly small party, a well thought-over and weight-calculated outfit, manage to live without unendurable privation for at least two months, if necessary, even if the country would not support me. I fear I seemed a little boastful to Mr. Ingraham in saying that I intended to make the attempt to cross the Everglades without sleeping in wet clothes, for I never remembered having done so in all my out-door life. Let it be set down to my credit that I did not say that I would, but that I would try to do it. I am glad

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

to say now that my trip is ended, that I have been successful, especially about the wet clothes, as I never have been troubled with rheumatism, and if I had not succeeded on this point, I am afraid I would not now be writing so comfortably in my little den at home.

In making my proposed trip there were three things that I had in mind: First, the geographical exploration of the southern part of the Everglades and the making of an accurate line, the stations of which I intended to verify with my sextant, as has been my wont to do at sea. Secondly, the surveying of a channel through the Ten Thousand Islands and a reconnoissance of the southwest coast, for the confidential charts of the United States Naval War College (in which I had taken a two years' course). Thirdly, the collection of specimens of natural history for the University of Pennsylvania.

In order to be well posted for such an expedition, I thoroughly familiarized myself with the method the Indians adopt in travelling (for they alone have the secret). I started in the winter of 1896, after procuring an Indian canoe, one of the medium size (they vary in length from fourteen to thirty feet), with a hunter by

003264

CORPS003275

the name of Ed. Brewer, whom I had accidentally met. This man had been among the Indians for many years, in his hunting trips, and had the natural faculty of the backwoodsman in following a trail; moreover, he was a splendid poler. The skilful use of the pole is an absolute necessity in work in the Everglades. The Seminole hardly knows the use of the paddle; even on salt water he poles or sails round the coast. In the Everglades the paddle is useless, and if you break a pole and have not a second one with you, you are in very bad plight indeed, as straight saplings are hard to find. The poles used are procured mostly from near the coast. On these poles, about one inch from the lower and larger end, a triangular inverted bracket, or foot, is nailed, like that put on the stilts of our childhood. The portion of the pole that projects beyond the bracket prevents slipping on the rock, and its lower surface, together with that of the inverted bracket, stops the pole from sinking very far into the mud. The Indians use this pole with a skill that can only come of practice from infancy. The canoes are hollowed from a cypress-log, and are quite narrow for their length, rather sharp on the water-line forward,

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

but above-water flaring out suddenly into a blunt bow, well narrowed at the stern, and finishing in an overhang.

Though the cypress-wood is rather light, the bottom and sides are so thick that they will weigh two or three hundred pounds. A seat is formed in the stern partly upon the overhang, and the surface helped out by a few boards. On this seat, which is pretty high, the poler stands, giving, besides the push, a very good guiding force. The extra elevation helps him very much in seeing over the tall grass, and judging which water leads are the best to follow. It is astonishing how much the bows of these canoes resemble some made by the Alaska Indians. Formerly many painted their canoes white and indulged in much ornamentation about the bows in red paint, with the boat's name in letters on the side. The universal color now seems to be black, with little or no ornamentation. In a canoe such as I have described (built by Tiger Tail thirty years ago, and used by various Indians previous to coming into my possession) my wife, my eleven-year-old son, Ed. Brewer, and myself started on our expedition, leaving our little yacht at the mouth of the swift stream.

003266

CORPS003277

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

The sun was just rising, and a pleasant, cool breeze ruffled the surface of the river. Brewer with his pole in the stern, and myself with the Canadian paddle in the bow, made rapid headway against the current, which was getting stronger and stronger. The river winds in beautiful curves, the trees growing to the water's edge, and were it not for the occasional cocoanut-tree or cabbage-palm, you would almost imagine yourself in one of the wild streams of the Maine woods. Very soon we saw large white objects ahead, which proved to be balls of foam hurrying down with the current. With a quick turn to the left, after about three miles of paddling, we struck the South Fork, the water becoming swifter and swifter, and the cotton-like balls larger and more numerous. We were on the falls, and how the water did run! I could hear Brewer panting behind me, but I never turned my head or gave any signal that we were conquered, but started in on my old-time stroke, inch by inch crawling up that water, dodging the rocks. After about three-quarters of an hour of the hardest paddling I think I have ever done, the water slowed up a little, and we could get some speed on the canoe. The trees opened up

003267

CORPS003278

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

more, the stream becoming narrower and narrower, until we came to an opening where everything was clear ahead.

This was the edge of the Everglades, and the place for which the Indians make when bound to the coast by way of the Miami River. The stream here loses itself among the lily-pads and before you lies a sea of apparently pathless grass. On closer observation shallow water-courses are seen running through the grass, cutting in all directions, spreading out like the lines in the human hand, and whichever one you take you regret that you did not choose the other.

Brewer knew the general direction of the camp, as he had previously visited it, and, though headed off several times, did not go very much off his course. It was along this Indian trail that I noticed for the first time an enormous quantity of a certain kind of plant, called by naturalists *Cabomba Caroliniana*, growing in very large patches. There must have been tons of it. Surely this plant must be a great factor in keeping the water so clear, as it is the same sold by goldfish dealers in our cities to put in self-sustaining aquaria, at ten cents a bunch. Much of this we poled

003268

CORPS003279

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

through, and other grasses, of which I will speak later. For five miles we pushed out into the Glades, and reached one of the large islands we had seen from a distance. Rounding a turn of the island, we came upon a rude landing made of wreckage from the coast, with light timbers and planks. The Indians transport these very long distances, lashed to their canoes on the outside. Numerous poles were stuck at random, where they were left by their owners.

Close to this wharf were a number of canoes of different sizes, and standing in one of the largest was an Indian working, and doing very hard work, too. He did not appear to be ashamed of it, which surprised me greatly. Fancy an Apache doing even the most trivial thing to relieve the squaws from their arduous camp duties! In front of this Indian (who proved to be Miami Jimmy) was a very curious piece of mechanism. It was a sheet of tin roofing about three feet square, in which holes about half an inch apart had been driven, with the rough side up, and he was using it like a nutmeg-grater. The Indian was rubbing very violently back and forth the roots of the coonti plant. The starch made from this plant is a staple article of food with them. It tastes a little like

003269

CORPS003280

arrowroot and is exceedingly nutritious and healthy. Growing in great abundance on the pine-land, it is also gathered by the whites and converted into starch by a more elaborate process than that used by the Indians.

As we passed on towards the centre of the island, we saw a few braves standing about, the remainder of the men being out on a hunt, but not a woman or child anywhere in sight. All had run away to hide behind trees or under the shelter of their palmetto shacks. These shacks, or huts, are framed with four upright pieces, a floor, made of drift-wood, being placed about three feet from the ground, on which are strewn deer-skins. This structure is covered overhead by a thatching of palmetto-leaves. The sides are usually open, but at night curtains made of canvas or bagging are dropped on two sides to protect against the wind and rain.

It was only when they found that we intended no harm that they came out, eying us curiously and distrustfully, the sight of a white woman in the Everglades being of most unusual occurrence. About eight men, six squaws, and ten pickaninnies composed the camp. The squaws were dressed in a very tasteful, modest manner; their skirts, about to



BILLY STEWART AND HIS BRIDE
(Showing Indian attire)

their ankles, were made of blue or brown calico, and trimmed with bright red or yellow bands, stitched in odd designs; little zouave jackets with long sleeves, made of some bright-colored calico, which did not meet the skirt belt by several inches, leaving their bronze skin exposed, completed the costume. But their chief and most prized ornaments are strings of colored beads. They are very particular about the kind of bead. It must be solid and about the size of a small pea, they being especially fond of turquoise blue and light red. One woman had over twenty-five pounds of these around her neck. As they are worn all the time it must be rather a heavy burden to carry. The children were exceedingly bright and disposed to be friendly with the small boy of our party. One of Little Tiger's sons sold a small canoe that he had made himself, and a bow and arrows. The bow was about four feet long, rather flat in shape. The arrows were tipped with empty pistol cartridges, old spools, and bits of iron. We had a quantity of beads with us, and were able to bargain with them for some "sofke" spoons, which is their one article of table service, each one dipping it into the cooking-pot in turn. It is a carved wooden

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

spoon about the size of a soup-ladle. Bead-work articles, buckskin leggings, tanned deer-skins, and otter-hides were scattered about the camp. All seemed to be doing something, and went on with their work, not paying the slightest attention to us.

Two Indians were skinning some freshly killed otters on a wooden platform. In one corner a squaw had a great prize in the shape of a rusty, hand sewing-machine, which was no doubt the envy of the rest of the women. She was working with great diligence, squatting on the ground in front of it. This industry was frequently interrupted by the snapping of the thread, which seemed to bother her a great deal; no doubt she had many misgivings as to whether it would not be more profitable to return to her more primitive method.

The dandy of the camp, "Willie Tiger," whose Indian name is "Coacochee," spoke a little English. I had made his acquaintance the week before on the shores of Biscayne Bay, and had told him that in seven days I would meet him at his camp in the Everglades. He replied, with a very doubtful expression on his face, "You white man no lie?" and when he saw us, if an Indian could look surprised, he

003273

CORPS003284

certainly did. Dr. Tiger was very gorgeous in his deer-skin leggings, moccasins, white shirt, and red turban, which head-dress is a characteristic of the Seminole's attire, being made of a shawl twisted round and knotted. This turban has several other purposes besides mere ornament. At night it is sometimes unwound and used as a covering. The bright colors in it are of much value in attracting the attention of a deer, and it is frequently used for this purpose while hunting. The rest of the men were barelegged and bareheaded, with a calico shirt belted around the waist. Their hair was cut short, with the exception of a straight bang. The women wore their hair drawn into a knot, and also wore the bang. Silver ear-rings are worn by men, women, and children. Formerly there was much more hammered silver used than at present, as the Indians have become poorer and poorer; many of the large silver crescents having long ago found their way to the trading-post.

At different times they have had among them men who were quite noted as silversmiths and became celebrated throughout the tribe. The squaws make very pretty bead-work belts, bags, and ornaments. They also

003274

CORPS003285



MIAMI DOCTOR'S BOY

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

make neat baskets, which they use for all conceivable purposes.

After leaving the camp we retraced our steps to the landing, where we found "Miami Jimmy" still working at his huge nutmeg-grater. I had left my canoe close to where he was at work, and, although there were many things in sight which must have been interesting to him, nothing had been disturbed. As a rule, you may place implicit confidence in the honesty of a Seminole. Before leaving I showed him the mechanism of my three-barrelled gun, which he seemed to understand perfectly, and thought "heap good."

Loading the canoe, we took our homeward course, following very nearly the one on which we had come, reaching the source of the Miami late in the afternoon by hard and rapid poling. The travel down stream was very swift, and when the falls were reached the canoe was moving like a torpedo-boat. It seemed hardly any time before Biscayne Bay was sighted, just as the sun was making one of those gloriously colored skies which are only seen in Southern Florida.

I had learned much on this little trip that I hoped would be useful to me, as I had now fully determined during the next winter to cross

003276

CORPS003287

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

the Everglades and make careful note of everything that I should see, and if possible to plot my course in such a way that it might be of some scientific value to geographical and zoological research. With this idea I searched all the maps, ancient and modern, and read all the books on Florida that I could find.

Having spent three months, for the past twenty winters, in hunting, fishing, canoeing, and yachting around the coast, I was in very good training to undertake this journey. During the summer of 1896 I began my preparations, and as an old sportsman made long lists from which to make up my outfit, which were eventually to be cut down to attain the minimum weight. The first thing to occupy my attention was what kind of boat I should use. My old shadow cruising canoe was out of the question in a place where the pole had to be used so constantly, and she would not carry enough for so long a journey with such slender chance of replenishing provisions; moreover, the standing position is imperative, in order to look over the tall grass and find your road. A sail I thought might be of use, but eventually I abandoned that. My first thought was a Seminole dug-out, but thinking that I might

003277

CORPS003288

have to make some long portages, I decided that a lighter canoe would be more serviceable. I entered into correspondence with one of our best canoe-builders, who had been my personal friend in the early days of the American Canoe Association, and gave him an order to build me two canoes. Having spent so much time in the Maine woods, and frequently noted over what shoal water the Canadian model could travel with a good load, and that the light frame and planking, covered with canvas, could be readily mended in case of accident, I accordingly gave my order for this model, the first canoe to be sixteen feet long and thirty inches beam, to be called "Coacochee;" the second fourteen feet long and thirty inches beam, to be called "Hissee." One of these boats, the "Hissee," was sent to my home in Newport, that I might experiment with her and add all those little extra arrangements so dear to the heart of a canoeist. The "Coacochee" was sent direct to St. Augustine, where the "Hissee" joined her a little later. A single sail was given each canoe (the Bailey rig), with forty square feet in each.

The getting together of a camp outfit is always interesting, and the peculiarity of the

place in which it was to be used made it doubly so. There are certain standard things that I have used for many years, and always keep in a trunk, that I bring out when contemplating a trip to the woods. Sleeping-bags I take whether I go to a cold or a hot climate. They are simply made of two heavy blankets. The first blanket is sewed up into a long bag, with a good slit in the top of it; the second is sewed in the same manner, but with a muslin cover. The second covering serves to keep the bags clean, and adds to their warmth by stopping some of the air from passing through. On a warm night the single, uncovered bag is used, and on a cold one the second is added.

A rubber bed was purchased as an experiment, but the experiment was a failure, and ended by my sleeping on it without blowing it up, as whenever I would turn over it would roar like an alligator, and it bulged so in the middle that I would constantly roll off. A rubber ground sheet was of course indispensable. For a pillow I used my coat, which I found better than rubber pillows. A full suit of rubber mackintosh made by a Boston firm, in the same shape as "oil-skins," which keep you dry all day in a pouring rain, I always kept loose in

the canoe, this being the only extra outer clothing carried. The suit I habitually wear consist- of a brown tweed Norfolk jacket with knickerbockers, brown flannel shirt, leather leggings to protect as much as possible from snakes and mosquitoes, and heavy leather shoes, with tennis shoes to wear in the canoe, which slip off easily when preparing for wading, when rubber hip boots are put on. These I consider absolutely indispensable for a white man travelling in the Everglades.

The clothing and sundry list included an extra pair of long woollen stockings, one pair of drawers, five handkerchiefs, one undershirt, and one brown flannel shirt. The sleeping-bags and clothing go into a rubber mackintosh bag in the daytime; the rubber ground sheet is left out to cover things in the canoe in case of a shower. In a game-bag is carried soap (in aluminum box), letter paper, note-books, spyglass, linen rags, rubber surgical plaster, comb, tobacco, tooth-brush, tooth-powder in tube, small medicine-case containing cholera mixture, castor oil, quinine pills, aristol, carbolized sinew (for sewing wounds), zinc ointment, and colocynth pills; a pocket surgical case containing many necessary instruments in a small compass,

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

also a clinical thermometer, a small bag with scissors, needles, thread, and buttons, pocket-compass, small whiskey-flask, veil for hat, with two elastic bands, one fitting round the neck the other round the top of the hat, two lead-pencils, small fishing-bag containing one heavy trolling line, one light trolling line float, sinkers, hooks, one large spoon, one small spoon, and six red ibis flies.

My scientific instrument case, which could be dispensed with on an ordinary hunting trip, contained an octant, an aluminum aneroid barometer, a maximum and minimum registering thermometer mounted on aluminum, an artificial horizon, a lock level, a light but very accurate azimuth compass with four-inch dial, and two watches in a waterproof case, the watches themselves being waterproof, running with an accuracy that was something marvellous, one having a rate of four-tenths of a second a day, and the other eight-tenths of a second. These watches were supplied to me by a chronometer-maker of Philadelphia, who had been regulating them on Greenwich time for many months.

The artificial horizon was not the one of mercury which I have generally carried when

003281

CORPS003292

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

using a sextant on shore, but was a black mirror. I am aware that the use of a mirror is not orthodox, and that all the old books on navigation say that a mirror cannot be used on account of the refraction in the glass, which error is so variable that it cannot be properly tabulated, but being determined to do away with the weight that mercury would involve, and its liability to spill, I made a visit in my perplexity to my old professor in physics, at the University of Pennsylvania, and when I suggested "mirror," he said to me, "I have just the thing you want; come into the physical laboratory. Here is a black mirror whose anterior surface alone gives the true reflection. I use it in astronomical work and the measurement of light waves." It was mounted on three posts, with slow motion thumb-screws, so that it could be levelled with a small spirit level with quickness and accuracy. The mirror was backed with brass in such a way that it would be difficult to break, and a protective pad was always kept on its surface when packed for travelling. This was a find for me, as I had no doubt that I could use it in taking meridian altitudes, and long and careful experiment in comparison with mercury proved that I was correct.

003282

CORPS003293

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

One of the most important things in a life out of doors is the selection of a tent. A perfect tent should cover the maximum ground with the minimum weight of muslin, and should have but one pole. Choosing from a geometric figure, the cone tent seems to fill these requirements, and for many years I have used such a tent, adding a small awning to shelter the sloping door from the rain. I thought this was as near perfection as could be obtained, until at the World's Fair at Chicago I spied, in a corner of the Fisheries Exhibit, a tent the merits of which could not be disputed; it could be used in so many different ways to suit the nature of the ground. It had but one pole, the door was vertical, there was a wall where a wall was required, with the greatest head-room near the door. A fly was used that could be arranged in many different ways, as protection from extra heavy rains, or placed in front, nearly doubling the available room and ground covered. This tent I added to the outfit, with its jointed pole, all stowing nicely in a canvas bag with shoulder straps and weighing complete twenty pounds. Many a time in the Everglades I pitched a part of this tent, and made a comfortable shelter for the night, where

003283

CORPS003294

no other tent would have been of the slightest use.

During the summer evenings I made of very light wood two chests that formed convenient packages to load and unload from a canoe, the dimensions being twenty-two inches by thirteen, and nine inches in depth. These chests made very good seats or tables. The first, which I called my cooking chest, was divided by a bulkhead running across the box. In the left compartment was the aluminum cooking outfit, which weighed six pounds. It consisted of an outer cooking-pot, a second nearly the same size nesting into it; inside of this was a frying-pan and three plates; on the plates rested a coffee-pot; in the coffee-pot were three cups (nested), pepper and salt, three knives, three spoons, and three forks. The pots and frying-pan had detachable handles. The right-hand compartment contained bacon, portable foods of various kinds in pots and cans, also fresh provisions.

I had three varieties of portable soups; tea, root-beer, lemonade, and sarsaparilla put up in tablets, and condensed cola-nut preparations; also a good supply of chewing-gum (containing cola-nut). The second chest I called

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

the grocery chest. It contained large-mouthed, screw-top cans of various sizes, closing water-tight, with rubber gaskets; these were marked sugar, flour, salt, pepper, oatmeal, cocoa-leaves, cocoa, paint and varnish for canoes, and a sealed can of whiskey exclusively for snake-bite. In this way I had no fear of anything getting wet or spoiling. The canoe might upset, and I could go ashore, cook my supper, and sleep in dry clothes.

The kerosene-stove and a lantern were carried loose in the boat. The stove was an experiment, but proved a great success, as I had many a hot meal in places where no fire could be made, and the flame burns well in the open air. I have cooked over naphtha-stoves for many years at sea without accident, but have never felt safe in leaving them in the hands of careless stewards, for if one burner goes out, it converts the galley into a first-rate dynamite cartridge, which the lighted one touches off, and there you are! Of kerosene-stoves I have tried many, as they came out; those with wicks were discarded at once; some burning kerosene vapor were used for a while, but one and all smutted the pots and blew out easily, besides using too much fuel. The stove that I

003285

CORPS003296

decided to take with me seemed to combine all the virtues that a properly behaved stove should have; its trade-name I will suppress, as I do not intend to lend these pages to any kind of advertisements, though the temptation is great to recommend a really good thing. In the way of hunting and defensive implements I carried a repeating rifle shooting a 45-90 cartridge with steel-covered bullet. Last year I had such poor success, losing many crocodile on which I had made good shots with a 38-55, and rumors coming to me that I should probably meet with a stray puma or a large gray wolf, that I made up my mind I would carry something that would be more successful. A three-barrelled gun (carried by my hunter), two barrels, 16-gauge shot, with rifle barrel underneath of 38-55 calibre. A long 38-calibre revolver and a six-inch hunting-knife completed the equipment, with a box containing fifteen pounds of cartridges.

One thing that greatly troubled me was how to obtain my distance travelled with any accuracy. Chaining was proved by the two former expeditions to be out of the question, and it certainly was necessary to have something to work up the dead reckoning by, and know as



THE MOUTH OF THE MIAMI RIVER

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

nearly as possible the distance covered by the canoe. I had often used my bicycle to measure the miles between the house and the post-office, or the number of yards across a patch of lawn, and found that the cyclometer would measure within ten yards very accurately, so why could not some arrangement of the wheel be used on water and through the grass? No arrangement of any kind of log used at sea would be practicable, so I obtained an old twenty-eight-inch front wheel and a front fork which came from a thirty-inch bicycle; to this I added a new cyclometer and pneumatic tire, and a band of paddles that buckled on the de-inflated tire, which by using the air-pump made a very rigid paddle-wheel. I then fitted a stick that lashed to either side of the canoe, keeping the wheel in a vertical position. After repeated experiments with this machine I found that the slip was very constant, and that trailing behind a boat I could get good measurement, at even a slow rate of speed.

After completing all the little details of this outfit, I shipped canoes and boxes to Miami, in order to have everything well in advance of me, and left my home for Philadelphia, where I spent a month in study at the Natural History

003288

CORPS003299

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

Museums and the University of Pennsylvania, taking many meridian altitudes, brushing up my navigation, and trying to work under the conditions that I imagined would confront me. It was my desire to inform myself of the fauna and flora of the State of Florida, in order to allow nothing that was strange or peculiar in animal or flower to escape me, and to be able to collect intelligently any prehistoric relics that might come in my way.

On the 30th day of December I left Philadelphia, alone, leaving my wife and family with friends, and started by rail for St. Augustine, where I arrived on the afternoon of the next day. Here I tarried a week among my old friends, and then proceeded to Miami. Through the courtesy of the railroad company all my things had been sent down to their warehouse on the Miami River dock, which had just been completed. Everything had arrived and was uninjured in transportation, much to my relief. My next move was to communicate with Ed. Brewer, who had hunted with me the year before, and tell him to come at once to Miami and prepare himself for a big trip across the Everglades.

003289

CORPS003300

## CHAPTER III

Miami—Fowey Rocks Light-House—Florida Wreckers —Vaseline à la Seminole—Soldier Key—The Habitat of the Crocodilus Americanus—The North American Alligator.

MY original idea was to start from either the head of the Miami River or the head of New River and take a general westerly course, which would carry me through the very centre of the unexplored and unknown portion. On mature deliberation I gave up this route, and decided to enter from the west coast, in the vicinity of the Ten Thousand Islands archipelago, and come out on the Atlantic.

The reason for my change of direction was this: Going west, I would come out upon an entirely uninhabited coast; the distance from the edge of the Glades to the Gulf of Mexico is great, and after leaving the fresh water I would not be able to carry a sufficient quantity in the canoes to reach any spot where I could procure more, and it would be impossible for me to indicate a definite place where a boat



COCOANUT GROVE

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

could meet me. On the other hand, going first around to the Gulf with a good load of supplies and fresh water after making the journey across, I would carry the fresh water to within a very few miles of the Everglades, and on the other side be sure to strike Mr. Flagler's new railroad, which was just completed to Miami.

Deciding on this latter plan, the first requisite was to procure a boat of suitable size in which to proceed around the coast with my two canoes, my entire outfit, and about one hundred gallons of water. After looking over many boats at Miami, I could find nothing that suited me, many of them being unnecessarily large and drawing too much water. I wished nothing that drew over two feet. At last I was told of a boat that was on the ways at Cocoanut Grove, which if I liked and put in order I could get on reasonable terms. I made a trip to Cocoanut Grove and found a very good sloop, thirty feet long, good beam, and drawing two feet, called the "Cupid." She had been built by Ivanosky, of St. Augustine, and was of the type that does such good service around that city, being fast, and carrying a heavy load on light draft.

003292

CORPS003303

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

Finding that it would take me a week to put her in commission, I returned to Miami for my trunk, and moved over immediately to the hospitable shelter of the Peacock Inn at Cocoanut Grove. With the assistance of a Bahama darky, I put the little ship in seaworthy condition, and at the end of the week began to look around for a good man who would be sufficiently familiar with the coast to bring the "Cupid" back again after leaving Brewer and myself to start our journey into the mysterious Everglades. Such a man I found in the person of Sam Roberts. Sam was a man of medium stature, powerfully built, and of a pleasant disposition; he was a native of the Bahama Islands, and, like most of his countrymen, was a good sailor, swimmer, and diver. He had spent a great deal of his time in sponge-fishing, and was quite an adept in the business, had been on several excursions around the west coast, and was quite familiar with the Florida Keys.

As soon as the "Cupid" was ready, Sam joined me, and after filling our water-casks at the beautiful, bubbling spring belonging to my old friend, Mr. Kirk Munroe, and bidding adieu to my many acquaintances at the Peacock Inn

003293

CORPS003304

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

and the Biscayne Bay Yacht Club, I sailed for Miami. That evening Ed. Brewer reported to me at the railroad warehouse, on the river front. I gave him orders to procure three Indian poles, and to join me at the railroad warehouse, and we would load the "Cupid" for her voyage. What a change had been made in this place since the same time last year!—from two houses it has been made a town of two thousand inhabitants. Of course, its splendid big hotel, with every modern convenience, will prove a great boon to the tourist, but for me the picturesqueness seemed to have gone; its wildness has been rudely marred by the hand of civilization.

In all Florida I have never seen a more beautiful spot than where this deep, narrow river suddenly opens into Biscayne Bay between those tall, graceful cocoanut-trees, that seem to stand as sentinels guarding the secrets of its source, the mysterious Everglades. Of course, it will all be very beautiful around the hotel when the tropical vegetation will have grown up, as a large sum of money has been spent, and no doubt the majority will prefer it as they see it to-day, but, as far as I am concerned, I regret the change. All who have

003294

CORPS003305

seen the enormous increase of hotels in the Adirondacks will appreciate this feeling. But in the nature of things the wilderness must be gradually encroached upon. What would the settler and the farmer do without this railroad that now gives him rapid communication with the North for his winter products?

We must not look upon these things from the sentimental point of view. The romance and poetry must be suppressed for the sterner, material welfare of our fellow-man. Early next morning Ed. Brewer came on board with the poles. I got the "Cupid" under way with easy canvas and ran up the river to the freight-house to receive my load. Ed. Brewer was a Virginian by birth, but had lived in Florida for many years, and had always made a living by hunting and trapping. He would sometimes be in the woods, and partly in the Everglades, for six months at a stretch, without seeing a soul except an occasional Indian. He was a man of medium height, heavily built without being fat, black hair, black eyes, inured to hardship, and able to make himself comfortable in his long tramps, with a canoe, a tin pot, a blanket, a deer-skin, a mosquito-bar, and a rifle, with perhaps a plug or two of tobacco as a luxury.

My experience in hunting with him the year previous had shown that he was just the man to face with me whatever dangers there might be in store in my attempt to cross the Everglades. Although warned by some of my friends that he was a dangerous character, I preferred to rely upon my own judgment of human nature rather than on unproved stories about him. In our solitary companionship, far from the reach of any law but that of our own making, I always found him brave and industrious, constantly denying himself, deceiving me as to his appetite when our supplies ran low that I might be the more comfortable, and many a night did he stay up an extra hour, while I was finishing my notes and plotting work, that he might tuck me in my cheese cloth from the outside. A few hundred yards up the river brought us to the strongly built dock belonging to the railroad company, and on it rests an object which has an unusual interest, as it is the most southerly piece of railroad iron in the United States.

The work of breaking up boxes and transferring things to the "Cupid" occupied most of the morning. On the 29th of December we started from Miami and ran to Cocoanut



POST-OFFICE AT CUTLER

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

Grove, the wind being light, and stopped there to pick up some things that we wanted and could not get at Miami. The next morning at nine o'clock we sailed for the South. The canoes were lashed partly under the " summer cabin" when under way, and when at anchor were put overboard in order to make plenty of room.

All along this shore there are places where the fresh water comes up through the rock under the salt water with quite a head. It no doubt comes from the Everglades by subterranean passages. The shoal water here reaches quite a distance from shore. The weather had been threatening, and large masses of clouds were being driven by; occasionally one of these would drop its moisture in the shape of a tropical shower, that wets you to the skin before you can put on a rubber coat.

At about eleven o'clock we were abreast an island inshore, near a little settlement called Cutler. It is situated on the Perrine Grant, which has been under litigation for many years, and has the most southerly post-office on the main land of the United States. The building itself is a very unique affair, and is a puzzle that the visitor is curious to solve. The

003298

CORPS003309



FOWEY ROCKS LIGHT-HOUSE

weighty mail matter is handled by the pretty postmistress in the body of an old freight-car. How did that freight-car get to its present resting-place? The more you look at it the more you wonder. The railroad has but just reached Miami, and this is fifteen miles away. When I visited the place later in the year, I asked the postmistress where she obtained her peculiar dwelling, and she told me that a few years ago a steamer loaded with the running equipment of a railroad had been wrecked on the beach beyond the bay, and that the box of a freight-car was floated to Cutler.

The rain-squalls continued, greatly to our annoyance, but we were fast losing sight of the Fowey Rocks Light-House. This light is the first of the light-houses on the Hawk Channel, and marks the entrance of that peculiar inside passage which before the days of light-houses was such a haunt for the pirate and the wrecker. There are several of these lights that mark the outer reef. This particular one was built in 1886. The French lens was on exhibition at Philadelphia and immediately brought South to complete the structure. It now shines forth to the Gulf Stream bewildered mariner at a height of one hundred and ten feet above the

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

level of the Atlantic. Around this light-house seems to be a favorite haunt of fish; perhaps they are attracted there at night and are too lazy to move off in the daytime. Their number and variety are simply marvellous. You can at one glance, through this crystal water, see over fifty varieties. The colors would put to blush the palette of an "impressionist."

The nearest land to the "Light" is a little island called Soldier Key, which was used by the constructing engineers to work upon and for a supply station. The old buildings are still to be seen, though they have never had any attention or care since. Biscayne Bay now began to narrow up, and passing Elliot's Key we see a lot of small islands to our left, where lies Cæsar's Creek, named after a famous old pirate called Black Cæsar. Countless are the interesting and romantic tales told about him and the days when "gentlemen" of his profession added one more risk to marine insurance.

All the surroundings here seem to be filled with legends; you meet constantly something that reminds you of the old days of the "Florida wreckers." On many of the small islands quite large sums of money have been unearthed at different times. This whole stretch of coast

003301

CORPS003312



SOLDIER KEY

003302

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

has been for centuries a ship's graveyard. Even at the present time tombstones in the shape of a rudder-post, two or three fractured ribs, or the section of a keelson, are constantly visible, and hardly a month passes but some lumber-laden vessel loses, at least, her deck load.

Speaking of wrecks, a rather funny incident occurred a few years ago. A large steamer was stranded on the reef not far from Cape Florida; no sooner had she struck than the news spread rapidly along the shore, and within an incredibly short space of time the people for twenty miles around gathered on the beach opposite the scene of disaster. Two or three families of Indians chanced to be down from the Everglades, and they too, being keen wreckers, started at once for the beach.

The ship was loaded with quite a valuable assorted cargo, and as she began to break up the ocean was strewn with barrels, cases, and boxes of all kinds. These drifted gradually ashore,—casks of wine, bags of flour, boxes of Colgate's soap, a carriage (which is in use to-day at Cocoanut Grove), and a thousand and one different articles. The Indians soon possessed themselves of a box containing bottles of wine of iron, and it was not very long before

003303

CORPS003314

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

they were in a condition that allowed the white men to secure the larger prizes.

The squaws had struck a bonanza in the shape of a case containing Cheeseborough's vaseline, which they mistook for some variety of the white man's cooking-fat. After starting a fire, they proceeded very leisurely to fry their pancakes in it. What a dish for the stomach of an epicurean,—pancakes fried in vaseline *à la* Seminole!

Continuing our course to the southward, we soon reached the narrow channel abreast Arseniker Keys, in which there is but three feet of water at times, and only two stakes to mark it; these are often knocked down by boats from Key Largo. We emerged into Card Sound, which is six miles long by three and a half wide,—a fine sheet of water with good depth. We were now approaching a place that I was anxious to visit, as being one of the few localities where crocodile could be found. I had promised to obtain some good specimens, if possible, for the University of Pennsylvania and the Academy of Natural Science. I therefore decided to spend two days in hunting. It has been known but a short time that the crocodile exists in North America. Usually, when you

003304

CORPS003315



v-00119-RDM Document 112-6 Filed 07/19/23 Pag

ON SOLDIER KEY

003305

CORPS003316

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

speak about them, you are told, "I suppose you mean alligators."

Early in the morning, Brewer and myself started in the "Hissee" with our guns to make a thorough reconnoissance of the shore and run up any small creeks that we might find, in search of these formidable and interesting creatures. I say formidable, for in this, as in many other respects, they differ from the alligator. My hunting of the year previous, when I had killed three, had given me somewhat of an insight into their habits; but there were certain facts in regard to them that from a scientific point of view I was anxious to solve. We had just rounded a point of land, and were still moving very slowly, when my eye caught an object on a point about half a mile off that from the distance seemed to be the trunk of a tree, and it was only when I got much nearer that I discovered it to be a crocodile larger than any one I had ever seen before.

Several times I had observed that their color was of an ashen gray, but this one was as light as an old sun-dried stump, a great contrast to the glossy black of the alligator. I soon saw that this old fellow was anything but asleep, but the difficulty was to get near enough to

003306

CORPS003317

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

make a sure shot, for if your bullet does not enter the spinal column, you might just as well use quail shot. My favorite shot is to sever the spine just in front of the fore-shoulder. Unfortunately, as he was to leeward of my position, there was no way for me to get the wind of him, although I paddled without noise or splash. He began to move gently, straightening himself up half-way on his legs, which gave me a chance to see his full length. I am almost afraid to state what I consider that length to have been, but as I sent two specimens North later in the winter, one of which measured thirteen feet, and I had killed several the winter before, my estimate of his length must have been quite accurate.

With a gentle slide, and without splash, this splendid fellow sank and was seen no more. Every inch of that beach and of his huge crawl is photographed on my memory. I have vowed that next winter, if his capture is possible, he may yet adorn the walls of some natural history museum. After an unsuccessful attempt to get a shot at a smaller crocodile, Brewer and I returned to the "Cupid" for supper. The earliest account I have been able to get from natives of the State of the occurrence of croco-

003307

CORPS003318

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

dile was in 1877. By a curious condition of wind and weather the water of the ocean had encroached upon the land, backing up the St. John's River and the easterly bound streams of Southern Florida. Not far from the edge of Lake Okeechobee some Indians who belonged to the tribe that lived in the vicinity of the Kissimmee River captured a crocodile and took it to Kissimmee, where it was recognized by the whites as being a distinct variety from the alligator, with which they were so familiar.

The Indians have probably known of its existence from the earliest times, and in their language called it the "sharp-nosed alligator." The habitat of the *Crocodilus Americanus* is rather difficult to define, but I think that in very early times it could have been found in detached families along the whole sea-coast of the State. Its propagation is much less rapid than the alligator; they never affiliate, being bitter foes. The fights that occur between them are very unequal conflicts. The broad snout, short teeth, and less active body of the alligator are no match for the narrow jaw, long sharp teeth, and greater ferocity of the crocodile.

003308

CORPS003319



CROCODILE HUNTING

On one of my hunting expeditions I was fortunate enough to find the nest of this reptile, and employed my hunter to obtain the eggs during the succeeding summer. The eggs were given to the Smithsonian and other museums, and were the first that have ever been presented. I was much struck by the difference of this nest and that made by the alligator, who deposits its eggs well back from the fresh-water stream on which he lives, hidden in vegetation, with a mound erected over the hole consisting of leaves, stumps, broken pieces of wood, and vegetable mould, about two feet high and four feet in diameter; in this the female deposits from one hundred to three hundred eggs.

The crocodile, on the other hand, makes its nest on the edge of the salt water, in a very similar manner to that of the green turtle. A hole is scooped out of the dry sand low enough to insure the proper amount of moisture (independent of rains), which is so important for incubation. The eggs are then laid in layers and the sand smoothed down perfectly level, which makes the place very difficult to find. As I have had but two nests under my observation, it would be rather rash for me to gen-



THE HAUNT OF THE CROCODILE

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

eralize as to the number of eggs the crocodile deposits, but I am under the impression that it is far less than that laid by the alligator. The nests referred to contained, respectively, fifty and seventy-five eggs. I have not been able to prove that the female crocodile returns to the nest at the time of hatching, as is stated of the alligator, but the presumption is that she does. I attempted to hatch eggs last summer, but not being aware of the amount of moisture necessary, succeeded only in drying them up.

My hunter in South Florida was more successful in hatching three, which, however, died afterwards. These specimens, I believe, are the only ones in existence, with the exception of a very imperfect one in the possession of Mr. Ralph Munroe, commodore of the Biscayne Bay Yacht Club, at Cocoanut Grove. The present local habitat of the *Crocodilus Americanus* extends from the north end of Biscayne Bay to Cape Sable. The group Crocodilus is divided into (1) Crocodiles; (2) Alligators. Of the crocodiles there are many varieties, some of which are most interesting. I will give the general characteristics and habitat of those that are known.

003312

CORPS003323

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

GAVIALIS GANGETICUS.

It is remarkable for its long narrow snout. The two lower front teeth, and, skipping two teeth, the next ones back, run into orifices in the upper jaw. They attain a length of from twenty-five to thirty feet.

*Habitat.*—Hindostan, Malabar, Ganges River.

CROCODILUS ACUTUS.

This reptile was first described by Alexander von Humboldt. It lies in wait along the trails that lead through the jungle and attacks many small quadrupeds, even the jaguar. They attain the length of eighteen feet.

*Habitat.*—South America, West Indies, Ecuador, New Granada, Venezuela, Yucatan, Guatemala, Cuba, San Domingo, Jamaica, Martinique, Margarita.

CROCODILUS BIPOCRATUS.

Very wide, smooth saddle across the shoulders. Color, yellowish green, with dark blotches. A long, pointed snout, with two high parallel ridges running from the eye formed of bones. Back of the head is a group of six heavy plates. Length, thirty feet.

003313

CORPS003324

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

*Habitat.*—South Asia, Sunda River, from Ceylon to New Ireland.

### Crocodilus Vulgaris
(the Crocodile of the Nile).

Four plates in pairs behind the head; six plates in pairs on the neck. The plates on the back vary in number in individuals, but are usually from fifteen to sixteen. On the tail, eighteen pairs and twenty single plates. The color is a bronze-green, with small black blotches on the back. The sides and belly are of a dirty yellow, with dark blotches, but on the back these blotches vary with the individual. Length, twenty to thirty feet.

*Habitat.*—All the big rivers in Africa, especially the Nile and the rivers near Madagascar.

### Crocodilus Frontatus
(or Short-Bodied Crocodile).

It is distinguished by its high head, short forehead, and broad snout, which is very blunt. The nose is slightly turned up. High bone ridges extend over the eyes. The swimming ligaments between the toes are very short. The head is dark in color, and light-brown ridges

003314

CORPS003325



THE CROCODILE AT HOME

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

extend over the back. Length, fifteen to twenty feet. Paul du Chaillu (the discoverer of the gorilla and the pigmies) brought the first specimens of this crocodile to the United States.

*Habitat.*—Africa, from seven degrees north to fourteen degrees south latitude.

### Crocodilus Porosus.

This crocodile resembles very much the *Crocodilus Bipocratus*, having the two ridges running from the eye to the end of the snout, but is slightly different in color, being of an even gray tint.

*Habitat.*—India.

### Crocodilus Palustris.

The jaw is of moderate width and well arched. Color, gray with black blotches. Probably attains a larger size than any of the Crocodilia, one now in the possession of the British Museum being thirty-three feet in length.

*Habitat.*—India, Australia (where it is called the marsh crocodile).

003316

CORPS003327

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

### Crocodilus Marginatus
(or Marginal Crocodile).

This species differs from the North African crocodile by a curious concavity of the forehead and its stronger dorsal plate.

### Crocodilus Americanus.

This crocodile is akin to *Crocodilus Acutus*, which it most closely resembles. The head is low, snout long and narrow, with two well-defined arches on the upper jaw. The teeth are long and narrow, the ivory being very white. The two front lower ones protrude through holes in the upper jaw. In some specimens but a single one of these come through, though I think these cases are rare and probably occurred from the malformation of one of the teeth.

On the back of the neck is a group of high ridges, back of which is a wide, smooth saddle. Four rows of ridges extend half-way down the tail, the two outer ones extending to the end. The hind legs are very powerful, but the body is usually slimmer than that of the alligator. The color is of a greenish gray, lighter on the belly, with black blotches all over the body.

003317

CORPS003328

It is much more active and savage than the alligator. I have known one to attack a boat and, closing its powerful jaws, take a piece of wood out of her bow; with great difficulty it was despatched with a rifle.

*Habitat.*—The Southeast Atlantic coast of Florida.

CROCODILUS CALAPHACTUS
(called the False Crocodile).

CROCODILUS INTERMEDIUS.

*Habitat.*—Orinoco.

This crocodile differs from the *Crocodilus Americanus* by having a more slender snout and the plates on the back more nearly uniform.

CROCODILUS ROBUSTUS.

*Habitat.*—Madagascar.

CROCODILUS RHOMBIFER.

*Habitat.*—Central America.

CROCODILUS MORELETI.

*Habitat.*—Guatemala.

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

CROCODILUS JOHNSTONI.

*Habitat.*—Australia.

CROCODILUS CATAPHRACTUS.

*Habitat.*—West Africa.

Following are the characteristics and habitat of several varieties of alligator:

ALLIGATOR SCELEROPS.

Snout broad, articulations running in rows from the head to the tail. High ridges over the eyes. Color black, light yellow on the belly.

*Habitat.*—East Brazil, Buenos Ayres, Peru.

ALLIGATOR NIGER
(called the Moorish Cayman).

The characteristic is five rows of plates around the neck. Color, black. Belly, yellowish white.

*Habitat.*—North Brazil, Bolivia, Peru, Ecuador, North Peru, the Amazon River.

003319

CORPS003330

CAMPSA LUCIUS
(the North American Alligator).

This alligator is akin to the South American varieties. The snout is broad, body heavy, eyes prominent, and protected by ridges. Articulations running in rows down the back. Color black, yellowish white on the belly. Teeth, yellow ivory, thick and strong.

*Habitat.*—South Carolina, Georgia, Mississippi, Louisiana, Florida.

## CHAPTER IV

Land of the Big Snake—Florida Sponges—Crawfish—An Unlucky Dive—Amateur Surgery—Cape Sable—The Edge of the Everglades.

WITH an apology for my slight digression, we will return to our coasting trip and our unsuccessful crocodile hunt on Card Sound. I had originally intended to hunt crocodile for a few days more, but, knowing the water in the Everglades would be getting lower as the month advanced, I considered it prudent to push south, locating well where the largest crocodile lived, intending to return in March for a systematic hunt after my winter's work in the Everglades had been accomplished.

On the 31st of December we got the "Cupid" under way and ran as far as the mouth of Jew-Fish Creek. This creek is nothing but a very narrow passage, which connects Barnes Sound with Black Water Sound. I am using here the names as given by the Geodetic Coast Survey Chart. Barnes Sound is known to the na-

003321

CORPS003332

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

tives as Little Card Sound, and the northeast end of Florida Bay is called by them Barnes Sound. Comparatively little is known of these sounds, especially the northwest shores, as the few people who live on Key Largo and the smaller keys use the better water communication of the Hawk Channel for the transportation of their produce. Jew-Fish Creek has rather a blind entrance, which passes through a heavy growth of mangroves.

The water is quite deep and the current runs through with great swiftness, and is a fine place for all kinds of fish. The channel divides into two or three branches, the one running nearest Key Largo being the best. With a light wind we sailed across Blackwater Sound, which is a pretty sheet of water nearly circular, and about four miles in diameter, taking a course nearly west, in order to find the opening which leads into the Bay of Florida, called Boggy Creek, a rather difficult place to get a sail-boat through, as the bottom is so soft that a pole pushes in to its full length.

There is a second opening to this bay, more to the northwest, which runs into several small land-locked bays. After much difficulty we succeeded in getting through "Boggy," and

003322

CORPS003333

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

anchored for the night near its opening into the Bay of Florida. From here I took a westerly course, which was somewhat out of my way, in order to reconnoitre the uninhabited north-west shore of this large bay, and also to prove the accuracy of a statement made by Ed. Brewer, that a year and a half ago, while hunting on a certain creek, he had killed a great snake of a kind that he had never seen before. This creek leads nearly to the Everglades. Brewer believed that he could take me to the very spot, and thought that perhaps I might find others of the same variety. I have for a long time believed that in the southern part of Florida there exists a snake of immense size. What this snake is has been my longing desire to discover.

Many absurd and sensational stories have been circulated this winter, without any truth in them whatever, concerning the capture of this huge reptile. A circus charlatan brought a python down from the North in a box. He disappeared for a few days, and returned to the settlement with a twelve-pound snake in a bag, that he claimed to have captured on Long Key, which is in the Everglades. I am quite sure that without an Indian guide this man never reached that spot alone. But the fraud was

003323

CORPS003334

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

quite successful, and the newspapers were completely taken in. Taking the sloop along the northwest shore as far as the water would permit, Brewer and I left the "Cupid" in charge of Sam, and with the "Coacochee" started for the "Land of the Big Snake."

Leaving the main part of the bay, we entered a smaller one, which we crossed, and with unerring accuracy Brewer steered for what appeared to be a solid wall of trees; but on reaching it a hole in the foliage was seen, from which a fresh-water stream was issuing. The water was perfectly clear, and just after entering I could see many fish. Reaching for my light spear, I soon landed three fresh-water garfish. Continuing farther up the stream, the foliage became more tangled and made our progress very slow, until we reached what seemed to be the head of canoe navigation. The scene would rival some of those depicted on the Amazon River. The hanging vines, the tropical foliage, obscured nearly all light, and the air had an earthy, snaily smell.

Brewer, who had been pulling the canoe along by the overhanging branches, stopped and said, "We are near the place where I killed the snake." I immediately felt for my revolver,

003324

CORPS003335

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

thinking there might be a whole den of pythons somewhere in the vicinity, that had come to the funeral of their progenitor. The place itself was certainly the snakiest one I have ever been in. Brewer crawled on shore, with his head to the ground, and began lifting up the rotten leaves, examining everything very carefully. This search continued for nearly half an hour, when he said, "I have got it, but the buzzards have scattered the bones pretty bad." I jumped out of the canoe at once and joined him, all eagerness, to find a skeleton that might have belonged to the strange variety I have been in search of. Under the first layer of leaves was a section of vertebra, evidently that of a snake; its diameter, as compared with snakes I had usually seen, seemed very large. By clearing a space of ten feet around, we uncovered more pieces of the backbone and a great number of ribs. I returned to the canoe for a pail, and after a long period of careful work we recovered more than two-thirds of the entire body, but nothing as yet of the head, that I was so anxious to find; among the last two pieces, however, I discovered a bit of the jaw, with a large fang sticking in it.

That fang told me much, as I could plainly

003325

CORPS003336

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

see the capillary tube running through it, which indicated to me rattlesnake. I did not, however, wish to decide hurriedly as to this fact, and preferred to wait until I had assembled the bones into the full structure, at the University of Pennsylvania, in consultation with the professors skilled in osteology. I got Brewer to tell me again of the killing of this reptile, a year and a half ago. It seems he had been hunting and exploring up this creek, in order to find a canoe passage that would lead to the Everglades. Pushing his way through the thick foliage, as we had done, he saw a little way ahead of him, on the low limb of a tree, what seemed to be the largest snake he had ever seen in his life. The snake he describes as having longitudinal stripes, and not looking like a rattler. To pick up his shot-gun and fire was the work of a second. The snake was badly riddled. He approached with the idea of despatching him and taking his skin, when he was overpowered by a strong, sickening smell, which caused him great sickness of the stomach and faintness. He lay in a partly unconscious condition for some time, and when he recovered sufficiently, he reached his canoe and made his way to the coast without paying any more attention to the

003326

CORPS003337

snake. On my return to the North, this skeleton was carefully put together, and it was decided that it had belonged to a rattlesnake, but the formation of the vertebræ seemed to be different from those of the usual variety of the Florida rattler, which may account for the observation Brewer had made of the longitudinal stripes. In life it would have been about eight feet in length.

That great snakes of some species do exist in Florida, yet to be discovered, I have not the slightest doubt. I pin my faith to the account that two different Indians have given me of snakes that were at least eighteen feet in length, and evidently belonged to the constrictor family. As I have remarked before, I have never found a Seminole to lie. I did not explore the head of this creek, but I am under the impression that it reaches to within two miles of the Everglades.

With our successful find we paddled back to the "Cupid," and on reaching open water found that it was blowing very fresh, and a tough splashing paddle we had of it. I immediately took two reefs in the mainsail, and squared away for Whaleback Key, to the leeward of which we anchored for the night. On the coast



BREWER ON KEY LARGO

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

chart the Bay of Florida is quite accurately put down, but there are a countless number of shallow bays to the northwest, some of them quite large, the outlines of which have not been attempted, and as the water is so shoal that nothing but the lightest-draught canoe can float, the probabilities are that they have never all been explored.

On the 2d of January we got under way with a stiff southeaster, and beat up to the Key Largo shore, finding a snug little harbor back of Hammer Point, where we went ashore to do a little reconnoitring. Key Largo is one of the most fertile of the Florida Keys. It has not very much soil to boast of, but what there is is exceedingly rich and lies in pockets in the coralline rock. At one time there was quite a lot of valuable wood growing, but the settlers have made sad inroads upon it. Small trees of mahogany, crab-wood, lignum-vitæ, and satin-wood are still to be seen. This island, considering the comparatively few people that are on it, ships during the year a great many tropical fruits and vegetables to the Northern market, the pineapple doing very well. The houses are all on the southeast side of the island, and have their little docks on the Hawk Channel,

003329

CORPS003340



THE CRAW FISHERMEN

where small steamers and sail-boats can stop for freight. The people are industrious, intelligent, and very hospitable to strangers.

Crossing the island from the Bay of Florida is rather difficult, as there are no roads, and the very blind trails, which seem to be little used, have to cross several swampy places. A short time after our return to the yacht, a skiff containing two young men came alongside; they had been fishing for crawfish, and had quite a boat-load; they threw a quantity on deck, and seemed offended when pay was offered them. They gave me information as to where the best fishing-grounds could be found. The crawfish is much like our Northern lobster, but has a more delicate flavor and the shell is thinner. Instead of the large claws, it has feelers that are quite thick at the base, and more like the shrimp. The shell is rougher than that of the lobster, and there is more red in the variegated color. They average in weight about a pound and a half, though one we caught weighed four.

I found these men had been using fish-spears. After they had left us, with various information about Key Largo, Sam and I started off for a good supply of fresh provisions. We hunted

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

in vain for the home of the crawfish, but at last, after rounding a point in about two feet of water, the bottom seemed to be alive with them, and in less than one hour, with a spear, I landed in my canoe two hundred pounds of these delicious shell-fish. On returning to the "Cupid" we had a splendid dinner, after which we salted down the remaining fish, which the following day we sun-dried. A good-sized bundle of these I carried into the Everglades, and, by soaking a couple overnight, had many a palatable breakfast.

Nearly all these bays and sounds abound in sponges, the gathering of which is a great industry of the people of the Bahama Islands and the Florida Keys, Key West being the great market for their sale, entirely by the method of auction. Sponges are taken on the coral banks, in various depths of water, by diving or by means of the sponge-hook. A sponge-hook is a curved iron with three prongs, into the socket of which is fitted a very long pole. The hook is thrown over the sponge (located with the water-glass), which by a quick jerk is loosened from its root and brought to the surface.

The water-glass is the constant companion of the fishermen here, and usually consists of

003332

CORPS003343



A FOUR-POUND CRAWFISH

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

a bucket whose bottom has been replaced by a sheet of glass. It is curious to how many different purposes they put this glass. I have watched with great amusement two darkies fishing for large fish, one looking down into the water, the other with the line in his hand. The darky with the water-glass would sing out, "Pull," as soon as he would see the hook disappear in a fish's mouth; his companion would haul in, perhaps, a thirty-pound mutton-fish. The appearance of a sponge when taken from the bottom is not the light, springy, soft, yellow-colored affair that we are accustomed to. The general shape is similar, but the surface is smooth, with the exception of a few sharp volcano-like craters on the top; in color as black as your hat, and to the touch like soft india-rubber.

Like the anemone, it has life like a fish, but grows to the bottom like a plant. What annoys the sponge-fisherman is, that he sees so many sponges of different kinds before he meets one that is marketable. The largest of the worthless kind is the "Loggerhead." This sponge is on the bottom in enormous quantities. It is the shape of a round life-preserver, and sometimes attains the diameter of five feet.

003334

CORPS003345

Then there is the potato-sponge, and several curious varieties which have sharp spines through them, that hurt the hands very badly when pressed. Neptune's cup is also another variety. These sponges are known at a long distance by the expert, and are passed by, but the beginner is apt to bring many to the surface before he recognizes them. The sponges that are marketable are the glove, sheep's-wool, grass, and yellow. These vary somewhat among themselves in quality.

I have a sheep's-wool in my possession that is larger than my head, but so soft that I can put it in my closed hand and it cannot be seen.

Sponge-fishing and the examination of the wonderful marine life on the coral bottom through the glass has always had a great fascination for me, and my fondness for sponge-diving caused the only accident that occurred to me during the winter. While at our anchorage, near Hammer Point, Sam expressed his desire to take a paddle in one of the canoes, so I pushed off with him in the "Hissee." Sam is a good sailor and oarsman, but the quick motion of the narrower boat was too much for his accuracy of balance and we had not proceeded far before he made a quick side move-

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

ment that capsized the canoe, throwing us both into the water. I righted the canoe, and after baling her out we returned to the "Cupid," which was not far away. Regaining the deck, I took off my wet clothes, and while undressing I saw on the bottom a sponge that seemed a good one, and, wishing to prolong my bath, prepared to make a dive. I was perfectly well aware that we were anchored in about five feet of water, and that a flat dive was necessary, but I had not noticed that in taking off my clothes I had made the deck very wet and slippery, and just before jumping my feet went from under me backward. I entered the water in nearly a vertical position, and struck the bottom just at a place where there was a sharp piece of coral sticking up. This made a gash in my forehead and cut half-way through the bone of my nose like a knife, with a smaller slit running nearly to the end. With great difficulty I regained the deck, with the help of the two men, for I was greatly stunned by the blow and had swallowed a great deal of salt-water. A quantity of blood was running down my chest, and a terrible spectacle I must have presented, as I could see by the expression on the faces of my two companions.

003336

CORPS003347



THE LOOKOUT FORWARD

I said to Sam, "If I am going to have any nose the rest of my life, you and Brewer must assist me in a little surgery. Hand me the bag that contains my surgical case."

He did this as quickly as possible. I selected a flesh needle of the proper size, then drew from the bottle the medium carbolized sinew, with which I threaded the needle. Washing the wound with fresh water, I felt the parts carefully to see where the stitches were to go. I told Sam that I depended on him to make a good flat knot and drive the needle through where I directed him, as light stitches might pull out and would be of no use. I told him that I was suffering very little, that the pain would come to-morrow, that he must not be unnerved by the amount of blood, and that I could lose much more, and that without fainting. So we set to work, and in a short time completed a good bit of amateur surgery, which has been pronounced by a skilful surgeon as good a piece of work as could have been done under the most favorable circumstances at home.

I have always been very grateful to Sam for his efficient aid, for, blinded with blood, without his eyes and hands I could have done but little, and we were a hundred miles away from a doc-

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

tor. Brewer helped also as much as he could, and did quick work in getting me out of the water. It seems strange how one accident is so often followed by another. First the upsetting of the canoe, then my unfortunate dive. Some of the people in Miami had insisted that the Everglade business was merely a blind; that our real destination was Cuba. If they could have seen me at this time, they would have been certain that I had been fighting for Cuba's freedom.

We got under way the next morning and ran through a very narrow channel between two banks, but the sun, being in the right direction, helped us very much. By running by the color of the water, one becomes quite expert after a while in judging the depth. Leaving Cotton Key and Bird Bush on our left, we took a course which led us between Upper and Lower Matecumbe Islands, into the Hawk Channel, in order to avoid some very shoal water, that stretches across the Bay of Florida almost to the main land.

In the opening between the two islands we very soon sighted Indian Key. It was on this Key that Dr. Perrine was killed by the Indians during the Seminole War, and his children so

003339

CORPS003350



CAPE SABLE BEACH

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

miraculously escaped by hiding in a turtle-pen. The island is high, with deep water around it, and has about ten acres of good land. We landed on the northeast end of Lower Matecumbe to take a stroll among the cocoanut-trees and allay our thirst with the cool milk, which was a great relief from our barrelled water.

After dinner we skirted the shore of Lower Matecumbe and swung sharply round the point, dodging the banks, to a snug little anchorage for the night. The wound in my face was doing well; my nose felt about two inches wide. As it was originally of generous proportions, I was a little curious as to the ultimate result.

On the 4th of January, after a comfortable breakfast of crawfish and green turtle, we shaped our course for Cape Sable. The detour to Lower Matecumbe Island was necessary in order to avoid the very shoal water that extends over the east end of the Bay of Florida. Carefully feeling our way through the gaps between the banks, with a light wind, we made very good headway. At noon, having a good natural horizon, I took a meridian altitude for practice, to see how my instruments were working, and

003341

CORPS003352



COCOANUT-TREES NEAR THE SHORE

made out my latitude and longitude within a mile and a half of what the chart gave, determined by cross bearings on known islands.

We reached Cape Sable (Southeast Cape) early in the afternoon, and came to anchor near a small schooner loaded with wood. Brewer and I took a canoe and landed on the extreme point. The first thing I saw was the skull of what must have been a turtle of enormous size; it was white and water-worn, eleven inches wide and a foot long. I threw it at once into the canoe, that we had hauled upon the beach, thinking it would make a pleasant souvenir of the most southerly point of the United States, to put in my den. We walked around the point along a very pretty sand beach, and watched the shark and tarpon that were occasionally rising to the surface. About a mile from where we were a large bunch of cocoanut-trees reached to the water's edge. This is a part of a plantation that was started many years ago, but the people who lived there had deserted it. We examined an old house which had signs of being occupied by a darky, but no one was in sight. There was an air of desolation about the place, and, looking out upon the Gulf, not a sail could be seen.

On returning to the "Cupid" I received a hail from an old man on the wood schooner (that we had supposed was without a crew), asking me if I could send a boat ashore to get two of his men, who had been cutting wood, as they had no small boat, and otherwise would have to swim. I immediately despatched Brewer in the "Coacochee." When he returned from his errand I took the canoe to make a visit. I found a very dilapidated old craft about fifty feet long that was leaking badly. The captain had evidently looked upon us with a great deal of suspicion, having mistaken us for Cuban filibusters. Can it be wondered at? My own appearance at this time must have intensified this idea. I was sunburned to the color of old mahogany, and had a cross bandage over my forehead and nose. He implored me to let him have a little sugar and coffee, as they were in an almost starving condition, the food having given out two weeks before; his men had been delayed in getting the lumber out, also by the mosquitoes that had infested the place where they were chopping to such an extent that one man nearly lost his life. Their faces and hands certainly bore evidence to the truth of this statement. I glad-



ON CAPE SABLE

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

dened the old man's heart by sending him a good supply of coffee, sugar, tobacco, and some of our salted crawfish.

It was not long before I saw the smoke of a pine-knot fire started in his sand-box on deck. We got under way the next morning and surveyed a channel along shore some fifteen miles to the eastward, finding six feet of water, where the Coast Survey Chart marks one. I carefully made up my corrections for future use, as I found some splendid tarpon ground. On Wednesday, January 6, we started with a heavy northeaster and ran for Cape Sable; on rounding it the wind veered to the northwest, and three reefs and bobbed jib were in order. All day we thrashed to windward against a heavy sea, which kept us working at the pump constantly. After getting by the Northwest Cape the wind stopped a little and we were enabled to gain ground. The heavy squalls would strike so hard and so quickly that I became very much exhausted with the steering, but did not like to turn back, as I believed that towards afternoon the heaviest wind would be over, which proved to be the case, and I knew that as soon as we could get a little farther up the coast we would have good har-

003346

CORPS003357

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

bors to depend on. Early in the afternoon we were abreast of what is known as Shark River. Why Shark River is not easy to decide, for it is merely an opening among the many that lead through the Ten Thousand Islands Archipelago. The real mouths of the Shark and Harney Rivers are about fifteen miles back of the islands. Taking this opening, we ran into perfectly smooth water, letting go our anchor to cook and have a rest. Very few people ever travel among these islands, and many have lost their way and almost starved to death. The shore appearance is very deceptive. It would be supposed such very large trees could only be supported by hard deep soil, but such is not the case. On landing on some of the islands, we found them to be low and covered with two varieties of mangrove, the trees having large trunks and growing to the height of from fifty to sixty feet. By jumping on the ground you can shake it for many yards. It seems to consist of nothing but a mass of floating roots. These islands cover an area of about seventy-five miles by fifty.

The Geodetic Chart merely indicates the edges lying on the Gulf of Mexico, and has attempted nothing of the inside work; no sur-

003347

CORPS003358



ALONG THE COAST

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

veys of any kind have been made. I soon discovered that all the data given in the land-maps were entirely erroneous. The lack of knowledge of the depth of water existing here had been of great disadvantage in working out certain problems at the Naval War College. I had decided before leaving home that, could I spare the time from the main object of my trip, I would carefully sound out and familiarize myself with some of the channels through this labyrinth, which would permit me to pilot a torpedo-boat or fleet of boats operating on the coast. As this matter is somewhat confidential in its nature, I will omit mention of the time occupied by my hydrographic work and take up my narrative at the mouth of the Harney River, which as the crow flies is nine miles from the Gulf.

The water here became perfectly fresh, and as we ascended the current got stronger. The bottom is formed of coralline limestone and is smooth, but higher up the character of the rock is jagged, so much so that a mile before reaching the source in the Everglades we were brought to a stand-still and cast anchor. Here I decided on making my first Everglade station, and the next day, taking my instruments and an axe ashore,

003349

CORPS003360

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

I made a clearing, and with my sextant and artificial horizon took a meridian altitude. In the afternoon I decided to make a preliminary reconnoissance of the rest of the river and cut out timber in order to let our loaded canoes pass. Sam had never seen the Everglades, and begged to be taken along, that he might judge of our wisdom in trying to cross to the Atlantic. After a good dinner, Brewer, Sam, and I started up the stream, which at this point was not more than fifty feet wide. The rough, rock formation of the bottom still continued, the banks approaching each other gradually until, after paddling three-quarters of a mile, the foliage met overhead and we were obliged to lie in the bottom of the canoe, dragging her along the narrow water-way, that was hardly wider than our beam.

Here we found for the first time that we were on a travelled Indian route. The fallen trees and branches had been cut out just the right width to admit of the passing of a canoe; some cuts must have been made many years ago, while others were evidently made within the year. The water still ran swiftly. Just before entering the tangle of vines we surprised two wood-ibis, that I thought might prove

003350

CORPS003361

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

edible. The range was not more than thirty yards, and I killed them both with a well-directed right and left from the shot-gun. But a little way farther and an opening appeared, letting in a flood of daylight, and we suddenly burst into the pathless Everglades. Here was the source of the Harney River very closely defined. We were standing on the rim that dams up that great basin of shoal water, with so few outlets that except in very dry seasons it cannot drain itself. What a sea of grass! What was there beyond that horizon before reaching the shore of the Atlantic? Did those wonderfully fertile islands exist, the secret of which is so strictly guarded by the Seminole from the white man? Were great springs and lakes to be found as the main supply of all this water, which cannot alone be accounted for by the rainfall? Does yonder horizon cover the land of the Big Snake? These and many other questions presented themselves as I gazed upon that apparently limitless grassy sea.

The silence was broken by Sam, who said, "I am glad I have seen this; it looks like a mighty hard place to travel in, and I can easily see how people have lost their way in going a mile. I think *I* can get back to Miami by the

003351

CORPS003362

coast a month or so before *you* are heard of." A few small scattered islands can be seen to the east close by; to the southeast a line of trees which define the edge of the Glades. About a mile from us is the source of the Shark River, in which the water is not so deep as the Harney. The Indians seldom use it for canoe-travel. The Harney River also strikes a better point, from which the Big Cypress can be reached to the north. Along the edge of the Big Cypress Swamp is a favorite place for the Indians to hunt the otter.

Before leaving Miami I had seen Robert Osceola in his canoe, who had just come across the Everglades with nineteen otter-hides, to sell at the trading-post. He said, "All Indians over Big Cypress; big otter-hunt; stay good while." I was glad to hear this, for it was just as well that they should not know that I was penetrating into what they consider is their country, and if they should see any of my scientific instruments they would jump at the conclusion that I was employed by the government, and (though they will probably never raise their hand against the white man again) might make things unpleasant.

With the northeasterly route intended, it was



THE "CUPID" IN HARNEY RIVER

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

not probable that we should meet any Indians, even if we should pass their camps; and upon these great winter hunts they are always accompanied by their squaws and children. As I knew, from the experience of others, how useless it was to obtain any travelling information from them, my wish was, if possible, that they should not even know that I was in the Everglades. If I had started from Miami, this would have been impossible, as some of their runners would have been encountered, and in a week all the Indians in South Florida would have known that "Willie Bee," as they had named me, who usually travelled in one of their canoes, was going to try and cross the Everglades. Not meeting any Indians on the coast, my start and my entrance into the Glades by the Harney River was unknown to them.

After taking a short rest we retraced our steps through the hole in the wall of tropical foliage, where the river starts, and, the current aiding us greatly, we soon reached the sloop. It was getting so late in the afternoon that taking photographs seemed rather uncertain, but as we were to make our start the next day in the canoes, it would be my last chance to get a picture of the "Cupid." This negative, as I

003354

CORPS003365

v-00119-RDM Document 112-6 Filed 07/19/23 Pag



feared, turned out under-exposed. The photographs taken with my three-and-a-half-square film camera, to illustrate this book, have proved fairly good, considering that some of the choicest bits I had wished to reproduce were usually caught late in the afternoon, and our starts were made before the sun rose in the morning. Films are never as satisfactory as dry plates. I regretted very much that economy in weight and the liability to breakage forbade my using them.

The night proved very cool, the minimum registering thermometer showing 42.5°, a stiff norther having blown during the night. This meant a killing frost for North Florida. Early on the morning of the 9th we began sorting the outfit to go in the canoes, leaving on board the "Cupid" a good supply of groceries for her return trip, taking a good bundle of salted crawfish, a gallon can of kerosene for each canoe, a brush-hook, two Newhouse traps, two cheesecloth mosquito-bars, and my Maine woods axe, the only things added to the outfit already described. We divided the load between the two canoes, the grocery-chest going in my boat and the cooking-chest in Brewer's. When completely loaded up I found that the canoes were



003355

CORPS003366

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

not in the least overweighted, and would naturally get lighter as we progressed. After bidding Sam adieu and giving him a letter to mail at Miami (written on a piece of wrapping-paper), at half-past nine I gave the order to shove off.

003356

CORPS003367



THE EDGE OF THE EVERGLADES

## CHAPTER V

Fighting Saw-Grass—The Limpkin—Making Camps—Sweet Water—Long Key—A Meridian Altitude—Willoughby Key—The Cabbage-Palm.

OUR reconnoissance of the previous day helped us very much in the ascent of the river. It was not very long before we emerged from the woods, on the edge of the Everglades, where we made a halt to give me time to adjust the bicycle wheel to my canoe and get my field-book, pencil, and compass ready to take my courses and lay down my distance. Brewer has a way of his own in figuring miles by the number of poles required. I told him to make an independent calculation on each distance run, which would give me a third check on my own work; it was always a surprise to me how his crude reckoning tallied with my cyclometer. My general plan was to take a distant object as a sub-station, and when it was reached to work up my dead reckoning to it, then at noon, whenever an opportunity offered, to take a meridian altitude with my

sextant to more accurately establish my latitude and longitude. There seems to be plenty of water, and most of the leads have been good, enabling me to go in a northeasterly direction, but much dodging around is necessary, to avoid heavy bunches of grass, of which about three varieties are encountered. First, the matted, half-floating grass, which where the water is low gives some trouble and hard pushing, but ordinarily is not noticed. Secondly, the round grass, which is more abundant on the eastern edge. Thirdly, the saw-grass, which is the worst of all.

When the rock is near the surface, with little soil, this saw-grass grows to a height of about four feet, but where the soil is deeper it has very little water around its roots and reaches a height of ten feet. This is the great barrier to Everglade travel; it pays better to go twenty-five miles around than half a mile through. What makes this grass so formidable and so much to be dreaded is the saw-like edge with which it is armed on three sides. If you get a blade between your hand and the pole, it will cut you to the bone, with a jagged gash that takes long to heal. The nose and face suffer much. When very thick, pushing through it

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

becomes almost impossible. To cut it down ahead leaves a short stubble that spikes the canoe. The best method is to push from the stern, your feet and legs protected by rubber hip-boots, the canoe dividing the grass on either side ahead. If, however, you should have very much of this to do, the upper parts of the boots will be cut through. This happened to me once, but I had repair cloth and cement, with which I mended them. Game was very plentiful on the edge of the Glades, but as we advanced to the interior it became less abundant. But having found deer a long way from solid land, we hoped to come across them again. We saw the white egret (plume birds) in every direction. On a little island that we passed, about twenty feet long, was the nest of a blue heron, with young ones about a week old. Two large ducks flew up ahead of us, which were about the size of brant, and are of a variety peculiar to the Everglades; they are very good eating. A bird which we became intimately acquainted with later on, and which we then saw for the first time, was the limpkin (suborder, Ralli; family Aramidæ; genus, Aramus; species, Aramus Giganteus).

If an English snipe were three feet high he

003360

CORPS003371

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

would look very much like this bird. In fact, the resemblance was so great that I had no hesitation in cooking and eating the first that I shot, and found them really very good, especially some of the younger birds. The limpkin is a native of Florida, where it breeds freely. It is also found in Central America and the West India Islands. Authorities state that it was once a very abundant species, but is now seldom seen, except in the less inhabited districts. Brewer drew my attention to two birds soaring quite a distance off; he said they were the Everglade kite, and are found nowhere else; he had a standing order to kill some, and was anxious to get a shot, but they are difficult to approach. They look like a small henhawk, with rather darker plumage. To collectors a single egg of this bird is worth ten dollars. The same price is also paid for a good skin.

There must be thousands of otter in this vicinity, for their trails crossed each other in all directions, and wherever there was a little dry ground their fresh slides of the night before could be observed. We had no serious setbacks to our travel, but the water was not as high in the Glades as I should have liked to

003361

CORPS003372



THE NOONDAY REST

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

have seen it. A good rain might have given us an extra inch or two, but we did not get it. Being obliged to stop every little while to get compass-bearings and calculate distances retarded us very much, but I was determined to spend all the time on this work that was necessary, as any grave error at the start would have thrown things badly out at the other end. The same care was given throughout the trip to the very last mile; at no time did I allow myself to become hurried. A little before noon we crossed a fresh Indian canoe trail, less than a week old. It led to the north, and we supposed that the owner was on his way to join the hunt on the Big Cypress.

I preferred not to sleep in the canoes unless absolutely forced to do so, and made it a practice after three o'clock not to pass any little island without examination for dry ground, which was evidently getting rarer as we journeyed on. At four in the afternoon we passed a little bunch of bushes, which I sent Brewer in to investigate; he reported that we might clear a piece seven or eight feet long that would be dry enough, and, there being nothing in sight that looked more promising, we proceeded to make camp with brush-hook and axe.

003363

CORPS003374



v-00119-RDM Document 112-6 Filed 07/19/23 Pag

OUTLOOK FROM STATION 2

003364

CORPS003375

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

Places were cleared for the two canoes, and after unloading them they were placed bottom up.

The little spot of ground was not large enough to spread the tent, so the fly alone was used; sticks were cut for the cheese-cloths and the blankets unrolled. No fire could be made here, so we started the kettle boiling on the kerosene-stove, and in a very short time had cocoa, cumpti, and crackers ready. Supper over, we enjoyed a good smoke, and I began by the light of the lantern to plot my course on my chart and work up my reckoning, calling this camp Station No. 2. I found that in a straight line we had covered eight miles and a quarter, but the path of the canoe was nineteen miles long. This was quite as good as I expected to make, in fact, better, as I surely thought that the daily rate would be reduced to five miles when we got into heavier work. Several very good leads were met, in which the boats made good progress, and the water was in all places clear, even where the grass was thick, with a mile and a half current setting to the southwest; rocky bottom was found frequently near the surface, with no mud on it; then again the mud was from two inches to a foot thick.

003365

CORPS003376

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

The popular impression has always been that the Everglades is a huge swamp, full of malaria and disease germs. There was certainly nothing in our surroundings that would remind one of a swamp. Around the shores of the little islands the mud may be a trifle soft, but pure water is running over it, and no stagnant pools can be found. In the daytime the cool breeze has an undisturbed sweep, and the water is protected from overheating by the shade the grass affords. Water-plants of various kinds and several varieties of fish and reptiles keep the balance of life, as in a self-sustaining aquarium. As will be seen by the analysis, this water is quite wholesome to drink. As would naturally be supposed, it is rather hard, as much of it comes out of and flows over the coralline limestone.

I had no hesitation in drinking it whenever the canoe stopped, taking two or three glasses at a time, when thirsty from the exertion of poling. It agreed with Brewer and myself perfectly; we did not know a sick hour from this or any other cause. After working for about an hour and a half, I undressed and crawled into my sleeping-bag, not forgetting the very important task of winding my watch

003366

CORPS003377

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

and the two chronometers. I expected of course to drop off quickly to sleep, as I was just comfortably tired by the day's work. But I had reckoned without my host. Everything had been so desolate and quiet during the day that one would naturally think that the stillness of the night would be quite appalling. But as the hours advanced new combinations of sounds broke on the ear, until it seemed that a menagerie had arrived and all the animals were exercising their lungs. From whence could all these noises come, a few only of which I could recognize? The first to tune up were the frogs. These frogs do not have the respectable croak of their Northern brothers, which is rather soothing to the nerves than otherwise; they make a noise like a creeky sheave in an old block, the pitch of which is in direct ratio to the size of the frog. But the worst sound to sleep through is the cry of the limpkin. When do these birds sleep? or do they ever sleep? We have seen them about all day, and they seemed like a quiet, well-behaved bird, but their conduct at night is something most disreputable. I would drop off into a doze, conquering the other sounds, but as soon as a limpkin would screech I would be wide awake

003367

CORPS003378

at once. The mosquitoes at Station No. 2 had been rather bad, possibly because we were not yet far enough from the coast, as I expected immunity from these pests when we were well in the interior. There is no harbor for them from the wind but the tall grass, and the water is not stagnant for their larvæ.

We turned out early and cooked a simple breakfast of coffee, oatmeal, and crawfish. Thinking it better to do the cooking for the day as much as possible in the morning, I boiled a pot of potatoes, of which we had a good supply. The oatmeal, with condensed milk poured out of the can, was especially good, and we felt in fighting trim for the day. Loading the canoes with exactly the same articles they contained yesterday, I took a last look around the little patch of ground which we called camp, lest anything should be forgotten. After deciding on my course and spending a short time on my field-book, we struck a good water-lead and made very good headway at first, but the difficulties of Everglade travel soon made themselves apparent. The good water-leads came to an end, many of them heading up in big saw-grass, beyond which we could see nothing that could float a

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

canoe. Sometimes reaching within a quarter of a mile of the little object that my sights were taken to, I would be compelled to return to my starting-point and make a departure, with perhaps little better success than the first time. Game was very plentiful; deer were started frequently, but the swinging of the pole from a standing position would take them out of range, and there would be no chance of shooting one. To hunt successfully would have required a whole day, and I could not make use of an entire deer; that, indeed, would have been the kind of waste that I have so much condemned in other hunters. Both canoes were loaded as much as I wished them to be, and even if the game became very scarce I had no fear of starving, having portable food with me enough to last two months.

At the end of a long stretch of low grass a beautiful sight presented itself: seven deer were feeding in about four inches of water. We had the wind of them, and got rather closer than usual. The sight of a white man was strange to them, and if we had been seated in our canoes could no doubt have gone very close to them. A little way ahead from here we saw some cormorants and blue heron. On ap-

003369

CORPS003380

proaching we found quite a large "rookery;" most of the birds were laying, so we took quite a supply of cormorant and blue heron eggs, with which I intended to make omelets. A few Everglade terrapins and a fresh-water turtle, about a foot long, were seen to-day; also some of the flat, soft-shell turtle. Both these varieties the Seminoles eat; they usually broil them in their shells before the fire. The water seemed all to be moving in a southwesterly direction, over a more broken rocky formation. Sometimes pools would be crossed eight or ten feet wide and five feet deep. These would look like a pretty aquarium, with its growth of water-plants and its picturesque rock bottom, through which big-mouthed bass eight or ten inches long could be seen swimming. Occasionally, in the centre of these pools, a dark hole a few inches in diameter could be seen; down one of these I could push my pole to a long distance, and the water was coming out from it with quite a little head. They are to be found all over the Everglades, and are, I believe, one of its greatest water-supplies.

All this moving water cannot be accounted for by the rain alone, and the water is too hard



MAKING CAMP

for rain-water, so that in all probability more comes from below than above. Serpent life seems to abound; many moccasins were passed, but we comforted ourselves that we would meet few rattlesnakes, as there was certainly not enough dry ground for them. There are many natives, however, who dread the bite of the moccasin quite as much as the rattler, but having seen the fearfully quick work of the latter on several occasions, all known antidotes having been administered in vain, I had occasion to dread it. We encountered very heavy bunches of saw-grass, and the little distance we made to the good was rather disheartening. Hoping to get more easting on the following day, I began looking for a camp. The prospects were more discouraging than the day before. All large islands had disappeared, and nothing was left but small detached groups of bushes, which gave little encouragement even to examine for land.

So we travelled on till it was nearly night, and halted at a little wet island, intending to use it as best we could. There was a knob of land about two inches out of water and four feet in diameter (rather close quarters for two men); this we helped out by throwing down small

branches and, finally, fern-leaves, with the tent-fly spread to keep off the dew. After a good supper of fried blue heron and cormorant egg omelet, I finished my note-book work, and we turned in. The camp at Station No. 3 was certainly not a very comfortable one, though I did not wake once during the night, in spite of the racket of frogs, limpkins, etc. I found that the best work could be done in the early morning, so I made a practice of waking up about four o'clock, which gave us good time to finish our breakfast and load the canoes, usually starting just as the sun was rising. That morning proved no exception to our early habits, and everything pointed towards making a good run, but our expectations were far from being realized. Our course seemed completely blocked to the northeast, with nothing but heavy saw-grass, into which every water-lead headed up, and nothing beyond that could be travelled through,—our hardest day's work, and the most discouraging. This central mass of saw-grass no doubt reaches from the south end of Okeechobee to our present latitude, which is 25° 36″ N. Mr. Ingraham crossed it at lat. 26° 10″ N. in his almost fatal attempt to travel in a straight line, having penetrated it so far



OUTLOOK FROM STATION 3

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

that the return to Fort Shackelford would be as fruitful of danger as to push on to Miami.

That there is a break somewhere about lat. 25° 50″ known only to the Indians I have little doubt, else how could they travel from the edge of the Big Cypress to Miami with such rapidity. In many places we forced our way through where there was a slight indication of lower grass beyond, but at a terrible expense of muscular power, and the grass cut our hands and faces severely. The day was very hot, and if Everglade water was unwholesome it had a good chance on this occasion to make us ill, for we never limited ourselves in its use.

The only way this hard poling affected me was in causing great pain between my shoulder-blades, which became almost unbearable. Every little while I had to change the object taken for a bearing, when nearly reaching it. It was getting late in the afternoon, and nothing had been accomplished and no place in sight on which to pass the night. Reluctantly we called this a lost day, and headed the canoes on the back trail to Station No. 3, which, by my reverse bearings and the many long stretches already broken through, was not very difficult. After the fight we had made for nothing and the ex-

003375

CORPS003386

hausted condition we were in, Station No. 3, that had seemed to us such a miserable place and little better than a make-shift, suddenly became to our minds the cosiest of camps. We cut out more of the bushes, and arranged the tent in connection with the fly so that it made a huge umbrella, and increased the ground space by building up with branches. A few small sweet-bay-trees were standing near us. I cut off the twigs and leaves to make my bed more comfortable than it was the previous night. It reminded me of the beds we used to make of balsam in the Adirondacks, but the smell of the bay is, if anything, more agreeable.

The Indians use the leaves of the sweet-bay also for making a tea which they consider very wholesome. Brewer suggested that we use the inner bark, and, as I had a little extra time for cooking, I made a gallon of this tea, which I poured into my rubber water-bag, to drink cold during the warm work of the day. While I was at work, Brewer took his canoe and said he would make a run to the north and leave an otter-trap a quarter of a mile from us, to be picked up the next day. I hoped for his success, for we had had no meat for some time, and,

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

having used a beaver for the table on one occasion in the Maine woods, I thought perhaps the flesh of the otter (which is similar in its habits) might be as palatable. The character of the Glades had changed but little, the horizon being sharper and fewer clumps of bushes in sight.

From the most easterly point reached on this day I sighted the edge of Long Key and got a bearing to it. The existence of this large island at the southern end of the Everglades has been guessed at by white men, who have seen it from the edge of the pine-timber bordering the Atlantic coast; but there is no accurate knowledge of its dimensions, and many have vainly tried to reach it. Brewer on one of his hunting expeditions, a few years ago, succeeded in making a landing on the south end, and later in this expedition I crossed the broken part of the north end. Brewer returned at sundown and reported that he had found a lead to the northwest that gave a prospect of getting out in that direction.

The work of the day had told badly on my rubber hip-boots and several cuts had gone through; these I patched up neatly with my bicycle repair outfit. The bicycle wheel and cyclometer gave most excellent results as a

003377

CORPS003388



FILLING THE CAMP BUCKET

"log." My sights at noon had been carefully worked out and we knew where we were. I could put the point down on the chart; but the question I should have best liked answered then was, Where we shall be to-morrow night? We had gained nothing all day. We awoke next morning having had a most comfortable sleep and feeling in good spirits to encounter whatever difficulties and trials the day might bring forth.

When the sun just began to peep over the horizon it found us in our loaded canoes with pole in hand. We followed the trail that Brewer had broken out the evening before, and made a halt for our otter-trap. Sad to relate, though there were fresh signs all around it, nothing had been caught. After proceeding a mile from Station No. 3, we found a very good lead, which, though carrying us rather more to the north than we wished to go, we followed. It left the worst saw-grass on our right, but by getting farther to the northward we hoped to discover some breaks in this terrible barrier, that seemed to block our northeast course. Though we had seen little game of late, we started three deer, that went plunging through the saw-grass. When I first heard them I

003379

CORPS003390



A MERIDIAN ALTITUDE

picked up my rifle, thinking that some huge animal was about to charge on us, but I soon recognized and located the sound, although they managed to keep entirely out of sight. How with their sharp feet they can get through this grass at all is a mystery, and they must cut their noses frightfully. These deer may have wandered from the western side of the Everglades, though what they can find to feed upon and where they sleep is somewhat of a puzzle.

About eleven o'clock I sighted an island a little to the left of our course, and by a careful examination with the glass I could plainly make out a cabbage-palm growing from its centre. Now, in any other part of Florida the appearance of a cabbage-palm would excite but little interest, as in some places you can see forests of many thousands, but here away out in the Everglades it told a story that gladdened our hearts. It meant dry land. I stopped here to take my usual noon sights, and, though we had made but four miles, we decided to camp on that island. I was sorry that the island could not be reached before the sun crossed the meridian, but did very well without land for my artificial horizon, so after all it made little difference.

I constructed my support in the usual manner by driving three paddles through a few inches of mud to the hard rock bottom, and on the tripod so formed inverting a box to obtain a level surface. This was quite as steady as could be desired. On this I placed my black mirror and levelled it. After carefully noting the vernier reading on the sextant and the time by the two chronometers, I set my "hack watch" and shaped our course for the island. On a nearer approach a dark gap in the trees was seen, and through it a large clearing and plenty of good high ground. At once we saw that we had struck a permanent camp and a very old one, too. I jumped ashore at the canoe landing and found the island deserted; but the many objects of interest around incited me to work at once. The island is nearly circular in shape, supporting a heavy growth of timber, matted together near the ground by thick vines. Near the centre, and approached by a cut-out trail from the eastward, was a clearing about sixty feet in diameter, and like a great tent-pole supporting the canopy of foliage overhead stands the cabbage-palm, whose top projects a few feet above the surrounding trees and had attracted my attention from the distance. On

its trunk a few feet above the ground was a smooth place made with a knife; on this a charcoal drawing of a deer's head and body; at one side a double oval somewhat like an elongated figure of eight; beneath and to the right was a figure evidently intended for a squaw; on the left was a hand turned downward. All this is intended to convey some information from one Indian to another. I could not venture upon an interpretation until I should meet some of my Indian friends and describe the place, when, finding that I had visited it, they might be willing to tell me what it signifies.

A hundred years ago there were two other cabbage-palmettos growing on this island, which were larger than the central one. I say a hundred, though it may be many more years than this; the fallen trunks were so rotten that merely a shell remained, and in the position I found them a palmetto would keep sound for a very long time. These trees had not fallen by accident, but were cut down when the clearing was made. Over the ground were strewn a dozen shells of the Everglade terrapin, some probably killed a year ago, others almost reduced to dust, showing great age. It is a cus-

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

tom with the Indians to cook this turtle by broiling it before the fire without removing it from the shell. The flesh is really very good and makes quite a savory stew, resembling when carefully prepared the smaller terrapin that bring such high prices in the Northern market. There were many poles scattered about that had been used for shelters and frames for palmetto "shacks." At one side of the clearing was a place where the cooking-fire had always been made, and over a large pile of ashes were the charred remains of the last pieces of wood that were used.

Now, the Seminole has his own peculiar way of making a fire, as with all Indians his aim is to do the greatest amount of cooking with the least expenditure of wood, prepared with the fewest number of cuts. Though the fire is small, it requires a circular hearth of about six-teen feet in diameter. The wood is cut in six- or eight-feet lengths and placed radially like a huge cart-wheel, a few light twigs starting the fire at the hub. An Indian is constantly moving around the rim of this wheel and pushing the spokes towards the central point an inch or two at a time. A pot is hung from a couple of uprights, or a frying-pan is used in the hand.

003384

CORPS003395

The only thing for which I have ever seen them use a frying-pan is for parching their coffee or the making of a kind of pancake.

Their great dependence is "sofkee," which is made in the pot and helped out with a large carved wooden spoon, which is their one article of table or, rather, pot ware, all eating from the same spoon whenever appetite impels them. The best description I can give of "sofkee" is to say that it is the analogue of the Spanish "olla podrida." On the east side of the island stands a sweet-bay-tree, with a crooked trunk, that seemed to invite an easy climb, so before the light waned I took the telescope and without difficulty reached the topmost branch. Looking carefully at the limbs on which I stood, I found that I had not been the first to climb that tree by many. This must have been a favorite place during the Seminole War to keep a lookout constantly posted, to ascertain if any troops had succeeded in passing the natural barriers nature had given to them for protection.

My elevation gave me a marvellous view in every direction, and, by using a powerful aluminum glass, I could distinctly make out the line of timber on the east edge of the Glades,



ON WILLOUGHBY KEY

and towards the west the timber-line of the Big Cypress. The distance to each seemed to be about the same. We were in almost the exact centre of the Everglades east and west. No wonder this has been a favorite camping-place of the Seminole, and how many anxious warriors must have climbed this tree and watched from this very perch for long hours during the war, and with what joy they greeted the news from the North that no further attempt would be made to conquer them, a verbal agreement having been entered upon that so long as they let the white settlers alone no further steps would be taken against them. The vicinity of this spot had been one of my objective-points, as it was near the centre of an unknown area, bounded on the north by the two previous lines of exploration, and much to the south of the line made by scouting parties of troops. I felt for once in my life that I had reached ground never before touched by a white man, and in my enthusiasm took my little New York Yacht Club flag from my pocket and Brewer christened the island Willoughby Key.

After remaining for some time in the tree-top, I joined Brewer on the ground and communicated to him the result of my observa-

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

tions. What most interested him was the finding of good water-leads to the eastward; but on this point I could give him little encouragement. It is rather a strange thing that from a great elevation you are much disappointed at the amount of water seen; in fact, you see no water at all, nothing but grass, and as for doing advance piloting, you might just as well be standing in your canoe. I made up my mind that in the future, if opportunity presented, to climb no more trees with this purpose in view. This is the first camp in which we were really comfortable. The tent was pitched to its full proportions, with the fly extending over the front.

On the remains of the Indian fire we built up a most cheerful blaze, as there was an abundance of dry wood about, and in a very short time I notified Brewer that supper was ready. Our supper on this occasion was very much as usual, but the hot embers enabled me to broil a limpkin, which gave a pleasant change from the frying-pan. The camp was so picturesque that before sunset I made an attempt to get a picture with the camera, but the light was so weak that I feared poor results, the clearing being obscured by heavy foliage. This has

003388

CORPS003399

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

been my difficulty with nearly all the choicest bits worth preserving. During the run of the day Brewer was so unfortunate as to break a pole, which had jammed in a crevice in the rock, and he would have been in a very bad fix to replace it had I not insisted at starting upon carrying an extra one. The shelter-poles the Indians have left here were all too crooked for the purpose of poling.

003389

CORPS003400

## CHAPTER VI

Baffled by Saw-Grass—Return to Willoughby Key—A Fresh Start—A Dead Snake by Moonlight—Mosquitoes—Supplies Running Low—The Palmetto as Food.

WE made our usual morning start after breakfast. My object was to take bearings that would lead me to the east and find, by zigzagging the leads, a route to get through this impenetrable barrier of saw-grass. This day was one of our hardest, and yet we made the least number of miles, only gaining two miles and a half to the eastward. Fifty times or more, leads that seemed good headed up in saw-grass that was nine or ten feet high, with hardly any water at its roots. I was tempted to strike a due east course, but the rate of travel would immediately be reduced to a mile a day, and should the strip prove to be fifteen miles across, the chances of starvation would be great.

This part of the Everglades seems to be devoid of animal and bird life; a few small black bass are occasionally seen near deeper holes in



A GOOD CAMPING ISLAND

the rock bottom, but we would have had to devote the greater part of the day to catching them. We had about three pounds of bacon left, and, as it was important in frying, also to use as butter, if that gave out, we would feel its loss greatly. Our last pieces of ham and cheese had been consumed, but we still had a few pounds of dry crawfish and some potatoes in the bag. I had no fear of the groceries and portable food giving out. We had not used half of it yet, and the supply of cocoa was not one-third exhausted. The poling was most trying on my shoulders, and at times the pain would be so great that I would be afraid to sit down in the canoe, lest I should get so stiff that I could not continue before a proper day's work had been accomplished. Probably the mental annoyance had much to do with my fatigue. Even Brewer, accustomed as he was to this arduous poling, acknowledged, for the first time, that he was completely "played out."

Still we fought on, and about five o'clock in the afternoon a small clump of bushes was reached, and we made camp at Station No. 5 as best we could. After clearing out these bushes there was barely room to stretch our

cheese-cloths; the ground was very soft and wet, a great contrast to the dry island we were on the night before. The kerosene-stove was a great comfort here, as I soon had a good hot supper ready, and, though I felt sore all over, I managed to do my usual plotting and navigating before I put the lantern out to retire to my uncomfortable couch, which was but an inch above the water; but for the rubber blankets we would have been thoroughly wet through before morning; as it was, only the lower end of my sleeping-bag was slightly damp.

I have not said very much about snakes, but it must not be supposed that these agreeable creatures were absent; the very places we selected for camps were usually the ones appreciated by their snakeships, and the first careful work we usually did was to clear them out before trusting our legs too recklessly in dark corners. There are many varieties that live in the Everglades, and their numbers have certainly not been exaggerated by other explorers. Our start on the following day was not quite as early as usual, as Brewer and I were somewhat muscle-sore by our unusually tiresome work of the day before. We managed to get



IN THE BIG SAW-GRASS

under way an hour after sunrise, but before poling very far in the cool air we felt that we were equal to the day's possible trials and vexations. We first started to the east, and could make no headway at all, the saw-grass in this direction being even heavier than we had yet seen it, and not an opening could be discovered. We abandoned an easterly course after several hours, but what made things more serious was that our further progress to the north was also blocked. From this point I could see an Indian ring-fire due north about forty miles distant, well up towards Okeechobee, probably made by some of the Micasukees. To the west was a similar ring-fire on the edge of the Big Cypress Swamp. The latter I could easily account for as being about the position where my friends Robert Osceola, Little Tiger, Johnnie Billie, and Dr. Jimmie were having their big otter-hunt. To the eastward I could see a column of smoke that was not of Indian origin. It was in the exact bearing that the Miami River should be, and, after making a careful examination through the glass, both Brewer and myself decided that it came from the mill or a steamboat at the mouth of the river.

Miami seemed so near, and yet, as the sequence proved, how many miles we were destined to travel before reaching it! It seemed hard, after making so much easting, that we could not get by that terrible strip of grass, into which I did not dare venture, and to penetrate even but a short distance might take weeks of most trying labor and, what was worse, exhaust our supply of provisions. I weighed the matter very carefully, and determined that the longest way round was the shortest way through. The character of the Everglades at this point was similar to what it had been for the past two days. The water was still clear and running at the rate of from half a mile to a mile an hour in a southwesterly direction, at times showing a symptom of moving southerly even a little east of south. This showed me clearly that we were very near the dividing water-shed which runs down the centre of the State and has its terminus in the heart of the Everglades. The rock is everywhere found, usually smooth, in very many places with no mud on top of it. Where it underlies the big saw-grass it is occasionally seven or eight feet under. But the coralline limestone can always be depended on as not being very far off.

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

Crevices in the rock were still passed, but I could not stop to ascertain about how much water was coming directly from this source. Before making camp for the night I had come to the conclusion that there was but one safe course opened to us, and that was to travel on our back trail till the first opening to the eastward presented itself, and then make our northing good again, coming up on the eastern edge of the long tongue of saw-grass. There was a ray of comfort in our disappointments, and that was that I had reached a central point upon which before starting I had put my pencil and said to Brewer, "That is the locality that I am most anxious to reach, for many people suppose large islands may there be found;" and as not to find them proved one of my theories, I was less annoyed at the partial retracing of our steps.

The canoes were beginning to show the effects of the terrible rubbing and scraping to which they had been subjected. The paint and varnish were nearly all worn off the bottoms, and they would not run much farther without another coat, but a whole day could not be spared for this work. Our camp was much the counterpart of the one of last night, if anything the patch of ground was smaller and had to be

003397

CORPS003408

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

pieced out with sticks and leaves. Nothing but the fly of the tent could be used as a shelter.

As Station No. 6 was a very important one, I took more time than usual to work out my sights at noon, and was much pleased to find that my various ways of obtaining distance corresponded closely, and I felt that the plotting on my chart was so far accurate. The almost perpetual sunshine was varied to-day by many clouds, and I was greatly in hopes that during the night we would get a good rain. I could see by the water-line on the grass that it was lowering at the rate of a quarter of an inch a day, which gave me uneasiness. The work was certainly hard enough as it was, but with less water and the dry season coming on, the future looked dark enough. Nothing could be killed to add to our provisions, our last piece of bacon had disappeared, and but one dried crawfish remained. We had seen two Everglade terrapin during the day, but were not able to capture them. Only an occasional fish was seen, and small ones at that, hardly large enough to warrant the expenditure of many hours in their capture.

Making an early start from Station No. 6, we poled south, and by my reverse bearings, and

003398

CORPS003409

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

the fresh trail to help us, we made rapid progress. Before the sun had crossed the meridian we were at Station No. 5, a day's work completed in half a day. This was made possible by having so few detours and the boats slipping with greater ease through the old trail. The usual noonday halt of an hour was made for dinner and rest, after which we continued on the back trail, watching the country continually to the eastward to discover any gaps that offered sufficient inducements to penetrate for any distance; but, as on our outward journey, there seemed to be no possibility of getting to the eastward.

On the bottom, near a smooth rocky surface, I saw what I took to be a dead fish, which I stopped and picked up, and, much to my surprise, found it to be something that looked like a fish with a tail at each end. On a closer examination it proved to be two large-mouthed black bass, each ten inches in length. One had attempted to swallow the other, resulting in the death of both. This singular duel could not have occurred many hours before, as the flesh was quite fresh, though the doubt as to the time that had elapsed since their death forbade our using them in the frying-pan. The food for fish must be scarce in this section when

003399

CORPS003410

small fish of this size have taken to eating up each other. Early in the afternoon we sighted Willoughby Key, and made directly for it. After the uncomfortable camps we had made recently, it was like getting home.

My attention was at once arrested by the appearance of the old camp-fire. The ashes and charred wood were scattered in every direction. Surely some one had been there since we left the spot. Who could it have been? On closer examination, Brewer and myself decided that nothing could have left this sign but otter; there seemed to have been six or eight of them, and the dry ashes had apparently offered a means of getting rid of the insects on them, or of drying their fur. They had evidently run up to the fireplace, then gone to the nearest tree-trunk, rubbed and rolled, repeating the process several times. A little to one side of the cabbage-palm were the freshly scattered feathers of a large bird, the body of which had been eaten, leaving but few bones. This did not look like the work of otter, and after examining the soft mould we found the fresh track of a panther. We thought perhaps his catship might return again, finding no other dry place on which to sleep if still in the vicinity; but he probably

smelled our fire, and we got no chance for a shot.

Still a little time remained before sunset, which we devoted to making camp and taking an observation from the Indian watch-tower in the tree-top. The tent was fully set up on a smooth piece of ground, with the fly extended to the front nearly to the fire, and plenty of wood was cut and a good blaze started. A large kettle of sweet-bay tea was prepared to drink cold when travelling. While unloading the canoes, standing in the water with my hip-boots on, my working compass dropped from its lanyard and settled in the soft mud. I did not dare to move, but, stooping gently, I began groping around in the direction it had disappeared, and by great good luck soon recovered it. Being nearly water-tight, it was soon put in order. We would have felt the loss of this compass very much, as it was so convenient for the short bearings, being a most accurate instrument and an old companion on land and sea for twenty years, the larger asimuth compass taking more time to manipulate. Our camp that night was by far the most comfortable of any we had made, and looked more like a permanent one than if intended for "one night only."



A GOOD WATER-LEAD

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

As my navigation and chart work was somewhat simplified on returning to a known station, I was enabled to retire much earlier than usual, dropping off into such a deep sleep that Brewer could hardly wake me up at our usual hour for turning out. Nothing short of a rattlesnake crawling over my legs and sounding his castanets could have disturbed me. The extra room for moving about this camp and the comparatively soft beds we had used made us feel quite strong and fresh for the continuance of our journey.

When breakfast was over and everything packed, we branched off from our old trail and kept a more southerly course, the trend of the water enabling us to do this, and the slight current was in our favor. A northerly wind was also blowing, which made poling much easier than usual, except when the leads headed up and we would have to back out of them. Many times during the day we tried to gain more easting, but without success. Should we have to go clear to the sea before getting around the south end of that terrible saw-grass? I was aware that on the west the Shark River was the last place by which the coast could be reached by a human being with a canoe, and on the east things were nearly as bad, the first stream

003403

CORPS003414

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

emerging from that side being the Miami River. The feeling that we were boxed up in this manner was not a very pleasant one; but we declared that, as we had set out to make Miami through the Everglades, no obstacle should be permitted to baffle us in our undertaking.

Progress might at times be slow, but with the exception of the one day we were obliged to go nearly in a circle, returning to our starting-point, we had always made at least three miles for the day's work, and, as we had plenty of groceries left, the fear of starving did not trouble us very much, though we felt the need of fresh meat. The diet of a vegetarian never seemed to me suitable for hard work. I never felt better in my life, but was conscious of losing somewhat in flesh. We were making rapid progress, but unless we were able to make at least ten miles of our surround-work, we felt it would almost be better to tackle the big saw-grass at the rate of half a mile a day.

I got a shot at a limpkin, which I missed, probably, in my anxiety not to let him escape, requiring too much from the range of the gun. So our dinner took unto itself wings, and we were not even able to catch a turtle. The game, however, promises to become plentiful.

003404

CORPS003415

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

It was past our usual time for camping before we sighted an island that gave any promise of a dry spot. On starting in to cut out bushes, I found that several deer had been there the night before. On a little circle about six feet in diameter a buck and two does had made a snug little nest. The ferns had been pressed down smoothly by their bodies, showing plainly the outlines of their forms. As compared with islands upon which we have camped, this little spot, elevated but a few inches above the water, seemed perfection, though there was hardly enough room to set the tent in its full shape. The deer had evidently made a comfortable night here, and we hoped to be as fortunate.

The next day was Sunday, the 17th of January, and as we had been travelling so continuously (last Sunday there being no place to stop), we were beginning to feel the need of a day of rest and an opportunity to dry and repair the bottoms of the canoes. My surveying work had been rather easier, as, looking towards the south, I could get objects of more distinct shape, but when once decided on an object and figured up to it, I had never mistaken it, as both Brewer and I kept it con-

003405

CORPS003416



STATICN 8

stantly before our eyes, and the indentations on the horizon were not many. If we never got a worse camp than that at Station No. 8, that the deer had chosen for us, we would have great reason to be thankful.

What a delightful feeling of rest it was, after getting awake at four o'clock the next morning, to drop off to sleep again and know nothing till the sun was quite high in the sky, and then lie still for another hour, until the feeling of hunger reminded us that a hot bowl of oatmeal and a cup of as good coffee as could be procured at Delmonico's would be just the "lacking ingredient" at this time! There was still no sign of rain. The water was getting each day lower; our big detours had made it necessary to consume more time and provisions than we had expected. We had started for the Miami, and to the Miami we were bound to go, at the same time taking up our explorations as near east to Station No. 6 as the width of that terrible strip of saw-grass would permit. We had been baffled, but not conquered. The superb pluck of Brewer always dissipated any latent misgivings in my own mind as to the ultimate result of our undertaking. Our health was good, no accident had occurred, and



SLOW TRAVELLING

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

I could foresee none, with our system and care, unless one of us should be so unfortunate as to be bitten by the snakes that so abounded.

After making a few courses to the southward, we at last found signs that we had reached the south end of the line of big saw-grass. The rock was more frequently near the surface, and could not support the heavier growth, but as one obstacle grew less another became greater. The water was lower and bore the canoes with great difficulty. The progress, too, was very slow, and much wading had to be done, easing the canoes over bad places as much as possible. Take it altogether, this more open travel was to be preferred, though more trying to the legs, than the hard pushing through the high, cutting grass. Occasionally a good water-lead would help us on our way, and we were at last headed to the northeast.

But with all our work the amount of easting did not exceed a mile and a half, as it had only been on the last two courses that we made anything in that direction. That afternoon I killed a blue heron and a limpkin, which was an acquisition to our larder, especially as the limpkin was young and tender. There seemed to be the same difficulty that we had met all along

003409

CORPS003420

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

in selecting a good place for a camp and to establish Station No. 9. But at last a little island hove in sight with large enough bushes on it to invite an investigation. Brewer waded ashore and said he thought it might do, and as it was getting late we made camp.

The island was surrounded with saw-grass, and we made a trail to it by running a canoe through several times, which required much extra exertion. With axe and brush-hook we soon had it cleared, and found about the usual amount of wet ground,—some twenty square yards. It was hard on these small patches to find a place where the canoes could be turned bottom up to dry and examine. I have adopted a method of throwing them on top of the saw-grass, which is so strong that it keeps them a couple of feet out of the water. Unloading the canoes after the arduous work of the day on the places we were forced to camp seemed like a waste of strength, and was much like wasted work. In my conceit as an old camper I had made an error in selecting my canoes for this journey. I expected always to find dry islands; such were conspicuous by their absence. The Seminole when travelling always sleeps in his boat, but not until many nights spent on wet ground did I realize why

003410

CORPS003421



v-00119-RDM Document 112-6 Filed 07/19/23 Pag

OUTLOOK FROM STATION 9

003411

CORPS003422

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

this was necessary. The canoe which I proposed to use for my intended hunting-trip the next winter would be seventeen feet long and twenty-eight inches beam, weighing about one hundred pounds, built of cedar, with heavy bilge keels; otherwise, the Canadian model.

I have not tried steel canoes, but as it would insure a tight boat and would drag well, it might be a good material with which to build. A repair like a puncture could be made with solder. The dimensions given above would insure easy poling, and at night the load could be placed in each end, giving plenty of space to sleep. A canoe shelter, with cheese-cloth inside, similar to those used on the old Shadow canoe, or the Indian method of driving four stakes outside of the boat to support the cheese-cloth, would afford greater comfort. After starting supper on the kerosene-stove and sitting down on one of the camp-chests, I happened to look down towards the canoes through the little tunnel of foliage we had made, and on a limb, within two feet of where our heads had passed many times in our trips with the canoe loads, was a five-foot snake. He had been watching us all this time, and kept his wicked little eyes on our every movement.

003412

CORPS003423

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

I now took my turn at watching him for a time, to see if he would move when he found himself observed. But no; he had evidently made his camp also for the night, with no intention whatever of allowing any one to disturb him. So I picked up the shot-gun and gave him a load of small shot in order not to spoil his skin. He dropped from the limb, but was caught in a crotch and wedged near his tail, so that he hung down nearly his full length, with blood running from where the shot had gone into his backbone, as dead as snakes usually are inside of twelve hours.

We continued our supper, giving no further thought to the reptile, as snakes had by this time become a familiar sight. After finishing my evening task on my map and notes, and the important operation of winding my chronometers, I disappeared under my cheese-cloth. but somehow could not go to sleep as usual, Looking out towards the open Glades, I saw, silhouetted against the bright moonlight, that miserable snake, which I had forgotten all about, his body assuming those easy curves that snakes only can make. I rolled over on my other side, but my eyes kept getting back to that snake, and I soon found that sleep

003413

CORPS003424



SHOAL WATER OVER ROCKY BOTTOM

would be impossible so long as it hung there. Brewer was snoring in such bliss that I had not the heart to disturb him, so I turned out and with the help of a short stick pulled the reptile from the branch.

The mosquitoes, that had not been troublesome in most of our camps, were abundant here, and I dreaded lest some of them would follow me under the net, and they did. But after that ghastly picture had been destroyed, I had no trouble in going to sleep in spite of them. The day had been most fatiguing, the water being so low and the rock getting rougher. Just before reaching Station No. 9 we had sighted Long Key, but we were too far to the north to see anything of the royal palm-trees.

On the 19th of January we were under way at seven o'clock, and the weather being cooler made us feel like putting a good stretch of country behind us. We had not proceeded far before Brewer broke the foot of his only pole. As the bottom was all rock here, the accident would not cause any delay, so I tossed him a spare foot which I carried in my canoe, telling him to put it on in camp that evening. The islands were becoming more frequent, and on many of them there were, no doubt, patches

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

of ground, but we pushed on as long as we could see islands ahead that seemed dry. For the first time since leaving Willoughby Key we saw a cabbage-palm, which was a very encouraging sight, as it meant more dry ground. Our noonday meal was rather an unsatisfactory one of cold boiled potatoes. Our biscuit had given out, and I had to try my hand at bread-making over the stove during the evening. A few better leads were met with the next day, but the water was provokingly shoal, more rock showing itself, over which the grass grew thinly. Long Key lay to the east; the timber on it could be seen occasionally. A very interesting landmark for which I had been steering was a tall pine-tree on a small island. I say interesting, for it was such an uncommon sight to us, and meant not only dry land, but very dry land. This tree had been in sight since the day before, and that afternoon we were leaving it well astern. Our distance on that day was eight and a half miles, though the log showed nearly fifteen, but in the Everglades this must be regarded as a pretty straight course.

The islands were getting closer together, and by three o'clock we made camp on one which seemed especially adapted to our purposes. The

003416

CORPS003427

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

water ran close up to it, and from its centre grew two cabbage-palms. After the usual clearing was made I cut down one of the cabbage-palms and extracted the cabbage, to form a relish for our evening meal. Very few people, even in Florida, know how delicious the cabbage from the palm can be made. The simplest way is to cut it up raw and use it as cold-slaw; it is tender and has a slight nutty flavor. Boiled as ordinary cabbage, it is excellent. In addition to cabbage, this variety of palm bears a black berry about the size of a pea, which resembles a little in flavor the Chinese litchi nut, but the seed is so large in proportion to the nut that many have to be gathered to get much out of them. The heart of the scrub-palmetto can also be used as is the cabbage-palm, but many have to be cut and prepared to afford a dish. This camp was by far the best we had made since the one on Willoughby Key, the ground being dry and the water coming well up to the shore, making a short carry for the canoe loads. To the east many islands can be seen, and a line of timber, which is on the west edge of Long Key. Station No. 10 was established, and the camp was a most satisfactory one.

003417

CORPS003428



v-00119-RDM Document 112-6 Filed 07/19/23 Pag

TWO INCHES OF WATER OVER ROCK

003418

CORPS003429

## CHAPTER VII

Canoeing over Two Inches of Water—Nearing the End—Welcome to Civilization—Analysis of Water—Seminole Vocabulary.

THE following day we attempted to run on a northeast course, but the water was so low that after many fruitless efforts we decided that we must get more to the eastward, and then followed one of the most exhausting and trying days experienced yet, in which we were out of our canoes nearly all the time; poling was impossible, and dragging for hours became a necessity. It seemed the choice of evils between the big saw-grass country or the section we were then in. Plenty of small high islands surrounded us, and the water about them was so shoal that a loaded canoe could not be floated. The bare rock was everywhere visible, with hardly any grass. This rock had entirely lost its smooth character, and was very rough, little peaks sticking out of the water like stalagmites in a cave, and, though of soft coralline limestone, had very

sharp edges and corners, which cut the bottoms of the canoes in a terrible way, so that both boats were leaking badly. Things became serious, the best method to advance more puzzling. Poling was impossible, and portages could not be made, no wading, with a load on the back, could be thought of, as there were thousands of deep holes among the rocks, in which the legs would jam, with imminent danger of fracture.

It was not safe to leave the bow or stern of the boats, dependent as we were on their friendly support. Every now and then the canoes would get wedged in the rocks, taking several minutes to extricate them. The advance could be counted by inches, as the halts had to be made every few hundred feet in order to bail the canoes. The sun was hot and the wind light, so that the perspiration trickled in a stream down our backs, and the amount of water we drank was something surprising. Surely this Everglade water must be a wholesome beverage, for we gave it a thorough trial that day. All these islands are really the broken part of Long Key; they become fewer and fewer to the north, extending in all about three miles. Towards the south the islands

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

become thicker and larger till they reach Long Key proper. This was evidently the termination of the ridge of rough rocks that forms the high land of the key itself, and if we could only get three miles to the eastward we would reach better water for the canoes.

We were very tired towards evening. The work of the day had brought into play a somewhat different set of muscles. The difficult wading, the lifting of the feet out of holes in the rock, the pulling, dragging, and the extra care necessary to avoid tearing the loaded canoes to pieces exhausted us terribly. Brewer felt this day's work more than I, and he declared he would rather pole a canoe over dry ground. It was important that we should gain more distance to the eastward, for I had every reason to believe that this dividing ridge could not extend many miles, crossing it as we were at right angles. Amid our troubles and vexations we were certain of a good dry camp for the night.

The islands, though small, were high, many of them having several cabbage-palms upon them, and so close together that very short compass-bearings could alone be taken. At six o'clock we selected an island and prepared to

003421

CORPS003432

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

camp. Before doing anything else I repaired the bottom of both canoes with canvas and varnish.

Many cuts were through, the holes causing serious leaks during the day, but I had no doubt that I could make them quite tight again. The shape of the island on which we were camped was circular, rising to about four feet in the centre, at which point grew a tall pine. With the exception of a high island to the east, this was the only one on which pine-wood was growing. We found that even a high island might have its inconveniences, as the land at Station No. 11 was so sloping that in the middle of the night we nearly slid into the water. Continuing an easterly route the next day, we encountered much the same obstacles in the way of rough rock near the surface. At last we cleared the ridge, and the face of the rock began to get smoother, and more of the round grass and deeper water could be seen ahead.

Brewer thought that we would not have many more miles to travel before reaching a district that he had hunted over when going in from the east coast. He had followed down the pine-timber of the main land at a sufficient dis-

003422

CORPS003433



OUTLOOK FROM STATION 12

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

tance from it to find it insured deep enough water for the canoes. Finding better leads, we were now able to take the much-desired northeasterly direction, and about noon we sighted a small, high island that on approaching Brewer recognized as the one on which he had camped the previous year. He had made a small clearing, and there was plenty of dry wood. This was the first evidence of the previous presence of a white man that we had met since leaving the west coast, and we felt almost as if the difficulties of our journey were at an end; but I wished to get well to the northward before striking east to Miami, and by so doing get as near Station No. 6 as possible, in order that nothing of importance would escape that might lie between this line and the above-mentioned station.

This gave us many miles of travel yet, but we hoped that better water would make poling easier. At this old camp of Brewer's I established Station No. 12, and as game was abundant in this vicinity I hoped to return to it another winter for the purposes of hunting. The canoes needed attention again, as they had been leaking badly during the day. Many deer and birds were seen between Stations Nos.

003424

CORPS003435



LOOKING FOR LAND

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

11 and 12. A large buck stood so long that Brewer tried to shoot at him, but, not being accustomed to my heavy-calibre rifle, the ball failed to hit, to my regret, as our larder was in a condition that justified the killing. Clouds had been gathering all day, but the rain that we so desired never came.

It was then the 22d of January, and, unless the usual order of things failed, we had no right to expect showers before March. The water was certainly getting lower every day, but with our northward course we should find better channels. From Station No. 12 the travel became more rapid; we had left the thickly clustered islands, and the horizon to the north and east was assuming the same lonely, desolate appearance that it had in the central portions. To the east, however, the faint line of pine on the main land could be seen. At noon we reached an Indian camp that had been deserted for some time. Near the landing the skeletons of twelve alligators and two otters had been left after skinning. The heads of the alligators were badly knocked to pieces, the teeth having been removed from the jaws.

Old canoe-trails were leading from this camp

003426

CORPS003437

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

in many directions, and, selecting one that led towards the northeast, we made rapid progress. After almost despairing of finding a camp for the night, we were compelled to make use of the first clump of bushes in sight after four o'clock. Brewer was busy with the bush-hook levelling the small piece of wet ground, when he suddenly gave a cry of alarm. I jumped out of the canoe to ascertain the trouble, and found that a large moccasin had struck at his legs at close quarters, but had missed him. A narrow escape for which we were truly most thankful.

The run for the day had been eleven and one-quarter miles, and the course of the canoes was very much more direct than usual. If as long a run could be made on the following day, the head of the Miami River should be in sight. The canoes again needed repair, Brewer's being in the worst condition. Looking to the westward from Station No. 13, I could see the heavy saw-grass that we had been unable to cross from Station No. 6, and by my map I found that it was seven miles wide. Fifty-five miles around to save those seven miles of big saw-grass, and I did not in the least regret the caution that had dictated this long detour. The

003427

CORPS003438



v-00119-RDM Document 112-6 Filed 07/19/23 Pag

EASTERN EDGE OF THE EVERGLADES

003428

CORPS003439

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

canoes had, of course, travelled much farther, as the above distance was measured on the compass courses. I was reconciled to the enforced lengthening of my line of survey, as this huge zigzag had thrown light on a section that would probably have remained in the dark for some time to come.

After a good night's rest we continued our journey, being enabled by the straighter and deeper water-leads to make a better course for the Miami River. Near the middle of the day the country began to look very familiar, and I saw in the distance an island that, from a peculiar-shaped tree that grew on it, I knew at once as being the camp of Miami Jimmie and the Tiger family that I had visited the previous year. At one o'clock we arrived at the camp, but a disappointment awaited me. Hardly a sign to remind me of the old place remained. A white man had taken possession of the island, driving the Indians away, destroying their palmetto shacks, and giving them to understand that the land belonged to the white man.

On the ruins of the picturesque Indian village, that we had so much admired the year before, was built an unsightly wooden shanty, and the quadrangle around which the palmetto

003429

CORPS003440

shacks had stood was occupied by a rude vegetable garden.

The happy little faces we remembered, the squaws busying themselves with their household cares, the stalwart braves returning laden from the chase, the air of quiet contentment which pervaded the scene, had vanished to return never again. Poor Miami Jimmie so loved the Miami River that he could not tear himself away from its vicinity, and had taken up his abode on a little island five miles distant; the rest had gone to the Big Cypress. This white man had taken advantage of the unwillingness of the Seminole to provoke hostilities. The Indians had gone without a murmur, but through no spirit of cowardice; the blood that fills their veins to-day is as brave as any spilled in the Seminole War, and their courage is as high now as then, but loyalty to their pledge makes them submit to many an outrage. Some day I hope to interest myself in their behalf when an opportunity presents itself.

The island was deserted at the time we arrived, but we met the white settler's man making his way back to the island from Miami in a flat skiff. I was so long without seeing



THE RAPIDS OF THE MIAMI RIVER

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

the face of a human being other than Brewer's that I thought it would be pleasant to meet some one. I would have liked to make inquiries in regard to the state of affairs in Cuba, but to the hireling of so mean a "land-grabber" my heart did not go out. We were then moving along at a rapid rate, there being a well-cut trail leading from the island in a north-easterly direction.

We soon saw ahead the well-known gap in the cypress-trees on the edge of the Glades at which the Miami River takes its rise. We felt that we were really nearing home. Entering the Miami where it was but a few feet wide, we were hurried rapidly along, and as it was getting late and we were very tired, having covered fifteen miles, we thought it best to camp a short distance down the river at a place that has been used by the Seminoles for many years. The sight of the cypress- and pine-trees was very restful to our eyes, that had grown accustomed to looking at nothing higher than the horizon.

Near our camp was a pretty spring of clear water that rushed from the side of the hill. There was plenty of room in the little clearing to pitch the tent once more to its full propor-

003432

CORPS003443

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

tions and for making a few repairs on the canoes. Here we met some negroes, from whom we obtained fish, which helped out our meagre fare. We also met a sportsman who had been fishing on the upper river. We plied him with so many questions that he must have thought we had just landed from the antipodes, but when I gave him my name he was all interest, and in turn began questioning me. My friends in Miami had, he told me, been waiting anxiously for news; that the "Cupid," with Sam on board, had been back a week, reporting our starting to the Everglades from the Gulf of Mexico. As he intended reaching Miami that night, I sent several messages by him.

Devoting more time than usual to the map I was making, I was gratified to find that my calculations had brought me to within half a mile of the source of the river. By my diary it should have been Saturday night,—I had made Brewer keep the record of time and the days of the week, and the two tallied. We made a hasty supper, and our beds were so comfortable that it was late the next morning when we awoke. The canoes were loaded for the last time, and we shoved off into the swift

003433

CORPS003444

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

current of the river. How beautiful everything seemed on that quiet Sunday morning! No exertion was necessary but the light turn of the paddle to give the canoes their proper course. The four miles seemed like one when we reached the last bend.

A house-boat was moored near the river bank, on which a man sat reading a newspaper, from which he looked up in an inquiring way at our loaded canoes and bronzed faces. A few more strokes and we ran alongside the dock from which we had started a month before. My coming had been already heralded, and there was a little crowd assembled to welcome my return. Foremost among them we saw the smiling face of Sam Roberts, and his first remark after congratulating me upon my success was, "Why, you are going to have a good-shaped nose after all, but you look mighty thin."

And so ends my "Trip across the Everglades."

003434

CORPS003445

## ANALYSIS OF WATER FROM THE EVERGLADES

100,000 parts contain:

| | |
|---|---|
| Total solids | 31.4 parts. |
| Silica | 0.28 part. |
| Iron oxide and alumina | 0.64 part. |
| Lime | 8.48 parts. |
| Magnesia | trace. |
| Chlorides | 4.65 parts. |
| Nitrites | none. |
| Nitrates | none. |
| Sulphates | none. |
| Ammonia | none. |
| Organic matter | trace. |

Solid matter, chiefly salt (trace), and calcium carbonate.

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

# VOCABULARY OF THE SEMINOLE LANGUAGE

## A.

| | |
|---|---|
| Accordion | Hi-eets-caw. |
| Adam's apple | No-quif-pa-tock-ock-naw. |
| Air-plant | Aw-shen-lock-o. |
| Alive | Hee-sah-kee. |
| Alligator | Aal-pa-tah. |
| Ankle | E-lay-tooke-to-snaw. |
| Ant (black) | Tock-o-cha-lus-tee. |
| Ant (red) | Tock-o-cha-cha-tee. |
| Antlers | E-cho-yi-pee. |
| Apple | Shot-o-lock-o. |
| Arm | E-shock-pan. |
| Arm (left) | Aw-clos-clin-aw. |
| Arm (left, above elbow) | Aw-kos-ko-nof-o-nee. |
| Arm (right) | In-clop-pe-claw. |
| Arm (right, above elbow) | Sock-pof-o-nee. |
| Armpits | Ho-lo-wa-to-tee-ta-gaw. |
| Arrow | Chot-a-dox-cha-in-chee. |
| Ashes | Tock-ees-so. |
| Awl | Shif-fon-wah. |
| Axe | Pa-chas-wah. |

## B.

| | |
|---|---|
| Bachelor | E-hi-was-ko. |
| Back | E-claw. |
| Backbone | E-claw-fo-nee. |
| Back of hand | In-tee-ta-pix-tee-e-naw-pa. |
| Back teeth | E-no-tee-lock-ko. |
| Bad | Holwa-gus. |
| Banana | We-len-tee-lo. |

003436

CORPS003447

| | |
|---|---|
| Barefoot | Es-tel-e-pi-e-ca-och-a-co. |
| Bare head | Cop-a-to-ca-och-a-co. |
| Basket | Som-pa-chee. |
| Beads | Co-na-waw. |
| Bear | Lo-ko-see. |
| Beard | No-ti-ka-is-see. |
| Bear-skin (robe) | Lo-cus-haft-ee-pa-ta-ko. |
| Beaver-skin | O-sho-aw-haft-bee. |
| Bed | Pa-tan-can. |
| Bee (drone) | Chil-lock-o-fa. |
| Beetle (black) | Soxe-so. |
| Bell | Chum-chan-cho-lock-ko. |
| Bird | Fuss-wah. |
| Biscuit | Tol-a-la-go-chee. |
| Black | Luss-tee. |
| Blackberry | Gatch-ho-ho-e-claw. |
| Blackbird | O-chot-aw. |
| Blackbird (red wing) | Shock-kit-law. |
| Black-snake | Chit-ta-lus-tee. |
| Bladder | E-ho-sit-waw. |
| Blanket | Ech-e-taw. |
| Blaze | Lits-la-it. |
| Blood | Chaw-taw. |
| Blue | Ok-ho-la-tee. |
| Boat | Pah-lo. |
| Body | E-naw-chee. |
| Bog | On-lee-wah-nee. |
| Bone (cow) | Wa-ka-e-fo-nee. |
| Boy | Che-pon-no. |
| Brain (man) | E-kol-pee. |
| Brass | Chat-o-lon-ee. |
| Bread | Tock-a-la-kee. |
| Bread (corn) | O-chee-tot-o-la-go-chee. |
| Breast (man) | E-hoke-pee. |
| Breast (woman) | E-pee-see. |
| Breech-cloth | E-kof-kaw. |
| Breech-cloth-belt | She-won-nock-e-taw. |
| Brick | Tock-kin-o-shaw. |

003437

CORPS003448

## Seminole Vocabulary

Broom . . . . . . . . . . Sin-ti-ne-ta-pi-ee-te-caw.
Broomstick . . . . . . . . Op-pee.
Brother . . . . . . . . . . E-chock-a-tee.
Brother (older) . . . . . . . E-la-ha.
Brother (younger) . . . . . . E-cho-see.
Brown . . . . . . . . . . Ho-ko-lon-i-tee.
Brush . . . . . . . . . . . Tol-lot-to-chee.
Bucket . . . . . . . . . Sto-caw.
Buckskin . . . . . . . . . Cho-see.
Buggy . . . . . . . . . . . Tost-to-lese-ta-pof-no-chee.
Burn . . . . . . . . . . . No-clit.
Butter . . . . . . . . . . Wa-ka-pish-a-ne-haw.

### C.

Cactus . . . . . . . . . . Gout-lock-o.
Cake . . . . . . . . . . . Tot-o-lo-som-po-chee.
Cake (small) . . . . . . . . Tock-a-la-kee-chum-po-chee.
Calf . . . . . . . . . . . Wal-ka-chee.
Calf (of leg) . . . . . . . . E-lim-pock-ko.
Canoe . . . . . . . . . . . Bith-low.
Cap . . . . . . . . . . . . Cot-to-po-kaw.
Cartridge . . . . . . . . . Chat-o-ko-cho.
Cat . . . . . . . . . . . . Po-sha-chee.
Cat (wild) . . . . . . . . . Ko-wat-go-chee.
Catfish . . . . . . . . . . Sar-sho-o-kee-lon-waw.
Cauliflower . . . . . . . . . Ist-so-lock-ko.
Chair . . . . . . . . . . . O-like-a-taw.
Chameleon . . . . . . . . . Kon-kla-po-chee.
Cheek . . . . . . . . . . . E-yan-i-waw.
Cheese . . . . . . . . . . Wa-ka-pish-aw-lock-o-la-kee.
Cherries . . . . . . . . . . Pe-kon-o-soch-o-chee.
Chewing-gum . . . . . . . . Hil-o-cho-waw.
Chicken . . . . . . . . . . To-to-lo-chee.
Chicken (Mother Carey's) . . . E-chee-pa-hot-tee.
Chief . . . . . . . . . . . Micco-or-lee-a-pati-ya.
Child . . . . . . . . . . . Es-to-chee.
Chin . . . . . . . . . . . No-ti-caw.

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

| | |
|---|---|
| Chip | Ech-to-fa-la-ho-lee. |
| Clock | Ach-a-kil-caw-lock-o. |
| Cloud | Ho-lo-chee. |
| Coat | Ai-o-kof-kee-lah. |
| Cocoanut | Tol-o-so-caw. |
| Colt | Chil-lock-o-chee. |
| Comb | Ees-cos-caw. |
| Compass, To | Aw-lock-chay. |
| Compass | E-skil-caw. |
| Cord-wood | To-fo-la-hi-lee. |
| Corn | Chee. |
| Corn-bread | O-chee-tot-o-la-go-chee. |
| Corn (green) | Och-chee-lo-wat-kee. |
| Cow | Wal-ka. |
| Creek | Hatch-o-o-chee. |
| Crow | O-shaw-o-waw. |
| Cry (to) | Hock-ka-eet-kit. |
| Cup | Hi-lo-chee. |
| Curlew | Hi-lo-lo. |
| Curlew (pink) | Hi-lo-lo-chaw-tee. |

## D.

| | |
|---|---|
| Dark | Um-us-ka-taw. |
| Date (to) | E-lo-chaw. |
| Day | Nit-taw. |
| Day (To-) | Mon-son-nit-taw. |
| Dead | E-lot-tee. |
| Death | Il-lit. |
| Deer-meat | E-cho-push-waw. |
| Deer-skin (robe) | E-cho-haft-ee-pa-ta-kaw. |
| Deer-walk | E-cho-yak-op-po-sit. |
| Dew | Chit-cho. |
| Dog | E-faw. |
| Door | Shot-ho-te-caw. |
| Doorway | Aw-ho-gee. |
| Dove | Posh-e-ho-we. |
| Duck | Fo-cho. |

003439

CORPS003450

E.

Eagle . . . . . . . . . . . . . Hat-tit-e-fon-caw.
Ear . . . . . . . . . . . . . . E-hots-ko.
Ear-lobe . . . . . . . . . . . Hots-cote-es-caw.
East . . . . . . . . . . . . . Ha-so-saw.
East star . . . . . . . . . . . Ho-so-shaw.
Egg . . . . . . . . . . . . . Its-hoos-tas-gay.
Elbow . . . . . . . . . . . . E-poo-chee.
Enemy . . . . . . . . . . . . Ho-thlee.
Entrails . . . . . . . . . . . Fit-chee-law-pots-kee.
Eye . . . . . . . . . . . . . . E-tox-lo-waw.
Eyebrow . . . . . . . . . . . To-do-no-lup-pa-is-see.
Eyelash . . . . . . . . . . . Tose-lis-kee.

F.

Face . . . . . . . . . . . . . To-so-faw.
Fan . . . . . . . . . . . . . She-ma-caw.
Fat . . . . . . . . . . . . . . Nee-haw.
Father (my) . . . . . . . . . Solk-go-chee.
Feathers . . . . . . . . . . . Shee.
Feed (to) . . . . . . . . . . Hum-bi-oa-lon-es-chay.
Female infant . . . . . . . . Hoke-e-to-chee.
Fence . . . . . . . . . . . . To-hop-kee.
File . . . . . . . . . . . . . E-show-gaw.
Fingers . . . . . . . . . . . In-ka-we-sa-kaw.
Fire . . . . . . . . . . . . . Tode-caw.
Fire-wood (burning) . . . . . Tock-hot-chee.
First finger . . . . . . . . . Som-kil-smil-kaw.
Fish . . . . . . . . . . . . . Thla-theo.
Fish-hawk . . . . . . . . . . Hos-cho-kee-waw.
Fishing-pole . . . . . . . . . Phon-e-o-hop-ee.
Fish-line . . . . . . . . . . . Sar-sho-e-faw-caw.
Fish-net . . . . . . . . . . . Whe-ah.
Flea . . . . . . . . . . . . . Cuff-ko.
Flour . . . . . . . . . . . . . To-paw.
Flower . . . . . . . . . . . . Im-pock-pock-ee.
Fly . . . . . . . . . . . . . . Tsa-na.

003440

CORPS003451

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

Foot . . . . . . . . . . . . . E-lee.
Footprint . . . . . . . . . . Es-tel-e-hop-o.
Forehead . . . . . . . . . . Ka-ho-waw.
Forget . . . . . . . . . . . Cha-ho-sit.
Fox . . . . . . . . . . . . . Chil-la.
Friend . . . . . . . . . . . His-see.
Frog . . . . . . . . . . . . Aw-pa-to-naw.
Frog (Tree-) . . . . . . . . Skin-cho-caw.
Front teeth . . . . . . . . . E-no-tee-ho-maw.

G.

Gall berries . . . . . . . . . Aw-shit-ta-taw.
Ginger-cake (large) . . . . . Tock-a-la-kee-chom-paw.
Ginseng . . . . . . . . . . . Hi-lis-hot-kee.
Girl . . . . . . . . . . . . . Hoke-ti-chee.
Give (to) . . . . . . . . . . Ah-mos-chay.
Glass tumbler . . . . . . . . Shot-hit-go-chee.
Gnat . . . . . . . . . . . . . Scop-o-swaw.
Go (to) . . . . . . . . . . . Hi-e-pus.
Goat . . . . . . . . . . . . . Cho-wa-taw.
Goat (mountain) . . . . . . . E-cho-wa-a-taw.
Good . . . . . . . . . . . . . Hintz-kay.
Goose . . . . . . . . . . . . A-hak-wa.
Grapes . . . . . . . . . . . . Chil-loos-wa.
Grasshopper . . . . . . . . . A-caw-ko-taw.
Gravy . . . . . . . . . . . . E-po-see-waw.
Gray . . . . . . . . . . . . . Sho-po-ka-hot-ka-chee.
Green . . . . . . . . . . . . Pi-e-lon-o-maw.
Ground . . . . . . . . . . . . E-ho-tee.
Gun . . . . . . . . . . . . . Ayt-sah.

H.

Hair . . . . . . . . . . . . . E-caw-e-see.
Hammock . . . . . . . . . . . Sho-a-los-ga-taw.
Hand . . . . . . . . . . . . . In-kee.
Hatchet . . . . . . . . . . . Po-chos-wo-chee.
Hawk . . . . . . . . . . . . . Sho-caw.
Head . . . . . . . . . . . . . E-caw.

003441

CORPS003452

Head-dress . . . . . . . . . . . Eka-sim-enah-hits-ka.
Hear (to) . . . . . . . . . . Im-po-hos-chee.
Heart . . . . . . . . . . . . E-fer-caw.
Heaven . . . . . . . . . . . In-like-e-taw.
Hell . . . . . . . . . . . . E-lich-es-caw.
Heron (great blue) . . . . . Wak-ko-lot-ko.
Heron (great white) . . . . . O-shot-caw.
Heron (little blue) . . . . . . Wak-ko-lot-ko-o-hi-lot-tee.
Heron (little white) . . . . . O-shot-co-chee.
Hickory-tree . . . . . . . . O-chee-o-pee.
Hide (cow) . . . . . . . . . Wa-ka-haft-bee.
Hip . . . . . . . . . . . . . Im-po-loke-cho.
Hoe . . . . . . . . . . . . . E-sho-e-caw.
Hog . . . . . . . . . . . . . Sok-a.
Hog (wild) . . . . . . . . . Su-caw-pin-si-law.
Home (my) . . . . . . . . . Aw-lock-a-taw-chaw-ho-tee.
Hommock . . . . . . . . . . Ez-ee-lo-faw.
Honey . . . . . . . . . . . Chum-pee.
Horn . . . . . . . . . . . . Yi-pee.
Horse . . . . . . . . . . . . Cha-lok-ko.
Hot . . . . . . . . . . . . . Hai-see.
Hunt (to) . . . . . . . . . . Fi-i-it-lot-es-chee.

I.

I . . . . . . . . . . . . . . . Annee.
Ibis (white) . . . . . . . . . Hi-lo-lo.
Ice . . . . . . . . . . . . . . It-to-tee.
Ice-hatchet . . . . . . . . . It-to-tee-butch-es-waw.
Ice-house . . . . . . . . . . It-to-tee-in-so-go.
Ice-machine . . . . . . . . . It-to-tee-saw-gaw.
Ice-moulds . . . . . . . . . It-to-tee-ock-les-waw.
Ice-saw . . . . . . . . . . . It-to-tee-ish-fo-gaw.
Ice-tongs . . . . . . . . . . It-to-tee-she-lot-caw.
Ice-water . . . . . . . . . . It-to-tee-we-waw.
Indian . . . . . . . . . . . Es-ta-chat-tee.
Indian's heaven . . . . . . . Po-ya-fits-a.
Infant . . . . . . . . . . . . Est-to-chee.
Instep . . . . . . . . . . . . E-lit-ta-pix-tee-e-fa-cho-to-kee-not-ee.

Iron . . . . . . . . . . . . . Shot-to.
Iron kettle . . . . . . . . . Hot-cus-waw.
Island . . . . . . . . . . . . O-tee.

J.

Jay (blue) . . . . . . . . . . Tos-chee.

K.

Kettle . . . . . . . . . . . . Alk-us-wah.
Key . . . . . . . . . . . . . Ees-how-ees-caw.
Kingfisher . . . . . . . . . O-cho-ka.
Knife . . . . . . . . . . . . Slof-ka.
Knife-belt . . . . . . . . . She-won-nock-e-ta-sa-lof-kaw.
Knife (dull) . . . . . . . . Sa-lof-ka-tof-nee.
Knife (sharp) . . . . . . . Sa-lof-ka-fots-kee.
Knuckle . . . . . . . . . . . In-ka-we-sock-ka-e-to-pee.

L.

Lake . . . . . . . . . . . . . Ok-hass-ee.
Lamp . . . . . . . . . . . . . Ko-lo-kee.
Lantern . . . . . . . . . . . Ko-lo-kee-e-ho-tee.
Laugh (to) . . . . . . . . . Op-peel-it.
Leg . . . . . . . . . . . . . . Hats-ka-wats.
Leg (above knee) . . . . . Chee-hof-ee.
Leg (below knee) . . . . . Chee-host-go-waw.
Leggings . . . . . . . . . . . Aw-fa-tee-kaw.
Lemonade . . . . . . . . . . Yel-la-haw.
Like (to) . . . . . . . . . . Chi-yot-chit.
Limpkin . . . . . . . . . . . Ho-shock-e-a-caw.
Little . . . . . . . . . . . . Chat-kee.
Liver . . . . . . . . . . . . . E-lo-pee.
Living coals . . . . . . . . Toke-la-waw.
Lung . . . . . . . . . . . . . In-hee-shock-e-taw.

M.

Maid (old) . . . . . . . . . E-he-se-ko.
Mallet . . . . . . . . . . . . Chot-to-go-chee.

## Seminole Vocabulary

Man . . . . . . . . . . . . . Es-tee.
Man (married) . . . . . . . . E-hi-wa-o-chit-ee.
Man (old) . . . . . . . . . . Ach-o-be-li-tee.
Manatee . . . . . . . . . . . E-chos-waw.
Meat . . . . . . . . . . . . . A-pess-wah.
Milk . . . . . . . . . . . . . Wah-ku-pissee.
Minnow . . . . . . . . . . . . Sar-sho-chee.
Moccasin . . . . . . . . . . Ist-e-lee-pik-kah.
Mocking-bird . . . . . . . . O-shi-hi-yi.
Money . . . . . . . . . . . . Shaw-toke-e-naw-waw.
Moon . . . . . . . . . . . . . Ha-lits-chey.
Morning . . . . . . . . . . . Hal-ay-yat-kee.
Morning star. . . . . . . . . Hi-yi-tee-e-chaw.
Morrow (To-) . . . . . . . . A-pox-see.
Mosquito . . . . . . . . . . O-he-aw.
Moss . . . . . . . . . . . . . Aw-shen-waw.
Mouth . . . . . . . . . . . . E-choke-o-waw.
Mulberry-tree . . . . . . . . Kee.

N.

Naked . . . . . . . . . . . . E-caw-e-pee.
Navel . . . . . . . . . . . . . E-ho-cho-waw.
Neck . . . . . . . . . . . . . No-ka-pee.
Needle . . . . . . . . . . . . Ees-la-pode-caw.
Negro . . . . . . . . . . . . . Es-tee-lus-tee.
Night . . . . . . . . . . . . . Hih-lee.
Night (To-) . . . . . . . . . Mo-shon-nist-lee.
Night (To-morrow) . . . . . A-pox-see-nist-lee.
No . . . . . . . . . . . . . . . Hick-ast-chee.
Nose . . . . . . . . . . . . . E-ho-po.
Nostril . . . . . . . . . . . . E-po-haw-kee.

O.

Oak . . . . . . . . . . . . . . Lok-tsa-sum-pa.
Oak-leaf . . . . . . . . . . . Lok-e-tum-ba-e-cee.
Oatmeal . . . . . . . . . . . To-lee-ko.
Oats . . . . . . . . . . . . . Til-e-ko.
Onion . . . . . . . . . . . . . Ti-fum-bee.

Opossum . . . . . . . . . . . Sok-a-hat-kee.
Orange . . . . . . . . . . . Il-la-haw.
Otter . . . . . . . . . . . O-sa-na.
Otter-skin . . . . . . . . . O-shon-aw-haft-bee.
Owl . . . . . . . . . . . . O-pah.
Ox . . . . . . . . . . . . . Wal-ka-ho-non-waw.
Oysters . . . . . . . . . . Whit-lo-ko.

P.

Paddle . . . . . . . . . . . Is-kahf-ko-chee.
Paint . . . . . . . . . . . Co-lo-waw.
Paint (black) . . . . . . . . Co-lo-wa-lus-tee.
Paint (red) . . . . . . . . . Co-lo-wa-chaw-tee.
Paint (yellow) . . . . . . . Co-lo-waw-la-nee.
Palm (of hand) . . . . . . . In-ko-faw.
Palmetto (cabbage-tree) . . . Tol-o-lock-o.
Palmetto (seed) . . . . . . . Tol-o-neck-la.
Palmetto (young cabbage-tree) . Tol-o-chee.
Panther . . . . . . . . . . Kat-sa.
Paroquet . . . . . . . . . . Pot-see-lon-ee.
Partridge . . . . . . . . . Ko-ai-kee.
Peanut . . . . . . . . . . . Com-to-lock-o.
Pepper-sauce . . . . . . . . Ho-wah.
Persimmon . . . . . . . . . Shot-taw.
Persimmon (seed) . . . . . . Shot-o-nin-kla.
Persimmon (tree) . . . . . . Shot-i-pee.
Pickerel . . . . . . . . . . Shup-sho-chee.
Picture . . . . . . . . . . Es-ti-ha-kee.
Pillow . . . . . . . . . . . We-hop-caw.
Pin . . . . . . . . . . . . Ti-sos-so-chee.
Pine . . . . . . . . . . . . Choo-lee.
Pineapple . . . . . . . . . Chili-i-hos-waw.
Pistol . . . . . . . . . . . Ta-pate-go-chee.
Plant (to) . . . . . . . . . Ah-ho-chee.
Plenty . . . . . . . . . . . Or-gis.
Poor . . . . . . . . . . . . Wi-o-kee-tus-chay.
Pot (of pottery) . . . . . . Le-ho-chaw.
Potato (sweet) . . . . . . . Aw-haw.

Potato (white) . . . . . . . . Aw-hot-to-pox-to-chee.
Potted ham . . . . . . . . . Aw-pis-ta-lake-a-to-me.
Pottery . . . . . . . . . . Polk-ko.
Powder . . . . . . . . . . To-ho-to-waw.
Pulse . . . . . . . . . . . In-ka-shock-a-tee.
Pumpkin (Indian) . . . . . . Chos-chee.
Pumpkin (white man's) . . . Chos-chee-lock-o.
Puppy . . . . . . . . . . . E-fa-chee.

Q.

Quail . . . . . . . . . . . Fo-a-kee.
Quinine . . . . . . . . . . He-swan-i-hit-caw.

R.

Rabbit . . . . . . . . . . Cho-fee.
Rabbit (gray) . . . . . . . Cho-fee-chaw-hot-ee.
Rabbit (skin) . . . . . . . Cho-fee-haft-bee.
Raccoon . . . . . . . . . . Wood-ko.
Railing . . . . . . . . . . See-la-hot-tit-taw.
Railroad (car) . . . . . . . To-to-lese-pof-a-naw-o-cha-go.
Rat . . . . . . . . . . . . Ches-she.
Rattlesnake . . . . . . . . Chit-ko-la-la-go-chee.
Red . . . . . . . . . . . . Chat-tee.
Redbird . . . . . . . . . . Fost-chi-taw.
Rib . . . . . . . . . . . . In-to-law.
Ridge (of nose) . . . . . . E-po-fa-nee.
Rifle . . . . . . . . . . . E-chaw.
Ring . . . . . . . . . . . Stink-ko-shot-ti-tee-caw.
Robin . . . . . . . . . . . Eash-pock-a-waw.
Rookery . . . . . . . . . . Fo-shon-nits-kaw.
Rump . . . . . . . . . . . E-tol-kay.

S.

Sack . . . . . . . . . . . Shoke-chaw.
Saddle . . . . . . . . . . O-pa-tock-o.
Saliva . . . . . . . . . . E-to-ka-lo-swa.
Salt . . . . . . . . . . . Oke-tsam-wa.
Sardines . . . . . . . . . Cot-lo-chee.

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

Sausage . . . . . . . . . . . . Fit-chee.
Sausage (beef) . . . . . . . . Wa-ka-fit-chee.
Sausage (pork) . . . . . . . . Suck-a-fit-chee.
Sawdust . . . . . . . . . . . . To-fo-ga-ta-leg-a-mee.
Saw-palmetto . . . . . . . . . She-hop-paw.
Scalp . . . . . . . . . . . . . Cho-pock-e-taw.
Sea . . . . . . . . . . . . . . We-hat-ka.
See (to) . . . . . . . . . . . He-ches-chee.
Seine . . . . . . . . . . . . . Wee-aw.
Sell (to) . . . . . . . . . . . Yi-co-chay.
Shirt . . . . . . . . . . . . . Hi-ef-cof-ka-taw.
Shoes . . . . . . . . . . . . . Stila-pa-won-hee.
Silkworm . . . . . . . . . . . To-ka-tes-kee-at-tee-lo-e-waw.
Silver . . . . . . . . . . . . Chat-to-ko-na-wah.
Sing (to) . . . . . . . . . . . E-hi-e-kit.
Sister . . . . . . . . . . . . Cho-wen-waw.
Skin . . . . . . . . . . . . . Shon-aw-haft-bee.
Sleep (to) . . . . . . . . . . Sop-pa-lon-es-chay.
Smell (to) . . . . . . . . . . Oh-in-i-it.
Smoke . . . . . . . . . . . . . Eh-cho-chee.
Snake . . . . . . . . . . . . . Chit-to.
Snake (green) . . . . . . . . O-co-la-chit-ta.
Snake-plant . . . . . . . . . Chit-ta-hum-pe-ta.
Snake (spotted) . . . . . . . Chit-ta-lock-a-chee.
Snipe . . . . . . . . . . . . . We-hot-ko-fo-sho-wo-chee.
Soap . . . . . . . . . . . . . So-cose-caw.
Sole (of foot) . . . . . . . . Es-tel-e-ho-faw.
Son (my) . . . . . . . . . . . Sop-po-chee.
Soup . . . . . . . . . . . . . O-po-swaw.
Sour . . . . . . . . . . . . . Ka-mok-see.
Space (between knuckles) . . . In-ko-yock-pee.
Sparrow-hawk . . . . . . . . . Sho-ko-chee.
Spider . . . . . . . . . . . . Och-klo-kow.
Spider-web . . . . . . . . . . Och-o-klon-we-ahr.
Spring . . . . . . . . . . . . We-waw-ese-pay-lot-caw.
Squash . . . . . . . . . . . . Tahai-ah.
Squirrel . . . . . . . . . . . E-thlo.
Squirrel (red) . . . . . . . . Klo-hi-lee-chaw-tee.

003447

CORPS003458

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

Squirrel (gray) . . . . . . . . Klo-hot-go-chee.
Stomach . . . . . . . . . . Im-pa-shaw.
Stove . . . . . . . . . . . Tode-ca-e-ho-tee.

T.

Tail . . . . . . . . . . . E-hot-chee.
Teeth . . . . . . . . . . . E-no-tee.
Throat . . . . . . . . . . Sin-no-ka-nil-caw.
Thumb . . . . . . . . . . Som-kit-kee.
Thunder . . . . . . . . . . Ti-nit-kee.
Toad . . . . . . . . . . . Ko-tee.
Tobacco . . . . . . . . . . Hee-chee.
Toe (large) . . . . . . . . . Es-tel-e-eeds-kee.
Toe (nail) . . . . . . . . . E-la-ni-ka-so-swaw.
Toe (second) . . . . . . . . Es-tel-e-nock-clay-ho-e-claw.
Tongue . . . . . . . . . . To-los-waw.
Toothpick . . . . . . . . . Ees-ti-no-tee-some-fo-tee-taw.
Towel . . . . . . . . . . . In-ka-e-to-shi-eets-caw.
Town . . . . . . . . . . . Tolo-fa.
Trunk . . . . . . . . . . . To-how-ho-waw.
Turkey . . . . . . . . . . Pen-na-waw.
Turkey (beard) . . . . . . . Pen-na-waw-en-to-wee.
Turkey (cry) . . . . . . . . Pen-cha-ho-gaw.
Turkey (gobbler) . . . . . . Pen-ni-chaw.
Turkey (hen) . . . . . . . . Pen-nit-kee.
Turtle . . . . . . . . . . . Lot-sa.
Turtle (land) . . . . . . . . Lo-chaw.
Turtle (soft shell) . . . . . . Ho-lock-wa.

U.

Upper eyelid . . . . . . . . Tode-le-waw-hos-pee.
Upper lip . . . . . . . . . Choke-hos-pon-a-paw.

V.

Valise . . . . . . . . . . . To-hi-o-waw.
Village . . . . . . . . . . Cho-co-ta-ti-yee.
Vulture . . . . . . . . . . Sho-lee.
Vulture (black) . . . . . . . Sho-lee-pee-los-pes-ko.

003448

CORPS003459

W.

| | |
|---|---|
| Wagon | Tose-to-lese-taw. |
| Walk (pavement) | Ho-low-paw. |
| Wash-pavement (bowl) | Ho-e-so-clope-pa-lock-a-naw. |
| Water | We-wa. |
| Water-lily | Shil-o-fo-haw. |
| Water-tank | We-wa-ho-tee. |
| Weed | Aw-tock-claw. |
| Whang (for sewing moccasins) | To-shay-sil-caw. |
| Whippoorwill | Chip-ee-lop-law. |
| Whisk-broom | Sin-ti-ne-ta-pi-ee-to-caw. |
| Whiskey | Y-o-mee. |
| Whistle (to) | Tote-ca-taw. |
| White | Hot-ka-tee. |
| Whooping-crane | Wa-to-law. |
| Widow | E-hi-lift-mus-chee. |
| Widower | E-hi-wa-se-ke. |
| Wild | Ho-nit-chay. |
| Willow-tree | Aw-won-aw. |
| Wolf | Yee-haw. |
| Woman | Hoke-tee. |
| Woman (old) | Hoke-tee-li-tee. |
| Wood (to burn) | E-to. |
| Worm | U-e-cot-taw. |
| Wrist | In-tee-ti-pix-tee-e-toke-kee-tay-gaw. |

Y.

| | |
|---|---|
| Yesterday | Pox-son-gay. |
| Young (man) | Ho-non-wa-mi-nit-ti-tee. |
| Young (woman) | Hoke-tee-ti-mit-nit-ti-tee. |

Months.

| | |
|---|---|
| January | Ho-ti-lee-has-ee. |
| February | Ti-sot-to-chee. |
| March | Ti-sot-to-lock-o. |
| April | Kee-hos-ee. |

003449

CORPS003460

May . . . . . . . . . . . . . Got-so-hos-ee.
June . . . . . . . . . . . . . Hi-yote-chee.
July . . . . . . . . . . . . . Hi-yote-lock-o.
August . . . . . . . . . . . . Ti-ose-go-chee.
September . . . . . . . . . . Ti-ose-go-lock-o.
October . . . . . . . . . . . E-ho-lee.
November . . . . . . . . . . Si-lof-slop-ko.
December . . . . . . . . . . Si-lof-so-kee.

**Numerals.**

One . . . . . . . . . . . . . Hum-kin.
Two . . . . . . . . . . . . . Ho-ko-lin.
Three . . . . . . . . . . . . To-che-nes.
Four . . . . . . . . . . . . . Os-tin.
Five . . . . . . . . . . . . . Chaw-kee-bin.
Six . . . . . . . . . . . . . . A-pa-kin.
Seven . . . . . . . . . . . . Ko-lo-pa-kin.
Eight . . . . . . . . . . . . Chin-na-pa-kin.
Nine . . . . . . . . . . . . . Os-ta-pa-kin.
Ten . . . . . . . . . . . . . . Pa-lin.
Eleven . . . . . . . . . . . . Pa-lin-hum-kin-hum-kin.
Twelve . . . . . . . . . . . . Pa-lin-hum-kin-ho-ko-lin.
Thirteen . . . . . . . . . . . Pa-lin-hum-kin-to-che-nes.
Fourteen . . . . . . . . . . . Pa-lin-hum-kin-os-tin.
Twenty . . . . . . . . . . . . Pa-lin-ho-ko-lin.
Twenty-one . . . . . . . . . Pa-lin-ho-ko-lin-hum-kin.
Twenty-three . . . . . . . . Pa-lin-ho-ko-lin-to-che-nes.
Thirty . . . . . . . . . . . . Pa-lin-to-che-nes.
Forty . . . . . . . . . . . . . Pa-lin-ostin.
Fifty . . . . . . . . . . . . . Pa-lin-chaw-kee-bin.
Sixty . . . . . . . . . . . . . Pa-lin-a-pa-kin.
Seventy . . . . . . . . . . . Pa-lin-ko-la-pa-kin.
Eighty . . . . . . . . . . . . Pa-lin-chin-na-pa-kin.
Ninety . . . . . . . . . . . . Pa-lin-os-ta-pa-kin.
One hundred . . . . . . . . Chope-kee-hum-kin.
Two hundred . . . . . . . . Chope-kee-ho-ko-lin.
Three hundred . . . . . . . Chope-kee-too-chin-ee.

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

**Sentences.**

A great deal . . . . . . . . . Stu-es-taw.
All gone . . . . . . . . . . Suc-chay.
All sit down . . . . . . . . A-pok-es-chay.
Are you sleepy ? . . . . . . . Che-mo-on-ot-es-chay.
Bird cry . . . . . . . . . . Hoc-es-chee.
By and by . . . . . . . . . Aw-tee-tus-chee.
Come here . . . . . . . . . He-a-maw.
Deer walk . . . . . . . . . E-cho-wak-op-po-sit.
Don't know . . . . . . . . Kit-lix-chay.
Do you hear ? . . . . . . . . Im-po-hitch-caw.
Give me money . . . . . . . So-toke-kee-na-aw-mun-chee.
Glad to see . . . . . . . . . Ha-tee-e-tew-chee-hick-chay-hit-es-chay.
Good-by . . . . . . . . . . Ay-lip-ka-shaw.
Good luck . . . . . . . . . Som-mus-ka-lar-nee-shaw.
Good wishes to white man . . Som-mus-ka-lar-nee-sha-maw-lin.
Green corn dance . . . . . . Shot-cay-taw.
I am lost . . . . . . . . . Chi-ho-ches-chee.
I can't find it . . . . . . . He-chos-kos-chay.
I saw deer run . . . . . . . E-cho-lid-kit-he-chus-chee.
I saw deer walk . . . . . . . E-cho-yac-op-po-sit-hi-chus-chee.
I take . . . . . . . . . . . Sup-pa-lon-es-chay.
I will grow tall . . . . . . . I-ti-it-tot-chi-mi-he-taw-mi-he-taw-te-hee.
Let us go . . . . . . . . . . I-hoo-es-chay.
Let us hunt . . . . . . . . . Lop-fi-ets-chay.
Lie down and sleep . . . . . No-chit-pay-lon-es-chay.
Like them . . . . . . . . . Chi-yot-chit.
Long time . . . . . . . . . O-fun-net-taw.
Many come . . . . . . . . . I-wox-chee.
Me too . . . . . . . . . . . On-e-wa.
Mother wants to keep him . . Its-kee-e-i-chee-tok-naw.
My knife is long . . . . . . Sa-lof-ka-chop-kaw.
Sit down . . . . . . . . . . Li-kus-chay.
Sit down on steps . . . . . . Hi-top-cay-ta-li-kus-chay.
Sit on floor . . . . . . . . . To-pa-li-kus-chay.

003451

CORPS003462

# Seminole Vocabulary

| | |
|---|---|
| Sun come up | Ha-sha-i-sit. |
| Sun gone down | Ha-sha-col-lok-tit. |
| To pole a boat | Che-to-gaw. |
| To put moccasins on | Es-tel-e-pi-e-ka-u-cha-ko-ot-e-he. |
| To row a boat | Scof-gaw. |
| Wash hands | In-ka-o-ko-sit. |
| Water rough | Im-e-lo-la-tee-ti-yee. |
| What is it? | Nok-a-tee. |
| Which way? | Stom-a-taw. |
| Wind blew hard | Is-chay-to-ma-es-chee. |
| You eat plenty | Hum-bug-a-chay-hum-pee-taw. |
| You lie | Lox-a-dox-chay. |

# INDEX

PAGE

Accident, serious . . . . . 94
to provisions . . . . . 25
Accurate plotting . . . . . 140
Advance by inches . . . . . 156
Alligators . . . . . 28
Niger . . . . . 80
Scelerops . . . . . 80
sharp-nosed . . . . . 72
skeletons . . . . . 160
Analysis of water . . . . . 167
Arrival of expedition . . . . . 33
Artificial horizon . . . . . 51, 127

Backward track . . . . . 139
Bay of Florida . . . . . 83
Bicycle log . . . . . 57, 109
Big Cypress Swamp . . . . . 14, 105
Billy Fiewel . . . . . 24
Billy Harney . . . . . 31
Bird Bush . . . . . 96
Black Cæsar . . . . . 67
Black mirror . . . . . 127
Blind leads . . . . . 134
Blocked course . . . . . 121
Boggy Creek . . . . . 83
"Boxed up" . . . . . 145
Brewer, Ed., arrival of . . . . . 63
description of . . . . . 63
discouraged . . . . . 135
Brewer's escape . . . . . 161
method . . . . . 109
old camp . . . . . 159
pluck . . . . . 147

# Index

PAGE

Brewer's snake . . . . . . . . . . . . . . . . . . . . 84
story . . . . . . . . . . . . . . . . . . . . . . 87

Cabbage-palm . . . . . . . . . . . . . . . . . 126, 131, 153
Cabomba Caroliniana . . . . . . . . . . . . . . . . . . 40
Calendars agree . . . . . . . . . . . . . . . . . . . 165
Camp . . . . . . . . . . . . . . . . . 41, 113, 135, 154
comfortable . . . . . . . . . . . . . . . . . . . 143
old . . . . . . . . . . . . . . . . . . . . 127, 160
picturesque . . . . . . . . . . . . . . . . . . . . 132
Campsa Lucius . . . . . . . . . . . . . . . . . . . . 80
Canoes . . . . . . . . 16, 35, 47, 93, 107, 139, 150, 158, 160
Cape Sable . . . . . . . . . . . . . . . . . . . . . . 98
Cattle range . . . . . . . . . . . . . . . . . . . . . 22
Ceding of Florida . . . . . . . . . . . . . . . . . . . 9
Charlatan's deception . . . . . . . . . . . . . . . . . 84
Children's toys . . . . . . . . . . . . . . . . . . . 43
Chronometers . . . . . . . . . . . . . . . . . . . . 116
Clothing . . . . . . . . . . . . . . . . . . . . . . 50
Cocoanut Grove . . . . . . . . . . . . . . . . . . 60, 65
Computing distance . . . . . . . . . . . . . . . . . . 56
Cooking breakfast . . . . . . . . . . . . . . . . . . 117
cabbage-palm . . . . . . . . . . . . . . . . . . . 154
difficult . . . . . . . . . . . . . . . . . . . . . 31
outfit . . . . . . . . . . . . . . . . . . . . . . 54
stove . . . . . . . . . . . . . . . . . . . . 55, 114
Coonti plant . . . . . . . . . . . . . . . . . . . . . 41
Cotton Key . . . . . . . . . . . . . . . . . . . . . 96
Crawfish . . . . . . . . . . . . . . . . . . . . . . 90
Crocodile: Group Crocodilus . . . . . . . . . . . . . . 74
Crocodilus Acutus . . . . . . . . . . . . . . . . . 75
Americanus . . . . . . . . . . . . . . . . . . 78
Bipocratus . . . . . . . . . . . . . . . . . . 75
Calaphactus . . . . . . . . . . . . . . . . . . 79
Cataphractus . . . . . . . . . . . . . . . . . 80
Frontatus . . . . . . . . . . . . . . . . . . 76
Intermedius . . . . . . . . . . . . . . . . . 79
Johnstoni . . . . . . . . . . . . . . . . . . 80

# Index

PAGE

Crocodile: Group Crocodilus.
Crocodilus Marginatus . . . . 78
Moreleti . . . . 79
Palustris . . . . 77
Porosus . . . . 77
Rhombifer . . . . 79
Robustus . . . . 79
Vulgaris . . . . 76
eggs . . . . 73
escape of . . . . 71
first notice of . . . . 72
home of the . . . . 69
hunt . . . . 70
nature of . . . . 72
nest of . . . . 72
"Cupid," farewell to . . . . 108
return to . . . . 71
selection of . . . . 60
Cutler . . . . 65

Deer . . . . 26, 125, 146
Departure from Miami . . . . 64
from Philadelphia . . . . 58
from sloop . . . . 108
De Soto's map . . . . 11
Diet . . . . 145
Difficulties . . . . 27, 31, 110, 117, 120, 148, 155
Dive, unlucky . . . . 94
Dr. Tiger . . . . 45
Dry land . . . . 126
plates . . . . 107

Eggs, valuable . . . . 112
Everglades, centre of . . . . 131
character of . . . . 138
extent of . . . . 13
Experiences, former, in Florida . . . . 47
Exploration, first . . . . 21
Explorer's enthusiasm . . . . 131

# Index

PAGE
Fauna and flora . . . . . 58
Fish . . . . . 29, 67, 83
duel . . . . . 141
spearing . . . . . 85
Fitting out the "Cupid" . . . . . 61
Fowey Rocks Light-House . . . . . 66
Frog, Everglade . . . . . 116

Game . . . . . 23, 111, 118, 134, 159
Gavialis Gangeticus . . . . . 75
Geography, early . . . . . 10
errors in . . . . . 13
Grass, dangerous . . . . . 110
saw- . . . . . 25
sea of . . . . . 104, 132
terrible strip of . . . . . 138
Guns . . . . . 56

Hammer Point . . . . . 89
Harney River . . . . . 24
source of . . . . . 104
Harney's camp . . . . . 32
Healthfulness in winter . . . . . 15
Heat . . . . . 122, 156

Ice in Florida . . . . . 15
Incubation of eggs . . . . . 74
Indian adornment . . . . . 45
attire . . . . . 43
at work . . . . . 41
camps . . . . . 42, 160
cooking . . . . . 129
fires . . . . . 28, 129, 137
honor . . . . . 20, 163
paddling . . . . . 37
route . . . . . 103
secrecy . . . . . 20
veracity . . . . . 20, 88
vocabulary . . . . . 168

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

# Index

PAGE

Indian War . . . . . . . . . . . . . . . . . . . . . . 16
watch-tower . . . . . . . . . . . . . . . . . . . . 143
writings . . . . . . . . . . . . . . . . . . . . . . 128
Indian Key . . . . . . . . . . . . . . . . . . . . . . 96
Indians . . . . . . . . . . . . . . . . . . . . . . 16, 113
taken by surprise . . . . . . . . . . . . . . . . . 17
Ingraham expedition . . . . . . . . . . . . . . . . . 21
Inhabitants . . . . . . . . . . . . . . . . . . . . . 90
Intruders . . . . . . . . . . . . . . . . . . . . . . 142
Islands, frequent . . . . . . . . . . . . . . . . . . 152
peculiar . . . . . . . . . . . . . . . . . . . . . . 101

Jew-Fish Creek . . . . . . . . . . . . . . . . . . . 82

Kerosene stove . . . . . . . . . . . . . . . . . . . 114
Key Largo . . . . . . . . . . . . . . . . . . . . . . 89
Kite, the Everglade . . . . . . . . . . . . . . . . . 112

"Land of the Big Snake" . . . . . . . . . . . . . . . 85
Legends . . . . . . . . . . . . . . . . . . . . . . . 67
Limpkin, the . . . . . . . . . . . . . . . . . . . 112, 116
Long Key . . . . . . . . . . . . . . . . . . . . . . 124
Lower Matecumbe . . . . . . . . . . . . . . . . . . . 97

Map, De Soto's . . . . . . . . . . . . . . . . . . . 11
early French . . . . . . . . . . . . . . . . . . . . 12
government . . . . . . . . . . . . . . . . . . . . . 11
of route . . . . . . . . . . . . . . . . . . . . . . 9
Marine life . . . . . . . . . . . . . . . . . . . . 10, 93
Mental annoyance . . . . . . . . . . . . . . . . . . 135
Miami changed . . . . . . . . . . . . . . . . . . . . 62
Jimmie's camp . . . . . . . . . . . . . . . . . . . . 162
River . . . . . . . . . . . . . . . . . . . . . . 39, 166
source of . . . . . . . . . . . . . . . . . . . . . 40
Mosquitoes . . . . . . . . . . . . . . . . . . . . . . 99
Muscle-soreness . . . . . . . . . . . . . . . . . . . 136

"Nancy" . . . . . . . . . . . . . . . . . . . . . . . 23
Natural aquarium . . . . . . . . . . . . . . . . . . . 119
barriers . . . . . . . . . . . . . . . . . . . . . . 110

003457

CORPS003468

v-00119-RDM Document 112-6 Filed 07/19/23 Pag

# Index

PAGE

Navigation . . . . . . 96
Night sounds . . . . . . 116
Northwest Cape . . . . . . 100

Object of expedition . . . . . . 9
Observation, first . . . . . . 103
Old Tommy . . . . . . 18
Omelets, novel . . . . . . 121
Otter . . . . . . 105, 112
Outfit, general . . . . . . 50
  Ingraham . . . . . . 22

Palmetto shacks . . . . . . 42
Panther track . . . . . . 142
Photography, difficult . . . . . . 106
Pirates . . . . . . 66
Plume birds . . . . . . 111
Pole, broken . . . . . . 133
  the use of . . . . . . 37
Poling, easy . . . . . . 144
  exhausting . . . . . . 135
Post-office, curious . . . . . . 65
Preparations . . . . . . 35
Progress, rapid . . . . . . 141
  rate of . . . . . . 114
  slow . . . . . . 148
Provisions . . . . . . 54
  accident to . . . . . . 25
  counting . . . . . . 135
  shortage of . . . . . . 100
  unsatisfactory . . . . . . 153

Rain squalls . . . . . . 66
Result of trip . . . . . . 33
Robert Osceola . . . . . . 105
Rookeries . . . . . . 119
Rubber bed . . . . . . 49

Sam Roberts . . . . . . 61

003458

CORPS003469

# Index

PAGE
Scientific outfit . . . . . 51
study . . . . . 58
Scouting expeditions . . . . . 19
Sea of grass . . . . . 104, 132
Seminoles. See Indians.
Shallow bays . . . . . 89
Shark River . . . . . 101
Shipping equipment . . . . . 57
Ship's graveyard . . . . . 68
Sleeping-bags . . . . . 49
Snake by moonlight . . . . . 152
fang . . . . . 86
great . . . . . 88
in camp . . . . . 151
life . . . . . 120, 136
moccasin . . . . . 161
precautions . . . . . 136
skeleton . . . . . 86
Snipe . . . . . 111
Sofkee . . . . . 130
spoon . . . . . 43
Soldier Key . . . . . 67
Southerly course . . . . . 69
Sponges . . . . . 91, 93
Springs . . . . . 119
Squalls . . . . . 100
Station No. 1 . . . . . 102
No. 2 . . . . . 114
No. 3 . . . . . 121
No. 4 . . . . . 131
No. 5 . . . . . 135, 141
No. 6 . . . . . 140, 159, 161
No. 7 . . . . . 142
No. 8 . . . . . 147
No. 9 . . . . . 149
No. 10 . . . . . 154
No. 11 . . . . . 158
No. 12 . . . . . 159

003459

CORPS003470

# Index

PAGE
Station No. 13 . . . . . 161
Surgery . . . . . 94
Sweet-bay tea . . . . . 123

Tarpon ground . . . . . 100
Ten Thousand Islands . . . . . 101
Tent, selection of . . . . . 53
Terrapin . . . . . 119
shells . . . . . 128
Tree lookout . . . . . 130
Tropical foliage . . . . . 85
fruits . . . . . 89
Turtle, gigantic . . . . . 98

Vaseline à la Seminole . . . . . 68
Vision limited . . . . . 30

Water, character of . . . . . 14, 115
clear . . . . . 138
fresh . . . . . 102
glass . . . . . 92
leads . . . . . 117, 124, 153
low . . . . . 113, 140, 148, 155
plants . . . . . 115
purity of . . . . . 115
smooth . . . . . 101
supply of . . . . . 61, 119
way, narrow . . . . . 103
Western Reservation . . . . . 19
White man's greed . . . . . 163
"Willie Bee" . . . . . 106
"Willie Tiger" . . . . . 44
Willoughby Key . . . . . 131
Wood ibis . . . . . 103
schooner . . . . . 99
Wreckers . . . . . 66

THE END.

H 15 89

003460

CORPS003471



LIBRARY OF CONGRESS

0 005 457 872 6

003461



THE EVERGLADES
& OTHER ESSAYS RELATING TO
SOUTHERN FLORIDA
By JOHN GIFFORD

003462



THE LIBRARY OF CONGRESS
1800
Class F317
Book E9G4
Copyright No.
COPYRIGHT DEPOSIT.
003463

# THE EVERGLADES

AND

## Other Essays Relating

TO

# Southern Florida

BY

JOHN GIFFORD, D. OEc.

Formerly Assistant Professor of Forestry, Cornell University. Author of "Practical Forestry," etc.

Published by the

EVERGLADE LAND SALES CO.

KANSAS CITY, MO.

COPYRIGHT, 1911
BY
EVERGLADE LAND SALES CO.

003465

©Cl.A283671

DEDICATED TO THE MEMORY

of

NAPOLEON BONAPARTE BROWARD

the

"FATHER OF THE EVERGLADE DRAINAGE PROJECT"

CONTENTS.

CHAPTER I. PAGE

The Everglades of Florida and the Landes of France. From *Conservation*, 1909 ..... 1

A Tribute to Broward. From the *Atlanta Georgian* ..... 12

CHAPTER II.

Southern Florida. *Forestry and Irrigation*, 1904 ..... 13

CHAPTER III.

Trees as an Aid to Drainage. From the Spanish, in *La Hacienda* ..... 21

CHAPTER IV.

The Coco Palm. *Garden Magazine*, 1910 ..... 27

CHAPTER V.

The Lime and the Sapodilla. *Garden Magazine*, 1910 ..... 33

CHAPTER VI.

The Banana and the Papaw. *Garden Magazine*, 1910 ..... 38

CHAPTER VII.

What Will Grow in the Everglades. *Everglade Magazine* ..... 42

CHAPTER VIII.

Valuable Trees for the Everglades. *Everglade Magazine* ..... 48

CHAPTER IX.

Some Common Florida Plants. *Everglade Magazine* ..... 52

CHAPTER X.

Vines for Everglade Planting. *Everglade Magazine* ..... 56

CHAPTER XI.

Mahogany in South Florida and the West Indies. *Woodcraft*, 1909 ..... 60

CHAPTER XII.

Bungalow Construction in South Florida. *Everglade Magazine* ..... 83

CHAPTER XIII.

The Everglades of Florida. *Southland Magazine* ..... 95

CHAPTER XIV.

The Problem of Growing Pineapples for Market. *Garden Magazine* ..... 104

CHAPTER XV.

The Mango, the Best of All the Tropical Fruits. *Garden Magazine* ..... 109

APPENDIX.

A List of the Trees of South Florida, Native and Introduced ..... 114

LIST OF ILLUSTRATIONS.

PAGE

Views of Arcachon in France on the Bay of Biscay and Miami, Florida, on Biscayne Bay.................................Frontispiece
Natives of the Landes of France.................................. 2
A Scene in the Landes before Drainage.................................. 3
Tapping a Pine for Resin in the Landes of France.................................. 6
Indian Family in Canoes on the Miami River.................................. 8
A Cypress Island in the Everglades.................................. 9
On the Beach at Cape Florida.................................. 26
Coco-Palm Grove on the Keys.................................. 26
A Camphor Tree .................................. 31
Picking Sapodillas.................................. 32
A Lime Tree on Elliott's Key.................................. 32
A Papaw Tree in Full Fruit.................................. 37
State Canal in the Everglades.................................. 44
In the Hammock on Key Largo.................................. 59
In the Mangrove Swamp.................................. 76
A Cool Tile Covered Bungalow.................................. 82
A Shingled Bungalow.................................. 82
A Cuban Country House in the Tobacco District of Pinar del Rio... 84
A Cuban Bohio.................................. 85
Type of Inexpensive Bungalow Suited to the Climate of South Florida 86
A Patio Floor Plan.................................. 87
A Cistern Plan.................................. 88
Floor Plan of Flat Roofed Unit House.................................. 89
Side View of Flat Roofed Unit House.................................. 90
Plan of a Strong, Attractive Fence.................................. 91
A House for Poultry.................................. 92
Two Views of Unit House in Process of Construction.............. 94
A Scene in the Pineland, a Rock Road and a Rock Fence............ 99
A Scene in Egypt where Flat Roofed Houses Prevail.............. 100
A Field of Pineapples on the East Coast of Florida................ 103
Sundersha Mango Tree.................................. 108
A Rubber Tree (*Ficus aurea*), in Florida, on the South Side of the Miami River.................................. 113
West Indian Almond Trees Bent by the Wind.................................. 114
An Avenue of West Indian Almond Trees.................................. 115
A Mahogany Tree in the Bahamas.................................. 116
The Live Oak.................................. 117
Seminole Indians Coming to Miami with Venison and Skins......... 118
A Branch of the Candlenut Tree.................................. 120
A Mastic Tree in the Hammock.................................. 121
A Cedrela Tree.................................. 124
A Rubber Killing a Coco Palm.................................. 126
A Piece of Reclaimed Land in Holland.................................. 130

## PREFACE.

I have been writing on the subject of the Everglades and South Florida in general since 1904 in various magazines. Requests for this literature have come to me from time to time and in ever-increasing number until my reprints are exhausted. It is impossible to answer all the letters which come to me requesting information in reference to this region. Friends have suggested many times that I collect some of these articles into book form. This I have attempted to do in the following volume. I am well aware that as a book it has many shortcomings and, owing to the fact that it contains articles hastily written at odd times and for different purposes, there is considerable repetition and perhaps even contradiction. If, however, it succeeds in arousing interest in this great Everglade drainage project and offers helpful suggestions to newcomers, its mission will have been fulfilled, and its author and publisher will be satisfied. I wish to thank the various magazines for permission to copy these articles and the Everglade Land Sales Company for assuming the burden of publication.

JOHN GIFFORD.

Coconut Grove, Florida, 1911.



ARCACHON—ON THE BAY OF BISCAY. A GREAT RESORT WHICH DEVELOPED AFTER THE RECLAMATION OF THE LANDES OF FRANCE, CORRESPONDING TO MIAMI, ON BISCAYNE BAY, WHICH WILL DEVELOP IN A SIMILAR WAY WHEN THE EVERGLADES ARE DRAINED.

003470

MIAMI, ON BISCAYNE BAY.

*From Conservation, 1909.*

# The Everglades
AND
# Southern Florida

## CHAPTER I.

### THE EVERGLADES OF FLORIDA AND THE LANDES OF FRANCE.

URING a recent visit to the great work of reclamation now in progress in the Everglades of Florida, I was impressed with its resemblance in many respects to the great work the French have accomplished in the Landes of France, and with the fact that ex-Governor Broward, after many trials and tribulations, is succeeding, just as did the French engineers after similar troubles. This also applies to the work of Enrico Dalgas in the reclamation of the Heathland of Denmark.

The drainage of the Everglades is now well under way, and almost every unprejudiced person who visits this work becomes an enthusiastic convert. Just as the French engineers practically added a new province to France, Broward has been instrumental in promoting a work which will convert a vast, useless waste into what promises to be the most productive part of Florida, if not the most productive area of land of equal size in the whole United States of America. This drainage is being done at the insignificant cost of about $1 per acre; and when done the land will be ready at once for the plow and for the production of tender crops, the like of which cannot be produced elsewhere in the United States, and at a time when the rest of the country is frost-bound. This is no small area; it is many miles in extent, and is capable of yielding, at small outlay, enormous crops of the most delicate tropical products, as well as Northern

-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 3

vegetables, in midwinter. A visit to this region, even at this time (May, 1909), at the very beginning of the work, since it is a colossal task, will convince the most skeptical person that this is no idle dream or wild land scheme, but a feasible, practical piece of good business. After inspecting this work, one naturally wonders why it was not done long ago. It is not a complex engineering problem; it is merely a matter of digging, so that

NATIVES OF THE LANDES OF FRANCE. A REGION RECLAIMED BY DRAINAGE.

the water in this great Everglade basin can flow into the sea. Behind the giant maws of these dredges which, when they work day and night, are literally eating their way through rock, mud

003472

CORPS003483

and sand at the rate of a mile a month per dredge, there are left broad, navigable canals, which are comparable only to those of Holland, and which will afford miles of placid water courses, avenues of traffic for the products of the land, and a never-ending source of enjoyment to pleasure craft.

In the case of the Everglades, the exit of the water to the sea is prevented by a limestone rim. In the case of the Landes it was due to a bank of wind-blown sand, which clogged all outlets to the sea. The resemblance of the two conditions is much closer than is at first apparent, since this very rock rim was

A SCENE IN THE LANDES OF FRANCE BEFORE RECLAMATION. THE NATIVES WALK ABOUT ON STILTS. (PHOTO OF AN ILLUSTRATION IN AN OLD FRENCH GEOGRAPHY.)

once, no doubt, limestone sand blown in by the wind and later hardened into rock. I think geologists now generally recognize that this rocky rim is of eolian formation. The main difference between the two propositions is that, in the case of the Landes, it was silicious sand, which did not harden into rock, but re-

mained mobile, shifting back and forth with every caprice of the wind, while, in the case of the Everglades rim, it was limestone sand, which soon hardened into solid limestone rock. As in sand dunes, the wind laminations show in the rock like leaves in a book, recording forever the character of its formation. Some distance up the Coast, in the great pineapple district of Eden and Jensen, the obstructing dune consists of silicious sand. Southward the rim is not pure limestone in every instance but a calcareous sandstone, that is, granules of silicious sand cemented together with lime.

Before further describing the Everglades, let me quote from my notes made a few years ago, while visiting the Landes of France. Not only are the physical conditions similar, but there was the same opposition at the start. As in the case of the Everglades, the work in France was pushed by the personal initiative and persistency of one or two men, and the method of securing the funds for the purpose was very much the same. In the early part of the last century (before 1857), the condition of the flat, triangular plain known as the Landes, which is roughly bounded by the Bay of Biscay, the River Adour and the River Garonne, and the Medoc, was, in brief, as follows: There were miles of marshy, almost treeless wastes, covered mainly with a low growth of herbage. It was wet, unhealthy and sparsely inhabited. The few people who lived there depended upon their flocks. The accompanying picture shows a native of the Landes standing upon stilts, watching his sheep. He is dressed in a heavy sheepskin paletot. By standing on stilts, these shepherds can easily see their sheep in the bushes and grass, and can easily follow them through wet and marshy regions. Their spare time is spent in knitting stockings. The condition of the Landes is due to the immense sand dunes, which arrayed themselves along the shore of the Bay of Biscay. They moved inland, covered villages and occluded inlets. Bremontier tells of a dune which advanced in a violent tempest at the rate of two feet in three hours. The damage done by these moving sands so increased that the government officials studied the work and devised and executed plans; and now, thanks to De Villers, Chambrelent and

Bremontier, the pioneer workers, the Dunes and Landes are covered with a beautiful growth of the maritime pine. The region is now a famous health resort, combining the beauties and pleasures of the seashore with those of a well-managed pine forest, which extends almost to the edge of the ocean.

There are evidences that originally the Dunes were fixed naturally by forests. These forests were destroyed by vandals, and all attempts to stop these menacing mountains of sand failed. In 1778 a talented engineer, Baron Charlevoix de Villers, was sent to Arcachon for the purpose of forming a military post. He saw at once the necessity of fixing the sand, and was, according to Grandjean, the first to establish the fact that the way to fix the Dunes is by means of plantations of pine. He met with troubles in his work, and was finally sent back to the Island of Santo Domingo.

In 1784, Bremontier began the work, and it is said that, by using the results of De Villers' labors, he finally succeeded in fixing the moving sand.

The fixation of the Dunes rendered possible the work of M. Chambrelent, which was the reclamation of the Landes by drainage and plantings. It is a unique example of personal initiative. M. Chambrelent, a young engineer in the Department of Bridges and Roads, in 1837, was sent to the Gironde to study the drainage of 800,000 hectares of land in the districts of Gascony and the Landes. His conclusions were not accepted, so he bought some land and put in effect the measures he advocated. In 1855, the results of his experiments were submitted to an international jury. The jury was so favorably impressed that it recommended the application of Chambrelent's plans for the entire region, and in 1857 a law was passed requiring the Communes to do this work. The Communes paid for it by selling a part of this land, which increased in value after the completion of the work. This region was 100 meters above sea level, flat and sandy. It was underlain with a hard-pan called "alios." In summer it was a bed of burning sand, in winter in a state of constant inundation, while between the two was a period of pestilence. The country was characterized by sterility and insalubrity.



TAPPING A PINE FOR RESIN IN THE LANDES OF FRANCE. NOTE THE CUPS TO CATCH THE PITCH.

A complete system of drain ditches was dug and the seeds of pine were sown. In 1865 all works of drainage were complete. By the fixation of the Dunes and the drainage of the Landes 650,000 hectares of land were made productive. Formerly, if one wished to buy land he mounted a hill and called in a loud voice; the land over which his voice carried was worth 25 francs. "A man," says Grandjean, "was forced to take some of this sand for a debt. He became a millionaire later by selling it in small parcels." The first summers, the visitors lived in the resin-gatherers' cabins; now every luxury is afforded the 200,000 tourists who come there every year. In the Landes a man could buy a farm for a few francs, but it required over two acres to support one sheep. In less than a century the population sex-tupled, while that of a large part of the rest of the country either remained stationary or decreased. The fecundity of the French in places where there is plenty of room and opportunity is proverbial, as in Canada; it is even so in the Landes, which, on being reclaimed, was equivalent to a new province or colony.

All along the East Coast of Florida there are dunes of snow-white sand covered with scrub pines and palmettoes. This fine, white, silicious sand, although naturally sterile, is excellent for the growth of pineapples in regions where there is sufficient warmth. Mile after mile of this sand along the line of the rail-road between the Everglades and the sea is used in the cultiva-tion of pineapples, which are fed a balanced ration of fertilizer, just as cows are fed a balanced ration of feed for the produc-tion of high-grade milk.

The great Everglades basin, extending from Lake Okeecho-bee to Miami and westward to the Gulf of Mexico, contains 3,000,000 acres, more or less. The whole cultivated area of the State of Florida is estimated at only about a million acres. The Everglades are larger than Porto Rico or Jamaica and as big as Rhode Island and Delaware combined. This great area is mainly confined by dunes of sand and ridges of limestone rock. These ridges, like fingers, project into the Everglades and are usually covered with pine. Between these ridges are small glades on the edge of the main or "big glade." The accepted definition

of a glade is a narrow strip of grassy land between forests. Glade refers to a grassy area. The big glade is all or "ever" glade. In this way, no doubt, the term of Everglade originated. Here and there in the Everglades are islands covered with rich jungle or hammock hardwood growth. On these islands the Seminoles clear small areas, where they raise their crops.

We visited the Everglades from Fort Lauderdale. It was after a long period of heavy rains, and the mosquitoes were bad in the pine woods. We ascended the New River, a beautiful,

INDIAN FAMILY IN CANOES ON MIAMI RIVER.

winding stream, generally deep, but very deep in places, one spot having a depth of eighty-five feet. The banks were quite low and sandy and lined with moss-draped cypress, oak, maple, magnolia, coco-plum, pond-apple, etc. After a short ride we reached the beginning of the drainage work—one long canal ran northwestward, with the dredge Everglades, another due westward, with the dredge Okeechobee, at work. These canals will run about twenty miles out into the Glades and will be met by a canal running north and south from Lake Okeechobee to a point about

twenty miles west of Miami. The dredge Miami is now at work at the head of the Miami River; another dredge is at work on the West Coast, opening the old Disston Canal into Lake Okeechobee.

As these canals are finished, dams are made to hold back the water to facilitate dredging, showing rather a surprising amount of fall and how effective these canals will prove in discharging the floods of water from this big area. I understand

A CYPRESS ISLAND IN THE EVERGLADES.

that the Government will permit the level of Lake Okeechobee to be lowered only four feet, since a federal appropriation has been made to dredge the Kissimmee River, which empties into the northern part of the lake.

There were no mosquitoes in the Everglades during our visit, and crops already growing on the land, owned by eager settlers, show what can be done on land only partially drained.

Western capitalists mainly have bought this land; the money from the sales is doing the work, and the further it progresses the more the land will bring and the more eager people will be to get hold of it. The Board of Internal Improvement is wisely holding back much of the land from sale, knowing full well that as time goes on it will increase in value and thus yield ample funds for the continuation of this important work. In many cases the state has sold only the alternate sections.

There are agents at work selling this land in every State in the Union. Men of wealth and influence are behind this project. If any one doubts its feasibility, he should come to Florida and see with his own eyes. Much praise is due ex-Governor Broward for his work in this line, and in the years to come he will shine forth as the governor who really did something to add to the productivity and worth of his State. The man who makes two blades of grass grow where only one grew before is the proverbial public benefactor; but the man who, by his energy and foresight inaugurates a movement to render 3,000,000 acres of waste land highly productive deserves endless commendation in this day, when we talk so much about the conservation of nature's resources. Mr. Broward is a masterful promoter; the keynote of his campaign was drainage; he worked at it incessantly while in office, and he has been working at it ever since, and has made good.

We must not forget that this reclamation is in a land of perpetual summer in the only part of the mainland of the United States which is truly tropical, and where the productive capacity of the land is many times greater than in northern climes; where not only a greater quantity, but a much greater variety of crops can be produced than elsewhere in this country.

This may be far-fetched, but I can picture in my mind's eye long avenues of Eucalyptus, Australian pine and royal palms along these canals; great masses of Hibiscus, Allamanda, Oleander, Bouganvillea, Poinciana, and countless other resplendent ornamentals around thousands of neat homes surrounded by fields of peppers, tomatoes, eggplants, celery, onions, okra, arrowroot, tobacco, etc.; also, no doubt, orange and grapefruit groves,

as well as choice mangoes, avocadoes, and other tropical fruits. The canals filled with boats will lead to Miami and Biscayne Bay, the Arcachon and Biscay of Florida.

The land of the moccasin, alligator and Seminole will see a great transformation in a very short time—it does not take long in a tropical country, especially on land where there is no forest to clear.

It is more than a drainage scheme, since by means of dams and locks the water table may be kept at all times just where it is needed for irrigation purposes. The land is level, fertile, and free from alkali and other injurious minerals. The canals serve the triple purpose of drainage, irrigation and transportation.

The soil is usually a black muck, in places several feet in thickness; under this is usually a layer of marl; under the marl, sand, and under the sand, limestone rock. There is considerable mineral matter mixed with this muck, and, although it will shrink some, I doubt if the shrinkage will ever prove a serious drawback. By the application of lime, the cultivation of legumes, etc., this soil can be kept at a maximum state of fertility, so that five acres would be ample for the support of an ordinary family.

The water of the Everglades is usually heavily charged with lime, which is deposited on the surface of everything in a fine, flocculent state during the period of overflow. This deposit, added to the muck, no doubt, contributes much to the quality of the soil. There are deposited also the shells of many fresh-water mollusks. In short, with the fertile, easily worked soil, an abundance of water for irrigation, a tropical, healthful climate, canals for transportation purposes, all within easy access, by both water and land, to our great northern markets, there is a combination of favorable conditions which probably cannot be equaled elsewhere in the whole world.

And lo! the poor Seminole; what of him? At best, he is merely a renegade; and the time will soon come when he will have to put on pants and go to work on the land, join his relatives in Oklahoma, or die from the effects of too much bad whisky.


THE EVERGLADES

The following is a fitting tribute to the work of Broward from the *Atlanta Georgian:*

"Napoleon B. Broward, the beloved Florida statesman, whose untimely death took place a few days ago, was the apostle of reclaiming Southern swamp lands—a pioneer in the work of saving the great inundated tracts to the productive resources of the South.

"It was the dream of his life to do this for his State—to change the hundreds of square miles of the Everglades from a dreary waste of bog and morass to gardens teeming with fruits and vegetables—to make two useful plants grow where none grew before.

"It was a dream worthy the best quality of constructive statesmanship. He not only dreamed this dream, but he set about to put it into reality. He took it and his plan for its realization before the people of his State.

"He met with cries that the builder always meets—'It can't be done. Drain the Everglades? Absurd!'

"But the people had faith in him and his policies and they won. He was elected governor and secured the necessary legislative enactments to put his plan of draining the Everglades into operation.

"It has been a success. Its effect is the same as if some great fertile island were gradually rising out of the ocean to add itself to Florida's riches. It is an ever-increasing source of income direct to the State and a source of additional thousands of inhabitants and additional millions of invested capital.

"In anticipation of its progress, land now under water and a few years ago worse than worthless is now selling for prices that are remarkable under the circumstances.

"Broward was a pioneer in a movement that is going to mean much for every Southern State. In the South there are 87,000 square miles of swamp lands. In Georgia alone there are 4,210 square miles or 2,694,400 acres. Making these lost acres serve the use of man and the good of civilization is a worthy task. Broward, the pioneer, has pointed the way. Let the leaders in every Southern State follow it."

003482

CORPS003493

*Written for Forestry and Irrigation in 1904.*

## CHAPTER II.

## SOUTHERN FLORIDA.

NOTES ON THE FOREST CONDITIONS OF THE SOUTHERNMOST PART OF THIS REMARKABLE PENINSULA.

CCORDING to the report of the Biological Survey of the United States Department of Agriculture, there are three regions in the United States which belong to the Tropical Zone. One is in Southern Texas close to the mouth of the Rio Grande, another is along the Colorado River in Arizona and California, and the other in Southern Florida.

The first two are hot and arid, the other is humid and pleasant throughout the major portion of the year. The southernmost part of Florida can rightfully claim, therefore, the distinction of being the only humid or truly tropical part of the mainland of the United States—the only tropical part of this country which can be reached by rail. Early geographers arbitrarily made the frigid zones and torrid zone the same number of degrees and then divided the balance of degrees left over between the two temperate zones. The lines called the tropics of Capricorn and Cancer, although of course perfectly straight on the map, are really very crooked and very difficult to definitely locate. Some claim that the frost line is the limit; if this be so no part of Florida is in the tropics, since frost has occurred, in spots at least, throughout the whole peninsula. The best guide is the character of the vegetation, and wherever the coco palm, avocado, mango, pineapple, and hundreds of other strictly or characteristically tropical plants flourish and fruit without protection, the region is truly tropical.

The territory referred to in this article is unique in another

003483

CORPS003494

respect. It is the only region of coral formation in the United States. These two peculiarities combine to render it a region of extreme interest to foresters and botanists. Here is field for research for many years to come, where many phases of plant ecology may be studied to better advantage than elsewhere on the continent. One can pass through all the climatic zones from the boreal to the tropical in going from the region of the proposed Appalachian Park to Biscayne Bay in a little more than twenty-four hours. Were the roads all good, it would be little more than a pleasant automobile trip.

The part of Florida to which this article refers lies between the Everglades and the Florida Strait, and includes the territory around Miami, and southward to Cape Sable, including many coral keys, mangrove islands, and wooded islands in the Everglades.

The vegetation of this district from a forestry standpoint may be divided into three distinct types—the hammock, the pineland, and the mangrove swamp. It is, of course, impossible in so short a space to give more than a superficial description of these types.

The hammock is undoubtedly the climax forest. It represents the type that the rest would in time become were it not for fire, flood and other detrimental and retarding influences.

The hammock is a tropical jungle, consisting of species of trees characteristic of the Antillean Flora. Most of these species produce a vigorous coppice, and the ground is covered with a rich black mold resulting from the leaves and detritus of these hardwoods. It is in the hammock where one finds mastic, crabwood, satin-leaf, gumbo-limbo, princewood, whitewood, manchineel, and many other rare and in many instances valuable woods.

This hammock may be found in patches in the pineland, on islands in the Everglades, and on the keys north of Bahia Honda. Strange to say, the southernmost keys are like the pineland of the mainland in character. Sand Key, seven miles to the southwest of Key West, is the southernmost point in the United States. Although all the keys north of Bahia Honda were once

covered with a dense tropical growth, much of it has been cut for pineapple clearings. In many places, especially on Key Largo, it is still in virgin condition. Wherever these keys are above tidewater, the growth is hammock; when subject to overflow, it is mangrove swamp. Some keys are all hammock; others are all mangrove, and others have hammock centers fringed with mangrove.

For half a century the timber on these keys has been cut, allowed to dry, and is then burnt. In the ashes a fine crop is produced, and fertilizers have never been used. The fact that pineapple patches are very combustible has caused these natives to burn cautiously. In referring to the vegetation of these keys, I cannot refrain from quoting the following from an article by the botanist Curtiss in "Garden and Forest," volume I, page 279:

"A person who is acquainted only with the vegetation of more northern states, or with that of Northern Florida in traversing these keys, will find scarcely a tree or herb identical with, or even resembling those with which he has been acquainted. He may hear familiar names in use by the inhabitants, such as cherry and cedar, but on examination he will find the species thus designated to be entirely different from those which he has known by such names before. The curiosity is piqued at every step by some unfamiliar and interesting form of vegetation, and if the tourist be accompanied by one of the inhabitants he will learn much of the popular lore regarding names and uses, for these people are remarkably intelligent in regard to the vegetable and animal life of the region they inhabit. It will be found that almost all the adult inhabitants come from the Bahamas, that nearly all the trees and other plants are common to those islands, and, in short, that these islands have much more in common with the Lesser Antilles than with the Florida mainland.

"A tour of the Florida Keys reveals nature and society under such peculiar conditions that any one who has never visited this insular region may rest assured that there remains in store for him at least one source of novel and enjoyable experience, though he may have traversed the mainland of the United States from Maine to California. As regards conformation and

soil, the inhabitants and their pursuits, the surrounding waters and the marine life they support, these coral islands differ essentially from all other portions of our vast country; but in no particular do they present so striking a dissimilarity as in the vegetation which covers them."

In spite of the mosquitoes these keys are charming places, especially Elliott's, which is bounded on one side by the waters of Biscayne Bay and on the other by the straits of Florida. They are protected from storms by a chain of coral reefs. Near at hand are the famous Sea Gardens.

The pineland, although less rich and luxuriant in growth, is also peculiarly interesting. The rocky ridges or reefs, with sandy swales in between, are covered with pine and palmetto. The pine, strange to say, seems to shun the sandy swales. The sand of these swales is underlain usually with a reddish calcareous clay, resulting from the disintegration of the coral rock. This rock may be found in all stages of disintegration. In the swales the palmetto is most luxuriant, and no doubt the absence of the pines in these places is due to this fact. The regeneration of these pines, in spite of fire and rock, is generally good. The pines grow right on the rock, the roots penetrate its crevices, and the tree is anchored to such extent that when it upturns the rock sometimes upturns with it.

On the keys the soil is crumbled coral, and coral sand. On the mainland it is a limestone as soft in places as chalk and as hard in others as flint. In places it seems stratified or in plates and lifts out in good flat building stones, which harden on exposure; in others it is jagged, honeycombed, and filled with potholes and pockets; in others it is coquina-like in character, and in others has an oölitic structure.

The pine is Cuban pine (*Pinus Elliottii*). It does not yield resin satisfactorily, and is therefore not tapped. The wood is often so heavy that it sinks in water, and on the whole is one of the meanest woods on earth to work with. The heart or light wood is durable, but it warps to such extent and is so hard when dry that it is cut, hauled to the mill, sawed into boards, and used for constructive purposes just as soon as possible.

1-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 38

It is almost impossible to drive a nail into the dry wood without splitting it, and in order to saw it one must flood the tools with kerosene to prevent gumming. Mechanics shun it, although many people use it because of its cheapness. The sapwood soon rots and leaves a heavy, durable heart, which is in great demand for posts, ties, poles and fuel. Much of it is used in burning the coral rock into lime, and much of it is burnt up in the clearing simply to get rid of it. The "log-rolling" stage is still on in this district. In many cases it is blasted down with dynamite and then burnt; in others it is "deadened" and then burnt standing. It would probably pay to distill this wood, since it could be secured cheaply and would yield large quantities of tar.

Fire sweeps over these pine regions frequently. The pine needles, grass and palmettoes burn like tinder. The dry pine bark and rotten sapwood hold fire like punk. Fire gets down in the crevices of the rock, so that it is next to impossible to extinguish it. The effect of fire on this rock is peculiar. It becomes a potent geological agent. It converts the rock into lime, which slakes when wet by rain or dew. In burning piles of brush, rocks are often thrown into the heap to check the flames or prevent the wind from blowing sparks. These rocks are burnt with the wood and crumble into soil.

This rock crumbles into soil in the presence of decomposing organic matter. By the use of velvet beans, dynamite, and hard grubbing by Bahaman darkies, the roughest, most hopeless looking rock-bed may be converted into productive soil.

There ought to be considerable nitrogen present in this soil, since the ground is often covered with thirty or more species of creeping legumes. There must be potash somewhere, since the palmetto ash is extremely rich. Few things will grow, however, in this rock without the help of fertilizer. Plant-food materials may be there, but they are not available. The rock is usually wet, even in the driest times. In fact, under the limestone ridge there are channels of water running from the Everglades and bubbling out in the form of springs along the shores of Biscayne Bay.

003487

CORPS003498

All this pineland would in time become hammock, no doubt, were it not for forest fires. One can find all stages between the true hammock type and the pineland. Where pineland has been protected from fire, it becomes hammock-like in character.

The type of forest called mangrove consists in places of pure red mangrove, the great land-former, but gradually merges into forest similar to hammock. The vegetation of the mangrove swamp consists of those species which can stand a salt-water bath occasionally. They are located on mud lands which are being gradually wrested from the sea. The red mangrove is chief among those plants which can thrive in salt water. With it, however, are often associated the coco palm, the seeds of which float in, become covered with wet seaweed, and then sprout and grow together with buttonwood, black mangrove, sea grape, and others. There are hundreds of thousands of acres of land in which mangrove predominates. Fringing these mud lands are often sand beaches. In the course of time, when this land becomes high and dry by the continued deposit of vegetable detritus, other trees, such as grow in the hammock, gain a foothold and spread.

Back of the rock ridge, which stretches along the coast from the region of Miami southward, is that vast territory called the Everglades. The extension of tree growth on the Everglades has been restrained by an excess of fresh water. With drainage the hammock islands will quickly extend. A very large proportion of the tropical hammock trees of South Florida are berry producers. Such seeds are quickly disseminated by birds and other animals. In the Everglades there are hammock islands, on some of which the Seminole Indians live. This Everglade region, it is claimed, contains 3,760,000 acres. Since ten acres or less is sufficient for the support of a family in this climate, there is room for 376,000 families. The whole cultivated area of Florida is estimated at 1,000,000 acres. It is interesting to compare the size of this wild territory with other parts of the world. For instance, the Everglades cover 5,875 square miles; Porto Rico, 3,550 square miles; Rhode Island, 1,250 square miles; Delaware, 2,050 square miles; Jamaica, 4,207 square miles.

When this area is once properly reclaimed there will be little of it which can not be cultivated. The complete drainage of these Everglades is not only being seriously considered, but is actually in progress. The following on the "Drainage of the Everglades" is from a recent issue of *Success*, by J. E. Ingraham, one of the vice-presidents of the Florida East Coast Railroad:

"There are great agricultural possibilities in the Florida Everglades. Though they are yet merely an expansive waste of swamp and lake and jungle, I venture to predict that they will be the location of hundreds of fertile farms within ten years, and will by degrees develop into one of the most productive tracts of land in the world. The barrier to the utilization of the Everglades has been, of course, the water which covers the greater part of them to a depth of from one to six feet; but it has been found entirely practicable to drain off the water. Work to this end has already been begun and is being pushed rapidly. When it is completed a tract of land one hundred and sixty miles long and sixty wide will have been opened to cultivation. The size of this region is not as important as the remarkable productivity of the soil. The latter is not only absolutely virgin, but has been fertilized by animal and vegetable life through many centuries. I am confident that its crops will lift Florida to a place among the leading agricultural states.

"The project of draining the Everglades attracted the attention of Henry B. Plant in the early nineties, but he was by no means sure that the scheme was feasible, so I, acting under his direction, undertook an expedition through the region. Despite its proximity to centers of population, it was then for the first time thoroughly explored by white men. Ours was virtually a voyage of discovery. We paddled our light boats on lakes and camped on islands that, I have good reason to believe, had never before been visited by any human beings but Seminole Indians, and by these but rarely. We underwent so many hardships that some of our party were compelled to turn back, but our efforts were not in vain, for we ascertained the important fact that the Everglades, along the whole 160 miles of the eastern side, are

rimmed by a rock ledge. We furthermore learned that all of the lakes are several feet above sea level, and we decided that there was nothing whatever to prevent the water of the lakes from flowing into the ocean and leaving the land drained if vents could be made in this long ledge of rock. The chief question before us pertained to the practicability of cutting through the ledge in various places, and dredging out outlets into the Atlantic, which is not more than two or three miles away at numerous points.

"Experiment proved that this work would present no great difficulties. It was merely a matter of a great deal of digging. Henry M. Flagler took up the project, and it is being carried out by his lieutenants. We are not only making artificial outlets through the rock, but are also, by ditching and dredging, turning large bodies of water into rivers and creeks which flow to the ocean. The work has progressed far enough to enable me to predict confidently the opening in Florida, within a very few years, of a great tract of land of almost unprecedented fertility."

When one considers what the Bermudas yield, with only twenty square miles of rocky land, the possibilities of this great Southern tropical peninsula seem almost limitless. The whole region is one of great interest, and although one of the first to be explored and partly settled it has remained dormant until lately. Settlement is difficult, but gradually obstacles are being overcome, and when competition in transportation facilities develops, the boom will be on in earnest.

This region of perpetual summer is also the natural gateway to the West Indies, and the great peninsula of Florida, like a huge finger, directs the way to fertile regions beyond, awaiting American capital and enterprise.

*From La Hacienda, 1911.*

CHAPTER III.

## TREES AS AN AID TO DRAINAGE.

ALL trees, in fact all kinds of vegetation, transpire. Although a large part of the body of all plants is water (96 per cent in plants like the banana), a still larger quantity is absorbed by the roots and is again discharged by the leaves into the air. This passage of water into the air from the leaf surface of the plant is called transpiration. Water absorbed by the roots contains the nutrient substances of the soil. There is thus a current of water from soil to air through vegetation which is known, botanically, as the transpiration current. This keeps the plant turgid. When evaporation from the leaves is in excess of the supply from the roots, or in other words, when there is no transpiration current, due to an insufficiency of water, the tender parts of the plant wilt. The cells of the tender rootlets of plants not only absorb this watery solution but have a selective power in choosing from the many mineral substances contained in the moisture of the soil, the kinds and quantities needed for the use of the plant. If even one necessary element is absent the plant dies of starvation. These substances are left in the plant for the manufacture of wood and fruit, while the water which has served as the vehicle of transmission evaporates from the leaf surface of the tree. The actual source of the power of this great transpiration force is still unknown. It is a mighty pump that will lift enormous quantities of water from the roots through the wood to the topmost branches of a tree two hundred and fifty feet in height. In fact, every tree is a natural pump with many valves. The power that does the pumping is simply another one of the great problems in plant life which remain

003491

CORPS003502

to be solved. The leafage is a broad surface spread out to the sun and air. In addition there are numerous stomata (air-pores) which increase the porousness and promote evaporation of moisture from the surface. These air-pores or stomata open and close to suit the needs of the plant. The leaves and green twigs are then the special organs of transpiration.

The water evaporated in the five months from June to November from an oak standing perfectly free and apart and having about 700,000 leaves has been estimated at 111,225 kilograms. This is equivalent to about a quarter of a million pounds of water.

A clover plant has been found to give off in one day twice its weight of water. A crop of hay on one acre producing two tons has been found to use during its growing season more than six hundred tons or wagon loads of water.

Storer in a chapter in his work on agriculture on "Trees as Pumping Engines" quotes that a single oak in Germany in about five months transpired 264,000 pounds of water, or about eight and one-third times the amount that fell in rain on the surface it occupied. He mentions another oak tree that transpired 4,400 pounds of water in a single summer's day.

Some trees transpire more than others, and, of course, in a climate of continuous summer, transpiration throughout the year is enormous. Rapidity of growth is determined by the amount of moisture available. The amount transpired depends upon the supply of water, the rate of growth and the condition of the atmosphere. Given then a wet soil, a fast growing tree, such as a cedrela or eucalytpus or any one of a hundred or more fast growing tropical trees, with a dry, windy atmosphere, and you will have a pump working quietly and constantly that would rival a windmill.

In a parliamentary paper relating to Natal is the following statement: "Clumps of eucalyptus planted in undrained swamp lands at elevations up to 4,000 feet have been known to completely dry up the space within reach of their roots."

I have heard it said that in India eucalyptus trees were planted along an irrigation ditch. These trees robbed the ditch

of so much water that they were cut down. The region around San Paulo delle Tre Fontane, it is claimed, was drained and rid of pestilential fevers by the planting of eucalyptus. Along the Mediterranean shore I have found the belief prevalent that eucalyptus plantations keep off fever. Müller speaks of the cajeput tree (*Melaleuca leucodendron*) as the "anti-malarial tree." Many attributed this effect to emanations of oil from the leaves. It is a "poor lie that is devoid of all truth" and it is a poor popular belief that is not based on some shadow of fact or reason.

I think the modern development of medical science proving the causes and manner of transmission of tropical fevers explains it all.

In order to contract malaria or yellow fever one must be bitten by an infected mosquito. The notion that these fevers are carried by miasmatic emanations from swamp lands no longer holds.

To keep off fevers either one of two things is necessary—remove all mosquitoes that are infected or remove or segregate all people that can infect the mosquito.

The mosquito does not travel far. He must have water to breed in. Undrained land furnishes the breeding place. In the Roman Campagna the water was held in pockets and the land was difficult to drain by ditches. Trees were planted. They drained the land, the mosquito was left without a breeding place and without him, or rather her, since the female does the mischief, the fever was not transmitted.

The eucalyptus has been singled out as the great genus for this purpose, but there are other trees of quite as much value, which I shall mention later.

*Eucalyptus rostrata*, the red gum, is a favorite because it grows on moist ground with a clay subsoil. It will grow on land subject to fresh water inundations for a considerable time. In Mauritius it resisted hurricanes better than other species. It yields a heavy wood, which is highly esteemed in Australia.

*Eucalyptus resinifera*, the red mahogany gum, has proved best for the tropics. It is not, however, such a rapid grower. It yields a good timber, but has an unfortunate common name. It

-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 3

should not be called mahogany, because it does not belong in the same class with this time-tried prince of timbers. It should not be called gum because the term gum to many minds carries with it little to recommend it.

In Cuba I found a eucalypt growing with magical rapidity. It was the fastest growing eucalypt I have ever seen in the tropics. An expert of the Department of Agriculture, Washington, D. C., diagnosed it to be *Eucalyptus crebra*, the narrow leaved iron-bark tree of New South Wales and Queensland. I am not sure that he is right, but if he is this species is the one to plant in Western Cuba. In our excitement over the eucalyptus, some of the many species of which are good for certain special districts, such as Southern California and Mexico, we have overlooked other Australian and American trees which are quite their equals, if not in many instances by far their superiors.

We have many species of the order *Myrtaceae*, to which the eucalyptus belongs, so similar to eucalyptus that the novice could not tell the difference. For instance, the rose apple or pomerosa and many other species of the genus *Eugenia* and allied genera, which have large seeds, grow very rapidly, and yield fruit as well as wood.

Any quick-growing tree such as the cedrela or cigar-box cedar will pump just as much, if not more, water than the eucalyptus. The Australian pine is a fine tree for swamp lands. It is storm fast, grows very quickly, in fact faster than any eucalyptus in Florida, and yields a fine, hard wood.

*Melaleuca leucodendron*, the cajeput tree of India, which yields the cajeput oil of commerce, is, according to Baron V. Mueller, a great tree for swamp lands. He thus speaks of it: "It can with great advantage be utilized for such areas for subduing malarial vapors in salt swamps where no eucalyptus will live." I have it growing successfully on the bay shore here in Florida. We have all noticed how the roots of trees will run to an old well and then form in great hair masses down its sides to the water below; we have all noticed how the roots of quick growing trees such as the poplars and willows will go long distances to a tile drain and fill it completely with hundreds of

003494

CORPS003505

rootlets; and we have all noticed how the roots of some trees will run out and under a pavement so persistently that they crack and ruin it. The rootlets are merely doing their part—hunting for moisture, so that the tree can hold up its head, and hunting for mineral food which is dilutely dissolved in the water which it drinks. When the earth fails to yield sufficient moisture and in consequence sufficient plant-food held in solution the tree begins to die at the top first—a condition called stagheadedness, which is the beginning of the end. In the selection of soils, look up and not down. The height of the timber is usually a good measure of the soil's depth and fertility. On an old homestead in this region there was a well cut from the solid rock. By the side of this well a wild rubber grew. The well was long ago abandoned and is now almost filled by its hose-like roots.

In conclusion let me say that the greatest function of the forest, aside from yielding materials useful to man, is soil betterment. It holds the soil in place against the erosive action of wind and water, but what is more important, the roots penetrate to the deeper layers of the soil, absorb the mineral substances and then deposit them again on the surface in the form of detritus, which soon becomes humus. Thus the surface soil is being constantly fed, thus the mineral ingredients of the soil are conserved and thus the wornout fields and ruinate lands of the tropics may be rejuvenated and rendered virgin. This deposit on the surface gradually raises the level and thus helps also in the process of drainage.



ON THE BEACH AT CAPE FLORIDA. (PHOTO BY HOMER SAINT-GAUDENS.)

COCO-PALM GROVE OR "COCAL" ON ONE OF THE KEYS.
(PHOTO BY FLORIDA PHOTOGRAPHIC CONCERN.)

*From the Garden Magazine, November, 1910.*

Copyright, 1910, Doubleday, Page & Co.

CHAPTER IV.

## THE COCO PALM.

T IS so much better to call this tree the "coco palm" than the "cocoanut palm tree." There seems also no reason for spelling coconut with *a* in it. The source of this word is probably not known, but when no other source is plausible, ancient Greek or Latin is sought, and a possible origin is guessed at, for instance the Greek *kokkus,* a berry. As another instance the natives of the Bahamas are called "Conchs," apparently because they are fond of the shellfish called conch, from the Latin *concha,* a shell. It more than likely comes from a very old English word similarly spelled, meaning a "beach thief," or "beachcomber."

The use of an *a* in the word simply helps to confound it with cacao, coca, and a few other plant names with similar spelling. The Spanish call it *coco,* and the German *kokos-palme.* The generic name is *Cocos,* the specific name *nucifera,* and when Linnaeus called it nuciferous, or nut-bearing, he perpetuated in its name its most striking quality. The use of the word "perpetuated" is good, since *Cocos nucifera* is one of the few plant names which have not been changed a dozen or more times by ardent botanists.

From the standpoint of utility, the coco palm leads the procession in the tree world. As to beauty, that depends altogether on the character of your art education. I have heard both the royal palm and coco palm likened to huge feather dusters set on end over the landscape. This much is certain—a coral strand without coco palms would look like Father Time without his whiskers.

In spite of the fact that the fruits of the royal palm are only used for pigfeed, this tree is more stately and aristocratic than the coco palm. It is perfectly straight, smooth, and columnar and well fitted for avenues leading up to Southern mansions. The coco palm, on the other hand, is plebeian. It bends accommodatingly at the start, and has pronounced ridges where the massive leaves have fallen away, which give the monkey-like pickaninny a good toehold.

It is a fitting shade to the hut of a fisherman, for with a long-handled sponge hook he can pull down at any time a green nut which yields a cool, sweet, fresh, invigorating drink from nature's own distillery. Strange to say, this liquid is under pressure and, although there is not the decided "pop" which is always looked for in the case of a soft drink, there is a good active "squirt" indicating that the water is fresh and the nut sound. Inside, under the shell, which in this stage is just beginning to harden, there is a layer of soft nutritious jelly.

The white meat of the ripe nut is used for candy, feed for animals, and, when ground very fine, makes a cream which is delicious on fruits, etc. I have seen chickens, goats, dogs, pigs, and pickaninnies all feeding in the same yard at the same time on the white meat of the coconut.

The coco palm is a queer tree—it seems to love the winds and salt of the seashore; yet some scientist has tried to prove that its home is inland on a high plateau in South America.

It has been pictured in times past as a perfect adaptation to the seashore. What the date is to the desert, the coco palm is to the strand. The hard shell of the nut is filled with a rich oily meat which floats high. The germ is protected and well supplied with nutriment for the days of its youth. On the outside of the shell there is a pad of fiber which protects it when it falls to the hard coral strand. The nut will not break when it falls; it bounds and rolls like a ball down the incline into the sea, and floats and floats and floats till washed on some muddy shore which the coral polyps, the waves, and the mangrove trees have been many a year in making. Then it is gradually covered with sand and seaweed by wind and wave. Soon the tree springs from

one of the three eyes in the end of the nut. The leaves are at first simple, and in youth the tree needs shade, which it gets naturally from the bushes on the shore. Soon it throws out great compound leaves of woody texture, some of which are fully fifteen feet in length. Think of leaves fifteen feet long! In a few years, seldom under five, it bears a bunch of nuts, followed by other bunches in all stages of growth.

Then the mangrove island is fit for human habitation, fit for the home of some smoky colored, semi-nude sea-islander, who from this palm can garner all the necessities and a few of the luxuries of life. With the fish in the sea by the shore, and the turtles that lie and lay on the beach, starvation is not possible. Man's ultimate wants are shelter, food, and drink. The coco palm supplies them all, with more besides.

The Negro who lives in the shade of this useful tree has also fortunately developed a thick skull-shell, covered with a mat of tow. And well so, since the fall of a coconut from a sixty-foot palm is nigh like a ball from the cannon's mouth. A single fruit of the double coconut of the Seychelle Islands weighs from forty to fifty pounds. Our common coconut when green will weigh at least five pounds. Over in Brazil men wear bucklers of wood to protect themselves from the fall of the balls of Brazil-nuts. These actually plant themselves when they hit the soft, moist earth of the jungle.

Still there are scientists at work who have proved, to their own satisfaction at least, that the coconut does not float far, that it soon loses its vitality when soaked in salt water, that it rarely sprouts when washed upon the beach, and that it has been distributed completely round the globe mainly by the hand of man.

The waves wash the tree half over, break over it with great fury and bang great booms against it in times of storm, but it lives on and bears on in spite of abuse. Dig it up carefully and pet it with fertilizer, and it will more than likely turn yellow and die. Cut off its tough fibrous roots to the stub, and cut off its leaves, then stick it in the ground as you would plant a fence-post, and it will very likely live.

In Porto Rico the water of the green coconut is relished by everybody. It is almost a national beverage, and a wholesome germ-free beverage it is—absolutely free from chemical adulteration and ptomaine poisoning. All through the day and late at night in Porto Rican cities may be heard the welcome call of the *coco-de-aqua* vender.

In some parts of the East the fruit stalks are cut while green and tender, and the stub is attached to a light bamboo trough. Several flower-stalks may be thus treated and several little troughs may be led to one spot where there is a receptacle in the form of a big gourd or calabash awaiting the liquid which oozes out and trickles down to form a cider or toddy.

Could one imagine a state more seraphic to the minds of many men than a hut closely surrounded by coco plams with bamboo conduits leading this cidery juice slowly, but continuously, into a receptacle on the kitchen table?

From the outside of the nut comes the husk or coir which is used for cordage and woven into tough matting for church aisles, office floors, etc.

The oil which is expressed from the copra, or dried meat of the nut, enters into butter, soap, etc.

The hard shells are carved and used for utensils of various kinds.

The trunk wood is poor and hard on tools. It is used, nevertheless, because it is cheap and answers the purpose, although, of course, a fine full-bearing coco palm is never cut for its wood. It is called "porcupine wood" because it has hard bundles of tissue in it which, when cut on the slant, appear like spines in the wood. The heart is spongy, but the outer layer, although rough, is tough and durable.

A coco palm usually bears a terrific weight of fruit, and bears it continuously, but if it fails the native hacks it or drives iron into it or cuts deep notches into the trunk, which at the same time facilitate climbing, and lo! it bears—bears because its vegetative activity has been restrained, and, like every other creature on earth, it strives all the more to perpetuate its kind.

Among the leaves around the stem there is a natural cloth, to

be sure not woven with warp and woof, but of such a nature that primitive man could have easily taken the hint. I don't know whether this cloth is ever used for wearing apparel or not, certainly not in the majority of even remote regions where gunny sacks are plentiful.

There are those who grow passionately fond of the coco palm, especially when grouped by the shimmering particolored sea of the tropics. There is nothing sorrowful about them; in the breeze they never emit a whining tune as do the pines, but a

A CAMPHOR TREE.

lusty clattering and banging. I heard an old sailor once say that he wanted to be buried in the shade of a coco palm by the shore.

But like all good things on earth it has its tormentors. In parts of the West Indies it has fallen a prey to a fungous blight. Strong efforts are being used to check its spread, and close watch should be kept to prevent it from entering Florida from Cuba, since in south Florida there are many coco palms, and many acres of land where they can be successfully planted.



PICKING SAPODILLAS. (PHOTO BY PROF. JOHN CRAIG.)

A LIME TREE ON ELLIOTT'S KEY GROWING IN THE CORAL ROCK.
(PHOTO BY PROF. JOHN CRAIG.)

*From The Garden Magazine, September, 1910.*
Copyright, 1910, Doubleday, Page & Co.

# CHAPTER V.

## THE LIME AND SAPODILLA, COMMONLY CALLED "SOURS AND DILLIES."

VISIT a conch farmer on the Florida Keys and the conversation will soon drift to the condition of his "sours and dillies."

The "sours" or limes were planted long ago mainly for their acid juice which was cherished by seafaring folk to combat scurvy, while "dillies," the short for sapodillas, were grown because they have always been held in high esteem by the natives, both black and white, of the Florida Keys and the Bahama Islands.

The buccaneerish taint in my blood got the upper hand when I bought a farm on the Keys, well stocked with limes, sapodillas, and coco palms, and a sloop which I named The Dilly. Since then my interest in sours and dillies has grown, in spite of devastating storms, tricky commission men, and long droughts.

These two fruits grow together on the Keys among lime rocks of coral origin, where soil is often so scarce that on some acres, which one could easily select without wandering far, a man would have to scrape with a spoon for a whole day to get a barrow load. The rocks stick up as though the bones of mother earth were dry and bare, without skin or flesh of any kind.

In the crevices of the rock there is some soil, and from the porous rock itself the plant must derive nourishment. At any rate, the lime tree produces sour limes, and the sapodilla tree sweet sapodillas, in great abundance.

If one plows this soil he must use dynamite, and all weeding is done with a machete or a sailor's sheathknife.

003503

CORPS003514

In a moist season the little lime, hardly more than a seedling, is planted in a rock crevice or pot-hole. If the ocean keeps its place and the weeds are kept in check, the lime tree will thrive and in three years will blossom and fruit—a fruit with a delicious refreshing aroma which puts the lemon to shame. The lemon is a coarse, thick-skinned, rough, raggy and acrid product compared with the lime. School children in Boston eat limes pickled in salt-water, at recess. The lime is a naturally refined and delicate acid fruit.

The lime is a spiny, semi-wild crop, although a spineless variety from Trinidad is being tried. It stands no frost and will not flourish if too carefully tended. No fertilizer except a little half-rotted seaweed, and no cultivation except a couple of weedings a year, are needed. Heavy crops of fruit are produced almost every summer, often with a light winter crop, and the limes from the Keys are especially cherished because, unlike mainland limes, they will carry long distances without deterioration.

The lime is thin-skinned, full of juice in proportion to rag, of a delicate inimitable aroma, and once a lime-convert the epicure forever after spurns the lemon.

There is little trouble in getting them picked in spite of the mosquitoes and their needle-like thorns.

The lime is in active demand because there is an unquenchable desire—the awful thirst which besets the American people in the summer time. Great pyramids of limes may be seen at almost every soda fountain where limeades are in vogue or at the club where the gin-rickey holds sway. A whole lime for a glass with the thin aromatic rind thrown in is the rule. For that reason big limes are not wanted, and then, limes are usually bought by the barrel and sold by the dozen.

My crop last year on about four acres of land amounted to two hundred and some barrels. A flour barrel is the standard and holds about one hundred and twenty-five dozen limes. They netted me on the average $3.50 a barrel. They probably retailed at twenty cents a dozen, costing the consumer about

1-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 39

twenty-five dollars a barrel—a fair instance of the abysmal gulf between the consumer and producer.

Limejuice has other uses than assuaging thirst. In the form of citric acid it is extensively used in manufacturing establishments.

A little lime juice put in the water in which meat is boiled renders it more tender and palatable.

Added to desserts, other fruits, jams, etc., it brings out their peculiar flavors and removes flatness.

It offsets hardness in water.

With salt it will clean brass and remove stains from the hands.

It improves and whitens boiled rice and sago. It is a soothing application to irritations caused by insect bites. It is better than vinegar as a salad dressing. It makes a cleansing toothwash diluted with water. It is good for the liver, useful in fevers, and they say a little limejuice in the water you drink is sure death to the typhoid bacillus!

And so I manage my lime plantation—a kind of *laissez-faire* system—but it pays a good interest. A new-comer would hardly notice it in passing. A colored man called Parson Jones, otherwise known as the Sultan of Cæsar's Creek, has an eye on it. Every month or so I meet him in town, but his good wife, who picks limes also, has not been away from home for three years. Three or four times a year when we want to bathe in the briny parti-colored waters of the Keys or seek plunder on beachcombing expeditions along the shores, I drop in to look over my plantation and pick some green coconuts for the refreshing liquid which they contain. My only concern is in summer, awaiting returns from shipments. Sometimes the sales are disappointing, especially in the region of New York, if a ship has arrived with a cargo of "sours," each wrapped in brown paper, from the island of Santo Domingo.

My sapodillas were planted because they yield a very sweet fruit and stand firm in the teeth of the gale. The trees are so dense and sturdy that they form a wind-shield and storm-break. Good dillies have a local sale of a penny each. Some are

003505

CORPS003516

smooth, light brown, with a pink blush on one side, but many resemble a rusty-coat apple. The colored gentry will invest in this luxury even when grits are low in the larder. And the raccoons are so fond of them that ripe dillies on the trees are seldom found.

But there is a future to the dilly beyond all this. The gum or milky juice of the tree is the basis of chewing-gum, and although the world at large may not be cognizant of this impending calamity, and although even the conservation commission has not considered it, we are on the verge of a chewing-gum famine. The price of this gum, called chicle, has risen, the quantity given in a cake of gum has been reduced to the severest minimum, and adulteration has reached its maximum. Still the demand is beyond the supply.

The man who plants limes, with sapodillas for a wind-break, is actually, but perhaps unwittingly and indirectly, furnishing important ingredients for two articles not destined to uplift mankind—the gin-rickey and chewing-gum.

In addition to yielding a sweet fruit and a valuable gum, the wood of the sapodilla tree is probably as near everlasting as wood can be, in fact it outlasts many metals. Lintels of zapote, or sapodilla wood, in the ruins of Mexico are still hard and sound, having endured many centuries, probably 3,000 years.

In a few years, no doubt, there will be many chicle plantations, under the control of companies inducing the unwary to part with their coin on the promise of great future returns, as in the case of rubber.

Even now chicle figures in American stock reports, and American chicle is bought and sold in Wall Street by the side of stock of other great corporations.



1-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 40

A PAPAW TREE FULL OF FRUIT.

003507

CORPS003518

*From The Garden Magazine, August, 1910.*
Copyright, 1910, Doubleday, Page & Co.

## CHAPTER VI.

## THE BANANA AND THE PAPAW.

NEVER cease to marvel at the banana and the papaw. Statisticians who have predicted a famine from the increase of population without a corresponding increase in the production of breadstuffs have neglected one potent factor—the banana.

The papaw or papaya is another succulent, quick-growing, prolific tropical fruit-producer, belonging in the same class of marvels with the banana, but is not related to it.

The banana has been the cause of the formation of steamship lines to the tropics; it has caused the building of railroads within the tropics; it has figured conspicuously in Spanish-American politics, and even the dreaded Black Hand is known to many as "the Society of the Banana." We are now importing $12,000,000 worth of bananas annually.

The banana is marvelous because of its prolific nature, yet it forms no seeds, and the great bunch of foodstuff when not used by man or other animals simply rots, and the stalk which produced it dies to give space to another to repeat the performance.

With me the banana is a favorite crop. I dig a deep hole in moist soil or muck. Into this hole I empty my waste basket containing old letters, newspapers, returned manuscripts, etc.; also the kitchen barrel containing tin cans and other stuff that the chickens will not eat; then I throw in sweepings, rakings, old fertilizer bags, old iron, useless wood, bottles, and trash of any and every kind. On top of this I put a good forkful of stable manure and then some sand or muck. Then the banana root, often no bigger than your two fists, dry and lifeless-looking, after having been kicked about in the sun for a few days,

1-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

waiting for planting time, is stuck into the ground and covered with a few inches of dirt.

In three months, if the weather is good, you may sit in the grateful shade of this big green-leaved plant. I almost called it a tree, because its stalk is as big as a man's leg and its foliage may be several feet above your head, but according to the definitions a tree must have a central *woody* axis, and to the banana there is no woody texture; it is all as soft as a cabbage and is usually completely consumed in a short time when left to chickens.

Within a year a bunch of fruit is produced which a man can hardly carry—a bunch so big that it often bends the plant to the ground unless propped by forked sticks. As soon as the bunch and stalk are cut, up shoots another and another. A dozen or more suckers are at the same time produced so that more and more may be planted. What an active chemical laboratory this plant is to form so much leaf and stalk and fruit from soil and atmosphere in less than a year!

It is a sight seldom forgotten to see picturesque Indians in Central America working in banana plantations where the plants have met to form a forest-like canopy. In Mexico there are young coffee trees in the shade of these banana plants. I have seen the semi-nude Karif women of British Honduras meet the ship far from shore with their dugouts loaded to the gunwales with bananas.

But the most marvelous kind of banana culture may be seen in the Bahamas, on the Island of Eleuthera. Here there are deep holes called "banana holes" some of which are fifty or sixty or more feet in depth. At the bottom of these holes is moist rich earth. They are just like deep dry wells. A banana root is planted in a basket of soil, which is lowered with a rope to the bottom. The root sprouts and the stem shoots up like magic till it reaches the top of the hole. Then the foliage spreads out in the sunshine like flowers in a vase. There it grows and forms its bunch protected from the wind in the cool moist recesses of the hole. The bunch is formed at the surface of the ground, so that the enterprising native has but to pull it over

003509

CORPS003520

with boat or sponge hook, sever it from the stalk with his machete, and walk proudly home with a week's provender for himself and family on his head—a fitting illustration of man's mastery over nature.

Little wonder that the native of the tropics is a lover of leisure; little wonder that he rests content in his palm-thatched hut amid his beloved bananas.

A good papaw will bear a hundred or more melon-like fruits, a fruit to the axil of each leaf, ripe at the bottom and in all stages of development up to the bloom. The staminate and pistillate flowers are usually on separate plants, and the fruit varies a great deal in quality.

The fruit contains a large quantity of black, peppery seeds which may be removed *en masse*, as in the case of the cantaloup. A good papaw, cold and treated with sugar and lime-juice, is relished by many people on a par with a muskmelon. The seeds are usually scattered in the midst of rubbish during the rainy season. As soon as the plants begin to bloom, all but one or two staminate plants are destroyed. In the course of a few months one may begin to pick papaws every day or so.

Of course some people have to learn to like them, but one lady that I know, of good habits, will steal this fruit when buying and begging fail. She has for the papaw the same irresistible longing that the negro has for the watermelon.

Next in wonder to the prolific nature of this fruit is the marvelous fact that it contains a natural food-digester, a ferment now famous the world over as a medicine. Under various patent names it enters into the lists of many drug firms. By means of it men have already accumulated fortunes—not the producer, but the manufacturer and peddler who invent appealing names and have them patented.

I have before me a sample bottle containing one hundred pills for twenty-five cents. It is marked "Physician's sample. Our own preparation of the digestive juice of *Carica papaya* with willow charcoal." It is also marked a sure cure for dyspepsia or indigestion. I have often wondered where all this juice comes from. I have traveled in many parts of the tropics,

but have never seen or heard of anybody collecting it, and the plant will not grow north of the frost line.

How fortunate the dweller in the tropics! If his meat is tough he can wrap it in papaw leaves over night and it will be tender in the morning. If his meal has disagreed with him, he can step into his back yard and pick and eat a papaw for dessert.

Both bananas and papaws, however, are picked when full, but still green. This must be done to save them from the rats and birds. The tropical planter has bananas to roast and bananas to fry, sweet bananas and acid bananas, big bananas and little bananas, yellow bananas and red bananas—in fact, varieties galore.

If his bananas are slow to ripen, he can hurry the process by putting the bunch in a barrel and filling the barrel with warm air and smoke. This is easily done by turning the barrel upside down, hanging the bunch to a nail in the bottom which is now the top, and building a small fire in the hole in the earth under it.

In a native school in India I have been told the pupils are fed almost exclusively on bananas. Bananas must be had at all times in proper condition. So they have a trench in the earth arranged in such a way that they can fill it with bananas, warm air, and smoke at any time and thus hasten the process of ripening.

The banana has been in a way the emancipator of the tropics. In many instances it has led the native out of thraldom. In many places from which bananas are not shipped he must work in the fields at a small recompense. At banana ports he can usually receive a cash payment for every full bunch. With bananas to eat and bananas to sell, the copper-colored native can rest in his home-made hammock, thump his home-made guitar, and smoke his home-made cigar with only one worry, and that is that he might at any time be forced to serve in the army of either the *de facto* or *de jure* government, for the cause of liberty. Even so he knows that the folks at home can live on the bananas and papaws and other fruits and vegetables growing in a semi-wild state around his bungalow.

-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

*From the Everglade Magazine.*

## CHAPTER VII.

## WHAT WILL GROW IN THE EVERGLADES.

O MANY plants will grow in the Everglades when drainage is complete that a book and not one or two articles would have to be written to cover the subject and do it justice. The growing of things is, of course, the purpose of all reclamation, and upon this alone depends the future value of the land. *This Everglade land when drained, owing to its favorable location, will produce a greater variety of crops than any other land in the United States of America.* We know of many things which have been successfully grown on the edge of the Everglades already, but think of the hundreds of useful plants now growing in other parts of the world which have yet to be introduced and tested!

Let me say at the start that this Everglade drainage question is no question at all; it is a question only in the minds of doubting Thomases, who are prejudiced, who are ignorant or who are born knockers and who belittle every project in which they have no hand and out of which they can make no rake-off. We need not go to Europe for examples of successful works of a similar nature. The Dutch in fact would smile at such a project. They are making farm lands out of such places as Biscayne Bay. They reclaim places below the level of the sea. They pump the water out. Look over the great irrigation projects of our West, or better still the banked lands of the Mississippi Valley where huge and costly levees hold our mightiest river in check. The overflow of Okeechobee is insignificant compared with the floodwaters of the great river which drains a third of this whole country.

The first product for our consideration on Everglade soils

003512

CORPS003523

should be forage. Few countries can be highly and wholly successful in an agricultural way without being able to raise sufficient food for farm animals of all kinds. Aside from the expense of feeding these animals on hay and grain brought from a distance, they are necessary for the maintenance of soil fertility and the conversion of roughage into manure, which is an expensive and to some extent an imported article. Enough vegetables are wasted to feed many pigs. The fertilizer bill is the main item of expense.

In the West alfalfa means corn, alfalfa and corn mean hogs and cattle and horses; these in turn mean fertility, money, prosperity and happiness.

There seems to me to be only one great work in this world; all other aims are subsidiary to it; it is the production of happy and prosperous homes. Every man who honestly works to that end is a benefactor to mankind. The men who reclaim waste land, the men who introduce valuable plants from foreign lands, the men who by selection improve varieties and increase productiveness, the men who devise means for combating plant diseases, in fact the men who in any way increase the productivity of the soil in proportion to the labor expended thereon are doing a great work for all time. They may be long forgotten, but the effects of their labors will roll down the ages for all time to come. All other movements are insignificant compared with the one great movement of producing the largest amount of food and shelter for our people with the minimum amount of labor outlay.

In the matter of forage for animal feed, velvet beans, cowpeas, beggarweed and grasses and other legumes are already common. The Indians have successfully grown corn for many years on islands in the Everglades, and the green corn dance has always been to them an important event. In places in the Everglades where vegetables have been recently grown there are oats waist high with good heavy heads, having sprung from seed in the manure used for fertilizer or from oats, accidentally scattered by the horses while eating their mess. There is no stronger hay than oats cured in the milk, and in the land where

I was bred farmers all said that animals fed on fodder of this kind needed no grain. And why should oats not thrive? The winter climate of Florida is not unlike the summer climate of Northern regions where oats are abundantly produced.

The soil has never been inoculated with the bacteroid of red clover, yet in places red clover may be seen in full flower, having sprung from the seed from baled hay. This same baled hay brings in many weeds from the North, and the Canada thistle and other noxious weeds may be already seen in the vegetable patches on the Glades.



STATE CANAL IN THE EVERGLADES, FOR DRAINAGE, IRRIGATION AND TRANSPORTATION.

Remove the water from the Glades, plant forage crops, keep animals, convert all roughage and waste products into manure and the agricultural future of this whole region will be assured for all time to come. Farming seldom succeeds without manure, work and sense. The maintenance of soil fertility and the con-

trol of plant diseases are the two main agricultural problems throughout the world.

It does not make any difference where you live, says Gleanings in *Bee Culture*, alfalfa can be made to grow all the way from Maine to Florida. Here are the directions boiled down from the *Ohio Farmer*, written by Willis O. Wing, the great authority on the subject of alfalfa:

"Please do not make a mystery of alfalfa-growing any longer. It is such a simple matter that one can write all the rules needed in small space. Here they are: Drain the water out; let the air into the soil; fill the land with lime if nature did not do it; get humus into it—stable manure or some vegetable matter to rot and promote the life of bacteria there. Put in plenty of phosphorus. Sow good seed, with a little inoculated soil. Lime brings afalfa. Alfalfa brings corn. Corn brings money, homes, pianos and education for farm boys."

As to the production of vegetables nothing need be said, since it is hard to name a common garden variety which will not thrive on the glades.

As to the production of rice, sugarcane and tobacco the prospects are not so bright for the *small* farmer. They will no doubt all grow well in the Everglades region. In the case of rice considerable capital is necessary in order to compete with Texas and Louisiana, where machinery has materially lessened the cost of production. There is a large rice eating population throughout the world, and although the price may be low the demand is unlimited.

The development of sugar estates requires much capital, but the system of sugar production may change. Experiments along this line are now in progress in Cuba. The plan is to shred the cane, drying it and baling it with the sugar in it. In this form it is shipped to northern refineries. Thus handled they are able to get more sugar out of it and the bagasse which is left is fit for the manufacture of a coarse grade of paper. If this new system proves successful one farmer or at most half a dozen farmers could afford the necessary machinery and raise

-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

cane profitably even if there is not a big sugar factory in the vicinity.

Tobacco will no doubt grow in the Everglades, but I have never seen it tried to any extent. It is quite possible that it might be successful and yield a leaf of superior quality or something out of the ordinary like the Perique of Louisiana.

Cotton may also prove a valuable crop. The climate surely suits it and I have seen it growing elsewhere on soils of a similar nature.

Bananas may be successfully grown. The Cavendish variety seems best suited for the purpose. There need never be starvation in a region where bananas will grow. It is certainly one of the most wonderful food producers of the world. It has been grown successfully and of delicious flavor on the edge of the glades for years. It continually produces food from the same root and after the bunch is cut the chickens will completely consume the succulent stem and leaves.

The Everglades will grow many of the vegetables and forage crops of the North in midwinter, and in addition a long list of tropical trees, fruits and vegetables which cannot be grown elsewhere in our country, some of which are well known, but many kinds have yet to be tested. In another article I will mention some of the most promising of these, since in addition to food many of these tropical plants yield medicines, gums, perfumes, dyes, tanning materials, cabinet woods, etc., of more or less value to mankind.

All that part of Florida south of Ft. Lauderdale is tropical and has a tropical flora. It is the only part of the United States where the mango, avocado, sapodilla, anonas, etc., thrive and although many of these tropical fruits ripen in the summer time, they may be preserved no doubt into midwinter by cold storage.

The territory toward Cape Sable (Lower Glades) is still a wild and unreclaimed region. Its development has just begun, although its possibilities may be unlimited. The whole country needs people and capital, coupled with active enterprise. The tide is moving Southward and it is human nature to follow the crowd. Some will not stay and some will not succeed. Home-

003516

CORPS003527

1-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

sickness has killed more soldiers than bullets. Some people cannot cut loose from old associations and are not fitted for the life of pioneers. Others love it and are stimulated and improved by it. Only a certain percèntage can succeed at agriculture, anyway, anywhere, since although it is the most important, it is at the same time the most intricate of all professions. One must also have foresight and business ability to fight against soulless transportation companies and tricky middlemen. If one cannot prosper in agriculture in Southern Florida, there is little hope elsewhere in this line.

The newcomer cannot freeze to death, and unless hampered by illness and dire misfortune he cannot starve, because wild in the woods is comptie or coontie, a plant which yields a starch equal in quality to sago. This still serves people in remote districts and was at one time the mainstay of the settler. The waters teem with fish, and poultry thrives.

Although in the beginning there may be isolation and discomfiture, the man who works can make a living and a home such as cannot be made elsewhere in the United States in the same length of time and with the same amount of capital.

One thing is certain, if one is in search of a tropical climate and a place to grow tropical crops, he will settle in Southern Florida or go out of the United States, and if he goes out of the United States he will have to face conditions and people with which he is not familiar, and to which he can never become wholly reconciled and there will always lurk in him a desire to return to his country and his kind.

003517

CORPS003528

*From the Everglade Magazine.*

## CHAPTER VIII.

## VALUABLE TREES FOR THE EVERGLADES.

N THE following article I shall mention a few trees specially worthy of cultivation and certain to succeed on Everglade soil when drainage has sufficiently progressed to lower the water table three or four feet below the surface level. Some of these trees will stand submergence for a short time. Even grapefruit or pomelo will stand submergence in two or three feet of water for a period of a couple of weeks without apparent injury.

The following opinions are based entirely on my own experiences and observations. These are based on ten years of experience in the tropics, especially in Southern Florida, and fifteen years of experience as a forester.

Bamboo (*Bambos vulgaris*) is very abundant along mucky water courses in the West Indies, where it forms stately groves or thickets. Although there is not a fortune in growing bamboo it is highly ornamental and the poles are very useful on the farm. It is sure to become a great favorite for Everglade planting. The Government is now experimenting, and in a short time we may be able to select varieties especially fitted for fish poles, furniture, etc. Bamboo throws a dense shade and is fine as a shelter and forage for poultry.

Of the palm family the royal palm (*Roystonea regia*) and the coco palm (*Cocos nucifera*) are of first importance. The royal palm is native to Southern Florida. It loves a moist, mucky soil. It is a majestic tree for avenue or roadside planting. Its berries for pigfeed are equal to corn.

Although the coco palm is a lover of the seashore, it will

003518

CORPS003529

grow on moist soil several miles inland. Just how far it is difficult to say, but I have seen it growing in the West Indies ten miles from the coast. This tree and its many products are too well known to need description. It is sufficient to say that it is considered by many authorities to be, on the whole, the most useful member of the plant world. A home in the tropics, at least near the seashore, seems incomplete without it. Many nuts were planted years ago on our sandbeaches, and although many did sprout and grow, thousands were lost because the young, tender leaves of the germinating nut were devoured by rabbits.

Australia pine or beefwood (*Casuarina equisctifolia*) is second to none as a quick hardwood producer in mucky soil or in saline land along the coast. In my opinion *it is superior to any eucalypt that I know of for the production of hardwood lumber.*

Very few of the eucalypts produce first-class sawlogs in a short length of time. The eucalypt is not a sawlog proposition. I am upheld in this statement by Bulletin No. 61, Agricultural Experiment station, Tucson, Arizona: "It is not very likely that eucalyptus culture will ever prove a success as a *sawlog proposition* in any part of Arizona." I think I can safely say the same for this part of Florida. It is a pole, sleeper and fuel proposition and a California proposition. There is no reason why we should ever concern ourselves about fuel anyway. There is no danger of freezing to death in this part of Florida. The limbage alone will be sufficient; there will always be a lot of waste lumber, and then the coal supply of the Eastern United States is by no means exhausted. Plant for fine timber or other valuable products. The fuel question will take care of itself in the tropics.

We have several native trees belonging to the same family as the eucalyptus, and they are apparently quite as good. The rose-apple or pomerosa belongs to this family and is a magical fuel wood producer on the edge of streams in Cuba. It looks just like a eucalypt and yields an abundance of edible fruits. This tree would succeed on Everglade muck. I am growing

-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

another tree similar to the eucalyptus on muck soil. It is the cajeput of India. It is a beautiful tree, of very quick growth and yields the cajeput oil of commerce. This oil is used in India for rheumatism and I believe is the basis of some massage creams and hair oils.

My choice of all the softwood trees, which produce fine timber, are easily propagated from cuttings, free from disease, and grow with great rapidity, is three or four species of the genus *Cedrela*—the commonest of which is *Cedrela odorata* or Cuban cigar-box wood. The wood of this tree is worth more than mahogany; in fact, much of the so-called mahogany in the market belongs to this genus and is not true mahogany.

In the spring of the year stick a cutting, twelve inches long, of *Cedrela odorata,* Cuban cedar, *Cedrela toona,* the red cedar of Australia, or *Cedrela Brasiliensis,* the acajou of Brazil, in moist muck land and in six weeks it will have shoots on it six feet high. I have specimens growing at the rate of more than one foot a month. The trees resemble walnut trees and lead as softwood timber producers for tropical regions.

*Were I engaged tomorrow to plant a tract of land in trees for lumber on the Everglades I would plant Australian pine for hardwood and Cuban cedar for softwood.*

For quick growing, valuable shade trees I would like to recommend the Spanish laurel (*Ficus nitida*) and the Sacred Bo tree of India (*Ficus religiosa*). The wood of these trees is no good but they afford a fine shade, are very decorative and grow very quickly.

I think all the trees mentioned above will hold up in bad winds. On mucky soil one must select trees that do not blow over easily. That is a fault of the eucalyptus in this region. It probably would not happen if the tree could get deep rootage.

Another good shade tree for mucky soil is *Thespesia populnea,* called in Cuba the Florida mahoe (*majagua de Florida*), although not a native of Florida. It bears a beautiful flower and is easily reproduced from cuttings. A brother to this tree, called "maga" in Porto Rico, is one of the most beautiful trees

003520

CORPS003531

I have ever seen. I have not been able to get seeds or cuttings for Florida, but I hope to some day.

Speaking of fuel wood above, I think we have the best fuel wood producer in the world. It is the Florida buttonwood (*Conocarpus erecta*). This tree grows on the seashore. The wood gives out a great deal of heat and produces very little smoke. *It will now bring twice the price of any other fuel wood in Key West or Nassau.*

The sapodilla is a great favorite of mine. It grows especially in the hammock, but will, I think, grow well anywhere in the glades when drainage is complete. It is stormfast and tough, it produces a wood that is everlasting, a fruit that is good and salable locally, and a gum called chicle, which is in great demand in the manufacture of chewing gum. In fact, we are on the verge of a chewing gum famine, owing to the scarcity of this gum.

The mastic is a fine native hardwood.

Princewood is also a good wood. Its bark is a splendid tonic, containing quinine or a similar drug. It is worth while to plant a tree or two of this just to have a fine, unadulterated tonic near at hand.

In addition we have mahogany and Jamaica dogwood, well known native woods of excellent quality and in demand locally. Mahogany is ordinarily regarded as the "king of all hardwoods." I have sent samples of our mahogany, here called madeira, to England and France and experts there pronounced it of first quality for the manufacture of solid furniture. This grows wild on islands just south of the Everglades.

We have other woods of great value too numerous to mention in one article. In addition to the plants I have already mentioned, there are, of course, many tropical fruit trees and many ornamental shrubs and vines.

*From the Everglade Magazine.*

## CHAPTER IX.

## SOME COMMON FLORIDA PLANTS.

HAVE often been asked to recommend plants which will make good hedges for South Florida. For this purpose I know nothing better than Carissa or Natal Plum. There are supposed to be two species of Carissa in Florida—grandiflora and arduina, but I can see no difference. This bush is always a rich dark green. It has vicious thorns; it bears a sweet scented white flower and red plum-like fruit. It is easily reproduced by layering and may be grown from seed. It is best always to propagate from a heavy bearing plant, since it seems that all strains are not the same in this respect. When cooked the fruit makes a sauce hardly distinguishable from cranberry. The sauce is improved by the addition of a few chopped raisins. This plant bears throughout the year, and the sauce is welcome at almost every meal. I believe this fruit can be successfully dried or evaporated, as are dates, figs, raisins, prunes, etc. The home of this bush is South Africa, where it is effectively used for hedges. It seems to be perfectly adapted to Florida conditions.

Another good hedge plant is the lime. This yields the well-known "sour" of commerce which will in time no doubt replace the lemon. For good limes there is a growing demand and after one has become accustomed to using them he ever after spurns the lemon. No home in the tropics is complete without a few lime trees.

The same may be said of the guava, sometimes referred to as the "apple of Florida." The guava grows with little care,

1-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

fruits heavily and is perhaps the greatest of all jelly fruits. The ripe fruit has a smell which is at first detested by the newcomer, quite in contrast to the aromatic lime, but one usually learns to relish it, after a time, out of hand. Guava jelly brings many dollars to Florida and I know several small jelly factory owners who ship their products to every State in the Union and to England as well.

The Surinam cherry is a handsome bush. It yields an abundance of rich red cherries which are relished on a par with northern cherries by many people. It is of course in no way related to the true cherry of the North, and it has a slight resinous flavor, but it is a good substitute.

Around every home there should be many pigeon pea bushes. This is the cajan bush of India and Africa, now common throughout the tropics of the world. The peas are worth fifteen cents a quart. They make the famous pigeon pea or Congo pea soup. The negroes cook them green. They shade the ground, improve the soil, keep down weeds and deposit a rich leaf-mold over the surface of the ground. I plant them in my grove. Chickens, quail and doves are fond of the peas and they flourish in the shade, scratching for bugs and the peas which fall.

The Castor bean grows well in Florida and ought to be an extensive industry. There is good demand for the oil, and the pumice from the seeds is a fine fertilizer.

All of the above have been introduced into this State but are now perfectly at home here. Among our native plants we have many yet to try and to improve under careful cultivation.

Some time ago my attention was attracted to a little pea-like plant growing by the roadside. It reminded me of the white clover of the North and like the famous camomile grows the faster the more it is trod upon. I am testing it and think it will make a fine lawn plant. In looking up its name I find it belongs to the Indigo genus, Indigofera mineata, and this reminds me of the fact that indigo was once extensively grown in Florida before the days of aniline dyes and synthetic chemists.

In patches out in the Everglades there are many pond-ap-

003523

CORPS003534

ples. The pond-apple is the Florida representative of the great Anona family which includes many delicious fruits. Some people eat the pond-apple and I think I have seen it on sale in Mexican markets. The wood of the pond-apple is almost as light as cork, and may be used in place of cork for net floats, etc.

The pond-apple may prove a good stock on which to bud the famous Cherimolia, Rollinia, Uvaria and other choice, but little known, fruits of this order.

Nothing is commoner on islands in the Everglades than the Coco-plum. This is a beautiful small tree yielding a fruit which makes a fine preserve. There is great variation in the quality of the fruit. In many cases it is mostly one big seed but I have seen some that were large and meaty and well worthy of cultivation and improvement. It is not very distantly related to the peach, apricot, etc., being of the same family, and might be useful as a hardy stock for budding something of greater merit.

We have a wild West Indian cherry fruiting in our hammocks which might be useful also as a stock for budding purposes.

I have used above the word "hammock," the term applied in South Florida to a dense hardwood jungle. This is not the same word as "hummock," or the same as "hammock," a swinging bed, but is probably a word of local Indian origin, spelled in early times "hamak."

I will conclude this chapter with a few words in reference to the humble coontie or comptie, a little plant which grows wild everywhere in the pine woods, avoiding the wet places. The root of this plant kept the early settlers supplied with starch for bread, as well as the Indians before them. It was the main industry of this country in the early days. The starch from the root is still in demand. It is a sago. From it easily digested and nutritious biscuits can be made. In the wild state the plant contains prussic acid and is poisonous and for that reason is never molested except by man and the comptie fly, a beautiful insect which is immune to its deadly juice. Fire does not injure it, in fact helps to scatter the seeds, since the heat opens the cone-like head which holds them.

Cassava also grows like a weed in Florida. From its root a starch is made. If further treated this starch becomes the tapioca of commerce.

With its sunshine and its moisture, with its host of useful native and introduced plants, with its black mucky soils and light sandy soils, with its vast beds of phosphate holding great stores of the most precious of all plant foods, phosphorus, with its long coast line and canals and harbors to come, it seems to me that all this great State lacks is people with capital and energy to furnish fun and feed for millions.

*From the Everglade Magazine.*

## CHAPTER X.

## VINES FOR EVERGLADE PLANTING.

N THE development of a home in a tropical country there is no group of plants which give as much gratification as do the vines. They grow quickly, they afford shade in a short time, they occupy but small space, in fact space which would otherwise not be utilized, and in addition many vines yield products which are quite equal in value to other crops of forest and field.

They are in a peculiar way attractive, and to many people far more attractive than bushes and trees.

They gracefully cover unsightly places and clamber into nooks and corners, covering with a rich green fences and outbuildings and at times are a delight beyond expression when in the acme of their bloom. A poultry wire fence covered with vine is usually a more effective screen than a solid board fence and although the effect of complete seclusion is secured the air can filter through.

In the old world, where space is scarce, even fruit trees, such as figs, peaches, apples, lemons, etc., are grown on trellises. In this case the fruit is larger, brighter in color and of better flavor because of the abundance of light and free circulation of air which this form of culture provides. I have just received a postcard from a friend summering on the Austrian side of the Lake of Garda, showing lemons growing on trellises. The writer says: "I am sending this to you because I doubt if anywhere except here on the Lake of Garda lemons are trained against walls between pillars in this way. There is a lattice overhead and I suppose they can cover them in winter if necessary."

1-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

Suppose one owns only a small lot and builds in such a way that he has a central court or patio and suppose over this patio he builds a lattice and on this lattice he trains grapefruit or lime or orange, he would have an attraction that would afford himself and his family comfort, but above all it would be a sight which would hold a Northern visitor spellbound.

I know a man who owns a little one-story wooden house, covered with paper for a roof. This was hot in summer and he could not afford tiles or shingles. He built over it one foot or more from the roof a light lattice frame. He planted a quick-growing vine and now his house is actually roofed with a mantle of green. It acts like the double roofs so common in the Southwest. Between his house and the sun there is not only this roof of green but a current of air. It furnishes a nesting place for the birds and cuts out the bare, cheap look of a paper roof.

It would be impossible in so short a space to treat of all the vines which grow in South Florida, because they are legion, but some, in addition to being beautiful in leafage and flower, bear fruits of more or less value.

Probably few visitors to Florida realize that the vanilla vine is native, that it grows wild in our hammocks. It is slightly different from the vanilla of Mexico and South America and is almost leafless. It hangs pendant from branches like long slender green snakes. It was for a long time considered by botanists of the same species as the Mexican. In Small's Botany of the Southeastern United States it is called *Vanilla planifolia*. "In forests, peninsular Florida and tropical America, also widely cultivated." It is an orchid and might some day be profitably grown for the aromatic pods it yields.

The yam is a quick growing vine. Yams form one of the staple foods of many tropical peoples, especially in the East. The yam vine forms a root similar to a sweet potato but many times as large. I have seen a party of ten at dinner served with one-half a yam. There are many kinds of yams. They grow like mad in rich mucky soil and in addition to the shade afforded yield a food almost equal to a white potato.

003527

CORPS003538

-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

That strange fruit called the ceriman is really a vine. In its native state it grows high into the trees. It has big leaves with natural holes in them and produces a flower something like a big calla lily and a fruit the shape of an ear of corn. Its scientific name is *Monstera deliciosa.*

The passion vine is too well known to need description. It yields a fruit called the granidilla in tropical America.

The black pepper of commerce is a vine. Also rattan is a climbing palm and who knows but that both of these may grow in South Florida?

Some time ago over in the Bahamas I saw a man planting vines in the hammock for rubber. Several vines yield rubber of commercial importance. We have one native rubber vine, *Rhabdadenia biflora* (same as *Echites paludosa*), and the one which has been planted in the West Indies for rubber is *Cryptostegio grandiflora.*

*Pereskia aculeata,* the lemon vine—the Barbadoes' gooseberry—has already grown to be a favorite in South Florida. It belongs to the cactus family and produces an edible fruit.

Think of the gourds which yield such useful utensils. The chayote, a vegetable vine from Mexico, has fruited in Florida, but has never become popular.

Then there is the grape, some variety of which will no doubt do well here. One good scuppernong will cover an arbor a quarter of an acre in extent in the course of time. The Key grape is already common and wild grapes are abundant.

There are many morning glory vines in Florida. They are usually treated as weeds. One of our morning glory vines yields jalap, a famous medicine. Many are highly ornamental and furnish in addition honey for bees when other bee food is scarce.

The velvet bean and other vines of the family grow very rapidly and yield an abundance of beans and fodder.

We have one little vine—very delicate—holding tight to stone walls, soon covering the stone completely with a growth of dark green. It is *Ficus repens.* I heard a man once say that he wanted a stone house just to be able to have this vine

003528

CORPS003539

on it. Strange to say it is a *Ficus,* the same genus to which the fig, the common rubber trees and the great banyans of India belong.

And then there is a host of highly ornamental vines that one must learn to know before appreciation is possible—such as the night-blooming cereus, bignonias, christmas vine, jasmines, solanums, chalice flower, clematis, woodbine, Virginia creeper, roses, allamanda, antigonon, bougainvillea, tacomas, etc., etc., all of which enliven the landscape and render the barest weather-beaten, tumble-down shack a thing of beauty and a joy forever.

IN THE MIDST OF THE HAMMOCK ON KEY LARGO. IT IS IN THIS REGION THAT THE LARGEST MAHOGANY OF THE KEYS IS LOCATED. KEY LARGO IS THE LARGEST AND HIGHEST OF THE KEYS. THE PHOTO SHOWS THE LINE OF THE NEW RAILROAD TO KEY WEST. (PHOTO BY FLORIDA PHOTOGRAPHIC CONCERN, FORT PIERCE, FLA.)

003529

CORPS003540

*From Woodcraft, August, 1909.*

CHAPTER XI.

## MAHOGANY IN SOUTH FLORIDA AND THE WEST INDIES.

EFORE describing mahogany wood let me quote some statistics as to the quantity imported into this country and the value of the import. I don't know how reliable these statistics are. They are furnished by the Government and are probably approximately correct.

In 1908 41,678,000 feet of mahogany were imported into this country. Its value is given as $2,566,954, an average of $61.56 a thousand feet. This represents the price actually paid for it laid down in our ports, two-thirds to Atlantic and one-third to Gulf ports. Central America, Mexico and the West Indies furnished 65.5 per cent, South America 2.2 per cent, Africa 13.8 per cent, Asia 0.40 per cent, and 18.1 per cent came through Europe, mostly from England.

Mexico, Nicaragua, British and Spanish Honduras, Cuba and Santo Domingo furnish the bulk of the mahogany used in this country, and some which reaches us through Europe may have come originally from one of these places.

The value of mahogany from tropical America was $51.75, of that from Africa $51.13, of that from South America $52.79, all about the same, while that which came through Europe was worth twice as much, $105.78 per thousand, and that from Asia $88.63 per thousand. The great difference in the price is probably due to the fact that the wood was of special, selected quality.

Mahogany and other cabinet woods are often shipped to England and then reshipped. Only a hundred miles across the

Straits of Florida is the island of Andros in the Bahamas, a British possession. The same kind of mahogany is produced there that grows on our Florida Keys and near Cape Sable. This Andros mahogany has been shipped to England from time to time and I have no doubt that some of it crosses the ocean again to New York.

It easily may be seen from the above figures that up to the time the retailer gets hold of it, mahogany is not an expensive wood. It makes a great difference in this world whether one is buying or selling, and the difference between the price the consumer pays and the price the producer gets is very wide, especially on products of the soil. In many cases I have no doubt that there is fully $50 worth of hard human labor in almost every thousand feet of mahogany landed in American ports. There is small profit in it at this price.

Mahogany is usually scattered in a tropical forest and is often transported with the greatest difficulty over rough roads or no roads with the crudest kind of vehicles and other apparatus to the nearest shipping point. Some small logs are often carried by pack mules over slippery and precipitous trails, while the transportation of a log for a mile or more on the heads of three or four negroes is not uncommon.

One reads statements of the fabulous prices paid for mahogany. No doubt at times special logs will bring a high figure, but for years I have endeavored to trace every such statement to its source and I have found them all unreliable, exaggerated, or out and out figments of the imagination. Four or five months ago a popular American magazine published the statement, under the heading of "Notes," that two mahogany logs had sold in Liverpool for $1,500. I wrote to the magazine and it claimed it took the note from a newspaper. I wrote to the newspaper and it said it found the statement in a book on timber published in 1870.

Logs sometimes bring high prices, but I think it is safe to assume that it happens rarely. A large part of the tree is usually left in the woods anyway and if the wood had such value it would pay to make a special trip to the spot just to get the stump.

-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

It will be seen from the statistics quoted above that 34.5 per cent of our mahogany comes from South America, Africa, Asia and through Europe. Just what trees yield this wood I am, of course, unable to say. I am also, I think, quite safe in saying that nobody knows. There is a whole lot of wood which sells for mahogany, which looks like mahogany, and which brings just as much money as mahogany and may be just as good, but it is not all mahogany from a botanical standpoint. Nobody can tell the species of tree that yields a tropical timber by merely looking at the log. Without leaf, flower or fruit, or even bark, the naming of the tree which yielded the timber is simply the purest kind of guesswork.

English tramp ships are running to all parts of the world. They pick up here and there small lots of anything marketable. A mahogany log, using the term "mahogany" in a commercial and not a botanical sense, on the wharf of an English port may come from one of many places and may be the product of a tree which looks no more like the mahogany tree than a peach resembles an apple. Mahogany in a commercial sense applies to any wood that will sell under that head; in a botanical sense it applies only to *Swietenia mahagoni*. I have heard of expert mahogany dealers in England, and I presume we have the same in the United States, who can, as it were, look right through a mahogany log, tell to a surety the kind of grain it will yield and the country which grew it. There is not the man living who from the appearance of the log or the finished wood can tell whether it came from Honduras, Mexico, the Bahamas, Cuba, Santo Domingo, Asia or Africa. It is very much the same with coffees. Java, Mocha and Rio are very often picked from the same tree. Some time ago I sent a sample of Florida mahogany in the form of a block two inches square to a mahogany dealer. He wrote back that the sample "evidently came from a tree five inches in diameter. Please send sample from a tree two feet in diameter." I don't believe the man is living who can tell from a block of wood two inches square without sapwood or bark whether it came from a tree five inches or five feet in diameter or whether it came from the top of a large tree or from a

003532

CORPS003543

limb. The sample above referred to came from the heart of a large branch which had been reserved for boat timber. Close to a tropical seashore the limbs are usually much bent by the prevailing winds, but the wood is of very good quality and especially fine for boat construction.

The wood of the mahogany tree, in fact of every tree that I know of, varies very much, depending upon the conditions under which the tree grew. It must be borne in mind that the mahogany tree, although it cannot stand frost, will grow under other very adverse conditions. It will grow on hot coral rock on the Keys of Florida. Sometimes it is so close to the sea that its foliage is sprinkled with ocean spray. It will grow in parts of the West Indies where there is hardly a drop of rain for over six months at a time, and it will grow on steep mountain sides high up in crevices of the rock. In such places where the growth is slow, the wood is heavy and rich in color and grain. In warm, tropical valleys where there is an abundant and constant supply of moisture and where the tree is actually intoxicated with the very richness of the soil, its growth is rapid and the wood is light and of less value. In Florida it usually grows in hardwood thickets called "hammocks."

Some say that much of the mahogany on the market is really *Cedrela* or Spanish cedar. This may be so, since Spanish cedar from a tree which grows very slowly is hardly distinguishable from the wood of a mahogany tree which has grown quickly. Spanish cedar and mahogany trees are closely related, although they do not look alike. The mahogany looks something like a live oak, while the *Cedrela* or Spanish cedar looks like a *pecan*. From my own observations in the American tropics (Mexico, Honduras, Cuba and the Bahamas—there is no mahogany in Porto Rico) mahogany logs are cut for shipment at Atlantic and Gulf ports from the mahogany tree *Swietenia mahagoni*.

Color is perhaps the first quality in wood which attracts attention. We have in the tropics white, red, yellow and black woods—the same as in races. Many tropical woods are dark in color, in fact I think dark colors predominate, especially reds and browns. Mahogany is usually a rich reddish brown not

003533

CORPS003544

-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

unlike the color of the skin of a good healthy red Indian. According to an official color scale, 25 parts red, 64 black and 11 orange produce the shade called "acajou;" 85 of black to 15 of orange "mahogany," and 83 of black, 4 of red and 13 of orange form "mahogany brown."

There are floors in parts of the tropics made of plank cut from the log by hand and from such woods that the colors alternate red, white and black. I believe that a good, rich, reddish brown is a normal color at least for the tropics. In the races pure white is just as abnormal as jet black. At any rate a reddish brown color is a good characteristic. There are more bay horses than any other color, and in Spanish America they say, "A tired red horse is a dead horse," meaning, of course, that a red horse is so tough that he never gets tired. In my own experience red poultry and red pigs do better in the tropics than those of other colors. The tips of very tender foliage are usually red. This is especially so in the tropics, but is not uncommon in the North, as with roses, Virginia creeper, etc. There is a red liquid in the outer cells of the plant which probably serves the purpose of screening out the actinic rays of the sun.

Unless one has strong race prejudice, and one usually gets over that if he lives in the tropics long, a rich, healthy, brownish red complexion is the handsomest of all. Of course mahogany wood varies in color, but reddish brown is the standard. It must not be dull but full of luster. In some cases when finished it has a satiny look which adds much to its beauty. Its color should be a rich red, darkening with age. In some woods this luster reaches a stage called "fire." Cape walnut, called also cannibal stinkwood, for instance, according to Stone, "exhibits much 'fire' or phosphorescent luster." Mahogany is cold to the touch. Birdseye mahogany is not uncommon and is produced by scars due to sap-suckers. In the Bahama Islands the mahogany is often badly ringed by sap-sucker holes.

We look upon mahogany as a cabinet wood. In the countries where it grows it is used for every purpose that a wood can be put to, not excepting fuel. It makes excellent shingles

003534

CORPS003545

and was once used for this purpose in Jamaica. I believe that defective trees, limbage, etc., might still be profitably used for this purpose. A house shingled with mahogany would be handsome without paint or stain. It would surely last as long as any wood and might not cost much more than first-class cypress. Shingle billets could be easily carried from the forest on the heads of negroes. Although often used for floors it becomes very slippery.

It is a combination of useful qualities with beauty which has made mahogany famous. Its popularity is founded upon true worth. It is heavy, very hard, close-grained, very durable and takes a fine polish. It seldom warps, cracks or shrinks under trying conditions if properly seasoned. Many tropical woods crack badly when taken north, but mahogany stands all climates and lasts well under water if kept constantly wet. It is seldom attacked by wood-eating insects, but is invaded by wood-boring crustaceans if left too long on the seashore. It is mostly all heartwood. It usually has only a thin yellow zone of sapwood. Its only fault is the fact that it is hard to work. The annual rings which ordinarily make the grain of wood are often very indistinct in mahogany. In many cases they are not "annual" at all. Several rings or additions of wood may occur in a year. Many times what appear at first sight to be rings in tropical woods are merely bands of color.

Mahogany must dry a little in order to float well. Sometimes the trees are girdled on the stump, some time before cutting, and sometimes they are left to dry in the shade of the forest. In case one wants a fine grade of wood for boat building, "mud seasoning" is good. Thus buried in mud a slow osmotic seasoning takes place which produces a wood of very superior grade. The wood has no special taste or smell. It colors water red.

It was the first tropical cabinet wood used in Europe and for two centuries has had unabated popularity. It has figured more or less in literature but never more conspicuously than in the following short and charming ballad by Thackeray:

"Christmas is here;
Winds whistle shrill,
Icy and chill,
Little we care:
Little we fear
Weather without,
Sheltered about
The mahogany tree.

Once on the boughs
Birds of rare plume
Sang in its bloom;
Night birds are we:
Here we carouse,
Singing like them,
Perched round the stem
Of the jolly old tree."

The mahogany tree is strictly tropical. It can endure only a small amount of frost. Tropical Florida, south of Lake Okeechobee, is its Northern limit. It grows in the Bermudas, which are farther North, but owing to the position of these islands in the ocean, separated from the mainland by the warm water of the Gulf Stream, their climate is tropical.

It is of course a waste of time and money to try to grow mahogany in Northern regions. I mention this because I have received requests for seeds or young plants from Northern people. Although frost-tender, it is otherwise a hardy tree. It grows in all kinds of soils high in the mountains and so close to the seashore that it is sometimes killed by floods of salt water during severe storms. During a hurricane in Florida in the fall of 1906, mahogany trees a foot in diameter on the Keys were killed by the salt water which poured over all the lower portions of these islands.

In speaking of its hardiness, Rea, a surveyor of the British War Department, says: "The tree is of comparatively rapid growth, reaching maturity in about 200 years, the trunk exceed-

1-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 43

ing 40 to 50 feet in length and 6 to 12 feet in diameter. It is very handsome, with enormous branches of solid timber; and rather strangely, when it springs from low levels and rich soil the wood is most inferior, being poor in color, soft and spongy, and consequently almost valueless.

"That, however, which has been grown without nourishment on high levels, save what it derives from the atmosphere, is hard, figured, densely close in texture, as well as rich and deep in color, all qualifications which enhance its worth. It is also a curious fact that the tree does not seem to have any partiality, as it will flourish in low, marshy ground, or in a deep alluvial soil, or even on rocks to all appearance barren of earth; in fact wherever the seeds chance to drop. Its development is more rapid in the shade than in the open."

The above corresponds with my own observations, although I have never seen mahogany trees 12 feet in diameter. There are trees now standing on Key Largo, Florida, from 4 to 5 feet in diameter and I have seen trees in Cuba 9 feet in diameter. Many of these tropical trees are heavily buttressed and only carry such size a short distance up the stem. Such trees are often cut ten feet from the ground. Mr. Rea lived for four years in St. Lucia and his observations are probably correct.

Mahogany seldom grows alone in pure stand except perhaps in small clumps here and there scattered among a great variety of other trees. It seems quite able to hold its own and abandoned clearings usually show many young mahogany trees. The fact that it endures some shade permits it to grow where many other trees would never start.

In the forest it grows, of course, taller than in the open, but it nevertheless likes to spread as does the beech. Some mahogany trees which have been left for shade in pastures in the West Indies, especially in Jamaica, are truly magnificent in their spread, having a stately and sturdy look defying even the fierceness of tropical gales. Strange to say there is no mahogany in Porto Rico. I have heard of one or two trees on the island, but in the unsettled Luquillo Forest, now a federal reservation, I could not find a single tree. It grows in the island of Culebra,

003537

CORPS003548

only a short distance to the eastward, and in abundance in Santo Domingo, only a short distance to the westward.

It is hard to believe that it could have been completely exterminated on the island. I believe such must have been the case, however, since place names often give one a clue to the character of the primeval woods. For instance, there is a place called "Mangler Caoba Laguna Soroco y Grande." Mangler refers to mangrove, caoba to mahogany, and I presume mahogany once grew on the edge of the mangrove swamp or on islands in the swamp just as it does on the south coast of Cuba, Florida Keys and in the Bahamas. Although Cuba and Santo Domingo have been settled for about the same length of time, they have never had the population of Porto Rico. The scarcity of Spanish cedar on the island tends to strengthen the belief that both of these trees have been practically exterminated.

The mahogany is a prolific seed bearer and will grow in almost all locations with sufficient warmth and moisture. It is these qualities which enable it to hold its own in the majority of places where it grows. Browne in his "Trees of America," published in 1857, describes the tree fairly well as follows: "The *Swietenia mahagoni* is one of the most beautiful among intertropical trees. Its trunk is often 40 feet in height and 6 feet in diameter, and it divides into so many massy arms, and throws the shade of its glossy foliage over so great an extent of surface that few more magnificent objects are to be met with in the vegetable world. Its summit is wide and spreading, subevergreen, and adorned with abruptly pinnate, shining leaves. The flowers, which are produced in handsome spikes not unlike those of the lilac, are whitish, sometimes reddish or saffron color and are succeeded by fruit or capsules of an oval form about the size of a turkey's egg. The fruit ripens in early summer, bursts into five parts, and discloses its winged seeds, which are soon after dispersed by the winds; some falling into the crevices of rocks, strike root, then creeping out on the surface, seek other chinks or crevices, re-enter, and swell to such a size and strength that at length the rocks are forced asunder, to admit the deeper penetration of the roots and in this manner, in process of time,

increase to large trees." The flower is not conspicuous but the large brown hard capsule incites curiosity. It splits in five segments from the under side and the seeds, which are winged like maple seeds, flutter to the ground. On the Florida Keys these ripen in midwinter.

How the tree can get a foothold on some of these coral islands is wonderful. The rock is hard and hot at times and the soil is so scant in some places that I believe it would be difficult to scrape together a wagon load on an acre. Mahogany may be easily grown from seed and the young plants may be easily transplanted. Last winter was a great seed year (1908-09). Trees ten feet in height were full of seed. In places on the Florida Keys one could collect seeds enough in a few hours to plant hundreds of acres. It is a common saying that trees fruit heavily a year or so after a severe hurricane.

The State of Florida is now engaged in draining the Everglades. If this project is successful, and I can see no reason why it should not be, a large amount of land will be reclaimed and although much of this land will be too valuable for tree planting, there will, no doubt, be many acres better fitted for forest trees than for field crops. This land would probably produce mahogany to perfection. Some trees should be planted for shade at any rate. The mahogany trees frequently grow on islands in the mangrove swamps.

Florida mahogany has been shipped to New York. The trade did not like it, in fact they found all kinds of fault with it. The logs were too small, which was due to the fact that the big logs were too heavy to handle. They claim it had black specks in it, but Honduras mahogany often has gray specks in it. In truth Florida Key mahogany is just like the Andros Island product. If we were to ship it to Liverpool and then reship it to New York it would sell no doubt to better advantage. Andros Island is only about fifty miles away and very similar in almost every respect to the Florida Keys.

In speaking of Andros mahogany Rea says: "It grows to a large size but is generally cut to small dimensions owing to the want of proper roads and other means of conveyance. It is

-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

principally used for bedsteads, etc., and the crooked trees and branches for ship timber. It is a fine, hard, close-grained, moderately heavy wood, of a fine rich color, equal to that of Spanish mahogany, although probably too hard to be well adapted for the purposes to which the latter is usually applied." The above description applies exactly to the Florida variety.

It is commonly thought that hard, heavy woods grow slowly. This is not always the case. The northern black locust is a hard, heavy wood, but it grows very quickly. The same is so of some species of eucalyptus. On the other hand some soft light cedars grow very slowly. Mahogany is usually considered a slow grower.

If one counts the rings of a tropical tree and allows a ring to a year, as is common in the North, he is very apt to get fooled. He should first of all make sure that they are rings and not merely bands of color and then make sure that the tree in that special locality makes only one ring a year. Whenever a tree drops its leaves growth stops and a ring is formed. When a tree is rooted in a rich moist soil in a warm climate, it has no struggle except against its neighbors. It seems to do very much as it pleases.

In a paper read before the British Association for the Advancement of Science on "Foliar Periodicity in Ceylon" by Herbert Wright there is the following statement: "In studying the behavior of our deciduous trees, the most usual conclusion is that no law and order prevails and any tree drops its leaves how and when it chooses. There are, however, certain features which point to a climatic response, and others which indicate that the personal or internal forces are the chief agencies at work."

It seems strange to speak of the "personal" forces of trees, nevertheless the study of trees in the tropics, which is biological headquarters, leads one to the conclusion that they have, to say the least, many idiosyncrasies. Some trees will drop their leaves before and after the rainy season, some during the wet weather, some will throw out new leaves at certain seasons of the year regardless of the weather, and so on with similar peculiarities in

003540

CORPS003551

reference to flowering and fruiting. I have never seen a mahogany tree drop its leaves all at once unless when injured by flood or fire. Its foliage always looks the same. Sometimes it may be a little greener and there may be more young shoots at one time than at another, but its growth, judging from the appearance of its leaves, is practically continuous.

"When M. de Charnay visited Palenque in 1859 he had the eastern side of the palace cleared of its dense vegetation in order to get a good photograph; and when he revisited the spot in 1881 he found a sturdy growth of young mahogany, the age of which he knew did not exceed twenty-two years. Instead of making a ring once a year, as in our sluggish and temperate zone, these trees had made rings at the rate of about one in a month; their trunks were already more than two feet in diameter; judging from this rate of growth the biggest giant in the place need not have been more than two hundred years old, if as much." (The Discovery of America, Fiske, Vol. I, page 156.) The rings indicated that those trees were over two hundred and fifty years old, while in reality they were not over twenty-two and possibly younger.

In Vera Cruz wires are run from one tree to another on which the vanilla vine is grown. The vanilla vine grows wild in the hammocks of South Florida. It has never been developed commercially, but it resembles very closely the vanilla of Mexico. The mahogany tree is a favorite for this purpose. Cook, in his report on "Shade in Coffee Culture," thus speaks of mahogany: "It has been used for shade in cacao plantations in the Island of Guadeloupe, and according to Guerin, is preferable to *Erythrina Indica,* since it resists parasites, and the wood is valuable after thirty or forty years."

In Trinidad the planting of mahogany under forest conditions has been advocated by Superintendent Hart of the Botanical Gardens, who finds that under favorable conditions the annual average increase of thickness in the trunk is about one inch, and even in trees sixty years old or over is about nine-tenths of an inch. American mahogany has been successfully planted

in India. Even in Africa the mahogany forests are under the control of foresters.

A. H. Unwin, Forester, Benin City, West Africa, estimates that there are about 400 trees and 1,200 logs per square mile. This is less than one tree to the acre. In this region the mahogany is big, with large buttress-like roots, so that the tree is cut from platforms 10 to 15 feet from the ground. The ground is so soft and trees scattered to such extent that the logs after being squared are pulled by man power on rough rollers to the nearest stream. The timber is then rafted to the coast.

An important part of the forester's work in the Benin region is the planting and raising of seedlings to be planted to replace the trees cut. According to the old rule twenty seedlings are allowed for each tree felled.

A group of young trees is made near and around the stump of the old tree and seedlings are also put in along the hauling roads. In this way a future growth is assured. In three years one of the plants has attained a height of 20 feet and the average is even 15 feet. There is also a diameter limit but the figures are not given by Unwin.

The firms working these lands pay a royalty and export duty which is sufficient to pay the cost of the Forestry Service.

I once had the pleasure of traveling on the steamship Sokoto now running from Halifax to Mexico. She was formerly in the West African trade, oil nuts, mahogany, etc., and her officers told how the naked natives propelled these logs through the breakers to where they could be reached by the ship's launch. All this labor after dragging the logs from the forest to the shore by man power alone, then the long journey to England and perhaps to America, is evidence of the labor required to supply the market with this valuable wood from regions where men do the work of oxen and machines.

I have a sample of African mahogany secured in a wood-working establishment in Ottawa, Canada. It seems so light and soft and dull in color that I can hardly imagine how it could pass for mahogany.

1-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 43

In case any enterprising person desires to grow mahogany I would suggest that any of the following trees be planted with it at the same time, since the returns would be quicker. The planting of the following on suitable soil in a favorable location would no doubt in time yield handsome returns. Since mahogany endures some shade the mixture would be an advantage.

*Cedrela toona*—The "toon tree" of India and the "red cedar" of Australia. Wood light, soft, red, very rapid growth, a very valuable wood used for furniture, carvings, boxes, canoes, shingles, etc.

*Cedrela odorata*—"Cedro hembra," "Cuban cigar-box cedar" or "Spanish cedar." Wood similar to the above. Highly odorous and supposed to keep insects out of cigars.

*Cedrela Brasiliensis*—"Acajou." Wood soft, fragrant, red, easily worked. Trees of this species planted in Dr. Franceschi's garden in Santa Barbara, Cal., have grown with great rapidity.

*Gaurea trichilioides*, called "Gauraguao" in Porto Rico. This species closely resembles the above mentioned trees but the wood is not fragrant.

When the countries of the American tropics get over the revolution habit, when trunk lines of railroads get established and freight rates decrease, and when wood gets scarcer and of more value, there will be stronger incentive toward the proper utilization and regeneration of these tropical forests. There will be more careful exploitation with the future in view and not merely the utilization of a product which nature has given us. We are in the habit of looking too much to the Government to do things. In consequence they are never done. If on the average one man in every ten owns and properly cares for ten acres of timber land, there will never be any danger of a timber famine. It is up to the Government, however, to arrange conditions of protection, taxation and even transportation in such a way that private parties may feel safe in such an enterprise. The main function of government is to afford protection to property and life and to hold in check the greed of great corporations so that individual incentive, initiative and industrial activity may

003543

CORPS003554

have full encouragement and progress without interruption or onerous restrictions.

But when one tries such a commendable enterprise in the land of the mahogany tree he usually comes into sudden contact with high taxation, with sole concessions granted to other parties, thievery, incendiarism, shipping fees, brokerage, graft, high freight rates, dishonest commission agents, local uprisings and a host of other difficulties which the producer has to struggle against before his product reaches the consumer. There is the producer who with the help of nature makes the product at a small profit and there is the consumer who uses it, is glad to get it and pays high for it, but between the two is always a group who by hook or crook usually carry off the lion's share of the spoil.

Mahogany is quite common in Florida south of Biscayne Bay and the Everglades. Much of this territory extending southward to Cape Sable is little known. There is an area as big as the State of Delaware in a condition of pristine wildness. It is usually marked the Big Mangrove swamp on the maps and is not unlike the big Zapata swamp on the south coast of Cuba.

When I use the term "swamp" I mean it in the Southern sense, namely, a low, wet, but wooded area. Here and there in these swamps are slightly elevated portions or islands. On these islands there is usually a rich hammock growth. In these hammocks mahogany is common, in fact in one place it predominates to such extent that the place is called "Madeira Hammock" or "Island."

Forest land in tropical Florida may be divided into pineland, hammock and mangrove swamp. There are hammock islands in the Everglades, there are patches of hammock here and there in the pine woods, and some of the Florida Keys are covered or were originally covered with a heavy hammock growth. The hammock in this part of Florida consists almost entirely of trees of the Antillean flora, trees which grow here and are native here, but many of them do not reach their optimal growth in this section. This part of Florida corresponds very closely with the Bahama Islands.

The presence of hammock growth here and there may be explained in two or three ways. The hammock may be the climax forest. Suppose we have a bare parcel of land; suppose the various forces of nature scatter seeds over this area; suppose there are no retarding influences of any kind such as flood or fire or insect invasion, this land would according to some authorities become in time and remain a hammock growth.

If fire swept over the territory, it would soon be covered with nothing but pines and a few other trees able to withstand some fire. If floods of fresh water covered it frequently, it would remain a saw-grass country with perhaps clumps of cypress, saw palmetto and a few other trees here and there. If floods of salt water covered it, it would become a mangrove swamp. It is true that hammock growth is gradually working into the pine land and into the mangrove swamp, but I lean to the opinion that the soil where the hammock grows is richer—richer at the start mainly because of the nature of the rock which disintegrates to make the soil.

In many parts of the tropics there is a so-called limestone which, when it disintegrates, yields a poor soil. This is in truth not a limestone but a sandstone, the sand being cemented together with a little lime. Wherever a pure limestone disintegrates it yields a rich, reddish soil on which hammock grows. When a calcareous sandstone disintegrates it yields a poor soil on which the Caribbean pine predominates. A limestone soil is usually good. Grain and fodder from such soil is rich in bonemaking ingredients and in turn the people of such soils are usually big-boned and rugged.

When I said above that the land in South Florida between the Florida East Coast Railroad and Cape Sable is unexplored, I meant that it had never been surveyed and properly mapped. The islands are indefinitely marked and the water courses are merely indicated by dotted lines. Men have been all through it over and over again. Some new travelers go into the region now and then, and when they look around and see no human beings or signs of human beings they conclude that they are discoverers



IN THE MANGROVE SWAMP. THIS TREE GROWS IN SALT WATER AND IS A GREAT CONSOLIDATOR OF MUDDY SHORES AND A PROTECTION IN TIMES OF STORM. (PHOTO BY HOMER SAINT-GAUDENS.)

walking on land where the foot of white man has never trod before. But plume hunters, prospectors, scientists, etc., have been there.

It will be a long time before mahogany is exhausted in this region owing to the unsettled nature of the country and its inaccessibility. The drainage of the Everglades may some day lower the level of the water throughout this whole region. Even if it lowers it only a few inches it will increase to a great extent the area where mahogany can grow.

Over in the Bahama Islands, what we call the hammock is usually referred to as "bush" or "scrub." This land is the "provision land" where the bulk of the crops is grown. Here the terms bush and scrub are applied, very much as in Africa and Australia, to forests of considerable size, especially when there is a thick undergrowth.

The Bahamas belong to Great Britain and there is mahogany on almost every island, but the largest quantity is on the largest and least settled island of Andros. These people have made good use of this mahogany at home in furniture and boat construction. Labor is cheap there, but if the negroes continue to emigrate to Florida as fast as during the past winter it will soon be scarce.

Mahogany is seldom shipped north from Florida or the Bahamas because it is worth at home as much as it would bring in Northern markets. There is no mahogany in Porto Rico, and there is very little in Jamaica, so that Cuba and Santo Domingo are the two islands which have the most of it and which ship the bulk of all the West Indian mahogany in the market.

I have been over a large part of Cuba several times and I believe Cuba has very little timber of any kind to spare. There are great areas devoid of timber. One hears of vast tracts of virgin timber, but they usually dwindle in size and density the closer one comes to them. The Spanish and American ideas as to quantities of timber are often at variance. I know of no place where forestry is more needed. Cuba exports mahogany and imports yellow pine. She practically trades mahogany for yellow pine.

Cuba is not all a tropical land of luxuriant vegetation. There are miles after miles of pine-covered sand land in Pinar del Rio. The time is practically at hand when Cuba can use every stick of timber she cuts right at home. With a population of over 2,000,000 and a strong emigration from Spain there is necessity for conserving all available timber. The houses of the well-to-do are now mostly made of brick, stone and tile, while the natives depend almost entirely on poles and palm thatch for building material.

Santo Domingo is therefore left as the main source of West Indian mahogany for the future. In this beautiful island is concentrated all that is good and bad in the West Indies. It has the highest mountains, the deepest valleys and the richest soil and vegetation of the Antilles. It was the first place to be settled in this continent, the last to be developed. It is here that mahogany is most abundant and of fine quality. The land is rich in minerals, with a fine climate, or in fact many climates, with a thin population, with some poor pine land, but much of it is rich soil and as virgin in appearance as when Columbus landed. It consists of the famous Haitian Republic and the Republic of Dominica. Conditions in this island are by no means as bad as painted, and even Haiti, the Black Republic, has not been as complete and dismal a failure as is often represented.

Some very valuable timber concessions have been granted by the Haitian Government within the past few years. The following quoted from the New York *Sun* corresponds exactly with what I have heard from travelers who have visited the interior of the Black Republic:

"That the country is sadly misgoverned by her politicians there seems, however, no reason to doubt. On the other hand Haiti pays the interest on her bonds, encourages education by liberal grants, protects foreigners, and of late has welcomed the exploitation of her natural resources by American, English and German capital. The hospitality of the country people, their sterling honesty and natural kindliness, are vouched for by all travelers who have disregarded the ogrelike reputation of the

people and penetrated the interior. In the cities the stranger can always look to his consulate for protection. In short, Haiti is not as black as it has been painted, but we would not venture to predict that the feuds of her politicians will not ultimately compel intervention for the general good and the interests of other nations."

I have never visited the interior of either Haiti or the Republic of Dominica, but judging from what I have seen merely from the coast towns and in sailing along its shores, it is one of the most beautiful and varied spots of earth. Both Haiti, now a republic in control of negroes, once a French colony, French being still the common language, and the Republic of Dominica, once a Spanish possession, now independent with the United States Government in charge of its custom houses and with Spanish the common language, have had the most checkered history possible to imagine.

I think the time is near at hand when there will be established a West Indian trunk line of railroad. The people of Florida are beginning to realize this when they see trainload after trainload of Cuban pineapples pass their doors. The Florida East Coast Railroad will soon be completed to Key West. If the car ferry from Key West to Havana is successful, sugar and other products will come direct from the plantations along the Cuban lines to our Northern markets without breaking cargoes. A trunk line of railroad now runs to the eastern end of the island. Another short car ferry would reach Haiti. By using lines already constructed Haiti and the Dominican Republic could be tapped at slight expense. By making another car ferry to Mayaguez, Porto Rico, and using the railroad already in operation to San Juan, this West Indian trunk line would be complete. When this happens, and I can see no reason why it should not happen, many fine forests of rich tropical woods will become available and will be shipped direct by rail into this country. Owing to the lack of roads, etc., it is impossible to get much of this timber to the coast. Even in the Dominican Republic, where timber is still comparatively plentiful, it costs $30

-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

per thousand or thereabouts to deliver mahogany at the ship's side.

The largest portion of the Dominican and the Haitian republics is covered with forest. According to an official report there are over 6,000,000 acres of hardwoods in Santo Domingo, among which mahogany ranks first, and mahogany from this island ranks first in quality.

Santo Domingo has broad, high plateaus with cool climate where it is claimed wheat, oats, rye, apples, pears and strawberries thrive. Loma Tina, 9,420 feet above sea level, is the highest peak in the West Indies. There are large quantities of Spanish cedar, also pine and "sabina," sabina being the Spanish name for our Florida pencil cedar. The silva of Santo Domingo is undoubtedly richer than that of any other West Indian island. These forests yield gums, resins, medicines, etc., and I have been told that cinchona, the tree from which quinine is made, grows in the mountains. Our vice consul from Puerto Plata writes as follows in reference to the hardwoods of Santo Domingo:

"Those chiefly exported are cedar, mahogany, lignum vitae, lancewood, fustic, greenheart and mora. The largest diameters procurable are, in cedar, 60 inches; mahogany, 35 inches, and in lignum vitae, 10 inches. On the northern side of the island quantities of large timber can be procured about 10 miles from the railroad. It is expensive to draw out the wood. There are no roads, and paths have to be cleared through the forests. The people usually drag the logs with bulls, but the more intelligent use two large wheels on an axle, on which they hang the timber. Roads could be made in the woods for wagons, but as this would be expensive it would all depend on the extent of the enterprise.

"In some sections there are rivers on which the logs may be floated, but one has to wait for a freshet, which often delays three years. The facilities and price of getting out the wood depends entirely on the location. Where one owns the trees, the medium cost of felling, squaring, hauling from forest, railroad freight, and delivering alongside ship is about $30, Ameri-

003550

CORPS003561

can money, per 1,000 feet (mahogany or cedar). Trees can be bought standing at from 25 cents to $1 per tree, depending on the size, condition and location. It is preferable to purchase the right to fell over an extent of land, first going over same to estimate the amount of timber that can be gotten out, or one can buy it at the rate of $5 per 1,000 feet.

"A foreigner who attends to his own business is perfectly safe, both in life and property. The only inconvenience that would be experienced is that his laborers will leave him when a disturbance is going on in the district where he may be working, to avoid being impressed either in the government or revolutionists' ranks. After this danger is past they will return to their work. For this kind of work, laborers can be procured at $1, American, per day. The price of labor is higher in this class, for it is considered harder than the ordinary run and as requiring more skill."

Some time ago I sent a sample of Florida mahogany to Herbert Stone, a wood expert and an officer of the Association of Economic Biologists. Aside from his scientific knowledge of the subject Mr. Stone has operated a business in Birmingham, England, in which many varieties of wood were handled. The following is his reply in reference to the sample sent. The sample was cut from a tree on Elliott's Key, Florida. The tree grew close to the sea, in fact was killed by a severe storm in October, 1906:

"The piece of mahogany is most interesting and valuable. It is precisely the same as the specimen I have, named Caoba, except as regards depth of color."

The specimen he refers to marked Caoba is described in Stone's "Timbers of Commerce." This specimen came from Mexico and is a type specimen received from the Royal Gardens, Kew, being one of the series of Mexican woods exhibited at the Paris Exposition of 1900 by the Mexican Government. The specimen was marked, "Caoba: Nombre Scientifico, *Swietenia mahagoni.*" The alternative common name given is "Bois d'Acajou à Meubles," seeming to indicate according to the French view that this wood is especially fitted for furniture construction.



A COOL TILE-COVERED BUNGALOW IN SOUTHERN FLORIDA—COMBINATION WOOD AND STONE WITH LOTS OF WINDOW SPACE.

A SHINGLED BUNGALOW, SOUTHERN FLORIDA.

1-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

*From the Everglade Magazine.*

## CHAPTER XII.

## BUNGALOW CONSTRUCTION IN SOUTH FLORIDA.

INCE coming to Florida, almost ten years ago, I have been designing and building bungalows. During this period there has hardly been a time when I have not been altering an old one or planning or building a new. All the while I have been striving to produce something perfectly adapted to the environment. Long before I could finish one I would discover changes that would cheapen the cost of construction or add beauty or comfort to the structure. I disregarded all precedent, had difficulties with mechanics who would persistently do things the old way until finally I found myself doing most of the work with the help of a couple of negroes, who were willing workers but who could neither see straight nor saw straight.

In this part of Florida we sometimes begin at the beginning by cutting the trees and hauling the logs to the mill. The soil is lime rock, some of it loose, but much of it solid. This is good building material and by blasting, a lot of it may be secured on a small space for house walls, fence walls and roads in the process of clearing the land. The holes when filled with trash and rakings are fine for bananas and papaws. By building a kiln of wood and the proper kind of rock a fairly good quality of lime may be secured at a very low figure. With wood, stone, lime, sand and water all off the very lot you are building on, the house becomes in truth a product of the land.

The next step is to buy a galvanized iron pipe and a cheap pitcher pump. A twenty-foot length of pipe and sometimes much less is ample. A coupling is put on the end of the pipe. One edge of this coupling is filed or pounded sharp and opened over the beak of an anvil for a cutting surface. By churning this

003553

CORPS003564

-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

pipe up and down through the soft, white rock with the help of a little water two men in a few hours can have a pump in good working order—pump, pipe and labor not costing more than a ten-dollar bill.

A pile of planed lumber, costing about $22 per thousand, a case of dynamite, with caps and fuse, and with plenty of lime and water, all is in readiness for business. I find it pays to mix some

A FAVORITE TYPE OF HOUSE IN THE TOBACCO DISTRICT OF WEST CUBA, WHERE CLIMATIC CONDITIONS, VEGETATION, ETC., ARE SIMILAR TO SOUTH FLORIDA.

cement in the mortar and cement is now so cheap that the increase in cost is slight. The center of a thick lime-mortar wall does not harden for a long time. A little cement therefore helps to stiffen it. By building low of rock and timber and by giving the main lines of the structure the right proportions and sharp outlines to produce contrast, the house appears to grow out of the land and when surrounded by vines and shrubbery becomes in fact part and parcel of it.

003554

CORPS003565

The natural conditions to be considered are long, dry periods, continuous sunshine for months, very heavy rains and strong winds at times, which drive water in a fine spray through the smallest chink.

This calls for tight, cool, solid, low structures. I should add also that the well water is hard and cisterns are necessary, so that the roof must be of a material that will not taint or discolor or render impure the water.

Although a forester by profession, I do not believe that the

A CUBAN "BOHIO"—A HOUSE BUILT MAINLY OF PALM THATCH.

earth rotates upon a wooden axis, and I realize also that wood has been used in the past for many purposes merely because of its abundance and cheapness. It is, however, in the end an expensive constructive material if we consider the cost of paint and repairs, the danger from fire and the tribute we pay to fire and insurance companies.

The appearance of it is, however, good and although rock in this section is as cheap at the start, even considering the low price of lumber, many prefer the effects gained by a combination of both.

-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

I have used cement blocks, concrete, paper roofing, corrugated iron, shingles, tile, etc. I have even used old barrel staves, cut in half, for shingles. When one lives near the shore there is a possibility of collecting a lot of valuable drift lumber. I have captured ash, mahogany and Spanish cedar logs adrift in the bay. The tile in my hearth came from the floor of the engine room of a wrecked steamer. The wrecks often yield brass hinges, etc., which are difficult to get in any other way. The enterprising beachcomber can usually find many useful articles along the

TYPE OF BUNGALOW SUITED TO THE CLIMATE OF SOUTH FLORIDA.

shore and the waste of lumber on the beaches is enormous, since it is soon riddled with holes and rendered useless by borers of various kinds.

Since the roof is half the building, let me dispose of it first. Paper roofing or felt roofing is not very durable, it taints the water and looks cheap at best. Few people desire it as a permanent roof cover, although if carefully put on and frequently

003556

CORPS003567

1-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 45

painted, it is tight and lasts longer than one would expect under the trying conditions of the tropics.

We have no snow, of course, and steep roofs are therefore unnecessary; in fact the roofs I have built have grown flatter until I have now reached the flat roof stage. A flat roof is easier to build, requires less material and in heavy rains and high winds much of the water blows off instead of into the house.

Shingles taint the water, curl up and open up in the hot sun so that the rain beats in and insects find a fine harbor under

them. Corrugated iron is hot and noisy, although extensively used everywhere in the tropics, because it is cheap and quickly put on. It is tight and yields good water. Covered with concrete it forms a fine roof. Tiles are beautiful and cool, but they are seldom tight and since they are usually elevated on strips a couple of inches above the boards of the roof they form a fine harbor for rats and other vermin. If every crack is cemented

003557

CORPS003568

an enterprising tropical rat will work at a tile till he loosens it. In time he will succeed in pulling out cement enough to squeeze through. Then he has lovely quarters. He could not be safer from intrusion.

I no longer build large houses. I have adopted instead the unit system on the bookcase plan. Each unit measures twelve by twenty-two or thereabouts. These can be built around a central court in any number to suit the size of your family, your lot and your bank account. These may be connected by "blow-ways" or "dog trots" or "pergolas" or "galleries" or "porches." I was working toward this plan when I struck the following

CISTERN
LEADER FROM ROOF
CONCRETE SLAB OVER CISTERN
WINDOWS, COVERED WITH COPPER WIRE FOR VENTILATION, BIG ENOUGH TO CRAWL THROUGH
BODY OF CISTERN
PIPE AND SPIGOT
FLOOR OF COURT
CONE SHAPED BOTTOM

in an article on Chinese art in the International Encyclopedia: "A Chinaman's house, if he is a rich man, is a group of small one-story buildings interspersed with gardens, all within a bounding wall."

That fills my bill exactly, and I am neither Chinese nor rich. The cost of a unit is about $200 and each unit ought to be rentable almost anywhere at $5 per month. Suppose one owns only a small lot. Place a unit on each corner. Connect the units with pergolas and close the spaces open to the street with an attractive wall. In the center one would have a spacious patio.

003558

CORPS003569

In the patio is the place for the cistern, which should be built above ground. If above ground the water may be completely drawn off at any time by means of a spigot. The bottom of the cistern should be cone-shaped, with the apex down, from which the pipe leading to the spigot should start. In that way every speck of sediment may be drawn off at any time.

In the tropics the cistern should be screened and well ventilated. It is cooler above ground than below it. Pump water is always warm in cool weather. If the cistern material is slightly porous all the better. The evaporation will cool the water like a Spanish olla and on the basis of the iceless refrigerator. It is necessary to screen out the mosquitoes since cisterns are their favorite breeding places.

The flat roofs are fine places for solar heaters. A flat tank on the roof into which water may be pumped by hand with a small force pump in a sunshiny climate yields fine, warm water for bathing if covered with glass sash.

The following is a brief discription of how I build a unit house: I lay up a narrow wall of rough stone (12x22 feet), a foot or more above the ground. I usually build against boards and pile in mortar and rock. This enclosure I fill with rock, which is packed and pounded down solid. Over the surface of this I lay a cement floor.

On the cement floor I set up frames of 2x6-inch stuff, each frame 8x8 feet, two frames on each side and one at each end.

-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

This leaves room for three piers on each side. These piers are triangular in shape, showing two feet on each face on the outside. They are constructed of concrete, one part cement, two sand and four blasted rock. This mixture is thrown in a wet state inside of rough pier forms.

By making these piers triangular they are strong; it gives a fine space inside for hanging a mirror or picture or for shelves and it avoids sharp corners in the house. The tops of the 8x8 frames serve as a plate on which the roof beams rest. They rest also on the tops of the piers.

All roofs in the tropics should have a good overhang. In early times on this coast houses were built with practically no

eaves. They saved lumber and felt safer in times of storm. Eaves throw the water from the house and shade the walls, thus rendering the house much cooler, since the secret of keeping cool in the tropics is keeping in the shade and in good ventilation.

On top of the roof-beams I lay corrugated iron. Boards may be used instead between the beams and afterwards removed. On this I lay four inches of concrete reinforced with poultry fencing, barbed wire or common galvanized wire of any kind. A rim of cement serves for a gutter and the slope is left to one corner or to the middle of one side. Thus iron gutters are dispensed with. This roof forms a pleasant mirador and a second story may be put on in the same way if the owner desires.

003560

CORPS003571

The main part is complete—the finish is easy. A Tropical house should have many openings so as to be all-porch in hot weather and yet tight as a drum in times of storm. Tongue and groove stuff shingled on the outside is good. I use narrow shingles (three-inch) and put one nail in each shingle. A small shingle when it contracts makes a smaller crack than a wider one and if only one nail is used it is less apt to split in the process of expansion and contraction. I prefer shingles and up-and-down boarding to clapboards, since then the rain drips or runs down with the grain of the wood. Good copper screening is necessary, but glass is often dispensed with, solid board shutters being often used.

Such a building is cool and cheap. It has no large timbers in it. It is anchored to the ground by stone pillars and a solid

slab of a roof. One of the corner piers may be made hollow for a chimney, and a fireplace is pleasant since there comes a time in almost all tropical countries when a fireplace fire is grateful.

Such a house looks plain and solid—Assyrian or Zuni-like in character—quite in contrast to many of our ornate, ginger-bread carpenteresque constructions, but the shubbery in the patio and the vine-covered pergolas and fences with many shades of leaf and flower give it all variety necessary. These units may be connected with a fence and the following I have found to be very good and not very expensive: Put up posts ten or twelve feet apart, five or six feet high and one foot square, built in a form of the same kind of concrete mentioned above. Connect these with a wall two or three feet high. Run

a 4x4 railing along the top of the posts and fill the space with poultry wire. This is "horse high, pig tight and bull strong," and is at the same time attractive and fine for vines. These unit houses cannot properly be called bungalows, since a bungalow is supposed to be a low, flat, rambling, wooden structure, often with a thatched roof in the East Indies, but the term in America

now covers a multitude of sins. One of these unit houses I have built for a garage, but prefer to call it an "autola." One unit may be used for a kitchen and lavatory. In case the baby is cross or some one snores it is easy to relegate them to the units in the farthest corner of the patio. In conclusion let me add that no place, however small, is complete without a place

003562

CORPS003573

for animals of various kinds, the houses for which may be built in the same way around a central court. Then, too, many people are fond of pigeons. I have built a dove cote twenty feet in the air on top of four posts put slantwise in the ground. Two feet from the ground I have built a floor of boards which serves as a roof for the ducks and a floor for the hens. Six or eight feet higher up I have built another board floor, which serves as a roof for the chickens and floor space for pigeons. The whole is enclosed in netting. The pigeon house has a hole in the center underneath so that they can enter their department from below and thus be safe from intruding hawks.



A UNIT HOUSE IN PROCESS OF CONSTRUCTION. CONCRETE ROOF AND CONCRETE FLOORS. THIS HOUSE CONSISTS OF THREE UNITS JOINED TOGETHER ON A TRIANGULAR LOT. VIEW FROM SOUTHWEST.
(PHOTO BY KAUFMAN, MIAMI, FLA.)

003564

SAME HOUSE—VIEW FROM NORTHWEST.

*From Southland Magazine, 1910.*

CHAPTER XIII.

## THE EVERGLADES OF FLORIDA.

OUTH of Lake Okeechobee, reputed to be the largest body of fresh water wholly within the confines of the United States except, of course, Lake Michigan, is a large tract of marsh land, called the Everglades. A glade is usually defined as a grassy opening, strip or lane, between growths of trees. There are many such little glades between the long pine-covered ridges which jut out into what the natives designate the main or Big Glades. This is, no doubt, the meaning of the word Everglades, the term *ever* signifying *all*, or wholly glade or grassy, with few islands—in short, mile after mile of low grass morass.

This territory is all south of latitude 27°, the same latitude as the valleys of the Nile and Ganges, and is the only part of the mainland of the United States with a tropical or Antillean flora, for although a part of Texas is also below this same parallel, the land is more or less arid, and there is no great body of warm water to the northwestward to temper the cold winds from that quarter. We may safely say, therefore, that the Everglade region is the only part of the mainland of the United States which is truly humid tropical, the only place where tropical crops can be successfully produced without irrigation, although irrigation is desirable in almost all tropical countries.

The warm trade winds reach us from the West Indies, so that climatically and botanically we are in the same class with Western Cuba and the Bahamas, and, although it is a little cooler here in winter, it is all the better, since cool weather, up to a certain point, of course, produces quality in fruits and

vegetables—that is, richness of flavor combined with firmness, permitting shipments long distances.

The Everglade region is over three million acres in extent, fully as large as Porto Rico or Jamaica. From the center of Lake Okeechobee to Miami is at least a hundred miles, and southward to the shore of the Bay of Florida is fifty more.

Although there are patches of sand and marl and rock, the soil of the Everglades is mostly black muck, the result of ages of decomposition of vegetable matter. Reclaimed muck lands throughout the world usually have great productivity, and, therefore, high value. The fact that these muck lands are in a region where tropical fruits and tropical staple crops, such as sugar cane, as well as Northern vegetables, grow in midwinter, gives this region an added value over muck lands elsewhere. I spoke above of "Northern vegetables," but we must not forget that the original home of many of these was in the Southland.

This vast area of mud sloughs is usually completely inundated for several months of the year. It is a weary waste of saw-grass, through which neither walking nor boating is satisfactory. Remove the water, burn off the saw-grass, and the aspect soon changes. The cool breezes sweep over it; it is a broad, level prairie; other grasses and wild flowers appear. With teams plowing and cattle pasturing, it would look not unlike the low countries of Europe, which the enterprising Dutch have wrested from the sea, nor unlike the prairies of Louisiana which our own people have reclaimed by holding the mighty Mississippi in its course. Although the whole body of the Everglades is considerably above sea level (Lake Okeechobee 23 feet), the water could not escape to the sea, because of sand dunes and a rock rim around the edges. This rock rim, although usually called limestone, is in reality in many sections a calcareous sandstone, and was once no doubt mobile. It was blown in by the wind in the form of a dune and afterwards hardened into rock called Miami oölite. These dunes, just as has happened in other parts of the world, notably the Landes of France, choked up the rivers, caused inundation, and this in turn caused the formation of muck and bottled up a great mass of

fertility for future use. Before this dune hardened many streams succeeded in working holes through it, and this explains many of the subterranean channels to the bay and ocean. This dune formation and wind origin of limestone ridges is no fairy tale. Go to Eleuthera, in the Bahamas, and other places of a like nature, and you will see it in all stages.

It is worthy of note in passing that just to the west of the Everglades are great deposits of phosphate, the remains of sea animals, rich in phosphorus, the scarcest and most precious of plant foods, in fact, also animal foods, since foods deficient in it are deficient in bone-making qualities. One-third of the world's phosphate supply is here in Florida, and in time the fertility of the great agricultural soils of the world will be measured by the amount of phosphorus available. It is more than likely that phosphate beds will be found in the Everglades.

On the south the Everglade region is bounded by a little-known section, usually marked on the map the Big Mangrove Swamp. Much of this section has never been surveyed, and less is really known about it than is known of Angola or Quintana Roo. On the maps the stream courses are usually marked with dotted lines. Some maps show White Water Bay as a big sheet of water; others don't show it at all. In this region there is considerable hardwood, even mahogany, locally known as madeira. It is so common in one place that it furnishes the name "Madeira Hammock." This madeira is the true mahogany, *Swietenia Mahagoni*, and samples which I sent to London experts were pronounced first class for solid furniture and appeared identical in character with a specimen of mahogany, or *Caoba*, which was sent by the government of Mexico to the Paris Exposition.

On the northwestern edge of the Everglades is the Big Cypress Swamp, one of the largest and finest bodies of cypress timber left in the South.

The drainage work now under way and certain to be completed within a short time, since the work is in charge of a competent engineer, and the contract has been let to a Baltimore firm accustomed to handling such big enterprises, is being paid

for by the sale of lands. The question of drainage resolves itself into two factors, all a matter of digging through mud and rock, opening the outlets to the sea and lowering the level of Lake Okeechobee. For example, suppose we have one big plate representing the Everglades as a whole. Inside this plate on the edge to one side is another very much smaller plate, representing Lake Okeechobee. Flowing into the small plate is a large quantity of water from another watershed. The small or Okeechobee plate spills over and in the course of time the Everglade plate spills over its rim into the sea. I have seen the water rise at the south end of the Glades without any rain or signs of rain. But it had rained up the State and filled to overflowing the Okeechobee plate. Of course, there are local rains which come quickly and heavily; in fact, there are rains called "glade rains." In the summer I have seen it day after day raining on the Glades, while the bay shore was suffering from drought. What passes away through underground channels and what passes away through evaporation and transpiration is probably quite equal to the precipitation, and I have always believed that if the excess from Okeechobee could be disposed of, floods would be seldom and of slight duration in the Everglades. The rivers which run into the sea are narrow and clogged with rocky bottoms. Two or three streams of considerable size disappear on the edge of the Glades and appear again in the form of big springs on the edge of Biscayne Bay.

There were attempts at drainage in times past, but they did little good. To be sure, they lowered the water a little and increased the zone dry enough for cultivation around the edge and permitted earlier cropping, but these attempts were like nibbles at a big project which had to be complete throughout and on a large scale in order to be effective.

The late Napoleon Broward, with the eye of a practical man, knew good land when he saw it, and knew also that water would run down hill. Used to pulling wrecks off reefs, he came to conclusions quickly and intuitively. When some insisted that it would take fifteen years of rainfall observations, several years of careful topographical surveying and the reports of

several expensive and conflicting experts to determine the feasibility of his scheme, he was abashed, but not discouraged. He replied: "I will be dead by that time. The State will be poor and the money thus expended would buy a couple of dredges. We can sell some land to build dredges and if my friends will hold the knockers in check, we can soon make a convincing ocular demonstration." Corporate interests which had lost their grip

A SCENE IN THE PINE LAND ON THE MAINLAND. THE PINES (P. CARIBAEA) IN THE BACKGROUND. THE ROAD IS CONSTRUCTED OF LIME-ROCK, ALSO THE FENCE. THE ROCK WAS TORN FROM THE CLEARING ON THE LEFT BY GRUBBING AND BLASTING. (PHOTO BY PROF. JOHN CRAIG.)

on these lands, of course, opposed him out of sheer bitterness, but there were also hundreds of knockers, strange to say, among home people, who had nothing to lose and everything to gain, and who talked it down by the hour on the street corners to every newcomer. I remember visiting the Everglades with one of the first groups of newcomers from New Mexico. They had heard so many stories that they were skeptical. Instead of being

disheartened at the sight of so much water, coming from a land of drought and desert, they enthused over it, and without exception bought, and most of them have bought and sold several times since.

To Broward the credit is due. He was to Florida what Bremontier and Chambrelent were to France and Dalgas to Denmark.

SCENE IN EGYPT, WHICH IS IN THE SAME LATITUDE AS SOUTH FLORIDA, WHERE FLAT ROOFS NOT ONLY PREVAIL, BUT WHERE THEY ARE USED AS MUCH AS ANY ROOM IN THE DWELLING.

Broward possessed to a striking degree the three qualities that make good manhood and citizenship—he was honest, he had a lot of good common sense, and he had also the sense of humor. Above all, he had common sense—the sense of proportions—good judgment or the ability to do the right thing in the right way and at the right time. He worked against jealous and greedy corporations, rival politicians and a host of born knockers, but he fought a good fight, and Florida owes more to

Broward than to any other man. In Arcachon, in the Landes of France, there is a statue of Bremontier, the man who added a new province to that Republic by the reclamation of swamp land. Soon there will be, probably in Jacksonville, a monument to Broward, the man who was the maker of South Florida.

I have called this the greatest conservation project in the United States because at the cost of about one dollar, an acre of land capable of producing net two hundred dollars' worth of vegetables annually is actually formed out of the useless mud sloughs. The saw-grass can be quickly burnt and the land is ready for the plow, with plenty of water for irrigation purposes, if it is necessary. Compare this with the cost of any of our irrigation projects. Think of buying a farm and paying for it with the first year's crop! Land dry enough to crop rents now at ten dollars per acre.

The Chattahoochie Canal is practically done. This leads from Okeechobee to the Gulf. A dredge is working southward from Okeechobee on the main canal toward Miami. Another is working northward from Miami, and two are at work back of Fort Lauderdale, well out into the Glades.

These are all fine, large canals and of great usefulness for transportation as soon as the dams are replaced by locks. Dams are now necessary to hold back the water to float the dredges.

What will grow in the Everglades is a hard question to answer. It would be easier to tell what will not grow there. Under the head of fruits there are about fifty kinds which grow in this region; add to this list almost all the vegetables grown in the tropics and the North; add to this many staples and forage crops; many bushes and vines and three hundred or more useful native and introduced trees.

As the water goes down there is left over the Glades a deposit of lime. This is mostly precipitated lime, which goes to form marl. Mixed with it are the shells of fresh-water mollusks, and in some places tons of dead fish. During the past summer I saw pool after pool filled with dying and putrefying fish, emitting an unbearable stench. Around these pools were hundreds of birds, buzzards, herons and crackles, all eating their

003571

CORPS003582

-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

fill from these charnel pits, and fighting and screaming over the booty. When the land is all drained these spots will have magical fertility.

That the Everglades will be drained within about a couple of years seems certain, and that people are coming here is already evident. Although houses to rent are scarce and board in the tourist season high, it is the land for the poor man. The climate is fine—fully as good as any Mediterranean, Caribbean or Californian climate. Wood is cheap for fuel and house construction. A rustic bungalow can be cheaply made and a pipe churned into the ground to a depth of fifteen feet or less yields an abundance of water. There is plenty of rock for roads, fences and house construction. The surrounding waters are famous for fish of many varieties. The inland canal route from Jacksonville to Key West is done. There will be miles of inland canals, and there is bay after bay along the shore.

In Southern California the hand of man has produced a highly developed and attractive region with no resources except vim and climate. Obstacles were met on every hand. In Southern Florida we have the resources, but the vim has been lacking. We have been reposing since the Seminole war. It is not laziness. We have been indulging our love of leisure. But it is this grappling with nature which develops the latent forces within the man. The coming age is to be an age of conquest, the conquest of nature, the reclamation of swamp lands and the irrigation of deserts.

003572

CORPS003583



PINEAPPLE FIELD, SOUTHERN FLORIDA.

*From the Garden Magazine for January, 1911.*

Copyright by Doubleday, Page & Co.

## CHAPTER XIV.

## THE PROBLEM OF GROWING PINEAPPLES FOR MARKET.

FEW years ago the pineapple was extensively cultivated on the coral keys of Florida. The natives cut the forest, burnt the wood and debris on the ground and planted "pines" in the ashes. I protested against this method because it destroyed the humus, and ordered all wood and brush burnt in piles on my land. My man, a Bahaman negro, well versed in the pineapple business, insisted that the land must be "hot" for pines, that they needed the ashes, and that if the burning was done in a moist time only the surface rubbish would be destroyed. Time proved that he was right. These pineapple fields were weeded once or twice a year, no fertilizer was applied, but a heavy yield was secured in spite of the sparseness of the soil and the crude nature of cultivation.

But what a mess it was at harvest time! They commenced to break pines in early summer. The plants were full of spines and more than waist high. Canvas mittens were necessary. It was usually hot and the mosquitoes were a pest beyond description. The negroes toted the pines to the boat in baskets on their heads, over rough rocks along narrow, well-worn paths. There is uncut land left on these keys and a railroad is now in operation in a part of this region, but the pineapple business is practically dead. With a field of pines and a patch of limes and wrecking on the side these Key people were once well-to-do and their lands were valuable.

Further up the State along the East Coast there is a long stretch of sand dune country. It was covered with a sparse

growth of pine trees and the soil was naturally sterile. A balanced ration of fertilizer was applied by the pineapple growers and immense crops were produced, a few acres yielding a fine income. Of late, returns have been small and many growers have quit the business. Over in the Bahama Islands it is the same story.

In Cuba there is a lot of soil especially adapted to pineapple culture. An owner of a young citrus grove plants pineapples between the trees and thus receives a quick return. The Cuban people are fond of the pineapple or "la piña" as they call it. It is ground fine, sweetened and mixed with cracked ice. It is sold in this form at all refreshment stands and is certainly one of the most refreshing drinks imaginable on a hot day. If served throughout the United States in this way it would soon become popular. This would increase the consumption of this fruit to an enormous extent.

One hears complaints of small returns on pines even in Cuba. In fact it looks like a case of overproduction. The pineapple is well known in the North, is largely canned and relished by everybody. We import twelve million dollars' worth of bananas every year, but the pineapple, coming only at a special season and not having the filling food value of the banana, is at a disadvantage. The pineapple suffers severely in the process of transportation. It is usually picked too green. A pine is at its best when it ripens on the plant. A ripe pine may be located in the patch by the fragrance which spreads far and wide. A rat may have eaten one side but you will find the other side very delicious.

Good drainage seems essential to the pineapple and it is no doubt for this reason that it does so well in sandy soil. In the Hawaiian Islands they grow pines on a stiff soil, the favorite variety being the smooth Cayenne.

The pineapple is a strictly tropical fruit needing lots of warmth, and, although it will grow on sterile, sandy soil, it must be carefully and abundantly fed with fertilizer. The food it needs is rich—such as cottonseed meal, unleached tobacco dust and dried blood and bone.

Although the pineapple is referred to as a semi air-plant, since it belongs with a group of epiphytes, it must have something more than air to live on. Water often stands in little pockets at the base of the leaves. In this are often the dead bodies of insects and it is quite likely that the plant secures some sustenance in this way. It is a very shallow rooter and the roots must have air. I have known pineapples to actually sucker themselves out of the ground and have found them resting very loosely in the fluffy humus which covers the rocks on the Florida Keys. Although I have no means of positively knowing, I believe Florida produces one and one-half million crates of pines a year. Cuba probably exceeds this amount, also the Bahama Islands. This places the pine in the front rank with other staple fruits.

The Red Spanish is the chief commercial variety. It multiplies well, is hardier and ships better than any other sort known to the writer. The Porto Rico is a close second.

The pineapple is not seriously troubled by disease and in spite of the small returns it is still a favorite crop with many small farmers. It is easily reproduced from slips and suckers. Now and then a fertile seed is produced. Pines may be grown from rattoons which spring from the root, suckers which grow on the stem higher up, slips which grow at the base of the fruit, crown slips which grow at the base of the crown, and from the crown itself. In this district slips from the base of the fruit are ordinarily used. The bottom of the slip should be cut smooth with a sharp knife and the stem trimmed. There is less danger of a trouble called "tangle root."

Canning factories use many pines, but many go to waste that could be easily converted into commercial alcohol. It is one of the fruits which does not lend itself to wine manufacture but would probably yield a good cordial. The pineapple, it is claimed, contains a ferment similar to the ferment in the papaw which aids digestion. In the East the fiber of the leaf is extensively used for cloth manufacture. This cloth is as delicate and beautiful as silk. The fiber is used for nets, thread for sewing, etc., and although very fine it is strong. I have often wondered why an extensive industry in this line has not developed in the West

Indies. A pineapple field in dry weather, like a field of cane, is very combustible.

The scientific name of the pineapple is now *Ananas ananas,* which is also a common Spanish name for the plant although piña is much more frequently used. I have often thought that ananas would be a better common name for it than pineapple. It is, of course, nothing like an apple and was so called probably because it faintly resembles in shape the pine cone. We are calling grapefruit, pomelo; alligator pear, avocado; why not call the pineapple ananas?

It appears from present conditions that in pineapple culture, in spite of the duty, Western Cuba has the advantage. When solid trainloads of pines sweep by from Cuba over the Florida East Coast Railway, and when his returns come in, the Florida pineapple grower realizes that he has a competitor to the south of him and that he lives at a way station on a West Indian trunk line.



THE SUNDERSHA MANGO, ONE OF THE LATEST TO RIPEN.
(PHOTO BY KAUFMAN.)

*From the Garden Magazine, February, 1911.*
Copyright by Doubleday, Page & Co.

## CHAPTER XV.

## THE MANGO, THE BEST OF ALL THE TROPICAL FRUITS.

OME call the mango "the apple of the tropics." It is more; it is the apple, peach and pear combined. The novice in eating the old common seedling sorts meets with difficulties. Such an experience is sure to prejudice him against mangoes forever. These old-time sorts have the smell and taste of turpentine and a tough cottony fiber around their big seeds which completely fills the crevices between the teeth, making business for the dental profession. It is mushy, slippery and hard to hold. The juice stains the clothing. One smells and feels and looks as though he had been the victim of a yellow paint accident. After eating such a fruit for the sake of three or four tablespoonfuls of pulp, one must take a bath and then retire to some shady nook for the rest of the day to pick his teeth. But some of the improved sorts which sell locally at twenty-five cents each are quite otherwise. The skin peels off easily, the aroma is pleasant, there is no fiber, the seed is small, the fruit weighs twenty or more ounces and the creamy, delicious peach-like pulp melts in your mouth. I have never tasted a mangosteen, which, according to the books, holds the world's record for goodness, but of all the fruits I know, temperate and tropical, two or three varieties of mangoes lead in my estimation.

South Florida is making rapid strides in mango culture. Many varieties have been introduced from all parts of the tropics, both by the Government and enterprising growers. Many choice

seedlings are just coming into fruit and our budders are learning the trick.

I have always contended that a Florida seedling mango will become the commercial mango of the future. None of the choice imported sorts fill the bill perfectly. There is usually some defect, such as shy bearing, poor carrying qualities, or lack of resistance against pests. If the Government had imported a large quantity of seeds of all the best varieties of mangoes the world affords ten years ago, we would now have several new varieties of local origin which would exactly fill the bill for home needs and shipment North. It is possible that we have it anyway in the form of a seedling Mulgoba, bearing this year for the first time; it is too early to say. But this tree bears fruits of a large size, of very beautiful coloring; hard, rather thick skin; no fiber; small flat seed and delicious flavor. It remains to be seen whether it is a shy bearer or not. This is the fault of many of these high-grade mangoes. It is possible that this difficulty may be remedied by root-pruning, girdling, or by proper fertilizing.

I have a little book on the mango written by Woodrow of India, the man who sent Mulgoba plants to Florida in 1889, in which over eighty varieties of mangoes are listed and this is probably not more than half of the varieties now known, many of which are of recent origin and many of which are no good.

For instance, the Alphonse, Alphoos or Alfoss is highly prized. Higgins thus describes it: "This is one of the most noted of the India mangoes. Size, medium to large; color, greenish yellow on the unexposed side and running to yellow on the exposed side, which is overlaid with light red; peeling qualities excellent; texture excellent, may be readily eaten with a spoon; flavor unique, with a peculiar mingling of acidity and sweetness in the bright colored fruit." In looking over Woodrow's list, on the other hand, one runs up against all kinds of Alphonses. For instance:

Afonza of Goa; Alphonze, Kirkee, "the keeping qualities of this fruit are excellent and it is generally admitted the best of all

mangoes. *The name is applied in the markets to many distinct sorts of greatly varied merit."* (The italics are mine.) Kola-Alphonse; Kagdi-Alphonse, Bombay; Surawini Alphonse, Bombay. In fact, it seems that whenever they found a really good mango, they called it Alphonse.

The Mulgoba, Cambodiana and a long yellowish kind from Burmah are my favorites. There is a little mango in Florida about the size of a peach, yellow in color, with a beautiful pink blush on one side. It has a thin skin, no fiber and delicious flavor. It is commonly called the "peach mango" and was raised from seed sent from Jamaica. For home use one would hardly wish for a more perfect fruit.

The Khatkia, according to Woodrow, is meant to be sucked, while others such as Fernandino II. of Goa is a cooking mango of special value. It should be stated to the credit of the mango that good apple pies can be made from the green fruit. The merits of the many kinds is a fruitful topic of discussion among mango cranks. Conclusions are not warranted as yet. It takes time to settle such questions. Some of the old timers with perverted taste settle it by saying that the common turpentine mango is good enough for anybody.

The mango belongs to a disreputable family, the Spondiaceæ or sumac family. It is probably the most respectable of all its relations. It is represented in Florida by a poison tree (*Metopium Metopium*) commonly called hog plum, poisonwood, bumwood and doctor gum. It includes the cashew nut (*Anacardium occidentale*), the jobo, pronounced hobo, and should be spelled the same way (*Spondias lutea*), the famous pepper tree (*Schinus molle*) so common in California, and the cassava (*Manihot Manihot*).

In spite of the highly poisonous nature of many plants of this family, the mango is very wholesome although I have heard of one or two cases of "mango rash" due presumably to the excessive eating of this fruit. Negroes in many parts of the tropics practically quit work during mango season, devoting themselves assiduously to making the best of a good thing while it lasts.

The mango is a beautiful, broad-spreading shade tree. Its rounded crown and dense foliage form a perfect shelter from the sun. It has a dark green leaf larger than, but similar in shape to that of the peach. It is never leafless. The young leaves are a beautiful pinkish red. The tree grows to be very large and groups of such trees around the homestead are striking features of many tropical landscapes.

The flowers are small but profuse and a dry winter season is favorable to a good crop. Some of the common mangoes bear heavily almost every year, the branches bending to the ground with the weight of fruit. In planting the seed it is best to remove the outer covering or case by carefully cutting the margin with a sharp knife. The seed may contain two or three embryos, so that is is often possible to secure two or even three trees from a single seed. It is a promising fruit for South Florida and, although it bears in the summer when peaches and other Northern fruits are in the market, it will sell on its merits; and besides there is the probability of keeping it in cold storage till winter, when the tourists come with plenty of money and good appetites for the fruits of the land. By this means, too, the railroads and commission men may be prevented from robbing the owner of the fruits of his toil. Ten years in the future Florida mangoes will be famous. Many local varieties will be developed and perfected and become as well and as favorably known as is the Florida standard grapefruit or pomelo The same prediction applies to the avocado or alligator pear.

003582

CORPS003593



1-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 47

A RUBBER TREE IN FLORIDA.

003583

CORPS003594

# APPENDIX

A LIST OF THE TREES OF SOUTH FLORIDA, NATIVE AND INTRODUCED.

The following list is of course by no means complete. Florida is a land of many flowers, fruits and forests. It is difficult at times to distinguish between a shrub and a tree. New trees are being introduced into this country almost every day, and of the great number of tropical trees in the world there are many which have never been tried and which will probably grow here as well, if not better, than in their native land.

WEST INDIAN ALMOND TREES BENT BY THE WIND.

## ORDER CYCADACEAE. CYCAS FAMILY.

Cycas revoluta. Sago Palm.

To this same order belongs our common coontie or comptie (Zamia Floridana), a valuable starch-yielding plant, which might be used to advantage in the manufacture of grain alcohol.

## ORDER PINACEAE. PINE FAMILY.

**Pinus clausa.** Sand Pine.

Coast of East Florida on sand dunes.

**Pinus Caribaea.** Cuban Pine.

The common timber pine of South Florida. Grows also in West Indies and Central America. Also called Pinus Elliottii—Slash Pine. This pine and the Longleaf or Yellow Pine yield the naval stores of our South. It is generally believed that resin will not run satisfactorily in Tropical Florida. The wood resists sea worms better than any of our native pines.

## ORDER JUNIPERACEAE. JUNIPER FAMILY.

**Taxodium distichum.** Bald Cypress.

A valuable timber tree.

**Taxodium imbricarium.** Pond Cypress.

A species recently named by Harper.

AN AVENUE OF THE WEST INDIAN ALMOND, A FAVORITE SHADE TREE IN THE WEST INDIES. NOT SIMILAR TO NOR RELATED TO THE ALMOND OF COMMERCE.

**Thuja occidentalis.** Arborvitae.

Various cultivated varieties of this tree commonly planted for shade and ornament. Probably does not extend naturally southward further than the mountains of North Carolina.

**Sabina Virginiana.** Red Cedar.

The word "sabina," corresponding to the English savin, is a better name than the old name Juniperus. Sabina is the common name of the following species in Cuba and Santo Domingo.

003585

CORPS003596

**Sabina Barbadensis.** **Pencil Cedar.**

Formerly called Juniperus Barbadensis.

The famous pencil cedar of Florida. Some years ago forests of cedar and live oak were reserved in Florida and elsewhere on the coast to insure a future supply of these valuable timbers for our navy. These were, of course, abandoned when steel replaced wood for this purpose. These, however, were our first national reserves.

Other conifers in cultivation are:

**Araucaria excelsa.** **Norfolk Island Pine.**

**Cedrus Deodara.** **Deodar Cedar.**

According to Reasoner, this tree succeeds everywhere in the South. It is very similar to the cedar of Lebanon and the Atlas cedar.

## PANDANACEAE. PANDANUS FAMILY.

**Pandanus utilis.** **Screw Pine.**

A MAHOGANY TREE IN THE BAHAMAS.

## ORDER POACEAE. GRASS FAMILY.

**Bambos spp.** **Bamboo.**

Several species are growing here and the government has started a bamboo farm at Brooksville, Florida. Bambos vulgaris is abundant along water courses in the West Indies, forming stately groves. Since it loves moist stream banks it will, no doubt, be a great favorite

for Everglade planting. It throws a heavy shade and is a fine protective cover for poultry and social birds.

**ORDER ARECACEAE. PALM FAMILY.**

| | |
|---|---|
| Thrinax Floridana | Palmettoes |
| Thrinax microcarpa | |
| Thrinax Keyensis | |
| Cocothrinax jucunda | |
| Sabal palmetto | |
| Serenoa arborescens | |

The leaves of these palmettoes are highly valued in some countries for thatch, also for mats, baskets, etc. The leaves of the "Pond Thatch" in the Bahamas last longer than shingles. Thrinax Keyensis is good for this purpose. When timber gets scarcer, they will be more extensively used, just as straw is used on even expensive buildings in Holland.

THE LIVE OAK.

**PALMS.**

**Pseudophoenix Sargentii.** **Sargent Palm.**

Southern Keys and the Bahamas. Resembles the date palm. Getting very scarce.

003587

CORPS003598

**Roystonea regia.** **Royal Palm.**

This majestic tree reaches its optimal growth in Cuba, of which country it is emblematic; it adorns the Cuban two-cent postage stamp and coat-of-arms and its rich berries fatten many swine for their Christmas festivities. Extensively planted in South Florida and appears to be indigenous in several patches in the neighborhood of the Everglades.

**Cocos nucifera.** **Coco Palm.**

One of the most beautiful and useful members of the plant world, yielding food, drink and shelter to many primitive peoples of the world. This tree grows in sandy soil along the seashores of tropical Florida and although most of the nuts were planted by the

SEMINOLE INDIANS COMING TO TOWN WITH VENISON AND SKINS.

hand of man, undoubtedly some have sprung from seeds which have washed ashore and been buried in seaweed and sand on the beach. The original home of the coco palm is probably not known and since it grows as well in South Florida as elsewhere, it deserves to be listed at least as a naturalized member of our silva. Rabbits are fond of the young sprouts. They must be protected in youth.

**Phoenix dactylifera.** **Date Palm.**

**Phoenix Canariensis.** **The Canary Island Date Palm.**

**Washingtonia filamentosa.** **Fanleaf Palm.**

## MUSCAEAE. BANANA FAMILY.

The banana is, by some people, called a tree because of its size, but according to the accepted definition of a tree, the stem must be woody in nature.

## CASAURINACEAE. BEEFWOOD FAMILY.

**Casuarina equisetifolia.**

A tree of the East Indies and Australia, but now common throughout the tropics. Grows close to the sea, and has been used in the fixation of moving dunes along the seashore. It is usually called Australian Pine, but a patch of them on Biscayne Bay is known as the "cedars." The tree has become naturalized in South Florida and young trees of this species are growing here and there on the shore, the seeds of which have no doubt been washed ashore. It is a valuable addition to the silva of the State of Florida. Should be extensively planted for timber. It withstands the gales and yields a wood like oak.

## JUGLANDACEAE. WALNUT FAMILY.

**Hicoria pecan.** **Pecan.**

The king of nuts extensively cultivated in improved form in North Florida. Both the words "hickory" and "pecan" are probably of Indian origin. It is quite probable that some Spanish tree names such as "Ucare" are corruptions of hickory since hickory has been extensively used by West Indian peoples for barrel and hogshead hoops.

The pecan grows well in Florida, but apparently does not flourish south of central part of the State.

## MYRICACEAE. BAYBERRY FAMILY.

**Morella cerifera.** **Wax Myrtle.**

## SALICACEAE. WILLOW FAMILY.

**Salix longipes.** **Long Stalk Willow.**

## FAGACEAE. BEECH FAMILY.

**Quercus Virginiana.** **Live Oak.**

Excellent timber tree, common in Florida, also Mexico, Cuba and Central America. These sturdy, broadspreading live oaks draped with Florida moss form a very characteristic feature of the Florida landscape.

**Quercus myrtifolia.** **Myrtle Leaved Oak.**

## ARTOCARPACEAE. MULBERRY FAMILY.

**Morus rubra.** **Red Mulberry.**

Common throughout the State.

**Morus nigra.** **Black Mulberry.**

Commonly planted for its large, black, juicy fruits. Probably originally came from Persia.

**Morus alba.** **White Mulberry.**

From China. Introduced mainly for silk-worm food.

**Broussonetia papyrifera.** **Paper Mulberry.**

From Japan. Common throughout the State.

**Ficus aurea.** **Golden Fig.**

South Florida and the West Indies. A striking weed tree in the forest. Grows first on limbs of other trees, throws down aerial roots to the ground and finally chokes and kills the tree upon which it started.

ALEURITES TRILOBA — THE CANDLE-NUT. HAS FRUITED IN SOUTH FLORIDA AND IS A VALUABLE TREE.

**Ficus populnea.** **Poplarleaf Fig.**

South Florida and the West Indies. Easily propagated from cuttings and might prove a satisfactory shade tree for South Florida.

**Ficus carica.** **The Fig.**

Cultivated throughout the South for its fruits.

**Ficus nitida.** **Spanish Laurel.**

A beautiful shade tree in Nassau and Key West. Also common in Cuba. A very satisfactory tree for roadside planting.

003590

CORPS003601

**Ficus religiosa.** **Sacred Bo of India.**

Growing in favor as a shade tree in Tropical Florida. Very common avenue shade tree in Cuba.

**Ficus altissima.** **East Indian Rubber.**

Makes excellent growth in Southern Florida.

**Ficus glomerata.** **Cluster Fig.**

Of India. Grows well and bears well in Southern Florida.

**Artocarpus integrifolia.** **The Jack Fruit.**

This tree, similar to the Bread Fruit, has fruited in South Florida.

## ULMACEAE. ELM FAMILY.

**Trema Floridana.**

A MASTIC TREE IN THE HAMMOCK.
(PHOTO BY DR. R. M. HARPER.)

## POLYGONACEAE. BUCKWHEAT FAMILY.

**Coccolobis uvifera.** **Sea Grape.**

Common on the seashore of Southern Florida, also West Indian

**Coccolobis laurifolia.** **Pigeon Plum.**

South Florida and West Indies. A fine tree in the hammocks of Southern Florida. (A hammock is a rich hardwood jungle. It is probably an old Indian word and the old spelling "hamak" is sometimes still used.)

## ALLIONIACEAE. FOUR-O'CLOCK FAMILY.

Pisonia obtusata. — Blolly.

Sea beaches and shores of brackish lagoons. Tropical Florida.

## ANONACEAE. CUSTARD APPLE FAMILY.

Anona glabra. — Custard or Pond-Apple.
Anona squamosa. — Sugar Apple or Sweet Sop.
Anona muricata. — Sour Sop.
Anona reticulata. — Custard Apple, called also Bullocks's, Heart or Corazon.
Anona cherimolia. — Cherimoyer.

The fruit of the latter is very highly prized in Spanish-American countries. It can be budded on our native Pond-apple. The wood of Pond-apple is very light and useful for net floats and stoppers in place of cork. Canangium odoratum of this order, a few of which have been planted in South Florida, yields the famous ilang-ilang perfume. To this order belong several important genera, such as Uvaria and Rollinia, which yield valuable fruits.

## MAGNOLIACEAE. MAGNOLIA FAMILY.

Magnolia glauca. — Magnolia or Sweet Bay.

A beautiful tree which should be more extensively planted. Grows well on Everglade soil.

## CAPPARIDACEAE. CAPER FAMILY.

Capparis Jamaicensis. — Florida Caper.

## MORINGACEAE. HORSERADISH TREE FAMILY.

Moringa moringa. — Horseradish Tree.

The root of this tree, finely scraped, is eaten as horseradish. The Oil of Ben, used by perfumers, is extracted from the seeds of this tree.

## AMYGDALACEAE. PLUM FAMILY.

Chrysobalanus Icaca. — Coco-plum.
Amygdalus Persica. — Peach.
Laurocerasus sphaerocarpa. — West India Cherry.
Eriobotrya Japonica. — Loquat.

## LEGUMINOSEAE. BEAN FAMILY.

Pithecolobium unguis-cati. — Florida Cat's Claw.
Pithecolobium dulce. — Gaumachil.

One of the fastest-growing trees ever introduced into Florida. It grows five feet in height per year, on rocky land. Grows well in regions of very slight rainfall. The pulp of the pod is eaten by the poorer classes of Mexico. Pods are a good feed for cattle, and the bark contains twenty-five per cent tannin and is therefore extensively used for tanning purposes in regions where it is plentiful.

**Pithecolobium saman.** **Rain Tree or Guango.**
Similar to the above.

**Pithecolobium Gaudeloupense.** **Goatbush.**
This is a native bush, but sometimes reaches tree proportions. It is valuable because it is the first hardwood leguminous shrub to appear in the pine woods. It enriches the soil by its litter and paves the way for other hardwoods. It marks the beginning of the transition from pinewoods to hammock conditions.

**Albizzia Julibrissin.**
A favorite shade tree in the Southeastern United States.

**Albizzia Lebbek.** **Siris or Lebbek Tree.**
Called Woman's Tongue in Nassau.

**Lyoiloma latisiliqua.** **Wild Tamarind.**
Common in places on the Keys. Wood, heavy, hard, tough, close-grained, rich brown, tinged with red.

**Vachellia Farnesiana.** **Yellow Opoponax.**
Called also Popinac. The flowers are used for perfume.

**Leucaena glanca.**

**Mimosa spp.**

**Dalbergia Sissoo.** **Sissoo Tree of India.**
It is a species of this same genus that yields one variety of "Rosewood."

**Tamarindus Indica.** **Tamarind.**

**Ceratonia siliqua.** **St. John's Bread or Carob.**

**Haematoxylon Campechianum** **Logwood.**
Grows well on dry, rocky ridges.

**Cassia fistula.** **Shower of Gold.**
A favorite ornamental tree.

**Delonix regia.** **Poinciana Tree.**
A favorite shade tree.

**Ichthyomethia piscipula.** **Jamaica Dogwood.**
A common and very valuable timber tree for South Florida. Might be used to advantage as a shade and ornamental. Grows quickly, has an abundance of pea-like flowers in clusters which honey bees are fond of. As the name indicates, it is a fish poison. The bark and twigs are bruised and lowered in a basket into the water. A poison is dissolved which stupefies fish that comes near it. They float to the surface and are easily captured. This tree grows well from seeds and its propagation should be encouraged.

**Bauhinia spp.**
Several species, beautiful, ornamental small trees.

**Cajan cajan.** **Pigeon Pea.**
Makes a small but useful tree. Poultry are fond of its seeds and its leaves enrich the soil.

**Erythrina arborea.**



A CEDRELA TREE—GROWN FROM A CUTTING. RATE OF GROWTH TO DATE, TWO FEET PER MONTH.

## ZYGOPHYLLACEAE. CALTROP FAMILY.

**Guaiacum sanctum.** — **Lignum Vitae.**

Very hard, slow-growing wood.

## RUTACEAE. RUE FAMILY.

**Fagara fagara.** — **Wild Lime.**
**Fagara flava.** — **Yellow wood.**

Valued for timber in the Bahamas. Good for plane stocks, tool handles and furniture.

**Fagara clava-Herculis.** — **Prickly Ash.**
**Fagara coriacea.**
**Amyris elemifera.** — **Torchwood.**

Wood heavy, hard, strong, close-grained; very resinous, very durable; light orange in color.

**Amyris maritima.**
**Amyris balsamifera.**
**Citrus vulgaris.** — **Bitter Sweet Orange.**
**Citrus aurantium.** — **Sweet Orange.**
**Citrus limonium.** — **Lemon.**
**Citrus limetta.** — **Lime.**
**Citrus medica.** — **Citron.**
**Citrus decumanna.** — **Grapefruit, Pomelo, or Shaddock.**
**Citrus nobilis.** — **Tangerine.**
**Citrus Japonica.** — **Kumquat.**

## SIMARUBACEAE. QUASSIA FAMILY.

**Simarouba glauca.** — **Paradise Tree.**

South Florida and West Indies. A pretty, quick-growing tree in the hammocks. Would make a handsome avenue tree.

**Bursera simaruba.** — **Gumbo-Limbo.**

South Florida and West Indies. Grows easily from a cutting or large limb stuck in the ground, frequently used in this way for live fence posts. Grows very quickly and has a very striking, bronzy red trunk, with papery bark. The term gumbo-limbo is probably a negro corruption of the term gum-elemi. Called "gamolimie" in the Bahamas, which is probably a corruption of gum-elemi.

## MELIACEAE. MAHOGANY FAMILY.

**Melia azedarach.** — **China Berry.**

Called also "Lilaila." In the northern part of the State and along the Gulf Coast a variety of this tree, umbraculiformis or "Umbrella China Tree," or "Texas Umbrella Tree," is the favorite tree for shade and ornament. Although a native of Persia, is now naturalized in the Southern United States.

**Swietenia mahagoni.** **Mahogany.**

Called also madeira, the latter word being simply the Spanish for "wood." Common on the Keys and parts of the southern mainland. The king of all woods. Something ought to be done to encourage the perpetuation of this, our choicest native hardwood, in the only part of the mainland of the United States where it can possibly grow.

A RUBBER TREE KILLING A COCO PALM. WILD RUBBER TREES ARE PERNICIOUS WEEDS. THE SEED IS DROPPED BY A BIRD IN THE FORK OF THE TRUNK OR IN THE CREVICE OF THE BARK. IT SPROUTS, ITS ROOTS RUN DOWN THE TRUNK TO THE GROUND. IN TIME IT CHOKES TO DEATH THE TREE WHICH SUPPORTED IT IN YOUTH.

**Cedrela Sinensis.**
**Cedrela toona.**

The toon tree of India, called Red Cedar in Queensland.

**Cedrela odorata.** **Spanish Cedar.**

003596

CORPS003607

## EUPHORBIACEAE. SPURGE FAMILY.

**Drypetes lateriflora.** — **Florida Plum.**

Also called "white-wood." South Florida and West Indies.

**Drypetes Keyensis.** — **Guiana Plum.**

Also called "white-wood." South Florida and West Indies.

**Gymnanthes lucida.** — **Crabwood.**

Southern Florida and West Indies. Some say this wood is poisonous. It is, however, a very pretty wood and is often used in the manufacture of canes, paper-knives and similar articles.

**Ricinus communis.** — **Castor Oil Tree.**

Attains the size of a small tree in South Florida. Valuable plant. Oil is very useful, seed pumice is a valuable fertilizer and the plant is not exhaustive to the soil.

**Hura crepitans.** — **Sand Box Tree.**

**Aleurites triloba.** — **Candlenut Tree.**

**Hippomane mancinella.** — **Manchineel.**

Southern Florida and the West Indies. A tree to be shy of; fortunately not common on the mainland. Poisonous to the touch to many people, producing a distressing dermatitis worse than poison ivy. It is called "guao" in Cuba, and I have known persons who have handled it without knowing suffer agonies with face and hands a solid mass of large blisters. It has a small fruit of pleasant appearance which might be eaten by children with dire results.

## SPONDIACEAE. SUMAC FAMILY.

**Metopium metopium.** — **Poison Wood.**

Very common in Southern Florida. Poisonous, and when bruised exudes a gum which blackens the trunk of the tree. One of the first trees to come up after hammock land has been cut and burnt.

**Mangifera Indica.** — **Mango.**

Extensively planted in the southern countries, producing an abundance of choice fruits, some of the recent imported and improved varieties ranking with the choicest of our fruits. At the same time a valuable shade and ornamental tree.

**Anacardium occidentale.** — **Cashew Apple. Cashew Nut.**

**Spondias dulcis.** — **Otahaite Apple.**

**Spondias lutea.** — **Hog Plum Jobo.**

**Spondias purpurea.** — **Scarlet or Spanish Plum.**

**Schinus molle.** — **Pepper Tree.**

**Manihot manihot.** — **Cassava.**

**Phyllanthus (Cicca) distichus.** — **Gooseberry Tree.**

## AQUIFOLIACEAE. HOLLY FAMILY.

Ilex Cassene. Dahoon.

## CELASTRACEAE. STAFF TREE FAMILY.

Gyminda Grisebachii. False Boxwood.
Schafferia frutescens. Boxwood or Yellow Wood.

## ACERACEAE. MAPLE FAMILY.

Acer rubrium. Red Maple.

## SAPINDACEAE. SOAP BERRY FAMILY.

Sapindus saponaria. Soap Berry.
Exothea paniculata. Inkwood Ironwood.
Wood very hard and heavy. Used for tool handles, etc.
Hyperlate trifoliata. White Ironwood.
Wood used in shipbuilding in Bahamas. Berries edible.
Cupania glabra.
Blighia sapida.
Formerly known as Cupania edulis, is the Akee of Africa and Jamaica. This tree has fruited at the Sub-Tropical Gardens. The white covering of the seeds is a wholesome vegetable; the rest of the fruit is poisonous, so that great care must be exercised in using it.
Melicocca bijuga. Genip.
Pulp edible. Nuts in Venezuela are roasted and eaten like chestnuts.

## FRANGULIACEAE. BUCKTHORN FAMILY.

Rhamnidium ferreum. Black Ironwood.
Colubrina reclinata. Nakedwood.
Reynosia latifolia. Darling Plum.
Fruit edible.

## MALVACEAE. MALLOW FAMILY.

Hibiscus tiliaceus. Mahoe.
Thespesia populnea.
This tree is called "majagua de Florida" in Cuba.
Gossypium religiosum. Tree Cotton.
Ceiba pentandra. Silk Cotton Tree.

## CANELLACEAE. WILD CINNAMON FAMILY.

Canella Winteriana. Cinnamon Bark or White Wood.

## CLUSIACEAE. BALSAM TREE FAMILY.

Clusia flava.
Mammea Americana. Mammee Apple.

003598

CORPS003609

## PAPAYACEAE. PAPAW FAMILY.

**Carica papaya.** **Papaw.**

## BIXACEAE. BIXA FAMILY.

**Bixa Orellana.** **Annatta.**

A small tree yielding an orange-colored dye, used for butter color.

## PROTEACEAE. PROTEA FAMILY.

**Grevillea robusta.** **Sheoak from Australia.**

## FAMILY LAURACEAE. LAUREL FAMILY.

**Persea, aquacate, avocado, avocato, alligator pear, butter pear, midshipman's butter, palta, etc.**

A salad fruit. A species, P. sylvestris, grows wild in Cuba. Practically naturalized in South Florida. Extensively cultivated for home consumption and shipment North. Several improved varieties propagated by budding.

**Persea borbonia.** **Red Bay.**

Common throughout Florida. Called sometimes "Florida mahogany," but should never be confounded with the true mahogany which grows on the Keys.

**Persea pubescens.** **Swamp Bay.**

The term "bay" sometimes applied to trees may come from the French *baie*, meaning berry; it may have to do with the color of the wood, although the word *bay* in this sense is usually only applied to horses and in the case of "bay-wood" sometimes applied to mahogany; *bay* may refer to the "Bay Islands" in the Gulf of Honduras, a great mahogany center.

**Ocotea Catesbyana.** **Lancewood.**

A very valuable wood.

**Misantica triandra.**

One tree 18 inches in diameter and a few small ones found by Miss Olivia Rodham in the Brickell Hammock, near Miami. Identified by C. S. Sargent. Broad-topped, handsome tree, native to Cuba.

**Cinnamomum camphora.** **Camphor Tree.**

Grows well throughout the State. Well-established plantations of this tree in the proper locations would probably in time bring large returns.

According to a recent report citrus groves with camphor planted here and there are not infested with white-fly.

**Cinnamomum cassia.** **Chinese Cinnamon.**

A magnificent shelter tree, very dense and of quick growth. Will grow throughout the State.

**Laurus nobilis.** **Apollo's Laurel.**



A SCENE IN HOLLAND. ONLY A FEW YEARS AGO THIS SPOT WAS COVERED WITH NAVIGABLE SALT WATER.

### PUNICACEAE. POMEGRANATE FAMILY.

**Punica granatam.** — **Pomegranate.**

### TERMINALIACEAE. WHITE MANGROVE FAMILY.

**Conocarpus erecta.** — **Buttonwood.**

Southern Florida. Chiefly along salt shores. Highly prized for fuel. The best fuel I know of, since it makes great heat and almost no smoke.

**Bucida buceras.** — **Black Olive Tree.**

Keys and West Indies.

**Laguncularia racemosa.** — **White Mangrove or Buttonwood.**

South Florida and West Indies. Muddy shores, common.

**Terminalia cattappa.** — **West Indian Almond.**

Common West Indian shade tree.

### MYRTACEAE. MYRTLE FAMILY.

**Eugenia buxifolia.** — **Gurgeon Stopper. Spanish Stopper.**

South Florida and West Indies.

**Eugenia monticola.** — **Stopper. White Stopper.**

Southern Florida.

**Eugenia Garberi.** — **Garber Stopper.**

South Florida and West Indies.

**Eugenia procera.** — **Red Stopper.**

Keys.

**Eugenia jambos.** — **Rose-Apple.**

A common introduced species; although a native of India it is naturalized in the West Indies. *Eugenia Micheli* is the much-prized Surinam Cherry in Dade County.

**Eugenia longipes.**

There are many species of Eugenia in South America which yield valuable fruits.

**Anamomis dichotoma.** — **Naked Stopper.**

South Florida.

**Chytraculia chytraculia.** — **Stopper.**

South Florida and West Indies.

**Psidium guajava.** — **Common Guava.**

Probably the greatest of all jelly-producing fruits. Common throughout Florida.

**Eucalyptus spp.**

Many claim that the right species of the many kinds are the most promising of all trees for planting in Florida, because of their great rapidity of growth and aid to drainage, since they suck up in the

003601

CORPS003612

process of transpiration many times the amount of water which falls upon the surface of their foliage in the form of rain.

The following kinds have been highly recommended for trial:

E. meliodora, E. viminatis, E. citraodora, E. robusta, E. rostrata, E. crebra, E. corynocalyx, E. resinifera.

**Melaleuca leucodendron.** **The Cajeput Tree.**

Grows well in Florida and yields Cajeput oil.

## RHIZOPHORACEAE. RED MANGROVE FAMILY.

**Rhizophora mangle.** **Red Mangrove.**

South Florida and the West Indies. A wonderful tree, grows in salt water and of great value in consolidating muddy shores; it has been called the "Land Former." Deserves to be protected because of the protection it affords to exposed shores in times of storm. Plantations on the Keys in the shelter of mangroves suffered little damage in the great storm of the fall of 1906, while those exposed to the fury of the waves bearing floating wreckage were ruined. Seeds of this tree have been sent to the Hawaiian Islands to be planted for this purpose, and when the mangrove takes hold along the line of the railroad to Key West it will safely protect it against the severest storms.

## THEOPHRASTACEAE. JACQUINIA FAMILY.

**Jacquinia Keyensis.** **Joewood.**

According to Nash, in the Bahamas the bark is mixed with lime, placed in a bag and put in the water to stupefy fish.

## ARDISIACEAE. MYRSINE FAMILY.

**Icaoroea paniculata.** **Marlberry Cherry.**

## SAPOTACEAE. SAPODILLA FAMILY.

**Chrysophyllum oliviforme.** **Satin-Leaf.**

Southern Florida. Highly prized as an ornamental tree because of the bright golden color on the under side of its leaves. To this same genus belongs the beautiful "Cainito" or Star-apple, a fruit relished by peoples of the West Indies. It might be possible to bud the Star-apple on the native Satin-leaf.

**Mimusops Sieberi.** **Wild Dilly.**

Keys.

**Sapota zapotillo.** **Sapodilla.**

Naturalized on the Keys, where it is a common fruit. Planted also on the mainland. A tree hard to start, but hardy when started, yields an everlasting wood and a gum called Chicle.

**Sideroxylum mastichodendron.** **Mastic.**

Valuable forest tree of Southern Florida. Grows to be large and is quite common, shedding an abundance of yellow fruits which are

edible in case one likes the flavor. Mastic would probably make a satisfactory shade tree.

**Dipholis salicifolia.** Bustic or Cassada.

Southern Florida and West Indies.

**Lucuma Rivicoa var angusttifolia.** Ties, or Egg Fruit.

**Chrysophyllum cainito.** Star-Apple

A fruit highly relished in the West Indies.

**Lucuma mammosa.** Mammee Sapota.

### EBENACEAE. PERSIMMON OR EBONY FAMILY.

**Diospyros kaki.** Japanese Persimmon.

**Diospyros Virginiana.** Persimmon.

Throughout Florida. There is a curious mix-up in names in connection with the persimmon and the sapodilla just mentioned above. The black persimmon of Texas and Northern Mexico is called "Chapote," which is a slight modification of the name Sapota. The Spanish for sapodilla is Nispero, the name of the European Medlar. From Nispero comes the term Naseberry, a name frequently applied to the Sapodilla in the British West Indies. Both words, Persimmon and Sapota, are probably of Indian origin, the one North American and the other South American.

### OLEACEAE. OLIVE FAMILY.

**Olea Europea.** Olive.

Grows luxuriantly in South Florida but does not fruit. There was the same difficulty with it in Southern California. With proper treatment it might yield a valuable crop for this region.

### APOCYNACEAE. DOGBANE FAMILY.

**Nerium oleander.** Oleander.

A beautiful ornamental but poisonous. According to report on the subject by the Arizona Experiment Station, the physiological effects are similar to those of digitalis, and if enough poison is obtained the patient is sure to die. Fifteen to thirty grains of the leaves will kill a horse, ten to twenty grains a cow, and from one to five grains a sheep.

**Plumieria rubra.** Frangipani.

A fine ornamental.

### EHRETIACEAE. EHRETIA FAMILY.

**Cordia Sebastina.** Geiger Tree.

**Bourreria Havanensis.** Strong Bark.

Bark used in making tea in the Bahamas.

### VERBENACEAE. VERBENA FAMILY.

**Citharexylum villosum.** Fiddlewood.

South Florida. One must not assume from both the scientific and common names that this wood is good for fiddles; quite otherwise,

-cv-00119-RDM Document 112-6 Filed 07/19/23 Page 4

because the wood is heavy and exceedingly hard. Both names are supposed to be mistakes, or rather the common name is a corruption of the French "fidele," meaning true or strong, and the scientific name is merely a translation of the common name. On the other hand, one softer and lighter wooded member of this genus might have been used for this purpose. Bello gives the common name "palo de guitara" to *C. quadrangulare* in Porto Rico, and Cook says the natives make their guitars of this wood.

**Avicenna nitida.** **Black Mangrove.**

Very valuable tree, like the red mangrove, for consolidating muddy shores.

## BIGNONIACEAE. BIGNONIA FAMILY.

**Crescentia cujete.** **Calabash.**

**Crescentia ovata.** **Black Calabash.**

## OLACACEAE. XIMENIA FAMILY.

**Ximenia Americana.** **Purging Nut.**

Called also Mountain Plum, in Jamaica. Fruit eaten.

## RUBIACEAE. MADDER FAMILY.

**Exostema Caribaeum.** **Princewood.**

Bark a tonic. Would probably make a useful bitters.

**Coffea Arabica.** **Coffee.**

Coffee has fruited in South Florida.

**Genipa clusiifolia.** **Seven-Year Apple.**

Fruit eaten.

**Guettarda elliptica.**

**Guettarda scabra.** **Nakedwood.**

**Psychotria undata.**

In addition to the above mentioned trees, I have seen two specimens of Kigelia pinata, the Sausage Tree of Africa: Cecropia peltata, the Trumpet Tree; Castilloa elastica, the Mexican rubber tree; Manihot Glaziovii, Ceara rubber; one specimen of the true banyan, Ficus Indica, a Covillea from Madagascar, and others not sufficiently tried to be worthy of record until they grow older.

003604

CORPS003615



LIBRARY OF CONGRESS
0 014 496 759 8
003605