**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

      Plaintiffs,

      v.

U.S. ENVIRONMENTAL
PROTECTION AGENCY, et al.,

      Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

**SUPPLEMENTAL JOINT APPENDIX**

**VOLUME 7**

| | |
|---|---|
| **From:** | Palmer, John C CIV USARMY CESAJ (US) |
| **To:** | Currie, Steven J CIV USARMY CESAJ (US) |
| **Subject:** | FW: more sources for canoe travel |
| **Date:** | Thursday, March 22, 2018 10:20:54 AM |
| **Attachments:** | evergladesofflorida1912.pdf |

And this one....

John Palmer, Project Manager
U.S. Army Corps of Engineers
400 High Point Drive, Suite 600
Cocoa, FL  32926
321-504-3771 extension 10
321-504-3803 (fax)
john.palmer@usace.army.mil

Service
"The happiest people are those who do the most for others. The most miserable are those who do the least." — Booker T. Washington

"To give real service you must add something which cannot be bought or measured with money, and that is sincerity and integrity".  - Douglas Adams


-----Original Message-----
From: Victoria Menchaca [mailto:VictoriaMenchaca@semtribe.com]
Sent: Wednesday, March 21, 2018 4:55 PM
To: Palmer, John C CIV USARMY CESAJ (US) <John.Palmer@usace.army.mil>
Cc: White, Tori K CIV USARMY CESAJ (US) <Tori.White@usace.army.mil>; Moore, Robin E CIV USARMY CESAJ (US) <Robin.E.Moore@usace.army.mil>
Subject: [Non-DoD Source] more sources for canoe travel

More sources for canoe travel.


Thanks,



Victoria Menchaca, M.A.

Compliance Review Specialist

Seminole Tribe of Florida

Tribal Historic Preservation Office

30290 Josie Billie Hwy, PMB 1004

Clewiston, FL 33440

Tel: 863-983-6549 Ext: 12216

Email: victoriamenchaca@semtribe.com

003607
CORPS003618



003608

CORPS003619



# *The* Florida Everglades

### By J. O. WRIGHT

003609

CORPS003620

# THE EVERGLADES

## *of*  F L O R I D A

6 3 3
4 1

003610

CORPS003621



Class F 317

Book E9W'95

Copyright Nº

COPYRIGHT DEPOSIT.

003611

# THE  EVERGLADES
## *of* FLORIDA

### THEIR ADAPTABILITY FOR THE
### GROWTH  OF  SUGAR  CANE

#### *PART ONE*

A BRIEF DESCRIPTION OF THE EVERGLADES
AND THEIR PRESENT CONDITION.

#### *PART TWO*

A DISCUSSION OF THE SOIL AND  CLIMATIC
CONDITIONS NECESSARY FOR THE GROWTH
OF SUGAR CANE,  METHODS AND COST OF
CULTIVATING,  HARVESTING  AND  MANU-
FACTURING  THE SAME.

BY

## J.  O.  WRIGHT

FORMERLY  SUPERVISING  DRAINAGE  ENGINEER  IN  THE  UNITED
STATES DEPARTMENT OF AGRICULTURE  AND  LATER
CHIEF DRAINAGE ENGINEER  FOR THE
STATE OF FLORIDA.

TALLAHASSEE, FLA.
DECEMBER
1 9 1 2

003612

CORPS003623



003613

Copyright, 1912, by
J. O. WRIGHT.

*T*HE way to develop a country
is to grow and manufacture
within its borders the necessities
its people must have in their daily
life.

003614

CORPS003625

## CONTENTS.

Page.

Introduction ....................................... 13

### PART ONE.

General description of the Everglades............... 17
Early description of Col. Long..................... 19
Formation of the Everglades....................... 22
Natural drainage ................................ 24
Growth and vegetation............................ 25
Ownership and control............................ 26
Plan of drainage adopted by the State.............. 28
Lateral canals .................................. 31
Low cost of work................................. 32
Present condition ............................... 34
Obligation of the State........................... 36
Difficulties to overcome.......................... 39
Means of transportation .......................... 40
Survey of the Everglades......................... 41
Healthfulness ................................... 45

### PART TWO.

Sugar Cane—Where found ....................... 49
Climatic condition necessary...................... 49
Essentials for profitable cane culture................ 52
Everglade soil ................................. 53
Temperature ................................... 56
Rainfall and water supply......................... 58
Advantageous features of the Everglades........... 64
Opinion of Dr. Stubbs............................ 65
Drainage of a sugar plantation in the Everglades..... 66
Dual use of canals............................... 68
Method of planting and cultivating cane........... 69
Cost of growing sugar cane....................... 75
Marketing and manufacturing..................... 78
Supply and consumption of sugar................. 80
Value to the state............................... 81

003615

## LIST OF ILLUSTRATIONS

1. First page of cover.
   a. Everglades of the past.
   b. Everglades of the future.

2. Map of the peninsula of Florida.

3. Map of Drainage District, showing canals being constructed by the State.

4. Map of Drainage Canals as recommended by J. O. Wright.

5. Tractor used in surveying Everglades.

6. Diagram showing rainfall.

7. Diagram showing rainfall.

8. Map showing arrangement of canals on a Sugar Plantation of 2,560 acres.

9. Plowing with a Tractor.

10. Sugar Cane on Miami canal.

11. A modern Sugar Factory.

12. Sugar cane on Fellsmere Farms.

003616

# INTRODUCTION.

My first public utterance concerning the Everglades of Florida was an address delivered in Miami, Fla., Feb. 26, 1908. At this meeting I gave it as my opinion the Everglades would be drained, but the land would not be permanently settled without the introduction and growth of some staple crop of a high commercial value, and suggested rice and sugar cane as the crops that would most likely be found best suited to the climate and soil.

After having completed my investigation for the U. S. Department of Agriculture, in a report prepared by me June 25, 1909, I used the following language:

"It is believed by agriculturists and chemists who have studied the situation, and from evidence afforded by the demonstrations that have been made, that sugar cane can be grown successfully on these muck lands. The writer saw in numerous places, visited many patches of sugar cane, the stalks as large and heavy as those grown in Louisiana and thick enough on the ground to yield a big tonnage per acre.

"It requires much capital to grow and manufacture sugar cane profitably. Owners of small areas cannot engage successfully in this work unless modern central factories are provided, to convert the cane into sugar. Another serious drawback is harvesting the cane and transporting it to the factory. Owing to the soft condition of the ground this will have to be done by means of tram-roads and cars or canals and barges.

"If adequate facilities for handling the crop economically were provided, there seems to be but little doubt in the minds of those who have given the matter careful consideration that sugar cane is THE staple crop that can be grown safely and profitably in the Everglades.

"The amount of sugar produced in the United States has but little influence on the price, as we are compelled to import large quantities from other countries to supply our needs. At the present time the price of sugar is high enough to make the growing of cane a profitable business. In Louisiana the price of cane at the mill is about $3.00 per ton, varying somewhat with the price of sugar.

"Although cane is an expensive crop to grow, a yield of thirty tons per acre, which is not at all uncommon, would show a profit much greater than can be secured from any field crop in the Mississippi Valley.

2—Ev.

003617

"There may be other staple field crops that can be grown successfully on these muck lands, but the fact has not yet been demonstrated. At the present time sugar cane seems to be the most promising crop that can be raised extensively on these lands. It is true that many other crops may be grown, but they are of a perishable nature, the demand for them is limited, and the cost of transportation so great that to undertake their production on a large scale does not seem warranted."

The object of this publication is to set forth my views somewhat at length, after a more thorough and systematic study of this subject. The facts stated in support of my arguments are all well authenticated, and the conclusions reached conservative and reasonable.

Tallahassee, Fla., Dec. 1, 1912.        J. O. WRIGHT.

003618

# PART ONE.

003619

# PART ONE.

## A BRIEF DESCRIPTION OF THE NATURAL FEATURES OF THE EVERGLADES AND THEIR PRESENT CONDITION.

THERE are but few persons in the United States who have not heard of the Everglades of Florida, yet a large per cent of those who have not SEEN the Everglades have an erroneous and imperfect conception of this territory. The general impression is that the Everglades is an impenetrable swamp or jungle covered with a dense growth of trees and vines, infected with all kinds of reptiles, and reeking with fever and malaria.

During the past three years the writer has had an opportunity of meeting a great many persons from different parts of the country, on their first visit to this famous territory. With hardly a single exception they were filled with surprise and admiration. Instead of an impenetrable swamp, covered with timber, they found a vast PRAIRIE sixty miles wide, stretching from Lake Okeechobee on the north to Biscayne Bay on the south.

Between the Everglades and the Atlantic Ocean is a belt of small timber, whose general surface is one to three feet higher than the Everglades directly west, and having a slight slope toward the south. This strip of land is composed of sand, loam and clay, with some muck in the low places, the entire area being

003620

underlain with an oolitic limestone. The depth
of earth on this limestone ranges from twelve
feet or more at the north end, to a mere covering
at the south end. Near the coast a series of flat
ridges of sand have been thrown up by the
action of the wind and waves, two to ten feet
higher than the general level. The growth in
this belt is scattering pine and scrub palmetto,
on the sandy portions, and small cypress in the
sloughs. There is a similar strip of high land,
though much wider, on the west side of the
Everglades, having a slope toward the south
and west.

The soil between these two ridges is a well
decomposed ''muck'' (not peat) two to four-
teen feet deep. This muck is underlain with a
porous rotten limestone mixed in many places
with sand, clay, shell and marl.

As a general proposition, the muck is deepest
near Lake Okeechobee, and shallowest in the
southern portion of the Everglades. For a dis-
tance of about twenty miles south from Lake
Okeechobee, the underlying material is prac-
tically level on top. Beyond this it becomes
uneven, being marked with irregular depres-
sions and ridges. As the surface is level, this
unevenness of the sub-stratum causes a varying
depth of muck within a limited area.

The surface of the Everglades, taken as a
whole, appears to be a level plain, having a
slope of three inches per mile toward the south
and east, yet this general statement is subject
to slight modification. Throughout the entire
area there are numerous winding shallow de-
pressions or channels 100 to 500 feet wide, and

003621

one to three feet lower than the land through which they pass. These depressions, locally called ''Strands,'' wind through the 'Glades in all directions, though their general trend is from north to south. In other places there are slight depressions, like ponds or lagoons, covering one to forty acres. These are most numerous along the eastern margin and throughout the southern portion. The muck in these depressions is usually less firm than the land on either side. These irregularities of the surface also affect the depth of muck at these points, as the underlying hard material is no lower in these surface depressions than under the adjacent land. These low places are usually filled with water, while the general surface of the Everglades is comparatively dry.

### Early Description of the Everglades.

The following description of the Everglades was written in 1848, by Col. S. H. Long, Topographical Engineer of the U. S. Army, and transmitted to Hon. J. D. Wescott, Jr., U. S. Senator from Florida. It presents very clearly the condition at that time, and the opinion that was held as to the future possibilities of the Everglades.

''The main body of this district appears to be situated between 25 degrees 31 minutes and 27 degrees of north latitude, and between 80 degrees 30 minutes and 81 degrees 15 minutes of west longitude from Greenwich. Its extent from north to south is about 100 miles, and its average width from east to west about 50 miles.

003622

It is bounded on the north by Lake Okeechobee, which may be regarded as an extensive water sheet covering a portion of the Everglades and holding it in a state of constant submersion, and on the east, south and west by a sort of rim or margin, elevated a few feet above the common level of the included district and of the circumjacent country. A profusion of insular tracts of greater or less extent, and of elevations about equal to that of the rim, or a few feet above the common level of the district, are scattered in every direction over the surface of the district.

"With the exception of these insulated tracts and the rim with which it is bounded, the entire district is subject to periodical overflows of water to the depth of two or four feet during the rainy season, which usually prevails from August or September to February or March of every year. These overflows are supposed to have their principal origin in the country northward of Lake Okeechobee and to be brought down to the lake through the channel and valley of the Kissimmee River.

"The entire district embraces an area of about 5,000 square miles, nearly one-half of which, agreeably to the best information I can obtain, is susceptible of drainage, and, when thus reclaimed, would present fields of vast magnitude adapted to the cultivation of sugar, rice, and numerous tropical products of great value. The method of drainage that has been proposed and recommended is as follows, viz:

"First—A spacious canal or drain leading

003623

from Lake Okeechobee westward, through the valley or pass of Caloosahatchee River to the Gulf of Mexico;

"Second—A similar canal leading from the same lake eastward, through the valley of Loch-ahatchee River to the Atlantic Ocean; and

"Third—Numerous drains of much smaller size leading across the rim and communicating, respectively, with one or more of the numerous rivulets that rise in the vicinity of the rim and empty into the Gulf of Mexico and Atlantic at various points along the coast of Florida.

"It is believed by many that the two large canals first mentioned will amply subserve the purpose of drainage; but, should they prove in-adequate, that the desired end may be effectual-ly attained by means of the smaller drains men-tioned in the third proposition.

"The practicability of draining the Ever-glades must, of course, depend on the elevation of Lake Okeechobee, and of the Everglades themselves, above the level of the high tides in the ocean. This elevation is supposed to be from twelve to twenty feet. The difference of the levels alluded to, so far as I can learn, has never been determined by instrumental surveys. Its accurate determination should unquestion-ably precede any attempts to accomplish the ob-ject in view.

"By means of the two canals connecting Lake Okeechobee with tidewater, together with a lock in each (if necessary) of suitable dimensions to admit small coasters and steamers, it is sup-posed that a line of continuous navigation may

003624

22      FLORIDA EVERGLADES

be opened entirely across the Isthmus of Florida from the Atlantic to the Gulf of Mexico. In case the locks should be found expedient and proper, they should be accompanied by spacious waste weirs or sluices and perhaps flood-gates, in order to afford a full and free discharge of water from the lake,'' etc.

### Formation of the Everglades.

The southern part of the Peninsula of Florida was at one time covered with water, which receded and left the rock ridges on either side of what is now the Everglades exposed. The basin between these ridges has been gradually filled by accretions and the growth of vegetable matter. There are no indications of an upheaval or of volcanic action in South Florida. Neither is there any indication that the rock underlying the muck is of coral formation, except in very limited areas. It is not stratified, but is homogeneous in charcter. In most places it is soft and porous, but there are, however, certain limited areas in which it is very hard and difficult to remove. When in place, this stone is quite retentive of moisture, but dries out and hardens when it is exposed to the air, and makes good concrete and surface dressing for roads.

The most important factor connected with the formation and reclamation of the Everglades is Lake Okeechobee, the largest body of fresh water, except Lake Michigan, wholly within the United States. This lake is almost circular in shape, covers a half million acres, and has an average depth of thirteen feet. It lies at the

003625

northern end of the Everglades, and has a mean surface elevation of 20.6 feet above sea level. It is not fed by springs or subterranean channels, but derives its supply of water from the run-off from the flat pine lands lying to the north and west. The area draining into Lake Okeechobee is seven and one-half times as large as the lake itself. This, with the surface of the lake, gives a catchment area of 4,000,000 acres to furnish the supply of water for the lake. Until recently Okeechobee had no well-defined outlet, but canals have now been dug, connecting it with the sea. It has low, marshy banks on the south and west, and during the rainy season (June to October), after filling to an elevation of 21.6 feet, about one foot above normal, it overflows its banks in the lowest places for a distance of seventy miles, and the surplus water passes off over the land, finally reaching natural channels through which it is discharged into the Gulf of Mexico or the Atlantic Ocean. It is this annual overflow from the lake, flooding the deposit of muck lying between the ridges of highland, that has formed the ''Everglades.''

If a water-tight dam were built across the Peninsula of Florida at the south end of Lake Okeechobee, so as to cut off all the water from the lake, there would be no Everglades. The surface water would soon evaporate and the pools dry up. The muck would become parched, and the water-loving plants that now cover the surface would die from lack of moisture, and the area would become a barren plain. Like the arid lands of the West, it ''would cry for water.''

003626

24     FLORIDA EVERGLADES

### Natural Drainage.

During this formative period, water that was discharged by the Kissimmee River into Lake Okeechobee, while endeavoring to find an outlet to the sea, broke through the rock rim in many places, both on the east and west coast, and by its constant action eroded the rock, so that there are numerous channels through which the surface water flows quite freely from the Everglades, both into the Atlantic Ocean and the Gulf of Mexico. In many places these channels are worn down several feet, but do not extend far beyond the rim into the interior. The water is brought from the margin of the 'Glades in small rivulets to the heads of these streams, which increase in size as they approach their outlets. The difference in elevation between sea level and the source of these streams gives many of them sufficient fall to cut out large and deep channels. The streams on the east coast, beginning at Rockledge and going south, are as follows:

Sebastian River, St. Lucie River, Loxahatchee River, Hillsboro River, Cypress Creek, Middle River, New River, Snake Creek, Arch Creek, Little River, Miami River and Snapper Creek. These streams are shorter, and have more fall per mile than those on the west coast. None of these were originally connected directly with Lake Okeechobee, although they receive more or less water from it during the period of heavy rains. On the west coast the conditions are somewhat different.

The Caloosahatchee River, a stream of consid-

003627

erable importance, now takes its water directly from Lake Okeechobee and the adjacent country on the west, and flows southwest to Fort Myers.

## Natural Growth and Vegetation.

Along the south shore of Lake Okeechobee there is a strip of land, one-half to two miles wide, covered with a dense growth of "Custard Apple," a dwarfed, gnarled tree, twenty to thirty feet high and eight to twelve inches in diameter. The wood of this tree is hard, but decays quickly when cut down, while the roots are very soft, almost as light as cork when dry, and are easily removed from the soil. Along the edges of this custard apple there are clumps of willow, elder and other soft shrubs. This entire fringe of timber and bushes is covered with a wild morning glory, giving the whole a picturesque appearance.

Along the eastern margin of the Everglades there is a growth of small cypress, scattering pine, myrtle and willow. The line between the sandy land and the muck is not well defined. It is difficult to tell just where the upland ceases and the muck begins. In some places the clumps of small trees and underbrush extend three to five miles from the rock rim into the open prairie, while in others the open prairie terminates in a well-defined line next to the rock rim. The combined area of these strips of timber and clumps of bushes is less than one per cent of the entire area of the Everglades.

The depressions and ponds above described,

003628

probably aggregating five per cent of the entire area, are covered with a growth of lily-pads and other aquatic plants. The remainder is covered with a dense growth of coarse grass, four to eight feet high, which, from the structure of its blades, is called "Saw Grass." The stem of this grass is quite coarse, the blade is tough, with a serrated edge, and the plant is unfit for forage or any other use. When the land is once broken and this saw grass destroyed, it does not reproduce itself, but the ground is soon covered with a growth of coarse weeds, principally with what is called "Careless Weed." The writer has seen careless weeds along the canal banks, twenty inches in circumference at the ground and sixteen feet high—the growth of one season.

### Ownership and Control.

As but few persons outside of the State of Florida are familiar with the method of handling the swamp and overflowed lands, a brief description of the ownership and control of these lands may be useful.

By the treaty of 1819, Spain ceded to the United States the territory then known as East and West Florida. This territory was by Act of Congress, approved March 3, 1845, admitted into the union under the name of the State of Florida.

The Federal Government, in 1850, by what is commonly known as the "Swamp Land Grant," ceded to the several States for the purpose of drainage and reclamation, all the swamp and

003629

overflowed land within their respective borders, remaining unsold at the time.  By this act Florida acquired title to all the swamp and over- flowed lands within her borders, amounting to upwards of twenty million acres.

Patents or deeds for these lands have been issued by the Federal Government to the several States, from time to time. Patent No. 137, known as the Everglades, embracing 2,862,080 acres, was issued April 29, 1903.  The Legislature of the State, in 1851, passed an Act accepting the swamp and overflowed lands ceded to it by the Federal Government, and made provision for a Board of Internal Improvement, composed of members from the several judicial circuits of the State, to take charge of these swamp lands. This Board was unable to discharge its duty and recommended a new bill, which became a law June 6, 1855.  (See Chapter 610, Laws of Florida).  This Act creates a Board of Trustees of the Internal Improvement Fund by designating the Governor, Comptroller, Treasurer, Attorney- General and Commissioner of Agriculture, and their successors in office, as Trustees, and grants to said Trustees irrevocably the lands granted to the State of Florida by the Act of 1841, for internal improvement purposes, remaining unsold, and also the lands granted to the State of Florida under the Act approved September 28, 1850, for the purpose and trust therein set forth, the main trust being the drainage and reclamation of the overflowed lands.

The personnel of the Board of Trustees of the Internal Improvement Fund, which has control of the public lands, has been frequently changed

003630

28    FLORIDA EVERGLADES

by the election of new State officers. These frequent changes have been detrimental to the formation and carrying out of any fixed policy concerning the drainage of the swamp lands. It has generally been the belief of the Trustees that they should be drained, but how or by whom has been an open question.

In February, 1881, the Trustees entered into a contract with Hamilton Disston, of Philadelphia, Pa., to drain and reclaim several million acres of land in South Florida in which were included the Everglades. He entered upon the undertaking, and considerable work was done in Osceola County, near Kissimmee, and in the Caloosahatchee River valley, between Fort Thompson and Lake Okeechobee. The work contemplated was never completed, and very little permanent good was accomplished. The Disston contract was terminated in 1893. No other drainage was undertaken by the Trustees until 1907, when the work now being carried on was inaugurated.

### The Plan of Drainage Adopted by the State.

The foregoing statements explain why Lake Okeechobee is the dominant feature in any rational plan for the reclamation of the Everglades. Without Lake Okeechobee the Everglades would never have been formed, and without it the Everglades can never be reclaimed and made productive.

Any intelligent person, familiar with the natural conditions, will recognize at once that the first step in any plan of reclamation is the con-

003631



3—Ev.

003632

CORPS003643

trol of the flood waters from Lake Okeechobee.
To accomplish this the Trustees have under-
taken to cut enough canals from the lake to
tide-water to permanently lower the level of the
lake to an elevation of sixteen feet above sea
level. No one knows certainly just how many
canals of given capacity will be required to do
this.

The Trustees have already completed a canal
sixty feet wide and eight feet deep from the
west side of the lake to the channel of the Ca-
loosahatchee River at Fort Thompson, and have
let a contract, which is now seventy per cent
completed, for three canals fifty feet wide and
ten feet deep from the south end of the lake to
the Atlantic Ocean. These three canals will be
finished some time during the year 1913.
Another canal eighty feet wide and ten
feet deep is projected from the east side
of the lake to tide-water at West Palm
Beach. This canal will no doubt be com-
pleted within the next two years. These
five canals leading from the lake, having a com-
bined width of 290 feet and a depth of flow of
eight feet, when the lake is bank-full, will, in
the judgment of the writer, be sufficient to con-
trol the overflow from the lake.

In addition to the discharge capacity of these
five canals during the rainy season, the plan
adopted by the Trustees contemplates lowering
the level of the lake to sixteen feet above sea
level at the beginning of the rainy period, and
allowing it to fill to nineteen or twenty feet at
the close of the season. The object of this stor-
age is two-fold:

003633

1.  To lessen the number of canals that would be necessary to discharge this run-off during the short period in which it is accumulating.

2.  To hold an adequate supply of water in the lake for irrigation, if needed, and to maintain a uniform flow in the canals throughout the year.

For this purpose concrete locks and dams are to be built in each canal near the shore of the lake. These dams are provided with sluice gates, by means of which the quantity of water flowing from the lake into the canals is at all times under the control of the lock-tender. There is probably no other place in the world where the conditions are so favorable for both irrigation and drainage as in this project.

By lowering the level of the lake a storage capacity, having an area as large as the State of Rhode Island, and three or four feet deep, is formed. This will provide an inexhaustible supply for irrigation and assist in maintaining a sufficient depth of flow in the canals throughout the year to afford navigation for shallow-draft boats and barges. There are skeptics, and so-called "engineers," who claim this cannot be done, but those who have given this matter the most careful consideration maintain that, by the construction of suitable locks and dams, with sluice gates at proper intervals in the canals, it is a simple and inexpensive matter. By opening or closing the gates the stage of water, within certain limits, in any portion of the canals, may be successfully regulated.

When these five canals are completed, should it be found that their discharge is not sufficient

003634

PLAN FOR DRAINING THE
## FLORIDA
## EVERGLADES
Recommended by
J.O.WRIGHT
Supervising Drainage Engineer
U.S.Department of Agriculture

003635

CORPS003646

to control the level of the water in the lake, others can be constructed, and the money so far expended will not have been wasted. This is a much wiser method of procedure than to have constructed six or seven canals and find that only five were required to do the work.

### Lateral Canals.

The next step in any plan of reclamation is to provide means for promptly removing the excess of water that falls directly on the Everglades. This can be done on practically all the area by gravity drainage. In the southern part some of the ponds and depressions may be so low as to require pumping, but these are very small and the land of doubtful value when drained. Just how much local precipitation will have to be removed from this area by drainage is another matter about which engineers do not agree, since no other body of land like the Everglades has been reclaimed. Results obtained by actual experience are lacking. Conclusions based solely on theory are often disappointing, so experience must be the final arbiter in determining the quantity that must be removed.

The main arteries now being built for controlling the overflow from the lake increase in width at stated intervals, so that their combined discharge capacity at their outlets is much greater than at the lake end. In a plan of drainage prepared by the writer (see Senate Document No. 89, pages 168 to 171), eight canals, having a discharge capacity at their out-

003636

lets two and one-third times their capacity near the lake, were recommended as main arteries. The arrangement shown on this plan is not being strictly carried out by the Trustees, but the exact location of these canals is not a matter of vital importance so long as the requisite discharge capacity is provided.

There is no difficulty whatever in completely draining the Everglades when the overflow from Lake Okeechobee is cut off; it is simply a matter of digging enough canals and laterals to remove the rainfall as rapidly as it accumulates. The material is soft, free from trees and roots, and is easily handled with a steam dredge or ditching machine.

### Low Cost of Work.

There is probably not another large body of land in the United States that can be drained and put in cultivation as cheaply as the Everglades. The main arteries or outlets to serve the entire area will not cost to exceed $2.00 per acre. The cost of laterals and farm drains will depend largely upon the purpose for which the land is to be used. For general farming this will be from $3.00 to $5.00 per acre. If the land is to be used for intensive farming, and a complete system of canals and ditches for both drainage and irrigation are provided, the cost will not exceed $10.00 per acre. The difference between the cost of reclaiming this land and the reclamation work in the arid west is simply astounding. In a report published by the De-

003637

partment of Commerce and Labor December 1, 1910, it is stated the Federal Government has approved thirty reclamation projects having an area of 3,029,951 acres at an estimated cost of $119,555,555.00, or approximately $40.00 per acre.

When land in the Everglades is drained there is no grubbing or clearing to be done before it can be put in cultivation. The low cost of complete drainage and irrigation, the absence of clearing and grubbing, and the favorable climatic conditions, are facts that must be taken into consideration by prospective purchasers in comparing the value of this land with other lands on the market.

Persons who claim the Everglades cannot be drained are ignorant of the natural conditions or wilfully misrepresent them. The fact that the State has been working on this project for five years and the land is not yet drained does not indicate failure or impossibility. The Panama Canal was commenced before the drainage of the Everglades, but no ships have yet passed through this canal. If a farmer should buy land on a projected railroad and grow crops, he could not reasonably expect to ship his products on this line of road before the grade was completed and the ties and rails laid. The fact that trains were not running would be no indication that the road could not be built. Because the land in the Everglades cannot be occupied and farmed at the present time does not signify it cannot be reclaimed. The beneficial results of the work now under contract and pro-

003638

jected cannot be realized until the canals are completed.

A piece of unfinished work often makes the natural conditions worse than they were before the work was commenced. An unimproved street, when ploughed up and partially graded, is frequently worse than it was before the improvement was begun. This is particularly true of this project at the present time. The unfinished canals concentrated the overflow from the lake during the past rainy season and flooded the lower part of the Everglades west of Fort Lauderdale. This has caused the opponents of this work to reiterate the old falsehood—''The Everglades cannot be drained.'' They cite the overflow as an illustration that the work is a failure. Such statements are the result of an ignorance too dense to be overcome, or else are made with a sinister motive.

### Present Condition.

At this point I wish to emphasize the fact that no part of the Everglades is yet sufficiently drained for occupancy and cultivation. This is because the main arteries for controlling the overflow from Lake Okeechobee are not complete. Attempts have been made, although the land is imperfectly drained and subject to overflow each year, to cultivate limited areas adjacent the canals and on the south shore of the lake. Some of these attempts have been successful, while others have been failures.

From the present rate of progress it now

003639

seems that the drainage work will be sufficiently advanced by December 1, 1913, to cultivate with safety and profit much of the higher land immediately south of Okeechobee. It will, however, be necessary to dig additional outlets, and put in a complete system of laterals, before the Everglades as a whole can be put in cultivation. No arrangement has yet been made for doing this work.

More than one-half of the muck land in the Everglades has been sold by the Trustees of the Internal Improvement Fund to private parties, without any stipulation or agreement as to lateral drains. Much of this land has since been resold, and is now held in small tracts (ten to forty acres), by persons scattered throughout the United States. This is an unfortunate condition confronting the owners of Everglade land that must be met and overcome.

So far as the records show, the Trustese have not officially adopted any policy concerning lateral ditches. In certain instances, in which they have sold large areas of Everglade land, they have agreed with the purchasers to expend seventy-five per cent of the purchase money, in the construction of certain canals, which are now under contract and will soon be completed. In no instance do the records show that the Trustees have promised or agreed to drain any particular part of the Everglades. The canals now being constructed are an essential part of any drainage plan, and must be completed before a system of laterals can be provided.

003640

### Obligation of the State.

When the swamp and overflowed land was ceded to the several States by the Federal Government the following condition was imposed by the Act: ''The proceeds of said land, whether from sale or direct appropriation in kind, shall be applied exclusively, as far as necessary, to reclaiming said land by means of levees and drains.'' (Rev. Stat., Sect. 2480.)

It is quite evident from this statute that Congress intended to place, and did place, the burden of draining this land on the land itself, and not on some other person or property. It was never contemplated by Congress, or by the States accepting the land, that it would ever be drained by the Federal Government, or at the expense of the State, other than in the manner set forth in the act itself. The burden of drainage is still on this land, and it cannot be shifted by change in ownership.

In the case of Kimball vs. the Reclamation Fund Commissioner (43 Cal. 344), the Supreme Court of that State said: ''In accepting this grant the State was bound to carry out in good faith the objects for which it was made. It would practically defeat the whole cause of reclamation contemplated by Congress if the mere sale of land to private proprietors should have the effect to exempt it from the power of the Legislature to reclaim it. Such a result would be a flagrant violation of its duty toward the Federal Government.''

In order to discharge this obligation, the State of Florida has provided two ways for raising

003641

funds for carrying on the work: First—the Legislature, in 1907, created a Special Drainage District embracing the Everglades and some contiguous territory, containing approximately 4,-300,000 acres, and levied a drainage tax of five cents per acre, per annum on all the lands in the district for the purpose of draining the land; second—it has seventy-five per cent of the money received from the sale of swamp and overflowed lands for the purpose of drainage. These are the only sources of revenue the State has for carrying on the drainage work in the Everglades.

From the first of these sources (the drainage tax) a fund of about $150,000 per annum is collected—the Trustees owning about 1,300,-000 acres in the drainage district on which no assessment is made. This tax has been levied and collected each year since 1907.

The amount raised by the second method (from the sale of swamp and overflowed lands) is uncertain and indefinite. The constitution of the State provides that twenty-five per cent of all the moneys received from the sale of public lands shall be turned into the school fund for the purpose of education. This leaves but three-fourths of the amount received for the purpose of drainage.

When the drainage work was commenced, the public had but little confidence in the success of the undertaking, and it was difficult to sell the land at any price. The Trustees, however, finally succeeded in selling about 700,000 acres at $1.25 to $2.00 per acre. When pending suits which had been brought against the Trustees to

003642

restrain the collection of the drainage tax were dismissed, and a contract for the excavation of 184 miles of drainage canal was let to a responsible firm, the price of Everglade land advanced to $12.00 to $20.00 per acre, according to location. It then seemed that the Trustees would have no difficulty whatever in raising the money that would be needed to reclaim all the land in the drainage district. This, however, was not the case. Just when all the difficulties seemed to have been met and overcome, a powerful interest, both within and without the State, that was opposed to the drainage, set out to injure or destroy the project by circulating false and malicious reports concerning the character of the land and the efficiency of the work being done. The old adage—"a lie travels faster than the truth"— was more than verified in this instance. Within a very few months it was proclaimed throughout the country that the Everglades was nothing but worthless peat and the drainage was a failure. The effect of these false and pernicious reports created distrust in the minds of the public and impaired the demand for Everglade land. These unwarranted attacks have peojardized the resources of the Trustees, and will no doubt retard the completion of the drainage work.

Although a lie travels faster than the truth, it is not so enduring. In the course of a few years, these false statements concerning the Everglades will have been disproved and public confidence fully restored. It is a remarkable fact that practically all the derogatory statements relating to the character of the Ever-

003643

glades and the plan of reclaiming them have
been made by persons who have no personal
knowledge of existing conditions. These criti-
cisms are based on vague rumors and ''hearsay
evidence,'' that would not be accepted in any
court of inquiry. These false and misleading
statements, that have been so assiduously cir-
culated, are the creatures of an inexcusable ig-
norance, or else they have been circulated with
malicious intent or for personal gain.

### Co-operation Necessary.

Experience in other States has convinced me
that some form of co-operation among the sev-
eral land owners must be secured before perfect
drainage can be accomplished. No individual
land owner, unless his land lies adjacent to one
of the outlets, can drain his own land without
affecting that of others. If the holdings in the
Everglades were all in the State, or all in a
single individual, it would be a simple matter to
provide this lateral drainage, but with a diver-
sified and widely distributed ownership it is a
more difficult proposition.

Voluntary co-operation of all the land owners
interested in a project of this kind is ideal, but
not possible. Differences of opinion as to plans,
distribution of cost, method of procedure and
many other details will naturally arise to hin-
der and delay the work. Some legal instrument
must be provided through which public senti-
ment, as expressed by a majority of the people
interested, can be carried out.

To meet existing conditions, and make possi-

003644

ble the complete reclamation of the Everglades, the ownership must practically all be controlled by some one person, or else the State Legislature must enact a General Drainage Law similar to those now in operation in many of the other States, under which the work can be carried out. Without some such provision, it will be difficult to complete the reclamation of the Everglades.

The intrinsic value of this land, in its present state, is not very great, but when drained it will become one of the most productive areas in the United States. The demand for good farm land is steadily increasing, while the supply becomes less and less each year. The writer remembers quite distinctly when the swamp lands in Indiana and Illinois were worth less than $5.00 per acre; the same lands are selling today at $100.00 to $200.00 per acre. This increase in value has been brought about by drainage, which made possible a natural growth and development of the country.

The holders of Everglade land should not be discouraged, but should unite in a common and persistent effort to complete the drainage as soon as possible and thereby reap the benefits of a substantial increase in price.

### Transportation.

To any one owning land in the Everglades the facilities for easy access and transportation are of vital importance. It is generally conceded that water transportation is the cheapest method of handling freight, unless long distances

003645

are to be covered and time becomes an essential element. When the necessary canals are completed, any part of the Everglades can be reached with shallow-draft boats and barges. Locks are to be constructed in the main canals at proper intervals to maintain a boating stage at all seasons of the year. This method of transportation has been found quite satisfactory in Holland and some parts of Germany. Through these canals the Florida East Coast Railway can be reached at Miami, Fort Lauderdale, Deerfield and West Palm Beach. This road is now building a branch from Maytown to Okeechobee City, on Taylor's Creek, four miles north of Lake Okeechobee. This will afford an additional outlet for products grown in the Everglades. The Atlantic Coast Line can be reached at Fort Myers via the Caloosahatchee River. There is a road projected across the Everglades from Tampa to Fort Lauderdale. This will no doubt be built as soon as there is a demand for it.

After the drainage is completed, and the land has had time to settle, highways can be built at a reasonable cost. The canal banks can be used for the road bed and the stone excavated from the canals for covering the surface.

### The Survey of the Everglades.

The tract known as the Everglades has not been divided into townships and ranges and subdivided into sections. The high land on either side was surveyed many years ago by the Federal Government, but the work was not

4—Ev.

003646

extended into the open marsh because of its swampy condition.

Many maps have been published showing the township and range lines, and in many instances the sections and subdivision of sections, in the Everglades. These are all "Office Maps," made from data at hand and assumed, and not from an actual survey of the land. They give general information, but are not to be accepted as accurate.

The Trustees of the Internal Improvement Fund adopted a map June 10, 1907, dividing the Everglades into townships and ranges. This map was made by projecting on a plot the township and range lines on the north, east and west sides of the Everglades, and not from any survey of the land. This was designated an "official map," and land has been bought and sold by it. Each township was supposed to contain 36 sections of 640 acres each.

On October 29, 1910, the Trustees requested their Chief Drainage Engineer to prepare and submit a plan for surveying the Everglades. Instructions for making a survey in accordance with the official map above mentioned were prepared by the engineer and approved by the Board of Trustees December 29, 1910, and the work was commenced the following March. One party of surveyors was placed in the field on the east side of the Everglades and another on the west side. Although the field notes of the U. S. survey adjacent to the Everglades showed the townships to be exactly six miles wide, an actual measurement showed them to be greatly in excess of this width. Many of the corner posts

003647

previously set by the Government were missing, and in many places no trace could be found on the ground to show that the lines had ever been run. This made it necessary to re-run many of the lines and re-locate the lost corners, at great expense to the State, as it required several months to do this work.

When the existence of this surplus was brought to the attention of the Trustees, and it was discovered that the sections in the Everglades, under the plan of subdivision adopted, would contain more than 640 acres each, they directed their Engineer to prepare another plan that would divide the territory into townships exactly six miles square, containing thirty-six sections of 640 acres each. In compliance with this order, a second plan was prepared and approved by the Trustees, in which it is proposed to make the several townships each six miles square, as nearly as may be, and containing thirty-six sections of 640 acres each. The surplus, instead of being distributed among the several townships, is disposed in large blocks, throughout the area. This is held by the State, and will be sub-divided into lots of a convenient size.

After adopting the second plan, it became necessary to re-locate several of the corners that had already been established. The survey is now being carried on in conformity with this modified plan. Permanent markers, consisting of a 1¼ -inch galvanized iron pipe, are driven through the muck into the underlying hard material and surmounted by a bronze cap, with a proper inscription to designate the loca-

003648

tion.  These markers are placed at the section corners.

Owing to the swampy condition of the land, this work was found to be both slow and expensive.  There is not sufficient water for the use of boats for transporting supplies, and the ground is too soft for the use of horses or oxen.  Along the margin of the Everglades, near the highland, supplies and subsistence were carried in on the shoulders of the laborers, but as the interior of the 'Glades was reached, the cost of this work became prohibitive.  The time lost in moving camp and going to and from the work, was much more than that employed in running lines and setting corners.

The writer, who at that time was Chief Drainage Engineer, decided it would be necessary to abandon the survey until the drainage was completed, or else find some less expensive method of doing the work.  After considering various expedients suggested, it was decided to build a tractor that would run in the Everglades, and transport the necessary supplies and furnish comfortable quarters for the men employed.  Such a machine was designed and built and has proven eminently satisfactory.

This machine travels in the Everglades at the rate of two miles an hour, and carries 3,000 pounds, in addition to its own weight.  A cook house and sleeping quarters are erected on the machine, so that no time is lost in going to and from the work.  The corner markers and supplies are carried on it, thereby greatly reducing the number of men required in a party making the survey.

003649



TRACTOR USED IN SURVEYING EVERGLADES.

003650

CORPS003661

The use of this machine makes possible the survey of the Everglades in its present condition at a reasonable cost. Six men with this tractor can accomplish twice as much work in a week as twelve men under the old method. It mashes down the vegetation, and makes a smooth surface on which to measure the distance, and furnishes an elevated platform from which to take observations with an instrument, thus making it possible to do much more accurate work than by the old method. With two of these tractors in use, the survey of the entire Everglades can be completed within a year, if the work is steadily prosecuted.

### Healthfulness.

The writer has received hundreds of letters asking about the healthfulness of the Everglades. Swamp lands are usually unhealthful and malarious, but the Everglades seem to be an exception to the rule. There have been from 200 to 300 men from different sections of the country employed as engineers and surveyors, and workmen on the dredges for the past four years. These men have lived in the 'Glades, waded in the water, slept in wet clothing, eaten simple food, and in many instances drunk the water from the sloughs and ponds; and yet there has been practically no illness among them. I doubt if a more healthy lot of workmen can be found in any place than those employed in the Everglades. I attribute the healthfulness of this area to the fact that the water is not stagnant, and that the surface is swept at all times

003651

46    FLORIDA EVERGLADES

with a salt breeze from the Gulf of Mexico or the Atlantic Ocean. No one need hesitate in purchasing land in the Everglades because of the unhealthfulness of the locality. With screened houses, pure water and wholesome food, as good health can be enjoyed here as in any place in the country.

### Conclusion.

Like all new countries, the settlement of the Everglades will be attended with many failures and disappointments. Persons will settle here whose lives are not in harmony with rural conditions; they will become dissatisfied and move away, and their places will be filled by others better fitted for farm life.

I have studied the reclamation and settlement of the Everglades from all view points, and am fully convinced that within a score of years it will be one of the most productive areas in the United States.

003652

# PART TWO.

003653

# PART TWO.

## THE ADAPTABILITY OF THE EVERGLADES FOR THE GROWTH OF SUGAR CANE.

### Sugar Cane—Where Found.

IN order to determine the conditions under which sugar cane can be grown most advantageously we have but to study the soil and climatology of the localities in which it flourishes in a natural state, or in which it is most successfully cultivated.

Writers and travelers tell us that sugar cane is found in practically all the low moist lands in both hemispheres extending about thirty-five degrees both north and south of the equator. From this we see that its natural habitat is a warm climate, having a mean temperature ranging from seventy to ninety degrees, with an abundance of moisture and sunshine. It seems to thrive best in low lands swept by a moist sea breeze. For commercial use cane is most extensively grown in British India, Cuba, Java, Hawaii, Louisiana and Texas.

### Climatic Conditions Necessary.

Although sugar cane is a tropical plant, it will withstand about 30 degrees F. for a few hours without serious injury, but it will not endure extreme or continued cold. In the countries where sugar cane is grown most success-

003654

50        FLORIDA EVERGLADES

fully (without irrigation), the average annual rainfall is about sixty inches. In the sugar districts of Cuba it is 56 inches; in Porto Rico 77 inches, and in Louisiana 58 inches. Large crops of cane are grown in Guinea and other countries with a rainfall of upwards of 100 inches, but it remains green at maturity and is low in sugar content.

Where the annual average rainfall is much below sixty inches, as in the Hawaiian Islands, irrigation is necessary to produce a maximum yield. From careful experiments it has been ascertained that each ton of cane produced in Louisiana evaporates through its foliage about 150 tons of water. The only way in which the sugar content is extracted from the soil and deposited in the stalk is by the evaporation of water through the foliage. However fertile or rich in plant food the soil may be, it cannot yield a profitable crop of sugar cane unless the necessary amount of water is available at all times. Not only must the requisite quantity of water be provided, but it must be distributed throughout the season as required by the growth of the plant. Too much at one time and not enough at another is a serious detriment.

During the months of March, April and May, while the cane plant is small, it cannot evaporate as much water per day as during the months of June, July and August, when the stalks are large and the foliage more dense. In order that the cane may ripen properly and yield a large quantity of sugar, but little moisture is required in October and November. A

003655

dry season is also advantageous during the winter months, while the cane is being cut and hauled out of the field, but a certain amount of moisture is necessary during these months to sprout the plant cane and keep the stubble in good condition. From these facts it appears that a dry winter, followed by a comparatively dry spring, then a wet, hot summer with a high degree of humidity, followed by a dry fall, are the ideal conditions for the growth of sugar cane, producing a large yield of sugar. In Hawaii and other places, where the annual rainfall is deficient, cane is most successfully grown by irrigation. This does not signify that the requirements or essential conditions cited above are in any way changed or modified; it simply means that the exact amount of water required by the cane is supplied as needed.

The average of fifteen tests made under identical conditions at the Hawaiian Experiment Station, giving the total amount of water received by two crops for the season of 1897 and 1898, 1898 and 1899 (a period of seventeen months each), is as follows:

| Crop Period. | Rainfall. | Irrigation. | Water Per Acre. | Yield Sugar Per Acre. | Water Required to Produce 1 lb. of Sugar. |
|---|---|---|---|---|---|
| 1897-98.... | 46.56 | 48.00 | 2,567,682 | 25,755 | 865 |
| 1898-99.... | 26.01 | 77.00 | 2,797,133 | 27,133 | 859 |

*The author states that no single rainfall exceeded one inch, and no more than one inch of water was applied at any single irrigation.

003656

By withholding the water at the end of the growing season, where irrigation is practiced, the cane is ripened naturally and the sugar content is much greater than it otherwise would be. In fact, the ideal condition for growing any crop is that in which the grower is able to control the amount of moisture in the soil. When there is too much he must be able to promptly remove the excess; when there is too little to supply the deficiency. Where these conditions exist, or can be secured, a maximum crop may be produced each year with a degree of certainty that makes agriculture profitable.

### Essentials for Profitable Cane Culture.

Dr. W. C. Stubbs, a recognized authority on sugar cane, says: ''It may be asserted most positively that the conditions best suited to sugar cane are: (1) Fertile soil, (2) necessary conditions of temperature; (3) an abundant water supply, either naturally or through irrigation, so that it may be applied in ample quantities only when needed, and withheld when the cane has attained growth so that the process of maturation may take place.'' (See ''Cultivation of Sugar Cane,'' by Wm. C. Stubbs, page 30).

### Everglade Soil.

We will now examine briefly the natural features of the Everglades, and see to what extent the necessary conditions for the growth of sugar cane exists or can be readily secured.

The principal part of the Everglades lies be-

003657

tween the 25th and 27th parallels of north lati-
tude, being well in the limits of the sugar belt.
The surface elevation ranges from six to twenty
feet above sea level.    The entire area is exposed
to damp, moist winds, with a high degree of
humidity during the summer months.    There
is an abundant supply of water for irrigation at
all times.    No intelligent agriculturist, who has
ever examined the soil of the Everglades, ques-
tions its fertility.    It is a bed of muck from two
to fourteen feet deep underlain with a rotten
limestone.    A great many samples of soil from
different parts of the Everglades have been
analyzed by a number of competent chemists
and the results obtained are practically the same
throughout the entire area.    Around the mar-
gin of the lake, and in other places where the
land is driest, the muck is more thoroughly de-
composed, and is in better condition for plant
growth, but it possesses no elements of plant
food not found in other parts of the Everglades.

Two representative samples taken from the
interior west of Pompano, and examined for
lime, potash and phosphoric acid and nit-
rogen by the Bureau of Soils, U. S. Department
of Agriculture, Washington, D. C., show the
following results:

<div align="center">TABLE OF ANALYSIS.</div>

| Sample 1. | | Sample 2. | |
|---|---|---|---|
| Lime ................2.25 per cent. | | 2.21 per cent. | |
| Potash ...............15 ” ” | | .08 ” ” | |
| Phosphoric acid .......19 ” ” | | .19 ” ” | |
| Nitrogen .............3.16 ” ” | | 2.58 ” ” | |

From hundreds of samples of soil taken from
various sections of the sugar district of Louis-

003658

iana, Dr. Stubbs says the average analysis will
be about as follows:

Lime .......................... .50 per cent.
Potash ......................... .40 per cent.
Phosphoric Acid ................. .10 per cent.
Nitrogen ....................... .10 per cent.

Dr. Walter Maxwell, Director of the Experi-
ment Station of Honolulu, gives the following
mean result of nearly one hundred analyses
from that locality:

TABLE OF DR. MAXWELL'S ANALYSES.

| Island. | Lime Per Cent. | Potas Per Cent. | Phos. Acid Per Cent. | Nitrogen Per Cent. |
|---|---|---|---|---|
| Oahu ........... | .38 | .342 | .207 | .176 |
| Kauai .......... | .418 | .309 | .187 | .227 |
| Maui ........... | .396 | .357 | .270 | .388 |
| Hawaii ......... | .185 | .346 | .513 | .540 |

These analyses are given to show the simi-
larity of the soil in the Everglades to that of
well-known sugar-producing sections. The writ-
er does not believe that a soil analysis alone is
conclusive proof of the productivity of any soil.
Certain conditions of aeration and moisture are
absolutely essential to render the plant food
found in the soil available for the growth of
the plant. In many places the yield of certain
crops is materially increased by an application
of potash or phosphoric acid, when an analysis
of the soil shows the existence of a much larger
quantity of these elements in the soil than is
required for the growth and perfection of the
crop being cultivated.

The old adage—"The proof of the pudding is
in the eating"—is quite applicable in determin-

003659

ing what a certain soil will produce. A real practical demonstration is a much safer guide than any laboratory analysis that can be made in determining whether a soil will or will not produce certain crops.

Although the Everglades as an entirety are not sufficiently drained for cultivation, there are certain limited areas partially drained where field demonstrations have been made. On the bank of Rita river, one mile south of Lake Okeechobee, sugar cane was grown quite successfully for a number of years with very little cultivation and without fertilizer of any kind. The writer inspected this patch of cane three different years and found a most remarkable growth. The stalks were large and heavy and yielded a profitable crop of syrup.

At the present time there is a patch of cane on the bank of south canal, five miles south of the lake, that was planted last April. This cane has made a good growth, and demonstrates conclusively the adaptability of the soil and climate for this crop. On the canal five miles from Miami is another field of cane, which I had photographed Nov. 15, 1912. (See plate X.) In this instance the saw grass was burned off the land, a furrow opened and the seed cane laid in and covered. I am informed this cane was not cultivated and no fertilizer of any kind was used. In the same locality the owner tells me he harvested forty tons of cane per acre last year.

On the Fellsmere Farms, near Sebastian, 80 miles north of the Everglades, they are grow-

5—Ev.

003660

ing sugar cane quite successfully. (See plate XII.)

On St. Cloud plantation, near Kissimmee, Fla., on land exactly like the Everglades so far as can be determined, as high as sixty-three tons of cane per acre was grown and manufactured into sugar, yielding 12,600 pounds per acre.

These demonstrations show most conclusively that the soil of the Everglades is suited to the growth of sugar cane. It is richer in lime and nitrogen than the cane lands in Louisiana and the Hawaiian Islands, and has about the same amount of phosphoric acid as these lands, but is slightly deficient in potash.

### Temperature.

The conditions of temperature in the Everglades are about all that can be desired for the growth of sugar cane. The summers are long and hot, while the winter months have just enough cool weather to ripen the cane. Frosts are of rare occurrence, and when they do occur cause but little injury.

The following table gives the mean annual, highest and lowest temperature at Jupiter and Fort Myers, 1898-1906:

003661

## FLORIDA EVERGLADES

| Year. | Jupiter. | | | Fort Myers. | | |
|---|---|---|---|---|---|---|
| | Annual Mean Temperature. | Highest During the Year. | Lowest During the Year. | Annual Mean Temperature. | Highest During the Year. | Lowest During the Year. |
| 1898 ........ | 73.7 | 91 | 31 | 72.6 | 94 | 28 |
| 1899 ........ | 74.4 | 93 | 28 | 73.1 | 93 | 28 |
| 1900 ........ | 74.3 | 93 | 31 | 72.3 | 92 | 34 |
| 1901 ........ | 72.6 | 92 | 38 | 70.3 | 94 | 32 |
| 1902 ........ | 74.4 | 96 | 38 | 72.2 | 94 | 31 |
| 1903 ........ | 74.1 | 96 | 36 | 71.8 | 94 | 35 |
| 1904 ........ | 73.8 | 94 | 39 | .... | 94 | 34 |
| 1905 ........ | 74.6 | 94 | 24 | 73.5 | 94 | 27 |
| 1906 ........ | 73.7 | 91 | 30 | 72.4 | 92 | 31 |

These stations are both north of the body of the Everglades, and, no doubt, show from three to four degrees lower temperature than would be registered south of Lake Okeechobee.

The following table gives the mean annual, highest and lowest temperature at the sugar experiment station at New Orleans, La., for ten years, 1888-1896:

TEMPERATURE—SUGAR EXPERIMENT STATION— NEW ORLEANS, LOUISIANA.

| Year. | Mean Annual Temperature. | Highest. During Year. | Lowest. During Year. |
|---|---|---|---|
| 1887 ............. | 70.3 | 99 | 72 |
| 1888 ............. | 70.2 | 98 | 27 |
| 1889 ............. | 70.1 | 96 | 30 |
| 1890 ............. | 69.98 | 95 | 32 |
| 1891 ............. | 68.20 | 98 | 29 |
| 1892 ............. | 67.70 | 99 | 21 |
| 1893 ............. | 68.40 | 99 | 28 |
| 1894 ............. | 68.05 | 99 | 19 |
| 1895 ............. | 68.43 | 98 | 15 |
| 1896 ............. | 68.76 | 98 | 24 |

003662

An inspection of these tables shows that the mean annual, and also the minimum, temperature is higher in the Everglades than in the sugar district of Louisiana. Cold waves are not so frequent and are of shorter duration. On account of this immunity from cold, sugar cane in the Everglades has a longer season in which to grow and ripen than in Louisiana and is consequently much richer in sucrose. In Louisiana the grinding season commences about the third week in October and is completed on most plantations by December 31. This is necessary in order to save the crop before the cold weather, which usually comes in January or February. This short period in which the crop must be handled entails a great loss to the sugar planter.

When the grinding season commences the cane is immature, and the yield of sugar per ton is much less than after the first of December, when the cane is fully ripe. On the other hand, if the grinding is not finished before a severe freeze comes, a much greater loss is sustained.

This drawback will not be encountered in the Everglades. The harvesting need not commence until December, giving the cane ample time to mature, and it can continue without loss until March or April. This advantage alone represents a handsome profit in favor of the cane grower in the Everglades.

### Rainfall and Water Supply.

The next essential to be considered is that of precipitation and water supply. On this condition depends largely the success or failure of

003663

sugar cane culture in any country. Sugar
cane cannot be grown successfully, and manu-
factured at a profit, unless the proper quantity
of water is supplied to the cane at the right
time. If this cannot be provided naturally it
must be supplied artificially. If there is too
much rain at one period adequate provision must
be made by drainage to remove the excess
promptly. If there is likely to be a deficiency
at any season of the year, provision must be
made to supply it by irrigation.

The following tables show the monthly dis-
tribution of the rainfall at Jupiter, Kissimmee
and Fort Myers. These are the nearest points
to the Everglades at which reliable records have
been kept for any length of time, and, no doubt,
represent fairly well the rainfall in the northern
part of the Everglades:

003664

MONTHLY PRECIPITATION.

TABLE NO. 1—JUPITER.

|  | 1898. | 1899. | 1900. | 1901. | 1902. | 1903. | 1904. | 1905. | 1906. | Average Monthly |
|---|---|---|---|---|---|---|---|---|---|---|
| March | 3.26 | 3.58 | 8.20 | 2.30 | .97 | 9.27 | 3.06 | 5.39 | 2.50 | 4.17 |
| April | 1.90 | 3.11 | 2.16 | 2.13 | .97 | .44 | 2.85 | 3.14 | 2.57 | 2.14 |
| May | 1.15 | 1.65 | 7.43 | 3.63 | 4.83 | 2.71 | 2.42 | 3.35 | 7.04 | 3.80 |
| Total | 6.31 | 8.34 | 17.79 | 8.06 | 6.77 | 12.42 | 8.33 | 11.88 | 12.11 | . |
| June | .12 | 3.45 | 2.90 | 17.41 | 3.92 | 7.01 | 10.54 | 2.08 | 11.90 | 6.59 |
| July | 6.80 | 3.35 | 3.49 | 7.23 | 4.73 | 3.23 | 4.38 | 9.12 | 7.97 | 5.59 |
| August | 6.62 | 5.96 | 1.12 | 12.13 | 1.91 | 2.47 | 5.79 | 10.72 | 8.55 | 6.14 |
| Total | 13.54 | 12.76 | 7.51 | 36.77 | 10.56 | 12.71 | 20.71 | 21.92 | 28.42 | . |
| September | 3.38 | 11.27 | 7.62 | 9.71 | 6.01 | 15.82 | 8.92 | 10.77 | 8.37 | 9.09 |
| October | 10.89 | 16.66 | 10.11 | 7.08 | 13.74 | 1.81 | 21.49 | 4.26 | 8.31 | 9.37 |
| November | 1.11 | .99 | .73 | .94 | 2.38 | 2.50 | 3.98 | 2.88 | 4.53 | 2.22 |
| Total | 15.38 | 28.92 | 18.46 | 17.73 | 22.13 | 20.13 | 34.39 | 17.91 | 21.21 | . |
| December | 2.56 | 2.97 | 3.10 | 4.17 | .71 | .56 | .49 | 15.18 | .05 | 2.30 |
| January | .36 | 4.30 | 3.49 | 8.29 | .98 | 6.98 | 2.56 | 1.40 | 2.62 | 3.44 |
| February | .95 | 4.64 | 2.28 | 1.07 | 4.64 | 4.50 | 2.20 | 1.50 | 6.44 | 3.40 |
| Total | 3.87 | 11.91 | 8.87 | 13.53 | 6.33 | 12.04 | 5.25 | 18.08 | 9.11 | . |
| Total annual | 39.10 | 61.93 | 52.63 | 76.09 | 45.79 | 57.30 | 68.68 | 69.79 | 70.85 | . |

003665

CORPS003676

## MONTHLY PRECIPITATION.

### TABLE 2—KISSIMMEE.

| | 1898. | 1899. | 1900. | 1901. | 1902. | 1903. | 1904. | 1905. | 1906. | Average Monthly. |
|---|---|---|---|---|---|---|---|---|---|---|
| March | .00 | 1.68 | 6.07 | 3.51 | 1.88 | 5.84 | .80 | 3.88 | 2.74 | 2.93 |
| April | .12 | 3.06 | 3.02 | 3.23 | 1.73 | .25 | 2.25 | 1.82 | 1.48 | 1.88 |
| May | .35 | 1.60 | 5.84 | 2.96 | .34 | 6.68 | .51 | 7.17 | 6.77 | 3.58 |
| Total | .47 | 6.34 | 14.93 | 9.70 | 3.95 | 12.77 | 3.56 | 12.87 | 10.99 | |
| June | 5.75 | 3.06 | 8.18 | 8.78 | 5.85 | 10.12 | 8.19 | 4.46 | 10.21 | 7.17 |
| July | 7.90 | 8.37 | 5.66 | 2.84 | 5.36 | 6.07 | 8.56 | 14.05 | 6.65 | 7.27 |
| August | 11.41 | 11.06 | 3.23 | 9.91 | 7.27 | 4.31 | 4.53 | 13.90 | 2.59 | 7.57 |
| Total | 25.06 | 22.49 | 17.07 | 21.53 | 18.48 | 20.50 | 21.28 | 32.41 | 19.45 | |
| September | 4.52 | 7.03 | 4.50 | 12.95 | 3.35 | 12.06 | 4.66 | 5.05 | 3.26 | 6.70 |
| October | 5.17 | 15.98 | 4.83 | 1.18 | 3.07 | 1.02 | 6.72 | 3.19 | 2.00 | 4.79 |
| November | .88 | .23 | 1.62 | .67 | 1.15 | 3.56 | 3.15 | .00 | .16 | 1.26 |
| Total | 10.57 | 23.24 | 10.95 | 14.80 | 10.57 | 16.64 | 14.53 | 8.23 | 5.42 | |
| December | 3.02 | 1.60 | 5.00 | 1.35 | .98 | 1.51 | .80 | 9.43 | .04 | 2.64 |
| January | .23 | 5.72 | 4.88 | .92 | .19 | 4.76 | 4.16 | .70 | 6.43 | 3.10 |
| February | 1.12 | 11.53 | 2.65 | 2.26 | 6.07 | 5.04 | 5.16 | .91 | 1.49 | 4.02 |
| Total | 4.37 | 18.85 | 12.56 | 4.53 | 7.22 | 11.31 | 10.12 | 11.04 | 7.96 | |
| Total Annual | 40.47 | 70.92 | 55.51 | 50.56 | 40.22 | 61.22 | 49.49 | 64.55 | 43.82 | |

003666

## MONTHLY PRECIPITATION.
### TABLE NO. 3—FORT MYERS.

|  | 1898. | 1899. | 1900. | 1901. | 1902. | 1903. | 1904. | 1905. | 1906. | Average Monthly. |
|---|---|---|---|---|---|---|---|---|---|---|
| March | .46 | 1.23 | 4.12 | 2.67 | .18 | 7.78 | 1.90 | .18 | 2.84 | 2.35 |
| April | .37 | 1.74 | 2.87 | 1.89 | 1.03 | .00 | 1.10 | 4.83 | .21 | 1.56 |
| May | 3.53 | 1.15 | 4.65 | 2.30 | 1.23 | .71 | 3.57 | 3.97 | 6.12 | 3.02 |
| Total | 4.36 | 4.12 | 11.64 | 6.86 | 2.44 | 8.49 | 6.57 | 8.98 | 9.17 | — |
| June | 2.83 | 5.93 | 7.12 | 20.28 | 8.63 | 10.45 | 14.86 | 5.97 | 11.00 | 9.67 |
| July | 8.16 | 12.08 | 9.63 | 5.23 | 4.60 | 11.40 | 5.60 | 13.90 | 9.69 | 7.81 |
| August | 11.62 | 6.72 | 9.77 | 12.41 | 3.97 | 5.50 | 6.30 | 10.52 | 12.02 | 8.75 |
| Total | 22.62 | 27.43 | 26.52 | 37.92 | 17.20 | 27.35 | 26.76 | 30.39 | 32.71 | — |
| September | 10.73 | 2.31 | 8.29 | 6.86 | 6.60 | 4.15 | 3.07 | 9.09 | 3.39 | 6.05 |
| October | 4.99 | 2.58 | 10.33 | .78 | 7.46 | 1.62 | 1.78 | 1.51 | 2.41 | 3.81 |
| November | 1.29 | .94 | 1.91 | .52 | .96 | 2.02 | 1.93 | .06 | .32 | 1.10 |
| Total | 17.01 | 5.83 | 20.53 | 8.16 | 15.02 | 7.79 | 6.78 | 10.66 | 6.12 | — |
| December | 3.12 | .58 | 2.78 | 1.62 | 2.93 | 1.69 | .83 | 6.31 | .02 | 2.20 |
| January | .05 | 5.21 | 3.17 | .50 | .52 | 4.76 | 3.12 | .50 | 2.02 | 2.20 |
| February | .02 | 8.77 | 3.99 | .72 | 6.79 | 3.37 | 2.00 | .10 | 2.18 | 3.10 |
| Total | 3.19 | 14.56 | 9.94 | 2.84 | 10.24 | 9.74 | 5.95 | 6.91 | 4.22 | — |
| Total annual | 47.17 | 49.24 | 68.63 | 55.78 | 44.90 | 53.37 | 46.00 | 56.84 | 52.22 | — |

003667

CORPS003678



DIAGRAM SHOWING MEAN SEASONABLE DISTRIBUTION OF RAINFALL
AT
JUPITER KISSIMMEE AND FORT MYERS

Explanation  The solid line indicates the actual rainfall during each season
The shaded line indicates approximately the amount of water
required for maximum growth of cane crop

003668

CORPS003679



AVERAGE OF ANNUAL RAINFALL
AT
JUPITER  KISSIMMEE AND FORT MYERS

003669

CORPS003680

The accompanying diagrams show in graphic form the average of the annual rainfalls at Jupiter, Kissimmee and Fort Myers, and also the seasonable distribution of the same for nine years. In the absence of actual gaugings of the rainfall in the Everglades, covering a period of several years, these diagrams may be accepted as the most reliable data available on the subject:

From a careful inspection of the foregoing tables and diagrams the following conclusions are reached:

1.  In five of the nine years reported the total rainfall, if properly distributed, was sufficient to produce a good cane crop.

2.  In four of the nine years reported the total rainfall was not sufficient to meet the requirements for a maximum cane crop.

3.  In four of the nine years the monthly distribution of the rainfall conformed quite closely to the quantities required by the growing cane.

4.  In five of the nine years the distribution was quite irregular, there being a large **excess** in some months and a **deficiency in others**.

6.  During the fall months there is too much rain for the proper ripening of the cane and a good yield of sugar.

In studying the climate of the sugar-producing countries in no place is found a uniform distribution of the rainfall throughout a series of years, and in no place do they grow a maximum crop of cane each year. In Louisiana the rainfall during the spring months ranges from 6.42 to 20.4 inches; in the summer months from

003670

13.49 to 29.98; in the fall months from 3.71 to 20.39; in the winter months from 4.53 to 21.36.

In Porto Rico the rainfall during the spring months ranges from 1.13 to 13.78; in the summer months from 3.92 to 16.12; in the fall from 5.13 to 13.90; in the winter from .51 to 8.11.

In the Everglades it ranges from 3.4 to 11.2 inches in the spring months; from 15 to 30 inches in the summer; from 10.6 to 19 inches in the fall; and from 3.5 to 15 inches in the winter.

## Advantageous Features of the Everglades.

The amount and distribution of the rainfall cannot be controlled by human agency. In some months there will be too much rain, and in some too little for the best growth of sugar cane. With the overflow from Lake Okeechobee cut off, and the outlet canals (seven to ten feet deep) completed, practically all the land in the Everglades can be properly drained by the digging of sufficient lateral ditches. Just how close together and how deep these ditches should be to properly drain the land for the cultivation of sugar cane will depend largely upon the methods of cultivation and the degree of risk, from too much rainfall, the proprietor is willing to assume.

Although sugar cane is a water-loving plant, any amount of rainfall in excess of that required by the plant must be promptly removed or it works an injury. This can be done only by providing adequate drainage. The field ditches must be of sufficient capacity to remove promptly the heaviest rainfall that is likely to occur.

003671

Cane growers, as a rule, do not appreciate this fact. They plant land that is imperfectly drained with a hope that heavy rains may never come. The result is the crop is often damaged and the financial loss in a single year greater than the cost of proper ditching.

### Opinion of Dr. Stubbs.

On the importance of drainage for sugarcane I desire to quote at length from the ''Cultivation of Sugar Cane,'' by William C. Stubbs, Part I, page 39:

''Nowhere on earth is drainage more essential than in the alluvial districts of Louisiana, and while many plantations may be considered well drained, the average planter has not yet fully appreciated the necessity for multiplying open ditches to the extent of forcing his soils to their fullest capacity. This is evidenced by a trip over the State and observing the varying distances between ditches which obtain in different plantations.

''Only in very dry seasons can badly drained lands be made to yield large crops. Since these unfortunately occur only at long intervals, the average yield on such lands is far below their natural capacity. On badly drained lands neither fertilizer nor cultivation have their full effects, hence the discordant opinions which frequenty prevail among our planters from the use of the same fertilizer or the same method of cultivation. From the experiences of this station it is almost impossible to be 'over-drained,' providing the work of draining be intelligently

003672

performed. It is well for every planter to study his system of drainage and examine his ditches, and see if they be deep enough, wide enough and sufficiently abundant to carry off our heaviest rainfalls and retain the 'bottom or ground water' at a constant depth below the surface. Excellent results can be obtained with open ditches, provided they are numerous, deep and wide. In the lower sugar district these ditches should be at least as close as 100 to 125 feet, and deep enough to hold the bottom water at least three feet below the surface.''

### Drainage in the Everglades.

The rainfall is just as heavy in the Everglades as in Louisiana, and because of this field ditches are absolutely necessary; but the muck soil of the Everglades is more porous than the alluvial soil of the sugar lands of Louisiana, and for this reason field ditches need not be so close together.

There is much speculation and difference of opinion as to the proper distance apart, and size and depth of field ditches required, for perfect drainage in the Everglades. While the land is new and the soil porous I believe that field ditches with free outlets 660 feet apart will afford good drainage for the cultivation of sugar cane. When the land has been cultivated a number of years it will become more compact and the ditches will need to be closer together, probably 330 feet apart for good drainage. These ditches should be at least four feet deep and not less than three feet wide on the bottom. The plot between the lateral ditches should

003673



**PLAN OF SUGAR PLANTATION**
Showing System of Drainage and Irrigation Canals

003674

CORPS003685

have frequent shallow surface ditches (called in Louisiana **quarter drains)** to lead the surface water, when the ground is saturated, into the lateral ditches.    These should not be deep enough to interfere with cultivation.

Without a complete system of lateral ditches the growing of sugar cane in the Everglades will be a hazardous business.    There are times when there is too much rainfall for it to be taken up by free evaporation from the soil and by the growing crops.    This surplus must be promptly removed by proper drainage, or the crop will be impaired.    This is particularly necessary in the late fall, when the cane begins to ripen.    Unless the land is thoroughly drained at this time the cane will remain green and the sugar content will be small.

A perfect arrangement for controlling the supply of water can be secured by placing movable dams in the canals on the sugar plantation to cut off the supply from the main arteries and installing a pumping plant of sufficient capacity to empty the canals on the plantation when desirable to do so.    By this method the plane of soil water can be reduced to any level desired. Such a system will provide perfect drainage at all times, thereby insuring the planter against adverse weather conditions.

This same pumping plant can be used to raise the water for irrigation when there there is a low stage in the drainage canals.    The water can be distributed over the land in shallow ditches and let into the furrows between the cane rows and drawn off through the drainage canals, or the dams can be closed and the ca-

6—Ev.

003675

nals filled to the proper stage to water the crop by sub-irrigation.

Because of the low lift and the abundant supply of water at hand the cost of irrigation will be less in the Everglades than in any other sugar-producing district in the world.

Since sugar cane is a crop of high commercial value—$90.00 to $150.00 per acre—no pains should be spared to prepare the land in such a way as to produce a full crop each year. The grower cannot afford to assume any risk that can be provided against by irrigation and drainage.

### Dual Use of Canals.

In planning a system of drains for a sugar plantation in the Everglades the use of the canals for transportation purposes must be given due consideration. The distribution of seed cane at planting, and the hauling of cane from the field to the sugar mill, are important items.

In Louisiana the cane is usually handled from the field to the sugar house in cars, holding from three to seven tons, drawn on a tram road by a small locomotive. This work can be done at much less cost in the Everglades by means of canals and barges.

One mile of tram road, with good ties and thirty-pound steel rails, will cost at least $2,500.00 per mile without the equipment for operating same. A canal twenty feet wide and seven and one-half feet deep will cost about $1,765.00 per mile. The barges and launches necessary to handle 1,200 tons of cane per day

003676

will cost much less than an equipment of cars and locomotives for the same service. In addition to handling the cane, the barges can be used to haul the finished product to the shipping point, while locomotives and cars cannot, without the building of a road for that purpose.

————————

## METHODS TO BE EMPLOYED AND COST OF PREPARING THE LAND.—PLANTING AND CULTIVATING SUGAR CANE IN THE EVERGLADES.

————

### Condition of the Land.

Practically all the land in the Everglades is free from trees and bushes, so there is no expense to be incurred for clearing and grubbing. The saw grass can be burned off, leaving nothing on the ground but a coarse stubble. This burning destroys the seeds of any grasses or weeds, making the cultivation the first year quite easy. The land is too soft, at the present time, to admit of the use of animal power for plowing and cultivating. When it is drained and put in cultivation it will become more compact each year, and in a few years will be firm enough to be cultivated in the usual manner. In Louisiana this work is done with the best mules that can be secured, the initial cost and maintenance of which is a large item of expense. In Cuba, oxen are largely used as the motive power on the sugar plantation.

003677

## A Tractor as Power.

A form of tractor for use on soft ground is now being built by a number of manufacturers.  It is used in the same manner as an ordinary traction engine, and moves readily over ground too soft to carry the weight of a horse or an ox.  These tractors have been thoroughly tried out in the Everglades and are a decided success.  They are also successfully used for plowing swamp lands in southern Louisiana and in the cultivation of sugar beets in the Western States.  Where the land is practically level and free from obstructions, it can be broken and cultivated much cheaper by a steam or gasoline plow than by animal power.

On a large plantation the initial cost of the required number of tractors and gang plows is but little, if any, greater than the cost of the necessary mules and implements to do the same work.  The cost of fuel to operate a tractor is much less than the cost of feed for the animals that would be required to do the same work.  The cost of the labor to operate a tractor and gang plows is much less than the cost of the labor necessary to cultivate the same land with animal power.

During that portion of the year when the tractor is not in use it requires no attention or expense, while mules must be cared for and fed, whether idle or at work.  Where a large number of animals are employed on a plantation, the loss from accident and disease is a large item—much greater than the depreciation of a mechanical equipment.

003678



PLOWING WITH A TRACTOR.

003679

With a machine of this type the raw land in the Everglades can be prepared and planted, at a less cost per acre, than by the methods now in vogue in Cuba, Louisiana or the Hawaiian Islands. One of these tractors will travel at the rate of two miles per hour and will plow a strip one-half rod wide as fast as it moves. At this rate it will plow twenty acres per day of ten hours at a cost for labor and gasoline of twenty dollars per day, or a unit cost of one dollar per acre. The same tractor can be used for harrowing the ground and opening the furrows to receive the seed cane.

### Seed Cane.

For planting any large area in the Everglades for the first time, seed cane will have to be secured from the cultivated lands in Florida and brought to Fort Myers or Fort Lauderdale by rail or on barges. Here it can be transferred to small barges and delivered to the plantation through the drainage canals. This seed cane, delivered at the plantation, will probably cost six dollars per ton.

In common practice four or four and a half tons of seed cane are required to plant one acre. Since the seed cane for planting in the Everglades must be brought a long distance, there is a possibility that many of the eyes or buds will be injured and that some will not sprout. For these reasons it will be prudent to plant at least five tons of seed per acre to insure a good stand.

003680

## Method of Handling.

In order to distribute the seed cane economically in the field, and for the purpose of harvesting the crop, a quantity of portable track in sections of fifteen feet each, made of fifteen-pound "T" rails, and a supply of cane cars, holding two or three tons each, will be required. With this equipment cane can be distributed and planted quickly and cheaply with a minimum of laborers. The cane can also be distributed over the field very economically by means of the tractor used for plowing the land.

Seed cane is usually planted by opening a furrow with a double mould-board plow, and laying the stalks about two to the running foot in the furrow and covering by hand, or with a disc-plow. In some localities, the stalks are cut into short pieces, but this is not necessary unless they are very crooked.

Cane may be planted in the Everglades any time from October to April. Where a large plantation is being established, it will be more economical to purchase seed, and plant about fifteen per cent. of the area the first year, and then use this crop for seeding the remainder of the plantation. After a few years, when the stubble cane begins to deteriorate, about twenty per cent. of the plantation should be replanted each year.

## Cultivation.

The cultivation of sugar cane in the Everglades will be light work. After the saw grass

003681



SUGAR CANE ON MIAMI CANAL.

003682

CORPS003693

is burned, and the land broken, there will be no weed and grass seeds left on the soil, to germinate and spring up the first year. The soil is loose and finely pulverized, and will not bake, and become compacted, so as to break up in clods. The cultivation can be done largely with the tractor, and some form of disc or gang plow. But little hand labor will be required. The land is free from those fine grasses, like nut grass and Johnson grass, that are so hard to destroy. The most common vegetation, after the first year, is coarse weeds, that grow rapidly and are easily killed.

### Care of Ditches.

Since complete and perfect drainage is the key to success in cane culture, the ditches must be kept at all times in good order. The cane rows will run parallel with the field ditches, and the furrows between the rows will collect the surface water in times of heavy rains. Provision must be made for leading the water from these furrows into the side drains. This can be done by shallow furrows or surface ditches, across the plot, at frequent intervals. These need not be deep enough to interfere with the cultivation, but must be kept open at all times.

### Commercial Fertilizer.

It is the opinion of the writer that no commercial fertilizer will be required on this land. Experience will, however, finally determine the matter.

003683

74    FLORIDA EVERGLADES

### Harvesting.

Cutting, stripping and delivering the cane to the sugar mill is an arduous task on a sugar plantation. When one considers there may be thirty to forty tons of cane per acre; that it may be badly blown down and tangled; that each stalk must be cut separately; the heavy cost of harvesting becomes apparent. Each sugar-producing country has its own method (best suited to its conditions) for doing this work. In the Everglades I think the method best suited will be similar to that used in Louisiana. Each stalk of cane will be cut by hand flush with the ground, stripped of its leaves and topped at the proper joint. Three or four rows may be thrown together in small piles, of 100 to 200 stalks. These piles can be gathered by hand labor and placed in cane cars on a portable track alongside the piles of cane. These cars can be handled by a hoisting engine and a wire rope, leading to barges holding forty to sixty tons in the collecting canals. The cars can be unloaded by means of a derrick and grapple. It will probably cost a little more per ton to handle cane in the Everglades than it does in Louisiana, where the ground is firm enough to use mechanical cane loaders and carts.

### Life of Sugar Cane.

In Louisiana they have found, from experience, that it is necessary to dig up the stubble, every two or three years and re-plant the field to maintain a good crop and a profitable yield.

003684

In Cuba, owing to the mild climate, cane grows six to ten years without re-planting. In the Everglades it will probably produce a good yield six to eight years from one planting. This saving, in seed cane and labor is a very important item.

## Cost of Growing Cane.

In the absence of actual experience, I think the following may be taken as a conservative estimate of the cost of preparing the land, cost of seed cane, planting, cultivating and harvesting, first and second years cane crop in the Everglades. After the first year, the cost of preparing the land and the cost of seed cane will be largely eliminated, as the cane will continue to reproduce from the rattoons for a number of years. The cultivation after the first year will be more expensive, as some hand labor will be required, while the plant is young and tender:

ESTIMATED COST OF GROWING SUGAR CANE ON A LARGE PLANTATION IN THE EVERGLADES.

STATEMENT FIRST YEAR.

| | | |
|---|---|---|
| Breaking land with tractor and gang plows.. | $ 1.00 | per acre |
| Pulverizing and bedding with tractor...... | 1.50 | " " |
| Seed cane, 5 tons at 6.00 per ton.......... | 30.00 | " " |
| Distributing and planting seed cane...... | 5.00 | " " |
| Three cultivations with tractor and gangs.. | 3.00 | " " |
| One cultivation with hand tools............ | 2.00 | " " |
| Care of ditches and quarter drains........ | .50 | " " |
| Total cost of production................$43.00 | | " " |
| Conservative yield 35 tons per acre: | | |
| Cutting, stripping and loading at 80 cents per ton.. | $28.00 | |
| Total cost of crop...........................$71.00 | | |

003685

## 76    FLORIDA EVERGLADES

Value of 35 tons at $3.00 per ton................  $105.00
Less cost of production.............................  71.00

Net profit first year ...........................$ 34.00

### STATEMENT SECOND YEAR.

| | | |
|---|---|---|
| Off-barring and scraping stubble...........$ 3.00 | per | acre |
| Five cultivations with tractor.............  5.00 | " | " |
| One cultivation with hand tools............  2.00 | " | " |
| Care of ditches and quarter drains.........  1.00 | " | " |

Total cost of production................$11.00

Conservative yield 35 tons per acre.

Cutting, stripping and loading:
Thirty-five tons at 80 cents per ton.......$ 28.00 per  acre

Total cost of crop....................$ 39.00  "   "
Value of thirty-five tons at $3.00 per ton...........$105.00
Less cost of production...............................  39.00

Net profit second year .........................$ 66.00

For the third and subsequent years the cost of production will be about the same as that for the second year.

In the foregoing estimate of the cost of growing cane in the Everglades no account has been taken of interest on investment on the depreciation of the equipment required for running the plantation. The figures are intended merely to show the probable cost of growing sugar cane under favorable conditions and delivering it to a central factory.

The personal supervision and degree of intelligence exercised in the management of any business has much to do with the cost of operation. This is particularly true of farming. Judgment in preparing the land, selecting the seed and methods of cultivation often have more to do with the harvest than the character

003686

CORPS003697

of the land. Some planters have grown rich in Louisiana growing cane, while others have failed on similar land. The same thing is likely to happen in the Everglades. Unless the land is properly drained and advanced methods of cultivation employed the crop undertaken is likely to be failure, and sugar cane will be no exception to the rule.

From the small patches of cane, I have observed growing around the margin of the Everglades and throughout South Florida, I am fully convinced that with proper methods of culture enormous yields can be secured. In the estimate given, thirty-five tons per acre were taken as a probable yield. This I regard as very conservative. If the soil is put in proper tilth and a good stand of cane is secured and irrigation practiced when needed, I see no reason why the yield may not be forty-five to fifty tons per acre.

I have secured from a reliable source the cost of growing cane by one of the most successful planters in Louisiana, which is as follows.

| | | |
|---|---|---|
| Preparation of the land.....................$ 1.80 | per | acre |
| Fertilizer and applying same.............  6.30 | ” | ” |
| Cane for seed ............................ 15.00 | ” | ” |
| Planting seed cane....................... 6.00 | ” | ” |
| Cultivation ............................. 9.35 | ” | ” |
| Total cost of first year's crop...........$ 38.45 | ” | ” |

In Louisiana the land is re-seeded once in two years, the rotation being: First year, plant cane; second year, stubble cane; third year, corn and cowpeas. The yield of plant cane will

003687

average twenty-five to thirty tons per acre; stubble cane, eighteen to twenty-two tons per acre. The cost of cutting, stripping and hauling cane, under favorable conditions, is estimated at 70 cents per ton. It requires two good mules to properly cultivate twenty acres of cane.

The Cuban Department of Agriculture has issued a bulletin, dated March 9, 1912, in which is given the following data as to the cost of growing cane in Cuba:

| | | |
|---|---|---|
| Preparation of land..............$10.45 to $22.10 per acre | | |
| Cost of planting (including seed). 10.50 to 13.80 " " | | |
| Cost of cultivation.............. 10.55 to 12.00 " " | | |
| Total cost of production........$31.50 to $48.50 " " | | |

The cost of hauling and delivering to the mill is given as follows

| | | |
|---|---|---|
| Cutting and loading.............$12.75 to $18.00 per acre | | |
| Hauling to mill................ 9.00 to 18.00 " " | | |
| Total harvesting .............$21.75 to $36.00 " " | | |

This bulletin says: "Good land in Cuba often yields thirty to thirty-five tons of cane per acre. If irrigation is available, and intense cultivation is employed, it is possible to raise the production to fifty to sixty tons per acre."

### Marketing and Manufacturing.

After a cane crop is grown it must be marketed in the field or converted into syrup or sugar. Throughout Florida and Georgia, where small areas of cane are grown, it is

003688



A MODERN SUGAR FACTORY.

7—Ev.

003689

usually ground in a small mill in the neighborhood and converted into syrup.

In Louisiana, before the war, most of the cane grown was ground on the plantation and made into yellow sugar. Experience has demonstrated this practice is wasteful. A small mill, costing but a few hundred dollars, will extract from forty to sixty per cent. of the juice from the cane, while a heavy, modern mill will extract ninety to ninety-six per cent. at a much less cost per ton of cane ground. Improved methods of converting the juice into sugar are too expensive to install in a small factory. It is also much more profitable to manufacture a high grade of sugar than cheap sugar or syrup. Because of these facts practically all the cane grown in Louisiana, Cuba and the Hawaiian Islands is now ground at Central Factories and made into a high grade of sugar.

Where a plantation is large enough to justify the initial cost, it builds and operates its own factory for grinding the cane grown on the place. For the accommodation of the numerous small planters in a given section, central factories are built, which purchase the cane, within reach, at a fixed price per ton, direct from the grower. In this way the planter gets a fair price for his cane, and the manufacturer makes a profit because of the efficiency and superior advantages of his factory. In most places the price paid per ton for cane is determined each week, by the market price of sugar and the per cent of sucrose in the cane that week. A similar arrangement can be made in the Everglades. To encourage cane growing a large plan-

003690

tation—2,000 to 4,000 acres in cultivation—should be established to furnish seed cane to small planters and provide a reasonable supply of cane for the factory throughout the grinding season.

The sugar mill should have ample capacity to grind all the cane raised on the plantation, and also be able to purchase and grind all the cane raised on the smaller farms near by. Such an arrangement will make it possible for the owners of small tracts to grow sugar cane as a profitable staple crop.

Although sugar cane may not yield as large a return per acre as some vegetables that are now grown, it is practically a sure crop. Where the conditions are at all favorable a total failure of a cane crop is unknown.  With adequate provisions for controlling the water the growing of sugar cane in the Everglades is less hazardous than any other branch of agriculture. It is probably more free from disease than any other staple crop produced in the Uinted States. It requires no special skill in planting and cultivation; it can be harvested any time from December to May; it will produce a profitable crop for five to eight years without replanting. In fact, sugar cane is the ideal staple crop to be grown in the Everglades.

### Supply and Consumption.

There is no probability that the supply of sugar produced in the United States will ever exceed the demand for home consumption. The

003691



SUGAR CANE ON FELLSMERE FARMS.

003692

annual consumption of sugar per capita in this country is steadily increasing. In 1870 it was 32.7 pounds; in 1880, 39.5 pounds; in 1890, 50.7 pounds; in 1900, 58.9 pounds, and in 1910, 79.9 pounds.

The total consumption in the United States, in 1910 (according to the report of Willett & Gray) was 3,405,204 tons. Of this amount (including both cane and beet sugar) 824,574 tons, or less than one-fourth, was produced in the United States. The deficiency was supplied by importing from Hawaii 489,974 tons; from Porto Rico 285,128 tons; from the Philippines 171,-112 tons; making a total of 946,214 tons from our insular possessions, on which no duty was collected. We imported 1,431,888 tons from Cuba, with twenty per cent reduction from the full tariff rates. From other countries were imported 202,536 tons, at full tariff rates, making the total importation for the year 2,580,630 tons. This enormous importation should be produced in the United States. It would require only about 800,000 acres of the best Everglade land, if properly cultivated, to supply this deficiency.

### Value to the State.

There are at least 2,000,000 acres of land in the Everglades and adjacent thereto that are especially adapted to the growth of sugar cane. Most of this land is now non-productive, yielding no revenue either to its owner or to the State.

This land can be cleared and prepared for

003693

planting at a cost of $8.00 to $20.00 per acre. If this were done, and the land planted in sugar cane and properly cultivated, the average yield would not likely be less than thirty tons per acre.   Many persons who have studied the subject, place the yield much higher—forty to fifty tons per acre.

With an average of thirty tons per acre, the yield from this area would be 60,000,000 tons of cane per annum, which, at $3.00 per ton (a very low price), would amount to the enormous sum of $180,000,000.00 per year   This is almost as much as the assessed value of all the property in the State at the present time.   It is more than twenty times the value of the largest citrus crop ever grown in the State.

These figures may seem incredible, yet they are susceptible of actual demonstration and proof.   There are numerous small patches of cane now growing in South Florida, under adverse conditions, that will make more than thirty tons per acre.   It is easy for any one interested to prove this statement, by selecting a small area, measuring the ground, and weighing the cane.   In December or January, when the cane is mature, samples can be selected and analyzed, and the actual sugar content definitely ascertained.   This will be found to be worth more than three dollars per ton, after deducting a reasonable price for grinding and manufacturing.   Such an examination and test can be readily made, and it is worth a great deal more, in determining the value and possibilities of Everglade land, than the opinion of

003694

any expert agriculturist or soil physicist, in the country.

When this land shall have been reclaimed, and utilized for the production of sugar, South Florida will no longer be spoken of as the ''rich man's winter playground,'' but it will actually become the greatest wealth-producing section of the United States.



003695

CORPS003706



T. J. APPLEYARD, STATE PRINTER,
TALLAHASSEE, FLA.

003696

CORPS003707

LIBRARY OF CONGRESS

0 014 497 163 2

003697

| | |
|---|---|
| **From:** | Alderson, Doug |
| **To:** | Navigability Determination |
| **Subject:** | [Non-DoD Source] navigability of waterways |
| **Date:** | Friday, March 30, 2018 1:21:43 PM |

Hello:

We have recently updated our opportunity paddling trails map. To the best of our knowledge, these are waterways around the state that are navigable for kayaks and canoes and have potential to become a state designated paddling trail if they are not currently designated. The maps can be found by region on our website: Blockedhttps://floridadep.gov/parks/ogt/content/florida-greenways-and-trails-system-plan-and-maps <Blockedhttps://floridadep.gov/parks/ogt/content/florida-greenways-and-trails-system-plan-and-maps> . And this is our overall opportunity paddling trails map: Blockedhttps://floridadep.gov/sites/default/files/2018%20FGTS%20Paddling%20Trail%20Opportunity%20Map.pdf <Blockedhttps://floridadep.gov/sites/default/files/2018%20FGTS%20Paddling%20Trail%20Opportunity%20Map.pdf> .

I hope you find this information useful.

Doug

Doug Alderson

Assistant Bureau Chief

Office of Greenways and Trails, Division of Recreation and Parks

850-245-2061

Doug.Alderson@dep.state.fl.us

<Blockedhttp://survey.dep.state.fl.us/?refemail=Doug.Alderson@dep.state.fl.us>

**From:** Lee, Alvin Bryan (Al) SES USARMY CESAD (US)
**To:** Ferguson, John D CIV USARMY CESAD (US); Beter, Dale E CIV USARMY CESAJ (US)
**Subject:** FW: LTG SEMONITE WILCO - : UPDATE: Jacksonville District Navigation Studies
**Date:** Tuesday, April 10, 2018 5:10:44 AM

FYI..SA

-----Original Message-----
From: Kirk, Jason A COL USARMY CESAJ (US)
Sent: Monday, April 9, 2018 10:51 PM
To: Semonite, Todd T LTG USARMY HQDA OCE (US) <Todd.T.Semonite@usace.army.mil>
Cc: Dalton, James C SES USARMY USACE (US) <James.C.Dalton@usace.army.mil>; Holland, Diana M BG
USARMY CESAD (US) <Diana.M.Holland2@usace.army.mil>; Lee, Alvin Bryan (Al) SES USARMY CESAD
(US) <Alvin.B.Lee2@usace.army.mil>
Subject: RE: LTG SEMONITE WILCO - : UPDATE: Jacksonville District Navigation Studies

LTG Semonite,
Acknowledge guidance and WILCO.
Vr/
COL Kirk

-----Original Message-----
From: Semonite, Todd T LTG USARMY HQDA OCE (US)
Sent: Monday, April 9, 2018 10:40 PM
To: Ryan A. Fisher <Ryan.A.Fisher12.civ@mail.mil>; James, Rickey Dale (RD) HON USARMY HQDA ASA CW
(US) <rickey.d.james.civ@mail.mil>
Cc: Diana M. Holland BG <Diana.m.holland2.mil@mail.mil>; Kirk, Jason A COL USARMY CESAJ (US)
<Jason.A.Kirk@usace.army.mil>; Dalton, James C SES USARMY USACE (US)
<James.C.Dalton@usace.army.mil>
Subject: LTG SEMONITE WILCO - : UPDATE: Jacksonville District Navigation Studies

Mr. FISHER:  Tracking all below...clear guidance....will direct my team to execute as directed.

DIANA / JASON:  CEASE WORK on all actions related to the NAVIGABLE WATERS STUDIES to support
ASSUMABLE WATERS STUDY leading to assumption of 404 permit authorities by the STATE of FLORIDA.
See traffic below.  Let's discuss tomorrow if you need more background....do on phone if needed.  Thanks for ALL
you guys do every day to work toward positive results...and appreciate FLEXIBILITY!!

                            Vr  LTG S

LTG Todd T. Semonite
54th Chief of Engineers
Commanding General, USACE
ARMY STRONG……BUILDING STRONG!!

-----Original Message-----
From: Fisher, Ryan A SES USARMY HQDA ASA CW (US) [mailto:ryan.a.fisher12.civ@mail.mil]
Sent: Monday, April 9, 2018 4:08 PM
To: James, Rickey Dale (RD) HON USARMY HQDA ASA CW (US) <rickey.d.james.civ@mail.mil>; Semonite,
Todd T LTG USARMY HQDA OCE (US) <Todd.T.Semonite@usace.army.mil>
Subject: UPDATE: Jacksonville District Navigation Studies

Mr. James/Chief,

I just spoke with the FL DEP Secretary.  Per our discussion last week, he agreed to send a letter to LTG Semonite

that would request the Jacksonville District to cease the navigation studies.  You can expect the letter to arrive later this week.

Ryan

CORPS003715



**DEPARTMENT OF THE ARMY**
**JACKSONVILLE DISTRICT CORPS OF ENGINEERS**
**POST OFFICE BOX 4970**
**JACKSONVILLE, FLORIDA 32232-0019**

**REPLY TO**
**ATTENTION OF**

April 10, 2018

Regulatory Division

# *UPDATED PUBLIC NOTICE*

## *Cessation of Public Comment Period*

<u>TO WHOM IT MAY CONCERN</u>:  The Jacksonville District, U.S. Army Corps of Engineers (Corps), is terminating the comment period for a previously issued public notice titled "Determination of Navigable Waters" and dated March 19, 2018.  As of today, the comment period originally set to expire on April 20, 2018, is considered closed until further notice.

for

Donald W. Kinard
Chief, Regulatory Division

CORPS003717

| | |
|---|---|
| **From:** | Cris Costello |
| **To:** | Navigability Determination |
| **Cc:** | Frank Jackalone |
| **Subject:** | [Non-DoD Source] Sierra Club Comment Submission RE: Determination of Navigable Waters |
| **Date:** | Monday, April 16, 2018 1:59:52 PM |
| **Attachments:** | SIERRA CLUB_Letter to USACE_404 Issue_April 16 2018_FINAL.pdf |
| | Public Notice dated March 19 2018 Determination of Navigability (1).pdf |
| | Public Notice dated April 10 2018 Cessation of Public Comment Period.pdf |
| | Short summary of the use of Florida waters for small scale commerce during the navigation era (2).pdf |
| | Draft Memorandum of Agreement between FDEP and the Corps (2).pdf |
| | Jacksonville District Section 10 Waters (2).pdf |
| | Jacksonville District Section 10 Waters_long list_2017 (2).pdf |
| | awsubcommitteefinalreport_05-2017_tag508_05312017_508_reduced (2).pdf |

Attention:  Determination of Navigable Waters

Please find attached comment letter and seven (7) appendices.


--

Cris Costello
Organizing Manager
Sierra Club
2127 S. Tamiami Trail
Osprey, FL 34229
Cell:  941-914-0421

Office:  941-966-9508
cris.costello@sierraclub.org <mailto:cris.costello@sierraclub.org>

1



April 16, 2018

To: Jason A. Kirk, District Commander;
Copy: Donald W. Kinard, Chief, Regulatory Div.
Department of the Army
Jacksonville District Corps of Engineers
ATTN: Determination of Navigable Waters
P.O. Box 4970
Jacksonville, FL 32232-0019

**Re:  Proposed Florida Department of Environmental Protection's assumption of delegation
of Section 404 Dredge and Fill Permitting authority; Jacksonville District Corps of
Engineers Public Notice dated March 19, 2018 seeking public comment regarding
Determination of Navigable Waters; Jacksonville District Corps of Engineers Public Notice
dated April 10, 2018 titled Cessation of Public Comment Period**

Dear Colonel Kirk:

Sierra Club Florida demands that the Corps completely rectify its inventory of Florida's
navigable waters before any actions take place with regard to the assumption of delegation of
Section 404 dredge and fill permitting authority by Florida's Department of Environmental
Protection (FDEP).  In the penultimate paragraph of the Public Notice dated March 19, 2018
(appendix A) the phrase "To assist with completion of the navigability studies,"  makes it clear
that the Corps does not have a complete inventory of the navigable waters of the state. Sierra
relied on the information in the public notice dated March 19, 2018 specifying the close of the
public comment as April 18, 2018 as the deadline for submitting the requested information. In
the Public Notice dated April 10, 2018 (Appendix B), the public comment period was
peremptorily closed leaving us no clear official avenue to participate as requested in the original
Public Notice.  If the Corps had disclosed in advance that the time limit for submission of
additional information was April 10, comments and additional information would have been
filed by that date.

Discussion:
Allowing the FDEP assumption of delegation process to move forward in the absence of an
accurate inventory of Florida's navigable waters threatens the destruction of even more of our
state's posterity by potentially opening vast swaths of protected wetlands to be  drained to make
way for new development, including open pit mining.  Proponents of such destructive large scale
projects have considerable influence in state elections and policy, and their interests are not
congruent with those of the state or nation, or the intent of the Clean Water Act.  The Corps in

discharging its duty to the federal interest in protecting the nation's waters specified in Section 404 (g)(1) must retain its authority over *all* of those specified waters. In order to fulfill that responsibility, the Corps must know which waters fall into the (g)(1) category. Florida has lost over 9.3 million acres of its original wetland areas[1] to development and must not lose any more. Florida has managed without section 404 permitting authority for forty-six years; a delay of another six months or a year to acquire essential information will not cause lasting damage.

The Corps' lists of navigable waters are incomplete and inadequate. They total 492 Rivers and Creeks and 110 Lakes. The Supplement to those lists totals 1767 Rivers and Creeks and 1186 Lakes and the text prefacing the Supplement's lists includes this sentence, "The District makes no claim that these lists are complete or completely accurate." Thousands of acres of Florida's most important environmental lands could be effectively destroyed if the Government doesn't get the right list of what has to be protected. These lists were done in a rush and the Corps needs to go back and fix them.

Among the numerous resources listing Florida's water bodies are:
- the FDEP 2016 Integrated Water Quality Assessment for Florida, June 2016 (https://floridadep.gov/sites/default/files/2016-Integrated-Report.pdf) in Table 2.1. Florida atlas (p. 34) lists:
  - Total number of rivers and streams: More than 1,700 / 27,561 linear miles
  - Total number of ditch and canal miles: 47,708 linear miles
  - Number of lakes, reservoirs, and ponds: 7,748 (area greater than or equal to 10 acres)
  - Number of known springs: 1,089
- The USF Water Institute's Florida Atlas of Lakes lists 5466 lakes (http://www.wateratlas.usf.edu/atlasoflakes/florida/)
- The 1982 Gazetteer of Florida Lakes refers to 7318 lakes, 3191 named. 624 are over 100 acres; 1483 over 25 acres (http://ufdc.ufl.edu/AA00001540/00001)

These partial and uncertain lists require USACE to go back to the drawing board and contact the officials of each water management district, county, municipality, soil and water conservation district, and the like to find out from the people on the ground where navigable waters are. The Corps should also preserve the ability of waterways to provide a means of transportation for commerce by recognizing the historic use of small Florida streams for commerce during the navigation era of the 19th and early 20th century, when waterways were the only practical avenues of communication. See 'Short summary of the use of Florida waters for small scale commerce during the navigation era.' (Appendix C).

<u>Determination of Navigability Public Notices from the Jacksonville District:</u>
Despite the assertion in the Public Notice of March 19, 2018 that the Corps is performing an analysis of waterways in the state of Florida "in an effort to provide clarity to the regulated public," it is clear that the determination of navigability is a fundamental responsibility of the Corps, especially in light of FDEP's pursuit of assumption of delegation. Section 329 of the Code of Federal Regulations makes this clear:

---

[1] See report of the University of Florida Institute of Food and Agriculture Sciences Florida Wetlands Report (2015) available at https://soils.ifas.ufl.edu/wetlandextension/threats.htm

3

**§ 329.14 Determination of navigability.**
https://www.law.cornell.edu/cfr/text/33/329.14

(a) *Effect on determinations.* Although conclusive determinations of navigability can be made only by federal Courts, those made by federal agencies are nevertheless accorded substantial weight by the courts. **It is therefore necessary that when jurisdictional questions arise, district personnel carefully investigate those waters which may be subject to Federal regulatory jurisdiction under guidelines set out above, as the resulting determination may have substantial impact upon a judicial body**. Official determinations by an agency made in the past can be revised or reversed as necessary to reflect changed rules or interpretations of the law. *(emphases added)*

The langauge of 329.14 (a), "when jurisdictional questions arise", applies. In this case the question is whether the USACE or FDEP will have authority over waters and wetlands that may or may not fall within Section 404 (g)(1). This is not a discretionary activity for the Corps, it is necessary. The Draft Memorandum of Agreement between FDEP and the Corps (Appendix D) contains the following paragraph:

> III. WATERS TO BE ASSUMED A. All waters of the United States, as defined at 40 C.F.R. 232.2, within the State will be assumed by DEP as part of its State 404 Program, with the exception of those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement, as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto as described in Section III.B., below. **For purposes of this agreement, the Corps shall retain permitting authority over those Section 10, Rivers and Harbors Act of 1899 waters, which have been included, as of the effective date of this MOA, on the Jacksonville District Navigable Waters List for the State of Florida in Attachment A,** except those waters included on the list based solely on their historical use. This is consistent with the majority recommendations in the May 2017 Final Report of the Assumable Waters Subcommittee. *(emphases added)*

As of the date of this writing, the Jacksonville District Navigable Waters Lists (http://www.saj.usace.army.mil/Portals/44/docs/regulatory/sourcebook/other_permitting_factors/Jacksonville%20District%20Section%2010%20Waters.pdf) (Appendix E) lists 492 Rivers and Creeks and 110 Lakes. The third sentence of the text preceding the lists reads, **"However, complete lists of all rivers, creeks, ponds, and lakes subject to Corps section 10 authority are not available."** The Supplement to those lists dated October 5, 2017 (http://www.saj.usace.army.mil/Portals/44/docs/regulatory/sourcebook/other_permitting_factors/20171005SupplementToJacksonvilleDistrictSection10Waters.pdf?ver=2017-10-05-123156-363) (Appendix F) as noted above is prefaced by the caveat that "The District makes no claim that these lists are complete or completely accurate." The process of delegating assumption of permitting authority to FDEP must not continue until complete lists are available. The MOA excerpted above in bolded text would, if adopted today, usurp USACE's appropriate jurisdiction over (g)(1) waters simply because no complete list exists. The underlined text in the excerpt

003716

CORPS003727

takes as determinative the majority recommendations of the 2017 Final Report of the Assumable Waters Subcommittee (Appendix G) which is contrary to the USACE's Minority Recommendation.

### § 329.15 Inquiries regarding determinations.
https://www.law.cornell.edu/cfr/text/33/329.15

 **(c)** Specific inquiries regarding the ***jurisdiction*** of the Corps of Engineers can be answered only after a determination whether (1) the waters are navigable waters of the United States or

> **(2)** If not navigable, whether the proposed type of activity may nevertheless so affect the navigable waters of the United States that the assertion of regulatory <u>jurisdiction</u> is deemed necessary.

Since the MOA between FDEP and USACE will set the parameters of Corps and state jurisdictions, it is essential that a complete and accurate list of (g)(1) waters be available.

### § 329.16 Use and maintenance of lists of determinations.
https://www.law.cornell.edu/cfr/text/33/329.16

**(a)** Tabulated lists of final determinations of <u>navigability</u> are to be maintained in each district office, and be updated as necessitated by court decisions, jurisdictional inquiries, or other changed conditions.

**(b)** It should be noted that the lists represent only those waterbodies for which determinations have been made; absence from that list should not be taken as an indication that the waterbody is not navigable.

**(c)** Deletions from the list are not authorized. If a change in status of a waterbody from navigable to non-navigable is deemed necessary, an updated finding should be forwarded to the division engineer; changes are not considered final until a determination has been made by the division engineer.

Section 329.16 (a) requires the maintenance of tabulated lists of final determinations of navigability. That responsibility is not satisfied by the current lists of waters that have been determined to be navigable if the supplemental lists are included as they are, by the USACE's admission, possibly incomplete and/or inaccurate. At best, those lists are necessary but not sufficient as 329.16 (b) makes crystal clear. Finally, 329.16 (c) says "Deletions from the list are not authorized." The elimination of "waters included on the list based solely on their historical use" cited in the Draft MOA between USACE and FDEP would effectively remove these waters from the lists of waters that have been determined to be navigable without following the required procedures of subsection (c).

The Public Notice dated April 10, 2018 titled Cessation of Public Comment Period effectively denies Sierra and others of the opportunity to provide important information to USACE and weakens the ability of the Corps to fulfill its responsibility to determine the navigability of all the waters of the state that may come into question during the assumption of delegation process. The peremptory denial of an official conduit for comment on this important issue belies

recognition by USACE that the existing lists of Florida's navigable waters are inadequate and insufficient to meet regulatory and legal requirements.  Additionally, the April 10 notice incorrectly identifies the public comment deadline as April 20 instead of April 18.  Whether this is a typographical error or a cynical effort to convince members of the public who still wanted to submit their comments to do so after the actual deadline passed so it could be ignored is impossible to know.

Under these circumstances, the USACE must reopen the comment period, and comply with its rules and governing law by correcting the errors in its lists of navigable waters.

Thank you for your prompt attention to this matter.

Sincerely,


Frank Jackalone
Florida Chapter Director
Sierra Club
1990 Central Avenue
St. Petersburg, FL 33712
727-824-8813, Extension 302


**ATTACHMENTS (7)**

**LIST OF APPENDICES**

Appendix A - Public Notice dated March 19, 2018
Appendix B - Public Notice dated April 10, 2018
Appendix C - Short summary of the use of Florida waters for small scale commerce during the
                        navigation era
Appendix D - Draft Memorandum of Agreement between FDEP and the Corps
Appendix E - Jacksonville District Navigable Waters Lists
                        (http://www.saj.usace.army.mil/Portals/44/docs/regulatory/sourcebook/other_perm
                        itting_factors/Jacksonville%20District%20Section%2010%20Waters.pdf)
Appendix F – Supplement to Jacksonville District Navigable Waters Lists
                        (www.saj.usace.army.mil/Portals/44/docs/regulatory/sourcebook/other_permitting
                        _factors/20171005SupplementToJacksonvilleDistrictSection10Waters.pdf?ver=20
                        17-10-05-123156-363)
Appendix G - 2017 Final Report of the Assumable Waters Subcommittee



**DEPARTMENT OF THE ARMY**
JACKSONVILLE DISTRICT CORPS OF ENGINEERS
POST OFFICE BOX 4970
JACKSONVILLE, FLORIDA  32232-0019

REPLY TO
ATTENTION OF

March 19, 2018

Regulatory Division

# *PUBLIC NOTICE*

# *Determination of Navigable Waters*

TO WHOM IT MAY CONCERN:  The Jacksonville District, U.S. Army Corps of Engineers (Corps), seeks input from the public regarding the use of waters within the State of Florida for navigation.

BACKGROUND:  Pursuant to 33 C.F.R. § 329.4, navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce.  A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity.

Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403) (Section 10) requires a Department of the Army (DA) permit for certain activities in, over, or under navigable waters of the United States.  A determination whether a waterbody is a navigable water of the United States is made by the division engineer and is based on a report of findings prepared at the district level according to specific criteria (33 C.F.R. § 329.14(b)).

In an effort to provide clarity to the regulated public regarding which waters are subject to permitting authority under Section 10, the Corps is performing an analysis of waterways in the state of Florida to determine the extent of navigability and identify the limits of Section 10 jurisdiction.

These navigability studies are required by regulation to be conducted and updated whenever a question arises regarding the navigability of a waterbody.  Where no determination has been made, a report of findings will be prepared and forwarded to the Division engineer for approval (33 C.F.R. § 329.15(a)).  Tabulated lists of final determinations of navigability are to be maintained in each district office, and be updated as necessitated by court decisions, jurisdictional inquiries, or other changed conditions (33 C.F.R. § 329.16(a)).

Section 404(a) of the Clean Water Act of 1972 (CWA), 33 U.S.C. § 1344, authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue DA permits for

003719

CORPS003730

the discharge of dredged or fill material into waters of the United States (Section 404 Program). Pursuant to Section 404(g) of the CWA, the Florida Department of Environmental Protection (DEP) is pursuing approval from the United States Environmental Protection Agency (EPA) to assume the Section 404 Program and administer its own individual and general permit program. State assumption of the Section 404 Program would be limited to certain waters and does not include navigable waters of the United States. The navigability studies will also assist with determining the waters that would be retained by the Corps if the EPA approves the State's application for Section 404 Program assumption. The Regulations governing the assumption process can be found at 40 C.F.R. §233.

**To assist with completion of the navigability studies, the Corps is seeking comments from the public regarding use of waters in the state of Florida for navigation. This includes identification of those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities.**

COMMENTS: Comments should be submitted in writing to the District Engineer or sent via email to the below addresses within 30 days from the date of this notice. Please include mapping, figures, coordinates, etc. that clearly identify the reach of the associated waterbody and documentation relating to navigation, commerce, and recreation.

> DEPARTMENT OF THE ARMY
> JACKSONVILLE DISTRICT CORPS OF ENGINEERS
> REGULATORY DIVISION
> ATTN: DETERMINATION OF NAVIGABLE WATERS
> P. O. BOX 4970
> JACKSONVILLE, FLORIDA 32232-0019


> Navigability_Determination@usace.army.mil


for

> Donald W. Kinard
> Chief, Regulatory Division

003720



**DEPARTMENT OF THE ARMY**
**JACKSONVILLE DISTRICT CORPS OF ENGINEERS**
**POST OFFICE BOX 4970**
**JACKSONVILLE, FLORIDA  32232-0019**

REPLY TO
ATTENTION OF

April 10, 2018

Regulatory Division

# *UPDATED PUBLIC NOTICE*

# *Cessation of Public Comment Period*

<u>TO WHOM IT MAY CONCERN</u>:  The Jacksonville District, U.S. Army Corps of Engineers (Corps), is terminating the comment period for a previously issued public notice titled "Determination of Navigable Waters" and dated March 19, 2018.  As of today, the comment period originally set to expire on April 20, 2018, is considered closed until further notice.

for

Donald W. Kinard
Chief, Regulatory Division

003721

**Navigable Lakes and Rivers**

A waterway is navigable under the Rivers and Harbors Act if at any the time it was used or was *capable* of being used as a highway for waterborne trade or travel conducted by the customary modes of that period. To be federally navigable, the watercourse must connect to interstate or international waters. With a handful of exceptions, all streams in Florida flow into waters that ultimately flow into the Atlantic Ocean or Gulf of Mexico. Navigability does not require year-round capacity for navigation, but does require capacity for navigation in the water body's ordinary state. Contemporary capacity for navigation in vessels of the size used for transporting passengers and goods is substantial evidence of navigability. Artificial water bodies or waterways rendered navigable through improvement are legally navigable. Customary modes of waterborne trade and travel in the mid-1800s – prior to the advent of railways – included steamboats,[1] barges,[2] dugout canoes,[3] and home-made skiffs,[4] all of which were used to transport passengers, products of the country, and produce from local farms.[5] Navigability must also be understood in the context of the land transportation system that existed at the time of statehood. Railroads were virtually nonexistent. In 1845, the only railroad in the state ran from Tallahassee to St. Marks, operated on wooden rails, and had carts pulled by mules.[6] Engines didn't arrive until 11 years later.[7] Roads were little better. The legislature declared that public roads were in satisfactory condition so long as the tree stumps left in the road were less than 12 inches high,[8] the few bridges that existed washed out during times of high water, and uncertain ferry service provided crossing of all the major streams.[9] As a result, lakes and streams were by far the most reliable public highways for moving goods and people.

---

[1] Edward A. Mueller, Perilous Journeys: A History of Steamboating on the Chattahoochee, Apalachicola, and Flint Rivers, 1828-1928 (1990); Mueller & Purdy (eds.), The Steamboat Era in Florida (1984); Edward A. Mueller, Steamboating on the St. Johns (1980).

[2] For example, barge traffic is evidenced by the following newspaper advertisement from the Florida Whig: "For Freight or charter. My barge ROUGH AND READY, carrying one hundred and seventy bales cotton, is now in Fine order, with an experienced Captain and crew, will ply regularly, during the business season, between this place and Apalachicola. Freighting done on the most Favorable terms. Apply to ISSAC WIDGEON or the captain on board. Marianna, Oct. 28, 1848."

[3] Dugout canoes were used throughout Florida during the water transportation era. The Museum of Florida History in Tallahassee has an extensive collection of dugout canoes and archives on canoe uses. For example, The Louis, which is displayed in the museum foyer, is a four foot wide, thirty foot long dug out canoe that was constructed in the 1800s and was used through the early 1900s to haul passengers and freight on the St. Johns and its tributaries

[4] *See* Johnson, Highways and Byways of the South 14-15 (1904), describing a planter setting off to market from his farm on the Miami River in a skiff loaded with potatoes, cabbages, poultry, eggs, tomatoes, and bananas.

[5] *Broward v. Mabry,* 50 So. 826 (Fla. 1909), at 829 (describing navigability in terms usefulness of the water body for transport of products of the community in which the water body is located).

[6] Tebeau, A History Of Florida, 142-43 (1971).

[7] *Id.* at 143.

[8] Page 95, Laws of the Territory of Florida, 1822.

[9] Tebeau, *supra* note 9, at 140-41.

CORPS003733

**Determining Navigability**

Given the extensive recorded archives of Florida's rich history, facts establishing navigability are not difficult to ascertain. In the 1997 trial over a landowner's attempts to close Fisheating Creek to the public, the attorney general's office produced documentary evidence of an 1842 naval expedition on the creek using 30-foot-long dugout canoes and evidence of early 20th century navigation to trading posts on the waterway.[10] Based on this evidence, a jury deliberated less than two hours before returning a verdict that Fisheating Creek was navigable. In the previous navigability case which settled in 1987, the attorney general's office marshaled evidence of navigability of the upper reaches of the Peace River including historical newspaper accounts describing the navigability of the river for steamboats,[11] evidence of small scale traffic by commercial fishermen in more recent years,[12] and photographs of a sunken boat near the river's headwaters.[13] In both cases, the navigability of the respective waterways was common knowledge among the people of the locale because the rivers had been used for generations as public waterways.[14]

---

[10] The trip had been recorded in the personal diary of one of the Marines. The diary was subsequently published in a military history journal. Evidence of early 20th century use was provided by deposition testimony of an elderly gentleman who lived near the creek his entire life. Evidence supporting his account included newspaper accounts and photographs.

[11] Historical newspaper articles are a readily available source of information on the day to day use of a water body.

[12] Deposition testimony of commercial fisherman who had used the river.

[13] The boat was over 80 feet long and was known as *The Mayflower*. It was the subject of an underwater archeological excavation during the course of the trial.

[14] The landowner in the Fisheating Creek case had operated had year-round canoe rental and livery service on the creek for almost two decades. In the Peace River case, Polk County at one time operated a boat lift at the river's headwaters and still maintains two boat ramps in the upper reach of the waterway which was in dispute.



003724

CORPS003735



003725



003726

CORPS003737

***DRAFT WORK PRODUCT***

## MEMORANDUM OF AGREEMENT BETWEEN
## THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION
## AND THE DEPARTMENT OF THE ARMY

### I.    PURPOSE AND AUTHORITY

A.    Section 404(g)-(l) of the Clean Water Act of 1972 (CWA) Public Law 92-500, as amended by Public Law 95-217, 33 U.S.C. 1344(g)-(l) authorizes the Administrator of the United States Environmental Protection Agency (EPA) to approve a state administered program for the assumption of the Section 404 permit program for certain waters of the state. The EPA has promulgated regulations at 40 C.F.R. Part 233 outlining its requirements for approving a state program.

B.    The State of Florida (State) is submitting its program for the assumption of the Section 404 program in compliance with the above-cited authorities. This Memorandum of Agreement (MOA) between the State and the United States Army Corps of Engineers (Corps) fulfills the requirements of 40 C.F.R. 233.14.

C.    Section 404 of the CWA authorizes the Secretary of the Army, acting through the Chief of Engineers, to regulate the discharge of dredged or fill material into waters of the United States. The South Atlantic Division of the Corps, acting through the Jacksonville District, currently administers the Section 404 program in the State. The Division Engineer, South Atlantic Division, has been delegated the authority to enter into this MOA.

D.    The Florida Department of Environmental Protection (DEP) pursuant to Part IV of Chapter 373, Florida Statutes, is authorized to issue permits for regulated activities conducted in State regulated waters, including the discharge of dredged and fill material. The Secretary of DEP is given the authority to issue permits pursuant to Part IV of Chapter 373, Florida Statutes, and is the State official charged with administering the State 404 Program when assumed in accordance with 40 C.F.R. Part 233.

### II.    EFFECTIVE DATE AND REVISIONS

A.    Once executed by the signatories, this MOA shall become effective at the time the EPA's approval of the State 404 Program takes effect, which shall be the date set out in the Federal Register of the EPA's decision to approve the State's application to administer the Section 404 program.

B.    This MOA, and procedures established in conformance with it, shall be reviewed as necessary by DEP and the Corps. Either party may request an amendment or modification to the MOA. Amendments and modifications to this MOA shall be in writing and shall be effective upon the signature of both parties.

003727

CORPS003738

***DRAFT WORK PRODUCT***

C.    This MOA will remain in effect until DEP's program authorization is withdrawn or is voluntarily transferred by DEP to the Corps according to the criteria and procedures established in 40 C.F.R. 233.53.

III.    WATERS TO BE ASSUMED

A.    All waters of the United States, as defined at 40 C.F.R. 232.2, within the State will be assumed by DEP as part of its State 404 Program, with the exception of those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement, as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto as described in Section III.B., below. For purposes of this agreement, the Corps shall retain permitting authority over those Section 10, Rivers and Harbors Act of 1899 waters, which have been included, as of the effective date of this MOA, on the Jacksonville District Navigable Waters List for the State of Florida in Attachment A, except those waters included on the list based solely on their historical use. This is consistent with the majority recommendations in the May 2017 Final Report of the Assumable Waters Subcommittee.

B.    The Corps shall retain permitting authority over wetlands adjacent to retained waters, which is defined as those wetlands that are located within 300 feet of the ordinary high water mark of non-tidally influenced surface waters or the mean high water mark of those tidally influenced surface waters that are subject to the ebb and flow of the tide. This is consistent with the majority recommendations in the May 2017 Final Report of the Assumable Waters Subcommittee.

C.    In those waters over which DEP does not assume jurisdiction under the State 404 Program, DEP will retain jurisdiction under State law, and both State and federal requirements will continue to apply.

D.    Modifications to the extent of State assumed waters will be made when the Corps makes a navigability determination in accordance with the provisions of 33 C.F.R. Part 329 that the waterway is presently used or is susceptible to use in its natural condition or by reasonable improvement to transport interstate or foreign commerce. Modifications will be made according to the provisions of Section II.B., above.

IV.    JOINT PROCESSING PROCEDURES

In areas where DEP and the Corps have concurrent permitting authority, DEP and the Corps agree to establish and follow joint processing procedures, as practicable. Such procedures may significantly reduce duplicative regulatory effort by DEP and the Corps, and duplicative requirements upon applicants for DEP and Corps permits. The procedures may include joint applications, mitigation coordination, and creation and implementation of State or regional

003728

CORPS003739

***DRAFT WORK PRODUCT***

programmatic general permits for use in areas where the Corps retains permitting jurisdiction pursuant to Section III, above.

V.    PERMITS AND PENDING PERMIT APPLICATIONS

A.    Individual Permits

Department of the Army individual permits issued prior to the date of assumption for regulated activities in assumable waters shall remain in effect for the purposes of Section 404 after State assumption. These permits shall continue to be effective for the original duration established by the Corps. Requests for extensions or modifications of the above-described permits, after the date of assumption, shall be made to DEP.

B.    Nationwide Permits

After assumption of the Section 404 program by DEP, the Corps will no longer issue nationwide permits for activities in waters assumed by the State. Nationwide permits issued prior to the date of assumption for regulated activities in assumable waters shall remain in effect for the purposes of Section 404 after State assumption. These permits shall continue to be effective for the original duration established by the Corps. After assumption, activities previously subject to a nationwide permit shall only require a permit under the State 404 Program.

C.    General Permits

After assumption of the Section 404 program by DEP, the Corps will no longer issue regional general permits, state programmatic general permits, or any other general permits in waters assumed by the State. Authorizations approved prior to the date of assumption, under existing regional general permits, state programmatic general permits, or any other general permits issued by the Corps for regulated activities in assumable waters shall remain in effect for the purposes of Section 404 after State assumption. These authorizations shall continue to be effective for the original duration established by the Corps. After assumption, all activities previously subject to a regional permit, state programmatic general permit, or any other general permit in waters assumed by the state shall only require a permit under the State 404 Program.

D.    Records Transfer

Upon notification of program approval from the Administrator of the EPA, the Corps will transfer to DEP any pending Section 404 program permit application files and unexpired issued Section 404 program permit files within the area of State assumed waters. Transfer methods shall be mutually agreed upon by DEP and the Corps.

003729

CORPS003740

***DRAFT WORK PRODUCT***

VI.    REVIEW OF APPLICATIONS FOR STATE PROGRAM PERMITS

The Corps reserves the right to review applications for permits to be issued under the State 404 Program, for projects which may substantially impair the anchorage and navigation of Navigable Waters of the United States as defined at 33 C.F.R. Part 329, and projects involving discharges which could have an impact upon existing or proposed Corps projects. The Corps shall provide a list to DEP of proposed Corps projects which may be impacted by projects proposed by other persons. The Corps agrees to update this list as necessary.

VII.    COORDINATION OF MITIGATION BANKING

DEP and the Corps agree that mitigation banking projects shall be subject to review by an Interagency Review Team (IRT) consistent with the 404(b)(1) Guidelines, Subpart J. The IRT shall be chaired by DEP, or its delegate, except where the mitigation bank, including any part of the proposed service area, is located in an area where the Corps retains Section 404 jurisdiction, in which case DEP and the Corps shall co-chair the IRT.

VIII.    ENFORCEMENT

A.    In those waters assumed by the State, the Corps will not be responsible for enforcing against unauthorized discharges of dredged and fill material in violation of the CWA which occur after the effective date of this MOA. DEP will take timely and appropriate enforcement action against persons in violation of any transferred Corps permit conditions or State 404 Program permit conditions and against persons conducting unauthorized discharges of dredged or fill material into State assumed waters.

B.    For those unauthorized activities, which are the subject of ongoing enforcement actions by the Corps, the Corp agrees to transfer these cases to the State. However, upon request by DEP, the Corps will assist in resolving specific cases. If there is an unusual circumstance concerning a violation, the parties to this MOA may discuss the Corps retaining authority to pursue resolution of a violation.

IX.    COMMUNICATION BETWEEN PARTIES

Communication and record sharing between the parties of this MOA may be accomplished through electronic means.

003730

CORPS003741

***DRAFT WORK PRODUCT***

X.    SIGNATURES

**Florida Department of Environmental Protection**


Date: _____          By: _____

**Department of the Army**


Date: _____          By: _____

5

003731

CORPS003742

***DRAFT WORK PRODUCT***

# ATTACHMENT A

## Jacksonville District Navigable Waters Lists

In Florida, Puerto Rico, and the U.S. Virgin Islands, the U.S. Army Corps of Engineers, Jacksonville District, exercises section 10 (of the Rivers and Harbors Act of 1899) regulatory jurisdiction over the Atlantic Ocean, Gulf of Mexico, and Caribbean Sea. Additionally, all or portions of tributaries to the above waters may also be subject to section 10 authority. However, complete lists of all rivers, streams, creeks, ponds, and lakes subject to Corps section 10 authority are not available. Below are lists of waters over which the Jacksonville District currently exercises regulatory jurisdiction under the authority of both section 10 of the Rivers and Harbors Act of 1899 and section 404 of the Clean Water Act on all or a portion of the listed water. The absence of a water on these lists does not mean it or a portion of it is not a navigable water. Likewise, the inclusion of a water on these lists is not meant to imply that the water is subject to section 10 authority in its entirety. All waters subject to the ebb and flow of the tide (tidal action) are navigable waters of the US, and many of the waters listed below have some portion that is subject to the ebb and flow of the tide. Inquiries concerning Department of the Army Permit requirements on these and other tributary streams and lakes not listed below should be submitted on a case-by case basis to the Regulatory Division, Jacksonville District.

The section 10 waters lists (below) from the Jacksonville District were compiled from multiple approved and draft navigability studies conducted during the 1970s and 1980s, and from local knowledge of tidally influenced waters. The District makes no claim that these lists are complete or completely accurate. These lists are for regulatory reference purposes only. They are not a substitute for a jurisdictional determination (JD). It is imperative that you contact the appropriate Regulatory Permit Section for a determination on whether the Corps is able to ascertain if a particular project falls within or outside of section 10 authority.

## STATE OF FLORIDA

### Rivers and Creeks

| | | |
|---|---|---|
| Acosta Creek | Bessey Creek | Bowlees Creek |
| Alafia River | Big Davis Creek | Box Branch |
| Alapaha River | Big Fishweir Creek | Boynton Canal |
| Alapahoochee River | Big Juniper Creek | Braden River |
| Alaqua Creek | Big Marco River | Bradley Creek |
| Alexander Springs Creek | Big Mud Creek | Bray Creek |
| Alligator Creek | Big Mulberry Branch | Brick-Alligator Lake Canal |
| Alligator Lake-Lake Gentry | Billy Creek | Britt Creek |
| Canal | Black Creek | Broad River |
| Amelia River | Black Creek (Walton County) | Brothers River |
| Anclote River | Black Water Creek | Broward Creek |
| Apalachicola River | Blackwater River | Broward River |
| Arlington River | Blind Creek | Browns Creek |
| Aucilla River | Blockhouse Creek | Buck Creek |
| Axle Creek | Blounts Branch | Buckhorn Creek |
| Banana River | Blue Creek | Bull Creek |
| Barrentine Creek | Blue Hole Creek | Bulow Creek |
| Barron River | Blue Springs Run | Bumble Bee Creek |
| Basin Creek | Bluff Branch | Burnt Mill Creek |
| Bayou Marcus Creek | Boathouse Creek | Butcher Pen Creek |
| Bear Creek | Bogey Branch | Butler Creek |
| Bear Creek (Bay County) | Boggy Creek | C-15 Canal |
| Belcher Canal | Bonnet Creek | C-17 Canal |
| Bells River | Botts Creek | C-18 Canal |

6

003732

CORPS003743

***DRAFT WORK PRODUCT***

C-23 Canal
C-24 Canal
C-51 Canal
Cabbage Creek
Callaway Creek
Caloosahatchee River
Camp Branch
Caney Branch
Canoe Creek
Capo Creek
Carpenters Creek
Carrabelle River
Casa Cola Creek
Cat Creek
Cedar Creek
Cedar Point Creek
Cedar River
Cemetery Creek
Chassahowitzka River
Chatham River
Chattahoochee River
Chicopit Bay
Chipola River
Choctawhatchee River
Christopher Creek
Clapboard Creek
Clark Creek
Clarkes Creek
Clear Creek -
Cocohatchee River
Coldwater Creek
Coon Lake-Lake Lizzie Canal
Coral Gables Waterway
Cormorant Creek
Cow Creek
Cowhead Creek
Cracker Branch
Cradle Creek
Craig Creek
Crane Creek
Crooked Creek
Crooked Creek (Martin County)
Crooked River
Crooked River (Franklin County)
Cross Creek
Cross Florida Barge Canal
Crystal River
Cunningham Creek
Cut Creek
Cypress Creek
Danforth Creek
Dania Cut-off canal
Days Creek
Dead River (Kissimmee River)
Dead River (Lake County, Florida)
Dead River (Wakulla County)
Dean Dead River
DeBlieu Creek
Deep Bottom Creek
Deep Creek

Deer Creek
Depot Creek
Dillaberry Branch
Doctors Lake
Dog Branch
Drummond Creek
Dunns Creek
Durbin Creek
East Bay River
East Creek
East River
Eau Gallie River
Econfina Creek
Econfina River
Econlockhatchee River
Egans Creek
Eight Mile Creek
Elbow Branch
Elbow Creek
Eleven Mile Creek
Eph Creek
Escambia River
Estero River
Etonia Creek
Fakahatchee River
Fenholloway River
Fish Creek
Fisheating Creek
Fishing Creek
Fitzpatrick Creek
Five Mile Creek
Flora Branch
Forked Creek
Fort George River
Fourmile Creek
Fox Cut
Frazier Creek
Garden Creek
Get Out Creek
Ginhouse Creek
Goodbys Creeks
Governor Creek
Graham Creek
Grog Branch
Guano River
Gulley Creek
Haines Creek
Half Creek
Halifax River
Hannah Mills Creek
Harney River
Harrison Creek
Harry's Creek
Hatchett Creek
Hatchineha Canal
Haulover Creek
Haw Creek
Haynes Creek
Henderson Creek
Highland Park Run
Hillsboro Canal
Hillsboro River

Hillsborough River
Hitchens Creek
Hog Creek
Hogan Creek
Hogpen Creek
Holiday Harbor
Holmes Creek
Holmes Creek  (Jackson County)
Hominy Branch
Homosassa River
Honey Creek
Hontoon Dead River
Hopkins Creek
Horseshoe Creek
Hospital Creek
Howard Creek
Hudson Bayou
Hulett Branch
Huston River
Ichetucknee River
Imperial River
Inconstantion Creek
Indian Creek
Indian Creek
Indian River
Indian River North
Istokpoga Creek
Jackson Canal
Jackson Creek
Jackson River
Joe River
Johnson Creek
Johnson Creek (Gulf County)
Johnson Slough
Jolly River
Jones Creek
Jones Swamp Creek
Julington Creek
Juniper Creek
Karen Canal
Kendall Creek
Kentner Creek
Kentucky Branch
Kissimmee River
Krueger Creek
L-40 Canal
L-8 Canal
Lafayette Creek
Lake Ajay-Fells Cove Canal
Lake Apopka-Beauclerc Canal
Lake Ashby Canal
Lake Center-Coon Lake Canal
Lake Griffin-Yale Canal
Lake Hart-Ajay Canal
Lake Joel-Myrtle Canal
Lake Joel-Trout Canal
Lake Lizzie-Alligator Canal
Lake Marion Creek
Lake Mary Jane-Hart Canal
Lake Myrtle-Mary Jane Canal
Lake Okeechobee Rim Canal

003733

CORPS003744

***DRAFT WORK PRODUCT***

Lake Okeechobee Waterway
Lake Preston-Myrtle Canal
Lake Worth Lagoon
Lanceford Creek
Lehigh Canal
Leitner Creek
Little Black Creek
Little Cedar Creek
Little Clapboard Creek
Little Double Creek
Little Econlockhatchee River
Little Fishweir Creek
Little Juniper Creek
Little Manatee River
Little Mud Creek
Little Pottsburg Creek
Little River (Biscayne Bay)
Little River (Ochlockonee River)
Little Rocky Creek
Little Saint Marys River
Little Trout River
Little Wekiva River
Little Withlacoochee River
Lofton Creek
Lolly Creek
Long Branch
Long Creek
Lopez River
Lostmans River
Lower Sister Creek
Loxahatchee River
Lumber Creek
Mainard Branch
Manatee Creek
Manatee River
Marshall Creek
Mason Branch
Matanzas River
McCoys Creek
McCullough Creek
McGirts Creek
McQueen Creek
Miami Canal
Miami River
Middle River
Middle River (South and North Fork)
Mill Branch
Mill Log Creek
Mills Creek
Moccasin Branch
Moccasin Slough
Moncrief Creek
Monroe Canal
Moore's Creek
Moore's Creek (Martin County)
Morris Dead River
Morrison Creek
Moses Creek
Moultrie Creek
Mud Creek
Murphy Creek

Myakka River
Myakkahatchee Creek
Nassau River
New Castle Creek
New River (Broward County)
New River (Collier County)
New River (Franklin County)
New River (Pasco County)
New River (Union/Bradford County)
New River Canal off LO
New Rose Creek
Nichols Creek
Ninemile Creek
NN Creek
Norris Dead River
North Fork St. Lucie River
North New River Canal
Ochlockonee River
Ocklawaha River
Old Channel
Oldfield Creek
Oleta River
Open Creek
Orange Creek
Orange Grove Branch
Orange River
Ortega River
Pablo Creek
Paines Branch
Palatlakaha River
Palm River
Payne Creek
Pea River
Peace River
Pecks Branch
Pellicer Creek
Perdido River
Peters Branch
Peters Creek
Phelps Creek
Philippi Creek
Pine Barren Creek -
Pine Log Creek
Pinhook River
Pithlachascotee River
Plummer Creek
Polly Creek
Poncho River
Pond Creek
Poppleton Creek
Porpoise Creek
Pottsburg Creek
Puckett Creek
Pumpkin Hill Creek
Rainbow River
Red House Branch
Reedy Creek
Ribault River
Rice Creek
Robinson Creek
Rock Springs Run

Rocky Creek
Rocky Creek (Okaloosa/Walton)
Rodgers River
Rosalie Creek
Rushing Branch
Saint Sebastian River
Salt Creek
Salt Creek (Dixie County)
Salt Run
Salt Springs Run
San Carlos Creek
San Julian Creek
San Sebastian River
Sand Beach Branch
Sandy Creek
Sandy Run
Santa Fe River
Saul Creek
Sawpit Creek
Scipio Creek
Scoggin Creek
Shad Creek
Shark River
Shell Creek
Shingle Creek
Shipyard Creek
Shired Creek
Shoal River
Short Canal
Silver Glenn Springs Run
Silversmith Creek
Simms Creek
Simpson Creek
Sink Creek
Sisters Creek
Six Mile Creek
Sixteen Mile Creek
Smith Creek (Flagler)
Smith Creek (St. Johns)
Snake Creek
Snell Creek
Soap Creek
Soldier Creek
Soldier Creek (Escambia County)
Sombrero Creek
Sopchoppy River
South Amelia River
South Fork Black Creek
South Fork St. Lucie River
South Port Canal
Spring Creek
Spring Garden Creek
Spring Warrior Creek
Spruce Creek
St Francis Dead River
St. Cloud Canal
St. Johns River
St. Lucie Canal
St. Lucie River
St. Marks River
St. Marys River

003734

CORPS003745

***DRAFT WORK PRODUCT***

Steinhatchee River
Stokes Creek
Stranahan River
Strawberry Creek
Styles Creek
Summer Haven River
Suwannee River
Sweetwater Creek
Swimming Pen Creek
Tarpon River
Taylor Creek
Telogia Creek
Ten Mile Creek
Terrapin Creek
Thomas Creek
Thomas Mill Run
Three Otter Creek
Tiger Creek
Tocoi Creek
Tolomato River

Tomoka River
Trout -Coon Lake Canal
Trout Creek
Trout River
Turkey Creek
Turkey Creek (Okaloosa County)
Turner River
Upper Sister Creek
Waccasassa River
Wacissa River
Wakulla River
Walker creek
Wares Creek
Warf Creek
Warner Creek
Weeki Wachee River
Wekiva River
Weohyakapka Creek
West Branch
West Palm Beach Canal

West Run Cracker Branch
Wetappo Creek
Whitney River
Whittenhorse Creek
Williamson Creek
Willoughby Creek
Wills Branch
Withlacoochee River (central Florida)
Withlacoochee River (north Florida)
Woodruff Creek
Wrights Creek
Wrights Creek (Walton County)
Ximanies Creek
Yellow River
Ziegler Dead River

## Lakes

Adams Lake
Alligator Lake
Blue Cypress Lake
Blue Lagoon
Brick Lake
Cherry Lake
Clark Lake
Clear Lake
Coon Lake
Crescent Lake
Cypress Lake
Dead Lakes
Deer Point Lake
Doctors Lake
Dumfoundling Bay
East Lake Tohopekaliga
Fells Cove
Horseshoe Mud Lake
Kimball Lake
Lake Ajay
Lake Apopka
Lake Ashby
Lake Beauclair
Lake Beresford
Lake Carlton
Lake Center
Lake Cone
Lake Dexter
Lake Dora
Lake Emma
Lake Eustis
Lake Florence
Lake Gentry
Lake George
Lake Griffin

Lake Harney
Lake Harris
Lake Hart
Lake Hatchineha
Lake Hell 'n Blazes also called
Lake Hellen Blazes or Lake
Helen Blazes
Lake Ida
Lake Istokpoga
Lake Jackson
Lake Jessup
Lake Jesup
Lake Joel
Lake Kissimmee
Lake Lizzie
Lake Louisa
Lake Lucy
Lake Manatee
Lake Manatee (Manatee County)
Lake Mangonia
Lake Marion
Lake Mary Jane
Lake Minnehaha
Lake Minneola
Lake Monroe
Lake Myrtle
Lake Nellie
Lake Okeechobee
Lake Ola
Lake Osborne
Lake Poinsett
Lake Powell
Lake Preston
Lake Rosalie
Lake Rousseau

Lake Santa Fe
Lake Seminole (Gadsden, Jackson Counties)
Lake Seminole (Leon County)
Lake Seminole (Pinellas County)
Lake Susan
Lake Talquin
Lake Tarpon
Lake Thonotosassa
Lake Tohopekaliga
Lake Washington
Lake Weohyakapka
Lake Wimico
Lake Winder
Lake Woodruff
Lake Yale
Little Lake George
Little Lake Harris
Little Lake Santa Fe
Little Sawgrass Lake
Lochloosa Lake
Loughman Lake
Marco Lake
Maul Lake
Mud Lake
Orange Lake
Puzzle Lake
Rodman Reservoir
Ruth Lake
Salt Lake
Sawgrass Lake
Silver Lake
Spring Garden Lake
Stagger Mud Lake
Tick Island Mud Lake

003735

CORPS003746

***DRAFT WORK PRODUCT***

Tiger Lake                          Ward Lake
Trout Lake                          Ward Lake (Manatee County)
Tsala Apopka Lake



003736

CORPS003747

Supplement

to the

Jacksonville District Navigable Waters Lists

October 5, 2017

The waters named below were those identified in the first preliminary increment of an effort to update the Jacksonville District Navigable Waters List (List).  Some of the waters named below are duplicated on that List.  Some of the waters below are in addition to that List.  There may be additional waters not listed either below or on the List.

The District makes no claim that these lists are complete or completely accurate.  These lists are for regulatory reference purposes only.  They are not a substitute for a jurisdictional determination (JD).  It is imperative that you contact the appropriate Regulatory Permit Section for a determination on whether the Corps is able to ascertain if a particular project falls within or outside of section 10 authority.

# STATE OF FLORIDA

## Rivers and Creeks

| | | |
|---|---|---|
| Acorn Lake Creek | Ates Creek | Bayou Canal |
| Acosta Creek | Athena Warrior Creek | Bayou Creek |
| Adams Mill Creek | Attapulgus Creek | Bayou George Creek |
| Adams Spring Branch | Aucilla River | Bayou Marcus |
| Addison Creek | Austin Bayou | Bayou Texter |
| Africa Bayou | Avocado Creek | Bayview Creek |
| Airport Canal | Axle Creek | Beale Creek |
| Alafia River | Back River | Bear Bay Creek |
| Alapaha River | Back Slough | Bear Branch |
| Alapahoochee River | Baggett Creek | Bear Creek |
| Alaqua Creek | Bailey Branch | Bearman Creek |
| Alexander Springs Creek | Bailey Mill Creek | Beasley Creek |
| Alice Creek | Baird Creek | Beatty Bayou |
| Allen Creek | Baker Bayou | Beaver Branch |
| Alligator Bayou | Baker Branch | Beaver Creek |
| Alligator Branch | Baker Creek | Beaverdam Creek |
| Alligator Creek | Banana Branch | Bedman Creek |
| Amason Creek | Banana Creek | Bee Branch |
| Amberjack Cove | Banana River | Beech Branch |
| Amelia River | Bannahassee River | Beecher Run |
| Ammonia River Sand Slough | Barbecue Branch | Beetree Slough |
| Anclote River | Barber Branch | Belcher Canal |
| Andrews Creek | Barnett Creek | Bell Bay Branch |
| Andrews Mill Creek | Barnett Mill Creek | Bell Branch |
| Angelfish Creek | Barron River | Bell Creek |
| Angelico Branch | Basin Bayou | Bells Leg |
| Angelwing Creek | Basin Creek | Bells River |
| Apalachicola River | Bass Branch | Bellshead Branch |
| Arbor Bush Branch | Bass Brinks Creek | Bends Creek |
| Arbuckle Branch | Bass Slough | Bennetts Creek |
| Arbuckle Creek | Basset Branch | Bessy Creek |
| Arch Creek | Battle Creek | Bethel Creek |
| Archie Creek | Bauldree Branch | Bethel Spring Branch |
| Arlington River | Bay Branch | Betsy Branch |
| Ash Slough | Bay Head Branch | Big Bayou |

CORPS003748

Big Bear Creek
Big Boggy Branch
Big Branch
Big Branch Beaver Creek
Big Coldwater Creek
Big Creek
Big Cypress Branch
Big Cypress Creek
Big Davis Creek
Big Ditch
Big Fishweir Creek
Big Flounder Creek
Big Fork
Big Head Branch
Big Horse Creek
Big Jones Creek
Big Juniper Creek
Big Lige Branch
Big Magnesia Creek
Big Mound Creek
Big Muddy Creek
Big Mulberry Branch
Big Rock Creek
Big Sable Creek
Big Slough
Big Spring Creek
Big Sweetwater Creek
Big Trout Creek
Big West Bayou
Billies Branch
Bills Arm
Billy Creek
Billys Branch
Bird Branch
Bird Creek
Bird Island Creek
Bishop Creek
Bivens Creek
Black Branch
Black Creek
Black Lake
Black Prong
Black Rock Creek
Black Water Creek
Blackburn Canal
Blackjack Creek
Blackwater Creek
Blackwater River
Blakeslee Creek
Blanket Bay Slough
Blind Creek
Blockhouse Creek
Blount Creek
Blount Mill Creek
Blounts Branch
Blue Creek
Blue Spring Creek
Bluff Branch
Bluff Creek
Boardhead Branch
Boat Creek
Boathouse Creek

Bogey Branch
Boggess Creek
Boggy Bayou
Boggy Branch
Boggy Creek
Boggy Jordan Bayou
Bogy Branch
Boiling Creek
Bone Creek
Bonnet Gully
Bonnet Pond
Booker Creek
Boone Creek
Bootheel Creek
Bostick Branch
Botheration Bayou
Botheration Creek
Bottle Branch
Botts Creek
Boutwell Branch
Bowen Branch
Bowlees Creek
Bowlegs Creek
Bowman Bayou
Box Branch
Braddock Creek
Braden River
Bradford Brook
Bradley Creek
Braggs Branch
Brandy Branch
Brandy Creek
Brannen Creek
Branning Branch
Bray Creek
Bray Mill Creek
Brickyard Creek
Brickyard Cut Off
Brickyard Slough
Bridge Branch
Bridge Creek
Britches Creek
Britt Branch
Britt Creek
Broad Creek
Broad River
Brock Mill Branch
Brooks Branch
Broomstraw Branch
Brothers River
Broward River
Brown Branch
Brown Creek
Broxson Branch
Bruce Creek
Brush Creek
Brushy Creek
Buck Bayou
Buck Branch
Buck Creek
Buck Head Branch
Buck Pelt Branch

Bucket Branch
Buckford Creek
Buckhannon Branch
Buckhead Slough
Buckhorn Creek
Buffalo Mill Creek
Bull Branch
Bull Creek
Bullfrog Creek
Bulow Creek
Bumblebee Creek
Bumpy Creek
Burgess Creek
Burkett Bayou
Burnt Grocery Creek
Burnt Mill Creek
Burton Creek
Butcher Pen Creek
Butler Creek
Buttermilk Slough
Cabbage Creek
Cabbage Drain
Cabbage Slough
Caesar Creek
Caldwell Branch
Calf Branch
California Creek
Callalisa Creek
Callaway Creek
Caloosahatchee Canal
Caloosahatchee River
Camp Branch
Camp Creek
Campbell Branch
Campbell Creek
Campbells Mill Creek
Canal C-41A
Canaveral Barge Canal
Caney Branch
Caney Creek
Cannon Creek
Canoe Creek
Capo Creek
Carlisle Lake
Carlton Branch
Carpenter Creek
Carr Branch
Carr Spring Branch
Carrabelle River
Carroll Creek
Carter Branch
Carter Creek
Casa Cola Creek
Cash Creek
Cat Creek
Catfish Branch
Catfish Creek
Catfish Slough
Catfish Waterway
Cebe Land Cutoff
Cedar Branch
Cedar Creek

CORPS003749

Cedar Hammock Creek
Cedar Point Creek
Cedar River
Cedar Swamp Creek
Cemetery Creek
Chaires Creek
Chandler Hammock Slough
Chandler Slough
Chapel Branch
Charley Creek
Charlie Creek
Chassahowitzka River
Chatham River
Chattahoochee River
Cherry Branch
Chicken Head
Chicken Slough
Chickenhouse Branch
Chipley Creek
Chipola Cutoff
Chipola River
Chito Branch
Choctawhatchee River
Christopher Creek
Chub Creek
Chub Slough
Chula Vista Bayou
Church Creek
Churchhouse Branch
Clabber Creek
Clapboard Creek
Clark Branch
Clark Creek
Clarkes Creek
Clay Branch
Clay Creek
Clay Gully
Clear Branch
Clear Creek
Clearwater Creek
Cleve Hinton Creek
Cobb Branch
Cobb Creek
Cochran Slough
Cockroach Creek
Cocohatchee River
Coffee Branch
Colorinda Creek
Columbia Spring
Commander Creek
Compass Point Creek
Conecuh River
Cook Creek
Cooks Bayou
Coon Camp Branch
Coon Head
Coon Head Branch
Coons Bay Branch
Cooper Branch
Cooper Creek
Coot Creek
Coral Creek

Corbett Branch
Corbit Branch
Cork Slough
Corley Slough
Cormorant Branch
Cossiers Creek
Cosson Mill
Cotton Creek
Counterfeit Mill Creek
Covas Creek
Cow Creek
Cow House Creek
Cow Log Branch
Cowdevil Creek
Cowhead Creek
Cowpen Branch
Cox Creek
Coxes Branch
Crab Creek
Crabgrass Creek
Cracker Branch
Cradle Creek
Craig Creek
Crane Branch
Crane Creek
Crawford Creek
Creighton Bayou
Crooked Creek
Crooked River
Crooked Run
Cross Bayou Canal
Cross Branch
Cross Creek
Cross Cypress Branch
Cross Florida Barge Canal
Crossway Branch
Crystal River
Cunningham Creek
Cuno Creek
Curiosity Creek
Curlew Creek
Curry Creek
Cushion Creek
Cut Creek
Cut Off Creek
Cypress Branch
Cypress Creek
Cypress Pond Branch
Cypress River
Cypress Slough
Cypress Strand
Dallus Creek
Dan May Creek
Danforth Creek
Daughtrey Creek
Dave Branch
Davenport Creek
Davis Branch
Davis Mill Creek
Days Creek
Dead Boy Creek
Dead End Creek

Dead River
Deadfall Creek
Deadmans Branch
Dean Creek
Dean Dead River
DeBarry Creek
Deep Bottom Creek
Deep Branch
Deep Creek
Deep Creek Diversion Canal
Deer Creek
Deer Moss Creek
Deer Prairie Creek
Deer Prairie Slough
Deese Creek
Delaney Creek
Delaney River
Demory Creek
Denham Bayou
Dennis Creek
Depew Creek
Depot Creek
Devall Branch
Devils Den Creek
Devon Creek
Diamond Creek
Dick Creek
Dillaberry Branch
Dip Vat Branch
Dismal Creek
Dispatch Creek
Ditch Branch
Divedapper Creek
Dog Branch
Dolphin Creek
Doorshutter Creek
Dorset Creek
Double Barrel Creek
Double Branch
Double Branches
Double Hammock Creek
Double Head Branch
Double Run Creek
Douglas Slough
Dove Creek
Doyle Bayou
Doyle Creek
Dram Branch
Driver Branch
Drummond Creek
Dry Branch
Dry Creek
Dry Ford Branch
Dry Run
Duck Creek
Duck Pond Branch
Duck Slough
Duckwater Branch
Dug Creek
Dunham Branch
Dunn Creek
Dunns Creek

CORPS003750

Durbin Creek
Dusenbury Creek
Duval Branch
Eagle Creek
Eagle Nest
Eagle Nest Bayou
Eaglenest Creek
Early Branch
Earnest Mill Creek
East Bay River
East Branch Coral Creek
East Branch Fourmile Creek
East Branch Mare Creek
East Branch Troublesome Creek
East Creek
East Cutoff
East Cutoff Creek
East Fork Big Coldwater Creek
East Fork Juniper Creek
East Fork Manatee River
East Fork Syfrett Creek
East Goose Creek
East Griffin Creek
East Pepper Creek
East Pittman Creek
East River
East River Cut Off
East Run Cracker Branch
Eaton Creek
Eau Gallie River
Econfina Creek
Econfina River
Econlockhatchee River
Edwards Creek
Egans Creek
Eightmile Creek
Eightmile Slough
Elbow Branch
Elbow Creek
Elevenmile Creek
Ellis Branch
Ellis Creek
Elwood Branch
English Branch
English Creek
Eph Creek
Equaloxic Creek
Ericson Creek
Escambia River
Estero River
Etonia Creek
Evans Creek
Evans Slough
Everett Slough
Faka Union River
Fakahatchee River
Falling Branch
Falling Creek
Fanning Branch
Farley Creek
Farm Creek
Farmdale Bayou

Fenholloway River
Ferguson River
Fern Creek
Ferrell Branch
Ferry Pass Bayou
Finns Slough
First Branch
First Puncheon Branch
Fish Branch
Fish Creek
Fish Pond Branch
Fish Slough
Fishbone Creek
Fisheating Creek
Fisher Branch
Fishing Creek
Fitzpatrick Creek
Fivemile Creek
Flag Creek
Flat Branch
Flat Creek
Fleming Creek
Fletcher Creek
Flint Creek
Flopbuck Creek
Flora Branch
Florida River
Forked Creek
Fort Crawford Creek
Fort Drum Creek
Fort Gadsden Creek
Fort George River
Fort Kirkland Branch
Fort Simmons Branch
Four Mile Branch
Four Mile Creek
Four Tree Cut Off
Fourmile Creek
Fowler Branch
Fox Branch
Fox Creek
Fox Cut
Fox Head Branch
Frazier Creek
Freeman Creek
Frenchman Creek
Frenchmans Creek
Frog Creek
Frye Canal
Fuller Creek
Fundy Bayou
G Creek
Gable Branch
Gamble Creek
Game Creek
Gander Creek
Gap Creek
Garden Creek
Gardner Creek
Gardner Run
Garnier Creek
Garrett Branch

Gaskin Branch
Gates Creek
Gator Branch
Gator Creek
Gator Slough
Gee Creek
Geiger Creek
Georgia Fruit Farm Creek
Get Out Creek
Ghost Creek
Giger Creek
Gilley Creek
Gilshey Branch
Ginhouse Branch
Ginhouse Creek
Glenn Branch
Goat Creek
Goddard Creek
Goldfish Creek
Gomez Creek
Goodbys Creek
Goodwin Creek
Goose Creek
Gopher Creek
Gopher Gully
Gopher River
Gordon River
Gore Branch
Goshum Branch
Gottfried Creek
Gourd Bay
Governors Bayou
Governors Creek
Graham Creek
Grand Canal
Grandaddy Branch
Grape Head Branch
Grassy Creek
Graves Creek
Graveyard Branch
Graveyard Creek
Grayson Slough
Green Branch
Greenfield Creek
Greenhead Branch
Greens Creek
Gregory Mill Creek
Griffin Branch
Grog Branch
Grooms Creek
Groover Branch
Grouper Creek
Guana River
Guardhouse Branch
Gude Branch
Guinea Creek
Gulf County Canal
Gulley Branch
Gully Branch
Gum Branch
Gum Creek
Gum Drift Slough

Gum River
Gum Slough
Gum Springs Branch
Gum Swamp Branch
Gun Branch
Gunn Creek
Half Creek
Halfway Creek
Halifax River
Hall Creek
Halls Branch
Halls River
Hammock Branch
Hammock Creek
Hampton Branch
Hancock Creek
Hannah Branch
Hannah Mills Creek
Hansford Branch
Happy Creek
Harden Creek
Harlow Branch
Harney River
Harris Creek
Harrison Creek
Harrys Creek
Hart Branch
Harvey Creek
Harvey Prong
Hathaway Mill Creek
Haulover Canal
Haulover Creek
Haw Creek
Hawthorne Creek
Hayes Creek
Heidelberg Branch
Helverson Creek
Henderson Branch
Henderson Creek
Henderson River
Henderson Slough
Hendry Creek
Henry Creek
Hewett Bayou
Hickey Branch
Hickey Creek
Hickory Branch
Hickory Creek
Hickory Slough
Hickory Tree Flat Slough
Hicks Creek
Hidden Johnson Creek
Higgenbotham Creek
High Bluff Creek
High Hill Creek
Highland Park Run
Hillsborough River
Hodges Branch
Hoffman Creek
Hog Branch
Hog Creek
Hog Island Creek

Hog Pen Branch
Hogan Creek
Hogpen Branch
Hogpen Creek
Hogtown Creek
Hole in the Wall
Holley Branch
Holliman Branch
Hollin Creek
Hollis Branch
Hollomans Branch
Holly Creek
Holman Branch
Holmes Creek
Holton Creek
Holy Creek
Hominy Branch
Homosassa River
Honey Creek
Honey Run
Hontoon Dead River
Hopkins Creek
Horns Creek
Horse Creek
Horse Island Creek
Horsehead Creek
Horsehead Run
Horseshoe Creek
Hosford Branch
Hospital Creek
Howard Creek
Howell Branch
Howell Creek
Hubbard Branch
Hubbert Branch
Huckaby Creek
Huckleberry Creek
Hudson Creek
Hughes Ditch
Hulett Branch
Hunter Branch
Hunter Creek
Hurddles Creek
Hurricane Branch
Hurricane Creek
Hurst Branch
Huston River
Hynote Branch
Ichetucknee River
Imperial River
Inconstanton Creek
Indian Bayou
Indian Branch
Indian Camp Creek
Indian Creek
Indian Mound Slough
Indian River
Ingram Creek
Inlet Creek
Intracoastal Waterway
Irvine Slough
Irwin Creek

Island Branch
Island Creek
Istokpoga Canal
Istokpoga Creek
Itchepackesassa Creek
Jack Branch
Jack Creek
Jacks Branch
Jacks Creek
Jackson Creek
Jackson River
Jacobs Creek
Jakes Bayou
Jane Green Creek
Jeffs Cowpen Creek
Jenkins Creek
Jerry Branch
Jewfish Creek
Jim Branch
Jim Creek
Jim Green Creek
Jim Lee Creek
Joe Lamb Branch
Joe River
Joel Branch
John Branch
Johns Creek
Johns Island Creek
Johnson Branch
Johnson Creek
Johnson Mill Branch
Johnson Slough
Johnsontown Bayou
Jolly River
Jones Creek
Jones Mill Creek
Jones Rice Mill Branch
Josephine Creek
Joshua Creek
Joyce Branch
Julian Mill Creek
Julington Creek
Jumper Creek
Jumping Gully
Jumping Gully Branch
Jumping Gully Branch
Juniper Branch
Juniper Creek
Juno Canal
Jupiter Canal
Karen Canal
Keen Branch
Kelley Branch
Kelly Branch
Kelly Creek
Kelly Spring Branch
Kendall Creek
Kennedy Creek
Kentucky Branch
Kestner Creek
Kettle Creek
Kid Creek

CORPS003752

King Branch
King Creek
Kings Creek
Kingsley Creek
Kiser Branch
Kissimmee River
Kitchen Branch
Kitching Creek
Kohler Bayou
Krueger Creek
L Bowden Creek
Lafayette Creek
Laird Mill Creek
Lake Dale Branch
Lake Drain
Lake Marion Creek
Lanceford Creek
Langston Branch
Larkin Slough
Lawton Branch
Lee Branch
Left Hand Turner River
Leitner Creek
Lemkin Creek
Lemon Creek
Lettuce Creek
Lettuce Lake Cutoff
Lighter Knot Creek
Lightwood Knot Creek
Lilly Creek
Lily Miller Branch
Limestone Branch
Limestone Creek
Linderman Creek
Linton Spring Branch
Little Alaqua Creek
Little Alligator Creek
Little Angelfish Creek
Little Aucilla River
Little Basin Creek
Little Bear Creek
Little Black Branch
Little Black Creek
Little Boggy Creek
Little Branch Beaver Creek
Little Bullfrog Creek
Little Cedar Bayou
Little Cedar Creek
Little Chaires Creek
Little Charlie Creek
Little Cow Creek
Little Creek
Little Crooked Creek
Little Cypress Creek
Little Denham Bayou
Little Dispatch Creek
Little Dram Branch
Little Dunn Creek
Little Econlockhatchee River
Little Escambia Creek
Little Fishhawk Creek
Little Fishweir Creek

Little Flounder Creek
Little Fort Crawford Creek
Little Grooms Creek
Little Gum Creek
Little Harden Creek
Little Haw Creek
Little Horse Creek
Little Huckleberry Creek
Little Juniper Creek
Little Magnesia Creek
Little Manatee River
Little Moccasin Creek
Little Monteocha Creek
Little Mulberry Branch
Little Orange Creek
Little Payne Creek
Little Porpoise Creek
Little Pottsburg Creek
Little Pumpkin Creek
Little Redfish Creek
Little Reedy Branch
Little River
Little River Canal
Little Rocky Creek
Little Run
Little Sable Creek
Little Saint Marks River
Little Saint Marys River
Little Sandy Creek
Little Shark River
Little Simpson River
Little Sixmile Creek
Little Snake Creek
Little Spring Creek
Little Sweetwater Creek
Little Tide Creek
Little Tomoka River
Little Trout Creek
Little Trout River
Little Wekiva River
Little White River
Little Withlacoochee River
Little Wood River
Littles Bayou
Live Oak Creek
Live Oak Cutoff
Livingston Creek
Lochloosa Creek
Lock Creek
Lofton Creek
Log River
Lolly Creek
London Creek
Lone Cabbage Creek
Long Bayou
Long Branch
Long Branch Creek
Long Creek
Long Grassy Creek
Lost Creek
Lostmans Creek
Lostmans Creek Number Three

Lostmans River
Lower Sister Creek
Lows Creek
Loxahatchee River
Lucy Branch
Lukens Creek
Lumber Creek
MacDonald Creek
Machine Branch
Mack Bayou
Magee Branch
Magnolia Creek
Magnolia Slough
Main Canal
Mainard Branch
Malloy Branch
Malone Creek
Malone Hammock Branch
Manatee Creek
Manatee River
Manning Creek
Manuel Branch
Maple River
Mapps Creek
Mare Branch
Maria Branch
Marian Creek
Mars Canal
Marsh Branch
Marshall Creek
Mary Slough
Mason Branch
Mason Creek
Matanzas River
Mathison Creek
Max Branch
May Creek
May Mill Creek
Mayo Mill Branch
McBride Branch
McBride Slough
McCall Branch
McCollough Branch
McCormick Creek
McCostill Mill Creek
McCoy Branch
McCoy Creek
McCullough Creek
McDavid Creek
McDonald Branch
McGirts Creek
McIntyre Creek
McIver Branch
McKay Creek
McKinney Branch
McKinnon Branch
McMullen Creek
McNair Branch
McQuage Bayou
McQuage Branch
McQueen Creek
Medcalf Lake

003742

CORPS003753

Mensler Creek
Merrill Branch
Metts Creek
Miami Canal
Miami River
Middle Creek
Middle Haw Creek
Middle River
Middle Rocky Creek
Middle Warrior Creek
Midway Branch
Mile Branch
Mill Bayou
Mill Branch
Mill Creek
Mill Dam Branch
Mill Log Creek
Mill Pond Branch
Mill Seat Creek
Mill Slough
Miller Bayou
Miller Creek
Milligan Creek
Mills Branch
Mills Creek
Minerva Canal
Minge Branch
Mink Creek
Minnow Creek
Mitchell Branch
Mitchell Creek
Mitchell Mill Creek
Mitchell River
Mizelle Creek
Mobbly Bayou
Moccasin Branch
Moccasin Creek
Moccasin Slough
Molasses Branch
Moncrief Creek
Monden Creek
Money Bayou
Monkey Creek
Monroe Canal
Monroe Creek
Monteocha Creek
Montgomery Slough
Moody Branch
Moore Branch
Moore Creek
Moores Mill Creek
Morgan Creek
Moriah Creek
Morman Branch
Morrell Branch
Morrison Spring Run
Moses Creek
Mosquito Creek
Mossy Head Branch
Moultrie Creek
Mount Pleasant Creek
Mud Creek

Mud Flats Creek
Mud River
Muddy Branch
Mulatto Bayou
Mule Creek
Mullet Creek
Mullock Creek
Munson Slough
Murder Creek
Murray Creek
Mussett Bayou
Myakka River
Myrtle Creek
Myrtle Slough
Nancy Creek
Nancys Cutoff
Narrows Creek
Nassau River
Neat Creek
New River
New Rose Creek
Newcastle Creek
Newman Branch
Nichols Creek
Ninemile Branch
Ninemile Creek
Nomans River
Norris Dead River
North Branch Smith Creek
North Creek
North Double Barrel Creek
North Fork Alligator Creek
North Fork Black Creek
North Fork Loxahatchee River
North Fork Manatee River
North Fork Miami River
North Fork Middle River
North Fork Saint Lucie River
North Fork Taylor Creek
North Harney River
North Palm Beach Waterway
North Prong Alafia River
North Prong Alligator Creek
North Prong Otter Creek
North Prong Saint Sebastian
River
North River
North Sound Creek
Nubbin Slough
Oak Branch
Oak Creek
Oak Grove Branch
Oakie Creek
Ocheesee Creek
Ochlockonee River
Ocklawaha Creek
Ocklawaha River
Okefenokee Slough
Old Canal
Old River
Oldfield Creek
Oleta River

Olive Branch
Oliver Bayou
Olivers Creek
Olustee Creek
Open Creek
Orange Branch
Orange Creek
Orange Grove Branch
Orange Hammock Slough
Orange River
Ortega River
Osceola Creek
Otter Creek
Otter Slough
Outlet River
Outside Lake
Owens Branch
Owl Creek
Oyster Creek
Oyster Prong
Pablo Creek
Packingham Slough
Padgett Branch
Page Creek
Paines Branch
Painter Branch
Palatlakaha River
Palm River
Palmer Slough
Palmetto Branch
Pancho Creek
Panther Branch
Panther Creek
Pareners Branch
Parker Branch
Parrot Creek
Pate Branch
Patterson Branch
Pattillo Creek
Patty Wiggins Branch
Paul Branch
Payne Creek
Peace Creek
Peace Creek Drainage Canal
Peace River
Peach Creek
Peacock Slough
Pearl Creek
Pearly Island Creek
Pecks Branch
Peler Creek
Pelican Bayou
Pelleham Branch
Pellicer Creek
Pelt Creek
Pemberton Creek
Penasula Creek
Penny Creek
Perdido River
Peters Branch
Peters Creek
Petty Branch

Philippe Creek
Phyllis Branch
Piclalene Bayou
Picnic Island Creek
Pierce Branch
Pigeon Creek
Pimple Creek
Pine Barren Creek
Pine Creek
Pine Island Creek
Pine Log Creek
Piney Branch
Piney Creek
Piney Point Creek
Piney Reach Slough
Piney Woods Creek
Pinhook Cut-Off
Pinhook River
Pippin Mill Creek
Pithlachascotee River
Pitt Creek
Pittman Creek
Pitts Bayou
Pitts Creek
Pitts Mill Creek
Pitts River
Plate Creek
Platt Branch
Plummer Creek
Plunder Branch
Pochanee Branch
Polander Branch
Pole Branch
Poley Branch
Polk Creek
Polley Creek
Pollywog Creek
Ponce de Leon Cut
Pond Creek
Poorhouse Creek
Popash Creek
Popash Slough
Poplar Branch
Poplar Creek
Poplar Head Branch
Poppolton Creek
Porpoise Creek
Port Leon Creek
Porter Slough
Porters Bar Creek
Postun Bayou
Potter Creek
Pottsburg Creek
Poucher Branch
Pound Net Creek
Poverty Creek
Powell Creek
Powell Spring Branch
Prairie Creek
Pretty Branch
Price Creek
Priest Branch

Pringle Branch
Pritchell Mill Branch
Prodie Creek
Puckett Creek
Pump Branch
Pumpkin Creek
Pumpkin Hill Creek
Pumpkin River
Purify Creek
Quarry Creek
Quincy Creek
Rainbow River
Rainey Slough
Rake Creek
Ramsey Branch
Ramsey Creek
Ratliff Creek
Rattlesnake Bayou
Rattlesnake Branch
Rattlesnake Slough
Rattlesnake Spring Branch
Raulerson Creek
Rauslerson Branch
Raysor Creek
Reader Creek
Red Bay Branch
Red Bay Creek
Red Fish Creek
Red Head Branch
Red House Branch
Red Wash Branch
Redfish Bayou
Redfish Creek
Redland Canal
Reed Canal
Reedy Branch
Reedy Creek
Regular Creek
Revell Branch
Ribault River
Rice Creek
Richard Creek
Richlander Creek
Ridgeway Creek
Right Prong Stone Mill Creek
Rim Ditch
Ring Jaw Branch
Rio Barcelona Canal
Riomar Creek
River Styx
Roaring Creek
Roberts Creek
Roberts River
Roberts Slough
Robinson Branch
Robinson Creek
Rock Creek
Rock Springs Run
Rock Yard Creek
Rockedge Creek
Rockhouse Creek
Rocky Branch

Rocky Comfort Creek
Rocky Creek
Rocky Run
Rodgers Creek
Rodgers River
Roebuck Creek
Rookery Branch
Rosalie Creek
Rose Creek
Rowell Creek
Royal Palm Hammock Creek
Rum Still Branch
Rushing Branch
Rushing Cutoff
Rutland Creek
Rye Branch
Ryle Creek
Saddle Creek
Sailor Hammock Slough
Saint Francis Dead River
Saint Joe Canal
Saint Joes Creek
Saint Johns Creek
Saint Johns River
Saint Joseph Creek
Saint Lucie Canal
Saint Lucie River
Saint Marks River
Saint Marys River
Saint Sebastian River
Sal Marie Branch
Sal Taylor Creek
Salt Creek
Salt Island Creek
Salt Pan Creek
Salt Run
Salt Springs Run
Saltwater
Sam Knight Creek
Samples Creek
Sampson Creek
Sampson River
Sams Creek Cutoff
San Carlos Creek
San Julian Creek
San Sebastian River
Sand Beach Branch
Sand Branch
Sand Creek
Sand Gully
Sand Hill Creek
Sand Slough
Sandbank Creek
Sanders Branch
Sanders Creek
Sandfly Creek
Sandfly Gully
Sandy Branch
Sandy Creek
Sandy Gully
Sandy Mountain Branch
Sandy Point Bayou

Sandy Run
Santa Fe River
Sarah Ann Branch
Saul Creek
Saul Creek Cut Off
Saultsman Bayou
Saultsman Cutoff
Saunders Creek
Sawed Slough
Sawmill Slough
Sawpit Creek
Schoolhouse Branch
Scipio Creek
Scoggin Creek
Sconiers Mill Creek
Seabreeze Creek
Searcy Creek
Seaton Creek
Seminole Creek
Seven Pines Creek
Seven Runs
Sevenmile Creek
Sewell Branch
Seybold Canal
Shad Creek
Shady Brook
Shaky Joe Branch
Shark Cutoff
Shark River
Shaw Still Branch
Sheephead Creek
Shell Creek
Shepherd Spring Creek
Sherman Creek
Shine Creek
Shingle Branch
Shingle Creek
Shinney Creek
Shipyard Canal
Shipyard Creek
Shired Creek
Shirttail Branch
Shoal River
Short Creek
Shuler Branch
Sikes Creek
Silcox Branch
Silver Creek
Silver Glen Springs Run
Silver River
Silversmith Creek
Simms Creek
Simpson Creek
Simpson River
Sink Branch
Sink Creek
Sister Pond Creek
Sister River
Sisters Creek
Sixmile Creek
Sixteenmile Creek
Skipper Creek

Slave Canal
Sloman Branch
Smith Bayou
Smith Creek
Smith McCullah Creek
Smokehouse Creek
Smyrna Creek
Snake Bayou
Snake Creek
Snead Creek
Snipe Creek
Snowden Creek
Soap Creek
Soapstone Branch
Soldier Creek
Soldiers Creek
Sombrero Creek
Sopchoppy River
South Amelia River
South Branch Anclote River
South Broad Creek
South Canal
South Creek
South Double Barrel Creek
South Fork Bear Creek
South Fork Black Creek
South Fork Little Manatee River
South Fork Miami River
South Fork Middle River
South Fork Saint Lucie River
South Marsh Creek
South Mouth
South Prong Alafia River
South Prong Alligator Creek
South Prong Fort Godsden Creek
South Prong Saint Marys River
South Prong Saint Sebastian River
South Sound Creek
Southwest Fork Loxahatchee River
Spanish Creek
Spanish Mill Creek
Spiders Gut
Sponge Crawl Creek
Spots Branch
Spring Branch
Spring Creek
Spring Garden Creek
Spring Hammock Run
Spring Run
Spring Warrior Creek
Springhead Creek
Spruce Creek
Squawk Creek
Stag Branch
Stage Stand Branch
Stagger Creek
Stanton Creek
Stapleton Creek
Starrett Creek

Starvation Slough
Stave Branch
Steamboat Creek
Steep Head Branch
Steinhatchee River
Stevens Branch
Stevenson Creek
Steves Wash Branch
Still Creek
Stingray Creek
Stokes Branch
Stokes Creek
Stone Mill Creek
Stopper Creek
Straw Bay Branch
Strawberry Creek
Stroud Creek
Strouds Creek
Styles Creek
Sugar Creek
Sugar Mill Branch
Sugarhouse Creek
Sugarloaf Creek
Sulfur Creek
Sullivans Ditch
Sulphur Run
Sunday Rollaway Creek
Surveyor Creek
Suwannee River
Swamp Creek
Sweetwate Creek
Sweetwater Branch
Sweetwater Creek
Swift Creek
Swift Slough
Swimming Pen Creek
Syfrett Creek
Syrup Branch
Tan Branch
Tan Vat Branch
Tanyard Branch
Tarpon Creek
Tavernier Creek
Taylor Branch
Taylor Creek
Taylor River
Telegraph Creek
Telogia Creek
Tenmile Branch
Tenmile Creek
Terrapin Creek
Tetabar Creek
Thankyouma'am Creek
The Bayou
The Boggies
The Cutoff
Thirtymile Creek
Thomas Branch
Thomas Creek
Thomas Mill Run
Thompson Bayou
Thompson Branch

CORPS003756

Thompson Cutoff
Thornton Branch
Thousandmile Creek
Three Brothers Creek
Three Otter Creek
Threemile Branch
Tick Island Creek
Tick Island Slough
Tide Creek
Tidwell Mill Creek
Tiger Branch
Tiger Creek
Tiger Ford Branch
Tiger Pond Creek
Tiller Branch
Timber Branch
Titi Branch
Titi Creek
Tocoi Creek
Todd Branch
Tolomato River
Tom Hahn Creek
Tom King Bayou
Tom Smith Branch
Tomoka River
Toms Creek
Tooke Creek
Toolchest Branch
Tootoosahatchee Creek
Town Branch
Tracy Branch
Trammel Creek
Trawick Creek
Tripod Creek
Troublesome Creek
Trout Bayou
Trout Creek
Trout River
Tubbys Creek
Tucker Bayou
Tucker Creek
Turket Creek
Turkey Creek
Turkey Gobbler Creek
Turkey Hen Creek
Turkey Slough
Turnbull Creek
Turner Creek
Turner River
Turners Creek
Turnpike Branch
Turtle Creek
Turtle Lake Branch
Twin Creek
Twomile Branch
Twomile Creek
Tyner Branch
Tyre Creek
Tyson Creek
Underhill Creek
Upper Sister Creek

Upper Sweetwater Creek
Van Horn Slough
Van Swearingen Creek
Vassey Creek
Vause Branch Ochlockonee
River
Virginia Cut
Vossinbury Creek
Waccasassa River
Wacissa River
Wade Canal
Wagner Creek
Wakulla River
Walker Bayou
Walker Branch
Walker Creek
Wall Creek
Ward Creek
Ward Mill Creek
Wards Creek
Wares Creek
Warner Branch
Wasteway Branch
Watch Chain Slough
Water Oak Creek
Watering Creek
Watson River
Weaver Creek
Weaver River
Weaver Warrior Creek
Webb Branch
Week Creek
Weeki Wachee River
Weeks Fisher Creek
Wekiva River
Weohyakapka Creek
West Bay Creek
West Branch Blockhouse Creek
West Branch Coral Creek
West Branch Lightwood Knot
Creek
West Branch Mare Creek
West Branch South Prong Alafia
River
West Creek
West Cutoff
West Fork Big Coldwater Creek
West Fork Juniper Creek
West Fork Syfrett Creek
West Goose Creek
West Griffin Creek
West Palm Run
West Pepper Creek
West Pittman Creek
West Run Cracker Branch
West Sandy Creek
Western Branch
Wetappo Creek
Whackup Creek
Wharf Creek
Wheeler Branch

Whidden Branch
Whidden Creek
Whiskey Creek
Whiskey George Creek
White Branch
White River
Whiteoak Bayou
Whites River
Whitewater Branch
Whitney River
Whittenhorse Creek
Wiggins Branch
Wigwam Creek
Wilburn Branch
Wildcat Branch
Wildcat Creek
Wilder Branch
Wilder Creek
Wilkinson Creek
Willacoochee Creek
Williams Branch
Williams Creek
Williams Lake
Williamson Creek
Willoughby Creek
Willow Cove Branch
Wills Branch
Wilson Branch
Windmill Branch
Winegourd Creek
Winkley Branch
Winters Creek
Winzy Creek
Wisher Creek
Withlacoochee River
Wolf Branch
Wolf Creek
Wolf Slough
Wolfe Creek
Wolftrap Branch
Womack Creek
Wood River
Woodbine Bayou
Woods Creek
Wrights Creek
Wynn Branch Creek
Ximanies Creek
Yates Creek
Yates Mill Creek
Yellow Bluff Creek
Yellow Creek
Yellow Fever Creek
Yellow River
Yellow Slough
Yellow Water Creek
Yent Bayou
Yoke Branch
Yucca Pen Creek
Zeigler Dead River

CORPS003757

# Lakes

A A Hilton Pond
A J Spencer Pond
Abbott Lake
Acorn Lake
Adams Lake
Adams Pond
Ajay Lake
Albert Gordon Pond
Albritton Lake
Alford Arm
Alligator Lake
Alligator Pond
Alligator Ponds
Alva Davidson Pond
Amory Lake
Anderson Lake
Anderson Pond
Andover Lakes
Andrew Lake
Andrews Lake
Angeles Lake
Anglers Lake
Apshawa Lake
Argenta Lake
Ashton Dead River
Bachelor Lake
Bagget Lake
Bait Lake
Baker Pond
Banana Lake
Banner Lake
Baptizing Pond
Barbara Lake
Barnett Lake
Barpost Lake
Bass Lake
Bath Lake
Battle Pond
Bay Gall Ponds
Bay Horse Pond
Bay Lake
Bazzell Pond
Beakman Lake
Beany Pond
Bear Harbor Lake
Bear Lake
Bear Pond
Beaverdam Lake
Bee Gum Lake
Beer Can Pond
Beetree Pond
Belcher Hole
Bell Lake
Bell Pond
Bell Prairie
Bellamy Pond

Beltons Millpond
Bens Lake
Berchfield Lake
Berry Pond
Bert Brothers Pond
Bethea Lake
Big Blue Lake
Big Boy Lake
Big Island Lake
Big Lake
Big Lake Vienna
Big Lilly Lake
Big Morrell Lake
Big Redfish Lake
Big Trail Pond
Big Whirl
Billy Lake
Bimini Basin
Bird Lake
Bird Pond
Black Lake
Black Pond
Blackfish Lake
Blair Pond
Blanton Lake
Block Pond
Blossom Lake
Blue Lake
Blue Peter Lake
Blue Pond
Blue Sink
Blue Sink Pond
Boat Lake
Boat Pond
Bobcat Pond
Boggess Hole
Boggy Lake
Boiling Creek Lake
Boll Green Lake
Bolt Lake
Bone Bluff Lake
Bone Pond
Bonnet Lake
Bonnet Pond
Boram Lake
Bosse Lake
Bottonwood Pond
Brandt Pond
Brandy Beach Pond
Brickyard Lake
Brickyard Pond
Bright Lake
Brooks Lake
Brooks Pond
Brown Lake
Brown Pond

Brunner Pond
Bryant Pond
Buck Lake
Buck Pond
Buckhorn Creek
Buddy Pond
Buffalo Lake
Bull Slough
Bully Lake
Burke Pond
Burns Lake
Burnt Cypress Lake
Bush Pond
Butterfly Lake
Buttonwood Pond
C R Wise Pond
Cabbage Bay
Caldwells Pond
Calf Lake
Calf Pond
California Lake
Camp Creek Lake
Camp Pond
Campbell Pond
Campground Pond
Carl Pond
Carlney Lake
Carpenter Pond
Carter Pond
Carver Pond
Casa Linda Lake
Cascade Lake
Casson Pond
Casterline Lake
Castle Lake
Cat Island Lake
Cattail Lake
Cattail Lakes
Cedar Lake
Cemetery Lake
Chain O Lakes
Chapman Lake
Charley Pond
Charlotte Pond
Chason Pond
Chason Ponds
Cheney Pond
Chipley Lake
Chub Pond
Clair Pond
Clam Bayou
Clark Lake
Clay Hole Pond
Clay Lake
Clayhole Pond
Clear Basin

003747

Clear Lake
Clear Pond
Clearview Lake
Clearwater Lake
Clyde Reese Pond
Coal Spring Lake
Coleman Pond
Como Lake
Complex Lake
Cooeg Pond
Cook Lake
Coon Pond
Cooney Pond
Coop Pond
Cooper Basin
Coot Bay Pond
Cooter Lake
Coral Cove
Corkins Lake
Cotton Lake
Coulter Basin
Cow Pen Pond
Cow Pond
Cowarts Lake
Cowpen Lake
Cox Lake
Crain Pond
Crane Lake
Crane Pond
Crane Ponds
Cravero Lake
Crawford Lake
Crescent Lake
Crest Lake
Crews Lake
Croft Pond
Crowder Holes
Crown Lake
Crystal Lake
Curry Lake
Cuthbert Lake
Cypress Creek
Cypress Lake
Cypress Pond
Daddy Hole
Dade Lake
Dallis Waterhole
Danley Lake
Danley Pond
Danny Hole
Darkwater Lake
Davenport Bayou
Davis Lake
Davis Pond
Deacon Lake
Deacon Pond
Dead Lake
Dead Lakes
Dead River Lake
Deep Hole
Deep Lake
Deer Lake

Deer Point Lake
Deer Pond
Dempsey Lake
Devils Elbow
Dicks Lake
Dillard Pond
Dinken Bayou
Dinners Pond
Dixon Lake
Dobes Hole
Doctors Lake
Doe Pond
Dog Hole
Dog Lake
Dollar Lake
Dollar Pond
Dolly Lakes
Dorman Pond
Dorset Lake
Dosson Lake
Double Bluff Lake
Double Branch Pond
Double Pond
Double Ponds
Dove Sound
Downing Lake
Dozier Lake
Draper Lake
Dream Pond
Dry Lake
Dry Pond
Duck Lake
Duck Pond
Dykes Mill Pond
Eagle Lake
Eagle Nest Pond
East Fox Lake
East Lake
East Lake Tohopekaliga
East River Pool
Eastern Lake
Echo Lake
Eden Lake
Egypt Lake
Eightmile Pond
Eleven Ponds
Elsie Lake
Emerald Lake
Emmons Bayou
Enchanted Lake
Endless Lake
English Lake
Equus Meadow Pond
Faircloth Lakes
Fairview Lake
Fairway Lake
Fannin Bayou
Fanny Lake
Farles Lake
Faye Lake
Ferguson Bay
Fish Lake

Fivemile Pond
Flora Lake
Flowers Pond
Forehand Pond
Fountain Lake
Four Prong Lake
Fox Lake
Fox Pond
Frank Taucher Reservoir
Freshwater Bayou
Freshwater Lake
Frierson Lakes
Frog Lake
Gainer Pond
Gar Pond
Garden Lake
Gator Hole
Gator Lake
George Ann Lake
Gibbs Pond
Gillis Pond
Gin House Lake
Glenvar Lake
Glisson Pond
Goggleye Lake
Golden Isles Lake
Golden Lake
Goose Pond
Grass Lake
Grass Pond
Grassy Lake
Grassy Pond
Graveyard Lake
Great Pocket
Green Lake
Green Pond
Greenback Lake
Greyknoll Lake
Grimes Lake
Grisset Pond
Guest Lake
Gum Pond
Gum Slough
Gyte Chester Pond
Half Moon Lake
Half Moon Pond
Halfmoon Lake
Halfway Lake
Halfway Pond
Ham Pond
Hamilton Lake
Hammock Lake
Hampton Lake
Handcock Lakes
Hankley Lake
Harbor Lake
Hardesty Lake
Hardworking Bayou
Hardy Sink
Hare Lake
Harolds Pond
Harris Pond

Hart Pond
Harvest Lake
Hasenjaeger Lake
Hay Lake
Hay Pond
Headquarters Pond
Heath Pond
Henderson Pond
Hendrics Lake
Henry Dover Pond
Henry Lake
Henry Prescott Pond
Heron Lagoon
Hettie Pond
Hewitt Lakes
Hickory Hammock Lake
Hidden Hollow Lake
Hidden Lake
Higginbotham Lake
Highlog Lake
Hitchcock Lake
Hobart Lake
Hog Pond
Hokey Lake
Holden Lake
Hole in the Wall
Holley Ponds
Homer Lake
Honeymoon Lake
Horse Pond
Horselot Pond
Horseshoe Lake
Horseshoe Mud Lake
Howard Lake
Hubbard Pond
Hubert Bell Pond
Hudson Lake
Huguenot Lagoon
Hundred Acre Pond
Hungerford Lake
Hutson Pond
Hydrilla Lake
Indian Lake
Indian Pond
Inner Clam Bay
Inside Lake
Iola Lake
Island Lake
Island Pond
Ivy Stag Lake
J C Headley Pond
J R Alford Pond
Jacks Lake
James Lake
Jane Pond
Jeb Knight Pond
Jennings Lake
Jernigan Lake
Jernigans Pond
Jessamine Lake
Jewel Lake
Jim Long Lake

John C Pace Pond One
John Quiet Lakes
John Stafford Pond One
John Stafford Pond Two
Johns Pond
Johnson Bayou
Johnson Lake
Johnson Pond
Joiner Lake
Jones Lake
Jones Pond
Jordan Lake
Jug Lake
July Lake
Jungle Bay
Karick Lake
Keene Lake
Kelly Pond
Kemp Pond
Kendale Lake
Kendall Lake
Kentucky Lake
Key Pond
Kimball Lake
King Pond
Knight Lake
Konomac Lake
Ladyfinger Lake
Lago Lindo
Lago Maggiore
Lago Minore
Lago Monaco
Lake Alfred
Lake Alice
Lake All Bright
Lake Allen
Lake Altamaha
Lake Alto
Lake Ann
Lake Annette
Lake Annie
Lake Arcola
Lake Asbury
Lake Audrey
Lake Austin
Lake Avoca
Lake Azalea
Lake Barbara
Lake Beauty
Lake Bedford
Lake Belle
Lake Bellevue
Lake Belmar
Lake Beresford
Lake Bessiola
Lake Bethel
Lake Beulah
Lake Blue
Lake Boca Raton
Lake Bonita
Lake Bonnet
Lake Bonny

Lake Bracy
Lake Bright
Lake Brooker
Lake Brooklyn
Lake Buchanan
Lake Buckhorn
Lake Burbank
Lake Burns
Lake Buynak
Lake Byron
Lake Cannon
Lake Carol
Lake Caroline
Lake Carroll
Lake Cecile
Lake Chapin
Lake Charles
Lake Chasco
Lake Chautauqua
Lake Chelton
Lake Chipley
Lake Citrus
Lake Claire
Lake Clarke
Lake Claudette
Lake Clyde
Lake Coma
Lake Cone
Lake Cooley
Lake Cooper
Lake Crago
Lake Dan
Lake Daugharty
Lake Davis
Lake Deer
Lake Deon
Lake Destiny
Lake Dexter
Lake Diamond
Lake Dicie
Lake Disston
Lake Dixie
Lake Dot
Lake Downey
Lake Duval
Lake Earl
Lake Ebby
Lake Eckles
Lake Eden
Lake Edward
Lake Effie
Lake Elizabeth
Lake Ella
Lake Ellen
Lake Elsie
Lake Emerald
Lake Emily
Lake Emma
Lake Emporia
Lake Enola
Lake Erin
Lake Evergreen

Lake Fan
Lake Fanny
Lake Flamingo
Lake Florence
Lake Fox
Lake Frances
Lake Francis
Lake Galilee
Lake Gass
Lake Gem
Lake Geneva
Lake George
Lake Gibson
Lake Gleason
Lake Grace
Lake Green Sills
Lake Greenwood
Lake Griffin
Lake Harney
Lake Harris
Lake Harry
Lake Hartley
Lake Hartridge
Lake Harvey
Lake Hattie
Lake Henry
Lake Hermosa
Lake Hialeah
Lake Hiawatha
Lake Hicpochee
Lake Holden
Lake Holloway
Lake Hollywood
Lake Horney
Lake Howard
Lake Hugh
Lake Huntington
Lake Hutchinson
Lake Iamonia
Lake Ida
Lake Idlewild
Lake Idylwild
Lake Ingraham
Lake Irene
Lake Issue
Lake Ivanhoe
Lake Jane
Lake Jean
Lake Jennie
Lake Jessie
Lake Jesup
Lake Jewel
Lake John
Lake Juanita
Lake Julia
Lake Juno
Lake Kanapaha
Lake Karen
Lake Katherine
Lake Kersky
Lake Keuka
Lake L Rancho

Lake LaChard
Lake Lafayette
Lake Lagonda
Lake Lappin
Lake Laura
Lake Lee
Lake Lillie
Lake Lily
Lake Lincoln
Lake Lipsey
Lake Little Worth
Lake Loladeo
Lake Lorraine
Lake Lotus
Lake Louisa
Lake Louise
Lake Lucas
Lake Lucille
Lake Lucy
Lake Lula
Lake Lulu
Lake Lure
Lake Madeline
Lake Magdalene
Lake Maggie
Lake Maggiore
Lake Mahar
Lake Manatee
Lake Mangonia
Lake Manning
Lake Marae
Lake Maria
Lake Marie
Lake Marietta
Lake Marion
Lake Martin
Lake Mary
Lake McBride
Lake McLeod
Lake Medora
Lake Miccosukee
Lake Midget
Lake Millbite
Lake Mirror
Lake Monarch
Lake Monroe
Lake Morton
Lake Myra
Lake Myrtle
Lake Nally
Lake Neptune
Lake Number 1
Lake Number 2
Lake Number 3
Lake Number 4
Lake Number Five
Lake Oakland
Lake of the Woods
Lake Okahumpka
Lake Olivia
Lake Omega
Lake Orange

Lake Osborne
Lake Overstreet
Lake Palm
Lake Palmer
Lake Palmerito
Lake Panasoffkee
Lake Pancoast
Lake Patient
Lake Patricia
Lake Pearl
Lake Phillips
Lake Placid
Lake Poinsett
Lake Pollock
Lake Ponte Vedra
Lake Reaves
Lake Rey
Lake Rhea
Lake Roberta
Lake Roberts
Lake Robin Hood
Lake Rogers
Lake Rousseau
Lake Roy
Lake Ruby
Lake Runnymede
Lake Ruth
Lake Sable
Lake Sanitary
Lake Sarah
Lake Sarasota
Lake Saratoga
Lake Seminole
Lake Senac
Lake Sentinel
Lake Serena
Lake Sharpe
Lake Shepherd
Lake Shippey
Lake Sidney
Lake Silver
Lake Simmons
Lake Somerset
Lake Sparkle
Lake Speer
Lake Spencer
Lake Sperry
Lake Stahl
Lake Stanley
Lake Steven
Lake Stone
Lake Surprise
Lake Susan
Lake Sylvia
Lake Terry
Lake Theresa
Lake Tilden
Lake Trowed
Lake Tuttle
Lake Tutuola
Lake Van
Lake Vedra

Lake Virginia
Lake Vivian
Lake Ward
Lake Ware
Lake Warren
Lake Wastena
Lake Wayman
Lake Weader
Lake Weston
Lake Whitcomb
Lake Wilbar
Lake Wimico
Lake Winston
Lake Wire
Lake Woodruff
Lake Worth
Lake Worth Creek
Lake Wyman
Lake Yarbo
Lake Yvette
Lake Yvonne
Lake Zephyr
Lamar Lake
Lamps Pond
Lands Lake
Landy Lake
Lane Pond
Lassiter Lake
Laura Lake
Lazy Lake
Leavins Lake
Lemon Lake
Leroy Ponds
Lettuce Lake
Lighthouse Pool
Lily Lake
Lily Pond
Little Banana Lake
Little Blue Pond
Little Brushy Pond
Little Deer Lake
Little Ellen Lake
Little Fox Lake
Little Gant Lake
Little Gar Lake
Little Halfmoon Lake
Little Henry Lake
Little Lake
Little Lake Barton
Little Lake Bryan
Little Lake Geneva
Little Lake George
Little Lake Green Sills
Little Lake Jackson
Little Lake Maule
Little Lost Lake
Little Morrell Lake
Little Porter Lake
Little Redfish Lake
Little Salt Spring
Little Sand Pond
Little Sawgrass Lake

Little Tucker Lake
Little Van Lake
Live Oak Pond
Lockey Lake
Log Creek Pond
Log Pond
Long Lake
Long Pond
Long Sun Lake
Long Swamp
Lorraine Lake
Lost Boy Pond
Lost Lake
Lovers Lake
Lower Lake Louise
Loxahatchee Slough
Mabel Porter Pond
Major Lake
Major Shear Pond
Manatee Pocket
Mango Lake
Mansfield Pond
Marco Lake
Maria Sanchez Lake
Mariner Lake
Marquis Basin
Martin Lakes
Martin Pond
Martins Mill Pond
Mary Lake
Mary Lou Lake
Maule Lake
Mayan Lake
Mays Pond
McCarthy Lake
McClendon Lake
McQuaig Lake
Mead Lake
Melvina Pond
Menge Pond
Meridian Lake
Metcalf Lake
Middle Fox Lake
Middle Lake
Mile Lake
Mill Pond
Miller Lake
Mills Smokehouse Pond
Milly Lake
Minom Sog
Mirror Lake
Monroe Lake
Moody Lake
Moore Pond
Moran Lake
Morgan Pond
Morris Lake
Morrison Lake
Moses Hole
Mosquito Lake
Moss Pond
Mound Lake

Mounds Pond
Mounds Pool
Mountain Lake
Mountain Sink
Mud Lake
Mud Lakes
Mud Pond
Mudd Lake
Muddy Lake
Mullet Lake
Mullet Pond
Muscogee Lake
Myrtle Lake
Nature Conservancy Bay
Ned Pond
Needmore Pond
Nelson Lake
Newman Bayou
Ninemile Pond
Noreast Lake
North Bear Lake
North Crystal Lake
North Lake
Norwood Lake
Oak Pond
O'Berry Lake
Ocala Pond
Ogden Lake
Ogden Pond
Old Blind Pass
Old Fern Pond
Old Lake
Old Pond
Oldfield Pond
Olsen Lake
Open Pond
Orange Lake
Otter Pond
Otter Ponds
Outlook Lake
Owens Pond
Ox Lake
Ox Pond
Oyster Lake
Oyster Pond
Pace Lake
Palatka Pond
Palm Lake
Palmer Lake
Palmetto Lake
Panama Lake
Paradise Lake
Park Lake
Pasadena Lake
Paul Pond
Payne Pond
Peace Pond
Peacock Lake
Peacock Pond
Pearl Bayou
Pearl Lake
Peck Lake

Pelican Lake
Pelican Pond
Penner Ponds
Perch Lake
Perch Pond
Perry Pond
Peter Gibson Pond
Phyllis Lake
Piclalene Bayou
Picnic Lake
Picnic Pond
Pigott Pond
Pillans Prairie
Pine Bluff Lake
Pine Lake
Pine Log Lake
Piney Z Lake
Pinhook Lake
Pioneer Lake
Pippin Lake
Pirate Cove
Plank Bridge Lake
Plantation Pond
Platt Lake
Playland Lake
Plaza Pool
Pleasant Point Lake
Plew Lake
Point Lake
Polk Lake
Port Leon Lake
Porter Lake
Potter Pond
Pouratis Pond
Powell Lake
Prairie Ponds
Pretty Lake
Pretty Pond
Princess Lake
Puddin Head Lake
Pump Pond
Puzzle Lake
Queen City Lake
R B Spires Pond
R B Squirls Pond
R B Underwood
Race Pond
Railroad Pond
Rainbow Lake
Rat Pond
Rattlesnake Lake
Raulerson Prairie
Rayner Pond
Reason Lakes
Red Bug Lake
Red Lake
Reedy Lake
Rees Lake
Reinheimer Lake
Renfro Lake
Republic Lake
Rexford Lake

Riverside Lake
Roberts Lake
Rock Lake
Rock Pond
Rose Apple Lake
Rosemary Pond
Round Lake
Round Pond
Royal Lake
Ruth Lake
Sabal Lake
Saddleback Lake
Saddlebag Lake
Saddlebags Lake
Saint Johns Lake
Salerno Lake
Salt Lake
Salters Lake
Sam Joe Pond
Sampson Lake
Sams Lake
Sanborn Lake
Sand Hill Pond
Sand Lake
Sand Pond
Sandy Pond
Sanibel Bayou
Santa Fe Lake
Sapp Lake
Sapphire Lake
Sawdust Lake
Sawgrass Lake
Schoolhouse Lake
Scoggin Lake
Sconiers Mill Pond
Sea Pond
Seaboard Pond
Sears Lake
Secret Lake
Sellers Lake
Seminole Lake
Seven Palm Lake
Sevenmile Lake
Sewell Lake
Shacklefoot Pond
Sharon Lake
Sharpes Lake
Sharpless Pond
Shaw Pond
Sheephead Bayou
Sheppard Lake
Sherman Cove
Sherman Inlet
Shirt Tail Lake
Sigler Lake
Silver Lake
Silver Pond
Simmon Pond
Sink Hole Ponds
Sister Pond
Sixmile Pond
Skim Lake

Skinner Lake
Sky Lake
Smokehouse Lake
Smokehouse Pond
Snag Lake
Snapper Creek Lake
South Bass Lake
South Bear Lake
South Bonnet Pond
South Crystal Lake
South Lake
South Lake Asbury
South Moon Lake
South Twin Lake
Southern Pond
Southwater
Sparkleberry Lake
Sparkling Water Lake
Sparling Lake
Spectacle Pond
Spring Head Pond
Spring Lake
Spring Lake Number Two
Spruce Lake
Square Lake
Squirrel Prairie Lake
Stagger Mud Lake
Stalworth Lake
Stanley Sog
Star Lake
Starks Prairie
Starvation Lake
Station Lake
Stealing Lake
Steer Pen Slough
Stergan Lake
Stevens Pond
Still Pond
Stokes Lake
Stony Bayou Pool
Story Lake
Strayhan Pond
Stubbs Lake
Sugarbowl Lake
Suggs Lake
Sunset Lake
Sunshine Lake
Surprise Lake
Swan Lake
Sweet Water Lake
Sweetwater Lake
Sylvia Lake
Tank Pond
Tanner Lake
Tarkiln Bayou
Tarpan Lake
Tarpon Creek
Tater Patch Pond
Taylor Lake
Taylor Slough
Tea Pond
Tee Lake

Tenmile Lake
The Basin
The Black Holes
The Cutoff
The Lungs
The Narrows
The Pond
Thirsting Lake
Thomas Lake
Thompson Lake
Thompson Pond
Thornhill Lake
Thrasher Nest Pond
Three Pond
Threemile Lake
Tick Island Mud Lake
Tiger Lake
Tiller Mill Lake
Tillmans Pond
Timber Lake
Tom Black Lake
Townsen Lake
Tractor Lake
Triple Lakes
Tropic Lagoon
Trout Lake
Trues Lake
Tucker Lake
Turf Pond
Turner Lake

Turnip Pond
Turtle Harbor
Tusset Pond
Twin Lake
Twin Lakes
Twomile Prairie Lake
Up and Down Lake
Upper Lake Louise
Varnes Lake
Vienna Lake
Waldon Lake
Waldorf Lake
Walton Pond
Ward Lake
Warner East Bayou
Warner West Bayou
Warren Bayou
Wash Pond
Waterview Lake
Watson Pond
Watson Prairie
Wee Lake
Weeks Lakes
Weeks Waterhole
Well Pond
West Arm of Dead Lakes
West Lake
Western Lake
Whidden Lake
Whirlwind Lake

White Flank Pond
White Lake
White Pond
Whitehead Lake
Whitmore Lake
Wicker Lakes
Wickers Pond
Williams Lake
Williams Pond
Wilma Lake
Wilson Lake
Wind Lake
Windsor Pond
Winston Lake
Wistaria Lake
Wolf Pond
Wood Lake
Woodbine Springs Lake
Woodbury Lake
Workman Lake
Workman Pond
Wright Lake
Wynn Lake
X L Lake
Yarber Pond
Yard Pond
Yearling Pond
Zephyr Lake

CORPS003764

**Jacksonville District Navigable Waters Lists**

In Florida, Puerto Rico, and the U.S. Virgin Islands, the U.S. Army Corps of Engineers, Jacksonville District, exercises section 10 (of the Rivers and Harbors Act of 1899) regulatory jurisdiction over the Atlantic Ocean, Gulf of Mexico, and Caribbean Sea.  Additionally, all or portions of tributaries to the above waters may also be subject to section 10 authority.  However, complete lists of all rivers, streams, creeks, ponds, and lakes subject to Corps section 10 authority are not available.  Below are lists of waters over which the Jacksonville District currently exercises regulatory jurisdiction under the authority of both section 10 of the Rivers and Harbors Act of 1899 and section 404 of the Clean Water Act on all or a portion of the listed water.  The absence of a water on these lists does not mean it or a portion of it is not a navigable water.  Likewise, the inclusion of a water on these lists is not meant to imply that the water is subject to section 10 authority in its entirety.  All waters subject to the ebb and flow of the tide (tidal action) are navigable waters of the US, and many of the waters listed below have some portion that is subject to the ebb and flow of the tide.  Inquiries concerning Department of the Army Permit requirements on these and other tributary streams and lakes not listed below should be submitted on a case-by case basis to the Regulatory Division, Jacksonville District.

The section 10 waters lists (below) from the Jacksonville District were compiled from multiple approved and draft navigability studies conducted during the 1970s and 1980s, and from local knowledge of tidally influenced waters.  The District makes no claim that these lists are complete or completely accurate.  These lists are for regulatory reference purposes only.  They are not a substitute for a jurisdictional determination (JD).  It is imperative that you contact the appropriate Regulatory Permit Section for a determination on whether the Corps is able to ascertain if a particular project falls within or outside of section 10 authority.

# STATE OF FLORIDA

## Rivers and Creeks

Acosta Creek
Alafia River
Alapaha River
Alapahoochee River
Alaqua Creek
Alexander Springs Creek
Alligator Creek
Alligator Lake-Lake Gentry Canal
Amelia River
Anclote River
Apalachicola River
Arlington River
Aucilla River
Axle Creek
Banana River
Barrentine Creek
Barron River
Basin Creek
Bayou Marcus Creek
Bear Creek
Bear Creek (Bay County)
Belcher Canal
Bells River

Bessey Creek
Big Davis Creek
Big Fishweir Creek
Big Juniper Creek
Big Marco River
Big Mud Creek
Big Mulberry Branch
Billy Creek
Black Creek
Black Creek (Walton County)
Black Water Creek
Blackwater River
Blind Creek
Blockhouse Creek
Blounts Branch
Blue Creek
Blue Hole Creek
Blue Springs Run
Bluff Branch
Boathouse Creek
Bogey Branch
Boggy Creek
Bonnet Creek
Botts Creek

Bowlees Creek
Box Branch
Boynton Canal
Braden River
Bradley Creek
Bray Creek
Brick-Alligator Lake Canal
Britt Creek
Broad River
Brothers River
Broward Creek
Broward River
Browns Creek
Buck Creek
Buckhorn Creek
Bull Creek
Bulow Creek
Bumble Bee Creek
Burnt Mill Creek
Butcher Pen Creek
Butler Creek
C-15 Canal
C-17 Canal
C-18 Canal

003754

C-23 Canal
C-24 Canal
C-51 Canal
Cabbage Creek
Callaway Creek
Caloosahatchee River
Camp Branch
Caney Branch
Canoe Creek
Capo Creek
Carpenters Creek
Carrabelle River
Casa Cola Creek
Cat Creek
Cedar Creek
Cedar Point Creek
Cedar River
Cemetery Creek
Chassahowitzka River
Chatham River
Chattahoochee River
Chicopit Bay
Chipola River
Choctawhatchee River
Christopher Creek
Clapboard Creek
Clark Creek
Clarkes Creek
Clear Creek -
Cocohatchee River
Coldwater Creek
Coon Lake-Lake Lizzie Canal
Coral Gables Waterway
Cormorant Creek
Cow Creek
Cowhead Creek
Cracker Branch
Cradle Creek
Craig Creek
Crane Creek
Crooked Creek
Crooked Creek (Martin County)
Crooked River
Crooked River (Franklin
County)
Cross Creek
Cross Florida Barge Canal
Crystal River
Cunningham Creek
Cut Creek
Cypress Creek
Danforth Creek
Dania Cut-off canal
Days Creek
Dead River (Kissimmee River)
Dead River (Lake County,
Florida)
Dead River (Wakulla County)
Dean Dead River
DeBlieu Creek
Deep Bottom Creek
Deep Creek

Deer Creek
Depot Creek
Dillaberry Branch
Doctors Lake
Dog Branch
Drummond Creek
Dunns Creek
Durbin Creek
East Bay River
East Creek
East River
Eau Gallie River
Econfina Creek
Econfina River
Econlockhatchee River
Egans Creek
Eight Mile Creek
Elbow Branch
Elbow Creek
Eleven Mile Creek
Eph Creek
Escambia River
Estero River
Etonia Creek
Fakahatchee River
Fenholloway River
Fish Creek
Fisheating Creek
Fishing Creek
Fitzpatrick Creek
Five Mile Creek
Flora Branch
Forked Creek
Fort George River
Fourmile Creek
Fox Cut
Frazier Creek
Garden Creek
Get Out Creek
Ginhouse Creek
Goodbys Creeks
Governor Creek
Graham Creek
Grog Branch
Guano River
Gulley Creek
Haines Creek
Half Creek
Halifax River
Hannah Mills Creek
Harney River
Harrison Creek
Harry's Creek
Hatchett Creek
Hatchineha Canal
Haulover Creek
Haw Creek
Haynes Creek
Henderson Creek
Highland Park Run
Hillsboro Canal
Hillsboro River

Hillsborough River
Hitchens Creek
Hog Creek
Hogan Creek
Hogpen Creek
Holiday Harbor
Holmes Creek
Holmes Creek  (Jackson
County)
Hominy Branch
Homosassa River
Honey Creek
Hontoon Dead River
Hopkins Creek
Horseshoe Creek
Hospital Creek
Howard Creek
Hudson Bayou
Hulett Branch
Huston River
Ichetucknee River
Imperial River
Inconstante Creek
Indian Creek
Indian Creek
Indian River
Indian River North
Istokpoga Creek
Jackson Canal
Jackson Creek
Jackson River
Joe River
Johnson Creek
Johnson Creek (Gulf County)
Johnson Slough
Jolly River
Jones Creek
Jones Swamp Creek
Julington Creek
Juniper Creek
Karen Canal
Kendall Creek
Kentner Creek
Kentucky Branch
Kissimmee River
Krueger Creek
L-40 Canal
L-8 Canal
Lafayette Creek
Lake Ajay-Fells Cove Canal
Lake Apopka-Beauclerc Canal
Lake Ashby Canal
Lake Center-Coon Lake Canal
Lake Griffin-Yale Canal
Lake Hart-Ajay Canal
Lake Joel-Myrtle Canal
Lake Joel-Trout Canal
Lake Lizzie-Alligator Canal
Lake Marion Creek
Lake Mary Jane-Hart Canal
Lake Myrtle-Mary Jane Canal
Lake Okeechobee Rim Canal

Lake Okeechobee Waterway
Lake Preston-Myrtle Canal
Lake Worth Lagoon
Lanceford Creek
Lehigh Canal
Leitner Creek
Little Black Creek
Little Cedar Creek
Little Clapboard Creek
Little Double Creek
Little Econlockhatchee River
Little Fishweir Creek
Little Juniper Creek
Little Manatee River
Little Mud Creek
Little Pottsburg Creek
Little River (Biscayne Bay)
Little River (Ochlockonee River)
Little Rocky Creek
Little Saint Marys River
Little Trout River
Little Wekiva River
Little Withlacoochee River
Lofton Creek
Lolly Creek
Long Branch
Long Creek
Lopez River
Lostmans River
Lower Sister Creek
Loxahatchee River
Lumber Creek
Mainard Branch
Manatee Creek
Manatee River
Marshall Creek
Mason Branch
Matanzas River
McCoys Creek
McCullough Creek
McGirts Creek
McQueen Creek
Miami Canal
Miami River
Middle River
Middle River (South and North
Fork)
Mill Branch
Mill Log Creek
Mills Creek
Moccasin Branch
Moccasin Slough
Moncrief Creek
Monroe Canal
Moore's Creek
Moore's Creek (Martin County)
Morris Dead River
Morrison Creek
Moses Creek
Moultrie Creek
Mud Creek
Murphy Creek

Myakka River
Myakkahatchee Creek
Nassau River
New Castle Creek
New River (Broward County)
New River (Collier County)
New River (Franklin County)
New River (Pasco County)
New River (Union/Bradford
County)
New River Canal off LO
New Rose Creek
Nichols Creek
Ninemile Creek
NN Creek
Norris Dead River
North Fork St. Lucie River
North New River Canal
Ochlockonee River
Ocklawaha River
Old Channel
Oldfield Creek
Oleta River
Open Creek
Orange Creek
Orange Grove Branch
Orange River
Ortega River
Pablo Creek
Paines Branch
Palatlakaha River
Palm River
Payne Creek
Pea River
Peace River
Pecks Branch
Pellicer Creek
Perdido River
Peters Branch
Peters Creek
Phelps Creek
Philippi Creek
Pine Barren Creek -
Pine Log Creek
Pinhook River
Pithlachascotee River
Plummer Creek
Polly Creek
Poncho Creek
Pond Creek
Poppleton Creek
Porpoise Creek
Pottsburg Creek
Puckett Creek
Pumpkin Hill Creek
Rainbow River
Red House Branch
Reedy Creek
Ribault River
Rice Creek
Robinson Creek
Rock Springs Run

Rocky Creek
Rocky Creek (Okaloosa/Walton)
Rodgers River
Rosalie Creek
Rushing Branch
Saint Sebastian River
Salt Creek
Salt Creek (Dixie County)
Salt Run
Salt Springs Run
San Carlos Creek
San Julian Creek
San Sebastian River
Sand Beach Branch
Sandy Creek
Sandy Run
Santa Fe River
Saul Creek
Sawpit Creek
Scipio Creek
Scoggin Creek
Shad Creek
Shark River
Shell Creek
Shingle Creek
Shipyard Creek
Shired Creek
Shoal River
Short Canal
Silver Glenn Springs Run
Silversmith Creek
Simms Creek
Simpson Creek
Sink Creek
Sisters Creek
Six Mile Creek
Sixteen Mile Creek
Smith Creek (Flagler)
Smith Creek (St. Johns)
Snake Creek
Snell Creek
Soap Creek
Soldier Creek
Soldier Creek (Escambia
County)
Sombrero Creek
Sopchoppy River
South Amelia River
South Fork Black Creek
South Fork St. Lucie River
South Port Canal
Spring Creek
Spring Garden Creek
Spring Warrior Creek
Spruce Creek
St Francis Dead River
St. Cloud Canal
St. Johns River
St. Lucie Canal
St. Lucie River
St. Marks River
St. Marys River

Steinhatchee River
Stokes Creek
Stranahan River
Strawberry Creek
Styles Creek
Summer Haven River
Suwannee River
Sweetwater Creek
Swimming Pen Creek
Tarpon River
Taylor Creek
Telogia Creek
Ten Mile Creek
Terrapin Creek
Thomas Creek
Thomas Mill Run
Three Otter Creek
Tiger Creek
Tocoi Creek
Tolomato River

Tomoka River
Trout -Coon Lake Canal
Trout Creek
Trout River
Turkey Creek
Turkey Creek (Okaloosa County)
Turner River
Upper Sister Creek
Waccasassa River
Wacissa River
Wakulla River
Walker Creek
Wares Creek
Warf Creek
Warner Creek
Weeki Wachee River
Wekiva River
Weohyakapka Creek
West Branch
West Palm Beach Canal

West Run Cracker Branch
Wetappo Creek
Whitney River
Whittenhorse Creek
Williamson Creek
Willoughby Creek
Wills Branch
Withlacoochee River (central Florida)
Withlacoochee River (north Florida)
Woodruff Creek
Wrights Creek
Wrights Creek (Walton County)
Ximanies Creek
Yellow River
Ziegler Dead River

# Lakes

Adams Lake
Alligator Lake
Blue Cypress Lake
Blue Lagoon
Brick Lake
Cherry Lake
Clark Lake
Clear Lake
Coon Lake
Crescent Lake
Cypress Lake
Dead Lakes
Deer Point Lake
Doctors Lake
Dumfoundling Bay
East Lake Tohopekaliga
Fells Cove
Horseshoe Mud Lake
Kimball Lake
Lake Ajay
Lake Apopka
Lake Ashby
Lake Beauclair
Lake Beresford
Lake Carlton
Lake Center
Lake Cone
Lake Dexter
Lake Dora
Lake Emma
Lake Eustis
Lake Florence
Lake Gentry
Lake George
Lake Griffin

Lake Harney
Lake Harris
Lake Hart
Lake Hatchineha
Lake Hell 'n Blazes also called
Lake Hellen Blazes or Lake
Helen Blazes
Lake Ida
Lake Istokpoga
Lake Jackson
Lake Jessup
Lake Jesup
Lake Joel
Lake Kissimmee
Lake Lizzie
Lake Louisa
Lake Lucy
Lake Manatee
Lake Manatee (Manatee County)
Lake Mangonia
Lake Marion
Lake Mary Jane
Lake Minnehaha
Lake Minneola
Lake Monroe
Lake Myrtle
Lake Nellie
Lake Okeechobee
Lake Ola
Lake Osborne
Lake Poinsett
Lake Powell
Lake Preston
Lake Rosalie
Lake Rousseau

Lake Santa Fe
Lake Seminole (Gadsden, Jackson Counties)
Lake Seminole (Leon County)
Lake Seminole (Pinellas County)
Lake Susan
Lake Talquin
Lake Tarpon
Lake Thonotosassa
Lake Tohopekaliga
Lake Washington
Lake Weohyakapka
Lake Wimico
Lake Winder
Lake Woodruff
Lake Yale
Little Lake George
Little Lake Harris
Little Lake Santa Fe
Little Sawgrass Lake
Lochloosa Lake
Loughman Lake
Marco Lake
Maul Lake
Mud Lake
Orange Lake
Puzzle Lake
Rodman Reservoir
Ruth Lake
Salt Lake
Sawgrass Lake
Silver Lake
Spring Garden Lake
Stagger Mud Lake
Tick Island Mud Lake

CORPS003768

Tiger Lake
Trout Lake
Tsala Apopka Lake

Ward Lake
Ward Lake (Manatee County)

# COMMONWEALTH OF PUERTO RICO

## Rivers, Streams, Creeks and Channels in Puerto Rico with tidal portions

Canal Blasina (Carolina/Loíza)
Canal Suarez (Carolina)
Caño Boca Chica (Juana Díaz)
Caño Boca Prieta (Humacao)
Caño Boquerón (Cabo Rojo)
Caño Boquilla (Mayaguez)
Caño Cabo Caribe (Vega Baja)
Caño Corazones (Mayaguez)
Caño de Martín Peña (San Juan)
Caño de Santi Ponce (Aguada)
Caño de Santiago (Yabucoa)
Caño García (Rincón)
Caño La Malaria (Cataño)
Caño La Puente (Añasco)
Caño Madre Vieja (Aguadilla)
Caño Matos (Barceloneta)
Caño Merle (Mayaguez)
Caño Tiburones (Arecibo)
Laguna Tortuguero Outlet Channel (Manatí)
Quebrada Branderí (Guayama)
Quebrada Ceiba (Ceiba)
Quebrada Corazón (Guayama)
Quebrada de Los Cedros (Isabela/Aguadilla)
Quebrada del Oro (Mayaguez)
Quebrada Grande de Calvache (Rincón)
Quebrada Icacos (Añasco)
Quebrada Piletas (Rincón)
Quebrada Ramos (Rincón)
Quebrada Salada (Arroyo/Guayama)
Río Antón Ruiz (Naguabo/Humacao)
Río Blanco (Naguabo)
Río Bucaná (Ponce)
Río Camuy (Camuy/Hatillo)
Río Candelero (Humacao)
Río Cañas (Juana Díaz)
Río Cayures (Santa Isabel)
Río Chico (Patillas)
Río Cibuco (Vega Baja)
Río Coamo (Santa Isabel)
Río Cocal (Dorado/Toa Baja)
Río Culebrinas (Aguadilla/Aguada)

Río Daguao (Naguabo/Ceiba)
Río de Bayamón (Toa Baja/Cataño)
Río de La Plata (Dorado)
Río Demajagua (Fajardo/Ceiba)
Río Descalabrado (Juana Díaz/Santa Isabel)
Río Espíritu Santo (Río Grande)
Río Fajardo (Fajardo)
Río Grande (Aguada/Rincón)
Río Grande de Añasco (Añasco/Mayaguez)
Río Grande de Arecibo
Río Grande de Loíza (Loíza)
Río Grande de Manati (Barceloneta/Manatí)
Río Grande de Patillas (Patillas)
Río Guajataca (Quebradillas/Isabela)
Río Guamaní (Guayama)
Río Guanajibo (Mayaguez)
Río Guayabo (Aguada)
Río Guayanés (Yabucoa)
Río Guayanilla (Guayanilla)
Río Herrera (Loíza/Río Grande)
Río Humacao (Humacao)
Río Inabón (Ponce)
Río Jacaboa (Patillas)
Río Jacaguas (Ponce/Juana Díaz)
Río Jueyes (Salinas/Santa Isabel)
Río Loco (Guánica)
Río Mameyes (Río Grande/Luquillo)
Río Matilde (Ponce)
Río Maunabo (Maunabo)
Río Nigua (Arroyo)
Río Nigua (Salinas)
Río Portugués (Ponce)
Río Puerto Nuevo (San Juan)
Río Sabana (Luquillo)
Río Santiago (Naguabo)
Río Tallaboa (Peñuelas)
Río Yaguez (Mayaguez)
Río Yauco (Yauco)

## Tidal lagoons and ponds

Laguna Aguas Prietas (Fajardo)
Laguna Algodones (Vieques)
Laguna Anones (Vieques)
Laguna Arenas (Vieques)
Laguna de las Salinas (Ponce)
Laguna de Levittown (Toa Baja)
Laguna de Piñones (Carolina/Loíza)

Laguna del Condado (San Juan)
Laguna del Flamenco (Culebra)
Laguna del Molino (Culebra (Culebrita))
Laguna El Pobre (Vieques)
Laguna Grande (Fajardo)
Laguna Guaniquilla (Cabo Rojo)
Laguna Joyuda (Cabo Rojo)

CORPS003769

Laguna Kiani (Vieques)
Laguna La Plata (Vieques)
Laguna La Torrecilla (Carolina/Loíza)
Laguna Los Corozos (San Juan/Carolina)
Laguna Los Machos (Ceiba)
Laguna Monte Largo (Vieques)

Laguna Playa Grande (Vieques)
Laguna Puerto Diablo (Vieques)
Laguna San José  (San Juan/Carolina)
Laguna Tortuguero (Manatí/Vega Baja)
Laguna Yanuel (Vieques)
Laguna Zoni (Culebra)

## TERRITORY OF THE U.S. VIRGIN ISLANDS

## Ponds and Guts in the U.S. Virgin Islands

### St. John

Brown Bay Pond
Chocolate Hole Pond
Drunk Bay Pond
Elk Bay Pond
Europa Bay Pond
Fish Bay Gut
Fish Bay Pond
Francis Bay Pond
Friis Bay Pond
Great Lameshur Pond
Grootpan Bay Pond
Guinea Gut

Hart Bay Pond
Kiddel Bay Pond
Lagoon Point Pond
Leinster Bay Pond
Mt. Pleasant Pond
Newfound Bay Pond
Privateer Bay Pond
Reef Bay Pond
Salt Pond
Southside Pond
Turner Point Pond

### St. Thomas

Benner Bay Pond
Bolongo Bay Pond
Bovoni Bay Pond
Cabrita Point Pond
Christmas Cove Pond
Coculus Bay Pond
East Gregerie Pond
Eva Point Pond
Fortuna Bay Pond
Frenchman Bay Pond

Great St. James Pond
Hassel Island Pond
Limestone Bay Pond
Little Coculus Bay Pond
Perseverance Bay Pond
Red Hook Pond
Saba Island Pond
Salt Cay Pond
Smith Bay Pond
Sprat Point Pond

### St. Croix

Altona Lagoon
Billy French Ponds
Buck Island Pond
Caledonia Gut
Coakley Bay Pond
Great Pond
Jolly Hill Gut
Krause Lagoon
Manning Bay Pond
River Gut
Robin Bay Pond
Southgate Pond
West End Saltpond



# FINAL REPORT OF THE
# Assumable Waters Subcommittee

May 2017

Columbia River

Willamette River

Kincaid River

Black 003760

Intentionally left blank

003761

CORPS003772

# Table of Contents

Executive Summary ..................................................................................................................... iii

    Problem Statement ................................................................................................................ iii

    Underlying Assumptions ........................................................................................................ iv

    Subcommittee Activities ........................................................................................................ iv

    Subcommittee Findings and Recommendations .................................................................. v

    Implementation and Process Recommendations ................................................................. vi

1. Statement of the Problem ...................................................................................................... 1

2. Background ............................................................................................................................ 2

    What is Assumption? ............................................................................................................. 2

    Tribal Considerations Regarding Assumption ....................................................................... 3

    Overview of Assumption by Michigan and New Jersey ......................................................... 3

    No Further Assumption by States or Tribes Since the 1990s ............................................... 5

    The Importance of Assumption to States and Tribes ........................................................... 5

    Establishment of the Subcommittee ..................................................................................... 6

    Operation of the Subcommittee ............................................................................................ 7

    About the Writing of this Report ............................................................................................ 7

3. Origin and Purpose of Section 404(g) .................................................................................. 9

    Organization of the Work Group ........................................................................................... 9

    Background on Navigable Waters to be Retained by the USACE as Defined in Section 404(g)(1) ........................ 9

    Background on Adjacent Wetlands to be Retained by the USACE ...................................... 11

4. Description of Alternatives for Identifying Waters (other than Wetlands) Assumable by a State or Tribe, and Waters that Must be Retained by the USACE ................................. 13

    Waters Alternative A ............................................................................................................. 14

    Waters Alternative B ............................................................................................................. 14

    Waters Alternative C ............................................................................................................. 15

003762

5.  Subcommittee Discussion and Recommendations for Identifying Retained Waters ........................... 17

Majority Recommendation ................................................................................................................ 17

USACE Recommendation ................................................................................................................ 21

6.  Description of Alternatives for Identifying Adjacent Wetlands Assumable
by a State or Tribe, and Adjacent Wetlands that Must be Retained by the USACE ........................... 23

Wetlands Alternative A .................................................................................................................... 24

Wetlands Alternative B .................................................................................................................... 25

Wetlands Alternative C .................................................................................................................... 25

7.  Subcommittee Discussion and Recommendations on Identifying Adjacent Wetlands ...................... 29

Majority Recommendation ................................................................................................................ 29

USACE Recommendation ................................................................................................................ 34

8.  Implementation and Process Recommendations ............................................................................. 35

Maintain Michigan and New Jersey 404 Assumed Programs ......................................................... 35

Develop Guidance for the Field ....................................................................................................... 35

Provide Flexibility ............................................................................................................................ 36

Incorporate National Principles and Considerations into Field Guidance ...................................... 36

Provide General Procedures for the Assumption Process .............................................................. 37

Utilize Best Available Technology .................................................................................................... 38

Appendix A:  Tribal Findings, Issues, and Considerations during Assumption ............................................. 39

Appendix B:  Michigan and New Jersey's Assumed Programs ..................................................................... 41

Appendix C:  Letter from the Association of Clean Water Administrators,
the Environmental Council of the States, and the Association of State Wetland Managers ........................ 47

Appendix D:  List of Subcommittee Members .............................................................................................. 50

Appendix E:  Subcommittee Charter ............................................................................................................ 52

Appendix F:  The Legislative History of Section 404(g)(1) of the Clean Water Act ..................................... 55

003763

CORPS003774



# Executive Summary

## PROBLEM STATEMENT

Section 404 of the Clean Water Act (CWA) authorizes the US Army Corps of Engineers (USACE) to issue permits for discharge of dredged or fill material in navigable waters. "Navigable waters" is defined under the CWA to mean "the waters of the United States and territorial seas." Section 404(g) of the CWA authorizes states,[1] with approval from the US Environmental Protection Agency (EPA), to assume authority to administer the 404 program in some, but not all, navigable waters and adjacent wetlands. Section 404(g)(1) describes the waters over which the USACE must retain administrative authority even after program assumption by a state or tribe.

Only two states, Michigan and New Jersey, have been approved to assume the Section 404 Program. Other states have explored assumption, but those efforts have not borne fruit in part due to uncertainty over the scope of assumable waters and wetlands. The EPA formed the Assumable Waters Subcommittee under the auspices of the National Advisory Council for Environmental Policy and Technology (NACEPT) to provide advice and develop recommendations for NACEPT on how the EPA can best clarify for which waters a state or tribe may assume CWA section 404 permit responsibilities, and for which waters the USACE retains CWA section 404 permit responsibility under an approved state or tribal program. The Subcommittee included 22 members representing states and tribes, federal agencies, and other stakeholders. This report represents the results of the Subcommittee's work from October 2015 to April 2017 and is being presented to NACEPT for its consideration.

---

[1] Tribes were not specifically called out in the 1977 CWA amendments but are able to assume as provided in Section 518(e) of the CWA.

## UNDERLYING ASSUMPTIONS

Recommendations to the NACEPT were developed against the background of the following assumptions.

- In accordance with the requirements of Section 404, a state or tribe may only be authorized to assume the Section 404 Program if it has authority over all assumable waters of the United States, and demonstrates that it will apply legal standards consistent with the Clean Water Act (CWA) requirements in operating a permitting program.

- Assumption by a state or tribe does not alter CWA jurisdiction over waters of the United States.  Moreover, nothing in the report or recommendations of the subcommittee is intended to alter in any way the definition or scope of federal jurisdiction.  Rather, this report speaks only to the administrative division of authority under Section 404 between the USACE and an approved state or tribe.

- In accordance with EPA's charge to the subcommittee, recommendations are intended to provide clarity, to be practical and readily implementable in the field, and to be consistent with the CWA, particularly Section 404(g) (1).

- Waters, such as rivers, lakes, and streams, and adjacent wetlands are clearly linked legally, in policy, and in hydrology, and in total are often referred to as "waters."  However, for the purposes of developing recommendations and for usage in this report, the Subcommittee chose the use of two terms:  "waters" and "adjacent wetlands."

- Since the EPA will be receiving formal advice from the NACEPT, the EPA participated actively in the discussion, formulation, and review of the alternatives and provided technical advice, but did not take a position regarding the specific recommendations made by the Subcommittee.  The US FWS also participated in the discussions but did not take a position on the final recommendations.  Members who took a position regarding the recommendations are referred to as "recommending members."  These include all members, including the USACE, but not the US EPA and the US FWS.

## SUBCOMMITTEE ACTIVITIES

Subcommittee members met eight times and also worked independently from October 2015 through April 2017. Investigations and discussions were divided into three primary topics.

- The origins, legislative history, and processes of Section 404 state or tribal assumption.  Subcommittee members, including attorneys and others, reviewed the language of Section 404(g), the legislative history, and other policy documents.  The full findings of this group are included in *Appendix F*.  The histories of the programs in Michigan and New Jersey are included in *Appendix B*.

- The extent of waters of the United States that may be assumed by an approved state or tribe, and the extent of waters where Section 404 authority must be retained by the USACE, even following state or tribal assumption.  Findings and recommendations are discussed in detail in this report.

- The extent of wetlands that must also be retained by the USACE following state or tribal assumption.  Findings and recommendations are discussed in detail in this report.

003765

CORPS003776

## SUBCOMMITTEE FINDINGS AND RECOMMENDATIONS

### *Waters (other than Wetlands) Assumable by a State or Tribe, and Waters that Must be Retained by the USACE*

**MAJORITY RECOMMENDATION.** All the recommending Subcommittee members (the majority) except the member representing the USACE recommend to NACEPT that the EPA develop guidance or regulations to clarify that when a state or tribe assumes the 404 program, the USACE must retain authority over waters included on lists of waters regulated under Section 10 of the Rivers and Harbors Act (RHA). These lists are compiled and maintained by the USACE district offices for every state except Hawaii, and the majority of the Subcommittee recommends the lists be used with two minor modifications: any waters that are on the Section 10 lists based solely on historic use (e.g. based solely on historic fur trading) are not to be retained (based on the Congressional record and statute), and waters that are assumable by a tribe (as defined in the report) may also be retained by the USACE when a state assumes the program. The majority recognizes that waters may be added to Section 10 lists after a state or tribe assumes the program, and recommends in that case, such waters may also be added to lists of USACE-retained waters at that time.

The majority believes that this option is clear and practical, can be implemented efficiently at the time a state or tribe seeks assumption as well as in the operation of an assumed program, and is consistent with Congress' intent that the USACE retain authority over RHA Section 10 waters and adjacent wetlands. This alternative also is based on relatively stable and predictable information.

All other waters of the United States (with the exception of adjacent wetlands as discussed below) are assumable by a state or tribe.

**MINORITY RECOMMENDATION.** The Subcommittee member representing the USACE recommends USACE retain authority over waters on the Section 10 lists, and also waters that have been identified as Traditional Navigable Waters (TNWs) under the CWA in accordance with USACE CWA regulations at 33 CFR 328.3(a)(1) and guidance issued by the USACE and the EPA to implement the Supreme Court's opinion in Rapanos, Appendix D.[2] Under this recommendation waters that are officially determined by a USACE district as Section 10 or stand-alone CWA (a) (1) TNW waters at the time a state or tribe assumes the program would be retained by the USACE. In addition, the District would evaluate all of its completed case-specific TNW determinations to determine whether addition of that water to the retained waters list is warranted under a stand-alone determination. Waters that are later identified and officially determined as a Section 10 or stand-alone CWA(a)(1) TNW after assumption occurs will also be added to the list of retained waters. The USACE believes there should not be a distinction between different uses of the term "navigable waters" under different sections of the statute, and believes this is consistent with the purposes of the CWA and Section 404(g). While the statutory language of the CWA Section 404(g) parenthetical waters slightly differs from the regulatory language of 328.3(a)(1), the USACE believes the interpretation of the term "navigable waters" is the same under 404(g) and 328.3(a)(1) (other than those waters considered navigable based solely on their historic use).

---

[2] Appendix D of the 2007 "US Army Corps of Engineers Jurisdictional Determination Instructional Guidebook" available at: http://www.usace.army.mil/Portals/2/docs/civilworks/regulatory/cwa_guide/ app_d_traditional_navigable_waters.pdf. The Guidebook, of which Appendix D is part, was dated 1 June 2007 and signed by USACE and the US EPA on 5 June 2007.

003766

CORPS003777

*Adjacent Wetlands Assumable by a State or Tribe, and Adjacent Wetlands that Must be Retained by the USACE*

MAJORITY RECOMMENDATION.  All the recommending Subcommittee members (the majority) except for the USACE member recommend that the EPA adopt and implement a policy under which the USACE would retain administrative authority over all wetlands adjacent to retained navigable waters landward to an administrative boundary agreed upon by the state or tribe and the USACE.  The USACE CWA regulatory definition of "adjacent" would be used to identify adjacent wetlands, and the USACE would retain administrative authority only over adjacent wetlands within the agreed-upon administrative boundary.  This administrative line could be negotiated at the state or tribal level to take into account existing state regulations or natural features that would increase practicability or public understanding; if no change were negotiated, a 300-foot national administrative default line would be used.

The majority of the subcommittee understands that the purpose of retention by the USACE of wetlands adjacent to Section 10 waters is primarily to ensure that the USACE has authority over activities that may alter the physical structure of the navigational channel or otherwise interfere with navigation.  Thus, it believes that the extent of USACE authority over adjacent wetlands under an assumed program is reasonably limited to wetlands that are likely to affect navigation.

MINORITY RECOMMENDATION.  The representative of the USACE recommends that the USACE retain the entirety of wetlands that are "adjacent" to retained navigable waters, using the definition of adjacent wetlands currently being used by the USACE for regulatory actions under Section 404 (i.e. the wetlands defined as adjacent under 33 CFR 328.3, implemented through the 2008 Rapanos guidance).  The USACE believes that this recommendation is consistent with CWA Section 404, provides clarity regarding the permitting authority, and is easily understood and implementable in the field.

## IMPLEMENTATION AND PROCESS RECOMMENDATIONS

This report also provides general recommendations regarding the potential content of new guidance or regulations on state or tribal assumable waters, and effective procedures for implementation.



# 1. Statement of the Problem

Section 404(a) of the Clean Water Act (CWA) authorizes the US Army Corps of Engineers (USACE) to issue CWA permits for the discharge of dredged or fill material into navigable waters.  Section 404(g) authorizes states,[3] with approval from the US Environmental Protection Agency (EPA), to assume authority to administer the 404 program in some but not all navigable waters. The waters and wetlands that a state may not assume, and that the USACE must retain even after a state has assumed the program, are specified in a parenthetical phrase in section 404(g)(1) as:

> *"... those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto ..."*[4]

It was the intent of Congress for states to implement the permit program under Section 404 of the Federal Clean Water Act.[5]  However, since the enactment of 404(g) in 1977, only two states and no tribes have assumed the 404 Program.  While other states (most recently including Maryland, Oregon, Virginia, Montana, Florida, Arizona, and Alaska) and some tribes have explored assuming the program, their efforts have not resulted in actual assumption. States have indicated that this is due in part to confusion about the meaning of Section 404(g)(1).  This report focuses on clarifying the meaning of Section 404(g)(1) and thus the scope of waters and adjacent wetlands that may be assumed by a state or tribe.

---

[3]  Tribes were not specifically called out in the 1977 CWA amendments but are able to assume as provided in statute in Section 518(e) of the CWA, 33 USC 1378(e), which authorizes the Administrator to treat an Indian Tribe as eligible to apply for numerous CWA programs, including the 404 permit program under section 404(g).  The EPA has also issued regulations on this matter at 40 CFR Part 233g: 404 – Tribal Program Regulations.

[4]  §1344(g)(1)

[5]  33 USC § 1251(b)

003768



# 2. Background

## WHAT IS ASSUMPTION?

"Assumption" of the CWA Section 404 program describes the process whereby a state or tribe obtains approval from the EPA to administer the 404 program within their borders and consequently begins administering the program.  To obtain EPA approval, the state or tribal program must be consistent with and no less stringent than that required by law of the federal agencies.  For example, a state or tribe must:

- have sufficient authority to regulate all waters of the US that may be assumed;

- regulate at least the same activities as listed in the Act and regulations;

- provide for sufficient public participation;

- ensure compliance with the Section 404(b)(1) guidelines, which provide environmental criteria for permit decisions;

- have adequate enforcement authority; and

- comply with other applicable regulations (33 USC part 1344(h); 40 CFR part 233).

In an assumed 404 program, the EPA retains the authority to review defined categories of permit applications and may request review of any application.  The EPA coordinates its review of a particular application with the USACE and requests comments from the US Fish and Wildlife Service, and, as appropriate, the National Marine Fisheries Service, with the EPA providing comments to the state or tribe.  In the event that the EPA objects to issuance of a 404 permit,

003769

the state or tribe cannot issue the 404 permit unless the EPA's objection is resolved. If the objection is not resolved, the USACE takes responsibility for the permit, including the decision to issue or deny the permit. These provisions of federal law provide safeguards that ensure consideration of both state or tribal and federal requirements as well as national consistency.

Before assuming the program, the state or tribe must enter into and sign separate Memoranda of Agreement (MOAs) with both the EPA and USACE. The MOA with the USACE must describe which navigable waters and adjacent wetlands will be retained by the USACE. To date, there has been little guidance to USACE districts, EPA regions, or states and tribes on how to make that determination.[6]

## TRIBAL CONSIDERATIONS REGARDING ASSUMPTION[7]

Section 518 of the CWA, enacted as part of the 1987 amendments to the statute, authorizes the EPA to treat eligible Indian tribes in a manner similar to states ("treatment as a state" or TAS) for a variety of purposes, including administering each of the principal CWA regulatory programs and receiving grants under several CWA authorities (81 FR at 30183). This includes CWA Section 404. Tribal governments pursuing assumption of the 404 program will follow the same process as states, though it is expected that there will be some nuanced differences; for example, in addressing Tribal Indian Reservation boundaries.

In a state-assumed program, states will generally not assume authority for administering the 404 program within Indian country; instead, such authority will generally be retained by the USACE unless the tribe itself is approved by the EPA to assume the 404 program. Because Tribal Indian Reservation boundaries are not static and precise definitions and considerations vary from state to state, it is essential that waters to be retained by the USACE on tribal lands be specifically addressed in any MOA developed between the USACE and a state assuming the program.

Per Executive Order 13175 of November 6, 2000 – Consultation and Coordination With Indian Tribal Governments,[8] the federal government has an obligation to consult with federally-recognized tribes that may be affected during a state assumption effort.

## OVERVIEW OF ASSUMPTION BY MICHIGAN AND NEW JERSEY

Since Section 404(g) was enacted in 1977, two states have assumed the program: Michigan and New Jersey.

Michigan and EPA signed a MOA regarding assumption in 1983. In 1984, the state and the USACE signed a MOA describing waters over which the USACE retained administration. Prior to assumption, Michigan had enacted a number of statutes related to water protection, including the 1955 Great Lakes Submerged Lands Act, the 1972

---

[6]  In 1980, the EPA produced a document entitled: "The State's Choice: 404 Permit Program" that provides some insight into the agency's thinking at that time (*US EPA, Office of Water Regulations and Standards Criteria and Standards Division, EPA 440/5-81-002, October 1980*). The EPA's implementing regulations also provide very general guidance. These regulations state that the MOA between the USACE and state or tribe will contain "A description of waters of the United States within the State over which the Secretary retains jurisdiction, as identified by the Secretary." 40 CFR Part 233: 404 State Program Regulations.

[7]  *See Appendix A*, Tribal Findings, Issues, and Considerations during Assumption.

[8]  Federal Register Vol. 65, No. 218, pages 67249-67252.

Inland Lakes and Streams Act, and the 1979 Wetland Protection Act.  The Wetland Protection Act was passed to facilitate assumption of the 404 Program.  In 1984, EPA formally approved Michigan's program.[9]

The waters and wetlands assumed by Michigan are described in the MOA between Michigan and the USACE.  In this MOA, the USACE retains responsibility for waters that are on a Rivers and Harbors Act (RHA) Section 10 list maintained by the USACE district office.  In addition, the USACE retains permitting authority over the Great Lakes, which although not on the list clearly qualify as Section 10 waters.  This list is specific and results in well-defined boundaries and upstream limits for waters retained by the USACE.  Most of these USACE-retained waters are within a narrow band of streams that flow into the Great Lakes.  This list has been refined over time with the addition of some small tributaries and wetlands that are influenced by the water level of the Great Lakes.  Michigan has assumed the remaining waters, which are the vast majority of the waters internal to the state.

The extent of adjacent wetlands over which the USACE retains authority is determined by the USACE on a case-by-case basis – generally including wetlands in close proximity to Section 10 waters, and having a direct surface water connection to and within the influence of the ordinary high water mark of those waters.

There are some waters over which Michigan and the USACE have joint authority.  In these cases the two agencies work together on the permitting and compliance activities, and site inspections.  Usually the state takes the lead on mitigation because the state has a robust mitigation program and can own property, hold conservation easements, and hold financial instruments, which the USACE cannot.

New Jersey assumed the program in 1994.[10]  Prior to assumption, New Jersey passed its Wetlands Act in 1970, Coastal Zone Management Act in 1972, and the Freshwater Wetlands Protection Act in 1987.  As part of the Freshwater Wetlands Protection Act, New Jersey undertook a mapping program to identify freshwater wetlands and waters.  While the maps are not regulatory in nature, New Jersey's 404 program is keyed to these freshwater wetlands maps.

In the MOA between New Jersey and the USACE, the USACE retained regulatory authority over those wetlands that are:  "... partially or entirely located within 1000 feet of the ordinary high water mark or mean high tide of the Delaware River, Greenwood Lake, and all water bodies which are subject to the ebb and flow of the tide."[11]  State-administered waters in turn are generally determined by superimposing head of tide data on the state's freshwater wetlands quarter quadrangles that are at a scale of one inch equals 1000 feet.  A line was established parallel to and 1000 feet from the ordinary high water mark or mean high tide of the waters described above.  The USACE retains permitting authority over all wetlands that are waterward of, or intersected by, the administrative line described above.  Because New Jersey regulates all wetlands/waters, it rarely has to determine whether a wetland is assumable or non-assumable. However, if there is any question or a reason that it makes a difference to an applicant, the state either adds a permit condition informing the applicant or contacts the USACE in advance to request the USACE determine whether they will or will not assert authority to regulate.  See *Appendix B* for further elaboration of these two states' assumed programs.

---

[9]  49 FR 38948, Oct. 2, 1984. Redesignated at 53 FR 20776, June 6, 1988. Redesignated at 58 FR 8183, Feb. 11, 1993. Effective date, October 16, 1984.

[10]  59 FR 9933, Mar. 2, 1994.

[11]  Ibid.

003771

CORPS003782

## NO FURTHER ASSUMPTION BY STATES OR TRIBES SINCE THE 1990s

The legislative history and statute indicate that Congress intended and expected that a number of states would choose to assume authority over the discharge of dredged or fill materials under the provisions of Section 404(g). However, no states or tribes have assumed the 404 Program since Michigan and New Jersey. There are many possible reasons for this, from the increasing complexity and cost of administering the program, to decades-long challenges about which waters should even be regulated under Section 404, to the fact that unlike several other EPA programs, Congress did not dedicate specific additional funding for states or tribes to cover the costs of administering a 404 program. Additionally, EPA and the USACE have not provided specific guidance that can be used to identify the waters (and wetlands) that must be retained by the USACE under 404(g). Without specific guidance, individual states or tribes and USACE districts have been left to interpret the meaning of 404(g)(1) to determine the extent of waters to be retained in each MOA negotiation. In turn, these negotiations have often broken down or stopped due to lack of clarity, uncertainty, or disagreement over the scope of retained waters and wetlands.

## THE IMPORTANCE OF ASSUMPTION TO STATES AND TRIBES

States and tribes play a significant role in many Clean Water Act programs (for example, point and nonpoint source management, waste management, wastewater permitting under Section 402, and development of water quality standards). In most CWA programs, states and tribes partner primarily with the EPA. Section 404 is unique in the sharing of regulatory responsibilities with the USACE in addition to EPA. For those states or tribes with mature, integrated water management programs that include the regulation of dredged or fill activities, 404 Program assumption allows a state or tribe to carry out a fully integrated and comprehensive water program addressing the full range of state, tribal, and CWA requirements. Despite the complexity of the program and potential administrative costs, states and tribes remain interested in pursuing assumption.

While not all states and tribes are qualified or positioned to assume Section 404 responsibility, or are willing to bear the additional cost of doing so, assumption may have significant benefits for some states and tribes, as well as the public. State or tribal assumption in accordance with Section 404(g) could reduce the overlap and duplication of state, tribal, and federal permitting programs, and be the best use of state, tribal, and federal program resources. This is, of course, dependent upon assurance that the state or tribal program is as stringent as is required by the federal statutes and regulations, an assurance required by the CWA and provided by initial EPA approval and by ongoing federal oversight. Assumption allows a state or tribe to meet state or tribal regulatory time constraints; to incorporate needed local requirements and permit conditions; and, to integrate review of applications for discharge of dredged or fill material with other applicable regulatory requirements. The public may be supportive of assumption and willing to accept the costs to a state or tribal government and the potentially higher permit fees given potentially significant streamlining of the permitting process for many projects.

## ESTABLISHMENT OF THE SUBCOMMITTEE

In 2014, the Association of Clean Water Administrators, the Environmental Council of the States, and the Association of State Wetland Managers asked EPA to clarify which waters are assumable under the statute (see *Appendix C* for a copy of the request from the state associations).  In response, EPA convened a stakeholder group to provide advice on this matter.  To form the stakeholder group, EPA drew on its authority under the Federal Advisory Committee Act (FACA), Public Law 92-463[12].  In 1988, EPA established the National Advisory Council for Environmental Policy and Technology (NACEPT), a body subject to FACA, to provide advice to the EPA Administrator on a broad range of environmental policy, management, and technology issues.  In March 2015, the Agency published a Federal Register Notice announcing that NACEPT would be establishing the Subcommittee to address the issue raised by the states and national organizations, and that it was seeking nominations for membership.  In June of that year, EPA announced the appointment of 22 members representing federal, state, and tribal governments, non-governmental organizations and the regulated public (see *Appendix D* for a list of members and their affiliations).

EPA directed the Subcommittee to focus on a narrow and specific task related to the waters for which a state or tribe may assume permitting responsibility (see the Subcommittee Charter in *Appendix E*).  The Subcommittee was asked to provide advice and develop recommendations for NACEPT on how EPA can best clarify for which waters a state or tribe may assume CWA section 404 permit responsibilities, and for which waters the USACE retains CWA section 404 permit responsibility under an approved state or tribal program.

As set forth in the Charter's Charge to the Subcommittee:  "this effort will address the States' request to provide clarity on this issue enabling them to assess and determine the geographic scope and costs and benefits associated with implementing an approved program."  The Subcommittee has had a limited duration and narrow focus.  Other aspects of state or tribal assumption were not within the scope of Subcommittee deliberations.  *In particular, the Charge emphasized that "the subcommittee will not be deliberating on the merits of assumption, nor on any aspect of the larger question of which waters are 'waters of the US.'"*

EPA asked that the final Subcommittee report to NACEPT reflect consideration of the following assumptions:

- A CWA section 404 permit is required – meaning there is an activity regulated under section 404 that will result in a discharge of dredged or fill material into a water of the US;

- Any recommendation must be consistent with the CWA and in particular section 404(g); and

- Clarity regarding who is the permitting authority (the state or tribe or the USACE) should be easily understood and implementable in the field.

---

[12] 5 USC Appendix 2

## OPERATION OF THE SUBCOMMITTEE

With this direction in mind, the Subcommittee held its initial meeting October 6–7, 2015, followed by four additional multi-day meetings and three webinars. The early meetings were spent clarifying and understanding the nature of the question being asked. Subsequently, the Subcommittee formed four work groups to focus on assigned issues – specifically, Tribal Considerations, Origin and Purpose of Section 404(g), Waters, and Adjacent Wetlands.

The Tribal Considerations work group clarified issues that both states and tribes need to address from the earliest stages of consideration of assumption. The work of the Origin and Purpose of Section 404(g) work group served as an underpinning not only for the entire Subcommittee's work but particularly for the work of the Waters and Adjacent Wetlands work groups. Waters, such as rivers, lakes, and streams, and adjacent wetlands are clearly linked legally, in policy, and in hydrology, and in total are often referred to as "waters." However, for the purposes of developing recommendations and for usage in this report, the Subcommittee chose the use of two terms: "waters" and "adjacent wetlands." The Subcommittee felt that the recommendation for which waters could be assumed vs. retained would relate directly to which adjacent wetlands would be assumed vs. retained: only wetlands adjacent to waters retained by the USACE, for example, would be retained by the USACE, regardless of the nature of the recommendation for retained wetlands.

The work groups were tasked with studying the assigned topics, reporting their findings, and developing alternatives for consideration by the entire Subcommittee. Typically, the work groups met during Subcommittee meetings at key points, and between meetings continued their work through conference calls and exchanges of emails.

It was immediately apparent to all participants that the Subcommittee should not deviate from the defined charge and should avoid addressing questions about the scope of CWA jurisdiction over "the waters of the United States." Thus, consistent with EPA's Charge to the Subcommittee, the question for the Subcommittee was not which waters are "waters of the United States," but rather which of the "waters of the United States" will be *retained* by the USACE, and which "waters of the United States" may be *assumed* by a state or tribe. All waters of the United States will continue to be regulated in accordance with Section 404 requirements regardless of whether a state or tribe assumes the program. The Subcommittee stresses that this distinction between administrative responsibility and jurisdictional authority is essential to keep in mind in reading the findings and recommendations in this report. The Subcommittee's focus has been on clarifying administrative responsibility.

## ABOUT THE WRITING OF THIS REPORT

This report is based on extensive written work completed by the Subcommittee's work groups and reviewed and discussed by the full Subcommittee. A drafting work group assembled and edited the final report based on those work groups' products.

The work groups carried out extensive discussion, then one or two participants produced a draft working paper or brief that was in turn reviewed and edited by all work group members, and then further reviewed and edited by all Subcommittee members. In the case of the Origin and Purpose of Section 404(g) section, the Subcommittee relied heavily on non-agency Subcommittee members who were attorneys with extensive experience in the CWA.

003774

The reader may note that the following alternatives and recommendations sections for retained waters and adjacent wetlands vary somewhat in format and style. While the sections follow the same general approach (discussion, presentation of alternatives, and majority and minority recommendations), there are differences in the presentations. The Subcommittee has chosen to allow these differences to remain. These differences are in part due to the different work groups' writing style and formatting, and in part because the two issues have different legislative histories and treatments. The full Subcommittee agrees that the report accurately describes the Subcommittee's deliberations and majority and USACE minority recommendations.

While the US EPA provided comments along with all other Subcommittee members, drafting of this report was by non-EPA members of the subcommittee. Since the US EPA will be receiving formal advice from the NACEPT, the EPA participated actively in the discussion, formulation, and review of the alternatives and provided technical advice, but did not take a position regarding the specific recommendations made by the Subcommittee. The US FWS also participated in the discussions but did not take a position on the final recommendations. Members who took a position regarding the recommendations are referred to as "recommending members." These include all members, including the USACE, but not the US EPA and the US FWS.



Report of the Assumable Waters NACEPT Subcommittee

003775

CORPS003786



# 3. Origin and Purpose of Section 404(g)

## ORGANIZATION OF THE WORK GROUP

In accordance with EPA's charge to the Subcommittee that "any recommendation must be consistent with the CWA and in particular 404(g)(1)," the Subcommittee established a work group to look into the meaning and history of Section 404(g)(1). The work group sought to provide clarification and understanding of the language of the statute by referring to the record of administrative developments, Congressional hearings, committee reports, and debates that led to the 1977 amendments to the CWA – which amendments resulted in, among other things, the adoption of section 404(g)(1). Memoranda of the work group's findings and conclusions are attached in *Appendix F* to this Report. Following is a brief summary of the work group's findings and conclusions. In the interest of brevity, citations to original sources are omitted from this summary, but they can be found in the Memoranda attached in *Appendix F*.

## BACKGROUND ON NAVIGABLE WATERS TO BE RETAINED BY THE USACE AS DEFINED IN SECTION 404(g)(1)

At the time Congress enacted the CWA in 1972, the USACE had been regulating "navigable waters of the United States" under the Rivers and Harbors Act (RHA) since the 19th century. The CWA went beyond the RHA to regulate "navigable waters," which it defined to mean "the waters of the United States." The strikingly similar language in the two statutes led to confusion, and the USACE's initial post-CWA regulations treated the two jurisdictional terms interchangeably. But the statutes had different purposes: the RHA focused primarily on navigable capacity; the CWA on water quality. In 1975 the District Court for the District of Columbia ordered the USACE to adopt new regulations in accordance with the broader water quality purposes of the CWA. In July 1975, the USACE issued new regulations announcing a phase-in schedule for expanding the 404 program as follows:

003776

- *Phase I:* [effective immediately] discharges of dredged material or of fill material into coastal waters and coastal wetlands contiguous or adjacent thereto or into inland navigable waters of the United States and freshwater wetlands contiguous or adjacent thereto are subject to … regulation.

- *Phase II:* [effective July 1, 1976] discharges of dredged material or of fill material into primary tributaries, freshwater wetlands contiguous or adjacent to primary tributaries, and lakes are subject to … regulation.

- *Phase III:* [effective after July 1, 1977] discharges of dredged material or of fill material into any navigable water [including intrastate lakes, rivers and streams landward to their ordinary high water mark and up to the headwaters that are used in interstate commerce] are subject to … regulation.

Many in Congress were concerned about the expansion of the USACE's CWA dredge or fill regulatory program as addressed in their 1975 regulations quoted above, and in 1976 the House of Representatives passed HR 9560 which redefined the CWA term "navigable waters" specifically for the 404 program (but not the rest of the CWA) to:

The term "navigable waters" as used in this section shall mean all waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark (mean higher high water mark on the west coast).

This House bill was not approved by the Senate and therefore it never became law. The Committee report accompanying the House bill explained that the new definition would be "the same as the definition of navigable waters of the United States as it has evolved over the years through court decisions ... with one exception. [It] omits the historical test of navigability." The Committee believed "that if a water is not susceptible of use for the transport of interstate or foreign commerce in its present condition or with reasonable improvement," then it should be excluded from the definition. "Activities addressed by section 404, to the extent they occur in waters other than navigable waters of the United States ... are more appropriately and more effectively subject to regulation by the States."

Although HR 9560 did not include wetlands in the definition of navigable waters, it protected wetlands by requiring 404 permits for dredged or fill activities in "coastal wetlands and ... those wetlands lying adjacent and contiguous to navigable streams."

The Senate declined to redefine "navigable waters" for purposes of the 404 program. But the Senate did pass a bill in August 1977 that allowed the states to assume 404 permitting authority, subject to EPA approval, in phase II and III waters (as defined in the USACE's 1975 regulations quoted above). Until the approval of a state program for Phase II and III waters, the USACE would administer section 404 in all navigable waters. After assumption, the USACE would retain 404 permitting authority in Phase I waters.

The final bill, HR 3199, referred to as the 1977 CWA Amendments, was a compromise. It did not change the definition of "navigable waters" for the 404 program. But it allowed the states to assume permitting authority in "phase II and III waters after the approval of a program by [EPA]."

To effectuate this intent, the final bill inserted the language from HR9560 that had limited the term "navigable waters" into a parenthetical phrase in section 404(g)(1) that defined the waters the USACE must retain. The parenthetical

003777

CORPS003788

tracked the language the House Committee had originally used to limit USACE jurisdiction, except that the Conference Committee added "wetlands adjacent thereto" to the parenthetical phrase that defined waters to be retained by the USACE, known as "retained waters."

The legislative history of 404(g) in both the House and the Senate evidences a Congressional expectation that most States would assume the 404 program, and therefore effectively limit USACE permitting authority to Phase I waters (except waters deemed navigable based solely on historical use, which are assumable by a state). The USACE defined Phase I waters as "navigable waters of the United States" and "wetlands contiguous or adjacent thereto."  The preamble to the USACE's 1977 regulations described them as "waters already being regulated by the USACE," i.e., those waters subject to regulation by the USACE under section 10 of the RHA, plus adjacent wetlands.

Numerous judicial opinions over more than a century have factored into the meaning and scope of USACE jurisdiction under the RHA.  As the USACE states in its 1977 section 10 regulations, "[p]recise definitions of 'navigable waters' or 'navigability' are ultimately dependent on judicial interpretation, and cannot be made conclusively by administrative agencies."  Therefore, if and when questions arise in identifying the RHA waters to be retained according to the 404(g) (1) formula at the time a state or tribe assumes permitting authority, agency expertise will be necessary to interpret the RHA standard and apply it on the ground to determine whether a particular feature is assumable or must be retained by the USACE, all of which will be subject to judicial review.

## BACKGROUND ON ADJACENT WETLANDS TO BE RETAINED BY THE USACE

When a state or tribe assumes permitting authority, the USACE must retain those waters described above and "wetlands adjacent thereto."

The phrase "wetlands adjacent thereto" was first added to Section 404(g)(1) by the Conference Committee during the final run-up to enactment of the 1977 amendments, although there had been a reference to wetlands earlier, in HR 9560, which had been passed by the House in the summer of 1976.  That bill did not include wetlands in the definition of "navigable waters" but it required permits for discharges to "wetlands lying adjacent and contiguous to navigable streams."  However, neither the House nor the Conference Committee defined what they meant by the terms "adjacent," "contiguous" or "wetlands."

While actual definitions of adjacent and wetlands were not included, the terms "contiguous or adjacent wetlands" were used in the USACE's July 1975 regulations.  In July 1977 the USACE for the first time promulgated definitions of "adjacent" and "wetlands" for purposes of its "waters of the United States" regulatory definitions under the CWA.  The preamble to the 1977 rule explained that:

> "[s]ince 'contiguous' is only a subpart of the term 'adjacent,' we have eliminated the term 'contiguous.'  At the same time, we have defined the term 'adjacent' to mean 'bordering, contiguous, or neighboring.'  The term would include wetlands that directly connect to other waters of the United States, or that are in reasonable proximity to these waters but physically separated from them by man-made dikes or barriers, natural river berms, beach dunes, and similar obstructions."[13]

---

[13] 42 Fed. Reg. 37,122, 37,129 (July 19, 1977).

003778

There are no references in the legislative history of section 404(g) to the USACE's 1977 definition of "adjacent," though the regulatory definition quoted above was in place when Congress debated the 1977 amendments.  Mention of the meaning of the term "adjacent" came up only once during the final floor debate on the 1977 amendments.  In response to questions raised by another Member, Congressman Don H. Clausen, the ranking minority member of the Subcommittee on Water Resources of the House Committee on Public Works and Transportation and one of the drafters of the 1977 CWA amendments, replied that the word "adjacent" as used in 404(g)(1) means "immediately contiguous to the waterway."  Other than this colloquy, there is no significant discussion of what Congress intended by using the word "adjacent" for purposes of allocating permitting authority under 404(g)(1).

In sum, no definitive meaning of the term "adjacent" in 404(g)(1) emerges from a review of the legislative history. Therefore, the meaning of adjacency within 404(g)(1) is susceptible to various interpretations.





# 4. Description of Alternatives for Identifying Waters (other than Wetlands) Assumable by a State or Tribe, and Waters that Must be Retained by the USACE

The Subcommittee tasked the Waters work group with identifying a plausible, limited set of options that the federal agencies could use to clarify which waters (other than wetlands) are assumable by states or tribes and which need be retained by the USACE. These options were based on the experience in Michigan and New Jersey, a reading and understanding of the CWA and the legislative history of 404(g)(1), the input and experience of other states and tribes with a potential interest in assumption, and the experience of the USACE in administering the program in its entirety in all but two states since 1977. These options are listed below as ALTERNATIVES A, B, and C.

As a starting point, the waters work group noted that the following three regulations or statutes all use the term "navigable":

- RHA interpreted at 33 CFR 329.4, 1977,

- CWA jurisdictional definition of "(a)(1)" waters at 33 CFR 328.3(a)(1), and

- CWA Section 404(g)(1) parenthetical definition of waters to be retained by the USACE under a state- or tribe-assumed program.

003780

CORPS003791

However, the term "navigable" has different meanings in each of these passages, and the statutes and/or regulations that use "navigable" have different purposes.  For example, the purpose of 328.3(a)(1) is to define the scope of jurisdiction under the CWA, while the purpose of 404(g) is to provide for an administrative division of permitting responsibilities between states or tribes and the USACE.

## WATERS ALTERNATIVE A:
## Case-by-case determination of USACE-retained and state- or tribal-assumable waters at the time of program assumption (the status quo).

At the time a state or tribe decides to pursue assumption, the USACE district and the state or tribe will work together to identify, utilizing existing information, which waters will be retained by the USACE and which will be assumed by the state or tribe.  Under this alternative, neither EPA nor the USACE would provide further guidance or clarification on criteria to be used to help define the scope of retained vs. assumed waters, but states or tribes would retain their ability to seek assumption within existing processes and procedures.  While the Subcommittee deemed it important to put forward this option as one of three, it should be noted that states and tribes have requested that EPA clarify the extent of assumable waters because uncertainty regarding the potential scope of state and tribal permitting authority under an assumed program has proven to be a barrier to full consideration of 404 Program assumption by the states and tribes.  This option provides no further clarity due to historic differences and communications in different states, tribes, and districts.

## WATERS ALTERNATIVE B:
## Primary Dependence on RHA Section 10 Lists of Navigable Waters to Define USACE-Retained Waters

This alternative uses existing USACE lists of RHA Section 10 waters to define USACE-retained waters.  USACE district offices maintain state-by-state lists of waters that are regulated by the USACE under Section 10 of the RHA for every state except Hawaii.  These include waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce. This district-maintained list will be used as the basis for the list of USACE-retained waters (List of Retained Waters) for any state or tribe pursuing assumption.

Waters included on the Section 10 lists based solely on historical navigational use may be assumed by a state or tribe,[14] and thus would be deleted from a list of USACE-retained waters.  All waters of the United States not included on the list of USACE-retained waters would be assumable by a state or tribe.

As discussed earlier in this report in *Section 2*, subsection on *Tribal Considerations Regarding Assumption* (*see page 3*), if a state (as opposed to a tribe) is seeking assumption, waters associated with lands held in trust for federally recognized Indian tribes – that is, that are subject to assumption by a tribe – could also be retained by the USACE unless and until the time of a tribal assumption.

Under ALTERNATIVE B, when a state or tribe initiates the assumption process, the USACE district will use the Section 10 list to develop a List of Retained Waters by (1) deleting waters included on the Section 10 list based on

---

[14] See *Appendix F* of this report regarding assumption of such waters.

003781

CORPS003792

historical use only (applying the relevant factors set forth in the RHA Section 10 regulations); (2) in the case of a state assumption, adding tribal waters, and (3) identifying and adding waters that appropriately belong on the Section 10 list and therefore on the List of Retained Waters.

If the USACE identifies waters that are eligible for but not included on the list of waters regulated under RHA Section 10, either at the time of assumption or following some future alteration in the physical condition of a water body, the USACE can add such waters following consideration of the RHA case law and relevant factors set forth in the RHA Section 10 regulations, including 33 CFR 329.8 (improved or natural conditions of the water body), 329.9(a) (past use), 329.9(b) (future or potential use), and 329.10 (existence of obstructions).  Under ALTERNATIVE B, these waters would be retained by the USACE only if they are added to the Section 10 list, unless the determination is based solely on historical use.  Once added, these waters would be included in the List of Retained Waters.

The Subcommittee discussed variations within this option at length, but all variations relied on the use of the existing Section 10 lists as the starting point.  When a state or tribe seeks assumption, the state or tribe, the USACE, and the EPA would collaborate in review of the existing Section 10 list, clarify the scope of assumable waters, and resolve any waters that do not clearly meet the guidance described in the above paragraph.  It is of note that while the state and federal agencies would collaborate in the development of the List of Retained Waters, the USACE would still have sole responsibility for maintaining and adding to the underlying Section 10 list. Inclusion of EPA in these discussions would further assure consideration of state or tribal assumption factors and concerns in devising the List of Retained Waters, including consideration of related issues (e.g., tribal waters).  The EPA and the USACE would need to establish a clear dispute resolution procedure to be followed if the state or tribe and the USACE district were not able to complete the List of Retained Waters as part of their MOA development within a reasonable time frame.

## WATERS ALTERNATIVE C:
## Rivers and Harbors Act (RHA) Section 10 Waters plus CWA 33 CFR 328.3(a)(1) Waters as Retained Waters.

ALTERNATIVE C was proposed by the USACE representative on the Subcommittee and the following explanation of the Alternative has been written by the USACE.

Under this option, retained waters would be determined using both the RHA Section 10 lists, and additional waters determined by the USACE to be Traditional Navigable Waters (TNWs, or (a)(1) waters) under the CWA.  In this option, the following process would be used[15].

---

[15] The USACE recognizes that there may be Section 10 and/or TNW waters that are not on the existing District lists under paragraphs (i) and (ii).  If a state or tribal government asks the USACE for a list of Section 10 waters and TNWs that the USACE does not believe are subject to state CWA Section 404 assumption, the appropriate District office(s) will provide to the state or tribe the existing list of Section 10 waters (minus those based solely on historical use) and TNWs the USACE has available at that time.  However, if and when assumption of the Section 404 program is being pursued by a state or tribe, at that time the USACE may be able to provide a more complete and updated list of retained waters, which might differ from the list given initially, and would include the waters resulting from completion of the process outlined in paragraphs (i) and (ii).  The USACE recognizes that in many states some waters that have the legal status of Section 10 waters and/or TNWs have not yet been determined by the USACE to have such status.  To the extent that available USACE resources allow, the USACE would try to update the list of retained waters for any particular state before the assumption process is finalized by the EPA.  For purposes of clarity for the administrative process of state or tribal assumption and in recognition of limited USACE resources to identify all Section 10 and/or TNW waters with such legal status which have not yet been identified within a state, it is practical to limit the list of retained waters by the USACE at the time of final state assumption to those already identified as a Section 10 and/or TNW waters.  Nothing in this part diminishes the statutory authorities over waters that may be Section 10 and/or TNWs but have not yet been formally determined as such.

- Include the RHA Section 10 "navigable waters of the US" identified on Section 10 lists developed by the USACE districts within their areas of responsibility.  These include waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce.  For purposes of state or tribal assumption, the list would exclude any waters or reaches of such waters based solely on use in the past.

- Include the Traditional Navigable Waters (TNWs).[16,17]  For purposes of state or tribal assumption, the list of "navigable waters" that would be retained by the USACE would include any waters for which TNW stand-alone determinations or EPA TNW determinations have been previously made.  In addition, case-specific TNW determinations are also made by USACE Districts but are only valid for the specific approved jurisdictional determination for which they are prepared.  At the time a state or tribe begins assumption discussions with a USACE District, the District would evaluate all of their completed case-specific TNW determinations to determine whether addition of that water to the retained navigable waters list is warranted under a stand-alone determination.  Any CWA (a)(1) TNW[18] determination can also serve as precedent for evaluation as a navigable water of the US to be added to the District Section 10 list.

- For purposes of the assumption process, only those waters in paragraphs (i) and (ii) would be retained by the USACE except for the rare exceptions described in paragraph iv below which may occur after a state or tribe has assumed the program under 404(g).

- Post-Assumption:  There may be rare occasions when the USACE must make a new or revised Section 10 or TNW determination after it has provided its "retained navigable waters" list to a state or tribe (e.g., when a District independently makes changes to determinations per regulations at 33 CFR 329.14 or under TNW determination guidance, or when a Federal court has made a determination of "navigable waters of the US" or TNW, or when Congress makes a "non-navigable" determination under 33 USC Chapter 1, Subchapter II).  In these cases, as with the above option, appropriate adjustments would be made to the retained navigable waters list to account for these revisions.  Note that the state or tribe will primarily take on permitting and thereby jurisdictional determinations under their state or tribal programs post-assumption unless and otherwise triggered by these exceptions.

---

[16] See 33 CFR 328.3(a)(1) and Appendix D of the 2007 "US Army Corps of Engineers Jurisdictional Determination Instructional Guidebook" for a definition and guidance on identifying TNWs available at: http://www.usace.army.mil/Portals/2/docs/civilworks/regulatory/cwa_guide/app_d_traditional_navigable_waters.pdf

[17] TNWs in this paragraph are only based on the EPA determinations or determinations made under the USACE's approved jurisdictional determinations and do not include determinations made under a preliminary jurisdictional determination which only indicate which waters "may be" subject to USACE jurisdiction under the USACE's statutory authorities.

[18] The USACE proposes retaining waters that the USACE deems to be "traditional navigable waters" or TNWs under the CWA regulation defining 'the waters of the United States' at 33 CFR Section 328.3(a)(1).  To avoid confusion with "navigable waters of the United States" regulated under the Rivers and Harbors Act, this report refers to these as "CWA (a)(1) TNWs."

003783

CORPS003794



# 5. Subcommittee Discussion and Recommendations for Identifying Retained Waters

## MAJORITY RECOMMENDATION:
### WATERS ALTERNATIVE B – Primary Dependence on RHA Section 10 Lists of Navigable Waters to Define USACE Retained Waters

After consideration of various options, all recommending subcommittee members with the exception of the USACE member recommend that EPA adopt and implement policy (guidance and/or regulations) consistent with ALTERNATIVE B to differentiate between assumable waters and those that must be retained by the USACE. The majority of the Subcommittee understands this option to have two primary advantages: clarity, and consistency with CWA Section 404(g)(1) as understood by the majority of Subcommittee members. The following discussion provides reasons for this recommendation as developed by the majority of the Subcommittee, referencing two of the criteria included in the charge to the Subcommittee and identifying a separate third criteria related to Congressional intent based on the legislative history of 404(g). These recommendations are made with the understanding that the Subcommittee is not making any recommendation that would affect the jurisdictional definition of waters of the United States.

*Note that none of the Subcommittee members endorsed ALTERNATIVE A – essentially a "no action" alternative – and thus the Subcommittee provides no further discussion of this alternative.*

003784

*CRITERION 1.  Does the recommendation provide clarity and is it easily understood and implementable in the field?*

ALTERNATIVE B – the use of Section 10 lists to define USACE retained waters – is practical at the field level, being based on currently available information.  It is also reasonably predictable for both the agencies and the public.

The recommended alternative provides a clearly defined set of waters to be retained by the USACE based on an existing administrative tool:  the RHA Section 10 lists.  This reduces confusion, uncertainty, and prolonged negotiations between a state or tribe and the associated USACE district or districts.  Thus, it meets the criterion set forth in the Charge to the Subcommittee.

Lists of RHA Section 10 navigable waters of the United States are maintained by the USACE for all states except Hawaii.  Additionally, ALTERNATIVE B recognizes that some RHA Section 10 lists, while generally stable, may not include all Section 10 regulated waters, and that the status of a specific water may change over time (e.g., removal of a dam that renders a stream reach navigable under the RHA).  If changes are necessary, agencies can rely on existing regulations to guide the process for modifying the list.  This alternative acknowledges that as the USACE and RHA case law amends a state Section 10 list as needed, parallel revisions may be made to the list of USACE-retained waters.

It is not expected that the overall reach of these lists will be modified greatly in the future.  Thus, states and tribes can predict with reasonable accuracy which waters would be retained by the USACE in considering whether to pursue an application for Section 404 assumption.  Moreover, relying on pre-existing lists (which may be augmented based on existing regulations and RHA case law) will foster efficient assumption procedures and minimize disagreements.

Of equal importance, identification of USACE-retained waters on a list of retained waters in a manner that is generally consistent with RHA Section 10 lists will allow the public to readily determine which agency is responsible for Section 404 regulation at a specific location under a state or tribal assumed program.  The Section 10 lists are well established, and can be relatively easily labeled on regional maps or GIS systems, and therefore the Lists of Retained Waters would similarly be easily labeled.  As noted in the discussion of the alternatives, the one complexity in utilizing the RHA Section 10 list for state or tribal assumption is those RHA Section 10 listed waters that may be based solely on historical use and would not be retained by the USACE.

By contrast, ALTERNATIVE C could result in uncertainty at the statewide and field level regarding the scope of state- or tribal-assumable versus USACE-retained waters, both before and after state or tribal program assumption.  Under ALTERNATIVE C, the USACE would retain both RHA Section 10 waters and CWA "traditional navigable waters" under the USACE's jurisdictional regulations at 33 CFR 328.3(a)(1).  As compared to ALTERNATIVE B, which relies on the clear definition of RHA waters, ALTERNATIVE C depends on multiple regulations, guidance, and procedures, and ties the identification of retained waters to determining the extent of CWA (a)(1) TNWs – waters that are less clearly defined than Section 10 waters.

Whereas the majority of RHA Section 10 waters are identified on lists maintained by each USACE district, the location and extent of CWA (a)(1) TNWs that would be retained by the USACE in the case of assumption are identified through a number of different approaches.  The USACE and EPA have made some "stand-alone" CWA (a)(1) TNW determinations, and the USACE districts have documented some of these.  These stand-alone determinations would be included in the list of retained waters under ALTERNATIVE C.  The USACE also issues approved jurisdictional

CORPS003796

determinations when they are requested by landowners or other interested parties.  Many of these case-by-case jurisdictional determinations issued after the Supreme Court decision in *Rapanos v. United States*, 547 US 715 (2006) identify the nearest CWA (a)(1) TNW, but these "case-by-case" determinations are not considered permanent.

Because most TNWs have not yet been identified as such and thus lists of stand-alone TNWs could increase, ALTERNATIVE B provides more clarity, certainty and predictability to states, tribes and the regulated community regarding the scope of the state or tribal program.

After state or tribal program assumption, the USACE proposes to cease routine jurisdictional determinations in assumed waters but ALTERNATIVE C notes that additional waters might still be identified as CWA (a)(1) TNW waters in association with various legal proceedings, including federal enforcement actions.  These CWA (a)(1) TNWs identified after assumption would be added to the List of Retained Waters at the time they are identified.

*CRITERION 2.  Is the recommendation consistent with the CWA, and with Section 404(g)?*

ALTERNATIVE B is consistent with CWA Section 404(g) based on the plain language of Section 404(g) and the legislative history.  Congress clearly intended that states and tribes should play a significant role in the administration of Section 404 – as they do in other CWA programs – anticipating that many states would assume the Section 404 program.

Congress also recognized the long-standing role and expertise of the USACE in maintaining navigation under the RHA, and therefore specified that the USACE would retain the parallel 404 permitting authority in those RHA waters and adjacent wetlands even after a state or tribe assumed 404 permitting authority over remaining waters and wetlands. Congress relied on RHA Section 10 to identify USACE-retained waters, with one exception: waters that were deemed "navigable" for RHA purposes based solely on historical practices (e.g., waters capable of carrying canoes for fur-trading in the 18th century) are also assumable by states or tribes.

On the other hand, all Subcommittee members except the USACE member believe that ALTERNATIVE C – under which the USACE would retain both RHA Section 10 waters and CWA (a)(1) TNWs identified up to the date of assumption – is not consistent with CWA Section 404(g), based upon its plain language and the legislative history. Congress was specific about what it intended in 404(g):

> *"The Committee amendment does not redefine navigable waters.  Instead the committee amendment intends to assure continued protection for all of the Nation's waters, but allows States to assume primary responsibility for protecting those lakes, rivers, streams, swamps, marshes and other portions of the navigable waters outside the USACE program in the so-called Phase I waters."[19]*

The USACE's 1977 regulations reinforced that understanding.  The preamble characterized Phase I as covering "waters already being regulated by the USACE [i.e. RHA waters] plus all adjacent wetlands to these waters."

---

[19] Clean Water Act of 1977 Report of the Committee on Environment and Public Works, United States Senate, July 1977, pg. 75

The USACE definition of "navigable waters of the United States" under the RHA is similar to the definition of waters to be retained by the USACE under Section 404(g)(1) – except for the deletion of historically used waters and addition of adjacent wetlands.

> Section 10 regulations, 33 CFR section 329.4:  *"Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible to use to transport interstate or foreign commerce."*

> Section 404(g)(1) description of waters to be retained by the USACE:  " *... waters that are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate and foreign commerce ... including wetlands adjacent thereto.*"

This similarity leads the majority of Subcommittee members to again conclude that the "navigable waters" to be retained by the USACE were intended to be the same waters regulated by the RHA.  Further, the USACE regulation indicates that, "*This definition does not apply to authorities under the Clean Water Act, which definitions are described at 33 CFR parts 323 and 328.*"[20]

Moreover, the majority of the Subcommittee also understands the USACE to have acknowledged during Subcommittee discussions that the USACE can and does distinguish between Section 10 waters and CWA (a)(1) waters for regulatory purposes, displaying maps showing the two different categories in two states where USACE districts have identified Section 10 and CWA TNW waters.  The Nationwide Permits issued by the USACE on January 6, 2017 also repeatedly distinguish between RHA waters and CWA waters, suggesting that such a distinction is and can be made with relative ease.  Therefore, the majority of the Subcommittee holds that distinguishing between Section 10 and CWA (a)(1) waters for the purpose of distinguishing between assumable and USACE-retained waters remains practical and appropriate in accordance with 404(g).

*CRITERION 3.   Does the Recommendation comport with Congressional intent that qualified states assume responsibility for the Section 404 regulatory program?*

The Subcommittee majority views that ALTERNATIVE B makes it easier for states and tribes to understand the costs associated with assumption and thus more readily weigh the costs and benefits of assuming the program, thereby encouraging state or tribal assumption, if desired, consistent with Congressional intent and with other CWA programs.

States and tribes may be willing to undertake Section 404 program assumption for the reasons discussed earlier in this report, but they do incur the cost of development and administration of a state or tribal 404 program.  Assumption of all CWA waters except those on the RHA Section 10 list minus solely historical use – as has occurred in Michigan and New Jersey – would provide an economy of scale to the state and the public, which could make the development and ongoing fixed costs more acceptable for qualified states or tribes who wish to pursue this approach under the CWA.

ALTERNATIVE C would be an effective barrier to assumption for many if not most states and tribes.  The impact of ALTERNATIVE C would vary geographically, but particularly in states with significant wetlands and other water resources, the USACE could retain a greater percentage of waters (and adjacent wetlands) under this option.  As

---

[20] 33 CFR §329.1.

an example, during Subcommittee discussions the USACE representatives presented a graphic map prepared by the Kansas City District that compared CWA (a)(1) waters to RHA Section 10 waters in the district. RHA Section 10 waters in the district totaled 887 stream miles; the addition of CWA (a)(1) waters tripled this to 2476 stream miles. The extent of adjacent wetlands would be expected to increase proportionally.

Many waters identified as "TNWs" under CWA jurisdictional guidance[21], such as inland lakes, have an impact on interstate commerce resulting from tourism, but may have little to no impact on the *transport* of interstate or foreign commerce (as do RHA waters). Examples of determinations made under this jurisdictional federal guidance include Bah Lake (an isolated 70-acre water, maximum depth 10 feet) and Boyer Lake (300-acre 28-feet maximum depth) – both of which are defined as CWA (a)(1) TNWs. Such water bodies are common on the American landscape. While the scale might be different in different states it is clear that there are more CWA (a)(1) TNW waters, and more scattered across the landscape, than are RHA waters. The net effect is that the scope and location of CWA (a)(1) TNW waters are such that having the USACE retain these waters could undermine Congress's intent that the states assume authority over most of the waters within their borders.

Finally, it should be noted that states and tribes have operated for many years under the belief that if they develop a comprehensive wetland/dredge and fill permitting program consistent with federal statute and regulations, they will be eligible to assume that program for all but Section 10 waters (and adjacent wetlands). In order to protect state waters, many states have developed wetland assessment and monitoring programs, wetlands water quality standards, and regulatory processes that would eventually help to provide eligibility for full Section 404 assumption should they choose to pursue that option. ALTERNATIVE C could decrease the value of that investment.

## USACE RECOMMENDATION:
## WATERS ALTERNATIVE C – Section 10 waters plus CWA (a)(1) Waters as Retained Waters.

While the USACE is neutral with respect to state or tribal assumption of Section 404 of the CWA program, the USACE does believe there are valid considerations that must be factored into the determination of which waters must be retained (and ultimately which waters can be assumed by a state or tribe). The USACE believes there should not be a distinction between different uses of the term "navigable waters" under different sections of the statute, and believes this is consistent with the purposes of the CWA and Section 404(g). While the statutory language setting forth the CWA Section 404(g) parenthetical waters slightly differs from the regulatory language of 328.3(a)(1), the USACE believes the interpretation of the term "navigable waters" is the same under 404(g) and 328.3(a)(1) (other than those waters considered navigable based solely on their historic use). The USACE believes TNWs reflect the concept of "navigability" appropriate to ensure the objective of the CWA to restore and maintain the chemical, physical, and biological integrity of the Nation's waters (see "Appendix D: Legal Definition of 'Traditional Navigable Waters'"[22]). The USACE has maintained this position since at least the 2008 post-Rapanos guidance was issued and it is not a "new" position created by the agency for purposes of this subcommittee.

---

[21] Appendix D of the 2007 "US Army Corps of Engineers Jurisdictional Determination Instructional Guidebook" available at: http://www.usace.army.mil/Portals/2/docs/civilworks/regulatory/cwa_guide/app_d_traditional_navigable_waters.pdf

[22] Ibid.

003788

A narrower reading of those waters retained by the USACE under the state assumption program would not take into consideration the evolution of the USACE Regulatory Program since 1977. The USACE must continue to modify its program to reflect changes in law, policy, science, and other considerations, including changes in what waters constitute waters of the US under the CWA.

Different definitions for the term "navigable waters" under different provisions of the same statute could also result in confusion that would not provide clarity for the regulated public. The states and tribes would know the Section 10 waters (as identified by the District lists) as well as the stand-alone TNW determinations made by the Districts. All approved jurisdictional determinations made by the USACE are posted on District websites and are publicly available. Thus, the case-specific TNW determinations that may be included on the retained waters list when the state initiates that process are also available. In conclusion, these lists and waters are known and publicly available and therefore provide clarity to the USACE, the state, and the regulated public.



Report of the Assumable Waters NACEPT Subcommittee

003789

CORPS003800



# 6. Description of Alternatives for Identifying Adjacent Wetlands Assumable by a State or Tribe, and Adjacent Wetlands that Must be Retained by the USACE

The Adjacency work group was established by the Subcommittee to develop alternatives for the identification of wetlands adjacent to the navigable waters being retained by the USACE under an assumed CWA Section 404 permit program. The work group learned that unlike the background information regarding retained waters, there is no conclusive Congressional intent on the meaning of "wetlands adjacent thereto" – i.e., wetlands that must be retained by the USACE.

The work group's initial discussion on adjacent wetlands was influenced by the floor debate between Congressman Bauman and Congressman Clausen on the 1977 amendments to the CWA. During their debate, Congressman Bauman asked about the meaning and extent of adjacent wetlands in Section 404(g). In response, Congressman Clausen stated that he would "interpret the word 'adjacent' to mean immediately contiguous to the waterway." This is the only reference to the meaning of "adjacent" in the context of 404(g) in the entire legislative record.

The work group also considered the use of the word "adjacent" in the USACE's 1975[23] and 1977 regulations defining "waters of the United States." Although the word "adjacent" was being used in the USACE regulations defining

---

[23] 40 Fed. Reg. 31,320, 31,324, 31, 326 (July 25, 1975).

003790

CORPS003801

"waters of the United States" just prior to the 1977 CWA amendments, there are no references to the USACE regulations in the legislation or Committee reports.  In addition, the regulatory definition of adjacency was established after the original statutory language, but before final passage, of the 1977 amendments.  Because of the timing of the various actions, the Subcommittee could not assume that Congress was aware of the USACE regulatory definition when this section of the statute was written.  For most subcommittee members, it is clear, however, that the word "adjacent" in 404(g) was referring to adjacency to RHA waters, which were being retained primarily to foster federal navigation interests.  Therefore, while the meaning of adjacent in 404(g) is not certain, the majority of the Subcommittee believes the purpose of adjacent in 404(g) is different than the jurisdictional definition in the USACE "waters of the United States" regulations.  "Adjacent" is used in Section 404(g) to allocate permitting responsibilities between the USACE and a state or tribe that is assuming the 404 program, whereas "adjacent" is used in the USACE "waters of the United States" regulations to define the scope of jurisdiction under the CWA. Agencies generally have discretion in making judgments on how to administer their programs, and thus should have some discretion in how they define what is adjacent for purposes of allocating administrative authority between states or tribes and the USACE.

## WETLANDS ALTERNATIVE A:
## USACE Retains All Wetlands Whether Touching or Not Touching Retained Navigable Waters, Regardless of Furthest Reach

WETLANDS ALTERNATIVE A interprets the word "adjacent" in 404(g) to mean the same as the word "adjacent" in regulations[24] currently being used by the USACE to identify jurisdictional "adjacent" wetlands. Under WETLANDS ALTERNATIVE A, the USACE would retain permitting authority over all wetlands adjacent to retained navigable waters whether or not they are touching retained navigable waters and regardless of their extent (see *Figure 1: WETLANDS ALTERNATIVE A*).



Figure 1. WETLANDS ALTERNATIVE A

ALTERNATIVE A would require that the USACE retain expansive wetland systems that are touching a retained water, regardless of their extent.  Thus, the specific extent of retained wetlands could not be determined at the time of program assumption and the majority of projects would require a case-by-case field inspection to determine whether the USACE would retain permitting authority.

---

[24] 33 CFR S328.3(c).  ("The term adjacent means bordering, contiguous, or neighboring.  Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms beach dunes and the like are 'adjacent wetlands'."

003791

CORPS003802

## WETLANDS ALTERNATIVE B:
## USACE Retains Entirety of Wetlands Touching Retained Waters, Regardless of Furthest Reach

WETLANDS ALTERNATIVE B also relies on the current definition of "adjacent" in the regulations that define "waters of the United States," but under this alternative, the USACE would not retain all "adjacent" wetlands. Rather, it would only retain permitting authority over wetlands touching the waters being retained by the USACE.

As discussed in the Origin and Purpose of Section 404(g) section of this report, above, Congress intended that in a case of state or tribal assumption the USACE would retain permitting authority over "Phase I waters" (except waters deemed navigable based solely on historical use, which would be assumable by a state or tribe). Phase I waters were defined in the USACE's 1975 regulations as coastal and inland "navigable waters of the United States" and wetlands "contiguous or adjacent thereto" – i.e., waters subject to regulation by the USACE under Section 10 of the RHA, plus adjacent wetlands. The RHA is designed to protect the navigable capacity of the "navigable waters of the US" and thus requires permits for work in "navigable waters of the US" and work outside "navigable waters of the US ... if these structures or work affect the course, location, or condition of the waterbody in such a manner as to impact on its navigable capacity." WETLANDS ALTERNATIVE B assumes that wetlands touching retained waters have the greatest ability to impact navigability under Section 10 of the RHA and that wetlands not affecting navigability can be assumed by a state or tribe for administrative purposes under the CWA. As a result, wetlands that are "not touching" retained waters could be assumed by a state or tribe (see *Figure 2: WETLANDS ALTERNATIVE B*).



Figure 2. WETLANDS ALTERNATIVE B

Like WETLANDS ALTERNATIVE A, WETLANDS ALTERNATIVE B would require that the USACE retain expansive wetland systems that are touching a retained water, regardless of their extent. Also similar to WETLANDS ALTERNATIVE A, the specific extent of retained wetlands could not be determined at the time of program assumption and the majority of projects would require a case-by-case field inspection to determine whether the USACE would retain permitting authority.

## WETLANDS ALTERNATIVE C:
## Establishment of a National Administrative Boundary

WETLANDS ALTERNATIVE C requires the establishment of a national administrative boundary based on a fixed distance from USACE-retained navigable waters (e.g., 100, 300, or 1,000 feet). The boundary would depict the limits of federal program administration and the beginning of state or tribal administration under an assumed CWA Section 404 permit program.

The establishment of a national administrative boundary to assign regulatory responsibility over adjacent wetlands should build on USACE authorities under the RHA. The RHA was enacted primarily to protect navigation and the

2003792

navigable capacity of the nation's waters.  Section 10 of the RHA requires that the following regulated activities be approved or permitted by the USACE:  placement and removal of structures; work involving dredging; disposal of dredged material; filling, excavation, or any other disturbance of soils or sediments; or modification of a navigable waterway.  All of these activities have the potential to affect navigability, further underscoring that the RHA's primary purpose is to protect navigable capacity.  Depicting adjacent wetlands retained by the USACE as an administrative distance from retained waters based on existing state-established setbacks, buffers, or a defined elevation as in the case of New Jersey, or other criteria, preserves the USACE's control over waters and wetlands necessary to protect these waters from activities that may adversely impact navigability.

In general, the activities taking place landward of the "ordinary high water mark" (inland) or "mean high water mark" (coastal) that potentially impact navigation and warrant continued regulation by the USACE under an assumed program are those that are likely to generate sediment and debris that reach channels and harbors and affect the navigable capacity of waters used to transport interstate or foreign commerce.  Consequently, activities taking place in wetlands adjacent to navigable waters may warrant regulation by the USACE either under the CWA, the RHA, or both.  Regulated activities that may impact navigable capacity, however, would likely occur in areas that are in close proximity to the waterways retained by the USACE.  Riparian buffers and setbacks are established by many states to, among other purposes, help store floodwaters and prevent sediment transport, directly supporting and preserving navigation.  Thus, such state-established boundaries can provide both a practical and a logical basis for the establishment of a national administrative boundary between wetlands retained by the USACE and wetlands assumed by a state or tribe.

The establishment of a national administrative boundary would resolve a number of adjacency issues.  The use of an administrative line to assign regulatory responsibility for the implementation of the CWA ensures complete protection of water and wetland resources without confusion or unnecessary duplication, while preserving the USACE's responsibility to protect and maintain navigation under the RHA as required by Congress.  Since the boundary defines the landward extent of the adjacent wetlands retained by the USACE, it eliminates the need to determine the extent and connectivity of large wetland systems to allocate administrative authority between the USACE and a state or tribe.  The boundary would be established prior to program assumption and incorporated into GIS or other mapping methods to facilitate a state or tribe's assessment of the costs and benefits of assumption.  Finally, because WETLANDS ALTERNATIVE C establishes a bright line boundary, the entirety of expansive wetland systems such as those in examples from Alaska, Minnesota, and the Fond du Lac Reservation would not be retained by the USACE.  Thus, more wetlands would be assumable than would be the case under other alternatives.

Based on the above discussion, the Subcommittee agreed that a default distance of 300 feet from the retained navigable water would be fully adequate to protect federal navigation interests and could serve as a reasonable national administrative boundary.  The Subcommittee identified several possible implementation strategies once this national administrative boundary is established, which are presented below.

### WETLANDS ALTERNATIVE C1:  *USACE Retains All Wetlands Touching Retained Navigable Waters and Extending Landward to the National Administrative Boundary*

Under WETLANDS ALTERNATIVE C1, the USACE would retain permitting authority over all wetlands physically "touching" retained navigable waters and extending landward to the national administrative boundary.  The state or tribe would assume those wetlands beyond the established boundary.  Additionally, wetlands that are shoreward of

the administrative boundary but not "touching" a retained navigable water would be assumed by the state or tribe (see *Figure 3:  WETLANDS ALTERNATIVE C1*).

While the administrative boundary would clearly define the extent of USACE retention for large or expansive wetlands, many projects would still require a case-by-case field inspection to determine whether the affected wetland is in fact touching the retained water.  This alternative would likely result in the greatest amount of wetlands assumable by a state or tribe, but contains some implementation inefficiencies similar to *WETLANDS ALTERNATIVES A* and *B* due to the need for case-by-case field inspections on many projects.  For instance, physical separations, such as river berms or beach dunes are dynamic, meaning that this alternative would result in an equally dynamic "sometimes in or sometimes out" scenario that is not conducive to predictability for the public.



Figure 3. WETLANDS ALTERNATIVE C1

*WETLANDS ALTERNATIVE C2:  USACE Retains All Adjacent Wetlands Between Retained Waters and the National Administrative Boundary*

Under *WETLANDS ALTERNATIVE C2*, the USACE retains permitting authority over all wetlands adjacent to retained navigable waters up to the national administrative boundary.  The state or tribe would only assume those wetlands beyond the national administrative boundary (see *Figure 4:  WETLANDS ALTERNATIVE C2*).



Figure 4. WETLANDS ALTERNATIVE C2

Under this alternative, there is no need for case-by-case field investigations to determine the extent and connectivity of large or expansive wetland systems. The partitioning of administrative authority under Section 404 assumption would be completely separate from issues relating to determining Section 404 jurisdiction, and the farthest reach of all retained wetlands would be known prior to program assumption.  *WETLANDS ALTERNATIVE C2* provides substantial clarity and certainty for states, tribes, the USACE, and the regulated public.

*WETLANDS ALTERNATIVE C3:  USACE Retains All Wetlands Landward to an Administrative Boundary Established During the Development of the Memorandum of Agreement with the USACE, with a 300-foot National Administrative Boundary as a Default*

*WETLANDS ALTERNATIVE C3* establishes a 300-foot national administrative boundary up to which the USACE retains permitting authority over all wetlands regardless of whether they are touching retained navigable waters.  However, under this alternative, that boundary could shift in accordance with negotiations between a state or tribe and the

2003794

USACE during the development of the required MOA with the USACE. The actual boundary could be established to account for the expertise and comprehensive programs of a state or tribe, planning and regulatory authorities, regional or geographic differences, and other local conditions that may affect or complement the CWA Section 404 Program. For example, the 300 foot National Administrative Boundary could be moved up to as close as 75 feet to match up with established building setback requirements, or as far away as 1,000 feet to match



Figure 5. WETLANDS ALTERNATIVE C3

up with a broad state shoreland boundary. In the event that negotiations to establish an administrative boundary specific to that state or tribe are unsuccessful, the extent of USACE-retained wetlands default to the 300-foot National Administrative Boundary (see *Figure 5: WETLANDS ALTERNATIVE C3*).

This alternative retains the clarity and certainty of WETLANDS ALTERNATIVE C2 and continues to separate assumption from issues relating to determining Section 404 jurisdiction. However, WETLANDS ALTERNATIVE C3 also provides the added benefit of improving the consistency and effectiveness of an assumed program by allowing states or tribes to incorporate Section 404 requirements into existing programs and requirements established to address local resource needs and circumstances.

In formulating WETLANDS ALTERNATIVE C3, which establishes an administrative boundary measured from retained waters to define the limits of a federally-administered Section 404 program and the beginning of a state- or tribally-assumed program, the Subcommittee discussed state or tribal programs that could form the basis for establishing an administrative boundary. For example, a state or tribe may have statutes or regulations for riparian buffers or setbacks. The benefits associated with buffers or setbacks accrue from the existence of appropriate vegetation and their ability to reduce erosion and sedimentation, among other benefits, which benefits are directly linked to navigability. Finally, in addition to existing government programs, the consideration of natural features such as topography, hydrology, or other unique conditions may also influence the location of an administrative boundary and improve the effectiveness and efficiency of an assumed CWA Section 404 permit program.

Criteria for establishing a state or tribal-specific administrative boundary could be developed by the EPA in guidance or regulations, and allow for the recognition and integration of state or tribal-specific programs and circumstances as discussed above, provided the ability to keep nutrients, sediment, or debris from impacting the retained navigable water is maintained. The state or tribe and the USACE would address these criteria during the development of the MOA and, once negotiations were completed, document the rationale for the selected administrative boundary in the MOA.



# 7. Subcommittee Discussion and Recommendations on Identifying Adjacent Wetlands

**MAJORITY RECOMMENDATION:**
USACE Retains All Wetlands Landward to an Administrative Boundary Established During the Development of the Memorandum of Agreement with the USACE, with a 300-foot National Administrative Boundary as a Default.

After consideration of various options, all recommending Subcommittee members except the USACE representative recommend that the EPA adopt and implement a policy consistent with WETLANDS ALTERNATIVE C3 to differentiate between wetlands retained by the USACE and those assumed by a state or tribe under an assumed Section 404 Program. The majority's reasons for this recommendation include that WETLANDS ALTERNATIVE C3:

- is consistent with the Subcommittee's findings and conclusions about the origin and purpose of Section 404(g);

- establishes an administrative boundary that is consistent with many state and tribal boundaries already established for administrative ease;

- provides states and tribes with the flexibility to adjust the boundary based on their unique circumstances, including but not limited to regulatory authority, topography, and hydrology;

003796

CORPS003807

- assures that the USACE is able to maintain navigability as required by the Rivers and Harbors Act;

- allows for the identification and mapping of the administrative boundary prior to program assumption, providing clarity, understanding, and after assumption, ease of implementation;

- uses a process to determine the extent of retained wetlands that is easily distinguished from the process used to determine Section 404 jurisdiction, resulting in improved efficiency, regulatory certainty, and sufficient wetland resources for a state or tribe to assume;

- provides a clear, reasonable, and implementable separation of administrative authority by establishing a clearly demarcated boundary between USACE-retained and state or tribally-assumed wetland areas; and

- maximizes the efficiency and effectiveness of assumed programs by allowing them to be tailored to a state's or tribe's specific circumstances.

Discussion on the justification and rationale for WETLANDS ALTERNATIVE C3 follows, including comparisons to other alternatives when appropriate based on criteria developed by the Adjacency work group.

*CRITERION #1:  WETLANDS ALTERNATIVE C3 is consistent with Section 404(g) of the CWA.*

Congress passed 404(g) with the expressed intention that states and tribes would play a significant role in the administration of the Section 404 program.  The purpose of section 404(g)(1) is to identify those waters and wetlands that must be retained by the USACE.  The legislative history also indicates that the purpose of retention by the USACE is related to RHA Section 10 authorities primarily to maintain navigability and related interests.

WETLANDS ALTERNATIVE C3 is consistent with Congressional intent because it provides clarity on the wetlands for a state or tribe may assume, thereby removing one of the current barriers to assumption.  WETLANDS ALTERNATIVE C3 is also consistent with Congressional intent because it establishes an administrative boundary that will ensure that the USACE can protect and maintain navigability and water quality in retained waters.

The unique state-assumed section 404 program administered by New Jersey since 1994 has clearly demonstrated that a state-specific administrative boundary, different from a CWA jurisdictional boundary, is both implementable and consistent with Section 404(g)(1).  WETLANDS ALTERNATIVE C3 allows for the establishment of other assumed programs with state-specific or tribal-specific administrative boundaries.

*CRITERION #2:  WETLANDS ALTERNATIVE C3 provides a clear, reasonable, and implementable separation of administrative authority.*

The stated charge of the Assumable Waters Subcommittee is to provide advice and recommendations on how to best clarify which waters a state or tribe can assume under an EPA-approved CWA Section 404 program.  WETLANDS ALTERNATIVE C3, by establishing a "bright line" administrative boundary, provides needed clarity.  The public, states, tribes, and federal agencies can easily identify the appropriate permitting authority at the time an application is submitted.

WETLANDS ALTERNATIVE A (USACE Retains All Wetlands, Whether Touching or Not Touching Retained Navigable Waters, Regardless of Furthest Reach) and WETLANDS ALTERNATIVE B (USACE retains entirety of wetlands touching

CORPS003808

retained waters, regardless of further reach) would result in four problem scenarios. First, large wetland complexes can extend tens or even hundreds of miles from the retained water. Examples provided by the states of Alaska and Minnesota demonstrate that using the regulatory CWA jurisdictional definition of adjacency to describe retained wetlands would result in expansive wetland systems being retained by the USACE, leaving fewer wetlands to be assumed by a state or tribe.

Second, wetlands often extend away from navigable waters in intricate and snakelike networks, which could result in a confusing pattern of USACE and state or tribal permitting authority across the landscape. For example, the St. Louis River (a tributary to Lake Superior) forms some of the boundaries of the Fond du Lac Indian Reservation in Minnesota where wetlands comprise 44% of the Reservation. Wetlands adjacent to the St. Louis River, which has been determined to be a navigable water, are interconnected with other wetlands that extend tens of miles away from the river, well beyond other wetlands that are not connected or adjacent to the river.

Third, wetlands adjacent to USACE-retained waters can extend beyond state-assumed waters. For example, the USACE retains a stream with the exception of the upstream portion of it that is beyond the point of navigability (or "head of navigation"), but wetlands adjacent to the retained portion of the stream continue to extend farther up the watershed (a common occurrence, particularly in upstream reaches). Absent some administrative demarcation of which adjacent wetlands would be retained, an awkward situation results where a state or tribe assumes an upstream section of a stream, but the USACE retains its adjacent wetlands.

Fourth, scenarios that require case-by-case field inspections to determine the appropriate regulating authority will reduce the efficiencies of an assumed program.

Prior to assumption, the problems associated with WETLANDS ALTERNATIVES A and B would make it difficult for states or tribes to accurately assess the feasibility and benefits of assumption because the extent of retained wetlands would be unknown or unclear. Lacking a known boundary for retained wetlands, it would require a significant upfront investment for a state or tribe to make an informed decision about pursuing assumption of the 404 program and accurately planning for its development. In the event that a state or tribe assumed the program without having ascertained the boundary, the problem scenarios discussed above would essentially make it more difficult for the state or tribe to deliver on the stakeholder efficiencies anticipated under an assumed Section 404 permit program such as ease of determining administrative control, speed of reaching a permit decision, and other customer service improvements. Use of WETLANDS ALTERNATIVE C3 would eliminate these problems by establishing a standard national boundary.

*CRITERION #3: WETLANDS ALTERNATIVE C3 establishes an administrative boundary that can be consistent with already established state or tribal program boundaries.*

Many states and tribes have already established various boundaries, lines, or demarcations in their state or tribal programs. For administrative ease, these established lines can be used to establish the administrative line for retained and assumable waters. Such an administrative boundary will assure that the USACE is able to maintain navigability as required by RHA waterward of the boundary, while the state or tribe assumes authority to protect wetlands and water quality as required by the CWA landward of the boundary.

003798

*CRITERION #4:  WETLANDS ALTERNATIVE C3 provides flexibility to maximize the efficiency and effectiveness of a State- or Tribally-assumed 404 program.*

In WETLANDS ALTERNATIVE C3, under prescriptive guidance or regulations that establish a default administrative boundary (i.e., 300 feet from retained navigable water), states and tribes can still further negotiate the location of the administrative boundary with the USACE during the establishment of the relevant MOA (for example, 75 or 1,000 feet).  Unlike WETLANDS ALTERNATIVES C1 and C2, WETLAND ALTERNATIVE C3 allows the parties to establish a boundary taking into account other existing regulatory programs or requirements and the unique landscape characteristics of the state or tribal territory.  This could lead to better environmental results, administrative efficiency, clarity for the public and regulators, and a strengthening of the aligned state or tribal program.

WETLANDS ALTERNATIVE C3 also provides states and tribes with the ability to tailor the line to features specific to the state or tribe.  In such a large geographically and biologically diverse nation, there are significant differences in landscapes and the nature of our waters and wetlands among the states.  WETLANDS ALTERNATIVE C3 allows USACE and the state or tribe to address these regional resource differences and provide an opportunity to utilize the best available information, tools, and procedures.  For example, the distance used to establish the administrative boundary could vary based on unique floodplain characteristics of a given waterbody.  Focusing on up-front mapping may even encourage the development of improved, more comprehensive inventories and cartography.

*CRITERION #5:  Under WETLANDS ALTERNATIVE C3, the administrative boundary for retained wetlands can be identified and mapped prior to program assumption, providing clarity, understanding, and ease of implementation.*

In many cases, the state or tribe would assert continuous permitting authority over all waters and wetlands regardless of whether the USACE also regulates those waters and wetlands.  In other cases, a state or tribe may choose to minimize or eliminate permitting duplication entirely and not require a permit for projects permitted by the USACE (i.e., exempt landowners from state or tribal permitting requirements).  While in either case, the extent of retained waters and wetlands must be identified, in those instances where a state or tribe exempts federally regulated activities, it is even more important for landowners to know the permitting authority before submitting a permit application (i.e., know the boundary and extent of retained wetlands) because the application will go to either the state, tribe or the USACE.  WETLANDS ALTERNATIVE C3 provides a relatively simple and consistent mechanism for identifying the clear boundary of retained wetlands.

The extent of the wetlands retained by the USACE under WETLANDS ALTERNATIVES A and B is not limited by distance.  This could make identifying and mapping assumable waters extremely challenging.  WETLANDS ALTERNATIVES A and B would often require a case-by-case analysis or the equivalent of a jurisdictional determination of proposed projects to determine the appropriate permitting authority(s).

*CRITERION #6:  WETLANDS ALTERNATIVE C3 improves applicant confidence and program effectiveness.*

Absent a map or clearly identified boundary criteria, applicants may not know who the permitting authority is until after their application is submitted.  This uncertainty would result in longer or inconsistent permitting timeframes.  Regulatory uncertainty also tends to result in less effective regulation.  A standardized boundary eliminates permitting barriers.  Separating the administrative boundary from Section 404 jurisdiction issues and coupling it with other state and tribal

003799

regulatory programs improves predictability for agencies and applicants. Improved consistency shortens permitting wait times.

*CRITERION #7:  WETLANDS ALTERNATIVE C3 improves decision-making abilities for States and Tribes*

Bounding the extent of retained wetlands allows states and tribes to better assess potential assumption and development of a 404 program.  The WETLANDS ALTERNATIVES A and B do not support a consistent and clear basis for states or tribes to determine the extent and location of wetlands they would be assuming.

*CRITERION #8:  WETLANDS ALTERNATIVE C3 identifies retained and assumable wetlands independently of Section 404 jurisdiction*

WETLANDS ALTERNATIVES A and B use the same or similar criteria to determine retained wetlands as are used to determine Section 404 jurisdiction.  These alternatives generate confusion between the administrative process of assumption and the CWA jurisdictional determinations of the regulatory program.  WETLANDS ALTERNATIVE C3 provides a state or tribe with a well-understood and precise scope of assumable wetlands that should not be affected or confused by changes to CWA jurisdictional definitions.  WETLANDS ALTERNATIVE C3 provides regulatory certainty about the agency responsible for 404 permitting, even while certainty may change over whether the activity will require a permit under federal law.

*Summary of Majority Recommendation*

Congress passed section 404(g) of the CWA to enable a state or tribe to assume section 404 permitting authority over many, but not all, of the "waters of the United States."  However, the legislative history relating to retained wetlands does not reveal a conclusive legislative intent about the meaning of "adjacent."  What is certain is that the word "adjacent" in 404(g)(1) was focused on adjacency to Phase 1 waters, essentially Section 10 RHA waters. WETLANDS ALTERNATIVE C3 ensures the USACE's ability to maintain navigability as required by the RHA, while the state or tribe (under an assumed program) protects wetlands and water quality as required by the CWA.

It is also clear to the majority of the Subcommittee that the word "adjacent" is used in Section 404(g)(1) for a different purpose than it is used in the "waters of the United States" regulations published by the USACE in 1977.  The USACE regulations define the wetlands that are subject to CWA regulation while Section 404(g)(1) describes which entity will exercise permitting authority over them.  As a result, the EPA has substantial administrative discretion in allocating administrative authority between states, tribes, and the USACE pursuant to Section 404(g)(1).  Since all jurisdictional wetlands will continue to be subject to 404 protections, it is reasonable to use that discretion to establish an administrative boundary that clearly identifies the division of regulatory authority.

WETLANDS ALTERNATIVE C3 is not only consistent with the CWA and legislative history, but it also addresses shortcomings of other alternatives.  It provides clarity while still allowing individual states and tribes the ability to tailor the program to their administrative needs and align with other regulatory programs to improve the efficiency and effectiveness of the regulations.  WETLANDS ALTERNATIVE C3 clearly separates administrative authority from jurisdiction, resulting in clear, predictable, and implementable administrative boundaries; a reasonable extent of assumable wetlands; and state or tribal programs that are insulated from challenges to 404 jurisdiction.

Under WETLANDS ALTERNATIVE C3, states and tribes will be able to accurately assess the feasibility and benefits of assumption because the extent of retained wetlands will be a known factor. States and tribes can make informed decisions about pursuing an assumed program and plan for its development. Finally, WETLANDS ALTERNATIVE C3 ensures that the regulated public, states, tribes, and federal agencies will know the permitting authority at the time an application is submitted.

## USACE RECOMMENDATION:
## WETLANDS ALTERNATIVE A – USACE Retains All Adjacent Regardless of Furthest Reach

The USACE representative on the Subcommittee proposed WETLANDS ALTERNATIVE A and has written the following section explaining the reasons the USACE favors this Alternative.

Under WETLANDS ALTERNATIVE A, the USACE would retain permitting authority over all wetlands adjacent to retained navigable waters. WETLANDS ALTERNATIVE A uses the definition of adjacent wetlands currently being used by the USACE for regulatory actions under Section 404. Adjacent wetlands are determined in accordance with current regulations and implementing guidance.

With respect to implementing which "wetlands adjacent thereto" should be retained by the USACE under state or tribal assumption, such wetlands would be identified by continuing to use the definition of adjacent wetlands which has not changed since it was originally published in USACE regulations in July 1977. This definition existed at the time Congress passed Section 404(g). It is reasonable to conclude that if Congress had desired to limit the wetlands that are to be retained by the USACE during a program assumption, more restrictive language would have been included in the statute rather than simply using the term "adjacent" which had already been defined and of which the Congress would have certainly been aware. The interpretation of "legislative intent" based on Congressional Committee Reports and floor debates has not provided rationale to support changes in interpretation of the term "adjacent". This alternative inherently satisfies the criterion in the charge to the subcommittee that the recommendation be consistent with the CWA and in particular section 404(g). The USACE has a defined process of determining whether particular wetlands are considered adjacent and USACE personnel are familiar with these procedures. In practice, if a discharge of dredged or fill material is proposed into a wetland that is determined to be adjacent to retained navigable waters, the USACE would be the permitting authority. If it is not, the state or tribe would be. The process of determining whether a particular wetland is adjacent to the retained navigable waters would be agreed upon during development of the MOA. This alternative meets the criterion of providing clarity regarding who is the permitting authority (the state or tribe or the USACE) and it is easily understood and implementable in the field.

003801

CORPS003812



# 8. Implementation and Process Recommendations

The Subcommittee also developed additional implementation and process recommendations. These recommendations apply no matter which substantive recommendations are followed. Note that the recommendations below sometimes refer to regulation changes, sometimes to field level guidance, and sometimes to memos. The important point is that the guidance is requested, while it is understood that the form the guidance takes may be different. All recommending members of the Subcommittee support these recommendations. The USACE supports these recommendations, except and unless they contradict their preferred alternatives as described earlier in this report.

## MAINTAIN MICHIGAN AND NEW JERSEY 404 ASSUMED PROGRAMS

Nothing in these recommendations or report is intended to require alterations or changes to the existing assumed programs in Michigan and New Jersey. The Subcommittee recognizes that these two long-standing programs were created through specific state-district negotiations and have established and functional track records.

## DEVELOP GUIDANCE FOR THE FIELD

The Subcommittee recommends that the federal agencies develop guidance or regulations on state and tribal 404 Program assumption. This guidance could be in the form of a memorandum to the field, and/or amendments to current EPA Section 404 State Program Regulations (40 CFR Part 233). The EPA and USACE should develop this guidance jointly, with input from states and tribes, for use by the EPA Regional Offices and USACE districts, as well as

by state and tribal governments. The guidance should enable states or tribes and the USACE districts to distinguish between state- or tribal-assumable waters and those waters where responsibility for 404 permitting is to be retained by the USACE following assumption. It is also important that the guidance carefully differentiate between the legal definition of <u>jurisdictional waters</u> (i.e. waters of the United States), and the assignment of <u>administrative authority</u> based on state- or tribally-assumed waters and USACE-retained waters. The Subcommittee did not determine whether the guidance should be implemented through policy or regulation.

## PROVIDE FLEXIBILITY

The distribution and concentration of waters of the United States, as well as the subset of those waters that may be administered under an assumed Section 404 program, differ greatly across the nation. For example, state or tribal territory can be comprised of coastal zones or arid western regions; they can support larger interstate rivers, or sustain numerous lakes, streams, and wetlands within their territorial boundaries. The extent of waters, the primary hydrologic patterns that dictate the flow and use of waters, and the overall ecology can also vary greatly, as can the type and extent of interstate and foreign commerce transported on the waters within state or tribal territory. This variability requires that the guidance called for above provide states and tribes sufficient flexibility to meet the geographically and programmatically diverse needs of the states and tribes while adhering to CWA section 404 (g)(1).

## INCORPORATE NATIONAL PRINCIPLES AND CONSIDERATIONS INTO FIELD GUIDANCE

Field guidance should incorporate general principles and considerations – arising from the language of Section 404(g), records reflecting Congressional intent, and subsequent federal regulations – that identify the extent of state or tribal assumable waters, and lead to relatively consistent decisions from state to state and tribe to tribe, and certainly within a particular state from the perspective of various agencies. The principles and considerations that should be incorporated into national guidance are listed below.

- Federal agencies should support state or tribal assumption, consistent with Congressional intent. Most Subcommittee members believe, based on the background leading up to the enactment of the 1977 CWA amendments, that Congress intended states and tribes to play a significant role in the administration of Section 404, as they do in other CWA programs, including assumption.

- Program assumption is a partnership between a state or tribe and federal agencies. This partnership enables a state or tribe to not only reduce duplication of state, tribal and federal permitting, but also take full advantage of state, tribal and federal expertise. Provisions of the program assumption regulations ensure an equivalent or greater level of resource protection meeting 404 criteria, provide for federal government oversight, and maintain USACE responsibilities in navigable waters, including adjacent wetlands

- The final list of retained waters prepared by the USACE in accordance with current federal law and regulations should also include input from the state or tribe and the appropriate federal agencies. The list should be available at the signing of the MOA between the state or tribe and the USACE.

- A national methodology should be developed to support the identification of retained waters. The methodology should be flexible and enable a state or tribe and USACE to use the best records, data, and procedures available.

003803

- Tribal lands defined as Indian country, including lands within reservation boundaries, dependent Indian communities, and other lands held in trust for the tribes by the federal government, may be assumed by a tribe if approved by the EPA, but typically may not be assumed by a state.

## PROVIDE GENERAL PROCEDURES FOR THE ASSUMPTION PROCESS

Field level national guidance prepared by the EPA and USACE, with input from states and tribes, should include general procedures to be followed when a state or tribe proposes to assume the Section 404 permit program.  The guidance would amend or supplement existing EPA regulations governing the state assumption process in 40 CFR Part 233 by providing a greater degree of specificity about negotiations between a state or tribe and the USACE.

- A state or tribe initiates the 404 Program assumption process with the EPA and the USACE.

- Upon request by a state or tribe that is considering assumption, the USACE District will provide a list and/or map of waters within state or tribal borders that would be retained by the USACE based upon national guidance or regulation.

- The terms used in 404(g)1 such as the "ordinary high water mark" (inland) or "mean high water mark" (coastal) or "mean higher high water mark" (West coast) may require further clarification or definition in the USACE District's initial listing.

- The USACE list of retained waters provided by the USACE, EPA, and/or the tribe may include waters located on Indian reservation land (unless such waters have already been assumed by a tribe).  In many cases, these waters will be retained by the USACE for CWA 404 administration because states will lack authority to regulate activities on Indian reservation lands.  Engagement with tribes will be important to determine the extent of these lands.

- Where a tribe is proposing 404 Program assumption, the tribe will prepare a description (list, map) of Indian country lands over which the tribe would request Section 404 program authority.  The tribe will coordinate with the EPA and state regulatory authorities and state and federal tribal coordinators in the review of lands that would be under tribal authority.

- The state or tribe will review the retained waters list, and may request additional information from the USACE regarding the basis for including particular waters, if needed.  The USACE will make available to the state or tribe any written navigational determinations, court orders, or similar documentation.  The state or tribe and the USACE may also agree to modify the list based on more accurate, currently available geographic information.  The EPA should participate in this review, to ensure that the list of assumed waters is consistent with the CWA and acceptable at the time the EPA approves assumption.

- The state or tribe and the USACE will include the agreed-upon list of waters for which Section 404 administration must be retained by the USACE in an MOA regarding state or tribal assumption (see 40 CFR §233.14).  The MOA will clarify that all other waters will be under the administration of the state or tribe in accordance with 404(g) upon approval of the state or tribal program by the EPA.  Descriptions of waters

under state or tribal and federal authority may be based on any data that are available and useful to the public, including lists, maps, descriptions, digital geographic information, etc.

- The MOA between the state or tribe and the USACE should include provisions to amend the MOA and the attached lists of state or tribal and federal authority at such time as the status of a particular water is modified due to improvements, legal decisions, or other pertinent changes (such as natural events which significantly alter the condition of a waterway).  If desired, a regular period for review may be established.

- The field guidance should establish a dispute resolution procedure to be followed if a state or tribe and the USACE district are not able to complete the list of retained waters as part of the MOA development within a reasonable amount of time.  This dispute resolution process should be developed by the EPA and USACE.

## UTILIZE BEST AVAILABLE TECHNOLOGY

The Subcommittee recommends that retained waters and adjacent wetlands, to the greatest extent practicable, be identified on an appropriate map or geographic information system for administrative purposes.  This will provide readily available information to regulatory agencies, as well as the general public, applicants and other interested parties.  In support of this recommendation, the Subcommittee encourages states, tribes, and USACE districts to use the best available technologies, such as LiDAR (Light Detection and Ranging) remote sensing, drones, and other tools during the development of the MOA between a state or tribe and the USACE district.





# Appendix A:  Tribal Findings, Issues, and Considerations during Assumption

Section 518 of the CWA, enacted as part of the 1987 amendments to the statute, authorizes the EPA to treat eligible Indian tribes in a manner similar to states ("treatment as a state" or TAS) for a variety of purposes, including administering each of the principal CWA regulatory programs and receiving grants under several CWA authorities (81 FR at 30183).  This includes CWA Section 404.

The Subcommittee, with the leadership of its two tribal participants, identified a set of "Tribal Issues" that the EPA, USACE, states, tribes and other interested parties should be aware of when considering assumption under CWA Section 404(g)(1).  It should be noted that there may be specific jurisdictional and other legal matters that are in dispute within specific states and with specific tribes.  The EPA may need to consider these issues as it addresses any application for assumption of the program.

## USACE RETAINS INDIAN COUNTRY AQUATIC RESOURCES

The EPA-approved state assumed programs generally would not extend to waters and wetlands within Indian country. Instead, such areas would generally continue to be administered by USACE, at least until such time that a tribe is approved by the EPA to assume the 404 program itself.[25]  This retention of administration by USACE should be outlined in any MOA between the USACE and the state when such state wishes to assume the 404 program.

---

[25] See 40 CFR 233.1(b).

CORPS003817

## INDIAN RESERVATION BOUNDARIES

Tribal Indian Reservation boundaries are not necessarily static; for instance, additional lands can be added to reservations and new reservations can be created.  As stated in the Indian Reorganization Act of 1934 "The Secretary of the Interior is hereby authorized to proclaim new Indian reservations on lands acquired pursuant to any authority conferred by this Act, or to add such lands to existing reservations:  Provided, that lands added to existing reservations shall be designated for the exclusive use of Indians entitled by enrollment or by tribal membership to residence at such reservations," (25 US Code Section  467) and as provided by the Bureau of Indian Affairs regulations (25 CFR Section § 151.3, 151.10, and 151.11).

In addition, Indian Reservations can have varied land ownership patterns.  Some Indian reservations consist solely of lands that are held in trust status with the United States.  Other reservations may have mixed ownership of property within the reservation (including tribal, public and private ownership).  Mixed ownership and trust status within reservations can occur for a variety of reasons including land inheritance, when and how the reservation was established, and treatment of the reservation by Congress as interpreted in court decisions.  The EPA has interpreted CWA section 518 as including a delegation of authority by Congress to eligible Indian tribes to administer regulatory programs under the statute over their entire reservations, irrespective of who owns the land 81 FR 30183 (May 16, 2016).

## LANDS OUTSIDE OF THE RESERVATION

In CWA Section 518(e)(2), the phrase "…or otherwise within the borders of an Indian reservation." is interpreted to modify each category of land (*i.e.*, "…held by an Indian tribe, held by the United States in trust for Indians, held by a member of an Indian tribe if such property interest is subject to a trust restriction on alienation…").[26]  Thus, any land that an Indian tribe wishes to regulate under the CWA – including under section 404 – must qualify as Indian reservation land as used in CWA 518.  Such lands must therefore be located within the exterior boundaries of a formal Indian reservation, or qualify as an informal Indian reservation – *e.g.*, tribal trust lands located outside the boundaries of a formal reservation or Pueblos.  Thus, privately owned reservation lands that are part of the reservation should generally be excluded from assumed state programs, and thus retained by USACE), or could generally be assumed by the relevant tribe.

Lands can be brought into trust at various times, before or after a state or tribe has assumed a 404 program, and trust lands can create a patchwork of assumed and retained waters.  Thus, cooperative relationships and agreements should be developed between the federal agencies, states and tribes in order to appropriately administer the program. Therefore, the assumption MOAs between the states or tribes and the EPA and the USACE should contain language on how changes in the trust status of Indian land is going to be handled.

---

[26] See Preamble to the Clean Water Act Treatment As a State – TAS rules at 56 FR 64881 and 58 FR 8177).  (See also CWA Section 518(e)(2).



# Appendix B:  Michigan and New Jersey's Assumed Programs

## CASE STUDY OF MICHIGAN PROGRAM

Michigan has a long history of leadership in environmental protection and management, beginning with passage of a state water pollution control statute in 1929.  So with passage of the Federal Water Pollution Control Act Amendments of 1972, Michigan began working to align state programs with the new federal regulations to enable Michigan to administer the CWA programs.  Michigan was delegated authority to administer the Section 402, National Pollution Discharge Elimination Program in 1973.  In 1972 Michigan also passed an inland lakes and streams statute that established dredged or fill regulations over inland waters.  Regulations over dredged or fill activities and bottomland occupations within the Great Lakes had been in place since 1955.

During the 1970's as the federal agencies were developing implementation guidelines and regulations, and Congress was considering amendments to the CWA, Michigan began development of a wetland program and was building a partnership with the USACE.  Michigan and the USACE signed an agreement in 1977 to use a joint permit application form for projects within all state and federally regulated waters, and to coordinate public hearings when required for those projects.  Over the next several years, the agencies continued to align the state and federal programs to improve efficiency and reduce duplication, including issuance of additional federal general permits and state statutory amendments.  Following passage of the 1977 CWA amendments that added Section 404(g)(1), Michigan passed a wetland statute in 1979 with the intention of assuming the Section 404 program.

In 1981 the agencies entered into two additional agreements to streamline the state and federal programs.  The first was an agreement to coordinate enforcement actions and after-the-fact permitting procedures.  The second was

an agreement to share staff resources; this agreement allowed the state to place staff in locations throughout the state to conduct site reviews for both state and federal permits, in exchange the USACE provided joint staff training, reimbursed state travel costs, and funded the development of public outreach materials.

This effort laid the groundwork for assumption of the 404 program.  Michigan formally requested assumption in 1983 and the Environmental Protection Agency (EPA) approved the program the same year.  With the signing of the USACE Memorandum of Agreement (MOA) in 1984, which identified the retained waters, Michigan became the first state to assume the 404 program[27].

*The EPA and USACE Memoranda*

The 1983 MOA with the EPA provided the framework for Michigan's administration of the 404 program.  The agreement specifies the state's responsibilities for permitting and enforcement, the federal oversight responsibilities including procedures for federal review of certain permit applications, and state program reporting requirements.  The categories of permit applications which the EPA did not waive federal review under Section 404(j) are specifically defined; they include proposed state general permit categories and major discharges of dredged or fill material.  Major discharges are further defined and include:  discharges of toxic pollutants or hazardous substances; impacts to unique waters for a geographic region, commercial or recreational values of a significant area, or endangered or threatened species; and wetland fills, breakwater or seawall construction, or culvert enclosures of specified volumes and sizes.

Michigan's program agreement with the EPA was updated in 2011 after an extensive review of Michigan's program and nearly three decades of program changes at both the federal and state level.  The updated agreement is substantially the same as the original agreement, with new language added to clarify responsibilities for coordination with other states and tribes, coordination with federal agencies for mitigation banks, and streamlining of reporting requirements.

The 1984 MOA with the USACE identifying retained waters is still in effect.  In defining waters to be assumed by the state and the waters to be retained by the USACE the MOA simply states that all waters within the state are assumed other than waters identified by the language in 404(g)(1).  The MOA quotes the 404(g)(1) language, and then states that those waters are identified on an attached list of "Navigable Waters of the United States in US Army Engineer District, Detroit, November 1981".  The list of navigable waters of the United States identifies specific waterways by name and location, and identifies the head of navigation that is the upstream limit of the USACE's retained authority under the 404 program.

*Current Status of Michigan's Program*

Michigan has been successfully implementing the 404 program for over 3 decades.  But implementation requires continual coordination with the federal agencies.  State staff screen each permit application to determine if the proposed project is located within assumed or retained waters.  If the project is in a retained area, a copy of the application is forwarded to the USACE.  Michigan still regulates all waters and wetlands throughout the state, so applications within retained waters are coordinated with the USACE.  All application information is shared between the agencies, site inspections are coordinated when appropriate, and permit conditions and mitigation requirements

---

[27] 49 FR 38948, Oct. 2, 1984. Redesignated at 53 FR 20776, June 6, 1988. Redesignated at 58 FR 8183, Feb. 11, 1993. Effective date, October 16, 1984.

CORPS003820

are coordinated to avoid conflicts and inconsistencies. Since Michigan has a robust wetland mitigation program and the state can own property, hold conservation easements, and hold financial instruments, state staff normally take the lead in negotiating and reviewing mitigation proposals. The state and USACE also coordinate compliance and enforcement actions within retained waters to reduce duplication and prevent conflicting compliance requirements.

Coordination with the United States Fish and Wildlife Service (US FWS) is also a necessary part of the program. State staff are responsible for screening applications for potential impacts to threatened and endangered species and coordinating with US FWS and state endangered species staff. State staff also work with US FWS to develop species specific screening criteria, permit conditions and best management practices.

State staff work continuously with the EPA staff to coordinate review of major discharge applications, new or revised general permit categories, major enforcement actions, and all statutory, rule or policy changes that affect the 404 program. The state has one staff person who is designated as the 404 program liaison to streamline communication between the agencies.

Annually Michigan processes approximately 3,000 to 4,000 permit applications under the 404 program in assumed waters. Normally 60 to 70 percent of those projects fall within the state's general permit categories. Typically, the EPA reviews one to two percent of the total applications because they fall within the major discharge categories described in the state's MOA with the EPA. In addition, state staff investigates and takes action on approximately 1000 to 1500 reports of non-compliance.

## CASE STUDY OF NEW JERSEY PROGRAM

New Jersey is the most densely populated state in the nation with a population of 8,958,013 in 8,721.3 square miles or 1,195.5 people per square mile (2015 Statistics from the US Census). As a result, New Jersey faces many environmental issues in advance of other states and has developed an active and vocal grass roots environmental movement.

As early as 1917, New Jersey enacted a Waterfront Development law to protect navigation and ensure adequate dockage for shipping along the coast. In 1929, the state began protecting streams under the Flood Hazard Area Control Act which regulated structures placed within the natural waterway of any stream. The New Jersey Department of Environmental Protection was created on the first Earth Day, April 22, 1970. That same year, New Jersey passed the Coastal Wetlands Act.

In response to passage of the 1972 Federal Coastal Zone Management Act, in 1973 New Jersey passed the Coastal Area Facility Review Act. In 1977, the state's Pinelands Preservation Act began protecting from development a unique area in the southern part of New Jersey. It also prohibited development in freshwater wetlands.

New Jersey does not have its own USACE District. The state is served by the New York District, located in New York City and serving New York state and the eastern portion of New Jersey; and the Philadelphia District, located in Philadelphia, Pennsylvania and serving Pennsylvania and the western part of New Jersey. In the 1980s, the USACE program included Nationwide permits which were self-regulating and that allowed up to 10 acres of impacts per permit. New Jersey used its Water Quality Certificate authority to try to limit the impacts. However, a review by the

003810

US Fish and Wildlife Service of 40 wetland fill cases in northern New Jersey between 1980 and 1984 documented approximately 800 acres of wetland impacts resulting from illegal filling, Nationwide permits, and Individual permit activities.

In the mid-1980s, environmental groups in New Jersey united with the goal of obtaining a state freshwater wetlands protection law.  On June 8, 1987, Governor Tom Kean enacted a building moratorium prohibiting all development in wetlands until passage of a wetland law.  On July 1, 1987, New Jersey passed the Freshwater Wetlands Protection Act (FWPA), effective July 1, 1988.

The law contained a provision, directing the state to "take all appropriate action to secure the assumption of the permit jurisdiction exercise by the United States Army Corps of Engineers pursuant to the Federal Act."  (NJSA 13:9B-27) To fulfill this mandate, the statute was structured to give the state the necessary authority to assume the Federal permitting program.  In addition, the state legislature appropriated sufficient funds for the Department of Environmental Protection to staff and equip a statewide, freshwater wetlands regulatory program independent of the USACE.

New Jersey submitted an application for assumption to the EPA in 1993.  The program was approved and New Jersey became the second state to implement an assumed Federal 404 program in 1994.

## MOA with the EPA

As required by the Federal Transfer Regulations[28], New Jersey signed a memorandum of agreement with the EPA.  In addition to those projects that continue to require Federal review in accordance with the EPA transfer regulations, New Jersey agreed that the following project types would also continue to get Federal review under its assumed program:

- Filling of 5 or more acres of wetlands;

- Significant reduction in ecological, commercial or recreational value of 5 or more acres;

- Culverts longer than 100 feet;

- Channelization of more than 500 feet of river or stream.

## MOA with the Army USACE

As required by the Federal Transfer Regulations, the State of New Jersey signed a memorandum of agreement with the USACE[29].  The state and the USACE agreed to the following definition to distinguish assumed and non-assumed waters:

"All waters of the United States, as defined at 40 CFR Section 232.2(q), within the State of New Jersey will be regulated by NJDEP as part of their state program, with the exception of those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto.  *For the purposes of this agreement, the USACE will retain regulatory authority over those*

---

[28] 40 CFR Part 233: 404 State Program Regulations

[29] 59 FR 9933, Mar. 2, 1994

Report of the Assumable Waters NACEPT Subcommittee

003811

CORPS003822

*wetlands that are partially or entirely located within 1,000 feet of the ordinary high water mark or mean high tide of the Delaware River, Greenwood Lake, and all water bodies which are subject to the ebb and flow of the tide."*

The "1,000 feet" criterion had two sources.  First, the USACE traditionally took jurisdiction to elevation 10 in coastal areas in New Jersey under the Rivers and Harbors Act.  They consider any wetlands and/or waters located between the water and 10 feet above sea level to be navigable waters or "wetlands adjacent thereto."  They estimated that on average, the distance from the Mean High Water Line landward to 10 feet above sea level is approximately 1,000 feet.  In addition, the state's wetland maps were drawn at a scale where one inch equals 1,000 feet.  Therefore, the state and the USACE agreed to use 1,000 feet from the ordinary high water mark or mean high tide as the division between waters to be retained (regulated by both agencies), and those to be assumed (regulated by the state alone).

*MOU with the US Fish and Wildlife Service*

The US Fish and Wildlife Service (FWS) opposed assumption by the State of New Jersey.  In order to assuage their concerns, the state voluntarily signed a memorandum of understanding (MOU) with both the EPA and FWS.  The MOU requires the state to provide certain applications directly to the FWS for review if they are located within municipalities known to contain federally-listed threatened or endangered species.

*Coordination with State Historic Preservation Office (SHPO)*

As part of its assumed program, the state also screens applications for referral to the SHPO to comply with Section 106 of the National Historic Preservation Act (16 USC Section  470(f)).

*Current Status of Program*

The state of New Jersey reviews all incoming wetlands/waters permit applications regardless of whether they are in assumed or non-assumed waters.  The state also conducts jurisdictional determinations throughout most of the state.  The state prescreens incoming permit applications to identify projects constituting "major discharges," which are then sent to the EPA for Federal review.  In addition, if a permit application falls within one of the identified municipalities with federally-listed threatened or endangered species, and constitutes one of the permit types of concern to the FWS, the state screens the application and sends a copy to the FWS.  The FWS returns comments to DEP and the EPA for consideration.  If the state cannot satisfy FWS concerns, the project begins a new review with the EPA through the "major discharge" process.  The state cannot approve a Section 404 permit over the EPA objections.

In those cases where a project is in a non-assumed water, the state issues its state permit independently of the USACE.  However, monthly coordination meetings with the USACE let the agencies compare information on projects under review by both agencies.  In addition, the agencies coordinate required mitigation.  New Jersey also reviews and approves mitigation banks independently in assumed areas.  In non-assumed areas, the state is a member of both the New York and Philadelphia USACE Interagency Review Teams.

The state also conducts compliance and enforcement for violations in non-assumed waters.

CORPS003823

Over the years, the state has made between 550 and 2,000 permit decisions annually.  Of these, on average fewer than 10 applications per year require coordination with the EPA as "major discharges," approximately 80 per year required FWS review, and between 225 and 250 are coordinated with the State Historic Preservation Office.

In addition, the state's Enforcement Bureau has undertaken an average of 1,000 actions annually on reports of non-compliance.



Report of the Assumable Waters NACEPT Subcommittee

003813

CORPS003824



# Appendix C:  Letter from the Association of Clean Water Administrators, the Environmental Council of the States, and the Association of State Wetland Managers

  

April 30, 2014

Nancy K. Stoner
Acting Assistant Administrator for Water
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, NW (4101M)
Washington, DC 20460

Via email to: stoner.nancy@epa.gov

Dear Acting Assistant Administrator Stoner:

Re:  Assumable Waters under Clean Water Act Section 404

In the rule proposed by the U.S. Environmental Protection Agency (EPA) and the U.S. Army Corps of
Engineers (Corps) regarding the scope of the definition of "waters of the United States," a statement in
the preamble explains that the rule does not affect the scope of waters subject to state assumption in
accordance with §404(g).  79 Fed. Reg. 22,188, p. 22,200 (April 21, 2014).  The undersigned
organizations appreciate that such language was included in the proposed rule addressing this critical
aspect of state §404 program assumption.

We agree with the preamble statement in the rule that "[c]larification of waters that are subject to
assumption by states or tribes or retention by the Corps could be made through a separate process
under section 404(g)" (ibid).  We recommend that steps to further clarify the scope of assumable and
non-assumable waters be initiated in a timely manner.  We are concerned that states currently
considering assumption are having difficulty making progress because of the current uncertainty.

We would appreciate the opportunity to actively engage in a discussion with EPA to address this issue.
Our organizations recognize that any steps toward clarification must be undertaken thoughtfully in
accordance with the provisions of §404(g), and without altering the existing state 404 programs in
Michigan and New Jersey.

Clear identification of assumable and non-assumable waters has been made more difficult by legal
decisions that address terms such as "navigable" and "adjacent."  Nonetheless, Congress intended that
states be able to assume regulatory responsibility for the majority of waters within their boundaries.
Clarification of assumable waters will help to facilitate state assumption where it is desired – providing
benefits to the public, the resource, and the state and federal agencies.

Under §404 of the Clean Water Act – all waters regulated by the Corps or by a state/tribal program – are
deemed "waters of the United States." We believe that "other waters," as well as some portion of both
"navigable waters," and "adjacent wetlands" may be administered by a state or tribe in accordance with
404(g).  We look forward to discussions with EPA to explore this very important area of public policy.

003815



Our goal is to work collaboratively to discern the criteria that will be used by a state/tribe, EPA, and the Corps to identify assumable/non-assumable waters pursuant to §404(g). We would also like to reach agreement on how to formalize these criteria (e.g., Memorandum of Understanding). Several steps may be needed to address both the immediate concerns of states pursuing assumption and the needs of those that may do so in the future.

Our organizations are committed to supporting state efforts to assume the Section 404 program by identifying issues and working with partners to resolve them. See, for example, ECOS Resolution #08-3 on State Delegation of the Clean Water Act Section 404 Permit Program – originally approved in 2008 – was on April 2, 2014 reaffirmed, with the addition of the following language: "[NOW, THEREFORE, BE IT RESOLVED THAT THE ENVIRONMENTAL COUNCIL OF THE STATES] Encourages U.S. EPA to work with states to bring clarity and certainty to the identification of assumable and non-assumable waters."

We look forward to a timely and productive discussion with you. Please contact Jeanne Christie of ASWM at 207-892-3399 or jeanne.christie@aswm.org, to discuss this request. Thank you again for your attention to this matter.

Sincerely,

Alexandra Dapolito Dunn          Sean Rolland          Jeanne Christie
ECOS                             ACWA                  ASWM


Cc:    Ken Kopocis, EPA
       Benita Best-Wong, EPA
       Jim Pendergast, EPA
       Bill Ryan, OR DSL
       Ben White, AK
       Eric Metz, OR DSL
       Ginger Kopkash, NJ
       Bill Creal, MI

CORPS003827



# Appendix D:  List of Subcommittee Members

**COLLIS G. ADAMS, CWS, CPESC**
Wetlands Bureau Administrator
New Hampshire Department of Environmental Services
Land Resources Management

**VIRGINIA S. ALBRECHT**
Special Counsel
National Association of Home Builders
Hunton & Williams LLP

**CRAIG W. AUBREY**
Chief, Division of Environmental Review
Ecological Services Program
US Fish and Wildlife Service Headquarters
Ecological Services, MS: ES

**TREVOR BAGGIORE**
Division Director, Water Quality
Arizona Department of Environmental Quality

**LAUREEN MONICA BOLES**
NACEPT Liaison

**PEG BOSTWICK**
Senior Policy Analyst
Association of State Wetland Managers
Great Lakes Office

**DAVID L. DAVIS, CPWD, PWS**
Director, Office of Wetlands & Stream Protection
Virginia Department of Environmental Quality

**JAMES P. DENOMIE**
Tribal Consultant
Tribal Member of Bad River Chippawa Tribe
of Lake Superior
Midwest Alliance of Sovereign Tribes

Report of the Assumable Waters NACEPT Subcommittee

003817

CORPS003828

**TOM DRISCOLL**
Government Relations Representative
National Farmers Union

**DAVID S. EVANS, DEPUTY DIRECTOR**
Co-Chair of the Subcommittee
Office of Wetlands, Oceans, and Watersheds
USEPA OWOW *(resigned as of 12-9-2016 due to employment change)*

**KIMBERLY FISH**
Assistant Division Chief
Michigan Department of Environmental Quality
Water Resources Division

**RICHARD D. GITAR**
Water Regulatory Specialist/Tribal Inspector
Office of Water Protection
Fond du Lac Reservation

**JAN GOLDMAN-CARTER**
Director of Wetlands and Water Resources,
National Wildlife Federation
National Advocacy Center

**MICHELLE HALE**
Director, Division of Water
Alaska Department of Environmental Conservation

**WILLIAM L. JAMES**
US Army Corps of Engineers National Mining Expert

**LES LEMM**
Wetlands Section Manager
Minnesota Board of Water and Soil Resources

**SUSAN D. LOCKWOOD**
Environmental Specialist 4
New Jersey DEP Division of Land Use Regulation

**ERIC D. METZ, P.W.S.**
Planning and Policy Manager
Aquatic Resource Management Program
Oregon Department of State Lands

**BARRY RABE, PH.D**
Co-Chair of the Subcommittee
Director of the Center for Local, State,
and Urban Policy
Gerald R. Ford School of Public Policy
University of Michigan

**DAVE ROSS**
Senior Assistant Attorney General
Wyoming Attorney General's Office
Water & Natural Resources Division *(resigned as of 5-16-2016 due to employment change)*

**GARY T. SETZER**
Policy Advisor, Office of the Secretary
Maryland Department of the Environment

**MICHAEL J. SZERLOG, MANAGER**
Aquatic Resources Unit
Office of Environmental Review and Assessment,
Environmental Protection Agency, EPA Region 10



# Appendix E:  Subcommittee Charter

## INTRODUCTION

Section 404(g) of the Clean Water Act (CWA) lays out the requirements for the assumption and implementation of state and tribal CWA section 404 permitting programs.  Congress, with the addition of CWA section 404(g), made clear that states and tribes wishing to assume administration of the dredge and fill permit program, could do so for certain waters.  This Subcommittee under the National Advisory Council for Environmental Policy and Technology (NACEPT) will focus on a very narrow and specific charge related to which waters a state or tribe assumes permitting responsibility for under an approved CWA section 404 program and for which waters the US Army Corps of Engineers (USACE) will retain CWA section 404 permitting authority.  To be known as the "Assumable Waters Subcommittee," (Subcommittee), the Subcommittee will be asked to provide advice and develop recommendations on how the US Environmental Protection Agency (EPA) can best clarify for which waters the state/tribe has CWA section 404 permit responsibilities, and for which waters the USACE retains CWA section 404 permit responsibility, under an approved state/tribal program.  This effort is part of the Administrator's priorities as it supports states and tribes seeking to assume the CWA section 404 program by providing clarity on the scope of waters for which they would be responsible for administering the CWA section 404 program.  Specifically, this effort will address the states' request to provide clarity on this issue enabling them to assess and determine the geographic scope and costs associated with implementing an approved program.

## BACKGROUND

The NACEPT is a Federal Advisory Committee chartered under the Federal Advisory Committee Act (FACA), Public Law 92–463.  The EPA established the NACEPT in 1988 to provide advice to the EPA Administrator on a broad

range of environmental policy, management, and technology issues. The EPA is now seeking to form a subcommittee under the NACEPT, to be known as the Assumable Waters Subcommittee (Subcommittee) to provide advice on how the EPA can best clarify the waters that a state or tribe may assume permitting responsibility for under an approved CWA dredge and fill permit program. Subcommittee members, like the parent NACEPT committee, serve as representatives from academia, industry, non-governmental organizations, and federal, state, tribal, and local governments.

The Subcommittee is being formed to provide advice and recommendations concerning a focused, but critical, aspect of implementing the CWA section 404 program for the discharge of dredge and fill materials. The USACE currently evaluates CWA section 404 permit applications for activities in the majority of the nation's waters subject to the CWA. Although states and tribes may assume the dredge and fill permit responsibilities pursuant to section 404(g) of the CWA, only two states (Michigan and New Jersey) and no tribes have assumed such responsibility to date. When a state or tribe considers assuming such responsibilities, among the first questions that needs to be answered is for which waters will the state or tribe assume permitting responsibility and for which waters will the USACE retain permitting authority. States have raised concerns to the EPA that section 404 of the CWA and its implementing regulations lack sufficient clarity to enable states and tribes to estimate the extent of waters for which they would assume program responsibility and thus calculate associated program implementation costs.[30] The lack of clarity on these questions has been identified by the states as a challenge to pursuing assumption as envisioned under the CWA.[31]

The Subcommittee will have a limited duration and narrow focus. Other aspects of state or tribal assumption will not be within the scope of the deliberations for this Subcommittee. For example, the Subcommittee will not be deliberating on the merits of assumption, nor on any aspect of the larger question of which waters are "waters of the US." It will focus on how the EPA can clarify the waters for which a state or tribe assumes CWA section 404 permitting responsibility and for which waters the USACE will retain this authority.

## CHARGE TO THE SUBCOMMITTEE

The final Subcommittee report to NACEPT should provide advice and recommendations to EPA on how to clarify for which waters states and tribes will assume CWA section 404 permitting responsibilities, and for which waters the USACE will retain permitting authority. The recommendations should reflect consideration of the following assumptions:

1. A CWA section 404 permit is required – meaning there is an activity regulated under section 404 that will result in a discharge of dredge or fill material to a Water of the US

2. Any recommendation must be consistent with the CWA and in particular section 404(g)

3. Clarity regarding who is the permitting authority (the state/tribe or the USACE) should be easily understood and implementable in the field

---

[30] Environmental Council of States, the Association of Clean Water Administrators, and the Association of State Wetland Managers letter. April 30, 2014. Letter can be found in the docket.

[31] Ibid

003820

## PROPOSED SCHEDULE

The Subcommittee will meet approximately four to six times following initiation of the group for twelve to sixteen months face-to-face or via video/teleconference.  Additionally, members may be asked to participate in ad hoc workgroups to develop potential policy recommendations and reports to address specific issues.

Tentative meeting schedule (subject to change):

- September 2015 – Meeting 1
- December 2015 – Meeting 2
- Late February 2016 – Meeting 3
- April 2016 – Meeting 4
- June 2016 – Meeting 5
- September 2016 – Meeting 6 (if needed) to finalize recommendations to NACEPT



Report of the Assumable Waters NACEPT Subcommittee

003821

CORPS003832



# Appendix F:  The Legislative History of Section 404(g)(1) of the Clean Water Act[32]

## INTRODUCTION

Section 404 of the Clean Water Act (CWA) authorizes the US Army Corps of Engineers (the USACE) to issue permits for the discharge of dredged or fill material into "navigable waters."[33]  Pursuant to section 404(g)(1), States, with approval from the Environmental Protection Agency (EPA), may assume authority to administer the 404 permit program in some but not all navigable waters.  The waters that a state may not assume, and which the USACE must retain even after a state has assumed the program, are defined in a parenthetical phrase in section 404(g)(1) as:

(… those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto) …[34]

This memorandum explores the meaning of this parenthetical language by reviewing the legislative history of the 1977 CWA amendments that led to section 404(g)(1).  The legislative history summarized below includes the reports of the House Committee on Public Works and Transportation and the Senate Committee on Environment and Public Works, passages from earlier versions of both the House and Senate bills, and excerpts from the Conference

---

[32] Prepared by Virginia S. Albrecht, Jan Goldman-Carter, and Dave Ross

[33] 33 USC § 1344(a).

[34] 33 USC § 1344(g)(1).

Report regarding the final language of the amendments.  After careful review of this material, it is clear that the waters Congress intended the USACE to retain after a state assumed 404 authority are:  (1) the waters identified by the USACE as Phase I waters in its 1975 regulations, except for those navigable waters of the United States deemed navigable based solely on historic uses, and (2) wetlands adjacent to the retained Phase I waters.[35]

## HISTORY OF SECTION 404(g)(1)

*Responding to a court order, the USACE proposes to expand its definition of navigable waters for section 404.*

After the CWA was enacted in 1972, the USACE promulgated regulations defining the CWA term "navigable waters" synonymously with the RHA term "navigable waters of the United States."  The National Wildlife Federation and the Natural Resources Defense Council challenged the USACE' CWA definition, and in March 1975 the District Court for the District of Columbia ordered the USACE to issue new regulations broadening the definition to accord with the broader water quality purposes of the CWA.[36]  On July 25, 1975, in compliance with the court order, the USACE issued revised regulations creating a phased schedule for expanding the program, as follows:

- *Phase I:*  [effective immediately] discharges of dredged material or of fill material into coastal waters and coastal wetlands contiguous or adjacent thereto or into inland navigable waters of the United States[37] and freshwater wetlands contiguous or adjacent thereto are subject to … regulation.

- *Phase II:*  [effective July 1, 1976] discharges of dredged material or of fill material into primary tributaries, freshwater wetlands contiguous or adjacent to primary tributaries, and lakes are subject to … regulation.

- *Phase III:*  [effective after July 1, 1977] discharges of dredged material or of fill material into any navigable water [including intrastate lakes, rivers and streams landward to their ordinary high water mark and up to the headwaters that are used in interstate commerce] are subject to … regulation.[38]

---

[35] As described below, Phase I waters were understood to be "navigable waters of the United States" already regulated by the USACE under section 10 of the Rivers and Harbors Act (RHA), plus adjacent wetlands.

[36] *Nat. Res. Def. Council, Inc. v. Callaway*, 392 F. Supp. 685 (D.D.C. 1975).  The CWA defines the term "navigable waters" to mean "the waters of the United States."  At the time the CWA was passed, the USACE had been regulating "navigable waters of the United States" under the Rivers and Harbors Act for more than 100 years.  The strikingly similar language in the two statutes led to confusion.  The USACE' initial post-CWA regulations treated the terms synonymously. 39 Fed. Reg. 12,115, 12,119 (Apr. 3, 1974).  But the two statutes had different purposes – the RHA was focused on maintaining navigable capacity, the CWA on water quality.  And the CWA Conference Report stated that the "term 'navigable waters' [should] be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes."  S. Rep. No. 92-1236, at 144 (1972), *reprinted in* Comm. on Pub. Works, 93D Cong., 1 A Legislative History of the Water Pollution Control Act Amendments of 1972, at 281, 327 (Jan. 1973).

[37] The term "navigable waters of the United States" is a term of art used to reference waters subject to the USACE' jurisdiction under the RHA.  The USACE defined the term in the 1975 regulations as "waters that have been used in the past, are now used, or are susceptible to use as a means to transport inter-state commerce landward to their ordinary high water mark and up to the head of navigation as determined by the Chief of Engineers, and also waters that are subject to the ebb and flow of the tide shoreward to their mean high water mark…. See 33 CFR 209.260 … for a more definitive explanation of this term."  40 Fed. Reg. 31,320, 31,324 (July 25, 1975).  The regulatory cross-reference included in this definition was to the USACE' then current RHA regulations.  Those regulations emphasized that, "[p]recise definitions of 'navigable waters' or 'navigability' are ultimately dependent on judicial interpretation, and cannot be made conclusively by administrative agencies." 33 CFR § 209.260(b) (1973).  Those regulations were later updated, and now read "[p]recise definitions of 'navigable waters of the United States' or 'navigability' are ultimately dependent on judicial interpretation and cannot be made conclusively by administrative agencies."  33 CFR § 329.3 (2015).

[38] 40 Fed. Reg. at 31,326.

Report of the Assumable Waters NACEPT Subcommittee

003823

CORPS003834

*Responding to the USACE' regulations, the House Committee on
Public Works writes a bill to limit 404 jurisdiction to Phase I waters.*

Reviewing the new USACE regulations, the House Committee on Public Works and Transportation expressed concern that "full implementation of this permit program under the new regulations would have a dramatic effect on the overall Corps of Engineers permit program."[39]  The Committee Report noted that permits under the RHA numbered close to 11,000 per year and were expected to remain constant, but the new 404 regulations would increase 404 applications from 2,900 to 30,000 per year as Phases II and III became effective.[40]  The Committee was concerned that the expanded 404 program "will prove impossible of effective administration and … discourage the States from exercising their present responsibilities in protecting water and wetland areas."[41]  The Committee report stated that environmental protection should be a shared responsibility of the States and the Federal government.  Noting that "[t]he Federal government has traditionally had the responsibility of protecting the navigable waters of the United States for public use and enjoyment," the Committee concluded that "activities addressed by section 404, to the extent they occur in waters other than navigable waters of the United States … are more appropriately and more effectively subject to regulation [by] the States."[42]

*The House bill tracks the RHA definition, except it omits "historic" navigable waters of the United States.*

To address the concerns identified in the Committee report, section 17 of the Committee bill, H.R. 9560, added a definition of "navigable waters" to be applied to the 404 program that is "the same as the definition of navigable waters of the United States as it has evolved over the years through court decisions with one exception.  [It] omits the historical test of navigability."[43]  The Committee noted that the historical test had been used "to classify as navigable … many bodies of water … [that] were not capable of supporting interstate commerce in their existing condition or with reasonable improvement,"[44] for example, waters that were used in the fur trade in the 1700's, "where traders would transport their furs by trail to the lake, across the lake by boat, and then again by trail into another State."[45]  Similarly, "small lakes located entirely within one State, which were part of a highway of commerce in the 1800's by virtue of their proximity to a railway track which led into another State, [had] been classified as navigable."[46]  Thus, the Committee intended to exclude "small intra-state lakes … which could not conceivably be used today or in the future for interstate commerce."[47]  The Committee "fe[lt] strongly that if a water is not susceptible of use for the transport of interstate or foreign commerce in its present condition or with reasonable improvement, then it should not be considered a 'navigable water of the United States.'"[48]

---

[39] H.R. Rep. No. 94-1107, at 22 (1976).

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.* at 23.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.* at 23-24.

[48] *Id.* at 24

003824

CORPS003835

Reflecting these Congressional intentions, section 17 read as follows:

> The term "navigable waters" as used in this section shall mean all waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark (mean higher high water mark on the west coast).[49]

As discussed below, section 17 morphed during the legislative process, and the above language ended up in 404(g)(1) and was used to describe the navigable waters the USACE would retain in a case of state assumption.  The language "wetlands adjacent thereto" was added to the final bill separately.

*During debate in the House, the 404 permit requirement is extended to certain wetlands, and certain activities are exempted.*

Section 17 was debated vigorously on the House floor in 1976.[50]  Many vehemently opposed restricting the USACE' jurisdiction, while proponents of section 17[51] feared the USACE's infringement on States' authorities and farmers' operations.[52]  In a compromise, the final House bill included the Committee's definition of "navigable waters" (for 404 purposes), but protected wetlands by requiring 404 permits for dredge and fill activities in "coastal wetlands and … those wetlands lying adjacent and contiguous to navigable streams."[53]  The bill did not include wetlands in the definition of navigable waters, however.

The bill also exempted from the permit program normal farming activities, ranching, and the construction or maintenance of farm or stock ponds and irrigation ditches.[54]  Additionally, it created a process for States to administer the program themselves whenever the Secretary of the Army found that they have sufficient legal authority and capability to carry out such functions and that the delegation of authority would be within the public interest.[55]  The House of Representatives passed H.R. 9560 and approved these amendments to the 404 program on June 3, 1976.[56]

*The Senate bill creates a mechanism for States to assume the 404 program but does not modify the definition of navigable waters.*

The Senate took up the bill in the summer of 1977.  Emphasizing the ambitious water quality goals of the 1972 Clean Water Act, the Senate Committee on Environment and Public Works declined to redefine "navigable waters" for purposes of the 404 program.  Instead, the Senate bill, S. 1952, in section (l)(5), allowed States to assume the

---

[49] *Id.* at 63.

[50] *See* 122 Cong. Rec. 16,514-73 (June 3, 1976).

[51] Note: In the final bill, the definition of "navigable waters" appears in section 16.  *Id.* at 16,572.

[52] *See id.* at 16,514-73.

[53] *Id.* at 16,553.

[54] *Id.* at 16,552.

[55] *Id.* at 16,572.

[56] *Id.* at 16,569.

primary responsibility for implementing the permit program "outside the USACE program in the so-called phase I waters."[57]  The waters that would be retained by the USACE if a state assumed the program were the same waters the House bill had defined as "navigable waters" except section (l)(5) added adjacent wetlands:

> [A]ny coastal waters of the United States subject to the ebb and flow of the tide, including any adjacent marshes, shallows, swamps and mudflats, and any inland waters of the United States that are used, have been used or are susceptible to use for transport of interstate or foreign commerce, including any adjacent marshes, shallows, swamps and mudflats.[58]

S. 1952 would allow the States to assume authority over "phase 2 and phase 3 waters."[59]  The assumption procedures were modeled on the 402 procedures for transfer of National Pollutant Discharge Elimination System ("NPDES") authority to the States in the hopes that the familiar process would expedite state adoption of the program.[60]  The amendment also exempted activities similar to those exempted in the House bill and provided for general permits to eliminate delays and administrative burdens associated with the program.[61]  The Senate concluded that until the approval of a state program for Phase II and Phase III waters, the USACE would administer section 404 in all navigable waters.[62]  The Senate passed S. 1952 on August 4, 1977.[63]

*The final bill does not change the definition of "navigable waters" but does provide for state assumption that would effectively limit USACE permitting authority in assumed States to Phase I waters.*

Ultimately, the final bill, H.R. 3199, referred to as the 1977 Clean Water Act Amendments, did not change the definition of navigable waters for the 404 program.  Instead, the amendments were a combination of the House and Senate bills.  While members of the House, and more specifically the House Committee on Public Works and Transportation, wanted to redefine "navigable waters" for the 404 program, others strongly opposed such restrictions.  Both chambers agreed, however, that the States could properly assume authority for administering the 404 program in waters other than those called out in section 17 of the House bill and section (l)(5) of the Senate bill.  Accordingly, the conferees agreed upon an amendment that would leave the definition of "navigable waters" unchanged, but would allow the States to assume the program in most waters.

Thus, under the 1977 amendments, the States can administer an individual and general permit program for the discharge of dredged or fill material into "phase 2 and 3 waters after the approval of a program by the Administrator."[64]

---

[57] S. Rep. No. 95-370, at 75 (1977) *reprinted in* Comm. on Env't & Publ. Works, 95th Cong., 4 A Legislative History of the Clean Water Act of 1977 ("Legis. History 1977"), at 635, 708 (Oct. 1978).

[58] 4 Legis. History 1977, at 830.

[59] *Id.* at 708.

[60] *Id.* at 710-11.

[61] *Id.* at 707.

[62] *Id.* at 708.

[63] 123 Cong. Rec. 26,775 (Aug. 4, 1977).

[64] H.R. Rep. No. 95-830, at 101 (1977) *reprinted in* 3 Legis. History 1977, at 185, 285.

003826

If and when a state assumed the program, the C' permitting authority would be limited to "those waters defined as the phase I waters in the Corps … 1975 regulations, with the exception of waters considered navigable solely because of historical use."[65]

The final bill inserted the language that the House Committee had originally used to limit USACE jurisdiction, except that the Conference Committee added "wetlands adjacent thereto" to the parenthetical phrase defining the waters over which the USACE would always retain permitting authority.[66]

The legislative history in both the House and the Senate evidences a Congressional expectation that most States would assume the 404 program, and therefore effectively limit USACE permitting authority to Phase I waters.

> By using the established mechanism in section 402 …, the committee anticipates the authorization of state management of the [404] permit program will be substantially expedited.  At least 28 state entities which have already obtained approval of the national pollutant discharge elimination system under the section should be able to assume the program quickly.[67]

Also, "the corps [conducted] … a study [in 1976] to determine the scope of state programs similar to or duplicative of corps regulations and to determine the interest of the States in accepting delegation of the 404 program."[68]  Based on the preliminary responses of 52 states and territories, 34 indicated their intent, under certain conditions, such as federal funding, to assume the dredge and fill program.[69]  Only 6 responded that they would not seek assumption of the program, and 12 were undecided.[70]

## Summary of Key Points

The language in the 404(g)(1) parenthetical phrase that defines the waters over which the USACE will retain jurisdiction in an assumed state is identical to the language used by the House Committee to narrow the definition of "navigable waters," except that it includes "wetlands adjacent thereto."

Congress intended that the parenthetical language be interpreted to mean the same waters as the USACE had defined as Phase I waters in its 1975 regulations, except those deemed navigable based solely on historical use.  Thus, waters deemed navigable based on historical use only are assumable by a state.

The 1977 Congress anticipated that most states would assume the 404 program and therefore regulate dredge and fill activities in Phase II and III waters, leaving the USACE with authority over Phase I waters (including their adjacent wetlands but excluding historical use waters).

---

[65] 123 Cong. Rec. 38,969 (Dec. 15, 1977).  The USACE's July 19, 1977 final regulations characterized Phase I as covering "waters already being regulated by the Corps[ ] plus all adjacent wetlands to these waters."  42 Fed. Reg. 37,122, 37,124 (July 19, 1977).

[66] H.R. Rep. No. 95-830, at 39, reprinted in 3 Legis. History 1977, at 285.

[67] S. Rep. No. 95-370, at 77-78, reprinted in 4 Legis. History 1977, at 710-11.

[68] H.R. Rep. No. 95-139, at 67, reprinted in 4 Legis. History 1977, at 1196, 1262.

[69] Id.

[70] Id.

003827

CORPS003838

The parenthetical waters identified by the USACE as Phase I waters in its 1975 regulations incorporated the description of "navigable waters of the United States" already regulated by the USACE under section 10 of the RHA, except the parenthetical excluded waters deemed navigable based solely on historical use, and included adjacent wetlands.  The USACE's regulations at the time emphasized that "[p]recise definitions of 'navigable waters' or 'navigability' are ultimately dependent on judicial interpretation, and cannot be made conclusively by administrative agencies."  33 CFR § 209.260(b) (1973).  The language changed later, and the current regulation now states "[p]recise definitions of 'navigable waters of the United States' or 'navigability' are ultimately dependent on judicial interpretation and cannot be made conclusively by administrative agencies."  33 CFR § 329.3 (2015).



Report of the Assumable Waters NACEPT Subcommittee

003828



003829

CORPS003840



003830



003831

**From:** Farrell, Chris
**To:** Kinard, Donald W CIV USARMY CESAJ (US); Navigability Determination; SAJ-RD
**Subject:** [Non-DoD Source] Navigable Waters identification for Florida
**Date:** Tuesday, April 17, 2018 5:24:34 PM
**Attachments:** Audubon FL comments on Navigable Waters.docx

Mr. Kinard,

Attached please find comments from Audubon Florida regarding the identification of navigable waters in Florida as it pertains to the pending assumption of 404 permitting by the State of Florida.

Thank you,

---

Chris Farrell

Northeast Florida Policy Associate

Audubon Florida

cfarrell@audubon.org

904-325-9940

fl.audubon.org



April 17, 2018

Mr. Donald W. Kinard
Chief, Regulatory Division
Jacksonville District Corps of Engineers
P. O. Box 4970
Jacksonville, FL 32232-0019

RE: Comments regarding the Determination of Navigable Waters in Florida

Dear Mr. Kinard,

As the State of Florida moves toward assumption of the Section 404 Program of the Clean Water Act (CWA), a determination must be made regarding which waters are to remain within federal jurisdiction. Audubon Florida appreciates the importance of this effort and thanks the Corps for soliciting input from the public. We also support and anticipate a public process leading to the creation of the related Memoranda of Agreement between the state and federal agencies.

We offer the following comments on the creation of the navigable waters list. In general, Audubon supports the positions put forth by the Corps in the Final Report of the Assumable Waters Subcommittee in 2017 and believes this reasoning should be the basis for the current effort. Listed below are the steps we feel the Corps should take to create the list of the waters and wetlands to remain within their administrative authority.

1. **Begin with the waters listed on the "Supplement to the Jacksonville District Navigable Waters Lists" dated October 5, 2017.**

The October 5, 2017 list should represent the baseline from which to build the complete list of retained waters. This list should be augmented with additions based on the suggestions that follow.

2. **Add waters on Indian lands that are assumable by tribes under the CWA section 404.**

Since tribes could request assumption of waters on their lands at a future date they should remain under the authority of the Corps.

3. **The Corps should retain wetlands adjacent to navigable waters according to the guidance and process that has been in place for many years.**

Wetlands considered adjacent to a navigable water are those that contribute to its continued navigability. Changes in the conditions of these wetlands will have direct impacts on navigable waters and should be included in the list of retained waters under authority of the Corps. Given Florida's unique, highly transmissive karst geology, the identification of adjacent waters should go beyond a simple examination of distance from a navigable water and should consider groundwater flow.

4. **The Corps should add waters and wetlands that are connected to recreation and tourism, Florida's primary industry and chief source of interstate and international commerce.**

The EPA defines "Waters of the U.S." in part by their use for interstate and international commerce, including recreation and travel tourism (emphasis added):

*40 CFR 230.3(s) The term waters of the United States means:*

1. *All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;*
2. *All interstate waters including interstate wetlands;*
3. *All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:*
   a. ***Which are or could be used by interstate or foreign travelers for recreational or other purposes; or***
   b. *From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or*
   c. *Which are used or could be used for industrial purposes by industries in interstate commerce;*

Accordingly, the Corps' Section 10 criteria must ensure that navigable waters and their adjacent wetlands which support tourism and recreational use are not assumable by the state. These uses, especially throughout Florida, clearly involve interstate and international commerce.

Thank you for considering our comments. Florida's assumption of Section 404 permitting will be very complex and will require careful development to ensure state implementation will be no less protective than existing federal standards. A public process to develop this assumed program will be essential. Please keep Audubon Florida apprised of continued work on this issue as it of great importance to our organization and our members throughout the state.

Sincerely,

Julie Wraithmell
Interim Executive Director

| | |
|---|---|
| **From:** | Jacki Lopez |
| **To:** | Navigability Determination; Kirk, Jason A COL USARMY CESAJ (US) |
| **Subject:** | [Non-DoD Source] Florida assumption of delegation of Section 404 Dredge and Fill Permitting authority - comment letter |
| **Date:** | Wednesday, April 18, 2018 12:18:32 PM |
| **Attachments:** | 404 assumption comments.pdf |

Dear Colonel Kirk:

I am pleased to present you the following comments on behalf of the Center for Biological Diversity (Center) regarding the navigability of waters in the State of Florida within the meaning of Section 10 of the Rivers and Harbors Act of 1899 (RHA), 33 U.S.C. § 403, for purposes of determining the U.S. Army Corps of Engineers' (Corps) jurisdiction should the U.S. Environmental Protection Agency (EPA) grant Florida's anticipated request to administer its own permitting program under Section 404(a) of the Clean Water Act of 1972 (CWA), 33 U.S.C. § 1344, in waters of the United States.

The Center opposes Florida's attempt to assume jurisdiction over Section 404 permitting. Florida's waters are uniquely complex and assumption would imperil important water resources. Any process to allow assumption must ensure a broad, transparent, comprehensive assessment based in science, and informed by public participation. The Corps must retain the maximum jurisdiction possible under federal law in the Nation's interest.

Further, the Center requests that the Corps complete its inventory of Florida's navigable waters before any actions take place with regard to the assumption of delegation of Section 404 dredge and fill permitting authority by Florida's Department of Environmental Protection (FDEP).

The Center incorporates by reference and adopts the comment letters submitted by the Florida Sierra Club, EarthJustice (on behalf of Florida Wildlife Federation, Conservancy of Southwest Florida, Miami Waterkeeper, and St. Johns Riverkeeper), and the Florida Conservation Coalition.

Please keep us informed of any future efforts with respect to assumption and determination of navigable waters.

Sincerely,

Jaclyn Lopez, Florida Director

Center for Biological Diversity

P.O. Box 2155

St. Petersburg, Florida 33731

jlopez@biologicaldiversity.org <mailto:jlopez@biologicaldiversity.org>

727-490-9190

CENTER for BIOLOGICAL DIVERSITY                    *Because life is good.*

*Sent via Emailt*

April 17, 2018

Colonel Jason A. Kirk, District Commander;
Department of the Army
Jacksonville District Corps of Engineers
ATTN: Determination of Navigable Waters
P.O. Box 4970
Jacksonville, FL 32232-0019
Navigability_Determination@usace.army.mil
Jason.a.kirk@usace.army.mil

**Re:  Proposed Florida Department of Environmental Protection's assumption of delegation of Section 404 Dredge and Fill Permitting authority; Jacksonville District Corps of Engineers Public Notice dated March 19, 2018 seeking public comment regarding Determination of Navigable Waters; Jacksonville District Corps of Engineers Public Notice dated April 10, 2018 titled Cessation of Public Comment Period**

Dear Colonel Kirk:

I am pleased to present you the following comments on behalf of the Center for Biological Diversity (Center) regarding the navigability of waters in the State of Florida within the meaning of Section 10 of the Rivers and Harbors Act of 1899 (RHA), 33 U.S.C. § 403, for purposes of determining the U.S. Army Corps of Engineers' (Corps) jurisdiction should the U.S. Environmental Protection Agency (EPA) grant Florida's anticipated request to administer its own permitting program under Section 404(a) of the Clean Water Act of 1972 (CWA), 33 U.S.C. § 1344, in waters of the United States.

The Center opposes Florida's attempt to assume jurisdiction over Section 404 permitting. Florida's waters are uniquely complex and assumption would imperil important water resources. Any process to allow assumption must ensure a broad, transparent, comprehensive assessment based in science, and informed by public participation. The Corps must retain the maximum jurisdiction possible under federal law in the Nation's interest.

Further, the Center requests that the Corps complete its inventory of Florida's navigable waters before any actions take place with regard to the assumption of delegation of Section 404 dredge and fill permitting authority by Florida's Department of Environmental Protection (FDEP).

The Center incorporates by reference and adopts the comment letters submitted by the Florida Sierra Club, EarthJustice (on behalf of Florida Wildlife Federation, Conservancy of Southwest

*Alaska · Arizona · California · Florida · Minnesota · Nevada · New Mexico · New York · Oregon · Vermont · Washington, DC*

Jaclyn Lopez, Staff Attorney Florida Director · P.O. Box 2155 · St. Petersburg, FL 33731
Phone: 727-490-9190 · jlopez@biologicaldiversity.org

CORPS003848

Florida, Miami Waterkeeper, and St. Johns Riverkeeper), and the Florida Conservation Coalition.

Please keep us informed of any future efforts with respect to assumption and determination of navigable waters.

Sincerely,

Jaclyn Lopez, Florida Director
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, Florida 33731
jlopez@biologicaldiversity.org
727-490-9190

CORPS003849

| | |
|---|---|
| **From:** | amber crooks |
| **To:** | Navigability Determination; Currie, Steven J CIV USARMY CESAJ (US); White, Tori K CIV USARMY CESAJ (US) |
| **Cc:** | Kinard, Donald W CIV USARMY CESAJ (US); "Mcgill,Thomas@epa.gov"; Kirk, Jason A COL USARMY CESAJ (US) |
| **Subject:** | [Non-DoD Source] Conservancy of Southwest Florida additional comment re: Navigable Waters in Florida |
| **Date:** | Wednesday, April 18, 2018 5:19:24 PM |
| **Attachments:** | 5 County area.pdf |
| | 515_Charlotte County Blueways1.pdf |
| | Collier blueway_overview.pdf |
| | Jacksonville District Section 10 Waters_6 page.pdf |
| | Jacksonville District Section 10 Waters_17 page_2017.pdf |
| | Great Calusa Blueway.pdf |
| | 4-18-18 CSWFL letter re ACOE navigability.pdf |

Hello,

Please see the attached public comments on behalf of the Conservancy of Southwest Florida and our supporters. This submittal (a total of 7 pdf documents are attached on this email) is in response to the Army Corps of Engineers March 19, 2018 request for public input regarding navigable waters in Florida.

Feel free to contact me if you have any questions.

Sincerely,

Amber Crooks

Amber Crooks, Environmental Policy Manager

Conservancy of Southwest Florida

1495 Smith Preserve Way

Naples, FL 34102

(239)262-0304 ext. 286

amberc@conservancy.org <mailto:amberc@conservancy.org>

Blockedwww.conservancy.org <Blockedhttp://www.conservancy.org/>

 <Blockedhttp://www.conservancy.org/>

Protecting Southwest Florida's unique natural
environment and quality of life…now and forever.

Please consider the environment before printing this e-mail

003840
CORPS003851



Florida Waterways: Charlotte County, 2008
Florida Center for Instructional Technology, (Tampa, FL: University of South Florida, 2008)
Downloaded from *Maps ETC*, on the web at http://etc.usf.edu/maps    [map #f11221]

003841

CORPS003852



Florida Waterways: Collier County, 2008
Florida Center for Instructional Technology, (Tampa, FL: University of South Florida, 2008)
Downloaded from *Maps ETC*, on the web at http://etc.usf.edu/maps    [map #f11224]

003842

CORPS003853



Florida Waterways: Glades County, 2008
Florida Center for Instructional Technology, (Tampa, FL: University of South Florida, 2008)
Downloaded from *Maps ETC*, on the web at http://etc.usf.edu/maps    [map #f11234]

003843

CORPS003854



Florida Waterways: Hendry County, 2008
Florida Center for Instructional Technology, (Tampa, FL: University of South Florida, 2008)
Downloaded from *Maps ETC*, on the web at http://etc.usf.edu/maps     [map #f11238]



Florida Waterways: Lee County, 2008
Florida Center for Instructional Technology, (Tampa, FL: University of South Florida, 2008)
Downloaded from *Maps ETC*, on the web at http://etc.usf.edu/maps    [map #f11248]

003845

CORPS003856



Charlotte County
Parks & Recreation

Blueway
Trails

003846

# Charlotte County Blueway Facilities

## How to Use This Guide

This guide provides information on the excellent paddling opportunities in and around the Charlotte Harbor estuary. Charlotte County's shoreline is divided into the following four distinct sections: Charlotte Harbor section, Coastal section, Myakka River section, and Peace River section. The trail routes in each section are shown in color on the aerial photomap. Trails are numbered to correspond with the information provided in the table. The information table shows the trail name, length, classification, accessibility, and the trail's scenic rating. A lettered facility guide is provided to show launch areas, type of access, and amenities such as water, food, and phone locations along the trails.

## Explanation of Classifications

These guidelines are for educational purposes only. They are not intended to provide a basis for evidence of responsibility or negligence in any legal action. Use of the Blueway Trails is at the user's own risk. Each area and each situation may require different responses and judgments by the user based on his/her ability and current evaluation of the situation. Factors that can change the classification of a trail include weather, time of year, time of day, group and individual needs.

**BEGINNER:** Involves gentle paddling in lakes, deltas, creeks and embayments, in inhabited, non-challenging, protected waterways exposed to slight currents or tides. Such trips are usually undertaken for a secondary purpose such as birding, fishing, or photography. Trips will generally require less than two (2) hours of paddling.

**NOVICE:** Involves protected water in lightly populated areas with occasional exposure to moderate currents or tides. Sheltered coves or landing areas are available every mile or so with no crossing greater than two miles. Trips will generally require less than four (4) hours. On-board water and snacks are recommended.

**INTERMEDIATE:** Involves exposure to open water subject to moderate currents, tides and wind. Landing areas may be unavailable for up to five miles. Moderate hazards may exist such as bottom conditions and unrestricted motorboat traffic. Trips will generally require less than six (6) hours. Trail may be difficult to follow. On-board food and water is required.

**EXPERT:** Involves exposure to broad reaches of open water with potential for heavy currents, tides, wind and surf. Areas may be remote with assistance more than four hours away. Landing areas are not predictable. Uncharted hazards and conditions may exist. Trips may exceed eight (8) hours. Thorough knowledge of trail route and conditions is required. On-board food and water is required.

| | Facility | Access | Rest Rooms | Water | Food | Phone |
|---|---|---|---|---|---|---|
| A | Middle Beach<br>Manasota Key Dr., Englewood | Sand Ramp | Yes | Fountain | No | Coin |
| B | Indian Mound Park<br>210 Winson Ave., Englewood | Boat Ramp | Yes | No | No | No |
| C | Tom Adams Bridge<br>S.R. 776, Englewood | Boat Ramp | No | No | No | No |
| D | Rocky Creek Marina<br>1990 Placida Rd., Placida | Dock | Yes | Bottled | No | Coin |
| E | Ainger Boat Ramp<br>2025 Placida Rd., Englewood | Boat Ramp | No | No | No | No |
| F | Beach Place<br>1863 Gulf Blvd., Englewood | Public Beach | No | No | No | No |
| G | Cedar Point Park<br>2300 Placida Rd., Englewood | Dock | Yes | Fountain | No | No |
| H | Stump Pass Park<br>Manasota Key Rd., Englewood | Beach | Yes | No | No | No |
| I | Panama Blvd.<br>West end of Panama Blvd., Rotonda | Roadside | No | No | No | No |
| J | Grande Tours<br>12575 Placida Rd., Placida | Sand Ramp | Yes | Bottled | No | Office |
| K | Gasparilla Marina<br>15001 Gasparilla Rd., Placida | Boat Ramp | Yes | Bottled | Snacks | Coin |
| L | Placida Ramp<br>Boca Grande Causeway, Placida | Boat Ramp | No | No | No | No |
| M | Uncle Henry's Marina<br>5800 Gasparilla Rd., Placida | Boat Ramp | Yes | No | No | Coin |
| N | Port-O-Call Marina<br>4230 S.R. 776, El Jobean | None | Yes | Bottled | Snacks | Coin |
| O | El Jobean Ramp<br>4333 Kerrigan Cir., El Jobean | Boat Ramp | Yes | No | No | Coin |
| P | Spring Lake Ramp<br>20080 Edgewater Dr., Port Charlotte | Boat Ramp | No | No | No | No |
| Q | Port Charlotte Beach<br>4500 Harbor Blvd., Port Charlotte | Ramp & Beach | Yes | Fountain | Vending | Coin |
| R | Sea Horse Marina<br>4999 Tamiami Trl., Port Charlotte | Beach | No | No | No | No |
| S | Harbour Heights Park<br>27420 Voyageur Dr., Harbour Heights | Boat Ramp | Yes | No | No | Coin |
| T | Nav-A-Gator Grill<br>9700 S.W. Riverview Cr., Arcadia | Boat Ramp | Yes | Bottled | Bar & Grill | Coin |
| U | Farm Store U.S. 17<br>N End of Washington Loop Rd., Punta Gorda | None | Yes | Bottled | Snacks | Coin |
| V | Shell Creek Lodge<br>3269 Duncan Rd. Hwy. 17, Punta Gorda | Floating Dock | Yes | Hose | No | Office |
| W | Prairie Creek Access<br>Off Washington Loop Rd., Punta Gorda | Roadside | No | No | No | No |
| X | Hathaway Park<br>35461 Washington Loop Rd., Punta Gorda | Boat Ramp | Yes | No | No | No |
| Y | Tower Garden Lagoon<br>Riverside Dr. & U.S. 17, Punta Gorda | Boat Ramp | Yes | Hose | Bar & Grill | Coin |
| Z | Riverside Ramp<br>Riverside Dr., Punta Gorda | Boat Ramp | No | No | No | No |
| AA | Darst Ramp<br>537 Darst Ave., Punta Gorda | Boat Ramp | No | No | No | No |
| BB | Laishley Park<br>E. Marion Ave., Punta Gorda | Boat Ramp | Yes | No | No | No |
| CC | Fishermen's Village<br>1200 W. Retta Esplanade, Punta Gorda | Dock | Yes | No | No | Office |
| DD | Ponce de Leon Park<br>4000 W. Marion Ave., Punta Gorda | Boat Ramp | Yes | Fountain | No | Coin |
| EE | Wisteria Road<br>End of Wisteria, of Rio Villa, Punta Gorda | Boat Ramp | No | No | No | No |
| FF | Taylor Rd. access<br>Taylor Rd., Punta Gorda | Riverbank | No | No | No | No |
| GG | Burnt Store Marina<br>5000 Burnt Store Rd, Punta Gorda | Boat Ramp | Yes | Bottled | Sit Down | Coin |
| HH | Pirate Harbor<br>Jolly Rodger Blvd., Punta Gorda | Roadside | No | No | No | No |
| II | Allapatchee Shores Park<br>3100 Hickory Ct., Punta Gorda | Launch w/ dock | No | No | No | No |

003847

# Charlotte County Blueway Trails

| | Trail Name | Length | Difficulty | Interpretive | | Access | | Scenic | | Overall Rating |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Rock Creek | 2.1 miles | Beginner | B,H,M | 5 | Good | 6 | Wild/Dev | 5 | 5 |
| 2 | Stump Pass | 2.2 miles | Novice | M,B,F,GB | 9 | Good | 7 | Wild/Dev | 8 | 8 |
| 3 | Oyster Creek | 1.6 miles | Beginner | M,B,F | 6 | Poor | 4 | Wild/Dev | 6 | 5 |
| 4 | Intra Coastal | 18.2 miles | Novice | M,B,F,GB | 8 | Fair | 4 | Open/Dev | 6 | 6 |
| 5 | Don Pedro Island | 2.9 miles | Novice | B,M,F | 8 | Fair | 7 | Developed | 8 | 8 |
| 6 | Little Gasparilla | 2.4 miles | Novice | B,F,GB | 7 | Good | 7 | Developed | 6 | 7 |
| 7 | W. Coral Creek | 1.5 miles | Beginner | M,B,F,GB | 8 | Very Good | 8 | Developed | 8 | 8 |
| 8 | E. Coral Creek | 1.8 miles | Beginner | M,B,F,GB | 8 | Very Good | 8 | Developed | 8 | 8 |
| 9 | Grande Tours | .8 miles | Beginner | M,B,F,GB | 7 | Very Good | 9 | Developed | 6 | 8 |
| 10 | Woolveton | 1.7 miles | Novice | M,B | 9 | Good | 8 | Wild | 9 | 9 |
| 11 | M. Cantelas | 4.3 miles | Novice | B,F | 8 | Good | 7 | Wild/Dev | 7 | 7 |
| 12 | Catfish Creek | 2.5 miles | Beginner | M,G,F | 8 | Good | 8 | Wild | 8 | 8 |
| 13 | Boggess Hole | 1.6 miles | Novice | B,M,F | 9 | Good | 9 | Wild | 9 | 9 |
| 14 | Boca Grande | 4.9 miles | Novice | B,F,M | 7 | Good | 7 | Wild/Dev | 8 | 7 |
| 15 | Widden Creek | 2.2 miles | Novice | M,B,F,GB | 9 | Good | 8 | Wild | 8 | 9 |
| 16 | Bird Key | 0.8 miles | Novice | B | 9 | Good | 7 | Wild | 9 | 8 |
| 17 | Bull Bay Bypass | 2.4 miles | Novice | B,F,M | 9 | Good | 8 | Wild | 9 | 9 |
| 18 | Bull Bay | 4.9 miles | Novice | M,B,F,GB | 9 | Good | 8 | Wild | 9 | 9 |
| 19 | Shallow Water | 2.9 miles | Novice | M,B,F | 9 | Good | 8 | Wild | 9 | 9 |
| 20 | Turtle Bay | 4.4 miles | Novice | M,B,F,GB | 9 | Good | 9 | Wild | 9 | 9 |
| 21 | Sister Pond | 2.7 miles | Novice | M,B,F | 9 | Good | 8 | Wild | 9 | 9 |
| 22 | West Wall | 15.6 miles | Expert | B,M,GB,H | 9 | Good | 6 | Wild | 8 | 8 |
| 23 | Santa Fe | 8.3 miles | Beginner | B,M,MR | 6 | Poor | 5 | Wild/Dev | 6 | 6 |
| 24 | Trout Creek | 1.6 miles | Intermediate | B,M,F | 9 | Good | 8 | Wild | 8 | 8 |
| 25 | Interceptor | 2.7 miles | Beginner | B,M,MR | 6 | Poor | 5 | Wild/Dev | 6 | 6 |
| 26 | Myakka River | 5.2 miles | Intermediate | B,H | 7 | Poor | 5 | Developed | 7 | 6 |
| 27 | Tippecanoe | 2.5 miles | Novice | B,M,F,MR | 9 | Fair | 5 | Wild | 8 | 8 |
| 28 | Ghost Point | 2.8 miles | Novice | B,M,F | 7 | Good | 6 | Developed | 9 | 7 |
| 29 | Sasha's | 1.0 miles | Novice | B,M | 8 | Good | 6 | Wild | 9 | 8 |
| 30 | Arapahoe | 5.0 miles | Beginner | M,F | 6 | Poor | 4 | Developed | 9 | 5 |
| 31 | Three Lakes | 1.2 miles | Novice | B,M,F | 8 | Good | 8 | Wild | 5 | 8 |
| 32 | Myakka Cutoff | 4.6 miles | Intermediate | B,M,F | 8 | Good | 8 | Wild | 8 | 8 |
| 33 | Muddy Cove Cut | 1.1 miles | Novice | B,M,F | 6 | Good | 7 | Wild | 7 | 7 |
| 34 | Lewis Creek | 1.9 miles | Novice | B,M,F | 6 | Good | 7 | Developed | 6 | 6 |
| 35 | W. Spring Lake | 2.3 miles | Beginner | B,M | 7 | Very Good | 9 | Wild/Dev | 8 | 8 |
| 36 | E. Spring Lake | 1.5 miles | Beginner | B,M | 7 | Very Good | 9 | Wild/Dev | 8 | 8 |
| 37 | Parks & Recreation | 4.7 miles | Novice | M,B,F,GB | 8 | Very Good | 8 | Developed | 7 | 7 |
| 38 | Harbour Heights | 5.6 miles | Novice | B,M,F,MR | 7 | Good | 7 | Wild/Dev | 7 | 7 |
| 39 | Peace River | 4.2 miles | Novice | B,F,A,C,MR | 9 | Good | 8 | Wild | 9 | 9 |
| 40 | Deep Creek | 5.0 miles | Novice | B,A,C | 9 | Good | 8 | Wild | 9 | 9 |
| 41 | Outer Shell Creek | 3.9 miles | Novice | B,A,MR | 8 | Good | 8 | Wild | 8 | 8 |
| 42 | Prairie Creek | 6.1 miles | Novice | B,A,C | 9 | Good | 7 | Wild | 8 | 8 |
| 43 | Shell Creek | 6.7 miles | Intermediate | B,A,C | 8 | Good | 8 | Wild | 8 | 8 |
| 44 | Upper Shell Creek | 2.2 miles | Intermediate | B,A,C | 8 | Good | 8 | Wild | 9 | 8 |
| 45 | Tranquility Island | 6.3 miles | Novice | B,F,MR,M | 7 | Good | 7 | Wild/Dev | 7 | 7 |
| 46 | Explorer Trail | 3.5 miles | Intermediate | B,F,GB,M | 7 | Poor | 6 | Wild/Dev | 7 | 7 |
| 47 | Alligator Creek | 3.2 miles | Novice | B,F,M | 8 | Fair | 6 | Wild/Dev | 9 | 7 |
| 48 | East Wall | 8.3 miles | Expert | B,M,F | 9 | Poor | 4 | Wild | 9 | 7 |
| 49 | Gasper | 0.7 miles | Intermediate | B,M,F | 9 | Poor | 4 | Wild | 9 | 7 |
| 50 | Mosquito | 1.3 miles | Intermediate | B,M,F | 9 | Poor | 4 | Wild | 9 | 7 |
| 51 | Spider | 3.5 miles | Intermediate | B,M,F | 9 | Poor | 4 | Wild | 9 | 7 |
| 52 | Pirate Harbor | 4.9 miles | Intermediate | B,M,F | 9 | Poor | 4 | Wild | 9 | 7 |
| 53 | Allapatchee Shores | 1.6 miles | Novice | B,F,M | 7 | Fair | 6 | Wild/Dev | 7 | 7 |

Rating System:  1 - Poor     9 - Excellent

F – Fishing,   B – Birds,   A – Alligators,   Ms – Marsh,   GB – Grass Beds,   M – Mangrove,   C – Cypress,   H – History,   O – Oak Hammock

003848

# Habitats You Can Expect to See

## SEAGRASS BEDS



**Seagrasses** are underwater flowering plants that inhabit the nearshore areas of our coastal waters. They are predominantly found in protected bays and lagoons where the water is fairly clear and wave action is moderate. The four most common types of seagrasses that occur in southwest Florida and the Charlotte Harbor area are **shoal grass** (*Halodule wrightii*), **turtle grass** (*Thalassia testudinum*), **manatee grass** (*Syringodium filiforme*), and **widgeon grass** (*Ruppia maritima*). They can form thick, expansive areas known as **seagrass beds** or **meadows.**

Seagrass beds are of vital importance to the health of our estuarine waterways. Seagrasses form the base of a large underwater community. Dense seagrass beds serve as a lifelong shelter for many species of small fish and invertebrates. Many recreational marine fish species are dependent upon seagrass beds at some stage of their life. Seagrasses can also help to improve water quality by stabilizing bottom sediments.

Seagrass beds are fragile and extremely vulnerable to human impacts. Boat propellers and anchors can cut through seagrass blades and roots. Damage from "prop dredging" can take up to ten years to recover. Utilization of best management practices during construction activities, control of contaminants such as fertilizers from entering area waterways, and safe boating practices are necessary in order to preserve and protect our seagrass beds.

## SALT MARSHES



**Salt marshes** are **tidal wetlands** that occur along low-energy coastlines and river shorelines. They are characterized as expanses of grasses, rushes, and sedges, and are usually found in the zone between low and high tide. Typical plant species found in our area salt marshes include **smooth cordgrass** (*Spartina alterniflora*), **black rush** (*Juncus roemerianus*), **salt meadow cordgrass** (*Spartina patens*), **salt grass** (*Distichlis spicata*), and **salt wort** (*Batis maritima*).

Salt marshes are one of our most biologically productive ecosystems. Movement of the tides distributes decomposing plant material through the salt marsh, providing food for many species of animals and forming the base of the marsh food web. The salt marsh serves as a nursery for several species of fish, crabs, and shellfish. Many species of birds forage and nest in salt marshes. Salt marshes also buffer upland areas from storm surge, helping to protect homes and other developments.

Despite their ecological importance, nearly half of all of Florida's marshes, both saltwater and freshwater, have been lost to development, dredging, and mosquito control impoundments during this century.

## MANGROVE FORESTS



**Mangrove forests,** or **mangrove swamps,** are also tidal wetlands that inhabit low energy shorelines in the coastal areas of southwest Florida. Mangrove trees are specially adapted to salt- and brackish-water environments. Although there are more than 50 species of mangroves that grow in tropical climates worldwide, there are four species found in our area: **red mangrove** (*Rhizophora mangle*), **black mangrove** (*Avicennia germinans*), **white mangrove** (*Laguncularia racemosa*), and **buttonwood** (*Conocarpus erecta*).

Red mangroves grow at the water's edge, and are nicknamed "the walking tree" for their long, dark-red, aerial prop-roots. In the summer months, they produce pencil-shaped seedlings, or **propagules**. One red mangrove seedling can be the start of a new island. Black mangroves have a dark trunk, and may grow to be 60 feet tall. Their extensive root system has finger-like projections called **pneumatophores** that stick out of the sand by up to six inches. White mangroves are usually found growing landward of red and black mangroves and can be distinguished by their rounded, bright-green leaves. Buttonwood trees inhabit areas landward of the other mangroves, well above high tide and often in uplands. A variety of this tree, silver buttonwood, is a common specimen tree or hedge and has silvery, soft leaves.

Mangrove forests are very high in ecological value, and contribute much to the health of our waterways and local economy. Their root systems stabilize shoreline areas, buffer storm surge, and help to prevent erosion. They provide nesting sites for shorebirds, and habitat and nursery grounds for many species of fish and invertebrates.

As with our other significant coastal habitats, the importance and beauty of mangroves have not always been recognized. Although now protected by State law, vast areas of mangrove forests have been lost over the last 50 years due to development, and trimmed or severely altered for creation of waterway views.

# History of the Area

The historical and archeological record of the area dates back some 3,000 years. The Native people, either the Calusa or Timucua aborigines first inhabited the area. These natives built numerous shell mounds and established camps along the harbor. The first Europeans to visit the area were Spaniards including Ponce de Leon and Hernando de Soto. In 1566-67 the Spaniard Menendez explored the area and named the harbor San Carlos Bay. In 1774 the English explorer Bernard Romans surveyed the area and renamed it Charlotte Harbor in tribute to Queen Charlotte Sophia, wife of King George III. America took possession of Florida in 1819.

In 1862 during the Civil War, Joel and Thomas Knight constructed a cattle dock on the northern shore of Charlotte Harbor. The dock was used by the Confederacy to load the schooners running the union blockade at Boca Grande. Cattle and cotton were shipped to Cuba in support of the Confederate market. Homes were built in the area surrounding the dock. This first settlement was known as Charlotte Harbor Town and is located in the triangle area formed by Charlotte Harbor, US 41 and Edgewater Road.

*For more information on environmental parks and upcoming programs in Charlotte County contact:*
**Charlotte County Parks & Recreation Department Administrative Offices**
2300 El Jobean Road, Port Charlotte, FL  33948     (941) 625-PLAY (7529)     Fax (941) 235-3196     www.charlottecountyfl.com

003849



**Legend**
- Everglades City to Goodland
- Goodland-Coon Key Loop
- Collier-Seminole State Park-Blackwater River
- Port of the Islands to Panther Key
- Everglades City to Sandfly Island
- Chokoloskee to Rabbit Key
- Turner River
- Road

*GULF OF MEXICO*

0  0.5  1    2    3    4
Miles

003850

CORPS003861



# The Great Calusa Blueway - Estero Bay

NATIONAL RECREATION TRAIL USA
Summerlin Rd.
Ten Mile Canal
Alico Rd.
Bunche Beach
N26 28 42 W81 58 21 48
Channel Crossing Navigate With Care
Hurricane Bay
Hendry Creek
Mullock Creek
SAN CARLOS PARK
Matanzas Pass
45 N26 20 05 W81 57 28
San Carlos Island
Bowditch Point
40 N26 27 23 W81 55 33
Estero Bay Preserve State Park
Hell Peckney Bay
FORT MYERS BEACH
Estero Blvd.
Estero Island
29 N26 26 18 W81 53 03
Estero River
Decibels Rocks
26 N26 25 57 W81 51 40
21 N26 25 40 W81 51 17
Estero Bay Aquatic Preserve
Mound Key
Coon Key
22 N26 24 42 W81 52 33
13 N26 24 14 W81 52 42
Portage Required
ESTERO
Big Carlos Pass
Black Island
Lovers Key
14 N26 22 47 W81 50 22
7 N26 22 19 W81 50 23
8 N26 22 13 W81 51 13
New Pass
Spring Creek
Big Hickory Island
Big Hickory Pass
Little Hickory Island
BONITA SPRINGS
Bonita Beach
Intrepid Waters
N26 20 14 W81 50 09
Imperial River
Fish Trap Bay
Bonita Beach Rd.
LEE CO.
COLLIER CO.
THE GREAT CALUSA BLUEWAY
1
Estimated mile marks
Advanced paddlers
No trail markers
Trail marker
GPS coordinates
Channels
Major boating channels
MARKER 2 GREAT CALUSA BLUEWAY
Trail markers
Selected markers shown
Accessible Public Land
County sites
State sites
Wading Bird Feeding & Loafing Areas
At low and medium tides, these areas are the main formations of oyster beds in Estero Bay, providing habitat for all species of shellfish feeders, probers and fish foragers.
TRAIL MARKER NOTE
Please note that trail markers are not numbered sequentially due to forks in the trail
NOT FOR NAVIGATIONAL USE
For local navigation charts, see those listed below:
NOAA Charts:
#11426 Charlotte Harbor - Estero Bay
#11427 ICW from Estero to Boca Grande
Waterproof Charts:
#15F Fish Dive Sites- Marco to Tampa
#20 ICW Fort Myers to Stewart
#21 ICW Fort Myers to Tampa
#25 Cape Romano to Boca Grande
#121F Sanibel To Venice
N E S W
MILES
1 0 1 2
41
41B
75
Great Florida Birding Trail
www.floridabirdingtrail.com
Florida Greenways & Trails
www.dep.state.fl.us/gwt/guide/
003851

## Highlights & Access Points

**1 SAN CARLOS BAY - BUNCHE BEACH PRESERVE**
**GPS: N26 28 34 W81 58 02**
This Lee County property offers varied ecosystems including sandy beaches, salt flats and mangroves. The 730-acre site offers excellent opportunities for observation of shorebirds. Kayak / SUP rentals and guided trips available through concessionaire Kayak Excursions, 239-297-7011.
**239-533-7444.**

**2 BOWDITCH POINT REGIONAL PRESERVE**
**GPS: N26 27 48 W81 57 58**
An unspoiled 17-acre Lee County recreation area with sandy beaches on both the bay and the gulf, and a boardwalk to the beach. Grills, changing facilities and outdoor showers are available. Named for the famous navigator, Nathaniel Bowditch. **239-533-7444.**

**3 HOLIDAY ADVENTURE TOURS & BOAT RENTAL AT PINK SHELL RESORT & MARINA**
**GPS: N26 27 38 W81 57 51**
Kayak / SUP rentals, boat rentals, fishing charters, parking (fee) and beachside restaurants. Second location at Best Western Plus Beach Resort. **239-463-8661.**

**4 SAN CARLOS RV PARK & ISLAND RESORT**
**GPS: N26 28 05 W81 56 54**
Camp or stay in rentals in family-owned and operated resort surrounded by the bay. Tenters welcome. Stay along the water's edge and for paddling, fishing and birding. Launch sites for guests of campground only.
**239-466-3133 or 800-525-7275.**

**5 SALTY SAM'S MARINA**
**GPS: N26 27 28 W81 56 36**
In addition to kayak rentals, this marina offers boat/paddle craft launching (fee), parking (fee), food, restaurant, and powerboat rentals. **239-463-7333.**

**6 MATANZAS PASS PRESERVE**
**GPS: N26 27 05 W81 56 11**
A 60-acre preserve where visitors can explore a maritime oak hammock and mangrove forest via two miles of boardwalk, which includes paddle craft landing. Historic cottage on site.
**239-533-7444.**

**7 MOUND HOUSE**
**GPS: N26 26 46 W81 55 39**
Explore the culture and natural environment of Fort Myers Beach through hands-on experiences atop a 2,000 year old Calusa Indian Shell Mount. This unique archaeological and historical site located directly off Estero Bay, offers guided kayak tours, boat tours, beach walks and museum programs. Grounds open daily, sunrise to sunset for launching. www.moundhouse.org
**239-765-0865.**

**8 LOVERS KEY STATE PARK**
**GPS: N26 23 29 W81 50 23**
Gulf to bay state park offers a variety of amenities. Three launch sites within park, which has three entrances; admission fee. **239-463-4588.** Kayak, canoe and SUP rentals and guided tours available through Nature Recreation Management of Lee County. 239-765-7788.

**9 DOG BEACH**
**GPS: N26 22 49 W81 51 44**
Dogs run free in this beach setting on protected water. Launch bayside across from Dog Beach. **239-533-7444.**

**10 BIG HICKORY ISLAND AREA LAUNCHES**
**GPS: N26 22 0 W81 51 24**
Squaw Creek
**GPS: N26 22 34 W81 51 37**
Big Hickory Island West
**GPS: N26 22 49 W81 51 42**
Kayak Beach
Primitive launches with free parking and access to barrier island beach of Big Hickory. Landmark is the Bonita Springs water tower.
**239-533-7444.**

**11 BOW TIE ISLAND**
**GPS: N26 22 35 W81 51 13**
Blueway Marker 8 is near this primitive site for tent camping, picnicking and landing. Practice Leave No Trace principles.
**239-533-7444.**

**12 MOUND KEY ARCHAEOLOGICAL STATE PARK**
**GPS: N26 25 12 W81 51 43**
This man-made island, consisting of large shell middens rising as high as 31 feet, is one of the foremost preserved sites within the Calusa domain. Mound Key is believed to be the capital of the Calusa when the Spanish arrived in Florida and the location of the first Jesuit mission in the Spanish New World. Accessible only by boat; canoe and kayak landings are located at trail heads on the northwest and southeast portions of the island.
**239-992-0311.**

**13 ESTERO RIVER SCRUB**
**GPS: N26 26 21 W81 50 24**
Part of Estero Bay Preserve State Park, this site features six miles of hiking, mountain biking and running trails through 1,260 acres of scrub habitat. These scrub ridges are historic dune systems providing habitat for gopher tortoises and other plants and animals that tolerate dry conditions. Paddlecraft landing only. **239-992-0311.**

**14 KORESHAN STATE HISTORIC SITE**
**GPS: N26 26 11 W81 49 10**
One of Florida's most unusual riverside parks features the remains of a utopian pioneer settlement founded in 1894 by Dr. Cyrus Teed. The group was based on a religious illumination that led the Koreshans to believe that the earth was a hollow sphere with life existing on the interior surface. Canoe / kayak rentals and tours are available through concessionaire College of Life Foundation, 239-992-2184. Entrance fee.
**239-992-0311.**

**15 ESTERO RIVER CANOE & TACKLE OUTFITTERS**
**GPS: N26 26 06 W81 48 38**
Canoe, kayak and SUP rentals / sale. Fully stocked fishing tackle shop.
**239-992-4050.**

**16 MULLOCK CREEK MARINA**
**GPS: N26 28 25 W81 51 6**
Small "Old Florida" paddle friendly marina with backwater access to eastern Estero Bay. Canoe and Kayak rentals, live bait, cold beverages and snacks. **239-992-3945.**

**17 FISH TRAP MARINA**
**GPS: N26 19 21 W81 49 55**
Paddlecraft launching allowed. Parking limited. Fully stocked bait and tackle shop.
**239-992-6055.**

**18 RIVER PARK**
**GPS: N26 20 14 W81 48 29**
This site has green space, boardwalks through mangroves and floating docks. Within walking distance of places to purchase lunch, provisions. **239-992-2556.**

**19 IMPERIAL RIVER BOAT RAMP**
**GPS: N26 20 19 W81 48 17**
A Lee County Parks & Recreation facility. Canoe and kayak launch separate from boat ramp. **239-533-7275.**

**20 RIVERSIDE PARK**
**GPS: N26 20 30 W81 46 46**
Spacious riverfront park with frequent art shows and festivals. Grounds showcase historic Lile's Hotel and Imperial River Cottages. Kayak / SUP rentals and tours available through concessionaire Calusa Ghost Tours at Riverside Park, 239-938-5342. Full paddle outfitter shop across the street, 239-221-8218. **239-992-2556.**

**21 CULLUM'S BONITA TRAIL**
**GPS: N26 20 13 W81 44 40**
Paddle craft launch with access to eastern Imperial River. Park connected to Bonita Nature Place via hiking trails. Bonita Nature Place includes gopher tortoise preserve, bat house, bee house, butterfly garden and picnic area. **239-992-2556.**

Boat Launch
Paddle Craft Launch
Parking (not always free)
Restaurant or Concession
Phone
Picnic Facilities
Restrooms
Lodging
Hiking
Biking
Camping
Historic Site

**A COMPLETE LIST OF GUIDES AND OUTFITTERS CAN BE FOUND AT WWW.CALUSABLUEWAY.COM**



### Observing Wildlife

Along the Great Calusa Blueway, you'll have the opportunity to observe many remarkable species in their natural habitats. You'll have the chance to spy dolphins racing across the horizon and manatees lumbering through the backwaters. Bird watching is big here, and best of all, birds can be spotted just about anytime and anywhere. Bald eagles, herons, egrets, ospreys, pelicans, roseate spoonbills and wood storks are just a few of the more than 300 species you may discover here.

### Unspoiled, Undisturbed, Uninterrupted

During your visit, we hope you will find time to enjoy many of the wonderful experiences there are to be found in our diverse ecosystem. It is an environment that is as beautiful as it is fragile. It is up to all of us – residents and guests alike – to protect it, and leave the same wonders we enjoy today preserved for generations to come.

### Help Our Wildlife

- Please dispose of trash and food items properly.
- Observe all wildlife from a safe distance. When on board a vessel, stay at a distance of at least 50 yards (150 feet or 45 meters) and use binoculars or a telephoto lens to improve your view.
- Feeding wildlife is illegal, causes animals to lose their natural fear of humans and increases their vulnerability to injuries and death.
- Seagrasses are a valuable part of Florida's marine environment. Please use caution at low tide, so as not to impact the fragile sea grass beds and marine life nurseries.
- Pick up fishing line and debris – leave the scene cleaner than you found it.

### Recommended Safety Gear

- Flotation gear - Florida law requires a Coast Guard approved, readily accessible and wearable personal flotation device (PFD) for each occupant. PFDs must be worn by all occupants under age 6.
- Potable water – Be careful of dehydration
- Extra paddle
- Bow and stern line
- First aid kit
- Flashlight and whistle
- Insect repellent
- Sunglasses, sunscreen, covering and hats
- Binoculars, GPS unit or Compass
- Cell phone
- Water shoes, dry bag
- Map or chart
- Smartphone app

Lee County invites paddlers from around the world to explore the fabled bays, rivers, backwaters and shorelines of Southwest Florida.

The Great Calusa Blueway paddling trail has been developed by Lee County Parks & Recreation and funded with tourist development tax dollars specifically dedicated to beach and shoreline enhancement projects.

Inspired by the indigenous Calusas, the Great Calusa Blueway encompasses three distinct regions of the Gulf of Mexico coast. The first portion of the trail meanders through Estero Bay, while the second segment centers on Pine Island Sound and Matlacha (pronounced Mat-la-shay) Pass. A third leg of the trail takes paddlers inland to the Caloosahatchee and its tributaries.

This map shows all three regions, but covers only Estero Bay in detail. We hope it will serve as your guide to the natural and historic highlights of these protected waterways, while also helping you locate amenities along the trail.

3410 Palm Beach Blvd, Fort Myers, FL 33916
**239-533-7275**
For More Information:
Paddling Trail – www.CalusaBlueway.com
Area Information – www.FortMyers-Sanibel.com
Lee County Parks & Recreation – www.LeeParks.org
Volunteer Opportunities – Call 239-533-7422

### Play It Safe

- Use caution at passes; strong currents exist.
- Watch for powerboats; stay to the right and turn your bow into the wake.
- Secure your car and take keys with you.
- Paddle in a group or with a buddy.
- Let someone know your plans – where you are going and when you plan to be back.
- Be careful with campfires; use cook stoves whenever possible.
- Access to private land should be by invitation only.
- Make mental notes as you pass trail markers – knowing the number of the closest marker will help emergency personnel should you need assistance.
- Watch the sky for changing weather.




### Navigation

The enlarged map of Estero Bay shows suggested routes for canoes and kayaks as well as random Global Positioning System (GPS) coordinates along the trail. For a complete list of marker numbers with GPS coordinates, visit www.GreatCalusaBlueway.com.

Markers are intermittent and sometimes not always within your line of sight. Marker numbers do not appear in consecutive order because of forks in the trail. Portions of the trail may be inaccessible during periods of extreme low tide.

Tick marks on the map indicate an approximate mile wherever possible. Note that the trail crosses busy boating channels used by recreational and commercial powerboats. Please paddle safely.

The Calusa Blueway is among the first trails in the country to have a state-of-the-art smart-phone application users can download for free to more easily navigate Southwest Florida waters. It provides real-time GPS coordinates and navigation, an interactive trail map with places of interest identified, tips and regulations, historical and cultural information, and launches and highlights of the entire 190-mile trail. Visit Google Play or the iTunes store. http://goo.gl/244Zp

A Boater's Guide with additional navigation information is also available for smart phones at Google Play or the iTunes store. http://goo.gl/2442o

As you explore the Great Calusa Blueway, we remind you to preserve this paddling paradise by leaving nothing behind and taking only photos.



# Lee County Paddling Trails
## Estero Bay - Pine Island Sound - Matlacha Pass

For paddling opportunities in Charlotte County visit:
http://charlottecountyfl.com/communityservices/blueway.asp

### Eco Parks Guide

Parks with an emphasis on the ecology of Southwest Florida are identified by the numbers below. For detailed information on each of them, and a complete list of parks, visit www.FortMyers-Sanibel.com.

1. Audubon Corkscrew Swamp Sanctuary
2. Bowditch Point Regional Park
3. Caloosahatchee Regional Park
4. Cayo Costa State Park
5. Four Mile Cove Ecological Preserve
6. Hickey's Creek Mitigation Park
7. J.N. "Ding" Darling National Wildlife Refuge
8. Koreshan State Historic Site
9. Lakes Regional Park
10. Lovers Key State Park
11. Manatee Park
12. Matlacha Pass Preserve
13. Rotary Park
14. Six Mile Cypress Slough Preserve & Interpretive Center
15. Mound House
16. Randell Research Center
17. Sanibel-Captiva Conservation Foundation

### The Great Calusa Blueway

**Phase 1 & 2:**
Miles of marked trail ........ 97

**Phase 3:**
Miles of tributaries ........ 52
Miles of river ........ 38

For more information, visit www.CalusaBlueway.com

For paddling opportunities in Collier County visit:
www.paradisecoastblueway.com

Funding for printing provided by: WCIND

CORPS003863
003862



# The Great Calusa Blueway — Pine Island Sound - Matlacha Pass

## Highlights & Access Points

**1** CAYO COSTA STATE PARK
GPS: N26 41 08  W82 14 43 This island, accessible by watercraft only, has beach, paddle craft launch, nature trails, tent camping, primitive cabin rentals (sleeps 6 people), kayak rentals, bicycle rentals and overnight boat slips. Entrance fee. www.floridastateparks.org. 941-964-0375. Cabin and campsite reservations – 1-800-326-3521. Ferry service - 239-283-0015.

**2** CABBAGE KEY
GPS: N26 39 23  W82 13 20 At Intracoastal Waterway Marker 60. Paddle craft landing and fishing guide services. www.cabbagekey.com. 239-283-2278.

**3** JUG CREEK COTTAGES/CAYO COSTA LAND BASE
GPS: N26 42 20  W82 07 33 State park cabins sleep up to six people. Paddle craft rentals, shuttle service to Cayo Costa State Park. Restaurant nearby. Launch for cottage guest only. www.tropicstarcruises.com or www.leeparks.org. 239-283-0015.

**4** BOKEELIA BOAT RAMP/LAVENDER'S LANDING
GPS: N26 41 39  W82 08 45 The Lee County facility located on Barrancas Street offers powerboat and paddle craft launch, kayak rentals, parking (fee), rustic cottages and a slip's store. www.tropicstarcruises.com. 239-283-0015 or 239-533-7275.

COAST CONNECTIONS
GPS: N26 42 40  W82 09 45 This private facility is located at the end of Pontobello Street. Launch (fee). 239-677-6931.

**5** CHARLOTTE HARBOR PRESERVE STATE PARK
ANNIE'S CREEK
GPS: N26 44 57  W82 03 17 The creek is part of the state preserve with parking along Old Burnt Store Road. Hike in to unimproved primitive launch. No facilities.

**6** VILLAGE OF PINELAND
GPS: N26 41 15  W81 47 36 A historic village on the western shore of Pine Island featuring:

RANDELL RESEARCH CENTER
GPS: N26 39 40  W82 09 11 Features the Calusa Heritage Trail, a 3,700-foot self-guided interpretive path. Call for guided tour schedule. Parking for Randell Research Center Guest Only. www.flmnh.ufl.edu. 239-283-2062 and 239-283-2157.

PINE ISLAND LAND MONUMENT
GPS: N26 39 33  W82 09 09 Small Lee County park on Waterfront Drive with paddle craft landing and limited parking. No facilities. No parking along street. 239-533-7275.

TARPON LODGE
GPS: N26 39 39  W82 09 13 This historic inn offers both lodging and a restaurant. Boat dock and guide services available for guests. www.tarponlodge.com. 239-283-3999.

**7** SIRENIA VISTA PARK
GPS: N26 38 30  W82 02 59 This City of Cape Coral Park, located at the end of Coronado Parkway, has an unimproved paddle craft launch area. 239-549-4606.

**8** GULF COAST KAYAK
GPS: N26 38 12.37"  N82 03 52.75 Kayak rentals and free launch for party if there is at least one rental, kayak guide services. Concessions and restaurants nearby. www.gulfcoastkayak.com. 239-283-1125.

**9** MATLACHA PARK AND BOAT RAMP
GPS: N26 37 38  W82 04 11 This Lee County facility has a paddle craft launch separate from the boat ramp with water park amenities and a community center. www.leeparks.org. 239-533-7275.

**10** TROPICAL POINT
GPS: N26 32 48  W82 04 50 Small Lee County park at the end of Tropical Drive with paddle craft landing and limited parking. 239-533-7275.

**11** PICNIC ISLAND
GPS: N26 29 23  W82 02 59 Primitive camping on an island near the mouth of the Caloosahatchee River.

**12** BARNACLE PHIL'S
GPS: N26 36 06  W82 13 04 Located on North Captiva. Food, marina supplies, boat dock. 239-472-1200.

**13** ADVENTURE SEA KAYAKS
GPS: N26 30 36  W82 11 25 At 'Tween Waters Inn. Offers paddle craft rentals, guided tours. www.captivaadventures.com. 239-822-3337.

**14** TURNER BEACH AT BLIND PASS
GPS: N26 29 32  W82 11 00 Lee County park with great shelling and beach swimming. Parking on Gulf side (fee). www.leeparks.org. 239-533-7275.

**15** J.N. "DING" DARLING NATIONAL WILDLIFE REFUGE
GPS: N26 26 42  W82 06 48 A 7,600± acre refuge with visitor center, interpretive programs, hiking and biking trails, fishing and crabbing, tram tours, paddle craft launching. Launching permitted on right side of Wildlife Drive only. Refuge open daily, but tram tours and road closed Fridays. Entrance fee. www.fws.gov/dingdarling. 239-472-1100.

**16** TARPON BAY EXPLORERS
GPS: N26 27 12  W82 06 58 Located in the J.N. "Ding" National Wildlife Refuge. Paddle craft rentals, bike and pontoon boat rentals, kayak and fishing guide services, bait and tackle, gift shop, boat tours, interpretive programs. www.tarponbayexplorers.com. 239-472-8900.

**17** SANIBEL BOAT RAMP
GPS: N26 27 12  W82 02 09 City of Sanibel facility on the east side of the causeway. www.mysanibel.com. Launch fee. Parking (fee). 239-472-4397.

**18** SANIBEL FISHING PIER AND LIGHTHOUSE
GPS: N26 27 10  W82 00 51 City of Sanibel facility at tip of island stretching from fishing pier on San Carlos Bay to Gulf beach with historic lighthouse. Parking (fee). 239-472-6397.

**19** SANIBEL CAUSEWAY ISLAND PARK
GPS: N26 28 06  W82 01 43 Lee County site on Sanibel Causeway between bridges. www.leeparks.org. 239-533-7275.

**20** PUNTA RASSA BOAT RAMP
GPS: N26 27 04  W82 00 37 Lee County boat ramp and paddle craft launch site is off the north side of Summerlin Road just before the Sanibel Bridge toll booth. Parking (fee). www.leeparks.org. 239-533-7275.

**21** YOLO BOARD ADVENTURES
GPS: N26 29 23  W81 59 18 Open daily at Port Sanibel Marina. Parking, paddle craft launch (fee), fishing gear, SUP and kayak rentals, tours, walking trail. Yoloboardadventuressanibel.com. 239-249-4701.

**22** SAN CARLOS BAY - BUNCHE BEACH PRESERVE
GPS: N26 28 33  W81 58 02 Lee County site with varied ecosystems including sandy beaches and mangroves. Excellent opportunities for bird observation. 731 acres. Kayak / SUP rentals and guided trips available through concessionaire Kayak Excursions, 239-297-8011. www.leeparks.org. 239-533-7275.

**23** ACE PERFORMER SUP/KAYAK/WINDSURF SHOP
GPS: N26 27 58  W81 57 42 Paddle craft and wind powered rentals and sales. www.aceperformer.com. 239-565-4860.

### ADDITIONAL HIGHLIGHTS OF INTEREST

Connections to paddling trails managed by the Calusa Land Trust are identified by the symbols below. For detailed information on each of them, visit www.calusablueway.com or www.calusalandtrust.org. The Calusa Land Trust and Nature Preserve of Pine Island Inc. acquires and preserves environmentally sensitive and historically important land.

**A** SHELL CUT, CALUSA LAND PRESERVE
**B** FRITTS PARK
**C** KREIE & BIG JIM CREEK PRESERVES
**D** UNDERHILL CREEK CANOE TRAIL
**E** ST. JUDE TRAIL - ST. JAMES CREEK PRESERVE
**F** BACK BAY PRESERVE
**G** PINE ISLAND FLATWOODS PRESERVE
**H** PINE ISLAND COMMERCIAL MARINA
Only open for recreational use on weekends and country recognized holidays.

**I** BOWMAN'S BEACH
**J** GASPARILLA ISLAND STATE PARK
**19TH STREET ACCESS (BAYSIDE)**

### LEGEND

Boat Launch · Restrooms
Paddle Craft Launch · Lodging
Parking · Hiking
Restaurant or Concession · Biking
Phone · Camping
Picnic Facilities · Historic Site

### THE GREAT CALUSA BLUEWAY

**2**

Estimated mile marks

Advanced paddlers — No trail markers

Trail marker GPS coordinates

Channels — Major boating channels

MARKER 2 — GREAT CALUSA BLUEWAY

Trail markers — Selected markers shown

**NOT FOR NAVIGATIONAL USE**
For local navigation charts, see those listed below:
NOAA Charts:
#11426 Charlotte Harbor - Estero Bay
#11427 ICW from Estero to Boca Grande
Waterproof Charts:
#21F Fish Drive Sites - Marco to Tampa
#21 ICW Fort Myers to Stewart
#21 ICW Fort Myers to Stewart
#25 Cape Romano to Boca Grande
#121F Sanibel Ft to Venice

Accessible Public Land · County sites · Calusa Land Trust sites · State sites · Federal sites

**Great Florida Birding Trail**

**Florida Greenways & Trails** — www.dep.state.fl.us/gwt/guide/

MILES  0  1  2

CORPS003864





# Lee County Paddling Trails
## Estero Bay - Pine Island Sound - Matlacha Pass

**THE GREAT CALUSA BLUEWAY**

*Lee County Paddling Trail*
*Pine Island Sound - Matlacha Pass*

For paddling opportunities in Charlotte County visit:
http://charlottecountyfl.com/CommunityServices/blueway.asp

## Observing Wildlife

Along the Great Calusa Blueway, you'll have the opportunity to observe many remarkable species in their natural habitats. You'll have the chance to spy dolphins racing across the horizon and manatees lumbering through the backwaters. Bird watching is big here, and best of all, birds can be spotted just about anytime and anywhere. Bald eagles, herons, egrets, ospreys, pelicans, roseate spoonbills and wood storks are just a few of the more than 300 species you'll find here.

## Unspoiled, Undisturbed, Uninterrupted

During your visit, we hope you will find time to enjoy many of the wonderful experiences there are to be found in our diverse ecosystem. It is an environment that is as beautiful as it is fragile. It is up to all of us – residents and guests alike – to protect it, and leave the same wonders we enjoy today preserved for generations to come.

## Help Our Wildlife

- Please dispose of trash and food items properly.
- Observe all wildlife from a safe distance. When on board a vessel, stay at a distance of at least 50 yards (150 feet or 45 meters) and use binoculars or a telephoto lens to improve your view.
- Feeding wildlife is illegal, causes animals to lose their natural fear of humans and increases their vulnerability to injuries and death.
- Seagrasses are a valuable part of Florida's marine environment. Please use caution at low tide, so as not to impact the fragile sea grass beds and marine life nurseries.
- Pick up fishing line and debris – leave the scene cleaner than you found it.

## Recommended Safety Gear

- Flotation gear - Florida law requires a Coast Guard approved, readily accessible and wearable personal flotation device (PFD) for each occupant. PFDs must be worn by all occupants under age 6.
- Potable water – Be careful of dehydration
- Extra paddle
- Bow and stern line
- First-aid kit
- Flashlight and whistle
- Insect repellent
- Sunglasses, sunscreen, covering and hats
- Binoculars, GPS unit or compass
- Cell phone
- Water shoes, dry bag
- Map or chart

## Play It Safe

- Use caution at passes; strong currents exist.
- Watch for powerboats; stay to the right and turn your bow into the wake.
- Secure your car and take keys with you.
- Paddle in a group or with a buddy.
- Let someone know your plans – where you are going and when you plan to be back.
- Be careful with campfires; use cook stoves whenever possible.
- Access to private land should be by invitation only.
- Make mental notes as you pass trail markers – knowing the number of the closest marker will help emergency personnel should you need assistance.

## Navigation

The enlarged map of Pine Island Sound shows suggested routes for canoes and kayaks as well as random Global Positioning System (GPS) coordinates along the trail.
For a complete list of marker numbers with GPS coordinates, visit www.CalusaBlueway.com.
Markers are intermittent and sometimes not always within your line of sight. Markers end at Captiva, beyond which point advanced paddlers can use GPS coordinates to navigate to Cayo Costa. No markers exist in Boca Grande and it's not recommended to paddle across Boca Grande Pass to the town from Gasparilla Island only. Marker numbers do not necessarily run in consecutive order because of forks in the trail. Portions of the trail may be inaccessible during periods of extreme low tide.
Tick marks on the map indicate an approximate mile wherever possible. Note that the trail crosses busy boating channels used by recreational and commercial powerboats – please paddle safely.
A Boater's Guide with additional navigation information is available at: www.lee-county.com/gov/dept/NaturalResources/Marine/Pages
As you explore the Great Calusa Blueway, we remind you to preserve this paddling paradise by leaving nothing behind and taking only photos.

Lee County invites paddlers from around the world to explore the fabled bays, rivers, backwaters and shorelines of Southwest Florida. The Great Calusa Blueway paddling trail has been developed by Lee County Parks & Recreation and funded with tourist development tax dollars specifically dedicated to beach and shoreline enhancement projects.

Inspired by the indigenous Calusa, the Great Calusa Blueway encompasses three distinct regions of the Gulf of Mexico coast. The first portion of the trail meanders through Estero Bay, while the second segment centers on Pine Island Sound and Matlacha (pronounced Mat-la-shay) Pass. A third leg of the trail takes paddlers inland to the Caloosahatchee and its tributaries.

This map shows all three regions, but covers only Pine Island Sound and Matlacha Pass in detail. We hope it will serve as your guide to the natural and historic highlights of these protected waterways, while also helping you locate amenities along the trail.



3410 Palm Beach Blvd., Fort Myers, FL 33916
**239-533-7275**
For More Information:
Paddling Trail - www.CalusaBlueway.com
Area Information - www.FortMyers-Sanibel.com
Lee County Parks & Recreation - www.LeeParks.org
Volunteer Opportunities - Call 239-533-7422



## Eco Parks Guide

Parks with an emphasis on the ecology of Southwest Florida are identified by the numbers below. For detailed information on each of them, and a complete list of parks, visit www.FortMyers-Sanibel.com.

1. Audubon Corkscrew Swamp Sanctuary
2. Bowditch Point Regional Park
3. Caloosahatchee Regional Park
4. Cayo Costa State Park
5. Four Mile Cove Ecological Preserve
6. Hickey's Creek Mitigation Park
7. J.N. "Ding" Darling National Wildlife Refuge
8. Koreshan State Historic Site
9. Lakes Regional Park
10. Lovers Key State Park
11. Manatee Park
12. Matanzas Pass Preserve
13. Rotary Park
14. Six Mile Cypress Slough Preserve & Interpretive Center
15. Mound House
16. Randell Research Center
17. Sanibel-Captiva Conservation Foundation

## The Great Calusa Blueway

**Phases 1 & 2:**
Miles of marked trail........97

**Phase 3:**
Miles of tributaries........52
Miles of river........38

For more information, visit www.CalusaBlueway.com
Volunteer opportunities available: 239-432-2159.

**MARKER 2** GREAT CALUSA BLUEWAY

For paddling opportunities in Collier County visit:
www.paradisecoastblueway.com

Funding for printing provided by:
**WCIND**

003854

CORPS003865





# The Great Calusa Blueway · Caloosahatchee River & tributaries

THE GREAT CALUSA BLUEWAY
3
Tributary Trails
Major Boating Channels
Hiking Trails
Accessible Public Lands
County Sites
Municipal Park Sites
NATIONAL RECREATION TRAIL USA
MILES
1 0 1 2
North River Rd.
Owl Creek N26 43 42 W81 45 01
Telegraph Creek N26 43 32 W81 42 24
Fichters Creek N26 43 09 W81 40 00
Caloosa Creek N26 43 15 W81 38 24
Alva
Spanish Creek N26 43 03 W81 35 33
Cypress Creek N26 43 11 W81 38 08
Hickey's Creek N26 43 04 W81 40 12
Bedman Creek N26 42 43 W81 36 15
Otter Creek N26 43 29 W81 43 04
Trout Creek N26 43 27 W81 45 06
Caloosahatchee National Wildlife Refuge
Pop Ash Creek N26 42 10 W81 48 18
Stroud Creek N26 42 02 W81 48 00
Orange River N26 41 41 W81 47 47
Buckingham
Buckingham Rd.
Orange River Blvd.
(SR78) Bayshore Rd.
Daughtry's Creek N26 41 37 W81 49 46
Beautiful Island
North Fort Myers
Powell Creek N26 40 05 W81 52 22
Marsh Point Creek N26 40 41 W81 51 18
(SR80) Palm Beach Blvd.
(SR 78) Pine Island Rd.
Edison Bridge
Caloosahatchee Bridge
Hancock Creek/ Yellow Fever Creek N26 39 25 W81 53 35
Billy's Creek N26 39 09 W81 51 26
Manuel's Branch N26 37 50 W81 53 02
Fort Myers
Caloosahatchee River
Look for Great Calusa Blueway signs for paddling access and services
Paddling Trail Access
www.greatcalusablueway.com
Cleveland Ave. (US 41)
Colonial Blvd.
Veterans Pkwy.
Midpoint Memorial Bridge
Four Mile Cove N26 36 30 W81 54 45
Cape Coral
Whiskey Creek N26 34 42 W81 53 56
Intracoastal Waterway (ICW)
Cape Coral Pkwy.
Cape Coral Bridge
College Pkwy.
Cypress Lake Dr.
Deep Lagoon N26 30 37 W82 00 33
Jewfish Creek N26 31 46 W82 00 56
(SR 867) McGregor Blvd.
Gladiolus Dr.
Shell Creek N26 30 37 W82 00 33
Summerlin Rd.
Boat Launch
Paddle Craft Launch
Parking (not always free)
Restaurant or Concession
Phone
Picnic Facilities
Restrooms
Lodging
Hiking
Biking
Camping
Historic Site
Great Florida Birding Trail

NOT FOR NAVIGATIONAL USE

For local navigation charts, see those listed below:

**NOAA Charts:**
#11426 Charlotte Harbor - Estero Bay
#11427 ICW from Estero to Boca Grande

**Waterproof Charts:**
#15F Fish Dive Sites- Marco to Tampa
#20 ICW Fort Myers to Stewart
#21 ICW Fort Myers to Tampa
#25 Cape Romano to Boca Grande
#121F Sanibel To Venice

## Additional Highlights

With parking · Without parking · Water access only

- A DEEP LAGOON PRESERVE N26 31 56 W81 55 37
- B BILLY'S CREEK FILTER MARSH N26 39 36 W81 49 30
- C OLD BRIDGE PRESERVE N26 40 24 W81 52 06
- D TARPON STREET PIER N26 39 43 W81 50 50
- E ROYAL PALM PARK N26 40 53 W81 49 01
- F RUSSELL PARK N26 40 58 W81 48 52
- G DAVIS BOAT RAMP N26 42 41 W81 45 10
- H COLUMBUS G. MCLEOD PRESERVE OXBOW N26 43 12 W81 43 48
- I IDALIA/OLGA N26 43 20 W81 42 00
- J DR. SAM NIXON OXBOW ISLAND N26 43 04 W81 39 42

## Highlights

### 1 PUNTA RASSA BOAT RAMP
**GPS: N26 29 04 W81 00 37**
Boat ramp with fish cleaning station and several long docks.
**(239) 533-7275**

### 2 CAPE HARBOUR
**GPS: N26 32 38 W82 00 28**
Full-service marina with bait/tackle shop, kayak rentals and access to restaurant and shops. Boat docks and paddle craft landing.
**(239) 945-4330**

### 3 TARPON POINT
**GPS: N26 32 21.2 W82 00 01**
Full-service marina and resort with special kayak launch (fee), boat/kayak rentals, charters, ship's store, restaurants and shopping.
**(239) 549-4900**

### 4 CAPE CORAL YACHT CLUB
**GPS: N26 32 33 W81 57 08**
A riverfront park offering boat ramp, beach, barbecue grills, restrooms, and a 1,000 square-foot fishing pier and marina.
**(239) 574-0806**

### 5 FREEDOMS PARK/BIMINI BASIN
**GPS: N26 33 41 W81 57 47**
Nestled on more than 3 acres in the heart of Cape Coral, the shady park also has a playground and recreation facility and frequently hosts special waterfront events.
**(239) 574-0804**

### 6 CAPE CORAL WATER FRONT MID-RIVER:
**FOUR MILE COVE ECOLOGICAL PRESERVE**
**GPS: N26 36 30 W81 54 45**
Featuring 365 acres of wetlands and mangrove swamps, the preserve also has a boardwalk, visitor's center, picnic area and a maze of paddlecraft waterways. Kayak rentals available weekends mid-October through Memorial Day by calling **(239) 574-7395**.
**(239) 549-4606**

**HORTON PARK**
**GPS: N26 36 26 W81 54 48**
The park offers a scenic river view with a boat ramp.

### 7 JUDD COMMUNITY PARK
**GPS: N26 40 24 W81 54 00**
A 14-acre park has a launch site, shade trees, pavilions, barbecue grills, a playground and dog park.
**(239) 533-7275**

### 8 HOWARD & BIDDY LANG SUNSET POINT
**GPS: N26 39 26 W81 52 58**
Beach access to the river, fishing pier and picnic amenities. Also home to Edison Sailing Center, a non-profit offering kayak, powerboat and sailing instruction. Former name: North Shore Park.
**(239) 533-7275**

### 9 DOWNTOWN FORT MYERS:
**CENTENNIAL PARK**
**GPS: N26 38 45 W81 52 21**
Ten-acre park emphasizing the ambiance of the Caloosahatchee waterfront.
**(239) 321-7530**

**CITY OF FORT MYERS YACHT BASIN**
**GPS: N26 38 52 W81 51 11**
Safely accommodates any size vessel and provides access to the downtown area with many restaurants, shops, lodging and other services. Free day use dockage is available; floating docks.
**(239) 321-7080**

**LEGACY HARBOUR MARINA**
**GPS: N26 38 28 W81 52 33**
This marina is situated just west of the Caloosahatchee Bridge with a hotel on site and floating docks for easy unloading; access to downtown shops and amenities.
**(239) 461-0775**

### 10 ROCK LAKE RESORT
**GPS: N26 39 09 W81 51 11**
Good site for group paddling events; launching limited to hotel guests and clubs/groups only. Shady grounds and access to Billy's Creek from 1940s cottages.
**(239) 332-4080**

### 11 RIVERSIDE PARK
**GPS: N26 39 27 W81 51 11**
Nature trails, picnicking, playground and beach launch into river.
**(239) 321-7530**

### 12 CALOOSAHATCHEE CREEKS PRESERVE
**GPS: N26 42 43 W81 48 36**
This 1,300-acre Conservation 20/20 preserve features a kayak launch with access to Pop Ash Creek and the Caloosahatchee as well as nearly two miles of hiking trails.
**(239) 533-7275**

### 13 UP RIVER RV RESORT
**GPS: N26 42 29.6 W81 47 06.6**
Tenters accommodated off-season, May 1 – Nov. 30; launch available only to residents and guests. Access to Caloosahatchee Creeks Preserve.
**(239) 543-3330**

### 14 MANATEE PARK
**GPS: N26 41 30 W81 46 36**
This park is a winter home for manatees and a year-round home for native plants and butterflies. Amenities include picnic areas and shelters, fishing cover, pier and canoe/kayak launch on the Orange River. Parking fee.
**(239) 690-5030.** Canoe/kayak rentals and tours available through park concessionaire,
**Calusa Blueway Outfitters, (239) 481-4600.**

### 15 SWEETWATER LANDING MARINA
**GPS: N26 42 44 W81 45 39**
This marina is open to the public with floating docks on the Caloosahatchee.
**(239) 694-3850**

### 16 CALUSA JACK'S MARINA
**GPS: N26 43 16 W81 43 32**
Among Southwest Florida's oldest marinas, this site has a ship's store and amenities perfect for day-trippers.
**(239) 694-2708**

### 17 W.P. FRANKLIN LOCK, DAM AND RECREATION AREA
**GPS: N26 43 25 W81 41 34**
A tropical atmosphere providing an excellent setting for visitors to camp, swim, fish, picnic, launch, watch boats or view manatees and abundant wildlife. Short Paddle to Telegraph Creek.
**(239) 694-2582 or (239) 694-8770**

### 18 HICKEY'S CREEK MITIGATION PARK
**GPS: N26 42 30 W81 39 47**
This 862 acre preserve offers varied habitats plus sightings of threatened Florida scrub jay and gopher tortoises. Amenities include a fishing deck, bridges across Hickey's Creek, trail shelters, hiking trails and a kayak landing. Parking is $1/hour or $5/day.
**(239) 229-0240**

### 19 CALOOSAHATCHEE REGIONAL PARK
**GPS: N26 43 16 W81 38 39**
This park features 765 wooded acres with 12 miles of hiking, off-road cycling and equestrian trails and a campground for tenters. Also available: lodge for group activities. Kayak rentals available with advance reservation. Parking is $1/hour or $5/day.
**(239) 694-0398**

### 20 ALVA BOAT RAMP
**GPS: N26 42 49 W81 36 22**
Perfect launch site for daytrip to Hickey's Creek Mitigation Park and other Alva-area creeks.
**(239) 533-7275, (239) 694-0398**

003855

www.CalusaBlueway.com



THE GREAT
CALUSA
BLUEWAY

Lee County Paddling Trail on the
Caloosahatchee River & tributaries

## Observing Wildlife

Along the Great Calusa Blueway, you'll have the opportunity to observe many remarkable species in their natural habitats. You'll have the chance to witness dolphins racing across the horizon and manatees gliding through the backwaters. Bird watching is big here, and best of all, birds can be spotted just about anytime and anywhere. Bald eagles, herons, egrets, ospreys, pelicans, roseate spoonbills and wood storks are just a few of the more than 300 species you can find here.

## Unspoiled, Undisturbed, Uninterrupted

During your visit, we hope you will find time to enjoy many of the wonderful experiences there are to be found in our diverse ecosystem. It is an environment that is as beautiful as it is fragile. It is up to all of us – residents and guests alike – to protect it, and leave the same wonders we enjoy today preserved for generations to come.

## Help Our Wildlife

• Please dispose of trash and food items properly.
• Observe all wildlife from a safe distance. When on board a vessel, stay at a distance of at least 50 yards (150 feet or 45 meters) and use binoculars or a telephoto lens to get a good view.
• Feeding wildlife is illegal and causes animals to lose their natural fear of humans, and increases their vulnerability to injuries and death.
• Seagrasses are a valuable part of Florida's marine environment. Please use caution at low tide, so as not to impact the fragile sea grass beds and marine life nurseries.
• Pick up fishing line and debris – leave the scene cleaner than you found it.

## Recommended Safety Gear

• Floatation gear – Florida law requires a Coast Guard approved, readily accessible and wearable personal flotation device (PFD) for each occupant. PFDs must be worn by all occupants under age 6.
• Potable water – Be careful of dehydration
• Extra paddle
• Bow and stern line
• First aid kit
• Flashlight and whistle
• Insect repellent
• Sunglasses, sunscreen, covering and hats
• Binoculars, GPS system and compass
• Phone
• Water shoes, dry bag
• Map or chart



Lee County invites paddlers from around the world to explore the fabled bays, rivers, backwaters and shorelines of Southwest Florida.

The Great Calusa Blueway paddling trail has been developed by Lee County Parks & Recreation and funded with tourist development tax dollars specifically dedicated to beach and shoreline enhancement projects.

Inspired by the indigenous Calusa, the Great Calusa Blueway encompasses three distinct regions of the Gulf of Mexico coast. The first portion of the trail meanders through Estero Bay, while the second segment centers on Pine Island Sound and Matlacha (pronounced Mat-la-shay) Pass. A third leg of the trail takes paddlers inland to the Caloosahatchee and its tributaries.

This map shows all three regions, but covers only the Caloosahatchee River and its tributaries in detail. We hope it will serve as your guide to the natural and historic highlights of these protected waterways while also helping you locate amenities along the trail.



3410 Palm Beach Blvd., Fort Myers, FL 33916
239-533-7275
For More Information:
Paddling Trail – www.CalusaBlueway.com
Area Information – www.FortMyers-Sanibel.com
Lee County Parks & Recreation – www.leeparks.org
Statewide Trails –
http://www.dep.state.fl.us/gwt/paddling/saltwater.htm

## Play It Safe

• Use caution at passes; strong currents exist.
• Watch for motorboats; stay to the right and turn your bow into the wake.
• Secure your car and take keys with you.
• Paddle in a group or with a buddy.
• Let someone know your plans – where you are going and when you plan to be back.
• Be careful with campfires; use cook stoves whenever possible.
• Access to private land should be by invitation only.
• Make mental notes as you pass trail markers – knowing the number of the closest marker will help emergency personnel should you need assistance.

## Navigation

The enlarged map of the Caloosahatchee River shows tributaries that are suggested routes and destinations for canoeists and kayakers. There is no marked trail on the river itself, so explore as you please. But it's advisable for paddlers to avoid the powerboat channel. Also provided here are Global Positioning System (GPS) coordinates for the mouth of each tributary as well as put-in spots and other land-accessible locations of interest to paddlers. For a complete list of GPS coordinates, you can also go online to www.calusablueway.com

Unlike the Estero Bay (Phase 1) and Pine Island Sound (Phase 2) legs of the blueway, on-water markers are not used on the Caloosahatchee (Phase 3). However, you will see Great Calusa Blueway Paddling Trail Access signs at various shore-access points. These signs serve to let paddlers know they are at a location that is also listed on the map and Web site.

Please note that creeks along the trail may be inaccessible during periods of low rainfall and/or extreme low tide. Note that as you traverse the river, you may have to cross the powerboat channel, which is busy and used by recreational and commercial vessels. Please paddle safely.

For a Boater's Guide with additional navigation information follow the online link at http://LeeWaterways.com.

As you explore the Great Calusa Blueway, we remind you to preserve this paddling paradise by leaving nothing behind and taking only photos.



## Lee County Paddling Trails
### Estero Bay · Pine Island Sound · Matlacha Pass

For paddling opportunities in Charlotte County visit:
www.charlottecountyfl.com/communityservices/blueway.asp

Hendry & Glades counties / Okeechobee Waterway ▶

### Eco Parks Guide

Parks with an emphasis on the ecology of Southwest Florida are identified by the numbers below. For detailed information on each of them, and a complete list of parks, visit www.FortMyers-Sanibel.com.

1. Audubon Corkscrew Swamp Sanctuary
2. Bowditch Point Regional Park
3. Caloosahatchee Regional Park
4. Cayo Costa State Park
5. Four Mile Cove Ecological Preserve
6. Hickey's Creek Mitigation Park
7. J.N. "Ding" Darling National Wildlife Refuge
8. Koreshan State Historic Site
9. Lakes Regional Park
10. Lovers Key State Park
11. Manatee Park
12. Matanzas Pass Preserve
13. Rotary Park
14. Six Mile Cypress Slough Preserve
15. Mound House
16. Randell Research Center
17. Sanibel-Captiva Conservation Foundation
18. Jaycee Park
19. Prairie Pines
20. Bob Janes Preserve

### The Great Calusa Blueway

**Phases 1 & 2:**
Miles of marked trail ........ 97

**Phase 3:**
Miles of tributaries ........ 52
Miles of river ........ 38

For more information, visit www.CalusaBlueway.com

For paddling opportunities in Collier County visit:
www.paradisecoastblueway.com

WCIND
Funding for printing provided by WCIND

CORPS003867

003856

## Jacksonville District Navigable Waters Lists

In Florida, Puerto Rico, and the U.S. Virgin Islands, the U.S. Army Corps of Engineers, Jacksonville District, exercises section 10 (of the Rivers and Harbors Act of 1899) regulatory jurisdiction over the Atlantic Ocean, Gulf of Mexico, and Caribbean Sea.  Additionally, all or portions of tributaries to the above waters may also be subject to section 10 authority.  However, complete lists of all rivers, streams, creeks, ponds, and lakes subject to Corps section 10 authority are not available.  Below are lists of waters over which the Jacksonville District currently exercises regulatory jurisdiction under the authority of both section 10 of the Rivers and Harbors Act of 1899 and section 404 of the Clean Water Act on all or a portion of the listed water.  The absence of a water on these lists does not mean it or a portion of it is not a navigable water.  Likewise, the inclusion of a water on these lists is not meant to imply that the water is subject to section 10 authority in its entirety.  All waters subject to the ebb and flow of the tide (tidal action) are navigable waters of the US, and many of the waters listed below have some portion that is subject to the ebb and flow of the tide.  Inquiries concerning Department of the Army Permit requirements on these and other tributary streams and lakes not listed below should be submitted on a case-by case basis to the Regulatory Division, Jacksonville District.

The section 10 waters lists (below) from the Jacksonville District were compiled from multiple approved and draft navigability studies conducted during the 1970s and 1980s, and from local knowledge of tidally influenced waters.  The District makes no claim that these lists are complete or completely accurate.  These lists are for regulatory reference purposes only.  They are not a substitute for a jurisdictional determination (JD).  It is imperative that you contact the appropriate Regulatory Permit Section for a determination on whether the Corps is able to ascertain if a particular project falls within or outside of section 10 authority.

# STATE OF FLORIDA

## Rivers and Creeks

Acosta Creek
Alafia River
Alapaha River
Alapahoochee River
Alaqua Creek
Alexander Springs Creek
Alligator Creek
Alligator Lake-Lake Gentry Canal
Amelia River
Anclote River
Apalachicola River
Arlington River
Aucilla River
Axle Creek
Banana River
Barrentine Creek
Barron River
Basin Creek
Bayou Marcus Creek
Bear Creek
Bear Creek (Bay County)
Belcher Canal
Bells River

Bessey Creek
Big Davis Creek
Big Fishweir Creek
Big Juniper Creek
Big Marco River
Big Mud Creek
Big Mulberry Branch
Billy Creek
Black Creek
Black Creek (Walton County)
Black Water Creek
Blackwater River
Blind Creek
Blockhouse Creek
Blounts Branch
Blue Creek
Blue Hole Creek
Blue Springs Run
Bluff Branch
Boathouse Creek
Bogey Branch
Boggy Creek
Bonnet Creek
Botts Creek

Bowlees Creek
Box Branch
Boynton Canal
Braden River
Bradley Creek
Bray Creek
Brick-Alligator Lake Canal
Britt Creek
Broad River
Brothers River
Broward Creek
Broward River
Browns Creek
Buck Creek
Buckhorn Creek
Bull Creek
Bulow Creek
Bumble Bee Creek
Burnt Mill Creek
Butcher Pen Creek
Butler Creek
C-15 Canal
C-17 Canal
C-18 Canal

003857

C-23 Canal
C-24 Canal
C-51 Canal
Cabbage Creek
Callaway Creek
Caloosahatchee River
Camp Branch
Caney Branch
Canoe Creek
Capo Creek
Carpenters Creek
Carrabelle River
Casa Cola Creek
Cat Creek
Cedar Creek
Cedar Point Creek
Cedar River
Cemetery Creek
Chassahowitzka River
Chatham River
Chattahoochee River
Chicopit Bay
Chipola River
Choctawhatchee River
Christopher Creek
Clapboard Creek
Clark Creek
Clarkes Creek
Clear Creek -
Cocohatchee River
Coldwater Creek
Coon Lake-Lake Lizzie Canal
Coral Gables Waterway
Cormorant Creek
Cow Creek
Cowhead Creek
Cracker Branch
Cradle Creek
Craig Creek
Crane Creek
Crooked Creek
Crooked Creek (Martin County)
Crooked River
Crooked River (Franklin County)
Cross Creek
Cross Florida Barge Canal
Crystal River
Cunningham Creek
Cut Creek
Cypress Creek
Danforth Creek
Dania Cut-off canal
Days Creek
Dead River (Kissimmee River)
Dead River (Lake County, Florida)
Dead River (Wakulla County)
Dean Dead River
DeBlieu Creek
Deep Bottom Creek
Deep Creek

Deer Creek
Depot Creek
Dillaberry Branch
Doctors Lake
Dog Branch
Drummond Creek
Dunns Creek
Durbin Creek
East Bay River
East Creek
East River
Eau Gallie River
Econfina Creek
Econfina River
Econlockhatchee River
Egans Creek
Eight Mile Creek
Elbow Branch
Elbow Creek
Eleven Mile Creek
Eph Creek
Escambia River
Estero River
Etonia Creek
Fakahatchee River
Fenholloway River
Fish Creek
Fisheating Creek
Fishing Creek
Fitzpatrick Creek
Five Mile Creek
Flora Branch
Forked Creek
Fort George River
Fourmile Creek
Fox Cut
Frazier Creek
Garden Creek
Get Out Creek
Ginhouse Creek
Goodbys Creeks
Governor Creek
Graham Creek
Grog Branch
Guano River
Gulley Creek
Haines Creek
Half Creek
Halifax River
Hannah Mills Creek
Harney River
Harrison Creek
Harry's Creek
Hatchett Creek
Hatchineha Canal
Haulover Creek
Haw Creek
Haynes Creek
Henderson Creek
Highland Park Run
Hillsboro Canal
Hillsboro River

Hillsborough River
Hitchens Creek
Hog Creek
Hogan Creek
Hogpen Creek
Holiday Harbor
Holmes Creek
Holmes Creek  (Jackson County)
Hominy Branch
Homosassa River
Honey Creek
Hontoon Dead River
Hopkins Creek
Horseshoe Creek
Hospital Creek
Howard Creek
Hudson Bayou
Hulett Branch
Huston River
Ichetucknee River
Imperial River
Inconstante Creek
Indian Creek
Indian Creek
Indian River
Indian River North
Istokpoga Creek
Jackson Canal
Jackson Creek
Jackson River
Joe River
Johnson Creek
Johnson Creek (Gulf County)
Johnson Slough
Jolly River
Jones Creek
Jones Swamp Creek
Julington Creek
Juniper Creek
Karen Canal
Kendall Creek
Kentner Creek
Kentucky Branch
Kissimmee River
Krueger Creek
L-40 Canal
L-8 Canal
Lafayette Creek
Lake Ajay-Fells Cove Canal
Lake Apopka-Beauclerc Canal
Lake Ashby Canal
Lake Center-Coon Lake Canal
Lake Griffin-Yale Canal
Lake Hart-Ajay Canal
Lake Joel-Myrtle Canal
Lake Joel-Trout Canal
Lake Lizzie-Alligator Canal
Lake Marion Creek
Lake Mary Jane-Hart Canal
Lake Myrtle-Mary Jane Canal
Lake Okeechobee Rim Canal

CORPS003869

Lake Okeechobee Waterway
Lake Preston-Myrtle Canal
Lake Worth Lagoon
Lanceford Creek
Lehigh Canal
Leitner Creek
Little Black Creek
Little Cedar Creek
Little Clapboard Creek
Little Double Creek
Little Econlockhatchee River
Little Fishweir Creek
Little Juniper Creek
Little Manatee River
Little Mud Creek
Little Pottsburg Creek
Little River (Biscayne Bay)
Little River (Ochlockonee River)
Little Rocky Creek
Little Saint Marys River
Little Trout River
Little Wekiva River
Little Withlacoochee River
Lofton Creek
Lolly Creek
Long Branch
Long Creek
Lopez River
Lostmans River
Lower Sister Creek
Loxahatchee River
Lumber Creek
Mainard Branch
Manatee Creek
Manatee River
Marshall Creek
Mason Branch
Matanzas River
McCoys Creek
McCullough Creek
McGirts Creek
McQueen Creek
Miami Canal
Miami River
Middle River
Middle River (South and North Fork)
Mill Branch
Mill Log Creek
Mills Creek
Moccasin Branch
Moccasin Slough
Moncrief Creek
Monroe Canal
Moore's Creek
Moore's Creek (Martin County)
Morris Dead River
Morrison Creek
Moses Creek
Moultrie Creek
Mud Creek
Murphy Creek

Myakka River
Myakkahatchee Creek
Nassau River
New Castle Creek
New River (Broward County)
New River (Collier County)
New River (Franklin County)
New River (Pasco County)
New River (Union/Bradford County)
New River Canal off LO
New Rose Creek
Nichols Creek
Ninemile Creek
NN Creek
Norris Dead River
North Fork St. Lucie River
North New River Canal
Ochlockonee River
Ocklawaha River
Old Channel
Oldfield Creek
Oleta River
Open Creek
Orange Creek
Orange Grove Branch
Orange River
Ortega River
Pablo Creek
Paines Branch
Palatlakaha River
Palm River
Payne Creek
Pea River
Peace River
Pecks Branch
Pellicer Creek
Perdido River
Peters Branch
Peters Creek
Phelps Creek
Philippi Creek
Pine Barren Creek -
Pine Log Creek
Pinhook River
Pithlachascotee River
Plummer Creek
Polly Creek
Poncho Creek
Pond Creek
Poppleton Creek
Porpoise Creek
Pottsburg Creek
Puckett Creek
Pumpkin Hill Creek
Rainbow River
Red House Branch
Reedy Creek
Ribault River
Rice Creek
Robinson Creek
Rock Springs Run

Rocky Creek
Rocky Creek (Okaloosa/Walton)
Rodgers River
Rosalie Creek
Rushing Branch
Saint Sebastian River
Salt Creek
Salt Creek (Dixie County)
Salt Run
Salt Springs Run
San Carlos Creek
San Julian Creek
San Sebastian River
Sand Beach Branch
Sandy Creek
Sandy Run
Santa Fe River
Saul Creek
Sawpit Creek
Scipio Creek
Scoggin Creek
Shad Creek
Shark River
Shell Creek
Shingle Creek
Shipyard Creek
Shired Creek
Shoal River
Short Canal
Silver Glenn Springs Run
Silversmith Creek
Simms Creek
Simpson Creek
Sink Creek
Sisters Creek
Six Mile Creek
Sixteen Mile Creek
Smith Creek (Flagler)
Smith Creek (St. Johns)
Snake Creek
Snell Creek
Soap Creek
Soldier Creek
Soldier Creek (Escambia County)
Sombrero Creek
Sopchoppy River
South Amelia River
South Fork Black Creek
South Fork St. Lucie River
South Port Canal
Spring Creek
Spring Garden Creek
Spring Warrior Creek
Spruce Creek
St Francis Dead River
St. Cloud Canal
St. Johns River
St. Lucie Canal
St. Lucie River
St. Marks River
St. Marys River

Steinhatchee River
Stokes Creek
Stranahan River
Strawberry Creek
Styles Creek
Summer Haven River
Suwannee River
Sweetwater Creek
Swimming Pen Creek
Tarpon River
Taylor Creek
Telogia Creek
Ten Mile Creek
Terrapin Creek
Thomas Creek
Thomas Mill Run
Three Otter Creek
Tiger Creek
Tocoi Creek
Tolomato River

Tomoka River
Trout -Coon Lake Canal
Trout Creek
Trout River
Turkey Creek
Turkey Creek (Okaloosa County)
Turner River
Upper Sister Creek
Waccasassa River
Wacissa River
Wakulla River
Walker creek
Wares Creek
Warf Creek
Warner Creek
Weeki Wachee River
Wekiva River
Weohyakapka Creek
West Branch
West Palm Beach Canal

West Run Cracker Branch
Wetappo Creek
Whitney River
Whittenhorse Creek
Williamson Creek
Willoughby Creek
Wills Branch
Withlacoochee River (central Florida)
Withlacoochee River (north Florida)
Woodruff Creek
Wrights Creek
Wrights Creek (Walton County)
Ximanies Creek
Yellow River
Ziegler Dead River

# Lakes

Adams Lake
Alligator Lake
Blue Cypress Lake
Blue Lagoon
Brick Lake
Cherry Lake
Clark Lake
Clear Lake
Coon Lake
Crescent Lake
Cypress Lake
Dead Lakes
Deer Point Lake
Doctors Lake
Dumfoundling Bay
East Lake Tohopekaliga
Fells Cove
Horseshoe Mud Lake
Kimball Lake
Lake Ajay
Lake Apopka
Lake Ashby
Lake Beauclair
Lake Beresford
Lake Carlton
Lake Center
Lake Cone
Lake Dexter
Lake Dora
Lake Emma
Lake Eustis
Lake Florence
Lake Gentry
Lake George
Lake Griffin

Lake Harney
Lake Harris
Lake Hart
Lake Hatchineha
Lake Hell 'n Blazes also called Lake Hellen Blazes or Lake Helen Blazes
Lake Ida
Lake Istokpoga
Lake Jackson
Lake Jessup
Lake Jesup
Lake Joel
Lake Kissimmee
Lake Lizzie
Lake Louisa
Lake Lucy
Lake Manatee
Lake Manatee (Manatee County)
Lake Mangonia
Lake Marion
Lake Mary Jane
Lake Minnehaha
Lake Minneola
Lake Monroe
Lake Myrtle
Lake Nellie
Lake Okeechobee
Lake Ola
Lake Osborne
Lake Poinsett
Lake Powell
Lake Preston
Lake Rosalie
Lake Rousseau

Lake Santa Fe
Lake Seminole (Gadsden, Jackson Counties)
Lake Seminole (Leon County)
Lake Seminole (Pinellas County)
Lake Susan
Lake Talquin
Lake Tarpon
Lake Thonotosassa
Lake Tohopekaliga
Lake Washington
Lake Weohyakapka
Lake Wimico
Lake Winder
Lake Woodruff
Lake Yale
Little Lake George
Little Lake Harris
Little Lake Santa Fe
Little Sawgrass Lake
Lochloosa Lake
Loughman Lake
Marco Lake
Maul Lake
Mud Lake
Orange Lake
Puzzle Lake
Rodman Reservoir
Ruth Lake
Salt Lake
Sawgrass Lake
Silver Lake
Spring Garden Lake
Stagger Mud Lake
Tick Island Mud Lake

CORPS003871

Tiger Lake
Trout Lake
Tsala Apopka Lake

Ward Lake
Ward Lake (Manatee County)

# COMMONWEALTH OF PUERTO RICO

## Rivers, Streams, Creeks and Channels in Puerto Rico with tidal portions

Canal Blasina (Carolina/Loíza)
Canal Suarez (Carolina)
Caño Boca Chica (Juana Díaz)
Caño Boca Prieta (Humacao)
Caño Boquerón (Cabo Rojo)
Caño Boquilla (Mayaguez)
Caño Cabo Caribe (Vega Baja)
Caño Corazones (Mayaguez)
Caño de Martín Peña (San Juan)
Caño de Santi Ponce (Aguada)
Caño de Santiago (Yabucoa)
Caño García (Rincón)
Caño La Malaria (Cataño)
Caño La Puente (Añasco)
Caño Madre Vieja (Aguadilla)
Caño Matos (Barceloneta)
Caño Merle (Mayaguez)
Caño Tiburones (Arecibo)
Laguna Tortuguero Outlet Channel (Manatí)
Quebrada Branderí (Guayama)
Quebrada Ceiba (Ceiba)
Quebrada Corazón (Guayama)
Quebrada de Los Cedros (Isabela/Aguadilla)
Quebrada del Oro (Mayaguez)
Quebrada Grande de Calvache (Rincón)
Quebrada Icacos (Añasco)
Quebrada Piletas (Rincón)
Quebrada Ramos (Rincón)
Quebrada Salada (Arroyo/Guayama)
Río Antón Ruiz (Naguabo/Humacao)
Río Blanco (Naguabo)
Río Bucaná (Ponce)
Río Camuy (Camuy/Hatillo)
Río Candelero (Humacao)
Río Cañas (Juana Díaz)
Río Cayures (Santa Isabel)
Río Chico (Patillas)
Río Cibuco (Vega Baja)
Río Coamo (Santa Isabel)
Río Cocal (Dorado/Toa Baja)
Río Culebrinas (Aguadilla/Aguada)

Río Daguao (Naguabo/Ceiba)
Río de Bayamón (Toa Baja/Cataño)
Río de La Plata (Dorado)
Río Demajagua (Fajardo/Ceiba)
Río Descalabrado (Juana Díaz/Santa Isabel)
Río Espíritu Santo (Río Grande)
Río Fajardo (Fajardo)
Río Grande (Aguada/Rincón)
Río Grande de Añasco (Añasco/Mayaguez)
Río Grande de Arecibo
Río Grande de Loíza (Loíza)
Río Grande de Manati (Barceloneta/Manatí)
Río Grande de Patillas (Patillas)
Río Guajataca (Quebradillas/Isabela)
Río Guamaní (Guayama)
Río Guanajibo (Mayaguez)
Río Guayabo (Aguada)
Río Guayanés (Yabucoa)
Río Guayanilla (Guayanilla)
Río Herrera (Loíza/Río Grande)
Río Humacao (Humacao)
Río Inabón (Ponce)
Río Jacaboa (Patillas)
Río Jacaguas (Ponce/Juana Díaz)
Río Jueyes (Salinas/Santa Isabel)
Río Loco (Guánica)
Río Mameyes (Río Grande/Luquillo)
Río Matilde (Ponce)
Río Maunabo (Maunabo)
Río Nigua (Arroyo)
Río Nigua (Salinas)
Río Portugués (Ponce)
Río Puerto Nuevo (San Juan)
Río Sabana (Luquillo)
Río Santiago (Naguabo)
Río Tallaboa (Peñuelas)
Río Yaguez (Mayaguez)
Río Yauco (Yauco)

## Tidal lagoons and ponds

Laguna Aguas Prietas (Fajardo)
Laguna Algodones (Vieques)
Laguna Anones (Vieques)
Laguna Arenas (Vieques)
Laguna de las Salinas (Ponce)
Laguna de Levittown (Toa Baja)
Laguna de Piñones (Carolina/Loíza)

Laguna del Condado (San Juan)
Laguna del Flamenco (Culebra)
Laguna del Molino (Culebra (Culebrita))
Laguna El Pobre (Vieques)
Laguna Grande (Fajardo)
Laguna Guaniquilla (Cabo Rojo)
Laguna Joyuda (Cabo Rojo)

Laguna Kiani (Vieques)
Laguna La Plata (Vieques)
Laguna La Torrecilla (Carolina/Loíza)
Laguna Los Corozos (San Juan/Carolina)
Laguna Los Machos (Ceiba)
Laguna Monte Largo (Vieques)

Laguna Playa Grande (Vieques)
Laguna Puerto Diablo (Vieques)
Laguna San José  (San Juan/Carolina)
Laguna Tortuguero (Manatí/Vega Baja)
Laguna Yanuel (Vieques)
Laguna Zoni (Culebra)

# TERRITORY OF THE U.S. VIRGIN ISLANDS

## Ponds and Guts in the U.S. Virgin Islands

### St. John

Brown Bay Pond
Chocolate Hole Pond
Drunk Bay Pond
Elk Bay Pond
Europa Bay Pond
Fish Bay Gut
Fish Bay Pond
Francis Bay Pond
Friis Bay Pond
Great Lameshur Pond
Grootpan Bay Pond
Guinea Gut

Hart Bay Pond
Kiddel Bay Pond
Lagoon Point Pond
Leinster Bay Pond
Mt. Pleasant Pond
Newfound Bay Pond
Privateer Bay Pond
Reef Bay Pond
Salt Pond
Southside Pond
Turner Point Pond

### St. Thomas

Benner Bay Pond
Bolongo Bay Pond
Bovoni Bay Pond
Cabrita Point Pond
Christmas Cove Pond
Coculus Bay Pond
East Gregerie Pond
Eva Point Pond
Fortuna Bay Pond
Frenchman Bay Pond

Great St. James Pond
Hassel Island Pond
Limestone Bay Pond
Little Coculus Bay Pond
Perseverance Bay Pond
Red Hook Pond
Saba Island Pond
Salt Cay Pond
Smith Bay Pond
Sprat Point Pond

### St. Croix

Altona Lagoon
Billy French Ponds
Buck Island Pond
Caledonia Gut
Coakley Bay Pond
Great Pond
Jolly Hill Gut
Krause Lagoon
Manning Bay Pond
River Gut
Robin Bay Pond
Southgate Pond
West End Saltpond

003862

**Supplement**

**to the**

**Jacksonville District Navigable Waters Lists**

**October 5, 2017**

The waters named below were those identified in the first preliminary increment of an effort to update the Jacksonville District Navigable Waters List (List).  Some of the waters named below are duplicated on that List.  Some of the waters below are in addition to that List.  There may be additional waters not listed either below or on the List.

The District makes no claim that these lists are complete or completely accurate.  These lists are for regulatory reference purposes only.  They are not a substitute for a jurisdictional determination (JD).  It is imperative that you contact the appropriate Regulatory Permit Section for a determination on whether the Corps is able to ascertain if a particular project falls within or outside of section 10 authority.

# STATE OF FLORIDA

# Rivers and Creeks

Acorn Lake Creek
Acosta Creek
Adams Mill Creek
Adams Spring Branch
Addison Creek
Africa Bayou
Airport Canal
Alafia River
Alapaha River
Alapahoochee River
Alaqua Creek
Alexander Springs Creek
Alice Creek
Allen Creek
Alligator Bayou
Alligator Branch
Alligator Creek
Amason Creek
Amberjack Cove
Amelia River
Ammonia River Sand Slough
Anclote River
Andrews Creek
Andrews Mill Creek
Angelfish Creek
Angelico Branch
Angelwing Creek
Apalachicola River
Arbor Bush Branch
Arbuckle Branch
Arbuckle Creek
Arch Creek
Archie Creek
Arlington River
Ash Slough

Ates Creek
Athena Warrior Creek
Attapulgus Creek
Aucilla River
Austin Bayou
Avocado Creek
Axle Creek
Back River
Back Slough
Baggett Creek
Bailey Branch
Bailey Mill Creek
Baird Creek
Baker Bayou
Baker Branch
Baker Creek
Banana Branch
Banana Creek
Banana River
Bannahassee River
Barbecue Branch
Barber Branch
Barnett Creek
Barnett Mill Creek
Barron River
Basin Bayou
Basin Creek
Bass Branch
Bass Brinks Creek
Bass Slough
Basset Branch
Battle Creek
Bauldree Branch
Bay Branch
Bay Head Branch

Bayou Canal
Bayou Creek
Bayou George Creek
Bayou Marcus
Bayou Texter
Bayview Creek
Beale Creek
Bear Bay Creek
Bear Branch
Bear Creek
Bearman Creek
Beasley Creek
Beatty Bayou
Beaver Branch
Beaver Creek
Beaverdam Creek
Bedman Creek
Bee Branch
Beech Branch
Beecher Run
Beetree Slough
Belcher Canal
Bell Bay Branch
Bell Branch
Bell Creek
Bells Leg
Bells River
Bellshead Branch
Bends Creek
Bennetts Creek
Bessy Creek
Bethel Creek
Bethel Spring Branch
Betsy Branch
Big Bayou

003863

Big Bear Creek
Big Boggy Branch
Big Branch
Big Branch Beaver Creek
Big Coldwater Creek
Big Creek
Big Cypress Branch
Big Cypress Creek
Big Davis Creek
Big Ditch
Big Fishweir Creek
Big Flounder Creek
Big Fork
Big Head Branch
Big Horse Creek
Big Jones Creek
Big Juniper Creek
Big Lige Branch
Big Magnesia Creek
Big Mound Creek
Big Muddy Creek
Big Mulberry Branch
Big Rock Creek
Big Sable Creek
Big Slough
Big Spring Creek
Big Sweetwater Creek
Big Trout Creek
Big West Bayou
Billies Branch
Bills Arm
Billy Creek
Billys Branch
Bird Branch
Bird Creek
Bird Island Creek
Bishop Creek
Bivens Creek
Black Branch
Black Creek
Black Lake
Black Prong
Black Rock Creek
Black Water Creek
Blackburn Canal
Blackjack Creek
Blackwater Creek
Blackwater River
Blakeslee Creek
Blanket Bay Slough
Blind Creek
Blockhouse Creek
Blount Creek
Blount Mill Creek
Blounts Branch
Blue Creek
Blue Spring Creek
Bluff Branch
Bluff Creek
Boardhead Branch
Boat Creek
Boathouse Creek

Bogey Branch
Boggess Creek
Boggy Bayou
Boggy Branch
Boggy Creek
Boggy Jordan Bayou
Bogy Branch
Boiling Creek
Bone Creek
Bonnet Gully
Bonnet Pond
Booker Creek
Boone Creek
Bootheel Creek
Bostick Branch
Botheration Bayou
Botheration Creek
Bottle Branch
Botts Creek
Boutwell Branch
Bowen Branch
Bowlees Creek
Bowlegs Creek
Bowman Bayou
Box Branch
Braddock Creek
Braden River
Bradford Brook
Bradley Creek
Braggs Branch
Brandy Branch
Brandy Creek
Brannen Creek
Branning Branch
Bray Creek
Bray Mill Creek
Brickyard Creek
Brickyard Cut Off
Brickyard Slough
Bridge Branch
Bridge Creek
Britches Creek
Britt Branch
Britt Creek
Broad Creek
Broad River
Brock Mill Branch
Brooks Branch
Broomstraw Branch
Brothers River
Broward River
Brown Branch
Brown Creek
Broxson Branch
Bruce Creek
Brush Creek
Brushy Creek
Buck Bayou
Buck Branch
Buck Creek
Buck Head Branch
Buck Pelt Branch

Bucket Branch
Buckford Creek
Buckhannon Branch
Buckhead Slough
Buckhorn Creek
Buffalo Mill Creek
Bull Branch
Bull Creek
Bullfrog Creek
Bulow Creek
Bumblebee Creek
Bumpy Creek
Burgess Creek
Burkett Bayou
Burnt Grocery Creek
Burnt Mill Creek
Burton Creek
Butcher Pen Creek
Butler Creek
Buttermilk Slough
Cabbage Creek
Cabbage Drain
Cabbage Slough
Caesar Creek
Caldwell Branch
Calf Branch
California Creek
Callalisa Creek
Callaway Creek
Caloosahatchee Canal
Caloosahatchee River
Camp Branch
Camp Creek
Campbell Branch
Campbell Creek
Campbells Mill Creek
Canal C-41A
Canaveral Barge Canal
Caney Branch
Caney Creek
Cannon Creek
Canoe Creek
Capo Creek
Carlisle Lake
Carlton Branch
Carpenter Creek
Carr Branch
Carr Spring Branch
Carrabelle River
Carroll Creek
Carter Branch
Carter Creek
Casa Cola Creek
Cash Creek
Cat Creek
Catfish Branch
Catfish Creek
Catfish Slough
Catfish Waterway
Cebe Land Cutoff
Cedar Branch
Cedar Creek

003864

CORPS003875

Cedar Hammock Creek
Cedar Point Creek
Cedar River
Cedar Swamp Creek
Cemetery Creek
Chaires Creek
Chandler Hammock Slough
Chandler Slough
Chapel Branch
Charley Creek
Charlie Creek
Chassahowitzka River
Chatham River
Chattahoochee River
Cherry Branch
Chicken Head
Chicken Slough
Chickenhouse Branch
Chipley Creek
Chipola Cutoff
Chipola River
Chito Branch
Choctawhatchee River
Christopher Creek
Chub Creek
Chub Slough
Chula Vista Bayou
Church Creek
Churchhouse Branch
Clabber Creek
Clapboard Creek
Clark Branch
Clark Creek
Clarkes Creek
Clay Branch
Clay Creek
Clay Gully
Clear Branch
Clear Creek
Clearwater Creek
Cleve Hinton Creek
Cobb Branch
Cobb Creek
Cochran Slough
Cockroach Creek
Cocohatchee River
Coffee Branch
Colorinda Creek
Columbia Spring
Commander Creek
Compass Point Creek
Conecuh River
Cook Creek
Cooks Bayou
Coon Camp Branch
Coon Head
Coon Head Branch
Coons Bay Branch
Cooper Branch
Cooper Creek
Coot Creek
Coral Creek

Corbett Branch
Corbit Branch
Cork Slough
Corley Slough
Cormorant Branch
Cossiers Creek
Cosson Mill
Cotton Creek
Counterfeit Mill Creek
Covas Creek
Cow Creek
Cow House Creek
Cow Log Branch
Cowdevil Creek
Cowhead Creek
Cowpen Branch
Cox Creek
Coxes Branch
Crab Creek
Crabgrass Creek
Cracker Branch
Cradle Creek
Craig Creek
Crane Branch
Crane Creek
Crawford Creek
Creighton Bayou
Crooked Creek
Crooked River
Crooked Run
Cross Bayou Canal
Cross Branch
Cross Creek
Cross Cypress Branch
Cross Florida Barge Canal
Crossway Branch
Crystal River
Cunningham Creek
Cuno Creek
Curiosity Creek
Curlew Creek
Curry Creek
Cushion Creek
Cut Creek
Cut Off Creek
Cypress Branch
Cypress Creek
Cypress Pond Branch
Cypress River
Cypress Slough
Cypress Strand
Dallus Creek
Dan May Creek
Danforth Creek
Daughtrey Creek
Dave Branch
Davenport Creek
Davis Branch
Davis Mill Creek
Days Creek
Dead Boy Creek
Dead End Creek

Dead River
Deadfall Creek
Deadmans Branch
Dean Creek
Dean Dead River
DeBarry Creek
Deep Bottom Creek
Deep Branch
Deep Creek
Deep Creek Diversion Canal
Deer Creek
Deer Moss Creek
Deer Prairie Creek
Deer Prairie Slough
Deese Creek
Delaney Creek
Delaney River
Demory Creek
Denham Bayou
Dennis Creek
Depew Creek
Depot Creek
Devall Branch
Devils Den Creek
Devon Creek
Diamond Creek
Dick Creek
Dillaberry Branch
Dip Vat Branch
Dismal Creek
Dispatch Creek
Ditch Branch
Divedapper Creek
Dog Branch
Dolphin Creek
Doorshutter Creek
Dorset Creek
Double Barrel Creek
Double Branch
Double Branches
Double Hammock Creek
Double Head Branch
Double Run Creek
Douglas Slough
Dove Creek
Doyle Bayou
Doyle Creek
Dram Branch
Driver Branch
Drummond Creek
Dry Branch
Dry Creek
Dry Ford Branch
Dry Run
Duck Creek
Duck Pond Branch
Duck Slough
Duckwater Branch
Dug Creek
Dunham Branch
Dunn Creek
Dunns Creek

Durbin Creek
Dusenbury Creek
Duval Branch
Eagle Creek
Eagle Nest
Eagle Nest Bayou
Eaglenest Creek
Early Branch
Earnest Mill Creek
East Bay River
East Branch Coral Creek
East Branch Fourmile Creek
East Branch Mare Creek
East Branch Troublesome Creek
East Creek
East Cutoff
East Cutoff Creek
East Fork Big Coldwater Creek
East Fork Juniper Creek
East Fork Manatee River
East Fork Syfrett Creek
East Goose Creek
East Griffin Creek
East Pepper Creek
East Pittman Creek
East River
East River Cut Off
East Run Cracker Branch
Eaton Creek
Eau Gallie River
Econfina Creek
Econfina River
Econlockhatchee River
Edwards Creek
Egans Creek
Eightmile Creek
Eightmile Slough
Elbow Branch
Elbow Creek
Elevenmile Creek
Ellis Branch
Ellis Creek
Elwood Branch
English Branch
English Creek
Eph Creek
Equaloxic Creek
Ericson Creek
Escambia River
Estero River
Etonia Creek
Evans Creek
Evans Slough
Everett Slough
Faka Union River
Fakahatchee River
Falling Branch
Falling Creek
Fanning Branch
Farley Creek
Farm Creek
Farmdale Bayou

Fenholloway River
Ferguson River
Fern Creek
Ferrell Branch
Ferry Pass Bayou
Finns Slough
First Branch
First Puncheon Branch
Fish Branch
Fish Creek
Fish Pond Branch
Fish Slough
Fishbone Creek
Fisheating Creek
Fisher Branch
Fishing Creek
Fitzpatrick Creek
Fivemile Creek
Flag Creek
Flat Branch
Flat Creek
Fleming Creek
Fletcher Creek
Flint Creek
Flopbuck Creek
Flora Branch
Florida River
Forked Creek
Fort Crawford Creek
Fort Drum Creek
Fort Gadsden Creek
Fort George River
Fort Kirkland Branch
Fort Simmons Branch
Four Mile Branch
Four Mile Creek
Four Tree Cut Off
Fourmile Creek
Fowler Branch
Fox Branch
Fox Creek
Fox Cut
Fox Head Branch
Frazier Creek
Freeman Creek
Frenchman Creek
Frenchmans Creek
Frog Creek
Frye Canal
Fuller Creek
Fundy Bayou
G Creek
Gable Branch
Gamble Creek
Game Creek
Gander Creek
Gap Creek
Garden Creek
Gardner Creek
Gardner Run
Garnier Creek
Garrett Branch

Gaskin Branch
Gates Creek
Gator Branch
Gator Creek
Gator Slough
Gee Creek
Geiger Creek
Georgia Fruit Farm Creek
Get Out Creek
Ghost Creek
Giger Creek
Gilley Creek
Gilshey Branch
Ginhouse Branch
Ginhouse Creek
Glenn Branch
Goat Creek
Goddard Creek
Goldfish Creek
Gomez Creek
Goodbys Creek
Goodwin Creek
Goose Creek
Gopher Creek
Gopher Gully
Gopher River
Gordon River
Gore Branch
Goshum Branch
Gottfried Creek
Gourd Bay
Governors Bayou
Governors Creek
Graham Creek
Grand Canal
Grandaddy Branch
Grape Head Branch
Grassy Creek
Graves Creek
Graveyard Branch
Graveyard Creek
Grayson Slough
Green Branch
Greenfield Creek
Greenhead Branch
Greens Creek
Gregory Mill Creek
Griffin Branch
Grog Branch
Grooms Creek
Groover Branch
Grouper Creek
Guana River
Guardhouse Branch
Gude Branch
Guinea Creek
Gulf County Canal
Gulley Branch
Gully Branch
Gum Branch
Gum Creek
Gum Drift Slough

CORPS003877

Gum River
Gum Slough
Gum Springs Branch
Gum Swamp Branch
Gun Branch
Gunn Creek
Half Creek
Halfway Creek
Halifax River
Hall Creek
Halls Branch
Halls River
Hammock Branch
Hammock Creek
Hampton Branch
Hancock Creek
Hannah Branch
Hannah Mills Creek
Hansford Branch
Happy Creek
Harden Creek
Harlow Branch
Harney River
Harris Creek
Harrison Creek
Harrys Creek
Hart Branch
Harvey Creek
Harvey Prong
Hathaway Mill Creek
Haulover Canal
Haulover Creek
Haw Creek
Hawthorne Creek
Hayes Creek
Heidelberg Branch
Helverson Creek
Henderson Branch
Henderson Creek
Henderson River
Henderson Slough
Hendry Creek
Henry Creek
Hewett Bayou
Hickey Branch
Hickey Creek
Hickory Branch
Hickory Creek
Hickory Slough
Hickory Tree Flat Slough
Hicks Creek
Hidden Johnson Creek
Higgenbotham Creek
High Bluff Creek
High Hill Creek
Highland Park Run
Hillsborough River
Hodges Branch
Hoffman Creek
Hog Branch
Hog Creek
Hog Island Creek

Hog Pen Branch
Hogan Creek
Hogpen Branch
Hogpen Creek
Hogtown Creek
Hole in the Wall
Holley Branch
Holliman Branch
Hollin Creek
Hollis Branch
Hollomans Branch
Holly Creek
Holman Branch
Holmes Creek
Holton Creek
Holy Creek
Hominy Branch
Homosassa River
Honey Creek
Honey Run
Hontoon Dead River
Hopkins Creek
Horns Creek
Horse Creek
Horse Island Creek
Horsehead Creek
Horsehead Run
Horseshoe Creek
Hosford Branch
Hospital Creek
Howard Creek
Howell Branch
Howell Creek
Hubbard Branch
Hubbert Branch
Huckaby Creek
Huckleberry Creek
Hudson Creek
Hughes Ditch
Hulett Branch
Hunter Branch
Hunter Creek
Hurddles Creek
Hurricane Branch
Hurricane Creek
Hurst Branch
Huston River
Hynote Branch
Ichetucknee River
Imperial River
Inconstanton Creek
Indian Bayou
Indian Branch
Indian Camp Creek
Indian Creek
Indian Mound Slough
Indian River
Ingram Creek
Inlet Creek
Intracoastal Waterway
Irvine Slough
Irwin Creek

Island Branch
Island Creek
Istokpoga Canal
Istokpoga Creek
Itchepackesassa Creek
Jack Branch
Jack Creek
Jacks Branch
Jacks Creek
Jackson Creek
Jackson River
Jacobs Creek
Jakes Bayou
Jane Green Creek
Jeffs Cowpen Creek
Jenkins Creek
Jerry Branch
Jewfish Creek
Jim Branch
Jim Creek
Jim Green Creek
Jim Lee Creek
Joe Lamb Branch
Joe River
Joel Branch
John Branch
Johns Creek
Johns Island Creek
Johnson Branch
Johnson Creek
Johnson Mill Branch
Johnson Slough
Johnsontown Bayou
Jolly River
Jones Creek
Jones Mill Creek
Jones Rice Mill Branch
Josephine Creek
Joshua Creek
Joyce Branch
Julian Mill Creek
Julington Creek
Jumper Creek
Jumping Gully
Jumping Gully Branch
Jumping Gully Creek
Juniper Branch
Juniper Creek
Juno Canal
Jupiter Canal
Karen Canal
Keen Branch
Kelley Branch
Kelly Branch
Kelly Creek
Kelly Spring Branch
Kendall Creek
Kennedy Creek
Kentucky Branch
Kestner Creek
Kettle Creek
Kid Creek

003867

King Branch
King Creek
Kings Creek
Kingsley Creek
Kiser Branch
Kissimmee River
Kitchen Branch
Kitching Creek
Kohler Bayou
Krueger Creek
L Bowden Creek
Lafayette Creek
Laird Mill Creek
Lake Dale Branch
Lake Drain
Lake Marion Creek
Lanceford Creek
Langston Branch
Larkin Slough
Lawton Branch
Lee Branch
Left Hand Turner River
Leitner Creek
Lemkin Creek
Lemon Creek
Lettuce Creek
Lettuce Lake Cutoff
Lighter Knot Creek
Lightwood Knot Creek
Lilly Creek
Lily Miller Branch
Limestone Branch
Limestone Creek
Linderman Creek
Linton Spring Branch
Little Alaqua Creek
Little Alligator Creek
Little Angelfish Creek
Little Aucilla River
Little Basin Creek
Little Bear Creek
Little Black Branch
Little Black Creek
Little Boggy Creek
Little Branch Beaver Creek
Little Bullfrog Creek
Little Cedar Bayou
Little Cedar Creek
Little Chaires Creek
Little Charlie Creek
Little Cow Creek
Little Creek
Little Crooked Creek
Little Cypress Creek
Little Denham Bayou
Little Dispatch Creek
Little Dram Branch
Little Dunn Creek
Little Econlockhatchee River
Little Escambia Creek
Little Fishhawk Creek
Little Fishweir Creek

Little Flounder Creek
Little Fort Crawford Creek
Little Grooms Creek
Little Gum Creek
Little Harden Creek
Little Haw Creek
Little Horse Creek
Little Huckleberry Creek
Little Juniper Creek
Little Magnesia Creek
Little Manatee River
Little Moccasin Creek
Little Monteocha Creek
Little Mulberry Branch
Little Orange Creek
Little Payne Creek
Little Porpoise Creek
Little Pottsburg Creek
Little Pumpkin Creek
Little Redfish Creek
Little Reedy Branch
Little River
Little River Canal
Little Rocky Creek
Little Run
Little Sable Creek
Little Saint Marks River
Little Saint Marys River
Little Sandy Creek
Little Shark River
Little Simpson River
Little Sixmile Creek
Little Snake Creek
Little Spring Creek
Little Sweetwater Creek
Little Tide Creek
Little Tomoka River
Little Trout Creek
Little Trout River
Little Wekiva River
Little White River
Little Withlacoochee River
Little Wood River
Littles Bayou
Live Oak Creek
Live Oak Cutoff
Livingston Creek
Lochloosa Creek
Lock Creek
Lofton Creek
Log River
Lolly Creek
London Creek
Lone Cabbage Creek
Long Bayou
Long Branch
Long Branch Creek
Long Creek
Long Grassy Creek
Lost Creek
Lostmans Creek
Lostmans Creek Number Three

Lostmans River
Lower Sister Creek
Lows Creek
Loxahatchee River
Lucy Branch
Lukens Creek
Lumber Creek
MacDonald Creek
Machine Branch
Mack Bayou
Magee Branch
Magnolia Creek
Magnolia Slough
Main Canal
Mainard Branch
Malloy Branch
Malone Creek
Malone Hammock Branch
Manatee Creek
Manatee River
Manning Creek
Manuel Branch
Maple River
Mapps Creek
Mare Branch
Maria Branch
Marian Creek
Mars Canal
Marsh Branch
Marshall Creek
Mary Slough
Mason Branch
Mason Creek
Matanzas River
Mathison Creek
Max Branch
May Creek
May Mill Creek
Mayo Mill Branch
McBride Branch
McBride Slough
McCall Branch
McCollough Branch
McCormick Creek
McCostill Mill Creek
McCoy Branch
McCoy Creek
McCullough Creek
McDavid Creek
McDonald Branch
McGirts Creek
McIntyre Creek
McIver Branch
McKay Creek
McKinney Branch
McKinnon Branch
McMullen Creek
McNair Branch
McQuage Bayou
McQuage Branch
McQueen Creek
Medcalf Lake

Mensler Creek
Merrill Branch
Metts Creek
Miami Canal
Miami River
Middle Creek
Middle Haw Creek
Middle River
Middle Rocky Creek
Middle Warrior Creek
Midway Branch
Mile Branch
Mill Bayou
Mill Branch
Mill Creek
Mill Dam Branch
Mill Log Creek
Mill Pond Branch
Mill Seat Creek
Mill Slough
Miller Bayou
Miller Creek
Milligan Creek
Mills Branch
Mills Creek
Minerva Canal
Minge Branch
Mink Creek
Minnow Creek
Mitchell Branch
Mitchell Creek
Mitchell Mill Creek
Mitchell River
Mizelle Creek
Mobbly Bayou
Moccasin Branch
Moccasin Creek
Moccasin Slough
Molasses Branch
Moncrief Creek
Monden Creek
Money Bayou
Monkey Creek
Monroe Canal
Monroe Creek
Monteocha Creek
Montgomery Slough
Moody Branch
Moore Branch
Moore Creek
Moores Mill Creek
Morgan Creek
Moriah Creek
Morman Branch
Morrell Branch
Morrison Spring Run
Moses Creek
Mosquito Creek
Mossy Head Branch
Moultrie Creek
Mount Pleasant Creek
Mud Creek

Mud Flats Creek
Mud River
Muddy Branch
Mulatto Bayou
Mule Creek
Mullet Creek
Mullock Creek
Munson Slough
Murder Creek
Murray Creek
Mussett Bayou
Myakka River
Myrtle Creek
Myrtle Slough
Nancy Creek
Nancys Cutoff
Narrows Creek
Nassau River
Neat Creek
New River
New Rose Creek
Newcastle Creek
Newman Branch
Nichols Creek
Ninemile Branch
Ninemile Creek
Nomans River
Norris Dead River
North Branch Smith Creek
North Creek
North Double Barrel Creek
North Fork Alligator Creek
North Fork Black Creek
North Fork Loxahatchee River
North Fork Manatee River
North Fork Miami River
North Fork Middle River
North Fork Saint Lucie River
North Fork Taylor Creek
North Harney River
North Palm Beach Waterway
North Prong Alafia River
North Prong Alligator Creek
North Prong Otter Creek
North Prong Saint Sebastian
River
North River
North Sound Creek
Nubbin Slough
Oak Branch
Oak Creek
Oak Grove Branch
Oakie Creek
Ocheesee Creek
Ochlockonee River
Ocklawaha Creek
Ocklawaha River
Okefenokee Slough
Old Canal
Old River
Oldfield Creek
Oleta River

Olive Branch
Oliver Bayou
Olivers Creek
Olustee Creek
Open Creek
Orange Branch
Orange Creek
Orange Grove Branch
Orange Hammock Slough
Orange River
Ortega River
Osceola Creek
Otter Creek
Otter Slough
Outlet River
Outside Lake
Owens Branch
Owl Creek
Oyster Creek
Oyster Prong
Pablo Creek
Packingham Slough
Padgett Branch
Page Creek
Paines Branch
Painter Branch
Palatlakaha River
Palm River
Palmer Slough
Palmetto Branch
Pancho Creek
Panther Branch
Panther Creek
Pareners Branch
Parker Branch
Parrot Creek
Pate Branch
Patterson Branch
Pattillo Creek
Patty Wiggins Branch
Paul Branch
Payne Creek
Peace Creek
Peace Creek Drainage Canal
Peace River
Peach Creek
Peacock Slough
Pearl Creek
Pearly Island Creek
Pecks Branch
Peler Creek
Pelican Bayou
Pelleham Branch
Pellicer Creek
Pelt Creek
Pemberton Creek
Penasula Creek
Penny Creek
Perdido River
Peters Branch
Peters Creek
Petty Branch

003869

Philippe Creek
Phyllis Branch
Piclalene Bayou
Picnic Island Creek
Pierce Branch
Pigeon Creek
Pimple Creek
Pine Barren Creek
Pine Creek
Pine Island Creek
Pine Log Creek
Piney Branch
Piney Creek
Piney Point Creek
Piney Reach Slough
Piney Woods Creek
Pinhook Cut-Off
Pinhook River
Pippin Mill Creek
Pithlachascotee River
Pitt Creek
Pittman Creek
Pitts Bayou
Pitts Creek
Pitts Mill Creek
Pitts River
Plate Creek
Platt Branch
Plummer Creek
Plunder Branch
Pochanee Branch
Polander Branch
Pole Branch
Poley Branch
Polk Creek
Polley Creek
Pollywog Creek
Ponce de Leon Cut
Pond Creek
Poorhouse Creek
Popash Creek
Popash Slough
Poplar Branch
Poplar Creek
Poplar Head Branch
Poppolton Creek
Porpoise Creek
Port Leon Creek
Porter Slough
Porters Bar Creek
Postun Bayou
Potter Creek
Pottsburg Creek
Poucher Branch
Pound Net Creek
Poverty Creek
Powell Creek
Powell Spring Branch
Prairie Creek
Pretty Branch
Price Creek
Priest Branch

Pringle Branch
Pritchell Mill Branch
Prodie Creek
Puckett Creek
Pump Branch
Pumpkin Creek
Pumpkin Hill Creek
Pumpkin River
Purify Creek
Quarry Creek
Quincy Creek
Rainbow River
Rainey Slough
Rake Creek
Ramsey Branch
Ramsey Creek
Ratliff Creek
Rattlesnake Bayou
Rattlesnake Branch
Rattlesnake Slough
Rattlesnake Spring Branch
Raulerson Creek
Rauslerson Branch
Raysor Creek
Reader Creek
Red Bay Branch
Red Bay Creek
Red Fish Creek
Red Head Branch
Red House Branch
Red Wash Branch
Redfish Bayou
Redfish Creek
Redland Canal
Reed Canal
Reedy Branch
Reedy Creek
Regular Creek
Revell Branch
Ribault River
Rice Creek
Richard Creek
Richlander Creek
Ridgeway Creek
Right Prong Stone Mill Creek
Rim Ditch
Ring Jaw Branch
Rio Barcelona Canal
Riomar Creek
River Styx
Roaring Creek
Roberts Creek
Roberts River
Roberts Slough
Robinson Branch
Robinson Creek
Rock Creek
Rock Springs Run
Rock Yard Creek
Rockedge Creek
Rockhouse Creek
Rocky Branch

Rocky Comfort Creek
Rocky Creek
Rocky Run
Rodgers Creek
Rodgers River
Roebuck Creek
Rookery Branch
Rosalie Creek
Rose Creek
Rowell Creek
Royal Palm Hammock Creek
Rum Still Branch
Rushing Branch
Rushing Cutoff
Rutland Creek
Rye Branch
Ryle Creek
Saddle Creek
Sailor Hammock Slough
Saint Francis Dead River
Saint Joe Canal
Saint Joes Creek
Saint Johns Creek
Saint Johns River
Saint Joseph Creek
Saint Lucie Canal
Saint Lucie River
Saint Marks River
Saint Marys River
Saint Sebastian River
Sal Marie Branch
Sal Taylor Creek
Salt Creek
Salt Island Creek
Salt Pan Creek
Salt Run
Salt Springs Run
Saltwater
Sam Knight Creek
Samples Creek
Sampson Creek
Sampson River
Sams Creek Cutoff
San Carlos Creek
San Julian Creek
San Sebastian River
Sand Beach Branch
Sand Branch
Sand Creek
Sand Gully
Sand Hill Creek
Sand Slough
Sandbank Creek
Sanders Branch
Sanders Creek
Sandfly Creek
Sandfly Gully
Sandy Branch
Sandy Creek
Sandy Gully
Sandy Mountain Branch
Sandy Point Bayou

CORPS003881

Sandy Run
Santa Fe River
Sarah Ann Branch
Saul Creek
Saul Creek Cut Off
Saultsman Bayou
Saultsman Cutoff
Saunders Creek
Sawed Slough
Sawmill Slough
Sawpit Creek
Schoolhouse Branch
Scipio Creek
Scoggin Creek
Sconiers Mill Creek
Seabreeze Creek
Searcy Creek
Seaton Creek
Seminole Creek
Seven Pines Creek
Seven Runs
Sevenmile Creek
Sewell Branch
Seybold Canal
Shad Creek
Shady Brook
Shaky Joe Branch
Shark Cutoff
Shark River
Shaw Still Branch
Sheephead Creek
Shell Creek
Shepherd Spring Creek
Sherman Creek
Shine Creek
Shingle Branch
Shingle Creek
Shinney Creek
Shipyard Canal
Shipyard Creek
Shired Creek
Shirttail Branch
Shoal River
Short Creek
Shuler Branch
Sikes Creek
Silcox Branch
Silver Creek
Silver Glen Springs Run
Silver River
Silversmith Creek
Simms Creek
Simpson Creek
Simpson River
Sink Branch
Sink Creek
Sister Pond Creek
Sister River
Sisters Creek
Sixmile Creek
Sixteenmile Creek
Skipper Creek

Slave Canal
Sloman Branch
Smith Bayou
Smith Creek
Smith McCullah Creek
Smokehouse Creek
Smyrna Creek
Snake Bayou
Snake Creek
Snead Creek
Snipe Creek
Snowden Creek
Soap Creek
Soapstone Branch
Soldier Creek
Soldiers Creek
Sombrero Creek
Sopchoppy River
South Amelia River
South Branch Anclote River
South Broad Creek
South Canal
South Creek
South Double Barrel Creek
South Fork Bear Creek
South Fork Black Creek
South Fork Little Manatee River
South Fork Miami River
South Fork Middle River
South Fork Saint Lucie River
South Marsh Creek
South Mouth
South Prong Alafia River
South Prong Alligator Creek
South Prong Fort Godsden Creek
South Prong Saint Marys River
South Prong Saint Sebastian River
South Sound Creek
Southwest Fork Loxahatchee River
Spanish Creek
Spanish Mill Creek
Spiders Gut
Sponge Crawl Creek
Spots Branch
Spring Branch
Spring Creek
Spring Garden Creek
Spring Hammock Run
Spring Run
Spring Warrior Creek
Springhead Creek
Spruce Creek
Squawk Creek
Stag Branch
Stage Stand Branch
Stagger Creek
Stanton Creek
Stapleton Creek
Starrett Creek

Starvation Slough
Stave Branch
Steamboat Creek
Steep Head Branch
Steinhatchee River
Stevens Branch
Stevenson Creek
Steves Wash Branch
Still Creek
Stingray Creek
Stokes Branch
Stokes Creek
Stone Mill Creek
Stopper Creek
Straw Bay Branch
Strawberry Creek
Stroud Creek
Strouds Creek
Styles Creek
Sugar Creek
Sugar Mill Branch
Sugarhouse Creek
Sugarloaf Creek
Sulfur Creek
Sullivans Ditch
Sulphur Run
Sunday Rollaway Creek
Surveyor Creek
Suwannee River
Swamp Creek
Sweetwate Creek
Sweetwater Branch
Sweetwater Creek
Swift Creek
Swift Slough
Swimming Pen Creek
Syfrett Creek
Syrup Branch
Tan Branch
Tan Vat Branch
Tanyard Branch
Tarpon Creek
Tavernier Creek
Taylor Branch
Taylor Creek
Taylor River
Telegraph Creek
Telogia Creek
Tenmile Branch
Tenmile Creek
Terrapin Creek
Tetabar Creek
Thankyouma'am Creek
The Bayou
The Boggies
The Cutoff
Thirtymile Creek
Thomas Branch
Thomas Creek
Thomas Mill Run
Thompson Bayou
Thompson Branch

Thompson Cutoff
Thornton Branch
Thousandmile Creek
Three Brothers Creek
Three Otter Creek
Threemile Branch
Tick Island Creek
Tick Island Slough
Tide Creek
Tidwell Mill Creek
Tiger Branch
Tiger Creek
Tiger Ford Branch
Tiger Pond Creek
Tiller Branch
Timber Branch
Titi Branch
Titi Creek
Tocoi Creek
Todd Branch
Tolomato River
Tom Hahn Creek
Tom King Bayou
Tom Smith Branch
Tomoka River
Toms Creek
Tooke Creek
Toolchest Branch
Tootoosahatchee Creek
Town Branch
Tracy Branch
Trammel Creek
Trawick Creek
Tripod Creek
Troublesome Creek
Trout Bayou
Trout Creek
Trout River
Tubbys Creek
Tucker Bayou
Tucker Creek
Turket Creek
Turkey Creek
Turkey Gobbler Creek
Turkey Hen Creek
Turkey Slough
Turnbull Creek
Turner Creek
Turner River
Turners Creek
Turnpike Branch
Turtle Creek
Turtle Lake Branch
Twin Creek
Twomile Branch
Twomile Creek
Tyner Branch
Tyre Creek
Tyson Creek
Underhill Creek
Upper Sister Creek

Upper Sweetwater Creek
Van Horn Slough
Van Swearingen Creek
Vassey Creek
Vause Branch Ochlockonee River
Virginia Cut
Vossinbury Creek
Waccasassa River
Wacissa River
Wade Canal
Wagner Creek
Wakulla River
Walker Bayou
Walker Branch
Walker Creek
Wall Creek
Ward Creek
Ward Mill Creek
Wards Creek
Wares Creek
Warner Branch
Wasteway Branch
Watch Chain Slough
Water Oak Creek
Watering Creek
Watson River
Weaver Creek
Weaver River
Weaver Warrior Creek
Webb Branch
Week Creek
Weeki Wachee River
Weeks Fisher Creek
Wekiva River
Weohyakapka Creek
West Bay Creek
West Branch Blockhouse Creek
West Branch Coral Creek
West Branch Lightwood Knot Creek
West Branch Mare Creek
West Branch South Prong Alafia River
West Creek
West Cutoff
West Fork Big Coldwater Creek
West Fork Juniper Creek
West Fork Syfrett Creek
West Goose Creek
West Griffin Creek
West Palm Run
West Pepper Creek
West Pittman Creek
West Run Cracker Branch
West Sandy Creek
Western Branch
Wetappo Creek
Whackup Creek
Wharf Creek
Wheeler Branch

Whidden Branch
Whidden Creek
Whiskey Creek
Whiskey George Creek
White Branch
White River
Whiteoak Bayou
Whites River
Whitewater Branch
Whitney River
Whittenhorse Creek
Wiggins Branch
Wigwam Creek
Wilburn Branch
Wildcat Branch
Wildcat Creek
Wilder Branch
Wilder Creek
Wilkinson Creek
Willacoochee Creek
Williams Branch
Williams Creek
Williams Lake
Williamson Creek
Willoughby Creek
Willow Cove Branch
Wills Branch
Wilson Branch
Windmill Branch
Winegourd Creek
Winkley Branch
Winters Creek
Winzy Creek
Wisher Creek
Withlacoochee River
Wolf Branch
Wolf Creek
Wolf Slough
Wolfe Creek
Wolftrap Branch
Womack Creek
Wood River
Woodbine Bayou
Woods Creek
Wrights Creek
Wynn Branch Creek
Ximanies Creek
Yates Creek
Yates Mill Creek
Yellow Bluff Creek
Yellow Creek
Yellow Fever Creek
Yellow River
Yellow Slough
Yellow Water Creek
Yent Bayou
Yoke Branch
Yucca Pen Creek
Zeigler Dead River

CORPS003883

# Lakes

A A Hilton Pond
A J Spencer Pond
Abbott Lake
Acorn Lake
Adams Lake
Adams Pond
Ajay Lake
Albert Gordon Pond
Albritton Lake
Alford Arm
Alligator Lake
Alligator Pond
Alligator Ponds
Alva Davidson Pond
Amory Lake
Anderson Lake
Anderson Pond
Andover Lakes
Andrew Lake
Andrews Lake
Angeles Lake
Anglers Lake
Apshawa Lake
Argenta Lake
Ashton Dead River
Bachelor Lake
Bagget Lake
Bait Lake
Baker Pond
Banana Lake
Banner Lake
Baptizing Pond
Barbara Lake
Barnett Lake
Barpost Lake
Bass Lake
Bath Lake
Battle Pond
Bay Gall Ponds
Bay Horse Pond
Bay Lake
Bazzell Pond
Beakman Lake
Beany Pond
Bear Harbor Lake
Bear Lake
Bear Pond
Beaverdam Lake
Bee Gum Lake
Beer Can Pond
Beetree Pond
Belcher Hole
Bell Lake
Bell Pond
Bell Prairie
Bellamy Pond

Beltons Millpond
Bens Lake
Berchfield Lake
Berry Pond
Bert Brothers Pond
Bethea Lake
Big Blue Lake
Big Boy Lake
Big Island Lake
Big Lake
Big Lake Vienna
Big Lilly Lake
Big Morrell Lake
Big Redfish Lake
Big Trail Pond
Big Whirl
Billy Lake
Bimini Basin
Bird Lake
Bird Pond
Black Lake
Black Pond
Blackfish Lake
Blair Pond
Blanton Lake
Block Pond
Blossom Lake
Blue Lake
Blue Peter Lake
Blue Pond
Blue Sink
Blue Sink Pond
Boat Lake
Boat Pond
Bobcat Pond
Boggess Hole
Boggy Lake
Boiling Creek Lake
Boll Green Lake
Bolt Lake
Bone Bluff Lake
Bone Pond
Bonnet Lake
Bonnet Pond
Boram Lake
Bosse Lake
Bottonwood Pond
Brandt Pond
Brandy Beach Pond
Brickyard Lake
Brickyard Pond
Bright Lake
Brooks Lake
Brooks Pond
Brown Lake
Brown Pond

Brunner Pond
Bryant Pond
Buck Lake
Buck Pond
Buckhorn Creek
Buddy Pond
Buffalo Lake
Bull Slough
Bully Lake
Burke Pond
Burns Lake
Burnt Cypress Lake
Bush Pond
Butterfly Lake
Buttonwood Pond
C R Wise Pond
Cabbage Bay
Caldwells Pond
Calf Lake
Calf Pond
California Lake
Camp Creek Lake
Camp Pond
Campbell Pond
Campground Pond
Carl Pond
Carlney Lake
Carpenter Pond
Carter Pond
Carver Pond
Casa Linda Lake
Cascade Lake
Casson Pond
Casterline Lake
Castle Lake
Cat Island Lake
Cattail Lake
Cattail Lakes
Cedar Lake
Cemetery Lake
Chain O Lakes
Chapman Lake
Charley Pond
Charlotte Pond
Chason Pond
Chason Ponds
Cheney Pond
Chipley Lake
Chub Pond
Clair Pond
Clam Bayou
Clark Lake
Clay Hole Pond
Clay Lake
Clayhole Pond
Clear Basin

003873

Clear Lake
Clear Pond
Clearview Lake
Clearwater Lake
Clyde Reese Pond
Coal Spring Lake
Coleman Pond
Como Lake
Complex Lake
Cooeg Pond
Cook Lake
Coon Pond
Cooney Pond
Coop Pond
Cooper Basin
Coot Bay Pond
Cooter Lake
Coral Cove
Corkins Lake
Cotton Lake
Coulter Basin
Cow Pen Pond
Cow Pond
Cowarts Lake
Cowpen Lake
Cox Lake
Crain Pond
Crane Lake
Crane Pond
Crane Ponds
Cravero Lake
Crawford Lake
Crescent Lake
Crest Lake
Crews Lake
Croft Pond
Crowder Holes
Crown Lake
Crystal Lake
Curry Lake
Cuthbert Lake
Cypress Creek
Cypress Lake
Cypress Pond
Daddy Hole
Dade Lake
Dallis Waterhole
Danley Lake
Danley Pond
Danny Hole
Darkwater Lake
Davenport Bayou
Davis Lake
Davis Pond
Deacon Lake
Deacon Pond
Dead Lake
Dead Lakes
Dead River Lake
Deep Hole
Deep Lake
Deer Lake

Deer Point Lake
Deer Pond
Dempsey Lake
Devils Elbow
Dicks Lake
Dillard Pond
Dinken Bayou
Dinners Pond
Dixon Lake
Dobes Hole
Doctors Lake
Doe Pond
Dog Hole
Dog Lake
Dollar Lake
Dollar Pond
Dolly Lakes
Dorman Pond
Dorset Lake
Dosson Lake
Double Bluff Lake
Double Branch Pond
Double Pond
Double Ponds
Dove Sound
Downing Lake
Dozier Lake
Draper Lake
Dream Pond
Dry Lake
Dry Pond
Duck Lake
Duck Pond
Dykes Mill Pond
Eagle Lake
Eagle Nest Pond
East Fox Lake
East Lake
East Lake Tohopekaliga
East River Pool
Eastern Lake
Echo Lake
Eden Lake
Egypt Lake
Eightmile Pond
Eleven Ponds
Elsie Lake
Emerald Lake
Emmons Bayou
Enchanted Lake
Endless Lake
English Lake
Equus Meadow Pond
Faircloth Lakes
Fairview Lake
Fairway Lake
Fannin Bayou
Fanny Lake
Farles Lake
Faye Lake
Ferguson Bay
Fish Lake

Fivemile Pond
Flora Lake
Flowers Pond
Forehand Pond
Fountain Lake
Four Prong Lake
Fox Lake
Fox Pond
Frank Taucher Reservoir
Freshwater Bayou
Freshwater Lake
Frierson Lakes
Frog Lake
Gainer Pond
Gar Pond
Garden Lake
Gator Hole
Gator Lake
George Ann Lake
Gibbs Pond
Gillis Pond
Gin House Lake
Glenvar Lake
Glisson Pond
Goggleye Lake
Golden Isles Lake
Golden Lake
Goose Pond
Grass Lake
Grass Pond
Grassy Lake
Grassy Pond
Graveyard Lake
Great Pocket
Green Lake
Green Pond
Greenback Lake
Greyknoll Lake
Grimes Lake
Grisset Pond
Guest Lake
Gum Pond
Gum Slough
Gyte Chester Pond
Half Moon Lake
Half Moon Pond
Halfmoon Lake
Halfway Lake
Halfway Pond
Ham Pond
Hamilton Lake
Hammock Lake
Hampton Lake
Handcock Lake
Hankley Lake
Harbor Lake
Hardesty Lake
Hardworking Bayou
Hardy Sink
Hare Lake
Harolds Pond
Harris Pond

Hart Pond
Harvest Lake
Hasenjaeger Lake
Hay Lake
Hay Pond
Headquarters Pond
Heath Pond
Henderson Pond
Hendrics Lake
Henry Dover Pond
Henry Lake
Henry Prescott Pond
Heron Lagoon
Hettie Pond
Hewitt Lakes
Hickory Hammock Lake
Hidden Hollow Lake
Hidden Lake
Higginbotham Lake
Highlog Lake
Hitchcock Lake
Hobart Lake
Hog Pond
Hokey Lake
Holden Lake
Hole in the Wall
Holley Ponds
Homer Lake
Honeymoon Lake
Horse Pond
Horselot Pond
Horseshoe Lake
Horseshoe Mud Lake
Howard Lake
Hubbard Pond
Hubert Bell Pond
Hudson Lake
Huguenot Lagoon
Hundred Acre Pond
Hungerford Lake
Hutson Pond
Hydrilla Lake
Indian Lake
Indian Pond
Inner Clam Bay
Inside Lake
Iola Lake
Island Lake
Island Pond
Ivy Stag Lake
J C Headley Pond
J R Alford Pond
Jacks Lake
James Lake
Jane Pond
Jeb Knight Pond
Jennings Lake
Jernigan Lake
Jernigans Pond
Jessamine Lake
Jewel Lake
Jim Long Lake

John C Pace Pond One
John Quiet Lakes
John Stafford Pond One
John Stafford Pond Two
Johns Pond
Johnson Bayou
Johnson Lake
Johnson Pond
Joiner Lake
Jones Lake
Jones Pond
Jordan Lake
Jug Lake
July Lake
Jungle Bay
Karick Lake
Keene Lake
Kelly Pond
Kemp Pond
Kendale Lake
Kendall Lake
Kentucky Lake
Key Pond
Kimball Lake
King Pond
Knight Lake
Konomac Lake
Ladyfinger Lake
Lago Lindo
Lago Maggiore
Lago Minore
Lago Monaco
Lake Alfred
Lake Alice
Lake All Bright
Lake Allen
Lake Altamaha
Lake Alto
Lake Ann
Lake Annette
Lake Annie
Lake Arcola
Lake Asbury
Lake Audrey
Lake Austin
Lake Avoca
Lake Azalea
Lake Barbara
Lake Beauty
Lake Bedford
Lake Belle
Lake Bellevue
Lake Belmar
Lake Beresford
Lake Bessiola
Lake Bethel
Lake Beulah
Lake Blue
Lake Boca Raton
Lake Bonita
Lake Bonnet
Lake Bonny

Lake Bracy
Lake Bright
Lake Brooker
Lake Brooklyn
Lake Buchanan
Lake Buckhorn
Lake Burbank
Lake Burns
Lake Buynak
Lake Byron
Lake Cannon
Lake Carol
Lake Caroline
Lake Carroll
Lake Cecile
Lake Chapin
Lake Charles
Lake Chasco
Lake Chautauqua
Lake Chelton
Lake Chipley
Lake Citrus
Lake Claire
Lake Clarke
Lake Claudette
Lake Clyde
Lake Coma
Lake Cone
Lake Cooley
Lake Cooper
Lake Crago
Lake Dan
Lake Daugharty
Lake Davis
Lake Deer
Lake Deon
Lake Destiny
Lake Dexter
Lake Diamond
Lake Dicie
Lake Disston
Lake Dixie
Lake Dot
Lake Downey
Lake Duval
Lake Earl
Lake Ebby
Lake Eckles
Lake Eden
Lake Edward
Lake Effie
Lake Elizabeth
Lake Ella
Lake Ellen
Lake Elsie
Lake Emerald
Lake Emily
Lake Emma
Lake Emporia
Lake Enola
Lake Erin
Lake Evergreen

Lake Fan
Lake Fanny
Lake Flamingo
Lake Florence
Lake Fox
Lake Frances
Lake Francis
Lake Galilee
Lake Gass
Lake Gem
Lake Geneva
Lake George
Lake Gibson
Lake Gleason
Lake Grace
Lake Green Sills
Lake Greenwood
Lake Griffin
Lake Harney
Lake Harris
Lake Harry
Lake Hartley
Lake Hartridge
Lake Harvey
Lake Hattie
Lake Henry
Lake Hermosa
Lake Hialeah
Lake Hiawatha
Lake Hicpochee
Lake Holden
Lake Holloway
Lake Hollywood
Lake Horney
Lake Howard
Lake Hugh
Lake Huntington
Lake Hutchinson
Lake Iamonia
Lake Ida
Lake Idlewild
Lake Idylwild
Lake Ingraham
Lake Irene
Lake Issue
Lake Ivanhoe
Lake Jane
Lake Jean
Lake Jennie
Lake Jessie
Lake Jesup
Lake Jewel
Lake John
Lake Juanita
Lake Julia
Lake Juno
Lake Kanapaha
Lake Karen
Lake Katherine
Lake Kersky
Lake Keuka
Lake L Rancho

Lake LaChard
Lake Lafayette
Lake Lagonda
Lake Lappin
Lake Laura
Lake Lee
Lake Lillie
Lake Lily
Lake Lincoln
Lake Lipsey
Lake Little Worth
Lake Loladeni
Lake Lorraine
Lake Lotus
Lake Louisa
Lake Louise
Lake Lucas
Lake Lucille
Lake Lucy
Lake Lula
Lake Lulu
Lake Lure
Lake Madeline
Lake Magdalene
Lake Maggie
Lake Maggiore
Lake Mahar
Lake Manatee
Lake Mangonia
Lake Manning
Lake Marae
Lake Maria
Lake Marie
Lake Marietta
Lake Marion
Lake Martin
Lake Mary
Lake McBride
Lake McLeod
Lake Medora
Lake Miccosukee
Lake Midget
Lake Millbite
Lake Mirror
Lake Monarch
Lake Monroe
Lake Morton
Lake Myra
Lake Myrtle
Lake Nally
Lake Neptune
Lake Number 1
Lake Number 2
Lake Number 3
Lake Number 4
Lake Number Five
Lake Oakland
Lake of the Woods
Lake Okahumpka
Lake Olivia
Lake Omega
Lake Orange

Lake Osborne
Lake Overstreet
Lake Palm
Lake Palmer
Lake Palmerito
Lake Panasoffkee
Lake Pancoast
Lake Patient
Lake Patricia
Lake Pearl
Lake Phillips
Lake Placid
Lake Poinsett
Lake Pollock
Lake Ponte Vedra
Lake Reaves
Lake Rey
Lake Rhea
Lake Roberta
Lake Roberts
Lake Robin Hood
Lake Rogers
Lake Rousseau
Lake Roy
Lake Ruby
Lake Runnymede
Lake Ruth
Lake Sable
Lake Sanitary
Lake Sarah
Lake Sarasota
Lake Saratoga
Lake Seminole
Lake Senac
Lake Sentinel
Lake Serena
Lake Sharpe
Lake Shepherd
Lake Shippey
Lake Sidney
Lake Silver
Lake Simmons
Lake Somerset
Lake Sparkle
Lake Speer
Lake Spencer
Lake Sperry
Lake Stahl
Lake Stanley
Lake Steven
Lake Stone
Lake Surprise
Lake Susan
Lake Sylvia
Lake Terry
Lake Theresa
Lake Tilden
Lake Trowed
Lake Tuttle
Lake Tutuola
Lake Van
Lake Vedra

003876

Lake Virginia
Lake Vivian
Lake Ward
Lake Ware
Lake Warren
Lake Wastena
Lake Wayman
Lake Weader
Lake Weston
Lake Whitcomb
Lake Wilbar
Lake Wimico
Lake Winston
Lake Wire
Lake Woodruff
Lake Worth
Lake Worth Creek
Lake Wyman
Lake Yarbo
Lake Yvette
Lake Yvonne
Lake Zephyr
Lamar Lake
Lamps Pond
Lands Lake
Landy Lake
Lane Pond
Lassiter Lake
Laura Lake
Lazy Lake
Leavins Lake
Lemon Lake
Leroy Ponds
Lettuce Lake
Lighthouse Pool
Lily Lake
Lily Pond
Little Banana Lake
Little Blue Pond
Little Brushy Pond
Little Deer Lake
Little Ellen Lake
Little Fox Lake
Little Gant Lake
Little Gar Lake
Little Halfmoon Lake
Little Henry Lake
Little Lake
Little Lake Barton
Little Lake Bryan
Little Lake Geneva
Little Lake George
Little Lake Green Sills
Little Lake Jackson
Little Lake Maule
Little Lost Lake
Little Morrell Lake
Little Porter Lake
Little Redfish Lake
Little Salt Spring
Little Sand Pond
Little Sawgrass Lake

Little Tucker Lake
Little Van Lake
Live Oak Pond
Lockey Lake
Log Creek Pond
Log Pond
Long Lake
Long Pond
Long Sun Lake
Long Swamp
Lorraine Lake
Lost Boy Pond
Lost Lake
Lovers Lake
Lower Lake Louise
Loxahatchee Slough
Mabel Porter Pond
Major Lake
Major Shear Pond
Manatee Pocket
Mango Lake
Mansfield Pond
Marco Lake
Maria Sanchez Lake
Mariner Lake
Marquis Basin
Martin Lakes
Martin Pond
Martins Mill Pond
Mary Lake
Mary Lou Lake
Maule Lake
Mayan Lake
Mays Pond
McCarthy Lake
McClendon Lake
McQuaig Lake
Mead Lake
Melvina Pond
Menge Pond
Meridian Lake
Metcalf Lake
Middle Fox Lake
Middle Lake
Mile Lake
Mill Pond
Miller Lake
Mills Smokehouse Pond
Milly Lake
Minom Sog
Mirror Lake
Monroe Lake
Moody Lake
Moore Pond
Moran Lake
Morgan Pond
Morris Lake
Morrison Lake
Moses Hole
Mosquito Lake
Moss Pond
Mound Lake

Mounds Pond
Mounds Pool
Mountain Lake
Mountain Sink
Mud Lake
Mud Lakes
Mud Pond
Mudd Lake
Muddy Lake
Mullet Lake
Mullet Pond
Muscogee Lake
Myrtle Lake
Nature Conservancy Bay
Ned Pond
Needmore Pond
Nelson Lake
Newman Bayou
Ninemile Pond
Noreast Lake
North Bear Lake
North Crystal Lake
North Lake
Norwood Lake
Oak Pond
O'Berry Lake
Ocala Pond
Ogden Lake
Ogden Pond
Old Blind Pass
Old Fern Pond
Old Lake
Old Pond
Oldfield Pond
Olsen Lake
Open Pond
Orange Lake
Otter Pond
Otter Ponds
Outlook Lake
Owens Pond
Ox Lake
Ox Pond
Oyster Lake
Oyster Pond
Pace Lake
Palatka Pond
Palm Lake
Palmer Lake
Palmetto Lake
Panama Lake
Paradise Lake
Park Lake
Pasadena Lake
Paul Pond
Payne Pond
Peace Pond
Peacock Lake
Peacock Pond
Pearl Bayou
Pearl Lake
Peck Lake

Pelican Lake
Pelican Pond
Penner Ponds
Perch Lake
Perch Pond
Perry Pond
Peter Gibson Pond
Phyllis Lake
Piclalene Bayou
Picnic Lake
Picnic Pond
Pigott Pond
Pillans Prairie
Pine Bluff Lake
Pine Lake
Pine Log Lake
Piney Z Lake
Pinhook Lake
Pioneer Lake
Pippin Lake
Pirate Cove
Plank Bridge Lake
Plantation Pond
Platt Lake
Playland Lake
Plaza Pool
Pleasant Point Lake
Plew Lake
Point Lake
Polk Lake
Port Leon Lake
Porter Lake
Potter Pond
Pouratis Pond
Powell Lake
Prairie Ponds
Pretty Lake
Pretty Pond
Princess Lake
Puddin Head Lake
Pump Pond
Puzzle Lake
Queen City Lake
R B Spires Pond
R B Squirls Pond
R B Underwood
Race Pond
Railroad Pond
Rainbow Lake
Rat Pond
Rattlesnake Lake
Raulerson Prairie
Rayner Pond
Reason Lakes
Red Bug Lake
Red Lake
Reedy Lake
Rees Lake
Reinheimer Lake
Renfro Lake
Republic Lake
Rexford Lake

Riverside Lake
Roberts Lake
Rock Lake
Rock Pond
Rose Apple Lake
Rosemary Pond
Round Lake
Round Pond
Royal Lake
Ruth Lake
Sabal Lake
Saddleback Lake
Saddlebag Lake
Saddlebags Lake
Saint Johns Lake
Salerno Lake
Salt Lake
Salters Lake
Sam Joe Pond
Sampson Lake
Sams Lake
Sanborn Lake
Sand Hill Pond
Sand Lake
Sand Pond
Sandy Pond
Sanibel Bayou
Santa Fe Lake
Sapp Lake
Sapphire Lake
Sawdust Lake
Sawgrass Lake
Schoolhouse Lake
Scoggin Lake
Sconiers Mill Pond
Sea Pond
Seaboard Pond
Sears Lake
Secret Lake
Sellers Lake
Seminole Lake
Seven Palm Lake
Sevenmile Lake
Sewell Lake
Shacklefoot Pond
Sharon Lake
Sharpes Lake
Sharpless Pond
Shaw Pond
Sheephead Bayou
Sheppard Lake
Sherman Cove
Sherman Inlet
Shirt Tail Lake
Sigler Lake
Silver Lake
Silver Pond
Simmon Pond
Sink Hole Ponds
Sister Pond
Sixmile Pond
Skim Lake

Skinner Lake
Sky Lake
Smokehouse Lake
Smokehouse Pond
Snag Lake
Snapper Creek Lake
South Bass Lake
South Bear Lake
South Bonnet Pond
South Crystal Lake
South Lake
South Lake Asbury
South Moon Lake
South Twin Lake
Southern Pond
Southwater
Sparkleberry Lake
Sparkling Water Lake
Sparling Lake
Spectacle Pond
Spring Head Pond
Spring Lake
Spring Lake Number Two
Spruce Lake
Square Lake
Squirrel Prairie Lake
Stagger Mud Lake
Stalworth Lake
Stanley Sog
Star Lake
Starks Prairie
Starvation Lake
Station Lake
Stealing Lake
Steer Pen Slough
Stergan Lake
Stevens Pond
Still Pond
Stokes Lake
Stony Bayou Pool
Story Lake
Strayhan Pond
Stubbs Lake
Sugarbowl Lake
Suggs Lake
Sunset Lake
Sunshine Lake
Surprise Lake
Swan Lake
Sweet Water Lake
Sweetwater Lake
Sylvia Lake
Tank Pond
Tanner Lake
Tarkiln Bayou
Tarpan Lake
Tarpon Creek
Tater Patch Pond
Taylor Lake
Taylor Slough
Tea Pond
Tee Lake

CORPS003889

Tenmile Lake
The Basin
The Black Holes
The Cutoff
The Lungs
The Narrows
The Pond
Thirsting Lake
Thomas Lake
Thompson Lake
Thompson Pond
Thornhill Lake
Thrasher Nest Pond
Three Pond
Threemile Lake
Tick Island Mud Lake
Tiger Lake
Tiller Mill Lake
Tillmans Pond
Timber Lake
Tom Black Lake
Townsen Lake
Tractor Lake
Triple Lakes
Tropic Lagoon
Trout Lake
Trues Lake
Tucker Lake
Turf Pond
Turner Lake

Turnip Pond
Turtle Harbor
Tusset Pond
Twin Lake
Twin Lakes
Twomile Prairie Lake
Up and Down Lake
Upper Lake Louise
Varnes Lake
Vienna Lake
Waldon Lake
Waldorf Lake
Walton Pond
Ward Lake
Warner East Bayou
Warner West Bayou
Warren Bayou
Wash Pond
Waterview Lake
Watson Pond
Watson Prairie
Wee Lake
Weeks Lakes
Weeks Waterhole
Well Pond
West Arm of Dead Lakes
West Lake
Western Lake
Whidden Lake
Whirlwind Lake

White Flank Pond
White Lake
White Pond
Whitehead Lake
Whitmore Lake
Wicker Lakes
Wickers Pond
Williams Lake
Williams Pond
Wilma Lake
Wilson Lake
Wind Lake
Windsor Pond
Winston Lake
Wistaria Lake
Wolf Pond
Wood Lake
Woodbine Springs Lake
Woodbury Lake
Workman Lake
Workman Pond
Wright Lake
Wynn Lake
X L Lake
Yarber Pond
Yard Pond
Yearling Pond
Zephyr Lake

003879



*Protecting Southwest Florida's unique natural environment and quality of life ... now and forever.*

April 18, 2018                                                    *Sent via email*

Department of the Army
Jacksonville District Corps of Engineers
Regulatory Division
Attn: Determination of Navigable Waters
PO Box 4970
Jacksonville, FL 32232-0019

The Conservancy of Southwest Florida is writing on behalf of our over 6,000 supporters, in regards to the navigability of waters in southwest Florida. The Conservancy strongly opposes the state of Florida assuming Clean Water Act Section 404 permitting authority.

This letter and its attachments should be considered as a response to the Army Corps of Engineers (ACOE) Public Notice dated March 19, 2018, entitled "Determination of Navigable Waters,"[1] along with additional forthcoming comments from the Conservancy and our partners. These comments should be used to provide clarity regarding which waters should be considered as subject to retained ACOE permitting authority under Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403). Additional information-gathering by the ACOE and other stakeholders will be needed to ensure that these determinations are made utilizing a transparent process and complete best available scientific information.

We are very concerned with the original limited public commenting window that the ACOE issued, and even more concerned with the updated public notice dated April 10, 2018[2] that stated the public comment period was closed in advance of the original published deadline.

In preparation of these comments, the Conservancy has reviewed a document entitled "Jacksonville District Navigable Waters List" (a 6 page document that has been attached to the draft Memorandum of Agreement between the Florida Department of Environmental Protection and the Department of the Army that will be referred to in this letter as the "old list") and a document called "Supplement to the Jacksonville District Navigable Waters List" dated October 5, 2017 (a 17 page document that will be referred to in this letter as the "new list"), both enclosed.

ACOE should use the new 17-page list as their <u>starting point</u> **with the inclusion of 139 waters that appear to be removed** from the old 6-page list (see Attachment A). It is unclear why these waters dropped off the list, so again we ask that ACOE adopt the most expansive list of retained waters, including all waters that have previously been identified as navigable.

---

[1] Army Corps of Engineers, 2018. Public Notice. Determination of Navigable Waters. March 19, 2018.
[2] Army Corps of Engineers, 2018. Updated Public Notice. Cessation of Public Comment Period. April 10, 2018.

 Conservancy of Southwest Florida has been awarded Charity Navigator's prestigious 4-Star top rating for good governance, sound fiscal management and commitment to accountability and transparency. Charity Navigator is America's largest and most respected independent evaluator of charities.

1495 Smith Preserve Way  I  Naples, Florida 34102  I  239.262.0304  I  Fax 239.262.0672  I  www.conservancy.org

003880

CORPS003891

Further, the waters identified below -while not an exhaustive list and not a complete description of past, current or potential future commerce, commercial, or recreational activity- may also meet the definition of navigable and should be considered for retention under ACOE purview under Section 10 of Rivers and Harbors[3]:

Charlotte County area
- Alligator Creek (on both lists): has recreational activity including paddling
- Bear Branch (on new list)
- Big Dead Creek (missing from both lists)
- Buck Creek (on both lists)
- Charlotte Harbor (missing from both lists): has recreational activity including paddling
- Charlie Creek (on new list): has recreational activity including paddling
- Coral Creek (on new list)
- Curry Creek (on new list)
- Deer Prairie Creek (on new list)
- Horse Creek (on new list)
- Howard Creek (on both lists)
- Jacks Branch (on new list)
- Joshua Creek (on new list)
- Lee Branch (on new list)
- Lewis Creek (missing from both lists)
- Little Alligator Creek (on new list)
- Myakka River (on both lists): has recreational activity including paddling
- North Fork Alligator Creek (on new list)
- Oyster Creek (on new list)
- Paynes Creek (missing from both lists)
- Peace River (on both lists): has commercial and recreational activity including sightseeing operators and paddling
- Rock Creek (on new list)[4]
- Sam Knight Creek (on new list)
- Shell Creek (on both lists): has recreational activity including paddling
- South Fork Alligator Creek[5] (missing from both lists)
- West Branch Coral Creek (on new list)
- Whidden Creek (on new list)

---

[3] Decades of administrative action and case law relating to the CWA and RHA have established that use in "interstate or foreign commerce" can also include use for recreational commerce activities such as fishing, swimming and boating. *See, e.g., State of Utah By & Through Div. of Parks & Recreation v. Marsh*, 740 F.2d 799, 803-04 (10th Cir. 1984) (interstate commerce included recreational use of lake by interstate travelers for fishing, hunting, boating, camping, wildlife viewing and other activities).
[4] There is a Rock Creek in Charlotte County area, as well as in the Collier County area. It is unclear which Rock Creek is listed on the new Supplemental list.
[5] The new Supplemental list includes a "South Prong Alligator Creek."

003881

<u>Collier County area</u>

- Barron River (on both lists): has recreational activity including paddling and boating
- Barron Canal (missing from both lists)
- Blackwater River (on both lists): has recreational activity including paddling
- Camp Keais Strand (missing from both lists)
- City of Marco area canals
- Clam Bay/Pass (missing from both lists): has recreational activity including paddling
- Cocohatchee River (on both lists): has recreational activity including paddling
- Cocohatchee Canal (missing from both lists): has recreational activity including boating
- Cow Slough (missing from both lists)
- East River (on both lists)
- Fakahatchee Bay (missing from both lists)
- Fakahatchee River (on both lists)
- Fakahatchee Strand (missing from both lists): has recreational activity including paddling
- Faka Union River (on new list)
- Faka Union Bay (missing from both lists)
- Faka Union Canal (missing from both lists): has recreational activity including paddling and boating
- Ferguson River (on new list)
- Haldeman Creek (missing from both lists): has recreational activity including paddling and boating
- Golden Gate Canal (missing from both lists): has recreational activity including Conservancy of Southwest Florida boat tour and kayaking
- Gordon River (on new list): has recreational activity including Conservancy of Southwest Florida boat tour and kayaking
- Henderson Creek (on both lists): has recreational activity including paddling and boating
- Lake Trafford (missing from both lists): has commercial and recreational activity including fishing, airboat operators, sightseeing operators, and marina
- Little Hickory Bay (missing from both lists)
- Naples Bay (missing from both lists)
- New River (on both lists)
- Okaloacoochee Slough (missing from both lists)
- Pumpkin Bay (missing from both lists) - paddling
- Silver Strand (missing from both lists)
- Rock Creek (on new list): has recreational activity including boating
- Rookery Bay (missing from both lists): has recreational activity including paddling
- Turner River (on both lists): has commercial and recreational activity including sightseeing operators and paddling
- Water Turkey Bay (missing from both lists)
- Whitney River (on both lists)
- Wiggins Pass (missing from both lists): has recreational activity including paddling

<u>Lee, Hendry, and Glades County areas</u>

- Bedman Creek (on new list): has recreational activity including paddling
- Bee Branch (on new list)
- Billy Creek (on both lists): has recreational activity including paddling

CORPS003893

- Caloosa Creek (missing from both lists): has recreational activity including paddling
- Caloosahatchee River (on both lists): has recreational activity including paddling
- Caloosahatchee Canal (on new list)
- Catfish Creek (on new list)
- City of Cape Coral canals (missing from both lists): has recreational activity including paddling, fishing, and boating
- Cypress Branch (on new list)
- Cypress Creek (on both lists): has recreational activity including paddling
- Daugherty Creek (missing from both lists): has recreational activity including paddling
- Deadmans Branch (on new list)
- Deep Lagoon Canal (missing from both lists): has recreational activity including paddling
- Estero River (on both lists): has commercial and recreational activity including paddling
- Estero Bay (missing from both lists): has recreational activity including paddling and boating
- Fisheating Creek (on both lists): has commercial and recreational activity including sightseeing operators and paddling
- Fitcher's Creek (missing from both lists): has recreational activity including paddling
- Fort Simmons Branch (on new list)
- Four Mile Cove[6] (missing from both lists): has recreational activity including paddling
- Gasparilla Sound (missing from both lists): has commercial and recreational activity including paddling, boating, sightseeing operators
- Gator Slough (on the new list) : has recreational activity including paddling
- Goodno Canal (missing from both lists)
- Hancock Creek (on new list): has recreational activity including paddling
- Hendry Creek (on new list)
- Hickey Creek (on new list): has recreational activity including paddling
- Imperial River (on both lists):  has commercial and recreational activity including paddling and sightseeing operators
- Jewfish Creek (on new list): has recreational activity including paddling
- Jug Creek (missing from both lists): has recreational activity including paddling, fishing, boating
- Lake Hicpochee (missing from both lists): has recreational activity including paddling
- Lake Okeechobee (missing from new list): has commercial and recreational activity including paddling, marina, resort
- Lake Okeechobee Rim Canal (missing from new list)
- Lake Okeechobee Waterway (missing from new list): has commercial and recreational activity including boating
- Long Hammock Creek (missing from both lists)
- Manuel Branch (on new list): has recreational activity including paddling
- Marsh Point Creek (missing from both lists): has recreational activity including paddling
- Matlacha Pass (missing from both lists): has commercial and recreational activity including paddling, boating, and shellfish harvesting
- Mullock Creek (on new list): has recreational activity including paddling
- Nine Mile Canal (missing from both lists)
- Oak Creek (on new list): has recreational activity including paddling
- Orange River (on both lists): has commercial and recreational activity including paddling

---

[6] The new Supplemental list includes a "Four Mile Branch" and "Four Mile Creek."

- Otter Creek (on new list): has recreational activity including paddling
- Owl Creek (on new list): has recreational activity including paddling
- Palm Creek (missing from both lists)
- Pine Island Creek (on new list)
- Pine Island Sound (missing from both lists): has commercial and recreational activity including paddling and boating
- Pollywog Creek (on new list)
- Popash Creek (on new list): has recreational activity including paddling
- Powell Creek (on new list)
- Roberts Canal (missing from both lists)
- San Carlos Bay (missing from both lists): has recreational activity including paddling and boating
- Sanibel River (missing from both lists): has recreational activity including paddling
- Shell Creek[7] (on both lists): has recreational activity including paddling
- Six Mile Cypress Slough (missing from both lists)
- Spanish Creek (on new list): has recreational activity including paddling
- Spring Creek (on both lists): has recreational activity including paddling
- St. James Creek (missing from both lists): has recreational activity including paddling
- Stroud Creek (on new list): has recreational activity including paddling
- Telegraph Creek (on new list): has recreational activity including paddling
- Ten Mile Canal (missing from both lists): has recreational activity including paddling
- Townsend Canal (missing from both lists)
- Trout Creek (on both lists): has recreational activity including paddling
- Whiskey Creek (on new list): has recreational activity including paddling
- Yellow Fever Creek (on new list): has recreational activity including paddling
- Yucca Pen Creek

If you have any questions about our letter, please contact me at (239) 262-0304, ext. 286. Thank you for considering our comments.

Sincerely,

Amber Crooks
Environmental Policy Manager

ENCLOSURES: Navigable Waters List (6 pages)
            Supplement to the Jacksonville District Navigable Waters List dated October 5, 2017
            (17 pages)

---

[7] There is a Shell Creek in Charlotte County area, as well as in the Lee County area. It is unclear which Shell Creek is listed.

**Attachment A**

**Waters that were on the 6-page document but not included in the 17-page update (2017):**

Rivers and Creeks

1. Alligator Lake – Lake Gentry
2. Barrentine Creek
3. Big Marco River
4. Big Mud Creek
5. Black Creek (Walton County)
6. Blue Hole Creek
7. Blue Springs Run
8. Bonnet Creek
9. Boynton Canal
10. Brick-Alligator Lake Canal
11. Broward Creek
12. C-15 Canal
13. C-17 Canal
14. C-18 Canal
15. C-23 Canal
16. C-24 Canal
17. C-51 Canal
18. Chicopit Bay
19. Coldwater Creek
20. Coon Lake-Lake Lizzie Canal
21. Coral Gables Waterway
22. Cormorant Creek
23. Cowhead Creek
24. Dania Cut-Off Canal
25. Deblieu Canal
26. Doctors Lake
27. Gulley Creek
28. Haines Creek
29. Hatchett Creek
30. Hatchineha Canal
31. Hillsboro Canal
32. Hillsboro River
33. Hitchens Creek
34. Holiday Harbor
35. Hudson Bayou

CORPS003896

36. Indian River North
37. Jackson Canal
38. Johnson Creek (Gulf County)
39. Jones Swamp Creek
40. Kentner Creek
41. L-40 Canal
42. L-8 Canal
43. Lafayette Creek
44. Lake Ajay-Fells Cove Canal
45. Lake Apopka-Beauclerc Canal
46. Lake Ashby Canal
47. Lake Center-Coon Canal
48. Lake Griffin-Lake Canal
49. Lake Hart-Ajay Canal
50. Lake Joel-Myrtle Canal
51. Lake Joel-Trout Canal
52. Lake Lizzie-Alligator Canal
53. Lake Mary Jane-Hart Canal
54. Lake Myrtle-Mary Jane Canal
55. Lake Okeechobee Rim Canal
56. Lake Okeechobee Waterway
57. Lake Preston-Myrtle Canal
58. Lake Worth Lagoon
59. Lehigh Central
60. Little Clapboard Creek
61. Little Double Creek
62. Little Mud Creek
63. Lopez River
64. Moore's Creek (Martin County)
65. Morris Dead River
66. Morrison Creek
67. Murphy Creek
68. Myakkahatchee Creek
69. NN Creek
70. North New River Canal
71. Old Channel
72. Pea River
73. Phelps Creek
74. Poncho Creek
75. Rocky Creek
76. Salt Creek

77. Short Canal
78. Snell Creek
79. South Port Canal
80. Stranahan River
81. Summer Haven River
82. Tarpon River
83. Trout-Coon Lake Canal
84. Turkey Creek
85. Warf Creek
86. West Branch*[8]
87. West Palm Beach Canal
88. Woodruff Creek
89. Wrights Creek (Walton County)

Lakes

1. Blue Cypress Lake
2. Blue Lagoon
3. Brick Lake
4. Cherry Lake
5. Coon Lake
6. Dumbfoundling Bay
7. Fells Cove
8. Lake Ajay
9. Lake Apopka
10. Lake Ashby
11. Lake Beauclair
12. Lake Carlton
13. Lake Center
14. Lake Dora
15. Lake Gentry
16. Lake Hatchineha
17. Lake Hell 'n Blazes
18. Lake Isokpoga
19. Lake Jackson
20. Lake Jessup
21. Lake Joel
22. Lake Kissimmee

---

[8] West Branch Blockhouse Creek, Coral Creek, Lightwood Knot Creek, Mare Creek, & South Prong Alafia River included in the update.

CORPS003898

23. Lake Lizzie
24. Lake Manatee
25. Lake Mary Jane
26. Lake Minnehaha
27. Lake Minneola
28. Lake Nellie
29. Lake Okeechobee
30. Lake Ola
31. Lake Powel
32. Lake Preston
33. Lake Rosalie
34. Lake Santa Fe
35. Lake Talquin
36. Lake Tarpon
37. Lake Thonotosassa
38. Lake Tohopekaliga
39. Lake Washington
40. Lake Weohyakapka
41. Lake Winder
42. Lake Yale
43. Little Lake Harris
44. Little Lake Santa Fe
45. Lochloosa Lake
46. Loughman Lake
47. Rodman Reservoir
48. Spring Garden Lake
49. Tsala Apopka Lake
50. Ward Lake (Manatee County)

| | |
|---|---|
| **From:** | Tania Galloni |
| **To:** | Navigability Determination; Kirk, Jason A COL USARMY CESAJ (US) |
| **Cc:** | Kinard, Donald W CIV USARMY CESAJ (US); White, Tori K CIV USARMY CESAJ (US); "Glenn.trey@Epa.gov"; "Mcgill.Thomas@epa.gov"; "pace.wilber@noaa.gov"; "larry_williams@fws.gov" |
| **Subject:** | [Non-DoD Source] Public Comment Submission re: Determination of Navigable Waters in Florida |
| **Date:** | Wednesday, April 18, 2018 3:52:52 PM |
| **Attachments:** | 2018 04 18 Public Comment Letter to USACE.pdf |
| | 2018 04 18 Exhibit 1.pdf |
| | 2018 04 18 Exhibit 2.pdf |
| | 2018 04 18 Exhibit 3.pdf |
| | 2018 04 18 Exhibit 4.pdf |
| | 2018 04 18 Exhibit 5.pdf |
| | 2018 04 18 Exhibit 6.pdf |
| | 2018 04 18 Exhibit 7.pdf |
| | 2018 04 18 Exhibit 8.pdf |

Please see the attached public comments submitted on behalf of Florida Wildlife Federation, the Conservancy of Southwest Florida, the Miami Waterkeeper, and St. Johns Riverkeeper, with exhibits, in response to the Corps' March 19, 2018 request for public input regarding navigable waters in Florida. Please feel free to contact me if you have any questions or would like additional information. Many thanks for your consideration.


* * *


Tania Galloni

Managing Attorney

Earthjustice Florida Office

earthjustice.org <Blockedhttp://www.earthjustice.org/>


4500 Biscayne Blvd., Ste 201

Miami, FL 33137

T: 305.440.5434


111 S. MLK Jr. Blvd.

Tallahassee, FL 32301

T: 850.681.7203

CORPS003900

The information contained in this email message may be privileged, confidential and protected from disclosure.

If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.

If you think that you have received this email message in error, please notify the sender by reply email and

delete the message and any attachments.

003890

CORPS003901



ALASKA   CALIFORNIA   FLORIDA   MID-PACIFIC   NORTHEAST   NORTHERN ROCKIES

NORTHWEST   ROCKY MOUNTAIN   WASHINGTON, D.C.   INTERNATIONAL

Colonel Jason A. Kirk, District Commander
Department of the Army
Jacksonville District Corps of Engineers, Regulatory Division
Att'n: Determination of Navigable Waters
P.O. Box 4970
Jacksonville, Florida 32232-0019

April 18, 2018
*Via Email* Navigability_Determination@usace.army.mil
Jason.a.kirk@usace.army.mil

Dear Colonel Kirk:

Please accept these comments on behalf of Florida Wildlife Federation, the Conservancy of Southwest Florida, the Miami Waterkeeper, and the St. Johns Riverkeeper regarding the navigability of waters in the State of Florida within the meaning of Section 10 of the Rivers and Harbors Act of 1899 (RHA), 33 U.S.C. § 403, for purposes of determining the Corps' jurisdiction should the U.S. Environmental Protection Agency (EPA) grant Florida's anticipated request to administer its own permitting program under Section 404(a) of the Clean Water Act of 1972 (CWA), 33 U.S.C. § 1344, in waters of the United States.[1]

Since 1936, the **Florida Wildlife Federation** (FWF) has worked to ensure that Florida's wildlife and fragile environment have a voice. Among other things, FWF is dedicated to protecting Florida's waterways, as wildlife cannot thrive where wetlands are drained, waters polluted and habitats degraded or destroyed. The **Conservancy of Southwest Florida** is dedicated to the protection of Southwest Florida's land, water, wildlife and future through advocacy, science, education, and wildlife rehabilitation. The Conservancy was founded in 1964 in response to plans to build a road through Rookery Bay and carries on its mission to preserve wetlands and downstream areas important to the health of the ecosystem, economy, and quality of life. **Miami Waterkeeper's** (MWK) mission is to defend, protect, and preserve South Florida's watershed through citizen engagement and community action rooted in sound science and research. MWK works to ensure swimmable, drinkable, fishable water for all. The **St. Johns Riverkeeper** mission is to be an independent voice that defends, advocates, and activates others to protect and restore the St. Johns River, Florida's longest and most significant river for commercial and recreational use.

---

[1] These comments are also supported by several additional **Florida Waterkeepers**, independent organizations belonging to Waterkeeper Alliance, whose members combine firsthand knowledge of their waterways with an unwavering commitment to the rights of their communities and to the rule of law. (*See* Exhibit 1 at 2, Letter from Florida Waterkeepers.)

003891
CORPS003902



ALASKA   CALIFORNIA   FLORIDA   MID-PACIFIC   NORTHEAST   NORTHERN ROCKIES

NORTHWEST   ROCKY MOUNTAIN   WASHINGTON, D.C.   INTERNATIONAL

We oppose Florida's attempt to assume jurisdiction over Section 404 permitting, which would imperil invaluable water resources in the state. We urge the Corps to recognize the unique complexity of waters in Florida; to ensure any assessment of Section 10 versus assumable waters is transparent, comprehensive, based in science, and informed by public participation; and to retain the maximum jurisdiction possible under federal law in the Nation's interest.

<u>The Unique Nature and Value of Waters in the State of Florida</u>

Florida's water resources are stunning and uniquely complex. The State's distinctive peninsular shape, flat topography and karst terrain create prolific coastlines, rivers, springs, and lakes. With almost 1,200 miles of coastline, more than 7,500 lakes (greater than 10 acres), 33 first-magnitude springs, and approximately 27,561 linear miles of rivers and streams, water is one of Florida's most prominent features. *See* Elizabeth Purdum, U.S. Geological Survey, *Florida Waters: A Water Resources Manual* 49 (2002), *available at* http://www.swfwmd.state.fl.us/publications/files/floridawaters.pdf; Florida Department of State, Quick Facts, http://dos.myflorida.com/florida-facts/quick-facts/ (last visited April 12, 2018); Florida Department of Environmental Protection, *2016 Integrated Water Quality Assessment for Florida* 34 (2016) *available at* https://floridadep.gov/sites/default/files/2016-Integrated-Report.pdf.

Countless valuable wetlands are widely distributed throughout the State, including the renowned Everglades and Big Cypress Swamp. *See e.g.*, Albert Hine, *Geology of Florida*, 17-18 (2009), *available at* https://www.cengage.com/custom/enrichment_modules.bak/data/1426628390_Florida-LowRes_watermarked.pdf. With approximately 11 million acres of wetlands, Florida has more than any of the other conterminous states. U.S. Geologic Survey, *National Water Summary on Wetland Resources Water Supply Paper* 2425, *available at* https://water.usgs.gov/nwsum/WSP2425/state_highlights_summary.html. These often shallow wetlands are vast and diverse and include rare habitats such as mangrove swamps and hydric hammocks. *See* Purdum, *Florida Waters: A Water Resources Manual* 49.

In addition to these expansive surface waters, Florida has more groundwater than any other state. *See id*. Florida's unusual terrain is significant. As the groundwater seeps beneath the ground through sinkholes, underground caverns, and limestone channels and cracks, it connects to Florida's abundant surface waters in fluctuating and intricate ways. *Id.* at 49-52. The interconnectedness of surface and ground waters make determining watershed boundaries and drainage patterns particularly challenging. *See id.* at 52. Drainage patterns have been described as "disjointed" because rivers and streams do not continuously flow on the surface but instead disappear at times in the karst terrain. *Id.*

FLORIDA REGIONAL OFFICE    4500 BISCAYNE BLVD., STE 201    MIAMI, FL    (305) 432-5433    FLOFFICE@EARTHJUSTICE.ORG



Florida's waters help sustain some of the world's most diverse species.  Florida lies within the North American Coastal Plan, the World's 36th Biodiversity Hotspot, and is considered the richest area biologically for endemic species.  Zenaida Kotala, *Florida Declared a Global Biodiversity Hotspot*, UCF Today (Feb. 26, 2016), https://today.ucf.edu/florida-declared-a-global-biodiversity-hotspot/.  Freshwater resources in Florida provide nesting, foraging, wintering and migrating habitats for numerous species of fish and wildlife.  Florida Fish and Wildlife Conservation Commission, *Florida's Freshwater Priority Resources: A Guide for Future Management* 1 (2017), *available at* http://myfwc.com/media/4386049/fwpriorityresourcesguide.pdf.

These resources are relied on by high numbers of threatened and endangered plants (26%) and animals (45%) and, as such, are designated as critical habitat under the Endangered Species Act. *Id*.  Due to having one of the highest rates of habitat loss, Florida's water resources and the species that depend on them are some of the most threatened.  *See* Denise Rocus and Frank Mazzotti, University of Florida/IFAS Extension, *Threats to Florida's Biodiversity* (1996), *available at* https://edis.ifas.ufl.edu/pdffiles/UW/UW10700.pdf; Zenaida Kotala, *Florida Declared a Global Biodiversity Hotspot*, UCF Today (Feb. 26, 2016), *available at* https://today.ucf.edu/florida-declared-a-global-biodiversity-hotspot/.

Florida's waterways are unique, extensive and complex.  Identifying wholesale which Florida waterbodies constitute navigable waters of the United States for purposes of assumption is impracticable.  It is sure to lead to jurisdictional conflict, regulatory uncertainty, public confusion, administrative delay and costly litigation.

In addition, Florida's waters are critical to several multi-billion dollar industries, including agriculture and tourism, affecting interstate commerce.  *See, e.g.*, Visit Florida, Tourism Fast Facts, https://www.visitflorida.org/about-us/what-we-do/tourism-fast-facts/ (last visited April 18, 2018); Florida Department of Agriculture and Consumer Services, Florida Agriculture Overview and Statistics, https://www.freshfromflorida.com/Divisions-Offices/Marketing-and-Development/Education/For-Researchers/Florida-Agriculture-Overview-and-Statistics (last visited April 18, 2018). The United States can and should retain jurisdiction over these waters to the greatest extent possible under federal law.

<u>Florida's Rush to Assume Jurisdiction is Ill-Advised</u>

As stated above, we oppose Florida's attempt to assume jurisdiction over Section 404 permitting—something that after careful study more than a decade ago the State determined would not be feasible in Florida.  We see no need for the State to revisit this issue, and to do so now is a wasteful expenditure of time and resources for all involved.  We are particularly concerned that the Governor is aggressively fast-tracking a plan to assume jurisdiction without giving sufficient consideration to all the issues at stake or providing adequate opportunity for

**EARTHJUSTICE**

ALASKA   CALIFORNIA   FLORIDA   MID-PACIFIC   NORTHEAST   NORTHERN ROCKIES

NORTHWEST   ROCKY MOUNTAIN   WASHINGTON, D.C.   INTERNATIONAL

meaningful public input and participation. Florida's plan is ill-advised and ill-conceived. We urge the Corps not to succumb to pressure to expedite this process.

In 2005, Florida thoroughly considered, but ultimately declined to pursue, assumption of the Section 404 program. *See* Florida Department of Environmental Protection, *Consolidation of State and Federal Wetland Permitting Programs Implementation of House Bill 759 (Chapter 2005-273, Laws of Florida)*, Sept. 30, 2005 ("2005 FDEP Report," attached as Exhibit 2).

Among other things, the FDEP observed that "[b]ecause all coastal waters and a significant number of inland waters are deemed navigable" these waters "would be excluded from state assumption under current federal law[.]" 2005 FDEP Report at 2. The FDEP concluded that for assumption in Florida to be feasible, several changes to state and federal law would be required. *Id.* at 3-5. The FDEP recognized that "the boundaries between navigable and non-navigable waters are not clearly defined in many waters" in Florida, and that as a result, Florida would "not [be] able to assume the federal program in large portions of the state." *Id.* at 8.

Relevant circumstances have not changed in the intervening 10+ years so as to justify Florida revisiting assumption. Specifically, Florida has failed to: (1) perform an updated study of the feasibility of assumption in Florida, (2) identify meaningful changes in the science, evidence, and circumstances that would warrant departing from its conclusion not to pursue assumption in the past, (3) provide adequate opportunity to the public to provide input on whether assumption should be pursued, (4) provide complete and accurate information to state legislators when they were presented with state agency-driven enabling legislation, (5) maintain and properly staff and fund its existing permitting and regulatory programs, (6) ensure adequate protection of Florida waters already under the State's jurisdiction, (7) request any resources to ensure the capacity to administer an additional federal program, or (8) strengthen state laws to ensure adequate protection of Florida's waters and meet federal standards. We understand that if Florida proceeds with this plan and submits an assumption application to EPA, the EPA will afford the public an opportunity to comment on that application. We intend to submit additional information at that time.

Given the lack of consideration and study by the State of Florida, the complexity of the waters involved, and the environmental, commercial and other interests that are at stake, it would be premature for the Corps to render navigability determinations for purposes of state assumption. To continue to rush this process will only create more confusion for the public, more uncertainty for the regulated community, and more challenges for ensuring that waters of the United States in Florida receive the full protections afforded by federal law.

003894

CORPS003905



In light of the foregoing, we also urge the Corps to recognize the impracticability of attempting to delineate where its navigable waters begin and end for purposes of assumption at this time, and to convey these challenges to the State of Florida for further review, study, public input and deliberation.

<u>Florida's Department of Environmental Protection Is Not Equipped to Administer a Section 404 Program</u>

Adequate funding and staff are a critical component of determining whether a state can adequately administer an important CWA program such as Section 404 permitting affecting the destruction or pollution of wetlands. Yet, rather than increase resources to take on such a large and important endeavor, over the past eight years Florida's Governor has severely reduced staff and funding for the State's Department of Environmental Protection, including in its wetlands regulatory division.

The Tampa Bay Times described Florida's recent environmental record as an "environmental disaster." *Editorial: The Rick Scott record: an environmental disaster*, Tampa Bay Times, Sept. 5, 2014 (Exhibit 3), *available at* http://www.tampabay.com/opinion/editorials/editorial-the-rick-scott-record-an-environmental-disaster/2196359. The State's leading paper observed that the administration had reduced water management budgets, rushed through permitting, weakened enforcement, caused widespread layoffs, provoked a brain drain of experts in the field, and replaced experts with political appointees focused on advancing business interests rather than environmental stewardship.[2] Plainly, this is not a department equipped to assume a major new program that must protect waters in Florida.

In 2016, an analysis released by Public Employees for Environmental Responsibility (PEER) found that in 2015 FDEP had opened 81% fewer enforcement cases, collected the lowest number of fines in 28 years, and assessed no penalties in a third of the cases. PEER, *Scott's Undeclared Polluters' Holiday Stains Florida* (Aug. 17, 2016), press release *available at* https://www.peer.org/news/news-releases/scott%e2%80%99s-undeclared-polluters%e2%80%99-holiday-stains-florida.html; PEER, *Report on Enforcement Efforts By the Florida Department of Environmental Protection Calendar Year 2015*, report *available at* https://www.peer.org/assets/docs/fl/8_18_16_DEP_Report_on_2015_Enforcement.pdf (both are attached as Exhibit 4).

---

[2] *See also* St. Johns Riverkeeper, *State Failing to Protect Our Waterways*, http://www.stjohnsriverkeeper.org/blog/state-agencies-failing-environment/ (compilation of newspaper articles describing the State's environmental record).

FLORIDA REGIONAL OFFICE    4500 BISCAYNE BLVD., STE 201    MIAMI, FL    (305) 432-5433    FLOFFICE@EARTHJUSTICE.ORG

003895



Despite having a weakened and underfunded agency, on December 28, 2017, the Florida legislature quietly introduced a bill to authorize the FDEP to pursue assumption over Section 404 waters.  FDEP assured legislators that assumption would be simple, that it would only streamline and expedite permit approvals, that the State would provide the same federal protections required under the current program, that very few permits were at issue, and that no additional resources would be needed.  Legislators relied on these baseless representations throughout the legislative process.

On January 29, 2018, the State's leading paper urged against allowing Florida to pursue assumption, citing the same concerns about the FDEP.  *Editorial: Don't Let Florida Take Over Wetlands Permitting*, Tampa Bay Times, Jan. 29, 2018 (Exhibit 5), *available at* http://www.tbo.com/opinion/editorials/Editorial-Don-t-let-Florida-take-over-wetlands-permitting_164963973 (raising concerns about the reduction of the DEP workforce and funding for environmental programs; "There is no reason to have confidence that the state agency is prepared to take on this obligation . . . The wetlands are too important to Florida's economy and to public safety in a coastal state to put the interests of developers ahead of the general good.").

Nevertheless, according to former FDEP Secretary Victoria Tschinkel, Florida legislators "tripped over themselves in a stampede" to pass vague enabling legislation on behalf of those who seek "fast and simple permitting."  Victoria Tschinkel, *Do Not Leave Wetlands Protection to Chance*, Orlando Sentinel, Mar. 9, 2018 (Exhibit 6), *available at* http://www.orlandosentinel.com/opinion/os-ed-do-not-leave-wetlands-protection-to-chance-20180309-story.html.

On March 9, 2018, former Secretary Tschinkel urged the Governor to veto the bill, noting among other things that "Florida has already lost half its wetlands, with great negative effects on water quality, fish nurseries, wildlife habitat and flood control." *Id.*  On March 23, 2018, Governor Scott signed the bill into law.

<u>The Corps' Determination of What Waters Can Be Assumed Under 33 U.S.C. § 1344(g) Requires Time, Resources, Public Input, Transparency and Scientific Integrity</u>

As the Corps notes in its Public Notice, any Section 404 program proposed by Florida would not include navigable waters of the United States, which remain under exclusive federal jurisdiction under federal law.  33 U.S.C. § 403; *id.* § 1344(g).  Specifically, federal law provides that waters and their adjacent wetlands that are "presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast" constitute "navigable waters" and therefore cannot be delegated to a state for administration of a Section 404 permitting program.  33 U.S.C. § 1344(g)(1).



ALASKA   CALIFORNIA   FLORIDA   MID-PACIFIC   NORTHEAST   NORTHERN ROCKIES

NORTHWEST   ROCKY MOUNTAIN   WASHINGTON, D.C.   INTERNATIONAL

To determine which waters and their adjacent wetlands are presently used or are susceptible to use in their natural condition or by reasonable improvement as a means to transport commerce and therefore not assumable under federal law, FDEP has asked the Corps to engage in extensive, highly complex mapping on an expedited basis.  Public records from FDEP indicate that the agency expects the Corps to complete this mammoth technical analysis by July 2018 so that the FDEP can submit its assumption application to the EPA in August 2018.

FDEP's rushed approach to such important issues disregards the need for thorough study and analysis to ensure waters in the State of Florida are protected; creates confusion in the public and among the regulated community; precludes meaningful public participation; and is likely to lead to disastrous results.  Plainly, determining which waters are or in their natural condition or with reasonable improvement could be, used in interstate commerce---particularly Florida's critical tourism and agriculture industries—is a fact and science-intensive process that requires documentation of each water at issue.  The Corps should resist political pressure to unnecessarily rush and take short cuts on a project of such lasting consequence to so many.

<u>The Corps' Request for Public Comment</u>

It is notable that in this hurried environment, the Corps issued its Public Notice regarding these determinations on March 19, 2018, days before Florida's enabling legislation had even been signed into law.  The Corps' notice seeks input relative to determining which waters in Florida would remain under federal jurisdiction pursuant to Section 10 of the RHA if Florida's request to assume jurisdiction under Section 404 of the CWA is approved by the EPA.  Jacksonville District U.S. Army Corps of Engineers, *Public Notice: Determination of Navigable Waters*, March 19, 2018 (Exhibit 7).  The Corps invited the public to submit comments "regarding use of waters in the [S]tate of Florida for navigation.  This includes identification of those rivers, streams, lakes, etc.[,] associated with past, current, or potential future commerce, commercial traffic, or recreational activities."  *Id.* at 2.  The deadline to submit comments was 30 days from the date of the notice, or April 18, 2018.

On April 10, 2018, the Corps circulated a document titled "UPDATED PUBLIC NOTICE" and "Cessation of Public Comment Period."  Jacksonville District U.S. Army Corps of Engineers, *UPDATED PUBLIC NOTICE*, April 10, 2018 (Exhibit 8).  That notice did not withdraw the March 19, 2018 Public Notice but summarily stated without explanation that "the comment period originally set to expire on April 20, 2018, is considered closed until further notice[.]"

It is not clear what the Corps' "cessation" notice means, or what the basis for its issuance may have been, if any.  In any event, the public is entitled to comment on the Corps' March 19, 2018 Public Notice.  These comments are submitted in compliance with the Public Notice deadline.



ALASKA   CALIFORNIA   FLORIDA   MID-PACIFIC   NORTHEAST   NORTHERN ROCKIES
NORTHWEST   ROCKY MOUNTAIN   WASHINGTON, D.C.   INTERNATIONAL

We note that the original comment period of 30 days was already unreasonably short for the task at hand.  Nevertheless, we and other members of the public began diligently working on submissions.  Those submissions must be taken into account in any decision the Corps is considering and/or makes.

The Corps should extend the formal comment period for an additional 60 days through and including June 20, 2018, as well as schedule workshops around the State of Florida to allow local experts to provide critical information relevant to the Corps' navigability studies.

<u>Determination of Navigable Waters in Florida</u>

As 33 U.S.C. § 1344(g)(1) makes clear, the waters and adjacent wetlands that are not assumable by a state specifically include those that are "presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast." 33 U.S.C. § 1344(g)(1).  Decades of administrative action and case law relating to the CWA and RHA have established that use in "interstate or foreign commerce" can also include use for recreational commerce activities such as fishing, swimming and boating.  *See, e.g.*, *State of Utah By & Through Div. of Parks & Recreation v. Marsh*, 740 F.2d 799, 803-04 (10th Cir. 1984) (interstate commerce included recreational use of lake by interstate travelers for fishing, hunting, boating, camping, wildlife viewing and other activities).

Given Florida's extensive water resources and unique hydrology, it is plain that any navigability study by the Corps will require a thorough analysis of numerous waterways to determine which waters may be assumable.  This undertaking must pay special attention to the rivers, streams and adjacent wetlands located throughout the State.

Although "conclusive determinations of navigability can be made only by federal Courts," 33 C.F.R. § 329.14(a), navigability determinations by federal agencies are "accorded substantial weight by the courts." It is therefore imperative that "when jurisdictional questions arise, district personnel *carefully investigate* those waters which may be subject to Federal regulatory jurisdiction[.]" *Id.* (emphasis added). Navigability determinations may have to be "revised or reversed . . . to reflect changed rules or interpretations of the law." *Id.*

The determination of whether a waterbody is a water that can or cannot be assumed under Section 404(g) is to be made by the division engineer in a report of findings based on criteria set out in the Corps' regulations.  These reports must be reviewed by district counsel before the division engineer issues a final determination.  33 C.F.R. § 329.14(b).  Each report by the division engineer should include a number of facts, including but not limited to the name of the

003898

CORPS003909



waterbody, its physical characteristics, approximate discharge volume, fall per mile, extent of tidal influence, range between high and ordinary low water, improvements, nature and location of significant obstructions, authorized projects, list of known survey documents or report describing the waterbody, past or present interstate commerce, potential use for interstate commerce, state or federal court decisions relating to navigability of the waterbody, and the Corps' finding regarding navigability. *Id.* § 329.14(c).

Federal regulations provide that "[s]pecific inquiries regarding the jurisdiction of the Corps of Engineers can be answered only after a determination whether (1) the waters are navigable waters of the United States or (2) If not navigable, whether the proposed type of activity may nevertheless so affect the navigable waters of the United States that the assertion of regulatory jurisdiction is deemed necessary." *Id.* § 329.15(c).

Importantly, each district of the Corps is required to maintain a tabulated list of final determinations of navigability, and to update these lists "as necessitated by court decisions, jurisdictional inquiries, or other changed conditions." *Id.* § 329.16(a). Since the district's list "represent[s] only those waterbodies for which determinations have been made[,] absence from that list should not be taken as an indication that the waterbody is not navigable." *Id.* § 329.16(b). Under federal regulations, "[d]eletions from the list are not authorized" and "changes are not considered final until a determination has been made by the division engineer" following updated findings. *Id.* § 329.16(c).

Waterbodies that may not presently be navigable but with reasonable improvements could be made navigable are subject to federal jurisdiction. *Id.* § 329.8(b). Artificial and privately-owned waterbodies may also be deemed navigable. *Id.* § 329.8(a)(1)-(3). Any waterbody that has in the past been navigable either in its natural or improved state remains navigable as a matter of law regardless of its subsequent use or navigability, unless there has been a Congressional declaration of the waterbody's non-navigability. *Id.* § 329.9. The existence of past or present obstructions does not necessarily defeat the navigability of a waterbody. *Id.* § 329.10.

The Corps' jurisdiction also "extend[s] laterally to the entire water surface and bed of a navigable waterbody, which includes all the land and waters below the ordinary high water mark." *Id.* § 329.11(a). "Marshlands and similar areas are thus considered navigable in law, but only so far as the area is subject to inundation by the ordinary high waters." *Id.* § 329.11; *see also id.* § 329.12(b); *United States v. DeFelice*, 641 F.2d 1169, 1175 (5th Cir. 1981) ("even shallow tidal areas, like sloughs or marshes below the elevation of a mean high water line" are subject to regulation under the Rivers and Harbors Act).

# EARTHJUSTICE

ALASKA   CALIFORNIA   FLORIDA   MID-PACIFIC   NORTHEAST   NORTHERN ROCKIES

NORTHWEST   ROCKY MOUNTAIN   WASHINGTON, D.C.   INTERNATIONAL

Determining the adjacency of wetlands in particular will require time, investigation and evidence and will be of critical importance to Florida's residents and economies. These determinations must be based on technical information, hydrology and science. By necessity, adjacency determinations must be made case by case, based on site-specific characteristics of the area's hydrology, topography and vegetation, among other factors.

To perform such studies, it will be imperative to solicit information from the public, as there are entities and individuals with relevant expertise located throughout the State.

<u>Conclusion</u>

Given the enormity of this undertaking, its lasting implications for waters in the State of Florida, and the communities, industries and wildlife that rely on them, and the national interests embodied in the Clean Water Act and Rivers and Harbors Act, we urge the Corps to ensure that its process is fully transparent, rooted in evidence-based science, and informed by meaningful opportunities for public input and participation. We further urge the Corps to retain the maximum jurisdiction available under federal law.

Sincerely,

Tania Galloni
Managing Attorney

cc:    Donald W. Kinard, Chief of the Regulatory Division, U.S. Army Corps of Engineers, Jacksonville District, donald.w.kinard@usace.army.mil

Tori White, Deputy Chief of the Regulatory Division, tori.white@usace.army.mil

Trey Green, Atlanta Regional Administrator, U.S. EPA, Glenn.trey@Epa.gov

Thomas McGill, U.S. EPA, Mcgill.Thomas@epa.gov

Pace Wilber, National Marine Fisheries Service, pace.wilber@noaa.gov

Larry Williams, U.S. Fish and Wildlife Service, Vero Beach, Florida, larry_williams@fws.gov

*April 18, 2018 Comment Letter to U.S. Army Corps of Engineers from Florida Wildlife Federation,*
*Conservancy of Southwest Florida, Miami Waterkeeper, St. Johns Riverkeeper*
*re: Florida Navigable Waters Determination*

# EXHIBIT 1

003901



Colonel Jason A. Kirk, District Commander
Jacksonville District Corps of Engineers
Regulatory Division
Att'n: Determination of Navigable Waters
P.O. Box 4970
Jacksonville, Florida  32232-0019

April 18, 2018
*Via Email* Jason.a.kirk@usace.army.mil, Navigability_Determination@usace.army.mil

Dear Colonel Kirk:

On behalf of our respective organizations, we are writing to request that the U.S. Army Corps of Engineers adopt the broadest interpretation of navigable waters under the Clean Water Act (CWA). Florida's waterways are uniquely connected and thus should be comprehensively and collectively protected under the Clean Water Act. We oppose any attempt to undermine these protections through unnecessary reclassification of waterways and we sincerely urge the Corps to maintain permitting authority over these important resources.

CWA Section 404 requires permits for the discharge of dredge and fill material into Waters of the United States, including wetlands. Florida has particularly fragile and critical areas that are regulated by Section 404 dredge and fill permits, and which require the highest level of review and scrutiny. We believe that the federal government is best able to conduct this review given their historic jurisdiction and agency expertise in this area. The federal authority to govern our waters has its origins in the Commerce Clause of the Constitution due to the central role our waterways and seas play in interstate commerce. Traditionally, wetlands have been subject to federal jurisdiction as well due to their critical role in providing watershed connectivity. As such, we strongly believe that CWA authority should remain with the federal government and any delegation to the state would be inappropriate and incongruous with the spirit of the law. Our organizations vehemently oppose the state of Florida's attempt to assume this jurisdiction.

Due to the value of these resources to our state, we urge the Corps to apply a broad interpretation to navigable waters in order to maintain federal control of these waterways. We request the Corps fully assess Florida's water bodies to ensure the Florida Navigable Waters List is complete and completely accurate. In addition, we urge the Corps to provide adequate public involvement and transparency during the process to update Florida's Navigable Waters.

In addition, we fully support comments submitted by Earthjustice regarding the navigability of waters in the State of Florida within the meaning of Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, for purposes of determining the Corps' jurisdiction should the U.S. Environmental Protection Agency (EPA) grant Florida's anticipated request to administer its own permitting program under Section 404(a) of the Clean Water Act of 1972 (CWA), 33 U.S.C. § 1344, in waters of the United States.

Each signatory is an independent organization and member of Waterkeeper Alliance, a global movement of on-the-water advocates who patrol and protect over 100,000 miles of rivers, streams and coastlines in North and South America, Europe, Australia, Asia and Africa. More than 300 Waterkeeper Organizations worldwide combine firsthand knowledge of their waterways with an unwavering commitment to the rights of their communities and to the rule of law.


Sincerely,
Rachel Silverstein                          Lisa Rinaman
Miami Waterkeeper                           St. Johns Riverkeeper

Georgia Ackerman                            Andrew Hayslip
Apalachicola Riverkeeper                     Tampa Bay Waterkeeper

Marty Baum                                  Andy Mele & Justin Bloom
Indian Riverkeeper                          Suncoast Waterkeeper

Jen Lomberk                                 John Quarterman
Matanzas Riverkeeper                        Suwannee Riverkeeper

Rick Frey                                   Reinaldo Diaz
St. Marys Riverkeeper                        Lake Worth Waterkeeper

Harrison Langley                            Laurie Murphy
Collier County Waterkeeper                   Emerald Coastkeeper

John Cassani
Calusa Waterkeeper

*April 18, 2018 Comment Letter to U.S. Army Corps of Engineers from Florida Wildlife Federation,*
*Conservancy of Southwest Florida, Miami Waterkeeper, St. Johns Riverkeeper*
*re: Florida Navigable Waters Determination*

# EXHIBIT 2

003904



**Consolidation of State and Federal Wetland Permitting Programs**
**Implementation of House Bill 759 (Chapter 2005-273, Laws of Florida)**
**Florida Department of Environmental Protection**
**September 30, 2005**

003905
CORPS003916

**Consolidation of State and Federal Wetland Permitting Programs**
**September 30, 2005**

## Introduction

The Florida Department of Environmental Protection is fully committed to implementing the most effective, efficient, and comprehensive wetlands protection in the United States. Florida's efforts to streamline wetlands permitting go back to 1992, when DEP first attempted to obtain the authority to administer some or all of the federal wetlands regulatory program, including testimony before the United States Congress.

Section 3 of House Bill 759 (chapter 2005-273, Laws of Florida, attached), requires the Department of Environmental Protection (DEP) to report on the federal and state statutory changes that would be required to consolidate, "to the maximum extent practicable," federal and state wetland permitting programs. The Legislature expresses its intent in the law that, "all dredge and fill activities impacting 10 acres or less of wetlands or waters, including navigable waters, be processed by the state as part of the environmental resource permitting program implemented by the department and the water management district."

This report, required by section 3 of chapter 2005-273, Laws of Florida (House Bill 759 during the 2005 Legislative Session), identifies options and outlines necessary next steps to streamline the federal and state wetlands permitting programs. The report analyzes two options: 1) "assumption" of the federal permitting program and 2) an expanded State Programmatic General Permit (SPGP).

## Background: Federal and State Wetland Permitting Authorities

The **federal wetland regulatory program** is administered under Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act. The Rivers and Harbors Act is focused on maintaining navigable waters while the Clean Water Act governs the discharge of potential pollutants, including fill, into the nation's waters. The scope of federal wetlands authority has historically been broad, encompassing all wet landscapes. However, the U.S. Supreme Court's SWANCC (Solid Waste Agency of Northern Cook County) decision in January 2001 has narrowed this scope uncertainly, removing some isolated and headwaters wetlands from Clean Water Act jurisdiction, and confused the issues relative to navigable waters.

The U.S. Army Corps of Engineers (COE) administers the permitting provisions of both federal laws, with Environmental Protection Agency (EPA) oversight, in effect combining Clean Water Act and Rivers and Harbors Act permits into a single action. The Clean Water Act provides two mechanisms by which a state may obtain authority to issue permits under its provisions (the Rivers and Harbors Act has no mechanism to grant state authority):

- **Assumption**, whereby the state permit replaces the federal Clean Water Act permit. As noted, there is no similar provision relating to the Rivers and Harbors Act. Because all coastal waters and a significant number of inland waters in Florida are deemed navigable, they would be excluded from state assumption under current federal law with respect to issues bearing on federal navigation concerns.

003906

CORPS003917

- **State Programmatic General Permit**, whereby the COE issues an SPGP to a state that effectively authorizes the state to issue Clean Water Act and most Rivers and Harbors Act permits on the COE's behalf.  The COE also could authorize a state to issue Regional General Permits on its behalf.

**Florida's wetland regulatory program** is administered primarily under part IV of chapter 373, F.S., and is commonly referred to as the Environmental Resource Permit (ERP) program.  The single ERP permit addresses dredging and filling in all wetlands and other surface waters, including waters no longer subject to federal jurisdiction under the SWANCC decision.  It also covers activities that impact the flow of water, such as stormwater, across the surface of the land.

In Northwest Florida, the state program regulates dredging and filling only in connected wetlands and other surface waters, excluding isolated wetlands, and regulates stormwater quality (but not quantity, i.e., flooding) using rules from the 1970s.  The boundaries of wetlands and other surface waters everywhere in Florida are determined by the statewide delineation rule (chapter 62-340, F.A.C.), which is binding on all levels of Florida government.

<u>**Assumption**</u>

Effective consolidation of federal and state wetland permitting requires amendments to the federal Clean Water Act, Rivers and Harbors Act, and state law.  The necessary changes are outlined below, while the specific amendatory language is included in the attachment.

<u>Federal statutory changes</u>

- Remove the prohibition the prevents states from assuming the entire Section 404 program so that DEP could assume the program for wetlands and surface waters throughout Florida.
- Change the Rivers and Harbors Act to allow state assumption of the Section 10 navigation-related permits.
- Remove the five-year limitation on state-issued Section 404 permits.  There is no similar limitation on the COE's issuance of Section 404 permits and no compelling reason to limit states in this manner.  Florida law allows issuance of up to 25-year permits, with an important five-year review cycle, which is critical to planning and permitting many large-scale multi-year developments.
- Delete the federal "clean break" provision, which requires transfer of all pending applications to the state at the time of assumption and instead require the COE to finish processing such permits.  The wholesale transfer of pending applications could overwhelm the state, resulting in delays for applicants while state personnel became familiar with the applications (all the while accepting new applications).  This change would make the state responsible only for applications received after assumption is approved.
  - This change to the "clean break" provision would be necessary unless substantial staff resources were provided to or secured by DEP and the water management districts in advance of assumption to manage the transferred federal permitting workload, which would amount to more than 9,700 permitting actions based on the number of actions in process at the COE at the present time, which is representative of the workload at any one time.  (It is roughly estimated that 3,000

3

permit actions would transfer to DEP with the remaining 6,700 transferring to the water management districts.)  These resources would be over and above the basic resources necessary to implement the assumed program, with its additional federal responsibilities, into the future.

- Require the COE to continue monitoring, enforcing and issuing modifications to previously issued COE permits, including Clean Water Act general permits.  Retaining COE responsibility for these activities would afford applicants better continuity and prevent an excessive workload burden on the state.
  - o This change would be necessary unless substantial staff resources were provided to the DEP and water management districts in advance of assumption to address the transferred federal compliance and enforcement workload relative to the permits issued by the COE over the last 30 years.  These resources would be over and above the basic resources necessary to implement the assumed program, with its additional federal responsibilities, into the future.
- Allow the EPA Administrator, when considering authorizing state assumption, to discount minor differences between the federal and state programs as long as waters of the United States would be equally well protected.  (For example, Florida's wetland methodology is ecologically equivalent, in the field, to use of the COE's 1987 wetland manual and should be accepted as such.)

State statutory changes – To assume the federal program the following changes are needed to state law, generally to part IV of chapter 373, F.S.

- Provide DEP, in its role as Florida's lead state agency for wetland permitting, the authority to modify, revoke or rescind permits issued by the water management districts or any delegated local program.  Such a provision previously existed in Florida law but was repealed by the Legislature in 1994; it would need to be recreated in statute.
- Amend Florida law to contain a clear "recapture" provision, equivalent to that contained in the Clean Water Act, addressing agriculture activities that convert wetlands to upland; and amend Florida law to be consistent with the Clean Water Act to exempt from permitting only agriculture closed systems—those that do not discharge to surface waters–constructed from uplands.
- Amend Florida law to explicitly address the same federal project criteria contained in 404(b)(1) Clean Water Act guidelines.  (As a practical matter, Florida's review criteria are quite similar.)  For example, state law would have to be revised to include consideration of project alternatives, including a "no project alternative," and account for economic considerations in the review of alternatives.
- Amend Florida law to eliminate the automatic "default" issuance of permits that are not processed within the state's generic 90-day permitting clock.  The Clean Water Act prohibits default permits.  This same change has been made for other federally delegated or authorized programs; and, in reality, very few permits are issued by default.
- Revise the dock exemptions in s. 403.813(2), F.S., to account for water depth, endangered species protection, protection of on-site submerged resources, and other requirements of the COE and federal resource agencies or replace them with General Permits that contain the appropriate requirements.

Additional considerations

003908

CORPS003919

- Federal funding to the state or additional state funding would be needed to support the program.
- To ensure a truly streamlined process, amendments may be needed to the federal Endangered Species Act. Under Section 7 of the federal Endangered Species Act, impacts to listed species are addressed through a consultation process that results in "take" issues being addressed in the COE permit at the federal <u>District</u> level. If a state assumes the Section 404 program, this consultation process would no longer be available and applicants whose projects involve an actual or potential "take" would be required to apply to the applicable federal resource agency <u>Regional</u> office for authorization under Section 10 of the federal Endangered Species Act. The Section 10 process is substantially more time consuming than the process under Section 7.

**<u>State Programmatic General Permit</u>**

The COE may issue an SPGP to authorize a state to issue Clean Water Act and Rivers and Harbors Act permits in limited circumstances:

- An SPGP is limited to similar classes of projects that have minimal individual and cumulative impact. For example, an SPGP may cover boat ramp construction as a specific activity but may not cover the mere act of placing fill where no consideration is given to what activity is supported by that fill. Because projects authorized under the SPGP are limited to minimal individual and cumulative impacts, the complexity and physical size of projects are limited as well. Typical wetland impacts allowed in SPGPs range from 5,000 square feet to one acre. The Maryland SPGP at one time allowed impacts of up to three acres in tidal waters and five acres in non-tidal waters, but was revised in 2001 to reduce the amount of authorized impact.
- The SPGP authorizes the issuance of federal permits, which means federal resource agency coordination requirements remain. The net effect is that individual permits deemed likely to result in impacts to listed species must be forwarded to the COE for coordination with federal resource agencies. This coordination is often lengthy and cannot be accommodated within Florida's chapter 120, F.S., time clocks; therefore, the state does not take final action under the SPGP but must elevate the permit to the COE.

<u>Florida's Experience with SPGP</u>

The COE issued a pilot SPGP to the State of Florida covering Duval, Nassau, Clay, and St. Johns counties in August, 1995 (SPGP I). This SPGP was limited to four categories of activities: docks, piers, and marinas; shoreline stabilization; boat ramps; and maintenance dredging. The pilot SPGP was expanded to the balance of DEP's Northeast District in September 1996 (SPGP II) and to the areas of the other DEP Districts, except Northwest Florida and Monroe County, in September 1997 (SPGP III). This authorization included the addition of most state exemptions and noticed general permits. SPGP III remains in effect until December 2005 and covers a variety of activities, including:

- Construction of shoreline stabilization activities, such as riprap and seawalls; groins, jetties, breakwaters, and beach nourishment/re-nourishment are excluded;
- Boat ramps and launch areas and structures associated with such ramps or launch areas;
- Docks, piers, marinas, and associated facilities;

003909
CORPS003920

- Maintenance dredging of canals and channels;
- Most regulatory exemptions; and
- ERP noticed general permits.

Applications received for these activities by DEP are reviewed to determine if they meet all SPGP conditions.  For those that meet the conditions, DEP's issuance of a permit constitutes issuance of the corresponding federal Clean Water Act and Rivers and Harbors Act permit.  DEP forwards a copy of all applications that do not meet the SPGP conditions, or meet certain "kick-out" provisions, to the COE.  The COE may return the permit application to DEP for processing, with or without additional federal conditions, or retain and process it at the federal level.

DEP has issued more than 28,000 authorizations under SPGPs I through III.  However, federal endangered species coordination, including that required for manatees, has resulted in a substantial decline (1/3 or more) in the number of SPGP authorizations issued by the state over the last five years.  It is worthwhile to note that any increase in the scope or volume of the current SPGP will require additional state resources to implement due to the additional actions and review criteria that are not part of Florida's normal ERP process and the corresponding increase in DEP's ERP permit workload (more than 50% since the late 1990s).

Recently the COE issued a public notice to replace SPGP III with a revised SPGP IV that substantially reduces the scope of projects covered based on the stated rationale that threatened and endangered species and fish habitat issues are consuming an unacceptable amount of COE staff time.  The new SPGP IV reduces coverage to only the original four project categories (docks, piers, and marinas; shoreline stabilization; boat ramps; and maintenance dredging) contained in the 1995 pilot SPGP and the exemptions and noticed general permits directly associated with those activities.  This change is an obstacle to streamlining wetland permitting and DEP believes its recommendations, below, can solve a variety of problems and allow expansion rather than narrowing of the SPGP.

## **Recommendations**

Florida is committed to streamlining state and federal wetlands permitting programs to increase protection for our sensitive natural resources. To meet that goal and the specific objectives of House Bill 759, DEP recommends pursuing a greatly expanded SPGP in the short-term, which will not require legislative action, while also pursuing federal and state legislative actions to obtain assumption for the long-term.

Next steps:
- Continue to reduce differences between state and federal wetland delineations without altering the statutory definition of wetlands.
  - As a first step, DEP has initiated rulemaking to list slash pine and gallberry as "facultative" (neutral) in the state's delineation rule (62-340, F.A.C.), which is scientifically appropriate and would make the state and federal wetland boundary lines ecologically equivalent.  While DEP has not received a formal federal response to its previous (1997) initiative along these lines, field-testing by state and federal agency staff and Phoenix Environmental at that time supports this conclusion.  The proposed rule changes will require approval of the

003910

CORPS003921

Environmental Regulation Commission and ratification by the Legislature under s. 373.4211(26), F.S.

- Request the COE to expand the SPGP to a comprehensive list of activities with impacts to no more than a specified acreage of non-tidal wetlands based on Florida's wetland delineation methodology.
  - o Discussions with the COE have indicated that the 10-acre upper limit proposed in HB 759 would be overly ambitious, at least initially.
  - o Any expanded SPGP would require state applicants to waive the chapter 120, F.S., completeness review time clock to allow for federal coordination on endangered species.
- Request that the expanded SPGP include projects reviewed by the water management districts and local delegated programs.
- Review existing state statutory and rule exemptions and noticed general permits for modifications necessary to ensure that qualification for these authorizations would meet the requirements for authorization under the SPGP with no federal agency coordination requirements.
- Extend SPGP in Northwest Florida by expanding the state wetlands program to the Northwest Florida Water Management District.
- Seek the support of the Florida congressional delegation for streamlining the federal program and encouraging federal agencies to work productively with the states to make the SPGP effective.
- Consult with the Florida Congressional delegation on opportunities to amend the federal Clean Water Act and Rivers and Harbors Act to make assumption of the federal wetlands program viable.
- Consult with the Florida Legislature on the potential for appropriating to DEP the additional resources that would be necessary to assume the federal wetlands permitting program, and the transferred federal permitting and compliance workload, should assumption become a viable option. (Additional resources would also be necessary for the water management districts.)

7

003911

CORPS003922

**Attachment**
**Federal and State Statutory Changes Necessary to Enable Assumption of Federal Wetland Permitting**

**Federal Statutory Changes**

Florida has proposed amendments to the Clean Water Act (CWA) in past Congressional testimony to address the CWA legal issues as follows:

1. Amend Section 404(g)(1) to remove the prohibition on states assuming the entire Section 404 program. Without this amendment, Florida is not able to assume the federal program in large portions of the state. In addition, because the boundaries between navigable and non-navigable waters are not clearly defined in many waters, assumption would require a determination of which agency has jurisdiction. Both factors severely impede the goal of establishing a procedurally simplified program. The following changes are recommended:

   Section 404(g)(1) is amended by striking language as follows:
   (g)(1) The Governor of any State desiring to administer its own individual and general permit program for the discharge of dredged or fill material into the navigable waters (other than those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto), within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State or the interstate compact, as the case may be, provide adequate authority to carry out the described program.

2. Amend the CWA to remove the current five-year limitation on state-issued Section 404 permits. There is no similar limitation on the issuance of Section 404 permits by the COE and no compelling reason to limit states in this manner. Florida law allows issuance of up to 25-year permits, with an important five-year review cycle, which is critical to planning and permitting many large-scale multi-year developments. The following changes are recommended:

   Clause (ii) of Section 404(h)(1)(A) is amended to read as follows:
   "(ii) shall be -
       "(I) issued for fixed terms not exceeding 25 years; and
       "(II) if issued for a term that exceeds 5 years, reviewed by the State not later than 5 years after the date of issuance and every 5 years thereafter for the duration of the term to ensure that the conditions of the permit are being met by the permittee and to consider, and include as permit conditions where

8

appropriate, all applicable rule requirements adopted during the prior 5 year period.

3. Amend the CWA to delete the "clean break" provision that requires transfer of all pending applications to the state at the time of assumption.  This wholesale transfer has adverse impacts on the state, the Corps of Engineers and applicants.  The immediate transfer of large numbers of permits, already partially processed by the COE, to new processors could overwhelm the state system.  This would result in delays for applicants, while the state processors become familiar with applications on which COE personnel have already spent considerable amount of time.  In addition, the sudden transfer of the permits would not allow the Corps of Engineers adequate time to adjust personnel to other tasks and allow for phase out of positions, should that be necessary.  This proposed provision would allow the COE to complete the processing on applications already before the agency, with the state being responsible for applications only after assumption is approved.  This is especially important in states such as Florida, where there is a are large number of permit applications pending at any one time.

In addition, the same section of the CWA would need to be amended to provide for the COE to continue monitoring, enforcing and issuing any modifications of previously issued COE permits.  Allowing the COE to retain responsibility for such activities would relieve the potentially excessive burden on the state in enforcing unfamiliar permits, provide for a smoother transition for the COE, and afford applicants better continuity by allowing them to deal with the original permitting agency.  The following changes are recommended:

> Paragraph (4) of Section 404(h) is amended by striking and adding language as follows:
> (4)  After the Secretary receives notification from the Administrator under paragraph (2) or (3) of this subsection that a State permit program has been approved, the Secretary shall transfer any applications for permits subject ~~before the Secretary for activities with respect to which a permit may be issued pursuant~~ to such State program and received after such notification to such State for appropriate action.  The Secretary shall retain the authority to administer and enforce the permits issued by the Secretary, including the authority to issue and enforce modifications thereto.

4. On a related issue, the CWA general permit language should also be amended to allow the COE to enforce and administer previously issued permits.  The following changes are recommended:

> Paragraph (5) of Section 404(h) is amended by striking and adding language as follows:
> (5)  Upon notification from a State with a permit program approved under this subsection that such State intends to administer and enforce the terms and conditions of a general permit issued by the Secretary under subsection (e) of this section with respect to activities in such State to which such general permit applies, the Secretary shall suspend the issuance ~~administration and enforcement~~ of such general permit with respect to such activities but shall retain the authority

9

CORPS003924

to administer and enforce the general permits previously issued by the Secretary with respect to such activities.

5. Finally the CWA should be amended to allow the Administrator the ability to discount minor differences in the proposed state program so long as the effectiveness of the protection of waters of the United States is not impaired. The following addition is suggested:

> Paragraph (6) is added to section 404(h) to read:
> "The Administrator may approve a program submitted under subsection (g)(1) that varies in minor respects from the requirements of this section if the Administrator determines, after review of the proposed state program, that the proposed state program will afford the same or greater degree of protection to waters of the United States as the federal program affords."

6. Changes to the federal Rivers and Harbors Act have not been proposed in the past. However, in order to make assumption of the federal wetlands program complete so that it results in streamlining, Section 10 of that law (33 U.S.C. 403) would have to be amended along the following lines:

> The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same. However, authority to issue authorizations on behalf of the Secretary of the Army shall be delegated to any state or tribe that assumes authority to administer Section 404 of the Clean Water Act.

003914

CORPS003925

## State Statutory Changes

1. EPA in its capacity as the federal agency in charge of reviewing proposals to assume the CWA program and under its authority to review COE permits, such as an SPGP, has expressed a concern that DEP, in its role as the lead state agency for wetland permitting, lacks the authority to modify, revoke or rescind permits issued by the water management districts or any delegated local program. Such a provision previously existed in Florida law but was repealed by the Legislature in 1994. Therefore, a new paragraph (20) would need to be added to s. 373.414, F.S., reading "(20) The department shall have the authority to review and modify any district order to ensure consistency with federal law." EPA has, in the past, expressed a preference that delegated local programs be limited to permit review functions with actual final agency action and any subsequent enforcement authority be reserved to DEP or the applicable water management district. However, at this time it is by no means certain if this is EPA's final position.

2. Florida law does not clearly contain a "recapture" provision, equivalent to that contained in the CWA, addressing agriculture activities that convert wetlands to upland nor is it clear in Florida law, as provided in the CWA, that only agriculture closed systems constructed from uplands that do not discharge to surface waters are exempt from permitting. To address these concerns, amendments to portions of s. 373.406, F.S., would be necessary similar to the following:

    - (2) Nothing herein, or in any rule, regulation, or order adopted pursuant hereto, shall be construed to affect the right of any person engaged in the occupation of agriculture, silviculture, floriculture, or horticulture to alter the topography of any tract of land for purposes consistent with the practice of such occupation. However, such alteration may not be for the sole or predominant purpose of impounding or obstructing surface waters. This section shall not be construed to allow the conversion of a surface water or wetland to upland without an environmental resource permit.

    - (3) Nothing herein, or in any rule, regulation, or order adopted pursuant hereto, shall be construed to be applicable to construction, operation, or maintenance of any agricultural closed system that is constructed entirely from uplands and does not discharge to surface waters of the state. However, part II of this chapter shall be applicable as to the taking and discharging of water for filling, replenishing, and maintaining the water level in any such agricultural closed system. This subsection shall not be construed to eliminate the necessity to meet generally accepted engineering practices for construction, operation, and maintenance of dams, dikes, or levees.

3. As a practical matter the wetland permitting review criteria in Florida law are very similar to the federal review criteria in 404(b)(1) CWA guidelines. However, Florida law does not explicitly spell out these federal criteria. In particular, EPA and the COE have stated that the review by the state must include a consideration of alternatives, a presumption of an alternative for non-water dependent projects (e.g., the "no project alternative") and the inclusion of economic considerations in the review of alternatives. In order to address these issues a new s. 373.414(l)(d), F.S., would have to be created to read:

    (d) An activity, which is in, on or over surface waters or wetlands, as delineated in s. 373.421(1), and is regulated under this part, is not contrary to the public interest, or is clearly in the public interest, only if:

003915

CORPS003926

> 1. the governing board or the department determines there are no practicable alternatives to dredging or filling in surface waters or wetlands. Alternatives considered shall include not dredging or filling in surface waters or wetlands, or dredging or filling in another area of surface waters or wetlands which will have less damaging consequences, so long as the alternative does not have significant adverse environmental consequences. For dredging or filling in wetlands, mud flats, vegetated shallows, coral reefs, or riffle and pool complexes, all as defined in 40 CFR 230.41 through 40 CFR 230.45, practical alternative sites are presumed to exist unless the activity associated with the dredging or filling requires access or proximity to, or siting within, that surface water or wetland to fulfill its basic purpose, i.e., is water dependent. An alternative is practicable if it is available and capable of being done considering the cost, existing technology, and logistics in light of overall project purposes; and
>
> 2. the applicant has made all appropriate and practicable changes to the project plan to minimize the environmental impact of the project. The applicant shall have the burden of proof of showing that there are no practicable alternatives. The department, in consultation with the districts, shall adopt rules by which the department and the districts shall implement this subsection.

4. The CWA does not contain provision that result in the issuance of a permit if the reviewing agency defaults on (i.e., does not meet) certain review time clock requirements as does Florida law. Therefore, where the state has authority to administer a federal program (Underground Injection Control, National Pollutant Discharge Elimination System, Air permitting, etc.), state legislation has been adopted to overcome the federal government's objection to the default permit provisions in Florida law. The simplest provisions are those adopted for the UIC program (s. 403.0876(2)(b), F.S.), which supersede the default permit provisions without further complications. Similar provisions should be adopted in s. 373.414, F.S., for the ERP program under Part IV of Chapter 373, F.S.

5. The COE and federal resource agencies have expressed concern regarding the dock exemptions contained in s. 403.813(2), F.S. These exemptions lack provisions for water depth, endangered species protection, protection of on-site submerged resources, etc. It is recommended that these exemptions be revised or repealed and replaced with General Permits with appropriate conditions.

003916

CORPS003927

*April 18, 2018 Comment Letter to U.S. Army Corps of Engineers from Florida Wildlife Federation,*
*Conservancy of Southwest Florida, Miami Waterkeeper, St. Johns Riverkeeper*
*re: Florida Navigable Waters Determination*

# EXHIBIT 3

003917

CORPS003928

4/18/2018          www.tampabay.com/apps/pbcs.dll/article?avis=HI&date=20140905&category=ARTICLE&lopenr=309059472&Ref=AR&profile=1082&tem…

URL: http://www.tampabay.com/opinion/editorials/editorial-the-rick-scott-record-an-environmental-disaster/2196359

# Editorial: The Rick Scott record: an environmental disaster



*CHRIS ZUPPA | Times*

Diver Josh Lunsford uses a vacuum pump to pull out nitrate-rich sediment from Chassahowitzka Springs as a part of a springs restoration project. Gov. Rick Scott ended a springs restoration initiative launched by Gov. Jeb Bush, and did nothing to push a bipartisan bill in the Senate that would have spent hundreds of millions of dollars to clean up springs.

For the last 50 years, Florida's governors have been reasonably responsible stewards of the state's fragile environment. They initiated efforts to clean up rivers and bays, buy and preserve millions of acres of sensitive land, manage growth and preserve the Everglades. Developers and agricultural interests still got their way too often in the state's boom-or-bust economy, but Tampa Bay is cleaner and more land is protected from development than a generation or two ago. In just four years, Gov. Rick Scott has put those accomplishments at risk.

Scott has bulldozed a record of environmental protection that his Republican and Democratic predecessors spent decades building. He weakened the enforcement of environmental laws and cut support for clean water, conservation and other programs. He simultaneously made it easier for the biggest polluters and private industries to degrade the state's natural resources. While the first-term Republican attempts to transform himself into an environmentalist during his re-election campaign, his record reflects a callous disregard for the state's natural resources and no understanding of how deeply Floridians care about their state's beauty and treasures.

Scott changed the direction of environmental policy from the start, appointing a Jacksonville shipping executive with "insights on the challenges businesses face in the permitting process" as the secretary of the Department of Environmental Protection. He asked the Legislature for smaller budgets for DEP every year except for this election year. But the governor's stinginess is only part of the problem. He also triggered a brain drain among regulators, sided with polluters and developers over public health, refused to acknowledge the impact of man-made climate change and stalled any serious attempt to address water quality, land conservation or growth management.

CORPS003929

Enforcement

In his first year, Scott forced the state's five regional water management districts to reduce their budgets by $700 million and filled their appointed boards with developers, land use lawyers and others more interested in granting permits than preservation. That triggered cuts to water supply, restoration and other projects, and led to widespread layoffs at the water management districts that turned them into shells of their former selves. The Scott administration undercut enforcement and dampened public input on development as it eliminated the state's growth management agency. DEP offered bonuses to employees to speed up permitting, and its departing regulatory chief boasted this year that the agency cut wait times for permits by two-thirds.

Scott's political appointees created a chilling culture at the DEP. The former deputy secretary ordered the agency's top wetlands expert to approve a permit that she said would violate state law. After Connie Bersok refused, she was suspended and investigated by the agency. She was later vindicated, and the project was dropped.

Water

In what was a priority for big polluters, Scott waged a protracted fight with the federal government over long-delayed clean water standards. The Environmental Protection Agency eventually caved to the pressure and gave the state too much discretion, a transparent attempt to boost the president's popularity in Florida during his re-election campaign. In 2012, Scott killed a statewide septic tank inspection program that would have been key to reducing water pollution. He ended a springs restoration initiative launched by Gov. Jeb Bush. This year, he did nothing to push a bipartisan bill in the Senate that would have spent hundreds of millions of dollars cleaning up the springs. He did ask for $55 million in his budget for springs, but instead the Legislature agreed to only $30 million.

Conservation

The economic meltdown caused spending for the Florida Forever land conservation program to drop by nearly two-thirds by the time Scott took office from its high-water mark years ago. But spending in Scott's first three years dropped significantly, from $100 million the year he came into office, to $27 million in 2012 and $17 million in 2013. Most of the money committed in the last two years has not been cash but permission to use money from the sale of surplus state property. Scott's plan in 2013 to generate $50 million for conservation by selling existing state lands was so controversial and mishandled that the administration scrapped the effort without selling a single acre.

Now Scott wants to pave over his record with a campaign plan that calls for more than $1 billion in spending over the next decade. He would commit $500 million each for springs restoration and alternative water supply projects. His proposal far exceeds what he budgeted for springs and conservation land during his first term, and he offers no suggestions for how to raise the money. The governor also calls for tougher legislation to punish polluters, which would be another major shift in direction.

It is difficult to imagine Scott increasing environmental enforcement when the number of such cases dropped by nearly two-thirds after his first year. Or pursuing a more robust effort to buy endangered land when the land-buying office has been decimated. Or following through on ambitious promises to emphasize restoration of the Everglades after he signed legislation that caps the sugar industry's financial liability for the cleanup. Scott also made it easier for private companies to tap the state's supply of reclaimed water even as he made it much harder for the public to challenge water and mining permit applications. He even signed legislation that fast-tracked the permitting process for gas pipelines and restricted how many times local officials may ask developers questions about their permit applications.

The governor won't even say whether he supports the land and water conservation measure, Amendment 1, that will appear on the November ballot. If that measure passes, the state would lock in funding for conservation by dedicating revenue from the tax on property sales. Advocates say the amendment, which could raise $19 billion over 20 years, is needed to protect environmental funding from the annual whims of

CORPS003930

state lawmakers. It's also needed to protect Florida from governors like the incumbent, who has no sense of Florida and its values.

Scott wants voters to believe he has turned green. His record shows he has been the least environmentally sensitive governor in the last half-century, and there is no reason to expect there would be a sudden transformation in a second term.

CORPS003931

*April 18, 2018 Comment Letter to U.S. Army Corps of Engineers from Florida Wildlife Federation,*
*Conservancy of Southwest Florida, Miami Waterkeeper, St. Johns Riverkeeper*
*re: Florida Navigable Waters Determination*

# EXHIBIT 4



**PROTECTING EMPLOYEES WHO PROTECT OUR ENVIRONMENT**

Search here

Home    About Us    Take Action    News    Publications    Help Center    Campaigns    State/Federal Watch    GIVE

**News**

News Releases

Press Clips

Like 0    SHARE

For Immediate Release: Aug 17, 2016
Contact: Kirsten Stade (202) 265-7337

## SCOTT'S UNDECLARED POLLUTERS' HOLIDAY STAINS FLORIDA

Total Pollution Fine Revenue at Historic Low; Many Violators Face No Fines at All

Posted on Aug 17, 2016 | Tags: **Florida**

Tallahassee — Pollution pays in Florida because violators often get off scot-free, according to a new analysis of state records by Public Employees for Environmental Responsibility (PEER). Overall, this review shows that anti-pollution enforcement by the state Department of Environmental Protection (DEP) continues on a radically downward trajectory coinciding with the tenure of Governor Rick Scott.

The PEER analysis of raw enforcement data from the Florida DEP reflects a slight uptick in cases opened during 2015 but the overall case activity is still at anemic levels – 81% below the number of cases opened in 2010, the year before Gov. Scott took office. The case outcomes, however, are more dismal than almost any previous year on record. In 2015, the DEP –

- Collected the lowest amount of fines in 28 years, going back to the advent of the agency's civil collection program. Most of the fines assessed were in paltry amounts. For the first time in nearly 30 years, DEP assessed no penalty above $100,000;

- Assessed penalties that totaled 32% lower than in 2014, which, in turn, issued penalty assessments totaling 29% lower than 2013; and

- In one-third of formal enforcement cases, levied no penalty at all against violators.

These low fines show corporate violators are not even being slapped on the wrist. Nor does Florida make any practical effort to recoup profits realized from cutting corners on environmental compliance.

Moreover, since the penalty assessments provide financial support for DEP enforcement activity, the nosedive in penalty revenue drives a vicious cycle of less funds for DEP enforcement which, in turn, means less enforcement leading to ever lower penalty revenues, and so on.

"In Florida, polluters do not need a 'Get Out of Jail Free' card because few pay any fine and virtually none risk going to jail no matter how egregious the environmental offense," stated Florida PEER Director Jerry Phillips, a former DEP enforcement attorney who compiled the report, which includes breakdowns of statistics by DEP district, pollution program and by type of enforcement action and outcome. "Under Governor Scott, DEP staff are strongly discouraged from bringing enforcement actions and the plummeting numbers reflect it."

The 2015 figures bear out this no-enforcement posture at DEP, which issued 87% fewer consent orders than the year before Scott took office. The vast majority of those orders were "short-form" orders with no provisions for cleanup or preventing repeat violations.

"Looking at the implosion in pollution enforcement under Governor Scott, it is no wonder that Florida is increasingly becoming an environmental basket case," added Phillips, noting that every week seems to bring news of a new eco-calamity in the Sunshine State. "A hyper-friendly business climate will not attract employers in the absence of a healthy, clean environment."

### #

**Read the PEER report**

**Examine how enforcement is short-circuited at DEP**

**View profile of Florida's broken safe drinking water program**

**See how Florida polluters profit from violations**

CORPS003933

**Look at pattern of illegal wastewater discharge into Florida waters**

Contact Us   Your Privacy
Ph: (202) 265-PEER (7337) • Fax: (202) 265-4192
All content © 2018 Public Employees for Environmental Responsibility
962 Wayne Ave, Suite 610, Silver Spring, MD 20910-4453



*Florida*

# PEER

_____

Public Employees for Environmental Responsibility

P.O. Box 14463 • Tallahassee, FL 32317-4463 • **Phone**: 850-877-8097 • **Fax**: 850-942-5264
**E-mail**: flpeer@peer.org • **Web**: www.peer.org

# Report on Enforcement Efforts

# By the
# Florida Department of Environmental Protection

# Calendar Year 2015

**Headquarters**: 962 Wayne Ave. • Suite 610 • Silver Spring, MD 20910
**Phone**: (202) 265-PEER • **Fax**: (202) 265-4192 • **E-mail**: info@peer.org • **Web**: www.peer.org

CORPS003935

003924

## PRELIMINARY STATEMENT

This report addresses the enforcement results of the State of Florida, Department of Environmental Protection (FDEP or the Department) in calendar year 2015. The information provided herein was obtained from raw data provided to Florida PEER by the FDEP in response to a public records request made to the FDEP by Florida PEER under Chapter 119, Florida Statutes.

## Table of Contents

*EXECUTIVE SUMMARY* ................................................................................ 1

   A.  Statewide Results ............................................................................. 1

   B.  District Results ................................................................................. 4

     1. Northwest District ....................................................................... 5

     2. Northeast District ........................................................................ 5

     3. Central District ............................................................................. 5

     4. Southeast District ......................................................................... 6

     5. South District ................................................................................. 6

     6. Southwest District ........................................................................ 6

     7. All Other Enforcement ................................................................ 7

*STATEWIDE ENFORCEMENT RESULTS* ............................................... 7

   A.  Case Reports, NOVs, Consent Orders, Final Orders—Statewide Results ..................................... 7

   B.  Statewide Trends In 2014 ............................................................... 9

   C.  Case Reports, NOVs, Consent Orders, Final Orders – District Comparisons ............................ 14

     1. Case Reports .............................................................................. 14

     2. NOVs ......................................................................................... 15

     3. Final Orders .............................................................................. 15

     4. Model Consent Orders ................................................................ 16

     5. Amended Consent Orders .......................................................... 17

     7. Short-Form Consent Orders ....................................................... 18

     8. All Consent Orders Combined ................................................... 19

   D.  Short-Form Consent Orders ........................................................ 19

   E.  Program Area Performance ......................................................... 21

   F.  Civil Penalty Assessments .......................................................... 24

CORPS003936

003925

1.   The Highest Assessments ...................................................................... 26

G.   Civil Penalty Assessments By Program Area—District Comparison ......... 27

1.   Air Program ........................................................................................ 27

2.   Asbestos Program ............................................................................... 32

3.   Beaches & Coastal Program ............................................................... 34

4.   Dredge and Fill Program ..................................................................... 36

5.   Domestic Waste Program ................................................................... 40

6.   Hazardous Waste Program ................................................................. 44

7.   Industrial Waste Program ................................................................... 48

8.   Mining & Phosphogypsum Program ................................................... 52

9.   Potable Water Program ...................................................................... 55

10.   Stormwater Discharge Program ........................................................ 60

11.   State Lands Program ......................................................................... 65

12.   Solid Waste Program ........................................................................ 70

13.   Tanks Program .................................................................................. 74

14.   Underground Injection Control .......................................................... 78

H.   Civil Penalty Collections By Program Area—District Comparison ........... 79

1.   Air Program ........................................................................................ 82

2.   Asbestos Program ............................................................................... 83

3.   Beaches & Coastal Program ............................................................... 83

4.   Dredge and Fill Program ..................................................................... 83

5.   Domestic Waste Program ................................................................... 84

6.   Hazardous Waste Program ................................................................. 85

7.   Industrial Waste Program ................................................................... 85

8.   Mining & Phosphogypsum Program ................................................... 86

9.   Potable Water Program ...................................................................... 86

10.   State Lands Program ......................................................................... 87

11.   Stormwater Discharge Program ........................................................ 88

12.   Solid Waste Program ........................................................................ 88

13. Tanks Program .................................................................................... 89

14. Underground Injection Control Program ............................................. 89

I.   A Quick Look At Statewide Results ....................................................... 89

iii

CORPS003937

003926

***DISTRICT ENFORCEMENT RESULTS*** ........................................................................ **92**

   A.   Northwest District ........................................................................................................ 92

       1.   Case Reports, NOVs, Consent Orders, Final Orders ................................................ 92

       2.   Program Area Enforcement .................................................................................... 92

       3.   Civil Penalty Assessments ...................................................................................... 93

       4.   Civil Penalty Collections ......................................................................................... 94

   B.   Northeast District ........................................................................................................ 94

       1.   Case Reports, NOVs, Consent Orders, Final Orders ................................................ 94

       2.   Program Area Enforcement .................................................................................... 95

       3.   Civil Penalty Assessments ...................................................................................... 96

       4.   Civil Penalty Collections ......................................................................................... 96

   C.   Central District ............................................................................................................ 97

       1.   Case Reports, NOVs, Consent Orders, Final Orders ................................................ 97

       2.   Program Area Enforcement .................................................................................... 97

       3.   Civil Penalty Assessments ...................................................................................... 98

       4.   Civil Penalty Collections ......................................................................................... 98

   D.   Southeast District ........................................................................................................ 99

       1.   Case Reports, NOVs, Consent Orders, Final Orders ................................................ 99

       2.   Program Area Enforcement .................................................................................... 99

       3.   Civil Penalty Assessments .................................................................................... 100

       4.   Civil Penalty Collections ....................................................................................... 100

   E.   South District ............................................................................................................ 101

       1.   Case Reports, NOVs, Consent Orders, Final Orders .............................................. 101

       2.   Program Area Enforcement .................................................................................. 101

       3.   Civil Penalty Assessments .................................................................................... 102

       4.   Civil Penalty Collections ....................................................................................... 102

   F.   Southwest District ..................................................................................................... 103

       1.   Case Reports, NOVs, Consent Orders, Final Orders .............................................. 103

       2.   Program Area Enforcement .................................................................................. 103

       3.   Civil Penalty Assessments .................................................................................... 104

       4.   Civil Penalty Collections ....................................................................................... 104

CORPS003938

G.  All Other Enforcement ........................................................................................... 105

    1.  Case Reports, NOVs, Consent Orders, Final Orders .................................................. 105

    2.  Program Area Enforcement ............................................................................... 105

    3.  Civil Penalty Assessments ................................................................................. 106

    4.  Civil Penalty Collections ................................................................................... 107

H.  A Quick Look At District Results ............................................................................. 107

***CONCLUSION*** ................................................................................. ***109***

***APPENDIX*** ..................................................................................... ***112***

CORPS003939

003928

# EXECUTIVE SUMMARY

## A.      *Statewide Results*

2015 was in some ways an improvement over the previous year. There were more enforcement cases opened and there were more assessments. However, penalty dollars assessed dropped in 2015 and, more telling, so did the medians for those assessments. Moreover, the agency continues to assess civil penalties in a lower percentage of cases that it opens than it has in the past. All in all the data continues to reveal an agency that has been severely crippled with little evidence of improvements on the horizon. As we have in the past, we have included a Quick Look section to provide the reader with bottom line results for a host of categories at the state level.

It is important for the reader to understand that under Governor Scott the Department initiated a new approach to environmental enforcement. Unlike prior administrations, the Department revised its *Enforcement Manual* to include the use of what is known as *compliance assistance offers* as a means of settling enforcement cases. These offers enable the violator to avoid formal enforcement if the violator does one of three things: (1) tells the Department what the violator has done to resolve the violation, (2) provides information to show the FDEP that the violation either didn't exist or wasn't that serious (a largely subjective determination), or (3) arranges for a Department inspector to visit the facility and show the violator how to return to compliance. If a compliance assistance offer is used the ultimate result is that there is no formal enforcement. The matter is resolved and the file closed.

The use of a compliance assistance offer does more than just resolve the immediate case, however. By using this mechanism and thereby avoiding the execution of a consent order to resolve the case the violator is also protected in the event of future violations. The protection is furnished for future administrative actions involving the violator because under Section 403.141 (7), Fla. Stat., the Department is only allowed to increase civil penalties in cases involving subsequent violations if the prior violations resulted in the entry of a consent order. The limitation upon the Department's enforcement options arises in these cases since no consent order is issued when a compliance assistance offer is issued—it is as if the violator has no past history of violations. In such cases the only arguable approach that the Department can take is thus foregoing administrative actions and resorting to the more severe route of circuit court action.

In two press releases[1] that we released earlier this year we described how the FDEP is handling enforcement in the all-important hazardous waste program. Our review of multiple enforcement files revealed how the agency has gone so far as to re-categorize issues that were found upon inspections so that they would not appear as violations needing enforcement. On at least one occasion the Department notified the facility well in advance of what should have been

---

[1] http://www.peer.org/news/news-releases/illegal-profits-from-polluting-florida-go-untouched.html and http://www.peer.org/news/news-releases/portrait-of-florida-coddling-corporate-pollution-offenses.html

CORPS003940

003929

an unannounced inspection. In some cases inspection reports were revised in order to show a facility as being in compliance. And in the case of a major pharmacy chain the Department's employees routinely negotiated case resolutions directly with attorneys for the violator without involving the FDEP's Office of General Counsel. Compliance assistance offers were repeatedly used to avoid enforcement. Subsequent inspections not infrequently found that earlier violations were repeated. Yet, in spite of this the Department continues with its unsubstantiated claims that compliance is at an all-time high.

It is with this background that we look at the Department's performance in 2015. The results discussed in this report pertain only to cases that did *not* involve compliance assistance offers. How many of those situations existed is not known, but logically one would expect that they far outnumber the formal enforcement actions described below.

The Department opened 297 cases in 2015, a 27% increase from the results in 2014. But the results are still 81% lower than those posted for calendar year 2010. The total number of cases rose in every district, falling only in the multi-district category. Statewide, most subcategories pretty much held their own, but notices of violation and long-form consent orders both fell while short-form consent orders saw a dramatic increase (almost double from 2014).

Despite the increase in the number of cases opened, the overall assessment of the FDEP's enforcement program remains poor. In terms of the total number of cases opened per year the Department's performance has fallen precipitously when looking at the past 9 years. In fact, the total number of cases has fallen 75% just since Governor Scott's first full year in office:



| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|
| Year | 1568 | 1582 | 1604 | 1654 | 1147 | 663 | 210 | 234 | 297 |

216 consent orders were issued in 2015, compared to 163 in 2014 and 153 in 2013. This two year increase in consent orders looks impressive until we consider that in 2011, Scott's first year in office, the FDEP issued 844 consent orders and in 2010, Governor Crist's last year in office the same agency issued 1249 consent orders. There were a combined 118 long-form consent orders, amended consent orders and model consent orders issued in 2015, 6 more than last year, 2014 being the second lowest in the Department's history. Short-form consent orders are the equivalent of traffic tickets, i.e. the polluter is simply required to pay a fine in order to resolve the case. 98 short-form consent orders were issued in 2015, a 192% increase from the 51 in 2014. The Department issued 43 short-form consent orders in 2013, 276 in 2012, 531 in 2011,

CORPS003941

003930

725 in 2010. As a percentage of all consent orders, short-form consent orders rose 14% from 2014.

The individual program areas generally improved upon the number of cases opened in the previous year. The air program, which has seen severe declines over the past 5 years did manage to improve somewhat. But what remains disturbing, particularly in light of the situation in Flint, Michigan, is that the potable water program continued to see drastic declines. It declined 88% in 2014 and in 2015 it fell yet another 46%--there were only 6 cases opened statewide in 2015. There were also declines in the beaches and coastal system program and in waste cleanup.

The number of actual assessments rose from 144 in 2014 to 192 in 2015. The increase in the number of assessments builds upon 2014's improvement that ended multiple years of declining numbers, but it is still markedly lower than previous years. For example, the Department levied assessments in 528 cases in 2012, 949 in 2011 and 1318 in 2010. The number of assessments dropped in the South District and rose in the other districts—but, with the exception of the Central and Southwest Districts the increases were modest when compared with 2014.

On a percentage basis the FDEP assessed penalties in 65% of those cases in which it took formal enforcement. This is 3% higher than in 2014 and in 2013. But overall, the clear trend continues to be that of fewer penalty assessments, even when enforcement is taken, with the largest declines coming in the Northwest and South Districts. The following chart demonstrates the point as to the agency as a whole:



The Department assessed $1,016,674.79 in civil penalties in 2015, a 33% decline from 2014's performance. *This amount, which includes in-kind assessments, is the lowest dollar value of assessments for FDEP since 1988, the first year in which the agency was engaged in a*

3

CORPS003942

003931

*comprehensive environmental enforcement program.* In that year the agency assessed $1,013,302.16 in civil penalties.

In terms of actual dollars, total penalties assessed dropped in many programs, most notably in the domestic waste and potable water programs. In addition, we found that if the highest assessment in 2014 of $466,300.00 (against Miami-Dade Water & Sewer Dept.) is subtracted from the $1,515,020.45 in civil penalties assessed in 2014 the resulting total of $1,048,720.45 is still greater than the total assessments for calendar 2015.

For the first time since 1987(when the Department was barely getting started) there were **no** cases in which the Department assessed a civil penalty of $100,000. Indeed, there were only two assessments that exceeded $50,000.00.

What is even more troubling is that median assessments fell $460.00 to $2,540.00 in 2015, a 15% decline. They fell in every district but the Northwest District. Median penalty assessments, when tracked over time enable us to gauge whether or not the Department is being more or less lenient with penalty assessments issued to violators. In 2015 it is evident that the agency is being more lenient with violators than in the past, even though it claims to be taking enforcement in only the worst cases.

Medians fell significantly in the domestic waste, hazardous waste, industrial waste and solid waste programs. *While the median penalty in the potable water program improved significantly it is due largely to the fact that there were only two potable water assessments in the entire state in 2015.* Medians did improve in the air, dredge and fill mangrove alteration, stormwater discharge and tanks programs.

Collections for the Department as a whole fell to $792,914.23 in 2015, down from $932,998.94 in penalties that the Department collected in the previous year. When in-kind and pollution prevention projects that were completed are included the total for 2015 becomes $1,355,504.02, still less than the $2,027,301.94 that was collected by the Department in 2014. However, as a percentage of assessments, the Department collected 92% of the penalties that it assessed in 2015, and when in-kind completions are factored into the equation the collection rate jumped to 133%. Civil penalty collections (excluding in-kind and pollution prevention projects) were up in every district but the Southeast District, which fell 77% compared to 2014.  As for program areas, collections were down across the board with the exception of the beaches & coastal program, hazardous waste, industrial waste, potable water and stormwater discharge programs. The bottom line is that the continual decline in assessments is having a significant effect upon the dollars collected by the Department which, in turn, means fewer resources for environmental projects and employee salaries.


## B.    ___District Results___

We have provided a **"Quick Look"** section in this report to give the reader an overview of the performance of each district. The performance of each individual district is as follows:

CORPS003943

003932

### 1. Northwest District

The Northwest District initiated enforcement in 35 cases in 2015, 2 less than in each of the 2 the previous years. The number of NOVs and case reports fell, while the number of final orders was unchanged from 2014. The number of consent orders increased, but among those, the usage of short-form consent orders rose 22% from the previous year. Penalty assessments rose by one case in 2015. The district only assessed penalties in 66% of its cases, but this is an improvement over the previous year. The number of assessments rose in the air and in the stormwater discharge programs. *But it has now been 3 years since the district had a potable water assessment.* While the total dollar value of assessed penalties increased in 2015, the dollar value of those assessments is still far below the levels seen in 2012 and earlier years. Median assessments rose significantly. Just as with assessments, collection dollars rose in 2015, stemming what had been a 4-year decline.

### 2. Northeast District

For the first time in 6 years the number of enforcement cases rose. Every enforcement mechanism saw increased numbers, the only caveat being that the number (and percent) of short-form consent orders also increased in 2015. The number of cases that resulted in penalty assessments rose significantly in 2015; however, as a percentage of the total number of enforcement cases opened the number fell from 82% in 2014 to 76% in 2015. The dollar value of assessments in 2015 was $236,926.61, an improvement over the year before. However, the median civil penalty assessment for 2015 for all programs fell from $4,250.00 in 2014 to $3,000.00 in 2015, a level that is also lower than the $3,875.00 median in 2013. Collections rose in 2015, ending a 5-year slide.

### 3. Central District

The Central District took enforcement in 44 cases in 2015, 18 more than in the previous year and the first increase in enforcement in 5 years. Most of the enforcement mechanisms remained steady in 2015, whereas there was a sharp increase in the number of consent orders that were issued (they more than doubled). The number of penalty assessments also increased for the first time in 5 years. Of the 44 enforcement cases opened in 2015, 33 (75%) resulted in civil penalty assessments. Last year the district assessed civil penalties in all of their cases. Improvements were seen in the domestic waste, hazardous waste and stormwater runoff programs while the remaining programs remained stable—except for the tanks program which had no cases in 2015 (it had 4 in the previous year). The Central District levied $219,397.00 in civil penalties in 2015. This is a significant decline from the $271,249.00 assessed in 2014 and the $359,295.00 assessed in 2013. The district has now had four straight years of declining assessments. Medians fell from $5,500.00 in 2014 to $4,260.00 in 2015. They fell in all but the stormwater discharge and dredge and fill programs. Collections rose 92% compared with 2014.

CORPS003944

003933

### 4.  Southeast District

The Southeast District initiated enforcement in 38 cases in 2015, which is 10 more than it had in the previous year and 20 more than in 2013. Yet, this densely populated region of the state still had the second fewest cases of all of the districts. NOVs, final orders and case reports all declined in 2015. The number of consent orders rose significantly, but most of them were of the short-form variety and the district used this mechanism 61% of the time in order to settle cases. None of the 38 cases that were opened in 2015 were potable water cases. The district assessed civil penalties in 79% of the cases that it opened, a 33% increase over 2014's results. The number of assessments rose from 13 in 2014 to 30 in 2015, but the total dollar value of civil penalties dropped from $506,216.63 in 2014 (a total based largely upon one case) to $92,033.00 in 2015, which is also lower than the total value of assessments in 2013. The median for all assessments also fell in 2015. Collections fell 77% in 2015.

### 5.  South District

The South District took enforcement in 46 cases in 2015, a 21% increase from 2014's performance. The number of case reports and NOVs fell in 2015, but final orders and consent orders rose. This district continues to use very few short-form consent orders, they accounted for just 7% of all enforcement cases. At the same time, they tied with the Southwest District for the most case reports sent to OGC. Nevertheless, the district assessed penalties in only 32% of the cases in which it took enforcement in 2015, a reduction from 2014. The dollar value of civil penalty assessments also dropped—this time to $92,033.00, making this the second straight year of declining numbers. The median assessment for all programs combined fell by $1,080.00 in 2015. Collections more than doubled in 2015.

### 6.  Southwest District

The Southwest District took enforcement in 52 cases in 2015, 14 more than in 2014 and 18 more than in 2013. In 2012, the same district opened 164 enforcement cases. While the district issued more case reports and consent orders, the number of NOVs and final orders dropped. The district issued significantly more short-form consent orders in 2015 and fully 33% of all its cases were settled via this route. In those cases that were opened, 54%, or 28, resulted in the assessment of civil penalties, an improvement over the previous year. But the dollar value of those assessments fell yet again, this time for the 5th straight year. They totaled just $135,533.18 in 2015. Median assessments also fell, this time by $3,000.00. What is striking is that median assessments fell in all but the dredge and fill and solid waste programs, the latter of which only had 1 assessment for the entire year. The potable water program had only one enforcement case for the entire year and it did not result in the assessment of civil penalties. Collections did increase by 12% in 2015, however.

6

CORPS003945

### 7. All Other Enforcement

This category typically involves the beaches and coastal systems program and the stormwater discharge program. In addition, most of the mining cases come out of this category. The remaining categories initiated 28 enforcement actions in 2015, the same number as in 2014 and 15 more than in 2013, but still significantly less than the 88 enforcement actions in 2012. Penalties were levied in 71% of the formal enforcement actions in 2015 and the number of penalty assessments rose in 2015 as well. The dollar value of those assessments fell from $40,242.00 in 2014 to $37,222.00 in 2015. However, medians rose from $392.00 in 2014 to $518.00 in 2015. The remaining categories collected $39,056.00 in civil penalty assessments in 2015, up marginally from the $38,576.10 that was collected in 2014.

## STATEWIDE ENFORCEMENT RESULTS[2]

### A.  *Case Reports, NOVs, Consent Orders, Final Orders—Statewide Results*

The Department initiated enforcement in 297 cases in 2015. This is a 27% improvement from 2014 and constitutes the second straight year in which the Department has increased the number of enforcement cases. But it is still well below the 1587 cases opened in 2010, before this administration took office.

The Department requested serious enforcement through the Office of General Counsel in civil circuit courts and/or administrative hearings in 30 cases in 2015, unchanged from 2014's results. But once again, the comparison to 2010 is eye opening. In that year there were 157 case reports.

22 NOVs were issued in 2015, a 21% decline from the 28 NOVs that were issued in 2014.  By comparison, there were 11 NOVs filed in 2013, 54 NOVs filed in 2012, 96 in 2011 and 114 in 2010.

The Department issued 225 consent orders in 2015, a 38% increase over the 163 issued in 2014. There were 153 consent orders issued in 2013, 482 in 2012, 844 in 2011 and 1249 consent

---

[2] *Florida* PEER has previously provided enforcement results for the FDEP based upon data obtained from the agency dating back to 1988. In the past at this juncture we have included a description of the various types of enforcement that the Department is capable of initiating. This description is now at the end of this report in the Appendix wherein the reader will find the descriptions of various enforcement tools, as well as the historical averages for the various program areas. A complete report on the past 20 years of environmental enforcement in Florida can be found at
http://www.peer.org/assets/docs/fl/08_25_11_fl_rpt_on_historical_enforcement.pdf.

CORPS003946

003935

orders in 2010. Of the 225 consent orders issued in 2015, 54 were long-form consent orders (1 more than in 2014).

Model consent orders are essentially long-form consent orders that are tailor-made to fit more routine violations in each program area. They increased from 43 in 2014 to 53 in 2015. Despite the increase, the results are still the lowest since 1990 when the agency was still in its infancy and issued 24 such orders.

There were a combined 107 long-form and model consent orders in 2015, compared with 96 long-form consent orders and model consent orders issued in 2014 and 86 in 2013. All of these results are the lowest in the Department's history, dating back to 1987 (when there were 13).

In 2015 the use of short-form consent orders almost doubled—from 51 in 2014 to 101. 43 were issued in 2013. Additionally, their usage as a percentage of all consent orders increased from 31% in 2014 to 45% in 2015, and their usage as a percentage of all enforcement cases rose from 22% to 34% respectively. We suggested in last year's report that it appeared as though the trend of using fewer short-form consent orders may be coming to an end, and the data from 2015 confirms it. Given that the Department claims to be using enforcement only in the worst cases we would expect that the usage of short-form consent orders would decline, inasmuch as the more extreme violations traditionally require more, not less, agency oversight into the future. These results suggest, however, that the Department is now content to allow even those violators to pay a fine and walk away with no additional oversight.

Final orders that were enforcement related increased from 13 in 2014 to 20 in 2015.

Overall, enforcement was divided between the Department's district offices as follows:



| | HQ | NWD | NED | CD | SED | SD | SWD |
|---|---|---|---|---|---|---|---|
| ■ District | 28 | 35 | 54 | 44 | 38 | 46 | 52 |

Total Number of Enforcement Cases By District--2015

CORPS003947

003936

In 2015 the number of cases increased in each district except for the Northwest. But none of the districts are performing at anywhere near 2010 levels:

| District | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| Headquarters | 134 | 67 | 88 | 15 | 28 | 28 |
| Northwest | 167 | 156 | 60 | 37 | 37 | 35 |
| Northeast | 230 | 133 | 116 | 41 | 39 | 54 |
| Central | 208 | 161 | 109 | 32 | 26 | 44 |
| Southeast | 206 | 128 | 56 | 18 | 28 | 38 |
| South | 187 | 145 | 70 | 33 | 38 | 46 |
| Southwest | 455 | 357 | 164 | 34 | 38 | 52 |

## B.    *Statewide Trends In 2014*

The following chart shows the overall number of enforcement cases brought by the Department over the past eight years. Even with the slight uptick in 2015 the overall results continue to be dismal:



**Total Number of Cases: 2007--2015**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|
| Year | 1568 | 1582 | 1604 | 1654 | 1147 | 663 | 210 | 234 | 297 |

9

CORPS003948

Consent orders continue to be the Department's enforcement mechanism of choice, but their usage has drastically declined.



| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|
| Year | 1344 | 1307 | 1156 | 1249 | 844 | 482 | 153 | 163 | 225 |

With the exception of NOVs, which showed marginal improvement, the above trend is seen throughout the various enforcement mechanisms. All of them have severe problems, a fact that is easily seen when viewed historically:



| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|
| Year | 66 | 85 | 116 | 114 | 96 | 54 | 11 | 28 | 22 |

10

CORPS003949





11

CORPS003950

003939



## Number of Model Consent Orders: 2007-2015

| Year | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|------|------|------|------|------|------|------|------|------|------|
| Year | 250 | 282 | 198 | 224 | 156 | 91 | 42 | 43 | 53 |



## Number of Short-Form Consent Orders: 2007-2015

| Year | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|------|------|------|------|------|------|------|------|------|------|
| Year | 949 | 887 | 811 | 725 | 531 | 276 | 43 | 51 | 101 |

CORPS003951

003940



Number of Consent Orders Combined: 2007-2015

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|
| Year | 1344 | 1307 | 1156 | 1249 | 844 | 482 | 153 | 163 | 225 |



Number of Case Reports: 2007-2015

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|
| Year | 72 | 78 | 126 | 157 | 109 | 68 | 28 | 30 | 30 |

13

CORPS003952

003941

## C. *Case Reports, NOVs, Consent Orders, Final Orders – District Comparisons*

The Department's various enforcement tools were distributed amongst the Districts as follows:

1. Case Reports



The Department's use of more aggressive enforcement, signaled by the use of case reports, dropped from 12.82% of the enforcement cases handled by the Department in 2014 to 10.10% in 2015. The total number of case reports continued to be quite low, less than 20% of the level that they were at in 2010. The Northwest, Central, Southeast and South districts used fewer case reports in 2015 when compared with the results in 2014.

CORPS003953

003942

2. NOVs



    The overall number of NOVs dropped from 28 in 2014 to 22 in 2015. Only the Northeast District increased the number of NOVs issued. The Central District held steady with a total of 3 NOVs. The remaining districts all turned in lower performance. The Northeast and Southwest Districts accounted for 59% of the NOVs issued statewide.

3. Final Orders



CORPS003954

003943

7 more final orders were issued in 2015 than in 2014. The reason for the increase is due to higher numbers in the South and Northeast Districts. These two districts combined for 60% of the 20 final orders issued statewide.

### 4.  Model Consent Orders



There was a 23% increase in the number of model consent orders issued in 2015, up from 43 in 2014 to 53 in 2015. The reason for the increase is mostly attributable to significant increases in the Central and South Districts. Otherwise, the districts turned in essentially the same performance, except for the Southwest District, which issued no model consent orders in 2015.

16

CORPS003955

003944

5. Amended Consent Orders



The issuance of amended consent orders rose minimally, from 16 in 2014 to 17 in 2015. This was due largely to an increase of 3 in the South District and a decrease of the same amount in the Southwest District, while the Northwest District issued 1 more order in 2015 than it did in the previous year. Overall, the South and Southwest Districts accounted for 69% of all amended consent orders issued by the Department.

**6. Long-Form Consent Orders**

CORPS003956

003945



Long-form consent orders, like amended consent orders, remained essentially unchanged in 2015. There were 54 such orders issued in 2015 and 53 in 2014. Increases were seen in the Northwest, Central and Southwest District.

7.  Short-Form Consent Orders



18

CORPS003957

003946

As previously indicated, the issuance of short-form consent orders almost doubled in 2015 to 101 from 51 in 2014. The Northwest and South Districts saw minimal increases, whereas the South District issued 1 less order in 2015. But significant increases were seen in the Northeast (8), the Central (12), the Southeast (17) and the Southwest (14) Districts.

8.  All Consent Orders Combined



The 38% increase in the number of consent orders issued by the Department in 2015 is not due to any single district. Every district saw increases with the smallest increase coming in the Northwest District (an increase of 3) and the largest being in the Central District (an increase of 19). Otherwise, the issuance of these orders remains fairly uniform from district to district.

D.    *Short-Form Consent Orders*

On a percentage basis the use of short-form consent orders increased in 2015 putting an end to two straight years of historically low numbers of these orders by the Department. Indeed, the reduced reliance upon these orders had been one bright spot in what had been exceedingly dismal overall results. With that said, while the number climbed in 2015 the current rate of

CORPS003958

003947

34.01% is hardly the highest in the Department's history and is still the third lowest under this administration.

The following table demonstrates the history of the use of these enforcement mechanisms from 1988 to the present by showing the percentage of all enforcement cases each year that were resolved via short-form consent orders.

| Year | % Short-Form Consent Orders |
|------|------------------------------|
| 1988 | 0.00% |
| 1989 | 0.00% |
| 1990 | 24.13% |
| 1991 | 38.74% |
| 1992 | 36.32% |
| 1993 | 46.84% |
| 1994 | 47.73% |
| 1995 | 52.60% |
| 1996 | 49.39% |
| 1997 | 48.29% |
| 1998 | 50.05% |
| 1999 | 48.90% |
| 2000 | 54.77% |
| 2001 | 56.38% |
| 2002 | 55.67% |
| 2003 | 58.46% |
| 2004 | 55.23% |
| 2005 | 60.20% |
| 2006 | 60.41% |
| 2007 | 62.23% |
| 2008 | 58.13% |
| 2009 | 54.03% |
| 2010 | 45.68% |
| 2011 | 46.29% |
| 2012 | 41.63% |
| 2013 | 20.48% |
| 2014 | 21.79% |
| 2015 | 34.01% |

Normally we would expect that the continued relatively low use of short-form consent orders would be due to the agency's stated determination not to take enforcement except in the worst cases. But as will be discussed later in this report, we are also seeing that, in general, the dollar amount of assessed penalties actually fell in 2015. Thus, the only logical interpretation of the data is that in 2015 the Department settled its cases with lower penalties and statistically less formal oversight than in the past, particularly since short-form consent orders require no additional oversight beyond collection of the assessed penalty. On the bright side, this year only

CORPS003959

003948

the Southeast District settled a majority of its cases through the short-form route, while the South District and the Headquarters actually issued a lower percentage of short-form consent orders compared with their 2014 results. The following table, which compares the use of short-form consent orders to all other enforcement tools, gives the actual percentages.

| District | % Cases Settled Through SF COs |
|---|---|
| Central | 47.73% |
| Northeast | 29.63% |
| Multi-District | 39.29% |
| Northwest | 28.57% |
| Southeast | 60.53% |
| South | 6.52% |
| Southwest | 32.69% |

We also looked at the use of short-form consent orders solely as a part of the consent order enforcement tool. In other words, once the decision had been made to settle a case through a consent order, how likely was the resolution to be via a short-form consent order, as opposed to a long-form or model consent order. Overall, the Department chose short-form consent orders in 44.89% of the cases in which a consent order was deemed the appropriate enforcement mechanism, a 13.60% increase from 2014. The following results give further insight into how enforcement cases are handled in each district.

| District | % Cases Settled Through SF Consent Orders Compared to Other Consent Orders--2013 | % Cases Settled Through SF Consent Orders Compared to Other Consent Orders--2014 | % Cases Settled Through SF Consent Orders Compared to Other Consent Orders--2015 |
|---|---|---|---|
| Central | 50.00% | 52.94% | 58.33% |
| Northeast | 35.29% | 26.67% | 47.06% |
| Multi-District | 45.45% | 54.17% | 44.00% |
| Northwest | 16.13% | 33.33% | 37.04% |
| Southeast | 55.56% | 30.00% | 62.16% |
| South | 0.00% | 18.18% | 10.34% |
| Southwest | 19.23% | 11.54% | 45.95% |

The Central, Northeast, Northwest, Southeast and Southwest Districts all increased their reliance upon short-form consent orders. The Southeast District more than doubled its use of the mechanism. The South District continues to be the district that least relies upon these orders.

## E.    *Program Area Performance*

21

CORPS003960

003949

The number of enforcement cases[3] brought in each key program area is as follows:

| Program Area | Total No. of Enforcement Cases--2012 | Total No. of Enforcement Cases--2013 | Total No. of Enforcement Cases--2014 | Total No. of Enforcement Cases--2015 |
|---|---|---|---|---|
| Asbestos | 10 | 0 | 1 | 0 |
| Air (Excluding Asbestos) | 10 | 7 | 11 | 18 |
| Beaches/Coastal | 17 | 10 | 8 | 7 |
| Waste Cleanup | 14 | 12 | 12 | 8 |
| Dredge & Fill[4] | 93 | 42 | 41 | 54 |
| Domestic Waste | 75 | 26 | 29 | 34 |
| Hazardous Waste | 52 | 20 | 21 | 43 |
| Industrial Waste | 39 | 10 | 7 | 7 |
| Mining & Phosphogypsum | 2 | 2 | 2 | 2 |
| Potable Water | 76 | 12 | 13 | 6 |
| Stormwater Discharge | 71 | 5 | 20 | 22 |
| State Lands | 17 | 24 | 23 | 29 |
| Solid Waste | 22 | 14 | 9 | 19 |
| Tanks | 129 | 14 | 20 | 25 |
| Underground Injection Control | 1 | 1 | 1 | 0 |

Generally speaking, the agency appears to be rebounding somewhat from the disastrous results in 2012 & 2013. Except for one, the major programs all showed increases in enforcement cases, while beaches and coastal programs and waste cleanup both declined. The very troubling result is in the potable water program, which had only **6** cases statewide. This result is largely the equivalent of having no program at all and is particularly astonishing in light of the potable water issues facing Floridians, not to mention the attention that drinking water programs are now receiving in light of the Flint, Michigan situation.

The following table sets out the average number of cases initiated by the Department on an annual basis (the historical average) and then compares those averages to the performance in 2011 through 2015 with respect to the same key program areas listed above. The results are as follows:

---

[3] Defined as the sum of case reports, all consent orders, NOVs and final orders.
[4] This includes Environmental Resource Permitting.

CORPS003961

003950

| Program Area | Historic Avg[5] | 2011 Results | 2012 Results | 2013 Results | 2014 Results | 2015 Results | 2015 Difference from Average |
|---|---|---|---|---|---|---|---|
| Asbestos | 13 | 20 | 10 | 0 | 1 | 0 | (13) |
| Air (Excluding Asbestos) | 93 | 80 | 10 | 7 | 11 | 18 | (75) |
| Beaches & Coastal | 14 | 21 | 17 | 10 | 8 | 7 | (7) |
| Waste Cleanup | 4 | 19 | 14 | 12 | 12 | 8 | 4 |
| Dredge & Fill | 216 | 148 | 93 | 42 | 41 | 54 | (162) |
| Domestic Waste | 119 | 108 | 75 | 26 | 29 | 34 | (85) |
| Hazardous Waste | 132 | 119 | 52 | 20 | 21 | 43 | (89) |
| Industrial Waste | 47 | 62 | 39 | 10 | 7 | 7 | (40) |
| Mining/Phos | 4 | 1 | 2 | 2 | 2 | 2 | 1 |
| Potable Water | 112 | 110 | 76 | 12 | 13 | 6 | (106) |
| State Lands | 25 | 41 | 17 | 24 | 23 | 29 | 4 |
| Stormwater Discharge | 35 | 55 | 71 | 5 | 20 | 22 | (13) |
| Solid Waste | 39 | 63 | 22 | 14 | 9 | 19 | (20) |
| Tanks | 72 | 251 | 129 | 14 | 20 | 25 | (47) |
| Underground Injection Control | 5 | 0 | 1 | 1 | 1 | 0 | (4) |

   While individual program performance looks better when the results are compared to the past few years, the above chart shows that a lot of work needs to be done when compared with their historical performance. The results for 2015 are better than 2014 (and certainly much better than 2012 & 2013), but with the exception of waste cleanup every program performed worse than the historical average—as was the case in 2013 & 2014. And just as in 2014, every program performed markedly worse than it did just 5 years ago, i.e. in 2011. Of the programs that underperformed all but the beaches & coastal control and underground injection control programs had results that were in the double digits in poor performance. The potable water program, which regulates drinking water in the state, has fallen 95% in the same period, the air program has fallen 81%, the dredge and fill program has fallen 75%, domestic waste enforcement has fallen 71%, hazardous waste has fallen 67%, industrial waste has fallen 85%, solid waste has fallen 51% and the tanks program has fallen 65%.

---

[5] The Historical Averages shown are for the twenty-year period of 1987 through 2007.

CORPS003962

003951

## F.    *Civil Penalty Assessments*

The Department assessed civil penalties in 192 cases in 2015, a 33% increase compared to the 144 cases in 2014 and 48% better than the 130 cases in 2013, a slight improvement, but still far behind the 946 assessments in 2011 just 4 years earlier. Yet, in spite of the increased number of assessments, the Department assessed fewer dollars in civil penalties in 2015. $857,639.79 in such fines were levied in 2015, compared to the $1,515,020.45 in civil penalties that was assessed in 2014. ($1,432,715.61 in civil penalties were assessed in 2013.) There is one major difference between the results in 2015 and 2014. In 2014 the highest assessment was $466,300.00 (against the Miami-Dade Water & Sewer Dept.) But even if that assessment is subtracted from the $1,515,020.45 in civil penalties in 2014 the resulting total of $1,048,720.45 is still greater than the total for 2015! Overall, the 2015 result represents a 43% drop from the dollar value of penalties assessed in 2014 and it is the lowest value (2013 was formally the lowest) the Department has amassed since 1988, the first full year for which data is available from the then Department of Environmental Regulation.

The reason for the significant decline in the penalty dollar assessments is a decline in some median dollars assessed on a per case basis in certain key program areas:[6]

| Program Area | Historical Medians | 2012 Medians | 2013 Medians | 2014 Medians | 2015 Medians |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
| Asbestos | $2,000.00 | $3,640.00 | $0.00 | $0.00 | $0.00 |
| Air (Excluding Asbestos) | $1,699.50 | $4,387.50 | $4,000.00 | $3,750.00 | $4,000.00 |
| Beaches/Coastal | $500.00 | $1,000.00 | $875.00 | $875.00 | $1,000.00 |
| Waste Cleanup | $4,500.00 | $36,925.00[7] | $0.00 | $0.00 | $0.00 |
| Dredge & Fill | $700.00 | $1,000.00 | $1,000.00 | $1,000.00 | $2,000.00 |
| Domestic Waste | $2,250.00 | $3,600.00 | $5,250.00 | $7,500.00 | $3,000.00 |
| Hazardous Waste | $4,100.00 | $4,104.00 | $10,700.00 | $4,250.00 | $3,275.00 |
| Industrial Waste | $4,500.00 | $1,500.00 | $2,750.00 | $9,500.00[8] | $2,000.00[9] |
| Mining/Phosphogypsum | $5,000.00 | $2,000.00 | $5,000.00 | $10,000.00 | $4,250.00[10] |
| Potable Water | $500.00 | $500.00 | $7,100.00 | $1,650.00 | $6,000.00[11] |
| State Lands | $1,250.00 | $1,500.00 | $1,710.00 | $1,420.00 | $1,100.00 |
| Stormwater Discharge | $600.00 | $1,199.00 | $1,250.00 | $370.00 | $518.00 |
| Solid Waste | $2,843.00 | $3,375.00 | $6,250.00 | $4,500.00 | $3,000.00 |

---

[6] Data in **red** represent declines from the performance in 2014. Data in **orange** represents performance in 2014 and previous years that represents declines from the immediately preceding year.
[7] This result is based on 2 cases statewide.
[8] This result is based upon 1 case statewide. That case was in the Central District.
[9] This result is based on 3 cases statewide.
[10] This result is based upon 2 cases statewide. The previous years 2012-2014 each had only 1 case/year statewide.
[11] This result is based on 2 cases statewide.

CORPS003963

003952

| | | | | |
|---|---|---|---|---|
| Tanks | $2,712.00 | $10,000.00 | $10,000.00 | $10,000.00 | $19,000.00 |
| Underground Injection Control | $6,850.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Although the above chart lists 13 different program areas only 4 showed lower medians in 2015. Yet, 3 of the 4 programs that underperformed (domestic waste, hazardous waste and solid waste) had the largest number of penalty assessments in 2015. Thus, they had a disproportionate impact upon the Department's overall numbers. The overall median penalty assessments for the Department as a whole fell from $3,000.00 in 2014 to $2,540.00 in 2015. This further helps to explain the substantial decrease in the overall drop in penalty assessments in 2015.

With the exception of the stormwater discharge and tanks programs, in 2015 the program areas whose medians did not decline mostly maintained their 2014 levels. *While the potable water program had the largest increase the program had only 2 assessments for the entire state in 2015, thus rendering the results rather meaningless.* The stormwater discharge and tanks programs had 24 and 8 assessments respectively. Finally, the increase in the air median is the first such increase since 2011.

Every district but the South District saw an increase in the number of assessments when compared with 2015. The increases in the number of assessments in the Central and Southwest Districts were the first increases in the last 5 years.

The gains made in 2014 in the Southeast and Southwest Districts vis-à-vis the total penalty dollars that they assessed were lost in 2015. The Southeast District alone saw a decline of $414,183.63 in 2015, while the Southwest District declined $125,280.64.

Overall, the Districts' performance in the area of penalty assessments was as follows:

| DISTRICT | NO. OF ASSESSMENTS IN 2012 | NO. OF ASSESSMENTS IN 2013 | NO. OF ASSESSMENTS IN 2014 | NO. OF ASSESSMENTS IN 2015 | TOTAL $ ASSESSED IN 2015 | % OF STATE TOTAL |
|---|---|---|---|---|---|---|
| Multi-District | 77 | 14 | 20 | 22 | $37,222.00 | 3.66% |
| NWD | 55 | 21 | 22 | 23 | $109,240.00 | 10.74% |
| NED | 80 | 25 | 32 | 41 | $317,676.61 | 31.25% |
| CEN District | 89 | 30 | 26 | 33 | $258,082.00 | 25.38% |
| SED | 45 | 8 | 13 | 30 | $92,033.00 | 9.05% |
| SD | 50 | 13 | 17 | 15 | $66,888.00 | 6.58% |
| SWD | 132 | 19 | 14 | 28 | $135,533.18 | 13.33% |

25

CORPS003964

This is the second year out of the last **seven** that the Northwest District has seen an increase in the number of overall assessments. Equally good news is that the Central District stopped its five-year slide in the number of penalty assessments and the Southwest District also stopped its four-year slide in the same category.

Compared with 2014 the dollar value of the assessments fell in four of the six districts as well as in the multi-district category of cases. Nevertheless, the Northwest District saw a minimal ($2,230.00) gain, while penalty assessments in the Northeast District rose 110,301.61.

*For the Department as a whole the median assessment fell significantly from $3,000.00 in 2014 to $2,540.00 in 2015.* The comparison of median assessments from 2014 to 2015 amongst the districts is as follows:

| DISTRICT | 2014 MEDIAN ASSESSMENTS | 2015 MEDIAN ASSESSMENTS |
|---|---|---|
| Multi-District | $392.00 | $518.00 |
| NWD | $1,420.00 | $3,420.00 |
| NED | $4,250.00 | $3,000.00 |
| CEN District | $3,500.00 | $4,260.00 |
| SED | $3,000.00 | $2,440.00 |
| SD | $4,500.00 | $3,420.00 |
| SWD | $5,000.00 | $2,000.00 |

Only two districts, the Northwest and Central, saw an increase in their median assessments in 2015 when compared to 2014. This is the second year in a row that medians have fallen in the Southeast and South Districts.

1.    The Highest Assessments

***For the first time since 1987 (when the Department was barely getting off the ground) the FDEP failed to have any assessments that exceeded $100,000.00.*** Indeed, the only two assessments that exceeded $50,000.00 are listed below:[12]

---

[12] The abbreviations are as follows: AB = Asbestos; AC = Air Construction; AF = Air Federal Enforcement Permit; AG = Air General Permit; AO = Air Operation Permit; AM = Air Resource Management; AS = Air Permitted Source; AV = Air Title 5; AW = Aquatic Weed; BS = Beaches and Shores; CC = Collections Case; CM—Coastal & Aquatic Managed Area; CR = Coral Reef ; CU = Waste Cleanup; CZ==Coastal Zone Management; DA = Disciplinary Action; DF = Dredge and Fill; DR= Dry Cleaners; DW = Domestic Waste; EP = Environmental Resource Permitting (Dredge & Fill); ES = ERP Stormwater; EW = ERP Wetlands / Surface Waters; HW = Hazardous Waste; IW = Industrial Waste; MA = Mangrove Alteration; MN = Mining Operations; MR= Marine Resources; OC = Operator Certification; OG = Oil & Gas; PG = Phosphogypsum; PW = Potable Water; RO = Stormwater Discharge; S1 = Untreated Domestic Waste Spills; S3 =Other Domestic Waste Spills; SL = State Lands; SW = Solid Waste; TK = Tanks; UIC = Underground Injection.

CORPS003965

003954

| District[13] | Program | Polluter | Amount |
|---|---|---|---|
| 2 | DW | JEA (City of Jacksonville) | $52,500.00[14] |
| 3 | HW | Thatcher Chemical of Florida | $87,332.00 |

## G.    *Civil Penalty Assessments By Program Area—District Comparison*

As in past reports, we now turn to the performance of the major program areas. What follows is a side-by-side comparison regarding the total dollars assessed in each program area, as well as a comparison of each district's median assessments. Given the serious downward trend in many program areas over the past 5 years we are also including the results from previous years so that the reader can better understand the state of enforcement in each program.

### 1.    Air Program

While markedly better than the previous two years, the Department-wide results continue to show a clear decrease in the number of air assessments:

| Year | Total Number of Air Assessments |
|---|---|
| **2009** | 100 |
| **2010** | 131 |
| **2011** | 70 |
| **2012** | 15 |
| **2013** | 9 |
| **2014** | 9 |
| **2015** | 16 |

---

[13] District numbers correspond to the following districts: 0=Multi-District; 1=Northwest District, 2=Northeast District, 3=Central District, 4=Southeast District, 5=South District, 6=Southwest District.
[14] This amount is actually the value of an in-kind project. The civil penalty assessment would have been less than $50.000.00, likely in the amount of $35,000.00.

27

CORPS003966

003955

2015 saw a 78% improvement in the number of cases in this program. Yet, even with those results the fact remains that the last two years have seen a total of just 25 cases in the entire state. These numbers continue to show that senior management has decided to do what they can to effectiveily eliminate enforcement of the air program in Florida. They are limited, however, by the fact that the Department receives federal funding for administering the federal Clean Air Act, a prerequisite of which is to have enforcement mechanisms to ensure compliance. Thus, the agency cannot fully eradicate enforcement without risking the loss of federal funds. Consequently, we expect to see the results fluctuate around the bottom so long as this administration is in control.

The following chart demonstrates that over the last five years there is a clear pattern of bringing fewer enforcement cases in the air program in every district. The gains in 2015 were the result of the performance of the Northwest and Southwest Districts. The South District also improved, but only by having 1 case, compared with no cases for the previous 3 years:



| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| 2009 | 16 | 31 | 16 | 6 | 13 | 18 |
| 2010 | 14 | 17 | 24 | 7 | 12 | 57 |
| 2011 | 11 | 7 | 10 | 5 | 5 | 32 |
| 2012 | 5 | 0 | 5 | 2 | 0 | 3 |
| 2013 | 2 | 3 | 3 | 0 | 0 | 1 |
| 2014 | 0 | 4 | 3 | 1 | 0 | 1 |
| 2015 | 4 | 4 | 3 | 0 | 1 | 4 |

The following table illustrates the point that even with the improvements in 2015 there is still a marked decline in the dollar value of assessments for the Department as a whole:

| Year | Total $ Assessed |
|---|---|
| 2009 | $325,918.66 |
| 2010 | $1,611,066.50 |
| 2011 | $332,506.00 |
| 2012 | $62,470.50 |
| 2013 | $64,250.00 |
| 2014 | $32,650.00 |
| 2015 | $108,432.00 |

CORPS003967

003956

Statewide there was a 232% increase in the dollar value of assessments in this program in 2015. This increase was attributable to increases in every district, except for the Southeast District, which had no cases for the entire year.[15] Nevertheless, when compared to the results in 2010 the program, as a whole, is still 93% lower. The only district that managed to top 50% when compared with 2010 is the Northwest District, which, in 2015, turned in results that were 25% lower than those of 2010:



Except for the Southeast District, every district had significant increases in penalty assessments in 2015:

---

[15] In those programs in which the multi-district group had no assessments we have not included the group in the tables.

29

CORPS003968

003957



| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| 2009 | $23,384.00 | $35,000.00 | $72,460.16 | $15,700.00 | $61,067.50 | $118,307.00 |
| 2010 | $24,100.00 | $111,125.00 | $68,527.50 | $34,490.00 | $41,012.00 | $1,331,812. |
| 2011 | $39,325.00 | $6,200.00 | $32,780.00 | $38,835.00 | $18,875.00 | $196,491.00 |
| 2012 | $25,283.00 | $0.00 | $22,887.50 | $5,800.00 | $0.00 | $8,500.00 |
| 2013 | $6,000.00 | $10,000.00 | $28,000.00 | $0.00 | $0.00 | $20,250.00 |
| 2014 | $0.00 | $17,000.00 | $10,900.00 | $1,000.00 | $0.00 | $3,750.00 |
| 2015 | $18,100.00 | $52,750.00 | $18,200.00 | $0.00 | $1,000.00 | $18,382.00 |

While median assessments for the Department as a whole dropped by $250 in 2014, it looks as though the decline was temporary. Median assessments improved in 2015 and have generally hovered around the $4,000 figure since 2012.

| Year | Median Air Assessments |
|---|---|
| **2009** | $1,200.00 |
| **2010** | $2,000.00 |
| **2011** | $1,900.00 |
| **2012** | $4,387.50 |
| **2013** | $4,000.00 |
| **2014** | $3,750.00 |
| **2015** | $4,000.00 |

Median air assessments amongst the districts broke down as follows:

CORPS003969

003958



Generally, in 2015 the air cases were somewhat uniformly dispersed amoungst the districts. But when there were only 16 cases statewide it makes evaluation of each individual district's performance problematic. The most cases in any one district was 4, hardly enough to provide a statistical pattern. Nonetheless, half of the districts saw improvements in the medians in 2015. The only district that seems to be showing a pattern is the Central District, which has seen its medians steadily decline over the past 3 years.



CORPS003970

003959

2.      Asbestos Program

The FDEP's website states that "[a]sbestos is well recognized as a health hazard and is highly regulated. The United States Environmental Protection Agency (EPA) and the United States Occupational Safety Health Administration (OSHA) asbestos regulations are intertwined in this area."[16] Yet, despite the assurances on this site, the number of asbestos assessments has declined **100%** Department-wide since 2010 and there have been **no** assessments for the last **three** years. In other words, there is no enforcement of this program at the state level:

| Year | Total Number of Asbestos Assessments |
|------|--------------------------------------|
| **2009** | 38 |
| **2010** | 19 |
| **2011** | 16 |
| **2012** | 14 |
| **2013** | 0 |
| **2014** | 0 |
| **2015** | 0 |

The breakdown at the district level looks like this:



| | NWD | NED | CEN | SED | SD | SWD |
|------|-----|-----|-----|-----|-----|-----|
| 2009 | 23 | 0 | 2 | 4 | 9 | 0 |
| 2010 | 7 | 0 | 2 | 1 | 7 | 2 |
| 2011 | 2 | 0 | 4 | 1 | 3 | 6 |
| 2012 | 4 | 0 | 6 | 1 | 1 | 2 |
| 2013 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2015 | 0 | 0 | 0 | 0 | 0 | 0 |

The downfall, in dollar terms, looks like this for the statewide results:

---

[16] http://www.dep.state.fl.us/air/emission/asbestos.htm

32

| Year | Total $ Assessed—Asbestos |
|------|---------------------------|
| 2009 | $133,005.00 |
| 2010 | $80,300.00 |
| 2011 | $53,148.76 |
| 2012 | $79,879.30 |
| 2013 | $0.00 |
| 2014 | $0.00 |
| 2015 | $0.00 |

A breakdown by district shows the extent to which each individual district has fallen:



| | NWD | NED | CEN | SED | SD | SWD |
|------|-----|-----|-----|-----|-----|-----|
| 2009 | $91,462.50 | $0.00 | $18,230.00 | $4,562.50 | $18,750.00 | $0.00 |
| 2010 | $42,750.00 | $0.00 | $15,550.00 | $500.00 | $18,000.00 | $3,500.00 |
| 2011 | $12,500.00 | $0.00 | $16,648.76 | $500.00 | $3,000.00 | $20,500.00 |
| 2012 | $28,000.00 | $0.00 | $41,732.50 | $750.00 | $3,640.00 | $5,756.80 |
| 2013 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2014 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2015 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Median asbestos assessments for the Department as a whole have fallen from $3,640.00 in 2012 to $0.00 in 2013, 2014 and 2015:

| Year | Median Asbestos Assessments |
|------|-----------------------------|
| 2009 | $1,937.50 |
| 2010 | $1,250.00 |
| 2011 | $2,000.00 |
| 2012 | $3,640.00 |
| 2013 | $0.00 |
| 2014 | $0.00 |
| 2015 | $0.00 |

CORPS003972

003961

So far as median assessments is concerned the historical overview for each district looks like this:



**Asbestos Medians: 2009 -- 2015**

| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| 2009 | $1,875.00 | $0.00 | $9,115.00 | $825.00 | $2,000.00 | $0.00 |
| 2010 | $1,250.00 | $0.00 | $7,775.00 | $500.00 | $1,000.00 | $1,750.00 |
| 2011 | $6,250.00 | $0.00 | $2,550.00 | $500.00 | $1,000.00 | $3,250.00 |
| 2012 | $3,750.00 | $0.00 | $4,575.00 | $750.00 | $3,640.00 | $2,878.40 |
| 2013 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2014 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2015 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

3.    Beaches & Coastal Program

The Department's website states that, "[n]o other state and very few countries can boast such an abundance of high quality beaches. The 825 miles of sandy coastline fronting the Atlantic Ocean, the Gulf of Mexico or the Straits of Florida are one of Florida's most valuable natural resources. Florida's beaches are deserving of this status because they serve several important functions, each being vital to maintaining the health of Florida's economy and environment."[17] Under Florida's Beach and Shore Preservation Act[18] the Department is charged with adopting and enforcing programs designed to protect this highly important aspect of Florida's environment.

---

[17] http://www.dep.state.fl.us/beaches/
[18] Chapter 161, Florida Statutes

CORPS003973

003962

The number of assessments levied by the Department has declined steadily since 2009. The result for 2015 is the 2nd lowest in the Department's history:

| Year | Total Number of Beaches & Coastal Assessments |
|------|-----------------------------------------------|
| 2009 | 25 |
| 2010 | 14 |
| 2011 | 20 |
| 2012 | 13 |
| 2013 | 8 |
| 2014 | 7 |
| 2015 | 4 |

All of the assessments in this program arose out of the Multi-District category. This has been the case since at least 2009.

The following table illustrates the decline in the dollar value of assessments for the Department as a whole:

| Year | Total $ Assessed |
|------|------------------|
| 2009 | $27,750.00 |
| 2010 | $11,750.00 |
| 2011 | $20,400.00 |
| 2012 | $18,000.00 |
| 2013 | $13,500.00 |
| 2014 | $6,250.00 |
| 2015 | $5,250.00 |

Assessments fell 16% compared with 2014 and they are currently 55% below the results for 2010.

Median assessments for the Department (and the Multi-District category) doubled in 2015 and they are 14% above the levels in 2010, although it must be remembered that the results from 2015 are based upon only 4 assessments:

| Year | Median Beaches & Coastal Assessments |
|------|--------------------------------------|
| 2009 | $750.00 |
| 2010 | $875.00 |
| 2011 | $750.00 |
| 2012 | $1,000.00 |
| 2013 | $875.00 |
| 2014 | $500.00 |
| 2015 | $1,000.00 |

35

CORPS003974

003963

4.    Dredge and Fill Program

The downward trend in the number of dredge and fill assessments was reversed a bit in 2015. There were 4 more cases than in the previous year. But this performance is still dismal compared with pre-2011 years:

| Year | Total Number of Assessments |
|------|----------------------------|
| 2009 | 231 |
| 2010 | 208 |
| 2011 | 156 |
| 2012 | 86 |
| 2013 | 38 |
| 2014 | 23 |
| 2015 | 27 |

The South and Southwest Districts were the only two districts to see an increase in the number of cases compared to 2014's performance. The Northwest District had only one case during the entire year:



| | Multi | NWD | NED | CEN | SED | SD | SWD |
|------|-------|-----|-----|-----|-----|----|-----|
| 2009 | 1 | 41 | 46 | 37 | 21 | 24 | 61 |
| 2010 | 0 | 40 | 36 | 48 | 19 | 13 | 52 |
| 2011 | 3 | 26 | 33 | 25 | 13 | 13 | 43 |
| 2012 | 0 | 14 | 19 | 9 | 4 | 16 | 24 |
| 2013 | 0 | 9 | 11 | 9 | 1 | 3 | 5 |
| 2014 | 0 | 6 | 4 | 3 | 3 | 3 | 4 |
| 2015 | 0 | 1 | 4 | 1 | 3 | 7 | 11 |

Statewide, the dollar value of dredge & fill assessments rose just over $9,000 in 2015, an expected result given the modest increase in the number of cases. But this is still the second worst performance in the program's history, second only to 2014:

CORPS003975

003964

| Year | Total $ Assessed |
|------|------------------|
| **2009** | $1,607,697.31 |
| **2010** | $1,309,603.40 |
| **2011** | $304,828.19 |
| **2012** | $251,762.00 |
| **2013** | $167,495.00 |
| **2014** | $59,330.00 |
| **2015** | $67,270.00 |

Three of the districts, the Northeast, South and Southwest saw an overall increase in assessments in 2015, the latter two being sizeable. Two of these districts, the South and Southwest also had more assessments in 2015 than in 2014. The combined total of the penalty dollars assessed in the Northeast, South and Southwest districts equalled $62,680.00, or 97% of all assessments statewide. The Northwest District assessed just $250 in penalties in 2015:



When looking at the 7-year history of the districts the overall downward trend is easy to see:

CORPS003976

003965



**Dredge & Fill Assessments: 2009 -- 2015**

| | Multi | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|---|
| 2009 | $2,000.00 | $743,888.0 | $215,899.3 | $140,385.0 | $107,345.0 | $106,150.0 | $292,030.0 |
| 2010 | $0.00 | $350,908.0 | $150,786.1 | $56,475.00 | $598,826.3 | $42,670.00 | $109,938.0 |
| 2011 | $18,250.00 | $59,208.36 | $66,419.50 | $27,180.00 | $25,442.33 | $62,458.00 | $45,870.00 |
| 2012 | $0.00 | $115,054.0 | $46,448.00 | $4,290.00 | $4,460.00 | $37,900.00 | $43,610.00 |
| 2013 | $0.00 | $21,755.00 | $57,570.00 | $8,500.00 | $250.00 | $65,000.00 | $14,420.00 |
| 2014 | $0.00 | $5,430.00 | $9,250.00 | $10,000.00 | $14,260.00 | $1,260.00 | $19,130.00 |
| 2015 | $0.00 | $250.00 | $10,000.00 | $3,000.00 | $1,340.00 | $17,760.00 | $34,920.00 |

In 2015 the median assessments doubled for the Department as a whole:

| Year | Median DF Assessments |
|---|---|
| 2009 | $1,500.00 |
| 2010 | $1,205.00 |
| 2011 | $1,000.00 |
| 2012 | $1,000.00 |
| 2013 | $1,000.00 |
| 2014 | $1,000.00 |
| 2015 | $2,000.00 |

The median assessments amongst the districts for 2015 were:

38

CORPS003977

003966



Median assessments improved significantly in the Northeast and South Districts, but fell just as significantly in the Southeast and Southwest District. Once again, however, it must be remembered that the overall number of cases was 7 or less per district with the sole exception being the Southwest District, which only had a total of 11 cases for the year. Thus, it is hardly possible to say much improvement was made in any of the districts over the course of the year.



| Dredge & Fill Medians: 2009 -- 2015 | Multi | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|---|
| 2009 | $2,000.00 | $7,250.00 | $1,455.00 | $600.00 | $600.00 | $3,000.00 | $1,500.00 |
| 2010 | $0.00 | $2,000.00 | $1,809.50 | $710.00 | $1,710.00 | $2,000.00 | $800.00 |
| 2011 | $6,500.00 | $1,500.00 | $1,710.00 | $710.00 | $1,000.00 | $1,000.00 | $960.00 |
| 2012 | $0.00 | $2,000.00 | $1,600.00 | $420.00 | $1,125.00 | $1,755.00 | $775.00 |
| 2013 | $0.00 | $2,000.00 | $1,000.00 | $420.00 | $250.00 | $10,000.00 | $710.00 |
| 2014 | $0.00 | $460.00 | $750.00 | $3,000.00 | $5,420.00 | $420.00 | $2,855.00 |
| 2015 | $0.00 | $250.00 | $2,625.00 | $3,000.00 | $420.00 | $3,420.00 | $2,000.00 |

CORPS003978

003967

**5**.    Domestic Waste Program

The Department assessed penalties in 39 cases in 2015, 10 more than in 2014, 12 more than in 2013. Despite the improvement, it was still the 4th lowest in Department history. The lowest output was a total of 4 cases in the Department's first year:

| Year | Number of Civil Penalty Assessments |
|------|-------------------------------------|
| 2009 | 174 |
| 2010 | 140 |
| 2011 | 108 |
| 2012 | 70 |
| 2013 | 17 |
| 2014 | 29 |
| 2015 | 39 |

This is the second year in which the number of domestic waste cases has risen. While good, it is obvious that the program is still far below where it was 5 years ago. Nevertheless, except for the Southwest District, which had only 2 cases all year, every district either met or exceeded the results in 2014. But the Southwest District was not alone. Two other districts, the Northwest and South, each had only 2 cases all year. The overall trends are shown below:



| | NWD | NED | CEN | SED | SD | SWD |
|------|-----|-----|-----|-----|-----|-----|
| 2009 | 41 | 21 | 22 | 29 | 31 | 30 |
| 2010 | 12 | 19 | 19 | 14 | 23 | 53 |
| 2011 | 16 | 11 | 21 | 2 | 24 | 34 |
| 2012 | 7 | 19 | 12 | 2 | 10 | 20 |
| 2013 | 0 | 5 | 4 | 0 | 2 | 6 |
| 2014 | 1 | 16 | 6 | 1 | 2 | 3 |
| 2015 | 2 | 17 | 13 | 3 | 2 | 2 |

The Department assessed $235,749.00 in civil penalties in 2015, a 27% decline from the $871,625.00 in civil penalties that were assessed in 2014. The results for 2015 are the worst

40

CORPS003979

overall results since 1989 and the 4th worst in the Department's history—the previous low returns being in 1987, 1988 and 1989.  The results for the past 7 years are as follows:

| Year | Domestic Waste Assessments |
|------|---------------------------|
| 2009 | $2,808,253.58 |
| 2010 | $2,439,599.07 |
| 2011 | $997,855.99 |
| 2012 | $1,097,055.56 |
| 2013 | $498,391.31 |
| 2014 | $871,625.00 |
| 2015 | $235,749.00 |

The dollars assessed were distributed amongst the districts as follows:



| District | NWD | NED | CEN | SED | SD | SWD |
|----------|-----|-----|-----|-----|-----|-----|
| District | $39,000.00 | $98,100.00 | $58,999.00 | $21,000.00 | $14,000.00 | $4,650.00 |

The Central District was the only district to perform better in 2015 than in the previous year. Steep declines were seen in the Southeast District (which in 2014 had only 1 case, but it was a major assessment) and the Southwest District. The general historical trend continues to be towards lower performance:

41

CORPS003980

003969



Domestic Waste Assessments: 2009 -- 2015

| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| 2009 | $580,196.58 | $249,450.00 | $68,150.00 | $844,200.00 | $375,247.00 | $691,010.00 |
| 2010 | $334,007.75 | $50,300.00 | $65,472.12 | $249,147.20 | $57,750.00 | $1,682,922. |
| 2011 | $240,999.99 | $77,500.00 | $123,350.00 | $5,750.00 | $110,827.00 | $439,429.00 |
| 2012 | $123,160.56 | $51,820.00 | $42,900.00 | $208,200.00 | $105,300.00 | $565,675.00 |
| 2013 | $0.00 | $180,125.00 | $58,666.31 | $0.00 | $196,400.00 | $63,200.00 |
| 2014 | $48,000.00 | $136,400.00 | $32,675.00 | $466,300.00 | $24,500.00 | $163,750.00 |
| 2015 | $39,000.00 | $98,100.00 | $58,999.00 | $21,000.00 | $14,000.00 | $4,650.00 |

Medians for the Department as a whole fell back to the level seen in 2011, thus marking a 4 year decline:

| Year | Median Assessments—Domestic Waste |
|---|---|
| **2009** | $2,275.00 |
| **2010** | $2,000.00 |
| **2011** | $3,000.00 |
| **2012** | $3,600.00 |
| **2013** | $5,250.00 |
| **2014** | $7,500.00 |
| **2015** | $3,000.00 |

The medians in the Northwest, South and Southwest Districts are based upon a total of 2 cases each and the median for the Southeast District is based upon only 3 cases. That leaves only the Northeast and Central Districts (with 17 and 13 cases respectively) with numbers that even remotely gauge the strictness of enforcement in this program area. The medians in both of those areas are lower than in 2014. The medians for each district are shown below:

42

CORPS003981

003970



**Median Domestic Waste By District--2015**

| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| District | $19,500.00 | $2,000.00 | $4,000.00 | $5,000.00 | $7,000.00 | $2,325.00 |

The historical trend for each district is shown below:

**Domestic Waste Medians: 2009 -- 2015**

| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| 2009 | $600.00 | $4,000.00 | $1,937.50 | $15,000.00 | $1,500.00 | $7,000.00 |
| 2010 | $1,250.00 | $2,000.00 | $2,750.12 | $4,500.00 | $1,000.00 | $4,500.00 |
| 2011 | $2,500.00 | $1,000.00 | $1,875.00 | $2,875.00 | $3,225.00 | $3,300.00 |
| 2012 | $14,313.31 | $1,300.00 | $3,600.00 | $83,000.00 | $1,750.00 | $4,000.00 |
| 2013 | $0.00 | $3,750.00 | $5,500.00 | $0.00 | $98,200.00 | $3,500.00 |
| 2014 | $48,000.00 | $6,250.00 | $5,187.50 | $466,300.00 | $12,250.00 | $50,000.00 |
| 2015 | $19,500.00 | $2,000.00 | $4,000.00 | $5,000.00 | $7,000.00 | $2,325.00 |

6.     Hazardous Waste Program

The number of hazardous waste assessments increased 42% in 2015, the second straight year of improvement. But the number of assessments still lags far behind pre-2011 performance:

| Year | Number of Hazardous Waste Assessments |
|------|---------------------------------------|
| 2009 | 198 |
| 2010 | 202 |
| 2011 | 125 |
| 2012 | 51 |
| 2013 | 14 |
| 2014 | 20 |
| 2015 | 34 |

Like the agency's performance in 2014, even though there were more cases overall in 2015 the improvement is not uniform. **For the second straight year the Northwest and Northeast Districts each had only one assessment for the entire year. In fact, the Northwest District has had a total of 3 assessments since January 1, 2012. The Northeast and South Districts have each had just 7 assessments during the same period.** The historical trends are:



| | NWD | NED | CEN | SED | SD | SWD |
|------|-----|-----|-----|-----|-----|-----|
| 2009 | 31 | 23 | 43 | 13 | 17 | 71 |
| 2010 | 23 | 27 | 43 | 19 | 28 | 62 |
| 2011 | 21 | 17 | 26 | 18 | 8 | 35 |
| 2012 | 1 | 3 | 25 | 12 | 1 | 9 |
| 2013 | 0 | 2 | 7 | 4 | 0 | 1 |
| 2014 | 1 | 1 | 6 | 7 | 4 | 1 |
| 2015 | 1 | 1 | 12 | 15 | 2 | 3 |

Predictably, the dollar assessments also increased in 2015 as a result of the increase in the overall number of assessments for the year. This 13% increase from 2014 is still 90% below 2010's results. The results for the past 7 years are:

CORPS003983

003972

| Year | Total Hazardous Waste Assessments |
|------|-----------------------------------|
| **2009** | $2,055,805.69 |
| **2010** | $2,731,922.74 |
| **2011** | $1,690,153.06 |
| **2012** | $540,107.59 |
| **2013** | $137,599.00 |
| **2014** | $245,909.63 |
| **2015** | $278,312.00 |

The Department's assessments in 2015 were divided amongst the districts as follows:



For the second year in a row, the Central District was responsible for the largest amount of penalties assessed in 2015.

Three of the districts, the Northwest, Central and South all saw a decrease in dollar assessments in 2015, compared with 2014. The decline was steepest in the Northwest District, which assessed only $750.00 in penalties (77% lower than the previous year. By comparison, the Southeast District's results are 150% better than in 2014.

45

CORPS003984

003973



**Hazardous Waste Assessments: 2009 -- 2015**

| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| 2009 | $190,231.00 | $290,727.24 | $1,004,144. | $101,466.00 | $63,167.50 | $406,069.95 |
| 2010 | $139,438.00 | $304,362.50 | $408,256.23 | $699,880.15 | $429,668.40 | $750,317.46 |
| 2011 | $106,960.00 | $402,251.00 | $568,960.00 | $220,693.86 | $111,773.00 | $279,515.20 |
| 2012 | $3,000.00 | $12,200.00 | $347,401.09 | $88,051.30 | $8,400.00 | $81,055.20 |
| 2013 | $0.00 | $20,000.00 | $139,665.00 | $38,238.00 | $0.00 | $137,599.00 |
| 2014 | $3,200.00 | $8,775.00 | $169,474.00 | $17,156.63 | $15,656.00 | $31,648.00 |
| 2015 | $750.00 | $32,170.00 | $164,383.00 | $42,694.00 | $5,128.00 | $33,187.00 |

Median assessments for the Department as a whole are falling. They declined 15% compared with the results of 2014 and are 15% lower than the performance in 2010:

| Year | Median Hazardous Waste Assessments |
|---|---|
| **2009** | $4178.25 |
| **2010** | $3868.50 |
| **2011** | $7,090.00 |
| **2012** | $4,104.00 |
| **2013** | $10,700.00 |
| **2014** | $4,250.00 |
| **2015** | $3,275.00 |

Median assessments for each district in 2015 were :

46

CORPS003985

003974



The median assessment in the Northeast District looks impressive, but (like the Northwest District) is based upon only 1 assessment. The results in the South District are based upon only 2 cases and the Southwest District is based upon 3. While the Central and Southeast Districts had more assessments (12 and 15 respectively) both saw declining medians of 72% and 15% respectively compared with 2014. The overall trends are shown below:



47

CORPS003986

003975

### 7.    Industrial Waste Program

This program had 3 assessments in 2015, a dismal result, but still better than the 1 assessment that it had in the previous year. As we stated last year, "[f]or all intents and purposes this is a program that has now ceased to function." The number of assessments has fallen 94% from 2010:

| Year | Number of Industrial Waste Assessments |
|------|----------------------------------------|
| 2009 | 73 |
| 2010 | 54 |
| 2011 | 46 |
| 2012 | 21 |
| 2013 | 4 |
| 2014 | 1 |
| 2015 | 3 |

The Northeast and Southwest Districts were the only two districts to improve upon 2014's results. There were no cases in any of the remaining four districts:



Overall the Department levied just $10,500.00 in civil penalties in 2015, an 11% increase over 2014's performance:

| Year | Total Industrial Waste Assessments |
|------|-------------------------------------|

48

CORPS003987

003976

| 2009 | $915,380.60 |
| 2010 | $192,352.98 |
| 2011 | $202,145.45 |
| 2012 | $43,700.08 |
| 2013 | $13,687.50 |
| 2014 | $9,500.00 |
| 2015 | $10,500.00 |

In 2015 the districts assessed penalties in this program as follows:



The annual decline continues to be seen in every district:

49

CORPS003988

003977



Median penalties fell $7,500.00 from 2014's level (which was based upon only one case). Given the scarcity of cases (8 cases in the last 3 years) the results are hardly indicative of a trend, but the current median is still 23% lower than the performance in 2010:

| Year | Median Industrial Waste Assessments |
|------|-------------------------------------|
| 2009 | $2,400.00 |
| 2010 | $2,590.10 |
| 2011 | $2,500.00 |
| 2012 | $1,500.00 |
| 2013 | $2,750.00 |
| 2014 | $9,500.00 |
| 2015 | $2,000.00 |

The Northeast and Southwest Districts were the only districts to assess penalties:

CORPS003989

003978



It has been now been **four** years since the Northwest District assessed a civil penalty and **three** years since a penalty was assessed in the Southeast District:



| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| 2009 | $1,506.44 | $5,000.00 | $5,000.00 | $2,500.00 | $2,000.00 | $2,700.00 |
| 2010 | $2,000.00 | $2,500.00 | $950.00 | $2,000.00 | $1,000.00 | $3,500.00 |
| 2011 | $6,975.00 | $5,000.00 | $3,500.00 | $2,000.00 | $1,500.00 | $3,500.00 |
| 2012 | $0.00 | $4,000.00 | $1,500.00 | $500.00 | $0.00 | $2,000.00 |
| 2013 | $0.00 | $0.00 | $2,750.00 | $0.00 | $1,187.50 | $7,000.00 |
| 2014 | $0.00 | $0.00 | $9,500.00 | $0.00 | $0.00 | $0.00 |
| 2015 | $0.00 | $1,250.00 | $0.00 | $0.00 | $0.00 | $8,000.00 |

CORPS003990

003979

**8**.     Mining & Phosphogypsum Program

This is a program that administers the reclamation and wetland resource permitting programs, including mines, oil & gas, dams and phosphogypsum stack systems. It is a program that has historically never seen tremendous levels of enforcement. In fact, the most assessments in any given year is 18 and that was in 2005. Generally speaking, the numbers have fallen since then.

The recent history is shown below:

| Year | Total Number of Mining & PG Assessments |
|------|------------------------------------------|
| 2009 | 5 |
| 2010 | 3 |
| 2011 | 3 |
| 2012 | 1 |
| 2013 | 1 |
| 2014 | 1 |
| 2015 | 2 |

In general, the level of assessments has fallen 33% since 2010, but it doubled from 2014 to 2015.

All of the assessments since 2009 have come out of the Multi-District Category and the Southwest District. But the Southwest District has had no assessments since 2012:

52

CORPS003991

003980



| | Multi | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|---|
| Count 2009 | 3 | 0 | 0 | 0 | 0 | 0 | 2 |
| Count 2010 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Count 2011 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Count 2012 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Count 2013 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Count 2014 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Count 2015 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |

The following table illustrates the decline in the dollar value of assessments for the Department as a whole:

| Year | Total $ Assessed |
|---|---|
| 2009 | $73,669.00 |
| 2010 | $17,200.00 |
| 2011 | $14,000.00 |
| 2012 | $2,000.00 |
| 2013 | $5,000.00 |
| 2014 | $10,000.00 |
| 2015 | $8,500.00 |

Statewide there was a 15% decline from 2014. The 2015 results are 51% below the results for 2010. The Multi-District Category was responsible for all of the assessments for 2013 through 2015.

CORPS003992

003981



| | Multi | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|---|
| District | $8,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

The historical trends are:

| | Multi | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|---|
| 2009 Assessments | $19,470.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $54,199.00 |
| 2010 Assessments | $12,200.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $5,000.00 |
| 2011 Assessments | $14,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2012 Assessments | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $2,000.00 |
| 2013 Assessments | $5,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2014 Assessments | $10,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2015 Assessments | $8,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Aside from 2014, which looks to be an outlier, median assessments have stayed relatively stable over the past 7 years. The history is shown below:

| Year | Median Mining & PG Assessments |
|---|---|
| 2009 | $5,000.00 |
| 2010 | $5,000.00 |

| 2011 | $3,000.00 |
| 2012 | $2,000.00 |
| 2013 | $5,000.00 |
| 2014 | $10,000.00 |
| 2015 | $4,250.00 |

The $4,250.00 median assessments in 2015 are all attributable to the Multi-District Category.  The same is true for 2011, 2013 & 2014:



### 9.    Potable Water Program

The importance of the potable water program became clearer in the aftermath of the Flint, Michigan disaster. The potable water program administers the federal Safe Drinking Water Act and, in turn, oversees the provision of drinking water to Florida's families, businesses, schools, daycare centers etc. The FDEP describes its responsibility on its website:

> "The Department of Environmental Protection has the primary role of regulating public water systems in Florida. Authority derives from Chapter 403, Part IV, Florida Statutes and by delegation of the federal program from the U.S. Environmental Protection Agency. The Department has promulgated a number of rules in the Florida Administrative Code.
>
> A public water system is one that provides water to 25 or more people for at least 60 days each year or serves 15 or more

CORPS003994

003983

service connections. These public water systems may be publicly or privately owned and operated."[19]

While the Department has not yet posted its results for 2015 the results for 2014 have been posted on its website and are available to the public.[20] In 2014 the report posted by the Department concluded that there were 5,310 active potable water systems in Florida. (See, report, page 11) Of those, 689 were in violation and those 689 had 1842 violations. Of the 1842 violations, 295 (16%) were what are known as Maximum Contaminate Level violations. These are violations for things such as total coliform, organic and inorganic compounds, radionuclides and disinfection byproducts. The remaining violations were monitoring and reporting (MNR) violations. During this same period, according to the FDEP's own enforcement records, the Department had a total of 5 cases in the entire state of Florida.

**In spite of these dismal results, the U.S. Environmental Protection Agency has just proposed delegating even more of its responsibilities under the Safe Drinking Water Act to the State of Florida's FDEP.** See, https://www.federalregister.gov/articles/2016/07/28/2016-17898/public-water-system-supervision-program-revision-for-the-state-of-florida   A review of the notice filed by EPA in the Federal Register shows that the FDEP applied for this action in 2013. The notice states, in pertinent part that:

> On March 20, 2013, the State of Florida submitted requests that EPA Region 4 approve a revision to the State's Safe Drinking Water Act Public Water System Supervision Program to include the authority to implement and enforce the Stage 2 Disinfectants and Disinfection Byproducts Rule, the Long Term 2 Enhanced Surface Water Treatment Rule, and the Ground Water Rule.

In other words, the EPA is just now acting upon it at a time when enforcement of the program has fallen through the floor.

*Notwithstanding the critical role that this program plays, there were only 2 assessments statewide in 2015.* The number of potable water assessments has declined steadily since 2010 to a point that it is all but nonexistent in Florida:

---

[19] http://www.dep.state.fl.us/water/drinkingwater/index.htm
[20] The results are found in a report entitled *The 2014 Annual Report on Violations of the U.S. Safe Drinking Water Act in the State of Florida* located online at http://www.dep.state.fl.us/water/drinkingwater/docs/2014-ACR-Florida.pdf . This report was issued on July 1, 2015.

CORPS003995

003984

| Year | Number of Assessments |
|------|----------------------|
| **2009** | 128 |
| **2010** | 141 |
| **2011** | 90 |
| **2012** | 65 |
| **2013** | 3 |
| **2014** | 5 |
| **2015** | 2 |

**This is the worst performance in the Department's history dating back to 1988.** None of the districts improved their performance in 2015. Only one, the South District, managed to equal the number of assessments that it had in 2014. **Three districts, the Northwest, Southeast and Southwest have had no assessments for the past 3 years.** The historical performance looks like this:



| | NWD | NED | CEN | SED | SD | SWD |
|------|-----|-----|-----|-----|-----|-----|
| **2009** | 13 | 43 | 9 | 9 | 17 | 37 |
| **2010** | 9 | 44 | 24 | 9 | 9 | 46 |
| **2011** | 20 | 16 | 15 | 6 | 4 | 29 |
| **2012** | 10 | 23 | 10 | 2 | 3 | 17 |
| **2013** | 0 | 1 | 1 | 0 | 1 | 0 |
| **2014** | 0 | 3 | 1 | 0 | 1 | 0 |
| **2015** | 0 | 1 | 0 | 0 | 1 | 0 |

Since 2011 there has been an unmistakeable decline in the number of assessments in every district.

**The Department as a whole assessed penalties of $12,000.00 in this program, a $20,000.00 decrease from 2014. This represents a 97% decline when compared with the results in 2010:**

57

CORPS003996

003985

| Year | Total Potable Water Assessments |
|------|--------------------------------|
| **2009** | $233,762.16 |
| **2010** | $249,554.51 |
| **2011** | $149,936.75 |
| **2012** | $94,397.50 |
| **2013** | $32,100.00 |
| **2014** | $32,000.00 |
| **2015** | $12,000.00 |

The fines were distributed amongst the districts in 2015 as follows:



None of the districts assessed more potable water penalties in 2015 than in 2014. Every district assessed fewer penalties than in 2010  The distinct downward trend over the past six years that was seen in the number of assessments is also seen in the penalty dollars assessed:

58

CORPS003997



| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| 2009 | $15,275.00 | $113,637.16 | $8,275.00 | $13,075.00 | $22,200.00 | $61,300.00 |
| 2010 | $7,720.00 | $98,372.51 | $62,685.00 | $17,327.00 | $11,800.00 | $51,650.00 |
| 2011 | $9,685.00 | $78,988.00 | $19,850.00 | $5,745.00 | $8,650.00 | $27,018.75 |
| 2012 | $6,310.00 | $43,595.00 | $8,125.00 | $6,150.00 | $2,200.00 | $28,017.50 |
| 2013 | $0.00 | $7,100.00 | $19,600.00 | $0.00 | $5,400.00 | $0.00 |
| 2014 | $0.00 | $12,150.00 | $700.00 | $0.00 | $19,150.00 | $0.00 |
| 2015 | $0.00 | $10,000.00 | $0.00 | $0.00 | $2,000.00 | $0.00 |

Median assessments rose markedly in 2015, but given that there were only 2 cases statewide the result is hardly impressive or statistically significant:

| Year | Median Potable Water Assessments |
|---|---|
| **2009** | $750.00 |
| **2010** | $875.00 |
| **2011** | $537.50 |
| **2012** | $500.00 |
| **2013** | $7,100.00 |
| **2014** | $1,650.00 |
| **2015** | $6,000.00 |

A comparison of the medians for the districts in 2015 yields these results:

59



Over the past six years there is no discernable pattern that applies to every district. This is due in large part to the lack of assessments over the past 3 years:



| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| 2009 | $1,000.00 | $900.00 | $500.00 | $1,000.00 | $750.00 | $550.00 |
| 2010 | $500.00 | $1,025.00 | $1,000.00 | $1,400.00 | $750.00 | $500.00 |
| 2011 | $362.50 | $940.00 | $1,000.00 | $875.00 | $2,000.00 | $500.00 |
| 2012 | $390.00 | $500.00 | $512.50 | $3,075.00 | $700.00 | $500.00 |
| 2013 | $0.00 | $7,100.00 | $19,600.00 | $0.00 | $5,400.00 | $0.00 |
| 2014 | $0.00 | $1,650.00 | $700.00 | $0.00 | $19,150.00 | $0.00 |
| 2015 | $0.00 | $10,000.00 | $0.00 | $0.00 | $2,000.00 | $0.00 |

### 10.    Stormwater Discharge Program

This is a program that is largely administered out of Tallahassee and to a lesser extent out of the Northwest District with the other districts occasionally opening a case. The program oversees the design and operation of stormwater discharge ponds/systems throughout Florida.

60

CORPS003999

003988

These systems collect and treat stormwater that is generated by large residential and commercial complexes throughout the state. The state's rapid growth means that this program (and its enforcement) will continue to be vital to Florida's environmental health.

The number of assessments rose in 2015 compared to the previous two years, but the overall number is still significantly below previous levels. This continues to be a troubling sign in light of the rapid development in the state, a situation that one would expect to result in an increase in violations:

| Year | Number of Assessments |
|------|----------------------|
| 2009 | 91 |
| 2010 | 123 |
| 2011 | 54 |
| 2012 | 65 |
| 2013 | 8 |
| 2014 | 14 |
| 2015 | 24 |

The statewide pattern seen above held true for both the Multi-District category and the Northwest District. The Northwest District and Central Districts were the only other districts to have any assessments in 2015:



**Number of Stormwater Discharge Assessments: 2009 -- 2015**

| | Multi | NWD | NED | CEN | SED | SD | SWD |
|------|-------|-----|-----|-----|-----|-----|-----|
| 2009 | 79 | 10 | 0 | 0 | 0 | 0 | 2 |
| 2010 | 100 | 17 | 0 | 0 | 0 | 0 | 6 |
| 2011 | 44 | 6 | 1 | 0 | 2 | 0 | 1 |
| 2012 | 64 | 1 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 5 | 3 | 0 | 0 | 0 | 0 | 0 |
| 2014 | 11 | 3 | 0 | 0 | 0 | 0 | 0 |
| 2015 | 16 | 6 | 0 | 2 | 0 | 0 | 0 |

The dollar value of assessments in this program rose 109% compared with the year before. But this result is still 97% less than the level in 2010:

CORPS004000

003989

| Year | Total Stormwater Discharge Assessments |
|------|----------------------------------------|
| **2009** | $169,737.75 |
| **2010** | $2,503,620.00 |
| **2011** | $182,953.02 |
| **2012** | $181,647.25 |
| **2013** | $22,209.25 |
| **2014** | $31,992.00 |
| **2015** | $66,972.00 |

These penalties were assessed across the state in the following fashion:



There is no discernable pattern over the past seven years:

62



| | Multi | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|---|
| 2009 | $146,562. | $21,675.0 | $0.00 | $0.00 | $0.00 | $0.00 | $1,500.00 |
| 2010 | $1,697,87 | $795,250. | $0.00 | $0.00 | $0.00 | $0.00 | $10,500.0 |
| 2011 | $143,353. | $9,000.00 | $22,000.0 | $0.00 | $8,000.00 | $0.00 | $600.00 |
| 2012 | $181,147. | $500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2013 | $6,459.25 | $15,750.0 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2014 | $3,992.00 | $28,000.0 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2015 | $23,472.0 | $31,000.0 | $0.00 | $12,500.0 | $0.00 | $0.00 | $0.00 |

Median assessments rose 40% in 2015:

| Year | Median Stormwater Discharge Assessments |
|---|---|
| 2009 | $500.00 |
| 2010 | $3,500.00 |
| 2011 | $1,199.00 |
| 2012 | $1,199.00 |
| 2013 | $1,250.00 |
| 2014 | $370.00 |
| 2015 | $518.00 |

Medians were highest in the Central District, however, this result is based upon only two cases for the entire year:

CORPS004002

003991



| | Multi | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|---|
| District | $390.25 | $4,500.00 | $0.00 | $6,250.00 | $0.00 | $0.00 | $0.00 |

The only discernible trend is the trend towards lower median assessments in the Multi-District category. Medians in the Northwest District fell 55% in 2015:

| | Multi | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|---|
| 2009 | $370.00 | $2,400.00 | $0.00 | $0.00 | $0.00 | $0.00 | $750.00 |
| 2010 | $518.00 | $4,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,500.00 |
| 2011 | $1,199.00 | $750.00 | $22,000.00 | $0.00 | $4,000.00 | $0.00 | $600.00 |
| 2012 | $1,199.00 | $500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2013 | $620.00 | $5,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2014 | $370.00 | $10,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2015 | $390.25 | $4,500.00 | $0.00 | $6,250.00 | $0.00 | $0.00 | $0.00 |

11.     State Lands Program

On its website, the FDEP describes the State Lands Program in these terms:

> "The Florida Department of Environmental Protection's (DEP) Division of State Lands is Florida's lead agency for environmental management and stewardship, serving as staff to the Board of Trustees of the Internal Improvement Trust Fund (Governor and Cabinet). As such, the Division's role goes far beyond just acquiring lands for protection. It provides oversight for the management of activities on more than 12 million acres of public lands including lakes, rivers and islands. These public lands help assure all Florida's residents and visitors have the opportunity to truly appreciate Florida's unique landscapes."[21]

This is a program that has lately received a lot of attention because of the current Secretary's stated goals of making Florida's state parks more self-sufficient. In response to various negative articles written about the Department's proposals the agency issued a press release on December 8, 2015, that was entitled *Setting the Record Straight – DEP Committed to Protecting and Ensuring the Future of State Parks.*[22] In the release, the agency stated: "We are beginning a dialogue among the park management team to evaluate options that are available, feasible and logical — all in an effort to restore state lands to a more natural condition faster. In addition, some of these activities may generate revenues that would go right back into the restoration and maintenance activities of Florida State Parks." The same press release quoted Secretary Steverson's statement to a senate committee wherein he stated that: "Florida's state parks are not for sale. I am not looking to surplus parks, commercialize parks or ruin any park visitor's experience. I am looking to improve our management practices and move more properties from a restoration condition to a maintenance condition (a lower-cost, less labor intensive and most importantly – a more natural condition)." Id. With that in mind, we felt it would be appropriate to include a section in this report that looks at the State Lands Program and how it is performing.

There were 11 assessments in 2015, 31% fewer than 2014's performance. And overall the program is performing at a level that is just 28% of what it was in 2010, when the Crist administration ended its term. However, this is also a program that really did not get off the ground until after the merger between DER and DNR. For the first 6 years the program had, at most, 4 assessments statewide. It then spiked briefly before settling in at roughly 11 cases per year until Governor Crist became governor. Under Secretary Sole the FDEP then saw much more aggressive enforcement that peaked in 2010. From that point on, however, the results have

---

[21] http://www.dep.state.fl.us/lands/
[22] http://content.govdelivery.com/accounts/FLDEP/bulletins/129c50b

CORPS004004

003993

fallen back to previous levels. The median number of assessments for the program is currently 12 per year. The following are the results from 2009 through 2015:

| Year | Number of State Lands Assessments |
|------|-----------------------------------|
| 2009 | 34 |
| 2010 | 40 |
| 2011 | 24 |
| 2012 | 14 |
| 2013 | 12 |
| 2014 | 16 |
| 2015 | 11 |

The Southeast District was the only district to see an improvement in 2015. The following chart shows a general declining trend among the districts, with the exception of the Northwest District. The South and Southwest Districts were historically the most active districts in the state, but they have fallen significantly. The Central District has had no assessments since 2012:



| | NWD | NED | CEN | SED | SD | SWD |
|------|-----|-----|-----|-----|-----|-----|
| 2009 | 2 | 4 | 4 | 1 | 15 | 8 |
| 2010 | 8 | 0 | 2 | 2 | 20 | 8 |
| 2011 | 5 | 1 | 1 | 2 | 11 | 4 |
| 2012 | 6 | 0 | 1 | 0 | 5 | 2 |
| 2013 | 7 | 0 | 0 | 0 | 5 | 0 |
| 2014 | 10 | 1 | 0 | 0 | 4 | 1 |
| 2015 | 8 | 1 | 0 | 2 | 0 | 0 |

Penalty assessments fell signficantly in 2015. The 62% decline marked the end of what had been 3 straight years of improvement. This is also the worst result since 2001:

| Year | Total State Lands Assessments |
|------|-------------------------------|
| 2009 | $63,830.00 |
| 2010 | $95,010.00 |

CORPS004005

003994

| 2011 | $44,929.00 |
| 2012 | $25,319.00 |
| 2013 | $44,900.00 |
| 2014 | $49,628.00 |
| 2015 | $19,060.00 |

Assessments were distributed among the districts as follows:



| District | NWD | NED | CEN | SED | SD | SWD |
| --- | --- | --- | --- | --- | --- | --- |
| | $10,140.00 | $3,000.00 | $0.00 | $5,920.00 | $0.00 | $0.00 |

In terms of the dollar value of assessments the Northwest District has been relatively uniform over the past 7 years. But there have been steep declines in the South and Southwest District, neither of which had any assessments in 2015. The Southeast District was the only district to see higher numbers.

The historical performance of each of the districts is shown below:

67

CORPS004006

003995



| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| 2009 | $1,500.00 | $13,000.00 | $2,130.00 | $4,250.00 | $30,850.00 | $12,100.00 |
| 2010 | $13,820.00 | $0.00 | $3,710.00 | $3,000.00 | $66,050.00 | $8,430.00 |
| 2011 | $7,000.00 | $3,629.00 | $12,610.00 | $5,250.00 | $13,560.00 | $2,880.00 |
| 2012 | $10,630.00 | $0.00 | $3,420.00 | $0.00 | $9,669.00 | $1,600.00 |
| 2013 | $10,260.00 | $0.00 | $0.00 | $0.00 | $34,640.00 | $0.00 |
| 2014 | $12,380.00 | $8,300.00 | $0.00 | $0.00 | $28,698.00 | $250.00 |
| 2015 | $10,140.00 | $3,000.00 | $0.00 | $5,920.00 | $0.00 | $0.00 |

Medians also fell in 2015, this time by 23% for the Department as a whole, falling back to the lowest level since 2011:

| Year | Median Assessments |
|---|---|
| 2009 | $1,125.00 |
| 2010 | $1,250.00 |
| 2011 | $1,000.00 |
| 2012 | $1,500.00 |
| 2013 | $1,710.00 |
| 2014 | $1,420.00 |
| 2015 | $1,100.00 |

The medians for each district are shown below:

CORPS004007

003996



The only discernable pattern among the districts is one of a steady decline in the medians in the Northwest and Southwest Districts. The South District was also declining until 2014 when it had a sizeable jump in its medians, only to be followed by no assessments at all in 2015.

The historical results for all 6 districts are shown below:



| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| 2009 | $2,400.00 | $2,250.00 | $340.00 | $4,250.00 | $2,000.00 | $1,300.00 |
| 2010 | $1,665.00 | $0.00 | $1,855.00 | $1,500.00 | $1,500.00 | $1,000.00 |
| 2011 | $1,500.00 | $3,629.00 | $12,610.00 | $2,625.00 | $850.00 | $640.00 |
| 2012 | $1,605.00 | $0.00 | $3,420.00 | $0.00 | $850.00 | $800.00 |
| 2013 | $1,710.00 | $0.00 | $0.00 | $0.00 | $1,000.00 | $0.00 |
| 2014 | $1,260.00 | $8,300.00 | $0.00 | $0.00 | $4,849.00 | $250.00 |
| 2015 | $1,100.00 | $3,000.00 | $0.00 | $2,960.00 | $0.00 | $0.00 |

69

12.    Solid Waste Program

This program (along with the hazardous waste program) is in the FDEP's Division of Waste Management. It oversees the handling of Florida's solid waste, most of which is deposited into landfills across the state. Since 2011 enforcement in this program has fallen steadily to the point that it is practically non-existent.

There were 11 assessments in 2015, a 450% improvement over 2014's disastrous results. Nevertheless, the current enforcement level remains 67% below the level in 2010 and the fourth worst since 1988 when the program was in its infancy:

| Year | Number of Solid Waste Assessments |
|------|-----------------------------------|
| 2009 | 48 |
| 2010 | 33 |
| 2011 | 44 |
| 2012 | 14 |
| 2013 | 4 |
| 2014 | 2 |
| 2015 | 11 |

The overall increase in assessments was in large part due to the performance in the Northeast District. The Central District maintained its 2014 levels, while The South and Southwest Districts each had 1 case, an improvement for each district. Meanwhile, since 2013 there have been no assessments in the Northwest District.

The general trends for each district are shown below:

CORPS004009

003998



| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| 2009 | 8 | 4 | 5 | 3 | 10 | 18 |
| 2010 | 3 | 7 | 4 | 3 | 3 | 13 |
| 2011 | 12 | 7 | 0 | 7 | 10 | 8 |
| 2012 | 4 | 0 | 3 | 1 | 4 | 2 |
| 2013 | 0 | 1 | 1 | 0 | 0 | 2 |
| 2014 | 0 | 0 | 2 | 0 | 0 | 0 |
| 2015 | 0 | 7 | 2 | 0 | 1 | 1 |

Penalty assessments rose substantially (298%) in 2015 as a result of the increase in cases. Yet, it is also the second worst result since 1988:

| Year | Total Solid Waste Assessments |
|---|---|
| **2009** | $697,737.00 |
| **2010** | $411,035.00 |
| **2011** | $3,072,814.00 |
| **2012** | $81,150.00 |
| **2013** | $45,076.71 |
| **2014** | $9,000.00 |
| **2015** | $35,794.33 |

Unlike in 2014, 4 of the 6 districts assessed civil penalties in this program:

71

CORPS004010

003999



It has now been over three years since there was any enforcement in the Northwest and Southeast Districts. But the Northeast, South and Southwest Districts assessed penalties in 2015, unlike their performance in the previous year. The historical performance of each of the districts is shown below:



Medians fell 33% in 2015 for the Department as a whole, but they are the same as they were in 2010:

72

CORPS004011

004000

| Year | Median Assessments |
|------|--------------------|
| **2009** | $3,000.00 |
| **2010** | $3,000.00 |
| **2011** | $3,000.00 |
| **2012** | $3,375.00 |
| **2013** | $6,250.00 |
| **2014** | $4,500.00 |
| **2015** | $3,000.00 |

The medians for each district are shown below:



The Central District, which was the only district to have assessments in each of the past two years, turned in a performance with medians that were 89% lower than those in 2014.

The historical results for all 6 districts are shown below:

73

CORPS004012

004001



| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| 2009 | $2,000.00 | $2,250.00 | $3,000.00 | $5,000.00 | $3,100.00 | $3,000.00 |
| 2010 | $10,000.00 | $2,000.00 | $6,267.50 | $18,400.00 | $2,500.00 | $3,000.00 |
| 2011 | $1,750.00 | $4,000.00 | $0.00 | $2,000.00 | $2,500.00 | $3,000.00 |
| 2012 | $10,000.00 | $0.00 | $1,500.00 | $6,000.00 | $2,200.00 | $2,875.00 |
| 2013 | $0.00 | $5,000.00 | $7,500.00 | $0.00 | $0.00 | $16,288.36 |
| 2014 | $0.00 | $0.00 | $4,500.00 | $0.00 | $0.00 | $0.00 |
| 2015 | $0.00 | $3,000.00 | $500.00 | $0.00 | $2,000.00 | $7,000.00 |

## 13.    Tanks Program

The tanks program regulates the use and cleanup of underground storage tanks throughout Florida. These tanks are used for multiple purposes, including the storage of gasoline at service stations. Many of those tanks are old and subject to leaking dangerous petroleum products into the soil and groundwater. This is a program that in the past had been relatively robust, but that began to change in 2012. It has declined markedly since that time.

Statewide the tanks program assessments assessed 5 fewer assessments than in 2014 and the overall result is the lowest since 1988:

| Year | Number of Tanks Assessments |
|---|---|
| **2009** | 164 |
| **2010** | 166 |
| **2011** | 169 |
| **2012** | 72 |
| **2013** | 12 |
| **2014** | 13 |
| **2015** | 8 |

The Northeast District was the only district to increase the number of assessments in 2015. The Southwest and Northwest Districts stayed the same, while the Central, Southeast and South Districts all reported fewer assessments.

74

CORPS004013

004002

The recent history for each district is shown below:



Despite the decline in the number of assessments, the total penalty dollars assessed rose 11% in 2015. While this is an improvement, the overall result is still the lowest total since 1996:

| Year | Total Tanks Assessments |
|------|-------------------------|
| 2009 | $1,505,376.25 |
| 2010 | $1,207,823.56 |
| 2011 | $1,537,209.03 |
| 2012 | $728,232.83 |
| 2013 | $187,273.84 |
| 2014 | $124,285.82 |
| 2015 | $137,862.28 |

Each district contributed to the overall results as shown in the following chart:

CORPS004014

004003



## Tanks Assessments--2015

| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| District | $10,000.00 | $83,362.28 | $0.00 | $0.00 | $25,000.00 | $19,500.00 |

The Northeast District was the only district to record an increase in penalty dollars assessed in this program and the four assessments that it made were relatively close in dollar amount. The remaining districts that had assessments each saw a decline in the total dollar amounts:

## Tanks Assessments: 2009 -- 2015

| | Multi | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|---|
| 2009 | $0.00 | $117,883. | $164,000. | $39,000.0 | $82,700.0 | $62,000.0 | $1,039,79 |
| 2010 | $31,500.0 | $58,800.0 | $106,500. | $136,125. | $93,000.0 | $55,000.0 | $726,898. |
| 2011 | $0.00 | $86,423.0 | $84,910.0 | $428,100. | $308,775. | $169,200. | $459,800. |
| 2012 | $0.00 | $10,000.0 | $124,050. | $256,500. | $59,300.0 | $67,000.0 | $211,382. |
| 2013 | $0.00 | $0.00 | $79,500.0 | $40,000.0 | $57,500.0 | $10,000.0 | $273.84 |
| 2014 | $0.00 | $10,000.0 | $15,500.0 | $29,000.0 | $7,500.00 | $32,000.0 | $30,285.8 |
| 2015 | $0.00 | $10,000.0 | $83,362.2 | $0.00 | $0.00 | $25,000.0 | $19,500.0 |

Medians rose for the Department as a whole:

| Year | Median Assessments |
|------|--------------------|
| 2009 | $4,100.00 |
| 2010 | $5,149.50 |
| 2011 | $5,100.00 |
| 2012 | $10,000.00 |
| 2013 | $10,000.00 |
| 2014 | $10,000.00 |
| 2015 | $19,000.00 |

In 2015 the median assessments in the districts were:



The Northeast and South Districts had the highest medians of the group. Both districts increased their medians, while the Southwest District declined and the Northwest District stayed the same:

77

CORPS004016

## Tanks Medians : 2009 -- 2015

| | Multi | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|---|
| 2009 | $0.00 | $5,000.00 | $2,250.00 | $5,000.00 | $5,450.00 | $15,000.00 | $4,000.00 |
| 2010 | $8,250.00 | $3,750.00 | $5,000.00 | $7,312.50 | $8,500.00 | $7,000.00 | $4,500.00 |
| 2011 | $0.00 | $10,000.00 | $10,000.00 | $8,000.00 | $10,000.00 | $8,000.00 | $3,200.00 |
| 2012 | $0.00 | $10,000.00 | $10,000.00 | $7,000.00 | $10,000.00 | $10,000.00 | $5,000.00 |
| 2013 | $0.00 | $0.00 | $10,000.00 | $20,000.00 | $18,500.00 | $10,000.00 | $273.84 |
| 2014 | $0.00 | $10,000.00 | $5,000.00 | $7,500.00 | $7,500.00 | $16,000.00 | $15,142.91 |
| 2015 | $0.00 | $10,000.00 | $20,681.14 | $0.00 | $0.00 | $25,000.00 | $9,750.00 |

### 14.    Underground Injection Control

The FDEP's website states that "The Department of Environmental Protection's Aquifer Protection program consists of a team of geologists and engineers dedicated to protecting Florida's underground sources of drinking water (USDW) while maintaining the lawful option of disposal of appropriately treated fluids via underground injection wells.  A USDW is defined as an aquifer that contains a total dissolved solids concentration of less than 10,000 milligrams per liter.  The program implements the Underground Injection Control (UIC) regulations (FDEP rule 62-528) and is dedicated to preventing degradation of the quality of other aquifers adjacent to the injection zone.  Subsurface injection, the practice of emplacing fluids in a permeable underground aquifer by gravity flow or under pressure through an injection well, is one of a variety of wastewater disposal or reuse methods used in Florida."[23]

Despite the assurances given by the Department, there have been no assessments since 2010.

| Year | Total Number of UIC Assessments |
|---|---|
| 2009 | 6 |
| 2010 | 2 |
| 2011 | 0 |

---

[23] http://www.dep.state.fl.us/water/uic/index.htm

78

CORPS004017

004006

| | |
|---|---|
| **2012** | 0 |
| **2013** | 0 |
| **2014** | 0 |
| **2015** | 0 |

The assessments listed above occurred solely in the Southeast and South Districts.

The results for the two districts that assessed penalties look like this in terms of the total dollars assessed:

| Year | Total $ Assessed—UIC |
|---|---|
| **2009** | $94,150.00 |
| **2010** | $43,541.47 |
| **2011** | $0.00 |
| **2012** | $0.00 |
| **2013** | $0.00 |
| **2014** | $0.00 |
| **2015** | $0.00 |

Median asbestos assessments are as follows:

| Year | Median UIC Assessments |
|---|---|
| **2009** | $14,250.00 |
| **2010** | $21,770.74 |
| **2011** | $0.00 |
| **2012** | $0.00 |
| **2013** | $0.00 |
| **2014** | $0.00 |
| **2015** | $0.00 |

## H.    *Civil Penalty Collections By Program Area—District Comparison*

Collections for the Department as a whole fell to $792,914.23 in 2015, down from $932,998.94 in penalties that the Department collected in the previous year. When in-kind and pollution prevention projects that were completed are included the total for 2015 becomes $1,355,504.02, still less than the $2,027,301.94 that was collected by the Department in 2014.

Another way of evaluating the Department's performance in this area is to consider the percentage of civil penalties that is collected each year. The following table shows how that has developed over the same time period, considering just penalty assessments (absent in-kind and penalty prevention projects) and collections:

| Year | Assessments | Collections | % Assessments Collected |
|---|---|---|---|

CORPS004018

004007

| 2007 | $9,079,363.10 | $6,083,693.04 | 67% |
| 2008 | $7,597,011.98 | $5,484,480.00 | 72% |
| 2009 | $8,370,981.04 | $4,842,642.95 | 58% |
| 2010 | $10,310,833.83 | $7,077,687.19 | 69% |
| 2011 | $8,333,933.39 | $3,037,727.79 | 36% |
| 2012 | $2,796,447.01 | $1,589,724.69 | 57% |
| 2013 | $1,017,405.30 | $687,777.69 | 68% |
| 2014 | $1,515,020.45 | $932,998.94 | 62% |
| 2015 | $1,016,674.79 | $792,914.23 | 78% |

The above results show that while the actual dollar amount collected in 2015 fell significantly from 2014, as a percentage of penalty assessments collected the Department actually performed 16% better in 2015 than it did in the previous year. In fact, the percentage of penalty assessments collected is the highest since at least 2007.

The Department also recorded in-kind and penalty prevention project fulfillments valued at $562,589.79 in 2015, down substantially from the $1,094,303.00 in projects that were completed during the previous year. For 2015 the cumulative total of penalties collected and in-kind and penalty prevention project fulfillments was $1,355,504.02, again, much lower than the $2,027,301.94 that was collected in 2014. For the sake of comparison, the cumulative total in 2013 was $3,232,525.69.

The following chart shows the highest individual collections for every program area that collected civil penalties in 2015, sorted by program area:

| Program | Dist. | OGC # | Highest Collection | Amount of Highest Collection |
|---|---|---|---|---|
| AP | 2 | 150081 | *VERDE PLAZA, LLC* | $36,000.00 |
| BS | 0 | 150124 | *CHATEAU OCEAN, LLC* | $2,500.00 |
| CU | 1 | 093329 | *COYOTE LAND CO., INC.* | $12,987.62 |
| DF | 6 | 140565 | *TAMPA ELECTRIC COMPANY* | $13,000.00 |
| DW | 3 | 150358 | *SHELLEY'S SEPTIC TANKS, INC.* | $9,270.00 |
| EP | 3 | 093154 | *FITZGIBBON, HENRY J.;* | $2,000.00 |
| EW | 2 | 150144 | *P & G CONSTRUCTION, INC.* | $3,750.00 |
| HW | 6 | 140489 | *THE ENSER CORPORATION OF ALABAMA* | $31,648.00 |
| IW | 5 | 052699 | *VIGIRON GENERAL PARTNERSHIP/BAY BREEZE FARMS, INC. & AGROIRON, INC.* | $28,500.00 |

80

CORPS004019

004008

| MA | 4 | 140724 | B & M MARINE CONSTRUCTION, INC. | $5,000.00 |
| MN | 0 | 121154 | COUNTS CONSTRUCTION COMPANY, INC. | $8,500.00 |
| PW | 5 | 150667 | J BROTHERS INVESTMENT LLC | $2,000.00 |
| RO | 1 | 140514 | ANDERSON COLUMBIA CO., INC. | $15,000.00 |
| SL | 3 | 080152 | SEMBLER MARINA PARTNERS, LTD. | $12,610.00 |
| SW | 2 | 140300 | SUWANNEE LANDFILL, LLC. | $6,500.00 |
| TK | 2 | 930576 | ALLEN, JAMES E. & BETTY | $33,057.00 |

The following chart shows each district and compares the dollars assessed by each district in 2015 with the dollars actually collected, including dollar equivalents for in-kind and penalty prevention projects. What becomes clear is that the Southwest District significantly outperformed the other districts in collections. However, the reason for its high performance is due largely to the completion of one in-kind penalty project (against Pinellas County, OGC # 093566) in the amount of $352,152.00. This was, by far, the largest amount collected in any case (whether penalty or otherwise) in 2015. In a year that saw noticeably lower dollar assessments, three of the districts, the Northwest, Northeast and Central were unable to collect more than they assessed:



When looking at the results on a percentage basis, i.e. the pure percentage of dollars collected that were assessed, both in penalties and projects, we see the same trends with clear

CORPS004020

004009

problems in the Northwest and Northeast Districts. The Central District faired only marginally better. The Southwest District benefitted from the single large in-kind project closure.[24]



| | Multi | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|---|
| District | 131% | 72% | 52% | 83% | 129% | 136% | 470% |

The results for the percentage of assessments actually collected by each district in the major program areas are discussed below.

### 1.    Air Program

In sharp contrast to 2014, in 2015 the Department as a whole collected 101% of assessed penalties. In 2014 it collected only 41.56% of its penalties. In 2015 5 of the 6 districts collected 100% of the penalties assessed. The Southeast District had no air assessments in 2015:

---

[24] The data shows that more than 100% of the assessed fines were collected in some districts. This is because the districts are also collecting assessments that were made in previous years. Since 100% of the assessments in any given year are seldom, if ever collected, it follows that in some instances the collection rate may exceed the dollars assessed in any given year.

CORPS004021

004010



| District | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| | 100.00% | 100.00% | 100.00% | 0.00% | 100.00% | 100.00% |

2.      Asbestos Program

It has now been 3 years since the Department assessed any penalties in this program. Therefore, there were no penalty dollars collected in 2015 by the Department in Florida.

3.      Beaches & Coastal Program

There were 3 collections statewide in this program in 2015. All were handled by the Multi-District Category and the total dollars collected was $5,250.00, which was 100% of the penalty dollars assessed by the category in that year.

4.      Dredge and Fill Program

The Department collected 94.94% of its penalty assessments in 2015, down significantly from the 139.33% of its penalty assessments in the previous year. Three of the districts, the Northwest, Northeast and Southeast collected at least 100% of the penalties assessed, while the remaining three were lower:

CORPS004022

004011



5.    Domestic Waste Program

Overall the Department collected 80.14% of its penalty assessments in 2015, down 6.52% from the results in 2014, but still much better than in 2013. The best turnarounds were seen in the Northwest and Northeast Districts.

The results for 2015 are:



84

CORPS004023

004012

6.      Hazardous Waste Program

Hazardous waste collections rebounded to 94.40% in 2015, up significantly from the 27.18% rate seen in 2014.  The Northwest District turned in the same performance as in 2014 when it was only one of two districts to meet or exceed 100%. The remaining districts all improved significantly in 2015:



| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| ■ District | 100.00% | 113.94% | 42.90% | 164.85% | 198.38% | 214.13% |

7.      Industrial Waste Program

Collections rose 230% in 2015, but there were only 5 collections for the entire state, with 4 of them being in the Southwest District. There were only 2 collections for the entire year in Florida in 2014.

The districts' performed as follows:

85

CORPS004024

004013



8.     Mining & Phosphogypsum Program

The only collections in this program were handled by the Multi-District Category. There were only 2 collections and they totaled $8,500.00.

9.     Potable Water Program

Collections rose from 3.75% in 2014 to 16.67% in 2015. The only district to collect any potable water penalties was the South District—and that result was based entirely on one case.

The results are thus:

86

CORPS004025

004014



## 10.    State Lands Program

In 2015 there was a total of $37,948.00 that was collected by the FDEP in this program area. The only district that collected no penalties was the Southwest District, which also assessed no penalties in that year. While the Central and South Districts assessed no penalties in 2015 they did collect penalties from previous years. Those penalty collections totaled $22,308.00.

The following chart shows the percentage of assessments in 2015 that were collected:



87

CORPS004026

004015

11.    Stormwater Discharge Program

In 2015 collections rose in this program as well. The current rate is 86.14%, compared to
22.90% for the previous year. All of the collections were in the Northwest District and the Multi-
District Category, both of which performed better in 2015:



| | Multi | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|---|
| District | 107.81% | 87.10% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

12.    Solid Waste Program

The Department collected 54.46% of its civil penalties in 2015, up significantly from
2014. Three of the districts, the Northeast, Central and South, collected penalties whereas the
other three collected nothing. The results are seen below:



| | NWD | NED | CEN | SED | SD | SWD |
|---|---|---|---|---|---|---|
| District | 0.00% | 50.09% | 250.00% | 0.00% | 150.00% | 0.00% |

88

13. Tanks Program

Performance also improved in this program in 2015. The Department collected 68.80% of the civil penalties it assessed, up substantially from the 29.99% that it collected in 2014. This result is largely due to significant increases in the South and Southwest Districts. The Northwest District has assessed penalties in 12 cases from 2011 through 2015, yet it has collected no tanks penalties since 2011.

The performance by each district was as follows:



14. Underground Injection Control Program

There have been no collections in this program since 2010.

I.  ***A Quick Look At Statewide Results***

The following is a summary of the overall enforcement picture for 2015:

| Enforcement Area | Performance Compared with 2013 | Performance Compared with 2014 |
|---|---|---|
| **Total Number of Cases** | Up 41% | Up 27% |
| **Case Reports** | Up 7% | Unchanged |
| **NOVs** | Up 100% | Down 21% |
| **Final Orders** | Up 11% | Up 54% |

89

| | | |
|---|---|---|
| **Consent Orders—Total** | Up 47% | Up 38% |
| **Consent Orders—Long-Form** | Up 23% | Up 02% |
| **Consent Orders—Model** | Up 26% | Up 23% |
| **Consent Orders—Short-Form** | Up 135% | Up 98% |

Assessments for 2015 can be summarized as follows:

| Assessment/Program Area | Performance Compared with 2013 | Performance Compared with 2014 |
|---|---|---|
| **Total Number of Assessments** | Up 51% | Up 39% |
| **Total Dollars Assessed in Penalties** | Down 29% | Down 32% |
| **Total Medians** | Down 14% | Down 14% |
| **Air Program—Number of Assessments** | Up 78% | Up 78% |
| **Air Program—Dollars Assessed** | Up 69% | Up 232% |
| **Air Program—Median** | Unchanged | Up 7% |
| **Asbestos Program—Number of Assessments** | Unchanged | Unchanged |
| **Asbestos Program—Dollars Assessed** | Unchanged | Unchanged |
| **Asbestos—Median** | Unchanged | Unchanged |
| **Beaches & Coastal—Number of Assessments** | Down 50% | Down 43% |
| **Beaches & Coastal—Dollars Assessed** | Down 61% | Down 16% |
| **Beaches & Coastal—Median** | Up 14% | Up 100% |
| **Dredge & Fill—Number of Assessments** | Down 29% | Up 17% |
| **Dredge & Fill—Dollars Assessed** | Down 60% | Up 13% |
| **Dredge & Fill—Median** | Up 100% | Up 100% |
| **Domestic Waste—Number of Assessments** | Up 129% | Up 134% |
| **Domestic Waste—Dollars Assessed** | Down 53% | Down 73% |
| **Domestic Waste—Median** | Down 43% | Down 60% |
| **Hazardous Waste—Number of Assessments** | Up 143% | Up 70% |
| **Hazardous Waste—Dollars Assessed** | Down 17% | Up 13% |
| **Hazardous Waste—Median** | Down 69% | Down 23% |
| **Industrial Waste—Number of Assessments** | Down 25% | Up 200% |

90

CORPS004029

004018

| | | |
|---|---|---|
| **Industrial Waste—Dollars Assessed** | Down 23% | Up 11% |
| **Industrial Waste—Median** | Down 27% | Down 79% |
| **MN & PG—Number of Assessments** | Up 100% | Up 100% |
| **MN & PG—Dollars Assessed** | Up 70% | Down 15% |
| **MN & PG--Median** | Down 15% | Down 57% |
| **Potable Water—Number of Assessments** | Down 97% | Down 60% |
| **Potable Water—Dollars Assessed** | Down 63% | Down 62% |
| **Potable Water—Median** | Down 15% | Up 264% |
| **State Lands—Number of Assessments** | Down 8% | Down 31% |
| **State Lands—Dollars Assessed** | Down 58% | Down 62% |
| **State Lands--Median** | Down 36% | Down 23% |
| **Stormwater Discharge—Number of Assessments** | Up 200% | Up 71% |
| **Stormwater Discharge—Dollars Assessed** | Up 202% | Up 109% |
| **Stormwater Discharge—Median** | Down 59% | Up 40% |
| **Solid Waste—Number of Assessments** | Up 175% | Up 450% |
| **Solid Waste—Dollars Assessed** | Down 21% | Up 298% |
| **Solid Waste—Median** | Down 52% | Down 33% |
| **Tanks—Number of Assessments** | Down 33% | Down 38% |
| **Tanks—Dollars Assessed** | Down 26% | Up 11% |
| **Tanks—Median** | Up 90% | Up 90% |
| **UIC—Number of Assessments** | Unchanged | Unchanged |
| **UIC—Dollars Assessed** | Unchanged | Unchanged |
| **UIC--Medians** | Unchanged | Unchanged |

A comparison of collections of penalty assessments (excluding in-kind and pollution prevention project closures) for 2015 and the two previous years are:

| Collections/Program Area | Performance Compared with 2013 | Performance Compared with 2014 |
|---|---|---|
| **Total $ Collected in Penalties & Closures** | Up 15% | Down 15% |
| **Air—Penalties Only Collected** | Up 76% | Up 276% |
| **Asbestos—Penalties Collected** | Unchanged | Unchanged |
| **Beaches & Coastal—Penalties Collected** | Down 61% | Up 24% |
| **Dredge& Fill—Penalties Collected** | Down 35% | Down 15% |

91

CORPS004030

004019

| | | |
|---|---|---|
| **Domestic Waste—Penalties Collected** | Down 17% | Down 84% |
| **Hazardous Waste—Penalties Collected** | Up 57% | Up 384% |
| **Industrial Waste—Penalties Collected** | Up 85% | Up 257% |
| **MN & PG—Penalties Collected** | Up 70% | Down 15% |
| **Potable Water—Penalties Collected** | Down 81% | Up 67% |
| **State Lands—Penalties Collected** | Up 201% | Down 5% |
| **Stormwater Discharge— Penalties Collected** | Up 91% | Up 614% |
| **Solid Waste—Penalties Collected** | Down 60% | Down 74% |
| **Tanks—Penalties Collected** | Down 86% | Down 90% |
| **UIC—Penalties Collected** | Unchanged | Unchanged |

# DISTRICT ENFORCEMENT RESULTS

## A.    *Northwest District*

### 1.    Case Reports, NOVs, Consent Orders, Final Orders

The Northwest District initiated enforcement in 35 cases in 2015, 2 less than in each of the 2 the previous years. 11.78% of all of the enforcement cases opened by the Department came out of this district. It issued 2 case reports, compared with 5 case reports in 2014, 3 NOVs (compared with 5 in 2014) and 3 final orders (the same number as in 2014). The district issued 27 consent orders in 2015, 3 more than in the previous year. Long-form consent orders increased from 6 in 2014 to 7 in 2015.  Short-form consent orders also increased from 8 in 2014 to 10 in 2015. The district issued 10% of all short-form consent orders issued by the Department. 44% of all cases initiated by the Northwest District in 2015 were resolved with short-form consent orders, a 22% increase from 2014.

### 2.    Program Area Enforcement

CORPS004031

004020

While the Northwest District opened 35 enforcement actions in 2015 it assessed civil penalties in just 23 of them, which is one more than in 2014. The following chart provides a breakdown[25] of how those assessments were distributed among the program areas:



While the number of assessments fell in most programs, there were slight improvements in the air and stormwater discharge programs. *It has now been 3 years since this district had any potable water cases.*

### 3.    Civil Penalty Assessments

The Northwest District assessed $109,240.00 in civil penalties in 2015, a slight improvement over the $107,010.00 that it assessed in the previous year. By comparison, civil penalty assessments were $53,765 in 2013, $366,937.56 in 2012 and $3,633,190.89 in 2011. The district's total assessments made up 11% of all assessments levied by the Department in 2015. The median civil penalty assessment for 2015 for all programs combined in this district rose significantly to $3,420.00 (it was $1,420.00 in 2014 and $2,025.00 in 2013).

---

[25] Only program areas with actual assessments in the past are shown. The same is true for the remaining districts that will be discussed.

CORPS004032

004021

Program area assessments for the Northwest District broke down as follows: [26][27]

| Program Area | Total $ Assessed in 2015 | 2015 Medians | 2014 Medians | 2013 Medians |
|:---:|:---:|:---:|:---:|:---:|
| AP | $18,100.00 | $4,000.00 | $0.00 | $0.00 |
| DF | $250.00 | $250.00 | $420.00 | $1,750.00 |
| DW | $39,000.00 | $19,500.00 | $48,000.00 | $0.00 |
| EW | $0.00 | $0.00 | $2,420.00 | $0.00 |
| HW | $750.00 | $750.00 | $3,200.00 | $0.00 |
| RO | $26,500.00 | $4,500.00 | $10,000.00 | $5,500.00 |
| SL | $10,140.00 | $1,100.00 | $1,260.00 | $1,710.00 |
| TK | $10,000.00 | $10,000.00 | $10,000.00 | $0.00 |

The dollar value of assessments declined in every program but the air and tanks programs. The dredge & fill, hazardous waste and tanks programs each assessed penalties in only 1 case in 2015. The domestic waste program had only 2 cases. The median assessment for the dredge & fill program has now declined for 3 straight years in a row and the state lands program has declined for 2 straight years. The air program turned in better results in 2015 (4 cases overall), but it had no cases in the previous 2 years.

### 4.    Civil Penalty Collections

The Northwest District collected $68,627.62 in civil penalties in 2015, compared to $56,107.30 that was collected in the previous year.[28] $92,240 was collected in 2013, $257,522.56 was collected in 2012 and $307,752.21 was collected in 2011 (itself a declining year). The Northwest District collected 9% of all collections by the Department in calendar year 2015.

## B.    *Northeast District*

### 1.    Case Reports, NOVs, Consent Orders, Final Orders

---

[26] Numbers in red represent results that were declines from the previous year's performance. The same format is used for the remaining districts. Only program areas with current assessments or assessments in the immediate past are listed.

[27] Assessments provided in this table include penalty assessments, in-kind assessments and pollution prevention project assessments. The same is the case in subsequent tables provided for each district.

[28] The civil penalty collections reported for each district do not include in-kind projects. Unless stated otherwise, the same is true for all subsequent district results.

CORPS004033

004022

The Northeast District initiated enforcement in 54 cases in 2015, 15 more cases than in 2014 and 13 more than in 2013. 116 cases were opened in 2012 and 133 cases in 2011. These cases accounted for 18.18% of all cases opened by the Department in 2015. It issued 7 case reports (an increase of 4), 8 NOVs (an increase of 4) and 5 final orders (an increase of 3). 34 consent orders were issued in 2015, 4 more than in the previous year and the same number as in 2013. 75 were issued in 2012, 90 in 2011 and 162 in 2010.  15 of the 34 consent orders in 2015 were long-form, 3 less than in 2014. 10 short-form consent orders were issued—2 more than in 2014. 30% of all cases initiated by the Northeast District in 2015 were resolved with short-form consent orders, an increase over 2014. 16% of all short-form consent orders issued by the Department came out of this district.

2.     Program Area Enforcement

The Northeast District assessed civil penalties in 41 cases in 2015, a 28% increase over its performance in 2014 and 2013, but still much less than the 80 cases in 2012. The breakdown of assessments by program area follows:



Essentially, the program areas performed about the same as in 2014 with the most notable increase coming in the solid waste program, which had no cases in 2014.

CORPS004034

004023

3.    Civil Penalty Assessments

The Northeast District assessed civil penalties totaling $236,926.61 in 2015.  This represents a 14% improvement over its performance in 2014. Just two years ago the district assessed $359,295.00 in civil penalties. When in-kind and pollution prevention projects are included this district's performance represented 31.25% of all assessments by the Department in 2015. However, the median civil penalty assessment for 2015 for all programs fell from $4,250.00 in 2014 to $3,000.00 in 2015, a level that is also lower than the $3,875.00 median in 2013.

Program area assessments for the Northeast District broke down as follows:

| Program | Total $ Assessed in 2015 | 2015 Median | 2014 Median |
|---|---|---|---|
| AP | $52,750.00 | $7,375.00 | **$3,500.00** |
| DW | **$98,100.00** | **$2,000.00** | $6,250.00 |
| EW | $10,000.00 | $2,625.00 | **$750.00** |
| HW | $32,170.00 | $32,170.00 | **$8,775.00** |
| IW | $2,500.00 | $1,250.00 | $0.00 |
| PW | **$10,000.00** | $10,000.00 | **$1,650.00** |
| SL | **$3,000.00** | **$3,000.00** | $8,300.00 |
| SW | $25,794.33 | $3,000.00 | $0.00 |
| TK | $83,362.28 | $20,681.14 | **$5,000.00** |

Total assessments and medians fell in both the domestic waste and potable water programs. The results in the hazardous waste, potable water and state lands programs are based upon only 1 assessment in each program. There were only 2 industrial waste assessments in 2015.

4.    Civil Penalty Collections

The Northeast District collected $150,729.65 in 2015, almost 3 times the $48,515.00 that was collected in 2014, yet a bit less than the $165,612.51 that was collected in 2013. This ends the slide that had been going on for 5 straight years. The district collected 19% of all collections by the Department in calendar year 2015, a 12% improvement over 2014.

CORPS004035

004024

## C.    *Central District*

### 1.    Case Reports, NOVs, Consent Orders, Final Orders

The Central District took enforcement in 44 cases in 2015, 18 more than in the previous year. It submitted 3 case reports to OGC in 2015, 1 less than in the previous year. It issued 3 NOVs and 2 final orders, both mechanisms holding steady compared with 2014's results. 36 consent orders were issued, more than double the 17 consent orders that were issued in 2014.  Of the 36 consent orders, 9 (25%) were long-form consent orders and 21 (58%) were the short-form variety. Of all of its cases 48% were resolved via short-form consent orders (a 13% increase) and 20% were resolved with long-form consent orders (a 3% decrease).

### 2.    Program Area Enforcement

The following chart provides the number of cases in which civil penalties were assessed by the Central District by program area in 2015:



**Number of Assessments for each Program Area Central District--2015**

| | AB | AP | DF | DW | EP | HW | IW | MA | RO | PW | SL | SW | TK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Program Areas | 0 | 3 | 1 | 13 | 0 | 12 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |

The Central District assessed penalties in 33 cases in 2015, up from 26 cases in 2014. Improvements were seen in the domestic waste and hazardous waste and stormwater runoff programs while the remaining programs remained stable—except for the tanks program which had no cases in 2015 (it had 4 in the previous year).

CORPS004036

004025

### 3.     Civil Penalty Assessments

The Central District levied $219,397.00 in civil penalties in 2015. This is a significant decline from the $271,249.00 assessed in 2014 and the $359,295.00 assessed in 2013. **The district now has four straight years of declining assessments.** Nevertheless, on a percentage basis the district continued to assess the second-most penalties of all of the districts. **Medians also fell from $5,500.00 in 2014 to $4,260.00 in 2015.**

Program area assessments for the Central District broke down as follows:

| Program | Total Assessments in 2015 | 2015 Medians | 2014 Medians |
|---|---|---|---|
| AP | $18,200.00 | **$3,675.00** | $4,000.00 |
| DF | **$3,000.00** | $3,000.00 | $3,000.00 |
| DW | $58,999.00 | **$4,000.00** | $5,187.50 |
| EP | **$0.00** | **$0.00** | **$0.00** |
| EW | **$0.00** | **$0.00** | **$0.00** |
| HW | **$164,383.00** | **$6,839.50** | $24,237.50 |
| IW | **$0.00** | **$0.00** | $9,500.00 |
| RO | $12,500.00 | $6,250.00 | |
| PW | **$0.00** | **$0.00** | **$700.00** |
| SW | **$1,000.00** | **$500.00** | **$4,500.00** |
| TK | **$0.00** | **$0.00** | **$7,500.00** |

As the above table shows, this district is essentially declining in most of the programs. The one bright spot is the domestic waste program. There was only 1 dredge and fill assessment and 2 assessments in each of the stormwater discharge and solid waste programs. There were no state lands assessments. Over the course of the past 3 years the potable water program has had a total of only 2 assessments.

### 4.     Civil Penalty Collections

The district did manage to collect more in civil penalties in 2015 than it did in the previous year. It collected $136,671.00, compared to $103,558.96 in 2014 and $74,070.36 in 2013. 2015's performance represented 17% of all of the penalties collected department-wide.

CORPS004037

004026

**D.**    ___Southeast District___

### 1.    Case Reports, NOVs, Consent Orders, Final Orders

The Southeast District initiated enforcement in 38 cases in 2015, which is 10 more than it had in the previous year and 20 more than in 2013. Yet, it still had the second fewest cases of all of the districts. It issued no NOVs and no final orders in 2015, both decreases from 2014.  It issued only 1 case report, 3 fewer than in 2014. Most of its cases (23) were resolved via short-form consent orders, whereas 2 were long-form consent orders and 12 were model consent-orders. Thus, in 61% of its cases the district chose to settle the matter with the payment of a fine and no other oversight.

### 2.    Program Area Enforcement

The Southeast District assessed penalties in 30 of the 38 cases, or 79% of the cases that it opened in 2015. This is substantially higher than the previous year's result of 46%. The following chart provides the number of civil penalty assessments made by the Southeast District by program area in 2015:



| | AB | AP | DF | DW | EP | EW | HW | IW | MA | OC | PW | S1 | SL | SW | TK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Program Areas | 0 | 0 | 2 | 3 | 0 | 1 | 15 | 0 | 7 | 0 | 0 | 0 | 2 | 0 | 0 |

Significant increases were seen in the hazardous waste and mangrove alteration programs in 2015. The domestic waste and state lands programs also saw minor increases. ___There were no___

CORPS004038

004027

*potable water or solid waste cases again in 2015.* Otherwise, the performance was essentially the same as in the year before.

### 3.     Civil Penalty Assessments

The increase in the number of assessments did not translate to an increase in the dollar value of those assessments. The district levied penalties totaling $506,216.63 in 2014. In 2015 that number dropped to $92,033.00, which is also lower than the total value of assessments in 2013. It should be noted, however, that the high result in 2014 was almost entirely due to one case and if that value is disregarded the total penalties in 2014 would drop to $39,916.63, significantly lower than the result for 2015. Even so, the Southeast District still accounted for the second lowest percentage of assessments of all of the 6 districts. In addition, the district's median assessments across all programs fell from $3,000.00 in 2014 to $2,440.00 in 2015. In 2013 the median was $10,450.00. There were no assessments in which in-kind or pollution prevention projects were used as mechanisms for resolving the enforcement case.

Program area assessments for the Southeast District broke down as follows:

| Program | Total $ Assessed in 2015 | 2015 Medians | 2014 Medians |
|---------|--------------------------|--------------|--------------|
| AP | $0.00 | $0.00 | $1,000.00 |
| DF | **$920.00** | **$460.00** | $5,420.00 |
| DW | **$21,000.00** | **$5,000.00** | $466,300.00 |
| EW | $420.00 | $420.00 | $0.00 |
| HW | $42,694.00 | **$2,130.00** | **$2,500.00** |
| MA | $21,079.00 | $2,500.00 | $0.00 |
| SL | $5,920.00 | $2,960.00 | $0.00 |
| TK | $0.00 | **$0.00** | **$7,500.00** |

The Southeast District finally stemmed the tide of declining assessments in the hazardous waste program. But note that there were no air or tanks program assessments for the entire year. There were only 2 dredge and fill assessments and the same is true for the state lands program. The large decline in the median for the domestic waste program is due to the fact that in 2014 the total dollars assessed and the median in this program was based upon only one assessment (which was the largest in the state that year).

### 4.     Civil Penalty Collections

The Southeast District collected $118,737.01 in civil penalties in 2015, down substantially from the $513,498.98 that it collected in 2014 (again mostly due to 1 case). But the result in 2015 was

CORPS004039

004028

much better than the $70,217.54 collected in 2013. Overall this district accounted for 15% of all dollars collected by the Department in civil penalties in 2015.

## E.    *South District*

### 1.    Case Reports, NOVs, Consent Orders, Final Orders

The South District took enforcement in 46 cases in 2015, a 21% increase from 2014's performance. The district sent 7 Case Reports to the OGC, 1 fewer than in 2014. There were 3 NOVs, 4 less than in the previous year, but 7 final orders, 6 more than in 2014. The district issued 29 consent orders, 7 more than in 2014. 3 of the consent orders were short-form consent orders, whereas 4 were long-form and 18 were model consent orders (4 were amended consent orders). *Only 7% of all enforcement cases were resolved through the use of short-form consent orders, by far the lowest percentage of all of the districts.* The South District accounted for 23% of all Case Reports (tied with the Southwest District for the most in the state), 35% of the final orders (the most in the state) and 13% of all consent orders issued in Florida.

### 2.    Program Area Enforcement

The following chart provides the number of civil penalty assessments issued by the South District by program area in 2015:



101

CORPS004040

004029

The South District assessed penalties in only 15 cases in 2015, 2 fewer than in the previous year and 10 fewer than in 2013, this despite the fact that the number of actual enforcement cases rose in 2015. In other words, the district assessed penalties in only **32% of the cases in which it took enforcement in 2015**. The air, dredge and fill and the state lands programs were the only programs to increase the number of assessments in 2015.

3.    Civil Penalty Assessments

For the second year in a row civil penalty assessments dropped—this time to $92,033.00. In 2014 the district assessed $122,114.00 in civil penalties and in 2013 the amount was $312,627.50. The district provided 7% of all assessments levied by the FDEP in 2015, down 1 % from 2014 and 15% from 2013.  The median assessment for all programs combined also fell, this time from $4,500.00 in 2014 to $3,420.00 in 2015. (The median was $7,000.00 in 2013.) There were no assessments in which in-kind or pollution prevention projects were used as mechanisms for resolving the enforcement case.

Program area assessments for the South District broke down as follows:

| Program | Total $ Assessed in 2015 | 2015 Medians | 2014 Medians |
|---|---|---|---|
| AP | $1,000.00 | $1,000.00 | $0.00 |
| DF | $17,760.00 | $3,420.00 | **$420.00** |
| DW | **$14,000.00** | $7,000.00 | **$12,250.00** |
| HW | **$5,128.00** | $2,564.00 | $3,000.00 |
| MA | **$0.00** | **$0.00** | $850.00 |
| PW | **$2,000.00** | **$2,000.00** | $19,150.00 |
| SL | **$0.00** | **$0.00** | $4,849.00 |
| SW | $2,000.00 | $2,000.00 | |
| TK | **$25,000.00** | $25,000.00 | $16,000.00 |

The results in the air, potable water, solid waste and tanks programs are each based upon 1 assessment for the year. There were only 2 assessments in the domestic and hazardous waste programs.

4.    Civil Penalty Collections

Collections improved in 2015. They totaled $91,131.00, compared to $38,016.25 in 2014, and they were better than the $37,717.42 collected in 2013. The amount collected represents 11% of all dollars collected by the Department in civil penalties in 2014.

102

004030

## F.   *Southwest District*

### 1.   Case Reports, NOVs, Consent Orders, Final Orders

The Southwest District took enforcement in 52 cases in 2015, 14 more than in 2014 and 18 more than in 2013. In 2012, the same district opened 164 enforcement cases. This district accounted for 18% of all enforcement taken by the Department in 2015, 1% more than in 2014 and 2013. 7 case reports were sent to the OGC, 4 more than in 2014 and 2013. There were 5 NOVs issued (6 were issued in 2014) and 3 final orders were issued (unchanged from the previous year). In 2015 the district issued 37 consent orders, 11 more than in 2014 and 2013. The district issued 117 consent orders in 2012. In 2015, 16% of all consent orders were issued out of the Southwest District. *46% of the consent orders issued by the district were short-form consent orders, 34% higher than just one year ago and 25% higher than in 2013.* 33% of all of the cases settled by the Southwest District were settled via short-form consent orders. 14 long-form consent orders were issued out of this district in 2015, 5 more than in the previous year.

### 2.   Program Area Enforcement

The following chart provides the number of enforcement cases in which civil penalties were assessed by the Southwest District by program area in 2015:



CORPS004042

004031

Of the 52 cases in which the Southwest District initiated enforcement in 2015 it assessed penalties in 28, or 54%, which is far better than the 37% rate in 2014. In 2010 the same district assessed civil penalties in 445 cases. In 2015 there were significant increases in the air (3), dredge and fill (8), while most other programs stayed relatively stable compared with 2014. *There were no potable water cases for the second year in a row.*

3.      Civil Penalty Assessments

Civil penalty assessments have now fallen for 5 years in a row. They totaled $135,533.18 in 2015, compared to $260,813.82 in 2014, $277,819.55 2013, $1,063,447.33 in 2012 and $1,592,075.89 in 2011. And in 2010 the district assessed fines of $4,941,029.22. Median assessments also fell. They were $2,000.00 in 2015 compared to $5,000.00 in 2014 and $2,500.00 in 2013. Overall, the district contributed 13% of all penalty assessments levied by the Department in 2015. There were no assessments in which in-kind or pollution prevention projects were used as mechanisms for resolving the enforcement case.

Program area assessments for the Southwest District broke down as follows:

| Program | Total $ Assessed in 2015 | 2015 Medians | 2014 Medians |
|---|---|---|---|
| AP | $18,382.00 | $3,000.00 | $3,750.00 |
| DF | $28,920.00 | $2,000.00 | $565.00 |
| DW | $4,650.00 | $2,325.00 | $50,000.00 |
| EP | $0.00 | $0.00 | $13,000.00 |
| EW | $6,000.00 | $2,000.00 | $5,000.00 |
| HW | $33,187.00 | $6,187.00 | $31,648.00 |
| IW | $8,000.00 | $8,000.00 | $0.00 |
| MA | $9,894.18 | $2,000.00 | $6,000.00 |
| SL | $0.00 | $0.00 | $250.00 |
| SW | $7,000.00 | $7,000.00 | $0.00 |
| TK | $19,500.00 | $9,750.00 | $15,142.91 |

What is striking is that median assessments have fallen in all but the dredge and fill and solid waste programs, the latter of which only had 1 assessment for the entire year (but still an improvement from 2014 and 2013). There was only 1 industrial waste assessment and only 2 domestic waste assessments for the entire year, making those results hardly meaningful. The same can be said for the hazardous waste program, which had only 3 assessments.

4.      Civil Penalty Collections

CORPS004043

004032

In 2015 the Southwest District collected $187,961.95 in civil penalties, an increase of $20,815.60 from the $167,146.35 in penalty collections in 2014. The district collected $350,218.44 in 2012 and in 2011 it collected $1,167,323.08. Overall, in 2015 this district accounted for 24% of all the monies collected by the Department across the state.

# G.    *All Other Enforcement*

The Department's headquarters in Tallahassee handles some cases, most of them being stormwater discharge cases associated with the National Pollutant Discharge Elimination Program (NPDES), a federally delegated program. Other types of cases, such as the beaches and coastal systems program and mining cases are also handled out of Tallahassee. The cases that are not handled directly by the districts are cumulatively referred to as the "Multi-District" or "remaining categories."

## 1.    Case Reports, NOVs, Consent Orders, Final Orders

The remaining categories initiated 28 enforcement actions in 2015, the same number as in 2014 and 15 more than in 2013, but still significantly less than the 88 enforcement actions in 2012. The performance in 2015 equaled 9% of all cases opened by the Department. They sent 3 case reports to the OGC in 2015, 0 NOVs, 0 final orders, and 25 consent orders. Their performance essentially remained static in 2015.  The remaining categories accounted for 10% of all case reports, and 11% of all consent orders.

## 2.    Program Area Enforcement

The following chart provides the number assessments issued by program area in 2015:

105

CORPS004044

**Number of Assessments for each Program Area Multi-District--2015**

| | BS | MN | RO |
|---|---|---|---|
| Program Areas | 4 | 2 | 16 |

22 of the 28 enforcement actions resulted in civil penalties being assessed in 2015, an increase of 2 assessments over the previous year and 8 more than in 2013. While the beaches and coastal systems program had 3 fewer assessment than in 2014 the stormwater discharge program had 5 more.

3.    Civil Penalty Assessments

Civil penalty assessments fell from $40,242.00 in 2014 to $37,222.00 in 2015. $24,959.25 in penalties were assessed in 2013, $199,147.25 in 2012 and $196,003.02 in 2011. Medians rose from $392.00 in 2014 to $518.00 in 2015. Medians were $1,000.00 in 2013. Overall, in 2015 the $37,222.00 that was assessed accounted for 4% of all assessments levied by the Department. There were no assessments in which in-kind or pollution prevention projects were used as mechanisms for resolving the enforcement case.

Assessments broke down as follows:

| Program | Total $ Assessed--2015 | 2015 Medians | 2014 Medians |
|---|---|---|---|
| BS | $5,250.00 | $1,000.00 | $500.00 |
| MN | $8,500.00 | $4,250.00 | $10,000.00 |
| OG | $0.00 | $0.00 | $20,000.00 |
| RO | $23,472.00 | $390.25 | $370.00 |

106

CORPS004045

Stormwater discharge assessments rose in 2015, as did the medians, though the medians were still lower than in 2013. The results for the mining program are based upon only 2 cases statewide and the beaches and coastal system program had only 4.

### 4.    Civil Penalty Collections

The remaining categories collected $39,056.00 in civil penalty assessments in 2015, up from $38,576.10 in 2014 and the $30,101.15 that was collected in 2013. The results for all 3 years pale in comparison to the $190,356.25 collected in 2012, and $171,850.61 collected in 2011. The 2015 performance represents 5% of all dollars collected by the Department in civil penalties that year.

### H.    *A Quick Look At District Results*

Overall Number of Enforcement Cases:

| District | Performance Compared with 2013 | Performance Compared with 2014 |
|---|---|---|
| Northwest | Down 5% | Down 5% |
| Northeast | Up 32% | Up 38% |
| Central | Up 111% | Up 69% |
| Southeast | Up 111% | Up 36% |
| South | Up 39% | Up 21% |
| Southwest | Up 53% | Up 37% |
| Multi-District | Up 87% | Unchanged |

Number of Assessments:

| District | Performance Compared with 2013 | Performance Compared with 2014 |
|---|---|---|
| Northwest | Up 10% | Up 5% |
| Northeast | Up 64% | Up 28% |
| Central | Up 10% | Up 27% |
| Southeast | Up 275% | Up 131% |
| South | Up 15% | Down 12% |
| Southwest | Up 47% | Up 100% |
| Multi-District | Up 57% | Up 10% |

107

CORPS004046
004035

Dollars Assessed:

| District | Performance Compared with 2013 | Performance Compared with 2014 |
|---|---|---|
| Northwest | Up 103% | Up 2% |
| Northeast | Down 12% | Up 53% |
| Central | Down 16% | Down 5% |
| Southeast | Down 4% | Down 82% |
| South | Down 79% | Down 45% |
| Southwest | Down 51% | Down 48% |
| Multi-District | Up 49% | Down 8% |

Medians By District:

| District | Performance Compared with 2013 | Performance Compared with 2014 |
|---|---|---|
| Northwest | Up 69% | Up 141% |
| Northeast | Down 23% | Down 29% |
| Central | Down 6% | Down 23% |
| Southeast | Down 77% | Down 19% |
| South | Down 51% | Down 24% |
| Southwest | Down 20% | Down 60% |
| Multi-District | Down 48% | Up 32% |

Overall civil penalty collections by district:

| District | Performance Compared with 2013 | Performance Compared with 2014 |
|---|---|---|
| Northwest | Down 26% | Up 22% |
| Northeast | Down 9% | Up 211% |
| Central | Up 85% | Up 92% |
| Southeast | Up 69% | Down 77% |
| South | Up 142% | Up 140% |
| Southwest | Down 14% | Up 12% |
| Multi-District | Up 30% | Up 1% |

CORPS004047

004036

## CONCLUSION

It would be tempting to say that the FDEP's data from 2015 shows that the Department improved its enforcement efforts compared with the recent past. After all, the number of cases opened by the Department as a whole increased. But in reality the number of cases brought by the Department remains at historically low levels, even with the modest increases in 2015. Moreover, the data shows a Department that remains incredibly reluctant to require polluters to pay a financial penalty for violating Florida's environmental statutes and regulations even when it opens a case. This is clearly seen in the statistics that show that in 2015 it required payment of a penalty in only 65% of the enforcement cases that it filed. Moreover, what we saw in 2015 was that the total penalty dollars assessed by the Department actually fell and that the median dollars assessed also fell. What this means is that the polluters who were the subject of enforcement actions by the Department were less likely to even have to pay a fine and even when they did pay a fine they typically had to pay less than their predecessors.

The Department's current policies call for issuing a "compliance assistance offer letter" when violations are discovered that are "minor" in nature.[29] This naturally means that formal enforcement is supposed to be taken in the serious cases. And when formal enforcement is initiated the Florida statutes dictate that civil and/or criminal fines should be imposed. Specifically, Section 403.161 (6), Florida Statutes, states that "[i]t is the legislative intent that the civil penalties and criminal fines imposed by the court be of such amount as to ensure immediate and continued compliance with this section." Thus, if the FDEP were to decide to take these cases to court, a trial judge, in looking at the statutes, would be obligated to impose penalties significant enough to ensure that the polluter (and others of like mind) would be deterred from engaging in such misconduct in the future. Yet, what we see happening is the exact opposite. Not only is the FDEP seeking court intervention in fewer cases, but in those cases that it handles without going to court (which has always been the vast majority) it is violating the clear legislative intent that it impose fines sufficient to deter future violations.

Take, for example, the potable water program. This program regulates drinking water systems in the state. It is at least one of the programs that should be protecting Floridians and tourists from the types of devastating situations that currently plague the residents of Flint, Michigan. So, what are the results of the FDEP's work in this area? As we stated above,

> "While the Department has not yet posted its results for 2015 the results for 2014 have been posted on its website and are available to the public.[30] In 2014 the report posted by the Department concluded (See, report, page 11) that there were 5,310 active potable water systems in Florida. Of those, 689 were in violation and those 689 had 1842 violations. Of the 1842 violations, 295 (16%) were what are known as Maximum

---

[29] See, http://www.dep.state.fl.us/legal/Enforcement/chapters/chapter3.pdf, page 15.

[30] The results are found in a report entitled *The 2014 Annual Report on Violations of the U.S. Safe Drinking Water Act in the State of Florida* located online at http://www.dep.state.fl.us/water/drinkingwater/docs/2014-ACR-Florida.pdf . This report was issued on July 1, 2015.

CORPS004048

004037

Contaminate Level violations. These are violations for things such as total coliform, organic and inorganic compounds, radionuclides and disinfection byproducts. The remaining violations were monitoring and reporting (MNR) violations."

(See, supra, page 55) So, how seriously does the Department carry out its mission in this program? Well, from 2012 through 2015 it opened a total of 107 cases statewide. And more recently, in 2014 It opened a total of 13 potable water cases and assessed penalties in only 5 of them. And in 2015, according to the FDEP's own enforcement records, the Department opened a total of 6 cases in the entire state of Florida and assessed penalties in only 2 of them. And now, the federal agency that is tasked with overseeing the administration of the Safe Drinking Water Act is proposing to give the FDEP even greater authority to "administer" this critical federal program.

It is not as if the Department's laissez faire approach to the potable water program is anything new or, for that matter, unusual. For decades the agency has known that livestock operations and agricultural concerns, together with Big Sugar, have caused the continual discharge of excessive nutrients into Lake Okeechobee and the tributaries that feed it. Yet, the Department has done precious little to realistically curb those discharges. Instead, with a willing Legislature and Governor, it has been quite content to cater to industry by refraining from the adoption of aggressive rules that would work towards cleaning up the area. Consequently, while we have seen some impacts from this contamination in the past, we are now witnessing even worse algae outbreaks as a result of the release of water from Lake Okeechobee. This is a situation that should surprise no one, least of all the Governor and FDEP.

As if it is intent upon doing as much damage as possible, the FDEP has now proposed increasing the amount of carcinogens and other contaminates that make their way into our groundwater and wastewater streams across the state. Despite statewide public outcry the agency moved forward with the final adoption of these rules, leaving the EPA as the only public agency standing in the way of the FDEP being able to unleash these toxins upon Floridians.

The hazardous waste program is but another example of the Department's willingness to look the other way so that polluters go unpunished. Earlier this year we published two articles[31] detailing the extent to which the agency has looked the other way when it finds that polluters have violated hazardous waste laws. Examples abound of non-lawyer agency employees working directly with lawyers representing polluters in order to secure a better deal for the polluters, employees rewriting inspection reports in order to show fewer violations and employees telling permittees when they can expect inspectors to visit their facilities. Such is the manner in which the agency protects the public against pollution arising from the unlawful handling and discharge of the most toxic pollutants used by industry.

The extent to which the Department has sold out to commercial interests is seen in the above examples. But its malfeasance is not limited to these four areas. One need only look at

---

[31] http://www.peer.org/news/news-releases/illegal-profits-from-polluting-florida-go-untouched.html and
http://www.peer.org/news/news-releases/portrait-of-florida-coddling-corporate-pollution-offenses.html

CORPS004049

004038

each of the programs covered in this report to see that every program has been targeted. Consequently, it is evident that the overall poor performance is not the result of a small minority of managers. Rather, this is a systemic problem that can only be corrected by wholesale changes—particularly in leadership. Unfortunately, it would be naïve to suggest that these changes will be forthcoming in the near future. Rather, it will require the collective effort by the Governor's Office, the Legislature and the public if the agency is to be salvaged. The health of Floridians and the environment depend upon that occurring sooner rather than later.

111

CORPS004050

# APPENDIX

## ENFORCEMENT HISTORICAL OVERVIEW

FDEP has long used an approach to enforcement that included a strong emphasis on the use of civil litigation in the state's circuit courts. This approach provided the FDEP with the ability to seek hefty civil penalty assessments against violators, while simultaneously sending a message to the community that environmental violations would not be taken lightly. The filing of such lawsuits was initiated by the filing of case reports that originated in the district offices and went to the FDEP's Office of General Counsel (OGC). However, the filing of lawsuits lost favor politically in the late 1990s. The result was a consistent decrease in the number of civil circuit court filings each year.

In January 2011 the Scott Administration took over the Department through its new Secretary, Herschel Vinyard. Vinyard revised the agency's *Enforcement Manual* to include the use of what is known as *compliance assistance offers* as a means of settling enforcement cases. These offers enable the violator to avoid formal enforcement if the violator does one of three things: (1) tells the Department what the violator has done to resolve the violation, (2) provides information to show the FDEP that the violation either didn't exist or wasn't that serious (a largely subjective determination), or (3) arranges for a Department inspector to visit the facility and show the violator how to return to compliance. If a compliance assistance offer is used the ultimate result is that there is no formal enforcement. The matter is resolved and the file closed.

The use of a compliance assistance offer does more than just resolve the immediate case, however. By using this mechanism and thereby avoiding the execution of a consent order to resolve the case the violator is also protected in the event of future violations. The protection is furnished for future administrative actions involving the violator because under Florida law the Department is only allowed to increase civil penalties in cases involving subsequent violations if the prior violations resulted in the entry of a consent order. The limitation upon the Department's enforcement options arises in these cases since no consent order is issued when a compliance assistance offer is issued—it is as if the violator has no past history of violations. In such cases the only arguable approach that the Department can take is thus foregoing administrative actions and resorting to the more severe route of circuit court action.

The FDEP's next strongest enforcement tool was the issuance of Notices of Violation (NOVs). NOVs are also initiated in the district offices and are filed by the OGC. Once filed they are similar to circuit court lawsuits, though they are brought before an administrative law judge (ALJ) at the Division of Administrative Hearings. Until 2001, ALJs were unable to levy civil penalties in these cases. Thus, the NOVs were used by the Department to bring about direct environmental improvements—both long and short term. After implementation of legislation in 2001, the FDEP was authorized to seek civil penalty assessments via the issuance of NOVs and the ALJs were given statutory authority to impose assessments where warranted. This change in law stopped what had been a general decline in the issuance of NOVs. 2002 saw the first dramatic increase in their usage.

CORPS004051

004040

Historically, the most frequently used enforcement tool has, without question, been the use of consent orders, both long-form and short-form. Consent orders (COs) are negotiated agreements between the FDEP and the violator wherein the violator agrees to undertake certain actions to reverse environmental damage caused by the violator's actions. In addition, COs most often require the payment of civil penalties. Consent orders typically take the following form:

- Long-form COs are used in order to require corrective actions on the part of the violator, as well as to require increased monitoring of the violator's future activities. They also typically require the payment of civil penalties.
- Model COs are essentially long-form COs that have been pre-approved by the OGC, thus allowing the individual districts to issue the Model CO without prior consultation with the OGC. They also provide for the assessment of civil penalties.
- Short-form COs are, according to the FDEP "Enforcement Manual" to be used only in those cases in which the violations have ceased and no further follow-up is required by the Department. Thus, these COs only require the payment of civil penalties.

Historically, the FDEP relied heavily upon long-form COs and Model COs in its enforcement cases. Thus, there was a demonstrable and measurable showing of its efforts to not only require environmental remediation, but to also require increased monitoring of known violators. However, as was pointed out in Florida PEER's 2007 report on the FDEP's history over the past 20 years, the use of long-form COs began waning in the 1990s. http://www.peer.org/assets/docs/fl/08_25_11_fl_rpt_on_historical_enforcement.pdf  There was also a sharp increase in the number of Short-form COs.

The Department also tracks the number of final orders that it issues each year. These are administrative orders akin to the final orders issued by judges in state circuit courts. These final orders are binding upon the Department and the violators. They are enforceable in circuit court.

113

CORPS004052

*April 18, 2018 Comment Letter to U.S. Army Corps of Engineers from Florida Wildlife Federation,*
*Conservancy of Southwest Florida, Miami Waterkeeper, St. Johns Riverkeeper*
*re: Florida Navigable Waters Determination*

# EXHIBIT 5

🖨  URL: http://www.tampabay.com/opinion/editorials/Editorial-Don-t-let-Florida-take-over-wetlands-permitting_164963973

# Editorial: Don't let Florida take over wetlands permitting



Gov. Rick Scott announced on Sept. 26, 2017, that he is calling for a series of new proposals to fight the opioid epidemic in Florida, including $50 million in new funding. [Associated Press file photo]

There is only one reason for allowing Florida to take over the job of issuing federal permits to fill in wetland areas: To make it faster, easier and cheaper for developers to build in some of the most sensitive areas of the state. Any public purpose served by streamlining the process is more than counter-balanced by the environmental risks of a regulatory rush job. State lawmakers should put the public interest first and reject this legislation.

A pair of bills (SB 1402 and HB 7043) are working through the Florida Legislature that call for the state Department of Environmental Protection to assume the federal government's authority to issue wetlands permits under the Clean Water Act. That measure, which Congress passed in 1972, recognizes the role that wetlands play in absorbing flood waters, filtering out pollution, providing critical habitat for endangered species and other uses. Florida has more wetlands than any other state. But as the *Tampa Bay Times'* Craig Pittman reported last Monday, builders see wetlands as an expensive impediment to their developments. For decades, builders have complained about the lag time in receiving federal permits, seeking more control at the state and local levels.

DEP regulates dredge and fill activities in state waters, while the U.S. Army Corps of Engineers oversees this activity in federal and interstate waters. For a state to take over federal permitting, it must regulate at least the same activities as required by federal law and have the enforcement capacity to back it up. Once the program is transferred, the state assumes primary responsibility for enforcing the law. In the 45 years since the Clean Water Act was passed, only two states — New Jersey and Michigan — have taken over federal permitting. Florida looked into a takeover in 2006 but decided the workload would be too high and that it would need federal money to process and enforce the permits.

CORPS004054

The bill's Senate sponsor, Republican David Simmons of Longwood, said at a committee hearing that the DEP had the staffing and expertise to take over the process and that handing this to the state would produce "a permit decision more quickly." Other states are looking to take over the process but are seeking federal funding to offset the costs. Florida is not seeking any federal aid, and the DEP does not intend to charge additional fees for federal permit applications.

Audubon of Florida has not taken a position on the bill, but it has expressed reservations that the DEP can take on the federal permitting with existing staffing levels. That other states would seek federal funding for taking over this task is a recognition that enforcing these provisions costs money. A state legislative staff analysis also warned that the high caseload in states like Florida, with its large number of endangered species, might prove to be a "significant impediment" to a state takeover. There are also questions about what territorial waters would fall under Florida's control.

Gov. Rick Scott has shrunk the DEP workforce, slashed funding for environmental programs and all but abandoned any attempt at responsible planning. There is no reason to have confidence that the state agency is prepared to take on this obligation. And it's unlikely the federal government would ever take the permitting process back once it has been handed to the state. Federal authorities have much deeper resources on which to draw to make the best decisions on federal permits. The wetlands are too important to Florida's economy and to public safety in a coastal state to put the interests of developers ahead of the general good.

CORPS004055

*April 18, 2018 Comment Letter to U.S. Army Corps of Engineers from Florida Wildlife Federation,*
*Conservancy of Southwest Florida, Miami Waterkeeper, St. Johns Riverkeeper*
*re: Florida Navigable Waters Determination*

# EXHIBIT 6

Florida's treasured wetlands on the eve of destruction - we cannot allow it - Orlando Sentinel

# Commentary: Florida's treasured wetlands on the eve of destruction — we cannot allow it



The city of Winter Park has acquired 55 acres of sloshy land off Howell Branch Road it long coveted. (Red Huber / Orlando Sentinel)

By **Victoria Tschinkel**
Guest Columnist

MARCH 9, 2018, 6:45 PM

Leave wetlands protection up to chance?

No way.

But in Tallahassee, it's the order of the day. Legislators have tripped over themselves in a stampede to pass House Bill 7043 at the behest of the very folks who want fast and simple permitting to destroy our most fragile natural heritage — our wetlands. Now this terrible legislation is on its way to Gov. Rick Scott. Florida has already lost half its wetlands, with great negative effects on water quality, fish nurseries, wildlife habitat and flood control. The legislation would allow the state of Florida to "take over" most Clean Water Act federal reviews and permitting, and poses a great risk to our wetlands.

Mind you, right now the state of Florida has authority to regulate potential destruction of wetlands under state law enacted in 1984. That authority remains untouched. But here's the sleight of hand: If and when Florida

CORPS004057

004046

adds federal permitting to its portfolio, significant protections available only under federal law will disappear because state law does not contain those protections. The entire Environmental Impact Statement process could disappear.

An EIS is a comprehensive review of all the effects a proposed project will have on the landscape: long-term productivity, irreversible and irretrievable commitment of resources, and unavoidable adverse impacts. Most importantly, an EIS considers alternate ways to achieve the goals of a project while protecting the greatest amount of wetlands.

The EIS is not all that's at stake; so is the Federal Endangered Species act (think manatees, sea turtles and Everglades snail kites).

The state's position is that all this will be magically covered by "agreements" and "memoranda of understanding" with a plethora of agencies, and that somehow, the state will follow "federal case law" (a verbal promise only). How can this happen without specific changes in Florida legislative authority? It can't, and no such changes are contained in the current legislation.

Michigan and New Jersey are the only states to have assumed delegation. Michigan's environmental community filed a complaint with EPA in 1997 that the state's performance and statutes were inconsistent with federal requirements, and as of 2016, deficiencies were still uncorrected. The feds never took back their proper role in protecting the state's wetlands. Florida does not need a deficient wetlands program or legal battles lasting decades.

The Federal Permitting Program started in 1975. Florida has consistently rejected responsibility for the program because of the decrease in wetland protection and lack of funding for the additional work. The environmental organizations comprising the Florida Conservation Coalition oppose accepting it now. Some members would have been willing to reconsider their opposition if the Legislature were required to review and ratify the mysterious packet of agreements during next year's session. At least legislators would know what they were voting for. But the Legislature declined this opportunity.

In 1994, the Florida Legislature passed a law requiring legislative ratification of each detail of DEP's method of determining exactly what qualifies as a wetland — down to the approval of every single wetland plant. This provided the development community with comfort. Yet now the Legislature is allowing the entire system for protecting Florida's wetlands to be weakened without a second thought. I guess the people of Florida don't deserve the same level of comfort as developers.

Why the rush? What is the emergency? The only credible answer is that the development industry (expected to thrive in the coming years), the mining industry and big agriculture all know this is a golden opportunity for them to get what they want: easier access to Florida's treasured wetlands.

Scott should veto HB 7043 when it lands on his desk.

*Victoria Tschinkel is former secretary of the Florida Department of Environmental Regulation.*

CORPS004058

004047

Copyright © 2018, Orlando Sentinel

**This article is related to:** Florida Legislature

CORPS004059

004048

*April 18, 2018 Comment Letter to U.S. Army Corps of Engineers from Florida Wildlife Federation,*
*Conservancy of Southwest Florida, Miami Waterkeeper, St. Johns Riverkeeper*
*re: Florida Navigable Waters Determination*

# EXHIBIT 7



**DEPARTMENT OF THE ARMY**
JACKSONVILLE DISTRICT CORPS OF ENGINEERS
POST OFFICE BOX 4970
JACKSONVILLE, FLORIDA  32232-0019

REPLY TO
ATTENTION OF

March 19, 2018

Regulatory Division

# *PUBLIC NOTICE*

# *Determination of Navigable Waters*

<u>TO WHOM IT MAY CONCERN</u>:  The Jacksonville District, U.S. Army Corps of Engineers (Corps), seeks input from the public regarding the use of waters within the State of Florida for navigation.

<u>BACKGROUND:</u>  Pursuant to 33 C.F.R. § 329.4, navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce.  A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity.

Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403) (Section 10) requires a Department of the Army (DA) permit for certain activities in, over, or under navigable waters of the United States.  A determination whether a waterbody is a navigable water of the United States is made by the division engineer and is based on a report of findings prepared at the district level according to specific criteria (33 C.F.R. § 329.14(b)).

In an effort to provide clarity to the regulated public regarding which waters are subject to permitting authority under Section 10, the Corps is performing an analysis of waterways in the state of Florida to determine the extent of navigability and identify the limits of Section 10 jurisdiction.

These navigability studies are required by regulation to be conducted and updated whenever a question arises regarding the navigability of a waterbody.  Where no determination has been made, a report of findings will be prepared and forwarded to the Division engineer for approval (33 C.F.R. § 329.15(a)).  Tabulated lists of final determinations of navigability are to be maintained in each district office, and be updated as necessitated by court decisions, jurisdictional inquiries, or other changed conditions (33 C.F.R. § 329.16(a)).

Section 404(a) of the Clean Water Act of 1972 (CWA), 33 U.S.C. § 1344, authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue DA permits for

CORPS004061

004050

the discharge of dredged or fill material into waters of the United States (Section 404 Program). Pursuant to Section 404(g) of the CWA, the Florida Department of Environmental Protection (DEP) is pursuing approval from the United States Environmental Protection Agency (EPA) to assume the Section 404 Program and administer its own individual and general permit program.  State assumption of the Section 404 Program would be limited to certain waters and does not include navigable waters of the United States.  The navigability studies will also assist with determining the waters that would be retained by the Corps if the EPA approves the State's application for Section 404 Program assumption.  The Regulations governing the assumption process can be found at 40 C.F.R. §233.

**To assist with completion of the navigability studies, the Corps is seeking comments from the public regarding use of waters in the state of Florida for navigation.  This includes identification of those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities.**

COMMENTS:  Comments should be submitted in writing to the District Engineer or sent via email to the below addresses within 30 days from the date of this notice.  Please include mapping, figures, coordinates, etc. that clearly identify the reach of the associated waterbody and documentation relating to navigation, commerce, and recreation.

> DEPARTMENT OF THE ARMY
> JACKSONVILLE DISTRICT CORPS OF ENGINEERS
> REGULATORY DIVISION
> ATTN: DETERMINATION OF NAVIGABLE WATERS
> P. O. BOX 4970
> JACKSONVILLE, FLORIDA 32232-0019


> Navigability_Determination@usace.army.mil



for

> Donald W. Kinard
> Chief, Regulatory Division

*April 18, 2018 Comment Letter to U.S. Army Corps of Engineers from Florida Wildlife Federation,*
*Conservancy of Southwest Florida, Miami Waterkeeper, St. Johns Riverkeeper*
*re: Florida Navigable Waters Determination*

# EXHIBIT 8



**DEPARTMENT OF THE ARMY**
**JACKSONVILLE DISTRICT CORPS OF ENGINEERS**
**POST OFFICE BOX 4970**
**JACKSONVILLE, FLORIDA  32232-0019**

**REPLY TO**
**ATTENTION OF**

April 10, 2018

Regulatory Division

# *UPDATED PUBLIC NOTICE*

# *Cessation of Public Comment Period*

<u>TO WHOM IT MAY CONCERN</u>:  The Jacksonville District, U.S. Army Corps of Engineers (Corps), is terminating the comment period for a previously issued public notice titled "Determination of Navigable Waters" and dated March 19, 2018.  As of today, the comment period originally set to expire on April 20, 2018, is considered closed until further notice.

*Jori K White*

for

Donald W. Kinard
Chief, Regulatory Division

CORPS004064