**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

**PLAINTIFFS' SUR-REPLY IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO
DEFENDANTS' AND INTERVENORS' CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 1

  I.   USFWS Violated the ESA........................................................................................... 1

      A.   The BiOp Failed to Analyze the Entirety of Florida's Program, the Baseline of the Species, and Impacts to Species from EPA's Transfer Decision. ............................... 1

      B.   The ITS Unlawfully Authorizes Unlimited Incidental Take. ...................................... 3

      C.   USFWS Violated the ESA by Relying Entirely on a Non-Statutory Technical Assistance Process Conducted at the Permit-Specific Level..................................... 4

      D.   *Cooling Water* is Not Persuasive Authority. .............................................................. 7

  II.   EPA's Reliance on the BiOp Was Unlawful. ................................................................ 7

  III.  EPA Violated the Clean Water Act by Approving a State 404 Program that is Less Stringent than Federal Law................................................................................................. 9

      A.   State 404 Programs Must Be "As Stringent" As Federal Law, Including As to Criminal Intent and Statutes of Limitations. ............................................................. 9

      B.   The State 404 Program's "Reasonable Assurances" Regime is Less Stringent. ........ 10

      C.   The Defendants' Belated Attempts to Salvage the Corps' Retained Waters List As Reasonable Fail..................................................................................................... 12

  IV.  Plaintiffs Have Standing. ............................................................................................. 16

  V.   Plaintiffs' Claims are Ripe. .......................................................................................... 19

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Butler v. Enter. Integration Corp.*,
   459 F. Supp. 3d 78 (D.D.C. 2020) ......................................................................................7

*City of Tacoma v. FERC*,
   460 F.3d 53 (D.C. Cir. 2006) ............................................................................................8

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ........................................................................................................18

*Coal. to Save Menominee River Inc. v. EPA*,
   423 F. Supp. 3d 560 (E.D. Wis. 2019) ...........................................................................20

\*    *Conner v. Buford*,
   848 F.2d 1441 (9th Cir. 1988) .......................................................................................6, 7

*Cooling Water Intake Structure Coal. v. EPA*,
   905 F.3d 49 (2d Cir. 2018) ............................................................................................6, 7

*Crutchfied v. County of Hanover*,
   325 F.3d 211 (4th Cir. 2003) ..........................................................................................12

\*    *Ctr. for Biological Diversity v. EPA*,
   No. CV 22-486, 2023 WL 5035782 (D.D.C. Aug. 8, 2023) ..............................................4

\*    *Ctr. for Biological Diversity v. Regan*,
   597 F. Supp. 3d 174 (D.D.C. 2022) ...........................................................................16, 17

*CTS Corps. v. EPA*,
   759 F.3d 52 (D.C. Cir. 2014) ..........................................................................................11

\*    *The Daniel Ball*, 77 U.S. (10 Wall.) 557 (1870) ..............................................................13

*Defs. of Crooked Lake, Inc. v. Fla. Dep't of Env't Prot.*,
   No. 17-5328, 2018 WL 3387900 (Fla. Div. Admin. Hrgs., May 7, 2018) .............................12

\*    *Defs. of Wildlife v. EPA*,
   420 F.3d 946 (9th Cir. 2005) .........................................................................................5, 8

*Defs. of Wildlife v. U.S. Dep't of the Navy*,
   733 F.3d 1106 (11th Cir. 2013) .........................................................................................6

\*    *Economy Light & Power Co. v. United States*,
   256 U.S. 113 (1921)...........................................................................................................13

*Friends of the Earth v. Hintz*,
    800 F.2d 822 (9th Cir. 1986) ..........................................................................12

\*   *Gerber v. Norton*,
    294 F.3d 173 (D.C. Cir. 2002) ......................................................................2, 3

*Menominee Indian Tribe of Wisc. v. EPA*,
    947 F.3d 1065 (7th Cir. 2020) ........................................................................20

\*   *Mozilla Corp. v. FCC*,
    940 F.3d 1 (D.C. Cir. 2019) ......................................................................18, 19

\*   *North Slope Borough v. Andrus*,
    642 F.2d 589 (D.C. Cir. 1980) ......................................................................6, 7

*Nat. Res. Def. Council v. Evans*,
    279 F. Supp. 2d 1129 (N.D. Cal. 2003) ...........................................................4

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    51 U.S. 644 (2007) .......................................................................................4, 5

\*   *Nat'l Wildlife Fed'n v. Brownlee*,
    402 F. Supp. 2d 1 (D.D.C. 2005) .................................................................6, 7

*Nat'l Wildlife Fed'n v. Norton*,
    332 F. Supp. 2d 170 (D.D.C. 2004) ...............................................................17

\*   *Oceana Inc. v. Ross*,
    No. CV 15-0555, 2020 WL 5995125 (D.D.C. Oct. 9, 2020) ............................4

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
    523 U.S. 726 (1998) .........................................................................................20

*Pacific Coast Fed'n of Fishermens Ass'ns v. NMFS*,
    482 F.Supp. 2d 1248 (W.D. Wash. 2007) ........................................................5

\*   *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
    992 F.3d 1071 (D.C. Cir. 2021) .......................................................................8

\*   *Sierra Club v. U.S. Dep't of the Interior*,
    899 F.3d 260 (4th Cir. 2018) ...........................................................................4

\*   *Sierra Club v. W. Va. Dep't of Env't Prot.*,
    64 F.4th 487 (4th Cir. 2023) ..........................................................................11

\*   *United States v. Hanousek*,
    176 F.3d 1116 (9th Cir. 1999) .........................................................................9

\*      *WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013) ........................................................................18

**Statutes**

16 U.S.C. § 1536(a)(2) ........................................................................................4

16 U.S.C. § 1536(b)(3)(A) ...................................................................................6

33 U.S.C. § 1319 ............................................................................................9, 10

33 U.S.C. § 1344(h)(1)(G) .................................................................................10

**Legislative Materials**

H.R. Conf. Rep. 95-830 (1977) ..........................................................................13

**State Administrative Code**

Fla. Admin. Code R. 62-330.301 .......................................................................12

