# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

    Plaintiffs,

        v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

    Defendants.

Case No. 1:21-cv-0119 (RDM)

## FEDERAL DEFENDANTS' OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION BY THE CENTER FOR BIOLOGICAL DIVERSITY AND SIERRA CLUB

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ......................................... 2

  A.  FWS's Technical Assistance, To Date, For The Bellmar Project ......................... 4

  B.  FWS's Technical Assistance, To Date, For The Kingston Project ....................... 6

III.   STANDARD OF REVIEW ................................................................................ 9

IV.    ARGUMENT ...................................................................................................... 10

  A.  Plaintiffs Have Not Shown That They Are Likely To Succeed On The Merits. ............... 10

  B.  Plaintiffs Have Not Shown That They Will Suffer Irreparable Harm ............................ 14

    1.  There has been no final decision on the Bellmar or Kingston permit applications, thus Plaintiffs cannot satisfy their burden to show imminent irreparable harm. ................... 15

    2.  Plaintiffs have an adequate remedy at law. ................................................. 19

    3.  In the alternative, the technical assistance that FWS provided to the state agencies is not the cause of any irreparable harm. .............................................................. 21

      a.  Plaintiffs' criticisms of FWS's analysis of the effects of the projects on the crested caracara have no merit. ................................................................ 24

      b.  Plaintiffs' criticisms of FWS's analysis of the effects of the projects on the Florida panther have no merit. ................................................................ 27

      c.  The Review/Response Forms plainly quantified incidental take. ................. 34

  C.  The Balance of the Harms and the Public Interest Do Not Support Plaintiffs' Request for Emergency Relief ................................................................................ 35

  D.  Plaintiffs' Requested Injunction Is Not Narrowly Or Appropriately Tailored. ................ 39

V.     CONCLUSION .................................................................................................. 41

# TABLE OF AUTHORITIES

## CASES

*Abdullah v. Obama*,
  753 F.3d 193 (D.C. Cir. 2014) .......................................................................................... 9

*Alaska v. Lubchenco*,
  825 F. Supp. 2d 209 (D.D.C. 2011) ................................................................................. 30

*Allina Health Servs. v. Sebellius*,
  756 F. Supp. 2d 61 (D.D.C. 2010) ................................................................................... 38

*Am. Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008) ........................................................................................ 30

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) ........................................................................................................ 35

*Apotex, Inc. v. FDA*,
  449 F.3d 1249 (D.C. Cir. 2006) ........................................................................................ 9

*Arkansas v. Oklahoma*,
  503 U.S. 91 (1992) .......................................................................................................... 39

*Ashland Oil, Inc. v. FTC*,
  409 F. Supp. 297 (D.D.C. 1976) ..................................................................................... 15

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
  462 U.S. 87 (1983) .................................................................................................... 23, 24

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................................ 17

*Biodiversity Legal Found. v. Norton*,
  285 F. Supp. 2d 1 (D.D.C. 2003) .................................................................................... 32

*Brandstetter v. City of Riverside*,
  No. 5:20-cv-01866-FLA (SHKx), 2021 WL 4620910 (C.D. Cal. Aug. 2, 2021) ..................... 19

*Cal. Native Plant Soc'y v. EPA*,
  No. C06-03604 MJJ, 2007 WL 2021796 n.7 (N.D. Cal. July 10, 2007) ................................. 32

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ........................................................................... 14, 15, 19

*City of Tacoma v. FERC,*
    460 F.3d 53 (D.C. Cir. 2006) ........................................................................ 14

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
    58 F.3d 738 (D.C. Cir. 1995) ........................................................................... 9

*Conservancy of Sw. Fla. v. Williams,*
    No. 13-14477-CIV-Martinez-Goodman, 2018 WL 11422990 (S.D. Fla. Dec. 21, 2018)... 31, 33

*Cooling Water Intake Structures Coal. v. EPA,*
    905 F.3d 49 (2d Cir. 2018) .............................................................. 10, 13, 35

*Ctr. for Biological Diversity v. Branton,*
    126 F. Supp. 3d 1090 (D. Ariz. 2015) ............................................................ 32

*Dallas Safari Club v. Bernhardt,*
    453 F. Supp. 3d 391 (D.D.C. 2020) ................................................................ 14

*Davis v. Pension Benefit Guar. Corp.,*
    571 F.3d 1288 (D.C. Cir. 2009) ....................................................................... 9

*Defs. of Wildlife v. Salazar,*
    812 F. Supp. 2d 1205 (D. Mont. 2009) .......................................................... 22

*Defs. of Wildlife v. U.S. Dep't of the Navy,*
    733 F.3d 1106 (11th Cir. 2013) ...................................................................... 13

*Depu v. Oath Holdings,*
    Civil Action No. 17-635 (RDM), 2021 WL 4399528 (D.D.C. Sept. 27, 2021) .......... 2

*Dist. of Columbia v. Schramm,*
    631 F.2d 854 (D.C. Cir. 1980) ................................................................. 21, 37

*Elec. Priv. Info. Ctr. v. Dep't of Justice,*
    15 F. Supp. 3d 32 (D.D.C. 2014) ................................................................... 41

*Friends of Blackwater v. Salazar,*
    691 F.3d 428 (D.C. Cir. 2012) ....................................................................... 30

*FTC v. Standard Oil Co.,*
    449 U.S. 232 (1980) ...................................................................................... 21

*Fund for Animals v. Rice,*
    85 F.3d 535 (11th Cir. 1996) .................................................................... 31, 33

*In re: Navy Chaplaincy*,
    516 F. Supp. 2d 119 (D.D.C. 2007) ................................................................. 10, 41

*Jubilant Draxlmage Inc. v. U.S. Int'l Trade Comm'n*,
    490 F. Supp. 3d 169 (D.D.C. 2020) ......................................................................... 36

*Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*,
    514 F. Supp. 2d 7 (D.D.C. 2007) ............................................................................. 15

*Live365, Inc. v. Copyright Royalty Bd.*,
    698 F. Supp. 2d 25 (D.D.C. 2010) ........................................................................... 21

*Marbled Murrelet v. Babbitt*,
    111 F.3d 1447 (9th Cir. 1997) ................................................................................. 16

*Marquette Cnty. Rd. Comm'n v. EPA*,
    188 F. Supp. 3d 641 (W.D. Mich. 2016) ................................................................. 18

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) .................................................................................................... 9

*Mdewakanton Sioux Indians of Minn. v. Zinke*,
    255 F. Supp. 3d 48 (D.D.C. 2017) ........................................................................... 21

*Melendres v. Maricopa Cnty.*,
    897 F.3d 1217 (9th Cir. 2018) ................................................................................. 16

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) ................................................................................................. 13

*Nat'l Private Truck Council v. Okla. Tax Comm'n*,
    515 U.S. 582 (1995) ................................................................................................. 16

*Nat'l Treasury Emps. Union v. Yeutter*,
    918 F.2d 968 (D.C. Cir. 1990) ................................................................................. 39

*Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Human Servs.*,
    435 F.3d 326 (D.C. Cir. 2006) ................................................................................. 39

*New York v. United States*,
    505 U.S. 144 (1992) ................................................................................................. 39

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................................. 35

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*,
   817 F. Supp. 2d 1290 (D. Or. 2011) ........................................................ 22

*Oceana, Inc. v. Pritzker*,
   125 F. Supp. 3d 232 (D.D.C. 2015)......................................................... 34

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*,
   606 F. Supp. 2d 1195 (E.D. Cal. 2008) ................................................... 22

*San Luis & Delta Mendota Water Auth.*,
   747 F.3d 581 (9th Cir. 2014) ................................................................... 30

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
   Case No. 2:20-cv-13-SPC-NPM, 2023 WL 7188933 (M.D. Fla. Nov. 1, 2023) ..................... 28

*Singh v. Carter*,
   185 F. Supp. 3d 11 (D.D.C. 2016)........................................................... 41

*Sw. Ctr. for Biological Diversity v. Bartel*,
   470 F. Supp. 2d 1118 (S.D. Cal. 2006)................................................... 33

*Watkins Inc. v. Lewis*,
   346 F.3d 841 (8th Cir. 2003) ................................................................... 19

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982)................................................................................ 36

*Wild Fish Conservancy v. Nat'l Park Serv.*,
   No. C12–5109 BHS, 2012 WL 2457425 (W.D. Wash. June 27, 2012) .................... 16

*Winter v. Natural Resources Defense Council*,
   555 U.S. 7 (2008) ...................................................................... 1, 9, 14, 35

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985)................................................................ 15

**FEDERAL STATUTES**

5 U.S.C. § 706(2)(A).................................................................................. 10

16 U.S.C. § 1540(e)(6)............................................................................... 35

33 U.S.C. § 1251(b) ................................................................................... 39

33 U.S.C. § 1344(g)(1) ............................................................................... 20

33 U.S.C. § 1344(g)-(l).......................................................................... 13, 22

33 U.S.C. § 1344(h)(1)(A)-(H) ................................................................... 20

## CODE OF FEDERAL REGULATIONS

40 C.F.R. § 233.31(a) ............................................................................... 40

40 C.F.R. § 233.50(e) ............................................................................... 40

50 C.F.R. § 402.02 .............................................................................. 26, 33

50 C.F.R. § 402.14(d) .............................................................................. 30

## STATE STATUTES

Fla. Stat. § 120.569(1) ............................................................................. 19

Fla. Stat. § 120.57(1)(b) ........................................................................... 20

Fla. Stat. § 120.68 .................................................................................... 20

Fla Stat. § 373.129(1) ............................................................................... 21

Fla Stat. § 373.430(1) ............................................................................... 21

Fla Stat. § 430.121(1) ............................................................................... 21

Fla Stat. § 430.121(2) ............................................................................... 21

Fla Stat. § 430.131 ................................................................................... 21

Fla Stat. § 430.141 ................................................................................... 21

Fla Stat. § 430.161 ................................................................................... 21

## FLORIDA ADMINISTRATIVE CODE

62-110.106(7)(e)(2), F.A.C…………………………………………………20

## RULES

Fed. R. Civ. P. 65(d)(1)(C) ....................................................................... 39

## I.    INTRODUCTION

Two of the seven Plaintiffs in this matter, Sierra Club and the Center for Biological Diversity, seek the extraordinary remedy of a temporary restraining order or preliminary injunction to stop any action on two State Section 404 permits under consideration by the Florida Department of Environmental Protection ("FDEP").  The two projects at issue, Bellmar and Kingston, are mixed-use development projects planned for areas of Collier County and Lee County, respectively, that are used primarily for agriculture.  The U.S. Fish and Wildlife Service ("FWS") provided technical assistance to FDEP, as outlined in the programmatic Biological Opinion ("BiOp") challenged in the Amended Complaint.  In its technical assistance memoranda, FWS provided FDEP with recommendations on effects determinations and protective measures, and thoroughly documented the avoidance and minimization measures to be required should FDEP decide to issue the permits.  As explained in FWS's technical assistance memoranda, FWS found that the projects are not likely to jeopardize the continued existence of, or adversely modify any designated critical habitat for, species listed as threatened or endangered under the Endangered Species Act ("ESA"), including the Florida panther and Audubon's crested caracara.  Sierra Club and the Center for Biological Diversity, however, contend that the Court should enjoin FDEP from issuing the permits (even though there has been no final determination to grant or deny the applications) and enjoin Federal Defendants from taking any action that would further the issuance of the permits.

