Exhibit A

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | )<br>)<br>) Case No. 1:21-cv-0119 (RDM)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) **Declaration of Robert Carey**<br>) |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | )<br>)<br>) |
| Defendants. | )<br>) |

I, Robert Carey, state the following:

1.      I am the Manager of the Division of Environmental Review in the Florida Ecological Services Field Office for the U.S. Fish and Wildlife Service ("Service" or "FWS"), an agency of the U.S. Department of the Interior, located in Washington, D.C.  In my capacity as the Division Manager, I supervise Service biologists in their implementation of the Service's Biological Opinion issued pursuant to the Endangered Species Act (ESA) for the U.S. Environmental Protection Agency's Approval of Florida Department of Environmental Protection's (FDEP's) Assumption of the Administration of the Dredge and Fill Permitting Program under Section 404 of the Clean Water Act dated November 17, 2020 ("Biological Opinion").

2.      In this capacity, I review technical assistance memoranda prepared by Service staff in response to their review of applications submitted by the State of Florida to ensure compliance with the standards of the ESA.  I consult with staff biologists, including species experts, during

1

project review and coordinate with State agencies as needed to ensure consistent application of State and Federal requirements, and thus compliance with the Biological Opinion, during the evaluation of individual projects.

3.      I submit this declaration in support of the technical assistance provided by the Service to the State of Florida for the Bellmar and Kingston projects and to address the assertions made by Robert Frakes and Joan Morrison with respect to the information the Service used and determinations the Service made.

**The Technical Assistance Process**

4.      Our Biological Opinion for the U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program under Section 404 of the Clean Water Act dated November 17, 2020, details the technical assistance process the Service follows when the State of Florida receives a permit application under Section 404 of the Clean Water Act.

5.      As part of the technical assistance process, FDEP must provide copies of all State 404 permit applications to the Florida Fish and Wildlife Commission ("FWC") and the Service for our review, even those that are not anticipated to effect listed species or their critical habitat. Consistent with the Biological Opinion, the FWS is committed to reviewing each application and determining whether the information is sufficient to conduct our analysis. If there is missing information necessary to complete the FWS review, the FWS will promptly notify FDEP. Once it has been determined by FDEP/FWC that an application will have no adverse impacts or adverse effects to federally listed endangered or threatened species (or species proposed to be listed) or their critical habitats, and the FWS does not dispute this, the species review concludes for that application. If the applicant modifies the project activities or increases the project area as the

application continues to be reviewed, FDEP/FWC/FWS may re-evaluate the application with this information, if warranted. Once it has been determined by FDEP/FWC that an application may cause an adverse impact or adverse effect to federally listed endangered or threatened species (or species proposed to be listed) or their critical habitats, technical assistance with FWS continues in order to determine if, and how, the impacts and effects can be addressed with protection measures. While the State generally makes preliminary effects determinations prior to sending the application to FWS, any determination made by FWS, even if different from those of the State, are controlling. FWS will recommend protection measures, or concur with the measures the State has provided, that are appropriate to avoid or minimize the expected adverse impacts associated with the proposed project. The protection measures must be incorporated into the public notice as proposed permit conditions.

6.     If modifications are made or new issues are raised during the public comment period that may change the original determination or anticipated effects to species or their critical habitats, FDEP reviewers will forward this information to FWC and FWS for further review and comment. If no modifications are made, or if the modifications during the public notice process can be addressed by FDEP/FWC/FWS, protective measures are incorporated into the permit as special conditions and the species review concludes for that application. Accordingly, unlike the ESA Section 7 consultation process, the technical assistance process established for Florida's State 404 program has an added public comment component.

7.     FWS's evaluation of the likelihood that a permit action may jeopardize a species or adversely modify critical habitat will take into account the effects of any unrelated non-federal actions occurring in the project area, similar to the way a cumulative effects analysis is conducted under section 7 of the ESA. If the review by FDEP, FWC, and FWS concludes that adverse impacts

are likely to jeopardize the continued existence of a species, or will destroy, or adversely modify critical habitat, additional protection measures that will satisfy the requirements of the ESA and avoid jeopardy or adverse modification must be developed in coordination with or as recommended by FWS and incorporated as permit conditions, or the permit must be denied.

8.      Impacts that are likely to adversely affect a species (e.g. likely to cause incidental take or jeopardy) or critical habitat (e.g. destroy or adversely modify critical habitat) must be recorded, monitored, and provided to the FWS for tracking and species conservation purposes. FDEP will provide an annual report to the FWS that: (1) Summarizes the number and types of State 404 permits issued or denied, including data on impacts to ESA-listed species or critical habitat; (2) Includes a table that identifies all ESA-listed species taken by State 404 permitted activities along with the amount or extent of such take;  (3) Identifies any permits that were elevated in accordance with the FDEP-FWC-FWS Memorandum of Understanding and how those elevations were resolved. If prior to the completion of a permitted activity, new information (e.g. listing of new species, new critical habitat, or modifications to permitted activity) shows that the magnitude of impacts to listed species is greater than originally anticipated by FWS, or that the amount of incidental take originally anticipated by FWS is exceeded, FDEP, in accordance with its authority under 62-331.080, F.A.C., will reopen the permit and coordinate with the FWS to: (1) determine if the additional impacts are likely to jeopardize any species; and (2) determine if additional minimization measures, reporting, or monitoring are required as deemed necessary by FWS.

9.      This process of the Service's coordination and technical assistance operates similarly to a Section 7 consultation because our technical assistance is intended to ensure a State 404 permit action is not likely to jeopardize a species or adversely modify or destroy critical

habitat; minimize adverse effects through protective measures; and track the amount of incidental take if take is reasonably certain to occur. The Service uses the best available science to inform its analysis and determinations in the species coordination and technical assistance processes. The technical assistance process continues, and the Service's expertise is available to FDEP and FWC, until a final decision has been made with respect to the issuance of any permit, which has not occurred for either the Bellmar application or the Kingston application.

**Florida Panther Analyses**

10.    The Service utilized the same approach for assessing effects of the action on the Florida panther in the way we reviewed and provided technical assistance for the Bellmar and Kingston projects. The Service considers the action area for panthers as all lands within the footprint of the projects, and all lands within 25 miles of the project footprints. The 25-mile buffer around each project footprint is designed to encompass the mean dispersal distance of sub-adult male panthers, which was reported by Maehr et al. (2002) to be 23.2 miles and by Comiskey et al. (2002) to be 24.9 miles. The 25-mile buffer distance encompasses the dispersal distance of both male and female panthers because male panther dispersal distances are known to exceed those reported for female panthers (Comiskey et al. 2002; Maehr et al. 2002). This approach accounts for the large movements and home ranges of panthers and is consistent with action areas defined in the Service's recent biological opinions for the panther.

