**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.

              Plaintiffs,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.

              Defendants,

STATE OF FLORIDA, ET AL.

              Intervenors.

**CASE NO.** 1:21-cv-00119 (RDM)

---

**STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL
PROTECTION'S OPPOSITION TO MOTION FOR A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

---

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................1

LEGAL & FACTUAL BACKGROUND ...........................................................................5

    I.      Litigation History ........................................................................... 5

    II.    Implementation Of Florida's 404 Program And Species Review Process ............. 8

        A.     Origins Of The Consultation Approach Used In Florida .............................8

        B.     Technical Assistance Process In The Florida-Led Process.......................11

        C.     Comparability Of Species Protections Under The Corps-Led And Florida-Led Programs ..............................................................................13

        D.     Florida's Track Record Of Successful Species Protection Efforts ...........14

    III.   Florida's Efforts To Conserve The Florida Panther And Crested Caracara ......... 15

        A.     Florida Panther .........................................................................................15

        B.     Audubon's Crested Caracara .....................................................................16

    IV.   Status Of Bellmar Villages And Kingston Permit Applications.......................... 17

        A.     Bellmar Villages Project ...........................................................................17

        B.     Kingston Project........................................................................................20

        C.     Timing and Nature of FDEP Action on Bellmar and Kingston Applications ...............................................................................................21

ARGUMENT ......................................................................................................................22

    I.      Movants Seek Emergency Relief Unavailable In This Court. .............................. 22

    II.    Even If Movants Could Overcome This Identified Jurisdictional Defect, They Cannot Meet The High Burden Required For Extraordinary Relief To Enjoin A State Agency Administrative Process. ............................................ 27

        A.     Movants' Are Not Likely To Succeed On The Merits Of The APA Record Review Challenge To EPA's Approval Of Florida's 404 Program ....................................................................................................27

             1.     Movants' Attempt To Manufacture Standing In Order To Seek Emergency Relief In Federal Court For A State Permit Application Should Be Rejected. ......................................27

             2.     Previous Briefing And Oral Argument Show That Movants Are Unlikely To Succeed As To The Merits And Justiciability Of Claims 2, 3, 4, 6, 10 And 13...............................31

i

3.      Movants Are Unlikely To Succeed On The Merits As To
         Any *Remedy That Directly Enjoins Specific State 404
         Permit Applications*. ......................................................................31

B.      Movants Will Not Suffer Irreparable Harm From Denial Of The
         TRO And PI ..............................................................................................33

1.      Since The State Permitting Process Is Not Yet Complete,
         There Is No Imminent Threat Of Irreparable Harm........................34

2.      Movants' Three Year Delay In Filing Its Request For
         Preliminary Injunctive Relief Undercuts Their Claims Of
         Irreparable Injury .........................................................................36

3.      Since The State 404 Permitting Process Has The Same Or
         More Rigorous Species Requirements Than The Federal
         Permitting Process, There Is No Threat Of Irreparable
         Harm. ............................................................................................38

C.      Balance Of Equities And The Public Interest Do Not Favor
         Emergency Relief .....................................................................................43

CONCLUSION .........................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aamer v. Obama,*
    742 F.3d 1023 (D.C. Cir. 2014) ............................................................27

*Agrico Chem. Co. v. Dep't of Env't Regul.,*
    406 So. 2d 478 (Fla. 2d DCA 1981) ..................................................29, 30

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) ............................................................32

*Am. Forest Res. Council v. Williams,*
    No. 21-601, 2021 WL 4819846 (D.D.C. Oct. 13, 2021) ......................37

*Am. Paper Inst., Inc. v. EPA,*
    890 F.2d 869 (7th Cir. 1989) ..............................................................25

*Amoco Prod. Co. v. Gambell,*
    480 U.S. 531 (1987).............................................................................43

*Chaplaincy of Full Gospel Churches v. Eng.,*
    454 F.3d 290 (D.C. Cir. 2006) ............................................................34

*Chesapeake Bay Found., Inc. v. Va. State Water Control Bd.,*
    495 F. Supp. 1229 (E.D. Va. 1980) ....................................................26

*Cobell v. Norton,*
    391 F.3d 251 (D.C. Cir. 2004) ............................................................27

*Conserve SW. Utah v. U.S.Dep't of Interior,*
    No. 1:21-cv-01506-ABJ, 2023 WL 792285, Mem. Op. (D.D.C. Nov. 16,
    2023) ....................................................................................................32

*Consol. Edison Co. v. N.Y. State Dep't of Env't. Conservation,*
    726 F. Supp. 1404 (S.D.N.Y 1989)......................................................26

*Cooling Water Intake Structure Coal. v. EPA,*
    898 F.3d 173 (2d Cir. 2018), amended, 905 F.3d 49 (2d Cir. 2018) ..................9, 10

*Defs. of Conewango Creek v. Echo Devs., LLC.,*
    No. CIV.A. 06-242 E, 2007 WL 3023927 (W.D. Pa. Oct. 12, 2007)................25, 36

*District of Columbia v. Schramm,*
    631 F.2d 854 (D.C. Cir.1980) ......................................................2, 23, 25

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
    878 F.3d 371 (D.C. Cir. 2017) .................................................................................28

*Fla. Home Builders Ass'n v. Dep't of Labor and Emp't Sec.*,
    412 So. 2d 351 (Fla. 1982)......................................................................................29

*Friends of Crystal River v. EPA*,
    794 F. Supp. 674 (W.D. Mich. 1992), *affirmed by* 35 F.3d 1073 (6th Cir.
    1994) ........................................................................................................................26

*Gen. Motors Corp. v. EPA*,
    168 F.3d 1377 (D.C. Cir. 1999) .................................................................24, 25, 27

*Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) .................................................................................27

*Idaho Conservation League v. EPA*,
    820 F. App'x 627 (9th Cir. 2020) ...........................................................................32

*Kobell v. Suburban Lines*,
    731 F.2d 1076 (3d Cir. 1984)...................................................................................37

*Legal Env't Assistance Found. v. Fla. Dep't of Env't Prot.*,
    702 So.2d 1352 (Fla. 1st Dist. Ct. App. 1997).................................................29, 30

*Marino v. Nat. Oceanic & Atmos. Admin.*,
    33 F.4th 593 (D.C. Cir. 2022) .................................................................................41

*McClash v. Manasota-88, Inc.*,
    No. 14-4735, 2015 WL 3966050 (Fla. Div. Admin. Hr'g June 25, 2015) .......29, 30

*Munaf v. Geren*,
    553 U.S. 674 (2008)................................................................................................27

*Nat. Res. Def. Council, Inc. v. Outboard Marine Corp.*,
    702 F. Supp. 690 (N.D. Ill. 1988) ..........................................................................26

*Nat'l Assoc. of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007)........................................................................................8, 9, 32

*Nken v. Holder*,
    556 U.S. 418 (2009)................................................................................................43

*Rose Acre Farms, Inc. v. N.C. Dep't of Env't & Nat. Res.*,
    131 F. Supp. 3d 496 (E.D.N.C. 2015).....................................................................25

*Shell Oil Co. v. Train*,
    585 F.2d 408 (9th Cir. 1978) ..................................................................................25

*Sierra Club v. U.S. Army Corps of Eng'rs,*
  2005 U.S. Dist. LEXIS 36385 (D.N.J. 2005) ........................................................37

*Sierra Club v. U.S. Fish & Wildlife Serv.,*
  No. 2:20-CV-13-SPC-NPM, 2023 WL 7188933 (M.D. Fla. Nov. 1, 2023)......................39, 40

*Sierra Club v. Van Antwerp,*
  526 F.3d 1353 (11th Cir. 2008) ..........................................................40

*Sugar Cane Growers Co-op. of Fla. v. Veneman,*
  289 F.3d 89 (D.C. Cir. 2002) .............................................................4

*Tough Traveler, Ltd. v. Outbound Prods.,*
  60 F.3d 964 (2d Cir. 1995)................................................................37

*W. Watersheds Project v. Bernhardt,*
  468 F. Supp. 3d 29 (D.D.C. 2020) ...............................................3, 28, 36

*Weinberger v. Romero-Barcelo,*
  456 U.S. 305 (1982).................................................................32, 43

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)........................................................4, 27, 33, 34, 43

**Statutes**

16 U.S.C. § 1536(a)(2)..................................................................10

16 U.S.C. § 1536(b)(4)(C) ..............................................................10

16 U.S.C. § 1539(a)(1)(b) ..........................................................10, 11

28 U.S.C. § 1331.......................................................................25

33 U.S.C. § 1251(b)....................................................................24

33 U.S.C. § 1344(j)....................................................................35

Fla. Stat. ch. 120 .....................................................................30

Fla. Stat. § 120.52(13)................................................................29

Fla. Stat. § 120.57 ...............................................................29, 30

Fla. Stat. § 403.412(5)............................................................28, 30

Fla. Stat. § 403.412(5)............................................................28, 30

Fla. Stat. § 403.412(7)................................................................29

**Regulations**

40 C.F.R. § 233.20(b), 233.50 .................................................................................35

40 C.F.R.§ 233.20(b), 33.50 ....................................................................................35

50 C.F.R. § 402.14(i)(1)(i) ......................................................................................39

50 C.F.R. § 402.14(i)(5) ..........................................................................................11

**Other Authorities**

118 Cong. Rec. 33761 (1972) ..................................................................................24

85 Fed. Reg. 30953 (May 21, 2020) ..........................................................................8

85 Fed. Reg. 57853 (Sept. 16, 2020) .........................................................................8

## INTRODUCTION

The State of Florida and the Florida Department of Environmental Protection (FDEP) (collectively, "Florida Intervenors") oppose the motion for a temporary restraining order and preliminary injunction (Motion) filed by Sierra Club and Center for Biological Diversity (collectively, "Movants"). This Court should reject Movants' attempt to cut short ongoing agency review processes for two permit applications: the "Bellmar Villages Project" (which has been under review by FDEP since late 2020) and the "Kingston Project" (which has been under review by FDEP since 2022).

The Motion is an improper attempt to force this Court to adjudicate state-administered Clean Water Act (CWA) permits, which is contrary to D.C. Circuit precedent. State permit actions are not subject to review under the federal Administrative Procedure Act (APA). It is also an improper attempt to force this Court to *preliminarily* block federal approval of Florida's CWA Section 404 Program *several years after* that action was fully implemented, which too is contrary to D.C. Circuit precedent. In early 2021, just a few days after filing the Complaint, Plaintiffs urged the Environmental Protection Agency (EPA) to "stay" its approval of Florida's program. Dkt. 31-1 at 107. They never asked this Court for that relief, until now, when it is clearly too late.[1]

Movants assume that FDEP will issue final permits for these two projects *without terms and conditions necessary to avoid jeopardizing* the continued existence of the Florida panther, the Audubon's crested caracara, or other relevant species or adversely modifying their designated critical habitat. They do not have a crystal ball. Movants (and many others) have submitted comments to FDEP as part of the permit process, and FDEP is still reviewing those comments.

---

[1] Florida Intervenors are filing two declarations with this response: Exhibit A, which is a Declaration of Justin Wolfe as FDEP General Counsel (herein, "Wolfe Decl."); and Exhibit B, which is the Declaration of Mary Duncan, who holds the Threatened and Endangered Species Coordination role for FDEP (herein, "Duncan Decl.").

