```
1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2

3     CENTER FOR BIOLOGICAL          )  Civil Action
      DIVERSITY, et al.,             )  No. 1:21-CV-119
4                                    )
                      Plaintiffs,    )  MOTION HEARING
5                                    )
      vs.                            )
6                                    )  Washington, D.C.
      ANDREW WHEELER, et al.,        )  October 19, 2023
7                                    )  Time:  2:08 P.M.
                      Defendants.    )
8     _____

9
                      TRANSCRIPT OF MOTION HEARING
10         HELD BEFORE THE HONORABLE JUDGE RANDOLPH D. MOSS
                     UNITED STATES DISTRICT JUDGE
11

12    _____

13                     A P P E A R A N C E S

14
      For Plaintiffs:          TANIA GALLONI
15                             CHRISTINA REICHERT
                               BONNIE MALLOY
16                             Earthjustice
                               4500 Biscayne Boulevard
17                             Suite 201
                               Miami, FL 33137
18

19    For Defendants:          ANDREW COGHLAN
                               ALISON C. FINNEGAN
20                             U.S. Department of Justice
                               P.O. Box 7611
21                             4 Constitution Square
                               150 M Street, NE
22                             Washington, DC 20002

23

24

25
```

```
 1              A P P E A R A N C E S (CONT'D.)

 2

 3    For Intervenor:          JEFFREY H. WOOD
                               Baker Botts, LLP
                               700 K Street, NW
 4                             Washington, DC 20001

 5                             LILY N. CHINN
                               Baker Botts, LLP
 6                             101 California Street
                               Suite 3200
 7                             San Francisco, CA 94111

 8

 9    Also Present:           AMBER CROOKS, Conservancy of Southwest
                              Florida;
10
                              ELISE BENNETT, Center of Biological
11                            Diversity;

12                            DANIEL FRANZ, Defenders of Wildlife;

13                            JUSTIN WOLFE, Florida Department of
                              Environmental Protection;
14
                              ERICA ZILIOLI, Army Corps of Engineers;
15
                              SIMMA KUPCHAN, EPA Office of General
16                            Counsel.

17

18

19

20
      Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
21                            Official Court Reporter
                              United States Courthouse, Room 6714
22                            333 Constitution Avenue, NW
                              Washington, D.C. 20001
23                            202-354-3246

24

25
```

```
1                        P R O C E E D I N G S
2              THE COURTROOM DEPUTY:  Your Honor, we're here on
3    Civil Case 21-119, Center for Biological Diversity, et al. v.
4    Leopoldo Miranda-Castro, et al.
5              Would counsel please state their names for the record
6    at the podium, starting with plaintiffs' counsel.
7              MS. GALLONI:  Good afternoon, Your Honor.  Tania
8    Galloni on behalf of the plaintiffs.
9              THE COURT:  Good afternoon to you.
10             MS. REICHERT:  Good afternoon, Your Honor.  Christina
11   Reichert on behalf of the plaintiffs.
12             THE COURT:  Good afternoon.
13             MS. MALLOY:  Good afternoon, Your Honor.  Bonnie
14   Malloy on behalf of the plaintiffs.
15             THE COURT:  Good afternoon.
16             MS. MALLOY:  I'd also like to introduce our clients
17   that are here with us.  Amber Crooks with the Conservancy of
18   Southwest Florida; Elise Bennett with Center of Biological
19   Diversity; and Daniel Franz with Defenders of Wildlife.
20             THE COURT:  Great.  Thank you.
21             MS. FINNEGAN:  Good afternoon, Your Honor.  Alison
22   Finnegan for the federal agencies.
23             THE COURT:  Good afternoon to you.
24             MR. COGHLAN:  Good afternoon, Your Honor.  Andrew
25   Coghlan for federal defendants.
```

```
1                THE COURT:  Good afternoon.

2                MR. COGHLAN:  And with Ms. Finnegan and I at

3    counsel's table is Simma Kupchan from EPA's Office of General

4    Counsel; and Erica Zilioli from the Army Corps of Engineers

5    counsel's office.

6                THE COURT:  All right.  Thank you for being here.

7                MS. CHINN:  Good afternoon, Your Honor.  Lily Chinn

8    for the intervenors.

9                THE COURT:  Good afternoon.

10               MR. WOOD:  Good afternoon, Your Honor.  Jeff Wood for

11   the State of Florida and the Florida DEP, intervenors.  We're

12   joined here today by Mr. Justin Wolfe, the general counsel of

13   the Florida DEP.

14               THE COURT:  Okay.  Well, welcome to all of you.

15   Thank you.

16               All right.  Well, we're here for argument on

17   plaintiffs' motion for summary judgment, the defendants'

18   cross-motion for summary judgment, and intervenor's motion for

19   summary judgment.

20               There's, obviously, a lot here.  I'll leave it up to

21   you to figure out how you want to organize things, and I will

22   go ahead and start with counsel for the plaintiffs.

23               MS. REICHERT:  Thank you, Your Honor.  Because of the

24   complexity and number of issues in this case, we'd like to

25   divide our argument between the Endangered Species Act claims,
```

1    which I would cover, and the Clean Water Act and Rivers and

2    Harbors Act claims, which my colleague Ms. Galloni would

3    address.

4           THE COURT:  Okay.  That's fine.

5           MS. REICHERT:  We would also like to reserve time for

6    rebuttal.

7           THE COURT:  I will do my best in that regard.  It

8    depends on, I think, how long you-all go and just whether we

9    have enough time left at the end of the day.  But if we do, I'd

10   be happy to allow that.

11          MS. REICHERT:  Thank you, Your Honor.  And I'd like

12   to start with a quick roadmap of our case in its entirety and

13   then turn to the Endangered Species Act.

14          THE COURT:  Okay.

15          MS. REICHERT:  The agency's actions here represent a

16   massive undermining of our core environmental laws, including

17   the Endangered Species Act, the Clean Water Act, and the Rivers

18   and Harbors Act.  It is alarming because the Florida model can

19   be used and applied across our country, including in other

20   areas that are very important to our nation's wetlands and by

21   diversity.

22          THE COURT:  Isn't -- hasn't it been applied for many

23   years, at least in similar form, for purposes of Section 402

24   permitting?

25          MS. REICHERT:  Which aspect, Your Honor?

1          THE COURT:  Well, I mean, obviously, there's certain

2     aspects, I guess, that don't apply to the source context.  But

3     there are a number of aspects of this that seem to track what

4     is done under Section 402 or what the agency has done --

5     permitted under 402 in the past; the programmatic biological

6     opinions, the programmatic ITS, the reliance on various state

7     enforcement authorities, and things of that nature.

8          MS. REICHERT:  I see.  I'm happy to address, first,

9     the Endangered Species Act portion.

10         For approval of a State 402 program, there is not

11     consultation under the Endangered Species Act, and there's not

12     a programmatic Incidental Take Statement that covers all

13     permitting that undergoes state permitting under a State 402

14     program.  So this is unique.

15         This is also not what has happened for other 404

16     programs that were approved.  The cooling water case, which is

17     cited extensively by the defendants, involves a particular

18     regulatory provision to create technology standards for State

19     402 programs, but it's not about an assumption of a 402

20     program.

21         THE COURT:  I recognize, I guess, the case is not

22     about the assumption of a 402 program, but it's implicit in the

23     analysis from the Second Circuit; at least, where the Second

24     Circuit concludes that the Endangered Species Act requirements

25     are satisfied where the actual permitting decisions are going

1        to be made, in most cases, by the states.  And that there's

2        going to be a -- there was only a programmatic Incidental Take

3        Statement in that case and only a programmatic biological

4        opinion in that case.

5                MS. REICHERT:  Your Honor, as we've put forward in

6        the briefs, cooling water is wrongly decided, and it's contrary

7        to the law of this circuit, including *North Slope* and *Brownlee*,

8        where courts here have applied the Connor rule that the agency

9        must consider all aspects of a federal action before

10       authorizing it under a programmatic biological opinion.

11               THE COURT:  I'm curious whether cooling water is a

12       standalone exception to the rule as far as you're concerned or

13       whether there are other programs under Section 402 -- I assume

14       not under 404 -- but other 402 permitting programs or anything

15       similar to that where the EPA has assigned or allowed a state

16       to assume permitting authority using a similar model.

17               MS. REICHERT:  To our knowledge, Your Honor, the

18       cooling water case stands alone in both the approach of the

19       programmatic opinion and programmatic ITS and also the holdings

20       of the Court.

21               THE COURT:  So, I mean, I read in your briefs, I

22       think, where you indicated that -- well, I'm trying to -- I

23       thought -- and maybe I'm mistaken about this.

24               I thought the defendants represented that, even

25       though there may not be judicial decisions on it, that there

1    were other programs that have followed the cooling water model

2    or taken a similar approach, and they may not have been

3    challenged.  But if there are others out there -- I just don't

4    know the answer to that question, whether there are or not.

5            MS. REICHERT:  There haven't been any that have been

6    introduced in briefing as examples of this being done, Your

7    Honor.

8            THE COURT:  Okay.  Thank you.  I apologize for

9    interrupting you so early.

10           MS. REICHERT:  That's all right.  Turning back to the

11   affirmative case, Congress in the Clean Water Act created a

12   minimum set of standards that all state programs must apply and

13   comply with in order to take over the 404 program.

14           Congress also ensured that the Corps would retain

15   jurisdiction over all traditionally navigable waters, and in

16   the ESA, Congress created strong protections for our most

17   imperiled species.  Because the agency's actions here failed to

18   abide by those congressional mandates, they are unlawful and

19   must be vacated.

20           Turning to the ESA, in particular, Florida's wetlands

21   support more than 130 threatened and endangered species,

22   including sea turtles, the West Indies manatee, and the

23   critically endangered Florida panther.  Southwest Florida, in

24   particular, is the last remaining habitat area for the Florida

25   panther, with population estimates as low as 120 species --

1    adults left in the wild.  The agency actions here threatened

2    this species, in particular, to the brink of extinction.

3            U.S. Fish and Wildlife Service here consulted on

4    EPA's action, which included the transfer of authority to the

5    state of Florida, as well as the implementation of that

6    decision; however, it violated the ESA in three ways.

7            First, U.S. Fish and Wildlife Service discarded the

8    clear mandates of the Endangered Species Act and its

9    implementing regulations when it refused to consider the entire

10    action, including general permits, no permit required

11    decisions, and the loss of NEPA and ESA consultation.

12            It also failed to analyze the baseline status of the

13    species considering all current and past activities in the

14    action area.

15            THE COURT:  So I had some questions for you about

16    this topic.  One question I had was, in your view, in engaging

17    in the analysis required in the biological opinion and

18    analyzing the agency action here, is the baseline that Fish and

19    Wildlife should have looked at -- in your view, what were the

20    risks and impacts of taking the program and transferring it

21    from the Corps to the state, or is the baseline that should be

22    looked at no permits are being granted versus these permits

23    being granted for purposes of that type of analysis?

24            In other words, are you supposed to say, well -- for

25    example, if the EPA were of the view that the state was going

1      to do the job just as well as the federal authorities and the

2      Corps, would the answer simply be there's not any impact on any

3      endangered species from this agency action because we think

4      that the state is going to do the job just as well as we're

5      going to do it?  Or is it, instead, you look at and you say the

6      action here is granting permitting authority to the state, the

7      state is going to grant permits, and what they have to look at

8      is -- in granting those permits is the -- the granting the

9      permits going to result in jeopardy to any endangered species?

10            MS. REICHERT:  Yes, Your Honor.  The latter.  Under

11     the Endangered Species Act, the way the baseline is defined is

12     all past and present activities that are done by private,

13     state, and federal actors.  And so that is backward-looking and

14     focused on status of the species themselves at the point where

15     the decision is made.

16            And the impacts of the action are also defined very

17     broadly in terms of what Fish and Wildlife Service was required

18     to consider.  It includes all reasonably foreseeable but-for

19     actions that flow from the agency decision.

20            And so that would include the state issuing permits

21     on areas within the state and the impacts on species from those

22     permits

23            THE COURT:  So what would I look to; just the

24     language of the statute?  Or where would I look to confirm that

25     the baseline is no permit versus issuance of permits versus

1    issuance of permits by the Corps versus issuance of permits

2    issued by the state?

3            MS. REICHERT:  The definitions would be in the

4    federal regulations in 50 CFR 402.02.  And then I think the

5    Court could look to case law, especially the nationwide permit

6    case law, including *Brownlee*, where the Corps was creating new

7    nationwide permits to cover a set of actions that, you know,

8    theoretically, would have been permitted otherwise had the

9    nationwide permit not been created.

10            THE COURT:  And then my other question for you is, if

11   it's the latter and that you -- the baseline is no permit and

12   then you analyze what the issuance of the permits would -- what

13   threat issuance of permits would pose, what would that look

14   like at a programmatic level, that type of analysis?

15            Because you can imagine that it could be a

16   breathtaking challenge.  There are hundreds, if not thousands,

17   of waterways -- probably thousands in Florida.  There are

18   critical habitats.  The program -- the assumption is for time

19   immemorial; it's going to go on forever.

20            And how would Fish and Wildlife go about saying,

21   okay, what is the development going to look like -- all

22   development going to look like with respect to endangered

23   species in the state of Florida over the next 25 years?  And

24   we're going to have to go waterway by waterway and critical

25   habitat by critical habitat and endangered species by

1    endangered species.  I'm trying to get a sense of, if I agree

2    with you, what it means they would have to do and what it would

3    look like.

4         MS. REICHERT:  Thank you, Your Honor.  First, I would

5    say that the Endangered Species Act doesn't require perfect

6    foresight.  It requires them to use the best available

7    information they have to create an assessment of jeopardy.

8         And then the ESA creates reinitiation requirements

9    for when the new information arises or when take limits are

10   exceeded to have the agency look back and reassess and

11   determine if there needs to be changes to protective measures

12   placed in the initial biological opinion so that jeopardy

13   doesn't occur.

14        In terms of a particular example, Your Honor,

15   plaintiffs pointed to the JAXBO Bi Op in our briefs.  This was

16   a biological opinion conducted by the National Marine Fisheries

17   Service.  It covered 10n categories of 404 permits that the

18   Corps would issue in Florida and the Caribbean.  The agency

19   looked at historic permitting data and historic consultations

20   to project future permitting; also adjusted that projection

21   based on development trends.

22        And then the agency analyzed the effects of that

23   future permitting on eight -- on species in particular and

24   created design criteria to minimize the impacts of those

25   permitting actions on species.

1          The agency also looked at habitat areas that may be

2    incredibly valuable for these species and created exclusion

3    zones where permitting could not occur, and the agency created

4    protective zones that would require a closer look when

5    permitting occurred in those areas.

6          So it has happened already in Florida using 404

7    permitting data to do the exact analysis that the ESA requires.

8          THE COURT:  And prior to the assumption, is the way

9    this worked is that the Army Corps would have to consult with

10   Fish and Wildlife before granting each and every permit?

11         MS. REICHERT:  No, Your Honor.  There were some

12   programmatic biological opinions in place for particular

13   species where the Corps could use consultation keys to

14   determine, based on those programmatic consultations, whether

15   there would need to be further protections and further

16   consultation with Fish and Wildlife Service.

17         Under those systems, concurrence was still required

18   for Fish and Wildlife.  They couldn't just operate under their

19   own autonomy.  And if they found that there would need to be

20   additional consultation, they would conduct that consultation

21   as required.

22         THE COURT:  Can you give me an example of one of the

23   programmatic ones?

24         MS. REICHERT:  Yes, Your Honor.  There's one for the

25   indigo snake in Florida.  So it would ask questions of the

1    Corps as to what size of project it was, the location of the

2    project, whether there were locations of burrows where the

3    snakes reside.

4           And then, depending on the answers to those

5    questions, the agency would calculate the mitigation that was

6    required and/or find that they have to consult with Fish and

7    Wildlife Service because there would be an impact of a

8    magnitude that would require that.

9           THE COURT:  So here, what they would have had to have

10   done would, essentially, do that, but 130 times over then?

11          MS. REICHERT:  Well, I think, in terms of how the

12   permitting itself would occur, it may not have to be done in a

13   species-specific level.  I think that there could be some form

14   of a technical assistance process where Fish and Wildlife

15   Service is actually required to be engaged on permits and

16   concur on decisions that the state is making where that would

17   be allowable under a programmatic opinion that has real binding

18   requirements on the state as well, like a take limit,

19   mitigation measures, and so forth.

20          THE COURT:  So on the take limit, using that as an

21   example -- for example, if this had been done here and there

22   actually had been the type of biological assessment and the

23   type of Incidental Take Statement that you submit is required

24   here, would it say that -- for example, with respect to the

25   black panther -- is that what it is?

1            MS. REICHERT:  The Florida panther.

2            THE COURT:  Florida panther.  I'm sorry.  The Florida

3    panther.

4            With respect to the Florida panther, that that

5    species is so in danger that the incidental take is zero, and

6    we will not -- and that any incidental killing of the Florida

7    panther would constitute a violation.  On the other hand, with

8    respect to the --

9            MS. REICHERT:  Indigo snake could be another example.

10           THE COURT:  The indigo snake, not as endangered.  The

11   species would not be put at risk itself by the loss of a few

12   snakes.  But if a project of X magnitude would result in the

13   incidental taking of more than five snakes or one snake nest,

14   or whatever it might be, that under those circumstances, you

15   could not proceed without further conditions and restrictions.

16   Is that the sort of thing -- and then you go species -- not

17   necessarily species by species, but at least group of species

18   by species and habitat by habitat as -- or critical habitat by

19   critical habitat as well.

20           And they say this particular critical habitat is so

21   at risk in Florida that you just need to -- there's a bright

22   red line around that.  Not only can there not be any actual

23   development in that habitat without risking violating the

24   Endangered Species Act, and we're certainly not going to give

25   you liability protection with respect to anything there; and,

1    indeed, if there's runoff into that area, here are the

2    following restrictions that would have to apply.

3              MS. REICHERT:  Yes, Your Honor.  I believe that is

4    what the JAXBO Bi Op shows was done, because that is what the

5    National Marine Fisheries Service did in terms of habitat and

6    species.

7              THE COURT:  Do I have -- I remember reading about

8    this in your briefs.  Do I actually have a citation to that

9    document?

10             MS. REICHERT:  Yes, Your Honor.  I'm happy to provide

11   that to you with a hyperlink to the access on the Corps'

12   website.

13             THE COURT:  If it's in the briefing, we can find it.

14   If it's not, I can just ask that you give that to me.  I would

15   like to see -- have in mind what you think they should have

16   done here.

17             MS. REICHERT:  Yes, Your Honor.

18             THE COURT:  Okay.  You can go ahead and continue.

19             MS. REICHERT:  Thank you.  In addition, Fish and

20   Wildlife Service affirmatively disavowed any duty to analyze

21   the effects of this action on species, claiming that it lacked

22   sufficient information.

23             However, as I just explained to the Court, that is

24   undermined by the fact that the National Marine Fisheries

25   Service did this exact analysis using the same kind of data.

1          Second, despite having not done the analysis required

2     under the ESA and its implementing regulations, U.S. Fish and

3     Wildlife Service created an unlimited incidental take liability

4     exemption that covered EPA, the state, and all future

5     permittees for the life of the program.  However, the ESA very

6     clearly requires that a take limit be instituted.

7          Also, the agency created no triggers for

8     reinitiation.  So that if in the future it turns out the take

9     is happening at a level that even could jeopardize species,

10     there's no mechanism in the ITS that would require consultation

11     to occur.

12          Finally, the --

13          THE COURT:  Do you know if, in practice, the permits

14     or some of the permits that Florida is issuing, after

15     submitting them to the EPA for the EPA's review, and permitting

16     Fish and Wildlife the opportunity to review it, do you know if

17     they're including in those permits the equivalent of a take

18     limitation?

19          MS. REICHERT:  Yes, Your Honor.  We know of at least

20     one example where take was anticipated based on the record for

21     the permit; and this is the Babcock project in our plaintiff --

22     Ms. Crooks' declaration, where take was anticipated in the

23     record, but there was no take limit created in the final

24     permit.

25          And we can show Your Honor as well -- I'm happy to

1    provide this -- the annual reporting that Florida has sent to

2    U.S. Fish and Wildlife Service and EPA that, similarly, does

3    not have evidence of take limits being created at the permit

4    level.

5            THE COURT:  I'll, obviously, ask counsel for Florida

6    and for the United States the same question.

7            At least, to your knowledge, are you aware of any

8    permits that have included take limitations in them?

9            MS. REICHERT:  I think there were two permits noted

10   on the annual report where they had mitigation requirements

11   listed as the take limits, but that's not the same as what is

12   required under the Endangered Species Act.

13           So it's unclear -- I haven't looked at those two

14   particular permits to assess whether they're equivalent to what

15   a take limit would be if the consultation had occurred.  But

16   those are the only two examples that I'm aware of.

17           THE COURT:  If there is a take limitation that is

18   imposed at the federal level, so the Corps is issuing permits,

19   the Corps includes -- or Fish and Wildlife includes a take

20   limitation, along with the issuance of a Corps permit, if that

21   take limitation is violated, obviously, the United States has

22   enforcement authority.

23           Do environmental groups like yours have some type of

24   ability to either petition Fish and Wildlife or the EPA to take

25   action?  Is there a citizen suit-type approach, or can you

1    actually bring an action to challenge the violation of the take

2    limitation?

3              MS. REICHERT:  Yes, Your Honor.  I think there are

4    lots of examples where environmental groups have sued the

5    wildlife agencies, either U.S. Fish and Wildlife Service or the

6    National Marine Fisheries Service, for failing to reinitiate

7    consultation when it was required based on new information or

8    when take limits were exceeded.

9              As far as approaches towards the permitted

10   individuals themselves, any future activity that would be in

11   violation of an ITS would be liable for Section 9 take

12   prohibition.  However, that requires evidence of take having

13   occurred.

14             And so rather than -- the way that consultation

15   works, which is to prevent take from happening, you wouldn't be

16   able to bring an action until it has already happened and the

17   species has been impacted.

18             THE COURT:  And could an environmental group bring

19   that action, or is that only in the -- only up to the justice

20   department to do that?

21             MS. REICHERT:  For a Section 9?

22             THE COURT:  Yes.

23             MS. REICHERT:  Yes.  After filing a 60-day notice,

24   which would allow the federal agencies to intervene, yes, Your

25   Honor.

```
1              THE COURT:  Okay.  Now, how does this work with
2     Florida?  I take it that it may well be the position of the
3     government and we'll -- or the government's -- and I'll hear
4     from them on this -- but that the rules that apply in Florida
5     are all part and parcel of the federal program, and I know that
6     you take the position that, well, it couldn't possibly be
7     because the biological opinion wasn't issued until after the
8     comment period had closed.  But assume that I disagree on that
9     for present purposes.
10             And their view is, you can do exactly the same thing
11    with Florida because if there is a take limitation that is
12    included in a permit, that is all being done pursuant to the
13    memorandum agreement and the biological opinion and the ITS
14    and, therefore, if -- and I'll have to ask them the same
15    question.  But at least, hypothetically, the Florida developer
16    who doesn't comply with the conditions that are intended to
17    ensure the take limitation or doesn't comply with the ITS
18    conditions, can you do anything about that, or are your hands
19    tied?
20             Or would you just have to bring a Florida action in
21    Florida state court instead of an action in federal court
22    against -- in which Fish and Wildlife might be a party?
23             MS. REICHERT:  Thank you, Your Honor.  In terms of
24    the Endangered Species Act, if there -- there's a few different
25    parts to this answer.
```

1          So, first of all, your hypothetical would mean that a

2     take limit was created at the permit level, which, as I've

3     said, is not what's happening.

4          THE COURT:  Right.

5          MS. REICHERT:  And the way that the ITS covers the

6     state program is, as long as any action in compliance with the

7     ITS occurs, it's covered and exempt from liability coverage.

8     The ITS terms and conditions don't have any requirements for

9     permittees.  The only requirements are on EPA and the State of

10    Florida.

11         So it's unclear whether there is this opportunity, if

12    a permit violates a take limit, whether the ITS covers -- would

13    lead to that being a Section 9 violation because the terms and

14    conditions are only as to EPA and Florida.  And their job for

15    EPA is to use its Clean Water Act oversight authority; and for

16    Florida, it's to engage in this technical assistance process.

17         There are parts of the biological opinion where Fish

18    and Wildlife assumes compliance with permit conditions that are

19    created.  So there may be an opportunity, but it's not as clear

20    as a take limit that is created in the ITS where it's very

21    clearly a requirement that would be violated.

22         THE COURT:  How does this work in -- in New Jersey

23    and Michigan?

24         MS. REICHERT:  Michigan has its own state Endangered

25    Species Act program, which is what it uses to ensure no

1    jeopardy at the permit level.  They didn't do consultation

2    under the Endangered Species Act, and so any take liability

3    coverage is due to their own already preexisting agreement on

4    their state program -- their state endangered species program.

5              THE COURT:  I take it that was because at that point

6    in time the EPA was of the view that the assumption authority

7    was nondiscretionary?

8              MS. REICHERT:  Right, Your Honor.

9              THE COURT:  And the same thing for New Jersey?

10             MS. REICHERT:  No.  For New Jersey, Your Honor, they

11   initiated consultation.  And during that process, New Jersey

12   shifted its program so that any permit that may affect species

13   would go through the federal agencies and, therefore, they

14   found there would be no effect on any protected species through

15   their program, so they did not complete consultation.

16             THE COURT:  I see.  Which, I take it, is -- your

17   bottom line here is that Florida or the EPA, in conjunction

18   with Fish and Wildlife, could have done either of those two

19   things here, but what they can't do is, in your view, abdicate

20   the Endangered Species Act consultation process?

21             MS. REICHERT:  Right, Your Honor.  There are more

22   options also.  States have been working on this issue for years

23   and have proposed doing statewide Section 10 permits having an

24   off-ramp for federal permitting.

25             Florida advocated for this approach to get the

1    broadest incidental take liability exemption it could get

2    without doing the required analysis of Section 7 or Section 10.

3              THE COURT:  All right.

4              MS. REICHERT:  Third, Your Honor, Fish and Wildlife

5    Service ignored the plain language of the Endangered Species

6    Act in its implementing regulations, as well as the sea of

7    authority on consultation, both programmatic and site-specific.

8    And, instead, it relied on the single outlier case that is

9    contrary to the law of this circuit, was wrongly decided and

10    distinguishable on its facts.

11              THE COURT:  I know what case you're going to say.

12              MS. REICHERT:  That would be the cooling water case,

13    Your Honor.

14              However, the ESA creates no exceptions for

15    programmatic or site-specific consultation.  It applies with

16    equal force to both, and that's what the most recent

17    regulations from Fish and Wildlife Service said explicitly.

18              And the TA process as well is not a stand-in for the

19    programmatic consultation that should have occurred here, and

20    the defendants don't argue that it is.

21              In reality, U.S. Fish and Wildlife Service is

22    required to only receive and review permit applications.  It's

23    not required to use the best available science.  The agency

24    need not analyze the baseline status of species.  The agency

25    does not need to analyze impacts to species from the permit or

 1    cumulatively across the program.  They're not required to come

 2    to a jeopardy determination or to issue take limits.

 3             In this program, U.S. Fish and Wildlife Service would

 4    never follow the ESA's mandates, not at the programmatic, nor

 5    at the permit level.  This is a clear violation of the

 6    Endangered Species Act.

 7             For its part, EPA unlawfully relied on Fish and

 8    Wildlife Service's actions when approving the State 404

 9    program, and it failed to consult on nesting sea turtles and

10    species under the jurisdiction of the National Marine Fisheries

11    Service.

12             THE COURT:  What is the status of the further review

13    that the NMFS is doing or what it promised to do with respect

14    to the non-assumed but, potentially, affected waters?

15             MS. REICHERT:  I'm happy to let the defendants

16    address that one in terms of what the National Marine Fisheries

17    Service is doing.

18             I know that EPA has completed its biological

19    evaluation and submitted that to NMFS, identifying impacts to

20    some of the species that are under the jurisdiction of NMFS.

21             THE COURT:  Okay.  I think this is the one that we

22    would hope might be done by July.

23             MS. REICHERT:  Uh-huh.

24             THE COURT:  I take it your view is that, to the

25    extent that the -- that Florida's application relied on the

1    memorandum agreement and to the extent the memorandum agreement

2    anticipated these various studies, that this isn't the sort of

3    thing that can be cured after the fact.  I want to make sure --

4    and that your concern is that without it -- that there's a --

5    essentially, a notice and comment problem if it's done now.

6           Even if -- you probably will have objections to

7    whatever is done, but even assuming you didn't have objections

8    to the substance of it, that there would be a notice and

9    comment problem; do I understand your position right on that?

10          MS. REICHERT:  Yes.  I think there's a few problems

11   with the reliance on -- if we're talking about the -- I'll

12   start with just NMFS in particular.

13          THE COURT:  Okay.

14          MS. REICHERT:  So one problem is that approval

15   itself, the program itself is required to show that no permit

16   would issue that would jeopardize a species.

17          EPA, in approving that program, finding that

18   404(b)(1) guideline was met relied on the biological opinion

19   and the no-effect determination.  And so the entire approval,

20   and that provision in particular, is tainted by the fact that

21   the no-effect determination was unlawful and also the

22   biological opinion and TA process would be unlawful.

23          THE COURT:  I think you said -- you just said better

24   what I was trying to ask you as to whether that was your

25   position.  Okay.  That's helpful.  Thank you.

1          MS. REICHERT:  Yes, Your Honor.  And that -- I'm

2    happy to turn the podium over to Ms. Galloni if you have no

3    further questions on the Endangered Species Act.

4          THE COURT:  Why don't we do that.  We have a lot of

5    ground to cover today.  Thank you.  It was very helpful.

6          MS. REICHERT:  Thank you.

7          THE COURT:  Ms. Galloni.

8          MS. GALLONI:  Thank you, Your Honor.  EPA's approval

9    of Florida's 404 program also violated the Clean Water Act in

10   three ways.

11         First, it approved a state program that did not meet

12   federal criteria, including as to criminal enforcement and the

13   404(b)(1) guidelines.

14         Second, it transferred authority to the state over

15   non-assumable waters.

16         And third, EPA was only authorized to approve a

17   complete program submission, but Florida's program submission

18   failed to adequately describe the waters that would be assumed

19   and demonstrate that its permits would not jeopardize species.

20         I'll start first with criminal enforcement, Your

21   Honor.  EPA violated Section 1344(h), which is the provision

22   that requires that state programs demonstrate adequate

23   authority to abate violations under the act under both civil

24   and criminal penalties.

25         The criminal violations, Your Honor, are enumerated

1      in Section 1319(c), and the floor for criminal liability under

2      the act is simple negligence.  That's not in dispute.

3              THE COURT:  I take it your position, then, is that

4      there never could be an assumption in Florida absent an

5      amendment to the Florida Constitution?

6              MS. GALLONI:  The position of Florida has been that

7      it is unconstitutional to criminalize simple negligence.  I

8      will say that the Florida Constitution has been amended many

9      times and, in fact, built into the constitution is a revision

10     every 20 years; there's a constitutional revision commission

11     that proposes changes to the constitution.  So amending the

12     constitution is a regular process in Florida.

13              But, yes, at the current position.

14              THE COURT:  Okay.  All right.  Thank you.

15              MS. GALLONI:  This goes to one of our points, Your

16     Honor.  If states want to assume the 404 program, they have to

17     get up to the federal floor those minimum criteria, and that's

18     something Florida did not do here.

19              Criminal liability under Section 1319(c) attaches a

20     permit whether it's issued by the Corps or the state.  And,

21     therefore, as I've said, a state must demonstrate that

22     authority to abate simple negligence violations.

23              If Congress intended for the states to take over 402

24     and take over 404, as the defendants have said, and be

25     primarily responsible for enforcement, it would make little

1    sense to interpret that abate violations provision or to

2    interpret 1319(c) as applying only to enforcement actions by

3    EPA.

4              THE COURT:  In your view, is the difference between

5    criminal negligence and negligence a difference of intent?

6    Because I think that's the language in the reg, right?

7              MS. GALLONI:  Yes, it is a difference of intent.  The

8    regulation says the burden of proof for state programs shall be

9    no greater than the burden of proof required for EPA under the

10   act.  And the burden of proof required under the act is simple

11   negligence.

12             THE COURT:  Although the burden of proof usually

13   would mean a preponderance of the evidence, clear and

14   convincing evidence, beyond a reasonable doubt.  That's the way

15   I would usually use the word -- the phrase burden of proof.

16             That's why I was asking you about -- I thought there

17   was some other language in the regulation that went beyond

18   burden of proof and talked about intent.  I was trying to put

19   my finger on which aspect of the reg you were relying on.

20             MS. GALLONI:  I will say, primarily, Your Honor,

21   we're relying on the plain language of the provision.

22             THE COURT:  Oh, here it is.  Let's see.  I think the

23   language is the burden of proof and degree of knowledge or

24   intent required under state law.

25             MS. GALLONI:  Right.  Shall be no greater than that

1      required of the EPA under the act.

2                THE COURT:  Right.

3                MS. GALLONI:  And the act, again, the burden of proof

4      or the intent -- the intent under the act is simple negligence.

5                THE COURT:  Right.

6                MS. GALLONI:  Defendants argued at one point that

7      Section 1319 does not define the violations of the act; that

8      only Section 1311 does that, or that Section 1311 also does

9      that.  But Section 1311 only relates to discharges of a

10     pollutant.  It's not cross-referenced in Section 1344(h) any

11     more than Section 1319 is.

12               We think Congress spoke very plainly by saying that

13     states must be able to abate violations of the act, and we know

14     where those are found; Section 1311 and Section 1319.

15               THE COURT:  Is the standard, as far as you know, in

16     New Jersey and Michigan simple negligence?

17               MS. GALLONI:  I can look.  According to the

18     government's submission, it looks like it may be in Michigan,

19     but not in New Jersey.

20               THE COURT:  Okay.

21               MS. GALLONI:  I will point out, though, Your Honor, I

22     know that the government had that addendum -- right? -- with

23     the states -- with 25 states that have a higher --

24               THE COURT:  I know your point is that most of it was

25     adopted before it was clarified in the circuits.

1          MS. GALLONI:  Right.  23 of them were adopted -- 21

2     of them were adopted.

3          THE COURT:  21 of 25?

4          MS. GALLONI:  Well, one of the states doesn't have a

5     program.  That's New Hampshire.  So that brings us down to 24.

6          So 22 of the 402 programs were approved before the

7     first circuit court announced that the standard was simple

8     negligence in 1999.

9          THE COURT:  Okay.

10         MS. GALLONI:  And, again, the only evidence that's in

11    the record that EPA ever gave this any thought is with regard

12    to the Idaho program where EPA said, oh, Idaho, your intent

13    standard is higher than what's required of EPA; we're not going

14    to be able to approve your program.

15         Then there was a change in administration, change in

16    position; they went forward with it.  Got challenged in the

17    Ninth Circuit, and the Ninth Circuit held their ground and

18    said, no, the burden of proof can't be any greater -- the

19    intent standard can't be any greater.

20         THE COURT:  Right.

21         MS. GALLONI:  On the statute of limitations, Your

22    Honor, Florida also has a shorter statute of limitations for

23    enforcement; one to three years, compared to the five-year

24    statute of limitations.  EPA's regulations provide that a state

25    program cannot be any less stringent than federal law requires,

1    but a shorter statute of limitations is less stringent because

2    it requires prosecutors to act quicker than they would be

3    required to under the federal standard.

4         I'll move on to the 404(b)(1) guidelines, if you

5    don't have any further questions on enforcement

6         THE COURT:  I'm sure I do, but let's move on.

7         MS. GALLONI:  I'll be here all day.  So on the

8    issuance of permits, Florida's program also failed to meet the

9    404(b)(1) guidelines.  And Section 1344(h) requires that state

10   permits -- I'm sorry -- that state programs show they will

11   issue permits that apply to 404(b)(1) guidelines.

12        The 404(b)(1) guidelines, in turn, require the

13   permitting authority to make factual determinations on a whole

14   series of issues related to the issuance of a permit.  But

15   nothing in the Florida program requires DEP to make factual

16   determinations.

17        Instead, the state relies on the applicant's

18   reasonable assurances that permit requirements will be met.

19   This is a feature and not a bug of Florida's program.  The

20   standard is vague, subjective, and deferential to applicants.

21        So regardless of whatever substantive criteria DOJ

22   can point to that parallels in the state and federal program,

23   at the end of the day, the state is still relying on the

24   applicant's reasonable assurances; whereas, the Corps is

25   required to make factual determinations.

```
1          And every subpart of Section -- of the 404(b)(1)

2     guidelines expressly states that the Corps must make factual

3     determinations regarding all of these issues and then use those

4     factual determinations to inform its finding of compliance or

5     noncompliance.

6          DEP -- the issue is not whether DEP can rely on

7     applicant information.  It can.  But the duty on the Corps is

8     to make an independent assessment, an independent analysis, and

9     independent factual determinations.

10         THE COURT:  What is the nexus between the

11    different -- that difference and any cognizable injury to any

12    of your clients?

13         MS. GALLONI:  So the --

14         THE COURT:  In other words, what's the standing on

15    that claim?

16         MS. GALLONI:  Sure.  This claim goes to the

17    sufficiency of the program, and the sufficiency of the program

18    turns on whether the state met the statutory criteria.  This is

19    one of the enumerated criteria that a state must meet.

20         So the harm to the plaintiffs is from the sufficiency

21    of the program which led to the approval which now has this

22    score of permits that are threatening plaintiffs' injuries.  We

23    also have our organizational harm from the loss of information

24    that also stems from the transfer of the program which we've

25    addressed fully in briefing.
```

1          THE COURT:  Right.  Okay.

2          MS. GALLONI:  But the concern, of course, is we have

3    and we've identified specific permits, and some that are very

4    close to issuance that we're concerned about; we're relying on

5    an applicant's reasonable assurances versus requiring the

6    agency to make factual determinations as to the impacts of

7    those permits is very concerning to us.

8          THE COURT:  Okay.

9          MS. GALLONI:  I'll move on briefly to water quality,

10   Your Honor, because this factual determination and reasonable

11   assurance difference is magnified in the water quality context.

12   Again, the applicant only needs to provide reasonable assurance

13   that the project will not adversely affect water quality.

14         But federal law is designed to address water quality

15   very broadly.  And the defendants have pointed to places,

16   again, where they say there's equivalence between the

17   prohibitions in Florida law versus the prohibitions in federal

18   law.

19         But, again, under Florida law, those decisions --

20   those determinations are based on the applicant's reasonable

21   assurances rather than their findings on whether a project will

22   run afoul of the requirements.  There are only three

23   determinations Florida's program can be said to require.

24         The first is whether the applicant can get away with

25   an exemption and not need a permit at all or whether they can

 1     qualify under a general permit.  That's a determination.

 2          The second is whether there are contaminants that may

 3     be present that rise to the level of water quality standard or

 4     toxic effluent limitation violations.

 5          And the third is the ultimate decision on the permit.

 6     Everything else is based on reasonable assurances.

 7          I'd like to move next, Your Honor, to retained waters

 8     and to the transfer of non-assumable --

 9          THE COURT:  I have one question for you, though,

10     which I think --

11          MS. GALLONI:  Yes.

12          THE COURT:  -- applies perhaps to all these

13     arguments.

14          My understanding is that your challenge is both a

15     procedural and a substantive one and that the -- in your view,

16     the application wasn't complete on the date that it was treated

17     as complete; that it was approved notwithstanding the fact that

18     it was missing critical elements.

19          And, procedurally, that -- to the extent the agency

20     relied on the biological opinions that were not made available

21     and were not done by the close of the comment period, that that

22     interfered with your clients' abilities to engage in meaningful

23     notice and comment, and perhaps there's some other aspects as

24     well.

25          The question for you is, as you know, I have

1    previously indicated my view that this was a rulemaking and it

2    was not an adjudication.  If I'm wrong about that or if I have

3    further thoughts and then say, well, maybe it was an

4    adjudication, does that change anything; because you might not

5    have a claim under 553 of the APA or Title 5, but would you

6    still have the same claim under the Clean Water Act itself

7    which requires an opportunity for notice and comment?

8         So does it matter, I guess, is my -- for the

9    remaining claims, does it matter?

10         MS. GALLONI:  I think it may matter.  I would say

11    there is also a separate right to notice and comment under the

12    Clean Water Act.

13         So that aspect of it, the fact that the application

14    was not complete when submitted, then the deficiencies in the

15    application itself are substantive, the ESA violations about

16    the adequacy of the biological opinion, and then the inadequacy

17    of the technical assistance process within that.  And I think

18    that there is still notice and comment violation under the

19    Clean Water Act.

20         I may have to give that more thought about -- under

21    the APA and what impact that would have.  I don't think it's

22    anything that we've briefed.

23         THE COURT:  I don't think it's briefed either.  I

24    guess I have a whole -- I'm not saying that I've changed my

25    mind on this, but I want to keep an open mind on these things

1    and think hard about it.

2          I suppose if it's under the Clean Water Act instead

3    of under the APA, I guess it would raise the question in my

4    mind of whether the rule of prejudicial error applies or not.

5    I don't know if there's any law on whether the rule of

6    prejudicial error applies outside of the APA context or whether

7    it's only -- whether there's a standalone or similar provision

8    that would apply under the Clean Water Act.  I just don't know

9    the answer to that question.

10          MS. GALLONI:  Right.

11          THE COURT:  And then, as we live in a day and age in

12    which there are questions about the status of Chevron if it's

13    not a rulemaking, that may raise some additional questions in

14    my mind about what level of deference would apply, and we may

15    get some guidance from the Supreme Court, at least, on the

16    status of Chevron as we go forward.

17          MS. GALLONI:  I will say, though, that your finding

18    on it being a rulemaking is soundly supported by the case law

19    in this circuit.

20          THE COURT:  Yes.

21          MS. GALLONI:  Mostly because it affected a change in

22    the legal relationship, the requirements, all of those aspects

23    that applicants -- that affect everybody, the public, the way

24    we interface, applicants, the rules, the regime, everything

25    changed, and that is definitely consistent with the rulemaking,

1     not to mention prior decisions that have referred to this as a

2     rulemaking.

3          THE COURT:  Understood.  And that was my reasoning.

4     I did notice that I think the Department of Justice in one of

5     its briefs, just in passing, referred to the fact that this was

6     placed on the non-rulemaking docket at the time that the

7     proceedings began.  Although there, obviously, were other

8     statements that were made indicating that the --

9          MS. GALLONI:  They referred to it as a rulemaking in

10    some other places and so on.

11         THE COURT:  Okay.

12         MS. GALLONI:  So next, I'll just move on to the

13    transfer of non-assumable waters to the state.  The definition

14    of retained waters is in Section 1344(g)(1); waters of the

15    United States that are presently used or are susceptible to use

16    in their natural condition or by reasonable improvement as a

17    means to transport interstate or foreign commerce, as well as

18    tidal waters and adjacent wetlands.

19         Those waters, Your Honor, are the traditionally

20    navigable waters, which include, but are not limited to, all

21    Rivers and Harbors Act waters.  The defendants argue that

22    Congress intended for the Corps only to retain jurisdiction

23    over Rivers and Harbors Act waters except for those that are

24    based on only historic use.  But Congress didn't say anything

25    of the sort.

1          The retained waters provision makes no reference to

2     the Rivers and Harbors Act and makes no reference to excluding

3     historic use waters.  Instead --

4          THE COURT:  Although, it doesn't refer to historic

5     use either.  I think it -- I don't have the language in front

6     of me.  But it uses a slightly different phrase, which seems

7     not as clearly to capture waters that in the past may have been

8     used for navigation purposes.

9          MS. GALLONI:  Right.  The clarity really comes from

10    the Supreme Court's articulation of this.  So the provision

11    uses terms that are -- that come from the case law that

12    originated with *The Daniel Ball* and so on in admiralty.

13         But what the Court did is in *Economy, Power & Light*,

14    it took that language, susceptible of use in its natural

15    condition, to say that that encompasses waters used in the past

16    for commerce.

17         THE COURT:  I see.

18         MS. GALLONI:  So when Congress used the same terms

19    that have been used in the case law to define retained waters,

20    it necessarily included historic waters, but it also included

21    other traditionally navigable waters.

22         EPA and the Corps have relied on those same judicial

23    precedents to define traditional navigable waters.  They've

24    used it to define -- the Corps has used it to define its Rivers

25    and Harbors Act jurisdiction, and then the EPA and the Corps

1    have used it to define the (a)(1) waters -- what we call the

2    (a)(1) waters, the traditionally navigable waters under the

3    Clean Water Act.  These are the waters that the Corps retains

4    jurisdiction over after state assumption.

5          But again, in the case of Florida, the Corps and EPA

6    allowed the state to assume authority over all waters except

7    Rivers and Harbors Act waters, and not including the historic

8    use waters.

9          So as a result of EPA's action, EPA transferred

10   authority over waterways to the state that should have remained

11   with the Corps.  The defendants have said, well, the MOA gives

12   us a process to address this, it's fluid and so forth; but it's

13   not.  If you read the MOA, in you read the application, if you

14   read the retained waters list, it says, "The Corps retains

15   jurisdiction over these waters on the retained waters list,

16   plus some unnamed tidal waters and wetlands, and everything

17   else goes to the state."  And that's what happened here.

18         THE COURT:  I thought that they actually, at least in

19   some places, just incorporated the statutory definition.  And

20   that was part of the problem, was that they didn't actually

21   spell out what that meant.  They just said whatever the statute

22   says, that's what we're going to do.

23         MS. GALLONI:  Right.  And it would be one thing if

24   they had said we're just going to do what the statute says and

25   left it at that, but they didn't.  They then said, here are the

1    waters the Corps retains jurisdiction over; all other waters

2    are assumed by the state.  So they did not -- they have that

3    catchall phrase in there, but that's not enough, especially in

4    the face of an MOA that specifically says the Corps is going to

5    retain jurisdiction over these waters and everything else is

6    assumed by the state.

7         Because we know that, in fact, happened, and we have

8    declarations identifying specific waterways that were not

9    retained by the Corps that should have been.

10        THE COURT:  One of the things I was wondering about

11   this argument -- again, this strikes me as you both have

12   perhaps a procedural and a substantive argument here.

13   Obviously, to the extent that waters or permitting authority

14   with respect to waters was assumed where those were retained

15   waters, that's a problem.  Although, it might be -- the remedy

16   for that would be simply to issue an order directing that the

17   retained waters, in fact, are retained.

18        But I took it that you were raising also more of a

19   procedural -- in addition, at least a procedural argument

20   saying there's a really good reason why the statute and

21   regulations require you to spell out what the waters are and

22   not to simply just incorporate the statutory test because the

23   public and the state and the Corps and all the other agencies

24   need to know what waters there are.

25        And it's a big problem, and perhaps it's something

1    that's happened here, if after this is all done, there's not

2    agreement about which waters are at issue, and I don't know if

3    this has happened here or not.  But where you have a situation

4    where the state is saying, not us, and the Corps is saying, not

5    us; and then there is nobody to issue permits with respect to

6    those waters.

7         And that that's one of the reasons -- I haven't gone

8    back to look at the legislative history or the regulatory

9    history to see if it's spelled out, but just in reading it, I

10   at least infer the possibility that one of the reasons it's

11   spelled out as a requirement is to avoid exactly that type of

12   uncertainty as you administer the programs.

13        MS. GALLONI:  Yes.  And that's exactly what EPA said

14   when it promulgated these regulations in the program

15   requirements.  I think it's 233.11 and .12, or it could be 230.

16        But what the EPA said was the state has to provide a

17   description of the retained waters that includes a list or a

18   description from the Army Corps of what those waters are.  And

19   then, separately, has to identify what the assumed waters are.

20   And EPA said exactly that.

21        It said, because this transparency is necessary for

22   the public to know what is being regulated by which entity.

23        THE COURT:  The language, I think, you're talking

24   about is in 233.11(h):  "A description of the waters of the

25   United States within a state over which the state assumes

1    jurisdiction under the approved program; a description of

2    waters of the United States within a state over which the

3    secretary retains jurisdiction, subsequent to the program

4    approval."

5         MS. GALLONI:  Right.  And in the explanation in the

6    preamble for that regulation, EPA expressly said the assumed

7    waters have to be separately described.

8         We would submit, it is, again, not sufficient to do

9    what happened here, which is to say, well, the assumed waters

10   are all the waters that aren't retained.

11        THE COURT:  Do you know what the status is of the

12   state and the Corps working out those demarcations after the

13   fact now?

14        MS. GALLONI:  The only thing I know, Your Honor, is

15   that I think Mr. Wolfe gave an example in his declaration of an

16   issue that had come up that they resolved.  But it was over a

17   tidal water.

18        So, again, the MOA and the retained waters list don't

19   describe the tidal waters at all.  So they had an issue and,

20   presumably, they decided who would have jurisdiction over

21   that -- or coastal water, I should say.  If it's tidal, it

22   should be retained

23        THE COURT:  But is there any dispute, as far as you

24   know, between the state and the Corps as to who has authority

25   or jurisdiction with respect to which waters at this point?

1          MS. GALLONI:  I don't know, Your Honor.  But I do
2     know that when this process started and the Corps was taking
3     the position that all the traditionally navigable waters, the
4     (a)(1) waters had to be retained, that there was a dispute, and
5     that's something that Florida fought against.  And we submit
6     this is another one of those shortcuts to get the assumption
7     done quickly that resulted, unfortunately, in a very truncated
8     list of retained waters and an unworkable process.
9          THE COURT:  Although, I suppose what they would say
10    in response to that is, we didn't just defer, we had the best
11    list that was available at the time.  And that's subject, of
12    course, to your argument about whether the historic waters
13    should be included or not.
14          But if you're wrong about the historic waters, they'd
15    say, yeah, it's not a perfect list; we know.  But we're never
16    going to have a perfect list.  By the time we're done with the
17    list, it's going to be time to start the next list.  And so you
18    can't require perfection here, and we used the best one we had
19    at the time.
20          MS. GALLONI:  I think that would be persuasive if the
21    Corps hadn't admitted that the 2014 list was already out of
22    date by the time they decided to use it.
23          So their own internal correspondence shows that they
24    believe that list was out of date and that they had begun to
25    prepare a supplement that would update the list with other

1    retained waters.  But when push came to shove, they pushed that

2    list to the side, and they did not consider it.

3         They also got scores of public comments, including

4    from the plaintiffs, identifying specific waters that should be

5    included in the retained waters list.  And they did nothing

6    with that information either.

7         THE COURT:  Thank you.  For some reason that reminded

8    me, I had a question -- and this may be for your colleague who

9    can look this up while you're at the podium -- Docket 104,

10   which is your lengthy reply brief at -- Docket 104 at docket

11   page 35, which is Note 13.

12        There's a reference to the administrative record at

13   FWS 6639, and I don't seem to have those pages.  I didn't think

14   that -- or, actually, the Fish and Wildlife Service portion of

15   the administrative record got to that page.  I was wondering if

16   that was a typo.  Someone can get back to me on that.  It's not

17   pressing.

18        MS. GALLONI:  Thank you.  We'll take a look at that.

19   Yes, we'll take a look at that.

20        THE COURT:  Okay.  Thank you.

21        MS. GALLONI:  I will also add that EPA made no

22   independent judgment about the waters, Your Honor.  EPA was the

23   one with the ultimate authority.  Its action is the one that

24   transferred authority over the waters.

25        We're not saying that perfection was required, but if

1    the agency is going to transfer all other waters to the state,

2    there has --

3              (Technical difficulties.)

4         MS. GALLONI:  So as I was saying, if the agency is

5    going to transfer all the other waters to the state, there has

6    to be a reasonable process.  Relying on an outdated list,

7    ignoring other information that's readily available, ignoring

8    public comment was not a reasonable process.  And if there were

9    many unknowns, then the answer would not have been to transfer

10   all the other waters to the state.  There could have been other

11   ways to handle that.

12             But it's unlawful to transfer those waters to the

13   state if they are, in fact, retained by law.

14             THE COURT:  Is the -- is your theory on that, under

15   the APA, it's unreasonable to rely on a list that you yourself

16   had conceded was outdated, and that under the Clean Water Act,

17   it is -- shows that the application was not complete because

18   the EPA itself conceded the list was not up to date?

19             I'm just trying to figure out which buckets you're

20   putting the arguments in.

21             MS. GALLONI:  The Corps is the one that conceded the

22   list was out of date.  The Corps also had a duty under the

23   Rivers and Harbors Act to update its Section 10 list whenever

24   there was a question about jurisdiction.

25             So there was a separate duty by the Corps to update

1    its list.  It began that when it started a navigability

2    assessment for Florida, but then abruptly terminated that

3    process.  And then there's a completeness issue with not having

4    adequately identified the waterways in the application.

5         THE COURT:  But the argument under the Rivers and

6    Harbors Act is an independent argument where you would not

7    invalidate the assumption here.  It would just -- if I were

8    convinced on that -- it would prompt me to issue an order

9    directing that they do what they're supposed to do, which is, I

10   guess, an agency action wrongfully withheld or something along

11   those lines.

12        MS. GALLONI:  Correct.  And it would at least remove

13   those waterways from the situation that all the state-assumed

14   waters are in, which is no ESA consultation for projects that

15   occur on those waters, no NEPA review, and all of those

16   consequences that flow.

17        So it's still very important.  You had

18   mentioned there --

19        THE COURT:  Although, the remedy would not be for me

20   to define the waters.  It would be to simply send it back to

21   the agency to do so.

22        MS. GALLONI:  You had mentioned earlier the problem

23   of if you're left with a water that isn't regulated by the

24   state or the Corps.  I wanted to just briefly mention -- this

25   is an issue that came up when the state's application did

1    not commit to abiding by the federal definition of waters of

2    the United States.

3            When a district court vacated the navigable waters

4    protection rule and expanded the scope of the waterways that

5    are covered under the Clean Water Act, Florida defied that;

6    defied EPA when EPA said you have to apply the now-governing

7    definition of waters of the United States.

8            And we were left in exactly that situation, where the

9    state said we're not covering X waters because we're going to

10   apply the old rule; and the Corps said, well, we're not

11   covering them either because they should have been assumed by

12   the state.  They're not retained waters.

13           THE COURT:  Has *Sackett* had any bearing on this?

14           MS. GALLONI:  No, Your Honor.

15           THE COURT:  Okay.

16           MS. GALLONI:  And the last point I'd like to make is

17   just briefly on the completeness of the application.

18           I think that the defendants at one point had argued

19   that we had not shown prejudice on not having access to the

20   information in the biological opinion.  I think the one place

21   that is indisputable -- and, in fact, they didn't dispute it on

22   reply -- is the terms and conditions of the biological opinion.

23           In our comment letter, we said the ESA requires terms

24   and conditions, and Florida had said in its biological

25   assessment, we'll be able to show that our permits will comply,

1    will not jeopardize species based on the terms and conditions

2    in this upcoming biological opinion.  We were not able to

3    comment on those.  There was no reasonable way for us to

4    anticipate or guess what they might be.

5             This is also not a typical situation where the

6    agency's changing its mind about a rule.  It's not.  It knew

7    this document was coming.  It didn't make it available.  It

8    closed the comment period.  We weren't able to comment on that.

9    And, as we've discussed, we weren't able to comment on the

10   inadequate waters list.

11            THE COURT:  Great.  Thank you.  I'd like to take a

12   break for ten minutes now, and then I'll hear from the

13   Department of Justice and then hear from the state of Florida

14   after that.

15            And if I can ask everyone, to the extent there are

16   technical terms they're using, just during a break, if you can

17   make sure the court reporter has those, that will be helpful.

18   All right.  I'll see you all in about ten minutes.

19            (Recess taken.)

20            THE COURT:  All right.  So I will hear from the

21   government now; the federal government.

22            MR. COGHLAN:  Thank you, Judge Moss.  Andrew Coghlan

23   for the United States.

24            And I'm going to be addressing plaintiffs' arguments

25   under the Clean Water Act and then, once my presentation

1    concludes, I'll hand it over to my colleague, Ms. Finnegan, to

2    address the Endangered Species Act arguments.  If you'd rather

3    we do it in the opposite order --

4            THE COURT:  That's fine.

5            MR. COGHLAN:  Okay.  Great.  I do want to delve into

6    details, Your Honor, but before I do, I want to take a step

7    back and just make two brief framing points, if I might?

8            THE COURT:  Please.

9            MR. COGHLAN:  They're points that I think are

10    essential to considering the Clean Water Act claimed here.

11            The first point is that Congress wanted states to

12    take the lead in regulating discharges of dredged and fill

13    material and to do so under state law.  We know that because

14    Congress told us that explicitly in the statute.

15            The second framing point I want to make is that

16    Congress defined certain minimum standards that state

17    Section 404 programs had to meet.  That's in Section 404(h)(1).

18    And then in Section 404(h)(2)(a), it told EPA, EPA, you have to

19    approve a state program that satisfies these minimum

20    requirements.

21            And so the question here is not whether state

22    assumption is good as a policy matter, because Congress already

23    made that policy call.  And the question is not whether

24    Florida's program is, in some general sense, better than the

25    federal program.

1          The question -- the central question on the Clean

2    Water Act piece of things is did EPA reasonably conclude that

3    Florida's program, as submitted, satisfied the act's minimum

4    requirements.  We would submit that it did, and that the Court

5    should, therefore, grant summary judgments on Claims 1, 2, and

6    7.

7          I can turn now to the specifics of plaintiffs'

8    arguments under those claims.  I'm happy to take it point by

9    point; I can also drill down wherever you have questions.

10         THE COURT:  Just to start with, I had two update

11   questions.  One is I know that EPA was considering an amendment

12   to 40 CFR 233.41, which is the burden of proof or the standard

13   of liability regulation.  Where is that?

14         MR. COGHLAN:  So EPA proposed a rule.  The comment

15   period closed, I believe it was, last week or immediately

16   before that.  And EPA is now considering comments on that

17   proposed rule.

18         The proposed rule clarifies EPA's long-standing

19   position, which is that a state can assume Section 404 or 402

20   permitting programs with any form of negligence requirement.

21         THE COURT:  Okay.  And then where are we with respect

22   to the further review by the Marine Fisheries Service?

23         MR. COGHLAN:  I'm going to let Ms. Finnegan address

24   that.  That's in her purview.

25         THE COURT:  Okay.  Go ahead.

1              MR. COGHLAN:  I'll take it point by point, and maybe

2    starting with the first claim that plaintiffs bring here, which

3    is their argument that Florida's application was incomplete as

4    submitted.

5              And the crux of that argument is that the application

6    had to submit the Bi Op.  And the reasoning there is that the

7    Bi Op, and the Bi Op alone, outlines the interagency permit

8    review process that Florida intended to use to safeguard

9    species and habitat.  But that's just not true.

10             I mean, the process that Florida intended to use, the

11   interagency permit review process, that the Bi Op calls

12   technical assistance, that's laid out in great detail in the

13   regulations that were included in Florida's program.  And I

14   haven't heard plaintiffs identify any substantive element

15   included in the Bi Op that wasn't included in those regulations

16   on which they had an opportunity to --

17             THE COURT:  Well, how can Florida's regulations

18   dictate what Fish and Wildlife do?  There's that supremacy

19   clause thing.

20             MR. COGHLAN:  Yeah.  Well, fair enough, Judge Moss.

21   What Florida's program is saying is -- Florida's submission is

22   saying is if we assume this program, then our intention is to

23   work with Fish and Wildlife in this process.

24             I mean, at the point that Florida is proposing the

25   program, it's just a proposed program.  None of it has been

1 codified in Florida's regulations.  So they're saying, here's

2 how we intend to do things if our program is approved.  And

3 plaintiffs then had every opportunity to say, no, that process

4 is insufficient for whatever reason.

5     THE COURT:  But, I mean -- I didn't mean to be flip

6 about that.  Do the Florida regulations really say, and this is

7 what the -- what we're proposing that Fish and Wildlife -- the

8 Fish and Wildlife Service will do the following things, and

9 it's actually in a Florida regulation?  That would be an odd

10 thing.

11     MR. COGHLAN:  We've laid out in our brief the

12 provisions of the Florida administrative code and the

13 Section 404 handbook, which are incorporated by reference into

14 Florida's regulations.  And they do lay out in a lot of detail,

15 we're going to get a permit, we're going to look at it, we're

16 then going to pass it along to Fish and Wildlife.  I'm

17 paraphrasing here, of course.

18     It basically says, whatever Fish and Wildlife Service

19 tells us to do, we'll do it, and we have to do it.  Even if we

20 don't like it, Fish and Wildlife Service, ultimately, gets the

21 ultimate call.  That's how we intend to address species issues.

22     THE COURT:  Okay.

23     MR. COGHLAN:  You know, I don't think it's surprising

24 that plaintiffs haven't identified a substantive requirement of

25 that interagency permit review process that wasn't contained in

1    Florida's application.  And that's because biological opinions

2    are opinions by the rendering agency that a proposed action

3    will or won't impact species and habitat.

4          So the agency, in this case Fish and Wildlife

5    Service, that renders that opinion, sort of, takes the proposed

6    action as it finds it.  In other words, the Bi Op doesn't

7    dictate the critical elements of a proposed action.  It just

8    summarizes those critical elements.  I think that's all the

9    Bi Op did here.

10         I don't think plaintiffs have a legal right to

11   comment on the Bi Op summary of the interagency permit review

12   process.  There's no statutory or regulatory requirement for

13   Florida to include the Bi Op in its application.  So the lack

14   of the Bi Op from that application submittal didn't render it

15   incomplete, and plaintiffs weren't denied an opportunity to

16   comment on that interagency permit review process.

17         THE COURT:  Okay.  I'll just have to do that work.  I

18   guess I'll have to go look at each of the regs and then compare

19   them to the Bi Op and see if there's -- if they match up.

20         MR. COGHLAN:  That's fair.  Yeah.  I'll move on to

21   Claim 2, Your Honor.  This is, sort of, an omnibus claim.

22   There are a lot of sub-arguments embedded in it.

23         One of those arguments is that EPA failed to ensure

24   that Florida permits would satisfy applicable requirements of

25   the 404(b)(1) guidelines.  And even within that, there are a

 1    couple of sub-arguments that I'll unpack a little bit.

 2         The first argument there that the plaintiffs make is

 3    that Florida's program is unconcerned with discharges unless

 4    those discharges would threaten water quality standards.  The

 5    second argument that they make is that FDEP, the Florida

 6    Department of Environmental Protection, the permitting agency

 7    in the state, that FDEP does not have to make factual

 8    determinations to support its permits.

 9         And then the third argument they make under that

10    heading is that that technical assistance process is inadequate

11    to safeguard species and habitat.  Now, that third argument,

12    I'm going to let Ms. Finnegan address in her presentation.

13    It's really a cross-reference to their ESA argument.  So I'll

14    address those first two arguments.

15         I think our primary submission for both of those

16    arguments is that they're belied by the record.  I mean,

17    Florida's regulations are clear on their face that the state

18    has to consider impacts from all discharges of pollutants, not

19    just those discharges of pollutants that threaten water quality

20    standards.  We've, again, cited in our brief the regulatory

21    provisions.

22         THE COURT:  I'm looking at the regs here.  And

23    Section 230.11 and 230.22 of the EPA reg -- I'm sorry.  Those

24    must be the Fish and Wildlife regs -- say that the permitting

25    authority shall determine in writing -- no.  This must be EPA.

1    I'm sorry.

2              "The permitting authority shall determine in writing

3    potential short-term or long-term effects of a proposed

4    discharge of dredged or fill material on the physical,

5    chemical, and biological components of the aquatic environment

6    in light of subpart C, which includes a broad array of water

7    quality impacts."

8              The Florida analog to that says, "An application must

9    provide reasonable assurances that the project will not

10   adversely affect the quality of receiving waters such that the

11   state quality standards will be violated."

12             It's that "such that" language which I think is --

13   what the plaintiffs were relying on.  Similar argument with

14   respect to 230.11(d).

15             MR. COGHLAN:  I think the problem there, Your Honor,

16   is that is a very, very selective reading of Florida's

17   regulations.

18             I would refer you to the pages in our brief where we

19   directly address this argument.  This is in our reply brief.  I

20   don't have a pin cite for it off the top of my head, but I'm

21   happy to find it for you.

22             THE COURT:  Okay.

23             MR. COGHLAN:  If you walk through what Florida's

24   regulations say in full, it is abundantly clear that it is not

25   just discharges that violate water quality standards.  It is

1      that Florida has to ensure -- Florida has to assess whether

2      there may be a pollutant present that might violate water

3      quality standards.  And if you line that up with the analogous

4      provision under the (b)(1) guidelines, which is work that we do

5      in our brief in response to the point that you're getting at

6      there, I think you'll find that they're materially identical.

7      There really isn't any daylight between --

8             THE COURT:  But it seems to me what you just

9      described to me is not different than what plaintiffs say the

10     Florida rule is.  They say that that's the problem.  Because

11     you have to find that it might violate the water quality

12     standards.

13            And I need to go back and look at this all more

14     carefully.  There's a heck of a lot here.  But plaintiffs say

15     to me that the federal rule is -- doesn't turn on whether it

16     might violate its -- if it's anything that is contributing to

17     or affects the water quality, period, even if it wouldn't

18     violate.  Even -- there's no way in the world this will

19     violate.

20            We agree, this is a drop in the bucket; it will not

21     violate.  We're completely with you.  But, yes, you need to

22     submit this to us, and we need to consider it, I think what

23     they're saying is; but Florida doesn't do that.

24            MR. COGHLAN:  Well, I just don't think that's an

25     accurate reading of the regulations, Judge Moss, and I think --

1          THE COURT:  Which side, though?  I was starting from

2     your description of the Florida rule.  So I think you must be

3     saying their description of the federal rule is not correct

4     then and the federal rule doesn't require that.

5          MR. COGHLAN:  I don't think that -- if you're

6     repeating my description, my description was inaccurate, and

7     that's my mistake.  I think what Florida's rules say -- and

8     this is the -- I want to be clear that we're dealing with a

9     very particular sub-issue here.  This is not whether discharges

10    matter, writ large.

11         I mean, there are tons of Florida regulations that

12    make clear that all discharges have to be looked at.  There

13    isn't just some blanket rule that only bad discharges somehow

14    matter under Florida's regime.

15         I think the point that plaintiffs make here is when

16    do you have to analyze the constituent pieces of that

17    discharge; when do you have to do an analysis of the material

18    to be discharged; and what -- going from memory here -- it's

19    all laid out in our brief; again, I'll rest on that.

20         But going from memory here, what the federal

21    regulations say is that the Army Corps has to assess, I think

22    it's something like the potential for violations of -- they

23    have to look at any -- they have to look at material in the

24    discharge, and they have to assess whether there's any

25    potential there for violation of water quality standard.

1     Doesn't have any requirement that it's only if there's a

2     possibility of water quality standard.  If there's material and

3     discharge, they have to identify potential water quality

4     standard.

5          I believe what Florida's regs say is that the state

6     has to look at whether there is present in the discharge

7     material some constituent.  So it's the question, is there a

8     presence of some constituent that has the possibility of

9     affecting the water quality standard?  I mean, I think those

10    are the two pieces that are the comparison.

11         And if the answer to that is yes, then there's

12    additional testing that the state has to require the applicant

13    to perform and to submit to the state.

14         THE COURT:  Okay.

15         MR. COGHLAN:  You know, the other argument that they

16    make under the (b)(1) guidelines heading is that Florida

17    doesn't have to make factual determinations to support its

18    permitting decision.  Here again, I think -- we think it's

19    clear on the face of Florida's regulations -- we've cited them

20    in our brief -- there are ample sections of the 404(g) handbook

21    that are, again, incorporated by reference into the

22    administrative code that say to Florida DEP, you have to assess

23    whether the information provided to you is sufficient to ensure

24    that the state -- that the proposed discharge meets substantive

25    standards that are materially identical to the substantive

1   standards under the (b)(1) guidelines.

2            Now, I realize that the plaintiffs say that that's

3   not good enough because there's this independent analysis

4   criteria.  I'm not really sure where they're getting that from,

5   but I can tell you that there is no mention in the (b)(1)

6   guidelines of any requirement by the Court to conduct

7   independent analysis.

8            I think what the Corps has to do under the (b)(1)

9   guidelines is it has to look at the information that applicants

10   provide, and it has to draw a rational connection between the

11   information that applicants provide and its ultimate permit

12   determination, which is just administrative law 101.

13            And that's the same thing that Florida has to do

14   under its permitting regime.  There's really no daylight there

15   either.

16            If there's any interest here, they raise a number of

17   arguments alleging post hoc rationalizations on those points

18   and go into some detail in their surreply.  I'm happy to

19   address those here if you want me to.

20            THE COURT:  You're welcome to do so.  I do think that

21   it's not a substantial argument.  So if you want to address it,

22   you may do so.

23            MR. COGHLAN:  Sure.  So I don't think the post hoc

24   charge fits here.  Their argument is that -- the arguments

25   about reasonable assurance language that we make in our brief

1    go beyond what EPA said in its response to comments.

2         But I think context is really important here.  And if

3    you look at plaintiffs' comment letter, it was a 55-page

4    single-spaced letter.  There were two sentences in that letter

5    that mentioned reasonable assurances, and those two sentences

6    were sandwiched in four or five paragraphs that looked at

7    specific factual determinations required under 230.11 of the

8    (b)(1) guidelines and said that there are no factual

9    determination analogs under Florida's program.

10        And look at what EPA said in response to that

11   comment.  The agency said, "We've reviewed appendix J3 to the

12   state's program description.  This is the 155-page crosswalk

13   that lays out the federal requirements in their state law

14   analogs.  And we have concluded that the factual determinations

15   required under Florida's program, while not the same as the

16   factual determinations required under the federal program, are

17   consistent with and no less stringent than the factual

18   determinations required under the federal program."

19        And then if you look at the sections that we cited in

20   our brief, those are the exact sections that Appendix J3

21   discusses as relevant to the analysis of 230.1, which is

22   nothing post hoc about that.

23        I also do want to emphasize here that, when we were

24   writing our opening brief, we were not responding to

25   plaintiffs' two-sentence comment letter.  We were responding to

1    three pages of briefing in their opening brief on this issue.

2    And you don't get from two sentences to three pages without

3    elaborating and adding on and expanding on an argument.  I

4    think if they do that, it's only fair that we would get to do

5    so in our response to their argument.

6         So for all of those reasons, I just don't think that

7    this is a valid, sort of, post hoc argument.  I think the

8    argument rings hollow.

9         I do want to address enforcement authority because

10   that's, obviously, a big issue here.  I think plaintiffs'

11   argument is that the Clean Water Act itself unambiguously

12   requires that a state have a simple negligence mens rea

13   requirement or statute of limitations of more than five years.

14   I just don't think that's true.

15        If you look at Section 404(h)(1), which, again, is

16   the section where Congress provided minimum standards for state

17   assumption, what Congress said there was that states have to

18   have authority to abate violations of the state program.

19   That's the statutory text.

20        And I will note that elsewhere in Section 404(h)(1),

21   Congress was extremely prescriptive.  It explicitly referenced

22   sections of the Clean Water Act that states had to meet or beat

23   in order to assume Section 404 permitting authority.  They said

24   nothing of the sort about the simple negligence mens rea

25   requirement in 1319.  They said nothing whatsoever about

1    statutes of limitations.  I think the --

2            THE COURT:  So the reg at 23- -- 233.41, does that

3    reg apply beyond the scope of this provision?  What does the

4    reg -- because the reg has the broader language in it.

5            MR. COGHLAN:  The plaintiffs do have a regulatory

6    argument here, Your Honor.  But I think to accept their

7    argument of 233.41, you have to read subparagraph (b)(2) to,

8    essentially, negate subparagraph (a)(3)(ii), which says that a

9    state has to have authority to issue -- excuse me -- authority

10   to bring criminal prosecutions based on a showing of criminal

11   negligence.

12           That's for unpermitted discharges and permit

13   violations; criminal negligence is the key term there.

14   Criminal negligence is a term of art.  I mean, it's defined in

15   Black's, it's defined in dozens of state criminal codes to mean

16   a heightened form of negligence.

17           And so what (b)(2) does, it's a gloss on subparagraph

18   (a)(3), and it says, "As a general matter, the degree of

19   knowledge or intent or burden of proof that a state brings in

20   pursuing a violation under (a)(3) can be no greater than under

21   the federal standard."

22           THE COURT:  But -- I mean, just to back up for a

23   second, though, here.  You're telling me that the statute

24   doesn't require particular criminal standards, correct?

25           MR. COGHLAN:  That is correct.

1          THE COURT:  Okay.  And you've also told me that if

2    the state does what the statute requires, done, and you have to

3    approve, you have no choice.  So are you telling me that your

4    regulation is ultra vires then?  Because ultra vires, the

5    regulation says that there are requirements with respect to the

6    particular types of criminal and civil remedies that are

7    available.

8          MR. COGHLAN:  No, Judge Moss.  That's not what I'm

9    saying.  Our argument is this.  That the statute is not

10   extremely prescriptive about what criminal negligence standard

11   the state has to employ.  What it says is it has to have

12   authority to abate violations.

13         THE COURT:  Right.

14         MR. COGHLAN:  Now, our submission is that that broad

15   language leaves a lot of play in the joints for EPA to decide

16   in its discretion what constitutes adequate authority to abate

17   violations.  And EPA's consistent approach on that issue has

18   been to say, well, any form of negligence suffices; and I think

19   that's embedded in the language in 233.41(a)(3)(ii), which says

20   that a state has to have authority to pursue criminal

21   prosecution based on the showing of criminal negligence.

22         I do want to reference that -- sorry.  Go ahead.

23         THE COURT:  I just -- I wonder whether -- there,

24   obviously, are a range of arguments you can make with respect

25   to the regulations.  You make the argument and say, well, you

1    read criminal negligence, you go look at Black's, you know what

2    criminal negligence means, and, therefore, (b)(1)(2) [sic]

3    can't really be more expansive than that.

4            I think the other -- the flip side -- and maybe this

5    is what the plaintiffs argue -- is to say you got it just

6    backwards.  The phrase criminal negligence itself is not

7    entirely clear; it means negligence.  It could mean simply

8    negligence which is criminal, which is what the federal

9    standard is here.

10           And when you read that language in light of (b)(2),

11    it must mean not criminal negligence as defined in Black's, but

12    negligence which is criminal and under the federal system we

13    now know under federal circuit case -- under circuit case law

14    that it is negligence which is criminal for purposes of the

15    Clean Water Act to engage in simple negligence.

16           MR. COGHLAN:  I'd make two points on that, Judge

17    Moss.  I mean, on the textual point, I don't think that's the

18    best reading of the regulations.  And one of the reasons for

19    that is because, if you look at (a)(3), it talks in the first

20    instance about authority to bring criminal fines for violations

21    committed with criminal negligence.

22           So if the only work that the word criminal is doing

23    in criminal negligence is to tell you that we're talking about

24    authority to bring criminal penalties, then it's really not

25    doing any work at all because the beginning of that sentence

1    has already clearly stated we're talking here about authority

2    to bring criminal penalties.

3              THE COURT:  Well, civil penalties or -- civil or

4    criminal; it's both.

5              MR. COGHLAN:  Yes, that's true.  But if we're talking

6    about -- specifically about (a)(3)(ii), which I think is the

7    provision that we're talking about here, you'll see that the

8    agency shall have authority to seek criminal fines.  So this is

9    a specific provision about authority to seek criminal fines.

10   And it already tells you that it's about criminal fines in the

11   first --

12             THE COURT:  When was this reg originally adopted?

13             MR. COGHLAN:  This reg was originally adopted, I

14   believe it was, in 1980.  That actually brings me --

15             THE COURT:  I could be wrong about this.  I think

16   maybe 1993.  Is that not right?

17             MR. COGHLAN:  Well, so I think that's when it was

18   originally brought.  And in its -- in more or less this form,

19   the first iteration of this reg, when you put it that way, was

20   brought in 1980; it was amended in 1988.  There may have been a

21   subsequent amendment in 1993.  But I think that the language

22   that is in the Code of Federal Regulations now was adopted in

23   1988.

24             You know, I think this actually brings me to another

25   point of why our reading of the reg is better.  And that's the

1    regulatory history that we discuss in our briefs.  So when the

2    reg was first adopted in 1980, EPA did not have the word

3    criminal negligence in what is now (a)(3)(ii).  But what was in

4    the reg was a note in -- under what is now (b)(2), and the note

5    said, when we're talking about authority to bring civil or

6    criminal penalties and we're talking about a form of

7    negligence, it's okay for a state to have criminal negligence

8    or gross negligence as its standard.

9            So that was EPA's understanding as of the passage of

10   the regs in 1980.  Fast forward to 1988, EPA added the word

11   criminal in front of negligence in (a)(3)(ii).  And it said in

12   the preamble to that regulation, we're not making substantive

13   changes to this provision.

14           And I think the clear inference from that course of

15   history is that EPA understood its regulations to allow for a

16   heightened form of negligence, not just simple negligence.  I

17   think EPA's course of dealing over the years has also

18   illustrated that this has been its long-standing view of the

19   regulation.

20           Plaintiffs mentioned that many of the approved NPDES

21   and 404 programs predate the Ninth Circuit's decision in

22   *Hanousek*, and that's true.  That's why we, in our brief, cited

23   three -- not two -- three that had been approved since the

24   *Hanousek* decision.  There's just an unbroken line of approvals

25   of state programs that have this more than simple negligence

1    mens rea requirement.

2            So this has been EPA's long-standing interpretation.

3    The preamble -- excuse me.  The proposed rule that you asked

4    about at the outset just clarifies what has been EPA's view all

5    along here.

6            You know, I do want to just make one other point and

7    revert back to a colloquy you had with Ms. Galloni.  If you

8    don't believe our way of reading the regs where (b)(2) is the

9    general rule, then the specific in (a)(3)(ii) controls the

10   general rule, then I think you put your finger on another way

11   to read this regulation, which is that the regulation speaks of

12   a requirement about the degree of knowledge or intent required

13   under state law shall be no greater than federal law.  That's

14   what (b)(2) says.

15           I mean, you can have different degrees of negligence,

16   but the common denominator of any form of negligence is that

17   there isn't any intent requirement.  I mean --

18           THE COURT:  Well, it's degree of knowledge or intent.

19           MR. COGHLAN:  Yeah.

20           THE COURT:  I think that that is probably in these

21   cases typically what negligence is about, where someone says we

22   weren't aware of what was going on.  We didn't know there were

23   turtles there when that happened.

24           And this is saying, it's the same -- if the lack of

25   knowledge is not a defense in the federal system, then that

1    lack of knowledge under the state system shouldn't be a problem

2    as well.

3            MR. COGHLAN:  Well, I guess, my point is that's going

4    to be true whether the mens rea requirement is gross negligence

5    or simple negligence.

6            I mean, any form of negligence does not require a

7    showing of knowledge or intent.  It's just an objective

8    standard.  That's the point I was trying to make there.

9            THE COURT:  I guess I'm not so convinced on -- on the

10   other issues, I need to go back and work my way through the

11   regulatory history on all of this.

12           But it strikes me that the way these things would

13   ordinarily play out, if it's a gross negligence one -- for

14   example, case, you would -- or other colleagues at the justice

15   department would be in court and arguing and saying, of course,

16   this was gross negligence here because -- they may not have

17   known that there were turtles there, but they knew there were

18   nests.

19           They knew that there had been turtles there in the

20   past, and it was gross negligence for them not to go look to

21   see if there were turtles there when they knew all these other

22   things.  So knowledge is always, I think, going to come into

23   play.

24           MR. COGHLAN:  Fair enough.  I don't want to rest the

25   case on this because this wasn't our primary submission.  I

1    wanted to relate back to the argument you had raised with

2    Ms. Galloni there.

3           THE COURT:  Fair enough.

4           MR. COGHLAN:  I think, if there aren't any other

5    questions on criminal enforcement -- well, actually I do want

6    to address another issue on criminal enforcement that

7    Ms. Galloni made.

8           THE COURT:  Okay.

9           MR. COGHLAN:  There's an argument, I think in their

10   surreply, which says EPA's long-standing position has been it

11   doesn't want to have to be the enforcer for a state program.

12   So a state program has to, actually, have a robust enough

13   enforcement mechanism so the federal government isn't

14   constantly rushing in to fill the void.

15          And I think that's a fair point.  I think that's been

16   EPA's long-standing view.  But what I'd say there is that the

17   real-world difference between cases that might be brought under

18   a simple negligence standard but not under a gross negligence

19   standard is likely to be vanishingly small, and -- I mean, we

20   addressed this point in our brief.

21          The federal government has stated in other settings,

22   including before the Supreme Court, that we almost never bring

23   prosecutions under simple negligence.  And when we do, it's

24   only when there's some aggravating conduct.  And there's a law

25   review article in the record that we discuss in our brief that

1    analyzes all prosecutions under the Clean Water Act.

2          I think only something like three percent of those

3    prosecutions involved, sort of, a pure, simple negligence claim

4    with no aggravating --

5          THE COURT:  Although, what I will say, though, is,

6    putting aside how often the department actually brings those

7    cases, it strikes me as almost certainly the case that there is

8    a substantial deterrent effect.

9          MR. COGHLAN:  Yeah.

10          THE COURT:  And that is, presumably, why the justice

11    department in at least those three appellate cases went to the

12    trouble of arguing and winning those cases in the courts of

13    appeals to establish that the standard was, in fact,

14    negligence.

15          Because when you're dealing with an enforcement

16    regime where people get away with what they can, oftentimes

17    having a negligence standard is going to keep people much more

18    in line than a gross negligence standard.  You go to your

19    lawyer and you say, can we do this?  Oh, you know, it's

20    negligence; you better be darn careful.  Versus gross

21    negligence; I think you're okay.

22          MR. COGHLAN:  I think that's a fair point.  But what

23    I'd say in response to that is I don't think you lose any of

24    that deterrence value by allowing states to assume Clean Water

25    Act permitting programs with a gross negligence requirement.

1    And the reason is because EPA always has the authority to bring

2    a criminal prosecution under Section 1319 even in a state

3    that's assumed a permitting program.

4         THE COURT:  Although, I think this gets back to your

5    opening point where you said it's not my job to decide what's

6    good policy and what's bad policy or what works better.  I just

7    have to decide what's consistent with the statute.

8         If the statute or the regs say it has to be the same

9    standard, then the fact that EPA could step in and fix it

10   doesn't really answer -- I also do think, as a matter of

11   political reality as well -- and I'm using the small P,

12   political there.  That just with respect to the allocations of

13   responsibility, once an application to assume permitting

14   authority is granted, I think the EPA loses some of its

15   accountability at that point in time.  They can point to the

16   state and say, look, they're the ones administering that

17   program.  Yes, this horrible thing happened; not on our watch.

18   It was on their watch.

19        And maybe you say, well, we had oversight authority,

20   but it gets a lot hazier and muckier once there's been an

21   assumption.  And the EPA, under those circumstances, is less

22   accountable and less likely to step in and probably also less

23   of a worry.

24        If you're a developer in Florida, you're probably a

25   little less worried that the EPA is going to bring an

1    enforcement action against you even on a negligence theory

2    after there's been an assumption and the state is actually

3    administering the permitting program.  It's possible.  But,

4    again, it's diminished risk at that point.

5              MR. COGHLAN:  I'm not going to concede that point,

6    Judge Moss, but there's nothing in the record that I can point

7    to to dispute it, so I'll move on.

8              THE COURT:  Fair enough.  Fair enough.

9              MR. COGHLAN:  I do want to get to the plaintiffs'

10    arguments about the retained waters list.  They spent a fair

11    amount of time on that.

12             I think their first two arguments are that the

13    retained waters list had to include what I'm going to call

14    historic use Section 10 waters.

15             THE COURT:  Yes.

16             MR. COGHLAN:  Those are Section 10 waters that are

17    only defined as navigable waters of the United States because

18    they may have been used in the past to transport interstate and

19    foreign commerce but can't be used now or used in the future to

20    transport interstate commerce.  So they say historic use

21    Section 10 waters had to be included.

22             They also say that the complete universe of what I'm

23    going to call (a)(1) TNWs -- those are the, sort of,

24    traditionally navigable waters -- also had to be included on

25    the retained waters list.

```
 1              We think that both of those arguments are foreclosed
 2      by statutory text here.  The text is actually pretty clear.
 3      And Congress in Section 404(g)(1) defined what retained waters
 4      are; and it said that retained waters are waters that are
 5      tidally influenced, waters that are used to transport
 6      interstate or foreign commerce, or waters that could be used.
 7              THE COURT:  Susceptible, is -- could be is the
 8      language or is --
 9              MR. COGHLAN:  Susceptible to use -- actually, let me
10      be precise about this and look at the actual text because I
11      think precision is important in this area here.
12              Section 404(g)(1) says, the parenthetical, "Those
13      waters which are presently used or are susceptible to use."
14      So, yeah, that's what I was --
15              THE COURT:  Right.  Again, this is an issue that I
16      have to run down.  There's a lot I have to run down on this
17      case still.  But I take it from -- Ms. Galloni's argument was
18      that that language comes from Supreme Court precedent, and that
19      Supreme Court precedent employed a historic use test.
20              MR. COGHLAN:  I don't think that's accurate, Your
21      Honor.  I think they've got it exactly backwards.  I think
22      we've run through why that is in the brief.
23              I mean, to briefly summarize the argument, the Rivers
24      and Harbors Act of 1899 gives the Army Corps jurisdiction over
25      navigable waters of the United States.  Doesn't define that
```

1    term.  There's a body of case law that evolves over time.  The

2    body of case law says, well, a water can be legally navigable

3    if it was used in the past for the transport of interstate and

4    foreign commerce.

5            The Corps adopts a regulation that adopts that case

6    law definition, says a navigable water for purposes of the RHA

7    is a water that was used, is used, or could be used -- again,

8    paraphrasing; susceptible to use is what I mean by could be

9    used -- in interstate or foreign commerce.

10           And I think all of that matters because if Congress,

11   when they were enacting Section 404(g), wanted to include in

12   the scope of retained waters all waters that had been

13   understood to be navigable under the Rivers and Harbors Act,

14   they could have just used the phrase navigable waters of the

15   United States.  I mean, that would have encompassed the Supreme

16   Court language.

17           THE COURT:  Well, assuming you're right about that,

18   isn't there still a problem here?  If you take a list and the

19   list has on it waters that are used for interstate commerce and

20   waters that are -- that are -- historically, have been used for

21   that purpose, and you say, oh, we're not covering historic;

22   let's cross all the historics off the list, it's got to be the

23   case -- I'm willing to grant you that some of the ones that

24   historically were used maybe, due to shifts in sedimentation or

25   whatever it may be, it once was navigable; that waterway is no

1    longer navigable.  Some of them probably still are navigable

2    unless you go and look at them.

3            If it's historically used, there's at least a

4    significant possibility that, even if it's not today being used

5    for that purpose, that it's susceptible to that purpose.

6            If you just cross it off the list without looking at

7    it, isn't that sort of the very definition of arbitrary and

8    capricious?

9            MR. COGHLAN:  Maybe.  But I don't think the record

10    reflects that that's what happened here.

11            I mean -- well, I guess two points.  First, the

12    record reflects that the Corps went through over a period of

13    some months and removed historic use waters based on its

14    assessment of materials in its records.

15            I think to your broader point, though, when the

16    Corps --

17            THE COURT:  Didn't they take all the historic --

18    maybe I'm misunderstanding the record.  I thought they took all

19    the historical use waters off the list.

20            MR. COGHLAN:  Yeah.  When the Corps designates

21    something as a navigable water of the United States, it has to

22    elucidate the basis for why it's designated as a navigable

23    water of the United States.

24            So it's a navigable water of the United States if it

25    could be used to transport interstate commerce with reasonable

1    improvements, if it is or if it was.  And when the Corps makes

2    a navigability determination, it says which of those it's based

3    on.

4             Actually, I don't think it's all that complicated for

5    the Corps to go back through its navigability studies and

6    identify those waters that were deemed navigable based solely

7    on historic use, not because they are used, not because they

8    could be used, and not because they're tidally influenced.

9             THE COURT:  So if you look at the list, then the list

10   would have said -- the equivalent of columns, is, could be,

11   historically was.  And you would check if all three were the

12   case, if this was a major -- this is the Mississippi River, all

13   three of those get checked.

14            MR. COGHLAN:  That's right.

15            THE COURT:  But there's some where it's only going to

16   say historically was checked, and that means that someone

17   actually made a determination, went out and looked at it and

18   said, we have determined that it could not be used for that

19   purpose.

20            MR. COGHLAN:  Yes, that's correct.  That's what I'm

21   telling you.

22            I think it's even more nuanced than that.  I think

23   some waters probably have reaches that were only historic,

24   were -- the only basis for Corps jurisdiction is historic

25   navigability.

1      So you can imagine a waterway at some point was

2   free-flowing but then was dammed or there was a low bridge or

3   berm or something like that, that cuts off the head of

4   navigation.  So above that obstruction, it's going to be a

5   historic use water; below that obstruction, it's going to be a

6   current use or susceptible to future use.

7      The Corps is going through and it's making those

8   cutoffs in its development of the retained waters list.  So

9   it's not just waters are off entirely.  It's also, sort of,

10  saying, well, up to this head of navigation.

11     THE COURT:  The list that is in the record would show

12  me, if I look at it, that there are cases in which they're

13  making all three designations, some cases where they're making

14  two designations, and some where they're making one

15  designation?

16     MR. COGHLAN:  You're not going to find that from the

17  list, Your Honor, but you're going to find that from the

18  navigability studies that are in the record.  So you would

19  actually have to go through and look.

20     I should say, you'd have to go through the

21  navigability studies and actually dig into what the Corps'

22  decision is as to each of those waters.

23     THE COURT:  Okay.

24     MR. COGHLAN:  You know, I think that the cases that

25  plaintiffs cite in their surreply, *The Daniel Ball* and the

1    *Economy, Light & Power* case, they're not wrestling with what is

2    and what isn't retained water.  They're trying to define what

3    is a navigable water.

4          That's a different question than what the Corps has

5    to do in developing a retained waters list.  A retained water

6    is a subset of navigable waters.  So the way Section 404(g) is

7    set up is that states can assume navigable waters except for

8    the subset of navigable waters that meet the criteria that

9    Congress specified.

10         So to say that, well, navigable waters include

11   historic use waters just doesn't really answer the question of

12   whether those historic use waters are in the carve-out

13   contained in the parenthetical in (g)(1).

14         THE COURT:  So has the list of retained waters

15   evolved or become more specific since the application was

16   approved here or has it just been static since then?

17         MR. COGHLAN:  There hasn't been a change to the

18   retained waters list itself.  To your question about

19   implementation, I think what the Corps and Florida have done

20   over the course of Florida's implementation is developed a GIS

21   mapping tool.  So that if the public is interested in figuring

22   out whether or not a potential project lies in assumed or

23   retained waters, it goes on to this website.  It can click on

24   the map, and that map will outline whether -- as a preliminary

25   cut, the Corps and Florida believe the jurisdictional line

1    falls on the federal side or the state side.

2         THE COURT:  With the exception of the regulation that

3    was set aside, is there any other area of disagreement between

4    the Corps and Florida with respect to what the retained waters

5    are?

6         MR. COGHLAN:  I'm not aware of any, Your Honor.  My

7    understanding is that the Corps and Florida regularly confer on

8    close calls when there's a question about whether, say, a

9    project is in a tidal water; and that process has been working

10   as far as I know.  I haven't heard any --

11        THE COURT:  But does the list that was provided

12   answer those questions, or do they have to go out and look at

13   it together and figure out the answer?

14        MR. COGHLAN:  Well, the list provides, I think it's

15   602, waters that are named.  And then it says this also -- the

16   scope of retained waters also includes tidal waters.

17        And so there might be some questions about a tidal

18   water or about the head of tide in a specific water where that

19   lies, and that's something that the Corps and Florida have to

20   figure out on a permit-by-permit process.

21        But I think that's just a practical accommodation to

22   reality.  I mean, when you're dealing with a state like Florida

23   that has as much water as it does, I mean, the Corps has been

24   administering the RHA for over a century.  This is the best

25   information that it has on the subject.

1          To their point about the Corps admitting that the

2     2014 Section 10 list was out of date, I strongly dispute that

3     there's any such admission of that in the record.  I think what

4     they're referring to is an email from 2017 where somebody in

5     the Jacksonville District said it is imperative that we add to

6     our Section 10 list all waters that might remotely be TNWs or

7     Section 10 waters whether or not we have a navigability study.

8          That is not a list of waters that the Corps believes

9     to be Section 10 waters.  The universe of Section 10 waters

10    that are not on the current Section 10 list is a null set.

11         THE COURT:  Why were they told to stop that process?

12         MR. COGHLAN:  Well, they were told to stop that

13    process because -- this is spelled out in the record.  But I

14    think when the Corps began initiating that process, they

15    contemplated a process whereby (a)(1) TNWs would be added to

16    the retained waters list and where there would be, sort of, a

17    more start-from-scratch process to develop the retained waters

18    list.

19         The backstory here is that, while this process is

20    going on, EPA has convened a subcommittee; it's called the

21    assumable waters subcommittee.  This is a body that the Corps

22    served on in parts of 2015 to 2017.  The charge of the

23    subcommittee was to make recommendations to EPA about how to

24    define the scope of retained waters and how Corps districts

25    ought to go about putting together their retained waters list.

1        It's true that the Corps' representative on that

2    subcommittee advocated an approach that would have brought in

3    all (a)(1) TNWs to retained waters lists and advocated an

4    approach that would have had the Corps, essentially, develop

5    all of its retained waters lists from scratch when approached

6    by a state interested in state assumption.

7        But I think there are a couple of points I have to

8    emphasize about that.  The first is that that was not a

9    long-standing Corps position on how this is supposed to happen.

10    The whole point of the assumable waters subcommittee was that

11    there was no policy guidance on these issues from EPA or the

12    Corps.  So the subcommittee was convened to provide

13    recommendations on how this process should be addressed.

14        The other point I have to emphasize is that the Corps

15    stood alone in making the recommendations that it did.  The

16    other 21 members of the assumable waters subcommittee, which

17    were members of red states and blue states, and environmental

18    organizations and industry organizations, groups that don't

19    often see eye to eye on a set of policy recommendations,

20    unanimously agreed that, based on considerations of policy and

21    based on the plain text, that the appropriate scope of retained

22    waters was Section 10 waters, less historic use waters, and

23    that the way to go about developing retained waters lists was

24    for the Corps districts to use their existing Section 10 lists

25    as the basis.

1          Now, they published that report in 2017.  The

2    assistant secretary of the Army for Civil Works reads that

3    report, and then in 2018 he says, you know what, the majority

4    was correct; the Corps got this one wrong.  The majority

5    explains at length in its report why it thought the Corps was

6    wrong.

7          So there's a fully fleshed-out basis for why the

8    Corps changed its position to the extent that it was a change

9    in position.  And the assistant secretary of the Army for Civil

10   Works says this is Corps policy now; Jacksonville District, use

11   your existing Section 10 list.  And Jacksonville District said,

12   so we shall.  That's why there was a change in position.

13         THE COURT:  What about the extent to which there was

14   not agreement on the retained waters at the time that the

15   notice and comment occurred?  Is that a procedural violation?

16         MR. COGHLAN:  I don't think so.  So there was no

17   notice and comment process as to the retained waters list when

18   the Corps was developing it.

19         THE COURT:  But that's one of the requirements of the

20   application, is that it identifies --

21         MR. COGHLAN:  Oh, I see.  You're saying, is it a

22   procedural violation if there was a dispute about retained

23   waters?

24         THE COURT:  Yes.

25         MR. COGHLAN:  I think all of those comment letters

1    are contained in the record that the Corps submitted.  All

2    those comment letters would be contained in EPA's record.  I

3    mean, they're in those records because they were considered.

4         The person who developed the retained waters list at

5    the Corps was also the person who developed the 2017

6    supplement.  If the agencies made a mistake in leaving off a

7    water that the plaintiffs think should be on that list, then

8    the plaintiffs have had every opportunity to make that argument

9    here, but they haven't.

10         THE COURT:  No.  But I -- perhaps I misunderstood.  I

11   thought you agreed that there were at least -- there were 602

12   waters that were named.  There are other waters that are still

13   retained waters that were not on the list that still have to be

14   decided on, perhaps, a case-by-case basis.

15         MR. COGHLAN:  Well, I think all tidally influenced

16   waters are retained waters, if that's what you're getting at.

17         THE COURT:  Okay.

18         MR. COGHLAN:  If a water is subject to the ebb and

19   flow of the tide, then it's a retained water.

20         THE COURT:  And that wasn't settled at the time that

21   the application was submitted, so does that mean the

22   application was incomplete?  Because it's pretty clear from the

23   statute, from 1344(h) that the applicant is required to

24   describe the waters.  So is it incomplete?

25         And also, was there -- is the notice and comment a

1      problem if various parties weren't in a position which they

2      could say, well, wait a second, all those, we think, are tidal

3      waters.  They should have been included.  And they just never

4      had the opportunity to do that.

5            MR. COGHLAN:  Well, a couple points on that.  One

6      clarifying point.

7            I think the legal basis comes from EPA's regs.  It's

8      not from the statute.  So this is an EPA regulation.

9            THE COURT:  Okay.

10           MR. COGHLAN:  That's a minor point.  EPA's

11     regulations require a description of waters to be retained and

12     waters to be assumed.

13           THE COURT:  Right.

14           MR. COGHLAN:  And I think that a 602-water list of --

15     is an adequate description.  Now, it's not going to be a

16     perfect description.

17           I guess my point there has to be, if you have to have

18     a completely exhaustive list of every single water that's

19     tidally influenced in the state of Florida, that's just a

20     massive undertaking.  There are tens of thousands of waters

21     that would have to be assessed.

22           You'd have to establish the head of tide for each of

23     those; you'd have to document it.  Presumably, it would be a

24     final agency action.  There'd be a litigation over each of

25     those.  You'd never have state assumption if that's the

1    requirement.  So I think there's a rule of reason that has to

2    apply here.

3            I think a 600-water list based on over a century of

4    administering the Rivers and Harbors Act is a pretty reasonable

5    basis for developing a retained waters --

6            THE COURT:  But were all tidal waters excluded?

7            MR. COGHLAN:  Yes.

8            THE COURT:  So of those, there must have been some

9    that would not have been terribly hard to include that were

10   pretty obvious, right?

11           MR. COGHLAN:  Oh, I'm sorry.  I don't think I

12   understood the question.

13           THE COURT:  I excluded -- I didn't mean retained.

14   What I meant to say was not included on the list.

15           MR. COGHLAN:  All tidal waters are retained.  I don't

16   think it's the case that the Corps just went through and didn't

17   include any tidal waters on that list.  There are some big

18   waters on that list.

19           Like, the Gulf of Mexico is not a retained water.

20   But I also think it's pretty obvious to anyone who is going to

21   seek a Section 404 permit that the Gulf of Mexico is tidally

22   influenced.  If there's any doubt about that, you go on FDEP's

23   website, and you'll see that that's on the federal jurisdiction

24   side of the line.

25           THE COURT:  Okay.

1          MR. COGHLAN:  I'm happy to address any other

2    questions --

3          THE COURT:  I want to make sure there's time for your

4    colleague here as well, or your colleagues.

5          MR. COGHLAN:  Yes.  Thank you.

6          THE COURT:  Anything else you want to add?

7          MR. COGHLAN:  No, Your Honor.  I think that covers

8    it.  Thank you.

9          THE COURT:  Thank you.  All right.  Ms. Finnegan.

10         MS. FINNEGAN:  Good afternoon again, Your Honor.

11   I've heard you pose this question to my colleague and to

12   plaintiffs, so I'd like to start with the question that you

13   have about EPA's biological evaluation and where things stand.

14         THE COURT:  Yes, thank you.

15         MS. FINNEGAN:  Okay.  Great.  We filed a notice in

16   July, Docket No. 103, indicating that EPA completed its

17   biological evaluation, its requested initiation of

18   consultation, and EPA's engaged in conversations with the

19   National Marine Fisheries Service, which will inform a timeline

20   for consultation, as the agencies are still working together to

21   evaluate that biological evaluation.

22         Does that answer --

23         THE COURT:  Well, what I'm taking from what you're

24   telling me is you don't really have a timeline because you

25   don't know?

 1            MS. FINNEGAN:  I do not have a timeline for

 2     completion of any consultation at this time.

 3            THE COURT:  Okay.

 4            MS. FINNEGAN:  Okay.  So I started from the back of

 5     my notebook.  I'd like to start from the beginning of my

 6     notebook, if that's okay.

 7            THE COURT:  Before you do that, let me ask you one

 8     preliminary question.

 9            MS. FINNEGAN:  Sure.

10            THE COURT:  I asked, I think it was Ms. Reichert,

11     about the cooling waters and whether that model has been

12     employed elsewhere of the programmatic biological opinion and

13     leaving it up to the states through consultation and the ITS

14     and the technical assistance program to actually implement

15     the -- or to ensure that the incidental takings are not -- are

16     properly implemented.

17            MS. FINNEGAN:  To my knowledge, the structure that

18     was set out in the cooling water intake decision, I believe

19     this is the first next time that it's been employed here for

20     Florida's assumption.

21            THE COURT:  Okay.  Thank you.

22            MS. FINNEGAN:  As the Court's aware, the final agency

23     action by the Fish and Wildlife Service in this case is the

24     biological opinion.  It's a programmatic biological opinion.

25     The Fish and Wildlife Service analyzed the change in

1    Section 404 permitting authority and assumed waters in Florida.

2    As part of its analysis, the Fish and Wildlife

3    Service recognized that approval of Florida's request would

4    result in Florida DEP regulating a broad array of activities

5    over a long period of time.  And as is stated throughout the

6    biological opinion, there's substantial uncertainty about the

7    number, location, timing, and intensity of regulated activities

8    going forward.  And that's why the Fish and Wildlife Service

9    determined that a programmatic or process-based approach was

10    the most appropriate.

11    So, in turn, the biological opinion described how

12    potential effects to ESA -- and I hope it's okay I'm using the

13    short term ESA for the court reporter -- ESA-listed species

14    will be assessed and minimized when the state processes

15    Section 404 permit applications and described a technical

16    assistance process in which the Fish and Wildlife Service will

17    provide assistance to the state to ensure that State 404 permit

18    actions comply with ESA Section 7.

19    It's clear the Court has read the briefs.  I think

20    it's important to give a couple of highlight items about what

21    that technical assistance process looks like.  And the

22    technical assistance process in the biological opinion, in

23    turn, was based on a memorandum of understanding that was

24    entered into between the Fish and Wildlife Service, the Florida

25    DEP, and the Florida Fish and Wildlife Conservation Commission,

 1    also referred to in our briefs as just -- by the acronym FWC.

 2            At the threshold, all State 404 applications,

 3    including project-specific information, are supposed to be

 4    provided to the Fish and Wildlife Service, and the Fish and

 5    Wildlife Service has committed to review them.  You'll see in

 6    the biological opinion that the Fish and Wildlife Service --

 7            THE COURT:  When you say they've committed to review

 8    them, where is that?  One question I have, are they actually

 9    under a legal obligation to do so?  And if so, if you can point

10    me to where it says that.

11            MS. FINNEGAN:  Well, I can point you to where it says

12    it in the biological opinion.  Is that what you have and what

13    you're looking at, Your Honor?

14            THE COURT:  I have the biological opinion in front of

15    me.

16            MS. FINNEGAN:  Do you have the Bates-numbered

17    version?

18            THE COURT:  6032.

19            MS. FINNEGAN:  That's the first page.  So if you look

20    at page 18 or Bates No. 6056.  And it starts out, as you go

21    through -- this is one of the places.  It's listed throughout,

22    but this is the one I was looking at, at my seat.  Hopefully,

23    you can work with this one.

24            It describes how the Fish and Wildlife Service will

25    get the applications -- well, take two steps back.  It

1    describes how initially Florida DEP and the Fish and Wildlife

2    Conservation Commission -- and I'm in the second paragraph

3    under the bolded heading.

4            You should see a bolded heading that says,

5    "Identifying applications that may pose adverse impacts." Are

6    you with me, Your Honor?

7            THE COURT: No, I'm not. I'm on page 6056. The

8    third paragraph has some bullets underneath it.

9            MS. FINNEGAN: Yeah. Can I point you to the second

10   paragraph.

11           THE COURT: Second. Okay. Okay. I got that.

12           MS. FINNEGAN: "Upon receiving an application,

13   Florida DEP and FWC will review the submittal by the applicant

14   and preliminarily identify the affected species, affected

15   project area, and critical habitats," and so forth.

16           THE COURT: I'm sorry. I'm not seeing what you're --

17   do you have this same page?

18           MS. FINNEGAN: I absolutely do. Let's not --

19           THE COURT: Oh, it's at the top. Okay. I'm sorry.

20           MS. FINNEGAN: This heading, skip this paragraph, go

21   to this one. It starts, "Upon receiving."

22           THE COURT: Okay. I'm with you now.

23           MS. FINNEGAN: All right. So that describes for you

24   what the state agencies are going to do.

25           THE COURT: Okay.

1          MS. FINNEGAN:  All right.  Skip down to the middle of

2    the paragraph.  It says, "Florida DEP, or FDEP, will forward

3    the application to Florida Fish and Wildlife Commission and the

4    USFWS, Fish and Wildlife Service, within three to five days of

5    receipt."

6          THE COURT:  Okay.

7          MS. FINNEGAN:  And then it describes further

8    thereafter what it will do.

9          The closing sentence of that paragraph says that the

10   Fish and Wildlife Service may submit questions regarding

11   missing information and must do so within a particular period

12   of time.  We're going to go down to the bullets now.

13         THE COURT:  Okay.

14         MS. FINNEGAN:  "If the state agencies, Florida DEP

15   and Fish and Wildlife Conservation Commission, do not get a

16   response from the U.S. Fish and Wildlife Service by the

17   deadline for questions or comments, the lack of a response will

18   be considered no comment and no further information from the

19   U.S. Fish and Wildlife Service is needed.  U.S. Fish and

20   Wildlife Service has internal processes in place to ensure that

21   all applications are received and reviewed."

22         And then as a fail-safe, "Fish and Wildlife Service

23   may submit its questions during the public notice period for

24   the State 404 application should the Fish and Wildlife Service

25   not respond during the early phase of FDEP and Fish and

1    Wildlife Service coordination."  Okay?

2              THE COURT:  Okay.

3              MS. FINNEGAN:  Is that sufficient to answer your

4    question?

5              THE COURT:  It answers my question.  I'm not sure

6    whether it's sufficient or not.  I have to think about that.

7              MS. FINNEGAN:  What can I do to further answer?

8              THE COURT:  Well, I guess, what's bothering me about

9    this whole issue here or at least, sort of, fundamentally, is I

10   take it, it is a big deal to give somebody liability protection

11   under the Endangered Species Act.  It's not something that's

12   done lightly.

13             The model in the statute and the way that it's

14   conceived in the statute is you go to the agency; I want to --

15   I'm going to -- I need to build a dam.  The agency decides

16   whether to license you to build a dam or not.

17             They then go to the Fish and Wildlife Service and

18   consult with the Fish and Wildlife Service and say there's

19   snail darters there.  If you build that dam, it's going to be

20   a real problem for the snail darters and they're an endangered

21   species.  It's going to have a significant impact on the snail

22   darters if you build that dam.

23             Here are the conditions.  If you build a run on the

24   side that does the following things that allows the snail

25   darters to get through -- we understand that a handful of snail

1     darters may perish in that run on the side, but we think that

2     that's sufficient.  And if you do that, we're not going to hold

3     you liable for the incidental take of killing those handful of

4     snail darters that are going through the run.

5           That's, I take it, what, sort of, the paradigm of how

6     this works and it's intended to work is.  It strikes me as --

7     it's troubling to me to say that -- I'm a Florida developer

8     now, and I'm going to get liability protection and not be

9     subject to liability for incidental take under the Endangered

10    Species Act because there's this programmatic biological

11    opinion that doesn't really talk at all about what I'm doing or

12    anything that's occurring on this land here, any of the species

13    are not discussed here.

14          But I'm going to get protection because the --

15    Florida has entered into a memorandum of agreement, and I

16    have -- Fish and Wildlife Service has issued a biological

17    opinion that says that Florida will send these applications to

18    us, and we will review them.  Doesn't say what we'll do,

19    doesn't say what standards we'll apply.  We're certainly not

20    the ones who are then directing and issuing, sort of, what

21    conditions apply on any of this.

22          None of those types of procedural protections, and I

23    think, as the plaintiffs put it, guardrails that apply

24    ordinarily are there.  But the state of Florida sends the

25    application in.  Someone at Fish and Wildlife may look at it;

1    maybe they're required to.  It's not at all clear to me that

2    this biological opinion gives rise to a legal obligation that

3    is enforceable in a court of law that they do so the same way

4    that the statute would be.

5         But they may look at it.  It's not clear that anyone

6    can sue if they don't look at it and would have a basis to do

7    so and an enforceable right.  They look at it and they then say

8    to Florida, here are some concerns we have.  Then Florida puts

9    something into a permit, and then there's an incidental take.

10   Someone says, you know, I have absolute protection.

11        It seems fairly removed from the scheme that Congress

12   had in mind for providing that really serious step.  You're out

13   there killing endangered species.  But you know what, it's okay

14   because Fish and Wildlife Service looked at it and set out the

15   conditions that do so -- that said so.

16        But it's nothing -- for example, it doesn't say what

17   standard the Fish and Wildlife Service is going to apply in

18   doing so.  That is causing me some concern here.

19        MS. FINNEGAN:  All right.  So let me try and unpack

20   things one at a time.  I'm going to go a little -- I'm going to

21   start at the end and go back to the beginning.

22        THE COURT:  Okay.

23        MS. FINNEGAN:  First of all, no one is intending for

24   intentional take of listed species.  I think the Court --

25        THE COURT:  Incidental take.  I understand.

1          MS. FINNEGAN:  Okay.  Just making sure.  I heard you

2     say killing endangered species.

3          THE COURT:  But incidental take is killing.

4          MS. FINNEGAN:  Okay.  Well, it takes up a whole lot

5     of other things, too.  I want to make sure you and I are on the

6     same page.  We're talking about --

7          THE COURT:  You're right, it could be harming.

8     You're right.  It's not just killing, but it could be harming

9     as well.

10          MS. FINNEGAN:  In the beginning you asked me where is

11     the commitment that the Fish and Wildlife Service will review

12     the permits, and it's throughout the biological opinion.  I can

13     give you a couple of pinpoint cites if you want them right now.

14          THE COURT:  I should have all that to look at.  There

15     may be more like this, but it still leads me to the question

16     of, is this anything that is legally enforceable, and does it

17     require Fish and Wildlife Service to actually comply with all

18     the ordinary guardrails that would apply with respect to the

19     best scientific methods or whatever the rules are that apply?

20          MS. FINNEGAN:  Okay.  So it's its own biological

21     opinion.  Of course, it's going to comply with it.  It's in an

22     MOU.  It's committed to that, Your Honor.  It's committed to --

23          THE COURT:  Come on.  Are you willing to commit to me

24     here that the United States concedes that someone can sue them

25     if they don't comply with this?

1          MS. FINNEGAN:  If the Fish and Wildlife Service

2     doesn't review the permit?

3          THE COURT:  Yes.  Not only doesn't review the permit,

4     but doesn't apply the best scientific standards or whatever the

5     requirements are ordinarily, and doesn't do all those things,

6     that someone would have a basis to sue the Fish and Wildlife

7     Service, and say, well, you put it in your biological opinion.

8          MS. FINNEGAN:  Well, I'm not sure what the cause of

9     action would be for that, Your Honor.  But in terms of the

10    standards, the express purpose of the technical assistance

11    process is to determine if state-issued 404 permits would

12    jeopardize species or adversely modify or destroy critical

13    habitats.

14          That's the standard the Fish and Wildlife Service is

15    going to apply.  And it clearly incorporates the meaning of

16    those terms from the Endangered Species Act and its

17    implementing regulations.  That interpretation is reinforced by

18    the fact that federal regulations that apply to EPA, the state

19    program rule, State 404 applicant handbook, all prohibit

20    issuance of a State 404 permit that's likely to jeopardize

21    ESA-listed species.

22          Those permits are not -- it's not just the biological

23    opinion that binds them to that, Your Honor.  It's not just the

24    memorandum of understanding.  That's what makes it a little

25    tiny bit different than the cooling water case.

1    In the cooling water case, you had disagreement by

2    the agencies.  Here, it's set out in the program rule as well

3    in Florida.  And another key difference -- I believe a key

4    difference between cooling water intake structures and this

5    case is that Florida agreed that the Fish and Wildlife Services

6    input is determinative.

7    If they do not agree to put the measures in place

8    that the Fish and Wildlife Service identifies, then Florida has

9    to issue a notice of intent to deny the permit.  These are not

10   optional issues.

11   THE COURT:  Let me ask you.  The guard- -- the

12   conditions that are imposed are then conditions -- well, I'll

13   put this into a question.

14   Are those conditions ones that are imposed by the

15   Fish and Wildlife Service or are they conditions that are

16   imposed by the state of Florida?  I guess what I'm wondering is

17   if someone then violates those conditions, who goes after them

18   or who has the authority to say, is it a power of the state, or

19   is it a power of the Fish and Wildlife Service?

20   MS. FINNEGAN:  So I'm going to get down -- I'm going

21   to try and answer because I think you're interested in the

22   mechanics.

23   THE COURT:  I am.

24   MS. FINNEGAN:  This is post-decisional, so there's

25   not necessarily information in the record.  But my

1    understanding of how it works is that the Fish and Wildlife

2    Service receives the permit, reviews it, provides a memorandum

3    that I believe goes to Florida.  I believe Florida then puts it

4    on its website and indicates what the Fish and Wildlife

5    Service's opinion is and what the measures are, and that those

6    are then incorporated into the permit that Florida issues.

7          As far as who is responsible for enforcement, I

8    believe it likely would be Florida DEP in the first instance,

9    but EPA also has oversight authority under its regulations and

10   guidelines.

11         THE COURT:  What about the Fish and Wildlife Service

12   just for an unlawful incidental taking?

13         MS. FINNEGAN:  Correct.  So if -- this is addressed

14   in the biological opinion.  So let me make sure that I'm

15   getting it exactly right.

16         I'm making sure I'm in the right spot, Your Honor.

17   If the permit conditions are not complied with or if the amount

18   or extent of incidental take is exceeded during the activity

19   that is being permitted, then there's a -- this is addressed in

20   the reinitiation statement -- then that permit, in and of

21   itself, can be reopened.

22         THE COURT:  Right.  So let me ask you this.  I

23   understand that Fish and Wildlife has agreed to receive and

24   review the permit applications.

25         MS. FINNEGAN:  Yes.

1          THE COURT:  But is there anything that says that

2     they're obligated, the Fish and Wildlife Service, other than

3     just the fact that it's the agency's mission?  Is there

4     anything that says, with respect to these applications, it's

5     actually obligated to weigh in?

6          So if it sees what it views as a risk to an

7     endangered species, is there something that says that Fish and

8     Wildlife Service is obligated to do something?

9          MS. FINNEGAN:  So I think -- I don't want to profess

10    to understand why the Court is asking the question.

11         But I did hear Ms. Reichert's discussion about the

12    fact that there was a permit application that had come in that

13    indicated there might be incidental take and that when it went

14    out -- when the permit was issued, there was no incidental take

15    limit.

16         I can't speak to that specific permit for two

17    reasons.  First, I didn't quite hear which one she identified,

18    and, second, I just don't have the information.

19         THE COURT:  That's not what the basis for my question

20    was.

21         MS. FINNEGAN:  I don't want to misapprehend what the

22    process is here.  The Florida DEP and the Florida Fish and

23    Wildlife Conservation Commission are supposed to review those

24    in the first instance.  That's what I was pointing to in Bates

25    No. 6056.

1          And they are supposed to propose in the first

2     instance that certain protection measures be implemented, and

3     that's what goes to the Fish and Wildlife Service for review.

4     So the Fish and Wildlife Service may -- if it reviews that, and

5     it deems them sufficient, then no, it may not comment.  The

6     idea is that --

7          THE COURT:  No, no, no.

8          MS. FINNEGAN:  -- comment as needed --

9          THE COURT:  I'm sorry to interrupt.

10          MS. FINNEGAN:  -- and put measures in place as

11     needed.  I'm so sorry.  I don't mean to interrupt you.

12          THE COURT:  What I was going to say is -- really, my

13     question, though, is there some documentation other than just

14     our confidence in the goodwill and good intentions of the Fish

15     and Wildlife Service -- which I'm not doubting -- but is there

16     some document that you can point to that says where the Fish

17     and Wildlife Service sees that the following standard is

18     violated, it will -- it must weigh in under those

19     circumstances?  That's different than saying that it will

20     review it.

21          MS. FINNEGAN:  I guess I'm not sure where in the

22     process Your Honor thinks that that is not going to happen.

23     Because the process is designed specifically to make sure that

24     the Fish and Wildlife Service does, in fact, do that and that

25     the Fish and Wildlife Service has, in fact, committed through

1    this biological opinion to do that.

2            THE COURT:  But that's what I'm wondering.  I don't

3    see that, actually, said somewhere, that they're committing to

4    do that.

5            It raises just, also, to me kind of another, sort of,

6    broader question here about this, which is there's a lot of

7    very knowledgeable people in this room about these laws, and

8    I'm not among them.  I apologize for that.

9            But what bothers me here about this is there is a

10    statute that provides a mechanism for EPA to permit a state to

11    assume the Army Corps of Engineers permitting.  There's a whole

12    process that you go through that does that, and there are

13    procedures and standards that deal with that.

14            It feels to me a little bit like there is a partial

15    delegation to the state or assumption by the state of the

16    authority to set the guardrails in ways that -- not set the

17    guardrails -- to, in essence, provide that very valuable

18    liability protection for incidental take that is usually in the

19    hands and protection of the Fish and Wildlife Service.

20            It's just not spelled out in the type of detail --

21    I'm left wondering, why not just -- why didn't you just do what

22    was done in New Jersey?  And if the Fish and Wildlife Service

23    is doing this and if somebody is getting protection, have the

24    Fish and Wildlife Service do it.

25            But I'm just left wondering if the Fish and Wildlife

1    Service doesn't get back to the state and the state issues a

2    permit, I think that person who got the permit probably has

3    liability protection and can't be -- no one can go after them

4    for any incidental take for that project, but without all of

5    the procedural protections and rules that are usually in place

6    when the Fish and Wildlife Service is according someone that

7    type of protection.

8            MS. FINNEGAN:  Well, I think what Your Honor is

9    failing to assess is that when you have an agency that's taking

10   an action --

11           THE COURT:  Right.

12           MS. FINNEGAN:  -- the statute itself -- right? -- put

13   aside cooling water, which we do think was correctly decided.

14   But the statute itself lets the action agency decide how to

15   structure its action to meet its obligation.

16           THE COURT:  Right.

17           MS. FINNEGAN:  Fish and Wildlife Service or the

18   National Marine Fisheries Service, whoever the consulting

19   agency is, that is its responsibility to determine whether that

20   action, as defined by the action agency, satisfies the

21   standards of ESA Section 782.

22           THE COURT:  Okay.  You're putting your finger on

23   the nail -- hammer on the nail -- whatever the expression is.

24   I think you're helping me refine what's bothering me.

25           MS. FINNEGAN:  Okay.  Well, that's good.

1          THE COURT:  I think the way the plaintiffs put this

2     in their briefs is you can't have your cake and eat it too.

3          I think it's fair to say that the Fish and Wildlife

4     Service is not making the type of determination that Congress

5     had in mind to provide liability protection to the developer in

6     Florida who is building the condos and needs the permit to do

7     that.  No one thinks that Congress intended, when the Fish and

8     Wildlife Service does a systematic biological statement or

9     opinion where there's no mention of any of the species that may

10     be at issue, that particular area, that's intended to

11     provide the -- so that's not the -- that can't be the agency

12     action that is at issue.

13          So then the question is, is the agency action, the

14     EPA's decision to let the permit application go through and not

15     step in, you know, what is the agency action at that point, and

16     is Fish and Wildlife Service at that second step doing what

17     it's supposed to do under the statute in order to accord the

18     protection?

19          MS. FINNEGAN:  Well, the action here is EPA's

20     approval of Florida's program as defined, and the way it's

21     defined is with a structure in which it's made all the

22     commitments that I've already identified to you.  I won't go

23     through them again.  Share the permits with the Fish and

24     Wildlife Service, Fish and Wildlife Service will review them,

25     will weigh in as needed if there are protection measures

1    needed, will set an incidental take limit if that is needed.

2         We'll -- if the provisions are not entered into the

3    permit, notice that -- I shouldn't use the word notice because

4    I don't want to imply there's an actual -- I mean that as the

5    legal term.  That permittee does not have take -- take

6    protection if it does not comply with the terms of the permit.

7         And that's another important point, Your Honor, that

8    I skipped in the beginning when you asked what it was that Fish

9    and Wildlife Service was going to do.  If the permittee does

10   not comply or Florida DEP acts without providing the permit

11   conditions, they don't have take protection.  If EPA doesn't

12   exercise its oversight authority as it's committed to do in the

13   terms and conditions, it, too, does not have take protection.

14        To go back to the nail on the head, if I can get back

15   there for you.

16        THE COURT:  Okay.  That's fine.

17        MS. FINNEGAN:  The action agency is free to define

18   the action, and that that's what the Fish and Wildlife Service

19   reviews.  And I've just described for you all the components of

20   the action.

21        And so for the Fish and Wildlife Service to review it

22   as it did, the Fish and Wildlife Service concluded that that

23   action is not likely to cause jeopardy or adverse modification

24   or destroy critical habitat.  That that action, as defined,

25   satisfies Section 7.

1          THE COURT:  Okay.  So that's fine.  If I go back to

2     the statute --

3          MS. FINNEGAN:  Yes.

4          THE COURT:  -- under 1536(b)(4).

5          MS. FINNEGAN:  Do you mind if I get my copy?

6          THE COURT:  Go ahead.  This is the trigger for

7     getting the liability protection.

8          The secretary shall provide the federal agency and

9     the applicant concerned -- and I think in my hypothetical from

10    before with building the dam, that's going to be whoever is

11    building the dam, but -- if any, with a written statement that

12    specifies the impact of such incidental taking on the species.

13         Species -- specifies those reasonable and prudent

14    measures the secretary considers necessary or appropriate to

15    minimize such impact on the species and then sets forth the

16    terms, conditions that must be complied with by the federal

17    agency or applicant, if any, or both to implement the measures

18    specified in 2 and 3.

19         And 2 is, specifies the reasonable and prudent

20    measures the secretary considers necessary or appropriate to

21    minimize such impact.

22         And where is that done here?  I mean, I think that's

23    the having your cake and eating it too.  It really wasn't -- no

24    one looked at any particular species.  It says the species.  It

25    doesn't say anything about particular species in the

1    programmatic or the biological opinion in this case.

2            MS. FINNEGAN:  Well, you know, Your Honor, we agree

3    that Congress expressed a preference for quantifying take in an

4    Incidental Take Statement and expressed a preference that it be

5    a number.  It also recognized that's not always possible.

6            So an ITS, Incidental Take Statement, that has no

7    numerical cap is adequate.

8            THE COURT:  But it has no analysis at all, really, of

9    a particular species or particular ecosystems.

10           MS. FINNEGAN:  But if it explains why it was

11   impractical to express a numerical take measure, then it is

12   permissible.

13           THE COURT:  Why couldn't the Fish and Wildlife

14   Service have said that incidental take of a single Florida

15   panther is -- you're not going to get protection, for example?

16           MS. FINNEGAN:  Just -- but, Your Honor, it's

17   impossible to know where these permits are going to apply for,

18   what activities they're going to cover, how frequently they're

19   going to occur, where they're going to be.  It's impossible to

20   predict --

21           THE COURT:  I'm completely with you on that.  I'm

22   wondering why not, then, do it the way it's done in Florida

23   [sic].  And then say, if somebody wants liability protection,

24   then they come to Fish and Wildlife and they say, here's the

25   project, and there are some Florida panthers in the region;

1    this is what we're planning on doing.  And the Fish and

2    Wildlife Service looks at it and says, okay, you know, as long

3    as you take these protections, we're okay with it.

4            MS. FINNEGAN:  Do you mean in New Jersey, Your Honor?

5            THE COURT:  I'm saying, why not do something like the

6    New Jersey model here.  It's just not -- I think -- I don't

7    think that the biological opinion and the Incidental Take

8    Statement at the generic level here does anything to really

9    promote the purposes of the Endangered Species Act or to

10   comply, frankly, with the language, which is much more specific

11   than that other than, perhaps, setting up a process.

12           And the question is, does the process itself provide

13   an adequate substitute for this, and is the process itself set

14   up consistent with the Endangered Species Act?  It seems to me

15   that for that to be the case, at least there's a substantial

16   argument, that Fish and Wildlife Service would have to do the

17   things that are typically required and, actually, put its name

18   to it.

19           Maybe it's doing it if it's posting it on the

20   website, saying that it is the opinion of the Fish and Wildlife

21   Service that this project is okay to go forward following to --

22   we've looked at it, we've considered it, we've applied the best

23   scientific methodology, whatever the standard is that you're

24   supposed to apply, we've done all those things, and we've

25   looked at it, and it is our assessment that it can go forward

1    subject to the following conditions.  And if you comply with

2    these conditions, then you have liability protection.

3         But this all just feels much looser than that.

4         MS. FINNEGAN:  I'm not sure where the disconnect is,

5    Your Honor, between what you just described and what you think

6    is actually happening.  I realize that we have a little bit of

7    a post-decisional line here, right?  Because the action

8    concluded with issuance of the biological opinion, and we don't

9    necessarily want to get into a disagreement about what's

10   happening with the facts on the ground because those issues are

11   not in the administrative record or before the Court.

12        But I will say that the technical assistance process

13   is not without standards, as I've explained.  The agencies have

14   committed themselves to the process in a similar situation in

15   the cooling water case.  The Court found that the paucity of

16   information, which is the same scenario that we have here, and

17   the agency's commitment to the technical assistance process

18   complied with the Endangered Species Act.

19        When you're presented with a similar action by the

20   same agency, you know, recognizing it was a one-time approval

21   with subsequent implementation actions, I can't think of

22   anything more reasonable than an agency not only following what

23   it believes the law is, but what a court specifically told it

24   no less than five years ago was appropriate to do.

25        THE COURT:  Okay.  Let me ask you, for the

1    intersection of the Endangered Species Act and the Clean Water

2    Act, is it a requirement for the EPA's approval of the

3    assumption application that there be adequate procedures in

4    place to protect endangered species?

5            MS. FINNEGAN:  I believe so.  But I might just want

6    to confer with my co-counsel as we sit down.

7            THE COURT:  Fair enough.

8            MS. FINNEGAN:  They have guidelines that require that

9    species not be jeopardized or habitat adversely modified or

10   destroyed.  So I believe the standard is cross-referenced.

11           THE COURT:  Okay.

12           MS. FINNEGAN:  I've already spoken with Your Honor

13   about the technical assistance process.  Again, the agency's

14   commitments to the process, as we've described in our briefs,

15   is entitled to a presumption of regularity.  Really, plaintiffs

16   here have brought nothing forward to indicate that any of the

17   agencies are not going to do what they say they're going to do.

18   EPA is bound by its regulations.  Florida DEP is bound by its

19   State 404 rule.

20           As the Court is aware, the Second Circuit rejected

21   similar arguments in the cooling water take.

22           THE COURT:  But what the agency is required to do

23   under the statute is when a federal agency comes to the

24   secretary and says here is an agency action that we think may

25   have an adverse effect on an endangered species, we'd like to

1    consult with you, you have an informal consultation, you have a

2    formal consultation, if need be, and then the secretary makes a

3    determination and, if necessary, sets certain conditions and

4    rules.

5            Here, there's not a federal agency that's coming to

6    Fish and Wildlife Service and consulting.  It's -- Florida is

7    just sending a copy of an application that they're getting

8    filed by a private party saying we're going to pass this along

9    to you, and we'd like your take on this.

10           I mean, how does that work normally if there's a

11   private party?  If there's -- it's not a federal agency that's

12   undertaking a project, but is just a developer and they're

13   concerned about liability for incidental take; is there a

14   process for them to come to you and get an opinion from the

15   secretary and conditions from the secretary?

16           MS. FINNEGAN:  Then what you're talking about, Your

17   Honor, is an incidental take permit under Section 10 --

18           THE COURT:  Right.

19           MS. FINNEGAN:  -- that the Fish and Wildlife Service

20   or the National Marine Fisheries Service, whichever one would

21   be considering and evaluating.  And since the Fish and Wildlife

22   Service would be the action agency issuing the permit, they

23   have intra-agency consultation in that scenario where they --

24   the office that issues the permits consults with the office

25   that forms the biological opinion.

1              THE COURT:  Right.

2              MS. FINNEGAN:  So that's what the case would be in

3     that scenario.

4              THE COURT:  Okay.

5              MS. FINNEGAN:  I think Your Honor understands my main

6     point, which is that the technical assistance process is not,

7     in fact, voluntary; and is, in fact, designed to provide

8     meaningful species protection.

9              THE COURT:  Just before we leave that topic -- and I

10    know we're running late on time here.  We'll -- I will make

11    sure that everyone has a chance to be heard even if we have to

12    come back or do something else on this, so don't worry about

13    that.

14             But I just want to make sure that I have your best

15    answer on where in the record it says that Fish and Wildlife

16    Service is actually obligated versus, say -- obligated to weigh

17    the -- to, actually, consider the environmental impacts and to

18    engage in the type of analysis that is typically required under

19    the Endangered Species Act.

20             I see where it says they're required -- or they agree

21    they will receive and review the permit application.  But where

22    does it say they're going to do, if anything, beyond that,

23    where they say they're going to actually engage in the type of

24    weighing or scientific analysis that is typically required

25    under the Endangered Species Act?

1              MS. FINNEGAN:  The best place that I can at this time

2      direct you to, Your Honor, is Bates No. 6057 through -58 where

3      the biological opinion explains the coordination, the technical

4      assistance process, and states that it has similar objectives

5      ensuring that Section 7 standards are applied and to minimize

6      and track take.

7              I'm sorry.  My handwriting is a little bad, so I

8      might not be following the quote exactly as it appears.

9              THE COURT:  Okay.  That's helpful.  Thank you.

10             MS. FINNEGAN:  We talked briefly, Your Honor, about

11     the Incidental Take Statement, and I've explained to you our

12     position as to why it's reasonable for there to be a

13     numerical -- for the absence of a numerical number here.

14             We touched on, although not specifically, both

15     reasonable and prudent measures in terms and conditions.  The

16     reasonable and prudent measures in the Incidental Take

17     Statement require EPA to use its authority under the Clean

18     Water Act to minimize impacts to species pursuant to its

19     oversight of the program.

20             Florida DEP, to use its authority under the state of

21     Florida 404 program rule and other authorities to minimize

22     impacts on listed species.  And the Fish and Wildlife Service,

23     Florida DEP, and the Fish and Wildlife Conservation Commission

24     to implement the memorandum of understanding.

25             These reasonable and prudent measures are legally

1    sufficient, most in part because the Endangered Species Act

2    doesn't mandate any particular form or content for reasonable

3    and prudent measures.  The ESA just says that a Bi Op that

4    authorizes incidental take should specify the measures that the

5    secretary considers necessary or appropriate and those, in

6    fact, are the measures that the secretary considered necessary

7    and appropriate here.

8              In the cooling water case, nearly identical

9    reasonable and prudent measures regarding EPA's oversight

10   authority satisfied the Endangered Species Act.  I think the

11   Court also has our argument on terms and conditions, as well,

12   set forth in our briefs.

13             With that, if you don't have any other questions --

14             THE COURT:  I have lots of questions, but there's

15   only so much time in a day.

16             MS. FINNEGAN:  Well, I'm here for them.

17             THE COURT:  Thank you.

18             MS. FINNEGAN:  Thank you, Your Honor.

19             THE COURT:  Give me just a second here.  I don't know

20   how much time you feel that you need.  I think we could

21   probably go for no more than maybe 20 minutes tonight.  I'd

22   like to give the plaintiffs a few minutes for rebuttal.

23             Also, if everyone wants to come back tomorrow morning

24   at 9:00 a.m., I'm free from 9:00 until 10:00.  I know you have

25   people in from out of town, so I don't want to make you fly

1    back another day, but I also don't want you to feel as though

2    you're rushed and don't have the opportunity to make your

3    points.

4              MR. WOOD:  If I could have 15 minutes, Your Honor, I

5    think that would be plenty, and I'm glad to indulge your

6    questions.  I'll be as brief as possible.  I do think there's

7    some important points --

8              THE COURT:  I'll try and keep my questions as brief

9    as possible.

10             MR. WOOD:  Happy to answer any questions you have.

11             THE COURT:  All right.  Why don't I give you 15

12   minutes and I'll give the plaintiffs 5 minutes for rebuttal.

13             MR. WOOD:  Okay.  Thank you, Your Honor.  I did want

14   to begin by -- I think what I'd like to try to do is hit

15   quickly the ESA, the clean water issues, and the retained

16   waters, and the standing, Your Honor, which we've raised.  I do

17   want to encourage, Your Honor, with regard to the key document

18   that the state of Florida believes you should consider as you

19   evaluate this case.

20             We do think the Florida 404 handbook, which is a

21   summation of the regulations -- Your Honor, I have before the

22   regulations.  It's voluminous.  The application itself was

23   voluminous.  But the handbook itself goes through the criteria

24   and the process that's used.  It's not nearly as simple and as

25   jaded as plaintiffs would like to present.

1          It's a comprehensive process that folds together the

2    environmental resource permit program, as well as the Florida

3    404 program.  I'll go into that in more detail in a moment.

4          Your Honor, we also would want to highlight for you

5    the biological opinion combined with Florida's BA.  This is it

6    here, Your Honor.  The EPA BA and the Fish and Wildlife Service

7    biological opinion.

8          I want to direct you to page 67 of the biological

9    opinion where it lays out the way the technical assistance

10   process will work.  And technical assistance goes back to 1998

11   when the original ESA consultation handbook was put in place.

12   It's not a new invention.  It says here, FDEP, FWC -- that's

13   the Florida Fish and Wildlife Commission -- and USFWS will

14   participate in a State 404 program species coordination

15   technical team.  And then it lays out exactly how that process

16   works.

17         They get every application.  And then when they get

18   the application, any condition, any term, any measure Fish and

19   Wildlife Service wants to include is included.  They have to

20   commit -- they've committed to participate in the Bi Op, which

21   has been approved as a matter of federal law.  They've

22   committed an MOU.

23         And then they are, in fact, are receiving these

24   applications, and we have lots of examples now, Your Honor,

25   including -- the Belmar project is a good example where Fish

1    and Wildlife Service has produced significant reports.  The

2    state fish and wildlife agency has also produced significant

3    reports.  It includes specific take amounts that are authorized

4    and lots of terms and conditions in terms of setbacks and

5    things like that.

6              THE COURT:  Can you give me the page number from the

7    biological opinion.

8              MR. WOOD:  It's the biological opinion, page 67.

9    It's paragraph 2.

10             THE COURT:  Page 67.  Hold on a second here.

11             MR. WOOD:  Under key commitments by the agency.  Key

12    commitments by FDEP, FWC, FWS that -- I'm sorry.  I have 15

13    minutes.  I have literally, Your Honor, seven years of work in

14    15 minutes.  That's the situation I'm in.

15             THE COURT:  No, you're not.  I'll let you come back

16    if you'd like to.

17             MR. WOOD:  Okay.  Thank you.

18             THE COURT:  I see what you're talking about.  I just

19    want to make sure that's in front of me.

20             MR. WOOD:  They will participate.  Fish and Wildlife

21    Service will participate in a state program process.  Their

22    determinations are controlling; whatever Fish and Wildlife

23    Service says about projects.  They use the same standard under

24    Section 7.  It's the same consultation process.

25             May affect, not likely to adversely affect, adversely

1    affect, jeopardy; it's all the same standard, and they --

2    whatever they say gets folded into the permit.  If they don't,

3    if DEP -- and they haven't done this.  If DEP said, you know

4    what, thanks but no thanks -- this goes to the cake and eat it

5    too thing.  Fish and Wildlife Service gets to have its cake and

6    eat it too.  Whatever condition they want gets folded into it.

7    If DEP doesn't accept it, EPA can veto it or federalize it or

8    they can sue for take.

9           THE COURT:  I understand that there's -- at least I

10   believe there's not notice and comment with respect to the Fish

11   and Wildlife process and the ITS and the biological opinion.

12   But to the extent that those were necessary elements of the

13   assumption here, and to the extent that the Clean Water Act

14   does require and the EPA regulations require consideration of

15   the effect on -- of the assumption on endangered species, why

16   isn't it problematic that this wasn't available as part of the

17   notice and comment process for the assumption?

18          MR. WOOD:  The application Florida submitted had a

19   very robust -- thousands of pages, robust record.  It included

20   the Fish and Wildlife Service agreement, and it included within

21   the record --

22          THE COURT:  The agreement is pretty thin.

23          MR. WOOD:  But the agreement, Your Honor, reflects

24   the biological assessment.  First of all --

25          THE COURT:  No.  The assessment wasn't done yet.  I'm

1    sorry.  The biological --

2            MR. WOOD:  There's actually three documents.  The

3    state of Florida put together a biological evaluation, a

4    comprehensive review, listed 230 species, went through where

5    they're located, provided data on where they're at, and then

6    provided an assessment for how this program was going to work

7    if EPA approved it.

8            Then EPA did a biological -- a BE -- BA, and that was

9    the second half of this document, Your Honor --

10           THE COURT:  Okay.

11           MR. WOOD:  -- that goes through all of that.

12           And then Fish and Wildlife Service received it and

13   they put together a third document, which is the biological

14   opinion with the Incidental Take Statement that says, no matter

15   what Fish and Wildlife Service says goes.  They're going to

16   protect species.  I would like to add, with regard to their

17   duty --

18           THE COURT:  I'm sorry.  Before you go on to that, if

19   I go and look at the biological assessment that was included as

20   part of the record --

21           MR. WOOD:  It's in the record, yes, sir.

22           THE COURT:  -- that will include the detail that's

23   all been set forth for me about how it's going to work?

24           MR. WOOD:  Absolutely.  It provides the framework and

25   additional detail on how the process would work.  I do want to

1    provide context for why this was used because I do think it's

2    super-important that the Court understand.

3              The Supreme Court issued a decision in the

4    *Homebuilders* case in 2007.  And that created a sea change in

5    what was understood about how consultation was supposed to

6    work.  The only program that EPA delegates to the state that

7    basically requires an agency or gives agency discretion to

8    consider impacts to species is the 404 program.

9              The 402 program, which is what the Supreme Court

10   said, does not give them discretion to consider impacts to

11   species.  Therefore, 402 doesn't go through consultation.  The

12   same with the solid waste program, the same with the Clean Air

13   Act program.

14             The other programs don't have discretion to consider

15   impacts to species.  404, which incorporates the 404(b)(1)

16   guidelines, which says you have to consider impact to species,

17   that was the hook that gave EPA the obligation to engage in

18   consultation.

19             So it's only under 404 where this comes up, and only

20   in 404 after the Supreme Court ruled in 2007.  That decision,

21   the way that approach was developed, was the subject of notice

22   and comment process by EPA to develop that understanding.

23   That's the understanding they adopted, and that's what Florida

24   used here in this process with EPA; was, okay, EPA has

25   discretion to consider impact to species.  Therefore, we have

1    to consult; therefore you're in the programmatic world.

2              THE COURT:  I'm sorry.  What regulation are you

3    talking about?

4              MR. WOOD:  I'm talking about the Clean Water Act,

5    Section 404 that says you consider impact to species when

6    you're approving a program.

7              THE COURT:  No.  I thought you said there was notice

8    and comment for rulemaking.  What rulemaking is it?

9              MR. WOOD:  This is the rulemaking that resulted in

10   EPA taking the position that they had to consult for a state

11   assumption.  They used notice and comment process, Your Honor,

12   on the decision to adopt a legal memo.

13             THE COURT:  Okay.  Thank you.

14             MR. WOOD:  So all that was done out in the open; it's

15   by legal memo.

16             The reason why I think that's important is because

17   programmatic consultation is not an invention that artifice to,

18   sort of, help out with the situation.  Programmatic

19   consultation has been used in many contexts, and the questions

20   the Court has raised today, I do want to emphasize, go to the

21   fundamentals of not Florida's program, but the fundamentals of

22   programmatic consultation.

23             The Department of Navy case cited in our decision,

24   programmatic consultation for the Navy's undersea program.  The

25   cooling water intake structure case, Second Circuit.  Another

1    example, the stream buffer rule used a programmatic

2    consultation approach.  That involves delegated state programs.

3    That's under the mining statutes; a little different.

4            But this was not an invention just to help out this

5    one situation.  This is consistent with technical assistance

6    approaches going back to 1998; consistent with programmatic

7    consultation policies and consistent with the Supreme Court's

8    decision in *Homebuilders* 2007, which is really the pivotal

9    defining point into how this is treated.

10           THE COURT:  Okay.

11           MR. WOOD:  If I could move forward, Your Honor --

12    because I know time is limited -- into the Clean Water Act

13    criteria.  You had expressed, I think, very significant

14    concerns about whether Florida's criteria was appropriate for

15    granting permits and whether it complied with the Clean Water

16    Act and 404(b)(1) requirements.

17           So with that, again, I would refer you to the 404

18    handbook, which is a summation of the regulations.  But the

19    criteria for issuing a permit is more than just will it or may

20    it affect water quality criteria.  It's spelled out entirely in

21    several pages in the handbook the process that they will go

22    through.  And, Your Honor, it is all-encompassing.

23           THE COURT:  You want to give me the page citations.

24           MR. WOOD:  I'll point you to page 31 through 32,

25    which is the sequence of review for the issuance of a 404

 1    permit; and then pages 32 to 33; and then all the way --

 2    actually, Your Honor, going all the way through -- frankly,

 3    it's half the handbook, Your Honor, the criteria that they go

 4    through.  Maybe the table of contents is the best spot to look.

 5           There's a whole section on the processing, the

 6    criteria, the way they review with agencies.  It's Section 8,

 7    Your Honor, of the handbook, pages 31 to 42.  Sequence of

 8    review, alternatives analysis, aesthetics reviews, mitigation,

 9    cumulative effect, secondary effects.

10           It also folds in -- and this is important because

11    it's unique in Florida.  We have an environmental resource

12    permit program that protects every water in the state, not just

13    water in the U.S.  And that entire program is folded into this

14    requirement.  So if you're going to go to 404, you also have to

15    go to state ERP, so that criteria is in there.

16           I think the plaintiffs paint a caricature of what the

17    Florida program is, and it's flat-out not consistent with what

18    the actual regulations provide, and I do think the handbook is

19    the best place to look for -- the quickest place for that.

20           THE COURT:  I will do that.

21           MR. WOOD:  The same is true, Your Honor, with the

22    retained waters list.  I think there was a lot of questions

23    about that.  Appendix A of the handbook contains the retained

24    waters list.

25           Florida is Number 3 in terms of the size of water

1    area coverage in the state.  It would be truly unworkable and

2    impossible to require a perfect retained waters list.  The list

3    itself does include over 600 bodies of water.  This includes

4    many rivers, creeks, lakes, bays of all kinds.  And then it

5    does have the catchall provision that includes everything else

6    that meets the statutory requirements.

7         There have been some instances where projects have

8    come up and there's a question; it's on one side of the line or

9    the other.  The Corps and Florida DEP have worked together to

10   address which line they should go on.  Tie goes to the Corps.

11   There's a 300-foot administrative boundary.  So if a project

12   exists on both sides of that boundary, the Corps keeps it.

13        If it's -- so there's a workable set of procedures

14   that the agencies are following.  I'm not aware of any

15   situation yet where there's been a water where they're able to

16   say, well, we got it wrong or shouldn't be treated one way or

17   the other.

18        I think all that, Your Honor, brings me back to --

19   what I guess I would like to finish my time with -- is

20   standing.  We do believe, Your Honor, that you should grapple

21   with three cases.  The first is *Crow Creek* involving a transfer

22   of lands from the Army Corps of Engineers to the state of South

23   Dakota.

24        And in that case the D.C. Circuit said the Indian

25   tribe lacked standing to challenge the transfer because there

1    was ongoing, continuous, federal enforcement and oversight.

2    That is the exact same scenario we have here.

3            The second case, Your Honor, is another D.C. Circuit

4    case, *Waterkeeper Alliance*, which just came out last summer.

5    No party briefed standing in that case.  There were four

6    claims; three of them were APA claims.  One was procedural APA,

7    and two were substantive APA claims.

8            The D.C. Circuit, sua sponte -- and it's important, I

9    should say.  It was a challenge to EPA's approval of Oklahoma's

10    environmental program for governing coal ash.  So pretty

11    similar context.

12            And the D.C. Circuit said, not only do you lack

13    standing -- this is sua sponte.  Not only do you lack standing

14    for your non-APA claims, you lack standing for all of your APA,

15    your procedural and your substantive, because of the fact that

16    EPA enforcement was there every step of the way.

17            I do believe, Your Honor, you should grapple with

18    *Crow Creek* and *Waterkeeper*.  And if those cases don't convince

19    you that they don't have standing here, Your Honor -- I'm

20    speaking too fast for the court reporter.  I apologize -- then

21    there's *Clapper*.  And *Clapper*, Your Honor, is the case --

22            THE COURT:  I know *Clapper* well.

23            MR. WOOD:  I know you do.  It's a surveillance case.

24    I just want you to think about the dominos.  We have a

25    demonstrative.  We can hand it out to everybody, but I know

1    time is limited.

2              In *Clapper* there were five dominos, Your Honor; five

3    dominos, and the Court said that's too speculative.  The chain

4    of events is too long.  Our brief and the reply brief explains

5    why we think that applies here.

6              Number one, for there to be injury, you have to have

7    five dominos that fall.  The first, DEP proposes to issue a 404

8    permit that would harm plaintiffs, and plaintiffs submit

9    comment.

10             Number two, EPA -- which receives the application --

11   fails to convince DEP to resolve the issue, and EPA neither

12   objects nor federalizes the permit.  EPA has already

13   federalized 3 permits in Florida, so they are actually

14   involved.  They've objected to 30.  They've worked out the

15   problem.  Only had to federalize 3.

16             Number three, DEP proceeds to issue the permit

17   without correcting the concerns submitted in public comment

18   process.

19             Number four, the plaintiffs file an administrative

20   challenge.  In Florida, if you file an administrative

21   challenge, it's like an automatic injunction.  It does not

22   become final agency action until a third-party administrative

23   law judge at the Florida Division of Administrative Hearings

24   takes the case and hears it.  Then you get judicial review.

25   That's number four.

```
 1                And then, Number five --

 2                THE COURT:  Who has standing under Florida law to

 3     bring a challenge like that?

 4                MR. WOOD:  There are three avenues for standing.

 5     Plaintiffs would have standing in almost every instance, Your

 6     Honor.  There are three avenues.  *Agrico*, which is a Florida

 7     Supreme Court case that addresses the standing principles in

 8     Florida.  Primarily, it's the main tests for substantial

 9     effects.

10                Number two, if you're in association with more than

11     25 members, and a couple of other requirements, you've --

12                THE COURT:  I remember reading this now.

13                MR. WOOD:  Number three, the best one for you, is if

14     it involves a federal program like this one and you meet

15     Article III standing, you're in.  So plaintiffs have nothing to

16     worry about in that regard.

17                The fifth domino is the project actually goes forward

18     in a manner that harms their interests.  So we think this puts

19     us right in *Clapper*, and we don't think they -- at least for

20     substantive standing; I understand informational is separate.

21     For substantive injury, they haven't asserted standing, Your

22     Honor.

23                And then the last thing I'll point you to -- because

24     I know my time is up -- during the first round with you, Your

25     Honor, you asked us to provide a supplemental brief on
```

1    informational injury, and we did.  It didn't -- not to say my

2    feelings were hurt, but it didn't make an appearance in your

3    opinion.

4            THE COURT:  You didn't read the appendix to my

5    opinion?

6            MR. WOOD:  That's right.  But I would point you to

7    the declaration of Mr. Wolfe, which summarizes and provides a

8    side-by-side comparison -- and, again, we're at the summary

9    judgment stage on different claims that were at issue earlier,

10   so I think you're free to reevaluate standing.  And we would

11   encourage the Court to look at it.

12           Mr. Wolfe has submitted a signed declaration that

13   goes through every piece of information you can get under the

14   Corps-led program and compares it with every piece of

15   information you get now under the Florida-led program.  And

16   under the Florida program, you get every kind of information

17   that you get in the program, but you get it a lot more quickly.

18   It's online, literally real-time basis.  You can see the permit

19   writer's file.

20           You have all these examples.  It's in his

21   declaration, Your Honor.  There are examples already.  The

22   program is young, but there are examples already where

23   applications have gone through the process, and there are

24   literally thousands of pages of environmental impact analysis

25   studies, Fish and Wildlife analysis, and studies of all sorts

1       of other aesthetic reviews.

2               The things that they seem to be concerned about on

3       the informational side, we don't think they pass muster now at

4       the summary judgment stage on informational standing.  We'd

5       encourage you to, sort of, grapple with the testimony in that

6       declaration.

7               THE COURT:  I will do so.

8               MR. WOOD:  With that, Your Honor, any other questions

9       you have?  I know you've had a long afternoon as well.

10              THE COURT:  As to all of this, I still have

11      questions.  This is not an easy case, but I will spare you for

12      now.

13              MR. WOOD:  Okay.  Thank you.  We're glad to come back

14      tomorrow if you'd like to have us.

15              THE COURT:  Probably no need to come back tomorrow.

16      If I'm working through this, if I think it would be helpful to

17      hear from you more, either on paper or otherwise, I'll let you

18      know.

19              MR. WOOD:  We would submit a brief.  Thank you.

20              THE COURT:  I'll give the plaintiffs five more

21      minutes.

22              MS. GALLONI:  Thank you, Your Honor.  Just to

23      conclude and wrap up a few things.  I want to make sure we've

24      conveyed that Congress did not approve assumption at all costs.

25      Congress was very clear about the statutory criteria that a

1    state has to meet.  Congress was very clear in the Endangered

2    Species Act.

3              So as much as assumption is encouraged, it was not at

4    all costs.  And there are bedrock environmental legal

5    principles that have to be -- and standards that have to be

6    met.

7              I think, just to hit on a couple of points that have

8    come up, one is the government on criminal intent has taken the

9    position that any form of negligence will suffice.  And they

10   cite Section 1319.  But, again, the form of negligence that is

11   under 1319 is simple negligence, as the circuit courts have

12   uniformly held.

13             The government disavowed that there's any independent

14   duty to verify applicant-submitted information.  But that is

15   inconsistent with the 404(b)(1) guidelines, which require

16   factual determinations.  I would direct the Court to the *Hintz*

17   case in the Ninth Circuit that very clearly spoke about the

18   independent verification that the Corps is required to

19   undertake.

20             On whether the retained waters -- the 2014 list that

21   the Corps used as the basis for the retained waters list, the

22   email the government mentioned did not only say what other

23   waters should we consider, it also said it's imperative that we

24   tell Florida that this list, the 2014 list, is not up to date.

25   That was a concession that that list was not up to date.

1          Mr. Coghlan mentioned the assumable waters

2     subcommittee.  I would like to just point out -- this is

3     probably obvious -- but that body has no legal authority to

4     interpret the Clean Water Act.  It gave a version of the

5     legislative history that was cherry-picked and not complete.

6     And that's something that we can address if it would be of

7     interest.

8          I will just say that it had no authority.  The only

9     entity on that body that had authority to interpret any of

10    these statutes was the Corps, and it put forward a position

11    that was consistent with us for the most part.

12         On the Endangered Species Act, I will just mention

13    that I think you've honed in on one of the key differences,

14    which is that under the federal system, U.S. Fish and Wildlife

15    Service has to act and, in fact, a permit can't issue unless it

16    does.  Under the state process, the state can issue if it

17    doesn't hear from Fish and Wildlife Service, and nothing

18    requires Fish and Wildlife Service to act.

19         THE COURT:  With respect to the Endangered Species

20    Act, what do you say in response to Mr. Wood's point that there

21    are lots of programs or other areas where there are

22    programmatic either ITS or biological opinions and that I need

23    to be careful that I'm not saying something that has reached

24    way beyond this case?

25         MS. GALLONI:  I think, by and large -- and you'll see

1    this in the cases that we've cited.  By and large, programmatic

2    biological opinions arise in the context where it's a federal

3    action and there's tiering.  There's a programmatic biological

4    opinion, but there's also consultation at the permit level

5    because it is still a federal action.  It's still a federal

6    permitting.  As Ms. Finnegan pointed out, this situation is the

7    second time that's a cooling water-type system.

8         Again, there are no guardrails on what Fish and

9    Wildlife needs to do here.  They're not required to use the

10   best available science; they're not required to do an

11   assessment baseline of the species; determine the effects to

12   the species.  They're not required to do any of the analysis

13   that is provided by -- in the Endangered Species Act.

14        I will also point out, Ms. Finnegan mentioned that

15   there's a paucity of information similar to cooling water.

16   We've pointed out in this case, when it came to permitting, the

17   Fish and Wildlife Service actually had complete information

18   because it had undertaken all the consultations.  And there

19   were about 50 to 60 biological opinions, I think, during the

20   period that they looked at.

21        They used that historical data to -- in developing

22   the biological opinion, or they said they did.  But then they

23   wouldn't use it for projections.  Again, they didn't have to

24   choose this path.  They could have done the New Jersey model.

25   But if they chose to do the hard thing, then they had to do the

1    hard analysis that comes under the Endangered Species Act.

2         Just a couple points on the cases that Mr. -- let me

3    turn to Ms. Reichert.  Anything else?

4         THE COURT:  Did you find that citation that I was

5    asking about?

6         MS. GALLONI:  Yes.  It's in the record.  It's not the

7    joint appendix.  I apologize for that.  If you'd like, we can

8    amend it and file it.

9         THE COURT:  Yes.  If it's something that's cited, I'd

10   like to have a copy of it.  Thank you.

11        MS. GALLONI:  Yes.  I apologize for that, Your Honor.

12        On standing, I will mention briefly that when you

13   decided Claim 8 and 9, those were on a summary judgment

14   standard; it was not a different standard.  You very clearly

15   laid out in your opinion that you were considering the

16   summary -- our standing under the summary judgment standard and

17   not under the motion to dismiss standard.

18        Florida had filed a motion to dismiss all claims, but

19   Claims 8 and 9 were at summary judgment when you made that

20   determination.

21        On some of the cases that Mr. Wood brought up, I'll

22   just point out some of the differences here.  *Clow Creek* was a

23   transfer of land to the state of South Dakota that left the

24   Corps with undiluted enforcement authority.  That's not the

25   case here.  Here, Florida has primary enforcement authority.

1      Just because a federal agency can serve as a backstop, it's not

2      the same at all.

3          The *Waterkeeper Alliance* case, if I remember

4      correctly, the Corps determined that even if the plaintiffs

5      prevailed, the system that would result by the vacater of that

6      action would actually put them in a worse position than they

7      are now; very different circumstances.

8          In *Clapper*, I think we've laid out in the briefing

9      pretty well why our circumstances are different than the

10     situation in *Clapper*.

11         I would also just mention that -- you had asked

12     earlier about the basis for standing.  We have identified a

13     series of projects that threatened our plaintiff organizations

14     and also the recreational and aesthetic interests of their

15     members.  We have discussed informational harm, and we have

16     also addressed the harm from access to the courts and it not

17     being comparable.  You mentioned that earlier.

18         I will just point out the *Agrico* standing, the *Agrico*

19     test is not a separate standing test.  It did not address

20     associational standing on which our clients typically rely.  It

21     did not address the citizen of the state requirement, which is

22     a requirement under the administrative code and for

23     intervention as well.

24         THE COURT:  All right.  One final question before we

25     adjourn.  There are a lot of issues in this case.

1          Are there certain ones that you think are necessary

2     for the Court to wrestle with and other ones that are backup

3     arguments that you're making or less necessary for the Court to

4     wrestle with?

5          MS. GALLONI:  I would say --

6          THE COURT:  Where should I start, in other words?

7          MS. GALLONI:  I would start with the ESA, Your Honor.

8     I say that partly because there are massive projects in panther

9     habitat; they're on the cusp of being permitted.  We're very

10    concerned about being in a position of having to determine

11    whether to seek emergency relief.

12         These are projects that are in the last remaining

13    habitat where take is a real concern.  And there are others in

14    the pipeline, but we've been told by Florida that that -- there

15    will be a public hearing, there will be 30 days.  So,

16    presumably, there's some time because we haven't seen that

17    public notice yet.  But those issues are paramount and

18    time-sensitive.

19         THE COURT:  And is your theory of standing with

20    respect to those claims, one, just the loss of the aesthetic

21    value of potentially losing species, but is there also a

22    procedural standing issue that you raise as well or is it just

23    the aesthetic injury?

24         MS. GALLONI:  It is also the inability to have the

25    same remedies available and challenge those permits and the

1     access to courts and the availability of remedies.

2                THE COURT:  All right.  Thank you.

3                MS. GALLONI:  Thank you.

4                THE COURT:  Thank you, all.  And thank you most of

5     all to the staff who not only stayed late but had to write down

6     a lot of words.  So this has been super helpful to me.

7                This is, obviously, a challenging case.  And as I

8     continue to work my way through it -- and a lot of these things

9     I'm just going to have to put regulations next to one another

10    and, really, just do the heavy lifting.

11               But if I conclude that it would be helpful to either

12    get any additional briefing on anything or to hear from you

13    further on anything, I will let you know.  If I do conclude

14    it's -- I want to hear more from you, I'm happy to do it by

15    Zoom if it's easier for people so they don't have to travel.

16               Well, thank you, all.  Have a good night.

17               (The hearing adjourned at 5:20 p.m.)

18

19

20

21

22

23

24

25

```
1                CERTIFICATE OF OFFICIAL COURT REPORTER

2

3           I, TAMARA M. SEFRANEK, do hereby certify that the

4   above and foregoing constitutes a true and accurate transcript

5   of my stenographic notes and is a full, true and complete

6   transcript of the proceedings to the best of my ability.

7               Dated this 30th day of October, 2023.

8

9                     /s/ Tamara M. Sefranek_____
                      Tamara M. Sefranek, RMR, CRR, CRC
10                    Official Court Reporter
                      Room 6714
11                    333 Constitution Avenue, N.W.
                      Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## /

**/s** [1] - 136:9

## 1

**1** [1] - 50:5
**10** [16] - 22:23, 23:2, 45:23, 72:14, 72:16, 72:21, 80:2, 80:6, 80:7, 80:9, 80:10, 81:22, 81:24, 82:11, 110:17
**101** [2] - 2:6, 59:12
**103** [1] - 86:16
**104** [2] - 44:9, 44:10
**10:00** [1] - 113:24
**10n** [1] - 12:17
**12** [1] - 41:15
**120** [1] - 8:25
**13** [1] - 44:11
**130** [2] - 8:21, 14:10
**1311** [4] - 29:8, 29:9, 29:14
**1319** [7] - 29:7, 29:11, 29:14, 61:25, 71:2, 129:10, 129:11
**1319(c** [3] - 27:1, 27:19, 28:2
**1344(g)(1** [1] - 37:14
**1344(h** [4] - 26:21, 29:10, 31:9, 83:23
**15** [4] - 114:4, 114:11, 116:12, 116:14
**150** [1] - 1:21
**1536(b)(4)** [1] - 105:4
**155-page** [1] - 60:12
**18** [1] - 89:20
**1899** [1] - 73:24
**19** [1] - 1:6
**1980** [4] - 65:14, 65:20, 66:2, 66:10
**1988** [3] - 65:20, 65:23, 66:10
**1993** [2] - 65:16, 65:21
**1998** [2] - 115:10, 121:6
**1999** [1] - 30:8
**1:21-CV-119** [1] - 1:3

## 2

**2** [5] - 50:5, 53:21, 105:18, 105:19, 116:9
**20** [2] - 27:10, 113:21
**20001** [3] - 2:4, 2:22, 136:11
**20002** [1] - 1:22
**2007** [3] - 119:4,

119:20, 121:8
**201** [1] - 1:17
**2014** [4] - 43:21, 80:2, 129:20, 129:24
**2015** [1] - 80:22
**2017** [4] - 80:4, 80:22, 82:1, 83:5
**2018** [1] - 82:3
**202-354-3246** [1] - 2:23
**2023** [2] - 1:6, 136:7
**21** [3] - 30:1, 30:3, 81:16
**21-119** [1] - 3:3
**22** [1] - 30:6
**23** [2] - 30:1, 62:2
**230** [2] - 41:15, 118:4
**230.1** [1] - 60:21
**230.11** [2] - 54:23, 60:7
**230.11(d)** [1] - 55:14
**230.22** [1] - 54:23
**233.11** [1] - 41:15
**233.11(h** [1] - 41:24
**233.41** [3] - 50:12, 62:2, 62:7
**233.41(a)(3)(ii** [1] - 63:19
**24** [1] - 30:5
**25** [4] - 11:23, 29:23, 30:3, 126:11
**2:08** [1] - 1:7

## 3

**3** [4] - 105:18, 122:25, 125:13, 125:15
**30** [2] - 125:14, 134:15
**300-foot** [1] - 123:11
**30th** [1] - 136:7
**31** [2] - 121:24, 122:7
**32** [2] - 121:24, 122:1
**3200** [1] - 2:6
**33** [1] - 122:1
**33137** [1] - 1:17
**333** [2] - 2:22, 136:11
**35** [1] - 44:11

## 4

**4** [1] - 1:21
**40** [1] - 50:12
**402** [15] - 5:23, 6:4, 6:5, 6:10, 6:13, 6:19, 6:22, 7:13, 7:14, 27:23, 30:6, 50:19, 119:9, 119:11
**402.02** [1] - 11:4
**404** [37] - 6:15, 7:14, 8:13, 12:17, 13:6,

24:8, 26:9, 27:16, 27:24, 49:17, 50:19, 52:13, 61:23, 66:21, 85:21, 88:1, 88:15, 88:17, 89:2, 91:24, 96:11, 96:19, 96:20, 109:19, 112:21, 114:20, 115:3, 115:14, 119:8, 119:15, 119:19, 119:20, 120:5, 121:17, 121:25, 122:14, 125:7
**404(b)(1** [11] - 25:18, 26:13, 31:4, 31:9, 31:11, 31:12, 32:1, 53:25, 119:15, 121:16, 129:15
**404(g** [3] - 58:20, 74:11, 78:6
**404(g)(1** [2] - 73:3, 73:12
**404(h)(1** [2] - 61:15, 61:20
**404(h)(1)** [1] - 49:17
**404(h)(2)(a** [1] - 49:18
**42** [1] - 122:7
**4500** [1] - 1:16

## 5

**5** [2] - 35:5, 114:12
**50** [2] - 11:4, 131:19
**55-page** [1] - 60:3
**553** [1] - 35:5
**58** [1] - 112:2
**5:20** [1] - 135:17

## 6

**60** [1] - 131:19
**60-day** [1] - 19:23
**600** [1] - 123:3
**600-water** [1] - 85:3
**602** [2] - 79:15, 83:11
**602-water** [1] - 84:14
**6032** [1] - 89:18
**6056** [3] - 89:20, 90:7, 99:25
**6057** [1] - 112:2
**6639** [1] - 44:13
**67** [3] - 115:8, 116:8, 116:10
**6714** [2] - 2:21, 136:10

## 7

**7** [6] - 23:2, 50:6, 88:18, 104:25, 112:5, 116:24

**700** [1] - 2:3
**7611** [1] - 1:20
**782** [1] - 102:21

## 8

**8** [3] - 122:6, 132:13, 132:19

## 9

**9** [5] - 19:11, 19:21, 21:13, 132:13, 132:19
**94111** [1] - 2:7
**9:00** [2] - 113:24

## A

**a)(1** [6] - 39:1, 39:2, 43:4, 72:23, 80:15, 81:3
**a)(3** [3] - 62:18, 62:20, 64:19
**a)(3)(ii** [3] - 62:8, 65:6, 67:9
**a)(3)(ii)** [2] - 66:3, 66:11
**a.m** [1] - 113:24
**abate** [7] - 26:23, 27:22, 28:1, 29:13, 61:18, 63:12, 63:16
**abdicate** [1] - 22:19
**abide** [1] - 8:18
**abiding** [1] - 47:1
**abilities** [1] - 34:22
**ability** [2] - 18:24, 136:6
**able** [8] - 19:16, 29:13, 30:14, 47:25, 48:2, 48:8, 48:9, 123:15
**abruptly** [1] - 46:2
**absence** [1] - 112:13
**absent** [1] - 27:4
**absolute** [1] - 94:10
**absolutely** [2] - 90:18, 118:24
**abundantly** [1] - 55:24
**accept** [2] - 62:6, 117:7
**access** [4] - 16:11, 47:19, 133:16, 135:1
**accommodation** [1] - 79:21
**accord** [1] - 103:17
**according** [2] - 29:17, 102:6
**accountability** [1] - 71:15
**accountable** [1] -

71:22
**accurate** [3] - 56:25, 73:20, 136:4
**acronym** [1] - 89:1
**Act** [76] - 4:25, 5:1, 5:2, 5:13, 5:17, 5:18, 6:9, 6:11, 6:24, 8:11, 9:8, 10:11, 12:5, 15:24, 18:12, 20:24, 21:15, 21:25, 22:2, 22:20, 23:6, 24:6, 26:3, 26:9, 35:6, 35:12, 35:19, 36:2, 36:8, 37:21, 37:23, 38:2, 38:25, 39:3, 39:7, 45:16, 45:23, 46:6, 47:5, 48:25, 49:2, 49:10, 50:2, 61:11, 61:22, 64:15, 70:1, 70:25, 73:24, 74:13, 85:4, 92:11, 93:10, 96:16, 107:9, 107:14, 108:18, 109:1, 109:2, 111:19, 111:25, 112:18, 113:1, 113:10, 117:13, 119:13, 120:4, 121:12, 121:16, 129:2, 130:4, 130:12, 130:20, 131:13, 132:1
**act** [12] - 26:23, 27:2, 28:10, 29:1, 29:3, 29:4, 29:7, 29:13, 31:2, 130:15, 130:18
**act's** [1] - 50:3
**Action** [1] - 1:3
**action** [48] - 7:9, 9:4, 9:10, 9:14, 9:18, 10:3, 10:6, 10:16, 16:21, 18:25, 19:1, 19:16, 19:19, 20:20, 20:21, 21:6, 39:9, 44:23, 46:10, 53:2, 53:6, 53:7, 72:1, 84:24, 87:23, 96:9, 102:10, 102:14, 102:15, 102:20, 103:12, 103:13, 103:15, 103:19, 104:17, 104:18, 104:20, 104:23, 104:24, 108:7, 108:19, 109:24, 110:22, 125:22, 131:3, 131:5, 133:6
**actions** [10] - 5:15, 8:17, 9:1, 10:19, 11:7, 12:25, 24:8,

28:2, 88:18, 108:21
**activities** [5] - 9:13,
10:12, 88:4, 88:7,
106:18
**activity** [2] - 19:10,
98:18
**actors** [1] - 10:13
**acts** [1] - 104:10
**actual** [5] - 6:25,
15:22, 73:10, 104:4,
122:18
**add** [4] - 44:21, 80:5,
86:6, 118:16
**added** [2] - 66:10,
80:15
**addendum** [1] - 29:22
**adding** [1] - 61:3
**addition** [2] - 16:19,
40:19
**additional** [5] - 13:20,
36:13, 58:12,
118:25, 135:12
**address** [20] - 5:3, 6:8,
24:16, 33:14, 39:12,
49:2, 50:23, 52:21,
54:12, 54:14, 55:19,
59:19, 59:21, 61:9,
69:6, 86:1, 123:10,
130:6, 133:19,
133:21
**addressed** [6] - 32:25,
69:20, 81:13, 98:13,
98:19, 133:16
**addresses** [1] - 126:7
**addressing** [1] - 48:24
**adequacy** [1] - 35:16
**adequate** [6] - 26:22,
63:16, 84:15, 106:7,
107:13, 109:3
**adequately** [2] -
26:18, 46:4
**adjacent** [1] - 37:18
**adjourn** [1] - 133:25
**adjourned** [1] - 135:17
**adjudication** [2] -
35:2, 35:4
**adjusted** [1] - 12:20
**administer** [1] - 41:12
**administering** [4] -
71:16, 72:3, 79:24,
85:4
**administration** [1] -
30:15
**administrative** [11] -
44:12, 44:15, 52:12,
58:22, 59:12,
108:11, 123:11,
125:19, 125:20,
125:22, 133:22
**Administrative** [1] -

125:23
**admiralty** [1] - 38:12
**admission** [1] - 80:3
**admitted** [1] - 43:21
**admitting** [1] - 80:1
**adopt** [1] - 120:12
**adopted** [8] - 29:25,
30:1, 30:2, 65:12,
65:13, 65:22, 66:2,
119:23
**adopts** [2] - 74:5
**adults** [1] - 9:1
**adverse** [3] - 90:5,
104:23, 109:25
**adversely** [6] - 33:13,
55:10, 96:12, 109:9,
116:25
**advocated** [3] - 22:25,
81:2, 81:3
**aesthetic** [4] - 128:1,
133:14, 134:20,
134:23
**aesthetics** [1] - 122:8
**affect** [8] - 22:12,
33:13, 36:23, 55:10,
116:25, 117:1,
121:20
**affected** [4] - 24:14,
36:21, 90:14
**affecting** [1] - 58:9
**affects** [1] - 56:17
**affirmatively** [1] -
16:20
**afoul** [1] - 33:22
**afternoon** [15] - 3:7,
3:9, 3:10, 3:12, 3:13,
3:15, 3:21, 3:23,
3:24, 4:1, 4:7, 4:9,
4:10, 86:10, 128:9
**age** [1] - 36:11
**agencies** [14] - 3:22,
19:5, 19:24, 22:13,
40:23, 83:6, 86:20,
90:24, 91:14, 97:2,
108:13, 109:17,
122:6, 123:14
**agency** [55] - 6:4, 7:8,
9:1, 9:18, 10:3,
10:19, 12:10, 12:18,
12:22, 13:1, 13:3,
14:5, 17:7, 23:23,
23:24, 33:6, 34:19,
45:1, 45:4, 46:10,
46:21, 53:2, 53:4,
54:6, 60:11, 65:8,
84:24, 87:22, 92:14,
92:15, 102:9,
102:14, 102:19,
102:20, 103:11,
103:13, 103:15,

104:17, 105:8,
105:17, 108:20,
108:22, 109:22,
109:23, 109:24,
110:5, 110:11,
110:22, 110:23,
116:2, 116:11,
119:7, 125:22, 133:1
**agency's** [6] - 5:15,
8:17, 48:6, 99:3,
108:17, 109:13
**aggravating** [2] -
69:24, 70:4
**ago** [1] - 108:24
**agree** [5] - 12:1,
56:20, 97:7, 106:2,
111:20
**agreed** [4] - 81:20,
83:11, 97:5, 98:23
**agreement** [10] -
20:13, 22:3, 25:1,
41:2, 82:14, 93:15,
117:20, 117:22,
117:23
**Agrico** [3] - 126:6,
133:18
**ahead** [5] - 4:22,
16:18, 50:25, 63:22,
105:6
**Air** [1] - 119:12
**al** [4] - 1:3, 1:6, 3:3,
3:4
**alarming** [1] - 5:18
**ALISON** [1] - 1:19
**Alison** [1] - 3:21
**all-encompassing** [1]
- 121:22
**alleging** [1] - 59:17
**Alliance** [2] - 124:4,
133:3
**allocations** [1] - 71:12
**allow** [3] - 5:10, 19:24,
66:15
**allowable** [1] - 14:17
**allowed** [2] - 7:15,
39:6
**allowing** [1] - 70:24
**allows** [1] - 92:24
**almost** [3] - 69:22,
70:7, 126:5
**alone** [3] - 7:18, 51:7,
81:15
**alternatives** [1] -
122:8
**AMBER** [1] - 2:9
**amber** [1] - 3:17
**amend** [1] - 132:8
**amended** [2] - 27:8,
65:20
**amending** [1] - 27:11

**amendment** [3] - 27:5,
50:11, 65:21
**amount** [2] - 72:11,
98:17
**amounts** [1] - 116:3
**ample** [1] - 58:20
**analog** [1] - 55:8
**analogous** [1] - 56:3
**analogs** [2] - 60:9,
60:14
**analysis** [22] - 6:23,
9:17, 9:23, 11:14,
13:7, 16:25, 17:1,
23:2, 32:8, 57:17,
59:3, 59:7, 60:21,
88:2, 106:8, 111:18,
111:24, 122:8,
127:24, 127:25,
131:12, 132:1
**analyze** [6] - 9:12,
11:12, 16:20, 23:24,
23:25, 57:16
**analyzed** [2] - 12:22,
87:25
**analyzes** [1] - 70:1
**analyzing** [1] - 9:18
**Andrew** [2] - 3:24,
48:22
**ANDREW** [2] - 1:6,
1:19
**announced** [1] - 30:7
**annual** [2] - 18:1,
18:10
**answer** [16] - 8:4,
10:2, 20:25, 36:9,
45:9, 58:11, 71:10,
78:11, 79:12, 79:13,
86:22, 92:3, 92:7,
97:21, 111:15,
114:10
**answers** [2] - 14:4,
92:5
**anticipate** [1] - 48:4
**anticipated** [3] -
17:20, 17:22, 25:2
**APA** [10] - 35:5, 35:21,
36:3, 36:6, 45:15,
124:6, 124:7, 124:14
**apologize** [5] - 8:8,
101:8, 124:20,
132:7, 132:11
**appeals** [1] - 70:13
**appearance** [1] -
127:2
**appellate** [1] - 70:11
**appendix** [4] - 60:11,
122:23, 127:4, 132:7
**Appendix** [1] - 60:20
**applicable** [1] - 53:24
**applicant** [10] - 32:7,

33:12, 33:24, 58:12,
83:23, 90:13, 96:19,
105:9, 105:17,
129:14
**applicant's** [4] -
31:17, 31:24, 33:5,
33:20
**applicant-submitted**
[1] - 129:14
**applicants** [5] - 31:20,
36:23, 36:24, 59:9,
59:11
**application** [34] -
24:25, 34:16, 35:13,
35:15, 39:13, 45:17,
46:4, 46:25, 47:17,
51:3, 51:5, 53:1,
53:13, 53:14, 55:8,
71:13, 78:15, 82:20,
83:21, 83:22, 90:12,
91:3, 91:24, 93:25,
99:12, 103:14,
109:3, 110:7,
111:21, 114:22,
115:17, 115:18,
117:18, 125:10
**applications** [11] -
23:22, 88:15, 89:2,
89:25, 90:5, 91:21,
93:17, 98:24, 99:4,
115:24, 127:23
**applied** [5] - 5:19,
5:22, 7:8, 107:22,
112:5
**applies** [5] - 23:15,
34:12, 36:4, 36:6,
125:5
**apply** [22] - 6:2, 8:12,
16:2, 20:4, 31:11,
36:8, 36:14, 47:6,
47:10, 62:3, 85:2,
93:19, 93:21, 93:23,
94:17, 95:18, 95:19,
96:4, 96:15, 96:18,
106:17, 107:24
**applying** [1] - 28:2
**approach** [10] - 7:18,
8:2, 18:25, 22:25,
63:17, 81:2, 81:4,
88:9, 119:21, 121:2
**approached** [1] - 81:5
**approaches** [2] - 19:9,
121:6
**appropriate** [8] -
81:21, 88:10,
105:14, 105:20,
108:24, 113:5,
113:7, 121:14
**approval** [5] - 6:10,
25:14, 25:19, 26:8,

32:21, 42:4, 88:3, 103:20, 108:20, 109:2, 124:9
**approvals** [1] - 66:24
**approve** [5] - 26:16, 30:14, 49:19, 63:3, 128:24
**approved** [11] - 6:16, 26:11, 30:6, 34:17, 42:1, 52:2, 66:20, 66:23, 78:16, 115:21, 118:7
**approving** [3] - 24:8, 25:17, 120:6
**aquatic** [1] - 55:5
**arbitrary** [1] - 75:7
**area** [8] - 8:24, 9:14, 16:1, 73:11, 79:3, 90:15, 103:10, 123:1
**areas** [5] - 5:20, 10:21, 13:1, 13:5, 130:21
**argue** [3] - 23:20, 37:21, 64:5
**argued** [2] - 29:6, 47:18
**arguing** [2] - 68:15, 70:12
**argument** [36] - 4:16, 4:25, 40:11, 40:12, 40:19, 43:12, 46:5, 46:6, 51:3, 51:5, 54:2, 54:5, 54:9, 54:11, 54:13, 55:13, 55:19, 58:15, 59:21, 59:24, 61:3, 61:5, 61:7, 61:8, 61:11, 62:6, 62:7, 63:9, 63:25, 69:1, 69:9, 73:17, 73:23, 83:8, 107:16, 113:11
**arguments** [18] - 34:13, 45:20, 48:24, 49:2, 50:8, 53:22, 53:23, 54:1, 54:14, 54:16, 59:17, 59:24, 63:24, 72:10, 72:12, 73:1, 109:21, 134:3
**arise** [1] - 131:2
**arises** [1] - 12:9
**Army** [10] - 2:14, 4:4, 13:9, 41:18, 57:21, 73:24, 82:2, 82:9, 101:11, 123:22
**array** [2] - 55:6, 88:4
**art** [1] - 62:14
**Article** [1] - 126:15
**article** [1] - 69:25
**articulation** [2] - 38:10
**artifice** [1] - 120:17
**ash** [1] - 124:10

**aside** [3] - 70:6, 79:3, 102:13
**aspect** [3] - 5:25, 28:19, 35:13
**aspects** [5] - 6:2, 6:3, 7:9, 34:23, 36:22
**asserted** [1] - 126:21
**assess** [6] - 18:14, 56:1, 57:21, 57:24, 58:22, 102:9
**assessed** [2] - 84:21, 88:14
**assessment** [12] - 12:7, 14:22, 32:8, 46:2, 47:25, 75:14, 107:25, 117:24, 117:25, 118:6, 118:19, 131:11
**assigned** [1] - 7:15
**assistance** [19] - 14:14, 21:16, 35:17, 51:12, 54:10, 87:14, 88:16, 88:17, 88:21, 88:22, 96:10, 108:12, 108:17, 109:13, 111:6, 112:4, 115:9, 115:10, 121:5
**assistant** [2] - 82:2, 82:9
**association** [1] - 126:10
**associational** [1] - 133:20
**assumable** [7] - 26:15, 34:8, 37:13, 80:21, 81:10, 81:16, 130:1
**assume** [12] - 7:13, 7:16, 20:8, 27:16, 39:6, 50:19, 51:22, 61:23, 70:24, 71:13, 78:7, 101:11
**assumed** [4] - 24:14, 26:18, 40:2, 40:6, 40:14, 41:19, 42:6, 42:9, 46:13, 47:11, 71:3, 78:22, 84:12, 88:1
**assumes** [2] - 21:18, 41:25
**assuming** [2] - 25:7, 74:17
**assumption** [24] - 6:19, 6:22, 11:18, 13:8, 22:6, 27:4, 39:4, 43:6, 46:7, 49:22, 61:17, 71:21, 72:2, 81:6, 84:25, 87:20, 101:15,

109:3, 117:13, 117:15, 117:17, 120:11, 128:24, 129:3
**assurance** [3] - 33:11, 33:12, 59:25
**assurances** [7] - 31:18, 31:24, 33:5, 33:21, 34:6, 55:9, 60:5
**attaches** [1] - 27:19
**authorities** [3] - 6:7, 10:1, 112:21
**authority** [49] - 7:16, 9:4, 10:6, 18:22, 21:15, 22:6, 23:7, 26:14, 26:23, 27:22, 31:13, 39:6, 39:10, 40:13, 42:24, 44:23, 44:24, 54:25, 55:2, 61:9, 61:18, 61:23, 62:9, 63:12, 63:16, 63:20, 64:20, 64:24, 65:1, 65:8, 65:9, 66:5, 71:1, 71:14, 71:19, 88:1, 97:18, 98:9, 101:16, 104:12, 112:17, 112:20, 113:10, 130:3, 130:8, 130:9, 132:24, 132:25
**authorized** [2] - 26:16, 116:3
**authorizes** [1] - 113:4
**authorizing** [1] - 7:10
**automatic** [1] - 125:21
**autonomy** [1] - 13:19
**availability** [1] - 135:1
**available** [10] - 12:6, 23:23, 34:20, 43:11, 45:7, 48:7, 63:7, 117:16, 131:10, 134:25
**Avenue** [2] - 2:22, 136:11
**avenues** [2] - 126:4, 126:6
**avoid** [1] - 41:11
**aware** [7] - 18:7, 18:16, 67:22, 79:6, 87:22, 109:20, 123:14

## B

**b)(1** [6] - 56:4, 58:16, 59:1, 59:5, 59:8, 60:8
**b)(1)(2** [1] - 64:2
**b)(2** [6] - 62:7, 62:17,

64:10, 66:4, 67:8, 67:14
**BA** [3] - 115:5, 115:6, 118:8
**Babcock** [1] - 17:21
**backstop** [1] - 133:1
**backstory** [1] - 80:19
**backup** [1] - 134:2
**backward** [1] - 10:13
**backward-looking** [1] - 10:13
**backwards** [2] - 64:6, 73:21
**bad** [3] - 57:13, 71:6, 112:7
**Baker** [2] - 2:3, 2:5
**Ball** [2] - 38:12, 77:25
**based** [18] - 12:21, 13:14, 17:20, 19:7, 33:20, 34:6, 37:24, 48:1, 62:10, 63:21, 75:13, 76:2, 76:6, 81:20, 81:21, 85:3, 88:9, 88:23
**baseline** [8] - 9:12, 9:18, 9:21, 10:11, 10:25, 11:11, 23:24, 131:11
**basis** [13] - 75:22, 76:24, 81:25, 82:7, 83:14, 84:7, 85:5, 94:6, 96:6, 99:19, 127:18, 129:21, 133:12
**Bates** [4] - 89:16, 89:20, 99:24, 112:2
**Bates-numbered** [1] - 89:16
**bays** [1] - 123:4
**BE** [1] - 118:8
**bearing** [1] - 47:13
**beat** [1] - 61:22
**become** [2] - 78:15, 125:22
**bedrock** [1] - 129:4
**BEFORE** [1] - 1:10
**began** [3] - 37:7, 46:1, 80:14
**begin** [1] - 114:14
**beginning** [5] - 64:25, 87:5, 94:21, 95:10, 104:8
**begun** [1] - 43:24
**behalf** [3] - 3:8, 3:11, 3:14
**belied** [1] - 54:16
**believes** [3] - 80:8, 108:23, 114:18
**Belmar** [1] - 115:25
**below** [1] - 77:5

**BENNETT** [1] - 2:10
**Bennett** [1] - 3:18
**berm** [1] - 77:3
**best** [17] - 5:7, 12:6, 23:23, 43:10, 43:18, 64:18, 79:24, 95:19, 96:4, 107:22, 111:14, 112:1, 122:4, 122:19, 126:13, 131:10, 136:6
**better** [5] - 25:23, 49:24, 65:25, 70:20, 71:6
**between** [12] - 4:25, 28:4, 32:10, 33:16, 42:24, 56:7, 59:10, 69:17, 79:3, 88:24, 97:4, 108:5
**beyond** [6] - 28:14, 28:17, 60:1, 62:3, 111:22, 130:24
**Bi** [15] - 12:15, 16:4, 51:6, 51:7, 51:11, 51:15, 53:6, 53:9, 53:11, 53:13, 53:14, 53:19, 113:3, 115:20
**big** [4] - 40:25, 61:10, 85:17, 92:10
**binding** [1] - 14:17
**binds** [1] - 96:23
**BIOLOGICAL** [1] - 1:3
**biological** [66] - 6:5, 7:3, 7:10, 9:17, 12:12, 12:16, 13:12, 14:22, 20:7, 20:13, 21:17, 24:18, 25:18, 25:22, 34:20, 35:16, 47:20, 47:22, 47:24, 48:2, 53:1, 55:5, 86:13, 86:17, 86:21, 87:12, 87:24, 88:6, 88:11, 88:22, 89:6, 89:12, 89:14, 93:10, 93:16, 94:2, 95:12, 95:20, 96:7, 96:22, 98:14, 101:1, 103:8, 106:1, 107:7, 108:8, 110:25, 112:3, 115:5, 115:7, 115:8, 116:7, 116:8, 117:11, 117:24, 118:1, 118:3, 118:8, 118:13, 118:19, 130:22, 131:2, 131:3, 131:19, 131:22
**Biological** [3] - 2:10, 3:3, 3:18
**Biscayne** [1] - 1:16

**bit** [4] - 54:1, 96:25, 101:14, 108:6
**black** [1] - 14:25
**Black's** [3] - 62:15, 64:1, 64:11
**blanket** [1] - 57:13
**blue** [1] - 81:17
**bodies** [1] - 123:3
**body** [5] - 74:1, 74:2, 80:21, 130:3, 130:9
**bolded** [2] - 90:3, 90:4
**Bonnie** [1] - 3:13
**BONNIE** [1] - 1:15
**bothering** [2] - 92:8, 102:24
**bothers** [1] - 101:9
**bottom** [1] - 22:17
**Botts** [2] - 2:3, 2:5
**Boulevard** [1] - 1:16
**bound** [2] - 109:18
**boundary** [2] - 123:11, 123:12
**Box** [1] - 1:20
**break** [2] - 48:12, 48:16
**breathtaking** [1] - 11:16
**bridge** [1] - 77:2
**brief** [23] - 44:10, 49:7, 52:11, 54:20, 55:18, 55:19, 56:5, 57:19, 58:20, 59:25, 60:20, 60:24, 61:1, 66:22, 69:20, 69:25, 73:22, 114:6, 114:8, 125:4, 126:25, 128:19
**briefed** [3] - 35:22, 35:23, 124:5
**briefing** [6] - 8:6, 16:13, 32:25, 61:1, 133:8, 135:12
**briefly** [6] - 33:9, 46:24, 47:17, 73:23, 112:10, 132:12
**briefs** [11] - 7:6, 7:21, 12:15, 16:8, 37:5, 66:1, 88:19, 89:1, 103:2, 109:14, 113:12
**bright** [1] - 15:21
**bring** [14] - 19:1, 19:16, 19:18, 20:20, 51:2, 62:10, 64:20, 64:24, 65:2, 66:5, 69:22, 71:1, 71:25, 126:3
**brings** [6] - 30:5, 62:19, 65:14, 65:24, 70:6, 123:18
**brink** [1] - 9:2

**broad** [3] - 55:6, 63:14, 88:4
**broader** [3] - 62:4, 75:15, 101:6
**broadest** [1] - 23:1
**broadly** [2] - 10:17, 33:15
**brought** [6] - 65:18, 65:20, 69:17, 81:2, 109:16, 132:21
**Brownlee** [2] - 7:7, 11:6
**bucket** [1] - 56:20
**buckets** [1] - 45:19
**buffer** [1] - 121:1
**bug** [1] - 31:19
**build** [5] - 92:15, 92:16, 92:19, 92:22, 92:23
**building** [3] - 103:6, 105:10, 105:11
**built** [1] - 27:9
**bullets** [2] - 90:8, 91:12
**burden** [11] - 28:8, 28:9, 28:10, 28:12, 28:15, 28:18, 28:23, 29:3, 30:18, 50:12, 62:19
**burrows** [1] - 14:2
**but-for** [1] - 10:18

# C

**CA** [1] - 2:7
**cake** [4] - 103:2, 105:23, 117:4, 117:5
**calculate** [1] - 14:5
**California** [1] - 2:6
**cannot** [1] - 30:25
**cap** [1] - 106:7
**capricious** [1] - 75:8
**capture** [1] - 38:7
**careful** [2] - 70:20, 130:23
**carefully** [1] - 56:14
**Caribbean** [1] - 12:18
**caricature** [1] - 122:16
**carve** [1] - 78:12
**carve-out** [1] - 78:12
**Case** [1] - 3:3
**case** [62] - 4:24, 5:12, 6:16, 6:21, 7:3, 7:4, 7:18, 8:11, 11:5, 11:6, 23:8, 23:11, 23:12, 36:18, 38:11, 38:19, 39:5, 53:4, 64:13, 68:14, 68:25, 70:7, 73:17, 74:1, 74:2, 74:5, 74:23,

76:12, 78:1, 83:14, 85:16, 87:23, 96:25, 97:1, 97:5, 106:1, 107:15, 108:15, 111:2, 113:8, 114:19, 119:4, 120:23, 120:25, 123:24, 124:3, 124:4, 124:5, 124:21, 124:23, 125:24, 126:7, 128:11, 129:17, 130:24, 131:16, 132:25, 133:3, 133:25, 135:7
**case-by-case** [1] - 83:14
**cases** [14] - 7:1, 67:21, 69:17, 70:7, 70:11, 70:12, 77:12, 77:13, 77:24, 123:21, 124:18, 131:1, 132:2, 132:21
**Castro** [1] - 3:4
**catchall** [2] - 40:3, 123:5
**categories** [1] - 12:17
**causing** [1] - 94:18
**CENTER** [1] - 1:3
**Center** [3] - 2:10, 3:3, 3:18
**central** [1] - 50:1
**century** [2] - 79:24, 85:3
**certain** [5] - 6:1, 49:16, 100:2, 110:3, 134:1
**certainly** [3] - 15:24, 70:7, 93:19
**CERTIFICATE** [1] - 136:1
**certify** [1] - 136:3
**CFR** [2] - 11:4, 50:12
**chain** [1] - 125:3
**challenge** [9] - 11:16, 19:1, 34:14, 123:25, 124:9, 125:20, 125:21, 126:3, 134:25
**challenged** [2] - 8:3, 30:16
**challenging** [1] - 135:7
**chance** [1] - 111:11
**change** [9] - 30:15, 35:4, 36:21, 78:17, 82:8, 82:12, 87:25, 119:4
**changed** [3] - 35:24, 36:25, 82:8

**changes** [3] - 12:11, 27:11, 66:13
**changing** [1] - 48:6
**charge** [2] - 59:24, 80:22
**check** [1] - 76:11
**checked** [2] - 76:13, 76:16
**chemical** [1] - 55:5
**cherry** [1] - 130:5
**cherry-picked** [1] - 130:5
**Chevron** [2] - 36:12, 36:16
**Chinn** [1] - 4:7
**CHINN** [2] - 2:5, 4:7
**choice** [1] - 63:3
**choose** [1] - 131:24
**chose** [1] - 131:25
**CHRISTINA** [1] - 1:15
**Christina** [1] - 3:10
**Circuit** [11] - 6:23, 6:24, 30:17, 109:20, 120:25, 123:24, 124:3, 124:8, 124:12, 129:17
**circuit** [7] - 7:7, 23:9, 30:7, 36:19, 64:13, 129:11
**Circuit's** [1] - 66:21
**circuits** [1] - 29:25
**circumstances** [5] - 15:14, 71:21, 100:19, 133:7, 133:9
**citation** [2] - 16:8, 132:4
**citations** [1] - 121:23
**cite** [3] - 55:20, 77:25, 129:10
**cited** [8] - 6:17, 54:20, 58:19, 60:19, 66:22, 120:23, 131:1, 132:9
**cites** [1] - 95:13
**citizen** [2] - 18:25, 133:21
**civil** [5] - 26:23, 63:6, 65:3, 66:5
**Civil** [4] - 1:3, 3:3, 82:2, 82:9
**claim** [7] - 32:15, 32:16, 35:5, 35:6, 51:2, 53:21, 70:3
**Claim** [2] - 53:21, 132:13
**claimed** [1] - 49:10
**claiming** [1] - 16:21
**claims** [11] - 4:25, 5:2, 35:9, 50:8, 124:6, 124:7, 124:14, 127:9, 132:18,

134:20
**Claims** [2] - 50:5, 132:19
**Clapper** [7] - 124:21, 124:22, 125:2, 126:19, 133:8, 133:10
**clarified** [1] - 29:25
**clarifies** [2] - 50:18, 67:4
**clarifying** [1] - 84:6
**clarity** [1] - 38:9
**clause** [1] - 51:19
**clean** [1] - 114:15
**Clean** [29] - 5:1, 5:17, 8:11, 21:15, 26:9, 35:6, 35:12, 35:19, 36:2, 36:8, 39:3, 45:16, 47:5, 48:25, 49:10, 50:1, 61:11, 61:22, 64:15, 70:1, 70:24, 109:1, 112:17, 117:13, 119:12, 120:4, 121:12, 121:15, 130:4
**clear** [18] - 9:8, 21:19, 24:5, 28:13, 54:17, 55:24, 57:8, 57:12, 58:19, 64:7, 66:14, 73:2, 83:22, 88:19, 94:1, 94:5, 128:25, 129:1
**clearly** [7] - 17:6, 21:21, 38:7, 65:1, 96:15, 129:17, 132:14
**click** [1] - 78:23
**clients** [3] - 3:16, 32:12, 133:20
**clients'** [1] - 34:22
**close** [3] - 33:4, 34:21, 79:8
**closed** [3] - 20:8, 48:8, 50:15
**closer** [1] - 13:4
**closing** [1] - 91:9
**Clow** [1] - 132:22
**co** [1] - 109:6
**co-counsel** [1] - 109:6
**coal** [1] - 124:10
**coastal** [1] - 42:21
**code** [3] - 52:12, 58:22, 133:22
**Code** [1] - 65:22
**codes** [1] - 62:15
**codified** [1] - 52:1
**COGHLAN** [63] - 1:19, 3:24, 4:2, 48:22, 49:5, 49:9, 50:14,

50:23, 51:1, 51:20,
52:11, 52:23, 53:20,
55:15, 55:23, 56:24,
57:5, 58:15, 59:23,
62:5, 62:25, 63:8,
63:14, 64:16, 65:5,
65:13, 65:17, 67:19,
68:3, 68:24, 69:4,
69:9, 70:9, 70:22,
72:5, 72:9, 72:16,
73:9, 73:20, 75:9,
75:20, 76:14, 76:20,
77:16, 77:24, 78:17,
79:6, 79:14, 80:12,
82:16, 82:21, 82:25,
83:15, 83:18, 84:5,
84:10, 84:14, 85:7,
85:11, 85:15, 86:1,
86:5, 86:7
**Coghlan** [3] - 3:25,
48:22, 130:1
**cognizable** [1] - 32:11
**colleague** [5] - 5:2,
44:8, 49:1, 86:4,
86:11
**colleagues** [2] -
68:14, 86:4
**colloquy** [1] - 67:7
**COLUMBIA** [1] - 1:1
**columns** [1] - 76:10
**combined** [1] - 115:5
**coming** [2] - 48:7,
110:5
**comment** [35] - 20:8,
25:5, 25:9, 34:21,
34:23, 35:7, 35:11,
35:18, 45:8, 47:23,
48:3, 48:8, 48:9,
50:14, 53:11, 53:16,
60:3, 60:11, 60:25,
82:15, 82:17, 82:25,
83:2, 83:25, 91:18,
100:5, 100:8,
117:10, 117:17,
119:22, 120:8,
120:11, 125:9,
125:17
**comments** [4] - 44:3,
50:16, 60:1, 91:17
**commerce** [9] - 37:17,
38:16, 72:19, 72:20,
73:6, 74:4, 74:9,
74:19, 75:25
**Commission** [7] -
88:25, 90:2, 91:3,
91:15, 99:23,
112:23, 115:13
**commission** [1] -
27:10
**commit** [3] - 47:1,

95:23, 115:20
**commitment** [2] -
95:11, 108:17
**commitments** [4] -
103:22, 109:14,
116:11, 116:12
**committed** [10] -
64:21, 89:5, 89:7,
95:22, 100:25,
104:12, 108:14,
115:20, 115:22
**committing** [1] - 101:3
**common** [1] - 67:16
**comparable** [1] -
133:17
**compare** [1] - 53:18
**compared** [1] - 30:23
**compares** [1] - 127:14
**comparison** [2] -
58:10, 127:8
**complete** [10] - 22:15,
26:17, 34:16, 34:17,
35:14, 45:17, 72:22,
130:5, 131:17, 136:5
**completed** [2] - 24:18,
86:16
**completely** [3] -
56:21, 84:18, 106:21
**completeness** [2] -
46:3, 47:17
**completion** [1] - 87:2
**complexity** [1] - 4:24
**compliance** [3] - 21:6,
21:18, 32:4
**complicated** [1] - 76:4
**complied** [4] - 98:17,
105:16, 108:18,
121:15
**comply** [12] - 8:13,
20:16, 20:17, 47:25,
88:18, 95:17, 95:21,
95:25, 104:6,
104:10, 107:10,
108:1
**components** [2] -
55:5, 104:19
**comprehensive** [2] -
115:1, 118:4
**concede** [1] - 72:5
**conceded** [3] - 45:16,
45:18, 45:21
**concedes** [1] - 95:24
**conceived** [1] - 92:14
**concern** [4] - 25:4,
33:2, 94:18, 134:13
**concerned** [6] - 7:12,
33:4, 105:9, 110:13,
128:2, 134:10
**concerning** [1] - 33:7
**concerns** [3] - 94:8,

121:14, 125:17
**concession** [1] -
129:25
**conclude** [4] - 50:2,
128:23, 135:11,
135:13
**concluded** [3] - 60:14,
104:22, 108:8
**concludes** [2] - 6:24,
49:1
**concur** [1] - 14:16
**concurrence** [1] -
13:17
**condition** [4] - 37:16,
38:15, 115:18, 117:6
**conditions** [28] -
15:15, 20:16, 20:18,
21:8, 21:14, 21:18,
47:22, 47:24, 48:1,
92:23, 93:21, 94:15,
97:12, 97:14, 97:15,
97:17, 98:17,
104:11, 104:13,
105:16, 108:1,
108:2, 110:3,
110:15, 112:15,
113:11, 116:4
**condos** [1] - 103:6
**conduct** [3] - 13:20,
59:6, 69:24
**conducted** [1] - 12:16
**confer** [2] - 79:7,
109:6
**confidence** [1] -
100:14
**confirm** [1] - 10:24
**Congress** [25] - 8:11,
8:14, 8:16, 27:23,
29:12, 37:22, 37:24,
38:18, 49:11, 49:14,
49:16, 49:22, 61:16,
61:17, 61:21, 73:3,
74:10, 78:9, 94:11,
103:4, 103:7, 106:3,
128:24, 128:25,
129:1
**congressional** [1] -
8:18
**conjunction** [1] -
22:17
**connection** [1] - 59:10
**Connor** [1] - 7:8
**consequences** [1] -
46:16
**Conservancy** [2] - 2:9,
3:17
**Conservation** [5] -
88:25, 90:2, 91:15,
99:23, 112:23
**consider** [15] - 7:9,

9:9, 10:18, 44:2,
54:18, 56:22,
111:17, 114:18,
119:8, 119:10,
119:14, 119:16,
119:25, 120:5,
129:23
**consideration** [1] -
117:14
**considerations** [1] -
81:20
**considered** [4] - 83:3,
91:18, 107:22, 113:6
**considering** [6] - 9:13,
49:10, 50:11, 50:16,
110:21, 132:15
**considers** [3] -
105:14, 105:20,
113:5
**consistent** [10] -
36:25, 60:17, 63:17,
71:7, 107:14, 121:5,
121:6, 121:7,
122:17, 130:11
**constantly** [1] - 69:14
**constituent** [3] -
57:16, 58:7, 58:8
**constitute** [1] - 15:7
**constitutes** [2] -
63:16, 136:4
**Constitution** [5] -
1:21, 2:22, 27:5,
27:8, 136:11
**constitution** [3] -
27:9, 27:11, 27:12
**constitutional** [1] -
27:10
**consult** [7] - 13:9,
14:6, 24:9, 92:18,
110:1, 120:1, 120:10
**consultation** [37] -
6:11, 9:11, 13:13,
13:16, 13:20, 17:10,
18:15, 19:7, 19:14,
22:1, 22:11, 22:15,
22:20, 23:7, 23:15,
23:19, 46:14, 86:18,
86:20, 87:2, 87:13,
110:1, 110:2,
110:23, 115:11,
116:24, 119:5,
119:11, 119:18,
120:17, 120:19,
120:22, 120:24,
121:2, 121:7, 131:4
**consultations** [3] -
12:19, 13:14, 131:18
**consulted** [1] - 9:3
**consulting** [2] -
102:18, 110:6

**consults** [1] - 110:24
**CONT'D** [1] - 2:1
**contained** [4] - 52:25,
78:13, 83:1, 83:2
**contains** [1] - 122:23
**contaminants** [1] -
34:2
**contemplated** [1] -
80:15
**content** [1] - 113:2
**contents** [1] - 122:4
**context** [7] - 6:2,
33:11, 36:6, 60:2,
119:1, 124:11, 131:2
**contexts** [1] - 120:19
**continue** [2] - 16:18,
135:8
**continuous** [1] - 124:1
**contrary** [2] - 7:6, 23:9
**contributing** [1] -
56:16
**controlling** [1] -
116:22
**controls** [1] - 67:9
**convened** [2] - 80:20,
81:12
**conversations** [1] -
86:18
**conveyed** [1] - 128:24
**convince** [2] - 124:18,
125:11
**convinced** [2] - 46:8,
68:9
**convincing** [1] - 28:14
**cooling** [18] - 6:16,
7:6, 7:11, 7:18, 8:1,
23:12, 87:11, 87:18,
96:25, 97:1, 97:4,
102:13, 108:15,
109:21, 113:8,
120:25, 131:7,
131:15
**coordination** [3] -
92:1, 112:3, 115:14
**copy** [3] - 105:5,
110:7, 132:10
**core** [1] - 5:16
**Corps** [88] - 2:14, 4:4,
8:14, 9:21, 10:2,
11:1, 11:6, 12:18,
13:9, 13:13, 14:1,
18:18, 18:19, 18:20,
27:20, 31:24, 32:2,
32:7, 37:22, 38:22,
38:24, 38:25, 39:3,
39:5, 39:11, 39:14,
40:1, 40:4, 40:9,
40:23, 41:4, 41:18,
42:12, 42:24, 43:2,
43:21, 45:21, 45:22,

45:25, 46:24, 47:10, 57:21, 59:8, 73:24, 74:5, 75:12, 75:16, 75:20, 76:1, 76:5, 76:24, 77:7, 78:4, 78:19, 78:25, 79:4, 79:7, 79:19, 79:23, 80:1, 80:8, 80:14, 80:21, 80:24, 81:4, 81:9, 81:12, 81:14, 81:24, 82:4, 82:5, 82:8, 82:10, 82:18, 83:1, 83:5, 85:16, 101:11, 123:9, 123:10, 123:12, 123:22, 127:14, 129:18, 129:21, 130:10, 132:24, 133:4
**Corps'** [3] - 16:11, 77:21, 81:1
**Corps-led** [1] - 127:14
**correct** [7] - 46:12, 57:3, 62:24, 62:25, 76:20, 82:4, 98:13
**correcting** [1] - 125:17
**correctly** [2] - 102:13, 133:4
**correspondence** [1] - 43:23
**costs** [2] - 128:24, 129:4
**Counsel** [2] - 2:16, 4:4
**counsel** [6] - 3:5, 3:6, 4:12, 4:22, 18:5, 109:6
**counsel's** [2] - 4:3, 4:5
**country** [1] - 5:19
**couple** [8] - 54:1, 81:7, 84:5, 88:20, 95:13, 126:11, 129:7, 132:2
**course** [8] - 33:2, 43:12, 52:17, 66:14, 66:17, 68:15, 78:20, 95:21
**COURT** [249] - 1:1, 3:9, 3:12, 3:15, 3:20, 3:23, 4:1, 4:6, 4:9, 4:14, 5:4, 5:7, 5:14, 5:22, 6:1, 6:21, 7:11, 7:21, 8:8, 9:15, 10:23, 11:10, 13:8, 13:22, 14:9, 14:20, 15:2, 15:10, 16:7, 16:13, 16:18, 17:13, 18:5, 18:17, 19:18, 19:22, 20:1, 21:4, 21:22, 22:5, 22:9, 22:16, 23:3, 23:11,

24:12, 24:21, 24:24, 25:13, 25:23, 26:4, 26:7, 27:3, 27:14, 28:4, 28:12, 28:22, 29:2, 29:5, 29:15, 29:20, 29:24, 30:3, 30:9, 30:20, 31:6, 32:10, 32:14, 33:1, 33:8, 34:9, 34:12, 35:23, 36:11, 36:20, 37:3, 37:11, 38:4, 38:17, 39:18, 40:10, 41:23, 42:11, 42:23, 43:9, 44:7, 44:20, 45:14, 46:5, 46:19, 47:13, 47:15, 48:11, 48:20, 49:4, 49:8, 50:10, 50:21, 50:25, 51:17, 52:5, 52:22, 53:17, 54:22, 55:22, 56:8, 57:1, 58:14, 59:20, 62:2, 62:22, 63:1, 63:13, 63:23, 65:3, 65:12, 65:15, 67:18, 67:20, 68:9, 69:3, 69:8, 70:5, 70:10, 71:4, 72:8, 72:15, 73:7, 73:15, 74:17, 75:17, 76:9, 76:15, 77:11, 77:23, 78:14, 79:2, 79:11, 80:11, 82:13, 82:19, 82:24, 83:10, 83:17, 83:20, 84:9, 84:13, 85:6, 85:8, 85:13, 85:25, 86:3, 86:6, 86:9, 86:14, 86:23, 87:3, 87:7, 87:10, 87:21, 89:7, 89:14, 89:18, 90:7, 90:11, 90:16, 90:19, 90:22, 90:25, 91:6, 91:13, 92:2, 92:5, 92:8, 94:22, 94:25, 95:3, 95:7, 95:14, 95:23, 96:3, 97:11, 97:23, 98:11, 98:22, 99:1, 99:19, 100:7, 100:9, 100:12, 101:2, 102:11, 102:16, 102:22, 103:1, 104:16, 105:1, 105:4, 105:6, 106:8, 106:13, 106:21, 107:5, 108:25, 109:7, 109:11, 109:22, 110:18, 111:1, 111:4, 111:9, 112:9, 113:14, 113:17, 113:19, 114:8, 114:11,

116:6, 116:10, 116:15, 116:18, 117:9, 117:22, 117:25, 118:10, 118:18, 118:22, 120:2, 120:7, 120:13, 121:10, 121:23, 122:20, 124:22, 126:2, 126:12, 127:4, 128:7, 128:10, 128:15, 128:20, 130:19, 132:4, 132:9, 133:24, 134:6, 134:19, 135:2, 135:4, 136:1
**court** [10] - 20:21, 30:7, 47:3, 48:17, 68:15, 88:13, 94:3, 108:23, 124:20
**Court** [32] - 2:20, 2:21, 7:20, 11:5, 16:23, 36:15, 38:13, 50:4, 59:6, 69:22, 73:18, 73:19, 74:16, 88:19, 94:24, 99:10, 108:11, 108:15, 109:20, 113:11, 119:2, 119:3, 119:9, 119:20, 120:20, 125:3, 126:7, 127:11, 129:16, 134:2, 134:3, 136:10
**Court's** [3] - 38:10, 87:22, 121:7
**Courthouse** [1] - 2:21
**COURTROOM** [1] - 3:2
**courts** [5] - 7:8, 70:12, 129:11, 133:16, 135:1
**cover** [4] - 5:1, 11:7, 26:5, 106:18
**coverage** [3] - 21:7, 22:3, 123:1
**covered** [4] - 12:17, 17:4, 21:7, 47:5
**covering** [3] - 47:9, 47:11, 74:21
**covers** [4] - 6:12, 21:5, 21:12, 86:7
**CRC** [2] - 2:20, 136:9
**create** [2] - 6:18, 12:7
**created** [14] - 8:11, 8:16, 11:9, 12:24, 13:2, 13:3, 17:3, 17:7, 17:23, 18:3, 21:2, 21:19, 21:20, 119:4
**creates** [2] - 12:8,

23:14
**creating** [1] - 11:6
**Creek** [3] - 123:21, 124:18, 132:22
**creeks** [1] - 123:4
**criminal** [42] - 26:12, 26:20, 26:24, 26:25, 27:1, 27:19, 28:5, 62:10, 62:13, 62:14, 62:15, 62:24, 63:6, 63:10, 63:20, 63:21, 64:1, 64:2, 64:6, 64:8, 64:11, 64:12, 64:14, 64:20, 64:21, 64:22, 64:23, 64:24, 65:2, 65:4, 65:8, 65:9, 65:10, 66:3, 66:6, 66:7, 66:11, 69:5, 69:6, 71:2, 129:8
**criminalize** [1] - 27:7
**criteria** [17] - 12:24, 26:12, 27:17, 31:21, 32:18, 32:19, 59:4, 78:8, 114:23, 121:13, 121:14, 121:19, 121:20, 122:3, 122:6, 122:15, 128:25
**critical** [12] - 11:18, 11:24, 11:25, 15:18, 15:19, 15:20, 34:18, 53:7, 53:8, 90:15, 96:12, 104:24
**critically** [1] - 8:23
**Crooks** [1] - 3:17
**CROOKS** [1] - 2:9
**crooks'** [1] - 17:22
**cross** [6] - 4:18, 29:10, 54:13, 74:22, 75:6, 109:10
**cross-motion** [1] - 4:18
**cross-reference** [1] - 54:13
**cross-referenced** [2] - 29:10, 109:10
**crosswalk** [1] - 60:12
**Crow** [2] - 123:21, 124:18
**CRR** [2] - 2:20, 136:9
**crux** [1] - 51:5
**cumulative** [1] - 122:9
**cumulatively** [1] - 24:1
**cured** [1] - 25:3
**curious** [1] - 7:11
**current** [4] - 9:13, 27:13, 77:6, 80:10
**cusp** [1] - 134:9

**cut** [1] - 78:25
**cutoffs** [1] - 77:8
**cuts** [1] - 77:3

## D

**D.C** [7] - 1:6, 2:22, 123:24, 124:3, 124:8, 124:12, 136:11
**Dakota** [2] - 123:23, 132:23
**dam** [6] - 92:15, 92:16, 92:19, 92:22, 105:10, 105:11
**dammed** [1] - 77:2
**danger** [1] - 15:5
**DANIEL** [1] - 2:12
**Daniel** [3] - 3:19, 38:12, 77:25
**darn** [1] - 70:20
**darters** [6] - 92:19, 92:20, 92:22, 92:25, 93:1, 93:4
**data** [5] - 12:19, 13:7, 16:25, 118:5, 131:21
**date** [8] - 34:16, 43:22, 43:24, 45:18, 45:22, 80:2, 129:24, 129:25
**Dated** [1] - 136:7
**daylight** [2] - 56:7, 59:14
**days** [2] - 91:4, 134:15
**DC** [2] - 1:22, 2:4
**deadline** [1] - 91:17
**deal** [2] - 92:10, 101:13
**dealing** [4] - 57:8, 66:17, 70:15, 79:22
**decide** [4] - 63:15, 71:5, 71:7, 102:14
**decided** [7] - 7:6, 23:9, 42:20, 43:22, 83:14, 102:13, 132:13
**decides** [1] - 92:15
**decision** [15] - 9:6, 10:15, 10:19, 34:5, 58:18, 66:21, 66:24, 77:22, 87:18, 103:14, 119:3, 119:20, 120:12, 120:23, 121:8
**decisional** [2] - 97:24, 108:7
**decisions** [6] - 6:25, 7:25, 9:11, 14:16, 33:19, 37:1
**declaration** [6] - 17:22, 42:15, 127:7,

127:12, 127:21, 128:6
**declarations** [1] - 40:8
**deemed** [1] - 76:6
**deems** [1] - 100:5
**Defendants** [2] - 1:7, 1:19
**defendants** [11] - 3:25, 6:17, 7:24, 23:20, 24:15, 27:24, 29:6, 33:15, 37:21, 39:11, 47:18
**defendants'** [1] - 4:17
**Defenders** [2] - 2:12, 3:19
**defense** [1] - 67:25
**defer** [1] - 43:10
**deference** [1] - 36:14
**deferential** [1] - 31:20
**deficiencies** [1] - 35:14
**defied** [2] - 47:5, 47:6
**define** [11] - 29:7, 38:19, 38:23, 38:24, 39:1, 46:20, 73:25, 78:2, 80:24, 104:17
**defined** [12] - 10:11, 10:16, 49:16, 62:14, 62:15, 64:11, 72:17, 73:3, 102:20, 103:20, 103:21, 104:24
**defining** [1] - 121:9
**definitely** [1] - 36:25
**definition** [6] - 37:13, 39:19, 47:1, 47:7, 74:6, 75:7
**definitions** [1] - 11:3
**degree** [4] - 28:23, 62:18, 67:12, 67:18
**degrees** [1] - 67:15
**delegated** [1] - 121:2
**delegates** [1] - 119:6
**delegation** [1] - 101:15
**delve** [1] - 49:5
**demarcations** [1] - 42:12
**demonstrate** [3] - 26:19, 26:22, 27:21
**demonstrative** [1] - 124:25
**denied** [1] - 53:15
**denominator** [1] - 67:16
**deny** [1] - 97:9
**DEP** [25] - 4:11, 4:13, 31:15, 32:6, 58:22, 88:4, 88:25, 90:1, 90:13, 91:2, 91:14,

98:8, 99:22, 104:10, 109:18, 112:20, 112:23, 117:3, 117:7, 123:9, 125:7, 125:11, 125:16
**Department** [6] - 1:20, 2:13, 37:4, 48:13, 54:6, 120:23
**department** [4] - 19:20, 68:15, 70:6, 70:11
**DEPUTY** [1] - 3:2
**describe** [3] - 26:18, 42:19, 83:24
**described** [7] - 42:7, 56:9, 88:11, 88:15, 104:19, 108:5, 109:14
**describes** [4] - 89:24, 90:1, 90:23, 91:7
**description** [12] - 41:17, 41:18, 41:24, 42:1, 57:2, 57:3, 57:6, 60:12, 84:11, 84:15, 84:16
**design** [1] - 12:24
**designated** [1] - 75:22
**designates** [1] - 75:20
**designation** [1] - 77:15
**designations** [2] - 77:13, 77:14
**designed** [3] - 33:14, 100:23, 111:7
**despite** [1] - 17:1
**destroy** [2] - 96:12, 104:24
**destroyed** [1] - 109:10
**detail** [7] - 51:12, 52:14, 59:18, 101:20, 115:3, 118:22, 118:25
**details** [1] - 49:6
**determination** [12] - 24:2, 25:19, 25:21, 33:10, 34:1, 59:12, 60:9, 76:2, 76:17, 103:4, 110:3, 132:20
**determinations** [17] - 31:13, 31:16, 31:25, 32:3, 32:4, 32:9, 33:6, 33:20, 33:23, 54:8, 58:17, 60:7, 60:14, 60:16, 60:18, 116:22, 129:16
**determinative** [1] - 97:6
**determine** [8] - 12:11, 13:14, 54:25, 55:2, 96:11, 102:19,

131:11, 134:10
**determined** [3] - 76:18, 88:9, 133:4
**deterrence** [1] - 70:24
**deterrent** [1] - 70:8
**develop** [3] - 80:17, 81:4, 119:22
**developed** [4] - 78:20, 83:4, 83:5, 119:21
**developer** [5] - 20:15, 71:24, 93:7, 103:5, 110:12
**developing** [5] - 78:5, 81:23, 82:18, 85:5, 131:21
**development** [5] - 11:21, 11:22, 12:21, 15:23, 77:8
**dictate** [2] - 51:18, 53:7
**difference** [8] - 28:4, 28:5, 28:7, 32:11, 33:11, 69:17, 97:3, 97:4
**differences** [2] - 130:13, 132:22
**different** [13] - 20:24, 32:11, 38:6, 56:9, 67:15, 78:4, 96:25, 100:19, 121:3, 127:9, 132:14, 133:7, 133:9
**difficulties** [1] - 45:3
**dig** [1] - 77:21
**diminished** [1] - 72:4
**direct** [3] - 112:2, 115:8, 129:16
**directing** [3] - 40:16, 46:9, 93:20
**directly** [1] - 55:19
**disagree** [1] - 20:8
**disagreement** [3] - 79:3, 97:1, 108:9
**disavowed** [2] - 16:20, 129:13
**discarded** [1] - 9:7
**discharge** [6] - 55:4, 57:17, 57:24, 58:3, 58:6, 58:24
**discharged** [1] - 57:18
**discharges** [11] - 29:9, 49:12, 54:3, 54:4, 54:18, 54:19, 55:25, 57:9, 57:12, 57:13, 62:12
**disconnect** [1] - 108:4
**discretion** [5] - 63:16, 119:7, 119:10, 119:14, 119:25
**discuss** [2] - 66:1,

69:25
**discussed** [3] - 48:9, 93:13, 133:15
**discusses** [1] - 60:21
**discussion** [1] - 99:11
**dismiss** [2] - 132:17, 132:18
**dispute** [7] - 27:2, 42:23, 43:4, 47:21, 72:7, 80:2, 82:22
**distinguishable** [1] - 23:10
**district** [1] - 47:3
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [3] - 80:5, 82:10, 82:11
**districts** [2] - 80:24, 81:24
**diversity** [1] - 5:21
**Diversity** [3] - 2:11, 3:3, 3:19
**DIVERSITY** [1] - 1:3
**divide** [1] - 4:25
**Division** [1] - 125:23
**docket** [2] - 37:6, 44:10
**Docket** [3] - 44:9, 44:10, 86:16
**document** [7] - 16:9, 48:7, 84:23, 100:16, 114:17, 118:9, 118:13
**documentation** [1] - 100:13
**documents** [1] - 118:2
**DOJ** [1] - 31:21
**domino** [1] - 126:17
**dominos** [4] - 124:24, 125:2, 125:3, 125:7
**done** [30] - 6:4, 8:6, 10:12, 14:10, 14:12, 14:21, 16:4, 16:16, 17:1, 20:12, 22:18, 24:22, 25:5, 25:7, 34:21, 41:1, 43:7, 43:16, 63:2, 78:19, 92:12, 101:22, 105:22, 106:22, 107:24, 117:3, 117:25, 120:14, 131:24
**doubt** [2] - 28:14, 85:22
**doubting** [1] - 100:15
**down** [9] - 30:5, 50:9, 73:16, 91:1, 91:12, 97:20, 109:6, 135:5
**dozens** [1] - 62:15
**draw** [1] - 59:10

**dredged** [2] - 49:12, 55:4
**drill** [1] - 50:9
**drop** [1] - 56:20
**due** [2] - 22:3, 74:24
**during** [7] - 22:11, 48:16, 91:23, 91:25, 98:18, 126:24, 131:19
**duty** [6] - 16:20, 32:7, 45:22, 45:25, 118:17, 129:14

## E

**early** [2] - 8:9, 91:25
**Earthjustice** [1] - 1:16
**easier** [1] - 135:15
**easy** [1] - 128:11
**eat** [3] - 103:2, 117:4, 117:6
**eating** [1] - 105:23
**ebb** [1] - 83:18
**Economy** [2] - 38:13, 78:1
**ecosystems** [1] - 106:9
**effect** [7] - 22:14, 25:19, 25:21, 70:8, 109:25, 117:15, 122:9
**effects** [7] - 12:22, 16:21, 55:3, 88:12, 122:9, 126:9, 131:11
**effluent** [1] - 34:4
**eight** [1] - 12:23
**either** [11] - 18:24, 19:5, 22:18, 35:23, 38:5, 44:6, 47:11, 59:15, 128:17, 130:22, 135:11
**elaborating** [1] - 61:3
**element** [1] - 51:14
**elements** [4] - 34:18, 53:7, 53:8, 117:12
**ELISE** [1] - 2:10
**Elise** [1] - 3:18
**elsewhere** [2] - 61:20, 87:12
**elucidate** [1] - 75:22
**email** [2] - 80:4, 129:22
**embedded** [2] - 53:22, 63:19
**emergency** [1] - 134:11
**emphasize** [4] - 60:23, 81:8, 81:14, 120:20
**employ** [1] - 63:11
**employed** [3] - 73:19,

87:12, 87:19
**enacting** [1] - 74:11
**encompassed** [1] -
74:15
**encompasses** [1] -
38:15
**encompassing** [1] -
121:22
**encourage** [3] -
114:17, 127:11,
128:5
**encouraged** [1] -
129:3
**end** [3] - 5:9, 31:23,
94:21
**endangered** [16] -
8:21, 8:23, 10:3,
10:9, 11:22, 11:25,
12:1, 15:10, 22:4,
92:20, 94:13, 95:2,
99:7, 109:4, 109:25,
117:15
**Endangered** [35] -
4:25, 5:13, 5:17, 6:9,
6:11, 6:24, 9:8,
10:11, 12:5, 15:24,
18:12, 20:24, 21:24,
22:2, 22:20, 23:5,
24:6, 26:3, 49:2,
92:11, 93:9, 96:16,
107:9, 107:14,
108:18, 109:1,
111:19, 111:25,
113:1, 113:10,
129:1, 130:12,
130:19, 131:13,
132:1
**enforceable** [3] - 94:3,
94:7, 95:16
**enforcement** [19] -
6:7, 18:22, 26:12,
26:20, 27:25, 28:2,
30:23, 31:5, 61:9,
69:5, 69:6, 69:13,
70:15, 72:1, 98:7,
124:1, 124:16,
132:24, 132:25
**enforcer** [1] - 69:11
**engage** [6] - 21:16,
34:22, 64:15,
111:18, 111:23,
119:17
**engaged** [2] - 14:15,
86:18
**engaging** [1] - 9:16
**Engineers** [4] - 2:14,
4:4, 101:11, 123:22
**ensure** [8] - 20:17,
21:25, 53:23, 56:1,
58:23, 87:15, 88:17,

91:20
**ensured** [1] - 8:14
**ensuring** [1] - 112:5
**entered** [3] - 88:24,
93:15, 104:2
**entire** [3] - 9:9, 25:19,
122:13
**entirely** [3] - 64:7,
77:9, 121:20
**entirety** [1] - 5:12
**entitled** [1] - 109:15
**entity** [2] - 41:22,
130:9
**enumerated** [2] -
26:25, 32:19
**environment** [1] - 55:5
**Environmental** [2] -
2:13, 54:6
**environmental** [11] -
5:16, 18:23, 19:4,
19:18, 81:17,
111:17, 115:2,
122:11, 124:10,
127:24, 129:4
**EPA** [82] - 2:15, 7:15,
9:25, 17:4, 17:15,
18:2, 18:24, 21:9,
21:14, 21:15, 22:6,
22:17, 24:7, 24:18,
25:17, 26:16, 26:21,
28:3, 28:9, 29:1,
30:11, 30:12, 30:13,
38:22, 38:25, 39:5,
39:9, 41:13, 41:16,
41:20, 42:6, 44:21,
44:22, 45:18, 47:6,
49:18, 50:2, 50:11,
50:14, 50:16, 53:23,
54:23, 54:25, 60:1,
60:10, 63:15, 66:2,
66:10, 66:15, 71:1,
71:9, 71:14, 71:21,
71:25, 80:20, 80:23,
81:11, 84:8, 86:16,
96:18, 98:9, 101:10,
104:11, 109:18,
112:17, 115:6,
117:7, 117:14,
118:7, 118:8, 119:6,
119:17, 119:22,
119:24, 120:10,
124:16, 125:10,
125:11, 125:12
**ePA's** [1] - 84:10
**EPA's** [23] - 4:3, 9:4,
17:15, 26:8, 30:24,
39:9, 50:18, 63:17,
66:9, 66:17, 67:2,
67:4, 69:10, 69:16,
83:2, 84:7, 86:13,

86:18, 103:14,
103:19, 109:2,
113:9, 124:9
**equal** [1] - 23:16
**equivalence** [1] -
33:16
**equivalent** [3] - 17:17,
18:14, 76:10
**ERICA** [1] - 2:14
**Erica** [1] - 4:4
**ERP** [1] - 122:15
**error** [2] - 36:4, 36:6
**ESA** [23] - 8:16, 8:20,
9:6, 9:11, 12:8, 13:7,
17:2, 17:5, 23:14,
35:15, 46:14, 47:23,
54:13, 88:12, 88:13,
88:18, 96:21,
102:21, 113:3,
114:15, 115:11,
134:7
**ESA's** [1] - 24:4
**ESA-listed** [2] - 88:13,
96:21
**especially** [2] - 11:5,
40:3
**essence** [1] - 101:17
**essential** [1] - 49:10
**essentially** [4] - 14:10,
25:5, 62:8, 81:4
**establish** [2] - 70:13,
84:22
**estimates** [1] - 8:25
**et** [4] - 1:3, 1:6, 3:3,
3:4
**evaluate** [2] - 86:21,
114:19
**evaluating** [1] -
110:21
**evaluation** [5] - 24:19,
86:13, 86:17, 86:21,
118:3
**events** [1] - 125:4
**evidence** [5] - 18:3,
19:12, 28:13, 28:14,
30:10
**evolved** [1] - 78:15
**evolves** [1] - 74:1
**exact** [4] - 13:7, 16:25,
60:20, 124:2
**exactly** [9] - 20:10,
41:11, 41:13, 41:20,
47:8, 73:21, 98:15,
112:8, 115:15
**example** [14] - 9:25,
12:14, 13:22, 14:21,
14:24, 15:9, 17:20,
42:15, 68:14, 94:16,
106:15, 115:25,
121:1

**examples** [7] - 8:6,
18:16, 19:4, 115:24,
127:20, 127:21,
127:22
**exceeded** [3] - 12:10,
19:8, 98:18
**except** [3] - 37:23,
39:6, 78:7
**exception** [2] - 7:12,
79:2
**exceptions** [1] - 23:14
**excluded** [2] - 85:6,
85:13
**excluding** [1] - 38:2
**exclusion** [1] - 13:2
**excuse** [2] - 62:9, 67:3
**exempt** [1] - 21:7
**exemption** [3] - 17:4,
23:1, 33:25
**exercise** [1] - 104:12
**exhaustive** [1] - 84:18
**existing** [2] - 81:24,
82:11
**exists** [1] - 123:12
**expanded** [1] - 47:4
**expanding** [1] - 61:3
**expansive** [1] - 64:3
**explained** [3] - 16:23,
108:13, 112:11
**explains** [4] - 82:5,
106:10, 112:3, 125:4
**explanation** [1] - 42:5
**explicitly** [3] - 23:17,
49:14, 61:21
**express** [2] - 96:10,
106:11
**expressed** [3] - 106:3,
106:4, 121:13
**expression** [1] -
102:23
**expressly** [2] - 32:2,
42:6
**extensively** [1] - 6:17
**extent** [10] - 24:25,
25:1, 34:19, 40:13,
48:15, 82:8, 82:13,
98:18, 117:12,
117:13
**extinction** [1] - 9:2
**extremely** [2] - 61:21,
63:10
**eye** [2] - 81:19

## F

**face** [3] - 40:4, 54:17,
58:19
**fact** [25] - 16:24, 25:3,
25:20, 27:9, 34:17,
35:13, 37:5, 40:7,

40:17, 42:13, 45:13,
47:21, 70:13, 71:9,
96:18, 99:3, 99:12,
100:24, 100:25,
111:7, 113:6,
115:23, 124:15,
130:15
**facts** [2] - 23:10,
108:10
**factual** [16] - 31:13,
31:15, 31:25, 32:2,
32:4, 32:9, 33:6,
33:10, 54:7, 58:17,
60:7, 60:8, 60:14,
60:16, 60:17, 129:16
**fail** [1] - 91:22
**fail-safe** [1] - 91:22
**failed** [6] - 8:17, 9:12,
24:9, 26:18, 31:8,
53:23
**failing** [2] - 19:6,
102:9
**fails** [1] - 125:11
**fair** [12] - 51:20, 53:20,
61:4, 68:24, 69:3,
69:15, 70:22, 72:8,
72:10, 103:3, 109:7
**fairly** [1] - 94:11
**fall** [1] - 125:7
**falls** [1] - 79:1
**far** [6] - 7:12, 19:9,
29:15, 42:23, 79:10,
98:7
**fast** [2] - 66:10, 124:20
**FDEP** [6] - 54:5, 54:7,
91:2, 91:25, 115:12,
116:12
**FDEP's** [1] - 85:22
**feature** [1] - 31:19
**federal** [53] - 3:22,
3:25, 7:9, 10:1,
10:13, 11:4, 18:18,
19:24, 20:5, 20:21,
22:13, 22:24, 26:12,
27:17, 30:25, 31:3,
31:22, 33:14, 33:17,
47:1, 48:21, 49:25,
56:15, 57:3, 57:4,
57:20, 60:13, 60:16,
60:18, 62:21, 64:8,
64:12, 64:13, 67:13,
67:25, 69:13, 69:21,
79:1, 85:23, 96:18,
105:8, 105:16,
109:23, 110:5,
110:11, 115:21,
124:1, 126:14,
130:14, 131:2,
131:5, 133:1
**Federal** [1] - 65:22

**federalize** [2] - 117:7, 125:15
**federalized** [1] - 125:13
**federalizes** [1] - 125:12
**feelings** [1] - 127:2
**few** [5] - 15:11, 20:24, 25:10, 113:22, 128:23
**fifth** [1] - 126:17
**figure** [4] - 4:21, 45:19, 79:13, 79:20
**figuring** [1] - 78:21
**file** [4] - 125:19, 125:20, 127:19, 132:8
**filed** [3] - 86:15, 110:8, 132:18
**filing** [1] - 19:23
**fill** [3] - 49:12, 55:4, 69:14
**final** [5] - 17:23, 84:24, 87:22, 125:22, 133:24
**finally** [1] - 17:12
**findings** [1] - 33:21
**fine** [4] - 5:4, 49:4, 104:16, 105:1
**fines** [4] - 64:20, 65:8, 65:9, 65:10
**finger** [3] - 28:19, 67:10, 102:22
**finish** [1] - 123:19
**Finnegan** [8] - 3:22, 4:2, 49:1, 50:23, 54:12, 86:9, 131:6, 131:14
**FINNEGAN** [63] - 1:19, 3:21, 86:10, 86:15, 87:1, 87:4, 87:9, 87:17, 87:22, 89:11, 89:16, 89:19, 90:9, 90:12, 90:18, 90:20, 90:23, 91:1, 91:7, 91:14, 92:3, 92:7, 94:19, 94:23, 95:1, 95:4, 95:10, 95:20, 96:1, 96:8, 97:20, 97:24, 98:13, 98:25, 99:9, 99:21, 100:8, 100:10, 100:21, 102:8, 102:12, 102:17, 102:25, 103:19, 104:17, 105:3, 105:5, 106:2, 106:10, 106:16, 107:4, 108:4, 109:5, 109:8, 109:12, 110:16, 110:19,

111:2, 111:5, 112:1, 112:10, 113:16, 113:18
**first** [29] - 6:8, 9:7, 12:4, 21:1, 26:11, 26:20, 30:7, 33:24, 49:11, 51:2, 54:2, 54:14, 64:19, 65:11, 65:19, 66:2, 72:12, 81:8, 87:19, 89:19, 94:23, 98:8, 99:17, 99:24, 100:1, 117:24, 123:21, 125:7, 126:24
**First** [1] - 75:11
**fish** [2] - 116:2, 116:20
**Fish** [127] - 9:3, 9:7, 9:18, 10:17, 11:20, 13:10, 13:16, 13:18, 14:6, 14:14, 16:19, 17:2, 17:16, 18:2, 18:19, 18:24, 19:5, 20:22, 21:17, 22:18, 23:4, 23:17, 23:21, 24:3, 24:7, 44:14, 51:18, 51:23, 52:7, 52:8, 52:16, 52:18, 52:20, 53:4, 54:24, 87:23, 87:25, 88:2, 88:8, 88:16, 88:24, 88:25, 89:4, 89:6, 89:24, 90:1, 91:3, 91:4, 91:10, 91:15, 91:16, 91:19, 91:22, 91:24, 91:25, 92:17, 92:18, 93:16, 93:25, 94:14, 94:17, 95:11, 95:17, 96:1, 96:6, 96:14, 97:5, 97:8, 97:15, 97:19, 98:1, 98:4, 98:11, 98:23, 99:2, 99:7, 99:22, 100:3, 100:4, 100:14, 100:16, 100:24, 100:25, 101:19, 101:22, 101:24, 101:25, 102:6, 102:17, 103:3, 103:7, 103:16, 103:23, 103:24, 104:8, 104:18, 104:21, 104:22, 106:13, 106:24, 107:1, 107:16, 107:20, 110:6, 110:19, 110:21, 111:15, 112:22, 112:23, 115:6, 115:13, 115:18, 115:25, 116:22, 117:5,

117:10, 117:20, 118:12, 118:15, 127:25, 130:14, 130:17, 130:18, 131:8, 131:17
**Fisheries** [10] - 12:16, 16:5, 16:24, 19:6, 24:10, 24:16, 50:22, 86:19, 102:18, 110:20
**fits** [1] - 59:24
**five** [11] - 15:13, 30:23, 60:6, 61:13, 91:4, 108:24, 125:2, 125:7, 126:1, 128:20
**five-year** [1] - 30:23
**fix** [1] - 71:9
**FL** [1] - 1:17
**flat** [1] - 122:17
**flat-out** [1] - 122:17
**fleshed** [1] - 82:7
**fleshed-out** [1] - 82:7
**flip** [2] - 52:5, 64:4
**floor** [2] - 27:1, 27:17
**Florida** [136] - 2:9, 2:13, 3:18, 4:11, 4:13, 5:18, 8:23, 8:24, 9:5, 11:17, 11:23, 12:18, 13:6, 13:25, 15:1, 15:2, 15:4, 15:6, 15:21, 17:14, 18:1, 18:5, 20:2, 20:4, 20:11, 20:15, 20:20, 20:21, 21:10, 21:14, 21:16, 22:17, 22:25, 27:4, 27:5, 27:6, 27:8, 27:12, 27:18, 30:22, 31:15, 33:17, 33:19, 39:5, 43:5, 46:2, 47:5, 47:24, 48:13, 51:8, 51:10, 51:24, 52:6, 52:9, 52:12, 53:13, 53:24, 54:5, 55:8, 56:1, 56:10, 56:23, 57:2, 57:11, 58:16, 58:22, 59:13, 71:24, 78:19, 78:25, 79:4, 79:7, 79:19, 79:22, 84:19, 88:1, 88:4, 88:24, 88:25, 90:1, 90:13, 91:2, 91:3, 91:14, 93:7, 93:15, 93:17, 93:24, 94:8, 97:3, 97:5, 97:8, 97:16, 98:3, 98:6, 98:8, 99:22, 103:6, 104:10, 106:14, 106:22, 106:25, 109:18,

110:6, 112:20, 112:21, 112:23, 114:18, 114:20, 115:2, 115:13, 117:18, 118:3, 119:23, 122:11, 122:17, 122:25, 123:9, 125:13, 125:20, 125:23, 126:2, 126:6, 126:8, 127:15, 127:16, 129:24, 132:18, 132:25, 134:14
**florida** [1] - 15:2
**Florida's** [34] - 8:20, 24:25, 26:9, 26:17, 31:8, 31:19, 33:23, 49:24, 50:3, 51:3, 51:13, 51:17, 51:21, 52:1, 52:14, 53:1, 54:3, 54:17, 55:16, 55:23, 57:7, 57:14, 58:5, 58:19, 60:9, 60:15, 78:20, 87:20, 88:3, 103:20, 115:5, 120:21, 121:14
**Florida-led** [1] - 127:15
**flow** [3] - 10:19, 46:16, 83:19
**flowing** [1] - 77:2
**fluid** [1] - 39:12
**fly** [1] - 113:25
**focused** [1] - 10:14
**folded** [3] - 117:2, 117:6, 122:13
**folds** [2] - 115:1, 122:10
**follow** [1] - 24:4
**followed** [1] - 8:1
**following** [9] - 16:2, 52:8, 92:24, 100:17, 107:21, 108:1, 108:22, 112:8, 123:14
**FOR** [2] - 1:1, 1:3
**force** [1] - 23:16
**foreclosed** [1] - 73:1
**foregoing** [1] - 136:4
**foreign** [5] - 37:17, 72:19, 73:6, 74:4, 74:9
**foreseeable** [1] - 10:18
**foresight** [1] - 12:6
**forever** [1] - 11:19
**form** [13] - 5:23, 14:13, 50:20, 62:16, 63:18, 65:18, 66:6, 66:16, 67:16, 68:6, 113:2,

129:9, 129:10
**formal** [1] - 110:2
**forms** [1] - 110:25
**forth** [6] - 14:19, 39:12, 90:15, 105:15, 113:12, 118:23
**forward** [12] - 7:5, 30:16, 36:16, 66:10, 88:8, 91:2, 107:21, 107:25, 109:16, 121:11, 126:17, 130:10
**fought** [1] - 43:5
**four** [4] - 60:6, 124:5, 125:19, 125:25
**framework** [1] - 118:24
**framing** [2] - 49:7, 49:15
**Francisco** [1] - 2:7
**frankly** [2] - 107:10, 122:2
**FRANZ** [1] - 2:12
**Franz** [1] - 3:19
**free** [4] - 77:2, 104:17, 113:24, 127:10
**free-flowing** [1] - 77:2
**frequently** [1] - 106:18
**front** [4] - 38:5, 66:11, 89:14, 116:19
**full** [2] - 55:24, 136:5
**fully** [2] - 32:25, 82:7
**fundamentally** [1] - 92:9
**fundamentals** [2] - 120:21
**future** [7] - 12:20, 12:23, 17:4, 17:8, 19:10, 72:19, 77:6
**FWC** [4] - 89:1, 90:13, 115:12, 116:12
**FWS** [2] - 44:13, 116:12

## G

**g)(1)** [1] - 78:13
**Galloni** [7] - 3:8, 5:2, 26:2, 26:7, 67:7, 69:2, 69:7
**GALLONI** [52] - 1:14, 3:7, 26:8, 27:6, 27:15, 28:7, 28:20, 28:25, 29:3, 29:6, 29:17, 29:21, 30:1, 30:4, 30:10, 30:21, 31:7, 32:13, 32:16, 33:2, 33:9, 34:11, 35:10, 36:10, 36:17,

36:21, 37:9, 37:12,
38:9, 38:18, 39:23,
41:13, 42:5, 42:14,
43:1, 43:20, 44:18,
44:21, 45:4, 45:21,
46:12, 46:22, 47:14,
47:16, 128:22,
130:25, 132:6,
132:11, 134:5,
134:7, 134:24, 135:3
**Galloni's** [1] - 73:17
**general** [7] - 4:12,
9:10, 34:1, 49:24,
62:18, 67:9, 67:10
**General** [2] - 2:15, 4:3
**generic** [1] - 107:8
**GIS** [1] - 78:20
**glad** [2] - 114:5,
128:13
**gloss** [1] - 62:17
**goodwill** [1] - 100:14
**governing** [2] - 47:6,
124:10
**government** [9] - 20:3,
29:22, 48:21, 69:13,
69:21, 129:8,
129:13, 129:22
**government's** [2] -
20:3, 29:18
**grant** [3] - 10:7, 50:5,
74:23
**granted** [3] - 9:22,
9:23, 71:14
**granting** [5] - 10:6,
10:8, 13:10, 121:15
**grapple** [3] - 123:20,
124:17, 128:5
**Great** [1] - 49:5
**great** [4] - 3:20, 48:11,
51:12, 86:15
**greater** [6] - 28:9,
28:25, 30:18, 30:19,
62:20, 67:13
**gross** [9] - 66:8, 68:4,
68:13, 68:16, 68:20,
69:18, 70:18, 70:20,
70:25
**ground** [2] - 26:5,
30:17, 108:10
**group** [2] - 15:17,
19:18
**groups** [3] - 18:23,
19:4, 81:18
**guard** [1] - 97:11
**guardrails** [5] - 93:23,
95:18, 101:16,
101:17, 131:8
**guess** [16] - 6:2, 6:21,
35:8, 35:24, 36:3,
46:10, 48:4, 53:18,

68:3, 68:9, 75:11,
84:17, 92:8, 97:16,
100:21, 123:19
**guidance** [2] - 36:15,
81:11
**guideline** [1] - 25:18
**guidelines** [17] -
26:13, 31:4, 31:9,
31:11, 31:12, 32:2,
53:25, 56:4, 58:16,
59:1, 59:6, 59:9,
60:8, 98:10, 109:8,
119:16, 129:15
**Gulf** [2] - 85:19, 85:21

## H

**habitat** [18] - 8:24,
11:25, 13:1, 15:18,
15:19, 15:20, 15:23,
16:5, 51:9, 53:3,
54:11, 104:24,
109:9, 134:9, 134:13
**habitats** [3] - 11:18,
90:15, 96:13
**half** [2] - 118:9, 122:3
**hammer** [1] - 102:23
**Hampshire** [1] - 30:5
**hand** [3] - 15:7, 49:1,
124:25
**handbook** [12] -
52:13, 58:20, 96:19,
114:20, 114:23,
115:11, 121:18,
121:21, 122:3,
122:7, 122:18,
122:23
**handful** [2] - 92:25,
93:3
**handle** [1] - 45:11
**hands** [2] - 20:18,
101:19
**handwriting** [1] -
112:7
**Hanousek** [2] - 66:22,
66:24
**Happy** [1] - 114:10
**happy** [11] - 5:10, 6:8,
16:10, 17:25, 24:15,
26:2, 50:8, 55:21,
59:18, 86:1, 135:14
**Harbors** [12] - 5:2,
5:18, 37:21, 37:23,
38:2, 38:25, 39:7,
45:23, 46:6, 73:24,
74:13, 85:4
**hard** [4] - 36:1, 85:9,
131:25, 132:1
**harm** [2] - 32:20,
32:23, 125:8,

133:15, 133:16
**harming** [2] - 95:7,
95:8
**harms** [1] - 126:18
**hazier** [1] - 71:20
**head** [6] - 55:20, 77:3,
77:10, 79:18, 84:22,
104:14
**heading** [5] - 54:10,
58:16, 90:3, 90:4,
90:20
**hear** [10] - 20:3, 48:12,
48:13, 48:20, 99:11,
99:17, 128:17,
130:17, 135:12,
135:14
**heard** [5] - 51:14,
79:10, 86:11, 95:1,
111:11
**HEARING** [2] - 1:4,
1:9
**hearing** [2] - 134:15,
135:17
**Hearings** [1] - 125:23
**hears** [1] - 125:24
**heavy** [1] - 135:10
**heck** [1] - 56:14
**heightened** [2] -
62:16, 66:16
**held** [2] - 30:17,
129:12
**HELD** [1] - 1:10
**help** [2] - 120:18,
121:4
**helpful** [7] - 25:25,
26:5, 48:17, 112:9,
128:16, 135:6,
135:11
**helping** [1] - 102:24
**hereby** [1] - 136:3
**higher** [2] - 29:23,
30:13
**highlight** [1] - 88:20,
115:4
**Hintz** [1] - 129:16
**historic** [22] - 12:19,
37:24, 38:3, 38:4,
38:20, 39:7, 43:12,
43:14, 72:14, 72:20,
73:19, 74:21, 75:13,
75:17, 76:7, 76:23,
76:24, 77:5, 78:11,
78:12, 81:22
**historical** [2] - 75:19,
131:21
**historically** [5] -
74:20, 74:24, 75:3,
76:11, 76:16
**historics** [1] - 74:22
**history** [6] - 41:8,

41:9, 66:1, 66:15,
68:11, 130:5
**hit** [2] - 114:14, 129:7
**hoc** [4] - 59:17, 59:23,
60:22, 61:7
**hold** [2] - 93:2, 116:10
**holdings** [1] - 7:19
**hollow** [1] - 61:8
**Homebuilders** [2] -
119:4, 121:8
**honed** [1] - 130:13
**Honor** [108] - 3:2, 3:7,
3:10, 3:13, 3:21,
3:24, 4:7, 4:10, 4:23,
5:11, 5:25, 7:5, 7:17,
8:7, 10:10, 12:4,
12:14, 13:11, 13:24,
16:3, 16:10, 16:17,
17:19, 17:25, 19:3,
19:25, 20:23, 22:8,
22:10, 22:21, 23:4,
23:13, 26:1, 26:8,
26:21, 26:25, 27:16,
28:20, 29:21, 30:22,
33:10, 34:7, 37:19,
42:14, 43:1, 44:22,
47:14, 49:6, 53:21,
55:15, 62:6, 73:21,
77:17, 79:6, 86:7,
86:10, 89:13, 90:6,
95:22, 96:9, 96:23,
98:16, 100:22,
102:8, 104:7, 106:2,
106:16, 107:4,
108:5, 109:12,
110:17, 111:5,
112:2, 112:10,
113:18, 114:4,
114:13, 114:16,
114:17, 114:21,
115:4, 115:6,
115:24, 116:13,
117:23, 118:9,
120:11, 121:11,
121:22, 122:2,
122:3, 122:7,
122:21, 123:18,
123:20, 124:3,
124:17, 124:19,
124:21, 125:2,
126:6, 126:22,
126:25, 127:21,
128:8, 128:22,
132:11, 134:7
**HONORABLE** [1] -
1:10
**hook** [1] - 119:17
**hope** [2] - 24:22,
88:12
**hopefully** [1] - 89:22

**horrible** [1] - 71:17
**hundreds** [1] - 11:16
**hurt** [1] - 127:2
**hyperlink** [1] - 16:11
**hypothetical** [2] -
21:1, 105:9
**hypothetically** [1] -
20:15

## I

**Idaho** [2] - 30:12
**idea** [1] - 100:6
**identical** [2] - 56:6,
58:25, 113:8
**identified** [6] - 33:3,
46:4, 52:24, 99:17,
103:22, 133:12
**identifies** [2] - 82:20,
97:8
**identify** [5] - 41:19,
51:14, 58:3, 76:6,
90:14
**identifying** [3] - 24:19,
40:8, 44:4
**Identifying** [1] - 90:5
**ignored** [1] - 23:5
**ignoring** [2] - 45:7
**Ill** [1] - 126:15
**illustrated** [1] - 66:18
**imagine** [2] - 11:15,
77:1
**immediately** [1] -
50:15
**immemorial** [1] -
11:19
**impact** [12] - 10:2,
14:7, 35:21, 53:3,
92:21, 105:12,
105:15, 105:21,
119:16, 119:25,
120:5, 127:24
**impacted** [1] - 19:17
**impacts** [16] - 9:20,
10:16, 10:21, 12:24,
23:25, 24:19, 33:6,
54:18, 55:7, 90:5,
111:17, 112:18,
112:22, 119:8,
119:10, 119:15
**imperative** [2] - 80:5,
129:23
**imperiled** [1] - 8:17
**implement** [3] - 87:14,
105:17, 112:24
**implementation** [4] -
9:5, 78:19, 78:20,
108:21
**implemented** [2] -
87:16, 100:2

**implementing** [4] - 9:9, 17:2, 23:6, 96:17
**implicit** [1] - 6:22
**imply** [1] - 104:4
**important** [11] - 5:20, 46:17, 60:2, 73:11, 88:20, 104:7, 114:7, 119:2, 120:16, 122:10, 124:8
**imposed** [4] - 18:18, 97:12, 97:14, 97:16
**impossible** [3] - 106:17, 106:19, 123:2
**impractical** [1] - 106:11
**improvement** [1] - 37:16
**improvements** [1] - 76:1
**IN** [1] - 1:1
**inability** [1] - 134:24
**inaccurate** [1] - 57:6
**inadequacy** [1] - 35:16
**inadequate** [2] - 48:10, 54:10
**incidental** [23] - 15:5, 15:6, 15:13, 17:3, 23:1, 87:15, 93:3, 93:9, 94:9, 94:25, 95:3, 98:12, 98:18, 99:13, 99:14, 101:18, 102:4, 104:1, 105:12, 106:14, 110:13, 110:17, 113:4
**Incidental** [9] - 6:12, 7:2, 14:23, 106:4, 106:6, 107:7, 112:11, 112:16, 118:14
**include** [11] - 10:20, 37:20, 53:13, 72:13, 74:11, 78:10, 85:9, 85:17, 115:19, 118:22, 123:3
**included** [18] - 9:4, 18:8, 20:12, 38:20, 43:13, 44:5, 51:13, 51:15, 72:21, 72:24, 84:3, 85:14, 115:19, 117:19, 117:20, 118:19
**includes** [9] - 10:18, 18:19, 41:17, 55:6, 79:16, 116:3, 123:3, 123:5
**including** [13] - 5:16,

5:19, 7:7, 8:22, 9:10, 11:6, 17:17, 26:12, 39:7, 44:3, 69:22, 89:3, 115:25
**incomplete** [4] - 51:3, 53:15, 83:22, 83:24
**inconsistent** [1] - 129:15
**incorporate** [1] - 40:22
**incorporated** [4] - 39:19, 52:13, 58:21, 98:6
**incorporates** [2] - 96:15, 119:15
**incredibly** [1] - 13:2
**indeed** [1] - 16:1
**independent** [9] - 32:8, 32:9, 44:22, 46:6, 59:3, 59:7, 129:13, 129:18
**Indian** [1] - 123:24
**indicate** [1] - 109:16
**indicated** [3] - 7:22, 35:1, 99:13
**indicates** [1] - 98:4
**indicating** [2] - 37:8, 86:16
**Indies** [1] - 8:22
**indigo** [3] - 13:25, 15:9, 15:10
**indisputable** [1] - 47:21
**individuals** [1] - 19:10
**indulge** [1] - 114:5
**industry** [1] - 81:18
**infer** [1] - 41:10
**inference** [1] - 66:14
**influenced** [5] - 73:5, 76:8, 83:15, 84:19, 85:22
**inform** [2] - 32:4, 86:19
**informal** [1] - 110:1
**information** [25] - 12:7, 12:9, 16:22, 19:7, 32:7, 32:23, 44:6, 45:7, 47:20, 58:23, 59:9, 59:11, 79:25, 89:3, 91:11, 91:18, 97:25, 99:18, 108:16, 127:13, 127:15, 127:16, 129:14, 131:15, 131:17
**informational** [5] - 126:20, 127:1, 128:3, 128:4, 133:15
**initial** [1] - 12:12
**initiated** [1] - 22:11

**initiating** [1] - 80:14
**initiation** [1] - 86:17
**injunction** [1] - 125:21
**injuries** [1] - 32:22
**injury** [5] - 32:11, 125:6, 126:21, 127:1, 134:23
**input** [1] - 97:6
**instance** [5] - 64:20, 98:8, 99:24, 100:2, 126:5
**instances** [1] - 123:7
**instead** [6] - 10:5, 20:21, 23:8, 31:17, 36:2, 38:3
**instituted** [1] - 17:6
**insufficient** [1] - 52:4
**intake** [3] - 87:18, 97:4, 120:25
**intend** [2] - 52:2, 52:21
**intended** [8] - 20:16, 27:23, 37:22, 51:8, 51:10, 93:6, 103:7, 103:10
**intending** [1] - 94:23
**intensity** [1] - 88:7
**intent** [15] - 28:5, 28:7, 28:18, 28:24, 29:4, 30:12, 30:19, 62:19, 67:12, 67:17, 67:18, 68:7, 97:9, 129:8
**intention** [1] - 51:22
**intentional** [1] - 94:24
**intentions** [1] - 100:14
**interagency** [5] - 51:7, 51:11, 52:25, 53:11, 53:16
**interest** [2] - 59:16, 130:7
**interested** [3] - 78:21, 81:6, 97:21
**interests** [2] - 126:18, 133:14
**interface** [1] - 36:24
**interfered** [1] - 34:22
**internal** [2] - 43:23, 91:20
**interpret** [4] - 28:1, 28:2, 130:4, 130:9
**interpretation** [2] - 67:2, 96:17
**interrupt** [2] - 100:9, 100:11
**interrupting** [1] - 8:9
**intersection** [1] - 109:1
**interstate** [8] - 37:17, 72:18, 72:20, 73:6, 74:3, 74:9, 74:19,

75:25
**intervene** [1] - 19:24
**Intervenor** [1] - 2:2
**intervenor's** [1] - 4:18
**intervenors** [2] - 4:8, 4:11
**intervention** [1] - 133:23
**intra** [1] - 110:23
**intra-agency** [1] - 110:23
**introduce** [1] - 3:16
**introduced** [1] - 8:6
**invalidate** [1] - 46:7
**invention** [3] - 115:12, 120:17, 121:14
**involved** [2] - 70:3, 125:14
**involves** [3] - 6:17, 121:2, 126:14
**involving** [1] - 123:21
**issuance** [12] - 10:25, 11:1, 11:12, 11:13, 18:20, 31:8, 31:14, 33:4, 96:20, 108:8, 121:25
**issue** [32] - 12:18, 22:22, 24:2, 25:16, 31:11, 32:6, 40:16, 41:2, 41:5, 42:16, 42:19, 46:3, 46:8, 46:25, 57:9, 61:1, 61:10, 62:9, 63:17, 69:6, 73:15, 92:9, 97:9, 103:10, 103:12, 125:7, 125:11, 125:16, 127:9, 130:15, 130:16, 134:22
**issued** [7] - 11:2, 20:7, 27:20, 93:16, 96:11, 99:14, 119:3
**issues** [14] - 4:24, 31:14, 32:3, 52:21, 68:10, 81:11, 97:10, 98:6, 102:1, 108:10, 110:24, 114:15, 133:25, 134:17
**issuing** [6] - 10:20, 17:14, 18:18, 93:20, 110:22, 121:19
**items** [1] - 88:20
**iteration** [1] - 65:19
**ITS** [15] - 6:6, 7:19, 17:10, 19:11, 20:13, 20:17, 21:5, 21:7, 21:8, 21:12, 21:20, 87:13, 106:6, 117:11, 130:22
**itself** [18] - 14:12,

15:11, 25:15, 35:6, 35:15, 45:18, 61:11, 64:6, 78:18, 98:21, 102:12, 102:14, 107:12, 107:13, 114:22, 114:23, 123:3

### J

**J3** [2] - 60:11, 60:20
**Jacksonville** [3] - 80:5, 82:10, 82:11
**jaded** [1] - 114:25
**JAXBO** [2] - 12:15, 16:4
**Jeff** [1] - 4:10
**JEFFREY** [1] - 2:2
**jeopardize** [6] - 17:9, 25:16, 26:19, 48:1, 96:12, 96:20
**jeopardized** [1] - 109:9
**jeopardy** [7] - 10:9, 12:7, 12:12, 22:1, 24:2, 104:23, 117:1
**Jersey** [10] - 21:22, 22:9, 22:10, 22:11, 29:16, 29:19, 101:22, 107:4, 107:6, 131:24
**job** [4] - 10:1, 10:4, 21:14, 71:5
**joined** [1] - 4:12
**joint** [1] - 132:7
**joints** [1] - 63:15
**JUDGE** [2] - 1:10, 1:10
**Judge** [6] - 48:22, 51:20, 56:25, 63:8, 64:16, 72:6
**judge** [1] - 125:23
**judgment** [9] - 4:17, 4:18, 4:19, 44:22, 127:9, 128:4, 132:13, 132:16, 132:19
**judgments** [1] - 50:5
**judicial** [3] - 7:25, 38:22, 125:24
**July** [2] - 24:22, 86:16
**jurisdiction** [17] - 8:15, 24:10, 24:20, 37:22, 38:25, 39:4, 39:15, 40:1, 40:5, 42:1, 42:3, 42:20, 42:25, 45:24, 73:24, 76:24, 85:23
**jurisdictional** [1] - 78:25
**justice** [3] - 19:19,

68:14, 70:10
**Justice** [3] - 1:20, 37:4, 48:13
**JUSTIN** [1] - 2:13
**Justin** [1] - 4:12

## K

**keep** [3] - 35:25, 70:17, 114:8
**keeps** [1] - 123:12
**key** [6] - 62:13, 97:3, 114:17, 116:11, 130:13
**Key** [1] - 116:11
**keys** [1] - 13:13
**killing** [6] - 15:6, 93:3, 94:13, 95:2, 95:3, 95:8
**kind** [3] - 16:25, 101:5, 127:16
**kinds** [1] - 123:4
**knowledge** [11] - 7:17, 18:7, 28:23, 62:19, 67:12, 67:18, 67:25, 68:1, 68:7, 68:22, 87:17
**knowledgeable** [1] - 101:7
**known** [1] - 68:17
**Kupchan** [1] - 4:3
**KUPCHAN** [1] - 2:15

## L

**lack** [7] - 53:13, 67:24, 68:1, 91:17, 124:12, 124:13, 124:14
**lacked** [2] - 16:21, 123:25
**laid** [5] - 51:12, 52:11, 57:19, 132:15, 133:8
**lakes** [1] - 123:4
**land** [2] - 93:12, 132:23
**lands** [1] - 123:22
**language** [20] - 10:24, 23:5, 28:6, 28:17, 28:21, 28:23, 38:5, 38:14, 41:23, 55:12, 59:25, 62:4, 63:15, 63:19, 64:10, 65:21, 73:8, 73:18, 74:16, 107:10
**large** [3] - 57:10, 130:25, 131:1
**last** [6] - 8:24, 47:16, 50:15, 124:4, 126:23, 134:12
**late** [2] - 111:10, 135:5

**latter** [2] - 10:10, 11:11
**law** [30] - 7:7, 11:5, 11:6, 23:9, 28:24, 30:25, 33:14, 33:17, 33:18, 33:19, 36:5, 36:18, 38:11, 38:19, 45:13, 49:13, 59:12, 60:13, 64:13, 67:13, 69:24, 74:1, 74:2, 74:6, 94:3, 108:23, 115:21, 125:23, 126:2
**laws** [2] - 5:16, 101:7
**lawyer** [1] - 70:19
**lay** [1] - 52:14
**lays** [3] - 60:13, 115:9, 115:15
**lead** [2] - 21:13, 49:12
**leads** [1] - 95:15
**least** [18] - 5:23, 6:23, 15:17, 17:19, 18:7, 20:15, 36:15, 39:18, 40:19, 41:10, 46:12, 70:11, 75:3, 83:11, 92:9, 107:15, 117:9, 126:19
**leave** [2] - 4:20, 111:9
**leaves** [1] - 63:15
**leaving** [2] - 83:6, 87:13
**led** [3] - 32:21, 127:14, 127:15
**left** [8] - 5:9, 9:1, 39:25, 46:23, 47:8, 101:21, 101:25, 132:23
**legal** [10] - 36:22, 53:10, 84:7, 89:9, 94:2, 104:5, 120:12, 120:15, 129:4, 130:3
**legally** [3] - 74:2, 95:16, 112:25
**legislative** [2] - 41:8, 130:5
**length** [1] - 82:5
**lengthy** [1] - 44:10
**Leopoldo** [1] - 3:4
**less** [11] - 30:25, 31:1, 60:17, 65:18, 71:21, 71:22, 71:25, 81:22, 108:24, 134:3
**letter** [5] - 47:23, 60:3, 60:4, 60:25
**letters** [2] - 82:25, 83:2
**level** [12] - 11:14, 14:13, 17:9, 18:4, 18:18, 21:2, 22:1, 24:5, 34:3, 36:14,

107:8, 131:4
**liability** [18] - 15:25, 17:3, 21:7, 22:2, 23:1, 27:1, 27:19, 50:13, 92:10, 93:8, 93:9, 101:18, 102:3, 103:5, 105:7, 106:23, 108:2, 110:13
**liable** [2] - 19:11, 93:3
**license** [1] - 92:16
**lies** [2] - 78:22, 79:19
**life** [1] - 17:5
**lifting** [1] - 135:10
**light** [2] - 55:6, 64:10
**Light** [2] - 38:13, 78:1
**lightly** [1] - 92:12
**likely** [6] - 69:19, 71:22, 96:20, 98:8, 104:23, 116:25
**LILY** [1] - 2:5
**Lily** [1] - 4:7
**limit** [10] - 14:18, 14:20, 17:6, 17:23, 18:15, 21:2, 21:12, 21:20, 99:15, 104:1
**limitation** [8] - 17:18, 18:17, 18:20, 18:21, 19:2, 20:11, 20:17, 34:4
**limitations** [7] - 18:8, 30:21, 30:22, 30:24, 31:1, 61:13, 62:1
**limited** [3] - 37:20, 121:12, 125:1
**limits** [5] - 12:9, 18:3, 18:11, 19:8, 24:2
**line** [10] - 15:22, 22:17, 56:3, 66:24, 70:18, 78:25, 85:24, 108:7, 123:8, 123:10
**lines** [1] - 46:11
**list** [67] - 39:14, 39:15, 41:17, 42:18, 43:8, 43:11, 43:15, 43:16, 43:17, 43:21, 43:24, 43:25, 44:2, 44:5, 45:6, 45:15, 45:18, 45:22, 45:23, 46:1, 48:10, 72:10, 72:13, 72:25, 74:18, 74:19, 74:22, 75:6, 75:19, 76:9, 77:8, 77:11, 77:17, 78:5, 78:14, 78:18, 79:11, 79:14, 80:2, 80:6, 80:8, 80:10, 80:16, 80:18, 80:25, 82:11, 82:17, 83:4, 83:7, 83:13, 84:14, 84:18, 85:3,

85:14, 85:17, 85:18, 122:22, 122:24, 123:2, 129:20, 129:21, 129:24, 129:25
**listed** [7] - 18:11, 88:13, 89:21, 94:24, 96:21, 112:22, 118:4
**lists** [4] - 81:3, 81:5, 81:23, 81:24
**literally** [3] - 116:13, 127:18, 127:24
**litigation** [1] - 84:24
**live** [1] - 36:11
**LLP** [2] - 2:3, 2:5
**located** [1] - 118:5
**location** [2] - 14:1, 88:7
**locations** [1] - 14:2
**long-standing** [6] - 50:18, 66:18, 67:2, 69:10, 69:16, 81:9
**long-term** [1] - 55:3
**look** [47] - 10:5, 10:7, 10:23, 10:24, 11:5, 11:13, 11:21, 11:22, 12:3, 12:10, 13:4, 29:17, 41:8, 44:9, 44:18, 44:19, 52:15, 53:18, 56:13, 57:23, 58:6, 59:9, 60:3, 60:10, 60:19, 61:15, 64:1, 64:19, 68:20, 71:16, 73:10, 75:2, 76:9, 77:12, 77:19, 79:12, 89:19, 93:25, 94:5, 94:6, 94:7, 95:14, 118:19, 122:4, 122:19, 127:11
**looked** [13] - 9:19, 9:22, 12:19, 13:1, 18:13, 57:12, 60:6, 76:17, 94:14, 105:24, 107:22, 107:25, 131:20
**looking** [5] - 10:13, 54:22, 75:6, 89:13, 89:22
**looks** [3] - 29:18, 88:21, 107:2
**looser** [1] - 108:3
**lose** [1] - 70:23
**loses** [1] - 71:14
**losing** [1] - 134:21
**loss** [4] - 9:11, 15:11, 32:23, 134:20
**low** [2] - 8:25, 77:2

## M

**magnified** [1] - 33:11
**magnitude** [2] - 14:8, 15:12
**main** [2] - 111:5, 126:8
**major** [1] - 76:12
**majority** [2] - 82:3, 82:4
**Malloy** [1] - 3:14
**MALLOY** [3] - 1:15, 3:13, 3:16
**manatee** [1] - 8:22
**mandate** [1] - 113:2
**mandates** [3] - 8:18, 9:8, 24:4
**manner** [1] - 126:18
**map** [2] - 78:24
**mapping** [1] - 78:21
**Marine** [10] - 12:16, 16:5, 16:24, 19:6, 24:10, 24:16, 50:22, 86:19, 102:18, 110:20
**massive** [3] - 5:16, 84:20, 134:8
**match** [1] - 53:19
**material** [6] - 49:13, 55:4, 57:17, 57:23, 58:2, 58:7
**materially** [2] - 56:6, 58:25
**materials** [1] - 75:14
**matter** [10] - 35:8, 35:9, 35:10, 49:22, 57:10, 57:14, 62:18, 71:10, 115:21, 118:14
**matters** [1] - 74:10
**mean** [35] - 6:1, 7:21, 21:1, 28:13, 51:10, 51:24, 52:5, 54:16, 57:11, 58:9, 62:14, 62:15, 62:22, 64:7, 64:11, 64:17, 67:15, 67:17, 68:6, 69:19, 73:23, 74:8, 74:15, 75:11, 79:22, 79:23, 83:3, 83:21, 85:13, 100:11, 104:4, 105:22, 107:4, 110:10
**meaning** [1] - 96:15
**meaningful** [2] - 34:22, 111:8
**means** [5] - 12:2, 37:17, 64:2, 64:7, 76:16
**meant** [2] - 39:21, 85:14

**measure** [2] - 106:11, 115:18

**measures** [17] - 12:11, 14:19, 97:7, 98:5, 100:2, 100:10, 103:25, 105:14, 105:17, 105:20, 112:15, 112:16, 112:25, 113:3, 113:4, 113:6, 113:9

**mechanics** [1] - 97:22

**mechanism** [3] - 17:10, 69:13, 101:10

**meet** [9] - 26:11, 31:8, 32:19, 49:17, 61:22, 78:8, 102:15, 126:14, 129:1

**meets** [2] - 58:24, 123:6

**members** [4] - 81:16, 81:17, 126:11, 133:15

**memo** [2] - 120:12, 120:15

**memorandum** [8] - 20:13, 25:1, 88:23, 93:15, 96:24, 98:2, 112:24

**memory** [2] - 57:18, 57:20

**mens** [4] - 61:12, 61:24, 67:1, 68:4

**mention** [7] - 37:1, 46:24, 59:5, 103:9, 130:12, 132:12, 133:11

**mentioned** [8] - 46:18, 46:22, 60:5, 66:20, 129:22, 130:1, 131:14, 133:17

**met** [4] - 25:18, 31:18, 32:18, 129:6

**methodology** [1] - 107:23

**methods** [1] - 95:19

**Mexico** [2] - 85:19, 85:21

**Miami** [1] - 1:17

**Michigan** [4] - 21:23, 21:24, 29:16, 29:18

**middle** [1] - 91:1

**might** [16] - 15:14, 20:22, 24:22, 35:4, 40:15, 48:4, 49:7, 56:2, 56:11, 56:16, 69:17, 79:17, 80:6, 99:13, 109:5, 112:8

**mind** [9] - 16:15, 35:25, 36:4, 36:14, 48:6, 94:12, 103:5,

105:5

**minimize** [6] - 12:24, 105:15, 105:21, 112:5, 112:18, 112:21

**minimized** [1] - 88:14

**minimum** [6] - 8:12, 27:17, 49:16, 49:19, 50:3, 61:16

**mining** [1] - 121:3

**minor** [1] - 84:10

**minutes** [10] - 48:12, 48:18, 113:21, 113:22, 114:4, 114:12, 116:13, 116:14, 128:21

**Miranda** [1] - 3:4

**Miranda-Castro** [1] - 3:4

**misapprehend** [1] - 99:21

**missing** [2] - 34:18, 91:11

**mission** [1] - 99:3

**Mississippi** [1] - 76:12

**mistake** [2] - 57:7, 83:6

**mistaken** [1] - 7:23

**misunderstanding** [1] - 75:18

**misunderstood** [1] - 83:10

**mitigation** [4] - 14:5, 14:19, 18:10, 122:8

**MOA** [4] - 39:11, 39:13, 40:4, 42:18

**model** [7] - 5:18, 7:16, 8:1, 87:11, 92:13, 107:6, 131:24

**modification** [1] - 104:23

**modified** [1] - 109:9

**modify** [1] - 96:12

**moment** [1] - 115:3

**months** [1] - 75:13

**morning** [1] - 113:23

**MOSS** [1] - 1:10

**Moss** [6] - 48:22, 51:20, 56:25, 63:8, 64:17, 72:6

**most** [8] - 7:1, 8:16, 23:16, 29:24, 88:10, 113:1, 130:11, 135:4

**mostly** [1] - 36:21

**MOTION** [2] - 1:4, 1:9

**motion** [5] - 4:17, 4:18, 132:17, 132:18

**MOU** [2] - 95:22, 115:22

**move** [8] - 31:4, 31:6,

33:9, 34:7, 37:12, 53:20, 72:7, 121:11

**MR** [89] - 3:24, 4:2, 4:10, 48:22, 49:5, 49:9, 50:14, 50:23, 51:1, 51:20, 52:11, 52:23, 53:20, 55:15, 55:23, 56:24, 57:5, 58:15, 59:23, 62:5, 62:25, 63:8, 63:14, 64:16, 65:5, 65:13, 65:17, 67:19, 68:3, 68:24, 69:4, 69:9, 70:9, 70:22, 72:5, 72:9, 72:16, 73:9, 73:20, 75:9, 75:20, 76:14, 76:20, 77:16, 77:24, 78:17, 79:6, 79:14, 80:12, 82:16, 82:21, 82:25, 83:15, 83:18, 84:5, 84:10, 84:14, 85:7, 85:11, 85:15, 86:1, 86:5, 86:7, 114:4, 114:10, 114:13, 116:8, 116:11, 116:17, 116:20, 117:18, 117:23, 118:2, 118:11, 118:21, 118:24, 120:9, 120:14, 120:9, 120:14, 121:11, 121:24, 122:21, 124:23, 126:4, 126:13, 127:6, 128:8, 128:13, 128:19

**MS** [158] - 3:7, 3:10, 3:13, 3:16, 3:21, 4:7, 4:23, 5:5, 5:11, 5:15, 5:25, 6:8, 7:5, 7:17, 8:5, 8:10, 10:10, 11:3, 12:4, 13:11, 13:24, 14:11, 15:1, 15:9, 16:3, 16:10, 16:17, 16:19, 17:19, 18:9, 19:3, 19:21, 19:23, 20:23, 21:5, 21:24, 22:8, 22:10, 22:21, 23:4, 23:12, 24:15, 24:23, 25:10, 25:14, 26:1, 26:6, 26:8, 27:6, 27:15, 28:7, 28:20, 28:25, 29:3, 29:6, 29:17, 29:21, 30:1, 30:4, 30:10, 30:21, 31:7, 32:13, 32:16, 33:2, 33:9, 34:11, 35:10, 36:10, 36:17, 36:21, 37:9, 37:12, 38:9, 38:18, 39:23, 41:13,

42:5, 42:14, 43:1, 43:20, 44:18, 44:21, 45:4, 45:21, 46:12, 46:22, 47:14, 47:16, 86:10, 86:15, 87:1, 87:4, 87:9, 87:17, 87:22, 89:11, 89:16, 89:19, 90:9, 90:12, 90:18, 90:20, 90:23, 91:1, 91:7, 91:14, 92:3, 92:7, 94:19, 94:23, 95:1, 95:4, 95:10, 95:20, 96:1, 96:8, 97:20, 97:24, 98:13, 98:25, 99:9, 99:21, 100:8, 100:10, 100:21, 102:8, 102:12, 102:17, 102:25, 103:19, 104:17, 105:3, 105:5, 106:2, 106:10, 106:16, 107:4, 108:4, 109:5, 109:8, 109:12, 110:16, 110:19, 111:2, 111:5, 112:1, 112:10, 113:16, 113:18, 128:22, 130:25, 132:6, 132:11, 134:5, 134:7, 134:24, 135:3

**muckier** [1] - 71:20

**must** [16] - 7:9, 8:12, 8:19, 27:21, 29:13, 32:2, 32:19, 54:24, 54:25, 55:8, 57:2, 64:11, 85:8, 91:11, 100:18, 105:16

**muster** [1] - 128:3

# N

**N.W** [1] - 136:11

**nail** [3] - 102:23, 104:14

**name** [1] - 107:17

**named** [2] - 79:15, 83:12

**names** [1] - 3:5

**nation's** [1] - 5:20

**National** [2] - 12:16, 16:5, 16:24, 19:6, 24:10, 24:16, 86:19, 102:18, 110:20

**nationwide** [3] - 11:5, 11:7, 11:9

**natural** [2] - 37:16, 38:14

**nature** [1] - 6:7

**navigability** [7] - 46:1,

76:2, 76:5, 76:25, 77:18, 77:21, 80:7

**navigable** [26] - 8:15, 37:20, 38:21, 38:23, 39:2, 43:3, 47:3, 72:17, 72:24, 73:25, 74:2, 74:6, 74:13, 74:14, 74:25, 75:1, 75:21, 75:22, 75:24, 76:6, 78:3, 78:6, 78:7, 78:8, 78:10

**navigation** [3] - 38:8, 77:4, 77:10

**Navy** [1] - 120:23

**Navy's** [1] - 120:24

**NE** [1] - 1:21

**nearly** [2] - 113:8, 114:24

**necessarily** [4] - 15:17, 38:20, 97:25, 108:9

**necessary** [9] - 41:21, 105:14, 105:20, 110:3, 113:5, 113:6, 117:12, 134:1, 134:3

**need** [16] - 13:15, 13:19, 15:21, 23:24, 23:25, 33:25, 40:24, 56:13, 56:21, 56:22, 68:10, 92:15, 110:2, 113:20, 128:15, 130:22

**needed** [6] - 91:19, 100:8, 100:11, 103:25, 104:1

**needs** [4] - 12:11, 33:12, 103:6, 131:9

**negate** [1] - 62:8

**negligence** [61] - 27:2, 27:7, 27:22, 28:5, 28:11, 29:4, 29:16, 30:8, 50:20, 61:12, 61:24, 62:11, 62:13, 62:14, 62:16, 63:10, 63:18, 63:23, 64:1, 64:2, 64:6, 64:7, 64:8, 64:11, 64:12, 64:14, 64:15, 64:21, 64:23, 66:3, 66:7, 66:8, 66:11, 66:16, 66:25, 67:15, 67:16, 67:21, 68:4, 68:5, 68:6, 68:13, 68:16, 68:20, 69:18, 69:23, 70:3, 70:14, 70:17, 70:18, 70:20, 70:21, 70:25, 72:1, 129:9, 129:10, 129:11

**NEPA** [2] - 9:11, 46:15

**nest** [1] - 15:13

**nesting** [1] - 24:9
**nests** [1] - 68:18
**never** [6] - 24:4, 27:4, 43:15, 69:22, 84:3, 84:25
**new** [4] - 11:6, 12:9, 19:7, 115:12
**New** [11] - 21:22, 22:9, 22:10, 22:11, 29:16, 29:19, 30:5, 101:22, 107:4, 107:6, 131:24
**next** [6] - 11:23, 34:7, 37:12, 43:17, 87:19, 135:9
**nexus** [1] - 32:10
**night** [1] - 135:16
**Ninth** [4] - 30:17, 66:21, 129:17
**NMFS** [4] - 24:13, 24:19, 24:20, 25:12
**no-effect** [2] - 25:19, 25:21
**nobody** [1] - 41:5
**non** [6] - 24:14, 26:15, 34:8, 37:6, 37:13, 124:14
**non-APA** [1] - 124:14
**non-assumable** [3] - 26:15, 34:8, 37:13
**non-assumed** [1] - 24:14
**non-rulemaking** [1] - 37:6
**noncompliance** [1] - 32:5
**nondiscretionary** [1] - 22:7
**none** [2] - 51:25, 93:22
**normally** [1] - 110:10
**North** [1] - 7:7
**Note** [1] - 44:11
**note** [3] - 61:20, 66:4
**notebook** [2] - 87:5, 87:6
**noted** [1] - 18:9
**notes** [1] - 136:5
**nothing** [10] - 31:15, 44:5, 60:22, 61:24, 61:25, 72:6, 94:16, 109:16, 126:15, 130:17
**notice** [22] - 19:23, 25:5, 25:8, 34:23, 35:7, 35:11, 35:18, 37:4, 82:15, 82:17, 83:25, 86:15, 91:23, 97:9, 104:3, 117:10, 117:17, 119:21, 120:7, 120:11,

134:17
**notwithstanding** [1] - 34:17
**now-governing** [1] - 47:6
**NPDES** [1] - 66:20
**nuanced** [1] - 76:22
**null** [1] - 80:10
**Number** [6] - 122:25, 125:10, 125:16, 125:19, 126:1, 126:10
**number** [10] - 4:24, 6:3, 59:16, 88:7, 106:5, 112:13, 116:6, 125:6, 125:25, 126:13
**numbered** [1] - 89:16
**numerical** [4] - 106:7, 106:11, 112:13
**NW** [2] - 2:3, 2:22

## O

**objected** [1] - 125:14
**objections** [2] - 25:6, 25:7
**objective** [1] - 68:7
**objectives** [1] - 112:4
**objects** [1] - 125:12
**obligated** [5] - 99:2, 99:5, 99:8, 111:16
**obligation** [4] - 89:9, 94:2, 102:15, 119:17
**obstruction** [2] - 77:4, 77:5
**obvious** [3] - 85:10, 85:20, 130:3
**obviously** [9] - 4:20, 6:1, 18:5, 18:21, 37:7, 40:13, 61:10, 63:24, 135:7
**occur** [6] - 12:13, 13:3, 14:12, 17:11, 46:15, 106:19
**occurred** [5] - 13:5, 18:15, 19:13, 23:19, 82:15
**occurring** [1] - 93:12
**occurs** [1] - 21:7
**October** [2] - 1:6, 136:7
**odd** [1] - 52:9
**OF** [3] - 1:1, 1:9, 136:1
**off-ramp** [1] - 22:24
**office** [3] - 4:5, 110:24
**Office** [2] - 2:15, 4:3
**OFFICIAL** [1] - 136:1
**Official** [2] - 2:21, 136:10

**often** [2] - 70:6, 81:19
**oftentimes** [1] - 70:16
**Oklahoma's** [1] - 124:9
**old** [1] - 47:10
**omnibus** [1] - 53:21
**once** [4] - 48:25, 71:13, 71:20, 74:25
**one** [62] - 9:16, 13:22, 13:24, 15:13, 17:20, 24:16, 24:21, 25:14, 27:15, 29:6, 30:4, 30:23, 32:19, 34:9, 34:15, 37:4, 39:23, 40:10, 41:7, 41:10, 43:6, 43:18, 44:23, 45:21, 47:18, 47:20, 50:11, 53:23, 64:18, 67:6, 68:13, 77:14, 82:4, 82:19, 84:5, 87:7, 89:8, 89:21, 89:22, 89:23, 90:21, 94:20, 94:23, 99:17, 102:3, 103:7, 105:24, 108:20, 110:20, 121:5, 123:8, 123:16, 124:6, 125:6, 126:13, 126:14, 129:8, 130:13, 133:24, 134:20, 135:9
**one-time** [1] - 108:20
**ones** [7] - 13:23, 71:16, 74:23, 93:20, 97:14, 134:1, 134:2
**ongoing** [1] - 124:1
**online** [1] - 127:18
**Op** [15] - 12:15, 16:4, 51:6, 51:7, 51:11, 51:15, 53:6, 53:9, 53:11, 53:13, 53:14, 53:19, 113:3, 115:20
**open** [2] - 35:25, 120:14
**opening** [3] - 60:24, 61:1, 71:5
**operate** [1] - 13:18
**opinion** [56] - 7:4, 7:10, 7:19, 9:17, 12:12, 12:16, 14:17, 20:7, 20:13, 21:17, 25:18, 25:22, 35:16, 47:20, 47:22, 48:2, 53:5, 87:12, 87:24, 88:6, 88:11, 88:22, 89:6, 89:12, 89:14, 93:11, 93:17, 94:2, 95:12, 95:21, 96:7, 96:23, 98:5, 98:14,

101:1, 103:9, 106:1, 107:7, 107:20, 108:8, 110:14, 110:25, 112:3, 115:5, 115:7, 115:9, 116:7, 116:8, 117:11, 118:14, 127:3, 127:5, 131:4, 131:22, 132:15
**opinions** [8] - 6:6, 13:12, 34:20, 53:1, 53:2, 130:22, 131:2, 131:19
**opportunity** [10] - 17:16, 21:11, 21:19, 35:7, 51:16, 52:3, 53:15, 83:8, 84:4, 114:2
**opposite** [1] - 49:3
**optional** [1] - 97:10
**options** [1] - 22:22
**order** [6] - 8:13, 40:16, 46:8, 49:3, 61:23, 103:17
**ordinarily** [3] - 68:13, 93:24, 96:5
**ordinary** [1] - 95:18
**organizational** [1] - 32:23
**organizations** [3] - 81:18, 133:13
**organize** [1] - 4:21
**original** [1] - 115:11
**originally** [3] - 65:12, 65:13, 65:18
**originated** [1] - 38:12
**otherwise** [2] - 11:8, 128:17
**ought** [1] - 80:25
**outdated** [2] - 45:6, 45:16
**outlier** [1] - 23:8
**outline** [1] - 78:24
**outlines** [1] - 51:7
**outset** [1] - 67:4
**outside** [1] - 36:6
**oversight** [7] - 21:15, 71:19, 98:9, 104:12, 112:19, 113:9, 124:1
**own** [5] - 13:19, 21:24, 22:3, 43:23, 95:20

## P

**P.M** [1] - 1:7
**p.m** [1] - 135:17
**P.O** [1] - 1:20
**page** [3] - 44:11, 44:15, 89:19, 89:20, 90:7, 90:17, 95:6,

115:8, 116:6, 116:8, 116:10, 121:23, 121:24
**pages** [9] - 44:13, 55:18, 61:1, 61:2, 117:19, 121:21, 122:1, 122:7, 127:24
**paint** [1] - 122:16
**panther** [10] - 8:23, 8:25, 14:25, 15:1, 15:2, 15:3, 15:4, 15:7, 106:15, 134:8
**panthers** [1] - 106:25
**paper** [1] - 128:17
**paradigm** [1] - 93:5
**paragraph** [7] - 90:2, 90:8, 90:10, 90:20, 91:2, 91:9, 116:9
**paragraphs** [1] - 60:6
**parallels** [1] - 31:22
**paramount** [1] - 134:17
**paraphrasing** [2] - 52:17, 74:8
**parcel** [1] - 20:5
**parenthetical** [2] - 73:12, 78:13
**part** [8] - 20:5, 24:7, 39:20, 88:2, 113:1, 117:16, 118:20, 130:11
**partial** [1] - 101:14
**participate** [4] - 115:14, 115:20, 116:20, 116:21
**particular** [21] - 6:17, 8:20, 8:24, 9:2, 12:14, 12:23, 13:12, 15:20, 18:14, 25:12, 25:20, 57:9, 62:24, 63:6, 91:11, 103:10, 105:24, 105:25, 106:9, 113:2
**parties** [1] - 84:1
**partly** [1] - 134:8
**parts** [3] - 20:25, 21:17, 80:22
**party** [5] - 20:22, 110:8, 110:11, 124:5, 125:22
**pass** [3] - 52:16, 110:8, 128:3
**passage** [1] - 66:9
**passing** [1] - 37:5
**past** [8] - 6:5, 9:13, 10:12, 38:7, 38:15, 68:20, 72:18, 74:3
**path** [1] - 131:24
**paucity** [2] - 108:15, 131:15

**penalties** [5] - 26:24, 64:24, 65:2, 65:3, 66:6
**people** [5] - 70:16, 70:17, 101:7, 113:25, 135:15
**percent** [1] - 70:2
**perfect** [5] - 12:5, 43:15, 43:16, 84:16, 123:2
**perfection** [2] - 43:18, 44:25
**perform** [1] - 58:13
**perhaps** [7] - 34:12, 34:23, 40:12, 40:25, 83:10, 83:14, 107:11
**period** [10] - 20:8, 34:21, 48:8, 50:15, 56:17, 75:12, 88:5, 91:11, 91:23, 131:20
**perish** [1] - 93:1
**permissible** [1] - 106:12
**permit** [74] - 9:10, 10:25, 11:5, 11:9, 11:11, 13:10, 17:21, 17:24, 18:3, 18:20, 20:12, 21:2, 21:12, 21:18, 22:1, 22:12, 23:22, 23:25, 24:5, 25:15, 27:20, 31:14, 31:18, 33:25, 34:1, 34:5, 51:7, 51:11, 52:15, 52:25, 53:11, 53:16, 59:11, 62:12, 79:20, 85:21, 88:15, 88:17, 94:9, 96:2, 96:3, 96:20, 97:9, 98:2, 98:6, 98:17, 98:20, 98:24, 99:12, 99:14, 99:16, 101:10, 102:2, 103:6, 103:14, 104:3, 104:6, 104:10, 110:17, 110:22, 111:21, 115:2, 117:2, 121:19, 122:1, 122:12, 125:8, 125:12, 125:16, 127:18, 130:15, 131:4
**permit-by-permit** [1] - 79:20
**permits** [44] - 9:10, 9:22, 10:7, 10:8, 10:9, 10:20, 10:22, 10:25, 11:1, 11:7, 11:12, 11:13, 12:17, 14:15, 17:13, 17:14,

17:17, 18:8, 18:9, 18:14, 18:18, 22:23, 26:19, 31:8, 31:10, 31:11, 32:22, 33:3, 33:7, 41:5, 47:25, 53:24, 54:8, 95:12, 96:11, 96:22, 103:23, 106:17, 110:24, 121:15, 125:13, 134:25
**permitted** [5] - 6:5, 11:8, 19:9, 98:19, 134:9
**permittee** [3] - 104:5, 104:9
**permittees** [2] - 17:5, 21:9
**permitting** [34] - 5:24, 6:13, 6:25, 7:14, 7:16, 10:6, 12:19, 12:20, 12:23, 12:25, 13:3, 13:5, 13:7, 14:12, 17:15, 22:24, 31:13, 40:13, 50:20, 54:6, 54:24, 55:2, 58:18, 59:14, 61:23, 70:25, 71:3, 71:13, 72:3, 88:1, 101:11, 131:6, 131:16
**person** [3] - 83:4, 83:5, 102:2
**persuasive** [1] - 43:20
**petition** [1] - 18:24
**phase** [1] - 91:25
**phrase** [5] - 28:15, 38:6, 40:3, 64:6, 74:14
**physical** [1] - 55:4
**picked** [1] - 130:5
**piece** [3] - 50:2, 127:13, 127:14
**pieces** [2] - 57:16, 58:10
**pin** [1] - 55:20
**pinpoint** [1] - 95:13
**pipeline** [1] - 134:14
**pivotal** [1] - 121:8
**place** [11] - 13:12, 47:20, 91:20, 97:7, 100:10, 102:5, 109:4, 112:1, 115:11, 122:19
**placed** [2] - 12:12, 37:6
**places** [4] - 33:15, 37:10, 39:19, 89:21
**plain** [3] - 23:5, 28:21, 81:21
**plainly** [1] - 29:12
**plaintiff** [2] - 17:21,

133:13
**plaintiffs** [40] - 3:8, 3:11, 3:14, 4:22, 12:15, 32:20, 44:4, 51:2, 51:14, 52:3, 52:24, 53:10, 53:15, 54:2, 55:13, 56:9, 56:14, 57:15, 59:2, 62:5, 64:5, 66:20, 77:25, 83:7, 83:8, 86:12, 93:23, 103:1, 109:15, 113:22, 114:12, 114:25, 122:16, 125:8, 125:19, 126:5, 126:15, 128:20, 133:4
**Plaintiffs** [2] - 1:4, 1:14
**plaintiffs'** [9] - 3:6, 4:17, 32:22, 48:24, 50:7, 60:3, 60:25, 61:10, 72:9
**planning** [1] - 107:1
**play** [3] - 63:15, 68:13, 68:23
**plenty** [1] - 114:5
**plus** [1] - 39:16
**podium** [3] - 3:6, 26:2, 44:9
**point** [56] - 10:14, 22:5, 29:6, 29:21, 29:24, 31:22, 42:25, 47:16, 47:18, 49:11, 49:15, 50:8, 50:9, 51:1, 51:24, 56:5, 57:15, 64:17, 65:25, 67:6, 68:3, 68:8, 69:15, 69:20, 70:22, 71:5, 71:15, 72:4, 72:5, 72:6, 75:15, 77:1, 80:1, 81:10, 81:14, 84:6, 84:10, 84:17, 89:9, 89:11, 90:9, 100:16, 103:15, 104:7, 111:6, 121:9, 121:24, 126:23, 127:6, 130:2, 130:20, 131:14, 132:22, 133:18
**pointed** [4] - 12:15, 33:15, 131:6, 131:16
**pointing** [1] - 99:24
**points** [12] - 27:15, 49:7, 49:9, 59:17, 64:16, 75:11, 81:7, 84:5, 114:3, 114:7, 129:7, 132:2
**policies** [1] - 121:7

**policy** [8] - 49:22, 49:23, 71:6, 81:11, 81:19, 81:20, 82:10
**political** [2] - 71:11, 71:12
**pollutant** [2] - 29:10, 56:2
**pollutants** [2] - 54:18, 54:19
**population** [1] - 8:25
**portion** [2] - 6:9, 44:14
**pose** [3] - 11:13, 86:11, 90:5
**position** [22] - 20:2, 20:6, 25:9, 25:25, 27:3, 27:6, 27:13, 30:16, 43:3, 50:19, 69:10, 81:9, 82:8, 82:9, 82:12, 84:1, 112:12, 120:10, 129:9, 130:10, 133:6, 134:10
**possibility** [4] - 41:10, 58:2, 58:8, 75:4
**possible** [4] - 72:3, 106:5, 114:6, 114:9
**possibly** [1] - 20:6
**post** [6] - 59:17, 59:23, 60:22, 61:7, 97:24, 108:7
**post-decisional** [2] - 97:24, 108:7
**posting** [1] - 107:19
**potential** [6] - 55:3, 57:22, 57:25, 58:3, 78:22, 88:12
**potentially** [2] - 24:14, 134:21
**Power** [2] - 38:13, 78:1
**power** [2] - 97:18, 97:19
**practical** [1] - 79:21
**practice** [1] - 17:13
**preamble** [3] - 42:6, 66:12, 67:3
**precedent** [2] - 73:18, 73:19
**precedents** [1] - 38:23
**precise** [1] - 73:10
**precision** [1] - 73:11
**predate** [1] - 66:21
**predict** [1] - 106:20
**preexisting** [1] - 22:3
**preference** [2] - 106:3, 106:4
**prejudice** [1] - 47:19
**prejudicial** [2] - 36:4, 36:6
**preliminarily** [1] -

90:14
**preliminary** [2] - 78:24, 87:8
**prepare** [1] - 43:25
**preponderance** [1] - 28:13
**prescriptive** [2] - 61:21, 63:10
**presence** [1] - 58:8
**Present** [1] - 2:9
**present** [6] - 10:12, 20:9, 34:3, 56:2, 58:6, 114:25
**presentation** [2] - 48:25, 54:12
**presented** [1] - 108:19
**presently** [2] - 37:15, 73:13
**pressing** [1] - 44:17
**presumably** [4] - 42:20, 70:10, 84:23, 134:16
**presumption** [1] - 109:15
**pretty** [8] - 73:2, 83:22, 85:4, 85:10, 85:20, 117:22, 124:10, 133:9
**prevailed** [1] - 133:5
**prevent** [1] - 19:15
**previously** [1] - 35:1
**primarily** [3] - 27:25, 28:20, 126:8
**primary** [3] - 54:15, 68:25, 132:25
**principles** [2] - 126:7, 129:5
**private** [3] - 10:12, 110:8, 110:11
**problem** [14] - 25:5, 25:9, 25:14, 39:20, 40:15, 40:25, 46:22, 55:15, 56:10, 68:1, 74:18, 84:1, 92:20, 125:15
**problematic** [1] - 117:16
**problems** [1] - 25:10
**procedural** [11] - 34:15, 40:12, 40:19, 82:15, 82:22, 93:22, 102:5, 124:6, 124:15, 134:22
**procedurally** [1] - 34:19
**procedures** [3] - 101:13, 109:3, 123:13
**proceed** [1] - 15:15
**proceedings** [2] -

37:7, 136:6

**proceeds** [1] - 125:16

**process** [69] - 14:14, 21:16, 22:11, 22:20, 23:18, 25:22, 27:12, 35:17, 39:12, 43:2, 43:8, 45:6, 45:8, 46:3, 51:8, 51:10, 51:11, 51:23, 52:3, 52:25, 53:12, 53:16, 54:10, 79:9, 79:20, 80:11, 80:13, 80:14, 80:15, 80:17, 80:19, 81:13, 82:17, 88:9, 88:16, 88:21, 88:22, 96:11, 99:22, 100:22, 100:23, 101:12, 107:11, 107:12, 107:13, 108:12, 108:14, 108:17, 109:13, 109:14, 110:14, 111:6, 112:4, 114:24, 115:1, 115:10, 115:15, 116:21, 116:24, 117:11, 117:17, 118:25, 119:22, 119:24, 120:11, 121:21, 125:18, 127:23, 130:16

**process-based** [1] - 88:9

**processes** [2] - 88:14, 91:20

**processing** [1] - 122:5

**produced** [2] - 116:1, 116:2

**profess** [1] - 99:9

**program** [92] - 6:10, 6:14, 6:20, 6:22, 8:13, 9:20, 11:18, 17:5, 20:5, 21:6, 21:25, 22:4, 22:12, 22:15, 24:1, 24:3, 24:9, 25:15, 25:17, 26:9, 26:11, 26:17, 27:16, 30:5, 30:12, 30:14, 30:25, 31:8, 31:15, 31:19, 31:22, 32:17, 32:21, 32:24, 33:23, 41:14, 42:1, 42:3, 49:19, 49:24, 49:25, 50:3, 51:13, 51:21, 51:22, 51:25, 52:2, 54:3, 60:9, 60:12, 60:15, 60:16, 60:18, 61:18, 69:11, 69:12, 71:3, 71:17, 72:3, 87:14, 96:19,

97:2, 103:20, 112:19, 112:21, 115:2, 115:3, 115:14, 116:21, 118:6, 119:6, 119:8, 119:9, 119:12, 119:13, 120:6, 120:21, 120:24, 122:12, 122:13, 122:17, 124:10, 126:14, 127:14, 127:15, 127:16, 127:17, 127:22

**Programmatic** [1] - 120:18

**programmatic** [31] - 6:5, 6:6, 6:12, 7:2, 7:3, 7:10, 7:19, 11:14, 13:12, 13:14, 13:23, 14:17, 23:7, 23:15, 23:19, 24:4, 87:12, 87:24, 88:9, 93:10, 106:1, 120:1, 120:17, 120:22, 120:24, 121:1, 121:6, 130:22, 131:1, 131:3

**programs** [19] - 6:16, 6:19, 7:13, 7:14, 8:1, 8:12, 26:22, 28:8, 30:6, 31:10, 41:12, 49:17, 50:20, 66:21, 66:25, 70:25, 119:14, 121:2, 130:21

**prohibit** [1] - 96:19

**prohibition** [1] - 19:12

**prohibitions** [2] - 33:17

**project** [19] - 12:20, 14:1, 14:2, 15:12, 17:21, 33:13, 33:21, 55:9, 78:22, 79:9, 89:3, 90:15, 102:4, 106:25, 107:21, 110:12, 115:25, 123:11, 126:17

**project-specific** [1] - 89:3

**projection** [1] - 12:20

**projections** [1] - 131:23

**projects** [6] - 46:14, 116:23, 123:7, 133:13, 134:8, 134:12

**promised** [1] - 24:13

**promote** [1] - 107:9

**prompt** [1] - 46:8

**promulgated** [1] -

41:14

**proof** [11] - 28:8, 28:9, 28:10, 28:12, 28:15, 28:18, 28:23, 29:3, 30:18, 50:12, 62:19

**properly** [1] - 87:16

**propose** [1] - 100:1

**proposed** [11] - 22:23, 50:14, 50:17, 50:18, 51:25, 53:2, 53:5, 53:7, 55:3, 58:24, 67:3

**proposes** [2] - 27:11, 125:7

**proposing** [2] - 51:24, 52:7

**prosecution** [2] - 63:21, 71:2

**prosecutions** [4] - 62:10, 69:23, 70:1, 70:3

**prosecutors** [1] - 31:2

**protect** [2] - 109:4, 118:16

**protected** [1] - 22:14

**Protection** [2] - 2:13, 54:6

**protection** [23] - 15:25, 47:4, 92:10, 93:8, 93:14, 94:10, 100:2, 101:18, 101:19, 101:23, 102:3, 102:7, 103:5, 103:18, 103:25, 104:6, 104:11, 104:13, 105:7, 106:15, 106:23, 108:2, 111:8

**protections** [5] - 8:16, 13:15, 93:22, 102:5, 107:3

**protective** [2] - 12:11, 13:4

**protects** [1] - 122:12

**provide** [7] - 16:10, 18:1, 30:24, 33:12, 41:16, 55:9, 59:10, 59:11, 81:12, 88:17, 101:17, 103:5, 103:11, 105:8, 107:12, 111:7, 119:1, 122:18, 126:25

**provided** [7] - 58:23, 61:16, 79:11, 89:4, 118:5, 118:6, 131:13

**provides** [5] - 79:14, 98:2, 101:10, 118:24, 127:7

**providing** [2] - 94:12,

104:10

**provision** [14] - 6:18, 25:20, 26:21, 28:1, 28:21, 36:7, 38:1, 38:10, 56:4, 62:3, 65:7, 65:9, 66:13, 123:5

**provisions** [2] - 52:12, 54:21, 104:2

**prudent** [7] - 105:13, 105:19, 112:15, 112:16, 112:25, 113:3, 113:9

**public** [10] - 36:23, 40:23, 41:22, 44:3, 45:8, 78:21, 91:23, 125:17, 134:15, 134:17

**published** [1] - 82:1

**pure** [1] - 70:3

**purpose** [5] - 74:21, 75:5, 76:19, 96:10

**purposes** [7] - 5:23, 9:23, 20:9, 38:8, 64:14, 74:6, 107:9

**pursuant** [2] - 20:12, 112:18

**pursue** [1] - 63:20

**pursuing** [1] - 62:20

**purview** [1] - 50:24

**push** [1] - 44:1

**pushed** [1] - 44:1

**put** [19] - 7:5, 15:11, 28:18, 65:19, 67:10, 93:23, 96:7, 97:7, 97:13, 100:10, 102:12, 103:1, 107:17, 115:11, 118:3, 118:13, 130:10, 133:6, 135:9

**puts** [3] - 94:8, 98:3, 126:18

**putting** [4] - 45:20, 70:6, 80:25, 102:22

## Q

**qualify** [1] - 34:1

**quality** [19] - 33:9, 33:11, 33:13, 33:14, 34:3, 54:4, 54:19, 55:7, 55:10, 55:11, 55:25, 56:3, 56:11, 56:17, 57:25, 58:2, 58:3, 58:9, 121:20

**quantifying** [1] - 106:3

**questions** [25] - 9:15, 13:25, 14:5, 26:3, 31:5, 36:12, 36:13, 50:9, 50:11, 69:5,

79:12, 79:17, 86:2, 91:10, 91:17, 91:23, 113:13, 113:14, 114:6, 114:8, 114:10, 120:19, 122:22, 128:8, 128:11

**quick** [1] - 5:12

**quicker** [1] - 31:2

**quickest** [1] - 122:19

**quickly** [3] - 43:7, 114:15, 127:17

**quite** [1] - 99:17

**quote** [1] - 112:8

## R

**raise** [4] - 36:3, 36:13, 59:16, 134:22

**raised** [3] - 69:1, 114:16, 120:20

**raises** [1] - 101:5

**raising** [1] - 40:18

**ramp** [1] - 22:24

**RANDOLPH** [1] - 1:10

**range** [1] - 63:24

**rather** [3] - 19:14, 33:21, 49:2

**rational** [1] - 59:10

**rationalizations** [1] - 59:17

**rea** [4] - 61:12, 61:24, 67:1, 68:4

**reached** [1] - 130:23

**reaches** [1] - 76:23

**read** [10] - 7:21, 39:13, 39:14, 62:7, 64:1, 64:10, 67:11, 88:19, 127:4

**readily** [1] - 45:7

**reading** [8] - 16:7, 41:9, 55:16, 56:25, 64:18, 65:25, 67:8, 126:12

**reads** [1] - 82:2

**real** [5] - 14:17, 69:17, 92:20, 127:18, 134:13

**real-time** [1] - 127:18

**real-world** [1] - 69:17

**reality** [3] - 23:21, 71:11, 79:22

**realize** [2] - 59:2, 108:6

**really** [22] - 38:9, 40:20, 52:6, 54:13, 56:7, 59:4, 59:14, 60:2, 64:3, 64:24, 71:10, 78:11, 86:24, 93:11, 94:12,

100:12, 105:23,
106:8, 107:8,
109:15, 121:8,
135:10
**reason** [6] - 40:20,
44:7, 52:4, 71:1,
85:1, 120:16
**reasonable** [26] -
28:14, 31:18, 31:24,
33:5, 33:10, 33:12,
33:20, 34:6, 37:16,
45:6, 45:8, 48:3,
55:9, 59:25, 60:5,
75:25, 85:4, 105:13,
105:19, 108:22,
112:12, 112:15,
112:16, 112:25,
113:2, 113:9
**reasonably** [2] -
10:18, 50:2
**reasoning** [2] - 37:3,
51:6
**reasons** [5] - 41:7,
41:10, 61:6, 64:18,
99:17
**reassess** [1] - 12:10
**rebuttal** [3] - 5:6,
113:22, 114:12
**receipt** [1] - 91:5
**receive** [3] - 23:22,
98:23, 111:21
**received** [2] - 91:21,
118:12
**receives** [2] - 98:2,
125:10
**receiving** [4] - 55:10,
90:12, 90:21, 115:23
**recent** [1] - 23:16
**recess** [1] - 48:19
**recognize** [1] - 6:21
**recognized** [2] - 88:3,
106:5
**recognizing** [1] -
108:20
**recommendations** [4]
- 80:23, 81:13,
81:15, 81:19
**record** [26] - 3:5,
17:20, 17:23, 30:11,
44:12, 44:15, 54:16,
69:25, 72:6, 75:9,
75:12, 75:18, 77:11,
77:18, 80:3, 80:13,
83:1, 83:2, 97:25,
108:11, 111:15,
117:19, 117:21,
118:20, 118:21,
132:6
**records** [2] - 75:14,
83:3

**recreational** [1] -
133:14
**red** [2] - 15:22, 81:17
**reevaluate** [1] -
127:10
**refer** [3] - 38:4, 55:18,
121:17
**reference** [7] - 38:1,
38:2, 44:12, 52:13,
54:13, 58:21, 63:22
**referenced** [3] - 29:10,
61:21, 109:10
**referred** [4] - 37:1,
37:5, 37:9, 89:1
**referring** [1] - 80:4
**refine** [1] - 102:24
**reflects** [3] - 75:10,
75:12, 117:23
**refused** [1] - 9:9
**reg** [13] - 28:6, 28:19,
54:23, 62:2, 62:3,
62:4, 65:12, 65:13,
65:19, 65:25, 66:2,
66:4
**regard** [5] - 5:7, 30:11,
114:17, 118:16,
126:16
**regarding** [3] - 32:3,
91:10, 113:9
**regardless** [1] - 31:21
**regime** [4] - 36:24,
57:14, 59:14, 70:16
**region** [1] - 106:25
**regs** [8] - 53:18,
54:22, 54:24, 58:5,
66:10, 67:8, 71:8,
84:7
**regular** [1] - 27:12
**regularity** [1] - 109:15
**regularly** [1] - 79:7
**regulated** [3] - 41:22,
46:23, 88:7
**regulating** [2] - 49:12,
88:4
**regulation** [15] - 28:8,
28:17, 42:6, 50:13,
52:9, 63:4, 63:5,
66:12, 66:19, 67:11,
74:5, 79:2, 84:8,
120:2
**regulations** [35] - 9:9,
11:4, 17:2, 23:6,
23:17, 30:24, 40:21,
41:14, 51:13, 51:15,
51:17, 52:1, 52:6,
52:14, 54:17, 55:17,
55:24, 56:25, 57:11,
57:21, 58:19, 63:25,
64:18, 66:15, 84:11,
96:17, 96:18, 98:9,

109:18, 114:21,
114:22, 117:14,
121:18, 122:18,
135:9
**Regulations** [1] -
65:22
**regulatory** [7] - 6:18,
41:8, 53:12, 54:20,
62:5, 66:1, 68:11
**Reichert** [3] - 3:11,
87:10, 132:3
**REICHERT** [43] - 1:15,
3:10, 4:23, 5:5, 5:11,
5:15, 5:25, 6:8, 7:5,
7:17, 8:5, 8:10,
10:10, 11:3, 12:4,
13:11, 13:24, 14:11,
15:1, 15:9, 16:3,
16:10, 16:17, 16:19,
17:19, 18:9, 19:3,
19:21, 19:23, 20:23,
21:5, 21:24, 22:8,
22:10, 22:21, 23:4,
23:12, 24:15, 24:23,
25:10, 25:14, 26:1,
26:6
**Reichert's** [1] - 99:11
**reinforced** [1] - 96:17
**reinitiate** [1] - 19:6
**reinitiation** [3] - 12:8,
17:8, 98:20
**rejected** [1] - 109:20
**relate** [1] - 69:1
**related** [1] - 31:14
**relates** [1] - 29:9
**relationship** [1] -
36:22
**relevant** [1] - 60:21
**reliance** [2] - 6:6,
25:11
**relied** [6] - 23:8, 24:7,
24:25, 25:18, 34:20,
38:22
**relief** [1] - 134:11
**relies** [1] - 31:17
**rely** [3] - 32:6, 45:15,
133:20
**relying** [6] - 28:19,
28:21, 31:23, 33:4,
45:6, 55:13
**remained** [1] - 39:10
**remaining** [3] - 8:24,
35:9, 134:12
**remedies** [3] - 63:6,
134:25, 135:1
**remedy** [2] - 40:15,
46:19
**remember** [3] - 16:7,
126:12, 133:3
**reminded** [1] - 44:7

**remotely** [1] - 80:6
**remove** [1] - 46:12
**removed** [2] - 75:13,
94:11
**render** [1] - 53:14
**rendering** [1] - 53:2
**renders** [1] - 53:5
**reopened** [1] - 98:21
**repeating** [1] - 57:6
**reply** [4] - 44:10,
47:22, 55:19, 125:4
**report** [4] - 18:10,
82:1, 82:3, 82:5
**Reporter** [3] - 2:20,
2:21, 136:10
**REPORTER** [1] -
136:1
**reporter** [3] - 48:17,
88:13, 124:20
**reporting** [1] - 18:1
**reports** [2] - 116:1,
116:3
**represent** [1] - 5:15
**representative** [1] -
81:1
**represented** [1] - 7:24
**request** [1] - 88:3
**requested** [1] - 86:17
**require** [20] - 12:5,
13:4, 14:8, 17:10,
31:12, 33:23, 40:21,
43:18, 57:4, 58:12,
62:24, 68:6, 84:11,
95:17, 109:8,
112:17, 117:14,
123:2, 129:15
**required** [40] - 9:10,
9:17, 10:17, 13:17,
13:21, 14:6, 14:15,
14:23, 17:1, 18:12,
19:7, 23:2, 23:22,
23:23, 24:1, 25:15,
28:9, 28:10, 28:24,
29:1, 30:13, 31:3,
31:25, 44:25, 60:7,
60:15, 60:16, 60:18,
67:12, 83:23, 94:1,
107:17, 109:22,
111:18, 111:20,
111:24, 129:18,
131:9, 131:10,
131:12
**requirement** [19] -
21:21, 41:11, 50:20,
52:24, 53:12, 58:1,
59:6, 61:13, 61:25,
67:1, 67:12, 67:17,
68:4, 70:25, 85:1,
109:2, 122:14,
133:21, 133:22

**requirements** [20] -
6:24, 12:8, 14:18,
18:10, 21:8, 21:9,
31:18, 33:22, 36:22,
41:15, 49:20, 50:4,
53:24, 60:13, 63:5,
82:19, 96:5, 121:16,
123:6, 126:11
**requires** [15] - 12:6,
13:7, 17:6, 19:12,
26:22, 30:25, 31:2,
31:9, 31:15, 35:7,
47:23, 61:12, 63:2,
119:7, 130:18
**requiring** [1] - 33:5
**reserve** [1] - 5:5
**reside** [1] - 14:3
**resolve** [1] - 125:11
**resolved** [1] - 42:16
**resource** [2] - 115:2,
122:11
**respect** [20] - 11:22,
14:24, 15:4, 15:8,
15:25, 24:13, 40:14,
41:5, 42:25, 50:21,
55:14, 63:5, 63:24,
71:12, 79:4, 95:18,
99:4, 117:10,
130:19, 134:20
**respond** [1] - 91:25
**responding** [2] -
60:24, 60:25
**response** [9] - 43:10,
56:5, 60:1, 60:10,
61:5, 70:23, 91:16,
91:17, 130:20
**responsibility** [2] -
71:13, 102:19
**responsible** [2] -
27:25, 98:7
**rest** [2] - 57:19, 68:24
**restrictions** [2] -
15:15, 16:2
**result** [5] - 10:9,
15:12, 39:9, 88:4,
133:5
**resulted** [2] - 43:7,
120:9
**retain** [3] - 8:14,
37:22, 40:5
**retained** [61] - 34:7,
37:14, 38:1, 38:19,
39:14, 39:15, 40:9,
40:14, 40:17, 41:17,
42:10, 42:18, 42:22,
43:4, 43:8, 44:1,
44:5, 45:13, 47:12,
72:10, 72:13, 72:25,
73:3, 73:4, 74:12,
77:8, 78:2, 78:5,

78:14, 78:18, 78:23,
79:4, 79:16, 80:16,
80:17, 80:24, 80:25,
81:3, 81:5, 81:21,
81:23, 82:14, 82:17,
82:22, 83:4, 83:13,
83:16, 83:19, 84:11,
85:5, 85:13, 85:15,
85:19, 114:15,
122:22, 122:23,
123:2, 129:20,
129:21
**retains** [4] - 39:3,
39:14, 40:1, 42:3
**revert** [1] - 67:7
**review** [31] - 17:15,
17:16, 23:22, 24:12,
46:15, 50:22, 51:8,
51:11, 52:25, 53:11,
53:16, 69:25, 89:5,
89:7, 90:13, 93:18,
95:11, 96:2, 96:3,
98:24, 99:23, 100:3,
100:20, 103:24,
104:21, 111:21,
118:4, 121:25,
122:6, 122:8, 125:24
**reviewed** [2] - 60:11,
91:21
**reviews** [5] - 98:2,
100:4, 104:19,
122:8, 128:1
**revision** [2] - 27:9,
27:10
**RHA** [2] - 74:6, 79:24
**rings** [1] - 61:8
**rise** [2] - 34:3, 94:2
**risk** [4] - 15:11, 15:21,
72:4, 99:6
**risking** [1] - 15:23
**risks** [1] - 9:20
**River** [1] - 76:12
**rivers** [1] - 123:4
**Rivers** [12] - 5:1, 5:17,
37:21, 37:23, 38:2,
38:24, 39:7, 45:23,
46:5, 73:23, 74:13,
85:4
**RMR** [2] - 2:20, 136:9
**roadmap** [1] - 5:12
**robust** [3] - 69:12,
117:19
**Room** [2] - 2:21,
136:10
**room** [1] - 101:7
**round** [1] - 126:24
**rule** [25] - 7:8, 7:12,
36:4, 36:5, 47:4,
47:10, 48:6, 50:14,
50:17, 50:18, 56:10,

56:15, 57:2, 57:3,
57:4, 57:13, 67:3,
67:9, 67:10, 85:1,
96:19, 97:2, 109:19,
112:21, 121:1
**ruled** [1] - 119:20
**rulemaking** [10] -
35:1, 36:13, 36:18,
36:25, 37:2, 37:6,
37:9, 120:8, 120:9
**rules** [6] - 20:4, 36:24,
57:7, 95:19, 102:5,
110:4
**run** [7] - 33:22, 73:16,
73:22, 92:23, 93:1,
93:4
**running** [1] - 111:10
**runoff** [1] - 16:1
**rushed** [1] - 114:2
**rushing** [1] - 69:14

# S

**Sackett** [1] - 47:13
**safe** [1] - 91:22
**safeguard** [2] - 51:8,
54:11
**San** [1] - 2:7
**sandwiched** [1] - 60:6
**satisfied** [3] - 6:25,
50:3, 113:10
**satisfies** [3] - 49:19,
102:20, 104:25
**satisfy** [1] - 53:24
**scenario** [4] - 108:16,
110:23, 111:3, 124:2
**scheme** [1] - 94:11
**science** [2] - 23:23,
131:10
**scientific** [4] - 95:19,
96:4, 107:23, 111:24
**scope** [6] - 47:4, 62:3,
74:12, 79:16, 80:24,
81:21
**score** [1] - 32:22
**scores** [1] - 44:3
**scratch** [2] - 80:17,
81:5
**sea** [4] - 8:22, 23:6,
24:9, 119:4
**seat** [1] - 89:22
**Second** [4] - 6:23,
109:20, 120:25
**second** [17] - 17:1,
26:14, 34:2, 49:15,
54:5, 62:23, 84:2,
90:2, 90:9, 90:11,
99:18, 103:16,
113:19, 116:10,
118:9, 124:3, 131:7

**secondary** [1] - 122:9
**secretary** [12] - 42:3,
82:2, 82:9, 105:8,
105:14, 105:20,
109:24, 110:2,
110:15, 113:5, 113:6
**section** [3] - 61:16,
73:12, 122:5
**Section** [61] - 5:23,
6:4, 7:13, 19:11,
19:21, 21:13, 22:23,
23:2, 26:21, 27:1,
27:19, 29:7, 29:8,
29:9, 29:10, 29:11,
29:14, 31:9, 32:1,
37:14, 45:23, 49:17,
49:18, 50:19, 52:13,
54:23, 61:15, 61:20,
61:23, 71:2, 72:14,
72:16, 72:21, 73:3,
74:11, 78:6, 80:2,
80:6, 80:7, 80:9,
80:10, 81:22, 81:24,
82:11, 85:21, 88:1,
88:15, 88:18,
102:21, 104:25,
110:17, 112:5,
116:24, 120:5,
122:6, 129:10
**sections** [4] - 58:20,
60:19, 60:20, 61:22
**sedimentation** [1] -
74:24
**see** [20] - 6:8, 16:15,
22:16, 28:22, 38:17,
41:9, 48:18, 53:19,
65:7, 68:21, 81:19,
82:21, 85:23, 89:5,
90:4, 101:3, 111:20,
116:18, 127:18,
130:25
**seeing** [1] - 90:16
**seek** [4] - 65:8, 65:9,
85:21, 134:11
**seem** [3] - 6:3, 44:13,
128:2
**sees** [2] - 99:6, 100:17
**Sefranek** [3] - 2:20,
136:9, 136:9
**SEFRANEK** [1] -
136:3
**selective** [1] - 55:16
**send** [2] - 46:20, 93:17
**sending** [1] - 110:7
**sends** [1] - 93:24
**sense** [3] - 12:1, 28:1,
49:24
**sensitive** [1] - 134:18
**sent** [1] - 18:1
**sentence** [3] - 60:25,

64:25, 91:9
**sentences** [3] - 60:4,
60:5, 61:2
**separate** [4] - 35:11,
45:25, 126:20,
133:19
**separately** [2] - 41:19,
42:7
**sequence** [2] -
121:25, 122:7
**series** [2] - 31:14,
133:13
**serious** [1] - 94:12
**serve** [1] - 133:1
**served** [1] - 80:22
**Service** [107] - 9:3,
9:7, 10:17, 12:17,
13:16, 14:7, 14:15,
16:5, 16:20, 16:25,
17:3, 18:2, 19:5,
19:6, 23:5, 23:17,
23:21, 24:3, 24:11,
24:17, 44:14, 50:22,
52:8, 52:18, 52:20,
53:5, 86:19, 87:23,
87:25, 88:3, 88:8,
88:16, 88:24, 89:4,
89:5, 89:6, 89:24,
91:4, 91:10, 91:16,
91:19, 91:20, 91:22,
91:24, 92:1, 92:17,
92:18, 93:16, 94:14,
94:17, 95:11, 95:17,
96:1, 96:7, 96:14,
97:8, 97:15, 97:19,
98:2, 98:11, 99:2,
99:8, 100:3, 100:4,
100:15, 100:17,
100:24, 100:25,
101:19, 101:22,
101:24, 102:1,
102:6, 102:17,
102:18, 103:4,
103:8, 103:16,
103:24, 104:9,
104:18, 104:21,
104:22, 106:14,
107:2, 107:16,
107:21, 110:6,
110:19, 110:20,
110:22, 111:16,
112:22, 115:6,
115:19, 116:1,
116:21, 116:23,
117:5, 117:20,
118:12, 118:15,
130:15, 130:17,
130:18, 131:17
**Service's** [2] - 24:8,
98:5

**Services** [1] - 97:5
**set** [16] - 8:12, 11:7,
78:7, 79:3, 80:10,
81:19, 87:18, 94:14,
97:2, 101:16, 104:1,
107:13, 113:12,
118:23, 123:13
**setbacks** [1] - 116:4
**sets** [2] - 105:15,
110:3
**setting** [1] - 107:11
**settings** [1] - 69:21
**settled** [1] - 83:20
**seven** [1] - 116:13
**several** [1] - 121:21
**shall** [8] - 28:8, 28:25,
54:25, 55:2, 65:8,
67:13, 82:12, 105:8
**share** [1] - 103:23
**shifted** [1] - 22:12
**shifts** [1] - 74:24
**short** [2] - 55:3, 88:13
**short-term** [1] - 55:3
**shortcuts** [1] - 43:6
**shorter** [2] - 30:22,
31:1
**shove** [1] - 44:1
**show** [5] - 17:25,
25:15, 31:10, 47:25,
77:11
**showing** [3] - 62:10,
63:21, 68:7
**shown** [1] - 47:19
**shows** [3] - 16:4,
43:23, 45:17
**sic** [1] - 64:2
**sic]** [1] - 106:23
**side** [12] - 44:2, 57:1,
64:4, 79:1, 85:24,
92:24, 93:1, 123:8,
127:8, 128:3
**side-by-side** [1] -
127:8
**sides** [1] - 123:12
**signed** [1] - 127:12
**significant** [5] - 75:4,
92:21, 116:1, 116:2,
121:13
**similar** [12] - 5:23,
7:15, 7:16, 8:2, 36:7,
55:13, 108:14,
108:19, 109:21,
112:4, 124:11,
131:15
**similarly** [1] - 18:2
**Simma** [1] - 4:3
**SIMMA** [1] - 2:15
**simple** [18] - 27:2,
27:7, 27:22, 28:10,
29:4, 29:16, 30:7,

61:12, 61:24, 64:15, 66:16, 66:25, 68:5, 69:18, 69:23, 70:3, 114:24, 129:11
**simply** [5] - 10:2, 40:16, 40:22, 46:20, 64:7
**single** [4] - 23:8, 60:4, 84:18, 106:14
**single-spaced** [1] - 60:4
**sit** [1] - 109:6
**site** [2] - 23:7, 23:15
**site-specific** [2] - 23:7, 23:15
**situation** [11] - 41:3, 46:13, 47:8, 48:5, 108:14, 116:14, 120:18, 121:5, 123:15, 131:6, 133:10
**size** [2] - 14:1, 122:25
**skip** [2] - 90:20, 91:1
**skipped** [1] - 104:8
**slightly** [1] - 38:6
**Slope** [1] - 7:7
**small** [2] - 69:19, 71:11
**snail** [6] - 92:19, 92:20, 92:21, 92:24, 92:25, 93:4
**snake** [4] - 13:25, 15:9, 15:10, 15:13
**snakes** [3] - 14:3, 15:12, 15:13
**solely** [1] - 76:6
**solid** [1] - 119:12
**someone** [9] - 44:16, 67:21, 76:16, 93:25, 94:10, 95:24, 96:6, 97:17, 102:6
**somewhere** [1] - 101:3
**sorry** [15] - 15:2, 31:10, 54:23, 55:1, 63:22, 85:11, 90:16, 90:19, 100:9, 100:11, 112:7, 116:12, 118:1, 118:18, 120:2
**sort** [18] - 15:16, 25:2, 37:25, 53:5, 53:21, 61:7, 61:24, 70:3, 72:23, 75:7, 77:9, 80:16, 92:9, 93:5, 93:20, 101:5, 120:18, 128:5
**sorts** [1] - 127:25
**soundly** [1] - 36:18
**source** [1] - 6:2

**South** [2] - 123:22, 132:23
**southwest** [1] - 8:23
**Southwest** [2] - 2:9, 3:18
**spaced** [1] - 60:4
**spare** [1] - 128:11
**speaking** [1] - 124:20
**speaks** [1] - 67:11
**Species** [35] - 4:25, 5:13, 5:17, 6:9, 6:11, 6:24, 9:8, 10:11, 12:5, 15:24, 18:12, 20:24, 21:25, 22:2, 22:20, 23:5, 24:6, 26:3, 49:2, 92:11, 93:10, 96:16, 107:9, 107:14, 108:18, 109:1, 111:19, 111:25, 113:1, 113:10, 129:2, 130:12, 130:19, 131:13, 132:1
**species** [79] - 8:17, 8:21, 8:25, 9:2, 9:13, 10:3, 10:9, 10:14, 10:21, 11:23, 11:25, 12:1, 12:23, 12:25, 13:2, 13:13, 14:13, 15:5, 15:11, 15:16, 15:17, 15:18, 16:6, 16:21, 17:9, 19:17, 22:4, 22:12, 22:14, 23:24, 23:25, 24:10, 24:20, 25:16, 26:19, 48:1, 51:9, 52:21, 53:3, 54:11, 88:13, 90:14, 92:21, 93:12, 94:13, 94:24, 95:2, 96:12, 96:21, 99:7, 103:9, 105:12, 105:13, 105:15, 105:24, 105:25, 106:9, 109:4, 109:9, 109:25, 111:8, 112:18, 112:22, 115:14, 117:15, 118:4, 118:16, 119:8, 119:11, 119:15, 119:16, 119:25, 120:5, 131:11, 131:12, 134:21
**species-specific** [1] - 14:13
**specific** [15] - 14:13, 23:7, 23:15, 33:3, 40:8, 44:4, 60:7, 65:9, 67:9, 78:15, 79:18, 89:3, 99:16,

107:10, 116:3
**specifically** [5] - 40:4, 65:6, 100:23, 108:23, 112:14
**specifics** [1] - 50:7
**specified** [2] - 78:9, 105:18
**specifies** [3] - 105:12, 105:13, 105:19
**specify** [1] - 113:4
**speculative** [1] - 125:3
**spell** [2] - 39:21, 40:21
**spelled** [5] - 41:9, 41:11, 80:13, 101:20, 121:20
**spent** [1] - 72:10
**spoken** [1] - 109:12
**sponte** [2] - 124:8, 124:13
**spot** [2] - 98:16, 122:4
**Square** [1] - 1:21
**staff** [1] - 135:5
**stage** [2] - 127:9, 128:4
**stand** [2] - 23:18, 86:13
**stand-in** [1] - 23:18
**standalone** [2] - 7:12, 36:7
**standard** [34] - 29:15, 30:7, 30:13, 30:19, 31:3, 31:20, 34:3, 50:12, 57:25, 58:2, 58:4, 58:9, 62:21, 63:10, 64:9, 66:8, 68:8, 69:18, 69:19, 70:13, 70:17, 70:18, 71:9, 94:17, 96:14, 100:17, 107:23, 109:10, 116:23, 117:1, 132:14, 132:16, 132:17
**standards** [21] - 6:18, 8:12, 49:16, 54:4, 54:20, 55:11, 55:25, 56:3, 56:12, 58:25, 59:1, 61:16, 62:24, 93:19, 96:4, 96:10, 101:13, 102:21, 108:13, 112:5, 129:5
**standing** [32] - 32:14, 50:18, 66:18, 67:2, 69:10, 69:16, 81:9, 114:16, 123:20, 123:25, 124:5, 124:13, 124:14, 124:19, 126:2, 126:4, 126:5, 126:7, 126:15, 126:20, 126:21, 127:10,

128:4, 132:12, 132:16, 133:12, 133:18, 133:19, 133:20, 134:19, 134:22
**stands** [1] - 7:18
**start** [12] - 4:22, 5:12, 25:12, 26:20, 43:17, 50:10, 80:17, 86:12, 87:5, 94:21, 134:6, 134:7
**start-from-scratch** [1] - 80:17
**started** [3] - 43:2, 46:1, 87:4
**starting** [3] - 3:6, 51:2, 57:1
**starts** [2] - 89:20, 90:21
**state** [131] - 3:5, 6:6, 6:13, 7:15, 8:12, 9:5, 9:21, 9:25, 10:4, 10:6, 10:7, 10:13, 10:20, 10:21, 11:2, 11:23, 14:16, 14:18, 17:4, 20:21, 21:6, 21:24, 22:4, 26:11, 26:14, 26:22, 27:20, 27:21, 28:8, 28:24, 30:24, 31:9, 31:10, 31:17, 31:22, 31:23, 32:18, 32:19, 37:13, 39:4, 39:6, 39:10, 39:17, 40:2, 40:6, 40:23, 41:4, 41:16, 41:25, 42:2, 42:12, 42:24, 45:1, 45:5, 45:10, 45:13, 46:13, 46:24, 47:9, 47:12, 48:13, 49:13, 49:16, 49:19, 49:21, 50:19, 54:7, 54:17, 55:11, 58:5, 58:12, 58:13, 58:24, 60:13, 61:12, 61:16, 61:18, 62:9, 62:15, 62:19, 63:2, 63:11, 63:20, 66:7, 66:25, 67:13, 68:1, 69:11, 69:12, 71:2, 71:16, 72:2, 79:1, 79:22, 81:6, 84:19, 84:25, 88:14, 88:17, 90:24, 91:14, 93:24, 96:11, 96:18, 97:16, 97:18, 101:10, 101:15, 102:1, 112:20, 114:18, 116:2, 116:21, 118:3, 119:6, 120:10, 121:2,

122:12, 122:15, 123:1, 123:22, 129:1, 130:16, 132:23, 133:21
**State** [13] - 4:11, 6:10, 6:13, 6:18, 21:9, 24:8, 88:17, 89:2, 91:24, 96:19, 96:20, 109:19, 115:14
**state's** [2] - 46:25, 60:12
**state-assumed** [1] - 46:13
**state-issued** [1] - 96:11
**Statement** [9] - 6:12, 7:3, 14:23, 106:4, 106:6, 107:8, 112:11, 112:17, 118:14
**statement** [3] - 98:20, 103:8, 105:11
**statements** [1] - 37:8
**STATES** [2] - 1:1, 1:10
**States** [16] - 2:21, 18:6, 18:21, 37:15, 41:25, 42:2, 47:2, 47:7, 48:23, 72:17, 73:25, 74:15, 75:21, 75:23, 75:24, 95:24
**states** [18] - 7:1, 22:22, 27:16, 27:23, 29:13, 29:23, 30:4, 32:2, 49:11, 61:17, 61:22, 70:24, 78:7, 81:17, 87:13, 112:4
**statewide** [1] - 22:23
**static** [1] - 78:16
**status** [7] - 9:12, 10:14, 23:24, 24:12, 36:12, 36:16, 42:11
**statute** [26] - 10:24, 30:21, 30:22, 30:24, 31:1, 39:21, 39:24, 40:20, 49:14, 61:13, 62:23, 63:2, 63:9, 71:7, 71:8, 83:23, 84:8, 92:13, 92:14, 94:4, 101:10, 102:12, 102:14, 103:17, 105:2, 109:23
**statutes** [3] - 62:1, 121:3, 130:10
**statutory** [8] - 32:18, 39:19, 40:22, 53:12, 61:19, 73:2, 123:6, 128:25
**stayed** [1] - 135:5
**stems** [1] - 32:24

**stenographic** [1] - 136:5
**step** [7] - 49:6, 71:9, 71:22, 94:12, 103:15, 103:16, 124:16
**steps** [1] - 89:25
**still** [15] - 13:17, 31:23, 35:6, 35:18, 46:17, 73:17, 74:18, 75:1, 83:12, 83:13, 86:20, 95:15, 128:10, 131:5
**stood** [1] - 81:15
**stop** [2] - 80:11, 80:12
**stream** [1] - 121:1
**Street** [3] - 1:21, 2:3, 2:6
**strikes** [4] - 40:11, 68:12, 70:7, 93:6
**stringent** [3] - 30:25, 31:1, 60:17
**strong** [1] - 8:16
**strongly** [1] - 80:2
**structure** [4] - 87:17, 102:15, 103:21, 120:25
**structures** [1] - 97:4
**studies** [6] - 25:2, 76:5, 77:18, 77:21, 127:25
**study** [1] - 80:7
**sua** [2] - 124:8, 124:13
**sub** [3] - 53:22, 54:1, 57:9
**sub-arguments** [2] - 53:22, 54:1
**sub-issue** [1] - 57:9
**subcommittee** [8] - 80:20, 80:21, 80:23, 81:2, 81:10, 81:12, 81:16, 130:2
**subject** [6] - 43:11, 79:25, 83:18, 93:9, 108:1, 119:21
**subjective** [1] - 31:20
**submission** [7] - 26:17, 29:18, 51:21, 54:15, 63:14, 68:25
**submit** [11] - 14:23, 42:8, 43:5, 50:4, 51:6, 56:22, 58:13, 91:10, 91:23, 125:8, 128:19
**submittal** [2] - 53:14, 90:13
**submitted** [10] - 24:19, 35:14, 50:3, 51:4, 83:1, 83:21, 117:18, 125:17,

127:12, 129:14
**submitting** [1] - 17:15
**subparagraph** [3] - 62:7, 62:8, 62:17
**subpart** [2] - 32:1, 55:6
**subsequent** [3] - 42:3, 65:21, 108:21
**subset** [2] - 78:6, 78:8
**substance** [1] - 25:8
**substantial** [5] - 59:21, 70:8, 88:6, 107:15, 126:8
**substantive** [13] - 31:21, 34:15, 35:15, 40:12, 51:14, 52:24, 58:24, 58:25, 66:12, 124:7, 124:15, 126:20, 126:21
**substitute** [1] - 107:13
**sue** [4] - 94:6, 95:24, 96:6, 117:8
**sued** [1] - 19:4
**suffice** [1] - 129:9
**suffices** [1] - 63:18
**sufficiency** [3] - 32:17, 32:20
**sufficient** [8] - 16:22, 42:8, 58:23, 92:3, 92:6, 93:2, 100:5, 113:1
**suit** [1] - 18:25
**suit-type** [1] - 18:25
**Suite** [2] - 1:17, 2:6
**summarize** [1] - 73:23
**summarizes** [2] - 53:8, 127:7
**summary** [14] - 4:17, 4:18, 4:19, 50:5, 53:11, 127:8, 128:4, 132:13, 132:16, 132:19
**summation** [2] - 114:21, 121:18
**summer** [1] - 124:4
**super** [2] - 119:2, 135:6
**super-important** [1] - 119:2
**supplement** [2] - 43:25, 83:6
**supplemental** [1] - 126:25
**support** [3] - 8:21, 54:8, 58:17
**supported** [1] - 36:18
**suppose** [2] - 36:2, 43:9
**supposed** [9] - 9:24, 46:9, 81:9, 89:3,

99:23, 100:1, 103:17, 107:24, 119:5
**supremacy** [1] - 51:18
**Supreme** [11] - 36:15, 38:10, 69:22, 73:18, 73:19, 74:15, 119:3, 119:9, 119:20, 121:7, 126:7
**surprising** [1] - 52:23
**surreply** [3] - 59:18, 69:10, 77:25
**surveillance** [1] - 124:23
**susceptible** [8] - 37:15, 38:14, 73:7, 73:9, 73:13, 74:8, 75:5, 77:6
**system** [6] - 64:12, 67:25, 68:1, 130:14, 131:7, 133:5
**systematic** [1] - 103:8
**systems** [1] - 13:17

## T

**TA** [2] - 23:18, 25:22
**table** [2] - 4:3, 122:4
**tainted** [1] - 25:20
**takings** [1] - 87:15
**talks** [1] - 64:19
**TAMARA** [1] - 136:3
**Tamara** [3] - 2:20, 136:9, 136:9
**TANIA** [1] - 1:14
**tania** [1] - 3:7
**team** [1] - 115:15
**Technical** [1] - 45:3
**technical** [20] - 14:14, 21:16, 35:17, 48:16, 51:12, 54:10, 87:14, 88:15, 88:21, 88:22, 96:10, 108:12, 108:17, 109:13, 111:6, 112:3, 115:9, 115:10, 115:15, 121:5
**technology** [1] - 6:18
**ten** [2] - 48:12, 48:18
**tens** [1] - 84:20
**term** [8] - 55:3, 62:13, 62:14, 74:1, 88:13, 104:5, 115:18
**terminated** [1] - 46:2
**terms** [24] - 10:17, 12:14, 14:11, 16:5, 20:23, 21:8, 21:13, 24:16, 38:11, 38:18, 47:22, 47:23, 48:1, 48:16, 96:9, 96:16,

104:6, 104:13, 105:16, 112:15, 113:11, 116:4, 122:25
**terribly** [1] - 85:9
**test** [4] - 40:22, 73:19, 133:19
**testimony** [1] - 128:5
**testing** [1] - 58:12
**tests** [1] - 126:8
**text** [5] - 61:19, 73:2, 73:10, 81:21
**textual** [1] - 64:17
**THE** [251] - 1:1, 1:1, 1:10, 3:2, 3:9, 3:12, 3:15, 3:20, 3:23, 4:1, 4:6, 4:9, 4:14, 5:4, 5:7, 5:14, 5:22, 6:1, 6:21, 7:11, 7:21, 8:8, 9:15, 10:23, 11:10, 13:8, 13:22, 14:9, 14:20, 15:2, 15:10, 16:7, 16:13, 16:18, 17:13, 18:5, 18:17, 19:18, 19:22, 20:1, 21:4, 21:22, 22:5, 22:9, 22:16, 23:3, 23:11, 24:12, 24:21, 24:24, 25:13, 25:23, 26:4, 26:7, 27:3, 27:14, 28:4, 28:12, 28:22, 29:2, 29:5, 29:15, 29:20, 29:24, 30:3, 30:9, 30:20, 31:6, 32:10, 32:14, 33:1, 33:8, 34:9, 34:12, 35:23, 36:11, 36:20, 37:3, 37:11, 38:4, 38:17, 39:18, 40:10, 41:23, 42:11, 42:23, 43:9, 44:7, 44:20, 45:14, 46:5, 46:19, 47:13, 47:15, 48:11, 48:20, 49:4, 49:8, 50:10, 50:21, 50:25, 51:17, 52:5, 52:22, 53:17, 54:22, 55:22, 56:8, 57:1, 58:14, 59:20, 62:2, 62:22, 63:1, 63:13, 63:23, 65:3, 65:12, 65:15, 67:18, 67:20, 68:9, 69:3, 69:8, 70:5, 70:10, 71:4, 72:8, 72:15, 73:7, 73:15, 74:17, 75:17, 76:9, 76:15, 77:11, 77:23, 78:14, 79:2, 79:11, 80:11, 82:13, 82:19, 82:24, 83:10,

83:17, 83:20, 84:9, 84:13, 85:6, 85:8, 85:13, 85:25, 86:3, 86:6, 86:9, 86:14, 86:23, 87:3, 87:7, 87:10, 87:21, 89:7, 89:14, 89:18, 90:7, 90:11, 90:16, 90:19, 90:22, 90:25, 91:6, 91:13, 92:2, 92:5, 92:8, 94:22, 94:25, 95:3, 95:7, 95:14, 95:23, 96:3, 97:11, 97:23, 98:11, 98:22, 99:1, 99:19, 100:7, 100:9, 100:12, 101:2, 102:11, 102:16, 102:22, 103:1, 104:16, 105:1, 105:4, 105:6, 106:8, 106:13, 106:21, 107:5, 108:25, 109:7, 109:11, 109:22, 110:18, 111:1, 111:4, 111:9, 112:9, 113:14, 113:17, 113:19, 114:8, 114:11, 116:6, 116:10, 116:15, 116:18, 117:9, 117:22, 117:25, 118:10, 118:18, 118:22, 120:2, 120:7, 120:13, 121:10, 121:23, 122:20, 124:22, 126:2, 126:12, 127:4, 128:7, 128:10, 128:15, 128:20, 130:19, 132:4, 132:9, 133:24, 134:6, 134:19, 135:2, 135:4
**themselves** [3] - 10:14, 19:10, 108:14
**theoretically** [1] - 11:8
**theory** [3] - 45:14, 72:1, 134:19
**there'd** [1] - 84:24
**thereafter** [1] - 91:8
**therefore** [8] - 20:14, 22:13, 27:21, 50:5, 64:2, 119:11, 119:25, 120:1
**they've** [7] - 38:23, 73:21, 89:7, 115:20, 115:21, 125:14
**thin** [1] - 117:22
**thinks** [2] - 100:22,

103:7
**third** [8] - 23:4, 26:16, 34:5, 54:9, 54:11, 90:8, 118:13, 125:22
**third-party** [1] - 125:22
**thoughts** [1] - 35:3
**thousands** [5] - 11:16, 11:17, 84:20, 117:19, 127:24
**threat** [1] - 11:13
**threaten** [2] - 54:4, 54:19
**threatened** [3] - 8:21, 9:1, 133:13
**threatening** [1] - 32:22
**three** [21] - 9:6, 26:10, 30:23, 33:22, 61:1, 61:2, 66:23, 70:2, 70:11, 76:11, 76:13, 77:13, 91:4, 118:2, 123:21, 124:6, 125:16, 126:4, 126:6, 126:13
**threshold** [1] - 89:2
**throughout** [3] - 88:5, 89:21, 95:12
**tidal** [12] - 37:18, 39:16, 42:17, 42:19, 42:21, 79:9, 79:16, 79:17, 84:2, 85:6, 85:15, 85:17
**tidally** [5] - 73:5, 76:8, 83:15, 84:19, 85:21
**tide** [3] - 79:18, 83:19, 84:22
**tie** [1] - 123:10
**tied** [1] - 20:19
**tiering** [1] - 131:3
**time-sensitive** [1] - 134:18
**timeline** [3] - 86:19, 86:24, 87:1
**timing** [1] - 88:7
**tiny** [1] - 96:25
**Title** [1] - 35:5
**TNWs** [4] - 72:23, 80:6, 80:15, 81:3
**today** [4] - 4:12, 26:5, 75:4, 120:20
**together** [7] - 79:13, 80:25, 86:20, 115:1, 118:3, 118:13, 123:9
**tomorrow** [3] - 113:23, 128:14, 128:15
**tonight** [1] - 113:21
**tons** [1] - 57:11
**took** [3] - 38:14,

40:18, 75:18
**tool** [1] - 78:21
**top** [2] - 55:20, 90:19
**topic** [2] - 9:16, 111:9
**touched** [1] - 112:14
**towards** [1] - 19:9
**town** [1] - 113:25
**toxic** [1] - 34:4
**track** [2] - 6:3, 112:6
**traditional** [1] - 38:23
**traditionally** [6] - 8:15, 37:19, 38:21, 39:2, 43:3, 72:24
**TRANSCRIPT** [1] - 1:9
**transcript** [2] - 136:4, 136:6
**transfer** [11] - 9:4, 32:24, 34:8, 37:13, 45:1, 45:5, 45:9, 45:12, 123:21, 123:25, 132:23
**transferred** [3] - 26:14, 39:9, 44:24
**transferring** [1] - 9:20
**transparency** [1] - 41:21
**transport** [6] - 37:17, 72:18, 72:20, 73:5, 74:3, 75:25
**travel** [1] - 135:15
**treated** [3] - 34:16, 121:9, 123:16
**trends** [1] - 17:7
**tribe** [1] - 123:25
**trigger** [1] - 105:6
**triggers** [1] - 17:7
**trouble** [1] - 70:12
**troubling** [1] - 93:7
**true** [9] - 51:9, 61:14, 65:5, 66:22, 68:4, 81:1, 122:21, 136:4, 136:5
**truly** [1] - 123:1
**truncated** [1] - 43:7
**try** [4] - 94:19, 97:21, 114:8, 114:14
**trying** [7] - 7:22, 12:1, 25:24, 28:18, 45:19, 68:8, 78:2
**turn** [8] - 5:13, 26:2, 31:12, 50:7, 56:15, 88:11, 88:23, 132:3
**turning** [2] - 8:10, 8:20
**turns** [2] - 17:8, 32:18
**turtles** [6] - 8:22, 24:9, 67:23, 68:17, 68:19, 68:21
**two** [22] - 18:9, 18:13, 18:16, 22:18, 49:7, 50:10, 54:14, 58:10,

60:4, 60:5, 60:25, 61:2, 64:16, 66:23, 72:12, 75:11, 77:14, 89:25, 99:16, 124:7, 125:10, 126:10
**two-sentence** [1] - 60:25
**type** [13] - 9:23, 11:14, 14:22, 14:23, 18:23, 18:25, 41:11, 101:20, 102:7, 103:4, 111:18, 111:23, 131:7
**types** [2] - 63:6, 93:22
**typical** [1] - 48:5
**typically** [5] - 67:21, 107:17, 111:18, 111:24, 133:20
**typo** [1] - 44:16

## U

**U.S** [13] - 1:20, 9:3, 9:7, 17:2, 18:2, 19:5, 23:21, 24:3, 91:16, 91:19, 122:13, 130:14
**ultimate** [4] - 34:5, 44:23, 52:21, 59:11
**ultimately** [1] - 52:20
**ultra** [2] - 63:4
**unambiguously** [1] - 61:11
**unanimously** [1] - 81:20
**unbroken** [1] - 66:24
**uncertainty** [2] - 41:12, 88:6
**unclear** [2] - 18:13, 21:11
**unconcerned** [1] - 54:3
**unconstitutional** [1] - 27:7
**under** [103] - 6:4, 6:5, 6:11, 6:13, 7:10, 7:13, 7:14, 10:10, 13:17, 13:18, 14:17, 15:14, 17:2, 18:12, 22:2, 24:10, 24:20, 26:23, 27:1, 27:19, 28:9, 28:10, 28:24, 29:1, 29:4, 31:3, 33:19, 34:1, 35:5, 35:6, 35:11, 35:18, 35:20, 36:2, 36:3, 36:8, 39:2, 42:1, 45:14, 45:16, 45:22, 46:5, 47:5, 48:25, 49:13, 50:8, 54:9,

56:4, 57:14, 58:16, 59:1, 59:8, 59:14, 60:7, 60:9, 60:15, 60:16, 60:18, 62:20, 64:12, 64:13, 66:4, 67:13, 68:1, 69:17, 69:18, 69:23, 70:1, 71:2, 71:21, 74:13, 89:9, 90:3, 92:11, 93:9, 98:9, 100:18, 103:17, 105:4, 109:23, 110:17, 111:18, 111:25, 112:17, 112:20, 116:11, 116:23, 119:19, 121:3, 126:2, 127:13, 127:15, 127:16, 129:11, 130:14, 130:16, 132:1, 132:16, 132:17, 133:22
**undergoes** [1] - 6:13
**undermined** [1] - 16:24
**undermining** [1] - 5:16
**underneath** [1] - 90:8
**undersea** [1] - 120:24
**understood** [5] - 37:3, 66:15, 74:13, 85:12, 119:5
**undertake** [1] - 129:19
**undertaken** [1] - 131:18
**undertaking** [2] - 84:20, 110:12
**undiluted** [1] - 132:24
**unfortunately** [1] - 43:7
**uniformly** [1] - 129:12
**unique** [2] - 6:14, 122:11
**UNITED** [2] - 1:1, 1:10
**United** [16] - 2:21, 18:6, 18:21, 37:15, 41:25, 42:2, 47:2, 47:7, 48:23, 72:17, 73:25, 74:15, 75:21, 75:23, 75:24, 95:24
**universe** [2] - 72:22, 80:9
**unknowns** [1] - 45:9
**unlawful** [5] - 8:18, 25:21, 25:22, 45:12, 98:12
**unlawfully** [1] - 24:7
**unless** [3] - 54:3, 75:2, 130:15
**unlimited** [1] - 17:3

**unnamed** [1] - 39:16
**unpack** [2] - 54:1, 94:19
**unpermitted** [1] - 62:12
**unreasonable** [1] - 45:15
**unworkable** [2] - 43:8, 123:1
**up** [24] - 4:20, 19:19, 27:17, 42:16, 44:9, 45:18, 46:25, 53:19, 56:3, 62:22, 77:10, 78:7, 87:13, 95:4, 107:11, 107:14, 119:19, 123:8, 126:24, 128:23, 129:8, 129:24, 129:25, 132:21
**upcoming** [1] - 48:2
**update** [4] - 43:25, 45:23, 45:25, 50:10
**uses** [3] - 21:25, 38:6, 38:11
**USFWS** [2] - 91:4, 115:13

## V

**vacated** [2] - 8:19, 47:3
**vacater** [1] - 133:5
**vague** [1] - 31:20
**valid** [1] - 61:7
**valuable** [2] - 13:2, 101:17
**value** [2] - 70:24, 134:21
**vanishingly** [1] - 69:19
**various** [3] - 6:6, 25:2, 84:1
**verification** [1] - 129:18
**verify** [1] - 129:14
**version** [2] - 89:17, 130:4
**versus** [8] - 9:22, 10:25, 11:1, 33:5, 33:17, 70:20, 111:16
**veto** [1] - 117:7
**view** [13] - 9:16, 9:19, 9:25, 20:10, 22:6, 22:19, 24:24, 28:4, 34:15, 35:1, 66:18, 67:4, 69:16
**views** [1] - 99:6
**violate** [7] - 55:25, 56:2, 56:11, 56:16, 56:18, 56:19, 56:21

**violated** [7] - 9:6, 18:21, 21:21, 26:9, 26:21, 55:11, 100:18
**violates** [2] - 21:12, 97:17
**violating** [1] - 15:23
**violation** [10] - 15:7, 19:1, 19:11, 21:13, 24:5, 35:18, 57:25, 62:20, 82:15, 82:22
**violations** [14] - 26:23, 26:25, 27:22, 28:1, 29:7, 29:13, 34:4, 35:15, 57:22, 61:18, 62:13, 63:12, 63:17, 64:20
**vires** [2] - 63:4
**void** [1] - 69:14
**voluminous** [2] - 114:22, 114:23
**voluntary** [1] - 111:7
**vs** [1] - 1:5

## W

**wait** [1] - 84:2
**walk** [1] - 55:23
**wants** [3] - 106:23, 113:23, 115:19
**Washington** [5] - 1:6, 1:22, 2:4, 2:22, 136:11
**waste** [1] - 119:12
**watch** [2] - 71:17, 71:18
**Water** [28] - 5:1, 5:17, 8:11, 21:15, 26:9, 35:6, 35:12, 35:19, 36:2, 36:8, 39:3, 45:16, 47:5, 48:25, 49:10, 50:2, 61:11, 61:22, 64:15, 70:1, 70:24, 109:1, 112:18, 117:13, 120:4, 121:12, 121:15, 130:4
**water** [62] - 6:16, 7:6, 7:11, 7:18, 8:1, 23:12, 33:9, 33:11, 33:13, 33:14, 34:3, 42:17, 42:21, 46:23, 54:4, 54:19, 55:6, 55:25, 56:2, 56:11, 56:17, 57:25, 58:2, 58:3, 58:9, 74:2, 74:6, 74:7, 75:21, 75:23, 75:24, 77:5, 78:2, 78:3, 78:5, 79:9, 79:18, 79:23, 83:7, 83:18, 83:19,

84:18, 85:19, 87:18, 96:25, 97:1, 97:4, 102:13, 108:15, 109:21, 113:8, 114:15, 120:25, 121:20, 122:12, 122:13, 122:25, 123:3, 123:15, 131:7, 131:15
**water-type** [1] - 131:7
**Waterkeeper** [3] - 124:4, 124:18, 133:3
**waters** [166] - 8:15, 24:14, 26:15, 26:18, 34:7, 37:13, 37:14, 37:18, 37:19, 37:20, 37:21, 37:23, 38:1, 38:3, 38:7, 38:15, 38:19, 38:20, 38:21, 38:23, 39:1, 39:2, 39:3, 39:6, 39:7, 39:8, 39:14, 39:15, 39:16, 40:1, 40:5, 40:13, 40:14, 40:15, 40:17, 40:21, 40:24, 41:2, 41:6, 41:17, 41:18, 41:19, 41:24, 42:2, 42:7, 42:9, 42:10, 42:18, 42:19, 42:25, 43:3, 43:4, 43:8, 43:12, 43:14, 44:1, 44:4, 44:5, 44:22, 44:24, 45:1, 45:5, 45:10, 45:12, 46:14, 46:15, 46:20, 47:1, 47:3, 47:7, 47:9, 47:12, 48:10, 55:10, 72:10, 72:13, 72:14, 72:16, 72:17, 72:21, 72:24, 72:25, 73:3, 73:4, 73:5, 73:6, 73:13, 73:25, 74:12, 74:14, 74:19, 74:20, 75:13, 75:19, 76:6, 76:23, 77:8, 77:9, 77:22, 78:5, 78:6, 78:7, 78:8, 78:10, 78:11, 78:12, 78:14, 78:18, 78:23, 79:4, 79:15, 79:16, 80:6, 80:7, 80:8, 80:9, 80:16, 80:17, 80:21, 80:24, 80:25, 81:3, 81:5, 81:10, 81:16, 81:22, 81:23, 82:14, 82:17, 82:23, 83:4, 83:12, 83:13, 83:16, 83:24, 84:3, 84:11, 84:12, 84:20, 85:5, 85:6, 85:15, 85:17, 85:18, 87:11,

88:1, 114:16, 122:22, 122:24, 123:2, 129:20, 129:21, 129:23, 130:1
**waterway** [4] - 11:24, 74:25, 77:1
**waterways** [6] - 11:17, 39:10, 40:8, 46:4, 46:13, 47:4
**ways** [4] - 9:6, 26:10, 45:11, 101:16
**website** [5] - 16:12, 78:23, 85:23, 98:4, 107:20
**week** [1] - 50:15
**weigh** [4] - 99:5, 100:18, 103:25, 111:16
**weighing** [1] - 111:24
**welcome** [2] - 4:14, 59:20
**West** [1] - 8:22
**wetlands** [4] - 5:20, 8:20, 37:18, 39:16
**whatsoever** [1] - 61:25
**WHEELER** [1] - 1:6
**whereas** [1] - 31:24
**whereby** [1] - 80:15
**whichever** [1] - 110:20
**whole** [7] - 31:13, 35:24, 81:10, 92:9, 95:4, 101:11, 122:5
**wild** [1] - 9:1
**wildlife** [2] - 19:5, 116:2
**Wildlife** [130] - 2:12, 3:19, 9:3, 9:7, 9:19, 10:17, 11:20, 13:10, 13:16, 13:18, 14:7, 14:14, 16:20, 17:3, 17:16, 18:2, 18:19, 18:24, 19:5, 20:22, 21:18, 22:18, 23:4, 23:17, 23:21, 24:3, 24:8, 44:14, 51:18, 51:23, 52:7, 52:8, 52:16, 52:18, 52:20, 53:4, 54:24, 87:23, 87:25, 88:2, 88:8, 88:16, 88:24, 88:25, 89:4, 89:5, 89:6, 89:24, 90:1, 91:3, 91:4, 91:10, 91:15, 91:16, 91:19, 91:20, 91:22, 91:24, 92:1, 92:17, 92:18, 93:16, 93:25, 94:14, 94:17, 95:11, 95:17, 96:1,

96:6, 96:14, 97:5, 97:8, 97:15, 97:19, 98:1, 98:4, 98:11, 98:23, 99:2, 99:8, 99:23, 100:3, 100:4, 100:15, 100:17, 100:24, 100:25, 101:19, 101:22, 101:24, 101:25, 102:6, 102:17, 103:3, 103:8, 103:16, 103:24, 104:9, 104:18, 104:21, 104:22, 106:13, 106:24, 107:2, 107:16, 107:20, 110:6, 110:19, 110:21, 111:15, 111:22, 112:23, 115:6, 115:13, 115:19, 116:1, 116:20, 116:22, 117:5, 117:11, 117:20, 118:12, 118:15, 127:25, 130:14, 130:17, 130:18, 131:9, 131:17
**willing** [2] - 74:23, 95:23
**winning** [1] - 70:12
**withheld** [1] - 46:10
**WOLFE** [1] - 2:13
**wolfe** [2] - 127:7, 127:12
**Wolfe** [2] - 4:12, 42:15
**wonder** [1] - 63:23
**wondering** [7] - 40:10, 44:15, 97:16, 101:2, 101:21, 101:25, 106:22
**wood** [1] - 132:21
**Wood** [1] - 4:10
**WOOD** [28] - 2:2, 4:10, 114:4, 114:10, 114:13, 116:8, 116:11, 116:17, 116:20, 117:18, 117:23, 118:2, 118:11, 118:21, 118:24, 120:4, 120:9, 120:14, 121:11, 121:24, 122:21, 124:23, 126:4, 126:13, 127:6, 128:8, 128:13, 128:19
**wood's** [1] - 130:20
**word** [5] - 28:15, 64:22, 66:2, 66:10,

104:3
**words** [5] - 9:24, 32:14, 53:6, 134:6, 135:6
**workable** [1] - 123:13
**Works** [2] - 82:2, 82:10
**works** [5] - 19:15, 71:6, 93:6, 98:1, 115:16
**world** [3] - 56:18, 69:17, 120:1
**worried** [1] - 71:25
**worry** [3] - 71:23, 111:12, 126:16
**worse** [1] - 133:6
**wrap** [1] - 128:23
**wrestle** [2] - 134:2, 134:4
**wrestling** [1] - 78:1
**writ** [1] - 57:10
**write** [1] - 135:5
**writer's** [1] - 127:19
**writing** [3] - 54:25, 55:2, 60:24
**written** [1] - 105:11
**wrongfully** [1] - 46:10
**wrongly** [2] - 7:6, 23:9

## Y

**year** [1] - 30:23
**years** [9] - 5:23, 11:23, 22:22, 27:10, 30:23, 61:13, 66:17, 108:24, 116:13
**you-all** [1] - 5:8
**young** [1] - 127:22
**yourself** [1] - 45:15

## Z

**zero** [1] - 15:5
**Zilioli** [1] - 4:4
**ZILIOLI** [1] - 2:14
**zones** [2] - 13:3, 13:4
**Zoom** [1] - 135:15