IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>    Defendants,<br><br>and<br><br>STATE OF FLORIDA, et al.,<br><br>    Defendant-Intervenors, | CIVIL CASE NO.: 1:21-cv-119 (RDM) |

## INTERVENORS CAMERATTA COMPANIES, LLC AND CAM7-SUB, LLC's BRIEF ON REMEDY

COMES NOW Intervenors, CAMERATTA COMPANIES, LLC and CAM7-SUB, LLC (hereinafter "Cameratta") pursuant to this Court's Order of January 30, 2024, directing all parties to submit briefing on the matter of remedy and submits the following proposal for the Court's consideration as to Cameratta's State 404 Permit Application No. 423130-001, to avoid the disruptive consequences to the project commonly referred to as "Kingston".

**Kingston's Permit.** Cameratta has sought and received multiple Section 7 permits during its many years of developing projects. At the time of application for the Kingston project, the State 404 program was Cameratta's only option. Cameratta met, and exceeded, the 404 requirements. Because Cameratta is confident in its ability to develop an environmentally conscious project, Cameratta would suggest this Court allow Cameratta to continue its path to obtaining a State 404 permit with the following additional requirements:

**Cameratta's Proposed Remedy:**

1. In the interim of the remand, Cameratta would prepare and submit to United States Fish and Wildlife Service (USFWS) and Florida Fish and Wildlife Conservation Commission (FWC) a site-specific biological assessment that would be used by USFWS to develop a Technical Assistance letter or a Biological Opinion with an Incidental Take statement (ITS) for Kingston.

2. Cameratta must adhere to the lower number indicated within any possible take range, as expressed in the individual Technical Assistance letter or Biological Opinion, to be evaluated by USFWS in an identical manner as would be appropriate for a Section 7. For example, in Kingston's case the estimated take range in the Technical Assistance Letter was 4-23 panthers.[1] USFWS has analyzed panther deaths within a five (5) mile radius during Cameratta's Section 7 permitting on its previous developments. Utilizing the same analysis Cameratta's permit for the Kingston project will limit the number of incidental takes to four (4) per year[2] within five (5) miles of the Kingston project. For example, the proposed language as to Kingston would state:

> *The authorized Incidental Take attributable to this project is four (4) per year within five (5) miles of the Kingston project. If vehicle collisions with panthers exceed the annual Incidental Take number per year within five (5) miles, the proponent shall confer with the USFWS and FWC to determine if these collisions are attributable to the project. If so, then the USFWS and FWC will require the implementation of additional conservation measures. The USFWS retains jurisdiction and is the appropriate authority to determine compliance with the terms and conditions of its biological assessment, and with the ESA, and may seek all enforcement remedies available pursuant to Section 9.*

This is supported by the telemetry map attached hereto as Exhibit A, showing the approximate locations of collared panthers within the action area. Each "dot" of the same color represents an individual panther and its movement pattern.

---

[1] Kingston disputes any suggestion that numbers show the chance of jeopardy because the formula did not incorporate the anticipated wildlife crossings or habitat improvement and the Action Area spanned 25 miles.

[2] Cameratta is confident it can comply with this number because within a five (5) mile radius of Kingston there have been an average of 1.5 collared and uncollared panther deaths per year from 2004 to 2023. This affirms Cameratta's record of never having a panther killed on any of its previous projects.

3.      The Memorandum of Understanding (MOU) between the FWC, USFWS and Florida Department of Environmental Protection (FDEP) does not conflict with, or in any way limit, the remedies of the Federal government to enforce the Endangered Species Act (ESA) in Florida. Specifically, Section VII(1) of the MOU states:

> *Nothing in this MOU shall be construed to restrict in any way the EPA's authority to fulfill its oversight and enforcement responsibilities under the CWA, nor shall it restrict the enforcement responsibilities of FDEP and FWC under Florida law or USFWS under Federal law.*

4.      If the Kingston permit is likely to jeopardize the continued existence of a covered species, even if the permit is being properly implemented, it can be revoked by USFWS, and in addition to revocation, there can be civil enforcement or criminal penalties under Section 11 of the ESA for permit violations.

