**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
|    Plaintiffs, | |
| v. | Case No. 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
|    Defendants, | |
| and | |
| TARPON BLUE SILVER KING I, LLC d/b/a COLLIER ENTERPRISES, | |
|    Defendant-Intervenor. | |

**COLLIER ENTERPRISES'S BRIEF ON POTENTIAL REMEDIES**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION .........................................................................................................1

I.      The Preliminary Injunction Motion Should be Denied.........................................2

II.     The Court Should Recognize the Substantial Reliance Interests at Stake and
        Corresponding Importance of Tailoring any Remedy to Avoid Undue Harm. ..................2

III.    The Court Should Carefully Consider Remand Without Vacatur, Especially as
        to the Biological Opinion......................................................................................3

        A.      Requiring Transfer of Applications to the Corps or Submission of
                Incidental Take Permit Applications to the Service Would Be
                Tremendously Disruptive............................................................................4

        B.      The Incidental Take Statement Need Not be Vacated. .............................5

        C.      It Is Especially Important Not to Vacate the Biological Opinion. ...........6

        D.      The Court Should Impose a Schedule for Any Corrective Action. .........7

CONCLUSION.............................................................................................................7

CERTIFICATE OF SERVICE .....................................................................................9

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ................................................................................4, 5

*Am. Water Works Ass'n v. EPA,*
  40 F.3d 1266 (D.C. Cir. 1994) ....................................................................................4

*Ctr. for Biological Diversity v. U.S. Env't Prot. Agency,*
  861 F.3d 174 (D.C. Cir. 2017) ....................................................................................4

*EPIC v. Simpson Timber,*
  255 F3d 1073 (9th Cir 2001) .......................................................................................6

*Shands Jacksonville Med. Ctr. v. Burwell,*
  139 F. Supp. 3d 240 (D.D.C. 2015) ............................................................................4

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
  282 F. Supp. 3d 91 (D.D.C. 2017) ..............................................................................4

**Statutes**

16 U.S.C. § 1536(d) (1988) ................................................................................................6

16 U.S.C. § 1538(a)(1)(B) (1988)......................................................................................6

16 U.S.C. § 1540(e)(1) (2002) ...........................................................................................6

16 U.S.C. § 1540(g)(1)(B) (2002) .....................................................................................6

**Other Authorities**

40 C.F.R. § 233.50 .............................................................................................................4

## INTRODUCTION

In a water-covered state like Florida, activities that impact land almost inevitably occasion Clean Water Act (CWA) section 404 review.  So unsurprisingly, the Florida Department of Environmental Protection (FDEP) has issued hundreds of section 404 permits for all manner of projects over the past three years, with hundreds more pending—including decisions on track to be issued within the next several months.  Scores of millions of dollars and countless hours have been spent on a wide range of municipal, commercial and individual projects in reliance on FDEP's process–projects that provide demonstrable public benefits.

Should the Court rule for Plaintiffs' on their Endangered Species Act (ESA) claims challenging the federal agencies' approval of Florida's assumption of section 404 permitting, the regulated community (and the regulators) will face considerable uncertainty and confusion that will cause a substantial loss of financial resources and time, all without any commensurate environmental benefit.  If the Court's remedy includes vacatur of the Incidental Take Statement, or especially the Biological Opinion, the public harm will increase exponentially.

The Court can minimize this disruption by carefully tailoring any remedy.  Collier Enterprises ("Collier")[1] does not agree Plaintiffs are entitled to a decision in their favor on their pending preliminary injunction motion or any underlying claims, much less any remedy.  But if the Court rules in Plaintiffs' favor, Collier urges the Court to recognize the substantial reliance interests at stake and the importance of tailoring any remedy to avoid undue harm to those interests.  The Court should, in that instance, carefully consider remand without vacatur, especially with regard to the Biological Opinion.

---

[1] Tarpon Blue Silver King I, LLC is the official name of the business entity that does business as Collier Enterprises.

1

A properly tailored remedy should allow permit applicants like Collier to efficiently complete the section 404 permitting process with FDEP while (if necessary) pursuing incidental take coverage through a separate process such as the ESA section 10 permit process.

I.      **The Preliminary Injunction Motion Should be Denied.**

Plaintiffs' preliminary injunction motion should be denied for all the reasons stated in Collier's and the other responses to that motion.[2]  In sum, Florida's ongoing review of Collier's section 404 application is not subject to Administrative Procedure Act (APA) review or this Court's jurisdiction because it is neither a federal agency action nor a final action, and is not ripe under Article III.  Plaintiffs cannot sidestep these jurisdictional problems by recharacterizing their motion to "preliminarily" enjoin the federal review framework they  challenged three years ago, because such a motion is untimely, is unjustified in light of  substantial reliance interests on the federal review framework, and is barred by laches.

