**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

    *Plaintiffs*,

    v.

MICHAEL S. REGAN, *et al.*,

    *Defendants*.

Civil Action No. 21-119 (RDM)

_____

**FLORIDA INTERVENORS' POST-HEARING BRIEF
CONCERNING REMEDY FOR CLAIMS RELATED TO THE PROGRAMMATIC
BIOLOGICAL OPINION AND/OR INCIDENTAL TAKE STATEMENT**

_____

On January 30, 2024, this Court heard argument on a motion for temporary restraining order and preliminary injunction ("TRO/PI Motion") filed by Sierra Club and Center for Biological Diversity. There, the Court invited the Parties to file post-hearing briefs (limited to seven pages) addressing remedy in the event the Court ultimately finds on the merits that the Programmatic Biological Opinion ("BiOp") and/or Incidental Take Statement ("ITS") is invalid. The State of Florida and the Florida Department of Environmental Protection ("FDEP") (collectively "Florida Intervenors") respectfully urge this Court to deny the TRO/PI Motion (Dkt. 149), and after doing so, to reject the eleven remaining claims for the reasons briefed last year (Dkt. 102, 107). A final judgment *as to all claims* is needed, which will allow the Parties to complete this stage of litigation and determine next steps in totality, not piecemeal. *See Elkins v. District of Columbia*, 685 F. Supp. 2d 1, 8 (D.D.C. 2010), *aff'd*, 690 F.3d 554 (D.C. Cir. 2012) ("Federal policy disfavors piecemeal litigation."). To the extent the Court finds for Plaintiffs on one or more claims,[1] questions surrounding remedy should be briefed comprehensively.

At this juncture, the Court has focused attention on claims related to the BiOp and ITS (Claims 3, 4, 6, 10 and 13). To the extent this Court ultimately decides that the BiOp and/or ITS is invalid, the specific nature of any such finding would need to be considered when fashioning a remedy based on (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and (2) the "disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal citation omitted). As explained below, the proper remedy would

---

[1] To the extent the Court decides only some, but not all, pending claims in its forthcoming ruling, Florida Intervenors respectfully urge the Court to direct entry of final judgment as to those specific claims pursuant to Federal Rule of Civil Procedure 54(b). Given the consequences of such a ruling and the strong public interest in this case, "no just reason for delay" of entry of final judgment would exist. *See Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 1 (1980).

1

be remand without vacatur of the BiOp/ITS to allow Federal Defendants and Florida the necessary opportunity to resolve the issue(s) identified in the Court's decision including, for example, striking particular language in the ITS or adding/relocating other language. To support this relief, Florida Intervenors enclose a Declaration of Justin G. Wolfe, FDEP General Counsel (Exhibit A).

I.      ***Allied-Signal* Factors**

Turning to the first *Allied-Signal* factor, the purported flaws in the terms of the BiOp/ITS should not be viewed as free from "doubt whether the agency acted correctly." Here, the federal and state agencies developed a regulatory framework that is protective of water resources and listed species. The BiOp/ITS, which is one element of that overall framework (along with other state and federal statutes and regulations, memoranda of agreement, etc.), was based on accepted approaches to programmatic formal consultation under the Endangered Species Act ("ESA"). If the Court finds that the BiOp/ITS should have contained additional language that is missing, or contains language that should be excluded, the agencies could address that promptly via re-initiation of consultation or other means. To the extent the Court disapproves of provisions in the BiOp/ITS that extend incidental take liability protection to state 404 permittees, Federal Defendants and Florida Intervenors have provided a rational legal basis for that approach. Indeed, across at least the last three administrations, the U.S. Department of Justice has expressed the view that ESA Section 7(o) take liability protection may extend to incidental take authorized through a programmatic BiOp/ITS covering state permittees under federally-approved programs. *See also* Dkt. 149 at 9 n.7 (citing FWS statement in 1993 regarding formal programmatic consultation for EPA approval of state 404 programs). To the extent this Court concludes that incidental take coverage should *never* extend to state permittees even when implementing Clean Water Act ("CWA") 404 programs, that is *at least* a close call.

