**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 21-119 (RDM) |
| MICHAEL S. REGAN, *et al.*, | |
| *Defendants*. | |

**<u>MEMORANDUM OPINION</u>**

Plaintiffs the Center for Biological Diversity, Defenders of Wildlife, the Sierra Club, the Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper ("Plaintiffs") bring this challenge to various agency actions relating to the Environmental Protection Agency's ("EPA") approval of the State of Florida's application to assume (from the U.S. Army Corps of Engineers ("Corps")) permitting authority under Section 404 of the Clean Water Act ("CWA") within the State. *See Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 179 (D.D.C. 2022) ("*CBD I*"). Defendants include the EPA, the Corps, the U.S. Fish and Wildlife Service ("FWS"), the National Marine Fisheries Service ("NMFS"), and several federal officials sued in their official capacities (collectively, the "Federal Defendants"). Defendants also include the State of Florida and the Florida Department of Environmental Protection ("FDEP") (collectively, "Florida" or the "State"), which have intervened to defend the assumption and resulting permitting program.

Plaintiffs allege that the Federal Defendants violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, the Endangered

Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*., and the Rivers and Harbors Act, 33 U.S.C. § 401 *et seq*., in their rush to transfer this permitting authority to Florida in the final days of the last administration.  In prior opinions, the Court addressed some, but not all, of Plaintiffs' APA claims.  This opinion addresses only Plaintiffs' claims involving the Endangered Species Act; the Court will, if necessary, address the remaining claims in a subsequent opinion.

Given the complexity of the relevant statutory and regulatory background, it is necessary to provide somewhat greater detail than usual to introduce the questions presented.  Under the ESA's implementing regulations, an "action agency"—here, the EPA—is required to "review its [contemplated] actions at the earliest possible time to determine whether any action may affect listed species or critical habitat."  50 C.F.R. § 402.14(a).  If the action agency determines that an "action may affect a listed species or critical habitat," *id.*, the agency must consult with the FWS and/or the National Marine Fisheries Service ("NMFS") (collectively, the "Service" or "Services") to ensure that its contemplated action "is not likely to jeopardize the continued existence of any endangered or threatened species."  16 U.S.C. § 1536(a)(2).  That process, which is referred to as "Section 7 consultation," requires the "consulting agency"—that is, the FWS and/or the NMFS—to prepare a Biological Opinion ("BiOp"), which details "how the agency action [at issue] affects the species or its critical habitat" and to determine whether the proposed action is likely to jeopardize the continued existence of any listed species.  *Id.* § 1536(b)(3)(A).  "If jeopardy . . . is found," the consulting agency is required to "suggest those reasonable and prudent alternatives which [the consulting agency] believes would not violate [the ESA] and [that] c[ould] be taken by the [action] agency or applicant in implementing the agency action."  *Id.*  "Following the issuance of a 'jeopardy' opinion, the [action] agency must either terminate the action, implement the proposed alternative, or seek an exemption from the

Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)."  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 652 (2007).

On the other hand, if the Service determines that the agency action will not violate the ESA (*i.e.*, that no "jeopardy" is likely) or that "reasonable and prudent alternatives" would avoid any such violation, the consulting agency must determine whether any "incidental take" of a listed species is nevertheless "likely to occur."  50 C.F.R. § 402.14(g)(5)–(7).  The ESA defines "take" to mean "to harass, harm, pursue, hunt, shoot, wound, trap, kill, capture, or collect, or to attempt to engage in any such conduct" with respect to a listed species.  16 U.S.C. § 1532(19).  "Take" is incidental if it "results from, but [is] not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant."  50 C.F.R. § 402.02.

If "incidental take" is "reasonably certain to occur," *id.* § 402.14(g)(7); *see Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1080 (D.C. Cir. 2021), the consulting agency is required to issue an Incidental Take Statement ("ITS"), which, among other things, "specifies the impact of such incidental taking on the species" and "sets forth the terms and conditions . . . that must be complied with by the [action] agency or applicant (if any), or both," in order to "minimize such impact," 16 U.S.C. § 1536(b)(4).  Significantly, the ITS must specify "the amount or extent[] of such incidental taking on the species" or must use a "surrogate (e.g., similarly affected species or habitat or ecological conditions)" that can "be used to express the amount or extent of anticipated take" and that "sets a clear standard for determining when the level of anticipated take has been exceeded."  50 C.F.R. § 402.14(i).  The ITS serves the ESA's mandate "to give endangered species priority over the 'primary missions' of federal agencies," *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978) ("*TVA*"), because, if the incidental take limit

is exceeded, the action agency "must reinitiate consultation *immediately*."  50 C.F.R.

§ 402.14(i)(4) (emphasis added).

The ITS is also important to regulated parties and serves their need for clarity, because "any taking that is in compliance with the terms and conditions specified in the [ITS] shall not be considered to be a prohibited taking of the species concerned."  16 U.S.C. § 1536(o)(2).  As discussed further below, however, formal consultation under Section 7 is not the only way a State or permittee can obtain liability protection:  Under Section 10 of the ESA, a State or private party may seek a permit that allows "any taking otherwise prohibited by" the ESA and that, accordingly, provides protection from liability for incidental take, *id.* § 1539(a)(1)(B).  But absent liability protection of some sort, anyone who violates the ESA by taking an endangered or listed "species within the United States," *id.* § 1538(a)(1)(B), risks civil penalties, criminal liability, and "[c]itizen suits," *id.* § 1540(a), (b) & (g).

This case turns on the meaning and operation of these provisions, along with the subsection of the CWA that authorizes a State to apply to the EPA to assume Section 404 permitting authority from the Corps.  *See* 33 U.S.C. § 1344(g).  Here, Florida submitted an assumption application on August 20, 2020.  Only twice before has the EPA approved a State's assumption application—it approved Michigan's application in 1984 and New Jersey's application in 1994.  *See* 40 C.F.R. § 233.70 (Michigan); *id.* § 233.71 (New Jersey).  In this case, however, Florida proposed something novel:  It sought to confer, through the Section 7 mechanism, broad ESA liability protection on all future state permittees for incidental take resulting from *state*-issued dredge and fill permits.  Under the approach that Florida proposed, the EPA would engage in Section 7 consultation with the FWS at the outset.  The agency action under review would be the EPA's approval of Florida's assumption application, and the FWS

would issue a "programmatic" BiOp finding no jeopardy followed by a "programmatic" ITS that would protect all future state Section 404 permittees.

As Florida explained during the administrative process, "where a state administers the Section 404 program, permittees" who cannot "avoid entirely adverse impacts to listed species" must "seek an incidental take permit under ESA Section 10," Dkt. 112-2 at 3, or, as in New Jersey, the EPA can federalize those applications likely to adversely affect listed species, thereby triggering Section 7 consultation, Dkt. 112-3 at 369.  But because those paths to ESA liability protection were, in Florida's view, "burdensome," "time consuming[,] and resource-intensive," Dkt. 112-2 at 3–4, the State suggested a third option: a one-time Section 7 programmatic consultation in connection with the EPA's review of Florida's assumption application, thus allowing the FWS to issue a programmatic BiOp and a programmatic ITS, which would provide Florida permittees with liability protection under the ESA for all future permits issued under the state program—without requiring future Section 7 or Section 10 consultation.

This, then, brings the Court to crux of the current dispute.  In Plaintiffs' view, the EPA and the FWS failed in this programmatic effort because neither the programmatic BiOp nor the programmatic ITS satisfies the demanding standards set by the ESA.  Neither, in their view, includes the ESA-mandated species-specific analysis, effects analysis, numerical quantification of take, and related statutory and regulatory requirements.  In short, neither document wrestles with the core ESA considerations or includes the fundamental ESA safeguards.

Defendants respond that, even if the programmatic BiOp and programmatic ITS lack these ESA-mandated elements, the FWS (and the EPA) permissibly deferred the relevant considerations to a "technical assistance process" involving Florida, the FWS, and the EPA. That technical assistance process, in their view, promises to address all of the ESA requirements

down the road, on a permit-by-permit basis—and they contend (over Plaintiffs' dissent) that the technical assistance process has successfully done so to date.  Under this process, Florida is required to consult with the FWS regarding each permit application, the FWS is provided the "opportunity" to specify take limits, and the State is required to include those limits, if supplied, in its state-issued permits.  In Defendants' view, this alternative process was not only justified, but necessary, because it would have been too difficult to conduct the required species-specific analyses, to quantify take, and to address similar concerns at the programmatic level given the scope of the agency action at issue.

To this, Plaintiffs reply:  If the FWS lacked the time, information, or ability to make the assessments and to set the limits required by the ESA and its implementing regulations, the FWS acted beyond its authority in purporting to make a no jeopardy finding and in conferring blanket ESA immunity on all future Florida Section 404 permittees.  The difficulty in their view, moreover, was not merely a product of the rush to finish the BiOp and ITS in the waning days of the last administration but, more fundamentally, was a product of the fact that the BiOp and ITS seek to attain an unlawful goal—that is, take liability protection premised on something other than the rigors of Section 7 or Section 10 of the ESA.

Now before the Court are the parties' cross-motions for partial summary judgment, Dkt. 98; Dkt. 99; Dkt. 101; Dkt. 102, and the Center for Biological Diversity ("CBD") and Sierra Club's motion for a temporary restraining order and preliminary injunction, Dkt 135.  CBD and the Sierra Club's motion seeks to enjoin Florida from issuing Section 404 permits for two developments, which they contend pose an imminent threat to the critically endangered Florida

6

panther and the threatened crested caracara, a rare bird of prey similar to a falcon.[1]  On October

19, 2023, the Court heard oral argument on parties' cross-motions for partial summary judgment

and, on January 30, 2024, the Court heard oral argument on CBD and the Sierra Club's motion

for a preliminary injunction.  In addition to the administrative record, the parties, intervenors,

and amici have submitted many hundreds of pages of briefs and exhibits.

For the following reasons, the Court will **GRANT** Plaintiffs' motion for partial summary

judgment with respect to Counts 3, 4, 6, 10–13 of the Third Amended Complaint, Dkt. 77, and

will **DENY** the Federal Defendants' and Florida's cross-motions with respect to those Counts.

In short, the Court is persuaded that the FWS's programmatic BiOp and ITS fail to satisfy the

requirements of the ESA, and the Court is unpersuaded that the non-statutory technical assistance

process is a lawful substitute for the procedures and remedies that Congress enacted in the ESA

and that the Services established in the implementing regulations.  The Court previously

dismissed Counts 8 and 9 and, at least for now, defers addressing Counts 1, 2, 5, and 7 of the

Amended Complaint.  Because the Court grants substantive relief on the merits of Plaintiffs'

ESA-related claims, the Court will **DENY** as moot CBD and the Sierra Club's motion for a

temporary restraining order and preliminary injunction, Dkt. 135, on the ground that the relief

granted on summary judgment will address the risk of imminent harm raised in that motion.

## I. BACKGROUND

This is the Court's third opinion addressing the merits of this case—and probably not the

last.  In the Court's first merits decision, it rejected Florida's threshold challenge to Plaintiffs'

standing to bring this action; rejected Defendants' contention that the EPA's decision to grant

---

[1] The Court granted both developers—Tarpon Blue Silver King I, LLC and Cameratta
Companies LLC—leave to intervene for the limited purpose of opposing this motion.  *See* Dkt.
145; Dkt. 146; Min. Order (Jan. 24, 2024).

Florida's assumption application was an adjudication, rather than a rulemaking; granted

Defendants' motions for summary judgment with respect to Count Nine, which challenged

EPA's failure to codify Florida's Section 404 program; and denied without prejudice

Defendants' motions for summary judgment with respect to Count Eight, which challenged the

EPA's decision to give immediate effect to its decision, on the ground that the Court required

further briefing to determine whether that claim was redressable.  *CBD I*, 597 F. Supp. 3d at179–

80.  The second opinion picked up where the first left off and further considered whether the

EPA's failure to provide 30 days' notice before its assumption decision took effect was

redressable—or whether that action constituted "a bell that cannot be unrung." *Ctr. for

Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2023 WL 5437496, *4 (D.D.C. Aug. 23,

2023) ("*CBD II*").  Concluding that it lacked authority to remedy the alleged wrong, the Court

granted the Federal Defendants' renewed motion for summary judgment and Florida's renewed

motion to dismiss with respect to Count Eight for lack of jurisdiction. *Id.* at *10.

      Having rejected Plaintiffs' procedural objections under the APA, the Court now turns to

the question whether the FWS and the EPA violated the ESA in approving Florida's assumption

application.  Central to that question are the "programmatic" BiOp and "programmatic" ITS

issued by the FWS—both lack, among other things, required species-specific analyses and take

limits, and they purport to confer ESA liability protection on, among others, future Florida

Section 404 permittees without complying with the dictates of Section 7 or Section 10 of the

ESA.

## A.  Statutory and Regulatory Landscape

      1.  *The Endangered Species Act*

Almost fifty years ago, Congress enacted the Endangered Species Act "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). With that legislation, Congress made a "conscious decision . . . to give endangered species priority over the 'primary missions' of federal agencies," *TVA*, 437 U.S. at 185, and to afford "endangered species the highest of priorities," *id.* at 194. The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180.

Under the ESA, a species may be listed as either "endangered" or "threatened." *See* 16 U.S.C. § 1533. An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). The ESA is administered by two federal agencies: the FWS and the NMFS. 50 C.F.R. § 402.01(b). The FWS administers the statute with respect to species under the jurisdiction of the Secretary of the Interior, while the NMFS does so with respect to species under the jurisdiction of the Secretary of Commerce. *Nat'l Ass'n of Home Builders*, 551 U.S. at 651.

Section 9 of the ESA prohibits any person, including private parties, States, and federal agencies, from "taking" a protected species. 16 U.S.C. § 1538(a)(1)(B). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harm in the definition of 'take' in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification

or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering."  50 C.F.R. § 17.3.

To enforce Section 9's prohibition on take, the Secretary of the Interior or the Secretary of Commerce (collectively, the "Secretary") may assess civil penalties against alleged violators through administrative, trial-like proceedings.  *See* 16 U.S.C. § 1540(a)(1)–(2).  The ESA also authorizes the imposition of criminal penalties on those who knowingly violate the Act, a permit issued under the Act, or certain regulations, *id.* § 1540(b), and it authorizes the Attorney General to bring civil actions for injunctive relief, *id.* § 1540(e)(6).  Finally, the ESA authorizes citizen suits, which allow private parties to bring suit in federal district court to enforce the substantive provisions of the ESA and its implementing regulations against regulated parties, 16 U.S.C. § 1540(g)(1)(A); *see Bennett v. Spear*, 520 U.S. 154, 173–74 (1997), or to compel the Secretary to apply the prohibition on the taking of listed species in any State, 16 U.S.C. § 1540(g)(1)(B).

Recognizing that some take can occur as a result of otherwise lawful activities, Congress created two paths to ensure that "incidental take" does not jeopardize protected species or adversely modify or destroy critical habitat:  The first path, under Section 7, applies to federal agency actions, *id.* § 1536; and the second, under Section 10, applies to non-federal actions, *id.* § 1538.  Both mechanisms offer the promise of liability protection for incidental take if, but only if, those involved abide by the specific measures and standards specified by Congress and the Services.  *See id.* § 1536(o)(2); *id.* § 1539(a); 50 C.F.R. § 402.14(i)(5).

    2.    *Section 7 and Formal Consultation*

"Section 7 of the ESA prescribes the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora."  *Nat'l Ass'n of Home Builders*, 551 U.S. at 652; *see* 16 U.S.C. § 1536.  An action "jeopardize[s] the continued existence of" a

species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Section 7 applies only to "actions in which there is discretionary Federal involvement or control," 50 C.F.R. § 402.03, however, because if a statute mandates that an agency act in a specified manner, the consultation process would "override" that statutory mandate "by subjecting such [agency] action to the further condition that it pose no jeopardy to endangered species," *Nat'l Ass'n of Home Builders*, 551 U.S. at 664. That conclusion applies, moreover, even when the statutory mandate "is not entirely mechanical"—that is, even when "it involves some exercise of judgment" on the agency's part "as to whether" the statutory criteria have been met—because, even then, the statute "does not grant [the agency] discretion to add another entirely separate prerequisite to [the] list" of relevant criteria, namely consideration of "the protection of threatened and endangered species as an end in itself." *Id.* at 671.

Under Section 7(a)(2), "[e]ach Federal agency shall, in consultation with and with the assistance of [Service], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). To achieve that end, "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). If the action agency determines—and the consulting agency concurs—that "the proposed action is not likely to adversely affect any listed species or critical habitat," then no formal consultation is required. *Id.* § 402.14(b)(1). But if a federal agency

concludes after an initial review that its action "may affect listed species or critical habitat," that

agency must engage in "consultation" with the Service.  *Id.* § 402.14(a).

The agency that proposes to act in a manner that might affect listed species or critical

habitat is referred to as the "action agency," while either the FWS and/or the NMFS serves at the

"consulting agency."  *See Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 474 n.3 (D.D.C. 2014).

In this case, the EPA was the "action agency," the FWS was the "consulting agency" (although,

in Plaintiffs' view, the EPA should have also engaged in formal consultation with the NMFS),

and the agency action subject to consultation was the EPA's approval of Florida's assumption

application.

"Broadly speaking, the object of consultation under the statute is for the [consulting]

agency to determine whether the project will violate [Section 7's] prohibition on jeopardizing the

continued existence of endangered and threatened species."  *Ctr. for Biological Diversity v. Ross*,

2020 WL 1809465, at *2 (D.D.C. Apr. 9, 2020).  At the conclusion of the Section 7 consultation

process, the consulting agency must issue a biological opinion—that is, a BiOp—"setting forth

[its] opinion, and a summary of the information on which the opinion is based, detailing how the

agency action affects the species or its critical habitat."  16 U.S.C. § 1536(b)(3)(A); *see also* 50

C.F.R. § 402.14(h).

<u>The Biological Opinion</u>

The consulting agency's BiOp must "detail[] how the agency action affects the species or

its critical habitat."  16 U.S.C § 1536(b)(3)(A).  To prepare the required BiOp, the consulting

agency must:

> (1)   Review all relevant information provided by the [action] agency or
> otherwise available. Such review may include an on-site inspection of
> the action area with representatives of the [action] agency and the
> applicant.

(2)     Evaluate the current status and environmental baseline of the listed species or critical habitat.

(3)     Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

(4)     Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat[,] [and]

. . .

(7)     Formulate a statement concerning incidental take, if such take is reasonably certain to occur.

50 C.F.R. § 402.14(g).  "In formulating its [a] biological opinion, [b] any reasonable and prudent alternatives, and [c] any reasonable and prudent measures, the Service" is required to "use the best scientific and commercial data available." *Id.* § 402.14(g)(8); *see also* 16 U.S.C. § 1536(a)(2) ("In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.").

Establishing the "environmental baseline of the listed species or critical habitat" is a substantial undertaking.  The "environmental baseline" is "the condition of the listed species . . . without the consequences to the listed species . . . caused by the proposed action."  50 C.F.R. § 402.02.  It includes (a) "the past and present impacts of all Federal, State, or private actions and other human activities in the action area;" (b) "the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation;" and (c) "the impact of State or private actions which are contemporaneous with the consultation in process."  *Id.*  The environmental baseline considers "[t]he consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify."  *Id.*

13

The consulting agency must then "[e]valuate the effects of the action and cumulative effects on the listed species." *Id.* § 402.14(g)(3). The "effects of the action" include "all consequences to listed species . . . that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." *Id.* § 402.02. A consequence is "caused by" the proposed action if (a) "it would not occur but for the proposed action" and (b) "it is reasonably certain to occur." *Id.* "Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action." *Id.* "Cumulative effects" on the listed species, by contrast, are "those effects of future State or private activities, *not* involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.* (emphasis added).

It is only after engaging in this detailed analysis that the consulting agency can "[a]dd the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate [its] opinion as to whether the action is likely to jeopardize the continued existence of listed species." *Id.* § 402.14(g)(4). With that analysis complete, the consulting agency must then offer its "opinion on whether the action" will violate Section 7, *i.e.*, will cause jeopardy to a listed species or result in destruction of adverse modification of a critical habitat. *Id.* § 402.14(h)(1); *see also* 16 U.S.C. § 1536(a)(2).

In sum, a BiOp (a) must use the best scientific data available, (b) must determine the environmental baseline of the listed species or critical habitat, (c) must evaluate the effects of the action and cumulative effects on the listed species or critical habitat, and (d) must add that baseline to that effects of the action and cumulative effects on the listed species or critical habitat (in light of the status of the species and critical habitat), 50 C.F.R. § 402.14(g), and (e) must then use this data and analysis to determine whether the action at issue  is "[l]ikely to jeopardize the

14

continued existence of a listed species or result in the destruction or adverse modification of critical habitat," which is referred to as "a 'jeopardy' biological opinion," or is "[n]ot likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat," which is referred to as "a 'no jeopardy' biological opinion," *id.* § 402.14(h)(1)(iv).