**Code of Federal Regulations**

33 C.F.R. § 328.3(a)(1) ................................................................................13, 14

33 C.F.R. § 329.4 ...............................................................................................13

40 C.F.R. § 233.1(d) ............................................................................................9

40 C.F.R. § 233.41(b)(2) ...................................................................................10

50 C.F.R. § 402.02 ..........................................................................................2, 6

50 C.F.R. § 402.14(c)(4) ......................................................................................6

50 C.F.R. § 402.14(g)(2) ......................................................................................2

50 C.F.R. § 402.14(h)(1)(ii) .................................................................................2

50 C.F.R. § 402.16(a) ..........................................................................................4

**Federal Register**

45 Fed. Reg. 33,290 (May 19, 1980) .................................................................10

53 Fed. Reg. 20,764 (June 6, 1988) ...............................................................9, 10

84 Fed. Reg. 44,976 (Aug. 27, 2019) ..................................................................6

88 Fed. Reg. 49,924 (July 31, 2023) ..................................................................17

## INTRODUCTION

EPA's approval of Florida's 404 program and the agency actions underlying that decision were unlawful.  The new arguments raised by the Defendants and Florida on reply lack any merit.  Plaintiffs' Motion for Summary Judgment should therefore be granted.

## ARGUMENT

### I.      USFWS Violated the ESA.

None of the Defendants' new arguments on reply rebut Plaintiffs' showing that USFWS violated the ESA by (1) refusing to evaluate the baseline status of species and the impacts of EPA's action; (2) authorizing an unlimited amount of incidental take at the programmatic level; and (3) claiming that the requisite analyses would occur later at the permit level through a non-statutory technical assistance process that lacks key ESA guardrails—e.g., that USFWS must use the best available science to analyze baseline of the species, evaluate impacts to species, and make incidental take and jeopardy determinations—and allows the State to issue permits without any input from USFWS.  Dkt. 98 at 37–51; Dkt. 104 at 20–49.

### A.      The BiOp Failed to Analyze the Entirety of Florida's Program, the Baseline of the Species, and Impacts to Species from EPA's Transfer Decision.

The Defendants' reply confirms that USFWS excluded parts of EPA's action from its review, including the effect of the general permits Florida adopted as part of the 404 program EPA approved.  Dkt. 98 at 38; Dkt. 104 at 23–25.  The Defendants now contend that USFWS was not required to consider these impacts because Florida's 404 general permits "were not issued pursuant to CWA Section 404," Dkt. 106 at 31, but rather pursuant to state law.  However, all aspects of Florida's 404 program were issued pursuant to state law.  The Defendants' argument would mean that USFWS was not required to consider the impacts of *any* part of the state 404 program, because *all of it* was promulgated pursuant to state law.  FWS-006028, at

1

FWS-006045–46 (BiOp).  To the contrary, USFWS was not authorized to evaluate *some* parts of the state program while ignoring others.  50 C.F.R. § 402.02 ("*all activities or programs of any kind authorized*" by a federal agency) (emphasis added); Dkt. 98 at 38; Dkt. 104 at 23–25.  Here, the agency action was EPA's approval of Florida's 404 program, which included scores of general permits, and USFWS therefore had to consider them.

As to baseline, neither the BiOp, BE, nor BA satisfied the ESA.  Dkt. 98 at 38–39; Dkt. 104 at 25–27.  On reply, the Defendants suggest Plaintiffs' only complaint is that USFWS unlawfully adopted the BE.  Dkt. 106 at 34.  Not so.  The BE also failed to include the required analysis.  Although USFWS copied parts of the BE almost word-for-word,[1] this just transferred the same missing analysis from the BE into the BiOp.  Dkt. 98 at 38–39; Dkt. 104 at 25–27.  *Contra* 50 C.F.R. §§ 402.14(g)(2), (h)(1)(ii), 402.02.

USFWS also unlawfully adopted the BE without independently analyzing it.  Dkt. 104 at 25–27.  On reply, the Defendants still fail to point to anything in the record to rebut this showing, other than conclusory statements.  Dkt. 106 at 33–34.  Instead, they belatedly try to distinguish *Gerber v. Norton*, where the Court found that USFWS unlawfully allowed a regulated entity to make decisions Congress had delegated to USFWS.  294 F.3d 173, 184–85 (D.C. Cir. 2002).  There, the regulated entity rejected an alternative that USFWS proposed and USFWS acquiesced.  *Id.*  Here, the regulated entities (EPA and Florida) proposed the "system" USFWS adopted in the BiOp: a programmatic consultation and ITS paired with a non-statutory technical assistance process at the permit level to obtain incidental take coverage while avoiding appropriately rigorous ESA analysis.  Dkt. 98 at 27–32.  The regulated entities here also

---

[1] *Compare* FWS-006028, at FWS-006083–92 (BiOp), *with* FWS-005610, at FWS-005662–80 (BE).  The BE in turn is a near carbon copy of the BA prepared by Florida.  *Compare* EPA-HQ-OW-2018-0640-0387-A8 (BA), *with* FWS-005610–5906 (BE).

produced the actual language (in the BA and BE) that USFWS largely copied-and-pasted together to form the BiOp, which was supposed to represent *USFWS'* independent, reasoned analysis.  Dkt. 98 at 27–32.

Following these directives, USFWS disavowed any duty to analyze the impacts of EPA's action on species, unreasonably claiming it lacked sufficient information to conduct such analysis, despite having access to historical permitting and consultation data on Section 404 permits in Florida.[2]  Dkt. 98 at 39–41; Dkt. 104 at 27–30.  USFWS then opined that EPA's action would not jeopardize species or adversely modify or destroy critical habitat.  Dkt. 98 at 41.  What transpired here is therefore even more troubling than the events in *Gerber*, because USFWS allowed the regulated entities to commandeer the consultation almost entirely.

Additionally, on reply, the Defendants argue that Plaintiffs failed to point to sea turtle habitat that will be directly impacted by the state 404 program.  Dkt. 106 at 36.[3]  But this ignores the evidence Plaintiffs provided on light pollution and sedimentation impacts to nesting sea turtles.  Dkt. 98 at 41; Dkt. 104 at 29–30.  The Defendants offer no evidence to the contrary.