The Court should deny the motion because Sierra Club and the Center for Biological Diversity have failed to meet the four-part test set forth in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), for injunctive relief.  As demonstrated in Federal Defendants' summary judgment briefs, Plaintiffs are not likely to succeed on the merits.  Their motion fails to demonstrate any legally cognizable imminent irreparable harm, particularly because Plaintiffs

already have an adequate remedy at law: to challenge any permits through the State's administrative process. Their claim that FWS's review and analysis has caused them irreparable harm lacks a legal and factual basis. The balance of the equities and the public interest do not run in their favor because an injunction would suspend action on the permit applications for an indefinite and potentially lengthy period. And, importantly, Plaintiffs' request for an injunction to enjoin Federal Defendants from "taking any action [to] further[] the issuance of these permits" is not narrowly or appropriately tailored and alters, rather than maintains, the status quo. Such an injunction would completely upend ongoing statutorily mandated permit application review and oversight procedures. Dkt. 135 at 8.

While Plaintiffs' preference is for the Court to "prioritize" a ruling on their ESA claims, *id*., "[a] preliminary injunction is not a garden-variety tool for expediting litigation; it is an extraordinary, equitable remedy limited to those rare occasions when waiting for a full adjudication on the merits is too late." *Depu v. Oath Holdings*, Civil Action No. 17-635 (RDM), 2021 WL 4399528, at *3 (D.D.C. Sept. 27, 2021). Here, the absence of a final determination on the permit applications (and many other factors) demonstrates that it is not "too late." Plaintiffs have not shown that they are entitled to the extraordinary remedy they seek and, considering the status of this case, no form of preliminary injunctive relief is warranted. If anything, the two projects that Plaintiffs challenge serve to demonstrate that the technical assistance process works effectively; FWS has engaged in the manner that it said it would; and Plaintiffs' arguments are legally baseless. The Court should deny the request for preliminary relief and proceed to a decision on the merits.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

In December 2020, the U.S. Environmental Protection Agency ("EPA") approved Florida's request to assume the Section 404 permitting process for discharges of dredge or fill material into

certain waters within its borders.  *See generally* Dkt. 99; Dkt. 106.  Florida recently updated the Court on the status of its program, explaining (among other things) that it has received over 8,760 applications for individual permits, coverage under general or regional permits, and/or requests for no permit required determinations since it assumed the program.  Dkt. 130 at 1.  Many of those applications were withdrawn.  *See id*.  Florida further explained that it has issued 608 individual state 404 permits and denied 270 applications.  *Id*.

The current motion concerns just two permit applications:  one for the Bellmar project and one for the Kingston project.  FWS provided technical assistance to the Florida Fish and Wildlife Conservation Commission ("FWC") and FDEP through the species coordination process set forth in the memorandum of understanding ("MOU") and the BiOp, ultimately making determinations about the effects of the projects on ESA-listed species and critical habitat and recommendations for additional and necessary avoidance and minimization measures, and identifying the amount of estimated take of ESA-listed species for each project.  *See* Dkt. 135-8 (Bellmar Review/Response Form); Dkt. 135-10 (Kingston Review/Response Form).  FWS prepared a technical assistance memorandum for each project, titled "State 404 Permit Application Review/Response Form."  *See id*. (referred to herein as "Review/Response Forms").  EPA has informed the parties and the Court that the earliest dates by which it would comment upon, object to, or make recommendations regarding the Bellmar or Kingston permit applications, or notify the State of Florida of its decision not to comment upon, object to, or make recommendations regarding those permit applications, are January 26, 2024, for the Bellmar project and February 9, 2024, for the Kingston project.  *See* Dkt. 137.  FDEP has not made a final determination for either project and does not anticipate doing so before February 5, 2024.  *See* Dkt. 136, 138.

3

Briefing on the parties' cross-motions for summary judgment was completed in mid-October 2023 and the Court heard argument on October 19, 2023. The parties also submitted post-hearing memoranda with leave of Court, *see* Dkt. 129, 130, 133, 134, before the Court directed that "[n]o further briefs will be accepted with respect to the now fully briefed and submitted cross-motions for summary judgment." *See* Minute Order (Nov. 7, 2023).

### A.    FWS's Technical Assistance, To Date, For The Bellmar Project

FDEP sent a request to FWS for technical assistance regarding the Bellmar project on December 30, 2020. *See* Decl. of R. Carey ¶ 19 (attached as Ex. A). FWS provided technical assistance through the species coordination process for the Bellmar project, sending its latest comments to FDEP on October 31, 2023. *See id.* After working with the State and the project applicant for almost three years, FWS concluded the project would have either no effect or no adverse effect on five ESA-listed species, and that four ESA-listed species are likely to be adversely affected: the Florida bonneted bat, the tricolored bat,[1] the Florida panther, and Audubon's crested caracara. Dkt. 135-8 at 3. Plaintiffs' motion focuses solely on the Florida panther and Audubon's crested caracara. *See generally* Dkt. 135.

In its Review/Response Form, FWS stated that the incidental take anticipated from the Bellmar project is limited to no more than four individual panthers at the year of buildout, a figure that accounts for the loss of three individuals via vehicle collision and one due to habitat loss and reduction in carrying capacity, and incidental take of three individuals per year thereafter due to vehicle mortality. Dkt. 135-8 at 6. FWS anticipated that 1,793 acres used by panthers and their prey are expected to be permanently lost. *Id.* at 17. This is a small portion of panther habitat in

---

[1] The tricolored bat is a candidate species, proposed to be listed under the ESA. *See* Dkt. 135-8 at 3. FWS nevertheless provided technical assistance during the species coordination process as indicated by the MOU. *See* FWS-006019-21.

south Florida, comprising just 0.15% of available habitat overall and a small percentage of the territory of a female panther (6.17%) and a male panther (2.8%). *Id*. This minor reduction in panther habitat is not expected to significantly increase the potential for intraspecific aggression among panthers in the action area. *Id*. The potential increase in vehicle-related panther deaths from project-generated traffic is expected to be minimized through the creation of wildlife crossings on area roads and increased maintenance of permanent wildlife corridors. *Id*. FWS further opined that it does not expect the actual number of panthers killed by vehicles to reach the estimated values because of these mitigation measures. *Id*. Because there are many unknown variables related to calculating a precise number of panther deaths from vehicles, FWS stated that it will monitor the number of panther/vehicle collisions and take steps necessary to further mitigate potential losses if the number exceeds the annual current average of three panthers per year in the action area. *Id*. at 17-18. Based on these factors, FWS concluded that the Bellmar project is not likely to jeopardize the continued existence of the Florida panther. *See id*.

FWS anticipated that incidental take of Audubon's crested caracara associated with the Bellmar project is the loss or failed reproduction of one caracara pair during the first year as the result of disturbance from site preparation and construction activities. Dkt. 135-8 at 6. As FWS explained, there are no active caracara nests within the footprint of the Bellmar project, although the project overlaps with the territory of a breeding pair. *Id*. at 7 (nests within the project area are inactive; caracara are nesting just offsite to the north). The project may cause caracara to permanently shift their territory, but FWS noted that such shifts occur with some regularity. *Id*. at 9. FWS, therefore, expects the caracara to acclimate and resume normal behavior following the first year. *Id*. Moreover, any reduction in breeding success is expected for only a short period, with minimal effect on the overall population. *Id*. FWS stated that the Bellmar project will cause

5

the permanent loss of approximately 1,440 acres of suitable caracara habitat. *Id.* But this habitat

loss is a small reduction in the overall range of the species and, therefore, not expected to adversely

affect the overall population to a significant degree. *Id.* Based on these factors, FWS concluded

that the Bellmar project is not likely to jeopardize the continued existence of the crested caracara.

*Id.*

### B. FWS's Technical Assistance, To Date, For The Kingston Project

FDEP sent a request to FWS for technical assistance regarding the Kingston project on July

7, 2022. *See* Decl. of R. Carey ¶ 32. FWS provided technical assistance through the species

coordination process for the Kingston project, sending its latest comments to FDEP on October

26, 2023. *See id.* After working for over a year to assess the effects of the action and recommend

appropriate protective measures to minimize those effects, FWS concluded that the project would

have either no effect or no adverse effect on four ESA-listed species, and that five ESA-listed

species are likely to be adversely affected: the Eastern indigo snake, the Florida bonneted bat, the

tricolored bat, the Florida panther, and Audubon's crested caracara. Dkt. 135-10 at 6; *see also* n.1,

*supra*. As with the Bellmar project, Plaintiffs focus solely on the Florida panther and Audubon's

crested caracara. *See generally* Dkt. 135.

As explained in the Review/Response Form, FWS anticipates that 3,400 acres used by the

Florida panthers and their prey are expected to be permanently lost. Dkt. 135-10 at 23. This is a

small portion of panther habitat in south Florida, comprising just 0.28% of available habitat. *Id.*

This minor reduction in panther habitat is not expected to affect more than two panthers via

intraspecific aggression because of the small proportion of any individual panther's home range

that will be impacted in the action area. *Id.* Moreover, the loss of this habitat is expected to be

minimized by the restoration and preservation of 3,273 acres of habitat that will remain available

to the panther onsite.  *Id*.  Without the Kingston project and its mitigation commitments, the retention of habitat is uncertain and would likely occur in smaller dispersed areas, as non-federally reviewed urbanization would occur in this area over time.  *Id*.  FWS also explained that the Kingston project is in an area where panther movement to the north already is limited by existing development, thus it is not crucial to the anticipated range expansion (that is, efforts necessary to expand the species' range for recovery purposes).  *Id*.  Other intact habitat areas of public conservation lands further to the south will continue to support the existing panther population. *Id*.  The minor habitat loss from the Kingston project is unlikely to substantially affect the range-wide population size of the panther.  *Id*. at 24.  However, FWS will continue to monitor the effects of habitat loss throughout the panther's range because collectively, over time, habitat loss could threaten the survival and recovery of the species.  *Id*.