11.    As explained in each project's technical assistance memorandum (which are titled "State 404 Permit Application Review/Response Form"), although an exact population size of panthers is not known, recent modeling techniques using vehicle mortality data from radio-collared panthers estimated a population of approximately 269 individuals in 2012, with a 95 percent confidence interval from 143 and 509 panthers (McClintock et al. 2015). In 2019, the McClintock

et al. (2015) model was updated with six additional years of data, resulting in a population size point estimate of 407 panthers in 2018, with a 95 percent confidence interval ranging from 222 to 773 panthers. Based on the data provided in both iterations of the McClintock et al. (2015) model, the panther population has increased from an approximate range of between 143 and 509 individuals in 2012 to between approximately 222 to 773 individuals in 2018, an average increase of between 9 and 39 [(222-62)/18 years and (773-62)/18 years] panthers per year. While the Service does not believe the actual number of panthers in the population is at or near the upper bound (>700), this value was used in our technical assistance memoranda to point out the uncertainty in the available data. Although not specifically stated in the technical assistance memoranda, the Service's determinations with respect to effects of the Bellmar and Kingston projects on the Florida panther were based on the lower, more conservative 2018 population projection of 222.

12.    The declaration by Dr. Frakes suggests that the population is between 120-230 adult panthers and notes that the Service's 2020 species status assessment for the panther quotes this number.  However, the 2020 species status assessment also explains that the technique applied to produce this number (the minimum count index) did not provide a true population estimate because it did not have an associated measure of variance and it did not consider changes in detectability or sampling effort. In addition, it provided a minimum count, so the index was used with the understanding that a portion of the population was not counted. Based on this minimum count method, FWS and FWC reported that as of 2015 there were 120 to 230 adult and subadult panthers in the Primary Zone (Kautz et al. 2006, FWC and FWS 2017). The last annual count was completed in 2015 and this count has since been discontinued. Regardless, using the lower bounds of the population projection as discussed in the prior paragraph is not inconsistent with this count and

likely does not account for any growth that has been projected. The 2020 species status assessment also explains that the methodology discussed in Paragraph 11 (McClintock et al. 2015) is currently the only technique that can inform managers as to the change in panther population size.

13.     The declaration by Dr. Frakes opines that multiple panthers will be affected by the Bellmar project because of "shifting" home ranges.  While the Service agrees that it is natural for the range of a species to shift to adapt to changing circumstances, the Service does not agree with the concept of "shifting of home ranges" as described by Dr. Frakes. That concept implies that the Service knows with some degree of certainty the number of individual panthers that would be using a proposed project site at the beginning of the site development as some portion of their larger home ranges. The Service does not have this information and, even if that information was available, the Service would consider this a one-time impact for those individual panthers.  The Service would not characterize it as shifting home ranges for a panther(s) that would theoretically be using that area in the future in a scenario with no development. Rather, in its review of the Bellmar and Kingston projects, the Service used the most current, reliable home range estimates of the panther as described in Lotz et al. 2005, which leads to a more conservative analysis. For example, presuming a smaller home range means that any development would represent a larger portion of that range.

14.     An earlier effort to map areas of South Florida important for panther habitat conservation resulted in three distinct regions of panther habitat (Kautz et al. 2006):  Primary Zone $(9,189 \text{ km}^2)$, Secondary Zone $(3,286 \text{ km}^2)$, and Dispersal Zone $(113 \text{ km}^2)$. The Primary Zone was defined as lands essential to the long-term persistence and survival of the Florida panther. Approximately 78 percent of the Primary Zone is in public ownership, 17 percent is in private ownership, and 5 percent is in tribal ownership.  The Secondary Zone, generally considered to be

7

areas of less suitable habitat only occasionally occupied by panthers, was defined as "natural and disturbed lands in south Florida that may be important to transient sub-adult male panthers and have the potential to support an expanding panther population, especially if habitat restoration were possible." (Kautz et al. 2006:123). The Dispersal Zone was defined as a small wildlife corridor east of LaBelle, Florida, intended for protection to facilitate long-term movements of panthers out of South Florida and into potentially suitable habitats in Central Florida north of the Caloosahatchee River. Kautz et al. (2006) developed their spatially explicit habitat model based on adult and subadult panther (>2 years old; $n = 79$) radio telemetry records collected from 1981–2001 and concluded that the habitat zones had the capacity to support approximately 80–94 adult and subadult panthers, a population size determined by the authors to have a high probability of persistence for 100 years. The Primary Zone, however, is not the same as critical habitat within the meaning of the Endangered Species Act; there is no critical habitat designation for the Florida panther. Furthermore, given that Primary Zone habitat is comprised in part by land in private ownership, the fact that land is designated as Primary Zone habitat does not preclude development from occurring there.

15.    The habitat zones delineated by Kautz et al. (2006) and their assessment that these zones had the capacity to support a viable population of 80–94 panthers formed the basis for the current FWS framework used to assess impacts to panther habitat. While information now suggests that the density estimate used by Kautz et al. (0.91 panthers per 100 $km^2$; Maehr et al. 1991) is much lower than the range of densities reported today (1.37 to 4.03 panthers per 100 $km^2$; Sollmann et al. 2013, Dorazio and Onorato 2018, Onorato et al. 2020; see Section 6.1.4), research is ongoing to determine how best to assess impacts to panther habitat; thus, at this time, Kautz et al. represents the best available information, even if it is a more conservative estimate.

16.     Dr. Frakes opines that his 2015 habitat model identified the suitable breeding habitat that remains in southern Florida.  Frakes Decl. ¶ 12.  He further states that there is less panther habitat remaining than previously thought and, therefore, his team has recommended that all remaining breeding habitat in southern Florida should be maintained.  *Id*.  Dr. Frakes also states that his model is useful for evaluating the impacts of future development projects.  *See id*.  However, the areas of suitable habitat identified by Frakes et al. (2015) are largely coincident with the previously mapped panther Primary Zone (Kautz et al. 2006) with a few notable exceptions that are not included: the Water Conservation Areas included along the east side of the Primary Zone, Shark River Slough in the Everglades, and a narrow finger of habitat extending east from the Primary Zone along an existing levee. As we discuss below in the context of Dr. Frakes' comments related to the Bellmar project, we do not consider Frakes et al. (2015) South Florida model or the subsequent statewide model (Frakes & Knight 2021), which was based on Frakes et al. (2015), to constitute the best available science at present.  FWS currently considers Kautz et al. 2006 to be the best available science.