But even if FDEP proposed permits for these two projects that, in Movants' opinion, lack adequate species protections, those claims should not be interjected into this Court given EPA's oversight role as well as opportunities for administrative appeals and judicial review in Florida.[2]

Moreover, the Motion is devoid of any case law supporting issuance of preliminary injunctions targeting *state permit actions under state law*. D.C. Circuit precedent forbids district courts from entertaining direct challenges to state CWA permits. *District of Columbia v. Schramm*, 631 F.2d 854, 863 (D.C. Cir.1980). That precedent is correct. Congress expressly invited the states to assume administration of the Section 404 Program in recognition of the primary role of states over water resources, and as such, Congress never intended for federal courts to take the kind of extraordinary steps sought by Movants here. That is especially true when, over three years ago, EPA approved Florida's 404 program and that program is now firmly established. Time and time again, Plaintiffs chose not to pursue preliminary relief at the outset of this litigation or any other earlier phase of this case, and it is much too late to provide *preliminary* relief now. Likewise, their refusal to first exhaust administrative remedies and other state-based judicial remedies is a puzzling waste of this Court's time. The mere filing of the administrative appeal in Florida would forestall final agency action on a permit application.

To be clear, Florida Intervenors are not taking a position at this time on the merits of these two pending permit applications. Agencies cannot prejudge the merits of a pending permit application. These applications remain in the permit process and will be subject to additional review by FDEP, EPA, United States Fish & Wildlife Service (FWS), and the Florida Fish & Wildlife Conservation Commission (FWC) before a final decision is made about whether a permit

---

[2] Movants attempt to evade normal state review by jettisoning five of their fellow Plaintiffs, who are "citizens of Florida." They do so only for the limited purpose of this Motion. Plaintiffs should not be allowed to play such games. All seven Plaintiffs brought this lawsuit together in one complaint and non-citizens can demonstrate standing in Florida.

will be issued. Wolfe Decl. ¶ 40 (Ex. A). Instead of defending the merits of these projects, Florida Intervenors oppose the Motion because it interferes with FDEP's legal duty to render permit decisions in the normal course. FDEP is committed to making a timely decision on these permits consistent with applicable laws and regulations.

Nevertheless, as more fully explained herein, this Court cannot grant Movants' requested extraordinary relief unless the Court first finds in favor of Movants on a host of jurisdictional and other issues. Specifically, as to jurisdictional issues, the Court would need to find that it has jurisdiction to: (1) review the claims in the Amended Complaint that underlie the Motion;[3] (2) impose an injunction upon Florida Intervenors when the Amended Complaint does not challenge FDEP actions related to any state permit applications; and (3) adjudicate state permit applications notwithstanding that (a) state CWA permits are not subject to federal judicial review; (b) these two permit applications are still in the state permit process with no underlying administrative record before this Court; and (c) state administrative and judicial review processes are available for these permit actions. Movants cannot prevail on any of these jurisdictional points (let alone all of them).

Likewise, before granting such extraordinary relief, this Court would need to find in favor of Movants across the waterfront of legal and factual issues necessary for obtaining a preliminary injunction. Again, Movants cannot prevail on any of these points (let alone all of them). As to the merits, Plaintiffs are not likely to prevail on the specific legal claims that underlie the Motion (as extensive briefing by Federal Defendants and Florida Intervenors have already demonstrated). Movants' request for relief – targeted at two specific projects – would not be available relief even

---

[3] Florida Intervenors have explained, claim-by-claim, why Plaintiffs lack standing in this case. Dkt. 102 at 37-51; Dkt. 107 at 10-25. All of those arguments are incorporated by reference here. To have standing for this Motion, Movants must demonstrate standing for the underlying claims (i.e., those claims in this case that form the basis of the need for preliminary relief) as well as injury arising from the specific projects they challenge as part of the Motion. *See W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 41 (D.D.C. 2020). They have done neither.

if Movants were found to be successful on the merits of specific claims in the Amended Complaint underlying the Motion. A plaintiff cannot receive interim relief that goes far beyond what it should achieve after prevailing on the merits. As importantly, the Programmatic Biological Opinion and Incidental Take Statement, which establishes the Technical Assistance Process employed for these permits, resulted from the Supreme Court's instructions concerning Section 7 consultation for EPA programs, and is supported by the Second Circuit's ruling in an analogous context.

As to irreparable harm, no such harm exists where: (a) FDEP has not yet issued permits with specific terms and conditions; (b) the species review process involves the same agencies reviewing the same information using the same legal standards as under the permit process led by the Corps of Engineers (Corps); and (c) FDEP *must* adopt all FWS-imposed terms and conditions for the protection of species.

As to the equities and public interest, those weigh heavily against Movants particularly where Congress has expressly invited states to assume administration of this program in recognition of the primary role of the states over water resources. Likewise, "preliminary" relief is not available where, after tremendous expenditures and efforts by the State of Florida and other stakeholders, the challenged program has been fully implemented for almost three years, with over 9,000 permit applications filed and hundreds of individual permits issued and denied by FDEP.[4]

Thus, because Movants have not met the requirements for a preliminary injunction, *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008), this Court should deny the Motion and allow the State of Florida to continue the permit processes for the Bellmar Villages Project and the Kingston Project consistent with applicable laws and regulations. The appropriate

---

[4] *See Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) (declining to vacate agency program where the "egg has been scrambled and there is no apparent way to restore the status quo ante").

course of action for Movants is to withdraw this improper Motion and focus their efforts on the ongoing state agency permit process where they already filed comments. If FDEP proposes a permit that Movants oppose, an administrative hearing can be requested. If, after that hearing, FDEP enters a final order issuing an objectionable permit, judicial review can be sought in Florida state courts.

## LEGAL & FACTUAL BACKGROUND

### I.    Litigation History

Plaintiffs filed their original nine-count complaint in this matter almost three years ago, on January 14, 2021, challenging EPA's approval of Florida's application to assume the CWA Section 404 dredge-and-fill permit program, which became effective on December 22, 2020.   Claims 3 through 6, which are most relevant to this Motion, allege violations of the Endangered Species Act (ESA) or CWA related to the FWS's Biological Opinion and Incidental Take Statement, among other things. Claim 2, which is also relevant here, alleges that EPA's approval of Florida's program violates the CWA because, among other things, standing under state law is more restrictive than federal law. The State of Florida and FDEP intervened to defend EPA's approval of Florida's program application. Dkt. 4; Feb. 1, 2021 Minute Order.

Just days after filing their complaint, Plaintiffs claimed in a January 20, 2021 letter to EPA that "[i]f expedited relief is not granted [in this matter], Plaintiffs … are likely to suffer irreparable harm" and expressly complained about purported harm they would incur if "the state unlawfully administers this program." Dkt. 31-1 at 107. At that time, Plaintiffs argued that they are "likely to succeed on the merits," and for that request, they "focus[ed] on two, critical violations" (Dkt. 31-1 at 111), including the species-based arguments that are at the center of Movants' current TRO request. Dkt. 31-1 at 111 (alleging that Florida's program fails to ensure "no jeopardy" and relies on an unlawful "programmatic biological opinion and incidental take statement"); *see also id* at

121-23 ("Absent preliminary relief, Plaintiffs are likely to suffer irreparable harm before the conclusion of this litigation," including from Florida's "unlawful operation of the state 404 program… [FDEP] is currently considering permits that are reasonably expected to fill precious wetlands that serve as habitat for threatened and endangered species, and their issuance is imminent."). And they sought to show, based on all four factors, why EPA should stay implementation of Florida's 404 program. *Id.* In a January 29, 2021 notice, Plaintiffs argued that they will be "harmed by EPA's immediate authorization of an unlawful state program that will issue permits to destroy wetlands essential to protected species …" Dkt. 21 at 1, 6.

Despite these statements, Plaintiffs only formally sought such relief *from EPA*, which never granted a stay. Crucially, Plaintiffs made a conscious decision not to request preliminary relief from this Court when they filed their complaint on January 14, 2021. Nor did they do so after the February 17, 2021 hearing regarding its pre-motion conference to bifurcate, or when Federal Defendants confirmed that the Corps transferred all permit files for projects in assumable waters to FDEP. And they did not seek a stay when FDEP confirmed that hundreds of newly trained employees were reviewing and processing applications consistent with state regulations and the federal requirements (Dkt. 40 at 23) or any subsequent time during the litigation until now, some three years after Florida began administering the 404 program.

Instead of seeking a judicial stay, Plaintiffs chose a different, non-traditional path. On January 29, 2021, they asked this Court to bifurcate non-ESA Claims 8 and 9 and proceed to dispositive briefing on those claims first. Federal Defendants and Florida Intervenors objected and asked the Court to resolve all claims through cross-motions on a typical schedule for an APA record review case. Dkt. 22-23. The Court granted Plaintiffs' requested path and issued a briefing schedule for Claims 8 and 9, which resulted in extensive briefing by the parties and a hearing in

March 2022. Dkt. 31, 34-37, 43-48, 51-57, 59-60, 65-72. On March 30, 2022, this Court rejected Count Nine and ordered further briefing on Count Eight. Dkt. 73. The Court eventually dismissed Count Eight for lack of standing as well.

In April 2022, the Court granted Plaintiffs' motion to file an amended complaint that included Claims 10 to 13, which added other species-based claims to this case. Dkt. 77 at 49-56. At the same time, this Court set a schedule for lodging the administrative record and filing cross-motions for summary judgment on all remaining claims, which was amended several times by the parties (including supplemental briefing and declarations) and briefing was eventually completed by October 12, 2023. Dkt. 98-108, 111-12, 114, 119, 121, 123, 125-26. A hearing on the summary judgment motions occurred on October 19, 2023, with additional post-hearing supplemental briefing occurring in October and November 2023. Dkt. 130, 133-34. At no time up to that point did Plaintiffs seek preliminary relief of any kind.[5]

On December 4, 2023, two of seven Plaintiffs filed the present Motion to enjoin FDEP and EPA from completing the permit process for the Bellmar and Kingston projects. Dkt. 135. Specifically, Movants asked this Court to enter Proposed Orders (Dkt. 135-11 and Dkt. 135-12) that would enjoin FDEP from "further action in furtherance of issuing state 404 permits for the Bellmar and Kingston projects" and "issuing state 404 permits for the Bellmar and Kingston projects." Movants also seek an order enjoining EPA and FWS from "further action in furtherance of issuing state 404 permits for the Bellmar and Kingston projects" and enjoining EPA "from waiving its authority over, or otherwise allowing the issuance of, state 404 permits for these projects." Dkt. 135-11 and Dkt. 135-12.

---

[5] This Court has also previously noted that Plaintiffs could have sought emergency relief long ago, but did not. *See*, *e.g.*, Dkt. 88 at 52; Dkt. 119 at 19-20.

## II.    Implementation Of Florida's 404 Program And Species Review Process

Florida Intervenors' prior briefs recount the state's extensive work over of the course of several years to prepare and apply for assumption of the Section 404 permit program along with the key provisions of the program. Dkt. 37 at 20-37; Dkt. 102 at 14-36. FDEP began implementing the program after EPA approval in December 2020. As of the end of December 2023, FDEP has completely stood up its comprehensive regulatory program, trained over 300 certified wetlands evaluators and other staff, and received approximately 9,300 permit applications for individual permits, coverage under general or regional permits, and NPR determinations. Wolfe Decl. ¶¶ 12-13. This includes approximately 400 individual permit applications for projects in assumable waters that were transferred by the Corps to FDEP in the early weeks of program. Wolfe Decl. ¶ 11. Of the applications received so far by FDEP, over 3,600 have been withdrawn, often based on requests by the state for more information or other concerns. To date, FDEP has issued approximately 703 individual 404 permits (including modifications) and denied approximately 302 applications (including individual, regional/general, and NPR requests). Wolfe Decl. ¶ 13.