**State 404 Permit Requirements:** The State 404 permit would require Cameratta to provide the following enhancement and/or mitigation, in addition to the Cameratta Remedies offered above.

a)      Increase primary panther habitat by setting aside a minimum of 3,273 acres as conservation land, remove all exotics and replant with trees, shrubs, and native vegetation enhancing 1,173 acres of existing wetlands. (Dec. of J. Cameratta, Doc#146-3, ¶ 14, 15)

b)      Construct a large mammal roadway crossing and multiple small mammal crossings in areas to be coordinated with USFWS and FWC. (Dec. of J. Cameratta, Doc#146-3, ¶ 17)

c)       Preserve 99% of existing wetlands, limiting wetlands impact to 12 +/- acres on the entire Kingston property. (Dec. of J. Cameratta, Doc#146-3, ¶ 14)

d)      Acquire 3,810 panther habit units (PHU's) from the Panther Passage Conservation Bank (as required by the agency similar to a Section 7 at cost of $2,667,000). (Dec. of J. Cameratta, Doc#146-3, ¶ 16)

e)      Install multiple ground water monitoring wells. There are currently no ground water monitoring wells on the Kingston property. (Dec. of J. Cameratta, Doc#146-3, ¶ 18)

f)       Forfeit approximately 3.6 billion gallons per year of permitted groundwater withdrawal which enhances local aquifer. (Dec. of J. Cameratta, Doc#146-3, ¶ 18) (Dec. of S. Johnson, Doc#146-4, ¶ 16)

g)       Reduce nitrogen levels by approximately 49% and phosphorus levels by approximately 80% on the Kingston property.  (Dec. of J. Cameratta, Doc#146-3, ¶ 18)

**Additional Environmental Benefits Cameratta's Development of Kingston Will Provide:** Upon issuance of the State 404 permit and acquisition of the Kingston property by Cameratta, Cameratta has committed to the following benefits which could not be mandated by either Federal or State agencies:

h)       Acquiring approximately 2,700 acres of oil, gas, and mineral rights existing under the Corkscrew Swamp Sanctuary, and voluntarily deeding these rights to the Audubon Society, Inc. to stop any future exploration in the Sanctuary. (Dec. of J. Cameratta, Doc#146-3, ¶ 15)

i)       Forever eliminate the ability to construct a rock mine on the Kingston property[3] or pursue exploration, or removal of oil, gas and minerals.

j)       Constructing a much-needed hurricane evacuation roadway allowing residents an alternative route in the event of an impending storm.  (Dec. of J. Cameratta, Doc#146-3, ¶ 19)

k)       Contributing approximately $20,000,000 to local government to fund Corkscrew Road improvements, including flowway culverts and wildlife crossings in areas to be determined by the agencies. (Dec. of J. Cameratta, Doc#146-3, ¶ 17)

l)       Voluntary contributions to the Fish and Wildlife Foundation of Florida Fund in the amounts of $350 per development acre (approximately $1,186,150); $200 per residential building permit

---

[3] As the Court is aware from Cameratta's filings, there was prior litigation regarding the Kingston property. In the underlying lawsuit to approve the Kingston development, Cameratta did not oppose the standing of others who intervened. Plaintiffs could have participated in the lawsuit and voiced any concerns at the hearings but chose not to. (Declaration of J. Cameratta, Doc#146-3, ¶ 6)

(approximately $2,000,000); $200 per home resale in perpetuity. (Dec. of J. Cameratta, Doc#146-3, ¶ 20)

m)   Reduce flooding that has historically occurred within neighboring developments. (Dec. of J. Cameratta, Doc#146-3, ¶ 14)

n)   Provide information to the Kingston homeowners regarding restrictions related to pets.

**Support for Kingston's Proposed Remedy**. Kingston is already in review and complying with existing Federal and State 404 law and should not be required to start over or be subject to a potential retroactive application of a new, yet to be determined, procedure. More importantly, it is unlikely that the Court or an agency could fashion a remedy that will provide greater protection, and benefit to panthers, than what is proposed for Kingston.