II.     **The Court Should Recognize the Substantial Reliance Interests at Stake and Corresponding Importance of Tailoring any Remedy to Avoid Undue Harm.**

Collier has spent three years, countless hours and millions of dollars in reliance on the only section 404 permit process available to it.  Upending the process just as it is about to conclude would be extremely disruptive and cause substantial added delay and expense to Collier (and numerous other applicants and permittees).  Any decision for Plaintiffs is likely to cause tremendous economic disruption and uncertainty in Florida, borne primarily by entities that have pursued section 404 permitting through the only process available to them (most of whom have had no voice in what may be a highly consequential outcome in this proceeding). Yet any harm to species from leaving the process in place is both minimal and theoretical.  The expert agencies are actively engaged in establishing protections to ensure against jeopardy to

---

[2] *See* ECF 145-146, 148-149.

species and minimize the effects of any incidental take, and Plaintiffs demonstrate no substantive difference in protections provided through the technical assistance process (*e.g.*, habitat conserved and buffers required) compared to section 7 consultation on a Corps permit.

Plaintiffs suggest permit applications may simply be transferred to the Corps, but (as explained below) neither the EPA transfer process nor the Corps review process is likely to be efficient, predictable, or completed in less than a year (or much longer).  Likewise, submission of hundreds or thousands of new ESA section 10 applications to the Service would result in an influx the Service may not be prepared to process.  And even if it was, the process could easily take well over a year per application.  Delays of over a year combined with costs and uncertainty of undertaking an entirely new application process would be especially disruptive and costly to applicants like Collier, for whom the permit process is (at long last) nearing completion.

This Court should recognize the substantial reliance interests of Collier and other applicants, and tailor any remedy to allow regulatory certainty for the public.  That certainty can be achieved by allowing State section 404 permitting to continue, along with a well-defined, efficient process for obtaining any needed incidental take coverage from the Service.

**III.    The Court Should Carefully Consider Remand Without Vacatur, Especially as to the Biological Opinion.**

Should the Court rule in Plaintiffs' favor on their ESA claims, the Court should carefully consider remand without vacatur, especially as to the Biological Opinion.  Remand without vacatur would avoid significant harm to public interests with minimal if any risk to listed species by allowing 404 permit processing to continue while the federal agencies consider any necessary corrective actions.

This Court's consideration of remand without vacatur should account not only for the seriousness of the challenged action's deficiencies but also the likely disruptive consequences of

vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993). Importantly, an opponent of vacatur need not "prevail on both factors, . . . Rather, resolution of the question turns on the Court's assessment of the overall equities and practicality of the alternatives." *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 270 (D.D.C. 2015). Thus, courts "have repeatedly considered the economic implications of vacatur— including in cases addressing environmental harms."[3] Even where an agency action is found deficient under the ESA, the fact that impacts have been considered can weigh in favor of remand without vacatur. *Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*, 861 F.3d 174, 188-89 (D.C. Cir. 2017) (EPA pesticide order violated ESA section 7 but allowed to remain in effect because EPA had completed a risk assessment and deemed the pesticide a "reduced risk").

A.   **Requiring Transfer of Applications to the Corps or Submission of Incidental Take Permit Applications to the Service Would Be Tremendously Disruptive.**

Collier would have no time- or cost-efficient options if suddenly required to obtain a section 404 permit from the Corps or incidental take coverage separate from State section 404 permitting. Plaintiffs suggest section 404 applications (like Collier's) could be transferred to the Corps for processing and ESA section 7 consultation, but the procedure to do so is uncertain and likely to be lengthy and complex. EPA's framework to federalize a permit has multiple steps, time frames, and required determinations.[4] Once (if) that process is completed, there is no telling how quickly the Corps would act. Serious questions include whether applications would restart at the back of the line, what process the Corps would use to deem a transferred application

---

[3] *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 104 (D.D.C. 2017); *see also Am. Water Works Ass'n v. EPA*, 40 F.3d 1266, 1273 (D.C. Cir. 1994) (no vactur because "vacatur would be unnecessarily disruptive to the [affected] industries").

[4] *See* 40 C.F.R. § 233.50 (discussing process and time frames for EPA to object to State permit application and State to address objection prior to transfer to Corps).

complete, and what added procedures the Corps would undertake *in addition to* a new section 7 consultation and a new National Environmental Policy Act (NEPA) analysis.[5]

Collier could also apply to the Service for an ESA section 10 permit (provided the Court fashions any remedy to allow State section 404 permitting to continue). But that would require, among other things: (1) time to complete the application (including a habitat conservation plan), (2) application submission, (3) response to requests from the Service, (4) waiting for the Service to deem the application complete, (5) public notice and comment, (6) response to public comments, (7) the Service's completion of internal ESA section 7 consultation and other reviews such as under NEPA, (8) waiting for a draft permit and associated conditions, and (9) ultimately (hopefully) review and signature of a final permit.[6]

The Court should, under *Allied-Signal*, balance the substantially disruptive consequences of vacatur against the numerous reasons listed species do not face serious risks from non-vacatur.

**B.     The Incidental Take Statement Need Not be Vacated.**

The risk of harm to species from the programmatic ITS remaining in place during a remand is both minimal and entirely conjectural. First, incidental take authorization flows from the ITS to applicants only if and to the extent incidental take is quantified by the Service and minimization measures required by the Service are adopted as binding section 404 permit conditions and implemented by the applicant.[7] Second, the quantification and conditioning of

---

[5] The Corps has different processes than the State for reviewing permit applications, such as NEPA analyses, but there is no basis to conclude that those processes are likely to result in a meaningfully better environmental analysis or otherwise mitigate attendant delays.