The Programmatic BiOp/ITS here is modeled on the one adopted in 2015 for the Cooling Water Intake Structure ("CWIS") Rule under CWA Section 316(b), which requires EPA to adopt standards to minimize harmful impacts from the trapping of aquatic species in water intake pipes at industrial facilities. 33 U.S.C. § 1326(b). The CWIS Rule is implemented through state Section 402 programs in over 45 states and employs the programmatic consultation approach adopted by the agencies here. Affirming that programmatic BiOp/ITS, the Second Circuit explained the ESA take liability framework in the programmatic context, including addressing FWS's *requirement* under Section 7(b)(4) to "provide an [ITS]" and Section 7(o)(2)'s broad coverage for any "taking that complies with measures specified in an ITS." *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 61, 71-78 (2d Cir. 2018). The Second Circuit also discussed the programmatic BiOp/ITS and noted that quantification of incidental take would be addressed as part of the "site-specific permitting process." *Id*. at 63. Under that BiOp/ITS, the ESA's incidental take exemption extends to "any take incidental to the operation of a CWIS permitted under the Rule *through the implementation process*" if a permittee complies with the species-related provisions "as reflected in the permit." EPA-HQ-OW-2018-0640-0688-A5 at 75-76. And Federal Defendants' brief filed in the Second Circuit also explained that permit applicants, including state NPDES permittees, would "receive an exemption from the prohibition against take" if they implemented the measures developed through the technical assistance process. EPA-HQ-OW-2018-0640-0673 at 11 n.23.[2]

The Second Circuit noted that the CWIS Rule itself did not "independently authorize take," and the court cited the portion of the CWIS Rule preamble found at "79 Fed. Reg. at 48,382," where EPA explains FWS' commitment as part of the technical assistance process to provide the reasonable and prudent measures necessary for authorizing take. *Cooling Water Intake Structure*

---

[2] *See* Respondents' Brief at 128, *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49 (2d Cir. 2018) (No. 14-4645), 2016 WL 6155984 (Oct. 19, 2016).

*Coal.*, 905 F.3d at 75 n.16. The Second Circuit also observed that environmental groups could file an enforcement action against take caused by operation of cooling water intake structures *if* "a facility engages in unlawful take *before the Rule is fully implemented*," i.e., before state or federal permittees are issued permits through the implementation process. *Id.*

For the second *Allied-Signal* factor, courts in this Circuit consider the disruptive consequences vacatur would have upon the parties, third parties, and the general public. *See e.g., Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). "[A] quintessential disruptive consequence arises when an agency cannot easily unravel a past transaction in order to impose a new outcome." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) (affirming remand without vacatur of a federal rule for international shipping rates for pilots based on disruptive consequences). Disruptive consequences weigh heavily against vacatur here, where the agency's action involves statewide regulation of all activities impacting jurisdictional wetlands in assumable waters.

Over 1,130 days have elapsed since Florida's Section 404 program commenced and the Corps of Engineers transferred thousands of permit files to the State for processing. In all, FDEP has received over 9,300 permit applications; over 700 individual permits have been issued. Ex. A at ¶ 5. At present, approximately 1,520 permit applications are pending. *Id*. Over 300 FDEP employees have been hired and trained to implement the 404 program. Environmental restoration projects, roads, bridges, hospitals, housing, schools, military projects, and a host of other projects seek and receive section 404 coverage from the State program. *Id*. The program is firmly in place and thousands of permit actions have occurred and thousands remain in process. The disruptive consequences of vacatur would be substantial. Ex. at ¶¶ 14-29.

Compared to the disruption that vacatur would inflict, remanding without vacatur would

not jeopardize species or harm plaintiffs. The Florida-led program, with continued regulatorily-required close coordination with FWS and FWC along with EPA oversight, remains protective of listed species and ensures no jeopardy. Minimal risk of harm exists because any state 404 applicants must still comply with all terms and conditions imposed as part of the joint federal-state technical assistance process. *See e.g., Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 538 (D.C. Cir. 2018) (remanding EIS and declining to vacate license action because of potential disruptive consequences and lack of harm from leaving license "in effect *for now"*).

## II.   Remedy Selection

Applying the *Allied-Signal* factors, this Court should – to the extent it finds the BiOp/ITS to be invalid in some respect – remand the BiOp/ITS to the agencies for further proceedings without vacatur. Absent that, other less disruptive forms of a limited or partial vacatur are also available for this Court's consideration, as set forth below.[3]

### A.   Remand Without Vacatur Would Be Proper In This Context.

Given the nature of the action's alleged deficiencies and the severe consequences of vacatur, this Court should, if it finds a deficiency with the BiOp/ITS, remand it to the agencies without vacatur. *See, e.g., Conserve SW. Utah v. U.S. Dep't of Interior*, No. 1:21-cv-01506-ABJ, 2023 WL 7922785, Mem. Op. (D.D.C. Nov. 16, 2023) (remanding BiOp without vacating it or the related grant of a right of way); *U.S. Sugar Corp. v. EPA*, 844 F.3d 268, 270 (D.C. Cir. 2016) (per curiam) (noting that courts have "frequently remanded without vacating when a rule's defects are curable").

---

[3] The remedy for a flaw in a BiOp/ITS should be narrowly tailored to the BiOp/ITS itself, and should not extend to approval of Florida's program, which was based on satisfying the criteria under Section 404(g)-(h). Florida Intervenors concur with Federal Defendants that invalidation of the BiOp/ITS does not render the separate approval action flawed or invalid. Dkt. 158 at 6-8. Likewise, a flaw in the ITS does not necessarily invalidate the BiOp either.