In the event of a "jeopardy biological opinion," the consulting agency "shall suggest those reasonable and prudent alternatives which [it] believes would not violate [Section 7(a)(2)] and can be taken by [the action agency]."  16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(h)(3), (g)(5).  "Following the issuance of a 'jeopardy' opinion, the [action] agency must either terminate the action, implement the proposed alternative, or seek an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)."  *Nat'l Ass'n of Home Builders*, 551 U.S. at 652.

<u>The Incidental Take Statement</u>

In the event of a "no jeopardy biological opinion," the consulting agency must provide an incidental take statement, 16 U.S.C. § 136(b)(4); 50 C.F.R. § 402.14(i), if it concludes that take is "reasonably certain to occur," 50 C.F.R. § 402.14(g)(7); *Shafer & Freeman Lakes Env't Conservation Corp*, 992 F.3d at 1080.  "Incidental take" refers "to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant."  50 C.F.R. § 402.02.  The ESA requires that the ITS:

(i)     specif[y] the impact of such incidental taking on the species,

(ii)    specif[y] those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

(iii)   in the case of marine mammals, specif[y] those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and

(iv)   set[] forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

16 U.S.C.A. § 1536(4).

The governing regulations define "the impact" of the incidental take to mean "the amount or extent[] of such incidental taking on the species."  50 C.F.R. § 402.14(i)(1)(i).  If necessary, the consulting agency may use a "surrogate (e.g., similarly affected species or habitat or ecological conditions) . . . to express the amount or extent of anticipated take," but only if the BiOp or ITS "[d]escribe[s] the causal link between the surrogate and take of the listed species, explains why it is not practical to express the amount or extent of anticipated take . . . and sets a clear standard for determining when the level of anticipated take has been exceeded."  *Id.*  The regulations also require monitoring of incidental take and provide that "the Federal agency or any applicant must report the progress of the action and its impact on the species to the [FWS or NMFS] as specified in the incidental take statement."  50 C.F.R. § 402.14(i)(3).  Most significantly, the action agency and consulting agency "must reinitiate consultation *immediately*" if the "amount or extent of incidental taking" specified in the ITS, as required by the regulations, "is exceeded."  50 C.F.R. § 402.14(i)(4) (emphasis added); *id.* § 402.16(a).  Finally, as discussed more fully below, "any taking that is in compliance with the terms and conditions specified" in an ITS "shall not be considered to be a prohibited taking of the species concerned."  16 U.S.C. § 1563(o)(2).

Framework Programmatic Action

The Services have jointly issued a "Consultation Handbook," which defines programmatic consultation as a "consultation addressing an agency's multiple actions on a

16

program, regional or other basis." Dkt. 112-1 at 195 (ESA Section 7 Consultation Handbook).[2]
The ESA's implementing regulations further explain that "[f]or a framework programmatic
action, an incidental take statement is not required at the programmatic level." 50 C.F.R.
§ 402.14(i)(6). This is because "any incidental take resulting from any action subsequently
authorized, funded, or carried out under the program will be addressed in subsequent section 7
consultation, as appropriate." *Id.* "For a mixed programmatic action, an incidental take
statement is required at the programmatic level only for those program actions that are
reasonably certain to cause take *and* are not subject to further section 7 consultation." *Id.*
(emphasis added).

The regulations define a "[f]ramework programmatic action" to mean "a Federal action
that approves a framework for the development of future action(s) that are authorized, funded, or
carried out at a later time," where "any take of a listed species would not occur unless and until
those future action(s) are authorized, funded, or carried out and subject to further section 7
consultation." *Id.* § 402.02. Similarly, a "[m]ixed programmatic action" is defined to mean "a
Federal action that approves action(s) that will not be subject to further section 7 consultation,
and also approves a framework for the development of future action(s) that" will be "authorized,
funded, or carried out at a later time" and that will be "subject to further section 7 consultation."
*Id.* In short, the regulations recognize that certain framework programmatic actions might not be
ripe for meaningful Section 7 consultation at the outset and thus permit the required consultation
to occur in stages, as the future federal actions are authorized, funded, or carried out.

---

[2] The Federal Defendants argue that the "Services' views in the Consultation Handbook are
entitled to deference." Dkt. 99 at 22 n.7 (citing *Miccosukee Tribe of Indians v. United States*,
566 F.3d 1257, 1273 (11th Cir. 2009)).

Section 7 Liability Protection

Section 9 of the ESA provides that "it is unlawful for any person subject to the jurisdiction of the United States to . . . take any [listed endangered species] within the United States or the territorial sea of the United States," 16 U.S.C. § 1538(a)(1)(B), and this prohibition, in turn, triggers potential civil or criminal liability under Section 11 of the Act, *id.* § 1540. Section 7, however, provides an escape hatch for "any taking that is in compliance with the terms and conditions specified" in an ITS.  16 U.S.C. § 1536(o)(2); *see also* 50 C.F.R. § 402.14(i)(5); *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36 (D.C. Cir. 2015).  Importantly, compliance with the terms and conditions specified in an ITS provides take liability protection not just to the federal agency and applicant, but to any party who "engage[s] in incidental takes consistent with the statement without applying for section 10 permits."  *Ramsey v. Kantor*, 96 F.3d 434, 437 (9th Cir. 1996).

The ITS thus acts as both a safe harbor and as a check.  Private entities and individuals (as well as government officers and employees) can avoid Section 9 liability for take in compliance with the terms and conditions of an applicable ITS—but, as soon as the take limit specified in the ITS is exceeded, the action and consulting agencies must "immediately" reinitiate consultation, 50 C.F.R. § 402.14(i)(4), thereby allowing the Service to reassess whether its original "no jeopardy" determination still holds in light of the unanticipated take and, if not, whether additional limitations and conditions are necessary to protect the species.

3.    *Section 10 and Incidental Take Permits*

Not all acts that result in incidental take involve a federal agency action, and thus not all such acts fall within the scope of the Section 7 consultation process.  For non-federal action, Section 10 of the ESA authorizes the Services to issue permits, "under such terms and conditions

as [the Service] shall prescribe," that allow "any taking otherwise prohibited by" Section 9, but

only "if such taking is incidental to, and not the purposes of, the carrying out of an otherwise

lawful activity."  16 U.S.C. § 1539(a)(1)(B).  As with Section 7 consultation, however, Congress

mandated robust analyses and standards that the Services must satisfy before permitting

incidental take pursuant to Section 10.  *See id.* § 1539(a).

      To obtain a Section 10 permit, the applicant must submit a conservation plan, known as a

"Habitat Conservation Plan" or "HCP," that describes:

> (i) the impact which will likely result from such taking;
>
> (ii)    what steps the applicant will take to minimize and mitigate such impacts,
> and the funding that will be available to implement such steps;
>
> (iii)    what alternative actions to such taking the applicant considered and the
> reasons why such alternatives are not being utilized; and
>
> (iv)    such other measures that the [Service] may require as being necessary or
> appropriate for purposes of the plan.

*Id*. § 1539(a)(2)(A).  The Service must publish notice of the permit application in the Federal

Register, and "[i]nformation received by the [Service] as part of [the] application shall be

available to the public as a matter of public record at every stage of the proceeding."  *Id*.

§ 1539(c).  The Service must also provide an "opportunity for public comment" on the

application and related conservation plan.  *Id*. § 1539(a)(2)(B).  Finally, before issuing the

permit, the Service must make certain findings, including findings that the taking will be

incidental, that it "will not appreciably reduce the likelihood of the survival and recovery of the

species in the wild," and that "the applicant will, to the maximum extent practicable, minimize

and mitigate the impacts of such taking."  *Id*.

      Section 10 requires all incidental take permits to include "such terms and conditions as

the [Service] deems necessary or appropriate" and directs that the Service "*shall* revoke a

permit . . . if he finds that the permittee is not complying with the terms and conditions of the permit."  *Id.* § 1539(a)(2)(B)–(C) (emphasis added).

**B.      Administrative Background**

Under Section 404 of the Clean Water Act, the Army Corps of Engineers is authorized to issue permits, "after notice and opportunity for public hearings[,] for the discharge of dredged or fill material into the navigable waters at specified disposal sites."  33 U.S.C. § 1344(a); *see also id.* § 1344(d) ("The term 'Secretary' as used in this section means the Secretary of the Army, acting through the Chief of Engineers.").  When Congress enacted the CWA, however, it "expressed its desire 'to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution,'" and it thus established a process to allow States to implement the Section 404 permit program on their own, "so long as the EPA first gives them permission to do so."  *CBD I*, 539 F. Supp.3d at 139 (quoting 33 U.S.C. § 1251(a)).  To apply, a State must submit an application to the EPA containing "a full and complete description of the program it proposes to establish and administer under State law" and "a statement from the attorney general" affirming that "the laws of such State . . . provide adequate authority to carry out the described program."  33 U.S.C. § 1344(g)(1).  After determining that the State's "submission is complete," 40 C.F.R. § 233.15(a), the EPA must publish the application in the Federal Register for public comment and must provide copies of the application to the Corps, the FWS, and the NMFS for comment, *id.* § 233.15(d)–(f); *see also* 33 U.S.C. § 1344(g).  Then, "[w]ithin 120 days of receipt of a complete program submission (unless an extension is agreed to by the State), the Regional Administrator [of the EPA] shall approve or disapprove the program based on whether the State's program fulfills the requirements of [the governing regulations] and

20

the [CWA], taking into consideration all comments received."  40 C.F.R. § 233.15(g); *see also*
33 U.S.C. § 1344(h)(1).

       After the EPA has transferred permitting authority to a State, the agency continues to
oversee that State's permitting program.  The State must transmit copies of each permit
application to the EPA; the EPA must then provide copies of each permit application to the FWS
and the NMFS; the EPA may also "provide written comments to such State with respect to such
permit application" within 90 days; and, if the EPA objects to the issuance of the permit, the
State may not issue the permit "unless it modifies [the] proposed permit in accordance with [the
agency's] comments."  33 U.S.C. § 1344(j).  "In the event that the [State] neither satisfies EPA's
objections or requirement for a permit condition nor denies the permit, the Secretary [of the
Army] shall process the permit application."  40 C.F.R. § 233.50(j); *see also id.* § 233.2; *id.*
§ 233.1(a).  In other words, permitting authority power reverts to Corps for that particular permit.
To facilitate this ongoing oversight, an EPA regulation requires participating States to enter into
a Memorandum of Agreement ("MOA") with the EPA that "set[s] out the State and Federal
responsibilities for program administration and enforcement" and that specifies the "classes and
categories of permit applications for which EPA will waive Federal review."  40 C.F.R.
§ 233.13(b), (b)(1).  Finally, if the EPA determines "after public hearing that a State is not
administering" its Section 404 program "in accordance with" the requirements of the CWA, and
if the State does not take "appropriate corrective action . . . within a reasonable time," the EPA
"shall . . . withdraw approval of such program until [it] determines" that the State has taken the
required "corrective action."  33 U.S.C. § 1344(i).  During any period of withdrawal, the Corps
"shall resume" administration and enforcement of the Section 404 program in the relevant
jurisdiction.  *Id.*

On August 18, 2020, the State of Florida submitted to the EPA an application to administer the Section 404 permitting program within its borders, and, just two days later, the EPA determined that the application was complete, thus triggering the 120-day review period. *See CBD I*, 597 F. Supp. 3d at 182; *see also* 33 U.S.C. § 1344(h)(3). Roughly four months later, in December 2020, the EPA published a notice in the Federal Register approving Florida's application, making it the first State to assume Section 404 authority in nearly thirty years. *CBD I*, 597 F. Supp. 3d at 183. Other than Florida, just two other states, New Jersey in 1994 and Michigan in 1984, have assumed Section 404 permitting authority. *Id.* at 182 (citing 40 C.F.R. § 233.70 (Michigan), 40 C.F.R. § 233.71 (New Jersey)).

Notably, the EPA did not engage in formal Section 7 consultation before approving either prior application. *See* Dkt. 104 at 63 n.35. When New Jersey applied to assume Section 404 permitting authority, the EPA undertook only informal Section 7 consultation.[3] Formal

---

[3] As explained further below, at that time, the EPA's view was that its approval of a Section 404 assumption application was discretionary and therefore subject to Section 7 of the ESA. *Cf.* Dkt. 112-3 at 373–74. The EPA changed its view following the Supreme Court's decision in *National Association of Homebuilders v. Defenders of Wildlife*, 551 U.S. 644 (2007), *see* Dkt. 112-3 at 373, and then subsequently reversed position again at Florida's urging, *see* Dkt. 56-1 at 775 (ESA Consultation Memo). Because Plaintiffs and Defendants agree that the EPA's approval of a state's Section 404 assumption application is discretionary and, accordingly, that it triggers the Section 7 consultation process, the Court need not—and does not—express a view on that question.

The Court notes, however, that the EPA premised its most recent view—that its approval of a State's 404 assumption application is discretionary and thus triggers Section 7 consultation—on the fact that the EPA is required "to consider the Services' comments before deciding to approve an assumption request, and [the requirement that] states . . . comply with the CWA Section 404(b)(1) Guidelines when issuing permits under an assumed program." Dkt. 56-1 at 779. The first of these premises, however, is in significant tension with the Federal Defendants' recent assertion that its decision to grant Florida's assumption application was not "based on its review of . . . the BiOp." Dkt. 158 at 6. Nor is it clear that the second of these premises shows that approving a State's Section 404 assumption application is "discretionary" under the reasoning of *National Association of Homebuilders*. There, the Supreme Court explained that the relevant

consultation was not required because the EPA determined, during informal consultation, that its approval of New Jersey's assumption application would not adversely affect any species.  *See* 50 C.F.R. § 402.14(b)(1) ("A federal agency need not initiate formal consultation if . . . the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat.").  In particular, because the State had agreed to "federalize"—that is, pass to the FWS and NMFS for review—any permits that might affect protected species, Dkt. 112-3 at 369; *see also* Dkt. 112-5 at 149, 152–54 (New Jersey MOA describing the process for federalizing permits), and because the State had agreed that, when the "[c]oordination process under the MOA" failed to eliminate adverse effects to listed species, it would ensure that it or the permit applicant would "seek authorization for [] incidental take" under Section 10, Dkt. 112-5 at 160, the assumption of Section 404 permitting authority would have no effect on any species.  Because neither the FWS nor the NMFS prepared a BiOp or ITS, New Jersey permit applicants did not receive federal incidental take liability protection under Section 7 as part of New Jersey's assumption.  To the contrary, the governing MOA states: "Nothing in this MOA authorizes any take of federally listed threatened

---

question is whether, as a matter of statutory interpretation, formal consultation would "override" the statutory text by "subjecting" the relevant agency action (here, the EPA's approval of a state Section 404 assumption application) to the "further condition that it pose no jeopardy to endangered species."  551 U.S. at 664.

Here, the EPA says that the statutory text effectively includes a no-jeopardy condition because Section 404 requires the EPA "to determine whether [the] [S]tate [submitting the application] . . . has the authority to issue permits which," among other things, prohibit the issuance of any permit that could "jeopardize the continued existence of" a listed species.  Dkt. 56-1 at 778 (citing 40 C.F.R. § 230.10(b)(3)).  The question whether a State has adequate *authority* to ensure that no state-issued permit causes jeopardy, however, at least arguably differs from the question whether the federal action—here, the approval of the assumption application—is likely to jeopardize a listed species.

or endangered spec[ies]." Dkt. 112-5 at 157 (New Jersey MOA). Thus, any take liability

protection would flow from either Section 7 (through a federalized permit) or Section 10.

Although the record is less revealing with respect to Michigan, all agree that it also

assumed Section 404 permitting authority without the EPA engaging in Section 7 consultation

and, accordingly, without the benefit of Section 7 liability protection for future, Michigan

permittees. According to the Plaintiffs, this is because Michigan entered into a cooperative

agreement with the Services pursuant to Section 6 of the ESA. For present purposes, however,

the Court need not go beyond what is disclosed by the administrative record and the parties'

agreement—that is, that Florida is the first State to seek protection for the State and future

Section 404 permittees based on a programmatic BiOp and ITS issued pursuant to Section 7 of

the ESA. *See, e.g.*, Dkt. 156 at 7, 87 (Oct. 19, 2023 Hrg. Tr.).

In 2010—long after Michigan and New Jersey had assumed Section 404 permitting

authority—the EPA concluded in a letter memorandum that its decision whether to approve a

state application to assume Section 404 permitting authority constituted a non-discretionary

federal action and, accordingly, was not subject to Section 7 of the ESA. *See* Dkt. 112-3 at 375–

76 (2010 EPA ESA Consultation Position Memo). The EPA explained that, based on its reading

of the Supreme Court's decision in *National Association of Home Builders v. Defenders of*

*Wildlife*, 551 U.S. 644 (2007), the decision to transfer Section 404 authority to a State is non-

discretionary because once a State satisfies the statutory criteria, the EPA *must* approve the

State's application. Dkt. 112-3 at 375 (2010 EPA ESA Consultation Position Memo). Indeed, if

the EPA does not act on a complete application within 120 days, the "program shall be deemed

approved." 33 U.S.C. § 1344(h)(3).

To achieve a "streamlined" process for Section 404 permittees to receive liability

protection for incidental take, Florida asked the EPA to reconsider its 2010 conclusion that the

Section 404 assumption process was non-discretionary under *National Association of Home*

*Builders* and to conclude that the assumption process requires Section 7 consultation and can,

accordingly, yield programmatic ESA liability protection.  *See, e.g.*, Dkt. 112-2 at 3 (Florida

white paper "Streamlined Approach to Address Endangered Species Act Incidental Take

Coverage"); Dkt. 112-3 at 344 ("Potential Endangered Species Act Compromise").  Florida

argued that the EPA's 2010 analysis "resulted from a rushed review, ignored the actual text and

legislative history of Section 404, and misapplied Supreme Court precedent" in *National*

*Association of Home Builders*, which had considered Section 402, not Section 404, of the CWA.

Dkt. 112-2 at 4.  Florida further argued that the ESA is "*at least ambiguous*" and that, as a result,

if the EPA agreed to change its position, it would "likely receive deference under *Chevron*

*U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)."  *Id.* at 11 (emphasis in

original).

Building on this argument, Florida proposed that the EPA engage in a "one time"

"programmatic consultation" under Section 7 "in connection with [the] EPA's initial review of a

state [Section 404 assumption] application."  *Id.* at 3, 11.  According to Florida's submission:

> This would allow the Services to issue a programmatic Biological Opinion
> ('BiOp') and a programmatic incidental take statement ('ITS'), which would
> identify procedural requirements for state permitting under Section 404 . . . .
> Provided these requirements are followed, the programmatic ITS would bring
> state Section 404 permits within the Section 7(o)(2) exemption from take
> liability.

*Id.* at 4.  By taking this approach, the State posited, the EPA and Service could "provide project

applicants the needed liability protection from claims arising under the ESA even though the

activity is authorized pursuant to a state permit."  Dkt. 112-3 at 345.  To support its contention

that the EPA and the Services have the authority to issue programmatic BiOps and programmatic ITSs, which defer species-specific analyses and take limitations to a "technical assistance process," Dkt. 112-2 at 11–14, Florida invoked the Second Circuit's decision in *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 76–77 (2d Cir. 2018).  The State stressed that the Second Circuit had upheld the use of a programmatic ITS in that case "despite its failure to numerically quantify the impacts" of take.  *Id.* at 14.

Florida further argued that this programmatic approach was needed because, "thus far, where a state administers the Section 404 program, permittees themselves must avoid entirely adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10 separate and apart from the Section 404 permit process, which can take years to complete in contrast to the Section 7 process and is more burdensome for all involved."  Dkt. 112-2 at 3. According to the State, around ten percent of the Section 404 permits in Florida would require some form of incidental take coverage, including for "many large real estate, mining, agriculture, and utility industry projects with significant economic benefits to the State."  *Id.* at 3.  Moreover, to "facilitate the process" that it proposed, Florida volunteered to "develop [a biological] assessment on [the] EPA's behalf or in cooperation with [the] EPA."  *Id.* at 14 & n.25; *see* 50 C.F.R. § 402.08.  A biological assessment ("BA") is "information prepared by or under the direction of" a federal agency to determine whether a proposed action may affect listed species. 50 C.F.R. § 402.02.  The EPA later used that BA (or, in Plaintiffs' words, "largely . . . cut and paste[d] it," Dkt. 98 at 31) to prepare its biological evaluation ("BE"), which it submitted to the FWS to assist in evaluating "the possible effects of [its] potential approval of . . . Florida's assumption" application.  Dkt. 112-4 at 89.

As the EPA acknowledged, there were other options available to protect state permittees from incidental take liability under the ESA.  It observed that state programs can (1) "completely avoid[] impacts" to protected species; (2) "federaliz[e]" all state 404 permits that may impact species, as occurs in New Jersey under its assumption program; or (3) require state permittees to engage in Section 10 review.  *See* Dkt. 112-3 at 368 (EPA response to comments).[4]  On December 12, 2019, however, the EPA agreed to Florida's "request[] that the [EPA] initiate an informal" ESA Section 7 consultation with the Services and "designate FDEP as the non-Federal representative to conduct informal consultation."  Dkt. 112-4 at 2 (EPA letter to FDEP).  The EPA explained that it was voluntarily initiating informal consultation while it gave "further consideration to [its] position" on whether consultation was required for approving a state 404 program.  *Id.*; *see also* Dkt. 112-2 at 351 (EPA letter to the NMFS).