## B.    The ITS Unlawfully Authorizes Unlimited Incidental Take.

On reply, the Defendants throw new arguments at the wall to defend the ITS' broad grant of liability exemption for incidental take, but none stick.  Dkt. 106 at 36–42.  The Defendants' argument that annual State reports satisfy the requirement to set take limits, Dkt. 106 at 39, fails. Because USFWS did not establish any take limits (neither a numerical limit, e.g., x number of panthers injured or killed, or through use of a surrogate limit, e.g., using x acres of panther

---

[2] *See also* Letter from NMFS to Donald W. Kinard, USACE, at 1, 16–17, 24, 45, 48–52, 71–239, 268–72 (Nov. 20, 2017), https://www.saj.usace.army.mil/Missions/Regulatory/Public-Notices/Article/1383940/final-programmatic-biological-opinion-jaxbo (using historical 404 data for analysis).

[3] The Defendants also ignore that USFWS' lack of any analysis of nesting sea turtles both renders USFWS' BiOp invalid and demonstrates EPA's failure to consult.  *See* Dkt. 106 at 36.

habitat loss as a surrogate for take of panthers), the ITS provides no way to trigger reinitiation if the amount or extent of taking specified in the ITS is exceeded. Dkt. 98 at 42–43; Dkt. 104 at 31–32. No amount of "reporting" changes the fact that there is no take limit that USFWS and the public can use to determine when the authorized amount of take has been exceeded. *See Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 272 (4th Cir. 2018); *Oceana Inc. v. Ross*, No. CV 15-0555, 2020 WL 5995125, at *13 (D.D.C. Oct. 9, 2020); *Nat. Res. Def. Council v. Evans*, 279 F. Supp. 2d 1129, 1182 (N.D. Cal. 2003).

The Defendants' argument that reinitiation based on newly listed species will not be required because the 404 program has already been transferred also lacks any merit. Dkt. 106 at 40. EPA and USFWS have ongoing duties to ensure compliance with the ESA where, as here, there is still discretionary federal involvement over the action. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(a). *See Ctr. for Biological Diversity v. EPA*, No. CV 22-486, 2023 WL 5035782, at *6–7, *10 (D.D.C. Aug. 8, 2023). EPA retains discretionary authority over Florida's program, including through oversight, and thus must reinitiate consultation when a new species is listed.[4]

### C.  USFWS Violated the ESA by Relying Entirely on a Non-Statutory Technical Assistance Process Conducted at the Permit Level.

In a last-ditch effort to defend their reliance on the unlawful technical assistance process, the Defendants argue that the ESA's requirements for Section 7 consultations do not apply to *programmatic* consultation on EPA's decision to approve a state 404 program because *site-specific* consultation is not required for state-issued 404 permits. Dkt. 106 at 44. But this position would allow USFWS to evade compliance with the ESA altogether: first at the programmatic level and then at the permit level. This would turn the ESA on its head. Nor does

---

[4] This same argument would apply to all of the reinitiation requirements. If that were the case, the ITS would truly operate as a blank check for incidental take under Florida's 404 program.

*National Association of Home Builders v. Defenders of Wildlife* require this result, as Defendants now claim.  Rather, *Home Builders* held that EPA's approval of state Section 402 (NPDES) programs is non-discretionary and therefore not subject to ESA consultation, whereas EPA has conceded that its approval of state Section 404 programs is discretionary, and therefore requires compliance with the ESA.  551 U.S. 644, 650, 669 (2007); EPA-HQ-OW-2018-0640-0660-A1.

In fact, the Ninth Circuit considered and rejected a similar argument in *Home Builders*, where the defendants argued that even if programmatic consultation were required, the ESA did not require that the BiOp evaluate impacts to species from EPA's approval of state 402 programs because Congress decided not to require Section 7 consultation on state permits.  *Defs. of Wildlife v. EPA*, 420 F.3d 946, 961 (9th Cir. 2005), *rev'd and remanded on other grounds Home Builders*, 551 U.S. 644.  The court rejected this "nonsensical" argument, finding it incongruous that Congress could have required EPA to consult on and exempt take from the transfer of a Clean Water Act program to a state but not consider the impacts on species from that transfer, including from state permits.  *Id.*[5]

The Defendants' theory would also mean that the ESA requires USFWS to comply with the Section 7 consultation requirements only when a programmatic action also involves future permit-level Section 7 consultations, but not when there are no further consultations (leading to a

---

[5] *Defenders of Wildlife* also held that neither a voluntary permit-level process, EPA oversight, or the Section 9 take prohibition were substitutes for Section 7 consultation.  420 F.3d at 973–75.  The Supreme Court's subsequent decision did not address these issues.  Contrary to the Defendants' claim, Dkt. 106 at 44, *Pacific Coast Federation of Fishermen's Associations v. NMFS* held that an agency may not defer all ESA consultation to future site-specific consultations; it did not cite *Defenders of Wildlife* to suggest that the *lack* of future consultation would require a different result.  482 F. Supp. 2d 1248, 1267 & n.9 (W.D. Wash. 2007).

never-need-comply scenario).[6]  Moreover, if the ESA's requirements are to apply only once, it is even more essential that the agency comply with those requirements at the programmatic level.

On reply, the Defendants urge the Court to ignore *Conner v. Buford*'s germinal holding that USFWS must consider the impacts of an agency action as a whole, 848 F.2d 1441 (9th Cir. 1988), and that it should rely instead on dicta from *Defenders of Wildlife v. U.S. Department of the Navy*, 733 F.3d 1106, 1118–23 (11th Cir. 2013).  But in *Defenders v. Navy*, the wildlife agency had, in fact, considered the whole action (both the installation and operation of a Naval undersea training range).  *Id.*  Although the court indicated that it was not adopting *Conner* because the ESA does not explicitly state that a BiOp must be coextensive in scope with the entire action, *id.* at 1121, the court did not address the ESA-mandated process by which USFWS must make jeopardy determinations, 16 U.S.C. § 1536(b)(3)(A), nor the ESA regulations that specifically require USFWS to consider the impacts of a programmatic action as a whole.  50 C.F.R. § 402.02; § 402.14(c)(4).[7]  84 Fed. Reg. 44,976, 44,996 (Aug. 27, 2019) (defining programmatic consultation and explaining that "all consultations" must "fully satisfy" the ESA).