In addition to habitat loss and disturbance, the Kingston project will result in increased vehicular traffic in the action area, and an increase in panther vehicle mortality is expected.  Dkt. 135-10 at 17-18.  Predicted background traffic from other activities co-occurring with the Kingston project also is expected to increase, making it difficult to distinguish between vehicle collisions associated with the project and those not associated with the project.  *Id*.  Thus, incidental take attributable to vehicle mortality is difficult to reduce to a single number.  For this reason, FWS factored in the uncertainty associated with any increased traffic as a result of the Kingston project and stated that incidental take is expected to be no more than between three and 23 individual panthers at the year of buildout due to vehicle collisions, with between three and 22 individuals per year thereafter.  The potential increase in vehicle-related panther deaths from project-generated traffic is expected to be minimized through the funding of wildlife crossings on area roads and increased maintenance of permanent wildlife corridors.  *Id*.  FWS recognized that the upper end

7

of its estimated increase in panther mortality due to vehicle strikes exceeds the approximate population growth rate of eight panthers per year. *Id*. But FWS explained that it does not expect the actual number of panthers killed by vehicles to reach the estimated value. *Id*. In light of the many unknown variables needed to calculate a precise number of panther deaths from vehicles, FWS stated that it will monitor the number of vehicle collisions with panthers because motor vehicle-related injuries and mortality could collectively threaten the survival and recovery of the species when combined with other threats to the panther. *Id*. at 24. FWS stated that it will take steps necessary to reduce the number if it exceeds the annual current average of 16 panthers per year in the action area. *Id*. Such measures include constructing additional fencing, recommending installation of additional crossings and/or reduced speed limits, and adding signage or other methods to increase driver awareness. *Id*. Based on all these factors, FWS concluded that the Kingston project is not likely to jeopardize the continued existence of the Florida panther. *Id*. at 23-24.

As to Audubon's crested caracara, FWS's assessment of effects to the species is similar to its assessment of the effects of the Bellmar project. *See id.* at 7-9. FWS anticipated that incidental take of caracara associated with the Kingston project is the loss or failed reproduction of one caracara pair during the first year of the project. *Id.* at 6, 8. In 2022, a survey revealed an active nest that successfully fledged juvenile caracara within the proposed project footprint. *Id*. at 7. Additional caracara were observed throughout the property during the survey effort, but no other nests were found. *Id*. FWS stated that disturbance from site preparation and construction activities is anticipated to cause caracara to permanently shift their habitat. *Id*. Nevertheless, the caracara likely use suitable habitat offsite, so they are expected to acclimate and resume normal behavior following the first year. *Id*. A short-term reduction in breeding success during this time is expected

to occur, but abandonment of the territory is not anticipated. *Id.* FWS stated that the Kingston project is likely to cause a permanent loss of approximately 3,233 acres of suitable caracara habitat, which likely will lead to increased competition for suitable foraging habitat and a reduction in nest productivity. *Id.* Nevertheless, the loss in breeding success is not expected to adversely affect the overall population to a significant degree. *Id.* FWS also stated that the habitat loss is a small reduction in the overall range of the species. *Id.* Based on these factors, FWS concluded that the Kingston project is not likely to jeopardize the continued existence of the crested caracara. *Id.* at 9.

## III.    STANDARD OF REVIEW

A preliminary injunction is an extraordinary form of interim relief and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). To demonstrate entitlement to such relief, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter,* 555 U.S. at 20. When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)). A plaintiff must satisfy all four factors, *see id.*, but a failure to show either irreparable harm or a likelihood of success on the merits obviates the need for the Court to address the remaining factors. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006) (per curiam). A party that seeks a mandatory injunction, seeking to change the status quo through action, typically must meet a higher standard: the movant must

demonstrate clear entitlement to the relief sought or that extreme or very serious damage will result. *In re: Navy Chaplaincy*, 516 F. Supp. 2d 119, 123 (D.D.C. 2007).

## IV.    ARGUMENT

### A.    Plaintiffs Have Not Shown That They Are Likely To Succeed On The Merits.

This action arises under the Administrative Procedure Act ("APA") and is governed by the APA's scope and standard of review.  Accordingly, agency action can be overturned only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  As explained in Federal Defendants' summary judgment briefs and at oral argument, FWS well cleared this standard in issuing the BiOp that Plaintiffs challenge in this case. *See* Dkt. 99, 106.  FWS reasonably opined that EPA's approval action and Florida's subsequent administration of the State Section 404 program is not likely to jeopardize the continued existence of ESA-listed species or destroy or adversely modify designated critical habitat within FWS's jurisdiction.  In reaching that opinion, FWS utilized a programmatic approach similar to the one it previously used to analyze a one-time EPA nationwide action that would result in a wide array of subsequent implementation actions where impacts similarly were unknown at the time of consultation.  *See Cooling Water Intake Structures Coal. v. EPA*, 905 F.3d 49 (2d Cir. 2018).  The Second Circuit rejected arguments nearly identical to the ones that Plaintiffs make here and held that FWS's approach and analysis were reasonable.  *See id*.  The Second Circuit's opinion is persuasive authority, and Plaintiffs' attempts to distinguish it on the facts are unconvincing.  As explained below, Plaintiffs are not likely to succeed on the merits of the claims against FWS set forth in Claims 3, 4, 6, and 13.

As a threshold matter, FWS properly construed the action under review as EPA's approval of Florida's request to assume Section 404 permitting at the state level, including the process-

10

based protections and conditions directed at ESA-listed species.  Dkt. 99 at 62-70; Dkt. 106 at 30-33.  The BiOp used a programmatic approach to evaluate whether and to what degree FDEP and EPA structured their regulatory and oversight programs to ensure that approval and implementation of Florida's Section 404 program is not likely to jeopardize the continued existence of ESA-listed species or adversely modify or destroy critical habitat.  *Id*.  In preparing the BiOp, FWS considered how compliance and enforcement would be monitored, properly evaluated the environmental baseline, and relied on information from prior consultations involving federal wetlands permitting to approximate the number and type of permitting activities that could occur over the next five years.  Dkt. 99 at 66-68, 77, 78 n.26; Dkt. 106 at 30-36.

The BiOp further outlined the technical assistance process in which FWS will engage with FDEP to evaluate individual permit applications on a site-specific and species-specific basis.  Dkt. 99 at 70-76; Dkt. 106 at 42-46.  FWS employed this approach because it was unable to anticipate the locations of future state Section 404 permit applications; thus, it could not undertake a site-specific or species-specific analysis to estimate the number of individuals that may be affected by permitted activities.  *See id.*  Instead, Florida will provide each State Section 404 permit application to FWS, even those that the State has preliminarily determined will have no effect/no impact.  Dkt. 99 at 70-76; Dkt. 106 at 45-46.  FWS then will evaluate potential effects on ESA-listed species and designated critical habitat based on project-specific information.[2]  *Id*.

---

[2]  Plaintiffs continue to argue that, "[a]t most, []FWS has committed only to receive and review permit applications."  Dkt. 135 at 23.  But this argument falls flat in light of (1) Plaintiffs' failure to provide any reason for this Court to assume that FWS will not abide by its commitment to provide technical assistance to the Florida state agencies, and (2) the extensive and detailed input provided for the Bellmar and Kingston permit applications.  *See* Dkt. 106 at 45-46; *see also* Dkt. 135-8, 135-10.

There is no merit to Plaintiffs' argument that FWS is not required to "comply with ESA guardrails" when providing technical assistance:  FWS explained that the purpose of the technical assistance process is to allow the agency to determine if State-issued 404 permits are likely to jeopardize species or destroy or adversely modify critical habitat.  Dkt. 99 at 70-71; Dkt. 106 at 45.  FWS expressly explained the standard it will apply in its review of permit applications, and that standard clearly incorporates the meaning of the terms from the ESA and its implementing regulations.  Dkt. 99 at 70-71; Dkt. 106 at 45-46.  Nor is there merit to Plaintiffs' argument that FWS is not required to identify permit conditions to limit incidental take.  The BiOp provides otherwise.[3]  FWS's position on the potential effects of a project on ESA-listed species or the effectiveness of proposed mitigation measures is determinative.  Dkt. 99 at 37, 65, 71-72; Dkt. 106 at 46.  FWS has committed to provide its input during the technical assistance process in furtherance of its responsibilities for listed species and critical habitat under the ESA, and that commitment is entitled to the presumption of regularity.  Dkt. 99 at 70-71; Dkt. 106 at 45-46. FDEP, in turn, will incorporate as permit conditions all impact avoidance and minimization measures recommended by FWS to avoid jeopardizing listed or proposed species and/or adversely modifying designated or proposed critical habitat.  FWS-006057; FWS-006066; FWS-006106; *see also* FWS-006050.

---

[3]  Plaintiffs also state that "[e]ven when []FWS anticipates take, nothing in the program gives that expectation of take the force of a permit condition that expressly limits authorized take."  Dkt. 135 at 24.  Although this statement is unclear on its face, Federal Defendants assume that Plaintiffs mean to imply that FWS will neither provide permit conditions to limit incidental take nor identify incidental take anticipated from each project.  Any such argument is speculative.  The Review/Response Forms for the Bellmar and Kingston projects show that FWS provided input on the potential effects of each project, recommendations on proposed mitigation measures, and the incidental take anticipated from the projects, all of which will be incorporated as permit conditions if FDEP issues a permit.

Similarly, Plaintiffs' wish for a site-specific "BiOp that is clearly enforceable in federal court" analyzing the effects of each State 404 permit does not automatically render the programmatic BiOp and the technical assistance process that it outlines legally insufficient. Dkt. 135 at 24. FWS prepared a programmatic BiOp and Plaintiffs have challenged it in federal court through this lawsuit. Plaintiffs are not entitled to a biological opinion on each State 404 permit. The Clean Water Act ("CWA") allows states to apply to assume the Section 404 permitting process. 33 U.S.C. § 1344(g)–(l). In such circumstances, Congress decided that neither review under the National Environmental Policy Act ("NEPA") nor ESA Section 7 consultation is required. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 653 & n.4 (2007) (the ESA's consultation requirement "does not apply to permitting decisions by state authorities"). That Plaintiffs are dissatisfied with the Congressional scheme or FWS's programmatic approach to consulting on state delegation approval decisions does not mean that it violates the ESA. As Federal Defendants explained at length, ESA Section 7(a)(2) directs an action agency to ensure that its actions are not likely to jeopardize the existence of listed species or their critical habitat; "[i]t is for the agencies to determine how best to structure consultation to fulfill Section 7(a)(2)'s mandate." Dkt. 106 at 43 (citing *Defs. of Wildlife v. U.S. Dep't of the Navy*, 733 F.3d 1106, 1121 (11th Cir. 2013)); *see* Dkt. 99 at 62-63. Consequently, the ESA does not prohibit a programmatic approach and, under similar factual circumstances, the Second Circuit has held that a programmatic approach, coupled with a technical assistance process, complies with the law. *See Cooling Water Intake Structures*, 905 F.3d at 73-74.