17.     FWS developed a panther habitat assessment methodology in 2006 and updated the methodology in 2009 for use in assessing the panther habitat values of sites proposed for development in the panther focus area ("PFA") (or consultation map area). The methodology is used to: 1) calculate the value of panther habitats in terms of panther habitat units (PHUs) on proposed development sites based on pre-development conditions; 2) calculate the value of panther habitats on the site post-development; and 3) calculate mitigation requirements. Recognizing that not all land cover types provide the same functional value as panther habitat, the FWS and FWC biologists developed a scoring system for major land cover types in South Florida based on the work of Kautz et al. (2006), Cox et al. (2008), and Land et al. (2008). Forest cover types have high

panther habitat values ranging from 9.0 to 9.5; agricultural lands, pasturelands, herbaceous wetlands, and dry prairie habitats have medium values ranging from 4.7 to 6.3; and water, urban lands, barren lands, salt marshes, mangrove swamps, and areas dominated by exotic vegetation have low values ranging from 0 to 3. The number of acres of each land cover type on a site prior to development is multiplied by its corresponding land cover score, and the results are summed to calculate the number of PHUs, a dimensionless metric of panther habitat value, on the site before development occurs. Similarly, the number of acres of each land cover type on the site post-development is multiplied by the corresponding land cover score, and the results are summed to calculate the number of PHUs on site post-development. The impact of the project on panther habitat is determined by the difference in PHUs on the site pre- and post-development. The amount of mitigation required is determined by applying what is called a "base ratio" to the number of PHUs of impact. As of December 2018, a base ratio of 1.98:1 is applied to all projects that occur within the Primary Zone, Secondary Zone, or Dispersal Zone of the PFA. Thus, the number of PHUs of impact for projects in these three PFA Zones is multiplied by 1.98 to determine the number of PHUs needed to mitigate impacts on panther habitats. However, if proposed projects are located in the Secondary Zone but mitigation occurs in the Primary Zone or Dispersal Zone, FWS allows for mitigation requirements to be reduced by a factor of 0.69 to encourage habitat conservation to be directed to regions of higher panther habitat value.

18.     The declaration of Dr. Frakes states that this methodology is flawed and should be revised. However, the calculation of PHUs has been used for many years by the Service, the U.S. Army Corps of Engineers, the State, and applicants. It has been determined to be the most appropriate method for evaluating how much mitigation is required to offset a specific amount of habitat loss. Again, research is ongoing and future efforts may provide a revised methodology, but

in relying on this methodology in assessing the Bellmar and Kingston projects, the Service used the best available information.

**Bellmar Project**

19.    The Applicant proposes to develop a mixed-use community on approximately 1,793.4 acres and preserve and enhance approximately 2,391.63 acres of native upland and wetland habitats. The FDEP sent a request for technical assistance to the Service regarding the Bellmar project on December 30, 2020. The Service sent its latest comments on October 31, 2023, as documented in the technical assistance memorandum.  Accordingly, the Service has been working with the State and the Applicant for almost three years to assess the effects of the action and ensure that any permit includes appropriate protective measures to minimize those effects. On November 6, 2023, public notice of the permit application was issued. A public meeting was held on December 7, 2023, and the public comment period closed on December 12, 2023.

20.    Land clearing and construction activities associated with the Bellmar project will result in the permanent loss of habitat for panthers, and their prey, of approximately 1,793 acres. According to the most current home range size estimates of the panther (Lotz et al. 2005), this loss represents 6.17 percent of a single female panther's average home range (29,059 acres) and 2.8 percent of a male panther's average home range (62,542 acres). Moreover, this loss represents 0.15 percent of the 1,202,699 acres of available rural private lands available to panthers in the Service's focus area south of the Caloosahatchee River. The project would avoid impacts to the majority of the existing native habitats. For example, the project would avoid impacts to the Camp Keais Strand, which is located on the Bellmar project's eastern boundary, and includes a buffer between the proposed development and Camp Keais Strand. The proposed site plan has been designed to minimize impacts to listed species by utilizing agricultural fields for development, thereby

preserving the majority of the natural wetland and upland habitats on-site. Priority has been given to preserving higher quality native vegetation that provides habitat for listed species. Approximately 94.2 percent (2,156.97± acres) of the wetlands on-site will be preserved. The proposal would establish approximately 2,392 acres of preserved lands, of which 2,372 will remain onsite for the panther.

21.    Dr. Frakes' declaration describes his South Florida Random Forest Panther model ("South Florida RFP model") (Frakes et al. 2015) and states that he applied it to the Bellmar project area. However, the South Florida RFP model described in Dr. Frakes' declaration employed grid cells of 1 km$^2$, a very large grid cell size relative to the resolution of many readily available GIS data layers in Florida. Many patches of functional panther habitat are smaller than this and are missed by this methodology. The use of grid cells this large could have the effect of over- or under-estimating the total area of panther habitat in south Florida due to the low resolution of the data. The justifications given for using 1-km$^2$ grid cells were to account for VHF-telemetry error of 120–230 m and because of an interest in modeling at a landscape scale. A grid cell size of 250 m (0.06 km$^2$), however, could have overcome the spatial error of the telemetry data and could have allowed for a resolution 16 times smaller than the resolution used in the study.

22.    The Frakes et al. (2015) model may have under-represented the value of panther habitats in some areas based on verified occurrence records of dens and adult females with dependent-aged kittens outside of areas mapped as "adult breeding habitat" (see Figure 6 5 and Figure 6 12 in Panther SSA Version 1.0). Verified occurrence records (e.g., VHF and GPS telemetry, roadkill locations, panther depredation locations, and verified sighting) of adult panthers and dependent aged kittens provide evidence that areas of South Florida, including areas immediately east of the Bellmar project site, provide habitat used by panthers, including breeding-

aged males and females, even though the Frakes et al. (2015) model delineated those areas as having a probability of presence value below 0.338. Dr. Frakes does not provide the probability of presence values for the post-development grid cells that fall below 0.338 based on his analyses. In light of these considerations, the Service does not consider the Frakes et al (2015) model to be the best available science at this time and does not use it when assessing effects and making recommendations for projects.