### A.    Origins Of The Consultation Approach Used In Florida

The species review process, which is at the center of the Motion, originates with EPA's correct decision, following a notice and comment process, to initiate Section 7 programmatic consultation when reviewing whether to approve Florida's Section 404 Program. Dkt. 99 at 29-33; Dkt. 102 at 21-27.[6] That path was required under *National Association of Home Builders v. Defenders of Wildlife*, where the Supreme Court explained that EPA must consult with the Services

---

[6] *See* 85 Fed. Reg. 30953 (May 21, 2020); *see also* 85 Fed. Reg. 57853, 57856 (Sept. 16, 2020) (explaining EPA decision to initiate ESA Section 7 consultation in accordance with EPA memorandum dated August 27, 2020, which is available in the Administrative Record at EPA-HQ-OW-2018-0640-0660-A1). Section 404 of the CWA gives EPA discretion to consider impacts to species when evaluating state 404 programs. *Id.*

under Section 7 *if EPA has discretion to consider impacts to listed species when deciding whether to approve a state environmental program.* 551 U.S. 644, 671-73 (2007) (explaining that "[n]othing in the text of Section 402(b) authorizes EPA to consider the protection of threatened or endangered species as an end in itself when evaluating a transfer application [for a state NPDES permit program"). As EPA fully explained, Section 404 (unlike Section 402) "provides authority for EPA to consult and consider protection of listed species in the approval decision" for a state program. EPA-HQ-OW-2018-0640-0660-A1 at 6. EPA's decision reflected careful consideration of the statutory text, the legislative history, as well as the Supreme Court's opinion in *NAHB. Id.* at 4-6.

That path also aligns with FWS's determination in 1993 when, after deciding to conduct informal consultation for approval of New Jersey's Section 404 Program, FWS stated that "future consultations on state assumptions will be conducted as programmatic formal consultations…"[7] In Florida's situation, where the state is home to *over 130 listed species* and *over 12,000 square miles* of water area, there can be no doubt that EPA properly determined that formal consultation was the correct path. Plaintiffs have not challenged EPA's decision to *initiate* ESA formal consultation when approving Florida's program.

EPA employed the same process when adopting a permit program governing cooling water intake structures implemented at the state level, which was upheld by the Second Circuit against challenges nearly identical to the ones brought here. *See Cooling Water Intake Structure Coal. v. EPA*, 898 F.3d 173 (2d Cir. 2018), amended, 905 F.3d 49, 72-78 (2d Cir. 2018) (rejecting environmental challenge to FWS's use of "programmatic" biological opinion where it extended incidental take coverage via a technical assistance process to permittees under state programs).

---

[7] *See* Letter from FWS Regional Director to EPA Acting Regional Administrator at 1 (Dec. 22, 1993), available at https://www.fws.gov/sites/default/files/documents/MOAUSFWS.pdf.

The programmatic BiOp with Incidental Take Statement (ITS) at issue in *Cooling Water Intake Structure* was a model for the FWS's programmatic approach here. EPA-HQ-OW-2018-0640-0568 at 101-02 (EPA Response to Comments).

As part of a "programmatic consultation" process, FWS concurred that the action of approving Florida's program was "likely to adversely affect" listed species, which supported FWS's decision to prepare a Programmatic BiOp and, in light of FWS's "no jeopardy" finding, FWS adopted an ITS. This was consistent with longstanding agency practices, the Supreme Court's instructions concerning Section 7 consultation for EPA programs, the Second Circuit's ruling in an analogous context, as well as the plain text of ESA Section 7. Thus, EPA and FWS were on firm ground.

The textual argument is straight-forward. ESA Section 7(a)(2) applies to "any action authorized" by a federal agency, 16 U.S.C. § 1536(a)(2), which encompasses EPA's approval of a state program. Where the action will not jeopardize listed species or adversely modify critical habitat, Section 7(b)(4) provides that FWS "shall provide" a written incidental take statement to not just "the Federal agency," but also to "the applicant concerned, if any," 16 U.S.C. § 1536(b)(4)(C), which includes FDEP as the applicant for EPA approval of a Section 404 program. That written statement must, among other things, "set[] forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both…" *Id*. § 1536(b)(4)(C)(iv). Third, Section 7(o)(2) provides incidental take coverage in broad fashion for "any taking" resulting from that action so long as it "is in compliance with the terms and conditions specified in [FWS's] written statement …" *Id*. § 1536(o)(2). Plaintiffs have suggested that only ESA Section 10's Incidental Take Permit process (found at 16 U.S.C. § 1539(a)(1)(b)) applies to such actions, but that view is not supported by the

ESA. Section 1539(a)(1)(b) provides that FWS "may" issue a permit for any incidental taking prohibited under Section 1538(a)(1)(B), but Section 1536(o)(2) clearly exempts incidental take in compliance with Section 7 from the prohibitions of § 1538(a)(1)(B). *See* 50 C.F.R. § 402.14(i)(5); *see also* EPA-HQ-OW-2018-0640-0660-A1 at 6-7 (explaining why incidental take coverage extends to state permittees in this context).

### B.    Technical Assistance Process In The Florida-Led Process

As previously briefed, the species review process under the Florida-led program was comprehensively described in the program application including (among other places) in the MOU entered between , FWC, and FDEP (EPA-HQ-OW-2018-0640-0016-A2); and in the Florida 404 Handbook (HQ-OW-2018-0640-0002-A20 at 6, 23-24). Ultimately, this process was integrated with the Technical Assistance Process established in the Programmatic BiOp and its ITS. FWS, FWC, and FDEP *must and do* participate in the species review process as part of the Florida 404 program. *See* Dkt. 127-1 at 3-4 (reciting obligations to participate in species review process). Importantly, for Florida 404 permits, FWS's conclusions regarding potential species impacts and necessary measures to address those impacts are "determinative." Dkt. 102 at 23-24. And incidental take, if any, is not authorized if a permittee fails to comply with *all* of those measures. *See* BiOp (EPA-HQ-OW-2018-0640-0642) at 70. Importantly, this process provides early ESA coordination engagement for all State 404 Program general and individual permit applications. Wolfe Decl. ¶ 16. The MOU describes the roles, responsibilities, and commitments of each agency in implementing the State 404 Program. *Id.* ¶ 17. Coordination procedures are further outlined in Fla. Admin. Code R. 62-331, and in the FWS's Programmatic Biological Opinion. *Id.*

These procedures ensure that endangered and threatened federally listed species and their critical habitats are protected as an integral part of the State 404 Program. FDEP's regulations expressly provide that no Section 404 permit will be issued when the project "[j]eopardizes the

continued existence of endangered or threatened species, or results in the likelihood of destruction or adverse modification of [designated critical] habitat…" Fla. Admin. Code R. 62-331.053(3)(a)4. Compliance is also "required" for "any requirements" set by FWC, FWS, and NMFS during the technical assistance process "for permits reviewed under the State 404 Program." Florida 404 Handbook (HQ-OW-2018-0640-0002-A20) at 1.3.3; *see also id.* at 5.2.3. In accordance with the requirements for the Technical Assistance Process as set forth in the Programmatic Biological Opinion, FWS must use the best available data when making species-related determinations. EPA-HQ-OW-2018-0640-0642 at iv; *see also* Dkt. 99 at 69.  The Programmatic Biological Opinion defines "best available data" as "data to assure the quality of the science used to establish official positions, decisions, and actions taken by the State of Florida during the review of State 404 program permit applications, the quality of the biological, ecological, technical, and other relevant information that is used will only be that which is reliable, credible and represents the best data available. Under Section 7(a)(2) of the ESA, the USFWS is required to use the best available science."  EPA-HQ-OW-2018-0640-0642 at iv.

In accordance with these processes, both FWS and FWC review a proposed project's effects on listed species before a permit is issued. Wolfe Decl. ¶ 19. The outcomes of the effect determinations are incorporated into the State 404 Program permit file and included in the public notice. *Id.* The coordination efforts result in a combination of determinations identifying projects as either "no effect" or "may affect." *Id.* Projects that are determined to be in the "may affect" category are further identified as either "likely" or "not likely to adversely affect," and a determination of jeopardy is made (jeopardy or no jeopardy). For example, a determination of "may affect, likely to adversely affect" for a listed species indicates anticipated incidental take and requires additional review by FWS. *Id.* If adequate protection measures are available, FWS's final

conclusion would be "no jeopardy" or "may affect, not likely to adversely affect." *Id.* If FWS's final conclusion is that the activities allowed by a potential permit will "jeopardize the continued existence of a species," and no protection measures are available to address the adverse impacts, the permit would not be issued pursuant to the ESA and Fla. Admin. Code R. 62-33.053(3)(a) 4, 62-331.201(3)(k), and 62-331.248(3)(j).

### C.      Comparability Of Species Protections Under The Corps-Led And Florida-Led Programs

Consistent with the terms of the Programmatic BiOp, the process for issuing FDEP 404 permits ensures that FWS (and NMFS, where involved) reviews the same species-related information using the same legal standards as in the Corps-led 404 program. *See* Ex. C (Comparison of Species Review Process in Corps-led and Florida-led Section 404 Programs). In particular, the same legal standards are used in both processes with the action agency (Corps or FDEP conferring with the species agencies) to evaluate whether (1) as an initial matter, a project "may affect" listed species or critical habitat; (2) a permit "may affect" but "is not likely to adversely affect" listed species or critical habitat; or (3) a permit is "likely to adversely affect" listed species or critical habitat, in which case a more formal consultation review ensues to obtain an opinion from the species agencies whether the permit is likely to jeopardize the continued existence of" listed species or "adversely modify" designated "critical habitat." *Id; see also* Wolfe Decl. ¶ 19. The same standards are then used to evaluate jeopardy and adverse modification, as well as to address "incidental take." *Id; see also* Wolfe Decl. ¶ 19.

Significantly, the Florida-led process ensures even more protection for species and even more public involvement than the Corps-led process for at least three reasons: (A) FDEP *must* incorporate all FWS measures, terms, and conditions into the Section 404 permit (whereas the Corps *may* do so for their permits); (B) FDEP *must* deny a permit if FWS, NMFS, or FWC finds

no protection measures are available to reduce the risk of jeopardy to an acceptable level (whereas the Corps *may* decide to issue a permit in such circumstances); and (C) the public has full access to review and comment on all species-related information *before* FDEP makes a final determination on the permit, which allows for FDEP, EPA, and the permit applicant to consider and respond to those concerns including with project and/or permit changes as warranted (whereas there is *no right of public review and comment* on the Biological Opinion/ITS under the Corps-led process). Wolfe Decl. ¶ 43. In most instances, the volume of species-related information available to the public for review and comment as part of the Florida 404 permitting process is substantially greater than under the Corps-led program. Wolfe Decl. ¶ 44.