Section 7 requires Federal agencies to consult with USFWS to ensure any actions they fund, authorize or permit will **not** jeopardize the existence of any listed species or adversely affect habitat. Section 7 usually includes a BiOp with an ITS. Florida's State 404 program has identical directives to review and prevent adverse consequences to potentially affected Federally and State-listed species concurrently by consulting with FWC and USFWS. Because similar guilds of species have similar habitat needs or life-history traits, the results are more holistic and efficient than the prior process. Both Section 7 and State 404 apply if there are wetlands, and there are no measurable differences in the evaluations performed under any of the two (2) options.  Both Section 7 and State 404 allow enforcement by USFWS to determine compliance with the terms of the BiOp, and with the ESA. However, State 404 also allows enforcement by FWC essentially doubling the oversight of the permit. Section 10 allows a private citizen to "take" a listed species if they develop a Habitat Conservation Plan (HCP), but Section 10 cannot authorize impacts to wetlands, thereby limiting its application in

Florida. If a permittee applies for Section 10, and there are wetlands present, the agency will direct the Permittee to obtain a State 404 permit anyway.[4]

It is difficult to ascertain with a reasonable degree of certainty how to attribute a specific take to any one project. This was evident during the January 30, 2024, hearing on Plaintiffs' Motion for Injunction. The declarations submitted in this matter explain the complexity of this type of analysis. While a State 404 permit considers any possible taking of a panther, or any other endangered species, within a 25-mile Action Area, there is absolutely no way to positively attribute a panther death to any project unless there are an extremely limited set of facts, such as when a taking occurs on property. For example, if a car on I-75 strikes a panther, that incident is within 25 miles of Kingston; however, it is illogical to attribute it Kingston. In this scenario, Kingston would be less to blame for the panther death then the Florida beaches would. In fact, there is little panther activity near the Kingston project. Cameratta submits without the benefits of Kingston's wildlife crossings, conservation easements and contributions to panther mitigation efforts, more panthers and caracara could be harmed. The above shows why the agencies are in the best position to evaluate each permit on a case-by-case basis and make the jeopardy determination. Should the Court rule the State 404 assumption was illegal, more likely than not, the process would return to Section 7. Having received multiple Section 7 permits in the past, Cameratta knows the process and notes in all of its prior permits issued under Section 7, none contain a minimum or maximum number of panther takes. If the concern is panther takes, it appears the State 404 process is the stronger of the two (2) options for Kingston and has community support. (Dec. of J. Cameratta, Doc#146-3, ¶ 19). Last, by submitting this brief on remedy Cameratta does not acquiesce to the granting of Summary Judgment. Plaintiffs' Motion should be denied for

---

[4] Any agency's issuance of a permit doesn't mean the process is over. After implementation, and continuing indefinitely, there is a management process with the permittee and the agencies monitoring the incidental take permit. This is especially accurate in a State 404 permit where there is an obligation to promptly identify permittees who may be incorrectly implementing their plan and identify steps to remedy any factors to reduce the risk of noncompliance in the future.

reasons stated by the Defendants in opposition, as well as Cameratta's briefs, all of which are incorporated herein.

**Conclusion.** On March 15, 2022, during oral argument, the Court stated:

"*It does strike me that it would invite some chaos in the permitting process for me to say wait a second, put everything on hold. It's not clear to me at this point in time whether the Army Corp is acting on permit applications, whether Florida is acting on permit applications. There are permit applications that have been in the works for long period of time. there's a lot of expectations that private parties have with respect to their interests where they could be many millions of dollars that they've invested, and someone is on the verge of getting a permit to go forward with the project and all of a sudden it gets yanked out from them.*"[5]