[6] Collier cannot simply resume the prior Eastern Collier Multiple Species Habitat Conservation Plan section 10 permit application on its own. That was a years-long large-scale undertaking involving 11 other ITP applicants who collectively own 150,000 acres of private property. Even if Collier could do so on its own (which it cannot), many of the processes described above have not been completed.

[7] Programmatic BO at 69-70 (ECF 148-3) ("amount and extent of incidental take … will be quantified … on a project-specific basis" and exempt from prohibition only if permittee

incidental take is determined by the USFWS—the same agency that would issue a project-specific ITS or an ITP (thus there is no basis to assume any difference in actual impacts to listed species between one process and another).  Third, any incidental take not within quantified limits or in compliance with binding permit conditions risks enforcement action by the Service or an ESA citizen suit.[8]  Fourth, any incidental take exceedance (or other material difference in expected effects) triggers a new USFWS review.[9]  Finally, any incidental take is likely so far in the future that any defect found by the Court may be cured before the take occurs.[10]  In sum, there would be little (likely no) actual benefit to listed species from vacatur of the ITS, much less benefit commensurate with the profoundly disruptive consequences of vacatur.

### C.      It Is Especially Important Not to Vacate the Biological Opinion.

While vacatur of the ITS would disrupt hundreds of applications that involve incidental take, vacatur of the BO could lead Plaintiffs to argue—or the agencies to conclude—the entire State section 404 program must be suspended until a new consultation is completed (a point Collier does not concede by raising), thereby substantially compounding the harm to public interests.[11]  Halting the entire State section 404 program would impact myriad projects in Florida such as driveways to local municipal projects, and causing wholesale disruptions across the state.

---

implements all permit conditions agreed upon by USFWS”).

[8] 16 U.S.C. §§ 1538(a)(1)(B), 1540(e)(1), 1540(g)(1)(B).

[9] Programmatic BO at 71-73 (new information on “magnitude of impacts” or if take levels are “exceeded” can trigger new project-specific USFWS review).

[10] Even if Bellmar receives its 404 permit this month, it will be at least 90 days before Bellmar receives all permits needed to begin construction.  Once all permits are received, at least another 30 days we be required before construction can actually begin due to preconstruction surveys and meetings, recording conservation easements, and other preliminary work.  Finally, Collier will not close with the builder before October 1, and as result no construction or other land-disturbing impacts associated with Bellmar will occur before October 2024.

[11] *See* 16 U.S.C. 1536(d) (no “irreversible or irretrievable” commitment of resources that foreclose reasonable and prudent alternatives after initiation of consultation); *EPIC v. Simpson Timber*, 255 F3d 1073, 1076 (9th Cir 2001)(“Reinitiation of consultation requires … a new Biological Opinion before the agency action may continue.”)

Yet vacatur of the BO is unwarranted for the same reasons it is for the ITS.  The effects of section-404 permits are being reviewed and addressed through required permit conditions by the same agency (the Service) that would consult on a Corps permit.  And any effects that exceed those anticipated would require a new review.  As a result, any actual benefit to species from vacatur of the BO is conjectural–and even more so if the ITS is vacated.  Specifically, if the ITS is vacated, any projects with take would undergo their own consultation.  There is no reason to expect effects below that level are likely to result in jeopardy, particularly where the Service is ensuring through technical assistance that no jeopardy would occur.

###### D.    The Court Should Impose a Schedule for Any Corrective Action.

If any challenged federal agency action is vacated, it will be critical for the agencies to quickly establish a framework that allows efficient completion of section 404 permitting, ESA reviews and any necessary take authorization in order to reduce harm to the public.  Accordingly, if any challenged federal agency action is vacated, Collier respectfully requests that the Court ask the federal defendants to provide a framework and schedule describing for corrective actions designed to minimize disruption and harm to section 404 applicants.

### <u>CONCLUSION</u>

Collier opposes any finding or relief for Plaintiffs.  Should the Court hold in favor of Plaintiffs on any underlying claim, Collier (and other 404 applicants) should be able to efficiently complete 404 permitting with FDEP and (if the ITS is vacated) efficiently obtain any required take coverage through an ESA section 10 incidental take permit from the USFWS.

Date: February 4, 2024

Respectfully submitted,

/s/ George P. Sibley, III
George P. Sibley, III (DC Bar No. 1011939)
**HUNTON ANDREWS KURTH LLP**
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8262
gsibley@HuntonAK.com

*Counsel for Defendant-Intervenor Tarpon*
*Blue Silver King I, LLC d/b/a Collier*
*Enterprises*

## CERTIFICATE OF SERVICE

I hereby certify that, on February 4, 2024, I electronically filed the foregoing motion with the Clerk of the Court for the U.S. District Court for the District of Columbia via the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by that system.

/s/ George P. Sibley, III
George P. Sibley, III

*Counsel for Defendant-Intervenor Tarpon*
*Blue Silver King I, LLC d/b/a Collier*
*Enterprises*