B.     **In the Alternative, The Court Should Grant Limited or Partial Vacatur.**

If this Court decides to declare the BiOp/ITS invalid in whole or in part and finds that vacatur is potentially warranted notwithstanding the disruptive consequences, this Court should postpone or limit the scope of the vacatur in at least three ways, as set forth below.

Stay Effectiveness of the Vacatur Order: This Court should, to minimize severe consequences of disruption, stay the order for an adequate period of time – at least six months – to allow the federal and state agencies to chart a new course. *See Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236 (D.D.C. 2020) (vacating BiOp but staying the Order for nine months to allow the agency time to produce new BiOp and conservation measures). Or, this Court should hold the question of *whether to vacate* the BiOp for an adequate period of time to allow the agencies to resolve the identified problems. *See Ctr. for Biological Diversity v. Raimondo*, No. 18-112 (JEB) 2022 WL 17039193 (D.D.C. Nov. 17, 2022), *vacated on other grounds,* 2024 WL 324103 (D.D.C. Jan. 29, 2024) (remanding agency action and related BiOp without vacatur and holding the question of whether to vacate the BiOp for a two-year period to provide time for the agency to resolve the issue through new action).

Prospective Application of Vacatur for New Permits Only: Vacatur, if any, should only apply prospectively to forthcoming permit actions under the Florida 404 Program, and not apply to permits issued prior to the order. *See e.g., Pub. Emps. For Env't Resp. v. Hopper*, 827 F.3d 1077, 1084 (D.C. Cir. 2016) (vacating EIS and ITS issued for approval of project, while declining to vacate lease or other regulatory approvals already issued); *In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.,* 853 F. Supp. 2d 138, 144 (D.D.C. 2012), *aff'd*, 751 F.3d 629 (D.C. Cir. 2014) (granting prospective vacatur where retroactive vacatur would be an "invitation to chaos" ).

Limit Vacatur to "May Affect, Likely to Adversely Affect" Projects: This Court should also limit vacatur to only projects in the "may affect, likely to adversely affect" category, as

6

projects *indicating incidental take*. For ESA purposes, 404 applications generally fall into three categories: (1) "no effect" on listed species; (2) "may affect, not likely to adversely affect" listed species; and (3) "may affect, likely to adversely affect" listed species. The third category aligns with those projects that, under a Corps-led program, would likely trigger formal consultation with a BiOp/ITS. Importantly, however, just 1.4% of Florida 404 permit applications fall within the third category, Ex. A at ¶ 13, which aligns closely with the percentage of Corps-led 404 permits in Florida that triggered formal consultation. *Id*. at ¶ 13 n.1. If vacatur is limited in this way, the ITS's liability protection would not extend to the third category (at least until the ITS/BiOp is fixed), while the other two categories (not indicative of incidental take) would be unaffected. *See e.g., Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 82 (D.C. Cir. 2020) (holding that courts should "limit the solution to the problem" by vacating only the parts of a rule that it finds invalid).

        **C.**      **Full Vacatur Of The BiOp/ITS Should Not Be Selected.**

In no event should vacatur of the BiOp/ITS occur, nor should EPA's approval of Florida's 404 program itself be vacated, which would cause severe, far-reaching consequences. Ex. A at ¶¶ 22-29. Complete vacatur should be avoided if at all possible. *Cf. Maine Lobstermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv*., 70 F.4th 582, 601 (D.C. Cir. 2023) (ordering vacatur of BiOp where the "error in [BiOp] is a serious one and vacating the [BiOp] will have no adverse consequences," but refusing to vacate the underlying agency rule where doing so "would create significant uncertainty." Federal courts should be wary of rendering orders with far-reaching disruptive consequences – some foreseen, even more unforeseeable. *See e.g., Defs. of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 118 (D.D.C. 2011) (refusing "invitation to chaos" in context of APA-based challenge to pesticide registration approved by EPA).

Dated:  February 4, 2024                                              Respectfully submitted,

                                                                                              BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

Lily N. Chinn (D.C. Bar No. 979919)
101 California Street
San Francisco, CA 94111
Phone: (415) 291-6200
lily.chinn@bakerbotts.com

Aaron M. Streett (TX Bar No. 24037561)
Harrison Reback (TX Bar No. 24012897)
(*pro hac vice*)
910 Louisiana Street
Houston, TX 77002-4995
Phone: (713) 229-1234
aaron.streett@bakerbotts.com
harrison.reback@bakerbotts.com

## CERIFICATE OF SERVICE

I hereby certify that on this the 4th day of February 2024, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com