As early as November 2019, the FDEP told the Corps that the EPA would treat its review of the State's application as a "discretionary" federal action, thereby requiring Section 7 consultation at the programmatic level, and that the State had hired a contractor to prepare a BA. Dkt. 112-8 at 106 (Corps email).  During a December 2019 meeting about Florida's assumption application, the FDEP further advised the Corps that the EPA would use that BA "to request consultation and produce a programmatic B[i]O[p]."  *Id.* at 107–09 (Corps email sending meeting notes).  Then, in February 2020, an FWS deputy field supervisor stated as follows in an email:

---

[4] At one point, the EPA expressed "institutional concerns regarding [Florida's] initial proposal to provide ESA Incidental Take authorization to permit applicants through the Section 7 consultation process."  Dkt. 112-3 at 344.  In response, Florida suggested yet a different approach under which the EPA would consult with the FWS on individual state 404 permits based on the EPA's oversight of state permits, *id.* at 344–45, essentially federalizing those permits.

> FYI—we had a good meeting yesterday with FWC, FDEP, EPA, and FDEP's consultants—GHD . . . . They went through the draft BA but I was not given a copy. The draft BA follows the [*Cooling Water*] BE as expected. We provided some suggestions like "be careful of using words like consultation when you really mean coordination and technical assistance" . . . .
>
> I've already started writing parts of the B[i]O[p] by adapting generic standard language from the [*Cooling Water*] B[i]O[p] where appropriate.

Dkt. 112-5 at 170. On April 1, 2020, FWS staff described the plan at follows:

> After assumption, FWS will not be issuing any project-by-project incidental take statements for State 404 permits because the State 404 BiOp will have a programmatic [ITS] that will cover any incidental take for any state 404 permit. FWS will merely be providing technical assistance on the project by project reviews to [F]DEP, [the Florida Fish and Wildlife Conservation Commission ("FWC")], and/or permit applicants and tracking on a project-by-project basis any incidental take that is anticipated to occur as the result of [F]DEP issuing any particular 404 permit.

Dkt. 112-4 at 9 (FWS email to FDEP and FWC staff). During that period, the EPA's formal position, remained that Section 7 did not apply to the agency's approval of a Section 404 assumption application, because such approvals were non-discretionary.

That changed when, five months after the EPA had initiated informal consultation and had designated the FDEP as its non-federal representative for consultation, it solicited public comment on "whether EPA's approval of a Clean Water Act Section 404 Program is non-discretionary for purposes of Endangered Species Act Section 7 consultation." Dkt. 112-2 at 367 (85 Fed. Reg. 99 at 30953 (May 21, 2020)) (capitalization altered). The EPA expressly referenced Florida's white paper in its request for comment, seeking public comment on whether it "should . . . adopt the position articulated in the FDEP white paper." Dkt. 112-2 at 369. That is, the EPA requested comment on the programmatic BiOp-plus-ITS model that Florida had proposed.

On July 24, 2020, Florida submitted its completed BA to the EPA, "as the non-federal representative" designated by the EPA "to prepare this BA."  *See* Dkt. 56-1 at 66, 68 (Florida BA).  That document explained that, "[b]ecause of the statewide nature of [the State's assumption application], the numerous covered species and diverse habitats, as well as lack of knowledge with respect to where and what type of future permits may be requested, a meaningful site-specific and species-specific analysis [was] not possible in th[e] BA."  *Id.* at 69.  Instead, the BA set out "to describe the regulatory process by which the State of Florida will make determinations on the issuance of State 404 permits."  *Id.*  Under that process, the FDEP proposed to "send copies of all permit applications and its preliminary site-specific determination of potential effects to listed species to the []FWS for review and comment," to "consider any information that the []FWS provides as technical assistance," and to "include all species protection measures that the []FWS may recommend as permit conditions or [to] deny the request for a permit."  *Id.* at 70.  The BA concluded that "[i]t is anticipated" that a programmatic approach and technical assistance process "will result in procedural and substantive protections that are at least as protective as the protections afforded by the [Corps] Section 404 program and through section 7 consultation with the [Corps] under the ESA."  *Id.* at 179.

On August 20, 2020, the State submitted its Section 404 assumption application to the EPA, and the EPA deemed the submission complete two days later.  *See CBD I*, 597 F. Supp. 3d at 182–83; Dkt. 112-4 at 85.  A draft Memorandum of Understanding ("MOU") was among the materials the State submitted.  Dkt. 55-1 at 120 (unexecuted application MOU).  As that document explained, "[u]pon assumption of the Section 404 Program, coordination between the []FWS and FDEP related to the proposed action's effects on species will occur through the technical assistance process, *which is anticipated to be outlined* in the []FWS's biological

opinion based on information included in the biological assessment," which Florida prepared, and the EPA "submitted" to the FWS.  *Id.* at 124 (emphasis added).  The BiOp was not, however, complete at that time and, therefore, was not included in Florida's assumption application.

A week later, on August 27, 2020, the EPA announced the reversal of its prior position regarding the applicability of the Section 7 consultation process to the EPA's consideration of Section 404 assumption applications.  Agreeing with Florida, the EPA concluded that the Section 7 process—including the issuance of a programmatic BiOp and ITS, and the extension of "Section 9 liability protections to individual permits issued pursuant to the state . . . program"—would apply.  Dkt. 56-1 at 775, 778, 781 (ESA Consultation Memo).  In its response to public comments, the EPA stressed that neither federalizing permits nor Section 10 consultation was "realistically feasible for states with an abundance of ESA listed species like Florida," Dkt. 112-3 at 368, and in its final decision, the EPA explained that the "streamlined permitting process" that the programmatic BiOp and ITS would put in place "would reduce costs and duplication of efforts by state . . . and federal authorities and facilitate more effective and efficient state . . . CWA Section 404 programs."[5]  Dkt. 56-1 at 781.  Later, the EPA wrote that "requiring Florida's permittees to seek an ESA Section 10 Incidental Take Permit, with the requirement to prepare a Habitat Conservation Plan, would be extremely costly and take years to complete and therefore is . . . not an option that Florida would pursue."  Dkt. 112-3 at 369.

---

[5] Although several of the Plaintiffs in this case agreed with the EPA's new view that approval of a State's assumption application was *discretionary*, thereby requiring Section 7 consultation, all opposed the use of Section 7 in the programmatic manner advocated by Florida as unlawful under the ESA.  *See* Dkt. 56-1 at 785.

A few days later, on September 2, 2020, the EPA submitted a request for formal consultation under Section 7(a)(2) to the FWS. Dkt. 112-4 at 85 (EPA letter). Enclosed with the EPA's letter to the FWS was the EPA's Biological Evaluation. *Id.*; *see also* Dkt. 112-4 at 87 (EPA BE). The EPA stated that it was "requesting a *programmatic* consultation." *Id.* at 85 (EPA letter) (emphasis added).

That same day, the EPA also sent a letter to the NMFS, but it did not request formal Section 7 consultation from the NMFS. Dkt. 112-2 at 351 (EPA letter to the NMFS). Rather, the EPA explained that, in its view, its decision whether to approve Florida's assumption application would have "no effect" on any species within the NMFS's jurisdiction. *Id.* The next day, the NMFS concurred with the EPA's "no effect" determination. *See* Dkt. 112-2 at 352 (September 2020 NMFS letter to EPA).

On November 17, 2020, the FWS finalized its programmatic BiOp and programmatic ITS. Dkt. 112-5 at 60 (BiOp); Dkt. 112-5 at 139 (ITS). The BiOp did not include any species-specific analyses of the baseline status of species or effects of the EPA's action; instead, it explained that "[s]pecies-specific and site-specific analyses will occur during the technical assistance process conducted between the USFWS and FDEP, and whenever EPA coordinates with USFWS on State permit actions." Dkt. 112-5 at 114 (BiOp). The BiOp further explained that it was "not feasible, nor [wa]s it required" to detail or analyze any "species-specific effects." *Id.* at 124 (BiOp). Like the BA that Florida had prepared, the BiOp explained that "[b]ecause the precise number and locations of future State 404 permit applications are unknown, the exact effects to ESA-species cannot be accurately determined." *Id.* at 126 (BiOp). Instead of species-specific analysis, the BiOp analyzed whether the Florida program was "structured" to ensure that no future permit would likely jeopardize ESA-listed species. *Id.* (BiOp). The FWS ultimately

"determined that the endangered species *coordination processes*" set out in the technical assistance process ("TAP") were "as protective" as Section 7(a)(2) of the ESA. *Id.* (BiOp).

The final portion of the BiOp contained the FWS's programmatic ITS, which extended ESA liability protection to (1) the EPA; (2) the State of Florida; and (3) any and all individual state permittees for all take of listed species incidental to state-permitted activities so long as that take is in compliance the "terms and conditions" of the ITS. Notably, however, none of the listed "terms and condition" govern the conduct of state permittees; instead, the "terms and conditions" bind only the EPA and FDEP. *Id.* at 141–42. The ITS also does not specify the amount or extent of permissible take or set a trigger for the reinitiation of consultation. *Id.* at 139–40 (BiOp).

On December 17, 2020, then-EPA Administrator Andrew Wheeler announced approval of Florida's assumption application, and the agency published a notice of approval in the Federal Register on December 22, 2020. Dkt. 56-1 at 433–34; *see also* 85 Fed. Reg. 83,553 (Dec. 22, 2020). Among other things, that notice asserted that the EPA had "determined that the State of Florida ha[d] the necessary authority to operate a CWA Section 404 program in accordance with the requirements found in CWA section 404(g)–(l) and EPA's implementing regulations." Dkt. 56-1 at 433. The notice further stated that the "EPA has taken final action to approve Florida's assumption of the program" and that "Florida's program assumption" took immediate effect on December 22, 2020, *id.*, which was the day the notice was published in the Federal Register, *see* 85 Fed. Reg. 83,553 (Dec. 22, 2020). Because the decision purported to constitute an adjudication, rather than a rule, and was made immediately effective, it was not subject to the regulatory freeze, which took effect on January 20, 2021. *But see CBD I*, 597 F. Supp. 3d at 173,

212 (concluding "that the EPA's approval of Florida's Section 404 program constituted a rule, rather than an adjudication").

## C.      Procedural Background

Plaintiffs filed this suit on January 14, 2021, alleging that "[t]he EPA's actions failed to effectuate a lawful transfer of [Section 404 permitting] authority" to Florida.  Dkt. 1 at 3, 10–14 (Compl. ¶¶ 1, 40–53).  Plaintiffs' original Complaint included nine claims.  *See* Dkt. 1 at 25–48 (Compl. ¶¶ 100–248).  As explained above, however, the Court already granted summary judgment in Defendants' favor with respect to Count Nine and held that Plaintiffs lack standing to pursue Count Eight.  *See CBD I*, 597 F. Supp. 3d at 179–80; *CBD II*, 2023 WL 5437496, at *9–10.  Seven of Plaintiffs' original claims, plus four additional claims that Plaintiffs later added to their Complaint, remain pending.  *See generally* Dkt. 77 (Am. Compl).  For present purposes, however, the Court addresses only Plaintiffs' ESA claims.

Plaintiffs' ESA claims against the FWS challenge the adequacy and lawfulness of that agency's programmatic BiOp and no-jeopardy decision (Count 3), the adequacy and lawfulness of its programmatic ITS (Count 4), and the adequacy and lawfulness of the combination of the ITS, the BiOp, and the technical assistance process (Counts 6 and 13), which Plaintiffs argue, "create an ESA scheme that is not authorized by law," *id.* at 44, 56 (Am. Compl.  ¶¶ 214, 297), and "give [Florida] a workaround regarding the mechanisms that Congress provided for establishing take limits, extending liability coverage, and determining jeopardy to species," *id.* at 44 (Am. Compl. ¶ 215).  Plaintiffs further allege that the EPA violated the ESA by relying on the facially deficient BiOp and ITS, *id.* at 49–52 (¶¶ 249–73) (Count 10); by failing to consult with the NMFS, *id.* at 53–55 (¶¶ 274–87) (Count 11); and by failing to consult with the FWS regarding "ESA-listed sea turtles that nest on Florida's beaches," *id.* at 55 (¶¶ 288–94) (Count

12).  Plaintiffs' Amended Complaint asks the Court to, among other things, "[v]acate and set

aside [the] []FWS' programmatic biological opinion and incidental take statement for the

challenged EPA decision and [to] remand with instructions for reopening and reinitiating

consultation" and to "[e]njoin the EPA's approval and transfer of authority to the state." *Id.* at

58 (Am. Compl. ¶¶ (m), (p)).

On February 28, 2023, Plaintiffs moved for summary judgment as to the remaining

counts contained in the Amended Complaint.  Dkt. 98.  The Federal Defendants cross-moved for

summary judgment, Dkt. 99, as did Florida, Dkt. 101.  The Court heard oral argument on

October 19, 2023.[6]

On December 4, 2023, CBD and the Sierra Club moved for a temporary restraining order

and/or preliminary injunction, seeking to preclude Florida from issuing two Section 404 permits

that, according to Plaintiffs, will cause irreparable harm to the endangered Florida panther and

the threatened crested caracara.  Dkt. 135.  Following a scheduling conference at which the EPA

indicated that it intended to comment on the permits in question (thereby delaying their

issuance), the parties agreed to a briefing schedule.  Min. Entry (Dec. 5, 2023); Dkt. 138 at 1–2.

The Court granted leave to intervene to the two developers whose permits CBD and the Sierra

Club sought to enjoin, Min. Order (Dec. 22, 2023); Min. Order (Jan. 24, 2024) and heard oral

---

[6] Before argument, the Court granted Plaintiffs' motion for leave to file a surreply, which they
filed on October 12, 2023.  *See* Dkt. 123; Min. Order (Oct. 6, 2023); Min. Order (Oct. 5, 2023).
After oral argument, the Court granted Defendant-Intervenors' motion for leave to file a post-
hearing memorandum, Dkt. 127, and provided Plaintiffs an opportunity to respond, which they
did on October 30, 2023, Dkt. 129.  *See* Min. Order (Oct. 27, 2023); *see also* Dkt. 130
(separately filing the memorandum originally attached to the Defendant-Intervenors' motion,
Dkt. 127).  The Federal Defendants then sought leave to file a supplemental response to
Plaintiffs' most recent supplemental filing, Dkt. 131, which the Court granted, *see* Min. Order
(Nov. 7, 2023); *see also* Dkt. 134 (separately filing the memorandum originally attached to the
Federal Defendants' motion, Dkt. 131).  The Court also allowed Plaintiffs to submit a short
response, Min. Order (Nov. 7, 2023), which Plaintiffs filed on November 9, 2023, Dkt. 133.

argument from all parties on January 30, 2024.  At that time, Florida indicated that the two

permits in question would issue no sooner than February 16, 2024.  Jan. 30, 2024 Hrg. Tr.

(Rough at 25:9–13).[7]

## II.  LEGAL STANDARD

"[W]hen a party seeks review of agency action under the APA[,] the district judge sits as

an appellate tribunal."  *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting *Am.*

*Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  The general standard for

summary judgment set forth in Rule 56 of the Federal Rules of Civil Procedure does not apply to

a review of agency action.  But summary judgment nonetheless "serves as the mechanism for

deciding, as a matter of law, whether the agency action is supported by the administrative record

and otherwise consistent with the APA standard of review."  *Sierra Club v. Mainella*, 459 F.

Supp. 2d 76, 90 (D.D.C. 2006) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir.

---

[7] In resolving the pending motions, the Court has considered over twenty briefs: Dkt. **98**
(Plaintiffs' Motion for Summary Judgment); Dkt. **99** (Federal Defendants' Cross-Motion for
Summary Judgment); Dkt. **102** (Defendant-Intervenors' Cross-Motion for Summary Judgment
and Opposition); Dkt. **104** (Plaintiffs' Consolidated Reply); Dkt. **106** (Federal Defendants' Reply
in Support of Cross-Motion for Summary Judgment); Dkt. **107** (Defendant-Intervenors' Reply in
Support of Cross-Motion for Summary Judgment); Dkt. **123** (Plaintiffs' Sur-Reply); Dkt. **127-
1**/Dkt. **130** (Defendant-Intervenors' Post-Hearing Memorandum); Dkt. **129** (Plaintiffs' Response
to Defendant-Intervenors' Post-Hearing Memorandum); Dkt. **131-1**/Dkt. **134** (Federal
Defendants' Supplemental Brief); Dkt. **133** (Plaintiffs' Response to Federal Defendants'
Supplemental Brief); Dkt. **135** (CBD and Sierra Club's Motion for TRO and PI); Dkt. **145**
(Limited-Intervenor Tarpon Blue Silver King I's Memorandum in Opposition to TRO and PI);
Dkt. **146** (Limited-Intervenor Cameratta's Memorandum in Opposition to TRO and PI); Dkt. **148**
(Federal Defendants' Memorandum in Opposition to TRO and PI); Dkt. **149** (Defendant-
Intervenors' Memorandum in Opposition to TRO and PI); Dkt. **153** (Plaintiffs' Reply); Dkt. **157**
(Limited-Intervenor Cameratta's Supplemental Remedy Brief); Dkt. **158** (Federal Defendant's
Supplemental Remedy Brief); Dkt. **159** (Limited-Intervenor Tarpon Blue Silver King I's
Supplemental Remedy Brief); Dkt. **160** (Defendant-Intervenors' Supplemental Remedy Brief);
Dkt. **161** (Plaintiffs' Supplemental Remedy Brief).  The Court also received and has considered
two briefs from the Florida Chamber of Commerce and the Association of Florida Community
Developers.  Dkt. **103**; Dkt. **108**; *see CBD I*, 597 F. Supp. 3d at 185 n.3.

1977)).  In other words, "[t]he entire case on review is a question of law."  *Marshall Cnty.*

*Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

Under the APA, a reviewing court shall "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "The arbitrary and capricious

standard is deferential; it requires that agency action simply be 'reasonable and reasonably

explained.'"  *Cmtys. for a Better Env't v. EPA*, 748 F.3d 333, 335 (D.C. Cir. 2014) (quoting

*Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009)); *see also Kennecott Greens*

*Creek Mining Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 954 (D.C. Cir. 2007) ("[The]

standard of review under the arbitrary and capricious test is only reasonableness, not

perfection.").  A "court is not to substitute its judgment for that of the agency" if the agency

"examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including

a rational connection between the facts found and the choice made."  *Airmotive Eng'g Corp. v.*

*Fed. Aviation Admin.*, 882 F.3d 1157, 1159 (D.C. Cir. 2018) (alterations in original) (quoting

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))

(internal quotation marks omitted).

"The Court's review, however, must be 'searching and careful.'"  *Colo. River Cutthroat*

*Trout v. Salazar*, 898 F. Supp. 2d 191, 199 (D.D.C. 2012) (quoting *Nat'l Env't. Dev. Ass'n's*

*Clean Air Project v. EPA*, 686 F.3d 803, 810 (D.C. Cir. 2012)).  "An agency decision is arbitrary

and capricious if it 'relied on factors which Congress has not intended it to consider, entirely

failed to consider an important aspect of the problem, offered an explanation for its decision that

runs counter to the evidence before the agency, or is so implausible that it could not be ascribed

to a difference in view or the product of agency expertise.'"  *Cablevision Sys. Corp. v. FCC*, 649

F.3d 695, 714 (D.C. Cir. 2011) (quoting *State Farm*, 463 U.S. at 43).  Just as the Court may not

"substitute [its] judgment for that of the agency" to set aside an agency action, *Rural Cellular*

*Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009), it also typically may not "affirm an agency

decision on a ground other than that relied upon by the agency," *Manin v. Nat'l Transp. Safety*

*Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011).

## III. ANALYSIS

The Court starts with standing and ripeness and then turns to the merits of the parties

ESA arguments.

### A.       Justiciability

Although Florida previously argued that Plaintiffs lack standing to pursue any of their

claims, it now appears to limit its standing challenge (other than its general challenge to

informational standing) to Counts One and Two, which are not presently at issue.  *See generally*

Dkt. 102; Dkt. 107; Dkt. 127-2 at 2.  With respect to Plaintiffs' ESA claims, Florida instead

argues that at least some—Counts Three, Four, Eleven, and Twelve—are not ripe.  *See generally*

Dkt. 102; Dkt. 107.  It does not, however, include other ESA claims—that is, Counts Six, Ten,

and Thirteen—in that ripeness challenge.  *Id.*; *but see* Dkt. 127-2 at 2 (labelling these claims

"arguably not ripe").  The Federal Defendants and the more recent intervenors, for their part,

raise no justiciability defenses at all.  But because the Court has an independent duty to ensure

that it has subject-matter jurisdiction, *see Attias v. Carefirst, Inc.*, 865 F.3d 620, 623 (D.C. Cir.

2017), the Court will address both standing and ripeness.