Moreover, *Defenders v. Navy* is contrary to the law of this Circuit.  *North Slope Borough v. Andrus* created a default rule that programmatic consultations must consider all aspects of an agency action with a narrow exception for OCSLA leasing.  642 F.2d 589, 608 (D.C. Cir. 1980). *Accord Conner*, 848 F.2d at 1455 (finding support in *North Slope*); *Nat'l Wildlife Fed'n v.*

---

[6] The Defendants also use this flawed reasoning in their attempt to distinguish the body of caselaw showing that programmatic BiOps must include the components laid out in the ESA and its implementing regulations. Dkt. 106 at 44–45 & n.25. For the same reason, that attempt fails.
[7] *Cooling Water* similarly ignores the language of the ESA and its implementing regulations, and that USFWS itself described the action as both the promulgation and implementation of the 316(b) rules in the BiOp and ITS. *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 63, 73 n.15 (2d Cir. 2018). FWS-006432, at FWS-006447–53; *id.* at FWS-006473; *id.* at FWS-006512.

*Brownlee*, 402 F. Supp. 2d 1, 10 (D.D.C. 2005) (requiring a programmatic consultation "as a whole" for Corps nationwide 404 permit).  The Eleventh Circuit's dicta is therefore neither governing nor persuasive, and USFWS was required to consider the agency action as a whole.

      **D.**    ***Cooling Water* is Not Persuasive Authority.**

The Defendants do not dispute that the out-of-circuit decision in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018), stands alone in a sea of contrary authority, including from this Circuit.  Dkt. 98 at 49–51 & n.21; Dkt. 104 at 46–49.  Instead, they assert that *Cooling Water* is persuasive authority.  Dkt. 106 at 28 (citing *Butler v. Enterprise Integration Corporation*, 459 F. Supp. 3d 78, 106 (D.D.C. 2020)).  However, *Butler* explains that out-of-circuit authority may be persuasive where "[c]ourts in this Circuit have had little occasion to interpret the statute."  459 F. Supp. 3d at 105.  That is not the case here.  The D.C. Circuit has had many occasions to interpret the ESA and has held that wildlife agencies must evaluate all aspects of a programmatic agency action (including its implementation) at the programmatic level.  *See North Slope*, 642 F.2d at 608; *Brownlee*, 402 F. Supp. 2d at 10;[8]  *Conner*, 848 F.2d at 1455 (relying on *North Slope*).  *Cooling Water* is therefore both contrary to the law of this Circuit and not persuasive authority.  Dkt. 98 at 49–51 & n.21; Dkt. 104 at 46–49.

**II.**    **EPA's Reliance on the BiOp Was Unlawful.**

Contrary to the Defendants' misleading assertions on reply, Dkt. 106 at 46–47, Plaintiffs addressed the caselaw governing EPA's unlawful reliance on the BiOp and provided ample supporting authority for the standard that should apply to this claim.  Dkt. 98 at 51–52; Dkt. 104 at 49–51.  Plaintiffs also discussed (with supporting authority) the rationale behind the "new

---

[8] Contrary to the Defendants' arguments that initiating programmatic consultation somehow satisfies *Brownlee*, Dkt. 106 at 42–43 n.22, that case holds that punting analysis to the site-specific level cannot stand in for *adequate* programmatic consultation.

information" standard, namely how it applies to factual disputes revolving over what information the agency considered in reaching a determination, rather than facial challenges to the legal approach taken in a BiOp, as is at issue here.[9] Dkt. 98 at 51 & n.24; Dkt. 104 at 49–50 & n.25.

While the Defendants point to language in *City of Tacoma v. FERC* stating that the court's inquiry should focus on the action agency's reliance and not on whether the BiOp is flawed, Dkt. 106 at 46–47, the court also acknowledged that "the two inquiries overlap to some extent, because reliance on a facially flawed BiOp would likely be arbitrary and capricious." 460 F.3d 53, 75 (D.C. Cir. 2006). Indeed, the most recent Ninth Circuit decision cited in *City of Tacoma* in support of the "new information" standard explained that it applies to cases involving "factual objections" to a BiOp rather than when a BiOp's "flaws are legal in nature." *Defs. of Wildlife v. EPA*, 420 F.3d at 976. *Defenders of Wildlife v. EPA* even held that the action agency's reliance was arbitrary regardless of there being new information because the BiOp's analysis had legal errors.[10] *Id.* at 962–63, 971, 976 (BiOp failed to consider harm from the loss of ESA Section 7 consultations on future projects being permitted by the state after transfer of federal Clean Water Act program). The court explained that these legal flaws require no "technical or scientific expertise" by the action agency and thus do not undermine the notion that action agencies should be able to rely on expert judgments. *Id.* at 976. The D.C. Circuit followed this same logic in *Shafer* where it applied the new information standard for factual disputes, but not for flaws that are legal in nature. *Shafer*, 992 F.3d at 1096; Dkt. 104 at 50.

---

[9] While the Defendants disagree over which holding is relevant in *Shafer & Freeman Lakes Environmental Conservation Corp. v. FERC*, 992 F.3d 1071 (D.C. Cir. 2021), Plaintiffs did not "skip" a holding; rather they explained fully the only holding relevant here. Dkt. 98 at 51 & n.24; Dkt. 104 at 49–50 & n.25.

[10] The court explicitly makes this finding and then goes on to say even if new information were required it was provided. *Defs. of Wildlife v. EPA*, 420 F.3d at 976.

III.    **EPA Violated the Clean Water Act by Approving a State 404 Program that is Less Stringent than Federal Law.**

As Plaintiffs have shown, EPA's decision to approve a less stringent state 404 program violated the Clean Water Act.  Dkt. 98 at 55–70; Dkt. 104 at 53–86.  Although the Defendants' reply introduces new arguments seeking to defend EPA's unlawful actions, they too fail.