Finally, Plaintiffs are not likely to succeed on the merits of their claims that EPA's reliance on the BiOp is arbitrary and capricious. EPA is fully entitled to rely on FWS's expert analysis and conclusions contained in the BiOp to ensure its compliance with the ESA. Dkt. 99 at 82. As

13

Federal Defendants previously explained, "the critical question is whether the action agency's reliance was arbitrary and capricious, not whether [the BiOp] itself is somehow flawed*." Id.* (quoting *City of Tacoma v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006)); Dkt. 106 at 46-47.  In their summary judgment briefs, Plaintiffs pointed to purported deficiencies in FWS's analysis, which they argued rendered EPA's reliance on the BiOp arbitrary.  *See* Dkt. 98 at 51-52.  The law is clear, however, that EPA is not required to "undertake a separate independent analysis of the issues addressed in the BiOp."  Dkt. 99 at 83 (quoting *City of Tacoma*, 460 F.3d at 75).  Rather, an action agency satisfies its obligations if a challenging party can point to no new information that challenges the biological opinion's conclusions.  *See id.*  Having failed to identify new information that FWS failed to consider, Plaintiffs' claims challenging EPA's reliance on the BiOp are not likely to succeed*. Id.* at 83; Dkt. 106 at 46-47.

### B.    Plaintiffs Have Not Shown That They Will Suffer Irreparable Harm.

Because Plaintiff's claims are unlikely to succeed, the Court may end its inquiry there.  *See, e.g.*, *Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief") (citation omitted).  But, even if the Court is inclined to consider the remaining *Winter* factors, Plaintiffs cannot meet their heavy burden of demonstrating irreparable harm.  "A movant's failure to show any irreparable harm is [ ] grounds for refusing to issue" injunctive relief.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  Indeed, "if a court concludes that a movant has not demonstrated irreparable harm, it need not even consider the remaining factors."  *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 398 (D.D.C. 2020).

Courts in this jurisdiction have recognized that "[t]he concept of irreparable harm does not readily lend itself to definition." *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007). Nonetheless, the D.C. Circuit has laid out "several well known and indisputable principles" that should underlie a court's analysis. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). First, the party seeking preliminary injunctive relief must demonstrate that the claimed injury is "both certain and great" and "actual and not theoretical." *Id.* Second, the movant "must show that '[t]he injury complained of [is] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" *Id.* (alterations in original) (quoting *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 307 (D.D.C. 1976)). And, finally, the injury must be "beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. As explained below, Plaintiffs have failed to make any of the necessary showings and, therefore, are unable to demonstrate that they will suffer irreparable harm. Even if Plaintiffs could demonstrate such harm, they cannot show that it is attributable to any technical assistance that FWS provided to the Florida state agencies.

> **1. There has been no final decision on the Bellmar or Kingston permit applications, thus Plaintiffs cannot satisfy their burden to show imminent irreparable harm.**

Plaintiffs have styled their request as to enjoin (1) Defendants and FDEP from taking further action in furtherance of issuing state 404 permits for the Bellmar and Kingston projects; (2) FDEP from issuing permits for the two projects; and (3) EPA from "waiving its authority over, or otherwise allowing the issuance of, state 404 permits for the two projects." Dkt. 135-11, 135-12. These requests for relief are premised on Plaintiffs' assumption that FDEP will approve the permit applications and issue the permits. But FDEP has not reached a final decision on whether to issue permits for either project or the full suite of conditions that might be included in any permits issued. *See* Dkt. 138 at 4. At the time Plaintiffs filed their motion, the permit applications

were in the public comment phase. *See id.* at 2; *see also* Dkt. 136-1, 136-2. FDEP held a public meeting on the Bellmar project on December 7, 2023. Dkt. 135-7. Since that time, FDEP has scheduled a public meeting on the Kingston project for January 16, 2024. *See* https://floridadep.gov/south/south/content/38896-public-meeting-kingston-state-404-permit-application (last visited Jan. 12, 2024). And FDEP has informed this Court that it will not reach a decision on either permit application until February 5, at the earliest. *See id.* at 2; *see also* Dkt. 138. At a bare minimum, until FDEP issues a permit, Plaintiffs' alleged irreparable harm remains "theoretical" and speculative, thus demonstrating the impropriety of injunctive relief.[4]

Plaintiffs repeatedly state that they must seek an injunction on the issuance of the two permits now because Federal Defendants have not conceded that FWS "can be held accountable" for its participation in the technical assistance process. Dkt. 135 at 26. Although this issue is not germane to whether Plaintiffs have met their burden to show irreparable harm, FWS is not engaged in a reviewable "agency action" when it provides technical assistance. *E.g.*, *Marbled Murrelet v. Babbitt*, 111 F.3d 1447, 1449-50 (9th Cir. 1997) (concurrence letter from FWS indicating its opinion that proposed timber harvest plans would avoid taking of protected species was not "agency action" triggering requirements of the ESA, absent any evidence of federal discretionary involvement or control over timber harvest plans, which instead had to be approved by the state); *see also Wild Fish Conservancy v. Nat'l Park Serv.*, No. C12–5109 BHS, 2012 WL 2457425, at

---

[4]    Federal Defendants further note that, where the request for injunctive relief involves the prohibition of state actors, courts are advised to consider principles of federalism and comity before enjoining state action. *Melendres v. Maricopa Cnty.*, 897 F.3d 1217, 1221 (9th Cir. 2018) ("Federalism principles make tailoring particularly important where ... plaintiffs seek injunctive relief against a state or local government."); *see also Nat'l Private Truck Council v. Okla. Tax Comm'n*, 515 U.S. 582, 586 (1995) ("We have long recognized that principles of federalism and comity generally counsel that courts should adopt a hands-off approach with respect to state tax administration.").

\*6-7 (W.D. Wash. June 27, 2012) (Fish Restoration Plan that provided technical advice and guidance was not final agency action). Here, FWS's technical assistance, as documented in its Review/Response Forms, does not establish any rights or obligations. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The Review/Response Forms are technical memoranda that provide a scientific review of the potential impacts on species from projects proposed in the permit applications, and document FWS's recommendations. FWS-006064 (referring to FWS's role as providing an assessment and recommendations). Nor is the completion of the Review/Response Forms the culmination of decisionmaking on any permit application. As explained in the accompanying declaration, FWS stands ready to provide additional assistance to FDEP as the State agency considers comments provided by the public and until FDEP makes a final determination on the permit applications. *See* Decl. of R. Carey ¶¶ 9, 57. Only a State 404 permit that includes the recommended permit conditions, as determined at the end of the State's administrative process, can establish conditions and consequences for a permittee.

Plaintiffs further assert that their harm allegedly arises from the input that FWS provided during the technical assistance process, as documented in the Review/Response Forms for the Bellmar and Kingston projects. *See* Dkt. 135-8; Dkt. 135-10. FWS's input, however, is just one step in the process. Both the BiOp and the MOU among FDEP, FWS, and FWC detail the procedures for coordinating interagency review and assessment of potential species and habitat impacts from state-issued Section 404 permits. FWS-006015 (MOU (attached hereto as Ex. B)); *see also* FWS-006057 (BiOp (attached hereto as Ex. C)). As explained in the MOU, after FDEP issues the public notice, the State species lead (either FWC or FDEP) "will review any additional information and public concerns that were received and coordinate with the []FWS to address them as appropriate." FWS-006020. It is only "[i]f there are no additional concerns or modifications

that would affect the species review" that "the conclusions and permit conditions by []FWS will be drafted as final correspondence for the file and recommended conditions incorporated into the permit." *Id*.; *see also* FWS-006057 (BiOp, explaining that, if modifications are made during the public comment period, FDEP reviewers will forward it to FWC and FWS for further review and comment). As explained above, no decision has been reached on either permit application. The content of the public comments may additionally inform the process, further demonstrating the lack of any irreparable harm attributable to FWS's input to date. The potential for further coordination and dialogue between FWS and FWC defeats Plaintiffs' reliance on the Review/Response Forms as the culmination of decisionmaking with respect to ESA-listed species. *See* Dkt. 135-5 (Decl. of R. Roff ¶ 17 (asserting that FWS provided its "'final' comments and conditions")).[5] Rather, the decisionmaking culminates when FDEP reaches a final determination on whether to issue or deny a State 404 permit. Dkt. 135-8 at 25 ("Upon FDEP's incorporation of the necessary avoidance and minimization measures as permit conditions, the []FWS concludes the issuance of the State 404 permit is not likely to jeopardize any federally listed species or adversely modify or destroy any critical habitat[.]"); Dkt. 135-10 at 27 (same). Thus, FWS's recent documentation of the technical assistance process has not caused, nor is likely to cause, any alleged irreparable harm.

---

[5]   Should EPA ultimately decide to object to issuance of the Bellmar or Kingston permits, that decision would not be a final agency action either. *See Marquette Cnty. Rd. Comm'n v. EPA*, 188 F. Supp. 3d 641, 647-48 (W.D. Mich. 2016). As explained in *Marquette County*, even after EPA objects to a Section 404 permit under consideration by a state authority, "it is not the case that there is nothing left for the EPA to do after it issues its objections" because EPA can withdraw the objections or work with the state to resolve them. *Id*. at 649.

Plaintiffs have not shown that their claimed injury is "certain and great." Unless and until FDEP approves the permit applications, Plaintiffs' harm is speculative and they have not demonstrated that they are entitled to preliminary injunctive relief.

### 2. Plaintiffs have an adequate remedy at law.

A preliminary injunction is even more inappropriate here because, if and when permits are issued, Plaintiffs will have an adequate legal remedy under the Florida Administrative Code, demonstrating that there is no irreparable harm. Specifically, Florida's program provides a detailed process for challenging state permits, including adequate legal remedies, thus precluding Plaintiffs' request for injunctive relief. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (the injury must be "beyond remediation"); *see also Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (a preliminary injunction is inappropriate when a plaintiff has "an adequate remedy at law" and "[f]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction"). "[I]f a legal, statutory, or administrative remedy exists that will produce the same relief as the injunction sought, the court should not issue the injunction." *Brandstetter v. City of Riverside*, Case No. 5:20-cv-01866-FLA (SHKx), 2021 WL 4620910, at *2 (C.D. Cal. Aug. 2, 2021). As outlined in prior submissions, if FDEP approves the Bellmar or Kingston permit applications, Plaintiffs may challenge those permits through the State's administrative process.[6] Such a challenge has the effect of pausing action on the permits. Fla. Stat. § 120.569(1). FDEP's

---

[6]    Of course, even before issuance of the permits, Plaintiffs are afforded the opportunity to participate in the public comment process. *See* Dkt. 102 at 25-26; EPA-HQ-OW-2018-0640-0002-A20 at 26-27 (State 404 Handbook). Sierra Club issued a press release, indicating that it participated in the public meeting for the Bellmar project. *See* https://www.sierraclub.org/florida/blog/2023/12/opposition-bellmar-overwhelms-fdep-meeting (last visited Jan. 12, 2024). A public meeting for the Kingson permit is scheduled to be held on January 16, 2024, where Plaintiffs will have the same opportunity. *See* https://floridadep.gov/south/south/content/38896-public-meeting-kingston-state-404-permit-application (last visited Jan. 12, 2024).

determination is then subject to an administrative hearing before the Florida Division of Administrative Hearings.  *Id*. § 120.57(1)(b).  The "administrative hearing process is designed to formulate agency action" so FDEP's "final action may be different from the proposed agency action and may result in the issuance of a permit as requested by the applicant or as modified in the course of the [administrative] proceeding or by settlement."  Rule 62-110.106(7)(e)(2), F.A.C. And parties to that proceeding may seek review of the administrative judge's decision by right in the Florida appellate court by filing a notice of appeal in accordance with Florida's Administrative Code.  Fla. Stat. § 120.68.