23.    As a conservation measure to benefit the survival and recovery of the panther, the Bellmar applicant will develop the lowest quality habitat (row crops) within the project area, and strategically restore and permanently protect 2,391.63 acres of currently unprotected habitat in areas where habitat connectivity can be maintained. The Applicant used the Service's Panther Habitat Assessment Methodology (2012) (described at length above) to determine the amount of panther habitat units (PHUs) needed to compensate for the panther habitat lost on the Bellmar project site. It is the Service's judgment that the PHUs provided by the onsite conservation, restoration, and preservation of the highest quality panther habitat available within the project area adequately compensates for the habitat lost to development of the Bellmar project.

24.    Additionally, the Bellmar project will result in increased vehicular traffic in the action area. While some level of take is reasonably certain to occur as a result of this increase in traffic, it should be noted that there is considerable uncertainty when correlating the number of panther deaths due to vehicle strikes to the overall population. This is because an increase in the number of panthers hit by cars may indicate an increase in the total number of panthers in the population and may not be attributable to a change in the volume of traffic. More specifically, factors such as panther population size and composition, individual animal behavior, habitat configuration, road design, driver behavior and others, all play a role in circumstances that lead to

a panther (or any species of wildlife) being hit by a car. As such, attributing panther mortality due to project induced traffic within 25 miles of the project area is challenging and fraught with uncertainty because the precise cause of future accidents cannot be known. Nonetheless, the Service used a model called the Traffic Impact Statement, which is among the best available scientific models, to provide an assumed estimate of how the traffic associated with the project may influence the panther population for the purpose of determining whether the project may jeopardize the panther population.

25.    The Traffic Impact Statement used by the Service includes background traffic (e.g. traffic that is the result of activity other than that attributable to the project under review) and traffic generated by the Bellmar project. It estimates the Bellmar project will increase traffic by 13% over 2015 background traffic. Range-wide, 226 panthers were killed by vehicle collisions from 2014 through 2022 (FWC 2023), with a yearly average of roughly 26 panther deaths. Over that same time period within the action area, 149 panthers were killed as a result of vehicle collisions, with a yearly average of 17 panther deaths. If the Service were to assume that traffic volume is directly correlated to the number of panthers killed by vehicle collisions, the 13 percent increase over current background traffic generated by the Bellmar project would add 3 (17*0.132=2.18, rounded to 3) panther deaths to the yearly average once construction is completed in 2042. For comparison, the forecasted 2042 background traffic without the project would add 13 (16.5*0.739=12.19, rounded to 13), and background plus project traffic would contribute 15 (16.5*0.871=14.4, rounded to 15) additional panther deaths. Said another way, our methods predict that an increase in background traffic would result in 13 panther deaths and an additional 3 would result from project related traffic by 2042 for a total of 16 additional panther deaths per year.

26.     Because of the uncertainties in describing the effects of traffic volume and speed on panther vehicle mortality ("PVM") outlined above, as well as any bias within the reporting of panther deaths, the Service expects that the calculation expressed above that three panther vehicle mortalities per year could be attributed to the increased traffic from the project is at the high end of anticipated panther vehicle mortalities from Bellmar project-generated traffic every year. To assist in reducing the threat of vehicle-related panther deaths, the Applicant has committed to fund and construct five wildlife crossings within the geographic region where this and proposed Rural Lands West project are located, including one just north of the project site on Oil Well Road. The wildlife crossings shall be constructed to provide and preserve a wildlife movement corridor. Additionally, the Applicant has committed to contribute to the Paul J. Marinelli Fund, which supports further land acquisition, corridor enhancement, and wildlife crossing installation outside of these permit requirements. In light of these measures, the Service is confident that the estimates of lethal incidental take as a result of motor vehicle collisions associated with the Bellmar project are on the high end and not likely to be exceeded.

27.     Despite the assertions in Dr. Frakes' declaration, the Service also considered the cumulative effects of the Bellmar project. The Service defines cumulative effects as the effects of future State, Tribal, local, or private actions that have the potential to affect Federally listed threatened and endangered species and are reasonably certain to occur in the project's action area. Federal actions unrelated to the proposed action are not considered cumulative effects because they require separate consultation pursuant to section 7 of the ESA. As we stated in our technical assistance memorandum, our projection of non-Federal actions (i.e., cumulative effects) in the action area incorporates Florida Land Use Cover and Forms Classification System (FLUCCS) mapping to decide if a property may be exempt from Federal Clean Water Act, section 404 wetland

regulatory review by the Corps or by FDEP. To assess if a development project would likely be exempt from regulatory review, the Service identified the percentage of the project site that was classified as wetland habitat based on FLUCCS 600 series (wetland), and the 411 and 419 (hydric pine flatwood) mapping unit classifications. Projects on properties with less than 5 percent wetlands were considered exempt from the Corps' regulatory review because impacts to wetlands could likely be avoided by project design.

28.    The Service finds that from 2017 through 2020, 554 projects in the action area affecting 7,967 acres were exempt from regulatory review. Therefore, the Service estimates that, in the action area, there is a potential impact to approximately 1,992 acres per year (7,967 acres/4 years = 1,992 acres per year) from projects that would be exempt from regulatory review.

29.    This level of development represents 0.1 percent of the non-urban private lands at risk of development in the Service's panther core area which covers 1,962,294 acres. In relation to the anticipated 2042 buildout of the proposed Bellmar project, non-Federal actions could develop approximately 43,823 acres without regulatory review. In conjunction with the Bellmar project, this would amount to 45,616 acres or 2.32 percent of the estimated 1,962,294 acres of non-urban private lands at risk of development in the Service's panther core area by 2042. In addition, the Service is aware of three other development projects under the State's Section 404 permitting process within the action area that, if approved, will convert approximately 11,977 acres of non-urban private lands (Kingston: 3081 acres; FFD: 2292 acres; Rural Lands West: 6603). In total, these Section 404 and non-Federal projects are expected to develop 57,593 acres or 2.93 percent of the estimated remaining non-urban private lands in the panther core area over the next two decades. However, it is important to note that the Section 404 projects mentioned above propose to conserve in perpetuity 9,849 acres (Kingston: 3,272 acres; FFD: 2,916 acres; Rural Lands West:

3,661 acres), likely removing that subset from risk of development. In addition, development of these Section 404 projects is expected to reduce the likelihood that smaller, non-Federally reviewed actions will be needed to meet the commercial and residential needs of the rapidly growing human population in this area, growth that will occur regardless of whether these Section 404 projects are authorized.