Likewise, as part of the FDEP 404 process, FDEP prepares a "Technical Staff Report" to "document how the project addresses the requirements" set forth in Florida's Section 404 regulations (including the "no jeopardy" requirements found in Rule 62-331.053). *See* Florida 404 Handbook (HQ-OW-2018-0640-0002-A20) at 8.2(j) (describing the "Technical Staff Report"). FDEP must also "[m]ake and document a finding of either compliance or noncompliance with the requirements" of Florida's Section 404 regulations (again, including the "no jeopardy" requirements found in Rule 62-331.053). *Id.* at 8.2(k) (explaining that this is a "determination of whether the project, including any mitigation, is permittable under the State 404 Program"). Finally, FDEP must "[p]repare a written determination on each application outlining the permitting decision and the rationale for the decision," which must be "included in the official record prior to final action on the application" along with a copy of the Technical Staff Report. *Id.* at 8.2(l).

### D.    Florida's Track Record Of Successful Species Protection Efforts

After almost three years of full program implementation, Florida has a record of successful implementation of the species-protection requirements applicable to Florida's Section 404 Program. For example, during the July 2022 to June 2023 time period, 115 permit applications for

Section 404 permits showed reasonable potential for affecting federally listed species. Wolfe Decl. ¶ 22. Those applications were reviewed by FWC and FWS, and appropriate conditions were included in the permits to ensure protection of species. *Id.* Likewise, during the July 2022-June 2023 time period, the species review process involved approximately 500 species-specific "effect" determinations involving over 30 listed species. *Id.* Again, those applications were reviewed by FWC and FWS, and appropriate conditions were included in the permits to ensure protection of species. *Id.*

## III. Florida's Efforts To Conserve The Florida Panther And Crested Caracara

Movants seek emergency relief based on concerns of potential impacts to two species: the Florida panther and the crested caracara. Both species are highly protected under the Florida ESA and the Federal ESA. *See* Fla. Admin. Code R. 68A-27.003(1)(b) (listing both of these species and providing that they "shall be afforded the protection afforded under [FWC] rules and Florida Statutes and under the Federal [ESA]…").[8]

### A. Florida Panther

The State of Florida is protecting, conserving, and recovering Florida panther populations and has been for over a half century. Duncan Decl. ¶ 12 (Ex. B). Almost 15 years *before* enactment of the federal ESA, FWC (then known as the Florida Game and Fresh Water Fish Commission) declared the Florida panther to be an endangered species protected under Florida law in 1958. Federal law has protected the Florida panther since 1967. The State of Florida has focused enormous efforts on conservation benefitting the Florida panther, including establishing a Florida Panther Protection Program, mapping suitable habitats, conducting population survey work,

---

[8] No critical habitat has been designated for the Florida panther or the Audubon's crested caracara. Thus, "adverse modification" of critical habitat under Section 7(a)(2) of the ESA is not a relevant basis for an injunction.

working to develop greater habitat connectivity through construction of new wildlife crossings, development of additional scientific information to better understand the threats and opportunities for panther populations, and educating the public. *Id.* ¶ 17. A variety of additional measures are described in the most recent FWC "Annual Report on the Research and Management of Florida Panthers: 2022-2023" and the "Species Status Assessment for the Florida Panther," which are attached to the Duncan Declaration. *Id.* ¶¶ 15-16.

In the early 1990s, the number of individual Florida panthers remaining in the wild was estimated at 20 to 30 individuals. *Id.* Attach. A at v, 76. According to most recent estimates, the current panther population size is estimated to be within the range of 120 to 230 individuals. *Id.* ¶ 13. The population is now "at least 5-fold larger in size when compared to the population three decades ago, has greater resiliency today than it has exhibited for likely well over 100 years." *Id.* ¶ 19 (citing the most recent species assessment). Thus, while continued conservation efforts are vital, the State of Florida is continuing to make progress on recovering panther populations. One of the primary means of advancing recovery efforts is FWC's continued practice of obtaining commitments from Florida permit applicants for mitigation benefitting Florida panther populations (as shown by the efforts thus far by the agencies in the context of the Bellmar and Kingston projects).

### B.    Audubon's Crested Caracara

Though less known, the Audubon's crested caracara is also a highly protected species in Florida.[9] This osprey-sized raptor is a boldly-patterned, dark-colored bird that can reach a body length of approximately two feet. *Id.* ¶ 30.

As shown by the FWC and FWS reports prepared in conjunction with the review of the

---

[9] FWC, *Crested Caracara*, available at https://myfwc.com/wildlifehabitats/profiles/birds/raptors-and-vultures/crested-caracara/.

Bellmar Villages Project, FWC typically seeks to require species avoidance measures and other actions to minimize the impact of projects on this bird species. For example, in the context of the Bellmar project, FWC and FWS jointly require that, prior to conducting any clearing activities within approximately 5,000 feet of any previously documented or newly discovered crested caracara nest site, the applicant must conduct a survey during nesting season (January 1 through April 30) to determine if any documented or discovered nest is active. *Id.* Attach. F at 3-4. This survey must include potential nesting and foraging habitat within the buffer zone. Likewise, to minimize the potential for disturbance to nesting caracaras, the permittee must conduct land clearing activities outside nesting season for areas that occur within the primary zone of any documented caracara nest site. Restoration activities are also required to ensure that nesting and foraging areas are put back in place. All such restoration activities must be performed in consultation with FWS and FWC field staff. And restored areas must be maintained in perpetuity and managed in a condition that supports use by crested caracara. These and other measures, as required by FWC and FWS, are designed to protect this species from jeopardy and to enhance recovery of the species over the long-term. *Id.* ¶ 31.

IV.     **Status Of Bellmar Villages And Kingston Permit Applications**

Movants have targeted two state 404 permit applications for emergency relief out of the over 9,000 received by FDEP since taking over the 404 program: the Bellmar Villages Project (DEP Application No. 396364-001) and the Kingston Project (DEP Application No. 423130-001). As described in detail below, agency review of both applications is still in progress. FDEP has not yet issued a decision on either permit application.

A.     **Bellmar Villages Project**

As explained in FDEP's public notice, the Bellmar Villages Project involves construction of a master-planned mixed-use community in Collier County, Florida. The project encompasses

an area of approximately 5,000 acres, with impacts to approximately 144 acres of "waters of the United States." Approximately 94% of jurisdictional wetlands on the project site will be preserved, with a "Conservation Area" exceeding 2,570 acres in size. This Conservation Area would be managed as habitat for listed species in according with a Listed Species Management and Human-Wildlife Coexistence Plan. Since the majority of the project is currently in active agricultural operation, the proposed on-site preservation, enhancement, and restoration activities (described in more detail below) are anticipated to result in a net benefit to the conservation of fish, wildlife, listed species, and their habitats

The Bellmar Villages Project has been under review by FDEP since December 28, 2020, when FDEP received the permit application, which was transferred from the Corps of Engineers to FDEP. Wolfe Decl. ¶ 33. Soon thereafter, in January 2021, FDEP and FWC both sent the applicant Requests for Additional Information (RAI). In April 2021, FDEP received applicant's RAI Response. Additional RAIs and Responses to RAIs were exchanged throughout 2021 and 2022. The applicant submitted voluminous information concerning the effects of the project on listed species, including a comprehensive applicant-prepared "Biological Assessment," with species habitat maps, impacts analysis, and other species-related documentation. In May 2022, FDEP received FWC response assessing the project. In August 2022, FDEP issued public notice for the permit application. Around the same time, FDEP received comments from FWS, and EPA requested its 90-day period for review of the permit application.

In September 2022, FDEP received an updated Biological Assessment from the applicant, along with multiple requests for a public meeting on the project from concerned citizens. Additional analysis, information, and comments were received from the project applicant, FWS, FWC, and other stakeholders from November 2022 through November 2023. On November 6,

2023, FDEP provided another public notice for the project and held a public meeting for this project on December 7, 2023. FDEP accepted additional comment until December 12, 2023.[10] FDEP has been informed that EPA will not complete its review of the Bellmar project before January 26, 2024. As a result, even if EPA elects to not "comment upon, object to, or make recommendations" on the Bellmar Project on January 26, 2024, FDEP will not be in a position to make a final determination on that application before February 5, 2024, at the earliest.

FDEP understands that the project applicant for Bellmar intends to also submit responses to comments to help inform FDEP's decision in this matter. FDEP has not yet received those responses but would review them before making determinations concerning next steps in the permit process. FDEP's potential next steps following the public meeting for the Bellmar project are outlined in the November 17, 2023 letter to Plaintiffs which has been filed with this Court. The application otherwise remains under review. FDEP has not determined whether to issue or deny the permit applications or to take other steps with regard to the processing of the permit applications at this time.

As reflected in the permit file,[11] the permit applicant for Bellmar would be required to, among other things, fully fund the construction of five wildlife crossings within the geographic region in locations designed to provide valuable wildlife movement corridors that will benefit Florida panthers. Duncan Decl. ¶ 27. They will also be required to make substantial monetary

---

[10] On December 12, 2023, Plaintiffs also submitted Movants' declarations (as filed with this Motion) to FDEP for purposes of the permit review process. FDEP will consider the information in determining whether to issue, modify, condition or deny a permit for the proposed project. Wolfe Decl. ¶ 25.

[11] Movants claim counsel for Florida Intervenors described the Bellmar permit process as a "gold standard of what Florida's program can do." Dkt. 135 at 20. That is a mischaracterization. Counsel simply noted that the "Bellmar project is a good example where [FWS and FWC have] produced significant reports" concerning "specific take amounts" and "terms and conditions." Tr. at 115-16 (Oct. 19, 2023).

contributions to a wildlife conservation fund (Marinelli Panther Protection Fund), which exists to support panther conservation efforts in South Florida.[12] *Id.* ¶ 28. Physical buffers (such as lakes and/or fencing) are also required in key project locations, as a means to prevent human encounters with panthers. *Id.* ¶ 29. Various other conditions are set forth in the FWC Declaration.

### B.    Kingston Project

With regard to the Kingston Project,[13] FDEP received a Section 404 application for this project in June 2022, and over the course of July 2022 to October 2023, FDEP sent RAIs to the applicant and received responses, along with species review reports from FWS on October 26, 2023 and FWC on November 1, 2023. FDEP issued public notice for this project on November 20, 2023, and on December 4, 2023, EPA provided notice of 90-day review period. On December 15, 2023, FDEP scheduled a public meeting for this permit application for January 16, 2024. This permit application remains under review. FDEP has made no determinations whether to issue or deny the permit application or to take other steps with regard to the processing of the permit application at this time. EPA has informed this Court that it would not complete its review of the Kingston Project before February 9, 2024. Even if EPA elects to not "comment upon, object to, or make recommendations" on the Kingston Project on February 9, 2024, FDEP will not be in a position to make a final determination on that application before February 19, 2024, at the earliest. Florida Intervenors understanding that the project applicant for Kingston intends to also submit

---

[12] The Marinelli Panther Protection Fund supports activities such as construction of additional wildlife crossings and fencing, habitat acquisition and restoration, corridor enhancement, public education and outreach focused on wildlife conservation, and scientific research relevant to species conservation. Duncan Decl. ¶ 28.