The Court seems to be rightfully concerned with harm to permittees, like Cameratta, who are complying with the process, and submitted the same information as if the process remained with the Corps. (Dec. of J. Cameratta, Doc#146-3, ¶ 26). Cameratta is not a hypothetical permittee. Cameratta is the manifestation of the Court's reasonable concerns. The likelihood of chaos, ensuing from the Plaintiffs' Motion being granted, is very real. Cameratta would suggest the Court deny Plaintiffs' Motion or alternatively that the Court's remedy as to Kingston be limited to the suggestions articulated above. Cameratta has a twenty (20) year history of development that focuses heavily on conservation, receiving awards of merit for best practices. (Dec. of J. Cameratta, Doc#146-3, ¶ 3). Cameratta's estimation of four (4) panther deaths per year within a five (5) mile radius was accepted in prior projects with a Section 7. Cameratta is very certain of its ability and offers the above remedies which would be more protective of the environment than anything the Unites States or Florida can require under the law. As stated in Cameratta's Motion to Intervene, Cameratta has in the past gone above and beyond in the interest of the environment and the protection of all species of wildlife. Cameratta is committed to doing the same with Kingston.

Respectfully submitted this 3rd day of February, 2024.

---

[5] Transcript March 15, 2022, Doc# 88, pgs 22-23, lines 24-25; 1-10

/s/ Chené M. Thompson
CHENÉ M. THOMPSON*
Florida Bar No. 465542
Pavese Law Firm
P.O. Box 1507
Fort Myers, FL  33902-1507
Telephone: 239.336.6234
Email: CheneThompson@paveselaw.com
*Co-Counsel for Cameratta Companies, LLC and CAM7-Sub, LLC*
　* Admitted pro hac vice

/s/ Rafe Petersen
RAFE PETERSEN (Bar # 465542)
ALEXANDRA E. WARD (Bar # 1688003)
800 17th Street NW, Suite 1100
Washington, District of Columbia  20006
Telephone: 202.419.2481
Rafe.Petersen@hklaw.com
*Counsel for Cameratta Companies, LLC and CAM7-Sub, LLC*

**CERTIFICATE OF SERVICE**

      I hereby certify that, on February 3, 2024, I electronically filed the foregoing brief on remedy with the Clerk of the Court for the U.S. District Court for the District of Columbia via the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by that system.

/s/ *Rafe Petersen*
Rafe Petersen

*Attorney for Cameratta Companies, LLC and CAM7-SUB, LLC*

NOTES:

PANTHER VEHICULAR COLLISIONS WERE ACQUIRED FROM THE FWCC ON SEPTEMBER 2023 AND ARE CURRENT TO AUGUST 2023.

PANTHER TELEMETRY WAS ACQUIRED FROM THE FLORIDA FISH AND WILDLIFE CONSERVATION COMMISSION IN SEPTEMBER 2021 AND SEPTEMBER 2022 AND IS CURRENT TO MAY 2022.

THE MAP DEPICTS TELEMETRY POINTS OF INDIVIDUAL PANTHERS DOCUMENTED WITHIN THE ACTION AREA SINCE 2012 AND INCLUDES ONLY THOSE PANTHERS THAT HAVE NOT BEEN REPORTED BY THE FLORIDA FISH AND WILDLIFE CONSERVATION COMMISSION AS DECEASED.

THE DATE RANGES INCLUDED IN THE LEGEND REPRESENT THE TIMEFRAMES IN WHICH EACH INDIVIDUAL PANTHER WAS RECORDED WITHIN THE ACTION AREA.

# AERIAL WITH FLORIDA PANTHER TELEMETRY AND VEHICULAR MORTALITIES MAP
# KINGSTON

| DRAWN BY | DATE |
|---|---|
| H.H. | 01/17/24 |
| REVIEWED BY | DATE |
| S.J. | 01/17/24 |
| REVISED | DATE |
| R.F. | 02/02/24 |

Consulting Ecologists
PASSARELLA & ASSOCIATES INC

J:\2021\21CCL3707\GIS\2024\0_Meetings_and_Field_Maps\01\1624_Meeting\Figures\Aerial_with_Panther_Telemetry_and_VehicularMortalities_Map_V5_8x11.mxd