### 1.       *Standing*

Because "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6

(1996), the Court must assess Plaintiffs' standing with respect to "each claim" currently at issue

and "each form of relief" sought, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  The "irreducible constitutional minimum of standing" requires that Plaintiffs demonstrate, for each claim, that they have (1) "suffered an 'injury in fact'" (2) that is "fairly . . . trace[able] to the challenged action of the defendant," and (3) that is "'likely' . . . that the injury will be 'redressed by a favorable decision.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555. 560–61 (1992) (citations omitted).  At the summary judgment stage, Plaintiffs bear the burden of proffering "affidavits or other evidence to demonstrate the specific facts necessary to support standing."  *CBD I*, 597 F. Supp. 3d at 188 (citing *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015)).

When an association seeks to invoke the jurisdiction of a federal court, it can establish standing in one of two ways.  It can assert "associational standing" to sue on behalf of its members.  *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Or it can assert "organizational standing" to sue on its own behalf.  *See People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).  Because Plaintiffs' invocation of associational standing suffices on the facts of this case, the Court need not consider whether Plaintiffs also have organizational standing.

Associational standing requires that "(1) at least one member of the association has standing to sue in her own right (based on a showing of harm, causation, and redressability), (2) the interests the association seeks to protect by suing on its members' behalf are germane to its purpose, and (3) neither the asserted claim nor the relief requested requires individual members to participate in the litigation."  *See Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022) (citing *Hunt*, 432 U.S. at 343).  "When more than one association brings suit, '[the Court] need only find one party with standing' to satisfy the requirement."  *Ctr. for Biological*

*Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017) (quoting *Ams. for Safe Access v. DEA*, 706 F.3d 438, 443 (D.C. Cir. 2013)).

Here, the Court concludes that at least the Conservancy of Southwest Florida ("the Conservancy"), the Defenders of Wildlife ("the Defenders"), and CBD satisfy the requirements of associational standing.  To start, each of these Plaintiffs easily meets the second and third requirements for associational standing.  The missions of all three associations include the protection of the diverse species and habitats, including listed species in Florida.  *See, e.g.*, Dkt. 98-1 at 1 (Crooks Decl. ¶ 4); Dkt. 98-3 at 2 (Fleming Decl. ¶¶ 4, 6); Dkt. 98-4 at 2, 3–4 (Hartl Decl. ¶¶ 7, 11–12).  The claims that they assert, moreover, do not require the participation of individual members.  *See Ctr. for Biological Diversity*, 56 F.4th at 67.

The Court is also satisfied that all three associations have carried their burden of demonstrating that at least one, identified member has suffered or faces an imminent risk of suffering an injury-in-fact that is fairly traceable to the challenged actions and that a favorable decision is likely to redress.[8]

      a.    Counts 3, 4, 6, 10, 12, and 13

The Court will analyze Counts Three, Four, Six, and Thirteen together because each challenges the FWS's programmatic approach, including the issuance of a programmatic BiOp, a programmatic ITS, and the use of a "technical assistance process" in lieu of the statutorily mandated approach.  And because Counts Ten and Twelve challenge the EPA's reliance on that

---

[8] The Court previously noted that there are grounds to conclude that Plaintiffs also have informational standing.  *CBD I*, 597 F. Supp. 3d at 179.  Florida responds by offering additional evidence regarding its provision information to members of the public relating to permitting decisions.  Given the Court's finding that Plaintiffs' have established their standing to sue on other grounds, the Court need not reach this issue and expresses no view on the sufficiency of Florida's additional evidence.

same, allegedly unlawful approach, the Court considers Plaintiffs' standing to pursue those claims at the same time.  Each of these Counts rests on a similar premise—that the BiOp and ITS prepared by the FWS failed to satisfy the dictates of the ESA—and each seeks the same remedy—vacatur of the BiOp and ITS and remand for reinitiation of consultation, *see* Dkt. 77 at 58 (Am. Compl. ¶¶ (m), (n)).

As the D.C. Circuit has held, "[a] claim of failure to fulfill the statutory consultation obligation under the ESA is at least in significant part a claim of procedural injury, as to which [courts] 'relax the redressability and imminence requirements' of standing."  *Ctr. for Biological Diversity*, 56 F.4th at 67 (quoting *Ctr. for Biological Diversity*, 861 F.3d at 182) (citing *Nat'l Ass'n of Home Builders*, 551 U.S. at 667).  Indeed, the D.C. Circuit has described an agency's failure to meet its statutory consultation requirement as the "archetypal procedural injury."  *Ctr. for Biological Diversity*, 861 F.3d at 182 (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)).  These precedents involved challenges to the action agency's failure to meet its consultation requirement, while, here, Plaintiffs challenge the failure of both the action agency (the EPA) and the consulting agency (the FWS) to comply with the ESA.  But the Court can discern no material difference when it comes standing.  *See Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232, 241 (D.D.C. 2015) (holding that conservation groups had standing to challenge a BiOp in which the NMFS concluded that the combined operation of seven fisheries was not likely to jeopardize the continued existence of certain sea turtles because, by permitting "an unlawfully excessive amount of harm to [the turtles], [the BiOp] threaten[ed] Plaintiffs'] enjoyment and study of those animals"); *Oceana, Inc. v. Ross*, 2020 WL 5995125 (D.D.C. Oct. 9, 2020) (same).  Even with relaxed redressability and imminence requirements that come with a procedural injury, however, "the injury in fact requirement [remains] a hard floor of Article III

jurisdiction," and "a plaintiff alleging a procedural violation" is not "freed" of the burden of establishing causation. *Ctr. for Biological Diversity*, 861 F.3d at 182–83.

Starting with injury, the administrative record and the declarations submitted by members of the Conservancy, the Defenders, and CBD amply support Plaintiffs' claims of injury in fact. The declarations show that members of the associations have concrete interests in minimizing the loss of listed species in the State, including, among others, the Florida panther, the crested caracara, and sea turtles. *See*, *e.g.*, Dkt. 98-1 (Crooks Decl.); Dkt. 98-3 (Fleming Decl.); Dkt. 98-5 (Schwartz Decl.); *cf. Lujan*, 504 U.S. at 562–63. When the FWS concluded that it was necessary to issue an ITS, the FWS concluded that approval of Florida's assumption application was "reasonably certain" to result in some take of all 139 listed species present in the State. *See* 50 C.F.R. § 402.14(g)(7). The FWS's preparation of a no-jeopardy BiOp and ITS that "bypass[es]" the core requirements of the ESA, and the EPA's approval of Florida's Section 404 assumption application based on that BiOp and ITS poses a material risk to the declarants' work and recreational interests in areas of Florida that will be directly affected. *Cf. Ctr. for Biological Diversity*, 56 F.4th at 67–68. Assuming that Plaintiffs will prevail on the merits, as the Court must for purposes of assessing standing, *see In re Navy Chaplaincy*, 534 F.3d 756, 760 (D.C. Cir. 2008) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)), Plaintiffs' allegations demonstrate a concrete injury in fact.

Without developing an objection as to the ESA claims specifically, Florida broadly objects to the idea that the Plaintiffs will suffer an injury from having Florida administer the 404 program rather than the federal agencies. For example, the State argues that "Plaintiffs 'must be able to sufficiently answer the question: What's it to you,' if Florida—instead of the Corps—has the primary role in administering the Section 404 Program for assumable waters in Florida where

EPA retains oversight responsibility?"  *See* Dkt. 107 at 10.  This is a version of Florida and the Federal Defendants' argument that whatever ESA requirements may have been omitted from the programmatic BiOp and programmatic ITS will be sufficiently addressed at the individual permit level through consultation with the FWS via the "technical assistance process."  But, contrary to Defendants' position, as more fully discussed in the merits section, that process does not eliminate the "'substantial probability' that the [Plaintiffs'] cognizable interests will be 'adversely affected.'"  *Id.*  In their briefing and their standing declarations, Plaintiffs aver to the multitude of ways that the technical assistance process has proven inadequate.  Conservancy member Amber Crooks recounts, for example, how "[o]n at least one occasion, the State failed to include a permit condition required by [the] []FWS to protect species on a project of concern to the Conservancy." Dkt. 98-1 at 11 (Crooks Decl. ¶ 31).  She also discusses at length her "concerning" experience with the technical assistance process that occurred in the State's consideration of a particular permit application.  *Id.* (Crooks Decl. ¶ 32).  During that application process, the Conservancy voiced concerns over potential harms to the crested caracara and the Florida bonneted bat.  *Id.*  The FWS shared these concerns, writing in an email that it was unable to submit a comment on the FDEP's website but that, in the agency's words: "We know there will be take of Florida bonneted bats."  Dkt. 98-1 at 38 (Attachment A to Crooks Decl.).  Florida permitted the project even though the state-issued permit "d[id] not assess take to [the] Florida bonneted bat *or* provide a take limit."  *Id.* at 12 (Crooks Decl. ¶ 33) (emphasis added).[9]  Florida

---

[9] Crooks further avers that the Conservancy "could not locate any information—not in the permit, not in FWC comments, and not in the public record—that assured [the Conservancy that the] []FWS had conducted a proper analysis of jeopardy/adverse modification of critical habitat for this project, or a proper analysis of whether or not take would occur, or if they adequately assessed take associated with this project."  *Id.* at 11 (Crooks Decl. ¶ 32).  For instance, the permit "acknowledge[d] an estimated take of up to five different pairs of caracara, but stop[ped]

offers no evidentiary response to these assertions of fact:  Neither of the two declarations from

Justin Wolfe, the General Counsel of the FDEP, submitted by the State addresses the Babcock

project.  *See* Dkt. 102-1 (Wolfe Decl.); Dkt. 107-1 (Supplemental Wolfe Decl.).

Even more fundamentally, the technical assistance program is no substitute for what

Plaintiffs allege is missing here—namely, the ESA-required analysis of species and effects that

the FWS must conduct *before* it can make a no-jeopardy finding and accord incidental take

protection on the EPA, the State, and future state-permittees.  *See* Dkt. 112-1 at 202 (ESA

Section 7 Consultation Handbook instructing the Services to "[n]ever determine the conclusion

of a biological opinion before completing the analysis of the best available data").  Plaintiffs

allege, for example, that the technical assistance program does not require the FWS (or the

NMFS) to evaluate the "effects of the action and cumulative effects to the environmental

baseline" using "the best scientific and commercial data available," 50 C.F.R. § 402.14(g); *see*

*also* 16 U.S.C. § 1536(a)(2), and they allege that the BiOp that the FWS did prepare was wholly

deficient.  They allege that Florida's Section 404 program is less protective of listed species than

the Corps' program.  And they allege that the FWS's ITS failed to satisfy ESA standards

because, among other things, it was not founded on an adequate BiOp, and—most critically—it

omitted any limit on incidental take, which functions to trigger reinitiation of consultation in

order to ensure that the Service's initial determination of no jeopardy remains sound.  Each of

these allegations supports a concrete injury in fact that is not avoided through the technical

assistance program.

---

short of setting a take limit for th[e] project."  *Id*. at 12 (Crooks Decl. ¶ 32).  If the Corps, instead
of Florida, permitted the Babcock project, it would have been subject to Section 7 of the ESA—
not the "technical assistance" process.

Two additional procedural injuries merit brief mention.  First, because the allegedly deficient ITS purports to bestow ESA liability protection on future, state-permittees, those permittees will be relieved of the need to seek protection under Section 10 of the ESA; indeed, one of the two private intervenors in this case was in the process of seeking a Section 10 permit before the ITS issued, Jan. 30, 2024 Hrg. Tr. (Rough at 70:6–9).  Plaintiffs, however, would receive far greater protection under the Section 10 process than under the technical assistance process.  Section 10, for example, requires the applicant to prepare a Habitat Conservation Plan that includes steps to "minimize and mitigate" takings, "funding that will be available to implement such steps," and an explanation for why "alternative actions" were "not being utilized," 16 U.S.C. § 1539(a)(2)(A), and—significantly—it requires the Service to provide notice and an opportunity for public comment on the plan, *see id.* § 1539(a)(2)(B).  .

Second, because the ITS lacks both any take limits *and* any terms and conditions which bind individual permittees, Plaintiffs cannot bring citizen suits pursuant to Section 11 of the ESA against permittees who engage in excess take.  *See* 16 U.S.C. § 1540(g).  Florida responds that a violation of a take limit included in a state-issued permit, to the extent the permit contains one, would open the door to a citizen suit, but its argument turns on the mistaken premise that the "terms and conditions" set forth in the ITS impose duties on state permittees.  Dkt. 112-5 at 141–42 (ITS).  The Federal Defendants, nonetheless, suggested at oral argument that a court could, in the future, read *other* language included elsewhere in the ITS to create implied "terms and conditions," which would bind state permittees and provide a basis for bringing a citizen suit. Jan. 30, 2024 Hrg Tr. (Rough at 31–32, 59–64).  But that argument both ignores the plain language of the ITS and is itself unduly speculative.

Plaintiffs have also established causation and redressability.  As to causation, a plaintiff asserting procedural injury "never has to prove that if he had received the procedure the substantive result would have been altered."  *City of Dania Beach v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007) (quoting *Sugar Cane Growers Coop. v. Veneman,* 289 F.3d 89, 94 (D.C. Cir. 2002)).  Rather, causation in the context of a procedural injury requires a showing of two causal links:  First that the omitted procedural step is connected to some substantive government decision that may have been wrongly decided because of the omission, and second, that that substantive government decision is connected to the plaintiff's harm.  *Ctr. for Biological Diversity*, 861 F.3d at 184.  Plaintiffs do not need to show but-for causation, only that the procedure and substance are connected and that there is a "substantial probability" that the procedural failure will create an adverse effect.  *Id.* at 184–85.  Here, it suffices that the FWS's bypassing of its ESA obligations led to the approval of Florida's Section 404 program and led to the ITSs authorization for the taking of listed species, without due attention to the risks posed to those species.

As for redressability, when a plaintiff's "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*," standing is "ordinarily 'substantially more difficult' to establish."  *Lujan*, 504 U.S. at 562.  When "causation and redressability . . . hinge on the response of the regulated (or regulable) third party to the government action or inaction," *id.*, the plaintiff must establish "facts . . . sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought."  *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007).  Here, the ultimate injury that Plaintiffs assert is the increased risk that Florida's program will jeopardize listed species, which

45

will result in losses to their aesthetic, scientific, and occupational endeavors.  *See, e.g.*, Dkt. 98 at

79–80.  The question, then, is whether vacating the allegedly deficient programmatic BiOp and

ITS and/or setting aside the EPA's assumption decision is likely to result in take limits that

would not otherwise apply or is otherwise likely to reduce the risk of jeopardy and take to listed

species in Florida.  Although the redressability requirement is relaxed in a case alleging

procedural injury, it is not "wholly eliminat[ed]."  *Ctr. for Law & Educ. v. Dep't of Educ.*, 396

F.3d 1152, 1157 (D.C. Cir. 2005).  The Court is satisfied that Plaintiffs have met their burden.

Notably, if the Court vacates the BiOp and ITS, the ESA liability protection that currently

protects the State and state-permittees will no longer apply.  At the very least, this means that for

projects that may affect listed species, and where the permittee is unwilling to risk civil and

criminal liability under the ESA, permittees will need to follow the process set forth in Section

10 of the ESA (or hope that the EPA federalizes the permit in question through its objection

power).[10]  In either case, both Section 7 and Section 10 are demanding processes, and there is at

least "some possibility," *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)—and, indeed, it seems

likely—that the process will result in greater protection for listed species in at least some cases.

On the programmatic level, there is also "some possibility"—and, again, a likelihood—

that the FWS and the EPA would conclude during any renewed Section 7 consultation that the

prospect of developing a legally and factually sufficient programmatic BiOp and programmatic

ITS is simply too daunting and that, instead, they should either create a process for federalizing

---

[10] *Cf.* Dkt. 112-3 at 344 ("[The] EPA's initial draft MOA . . . directs the Corps to take over processing of any permit application where EPA's objections are not satisfied.  The Corps could still process any permit application where an applicant does not agree to include the reasonable and prudent measures as special permit conditions.  This will provide permit applicants for large scale projects, which typically have endangered species impacts, the choice to have their permit processed by [F]DEP or transferred to the Corps.").

permits that may affect listed species (as was done in New Jersey) or leave it to Florida

permittees to seek protection under Section 10.  In either scenario, however, the FWS would be

required to engage in far more detailed consideration of the risks posed by particular projects to

listed species, and there is "some possibility"—and, indeed, a likelihood—that this more

searching analysis would lead to greater protection for at least some listed species.  Moreover,

and of equal importance, actually setting take limits in a Section 7 ITS or Section 10 incidental

take permit would require, respectively, that the action agency and the FWS immediately

reinitiate consultation or revoke the permit if that limit is exceeded.  Those take limits, if

exceeded, would also unambiguously—and in stark contrast to the instant ITS—provide grounds

under which Plaintiffs could bring citizen suits under the ESA.

　　　In addition, if the FWS prepares a new BiOp that finds jeopardy, that finding might

provide a basis for the EPA to withdraw its approval of Florida's program.  *See Nat'l Ass'n of

Home Builders*, 55 U.S. at 652 ("Following the issuance of a 'jeopardy' opinion, the agency

must either terminate the action, implement the proposed alternative, or seek an exemption from

the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)."); Dkt. 102 at

35 ("[W]here a State program does not comply with Federal standards, [the] EPA may seek to

withdraw the program." (citing 33 U.S.C. § 1344(i))).[11]  If the EPA withdraws its approval of the

Florida program—or if the Court sets aside the assumption decision—Section 404 permitting

authority would revert to the Corps.  That reversion, in turn, would satisfy redressability by

providing a process that will result, where appropriate, in the issuance of individual ITSs that

---

[11] Although Defendants maintain that the EPA's assumption decision is not dependent on the
BiOp or the ITS, that is a disputed question in the case, which the Court defers to the merits.

contain take limits, which, if exceeded, will require reinitiation of the consultative process as mandated by the ESA.

To be sure, it is possible that the Court might set aside the BiOp and ITS and that the EPA, the State, and future state permittees will simply decide to proceed without protection from potential ESA liability. But that prospect is extremely remote. A BiOp and ITS have "'powerful coercive effect,'" since those who engage the take of one or more listed species "risk civil and criminal penalties." *Maine Lobstermen's Assoc. v. NMFS*, 70 F.4th 582, 593 (D.C. Cir. 2023) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). The prospect that the EPA, the State, and future state permittees would run that risk here, moreover, seems particularly unlikely, given the breadth of the agency action at issue, the large number of listed species, and the fact that the EPA, the FWS, and the State went to extraordinary lengths to put a programmatic ITS in place precisely to avoid such risks.

      b.      <u>Count 11</u>

Count Eleven raises slightly different issues, which merit brief discussion. That Count alleges that the EPA was required to consult with the NMFS because the marine species under the NMFS's jurisdiction, even if not found in assumed waters, could be affected downstream of assumed waters. Dkt. 77 at 53–55 (Am. Compl. ¶¶ 274–87). This claim, once again, turns in substantial part on an alleged, procedural injury, so the Court will address it with that framework in mind. *See Ctr. for Biological Diversity*, 861 F.3d at 182 (describing an action agency's failure to consult as the "archetypal procedural injury").

Because a procedural right "*in vacuo*" is insufficient to create Article III standing, *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009), Plaintiffs must show that the failure to initiate consultation affects its members' concrete interests. They have done so. Plaintiffs

have submitted declarations showing that their members have concrete research, conservation, aesthetic, and moral interests in various marine species. One declaration, for example, describes the enjoyment the declarant derives from viewing marine wildlife and recreating in places where she can observe them in the wild. Dkt. 98-3 at 7–10 (Fleming Decl. ¶¶ 20–28). And another declaration describes how the declarant's work focuses on the smalltooth sawfish, Dkt. 98-1 at 3 (Crooks Decl. ¶ 11), which is "listed as endangered under the [ESA] by [the NMFS]," Dkt. 98-7 at 10 (Silverstein Decl. ¶ 24). As the Executive Director of Miami Waterkeeper attests, she is a resident of Coral Gables, Florida, who (1) uses her Ph.D. in marine biology and fisheries to research aquatic species, (2) "enjoy[s] observing listed coral and other marine wildlife," and (3) tries to "observe species such as manatees, herons, egrets, ibises, ospreys, sea turtles, and dolphins." Dkt. 98-7 at 1, 2, 11 (Silverstein Decl. ¶¶ 2–4, 7, 28). The EPA's approval of Florida's Section 404 program without engaging in the requisite consultation with the NMFS created a risk of harm to the endangered and threatened marine species of Florida.

Plaintiffs have also established a causal link between the EPA's decision and their alleged injury. The EPA's omitted procedural step of consulting with the NMFS is connected to the substantive government decision that Plaintiffs challenge—that is, the EPA's approval of Florida's Section 404 program without considering what effects, if any, that decision would have on marine life and without obtaining expert input from the NMFS regarding the approval's ecological impact. Those "omitted steps," moreover, "unquestionably connect to the EPA's decision," *Ctr. for Biological Diversity*, 861 F.3d at 184, to approve Florida's program. The Court is also persuaded that the EPA's failure to consult regarding listed marine species poses a substantial risk to Plaintiffs' aesthetic, scientific, and professional interest in those animals. And, the Court is unpersuaded that this causal link fails because the Corps might have issued the same

permits without consulting with the NMFS.  The simple answer is that, had the Corps done so, Plaintiffs could have challenged that allegedly unlawful conduct.