A.    **State 404 Programs Must Be "As Stringent" As Federal Law, Including As to Criminal Intent and Statutes of Limitations.**

The Defendants claim that there is no "free-floating stringency test" or "generally applicable stringency requirement" for state 404 programs.  Dkt. 106 at 18 & n.5.  And so, the Defendants argue, there was no requirement for Florida's criminal enforcement program to be as stringent as the Clean Water Act.  But the Clean Water Act sets the floor for state programs, and EPA itself promulgated the "free-floating stringency requirement" it now claims does not exist.  40 C.F.R. § 233.1(d) (state 404 program "may not impose *any* less stringent requirements for *any* purpose" (emphasis added)).  *Accord* 53 Fed. Reg. 20,764, at 20,766 (June 6, 1988) ("A State's [404] program must be at least as stringent and extensive as the Federal program.").  By excluding an entire class of criminal violations from criminal liability, and providing shorter statutes of limitation, Florida's criminal enforcement program is less stringent than federal law.

Next, the Defendants raise a novel argument that the criminal intents set forth in Section 1319 are not elements of a criminal offense and only determine penalties for those offenses.  Dkt. 106 at 17.  But it is blackletter law that criminal intent is an element of a criminal offense.  *See, e.g.*, *United States v. Hanousek*, 176 F.3d 1116, 1120 (9th Cir. 1999) (describing intent as an element of the government's burden of proof to establish a violation under Section 1319).

The Defendants claim that the violations a state must be able to "abate" are not contained in Section 1319 and are instead defined "elsewhere" in the Act.  Dkt. 106 at 17.  But for this proposition, they point to Section 1311(a), which prohibits only the unauthorized discharge of a

pollutant, and then right back again to Section 1319(c)(1)(A) itself, which addresses permit

violations (e.g., non-discharge violations, such as those related to incidental take or failure to

provide mitigation).  At most, then, Defendants' citation to Section 1311(a) merely identifies

*another* place in the statute that defines a type of violation that states must abate.  Notably,

Section 1311, like Section 1319, is not specifically enumerated in Section 1344.  Under the

Defendants' specific enumeration theory, then, neither Section 1311 nor Section 1319—nor any

other provision of law—would identify the violations of the Act that states are required to be

able to abate in order to assume Section 404.  Plainly this could not have been Congress's intent.

The Defendants concede, as they must, that simple negligence violations constitute

criminal violations under the Clean Water Act but claim that because EPA retains the authority

to prosecute those violations, the states need not have that authority.  However, Section

1344(h)(1)(G) explicitly requires that *states* show they have authority "[t]o abate violations of

the permit or the permit program, including civil *and* criminal penalties and other ways and

means of enforcement."  33 U.S.C. § 1344(h)(1)(G) (emphasis added).  EPA has consistently

made clear that state programs must meet minimum enforcement criteria precisely so that EPA

will not be "forced to take its own enforcement action."  45 Fed. Reg. 33,290, 33,382 (May 19,

1980); 53 Fed. Reg. at 20,771 ("We are interested in ensuring that State programs have strong

enforcement capability, since it is not desirable for EPA to constantly overfile in State

enforcement actions); *id.* (states "are expected to assume primary responsibility").  EPA's

regulations have consistently required that state programs not impose a higher burden of proof as

to criminal intent than that required of EPA under the Act.  40 C.F.R. § 233.41(b)(2).

**B.      The State 404 Program's "Reasonable Assurances" Regime is Less Stringent.**

On reply, the Defendants rely on *post-hoc* rationales to defend the adequacy of Florida's

"reasonable assurances" approach to permitting.  They claim they may do so because EPA's

response at the time was "proportional" to Plaintiffs' raising of this issue during public comment, but cite no proportionality doctrine that would allow an agency to rely on *post-hoc* rationales to defend its action.  Dkt. 106 at 12–16.  Regardless, Plaintiffs argued in comment that Florida's program was inadequate because it "only places obligations on permit applicants to provide 'reasonable assurances'" about their project's impacts, while the federal guidelines "obligate the permitting authority to make those factual findings, rather than relying whole cloth on assurances submitted by permit applicants."  EPA-HQ-OW-2018-0640-0386-A1, at 23 (Plaintiffs' Comments).  That is the very same argument Plaintiffs have made here.  Dkt. 98 at 61–64; Dkt. 104 at 69–73.  Therefore, Plaintiffs clearly stated their position to EPA, and EPA's decision must be upheld, if at all, on the basis articulated for its position at the time.  *CTS Corps. v. EPA*, 759 F.3d 52, 65 (D.C. Cir. 2014).[11]  At the time, however, the agency only stated that it "disagreed" with Plaintiffs' objection, with no explanation as to why.  EPA-HQ-OW-2018-0640-0568, at 27.

Now the Defendants ask the Court to uphold EPA's decision because: (1) the State program involves documentation; and (2) the Corps' program also relies on applicant-submitted information.  Dkt. 106 at 14–16.  But neither rationale supports the agency's action either.  That the State writes down *whether an applicant has provided reasonable assurances* that its project complies with the law does not alter the fact that the State is not required to independently evaluate the applicant's information and make its own factual findings as to the 404(b)(1) permit requirements.  By contrast, the Corps may rely on applicant information, but must independently evaluate that information to make its own findings.[12]  The Defendants' attempt to conflate

---

[11] That Plaintiffs have cited additional authority in briefing is not remarkable.  It does not mean they failed to adequately raise the issue with EPA or that EPA may rely on *post-hoc* rationales.

[12] Because the Defendants conflate independent review—assessing applicant information to determine whether a permit application would comply with the 404(b)(1) Guidelines, *Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487, 507 (4th Cir. 2023)—with independent

independent investigation (i.e., performing a completely independent study, which is not required) with independent verification (i.e., making an independent assessment of the information provided, which is required) fails.