The pausing of any permit is effectively the same remedy that Sierra Club and Center for Biological Diversity have requested in their motion here and, therefore, constitutes an adequate remedy at law that defeats the need for this Court to order any injunctive relief.  Florida already has explained at length that environmental groups such as Plaintiffs have significant opportunities to challenge FDEP permitting and regulatory actions.  Dkt. 37 at 46-48; *see also* Dkt. 102.  If Florida's contentions are correct, then Plaintiffs also have an adequate remedy at law.  And the availability of an administrative hearing and the automatic pausing of a permit (if any are issued) demonstrate that Sierra Club and the Center for Biological Diversity do not face imminent injury.

Plaintiffs' ability to seek a remedy for their alleged harm in state court is consistent with Congress's intent that states should resolve challenges to the Section 404 permits they issue to private parties under the law of the relevant state.  For a state to assume authority over a Section 404 permitting program, the state attorney general or other authorized legal officer must submit a statement that the laws of the state are adequate to carry out the program.  33 U.S.C. § 1344(g)(1). The CWA further provides that states must establish certain procedural rights and standards for civil and criminal enforcement and other enforcement mechanisms.  *Id*. § 1344(h)(1)(A)-(H); *see*

*also* Fla. Stat. §§ 373.129(1), 373.430(1); 403.121(1), (2), 403.131, 403.141, 403.161 (authorizing civil, criminal, and injunctive remedies for permits). Thus, Congress intended for challenges to State-issued permits held by private parties to be resolved at the state level, utilizing the procedures considered and approved as part of a state's assumption request. *See, e.g., Dist. of Columbia v. Schramm*, 631 F.2d 854, 863 (D.C. Cir. 1980) (holding that state courts were the proper forum for resolving challenges to state National Pollutant Discharge Elimination System permits).

Finally, Plaintiffs complain that they are unable to seek relief in Florida's administrative courts because they would "face the potentially prohibitive expense of having to litigate a de novo proceeding[.]" Dkt. 135 at 31. But "[t]he rule against economic losses constituting irreparable harm applies with full force to litigation expenses." *Mdewakanton Sioux Indians of Minn. v. Zinke*, 255 F. Supp. 3d 48, 52 (D.D.C. 2017); *see also Live365, Inc. v. Copyright Royalty Bd.*, 698 F. Supp. 2d 25, 45 (D.D.C. 2010) (noting that "[t]he Supreme Court has held that '[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury,'" even when those costs "are likely to be substantial") (quoting *FTC v. Standard Oil Co.*, 449 U.S. 232, 244 (1980)). Plaintiffs' suggestion that it would be burdensome to retain experts is further weakened by the fact that they did so for the purposes of this motion, indicating that they have both the means and inclination to do so when it suits them. *See* Dkt. 135-1 (Frakes Decl.) ¶ 2; Dkt. 135-2 (Morrison Decl.) ¶ 5. In short, Plaintiffs cannot validly claim that they are likely to suffer irreparable harm based on the purported expense associated with litigating in the forum designated for hearing challenges to the permits at issue in their motion.

### 3. In the alternative, the technical assistance that FWS provided to the state agencies is not the cause of any irreparable harm.

Even if the Court were inclined to find that the Review/Response Forms can be the source of irreparable harm, Plaintiffs nevertheless have failed to show that harm is likely to occur because

of FWS's input in the species coordination process. At the heart of Plaintiffs' complaints about the technical assistance process and FWS's documentation of its recommendations is that FWS's analysis did not result in a separate biological opinion that they can challenge in federal court. *E.g.*, Dkt. 135 at 28, 29, 31. This is a re-hash of the arguments that Plaintiffs have made throughout their merits briefing. As discussed above, Plaintiffs are not "entitled" to a biological opinion and NEPA analysis for each and every permit issued by Florida. *See* Dkt. 99 at 67 n.19; Dkt. 106 at 32-33. Congress provided otherwise when it designed the CWA to allow states to apply to assume the Section 404 permitting process at the state level. 33 U.S.C. § 1344(g)-(l).

Turning to Plaintiffs' specific arguments, they first appear to argue that any allowance of incidental take of panthers causes them irreparable harm. Dkt. 135 at 32-33. Such an argument is legally baseless: the ESA explicitly requires FWS to exempt incidental take of individual members of a species as long as there are not undue adverse consequences at the population level, which is why irreparable harm here "must be measured at the *species* level." *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1315 (D. Or. 2011); *Defs. of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1209 (D. Mont. 2009) (equating "take" of one individual to irreparable harm would "produce an irrational result"). Thus, irreparable harm must be "'significant' *vis-a-vis* the overall population." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1210 & n.12 (E.D. Cal. 2008) (citations omitted). Plaintiffs overlook these legal authorities with their insistence that the loss of even a few individuals satisfies their burden to demonstrate irreparable harm. Dkt. 135 at 32-33. Here, FWS determined that the Bellmar and Kingston projects are not likely to jeopardize the continued existence of either the Florida panther or

Audubon's crested caracara.  *See* Dkt. 135-8; Dkt. 135-10.[7]  Indeed, no lethal take is anticipated

for Audubon's crested caracara.  Dkt. 135-8 at 6; Dkt. 135-10 at 6.  As explained further below,

FWS's assessment with respect to the Florida panther and crested caracara is reasonable, and the

critiques by Dr. Frakes and Dr. Morrison fail to substantiate Plaintiffs' allegations of irreparable

harm.  The incidental take associated with the Bellmar and Kingston projects is not likely to

jeopardize either species and, therefore, Plaintiffs have not established irreparable harm to their

interests in these species.

Plaintiffs' remaining arguments rely on their assertion that FWS did not rely on the best

available science when analyzing the projects' effects on the Florida panther and crested caracara.

Dkt. 135 at 26.  But this back-door critique of FWS's recommendations serves only to second-

guess FWS's expert judgment.  Plaintiffs should not be permitted to bootstrap an attack on

individual permits under consideration by a State agency to their challenge to FWS's programmatic

BiOp that is pending before this Court.  Even if the Court is inclined to allow them to do so,

Plaintiffs' scientific critiques lack merit: as explained in the accompanying declaration, FWS used

the best available science to inform its analysis and decisions.  *See* Decl. of R. Carey ¶¶ 9, 16, 18,

22.  FWS's determinations concerning potential project effects on the Florida panther and the

crested caracara are entitled to "special deference" because FWS is "making predictions, within

its area of special expertise. . . ."  *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council,* 462 U.S. 87,

103 (1983).  A reviewing court's role "is simply to ensure that the agency has adequately

considered and disclosed the environmental impact of its actions and that its decision is not

arbitrary or capricious." *Id.* at 97-98.  In addition, where, as here, an agency's technical expertise

---

[7]    The Review/Response Forms included the same assessment for other species that FWS
determined were likely to be adversely affected by the projects, but Plaintiffs do not challenge
those assessments and so Federal Defendants do not address them either.

is involved, "a reviewing court must generally be at its most deferential." *Id*. at 103.  FWS considered the full scope of the issues, and Plaintiffs' arguments have no merit.

**a.    Plaintiffs' criticisms of FWS's analysis of the effects of the projects on the crested caracara have no merit.**

As explained in the Review/Response Forms, no lethal take of the crested caracara is anticipated to occur.  *See* Dkt. 135-8; 135-10.  At most, FWS anticipates that there will be brief, temporary loss of reproductive success and a permanent loss of habitat that comprises just a fraction of the species' range.  *See id.*; *see also* Decl. of R. Carey ¶¶ 42, 44, 54, 56.  Minimization measures were developed to ensure that no active crested caracara nest will be destroyed or disturbed, largely eliminating the risk of injury or mortality.  Dkt. 135-8 at 3-4; Dkt. 135-10 at 3-4. On these facts, Plaintiffs can hardly claim irreparable harm to any interest in the species.

Nor will Plaintiffs suffer irreparable harm from the loss of crested caracara habitat associated with the projects.  FWS determined that the Bellmar project will result in 1,440 acres of lost habitat.  Dkt. 135-8 at 7.  While these acres comprise 48% of an average caracara territory, they are less than one percent loss of overall habitat for the species.  Dkt. 135-8 at 7; *see also* Decl. of R. Carey ¶ 44.  Based on the extremely low percentage of loss of overall habitat, FWS determined that the Bellmar project is not likely to jeopardize the continued existence of the species.  Dkt. 135-8 at 7; *see also* Decl. of R. Carey ¶ 49.  The loss of crested caracara habitat associated with the Kingston project is larger, comprising 3,233 acres.  Dkt. 135-10 at 8.  This likely will lead to increased competition for suitable foraging habitat and a reduction in nest productivity.  *Id*. at 9.  But FWS does not anticipate that such impacts will adversely affect the overall population to a significant degree, as it believes that the nest of just one caracara breeding pair is associated with the project footprint and any loss of reproductive success will be temporary. *Id*. at 7-9.  Dr. Morrison also criticizes FWS for not requiring equivalent habitat replacement

24

elsewhere that is sufficient to create a new breeding territory, Dkt. 135-2 at ¶ 46, but this criticism wholly ignores the fact that the loss of suitable habitat is minimal.

Plaintiffs criticize the Review/Response Forms because they do not discuss population estimates for the species. Dkt. 135 at 27. But the nature of the evaluation and the resulting limited anticipated incidental take for crested caracara did not require such a discussion.[8] *See* Decl. of R. Carey ¶ 42. The footprint of the Bellmar project does not constitute a significant percentage of a crested caracara pair's home range, and the conversion of habitat within the Kingston project footprint is not anticipated to be located within any one caracara territory. *See id.* ¶ 44; Dkt. 135-10 at 7. Caracara home ranges are known to vary in size, depending on habitat suitability and proximity to other caracara territories. Dkt. 135-8 at 7. Indeed, the suitability of the habitat that is proposed for development is not static. *Id.* (describing variable suitability of the existing cropland for caracara use); *see* Decl. of R. Carey ¶ 43 (farming activity changes vegetative conditions throughout the year). Because the effects of the Bellmar and Kingston projects are expected to be limited to one resident crested caracara pair each, and those effects are not expected to result in injury or mortality, it was not necessary to compare the temporary loss of reproductive success to an overall population figure. *See* Decl. of R. Carey ¶ 42.