      **30.**    After considering the status of the Florida panther, both the minimization measures and the adverse effects of the proposed project, and any potential cumulative effects, the Service determined that the Bellmar Project as proposed is not likely to jeopardize the continued existence of the Florida panther. As stated in our technical assistance memorandum, the Service based this finding on the following: 1) Due to their mobility and large home ranges, panthers are not expected to be killed or injured during land clearing associated with the project's development and restoration activities; 2) Although 1,793 acres currently used by the panther and their prey will be permanently lost, this acreage represents a small portion (0.15 percent) of panther habitat available in south Florida. Also, the loss of 1,793 acres of panther habitat is a small percentage of a female (6.17 percent) and male (2.8 percent) panther territories; 3) The small reduction in panther habitat from the project is not expected to significantly increase the potential for intraspecific aggression among panthers in the action area; 4) The loss of this habitat is expected to be minimized by the restoration and permanent preservation of 2,372 acres of habitat that will remain available to the panther onsite; 5) The potential increase in vehicle-related panther deaths from project-generated traffic is expected to be minimized through the Applicant's funding of wildlife crossings on area roads and increased understanding and maintenance of permanent wildlife corridors; 6) While our estimated increase in panther mortality due to vehicle strikes does not exceed the approximate population growth rate of nine panthers a year, the Service does not expect the actual number of

panthers killed by vehicles as a result of this project to reach the estimated value for the reasons stated above. The Service will rely on monitoring the number of vehicle collisions with panthers and, in coordination with State agencies, take steps necessary to reduce this number if it exceeds the annual current average of three panthers per year within the action area. These steps can include construction of additional fencing, recommending installation of additional crossings, recommending reducing speed limits, adding signage or other methods to increase driver awareness. Further, if take is exceeded, it could trigger FDEP reopening the permit consistent with the terms and conditions in the Service's Biological Opinion. Expected build out for these developments exceeds 10 years. Each permit must be renewed every 5 years until the project is completed.

31.    Incidental take of Florida panther from the Bellmar project beyond the figures stated above is the only incidental take that is not prohibited.  Any take in excess of the stated figure is neither authorized nor exempt from liability.

**Kingston Project**

32.    The Applicant proposes to develop a mixed-use community on approximately 3,403.2 acres and preserve and enhance approximately 3,273.62 acres of native upland and wetland habitats. The FDEP submitted a technical assistance request for the Kingston project on July 7, 2022.  The Service provided its latest comments on October 26, 2023.  Accordingly, the Service has been working for over a year to assess the effects of the action and recommend that appropriate protective measures be included in any permit to minimize those effects. Public notice of the application was issued on November 20, 2023.  A public meeting is scheduled for January 16, 2024.

33.    The proposed Kingston project incorporates the conversion of approximately 3,400 acres of panther habitat to commercial and residential development, as well as the conservation and restoration of approximately 3,273.62 acres of habitat. According to the most current home range estimates of the panther (Lotz et al. 2005), this permanent loss of 3,400 acres represents 11 percent of a single female panther's average home range (29,059 acres) and 5 percent of a male panther's average home range (62,542 acres). Moreover, this loss represents 0.28 percent of the 1,200,906 acres of available non-urban private lands available to panthers in the Service's PFA south of the Caloosahatchee River.

34.    In addition to habitat loss and disturbance, the Kingston project will result in increased vehicular traffic in the action area and an increase in PVM is expected. As described above, while some level of take is reasonably certain to occur as a result of this increase in traffic, it should be noted that there is considerable uncertainty when calculating that increase and correlating the number of panther deaths due to vehicle strikes to the overall population. Historically, predictions have been made at the road segment level using the Future Roadkill Estimation Method ("FREM") which consists of a simple mathematical calculation equating the ratio of baseline to future Annual Average Daily Traffic ("AADT") to the ratio of baseline to future PVM. The FREM formula, however, is overly simple and not based on fit of a statistical model to observed data. Instead, it is a mathematical formula assuming the ratio of future to current PVMs is equal to the ratio of future to current AADT for each road segment. This can result in predictions that are too low:  if a segment has 0 current PVM then it will always be predicted to have 0 future PVM regardless of how much AADT increases; and also predictions that are unrealistically high for large increases in AADT for segments with previous PVMs. While theoretically it makes sense that the "risk" of seeing a mortality on a road segment would increase with increasing traffic, there

are so many variables to consider that it is not straightforward to turn an increased risk into a future predicted count. Accordingly, we utilized the Monte Carlo computer simulation to approximate sources of uncertainty associated with the FREM-calculated number. Rather than focusing on the single point estimate of the number of panthers that could be killed by project-generated traffic every year, we attempted to reasonably represent uncertainty with an estimate.[1]

35.    Range-wide, 226 panther mortalities due to vehicle collisions were reported from 2014 through 2022 (FWC 2023), with a yearly average of roughly 26 (226 panthers/9 years=25.1 rounded to 26) panther deaths. Over that same period within the action area, 143 panthers were killed as a result of vehicle collisions, with a yearly average of 16 panther deaths. If one were to assume that traffic volume is directly correlated to the number of panthers killed by vehicle collisions, the anticipated 98.68 percent increase over current background traffic generated by the project would add 16 (16*0.9868=15.78, rounded to 16) panther deaths to the yearly average upon project buildout. For comparison, the forecasted 2045 background traffic without the project would add 43, and 2045 background plus project traffic would contribute 59 additional panther deaths. Because of the uncertainties in describing the effects of traffic on panther mortality, time lag of the predicted change in traffic volume, as well as any bias in the reporting of panther deaths, the Service expects this calculation contains substantial uncertainty. Moreover, the Applicant's commitment to fund wildlife crossings on area roads and the increased maintenance of permanent

---

[1] We determined it was not necessary or appropriate to use this simulation for the Bellmar project. The Bellmar project occurs in an area with existing development and traffic. The single point number in its analysis was found reasonable given the density of panthers, and the nature and scope of the project. Kingston, however, is within an area without existing traffic and development. The single number produced in its analysis after accounting for the increase in traffic was determined unreliable based on the likely density of panthers within the action area. For this reason, the Service determined it was appropriate to re-evaluate and capture the uncertainty.

wildlife corridors is expected to minimize the likelihood of panther mortalities, both of which increase the likelihood that the calculation overestimates the potential for mortality.