[13] According to the FDEP public notice, the Kingston Project encompasses 6,676 acres, with impacts to less than 13 acres of "waters of the United States." To support issuance of a permit, the project applicant will purchase wetland mitigation credits and create a conservation area exceeding 3,250 acres, while also performing wetland preservation and enhancement activities, as outlined in the permit records.

responses to comments to help inform FDEP's decision in this matter. FDEP has not yet received those responses but would review them before making determinations concerning next steps in the permit process. Of course, if EPA does have comments on either or both projects, that will trigger an additional process for resolving those comments.

### C.    Timing and Nature of FDEP Action on Bellmar and Kingston Applications

With or without EPA comment, for both projects, there are a variety of paths that could occur in the weeks and months ahead.  For example, Florida could request more information from the permit applicant; Florida could engage with EPA and the other federal agencies to address new information received during the comment period; and/or modifications to the project or the permit could be proposed and considered. Ultimately, FDEP could make a proposed decision to either deny or grant the permits. Wolfe Decl. ¶ 35.[14]  Notably, under FDEP's 404 regulations, FDEP must determine, among other things, that the proposed project "meets the conditions for issuance in Rules 62-330.301 [and] 62-330.302 [which are the criteria for the state ERP permits] and 62-331.053 [which are the specific additional criteria for Florida 404 permits]." Fla. Admin. Code R. 62-331.052.[15]

If FDEP eventually approves a permit for either project, FDEP would issue a "Proposed Permit" first. *Id.* ¶ 35. The applicant is provided with an opportunity to review the proposed permit before accepting the permit with all of its terms and conditions. Florida 404 Handbook at 8.3.4.

---

[14] "FDEP will fully consider and address EPA's views, permit conditions, and objections when determining whether to issue the permit, to issue the permit with conditions and/or mitigation, or to deny the permit." MOU between FDEP and EPA found at EPA-HQ-OW-2018-0640-0018 at 5 ¶ II.A.2.

[15] These criteria are broader than those applicable under the federal 404 program only. FDEP is prohibited from issuing a 404 permit if the agency does not have "sufficient information to make a reasonable judgement as to whether the proposed activity will comply with the requirements of [FDEP's Section 404 regulations]." Fla. Admin. Code R. 62-331.053(c).

The Proposed Permit becomes "final" and "effective" when it is signed by <u>both</u> FDEP and the permit applicant; however, the permit is neither final agency action nor in effect if an administrative appeal is filed within 21 days of signature. Wolfe Decl. ¶ 35. In other words, FDEP's issuance of a permit is not "final agency action" if the Florida administrative appeal process is triggered. Under that scenario, the administrative hearing process allows for continued development of the agency record, culminating in a recommended order and eventually a final decision by FDEP that is then subject to state judicial review. *Id.* ¶ 36. Presumptively, if Movants have taken the time to file this Motion in federal court, they (or other similarly interested parties such as Plaintiffs Florida Wildlife Federation, Conservancy of Southwest Florida and/or Miami Waterkeeper) will file a request for administrative review to forestall the permit from becoming final.

## ARGUMENT

### I.    Movants Seek Emergency Relief Unavailable In This Court.

As an initial matter, Movants have asked this Court to venture down several paths outside this Court's limited jurisdiction. Specifically, this Court lacks jurisdiction over these state permits for several related reasons, including a lack of jurisdiction to review the claims in the amended complaint that underlie the Motion; a lack of jurisdiction to impose an injunction upon Florida Intervenors; a lack of jurisdiction to adjudicate state permit applications, especially state permit applications that are still in the state permitting process or those that are otherwise subject to state administrative appeals and state judicial review.

Movants are not actually seeking preliminary relief for this case. None of the claims cited in their proposed order as the basis for the requested relief (Claims, 2, 3, 4, 10 or 13) entitle Movants to enjoin Florida from administering its own 404 permitting program as to specific permit applications. Instead, Movants are trying to expand the amended complaint at this late stage in the

litigation (without seeking leave from this Court) to encompass specific state actions not before this Court. The Motion improperly seeks to enjoin FDEP, a state agency administering a state program under state law, on the sole basis that agency has, in Movants' words, "intervened" to defend the EPA decision to approve Florida's 404 program. But, this Court does not have jurisdiction over the state permit applications, and it should not be making determinations on the merits of particular applications that are still pending before FDEP and not properly before this Court when the state administrative process and state courts are the proper forum for such challenges.

Florida's intervention in this case, which was for purposes of defending federal approval of Florida's program based on the claims in the complaint, does not subject state issued 404 permits to review in this Court, particularly where the complaint has never been amended to bring any such claims into this case. Movants have not cited any precedent where a federal court has enjoined a state agency from even finishing its administrative review process or otherwise reaching a final decision to issue or deny a state permit under a federally-approved program in this manner. Movants seek relief that is unprecedented and contrary to D.C. Circuit precedent and precedents of many other circuits, which have held that there is no private right of action under the Clean Water Act to challenge permits issued by states in delegated permitting programs in the first instance.

In *District of Columbia v. Schramm*, 631 F.2d 854 (D.C.Cir.1980), the District of Columbia sought injunctive and declaratory relief against EPA and the state of Maryland related to a NPDES permit issued by Maryland and reviewed by EPA under a state delegated 402 program allowing effluent discharges into Rock Creek from a wastewater treatment plant. *Id.* at 859. The District did not believe Maryland's permit terms were sufficiently protective of Rock Creek and sought an

injunction prohibiting the permitted discharges under the CWA, National Environmental Policy Act (NEPA) and nuisance. *Id.* The trial district court denied the injunction, finding that the District did not show irreparable injury or sufficient public interest. The District appealed and the D.C. Circuit and largely affirmed the decision with the exception of the trial court's considerations of the challenges to the state issued permit, which it instructed to be dismissed for lack of subject matter jurisdiction. In coming to this decision, the D.C. Circuit focused on Congress' intent in creating a statutory framework built on the principle that states have primary responsibility over water resources: "In authorizing the creation of state NPDES permit programs, Congress made clear that state permits would be issued 'under State law (and) would be State, not Federal, actions ….' 118 Cong. Rec. 33761 (1972), reprinted in 1 Legislative History at 262 (remarks of Rep. Wright)."[16] *Id.* at 863. "By requiring states to maintain or create sufficient legal and equitable rights and remedies to deal with violations of state permits in order to exercise permit-granting powers under the Act, Congress must have intended that states apply their own law in deciding controversies involving state permits." *Id.* Thus, the D.C. Circuit declined to "infer a federal right of action" and instead held that "state courts are the proper forums for resolving questions about state NPDES permits, which are, after all, questions of state law." *Id.*

Almost 20 years later, the D.C. Circuit again found that state issued CWA permits should be challenged in state court. In *General Motors Corporation v. Environmental Protection Agency*, 168 F.3d 1377 (D.C. Cir. 1999), General Motors filed a petition for review against EPA

---

[16] The same purpose applies to Section 404 permit programs. "It is the policy of Congress that the States . . . implement the permit programs under sections [402] and [404]." 33 U.S.C. § 1251(b). That this creates permit programs under "state law" is even more clear in the 404 "assumption" context than the 402 "delegation" context. *See* H.R. Rep. No. 95–830 at 104 (1977) ("The Conference substitute provides for the administration by a State of its own permit program for the regulation of the discharge of dredged or fill material. . . . The conferees wish to emphasize that such a State program is one which is established under State law and which functions in lieu of the Federal program. It is not a delegation of Federal authority.").

challenging the award of administrative penalties for violations of a NPDES permit issued by the

state of Michigan. *Id.* at 1379-80. In denying the petition and holding that a state-issued permit

could not be challenged in the context of a federal enforcement proceeding, the D.C. Circuit

explained:

> EPA persuasively argues that it reasonably interpreted the Act to prevent GM
> from doing in a federal enforcement proceeding what the Company had
> declined to do before the MDNR and the Michigan state courts.. . . .  Not only
> would the EPA have to expend considerable resources to obtain the information
> from the state agency; it would also be second-guessing that agency, which is
> inconsistent with the primary role of the States under the Act.

*Id.* at 1382. The D.C. Circuit also cited to *Schramm*, noting that "the congressional silence on

federal court review of state permits is consistent with the view that challengers to those permits

should be relegated to state law remedies in state courts." (internal citations omitted). *Id.* at 1383.

Other courts have generally agreed with the D.C. Circuit and dismissed federal court

challenges to state issued permits given congressional intent to respect the primary role of states

under the Clean Water Act's regulatory framework. *See e.g., Am. Paper Inst., Inc. v. EPA*, 890

F.2d 869 (7th Cir. 1989) (declining to find federal jurisdiction to challenge a state issued CWA

permit and thus dismissing industry petitioners challenge to EPA's objections to Wisconsin's state

NPDES permit as an unreviewable discretionary act); *Shell Oil Co. v. Train*, 585 F.2d 408, 414

(9th Cir. 1978) (explaining that "existence of a state judicial forum for the review of the regional

board's action forecloses the availability of the federal forum under the [APA]" in affirming

dismissal of permittee's federal court challenge to state NPDES permit); *Rose Acre Farms, Inc. v.

N.C. Dep't of Env't & Nat. Res.,* 131 F. Supp. 3d 496, 507 (E.D.N.C. 2015) ("Here, the court

declines to exercise subject-matter jurisdiction under 28 U.S.C. § 1331 over Rose Acre's claim

because doing so would upset the congressionally-approved balance of responsibilities between

federal and state courts with respect to the CWA's NPDES permitting scheme"); *Defs. of*

*Conewango Creek v. Echo Devs., LLC.,* No. CIV.A. 06-242 E, 2007 WL 3023927, at *8 (W.D. Pa. Oct. 12, 2007) ("Whatever the veneer on the counts, assuming Plaintiff is challenging final Pennsylvania-issued permits, that challenge is properly brought in a Pennsylvania court, with the state able to defend the permit decision and terms, and not here in federal court."); *Consol. Edison Co. v. N.Y. State Dep't of Env't. Conservation*, 726 F. Supp. 1404, 1409 (S.D.N.Y 1989) (dismissing permittee's federal court challenge to a state issued permit); *Nat. Res. Def. Council, Inc. v. Outboard Marine Corp.*, 702 F. Supp. 690, 694 (N.D. Ill. 1988) (direct review of state-issued permits is confined to state courts); *Chesapeake Bay Found., Inc. v. Va. State Water Control Bd.*, 495 F. Supp. 1229, 1237 (E.D. Va. 1980) (granting state agency's motion to dismiss because claims that the board violated the Federal Water Pollution Control Act were traditionally relegated to state law and should be addressed at the state level).[17]

Thus, the Court can and should deny Movants' Motion on this basis alone and does not need to reach the merits of whether Movants have met the incredibly high burden for preliminary injunctive relief. Movants may attempt to argue that these cases do not involve permit challenges in the context of a TRO where the underlying federal approval of the state program is being challenged. But that distinction does not give this Court jurisdiction over state permits, nor have Movants cited any cases where a federal court issued the kind of extraordinary action Movants seek here. Plaintiffs cannot conjure up federal-court review for an otherwise-unreviewable state

---

[17] Counsel found only one court decision recognizing a narrow exception to the rule that federal courts cannot enjoin issuance of state CWA permits: *Friends of Crystal River v. EPA,* 794 F. Supp. 674, 678-86 (W.D. Mich. 1992), *affirmed by* 35 F.3d 1073, 1076-77 (6th Cir. 1994). But that case is clearly distinguishable on the facts. There, plaintiffs first challenged a proposed 404 permit via the state administrative process. While that challenge was occurring, EPA objected to, and then federalized, the permit. EPA then withdrew its objection and attempted to return the permit to the state for final action. Plaintiffs sued in federal court and the court found that EPA lacked statutory authority to *return* a federalized 404 permit to a state. The court enjoined the state from issuing a 404 permit for the project because it was still federalized. That is obviously not the situation here.

permit merely by labelling it a request for preliminary relief in an underlying APA challenge. This Court's jurisdiction—and D.C. Circuit review—cannot be so easily manipulated, particularly when all of the same reasons federal courts refuse to review state permits apply with full—if not greater—force in the TRO/PI context. As the D.C. Circuit explained in *GMC*, precluding collateral attacks of state-issued permits in federal court "ensures that the States [have] the opportunity as a threshold matter to address objections to the permits they issue." *Gen. Motors Corp.*, 168 F.3d at 1382 (recognizing also that the state agency "alone will have the information pertinent to an attack upon the decisionmaking process") (internal quotations omitted).