Turning to redressability, Plaintiffs ask the Court to "[i]ssue a declaratory judgment declaring that [the] EPA violated the ESA by failing to consult with NMFS" and to "[i]ssue any other appropriate injunctive relief."  Dkt. 77 at 57–58 (Am. Compl. ¶¶ (e), (q)).  As noted, a procedural-rights plaintiffs need not show that court-ordered compliance with the procedure would alter the outcome.  Instead, all Plaintiffs need to show is that "any required consultation would redress [Plaintiffs'] members' injury because the EPA *could* reach a different conclusion." *Ctr. for Biological Diversity*, 861 F.3d at 185 (emphasis in original).  They have made that showing since "there remains at least the possibility that" the EPA could reach a different conclusion or modify its approval of Florida's Section 404 program based on its consultation with the expert agency.  *Id.*

2.  *Ripeness*

Although Florida does not dispute that Plaintiffs have met their summary judgment burden of establishing standing to pursue their ESA claims, it maintains that at least some of those claims are not ripe for review.  In particular, Florida argues that Plaintiffs' ESA claims related to the ITS (Counts Three and Four) and to consultation for the NMFS-listed species (Count Eleven) are not ripe for review because they are "based on speculations of harm that may never arise."  Dkt. 102 at 12.  The Court is unpersuaded with respect to Counts Three and Four and agrees only in part with respect to Count Eleven.[12]

---

[12] Florida mistakenly labels Count Twelve as an "NMFS-based" claim.  *See* Dkt. 102 at 59.  But Count Twelve asserts that the EPA was required to consult with the FWS, not the NMFS, regarding ESA-listed sea turtles.  *See* Dkt. 77 at 55 (Am. Compl. ¶¶ 288–94).  That claim is ripe for the same reasons that Plaintiffs' challenges to the BiOp and ITS, asserted with respect to *all*

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies.'" *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807, (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)); *see also Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007). "The doctrine is premised, in part, on Article III's case or controversy limitation and, in part, on prudential considerations 'for refusing to exercise jurisdiction.'" *McCray v. Biden*, 574 F. Supp. 3d 1, 11 (D.D.C. 2021) (citation omitted). Prudential ripeness is assessed under the two-pronged test established in *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967). The Court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149.

With respect to Counts Three and Four, Florida argues that Plaintiffs must wait to bring a legal challenge to "an actual FDEP 404 permit issuance where, notwithstanding EPA and FWS involvement and oversight, take protections are claimed to be inadequate." Dkt. 107 at 28. In the State's view, without that context, the Court will be unable to assess whether and how the supplanting of the usual ESA processes with the technical assistance process affects Plaintiffs' rights. Plaintiffs disagree and observe that they have already identified two projects that the State permitted where the record showed that take was likely to occur, but the permit failed to include a take limit. *See* Dkt. 123 at 24–25 (citing Dkt. 98-1 at 9–12 (Crooks Decl. ¶¶ 28–33)). The Court is persuaded that Plaintiffs' challenges to the biological opinion and programmatic ITS are ripe.

---

FWS-listed species, are ripe. Plaintiffs' "NMFS-based" claim is set forth in Count Eleven, which is addressed below.

First, the programmatic ITS is likely to cause "hardship" to Plaintiffs because it creates a legal right at odds with Plaintiffs' interests in preserving listed species: it authorizes the incidental taking of all listed species in Florida, subject only to the non-statutory technical assistance process. The FWS's action constitutes "a definitive statement of [the] agency's position, has direct and immediate effect on the complaining parties, and has the status of law." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 940 (9th Cir. 2006) (alteration in original) (internal quotation marks and citation omitted) (holding that claim challenging ITS was ripe for review). Second, prompt judicial review of Plaintiffs' claim "will not interfere with further administrative action." *Id.* The FWS's position in the programmatic ITS "will not be reconsidered because the consultation process is complete once the biological opinion is issued." *Id.* To be sure, the FWS may have further involvement in the technical assistance process, but it will not have any further input on the ITS itself, and it is the programmatic ITS that Plaintiffs challenge. Third, "further factual development will not assist [the Court] in resolving the legal question at issue," *id.* at 941, which concerns the statutory authorization for extending, as the FWS did here, broad immunity from take liability through a technical assistance process distinct from and not authorized by the Section 7 process.

More generally, Florida's ripeness argument misapprehends the nature of Plaintiffs' challenges to the ITS. Plaintiffs challenge the ITS because it has conferred liability protection for incidental take on the EPA, the State, and state permittees without setting any statutorily-required take limits and without the necessary scientific, species-specific and effects analysis. The crux of Plaintiffs' claim, and the root of their alleged harm, is the fact that the programmatic ITS "creates an unlawful risk of take for Florida's program *as a whole* by failing to set limits on incidental take for the program *as a whole*, in contravention of the ESA." Dkt. 104 at 109

(internal quotation marks and citation omitted).  Plaintiffs correctly observe that the possibility that they might be able to bring a state-court challenge to a particular permit, or the possibility that the FWS and/or the EPA might prevent an individual permit from issuing, does not render their challenge to the administrative action that the EPA and the FWS have already taken—authorizing take without the risk of ESA liability and thereby supplanting the Section 7 and Section 10 processes—unripe for review.

But even placing those broader—and dispositive—considerations aside, the Court agrees with Plaintiffs that they have identified particular Florida-issued permits without take limits. *Contra* Dkt. 107 at 27 ("[T]he outcome of the agencies' technical assistance process as well as [the] EPA's Section 404 oversight role cannot be predicted and no harm will be caused to Plaintiffs' interest unless and until they show inadequate take protection will occur."); *id.* at 28 ("Plaintiffs . . . cannot point to any FDEP 404 permits that have resulted in or will result in inadequate take provisions.").  Florida contends that Plaintiffs can bring suit in Florida court to challenge permits that pose a risk of jeopardy to listed species, but that state-court remedy is not a substitute to the rights and remedies provided in the ESA.  Although Florida also suggested during oral argument that Plaintiffs might be able to bring a citizen suit under the ESA, for the reasons discussed above, the Court is not so sure.  *See infra* 44.  And, in any event, the remote possibility that a federal court might someday entertain a collateral challenge to the FWS's ITS based on the State's failure to include or to enforce a state-take-limit in a state-issued permit, hardly shows that the legal question presented in this case is not fit for judicial review or is unlikely to result in any hardship to the plaintiff.

Florida argues that this case is like *Wyoming Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 9–10 (D.D.C. 2001), where the Court held that an ESA Section 7 claim was not ripe for

review because the relevant oil and gas leases had not yet issued.  But, here, Florida has issued

permits—more specifically, over 700 individual permits as of February 2024, Dkt. 160 at 5.  And

in *Wyoming Outdoor Council*, unlike here, the FWS "was free to engage in further efforts to

fulfill its [statutory] obligations before the leases were issued."  148 F. Supp. 2d at 10 (quoting

*Wyo. Outdoor Council v. U.S. For. Serv.*, 165 F.3d 43, 50 (D.C. Cir. 1999)).  The ripeness

requirement is intended to "protect . . . agencies from judicial interference until an administrative

decision has been formalized and its effects felt in a concrete way by the challenging parties."

*Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732–33 (1998) (internal quotation marks and

citation omitted).  There is little doubt that the FWS's issuance of its programmatic ITS clears

that hurdle.  Finally, because the FDEP has issued hundreds of permits, Florida's reliance on

*New Hanover Township v. U.S. Army Corps of Engineers*, 992 F.2d 470 (3d Cir. 1993), is

similarly misplaced.  There, the Third Circuit reasoned that because "neither the Township nor

anyone else will experience any effects from the Corps' decision *unless and until* Pennsylvania

grants a water quality certificate, when fill work can begin, this case is not ripe."  *Id.* at 473

(emphasis added); *see also Ctr. for Biological Diversity*, 450 F.3d at 941 (holding that challenge

to an ITS was ripe and distinguishing *New Hanover Township* on similar grounds).

      With respect to Count Eleven, Florida argues that Plaintiffs' claims related to adverse

effects to species within the jurisdiction of the NMFS are not ripe because marine species under

NMFS' jurisdiction are "unlikely to be found in any assumable waters because the Corps retains

jurisdiction over" tide waters and adjacent wetlands.  Dkt. 107 at 30.  Florida asserts that if a

proposed Florida Section 404 permit "may eventually affect NMFS species, the federal agencies

(EPA, FWS, and NMFS) and the state agencies (FDEP and FWC) would address those concerns

at that time.  Otherwise, such a decision would be subject to challenge at that time."  Dkt. 102 at

59; *see also* Dkt. 107 at 30 (asserting that Plaintiffs have not been harmed by the EPA's decision "to defer NMFS consultation").  This argument, however, ignores the fact that the EPA was required to consult with the NMFS *before* approving Florida's Section 404 program.  Consultation is "designed as an integral check on federal agency action, ensuring that such action does not go forward without full consideration of its effects on listed species."  *Lujan*, 504 U.S. at 603 (Blackmun, J., dissenting).  That procedural harm has already occurred—no further factual development is necessary or helpful.  Indeed, by Florida's logic no claim for failure to consult would ever be ripe for review unless and until the federal action was complete.  That contention is untenable.

The Court does agree with the State, however, that Plaintiffs' NMFS-based challenge is at least arguably unripe in one respect.  Apparently recognizing its fault, the EPA has initiated informal consultation with NMFS, and that consultation is still ongoing.  It requires no further analysis to conclude that, to the extent Plaintiffs seek to challenge the adequacy of that not-yet-complete consultation, their claim is unripe.

3.    *Mootness*

Finally, Florida argues that Count Eleven is moot to the extent it challenges the EPA's failure to consult with the NMFS.  Dkt. 102 at 60.  As further explained below, however, that argument fails to confront the thrust of Plaintiffs' claim—which is that the EPA was required to consult with the NMFS *before* approving Florida's assumption application—and it fails to confront the State's own observation (just discussed) that any post-approval consultation has yet to reach fruition.

**B.    Merits**

This, then, brings the Court to the merits of Plaintiffs' ESA claims.  The Court will first address Plaintiffs' challenges to the FWS's programmatic BiOp, will then address the FWS's no-jeopardy determination and programmatic ITS, along with the related technical assistance process, and, finally, will turn to Plaintiffs' challenges to the EPA's related actions.

1. *ESA Claims Against the FWS*

The parties disagree about many things.  But they agree that the EPA was required to engage in a meaningful Section 7 consultation with the FWS (and perhaps the NMFS) where the Service(s) would determine (as reflected in a biological opinion) whether the EPA's approval of Florida's Section 404 program threatened to jeopardize ESA-listed species and/or to adversely modify or destroy their critical habitat.  If the FWS concluded that EPA's action was not likely to jeopardize a listed species or to threaten a critical habitat but that the EPA's action was likely to lead to incidental take of a protected species, the FWS was required to issue an ITS setting limits on that take, which, if exceeded, would trigger immediate reinitiation of the consultative process.  Plaintiffs allege that the FWS failed at these tasks, and they argue that the non-statutory technical assistance process is—as both a matter of law and as applied here—no substitute for the procedural and substantive requirements of Section 7.

a.      Challenges to the Biological Opinion

Plaintiffs first argue that the FWS's programmatic BiOp failed to include the analysis and data required to determine whether the EPA's action in approving Florida's program—as opposed to the State's action in issuing individual permits—would jeopardize a listed species.  The Court agrees.  Under the plain language of the statute, the FWS was required to prepare a BiOp "detailing how the agency action affects the species or its critical habitat," 16 U.S.C. § 1536(b)(3)(A), but, here, the FWS did not do so.  Under the regulations, the BiOp "shall

include" a "detailed discussion of the environmental baseline of the listed species and critical habitat" and a "detailed discussion of the effects of the action on listed species or critical habitat." 50 C.F.R. § 402.14(h).  The FWS is expressly required to "[r]eview all relevant information . . . available;" to "[e]valuate the current status and environmental baseline of the listed species;" to "[e]valuate the effects of the action and cumulative effects on the listed species;" and, in the end, to "[a]dd the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species . . . formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species." *Id.* § 402.14(g).  And, the ESA and the implementing regulations require the Service to "use the best scientific and commercial data available" in making these assessments.  *Id.* § 402.14(g)(8); *accord* 16 U.S.C. § 1536(a)(2).

For present purposes, the Court need not address every asserted shortcoming in the FWS's programmatic BiOp because it is clear that, at the very least, the FWS failed to undertake *any* species-specific analysis.  The most compelling evidence in support of this aspect of Plaintiffs' claim are the words of the BiOp itself.  To start, the BiOP states that the FWS merely "evaluated the effects of the action on *guilds* of ESA-proposed and -listed species and designated and proposed critical habitat."  Dkt. 112-5 at 114 (BiOp) (emphasis added); *see also supra* 31.  The BiOp does not define "guild"—nor does the ESA or the implementing regulations—but, according to Merriam-Webster, a "guild" is "a group of organisms that use the same ecological resource in a similar way."  "Guild," *Meriam Webster*, www.merriam-webster.com/dictionary/guild (last visited Feb. 11, 2024).  The BiOp explains that, in the FWS's view, "[a]nalysis of effects using a guild approach is more appropriate at the programmatic level," leaving the mandated "[s]pecies-specific and site-specific analyses [to] occur during the

technical assistance process." Dkt. 112-5 at 114 (BiOp).  But an analysis at the guild-level fails the statutory and regulatory demand to assess the environmental baseline, effects, and cumulative effects at the species-level.

Throughout, the BiOp is forthright that the FWS did not endeavor to address species-specific considerations, opting instead to defer analysis to the technical assistance process.  Here is a non-exhaustive sampling:

- "Because this is a consultation on a programmatic action, it is not feasible, nor is it required, to conduct a meaningful site-specific and species-specific effects analysis in this BiOp.  Therefore, the []FWS determined that a programmatic consultation is appropriate in determining whether FDEP's 404 program and EPA's oversight of FDEP's 404 program is structured to insure that no permit will be issued that is likely to jeopardize threatened and endangered species and destroy or adversely modify critical habitat.  For future permits issued under the State 404 program, site-specific and species-specific information will be available and assessed through the technical assistance process with the State and/or through coordination with the EPA, when EPA has not waived its review of the State permit action."  Dkt. 112-5 at 124–25 (BiOp).

- "We developed a programmatic consultation approach to determine whether and to what degree FDEP has structured their regulatory program and EPA has structured its oversight program to ensure approval and implementation of the State 404 program is not likely to jeopardize the continued existence of proposed or listed species . . . .  This approach also recognizes that site- and species-specific considerations would be addressed with the []FWS in subsequent technical assistance efforts . . . ."  Dkt. 112-5 at 113 (BiOp).

- "The [biological evaluation] lists anticipated stressors in Table C.1. of Appendix C and notes anticipated effect determinations in Table C.1.b of Appendix C.  During future reviews of State 404 permit applications, however, all potential impacts and effects to species and their habitat will be assessed and addressed during project by project permit application reviews."  Dkt. 112-5 at 95 (BiOp).

Against this backdrop, it comes as no surprise that of the over one hundred protected species in Florida, the BiOp names just a handful and, even for those, offers little analysis.  Dkt. 112-5 at 123, 129 (BiOp).  Instead, it merely addresses the effects on "mammalian species/subspecies,"

"birds," "reptiles," "amphibians," "fish," "insects," "crustaceans," "mollusks," and "plants." *Id.*
at 129–35. The ESA demands far more specific and detailed analysis of the effects of an agency
action to satisfy Section 7.

At first, the Federal Defendants seemed to concede that the BiOp failed to consider
species-specific baselines and effects. They wrote that, "[i]n lieu of site-specific or species-
specific analyses, [the] FWS determined that a programmatic or process-based approach to
EPA's potential approval of FDEP's request was appropriate" and that, "[w]ith this
programmatic approach, species-specific analyses were deferred, to be assessed on a permit-by-
permit basis through the technical assistance process." Dkt. 99 at 63. Later, however, the
Federal Defendants doubled back, arguing that there is "no merit" to Plaintiffs' contention that
the FWS failed to evaluate the environmental baseline because the BiOp "adopted the BE's
detailed description of the environmental baseline, which addressed the baseline of listed
species." *Id.* at 68.

Even if such incorporation by reference were proper (which Plaintiffs dispute) and even
assuming that the BE's analysis satisfied the ESA's requirement for setting a species-specific
environmental baseline (which is far from clear), the argument nonetheless fails for two reasons.
First, although the BiOp purports to adopt the BE and its "detailed description of the
environmental baseline," Dkt. 112-5 at 116 (BiOp); *see also id.* at 76, it simultaneously disavows
any ability to engage in "site- and species-specific considerations," which it defers technical
assistance process, *id.* at 113 (BiOp). Second, even if the BiOp adequately addressed the
environmental *baseline*, there is no dispute that it fails to consider any species-specific effects or
the cumulative effects of the EPA's action. Without those essential components, the BiOp fails
to meet the minimum statutory and regulatory requirements.

In response, the Federal Defendants make two principal arguments.  First, they argue that "[n]othing in the ESA requires the [FWS] assess every future phase of an agency action" and that, here, that the relevant action was the EPA's transfer of permitting authority from the Corps to Florida, which was assessed, in FWS's discretion and expertise, only at the programmatic level.  Dkt. 99 at 65 (quoting *Cooling Water*, 905 F.3d at 73).  In the words of the Federal Defendants, the FWS's analysis passes muster because the only "effect" that it assessed was the transfer of permitting authority from the Corps to the FDEP and

> whether, and to what degree, FDEP structured its Section 404 program to establish processes that provide the federal and state agencies will implement CWA Section 404 provisions, the State Section 404 program rule, and the MOU among FDEP, FWC, and [the] FWS in a manner that addresses adverse effects to listed species and their critical habitats to ensure that the regulated activities that require State Section 404 permits are not likely to jeopardize the continued existence of ESA-listed species or destroy or adversely modify designated critical habitat.

Dkt. 99 at 73.

The problem with this framing is that the EPA and the FWS cannot have it both ways: they accepted Florida's request that they engage in Section 7 consultation in order to provide the State and future state-permittees with Section 7 liability protection.  *See, e.g.*, Dkt. 112-2 at 3.  But to do so, they were required to make a finding that the proposed action—here, granting Florida's assumption application and adopting a technical assistance process—"may affect listed species or critical habitat."  50 C.F.R. § 402.14(a).  Indeed, formal consultation is not required if "as a result of the preparation of a biological assessment . . . the Federal agency determines, with the written concurrence of the [Service], that the proposed action is *not* likely to adversely affect any listed species or critical habitat."  *Id.* § 402.14(b)(1).  That was not their determination.  Having concluded that the proposed action *was* likely to adversely affect one or more listed species, the Federal Defendants cannot now argue that a detailed BiOp is unnecessary because

60

the technical assistance process, which purports to replicate traditional FWS review under Section 7, will (as a matter of process) preclude any adverse effects on listed species. If the assumption and technical assistance process "may affect listed species," *id.*, the FWS is required to engage in the detailed, species-specific analysis necessary to evaluate whether those contemplated effects are "likely to jeopardize the continued existence of any [listed] species," 16 U.S.C. § 1536(a)(2).

To the extent this sounds like circular logic, that is the Federal Defendants' doing. As the EPA explained in its response to comments regarding its proposal to engage in Section 7 consultation:

> As set forth in the FDEP White Paper and in Federal Register notice, EPA has *the discretion to consider impacts to listed species* and critical habitat when deciding whether to approve a state's Section 404 program. However, *whether [the] EPA is ultimately required to engage in Section 7 consultation when approving a State 404 program is a factual case-by-case determination and will depend on how a state chooses to develop its 404 program and whether [the] EPA's approval of that program may affect listed species and critical habitat.* States remain free to fashion their particular programs in such a way *as to avoid any possibility of effect on species or habitat* as part of the assumption process by, for example, mandating that their state permittees entirely avoid impacts to listed species or critical habitat or require federalizing state 404 permits where such impacts may occur. But Florida's program is not fashioned in this manner, for the reasons set forth in the White Paper, and we believe the approach Florida would take provides for a more effective and streamlined program.

Dkt. 112-3 at 368 (emphases added). The bottom line is that Federal Defendants were required to conduct the required species-specific analyses because Florida structured, designed, and implemented its program so as to provide incidental take liability upfront to itself and all future state permittees. But incidental take liability protection flows from the rigorous analysis required by Section 10 (for private actions) or Section 7 (for federal agency actions). Congress did not codify a third option, whereby incidental take liability might flow from an alternative set of arguably similar procedures.

61

The Federal Defendants' argument, accordingly, boils down to this:  We exercised our discretion to cast Florida's assumption program in a manner designed to confer ESA liability protection on future, state-permittees by inviting Section 7 consultation; to trigger the Section 7 process, we had to determine that the proposed technical assistance process would likely adversely affect species; during consultation, the FWS was unable meaningfully to assess the species-specific effects of that decision because, in our discretion, we have deferred species-specific review to the technical assistance process; but we should nonetheless be allowed to take advantage of Section 7 liability protection even though we did not engage in any species-specific analysis in the BiOp or engage in a consultation that went beyond assessing whether the proposed technical assistance process is an adequate proxy for Section 7 consultation.  That argument is untenable.