On reply, the Defendants also try to characterize *Defenders of Crooked Lake, Inc., v. FDEP* as showing that the State develops analyses to support its permit decisions, Dkt. 106 at 15–16, but the decision makes no reference to any independent analyses by the State.  No. 17-5328, 2018 WL 3387900, at *2–5 (Fla. Div. Admin. Hrgs., May 7, 2018) (identifying FDEP's exhibits as only the permit application, requests for information, the original and amended notice of intent to issue the permit).  Moreover, FDEP's testimony showed that the agency asked only if the project met the statutory criteria, *id.* at *5, and those criteria ask only whether an applicant has provided "reasonable assurances" as to impacts including to fish and wildlife.  Fla. Admin. Code R. 62-330.301.  The statutory criteria do not require the State to independently assess and make findings as to those same impacts, which is the crux of the issue here.[13]  Federal law requires the permitting authority to assess and evaluate applicant-provided information to reach its own conclusions as to permit impacts, while Florida law does not.

### C.    The Defendants' Belated Attempts to Salvage the Corps' Retained Waters List As Reasonable Fail.

The Defendants' assertion on reply that Plaintiffs have not "identified any flaws" in the retained waters list, Dkt. 106 at 27 & n.11, is flat wrong.  Among other things, Plaintiffs identified flaws in the 2014 Section 10 list, urged the Corps to include waters from the 2017 list,

---

investigation, their reliance on *Crutchfied v. County of Hanover*, 325 F.3d 211, 223–24 (4th Cir. 2003), and *Friends of the Earth v. Hintz*, 800 F.2d 822, 834–36 (9th Cir. 1986), is misplaced. Dkt. 106 at 14–15.  Both cases show that the Corps must independently verify, assess, and analyze applicant information, something that the State program does not require.

[13] Moreover, contrary to the Defendants' statement, Dkt. 106 at 16, Plaintiffs provided reasons for why de novo administrative review is an inadequate replacement for the State conducting this independent evaluation.  Dkt. 104 at 73 n.43, 96–97.

and identified waterways *not on either list* that should be retained.  *See, e.g.*, CORPS003900;

CORPS003850; CORPS004085.  Plaintiffs identified flaws again during EPA's comment period

on Florida's application.  EPA-HQ-OW-2018-0640-0386-A-1, at 2, 3, 7–9, 20, 49–50.

Plaintiffs have also identified as flaws the retained waters list's failure to include historic

use RHA Section 10 waters and Clean Water Act TNWs.[14]  *See* Dkt. 98 at 24–27; Dkt. 98-11,

98-12, 98-13; Dkt. 104 at 74–86.  The examples the Defendants cite on reply, Dkt. 106 at 24–25

& n.8, only bolster Plaintiffs' position.  In *The Daniel Ball*, the Supreme Court defined navigable

waters using virtually identical language to the language Congress used to define retained

waters: waters that are used, or are *susceptible to use in their natural condition,* for interstate

commerce.  77 U.S. (10 Wall.) 557, 563 (1870).  In *Economy Light & Power Co. v. United

States*, 256 U.S. 113, 123 (1921), the Court interpreted the *Daniel Ball* test as including waters

used for commerce in the past.  The principal difference between the scope of the RHA and the

Clean Water Act is that *commerce* has been construed narrowly under the former (continuous

highway for commerce over waters) and broadly under the latter (to reach other forms of

commerce).  And that is why the Great Salt Lake is covered by the Clean Water Act, but not the

RHA.  *See* Dkt. 106 at 24 n.8.  Since the retained waters provision appears in the Clean Water

Act, the term "commerce" in that provision must be given its meaning under that statute.  Thus,

retained waters encompass both TNWs under the Clean Water Act, 33 C.F.R. § 328.3(a)(1), and

all waters under the RHA, *id.* § 329.4, including historic use.  *See also* H.R. Conf. Rep. 95-830 at

104 (1977) (Corps to retain 404 jurisdiction over traditionally navigable waters).

---

[14] Plaintiffs use "TNWs" as shorthand for those waters under the Clean Water Act, as defined in
33 C.F.R. § 328.3(a)(1).

On reply, the Defendants also claim that the Corps never had a position on assumable waters that it later changed.  Dkt. 106 at 24–26.  The Defendants' belated denial, however, is belied by the record and the Defendants' Cross-Motion.  *See* CORPS002993, at CORPS002999, CORPS003021–22 (describing Corps' position that it retains jurisdiction over Section 10 waters and TNWs, referring to the latter as "CWA (a)(1) TNWs;" narrower reading of retained waters "would not take into consideration the evolution of the USACE Regulatory Program since 1977"); Dkt. 99 at 27–28 (in 2017, Corps initiated process to determine scope of retained waters in Florida, including Section 10 waters under RHA and TNWs under the Clean Water Act; acknowledging that the Corps took a contrary position in 2018).  The Corps' statement about its position is followed by the Corps' explanation of its position *on retained waters*, which is that a narrow reading would not take into account the evolution of the Corps' program over more than 40 years and would result in confusion to the public.

It is therefore the Defendants that have taken the Corps' words out of context by arguing that the Corps' reference to "this position" in the Subcommittee Report related to the Corps' position on navigability.  *See* Dkt. 106 at 25.  Indeed, the Subcommittee's purpose was to address the scope of retained waters, not to exchange views on navigability.  And the Corps explained why it would not take a narrow reading of *retained waters*, not navigability.  The Corps did not claim that its position was *based on* the post-*Rapanos* guidance (as Defendants now suggest), but only that it had taken this position *since* the issuance of that guidance.  And even if the Corps had not taken a position on retained waters *before* the Subcommittee Report, it is plain that the Corps took a position as of that Report, acted on that position in 2017–18, and

then reversed course in July 2018.[15]  The Court should not defer to the Corps' about-face without

an acknowledgement of the change and an adequate, reasoned justification for it.

In tacit recognition of the arbitrariness of the Corps' actions, the Defendants now also

claim that the Corps considered the 2017 update to the navigable waters list, and even public

comments, in developing Florida's retained waters list.  Dkt. 106 at 26–27.  But the Defendants'

opening brief stated only (and often) that the Corps used the 2014 list, Dkt. 99 at 29, 59–60, 62,

and "refined" that list only to remove duplicates and "historic use waters," *id.* at 29.  The

Defendants cite no evidence to show that the Corps actually considered the waterbodies on the

2017 list or those the public identified through public comment as waters that should be retained.