Dr. Morrison asserts that the loss of habitat associated with the Bellmar project also likely will remove the nest tree. Dkt. 135-2 at ¶ 31. However, the crested caracara pair that likely uses portions of the footprint of the Bellmar habitat has been associated with three different trees over the course of three breeding seasons. *See* Dkt. 135-8 at 7. This change in nest locations

---

[8]    Plaintiffs' declarant, Dr. Morrison, claims that Payne, et al. (2023) provides a population estimate for the species that is the best available scientific information. Dkt. 135-2 at ¶ 22. As explained above, the non-lethal nature of the anticipated incidental take did not require FWS to utilize population estimates to determine whether or not the projects are likely to jeopardize the survival or recovery of the species.

demonstrates a likely shift in the pair's territory as suitability of the affected acres shifts with agricultural use. *Id.* at 7. Assuming that the same crested caracara pair has utilized those three different trees, this pair has not demonstrated strong fidelity to any tree near or within the Bellmar project footprint, therefore removal of a previously used nest tree is anticipated to be insignificant to this pair. *See id.* at 7; *see also* Decl. of R. Carey ¶ 47. Moreover, the most recently used nest tree is outside the project footprint, and is not slated for removal. *See* Dkt. 135-8 at 7; *see also* Decl. of R. Carey ¶ 47. Regardless, FWS recommended a permit condition that prohibits removal of active nest trees, as well as measures to ensure that any previously used nest tree is removed only outside of breeding season and with accompanying restoration requirements. Dkt. 135-8 at 3; *see also* Decl. of R. Carey ¶ 47. Thus, this argument lacks a factual basis.

Dr. Morrison also asserts that FWS should have considered "cumulative effects" on the crested caracara from other "land conversion projects" identified in an attachment to her declaration. Dkt. 135-2 at ¶ 27 & Att. D. Because they involve other federal authorizations, FWS reviewed each of those projects in a biological opinion under Section 7 of the ESA and issued an incidental take statement for each of them.[9] *See* Decl. of R. Carey ¶ 48. The nearest of them is more than 10 miles from the Bellmar project footprint, and none of those projects involve State Section 404 permit applications. *See id.* Assuming an average territory size of 3,000 acres, the absence of overlapping territories, and occupation of all suitable habitat by crested caracara, there could be up to eight caracara territories between the Bellmar project footprint and the other nearest project. *See id.* Because of this distance, FWS does not view the effects of those four projects and the Bellmar project as interrelated, and any assertion that they (and "activities on inaccessible

---

[9] The term "cumulative effects" as used in the ESA, does not include effects from Federal activities. *See* 50 C.F.R. § 402.02; *see also* Section IV.B.3.b, *infra*.

private lands") "may or may not be contributing to overall loss" is speculative. *Compare id. with* Dkt. 135-2 at ¶ 27.

Dr. Morrison also criticizes the permit conditions proposed by FWS during the technical assistance process as insufficient. Dkt. 135-2 at 19. Crested caracara are most at risk of disturbance during nest building, incubation of eggs, and support of nestlings. *See* Decl. of R. Carey ¶ 50. Once nesting season activities are complete, disturbance typically results only in temporary avoidance of the immediate area, which is not expected to appreciably impair the species' ability to feed or shelter. *Id.* Accordingly, one proposed permit condition would require land-clearing activities to occur outside of nesting season, in an effort to minimize the likelihood of take. Dkt. 135-8 at 3; Dkt. 135-10 at 3. This proposed permit condition is reasonable given the importance of nesting season activities and the manner in which caracara typically respond to disturbance during the rest of the year. *See* Decl. of R. Carey ¶ 50. Further, if a primary zone is impacted immediately following breeding season, restoration of a comparable area within the pair's territory would be required. Dkt. 135-8 at 3-4; Dkt. 135-10 at 3-4; *see also* Decl. of R. Carey ¶ 50. FWS reasonably determined this minimization measure will reduce the likelihood of take of individual crested caracara, thereby leading it to conclude that the projects are not likely to jeopardize the survival or recovery of the species. Dkt. 135-8 at 9; Dkt. 135-10 at 9.

> **b.    Plaintiffs' criticisms of FWS's analysis of the effects of the projects on the Florida panther have no merit.**

FWS conducted a thorough analysis of the effects of the projects on the Florida panther. Plaintiffs' contentions that FWS failed to rely on the best available science or otherwise adequately assess the projects lack a factual and legal basis.

Plaintiffs rely on Dr. Frakes to criticize the amount of incidental take of the Florida panther associated with both projects. Dkt. 135 at 26-28. Plaintiffs argue that, because FWS used

inaccurate population estimates, they under-analyzed the effects of the estimated take. *Id*. at 22, 26-28. As explained in the Review/Response Forms, panther population estimates have a high degree of uncertainty. Dkt. 135-8 at 10; Dkt. 135-10 at 15-16; *see also* Decl. of R. Carey ¶ 11.[10] As FWS explains in the accompanying declaration, FWS does not believe the actual number of panthers in the population is close to the upper bound that exceeds 700 panthers; rather, the Review/Response Forms used this value to point out the uncertainty in the available data. Decl. of R. Carey ¶ 11. FWS's determinations with respect to the projects' effects on the Florida panther were based on a lower, more conservative population estimate of 222. Decl. of R. Carey ¶ 11. As the Review/Response Forms explain, FWS only used the upper bound value to point out the uncertainty in the available population data and the available survival rates, which are difficult to apply to a panther population of unknown demographics because they are model-averaged and categorized by sex and age cohort.[11] Dkt. 135-8 at 11; Dkt. 135-10 at 15. Therefore, FWS included qualitative and quantitative information in generating an estimate of take that it believes is

---

[10]  FWS has relied on a habitat surrogate to estimate incidental take of Florida panthers when evaluating other projects under ESA Section 7, given the wide-ranging nature of the species and the difficulty monitoring panthers in their territories, especially un-collared panthers. *Sierra Club v. U.S. Fish & Wildlife Serv.*, Case No. 2:20-cv-13-SPC-NPM, 2023 WL 7188933, at *6-7 (M.D. Fla. Nov. 1, 2023). In that case, the court took note of FWS's discussion of the difficulty associated with projecting the future amount of panther mortality resulting from motor vehicle collisions. *Id.* When environmental plaintiffs (including Sierra Club) challenged FWS's analysis on this point, the court rejected it, noting several other decisions that acknowledged the difficulty of estimating numeric take limits for panthers. *See id.* This recent case law also supports FWS's use of a surrogate to account for harm due to habitat loss and harassment.

[11]  Dr. Frakes' declaration opines that the Bellmar project will affect the home ranges of multiple Florida panthers because of "shifting" home ranges. Dkt. 135-1 at ¶¶ 44, 53. FWS disagrees with the concept of "shifting home ranges" as described by Dr. Frakes. Decl. of R. Carey ¶ 13. Such a concept implies that FWS knows with some degree of certainty the number of individual panthers that would be using a proposed project site at the beginning of site development as some portion of their larger home ranges. *See id.* FWS does not have this information and, even if it were available, FWS would consider it a one-time impact for those individual panthers. *See id.* In its review of the Bellmar and Kingston projects, the Service used the most current, reliable home range estimates, leading to a more conservative analysis. *See id.*

reasonably certain to occur.  Decl. of R. Carey ¶¶ 24-26, 34-36.  FWS further explained that it does not expect the upper end of the take values to occur because minimization measures will reduce the magnitude of the actual impact, and activities at the project sites during construction may cause resident or dispersing panthers to avoid the disturbance.  Dkt. 135-8 at 14, 16-17; Dkt. 135-10 at 19-20, 21, 23-24.

Plaintiffs also criticize FWS's reliance on the Habitat Assessment Methodology for the Florida panther, Dkt. 135-1 at 23, 38, which is used in assessing the panther habitat values of sites proposed for development in the panther focus area.  Decl. of R. Carey ¶ 17.  The methodology is used to: (1) calculate the value of panther habitats in terms of panther habitat units ("PHUs") on proposed development sites based on pre-development conditions; (2) calculate the value of panther habitats on the site post-development; and (3) calculate mitigation requirements.  *Id*.  The calculation of panther habitat units has been used for many years by federal agencies, the State, and applicants, and has been determined to be the most appropriate method for evaluating how much mitigation is required to offset a specific amount of habitat loss.  Decl. of R. Carey ¶ 18.  Dr. Frakes contends that the methodology has "serious flaws" and that "FWS should revise its methodology so that it is based on habitat suitability/function and a principle of no net loss of habitat."  *Id*. at 23, 38 (emphasis added).  This argument lacks merit for two reasons.  First, Dr. Frakes's contention seems to suggest that his Random Forest Panther habitat model, which dates to 2015, is a more appropriate tool "to better identify and prioritize panther habitat[.]"  Dkt. 135-1 at ¶¶ 11-12.  However, as FWS explains in the accompanying declaration, the model uses a "large grid cell size," which "could have the effect of over- or under-estimating the total area of panther habitat in South Florida due to the low resolution of the data."  Decl. of R. Carey ¶¶ 21-22. Verified occurrence records of adult panthers and dependent-aged kittens "provide evidence that areas of

South Florida, including areas to the immediate east of the Bellmar Project site, provide habitat used by panthers, including breeding-aged males and females, even though the Frakes et al. (2015) model delineated those areas as having a probability of presence value below 0.338." *Id*. ¶ 22. Dr. Frakes, however, "does not provide the probability of presence values for the post-development grid cells that fall below 0.338 based on his analyses." *Id*. In light of these considerations, FWS does not consider the Frakes et al. (2015) model to be the best available science at this time and does not use it when assessing effects and making recommendations for projects. *Id*. In light of FWS's reliance on what it considers the best available science, Plaintiffs' arguments should be rejected. *E.g.*, *Alaska v. Lubchenco*, 825 F. Supp. 2d 209, 223 (D.D.C. 2011) (the Service must utilize the best scientific data available, not the best scientific data possible); *see San Luis & Delta Mendota Water Auth. v. Jewell*, 747 F.3d 581, 620-21 (9th Cir. 2014).