36.    After utilizing the Monte Carlo computer simulation to incorporate reasonable uncertainty in the inputs for the reasons described above, a 99% interval is 3 to 22, and a 95% interval from 4 to 20. Therefore, based on the quantitative analysis and for the purposes of estimating impacts to panthers, we assume the Kingston project could result in the loss of 4 to 23 panthers per year and slightly fewer in each subsequent year once construction noise and habitat removal has been completed.  While Dr. Frakes criticizes this approach, we determined it more responsible given the many considerations than taking the point estimate of 16 panthers annually as if it has no uncertainty associated with it, even if deemed conservative. Further, the Service further expects that the recommended avoidance and minimization measures identified in the technical assistance memorandum make it unlikely that lethal take will occur at the upper bound expressed here.

37.    The Service also considered cumulative effects of the Kingston project based on the approach described above for the Bellmar project. In total, the Service determined the Section 404 and non-Federal projects are expected to develop 62,821 acres or 3.2 percent of the estimated remaining non-urban private lands in the panther core area over the next two decades. However, if approved, the Section 404 projects mentioned above propose to permanently conserve 8,969 acres (Bellmar: 2,392 acres; FFD: 2,916 acres; Rural Lands West: 3,661 acres), removing the risk of development in those conserved areas. In addition, development of these proposed Section 404 projects is expected to reduce the likelihood that smaller, non-Federally reviewed actions will be needed to meet the commercial and residential needs of the rapidly growing human population in this area, growth that will occur regardless of whether these section 404 projects are authorized.

The Service believes the conservation measures proposed to be included in these Section 404 projects have the potential to provide greater benefits to panthers compared to non-Federally reviewed projects because they propose to include measures to maintain high quality habitats that are connected, install fencing and crossings to reduce roadway mortality, and are planned to reduce human and wildlife conflicts.

38.    The declaration of Dr. Frakes expresses concern that development would fragment connectivity to Corkscrew Regional Ecosystem Watershed and other environmentally valuable lands; not enough habitat will be acquired, restored, and protected; and the required conservation measures will not be implemented.[2]   We acknowledge that some panther habitat will be lost but the proposed conservation measures to be required by the applicant minimize and mitigate the loss. The ESA does not require "no net loss" as Dr. Frakes contends.  Rather, the Service asks whether the loss will jeopardize the species. Further, connectivity is maintained by virtue of the design plan and installation of crossings that reduce the likelihood of panthers and other wildlife being struck by vehicles.

39.    With respect to Dr. Frakes' concerns regarding implementation of conservation measures, both the Bellmar and Kingston project applicants have established mechanisms to provide financial contributions to acquire, manage, and restore panther habitat as well as assist in installing fencing and crossings to reduce the likelihood of vehicle collisions with panthers and other wildlife.  Funds will be deposited at the rate of $350 for every developed acre and financial

---

[2] Dr. Frakes' declaration states that he used the habitat model described by Frakes and Knight (2021) for assessing impacts of the Kingston project on the panther, and the methods for using the model to predict impacts to adult panther habitat were the same or similar to Frakes (2018 impacts) and his analysis of Bellmar. Since Frakes and Knight (2021) is a statewide version of the South Florida RFP model, we do not use it for the same reasons discussed in the context of the Bellmar project.

contributions of $200 for every building permit and $200 for every dwelling sold will be required in perpetuity. The Service will have the opportunity to provide input on the best use of these funds to promote panther conservation in key places to achieve conservation priorities. Further, for the Kingston project, the applicant will contribute approximately $20,000,000 to the Lee County Proportionate Share Fee fund for Corkscrew Road roadway improvements inclusive of pavement widening, flow-way culverts, and wildlife crossings. They will also, at their sole cost and expense, construct a large wildlife crossing along the four-lane spine road. This location was coordinated with the Florida Wildlife Federation and will provide and preserve a wildlife movement corridor between conservation lands located east and west of the property. Additionally, 12 small wildlife crossings shall also be constructed within the Project to maintain intra-preserve connectivity and hydrologic flow throughout the Project.

40.     Thus, after considering the status of the Florida panther, both the minimization measures and the adverse effects of the Kingston project, and any potential cumulative effects, the Service determined that the Kingston project as proposed is not likely to jeopardize the continued existence of the Florida panther. The Service based this finding on the following: 1) Due to their mobility and large home ranges, panthers are not expected to be killed or injured during land clearing associated with the project's development and restoration activities; 2) Although 3,400 acres currently used by the panther and their prey will be permanently lost, this acreage represents a small portion (0.28 percent) of panther habitat available in south Florida. Also, the loss of 3,400 acres of panther habitat would reduce carrying capacity in this area for between 1.8 to 0.55 panthers depending on panther densities of between 1.37 and 4.03 panthers per 100 square kilometers; 3) The small reduction in panther habitat from the project is not expected to affect more than 2 panthers via intraspecific aggression because of the small proportion of any individual panther's

home range that will be impacted in the action area; 4) The loss of this habitat is expected to be minimized by the restoration and preservation of 3,273.62 acres of habitat that will remain available to the panther onsite. In the absence of the project, this retention of habitat is not certain and would likely occur in smaller dispersed areas as non-Federally reviewed urbanization would occur in this area over time; 5) This project is located in an area where panther movement to the north is limited by existing development and is not crucial to the anticipated range expansion. This area serves as somewhat of a sink for the panther population as a whole and other intact habitat areas of public conservation lands further to the south will continue to support the existing panther population. Further, the habitats occupied by panthers in the Corkscrew Regional Ecosystem watershed will become even more isolated in the future as the result of human population growth in southern Lee County and northwestern Collier County independent of the Kingston project; 6) The potential increase in vehicle-related panther deaths from project-generated traffic is expected to be minimized through the Applicant's funding of wildlife crossings on area roads and increased understanding and maintenance of permanent wildlife corridors; 7) While the upper end of the estimated increase in panther mortality due to vehicle strikes exceeds the approximate population growth rate of eight panthers a year, the Service does not expect the actual number of panthers killed by vehicles to reach the estimated value of between 3-22 mortalities each year for the reasons stated above. As stated in our technical assistance memorandum, we will monitor the number of vehicle collisions with panthers and, in coordination with the State agencies, take steps necessary to reduce this number if it exceeds the annual current average of 16 panthers per year within the action area. These steps can include construction of additional fencing, recommending installation of additional crossings, reducing speed limits, adding signage or other methods to increase driver awareness. Additionally, as discussed above, if take is exceeded, it could trigger FDEP reopening

the permit consistent with the terms and conditions in the Service's Biological Opinion. Expected build out for these developments exceeds 10 years. Each permit must be renewed every 5 years until the project is completed.