**II.     Even If Movants Could Overcome This Identified Jurisdictional Defect, They Cannot Meet The High Burden Required For Extraordinary Relief To Enjoin A State Agency Administrative Process.**

The primary "purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition—to preserve the status quo." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014). Injunctive relief is an "extraordinary and drastic remedy" that "should never be awarded as of right" *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). To receive such an "extraordinary remedy," a moving party must carry the burden of persuasion by making a "clear showing" that the following four factors, taken together, warrant relief:  (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of an injunction, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016); *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004); *see also Winter*, 555 U.S. at 20-22.

**A.     Movants' Are Not Likely To Succeed On The Merits Of The APA Record Review Challenge To EPA's Approval Of Florida's 404 Program**

**1.     Movants' Attempt To Manufacture Standing In Order To Seek Emergency Relief In Federal Court For A State Permit Application Should Be Rejected.**

"[T]he merits on which [a] plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction, including a party's standing." *W. Watersheds Project*, 468 F. Supp. 3d at 41 (internal quotations and citations omitted). "In the context of a preliminary injunction motion, [the court] require[s] the plaintiff to show a substantial likelihood' of standing under the heightened standard for evaluating a motion for summary judgment." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (internal quotations and citations omitted).

Movants seek to bypass the state administrative review process on the pending state permit applications and instead prematurely seek emergency relief in federal court. To do so, Movants have purposely filed this motion on behalf of only two of the seven Plaintiffs who filed the amended complaint in an attempt to manufacture a standing injury where there simply is none by rearguing issues already fully briefed before this Court.

Like they did in their motion for summary judgment on Claim 2, *see* Dkt. 98 at 79, the two moving parties, Center of Biological Diversity and Sierra Club, again assert here that "they face barriers to challenging state 404 permits because Florida law restricts access to administrative courts to citizens of the State." Dkt. 135 at 31. Florida has fully refuted Plaintiffs' baseless concerns about the Florida administrative and judicial review processes. Dkt. 102 at 30, 45-47; Dkt. 107 at 17-20. Here, yet again, Movants ignore that there are *three* avenues for demonstrating standing. Their motion only refers to two avenues: environmental groups in Florida with "at least 25 current members residing within the county where the activity is proposed" have automatic standing to challenge a permitting action (Fla. Stat. § 403.412(6)); and "[i]n a matter pertaining to a federally delegated or approved program," like Florida's Section 404 program, "a citizen of the state may initiate an administrative proceeding under this subsection if the citizen meets the

28

standing requirements for judicial review of a case or controversy pursuant to Article III of the United States Constitution" (Fla. Stat. § 403.412(7)).

While those two "liberalized" paths for standing do require – and appropriately so – state citizenship for standing, the third avenue for standing under the seminal case in Florida known as *Agrico Chem. Co. v. Dep't of Env't Regul.*, 406 So. 2d 478 (Fla. 2d DCA 1981) does not. Under *Agrico*, plaintiffs have standing to challenge permitting actions if they can demonstrate that their "substantial interests" are determined or affected by the action and their interests fall within the zone of interests of the relevant program. Under the *Agrico* framework, associations have standing if a "substantial number of its members, although not necessarily a majority, are substantially affected'…." *Fla. Home Builders Ass'n v. Dep't of Labor and Emp't Sec.*, 412 So. 2d 351, 353-54 (Fla. 1982). Importantly, *Agrico* creates a two-part test for standing to participate as a "party" in a chapter 403 permitting process (i.e., a challenge to an FDEP permit). Under Florida law, a "party" is "[a]ny other person … whose substantial interests will be affected by proposed agency action, and who makes an appearance as a party." Fla. Stat. § 120.52(13). Citizenship is not a requirement to be a party. In turn, nothing under Florida Statute § 120.57 requires citizenship for standing to be a party if that party otherwise is a "person…whose substantial interests will be affected…" Florida has made this clear in earlier briefing. FDEP Reply Br. (Dkt. 107 at 20 – "The first and most traditional path for standing, under the *Agrico* test, remains available irrespective of state citizenship. Wolfe Supp. Decl. ¶ 26.").

Movants cite two cases for the proposition that a "foreign corporation would not qualify as a citizen of the State," and thus, would lack standing to file an administrative appeal of these permits. Dkt. 135 at 31 (citing *Legal Env't Assistance Found. (LEAF) v. Fla. Dep't of Env't Prot.,* 702 So.2d 1352, 1353 (Fla. 1st Dist. Ct. App. 1997); *McClash v. Manasota-88, Inc.,* No. 14-4735,

2015 WL 3966050, at *8 (Fla. Div. Admin. Hr'g June 25, 2015)). Movants' reliance on these cases is wrong. Those cases do not stand for the proposition that environmental groups need to be citizens of Florida to qualify for standing under the *Agrico* test.

In *LEAF*, an Alabama-based environmental group sought standing to intervene under the "substantial interest test" of Florida Statute Section 120.57 or the "liberalized provisions of section 403.412(5)."[18] But in that case, the court expressly stated that "LEAF does not argue that it can meet the substantial interest test." 702 So. 2d at 1353. Thus, the court only addressed whether *LEAF* could benefit from the "liberalized provisions of section 403.412(5)," but since that avenue for standing only extends to "citizens," *LEAF* could not rely on it. Nothing in the case suggests that *LEAF* lacked standing under the "substantial interest" test because it was not a citizen of Florida; rather, it was because *LEAF* did not attempt to show "substantial interests" in the proceeding.

Likewise, in *McClash*, the Administrative Law Judge actually found that Sierra Club had standing based on "substantial interests" under Fla. Stat. ch. 120: "Sierra Club claims associational standing to intervene under chapter 120. Respondents stipulated that a substantial number of Sierra Club members have substantial interests in the use of the waters near the project site, but assert that Sierra Club failed to demonstrate injury to these interests. Sierra Club offered evidence to prove the interests of its members could be adversely affected by the proposed project. **Sierra Club has standing under chapter 120**." *McClash,* 2015 WL 3966050, at *8 (emphasis added). Thus, Sierra Club had standing for purposes of the *Agrico* avenue for standing. But what they did not have, according to the ALJ, was "standing to intervene pursuant to section 403.412(5)" because

---

[18] Note, Florida Statutes Section 403.412(5), as referenced in *LEAF*, subsequently became Section 403.412(6) after amendments were adopted to this portion of the Florida Statutes.

"Sierra Club is not a citizen of the state."[19]

### 2. Previous Briefing And Oral Argument Show That Movants Are Unlikely To Succeed As To The Merits And Justiciability Of Claims 2, 3, 4, 6, 10 And 13.

Previous briefing on cross-motions for summary judgment both by the Florida Intervenors and Federal Defendants (which was adopted by the Florida Intervenors), oral argument and Florida's post-hearing memorandum demonstrate why Movants are not likely to succeed on the merits of Claims 2, 3, 4, 6, 10 and 13 related to alleged violations of the ESA. Dkt. 99, 102, 106, 107, 127. Specifically, Florida Intervenors demonstrated that Movants do not have standing for any of their claims and/or certain species related claims are not ripe. Dkt. 102 at 37-60; Dkt. 10-30, Dkt. 127-2 (Oral Arg. Demonstrative Summarizing Standing Args.). Notwithstanding Movants' justiciability defects, Florida Intervenors and Federal Defendants have fully demonstrated in their briefs in this case that Movants should also lose on the merits of their ESA claims (as well as all other claims). Dkt. 99 at 49-50, 62-85; Dkt. 106 at 27-48.

### 3. Movants Are Unlikely To Succeed On The Merits As To Any *Remedy That Directly Enjoins Specific State 404 Permit Applications*.

The Movants' requested relief presumes that the remedy (if they were to actually succeed on the merits for at least one of their claims) would necessarily include vacatur of EPA's approval

---

[19] Florida Intervenors also incorporate by reference their previous responses to Plaintiffs' reiteration of their specious assertions that Florida's *de novo* standard of review in state proceedings would be more costly than an APA record review case in federal court because they would have retain experts they otherwise would not need. Dkt. 102 at 46 n.26; Dkt. 107 at 18-19. Plaintiffs retained several experts in this record review case as evidenced by the declarations they attached to their motion for preliminary relief.

Similarly, Florida Intervenors also incorporate by reference their previous responses to Plaintiffs' reiteration of the claim that loss of NEPA documentation from EPA's approval of Florida 404 program is a cognizable injury. Dkt. 102 at 38-42; Dkt. 107 at 11-16. Simply stated, Congress, not EPA, decided that state programs are not subject to the NEPA provisions that may trigger environmental documentation. *Id.* And more to the assertion of "harm," Florida Intervenors have fully demonstrated that Plaintiffs receive the same comparable environmental information under the Florida-led process than the Corps-led process. Dkt. 102 at 25-27; 37-42; Dkt. 107 at 11-16.

and therefore cessation of 404 permits issued by FDEP. But this is not the case. No court has ever vacated federal approval of a state environmental program (choosing instead to remand without vacatur). *See e.g., Idaho Conservation League v. EPA*, 820 F. App'x 627, 628 (9th Cir. 2020) (finding that EPA's approval of Idaho's NPDES permit program failed to comply with the Clean Water Act's criminal negligence requirements but deciding against vacatur).[20] "An inadequately supported rule, however, need not necessarily be vacated. . . . The decision whether to vacate depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal citation omitted).