The Federal Defendants' second argument is that the FWS was unable to conduct any species-specific analysis because it lacked sufficient information to anticipate the effects of every future Section 404 permit application.  *See, e.g.*, Dkt. 99 at 72–73.  But "Congress, in enacting the ESA, did not create an exception to the statutory requirement of a comprehensive biological opinion on that basis."  *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988).  To the contrary, Section 7 "admits of no exception."  *Nat'l Ass'n of Home Builders*, 551 U.S. at 674 (Stevens, J., dissenting) (quoting *TVA*, 437 U.S. at 173).  Nor is the hurdle quite as high as Defendants suggest; Plaintiffs point, for example, to the programmatic BiOp that the FWS prepared for the Jacksonville District to demonstrate what the FWS can—and must—do to prepare a legally and factually sufficient programmatic BiOp.  Dkt. 125 at 1 (the programmatic BiOp based on the FWS's review of the impacts associated with the Corps' Jacksonville District can be found at cdm16021.contentdm.oclc.org/utils/getfile/collection

/p16021coll3/id/577 (last visited Feb. 11, 2024)); *see also* Dkt. 140 at 40–42.

The ESA does not require perfect foresight—only that the FWS use the best available

information to create an assessment of jeopardy.  In light of the ESA requirement that the FWS

use the best scientific and commercial data available to insure that protected species are not

jeopardized, 16 U.S.C. § 1536(a)(2), the FWS cannot simply "ignore available biological

information or fail to develop projections" of the effects of the agency action, *Conner*, 848 F.2d

at 1454.  Here, it is undeniable that the FWS had at its disposal reams of data from previous

Section 7 consultations, which it tabulated but did not meaningfully discuss or analyze.  Many

species in Florida have been the subject of hundreds of prior Section 7 consultations—the

panther alone had 108 consultations, the bonneted bat had 383 consultations, and the wood stork

had 216 consultations, to name a few.  *See* Dkt. 112-4 at 151 (EPA BE).  The information was

available to the FWS, but the agency did not give it meaningful consideration.

Simply put, incomplete information about future Section 404 permits that the State might

issue does not excuse the FWS's failure to comply with the statutory requirement that it prepare

a comprehensive biological opinion.  With the biological information that was available,

moreover, the Court is persuaded that the FWS "could have determined whether post-

[assumption] activities in particular areas were fundamentally incompatible with the continued

existence of the species."  *Conner*, 848 F.2d at 1454.  For instance, in some areas, even minimal

permitted activities likely would be "incompatible with the conservation of the species," *id.*—

those areas could have been identified before any future permit location was known, and if they

could not have been the FWS failed to explain why.  *Id.*; *see also* Dkt. 156 at 14–16 (Oct. 19,

2023 Hrg. Tr.)

Regardless of how Defendants got here, district courts across the nation have rejected similar abdications in the past.  In *Forest Service Employees for Environmental Ethics v. U.S. Fish & Wildlife Service*, 726 F. Supp. 2d 1195 (D. Mont. 2010), for example, the court evaluated a BiOp analyzing the use of chemical fire retardant to fight wildfires.  The court held that the FWS had failed to consider, among other things, critical habitat when it applied a "coarse filter" and analyzed species at only the "taxonomic group -level."  *Id.* at 1204, 1224–25.  The FWS argued that it was both rational and necessary to proceed as it had given that the chemical retardant had the potential to affect 387 species, spread out over 192 million acres.  *Id.* at 1224.  But the court disagreed, holding that the FWS could not "excuse the failure to comply with the law Congress [enacted] by arguing that compliance would be too hard."  *Id.* at 1224.  The same holds true here.

The Federal Defendants' sole remaining argument is that the approach they took mirrors the approach that the Second Circuit approved in *Cooling Water*, 905 F.3d at 49.  *Cooling Water*, however, is distinguishable on its facts.  In that case, the federal agency action under review was not the approval of a state assumption application but, instead, the promulgation of a final rule pursuant to Section 316(b) of the CWA, 33 U.S.C. § 1326(b).  *Cooling Water*, 905 F.3d at 58.  The rule established requirements for cooling water intake structures at power plants and manufacturing facilities and was intended to address impacts to aquatic life from entrainment or impingement of fish and shellfish.  *Id.*; 79 Fed. Reg. 48,300.  The standards promulgated under Section 316(b) of the CWA are implemented by permits issued through the National Pollutant

Discharge Elimination System ("NPDES")—at the time that *Cooling Water* was decided, 47

states administered NPDES permitting programs.  *Cooling Water*, 905 F.3d at 59 & n.2.[13]

Notably, the requirements of the 316(b) technical assistance process were codified as part

of the rulemaking, creating legally binding responsibilities for all parties.  *Cooling Water*, 905

F.3d at 72 ("[T]he Rule obligates the Services to abide by those procedures.").  Here, in contrast,

the "Final Notice" published in the Federal Register approving Florida's program makes no

mention of the technical assistance process or any of its procedures, stating only: "[The] EPA has

met its requirements under ESA section 7(a)(2) by completing ESA consultation and receiving a

'no jeopardy' Biological Opinion from the USFWS on November 17, 2020."  85 Fed. Reg.

83,553.  The technical assistance process is, instead, set out in the programmatic BiOp, that is

itself evaluating the efficacy and protectiveness of those same procedures, and discussed in

various memoranda.  In other words, here, there is no regulatory framework binding the parties'

actions as in *Cooling Water*.  When the Court inquired of counsel for the FWS whether anything

in the technical assistance process is "legally enforceable," counsel responded:  "So it's [FWS's]

own biological opinion.  Of course, it's going to comply with it.  It's in an MOU.  It's committed

to that, Your Honor."  Dkt. 156 at 95 (Oct. 19, 2023 Hrg. Tr.); *see also id.* at 98–99, 111.  But

there is a fundamental difference between a notice and comment rulemaking of the sort at issue

in *Cooling Water*, which adopted a "legislative" rule requiring state officials to send applications

"to the Services for a sixty-day review period, after which [the state official] must publish any

---

[13] One law review article has observed that state assumption of 402 permitting authority is more
common in part because of "the attitude of [the] EPA, which might feel more comfortable
delegating a program that will continue to operate on the basis of objective, numerical federal
standards; the decisions to be made under section 404 are both far more subjective and
susceptible to influence by local politics."  Olivia A. Houck & Michael Rolland, *Federalism in
Wetlands Regulation: A Consideration of Delegation of Clean Water Act Section 404 and
Related Programs to the States*, 54 Md. L. Rev. 1242, 1293 (1995).

information or recommendation the Services provide," 905 F.3d at 72, and the technical

assistance process employed here, which was adopted without the benefit of a notice and

comment rulemaking and which binds only the signatories.

To be sure, the programmatic BiOp and ITS of *Cooling Water* are similar to those now

before the Court.  That is not a coincidence.  As the record makes clear, Florida modeled its

proposal on the path charted in *Cooling Water*.  *See, e.g.*, Dkt. 112-5 at 170 (email from FWS

supervisor) ("The draft BA follows the 316b BE as expected."); Dkt. 112-4 at 4 (FWS email

setting as an agenda item for discussion "the key assumptions used in the nationwide 316b

consultation, as much as that consultation serves as a model for this one"); Dkt. 112-4 at 8 (FWS

email discussing the claims that the "enviro-oriented litigants" raised before the Second Circuit

in *Cooling Water*); Dkt. 112-2 at 14 (Florida white paper highlighting that the *Cooling Water*

ITS was held "valid despite its failure to numerically quantify the impacts of the rule on take").

But, as counsel for both sides have confirmed, *Cooling Water* stands alone as the only case

concerning, much less approving, a programmatic biological opinion and incidental take

statement of this sort:  To quote counsel for the Federal Defendants, this case represents the "first

next time" that an agency has deployed this type of programmatic approach.  Dkt. 156 at 87 (Oct.

19, 2023 Hrg. Tr.).

More importantly, *Cooling Water* is at odds with the statute, regulations, and caselaw.

The critical misstep in *Cooling Water* occurs in the following passage:

> According to the Environmental Petitioners, the Services improperly
> disregarded their obligation to "consider all phases" of the agency action in their
> initial biological opinion, as the Ninth Circuit appears to require.  Envtl. Br. 100
> (citing *Connor v. Burford*, 848 F.2d 1441, 1453–54 (9th Cir. 1988)).  But "the
> rule that biological opinions must be coextensive in scope with the entire action
> or else violate the ESA is nowhere to be found in the language of the ESA,"
> *Defs. of Wildlife*, 733 F.3d at 1121. . . , and like the Eleventh Circuit, we decline
> to adopt such a rule here.[]  Nothing in the ESA requires that the Services assess

66

every future "phase" of an agency action on a site-specific or species-specific basis.

905 F.3d at 73.  That is, according to *Cooling Water*, an agency need not "assess every future" species-specific effect of an action in its "initial" BiOp.  That much is true.  The governing regulations permit "[p]rogrammatic consultation" when "[a] proposed program" sets forth "a framework for future proposed actions."  50 C.F.R. § 402.02 ("Programmatic consultation").  But what *Cooling Water* (like Defendants in this case) fails to confront is that a "phase[d]" approach to consultation requires either (1) complete and adequate consultation at the outset; (2) partial consultation at the outset, followed by the remaining Section 7 consultation at the later "phase" or "phases;" or (3) complete and adequate consultation solely at the later "phase," if that is the phase likely to adversely affect listed species.  What matters is that adequate consultation occur *at some point*; the ESA does not permit an agency to bypass the Section 7 consultative process by postponing the required, "detailed discussion of the effects of the action on listed species," 50 C.F.R. § 402.14(g), to a later phrase, only to conclude—as in *Cooling Water* and here—that the later phase involves state, rather than federal, action and thus lies beyond the reach of Section 7, *Cooling Water*, 905 F.3d at 73 n.15.

This understanding of the ESA is not only consistent with, but by compelled by, the Eleventh Circuit's decision in *Defenders of Wildlife v. U.S. Department of the Navy*, 733 F.3d 1106 (11th Cir. 2013), which is the sole precedent—and the only authority—that *Cooling Water* cites in support of its contrary holding.  That case involved the Navy's installation and operation of an underwater submarine warfare training range ("USWTR").  The NMFS prepared an "initial" BiOp, which concluded "that *installation* of the USWTR [was] not likely to adversely affect listed species," but that "*operations* on the USWTR [were] likely to adversely affect listed species."  *Id*. at 1113 (emphasis added).  For reasons that are not relevant here, the Navy and the

NMFS decided that, even though the initial BiOp considered the "impacts of the expected operations" of the USWTR, they would not rest on that early assessment alone and would, in addition, conduct a "new" Section 7 consultation in the future "before operational activities commence[d]." *Id.* at 1122. It was in that context that the Eleventh Circuit opined that it was permissible for the Navy and the NMFS to structure the consultative process in phases. *Id.* As the court explained, "[i]t is for the agencies to determine how best to structure consultation *to fulfill Section 7(a)(2)'s mandate*," and the approach crafted in that case, if anything, better served that mandate than a single, early consultation. *Id.* at 1121–22 (emphasis added). The essential point, though, is that the consulting Service must prepare one or more BiOps—even if in phases—that employ "the best scientific and commercial data available" to offer a "detailed discussion of the effects of the action on listed species." *Id.* at 1112 (internal quotation marks omitted).

This understanding of the ESA is not only consistent with the statutory text and purpose but finds further, compelling support in the governing regulations. Here, as in *Cooling Water*, the government characterizes the BiOp as a form of "programmatic consultation." That phrase is defined in the regulations, and applies to "a consultation addressing an agency's multiple actions," 50 C.F.R. § 402.02—not a single agency action followed by state-licensing decisions that may occur years later and that, on Defendants' own telling, do not constitute federal action subject to Section 7 consultation. That understanding of "programmatic consultation," moreover, finds additional support in the definition of "[f]ramework programmatic action," which means "a framework for the development of future action(s) that are . . . carried out at a later time," where "any take of a listed species [will] not occur unless and until those future action(s) are . . . carried out and *subject to further section 7 consultation*." *Id.* (emphasis

added); *see also id.* ("Mixed programmatic action means, for purposes of an incidental take statement, a Federal action that approves action(s) that [1] will not be subject to further section 7 consultation, and also approves [2] a framework for the development of future action(s) [for which . . .] any take of a listed species [will be . . .] subject to further section 7 consultation").

D.C. Circuit precedent, although not directly on point, further supports the sensible conclusion that an agency may not avoid its obligation to engage in meaningful Section 7 consultation by deferring detailed, species-specific analysis for another day—particularly when, by the time that day arrives, the relevant action will be out of the agency's hands and beyond the reach of Section 7. In *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980), the D.C. Circuit considered the interaction between the ESA and the Outer Continental Shelf Lands Act ("OCSLA") in the context of a lease sale for the development of oil and gas properties in waters north of Alaska. Under the OCSLA, the lease sale itself is, as the court explained, "only a preliminary and relatively self-contained stage within an overall oil and gas development program which requires substantive approval and review prior to the implementation of each of the major stages: leasing, exploring, and producing." *Id.* at 593 (emphasis omitted). The district court had held that the biological opinion at issue violated the ESA because it considered *only* the leasing stage, and it had "rejected the defendant's contention that the multistage flexibility contemplated within the OCSLA framework was an indication that ESA 'endangered life' considerations should be entertained stage-by-stage." *Id.* at 608.

The D.C. Circuit agreed, holding that it was in "qualified agreement with the district court's ruling that a 'biological opinion' may not deal exclusively with any one particular stage of an outer continental shelf project." *Id.* In the end, however, the *North Slope* court concluded that the "[m]andatory stage-by-stage review" required by the OCSLA meant that the consultation

before it did not violate the ESA when viewed in light of the "full contingent of OCSLA checks and balances." *Id.* at 609.  Fairly construed, the D.C. Circuit's opinion requires courts to consider whether "stage-by-stage" consultation under Section 7 is consistent with the ESA's mandate to consider the "agency action" as a whole.  *See Conner*, 848 F.2d at 1453–54 (so reading *North Slope*).  The programmatic approach applied here fails that test by a wide margin, since the FWS never considered the EPA's action as a whole, and deferring that consideration to a non-statutory technical assistance process cannot substitute for what the statute requires.  *See also National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d 1, 10 & n.15 (D.D.C. 2005) (distinguishing *North Slope* and holding that the Corps violated the ESA by seeking to defer consultation with the FWS regarding the effects of individual actions authorized under four general permits, which the Corps was aware "m[ight] affect" the Florida panther).  *Id.*[14]

Ultimately, however, *Defenders of Wildlife* and *North Slope* just discussed all address a distinct question:  Whether *federal* agencies conducting *federal* actions that proceed in tiers or stages can engage in Section 7 consultation at each tier, or instead whether the initial Section 7 consultation must evaluate the proposed agency action *in toto*, all tiers included.  The question in those cases was simply whether Section 7 consultation could be phased, or whether doing so might lead to "piecemeal chipping away at habitat."  *Conner*, 848 at 1454.  The Court's conclusion that the BiOp at issue here was inadequate, however, follows *a fortiori*:  If a phased assessment of federal action is suspect, even when each phase will receive review under Section

---

[14] Although no party makes the point, the Court notes for completeness that the FWS, at least according to its handbook, views the consultation at issue in *Conner* as an "incremental step," not a programmatic, consultation under 50 C.F.R. § 402.14(k).  *See* Dkt. 112-1 at 332–34 (ESA Section 7 Consultation Handbook).

7, a programmatic BiOp that fails adequate to address the effects of the agency action of listed

species and that provides no further opportunity for Section 7 consultation cannot stand.

For all of these reasons, the Court concludes that the FWS was not free to disregard the

ESA's mandate that it "detail[] how the agency action affects the species," 16 U.S.C. § 1536.

The Court, accordingly, concludes that the BiOp is "arbitrary, capricious, an abuse of discretion,

or otherwise contrary to law" and must be set aside.  5 U.S.C. § 706(2).

### b.   Challenges to the Incidental Take Statement

As explained above, formal consultation under Section 7 is required if the action agency

concludes that its action "may affect listed species or critical habitat"—unless that agency

determines, with the Service's concurrence, that the "action is not likely to adversely affect any

listed species."  50 C.F.R. § 402.14(a) & (b).  Absent a finding that listed species may be

affected, the Section 7 process never commences: the Service never prepares a BiOp and never

opines on the question of jeopardy and—most importantly for present purposes—the Service

never issues an ITS.  Before issuing an ITS, moreover, the Service must determine that incidental

"take is reasonably certain to occur."  *Id.* § 402.14(g)(7).  The Court considers the adequacy of

the programmatic ITS at issue here against this backdrop.  Consistent with this understanding,

Defendants cannot plausibly argue both (1) that it was necessary to issue an ITS (resulting in

take protection for future permittees) and (2) that the technical assistance process replicates the

Section 7 consultation process (thereby obviating the need for any species-specific analyses or

take limits).  *Cf.* Dkt. 107 at 8 ("Plaintiffs have not shown a single situation where the Corps

would decide a permit differently than Florida . . . ."); *see also id.* at 21 ("[Plaintiffs] make no

showing as to why Corps permits do not also cause the same kind of harms that Plaintiffs claim

arise from FDEP permits . . . .").

The ITS is crucial in a no-jeopardy BiOp.  It defines the extent of the permissible incidental take of listed species resulting from the agency action, 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1), and it ensures that the level of incidental take will not jeopardize any species in violation of the ESA, 16 U.S.C. § 1536(b)(4)(B).  When the Service issues a no-jeopardy BiOp, the ITS serves to monitor the impact that the approved action has on the listed species in real time.  50 C.F.R. § 402.14(i)(3).  And "[i]f during the course of the action the amount or extent of incidental taking, as specified [in the ITS], is exceeded"—in other words, if the effect on the species from the action is greater than anticipated and permitted by the Service—then "the Federal agency must reinitiate consultation *immediately*."  50 C.F.R. § 402.14(i)(4) (emphasis added).  Here, Plaintiffs challenge the FWS's programmatic ITS on numerous grounds, including that it fails to quantify the permissible take, and thus fails to set a reinitiation trigger.  For the reasons set forth below, the Court agrees that the FWS's programmatic ITS is unlawful.

The analysis here "is not taxing."  *Center for Biological Diversity v. Ross*, 613 F. Supp. 3d 336, 345 (D.D.C. 2020).  The ESA requires the Service to specify "the impact of [the] incidental taking on the species," 16 U.S.C. § 1536(b)(4)(C)(i), and the implementing regulations define "the impact" to mean "the amount or extent[] of such incidental taking on the species," 50 C.F.R. § 402.14(i)(1)(i).  The regulations further provide that the Service may use a "surrogate . . . to express the amount or extent of anticipated take," if it "explains why it is not practical to express the amount or extent of anticipated take," and it "sets a clear standard for determining when the level of . . . take has been exceeded."  *Id.*  In selecting an appropriate "surrogate," the Service can look to "similarly affected species," *id.*, or to measurable "changes in ecological conditions affecting the species," *Wildlife Fish Conservancy v. Salazar*, 628 F.3d 513, 531 (9th

Cir. 2010).[15] But whether the Service sets a numerical take limit for the listed species or, if necessary, uses a surrogate, the regulations unambiguously require that it to set "a clear standard for determining when the level of anticipated take has been exceeded." 50 C.F.R. § 402.14(i)(1)(i). Under no circumstances may the Service fail, in any way, to "specif[y] the impact." 16 U.S.C. § 1536(b)(4).

As discussed above, the ITS serves two functions: It provides a safe harbor for regulated parties, while ensuring that the ESA's core goal of "afford[ing] first priority to . . . saving endangered species," *TVA*, 437 U.S. at 185, remains front and center. *See CBD v. Salazar*, 695 F.3d 893, 911 (9th Cir. 2012) (explaining that the ITS "serves as a check on the agency's original decision that the incidental take of listed species resulting from the proposed action will not [jeopardize the continued existence of the species]" (alteration in original)). Those who comply with the terms and conditions set forth in an ITS—including its numerical take limits—are protected from Section 9 liability. 16 U.S.C. § 1536(o). But when the numerical take limit (or its surrogate) is exceeded, the safe harbor offers no shelter, and the Service and action agency must *immediately* reinitiate consultation to determine whether the original "no jeopardy" determination remains valid. *See Salazar*, 695 F.3d at 909; 50 C.F.R. § 402.14(i)(4); 50 C.F.R. § 402.16(a)(1) (requiring reinitiation "[i]f the amount or extent of taking specified in the incidental take statement is exceeded); *Or. Natural Resources Council v. Allen*, 476 F.3d 1031, 1038–39 (9th Cir. 2007) (rejecting ITS for using improper surrogate that authorized the take of

---

[15] *See also Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Engineers*, 538 F. Supp. 2d 242, 257 (D.D.C. 2008) (accepting ecological surrogate of harm to habitat as a permissible surrogate for quantifying take); *but cf. Oceana, Inc. v. Ross*, 2020 WL 5995125, at *12–13 (D.D.C. Oct. 9, 2020) (rejecting shrimp fishing "effort" as an inadequate surrogate for turtle take based on insufficient explanation); *Pritzker*, 75 F. Supp. 3d at 497 (rejecting surrogate that pegged 161 turtle takes to 252,323 dredge hours without sufficient explanation);

all spotted owls in certain acreage, which could not be measured during the course of the project and thus did not set forth an adequate reinitiation trigger).