The Defendants cite no authority to support the claim that the mere presence of the 2017

list and public comments in the administrative record is sufficient to demonstrate that the agency

considered the waterbodies on that list and in those comments.  Dkt. 106 at 27.  And they cite no

evidence to show that the Corps made reasoned judgments about the "more than double" number

of waterbodies on the 2017 list (or any of those identified by the public), Dkt. 99 at 61, as

compared to the 2014 list.  Indeed, the evidence—and the Defendants' own statements in this

litigation—demonstrate that the Corps did not.  *See* Dkt. 99 at 61–62 (stating that identifying all

retained waters added to the 2017 list would have been "time-consuming and, likely,

contentious," and so the Corps "relied instead on the 2014 Section 10 List.").[16]

---

[15] That the Report framed the Corps' position as a "recommendation" is of no moment, given
that the purpose of the Report was to advise *EPA* of what position *EPA* should take.  It does not
defeat the fact that the Corps had a position when it served on the subcommittee.

[16] Even if the Court were to find that retained waters are comprised only of Section 10 waters,
the Corps' action would have been unreasonable because the record shows that the Corps knew
the 2014 Section 10 List was out of date, had navigability studies nearing completion, and
considered it "absolutely imperative" that the list be updated.  Dkt. 104 at 80–81.  The
Defendants' claim that the Corps did not publish the 2017 list to its public website, Dkt. 106 at
26 & n.10, presumably in support of their argument that the update was merely a draft that could

## IV.      Plaintiffs Have Standing.

Florida's final arguments challenging Plaintiffs' standing are also unavailing.  The Court earlier found that Plaintiffs are harmed by the loss of information provided through NEPA review and ESA consultation.  *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 174, 202–03, 207 (D.D.C. 2022); *see also* Dkt. 98 at 78–79; Dkt. 104 at 90–95; Dkt. 31 at 45–46; Dkt. 43 at 67–74.[17]  Contrary to Florida's claim, the Court applied the summary judgment standard, not the more lenient motion to dismiss standard.  597 F. Supp. 3d at 203, 207.

The Court also previously found that no one had disputed that NEPA review is lost after transfer or that NEPA review would not be available for all (or even most) projects of concern. *Id.* at 203.  On reply, Florida claims that Plaintiffs' standing turns on whether one of the many projects that Plaintiffs identified would require an EA versus an EIS.  Dkt. 107 at 13–14.  That assertion is wrong on the law and misleading.  It remains undisputed that Troyer Mine would require *NEPA review*, which would generate a document that provides the agency's independent assessment of the project's impacts.  When the Corps considered Troyer Mine along with two other projects, it decided to prepare the more comprehensive EIS.  Dkt. 31-1 at 240.  When the other two projects were withdrawn, the Corps opted to begin with an EA first to determine if an EIS would still be necessary.  *Id.*  And it likely would, given that the two other projects have now been re-submitted for similar state 404 permits, a fact Mr. Wolfe fails to mention.  Dkt. 31-1 at 235–42 (Crooks Dec. Ex. P); Dkt. 98-1 at 12–13, 26–28 (Crooks Dec. ¶¶ 35, 82–83, 84(b)).

be disregarded by the agency, conflicts with their prior statements.  Dkt. 99 at 27.  In fact, Plaintiffs accessed (and could only have accessed) the 2017 list via the Corps' public website when they urged the Corps to use that list in developing the retained waters list.  The 2018 email attached as an exhibit conclusively demonstrates that the Corps published the 2017 list to its website and was proceeding with a navigability assessment consistent with its prior position.
[17] Florida's suggestion that this type of information loss is not cognizable because it does not involve "disclosure of private information" is unsupported and contrary to authority.

Florida's suggestion that new page limits for EISs and EAs (excluding appendices) defeat Plaintiffs' information loss fails, because it assumes agencies would meet these requirements by failing to produce the analyses required by NEPA.  Dkt. 107 at 16.  Florida's argument that agencies will now be able to rely on materials prepared by others rather than produce their own independent documents also fails.  Agencies have long been permitted to rely on outside information so long as their independent analyses comply with NEPA.  That has not changed. *See* 88 Fed. Reg. 49,924–25 (July 31, 2023) (amendments are "codifying existing practice with a few minor adjustments").  Florida's bald claim that the Supreme Court's decision in *Sackett*[18] has somehow eliminated Plaintiffs' harm, Dkt. 107 at 16, is not supported by any evidence.

In his supplemental declaration, Mr. Wolfe seeks to dispute Plaintiffs' information loss but relies on the same materials previously submitted to the Court and found lacking.[19]  He fails to identify where in the state system comparable information might be located (because it does not exist), and instead points to the availability of state "permit records."  Dkt. 107-1 at 4 (Wolfe Supp. Dec. ¶ 10).  But Mr. Wolfe describes those records as nothing more than applicant-provided information and the final permit decision.  *Id.*  His insinuation that BiOps are *only* made publicly available "long after" the federal permit process is completed, *id.* at 4–5 (Wolfe Supp. Dec. ¶¶ 11–12), ignores that BiOps are often made public during the permitting process via the Corps' NEPA document.  *See, e.g.*, *Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170, 174 (D.D.C. 2004).  It remains uncontested that Plaintiffs use BiOps both *during* the permitting process (for education and advocacy) as well *after* permits issue (for education, advocacy,

---

[18] EPA and the Corps are actively working on what this decision means and how to implement that decision using the framework set out by the Biden WOTUS rule.

[19] Contrary to Florida's suggestion, the Court clearly considered those materials when they were submitted.  *Regan*, 597 F. Supp. 3d at 185 (citing Dkts. 70–72).

litigation, and tracking take of ESA species).  *See, e.g.*, Dkt. 98-1 at 3–4, 8, 9–10, 12–14 (Crooks Dec. ¶¶ 13, 26, 28–29, 34–36, 39); Dkt. 104-1 at 2–5 (Crooks Supp. Dec. ¶¶ 5–8).