Alternatively, Dr. Frakes states that FWS should take steps to develop a new methodology, suggesting that FWS bears the burden of developing new science. Dkt. 135-1 at 28. The law provides otherwise: "Congress does not require the agency to conduct its own studies." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008); *accord Friends of Blackwater v. Salazar*, 691 F.3d 428, 439 (D.C. Cir. 2012). Even in the context of consultation under ESA Section 7, the consulting agency does not bear the responsibility for conducting or funding studies. *See* 50 C.F.R. § 402.14(d). Nor does the ESA require no net loss; rather, the Service asks whether the loss will jeopardize the species. *See* Decl. of R. Carey ¶ 38. Thus, the Court should disregard these critiques.

Plaintiffs also argue that they will be harmed because panther habitat will be lost and the preservation of "other habitat areas that are not being destroyed" is insufficient. Dkt. 135 at 34-35. Plaintiffs make the same argument regarding constriction of existing corridors, even though

FWS explicitly recognized that both projects were designed with the improvement of wildlife corridors in mind. Dkt. 135-8 at 12 (Bellmar project designed to conserve native habitat, maintain and improve existing wildlife corridors, and reduce impacts from vehicles by installing strategically placed wildlife crossings and fencing); Dkt. 135-10 at 17 (Kingston project designed to conserve native habitat that maintains and improves existing wildlife corridors); *see also* Decl. of R. Carey ¶¶ 26, 30, 38-40.

Again, such critiques are an inappropriate effort to substitute Plaintiffs' views for FWS's expert judgment. As other courts have explained, deference is due to FWS's expert determinations concerning appropriate measures to protect endangered species. *Conservancy of Sw. Fla. v. Williams*, Case No. 13-14477-CIV-Martinez-Goodman, 2018 WL 11422990, at *16-17 (S.D. Fla. Dec. 21, 2018) (deference was due where FWS enumerated how planned habitat protection and compensation would compensate for quality, function, and value of lost panther habitat); *see also Fund for Animals v. Rice*, 85 F.3d 535, 545 (11th Cir. 1996) (challenged permit, while facilitating development within panther habitat, would otherwise further other conservation benefits through a mitigation plan that provided for creation, restoration, and enhancement of adjacent wetland areas). FWS specifically explained in the Review/Response Form for the Kingston project that the small reduction in panther habitat is expected to be minimized by the restoration and preservation of 3,273 acres of habitat that will remain available to the panther onsite. Dkt. 135-10 at 23. Similarly, the Review/Response Form for the Bellmar project documents that the applicant plans to develop the lowest-quality habitat (row crops) within the project area, and strategically restore and permanently protect 2,391 acres of currently unprotected habitat in areas where habitat connectivity can be maintained. Dkt. 135-8 at 11. FWS stated that, in its judgment, the panther habitat units provided by this onsite conservation, restoration, and preservation of the highest-

quality panther habitat available adequately compensates for the habitat lost to development. *Id.*

FWS identified appropriate measures, and its expert determination is entitled to deference.[12]

Plaintiffs' assertion that the projects "will destroy thousands of acres of critically important Primary Zone habitat for the endangered Florida panther," Dkt. 135 at 7, is misplaced. It is true that both projects are within Primary Zone habitat for the Florida panther, as identified in the species' recovery plan. *Id.* at 7-8; Dkt. 135-8 at 10; Dkt. 135-10 at 15. The recovery plan described the "Primary Zone" as "lands essential to the long-term viability and persistence of the panther in the wild." *See* Dkt. 135 at 7 (citing EPA-HQ-OW-2018-0640-0388-A9). Approximately 78% of lands designated as Primary Zone are in public ownership; 17% are in private ownership; and 5% are in tribal ownership. *See* Decl. of R. Carey ¶ 14. A recovery plan, however, is a guidance document, not a regulatory document. *Cal. Native Plant Soc'y v. EPA*, No. C06-03604 MJJ, 2007 WL 2021796, at *21 n.7 (N.D. Cal. July 10, 2007); *accord Ctr. for Biological Diversity v. Branton*, 126 F. Supp. 3d 1090, 1105 (D. Ariz. 2015); *Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1, 13-14 (D.D.C. 2003). Accordingly, recommendations made in a species' recovery plan are not

---

[12]   The Bellmar project applicant also has committed to fund and install a wildlife crossing north of the project footprint. The crossing, which will be placed on an east-west roadway that facilitates travel from developed areas into a more remote area with higher risk of vehicle strikes, is expected to provide safe passage for panthers in an area that is designed to become a conserved wildlife corridor under the Rural Lands Stewardship program. Dkt. 135-8 at 14. The Bellmar project applicant also committed to contribute to a fund that supports land acquisition, corridor enhancement, and wildlife crossing installation outside of the permit requirements. Dkt. 135-8 at 14; *see* Decl. of R. Carey ¶ 26. Similarly, the Kingston project applicant committed to strategically restore and protect more than 3,200 acres of currently unprotected habitat in areas where habitat connectivity can be maintained. Dkt. 135-10 at 16. This acreage was identified using FWS's panther habitat assessment methodology to determine the amount of habitat units needed to compensate for panther habitat lost at the Kingston project site. *Id.* FWS determined that this restoration, together with credits acquired from the Panther Passage Conservation Bank, adequately compensate for habitat lost to development and any resulting harm to panthers. *Id.*; *see also* https://wetlandsbank.com/panther-passage-conservation-bank/ (last visited Jan. 12, 2024); Decl. of R. Carey ¶ 39.

binding and are not determinative of FWS's opinion on effects determinations. *See*, *e.g.*, *Fund for Animals Inc. v. Rice*, 85 F.3d 535, 547-48 (11th Cir. 1996) (a recovery plan does not have the force of law and does not divest FWS of its discretion and judgment in analyzing the effects of an action on the Florida panther); *cf. Sw. Ctr. for Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1137 n.16 (S.D. Cal. 2006) (disagreeing with *Fund for Animals'* line of reasoning). Thus, the fact that the recovery plan has identified habitat as "Primary Zone" does not preclude development from occurring in that area, particularly considering that Primary Zone habitat is comprised in part by land in private ownership. *See* Decl. of R. Carey ¶ 14. While designation of land as "Primary Zone," "Secondary Zone," or "Dispersal Zone" can inform the technical assistance provided during the species coordination process and calculation of panther habitat units, that the Bellmar and Kingston projects are located in Primary Zone habitat does not prevent FWS from exercising its expert judgment to determine that the project is not likely to jeopardize the species. *See Conservancy of Sw. Fla.*, 2018 WL 11422990, at *17.

Nor is there any merit to Plaintiffs' criticism of FWS's assessment of cumulative impacts. Dkt. 135 at 29. In the ESA Section 7 context, cumulative effects are the effects of future State or private actions that have the potential to affect Federally listed threatened and endangered species and are reasonably certain to occur in the action area. 50 C.F.R. § 402.02. FWS relied on this definition in assessing the cumulative effects in the Bellmar and Kingston action areas on the Florida panther. Dkt. 135-8 at 14-15; Dkt. 135-10 at 20-21. As FWS explained in the Review/Response Forms for both the Bellmar and Kingston projects, it relied on a mapping tool to assess the number of projects in the action area between 2017 and 2020 that were exempt from regulatory review and used that figure to approximate the number of acres that would be exempt from regulatory review in the future. *See id.* FWS found that "this value is representative of future

yearly development likely to occur in the action area," and should thus be evaluated as "cumulative effects," although it explicitly acknowledged that "many unforeseen factors can affect development in the action area," making it "difficult to forecast development related to non-Federal actions." *Id*. FWS also identified three projects that are seeking State Section 404 permits within the defined action area (which included a 25-mile buffer around the project footprints), and explained the total acreage expected to be developed with the anticipated conservation acreage. *See id*.; *see also* 135-8 at 10; 135-10 at 14.

Despite this reasoned analysis, Plaintiffs assert that FWS "omitted most future wetlands development permits from its assessment," and "failed to consider impacts or potential incidental take from those projects[.]" Dkt. 135 at 29. Plaintiffs do not identify any specific deficiency in FWS's approach, do not identify any specific projects that should have been considered, and do not explain why FWS's assumptions were unreasonable. Courts within this district have held that "in the absence of information to support future estimates, [a consulting agency's] assumption that future effects would be similar to past effects was a rational one." *Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232, 243 (D.D.C. 2015). This is particularly true when a plaintiff "fails to offer any reason or any facts or data of its own to conclude otherwise[,]" as Plaintiffs have done here. *Id*. FWS explained its assumptions and how it factored them into its assessment of effects on the Florida panther due to loss of habitat associated with these lands. Dkt. 135-8 at 15; Dkt. 135-10 at 21.

### c.    The Review/Response Forms plainly quantified incidental take.

Plaintiffs' assertion that FWS failed to provide an "express limitation on the amount of authorized take" is plainly incorrect. Dkt. 135 at 7. The programmatic BiOp explained that, if it is determined during the technical assistance process that take of ESA-listed species is still

expected to occur after implementation of recommended minimization measures, FWS would quantify the amount or extent of incidental take for each application, in coordination with FDEP. FWS-006108. Levels of take would be reported and tracked through the technical assistance process and exempted by the incidental take statement. *See id.* Consistent with this process, the Review/Response Forms for the Bellmar and Kingston projects both quantified the amount of incidental take anticipated from the projects. Dkt. 135-8 at 6; Dkt. 135-10 at 6. The incidental take statement in the programmatic BiOp exempts only the take specified for each proposed permit, and no more. *See* Dkt. 99 at 33, 77. Take in excess of the amounts specified in the Review/Response Forms is not authorized, nor does the incidental take coverage in the BiOp extend to such unauthorized take. *See* Decl. of R. Carey ¶¶ 31, 41, 46, 54. If take is exceeded, it could trigger FDEP reopening the permit, consistent with the terms and conditions in the BiOp, as project buildout is expected to exceed 10 years and each permit (if issued) must be renewed every five years. *See id.* ¶¶ 30, 40. Further, if unauthorized take of ESA-listed species occurs, Congress authorized Plaintiffs, other citizens, or the United States to file an action directly against the person or entity responsible to enjoin such take. 16 U.S.C. § 1540(e)(6), (g); *see Cooling Water Intake Structure*s, 905 F.3d at 75 n.16. FWS complied with the process outlined in the BiOp and any suggestion otherwise lacks a legal and factual basis.

### C.    The Balance of the Harms and the Public Interest Do Not Support Plaintiffs' Request for Emergency Relief.

The third and fourth factors of the preliminary injunction test, balancing the equities and the public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). In considering the balance of the equities between the parties, traditionally the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod.*

*Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citation omitted).  "[W]here an injunction is asked [for] which will adversely affect a public interest . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff."  *Id*. at 312-13 (citation omitted).  Thus, a court may deny injunctive relief even when a plaintiff has demonstrated a likelihood of success on the merits and that it would suffer immediate irreparable harm, neither of which has occurred in this case.  As discussed above, Plaintiffs fail to demonstrate that they are likely to succeed on the merits or to make a clear showing that they are likely to be irreparably harmed in the absence of an injunction.  *See* Section IV.A-B, *supra*.  For these reasons alone, the equities do not tilt in their favor.