41.    Incidental take of Florida panther from the Kingston project beyond the figures stated above is the only incidental take that is not prohibited.  Any take in excess of the stated figure is neither authorized nor exempt from liability.

**Audubon's Crested Caracara Analysis**

**Bellmar Project**

42.    The action area for the Audubon's crested caracara (caracara) is the entire 5,105.49-acre Bellmar project site. The Service is aware that Dr. Morrison criticized the absence of any discussion of population estimates in its technical assistance memorandum.  However, the Service did not deem it necessary to discuss population estimates for the caracara due to the limited nature of anticipated take.  As explained below, the Service does not anticipate incidental take from injury or mortality.  The only anticipated incidental take is the temporary loss of reproductive success for one breeding pair.

43.    Approximately 1,440.33 acres of suitable caracara habitat will be converted to development. Of the 1,440.33 acres, approximately 1,424.02 acres is current cropland and only 16.31 acres is dry prairie and pasture. As explained in the Service's technical assistance memorandum, the nature of the cropland shifts seasonally and is used opportunistically by the species.  For example, caracara may increase usage of the cropland during tilling as the activity can expose many potential prey items.  Conversely, caracara may reduce activity levels in this area during crop production in avoidance, irrigation, and intensive human activity during harvesting, or when fields are fallow. Caracara home ranges are known to vary from approximately 1,000

acres to approximately 5,000 acres, depending on habitat suitability and proximity to other caracara territories (Morrison 2001). To account for this variation in home range size and lack of more specific data, the Service used an average home range of approximately 3,000 acres for our analysis. Accordingly, the development of 1,440.33 acres would constitute a loss of 48 percent of an average caracara territory.

44.     In evaluating how an action may affect caracara, the Service primarily considers the amount of land clearing and construction that will occur in the context of the overall area caracara are known to occupy.  This is a common approach and application of that approach here shows that the loss is minor compared to the remaining available habitat.  Within the consultation area of the caracara, approximately half (about 6.1 million acres) is natural lands in conservation. We acknowledge that these conservation lands are not all suitable for use or occupation by caracara, and land cover as well as caracara use of "non-preferred" habitat is in constant flux. Therefore, if we conservatively estimate that only 10% of these conservation lands are usable by caracara, the Bellmar project would account for 0.24% of what habitat is available.  When we consider the expectation that the majority of caracara habitat is privately owned, the percentage lost is further reduced.  To provide more context, it was estimated in Root and Barnes (2007) (as referenced in the Service's most recent 5-year review) completed in 2009) that 864.4311 square kilometers (213,605.57 acres) of suitable habitat was available in the core area (Kissimmee Prairie region) alone.  The core area is comprised of 5 counties out of the 28 counties where caracara are known to occur.  Using only the amount of habitat identified in the core area, the Bellmar project footprint would account for a 0.67% loss in overall habitat.  As this calculation considers only a subset of available habitat, and the caracara and habitat loss addressed in Bellmar are located outside the core area (that is, we know suitable habitat exists elsewhere), the Service expects that

the estimate of <1% loss of overall habitat is a reasonable calculation.  Based on a less than 1% loss of overall habitat, it was determined that the Bellmar project would not jeopardize the survival or recovery of the species.

45.     The Bellmar project footprint consists of varying amounts of suitable caracara habitat, and the Service determined the development footprint was located within the expected territory of a caracara pair.  Based on these facts, the Service found that take of this caracara pair was reasonably certain to occur as a result of the project.  Minimization measures were developed and will be added as conditions to any permit that may be issued.  These minimization measures ensure that an active caracara nest would not be destroyed or disturbed, largely eliminating the risk of injury or mortality.  However, it was determined that the loss of approximately 1,440.33 acres of suitable caracara habitat could significantly impair the ability of these caracara to breed, feed, and/or shelter.  Therefore, take of caracara is expected to occur in the form of harm because of habitat loss, with a potential loss in reproductive success of the resident pair for the breeding season following the conversion of the 1,440.33 acres.  The loss of reproductive success during the one breeding season is expected to represent the upper limit of take as we anticipate that this pair uses suitable habitat offsite and is accustomed to shifting its use of the 1,440.33 acres onsite in response to agricultural use change/presence of people and machinery.

46.     Thus, the only incidental take of caracara from the Bellmar project is the temporary loss or failed reproduction of one caracara pair.  No other incidental take is anticipated and any take in excess of the stated figure is not authorized or exempt from liability.

47.     Surveys in 2020 and 2022 indicated that there were individual active nests on the Bellmar project site during each of those years.  Those nests were determined to be inactive in 2023, and a different nest was found offsite to the north.  It is reasonable to assume that the same

caracara breeding pair has used these three different nesting sites and further reasonable to conclude that this breeding pair does not demonstrate fidelity to any one tree. While Dr. Morrison refers to the "loss" of a tree, the tree hosting the nest found in the 2023 survey is not slated for removal because it is outside the project footprint. As noted above, should nests be found on the project footprint in future surveys, the Service recommended permit conditions designed to ensure any land clearing would not occur during nesting season for trees in the species' primary zone and would not occur within 300 meters of any tree hosting a nest until monitoring has determined that the nest has been abandoned or chicks within the nest have fledged and left the nest site.

48.    The effects of this action on caracara are not expected to extend beyond the proposed project's footprint; therefore, no additional cumulative effects are included in this analysis. Dr. Morrison points to "a number of land conversion projects" for which the Service has authorized incidental take and appears to assert they should have been considered in the context of the Bellmar project. The projects identified in the attachment to Dr. Morrison's declaration have been reviewed by the Service, each receiving an incidental take statement through biological opinions; they do not involve State Section 404 permit applications. The nearest of these projects is more than 10 miles away from the Bellmar project footprint. Assuming an average territory size of 3,000 acres, no overlap, and occupation of all suitable habitat by caracara, there could be 8 caracara territories between the nearest project and Bellmar. Because of the distance, the effects of these projects and Bellmar are not interrelated. Nevertheless, if we consider the loss of habitat of the projects Dr. Morrison references (29,125 acres) in comparison to just the habitat available in the core area (213,605.57 acres) (which none of these projects, including Bellmar and Kingston, are in), the Bellmar project constitutes a 0.78% [1,440.33/(213,605.57-29,125) = 0.0078] loss in habitat.