Under the second *Allied-Signal* prong, courts also consider "public consequences" of possible equitable remedies. This includes equities involving the parties as well as the "interests of third parties," as this Court noted. Dkt. 73 at 48; *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (reviewing district court's exercise of equitable discretion in CWA case and instructing courts to "pay particular regard for the public consequences" of a grant of equitable relief); *Conserve SW. Utah v. U.S.Dep't of Interior*, No. 1:21-cv-01506-ABJ, 2023 WL 792285, Mem. Op. (D.D.C. Nov. 16, 2023) (denying Federal Defendants' motion to vacate DOI's grant of a right-of-way under the *Allied Signal* test while granting their motion to remand the decision and related incidental take permit and biological opinions back to the relevant agencies for

---

[20] Federal Defendants and Florida Intervenors have explained why this Ninth Circuit decision is incorrect as to the merits (*see, e.g.*, Dkt. 99 at 56-57), but this case illustrates that even where an error is found by a reviewing court, vacatur is not the automatic or even likely remedy. Notably, a federal district court did vacate EPA's approval of Arizona's NPDES permit program (the only such example counsel has located for this proposition), but that decision was reversed by the U.S. Supreme Court in *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), where the Supreme Court clarified when Section 7 consultation should be triggered for purposes of EPA's approval of state environmental programs.

reconsideration). Depending on how this Court rules on the pending summary judgment motions, the parties will need to address complex issues around appropriate remedies. In fact, Plaintiffs themselves asked this Court to forego ruling on remedy until after summary judgment rulings were issued. Dkt. 98 at 15 n.2 ("Plaintiffs respectfully request the opportunity to brief the appropriate remedy _following_ the Court's ruling on summary judgment.") (emphasis added). It would be highly premature to block the issuance of state permits without first determining whether that form of drastic relief is likely to be appropriate and available as the remedy at the culmination of this case.[21] Movants have not shown (nor could they show) that are likely to succeed on the merits as to the substance and the selection of a remedy that _directly targets specific Florida 404 permit applications_.[22]

### B.  Movants Will Not Suffer Irreparable Harm From Denial Of The TRO And PI

The "basis of injunctive relief in the federal courts has always been irreparable harm."  A plaintiff seeking injunctive relief must "demonstrate that irreparable injury is likely in the absence of an injunction." _Winter_, 555 U.S. at 22. "Issuing a preliminary injunction based only on a

---

[21] Movants also present an "alternative" injunction where the Court issues an "order restoring authority to the Corps over permits that may affect ESA species" pending a decision by the Court on the merits "while the parties further brief remedy regarding vacatur of the programmatic BiOp, programmatic ITS, and EPA's approval of the State 404 program." Dkt. 135 at 42. This "alternative" is tantamount to partial _vacatur_ and therefore is improper for all reasons just discussed. Moreover, it is significantly broader than their preferred injunction, as it would apply to any Florida 404 permit that "may affect ESA species." That would likely cover hundreds of applications, including many where the "may affect" finding does not include "likely to adversely affect" situations or otherwise implicate any potential for jeopardy or adverse modification of critical habitat. As such, it is not narrowly tailored and inappropriate relief, even preliminarily.

[22] Even if this Court found a legal deficiency with the BiOp and/or ITS accompanying EPA's approval of Florida's 404 program, the remedy for any such outcome would not be directed at the issuance of particular permits; instead, those issued permits may not be able to rely on the protection afforded by the BiOp/ITS for purposes of defense against possible future claims based on incidental take. To the extent permittees engage in conduct that results in take of species that is not authorized by the ESA, federal enforcement and/or citizen suits could be brought.

*possibility* of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* (emphasis added). The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. Eng.*, 454 F.3d 290, 297 (D.C. Cir. 2006) "First, the injury 'must be both certain and great; it must be actual and not theoretical. . . The moving party must show [t]he injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm, Second, the injury must be beyond remediation." *Id.* (internal quotations omitted). "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Id.* (internal citation omitted).

   1. **Since The State Permitting Process Is Not Yet Complete, There Is No Imminent Threat Of Irreparable Harm.**

  Throughout their motion, Movants assert that the Bellmar Villages and Kingston permits will irreparably harm the Florida panther and/or crested caracara. Dkt. 135 at 12-21, 25-38. Movants claims of "imminent issuance" of permits for both projects and its declarations are focused on alleged impacts to species if the projects are implemented as currently proposed. However, what Movants omit from their factual and legal arguments is that the state 404 permit application process for these two projects has not yet been completed. The applications are still open for public comment and EPA had indicated that it is also reviewing both applications under its oversight authority pursuant the CWA and MOU. Wolfe Decl. ¶ 32.

  As Mr. Wolfe's fourth declaration makes clear, FDEP must still review the public comments received as well as address any comments from EPA and determine if additional information is needed before deciding whether to issue, modify, or deny the proposed permit. *Id.* ¶ 25.  EPA also has the option to take over the permitting process if it lodges objections that FDEP

has not satisfactorily resolved. 33 U.S.C. § 1344(j); 40 C.F.R. §§ 233.20(b), 233.50. Movants have not (and cannot) provide evidence that FDEP intends to bypass its own regulatory process and issue the proposed permits in their current form, let alone issue them in violation of the obligation to not "jeopardize" the continued existence of these species or adversely modify designated critical habitat. Thus, Movants' claimed harms are only theoretical at this point and may never occur depending on how FDEP proceeds with the permit applications.

Again, FDEP's regulations expressly provide that no Section 404 permit will be issued when the project "[j]eopardizes the continued existence of endangered or threatened species, or results in the likelihood of destruction or adverse modification of [designated critical] habitat…" Fla. Admin. Code R. 62-331.053(3)(a)4. Compliance is also "required" for "any requirements resulting from consultation with, or technical assistance by," FWC, FWS, and NMFS "for permits reviewed under the State 404 Program," which, as already explained, utilizes the same federal agency offices reviewing the same information using the same standards for the same purposes as under the Corps-led program. This includes the obligation, as set forth in the Programmatic Biological Opinion, to use the best available data when making species-related determinations. If FWS and FDEP reach the same final conclusion that the activities allowed by a potential permit will "jeopardize the continued existence of a species," and no protection measures are available to address the adverse impacts, the permit would not be issued pursuant to the ESA and Fla. Admin. Code R. 62-33.053(3)(a) 4, 62-331.201(3)(k), and 62-331.248(3)(j). If they find that protection measures are available to address those impacts such that a permit may be issued, project opponents are able to obtain review of that determination in the state administrative and judicial forums. Thus, Movants' attempts to tie their claims of irreparable harm to the Technical Assistance Process does not help their Motion, as the claimed "harm" is directly linked to the yet-to-be issued

permits.[23] Unless and until final permits are issued for the Bellmar Villages and/or Kingston projects with terms that jeopardize the continued existence of listed species or adversely modify designated critical habitat, there is no threat of imminent harm sufficient for a preliminary injunction. If such a situation occurs in the future, then either state permit can be challenged administratively (which results in an automatic stay of final agency action on the permit)[24] and judicially in Florida as described in detail in Florida Intervenors' previous briefing. Dkt. 102 at 29-36.

### 2. Movants' Three Year Delay In Filing Its Request For Preliminary Injunctive Relief Undercuts Their Claims Of Irreparable Injury

Plaintiffs' actions in this case also belies Movant's claim of immediate irreparable harm, which they have asserted from the beginning of this case but then only two Plaintiffs waited three years to request preliminary relief to address. *See*, *e.g.*, *W. Watersheds Project*, 468 F. Supp. 3d at 50 (finding plaintiffs "unexplained delays" in seeking emergency relief to enjoin the April 2019 Biological Opinion almost 11 months after issuance in May 2020 "undermine [plaintiffs'] contention that they will be irreparably harmed absent an injunction"); *Defs. of Conewango Creek,*

---

[23] Florida Intervenors have already cross-moved for summary judgment on species related Claims 3, 4, 5, 11 and 12 on several bases, including that those claims are not yet ripe. Dkt. 102 at 51-55; Dkt. 107 at 25-30. Movants' lack of irreparable harm with respect to the Bellmar and Kingston permit applications also show precisely why Movants' claims are not ripe. Movants' irreparable harm is tied directly to issuance of specific state issued permits, not FWS's Biological Opinion or the Technical Assistance Process which are at the heart of the species-related claims in Plaintiffs' Amended Complaint.

[24] When a petition for administrative hearing is filed, FDEP has a standard practice of sending a form letter to the permit applicant advising that FDEP has "received a petition for administrative hearing under Sections 120.569 and 120.57, Florida Statutes, challenging the Department's permitting decision." Wolfe Decl. ¶ 36. The letter explains that "action on this matter is proposed agency action only, and no permit has been issued" and, accordingly, "no action may be taken based on the above permit application, until the Department enters a Final Order either issuing or denying the above permit..." FDEP also reminds the applicant that they "must demonstrate prima facie entitlement to the permit issuance in any administrative hearing held under the filing of the petition." *Id.*

2007 WL 3023927 (finding delays in seeking preliminary relief to enjoin discharges under a state issued NPDES permit that allegedly impacted a listed species undercut assertions of irreparable harm); *Sierra Club v. U.S. Army Corps of Eng'rs*, 2005 U.S. Dist. LEXIS 36385, *60-61 (D.N.J. 2005) ("Plaintiffs' delay in moving for preliminary injunctive relief undermines their claim of irreparable injury."); *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) ("[F]ailure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggest that there is, is fact, no irreparable injury.") (internal citations and quotations omitted); *Kobell v. Suburban Lines,* 731 F.2d 1076, 1091 n.27 (3d Cir. 1984) ("the district court may legitimately think it suspicious that the party who asks to preserve the status quo through interim injunctive relief has allowed the status quo to change through unexplained delay.").[25]

What is obvious from their motion is that Movants believe that the potential source of irreparable harm is from specific state issued 404 permits (which their Amended Complaint does not address), not the FWS's Programmatic Biological Opinion or the Technical Assistance Process. Because the standard applied by FWS to review a proposed state permit issued under the 404 permitting program for Florida approved by EPA is the same or more rigorous than a proposed Corp permit, there is no basis to assert irreparable harm from either the Biological Opinion or Technical Assistance Process as set forth in detail in the next section.

---

[25] Others have tried Movants' tactic and failed. *See, e.g., Am. Forest Res. Council v. Williams*, No. 21-601, 2021 WL 4819846, at *4 (D.D.C. Oct. 13, 2021) ("[P]laintiffs' delay in seeking interim relief from this Court is highly indicative of the fact that plaintiffs do not in fact face the kind of harm warranting a preliminary injunction. . . Faced with plaintiffs' delay and their ultimate inability to point to a concrete, imminent harm from the challenged rules, it is difficult to not view this request for extraordinary relief as anything more than a procedural ploy to have the Court adjudicate their pending summary judgment claims more expeditiously.").

### 3. Since The State 404 Permitting Process Has The Same Or More Rigorous Species Requirements Than The Federal Permitting Process, There Is No Threat Of Irreparable Harm.

Movants' requested relief is premised on the notion that FDEP will issue Section 404 permits for these two projects that are less protective of species than permits resulting from the Corps-led 404 process such that the Florida panther and other species will be better protected from "irreparable harm" that Movants believe will occur absent extraordinary intervention by this Court. Yet, as already explained, the Florida-led 404 process ensures that the *same FWS offices* review the *same species-related information* using the *same legal standards* and provide the *same incidental take measures* as would apply in the Corps-led program. *See* Ex. C.

A comparison of the two programs clearly shows that the Florida-led process ensures *even more protection for species* and *even more public involvement* than the Corps-led process for at least three reasons:

a) FDEP *must* incorporate all FWS measures, terms, and conditions into the Section 404 permit (whereas the Corps *may* do so for their permits);

b) FDEP *must* deny a permit if FWS, NMFS, or FWC finds no protection measures are available to reduce the risk of jeopardy to an acceptable level (whereas the Corps *may* decide to issue a permit in such circumstances); and

c) the public has full access to review and comment on *all species-related information* before FDEP makes a final determination on the permit, which allows for FDEP, EPA, and the permit applicant to consider and respond to those concerns including with project and/or permit changes as warranted (whereas there is *no right of public review and comment* on the Biological Opinion/ITS under the Corps-led process).