Here, the FWS's programmatic ITS omits this essential term. *See Oceana*, 2020 WL 5995125, at *23 (holding that the ITS included in a shrimp BiOp was inherently flawed because it did "not function as an automatic trigger and no amount of further explanation by the agency" could remedy that flaw). It sets no numerical take limit, offers no surrogate, and provides no "clear standard for determining when the level of anticipated take has been exceeded." 50 C.F.R. § 402.14(i)(1)(i). Instead, the BiOp and ITS once again fall back on a claimed inability to make the necessary determinations at the programmatic level and once again look to the non-statutory technical assistance process to fill the scientific and regulatory gap. Dkt. 112-5 at 139–40 (BiOp). Neither argument can withstand scrutiny.

To start, as Plaintiffs persuasively argue, it is difficult to believe that the FWS lacked information sufficient to permit it to quantify numerical take for *any* species given the wealth of previous permit and ESA consultation data at their disposal. *See* Dkt. 98 at 42. The FWS's stated "inability to anticipate the *locations* of future State 404 permit applications," Dkt. 112-5 at 139 (BiOp) (emphasis added), moreover, is both implausible (the Corps was in the midst of reviewing permit applications at the time the assumption application was approved) and beside the point. The FWS failed to explain why or how the *location* of future projects is inescapably tied to incidental take limits for *all* endangered or threatened species in the State. *See Conner*, 848 F.2d at 1454. Consider the Florida panther, for example. The FWS failed to explain why it was unable to set a numerical limit on incidental take based on previously issued BiOps and incidental take statements. If there are about 150 panthers left in Florida, for example, it is not

difficult to imagine a cumulative take limit per year for the entire State (or for particular regions of the State).

Given the wealth of information and experience that the FWS has in assessing threats to listed species in Florida, the FWS was at least required to offer *some* meaningful explanation for why it could not do more. *See State Farm Mutual Automobile Ins. Co*., 463 U.S. at 52 ("The agency must explain the evidence which is available, and must offer a 'rational connection between the facts found and the choice made.'" (citation omitted)). By any measure, it is not enough—on a question of this importance—merely to assert in conclusory terms that "because of the large scale and broad scope of the proposed action, the best scientific and commercial data available are not sufficient to enable the []FWS to accurately estimate the specific amount of incidental take at this time that is anticipated to occur as a result of the action." Dkt. 112-5 at 140 (ITS).

The Federal Defendants offer little by way of response. They cite to cases holding that numerical take limits are not always required and that surrogates may at times be used. Dkt. 99 at 76 (collecting cases). That assertion is literally correct, but it overstates the precedential support for what the EPA and the FWS have sought to do here—namely, issue an ITS intended to confer ESA immunity on the EPA, the State, and future state-permittees, without (1) setting a take limit or (2) employing a surrogate. Notably, in a case that has been briefed beyond the point of exhaustion, the parties have identified only one case—*Cooling Water*—in which a court has upheld a final ITS that lacked either a numerical take limit or a surrogate. For the reasons explained above, however, that case is both distinguishable and unpersuasive.

A couple of additional observations regarding *Cooling Water*, moreover, bear on the present discussion. First, *Cooling Water* itself recognizes that "an ITS that 'contains no

numerical cap . . . *normally* violates the ESA.'"  905 F.3d at 77 (quoting *Ctr. for Bio. Diversity v. U.S. Bureau of Land Mgt.*, 698 F.3d 1101, 1126–27 (9th Cir. 2012) (emphasis added)).  To be sure, the case that *Cooling Water* cites for this proposition also held, as the Second Circuit noted, that an ITS need not set a numerical take limit if it explains "why it was impractical to" do so. *Ctr. for Bio. Diversity*, 698 F.3d at 1127.  But in that case, *Center for Biological Diversity v. U.S. Bureau of Land Management*, 698 F.3d 1101 (9th Cir. 2012), the Ninth Circuit held that the impracticality of setting a numerical limit was "self-evident, in light of the very large number and minute size of [the] fish eggs and fry" at issue, and, more importantly, stressed that the ITS "did not ignore the incidental take issue, *but instead used a surrogate for determining incidental take levels*." *Id.* at 1127 (emphasis added).

Second, the Eleventh Circuit's decision in *Defenders of Wildlife* is once again more persuasive than *Cooling Water*.  Recall that *Defenders of Wildlife* involved a Navy project that involved two stages: the (1) installation and (2) operation of an Undersea Warfare Training Range.  733 F.3d at 1113.  Although the initial BiOp did not include an ITS for the operation phase, the Eleventh Circuit concluded that "the NMFS provided a valid reason" for this omission—and, more importantly, the court stressed that the NMFS merely "postpone[d] the issuance of an incidental take statement" until the operation stage was scheduled to occur years later. *Id.* at 1123.  As the Eleventh Circuit explained, the absence of an ITS meant that *any* take would require "reinitiating consultation" and that, in any event, "the Navy ha[d] repeatedly committed to obtaining the required . . . incidental take statement during a future consultation with the NMFS, prior to operations on the range commencing." *Id.* at 1124.  The ITS in *Cooling Water* and the ITS in the instant case, in contrast, extend take liability protection through

incidental take statements that lack a numerical take limit or a surrogate.  In this respect, *Cooling Water*—and this case—stand alone.

Ultimately, the Federal Defendants once again fall back on the technical assistance process and argue that the "FWS considered the extent to which there would be sufficient processes to monitor and evaluate adverse effects on ESA-considered species and critical habitat and monitor and enforce permit compliance."  *See* Dkt. 99 at 79.  As previously explained, that argument improperly seeks to replace the statutory and regulatory ESA regime with a process defined in a BiOp and various memoranda that differs in important respects from the governing law.  Most notably, when the take limit set forth in an ITS is exceeded, the action and consulting agencies are required immediately to reinitiate consultation under Section 7.  50 C.F.R. §§ 402.14(i)(4), 402.16(a)(1).  The Federal Defendants' assertion that, "[i]f [the] FWS's assumptions about [the technical assistance process] prove incorrect or warrant changes to the implementation of the State program, it *could* . . . trigger reinitiation of consultation if effects occur that were not considered," Dkt. 106 at 38 (emphasis added), is both hopelessly noncommittal and, in any event, at odds with the terms of the ITS, which contain no program-level reinitiation trigger and, indeed, expressly disavows any such obligation.

After reciting the regulatory standard for reinitiation, the ITS provides as follows:

> For the purposes of this programmatic consultation, any exceedance of take for a State 404 permit action that has not been completed will be addressed as described in FDEP's term and condition number 9.  Additionally, the listing of a new species or critical habitat *shall not trigger reinitiation* of consultation on this action (approval of Florida's assumption of the CWA 404 program).  Since the State would administer the CWA 404 program, the []FWS has *no obligation to conduct section 7 consultation* on individual permits because the issuance of such a permit is not a Federal action.  However, the State's regulations require that the State comply with the technical assistance process with [the] []FWS for ESA listed species and critical habitat.  Accordingly, any effects to newly listed species or their critical habitat would be sufficiently considered and addressed.

77

Dkt. 112-5 at 143 (ITS) (emphasis added).  Term and Condition 9, in turn, provides that

*Florida*—not the FWS—will "reopen" *individual permits*—not Section 7 consultation at the

program-level—in the event of new information or exceedance of take as authorized in the

original permit.  *Id.* at 142 (BiOp).  So, in short, the ITS provides that the federal agencies—the

FWS and the EPA—will *not* reinitiate formal consultation, (1) even if the take limits set in the

state-issued permits (with input from the FWS) are exceeded and (2) even if new species found

in Florida are listed as endangered or threatened.  In the words of the ITS, "[s]ince the State

[will] administer the CWA 404 program, the []FWS has *no obligation* to conduct section 7

consultation on individual permits."  *Id.* at 143 (emphasis added).  Thus, in this and in other

respects,[16] the technical assistance process provides far less robust ESA protection of listed

species than the ESA procedures it supplants.  *See* 50 C.F.R. § 402.16(a)(1) (requiring

reinitiation of formal consultation "[i]f the amount or extent of taking specified in the incidental

take statement is exceeded"); *id.* § 402.16(a)(4) (requiring reinitiation "[i]f a new species is listed

. . . that may be affected by the identified action"); *see also Am. Rivers v. FERC*, 895 F.3d 32,

48–49 (D.C. Cir. 2018) (stressing the need for a trigger to reinitiate formal consultation).[17]

---

[16] Plaintiffs also challenge the ITSs "reasonable and prudent measures" and terms and conditions on the ground that neither created new, additional requirements on the EPA or Florida.  Dkt. 98 at 44.  An ITS must specify "reasonable and prudent measures" deemed "necessary or appropriate" to minimize incidental take from the action in question.  16 U.S.C. § 1536(b)(4)(ii); 50 C.F.R. § 402.14(i)(1)(ii).  And an ITS must also set forth "terms and conditions (including, but not limited to, reporting requirements) that must be complied with" in order to implement the reasonable and prudent measures specified.  16 U.S.C. § 1536(b)(4)(iv); 50 C.F.R. § 402.14(i)(1)(iv).

[17] As the Federal Defendants point out, *see* Dkt. 106 at 39, the BiOp requires *Florida* to provide the FWS with an annual report summarizing the number of permits issued or denied and a "table that identifies all ESA-listed species taken by state 404 permitted activities along with the amount or extent of such take," Dkt. 112-5 at 142 (BiOp).  Florida's reporting requirement, however, is not the equivalent of a reinitiation trigger which ordinarily serves to compel the FWS to immediately reinitiate consultation and reasses its original no jeopardy determination.

The District Court for the District Court of Montana's analysis in *Forest Service Employees for Environmental Ethics v. U.S. Forest Service*, 726 F. Supp. 2d 1195 (D. Mont. 2010), which rejected a similar scheme, is persuasive. There, the court considered a biological opinion prepared by the FWS for use of chemical fire retardant. *Id.* at 1195. The FWS's BiOp in that case did not include an ITS, instead explaining that take would be "authorized through emergency consultation on a case-by-case basis" because of uncertainty over where and to what extent the fire retardant would be used. *Id.* at 1205, 1231. The court rejected this approach as inconsistent with the ESA. "The problem with the ESA agencies' approach," the court explained, "is that it means that the first and only meaningful analysis under Section 7(a)(2) will occur during emergency consultation." *Id.* at 1231. The result is "biological opinions that purportedly constitute Section 7 consultation" but "defer[] significant aspects of the required Section 7 analysis until emergency consultation." *Id.* There, all that stood "between the listed species and take from exposure to fire retardant is an undefined emergency consultation process," in contrast to cases like *Conner*, *Defenders of Wildlife*, and *North Slope*, where, as discussed above, future site-specific biological opinions will be prepared in full compliance with Section 7. *Id.* at 1232.

The Federal Defendants' final argument is that the EPA's continued oversight of Florida's implementation of the Section 404 program saves the above-identified deficiencies in the programmatic BiOp and ITS. *E.g.*, Dkt. 99 at 62; Dkt. 106 at 29, 41. The Federal Defendants point to, for example, the EPA's right to review those permits with "reasonable potential for affecting endangered or threatened species," as determined during the technical assistance process. *See* Dkt. 55-1 at 304 & n.2 (MOA between the EPA and FDEP); *see also* 33 U.S.C. § 1344(j); 40 C.F.R. § 233.51. To be sure, if the EPA objects to a permit and the State

does not address its objection, the authority to issue that permit reverts to the Corps.  33 U.S.C. § 1344(j); 40 C.F.R. § 233.20(b); *id.* § 233.50(j) ("In the event that the Director neither satisfies [the] EPA's objections or requirement for a permit condition nor denies the permit, the Secretary shall process the permit application.").[18]  Similarly, at the program-level, if the EPA determines that Florida is "not administering" its 404 program "in accordance with" the requirements of the CWS, then the EPA may withdraw its approval and return the program to the Corps.  33 U.S.C. § 1344(i).

But the EPA's oversight of individual permits and authority to withdraw its approval of an assumption application, as established under the CWA, are not substitutes for the FWS's distinct duty under the ESA.  The EPA's oversight pursuant to a different statute—the CWA— serves a different purpose and does not determine whether and when incidental take liability protection is available under the ESA.  Oversight is intended to ensure that a state program is operating as approved, not to remedy a violation of the ESA.

The long and short of it is that the ESA creates two paths for extending take liability coverage: Section 7 (consultation for federal actions) and Section 10 (incidental take permits for non-federal actions).  16 U.S.C. §§ 1536(a)(2), 1539(a)(1)(B).  Neither authorizes the scheme that the EPA and the FWS constructed in the ITS at issue in this case.  That ITS was issued without the benefit of any species-specific analysis in the BiOp; it contains no numerical take limit and provides no surrogate for one; and it expressly disavows any duty to reinitiate formal consultation pursuant to Section 7 should the EPA's approval of the State's Section 404 program result in excess take or otherwise jeopardize the continued existence of an endangered species.  It

---

[18] Director means the state director, *see* 40 C.F.R. 233.2, and Secretary means Secretary of the Army, *see* 40 C.F.R. 233.1(a) (first mention).

is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and must be set aside.  5 U.S.C. § 706(2)(A).

*   *   *

For all of these reasons, Plaintiffs are entitled to summary judgment on Counts Three, Four, Six, and Thirteen.

### 2.  *ESA Claims Against the EPA*

Plaintiffs bring two ESA claims against the EPA:  First, they allege that the EPA unlawfully relied on the FWS's BiOp when it approved Florida's assumption application. Second, they allege that the EPA failed to consult on nesting sea turtles and other species under the jurisdiction of the NMFS.  The Court addresses each claim in turn.

### a.   The EPA's Reliance on the Biological Opinion

The EPA was required, pursuant to the ESA, to ensure that its approval of Florida's assumption application would not jeopardize any listed species.  16 U.S.C. § 1536(a)(2).  As the action agency, the EPA bore the "ultimate responsibility for compliance with the ESA."  *City of Tacoma v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006).  Arbitrarily relying on a faulty BiOp violates that duty.  *Id.*  Plaintiffs and the Federal Defendants, however, dispute the standard that this Court should apply.  The Federal Defendants argue that Plaintiffs must point to some "new" information that the Service should have considered in order to succeed on this claim; Plaintiffs argue that the "new" information standard does not apply to a facially invalid BiOp.

To an extent, each side has a point.  The Federal Defendants are correct that an agency can withstand an arbitrary and capricious challenge to an "admittedly weak" BiOp, if there is "no 'new' information . . . the [Service] did not take into account[,] which challenges the [biological] opinion's conclusions."  *Id.* at 76 (quoting *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of*

81

*Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990) and then citing *Defenders of Wildlife v. EPA*, 420

F.3d 946, 959, 976 (9th Cir. 2005), *rev'd on other grounds*, *Nat'l Assoc. of Home Builders*, 551

U.S. 644 (2007); and *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1459–60 (9th Cir. 1984)).  As the

D.C. Circuit explained in *City of Takoma v. FERC*, this rule strikes a balance between two

competing sets of considerations.  *Id.* at 75–76.  On the one hand, a court's review of an action

agency's reliance on a BiOp differs from its review of the sufficiency of the BiOp itself.  *Id.* at

75.  The question is not "whether the BiOp itself is somehow flawed," but "whether the action

agency's reliance [on it] was arbitrary and capricious."  *Id.* (emphasis omitted).  That assessment

must be made, moreover, in light of the unique "expertise of the consultant agency," which

"would be seriously undermined" if the action agency was required "to undertake an independent

analysis" of the relevant data and science.  *Id.* at 76.  On the other hand, however, "the two

inquiries [necessarily] overlap to some extent, because reliance on a facially flawed BiOp would

likely be arbitrary and capricious."  *Id.* at 75.  And given the action agency's "ultimate

responsibility for compliance with the ESA," "the action agency must not blindly adopt the

conclusions of the consultant agency."  *Id.* at 76.

The "new" information rule makes eminent sense when dealing with the types of expert,

technical, and scientific judgments made by consulting agencies.  In those circumstances, the

action agency can and should typically defer to the reasoned conclusions of the experts.  But that

logic fails when a BiOp is "facially flawed" or when the alleged flaw in a BiOp is legal in nature,

because discerning this type of flaw "requires no technical or scientific expertise," *Defenders of

Wildlife*, 420 F.3d at 976.  In observing that an action agency's "reliance on a facially flawed

BiOp would likely be arbitrary and capricious," *City of Tacoma* makes just this point.  460 F.3d

at 75.  The distinction finds additional support, moreover, in the D.C. Circuit's decision in *Shafer*

*& Freeman Lakes Environmental Conservation Corporation v. FERC*, 992 F.3d 1071 (D.C. Cir. 2021).

In that case, the D.C. Circuit considered whether the action agency, the Federal Energy Regulatory Commission ("FERC"), unreasonably relied on a BiOp prepared by the FWS. With respect to the FWS's scientific judgments, the *Shafer* court applied the "no new information" standard. The court explained, "because the Service acted reasonably in using a linear scaling methodology, [FERC] too acted reasonably in relying on the Service's resulting scientific judgments in the Biological Opinion." 992 F.3d at 1093. Quoting *City of Tacoma*, the *Shafer* court once again stressed that in deciding whether FERC acted reasonably, "'the critical question [was] whether [FERC's] *reliance* [on the Service's BiOp] was arbitrary and capricious.'" *Id.* (internal citation omitted).

But that did not end the *Shafer* court's relevant analysis. In the following section of the opinion, the court took up the plaintiffs' distinct "*legal objection* to the Biological Opinion and [FERC]'s reliance on it." *Id.* at 1093 (emphasis added). And, in considering that question, the court applied the "facially flawed" standard and held that FERC's reliance on the BiOp was unreasonable. *Id.* at 1096 (citing *City of Tacoma*, 460 F.3d at 75). The *Shafer* court did not ask whether the plaintiffs had identified any new information not considered, concluding instead that "the Service's complete failure to address an important issue was apparent on the face of the Biological Opinion." *Id.* In sum, then, when confronted with a *scientific* or *technical* challenge to a BiOp, the *Shafer* court applied the "new information" standard, and, when confronted with a *legal* challenge to the BiOp, the court applied the "facially flawed" standard. *Shafer*, 992 F.3d at 1093 (citing *City of Tacoma*, 460 F.3d at 75); *see id.* at 1096 (citing *City of Tacoma*, 460 F.3d at 75).

Applying that same distinction here, the Court is persuaded that the EPA impermissibly relied on a facially flawed BiOp. As in the final section of the *Shafer* decision, the programmatic BiOp at issue here entirely fails to address essential questions, and, instead, defers those question for another day and another process that is untethered to Section 7. The Court will not repeat its critique of the FWS's BiOp here but, instead, simply notes that the deficiencies do not involve scientific or technical judgments about which fair minds might differ. To the contrary, major swaths of what the ESA and its governing regulations require a consulting agency to consider in a BiOp are simply absent. Indeed, for example, the BiOp makes no effort to undertake *any* species-specific effects analyses whatsoever. *See, e.g.*, Dkt. 112-5 at 129–30 (BiOp). As in the final section of the *Shafer* opinion, these inadequacies raise questions of law, rather than science.

The EPA was as well situated at the FWS, for example, to decide whether the ESA permits the consulting and action agencies to defer all species-specific effects analyses to a non-statutory, technical assistance process that does not occur until after the federal action is complete and that lacks a trigger for reinitiating consultation because it does not specify any take limits, numerical or otherwise. In fact, if anything, this case flips the usual presumption on its head: Here, it was the action agency (the EPA) and the applicant (Florida) that proposed the technical assistance process to the consulting agency (the FWS) and that performed the initial legal analysis. As a result, this case is a far cry from one in which the action agency can reasonably claim that it deferred to the expertise of the consulting agency. *City of Tacoma*, 460 F.3d at 75–76 (rationale for "new information" standard is to give action agency a basis for doubting the expert conclusions).