On reply, Florida disputes that Plaintiffs are also harmed because permit challenges in state court would be far more costly than in federal court.  Dkt. 107 at 19 (claiming Plaintiffs are not injured because they hire experts to comment on permit applications).[20]  But it remains undisputed that the cost to *challenge* a permit in a de novo administrative trial is higher (which would require not only investigation, but also expert reports, depositions, and trial testimony), and often prohibitive, to the Plaintiffs.  Dkt. 98 at 78–79 (citing declarations); Dkt. 104 at 95–99.

Florida exaggerates the events that must occur before Plaintiffs would, in Florida's view, suffer harm, relying on *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013).  Dkt. 107 at 21–22.  But there is no comparison.  In *Clapper*, the plaintiffs had no relevant evidence of prior harm.  568 U.S. at 412–13.  Here, Florida has already issued permits that adversely affect Plaintiffs.  In *Clapper*, the plaintiffs speculated that the Government would specifically target their communications.  *Id.*  Here, Florida is actively considering permits that threaten Plaintiffs' interests.  In *Clapper*, judges would have to find the feared surveillance lawful.  *Id.*  Here, even if EPA could object to a permit, the agency is defending the very legal regime causing Plaintiffs' harms.  It is unreasonable to posit that EPA would object when it avers the program is unlawful.

As to standing to challenge Florida's inadequate criminal enforcement scheme, Florida's belated claim that *WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013), and *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019), are "of no relevance," Dkt. 107 at 24–25, fails.  Both cases held that a plaintiff has standing to challenge an agency's action so long as the action

---

[20] Mr. Wolfe's attempt to rebut Plaintiffs' fee shifting arguments, Dkt. 107-1 at 9 (Wolfe Supp. Dec. ¶ 23), also fails.  Plaintiffs' example related to a case without FDEP as a party, but the same fee-shifting provisions would apply to cases involving FDEP and serve as a strong deterrent.

injures the plaintiff; the plaintiff need not be harmed by each of the action's deficiencies.  Dkt.

104 at 101–102.  That *WildEarth* involved a procedural injury has no bearing on this principle,

and Florida fails to articulate how it would.  Florida claims that *Mozilla* is "inapposite" because

the rule at issue there would have injured petitioners by requiring them to affirmatively provide

public disclosures, whereas the rule here does not require specific actions of the Plaintiffs.  Dkt.

107 at 24–25.  But the court's holding was that a party can challenge the essential elements of a

rule, even if those elements are *not* directly linked to the party's injuries.  940 F.3d at 46–47.  A

plaintiff need only show that they are harmed by the rule.  There, as here, "if Petitioners'

objections carry the day, the rule will be struck down and their injury redressed."  *Id.*

Florida's suggestion that EPA's "independent enforcement authority" means that

Plaintiffs are not injured, Dkt. 107 at 23–24, also misses the mark.  It is undisputed that in an

assumed program the state takes primary enforcement responsibility.  If it were sufficient to rely

on EPA's supplemental authority, Congress would not have required states to demonstrate that

*they* have the capacity to abate criminal violations of the Act.  It is also undisputed that EPA

does not even review every state 404 permit and has waived review of entire categories of

permits.  *See* Dkt. 104 at 103, 106 n.69.  How would it then go about enforcing those permits?[21]

Florida's hail Mary reference to a U.S. Department of Justice manual only confirms that EPA's

enforcement role is narrow.  Dkt. 107 at 23–24 (federal proceedings may be initiated if *pending*

state environmental enforcement actions appear inadequate to protect federal interests).

## V.       Plaintiffs' Claims are Ripe.

Finally, as to ripeness, Florida's claim that Plaintiffs have failed to specify how they

would be harmed by the ITS fails.  Dkt. 107 at 25–28.  Plaintiffs identified two projects Florida

---

[21] That EPA may "request" information not otherwise provided to it in the ordinary course of
program administration, Dkt. 107 at 23 n.15, does not change this.

has already permitted where the record showed that take was likely but the permit set no take limit.  Dkt. 98-1 at 9–12 (Crooks ¶¶ 28–33).  Florida's claim also ignores all the other projects Plaintiffs have identified that threaten listed species and their habitats, such as Troyer Mine, Bellmar, and Immokalee Road Rural Village.  Dkt. 98 at 78–80 (citing declarations).

Also, contrary to Florida's reply, Plaintiffs have not argued that their retained waters claim falls into an exception to the ripeness doctrine.  *Contra* Dkt. 107 at 29.  Far from an exception or "carve-out," Plaintiffs directly addressed why their claims against two final agency actions—the Corps' retained waters list and EPA's approval of Florida's program based on the retained waters list—could not be any riper than they are now.[22]

Florida's attempt to diminish the relevance of *Menominee* and *Coalition to Save Menominee River* on the basis that Michigan's retained waters list and coordination process with the Corps are not before the Court, Dkt. 107 at 29–30, is a red herring.  Any difference between the states' coordination processes is irrelevant to whether a retained waters list constitutes a final agency action and when a challenge to that list becomes ripe.  Dkt. 104 at 112–113.  There, as here, the allocation of jurisdiction between the Corps and the State does not change unless and until proposed changes are approved by EPA.[23]  *Menominee Indian Tribe of Wisc. v. EPA*, 947 F.3d 1065, 1070 (7th Cir. 2020); *Coal. to Save Menominee River Inc. v. EPA*, 423 F. Supp. 3d 560, 567 (E.D. Wis. 2019).  Any discussion about specific projects does not change this.

---

[22] Nor does *Ohio Forestry Association, Inc. v. Sierra Club* support Florida's position.  523 U.S. 726, 733–36 (1998) (finding unripe a challenge to an unimplemented forest plan that was merely a "tool[] for agency planning" and could be modified prior to implementation).

[23] While acknowledging that the court found Michigan's retained waters list was a final agency action, Dkt. 107 at 29, Florida ignores that the MOA here does not create a different mechanism to modify the retained waters list.  Coordination to determine whether projects fall "inside or outside of 'retained waters'" to determine which agency processes the permit, Dkt. 107 at 30; Dkt. 102 at 58, is application of the retained waters list, not a modification of it.

Dated: October 12, 2023

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

* Appearing under LCvR 83.2(c)(1))

21

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of October 2023, I electronically filed the foregoing

document using the CM/ECF system.  Service was accomplished by the CM/ECF system.


Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org