Plaintiffs suggest that the balance of equities tips in their favor nonetheless because the parties' cross-motions for summary judgment have been fully briefed and the matter is "ripe for adjudication."  Dkt. 135 at 39.  But, on closer look, Plaintiffs are asking the Court to postpone a permitting decision by FDEP well beyond when the Court may issue a decision on the pending summary judgment motions to a time when "the Court has entered final judgment, <u>including any remedy</u>[.]" *Id,* (emphasis added).  The issue of remedy is not currently before the Court:  Plaintiffs specifically requested the opportunity to brief the issue of remedy separately, and the parties have not yet presented argument on that issue.  Dkt. 98 at 15 n.2; *see also* Dkt. 99 at 34 n.13 (joining request for supplemental briefing on remedy, should the Court grant relief to Plaintiffs).  Thus, granting preliminary injunctive relief to Plaintiffs would have the effect of suspending action on the permit applications for an indefinite and potentially lengthy period. *See Jubilant Draxlmage*

*Inc. v. U.S. Int'l Trade Comm'n*, 490 F. Supp. 3d 169, 190 (D.D.C. 2020) ("The reality is that although a preliminary injunction is temporary relief in the life cycle of a lawsuit, it can still result in substantial delay."). Plaintiffs' suggestion that "environmental harm" outweighs "temporary" harms is misplaced, *see* Dkt. 135 at 39, because there is no guarantee that the delay associated with an injunction will, in fact, be temporary. And, as explained above, Plaintiffs have not established irreparable harm to their interests in the Florida panther or Audubon's crested caracara. *See* Section IV.B.1, *supra*.

Plaintiffs argue that there is a public interest in preserving the status quo. Dkt. 135 at 41. But Plaintiffs' request to have the Court enjoin FDEP from issuing two state permits and to force EPA to prevent the issuance of those permits is inconsistent with the current legal regime and the fundamental notion that challenges to permits issued by state authorities to private parties should be resolved in state court. *Schramm*, 631 F.2d at 855, 863. In short, an injunction preventing the issuance of any permit would *alter* the status quo, not preserve it.

Plaintiffs also cite a public interest in the protection of threatened and endangered species that use the areas where the Bellmar and Kingston projects are planned. *See* Dkt. 135 at 40. The public interest, however, is much broader than that and should be assessed in the same way as their argument on preserving the status quo. The public has an interest in an open and transparent process, conducted pursuant to Florida's State 404 program procedures, that allows the relevant authority to make a decision on pending permit applications. Those procedures anticipate that FDEP will make decisions on a full record, after the opportunity to receive and consider public comments. Plaintiffs' requested injunction would interrupt that process, allowing just two organizations (which they say are not even Florida entities) to step in and prevent the issuance of

two permits before the input of other stakeholders is considered.  Such an outcome hardly serves the public interest.

Nor is there any merit to Plaintiffs' contention that this factor weighs in their favor because "the public has an interest in having Congress' environmental mandates 'carried out accurately and completely.'"  Dkt. 135 at 40.  Even if Plaintiffs had shown that there was some sort of failure in this regard (which they have not), "a court will not reflexively issue an injunction just because a movant has shown there to be a violation of the law."  *Allina Health Servs. v. Sebellius*, 756 F. Supp. 2d 61, 70 (D.D.C. 2010) (citation omitted).  Indeed, there was no violation of law: the programmatic BiOp was developed according to an approach that was endorsed by the Second Circuit.  FWS has acted within its defined role when providing technical assistance to FDEP and documented its recommendations in the Review/Response Forms.  In doing so, FWS acted in accordance with the standards in the ESA and relied on the best available scientific evidence.  *E.g.*, Dkt. 135-8 at 13.  The agency recommended mitigation measures that will ensure that neither the Bellmar nor Kingston projects are likely to jeopardize the continued existence of the Florida panther or the crested caracara.  *See id.* at 3-5; Dkt. 135-10 at 3-5.  As to the Florida panther, FWS articulated its intention to continue monitoring and, in coordination with the State agencies, will take steps necessary to reduce the number of vehicular deaths if those figures rise.  Dkt. 135-8 at 18; Dkt. 135-10 at 23-24; Decl. of R. Carey ¶¶ 30, 40.  There simply is no basis for Plaintiffs' assertions that FWS has acted outside the bounds of the law.

Finally, Plaintiffs ignore the equities and the public interest that favor honoring the principles of cooperative federalism that are inherent in Florida's assumption of its Section 404 program.  Section 404 assumption was designed by Congress to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution" within

the framework of a federal statutory scheme.  33 U.S.C. § 1251(b); *cf. Arkansas v. Oklahoma*, 503

U.S. 91, 101 (1992) (The CWA "anticipates a partnership between the States and the Federal

Government . . ."); *New York v. United States*, 505 U.S. 144, 167 (1992) (describing the CWA as

an example of "cooperative federalism"); *see also* Dkt. 99 at 35.  Thus, when Plaintiffs complain

that this approach has denied them the ability to challenge in federal court a biological opinion that

(purportedly) otherwise would have been prepared for these projects, their complaint lies with the

design of the CWA.  Congress designed the statute so that a state may seek to assume its Section

404 program; Congress did not guarantee a mirror image to the federal process.  This factor weighs

in favor of Federal Defendants and against an injunction.

### D.    Plaintiffs' Requested Injunction Is Not Narrowly Or Appropriately Tailored.

As stated in the Federal Rules of Civil Procedure, an injunction must be reasonably specific

in identifying what acts are prohibited or required.  Fed. R. Civ. P. 65(d)(1)(C) (requiring that all

injunctions "describe in reasonable detail—and not by referring to the complaint or other

document—the act or acts restrained or required").  Plaintiffs' request for an injunction fails this

test because it is not "narrowly tailored to remedy the specific harm shown."  *Neb. Dep't of Health

& Hum. Servs. v. Dep't of Health & Human Servs.,* 435 F.3d 326, 330 (D.C. Cir. 2006) (citation

omitted); *Nat'l Treasury Emps. Union v. Yeutter,* 918 F.2d 968, 977 (D.C. Cir. 1990) (injunctions

must be carefully circumscribed and "tailored to remedy the harm shown") (citation omitted).

Plaintiffs ask the Court to "(1) immediately issue a TRO enjoining Defendants and Intervenor

FDEP from taking any action furthering the issuance of these permits, up to and including issuing

the permits; and (2) preliminarily enjoin any further action on these permits until the Court grants

final judgment, including any remedy, on Plaintiffs' claims related to ESA-listed species."  Dkt.

135 at 8.[13]  But a request for an injunction to prevent EPA from taking any action is illogical in that it would effectively clear the path for FDEP to make a final decision on the permit applications, unless the Court also enjoins FDEP.

On the other hand, asking the Court to direct EPA to prevent issuance of the permits is outside EPA's narrow regulatory authority and in the nature of a mandatory injunction that requires Plaintiffs to meet a higher standard that they simply cannot attain here.  That is, Plaintiffs' proposed orders ask the Court to enjoin EPA "from waiving its authority over, or otherwise allowing the issuance of, state 404 permits for the two projects."  Dkt. 135-11, 135-12.  But, as described in its recent notice, EPA has three options remaining at this stage of the administrative process:  the agency can decide whether or not to comment, make recommendations, or object to the permit applications.  *See* Dkt. 137; 40 C.F.R. § 233.50(e); *see also* n.5, *supra* (explaining that EPA's decision to object is not a final agency action).  If EPA were to decide to object, any objection "shall be based on the Regional Administrator's determination that the proposed permit is (1) the subject of an interstate dispute under § 233.31(a) and/or (2) outside requirements of the [Clean Water] Act, these regulations, or the 404(b)(1) Guidelines."  40 C.F.R. § 233.50(e).  As styled, Plaintiffs' request is so broad that it appears to ask the Court to force EPA to object.[14]  Such an extraordinary request, however, is in the nature of a mandatory injunction as to EPA.  "When a party seeks a mandatory injunction—to change the status quo through action rather than merely to

---

[13]  This lack of specificity is further demonstrated by Plaintiffs' proposed orders, which make no specific reference to any Federal Defendant other than EPA.  *See* Dkt. 135-11, 135-12.  Neither Plaintiffs' brief nor their proposed orders identify any action by any Federal Defendant other than EPA that they want the Court to enjoin, leaving the parties and the Court guessing if they are seeking an injunction against FWS or the Corps of Engineers and, if so, the actions by those agencies that they seek to curtail.

[14]  Conversely, in asking the Court to enjoin any further action on the permits, Plaintiffs also appear to be asking the Court to enjoin EPA from objecting.

preserve the status quo—typically the moving party must meet a higher standard than in the ordinary case: the movant must show 'clearly' that she is entitled to relief or that extreme or very serious damage will result." *Navy Chaplaincy*, 516 F. Supp. 2d at 123 (citations omitted);[15] *see also Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016) (quoting *Elec. Priv. Info. Ctr. v. Dep't of Justice*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014)). Here, Plaintiffs have made no effort to meet that higher burden or even to explain how their requested injunction is narrowly tailored to their purported harm.

Thus, the Court should decline to grant injunctive relief as to EPA in light of these deficiencies, and as to any other Federal Defendant for the reasons described above.

## V.    CONCLUSION

Sierra Club and the Center for Biological Diversity have failed to meet the four-part test set forth in *Winter*. As demonstrated in Federal Defendants' summary judgment briefs, they are unlikely to succeed on the merits. These two Plaintiffs have not shown that it is likely that they will suffer any legally cognizable imminent irreparable harm. The balance of the equities and the public interest do not run in their favor. The requested injunction is not narrowly tailored and fails to comply with the more stringent standard applied when evaluating requests for a mandatory injunction. For these reasons, the Court should deny the motion.

Dated: January 12, 2024                          Respectfully submitted,

                                                 TODD KIM
                                                 Assistant Attorney General
                                                 Environment & Natural Resources Division
                                                 United States Department of Justice

                                                  /s/  Alison C. Finnegan

---

[15]   The *Navy Chaplaincy* court articulated this standard, relying on other decisions from this district, but acknowledged that the D.C. Circuit has not yet adopted or rejected this rule. 516 F. Supp. 2d at 123.

Alison C. Finnegan (PA Bar 88519)
Wildlife & Marine Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: 202-305-0500
Email: Alison.C.Finnegan@usdoj.gov

Andrew S. Coghlan (CA Bar 313332)
United States Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 514-9275
Fax: (202) 514-8865
Email: Andrew.Coghlan@usdoj.gov
*Attorneys for Federal Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2024, a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

/s/ Alison C. Finnegan