49.     After considering the status of the caracara, both the mitigation measures and the adverse effects of the proposed project, and any potential cumulative effects, the Service determined that the project as proposed is not likely to jeopardize the continued existence of the caracara. The Service based this finding on the following: 1) Disturbance from site preparation and construction activities is anticipated to cause caracara to permanently shift their territory; however, as these caracara likely shift territories with some regularity, the Service expects the caracara to acclimate and resume normal behavior following the first year. A reduction in breeding success during this time would occur, but abandonment of this territory by caracara is not anticipated; 2) The reduction of the breeding success is only expected for a short period, while birds adjust, and given that all suitable caracara habitat is believed to be saturated, this loss in breeding is expected to have minimal effect on the overall population; 3) The permanent loss of approximately 1,440.33 acres of suitable caracara habitat will likely lead to increased competition for suitable foraging habitat and a reduction in nest productivity, but as discussed above the loss in breeding is not expected to adversely affect the overall population to a significant degree; and 4) The habitat loss (1,440.33 ac) is a small reduction in the overall range of the species.

50.     Further, the Service identified avoidance and minimization measures to minimize and mitigate the effects of this project on the caracara.  While Dr. Morrison criticizes the sufficiency of those mitigation measures, they are designed to minimize disturbance to the species. Caracara are at most risk of disturbance during nest building, incubation of eggs, and support of nestlings.  Once nesting season activities are complete, disturbance typically results only in temporary avoidance of the immediate area and is not expected to appreciably impair the species ability to feed or shelter.  Accordingly, the Service recommended the inclusion of a permit condition that would require land clearing activities to occur outside of nesting season (which runs

from January 1 to April 30). This recommendation is reasonable given the importance of nesting season activities and the manner in which caracara typically respond to disturbance during the remainder of the year. Further, if a caracara primary zone. (i.e., a 300 meter buffer encircling an active nest tree) is impacted immediately following breeding season, the Service recommended that a comparable area within the pair's territory be restored.

51.     Dr. Morrison also criticizes the Service for not requiring equivalent habitat replacement elsewhere that is sufficient to create a new breeding territory. But neither the Bellmar project nor the Kingston project are likely to result in the complete loss of an average caracara territory. Under these circumstances, the Service did not deem compensatory mitigation of the sort identified by Dr. Morrison to be necessary.

**Kingston Project**

52.     The Applicant proposes to develop a mixed-use community on approximately 3,403.2 acres and preserve and enhance approximately 3,273.62 acres of native upland and wetland habitats. Through these actions, approximately 3,233.36 acres of suitable caracara habitat will be converted to development. Of the 3,233.36 suitable habitat acres to be developed, approximately 3,217.81 acres is current citrus grove in various stages of production. Caracara home ranges are known to vary from approximately 1,000 acres to approximately 5,000 acres, depending on habitat suitability and proximity to other caracara territories (Morrison 2001). As discussed above, to account for this variation in home range size and lack of more specific data, the Service used an average home range of approximately 3,000 acres for our analysis. Based on the results of the caracara survey, known nest location, observations of adult caracara, and average home range sizes, the project site could support portions of six caracara territories. Accordingly, the development of 3,233.36 acres would constitute a complete loss of an average caracara territory.

However, this conversion of habitat is expected to occur across the Kingston project footprint and is not anticipated to be located within any one caracara territory. Nevertheless, this habitat loss could result in increased intraspecific aggression with adjacent caracaras as the pair(s) move to neighboring territories in search of forage and nesting sites. This aggression and/or decrease in foraging area could also ultimately result in a lower reproductive potential.

53.    In addition to habitat loss, the Service anticipates the noise and activity from personnel and vehicles during site preparation and construction would disturb foraging or nesting caracara, potentially leading birds to change their behavior and abandon a foraging or nesting area. The degree of disturbance is related to the distance of these activities from the nest, as well as the nesting pairs' tolerance to human activities. Adverse effects could range from abandoning a nesting attempt, if construction is close to the nest during breeding season, to general avoidance of the area for foraging. Therefore, the Service recommended a permit condition requiring that a 984-foot exclusion buffer be maintained around an active nest.  This is expected to reduce the risk that caracara will abandon a nest attempt; however, avoidance of the project site for foraging could still adversely affect the breeding pair through lowering the adult fitness and/or reproductive success of a nest (via lower adult fitness or decreased food availability for young).  Because the Service expects the caracara that use the Kingston project site also utilize suitable habitat offsite, it is anticipated that these caracara may be less disturbed by noise, equipment, and human activity. Furthermore, the suitable caracara habitat onsite will be ultimately converted to development, eliminating suitability for use by caracara. Therefore, the effect of disturbance is expected to be superseded by the habitat loss described above.

54.    The only incidental take of caracara from the Kingston project is the temporary loss or failed reproduction of one caracara pair.  No other incidental take is anticipated and any take in excess of the stated figure is not authorized or exempt from liability.

55.    The effects of this action on caracara are not expected to extend beyond the proposed Kingston project's footprint; therefore, no additional cumulative effects are included in this analysis.

56.    After considering the status of the caracara, both the mitigation measures and the adverse effects of the proposed Kingston project, and any potential cumulative effects, the Service determined that the Kingston project is not likely to jeopardize the continued existence of the caracara. The Service based this finding on the following: 1) Disturbance from site preparation and construction activities is anticipated to cause caracara to permanently shift their territory; however, as these caracara likely use suitable habitat offsite, we expect the caracara to acclimate and resume normal behavior following the first year.   A reduction in breeding success during this time would occur, but abandonment of this territory by caracara is not anticipated; 2) The reduction of the breeding success is only expected for a short period, while birds adjust, and given that all suitable caracara habitat is believed to be saturated, this loss in breeding is expected to have minimal effect on the overall population; 3) The permanent loss of approximately 3,233.36 acres of suitable caracara habitat will likely lead to increased competition for suitable foraging habitat and a reduction in nest productivity, but as discussed above, the loss in breeding is not expected to adversely affect the overall population to a significant degree; 4) The habitat loss (3,233.36 acres) is small reduction in the overall range of the species.

57.    As described above, FWS has provided extensive technical assistance to FDEP through the species coordination process for the Bellmar and Kingston projects for both the Florida

panther and the caracara.  FWS stands ready to provide additional assistance to FDEP as the State agency considers comments provided by the public and until it makes a final determination on the permit applications.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   January 12, 2024

ROBERT CAREY
Digitally signed by ROBERT CAREY
Date: 2024.01.12 13:25:28 -05'00'

Robert Carey
Manager, Division of Environmental Review
Florida Ecological Services Field Office
U.S. Fish and Wildlife Service

33