Stated simply, while Movants seek to restore the Corps-led 404 program for these two permits, Movants cannot show that they will succeed on the merits in obtaining relief that avoids or changes the "irreparable harm" they assert will occur. This is fatal to their motion. Clearly, if the Corps had continued to process these two permits instead of Florida or was to begin processing them now,

the same permits would have been, or would be now, issued with the terms and conditions that are just as protective of species. Movants have not and cannot show otherwise.

In particular, Movants complain that the species reviews for these two projects have been inadequate because, among other things, FWS failed to ensure that the projects would not jeopardize the continued existence of the Florida panther and other species. *See e.g.,* Dkt. 135 at 30-34. For example, Movants argue that FWS failed to consider the cumulative effects of the project on the Florida panther, Dkt. 135 at 29-30, and that FWS was imposing inadequate incidental take measures, *id.* at 31. But on all of those points, the outcome of the Corps-led process would be no less protective of species than the Florida-led process.[26] A decision in recent weeks out of the U.S. District Court for the Middle District of Florida, in a lawsuit filed by Sierra Club (one of the Movants here using the same legal counsel representing Plaintiffs in this case), illustrates this point.

On November 1, 2023, the Middle District of Florida issued an order granting summary judgment for the Corps and FWS in a lawsuit by environmental groups challenging the Corps' Section 404 permit authorizing a three-mile expansion of a state road in Florida. *See Sierra Club v. U.S. Fish & Wildlife Serv.,* No. 2:20-CV-13-SPC-NPM, 2023 WL 7188933, (M.D. Fla. Nov. 1, 2023). Because the project would cross through habitat for the Florida panther, the Corps consulted with FWS before issuing the Section 404 permit. FWS issued a *21-page* biological opinion dated June 2020 finding that the road project is unlikely to jeopardize the continued existence of the

---

[26] Movants erroneously claim that FWS's "permit conditions express no limit on that take" of Florida panther and crested caracara. Dkt. 135 at 11. The ESA regulations require FWS to "specif[y] the impacts, i.e., the amount or extent, of such incidental taking on the species," noting that a "surrogate" such as "similarly affected species or habitat or ecological conditions" "may be used." 50 C.F.R. § 402.14(i)(1)(i). FWS and FWC have specified the amount or extent of take. *See* Duncan Decl. ¶ 26 Attach. F, FWS Report for Bellmar at 8, 16; ¶ 34 Attach. I, FWS Report for Kingston at 8, 21-22.

panther.

Counsel for Movants filed a lawsuit in the Middle District of Florida challenging the Section 404 permit, raising a long list of reasons why the species reviews conducted by the Corps and FWS for the road project were inadequate. The federal district court rejected *all of the Plaintiffs' arguments*, granting summary judgment in favor of the agencies and dismissing the case. Among other things, the court found that FWS adequately evaluated the environmental baseline for the project area, the effects of the project, and the cumulative effects on the panther. The court also rejected the groups' argument that using "habitat loss" as a surrogate to monitor incidental take rather than set a numerical take limit violated the ESA. The court found that FWS adequately explained why setting a numerical take is not practical and described the causal link between the surrogate metric and take. The court further found that the habitat loss surrogate provides a clear means for determining when anticipated take has been exceeded. In reaching these conclusions, the Middle District of Florida acknowledged that "[s]everal courts" in Florida had been called upon to address cases involving similar concerns about the Florida panther, noting that "the Court must exercise 'substantial deference' to the [FWS's] decision on 'how much data is necessary to fully address each [species-related] issue." *Id.* at *7 (citing *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008)).

Of course, these are precisely the same kinds of arguments that Movants are pressing in this case about alleged inadequacies of species protections arising out of the Florida-led process. At root, Movants object to FWS's approach to reviewing impacts to the Florida panther, but that only reinforces the fact that Movants experience no "irreparable harm" *from the continued*

*administration of the Florida-led process relative to the Corps-led 404 process.*[27] Indeed, Movants are equally unhappy with either the Corps or Florida issuing any Section 404 permits effecting panther habitat at all.

Notably, a comparison of the biological opinion for the project reviewed by the Middle District of Florida aligns with the species review documentation prepared for the two projects at issue in this Motion. For the Bellmar project, the publicly accessible FDEP permit file contains the FWS Technical Assistance Process Response report. *See* Duncan Decl., Attach. F. As shown in that response, FWS is participating in the species review process (which remains ongoing) and has been conducting an in-depth review whether the project has "adequate protection measures to avoid and minimize any incidental take that is reasonably certain to occur." *Id.* at 2. As such, FWS provided a list of "necessary avoidance and minimization measures" that FDEP must adopt in order to "ensure that the permitted activity is not likely to jeopardize any species, adversely modify or destroy critical habitat or to ensure that any incidental take is avoided or minimized." Id.

This included measures for species and critical habitat that are likely to be adversely affected by the project, including the Florida panther, the Florida bonneted bat, Audubon's crested caracara, and the tricolored bat. *Id.* Attach. F. Among other measures, FWS requires construction of wildlife crossings within the geographic region for the benefit of the Florida panther to provide and preserve a wildlife movement corridor. Pages 6 to 24 of the FWS response provides analysis of the action area, status of species, effects of the action, cumulative effects, amount of take (including numeric estimates), and jeopardy assessment. FWS determined that, "[u]pon FDEP's

---

[27] Movants have not pled that the outcome of the species review process under the Corps-led permit program would be any different in terms of protection of species. That is fatal to the requested relief in the Motion. *See Marino v. Nat. Oceanic & Atmos. Admin.*, 33 F.4th 593, 596-98 (D.C. Cir. 2022) (explaining that "redressability is established" only "where a remand would likely result in a favorable exercise of agency discretion," which requires that the plaintiff "plausibly plead that relief is indeed likely")).

incorporation of the necessary avoidance and minimization measures as permit conditions," the "issuance of the State 404 permit is not likely to jeopardize any federally listed species or adversely modify or destroy any critical habitat…" *Id.* Attach. F at 25. FWS based this opinion "on the information in the permit application, as well as the status of the affected species, and any cumulative effects within the permit applications' action area." The final 10 pages of the FWS response contains a set of "Special Conditions" and "Additional Commitments." A voluminous set of other documents in the FDEP Information Portal file also address species impacts issues. Wolfe Decl. ¶ 44; Duncan Decl. Attach. F. The volume of species-related information available to the public for review and comment as part of the ongoing Florida 404 permitting process for the Bellmar Project exceeds the volume of information available for review for the biological opinion reviewed by the Middle District of Florida. The same is true for the Kingston project. Wolfe Decl. ¶ 44; Duncan Decl. ¶ 36.

Ironically, because they cannot truly show a lack of comparability of species protections between the Corps-led and Florida-led 404 processes, the ultimate grounds for Movants' asserted harm is the lack of a "site-specific BiOp that is ***clearly reviewable*** in federal court to enforce the guarantees of the ESA." Dkt. 135 at 31 (emphasis added). But the record here provides voluminous species-related documentation along with the *opinion* of FWS as to the effects of these two projects. As such, there is no actual lack of a "site specific" biological opinion; in reality, FWS has provided its biological "opinion" to FDEP in comparable form and content to the "site-specific BiOp" Movants demand. Movants' point here is the ultimate "form over substance."

Concerning whether the substance of the FWS's species decision is "reviewable in federal court," Movants are careful to hedge their bets. Dkt. 135 at 8 (criticizing the lack of a biological opinion that is "***clearly susceptible*** to challenge in federal court" (emphasis added)). Whether

FWS's report and participation in the Technical Assistance Process are subject to challenge in federal court appears to be a question of first impression. But setting that aside, the terms and conditions in a final permit issued by FDEP would certainly be reviewable in state administrative and judicial forums, which is an adequate remedy at law. The state administrative and judicial review processes provide an avenue to vindicate Movants' concerns with the permit, including objections to terms and conditions related to species protection and claims that the permit fails to meet the criteria and requirements established as part of the Florida Section 404 Program.

### C.    Balance Of Equities And The Public Interest Do Not Favor Emergency Relief

In determining whether to grant a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "In exercising their sound discretion, courts . . . should [also] pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (quoting *Weinberger*, 456 U.S. at 312). "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The public consequences of granting the requested relief far outweigh the Movants' narrow interest in obtaining it. Here, there are two federal statutes at issue, the CWA and the ESA, with clear congressional intent that may appear inapposite, but in the context of the facts of this case actually are not. As detailed in Florida Intervenors' first argument, *supra* at I., Congress made clear that cooperative federalism is at the heart of the CWA, which is why Congress designed its key permit programs to be implemented and enforced by states in state courts. States like Florida, as well as the regulated public, have a strong interest in regulatory certainty, including that federally-approved state CWA permit programs will be administered in the normal course by those states. Granting the requested relief would: severely undermine Florida's ongoing implementation

of its CWA 404 program by reducing the administrative efficiency Congress created through cooperative federalism, delay or deprive the public of the environmental protections benefits of Florida's 404 program, as well as create public confusion and uncertainty regarding the permitting process. Wolfe Decl. ¶ 51. An injunction here, even if limited to just two projects, would likely have a severe chilling effect on the entire FDEP Section 404 permit program, potentially causing regulatory chaos with permit applicants lacking certainty as to whether FDEP could continue processing their applications or whether their applications, if granted, could be lawfully relied upon. Wolfe Decl. ¶ 50.

FDEP has hired and trained hundreds of employees to serve as Section 404 permitting staff, who have collectively spent hundreds of hours over the course of three years working on the review of these two permit applications. FDEP staff have held public meetings and reviewed extensive comments from a wide range of stakeholders, including other agencies (federal, state and local) and the public. FDEP has conducted public meetings and developed extensive analysis of the various issues relevant to a determination on these permit applications. The applicants themselves had expended significant resources and time in submitting permit applications and responding to additional FDEP requests for information.

In contrast, as detailed above, there is no threat of irreparable harm to listed species as FDEP has not yet made a decision on either the Bellmar or Kingston permit application or the terms of final permits, if issued. Moreover, even if permits were to be issued that may impact listed species, those permits can be challenged through both state administrative and judicial proceedings, which as explained above are more favorable than federal court to a challenger's concerns as an administrative appeal automatically prevents a permit from being finalized and there is no deference to the agency's decision under state law. Finally, there is no evidence that

the Technical Assistance Process itself leads to less protection for listed species. In fact, the opposite is true as detailed *supra* at II.C. The Florida Section 404 process ensures that the same agencies review the same species-related information using the same legal standards as in the Corps-led 404 program, and FDEP is required to adopt any species-related measures provided by FWS.

## CONCLUSION

For the foregoing reasons, Florida Intervenors respectfully request denial of Movants' motion for a temporary restraining order and preliminary injunction.[28]

Dated: January 12, 2024

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (DC Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

Lily N. Chinn (DC Bar No. 979919)
101 California Street
San Francisco, CA 94111
Phone: (415) 291-6200
lily.chinn@bakerbotts.com

Aaron M. Streett (TX Bar No. 24037561)
Harrison Reback (TX Bar No. 24012897)
(*pro hac vice*)
910 Louisiana Street
Houston, TX 77002-4995
Phone: (713) 229-1234
aaron.streett@bakerbotts.com
harrison.reback@bakerbotts.com

---

[28] Florida Intervenors take no position on whether this Court should set a bond.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of January 2024, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com