Because the BiOp and ITS that the FWS issued in this case were facially and legally flawed, the EPA unreasonably relied on those documents in approving Florida's assumption application.  Plaintiffs are entitled to summary judgment on Count Ten.[19]

    b. <u>The EPA's "No Effect" Determination</u>

Whenever an agency action "may affect" a listed species in the "action area," the agency must consult, as applicable, with the FWS, which administers the ESA with respect to species under the jurisdiction of the Secretary of the Interior, and with the NMFS, which administers the ESA with respect to species under the jurisdiction of the Secretary of Commerce.[20]  *See* 16 U.S.C. § 1536; *Nat'l Ass'n of Home Builders*, 551 U.S. at 651.  Only if the action agency determines that its actions will have *no* effect on listed species or critical habitat may it forego consultation.  50 C.F.R. § 402.14(a), (b).  The "action area" includes "all areas to be affected directly *or indirectly* by the Federal action and not merely the immediate area involved in the action."  50 C.F.R. § 402.02 (emphasis added).  "Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action."  *Id.*

---

[19] Plaintiffs separately allege in Count Twelve that the EPA failed to consult with the FWS regarding Florida's nesting sea turtles.  Plaintiffs explain that more than 90% of all sea turtle nesting in the continental U.S. occurs in Florida, and yet, the record contains no mention of them.  *See* Dkt. 98 at 41; Dkt. 104 at 29–30.  The Federal Defendants respond that Plaintiffs have not identified "any habitat that would be in or near assumed waters," the action area in question.  Dkt. 106 at 36.  The Court views Plaintiffs' turtle-specific challenge as subsumed by their larger claims that the FWS failed to evaluate the effects of the agency action on *any* species and that the EPA relied on the FWS's facially invalid BiOp and ITS.  For these reasons, Plaintiffs are entitled to summary judgment on Count Twelve.

[20] NMFS (also known as "NOAA Fisheries") currently has jurisdiction "over 164 endangered and threatened marine species (79 endangered; 85 threatened)."  NMFS, *Species Directory*, https://www.fisheries.noaa.gov/species-directory/threatened-endangered?oq=&field_species_categories_vocab=All&field_region_vocab=All&items_per_page=350 (last visited Feb. 15, 2024).

Here, the EPA requested formal Section 7 consultation with FWS.  It did not, however, request consultation with the NMFS.  As the EPA explained in its September 2, 2020 letter to the NMFS, the NMFS had previously informed the State that no "ESA-listed species under [the] NMFS'[s] jurisdiction . . . occur in waters that are assumable by the [S]tate based on the ESA-listed species that were identified . . . as part of th[e] proposed assumption."  Dkt. 112-2 at 351.  The NMFS had concluded, based on discussions with the State, a review of various mapping products and analysis, and a review of documentation provided by the State, that no ESA-listed species "under NMFS'[s] jurisdiction" are found "in the waters that are assumable by the [S]tate."  Dkt. 112-4 at 207.  Unsurprisingly, then, the day after the NMFS received the EPA's September 2, 2020 letter, it "provided a courtesy concurrence of this determination."  Dkt. 112-2 at 352.  What matters for present purposes is that the EPA's no-effect determination, and the NMFS's "courtesy concurrence," were based on the premise that no listed-species within NMFS jurisdiction "occur" in the assumable waters.

The problem with this determination is that it misapprehends the relevant "action area."  As explained above, the relevant "action area" is not limited to areas that are directly affected by the agency action but also included areas indirectly affected, including areas outside the "immediate area involved in the action."  50 C.F.R. § 402.02.  Nor was that error self-evidently harmless; to the contrary, the record suggests that listed species under NMFS jurisdiction may well have been affected by the EPA's decision.  The BiOp observes, for example, that "freshwater eventually makes its way to the nearly 2,000 miles of Florida coastline and marine ecosystem," Dkt. 112-5 at 112 (BiOp), raising the prospect that the EPA's action might affect listed species outside assumable waters.  At a minimum, the EPA was required to provide a reasoned basis for considering affects only in the assumable waters and failing to consider "an

important aspect of the problem," *State Farm Mut Auto. Ins. Co*., 463 U.S. at 43—that is whether species found in areas beyond the assumable waters might be "indirectly" affected by the agency action. The EPA's failure to consider the potential effects on any listed species under the jurisdiction of the NMFS that occur outside the assumable waters, but within the action area as defined by 50 C.F.R. § 402.02, and failure to offer a reasoned basis for that omission, runs afoul of the APA's arbitrary and capricious standard.

Although the Federal Defendants continue to maintain that the EPA's initial "no effect" determination was reasonable, the EPA has, "[o]ut of an abundance of caution," "undertaken to address [the] issue." Dkt. 99 at 85. In response to Plaintiffs' notice of intent to sue, the EPA stated that it had "considered th[e] issue further" and was "preparing a Biological Evaluation." Dkt. 112-3 at 301. Nearly two years later, the EPA informed the Court that its biological evaluation was complete and had been transmitted to the NMFS. *Compare id.* (dated December 20, 2021) *with* Dkt. 113 ("Notice of Completion of Biological Evaluation" filed July 19, 2023 (capitalization altered)). At oral argument another three months later, in October 2023, counsel for the Federal Defendants informed the Court that the NMFS did "not have a timeline for completion of any consultation at this time." Dkt. 156 at 87 (Oct. 19, 2023 Hrg. Tr.).

For the reasons explained above, the EPA's "no effect" determination was arbitrary and capricious at the time it was made—and at the time the agency approved the State's assumption application without the benefit of consultation with the NMFS. The EPA may be correct that its "ongoing work should provide a more fulsome analysis and ultimately resolve the matter," Dkt. 99 at 85, but Plaintiffs are not required to wait forever, and the EPA has had years to correct is omission. Nor can the Court conclude that this claim is "likely moot," Dkt. 102 at 60, based on the EPA's ongoing informal consultation with the NMFS. *See, e.g.*, *Ctr. for Biological*

*Diversity v. EPA*, 316 F. Supp. 3d 1156, 1174–75 (N.D. Cal. 2018) (claim of failure to consult not mooted by reinitiation because relief is available in injunctions and vacatur).  Because the EPA has not issued a superseding effects determination or BiOp addressing NMFS-listed species and because the EPA was required to complete the Section 7 process before deciding to approve Florida's application, Plaintiffs' claims are also not moot.  *Cf. Oceana*, 2020 WL 5834832, at *4 (agreeing with NMFS argument that reinitiation alone did not moot case, but the issuance of a new, superseding BiOp would).

Plaintiffs are entitled to summary judgment on Count Eleven.

## C.      Remedy

That brings the Court to the question of remedy.  Although the parties asked to brief remedy following the Court's ruling on summary judgment, Dkt. 98 at 15 n.2 (Plaintiffs); Dkt. 99 at 34 n.13 (Federal Defendants); Dkt. 102 at 60 (Florida), the posture of the case shifted with CBD and Sierra Club's motion for a temporary restraining order or preliminary injunction, Dkt. 135.  At the January 30, 2024 hearing on that motion, the Court sought the parties' views on what remedy would be appropriate if the Court were to identify substantial flaws in the programmatic BiOp and ITS.  The Court subsequently authorized and the parties submitted supplemental briefs on that question.  Dkt. 157 (Intervenor Cameratta); Dkt. 158 (Federal Defendants); Dkt. 159 (Intervenor Tarpon Blue Silver King I); Dkt. 160 (Florida); Dkt. 161 (Plaintiffs).

The APA directs that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  "[A]lthough vacatur is the normal remedy," courts in this circuit "sometimes decline to vacate an agency's action."  *Allina Health*

*Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).  The decision whether to vacate turns

on the factors set forth in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d

146 (D.C. Cir. 1993), which consider (1) the "seriousness of the order's deficiencies" and (2) the

likely "disruptive consequences" of vacatur.  *Id.* at 150–51 (internal citation omitted).

      The Court has now held that the FWS's programmatic BiOp and ITS, and the EPA's

reliance on those documents in approving Florida's assumption application, violate both the ESA

and the APA.  Under the APA, the normal remedy is vacatur of the FWS's BiOp and ITS, as

well as the EPA's approval of Florida's program.  Defendants, nonetheless, argue that vacatur is

not warranted and that the Court should, instead, remand the matter for further consideration.

Dkt. 158 at 2; Dkt. 160 at 3.  Doing so, they explain, would prompt the FWS to reopen formal

consultation with the EPA and would allow the FWS to "correct any errors or deficiencies

identified by the Court."  Dkt. 158 at 4.  The FWS could, in their view, "clarify that the ESA

obliges it to use the best available science in providing technical assistance to FDEP," *id.*, and

"strik[e] particular language in the ITS," Dkt. 160 at 3.

      With respect to the first *Allied-Signal* factor, Defendants argue that any deficiencies are

not serious because the FWS and the EPA had a good faith and reasonable belief, based on

*Cooling Water*, that the programmatic approach taken in the BiOp and ITS, and the technical

assistance process, were lawful.  Dkt. 158 at 3–4; Dkt. 160 at 3–4 (discussing *Cooling Water* and

arguing that this case presents "*at least* a close call" (emphasis in original)).  On the second

factor, they argue that vacatur would be highly disruptive because it would introduce regulatory

uncertainty in Florida regarding "how to seek incidental take coverage under the ESA,"

particularly given the "successful implementation of the program for the past three years."  Dkt.

158 at 5; *see also* Dkt. 160 at 5 ("Over 1,130 days have elapsed since Florida's Section 404

program commenced.").  To this, the State adds that remand without vacatur would pose little, if any, harm to Plaintiffs or the public because the technical assistance process "remains protective of listed species and ensures no jeopardy."  Dkt. 160 at 6.[21]

As for the EPA's approval of Florida's assumption application, the Federal Defendants argue that any deficiencies in the BiOp and ITS—no matter how grave—did not infect the EPA's approval of Florida's assumption because the EPA did not rely on the BiOp in approving Florida's program.  Dkt. 158 at 6.  On their telling:

> EPA's approval action rested, in relevant part, on the agency's determination that Florida had "the authority" to "issue permits which . . . apply and ensure compliance with . . . the [404(b)(1)] [G]uidelines," 33 U.S.C. § 1344(h)(1)(A)(i), including the requirement that no permit shall issue that "[j]eopardizes the continued existence of" ESA-listed species or "results in likelihood of the destruction or adverse modification" of critical habitat, 40 C.F.R. § 230.10(5)(b)(3).  EPA reached that determination based on its review of the regulations in Florida's program submittal, not in the BiOp.

Dkt. 158 at 6.  But that argument is belied by the Federal Defendants own words in this very case.  They observed in their cross-motion for summary judgment that the "EPA of course relied on the BiOp, but so too does virtually every action agency that issues a rule following a no-jeopardy determination by one of the consulting agencies."  Dkt. 99 at 43.  It is also belied by the fact that the consultation considered one—and only one—federal action, the EPA's decision to approve Florida's Section 404 assumption application.  And it is further belied by the fact that the Federal Defendants and Florida justified the issuance of an ITS, which accorded incidental take protection on the EPA, Florida, and future, state-permittees, on a theory that required far

---

[21] The intervenors join in these arguments.  *See generally* Dkt. 157; Dkt. 159.  Cameratta seems to suggest that the Court should allow its permit to move forward based on assurances provided in its brief, but it identifies no legal basis for such a remedy.  *See* Dkt. 157 at 2 ("In the interim of the remand, Cameratta would prepare and submit to [the FWS] and [FWC] a site-specific biological assessment . . . .").

more than assessment of whether Florida had the authority, under state regulations, to protect ESA-listed species.

Plaintiffs' operative complaint asks the Court, among other things, to "[v]acate and set aside []FWS' programmatic biological opinion and incidental take statement for the challenged EPA decision and remand with instructions for reopening and reinitiating consultation" and "[e]njoin the EPA's approval and transfer of authority to the state."  Dkt. 77 at 58 (Am. Compl. ¶¶ (m), (p)).  In their supplemental brief, Plaintiffs renew those requests and argue that the Court should vacate the BiOp, technical assistance process, and ITS.  Dkt. 161 at 7.  Plaintiffs also argue that because the EPA relied on an invalid BiOp and ITS to justify its approval of Florida's program, that approval must be set aside as unlawful as well.  *Id.* at 12–13.  The Plaintiffs also seek, for the first time, injunctive relief that "restores the Corps' authority over permits that may affect ESA-listed species."  Dkt. 161 at 12.

1.      *The Biological Opinion and ITS*

The Court concludes that it should vacate the BiOp and ITS.  The Court agrees, as all parties request, that this vacatur should be prospective and should not call into question previously issued Section 404 permits.  Dkt. 158 at 5; Dkt. 160 at 7; Dkt. 161 at 11 & n.12.

With respect to the first *Allied-Signal* factor, the Court concludes that the flaws in those documents are serious, and that these flaws cannot be cured merely by further explanation or changes to the technical assistance process on remand.  *See Conservation Law Found.*, 37 F. Supp. 3d at 271 (vacating agency action is proper where there is "no question that the agency has violated the law and absolutely no possibility of the [agency action's] survival on remand"); *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 245 (D.D.C. 2020) (vacating biological opinion because "neither *Allied-Signal* factor provides a reason to depart from the standard

vacatur remedy"); *Forest Serv. Emps for Env't Ethics*, 726 F. Supp. 2d at 1232 (vacating programmatic biological opinion that deferred analysis to later, site-specific FWS review).

Nor is the gravity of those flaws mitigated by the fact that the Federal Defendants and Florida modeled the programmatic BiOp and ITS on *Cooling Water*.  As explained at length above, *Cooling Water* is both distinguishable and the lone decision that has ever approved the use of a programmatic BiOp and ITS that fails to undertake any species-specific analysis, fails to set any numerical take limits or to employ surrogates to set a clear standard for determining when the level of anticipate take has been exceeded, and that purports to accord ESA-liability protection on future permittees without those limits.  Other settled precedent, moreover, has long raised serious questions about the approach the EPA and the FWS took here.  Finally, Defendants cite no authority for the proposition that vacatur is not required when an agency acts with some good faith basis to believe that its actions are lawful.  To the contrary, such good faith is generally presumed, yet the presumptive remedy under the APA remains vacatur.

With respect to the second *Allied-Signal* factor, courts typically focus on the disruption that might result from "an interim change," which "may itself be changed" at a later date—that is, the disruption that might result from flipflopping policies.  *Ross*, 180 F. Supp. 3d at 246 (quoting *Allied-Signal*, 988 F.2d at 150–51) (internal quotations omitted).  Here, Defendants have failed to show that the EPA can—and is likely to—reinstate the type of non-statutory incidental take protection that applied under the technical assistance program.  This does not leave the Federal Defendants, the State, or state-permittees without options, moreover.  A permittee can still, for example, seek protection under Section 10, and, indeed, one of the two developers that has intervened here was in the midst of doing so when the FWS issued is programmatic ITS.  *See* Dkt. 135-8 at 29 (Tarpon Blue Silver King I, LLC).  In addition, as the

New Jersey model and the administrative record in this very case show, the EPA and the State can pursue other options.  Those options, however, are appropriately explored and crafted by the administrative agencies and the State—and not by the Court.

Finally, the Federal Defendants point to a "prolonged delay in the issuance of individual Section 404 permits in Florida now pending with the State."  Dkt. 158 at 8.  The Court does not doubt that some disruption will occur, but the record says little about the extent of that disruption, and, in any event, setting aside unlawful agency action almost always results in some disruption.  Here, moreover, as discussed below, only a small percentage of state-permits require some form of ESA incidental take protection.  Finally, the type of disruption that Defendants invoke is inherent in the Section 404 program.  The Court is unaware of any complaints of disruption that were lodged when the EPA transferred Section 404 permitting authority from the Corps to the State, and the CWA anticipates that, if the State does not administer the program in accordance with the CWA, the EPA can—and should—withdraw its approval of the assumption.

The Court will, accordingly, **VACATE** effective immediately the FWS's programmatic BiOp and ITS.

> 2.      *The EPA's approval of Florida's assumption application*

Next, the Court must consider how the *Allied-Signal* factors apply to the EPA's decision granting Florida's assumption application and whether the Court should vacate that decision, in whole or in part, pending further consideration on remand.

Here, the Federal Defendants' principal argument for why the ordinary remedy of vacatur is unwarranted is that the EPA did not rely on the programmatic BiOp and ITS in approving Florida's assumption application under the CWA.  But, as explained above, that argument carries little weight.  *Cf. Me. Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 601–02 (D.C. Cir. 2023)

(directing district court to vacate BiOp but allowing challenged rule to stay in place because the court was "not convinced the error [in the BiOp] is fatal to the rule").  The Court, accordingly, undertakes its own analysis of whether to vacate the assumption decision.

With respect to the first *Allied-Signal* factor, the Court remains convinced that the ESA violation was a serious one, which will not easily be remedied on remand.  "In such circumstances—where there is no question that the agency has violated the law and [there is] absolutely no possibility of the [agency action's] survival on remand—the D.C. Circuit has suggested that the rule ought to be vacated."  *Conservation Law Found.*, 37 F. Supp. 3d at 271 (citing *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007)).  "Section 7 of the ESA is the most powerful safeguard in environmental law, and in the section 404 program," Olivia A. Houck & Michael Rolland, *Federalism in Wetlands Regulation: A Consideration of Delegation of Clean Water Act Section 404 and Related Programs to the States*, 54 Md. L. Rev. 1242, 1259 (1995), and by eliding the requirements of Section 7, the Federal Defendants committed a serious error.  In the ordinary course, the Court would have little difficulty in concluding that error of this magnitude requires vacatur.

Here, however, the extent to which the ESA violations infect the overall Florida assumption program is far from clear.  Most recently, Florida has told the Court that "just 1.4% of Florida 404 permit applications" are likely to adversely affect species.  Dkt. 160 at 8.  That estimate, however, is considerably smaller than the State's representation leading up to the adoption of the assumption program "that approximately ten percent of Section 404 permits issued in Florida require some form of incidental take coverage."  Dkt. 112-2 at 3.  But, either way, it seems likely that a large percentage of the permits at issue will have no effect on listed species.  It is even less clear, though, whether the EPA would have approved—or Florida would

have asked the EPA to approve—an assumption application that did provide incidental take protection to Florida permittees through the programmatic ITS and technical assistance program. *See, e.g.*, Dkt. 112-3 at 369.

For similar reasons, it is also difficult to make a definitive determination regarding the second *Allied-Signal* factor on the present record.  To start, the assumption has been in place now for over three years, giving rise to some expectation interests among the affected parties.  The Court also recognizes that Florida has expended funds to implement its 404 permitting program and that some, although far from insurmountable, administrative difficulties would result from returning the permitting authority to the Corps.  But the real question comes down to whether, and, if so, the extent to which vacatur could lead to further administrative flipflopping and confusion.  For the reasons explained throughout this opinion, the Court is skeptical that the EPA and the FWS will be able to replicate the current assumption program on remand and, more generally, is skeptical that the FSW and the EPA can accord incidental take liability protection on future, state-permittees without requiring Section 10 consultation, without federalizing permits likely to adversely affect species (as in New Jersey), or, at the very least, preparing a dramatically different BiOp and ITS than those addressed above.  The question whether the EPA could authorize a more modest assumption—and whether Florida would want it to do so—thus, cannot be answered on the present record.

Anticipating these issues, the Federal Defendants and Florida request that, if the Court is inclined to vacate the assumption decision, (1) it vacate the approval only as to those projects in the "may affect, likely to adversely affect" category, as those are the projects "*indicating incidental take*," Dkt. 160 at 7–8 (emphasis in original) (Florida); (2) it stay the order of vacatur for at least six months "to allow the federal and state agencies to chart a new course," *id.* at 7

(Florida); and (3) it postpone the effective date of its vacatur by at least 180 days, Dkt. 158 at 8 (Federal Defendants).

After considering these requests and weighing the seriousness of the defects as well as the potential disruptive consequences of vacatur, the Court concludes that the appropriate remedy is to **VACATE** the EPA's approval of Florida's assumption application.  The Court will, however, permit Defendants to seek a limited stay of that vacatur within ten days of this decision.  Any such request should exempt all pending and future permit applications that "may affect" any listed species under the jurisdiction of the FWS or the NMFS and should propose a mechanism for determining which permit applications "may affect" listed species.  Because the APA does not "contemplate that a court should substitute its judgment for that of the agency," *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc*., 435 U.S. 519, 555 (1978), the Court will leave it to the administrative agencies to determine, at least in the first instance, whether any such stay is desirable and workable, and, if so, how it should work.  Finally, the Court notes that this invitation to seek a limited stay is not intended to foreclose any arguments Plaintiffs may have to the contrary or to pretermit Plaintiffs' remaining claims, which challenge the assumption decision more broadly.

Having vacated the BiOp, ITS, and assumption decision, the Court will **DENY** CBD and the Sierra Club's motion for a temporary restraining order and preliminary injunction.  Given the Court's decision, neither of the two permits that they seek to enjoin can issue, and, even if the Court eventually grants a limited stay of its vacatur of the assumption decision, and even if those permittees were willing to risk ESA liability without the protection of the ITS or a Section 10 permit, the State will lack authority under Section 404 to issue those permits.

Finally, the State requests that the Court enter partial final judgment pursuant to Federal Rule of Civil Procedure 54(b).  The Court will **DENY** that request as premature but will permit the State to renew its request after the parties have reviewed this decision and have decided whether to seek a limited stay of the Court's vacatur of the assumption decision, and, if they seek a limited stay, the Court has decided how to proceed.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment, Dkt. 98, is hereby **GRANTED** with respect to Counts 3, 4, 6 and 10–13 of Plaintiffs' Amended Complaint.  The Federal Defendants' cross-motion for summary judgment, Dkt. 99, and Defendant-Intervenors' cross-motion for summary judgment, Dkt. 102, are hereby **DENIED**  as to those same Counts.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  February 15, 2024